Richard L. Wynne
Howard F. Sidman
JONES DAY
222 East 41st Street
New York, NY 10017.6702
Telephone:    212-326-3939
Facsimile:    212-755-7306

Erin N. Brady
JONES DAY
555 South Flower Street
Los Angeles, CA 90071
Telephone:    213-489-3939
Facsimile:    213-243-2539

Attorneys for Creditor
*Financial Guaranty Insurance Company*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x

In re:

RESIDENTIAL CAPITAL, LLC, et al.,

      Debtors.

------------------------------------------------------- x

Case No. 12-12020 (MG)

Chapter 11

Jointly Administered

**FINANCIAL GUARANTY INSURANCE COMPANY'S**
**OMNIBUS OPPOSITION TO MOTIONS IN LIMINE SEEKING EXCLUSION OF**
**CERTAIN TESTIMONY OF JOHN DUBEL CONCERNING NEGOTIATIONS**
**LEADING UP TO SETTLEMENT AGREEMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ................................................................................................... 3

I.   THE COURT APPOINTS A MEDIATOR AND ENTERS A MEDIATION
     ORDER WITH CONFIDENTIALITY PROVISIONS.................................................... 3

II.  THE MEDIATION IS SUCCESSFUL AND PRODUCES A GLOBAL
     RESOLUTION ALONG WITH A FGIC SETTLEMENT AGREEMENT..................... 4

III. THE SETTLEMENT PARTIES ADHERE TO THE CONFIDENTIALITY
     PROVISIONS OF THE MEDIATION ORDER .............................................. 5

ARGUMENT ....................................................................................................... 7

I.   THE COURT'S MEDIATION CONFIDENTIALITY ORDER DOES NOT
     PRECLUDE HEARING EVIDENCE ON MEDIATION PROCESS ............................ 8

     A.   The Settlement Parties Cannot Unilaterally Waive The Mediation Order's
          Protections................................................................................. 8

     B.   The Movants Never Filed A Motion Seeking Modification Of The
          Mediation Order........................................................................... 11

II.  THE SETTLEMENT PARTIES RELY SOLELY ON EVIDENCE AVAILABLE
     TO THE MOVANTS IN DISCOVERY TO SUPPORT THEIR APPLICATION......... 12

     A.   The Settlement Parties Rely On Expert Reports, Independent Analyses
          And Testimony Regarding The Mediation Process To Establish Their
          Case For Approval Of The Settlement Agreement............................................. 12

     B.   The Movants Have Been Afforded Discovery Of The Evidence The
          Settlement Parties Will Use To Demonstrate Good Faith ................................. 16

CONCLUSION................................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

CASES

*Arista Records LLC v. Lime Group LLC,*
  2011 WL 1642434 (S.D.N.Y. Apr. 20, 2011)........................................................................9

*Bernard v. Galen Group, Inc.,*
  901 F. Supp. 778 (S.D.N.Y.1995)........................................................................9

*Cohen v. Empire Blue Cross & Blue Shield,*
  178 F.R.D. 385 (E.D.N.Y. 1998)........................................................................8

*Dandong v. Pinnacle Performance Ltd.,*
  2012 WL 4793870 (S.D.N.Y. Oct. 9, 2012)........................................................................10

*Driscoll v. Morris,*
  111 F.R.D 459 (D. Conn. 1986)........................................................................9

*E.G.L Gem Lab Ltd. v. Gem Quality Inst., Inc.,*
  90 F.Supp.2d 277 (S.D.N.Y. 2000)........................................................................9

*Hays v. Equitex, Inc.* (*In re RDM Sports Group, Inc.*),
  277 B.R. 415 (Bankr. N.D. Ga. 2002) ........................................................................10

*In re BGI, Inc.,*
  465 B.R. 365 (Bankr. S.D.N.Y. 2012)........................................................................15

*In re Delphi Corp. Secs., Derivatives & ERISA Litigation,*
  248 F.R.D. 483........................................................................14

*In re Enron Corp.,*
  2003 WL 22023401 (Bankr. S.D.N.Y. Mar. 20, 2003) ........................................................................9

*In re Extended Stay Inc.,*
  2010 WL 6561113 (Bankr. S.D.N.Y. July 20, 2010) ........................................................................14

*In re Finlay Enters.,*
  2010 WL 6580628 (Bankr. S.D.N.Y. June 29, 2010)........................................................................14

*In re MSTG, Inc.,*
  675 F.3d 1337 (Fed. Cir. 2012)........................................................................2, 10

*In re Residential Capital, LLC,*
  491 B.R. 63 (Bankr. S.D.N.Y. 2013)........................................................................9

*In re Teligent*,
    417 B.R. 197(Bankr. S.D.N.Y. 2009) ........................................................................10

*In re Teligent, Inc.*,
    459 B.R. 190 (Bankr. S.D.N.Y. 2011) .......................................................................10

*In re Tribune Company*,
    No. 08–13141 (KJC), 2011 WL 386827 (Bankr. D. Del Feb 3. 2011) ...................11

*In re von Bulow*,
    828 F.2d 94 (2d Cir. 1987) ..........................................................................................9

*Lake Utopia Paper Ltd. V. Connelly Containers, Inc.*,
    608 F.2d 928 (2d Cir. 1979) ...............................................................................10, 11

*Martin v. City of N.Y.*,
    2010 WL 1948597 (S.D.N.Y. May 11, 2010) .............................................................8

*Trouble v. The Wet Seal, Inc.*,
    179 F.Supp.2d 291 (S.D.N.Y. 2001) ...........................................................................9

*U.S. v. Bilzerian*
    926 F.2d 1285 (2d Cir. 1991) ......................................................................................9

**OTHER AUTHORITIES**

Black's Law Dictionary (9th ed. 2009) ...........................................................................14

**EXHIBIT**

Exhibit 1:  FGIC's Letter Brief, July 24, 2013

Financial Guaranty Insurance Company ("FGIC") respectfully submits this omnibus objection to motions in limine (the "Motions") filed by the Junior Secured Noteholders ("JSNs") (Dkt. No. 4549) and the Investor Objectors[1] (Dkt. Nos. 4545, 4554) (collectively the "Movants") in connection with *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Individual Investors* (Dkt. No. 3929) (the "FGIC 9019 Motion") to the extent that they seek exclusion of certain testimony of John Dubel, Lewis Kruger and the FGIC Trustees concerning the facts and circumstances surrounding the global mediation in these cases and the negotiations leading up to the signing of the global plan settlement and Settlement Agreement.[2]

## PRELIMINARY STATEMENT

The Movants ask this Court to exclude all evidence relating to the nature and process of the global mediation in these cases. The Motions should be denied because they are based on false premises and lack legal support.

*First*, the Motions conflate court-ordered confidentiality and waivable privilege. The Movants suggest that the Settlement Parties had a choice either to shield or disclose the substance of mediation negotiations. They had no such choice. This Court's mediation order strictly forbids "**any party**" from disclosing any "discussion, mediation statement, other document or information, correspondence, resolution, offer or counteroffer" made during the mediation, absent a Court order. Unlike cases of waivable privilege, none of the Settlement Parties nor any other party to the mediation has the unilateral right to "waive" confidentiality

---

[1] The Investor Objectors include CQS ABS Master Fund Limited, CQS ABS Alpha Master Fund Limited, Bayview Fund Management LLC, Monarch Alternative Capital LP ("Monarch"), Stonehill Capital Management LLC (collectively, the "Monarch Investors"), and Federal Home Loan Mortgage Corporation ("Freddie Mac").

[2] Capitalized terms not otherwise defined herein shall have the meanings given to them in the FGIC 9019 Motion.

protections in the Court's mediation order, afforded to each of the more than twenty mediation participants.

*Second*, the Motions conflate mediation process and substance. The Movants contend that because the Settlement Parties—as this Court's Order compelled them to do—kept confidential the mediation's substance, they cannot now use evidence of the existence of the mediation, the mediation process, or the success of the mediation to support their Rule 9019 motion. Notwithstanding the many public statements and pleadings that discuss the mediation, including pleadings filed by the JSNs, the Motions seek to create an alternate reality, where the Mediation never existed and thus cannot be mentioned. Putting aside the fact that the Movants' position would make it nearly impossible for any party to obtain approval of a settlement agreement negotiated in confidential mediation proceedings, the mediation process and its substance are two very different topics entitled to different treatment in both discovery and court proceedings, as reflected in the recent thoughtful *Tribune* opinion, discussed below. The Settlement Parties consistently treated them as distinct throughout discovery, thereby allowing the Movants discovery into all facets of the mediation process (i.e., the number of parties who attended, the dates involved, etc.). And the Settlement Parties do not offer any evidence on any topics into which they did not afford the Movants discovery.

Finally, the Movants cite no case law to support their position that the Court can or should strike evidence as to the nature and process of the mediation, the complexity of the issues presented, or the resulting public settlement agreement. None of the cases cited by Movants involve a court order forbidding disclosure of confidential mediation communications. In fact, the case on which the Investor Objectors primarily rely, *In re MSTG, Inc.*, 675 F.3d 1337 (Fed.

Cir. 2012), does not even deal with confidentiality issues in a mediation, but rather addresses

whether privilege should be afforded to settlement negotiations.

As set forth herein, the Motions should be denied.

## **BACKGROUND**

### I.    **THE COURT APPOINTS A MEDIATOR AND ENTERS A MEDIATION ORDER WITH CONFIDENTIALITY PROVISIONS**

These bankruptcy cases were filed in May 2012.  By December 2012, after significant

progress in selling the Debtors' business as a going concern, the key parties were mired in

substantial litigation and inter-creditor conflict.  The Debtors' parent, AFI, the Debtors and some

creditor groups had, pre-petition, signed a plan support agreement that provided for a $750

million settlement with AFI, estate and non-consensual third party releases for AFI, and

allowance of approximately $8.7 billion in Allowed Claims for the RMBS Trustees.  That

agreement precipitated a major litigation spanning over eight months and costing tens of millions

of dollars, with the Official Creditors Committee, and many other creditors and creditor groups,

first investigating and then opposing that settlement and plan construct.  By December, the court-

appointed examiner was deep into an extensive investigation of the estates' claims against AFI,

among other issues, and substantial disputes simmered between and among various creditor

constituencies with respect  to not only the size and proper allocation of any settlement with AFI,

but also control over the estates' claims against AFI, the value of third party claims against AFI,

and the amount, priority and possible subordination of creditor and creditor group claims against

various Debtor estates.  The Debtors also faced substantial borrower litigation, and massive

investigations and intervention by various governmental regulatory bodies.  With no prospect of

a consensual plan in sight, the Debtors asked the Court to facilitate a confidential, global chapter

11 mediation (the "Mediation"). *See* Debtors Motion for Appointment of a Mediator (Dkt. No.

2357).

      This Court agreed to the Debtors' request, appointing as mediator the Honorable James

M. Peck, an experienced, sitting bankruptcy judge.  *See* Order Appointing Mediator (Dkt. No.

2519) at 1 (the "Mediation Order").  The Mediation Order contained express and stringent

confidentiality provisions:

> [N]o person or party participating in the mediation . . . shall in any
> way *disclose to any non-party* or to any court, including, without
> limitation, in any pleading or other submission to any court, any
> such discussion, mediation statement, other document or
> information, correspondence, resolution, offer or counteroffer that
> may be made or provided in connection with the mediation, unless
> otherwise available and not subject to a separate confidentiality
> agreement that would prevent its disclosure *or as authorized by
> this Court.*

¶ 4 (emphasis added).

## II.    THE MEDIATION IS SUCCESSFUL AND PRODUCES A GLOBAL RESOLUTION ALONG WITH A FGIC SETTLEMENT AGREEMENT

      The Mediation began in early January 2013, and continued throughout the months of

January, February, March, April, and May.  Dubel Stmt. at Ex. D.  The Mediation sessions took

place both in small and large groups and in one-on-one sessions with the mediator, until the

mediator determined that global "all hands" meetings were appropriate.  The first Mediation

meeting at which all parties were present occurred on April 22, 2013, lasting ten hours, and was

followed by another session on April 23, 2013, lasting nine hours.  *Id.* at ¶ 16.  In addition to

Judge Peck and his two law clerks, 140 individuals participated in these all-party Mediation

sessions, representing more than twenty different creditors and creditor groups, including AFI.

*Id.*  In accordance with the Mediation Order, each of these parties was afforded the promise of

complete confidentiality concerning the substance of the Mediation.

The Mediation succeeded beyond anyone's expectations, resulting in the Settlement

Agreement and the global plan settlement of which it is a part. The "before and after" picture

illustrates the scope of achievement for this Mediation. Remarkably, more than twenty creditor

groups took part and signed the plan support agreement, supporting a plan of reorganization and

clear path out of the morass of inter-creditor disputes. The plan of reorganization will pay the

JSNs in full on or before the effective date, and provides them with an opportunity to prove their

right to post-petition interest.[3]  AFI nearly tripled its proposed settlement payment, agreeing to

pay $2.1 billion, and substantially all inter-creditor issues were resolved with respect to priority

and allowance of major claims, as well as various subordination issues.

The Settlement Agreement itself is a noteworthy achievement, substantially reducing

FGIC's $1.8 billion in asserted claims, and allowing increased distributions to other creditor

groups, fit within the estates' limited resources and the AFI settlement contribution.

Notwithstanding broad creditor support for these two agreements, a small group of investors in

certain of the FGIC Insured Trusts—and the JSNs—challenge the Settlement Agreement.

Substantial discovery, and discovery disputes, ensued.

## III.    THE SETTLEMENT PARTIES ADHERE TO THE CONFIDENTIALITY PROVISIONS OF THE MEDIATION ORDER

The Movants took extensive discovery of the Debtors, the FGIC Trustees and FGIC.

Almost immediately, a dispute arose regarding whether FGIC and the other Settlement Parties

were required to provide discovery on the substantive negotiations of the Mediation.[4]  The

---

[3] At the time the parties agreed to the plan support agreement, the Debtors were also able to obtain the agreement of AFI and the supporting creditors to pay to the JSNs hundreds of millions of dollars on account of their secured claim in advance of plan confirmation, substantially benefitting the JSNs and lowering the potential amount of post-petition interest that the JSNs could seek from the Estates.

[4] At the deposition of Mary L. Sohlberg of Wells Fargo on July 16, 2013, the Investor Objectors' attorney was informed through an objection that "there's a pretty clear court order" that "[n]o person or party participating in the mediation shall in any way disclose to any nonparty or any court, et cetera, any document or discussion, mediation

Settlement Parties' position was that the Mediation Order—and reliance of the other Mediation

participants on the confidentiality afforded therein—precluded them from disclosing confidential

information about the content of Mediation discussions.  The Court ultimately agreed that the

Mediation Order protected the substance of the Mediation, and remarked that the Movants could

file a motion to compel if they wished to obtain protected information. Hr'g Tr. 61:13-16, July

17, 2013.  The Movants never filed any such motion.

FGIC, in fact, was the only party that sought Court authorization to disclose protected

mediation communications, and it did so for the benefit of the Investor Objectors.  Specifically,

FGIC became aware that the Trustee's expert, Allen M. Pfeiffer, had reviewed a one-page

mediation communication as part of his expert analysis.  In light of this fact, FGIC sought Court

authorization to disclose this one-page communication to the Investor Objectors in advance of

Pfeiffer's deposition.  *See* FGIC Letter Brief, July 24, 2013, at 1 (attached hereto as Exhibit 1).

Ultimately, the Court's schedule precluded entry of an order permitting production before the

Pfeiffer deposition, and thus FGIC provided the document during the deposition under a

reservation of rights, seeking to facilitate full and fair discovery.  The next day, on July 25, 2013,

this Court ruled that, notwithstanding FGIC's production of this document, "[t]he mediation

[confidentiality] privilege remains a proper basis on which FGIC may refuse production of

documents or information that are properly the subject of the mediation privilege."  Hr'g Tr.

34:15-17.  This Court also stated:

> The Court concludes that by permitting disclosure of the one-page
> commutation break-out, FGIC has not provided a subject matter
> waiver of any applicable privilege including mediation
> [confidentiality] privilege. This is not a situation where FGIC is
> seeking to use an assertion of privilege as a sword and a shield.

statement, other document or information, correspondence, resolution or offer or counteroffer that may be made or
provided in connection with the mediation."  Sohlberg Tr. 74:18-75:16.

*Id.* at 35:17-22.

While the Settlement Parties withheld information regarding the substance of the Mediation, such as offers and counteroffers, the content of which go to the heart of the Mediation's substance, they freely disclosed information regarding the Mediation process. These disclosures included information regarding the timing, number of meetings, participants, and overall course of the proceedings. FGIC's Chief Executive Officer, John S. Dubel, was deposed, providing extensive testimony regarding the Mediation process, and subsequently submitting a witness statement summarizing the Mediation process. *See* Witness Statement of John S. Dubel ("Dubel Stmt.") (Dkt. No. 4436). The Movants now seek to preclude admission of Dubel's testimony, and that of other witnesses, regarding the Mediation, claiming that because the Settlement Parties allegedly "shielded" from discovery certain confidential information, they cannot now use even non-confidential information as a "sword" to prove their case. These allegations are without basis, and the Motions are without merit.

## ARGUMENT

The Motions—which seek to preclude the Settlement Parties from offering testimony about the process of the Mediation—should be denied because (1) the Settlement Parties have no unilateral ability to waive the confidentiality protections the Mediation Order affords each of the more than twenty Mediation participants; and (2) the Settlement Parties do not rely on any information they have not made available in discovery. Contrary to the Movants' arguments, the Settlement Parties are not using confidential mediation communications they voluntarily "shielded" from discovery as a "sword" to make their Rule 9019 case. JSN Mot. ¶ 8;[5] Investor Objectors' Mot. at 9.

---

[5] Remarkably, if not bizarrely, although the JSNs purportedly move to preclude certain portions of Dubel's testimony based on an allegedly inappropriate reliance on the Mediation Order, most of the Dubel testimony the

I.    **THE COURT'S MEDIATION CONFIDENTIALITY ORDER DOES NOT PRECLUDE HEARING EVIDENCE ON MEDIATION PROCESS**

The Movants would have this Court believe that the Settlement Parties spent discovery

lying in wait, intending to foist upon them at trial previously undisclosed confidential settlement

communications to establish their Rule 9019 case.  The Settlement Parties could not unilaterally

waive the protections the Mediation Order afforded to each of the parties involved in the

Mediation even if they wanted to.  And while the Movants complain on the eve of trial about the

Settlement Parties' alleged lack of disclosure, it is the Movants who failed to seek modification

of the Mediation Order during discovery.

A.    **The Settlement Parties Cannot Unilaterally Waive The Mediation Order's Protections**

To make their sword and shield argument, the Movants conflate the concept of a

mediation confidentiality order and waivable attorney-client privilege.  As a matter of black

letter law, FGIC and the other proponents of the Settlement Agreement are bound by the

confidentiality terms imposed by this Court's December 26, 2013 Order Appointing Mediator

(Dkt. No. 2519).  *See, e.g., Martin v. City of N.Y.*, 2010 WL 1948597, at * 2 (S.D.N.Y. May 11,

2010) ("All litigants have an obligation to comply with court orders, and failure to comply may

result in sanctions, including dismissal with or without prejudice.") (quotation and alterations

omitted); *Cohen v. Empire Blue Cross & Blue Shield*, 178 F.R.D. 385 (E.D.N.Y. 1998)

(sanctioning attorney for violating confidentiality provisions of court-annexed mediation

---

JSNs seek to strike has nothing to do with Mediation.  Rather, such testimony consists of (1) a description of the Mediation Order (Dubel Stmt. ¶ 9); (2) a description of the cases and Mediation as discussed in the Debtors' Disclosure Statement (*id.* at ¶12); (3) a description of the issues Mediation resolved, as reflected in the FGIC Settlement Agreement, the PSA and the Debtors' Disclosure Statement (*id.* at ¶19); (4) a description of the consideration to be paid to the Trustees and a rebuttal to the Objecting Investors' experts analysis of the Objecting Investors' recoveries under the Settlement Agreement (*id.* at ¶¶ 23, 25, 28, 29); and (5) a description of certain remaining recoveries the FGIC Trustees will receive under FGIC's rehabilitation plan (*id.* at ¶¶ 21, 22, 24).  In fact, only one marked excerpt has anything to do with the Mediation Process—a sentence stating that Mediation involved a large variety of complex issues—and this sentence does not address the substantive back and forth of the Mediation ¶ 15. *See* JSN Exhibit B, marked copy of the Dubel Witness Statement, provided to the Court on August 12, 2013.

program); *Bernard v. Galen Group, Inc.*, 901 F. Supp. 778, 782–84 (S.D.N.Y. 1995)

(sanctioning attorney for intentionally disclosing to the court settlement offers made in mediation

proceeding).[6]  These confidentiality provisions preclude FGIC from disclosing confidential

mediation communications unless their disclosure is "authorized by this Court."  Mediation

Order at 4.  No party—not even a party to the Mediation—can unilaterally waive the

confidentiality protections afforded to each of the other parties in the Mediation and violate the

Mediation Order.

It is not surprising then that the Movants cite no case—nor does one exist to our

knowledge—where a party sought to use confidential, multi-party mediation communications

shielded by Court order as a sword to prove its case.  Instead, nearly all of the cases the Movants

cite involve the unilateral waiver of *privilege*.  *See U.S. v. Bilzerian*, 926 F.2d 1285 (2d Cir.

1991) (cited by Movants, involving privilege); *In re Residential Capital, LLC*, 491 B.R. 63

(Bankr. S.D.N.Y. 2013) (same); *Trouble v. The Wet Seal, Inc.*, 179 F.Supp.2d 291 (S.D.N.Y.

2001) (same); *E.G.L Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F.Supp.2d 277 (S.D.N.Y. 2000)

(same); *Arista Records LLC v. Lime Group LLC*, 2011 WL 1642434 (S.D.N.Y. Apr. 20, 2011)

(same); and *Driscoll v. Morris*, 111 F.R.D 459 (D. Conn. 1986) (involving a reporter's First

Amendment privilege).  Privilege protection, unlike a court confidentiality order, is personal and

can be unilaterally waived by the party it is intended to protect.  *See In re von Bulow*, 828 F.2d

94, 100 (2d Cir. 1987) (recognizing that, in the case of attorney-client privilege, the privilege

applies "solely to the client and may only be waived by him.").  As the cases cited by the

---

[6] Indeed, the Mediation Order in this case is not unusual, as the Southern District of New York Bankruptcy Court routinely enters mediation orders imposing a duty to maintain confidentiality.  *See, e.g., In re Enron Corp.*, 2003 WL 22023401, at * (Bankr. S.D.N.Y. Mar. 20, 2003) (party must  "maintain the confidentiality of information it receives directly through participation in the mediation or from a party in the mediation according to the terms of the [Mediation] Order and such information may not be used in any manner inconsistent" with the Mediation Order).

Movants discuss only waiver of privilege, they say nothing about confidentiality protections established by court order.

The Investor Objectors cite just two cases that do not involve attorney-client privilege. Their first case, *MSTG*, involves neither court-mandated mediation nor a court confidentiality order.[7]  *In re MSTG, Inc.*, 675 F.3d 1337, 1343 (Fed. Cir. 2012).  The second case, addressing mediation privilege, similarly did not involve a confidentiality order, and actually held that a mediation privilege was not being used as a sword and shield. *Hays v. Equitex, Inc.* (*In re RDM Sports Group, Inc.*), 277 B.R. 415, 438 (Bankr. N.D. Ga. 2002).

Indeed, the nature of mediation requires that its protections rise above the level of individual privilege.  Courts have long recognized the vital role confidentiality plays in encouraging free flow of information critical to successful mediations.  *In re Teligent, Inc.*, 459 B.R. 190, 194 (Bankr. S.D.N.Y. 2011) (citing *In re Teligent, Inc.*, 640 F.3d 53, 57-58 (2d Cir. 2011) ("Confidentiality is an important feature of the mediation and other alternative dispute resolution processes.  Promising participants confidentiality . . .  promotes the free flow of information that may result in the settlement of a dispute and protecting the integrity of alternative dispute resolution generally."); *Dandong v. Pinnacle Performance Ltd.*, 2012 WL 4793870, at *4 (S.D.N.Y. Oct. 9, 2012) (same); *In re Teligent*, 417 B.R. 197, 205-206 (Bankr. S.D.N.Y. 2009) ("Mediation plays a critical role in the resolution of lawsuits by fostering settlement and preserving personal and judicial resources . . . [and] requires confidentiality to promote the candor critical to its success."); *Lake Utopia Paper Ltd. V. Connelly Containers,*

---

[7] In *MSTG*, the court viewed the settlement negotiations as relevant only because a party's expert may have relied upon them in forming its opinion.  *In re MSTG, Inc.*, 675 F.3d at 1348.  Here, the Movants have made no argument that any of the experts in this case relied upon the substance of undisclosed mediation negotiations in forming their opinions.  In fact, in the one instance where FGIC learned that a co-proponent's expert had used a confidential mediation communication in his analysis, FGIC sought Court authorization to disclose that communication to the Investor Objectors, thus avoiding the issue.  *See supra* at 4-5.

*Inc.*, 608 F.2d 928, 930 (2d Cir. 1979) (recognizing that absent assurances of confidentiality,

parties "will feel constrained to conduct themselves in a cautious, tightlipped, non-committal

manner more suitable to poker players in a high-stakes game than to adversaries attempting to

arrive at a just resolution of a civil suit").  As Judge Carey aptly noted in the *Tribune* bankruptcy:

> Courts have recognized that confidentiality is essential to the
> mediation process:  absent the mediation privilege, parties and
> their counsel would be ***reluctant to lay their cards on the table*** so
> that a neutral assessment of the relative strengths and weaknesses
> of their opposing positions could be made . . . [absent
> confidentiality,] the ***effectiveness of mediation would be
> destroyed***, thereby ***threatening the well established public needs
> of encouraging settlement and reducing court dockets***.

*In re Tribune Company*, No. 08–13141 (KJC), 2011 WL 386827, at *8 (Bankr. D. Del Feb 3.

2011) (internal citations and quotations omitted).  It would certainly chill the willingness of

parties to participate in multi-party, chapter 11 mediation if they had reason to fear that their

confidential exchanges and negotiations—information protected by a Court order—could be

publicly disclosed, absent extraordinary circumstances, at the whim of any other mediation party.

For this reason, no party can unilaterally waive the protections of a court-mandated

confidentiality order.

> **B.     The Movants Never Filed A Motion Seeking Modification Of The Mediation
> Order**

While the Settlement Parties cannot unilaterally waive the protections of the Mediation

Order, all parties—including each of the Movants—were free throughout discovery to request

Court modification of that order.  S*ee* Mediation Order at 4. The Court went so far as to remind

the Investor Objectors as to their right to bring such a motion, advising them at a July 17, 2013

discovery conference:

> If you want to make a motion to compel with Kruger – about Kruger, you have a
> meet-and-confer with the debtors' counsel, and then you come back to me, after
> you've – that's not before me today.

Hr'g Tr. 61:13-16, July 17, 2013.[8]  Neither the Investor Objectors nor the JSNs heeded the

Court's advice.  If the Movants believed information regarding the conduct and substance of the

Mediation was relevant to their objections, they should have filed a motion—on notice to all

parties involved in the Mediation—seeking modification of the Mediation Order.  Now, having

sat on their hands throughout discovery, they should not be heard to complain.

## II.    THE SETTLEMENT PARTIES RELY SOLELY ON EVIDENCE AVAILABLE TO THE MOVANTS IN DISCOVERY TO SUPPORT THEIR APPLICATION

The Motions wrongly assume that the Settlement Parties will use previously withheld

confidential mediation communications as a "sword" to prove that the Settlement Agreement

was made in good faith, is reasonable and in the best interests of the Debtors and investors.  The

direct witness statements, expert reports and exhibits submitted to the Court in advance of trial—

which contain evidence available to the Movants in discovery, not confidential mediation

communications—belie this contention.  On this basis alone, the Motions should be denied.

### A.    The Settlement Parties Rely On Expert Reports, Independent Analyses And Testimony Regarding The Mediation Process To Establish Their Case For Approval Of The Settlement Agreement

The declarations, briefs, and other materials already exchanged and submitted make clear

that the Settlement Parties rely primarily on their own judgment and expertise, the advice of

financial advisors, and expert testimony to establish that the Settlement Agreement is reasonable

and in the best interests of the Debtors and investors, two of the three requisite elements for

settlement approval.[9]  For instance, the Debtors' Chief Restructuring Officer Lewis Kruger

---

[8] Moreover, at the deposition of Lew Kruger, counsel to the JSNs asked Kruger whether the Debtors had considered seeking modification of the confidentiality order, demonstrating an understanding that the order could, in fact, be modified upon appropriate showing.  Kruger Tr.  210:23-211:13.

[9] *See, e.g., Statement of the FGIC Trustees (I) in Support of the Debtors' Motion Pursuant to Fed. R. Bankr. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors and (II) Reply to Certain Objections Thereto* (Dkt. No. 4475) at 35

provided in his witness statement the following testimony regarding his independent assessment

that the Settlement Agreement is reasonable and in the best interests of the Debtors:

> Although I consulted with counsel and the Debtors' advisors, and
> participated in the long mediation process, I relied on and
> exercised my own independent business judgment in ultimately
> determining that entry into the Settlement Agreement was
> appropriate and in the best interests of the Debtors and their
> creditors.

Kruger Decl. ¶ 36 (Dkt. No. 4431).  And Robert Major of The Bank of New York Mellon

("BNY Mellon") testified as follows regarding his conclusion that the Settlement Agreement is

reasonable and in the best interests of investors:

> [W]hile I understood there was the potential for future Projected
> Payments in excess of the Commutation Payment, there was no
> certainty of the amount of any future Projected Payments, or the
> timing of such payments. In fact, I understand there is a risk that
> future Projected Payments may fall short of the amount of the
> Commutation Payment. My concern over the uncertainty of
> payments from FGIC was informed by, among other things, the
> fact that, (i) although the FGIC Insured Trusts continue to pay
> premiums under the FGIC Policies, they have received no payment
> on any claims made under the policies since late 2009 and (ii)
> FGIC was exposed to potentially large future claims relating to,
> among other things, municipal bonds that would have the effect of
> diluting the Projected Payments. The Settlement Proposal
> eliminated the risk and uncertainty associated with the Projected
> Payments in exchange for a certain recovery.

Major Decl. ¶¶ 31-38 (Dkt. No. 4438); *see also* Scott Decl. ¶¶ 28-35 (Dkt. No. 4444) (testifying

that after reviewing the Duff Report she understood the Commutation Payment to fall within the

reasonable range of estimated Projected Payments, which were by no means certain); Pfeiffer

Report ¶¶ 13-14 (Dkt. No. 4440)  (concluding that the Settlement Agreement and the

Commutation Payments are reasonable in light of the uncertainty of the Projected Payments);

Kothari Report ¶6 (Dkt. No. 4443) (concluding that the calculation methodology used in the Duff

Report is reasonable); D'Vari Report ¶58 (Dkt. No. 4432) (concluding that loss to the residual

tranches that could be attributed to any alleged deviation of the collateral pool characteristics

would be minimal).

The submitted briefs and witness statements further demonstrate that the Settlement

Parties do seek to rely in part on the facts surrounding the Mediation process—and not at all on

the Mediation's substance—to demonstrate good faith, the final requisite element for settlement

approval.[10]  For example, the testimony set forth in John Dubel's witness statement demonstrates

the good faith of the Settlement Parties:

- The settlement was negotiated as part of a global plan mediation.  Dubel Stmt. ¶ 4;

- The mediation involved more than twenty parties, represented by more than 100
  professionals from leading law firms and financial advisory firms.  Dubel Stmt. ¶ 16;
  *see also e.g., In re Extended Stay Inc.*, 2010 WL 6561113, at *7 (Bankr. S.D.N.Y.
  July 20, 2010) (plan "based upon extensive, arm's-length negotiations" representing
  "the culmination of months of intensive negotiations and discussions among all
  parties").

- The parties, all of whom had roughly equal bargaining power, entered the mediation
  only after extensive litigation in the RMBS 9019 proceedings Dubel Stmt. ¶¶ 8-9; *see
  also, e.g.,*  Black's Law Dictionary (9th ed. 2009) ("arm's-length" means "of or
  relating to dealings between two parties who are not related or not on close terms and
  who are presumed to have roughly equal bargaining.").

- The mediation was led by the Honorable Judge Peck, a respected bankruptcy judge.
  Dubel Stmt. ¶ 9; *see also, e.g., In re Delphi Corp. Secs., Derivatives & ERISA
  Litigation*, 248 F.R.D. 483, 498 (noting that "the Court and the parties have had the
  added benefit of the insight and considerable talents of a former federal judge who is
  one of the most prominent and highly skilled mediators of complex actions, who
  acted as Special Master in the settlement negotiations").

- The mediation lasted more than five months, and—as the JSNs themselves admit—
  was slow going due to the parties' diverse and "harden[ed] . . . negotiating positions."
  Dubel Stmt. ¶ 13; *see also, e.g., In re Finlay Enters*., 2010 WL 6580628, at *5
  (Bankr. S.D.N.Y. June 29, 2010) (finding negotiations to be "arm's-length" where,
  among other things, negotiations lasted for "months" and involved "all parties in
  interest"); *see also* Objection of Ad Hoc Group of Junior Secured Noteholders to

---

[10] The idea that the Settlement Parties would need to disclose the substance of their settlement negotiations to
demonstrate good faith—or indeed that the Settlement Agreement was not negotiated in good faith—is nonsensical.
If evidence of specific negotiations were required, it is unlikely that challenged Rule 9019 settlements, global or
otherwise, achieved after a confidential mediation could ever be approved.

-14-

Debtors' Motion for the Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof at 2-3 (Dkt. No. 2997).[11]

- The parties had ample opportunity to exchange information and legal positions in an informal (and confidential) setting. Dubel Stmt. ¶¶ 9, 14; *In re BGI, Inc.*, 465 B.R. 365, 378-79 (Bankr. S.D.N.Y. 2012) (arm's-length negotiation present where parties were "represented by experienced and capable counsel," "had an opportunity to exchange discovery informally," and "represented that they worked together to resolve the matter").

In addition to Dubel's testimony, the Mediation's remarkable result—as evidenced by the record in these bankruptcy cases—further evidences the parties' good faith.[12]  The months leading up to the Mediation were a quagmire of litigation.  When the Mediation began, the RMBS 9019 litigation was in its eighth month.  There existed outstanding securities class actions, borrower class actions, inter-debtor disputes, allocation disputes, and inter-creditor disputes, among others.  There also existed very significant issues relating to AFI, and its proposed $750 million contribution in exchange for full non-consensual third party releases.  After five months of Mediation, more than twenty creditor groups collectively resolved numerous complex, interrelated disputes, and agreed upon the terms of a plan (conditioned upon approval of the Settlement Agreement) under which AFI will contribute $2.1 billion toward the

---

[11] On February 21, 2013, the JSNs objected to the Debtors' motion to extend their exclusive time period to file a bankruptcy plan (where the Debtors in part relied upon the mediation process as cause for the extension), and in doing so acknowledged the hard fought nature of the negotiations:

> For the past two months, the Ad Hoc Group has patiently participated in a plan mediation process that has, to date, not resulted in the global compromise envisioned by the Court at its inception.  Perversely, these well-intentioned efforts to achieve consensus through mediation have seemingly emboldened certain parties to harden their negotiating positions, secure in the knowledge that the Debtors' present plan construct – with its non-consensual third party release provisions with Ally – remains the only show in town.  Even the best efforts of a sitting bankruptcy judge and experienced and respected mediator have been unable to break this impasse.

Objection of Ad Hoc Group of Junior Secured Noteholders to Debtors' Motion for the Entry of an Order Further Extending Their exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof at 2-3 (Dkt No. 2997).

[12] Additionally, at no point during the Mediation did Judge Peck report to the Court that the Settlement Parties were acting in bad faith, as he would have been required to do had such bad faith existed.  *See* Procedures Governing Mediation of Matters and the Use of Early Neutral Evaluations and Mediation/Voluntary Arbitration in Bankruptcy Cases and Adversary Proceedings at §3.2 ("The mediator shall report any willful failure to attend or participate in good faith in the mediation process or conference."); §5.0 (communications made in mediation must remain confidential, subject to the mediator's obligation "to report failures to . . . participate in good faith.").

Debtors' estate.  The "before and after" comparison strikingly demonstrates good faith efforts to resolve a very complicated case.

Absolutely none of foregoing evidence involves the "substantive back and forth" that took place in the Mediation.  Nor was any of this evidence withheld from the Movants in discovery.

**B.      The Movants Have Been Afforded Discovery Of The Evidence The Settlement Parties Will Use To Demonstrate Good Faith**

The Movants wrongly claim that the Settlement Parties' evidence goes beyond the scope of information they were afforded in discovery.

The Settlement Parties allowed full discovery regarding the process of the Mediation.[13] At Dubel's deposition, for example, the Movants were free to ask and, in fact, did ask Dubel about the procedural and formal aspects of the Mediation, including the time frame for the Mediation, the counsel involved in the process, which parties were involved at which times, which parties initiated specific ideas and discussions, the method by which the parties communicated, the ways in which the parties organized themselves, and the process by which comments to a draft agreement were exchanged.[14]  Dubel testified freely and extensively on these topics, stating among other things that:

  ▪  During the mediation, Dubel spent "many, many hours" negotiating the Settlement Agreement over "many months."  Dubel Tr. 89:3-22 (Ex. 3 to The Debtors' Omnibus Opposition to the Motions in Limine of the Parties Objecting to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees, and Certain Institutional Investors filed

---

[13] In addition to the discussion set forth herein, FGIC understands that the Debtors will include in their responses to *in limine* motions a chart setting forth numerous examples where witnesses in depositions testified about the mediation process.

[14] Kruger also testified that the mediation negotiations were conducted as "arm's-length" because they involved "obviously experienced trustees, experienced counsel, experienced advisors [and] FGIC itself w[as] well-represented, and all of that [was] a process overseen by Judge Peck, looked to me like a very vigorous, robust process that went on for months."  Kruger Tr. 192:7 - 18 (Ex. 2 to Debtors Omnibus Objection).

contemporaneously herewith (the "<u>Debtors Omnibus Opposition</u>"); *compare to* Dubel Stmt. ¶ 14, Ex. D.

- As part of the mediation process, the general concepts underpinning the Settlement Agreement started to be discussed around mid- to late-January 2013. Dubel Tr. at 89:23-90:10; *compare to* Dubel Stmt. Ex. D at 1.

- Dubel began communicating with the Kathy Patrick Group as part of the mediation process in January 2013. Dubel Tr. at 143:14-144:6; *compare to* Dubel Stmt. Ex. D at 1.

- Dubel did not communicate with the Trustees in January 2013, but it was represented to him that the Kathy Patrick Group was in discussions with the Trustees at this time as part of the mediation process. Dubel Tr. 143:14-145:10.

- Dubel communicated with Bank of New York in March 2013 as part of the mediation process. Id. at 146:11-147:10; 152:21-155:15; *compare to* Dubel Stmt. Ex. D at 3.

- In March 2013, a representative of Dechert, LLC, counsel for Bank of New York, was "leading the charge" in the mediation as "spokesman" for the Trustees. Dubel Tr. at 150:4-22.

- Dubel did not initiate contact with Bank of New York's counsel. *Id*. at 150:25-151:6.

- The idea of a commutation or settlement of the FGIC policies first arose around January 14 or 15, 2013. Dubel Tr. at 151:12-152:2; *compare to* Dubel Stmt. Ex. D at 1.

- The policy settlement communications in January 2013 took place with Kathy Patrick and MBIA. Dubel Tr. at 152:21-155:15; *compare to* Dubel Stmt. Ex. D at 1.

- Drafts of the Settlement Agreement were exchanged as a part of the mediation process; FGIC would provide the draft agreement to other parties, who would return the draft agreement with comments. Dubel Tr. at 161:2-162:4.

- The calculation of how much the non-ResCap Trusts will receive as a result of the settlement was part of the mediation topics for discussion. *Id*. at 138:3-139:15.

FGIC's counsel did not instruct Dubel to refrain from testifying on the above enumerated process matters—or any other process-related matter—on grounds of the Mediation Order, and only instructed Dubel not to answer when examiners sought information regarding the substance of the mediation discussions. *See, e.g.*, Dubel Tr. 151:12-20 ("You are asking him for the date, right? You're not asking him for the substance of the communications."); *see also*, Dubel Tr. 138:14-21, 156:13-25; 160:4-12. The JSNs, in fact, recognize this distinction in their own

Motion:  "As a result [of counsel's directions not to answer], Dubel's deposition testimony

lacked disclosure of any of the **substantive** back and forth between the [mediation] parties. . . ."

JSN Mot. ¶ 7 (emphasis added).

The Settlement Parties also allowed full discovery of the FGIC Trustees' and Debtors'

independent analysis of the Settlement Agreement.  Kruger, in fact, testified at length regarding

his independent analysis of the Settlement Agreement, stating among other things:

> I thought that this agreement as part of the overall global settlement agreement,
> was sensible from the debtor's perspective, which is my perspective, in that it
> eliminated from the debtor's estates significant claims by the trusts and by FGIC.
> At the same time it was part of the mosaic of the global settlement agreement,
> which generated in my mind a significant benefit to all of the debtor's estates and
> to their creditors, as well, with the injection of the Ally contribution, the
> elimination of significant litigation, the shortening of the time process of the
> Chapter 11 proceedings.  And for all those reasons, I thought this was a sensible
> thing for the debtors to do.

Kruger Dep. Tr. 37:19-38:11 (Ex. 2 to Debtors Omnibus Objection). Mamta Scott of U.S. Bank

similarly testified regarding her independent analysis:

> [W]e have eight transactions for which we are trustee where we are paying
> premiums and not seeing any protections or payments by FGIC on claims.  When
> we saw this proposal, we engaged Duff to do the analysis, do a comparison of this
> proposed settlement versus what was being offered in the rehabilitation plan.
> Duff, you know, provided insight.  They provided feedback that the lump sum
> payment was within a range of reasonableness.  They also highlighted the fact that
> there is a lot of uncertainty that surrounds what's being offered under the
> rehabilitation plan.  So considering those facts and the facts that these trusts no
> longer have to pay premiums, we considered that to be in the trusts' best interests.

Scott. Dep. Tr. 38:10-24 (Ex. 4 to Debtors Omnibus Objection).

And Robert Major of BNY Mellon offered extensive testimony regarding the Duff &

Phelps report, the Trustees' efforts during the Mediation, and BNY Mellon's independent

analysis.  Major testified on the following topics:

- ▪ The presentation given by Duff & Phelps regarding the Settlement Agreement.  Major Tr. at 15:4-16:18 (Ex. 6 to Debtors Omnibus Objection); *compare to* Major Decl. ¶ 31.

- Discussions with Duff & Phelps prior to the final Duff Report at the mediation sessions. Major Tr. at 16:19-17:8; *compare to* Major Decl. ¶ 8.

- Attendance at mediation sessions and the existence of separate, professionals-only sessions.  Major Tr. 17:9-18:5.

- Discussions of FGIC's commutation proposal and the proposed payment to the Steering Committee.  *Id*. 35:8-37:10.

- The fact that FGIC made settlement proposals during the mediation.  *Id*. 154:22-155:9.

- Negotiations about the commutation payment.  *Id*. 38:3-7.

- The late March proposal of approximately $253 million in cash payment to FGIC RMBS policyholders.  *Id*. 68:5-18.

- The point in time at which Bank of New York first became involved in negotiations on commutation.  *Id*. 67:13-17.

- That Duff & Phelps gave presentations at the mediation sessions.  *Id*. 137:3-15; *compare to* Major Decl. ¶ 8.

- Participation of the institutional investors in the Mediation.  Major Tr.. 145:16-146:8; *compare to* Major Decl. ¶ 22.

- The hard-fought arm's-length nature of negotiations.  Major Tr. 155:14-156:5; *compare to* Major Decl. ¶ 21.

- Major's understanding that any investor aware of the mediation who was a ResCap creditor could have participated in the mediations.  Major Tr. 186:14-25.

- BNY Mellon's internal meetings to consider the FGIC commutation proposals.  *Id*. 205:11-207:6.

Major also freely discussed the Duff Report—which is the analytical foundation of the Trustees' decision—throughout his deposition.

In sum, the Movants were afforded full discovery of all materials and information the Settlement Parties will use to establish that the Settlement Agreement is reasonable, made in good faith and in the best interests of the Debtors and investors.  There is no basis for preclusion of any evidence.  The Motions should be denied.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the Motions.

Dated: August 13, 2013

                                    _____/s/ Richard L. Wynne_____
                                    Richard L. Wynne
                                    Howard F. Sidman
                                    JONES DAY
                                    222 East 41st Street
                                    New York, NY 10017.6702
                                    Telephone:    212-326-3939
                                    Facsimile:    212-755-7306

                                    Erin N. Brady
                                    JONES DAY
                                    555 South Flower Street
                                    Los Angeles, CA 90071
                                    Telephone:    213-489-3939
                                    Facsimile:    213-243-2539

                                    Attorneys for Creditor
                                    *Financial Guaranty Insurance Company*

# Exhibit 1

# JONES DAY

222 EAST 41ST STREET • NEW YORK, NEW YORK 10017.6702

TELEPHONE: +1.212.326.3939 • FACSIMILE: +1.212.755.7306

DIRECT NUMBER: (212) 326-3418
hfsidman@JonesDay.com

July 24, 2013

<u>VIA E-MAIL</u>

The Honorable Martin Glenn
United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004

Re:     <u>In re Residential Capital, LLC, et al.</u>, Ch. 11 Case No. 12-12020 (MG)

Dear Judge Glenn:

Pursuant to the Court's request by e-mail yesterday, Financial Guaranty Insurance Company ("<u>FGIC</u>") respectfully submits this letter brief regarding the issues raised in FGIC's July 23, 2013 request that the Court enter a order granting relief relating to one document and related communications ("<u>FGIC Mediation Communications</u>") that are protected from discovery by the mediation confidentiality provisions set forth in the Court's December 26, 2012 Order Appointing Mediator [Docket No. 2519] (the "<u>Mediation Order</u>") and the General Order Amending and Restating M-143 and M-211, dated December 1, 2009 (the "<u>General Order</u>").

FGIC provided the Investor Objectors[1] and Freddie Mac[2] with the one-page FGIC Mediation Communication on July 24, 2013 at the deposition of Allen M. Pfeiffer of Duff & Phelps. FGIC, fully reserving its rights, provided the document at issue in a good-faith effort to permit the deposition to proceed and allow the Investor Objectors to obtain full discovery about the Duff & Phelps report and the materials on which it is based. Mr. Pfeiffer testified about the document, stating among other things that Duff & Phelps had received a copy of it prior to finalizing the Duff & Phelps report, and considered the contents of the document. The document has also been provided to the Court for *in camera* review. Notwithstanding that production to allow the deposition to proceed, FGIC believes it is appropriate that a Court order be obtained to provide for a limited exception to the Mediation Order.

_____

[1] The "Investor Objectors" include CQS ABS Master Fund Limited, CQS ABS Alpha Master Fund Limited, Bayview Fund Management LLC, Monarch Alternative Capital LP, and Stonehill Capital Management LLC.

[2] "Freddie Mac" is defined to be Federal Home Loan Mortgage Corporation.

ALKHOBAR • AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • JEDDAH • LONDON • LOS ANGELES • MADRID
MEXICO CITY • MIAMI • MILAN • MOSCOW • MUNICH • NEW YORK • PARIS • PITTSBURGH • RIYADH • SAN DIEGO
SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

12-12020-mg    Doc 4628    Filed 08/13/13    Entered 08/13/13 16:56:11    Main Document
Pg 27 of 34

JONES DAY

The Honorable Martin Glenn
July 24, 2013
Page 2

### 1.  Background

On May 23, 2013, after months of arm's-length negotiations, including numerous mediation sessions under the close supervision and guidance of a sitting bankruptcy judge, FGIC, the Debtors,[3] the FGIC Trustees,[4] and the Institutional Investors[5] entered into a settlement agreement (the "FGIC Settlement Agreement").  In choosing to enter into the FGIC Settlement Agreement, the FGIC Trustees relied upon a comprehensive report of their financial advisor, Duff & Phelps.  *See, e.g.*, July 16, 2013 Letter from John C. Weitnauer to the Court.  One of the documents that Duff & Phelps considered in connection with its report is a one-page document that FGIC shared with the FGIC Trustees as part of the mediation.  This document, which FGIC "made [and] provided in connection with the mediation," is protected by the Mediation Order's confidentiality provisions.

On July 17, 2013, Your Honor stated at the status conference that the parties should produce "anything that was provided to Duff & Phelps that they considered in preparing their report."  7/17/2013 Hearing Tr. 31:22-25.  On Sunday, July 21, 2013, the FGIC Trustees, with FGIC's consent, raised the issue of producing the document at issue with the Investor Objectors and Freddie Mac and provided them with a draft stipulation.  The draft stipulation, largely similar to the proposed order submitted to the Court yesterday, was carefully crafted to honor FGIC's and the FGIC Trustees' obligations under the confidentiality provisions of the Mediation Order while at the same time provide the Investor Objectors and Freddie Mac access to materials Duff & Phelps considered in preparing its report.  The Investor Objectors and Freddie Mac, however, did not respond to the FGIC Trustees' proposal for over two days, despite the FGIC Trustees again seeking a substantive response.  With the deposition of a Duff & Phelps representative scheduled for this morning at 8 a.m., FGIC believed it appropriate to involve the Court yesterday.

---

[3] The "Debtors" include Residential Capital, LLC and each of its debtor affiliates.

[4] The "FGIC Trustees" include The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., U.S. Bank National Association and Wells Fargo Bank, N.A., each solely in their respective  capacities as trustees or indenture trustees for trusts insured by FGIC.

[5] The "Institutional Investors" include certain members of the Steering Committee Consenting Claimants and the Talcott Franklin Consenting Claimants (each as defined in the Plan Support Agreement [Docket No. 3814]).

**JONES DAY**

The Honorable Martin Glenn
July 24, 2013
Page 3

### 2. Mediation Privilege

FGIC requests that the Court enter an order, in the form attached hereto, stating that the production of the document at issue does not constitute a waiver of the mediation confidentiality provisions set forth in the Mediation Order or the General Order and that production of the document may not be used as a basis to request other documents protected by the Mediation Order.

The Mediation Order provides that all documents or discussions made or provided in connection with the mediation by parties participating in the mediation should be kept confidential.  The Mediation Order states:

> [N]o person or party participating in the mediation . . . shall in any way *disclose to any non-party* or to any court, including, without limitation, in any pleading or other submission to any court, any such discussion, mediation statement, other *document or information*, correspondence, resolution, offer or counteroffer that may be made or provided in connection with the mediation, unless otherwise available and not subject to a separate confidentiality agreement that would prevent its disclosure *or as authorized by this Court.*

(emphasis added).

The need for, and benefits of, strict confidentiality with respect to mediation proceedings have been widely recognized. For example, the Second Circuit Court of Appeals has observed that "[t]he guarantee of confidentiality permits and encourages counsel to discuss matters in an uninhibited fashion" that helps simplify and resolve issues in dispute. *Lake Utopia Paper Ltd. v. Connelly Containers, Inc.*, 608 F.2d 928, 930 (2d Cir. 1979). The *Lake Utopia* court stressed that absent assurances of confidentiality, counsel and parties in proceedings resembling a mediation "will feel constrained to conduct themselves in a cautious, tightlipped, non-committal manner more suitable to poker players in a high-stakes game than to adversaries attempting to arrive at a just resolution of a civil dispute" – thus destroying the effectiveness of mediation as a tool of conflict resolution and case management.  *Id.*  As a result of these concerns, courts have repeatedly recognized the existence of a federal mediation privilege that precludes discovery into communications and information shared in connection with a mediation.[6]

---

[6] *See, e.g.*, *Microsoft Corp. v. Suncrest Enter.*, 2006 WL 929257, at *2 (N.D. Cal. Jan. 6, 2006) (refusing to distinguish between communications signifying an agreement and those comprising ongoing negotiations over settlement terms); *Chester Cnty. Hosp. v. Independence*

JONES DAY

The Honorable Martin Glenn
July 24, 2013
Page 4

Thus, the document at issue is protected by the mediation confidentiality provisions set forth in the Mediation Order because it was shared by FGIC with the FGIC Trustees as part of the mediation process.

However, because it became apparent during the deposition of Mr. Pfeiffer that he considered the document and relied upon it as part of explaining the proposed agreement in the Duff & Phelps report, it was appropriate to produce the one-page document and permit the Investor Objectors to question Mr. Pfeiffer about it.

_____

(continued…)

*Blue Cross*, 2003 WL 25905471, at *6 (E.D. Pa. Nov. 7, 2003) (stating that "[a]s almost all fifty states have elected to protect confidential mediation proceedings to facilitate settlement of cases, our refusal to recognize a similar federal privilege would frustrate their efforts to establish an expectation of privacy); *RDM Holdings Inc. v. Eguitex, Inc. (In re RDM Sports Grp., Inc.)*, 277 B.R. 415, 430 (Bankr. N.D. Ga. 2002) (holding that "[i]t is axiomatic that parties, especially those to complex litigation, should be encouraged to utilize alternative methods of dispute resolution. Accordingly, it makes little sense to place the costs of doing so—the requirement that they make communications and generate documents that would not otherwise come into existence—so high as to discourage their participation."); *Sheldone v. Pa. Turnpike Comm'n*, 104 F. Supp. 2d 511, 517 (W.D. Pa. 2000) (stating that the "Plaintiffs have not and cannot support their assertion that discussion in depositions of the Mediation by [the Plaintiffs] somehow effectuated a waiver of the privilege on behalf of the [Defendant]; *Folb v. Motion Picture Indus. Pension & Health Plans*, 16 F. Supp. 2d 1164, 1181 (C.D. Cal. 1998) (holding that "communications to the mediator and communications between parties during the mediation are protected. In addition, communications in preparation for and during the course of a mediation with a neutral must be protected. Subsequent negotiations between the parties, however, are not protected even if they include information initially disclosed in the mediation"); *cf. Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.)*, 2007 U.S. Dist. LEXIS 95882, at *5 (D. Del. May 25, 2007) ("[T]here is well-established judicial policy protecting the confidentiality of the settlement process.").

**JONES DAY**

The Honorable Martin Glenn
July 24, 2013
Page 5

      For the foregoing reasons, FGIC respectfully requests that the Court enter the enclosed Proposed Order.[7]

                                        Respectfully submitted,

                                        */s/ Howard F. Sidman*

                                        Howard F. Sidman

Enclosure

cc:     Counsel for the Investor Objectors
        Counsel for Freddie Mac
        Counsel for the FGIC Trustees
        Counsel for the Debtors

---

[7] Attached hereto are the Proposed Order and a blackline showing that § 1 of the Proposed Order has been revised since yesterday to include FGIC.

# Proposed Order

# Attachment Omitted

# Blackline Of July 24, 2013 Proposed Order Against July 23, 2013 Proposed Order

# Attachment Omitted