# Exhibit 6

FILED: NEW YORK COUNTY CLERK 04/14/2010

NYSCEF DOC. NO. 47

INDEX NO. 600352/2009

RECEIVED NYSCEF: 04/14/2010

12-12020-mg    Doc 4632-6    Filed 08/13/13    Entered 08/13/13 17:07:53    Exhibit 6
Pg 2 of 38

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

U.S. BANK NATIONAL ASSOCIATION, as Inden-
ture Trustee for the Benefit of the Insurers and Note-
holders of GreenPoint Mortgage Funding Trust 2006-
HE1, Home Equity Loan Asset-Backed Notes, Series
2006-HE1; SYNCORA GUARANTEE INC., formerly
known as XL CAPITAL ASSURANCE INC., as Con-
trolling Insurer, Note Controlling Party and Class Ax
Insurer; and CIFG ASSURANCE NORTH AMERICA,
INC., as Class Ac Insurer,

Index No.: 600352/09

                Plaintiffs,

          - against -

GREENPOINT MORTGAGE FUNDING, INC.,

                Defendant.

**FIRST AMENDED
COMPLAINT**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       The plaintiffs—(i) U.S. Bank National Association, solely in its capacity as inden-

ture trustee (the "Indenture Trustee") under the Indenture[1] for the benefit of the insurers and

holders ("Noteholders") of the notes issued by GreenPoint Mortgage Funding Trust 2006-HE1

(the "Issuer"), and at the direction of co-plaintiff CIFG Assurance North America, Inc.

("CIFG"), as the current Controlling Insurer; (ii) Syncora Guarantee Inc., formerly known as XL

Capital Assurance Inc. ("Syncora"), as Class Ax Insurer under the Indenture; and (iii) CIFG

(with Syncora, the "Insurers"), as Controlling Insurer, Note Controlling Party and Class Ac In-

surer under the Indenture—by their attorneys, Nixon Peabody LLP (for the Indenture Trustee) and

Patterson Belknap Webb & Tyler LLP (for the Insurers), for their first amended complaint against

---

[1] The "Indenture" is that certain Indenture dated as of August 1, 2006 between GreenPoint Mortgage
Funding Trust 2006-HE1, as Issuer, and the Indenture Trustee.

the defendant, GreenPoint Mortgage Funding, Inc. ("GreenPoint"), a wholly owned subsidiary of

Capital One Financial Corporation, hereby allege as follows:

## NATURE OF THE ACTION

1.      This is a breach-of-contract action arising from GreenPoint's blanket fail-

ure to comply with the plain and unambiguous terms of two agreements governing its sale of

nearly 30,000 residential mortgage loans that it originated and arising from GreenPoint's

breaches under its closely related agreements with the Insurers. In the Sale Agreements (as de-

fined below), GreenPoint (a) made numerous representations and warranties relating to the at-

tributes of the loans and the policies and practices pursuant to which the loans were originated,

underwritten and serviced and (b) agreed either to cure breaches of those representations and

warranties that materially and adversely affected the value of the loans or to repurchase the loans

at a contractually specified repurchase price. As contemplated by the Sale Agreements, the

rights to enforce GreenPoint's commitments were assigned along with the loans to the Indenture

Trustee in connection with a transaction involving the issuance of \$1.83 billion of securities (the

"Notes") that were secured and to be paid down by the cash flows from the loans. Certain pay-

ments on the Class Ax Notes and the Class Ac Notes were guaranteed by Syncora and CIFG un-

der the Syncora Policy (as defined below) and the CIFG Policy (as defined below), respectively.

In the CIFG Agreement (as defined below) and the Syncora Agreement (as defined below),

GreenPoint made representations and warranties relating to the transaction and induced CIFG

and Syncora to issue the CIFG and Syncora Policies.

2.      But less than two years after the close of the transaction, the loans began

to default at staggering rates, prompting Syncora as the then Controlling Insurer to hire a con-

sultant to review the loan documentation for compliance with GreenPoint's representations and

2

warranties. As Syncora informed the Indenture Trustee, an astonishing 963 (or 93%) out of a sample of 1,030 of the loans sold, with a total principal balance of $91.8 million, did not comply with GreenPoint's representations and warranties under the Sale Agreements. The breaches discovered primarily involve an error, omission, misrepresentation, negligence, fraud or similar occurrence in connection with the origination and underwriting of the loans, all of which were defects that GreenPoint explicitly represented did not exist and agreed to remedy if discovered. The results of the sample analysis, together with the severe underperformance of the entire pool of GreenPoint loans, indicated that such breaches were not confined to the sample of loans reviewed, but rather were pervasive. Indeed, as of March 31, 2010, approximately $747 million of the loans (40.82% of the original pool balance) had either been charged off as a total loss or were delinquent for sixty days or more.

3.      The indication that the breaches went beyond the loans in the initial sample of 1,030 loans was confirmed after the complaint in this action was filed in February 2009. The Insurers undertook another re-underwriting based on a random and, for statistical purposes, representative sample of the GreenPoint loans as a whole. The random sample of 388 loans, with an aggregate principal balance of approximately $27 million, included both defaulted loans and loans still current in payments. The results of that re-underwriting show that 86% of the randomly selected loans breached one or more of GreenPoint's representations and warranties in the Sale Agreements. The most prevalent of the breaches involve pervasive misrepresentations about borrower income, employment, assets, intentions to occupy the purchased properties and GreenPoint's pervasive failure to adhere to proper and prudent mortgage-lending practices and its own underwriting guidelines, specifically, a wholesale abandonment of any attempt to gauge the ability and willingness of borrowers to repay their obligations. The random-sample analysis

3

demonstrates at a very high (95%) confidence interval that breaches of GreenPoint's representations and warranties exist in a comparable percentage of loans in the total loan pool for the nearly 30,000 loans in the transaction at issue.

4.    The Indenture Trustee promptly notified GreenPoint in writing of the breaches identified by Syncora in the initial sample of 1,030 loans, thereby triggering Green-Point's extensive remedial obligations under the Sale Agreements. Specifically, the Sale Agreements require GreenPoint to repurchase *all* of the $1.83 billion of loans that it sold under those Agreements upon discovery that it made untrue statements in connection with the sales, a fact that was established upon notice of the breaches identified through the initial sample analysis. GreenPoint's untrue statements in connection with the sales are confirmed by the random sample analysis. GreenPoint has failed and continues to fail to comply with its explicit obligation to repurchase all loans, as well as its lesser-included but also explicit obligation of repurchasing the specifically identified breaching loans. GreenPoint's widespread breaches of the representations and warranties that it made in connection with the sale of the loans—as well as its failure to perform its contractually required remedial cure-or-repurchase obligation—constitute material breaches of each of the Sale Agreements as a whole. Those breaches also constitute breaches of the CIFG Agreement and the Syncora Agreement.

5.    Accordingly, the Indenture Trustee, acting at the direction of Syncora, as the then Controlling Insurer and Note Controlling Party, Syncora, as Class Ax Insurer, and CIFG, as Class Ac Insurer, commenced this action in February 2009 to compel the repurchase of all of the loans sold by GreenPoint, including those breaching loans, or, in the alternative, to recover as damages the contractually specified repurchase price for all the loans. This first amended complaint of the Indenture Trustee, acting at the direction of CIFG, as the current Con-

4

trolling Insurer and Note Controlling Party, Syncora, as Class Ax Insurer, and CIFG, as Class Ac
Insurer, seeks relief under both the Sale Agreements and under the CIFG and Syncora Agreements.

## THE PARTIES

6.     U.S. Bank National Association is a national banking association whose
articles of association designate Ohio as the location of its main office, and whose principal place
of business is in Minneapolis, Minnesota.

7.     Syncora is a New York corporation with its principal place of business in
New York, New York.  Syncora issued a policy of insurance (the "Syncora Policy") that guarantees certain payments on the Class Ax notes issued by the Issuer.

8.     CIFG is a New York corporation with its principal place of business in
New York, New York.  CIFG issued a policy of insurance (the "CIFG Policy") that guarantees
certain payments on the Class Ac notes issued by the Issuer.

9.     Upon information and belief, GreenPoint is a New York corporation with
its principal place of business at, until recently, 100 Wood Hollow Drive, Novato, California
94945 and, at present, 1100 Larkspur Landing Circle, Suite 360, Larkspur, California 94939.

## JURISDICTION AND VENUE

10.    This Court has personal jurisdiction over GreenPoint pursuant to C.P.L.R.
§ 301 because GreenPoint is present in the State of New York and C.P.L.R. § 302(a)(1) because
the causes of action pleaded herein arise from transactions of business by GreenPoint within the
State of New York.

11.    Venue is proper in New York County pursuant to C.P.L.R. § 503(a) and
§ 503(c) because several of the parties—namely, Syncora and CIFG—have their principal of-

fices within New York County and therefore are deemed to reside therein.

**BACKGROUND**

## A.    GreenPoint Built Its Mortgage-Loan Business on Its
   Assurances Concerning the Quality of Its Mortgage Loans

12.    GreenPoint is a wholly owned subsidiary of Capital One Financial Corpo-

ration ("Capital One"), which shut down GreenPoint's mortgage-origination operations in Au-

gust 2007. GreenPoint had been engaged in the business of originating and selling residential

mortgage loans. GreenPoint specialized in so-called "no-doc" and "low-doc" loans, or those for

which home buyers provide no or little documentation about their income and assets.[2] These

loans, which had traditionally been designed for prime borrowers with strong credit histories, are

also known as "non-conforming" loans because they do not comply with the standards set by

Fannie Mae and Freddie Mac. As discussed below, this non-compliance and limited documenta-

tion made GreenPoint's representations and commitments regarding the loans all the more im-

portant.

13.    Upon information and belief, the profitability of GreenPoint's "originate

and sell" business model was a function of its ability to originate a high volume of loans and then

convert those loans into cash to fund additional originations. That is, GreenPoint earned fees

from its loan originations and generated profit and funds for additional originations by selling the

loans for "securitization." The securitizations involved the sale of loans to a trust, which in turn

issued securities (or "notes") that were "backed" by the loans. The cash flow generated by the

loans was used to pay principal and interest on the notes. The better the quality of the loans (*i.e.*,

the greater the likelihood that the borrowers would make principal and interest payments when

due), the higher the price GreenPoint could command upon the sale of the loans. But because

---

[2] Valerie Bauerlein, *Capital One Shuts Down GreenPoint Mortgage Unit*, Wall St. J., Aug. 22, 2007.

6

GreenPoint specialized in the origination of loans with little or no documentation to substantiate

the borrowers' credit quality and repayment ability, and because the majority of its loans were

originated through a nationwide network of GreenPoint-approved independent mortgage brokers,

the success and viability of GreenPoint's business model depended on others' acceptance of its

representations concerning the attributes of the loans and its commitments to cover any loss re-

sulting from breaches of those representations. The importance of these representations cannot

be overstated: GreenPoint's "originate and sell" model meant that it retained no interest in the

performance of the loans after their sale and securitization—*except for* the continuing validity of

the representations that it had made, and the related remedial obligations that it had assumed, in

connection with the sales. GreenPoint's representations therefore had to be sufficiently robust to

persuade the parties to the securitization that GreenPoint—not they—bore the risk of loss due to

deficient or improper origination and underwriting practices or to misleading or incorrect loan

attributes.

14.    Upon information and belief, from 2003 to 2006, when the securitization

at issue occurred, GreenPoint touted the quality of its mortgage loans and origination and under-

writing practices to dramatically increase the volume of its loan originations and sales for securi-

tizations. In its parent company's 2003 filings with the U.S. Securities and Exchange Commis-

sion ("SEC"), for example, Thomas S. Johnson, the Chairman of GreenPoint Financial Corp.,

stated as follows:

> I would like to emphasize that our mortgage production growth did
> not come at the expense of the quality of loans we originated. . . .
> In addition, I would like to emphasize that all of the loans we
> originate, including our specialty, or "Alternative A", loans are
> "A" quality loans. We are not in the business of originating sub-
> prime loans. . . . *It is difficult to conceive of any reasonable sce-*

7

> *nario in which GreenPoint would suffer meaningful losses on our
> loan portfolio.*[3]

15.    The pace and volume of GreenPoint's originations and sales for securitiza-

tions escalated following its acquisition by North Fork Bank ("North Fork") in early 2004, espe-

cially with respect to the two types of loans—so-called "Alt-A" and "HELOC" loans—that con-

stitute the majority of the loans at issue in this action.[4]  From the outset, North Fork's executives

promised to significantly grow GreenPoint's productivity and geographic scope.[5]  Upon informa-

tion and belief, North Fork's acquisition of GreenPoint therefore increased the pressure on

GreenPoint management to expand its loan-origination and loan-selling business. And, indeed,

the first year following the acquisition saw a greater than 41% increase in the total dollar volume

of GreenPoint's production for Alt-A and HELOC loans.[6]

16.    Moreover, North Fork reiterated and reinforced the representations con-

cerning the purported quality of GreenPoint's loan portfolio and protocols, stating that "credit

underwriting procedures [at] GreenPoint specifically are excellent" and that "[GreenPoint]'s run

by what [we] believe are some of the best managers in the country, they are right up there with

Countrywide and others."[7]  Countrywide and its management are currently subject to myriad in-

---

[3] Letter of Chairman Thomas S. Johnson, incorporated into Form 10-K filed by GreenPoint Financial
Corp. with the SEC on March 28, 2003 (emphasis added).

[4] *See* Prospectus Supplement dated August 25, 2006 for GreenPoint Mortgage Funding Trust 2006-HE1,
Home Equity Loan Asset-Backed Notes, Series 2006-HE1 (together with the underlying Prospectus, the
"ProSupp"), at S-38.

[5] *See* Investor call with North Fork management (Feb. 17, 2004).

[6] *See* ProSupp at S-38.

[7] Investor call with North Fork management (Feb. 17, 2004).

8

vestigations and actions, some of which have already settled, for having engaged in systematic
fraud in connection with the origination of residential mortgage loans.[8]

17.    Even when the volume of originations in the industry declined, Green-
Point's executives promised that it would outperform the market.[9] But, as has only been learned
through the loan-documentation reviews conducted by the Insurers' consultant, contrary to
GreenPoint's representations and assurances, the loans that it was originating and selling for se-
curitizations were not quality loans and were not originated and underwritten pursuant to sound,
prudent practices.

18.    Capital One, which had acquired GreenPoint, together with North Fork, in
late 2006, shut down GreenPoint's mortgage-loan operations in August 2007, less than a year
later and only a year after the date of the securitization involved in this action. A GreenPoint
spokesperson and Capital One's chairman both offered the same explanation for GreenPoint's
demise: tightened underwriting standards in the lending industry.[10] Capital One publicly an-
nounced that it would "retain exposure to future repurchases of past GreenPoint production to
meet representation and warranty claims."[11]

---

[8] *See, e.g.*, *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058-59 (C.D. Cal.
2008) (denying Countrywide's motion to dismiss a shareholders' derivative suit and noting that former
Countrywide employees credibly "tell what is essentially the same story—a rampant disregard for under-
writing standards" and "support a strong inference of a Company-wide culture that, at every level, em-
phasized increased loan origination volume in derogation of underwriting standards").

[9] *See, e.g.*, Investor call with Jeffrey Leeds, Executive Vice President and Chief Financial Officer of
GreenPoint Financial Corp. (Oct. 16, 2003).

[10] *See* Jed Moss, *Alt-A Mortgage Lender Closes Up Shops*, Mortgage Found., June 9, 2007 (citing Green-
Point spokesperson Julie Rakes); Bauerlein, *Capital One Shuts Down GreenPoint Mortgage Unit* (citing a
memo circulated by Capital One Chairman and Chief Executive Richard D. Fairbanks).

[11] Press Release, Capital One, Capital One Closes GreenPoint Mortgage Wholesale Unit (Aug. 20, 2007)
(as filed with the SEC).

9

19.     Neither Capital One nor GreenPoint, however, has repurchased the loans that GreenPoint is contractually required to repurchase to address the harm that GreenPoint's practices have inflicted on the securitization at issue. The Indenture Trustee and the Insurers bring this action to compel GreenPoint to perform its obligations under the Sale Agreements and under the CIFG and Syncora Agreements.

## B.     The Sales and Securitization

20.     In two transactions in September 2005 and July 2006 ("Sales"), Green-Point sold nearly 30,000 residential mortgage loans that it had originated ("Loans") to GMAC Mortgage Corporation ("GMAC"). The Sales were effectuated pursuant to two agreements: a Flow Revolving Credit Loan Purchase and Warranties Agreement dated September 26, 2005 ("HELOC Sale Agreement") and a Flow Mortgage Loan Purchase and Warranties Agreement dated July 26, 2006 ("Mortgage Loan Sale Agreement") (collectively, "Sale Agreements").

21.     The Sale Agreements explicitly contemplated that the Loans would be securitized and used as collateral for notes issued to investors. Section 28 of the Sale Agreements not only authorizes GMAC, as Purchaser, to "convey the [Loans] to one or more securitized trust structures," but requires GreenPoint to "cooperate" with GMAC in connection with any such "Securitization Transfer."

22.     In addition, GreenPoint explicitly obligated itself to honor GMAC's rights and remedies under the Sale Agreements (the "Purchaser's Rights and Remedies") regardless of who ultimately acquired them through the assignments necessary to effectuate a contemplated securitization. Section 21 of the Sale Agreements states that the Purchaser's Rights and Remedies "shall bind and inure to the benefit of and be enforceable by [GreenPoint] and the Purchaser *and the respective successors and assigns of . . . the Purchaser*." (Emphasis added.) And Section 21 of the HELOC Sale Agreement, which applies to 95% of the Loans, states that, "in the

10

case of a Securitization Transfer . . . , Purchaser shall have the right to assign its rights under this Agreement into such Securitization Transfer . . . *after which the issuer or trustee for the issuer of any such Securitization Transfer . . . shall be deemed to be a Purchaser.*" (Emphasis added.)

        23.    As contemplated, the Loans and the Purchaser's Rights and Remedies were transferred into the Issuer, a Delaware statutory trust bearing GreenPoint's name, Green-Point Mortgage Funding Trust 2006-HE1, and then granted and assigned from the Issuer to the Indenture Trustee for the benefit of the Insurers and Noteholders, all as part of a securitization transaction that closed on August 28, 2006 (the "Securitization").[12] The transfers were accomplished through a chain of assignments executed within five days of the second GreenPoint-to-GMAC Sale.

        24.    GMAC initially assigned the Purchaser's Rights and Remedies, together with the Loans, to Lehman Brothers Bank, F.S.B. ("Lehman Bank") through two Assignment, Assumption and Recognition Agreements ("AARs"), one for each of the two Sale Agreements, dated July 28, 2006. Section 6 of the AARs makes clear that Lehman Bank, as "Assignee," "shall become the 'Purchaser' under the [Sale] Agreement[s]." Accordingly, "all representations, warranties and covenants by [GreenPoint] as the 'Seller' thereunder, including, but not limited to, the representations, warranties and covenants to repurchase any [Loan] . . . , shall accrue to [Lehman Bank] by virtue of the [AARs]." AARs § 6.

        25.    GreenPoint is a party to the two AARs assigning the Purchaser's Rights and Remedies, together with the Loans, to Lehman Bank. The August 1, 2006 chain of assign-

---

[12] Another company, Impac Funding Corporation, originated and also sold to GMAC a negligible percentage of the loans that were ultimately deposited into the Issuer, but only the GreenPoint loans are relevant to this action.

ments described in paragraph 26 below occurred within three days of GreenPoint's execution of the two AARs.

      26.    Lehman Bank subsequently assigned these representations, warranties and covenants and the other Purchaser's Rights and Remedies, together with the Loans, to its parent company Lehman Brothers Holdings, Inc. ("Lehman Holdings"),[13] which, in turn, assigned them to an affiliated special-purpose entity known as the Depositor, in this case, Structured Asset Securities Corporation ("SASC").[14] Finally, SASC assigned the Purchaser's Rights and Remedies, together with the Loans, to the Issuer, which then granted and assigned the Purchaser's Rights and Remedies, together with the Loans, to the Indenture Trustee for the benefit of the Insurers and the Noteholders.[15] This is precisely the "Securitization Transfer" contemplated by the Sale Agreements.

      27.    Under the Indenture, which effectuated the final step of the assignment process described above, the Insurers are granted various rights with respect to the enforcement of the Indenture Trustee's rights and remedies. First, as noted, the Issuer's grant and assignment of the Loans and the Purchaser's Rights and Remedies to the Indenture Trustee was for the benefit of the Insurers, among others. Section 11.10 of the Indenture explicitly names the Insurers as "third-party beneficiaries to the provisions of this Indenture," a status that entitles the Insurers "to rely upon and directly to enforce such provisions of the Indenture." In addition, Section 5.20 of the Indenture sets forth various "Insurers' Rights Regarding Actions, Proceedings or Investigations." These include the right of the Controlling Insurer "to participate in, to direct the enforcement . . . of, and, at the Controlling Insurer's sole option, to institute . . . any action, pro-

---

[13] Assignment and Assumption Agreement, dated August 1, 2006.

[14] Mortgage Loan Sale and Assignment Agreement, dated August 1, 2006.

[15] Transfer and Servicing Agreement and Indenture, each dated August 1, 2006.

ceeding or investigation that could adversely affect the Issuer . . . or the rights or obligations of the Insurers . . . under the related Policy or the Operative Agreements." Indenture § 5.20(a). Syncora was the Controlling Insurer under the Indenture at the time of the Securitization and the commencement of this action, and CIFG is now the Controlling Insurer under the Indenture after the occurrence of circumstances contemplated by the Indenture. *See id.* § 1.01(a). Finally, the Insurance and Indemnity Agreements that Syncora and CIFG separately entered into in connection with the Securitization grant them similar rights to direct the actions of the Indenture Trustee and the enforcement of the Indenture Trustee's rights and remedies.[16] The CIFG Agreement and the Syncora Agreement grant CIFG and Syncora additional rights with regard to GreenPoint.

28.     Accordingly, the Indenture Trustee, at the direction of Syncora and with both Syncora and CIFG, brought this action to exercise and enforce the Purchaser's Rights and Remedies for the benefit of the Insurers and the Noteholders, and, at the direction of CIFG, serves and files this first amended complaint to exercise and enforce the Purchaser's Rights and Remedies for the benefit of the Insurers and the Noteholders. As discussed further below, these include the right to demand that GreenPoint comply with its clear contractual obligations to repurchase the Loans upon notice that GreenPoint is in breach of one or more of its representations and warranties.

## C.    GreenPoint's Representations and Warranties Are the Linchpin of the Sales and Securitization

---

[16] Under Section 5.02(a)(iii) of the Insurance and Indemnity Agreement dated August 28, 2006 that Syncora entered into with, among others, the Indenture Trustee, Syncora is empowered to "exercise any rights and remedies under the Indenture in accordance with the terms thereof or direct the Indenture Trustee to exercise such remedies in accordance with the terms of the Indenture." Section 5.02(a)(iv) also empowers Syncora to "exercise any rights and remedies under the Transfer and Servicing Agreement ['TSA']," which include in Section 3.03 of that agreement the Indenture Trustee's right to demand from GreenPoint the repurchase of loans upon the breach of its representations and warranties. *See* TSA § 3.03. CIFG is granted the identical power under Section 5.02(a)(i) of the separate Insurance and Indemnity Agreement dated August 21, 2006.

13

29.    GreenPoint's numerous and broad representations and warranties relating

to the Loans and the practices pursuant to which the Loans were originated and underwritten

were an inducement to the initial Sales, the ultimate sale of the Loans to the Issuer as part of the

Securitization, and every assignment in between, as well as an inducement to the Insurers to is-

sue their insurance policies for the benefit of the Noteholders. In making these representations

and warranties, GreenPoint assured the Purchasers and Securitization participants that Green-

Point—not they—would bear the risk of the Loans' non-compliance. The Indenture Trustee and

the Insurers and, upon information and belief, the other Securitization participants, relied on

GreenPoint's representations and warranties and GreenPoint's assumption of this risk in deciding

to participate in the Securitization and the other transactions contemplated by the Sale Agree-

ments and, in the case of the Insurers, in assessing their own risk in issuing their respective in-

surance policies.

### i.    *GreenPoint's Representations and Warranties*

30.    GreenPoint's representations and warranties are contained in Sections 6

and 7 of the Sale Agreements. With respect to each of the Loans, GreenPoint represented and

warranted, among other things, that, as of the closing date of the Sales:

- The information set forth in the Loan Schedule is complete, true and correct. (Sale Agreements § 7(a));

- Each Loan at the time it was made complied in all material respects with applicable local, state and federal laws (including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer-credit protection, equal-credit-opportunity and disclosure laws, predatory- and abusive-lending laws and unfair- and deceptive-practices laws). (Sale Agreements § 7(g));

- The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading. (Sale Agreements § 7(k));

- No fraud was committed in connection with the origination of a Loan. (Sale Agreements § 7(k));

- Each Loan was underwritten in accordance with GreenPoint's underwriting guidelines in effect at the time such Loan was originated. (HELOC Sale Agreement § 7(u); Mortgage Loan Sale Agreement § 7(v));

- No error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a Loan has taken place on the part of any person including without limitation the Mortgagor, any appraiser, any builder or developer or any other party involved in the origination of the Loan; no predatory or deceptive lending practices, including, without limitation, the extension of credit without regard to the ability of the Mortgagor to repay and the extension of credit that has no apparent benefit to the Mortgagor, were employed in the origination of the Loan. (HELOC Sale Agreement § 7(tt); Mortgage Loan Sale Agreement § 7(yy));

- The origination and collection practices used with respect to a Loan have been in accordance with Accepted Servicing Practices, in all respects in compliance with all applicable laws and regulations and in all material respects proper and prudent in the mortgage origination and servicing business. (HELOC Sale Agreement § 7(ff); Mortgage Loan Sale Agreement § 7(hh)); and

- The methodology used in underwriting the extension of credit for each Loan employs objective mathematical principles which relate the Mortgagor's income, assets and liabilities to the proposed payment and such underwriting methodology does not rely on the extent of the Mortgagor's equity in the collateral as the principal determining factor in approving such credit extension. Such underwriting methodology confirmed that at the time of origination (application/approval) the Mortgagor had a reasonable ability to make timely payments on the Loan. (HELOC Sale Agreement § 7(ccc)).

31.    "[A]s a condition to the consummation of" the Sales and any other trans-

actions "contemplated by" the Sale Agreements (*i.e.*, the Securitization), GreenPoint also repre-

sented and warranted, among other things, that, as of the closing date of the Sales:

> [n]either this Agreement nor any statement, report or other document furnished or to be furnished pursuant to this Agreement or in connection with the transactions contemplated hereby contains any untrue statement of fact or omits to state a fact necessary to make the statements contained therein not misleading.

(Sale Agreements § 6(h)).

32.    GreenPoint also represented and warranted, among other things, that

15

> [GreenPoint's] decision to originate any mortgage loan or to deny
> any mortgage loan application is an independent decision based
> upon [GreenPoint's] Underwriting Guidelines, and is in no way
> made as a result of Purchaser's decision to purchase, or not to pur-
> chase, or the price Purchaser may offer to pay for, any such mort-
> gage loan, if originated.

(Sale Agreements § 6(o)).

33.     Among the documents furnished in connection with the Securitization was
the Prospectus Supplement (together with the underlying Prospectus, the "ProSupp") delivered to
prospective investors pursuant to the Securities Act of 1933, as amended. The ProSupp contains
additional assurances made by GreenPoint about its loan-origination and loan-underwriting
practices. The ProSupp includes, for example, an assurance to prospective investors that the
Loans were underwritten and issued in a prudent fashion and therefore were unlikely to default.[17]
Specifically, the ProSupp states that "the GreenPoint underwriting guidelines are applied to
evaluate the prospective borrower's credit standing and repayment ability and the value and
adequacy of the mortgaged property as collateral." ProSupp at S-38. The ProSupp further
specifies that, "[a]s part of its evaluation of potential borrowers, GreenPoint generally requires a
description of the borrower's income." *Id.* at S-39.

34.     With respect to its "no-doc" or "low-doc" loan-origination programs,
GreenPoint assured investors that the borrowers participating in such programs had "credit histo-
ries that demonstrate an established ability to repay indebtedness in a timely fashion." *Id.*
GreenPoint also claimed to conduct a "quality control review" of a sample of the loans that it
acquired from "approved correspondent lenders." *Id.*

---

[17] An identical description appears in an exhibit to the August 1, 2006 Mortgage Loan Sale and Assign-
ment Agreement between Lehman Holdings and SASC.

16

35.    To reinforce the absolute nature of its commitment to bear the risk in the

event that any of the Loans did not comply with the foregoing representations and warranties,

GreenPoint explicitly agreed in the Sale Agreements that a representation and warranty made to

the best of its knowledge, if proven to be inaccurate, would be deemed breached "notwithstand-

ing [GreenPoint]'s lack of knowledge with respect to the substance of such representation and

warranty." Sale Agreements § 8(b).

## ii.    *GreenPoint's Cure-or-Repurchase Obligation*

36.    GreenPoint's assumption of the risk that its representations and warranties

would prove inaccurate also included an obligation to cure any such breaches or to repurchase

Loans with respect to which breaches had been or are identified. Section 8 of the Sale Agree-

ments provides in relevant part as follows:

> Within 60 days of the earlier of either discovery by or notice to
> [GreenPoint] of any Breach of a representation or warranty,
> [GreenPoint] shall use its best efforts promptly to cure such Breach
> in all material respects and, if such Breach cannot be cured,
> [GreenPoint] shall, at the Purchaser's option, repurchase such
> [breaching loan(s)] at the Repurchase Price.[18]

Like GreenPoint's representations and warranties, its cure-or-repurchase obligation is broad,

(i) arising upon discovery or notice and (ii) extending to the breach of any representation or war-

ranty that materially and adversely affects the value of a given Loan, the interest of any Pur-

chaser, or the interest of any Purchaser in the Loan. *See* Sale Agreements § 8. The breaches at

issue, which involve errors, omissions, misrepresentations, negligence, fraud, abandonment of

prudent underwriting practices or similar occurrences in connection with the origination and un-

derwriting of the Loans, materially increased the risk of loss associated with, and decreased the

value of, the Loans.

---

[18] The "Repurchase Price" for the various types of Loans is defined in Section 1 of the Sale Agreements.

37.    And if "a Breach shall involve any representation or warranty set forth in Section 6" of the Sale Agreements, GreenPoint's remedial obligation is even broader, reflecting the seriousness of the representations set forth in that section: If "such Breach cannot be cured within 60 days of the earlier of either discovery by or notice to [GreenPoint] of such Breach, *all* of the [Loans] shall, at the Purchaser's option, be repurchased by [GreenPoint] at the Repurchase Price." Sale Agreements § 8 (emphasis added).  As explained above, the Indenture Trustee, as assignee of the Issuer, is the "Purchaser" for the purposes of these provisions and has exercised its option to demand repurchase at the contractually specified "Repurchase Price."

**D.    GreenPoint's Breaches of Its Representations and Warranties**

38.    In early 2008, Syncora informed the Indenture Trustee that 963 of the Loans ("Breaching Loans") purchased by the Issuer and assigned to the Indenture Trustee and with a total principal balance of $91.8 million did not comply with GreenPoint's representations and warranties.  These Breaching Loans represented 93% of a sample of 1,030 Loans that had been re-underwritten.  The Breaching Loans contained one or, in most cases, more than one defect that constituted a breach of one of more of the numerous representations and warranties made by GreenPoint in the Sale Agreements, including:

a)    pervasive misrepresentations and/or negligence with respect to the statement of the income, assets or employment of the borrower (*see, e.g.*, Sale Agreements § 7(a), (k), (tt));

b)    misrepresentations of the borrower's intent to occupy the property as the borrower's residence and subsequent failure to so occupy the property (*id.*);

c)    inflated and fraudulent appraisal values (*id.*); and

d)    pervasive violations of GreenPoint's own underwriting guidelines and prudent mortgage-lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social-security numbers, (iii) with credit scores below the required minimum, (iv) with debt-to-income and/or loan-to-value ratios

18

above the allowed maximum or (v) with relationships to GreenPoint or
other non-arm's-length relationships (*see, e.g.*, HELOC Sale Agreement §
7(u), (tt); Mortgage Loan Sale Agreement § 7(v), (yy)).

39.     The large number and seriousness of the breaches identified in the re-
underwriting of the sample of Loans not only demonstrate deficiencies in GreenPoint's loan-
underwriting practices with respect to the Breaching Loans, but also suggest a pervasive pattern
of malfeasance, misconduct and/or negligence in connection with GreenPoint's loan-origination
practices as a whole, and therefore call into question the origination and underwriting of all of
the Loans sold to the Issuer and assigned to the Indenture Trustee.

40.     A finding of prevalent underwriting failure and fraud in the origination of
the Loans is further suggested by the remarkably poor performance of the Loans following the
Securitization. As of March 31, 2010, the Securitization had experienced cumulative losses of
more than $747 million. Nearly 41% of the Loans had either been written off by the Issuer as
total losses or were more than 60 days delinquent as of March 31, 2010. The prevalence of un-
derwriting failure and fraud in the origination of the Loans has been confirmed by the re-
underwriting of a random sample of the Loans after the commencement of this action (described
in paragraph 3 above) and the re-underwriting of defaulting loans after the commencement of
this action (described in paragraphs 47-48 below). The Securitization's performance has been so
poor that it cannot be explained merely by adverse conditions in the housing market. This dete-
rioration parallels that of GreenPoint itself, which, as noted, saw its mortgage-origination opera-
tions shut down in August 2007.

41.     Numerous borrowers and former GreenPoint employees have sued the
company and made similar allegations of fraud and other pervasive failures in its origination and
underwriting practices. Such actions include a "whistleblower" action filed in June 2008 by a
former senior underwriter, who alleged, among other things, that GreenPoint had engaged in

19

fraudulent and other unlawful activities by forcing the approval of mortgage-loan applications

containing fraudulent information or by approving applications after the underwriter had either

denied such applications or made approval contingent upon obtaining additional borrower docu-

mentation.[19] Multiple individual borrowers and a class of borrowers have also sued GreenPoint

within approximately the last two-and-one-half years, alleging, among other things, discrimina-

tory and predatory lending practices, fraudulent loan-origination practices based on misstated or

overstated income and/or employment status, violations of the Truth in Lending Act, violations

of federal anti-kickback laws and elder abuse.[20] During that same time period, the Attorney

General of the State of New York had also been investigating GreenPoint for discriminatory

lending practices. GreenPoint paid $1 million in July 2008 to settle the State's charges against it,

and two New York mortgage brokers that had worked with GreenPoint agreed earlier this year to

pay an additional $665,000 in restitution to approximately 455 minority borrowers.[21] These nu-

merous lawsuits and investigations only further suggest that GreenPoint engaged in a pattern of

fraudulent and otherwise improper lending practices fraught with severe underwriting deficien-

cies.

      42.     By making untrue representations, warranties and other statements per-

taining to the Loans and the practices pursuant to which the Loans were underwritten, originated

and serviced, GreenPoint breached its representation and warranty in Section 6(h) of the Sale

---

[19] *Steinmetz v. GreenPoint Mortgage Funding, Inc.*, Case No. 08-civ-5367 (S.D.N.Y. June 11, 2008).

[20] *See Ferguson v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. 0:08-CV-60854-WPD (S.D. Fla. June 5, 2008); *Lewis v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. 1:08-cv-00567-TSE-TCB (E.D. Va. June 3, 2008); *Ouziz v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. 3:08-cv-02201-WHA (N.D. Cal. Apr. 29, 2008); *Perez v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. 5:08-cv-01972-JW (N.D. Cal. Apr. 15, 2008); *Ramirez v. GreenPoint Mortgage Funding, Inc.*, Case No. 3:08-cv-00369-EDL (N.D. Cal. Jan. 18, 2008); *Knapp v. GreenPoint Mortgage Funding, Inc. et al.*, Case No. CIV 466080 (Cal. Super. Ct. Sept. 14, 2007); *Feinstein v. GreenPoint Mortgage Funding, Inc. et al.* (E.D. Pa. May 7, 2007).

[21] *GreenPoint Brokers Targeted by New York*, MortgageDaily.com, Jan. 5, 2009.

Agreements that "[n]either this Agreement nor any statement, report or other document furnished

or to be furnished pursuant to this Agreement or in connection with the transactions contem-

plated hereby contains any untrue statement of fact or omits to state a fact necessary to make the

statements contained therein not misleading." By failing to disclose inaccurate statements about

borrower income, employment, assets, intentions to occupy the purchased properties and inaccu-

rate measures of borrowers' ability to repay their obligations and by failing to disclose Green-

Point's failure to adhere to proper and prudent mortgage-lending practices and GreenPoint's own

underwriting guidelines, specifically, GreenPoint's wholesale abandonment of any attempt to

gauge the ability and willingness of borrowers to repay their obligations, GreenPoint breached its

representation and warranty in Section 6(h) of the Sale Agreements that the Agreements and the

documents furnished and to be furnished in connection with the transactions contemplated by the

Agreements do not "omit[] to state a fact necessary to make the statements contained therein not

misleading." And by making decisions to originate mortgage loans as a result of GMAC's deci-

sion to purchase mortgage loans and/or as a result of the price GMAC might offer to pay for

mortgage loans, GreenPoint breached Section 6(o) of the Sale Agreements. These breaches enti-

tle the Indenture Trustee, for the benefit of the Insurers and the Noteholders, to substantial reme-

dies, including demanding, as it has, that GreenPoint repurchase all of the Loans.

## E.   GreenPoint's Willful Refusal to Comply with Its Contractual Cure-or-Repurchase Obligation

43.     By letter dated March 14, 2008 ("First Breach Notice"), the Indenture

Trustee notified GreenPoint of breaches of various of its representations and warranties in the

Sale Agreements with respect to approximately 655 Loans in the initial re-underwritten sample.

The Indenture Trustee requested that GreenPoint comply with Section 8 of the Sale Agreements

and either cure the breaches or repurchase the Breaching Loans.

21

44.    GreenPoint did not respond until June 16, 2008, more than three months later, when it refused to cure any of the identified breaches or repurchase any of the Breaching Loans. GreenPoint did not offer any tenable justification for its blanket rejection of its contractual obligations. To the contrary, its objections sound in bad faith. GreenPoint asserted, for example, that the Indenture Trustee had "unreasonably delayed" notifying GreenPoint of the breached representations and warranties. There is no support for that proposition. The Indenture Trustee provided timely notice and demand upon discovery of the Breaching Loans. It is Green-Point's delay in complying with its express contractual obligations that was and continues to be unreasonable and prejudicial to the Indenture Trustee's, as well as the Insurers' and the Noteholders', interests.

45.    By letter dated July 9, 2008 ("Second Breach Notice" and, together with the First Breach Notice, the "Breach Notices"), the Indenture Trustee notified GreenPoint of breaches of various of its representations and warranties in the Sale Agreements with respect to an additional group of approximately 308 Loans in the initial re-underwritten sample. The Indenture Trustee again requested that GreenPoint comply with Section 8 of the Sale Agreements and either cure the breaches or repurchase the Breaching Loans. To date, GreenPoint has not responded to the Second Breach Notice.

46.    By letter dated December 9, 2008 ("Breach Clarification"), the Indenture Trustee clarified that the breaches that it had previously identified in the Breach Notices necessarily also constituted breaches of Section 6(h) of the Sale Agreements and, therefore, required GreenPoint to repurchase not only the Breaching Loans, but all of the Loans. GreenPoint responded to the Breach Clarification in a letter dated January 26, 2009 by again rejecting the In-

denture Trustee's requests and failing to comply in any manner with GreenPoint's express contractual obligations.

47.     After the commencement of this action, by letter dated April 27, 2009 ("Third Breach Notice"), the Indenture Trustee notified GreenPoint of breaches of various of its representations and warranties in the Sale Agreements with respect to an additional group of approximately 873 Loans. The Indenture Trustee again requested that GreenPoint comply with Section 8 of the Sale Agreements and either cure the breaches or repurchase the loans identified in the Third Breach Notice. GreenPoint did not respond until May 26, 2009 and again refused to cure any of the identified breaches or repurchase the loans identified in the Third Breach Notice and again made bad faith objections to the Indenture Trustee's timely and specific notice of GreenPoint's breaches of representations and warranties.

48.     By letter dated October 7, 2009 ("Fourth Breach Notice" and, together with the Third Breach Notice, the "Post-Complaint Breach Notices"), the Indenture Trustee notified GreenPoint of breaches of various of its representations and warranties in the Sale Agreement with respect to an additional group of approximately 320 Loans (together with the 873 Loans identified in the Third Breach Notice, the "Additional Breaching Loans"). The Indenture Trustee again requested that GreenPoint comply with Section 8 of the Sale Agreements and either cure the breaches or repurchase the loans identified in the Fourth Breach Notice. Green-Point did not respond until November 30, 2009 and again refused to cure any of the identified breaches or repurchase the loans identified in the Fourth Breach Notice. GreenPoint again made bad faith objections to the Indenture Trustee's timely and specific notice of GreenPoint's breaches of representations and warranties, including an objection to the Indenture Trustee's

23

"status" that GreenPoint had not raised in response to the Breach Notices or in response to the
Third Breach Notice.

49.     By the memorandum of law in this action dated June 10, 2009, the Inden-
ture Trustee notified GreenPoint of additional breaches of various representations and warranties
in the Sale Agreements, including GreenPoint's breaches of Section 6(o) of the Sale Agreements
and GreenPoint's untrue statements and omissions of necessary facts in the Sale Agreements and
in the ProSupp in breach of Section 6(h) of the Sale Agreements. Notice of those breaches was
implicit in the Breach Notices and the Breach Clarification, all of which put GreenPoint on no-
tice that the Indenture Trustee considered the Sale Agreements to be breached by GreenPoint.
On information and belief, GreenPoint had knowledge of all of GreenPoint's breaches prior to
the Indenture Trustee's knowledge of GreenPoint's breaches of the representations and warran-
ties, and GreenPoint breached its obligation under Section 8 of the Sale Agreements to give
prompt written notice to the Purchaser (including the Indenture Trustee) of the breaches of
GreenPoint's representations and warranties.

50.     In sum, despite receipt of the Breach Notices, the Breach Clarification,
and the Post-Complaint Breach Notices, GreenPoint has not cured any of the breaches identified
in those letters and the June 10, 2009 memorandum of law. GreenPoint therefore must repur-
chase all of the Loans, including the Breaching Loans and the Additional Breaching Loans. *See*
Sale Agreements § 8.

## F.     GreenPoint's Representations and Warranties to CIFG and
        Syncora

51.     As part of its participation in the contemplated Securitization, GreenPoint
entered into an Indemnification Agreement with CIFG dated as of August 21, 2006 (the "CIFG
Agreement") and GreenPoint entered into an Indemnification Agreement with Syncora and Leh-

man Brothers Inc. dated as of August 22, 2006 (the "Syncora Agreement"). The CIFG Agree-

ment and Syncora Agreement set forth GreenPoint's representations and warranties to CIFG and

Syncora.

52.     GreenPoint's representations and warranties to CIFG are set forth in Sec-

tion 3 of the CIFG Agreement. GreenPoint represented and warranted, among other things, that,

as of August 28, 2006:

- "[A]ll material provided in writing [by GreenPoint to SASC] for inclusion in the Offering Document… and as included in such Offering Document… shall be true and correct in all material respects."

53.     GreenPoint's representations and warranties to Syncora are set forth on

Section 5 of the Syncora Agreement. GreenPoint represented and warranted, among other things

that:

- "All material provided in writing to [SASC] for inclusion in the Offering Document . . . and as included in such Offering Document… shall be true and correct in all material re-spects."

54.     The "Offering Document" covered by GreenPoint's representations and

warranties in the CIFG Agreement and in the Syncora Agreement includes the ProSupp.

55.     On information and belief, the portions of the ProSupp appearing at pages

S-37 through S-42 under the title "Origination of Loans and Underwriting Guidelines" (the

"GreenPoint Material") were provided in writing by GreenPoint to SASC for inclusion in the

ProSupp, including but not limited to the portions of the ProSupp described in paragraphs 33-

34 above.

56.     GreenPoint's assurances in the CIFG Agreement and Syncora Agreement

are significant. The ProSupp's disclosures about GreenPoint were used to market the Notes to

investors. By making representations and warranties to CIFG and Syncora about the ProSupp,

GreenPoint provided comfort to CIFG and Syncora about the Securitization.

57.   CIFG and Syncora were induced to issue the CIFG Policy and Syncora

Policy, respectively, on the basis of the GreenPoint Material.

58.   The GreenPoint Material is not true and correct in several material re-

spects, including but not limited to the ProSupp's assurance that the Loans were underwritten

and issued in a prudent fashion and therefore were unlikely to default, specifically:

- The ProSupp's statement that GreenPoint's underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and ade-quacy of the mortgaged property as collateral.

- The ProSupp's statement that as part of GreenPoint's evalua-tion of potential borrowers, GreenPoint generally requires a description of the borrower's income.

- The ProSupp's assurance that borrowers participating in a "no-doc" or "low-doc" loan – origination program had credit histories that demonstrate an established ability to repay the indebtedness in a timely fashion.

- GreenPoint's claim that GreenPoint conducts a quality con-trol review of a sample of the loans that it acquires from ap-proved correspondent lenders.

## G.   GreenPoint's Promises to Indemnify CIFG and Syncora

59.   GreenPoint promised to indemnify CIFG and Syncora for breaches of

GreenPoint's representations and warranties and for other losses to CIFG and Syncora.

60.   GreenPoint's indemnification obligations to CIFG are set forth in Sec-

tion 4 of the CIFG Agreement. GreenPoint promised to indemnify CIFG for, among other

things, "any and all claims, losses, liabilities . . . costs or expenses (including reasonable fees

and expenses of attorneys, consultants and auditors and reasonable costs of investigations) of

any nature, arising out of or by reason" of:

26

- "[A]ny untrue statement of material fact contained in the [GreenPoint Material]. "

- "[A] breach of any of [GreenPoint's] representations and warranties" in the CIFG Agreement.

61. GreenPoint's indemnification obligations to Syncora are set forth in Sec-

tion 6 of the Syncora Agreement. GreenPoint promised to indemnify Syncora for, among other

things, any actual damages incurred by Syncora ("including claims made under the [Syncora]

Policy") and any out-of-pocket costs or expenses reasonably incurred by Syncora ("including the

fees and expenses of its counsel and any other costs and expenses incurred" in connection with

investigating a claim) resulting from:

- GreenPoint's breach of any of GreenPoint's representations and warranties in the Syncora Agreement. (Syncora Agreement § 6(c)(i))

- GreenPoint's "failure to cure, repurchase or substitute for any of the Loans upon breach of a representation and warranty with respect [to the Loan]." (Syncora Agreement § 6(c)(ii))

- Syncora's losses arising out of or resulting from "an untrue statement of material fact contained [in the GreenPoint Material] or the omission to state therein a material fact required to be stated therein or necessary to make the statements therein . . . not misleading. " (Syncora Agreement § 6(c)(iii))

62. Section 6(c)(ii) of the Syncora Indemnification Agreement expressly in-

cludes indemnification for GreenPoint's failure to cure, repurchase or substitute for any of the

Loans pursuant to the provisions of the Sale Agreements described in paragraphs 36-37 above

and GreenPoint's breaches described in paragraphs 43-50 above.

63. Under the Insurance and Indemnity Agreements described in paragraph 27

above, CIFG and Syncora are entitled to reimbursement of payments made under their Policies

in the amounts of their payments with interest at a rate defined in those Insurance and Indemnity

Agreements as the "Late Payment Rate". GreenPoint's indemnification obligations to CIFG and

Syncora include, among other things, payment of interest at the Late Payment Rate on the amounts CIFG and Syncora have paid under their Policies.

## FIRST CAUSE OF ACTION (FOR U.S. BANK)

### (GreenPoint's Obligation to Repurchase All Loans)

64.     The Indenture Trustee repeats and realleges each and every allegation set forth in paragraphs 1 through 63 above as if fully set forth herein.

65.     The Sale Agreements are valid and binding contracts between the parties thereto and their successors and assigns.

66.     GreenPoint is a party to the Sale Agreements.

67.     The Issuer is the ultimate assignee of the Purchaser's Rights and Remedies against GreenPoint under the Sale Agreements, which Purchaser's Rights and Remedies have been granted and assigned to, and may (and, at the direction of the Controlling Insurer, must) be exercised and enforced by, the Indenture Trustee for the benefit of the Insurers and the Note-holders.

68.     The Indenture Trustee has consistently and timely performed its obligations under the Sale Agreements.

69.     By making untrue representations and warranties and statements pertaining to the Loans and the practices pursuant to which the Loans were underwritten, originated and serviced, and by omitting to state facts necessary to make statements contained in the Sale Agreements and the Pro Supp not misleading, GreenPoint breached both Sections 6 and 7 of the Sale Agreements, including, but not limited to, the specific representations and warranties that are both set forth therein and identified in the Breach Notices, the Breach Clarification, the Post-Complaint Breach Notices and the June 10, 2009 memorandum of law.

28

70.     The breaches identified in the Breach Notices, the Breach Clarification, the Post-Complaint Breach Notices and the June 10, 2009 memorandum of law materially and adversely affected the value of the Loans and the interests of the Issuer, the Indenture Trustee, the Insurers and the Noteholders.

71.     As a result of GreenPoint's breaches of representations and warranties contained in Sections 6 and 7 of the Sale Agreements and identified in the Breach Notices, the Breach Clarification, the Post-Complaint Breach Notices and the June 10, 2009 memorandum of law, the Issuer, the Indenture Trustee, the Insurers and the Noteholders have suffered irreparable injury and, unless the Court orders GreenPoint to specifically perform its contractual obligations to repurchase all of the Loans, including the Breaching Loans and the Additional Breaching Loans, the Issuer, the Indenture Trustee, the Insurers and the Noteholders will continue to suffer irreparable injury for which they have no adequate remedy at law.

## SECOND CAUSE OF ACTION (FOR U.S. BANK)

### (GreenPoint's Obligation to Repurchase All Loans)

72.     The Indenture Trustee repeats and realleges each and every allegation set forth in paragraphs 1 through 71 above as if fully set forth herein.

73.     The Sale Agreements are valid and binding contracts between the parties thereto and their successors and assigns.

74.     GreenPoint is a party to the Sale Agreements.

75.     The Issuer is the ultimate assignee of the Purchaser's Rights and Remedies against GreenPoint under the Sale Agreements, which Purchaser's Rights and Remedies have been granted and assigned to, and may (and, at the direction of the Controlling Insurer, must) be

exercised and enforced by, the Indenture Trustee for the benefit of the Insurers and the Note-holders.

76. The Indenture Trustee has consistently and timely performed its obligations under the Sale Agreements.

77. By rejecting the Indenture Trustee's demands that GreenPoint repurchase all of the Loans or, at a minimum, cure the breaches identified in the Breach Notices and the Post-Complaint Breach Notices, or repurchase the Breaching Loans and the Additional Breaching Loans, GreenPoint has materially breached its obligations under Section 8 of the Sale Agreements.

78. GreenPoint's material breaches of Section 8 of the Sale Agreements were and continue to be willful and have damaged and are continuing to damage the Issuer, the Indenture Trustee, the Insurers and the Noteholders in an amount to be determined at trial.

## THIRD CAUSE OF ACTION (FOR U.S. BANK)

### (GreenPoint's Obligation to Repurchase Breaching Loans

### and Additional Breaching Loans)

79. The Indenture Trustee repeats and realleges each and every allegation set forth in paragraphs 1 through 78 above as if fully set forth herein.

80. The breaches indentified in the Breach Notices, the Breach Clarification, the Post-Complaint Breach Notices and the June 10, 2009 memorandum of law materially and adversely affect the interests of the Issuer, the Indenture Trustee, the Insurers and the Noteholders in the Breaching Loans and the Additional Breaching Loans.

81. As a result of GreenPoint's breaches of representations and warranties contained in Section 7 of the Sale Agreements and identified in the Breach Notices, the Breach

30

Clarification, the Post-Complaint Breach Notices and the June 10, 2009 memorandum of law, the

Issuer, the Indenture Trustee, the Insurers and the Noteholders have suffered irreparable injury

and, unless the Court orders GreenPoint to specifically perform its contractual obligations to re-

purchase the Breaching Loans and the Additional Breaching Loans, the Issuer, the Indenture

Trustee, the Insurers and the Noteholders will continue to suffer irreparable injury for which they

have no adequate remedy at law.

### FOURTH CAUSE OF ACTION (FOR U.S. BANK)

### (GreenPoint's Obligation to Repurchase Breaching Loans,

### and Additional Breaching Loans)

82.     The Indenture Trustee repeats and realleges each and every allegation set

forth in paragraphs 1 through 81 above as if fully set forth herein.

83.     By rejecting the Indenture Trustee's demands that GreenPoint cure the

breaches identified in the Breach Notices and the Post-Complaint Breach Notices or repurchase

the Breaching Loans and the Additional Breaching Loans, GreenPoint has materially breached

its obligations under Section 8 of the Sale Agreements.

84.     GreenPoint's material breaches of Section 8 of the Sale Agreements were

and continue to be willful and have damaged and are continuing to damage the Issuer, the Inden-

ture Trustee, the Insurers and the Noteholders in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION (FOR U.S. BANK)

### (GreenPoint's Breaches of Representations and Warranties)

85.     The Indenture Trustee repeats and realleges each and every allegation set

forth in paragraphs 1 through 84 above as if fully set forth herein.

86.     The representations and warranties in Sections 6 and 7 of the Sale Agree-

31

ments are material to those Agreements.

87.     GreenPoint has breached the representations and warranties of Sections 6
and 7 of the Sale Agreements.

88.     The Issuer, the Indenture Trustee, and Insurers and the Noteholders have
been damaged by GreenPoint's breaches in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION (FOR CIFG)

### (GreenPoint's Breaches of Representations and Warranties)

89.     CIFG repeats and realleges each and every allegation set forth in para-
graphs 1 through 88 above as if set forth herein.

90.     The CIFG Agreement is a valid and binding contract between CIFG and
GreenPoint.

91.     GreenPoint is a party to the CIFG Agreement.

92.     CIFG has performed its obligations under the CIFG Agreement.

93.     GreenPoint's representations and warranties in the CIFG Agreement are
material and induced CIFG to issue the CIFG Policy.

94.     Pursuant to the terms of the CIFG Policy, CIFG has paid and in the future
will pay claims made by the Indenture Trustee on behalf of the holders of the Class Ac Notes.

95.     GreenPoint has breached its representations and warranties in the CIFG
Agreement.

96.     GreenPoint's breaches of its representations and warranties in the CIFG
Agreement were and continue to be willful and have damaged and are continuing to damage
CIFG in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION (FOR CIFG)

### (GreenPoint's Promise to Indemnify CIFG)

97.     CIFG repeats and realleges each and every allegation set forth in para-
graphs 1 through 96 above as if set forth herein.

98.     Pursuant to Section 4 of the CIFG Agreement, CIFG is entitled to be in-
demnified by GreenPoint for claims, losses, liabilities, costs and expenses of any nature arising
out of untrue statements of material fact in the GreenPoint Material and arising out of Green-
Point's breaches of its representations and warranties in the CIFG Agreement.

99.     GreenPoint made untrue statements in the GreenPoint Material and has
breached numerous representations and warranties that have caused CIFG to pay claims and in-
cur losses, liabilities, costs and expenses, and will continue to cause CIFG to pay claims and in-
cur losses, costs and expenses in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION (FOR CIFG)

### (Reformation of Section 3 of the CIFG Agreement)

100.    CIFG repeats and realleges each and every allegation set forth in para-
graphs 1 through 99 above as if fully set forth herein.

101.    Section 3 of the CIFG Agreement as written states that GreenPoint's rep-
resentations and warranties to CIFG concerning the GreenPoint Material cover information in the
Offering Document concerning " 'Origination of the Loans and Underwriting Guidelines –
GreenPoint Mortgage Funding, Inc.' and 'Origination of the Loans and Underwriting Guidelines
– GreenPoint Mortgage Funding, Inc.' "

102.    The repetition of "Origination of the Loans and Underwriting Guidelines –
GreenPoint Mortgage Funding, Inc." in Section 3 is the result of either the mutual mistake of

33

CIFG and GreenPoint or the mistake of the party that reduced the agreement of CIFG and
GreenPoint to writing. As written, the repetition in Section 3 does not express the agreement and
intention of CIFG and GreenPoint.

103.    The agreement and intention of CIFG and GreenPoint was to have Green-
Point make representations and warranties to CIFG concerning the GreenPoint Material covering
information in the Offering Document concerning " 'Origination of the Loans and Underwriting
Guidelines – GreenPoint Mortgage Funding, Inc.' and 'Origination of the Loans and Underwrit-
ing Guidelines – GreenPoint's Underwriting Guidelines.' "

## NINTH CAUSE OF ACTION (FOR SYNCORA)

### (GreenPoint's Breaches of Representations and Warranties)

104.    Syncora repeats and realleges each and every allegation set forth in para-
graph 1 through 103 above as if set forth herein.

105.    The Syncora Agreement is a valid and binding contract between Syncora
and GreenPoint.

106.    GreenPoint is a party to the Syncora Agreement.

107.    Syncora has performed its obligations under the Syncora Agreement.

108.    GreenPoint's representations and warranties in the Syncora Agreement are
material and induced Syncora to issue the Syncora Policy.

109.    Pursuant to the terms of the Syncora Policy, Syncora has paid and in the
future will pay claims made by the Indenture Trustee on behalf of the holders of the Class Ax
Notes.

110.    GreenPoint has breached its representations and warranties in the Syncora
Agreement.

34

111.    GreenPoint's breaches of its representations and warranties in the Syncora

Agreement were and continue to be willful and have damaged and are continuing to damage

Syncora in an amount to be determined at trial.

## TENTH CAUSE OF ACTION (FOR SYNCORA)

### (GreenPoint's Promise to Indemnify Syncora)

112.    Syncora repeats and realleges each and every allegation set forth in para-

graphs 1 through 111 above as set forth herein.

113.    Pursuant to Section 6 of the Syncora Agreement, Syncora is entitled to be

indemnified by GreenPoint for, among other things, any and all actual damages incurred by Syn-

cora (including claims made under the Syncora Policy) and out-of-pocket costs and expenses

reasonably incurred by Syncora (including fees and expenses of counsel and other costs and ex-

penses incurred in connection with investigating a claim) resulting from untrue statements or

omissions in the GreenPoint Material, GreenPoint's breaches of its representations and warran-

ties in the Syncora Agreement and GreenPoint's failure to cure or repurchase Loans that breach

GreenPoint's representations and warranties.

114.    GreenPoint made untrue statements in the GreenPoint Material, omitted

necessary facts in the GreenPoint Material, breached numerous representations and warranties,

and failed to cure or repurchase Loans that breach GreenPoint's representations and warranties

that have caused Syncora to pay claims and incur costs and expenses in an amount to be deter-

mined at trial.

35

## PRAYER FOR RELIEF

WHEREFORE, the Indenture Trustee and the Insurers respectfully pray for the following relief:

A.     For an Order compelling GreenPoint to comply with its obligations under Section 8 of the Sale Agreements and repurchase all of the Loans, including the Breaching Loans and the Additional Breaching Loans at the Repurchase Price, as that term is defined in the Sale Agreements;

B.     For an award of damages, including an amount equivalent to the Repurchase Price of all of the Loans, including the Breaching Loans and the Additional Breaching Loans, as well as any other damages to be proven at trial for GreenPoint's breaches of the Sale Agreements and the representations and warranties in the Sale Agreements;

C.     For an award of damages to the Insurers in an amount to be proven at trial for GreenPoint's breaches of the representations and warranties in the CIFG Agreement and the Syncora Agreement;

D.     For an award of indemnification to the Insurers for the claim payments and other losses and expenses that the Insurers have paid or will pay in the future that were caused by, with respect to both Insurers, GreenPoint's misstatements or omissions in the Pro-Supp and GreenPoint's breaches of its representations and warranties regarding the truth and correctness and of its statements in the ProSupp, and, with respect to Syncora, GreenPoint's failure to comply with its obligations under Section 8 of the Sale Agreements to repurchase all of the Loans, including the Breaching Loans and the Additional Breach Loans at the Repurchase Price.

E.     For an award of compensatory damages and/or reimbursement, together with interest, court costs, disbursements, attorneys' fees and other expenses;

36

F.     For reformation of Section 3 of the CIFG Agreement to substitute "'Origination of the Loans and Underwriting Guidelines – GreenPoint Mortgage Funding, Inc.' and 'Origination of the Loans and Underwriting Guidelines – GreenPoint's Underwriting Guidelines' for the mistaken " ' Origination of the Loans and Underwriting Guidelines – GreenPoint Mortgage Funding, Inc.' and 'Origination of the Loans and Underwriting Guidelines – GreenPoint Mortgage Funding, Inc.' "

G.     For interest at the Late Payment Rate;

H.     For prejudgment interest;

I.     For such other and further relief as the Court deems just and proper.

Dated: New York, New York
       April 14, 2010

_____
Constance M. Boland

_____
Philip R. Fortenza
David W. Dykhouse
Thomas W. Pippert
Benjamin S. Litman

NIXON PEABODY LLP
437 Madison Avenue
New York, New York 10022
Telephone: (212) 940-3000
Fax: (212) 940-3111

Attorneys for U.S. Bank National Association,
as Indenture Trustee

PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710
Telephone: (212) 336-2000
Fax: (212) 336-2222

Attorneys for Syncora Guarantee Inc. and CIFG
Assurance North America, Inc.