Marc Abrams
Joseph T. Baio
Mary Eaton
Paul Shalhoub
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

*Attorneys for Monarch Alternative Capital LP,
Stonehill Capital Management LLC and
Bayview Fund Management LLC, each in its
capacity as investment advisor to certain funds,
and for CQS ABS Master Fund Limited and
CQS ABS Alpha Master Fund Limited*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Residential Capital, LLC, _et al._, | : | 12-12020 (MG) |
| | : | |
| Debtors. | : | Jointly Administered |

------------------------------------------------------x

**OBJECTION OF MONARCH ALTERNATIVE CAPITAL LP,
STONEHILL CAPITAL MANAGEMENT LLC, BAYVIEW FUND
MANAGEMENT LLC, CQS ABS MASTER FUND LIMITED
AND CQS ABS ALPHA MASTER FUND LIMITED TO
DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019
FOR APPROVAL OF THE SETTLEMENT AGREEMENT
AMONG THE DEBTORS, FGIC, THE FGIC
<u>TRUSTEES AND CERTAIN INSTITUTIONAL INVESTORS</u>**

# TABLE OF CONTENTS

Page

**PRELIMINARY STATEMENT** ...................................................................................1

**BACKGROUND** ........................................................................................................3

**ARGUMENT**.............................................................................................................8

I.    The Court Lacks Jurisdiction to Make the Findings. ...........................................8

    A.    The Rehabilitation Court has Exclusive Jurisdiction to
Determine Whether The Settlement Agreement Is Fair and Equitable to
FGIC Policyholders Under the Reverse Preemption Doctrine....................................9

    B.    Absent Indemnification From the Debtors, This Court Has No Jurisdiction to Make
Findings Regarding the Trustees' Behavior
Toward the Investors. ...............................................................................10

    C.    The Trustees Cannot Be Indemnified for Negligence,
Therefore If A Debtor Indemnification Exists, There Is
No Jurisdiction In This Court for Making the Findings. ............................................12

    D.    The Trustees Cannot Manufacture Subject Matter
Jurisdiction Through a Demand for the Findings.......................................................12

    E.    The Findings Are Outside the Scope of a
Rule 9019 Motion....................................................................................13

    F.    Federal and State Due Process Requirements Have Not Been Satisfied...................14

II.    The Debtors And The Trustees Have Not Met
And Cannot Meet Their Burden To Establish The Findings. ...........................................15

    A.    The Governing Documents Prohibit
The Trustees From Commuting the Policies Without Investor Consent...................16

    B.    The Proposed Commutation Amount is Grossly Inadequate and the
Trustees Breached their Fiduciary Duties to the Investors.........................................19

    C.    The Trustees Violated Their Duty of Loyalty to the Beneficiaries. ...........................23

    D.    The Findings Are Factually Inaccurate Because the Commutation
Is Not in the Best Interests of the Investors or the FGIC Insured Trusts. .................24

i

# **TABLE OF AUTHORITIES**

Cases

Advanced Cellular Sys., Inc. v. Mayol (In re Advanced Cellular Sys., Inc.),
    235 B.R. 713 (Bankr. D.P.R. 1999) ...................................................................9

Bayerische Landesbank v. Deutsch Bank AG (In re Residential Capital LLC),
    488 B.R. 565 (Bankr. S.D.N.Y. 2013) ..............................................................11

Beck v. Mfrs. Hanover Trust Co.,
    218 A.D.2d 1 (1st Dep't 1995) ...................................................................17, 20

BNP Paribas Mortg. Corp. v. Bank of Am., N.A.,
    778 F. Supp. 2d 375 (S.D.N.Y. 2011).............................................................23

Cent. Hanover Bank & Trust Co. v. Brown,
    30 N.Y.S.2d 85 (Sup. Ct. N.Y. Cnty. 1941) ...................................................20

Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),
    722 F.2d 1063 (2d Cir. 1983)..........................................................................13

In re Dreier LLP,
    429 B.R. 112 (Bankr. S.D.N.Y. 2010) .............................................................13

Fin. Gty. Ins. Co. v. Countrywide Home Loans, Inc.,
    650736/2009 (Sup. Ct. N.Y. Cnty.) .................................................................21

In re IBJ Schroder Bank & Trust Co.,
    271 A.D.2d 322 (1st Dep't 2000) .....................................................................16

In re Innkeepers USA Trust,
    448 B.R. 131 (Bankr. S.D.N.Y. 2011)..............................................................19

Krys v. Official Comm. of Unsecured Creditors (In re Refco, Inc.),
    505 F.3d 109 (2d Cir. 2007)..............................................................................13

Levy v. Lewis,
    635 F.2d 960 (2d Cir. 1980)...............................................................................9

LNC Invs., Inc. v. First Fid. Bank, N.A.,
    No. 92-CIV-7584, 1997 WL 528283 (S.D.N.Y. Aug. 27, 1997) ......................20

Mass. Bricklayers & Masons Trust Funds v. Deutsche Alt-A Sec., Inc.,
    399 B.R. 119 (E.D.N.Y. 2009) .........................................................................11

Munich Am. Reinsurance Co. v. Crawford,
        141 F.3d 585 (5th Cir. 1998) ......................................................................10

Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),
        4 F.3d 1095 (2d Cir. 1993).........................................................................14

In the matter of the Rehabilitation of Fin. Gty. Ins. Co.,
        401265/2012 (Dec. 12, 2012) .......................................................................4

Sealink Funding, Ltd. v. Deutsch Bank AG (In re Residential Capital LLC),
        489 B.R. 36 (Bankr. S.D.N.Y. 2013)..........................................................11

Skandia Am. Reinsurance Corp. v. Schenck,
        441 F. Supp. 715 (S.D.N.Y. 1977)................................................................9

Stark v. United States Trust Co. of New York,
        445 F. Supp. 670 (S.D.N.Y. 1978)..............................................................20

United States Trust Co. v. First Nat'l City Bank,
        57 A.D.2d 285 (1st Dep't 1977), aff'd 45 N.Y.2d 869 (1978) .........................16

Washburn v. Corcoran,
        643 F. Supp. 554 (S.D.N.Y. 1986)..............................................................10


Statutes

11 U.S.C. § 109.............................................................................................10

15 U.S.C. § 1101............................................................................................9

15 U.S.C. § 777ooo(c)(1)...............................................................................12

15 U.S.C. § 77ppp(b) .....................................................................................19

TIA § 777ooo(a) .............................................................................................16

Monarch Alternative Capital LP, Stonehill Capital Management LLC and

Bayview Fund Management LLC, each in its capacity as investment advisor to certain funds, and

CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited (collectively, the

"**Investors**") object (the "**Objection**") to the relief requested by the debtors and debtors in

possession in the above-captioned cases (the "**Debtors**") in the Debtors' Motion (the "**9019**

**Motion**") Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**") for Approval of the Settlement Agreement (the "**Settlement Agreement**")

Among the Debtors, Financial Guaranty Insurance Company ("**FGIC**"), the trustees (the

"**Trustees**") of the FGIC Insured Trusts (as defined below) and Certain Institutional Investors,

including the Steering Committee (the "**Steering Committee**") of investors represented by

Gibbs & Bruns, LLP.  As grounds for the Objection, the Investors respectfully state as follows:

### PRELIMINARY STATEMENT[1]

1.      On a motion brought under Bankruptcy Rule 9019, this Court is empowered to

evaluate the Settlement Agreement and determine whether it provides the minimal acceptable

value *for the debtor.*  If the proposed settlement meets the applicable test, the Court may

authorize *the debtor's* entry into a settlement of claims against the estate.

2.      The 9019 Motion, however, requests this Court to undertake a broader evaluation

of the merits of the proposed Settlement Agreement and determine, among other things, whether

the proposed settlement is in the *best interests of a group of investors* in the trusts at issue.  The

Investors are neither creditors nor debtors in these proceedings.  The Investors who join in this

objection — and who collectively hold over $714 million in current principal balance of

---

[1]      Capitalized terms used but not defined in this section have the meanings given them elsewhere in the
Objection.

1

"wrapped" securities that would see their insurance "wrap" wiped out under the proposed

Settlement Agreement — believe that the proposed settlement is grossly inadequate based on

their own analyses and when compared to the projected recoveries under the New York Supreme

Court-approved Rehabilitation Plan for FGIC over which this Court has no jurisdiction.  The

insurance policies that would be terminated under the Settlement Agreement are not property of

the Debtors' estates but are instead irrevocable agreements between the FGIC Insured Trusts and

FGIC for the benefit of investors in the wrapped securities.

3.      The Investors respectfully submit that this Court cannot and should not enter the

challenged Findings; rule on the propriety of the Settlement Agreement from the Investors'

perspective; or exculpate the Trustees for their decision to enter into the Settlement Agreement,

because, among other reasons:

- The Rehabilitation Court has exclusive jurisdiction to determine whether the Settlement Agreement is fair and equitable to FGIC's policyholders as a whole.
- This Court lacks subject matter jurisdiction to adjudicate disputes among the Investors and the Trustees, and such disputes are beyond the scope of a Bankruptcy Rule 9019 inquiry.
- The Trustees do not have the power under the Governing Documents to commute insurance policies without investor consent, which they neither sought nor obtained.
- The Findings — which the Debtors and the Trustees have the burden to prove — are simply not true.  The Settlement Agreement is not in the Investors' "best interests" because the proposed commutation is vastly inferior to the expected recoveries under FGIC's Rehabilitation Plan and the Trustees did not act "reasonably" or in "good faith" in agreeing to it.

4.      This Court has neither the jurisdiction nor the evidentiary basis to make findings

regarding the Trustees' behavior toward their non-creditor investors or whether the commutation

of policies that are not part of the Debtors' estates is in the best interests of those Investors.  This

Court certainly may authorize the *Debtors'* entry into the Settlement Agreement *as it pertains to

the Debtors*, but anything beyond that must be left to either the Rehabilitation Court, to the

2

extent it relates to what is in the best interest of FGIC policyholders, or, if necessary, to the court adjudicating claims against the Trustees. The parties' attempt to manufacture jurisdiction in this Court to undermine the rights of the Investors and preempt the jurisdiction of other courts is inappropriate and should be denied.

## BACKGROUND

5.      The Investors either hold or are investment advisors to certain funds holding collectively over $714 million in current principal balance of "wrapped" securities issued by certain of the residential mortgage-backed securities trusts identified on Exhibit B of the proposed Settlement Agreement (the "**FGIC Insured Trusts**"). Such "wrapped" securities are insured by FGIC pursuant to irrevocable insurance policies issued by FGIC (collectively, the "**FGIC Policies**") for the benefit of the investors in the FGIC Insured Trusts. The FGIC Policies are not property of the Debtors' estates, but rather insure payment streams on securities issued by the non-debtor FGIC Insured Trusts.

6.      FGIC itself is the subject of insurance rehabilitation proceedings (the "**Rehabilitation Proceeding**") in the Supreme Court of the State of New York (the "**Rehabilitation Court**"), under the supervision of Benjamin M. Lawsky, Superintendent of Financial Services of the State of New York, as the court-appointed rehabilitator (the "**Rehabilitator**"). On June 11, 2013, the Rehabilitation Court approved FGIC's plan of rehabilitation (the "**Rehabilitation Plan**"). The Rehabilitation Plan generally provides that holders of policy claims against FGIC will receive an initial cash payment of 17.25% of their accrued policy claims (as a "CPP" payment), and will receive additional payments over time as (a) additional claims accrue under the policies, (b) the "CPP" percentage is adjusted upward and "true-up" payments are made with respect to previously accrued claims, and (c) the interest

3

accreting on unpaid but allowed claims is paid to the extent assets are available ("DPO"

payments).[2]  FGIC estimates that such payments will equal, cumulatively over time,

approximately 45% of policy claims, not counting substantial additional value which may inure

to the FGIC estate on account of certain litigation claims.[3]  FGIC has estimated that the present

value of the recoveries of the FGIC Insured Trusts under the Rehabilitation Plan, absent the

Commutation, would be approximately $361.9 million (over $100 million more than the

proposed Commutation Amount), before taking into account potential litigation recoveries which

would inure to the benefit of FGIC's policyholders under the Rehabilitation Plan. See D&P

Presentation, p. 5 (Exhibit B to the Shalhoub Declaration).

7.      Pursuant to the Settlement Agreement, the Debtors and FGIC have agreed to

resolve FGIC's litigation claims against the Debtors for a specified allowed claim, which is

expected to yield a recovery of $206.5 million to FGIC under the Debtors' proposed chapter 11

---

[2]      The "CPP" is a percentage recovery on insurance policy claims under the Rehabilitation Plan which is
established initially at 17.25%, but is subject to annual review and adjustment, which is projected by FGIC
to reach 38.6% of policy claims. In the matter of the Rehabilitation of Fin. Gty. Ins. Co., Index No.
401265/2012 (Dec. 12, 2012), Affidavit of Michael W. Miller in Further Support of Approval of First
Amended Plan of Rehabilitation (the "**Miller Affidavit**"), Ex. 1, p. 6 (See Exhibit A to the Declaration of
Paul V. Shalhoub (the "**Shalhoub Declaration**"), filed contemporaneously herewith).  Under the terms of
the Rehabilitation Plan, FGIC will pay the CPP in cash to policyholders once a claim under a policy is
allowed.  Rehabilitation Plan, Ex. B § 1.1.  The "DPO" is the amount of a policy claim which remains
unpaid after the payment of CPP.  The DPO accretes at a rate of 3% per annum, with some or all of the
accreted amount paid if and when the CPP is upwardly adjusted.  Rehabilitation Plan, Ex. B § 1.3.

[3]      Under the "Base Scenario" recovery estimates provided by the Rehabilitator in connection with the
Rehabilitation Plan, FGIC policyholders are projected to receive payments equaling approximately 45% of
their policy claims over time.  Miller Affidavit, Ex. 1, p. 6. Id.  At conservative discount rates of 10%, 15%
and 20%, the present value of recoveries under the Rehabilitation Plan are estimated to equal, in today's
dollars, 27 to 30% of policy claims. Id.  The Rehabilitator also provides projections for a "Stress
Scenario," which projects recoveries under the Rehabilitation Plan in a severe economic recession with
sharp declines in home prices and high mortgage default rates. Id. at ¶ 17.  In the "Stress Scenario"
projections, policyholders would receive approximately 23% in recoveries on their claims, which the
Rehabilitator calculates to be worth 17 to 18% in today's dollars (using the Rehabilitator's ultra-
conservative discount rates).  Id., Ex. 1, p. 6.  All of such projections exclude recoveries on account of
litigation claims, such as the recoveries being received by FGIC under the Settlement Agreement.

plan.  See Plan Support Agreement, Ex. B, Annex I. Also pursuant to the Settlement Agreement,

FGIC and the Trustees seek to commute the FGIC Policies (the "**Commutation**") for a cash

payment of $253.3 million (the "**Commutation Amount**"), in exchange for a release of all

claims against FGIC under the FGIC Policies — a payment representing a nominal recovery of

approximately 19.9% of the $1,270 million current and projected claims under the FGIC

Policies.  See D&P Presentation, p. 5.  Thus, the FGIC Settlement only provides 2.65% of value

for the potential future payment streams under the Rehabilitation Plan which are being released.

Even more startling, the Settlement Agreement releases the FGIC Insured Trusts' origination

claims against the Debtors for potentially *zero* consideration from the Debtors to the FGIC

Insured Trusts.  While the Settlement Agreement carves out from this release the specific

recoveries the FGIC Insured Trusts would receive under the chapter 11 plan proposed pursuant

to the PSA, absent approval and consummation of such plan, the Trustees will have given away

the recoveries of the FGIC Insured Trusts from the Debtors for nothing if the Settlement

Agreement is approved.

8.      In connection with the 9019 Motion, the Debtors and the Trustees have asked this

Court to determine, *inter alia*, that (a) the Settlement Agreement itself, including the

Commutation, is in the *best interests* of the investors in each of the FGIC Insured Trusts

(including the Investors) and in the best interests of each of the FGIC Insured Trusts, and (b) the

Trustees acted reasonably, in good faith, and in the best interests of all investors in the FGIC

Insured Trusts in entering into the Settlement Agreement (collectively, the "**Findings**").  9019

Motion, Ex. 1 ¶¶ C&D.

9.      That the Trustees were seeking to commute the FGIC Policies was first made

public when the Debtors filed their motion (the "**PSA Motion**") for approval of their plan

support agreement (the "**PSA**").[4]  The PSA did not make clear what the proposed economics of the settlement included but instead referred to a separate settlement agreement with FGIC to be submitted for court approval in both the Rehabilitation Proceeding and these cases.[5]  The commutation proposal was developed by FGIC and presented to the Steering Committee in late March in connection with the confidential plan mediation.[6]  A review of the disclosures previously made in the public record reveals that the Steering Committee, which brought the proposal to the Trustees, held insignificant amounts of securities in the FGIC Insured Trusts, especially when compared with their other holdings, meaning the holders of securities in the FGIC Insured Trusts were left to rely solely on the Trustees to represent their economic interests in the meditation.[7]

10.    The terms of the FGIC Settlement, including the $253.3 million Commutation Amount, were made public on or around May 31, 2013, when the Settlement Agreement was published  on FGIC's rehabilitation website.  On June 7, 2013, the Settlement Agreement was also filed with this Court for approval pursuant to Bankruptcy Rule 9019.

---

[4]    *Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter into and Perform Under a Plan Support Agreement* (the "**PSA**") *with Ally Financial Inc., the Creditors' Committee, and Certain Consenting Claimants,* [Docket No. 3814].

[5]    Id. at Ex. 3, Ex. A, p. 14.

[6]    D&P Presentation, p. 2.

[7]    Upon information and belief, based solely upon aggregate holdings previously disclosed in the Bankruptcy Court, the Investors understand that the so-called Institutional Investors that are party to the Settlement Agreement hold approximately $348 million in current face value of securities issued by the FGIC Insured Trusts, while they hold more than $12 billion in total current face amount in non-FGIC wrapped trusts. [Docket No. 318], Ex. F.  Clearly, the Institutional Investors' interests are heavily weighted to their non-FGIC wrapped holdings and they could not reasonably be suggested to fairly represent the interests of investors in the FGIC Insured Trusts.

11.     On June 10, 2013, the Trustees, in conjunction with the other trustees in these cases, filed a joinder (the "**PSA Joinder**"), attaching Trustee declarations, in support of the PSA and specifically the proposed Findings.[8]  The Trustees also filed a similar joinder to the 9019 Motion.[9]

12.     Having followed the progression of the Rehabilitation Proceeding and having analyzed the Rehabilitation Plan and related documents with respect to the Investors' expected recoveries thereunder, the Investors questioned the adequacy of the Commutation Amount which provides for a significantly lower recovery than that projected by FGIC in connection with the Rehabilitation Plan.  That skepticism proved well-founded:  even the limited discovery this Court has permitted has revealed that the Settlement Agreement is not in the best interests of the Investors because the Commutation Amount is demonstrably inadequate, that the Trustees failed to discharge their duties to the Investors by entering into the Settlement Agreement without first conducting an appropriate assessment of its terms, and that the Trustees continue to violate those duties by, in effect, asking this Court to preclude the Investors from ever obtaining redress against the Trustees for these wrongs.  Under these circumstances, as the Investors will demonstrate at trial, the Findings cannot be made.

---

[8]      [Docket No. 3940] ¶¶ 15-16.

[9]      [Docket N0. 3982] (the "**9019 Joinder**").

7

**ARGUMENT**

I.    The Court Lacks Jurisdiction to Make the Findings.

13.    The Investors do not dispute that bankruptcy courts have jurisdiction to authorize

a debtor's entry into a settlement of claims against the estate.[10]  However, jurisdiction to approve

settlements of claims of or against the estate does not confer jurisdiction on this Court to

adjudicate whether it is appropriate for FGIC to commute the FGIC Policies, which only the

Rehabilitation Court has jurisdiction to determine.  Nor does it confer jurisdiction to adjudicate a

dispute between the Investors and the Trustees with respect to their contractual and common law

obligations *inter se*.[11]  The Debtors fail entirely to provide a legal justification for this Court's

jurisdiction to make the Findings, while the Trustees assert in the 9019 Joinder that this Court

has jurisdiction to make such findings, purportedly "because the notice program utilized by the

FGIC Trustees is robust and fully satisfies New York and federal due process requirements."[12]

The Trustees provide no legal support for the theory that providing notice to investors of a

motion gives rise to this Court's subject matter jurisdiction — and there is none.

14.    The PSA Joinder, which the Trustees incorporate by reference into the 9019

Joinder, provides little additional support for this Court's jurisdiction.  The PSA Joinder asserts

that this Court has jurisdiction to make findings regarding the Trustees' actions as they relate to

the PSA on two bases (a) that the Debtors are required to indemnify the Trustees under the terms

of the indentures and pooling and servicing agreements which govern the FGIC Insured Trusts

---

[10]    See 28 U.S.C. § 157(b)(2).

[11]    Nor may this Court resolve any claims the Investors might assert against the Trustees for their breaches.
Those claims may only be adjudicated by a state or federal court with personal jurisdiction over the parties
and subject matter jurisdiction over the claims.

[12]    9019 Joinder, ¶ 5.

8

(collectively, the "**Governing Documents**"), and (b) that, in a circular leap of logic, the Trustees would not have agreed to enter into the PSA without certain hand-tailored findings related to the PSA, and therefore, their desire for the findings creates subject matter jurisdiction for this Court. See PSA Joinder ¶¶ 7-8.  Neither argument has any merit.

> A.  The Rehabilitation Court has Exclusive Jurisdiction to
> Determine Whether the Settlement Agreement is Fair and Equitable
> to FGIC Policyholders Under the Reverse Preemption Doctrine.

15.     The Debtors, FGIC and the Trustees ask this Court to make a determination that the Settlement Agreement is in the best interests of the investors in the FGIC Insured Trusts, and in the best interests of each FGIC Insured Trust — a request that tellingly was not made of the Rehabilitation Court.  However, this Court's authority to make findings regarding the Commutation is pre-empted by the McCarran-Ferguson Act.  15 U.S.C. § 1101, et seq.  "In the McCarran-Ferguson Act, Congress mandated that the regulation of the insurance industry be left to the individual states."  Levy v. Lewis, 635 F.2d 960, 963 (2d Cir. 1980).  "In other words, the McCarran-Ferguson Act reverses the normal supremacy of federal law over state law, so long as the activity in question falls under the heading of the 'business of insurance.'"  Advanced Cellular Sys., Inc. v. Mayol (In re Advanced Cellular Sys., Inc.), 235 B.R. 713, 718 (Bankr. D.P.R. 1999).

16.     Article 74 of the New York Insurance Law ("**NYIL**"), "insofar as it relates to the liquidation of insolvent insurers, provides an exclusive, comprehensive procedure for the winding up of their affairs."  Skandia Am. Reinsurance Corp. v. Schenck, 441 F.Supp. 715, 724 (S.D.N.Y. 1977).  "Thus the administrative and judicial scheme erected by New York to regulate insurance companies . . . operates pursuant to an express federal policy of noninterference in insurance matters."  Levy, 635 F.2d at 963.  Indeed, "[i]nsurance companies are inelibgle for the

protections afforded by the federal Bankrutpcy Code."  Munich Am. Reinsurance Co. v.

Crawford, 141 F.3d 585, 593 (5th Cir. 1998) citing 11 U.S.C. § 109.

17.    Given that the Findings relate to the commutation of FGIC insurance policies, and

the attendant loss of rights thereunder, entry of the Findings in connection with the approval of

the Settlement Agreement would "invalidate, impair or supersede" the Rehabilitation Court's

mandate under the NYIL to protect and regulate "the relationship between the insurance

company and the policyholder."  Washburn v. Corcoran, 643 F. Supp. 554, 555-56 (S.D.N.Y.

1986).  As such, under the reverse preemption doctrine, the determination of whether the

Settlement Agreement is in the best interests of FGIC policyholders is not one this Court may

make.[13]

> B. Absent Indemnification From the Debtors, This Court Has No Jurisdiction
> to Make Findings Regarding the Trustees' Behavior
> Toward the Investors.

18.    While it appears that the servicer under certain of the Governing Documents

typically provides a limited indemnification to the Trustees, the Debtors are no longer the

servicer of the FGIC Insured Trusts and have no current indemnification obligations to the

Trustees known to the Investors.  As this Court may judicially note, Ocwen Loan Servicing, LLC

("**Ocwen**") purchased the Debtors' servicing platform pursuant to a sale under section 363 of the

Bankruptcy Code, dated November 21, 2012, and therefore appears to be the current servicer of

the FGIC Insured Trusts.[14]  Pursuant to the Sale Order, Ocwen agreed to assume the Debtors'

indemnification obligations to the Trustees under the applicable servicing agreements for acts or

---

[13]    The Investors have objected on substantive grounds, through an objection filed in the Rehabilitation Court,
to the Rehabilitator's ability to discriminate against certain policyholders by entry into the Settlement
Agreement (See Exhibit C to the Shalhoub Declaration).

[14]    See [Docket No. 2246] ("**Sale Order**")

omissions arising after the closing of the sale.  See Sale Order ¶ 35.  As the sale to Ocwen closed

on February 15, 2013,[15] and the Trustees entered into the Settlement Agreement on May 23,

2013, the conduct complained of by the Investors occurred after the closing of such sale, and

presumably, if the Trustees are entitled to an indemnity at all, such indemnity would be provided

by Ocwen and not the Debtors.

19.    Courts have found that a bankruptcy court has "related to" jurisdiction where a

debtor has indemnification obligations to a defendant in a lawsuit.  Mass. Bricklayers & Masons

Trust Funds v. Deutsche Alt–A Sec., Inc., 399 B.R. 119, 123 (E.D.N.Y. 2009) ("related-to"

jurisdiction is appropriate in RMBS litigation against non-debtors where bankrupt debtor had

provided prepetition indemnification).  However, without an indemnity obligation, any claims

against the Trustees for entering into the Settlement Agreement, would not have a "conceivable

effect" on the Debtors' estates, and therefore would not give rise to "related to" jurisdiction in

this Court for making the proposed Findings.  See Bayerische Landesbank v. Deutsch Bank AG

(In re Residential Capital LLC), 488 B.R. 565, 576-78 (Bankr. S.D.N.Y. 2013) (investor's claims

against trustee *did* give rise to indemnification obligations against a Debtor and therefore to

"related-to" jurisdiction, although Court recommended abstaining from jurisdiction and

remanding to state court); Sealink Funding, Ltd. v. Deutsch Bank AG (In re Residential Capital

LLC), 489 B.R. 36, 49-51 (Bankr. S.D.N.Y. 2013) (same).  In the absence of jurisdiction, the

Court cannot make the Findings.

20.    If, in fact, the Trustees do have indemnification agreements with the Debtors, they

are precluded from relying on those agreements now.  During discovery, the Investors expressly

---

[15]    See PSA Motion ¶ 13.

sought production of all indemnification agreements between or among the Trustees and either

the Debtors or a third party, and no such agreements were produced.

> C.  The Trustees Cannot Be Indemnified for Negligence,
> Therefore If A Debtor Indemnification Exists, There Is
> No Jurisdiction In This Court for Making the Findings.

21.    Further, even if there are indemnification obligations for the relevant time period

which have not been transferred to Ocwen, the Trustees are not entitled to indemnification for

their *ultra vires* actions in entering into the Settlement Agreement.  Pursuant to The Trust

Indenture Act of 1939 (the "**TIA**"), a qualified indenture must not contain any provisions

relieving the indenture trustee from liability for its own negligent action, its own negligent

failure to act, or its own willful misconduct.  15 U.S.C. §§ 777ooo(c)(1).  The Governing

Documents similarly limit indemnity in the context of negligence or willful misconduct.[16]  As

discussed below, the Trustees are acting outside the scope of their authority under the Governing

Documents, and have breached their fiduciary duties to the Investors.  As such, the Trustees'

actions do not give rise to an indemnification under the very agreements they are violating.

Further, even if available, a potential contingent future right to indemnification by the debtor is

much too tenuous an anchor to establish jurisdiction in this Court over disputes which should be

decided elsewhere.

> D.  The Trustees Cannot Manufacture Subject Matter
> Jurisdiction Through a Demand for the Findings.

22.    In the PSA Joinder, the Trustees make a second jurisdictional argument, namely

that absent similar proposed findings in the PSA order, the Trustees would not have entered into

---

[16]    See, e.g., GMACM 2005-HE1 Servicing Agreement § 6.06(b); GMACM 2007-HE2 Servicing Agreement
§ 6.06(b); RFMSII 2006-HSA2 Servicing Agreement § 6.06(b); RAMP 2005 EFC-7 Pooling and Servicing
Agreement § 8.05(b); RFMSII 2006-HSA1 Pooling and Servicing Agreement § 8.05(b); RASC 2004-KS7
Pooling and Servicing Agreement §8.05(b).

the PSA, and therefore this Court has jurisdiction to make the requested findings.  PSA Joinder ¶

7.  It is illogical that a non-debtor party to a settlement with the debtor need only make an

ultimatum in negotiations in order to create subject matter jurisdiction for the bankruptcy court.

Indeed, this Court has been critical of such manufactured jurisdiction.  See In re Dreier LLP, 429

B.R. 112, 131 (Bankr. S.D.N.Y. 2010) (holding that non-debtor settling third-party's financial

contribution to debtor's estate under settlement cannot create subject matter jurisdiction,

"[o]therwise a debtor could create subject matter jurisdiction over any non-debtor third-party by

structuring a plan in such a way that it depended upon third-party contributions" (internal

quotations omitted)).  The Trustees' attempt to manufacture subject matter jurisdiction by

contractual fiat must fail.

>              E.    The Findings Are Outside the Scope of a
>                    Rule 9019 Motion.

23.    Even if this Court were to determine that it has *jurisdiction* over third-party

disputes among the Investors and the Trustees related to the FGIC Policies (which are not

property of the Debtors' estates), the Findings are beyond the scope of a Bankruptcy Rule 9019

motion.  Rather, the inquiry the Court must make under Bankruptcy Rule 9019 is whether a

settlement is in the best interest of the debtor and the debtor's estate, not non-debtor parties.  The

Second Circuit has noted that when determining whether to authorize a settlement pursuant to

Bankruptcy Rule 9019, "a bankruptcy court's obligation is to determine whether a settlement is

in the best interests of *the estate*, not to ensure that the *creditors'* representatives are honoring

their fiduciary duties . . . ."  Krys v. Official Comm. of Unsecured Creditors (In re Refco, Inc.),

505 F.3d 109, 119 (2d Cir. 2007) (emphasis in original); see also Comm. of Equity Sec. Holders

v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (similarly describing

the scope of a section 363 analysis); <u>Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)</u>, 4 F.3d 1095, 1098 (2d Cir. 1993) (similarly, in a section 365 analysis "it was error for the bankruptcy court to decide a disputed factual issue between the parties to a contract in [a 365] context").

24.    As discussed by the bankruptcy court in <u>Refco</u> when the investors of an entity settling with the debtor sought to intervene in the bankruptcy court's approval of a settlement agreement, "[a]ny internal dispute between a creditor and that creditor's investors belongs elsewhere." <u>Id.</u> at 118.  The Investors agree.  This Court's inquiry should extend no further than determining whether the Settlement Agreement meets the standards for approval under Bankruptcy Rule 9019.  The Investors' dispute with the Trustees regarding their agreement with FGIC belongs in another forum, *not* the Bankruptcy Court.

F.    <u>Federal and State Due Process Requirements Have Not Been Satisfied</u>.

25.    The Debtors and Trustees have asked this Court to find that federal and state due process requirements have been satisfied simply by providing notice of the Commutation to investors.  Proposed Order, ¶ E.  However, at every turn the Debtors and Trustees have unfairly and unjustifiably sought to block the Investors' access to the information needed to evaluate the Findings.  Under the guise of the "mediation privilege," the Debtors and the Trustees have refused to disclose any information about the negotiations over the Settlement Agreement and what (if anything) the Trustees did to protect and advance the interests of their beneficiaries. Similarly, the Trustees have invoked the "attorney client privilege" to block any inquiry into why they jettisoned the Rehabilitation Plan in favor of the Settlement Agreement, why — in stark contrast to the Rehabilitation Plan — they never afforded their beneficiaries any opportunity to comment on the terms of the Settlement Agreement before it became a *fait accompli*, or why

14

they kept the terms of the Settlement Agreement a secret for approximately one week after it had

been finalized. Indeed, the Trustees have made every effort to conceal their conduct from

scrutiny, including by forcing their beneficiaries to litigate these important issues in a forum and

in a context where the Trustees knew the Investors would not have a full and fair opportunity to

be heard. Further, even if sufficient discovery had been provided to the Investors — and it has

not — the extremely compressed timeframe permitted by the Court has not allowed the Investors

a meaningful opportunity to challenge the actions of the Trustees. In fact, it appears that the

Debtors, the Trustees, and FGIC deliberately sought to establish an approval regime outside the

plan approval process in order to limit the rights of investors to contest the Trustees' actions as

much as possible. Decoupled from the plan process, the Settlement Agreement parties have

designed an artificially accelerated process to obtain exculpatory findings from this Court

following limited discovery, to immunize the Trustees from future liability for their actions,

while simultaneously blocking access to information.

II.     The Debtors And The Trustees Have Not Met
        And Cannot Meet Their Burden To Establish The Findings.

        26.     As proponents of the requested Findings, the Debtors and the Trustees have the

burden of demonstrating facts sufficient to support a finding that the Settlement Agreement is in

the "best interests" of the Investors and that the Trustees acted "reasonably" and in "good faith"

in agreeing to its terms. They have not met and cannot meet that burden. For one thing, having

refused to disclose any information that would permit a meaningful challenge to their self-

serving assertions, the Debtors and the Trustees are not entitled to the relief they request. For

another, even if that were not the case, the record evidence (such as it is) is insufficient to

support those Findings. Simply stated, the Commutation (and therefore the Settlement

15

Agreement) is *not* in the best interests of each FGIC Insured Trust *or* the investors in each trust

because, among other reasons, (a) the Commutation is not authorized under the terms of the

governing trust documents, (b) the Commutation Amount is well below the value of the FGIC

Policies, and (c) the Settlement Agreement releases the Debtors from origination claims that the

FGIC Insured Trusts have against the Debtors whether or not the Debtors' proposed chapter 11

plan is confirmed.[17]  Further, the Trustees are not entitled to findings that they acted reasonably

or in good faith because they have not demonstrated that they acted in accordance with their

contractual and fiduciary obligations in negotiating and diligencing the Commutation.  Indeed, as

the Investors will establish at trial, the Trustees wholly failed to discharge their duties.

A.  The Governing Documents Prohibit
The Trustees From Commuting the Policies Without Investor Consent.

27.    The Governing Documents do not grant the Trustees the authority to unilaterally

commute, without investor consent, the FGIC Policies — which policies the Trustees hold

specifically for the benefit of investors.  First, if there were no default under the Governing

Documents, the powers of the Trustees are explicitly proscribed under the documents and

underlying law, and are primarily ministerial in nature.  TIA § 777ooo(a);  In re IBJ Schroder

Bank & Trust Co., 271 A.D.2d 322 (1st Dep't 2000) (citing United States Trust Co. v. First Nat'l

City Bank, 57 A.D.2d 285, 295-96 (1st Dep't 1977), aff'd, 45 N.Y.2d 869 (1978)) ("It is settled

that the duties and powers of a trustee are defined by the terms of the trust agreement and are

---

[17]    Settlement Agreement, § 2.01(a)(iv).  If the chapter 11 plan is confirmed, Duff & Phelps has estimated that
the FGIC Insured Trusts will receive $92 million on account of their claims against the Debtors, but, if it is
not, the FGIC Insured Trusts will apparently receive zero from the Debtors under the Settlement
Agreement.

16

tempered only by the fiduciary obligation of loyalty to the beneficiaries."). Thus, in the absence

of an event of default, the Trustees had no authority to consent to the Commutation.

28.    But even if there were a default, any additional powers must be provided for in

the Governing Documents. See Beck v. Mfrs. Hanover Trust Co., 218 A.D.2d 1, 13 (1st Dep't

1995) ("[t]he trustee must in the post-default context act prudently, but only in the exercise of

those rights and powers granted in the indenture. The scope of the trustee's obligation then is

still circumscribed by the indenture, albeit less narrowly.").[18]

29.    No power to commute the FGIC Policies is granted anywhere in the Governing

Documents. To the contrary, commutation directly contradicts various provisions of the

documents governing the FGIC Insured Trusts. Certain Governing Documents contain specific

negative covenants restricting the ability of a trust to impair the trust's rights in the relevant

FGIC Policy in a way that materially and adversely affects the interests of investors.[19] Also,

with respect to certain of the FGIC Insured Trusts, the FGIC Policy itself is a part of the *res* of

the trust, and there are specific restrictions in the relevant indentures on terminating the relevant

trust's lien on its property.[20]

30.    Further, the Trustees cannot amend the terms of the Governing Documents to

provide for a commutation, because the ability of the Trustees to alter the Governing Documents

---

[18]    The Trustees have been unable to provide sufficient clarity as to whether an event of default has occurred and is continuing with respect to each and every FGIC Insured Trust.

[19]    See, e.g., GMACM 2005-HE1Indenture § 3.09(d) (the trust shall not "impair or cause to be impaired the Issuer's interest in the Mortgage Loans, the Purchase Agreement or in any other Basic Document [which includes the FGIC Policy], if any such action would materially and adversely affect the interests of the Noteholders."); GMACM 2007-HE2 Indenture § 3.09(d) (same); RFMSII 2006-HSA2 Indenture § 3.09(d) (same) (Exhibits D through F to the Shalhoub Declaration).

[20]    See, e.g., GMACM 2005-HE1Indenture, Granting Clause & § 9.02(g).

17

by means of an amendment or entry into a supplemental indenture is also strictly proscribed.

Although the Governing Documents vary on a trust-by-trust basis, an amendment that would

alter the fundamental economic rights of the investors in each such trust requires the consent of

investors through either a 66% or 100% vote.  For example, the FGIC Insured Trusts that are

governed by pooling and servicing agreements typically provide that such pooling and servicing

agreements shall not be amended in a manner that "adversely affect[s] in any material respect the

interests of the Holders of Certificates of any Class . . . without the consent of Holders of

Certificates of such Class evidencing, as to such Class, Percent Interests aggregating not less

than 66%, . . ."[21]  Similarly, the FGIC Insured Trusts that are governed by indentures typically

require the consent of each affected noteholder for any amendment which reduces the amount of

any required payments to such noteholder.[22]

      31.     These requirements for investor consent are on par with the requirements of the

TIA, which provides that:

> Notwithstanding any other provision of the indenture to be qualified, the right of
> any holder of any indenture security to receive payment of the principal of and

---

[21]    See, e.g., RAMP 2005 EFC-7 Pooling and Servicing Agreement §11.01(b)(ii) (No amendment to the Pooling and Servicing Agreement shall "adversely affect in any material respect the interest of the Holders of Certificates of any Class in a manner . . . without the consent of Holders of Certificates of such Class evidencing, as to such Class, Percentage Interests aggregating not less than 66%"); RFMSII 2006-HSA1 Pooling and Servicing Agreement §11.01(b)(ii) (same); RASC 2004-KS7 Pooling and Servicing Agreement §11.01(b)(ii) (same) (Exhibits G through I to the Shalhoub Declaration).

[22]    See, e.g., GMACM 2005-HE1 Indenture §§ 5.07 (noteholders " . . . shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest, if any, on such Note on or after the respective due dates thereof expressed in such Note or in this Indenture and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.") & 9.02(a) (Without consent of each affected noteholder the indenture cannot be amended to, among other things "change the date of payment of any installment of principal of or interest on any Note, or reduce the principal amount thereof or the Note Rate thereon, change the provisions of this Indenture relating to the application of collections on, or the proceeds of the sale of, the Trust Estate to payment of principal of or interest on the Notes . . ."); GMACM 2007-HE2 Indenture §§ 5.07 & 9.02(a) (same); RFMSII 2006-HSA2 Indenture §§ 5.07 & 9.02(i) (same).

18

interest on such indenture security, on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, *shall not be impaired or affected without the consent of such holder* . . . .

15 U.S.C. § 77ppp(b) (emphasis added).

32.     By agreeing to commute the FGIC Policies, the Trustees are seeking, in contravention of the TIA, to *affect* the rights of investors to receive payments on their securities. Neither this Court nor the Rehabilitation Court has authority to alter the economic terms, rights, or responsibilities of a trustee or the consent requirements imposed under the Governing Documents.  See In re Innkeepers USA Trust, 448 B.R. 131, 144-45 (Bankr. S.D.N.Y. 2011) (refusing to "alter the bargained-for terms and risks investors undertook when they bought certificated interests").

33.     Neither the Governing Documents nor applicable law confer upon the Trustees unfettered authority to rewrite the Governing Documents and usurp the Investors' economic rights and interests in the FGIC Policies.  Simply put, the Trustees' actions are not permitted by the Governing Documents.  For that reason alone, the Court should not make the requested Findings.

> **B.  The Proposed Commutation Amount is Grossly Inadequate and the Trustees Breached their Fiduciary Duties to the Investors.**

34.     The Trustees have breached their fiduciary duties to the Investors by agreeing to cut off the FGIC Insured Trusts' two independent sources of recoveries (outside of the mortgage assets of the trusts) for highly inadequate consideration.  One source of recovery was bargained away at a 40% bargain barrel discount (the FGIC Insured Trusts' ability to recover from the FGIC Policies), and the other (the FGIC Insured Trusts' origination claims against the Debtors), was released for potentially zero consideration.   Settlement Agreement, § 2.01(a)(iv).

19

35.    If an event of default has occurred and is continuing under the FGIC Insured Trusts, the Trustees have fiduciary duties to the investors in the FGIC Insured Trusts similar to those of an ordinary trustee.  In exercising their duties on behalf of investors in such a scenario, the Trustees' decisions must be "the result 'of careful and informed deliberation.'"  LNC Invs., Inc. v. First Fid. Bank, N.A., No. 92-CIV-7584, 1997 WL 528283, at *17 (S.D.N.Y. Aug. 27, 1997) (internal citations omitted).  A trustee will not be held liable "for choosing between two prudent courses so long as 'an overall and knowledgeable judgment was brought to bear,' and the trustee's 'conduct under all the circumstances was prudent.'"  Id.  (quoting Stark v. United States Trust Co. of New York, 445 F. Supp. 670, 681 (S.D.N.Y. 1978)).  See also Cent. Hanover Bank & Trust Co. v. Brown, 30 N.Y.S.2d 85, 96 (Sup. Ct. N.Y. Cnty. 1941).

36.    Here, the Trustees have failed to exercise their most fundamental duty to the investors in the FGIC Insured Trusts, that of maximizing repayment on the underlying securities. A trustee "must, as prudence dictates, exercise [its] singularly conferred prerogatives in order to secure the basic purpose of any trust indenture, the repayment of the underlying obligation." Beck, 218 A.D.2d at 13.

37.    As the evidence will show, the Trustees did not conduct a careful and informed deliberation, did not seek the advice of a financial expert to assist in the "negotiations" with FGIC (to the extent any were held) or to improve the proposed terms of the settlement, did not conduct reasonable due diligence, did not consider all of the known facts (or chose to ignore them) when agreeing to commute the FGIC Policies for well below their value, and sought the limited opinion of a financial expert to evaluate only whether the proposed settlement fell within a fabricated and shifting range of potential outcomes, excluding material litigation recoveries.

20

38.     Pursuant to FGIC's own calculations as presented to the Trustees, the discounted present value of the recoveries which the FGIC Insured Trusts would receive under the Rehabilitation Plan is approximately $361.9 million.[23]  This number is already discounted to present value using a 15% discount rate for future recoveries under the Rehabilitation Plan, and does not include *any* projected recoveries relating to FGIC's litigation against the Debtors or others.  See Miller Affidavit, Ex. 1, ¶ 4.  Just taking into account the amounts that are projected to inure to FGIC's benefit under the Debtors' proposed chapter 11 plan, absent a commutation, the FGIC Insured Trusts would receive recoveries under the Rehabilitation Plan of a present value of $405.3 million, using FGIC's 15% discount rate.[24]  Even that amount is artificially deflated, and should have been the *starting point* of any negotiation with FGIC, since FGIC's calculations used an unreasonably high 15% discount rate and did not account for potentially material recoveries to FGIC under its other pending litigation, which recoveries would be shared pro rata among all of FGIC's policyholders under the Rehabilitation Plan.[25]

---

[23]    D&P Presentation, p. 5. (To determine FGIC's estimates of recoveries under the Rehabilitation Plan, items [F], representing the immediate recoveries under the Rehabilitation Plan, and [I], representing the discounted future recoveries, must be combined (i.e., $136.1 million, plus $225.8 million).

[24]    I.e., $361.9 million + $43.4 million = $405.3 million.  According to FGIC's base case calculations, the FGIC Insured Trusts consist of approximately 21% of the FGIC claims pool, and therefore would receive approximately $43.4 million as their pro rata share of FGIC's recoveries against the Debtors.

[25]    For example, FGIC has a pending lawsuit against Countrywide Home Loans, Inc. and Bank of America Corp., which involves allegations related to RMBS transactions.  See Fin. Gty. Ins. Co. v. Countrywide Home Loans, Inc., Index No. 650736/2009 (Sup. Ct. N.Y. Cnty.). Bank of America Corporation and/or its subsidiary Countrywide Financial Corporation have recently entered into three separate RMBS-related settlements with other similarly situated financial guaranty insurers.  See Bank of America Corporation, Current Report (Form 8-K) (May 6, 2013) ($1.6 billion settlement with MBIA); Press Release, Assured Guaranty Ltd., *Assured Guaranty Ltd. Announces Settlement with Bank of America* (April 15, 2011) ($1.1 billion settlement); Press Release, Syncora Guarantee, *Syncora Guarantee Settles its Countrywide Litigation* (July 17, 2012) ($375 million settlement) (Exhibits J through L to the Shalhoub Declaration).

21

39.    In FGIC's calculations presented to the Trustees, FGIC justified its $253.3 million proposal by applying an arbitrary 40% "haircut" to future recoveries under the Rehabilitation Plan.  See D&P Presentation, p. 5.  The Trustees' financial advisor, Duff & Phelps ("**D&P**") admittedly cannot explain or justify FGIC's 40% "haircut," but instead has indicated that it understands the haircut to account for the fact that the commutation payment would be an upfront cash payment, rather than a payment over time under the Rehabilitation Plan.  This is unsupportable, since FGIC's calculation of projected recoveries of $361.9 million is *already* discounted to present value by 15%, and thus already takes into account that the commutation is an upfront cash payment.  By discounting future payments *again* by another 40%, the FGIC commutation offer, among other earmarks of a results-oriented process, evidences an astronomically high discount rate.

40.    Instead of advocating for their beneficiaries by seeking a higher commutation payment from FGIC, or by questioning the need for a commutation at all, the Trustees sought to justify FGIC's low-ball offer by engaging D&P to justify the Settlement Agreement by purportedly evaluating whether it is "reasonable" from a financial perspective.  D&P then employed a series of convoluted and unjustifiable calculations in order to come up with a range of projected recoveries that *could include* the Commutation Amount.  In establishing this supposed range of reasonableness, D&P (among other things) adjusted the total notional claim amount by creating a low claims scenario (assuming low default rates, high property value, and a stable economy, among other factors).  When discounting expected claim payments under this more stable scenario, D&P utilized  a 20% discount rate, which is the *highest* discount rate that was illustrated by FGIC, to establish a range with a low enough bottom end to include the Commutation Amount.  Using the highest discount rate in a scenario that expects the most stable

22

economy and other favorable conditions, however, makes no sense whatsoever.  D & P also used

other veiled and unjustifiable discount rate assumptions and calculations to drive the bottom end

of the self-serving range even lower.

41.    Further, while the release in the Settlement Agreement specifically does not

release the Debtors from the claims of the FGIC Insured Trusts under the PSA, the Trustees

inexplicably have bargained away a huge asset of the FGIC Insured Trusts under the Settlement

Agreement without receiving anything in return from the Debtors should the chapter 11 plan not

be confirmed.

42.    The Trustees' (a) failure to conduct a reasonable inquiry and meaningful due

diligence, (b) failure to challenge FGIC's 40% haircut to already discounted projected

recoveries, (c) failure to challenge FGIC's 15% discount rate on recoveries, (d) failure to account

for value-accretive litigation proceeds for FGIC in calculating recoveries under the

Rehabilitation Plan, and (e) failure to consider the release of claims against the Debtors for no

consideration, among other things, demonstrate that the Trustees did not consider all known facts

or enter into careful and informed deliberation when determining to accept the Commutation.

Moreover, the proposed Commutation Amount is unjustifiably low and not in the "best interests"

of the Investors or the FGIC Insured Trusts.  The Findings cannot be made for these and other

reasons to be established at trial.

C.    The Trustees Violated Their Duty of Loyalty to the Beneficiaries.

43.    The Trustees owe a duty of undivided loyalty to beneficiaries of the FGIC Insured

Trusts.  BNP Paribas Mortg. Corp. v. Bank of Am., N.A., 778 F. Supp. 2d 375, 401 (S.D.N.Y.

2011).  However, the Trustees represent various constituencies in these cases and in the

Rehabilitation Proceeding, each with differing interests.  For example, the Trustees represent

23

holders of both wrapped and unwrapped trusts in the Debtors' cases, and also represent

beneficiaries of other FGIC policies which are unrelated to the Debtors.  The Settlement

Agreement unfairly discriminates among the holders of FGIC Insured Trusts, whose

beneficiaries are represented by the Trustees, to the benefit of other FGIC policyholders who

have claims in the Rehabilitation Proceeding, certain of whom are also represented by the

Trustees.  Settling claims against FGIC inures to the benefit of holders of securities in

unwrapped trusts in the Debtors' cases, certain of whom are also represented by the Trustees.

Further compounding the Trustees' conflicts is the fact that two of the Trustees are members of

the Official Committee of Unsecured Creditors in these cases, with duties in such capacity to all

unsecured creditors of the Debtors.  Because the Trustees have chosen to act to the detriment of

investors in the FGIC Insured Trusts, and such action benefited the Trustees' other constituents,

the Trustees have breached their duty of loyalty and are not entitled to the Findings.

> D.  The Findings Are Factually Inaccurate Because the Commutation
> Is Not in the Best Interests of the Investors or the FGIC Insured Trusts.

44.    In addition to findings regarding the behavior of the Trustees, the Debtors have

requested that this Court make a finding that the Settlement Agreement is in the best interest of

the investors in the FGIC Insured Trusts, and the best interests of each such FGIC Insured Trusts.

Proposed Order, ¶ C.  This is simply not so.  As discussed in greater detail above, and as the

Investors will establish at trial, the FGIC Insured Trusts are only receiving $253.3 million on

account of their claims against FGIC, while according to FGIC's own calculations, which reflect

a 15% discount rate, and which do not account for significant contingent assets, the discounted

present value of the FGIC Insured Trusts' recoveries under the Rehabilitation Plan is

$361.9 million.  See D&P Presentation, p. 5.

24

45.    FGIC, on the other hand, is receiving $206.5 million in recoveries on certain

litigation without the expense of complex litigation (*which FGIC had not even calculated into its*

*own plan projections*) and is therefore paying only $47 million in incremental dollars to remove

$1,270 million in policy claims from its balance sheet.  Absent the Settlement Agreement, FGIC

would have been required in short order to pay a minimum *initial* payment of $136.1 million to

the FGIC Insured Trusts under the Rehabilitation Plan.  See D&P Presentation, p. 5.  Further, the

FGIC Insured Trusts are inexplicably releasing the *Debtors* from origination claims, when the

FGIC Insured Trusts are receiving no consideration from the Debtors under the Settlement

Agreement.

46.    The Trustees have not demonstrated how such an extremely one-sided settlement

could possibly be in the best interests of the FGIC Insured Trusts or the investors in such trusts.

Therefore, even if this Court determines it has jurisdiction to make the Findings, and even if this

Court determines that the Trustees did not act outside of their powers in entering into the

Settlement Agreement, this Court *cannot* find that the Commutation is in the best interests of the

Investors.  Nor can this Court find that the Trustees acted reasonably, in good faith, and in the

best interests of the FGIC Insured Trusts and their investors.

## CONCLUSION

47.    Wherefore, the Investors respectfully submit that the Court lacks jurisdiction with

respect to the Commutation or any disputes between the Investors and the Trustees, that the

Debtors have not established and cannot establish that the Findings are appropriate, and

respectfully object to the approval of the Settlement Agreement to the extent inconsistent with

the foregoing.

25

Dated: New York, New York
     July 29, 2013

                    WILLKIE FARR & GALLAGHER LLP
                    Attorneys for Monarch Alternative Capital LP,
                    Stonehill Capital Management LLC and Bayview
                    Fund Management LLC, each in its capacity as
                    investment advisor to certain funds, and for CQS
                    ABS Master Fund Limited and CQS ABS Alpha
                    Master Fund Limited


                  By:  /s/ Paul V. Shalhoub
                       Marc Abrams
                       Joseph T. Baio
                       Mary Eaton
                       Paul Shalhoub

                   787 Seventh Avenue
                   New York, New York  10019
                   (212) 728-8000