# EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------x

In the Matter of the Rehabilitation of      :
FINANCIAL GUARANTY INSURANCE      :      Index No. 401265/2012
COMPANY.      :
      :      Motion Sequence No. 016
      :
      :

-----------------------------------------------------x

**OBJECTION OF MONARCH ALTERNATIVE
CAPITAL LP, STONEHILL CAPITAL MANAGEMENT
LLC, BAYVIEW FUND MANAGEMENT LLC, CQS ABS
MASTER FUND LIMITED AND CQS ABS ALPHA MASTER
FUND LIMITED TO REHABILITATOR'S MOTION FOR
ORDER PURSUANT TO SECTION 7428 OF NEW YORK
INSURANCE LAW APPROVING (I) THAT CERTAIN SETTLEMENT
AGREEMENT AMONG THE DEBTORS, FGIC, THE TRUSTEES
AND CERTAIN INSTITUTIONAL INVESTORS, DATED MAY 23, 2013,
AND (II) THAT CERTAIN PLAN SUPPORT AGREEMENT AMONG
THE DEBTORS, ALLY FINANCIAL INC., THE CREDITORS' COMMITTEE,
FGIC AND THE OTHER CONSENTING CLAIMANTS, DATED MAY 13, 2013**

WILLKIE FARR & GALLAGHER LLP
Marc Abrams
Joseph T. Baio
Mary Eaton
Paul Shalhoub
787 Seventh Avenue
New York, New York  10019
(212) 728-8000

*Attorneys for Monarch Alternative Capital
LP, Stonehill Capital Management LLC and
Bayview Fund Management LLC, each in its
capacity as investment advisor to certain
funds, and for CQS ABS Master Fund
Limited and CQS ABS Alpha Master Fund
Limited*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ................................................................................... 2

BACKGROUND ........................................................................................................ 6

ARGUMENT ............................................................................................................. 10

    A.      The Settlement Agreement is Not Fair and Equitable and
             Arbitrarily Discriminates Against the Affected Policyholders. ........................... 10

    B.      The Trustees Have No Authority to Commute the Policies. .................................. 14

    C.      This Court Should Not Make Certain Factual
             Findings Requested by the Rehabilitator for the Benefit of the Trustees. ............. 19

    D.      Standing of Investors to Object ........................................................................... 21

CONCLUSION ........................................................................................................... 22

## TABLE OF AUTHORITIES

*Carpenter v. Pac. Mut. Life Ins. Co. of Cal.*,
  10 Cal.2d 307 (1937) ..................................................................................................10

*BNP Paribas Mortg. Corp. v. Bank of Am. N.A.*,
  778 F. Supp. 2d 375 (S.D.N.Y. 2011).......................................................................18

*Beck v. Mfrs. Hanover Trust Co.*,
  218 A.D.2d 1, 632 N.Y.S.2d 520 (1st Dep't 1995) .....................................18, 19

*Dabney v. Chase Nat'l Bank*,
  196 F.2d 668 (2d Cir. 1952)........................................................................................20

*Elliot Assoc. v. J. Henry Schroder Bank & Trust Co.*,
  838 F.2d 66 (2d Cir. 1988).........................................................................................17

*Financial Guaranty Insurance Company v. Countrywide Home Loans, Inc.*,
  Index No. 650736/2009 (Sup. Ct. N.Y. Cnty.) ...................................................5

*In re IBJ Schroder Bank & Trust Co.*,
  271 A.D.2d 322, 706 N.Y.S.2d 114 (1st Dep't 2000) ......................................17

*In re Innkeepers USA Trust*,
  448 B.R. 131 (Bankr. S.D.N.Y. 2011)....................................................................16

*Knickerbocker Agency, Inc. v. Holz*,
  4 A.D.2d 71, 162 N.Y.S.2d 822 (1st Dep't 1957) ............................................10

*LNC Invs., Inc. v. First Fid. Bank, N.A.*,
  935 F. Supp. 1333 (S.D.N.Y. 1996)........................................................................17

*Meckel v. Continental Resources Co.*,
  758 F.2d 811 (2d Cir. 1985).......................................................................................17

*Mills v. Florida Asset Fin. Corp.*,
  31 A.D.3d 849, 818 N.Y.S.2d 333 (3d Dep't 2006) .........................................10

*Neblett v. Carpenter*,
  305 U.S. 297 (1938).......................................................................................................10

*Policemen's Annuity & Benefit Fund of Chicago v. Bank of Am., N.A.*,
  No. 12-civ-2865, 2013 U.S. Dist. LEXIS 64499 (S.D.N.Y. May 6, 2013) .....................17

*United States Trust Co. v. First Nat'l City Bank*,
  57 A.D.2d 285, 394 N.Y.S.2d 653 (1st Dep't 1977)
  aff'd, 45 N.Y.2d 869, 410 N.Y.S.2d 580, 382 N.E.2d 1355 (1978)..................17

*Van Schaick v. Lincoln Dye Works, Inc.,*
    263 N.Y.S. 114, 146 Misc. 342 (Sup. Ct. Albany Cnty. 1933) .........................................10

Monarch Alternative Capital LP, Stonehill Capital Management LLC and

Bayview Fund Management LLC, each in its capacity as investment advisor to certain funds, and

CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited (collectively, the

"**Investors**") object (the "**Objection**") to the relief requested in the motion (the "**Motion**") by

Benjamin M. Lawsky, Superintendent of Financial Services of the State of New York, as the

court-appointed rehabilitator (the "**Rehabilitator**") of Financial Guaranty Insurance Company

("**FGIC**") for an order pursuant to Section 7428 of the New York Insurance Law (the "**NYIL**")

approving (i) that certain settlement agreement (the "**Settlement Agreement**") entered into

among Residential Capital, LLC and its fifty direct and indirect subsidiaries listed on Exhibit A

to the Settlement Agreement (collectively, the "**ResCap Debtors**"), FGIC, the trustees (the

"**Trustees**") of the ResCap Trusts (as defined below) and a group of investors that hold securities

issued by the ResCap Trusts (all such signatories to the Settlement Agreement, collectively the

"**Settling Parties**"), dated as of May 23, 2013, and (ii) that certain Plan Support Agreement

entered into among the ResCap Debtors, Ally Financial Inc., on its own behalf and on behalf of

its direct and indirect subsidiaries excluding the ResCap Debtors, the Official Committee of

Unsecured Creditors of the ResCap Debtors, FGIC and the other Consenting Claimants (as

defined therein), dated May 13, 2013 (the "**Plan Support Agreement**").[1] As grounds for this

Objection, the Investors respectfully state as follows:

---

[1]    By this Objection, the Investors are objecting to this Court's approval of the Settlement Agreement only
(not the Plan Support Agreement) and the proposed findings sought regarding the conduct of the Trustees.
The Plan Support Agreement was approved by the United States Bankruptcy Court for the Southern
District of New York (the "**Bankruptcy Court**") on June 26, 2013. At the Investors' request, the
Bankruptcy Court order approving the Plan Support Agreement expressly preserved the Investors' rights to
challenge approval of the Settlement Agreement and related findings both in this Court and the Bankruptcy
Court. *Order Granting Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b)
Authorizing the Debtors to Enter into a Plan Support Agreement With Ally Financial Inc., the Creditors'
Committee, and Certain Consenting Claimants*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. June 26, 2013)
[Docket No. 4098] (*See* Exhibit A to the Affirmation of Paul V. Shalhoub (the "**Affirmation**"), filed

## PRELIMINARY STATEMENT[2]

1.      The Rehabilitation Plan is designed to provide an equitable result for all of FGIC's policyholders.  The Rehabilitation Plan seeks to ensure all policyholders share ratably in FGIC's assets, and receive an equal percentage recovery.  Such a result is consistent with the Rehabilitator's overarching mandate: to treat all policyholders fairly and equitably, without benefitting subsets of policyholders at the expense of others.  But the forced commutations the Rehabilitator seeks approval of here fly in the face of the Rehabilitator's mission.  Forced commutations on an unwilling group of policyholders are an affront to the "fair and equitable" standard this Court must demand.  Even more inexcusable is the Department of Financial Services itself affirmatively seeking to establish the dangerous precedent of allowing financial guaranty insurers to commute insurance policies without the consent of the underlying investors — an action which was never contemplated by the underlying documents.

2.      First and foremost, the Investors are seeking to be treated the same as other policyholders.  They are proactively seeking to opt out of the commutation in order to restore the status quo, keep their policies and maintain the same equitable claim to the recoveries under the Rehabilitation Plan as other FGIC policyholders.  The Rehabilitator has provided no explanation for why that cannot be the case.  There is no logical connection between the settlement of certain litigation claims that FGIC has against the ResCap Debtors, and the forced commutation of the Investors' policies.

---

herewith).  The Bankruptcy Court hearing to consider the approval of the Settlement Agreement currently is scheduled to commence on August 16, 2013, and the parties are currently engaged in discovery regarding the facts and circumstances surrounding the parties' conduct and entry into the Settlement Agreement.

[2]      Capitalized terms used in this section but not otherwise defined shall have the meaning ascribed to them elsewhere in this Objection.

3.    It has been a mere month since the approval of the Rehabilitation Plan, and the

Rehabilitator has dramatically changed the game for a large group of policyholders, who are

seeing their policies taken away from them just as they thought the terms of their recoveries had

been finalized.  Under the Settlement Agreement, instead of receiving the "CPP" and "DPO"

payments outlined in the Rehabilitation Plan,[3] which were approved by this Court, forty-seven

trusts which issued securities with a current face amount of $4.9 billion, and which hold more

than $1 billion in FGIC policy claims, will instead receive a one-time lump sum payment.  The

$253.3 million lump sum is at most 21.3% of the discounted present value of estimated claims

under the FGIC Policies, a percentage that is significantly less than the 45% in total payments

conservatively projected to be made over time under the Rehabilitation Plan (without giving

effect to any recoveries that might be achieved on account of substantial and valuable litigation

claims against the ResCap Debtors and others that should inure to the benefit of all FGIC

policyholders or to certain reimbursement recoveries).[4]

---

[3]    The "CPP" is a percentage recovery on insurance policy claims under the Rehabilitation Plan which is
established initially at 17.25%, but is subject to annual review and upward adjustment.  Under the terms of
the Rehabilitation Plan, FGIC will pay the CPP in cash to policyholders once a claim under a policy is
allowed.  Rehabilitation Plan, Ex. B § 1.1.  The "DPO" is the amount of a policy claim which remains
unpaid after the payment of CPP.  The DPO accretes at a rate of 3% per annum, with the accreted amount
paid if and when the CPP is upwardly adjusted.  Rehabilitation Plan, Ex. B § 1.3.

[4]    Under the "Base Scenario" recovery estimates provided by the Rehabilitator in connection with the
Rehabilitation Plan, FGIC policyholders are projected to receive payments equaling approximately 45% of
their policy claims over time.  *Affidavit of Michael W. Miller in Further Support of Approval of First
Amended Plan of Rehabilitation* (the "**Miller Affidavit**"), Ex. 1, p. 6.  The Miller Affidavit calculates the
present value of such recoveries at illustrative discount rates of 10%, 15% and 20%.  Id.  At such discount
rates, the present value of recoveries under the Rehabilitation Plan are estimated to equal, in today's
dollars, 27 to 30% of policy claims.  Id.  The Rehabilitator also provides projections for a "Stress
Scenario," which projects recoveries under the Rehabilitation Plan in a severe economic recession with
sharp declines in home prices and high mortgage default rates.  Id. at ¶ 17.  In the "Stress Scenario"
projections, policyholders would receive approximately 23% in recoveries on their claims, which the
Rehabilitator calculates to be worth 17 to 18% in today's dollars (using the Rehabilitator's conservative
discount rates).  Id., Ex. 1, p. 6.  All of such projections exclude recoveries on account of litigation claims,
such as the recoveries being received by FGIC under the Settlement Agreement.

4.    Based on documents filed in the chapter 11 bankruptcy of the ResCap Debtors, it appears that the Rehabilitator spent months negotiating behind closed doors for this alternative unequal treatment for the Affected Policyholders, in a mediation in which the Investors were not parties, while publicly seeking approval of the Rehabilitation Plan.[5]  All this despite the fact that the Rehabilitator trumpeted the Rehabilitation Plan as treating *all* policyholders the same — the Rehabilitation Plan, in the Rehabilitator's own words, "provides economically equivalent recoveries to creditors and avoids preferential treatment."[6]

5.    The Investors have chosen not to quarrel with the Rehabilitator's agreement with the ResCap Debtors to settle certain of FGIC's litigation claims against the ResCap Debtors. Nor have they challenged other questionable aspects of the Plan Support Agreement.  What the Investors do object to is the Rehabilitator arbitrarily deciding in connection with that settlement to treat certain policyholders in a manner different than that allowed under the Rehabilitation Plan — thereby effectively amending the Rehabilitation Plan.  The Rehabilitator has failed to articulate any valid reason to treat certain policyholders differently from others — and there is none.  To allow for such discriminatory treatment would be to allow other policyholders to receive a materially better recovery than the Affected Policyholders and would certainly not result in the fair and equitable treatment of the Affected Policyholders required by New York Insurance Law.

6.    Under the Settlement Agreement, the Rehabilitator will receive a distribution under the proposed chapter 11 bankruptcy plan of the ResCap Debtors which is expected to be

---

[5]    See e.g., *Declaration of Robert H. Major*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. June 10, 2013) [Docket No. 3940-1] ¶ 67 (Exhibit B to the Affirmation). (Stating that FGIC and other parties first brought the proposal to the Trustees in early April 2013).

[6]    See *Amended Omnibus Reply Memorandum of Law in Further Support of Approval of First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company*, dated January 25, 2013, p. 2.

4

approximately $206.5 million, and the Rehabilitator will pay $253.3 million to the Affected

Policyholders on account of FGIC policy claims which amount to a minimum of $1.189 billion

on a present value basis.[7]  While the Affected Policyholders will receive materially less than they

would under the Rehabilitation Plan, other FGIC policyholders benefit from the Settlement

Agreement, since they would no longer have to share recoveries with the Affected Policyholders.

This discriminatory treatment is neither fair nor equitable to the Affected Policyholders, and

remains unjustified by the Rehabilitator.

7.    In addition to the discriminatory actions by the Rehabilitator, the Trustees

themselves simply do not have the authority under the relevant Governing Documents to agree to

the commutation embedded in the Settlement Agreement.  As the Governing Documents

contemplate the existence of the FGIC Policies, and do not provide for authority to commute

them, any such commutation would require an amendment to the Governing Documents, which

could not be effected without affirmative investor consent, which has not occurred.  Therefore,

the Settlement Agreement is invalid on its face and should not be approved by this Court.

8.    To add insult to injury, as discussed in more detail below, the Rehabilitator also is

seeking in the Proposed Order to unjustifiably attempt to shield the Trustees from liability that

---

[7]    *Affirmation of Gary T. Holtzer*, dated May 29, 2013 (the "**Holtzer Affirmation**"), ¶ 13.  FGIC will
therefore only pay $46.8 million of its liquidated assets to the Affected Policyholders.  While this may be a
great deal for other policyholders since they will benefit from the additional assets made available by
the settlement of claims against the ResCap Debtors and from the payment to the Affected Policyholders of
less consideration than they would receive under the Rehabilitation Plan, it is a terrible deal for the
Investors and other Affected Policyholders, who would otherwise receive well in excess of $535 million
over time under the Rehabilitation Plan (i.e. 45% of the future value of the minimum of $1,189 million
FGIC policy claims) without accounting for *any* recoveries from the ResCap Debtors or other litigation
counterparties despite the fact that FGIC has significant pending lawsuits, or reimbursement.  For example,
FGIC has a pending lawsuit against Countrywide Home Loans, Inc. and Bank of America Corp., which,
like their litigation against the ResCap Debtors, involves allegations related to RMBS transactions.  See
Financial Guaranty Insurance Company v. Countrywide Home Loans, Inc., Index No. 650736/2009 (Sup.
Ct. N.Y. Cnty.).  Further, the $1,189 million minimum present value of commuted policy claims may be a
low figure, as a portion of those claims are estimated future claims under the FGIC Policies, and the
Investors do not have insight into the assumptions behind such estimates.

they may have to the beneficiaries of the FGIC Policies for improperly agreeing to the Settlement Agreement by requesting that this Court make specific findings that the Trustees acted reasonably, in good faith, and not negligently in entering into the Settlement Agreement.[8] Regardless of this Court's ultimate determination of the actions of the Rehabilitator, there is no justification for this Court to then shield the Trustees from liability to their immediate beneficiaries for violations of non-insurance agreements, allowing FGIC to essentially "self-commute" the FGIC Policies without effective counterparty consents or approvals.

9.    In sum, the Investors object to the Motion on the basis that (i) the Settlement Agreement improperly and arbitrarily discriminates against the Affected Policyholders and therefore is not fair and equitable as required by the NYIL, (ii) the Trustees do not have the authority to commute the FGIC Policies, and (iii) it is improper for the Rehabilitator to ask this Court to seek to inhibit the Investors from pursuing remedies against their fiduciaries for breaching their duties under the terms of the Governing Documents and applicable law.[9] It is beyond unreasonable to invoke the jurisdiction of this Court to insulate from ex post exposure the Trustees' offending conduct.

## BACKGROUND

10.    The Investors, either directly or as investment advisors to certain funds, collectively hold over $714 million in current face amount of "wrapped" securities issued by certain of the ResCap residential mortgage-backed securities trusts identified on Exhibit B of the

---

[8]    The Rehabilitator requests that this Court make factual findings that: (a) the settlement and release of FGIC's obligations under the FGIC Policies is "in the best interests of FGIC's policyholders and other claimants;" and (b) the Trustees "have acted reasonably and in good faith in entering into the Settlement Agreement, and the Trustees have not acted negligently in performing their duties in respect of the Settlement Agreement." See Holtzer Affirmation, Ex. A (the "**Proposed Order**") ¶ a & b.

[9]    The Investors reserve their rights to argue in any forum that any findings by this Court do not prejudice their rights in any future lawsuit against the Trustees under the Governing Documents and applicable law.

Settlement Agreement (the "**ResCap Trusts**").[10]  Such "wrapped" securities are insured by

FGIC pursuant to irrevocable insurance policies issued by FGIC (collectively, the "**FGIC**

**Policies**").

11.    On June 11, 2013, this Court approved the First Amended Plan of Rehabilitation

for FGIC, dated June 4, 2013 (the "**Rehabilitation Plan**").  The Rehabilitation Plan generally

provides that holders of policy claims against FGIC will receive an initial cash payment of

17.25% of their allowed policy claims, and will receive additional payments over time.[11]  FGIC

estimates that such payments will equal, cumulatively over time, approximately 45% of policy

claims, not counting substantial additional value which may inure to the FGIC estate due to

certain litigation claims.[12]  According to FGIC's own regulatory filings, FGIC has projected

more than $1 billion in gross recoveries for various loss mitigation activities, such as the pursuit

of litigation claims.[13]  Further it does not appear that the projected recoveries set forth in the

---

[10]    The Investors understand that the Federal Home Loan Mortgage Corporation ("**Freddie Mac**") also
opposes approval of the Settlement Agreement.  Collectively, the Investors and Freddie Mac hold in excess
of $1.2 billion of the approximately $4.9 billion of current face amount of securities issued by the ResCap
Trusts that are insured by FGIC.  Upon information and belief, based solely upon aggregate holdings
previously disclosed in the Bankruptcy Court, this amount far exceeds the approximately $348 million in
current face value of securities issued by the ResCap Trusts that the Investors understand are held by the
so-called Institutional Investors that are party to the Settlement Agreement.

[11]    Rehabilitation Plan, § 2.3.

[12]    Miller Affidavit, Ex. 1, p. 6.  As explained above, these are the "Base Scenario" recovery estimates
provided by the Rehabilitator in connection with the Rehabilitation Plan, representing FGIC's expected
performance under the Rehabilitation Plan.  In the "Stress Scenario" estimates projected by the
Rehabilitator, total payments under the Rehabilitation Plan would equal 23% over time, excluding any
litigation recoveries.  For illustrative purposes only, this Objection adopts the recovery percentages that are
set forth by the Rehabilitator in the Miller Affidavit.  However, for the reasons discussed herein, those
recovery percentages are artificially low, and the Investors do not adopt them as likely ultimate recoveries
under the Rehabilitation Plan.

[13]    See Quarterly Statement of the Financial Guaranty Insurance Company as of March 31, 2013, p. 6.16
(Exhibit C to the Affirmation).  This would provide nearly 17% of additional recovery in the Base Scenario
(i.e., $1,058 million, divided by $6,316 million in Base Scenario policy claims).  The projection of
litigation recoveries is by no means unjustified.  Bank of America Corporation and/or its subsidiary
Countrywide Financial Corporation (two of the defendants that FGIC itself has sued) have recently entered

Miller Affidavit include the significant reimbursements that FGIC expects to receive from RMBS trusts for which it has or will pay policy claims, which reimbursements FGIC projects will be $377 million in the Base Scenario.[14]

12.    Pursuant to the Settlement Agreement, the Rehabilitator and the Trustees seek to commute the FGIC Policies for a cash payment of $253.3 million (the "**Commutation Amount**"), in exchange for a release of claims of policyholders (the "**Affected Policyholders**") under the FGIC Policies — a one-time payment representing at most 21.3% of aggregate current and future projected claims under the FGIC Policies, which FGIC has projected to be a minimum of $1,189 million on a discounted present value basis.[15]  As the initial "CPP" payment under the Rehabilitation Plan is set at 17.25%, the FGIC Settlement only provides at most an incremental 4% of up front value in exchange for the additional, conservatively estimated, 23.7%[16] in undiscounted potential future payment streams under the Rehabilitation Plan which the Affected Policyholders are giving up (as well as future litigation recoveries which FGIC itself values in excess of $1 billion) — even as the settlement with the ResCap Debtors, in the worse case scenario, is providing for an incremental 1.8% in recoveries which could be distributed to all FGIC policyholders in the near future.[17]

---

into three separate RMBS-related settlements with other similarly situated financial guaranty insurers.  See Bank of America Corporation, Current Report (Form 8-K) (May 6, 2013) (providing for a $1.6 billion cash payment); Press Release, Assured Guaranty Ltd., *Assured Guaranty Ltd. Announces Settlement with Bank of America* (April 15, 2011) (on file with author) (providing for a $1.1 billion cash payment); Press Release, Syncora Guarantee, *Syncora Guarantee Settles its Countrywide Litigation* (July 17, 2012) (on file with author) (providing for a $375 million cash payment) (Exhibits D through  F to the Affirmation).

[14]    *Affirmation of John S. Dubel*, dated December 12, 2012, p. 11.

[15]    Holtzer Affirmation, ¶ 5.

[16]    I.e., 45%, minus 21.3%.

[17]    I.e., $206 million in recoveries, divided by $11,671 billion Stress Scenario policy claims.

8

13.     On June 7, 2013, the ResCap Debtors filed the ResCap Debtors' Motion Pursuant

to Fed. R. Bankr. P. 9019 For Approval of the Settlement Agreement Among the ResCap

Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors (the "**9019 Motion**")[18] in

the bankruptcy court overseeing their chapter 11 cases, seeking the bankruptcy court's approval

of the Settlement Agreement.  Because of the nature of the relief requested by the Settling

Parties, including factual findings regarding the benefits of the Settlement Agreement to

investors and the conduct of the Trustees, the Settling Parties have foisted evidentiary issues

before this Court and the Bankruptcy Court.  Accordingly, the Investors and Freddie Mac have

sought discovery from the Settling Parties in connection with the 9019 Motion in an attempt to

provide a full and fair record for such factual determinations.  This process is currently

underway.[19]  In connection with such discovery, no less than eleven depositions have either been

scheduled or have already taken place, and documents are being produced and reviewed by the

Investors and the Settling Parties, including the Rehabilitator, all regarding the agreement struck

during mediation sessions held behind closed doors among select parties in interest in the

ResCap bankruptcy, designed to advance the Chapter 11 Cases, shield the Trustees from

potential liability, and benefit the recoveries of others that were involved at the bargaining table

to effectively rob from a "blind-folded" Peter (the Affected Policyholders) to pay Paul (other

creditors of ResCap and other FGIC policyholders).

---

[18]     *In re Residential Capital, LLC, et al.,* Bankr. S.D.N.Y., Case No. 12-12020 (MG) [Docket No. 3929].

[19]     The Investors and Freddie Mac have requested that this Court allow them to use any discovery related to
the 9019 Motion in the Bankruptcy Court in connection with the proceedings in this Court, while the
Bankruptcy Court has deferred to this Court regarding such determinations.  *Order Concerning Use of
Discovery Obtained in Connection with the Rule 9019 FGIC Settlement Hearing,* Case No. 12-12020 (MG)
(Bankr. S.D.N.Y. July 10, 2013) [Docket No. 4191] (Exhibit G to Affirmation).  Notwithstanding the
evidentiary findings they seek, the Settling Parties have consistently sought in the discovery process to
limit the Investors' ability to receive discovery based on the assertion of various privileges.

# **ARGUMENT**

A.    The Settlement Agreement is Not Fair and Equitable and
Arbitrarily Discriminates Against the Affected Policyholders.[20]

14.    As previously articulated by other parties in this case, including the Trustees, the

Rehabilitator may not discriminate unfairly against claimants with the same legal rights, and

recoveries to claims holders must be fair and equitable to all interested parties.[21] The fair and

equitable standard is consistent with applicable New York precedent establishing that "[a] pre-

eminent purpose of [Article 74] of the Insurance Law is to 'insure equitable treatment for its

creditors and to avoid preferences' upon the liquidation of an insurer by providing that any

matter affecting the assets available for distribution be the subject of a single, integrated

administration." Knickerbocker Agency, Inc. v. Holz, 4 A.D.2d 71, 73, 162 N.Y.S.2d 822, 824

(1st Dep't 1957); see also, Van Schaick v. Lincoln Dye Works, Inc., 146 Misc. 342, 343, 263

N.Y.S. 114, 115 (Sup. Ct. Albany Cnty. 1933) ("The Insurance Law provides for an orderly

procedure in which all creditors are treated alike."). In fact, Article 7434 of the NYIL, which

governs the priorities of claims in an insurance rehabilitation, does not provide for disparate

treatment of holders with the same priority of claim.

15.    Even if this Court were to determine that the entry into the Settlement Agreement

is the type of action for which a Court will defer to the Rehabilitator's business judgment, such

deference is not without limits. A rehabilitator may not act arbitrarily or capriciously. Mills v.

---

[20]    The Investors expressly reserve their rights regarding any alternative characterization of the Commutation
Amount and the nature of the process through which it was devised following the further development of
the factual record in the discovery process. The discussion of the Commutation Amount herein relies
solely on materials available in the public record.

[21]    See, Trustee Objectors' Submission on Standard for Approval of a Plan of Rehabilitation, dated January 22,
2013, citing Carpenter v. Pac. Mut. Life Ins. Co. of Cal., 10 Cal. 2d 307, 317 (1937) aff'd sub nom. Neblett
v. Carpenter, 305 U.S. 297 (1938) (recognizing the fair and equitable standard when affirming an order of
the Supreme Court of California that approved an insurance commissioner's proposed plan of
rehabilitation).

Florida Asset Fin. Corp., 31 A.D.3d 849, 850, 818 N.Y.S.2d 333, 334 (3d Dep't 2006). Here, the

Rehabilitator's determination to discriminate against a subset of policyholders in contravention

of the terms of the Rehabilitation Plan with the intent to benefit the broader platform of non-

ResCap policyholders, and without adequate justification for the inequitable treatment, is an

arbitrary action and an abuse of the Rehabilitator's discretion which this Court should deny.

16.    The Commutation Amount represents at most 21.3% of the current and projected

minimum of $1,189 million of discounted present value claims under the FGIC Policies, whereas

the Rehabilitator estimates a base case scenario recovery of 45% over time for policyholders

under the Rehabilitation Plan without discounting the recovery to present value.[22] Even at the

highest illustrative discount rate of 20% (and therefore the lowest estimated recovery) used by

the Rehabilitator to estimate the present value of recoveries under the Rehabilitation Plan, such

recoveries are still estimated to be worth 27% in today's dollars, with such estimates not taking

into account recoveries on FGIC's valuable litigation and reimbursement claims — clearly a

conservative assumption when the Rehabilitator is receiving an estimated $206.5 million from

the ResCap Debtors in litigation settlement recoveries under the Settlement Agreement.

Therefore, the treatment of the Affected Policyholders is plainly unequal to that provided to

other policyholders under the Rehabilitation Plan and cannot be considered fair and equitable by

any reasonable measure.  It is beyond rational dispute that 27% of present value (which uses the

Rehabilitator's most conservative discount rate and adopts other conservative assumptions of the

Rehabilitator) is not equivalent to a maximum of 21.3% of present value, and reflects a total

disregard for the NYIL and the equitable principles that animate proceedings administered under

it.  This is even without taking into account that the illustrative discount rates of 10 to 20% that

---

[22]    Miller Affidavit, Ex. 1, p. 6.

the Rehabilitator uses to discount to present value the recoveries under the Rehabilitation Plan
are excessively conservative, further emphasizing the unfairness of the commutation to the
Affected Policyholders.

17.    The Rehabilitator fails to justify why the Affected Policyholders should receive
such inferior treatment, and why the Rehabilitator cannot simply settle with the ResCap Debtors
without then seeking to change the treatment of the Affected Policyholders under the
Rehabilitation Plan.  Such inferior treatment could serve no other purpose than the reallocation
of distributable value to enhance the treatment of other FGIC policyholders at the expense of the
Affected Policyholders.

18.    Further, this Court should not be fooled by the Rehabilitator styling the new
treatment of the Affected Policyholders as a "commutation."  The Settlement Agreement is
nothing more than a blatant modification of the terms of the Rehabilitation Plan under a different
name.  The Rehabilitation Plan does not include any provisions allowing for its modification
prior to its effective date and, following the effective date, it may not be altered unless it is
determined by the New York State Department of Financial Services that the modification is
necessary for the fair and equitable treatment of FGIC policyholders.[23]

19.    In addition, although the Rehabilitation Plan contains a broad reservation of rights
for FGIC to resolve policy claims after the effective date of the Rehabilitation Plan in a number
of ways, including by commutation, any such "Alternative Resolution" still must be fair and
equitable to policyholders in general.[24]  As the claims of the Affected Policyholders are projected

---

[23]    Rehabilitation Plan, § 9.3 ("[f]rom and after the Effective Date, only the NYSDFS may modify the Plan
and only to the extent it determines necessary for the fair and equitable treatment of Policyholders in
general; *provided, however,* that the NYSDFS shall obtain prior Court approval for any material
modification.").

[24]    Rehabilitation Plan, § 4.8.

to comprise at least 19% of all FGIC policyholder claims, the notion that the proposed

Settlement Agreement is fair and equitable to policyholders "in general" is inexplicable.[25]

Further, the only commutations which were specifically described in the Rehabilitation Plan or

related disclosures were commutations related to credit default swaps and reinsurance

agreements.  According to the *Disclosure Statement for Plan of Rehabilitation for Financial*

*Guaranty Insurance Company* (the "Disclosure Statement"), such commutation agreements were

consensual, having been negotiated between the Rehabilitator and the applicable counterparty.

No such commutation was previously proposed with respect to any of the policies insuring

residential mortgage backed securities ("**RMBS**"), much less an agreement where a trustee is

attempting to commute a policy without the consent of the underlying trust investors.  Prior to

the Motion, there was no previous disclosure that the Rehabilitator was even contemplating

commutation of RMBS policies.  Nor was there any disclosure that the Rehabilitator would then

seek unwarranted exculpatory findings for the RMBS trustees agreeing to such a tactic.

    20.    Despite these requirements in the Rehabilitation Plan, and the Rehabilitator's

unequivocal statements in its other pleadings regarding the overarching goal of fairness and

equity, the Rehabilitator seeks to provide unequal and unfairly discriminating treatment to the

Affected Policyholders.[26]  Removing the Affected Policyholders from the treatment approved by

---

[25]    In a Base Scenario, total notional claims of policyholders are projected by the Rehabilitator to equal $6.3 billion.  Miller Affidavit, Ex. 1, p. 6.  As discussed above, the projected claims of the Affected Policyholders are $1.19 billion.

[26]    See, e.g., *Memorandum of Law in Support of Plan of Rehabilitation for Financial Guaranty Insurance Company*, dated October 25, 2012, at 11; Omnibus Reply Memorandum of Law in Further Support of Approval of First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, dated December 12, 2012, at 18 ("This [Rehabilitation Plan] structure is intended to provide *equal percentage cash recoveries to all policyholders with allowed policy claims*, whether they arise in the short or long term.") (emphasis added); *Disclosure Statement for the Rehabilitation Plan*, dated September 27, 2012, at 21 ("[c]onsistent with the goal of the Plan, the Rehabilitator developed the Restructured Policy Terms to maximize the extent to which FGIC's Policyholders are treated *in a fair and equitable manner*.") (emphasis added).

this Court as part of the Rehabilitation Plan and giving them lesser treatment provided in the

Settlement Agreement is not only unfair and inequitable, but is arbitrary and unjustified.

Therefore, this Court should deny the Rehabilitator's attempt to commute the FGIC Policies,

with the consent of only a small minority of affected investors that have the incentive to enhance

their other ResCap holdings, and over the objection of the largest group of affected investors that

have voiced an opinion.

          B.      The Trustees Have No Authority to Commute the Policies.

            i.     *The Governing Documents Do Not Provide for a Power to Commute the FGIC Policies.*

      21.     Nowhere in the relevant indentures and pooling and servicing agreements

governing the ResCap Trusts (collectively, the "**Governing Documents**") is there an express

grant of authority to the Trustees to unilaterally commute, without investor consent, the FGIC

Policies — which policies the Trustees hold specifically for the benefit of investors. In fact, the

Governing Documents are silent as to *any* interested party's ability to commute the FGIC

Policies.

      22.     Commutation actually directly contradicts certain provisions of the documents

governing the ResCap Trusts. For instance, certain Governing Documents contain specific

negative covenants restricting the ability of a trust to impair the trust's rights in the relevant

FGIC Policy in a way that materially and adversely affects the interests of the noteholders.[27]

Also, with respect to certain of the ResCap Trusts, the FGIC Policy itself is a part of the *res* of

---

[27]    See, e.g., GMACM 2005-HE1Indenture § 3.09(d) (the trust shall not "impair or cause to be impaired the
Issuer's interest in the Mortgage Loans, the Purchase Agreement or in any other Basic Document [which
includes the FGIC Policy], if any such action would materially and adversely affect the interests of the
Noteholders."); GMACM 2007-HE2 Indenture § 3.09(d) (same); RFMSII 2006-HSA2 Indenture § 3.09(d)
(same).

the trust, and there are specific restrictions in the relevant indentures on terminating the relevant

trust's lien on its property.[28]

23.     Further, the Trustees cannot assert that they can simply amend the terms of the

Governing Documents to provide for a commutation, because the ability of the Trustees to alter

the governing documentation by means of an amendment or entry into a supplemental indenture

is also strictly proscribed.  Although the documents governing the various ResCap Trusts vary in

certain respects, any amendment that would alter the fundamental economic rights of the

investors in such trusts requires the consent of such investors through either a 66% or 100% vote.

For example, the ResCap Trusts that are governed by pooling and servicing agreements typically

provide that such pooling and servicing agreements shall not be amended in a manner that

"adversely affect[s] in any material respect the interests of the Holders of Certificates of any

Class . . . without the consent of Holders of Certificates of such Class evidencing, as to such

Class, Percent Interests aggregating not less than 66%, . . ."[29]  Similarly, the ResCap Trusts that

are governed by indentures typically require the consent of each affected noteholder for any

amendment which reduces the amount of any required payments to such noteholder.[30]

---

[28]    See, e.g., GMACM 2005-HE1 Indenture, Granting Clause & § 9.02(g).

[29]    See, e.g., RAMP 2005 EFC-7 Pooling and Servicing Agreement §11.01(b)(ii) (No amendment to the
Pooling and Servicing Agreement shall "adversely affect in any material respect the interest of the Holders
of Certificates of any Class in a manner . . . without the consent of Holders of Certificates of such Class
evidencing, as to such Class, Percentage Interests aggregating not less than 66%"); RFMSII 2006-HSA1
Pooling and Servicing Agreement §11.01(b)(ii) (same); RASC 2004-KS7 Pooling and Servicing
Agreement §11.01(b)(ii) (same).

[30]    See, e.g., GMACM 2005-HE1 Indenture §§ 5.07 (noteholders " . . . shall have the right, which is absolute
and unconditional, to receive payment of the principal of and interest, if any, on such Note on or after the
respective due dates thereof expressed in such Note or in this Indenture and to institute suit for the
enforcement of any such payment, and such right shall not be impaired without the consent of such
Holder.") & 9.02(a) (Without consent of each affected noteholder the indenture cannot be amended to,
among other things "change the date of payment of any installment of principal of or interest on any Note,
or reduce the principal amount thereof or the Note Rate thereon, change the provisions of this Indenture
relating to the application of collections on, or the proceeds of the sale of, the Trust Estate to payment of

15

24.    These requirements for investor consent are on par with the requirements of the Trust Indenture Act of 1939, 11 U.S.C. §§ 777aaa et seq (the "**TIA**"). The TIA provides that:

> Notwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, *shall not be impaired or affected without the consent of such holder* . . . .

15 U.S.C. § 77ppp(b) (emphasis added).

25.    By agreeing to commute the FGIC Policies, the Trustees are seeking, in contravention of the TIA, to *affect* the rights of investors to receive payments on their securities. Ironically, as was previously argued forcefully by the Trustees in their objections to the Rehabilitation Plan,[31] neither this Court nor the Bankruptcy Court has the power to amend the terms of a third-party contract, such as the Governing Documents. Just as a bankruptcy court should respect a 'no action' clause when certificateholders seek standing before it, this Court should also respect the economic terms, rights and responsibilities of a trustee and consent requirements imposed upon a trustee when a trustee seeks to alter them. See In re Innkeepers USA Trust, 448 B.R. 131, 144-45 (Bankr. S.D.N.Y. 2011) (refusing to "alter the bargained-for terms and risks investors undertook when they bought certificated interests[.]").

---

principal of or interest on the Notes . . .."); GMACM 2007-HE2 Indenture §§ 5.07 & 9.02(a) (same); RFMSII 2006-HSA2 Indenture §§ 5.07 & 9.02(i) (same).

[31]    See, e.g., *Objection to the Proposed Plan of Rehabilitation of Wells Fargo Bank, N.A., in its Capacity as Trustee for Certain RMBS Certificateholders and on Behalf of the Certificateholders and Noteholders for Such Trusts and Transactions*, dated November 19, 2012, p. 5-11 (arguing that the Rehabilitation Plan improperly seeks to amend the terms of the governing documents of trusts to which FGIC is not a party, unsettling the parties' contracted-for expectations); *Objections of the Bank of New York Mellon and the Bank of New York Mellon Trust Company, N.A., as Trustee to the Proposed Plan of Rehabilitation*, Index No. 401265/2012 (Sup. Ct. N.Y. Cnty.), Motion Sequence No. 4, Section I (there is no "provision of the NYIL, or any case, that grants this Court or the Rehabilitator the authority to wholesale re-write contracts which, in many cases, it is not even a party.").

16

ii.    *In the Absence of an Event of Default the Trustees' Powers are Limited.*

26.    Absent an event of default under the Governing Documents, the rights and obligations of the Trustees are explicitly proscribed under the documents and underlying law.

27.    The Governing Documents are subject to the terms of the TIA. See Policemen's Annuity & Benefit Fund of Chicago v. Bank of Am., N.A., No. 12-civ-2865, 2013 U.S. Dist. LEXIS 64499, at *25-26 (S.D.N.Y. May 6, 2013) (pooling and servicing agreements are subject to the TIA as well as indentures). Under the TIA, other than in a default scenario, an indenture trustee's duties are limited to the terms of the governing documents themselves. TIA § 777ooo(a); In re IBJ Schroder Bank & Trust Co., 271 A.D.2d 322, 706 N.Y.S.2d 114, 115 (1st Dep't 2000) (citing United States Trust Co. v. First Nat'l City Bank, 394 N.Y.S.2d 653, 660-61, 57 A.D.2d 285, 295-96 (1st Dep't 1977), aff'd, 45 N.Y.2d 869, 382 N.E.2d 1355, 410 N.Y.S.2d 580 (1978)) ("It is settled that the duties and powers of a trustee are defined by the terms of the trust agreement and are tempered only by the fiduciary obligation of loyalty to the beneficiaries."); Elliott Assoc. v. J. Henry Schroder Bank & Trust Co., 838 F.2d 66, 71 (2d Cir. 1988) (noting that the Second Circuit has consistently declined to ascribe extra duties to a trustee); Meckel v. Continental Resources Co., 758 F.2d 811, 816 (2d Cir. 1985) ("Unlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement"); see also LNC Invs., Inc. v. First Fid. Bank, N.A., 935 F. Supp. 1333, 1347 (S.D.N.Y. 1996) ("The role of an indenture trustee differs from that of an ordinary trustee because . . . its obligations are defined primarily by the indenture rather than by the common law of trusts.") (internal citations omitted).

28.     The Governing Documents themselves are consistent with the TIA, and grant the

Trustees very specific and limited roles in a non-default context, and expressly state that the

duties of the Trustees are limited to the four corners of the documents.[32]   Therefore, if no event

of default has occurred and is continuing under the Governing Documents, then the Trustees

have limited, and primarily ministerial duties and responsibilities.

> iii.     *In an Event of Default Scenario the Trustees Have Heightened Duties*
> *They Have Not Complied With.*

29.     As the Trustees note in pleadings filed elsewhere, following an event of default

under the Governing Documents, the Trustees have heightened fiduciary duties to their

constituents, such as the Investors, both under the terms of the Governing Documents and

applicable law.[33]   Unlike prior to a default, in the post-default setting, a commercial trustee's

duties "come more closely to resemble those of an ordinary fiduciary, regardless of any

limitations or exculpatory provisions contained in the indenture."  BNP Paribas Mortg. Corp. v.

Bank of Am., N.A., 778 F. Supp. 2d 375, 401 (S.D.N.Y. 2011) (quoting Beck v. Mfrs. Hanover

Trust Co., 218 A.D.2d 1, 12, 632 N.Y.S.2d 520, 527 (1st Dep't 1995)).

---

[32]     See, e.g., GMACM 2005-HE1 Indenture § 6.01(b)(1) (" . . . the Indenture Trustee undertakes to perform
such duties and only such duties as are specifically set forth in this Indenture . . ."); GMACM 2007-HE2
Indenture § 6.01(b)(1) (same); RFMSII 2006-HSA2 Indenture§ 6.01(b)(1) (same); RAMP 2005 EFC-7
Pooling and Servicing Agreement § 8.01(a) ("The Trustee, prior to the occurrence of an Event of Default
and after the curing of all Events of Default which may have occurred, undertakes to perform such duties
and only such duties as are specifically set forth in this Agreement."); RFMSII 2006-HSA1 Pooling and
Servicing Agreement § 8.01(a) (same); RASC 2004-KS7 Pooling and Servicing Agreement § 8.01(a)
(same) (Exhibits H through M of the Affirmation).

[33]     *Joinder of Certain RMBS Trustees to the Debtors' Motion for an Order Under Bankruptcy Code Sections*
*105(a) and (363)(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement*
*with Ally Financial Inc., the Creditors' Committee, and Certain Consenting Claimants,* ¶¶ 15-16 [Docket
No. 3940]; see also, GMACM 2005-HE1 Indenture § 6.01; GMACM 2007-HE2 Indenture § 6.01; RFMSII
2006-HSA2 Indenture § 6.01; RAMP 2005 EFC-7 Pooling and Servicing Agreement § 8.01(a); RFMSII
2006-HSA1 Pooling and Servicing Agreement § 8.01(a); RASC 2004-KS7 Pooling and Servicing
Agreement § 8.01(a).

30.    Further, following an event of default, the Governing Documents typically provide for additional powers for the Trustee, such as the power to institute legal proceedings to enforce the rights of noteholders.[34]  However, such additional powers must be provided for in the Governing Documents. See Beck, 632 N.Y.2d at 528 ("[t]he trustee must in the post-default context act prudently, but only in the exercise of those rights and powers granted in the indenture. The scope of the trustee's obligation then is still circumscribed by the indenture, albeit less narrowly."). An event of default does not give rise to unfettered power on the part of the Trustees, and nowhere in the Governing Documents, in a default or non-default scenario, are the Trustees granted the power and authority to commute the FGIC Policies. Further, even if such powers had been granted by the Governing Documents in a default scenario, the Trustees have not lived up to the heightened duties owed to their constituents by agreeing to bargain away the FGIC Policies for much less than their projected value. As the Trustees have not been granted the power to commute the FGIC Policies under the Governing Documents, the Settlement Agreement is invalid and cannot be approved.

C.    This Court Should Not Make Certain Factual
       Findings Requested by the Rehabilitator for the Benefit of the Trustees.

31.    Not only is the Rehabilitator seeking to treat the Affected Policyholders inequitably, but he is also inappropriately requesting that this Court's order approving the Settlement Agreement contain exculpatory findings to protect the Trustees from liability stemming from their improperly agreeing to the Settlement Agreement. More specifically, the Rehabilitator requests that this Court make factual findings that (i) the Settlement Agreement is

---

[34]    See e.g., GMACM 2005-HE1 Indenture § 5.04(a)(i); GMACM 2007-HE2 Indenture § 5.04(a)(i); RFMSII 2006-HSA2 Indenture § 5.04(a)(i); RAMP 2005 EFC-7 Pooling and Servicing Agreement § 5.04(a)(i); RFMSII 2006-HSA1 Pooling and Servicing Agreement § 8.01(a); RASC 2004-KS7 Pooling and Servicing Agreement § 8.01(a).

"in the best interests of FGIC's policyholders and other claimants;" and (ii) the Trustees "have

acted reasonably and in good faith in entering into the Settlement Agreement, and the Trustees

have not acted negligently in performing their duties in respect of the Settlement Agreement."[35]

With the Trustees' freelancing in plain view, the Rehabilitator requests these findings for the

Trustees without putting forward any factual basis for them. The Investors believe no valid basis

exists to support the findings, particularly given the discussion above regarding (i) the

discrimination among FGIC policyholders, (ii) the lack of authority to commute the FGIC

Policies, and (iii) the Trustees' agreement to take from one group of their constituents for the

benefit of another group, particularly relevant here, as an indenture trustee has a duty to avoid

conflicts of interests in its actions. Dabney v. Chase Nat'l Bank, 196 F.2d 668, 669-71 (2d Cir.

1952)).

32.    Therefore, even if this Court *were* to approve the discriminatory treatment

proposed by the Rehabilitator, the Court should not include these factually inaccurate findings in

the Proposed Order. The Investors should not be impaired by findings in this Court from seeking

recourse against the Trustees in an appropriate forum for willfully ignoring their contractual,

statutory and common-law duties, including their knowing violation of the terms of the

Governing Documents in agreeing to the Settlement Agreement. The inappropriateness of the

prophylactic "findings" is further reinforced by the extremely limited discovery in the

---

[35]    Proposed Order ¶¶ a & b. In a July 9, 2013 letter to this Court (the "**July 9th Letter**"), counsel for the
Rehabilitator stated that "the issues before the Bankruptcy Court are not the same as those before this Court
on the Motion" because the Settlement Agreement does not expressly require the Proposed Order to include
specific factual findings. However, this view ignores the fact that Section 1.11 of the Settlement
Agreement requires that this Court approve the Settlement Agreement pursuant to an order substantially in
the form of the Proposed Order, which was attached to the Settlement Agreement. Such Proposed Order
contains the unwarranted findings discussed herein. Therefore, either the Rehabilitator is not aware of what
was agreed to as part of the Settlement Agreement, or is deliberately misleading this Court.

Bankruptcy Court afforded the Investors, which has not as of yet been authorized for use in this Court.

D.    Standing of Investors to Object.

33.    If the Rehabilitator or the Trustees seek to argue that the Investors have no standing to object to the Motion (as the Rehabilitator suggested in its July 9th Letter) such arguments should be disregarded.  The Rehabilitator specifically invited dissenting investors to object to the Motion, and expressly asserted and acknowledged that such opportunity to be heard was an attempt to ensure that the Settlement Agreement will be binding on such investors, and procedures for objections by investors were explicitly provided for by order of this Court.[36] Further, the Rehabilitator specifically requests that this Court order that the Settlement Agreement be binding on the Investors.[37]  To now whipsaw the Investors by asserting they have no standing to object, when the Rehabilitator is specifically seeking to bind the Investors, is outlandish to say the least.

---

[36]    Holtzer Affirmation ¶ 29 ("Giving all Investors notice and an opportunity to be heard at the Hearing . . . ensures that the Settlement Agreement . . . will bind any Investors . . ."); see also *Order to Show Cause*, dated May 30, 2013 ¶ 1 (Providing procedures for investors to object to the Motion).

[37]    Proposed Order ¶ 4.

## CONCLUSION

34.    Wherefore, the Investors respectfully request that this Court deny the Motion and

grant such further relief as this Court deems appropriate.

Dated: New York, New York
          July 16, 2013

>  WILLKIE FARR & GALLAGHER LLP
>  Attorneys for Monarch Alternative Capital LP,
>  Stonehill Capital Management LLC and Bayview
>  Fund Management LLC, each in its capacity as
>  investment advisor to certain funds, and for CQS
>  ABS Master Fund Limited and CQS ABS Alpha
>  Master Fund Limited
>
>  By:  _____
>         Marc Abrams
>         Joseph T. Baio
>         Mary Eaton
>         Paul Shalhoub
>
>  787 Seventh Avenue
>  New York, New York  10019
>  (212) 728-8000

22