# <u>EXHIBIT F</u>

EX-4 4 hsa2ind.htm EX 4.5

EXECUTION COPY

HOME EQUITY LOAN TRUST 2006-HSA2

Issuer

AND

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION.

Indenture Trustee

INDENTURE

Dated as of February 24, 2006

---

HOME EQUITY LOAN-BACKED TERM NOTES

HOME EQUITY LOAN-BACKED VARIABLE FUNDING NOTES

---

RECONCILIATION AND TIE BETWEEN TRUST INDENTURE
ACT OF 1939 AND INDENTURE PROVISIONS*

| Trust Indenture Act Section | Indenture Section |
|---|---|
| 310(a)(1) | 6.11 |
| (a)(2) | 6.11 |
| (a)(3) | 6.10 |
| (a)(4) | Not Applicable |
| (a)(5) | 6.11 |
| (b) | 6.08, 6.11 |
| (c) | Not Applicable |
| 311(a) | 6.12 |
| (b) | 6.12 |
| (c) | Not Applicable |
| 312(a) | 7.01, 7.02(a) |
| (b) | 7.02(b) |
| (c) | 7.02(c) |
| 313(a) | 7.04 |
| (b) | 7.04 |
| (c) | 7.03(a)(iii), 7.04 |
| (d) | 7.04 |
| 314(a) | 3.10, 7.03(a) |
| (b) | 3.07 |
| (c)(1) | 8.05(c), 10.01(a) |
| (c)(2) | 8.05(c), 10.01(a) |
| (c)(3) | Not Applicable |
| (d)(1) | 8.05(c), 10.01(b) |
| (d)(2) | 8.05(c), 10.01(b) |
| (d)(3) | 8.05(c), 10.01(b) |
| (e) | 10.01(a) |
| 315(a) | 6.01(b) |
| (b) | 6.05 |
| (c) | 6.01(a) |

```
(d)..............................................  6.01(c)
(d)(1)...........................................  6.01(c)
(d)(2)...........................................  6.01(c)
(d)(3)...........................................  6.01(c)
(e)..............................................  5.13
316(a)(1)(A).....................................  5.11
316(a)(1)(B).....................................  5.12
316(a)(2)........................................  Not Applicable
316(b)...........................................  5.07
317(a)(1)........................................  5.04
317(a)(2)........................................  5.03(d)
317(b)...........................................  3.03(a)
318(a)...........................................  10.07
```

*This reconciliation and tie shall not, for any purpose, be deemed to be part of the within indenture.

---

TABLE OF CONTENTS

                                                                                PAGE

ARTICLE I          Definitions....................................................2

          Section 1.01.    Definitions..........................................2

          Section 1.02.    Incorporation by Reference of Trust Indenture Act....2

          Section 1.03.    Rules of Construction................................2

ARTICLE II         Original Issuance of Notes...................................3

          Section 2.01.    Form.................................................3

          Section 2.02.    Execution, Authentication and Delivery...............3

ARTICLE III        Covenants....................................................4

          Section 3.01.    Collection of Payments with Respect to the Home Equity Loans.......4

          Section 3.02.    Maintenance of Office or Agency......................4

          Section 3.03.    Money for Payments to Be Held in Trust; Paying Agent..............4

          Section 3.04.    Existence............................................6

          Section 3.05.    Payment of Principal and Interest; Defaulted Interest.............6

          Section 3.06.    Protection of Trust Estate..........................11

          Section 3.07.    Opinions as to Trust Estate.........................12

          Section 3.08.    Performance of Obligations; Servicing Agreement.....12

          Section 3.09.    Negative Covenants..................................13

          Section 3.10.    Annual Statement as to Compliance...................13

          Section 3.11.    Recording of Assignments............................14

          Section 3.12.    Representations and Warranties Concerning the Home Equity Loans...14

          Section 3.13.    Assignee of Record of the Home Equity Loans.........14

          Section 3.14.    Master Servicer as Agent and Bailee of the Indenture Trustee......14

          Section 3.15.    Investment Company Act..............................14

          Section 3.16.    Issuer May Consolidate, etc.........................15

          Section 3.17.    Successor or Transferee.............................16

          Section 3.18.    No Other Business...................................16

Section 3.19.    No Borrowing..............................................................16

Section 3.20.    Guarantees, Loans, Advances and Other Liabilities.................16

Section 3.21.    Capital Expenditures........................................................17

Section 3.22.    Owner Trustee Not Liable for Certificates or Related Documents....17

Section 3.23.    Restricted Payments........................................................17

Section 3.24.    Notice of Events of Default................................................17

Section 3.25.    Further Instruments and Act................................................17

Section 3.26.    Statements to Noteholders.................................................17

Section 3.27.    Determination of Note Rates...............................................18

Section 3.28.    Payments under the Policy.................................................18

Section 3.29.    Additional Representations of the Issuer.............................19

ARTICLE IV       The Notes; Satisfaction and Discharge of Indenture......................20

Section 4.01.    The Notes; Increase of Maximum Variable Funding Balance; Variable
Funding          Notes...............................................................................20

Section 4.02.    Registration of and Limitations on Transfer and Exchange of Notes;
                 Appointment of Certificate Registrar...............................................21

Section 4.03.    Mutilated, Destroyed, Lost or Stolen Notes........................24

Section 4.04.    Persons Deemed Owners......................................................25

Section 4.05.    Cancellation....................................................................25

Section 4.06.    Book-Entry Notes.............................................................25

Section 4.07.    Notices to Depository........................................................26

Section 4.08.    Definitive Notes...............................................................26

Section 4.09.    Tax Treatment...................................................................27

Section 4.10.    Satisfaction and Discharge of Indenture............................27

Section 4.11.    Application of Trust Money.................................................28

Section 4.12.    Subrogation and Cooperation.............................................29

Section 4.13.    Repayment of Monies Held by Paying Agent.........................29

Section 4.14.    Temporary Notes..............................................................30

ARTICLE V        Default and Remedies.........................................................30

Section 5.01.    Events of Default.............................................................30

Section 5.02.    Acceleration of Maturity; Rescission and Annulment...............30

Section 5.03.    Collection of Indebtedness and Suits for Enforcement by Indenture
                 Trustee ...........................................................................31

Section 5.04.    Remedies; Priorities..........................................................33

Section 5.05.    Optional Preservation of the Trust Estate.........................35

Section 5.06.    Limitation of Suits............................................................35

Section 5.07.    Unconditional Rights of Noteholders to Receive Principal and
                 Interest ...........................................................................36

Section 5.08.    Restoration of Rights and Remedies...................................36

Section 5.09.    Rights and Remedies Cumulative.......................................36

Section 5.10.    Delay or Omission Not a Waiver........................................36

Section 5.11.    Control by the Credit Enhancer or Noteholders....................37

Section 5.12.    Waiver of Past Default...........................................37

Section 5.13.    Undertaking for Costs...........................................37

Section 5.14.    Waiver of Stay or Extension Laws................................38

Section 5.15.    Sale of Trust Estate............................................38

Section 5.16.    Action on Notes.................................................40

Section 5.17.    Performance and Enforcement of Certain Obligations..............40

ARTICLE VI       The Indenture Trustee...........................................41

Section 6.01.    Duties of Indenture Trustee.....................................41

Section 6.02.    Rights of Indenture Trustee.....................................42

Section 6.03.    Individual Rights of Indenture Trustee..........................42

Section 6.04.    Indenture Trustee's Disclaimer..................................42

Section 6.05.    Notice of Event of Default......................................42

Section 6.06.    Reports by Indenture Trustee to Holders.........................43

Section 6.07.    Compensation and Indemnity......................................43

Section 6.08.    Replacement of Indenture Trustee................................43

Section 6.09.    Successor Indenture Trustee by Merger...........................44

Section 6.10.    Appointment of Co-Indenture Trustee or Separate Indenture Trustee.45

Section 6.11.    Eligibility; Disqualification...................................46

Section 6.12.    Preferential Collection of Claims Against Issuer................47

Section 6.13.    Representations and Warranties..................................47

Section 6.14.    Directions to Indenture Trustee.................................47

Section 6.15.    Indenture Trustee May Own Securities............................48

ARTICLE VII      Noteholders' Lists and Reports..................................48

Section 7.01.    Issuer to Furnish Indenture Trustee Names and Addresses of
                 Noteholders ...................................................48

Section 7.02.    Preservation of Information; Communications to Noteholders.......48

Section 7.03.    Reports by Issuer...............................................48

Section 7.04.    Reports by Indenture Trustee....................................49

Section 7.05.    Exchange Act Reporting..........................................49

ARTICLE VIII     Accounts, Disbursements and Releases............................49

Section 8.01.    Collection of Money.............................................49

Section 8.02.    Trust Accounts..................................................49

Section 8.03.    Officer's Certificate...........................................50

Section 8.04.    Termination Upon Distribution to Noteholders....................50

Section 8.05.    Release of Trust Estate.........................................50

Section 8.06.    Surrender of Notes Upon Final Payment...........................51

ARTICLE IX       SUPPLEMENTAL INDENTURES.........................................51

Section 9.01.    Supplemental Indentures Without Consent of Noteholders...........51

Section 9.02.    Supplemental Indentures With Consent of Noteholders.............52

Section 9.03.    Execution of Supplemental Indentures............................54

Section 9.04.    Effect of Supplemental Indenture................................54

Section 9.05.    Conformity with Trust Indenture Act..............................54

Section 9.06.    Reference in Notes to Supplemental Indentures....................54

ARTICLE X          MISCELLANEOUS............................................................54

Section 10.01.    Compliance Certificates and Opinions, etc........................54

Section 10.02.    Form of Documents Delivered to Indenture Trustee.................56

Section 10.03.    Acts of Noteholders..............................................57

Section 10.04.    Notices, etc., to Indenture Trustee, Issuer, Credit Enhancer and Rating
                  Agencies.........................................................57

Section 10.05.    Notices to Noteholders; Waiver...................................58

Section 10.06.    Alternate Payment and Notice Provisions..........................59

Section 10.07.    Conflict with Trust Indenture Act................................59

Section 10.08.    Effect of Headings...............................................59

Section 10.09.    Successors and Assigns...........................................59

Section 10.10.    Separability.....................................................59

Section 10.11.    Benefits of Indenture............................................59

Section 10.12.    Legal Holidays...................................................59

Section 10.13.    GOVERNING LAW....................................................60

Section 10.14.    Counterparts.....................................................60

Section 10.15.    Recording of Indenture...........................................60

Section 10.16.    Issuer Obligation................................................60

Section 10.17.    No Petition......................................................60

Section 10.18.    Inspection.......................................................60

ARTICLE XI         REMIC Provisions.....................................................61

Section 11.01.    REMIC Administration.............................................61

Section 11.02.    Servicer, REMIC Administrator and Indenture Trustee
                  Indemnification .................................................65

Section 11.03.    Designation of REMIC(s)..........................................65


EXHIBIT

Exhibit A-1  ..Form of Class I Notes, Form of Class A-II Notes                A-1
Exhibit A-2 ...Form of Variable Funding Notes                                A-2
Exhibit B .....Form of Rule 144A Investment Representation                   B-1
Exhibit C .....Form of Investor Representation Letter                        C-1
Exhibit D .....Form of Transferor Representation Letter                      D-1

---

This Indenture, dated as of February 24, 2006, between HOME EQUITY LOAN TRUST 2006-HSA2, a Delaware statutory trust, as Issuer (the "Issuer"), and JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, as Indenture Trustee (the "Indenture Trustee"),

WITNESSETH THAT:

Each party hereto agrees as follows for the benefit of the other party and for the equal and

ratable benefit of the Holders of the Issuer's 2006-HSA2 Home Equity Loan-Backed Term Notes and Home
Equity Loan-Backed Variable Funding Notes (together, the "Notes").

## GRANTING CLAUSE

        The Issuer hereby Grants to the Indenture Trustee at the Closing Date, as trustee for the
benefit of the Holders of the Notes, all of the Issuer's right, title and interest in and to the Home Equity
Loans and to all accounts, chattel paper, general intangibles, payment intangibles, contract rights,
certificates of deposit, deposit accounts, instruments, documents, letters of credit, money, advices of
credit, investment property, goods and other property consisting of, arising under or related to whether now
existing or hereafter created in (a) the Home Equity Loans, (b) the Payment Account, all funds on deposit in
or credited thereto from time to time and all proceeds thereof and (c) all present and future claims, demands,
causes and choses in action in respect of any or all of the foregoing and all payments on or under, and all
proceeds of every kind and nature whatsoever in respect of, any or all of the foregoing and all payments on
or under, and all proceeds of every kind and nature whatsoever in the conversion thereof, voluntary or
involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes,
drafts, acceptances, checks, deposit accounts, rights to payment of any and every kind, and other forms of
obligations and receivables, instruments and other property which at any time constitute all or part of or
are included in the proceeds of any of the foregoing (collectively, the "Trust Estate" or the "Collateral").

        The foregoing Grant is made in trust to secure the payment of principal of and interest on, and
any other amounts owing in respect of, the Notes, equally and ratably without prejudice, priority or
distinction, and to secure compliance with the provisions of this Indenture, all as provided in this
Indenture.

        The foregoing Grant shall inure to the benefit of the Credit Enhancer in respect of draws made
on the Group I Policy and Group II Policy and amounts owing to the Credit Enhancer from time to time pursuant
to the Insurance Agreement and payable to the Credit Enhancer pursuant to this Indenture, and such Grant
shall continue in full force and effect for the benefit of the Credit Enhancer until all such amounts owing
to it have been repaid in full.

        The Indenture Trustee, as trustee on behalf of the Holders of the Notes, (i) acknowledges such
Grant, (ii) accepts the trust under this Indenture in accordance with the provisions hereof, (iii) agrees to
perform its duties as Indenture Trustee as required herein and (iv) acknowledges receipt of the Group I
Policy and the Group II Policy and shall hold such Policies in accordance with the terms of this Indenture
for the benefit of the Holders of the Class I Notes and Class II Notes.

ARTICLE I

## Definitions

Section 1.01. Definitions. For all purposes of this Indenture, except as otherwise expressly provided herein
or unless the context otherwise requires, capitalized terms not otherwise defined herein shall have the
meanings assigned to such terms in the Definitions attached hereto as Appendix A which is incorporated by
reference herein. All other capitalized terms used herein shall have the meanings specified

herein.

Section 1.02.  Incorporation  by  Reference  of  Trust  Indenture  Act.  Whenever  this  Indenture
refers  to a
provision of the Trust  Indenture  Act (the "TIA"),  the provision is  incorporated  by reference
in and made a
part of this Indenture.   The following TIA terms used in this Indenture have the following
meanings:

> "Commission" means the Securities and Exchange Commission.

> "indenture securities" means the Notes.

> "indenture security holder" means a Noteholder.

> "indenture to be qualified" means this Indenture.

> "indenture trustee" or "institutional trustee" means the Indenture Trustee.

> "obligor" on the  indenture  securities  means the Issuer and any other obligor on
the indenture
> securities.

> All  other  TIA  terms  used in this  Indenture  that are  defined  by the TIA,
defined  by TIA
> reference to another  statute or defined by Commission  rule have the meaning  assigned
to them by such
> definitions.

Section 1.03.  Rules of Construction.  Unless the context otherwise requires:

(i)     a term has the meaning assigned to it;

(ii)    an accounting  term not otherwise  defined has the meaning  assigned to it in accordance
with generally
accepted accounting principles as in effect from time to time;

(iii)   "or" is not exclusive;

(iv)    "including" means including without limitation;

(v)     words in the singular include the plural and words in the plural include the singular;
and

(vi)    any agreement,  instrument or statute defined or referred to herein or in any instrument
or certificate
delivered in  connection  herewith  means such  agreement,  instrument or statute as from time to
time amended,
modified  or  supplemented  and  includes  (in  the  case  of  agreements  or  instruments)
references  to all
attachments  thereto and  instruments  incorporated  therein;  references to a Person are also to
its permitted
successors  and assigns.

---

ARTICLE II

Original Issuance of Notes

Section 2.01.  Form. The Term Notes and the Variable  Funding  Notes,  in each case together with
the Indenture
Trustee's  certificate of  authentication,  shall be in  substantially  the forms set forth in
Exhibits A-1 and
A-2,  respectively,  with such appropriate  insertions,  omissions,  substitutions  and other
variations as are
required or permitted by this  Indenture  and may have such letters,  numbers or other marks of
identification
and such legends or endorsements placed thereon as may,  consistently  herewith,  be determined
by the officers
executing such Notes,  as evidenced by their  execution of the Notes.  Any portion of the text
of any Note may
be set forth on the reverse thereof, with an appropriate reference thereto on the face of the
Note.

The Notes shall be  typewritten,  printed,  lithographed  or engraved or produced by any
combination of

these methods (with or without steel embossed borders), all as determined by the Authorized Officers
executing such Notes, as evidenced by their execution of such Notes.

The terms of the Notes set forth in Exhibits A-1 and A-2 are part of the terms of this Indenture.

Section 2.02. Execution, Authentication and Delivery. The Notes shall be executed on behalf of the Issuer by
any of its Authorized Officers. The signature of any such Authorized Officer on the Notes may be manual or
facsimile.

Notes bearing the manual or facsimile signature of individuals who were at any time Authorized
Officers of the Issuer shall bind the Issuer, notwithstanding that such individuals or any of them have
ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such
offices at the date of such Notes.

The Indenture Trustee shall upon Issuer Request authenticate and deliver Term Notes for original issue
in an aggregate initial principal amount of $447,900,000 and Variable Funding Notes for original issue in an
aggregate initial principal amount of $0. The Security Balance of the Variable Funding Notes in the
aggregate may not exceed the Maximum Variable Funding Balance.

Each Note shall be dated the date of its authentication. The Notes shall be issuable as registered
Notes and the Class I Notes, and the Class A-II Notes shall be issuable in the minimum initial Security
Balances of $100,000 and in integral multiples of $1 in excess thereof.

Each Variable Funding Note shall be initially issued with a Security Balance of $0 or, if applicable,
with a Security Balance in the amount equal to the Additional Balance Differential for the Collection Period
related to the Payment Date following the date of issuance of such Variable Funding Note pursuant to Section
4.01(b).

No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any
purpose, unless there appears on such Note a certificate of authentication substantially in the form provided
for herein executed by the Indenture Trustee by the manual signature of one of its authorized signatories,
and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has
been duly authenticated and delivered hereunder.

ARTICLE III

Covenants

Section 3.01. Collection of Payments with Respect to the Home Equity Loans. The Indenture Trustee shall
establish and maintain with itself the Payment Account in which the Indenture Trustee shall, subject to the
terms of this paragraph, deposit, on the same day as it is received from the Master Servicer, each remittance
received by the Indenture Trustee with respect to the Home Equity Loans. The Indenture Trustee shall make
all payments of principal of and interest on the Notes, subject to Section 3.03, as provided in Section 3.05
herein from monies on deposit in the Payment Account.

Section 3.02. Maintenance of Office or Agency. The Issuer will maintain in the City of New York, an office
or agency where, subject to satisfaction of conditions set forth herein, Notes may be surrendered for
registration of transfer or exchange, and where notices and demands to or upon the Issuer in respect of the

Notes and this Indenture may be served. The Issuer hereby initially appoints the Indenture Trustee to serve
as its agent for the foregoing purposes. If at any time the Issuer shall fail to maintain any such office or
agency or shall fail to furnish the Indenture Trustee with the address thereof, such surrenders, notices and
demands may be made or served at the Corporate Trust Office, and the Issuer hereby appoints the Indenture
Trustee as its agent to receive all such surrenders, notices and demands.

Section 3.03. Money for Payments to Be Held in Trust; Paying Agent. (a) As provided in Section 3.01, all
payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from
the Payment Account pursuant to Section 3.01 shall be made on behalf of the Issuer by the Indenture Trustee
or by the Paying Agent, and no amounts so withdrawn from the Payment Account for payments of Notes shall be
paid over to the Issuer except as provided in this Section 3.03.

The Issuer will cause each Paying Agent other than the Indenture Trustee to execute and deliver to the
Indenture Trustee an instrument in which such Paying Agent shall agree with the Indenture Trustee (and if the
Indenture Trustee acts as Paying Agent, it hereby so agrees), subject to the provisions of this Section 3.03,
that such Paying Agent will:

(i) hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the
benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed
of as herein provided and pay such sums to such Persons as herein provided;

(ii) give the Indenture Trustee and the Credit Enhancer written notice of any default by the Issuer of
which it has actual knowledge in the making of any payment required to be made with respect to the Notes;

(iii) at any time during the continuance of any such default, upon the written request of the Indenture
Trustee, forthwith pay to the Indenture Trustee all sums so held in trust by such Paying Agent;

(iv) immediately resign as Paying Agent and forthwith pay to the Indenture Trustee all sums held by it in
trust for the payment of Notes, if at any time it ceases to meet the standards required to be met by a Paying
Agent at the time of its appointment;

(v) comply with all requirements of the Code with respect to the withholding from any payments made by it
on any Notes of any applicable withholding taxes imposed thereon and with respect to any applicable reporting
requirements in connection therewith; and

(vi) deliver to the Indenture Trustee a copy of the report to Noteholders prepared with respect to each
Payment Date by the Master Servicer pursuant to Section 4.01 of the Servicing Agreement.

The Issuer may at any time, for the purpose of obtaining the satisfaction and discharge of this
Indenture or for any other purpose, by Issuer Request direct any Paying Agent to pay to the Indenture Trustee
all sums held in trust by such Paying Agent, such sums to be held by the Indenture Trustee upon the same
trusts as those upon which the sums were held by such Paying Agent; and upon such payment by any Paying Agent
to the Indenture Trustee, such Paying Agent shall be released from all further liability with respect to such
money.

Subject to applicable laws with respect to escheat of funds, any money held by the Indenture Trustee
or any Paying Agent in trust for the payment of any amount due with respect to any Note and remaining
unclaimed for one year after such amount has become due and payable shall be discharged from such trust and
be paid to the Issuer on Issuer Request; and the Holder of such Note shall thereafter, as an unsecured
general creditor, look only to the Issuer for payment thereof (but only to the extent of the amounts so paid

to the Issuer), and all liability of the Indenture Trustee or such Paying Agent with respect to such trust
money shall thereupon cease; provided, however, that the Indenture Trustee or such Paying Agent, before being
required to make any such repayment, shall at the expense and direction of the Issuer cause to be published
once, in an Authorized Newspaper, notice that such money remains unclaimed and that, after a date specified
therein, which shall be not less than 30 days from the date of such publication, any unclaimed balance of
such money then remaining will be repaid to the Issuer. The Indenture Trustee may also adopt and employ, at
the expense and direction of the Issuer, any other reasonable means of notification of such repayment
(including, but not limited to, mailing notice of such repayment to Holders whose Notes have been called but
have not been surrendered for redemption or whose right to or interest in monies due and payable but not
claimed is determinable from the records of the Indenture Trustee or of any Paying Agent, at the last address
of record for each such Holder).

Section 3.04. Existence. The Issuer will keep in full effect its existence, rights and franchises as a
statutory trust under the laws of the State of Delaware (unless it becomes, or any successor Issuer hereunder
is or becomes, organized under the laws of any other state or of the United States of America, in which case
the Issuer will keep in full effect its existence, rights and franchises under the laws of such other
jurisdiction) and will obtain and preserve its qualification to do business in each jurisdiction in which
such qualification is or shall be necessary to protect the validity and enforceability of this Indenture, the
Notes, the Home Equity Loans and each other instrument or agreement included in the Trust Estate.

Section 3.05. Payment of Principal and Interest; Defaulted Interest. (a)(I) On each Payment Date from
amounts on deposit in the Payment Account with respect to the Group I Loans (other than amounts deposited in
the nature of prepayment charges), the Paying Agent shall pay to the Class I Noteholders, the Certificate
Paying Agent, on behalf of the Certificateholders, and to other Persons the amounts to which they are
entitled, as set forth in the statements delivered to the Indenture Trustee pursuant to Section 4.01 of the
Servicing Agreement, and to the Class SB-I Certificateholders, amounts in the nature of prepayment charges,
as set forth below in the following order of priority:

(i)     first, to the Class I Noteholders, on a pro rata basis in accordance with their respective Interest
Distribution Amounts, the Interest Distribution Amount for each Class of the Class I Notes for such Payment
Date;

(ii)    second, to the Class I Noteholders, as principal on the Class I Notes, the Principal Collection
Distribution Amount for such Payment Date to be allocated to the Class I Notes as described in Section
3.05(b)(i) below, until the Security Balances thereof have been reduced to zero;

(iii)   third, to the Class I Noteholders, as principal on the Class I Notes, the Liquidation Loss
Distribution Amount with respect to the Group I Loans for such Payment Date to be allocated to the Class I
Notes as described in Section 3.05(b)(i) below, until the Security Balances thereof have been reduced to zero;

(iv)    fourth, to the Credit Enhancer, the amount of the premium for the Group I Policy and any previously
unpaid premiums for the Group I Policy, with interest thereon as provided in the Insurance Agreement;

(v)     fifth, to the Credit Enhancer, to reimburse it for prior draws made on the Group I Policy with
interest thereon as provided in the Insurance Agreement;

(vi)    sixth, to the Class I Noteholders, as principal on the Class I Notes, the Group I Overcollateralization
Increase Amount, if any, for such Payment Date to be allocated to the

Class I Notes as
described in Section 3.05(b)(i) below, until the Security Balances thereof have been reduced to zero;

(vii)    seventh, to the Credit Enhancer, any other amounts owed to the Credit Enhancer pursuant to the
Insurance Agreement and related to the Class I Notes;

(viii)   eighth, to the Class I Noteholders, any Prepayment Interest Shortfalls for such Payment Date allocated
to the Class I Noteholders as described in Section 3.05(b)(ii) below, and any Prepayment Interest Shortfalls
allocated to the Class I Notes on any previous Payment Date and not previously paid, plus interest on any
previously unpaid amount from the date the shortfall was allocated at the applicable Note Rate (as adjusted
from time to time), on a pro rata basis in accordance with their respective amounts of Prepayment Interest
Shortfalls allocated thereto and remaining unpaid;

(ix)    ninth, to the Class I Noteholders, their respective amounts of Group I Net WAC Cap Shortfalls for such
Payment Date, if any, and respective amounts of Group I Net WAC Cap Shortfalls for any previous Payment Date
and not previously paid, if any, plus interest on any previously unpaid amount from the date of the shortfall
at the applicable Note Rate (as adjusted from time to time), on a pro rata basis in accordance with their
respective amounts of Group I Net WAC Cap Shortfalls remaining unpaid;

(x)    tenth, to the Class I Noteholders, any Relief Act Shortfalls with respect to the Group I Loans
incurred during the related Collection Period allocated to the Class I Noteholders as described in Section
3.05(b)(ii) below, on a pro rata basis in accordance with the respective amounts of Relief Act Shortfalls so
allocated; and

(xi)    eleventh, any remaining amount (other than amounts in the nature of prepayment charges) to the
Certificate Paying Agent on behalf of the holders of the Group I Certificates and any amounts in the nature
of prepayment charges to the Certificate Paying Agent, on behalf of the holders of the Class SB-I
Certificates and the REMIC II Regular Interests SB-PO and SB-IO;

provided, however, in the event that on a Payment Date a Credit Enhancer Default shall have occurred and be
continuing, then the priorities of distributions described above will be adjusted such that payments of any
amounts to be paid to the Credit Enhancer (x) pursuant to clauses 3.05(a)(I) (iv) and (vii) will not be paid
until the full amount of interest and principal in accordance with clauses 3.05(a)(I) (i) through (iii), (vi)
and (viii) through (x) that are due and required to be paid on such Payment Date have been paid and (y)
pursuant to clause 3.05(a)(I) (v) will not be paid until the full amount of interest and principal in
accordance with clauses 3.05(a)(I) (i) through (iii) and (vi) that are due and required to be paid on such
Payment Date have been paid. For purposes of the foregoing, required payments of principal on the Class I
Notes on each Payment Date pursuant to clause 3.05(a)(I)(iii) above will include the pro rata portion
allocable to the Class I Notes of all Liquidation Loss Amounts for such Payment Date and for all previous
Collection Periods until paid or covered in full, to the extent not otherwise covered by a Liquidation Loss
Distribution Amount with respect to the Class I Notes, a reduction of the Group I Overcollateralization
Amount on such Payment Date or a draw on the Group I Policy (up to the outstanding Security Balance thereof).

On the Final Scheduled Payment Date or other final Payment Date for the Class I Notes, the amount to
be paid pursuant to clause (ii) above shall be equal to the Security Balances of the Class I Notes
immediately prior to such Payment Date. Notwithstanding anything herein to the contrary, if the final
Payment Date is a date on which the Master Servicer has exercised its right to purchase all of the Group I

Loans pursuant to Section 8.08 of the Servicing Agreement, the priorities set forth in clauses (i) through
(vi) above shall be disregarded, and amounts on deposit in the Payment Account with respect to the Group I
Loans will be applied first, to pay the Interest Distribution Amount for the Class I Notes, on a pro rata
basis in accordance with their respective Interest Distribution Amounts; second, to pay principal on the
Class I Notes on a pro rata basis in accordance with their respective Security Balances, until the Security
Balances thereof have been reduced to zero and then in accordance with the priorities set forth in clauses
(iv) through (xii) above.

(II) On each Payment Date from amounts on deposit in the Payment Account with respect to Group II
Loans (other than amounts deposited in the nature of prepayment charges), the Paying Agent shall pay to the
Class II Noteholders, the Certificate Paying Agent, on behalf of the Certificateholders, and to other Persons
the amounts to which they are entitled, as set forth in the statements delivered to the Indenture Trustee
pursuant to Section 4.01 of the Servicing Agreement, and to the Class SB-II Certificateholders, amounts in
the nature of prepayment charges, as set forth below in the following order of priority:

(i) first, to the Class A-II Noteholders and the Variable Funding Noteholders, the Interest Distribution
Amount for the Class A-II Notes and the Variable Funding Notes for such Payment Date, on a pro rata basis in
accordance with their respective Interest Distribution Amounts;

(ii) second, to the Class A-II Noteholders and the Variable Funding Noteholders, as principal on the Class
A-II Notes and Variable Funding Notes, the Principal Collection Distribution Amount with respect to the Class
A-II Notes and the Variable Funding Notes for such Payment Date, on a pro rata basis in accordance with the
outstanding Security Balances thereof;

(iii) third, to the Class A-II Noteholders and the Variable Funding Noteholders, as principal on the Class
A-II Notes and Variable Funding Notes, on a pro rata basis in accordance with the outstanding Security
Balances thereof, the Liquidation Loss Distribution Amount with respect to the Group II Loans for such
Payment Date;

(iv) fourth, to the Credit Enhancer, the amount of the premium for the Group II Policy and any previously
unpaid premiums for the Group II Policy, with interest thereon as provided in the Insurance Agreement;

(v) fifth, to the Credit Enhancer, to reimburse it for prior draws made on the Group II Policy related to
payments of principal and interest on the Class A-II Notes and the Variable Funding Notes with interest
thereon as provided in the Insurance Agreement;

(vi) sixth, to the Class A-II Noteholders and the Variable Funding Noteholders, as principal on the Class
A-II Notes and the Variable Funding Notes, on a pro rata basis in accordance with the outstanding Security
Balances thereof, the Group II Overcollateralization Increase Amount, if any, for such Payment Date;

(vii) seventh, to the Credit Enhancer, any other amounts owed to the Credit Enhancer pursuant to the
Insurance Agreement and related to the Class II Notes;

(viii) eighth, to the Class A-II Noteholders and the Variable Funding Noteholders, any Group II Net WAC Cap
Shortfalls for that Payment Date and any Group II Net WAC Cap Shortfalls for previous Payment Dates and not
previously paid (together with interest thereon at the Note Rate for the related Class of Class II Notes (as
adjusted from time to time)), on a pro rata basis in accordance with the respective amounts of Group II Net
WAC Cap Shortfalls allocated to each such Class for such Payment Date and any previous Payment Dates not
previously paid (with interest thereon);

(ix)    ninth,  to pay to the holders of the Class A-II Notes and the Variable  Funding Notes, pro rata,  any
Relief Act Shortfalls with respect to the Group II Loans incurred during the related Collection Period; and

(x)    tenth, any  remaining  amount  (other  than  amounts  in the  nature  of  prepayment
charges)  to the
Certificate  Paying  Agent on behalf of the  holders of the Class  SB-II  Certificates  and any amounts in the
nature  of  prepayment  charges  to the  Certificate  Paying  Agent,  on behalf of the holders of the Class SB-II
Certificates;

provided,  however,  in the event that on a Payment Date a Credit  Enhancer  Default shall have occurred and be
continuing,  then the priorities  of  distributions  described  above will be adjusted such that payments of any
amounts to be paid to the Credit Enhancer (x) pursuant to clauses  3.05(a)(II)  (iv) and (vii) will not be paid
until the full amount of interest and  principal in  accordance  with clauses  3.05(a)(II)  (i)  through  (iii),
(vi) and (viii)  through  (ix) that are due and required to be paid on such Payment Date have been paid and (y)
pursuant  to clause  3.05(a)(II)  (v)  will not be paid  until the full  amount of  interest  and  principal  in
accordance  with clauses 3.05(a)(II)  (i) through  (iii) and (vi) that are due and required to be paid on such
Payment Date have been paid. For  purposes of the  foregoing,  required  payments of principal on the Class II
Notes on each  Payment  Date  pursuant  to clause  3.05(a)(II)(iii)  above will  include  the pro rata  portion
allocable  to the Class II Notes of all  Liquidation  Loss  Amounts for such  Payment Date and for all previous
Collection  Periods until paid or covered in full, to the extent not  otherwise  covered by a Liquidation Loss
Distribution  Amount  with  respect to the Class II Notes,  a reduction  of the Group II  Overcollateralization
Amount on such Payment Date or a draw on the Group II Policy (up to the outstanding Security Balance thereof).

On the Final  Scheduled  Payment  Date or other final Payment Date for the Class II Notes, the amount to
be paid  pursuant  to clause  (iii) above  shall be  equal to the  Security  Balances  of the Class II Notes
immediately  prior to such Payment  Date.  Notwithstanding  anything  herein  to the  contrary,  if the  final
Payment  Date is a date on which the Master  Servicer has  exercised  its right to purchase all of the Group II
Loans  pursuant to Section 8.08 of the Servicing  Agreement,  the  priorities  set forth in  clauses (i) through
(iv) above shall be  disregarded,  and amounts on deposit in the Payment  Account  with respect to the Group II
Loans will be applied  first,  to pay the  Interest  Distribution  Amount for the Class A-II Notes and Variable
Funding Notes, on a pro rata basis in accordance with their respective Interest Distribution Amounts;  second,
to pay  principal  on the Class A-II Notes and Variable  Funding  Notes on a pro rata basis in  accordance  with
their respective  Security  Balances,  until the Security Balances thereof have been reduced to zero and then in
accordance with the priorities set forth in clauses (iv) through (xi) above.

(b)    (i) With respect to the Class I Notes and each Payment Date,  distributions  of principal to the Class
I Noteholders  pursuant  to clauses (ii),  (iii) and (vi) of Section  3.05(a)(I)  shall be made in the following
order: first,  to the Class A-I-5  Noteholders,  in an amount  equal to the Class A-I-5  Lockout  Distribution
Amount for that Payment  Date,  until the  Security  Balance of the Class A-I-5 Notes has been reduced to zero;
second,  to the Class A-I-1  Noteholders,  until the Security Balance of the Class A-I-1 Notes has been reduced
to zero;  third,  to Class  A-I-2  Noteholders,  until the  Security  Balance of the Class A-I-2 Notes has been
reduced to zero;  fourth, to the Class A-I-3  Noteholders,  until the Security Balance of the Class A-I-3 Notes
has been  reduced to zero;  fifth,  to the Class A-I-4  Noteholders,  until the  Security  Balance of the Class
A-I-4 Notes has been reduced to zero; and sixth,  to the Class A-I-5  Noteholders,  until the  Security  Balance

of the Class A-I-5 Notes has been reduced to zero.

(ii)...Relief Act Shortfalls and Prepayment Interest Shortfalls on the Group I Loans will be allocated to each Class of Class I Notes on a pro rata basis in accordance with the amount of accrued interest payable on that Class for such Payment Date, absent such reductions. Relief Act Shortfalls on the Group II Loans will be allocated to the Class A-II Notes and Variable Funding Notes on a pro rata basis in accordance with the amount of accrued interest payable on that Class for such Payment Date, absent such reductions.

(c)    On each Payment Date, the Certificate Paying Agent shall deposit in the Certificate Distribution Account all amounts it received pursuant to this Section 3.05 for the purpose of distributing such funds to the Certificateholders.

The amounts paid to Noteholders shall be paid in respect of the related Class or Classes of Term Notes or Variable Funding Notes, as the case may be, in accordance with the applicable percentage as set forth in paragraph (d) below. Interest will accrue on the Notes during an Interest Period, on the basis of the actual number of days in such Interest Period and a year assumed to consist of 360 days, in the case of the Class A-I-1 Notes and the Class II Notes, and on the basis of a 360-day year consisting of twelve 30-day months, in the case of the remaining Classes of Notes.

Any installment of interest or principal, if any, payable on any Note that is punctually paid or duly provided for by the Issuer on the applicable Payment Date shall, if such Holder holds Notes of an aggregate initial Security Balance or notional amount of at least $1,000,000, be paid to each Holder of record on the preceding Record Date, by wire transfer to an account specified in writing by such Holder reasonably satisfactory to the Indenture Trustee as of the preceding Record Date or in all other cases or if no such instructions have been delivered to the Indenture Trustee, by check to such Noteholder mailed to such Holder's address as it appears in the Note Register the amount required to be distributed to such Holder on such Payment Date pursuant to such Holder's Securities; provided, however, that the Indenture Trustee shall not pay to such Holders any amount required to be withheld from a payment to such Holder by the Code.

(d)    Principal of each Note shall be due and payable in full on the Final Scheduled Payment Date for such Note as provided in the related form of Note set forth in Exhibits A-1 and A-2. All principal payments on each of the Term Notes and Variable Funding Notes shall be made in accordance with the priorities set forth in paragraphs (a) and (b) above to the Noteholders entitled thereto in accordance with the related Percentage Interests represented thereby. Upon written notice to the Indenture Trustee by the Issuer, the Indenture Trustee shall notify the Person in whose name a Note is registered at the close of business on the Record Date preceding the Final Scheduled Payment Date or other final Payment Date. Such notice shall be mailed no later than five Business Days prior to such Final Scheduled Payment Date or other final Payment Date and shall specify that payment of the principal amount and any interest due with respect to such Note at the Final Scheduled Payment Date or other final Payment Date will be payable only upon presentation and surrender of such Note and shall specify the place where such Note may be presented and surrendered for such final payment.

Section 3.06.  Protection of Trust Estate. (a) The Issuer will from time to time execute and deliver all such supplements and amendments hereto and all such financing statements, continuation statements, instruments of further assurance and other instruments, and will take such other action necessary or

advisable to:

(i)    maintain or preserve the lien and security interest (and the priority thereof) of this Indenture or carry out more effectively the purposes hereof;

(ii)    perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture;

(iii)    cause the Trust to enforce any of the Home Equity Loans; or

(iv)    preserve and defend title to the Trust Estate and the rights of the Indenture Trustee and the Noteholders in such Trust Estate against the claims of all persons and parties.

(b)    Except as otherwise provided in this Indenture, the Indenture Trustee shall not remove any portion of the Trust Estate that consists of money or is evidenced by an instrument, certificate or other writing from the jurisdiction in which it was held at the date of the most recent Opinion of Counsel delivered pursuant to Section 3.07 (or from the jurisdiction in which it was held as described in the Opinion of Counsel delivered at the Closing Date pursuant to Section 3.07(a), if no Opinion of Counsel has yet been delivered pursuant to Section 3.07(b)) unless the Owner Trustee shall have first received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property will continue to be maintained after giving effect to such action or actions.

The Issuer hereby designates the Indenture Trustee its agent and attorney-in-fact to execute any financing statement, continuation statement or other instrument required to be executed pursuant to this Section 3.06.

Section 3.07. Opinions as to Trust Estate. (a) On the Closing Date, the Issuer shall furnish to the Indenture Trustee and the Owner Trustee an Opinion of Counsel at the expense of the Issuer stating that, upon delivery of the Loan Agreements relating to the Initial Home Equity Loans to the Indenture Trustee or the Custodian, the Indenture Trustee will have a perfected, first priority security interest in the Home Equity Loans.

(b)    On or before December 31st in each calendar year, beginning in 2006, the Issuer shall furnish to the Indenture Trustee an Opinion of Counsel at the expense of the Issuer either stating that, in the opinion of such counsel, such action has been taken with respect to the recording, filing, re-recording and refiling of this Indenture, any indentures supplemental hereto and any other requisite documents and with respect to the execution and filing of any financing statements and continuation statements as is necessary to maintain the lien and security interest in the Home Equity Loans and reciting the details of such action or stating that in the opinion of such counsel no such action is necessary to maintain such lien and security interest. Such Opinion of Counsel shall also describe the recording, filing, re-recording and refiling of this Indenture, any indentures supplemental hereto and any other requisite documents and the execution and filing of any financing statements and continuation statements that will, in the opinion of such counsel, be required to maintain the lien and security interest in the Home Equity Loans until December 31 in the following calendar year.

Section 3.08. Performance of Obligations; Servicing Agreement. (a) The Issuer will punctually perform and observe all of its obligations and agreements contained in this Indenture, the Basic Documents and in the instruments and agreements included in the Trust Estate.

(b)    The Issuer may contract with other Persons to assist it in performing its duties under this Indenture, and any performance of such duties by a Person identified to the Indenture Trustee in an Officer's

Certificate of the Issuer shall be deemed to be an action taken by the Issuer.

(c)     The Issuer will not take any action or permit any action to be taken by others which would release any
Person from any of such Person's covenants or obligations under any of the documents relating to the Home
Equity Loans or under any instrument included in the Trust Estate, or which would result in the amendment,
hypothecation, subordination, termination or discharge of, or impair the validity or effectiveness of, any of
the documents relating to the Home Equity Loans or any such instrument, except such actions as the Master
Servicer is expressly permitted to take in the Servicing Agreement.

(d)     The Issuer may retain an administrator and may enter into contracts with other Persons for the
performance of the Issuer's obligations hereunder, and performance of such obligations by such Persons shall
be deemed to be performance of such obligations by the Issuer.

Section 3.09.  Negative Covenants.  So long as any Notes are Outstanding, the Issuer shall not:

(a)     except as expressly permitted by this Indenture, sell, transfer, exchange or otherwise dispose of the
Trust Estate, unless directed to do so by the Indenture Trustee;

(b)     claim any credit on, or make any deduction from the principal or interest payable in respect of, the
Notes (other than amounts properly withheld from such payments under the Code) or assert any claim against
any present or former Noteholder by reason of the payment of the taxes levied or assessed upon any part of
the Trust Estate;

(c)     (i) permit the validity or effectiveness of this Indenture to be impaired, or permit the lien of this
Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be
released from any covenants or obligations with respect to the Notes under this Indenture except as may be
expressly permitted hereby, (ii) permit any lien, charge, excise, claim, security interest, mortgage or other
encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or
burden the Trust Estate or any part thereof or any interest therein or the proceeds thereof or (iii) permit
the lien of this Indenture not to constitute a valid first priority security interest in the Trust Estate; or

(d)     impair or cause to be impaired the Issuer's interest in the Home Equity Loans, the Purchase Agreement
or in any Basic Document, if any such action would materially and adversely affect the interests of the
Noteholders.

Section 3.10.  Annual Statement as to Compliance.  The Issuer will deliver to the Indenture Trustee, within
120 days after the end of each fiscal year of the Issuer (commencing with the fiscal year 2006), an Officer's
Certificate stating, as to the Authorized Officer signing such Officer's Certificate, that:

(a)     a review of the activities of the Issuer during such year and of its performance under this Indenture
and the Trust Agreement has been made under such Authorized Officer's supervision; and

(b)     to the best of such Authorized Officer's knowledge, based on such review, the Issuer has complied with
all conditions and covenants under this Indenture and the provisions of the Trust Agreement throughout such
year, or, if there has been a default in its compliance with any such condition or covenant, specifying each
such default known to such Authorized Officer and the nature and status thereof.

Section 3.11.  Recording of Assignments.  The Issuer shall enforce the obligation of the Seller under the
Purchase Agreement to submit or cause to be submitted for recordation all Assignments of Mortgages within 60
days of receipt of recording information by the Master Servicer.

Section 3.12.  Representations and Warranties Concerning the Home Equity Loans.  The Indenture Trustee, as

pledgee of the Home Equity Loans, has the benefit of the representations and warranties made by the Seller in
Section 3.1(a), Section 3.1(b) and 3.1(c) of the Purchase Agreement concerning the Home Equity Loans and the
right to enforce the remedies against the Seller provided in such Section 3.1(a), Section 3.1(b) and 3.1(c)
to the same extent as though such representations and warranties were made directly to the Indenture Trustee.

Section 3.13. Assignee of Record of the Home Equity Loans. As pledgee of the Home Equity Loans, the
Indenture Trustee shall hold record title to the Home Equity Loans by being named as payee in the
endorsements or assignments of the Loan Agreements and assignee in the Assignments of Mortgage to be recorded
under Section 2.1 of the Purchase Agreement. Except as expressly provided in the Purchase Agreement or in
the Servicing Agreement with respect to any specific Home Equity Loan, the Indenture Trustee shall not
execute any endorsement or assignment or otherwise release or transfer such record title to any of the Home
Equity Loans until such time as the remaining Trust Estate may be released pursuant to Section 8.05(b).

Section 3.14. Master Servicer as Agent and Bailee of the Indenture Trustee. Solely for purposes of
perfection under Section 9-313 or 9-314 of the Uniform Commercial Code or other similar applicable law, rule
or regulation of the state in which such property is held by the Master Servicer, the Issuer and the
Indenture Trustee hereby acknowledge that the Master Servicer is acting as agent and bailee of the Indenture
Trustee in holding amounts on deposit in the Custodial Account pursuant to Section 3.02 of the Servicing
Agreement that are allocable to the Home Equity Loans, as well as the agent and bailee of the Indenture
Trustee in holding any Related Documents released to the Master Servicer pursuant to Section 3.06(c) of the
Servicing Agreement, and any other items constituting a part of the Trust Estate which from time to time come
into the possession of the Master Servicer. It is intended that, by the Master Servicer's acceptance of such
agency pursuant to Section 3.02 of the Servicing Agreement, the Indenture Trustee, as a pledgee of the Home
Equity Loans, will be deemed to have possession of such Related Documents, such monies and such other items
for purposes of Section 9-305 of the Uniform Commercial Code of the state in which such property is held by
the Master Servicer.

Section 3.15. Investment Company Act. The Issuer shall not become an "investment company" or under the
"control" of an "investment company" as such terms are defined in the Investment Company Act of 1940, as
amended (or any successor or amendatory statute), and the rules and regulations thereunder (taking into
account not only the general definition of the term "investment company" but also any available exceptions to
such general definition); provided, however, that the Issuer shall be in compliance with this Section 3.15 if
it shall have obtained an order exempting it from regulation as an "investment company" so long as it is in
compliance with the conditions imposed in such order.

Section 3.16. Issuer May Consolidate, etc. (a) The Issuer shall not consolidate or merge with or into any
other Person, unless:

(i)    the Person (if other than the Issuer) formed by or surviving such consolidation or merger shall be a
Person organized and existing under the laws of the United States of America or any state or the District of
Columbia and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the
Indenture Trustee, in form reasonably satisfactory to the Indenture Trustee, the due and punctual payment of
the principal of and interest on all Notes and to the Certificate Paying Agent, on behalf of the
Certificateholders and the performance or observance of every agreement and covenant of this Indenture on the
part of the Issuer to be performed or observed, all as provided herein;

(ii)    immediately    after giving    effect    to    such    transaction,    no Event    of Default shall have
occurred and be
continuing;

(iii)    the Issuer    receives    consent    of the Credit    Enhancer and the Rating    Agencies    shall
have notified the
Issuer that such transaction    shall not cause the rating of the Notes to be reduced,    suspended
or withdrawn or
to be considered by either Rating Agency to be below    investment    grade without taking into
account the Group I
and Group II Policy;

(iv)    the Issuer shall have received an Opinion of Counsel (and shall have    delivered    copies
thereof to the
Indenture    Trustee and the Credit    Enhancer)    to the effect that such    transaction    will not have
any    material
adverse tax consequence to the Issuer, any Noteholder or any Certificateholder;

(v)    any action that is    necessary    to maintain the lien and    security    interest    created by
this    Indenture
shall have been taken; and

(vi)    the Issuer shall have    delivered to the Indenture    Trustee an Officer's    Certificate    and
an Opinion of
Counsel    each    stating    that such    consolidation    or merger and such    supplemental    indenture
comply with this
Article III and that all    conditions    precedent    herein    provided    for relating to such
transaction    have been
complied with (including any filing required by the Exchange Act).

(b)    The Issuer shall not convey or transfer any of its    properties or assets,    including
those included in
the Trust Estate, to any Person, unless:

(i)    the Person that    acquires    by    conveyance    or    transfer    the    properties    and assets of
the Issuer the
conveyance    or    transfer    of which is    hereby    restricted    shall    (i) be a United    States
citizen    or a Person
organized and existing    under the laws of the United States of America or any state,    (ii)
expressly    assumes,
by an indenture    supplemental hereto,    executed and delivered to the Indenture Trustee, in form
satisfactory to
the Indenture    Trustee,    the due and    punctual    payment of the    principal of and interest on all
Notes and the
performance    or    observance of every    agreement and covenant of this    Indenture on the part of
the Issuer to be
performed or observed,    all as provided herein, (iii) expressly agrees by means of such
supplemental    indenture
that all right,    title and interest so conveyed or transferred    shall be subject and    subordinate
to the rights
of Holders of the Notes,    (iv) unless otherwise    provided in such supplemental    indenture,
expressly agrees to
indemnify,    defend and hold harmless the Issuer against and from any loss,    liability or expense
arising under
or related to this    Indenture and the Notes and (v) expressly    agrees by means of such
supplemental    indenture
that such Person    (or if a group of    Persons,    then one    specified    Person)    shall make all
filings    with the
Commission (and any other    appropriate Person) required by the Exchange Act in connection with the
Notes;

(ii)    immediately    after    giving    effect to such    transaction,    no    Default    or Event of
Default    shall have
occurred and be continuing;

(iii)    the Issuer    receives    consent    of the Credit    Enhancer and the Rating    Agencies    shall
have notified the
Issuer that such    transaction    shall not cause the rating of the Notes to be reduced,    suspended
or    withdrawn,
if determined without regard to the Policies;

(iv)    the Issuer shall have received an Opinion of Counsel (and shall have    delivered    copies
thereof to the
Indenture    Trustee and the Credit    Enhancer)    to the effect that such    transaction    will not have
any    material
adverse tax consequence to the Issuer or any Noteholder;

(v)    any action that is    necessary    to maintain the lien and    security    interest    created by
this    Indenture
shall have been taken; and

(vi)    the Issuer shall have  delivered to the Indenture  Trustee an Officer's  Certificate  and an Opinion of
Counsel  each  stating  that  such  conveyance  or transfer  and such  supplemental  indenture  comply with this
Article III and that all  conditions  precedent  herein  provided  for relating to such  transaction  have been
complied with (including  any filing required by the Exchange Act).

Section 3.17.  Successor  or  Transferee. (a) Upon any  consolidation  or merger of the  Issuer in  accordance
with  Section  3.16(a),  the Person  formed by or  surviving  such  consolidation  or merger (if other than the
Issuer) shall succeed to, and be  substituted  for, and may exercise every right and power of, the Issuer under
this Indenture with the same effect as if such Person had been named as the Issuer herein.

(b)      Upon a  conveyance  or  transfer  of all the assets and  properties  of the Issuer  pursuant to Section
3.16(b),  the Issuer will be released  from every  covenant and  agreement of this  Indenture to be observed or
performed on the part of the Issuer with respect to the Notes  immediately  upon the delivery of written notice
to the Indenture Trustee of such conveyance or transfer.

Section 3.18.  No Other  Business.  The  Issuer  shall  not  engage  in any  business  other  than  financing,
purchasing,  owning and  selling  and  managing  the Home  Equity  Loans  and the  issuance  of the  Notes and
Certificates  in the  manner  contemplated  by this  Indenture and the  Basic  Documents  and all  activities
incidental thereto.

Section 3.19.  No Borrowing.  The Issuer shall not issue, incur, assume,  guarantee or otherwise  become liable,
directly or indirectly, for any indebtedness except for the Notes.

Section 3.20.  Guarantees,  Loans, Advances and Other Liabilities.  Except as contemplated by this Indenture or
the other Basic Documents,  the Issuer shall not make any loan or advance or credit to, or  guarantee  (directly
or  indirectly  or by an  instrument  having the effect of assuring  another's  payment or  performance  on any
obligation or capability of so doing or otherwise),  endorse or otherwise become contingently  liable,  directly
or indirectly,  in connection with the  obligations,  stocks or dividends of, or own,  purchase,  repurchase or
acquire  (or  agree  contingently  to do so) any  stock,  obligations,  assets or  securities  of, or any other
interest in, or make any capital contribution to, any other Person.

Section 3.21.  Capital  Expenditures.  The Issuer  shall not make any  expenditure  (by long-term or operating
lease or otherwise) for capital assets (either realty or personalty).

Section 3.22.  Owner Trustee Not Liable for Certificates or Related  Documents.  The recitals  contained herein
shall be taken as the  statements  of the  Depositor,  and the Owner  Trustee  assumes no  responsibility  for the
correctness  thereof.  The Owner Trustee makes no  representations  as to the validity or  sufficiency  of this
Indenture,  of any Basic  Document or of the  Certificates  (other than the  signatures of the  Owner Trustee on
the  Certificates)  or the Notes,  or of any Related  Documents.  The Owner  Trustee  shall at no  time have any
responsibility  or  liability  with respect to the  sufficiency  of the Trust Estate or its  ability to generate
the payments to be distributed to  Certificateholders  under the Trust Agreement or the  Noteholders  under this
Indenture,  including,  the compliance by the Depositor or the Seller with any warranty or  representation  made
under any Basic  Document or in any related  document or the accuracy of any such  warranty or  representation,
or any action of the  Certificate  Paying Agent,  the Certificate  Registrar or the Indenture  Trustee taken in
the name of the Owner Trustee.

Section 3.23.  Restricted  Payments.  The Issuer  shall not,  directly or  indirectly,  (i) pay  any dividend or
make any  distribution  (by  reduction of capital or  otherwise),  whether in cash,  property,  securities or a

combination thereof, to the Owner Trustee or the holder of a beneficial interest in the Issuer or otherwise
with respect to any ownership or equity interest or security in or of the Issuer, (ii) redeem, purchase,
retire or otherwise acquire for value any such ownership or equity interest or security or (iii) set aside or
otherwise segregate any amounts for any such purpose; provided, however, that the Issuer may make, or cause
to be made, (x) distributions to the Owner Trustee and the Certificateholders as contemplated by, and to the
extent funds are available for such purpose under the Trust Agreement and (y) payments to the Master Servicer
pursuant to the terms of the Servicing Agreement. The Issuer will not, directly or indirectly, make payments
to or distributions from the Custodial Account except in accordance with this Indenture and the other Basic
Documents.

Section 3.24. Notice of Events of Default. The Issuer shall give the Indenture Trustee, the Credit Enhancer
and the Rating Agencies prompt written notice of each Event of Default hereunder and under the Trust
Agreement.

Section 3.25. Further Instruments and Acts. Upon request of the Indenture Trustee, the Issuer will execute
and deliver such further instruments and do such further acts as may be reasonably necessary or proper to
carry out more effectively the purpose of this Indenture.

Section 3.26. Statements to Noteholders. On each Payment Date, the Indenture Trustee and the Certificate
Registrar shall forward by mail to each Noteholder or make available on its website initially located at
"www.jpmorgan.com/sfr" and Certificateholder, respectively, the statement delivered to it, on the Business Day
following the related Determination Date pursuant to Section 4.01 of the Servicing Agreement.

Section 3.27. Determination of Note Rates. On the second LIBOR Business Day immediately preceding (i) the
Closing Date in the case of the first Interest Period and (ii) the first day of each succeeding Interest
Period, the Indenture Trustee shall determine LIBOR and the Note Rates for the Class A-I-1 Notes and the
Class II Notes for such Interest Period and shall inform the Issuer, the Master Servicer and the Depositor at
their respective facsimile numbers given to the Indenture Trustee in writing.

Section 3.28. Payments under the Group I and Group II Policy. (a) On or prior to 12:00 noon New York City
time on the second Business Day before any Payment Date, the Indenture Trustee shall make a draw on each of
the Group I Policy and the Group II Policy, in an amount, if any, equal to the Deficiency Amount with respect
to the Class I Notes and the Deficiency Amount with respect to the Class II Notes, respectively. For
purposes of the foregoing, amounts in the Payment Account available for interest distributions on the Class I
Notes and the Class II Notes on any Payment Date shall be deemed to include all amounts distributed on the
Home Equity Loans in Loan Group I, in the case of the Class I Notes and all amounts distributed on the Home
Equity Loans in Loan Group II, in the case of the Class II Notes for such Payment Date, in each case, other
than the Principal Collection Distribution Amount distributed thereon. In addition, (x) on the Final
Scheduled Payment Date for each Class of Class I Notes, the Indenture Trustee shall make a draw on the Group
I Policy in the amount by which the Security Balances on the applicable Class or Classes of Class I Notes
exceeds the payments otherwise available to be made to the Holders thereof on the Final Scheduled Payment
Date and (y) on the Final Scheduled Payment Date for the Class II Notes, the Indenture Trustee shall make a
draw on the Group II Policy in the amount by which the Security Balances on Class II Notes exceeds the
payments otherwise available to be made to the Holders thereof on the Final Scheduled Payment Date.

(b)    The Indenture Trustee shall submit, if a Deficiency Amount is specified in any statement to Holders of

the Class I Notes or Class II Notes prepared by the Master Servicer pursuant to Section 4.01 of the Servicing
Agreement and timely delivered to the Indenture Trustee, the notice (in the form attached as Exhibit A to the
Group I Policy and Group II Policy) in the amount of the Deficiency Amount to the Credit Enhancer no later
than 12:00 noon, New York City time, on the second Business Day prior to the applicable Payment Date. Upon
receipt of such Deficiency Amount in accordance with the terms of the Group I Policy or Group II Policy, as
applicable, the Indenture Trustee shall deposit such Deficiency Amount in the Payment Account for
distribution to the Class I Noteholders or the Class II Noteholders, as applicable, pursuant to Section 3.05.

Section 3.29. Additional Representations of the Issuer.

(a)    This Indenture creates a valid and continuing security interest (as defined in the New York UCC) in
the Mortgage Notes in favor of the Indenture Trustee, which security interest is prior to all other Liens
(except as expressly permitted otherwise in this Indenture), and is enforceable as such as against
creditors of and purchasers from the Issuer.

(b)    The Mortgage Notes constitute "instruments" within the meaning of the New York UCC and the Delaware
UCC.

(c)    The Issuer owns and has good and marketable title to the Mortgage Notes free and clear of any Lien of
any Person.

(d)    The original executed copy of each mortgage Note (except for any Mortgage Note with respect to which a
Lost Note Affidavit has been delivered to the Custodian) has been delivered to the Custodian.

(e)    The Issuer has received a written acknowledgment from the Custodian that the Custodian is acting
solely as agent of the Indenture Trustee for the benefit of the Noteholders.

(f)    Other than the security interest granted to the Indenture Trustee pursuant to this Indenture, the
Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the
Mortgage Notes. The Issuer has not authorized the filing of and is not aware of any financing statements
against the Issuer that include a description of collateral covering the Mortgage Notes other than any
financing statement relating to the security interest granted to the Indenture Trustee hereunder or any
security interest that has been terminated. The Issuer is not aware of any judgment or tax lien filings
against the Issuer.

(g)    None of the Mortgage Notes has any marks or notations indicating that they have been pledged, assigned
or otherwise conveyed to any Person other than the Indenture Trustee, except for (i) any endorsements
that are part of a complete chain of endorsements from the originator of the Mortgage Note to the
Indenture Trustee, and (ii) any marks or notations pertaining to Liens that have been terminated or
released.

ARTICLE IV

The Notes; Satisfaction and Discharge of Indenture.

Section 4.01. The Notes; Increase of Maximum Variable Funding Balance; Variable Funding Notes. (a) The Term
Notes shall be registered in the name of a nominee designated by the Depository. Beneficial Owners will hold

interests in the Class A Notes as set forth in Section 4.06 herein in minimum initial Security Balances of $100,000 and integral multiples of $1 in excess thereof. The Capped Funding Notes will be issued as definitive notes in fully registered form in minimum initial Security Balances of $10,000 and integral multiples of $1 in excess thereof, together with any additional amount necessary to cover (i) the aggregate initial Security Balance of the Capped Funding Notes surrendered at the time of the initial denominational exchange thereof (with such initial Security Balance in each case being deemed to be the Security Balance of the Capped Funding Notes at the time of such initial denominational exchange thereof) or (ii) the aggregate initial Security Balance of any Capped Funding Notes issued in an exchange described in subsection (d) below.

The Indenture Trustee may for all purposes (including the making of payments due on the Notes) deal with the Depository as the authorized representative of the Beneficial Owners with respect to the Term Notes for the purposes of exercising the rights of Holders of Term Notes hereunder. Except as provided in the next succeeding paragraph of this Section 4.01, the rights of Beneficial Owners with respect to the Term Notes shall be limited to those established by law and agreements between such Beneficial Owners and the Depository and Depository Participants. Except as provided in Section 4.08, Beneficial Owners shall not be entitled to definitive certificates for the Term Notes as to which they are the Beneficial Owners. Requests and directions from, and votes of, the Depository as Holder of the Term Notes shall not be deemed inconsistent if they are made with respect to different Beneficial Owners. The Indenture Trustee may establish a reasonable record date in connection with solicitations of consents from or voting by Noteholders and give notice to the Depository of such record date. Without the consent of the Issuer and the Indenture Trustee, no Term Note may be transferred by the Depository except to a successor Depository that agrees to hold such Note for the account of the Beneficial Owners.

In the event the Depository Trust Company resigns or is removed as Depository, the Indenture Trustee with the approval of the Issuer may appoint a successor Depository. If no successor Depository has been appointed within 30 days of the effective date of the Depository's resignation or removal, each Beneficial Owner shall be entitled to certificates representing the Notes it beneficially owns in the manner prescribed in Section 4.08.

The Notes shall, on original issue, be executed on behalf of the Issuer by the Owner Trustee, not in its individual capacity but solely as Owner Trustee, authenticated by the Note Registrar and delivered by the Indenture Trustee to or upon the order of the Issuer.

(b)     On each Payment Date, the aggregate Security Balance of the Variable Funding Notes shall be increased by an amount equal to the Group II Additional Balance Differential for such Payment Date, subject to the Maximum Variable Funding Balance and the terms and conditions set forth below. The Maximum Variable Funding Balance may be increased as provided in Section 9.01(a)(viii).

(c)     The Variable Funding Notes issued on the Closing Date shall bear the Designation "VFN-1" and each new Variable Funding Note for such Class of Variable Funding Note will bear sequential numerical designations in the order of their issuance.

(d)     Subject to the following conditions, the Variable Funding Notes may be exchanged pursuant to Section 4.02 for one or more Capped Funding Notes. Prior to any such exchange, the party requesting the exchange must provide an Opinion of Counsel, addressed to the Credit Enhancer, the Issuer and the Indenture Trustee, to the effect that the Capped Funding Notes shall qualify for federal income tax purposes as indebtedness of

the Issuer and the Issuer will not be characterized as an association (or a publicly traded partnership) taxable as a corporation or a taxable mortgage pool within the meaning of Section 7701(i) of the Code. If required by the Opinion of Counsel, the Capped Funding Notes may be issued concurrently with a reduction in the Security Balance of the Variable Funding Notes and an equivalent increase in the Security Balance of the Certificates, pursuant to Section 3.12 of the Trust Agreement. Upon receipt of the Opinion of Counsel, the Indenture Trustee shall issue the Capped Funding Notes with a Security Balance equal to the Security Balance permitted under such Opinion of Counsel, in minimum denominations as set forth in subsection (a) above. The Capped Funding Notes shall bear the designation "Capped" in addition to any other applicable designation. In connection with such exchange, any Security Balance not represented by either a Capped Funding Note or an increase in the Security Balance of the Certificates referred to above shall result in the issuance of a new Variable Funding Note having an initial Security Balance equal to the excess of the outstanding Security Balance of the Variable Funding Note so surrendered over the initial Security Balances of the related Capped Funding Notes and an increase in the Security Balance of the Certificates referred to above. The Indenture Trustee and the Issuer agree to cooperate with each other and the party requesting the exchange of Variable Funding Notes for Capped Funding Notes, the Credit Enhancer, the Depositor, the Seller and the Owner Trustee and to cause no unreasonable delay in issuing Capped Funding Notes in connection with this Section and Section 3.12 of the Trust Agreement.

Section 4.02.    Registration of and Limitations on Transfer and Exchange of Notes; Appointment of Certificate Registrar. (a)        The Issuer shall cause to be kept at the Indenture Trustee's Corporate Trust Office a Note Register in which, subject to such reasonable regulations as it may prescribe, the Note Registrar shall provide for the registration of Notes and of transfers and exchanges of Notes as herein provided.

(b)    Subject to the restrictions and limitations set forth below, upon surrender for registration of transfer of any Note at the Corporate Trust Office, the Issuer shall execute and the Note Registrar shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes in authorized initial Security Balances evidencing the same aggregate Percentage Interests.

(c)    No Variable Funding Note, other than any Capped Funding Notes, may be transferred. Subject to the provisions set forth below, Capped Funding Notes may be transferred, provided that with respect to the initial transfer thereof by the Seller, prior written notification of such transfer shall have been given to the Rating Agencies and to the Credit Enhancer by the Seller.

(d)    No transfer, sale, pledge or other disposition of a Capped Funding Note shall be made unless such transfer, sale, pledge or other disposition is exempt from the registration requirements of the Securities Act of 1933, as amended, and any applicable state securities laws or is made in accordance with said Act and laws. In the event of any such transfer, the Indenture Trustee or the Issuer shall require the transferee to execute either (i)(a) an investment letter in substantially the form attached hereto as Exhibit B (or in such form and substance reasonably satisfactory to the Indenture Trustee and the Issuer) which investment letters shall not be an expense of the Trust, the Owner Trustee, the Indenture Trustee, the Master Servicer, the Depositor or the Issuer and which investment letter states that, among other things, such transferee (a) is a "qualified institutional buyer" as defined under Rule 144A, acting for its own account or the accounts of other "qualified institutional buyers" as defined under Rule 144A, and (b) is aware that the proposed transferor intends to rely on the exemption from registration requirements under the Securities Act of 1933, as amended, provided by Rule 144A or (ii)(a) a written Opinion of Counsel (which

may be in-house counsel) acceptable to and in form and substance reasonably satisfactory to the Indenture Trustee and the Issuer that such transfer may be made pursuant to an exemption, describing the applicable exemption and the basis therefor, from said Act and laws or is being made pursuant to said Act and laws, which Opinion of Counsel shall not be an expense of the Indenture Trustee or the Issuer and (b) the Indenture Trustee shall require the transferee executes an investment letter in substantially the form of Exhibit C hereto and the transferor executes a representation letter, substantially in the form of Exhibit D hereto acceptable to and in form and substance reasonably satisfactory to the Issuer and the Indenture Trustee certifying to the Issuer and the Indenture Trustee the facts surrounding such transfer, which investment letter shall not be an expense of the Indenture Trustee or the Issuer. The Holder of a Capped Funding Note desiring to effect such transfer shall, and does hereby agree to, indemnify the Indenture Trustee, the Credit Enhancer and the Issuer against any liability that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws. In addition, any Noteholder of a Capped Funding Note desiring to effect any such transfer shall deliver, if any private placement memorandum or other offering document prepared in connection with the offering of such Capped Funding Notes specifies that such delivery will be required, to the Indenture Trustee and the Master Servicer, either (i) a certificate substantially to the effect of the certification set forth in Exhibit G to the Trust Agreement or (ii) an Opinion of Counsel that establishes to the satisfaction of the Indenture Trustee and the Master Servicer that the purchase of Certificates is permissible under applicable law, will not constitute or result in any non-exempt prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Indenture Trustee or the Master Servicer to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in this Indenture, which Opinion of Counsel shall not be an expense of the Indenture Trustee or the Master Servicer. Notwithstanding the foregoing, the restrictions on transfer specified in this paragraph are not applicable to any Capped Funding Notes that have been registered under the Securities Act of 1933 pursuant to Section 2.4 of the Purchase Agreement.

(e)(i) In the case of any Class I Note or Class A-II Note (each such Note, a "Book-Entry Non-Restricted Note") presented for registration in the name of any Person, such Person shall be deemed to have represented to the Indenture Trustee, the Depositor and the Master Servicer that (A) the Person is not a Plan Investor, or (B) the acquisition of the Note by that Person does not constitute or give rise to a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code for which no statutory, regulatory or administrative exemption is available.

(ii) (A) If any Class I Note or Class A-II Note (or any interest therein) is acquired or held in violation of the provisions of clause (e)(i) above, then the last preceding Transferee that is not in violation of the provisions of clause (e)(i) above shall be restored, to the extent permitted by law, to all rights and obligations as Note Owner thereof retroactive to the date of such Transfer of such Book-Entry Non-Restricted Note. The Indenture Trustee shall be under no liability to any Person for making any payments due on such Note to such preceding Transferee.

(iii) Any Person investing assets of a Plan may not acquire any Note or any interest therein if the Depositor, the Master Servicer, the Indenture Trustee, the Owner Trustee or any affiliates of any such person (A) has investment or administrative discretion with respect to those plan assets of such Plan; (B) has authority or responsibility to give or regularly gives investment advice with respect to those plan assets

for a fee and pursuant to an agreement or understanding that such advice will serve as a primary basis for
investment decisions with respect to those plan assets and will be based on the particular investment needs
for the Plan; or (C) unless United States Department of Labor Prohibited Transaction Class Exemption 90-1,
91-38 or 95-60 applies, is an employer maintaining or contributing to the Plan.

(iv)    Any purported Beneficial Owner whose acquisition or holding of any Book-Entry Non-Restricted
Note (or interest therein) was effected in violation of the restrictions in this Section 4.02(e) shall
indemnify and hold harmless the Depositor, the Indenture Trustee, the Underwriter, the Master Servicer, any
Subservicer, and the Trust from and against any and all liabilities, claims, costs or expenses incurred by
such parties as a result of such acquisition or holding.

(f)    Subject to the foregoing, at the option of the Noteholders, Notes may be exchanged for other
Notes of like tenor, in each case in authorized initial Security Balances evidencing the same aggregate
Percentage Interests upon surrender of the Notes to be exchanged at the Corporate Trust Office of the Note
Registrar. With respect to any surrender of Capped Funding Notes for exchange the new Notes delivered in
exchange therefor will bear the designation "Capped" in addition to any other applicable designations.
Whenever any Notes are so surrendered for exchange, the Indenture Trustee shall execute and the Note
Registrar shall authenticate and deliver the Notes which the Noteholder making the exchange is entitled to
receive. Each Note presented or surrendered for registration of transfer or exchange shall (if so required
by the Note Registrar) be duly endorsed by, or be accompanied by a written instrument of transfer in form
reasonably satisfactory to the Note Registrar duly executed by, the Holder thereof or his attorney duly
authorized in writing with such signature guaranteed by a commercial bank or trust company located or having
a correspondent located in the city of New York. Notes delivered upon any such transfer or exchange will
evidence the same obligations, and will be entitled to the same rights and privileges, as the Notes
surrendered.

(g)    No service charge shall be imposed for any registration of transfer or exchange of Notes, but
the Note Registrar shall require payment of a sum sufficient to cover any tax or governmental charge that may
be imposed in connection with any registration of transfer or exchange of Notes.

(h)    All Notes surrendered for registration of transfer and exchange shall be cancelled by the Note
Registrar and delivered to the Indenture Trustee for subsequent destruction without liability on the part of
either.

(i)    The Issuer hereby appoints the Indenture Trustee as Certificate Registrar to keep at its
Corporate Trust Office a Certificate Register pursuant to Section 3.09 of the Trust Agreement in which,
subject to such reasonable regulations as it may prescribe, the Certificate Registrar shall provide for the
registration of Certificates and of transfers and exchanges thereof pursuant to Section 3.05 of the Trust
Agreement. The Indenture Trustee hereby accepts such appointment.

Section 4.03.    Mutilated, Destroyed, Lost or Stolen Notes. If (i) any mutilated Note is surrendered to the
Indenture Trustee, or the Indenture Trustee receives evidence to its satisfaction of the destruction, loss or
theft of any Note, and (ii) there is delivered to the Indenture Trustee such security or indemnity as may be
required by it to hold the Issuer and the Indenture Trustee harmless, then, in the absence of notice to the
Issuer, the Note Registrar or the Indenture Trustee that such Note has been acquired by a bona fide
purchaser, and provided that the requirements of Section 8-405 of the UCC are met, the Issuer shall execute,
and upon its request the Indenture Trustee shall authenticate and deliver, in exchange for or

in lieu of any
such mutilated,    destroyed, lost or stolen Note, a replacement Note of the same class; provided,
however, that
if any such destroyed,  lost or stolen Note, but not a mutilated  Note,  shall have become or
within seven days
shall be due and payable,  instead of issuing a replacement  Note, the Issuer may pay such
destroyed, lost or
stolen Note when so due or payable  without  surrender  thereof.  If, after the  delivery of
such  replacement
Note or payment of a destroyed,  lost or stolen Note pursuant to the proviso to the preceding
sentence,  a bona
fide  purchaser of the original  Note in lieu of which such  replacement  Note was issued
presents for payment
such original Note,  the Issuer and the Indenture  Trustee shall be entitled to recover such
replacement  Note
(or such  payment) from the Person to whom it was  delivered or any Person  taking such
replacement  Note from
such Person to whom such  replacement  Note was  delivered or any  assignee of such Person,
except a bona fide
purchaser,  and shall be entitled to recover upon the security or indemnity  provided therefor to
the extent of
any loss, damage, cost or expense incurred by the Issuer or the Indenture Trustee in connection
therewith.

        Upon the issuance of any  replacement  Note under this Section 4.03, the Issuer may
require the payment
by the  Holder  of such Note of a sum  sufficient  to cover any tax or other  governmental
charge  that may be
imposed  in  relation  thereto and any other  reasonable  expenses  (including  the fees and
expenses  of the
Indenture Trustee) connected therewith.

        Every  replacement  Note  issued  pursuant  to this  Section  4.03  in  replacement  of
any  mutilated,
destroyed,  lost or stolen Note shall constitute an original additional  contractual  obligation
of the Issuer,
whether or not the mutilated,  destroyed,  lost or stolen Note shall be at any time enforceable
by anyone,  and
shall be entitled to all the  benefits of this  Indenture  equally and  proportionately  with any
and all other
Notes duly issued hereunder.

        The  provisions of this Section 4.03 are exclusive and shall  preclude (to the extent
lawful) all other
rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or
stolen Notes.

Section 4.04.  Persons Deemed Owners.  Prior to due presentment  for  registration of transfer of
any Note, the
Issuer,  the Indenture  Trustee,  the Credit Enhancer and any agent of the Issuer or the
Indenture  Trustee may
treat the Person in whose name any Note is  registered  (as of the day of  determination)  as the
owner of such
Note for the purpose of  receiving  payments of principal  of and  interest,  if any, on such
Note and for all
other purposes  whatsoever,  whether or not such Note be overdue, and none of the Issuer, the
Indenture Trustee
or any agent of the Issuer or the Indenture Trustee shall be affected by notice to the contrary.

Section 4.05.  Cancellation.  All  Notes  surrendered  for  payment,  registration  of transfer,
exchange  or
redemption  shall,  if  surrendered  to any Person  other  than the  Indenture  Trustee,  be
delivered  to the
Indenture  Trustee  and shall be  promptly  cancelled  by the  Indenture  Trustee.  The  Issuer
may at any time
deliver to the Indenture Trustee for cancellation any Notes previously  authenticated and
delivered  hereunder
which the Issuer may have  acquired  in any manner  whatsoever,  and all Notes so  delivered
shall be promptly
cancelled by the Indenture  Trustee.  No Notes shall be  authenticated  in lieu of or in exchange
for any Notes
cancelled as provided in this Section  4.05,  except as expressly  permitted by this  Indenture.
All cancelled
Notes may be held or  disposed  of by the  Indenture  Trustee in  accordance  with its  standard
retention  or
disposal  policy as in effect at the time  unless the Issuer  shall  direct by an Issuer  Request
that they be
destroyed or returned to it; provided  however,  that such Issuer Request is timely and the Notes
have not been
previously disposed of by the Indenture Trustee.

Section 4.06.  Book-Entry  Notes.  The Term Notes shall  initially  be issued as one or more Term Notes held by
the  Book-Entry  Custodian or, if appointed to hold such Term Notes as provided  below,  the  Depository  Trust
Company,  the  initial  Depository,  and  registered  in the name of its nominee  Cede & Co.  Except as provided
below,  registration  of such Term Notes may not be  transferred  by the  Indenture  Trustee  except to another
Depository  that agrees to hold such Term Notes for the respective  Beneficial  Owners.  The  Indenture  Trustee
is hereby  initially  appointed  as the  Book-Entry  Custodian  and hereby  agrees to act as such  in  accordance
herewith and in accordance  with the agreement that it has with the  Depository  authorizing  it  to act as such.
The  Book-Entry  Custodian  may, and, if it is no longer  qualified  to act as such,  the  Book-Entry  Custodian
shall,  appoint, by a written instrument delivered to the Depositor,  the Master Servicer and, if the Indenture
Trustee is not the  Book-Entry  Custodian,  the Indenture  Trustee,  any other  transfer  agent  (including the
Depository  or  any  successor  Depository)  to  act as  Book-Entry  Custodian  under  such  conditions  as the
predecessor  Book-Entry Custodian and the Depository or any successor  Depository may prescribe,  provided that
the predecessor  Book-Entry  Custodian shall not be relieved of any of its duties or  responsibilities by reason
of any new  appointment,  except  if the  Depository  is the  successor  to the  Book-Entry  Custodian.  If the
Indenture  Trustee resigns or is removed in accordance with the terms hereof,  the successor  trustee or, if it
so elects, the Depository shall immediately succeed to its predecessor's  duties as Book-Entry  Custodian.  The
Depositor  shall have the right to inspect,  and to obtain copies of, any Term Notes held as  Book-Entry  Notes
by the Book-Entry  Custodian.  No Beneficial  Owner will receive a Definitive Note  representing  such Beneficial
Owner's  interest  in such Note,  except as  provided  in Section  4.08.  Unless  and until  definitive,  fully
registered Notes (the "Definitive Notes") have been issued to Beneficial Owners pursuant to  Section 4.08:

(i)     the provisions of this Section 4.06 shall be in full force and effect;

(ii)    the Note  Registrar and the Indenture  Trustee  shall be entitled to deal with the Depository  for all
purposes of this  Indenture  (including the payment of principal of and interest on the Notes and the giving of
instructions  or directions  hereunder)  as the sole holder of the Term Notes,  and shall have no obligation to
the Owners of Term Notes;

(iii)   to the extent that the  provisions  of this Section 4.06  conflict  with any other  provisions  of this
Indenture, the provisions of this Section 4.06 shall control;

(iv)    the rights of Beneficial  Owners shall be exercised only through the Depository and shall be limited to
those  established  by law and  agreements  between  such  Owners of Term Notes and the  Depository  and/or the
Depository  Participants.  Unless and until  Definitive  Term Notes are issued  pursuant to  Section  4.08,  the
initial  Depository will make book-entry  transfers among the Depository  Participants and  receive and transmit
payments of principal of and interest on the Notes to such Depository Participants; and

(v)     whenever this Indenture  requires or permits actions to be taken based upon  instructions or directions
of Holders of Term Notes  evidencing a specified  percentage  of the Security  Balances of the  Term Notes,  the
Depository  shall be deemed to represent such percentage  only to the extent that it has received  instructions
to such effect from Beneficial  Owners and/or  Depository  Participants  owning or representing,  respectively,
such required  percentage of the beneficial  interest in the Term Notes and has delivered such  instructions to
the Indenture Trustee.

Section 4.07.  Notices to  Depository.  Whenever a notice or other  communication  to the Term Note  Holders is
required  under this  Indenture,  unless and until  Definitive  Term Notes shall have been issued  to Beneficial

Owners pursuant to Section 4.08, the Indenture Trustee shall give all such notices and communications
specified herein to be given to Holders of the Term Notes to the Depository, and shall have no obligation to
the Beneficial Owners.

Section 4.08. Definitive Notes. If (i) the Depositor advises the Indenture Trustee in writing that the
Depository is no longer willing or able to properly discharge its responsibilities with respect to the Term
Notes and the Depositor is unable to locate a qualified successor, (ii) the Depositor notifies the Depository
of its intent to terminate the book-entry system and, upon receipt of a notice of intent from the Depository,
the participants holding beneficial interest in the book-entry notes agree to initiate a termination or (iii)
after the occurrence of an Event of Default, Owners of Term Notes representing beneficial interests
aggregating at least a majority of the Security Balances of the Term Notes advise the Depository in writing
that the continuation of a book-entry system through the Depository is no longer in the best interests of the
Beneficial Owners, then the Depository shall notify all Beneficial Owners and the Indenture Trustee of the
occurrence of any such event and of the availability of Definitive Term Notes to Beneficial Owners requesting
the same. Upon surrender to the Indenture Trustee of the typewritten Term Notes representing the Book-Entry
Notes by the Book-Entry Custodian or the Depository, as applicable, accompanied by registration instructions,
the Issuer shall execute and the Indenture Trustee shall authenticate the Definitive Term Notes in accordance
with the instructions of the Depository. None of the Issuer, the Note Registrar or the Indenture Trustee
shall be liable for any delay in delivery of such instructions and may conclusively rely on, and shall be
protected in relying on, such instructions. Upon the issuance of Definitive Notes, the Indenture Trustee
shall recognize the Holders of the Definitive Notes as Noteholders.

        In addition, if an Event of Default has occurred and is continuing, each Beneficial Owner materially
adversely affected thereby may at its option request a Definitive Note evidencing such Beneficial Owner's
Percentage Interest in the related Class of Notes. In order to make such request, such Beneficial Owner
shall, subject to the rules and procedures of the Depository, provide the Depository or the related
Depository Participant with directions for the Note Registrar to exchange or cause the exchange of the
Beneficial Owner's interest in such Class of Notes for an equivalent Percentage Interest in fully registered
definitive form. Upon receipt by the Note Registrar of instructions from the Depository directing the Note
Registrar to effect such exchange (such instructions to contain information regarding the Class of Notes and
the Security Balance being exchanged, the Depository Participant account to be debited with the decrease, the
registered holder of and delivery instructions for the Definitive Note, and any other information reasonably
required by the Note Registrar), (i) the Note Registrar shall instruct the Depository to reduce the related
Depository Participant's account by the aggregate Security Balance of the Definitive Note, (ii) the Issuer
shall execute and the Note Registrar shall authenticate and deliver, in accordance with the registration and
delivery instructions provided by the Depository, a Definitive Note evidencing such Beneficial Owner's
Percentage Interest in such Class of Notes and (iii) the Issuer shall execute and the Note Registrar shall
authenticate a new Book-Entry Note reflecting the reduction in the aggregate Security Balance of such Class
of Notes by the amount of the Definitive Notes.

Section 4.09. Tax Treatment. The Issuer has entered into this Indenture, and the Notes will be issued, with
the intention that, for federal, state and local income, single business and franchise tax purposes, the
Notes (exclusive of the right to payment of any Group I Net WAC Shortfall) will be treated as indebtedness for
purposes of such taxes and in addition, for federal tax purposes, the Class I Notes

(exclusive of the right
to payment of any Group I Net WAC  Shortfall)  will  qualify  as  regular  interests in a REMIC as defined in the
Code.  The Issuer,  by entering into this Indenture,  and each  Noteholder,  by its acceptance of its Note (and
each Beneficial Owner by its acceptance of an interest in the applicable  Book-Entry Note), agree to treat the
Notes (exclusive  of the right to  payment  of any Group I Net WAC  Shortfall)  for  federal, state and local
income,  single  business  and  franchise  tax  purposes  as  indebtedness  for  purposes  of such taxes and in
addition,  for the Class I Notes  (exclusive  of the right to  payment  of any Group I Net WAC Shortfall),  as
regular  interests in a REMIC as defined in the Code.  The Issuer  intends that,  for federal, state and local
income,  single business and franchise tax purposes,  the Class I Notes right to the payment of any Group I Net
WAC Shortfall  will be treated  as a Notional  Principal  Contract,  and the  Issuer,  by entering  into this
Indenture,  and each  Class I Noteholder,  by its  acceptance  of its Note (and each  Beneficial Owner by its
acceptance  of an interest  in the  applicable  Book-Entry  Note),  agree to treat the right of the Class I Notes
to payment of any Group I Net WAC Shortfall as a Notional Principal Contract for such purposes.

Section 4.10.  Satisfaction  and Discharge of Indenture.  This  Indenture  shall cease to be of further  effect
with respect to the Notes except as to (i) rights of registration of transfer and exchange,  (ii) substitution
of mutilated,  destroyed,  lost or stolen Notes,  (iii) rights of Noteholders to receive payments of principal
thereof and interest  thereon,  (iv) Sections 3.03,  3.04,  3.06,  3.09,  3.16,  3.18 and 3.19,  (v) the rights,
obligations and immunities of the Indenture  Trustee  hereunder  (including the rights of the Indenture Trustee
under  Section 6.07 and the  obligations  of the  Indenture  Trustee under Section 4.11) and (vi) the rights of
Noteholders  as  beneficiaries  hereof with  respect to the property so deposited  with the Indenture  Trustee
payable to all or any of them,  and the  Indenture  Trustee,  on demand of and at the  expense of the  Issuer,
shall execute proper  instruments  acknowledging  satisfaction  and discharge of this Indenture with respect to
the Notes, when

     (A)    either

     (1)    all Notes  theretofore  authenticated  and delivered (other than (i) Notes that have been
destroyed,  lost or stolen and that have been  replaced or paid as  provided  in Section 4.03 and (ii)
Notes for whose payment money has  theretofore  been deposited in trust or segregated and held in trust
by the Issuer and  thereafter  repaid to the Issuer or  discharged  from such trust,  as provided  in
Section 3.03) have been delivered to the Indenture Trustee for cancellation; or

     (2)    all Notes not theretofore delivered to the Indenture Trustee for cancellation

     a.    have become due and payable,

     b.    will become due and payable at the Final  Scheduled  Payment Date within one year,
or

     c.    have been declared immediately due and payable pursuant to Section 5.02.

and the  Issuer,  in the  case of a. or b.  above,  has  irrevocably  deposited  or  caused  to be  irrevocably
deposited with the Indenture  Trustee cash or direct  obligations  of or  obligations  guaranteed by the United
States of America  (which will mature prior to the date such amounts are  payable),  in trust for such purpose,
in an amount  sufficient to pay and  discharge  the entire  indebtedness  on such Notes and Certificates  then
outstanding  not  theretofore  delivered  to the  Indenture  Trustee  for  cancellation when due on the  Final
Scheduled Payment Date;

(B)   the Issuer has paid or will be paid all other sums payable   hereunder and under the
Insurance Agreement by the Issuer; and

(C)   the Issuer has delivered to the Indenture Trustee and the Credit Enhancer an Officer's
Certificate and an Opinion of Counsel, each meeting the applicable requirements of Section 10.01 and
each stating that all conditions precedent herein provided for relating to the satisfaction and
discharge of this Indenture have been complied with and, if the Opinion of Counsel relates to a
deposit made in connection with Section 4.10(A)(2)b. above, such opinion shall further be to the
effect that such deposit will not have any material adverse tax consequences to the Issuer, any
Noteholders or any Certificateholders.

Section 4.11.   Application of Trust Money. All monies deposited with the Indenture Trustee pursuant to
Section 4.10 hereof shall be held in trust and applied by it, in accordance with the provisions of the Notes
and this Indenture, to the payment, either directly or through any Paying Agent or Certificate Paying Agent,
as the Indenture Trustee may determine, to the Holders of Securities, of all sums due and to become due
thereon for principal and interest; but such monies need not be segregated from other funds except to the
extent required herein or required by law.

Section 4.12.   Subrogation and Cooperation. The Issuer and the Indenture Trustee acknowledge that (i) to the
extent the Credit Enhancer makes payments under the Group I Policy on account of principal of or interest on
the Group I Loans, the Credit Enhancer will be fully subrogated to the rights of the Class I Noteholders to
receive such principal and interest from the Group I Loans, (ii) to the extent the Credit Enhancer makes
payments under the Group II Policy on account of principal of or interest on the Group II Loans, the Credit
Enhancer will be fully subrogated to the rights of the Class II Noteholders to receive such principal and
interest from the Group II Loans and (iii) the Credit Enhancer shall be paid such principal and interest but
only from the sources and in the manner provided herein and in the Insurance Agreement for the payment of
such principal and interest.

The Indenture Trustee shall cooperate in all respects with any reasonable request by the Credit
Enhancer for action to preserve or enforce the Credit Enhancer's rights or interest under this Indenture or
the Insurance Agreement, consistent with this Indenture and without limiting the rights of the Noteholders as
otherwise set forth in the Indenture, including, without limitation, upon the occurrence and continuance of a
default under the Insurance Agreement, a request to take any one or more of the following actions:

(i)   institute Proceedings for the collection of all amounts then payable on the Class I Notes or the Class
II Notes or under this Indenture in respect of the Class I Notes and Class II Notes and all amounts payable
under the Insurance Agreement and to enforce any judgment obtained and collect from the Issuer monies
adjudged due;

(ii)   sell the Trust Estate or any portion thereof or rights or interest therein, at one or more public or
private Sales (as defined in Section 5.15 hereof) called and conducted in any manner permitted by law;

(iii)   file or record all assignments that have not previously been recorded;

(iv)   institute Proceedings from time to time for the complete or partial foreclosure of this Indenture; and

(v)   exercise any remedies of a secured party under the Uniform Commercial Code and take any other
appropriate action to protect and enforce the rights and remedies of the Credit Enhancer hereunder.

Following the payment in full of the Notes,  the Credit  Enhancer shall continue to have all rights and
privileges  provided to it under this Section and in all other provisions of this Indenture, until all amounts
owing to the Credit Enhancer have been paid in full.

Section 4.13.    Repayment of Monies Held by Paying Agent. In connection with the  satisfaction and discharge of
this Indenture with respect to the Notes,  all monies then held by any Person other than the Indenture  Trustee
under the  provisions of this Indenture  with respect to such Notes shall,  upon demand of the Issuer,  be paid
to the  Indenture  Trustee to be held and applied  according  to Section 3.05 and  thereupon such Paying Agent
shall be released  from all further  liability with respect to such monies.

Section 4.14.    Temporary  Notes.  Pending the preparation of any Definitive  Notes,  the Issuer may execute and
upon its written direction,  the Indenture Trustee may authenticate and make available for delivery,  temporary
Notes that are printed,  lithographed,  typewritten,  photocopied or otherwise  produced,  in any denomination,
substantially  of the tenor of the Definitive  Notes in lieu of which they are issued and with such appropriate
insertions,  omissions,  substitutions and other variations as the officers executing such Notes may determine,
as evidenced by their execution of such Notes.

If  temporary  Notes are  issued,  the  Issuer  will  cause  Definitive  Notes to be  prepared  without
unreasonable  delay.  After the preparation of the Definitive  Notes, the temporary Notes shall be exchangeable
for Definitive  Notes upon surrender of the temporary  Notes at the office or agency of the Indenture  Trustee,
without charge to the Holder.  Upon surrender for  cancellation of any one or more temporary Notes, the Issuer
shall  execute and the Indenture  Trustee  shall  authenticate  and make  available  for delivery,  in exchange
therefor,  Definitive  Notes of  authorized  denominations  and of like tenor and aggregate principal  amount.
Until so exchanged,  such  temporary  Notes shall in all respects be entitled to the same benefits  under this
Indenture as Definitive Notes.

---

ARTICLE V

Default and Remedies

Section 5.01.    Events of Default.  The Issuer shall deliver to the Indenture  Trustee and the Credit  Enhancer,
within five days after  learning of the  occurrence  any event which with the giving of notice and the lapse of
time would  become an Event of Default  under  clause  (iii) of the  definition  of "Event of Default"  written
notice in the form of an Officer's  Certificate  of its status and what action the Issuer is taking or proposes
to take with respect thereto.

Section 5.02.    Acceleration of Maturity;  Rescission and Annulment.  If an Event of Default  should occur and be
continuing or if the Master  Servicer  shall  purchase all of the Home Equity Loans pursuant to Section 8.08 of
the Servicing  Agreement,  then  and in  every  such  case  the  Indenture  Trustee  or the  Holders  of Notes
representing  not less than a majority of the  Security  Balances of all Notes with the written consent of the
Credit  Enhancer,  or, the Credit Enhancer may declare the Notes to be immediately due and payable,  by a notice
in writing  to the  Issuer  (and to the  Indenture  Trustee if  given  by Noteholders),  and  upon  any such
declaration  the unpaid  principal  amount  of such class of Notes,  together  with accrued and unpaid  interest
thereon through the date of acceleration, shall become immediately due and payable.

At any time after such declaration of acceleration of maturity with respect to an Event of Default has
been made and before a judgment or decree for payment of the money due has been obtained by the Indenture
Trustee as hereinafter provided in this Article V, the Holders of Notes representing a majority of the
Security Balances of all Notes, by written notice to the Issuer and the Indenture Trustee with the written
consent of the Credit Enhancer, or the Credit Enhancer, may in writing waive the related Event of Default and
rescind and annul such declaration and its consequences if:

(i)    the Issuer has paid or deposited with the Indenture Trustee a sum sufficient to pay:

(A)    all payments of principal of and interest on the Notes and all other amounts
that would then be due hereunder or upon the Notes if the Event of Default giving rise to such
acceleration had not occurred; and

(B)    all sums paid or advanced by the Indenture Trustee hereunder and the reasonable
compensation, expenses, disbursements and advances of the Indenture Trustee and its agents and
counsel; and

(ii)    all Events of Default, other than the nonpayment of the principal of the Notes that has become due
solely by such acceleration, have been cured or waived as provided in Section 5.12.

No such rescission shall affect any subsequent default or impair any right consequent thereto.

Section 5.03.  Collection of Indebtedness and Suits for Enforcement by Indenture Trustee.
(a) The Issuer
covenants that if default in the payment of (i) any interest on any Note when the same becomes due and
payable, and such default continues for a period of five days, or (ii) the principal of or any installment of
the principal of any Note when the same becomes due and payable, the Issuer shall, upon demand of the
Indenture Trustee, pay to it, for the benefit of the Holders of Notes, the whole amount then due and payable
on the Notes for principal and interest, with interest upon the overdue principal, and in addition thereto
such further amount as shall be sufficient to cover the costs and expenses of collection, including the
reasonable compensation, expenses, disbursements and advances of the Indenture Trustee and its agents and
counsel.

(b)    In case the Issuer shall fail forthwith to pay such amounts upon such demand, the Indenture Trustee,
in its own name and as trustee of an express trust, subject to the provisions of Section 10.17 hereof may
institute a Proceeding for the collection of the sums so due and unpaid, and may prosecute such Proceeding to
judgment or final decree, and may enforce the same against the Issuer or other obligor upon the Notes and
collect in the manner provided by law out of the property of the Issuer or other obligor upon the Notes,
wherever situated, the monies adjudged or decreed to be payable.

(c)    If an Event of Default shall occur and be continuing, the Indenture Trustee subject to the provisions
of Section 10.17 hereof may, as more particularly provided in Section 5.04, in its discretion, proceed to
protect and enforce its rights and the rights of the Noteholders, by such appropriate Proceedings as the
Indenture Trustee shall deem most effective to protect and enforce any such rights, whether for the specific
enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted
herein, or to enforce any other proper remedy or legal or equitable right vested in the Indenture Trustee by
this Indenture or by law.

(d)    In case there shall be pending, relative to the Issuer or any other obligor upon the Notes or any
Person having or claiming an ownership interest in the Trust Estate, Proceedings under Title 11

of the United
States Code or any other applicable federal or state bankruptcy, insolvency or other similar
law, or in case
a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or
similar official
shall have been appointed for or taken possession of the Issuer or its property or such
other obligor or
Person, or in case of any other comparable judicial Proceedings relative to the Issuer or
other obligor upon
the Notes, or to the creditors or property of the Issuer or such other obligor, the
Indenture Trustee,
irrespective of whether the principal of any Notes shall then be due and payable as therein
expressed or by
declaration or otherwise and irrespective of whether the Indenture Trustee shall have
made any demand
pursuant to the provisions of this Section, shall be entitled and empowered, by
intervention in such
Proceedings or otherwise:

(i)      to file and prove a claim or claims for the entire amount of principal and interest
owing and unpaid
in respect of the Notes and to file such other papers or documents as may be necessary or
advisable in order
to have the claims of the Indenture Trustee (including any claim for reasonable compensation to
the Indenture
Trustee and each predecessor Indenture Trustee, and their respective agents, attorneys and
counsel, and for
reimbursement of all expenses and liabilities incurred, and all advances made, by the
Indenture Trustee and
each predecessor Indenture Trustee, except as a result of negligence, willful misconduct or bad
faith) and of
the Noteholders allowed in such Proceedings;

(ii)     unless prohibited by applicable law and regulations, to vote on behalf of the Holders
of Notes in any
election of a trustee, a standby trustee or Person performing similar functions in any such
Proceedings;

(iii)    to collect and receive any monies or other property payable or deliverable on any such
claims and to
distribute all amounts received with respect to the claims of the Noteholders and of the
Indenture Trustee on
their behalf; and

(iv)     to file such proofs of claim and other papers or documents as may be necessary or
advisable in order
to have the claims of the Indenture Trustee or the Holders of Notes allowed in any
judicial proceedings
relative to the Issuer, its creditors and its property;

and any trustee, receiver, liquidator, custodian or other similar official in any such
Proceeding is hereby
authorized by each of such Noteholders to make payments to the Indenture Trustee, and, in the
event that the
Indenture Trustee shall consent to the making of payments directly to such Noteholders,
to pay to the
Indenture Trustee such amounts as shall be sufficient to cover reasonable compensation to
the Indenture
Trustee, each predecessor Indenture Trustee and their respective agents, attorneys and counsel,
and all other
expenses and liabilities incurred, and all advances made, by the Indenture Trustee and
each predecessor
Indenture Trustee except as a result of negligence, willful misconduct or bad faith.

(e)      Nothing herein contained shall be deemed to authorize the Indenture Trustee to authorize
or consent to
or vote for or accept or adopt on behalf of any Noteholder any plan of reorganization,
arrangement,
adjustment or composition affecting the Notes or the rights of any Holder thereof or to
authorize the
Indenture Trustee to vote in respect of the claim of any Noteholder in any such
proceeding except, as
aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

(f)      All rights of action and of asserting claims under this Indenture, or under any of the
Notes, may be
enforced by the Indenture Trustee without the possession of any of the Notes or the production
thereof in any
trial or other Proceedings relative thereto, and any such action or proceedings instituted by
the Indenture
Trustee shall be brought in its own name as trustee of an express trust, and any recovery

of judgment,
subject to the payment of the expenses, disbursements and compensation of the Indenture Trustee, each
predecessor Indenture Trustee and their respective agents and attorneys, shall be for the ratable benefit of
the Holders of the Term Notes or the Variable Funding Notes, as applicable.

(g)    In any Proceedings brought by the Indenture Trustee (and also any Proceedings involving the
interpretation of any provision of this Indenture to which the Indenture Trustee shall be a party), the
Indenture Trustee shall be held to represent all the Holders of the Notes, and it shall not be necessary to
make any Noteholder a party to any such Proceedings.

Section 5.04. Remedies; Priorities. (a) If an Event of Default shall have occurred and be continuing, the
Indenture Trustee subject to the provisions of Section 10.17 hereof may with the written consent of the
Credit Enhancer, or shall at the written direction of the Credit Enhancer do one or more of the following
(subject to Section 5.05):

(i)    institute Proceedings in its own name and as trustee of an express trust for the collection of all
amounts then payable on the Notes or under this Indenture with respect thereto, whether by declaration or
otherwise, and all amounts payable under the Insurance Agreement, enforce any judgment obtained, and collect
from the Issuer and any other obligor upon such Notes monies adjudged due;

(ii)    institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with
respect to the Trust Estate;

(iii)    exercise any remedies of a secured party under the UCC and take any other appropriate action to
protect and enforce the rights and remedies of the Indenture Trustee and the Holders of the Notes; and

(iv)    sell the Trust Estate or any portion thereof or rights or interest therein, at one or more public or
private sales called and conducted in any manner permitted by law;

provided, however, that the Indenture Trustee may not sell or otherwise liquidate the Trust Estate following
an Event of Default, unless (A) the Indenture Trustee obtains the consent of the Credit Enhancer, which
consent will not be unreasonably withheld, or, if a Credit Enhancer Default has occurred and is continuing,
the consent of the Holders of 100% of the aggregate Security Balances of the Notes, (B) the proceeds of such
sale or liquidation distributable to Holders are sufficient to discharge in full all amounts then due and
unpaid upon the Notes for principal and interest and to reimburse the Credit Enhancer for any amounts drawn
under the Policies and any other amounts due the Credit Enhancer under the Insurance Agreement or (C) the
Indenture Trustee determines that the Home Equity Loans will not continue to provide sufficient funds for the
payment of principal of and interest on the Notes as they would have become due if the Notes had not been
declared due and payable, and the Indenture Trustee obtains the consent of the Credit Enhancer, which consent
will not be unreasonably withheld; provided further that the Indenture Trustee shall not sell or otherwise
liquidate the Trust Estate if the proceeds of such sale or liquidation together with amounts drawn under the
Policies will not be sufficient to discharge in full all amounts then due and unpaid upon the Notes for
principal and interest and to reimburse the Credit Enhancer for any amounts drawn under the Policies and any
other amounts due the Credit Enhancer under the Insurance Agreement unless the Indenture Trustee obtains the
consent of the Holders of 66-2/3% of the aggregate Security Balances of the Notes. In determining such
sufficiency or insufficiency with respect to clause (B) and (C), the Indenture Trustee may, but need not,
obtain and rely upon an opinion of an Independent investment banking or accounting firm of national
reputation as to the feasibility of such proposed action and as to the sufficiency of the

Trust Estate for
such purpose.  Notwithstanding  the  foregoing,  so long as a Servicing  Default has not
occurred,  any Sale of
the Trust  Estate  shall be made  subject  to the  continued  servicing  of the Home Equity Loans
by the Master
Servicer as provided in the Servicing Agreement.

(b)    If the Indenture  Trustee  collects any money or property  pursuant to this Article V, it
shall pay out
the money or property in the following order:

FIRST: to the Indenture Trustee for amounts due under Section 6.07;

SECOND:(x) to Holders of the Class I Notes for amounts  due and unpaid on the
related  Notes for
interest,  ratably from the  collections  in Loan Group I, without  preference or
priority of any kind,
according  to  the amounts due and payable on such Notes for  interest  from  amounts
available  in the
Trust  Estate for such  Noteholders  and (y) to Holders  of the Class A-II Notes and
Variable  Funding
Notes for  amounts due and unpaid on the  related  Notes for  interest,  ratably  from
the  collections
relating to Loan Group II,  without  preference  or priority of any kind,  according  to
the amounts due
and payable on such Notes for interest from amounts available in the Trust Estate for
such Noteholders;

THIRD: (x) to Holders of the Class I Notes for amounts  due and unpaid on the
related  Notes for
principal,  ratably from the  collections in Loan Group I, without  preference or
priority of any kind,
according  to the amounts due and payable on such Notes for  principal,  from  amounts
available in the
Trust  Estate for such Noteholders,  until the Security Balances of such Notes have been
reduced to zero
and (y) to Holders of the Class A-II Notes and  Variable  Funding  Notes for  amounts due
and unpaid on
the related  Notes for  principal,  ratably  from  the  collections  relating to Loan
Group II,  without
preference  or  priority  of any kind,  according  to the  amounts  due and  payable  on
such Notes for
principal,  from  amounts  available  in the Trust  Estate  for such  Noteholders,  until
the  Security
Balances of such Notes have been reduced to zero;

FOURTH:to the payment of all amounts due and owing to the Credit  Enhancer  under
the  Insurance
Agreement;

FIFTH: to the  Certificate  Paying  Agent  for  amounts  due  under  Article  VIII
of the  Trust
Agreement; and

SIXTH: to the  payment  of the  remainder,  if any,  to the Issuer or any other
person  legally
entitled thereto.

With  respect to clauses  SECOND and THIRD above,  after the  Security  Balances of
either the Class I
Notes or the Class II Notes are reduced to zero,  all principal and interest  payments will be
distributed  to
the remaining  Classes of Notes relating to the other Loan Group until the Security  Balances
thereof have been
reduced to zero.  The Indenture  Trustee may fix a record date and payment date for any payment
to  Noteholders
pursuant to this Section  5.04. At least 15 days before such record date,  the Indenture  Trustee
shall mail to
each Noteholder a notice that states the record date, the payment date and the amount to be paid.

Section 5.05.  Optional  Preservation  of the Trust  Estate.  If the Notes  have  been  declared
to be due and
payable under Section 5.02 following an Event of Default and such  declaration  and its
consequences  have not
been rescinded and annulled,  the Indenture  Trustee may, but need not, (but shall at the written
direction of
the  Credit  Enhancer)  elect to take and  maintain  possession  of the Trust  Estate.  It is the
desire of the
parties hereto and the  Noteholders  that there be at all times  sufficient  funds for the
payment of principal
of and interest on the Notes and other  obligations  of the Issuer  including  payment to the

Credit  Enhancer,
and the  Indenture  Trustee  shall take such desire into  account when  determining  whether or
not to take and
maintain  possession of the Trust Estate. In determining  whether to take and maintain
possession of the Trust
Estate,  the Indenture Trustee may, but need not, obtain and rely upon an opinion of an
Independent  investment
banking or accounting  firm of national  reputation as to the feasibility of such proposed action
and as to the
sufficiency of the Trust Estate for such purpose.

Section 5.06.  Limitation  of Suits.  No Holder of any Note shall have any right to institute
any  Proceeding,
judicial or otherwise,  with respect to this  Indenture,  or for the  appointment of a receiver
or trustee,  or
for any other remedy hereunder, unless and subject to the provisions of Section 10.17 hereof:

(i)     such Holder has  previously  given  written  notice to the Indenture  Trustee of a
continuing  Event of
Default;

(ii)    the Holders of not less than 25% of the  Security  Balances  of the Notes have made
written  request to
the  Indenture  Trustee to  institute  such  Proceeding  in respect of such Event of Default in
its own name as
Indenture Trustee hereunder;

(iii)   such Holder or Holders have offered to the Indenture  Trustee  reasonable  indemnity
against the costs,
expenses and liabilities to be incurred in complying with such request;

(iv)    the Indenture Trustee for 60 days after its receipt of such notice,  request and offer of
indemnity has
failed to institute such Proceedings; and

(v)     no direction  inconsistent  with such written  request has been given to the Indenture
Trustee  during
such  60-day  period by the  Holders  of a  majority  of the  Security  Balances  of the Notes or
by the Credit
Enhancer.

It is  understood  and  intended  that no one or more  Holders  of Notes  shall  have any  right
in any  manner
whatever by virtue of, or by availing of, any provision of this  Indenture to affect,  disturb or
prejudice the
rights of any other Holders of Notes or to obtain or to seek to obtain  priority or  preference
over any other
Holders or to enforce any right under this Indenture, except in the manner herein provided.

        In the event the Indenture  Trustee shall receive  conflicting  or  inconsistent  requests
and indemnity
from two or more groups of Holders of Notes,  each  representing  less than a majority of the
Security Balances
of the Notes, the Indenture  Trustee in its sole discretion may determine what action,  if any,
shall be taken,
notwithstanding any other provisions of this Indenture.

Section 5.07.  Unconditional  Rights  of  Noteholders  to Receive  Principal and Interest.
Notwithstanding  any
other  provisions  in this Indenture,  the  Holder of any Note shall have the  right,  which is
absolute  and
unconditional,  to receive  payment of the  principal  of and  interest,  if any,  on such Note
on or after the
respective  due  dates  thereof  expressed  in such Note or in this  Indenture  and to  institute
suit for the
enforcement of any such payment, and such right shall not be impaired without the consent of such
Holder.

Section 5.08.  Restoration  of Rights and Remedies.  If the Indenture  Trustee or any Noteholder
has instituted
any  Proceeding to enforce any right or remedy under this Indenture and such  Proceeding has been
discontinued
or abandoned for any reason or has been determined  adversely to the Indenture  Trustee or to
such Noteholder,
then and in every such case the  Issuer,  the  Indenture  Trustee  and the  Noteholders  shall,
subject to any
determination in such Proceeding,  be restored severally and respectively to their former
positions  hereunder,
and thereafter all rights and remedies of the Indenture  Trustee and the  Noteholders  shall
continue as though
no such Proceeding had been instituted.

Section 5.09.  Rights and Remedies  Cumulative.  No right or remedy  herein  conferred  upon or reserved to the
Indenture  Trustee,  the Credit  Enhancer or to the  Noteholders is intended to be exclusive of any other right
or remedy,  and every right and remedy shall be, to the extent  permitted by law, be cumulative and in addition to
every other right and remedy given  hereunder or now or  hereafter  existing at law or in equity or  otherwise.
The assertion or employment of any right or remedy  hereunder,  or otherwise,  shall not prevent the concurrent
assertion or employment of any other  appropriate  right or remedy.

Section 5.10.  Delay or  Omission  Not a Waiver.  No delay or  omission of the  Indenture  Trustee,  the Credit
Enhancer or any Holder of any Note to exercise  any right or remedy  accruing  upon any Event of  Default  shall
impair  any such  right or remedy  or  constitute  a waiver of any such  Event of  Default  or an  acquiescence
therein.  Every  right  and remedy  given  by this  Article  V or by law to the  Indenture  Trustee  or to the
Noteholders  may be exercised  from time to time,  and as often as may be deemed  expedient,  by the  Indenture
Trustee or by the Noteholders, as the case may be.

Section 5.11.  Control by the Credit  Enhancer  or  Noteholders.  The  Holders of a majority  of the  Security
Balances of Notes with the  consent  of the Credit  Enhancer,  or the  Credit  Enhancer  (so long as no Credit
Enhancer Default  exists)  shall  have the  right to direct  the time,  method  and  place of  conducting  any
Proceeding  for any remedy  available to the  Indenture  Trustee with  respect to the Notes or  exercising  any
trust or power conferred on the Indenture Trustee; provided that:

(i)      such direction shall not be in conflict with any rule of law or with this Indenture;

(ii)     subject to the  express  terms of Section  5.04,  any  direction  to the  Indenture  Trustee to sell or
liquidate  the Trust  Estate  shall be by  Holders  of Notes  representing  not less than 100% of the  Security
Balances of Notes with the  consent  of the Credit  Enhancer,  or the  Credit  Enhancer  (so long as no Credit
Enhancer Default exists);

(iii)    if the  conditions  set forth in Section 5.05 have been  satisfied and the Indenture  Trustee elects to
retain the Trust Estate  pursuant to such Section,  then any  direction to the Indenture  Trustee by Holders of
Notes  representing  less than 100% of the  Security  Balances of Notes to sell or  liquidate the Trust Estate
shall be of no force and effect; and

(iv)     the Indenture  Trustee may take any other action  deemed  proper by the  Indenture  Trustee that is not
inconsistent with such direction.

Notwithstanding  the rights of  Noteholders  set forth in this Section,  subject to Section 6.01, the Indenture
Trustee need not take any  action  that it  determines  might  involve  it in  liability  or  might  materially
adversely  affect the rights of any Noteholders not consenting to such action unless the  Indenture  Trustee has
received satisfactory indemnity from the Credit Enhancer or the Noteholders.

Section 5.12.  Waiver of Past Default.  Prior to the  declaration  of the  acceleration  of the  maturity of the
Notes as provided in Section  5.02,  the Holders of Notes of not less than a majority of the  Security  Balances
of the Notes with the consent of the Credit  Enhancer,  or the Credit  Enhancer (so long as no Credit  Enhancer
Default  exists) may waive any past Event of Default and its  consequences  except an Event of  Default (i) with
respect  to payment  of  principal  of or  interest  on any of the Notes or (ii) in  respect  of  a covenant  or
provision  hereof  which cannot be modified or amended  without the consent  of the Holder of each  Note.  In the
case of any such waiver,  the  Issuer,  the  Indenture  Trustee and the Holders of the Notes shall be restored to
their respective  former positions and rights  hereunder;  but no such waiver shall extend to any  subsequent or

other Event of Default or impair any right consequent thereto.

Upon any such waiver, any Event of Default arising therefrom shall be deemed to have been cured and
not to have occurred, for every purpose of this Indenture; but no such waiver shall extend to any subsequent
or other Event of Default or impair any right consequent thereto.

Section 5.13. Undertaking for Costs. All parties to this Indenture agree, and each Holder of any Note by
such Holder's acceptance thereof shall be deemed to have agreed, that any court may in its discretion
require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against
the Indenture Trustee for any action taken, suffered or omitted by it as Indenture Trustee, the filing by any
party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its
discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such
suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant;
but the provisions of this Section 5.13 shall not apply to (a) any suit instituted by the Indenture Trustee,
(b) any suit instituted by any Noteholder, or group of Noteholders, in each case holding in the aggregate
more than 10% of the Security Balances of the Notes or (c) any suit instituted by any Noteholder for the
enforcement of the payment of principal of or interest on any Note on or after the respective due dates
expressed in such Note and in this Indenture.

Section 5.14. Waiver of Stay or Extension Laws. The Issuer covenants (to the extent that it may lawfully do
so) that it will not at any time insist upon, or plead or in any manner whatsoever, claim or take the benefit
or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, that may
affect the covenants or the performance of this Indenture; and the Issuer (to the extent that it may lawfully
do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not
hinder, delay or impede the execution of any power herein granted to the Indenture Trustee, but will suffer
and permit the execution of every such power as though no such law had been enacted.

Section 5.15. Sale of Trust Estate. (a) The power to effect any sale or other disposition (a
"Sale") of any
portion of the Trust Estate pursuant to Section 5.04 is expressly subject to the provisions of Section 5.05
and this Section 5.15. The power to effect any such Sale shall not be exhausted by any one or more Sales as
to any portion of the Trust Estate remaining unsold, but shall continue unimpaired until the entire Trust
Estate shall have been sold or all amounts payable on the Notes and under this Indenture and under the
Insurance Agreement shall have been paid. The Indenture Trustee may from time to time postpone any public
Sale by public announcement made at the time and place of such Sale. The Indenture Trustee hereby expressly
waives its right to any amount fixed by law as compensation for any Sale.

(b) The Indenture Trustee shall not in any private Sale sell the Trust Estate, or any portion thereof,
unless:

(1) the Holders of all Notes and the Credit Enhancer consent to, or direct the Indenture
Trustee to make, such Sale, or

(2) the proceeds of such Sale would be not less than the entire amount which would be
payable to the Noteholders under the Notes, the Certificateholders under the Certificates and the
Credit Enhancer in respect of amounts drawn under the Policies and any other amounts due the Credit
Enhancer under the Insurance Agreement, in full payment thereof in accordance with
Section 5.02, on
the Payment Date next succeeding the date of such Sale, or

(3) the Indenture Trustee determines, in its sole discretion, that the

conditions for
    retention of the Trust Estate set forth in Section 5.05 cannot be satisfied (in
making any such
        determination, the Indenture Trustee may rely upon an opinion of an Independent
investment banking
        firm obtained and delivered as provided in Section 5.05), and the Credit Enhancer
consents to such
        Sale, which consent will not be unreasonably withheld and the Holders representing at
least 66-2/3% of
        the Security Balances of the Notes consent to such Sale.

The purchase by the Indenture Trustee of all or any portion of the Trust Estate at a private
Sale shall not
be deemed a Sale or other disposition thereof for purposes of this Section 5.15(b).

(c)     Unless the Holders and the Credit Enhancer have otherwise consented or directed the
Indenture Trustee,
at any public Sale of all or any portion of the Trust Estate at which a minimum bid equal to or
greater than
the amount described in paragraph (2) of subsection (b) of this Section 5.15 has not been
established by the
Indenture Trustee and no Person bids an amount equal to or greater than such amount, the
Indenture Trustee
shall bid an amount at least $1.00 more than the highest other bid.

(d)     In connection with a Sale of all or any portion of the Trust Estate:

        (1)     any Holder or Holders of Notes may bid for and with the consent of the
Credit Enhancer
        purchase the property offered for sale, and upon compliance with the terms of sale may
hold, retain
        and possess and dispose of such property, without further accountability, and may,
in paying the
        purchase money therefor, deliver any Notes or claims for interest thereon in lieu of
cash up to the
        amount which shall, upon distribution of the net proceeds of such sale, be payable
thereon, and such
        Notes, in case the amounts so payable thereon shall be less than the amount due
thereon, shall be
        returned to the Holders thereof after being appropriately stamped to show such partial
payment;

        (2)     the Indenture Trustee may bid for and acquire the property offered
for Sale in
        connection with any Sale thereof, and, subject to any requirements of, and to the extent
permitted by,
        applicable law in connection therewith, may purchase all or any portion of the
Trust Estate in a
        private sale, and, in lieu of paying cash therefor, may make settlement for the
purchase price by
        crediting the gross Sale price against the sum of (A) the amount which would be
distributable to the
        Holders of the Notes and Holders of Certificates and amounts owing to the Credit
Enhancer as a result
        of such Sale in accordance with Section 5.04(b) on the Payment Date next succeeding
the date of such
        Sale and (B) the expenses of the Sale and of any Proceedings in connection
therewith which are
        reimbursable to it, without being required to produce the Notes in order to complete
any such Sale or
        in order for the net Sale price to be credited against such Notes, and any property so
acquired by the
        Indenture Trustee shall be held and dealt with by it in accordance with the
provisions of this
        Indenture;

        (3)     the Indenture Trustee shall execute and deliver an appropriate instrument
of conveyance
        transferring its interest in any portion of the Trust Estate in connection with a Sale
thereof;

        (4)     the Indenture Trustee is hereby irrevocably appointed the agent and
attorney- in-fact
        of the Issuer to transfer and convey its interest in any portion of the Trust Estate
in connection
        with a Sale thereof, and to take all action necessary to effect such Sale; and

        (5)     no purchaser or transferee at such a Sale shall be bound to ascertain
the Indenture
        Trustee's authority, inquire into the satisfaction of any conditions precedent
or see to the

Section 5.16. Action on Notes. The Indenture Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking, obtaining or application of any other relief under or with respect to this Indenture. Neither the lien of this Indenture nor any rights or remedies of the Indenture Trustee or the Noteholders shall be impaired by the recovery of any judgment by the Indenture Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Trust Estate or upon any of the assets of the Issuer. Any money or property collected by the Indenture Trustee shall be applied in accordance with Section 5.04(b).

Section 5.17. Performance and Enforcement of Certain Obligations. (a) Promptly following a written request from the Credit Enhancer or the Indenture Trustee with the written consent of the Credit Enhancer to do so, the Issuer, in its capacity as holder of the Home Equity Loans, shall, with the written consent of the Credit Enhancer, take all such lawful action as the Indenture Trustee may request to cause the Issuer to compel or secure the performance and observance by the Seller and the Master Servicer, as applicable, of each of their obligations to the Issuer under or in connection with the Purchase Agreement and the Servicing Agreement, and to exercise any and all rights, remedies, powers and privileges lawfully available to the Issuer under or in connection with the Purchase Agreement and the Servicing Agreement to the extent and in the manner directed by the Indenture Trustee, as pledgee of the Home Equity Loans, including the transmission of notices of default on the part of the Seller or the Master Servicer thereunder and the institution of legal or administrative actions or proceedings to compel or secure performance by the Seller or the Master Servicer of each of their obligations under the Purchase Agreement and the Servicing Agreement.

(b) If an Event of Default has occurred and is continuing, the Indenture Trustee, as pledgee of the Home Equity Loans, subject to the rights of the Credit Enhancer under the Servicing Agreement may, and at the direction (which direction shall be in writing or by telephone (confirmed in writing promptly thereafter)) of the Credit Enhancer (or if a Credit Enhancer Default has occurred which is continuing, Holders of 66-2/3% of the Security Balances of the Notes) shall, exercise all rights, remedies, powers, privileges and claims of the Issuer against the Seller or the Master Servicer under or in connection with the Purchase Agreement and the Servicing Agreement, including the right or power to take any action to compel or secure performance or observance by the Seller or the Master Servicer, as the case may be, of each of their obligations to the Issuer thereunder and to give any consent, request, notice, direction, approval, extension or waiver under the Purchase Agreement and the Servicing Agreement, as the case may be, and any right of the Issuer to take such action shall not be suspended. In connection therewith, as determined by the Indenture Trustee, the Issuer shall take all actions necessary to effect the transfer of the Home Equity Loans to the Indenture Trustee.

ARTICLE VI

The Indenture Trustee

Section 6.01. Duties of Indenture Trustee. (a) If an Event of Default has occurred and is continuing, the Indenture Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the

circumstances in the conduct of such person's own affairs.

(b)    Except during the continuance of an Event of Default:

(i)    the Indenture  Trustee  undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied  covenants or obligations  shall be read into this Indenture against the Indenture Trustee; and

(ii)    in the absence of bad faith on its part, the Indenture  Trustee may conclusively rely, as to the truth of the statements  and the  correctness  of the opinions  expressed  therein,  upon certificates  or opinions furnished to the Indenture  Trustee and conforming to the  requirements of this Indenture; provided,  however, the Indenture  Trustee shall examine the certificates and opinions to determine  whether or not they conform to the requirements of this Indenture.

(c)    The Indenture  Trustee may not be relieved  from  liability  for its own  negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i)    this paragraph does not limit the effect of paragraph (b) of this Section 6.01;

(ii)    the  Indenture  Trustee  shall  not  be  liable  for any  error  of  judgment  made in good  faith  by a Responsible  Officer  unless  it is proved  that the  Indenture  Trustee  was  negligent  in ascertaining  the pertinent facts; and

(iii)    the Indenture  Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance  with a  direction  received  by it (A)  pursuant  to Section  5.11 or (B) from the Credit Enhancer, which it is entitled to give under any of the Basic Documents.

(d)    The Indenture  Trustee  shall not be liable for  interest  on any money  received  by it except as the Indenture Trustee may agree in writing with the Issuer.

(e)    Money held in trust by the  Indenture  Trustee  need not be  segregated  from other funds except to the extent required by law or the terms of this Indenture or the Trust Agreement.

(f)    No provision of this Indenture  shall require the Indenture  Trustee to expend or risk its own funds or otherwise  incur financial  liability in the  performance of any of its duties  hereunder or in the exercise of any of its rights or powers,  if it shall have  reasonable  grounds to believe that  repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(g)    Every  provision of this  Indenture  relating to the conduct or affecting the liability of or affording protection to the Indenture  Trustee shall be subject to the  provisions of this Section and to the  provisions of the TIA.

Section 6.02.   Rights of Indenture  Trustee.  (a) The  Indenture  Trustee may rely on any document  believed by it to be genuine and to have been signed or  presented by the proper  person.  The  Indenture Trustee need not investigate any fact or matter stated in the document.

(b)    Before the Indenture Trustee acts or refrains from acting,  it may require an Officer's Certificate or an Opinion of Counsel.  The  Indenture  Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on an Officer's Certificate or Opinion of Counsel.

(c)    The  Indenture  Trustee  may  execute  any of the  trusts or powers  hereunder  or perform  any duties hereunder  either  directly or by or through  agents or attorneys or a custodian or nominee,  and the Indenture Trustee shall not be responsible  for any misconduct or negligence on the part of, or for the supervision of, any such agent, attorney, custodian or nominee appointed with due care by it hereunder.

(d)       The Indenture  Trustee shall not be liable for any action it takes or omits to take in good faith
it believes to be authorized or within its rights or powers;  provided,  however,  that the Indenture Trustee's
conduct does not constitute willful misconduct, negligence or bad faith.

(e)       The Indenture  Trustee may consult with  counsel,  and the advice or opinion of counsel with respect to
legal  matters  relating  to this Indenture and the Notes  shall  be full  and  complete  authorization  and
protection  from  liability in respect to any action  taken,  omitted or suffered by it hereunder in good faith
and in accordance with the advice or opinion of such counsel.

Section 6.03.   Individual  Rights of Indenture  Trustee.  The Indenture  Trustee in its individual or any other
capacity  may become the owner or pledgee  of Notes and may  otherwise  deal with the Issuer or its  Affiliates
with the same  rights it would have if it were not  Indenture  Trustee.  Any Note  Registrar,  co-registrar  or
co-paying  agent may do the same with like rights.  However,  the  Indenture  Trustee must comply with Sections
6.11 and 6.12.

Section 6.04.   Indenture  Trustee's  Disclaimer.  The Indenture  Trustee shall not be (i) responsible  for and
makes no  representation  as to the validity or adequacy of this Indenture or the Notes,  (ii) accountable for
the Issuer's use of the proceeds  from the Notes or (iii)  responsible  for any statement of the Issuer in this
Indenture or in any  document  issued in  connection  with the sale of the Notes or in the Notes other than the
Indenture Trustee's certificate of authentication.

Section 6.05.   Notice of Event of Default.  If an Event of Default  occurs and is continuing and if it is known
to a Responsible  Officer of the Indenture  Trustee,  the  Indenture  Trustee shall give notice thereof to the
Credit  Enhancer.  The Indenture  Trustee shall mail to each  Noteholder  notice of the Event of Default within
90 days after it occurs.  Except in the case of an Event of Default in payment of  principal  of or interest on
any Note,  the  Indenture  Trustee may  withhold  the notice if and so long as a committee  of its  Responsible
Officers in good faith determines that withholding the notice is in the interests of Noteholders.

Section 6.06.   Reports  by  Indenture  Trustee  to  Holders.  The  Indenture  Trustee  shall  deliver  to each
Noteholder  such  information  as may be required to enable such holder to prepare its federal and state income
tax returns.  In addition,  upon the Issuer's  written  request,  the  Indenture  Trustee shall promptly furnish
information  reasonably  requested  by the Issuer that is  reasonably  available  to the  Indenture  Trustee to
enable the Issuer to perform its federal and state income tax reporting obligations.

Section 6.07.   Compensation  and Indemnity.  The Indenture  Trustee shall be compensated and indemnified by the
Master  Servicer  in  accordance  with  Section  6.06 of the  Servicing  Agreement.  The  Indenture  Trustee's
compensation shall not be limited by any law on compensation of a trustee of an express trust.

Section 6.08.   Replacement of Indenture  Trustee.  No  resignation  or removal of the Indenture  Trustee and no
appointment  of a successor  Indenture  Trustee shall become  effective  until the acceptance of appointment by
the successor  Indenture  Trustee  pursuant to this Section 6.08. The Indenture  Trustee may resign at any time
by so notifying  the Issuer and the Credit  Enhancer.  The Holders of a majority  of Security  Balances of the
Notes or the Credit  Enhancer may remove the Indenture  Trustee by so notifying  the Indenture  Trustee and the
Credit  Enhancer and may appoint a successor  Indenture  Trustee.  The Issuer shall remove the Indenture Trustee
if:

(i)       the Indenture Trustee fails to comply with Section 6.11;

(ii)      the Indenture Trustee is adjudged a bankrupt or insolvent;

(iii)     a receiver or other public officer takes charge of the Indenture Trustee or its property;

or
(iv)      the Indenture Trustee otherwise becomes incapable of acting.

If the Indenture Trustee resigns or is removed or if a vacancy exists in the office of the Indenture Trustee for any reason (the Indenture Trustee in such event being referred to herein as the retiring Indenture Trustee), the Issuer shall promptly appoint a successor Indenture Trustee with the consent of the Credit Enhancer which consent will not be unreasonably withheld. In addition, the Indenture Trustee will resign to avoid being directly or indirectly controlled by the Issuer.

A successor Indenture Trustee shall deliver a written acceptance of its appointment to the retiring Indenture Trustee and to the Issuer. Thereupon, the resignation or removal of the retiring Indenture Trustee shall become effective, and the successor Indenture Trustee shall have all the rights, powers and duties of the Indenture Trustee under this Indenture. The successor Indenture Trustee shall mail a notice of its succession to Noteholders. The retiring Indenture Trustee shall promptly transfer all property held by it as Indenture Trustee to the successor Indenture Trustee.

If a successor Indenture Trustee does not take office within 60 days after the retiring Indenture Trustee resigns or is removed, the retiring Indenture Trustee, the Issuer or the Holders of a majority of Security Balances of the Notes may petition any court of competent jurisdiction for the appointment of a successor Indenture Trustee.

If the Indenture Trustee fails to comply with Section 6.11, any Noteholder may petition any court of competent jurisdiction for the removal of the Indenture Trustee and the appointment of a successor Indenture Trustee.

Notwithstanding the replacement of the Indenture Trustee pursuant to this Section, the Issuer's obligations under Section 6.07 shall continue for the benefit of the retiring Indenture Trustee.

Section 6.09.  Successor Indenture Trustee by Merger. If the Indenture Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Indenture Trustee; provided, that such corporation or banking association shall be otherwise qualified and eligible under Section 6.11. The Indenture Trustee shall provide the Rating Agencies written notice of any such transaction occurring after the Closing Date.

In case at the time such successor or successors by merger, conversion or consolidation to the Indenture Trustee shall succeed to the trusts created by this Indenture any of the Notes shall have been authenticated but not delivered, any such successor to the Indenture Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Indenture Trustee may authenticate such Notes either in the name of any predecessor hereunder or in the name of the successor to the Indenture Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Indenture Trustee shall have.

Section 6.10.  Appointment of Co-Indenture Trustee or Separate Indenture Trustee. (a) Notwithstanding any other provisions of this Indenture, at any time, for the purpose of meeting any legal requirement of any jurisdiction in which any part of the Trust Estate may at the time be located, the Indenture Trustee shall have the power and may execute and deliver all instruments to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees, of all or any part of the Trust Estate,

and to vest in such Person or Persons,  in  perpetuity and for the benefit of the Noteholders, such title to
the Trust Estate,  or any part thereof,  and,  subject to the other  provisions of this Section, such powers,
duties,  obligations,  rights and trusts as the  Indenture  Trustee may  consider  necessary or desirable.  No
co-trustee or separate  trustee  hereunder  shall be required to meet the terms of  eligibility as a successor
trustee  under  Section 6.11 and no notice to  Noteholders  of the  appointment  of any  co-trustee or separate
trustee shall be required under Section 6.08 hereof.

(b)     Every  separate  trustee and  co-trustee  shall,  to the extent  permitted by law, be appointed and act
subject to the following provisions and conditions:

(i)     all rights,  powers,  duties and obligations  conferred or imposed upon the Indenture Trustee shall be
conferred or imposed upon and  exercised or performed by the  Indenture  Trustee and such separate  trustee or
co-trustee  jointly (it being  understood  that such separate  trustee or  co-trustee is not authorized to act
separately  without the Indenture  Trustee joining in such act), except to the extent that under any law of any
jurisdiction  in which  any  particular  act or acts  are to be  performed  the  Indenture Trustee  shall  be
incompetent  or  unqualified  to perform  such act or acts,  in which  event such  rights, powers,  duties and
obligations  (including  the  holding  of  title  to the  Trust  Estate  or any  portion  thereof in any  such
jurisdiction)  shall be exercised and performed  singly by such separate  trustee or co-trustee, but solely at
the direction of the Indenture Trustee;

(ii)     no trustee  hereunder shall be personally  liable by reason of any act or omission of any other trustee
hereunder; and

(iii)   the  Indenture  Trustee may at any time accept the  resignation  of or remove any separate  trustee or
co-trustee.

(c)     Any notice,  request or other writing given to the Indenture Trustee shall be deemed to have been given
to each of the then  separate  trustees and  co-trustees,  as  effectively  as if given to each of them. Every
instrument  appointing any separate  trustee or co-trustee  shall refer to this Indenture and the conditions of
this Article VI. Each separate trustee and co-trustee,  upon its acceptance of the trusts conferred,  shall be
vested with the estates or property  specified  in its  instrument  of  appointment,  either jointly  with the
Indenture Trustee or separately,  as may be provided therein,  subject to all the provisions of this Indenture,
specifically  including every provision of this Indenture  relating to the conduct of,  affecting the liability
of, or  affording  protection  to,  the  Indenture  Trustee.  Every  such  instrument  shall be filed  with the
Indenture Trustee.

(d)     Any separate  trustee or co-trustee  may at any time  constitute  the Indenture  Trustee, its agent or
attorney-in-fact  with full power and  authority,  to the extent not  prohibited  by law,  to do any lawful act
under or in respect of this  Indenture  on its behalf and in its name.  If any separate  trustee or  co-trustee
shall die, become incapable of acting, resign or be removed, all of its estates,  properties, rights, remedies
and trusts shall vest in and be exercised by the Indenture  Trustee,  to the extent  permitted by law,  without
the appointment of a new or successor trustee.

Section 6.11.  Eligibility;  Disqualification.   The  Indenture  Trustee  shall  at  all  times satisfy  the
requirements  of TIAss.310(a).  The  Indenture  Trustee  shall have a combined  capital and surplus of at least
$50,000,000  as set forth in its most recent  published  annual  report of condition and it or its parent shall
have a  long-term  debt  rating of A or better by Moody's.  The  Indenture  Trustee  shall comply  with TIAss.
310(b),  including  the  optional  provision  permitted by the second  sentence of TIAss.

310(b)(9);  provided,
however,  that there shall be excluded from the operation of TIAss.310(b)(1) any indenture or indentures  under
which other  securities of the Issuer are outstanding if the  requirements  for such exclusion set forth in TIA
ss.310(b)(1) are met.

          Within 90 days after  ascertaining  the  occurrence  of an Event of Default which shall not have
been cured or waived,  unless  authorized by the  Securities  and Exchange  Commission,  the Indenture  Trustee
shall resign with respect to one or more Classes of Notes in  accordance  with Section 6.08 of this  Indenture,
and the Issuer  shall  appoint  a successor  Indenture  Trustee  for such  Classes.  In the event the  Indenture
Trustee  fails to comply with the terms of the  preceding  sentence,  the  Indenture  Trustee shall comply with
clause (ii) of TIAss.310(b).

          In the case of the appointment  hereunder of a successor  Indenture  Trustee with respect to any
Class of Notes  pursuant to this Section 6.11,  the Issuer,  the retiring  Indenture  Trustee and the successor
Indenture  Trustee with  respect to such Class of Notes shall  execute and deliver an  indenture supplemental
hereto  wherein each  successor  Indenture  Trustee shall accept such  appointment  and which (i) shall contain
such  provisions  as shall be necessary or desirable to transfer and confirm to, and to vest in, the  successor
Indenture  Trustee all the rights,  powers,  trusts and duties of the retiring Indenture Trustee with respect to
the Notes of the Class to which the  appointment  of such  successor  Indenture  Trustee relates,  (ii) if the
retiring  Indenture  Trustee  is not  retiring  with  respect  to all  Classes  of Notes,  shall contain  such
provisions  as shall be deemed  necessary  or  desirable  to confirm  that all the rights,  powers,  trusts and
duties of the  retiring  Indenture  Trustee  with  respect to the Notes of each Class as to which the  retiring
Indenture  Trustee is not retiring  shall continue to be vested in the Indenture  Trustee,  and (iii) shall add
to or change any of the  provisions  of this  Indenture as shall be necessary to provide for or facilitate  the
administration  of the trusts  hereunder by more than one Indenture  Trustee,  it being understood that nothing
herein or in such  supplemental  indenture  shall  constitute  such Indenture  Trustees  co-trustees of the same
trust and that each such Indenture  Trustee shall be trustee of a trust or trusts hereunder separate and apart
from any trust or trusts hereunder  administered  by any other such Indenture  Trustee;  and upon the removal of
the retiring Indenture Trustee shall become effective to the extent provided therein.

Section 6.12.  Preferential  Collection  of Claims Against Issuer.  The Indenture  Trustee shall comply with TIA
ss.311(a),  excluding any creditor  relationship  listed in TIAss.311(b).  An Indenture Trustee who has resigned
or been removed shall be subject to TIAss.311(a) to the extent indicated.

Section 6.13.  Representations and Warranties.  The Indenture Trustee hereby represents that:

(i)     The Indenture  Trustee is duly organized,  validly  existing and in good standing under the laws of the
United States with power and  authority to own its  properties  and to conduct its business as such  properties
are currently owned and such business is presently conducted.

(ii)    The Indenture  Trustee has the power and  authority to execute and deliver this Indenture and to carry
out its terms;  and the execution,  delivery and performance of this Indenture have been duly authorized by the
Indenture  Trustee by all necessary corporate action.

(iii)   The  consummation  of the  transactions  contemplated by this Indenture and the fulfillment of the terms
hereof do not conflict with,  result in any breach of any of the terms and  provisions of, or constitute  (with
or without notice or lapse of time) a default under,  the articles of  organization  or bylaws of the Indenture
Trustee  or any  agreement  or other  instrument  to which the  Indenture  Trustee is a party or by which it is

bound.

(iv)    To the Indenture Trustee's best knowledge, there are no proceedings or investigations pending or
threatened before any court, regulatory body, administrative agency or other governmental instrumentality
having jurisdiction over the Indenture Trustee or its properties: (A) asserting the invalidity of this
Indenture (B) seeking to prevent the consummation of any of the transactions contemplated by this Indenture
or (C) seeking any determination or ruling that might materially and adversely affect the performance by the
Indenture Trustee of its obligations under, or the validity or enforceability of, this Indenture.

(v)    The Indenture Trustee does not have notice of any adverse claim (as such terms are used in Delaware
UCC Section 8-302) with respect to the Home Equity Loans.

Section 6.14.  Directions to Indenture Trustee.  The Indenture Trustee is hereby directed:

(a)    to accept the pledge of the Home Equity Loans and hold the assets of the Trust in trust for the
Noteholders and the Credit Enhancer;

(b)    to authenticate and deliver the Notes substantially in the form prescribed by Exhibit A in accordance
with the terms of this Indenture; and

(c)    to take all other actions as shall be required to be taken by the terms of this Indenture.

Section 6.15.  Indenture Trustee May Own Securities.  The Indenture Trustee, in its individual or any other
capacity may become the owner or pledgee of Securities with the same rights it would have if it were not
Indenture Trustee.

ARTICLE VII

Noteholders' Lists and Reports

Section 7.01.  Issuer to Furnish Indenture Trustee Names and Addresses of Noteholders.  The Issuer will
furnish or cause to be furnished to the Indenture Trustee (a) not more than five days after each Record Date,
a list, in such form as the Indenture Trustee may reasonably require, of the names and addresses of the
Holders of Notes as of such Record Date and, (b) at such other times as the Indenture Trustee and the Credit
Enhancer may request in writing, within 30 days after receipt by the Issuer of any such request, a list of
similar form and content as of a date not more than 10 days prior to the time such list is furnished;
provided, however, that so long as the Indenture Trustee is the Note Registrar, no such list shall be
required to be furnished.

Section 7.02.  Preservation of Information; Communications to Noteholders.  (a) The Indenture Trustee shall
preserve, in as current a form as is reasonably practicable, the names and addresses of the Holders of Notes
contained in the most recent list furnished to the Indenture Trustee as provided in Section 7.01 and the
names and addresses of Holders of Notes received by the Indenture Trustee in its capacity as Note Registrar.
The Indenture Trustee may destroy any list furnished to it as provided in such Section 7.01 upon receipt of a
new list so furnished.

(b)    Noteholders may communicate pursuant to TIAss.312(b) with other Noteholders with respect to their
rights under this Indenture or under the Notes.

(c)    The Issuer, the Indenture Trustee and the Note Registrar shall have the protection of
TIAss.312(c).

Section 7.03.    Reports by Issuer.   (a)   The Issuer shall:

(i)     file with the Indenture Trustee, within 15 days after the Issuer is required to file the same with the
Commission,   copies of the annual reports and the   information,   documents and other reports (or copies of such
portions of any of the foregoing as the   Commission may from time to time by rules and regulations  prescribe)
that the Issuer may be required   to file with the   Commission   pursuant to Section 13 or 15(d) of the   Exchange
Act;

(ii)    file with the   Indenture   Trustee, and the   Commission   in accordance   with rules and   regulations
prescribed   from time to time by the   Commission   such   additional   information,   documents and reports  with
respect to compliance   by the Issuer with the   conditions   and   covenants of this   Indenture as may be required
from time to time by such rules and regulations; and

(iii)   supply to the Indenture   Trustee (and the Indenture   Trustee shall transmit by mail to all   Noteholders
described in TIAss.313(c)) such   summaries of any   information,   documents and reports   required to be filed by
the Issuer   pursuant to clauses (i) and (ii) of this Section   7.03(a) and by rules and regulations  prescribed
from time to time by the Commission.

(b)     Unless the Issuer otherwise determines,   the fiscal year of the Issuer shall end on December 31 of each
year.

Section 7.04.   Reports by   Indenture   Trustee.   If required by TIAss.313(a),   within 60 days after each January
1, beginning with January 1, 2007,   the Indenture   Trustee shall mail to each   Noteholder as required by TIAss.
313(c) and to the Credit   Enhancer a brief report dated as of such date that   complies   with TIAss.313(a).   The
Indenture Trustee also shall comply with TIAss.313(b).

        A copy of each report   at the time of its   mailing   to   Noteholders   shall   be filed by the   Indenture
Trustee   with the   Commission,   if   required,   and each   stock   exchange,   if any,   on which the Term Notes are
listed.   The   Issuer   shall   notify   the   Indenture   Trustee if and when the Term Notes are listed on any stock
exchange.

Section 7.05.   Exchange Act   Reporting In connection   with the   preparation   and filing of periodic   reports by
the Master Servicer   pursuant to Section 4.01 of the Servicing   Agreement,   the Indenture Trustee shall timely
provide to the Master   Servicer (I) a list of Holders as shown on the Note Register or Certificate   Register as
of the end of each calendar   year,   (II) copies of all pleadings,   other legal process and any other   documents
relating   to any   claims,   charges   or   complaints   involving   the   Indenture   Trustee,   as indenture   trustee
hereunder,   or the Trust Estate that are received by the Indenture   Trustee,   (III) notice of all matters that,
to the actual   knowledge of a Responsible   Officer of the Indenture   Trustee,   have been submitted to a vote of
the Holders,   other than those matters that have been   submitted to a vote of the Holders at the request of the
Depositor or the Master Servicer,   and (IV) notice of any failure of the Indenture   Trustee to make any payment
to the Holders as required   pursuant to this Indenture.   Neither the Master Servicer nor the Indenture   Trustee
shall have any   liability   with   respect   to the Master   Servicer's   failure to   properly prepare or file such
periodic   reports   resulting   from or   relating   to the Master   Servicer's   inability   or failure to obtain any
information not resulting from the Master Servicer's own negligence or willful misconduct.

ARTICLE VIII

Accounts, Disbursements and Releases

Section 8.01.  Collection of Money.  Except as otherwise  expressly  provided herein, the Indenture Trustee may
demand payment or delivery of, and shall receive and collect,  directly and without  intervention or assistance
of any  fiscal  agent or other  intermediary,  all money and other  property  payable to or receivable  by the
Indenture  Trustee  pursuant to this  Indenture.  The Indenture  Trustee shall apply all such money received by
it as provided in this Indenture.  Except as otherwise  expressly  provided in this  Indenture, if any default
occurs in the making of any  payment or  performance  under any  agreement  or  instrument  that is part of the
Trust  Estate,  the  Indenture Trustee may take such action as may be  appropriate  to enforce such payment or
performance,  including the institution and  prosecution of appropriate  Proceedings.  Any such action shall be
without  prejudice to any right to claim a Default or Event of Default  under this  Indenture and any right to
proceed thereafter as provided in Article V.

Section 8.02.  Trust  Accounts.  (a) On or prior to the Closing  Date,  the Issuer  shall  cause the Indenture
Trustee to establish and maintain,  in the name of the Indenture  Trustee,  for the benefit of the  Noteholders
and the Certificate  Paying Agent, on behalf of the  Certificateholders  and the Credit  Enhancer,  the Payment
Account as provided in Section 3.01 of this Indenture.

(b)      All monies deposited from time to time in the Payment Account  pursuant to the Servicing  Agreement and
all deposits  therein  pursuant to this Indenture are for the benefit of the  Noteholders  and the  Certificate
Paying Agent,  on behalf of the  Certificateholders  and all  investments  made with such monies including all
income or other gain from such  investments  are for the benefit of the Master  Servicer as provided in Section
5.01 of the Servicing Agreement.

On each Payment Date,  the Indenture  Trustee  shall  distribute  all amounts on deposit in the Payment
Account  to  Noteholders  in  respect  of  the  Notes  and in its  capacity  as  Certificate  Paying  Agent  to
Certificateholders  in the order of  priority  set forth in Section  3.05 (except  as  otherwise  provided  in
Section 5.04(b).

The Master  Servicer  shall  direct the Indenture  Trustee in writing to invest any funds in the Payment
Account in  Permitted  Investments  maturing no later than the  Business  Day  preceding  each  Payment Date and
shall not be sold or disposed of prior to the maturity.

Section 8.03.  Officer's  Certificate.  The  Indenture  Trustee  shall  receive at least seven days notice when
requested  by the  Issuer  to take any  action  pursuant  to  Section  8.05(a),  accompanied  by  copies of any
instruments to be executed,  and the Indenture  Trustee shall also require,  as a condition to such action,  an
Officer's  Certificate,  in form and substance  satisfactory  to the Indenture Trustee,  stating the legal effect
of any such action,  outlining the steps  required to complete the same,  and  concluding  that all  conditions
precedent to the taking of such action have been complied with.

Section 8.04.  Termination  Upon  Distribution  to Noteholders.  This Indenture and the respective  obligations
and  responsibilities  of the  Issuer  and the  Indenture  Trustee  created  hereby  shall  terminate  upon the
distribution to the Noteholders,  the Certificate  Paying Agent (on behalf of the  Certificateholders)  and the
Indenture  Trustee of all  amounts  required  to be  distributed  pursuant  to Article  III and the  Insurance
Agreement;  provided,  however,  that in no event shall the trust created hereby continue beyond the expiration
of 21 years from the death of the survivor of the  descendants  of Joseph P.  Kennedy,  the late ambassador of
the United States to the Court of St. James's, living on the date hereof.

Section 8.05.   Release of Trust Estate. (a) Subject to the payment of its fees and expenses, the  Indenture
Trustee may, and when required by the provisions of this Indenture or the Servicing  Agreement shall,  execute
instruments to release  property from the lien of this Indenture,  or convey the Indenture Trustee's  interest
in the same,  in a manner  and under  circumstances  that are not  inconsistent  with the  provisions  of this
Indenture.  No party relying upon an instrument  executed by the Indenture  Trustee as provided in Article VIII
hereunder shall be bound to ascertain the Indenture Trustee's  authority,  inquire into the satisfaction of any
conditions precedent, or see to the application of any monies.

(b)     The Indenture Trustee shall, at such time as (i) there are no Notes Outstanding,  (ii) all sums due the
Indenture  Trustee  pursuant to this  Indenture  have been paid, and (iii) all sums due the Credit Enhancer have
been paid,  release any  remaining  portion of the Trust  Estate  that  secured the Notes from the lien of this
Indenture.

(c)     The Indenture  Trustee shall release property from the lien of this Indenture  pursuant to this Section
8.05 only upon receipt of a request from the Issuer  accompanied by an Officers'  Certificate and a letter from
the Credit Enhancer, stating that the Credit Enhancer has no objection to such request from the Issuer.

(d)     The Indenture  Trustee shall, at the request of the Issuer or the Depositor,  surrender (x) the Group I
Policy to the Credit  Enhancer for  cancellation,  upon final payment of principal of and interest on the Class
I Notes and (y) the Group II Policy to the Credit  Enhancer for  cancellation,  upon final payment of principal
of and interest on the Class II Notes.

Section 8.06.  Surrender of Notes Upon Final  Payment.  By acceptance of any Note, the Holder thereof agrees to
surrender  such  Note to the  Indenture  Trustee  promptly,  prior to such  Noteholder's  receipt of the final
payment thereon.

ARTICLE IX

SUPPLEMENTAL INDENTURES

Section 9.01.  Supplemental  Indentures  Without  Consent  of  Noteholders. (a)  Without  the  consent  of the
Holders  of any Notes but with  prior  notice to the  Rating  Agencies  and the  written  consent of the Credit
Enhancer (which consent shall not be unreasonably  withheld),  unless an Enhancer  Default shall have occurred,
the Issuer and the  Indenture  Trustee,  when  authorized  by an Issuer  Request,  at any time and from time to
time, may enter into one or more indentures  supplemental  hereto (which shall conform to the  provisions of the
TIA as in force at the date of the execution thereof),  in form satisfactory to the Indenture  Trustee,  for any
of the following purposes:

(i)     to correct  or amplify  the  description  of any  property  at any time  subject  to the lien of this
Indenture,  or better to assure,  convey  and confirm  unto the  Indenture  Trustee  any  property  subject or
required  to be  subjected  to the lien of this  Indenture,  or to subject  to the lien of this  Indenture
additional  property;

(ii)    to evidence the succession,  in compliance  with  the applicable  provisions hereof, of another person to
the Issuer,  and the  assumption  by any such  successor of the covenants of the Issuer herein and in the Notes

contained;

(iii)   to add to the  covenants  of the  Issuer, for the  benefit  of the  Holders of the Notes or the Credit
Enhancer, or to surrender any right or power herein conferred upon the Issuer;

(iv)    to convey, transfer, assign, mortgage or pledge any property to or with the Indenture
Trustee;

(v)     to cure any ambiguity,  to correct any error or to correct or supplement any provision herein or in any
supplemental  indenture that may be  inconsistent  with any  other  provision  herein  or in any supplemental
indenture;

(vi)    to make any other  provisions  with respect to matters or questions  arising under this Indenture or in
any supplemental  indenture;  provided,  that such  action  shall not  materially  and adversely  affect  the
interests of the Holders of the Notes or the Credit Enhancer;

(vii)   to evidence and provide for the  acceptance of the  appointment  hereunder by a successor trustee with
respect to the Notes and to add to or change any of the  provisions of this  Indenture as shall be necessary to
facilitate the  administration  of the trusts hereunder by more than one trustee,  pursuant to the requirements
of Article VI;

(viii)  to increase the Maximum Variable Funding Balance with the written consent of the Credit Enhancer; or

(ix)    to modify,  eliminate or add to the  provisions of this  Indenture to such extent as shall be necessary
to effect the  qualification  of this Indenture under the TIA or under any similar  federal statute  hereafter
enacted and to add to this Indenture such other provisions as may be expressly required by the TIA;

provided,  however, that no such supplemental  indenture shall be entered into unless the Indenture Trustee and
the Credit  Enhancer  shall have  received  an Opinion  of  Counsel to the effect  that the  execution  of such
supplemental  indenture  will not  give  rise to any  material  adverse  tax  consequence  to the  Noteholders,
including any Adverse REMIC Event.

        The Indenture Trustee is hereby authorized to join in the execution of any such supplemental  indenture
and to make any further  appropriate agreements and stipulations that may be therein contained.

(b)     The Issuer and the  Indenture  Trustee,  when  authorized by an Issuer  Request,  may, also without the
consent of any of the Holders of the Notes but with prior  notice to the Rating  Agencies  and with the consent
of the Credit  Enhancer,  enter into an indenture or indentures  supplemental  hereto for the  purpose of adding
any  provisions  to, or changing in any manner or  eliminating  any of the  provisions of, this  Indenture or of
modifying in any manner the rights of the Holders of the Notes under this Indenture;  provided,  however,  that
such action shall not, as  evidenced by an Opinion of Counsel,  (i)  adversely  affect in any  material  respect
the  interests of any  Noteholder  or the Credit  Enhancer or (ii) cause the Issuer to be  subject to an entity
level tax.

Section 9.02.  Supplemental  Indentures  With Consent of  Noteholders.  The Issuer and the  Indenture  Trustee,
when authorized by an Issuer  Request,  also may, with prior notice to the Rating Agencies and with the consent
of the  Holders of not less than a majority of the  Security  Balances  of the Notes  affected thereby and the
Credit  Enhancer,  by Act (as defined in Section 10.03 hereof) of such Holders  delivered to the  Issuer and the
Indenture  Trustee,  enter into an indenture or  indentures  supplemental  hereto for the purpose of adding any
provisions  to, or  changing in any manner or  eliminating  any of the  provisions  of,  this  Indenture  or of
modifying in any manner the rights of the Holders of the Notes under this Indenture;  provided, however,  that

no such supplemental indenture shall, without consent of the Holder of each Note affected thereby:

(i)    change the date of payment of any installment of principal of or interest on any Note, or reduce the
principal amount thereof or the Note Rate thereon, change the provisions of this Indenture relating to the
application of collections on, or the proceeds of the sale of, the Trust Estate to payment of principal of or
interest on the Notes, or change any place of payment where, or the coin or currency in which, any Note or
the interest thereon is payable, or impair the right to institute suit for the enforcement of the provisions
of this Indenture requiring the application of funds available therefor, as provided in Article V, to the
payment of any such amount due on the Notes on or after the respective due dates thereof;

(ii)    reduce the percentage of the Security Balances of any Class of Notes, the consent of the Holders of
which is required for any such supplemental indenture, or the consent of the Holders of which is required for
any waiver of compliance with certain provisions of this Indenture or certain defaults hereunder and their
consequences provided for in this Indenture;
(iii)    modify or alter the provisions of the proviso to the definition of the term "Outstanding" or modify or
alter the exception in the definition of the term "Noteholder";

(iv)    reduce the percentage of the Security Balances of the Notes required to direct the Indenture Trustee
to direct the Issuer to sell or liquidate the Trust Estate pursuant to Section 5.04;

(v)    modify any provision of this Section 9.02 except to increase any percentage specified herein or to
provide that certain additional provisions of this Indenture or the other Basic Documents cannot be modified
or waived without the consent of the Holder of each Note affected thereby;

(vi)    modify any of the provisions of this Indenture in such manner as to affect the calculation of the
amount of any payment of interest or principal due on any Note on any Payment Date (including the calculation
of any of the individual components of such calculation); or

(vii)    permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with
respect to any part of the Trust Estate or, except as otherwise permitted or contemplated herein, terminate
the lien of this Indenture on any property at any time subject hereto or deprive the Holder of any Note of
the security provided by the lien of this Indenture;

and provided, further, that any action listed in clauses (i) through (vii) above shall not, as evidenced by
an Opinion of Counsel, cause the Issuer to be subject to an entity level tax or cause an Adverse REMIC Event.

        The Indenture Trustee may in its discretion determine whether or not any Notes would be affected by
any supplemental indenture and any such determination shall be conclusive upon the Holders of all Notes,
whether theretofore or thereafter authenticated and delivered hereunder. The Indenture Trustee shall not be
liable for any such determination made in good faith.

        It shall not be necessary for any Act (as defined in Section 10.03 hereof) of Noteholders under this
Section 9.02 to approve the particular form of any proposed supplemental indenture, but it shall be
sufficient if such Act shall approve the substance thereof.

        Promptly after the execution by the Issuer and the Indenture Trustee of any supplemental indenture
pursuant to this Section 9.02, the Indenture Trustee shall mail to the Holders of the Notes to which such
amendment or supplemental indenture relates a notice setting forth in general terms the substance of such
supplemental indenture. Any failure of the Indenture Trustee to mail such notice, or any defect therein,
shall not, however, in any way impair or affect the validity of any such supplemental indenture.

So long as there does not exist a failure of the Credit Enhancer to make a required payment under the
Policies, the Credit Enhancer shall have the right to exercise all rights of the Holders of the Notes under
this Indenture without any consent of such Holders, and such Holders may exercise such rights only with the
prior written consent of the Credit Enhancer, except as provided herein.

Section 9.03.  Execution of Supplemental Indentures. In executing, or permitting the additional trusts
created by, any supplemental indenture permitted by this Article IX or the modification thereby of the trusts
created by this Indenture, the Indenture Trustee shall be entitled to receive, and subject to Sections 6.01
and 6.02, shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such
supplemental indenture is authorized or permitted by this Indenture. The Indenture Trustee may, but shall
not be obligated to, enter into any such supplemental indenture that affects the Indenture Trustee's own
rights, duties, liabilities or immunities under this Indenture or otherwise.

Section 9.04.  Effect of Supplemental Indenture. Upon the execution of any supplemental indenture pursuant to
the provisions hereof, this Indenture shall be and shall be deemed to be modified and amended in accordance
therewith with respect to the Notes affected thereby, and the respective rights, limitations of rights,
obligations, duties, liabilities and immunities under this Indenture of the Indenture Trustee, the Issuer and
the Holders of the Notes shall thereafter be determined, exercised and enforced hereunder subject in all
respects to such modifications and amendments, and all the terms and conditions of any such supplemental
indenture shall be and be deemed to be part of the terms and conditions of this Indenture for any and all
purposes.

Section 9.05.  Conformity with Trust Indenture Act. Every amendment of this Indenture and every supplemental
indenture executed pursuant to this Article IX shall conform to the requirements of the TIA as then in effect
so long as this Indenture shall then be qualified under the TIA.

Section 9.06.  Reference in Notes to Supplemental Indentures. Notes authenticated and delivered after the
execution of any supplemental indenture pursuant to this Article IX may, and if required by the Indenture
Trustee shall, bear a notation in form approved by the Indenture Trustee as to any matter provided for in
such supplemental indenture. If the Issuer or the Indenture Trustee shall so determine, new Notes so
modified as to conform, in the opinion of the Indenture Trustee and the Issuer, to any such supplemental
indenture may be prepared and executed by the Issuer and authenticated and delivered by the Indenture Trustee
in exchange for Outstanding Notes.

ARTICLE X

MISCELLANEOUS

Section 10.01. Compliance Certificates and Opinions, etc. (a) Upon any application or request by the Issuer
to the Indenture Trustee to take any action under any provision of this Indenture, the Issuer shall furnish
to the Indenture Trustee and to the Credit Enhancer (i) an Officer's Certificate stating that all conditions
precedent, if any, provided for in this Indenture relating to the proposed action have been complied with and
(ii) an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent, if any,
have been complied with, except that, in the case of any such application or request as to which the

furnishing of such documents is specifically required by any provision of this Indenture, no additional
certificate or opinion need be furnished.

Every certificate or opinion with respect to compliance with a condition or covenant provided for in
this Indenture shall include:

(i)    a statement that each signatory of such certificate or opinion has read or has caused to be read such
covenant or condition and the definitions herein relating thereto;

(ii)    a brief statement as to the nature and scope of the examination or investigation upon which the
statements or opinions contained in such certificate or opinion are based;

(iii)    a statement that, in the opinion of each such signatory, such signatory has made such examination or
investigation as is necessary to enable such signatory to express an informed opinion as to whether or not
such covenant or condition has been complied with;

(iv)    a statement as to whether, in the opinion of each such signatory, such condition or covenant has been
complied with; and

(v)    if the signer of such certificate or Opinion is required to be Independent, the statement required by
the definition of the term "Independent".

(b)    (i) Prior to the deposit of any Collateral or other property or securities with the Indenture Trustee
that is to be made the basis for the release of any property or securities subject to the lien of this
Indenture, the Issuer shall, in addition to any obligation imposed in Section 10.01(a) or elsewhere in this
Indenture, furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of
each person signing such certificate as to the fair value (within 90 days of such deposit) to the Issuer of
the Collateral or other property or securities to be so deposited.

(ii)    Whenever the Issuer is required to furnish to the Indenture Trustee an Officer's Certificate
certifying or stating the opinion of any signer thereof as to the matters described in clause (i) above, the
Issuer shall also deliver to the Indenture Trustee an Independent Certificate as to the same matters, if the
fair value to the Issuer of the securities to be so deposited and of all other such securities made the basis
of any such withdrawal or release since the commencement of the then-current fiscal year of the Issuer, as
set forth in the certificates delivered pursuant to clause (i) above and this clause (ii), is 10% or more of
the Security Balances of the Notes, but such a certificate need not be furnished with respect to any
securities so deposited, if the fair value thereof to the Issuer as set forth in the related Officer's
Certificate is less than $25,000 or less than one percent of the Security Balances of the Notes.

(iii)    Whenever any property or securities are to be released from the lien of this Indenture, the Issuer
shall also furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of
each person signing such certificate as to the fair value (within 90 days of such release) of the property or
securities proposed to be released and stating that in the opinion of such person the proposed release will
not impair the security under this Indenture in contravention of the provisions hereof.

(iv)    Whenever the Issuer is required to furnish to the Indenture Trustee an Officer's Certificate
certifying or stating the opinion of any signer thereof as to the matters described in clause (iii) above,
the Issuer shall also furnish to the Indenture Trustee an Independent Certificate as to the same matters if
the fair value of the property or securities and of all other property, other than property as contemplated
by clause (v) below or securities released from the lien of this Indenture since the commencement of the
then-current calendar year, as set forth in the certificates required by clause (iii) above

and this clause
(iv),  equals 10% or more of the Security  Balances of the Notes, but such certificate need not be furnished in
the  case of any  release  of  property  or  securities  if  the fair value  thereof as set forth in the  related
Officer's  Certificate  is less than  $25,000 or less than one  percent of the then  Security  Balances  of the
Notes.

(v)      Notwithstanding  any  provision  of this Indenture,  the  Issuer may,  without  compliance  with  the
requirements  of the other  provisions of this Section 10.01,  (A) collect upon,  sell or otherwise  dispose of
the  Home  Equity  Loans as and to the extent  permitted  or required  by the Basic  Documents  or (B) make cash
payments  out of the Payment  Account as and to the extent  permitted  or required  by the Basic Documents,  so
long as the Issuer shall deliver to the Indenture  Trustee every six months,  commencing December 31, 2006, an
Officer's  Certificate of the Issuer stating that all the  dispositions of Collateral  described in clauses (A)
or (B) above that  occurred  during the  preceding  six calendar  months  were in the  ordinary course of the
Issuer's  business and that the proceeds thereof were applied in accordance with the Basic Documents.

Section 10.02. Form of  Documents  Delivered  to Indenture  Trustee.  In any case where  several matters  are
required to be certified by, or covered by an opinion of, any specified  Person,  it is not necessary  that all
such  matters  be  certified  by,  or  covered  by the  opinion  of,  only one such Person,  or that they be so
certified or covered by only one  document,  but one such Person may certify or give an opinion with respect to
some  matters and one or more other such Persons as to other  matters,  and any such Person may certify or give
an opinion as to such matters in one or several documents.

        Any certificate or opinion of an Authorized  Officer of the Issuer may be based,  insofar as it relates
to legal  matters,  upon a  certificate  or opinion of, or  representations  by,  counsel, unless such officer
knows, or in the exercise of reasonable  care should know,  that the certificate or opinion or representations
with  respect  to the  matters  upon  which  his  certificate  or  opinion  is based  are erroneous.  Any such
certificate  of an  Authorized  Officer or Opinion  of Counsel  may be based,  insofar as it relates to factual
matters,  upon a certificate or opinion of, or representations  by, an officer or officers of the Seller or the
Issuer,  stating that the  information  with respect to such factual matters is in the possession of the Seller
or the  Issuer,  unless  such  counsel  knows,  or in the  exercise  of reasonable  care should know,  that the
certificate or opinion or representations with respect to such matters are erroneous.

        Where any Person is required to make,  give or execute two or more  applications, requests,  consents,
certificates,  statements,  opinions or other  instruments  under this Indenture,  they may, but need not, be
consolidated and form one instrument.

        Whenever  in this  Indenture,  in  connection  with any  application  or certificate  or report to the
Indenture  Trustee,  it is provided  that the Issuer shall  deliver any document as a condition of the granting
of such  application,  or as evidence of the Issuer's  compliance with any term hereof, it is intended that the
truth  and  accuracy,  at the  time  of the  granting  of such  application  or at the  effective date of such
certificate  or report (as the case may be), of the facts and opinions  stated in such  document shall in such
case be  conditions  precedent  to the  right  of the  Issuer  to  have  such  application granted  or to the
sufficiency  of such  certificate  or report.  The  foregoing  shall not,  however,  be construed to affect the
Indenture  Trustee's  right to rely upon the truth and accuracy of any  statement  or opinion contained in any
such document as provided in Article VI.

Section 10.03. Acts of  Noteholders.  (a) Any  request,  demand,  authorization,  direction,

notice,   consent,

waiver or other action  provided by this Indenture to be given or taken by  Noteholders  may be embodied in and
evidenced by one or more  instruments of  substantially  similar tenor signed by such  Noteholders in person or
by agents duly  appointed  in writing;  and except as herein  otherwise  expressly  provided  such action shall
become effective when such instrument or instruments are delivered to the Indenture  Trustee, and, where it is
hereby  expressly  required,  to the Issuer.  Such instrument or instruments  (and the action  embodied  therein
and  evidenced  thereby)  are  herein  sometimes  referred  to as the  "Act" of the  Noteholders  signing  such
instrument  or  instruments.  Proof of execution of any such  instrument  or of a writing  appointing  any such
agent shall be sufficient for any purpose of this  Indenture and (subject to Section 6.01)  conclusive in favor
of the Indenture Trustee and the Issuer, if made in the manner provided in this Section 10.03.

(b)       The fact and date of the  execution  by any person of any such  instrument  or writing  may be proved in
any manner that the Indenture Trustee deems sufficient.

(c)       The ownership of Notes shall be proved by the Note Registrar.

(d)       Any request, demand,  authorization,  direction,  notice, consent, waiver or other action  by the Holder
of any Note shall bind the Holder of every Note issued upon the  registration  thereof or in exchange  therefor
or in lieu thereof,  in respect of anything  done,  omitted or suffered to be done by the  Indenture  Trustee or
the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

Section 10.04. Notices,  etc., to Indenture Trustee,  Issuer, Credit Enhancer and Rating  Agencies. Any request,
demand,  authorization,  direction,  notice,  consent, waiver or Act of Noteholders or other documents provided
or permitted by this  Indenture  shall be in writing and if such  request,  demand,  authorization,  direction,
notice, consent, waiver or Act of Noteholders is to be made upon, given or furnished to or filed with:

(i)      the  Indenture  Trustee by any  Noteholder  or by the Issuer  shall be  sufficient  for  every  purpose
hereunder if made,  given,  furnished  or filed in writing to or with the  Indenture  Trustee at the  Corporate
Trust Office.  The Indenture  Trustee shall promptly  transmit any notice  received by it from the  Noteholders
to the Issuer, or

(ii)      the  Issuer by the  Indenture  Trustee  or by any  Noteholder  shall be  sufficient  for  every  purpose
hereunder if in writing and mailed  first-class,  postage prepaid to the Issuer  addressed to:  Home Equity Loan
Trust 2006-HSA2,  in care of Wilmington Trust Company, or at any other address previously  furnished in writing
to the  Indenture  Trustee by the Issuer.  The Issuer shall  promptly  transmit any notice  received by it from
the Noteholders to the Indenture Trustee, or

(iii)     the Credit Enhancer by the Issuer,  the Indenture Trustee or by any Noteholders shall be  sufficient for
every  purpose  hereunder to in writing and mailed,  first-class  postage pre-paid,  or personally  delivered or
telecopied to: Financial Guaranty Insurance Company,  125 Park Avenue, New York, NY 10017,  Attention:  General
Counsel (Home Equity Loan Trust  2006-HSA2).  The Credit  Enhancer shall promptly  transmit any  notice received
by it from the Issuer,  the Indenture  Trustee or the  Noteholders to the Issuer or Indenture  Trustee,  as the
case may be.

        Notices required to be given to the Rating Agencies by the Issuer,  the Indenture  Trustee or the Owner
Trustee shall be in writing,  personally  delivered or mailed by certified mail, return receipt  requested,  to
(i) in the case of Standard & Poor's, at the following  address:  Standard & Poor's Ratings  Services,  55 Water
Street,  New York, New York 10041,  Attention of Asset Backed  Surveillance  Department and (ii) in the case of
Moody's,  at the following  address:  Moody's Investors  Service,  Inc., ABS Monitoring

Department, 99 Church Street, New York, New York 10007; or as to each of the foregoing, at such other address as shall be designated by written notice to the other parties.

Section 10.05. Notices to Noteholders; Waiver. Where this Indenture provides for notice to Noteholders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, first-class, postage prepaid to each Noteholder affected by such event, at such Person's address as it appears on the Note Register, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice. In any case where notice to Noteholders is given by mail, neither the failure to mail such notice nor any defect in any notice so mailed to any particular Noteholder shall affect the sufficiency of such notice with respect to other Noteholders, and any notice that is mailed in the manner herein provided shall conclusively be presumed to have been duly given regardless of whether such notice is in fact actually received.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Noteholders shall be filed with the Indenture Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

In case, by reason of the suspension of regular mail service as a result of a strike, work stoppage or similar activity, it shall be impractical to mail notice of any event to Noteholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be satisfactory to the Indenture Trustee shall be deemed to be a sufficient giving of such notice.

Where this Indenture provides for notice to the Rating Agencies, failure to give such notice shall not affect any other rights or obligations created hereunder, and shall not under any circumstance constitute an Event of Default.

Section 10.06. Alternate Payment and Notice Provisions. Notwithstanding any provision of this Indenture or any of the Notes to the contrary, the Issuer may enter into any agreement with any Holder of a Note providing for a method of payment, or notice by the Indenture Trustee to such Holder, that is different from the methods provided for in this Indenture for such payments or notices. The Issuer shall furnish to the Indenture Trustee a copy of each such agreement and the Indenture Trustee shall cause payments to be made and notices to be given in accordance with such agreements.

Section 10.07. Conflict with Trust Indenture Act. If any provision hereof limits, qualifies or conflicts with another provision hereof that is required to be included in this Indenture by any of the provisions of the TIA, such required provision shall control.

The provisions of TIA ss.ss. 310 through 317 that impose duties on any Person (including the provisions automatically deemed included herein unless expressly excluded by this Indenture) are a part of and govern this Indenture, whether or not physically contained herein.

Section 10.08. Effect of Headings. The Article and Section headings herein are for convenience only and shall not affect the construction hereof.

Section 10.09. Successors and Assigns. All covenants and agreements in this Indenture and the Notes by the Issuer shall bind its successors and assigns, whether so expressed or not. All agreements of the Indenture Trustee in this Indenture shall bind its successors, co-trustees and agents.

Section 10.10. Separability. In case any provision in this Indenture or in the Notes shall be held invalid,
illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions hereof shall
not in any way be affected or impaired thereby.

Section 10.11. Benefits of Indenture. Nothing in this Indenture or in the Notes, express or implied, shall
give to any Person, other than the parties hereto and their successors hereunder, and the Noteholders, the
Credit Enhancer, and any other party secured hereunder, and any other Person with an ownership interest in
any part of the Trust Estate, any benefit or any legal or equitable right, remedy or claim under this
Indenture.

Section 10.12. Legal Holidays. In any case where the date on which any payment is due shall not be a Business
Day, then (notwithstanding any other provision of the Notes or this Indenture) payment need not be made on
such date, but may be made on the next succeeding Business Day with the same force and effect as if made on
the date on which nominally due, and no interest shall accrue for the period from and after any such nominal
date.

Section 10.13. GOVERNING LAW. THIS INDENTURE SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF
NEW YORK, WITHOUT REFERENCE TO ITS CONFLICTS OF LAW PROVISIONS (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE
NEW YORK GENERAL OBLIGATIONS LAW), AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE
DETERMINED IN ACCORDANCE WITH SUCH LAWS.

Section 10.14. Counterparts. This Indenture may be executed in any number of counterparts, each of which so
executed shall be deemed to be an original, but all such counterparts shall together constitute but one and
the same instrument.

Section 10.15. Recording of Indenture. If this Indenture is subject to recording in any appropriate public
recording offices, such recording is to be effected by the Issuer and at its expense accompanied by an
Opinion of Counsel (which may be counsel to the Indenture Trustee or any other counsel reasonably acceptable
to the Indenture Trustee) to the effect that such recording is necessary either for the protection of the
Noteholders or any other Person secured hereunder or for the enforcement of any right or remedy granted to
the Indenture Trustee under this Indenture.

Section 10.16. Issuer Obligation. No recourse may be taken, directly or indirectly, with respect to the
obligations of the Issuer, the Owner Trustee or the Indenture Trustee on the Notes or under this Indenture or
any certificate or other writing delivered in connection herewith or therewith, against (i) the Indenture
Trustee or the Owner Trustee in its individual capacity, (ii) any owner of a beneficial interest in the
Issuer or (iii) any partner, owner, beneficiary, agent, officer, director, employee or agent of the Indenture
Trustee or the Owner Trustee in its individual capacity, any holder of a beneficial interest in the Issuer,
the Owner Trustee or the Indenture Trustee or of any successor or assign of the Indenture Trustee or the
Owner Trustee in its individual capacity, except as any such Person may have expressly agreed (it being
understood that the Indenture Trustee and the Owner Trustee have no such obligations in their respective
individual capacities) and except that any such partner, owner or beneficiary shall be fully liable, to the
extent provided by applicable law, for any unpaid consideration for stock, unpaid capital contribution or
failure to pay any installment or call owing to such entity. For all purposes of this Indenture, in the
performance of any duties or obligations of the Issuer hereunder, the Owner Trustee shall be subject to, and
entitled to the benefits of, the terms and provisions of Articles VI, VII and VIII of the Trust
Agreement.

Section 10.17. No Petition. The Indenture Trustee, by entering into this Indenture, and each Noteholder, by
its acceptance of a Note, hereby covenant and agree that they will not at any time institute against the
Depositor or the Issuer, or join in any institution against the Depositor or the Issuer of, any bankruptcy,
reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United
States federal or state bankruptcy or similar law in connection with any obligations relating to the Notes,
this Indenture or any of other the Basic Documents.

Section 10.18. Inspection. The Issuer agrees that, on reasonable prior notice, it shall permit any
representative of the Indenture Trustee, during the Issuer's normal business hours, to examine all the books
of account, records, reports and other papers of the Issuer, to make copies and extracts therefrom, to cause
such books to be audited by Independent certified public accountants, and to discuss the Issuer's affairs,
finances and accounts with the Issuer's officers, employees, and Independent certified public accountants,
all at such reasonable times and as often as may be reasonably requested. The Indenture Trustee shall and
shall cause its representatives to hold in confidence all such information except to the extent disclosure
may be required by law (and all reasonable applications for confidential treatment are unavailing) and except
to the extent that the Indenture Trustee may reasonably determine that such disclosure is consistent with its
obligations hereunder.

---

ARTICLE XI

REMIC PROVISIONS

Section 11.01 REMIC Administration.

(a)The REMIC Administrator shall make an election to treat the HELs in Loan Group I and the
proceeds of the HELs in Loan Group I on deposit in the Distribution Account, the Custodial Account and the
Payment Account as two REMICs under the Code and, if necessary, under applicable state law, in accordance
with Section 2.06 of the Trust Agreement. Such election will be made on Form 1066 or other appropriate
federal tax or information return (including Form 8811) or any appropriate state return for the taxable year
ending on the last day of the calendar year in which the Securities are issued. For the purposes of the
REMIC elections in respect of that portion of the Trust Estate, Securities and interests to be designated as
the "regular interests" and the sole class of "residual interests" in each REMIC will be set forth in Section
11.03. The REMIC Administrator and the Owner Trustee shall not permit the creation of any "interests"
(within the meaning of Section 860G of the Code) in each REMIC elected in respect of the Trust Fund other
than the "regular interests" and "residual interests" so designated.

(b)The Closing Date is hereby designated as the "Startup Day" of each of REMIC I and REMIC II,
as designated in Section 11.03 below, within the meaning of Section 860G(a)(9) of the Code.

(c)The REMIC Administrator shall hold a Class R Certificate representing at least a 0.01%
Percentage Interest in each Class of the Class R Certificates and shall be designated as "the tax matters
person" with respect to each REMIC in the manner provided under Treasury regulations section 1.860F-4(d) and
Treasury regulations section 301.6231(a)(7)-1. The REMIC Administrator, as tax matters person, shall (i) act
on behalf of each REMIC in relation to any tax matter or controversy involving the Trust

Estate and (ii)
represent the Trust Estate in any administrative or judicial proceeding relating to an examination or audit
by any governmental taxing authority with respect thereto. The legal expenses, including without limitation
attorneys' or accountants' fees, and costs of any such proceeding and any liability resulting therefrom shall
be expenses of the Trust Estate and the REMIC Administrator shall be entitled to reimbursement therefor out
of amounts attributable to the HELs on deposit in the Custodial Account unless such legal expenses and costs
are incurred by reason of the REMIC Administrator's willful misfeasance, bad faith or gross negligence. If
the REMIC Administrator is no longer the Master Servicer hereunder, at its option the REMIC Administrator may
continue its duties as REMIC Administrator and shall be paid reasonable compensation not to exceed $3,000 per
year by any successor Master Servicer hereunder for so acting as the REMIC Administrator.

(d)The REMIC Administrator shall prepare or cause to be prepared all of the Tax Returns that
it determines are required with respect to each REMIC created hereunder and, if approval therefore is
received from the applicable District Director of the Internal Revenue Service, shall sign and file such
returns in a timely manner and, otherwise, shall deliver such Tax Returns in a timely manner to the Owner
Trustee, if the Owner Trustee is required to sign such returns in accordance with Section 5.03 of the Trust
Agreement, and shall sign (if the Owner Trustee is not so required) and file such Tax Returns in a timely
manner. The expenses of preparing such returns shall be borne by the REMIC Administrator without any right
of reimbursement therefor. The REMIC Administrator agrees to indemnify and hold harmless the Owner Trustee
with respect to any tax or liability arising from the Owner Trustee's signing of Tax Returns that contain
errors or omissions. The Indenture Trustee and Master Servicer shall promptly provide the REMIC
Administrator with such information in their possession as the REMIC Administrator may from time to time
request for the purpose of enabling the REMIC Administrator to prepare Tax Returns.

(e)The REMIC Administrator shall provide (i) to any Transferor of a Class R Certificate such
information as is necessary for the application of any tax relating to the transfer of a Class R Certificate
to any Person who is not a Permitted Transferee, (ii) to the Indenture Trustee, and the Indenture Trustee
shall forward to the Noteholders and the Certificateholders, such information or reports as are required by
the Code or REMIC Provisions including reports relating to interest, original issue discount and market
discount or premium (using the Prepayment Assumption) and (iii) to the Internal Revenue Service the name,
title, address and telephone number of the person who will serve as the representative of each REMIC.

(f)The Master Servicer and the REMIC Administrator shall take such actions and shall cause
each REMIC created hereunder to take such actions as are reasonably within the Master Servicer's or the REMIC
Administrator's control and the scope of its duties more specifically set forth herein as shall be necessary
or desirable to maintain the status of each REMIC as a REMIC under the REMIC Provisions (and the Indenture
Trustee shall assist the Master Servicer and the REMIC Administrator, to the extent reasonably requested by
the Master Servicer and the REMIC Administrator to do so). The Master Servicer and the REMIC Administrator
shall not knowingly or intentionally take any action, cause the Trust Estate to take any action or fail to
take (or fail to cause to be taken) any action reasonably within their respective control that, under the
REMIC Provisions, if taken or not taken, as the case may be, could (i) endanger the status of any portion of
any of the REMICs as a REMIC or (ii) result in the imposition of a tax upon any of the REMICs (including but
not limited to the tax on prohibited transactions as defined in Section 860F(a)(2) of the Code and the tax on
contributions to a REMIC set forth in Section 860G(d) of the Code) (either such event, in the

absence of an
Opinion of Counsel or the  indemnification  referred to in this sentence,  an "Adverse REMIC
Event") unless the
Master Servicer or the REMIC Administrator,  as applicable,  has received an Opinion of Counsel
(at the expense
of the party seeking to take such action or, if such party fails to pay such expense,  and the
Master  Servicer
or the REMIC  Administrator,  as applicable,  determines that taking such action is in the best
interest of the
Trust Estate and the  Noteholders  and the  Certificateholders,  at the expense of the Trust
Estate,  but in no
event at the  expense of the Master  Servicer,  the REMIC  Administrator,  the Owner  Trustee or
the  Indenture
Trustee) to the effect that the  contemplated  action will not, with respect to each REMIC
created  hereunder,
endanger  such  status or,  unless  the Master  Servicer,  the REMIC  Administrator  or both,
as  applicable,
determine in its or their sole  discretion to indemnify the Trust Estate  against the imposition
of such a tax,
result in the  imposition  of such a tax.  Wherever in this  Indenture a  contemplated  action
may not be taken
because the timing of such action might result in the  imposition of a tax on the Trust Estate,
or may only be
taken  pursuant to an Opinion of Counsel  that such  action  would not impose a tax on the Trust
Estate,  such
action may  nonetheless  be taken provided that the indemnity  given in the preceding  sentence
with respect to
any taxes  that might be imposed  on the Trust  Estate has been given and that all other
preconditions  to the
taking of such action have been  satisfied.  The  Indenture  Trustee  shall not take or fail to
take any action
(whether  or not  authorized  hereunder)  as to which  the  Master  Servicer  or the  REMIC
Administrator,  as
applicable,  has advised  it in writing  that it has  received  an  Opinion  of Counsel to the
effect  that an
Adverse  REMIC Event could occur with  respect to such action or  inaction.  In  addition,  prior
to taking any
action with respect to any of the REMICs  created  hereunder or any related assets  thereof,  or
causing any of
the  REMICs to take any  action,  which is not  expressly  permitted  under the  terms of this
Indenture,  the
Indenture  Trustee will consult with the Master  Servicer or the REMIC  Administrator,  as
applicable,  or its
designee,  in writing,  with respect to whether  such action  could cause an Adverse  REMIC Event
to occur with
respect to any of the REMICs,  and the  Indenture  Trustee shall not take any such action or
cause either REMIC
to take any such  action  as to which the  Master  Servicer  or the REMIC  Administrator,  as
applicable,  has
advised  it in  writing  that an  Adverse  REMIC  Event  could  occur.  The  Master  Servicer
or the  REMIC
Administrator,  as  applicable,  may consult  with counsel  to make such  written  advice,  and
the cost of same
shall be borne by the party seeking to take the action not  expressly  permitted by this
Indenture,  but in no
event at the  expense of the Master  Servicer  or the REMIC  Administrator.  At all times as may
be required by
the Code,  the  Master  Servicer  will to the  extent  within  its  control  and the scope of its
duties  more
specifically  set forth herein,  maintain  substantially  all of the assets of each REMIC created
hereunder as
"qualified  mortgages" as defined in Section  860G(a)(3) of the Code and "permitted  investments"
as defined in
Section 860G(a)(5) of the Code.

        (g)In the event  that any tax is  imposed  on  "prohibited  transactions"  of any
of the  REMICs
created  hereunder as defined in Section  860F(a)(2) of the Code, on "net income from foreclosure
property" of
any of the REMICs as defined in Section  860G(c) of the Code, on any  contributions  to any of
the REMICs after
the Startup Day therefor  pursuant to Section  860G(d) of the Code,  or any other tax is imposed
by the Code or
any  applicable  provisions of state or local tax laws,  such tax shall be charged (i) to the
Master  Servicer,
if such tax arises  out of or results  from a breach by the Master  Servicer  of any of its
obligations  under
this  Indenture or the Master  Servicer has in its sole  discretion  determined  to indemnify
the Trust Estate
against  such tax,  (ii) to the  Indenture  Trustee,  if such tax arises out of or results from a
breach by the

Indenture Trustee of any of its obligations under this Article XI, or (iii) otherwise against amounts on deposit in the Custodial Account and on the Payment Date(s) following such reimbursement the aggregate of such taxes shall be allocated in reduction of the accrued interest due on each Class entitled thereto on a pro rata basis.

(h) The Indenture Trustee and the Master Servicer shall, for federal income tax purposes, maintain books and records with respect to each REMIC created hereunder on a calendar year and on an accrual basis or as otherwise may be required by the REMIC Provisions.

(i) Following the Startup Day, neither the Master Servicer nor the Indenture Trustee shall accept any contributions of assets to any of the REMICs created hereunder unless (subject to Section 11.01(f)) the Master Servicer and the Indenture Trustee shall have received an Opinion of Counsel (at the expense of the party seeking to make such contribution) to the effect that the inclusion of such assets in such REMIC will not cause any of the REMICs to fail to qualify as a REMIC at any time that any Class I Notes or Group I Certificates are outstanding or subject any of the REMICs to any tax under the REMIC Provisions or other applicable provisions of federal, state and local law or ordinances.

(j) Neither the Master Servicer nor the Trustee shall (subject to Section 11.01(f)) enter into any arrangement by which any of the REMICs created hereunder will receive a fee or other compensation for services nor permit any of the REMICs to receive any income from assets other than "qualified mortgages" as defined in Section 860G(a)(3) of the Code or "permitted investments" as defined in Section 860G(a)(5) of the Code.

(k) Solely for the purposes of Section 1.860G-1(a)(4)(iii) of the Treasury Regulations, the "latest possible maturity date" by which the Certificate Principal Balance of each Class of Class I Notes representing a regular interest in the applicable REMIC is the Final Scheduled Payment Date with respect to the Class I Notes.

(l) Within 30 days after the Closing Date, the REMIC Administrator shall prepare and file with the Internal Revenue Service Form 8811, "Information Return for Real Estate Mortgage Investment Conduits (REMIC) and Issuers of Collateralized Debt Obligations" for each REMIC created hereunder.

(m) Neither the Indenture Trustee nor the Master Servicer shall sell, dispose of or substitute for any of the Group I Loans (except in connection with (i) the default, imminent default or foreclosure of the Group I Loans, including but not limited to, the acquisition or sale of a Mortgaged Property acquired by deed in lieu of foreclosure, (ii) the bankruptcy of any of the REMICs created hereunder, (iii) the termination of the applicable REMIC pursuant to Section 8.02 of the Trust Agreement or (iv) a purchase of the Group I Loans pursuant to the Purchase Agreement) nor acquire any assets for any of the REMICs, nor sell or dispose of any investments in the Custodial Account or the Payment Account for gain nor accept any contributions to any of the REMICs after the Closing Date unless it has received an Opinion of Counsel that such sale, disposition, substitution or acquisition will not (a) affect adversely the status of any of the REMICs as a REMIC or (b) unless the Master Servicer has determined in its sole discretion to indemnify the Trust Estate (and the Indenture Trustee for any cost, expense or liability incurred by the Indenture Trustee in connection therewith) against such tax, cause any REMIC to be subject to a tax on "prohibited transactions" or "contributions" pursuant to the REMIC Provisions.

(n) The Trustee will apply for an employer identification number from the Internal Revenue Service on a Form SS-4 or any other acceptable method for all tax entities.

Section 11.02 Servicer, REMIC Administrator and Indenture Trustee Indemnification.

(a)The Indenture Trustee agrees to indemnify the Trust Estate, the Depositor, the REMIC Administrator and the Master Servicer for any tax, cost, expense or liability, including, without limitation, any reasonable attorneys fees imposed on or incurred by the Trust Estate, the Depositor or the Master Servicer, as a result of a breach of the Indenture Trustee's covenants set forth in Article VIII or this Article XI.

(b)The REMIC Administrator agrees to indemnify the Trust Estate, the Depositor, the Master Servicer, the Owner Trustee and the Indenture Trustee for any tax, cost, expense and liability (including, without limitation, any reasonable attorneys' fees) imposed on or incurred by the Trust Estate, the Depositor, the Master Servicer, the Owner Trustee or the Indenture Trustee, as a result of a breach of the REMIC Administrator's covenants set forth in this Article XI with respect to compliance with the REMIC Provisions, including without limitation, any penalties arising from the Owner Trustee's execution of Tax Returns prepared by the REMIC Administrator that contain errors or omissions; provided, however, that such liability will not be imposed to the extent such breach is a result of an error or omission in information provided to the REMIC Administrator by the Master Servicer in which case Section 11.02(c) will apply.

(c)The Master Servicer agrees to indemnify the Trust Estate, the Depositor, the REMIC Administrator, the Owner Trustee and the Indenture Trustee for any tax, cost, expense and liability (including, without limitation, any reasonable attorneys' fees) imposed on or incurred by the Trust Estate, the Depositor, the REMIC Administrator, the Owner Trustee or the Indenture Trustee, as a result of a breach of the Master Servicer's covenants set forth in this Article XI or in the Servicing Agreement with respect to compliance with the REMIC Provisions, including without limitation, any penalties arising from the Owner Trustee's execution of Tax Returns prepared by the Master Servicer that contain errors or omissions.

Section 11.03 Designation of REMIC(s).

The REMIC Administrator shall make an election to treat the HELs in Loan Group I and the proceeds of the HELs in Loan Group I on deposit in the Distribution Account, the Custodial Account and the Payment Account as a REMIC ("REMIC I") and will make an election to treat the pool of assets comprised of the REMIC I Regular Interests as a REMIC ("REMIC II") for federal income tax purposes.

The REMIC I Regular Interests will be "regular interests" in REMIC I and the Class R-I Certificates will be the sole class of "residual interests" in REMIC I for purposes of the REMIC Provisions under the federal income tax law.

The REMIC II Regular Interests will be "regular interests" in REMIC II and the Class R-II Certificates will be the sole class of "residual interests" in REMIC II for purposes of the REMIC Provisions under the federal income tax law.

IN WITNESS WHEREOF, the Issuer and the Indenture Trustee have caused their names to be signed hereto

by their respective officers thereunto duly authorized, all as of the day and year first above written.

                                        HOME EQUITY LOAN TRUST 2006-HSA2,
                                        as Issuer


                                        By:    WILMINGTON TRUST COMPANY,
                                               not in its individual capacity
                                               but solely as Owner Trustee


                                        By:/s/Joann A. Rozell
                                            Name: Joann A. Rozell
                                            Title: Asst. Vice President


                                        JPMORGAN CHASE BANK, NATIONAL ASSOCIATION,
                                        as Indenture Trustee


                                        By:/s/Joanne Murray
                                            Name: Joanne Murray
                                            Title:  Asst. Vice President


JPMORGAN CHASE BANK, NATIONAL ASSOCIATION
hereby accepts the appointment as
Paying Agent pursuant to Section 3.03
hereof and as Note Registrar pursuant
to Section 4.02 hereof.


By: /s/Joanne Murray
    Name: Joanne Murray
    Title: Asst. Vice President

---

STATE OF DELAWARE          )
                           ) ss.:
COUNTY OF NEWCASTLE        )

        On this 24th day of February,  2006, before me personally  appeared  _____/s/Joann A. Rozell__,  to me
known,  who being by me duly sworn,  did depose and say, that s/he resides at in  __Wilmington__
, that s/he is
the __Asst. Vice  President___ of the Owner Trustee,  one of the corporations  described in and which executed
the above instrument;  that s/he knows the seal of said  corporation;  that the seal affixed to said instrument
is such  corporate  seal;  that it was so affixed by order of the Board of Directors of said corporation;  and
that s/he signed her/his name thereto by like order.



                                        /s/ Bethany J. Taylor
                                        Notary Public

---

STATE OF TEXAS             )
                           ) ss.:
COUNTY OF HARRIS           )

        On this 21st day of February,  2006, before me personally  appeared  _____Joanne  Murray___,
to me known,

who being by me duly sworn,  did depose and say that s/he  resides at ____600 Travis_____
that s/he is the
_AVP_____  of JPMorgan Chase Bank, N.A., as Indenture Trustee,  one of the corporations
described in and
which executed the above  instrument; that s/he knows the seal of said  corporation; that the
seal affixed to
said  instrument  is such  corporate  seal;  that it was so affixed by order of the Board of
Directors of said
corporation; and that s/he signed her/his name thereto by like order.


/s/Cecilia A. Garcia
Notary Public


NOTORIAL SEAL

---

EXHIBIT A-1

FORM OF CLASS A-I-[__] NOTES

UNLESS THIS TERM NOTE IS PRESENTED  BY AN  AUTHORIZED  REPRESENTATIVE  OF THE  DEPOSITORY  TRUST
COMPANY, A NEW YORK CORPORATION  ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF  TRANSFER,  EXCHANGE OR
PAYMENT,  AND ANY TERM  NOTE  ISSUED  IS  REGISTERED  IN THE  NAME OF CEDE & CO.  OR IN SUCH  OTHER  NAME AS IS
REQUESTED  BY AN  AUTHORIZED  REPRESENTATIVE  OF DTC (AND ANY  PAYMENT  IS MADE TO CEDE & CO. OR TO SUCH  OTHER
ENTITY AS IS REQUESTED BY AN AUTHORIZED  REPRESENTATIVE  OF DTC), ANY TRANSFER,  PLEDGE OR OTHER USE HEREOF FOR
VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL  INASMUCH AS THE  REGISTERED  OWNER HEREOF, CEDE & CO., HAS
AN INTEREST HEREIN.

[SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES,  THIS TERM NOTE IS A "REGULAR  INTEREST" IN A "REAL
ESTATE MORTGAGE  INVESTMENT  CONDUIT," AS THOSE TERMS ARE DEFINED,  RESPECTIVELY,  IN SECTIONS  860G AND 860D OF
THE INTERNAL REVENUE CODE OF 1986 (THE "CODE").]

THE PRINCIPAL OF THIS TERM NOTE IS PAYABLE IN  INSTALLMENTS  AS SET FORTH  HEREIN.  ACCORDINGLY,
THE  OUTSTANDING  PRINCIPAL  AMOUNT OF THIS TERM NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE
HEREOF.

THIS TERM NOTE DOES NOT  REPRESENT AN INTEREST IN OR OBLIGATION  OF THE SELLER,  THE  DEPOSITOR,
THE  MASTER  SERVICER,  THE  INDENTURE  TRUSTEE,  THE  TRUSTEE OR GMAC  MORTGAGE  GROUP,  INC. OR ANY OF THEIR
RESPECTIVE AFFILIATES, EXCEPT AS EXPRESSLY PROVIDED IN THE INDENTURE OR THE BASIC DOCUMENTS.

HOME EQUITY LOAN TRUST 2006-HSA2
Home Equity Loan-Backed Term Note, Class A-I-[__]

Registered                                                       Principal Amount:  $[_____]

No. 1                                                            Note Rate:  [Floating]/[Fixed]

CUSIP NO.

Home Equity Loan Trust  2006-HSA2,  a statutory trust duly organized and existing  under the laws
of the State of Delaware  (herein referred to as the "Issuer"),  for value received,  hereby  promises to pay to
Cede & Co. or registered  assigns,  the principal sum of $[_____],  payable on each Payment  Date in an amount
equal to the Percentage  Interest  evidenced by this Term Note of the aggregate  amount,  if any,  payable from
the Payment  Account  in respect of principal on the Term Notes pursuant to Section 3.05 of the  Indenture  dated
as of February 24, 2006 (the  "Indenture") between the Issuer, as Issuer,  and JPMorgan Chase

Bank, N.A., as
Indenture Trustee (the "Indenture Trustee"); provided, however, that the entire unpaid principal amount of
this Term Note shall be due and payable on the Payment Date in [ ], to the extent not
previously paid on a prior Payment Date. Capitalized terms used but not defined herein are defined in
Appendix A of the Indenture.

[Interest on the Class A-I-[__] Notes will be paid monthly on each Payment Date at the Note
Rate for the related Interest Period subject to limitations which may result in Group I Net WAC Cap
Shortfalls (as further described in the Indenture). The Note Rate for each Interest Period will be a
[floating rate equal to the least of (i) LIBOR plus [__]% per annum and (ii) the Group I Net WAC Rate] [fixed
rate equal to the lesser of (i) [__]% per annum [(or, for any Interest Period commencing with the Payment
Date after the Group I Step-Up Date, [__]%)] or (ii) the Group I Net WAC Rate]. LIBOR for each applicable
Interest Period will be determined on the second LIBOR Business Day immediately preceding (i) the Closing
Date in the case of the first Interest Period and (ii) the first day of each succeeding Interest Period by
the Indenture Trustee as set forth in the Indenture. All determinations of LIBOR by the Indenture Trustee
shall, in the absence of manifest error, be conclusive for all purposes, and each holder of this Term Note,
by accepting this Term Note, agrees to be bound by such determination. Interest on this Term Note will
accrue for each Payment Date from the most recent Payment Date on which interest has been paid (in the case
of the first Payment Date, from the Closing Date) to but excluding such Payment Date. Interest will be
computed on the basis of [the actual number of days in each Interest Period and a year assumed to consist of
360 days][ a 360-day year consisting of twelve 30 day months]. Principal of and interest on this Term Note
shall be paid in the manner specified on the reverse hereof.]

Principal of and interest on this Term Note are payable in such coin or currency of the United
States of America as at the time of payment is legal tender for payment of public and private debts. All
payments made by the Issuer with respect to this Term Note shall be applied first to interest due and payable
on this Term Note as provided above and then to the unpaid principal of this Term Note.

Reference is made to the further provisions of this Term Note set forth on the reverse hereof,
which shall have the same effect as though fully set forth on the face of this Term Note.

Unless the certificate of authentication hereon has been executed by the Indenture Trustee
whose name appears below by manual signature, this Term Note shall not be entitled to any benefit under the
Indenture referred to on the reverse hereof, or be valid or obligatory for any purpose.

This Term Note is one of a duly authorized issue of Term Notes of the Issuer, designated as its
Home Equity Loan-Backed Term Notes, all issued under the Indenture, to which Indenture and all indentures
supplemental thereto reference is hereby made for a statement of the respective rights and obligations
thereunder of the Issuer, the Indenture Trustee and the holders of the Term Notes. The Term Notes are
subject to all terms of the Indenture.

The Term Notes and the Variable Funding Notes (collectively, the "Notes") are and will be
equally and ratably secured by the collateral pledged as security therefor as provided in the Indenture.

This Term Note is entitled to the benefits of an irrevocable and unconditional financial
guaranty insurance policy issued by Financial Guaranty Insurance Company.

Principal of and interest on this Term Note will be payable on each Payment Date, commencing
March 27, 2006, as described in the Indenture. "Payment Date" means the twenty-fifth day of

each month, or,
if any such date is not a Business Day, then the next Business Day.

The entire unpaid principal amount of this Term Note shall be due and payable in full on the
Payment Date in [ ] pursuant to the Indenture, to the extent not previously paid on a prior
Payment Date. Notwithstanding the foregoing, if an Event of Default shall have occurred and be continuing,
then the Indenture Trustee or the holders of Notes representing not less than a majority of the Security
Balances of all Notes with the consent of the Credit Enhancer, or the Credit Enhancer may declare the Notes
to be immediately due and payable in the manner provided in Section 5.02 of the Indenture. All principal
payments on the Term Notes shall be made pro rata to the holders of Term Notes entitled thereto.

Payments of interest on this Term Note due and payable on each Payment Date, together with the
installment of principal, if any, to the extent not in full payment of this Term Note, shall be made by check
mailed to the Person whose name appears as the Registered Holder of this Term Note (or one or more
Predecessor Notes) on the Note Register as of the close of business on each Record Date, except that with
respect to Term Notes registered on the Record Date in the name of the nominee of the Depository Agency
(initially, such nominee to be Cede & Co.), payments will be made by wire transfer in immediately available
funds to the account designated by such nominee. Such checks shall be mailed to the Person entitled thereto
at the address of such Person as it appears on the Note Register as of the applicable Record Date without
requiring that this Term Note be submitted for notation of payment. Any reduction in the principal amount of
this Term Note (or any one or more Predecessor Notes) effected by any payments made on any Payment Date shall
be binding upon all future holders of this Term Note and of any Term Note issued upon the registration of
transfer hereof or in exchange hereof or in lieu hereof, whether or not noted hereon. If funds are expected
to be available, as provided in the Indenture, for payment in full of the then remaining unpaid principal
amount of this Term Note on a Payment Date, then the Indenture Trustee, in the name of and on behalf of the
Issuer, will notify the Person who was the Registered Holder hereof as of the Record Date preceding such
Payment Date by notice mailed or transmitted by facsimile prior to such Payment Date, and the amount then due
and payable shall be payable only upon presentation and surrender of this Term Note at the address specified
in such notice of final payment.

As provided in the Indenture and subject to certain limitations set forth therein, the transfer
of this Term Note may be registered on the Note Register upon surrender of this Term Note for registration of
transfer at the Corporate Trust Office, duly endorsed by, or accompanied by a written instrument of transfer
in form satisfactory to the Indenture Trustee duly executed by, the holder hereof or such holder's attorney
duly authorized in writing, with such signature guaranteed by an "eligible guarantor institution" meeting the
requirements of the Note Registrar, which requirements include membership or participation in the Securities
Transfer Agent's Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined
by the Note Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities
Exchange Act of 1934, as amended, and thereupon one or more new Term Notes in authorized denominations and in
the same aggregate principal amount will be issued to the designated transferee or transferees. No service
charge will be charged for any registration of transfer or exchange of this Term Note, but the Note Registrar
shall require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in
connection with any registration of transfer or exchange of this Term Note.

Each holder or Beneficial Owner of a Term Note, by acceptance of a Term Note, or, in the case

of a Beneficial Owner of a Term Note, a beneficial interest in a Term Note, covenants and agrees that no
recourse may be taken, directly or indirectly, with respect to the obligations of the Issuer, the Owner
Trustee, the Seller, the Master Servicer, the Depositor or the Indenture Trustee on the Term Notes or under
the Indenture or any certificate or other writing delivered in connection therewith, against (i) the
Indenture Trustee or the Owner Trustee in its individual capacity, (ii) any owner of a beneficial interest
in the Issuer or (iii) any partner, owner, beneficiary, agent, officer, director or employee of the Indenture
Trustee or the Owner Trustee in its individual capacity, any holder of a beneficial interest in the Issuer,
the Owner Trustee or the Indenture Trustee or of any successor or assign of the Indenture Trustee or the
Owner Trustee in its individual capacity, except as any such Person may have expressly agreed and except that
any such partner, owner or beneficiary shall be fully liable, to the extent provided by applicable law for
any unpaid consideration for stock, unpaid capital contribution or failure to pay any installment or call
owing to such entity.

Each holder or Beneficial Owner of a Term Note, by acceptance of a Term Note or, in the case of
a Beneficial Owner of a Term Note, a beneficial interest in a Term Note, covenants and agrees by accepting
the benefits of the Indenture that such holder or Beneficial Owner of a Term Note will not at any time
institute against the Depositor or the Issuer, or join in any institution against the Depositor, the Seller,
the Master Servicer, GMAC Mortgage Group, Inc. or the Issuer of, any bankruptcy, reorganization, arrangement,
insolvency or liquidation proceedings under any United States federal or state bankruptcy or similar law in
connection with any obligations relating to the Term Notes, the Indenture or the Basic Documents.

Prior to the due presentment for registration of transfer of this Term Note, the Issuer, the
Indenture Trustee and any agent of the Issuer or the Indenture Trustee may treat the Person in whose name
this Term Note is registered (as of the day of determination or as of such other date as may be specified in
the Indenture) as the owner hereof for all purposes, whether or not this Term Note be overdue, and none of
the Issuer, the Indenture Trustee or any such agent shall be affected by notice to the contrary.

The Indenture permits, with certain exceptions as therein provided, the amendment thereof and
the modification of the rights and obligations of the Issuer and the Indenture Trustee and the rights of the
holders of the Term Notes under the Indenture at any time by the Issuer and the Indenture Trustee with the
consent of the holders of Notes representing a majority of the Security Balances of all Notes at the time
Outstanding and the Credit Enhancer and with prior notice to the Rating Agencies. The Indenture also
contains provisions permitting the holders of Notes representing specified percentages of the Security
Balances of all Notes, on behalf of the holders of all the Notes, to waive compliance by the Issuer with
certain provisions of the Indenture and certain past defaults under the Indenture and their consequences.
Any such consent or waiver by the holder of this Term Note (or any one of more Predecessor Notes) shall be
conclusive and binding upon such holder and upon all future holders of this Term Note and of any Term Note
issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof whether or not
notation of such consent or waiver is made upon this Term Note. The Indenture also permits the Issuer and
the Indenture Trustee to amend or waive certain terms and conditions set forth in the Indenture without the
consent of holders of the Term Notes issued thereunder but with prior notice to the Rating Agencies and the
Credit Enhancer.

The term "Issuer" as used in this Term Note includes any successor or the Issuer under the
Indenture.

The Issuer is permitted by the Indenture, under certain circumstances,  to merge or consolidate,
subject to the  rights of the Indenture Trustee and the holders of Term Notes under the Indenture.

The  Term  Notes are  issuable  only in  registered  form in  denominations  as  provided  in the
Indenture, subject to certain limitations therein set forth.

This Term Note and the Indenture  shall be construed in accordance with the laws of the State of
New York,  without reference to its conflict of law provisions and the obligations,  rights and remedies of the
parties hereunder and thereunder shall be determined in accordance with such laws.

No reference  herein to the  Indenture  and no  provision of this Term Note or of the  Indenture
shall  alter or  impair,  the  obligation  of the  Issuer,  which is  absolute  and unconditional,  to pay the
principal of and interest on this Term Note at the times,  place and rate,  and in the coin or currency  herein
prescribed.

Anything  herein to the  contrary  notwithstanding,  except as  expressly  provided in the Basic
Documents,  none of Wilmington  Trust Company in its individual  capacity, JPMorgan  Chase Bank, N.A., in its
individual  capacity,  any owner of a beneficial  interest in the Issuer, or any of their  respective  partners,
beneficiaries,  agents,  officers,  directors,  employees or successors  or assigns shall be personally  liable
for,  nor shall  recourse be had to any of them for,  the payment of principal of or interest on this Term Note
or performance of, or omission to perform, any of the covenants,  obligations or indemnifications contained in
the Indenture.  The  holder  of this Term Note by its  acceptance  hereof  agrees  that,  except as  expressly
provided in the Basic  Documents,  in the case of an Event of Default  under the  Indenture,  the  holder  shall
have no claim against any of the foregoing for any  deficiency,  loss or claim  therefrom; provided,  however,
that nothing  contained  herein shall be taken to prevent recourse to, and enforcement  against, the assets of
the Issuer for any and all  liabilities,  obligations  and  undertakings  contained in the Indenture or in this
Term Note.

---

IN WITNESS WHEREOF, the Owner Trustee, on behalf of the Issuer and not in its individual  capacity,  has
caused this Term Note to be duly executed.

HOME EQUITY LOAN TRUST 2006-HSA2,

By      WILMINGTON TRUST COMPANY, not
        in its individual capacity but solely as
        Owner Trustee

Dated:  February 24, 2006

By: _____
    Authorized Signatory


CERTIFICATE OF AUTHENTICATION

This is one of the Term Notes referred to in the within mentioned Indenture.

JPMORGAN CHASE BANK, N.A., not in
its individual capacity but solely as Indenture
Trustee

Dated:  February 24, 2006

By: _____
        Authorized Signatory

---

## ASSIGNMENT

Social    Security    or    taxpayer    I.D.    or    other    identifying    number    of
assignee:
_____

       FOR    VALUE    RECEIVED,    the    undersigned    hereby    sells,    assigns    and
transfer    unto _____

(name and address of assignee)

the   within   Term   Note   and   all   rights   thereunder,    and   hereby   irrevocably   constitutes
and    appoints
_____, attorney, to  transfer  said
Term Note on the
books kept for registration thereof, with full power of substitution in the premises.

Dated: _____     _____ */
                     Signature Guaranteed:

                      _____ */

*        NOTICE:  The signature to this assignment  must correspond with the name of the
registered   owner as it
appears  on the face of the  within  Term Note in every  particular,  without  alteration,
enlargement  or any
change  whatever.  Such  signature  must be  guaranteed  by an  "eligible  guarantor
institution"  meeting the
requirements  of the Note Registrar,  which  requirements  include  membership or participation in
STAMP or such
other  "signature  guarantee  program"  as may be  determined  by the Note  Registrar  in
addition  to,  or in
substitution  for, STAMP, all  in accordance  with the Securities  Exchange Act of 1934, as amended.

---

### FORM OF CLASS A-II NOTES

       UNLESS THIS TERM NOTE IS PRESENTED  BY AN  AUTHORIZED  REPRESENTATIVE  OF THE
DEPOSITORY  TRUST
COMPANY, A NEW YORK CORPORATION  ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF
TRANSFER,   EXCHANGE OR
PAYMENT,  AND ANY TERM  NOTE  ISSUED  IS REGISTERED  IN THE  NAME OF CEDE & CO.  OR IN SUCH
OTHER  NAME AS IS
REQUESTED  BY AN  AUTHORIZED  REPRESENTATIVE  OF DTC (AND ANY  PAYMENT  IS MADE TO CEDE & CO. OR
TO SUCH  OTHER
ENTITY AS IS REQUESTED BY AN AUTHORIZED  REPRESENTATIVE  OF DTC), ANY TRANSFER,  PLEDGE OR OTHER
USE HEREOF FOR
VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL  INASMUCH AS THE  REGISTERED  OWNER HEREOF,
CEDE & CO., HAS
AN INTEREST HEREIN.

       THE PRINCIPAL OF THIS TERM NOTE IS PAYABLE IN  INSTALLMENTS  AS SET FORTH  HEREIN.
ACCORDINGLY,
THE  OUTSTANDING  PRINCIPAL  AMOUNT OF THIS TERM NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT
SHOWN ON THE FACE
HEREOF.

THIS TERM NOTE DOES NOT REPRESENT AN INTEREST IN OR OBLIGATION OF THE SELLER, THE DEPOSITOR, THE MASTER SERVICER, THE INDENTURE TRUSTEE, THE TRUSTEE OR GMAC MORTGAGE GROUP, INC. OR ANY OF THEIR RESPECTIVE AFFILIATES, EXCEPT AS EXPRESSLY PROVIDED IN THE INDENTURE OR THE BASIC DOCUMENTS.

HOME EQUITY LOAN TRUST 2006-HSA2
Home Equity Loan-Backed Term Note, Class A-II

Registered                                    Principal Amount: $[            ]

No. 1                                              Note Rate:  Floating

CUSIP NO.

Home Equity Loan Trust 2006-HSA2, a statutory trust duly organized and existing under the laws of the State of Delaware (herein referred to as the "Issuer"), for value received, hereby promises to pay to Cede & Co. or registered assigns, the principal sum of $[ ], payable on each Payment Date in an amount equal to the Percentage Interest evidenced by this Term Note of the aggregate amount, if any, payable from the Payment Account in respect of principal on the Term Notes pursuant to Section 3.05 of the Indenture dated as of February 24, 2006 (the "Indenture") between the Issuer, as Issuer, and JPMorgan Chase Bank, N.A., as Indenture Trustee (the "Indenture Trustee"); provided, however, that the entire unpaid principal amount of this Term Note shall be due and payable on the Payment Date in February 2036, to the extent not previously paid on a prior Payment Date. Capitalized terms used but not defined herein are defined in Appendix A of the Indenture.

Interest on the Class A-II Notes will be paid monthly on each Payment Date at the Note Rate for the related Interest Period subject to limitations which may result in Group II Net WAC Cap Shortfalls (as further described in the Indenture). The Note Rate for each Interest Period will be a floating rate equal to the least of (i) LIBOR plus 0.17% per annum, (ii) 17.25% per annum and (iii) the Group II Net WAC Rate. LIBOR for each applicable Interest Period will be determined on the second LIBOR Business Day immediately preceding (i) the Closing Date in the case of the first Interest Period and (ii) the first day of each succeeding Interest Period by the Indenture Trustee as set forth in the Indenture. All determinations of LIBOR by the Indenture Trustee shall, in the absence of manifest error, be conclusive for all purposes, and each holder of this Term Note, by accepting this Term Note, agrees to be bound by such determination. Interest on this Term Note will accrue for each Payment Date from the most recent Payment Date on which interest has been paid (in the case of the first Payment Date, from the Closing Date) to but excluding such Payment Date. Interest will be computed on the basis of the actual number of days in each Interest Period and a year assumed to consist of 360 days. Principal of and interest on this Term Note shall be paid in the manner specified on the reverse hereof.

Principal of and interest on this Term Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. All payments made by the Issuer with respect to this Term Note shall be applied first to interest due and payable on this Term Note as provided above and then to the unpaid principal of this Term Note.

Reference is made to the further provisions of this Term Note set forth on the reverse hereof, which shall have the same effect as though fully set forth on the face of this Term Note.

Unless the certificate of authentication hereon has been executed by the Indenture Trustee whose name appears below by manual signature, this Term Note shall not be entitled to any benefit under the Indenture referred to on the reverse hereof, or be valid or obligatory for any purpose.

This Term Note is one of a duly authorized issue of Term Notes of the Issuer, designated as its
Home Equity Loan-Backed Term Notes, all issued under the Indenture, to which Indenture and all indentures
supplemental thereto reference is hereby made for a statement of the respective rights and obligations
thereunder of the Issuer, the Indenture Trustee and the holders of the Term Notes. The Term Notes are
subject to all terms of the Indenture.

The Term Notes and the Variable Funding Notes (collectively, the "Notes") are and will be
equally and ratably secured by the collateral pledged as security therefor as provided in the Indenture.

This Term Note is entitled to the benefits of an irrevocable and unconditional financial
guaranty insurance policy issued by Financial Guaranty Insurance Company.

Principal of and interest on this Term Note will be payable on each Payment Date, commencing
March 27, 2006, as described in the Indenture. "Payment Date" means the twenty-fifth day of each month, or,
if any such date is not a Business Day, then the next Business Day.

The entire unpaid principal amount of this Term Note shall be due and payable in full on the
Payment Date in February 2036 pursuant to the Indenture, to the extent not previously paid on a prior Payment
Date. Notwithstanding the foregoing, if an Event of Default shall have occurred and be continuing, then the
Indenture Trustee or the holders of Notes representing not less than a majority of the Security Balances of
all Notes with the consent of the Credit Enhancer, or the Credit Enhancer may declare the Notes to be
immediately due and payable in the manner provided in Section 5.02 of the Indenture. All principal payments
on the Term Notes shall be made pro rata to the holders of Term Notes entitled thereto.

Payments of interest on this Term Note due and payable on each Payment Date, together with the
installment of principal, if any, to the extent not in full payment of this Term Note, shall be made by check
mailed to the Person whose name appears as the Registered Holder of this Term Note (or one or more
Predecessor Notes) on the Note Register as of the close of business on each Record Date, except that with
respect to Term Notes registered on the Record Date in the name of the nominee of the Depository Agency
(initially, such nominee to be Cede & Co.), payments will be made by wire transfer in immediately available
funds to the account designated by such nominee. Such checks shall be mailed to the Person entitled thereto
at the address of such Person as it appears on the Note Register as of the applicable Record Date without
requiring that this Term Note be submitted for notation of payment. Any reduction in the principal amount of
this Term Note (or any one or more Predecessor Notes) effected by any payments made on any Payment Date shall
be binding upon all future holders of this Term Note and of any Term Note issued upon the registration of
transfer hereof or in exchange hereof or in lieu hereof, whether or not noted hereon. If funds are expected
to be available, as provided in the Indenture, for payment in full of the then remaining unpaid principal
amount of this Term Note on a Payment Date, then the Indenture Trustee, in the name of and on behalf of the
Issuer, will notify the Person who was the Registered Holder hereof as of the Record Date preceding such
Payment Date by notice mailed or transmitted by facsimile prior to such Payment Date, and the amount then due
and payable shall be payable only upon presentation and surrender of this Term Note at the address specified
in such notice of final payment.

As provided in the Indenture and subject to certain limitations set forth therein, the transfer
of this Term Note may be registered on the Note Register upon surrender of this Term Note for registration of
transfer at the Corporate Trust Office, duly endorsed by, or accompanied by a written instrument of transfer

in form  satisfactory  to the Indenture  Trustee,  duly executed by, the holder hereof or such holder's attorney
duly authorized in writing,  with such signature guaranteed by an "eligible guarantor institution" meeting the
requirements of the Note Registrar,  which  requirements  include membership or participation in the Securities
Transfer Agent's Medallion Program ("STAMP") or such other "signature  guarantee  program" as may be determined
by the Note Registrar in addition to, or in  substitution  for,  STAMP, all in accordance  with the Securities
Exchange Act of 1934, as amended,  and thereupon one or more new Term Notes in authorized denominations and in
the same aggregate  principal  amount will be issued to the designated  transferee or transferees.  No service
charge will be charged for any  registration  of transfer or exchange of this Term Note, but the Note Registrar
shall  require  payment of a sum  sufficient  to cover any tax or  governmental  charge  that may be imposed in
connection with any registration of transfer or exchange of this Term Note.

Each holder or Beneficial  Owner of a Term Note,  by acceptance of a Term Note, or, in the case
of a  Beneficial  Owner of a Term Note,  a beneficial  interest in a Term Note,  covenants  and agrees that no
recourse  may be taken,  directly or  indirectly,  with  respect to the  obligations  of the Issuer,  the Owner
Trustee,  the Seller,  the Master Servicer,  the Depositor or the Indenture  Trustee on the Term Notes or under
the  Indenture  or any  certificate  or other  writing  delivered  in  connection  therewith, against (i) the
Indenture  Trustee or the Owner Trustee in its  individual  capacity,  (ii) any owner of a beneficial  interest
in the Issuer or (iii) any partner, owner,  beneficiary,  agent, officer, director or employee of the Indenture
Trustee or the Owner Trustee in its  individual  capacity,  any holder of a beneficial  interest in the Issuer,
the Owner  Trustee or the  Indenture  Trustee or of any  successor  or assign of the  Indenture  Trustee or the
Owner Trustee in its individual  capacity,  except as any such Person may have expressly agreed and except that
any such partner,  owner or  beneficiary  shall be fully liable,  to the extent  provided by applicable law for
any unpaid  consideration  for stock,  unpaid capital  contribution  or failure to pay any installment or call
owing to such entity.

Each holder or Beneficial  Owner of a Term Note, by acceptance of a Term Note or, in the case of
a  Beneficial  Owner of a Term Note, a beneficial  interest in a Term Note,  covenants  and agrees by accepting
the  benefits  of the  Indenture that  such  holder  or  Beneficial  Owner of a Term Note will not at any time
institute  against the Depositor or the Issuer, or join in any institution  against the Depositor,  the Seller,
the Master Servicer, GMAC Mortgage Group, Inc. or the Issuer of, any bankruptcy,  reorganization, arrangement,
insolvency or liquidation  proceedings  under any United States  federal or state  bankruptcy or similar law in
connection with any obligations relating to the Term Notes, the Indenture or the Basic Documents.

The Issuer has entered into the Indenture and this Term Note is issued with the intention  that,
for federal,  state and local income,  single business and franchise tax purposes,  the Term Notes will qualify
as  indebtedness  of the Issuer. Each holder of a Term Note, by acceptance of a Term Note (and each Beneficial
Owner of a Term Note by  acceptance  of a beneficial  interest in a Term Note),  agrees to treat the Term Notes
for federal, state and local income, single business and franchise tax purposes as indebtedness of the Issuer.

Prior to the due  presentment for  registration  of transfer of this Term Note, the Issuer,  the
Indenture  Trustee  and any agent of the  Issuer or the  Indenture  Trustee  may treat the Person in whose name
this Term Note is registered (as of the day of  determination  or as of such other date as may be specified in
the  Indenture)  as the owner hereof for all  purposes,  whether or not this Term Note be overdue,  and none of
the Issuer, the Indenture Trustee or any such agent shall be affected by notice to the contrary.

The Indenture permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Issuer and the Indenture Trustee and the rights of the holders of the Term Notes under the Indenture at any time by the Issuer and the Indenture Trustee with the consent of the holders of Notes representing a majority of the Security Balances of all Notes at the time Outstanding and the Credit Enhancer and with prior notice to the Rating Agencies. The Indenture also contains provisions permitting the holders of Notes representing specified percentages of the Security Balances of all Notes, on behalf of the holders of all the Notes, to waive compliance by the Issuer with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences. Any such consent or waiver by the holder of this Term Note (or any one of more Predecessor Notes) shall be conclusive and binding upon such holder and upon all future holders of this Term Note and of any Term Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof whether or not notation of such consent or waiver is made upon this Term Note. The Indenture also permits the Issuer and the Indenture Trustee to amend or waive certain terms and conditions set forth in the Indenture without the consent of holders of the Term Notes issued thereunder but with prior notice to the Rating Agencies and the Credit Enhancer.

The term "Issuer" as used in this Term Note includes any successor or the Issuer under the Indenture.

The Issuer is permitted by the Indenture, under certain circumstances, to merge or consolidate, subject to the rights of the Indenture Trustee and the holders of Term Notes under the Indenture.

The Term Notes are issuable only in registered form in denominations as provided in the Indenture, subject to certain limitations therein set forth.

This Term Note and the Indenture shall be construed in accordance with the laws of the State of New York, without reference to its conflict of law provisions and the obligations, rights and remedies of the parties hereunder and thereunder shall be determined in accordance with such laws.

No reference herein to the Indenture and no provision of this Term Note or of the Indenture shall alter or impair, the obligation of the Issuer, which is absolute and unconditional, to pay the principal of and interest on this Term Note at the times, place and rate, and in the coin or currency herein prescribed.

Anything herein to the contrary notwithstanding, except as expressly provided in the Basic Documents, none of Wilmington Trust Company in its individual capacity, JPMorgan Chase Bank, N.A., in its individual capacity, any owner of a beneficial interest in the Issuer, or any of their respective partners, beneficiaries, agents, officers, directors, employees or successors or assigns shall be personally liable for, nor shall recourse be had to any of them for, the payment of principal of or interest on this Term Note or performance of, or omission to perform, any of the covenants, obligations or indemnifications contained in the Indenture. The holder of this Term Note by its acceptance hereof agrees that, except as expressly provided in the Basic Documents, in the case of an Event of Default under the Indenture, the holder shall have no claim against any of the foregoing for any deficiency, loss or claim therefrom; provided, however, that nothing contained herein shall be taken to prevent recourse to, and enforcement against, the assets of the Issuer for any and all liabilities, obligations and undertakings contained in the Indenture or in this Term Note.

IN WITNESS WHEREOF, the Owner Trustee, on behalf of the Issuer and not in its individual capacity, has caused this Term Note to be duly executed.

HOME EQUITY LOAN TRUST 2006-HSA2,

By    WILMINGTON TRUST COMPANY, not
      in its individual capacity but solely as
      Owner Trustee

Dated:  February 24, 2006

By: _____
      Authorized Signatory

CERTIFICATE OF AUTHENTICATION

This is one of the Term Notes referred to in the within mentioned Indenture.

JPMORGAN CHASE BANK, N.A., not in
its individual capacity but solely as Indenture
Trustee

Dated:  February 24, 2006

By: _____
      Authorized Signatory

ASSIGNMENT

Social    Security    or    taxpayer    I.D.    or    other    identifying    number    of
assignee:
_____

              FOR    VALUE    RECEIVED,    the    undersigned    hereby    sells,    assigns    and
transfer    unto
_____

(name and address of assignee)

the    within    Term    Note    and    all    rights    thereunder,    and    hereby    irrevocably    constitutes
and    appoints
_____, attorney, to transfer said
Term Note on the
books kept for registration thereof, with full power of substitution in the premises.

Dated: _____

                              _____ */
                              Signature Guaranteed:

                              _____ */

*      NOTICE: The signature to this assignment must correspond with the name of the
registered  owner as it
appears  on the face of the  within  Term Note in every  particular,  without  alteration,
enlargement  or any
change  whatever.  Such  signature  must  be  guaranteed  by an "eligible  guarantor
institution"  meeting the
requirements of the Note Registrar, which  requirements  include  membership or participation in
STAMP or such
other  "signature  guarantee  program"  as may be  determined  by the  Note  Registrar  in
addition  to,  or in

substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

EXHIBIT A-2

FORM OF VARIABLE FUNDING NOTES

THIS VARIABLE FUNDING NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE RESOLD OR TRANSFERRED UNLESS IT IS REGISTERED PURSUANT TO SUCH ACT AND LAWS OR IS SOLD OR TRANSFERRED IN TRANSACTIONS WHICH ARE EXEMPT FROM REGISTRATION UNDER SUCH ACT AND UNDER APPLICABLE STATE LAW AND IS TRANSFERRED IN ACCORDANCE WITH THE PROVISIONS OF SECTION 4.02 OF THE INDENTURE REFERRED TO HEREIN.

THE PRINCIPAL OF THIS VARIABLE FUNDING NOTE IS PAYABLE IN INSTALLMENTS AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS VARIABLE FUNDING NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF.

THIS VARIABLE FUNDING NOTE DOES NOT REPRESENT AN INTEREST IN OR OBLIGATION OF THE SELLER, THE DEPOSITOR, THE MASTER SERVICER, THE INDENTURE TRUSTEE, THE TRUSTEE OR GMAC MORTGAGE GROUP, INC. OR ANY OF THEIR RESPECTIVE AFFILIATES, EXCEPT AS EXPRESSLY PROVIDED IN THE INDENTURE OR THE BASIC DOCUMENTS.

HOME EQUITY LOAN TRUST 2006-HSA2
Home Equity Loan-Backed Variable Funding Note

Registered

Initial Maximum Variable
Funding Note Balance: $0.00

No.VFN-1                                                                 Note Rate: Floating

Home Equity Loan Trust 2006-HSA2, a statutory trust duly organized and existing under the laws of the State of Delaware (herein referred to as the "Issuer"), for value received, hereby promises to pay to Residential Funding Corporation or registered assigns, the principal amount set forth on Schedule A attached hereto (or otherwise owing hereunder as determined pursuant to the Indenture as defined below), payable on each Payment Date in an amount equal to the pro rata portion allocable hereto (based on the Security Balances of all Variable Funding Notes immediately prior to such Payment Date) of the aggregate amount, if any, payable from the Payment Account in respect of principal on the Variable Funding Notes pursuant to Section 3.05 of the Indenture dated as of February 24, 2006 (the "Indenture") between the Issuer, as Issuer, and JPMorgan Chase Bank, N.A., as Indenture Trustee (the "Indenture Trustee"); provided, however, that the entire unpaid principal amount of this Variable Funding Note shall be due and payable on the Payment Date in February 2036 to the extent not previously paid on a prior Payment Date. Capitalized terms used herein but not defined herein are defined in Appendix A of the Indenture.

Interest on the Variable Funding Notes will be paid monthly on each Payment Date at the Note Rate for the related Interest Period subject to limitations which may result in Group II Net WAC Cap Shortfalls (as further described in the Indenture). The Note Rate for each Interest Period will be a floating rate equal to the least of (i) LIBOR plus 0.17% per annum, (ii) 17.25% per annum and (iii) the Group II Net WAC Rate. LIBOR for each applicable Interest Period will be determined on the second LIBOR Business

Day immediately preceding (i) the Closing Date in the case of the first Interest Period and (ii) the first
day of each succeeding Interest Period by the Indenture Trustee as set forth in the Indenture. All
determinations of LIBOR by the Indenture Trustee shall, in the absence of manifest error, be conclusive for
all purposes, and each holder of this Variable Funding Note, by accepting this Variable Funding Note, agrees
to be bound by such determination. Interest on this Variable Funding Note will accrue for each Payment Date
from the most recent Payment Date on which interest has been paid (in the case of the First Payment Date,
from the Closing Date) to but excluding such Payment Date. Interest will be computed on the basis of the
actual number of days in each Interest Period and a year assumed to consist of 360 days. Principal of and
interest on this Variable Funding Note shall be paid in the manner specified on the reverse hereof.

Principal of and interest on this Variable Funding Note are payable in such coin or currency of
the United States of America as at the time of payment is legal tender for payment of public and private
debts. All payments made by the Issuer with respect to this Variable Funding Note shall be applied first to
interest due and payable on this Variable Funding Note as provided above and then to the unpaid principal of
this Variable Funding Note.

Reference is made to the further provisions of this Variable Funding Note set forth on the
reverse hereof, which shall have the same effect as though fully set forth on the face of this Variable
Funding Note.

Unless the certificate of authentication hereon has been executed by the Indenture Trustee
whose name appears below by manual signature, this Variable Funding Note shall not be entitled to any benefit
under the Indenture referred to on the reverse hereof, or be valid or obligatory for any purpose.

This Variable Funding Note is one of a duly authorized issue of Variable Funding Notes of the
Issuer, designated as its Home Equity Loan-Backed Variable Funding Notes (herein called the "Variable Funding
Notes"), all issued under the Indenture, to which Indenture and all indentures supplemental thereto reference
is hereby made for a statement of the respective rights and obligations thereunder of the Issuer, the
Indenture Trustee and the holders of the Variable Funding Notes. The Variable Funding Notes are subject to
all terms of the Indenture.

The Variable Funding Notes and the Term Notes (collectively, the "Notes") are and will be
equally and ratably secured by the collateral pledged as security therefor as provided in the Indenture.

This Variable Funding Note is entitled to the benefits of an irrevocable and unconditional
financial guaranty insurance policy issued by Financial Guaranty Insurance Company.

Principal of and interest on this Variable Funding Note will be payable on each Payment Date,
commencing March 27, 2006, as described in the Indenture. "Payment Date" means the twenty-fifth day of each
month, or, if any such day is not a Business Day, then the next Business Day.

The entire unpaid principal amount of this Variable Funding Note shall be due and payable in
full on the Payment Date in February 2036 pursuant to the Indenture, to the extent not previously paid on a
prior Payment Date. Notwithstanding the foregoing, if an Event of Default shall have occurred and be
continuing, then the Indenture Trustee or the holders of Notes representing not less than a majority of the
Security Balances of all Notes with the consent of the Credit Enhancer, or the Credit Enhancer may declare
the Notes to be immediately due and payable in the manner provided in Section 5.02 of the Indenture. All
principal payments on the Variable Funding Notes shall be made pro rata to the holders of

Variable   Funding
Notes entitle thereto.

Payments   of  interest   on  this  Variable   Funding   Note  due  and   payable  on  each
Payment   Date,
together   with   the   installment   of   principal,   if  any,   to  the   extent  not  in  full   payment   of
this  Variable
Funding  Note,   shall be made by check  mailed  to the  Person whose name appears as the  Registered
Holder of this
Variable   Funding  Note (or one or more   Predecessor   Notes) on the Note Register as of the close
of business on
each Record   Date,   except that with respect to Variable   Funding   Notes  registered   on the
Record Date in the
name  of the  nominee of the   Depository   Agency   (initially,   such nominee to be Cede & Co.),
payments   will be
made by wire transfer  in immediately  available  funds to the account  designated  by such
nominee.  Such checks
shall be mailed to the   Person  entitled   thereto   at the   address   of such   Person as it
appears   on the Note
Register as of the applicable   Record Date without   requiring that this Variable   Funding Note be
submitted for
notation of payment.  Any reduction in the principal   amount of this Variable   Funding Note (or
any one or more
Predecessor   Variable   Funding   Notes)  effected  by any payments  made on any Payment Date shall
be binding upon
all  future holders   of  this  Variable  Funding  Note and of any   Variable   Funding   Note
issued  upon  the
registration   of transfer   hereof or in exchange   hereof or in lieu   hereof,   whether or not
noted  hereon.  If
funds are expected to be available,   as provided  in the   Indenture,   for payment in full of the
then  remaining
unpaid   principal  amount of this Variable   Funding Note on a Payment Date, then the Indenture
Trustee,   in the
name of and on behalf  of the   Issuer,   will   notify the Person who was the   Registered   Holder
hereof as of the
Record Date   preceding   such Payment Date by notice mailed or   transmitted  by facsimile   prior
to such Payment
Date and the amount   then due and  payable  shall be   payable   only upon   presentation  and
surrender  of this
Variable Funding Note at the address specified in such notice of final payment.

As provided in the Indenture and subject to certain limitations set forth therein,
the transfer
of this Variable   Funding Note may be registered on the Note Register upon   surrender of this
Variable   Funding
Note for   registration   of transfer at the Corporate   Trust   Office,   duly   endorsed by, and
accompanied   by a
written  instrument   of transfer in form  satisfactory   to the   Indenture   Trustee duly executed
by, the holder
hereof or such holder's   attorney duly   authorized in writing,  with such signature   guaranteed
by an "eligible
guarantor   institution"   meeting the requirements of the Note Registrar,   which requirements
include membership
or  participation   in the Securities   Transfer   Agent's   Medallion   Program   ("STAMP") or such
other "signature
guarantee   program" as may be determined by the Note Registrar in addition to or in   substitution
for,   STAMP,
all in  accordance   with the   Securities   Exchange   Act of 1934,   as   amended,   and   thereupon
one or more new
Variable Funding Notes in authorized   denominations   and in the same aggregate   principal amount
will be issued
to the  designated   transferee   or  transferees.  No service   charge   will be charged for any
registration   of
transfer or exchange of this   Variable   Funding Note, but the Note   Registrar   shall require
payment of a sum
sufficient to cover any tax or governmental   charge that may be imposed in connection with any
registration of
transfer or exchange of this Variable Funding Note.

Each holder or Beneficial   Owner  of a Variable Funding Note, by acceptance  of a
Variable Funding
Note or, in the  case of a Beneficial   Owner  of a Variable   Funding   Note,   a beneficial   interest
in a Variable
Funding Note,  covenants and agrees that no recourse may be taken,  directly or indirectly,  with
respect to the
obligations of the Issuer, the Owner Trustee,   the Seller, the Master Servicer,   the Depositor or
the Indenture
Trustee on the Variable   Funding Notes or under the Indenture or any certificate or other writing
delivered in
connection  therewith,   against (i) the Indenture Trustee or the Owner Trustee in its individual
capacity,   (ii)

any owner of a beneficial interest in the Issuer, (iii) any partner, owner, beneficiary, agent, officer,
director or employee of the Indenture Trustee or the Owner Trustee in its individual capacity, any holder of
a beneficial interest in the Issuer, the Owner Trustee or the Indenture Trustee or of any successor or assign
of the Indenture Trustee or the Owner Trustee in its individual capacity, except as any such Person may have
expressly agreed and except that any such partner, owner or beneficiary shall be fully liable, to the extent
provided by applicable law, for any unpaid consideration for stock, unpaid capital contribution or failure to
pay any installment or call owing to such entity.

Each holder or Beneficial Owner of a Variable Funding Note, by acceptance of a Variable Funding
Note or, in the case of a Beneficial Owner of a Variable Funding Note, a beneficial interest in a Variable
Funding Note, covenants and agrees by accepting the benefits of the Indenture that such holder or Beneficial
Owner of a Variable Funding Note will not at any time institute against the Depositor or the Issuer, or join
in any institution against the Depositor, the Seller, the Master Servicer, GMAC Mortgage Group, Inc. or the
Issuer of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under any
United States federal or state bankruptcy or similar law in connection with any obligations relating to the
Variable Funding Notes, the Indenture or the Basic Documents.

The Issuer has entered into the Indenture and this Variable Funding Note is issued with the
intention that, for federal, state and local income, single business and franchise tax purposes, the Variable
Funding Notes will qualify as indebtedness of the Issuer. Each holder of a Variable Funding Note, by
acceptance of a Variable Funding Note (and each Beneficial Owner of a Variable Funding Note, by acceptance of
a beneficial interest in a Variable Funding Note), agrees to treat the Variable Funding Notes for federal,
state and local income, single business and franchise tax purposes as indebtedness of the Issuer.

Prior to the due presentment for registration of transfer of this Variable Funding Note, the
Issuer, the Indenture Trustee and any agent of the Issuer or the Indenture Trustee may treat the Person in
whose name this Variable Funding Note (as of the day of determination or as of such other date as may be
specified in the Indenture) is registered as the owner hereof for all purposes, whether or not this Variable
Funding Note be overdue, and none of the Issuer, the Indenture Trustee or any such agent shall be affected by
notice to the contrary.

The Indenture permits, with certain exceptions as therein provided, the amendment thereof and
the modification of the rights and obligations of the Issuer and the Indenture Trustee and the rights of the
holders of the Variable Funding Notes under the Indenture at any time by the Issuer and the Indenture Trustee
with the consent of the holders of Notes representing a majority of the Security Balances of all Notes at the
time Outstanding and the Credit Enhancer and with prior notice to the Rating Agencies. The Indenture also
contains provisions permitting the holders of Notes representing specified percentages of the Security
Balances of all Notes, on behalf of the holders of all the Notes, to waive compliance by the Issuer with
certain provisions of the Indenture and certain past defaults under the Indenture and their consequences.
Any such consent or waiver by the holder of this Variable Funding Note (or any one of more Predecessor
Variable Funding Notes) shall be conclusive and binding upon such holder and upon all future holders of this
Variable Funding Note and of any Variable Funding Note issued upon the registration of transfer hereof or in
exchange hereof or in lieu hereof whether or not notation of such consent or waiver is made upon this
Variable Funding Note. The Indenture also permits the Indenture Trustee to amend or waive certain terms and
conditions set forth in the Indenture without the consent of holders of the Variable Funding

Notes issued
thereunder but with prior notice to the Rating Agencies and the Credit Enhancer.

The term "Issuer" as used in this Variable Funding Note includes any successor to the Issuer under the Indenture.

The Issuer is permitted by the Indenture, under certain circumstances, to merge or consolidate, subject to the rights of the Indenture Trustee and the holders of Variable Funding Notes under the Indenture.

The Variable Funding Notes are issuable only in registered form in denominations as provided in the Indenture, subject to certain limitations therein set forth.

This Variable Funding Note and the Indenture shall be construed in accordance with the laws of the State of New York, without reference to its conflict of law provisions, and the obligations, rights and remedies of the parties hereunder and thereunder shall be determined in accordance with such laws. No reference herein to the Indenture and no provision of this Variable Funding Note or of the Indenture shall alter or impair the obligation of the Issuer, which is absolute and unconditional, to pay the principal of and interest on this Variable Funding Note at the times, place and rate, and in the coin or currency herein prescribed.

Anything herein to the contrary notwithstanding, except as expressly provided in the Basic Documents, none of Wilmington Trust Company in its individual capacity, JPMorgan Chase Bank, N.A., in its individual capacity, any owner of a beneficial interest in the Issuer, or any of their respective partners, beneficiaries, agents, officers, directors, employees or successors or assigns shall be personally liable for, nor shall recourse be had to any of them for, the payment of principal of or interest on this Variable Funding Note or performance of, or omission to perform, any of the covenants, obligations or indemnifications contained in the Indenture. The holder of this Variable Funding Note by its acceptance hereof agrees that, except as expressly provided in the Basic Documents, in the case of an Event of Default under the Indenture, the holder shall have no claim against any of the foregoing for any deficiency, loss or claim therefrom; provided, however, that nothing contained herein shall be taken to prevent recourse to, and enforcement against, the assets of the Issuer for any and all liabilities, obligations and undertakings contained in the Indenture or in this Variable Funding Note.

---

IN WITNESS WHEREOF, the Owner Trustee, on behalf of the Issuer and not in its individual capacity, has caused this Term Note to be duly executed.

HOME EQUITY LOAN TRUST 2006-HSA2,

By    WILMINGTON TRUST COMPANY, not in its individual capacity but solely as Owner Trustee

Dated:  February 24, 2006

By: _____
    Authorized Signatory

CERTIFICATE OF AUTHENTICATION

This is one of the Term Notes referred to in the within mentioned Indenture.

JPMORGAN CHASE BANK, N.A., not in
its individual capacity but solely as Indenture
Trustee

Dated:  February 24, 2006

By: _____
    Authorized Signatory

---

ASSIGNMENT

Social    Security    or    taxpayer    I.D.    or    other    identifying    number    of
assignee:
_____

        FOR    VALUE    RECEIVED,    the    undersigned    hereby    sells,    assigns    and
transfer    unto

(name and address of assignee)

the    within    Term    Note    and    all    rights    thereunder,    and    hereby    irrevocably    constitutes
and    appoints
_____,    attorney,    to    transfer    said
Term Note on the
books kept for registration thereof, with full power of substitution in the premises.

Dated: _____      _____ */
                               Signature Guaranteed:

                               _____ */

*      NOTICE:  The signature to this assignment  must correspond with the name of the
registered  owner as it
appears  on the face of the  within  Term Note in every  particular,  without  alteration,
enlargement  or any
change  whatever.  Such  signature  must be  guaranteed  by an "eligible  guarantor
institution"  meeting the
requirements of the Note Registrar,  which  requirements  include  membership or participation in
STAMP or such
other  "signature  guarantee  program"  as may be  determined  by the Note  Registrar  in
addition  to,  or in
substitution for, STAMP, all in accordance  with the Securities  Exchange Act of 1934, as amended.

---

SCHEDULE A
to
HOME EQUITY LOAN TRUST 2006-HSA2
Home Equity Loan-Backed Variable Funding Note

| DATE | PERCENTAGE INTEREST | PRINCIPAL PAYMENTS | SECURITY BALANCE OUTSTANDING | AUTHORIZED SIGNATURE OF INDENTURE TRUSTEE |
|------|---------------------|--------------------|------------------------------|-------------------------------------------|
| ----------- | ----------------------- | ----------------- | -------------------- | ------------------------- |
| ----------- | ----------------------- | ----------------- | -------------------- | ------------------------- |
| ----------- | ----------------------- | ----------------- | -------------------- | ------------------------- |



http://www.sec.gov/Archives/edgar/data/1351544/000135154406000007/hsa2ind.htm[6/14/2013 11:01:44 AM]

```
-
----------- ---------------------- ----------------- --------------------- -----------------------
-
----------- ---------------------- ----------------- --------------------- -----------------------
-
----------- ---------------------- ----------------- --------------------- -----------------------
-
----------- ---------------------- ----------------- --------------------- -----------------------
-
----------- ---------------------- ----------------- --------------------- -----------------------
-
----------- ---------------------- ----------------- --------------------- -----------------------
-
----------- ---------------------- ----------------- --------------------- -----------------------
-
----------- ---------------------- ----------------- --------------------- -----------------------
-
----------- ---------------------- ----------------- --------------------- -----------------------
-
----------- ---------------------- ----------------- --------------------- -----------------------
-
----------- ---------------------- ----------------- --------------------- -----------------------
-
----------- ---------------------- ----------------- --------------------- -----------------------
-
----------- ---------------------- ----------------- --------------------- -----------------------
-
----------- ---------------------- ----------------- --------------------- -----------------------
-
----------- ---------------------- ----------------- --------------------- -----------------------
-
----------- ---------------------- ----------------- --------------------- -----------------------
-
============ ====================== ================= ===================== =========================
```

EXHIBIT B

[FORM OF RULE 144A INVESTMENT REPRESENTATION]

Description of Rule 144A Securities, including numbers:

_____
_____
_____
_____

        The undersigned  seller, as registered holder (the "Seller"),  intends to transfer the Rule 144A
Securities described above to the undersigned buyer (the "Buyer").

        1.     In  connection  with such  transfer and in  accordance  with the
agreements  pursuant to
which the Rule 144A  Securities  were issued,  the Seller hereby  certifies the  following
facts:  Neither the
Seller nor anyone acting on its behalf has offered,  transferred,  pledged,  sold or otherwise
disposed of the
Rule 144A  Securities,  any interest  in the Rule 144A Securities or any other similar security
to, or solicited
any offer to buy or accept a transfer,  pledge or other  disposition of the Rule 144A Securities,
any interest
in the Rule 144A  Securities or any other similar  security  from, or otherwise  approached or
negotiated  with
respect to the Rule 144A  Securities,  any interest in the Rule 144A  Securities or any other
similar  security
with,  any person in any manner,  or made any general  solicitation  by means of general
advertising or in any
other manner,  or taken any other action,  that would  constitute a  distribution  of the Rule
144A  Securities
under the  Securities  Act of 1933, as amended (the "1933 Act"),  or that would render the
disposition  of the
Rule 144A Securities a violation of Section 5 of the 1933 Act or require  registration  pursuant

thereto, and
that the Seller has not offered the Rule 144A Securities to any person other than the Buyer or another
"qualified institutional buyer" as defined in Rule 144A under the 1933 Act.

        2.      The Buyer warrants and represents to, and covenants with, the Indenture Trustee and the
Issuer (as defined in the Indenture (the "Indenture"), dated as of February 24, 2006, between Home Equity
Loan Trust 2006-HSA2, as Issuer, and JPMorgan Chase Bank, N.A., as Indenture Trustee, pursuant to Section
4.02 of the Indenture, as follows:

        a.      The Buyer understands that the Rule 144A Securities have not
been registered under the 1933 Act or the securities laws of any state.

        b.      The Buyer considers itself a substantial, sophisticated institutional investor
having such knowledge and experience in financial and business matters that it is capable of
evaluating the merits and risks of investment in the Rule 144A Securities.

        c.      The Buyer has been furnished with all information regarding
the Rule 144A Securities that it has requested from the Seller, the Indenture Trustee, the Owner Trustee or the
Master Servicer.

        d.      Neither the Buyer nor anyone acting on its behalf has offered, transferred,
pledged, sold or otherwise disposed of the Rule 144A Securities, any interest in the Rule 144A
Securities or any other similar security to, or solicited any offer to buy or accept a transfer,
pledge or other disposition of the Rule 144A Securities, any interest in the Rule 144A Securities or
any other similar security from, or otherwise approached or negotiated with respect to the Rule 144A
Securities, any interest in the Rule 144A Securities or any other similar security with, any person in
any manner, or made any general solicitation by means of general advertising or in any other manner,
or taken any other action, that would constitute a distribution of the Rule 144A Securities under the
1933 Act or that would render the disposition of the Rule 144A Securities a violation of Section 5 of
the 1933 Act or require registration pursuant thereto, nor will it act, nor has it authorized or will
it authorize any person to act, in such manner with respect to the Rule 144A Securities.

        e.      The Buyer is a "qualified institutional buyer" as that term is defined in Rule
144A under the 1933 Act and has completed either of the forms of certification to that effect attached
hereto as Annex 1 or Annex 2. The Buyer is aware that the sale to it is being made in reliance on
Rule 144A. The Buyer is acquiring the Rule 144A Securities for its own account or the accounts of
other qualified institutional buyers, understands that such Rule 144A Securities may be resold,
pledged or transferred only (i) to a person reasonably believed to be a qualified institutional buyer
that purchases for its own account or for the account of a qualified institutional buyer to whom
notice is given that the resale, pledge or transfer is being made in reliance on Rule 144A, or (ii)
pursuant to another exemption from registration under the 1933 Act.

        3.      This document may be executed in one or more counterparts and by the different parties
hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such
counterparts, together, shall constitute one and the same document.

IN WITNESS WHEREOF, each of the parties has executed this document as of the date set forth below.

Print Name of Seller                              Print Name of Buyer

By:                                               By:
    Name:                                             Name:
    Title:                                            Title:

Tax Payer Identification:                         Tax Payer Identification:

No.                                               No.

Date:                                             Date:

---

                                                                              ANNEX
1 TO EXHIBIT B

                QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A

                [For Buyers Other Than Registered Investment Companies]

        The undersigned hereby certifies as follows in connection with the Rule 144A Investment Representation
to which this Certification is attached:

                1.      As indicated below, the undersigned is the President, Chief Financial
Officer, Senior
Vice President or other executive officer of the Buyer.

                2.      In connection with purchases by the Buyer, the Buyer is a "qualified
institutional
buyer" as that term is defined in Rule 144A under the Securities Act of 1933 ("Rule 144A")
because (i) the
Buyer owned and/or invested on a discretionary basis $
                                                **        in
securities (except for the excluded securities referred to below) as of the end of the
Buyer's most recent
fiscal year (such amount being calculated in accordance with Rule 144A) and (ii) the Buyer
satisfies the
criteria in the category marked below.

-       Corporation, etc. The Buyer is a corporation (other than a bank, savings and loan
association or
        similar institution), Massachusetts or similar business trust, partnership, or charitable
organization
        described in Section 501(c)(3) of the Internal Revenue Code.

-       Bank. The Buyer (a) is a national bank or banking institution organized under the laws
of any State,
        territory or the District of Columbia, the business of which is substantially confined
to banking and
        is supervised by the State or territorial banking commission or similar official or is
a foreign bank
        or equivalent institution, and (b) has an audited net worth of at least $25,000,000 as
demonstrated in
        its latest annual financial statements, a copy of which is attached hereto.

-       Savings and Loan. The Buyer (a) is a savings and loan association, building and loan
association,
        cooperative bank, homestead association or similar institution, which is supervised and
examined by a
        State or Federal authority having supervision over any such institutions or is a
foreign savings and
        loan association or equivalent institution and (b) has an audited net worth of at least
$25,000,000 as
        demonstrated in its latest annual financial statements.

- Broker-Dealer. The Buyer is a dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

- Insurance Company. The Buyer is an insurance company whose primary and predominant business activity is the writing of insurance or the reinsuring of risks underwritten by insurance companies and which is subject to supervision by the insurance commissioner or a similar official or agency of a State or territory or the District of Columbia.

- State or Local Plan. The Buyer is a plan established and maintained by a State, its political subdivisions, or any agency or instrumentality of the State or its political subdivisions, for the benefit of its employees.

- ERISA Plan. The Buyer is an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974.

- Investment Adviser. The Buyer is an investment adviser registered under the Investment Advisers Act of 1940.

- SBIC. The Buyer is a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

- Business Development Company. The Buyer is a business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

    Trust Fund. The Buyer is a trust fund whose trustee is a bank or trust company and whose participants are exclusively (a) plans established and maintained by a State, its political subdivisions, or any agency or instrumentality of the State or its political subdivisions, for the benefit of its employees, or (b) employee benefit plans within the meaning of Title I of the Employee Retirement Income Security Act of 1974, but is not a trust fund that includes as participants individual retirement accounts or H.R. 10 plans.

_____

** Buyer must own and/or invest on a discretionary basis at least $100,000,000 in securities unless Buyer is a dealer, and, in that case, Buyer must own and/or invest on a discretionary basis at least $10,000,000 in securities.

    3.    The term "securities" as used herein does not include (i) securities of issuers that are affiliated with the Buyer, (ii) securities that are part of an unsold allotment to or subscription by the Buyer, if the Buyer is a dealer, (iii) bank deposit notes and certificates of deposit, (iv) loan participations, (v) repurchase agreements, (vi) securities owned but subject to a repurchase agreement and (vii) currency, interest rate and commodity swaps.

    4.    For purposes of determining the aggregate amount of securities owned and/or invested on a discretionary basis by the Buyer, the Buyer used the cost of such securities to the Buyer and did not include any of the securities referred to in the preceding paragraph. Further, in determining such aggregate amount, the Buyer may have included securities owned by subsidiaries of the Buyer, but only if such subsidiaries are consolidated with the Buyer in its financial statements prepared in accordance with generally accepted accounting principles and if the investments of such subsidiaries are managed under the Buyer's direction. However, such securities were not included if the Buyer is a majority-owned,

consolidated
subsidiary of another enterprise and the Buyer is not itself a reporting company under the Securities
Exchange Act of 1934.

5.    The Buyer acknowledges that it is familiar with Rule 144A and understands that the
seller to it and other parties related to the Rule 144A Securities are relying and will continue to rely on
the statements made herein because one or more sales to the Buyer may be in reliance on Rule 144A.

            Will the Buyer be purchasing the Rule 144A
    Yes    No    Securities only for the Buyer's own account-

6.    If the answer to the foregoing question is "no", the Buyer agrees that, in connection
with any purchase of securities sold to the Buyer for the account of a third party (including any separate
account) in reliance on Rule 144A, the Buyer will only purchase for the account of a third party that at the
time is a "qualified institutional buyer" within the meaning of Rule 144A. In addition, the Buyer agrees
that the Buyer will not purchase securities for a third party unless the Buyer has obtained a current
representation letter from such third party or taken other appropriate steps contemplated by Rule 144A to
conclude that such third party independently meets the definition of "qualified institutional buyer" set
forth in Rule 144A.

7.    The Buyer will notify each of the parties to which this certification is made of any
changes in the information and conclusions herein. Until such notice is given, the Buyer's purchase of Rule
144A Securities will constitute a reaffirmation of this certification as of the date of such purchase.


                                    Print Name of Buyer

                                    By:
                                        Name:
                                        Title:

                                    Date:

2 TO EXHIBIT B


                QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A

                    [For Buyers That Are Registered Investment Companies]

        The undersigned hereby certifies as follows in connection with the Rule 144A Investment
Representation to which this certification is attached:

1.    As indicated below, the undersigned is the President, Chief Financial Officer or Senior
Vice President of the Buyer or, if the Buyer is a "qualified institutional buyer" as that term is defined in
Rule 144A under the Securities Act of 1933 ("Rule 144A") because Buyer is part of a Family of Investment
Companies (as defined below), is such an officer of the Adviser.

2.    In connection with purchases by Buyer, the Buyer is a "qualified institutional buyer"
as defined in SEC Rule 144A because (i) the Buyer is an investment company registered under the Investment
Company Act of 1940, and (ii) as marked below, the Buyer alone, or the Buyer's Family

of Investment Companies, owned at least $100,000,000 in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year. For purposes of determining the amount of securities owned by the Buyer or the Buyer's Family of Investment Companies, the cost of such securities was used.

- - The Buyer owned $                    in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being calculated in accordance with Rule 144A).

- - The Buyer is part of a Family of Investment Companies which owned in the aggregate $                    in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being calculated in accordance with Rule 144A).

    3.    The term "Family of Investment Companies" as used herein means two or more registered investment companies (or series thereof) that have the same investment adviser or investment advisers that are affiliated (by virtue of being majority owned subsidiaries of the same parent or because one investment adviser is a majority owned subsidiary of the other).

    4.    The term "securities" as used herein does not include (i) securities of are affiliated with the Buyer or are part of the Buyer's Family of Investment Companies, (ii) bank deposit notes and certificates of deposit, (iii) loan participations, (iv) repurchase agreements, (v) securities owned but subject to a repurchase agreement and (vi) currency, interest rate and commodity swaps.

    5.    The Buyer is familiar with Rule 144A and understands that each of the parties to which this certification is made are relying and will continue to rely on the statements made herein because one or more sales to the Buyer will be in reliance on Rule 144A. In addition, the Buyer will only purchase for the Buyer's own account.

    6.    The undersigned will notify each of the parties to which this certification is made of any changes in the information and conclusions herein. Until such notice, the Buyer's purchase of Rule 144A Securities will constitute a reaffirmation of this certification by the undersigned as of the date of such purchase.

                                        Print Name of Buyer

                                        By:
                                            Name:
                                            Title:

                                        IF AN ADVISER:

                                        Print Name of Buyer

                                        Date:

EXHIBIT C

FORM OF INVESTOR REPRESENTATION LETTER


_____ , 20__

Residential Funding Mortgage Securities II, Inc.
8400 Normandale Lake Boulevard
Suite 600
Minneapolis, MN 55437

JPMorgan Chase Bank, N.A.
4 New York Plaza, 6th Floor
New York, NY  10004
Attention:  Corporate Trust Administration

          Re:   Home Equity Loan-Backed Capped Funding Notes
                Series 2006-HSA2

Ladies and Gentlemen:

          _____ (the "Purchaser") intends to purchase from _____ (the
"Seller") $_____
Capped Funding Notes of Series 2006-HSA2 (the "Notes"), issued pursuant to the Indenture (the
"Indenture"),
dated as of  February  24,  2006  between  Home Equity Loan Trust  2006-HSA2,  as issuer  (the
"Issuer"),  and
JPMorgan  Chase Bank,  N.A.,  as indenture  trustee (the  "Indenture  Trustee").  All terms used
herein and not
otherwise  defined  shall have the  meanings  set forth in the  Indenture.  The  Purchaser
hereby  certifies,
represents and warrants to, and covenants with, the Issuer and the Indenture Trustee that:

          1.     The  Purchaser  understands  that (a) the Notes have not been and will not
be  registered
          or qualified  under the  Securities Act of 1933, as amended (the "Act") or any state
securities law, (b)
          the Depositor is not required to so register or qualify the Notes,  (c) the Notes may be
resold only if
          registered and qualified  pursuant to the provisions of the Act or any state  securities
law, or if an
          exemption from  such  registration  and  qualification  is  available,  (d)  the
Indenture  contains
          restrictions  regarding the transfer of the Notes and (e) the Notes will bear a legend to
the foregoing
          effect.

          2.     The  Purchaser is  acquiring  the Notes for its own account for  investment
only and not
          with a view to or for sale in  connection  with any  distribution  thereof  in any
manner  that  would
          violate the Act or any applicable state securities laws.

          3.     The  Purchaser is (a) a  substantial,  sophisticated  institutional
investor  having such
          knowledge  and  experience  in financial  and business  matters,  and, in  particular,
in such matters
          related to securities  similar to the Notes, such that it is capable of evaluating the
merits and risks
          of  investment  in the Notes,  (b) able to bear the  economic  risks of such an
investment  and (c) an
          "accredited  investor" within the  meaning of Rule 501(a) promulgated pursuant to the Act.

          4.     The  Purchaser has been  furnished  with, and has had an opportunity to
review (a) [a copy
          of the Private  Placement  Memorandum,  dated                      relating to
the Notes (b)] a
          copy of the Indenture and [b] [c] such other  information  concerning  the Notes,  the
Home Equity Loans
          and the  Depositor  as has been  requested  by the  Purchaser  from the  Depositor or the
Seller and is
          relevant to the  Purchaser's  decision to purchase  the Notes.  The  Purchaser  has had
any  questions
          arising  from such  review  answered  by the  Depositor  or the  Seller  to the
satisfaction  of the
          Purchaser.  [If the  Purchaser  did not  purchase  the Notes  from the  Seller in
connection  with the
          initial  distribution  of the Notes and was provided  with a copy of the Private
Placement  Memorandum
          (the  "Memorandum")  relating to the original sale (the "Original  Sale") of the Notes by
the Depositor,

the Purchaser acknowledges that such Memorandum was provided to it by the Seller, that the Memorandum was prepared by the Depositor solely for use in connection with the Original Sale and the Depositor did not participate in or facilitate in any way the purchase of the Notes by the Purchaser from the Seller, and the Purchaser agrees that it will look solely to the Seller and not to the Depositor with respect to any damage, liability, claim or expense arising out of, resulting from or in connection with (a) error or omission, or alleged error or omission, contained in the Memorandum, or (b) any information, development or event arising after the date of the Memorandum.]

5.    The Purchaser has not and will not nor has it authorized or will it authorize any person to (a) offer, pledge, sell, dispose of or otherwise transfer any Note, any interest in any Note or any other similar security to any person in any manner, (b) solicit any offer to buy or to accept a pledge, disposition of other transfer of any Note, any interest in any Note or any other similar security from any person in any manner, (c) otherwise approach or negotiate with respect to any Note, any interest in any Note or any other similar security with any person in any manner, (d) make any general solicitation by means of general advertising or in any other manner or (e) take any other action, that (as to any of (a) through (e) above) would constitute a distribution of any Note under the Act, that would render the disposition of any Note a violation of Section 5 of the Act or any state securities law, or that would require registration or qualification pursuant thereto. The Purchaser will not sell or otherwise transfer any of the Notes, except in compliance with the provisions of the Indenture.

6.    The Purchaser is not a non-United States person.

Very truly yours,

By:
    Name:
    Title:

---

EXHIBIT D

FORM OF TRANSFEROR REPRESENTATION LETTER

_____, 20___

Residential Funding Mortgage Securities II, Inc.
8400 Normandale Lake Boulevard
Suite 600
Minneapolis, MN 55437

JPMorgan Chase Bank, N.A.
4 New York Plaza
New York, NY 10004

Attention: Corporate Trust Administration

Re:    Home Equity Loan-Backed Capped Funding Notes
       Series 2006-HSA2

Ladies and Gentlemen:

_____(the "Purchaser") intends to purchase from _____ (the

"Seller")  $_____

Capped Funding Notes of Series 2006-HSA2 (the "Notes"),  issued pursuant to the (the "Indenture"),  dated as of
February  24, 2006 between  Home Equity Loan Trust  2006-HSA2,  as issuer (the  "Issuer"),  and JPMorgan  Chase
Bank, N.A., as indenture  trustee (the "Indenture  Trustee").  All terms used herein and not otherwise  defined
shall have the meanings set forth in the Indenture.  The Seller hereby  certifies,  represents and warrants to,
and covenants with, the Issuer and the Indenture Trustee that:

Neither the Seller nor anyone acting on its behalf has (a) offered,  pledged, sold, disposed of
or otherwise  transferred  any Note,  any interest in any Note or any other  similar  security to any person in
any manner,  (b) has solicited  any offer to buy or to accept a pledge,  disposition  or other transfer of any
Note, any interest in any Note or any other similar  security from any person in any manner,  (c) has otherwise
approached  or  negotiated  with respect to any Note,  any interest in any Note or any other similar  security
with any person in any manner,  (d) has made any general  solicitation  by means of general advertising  or in
any other  manner,  or (e) has taken  any  other  action,  that (as to any of (a)  through  (e) above)  would
constitute a  distribution  of the Notes under the  Securities  Act of 1933 (the "Act"),  that would render the
disposition  of any Note a  violation  of  Section  5 of the Act or any state  securities  law, or that  would
require  registration or qualification  pursuant  thereto.  The Seller will not act, in any manner set forth in
the  foregoing  sentence  with respect to any Note.  The Seller has not and will not sell or otherwise  transfer
any of the Notes, except in compliance with the provisions of the Indenture.

Very truly yours,


(Seller)


By:
Name:
Title:

An extra section break has  been  inserted  above  this paragraph.  Do not delete  this section  break if you plan
to add text after  the Table of Contents/Authorities.  Deleting this break will cause Table of
Contents/Authorities headers and footers to appear on any pages following the Table of Contents/Authorities.

APPENDIX A

DEFINITIONS

Accrued  Certificate  Interest:  With  respect  to the Class  SB-I  Certificates,

interest accrued
during the related  Interest  Period at the  Certificate  Rate for such  Certificate on the
Notional Amount for
such Payment Date.

    Additional   Balance:  With respect  to any HELOC,  any future Draw made by the
related  Mortgagor
pursuant  to the  related  Loan  Agreement  on and  after  the  Cut-off  Date;  provided,
however,  that if an
Amortization  Event occurs,  then any Draw after such Amortization Event shall not be acquired by
the Trust and
shall not be an Additional Balance.

    Additional  Balance  Differential:  With  respect  to any  Payment  Date,  unless
and  until an
Amortization  Event occurs,  (x) up to and including  the Payment Date  occurring  in the calendar
month during
which the Revolving Period ends, the amount,  if any, by which Additional  Balances  resulting
from Draws under
the Group II Loans during the related  Collection  Period exceed Principal  Collections  related
to the Group II
Loans  during such  Collection  Period and (y) after the Payment Date  occurring  in the calendar
month during
which the Revolving Period ends, the aggregate  amount of Additional  Balances in Loan Group II
conveyed to the
Trust during the related Collection Period.

    Additional  Certificate  Security Balance:  With respect to the issuance of Capped
Funding Notes
pursuant to Section 4.01(d) of the Indenture,  the amount,  if any,  required in accordance with
the Opinion of
Counsel in connection  therewith to be added to the  Security  Balances of the  Certificates  in
accordance with
Section  3.12 of the Trust  Agreement.  In addition,  with respect to any Payment Date  described
in the second
sentence of Section  3.12(a) of the Trust  Agreement,  the "Additional  Certificate  Security
Balance"  shall
include the amount of the excess described in such sentence.

    Adjusted  Mortgage  Rate:  With  respect to any Home Equity Loan and any date of
determination,
the Loan Rate borne by the  related  Home Equity  Loan,  less the rate at which the  related
Subservicing Fee
accrues.

    Adverse REMIC Event:  As defined in Section 11.01(f) of the Indenture.

    Affiliate:  With respect to any Person,  any other Person  controlling,
controlled  by or under
common  control with such  Person.  For purposes of this  definition,  "control"  means the power
to direct the
management and policies of a Person,  directly or indirectly,  whether through ownership of
voting  securities,
by contract or otherwise and "controlling" and "controlled" shall have meanings correlative to
the foregoing.

    Aggregate  Additional  Balance  Differential:  With respect to any Payment Date
and the Variable
Funding Notes,  the sum of Additional  Balance  Differentials  that have been added to the
Security  Balance of
Variable Funding Notes prior to such Payment Date.

    Aggregate  Security  Balance:  With respect to any Payment  Date,  the aggregate
of the Security
Balances of all  Securities  or specified  Classes of Securities  as of such date.

    Amortization Event:  Any one of the following events:

        (a)    the failure on the part of the Seller (i) to make any  payment or deposit
required to be
        made under the Purchase  Agreement  within five Business Days after the date such payment
or deposit is
        required  to be made;  or (ii) to observe or perform in any  material  respect any other
covenants  or
        agreements of the Seller set forth in the Purchase Agreement,  which failure continues
unremedied for a
        period of 60 days after written notice and such failure  materially and adversely affects
the interests
        of the Securityholders or the Credit Enhancer;

        (b)    if any  representation  or warranty made by the Seller in the Purchase

Agreement proves to have been incorrect in any material respect when made and which continues to be incorrect in any material respect for a period of 45 days with respect to any representation or warranty of the Seller made in Section 3.1(a) of the Purchase Agreement or 90 days with respect to any representation or warranty made in Section 3.1(b) or 3.1(c) of the Purchase Agreement after written notice and as a result of which the interests of the Securityholders or the Credit Enhancer are materially and adversely affected; provided, however, that an Amortization Event shall not be deemed to occur if the Seller has repurchased or caused to be repurchased or substituted for the related Home Equity Loan or all Home Equity Loans, if applicable, during such period (or within an additional 60 days with the consent of the Indenture Trustee and the Credit Enhancer) in accordance with the provisions of the Indenture;

(c)     the entry against the Seller or the Issuer of a decree or order by a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a trustee, conservator, receiver or liquidator in any insolvency, conservatorship, receivership, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days;

(d)     the Seller or the Issuer shall voluntarily go into liquidation, consent to the appointment of a conservator, receiver, liquidator or similar person in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to the Seller or the Issuer or of or relating to all or substantially all of its property, or a decree or order of a court, agency or supervisory authority having jurisdiction in the premises for the appointment of a conservator, receiver, liquidator or similar person in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Seller or the Issuer and such decree or order shall have remained in force undischarged, unbonded or unstayed for a period of 60 days; or the Seller or the Issuer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors or voluntarily suspend payment of its obligations;

(e)     the Issuer becomes subject to regulation by the Commission as an investment company within the meaning of the Investment Company Act of 1940, as amended;

(f)     a Servicing Default relating to the Master Servicer occurs under the Servicing Agreement and the Master Servicer is the Seller;

(g)     the occurrence of a draw on any of the Policies and the failure of the Credit Enhancer to be reimbursed for such draw, which failure continues unremedied for a period of 90 days after written notice to the Master Servicer; or

(h)     the Issuer is determined to be an association taxable as a corporation for federal income tax purposes.

In the case of any event described in (a), (b), (f) or (g), an Amortization Event will be deemed to have occurred only if, after any applicable grace period described in such clauses, any of the Indenture Trustee, the Credit Enhancer or, with the consent of the Credit Enhancer, Securityholders

evidencing not less than 51% of the Security Balance of each of the Term Notes and the Certificates, by
written notice to the Seller, the Master Servicer, the Depositor and the Owner Trustee (and to the Indenture
Trustee, if given by the Credit Enhancer or the Securityholders), declare that an Amortization Event has
occurred as of the date of such notice. In the case of any event described in clauses (c), (d), (e) or (h),
an Amortization Event will be deemed to have occurred without any notice or other action on the part of the
Indenture Trustee, the Noteholders or the Credit Enhancer immediately upon the occurrence of such event;
provided, that any Amortization Event may be waived and deemed of no effect with the written consent of the
Credit Enhancer and each Rating Agency, subject to the satisfaction of any conditions to such waiver.

Appraised Value: With respect to any Mortgaged Property, the lesser of (i) the appraised value
of such Mortgaged Property based upon the appraisal made at the time of the origination of the related Home
Equity Loan, and (ii) the sales price of the Mortgaged Property at such time of origination, except in the
case of a Mortgaged Property securing a refinanced or modified Home Equity Loan as to which it is either the
appraised value based upon the appraisal made at the time of origination of the loan which was refinanced or
modified or the appraised value determined in an appraisal at the time of refinancing or modification, as the
case may be.

Assignment of Mortgage: With respect to any Mortgage, an assignment, notice of transfer or
equivalent instrument, in recordable form, sufficient under the laws of the jurisdiction in which the related
Mortgaged Property is located to reflect the conveyance of the Mortgage, which assignment, notice of transfer
or equivalent instrument may be in the form of one or more blanket assignments covering Mortgages secured by
Mortgaged Properties located in the same jurisdiction.

Authorized Newspaper: A newspaper of general circulation in the Borough of Manhattan, The City
of New York, printed in the English language and customarily published on each Business Day, whether or not
published on Saturdays, Sundays or holidays.

Authorized Officer: With respect to the Issuer, any officer of the Owner Trustee who is
authorized to act for the Owner Trustee in matters relating to the Issuer and who is identified on the list
of Authorized Officers delivered by the Owner Trustee to the Indenture Trustee on the Closing Date (as such
list may be modified or supplemented from time to time thereafter).

Bankruptcy Code: The Bankruptcy Code of 1978, as amended.

Bankruptcy Loss: With respect to any Home Equity Loan, a Deficient Valuation or a Debt Service
Reduction; provided, however, that neither a Deficient Valuation nor a Debt Service Reduction shall be deemed
a Bankruptcy Loss hereunder so long as the Master Servicer has notified the Indenture Trustee in writing that
the Master Servicer is diligently pursuing any remedies that may exist in connection with the representations
and warranties made regarding the related Home Equity Loan and either (A) the related Home Equity Loan is not
in default with regard to payments due thereunder or (B) delinquent payments of principal and interest under
the related Home Equity Loan and any premiums on any applicable primary hazard insurance policy and any
related escrow payments in respect of such Home Equity Loan are being advanced on a current basis by the
Master Servicer or a Subservicer, in either case without giving effect to any Debt Service Reduction.

Basic Documents: The Trust Agreement, the Indenture, the Purchase Agreement, the Insurance
Agreement, the Group I Policy, the Group II Policy, the Servicing Agreement, the Custodial Agreement, the
Indemnification Agreement and the other documents and certificates delivered in connection

with any of the above.

Beneficial Owner: With respect to any Term Note, the Person who is the beneficial owner of
such Note as reflected on the books of the Depository or on the books of a Person maintaining an account with
such Depository (directly as a Depository Participant or indirectly through a Depository Participant, in
accordance with the rules of such Depository).

Billing Cycle: With respect to any Home Equity Loan and Due Date, the calendar month preceding
such Due Date.

Book-Entry Custodian: The custodian appointed pursuant to Section 4.06 of the Indenture.

Book-Entry Notes: Beneficial interests in the Notes, ownership and transfers of which shall be
made through book entries by the Depository as described in Section 4.06 of the Indenture.

Business Day: Any day other than (i) a Saturday or a Sunday or (ii) a day on which banking
institutions in the States of New York, California, Minnesota, Illinois or Delaware are required or
authorized by law to be closed.

Capped Funding Note: Any Class A-II Capped Funding Note issued in connection with an exchange
pursuant to Section 4.01(d) of the Indenture.

Cash Liquidation: As to any defaulted Home Equity Loan other than a Home Equity Loan as to
which an REO Acquisition occurred, a determination by the Master Servicer that it has received all Insurance
Proceeds, Liquidation Proceeds and other payments or cash recoveries which the Master Servicer reasonably and
in good faith expects to be finally recoverable with respect to such Home Equity Loan.

Certificate Distribution Account: The account or accounts created and maintained by the
Certificate Paying Agent pursuant to Section 3.10(c) of the Trust Agreement. The Certificate Paying Agent
will make all distributions on the Certificates from money on deposit in the Certificate Distribution Account.

Certificate Distribution Amount: For any Payment Date, the amount remaining in the Payment
Account following distributions pursuant to clauses (i) through (xi) of Section 3.05(a)(I) of the Indenture
and following distributions pursuant to clauses (i) through (x) of Section 3.05(a)(II) of the Indenture.

Certificate of Trust: The Certificate of Trust filed for the Trust pursuant to Section 3810(a)
of the Statutory Trust Statute.

Certificate Paying Agent: The meaning specified in Section 3.10 of the Trust Agreement.

Certificate Percentage Interest: With respect to any Payment Date, the Certificate Percentage
Interest as stated on the face of such Certificate, which percentage may be recalculated in accordance with
Section 3.12 of the Trust Agreement.

Certificate Principal Balance: As of any Payment Date, with respect to any Group II
Certificate, an amount equal to the then applicable Certificate Percentage Interest of such Certificate
multiplied by the Group II Overcollateralization Amount. As of any Payment Date with respect to any Class
SB-I Certificate, $2.00 as reduced by payments deemed made on prior Payment Dates in reduction of the
Uncertificated Principal Balance of REMIC II Regular Interest SB-PO pursuant to the provisions of Section
5.02(g) of the Trust Agreement. As of any Payment Date with respect to any Class R Certificate, $0.

Certificate Rate: With respect to the Class SB-I Certificates or REMIC II

Regular Interest SB-IO and any Payment Date, a rate per annum equal to the percentage equivalent of a fraction, the numerator of which is the sum of the amounts calculated pursuant to clauses (i) through (iv) below, and the denominator of which is the aggregate Uncertificated Principal Balance of the REMIC I Regular Interests. For purposes of calculating the Certificate Rate for the Class SB-I Certificates or REMIC II Regular Interest SB-IO, the numerator is equal to the sum of the following components:

(i) the REMIC I Remittance Rate for REMIC I Regular Interest LT1 minus the Loan Group I SB-IO Marker Rate, applied to a notional amount equal to the Uncertificated Principal Balance of REMIC I Regular Interest LT1;

(ii) the REMIC I Remittance Rate for REMIC I Regular Interest LT2 minus the Loan Group I SB-IO Marker Rate, applied to a notional amount equal to the Uncertificated Principal Balance of REMIC I Regular Interest LT2; and

(iii) the REMIC I Remittance Rate for REMIC I Regular Interest LT4 minus twice the Loan Group I SB-IO Marker Rate, applied to a notional amount equal to the Uncertificated Principal Balance of REMIC I Regular Interest LT4.

Certificate Register: The register maintained by the Certificate Registrar in which the Certificate Registrar shall provide for the registration of Certificates and of transfers and exchanges of Certificates.

Certificate Registrar: Initially, the Indenture Trustee, in its capacity as Certificate Registrar.

Certificateholder: The Person in whose name a Certificate is registered in the Certificate Register except that, any Certificate registered in the name of the Issuer, the Owner Trustee or the Indenture Trustee or any Affiliate of any of them shall be deemed not to be outstanding and the registered holder will not be considered a Certificateholder or a holder for purposes of giving any request, demand, authorization, direction, notice, consent or waiver under the Indenture or the Trust Agreement provided that, in determining whether the Indenture Trustee or the Owner Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Certificates that the Indenture Trustee or the Owner Trustee knows to be so owned shall be so disregarded. Owners of Certificates that have been pledged in good faith may be regarded as Holders if the pledgee establishes to the satisfaction of the Indenture Trustee or the Owner Trustee, as the case may be, the pledgee's right so to act with respect to such Certificates and that the pledgee is not the Issuer, any other obligor upon the Certificates or any Affiliate of any of the foregoing Persons.

Certificates: The Group I Certificates and the Group II Certificates.

Class: Collectively, all of the Notes or Certificates bearing the same designation.

Class A-I-1 Notes: The Class A-I-1 Home Equity Loan-Backed Term Notes, Series 2006-HSA2, in substantially the form set forth in Exhibit A-1 to the Indenture.

Class A-I-2 Notes: The Class A-I-2 Home Equity Loan-Backed Term Notes, Series 2006-HSA2, in substantially the form set forth in Exhibit A-1 to the Indenture.

Class A-I-3 Notes: The Class A-I-3 Home Equity Loan-Backed Term Notes, Series 2006-HSA2, in substantially the form set forth in Exhibit A-1 to the Indenture.

Class A-I-4 Notes: The Class A-I-4 Home Equity Loan-Backed Term Notes, Series

2006-HSA2, in
substantially the form set forth in Exhibit A-1 to the Indenture.

Class A-I-5 Lockout Distribution Amount: With respect to any Payment Date, the
product of (a)
the Class A-I-5 Lockout Percentage for that Payment Date and (b) the Class A-I-5 Pro Rata
Distribution Amount
for that Payment Date. In no event shall the Class A-I-5 Lockout Distribution Amount for a
Payment Date
exceed the Class I Principal Distribution Amount or the Security Balance of the Class A-I-5
Notes immediately
prior to that Payment Date.

Class A-I-5 Lockout Percentage: With respect to each Payment Date, the
applicable percentage
set forth below:

| PAYMENT DATES | CLASS A-I-5 LOCKOUT PERCENTAGE |
|---|---|
| March 2006 through and including February 2009.......... | 0% |
| March 2009 through and including February 2011.......... | 45% |
| March 2011 through and including February 2012.......... | 80% |
| March 2012 through and including February 2013.......... | 100% |
| March 2013 and thereafter............................... | 300% |

------------------------------------------------------------------------------------------------
----------------

Class A-I-5 Notes: The Class A-I-5 Home Equity Loan-Backed Term Notes, Series
2006-HSA2, in
substantially the form set forth in Exhibit A-1 to the Indenture.

Class A-I-5 Pro Rata Distribution Amount: With respect to any Payment Date, an
amount equal to
the product of (a) a fraction, the numerator of which is the Security Balance of the
Class A-I-5 Notes
immediately prior to that Payment Date and the denominator of which is the aggregate Security
Balance of the
Class I Notes immediately prior to that payment date and (b) the Class I Principal Distribution
Amount.

Class A-II Notes: The Class A-II Home Equity Loan-Backed Term Notes, Series
2006-HSA2, in
substantially the form set forth in Exhibit A-1 to the Indenture.

Class I Notes: The Class A-I-1 Notes, the Class A-I-2 Notes, the Class A-I-3
Notes, the Class
A-I-4 Notes and the Class A-I-5 Notes.

Class I Principal Distribution Amount: With respect to any Payment Date, the
aggregate amount
of principal paid on the Class I Notes on such Payment Date pursuant to clauses (ii),
(iii) and (vi) of
Section 3.05(a)(I) of the Indenture.

Class LT Principal Reduction Amounts: For any Payment Date, the amounts
by which the
Uncertificated Principal Balances of the REMIC I Regular Interests will be reduced on such
Payment Date by
the allocation of REMIC I Liquidation Loss Amounts and the distribution of principal, determined
as follows:

For purposes of the succeeding formulas the following symbols shall have the meanings set forth
below:

Y1 = the Uncertificated Principal Balance of REMIC I Regular Interest LT1 after the
allocation of
REMIC I Liquidation Loss Amounts and making of distributions on the prior Payment
Date.

Y2 = the Uncertificated Principal Balance of REMIC I Regular Interest LT2 after the
allocation of
REMIC I Liquidation Loss Amounts and making of distributions on the prior Payment
Date.

Y3 = the Uncertificated Principal Balance of REMIC I Regular Interest LT3 after the
allocation of
REMIC I Liquidation Loss Amounts and making of distributions on the prior Payment
Date.

Y4 = the Uncertificated Principal Balance of REMIC I Regular Interest LT4 after the
allocation of

REMIC I Liquidation Loss Amounts taking of distributions on the prior Payment Date (note:

Y4 = Y3 ).

(DELTA)Y1 =   the Class LT1 Principal Reduction Amount.

(DELTA)Y2 =   the Class LT2 Principal Reduction Amount.

(DELTA)Y3 =   the Class LT3 Principal Reduction Amount.

(DELTA)Y4 =   the Class LT4 Principal Reduction Amount.

P0 =   the aggregate Uncertificated Principal Balance of the REMIC I Regular Interests after

distributions and the allocation of REMIC I Liquidation Loss Amounts on the prior Payment Date.

=   the aggregate principal balance of the Group I Loans after giving effect to principal payments

distributed and Liquidation Loss Amounts allocated on the prior Payment Date.

P1 =   the aggregate Uncertificated Principal Balance of the REMIC I Regular Interests after

distributions and the allocation of REMIC I Liquidation Loss Amounts to be made on such Payment

Date.

=   the aggregate principal balance of the Group I Loans after giving effect to principal payments

distributed and Liquidation Loss Amounts allocated on such Payment Date.

(DELTA)P =   P0 - P1 = the aggregate of the Class LT1, Class LT2, Class LT3 and Class LT4, Principal

Reduction Amounts.

=the sum of (I) the aggregate of the Liquidation Loss Amounts attributable to the Group I Loans

for such Payment Date and allocated to principal by the definition of REMIC I Liquidation Loss

Amounts, (II) the portion of Principal Collections for such Payment Date attributable to the

Group I Loans and (III) the principal portion of amounts advanced for such Payment Date in

respect of the Group I Loans.

R0 =   the Group I Net WAC Rate (stated as a monthly rate) for the Group I Loans after giving effect

to amounts distributed and Liquidation Loss Amounts allocated on the prior Payment Date.

R1 =   the Group I Net WAC Rate (stated as a monthly rate) for the Group I Loans after giving effect

to amounts to be distributed and Liquidation Loss Amounts to be allocated on such Payment Date.

(alpha)=   (Y2 + Y3)/P0.  The initial value of (alpha) on the Closing Date for use on the first

Payment Date shall be 0.0001.

(gamma)0 =   the interest accruing on the Class I Notes in respect of the Interest Period related to

such Payment Date (without reduction by the interest portion of Liquidation Loss Amounts,

Prepayment Interest Shortfalls or Relief Act Shortfalls allocated to such Notes).

(gamma)1 =   the interest accruing on the Class I Notes  in respect of the Interest Period related

to the next succeeding Payment Date (without reduction by the interest portion of Liquidation

Loss Amounts, Prepayment Interest Shortfalls or Relief Act Shortfalls allocated to such Notes).

Then, based on the foregoing definitions:

(DELTA)Y1 =   (DELTA)P - (DELTA)Y2 - (DELTA)Y3 - (DELTA)Y4;

(DELTA)Y2 =   ((alpha)/2){((gamma) 0R1 - (gamma)1R0)/R0R1};

(DELTA)Y3 =   (alpha)(DELTA)P - (DELTA)Y2; and

(DELTA)Y4 =   (DELTA)Y3

if both (DELTA)Y2 and (DELTA)Y3, as so determined, are non-negative numbers.  Otherwise:

(1)....If (DELTA)Y2, as so determined, is negative, then

(DELTA)Y2 = 0;

(DELTA)Y2 = a{ a0R1P1 - a1R0P0}/{2R1R0P1 -  a1R0};

(DELTA)Y4 = (DELTA)Y3; and

(DELTA)Y1 = (DELTA)P - (DELTA)Y2 - (DELTA)Y3 - (DELTA)Y4.

(2)....If (DELTA)Y3, as so determined, is negative, then

(DELTA)Y3 = 0;

(DELTA)Y2 = {(alpha)(2)P0((gamma)0R1 - (gamma)1R0)} -
2(alpha)(DELTA)PY2R1R0}/(2(alpha)Y2R1R0-
          2(alpha)(DELTA)PR1R0 + (alpha)((gamma)0R1 - (gamma)1R0)};

(DELTA)Y4 = (DELTA)Y3; and

(DELTA)Y1 = (DELTA)P - (DELTA)Y2 - (DELTA)Y3 - (DELTA)Y4.

          Class II Notes:  The Class A-II Notes and the Variable Funding Notes.

          Class Principal Balance:  For each Class of Notes, the initial  Security
Balance  thereof as
reduced on each  successive  Payment  Date by  principal  distributed  in respect  thereof on
such Payment Date
pursuant to Section 3.05 of the Indenture.

          Class R  Certificates:  The Class R-I  Certificates  and the Class  R-II
Certificates,  each as
substantially in the form set forth in Exhibit I to the Trust Agreement.

          Class SB Certificates: The Class SB-I Certificates and the Class SB-II
Certificates.

          Class SB-I Certificates: The Class SB-I Home Equity Loan-Backed Certificates,
Series 2006-HSA2,
substantially in the form of Exhibit A to the Trust Agreement.

          Class SB-II  Certificates:  The  Class  SB-II  Home  Equity  Loan-Backed
Certificates,  Series
2006-HSA2, substantially in the form of Exhibit A to the Trust Agreement.

          Class SB-I Distribution  Amount: On any Payment Date, the sum of the amounts
deemed  distributed
in respect of REMIC II Regular  Interests  SB-IO and SB-PO pursuant to  Sections  5.01(f) and
(g) of the Trust
Agreement  reduced by the  amounts  required  to be paid  pursuant  to  clauses  (iv)  through
(ix) of Section
3.05(a)(I) of the Indenture.

          Closing Date:  February 24, 2006.

          Code: The Internal Revenue Code of 1986, as amended,  and the rules and
regulations  promulgated
thereunder.

          Collateral:  The meaning specified in the Granting Clause of the Indenture.

          Collection  Period:  With  respect to any Home Equity Loan and any Payment  Date,
the  calendar
month preceding any such Payment Date.

          Combined  Loan-to-Value  Ratio: With  respect  to  any  HELOC  and  any date,
the  percentage
equivalent of a fraction,  the  numerator of which is the sum of (i) the Credit Limit and (ii)
the  outstanding
principal  balance as of the date of the  origination  of such HELOC (or any  subsequent  date as
of which such
outstanding  principal  balance  may be  determined  in  connection  with an increase or decrease
in the Credit
Limit,  to reduce the amount of primary  insurance for such HELOC or to approve a subordinate
lien) and of all
other  mortgage  loans, if any,  that are  secured  by liens on the  Mortgaged  Property  that
are  senior  or
subordinate  to the Mortgage  and the  denominator  of which is the  Appraised  Value of the

related Mortgaged
Property. With respect to any HEL and any date, the percentage equivalent of a fraction, the numerator of
which is the sum of (i) the initial principal balance of such HEL and (ii) the outstanding principal balance
as of the date of origination of such HEL, and of all other mortgage loans, if any, that are secured by liens
on the Mortgaged Property that are senior or subordinate to the Mortgage and the denominator of which is the
Appraised Value of the related Mortgaged Property.

Commission:  The Securities and Exchange Commission.

Corporate Trust Office: With respect to the Indenture Trustee, Certificate Registrar,
Certificate Paying Agent and Paying Agent, the principal corporate trust office of the Indenture Trustee and
Note Registrar at which at any particular time its corporate trust business shall be administered, which
office at the date of the execution of this instrument is located at 600 Travis Street, 9th Floor, Houston,
Texas 77002, Attention: Worldwide Securities Services/Structured Finance Services. For purposes of Section
4.15 of the Indenture, however, such term shall mean the Indenture Trustee's agent, Chase Manhattan Trust
Company, National Association, located at 1650 Market Street, Suite 5210, Philadelphia, Pennsylvania 19103,
or such other office as the Indenture Trustee shall designate. With respect to the Owner Trustee, the
principal corporate trust office of the Owner Trustee at which at any particular time its corporate trust
business shall be administered, which office at the date of the execution of this Trust Agreement is located
at Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890, Attention: Corporate Trust
Administration.

Credit Enhancer: Financial Guaranty Insurance Company, or any successor thereto.

Credit Enhancer Default: If the Credit Enhancer fails to make a payment required under the
Group I Policy or the Group II Policy in accordance with its terms.

Credit Limit: With respect to any HELOC, the maximum Loan Balance permitted under the terms of
the related Loan Agreement.

Credit Limit Increase: As defined in Section 3.01 of the Servicing Agreement.

Credit Repository: Equifax, Transunion and Experian, or their successors in interest.

Credit Score: With respect to any Home Equity Loan, the numerical designation obtained from
credit reports provided by any credit reporting organization used to assess a borrower's credit-worthiness
and the relative degree of risk a borrower represents to a lender, as determined in accordance with the
applicable underwriting criteria.

Curtailment: Any Principal Prepayment made by a Mortgagor which is not a Principal Prepayment
in full.

Custodial Account: The account or accounts created and maintained by the Master Servicer
pursuant to Section 3.02(b) of the Servicing Agreement, in which the Master Servicer shall deposit or cause
to be deposited certain amounts in respect of the Home Equity Loans.

Custodial Agreement: Any Custodial Agreement among the Custodian, the Indenture Trustee, the
Issuer and the Master Servicer relating to the custody of the Home Equity Loans and the Related Documents.

Custodian: Wells Fargo Bank, National Association, and its successors and assigns.

Cut-off Date: February 1, 2006.

Cut-off Date Loan Balance: With respect to any Home Equity Loan, the unpaid


principal balance thereof as of the close of business on the last day of the Billing Cycle immediately prior to the Cut-off Date.

Debt Service Reduction: With respect to any Home Equity Loan, a reduction in the scheduled payment for such Home Equity Loan by a court of competent jurisdiction in a proceeding under the Bankruptcy Code that becomes final and non-appealable, except such a reduction constituting a Deficient Valuation or any reduction that results in a permanent forgiveness of principal.

Default: Any occurrence which is or with notice or the lapse of time or both would become an Event of Default.

Deficiency Amount: (a) with respect to the Class I Notes and any Payment Date, the sum of (i) the excess, if any, of (A) the Interest Distribution Amount for the Class I Notes on such Payment Date over (B) the amount on deposit in the Payment Account available for interest distributions on the Class I Notes on such Payment Date, (ii) the principal portion of any Liquidation Loss Amount with respect to the Group I Loans for such Payment Date, to the extent not distributed as part of the Liquidation Loss Distribution Amount for the Class I Notes or covered by a reduction of the Group I Overcollateralization Amount on such Payment Date and (iii) the Guaranteed Payment Amount, if applicable; and

(b) with respect to the Class II Notes and any Payment Date, the sum of (i) the excess, if any, of (A) the Interest Distribution Amount for the Class II Notes on such Payment Date over (B) the amount on deposit in the Payment Account available for interest distributions on the Class II Notes on such Payment Date, (ii) the principal portion of any Liquidation Loss Amount with respect to the Group II Loans for such Payment Date, to the extent not distributed as part of the Liquidation Loss Distribution Amount for the Class II Notes or covered by a reduction of the Group II Overcollateralization Amount on such Payment Date and (iii) the Guaranteed Payment Amount, if applicable.

Deficient Valuation: With respect to any Home Equity Loan, a valuation by a court of competent jurisdiction of the Mortgaged Property in an amount less than the then outstanding indebtedness under the Home Equity Loan and any senior lien on the Mortgaged Property, or any reduction in the amount of principal to be paid in connection with any scheduled payment that constitutes a permanent forgiveness of principal, which valuation or reduction results from a proceeding under the Bankruptcy Code that becomes final and non-appealable.

Definitive Notes: The meaning specified in Section 4.06 of the Indenture.

Deleted Loan: A Home Equity Loan replaced or to be replaced with an Eligible Substitute Loan.

Delinquent: As used herein, a Home Equity Loan is considered to be: "30 to 59 days" or "30 or more days" delinquent when a payment due on any scheduled due date remains unpaid as of the close of business on the next following monthly due date. Since the determination as to whether a Home Equity Loan falls into these categories is made as of the close of business on the last business day of each month, a Home Equity Loan with a payment due on July 1 that remained unpaid as of the close of business on July 31 would still be considered current as of July 31. If that payment remained unpaid as of the close of business on August 31, the Home Equity Loan would then be considered 30-59 days delinquent. Delinquency information as of the Cut-off Date is determined and prepared as of the close of business on the last business day immediately prior to the Cut-off Date.

Depositor: Residential Funding Mortgage Securities II, Inc., a Delaware

corporation, or its
successor in interest.

Depository or Depository Agency: The Depository Trust Company or a successor appointed by the
Indenture Trustee with the approval of the Depositor. Any successor to the Depository shall be an
organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act and the
regulations of the Securities and Exchange Commission thereunder.

Depository Participant: A Person for whom, from time to time, the Depository effects
book-entry transfers and pledges of securities deposited with the Depository.

Derivative Contract: Any ISDA Master Agreement, together with the related Schedule and
Confirmation, entered into by the Owner Trustee and a Derivative Counterparty in accordance with Section 5.07
of the Trust Agreement.

Derivative Counterparty: Any counterparty to a Derivative Contract as provided in Section 5.07
of the Trust Agreement.

Determination Date: With respect to any Payment Date, the 20th day of the month in which such
Payment Date occurs or if such day is not a Business Day, the next succeeding Business Day.

Disqualified Organization: Any organization defined as a "disqualified organization" under
Section 860E(e)(5) of the Code, and if not otherwise included, any of the following: (i) the United States,
any State or political subdivision thereof, any possession of the United States, or any agency or
instrumentality of any of the foregoing (other than an instrumentality which is a corporation if all of its
activities are subject to tax and, except for Freddie Mac, a majority of its board of directors is not
selected by such governmental unit), (ii) a foreign government, any international organization, or any agency
or instrumentality of any of the foregoing, (iii) any organization (other than certain farmers' cooperatives
described in Section 521 of the Code) which is exempt from the tax imposed by Chapter 1 of the Code
(including the tax imposed by Section 511 of the Code on unrelated business taxable income) and (iv) rural
electric and telephone cooperatives described in Section 1381(a)(2)(C) of the Code. A Disqualified
Organization also includes any "electing large partnership," as defined in Section 775(a) of the Code and any
other Person so designated by the Owner Trustee based upon an Opinion of Counsel that the holding of an
Ownership Interest in a Class R Certificate by such Person may cause the Trust Estate or any Person having an
Ownership Interest in any Class of Notes or Certificates (other than such Person) to incur a liability for
any federal tax imposed under the Code that would not otherwise be imposed but for the Transfer of an
Ownership Interest in a Class R Certificate to such Person. The terms "United States", "State" and
"international organization" shall have the meanings set forth in Section 7701 of the Code or successor
provisions.

Draw: With respect to any HELOC, a borrowing by the related Mortgagor under the related Loan
Agreement.

Draw Period: With respect to each HELOC, the period consisting of either the first five, ten
or fifteen years after the date of origination of such HELOC, during which the related Mortgagor is permitted
to make Draws.

Due Date: With respect to any Home Equity Loan, the day of the month the Minimum Monthly
Payment or fixed monthly payment is due as set forth in the related Mortgage Note.

Eligible Account: An account that is any of the following: (i) maintained with a depository

institution the short-term debt obligations of which have been rated by each Rating Agency in its highest
rating category available, or (ii) an account or accounts in a depository institution in which such accounts
are fully insured to the limits established by the FDIC, provided that any deposits not so insured shall, to
the extent acceptable to each Rating Agency, as evidenced in writing, be maintained such that (as evidenced
by an Opinion of Counsel delivered to the Indenture Trustee and each Rating Agency) the Indenture Trustee
have a claim with respect to the funds in such account or a perfected first security interest against any
collateral (which shall be limited to Permitted Investments) securing such funds that is superior to claims
of any other depositors or creditors of the depository institution with which such account is maintained, or
(iii) in the case of the Custodial Account, either (A) a trust account or accounts maintained at the
corporate trust department of the Indenture Trustee or (B) an account or accounts maintained at the corporate
trust department of the Indenture Trustee, as long as its short term debt obligations are rated P-1 by
Moody's and A-1 by Standard & Poor's (or the equivalent) or better by each Rating Agency and its long term
debt obligations are rated A by Standard & Poor's (or the equivalent) or better by each Rating Agency, or
(iv) in the case of the Custodial Account and the Payment Account, a trust account or accounts maintained in
the corporate trust division of the Indenture Trustee, or (v) an account or accounts of a depository
institution acceptable to each Rating Agency (as evidenced in writing by each Rating Agency that use of any
such account as the Custodial Account or the Payment Account will not reduce the rating assigned to any of
the Securities by such Rating Agency (if determined without regard to the Policy) below the lower of the
then-current rating or the rating assigned to such Securities (if determined without regard to the Policy) as
of the Closing Date by such Rating Agency).

Eligible Substitute Loan: A Home Equity Loan substituted by the Seller for a Deleted Loan
which must, on the date of such substitution, as confirmed in an Officer's Certificate delivered to the
Indenture Trustee, (i) have an outstanding principal balance, after deduction of the principal portion of the
monthly payment due in the month of substitution (or in the case of a substitution of more than one Home
Equity Loan for a Deleted Home Equity Loan, an aggregate outstanding principal balance, after such
deduction), not in excess of the outstanding principal balance of the Deleted Loan (the amount of any
shortfall to be deposited by the Seller in the Custodial Account in the month of substitution); (ii) comply
with each representation and warranty set forth in Section 3.1(b) of the Purchase Agreement (other than
clauses (xiv), (xvi), (xvii), (xxvi), (xxvii), (xxviii), (xxx)(B) and (xxxi) thereof), if such Deleted Loan
is a Group I Loan, or Section 3.1(c) (other than clauses (xiii), (xxiv)(B), (xxv)(B), (xxvi), (xxvii),
(xxxiv) and (xxxvi) thereof), if such Deleted Loan is a Group II Loan, as of the date of substitution; (iii)
have a Loan Rate, Net Loan Rate and Gross Margin (if applicable) no lower than and not more than 1% per annum
higher than the Loan Rate, Net Loan Rate and Gross Margin (if applicable), respectively, of the Deleted Loan
as of the date of substitution; (iv) have a Combined Loan-to-Value Ratio at the time of substitution no
higher than that of the Deleted Loan at the time of substitution; (v) have a remaining term to stated
maturity not greater than (and not more than one year less than) that of the Deleted Loan and (vi) not be 30
days or more delinquent.

ERISA: The Employee Retirement Income Security Act of 1974, as amended.

Event of Default: With respect to the Indenture, any one of the following events (whatever the
reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation
of law or pursuant to any judgment, decree or order of any court or any order, rule or

regulation of any
administrative or governmental body):

(i)    a default in the payment of any interest on any Note when the same becomes due and
payable, and such default shall continue for a period of five days; or

(ii)    a default in the payment of the principal of or any installment of the principal of any
Note when the same becomes due and payable, and such default shall continue for a period of five days;
or

(iii)    there occurs a default in the observance or performance of any covenant or agreement of
the Issuer made in the Indenture, or any representation or warranty of the Issuer made in the
Indenture or in any certificate or other writing delivered pursuant hereto or in connection herewith
proving to have been incorrect in any material respect as of the time when the same shall have been
made which has a material adverse effect on Securityholders or the Credit Enhancer, and such default
shall continue or not be cured, or the circumstance or condition in respect of which such
representation or warranty was incorrect shall not have been eliminated or otherwise cured, for a
period of 30 days after there shall have been given, by registered or certified mail, to the Issuer by
the Indenture Trustee or to the Issuer and the Indenture Trustee by the Holders of at least 25% of the
outstanding Security Balance of the Notes or the Credit Enhancer, a written notice specifying such
default or incorrect representation or warranty and requiring it to be remedied and stating that such
notice is a notice of default hereunder; or

(iv)    there occurs the filing of a decree or order for relief by a court having jurisdiction
in the premises in respect of the Issuer or any substantial part of the Trust Estate in an involuntary
case under any applicable federal or state bankruptcy, insolvency or other similar law now or
hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator
or similar official of the Issuer or for any substantial part of the Trust Estate, or ordering the
winding-up or liquidation of the Issuer's affairs, and such decree or order shall remain unstayed and
in effect for a period of 60 consecutive days; or

(v)    there occurs the commencement by the Issuer of a voluntary case under any applicable
federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or the
consent by the Issuer to the entry of an order for relief in an involuntary case under any such law,
or the consent by the Issuer to the appointment or taking possession by a receiver, liquidator,
assignee, custodian, trustee, sequestrator or similar official of the Issuer or for any substantial
part of the assets of the Trust Estate, or the making by the Issuer of any general assignment for the
benefit of creditors, or the failure by the Issuer generally to pay its debts as such debts become
due, or the taking of any action by the Issuer in furtherance of any of the foregoing.

Event of Liquidation: Following the occurrence of an Event of Default under the Indenture, the
determination by the Indenture Trustee, as evidenced by a written notice provided to the Owner Trustee, the
Depositor and the Credit Enhancer, that all conditions precedent to the sale or liquidation of the Trust
Estate pursuant to Section 5.04 of the Indenture have been satisfied.

Event of Servicer Termination: With respect to the Servicing Agreement, a Servicing Default as
defined in Section 7.01 of the Servicing Agreement.

Exchange Act: The Securities Exchange Act of 1934, as amended, and the rules and regulations
promulgated thereunder.

Excluded Amount:  For any Payment Date on or after the occurrence of an Amortization  Event, the portion of the balance with respect to each HELOC  attributable to all Draws not transferred to the Trust,  and the portion of the Principal  Collections (other than Net Liquidation  Proceeds to the extent that the Excluded Amount of Liquidation  Proceeds is not included in Net Liquidation  Proceeds) and Interest Collections thereon for each Collection  Period  allocated  to such  Excluded  Amount based on a pro rata allocation  between the related  Excluded  Amount and the Loan Balance in proportion to the  respective  amounts outstanding as of the end of the calendar month preceding such Collection Period.

Expenses:  The meaning specified in Section 7.02 of the Trust Agreement.

Fannie Mae: Fannie Mae,  formerly the Federal National  Mortgage  Association,  or any successor thereto.

FDIC:  The Federal Deposit Insurance Corporation or any successor thereto.

Final  Scheduled  Payment Date: With respect to the Class A-I-1 Notes and the Class A-I-2 Notes, the Payment Date in January  2021,  with respect to the Class A-I-3 Notes,  the Payment Date in November  2027, with  respect to the Class A-I-4 Notes and Class A-I-5  Notes,  the Payment Date in March 2036 and with respect to the Class II Notes, the Payment Date in February 2036.

Foreclosure  Profit:  With respect to a  Liquidated  Home Equity  Loan,  the amount,  if any, by which (i) the  aggregate of  Liquidation  Proceeds net of  Liquidation  Expenses  exceeds (ii) the related Loan Balance (plus accrued and unpaid  interest  thereon at the applicable Loan Rate from the date interest was last paid through  the date of receipt of the final  Liquidation  Proceeds)  of such  Liquidated Home  Equity  Loan immediately prior to the final recovery of its Liquidation Proceeds.

Form 10-K Certification:  As defined in Section 4.04(b) of the Servicing Agreement.

Freddie  Mac:  Freddie  Mac,  formerly  the  Federal  Home  Loan  Mortgage Corporation,  or any successor thereto.

Grant: Pledge,  bargain, sell, warrant,  alienate,  remise, release,  convey, assign,  transfer, create,  and grant a lien upon and a security interest in and right of set-off against,  deposit, set over and confirm  pursuant to the  Indenture.  A Grant of the Collateral or of any other  agreement or instrument  shall include  all  rights,  powers and options  (but none of the  obligations)  of the  granting party  thereunder, including the  immediate and  continuing  right to claim for,  collect,  receive and give receipt for principal and interest  payments in respect of such  collateral  or other  agreement or  instrument  and all other moneys payable  thereunder,  to give  and  receive  notices  and  other  communications,  to  make waivers  or  other agreements,  to exercise  all rights and options,  to bring  proceedings  in the name of the granting  party or otherwise,  and  generally to do and receive  anything  that the granting  party is or may be entitled to do or receive thereunder or with respect thereto.

Gross  Margin:  With  respect to any HELOC,  the  percentage  set forth as the "Margin" for such HELOC on the Home Equity Loan Schedule.

Group I Certificates:  The Class SB-I  Certificates,  the Class R-I  Certificates and Class R-II Certificates.

Group I Credit Enhancer  Premium Rate: The Premium Rate as specified in the Insurance  Agreement with respect to the Group I Policy.

Group I  Delinquency  Percentage:  With  respect  to any  Payment  Date  and  Loan

Group I, the
percentage equivalent of a fraction (A) the numerator of which is the Loan Balance of Group I Loans that are
Delinquent for 60 days or more as of such Payment Date and (B) the denominator of which is the Pool Balance
of Loan Group I as of the beginning of the related Collection Period, expressed as a percentage.

Group I Excess Spread: With respect to any Payment Date and Loan Group I and without taking
into account any Group I Insured Payment for such Payment Date, the P&I Collections on the Group I Loans
remaining after the application of clauses (i), (ii), (iv), (v) and (vii) of Section 3.05(a)(I) of the
Indenture.

Group I Loans:  The HELs in Loan Group I.

Group I Insured Payment: The Insured Payment as defined in the Group I Policy.

Group I Net WAC Cap Shortfall:  With respect to each Class of Class I Notes, on any Payment Date
an amount by which interest that would have accrued on such Notes at the applicable Note Rate during the
related Interest Period (without application of the Group I Net WAC Rate) exceeds interest accrued thereon at
the Group I Net WAC Rate.

Group I Net WAC Rate:  With respect to any Payment Date, a per annum rate equal to the weighted
average of the Net Loan Rates of the Group I Loans applicable for the related Collection Period.  With
respect to the Class A-I-1 Notes, the Group I Net WAC Rate is further adjusted by multiplying the Group I Net
WAC Rate by a fraction, the numerator of which is 30 and the denominator of which is the actual number of
days in the related Interest Period.

Group I Overcollateralization Amount: With respect to the Class I Notes, and any Payment Date,
the amount by which the Pool Balance of the Group I Loans after applying payments received in the related
Collection Period exceeds the aggregate Security Balance of the Class I Notes on such Payment Date (after
application of Principal Collections for such date and any payments in respect to Liquidation Loss Amounts).
On each Payment Date, the Group I Overcollateralization Amount available to cover Liquidation Loss Amounts
on such Payment Date, if any, shall be deemed to be reduced by an amount equal to any Liquidation Loss
Amounts for such Payment Date on the Group I Loans, except to the extent that such Liquidation Loss Amounts
were covered on such Payment Date by P&I Collections on the Group I Loans pursuant to Section 3.05(a)(I) of
the Indenture.

Group I Overcollateralization Floor:  An amount equal to 0.50% of the aggregate Cut-off Date
Loan Balances of the Group I Loans.

Group I Overcollateralization Increase Amount:  With respect to any Payment Date and the Class
I Notes an amount equal to the lesser of (i) P&I Collections on the Group I Loans remaining after application
of clauses (i) through (v) of Section 3.05(a)(I) of the Indenture and (ii) the excess, if any, of (x) the
Group I Required Overcollateralization Amount for that Payment Date over (y) the Group I
Overcollateralization Amount for that Payment Date.

Group I Policy: The financial guaranty insurance policy provided by the Credit Enhancer, dated
as of February 24, 2006, with respect to the Class I Notes.

Group I Required Overcollateralization Amount:  (i) With respect to any Payment Date prior to
the Group I Stepdown Date, an amount equal to 3.80% of the aggregate Cut-off Date Loan Balances of the Group
I Loans.

(ii) With respect to any Payment Date on or after the Group I Stepdown Date, the lesser of (a)

the initial Group I Required Overcollateralization Amount and (b) the greater of (x) 7.60% of the Pool
Balance of the Group I Loans after application of Interest Collections and Principal Collections received
during the related Collection Period and (y) the Group I Overcollateralization Floor.

(iii) Notwithstanding clause (ii) above, if on any Payment Date on or after the Group I
Stepdown Date, a Trigger Event is in effect (the "Group I Freeze Date"), the Group I Required
Overcollateralization Amount shall be no less than the Group I Required Overcollateralization Amount for the
previous Payment Date; provided, however, if on the Group I Freeze Date or any Payment Date thereafter, other
than a date on which a Trigger Event is in effect as a result of the Group I Rolling Three Month Delinquency
Percentage as provided in clause (iv) of the definition of "Trigger Event," the Group I Rolling Three Month
Liquidation Loss Amount Coverage Test is satisfied, then the Group I Required Overcollateralization Amount
will be the amount specified in clause (ii) above.

The Group I Required Overcollateralization Amount may be reduced with the prior written consent
of the Credit Enhancer, but without the consent of the Holders of the Notes so long as written confirmation
is obtained from each Rating Agency that the reduction will not reduce the rating assigned to any Class of
Notes by that rating agency below the lower of the then-current rating or the rating assigned to those Notes
as of the Closing Date by that Rating Agency without taking into account the Group I Policy.

Group I Rolling Three Month Delinquency Percentage: With respect to any Payment Date and the
Group I Loans, the arithmetic average of the Group I Delinquency Percentages determined for such Payment Date
and for each of the two preceding Payment Dates.

Group I Rolling Three Month Liquidation Loss Amount Coverage Test: With respect to any Payment
Date and Loan Group I, the Group I Rolling Three Month Liquidation Loss Amount Coverage Test shall be
satisfied if (i) the aggregate Group I Excess Spread for such Payment Date and the two preceding Payment
Dates divided by (ii) the aggregate Liquidation Loss Amounts for the Group I Loans as of the last day of the
related Collection Period and as of the last day of the related Collection Period for the two preceding
Payment Dates is an amount equal to 2 or more.

Group I Stepdown Date: The later to occur of (x) the Payment Date in September 2008 and (y)
the Payment Date on which the Pool Balance of the Group I Loans is less than 50% of the aggregate Cut-off
Date Loan Balances of the Group I Loans, after applying payments received during the related Collection
Period.

Group II Certificates: The Class SB-II Certificates.

Group II Credit Enhancer Premium Rate: The Premium Rate (as defined in the Insurance Agreement)
with respect to the Group II Policy.

Group II Delinquency Percentage: With respect to any Payment Date and Loan Group II, the
percentage equivalent of a fraction (A) the numerator of which is the Loan Balance of Group II Loans that are
Delinquent for 60 days or more as of such Payment Date and (B) the denominator of which is the Pool Balance
of Loan Group II, in each case as of the beginning of the related Collection Period, expressed as a
percentage.

Group II Excess Spread: With respect to any Payment Date and Loan Group II and without taking
into account any Group II Insured Payment for such Payment Date, the P&I Collections on the Group II Loans
for such Payment Date remaining after application of clauses (i), (ii), (iv), (v), (vi) and (vii) of Section
3.05(a)(II) of the Indenture.

Group II Excess Spread Percentage: With respect to any Payment Date and Loan Group II, the percentage equivalent of a fraction (A) the numerator of which is the product of (1) the Group II Excess Spread for such Payment Date and (2) 12, and (B) the denominator of which is the Pool Balance of Loan Group II as of the beginning of the related Collection Period, expressed as a percentage.

Group II Insured Payment: The Insured Payment as defined in the Group II Policy.

Group II Loans: The HELOCs in Loan Group II.

Group II Net WAC Cap Shortfall: With respect to either the Class A-II Notes or the Variable Funding Notes, on any Payment Date an amount by which interest that would have accrued on such Notes at the applicable Note Rate during the related Interest Period (without application of the Group II Net WAC Rate) exceeds interest accrued thereon at the Group II Net WAC Rate.

Group II Net WAC Rate: With respect to any Payment Date, a per annum rate equal to the weighted average of the Net Loan Rates of the Group II Loans as of the beginning of the related Collection Period, adjusted by multiplying the Group II Net WAC Rate by a fraction, the numerator of which is 30 and the denominator of which is the actual number of days in the related Interest Period.

Group II Overcollateralization Amount: With respect to the Class II Notes, and any Payment Date, the amount by which the Pool Balance of the Group II Loans after applying payments received in the related Collection Period exceeds the aggregate Security Balance of the Notes on such Payment Date (in each case, after application of Net Principal Collections or Principal Collections, as the case may be, for such date and acquisition by the Trust of Additional Balances on such Payment Date and any payments in respect of Liquidation Loss Amounts). On each Payment Date, the Group II Overcollateralization Amount available to cover Liquidation Loss Amounts on such Payment Date, if any, shall be deemed to be reduced by an amount equal to any Liquidation Loss Amounts for such Payment Date on the Group II Loans, except to the extent that such Liquidation Loss Amounts were covered on such Payment Date by P&I Collections on the Group II Loans pursuant to Section 3.05(a)(II) of the Indenture.

Group II Overcollateralization Floor: An amount equal to 0.50% of the aggregate Cut-off Date Loan Balances of the Group II Loans.

Group II Overcollateralization Increase Amount: With respect to the Class II Notes and any Payment Date, an amount equal to the lesser of (i) P&I Collections on the Group II Loans remaining after application of clauses (i) through (v) of Section 3.05(a)(II) of the Indenture and (ii) the excess, if any, of (x) the Group II Required Overcollateralization Amount for that Payment Date over (y) the Group II Overcollateralization Amount for that Payment Date.

Group II Policy: The financial guaranty insurance policy provided by the Credit Enhancer, dated as of February 24, 2006, with respect to the Class II Notes.

Group II Required Overcollateralization Amount: With respect to any Payment Date prior to the Group II Stepdown Date, 3.35% of the aggregate Cut-off Date Loan Balances of the Group II Loans. With respect to any Payment Date on or after the Group II Stepdown Date, the lesser of (a) the initial Group II Required Overcollateralization Amount and (b) 6.70% of the Pool Balance for the Group II Loans after application of Interest Collections and Principal Collections received during the related Collection Period but not less than the Group II Overcollateralization Floor; provided that, if a Trigger Event has occurred and is continuing on such Payment Date with respect to the Class II Notes, the Group II Required

Overcollateralization Amount will equal the Group II Required Overcollateralization Amount for the immediately preceding Payment Date.

The Group II Required Overcollateralization Amount may be reduced with the prior written consent of the Credit Enhancer, but without the consent of the Holders of the Notes so long as written confirmation is obtained from each Rating Agency that the reduction will not reduce the rating assigned to any Class of Notes by that Rating Agency below the lower of the then-current rating or the rating assigned to those Notes as of the Closing Date by that Rating Agency without taking into account the Group II Policy.

Group II Rolling Three Month Delinquency Percentage: With respect to any Payment Date and the Group II Loans, the arithmetic average of the Group II Delinquency Percentages determined for such Payment Date and for each of the two preceding Payment Dates.

Group II Rolling Three Month Excess Spread Percentage: With respect to any Payment Date and the Group II Loans, the arithmetic average of the Group II Excess Spread Percentages determined for such Payment Date and for each of the two preceding Payment Dates. For purposes of calculating the Group II Excess Spread Percentage for the current Payment Date, the Group II Required Overcollateralization Amount shall be determined without regard to the proviso set forth in such definition.

Group II Stepdown Date: The later of (a) the Payment Date in September 2008 and (b) the Payment Date on which the Pool Balance of the Group II Loans after applying payments received in the related Collection Period is less than 50% of the aggregate Cut-off Date Loan Balances of the Group II Loans.

Guaranteed Payment Amount: (a) With respect to the Class I Notes, (i) the aggregate outstanding Security Balance of the Class A-I-1 Notes and Class A-I-2 Notes on the Payment Date in January 2021, after giving effect to all other distributions of principal on the Class A-I-1 Notes and Class A-I-2 Notes on such Payment Date from all sources other than the Group I Policy, (ii) the aggregate outstanding Security Balance of the Class A-I-3 Notes on the Payment Date in November 2027, after giving effect to all other distributions of principal on the Class A-I-3 Notes on such Payment Date from all sources other than the Group I Policy and (iii) the aggregate outstanding Security Balance of the Class A-I-4 Notes and Class A-I-5 Notes on the Payment Date in March 2036, after giving effect to all other distributions of principal on the Class A-I-4 Notes and Class A-I-5 Notes on such Payment Date from all sources other than the Group I Policy; and

(b) with respect to the Class II Notes, the aggregate outstanding Security Balance of the Class II Notes on the Payment Date in February 2036, after giving effect to all other distributions of principal on the Class II Notes on such Payment Date from all sources other than the Group II Policy.

HEL: Each closed-end, fixed rate home equity mortgage loan, together with the Related Documents, included in the Trust Estate.

HELOC: Each adjustable-rate, home equity revolving line of credit loan, including Additional Balances, if any, together with the Related Documents, included in the Trust Estate.

Holder: Any of the Noteholders or Certificateholders.

Home Equity Loans: Collectively, the HELs and HELOCs.

Home Equity Loan Schedule: The initial schedule of Home Equity Loans as of the Cut-off Date set forth in Exhibit A of the Servicing Agreement, which schedule sets forth as to each Home Equity Loan (as applicable) (i) the Cut-off Date Loan Balance ("Principal Bal"), (ii) the Credit Limit,

(iii) the Gross Margin ("Margin"), (iv) the Maximum Rate ("Ceiling"), if any, (v) the lien position of the related Mortgaged Property, (vi) the Depositor's Home Equity Loan identifying number, (vii) the Subservicer's Home Equity Loan identifying number (viii) the city, state and zip code of the Mortgaged Property, (ix) a code indicating whether the Mortgaged Property is owner-occupied, (x) the type of residential dwelling constituting the Mortgaged Property, (xi) the original number of months to maturity, (xii) the remaining number of months to maturity from the Cut-off Date, (xiii) as to any first lien Home Equity Loan, the Loan-to-Value Ratio at origination and as to any second lien Home Equity Loan, the Combined Loan-to-Value Ratio at origination of such second lien Home Equity Loan, (xiv) the Loan Rate in effect as of the Cut-off Date, (xv) the stated maturity date, (xvi) the prior encumbrance principal balance (denoted as "Senior Lien" on the Home Equity Loan Schedule), if any, (xvii) the Credit Score, (xviii) the Mortgagor's debt-to-income ratio, (xix) a code indicating the product type, (xx) a code indicating the purpose of the Home Equity Loan, (xxi) the Mortgage Note date, (xxii) the teaser expiration date, and (xxiii) the Appraised Value.

Indemnified Party:  The meaning specified in Section 7.02 of the Trust Agreement.

Indenture:  The indenture, dated as of the Closing Date, between the Issuer, as debtor, and the Indenture Trustee, as indenture trustee.

Indenture Trustee:  JPMorgan Chase Bank, National Association and its successors and assigns or any successor indenture trustee appointed pursuant to the terms of the Indenture.

Indenture Trustee Information:  As specified in Section 9.05(a)(i)(A) of the Servicing Agreement.

Independent:  When used with respect to any specified Person, the Person (i) is in fact independent of the Issuer, any other obligor on the Notes, the Seller, the Depositor and any Affiliate of any of the foregoing Persons, (ii) does not have any direct financial interest or any material indirect financial interest in the Issuer, any such other obligor, the Seller, the Depositor or any Affiliate of any of the foregoing Persons and (iii) is not connected with the Issuer, any such other obligor, the Seller, the Depositor or any Affiliate of any of the foregoing Persons as an officer, employee, promoter, underwriter, trustee, partner, director or person performing similar functions.

Independent Certificate:  A certificate or opinion to be delivered to the Indenture Trustee under the circumstances described in, and otherwise complying with, the applicable requirements of Section 10.01 of the Indenture, made by an Independent appraiser or other expert appointed by an Issuer Order and approved by the Indenture Trustee in the exercise of reasonable care, and such opinion or certificate shall state that the signer has read the definition of "Independent" in this Indenture and that the signer is Independent within the meaning thereof.

Index:  With respect to any HELOC, the prime rate from time to time for the adjustment of the Loan Rate set forth as such on the related Loan Agreement.

Initial Certificates:  The Home Equity Loan-Backed Certificates, Series 2006-HSA2, issued on the Closing Date, each evidencing undivided beneficial interests in the Issuer and executed by the Owner Trustee.

Initial Class A-I-1 Security Balance:  $165,375,000.

Initial Class A-I-2 Security Balance:  $33,249,000.

Initial Class A-I-3 Security Balance:  $47,862,000.

Initial Class A-I-4 Security Balance:    $20,949,000.

Initial Class A-I-5 Security Balance:    $29,715,000.

Initial Class A-II Security Balance:    $150,750,000.

Initial Security Balance: With respect to the Initial Certificates, $0.00, the Term Notes, as listed above for each Class and the Variable Funding Notes, $0.00.

Insolvency Event: With respect to a specified Person, (a) the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of such Person or any substantial part of its property in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its property, or ordering the winding-up or liquidation of such Person's affairs, and such decree or order shall remain unstayed and in effect for a period of 60 consecutive days; or (b) the commencement by such Person of a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by such Person to the entry of an order for relief in an involuntary case under any such law, or the consent by such Person to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its property, or the making by such Person of any general assignment for the benefit of creditors, or the failure by such Person generally to pay its debts as such debts become due or the admission by such Person in writing (as to which the Indenture Trustee shall have notice) of its inability to pay its debts generally, or the adoption by the Board of Directors or managing member of such Person of a resolution which authorizes action by such Person in furtherance of any of the foregoing.

Insurance Agreement: The Insurance and Indemnity Agreement, dated as of February 24, 2006, among the Master Servicer, the Seller, the Depositor, the Issuer, the Indenture Trustee and the Credit Enhancer, including any amendments and supplements thereto.

Insurance Proceeds: Proceeds paid in respect of the Home Equity Loans pursuant to any insurance policy covering a Home Equity Loan or amounts required to be paid by the Master Servicer pursuant to the next to last sentence of Section 3.04(a) of the Servicing Agreement, to the extent such proceeds are payable to the mortgagee, any Subservicer, the Master Servicer or the Trustee and are not applied to the restoration of the related Mortgaged Property or released to the Mortgagor in accordance with the procedures that the Master Servicer would follow in servicing mortgage loans held for its own account or required to be paid to any holder of a mortgage senior to such Home Equity Loan.

Interest Collections: With respect to any Payment Date and the Group I Loans, the sum of all payments by or on behalf of Mortgagors and any other amounts constituting interest (including without limitation such portion of principal prepayments, Insurance Proceeds, Net Liquidation Proceeds and Repurchase Prices as is allocable to interest on the applicable Group I Loans) as is paid by the Seller or the Master Servicer or is collected by the Master Servicer under the Group I Loans, reduced by the Servicing Fee with respect to the Group I Loans for the related Collection Period, by any fees (including annual fees) or late charges or similar administrative fees paid by Mortgagors during the related Collection Period with respect to the Group I Loans. The terms of the related Loan Agreement shall determine the portion of each payment in respect of such Group I Loans that constitutes principal or interest.

With respect to any Payment Date and the Group II Loans, the sum of all

payments   by or on
behalf of Mortgagors and any other amounts  constituting   interest   (including   without
limitation such portion
of principal  prepayments,  Insurance Proceeds,  Net Liquidation Proceeds and Repurchase Prices
as is allocable
to interest on the applicable  Group II Loans) as is paid by the Seller or the Master  Servicer
or is collected
by the Master  Servicer under the Group II Loans  (exclusive of the pro rata portion thereof
attributable  to
any Excluded  Amounts not conveyed to the Trust  following an  Amortization  Event),  reduced by
the  Servicing
Fees for the related  Collection  Period and by any fees  (including  annual  fees) or late
charges or similar
administrative  fees paid by Mortgagors  during the related  Collection  Period with  respect
to the Group II
Loans.  The terms of the related  Loan  Agreement  shall  determine  the portion of each  payment
in respect of
such Group II Loan that constitutes principal or interest.

Interest   Distribution   Amount:   With  respect to any Class or Classes of Class I
Notes or Class
II Notes,  and any Payment  Date, an amount equal to interest  accrued  during the related
Interest  Period on
those  Classes of Notes on their  respective  Security  Balance or Notional  Amount  immediately
prior to that
Payment  Date, at the related Note Rate,  or Note Rates,  minus the amount of any Relief Act
Shortfalls on the
Group I Loans  during the related  Collection  Period,  in the case of Class I Notes,  the amount
of any Relief
Act Shortfalls on Group II Loans during the related  Collection  Period, in the case of the Class
II Notes, and
minus,  in the case of the Class I Notes,  any Prepayment  Interest  Shortfalls on the Group I
Loans during the
related Collection Period allocated to such Classes.

Interest  Period:  With  respect to the Class I Notes (other than the Class A-I-1
Notes) and any
Payment Date, the calendar  month  preceding the month in which such Payment Date occurs.  The
Interest  Period
for the Class A-I-1 Notes,  the Class A-II Notes and the Variable  Funding  Notes shall be, with
respect to any
Payment Date other than the first Payment Date, the period  beginning on the preceding  Payment
Date and ending
on the day preceding  such Payment Date,  and in the case of the first  Payment Date,  the period
beginning on
the Closing Date and ending on the day preceding the first Payment Date.

Interest Rate Adjustment  Date: With respect to each HELOC,  the date or dates on
which the Loan
Rate is adjusted in accordance with the related Loan Agreement.

Interim Certification:  The meaning specified in Section 2.1(c) of the Purchase
Agreement.

Issuer or Trust: The Home Equity  Loan Trust  2006-HSA2,  a Delaware  statutory
trust,  or its
successor in interest.

Issuer  Request:  A written order or request  signed in the name of the Issuer by
any one of its
Authorized Officers and delivered to the Indenture Trustee.

LIBOR:  For any  Interest  Period  other  than the first  Interest  Period,  the
rate for United
States dollar deposits for one month which appears on the Telerate  Screen Page 3750 as of 11:00
A.M.,  London,
England time, on the second LIBOR  Business Day prior to the first day of such  Interest  Period.
With respect
to the first  Interest  Period,  the rate for United States dollar  deposits for one month which
appears on the
Telerate  Screen  Page 3750 as of 11:00  A.M.,  London,  England  time,  two LIBOR  Business
Days prior to the
Closing  Date.  If such rate does not appear on such page (or such other page as may replace
that page on that
service,  or if such service is no longer offered,  such other service for displaying LIBOR or
comparable rates
as may be reasonably  selected by the Indenture  Trustee after  consultation  with the Master
Servicer and the
Credit  Enhancer),  the rate will be the  Reference  Bank Rate.  If no such  quotations  can be
obtained and no
Reference Bank Rate is available, LIBOR will be LIBOR applicable to the preceding Payment Date.

LIBOR Business Day: Any day other than (i) a Saturday or a Sunday or (ii) a day on which banking institutions in the city of London, England are required or authorized by law to be closed.

Lien: Any mortgage, deed of trust, pledge, conveyance, hypothecation, assignment, participation, deposit arrangement, encumbrance, lien (statutory or other), preference, priority right or interest or other security agreement or preferential arrangement of any kind or nature whatsoever, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing and the filing of any financing statement under the UCC (other than any such financing statement filed for informational purposes only) or comparable law of any jurisdiction to evidence any of the foregoing; provided, however, that any assignment pursuant to Section 6.02 of the Servicing Agreement shall not be deemed to constitute a Lien.

Limited Repurchase Right Holder: RFC Asset Holdings II, Inc. or it successor.

Liquidated Home Equity Loan: With respect to any Payment Date, any Home Equity Loan in respect of which the Master Servicer has determined, in accordance with the servicing procedures specified in the Servicing Agreement, as of the end of the related Collection Period that substantially all Liquidation Proceeds which it reasonably expects to recover, if any, with respect to the disposition of the related Home Equity Loan have been recovered. The Master Servicer will treat any Home Equity Loan that is 180 days or more Delinquent as having been finally liquidated.

Liquidation Expenses: Out-of-pocket expenses (exclusive of overhead) which are incurred by or on behalf of the Master Servicer in connection with the liquidation of any Home Equity Loan and not recovered under any insurance policy, such expenses including, without limitation, legal fees and expenses, any unreimbursed amount expended (including, without limitation, amounts advanced to correct defaults on any mortgage loan which is senior to such Home Equity Loan and amounts advanced to keep current or pay off a mortgage loan that is senior to such Home Equity Loan) respecting the related Home Equity Loan and any related and unreimbursed expenditures for real estate property taxes or for property restoration, preservation or insurance against casualty loss or damage.

Liquidation Loss Amounts: With respect to any Payment Date and any Home Equity Loan that became a Liquidated Home Equity Loan during the related Collection Period, the unrecovered portion of the related Loan Balance thereof at the end of such Collection Period, after giving effect to the Net Liquidation Proceeds applied in reduction of the Loan Balance. If a Bankruptcy Loss has occurred with respect to any Home Equity Loan, the amount of the Bankruptcy Loss will be treated as a Liquidation Loss Amount.

Liquidation Loss Distribution Amount: With respect to the Group I Loans and any Payment Date, the aggregate of (A) 100% of the Liquidation Loss Amounts incurred with respect to the Group I Loans during the related Collection Period, plus (B) any such Liquidation Loss Amounts remaining undistributed from any preceding Payment Date, provided that any Liquidation Loss Amount described in this clause (B) shall not be distributed to the extent that the Liquidation Loss Amount was previously paid on the Class I Notes by means of a draw on the Group I Policy, from collections on the Home Equity Loans in Loan Group I, or was reflected in the reduction of the Group I Overcollateralization Amount.

With respect to the Group II Loans and any Payment Date, the aggregate of (A) 100% of the Liquidation Loss Amounts incurred with respect to the Group II Loans during the related Collection Period, plus (B) any such Liquidation Loss Amounts remaining undistributed from any preceding Payment

Date, provided
that any Liquidation Loss Amount described in this clause (B) shall not be distributed to the extent that the
Liquidation Loss Amount was previously paid on the Class A-II Notes and the Variable Funding Notes by means
of a draw on the Group II Policy, from collections on the Group II Loans, or was reflected in the reduction
of the Group II Overcollateralization Amount.

Liquidation Proceeds: Proceeds (including Insurance Proceeds but not including amounts drawn
under the Group I Policy or the Group II Policy) if any received in connection with the liquidation of any
Home Equity Loan or related REO, whether through trustee's sale, foreclosure sale or otherwise or any
Subsequent Recoveries with respect to a Liquidated Home Equity Loan.

Loan Agreement: With respect to any HEL, the promissory note, or, with respect to any HELOC,
the credit line account agreement, executed by the related Mortgagor and any amendment or modification
thereof.

Loan Balance: With respect to any HEL, other than a HEL which has become a Liquidated Home
Equity Loan, and as of any day, the related Cut-off Date Loan Balance minus all collections credited as
principal in respect of any such HEL in accordance with the related Loan Agreement and applied in reduction
of the Loan Balance thereof. With respect to any HELOC, other than a HELOC which has become a Liquidated
Home Equity Loan, and as of any day, the related Cut-off Date Loan Balance, plus (i) any Additional Balances
in respect of such HELOC conveyed to the Trust, minus (ii) all collections credited as principal in respect
of any such HELOC in accordance with the related Loan Agreement (except for any such collections that are
allocable to any Excluded Amount) and applied in reduction of the Loan Balance thereof. For purposes of this
definition, a Liquidated Home Equity Loan shall be deemed to have a Loan Balance equal to the Loan Balance of
the related HEL or HELOC immediately prior to the final recovery of substantially all related Liquidation
Proceeds and a Loan Balance of zero thereafter.

Loan Rate: With respect to any Home Equity Loan and any day, the per annum rate of interest
applicable under the related Loan Agreement.

Loan Group: Loan Group I or Loan Group II.

Loan Group I: The HELs identified on the Home Equity Loan Schedule as being assigned to Loan
Group I and which correspond with the Class I Notes.

Loan Group I SB-IO Marker Rate: Two times the weighted average of the REMIC I Remittance Rates
for REMIC I Regular Interests LT2 and LT3 weighted by their respective Uncertificated Principal Balances.

Loan Group II: The HELOCs identified on the Home Equity Loan Schedule as being assigned to Loan
Group II and which correspond with the Class A-II Notes and Variable Funding Notes.

Lost Note Affidavit: With respect to any Home Equity Loan as to which the original Loan
Agreement has been permanently lost or destroyed and has not been replaced, an affidavit from the Seller or
the related Program Seller certifying that the original Loan Agreement has been lost, misplaced or destroyed
(together with a copy of the related Loan Agreement).

LT1 Principal Distribution Amount: For any Payment Date, the excess, if any, of the Class LT1
Principal Reduction Amount for such Payment Date over the principal REMIC I Liquidation Loss Amounts
allocated to the REMIC I Regular Interest LT1 on such Payment Date.

LT2 Principal Distribution Amount: For any Payment Date, the excess, if any, of the Class LT2
Principal Reduction Amount for such Payment Date over the principal REMIC I Liquidation

Loss Amounts
allocated to the REMIC I Regular Interest LT2 on such Payment Date.

LT3 Principal Distribution Amount: For any Payment Date, the excess, if any, of the Class LT3 Principal Reduction Amount for such Payment Date over the principal REMIC I Liquidation Loss Amounts allocated to the REMIC I Regular Interest LT3 on such Payment Date.

LT4 Principal Distribution Amount: For any Payment Date, the excess, if any, of the Class LT4 Principal Reduction Amount for such Payment Date over the principal REMIC I Liquidation Loss Amounts allocated to the REMIC I Regular Interest LT4 on such Payment Date.

Master Servicer: Residential Funding Corporation, a Delaware corporation, and its successors and assigns.

Master Servicing Fee: With respect to any Home Equity Loan and any Collection Period, the product of (i) the Master Servicing Fee Rate divided by 12 and (ii) the related Loan Balance as of the first day of such Collection Period.

Master Servicing Fee Rate: With respect to any Home Equity Loan, 0.08% per annum.

Maturity Date: With respect to each Class of Class I Notes of regular interest or Uncertificated Regular Interest issued by each of REMIC I and REMIC II, the latest possible maturity date, solely for purposes of Section 1.860G-1(a)(4)(iii) of the Treasury Regulations, by which the Security Balance of each such Class of Class I Notes representing a regular interest in the Trust Fund would be reduced to zero, which is, for each such regular interest, September 2035, which is the second Payment Date following the latest maturity date of any Group I Loan.

Maximum Variable Funding Balance: The maximum Security Balance of the Variable Funding Notes, which shall be an amount equal to $12,750,544 or such greater amount as may be permitted pursuant to Section 9.01 of the Indenture.

Maximum Rate: With respect to each HELOC with respect to which the related Loan Agreement provides for a lifetime rate cap, the maximum Loan Rate permitted over the life of such HELOC under the terms of such Loan Agreement, as set forth on the Home Equity Loan Schedule and initially as set forth on Exhibit A to the Servicing Agreement.

MERS: Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

MERS(R)System: The system of recording transfers of Mortgages electronically maintained by MERS.

MIN: The Mortgage Identification Number for Home Equity Loans registered with MERS on the MERS(R)System.

Minimum Monthly Payment: With respect to any HELOC and any month, the minimum amount required to be paid by the related Mortgagor in such month. With respect to any HEL and any month, the scheduled monthly payment due on the related Due Date.

MOM Loan: With respect to any Home Equity Loan, MERS acting as the mortgagee of such Home Equity Loan, solely as nominee for the originator of such Home Equity Loan and its successors and assigns, at the origination thereof.

Moody's: Moody's Investors Service, Inc. or its successor in interest.

Mortgage: The mortgage, deed of trust or other instrument creating a first or second lien on an estate in fee simple interest in real property securing a Home Equity Loan.

Mortgage File: The file containing the Related Documents pertaining to a particular Home
Equity Loan and any additional documents required to be added to the Mortgage File pursuant to the Purchase
Agreement or the Servicing Agreement.

Mortgage Note: With respect to a Home Equity Loan, the mortgage note pursuant to which the
related Mortgagor agrees to pay the indebtedness evidenced thereby and secured by a Mortgage on a related
Mortgaged Property, as modified or amended.

Mortgaged Property: The underlying property, including real property and improvements thereon,
securing a Home Equity Loan.

Mortgagor: The obligor or obligors under a Loan Agreement.

Net Liquidation Proceeds: With respect to any Liquidated Home Equity Loan, Liquidation
Proceeds (excluding any draws under the Group I Policy and Group II Policy) net of Liquidation Expenses (but
not including the portion, if any, of such net amount that exceeds the Loan Balance of the Home Equity Loan
at the end of the Collection Period immediately preceding the Collection Period in which such Home Equity
Loan became a Liquidated Home Equity Loan, plus accrued and unpaid interest on such Loan Balance from the
date last paid to the date of receipt of final Liquidation Proceeds).

Net Loan Rate: With respect to any Home Equity Loan and any day, the related Loan Rate less:
(1) 0.58% per annum and (2) the Group I Credit Enhancer Premium Rate or the Group II Credit Enhancer Premium
Rate, as applicable.

Net Principal Collections: With respect to the Group II Loans and any Payment Date, the
excess, if any, of Principal Collections for the related Collection Period over the amount of Additional
Balances created during the related Collection Period and conveyed to the Trust Estate.

Non-United States Person: Any Person other than a United States Person.

Note Owner: The Beneficial Owner of a Note.

Note Rate: With respect to the Notes and any Interest Period, the following rates:

(i) the Class A-I-1 Notes, the lesser of (1) a per annum rate equal to LIBOR plus 0.11% and
(2) the Group I Net WAC Rate;

(ii) the Class A-I-2 Notes, the lesser of (1) 5.50% per annum and (2) the Group I Net WAC
Rate;

(iii) the Class A-I-3 Notes, the lesser (1) 5.55% per annum and (2) the Group I Net WAC Rate;

(iv) the Class A-I-4 Notes, the lesser of (1) in the case of any Payment Date up to and
including the Step-Up Date, 5.81% per annum, and in the case of any Payment Date thereafter, 6.31% per annum
and (2) the Group I Net WAC Rate;

(v) the Class A-I-5 Notes, the lesser (1) 5.63% per annum and (2) the Group I Net WAC
Rate; and

(vi) With respect to the Class A-II Notes and the Variable Funding Notes, the least of (x) a
per annum rate equal to LIBOR plus 0.17%, (y) 17.25% per annum and (z) the Group II Net WAC Rate.

Note Register: The register maintained by the Note Registrar in which the Note Registrar shall
provide for the registration of Notes and of transfers and exchanges of Notes.

Note Registrar: The Indenture Trustee, in its capacity as Note Registrar.

Noteholder: The Person in whose name a Note is registered in the Note Register, except that,
any Note registered in the name of the Depositor, the Issuer or the Indenture Trustee or any Affiliate of any
of them shall be deemed not to be outstanding and the registered holder will not be considered a Noteholder
or holder for purposes of giving any request, demand, authorization, direction, notice, consent or waiver
under the Indenture or the Trust Agreement provided that, in determining whether the Indenture Trustee shall
be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver,
only Notes that the Indenture Trustee or the Owner Trustee knows to be so owned shall be so disregarded.
Owners of Notes that have been pledged in good faith may be regarded as Holders if the pledgee establishes to
the satisfaction of the Indenture Trustee or the Owner Trustee the pledgee's right so to act with respect to
such Notes and that the pledgee is not the Issuer, any other obligor upon the Notes or any Affiliate of any
of the foregoing Persons.

Notes: Collectively, the Term Notes and the Variable Funding Notes issued and outstanding at
any time pursuant to the Indenture.

Notional Amount: With respect to the Class SB-I Certificates and REMIC II Regular Interest
SB-IO and any Payment Date, the aggregate Uncertificated Principal Balance of the REMIC I Regular Interests
before giving effect to payments to be made and the allocation of REMIC I Liquidation Loss Amounts to occur
on such Payment Date.

Officer's Certificate: With respect to the Master Servicer, a certificate signed by the
President, Managing Director, a Director, a Vice President or an Assistant Vice President, of the Master
Servicer and delivered to the Indenture Trustee. With respect to the Issuer, a certificate signed by any
Authorized Officer of the Issuer, under the circumstances described in, and otherwise complying with, the
applicable requirements of Section 10.01 of the Indenture, and delivered to the Indenture Trustee. Unless
otherwise specified, any reference in the Indenture to an Officer's Certificate shall be to an Officer's
Certificate of any Authorized Officer of the Issuer.

Opinion of Counsel: A written opinion of counsel. Any Opinion of Counsel for the Master
Servicer may be provided by in-house counsel for the Master Servicer if reasonably acceptable to the
Indenture Trustee, the Credit Enhancer and the Rating Agencies or counsel for the Depositor, as the case may
be.

Original Trust Agreement: The Trust Agreement, dated as of February 22, 2006, between the
Owner Trustee and the Depositor.

Outstanding: With respect to the Notes, as of the date of determination, all Notes theretofore
executed, authenticated and delivered under this Indenture except:

(i) Notes theretofore cancelled by the Note Registrar or delivered to the Indenture
Trustee for cancellation; and

(ii) Notes in exchange for or in lieu of which other Notes have been executed,
authenticated and delivered pursuant to the Indenture unless proof satisfactory to the Indenture
Trustee is presented that any such Notes are held by a holder in due course;

provided, however, that for purposes of effectuating the Credit Enhancer's right of subrogation as set forth
in Section 4.12 of the Indenture only, all Notes that have been paid with funds provided under the applicable
Policy shall be deemed to be Outstanding until the Credit Enhancer has been reimbursed with respect thereto.

Ownership Interest: As to any Certificate, any ownership or security interest in such Certificate, including any interest in such Certificate as the Certificateholder thereof and any other interest therein, whether direct or indirect, legal or beneficial, as owner or as pledgee.

Owner Trust Estate: The corpus of the Issuer created by the Trust Agreement which consists of the Home Equity Loans.

Owner Trustee: Wilmington Trust Company not in its individual capacity but solely as Owner Trustee of the Trust, and its successors and assigns or any successor owner trustee appointed pursuant to the terms of the Trust Agreement.

Paying Agent: Any paying agent or co-paying agent appointed pursuant to Section 3.03 of the Indenture, which initially shall be the Indenture Trustee.

Payment Account: The account established by the Indenture Trustee pursuant to Section 8.02 of the Indenture and Section 5.01 of the Servicing Agreement. Amounts deposited in the Payment Account will be distributed by the Indenture Trustee in accordance with Section 3.05 of the Indenture.

Payment Date: The 25th day of each month, or if such day is not a Business Day, then the next Business Day.

Percentage Interest: With respect to any Note and any Payment Date, the percentage obtained by dividing the Security Balance of such Note by the aggregate of the Security Balances of all Notes (including the Term Notes and the Variable Funding Notes) or all Notes of the same Class, as applicable, prior to such Payment Date. With respect to any Certificate and any Payment Date, the Percentage Interest stated on the face of such Certificate.

Permitted Investments: One or more of the following:

(i) obligations of or guaranteed as to timely payment of principal and interest by the United States or any agency or instrumentality thereof when such obligations are backed by the full faith and credit of the United States;

(ii) repurchase agreements on obligations specified in clause (i) maturing not more than one month from the date of acquisition thereof, provided that the unsecured short-term debt obligations of the party agreeing to repurchase such obligations are at the time rated by each Rating Agency in its highest short-term rating available;

(iii) federal funds, certificates of deposit, demand deposits, time deposits and bankers' acceptances (which shall each have an original maturity of not more than 90 days and, in the case of bankers' acceptances, shall in no event have an original maturity of more than 365 days or a remaining maturity of more than 30 days) denominated in United States dollars of any U.S. depository institution or trust company incorporated under the laws of the United States or any state thereof or of any domestic branch of a foreign depository institution or trust company; provided that the debt obligations of such depository institution or trust company at the date of acquisition thereof have been rated by each Rating Agency in its highest short-term rating available; and, provided further that, if the original maturity of such short-term obligations of a domestic branch of a foreign depository institution or trust company shall exceed 30 days, the short-term rating of such institution shall be A-1+ in the case of Standard & Poor's if Standard & Poor's is a Rating Agency;

(iv) commercial paper and demand notes (having original maturities of not more than 365 days) of any

corporation incorporated under the laws of the United States or any state thereof which on the date of
acquisition has been rated by each Rating Agency in its highest short-term rating available; provided
that such commercial paper shall have a remaining maturity of not more than 30 days;

(v)     any mutual fund, money market fund, common trust fund or other pooled investment vehicle, the assets
of which are limited to instruments that otherwise would constitute Permitted Investments hereunder
and have been rated by each Rating Agency in its highest short-term rating available (in the case of
Standard & Poor's such rating shall be either AAAm or AAAm-G), including any such fund that is managed
by the Indenture Trustee or any affiliate of the Indenture Trustee or for which the Indenture Trustee
or any of its affiliates acts as an adviser; and

(vi)    other obligations or securities that are acceptable to each Rating Agency as a Permitted Investment
hereunder and will not reduce the rating assigned to any Class of Notes by such Rating Agency (without
giving effect to any Policy (if any) in the case of Insured Notes (if any)) below the then-current
rating assigned to such Notes by such Rating Agency, as evidenced in writing;

provided, however, that no instrument shall be a Permitted Investment if it represents, either
(1) the right to receive only interest payments with respect to the underlying debt instrument or (2) the
right to receive both principal and interest payments derived from obligations underlying such instrument and
the principal and interest payments with respect to such instrument provide a yield to maturity greater than
120% of the yield to maturity at par of such underlying obligations. References herein to the highest rating
available on unsecured long-term debt shall mean AAA in the case of Standard & Poor's and Fitch and Aaa in
the case of Moody's, and for purposes of this Agreement, any references herein to the highest
available on unsecured commercial paper and short-term debt obligations shall mean the following: A-1 in the
case of Standard & Poor's, P-1 in the case of Moody's and F-1 in the case of Fitch; provided, however, that
any Permitted Investment that is a short-term debt obligation rated A-1 by Standard & Poor's must satisfy the
following additional conditions: (i) the total amount of debt from A-1 issuers must be limited to the
investment of monthly principal and interest payments (assuming fully amortizing collateral);
(ii) the total
amount of A-1 investments must not represent more than 20% of the aggregate outstanding Security Balance of
the Notes and each investment must not mature beyond 30 days; (iii) the terms of the debt must have a
predetermined fixed dollar amount of principal due at maturity that cannot vary; and (iv) if the investments
may be liquidated prior to their maturity or are being relied on to meet a certain yield, interest must be
tied to a single interest rate index plus a single fixed spread (if any) and must move proportionately with
that index.

Permitted Transferee: Any Transferee of a Class R Certificate, other than a Disqualified
Organization or Non-United States Person.

Person: Any legal individual, corporation, partnership, joint venture, association,
joint-stock company, trust, unincorporated organization or government or any agency or political subdivision
thereof.

Plan: An employee benefit or other plan subject to the prohibited transaction restrictions or
the fiduciary responsibility requirements of ERISA or Section 4975 of the Code.

Plan Investor: A Plan, any Person acting, directly or indirectly, on behalf of any such Plan
or any Person using the "plan assets," within the meaning of the Department of Labor regulations at 29 C.F.R.
ss.2510.3-101, of a Plan.

Policy:  The Group I Policy or the Group II Policy, as applicable.

Pool  Balance:  With respect to any date,  the aggregate of the  Loan  Balances of all Home Equity
Loans in a Loan Group as of such date.

Predecessor  Note: With respect to any particular  Note, every previous Note evidencing all or a
portion of the same debt as that evidenced by such particular  Note;  and, for the purpose of this  definition,
any Note  authenticated  and  delivered  under  Section 4.03 of the  Indenture  in lieu of a mutilated,  lost,
destroyed  or stolen  Note shall be deemed to  evidence  the same debt as the  mutilated,  lost, destroyed  or
stolen Note.

Prepayment  Assumption:  With respect to the Class I Notes, the prepayment assumption that will
be used in determining  the rate of accrual of original issue discount,  market  discount and premium,  if any,
for federal income tax purposes,  based on the assumption  that,  subsequent to the date of any determination,
the Group I Loans will prepay at a rate equal to 100% of the  prepayment  assumption  with respect to the Group
I Loans as defined in the Prospectus Supplement.

Prepayment  Interest  Shortfall:  With  respect to any Group I Loans and any Payment  Date,  the
aggregate  shortfall,  if any, in Interest  Collections on the Group I Loans,  adjusted to the related Net Loan
Rate,  resulting from mortgagor  prepayments during the related Collection Period. These shortfalls will result
because  interest  on  prepayments  in full is  distributed  only to the date of  prepayment, and  because  no
interest  is  distributed  on prepayments  in part,  as these  prepayments  in part are  applied to reduce the
outstanding  Loan  Balance  of the  Home  Equity  Loans as of the Due Date  immediately preceding  the date of
prepayment.

Principal  Collection  Distribution  Amount: With  respect to the Class I Notes and any Payment
Date,  the  lesser  of (a) the  excess  of (i) the  P&I  Collections  for Loan  Group I over  (ii) the  Interest
Distribution Amount for the Class I Notes and (b) the sum of:

(i)    the  principal  portion of each  Minimum  Monthly  Payment  received  with respect to the
         Group I Loans and the related Collection Period;

(ii)    the Loan Balance of any Group I Loan  repurchased  during the related Collection  Period
         (or deemed to have been so  repurchased in accordance  with the Servicing  Agreement) and the amount of
         any shortfall  deposited in the Custodial  Account in connection with the substitution of a Deleted Loan
         during the related Collection Period; and

(iii)    the  principal  portion of all  other  unscheduled  collections  on the Group  I  Loans
         (including,  without limitation,  Principal Prepayments,  Insurance Proceeds,  Liquidation Proceeds and
         REO Proceeds) received during the related Collection Period (or deemed to have been so received);

provided,  however,  on any Payment  Date with respect to which the Group I Overcollateralization  Amount that
would  result  if  determined  without  application  of  this  proviso  exceeds  the  Group I Required
Overcollateralization  Amount,  the related  Principal  Collection  Distribution  Amount will be reduced by the
amount  of such  excess  until  the  Group  I Overcollateralization  Amount  equals  the Group I
Overcollateralization Amount.

With  respect  to the  Class  A-II  Notes,  for any  Payment  Date,  (i) at any time  during the
Revolving Period, so long as an Amortization Event has not occurred,  the related Net Principal Collections on
the Group II Loans and (ii)  following  an  Amortization  Event  or at any time  after the end of

the Revolving
Period, the related Principal Collections on the Group II Loans; provided, however, on any
Payment Date with
respect to which the Group II Overcollateralization Amount that would result if
determined without
application of this proviso exceeds the Group II Required Overcollateralization Amount, the
related Principal
Collection Distribution Amount will be reduced by the amount of such excess to an amount not less
than zero.

> Principal Collections: With respect to any Payment Date and any Home Equity
Loan in a Loan
Group, the aggregate of the following amounts:

> > (i) the total amount of payments made by or on behalf of the Mortgagor,
received and
applied as payments of principal on the Home Equity Loan during the related
Collection Period, as
reported by the related Subservicer;

> > (ii) any Net Liquidation Proceeds, allocable as a recovery of principal,
received in
connection with the Home Equity Loan during the related Collection Period;

> > (iii) if the Home Equity Loan was purchased by the Master Servicer pursuant
to Section 3.15
of the Servicing Agreement or was repurchased by the Seller pursuant to the Purchase
Agreement during
the related Collection Period, 100% of the Loan Balance of the Home Equity Loan as of
the date of such
purchase or repurchase and if a Home Equity Loan was substituted for a Deleted
Loan, the amount
deposited by the Seller as a Substitution Adjustment Amount; and

> > (iv) any other amounts received as payments on or proceeds of the Home
Equity Loan during
the Collection Period to the extent applied in reduction of the principal amount thereof;

provided that Principal Collections shall not include any Foreclosure Profits, and shall be
reduced by any
amounts withdrawn from the Custodial Account pursuant to clauses (c), (d) and (j) of
Section 3.03 of the
Servicing Agreement, and provided further that Principal Collections with respect to the Group
II Loans shall
not include any portion of such amounts that are allocable to any Excluded Amount.

> Principal Prepayment: Any payment of principal by a Mortgagor, which is received
in advance of
its scheduled Due Date and is not accompanied by an amount as to interest representing
scheduled interest on
such payment due on any date or dates in any month or months subsequent to the month of
prepayment.

> Proceeding: Any suit in equity, action at law or other judicial or administrative
proceeding.

> Program Guide: Together, the Seller's Seller Guide and Servicing Guide, as in
effect from time
to time.

> Program Seller: With respect to any Home Equity Loan, the Person that sold
such Home Equity
Loan to the Seller.

> Prospectus Supplement: The prospectus supplement dated February 22, 2006,
relating to the Term
Notes.

> Purchase Agreement: The Home Equity Loan Purchase Agreement, dated as of the
Closing Date,
between the Seller, as seller, and the Depositor, as purchaser, with respect to the Home Equity
Loans.

> Purchase Price: The meaning specified in Section 2.2(a) of the Purchase
Agreement.

> Purchaser: Residential Funding Mortgage Securities II, Inc., a Delaware
corporation, and its
successors and assigns.

> P&I Collections: With respect to Loan Group I and any Payment Date, the sum

of the related
Interest  Collections and the related  Principal  Collections for that Payment Date. With respect to Loan Group
II and any Payment Date, the sum of the related  Interest  Collections  for that Payment Date and so long as an
Amortization Event has not occurred and if during the Revolving Period,  the related Net Principal  Collections
for that  Payment  Date,  or if an  Amortization  Event has  occurred or the  Revolving  Period has ended,  the
related  Principal  Collections  for  the  applicable  Payment  Date,  in each case with respect to the Group II
Loans.

Rating Agency:  Any nationally  recognized  statistical rating  organization,  or its successor,
that rated  the  Securities  at the  request  of the  Depositor  at the time of the  initial issuance  of the
Securities.  Initially,  Moody's and  Standard & Poor's.  If such  organization  or a successor is no longer in
existence,  "Rating Agency" shall be such  nationally  recognized  statistical  rating  organization,  or other
comparable  Person,  designated by the Depositor,  notice of which  designation shall be given to the Indenture
Trustee.  References  herein to the highest short term unsecured  rating category of a Rating Agency shall mean
A-1 or better in the case of  Standard & Poor's or P-1 or better in the case of Moody's  and in the case of any
other Rating Agency shall mean such  equivalent  ratings.  References  herein to the highest long-term  rating
category of a Rating  Agency  shall  mean  "AAA" in the case of  Standard  & Poor's  and  "Aaa" in the case of
Moody's and in the case of any other Rating Agency, such equivalent rating.

Record  Date:  With respect to the Term Notes (other than the Class A-I-1 Notes and the Class II
Notes) and the  Certificates  and any Payment Date,  the last Business Day of the month preceding the month of
such  Payment  Date.  With  respect to the Class A-I-1 Notes and the Class II Notes and any Payment Date,  the
Business Day next preceding such Payment Date.

Reference  Bank Rate:  With respect to any Interest  Period,  as follows:  the arithmetic  mean
(rounded  upwards,  if  necessary,  to the nearest one  sixteenth of a percent) of the offered rates for United
States dollar  deposits  for one month which are  offered by the  Reference  Banks as of 11:00 A.M.,  London,
England  time,  on the second LIBOR  Business Day prior to the first day of such Interest  Period to prime banks
in the  London  interbank  market  for a period of one month in  amounts  approximately  equal to the sum of the
outstanding  Security Balance  of the  Class A-I-1 Notes  and the Class II Notes;  provided that at least two such
Reference  Banks provide such rate. If fewer than two offered  rates  appear,  the Reference Bank Rate will be
the  arithmetic  mean of the  rates  quoted  by one or more  major  banks in New  York  City,  selected  by the
Indenture Trustee after  consultation  with the Master Servicer and the Credit Enhancer,  as of 11:00 a.m., New
York  time,  on such date for loans in U.S.  Dollars  to  leading  European  Banks for a period of one month in
amounts  approximately  equal to the  aggregate  Security  Balance  of the Class  A-I-1  Notes and the Class II
Notes.  If no such  quotations  can be  obtained,  the  Reference  Bank Rate shall be the Reference  Bank Rate
applicable  to the preceding Interest Period.

Reference  Banks:  Three major banks which are  engaged in transactions  in the London  interbank
markets  selected  by the  Indenture  Trustee,  after  consultation  with the  Master  Servicer and the Credit
Enhancer.

Registered  Holder:  The Person in whose name a Note is  registered  in the Note Register on the
applicable Record Date.

Regular  Interest: Any of the REMIC I Regular  Interests and REMIC II Regular Interests.

Regulation  AB:  Subpart  229.1100  -  Asset  Backed  Securities  (Regulation

AB),  17  C.F.R.
ss.ss.229.1100-229.1123,  as  such  may  be  amended  from  time  to  time,  and  subject  to  such  clarification  and
interpretation  as  have  been  provided  by  the  Commission  in  the  adopting  release  (Asset-Backed  Securities,
Securities  Act  Release  No.  33-8518,  70  Fed.  Reg.  1,506,  1,531  (January  7,  2005))  or  by  the  staff  of  the
Commission,  or  as  may  be  provided  by  the  Commission  or  its  staff  from  time  to  time.

          Related  Documents:  With  respect  to  each  Home  Equity  Loan,  the  documents  specified  in  Section
2.1(c)  of  the  Purchase  Agreement  and  any  documents  required  to  be  added  to  such  documents  pursuant  to  the
Purchase  Agreement,  the  Trust  Agreement  or  the  Servicing  Agreement.

          Relief  Act  Shortfalls:  With  respect  to  any  Payment  Date,  for  any  Home  Equity  Loan  as  to  which
there  has  been  a  reduction  in  the  amount  of  interest  collectible  thereon  for  the  related  Collection  Period  as
a  result  of  the  application  of  the  Servicemembers  Civil  Relief  Act  or  any  other  similar  federal  or  state  law,
the  shortfall,  if  any,  equal  to  (i)  one  month's  interest  on  the  Loan  Balance  of  such  Home  Equity  Loan  at  the
applicable  Loan  Rate,  without  application  of  such  Act,  over  (ii)  the  interest  collectible  on  such  Home  Equity
Loan  during  such  Collection  Period.

          REMIC:  A  "real  estate  mortgage  investment  conduit"  within  the  meaning  of  Section  860D  of  the
Code.

          REMIC  Administrator:  Residential  Funding  Corporation.  If  Residential  Funding  Corporation  is
found  by  a  court  of  competent  jurisdiction  to  no  longer  be  able  to  fulfill  its  obligations  as  REMIC
Administrator  under  this  Agreement  the  Master  Servicer  or  Trustee  acting  as  successor  Master  Servicer  shall
appoint  a  successor  REMIC  Administrator,  subject  to  assumption  of  the  REMIC  Administrator  obligations  under
the  Indenture  and  the  Trust  Agreement.

          REMIC  I:  The  segregated  pool  of  assets  subject  hereto  with  respect  to  which  a  REMIC  election  is
to  be  made,  consisting  of  the  Group  I  Loans  and  the  proceeds  of  the  Group  I  Loans  on  deposit  in  the
Distribution  Account,  the  Custodial  Account  and  the  Payment  Account.

          REMIC  I  Liquidation  Loss  Amounts:  For  any  Payment  Date,  Liquidation  Loss  Amounts  on  the  Group
I  Loans  for  the  related  Collection  Period  shall  be  allocated  as  follows:  (i)  to  REMIC  I  Regular  Interests
LT2,  LT3  and  LT4  pro  rata  according  to  their  respective  Principal  Reduction  Amounts,  provided  that  such
allocation  to  each  of  REMIC  I  Regular  Interests  LT2,  LT3  and  LT4  shall  not  exceed  their  respective  Principal
Reduction  Amounts  for  such  Payment  Date,  and  (ii)  any  Liquidation  Loss  Amounts  not  allocated  to  any  of  REMIC
I  Regular  Interest  LT2,  REMIC  I  Regular  Interest  LT3  or  REMIC  I  Regular  Interest  LT4  pursuant  to  the  proviso
of  clause  (i)  shall  be  allocated  to  REMIC  I  Regular  Interest  LT1,  until  the  Uncertificated  Principal  Balance
of  such  Regular  Interest  shall  have  been  reduced  to  zero.  If  any  Liquidation  Loss  Amounts  for  such  Payment
Date  remain,  such  amounts  shall  be  allocated  among  REMIC  I  Regular  Interests  LT2,  LT3  and  LT4  pro  rata
according  to  their  respective  Uncertificated  Principal  Balances  after  reduction  by  the  Liquidation  Loss
Amounts  allocated  to  such  REMIC  I  Regular  Interests  pursuant  to  the  preceding  sentence.

          REMIC  I  Regular  Interests:  REMIC  I  Regular  Interests  LT1,  LT2,  LT3  and  LT4  having  the
properties  set  forth  in  the  following  table  and  elsewhere  herein:

| DESIGNATION | REMIC I REMITTANCE RATE | INITIAL UNCERTIFICATED PRINCIPAL BALANCE | LATEST POSSIBLE MATURITY DATE |
| --- | --- | --- | --- |

| | | | |
|---|---|---|---|
| LT1 | Variable (1) | $299,954,146.43 | March 2036 Payment Date |
| LT2 | Variable (1) | $9,324.00 | March 2036 Payment Date |
| LT3 | Variable (1) | $20,676.48 | March 2036 Payment Date |
| LT4 | Variable (1) | $20,676.48 | March 2036 Payment Date |

(1)    Calculated as provided in the definition of REMIC I Remittance Rate.

REMIC I Regular Interest LT1: A regular interest in REMIC I, held as an asset of REMIC II, that has an initial Uncertificated Principal Balance as set forth in the table in the definition of "REMIC I Regular Interests", as reduced from time to time, that bears interest at the related REMIC I Remittance Rate as set forth in the table in the definition of "REMIC I Regular Interests".

REMIC I Regular Interest LT2: A regular interest in REMIC I, held as an asset of REMIC II, that has an initial Uncertificated Principal Balance as set forth in the table in the definition of "REMIC I Regular Interests", as reduced from time to time, that bears interest at the related REMIC I Remittance Rate as set forth in the table in the definition of "REMIC I Regular Interests".

REMIC I Regular Interest LT3: A regular interest in REMIC I, held as an asset of REMIC II, that has an initial Uncertificated Principal Balance as set forth in the table in the definition of "REMIC I Regular Interests", as reduced from time to time, that bears interest at the related REMIC I Remittance Rate as set forth in the table in the definition of "REMIC I Regular Interests".

REMIC I Regular Interest LT4: A regular interest in REMIC I, held as an asset of REMIC II, that has an initial Uncertificated Principal Balance as set forth in the table in the definition of "REMIC I Regular Interests", as reduced from time to time, that bears interest at the related REMIC I Remittance Rate as set forth in the table in the definition of "REMIC I Regular Interests".

REMIC I Remittance Rate: With respect to REMIC I Regular Interests LT 1 and LT2, the Group I Net WAC Rate. With respect to REMIC I Regular Interest LT3, zero (0.00%) per annum. With respect to REMIC I Regular Interest LT4, twice the Group I Net WAC Rate.

REMIC II: The segregated pool of assets subject hereto, constituting a portion of the primary trust created hereby and to be administered hereunder, with respect to which a separate REMIC election is to be made, consisting of the REMIC I Regular Interests.

REMIC II Liquidation Loss Amounts: On any Payment Date, Liquidation Loss

Amounts for the
related Collection Period shall be allocated first to REMIC II Regular Interest SB-IO in reduction of the
accrued and unpaid interest thereon until such accrued and unpaid interest shall have been reduced to zero,
second to REMIC II Regular Interest SB-PO in reduction of the Uncertificated Principal Balance thereof until
such Uncertificated Principal Balance shall have been reduced to zero and third to the Class A-I Notes to the
same extent, if any, that (i) amounts interest accrued on such Notes since the prior Payment Date remain
unpaid after distributions on such Payment Date and (ii) the aggregate of the Class Principal Balances of the
Class A-I Notes following distributions on such Payment Date exceed the aggregate principal balance of the
Group I Loans by more than such excess, if any, after distributions on the immediately prior Payment Date.

REMIC II Regular Interest SB-IO: A regular interest in REMIC II with no entitlement to
principal and entitled to interest at the Certificate Rate on the Notional Amount.

REMIC II Regular Interest SB-PO: A regular interest in REMIC II with no entitlement to
interest and entitled to principal in an amount equal to the initial Certificate Principal Balance of the
Class SB-I Certificates and any amounts in the nature of prepayment charges received in connection with Loan
Group I, provided that any payment of prepayment charges shall not be deemed to reduce the principal balance
of REMIC II Regular Interest SB-PO.

REMIC II Regular Interests: Each Class of the Class I Notes (exclusive of the right to payment
of any Group I Net WAC Cap Shortfall) and REMIC II Regular Interests SB-IO and SB-PO.

REMIC II Remittance Rate: With respect to each Class of Class I Notes, the Note Rate for such
Class, limited to the Group I Net WAC Rate, if applicable. With respect to REMIC II Regular Interest SB-PO,
0% per annum. With respect to REMIC II Regular Interest SB-IO the Certificate Rate therefor.

REMIC Provisions: Provisions of the federal income tax law relating to real estate mortgage
investment conduits, which appear at Sections 860A through 860G of Subchapter M of Chapter 1 of the Code, and
related provisions, and temporary and final regulations (or, to the extent not inconsistent with such
temporary or final regulations, proposed regulations) and published rulings, notices and announcements
promulgated thereunder, as the foregoing may be in effect from time to time.

REO: A Mortgaged Property that is acquired by the Trust in foreclosure or by deed in lieu of
foreclosure.

REO Acquisition: The acquisition by the Master Servicer on behalf of the Trustee for the
benefit of the Noteholders of any REO Property pursuant to Section 3.07 of the Servicing Agreement.

REO Disposition: As to any REO Property, a determination by the Master Servicer that it has
received substantially all Insurance Proceeds, Liquidation Proceeds, REO Proceeds and other payments and
recoveries (including proceeds of a final sale) which the Master Servicer expects to be finally recoverable
from the sale or other disposition of the REO Property.

REO Proceeds: Proceeds, net of expenses, received in respect of any REO Property (including,
without limitation, proceeds from the rental of the related Mortgaged Property) which proceeds are required
to be deposited into the Custodial Account only upon the related REO Disposition.

REO Property: A Mortgaged Property acquired by the Master Servicer through foreclosure or deed
in lieu of foreclosure in connection with a defaulted Home Equity Loan.

Repurchase Event: With respect to any Home Equity Loan, either (i) a discovery that, as of the

Closing Date, the related Mortgage was not recorded on the related Mortgaged Property subject only to (A)
the lien of any prior mortgage indicated on the Home Equity Loan Schedule, (B) the lien of real property
taxes and assessments not yet due and payable, (C) covenants, conditions, and restrictions, rights of way,
easements and other matters of public record as of the date of recording of such Mortgage and such other
permissible title exceptions as are listed in the Program Guide and (D) other matters to which like
properties are commonly subject which do not materially adversely affect the value, use, enjoyment or
marketability of the related Mortgaged Property or (ii) with respect to any Home Equity Loan as to which the
Seller delivers a Lost Note Affidavit, a subsequent default on such Home Equity Loan if the enforcement
thereof or of the related Mortgage is materially and adversely affected by the absence of such original Loan
Agreement.

Repurchase Price:  With respect to any Home Equity Loan required to be repurchased on any date
pursuant to the Purchase Agreement or purchased by the Master Servicer or the Limited Repurchase Right Holder
pursuant to the Servicing Agreement, an amount equal to the sum of (i) 100% of the Loan Balance thereof
(without reduction for any amounts charged off) (or, in the case of a purchase by the Limited Repurchase
Right Holder pursuant to Section 5.07 of the Trust Agreement, the fair market value thereof, if greater) and
(ii) unpaid accrued interest at the Loan Rate (or with respect to the last day of the month in the month of
repurchase, the Loan Rate will be the Loan Rate in effect as to the second to last day in such month) on the
outstanding principal balance thereof from the Due Date to which interest was last paid by the Mortgagor to
the first day of the month following the month of purchase. No portion of any Repurchase Price shall be
included in any Excluded Amount for any Payment Date.

Request for Release:  The form attached as Exhibit 4 to the Custodial Agreement or an
electronic request in a form acceptable to the Custodian.

Required Insurance Policy:  With respect to any Home Equity Loan, any insurance policy which is
required to be maintained from time to time under the Servicing Agreement, the Program Guide or the related
Subservicing Agreement in respect of such Home Equity Loan.

Responsible Officer:  With respect to the Indenture Trustee, any officer of the Indenture
Trustee with direct responsibility for the administration of the Indenture and also, with respect to a
particular matter, any other officer to whom such matter is referred because of such officer's knowledge of
and familiarity with the particular subject.

Revolving Period:  The period commencing on the Closing Date and ending on February 28, 2011.

Securities Act:  The Securities Act of 1933, as amended, and the rules and regulations
promulgated thereunder.

Securitization Transaction:  Any transaction involving a sale or other transfer of mortgage
loans directly or indirectly to an issuing entity in connection with an issuance of publicly offered or
privately placed, rated or unrated mortgage-backed securities.

Security:  Any of the Certificates or Notes.

Security Balance:  With respect to any Payment Date and each Class of Term Notes, the Initial
Security Balance thereof prior to such Payment Date reduced by all payments of principal thereon prior to
such Payment Date and, in the case of the Class I Notes, Liquidation Loss Amounts allocated thereto prior to
such Payment Date. With respect to any Payment Date and the Variable Funding Notes, the Initial Security

Balance thereof prior to such Payment Date (i) increased by the Aggregate Additional Balance Differential
immediately prior to such Payment Date and (ii) reduced by all payments of principal thereon and Liquidation
Loss Amounts allocated thereto prior to such Payment Date. With respect to any Payment Date and the
Certificates, the Certificate Principal Balance thereof.

   Securityholder or Holder: Any Noteholder or a Certificateholder.

   Seller: Residential Funding Corporation, a Delaware corporation, and its successors and
assigns.

   Seller's Agreement: The agreement between the Seller, as purchaser, and the related Program
Seller, as seller.

   Servicing Agreement: The Servicing Agreement, dated as of the Closing Date, between the
Indenture Trustee, the Issuer and the Master Servicer, as master servicer.

   Servicing Certificate: A certificate prepared by a Servicing Officer on behalf of the Master
Servicer in accordance with Section 4.01 of the Servicing Agreement.

   Servicing Criteria: The "servicing criteria" set forth in Item 1122(d) of Regulation AB, as
such may be amended from time to time.

   Servicing Default: The meaning specified in Section 7.01 of the Servicing Agreement.

   Servicing Fee: With respect to any Home Equity Loan, the sum of the related Master Servicing
Fee and the related Subservicing Fee.

   Servicing Fee Rate: With respect to any Home Equity Loan, the sum of the related Master
Servicing Fee Rate and the related Subservicing Fee Rate.

   Servicing Officer: Any officer of the Master Servicer involved in, or responsible for, the
administration and servicing of the Home Equity Loans whose name and specimen signature appear on a list of
servicing officers furnished to the Indenture Trustee (with a copy to the Credit Enhancer) by the Master
Servicer, as such list may be amended from time to time.

   Servicing Trigger: As of any Payment Date, for purposes of Section 7.04 of the Servicing
Agreement, the occurrence of any of the following scenarios:

    (a) the Sixty-Plus Delinquency Percentage is greater than 27.00% for the then-current
Payment Date; or

    (b) on or after the Payment Date in September 2008, the aggregate amount of Liquidation
Loss Amounts on the Home Equity Loans as a percentage of the Cut-Off Date Loan Balance exceeds the applicable
amount set forth below:

| | |
|---|---|
| September 2008 to February 2009: | 2.00% with respect to September 2008, plus an additional 1/6th of 1.50% for each month thereafter. |
| March 2009 to February 2010: | 3.50% with respect to March 2009, plus an additional 1/12th of 2.00% for each month thereafter. |
| March 2010 to February 2011: | 5.50% with respect to March 2010, plus an additional 1/12th of 1.25% for each month thereafter. |
| March 2011 to February 2012: | 6.75% with respect to March 2011, plus an additional 1/12th of 0.75% for each month thereafter. |
| March 2012 and thereafter: | 7.50%. |

Single Certificate: A Certificate of the denomination of a Certificate Percentage Interest of 10.0000%.

Sixty-Plus Delinquency Percentage: With respect to any Payment Date and the Home Equity Loans, the arithmetic average, for each of the three Payment Dates ending with such Payment Date, of the fraction, expressed as a percentage, equal to (x) the aggregate Loan Balance of the Home Equity Loans that are 60 or more days delinquent in payment of principal and interest for that Payment Date, including Home Equity Loans in foreclosure and REO, over (y) the aggregate Loan Balance of all of the Home Equity Loans immediately preceding that Payment Date.

Standard & Poor's: Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. or its successor in interest.

Stated Value: With respect to any Home Equity Loan, the value of the Mortgaged Property as stated by the related Mortgagor in his or her application.

Statutory Trust Statute: Chapter 38 of Title 12 of the Delaware Code, 12 Del. Codess.ss.3801 et seq., as the same may be amended from time to time.

Step-up Date: With respect to the Group I Loans, the second Payment Date on which the aggregate Loan Balance of the Group I Loans (after application of payments received during the related Collection Period) is equal to or less than 10% of the aggregate Cut-off Date Loan Balances of the Group I Loans.

Subsequent Recoveries: As of any Payment Date, amounts received by the Master Servicer (net of any related expenses permitted to be reimbursed pursuant to the Servicing Agreement) specifically related to a Home Equity Loan that was treated as a Liquidated Home Equity Loan prior to the related Collection Period, and that resulted in a Liquidated Loss Amount.

Subservicer: Any Person with whom the Master Servicer has entered into a Subservicing Agreement as a Subservicer by the Master Servicer.

Subservicing Account: An Eligible Account established or maintained by a Subservicer as provided for in Section 3.02(c) of the Servicing Agreement.

Subservicing Agreement: The written contract between the Master Servicer and any Subservicer relating to servicing and administration of certain Home Equity Loans as provided in Section 3.01 of the Servicing Agreement.

Subservicing Fee: With respect to any Collection Period, the fee retained monthly by the Subservicer (or, in the case of a nonsubserviced Home Equity Loan, by the Master Servicer) equal to the product of (i) the Subservicing Fee Rate divided by 12 and (ii) the Pool Balance as of the first day of such Collection Period.

Subservicing Fee Rate: With respect to each Home Equity Loan, 0.50% per annum.

Substitution Adjustment Amounts: With respect to any Eligible Substitute Loan and any Deleted Loan, the amount, if any, as determined by the Master Servicer, by which the aggregate principal balance of all such Eligible Substitute Loans as of the date of substitution is less than the aggregate principal balance of all such Deleted Loans (after application of the principal portion of the monthly payments due in the month of substitution that are to be distributed to the Payment Account in the month of substitution).

Teaser Loan: Any HELOC which, as of the Cut-off Date, has a Loan Rate that is less than the sum of the Index at the time of origination plus the applicable Gross Margin.

Telerate Screen Page 3750: The display designated as page 3750 on the Moneyline Telerate Capital Markets Reports (or (i) such other page as may replace page 3750 on that service for the purpose of displaying London interbank offered rates of major banks) or (ii) if such service is no longer offered, such other service for displaying LIBOR or comparable rates as may be selected by the Indenture Trustee after consultation with the Master Servicer and the Credit Enhancer.

Term Notes: The Class I Notes and Class A-II Notes.

Transfer: Any direct or indirect transfer, sale, pledge, hypothecation or other form of assignment of any Ownership Interest in a Certificate.

Transfer Date: As defined in Section 3.15(c) of the Servicing Agreement.

Transfer Notice Date: As defined in Section 3.15(c) of the Servicing Agreement.

Transferee: Any Person who is acquiring by Transfer any Ownership Interest in a Certificate.

Transferor: Any Person who is disposing by Transfer of any Ownership Interest in a Certificate.

Treasury Regulations: Regulations, including proposed or temporary Regulations, promulgated under the Code. References herein to specific provisions of proposed or temporary regulations shall include analogous provisions of final Treasury Regulations or other successor Treasury Regulations.

Trigger Event: (A) A Trigger Event is in effect with respect to any Payment Date and the Class I Notes on or after the Group I Stepdown Date if any of the following conditions are met:

(i) if the Payment Date is occurring on or after the Payment Date in September 2008 and before the Payment Date in March 2009, the aggregate amount of Liquidation Loss Amounts on the Group I Loans since the Cut-off Date exceeds 1.25% plus 1/6th of 0.60% for each Payment Date within such period of the aggregate Cut-off Date Loan Balances of the Group I Loans; or

(ii) if the Payment Date is occurring on or after the Payment Date in March 2009 and before the Payment Date in March 2010, the aggregate amount of Liquidation Loss Amounts on the Group I Loans since the Cut-off Date exceeds 1.85% plus 1/12th of 0.40% for each Payment Date within such period of the aggregate Cut-off Date Loan Balances of the Group I Loans; or

(iii) if the Payment Date is occurring on or after the Payment Date in March 2010 and before the Payment Date in March 2011, the aggregate amount of Liquidation Loss Amounts on the Group I Loans since the Cut-off Date exceeds 2.25% plus 1/12th of 0.25% for each Payment Date within such period of the aggregate Cut-off Date Loan Balances of the Group I Loans; or

(iv) if the Payment Date is occurring on or after the Payment Date in March 2011 and before the Payment Date in March 2012, the aggregate amount of Liquidation Loss Amounts on the Group I Loans since the Cut-off Date exceeds 2.50% plus 1/12th of 0.25% for each Payment Date within such period of the aggregate Cut-off Date Loan Balances of the Group I Loans; or

(v) if the Payment Date is occurring on or after the Payment Date in March 2012, the aggregate amount of Liquidation Loss Amounts on the Group I Loans since the Cut-off Date exceeds 2.75% of the aggregate Cut-off Date Loan Balances of the Group I Loans; or

(vi) if on any Payment Date on or after the Group I Stepdown Date, the Group I Rolling Three Month Delinquency Percentage is equal to or in excess of 3.25%.

(B) A Trigger Event is in effect with respect to any Payment Date and the Class II Notes if any

of the following conditions are met:

(i)    if the Payment Date is occurring on or after the Payment Date in September 2008 and before the Payment Date in March 2009, the aggregate amount of Liquidation Loss Amounts on the Group II Loans since the Cut-off Date exceeds 1.50% plus 1/6th of 0.50% for each Payment Date within such period of the aggregate Cut-off Date Loan Balances of the Group II Loans; or

(ii)    if the Payment Date is occurring on or after the Payment Date in March 2009 and before the Payment Date in March 2010, the aggregate amount of Liquidation Loss Amounts on the Group II Loans since the Cut-off Date exceeds 2.00% plus 1/12th of 0.50% for each Payment Date within such period of the aggregate Cut-off Date Loan Balances of the Group II Loans; or

(iii)    if the Payment Date is occurring on or after the Payment Date in March 2010 and before the Payment Date in March 2011 the aggregate amount of Liquidation Loss Amounts on the Group II Loans since the Cut-off Date exceeds 2.50% plus 1/12th of 0.50% for each Payment Date within such period of the aggregate Cut-off Date Loan Balances of the Group II Loans; or

(iv)    if the Payment Date is occurring on or after the Payment Date in March 2011 and before the Payment Date in March 2012, the aggregate amount of Liquidation Loss Amounts on the Group II Loans since the Cut-off Date exceeds 3.00% plus 1/12th of 0.50% for each Payment Date within such period of the aggregate Cut-off Date Loan Balances of the Group II Loans; or

(v)    if the Payment Date is occurring on or after the Payment Date in March 2012, the aggregate amount of Liquidation Loss Amounts on the Group II Loans since the Cut-off Date exceeds 3.50% of the aggregate Cut-off Date Loan Balances of the Group II Loans; or

(vi)    if on any Payment Date on or after the Group II Stepdown Date, the Group II Rolling Three Month Delinquency Percentage is equal to or in excess of 3.50%.

Trust:    The Home Equity Loan Trust 2006-HSA2 to be created pursuant to the Trust Agreement.

Trust Agreement:    The Amended and Restated Trust Agreement, dated as of the Closing Date, between the Owner Trustee and the Depositor.

Trust Estate:    The meaning specified in the Granting Clause of the Indenture.

Trust Indenture Act or TIA: The Trust Indenture Act of 1939, as amended from time to time, as in effect on any relevant date.

UCC: The Uniform Commercial Code, as amended from time to time, as in effect in the States of New York, Delaware or Minnesota, as applicable.

Uncertificated Accrued Interest: With respect to any REMIC I Regular Interest for any Payment Date, one month's interest at the related REMIC I Remittance Rate for such Payment Date, accrued on the Uncertificated Principal Balance immediately prior to such Payment Date. Uncertificated Accrued Interest for the REMIC I Regular Interests shall accrue on the basis of a 360-day year consisting of twelve 30-day months. For purposes of calculating the amount of Uncertificated Accrued Interest for the REMIC I Regular Interests for any Payment Date, any Prepayment Interest Shortfalls or Relief Act Shortfalls relating to the Group I Loans for such Payment Date shall be allocated among the REMIC I Regular Interests pro rata based on, and to the extent of, the Uncertificated Accrued Interest thereon, as calculated without the application of this sentence. With respect to any Payment Date and REMIC II Regular Interest SB-IO, one month's interest at the Certificate Rate on the Notional Amount thereof reduced by its pro-rata share of any Prepayment Interest

Shortfalls or Relief Act Shortfalls related to Group I Loans, but not reduced by amounts distributable
pursuant to clauses (iv), (v) or (vi) of Section 3.05(a)(I) of the Indenture.

Uncertificated Principal Balance: With respect to any Payment Date and any REMIC I Regular
Interest, the initial uncertificated principal balance thereof (as set forth in the definition of REMIC I
Regular Interests) as reduced on each successive Payment Date first by Liquidation Loss Amounts allocated to
the principal thereof by the definition of REMIC I Liquidation Loss Amounts and second by principal deemed
distributed in respect thereof on such Payment Date pursuant to Section 5.01(f) of the Trust Agreement. With
respect to any Payment Date and REMIC II Regular Interest SB-PO, the initial uncertificated principal balance
thereof (as set forth in the definition of REMIC II Regular Interest SB-PO) as reduced on each successive
Payment Date first by Liquidation Loss Amounts allocated to the principal thereof by the definition of REMIC
II Liquidation Loss Amounts and second by principal deemed distributed in respect thereof on such Payment
Date pursuant to Section 5.01(g) of the Trust Agreement.

Uncertificated Regular Interests: The REMIC I Regular Interests and REMIC II Regular Interest
SB-IO and REMIC II Regular Interest SB-PO.

Underwriters: Credit Suisse Securities (USA) LLC, Residential Funding Securities Corporation,
Deutsche Bank Securities Inc. and Goldman, Sachs & Co.

Undercollateralization Amount: Initially equal to approximately $749,737. With respect to any
Payment Date, the amount, if any, by which the aggregate Security Balance of the Class II Notes on such
Payment Date exceeds the Pool Balance of the Group II Loans as of the last day of the related Collection
Period (after application of Net Principal Collections or Principal Collections, as the case may be, for such
date).

Uninsured Cause: Any cause of damage to property subject to a Mortgage such that the complete
restoration of such property is not fully reimbursable by the hazard insurance policies.

United States Person: A citizen or resident of the United States, a corporation, partnership or
other entity created or organized in, or under the laws of, the United States, any state thereof, or the
District of Columbia (except in the case of a partnership, to the extent provided in Treasury regulations) or
any political subdivision thereof, or an estate that is described in Section 7701(a)(30)(D) of the Code, or a
trust that is described in Section 7701(a)(30)(E) of the Code.

Variable Funding Notes: The Class II Notes designated as the "Class A-II Variable Funding
Notes" in the Indenture, including any Capped Funding Notes.