# EXHIBIT H

```
<DOCUMENT>
<TYPE>EX-10
<SEQUENCE>2
<FILENAME>hsalpsa.txt
<DESCRIPTION>EX 10.1
<TEXT>
```

EXECUTION COPY

================================================================================

RESIDENTIAL FUNDING MORTGAGE SECURITIES II, INC.,

Company,

RESIDENTIAL FUNDING CORPORATION,

Master Servicer,

and

JPMORGAN CHASE BANK, N.A.,

Trustee

POOLING AND SERVICING AGREEMENT

Dated as of January 1, 2006

Home Equity Loan Pass-Through Certificates

Series 2006-HSA1

================================================================================
```
<PAGE>

<TABLE>
<CAPTION>
```

TABLE OF CONTENTS

|  |  | PAGE |
|---|---|---|
| <S> | | <C> |
| ARTICLE I | DEFINITIONS | 3 |
| Section 1.01 | Definitions | 3 |
| Section 1.02 | Determination of LIBOR | 35 |
| ARTICLE II | CONVEYANCE OF MORTGAGE LOANS; ORIGINAL ISSUANCE OF CERTIFICATES | 36 |
| Section 2.01 | Conveyance of Mortgage Loans | 36 |
| Section 2.02 | Acceptance by Trustee | 40 |
| Section 2.03 | Representations, Warranties and Covenants of the Master Servicer and the Company | 41 |
| Section 2.05 | Execution and Authentication of Certificates; Conveyance of Uncertificated REMIC Regular Interests | 45 |
| Section 2.06. | Purposes and Powers of the Trust | 46 |
| ARTICLE III | ADMINISTRATION AND SERVICING OF MORTGAGE LOANS | 47 |
| Section 3.01 | The Master Servicer to Act as Servicer | 47 |

| | | |
|---|---|---|
| Section 3.02 | Subservicing Agreements Between Master Servicer and Subservicers; Enforcement of Subservicers' Obligations | 49 |
| Section 3.03 | Successor Subservicers | 50 |
| Section 3.04 | Liability of the Master Servicer | 51 |
| Section 3.05 | No Contractual Relationship Between Subservicer and Trustee, Credit Enhancer or Certificateholders | 51 |
| Section 3.06 | Assumption or Termination of Subservicing Agreements by Trustee | 51 |
| Section 3.07 | Collection of Certain Mortgage Loan Payments; Deposits to Custodial Account | 52 |
| Section 3.08 | Subservicing Accounts; Servicing Accounts | 54 |
| Section 3.09 | Access to Certain Documentation and Information Regarding the Mortgage Loans | 55 |
| Section 3.10 | Permitted Withdrawals from the Custodial Account | 55 |
| Section 3.11 | Maintenance of Fire Insurance and Omissions and Fidelity Coverage | 56 |
| Section 3.12 | Enforcement of Due-on-Sale Clauses; Assumption and Modification Agreements; Certain Assignments | 58 |
| Section 3.13 | Realization Upon Defaulted Mortgage Loans | 60 |
| Section 3.14 | Trustee to Cooperate; Release of Mortgage Files | 63 |
| Section 3.15 | Servicing and Other Compensation | 64 |
| Section 3.16 | Reports to the Trustee and the Company | 65 |
| Section 3.17 | Annual Statement as to Compliance and Servicing Assessment | 65 |
| Section 3.18 | Annual Independent Public Accountants' Servicing Report | 65 |
| Section 3.19 | Rights of the Company in Respect of the Master Servicer | 66 |
| ARTICLE IV | PAYMENTS TO CERTIFICATEHOLDERS | 66 |
| Section 4.01 | Certificate Account | 66 |
| Section 4.02 | Distributions | 67 |
| Section 4.03 | Statements to Certificateholders | 70 |
| Section 4.04 | Distribution of Reports to the Trustee and the Company | 74 |
| Section 4.05 | Allocation of Realized Losses | 75 |
| Section 4.06 | Reports of Foreclosures and Abandonment of Mortgaged Property | 75 |
| Section 4.07 | Optional Purchase of Defaulted Mortgage Loans | 76 |
| ARTICLE V | THE CERTIFICATES | 78 |
| Section 5.01 | The Certificates | 78 |
| Section 5.02 | Registration of Transfer and Exchange of Certificates | 80 |
| Section 5.03 | Mutilated, Destroyed, Lost or Stolen Certificates | 86 |
| Section 5.04 | Persons Deemed Owners | 86 |
| Section 5.05 | Appointment of Paying Agent | 86 |
| ARTICLE VI | THE COMPANY AND THE MASTER SERVICER | 87 |
| Section 6.01 | Respective Liabilities of the Company and the Master Servicer | 87 |
| Section 6.02 | Merger or Consolidation of the Company or the Master Servicer; Assignment of Rights and Delegation of Duties by Master Servicer | 87 |
| Section 6.03 | Limitation on Liability of the Company, the Master Servicer and Others | 88 |
| Section 6.04 | Company and Master Servicer Not to Resign | 89 |

ARTICLE VII        DEFAULT..................................................................89
Section 7.01       Events of Default........................................................89
Section 7.02       Trustee or Company to Act; Appointment of Successor......................91
Section 7.03       Notification to Certificateholders.......................................92
Section 7.04       Waiver of Events of Default..............................................92
Section 7.05       Servicing Trigger; Removal of Master Servicer............................93
ARTICLE VIII       CONCERNING THE TRUSTEE...................................................94
Section 8.01       Duties of Trustee........................................................94
Section 8.02       Certain Matters Affecting the Trustee....................................95
Section 8.03       Trustee Not Liable for Certificates or Mortgage Loans....................97
Section 8.04       Trustee May Own Certificates.............................................97
Section 8.05       Master Servicer to Pay Trustee's Fees and Expenses; Indemnification......97
Section 8.06       Eligibility Requirements for Trustee.....................................98
Section 8.07       Resignation and Removal of the Trustee...................................99
Section 8.08       Successor Trustee.......................................................100
Section 8.09       Merger or Consolidation of Trustee......................................100
Section 8.10       Appointment of Co-Trustee or Separate Trustee...........................101
Section 8.11       Appointment of Custodians...............................................102
Section 8.12       Appointment of Office or Agency.........................................102
ARTICLE IX         TERMINATION.............................................................102
Section 9.01       Optional Purchase by the Master Servicer of All Certificates;
                   Termination Upon Purchase by the Master Servicer or Liquidation of
                   All Mortgage Loans......................................................102
Section 9.02       Additional Termination Requirements.....................................106
ARTICLE X          REMIC PROVISIONS........................................................107
Section 10.01      REMIC Administration....................................................107
Section 10.02      Master Servicer, REMIC Administrator and Trustee Indemnification........110
ARTICLE XI         MISCELLANEOUS PROVISIONS................................................111
Section 11.01      Amendment...............................................................111
Section 11.02      Recordation of Agreement; Counterparts..................................113
Section 11.03      Limitation on Rights of Certificateholders..............................114
Section 11.04      Governing Law...........................................................115
Section 11.05      Notices.................................................................115
Section 11.06      Notices to Rating Agency and the Credit Enhancer........................116
Section 11.07      Severability of Provisions..............................................116
Section 11.08      Supplemental Provisions for Resecuritization............................116
Section 11.09      [Reserved]..............................................................117
Section 11.10      No Petition.............................................................117
ARTICLE XII        COMPLIANCE WITH REGULATION AB...........................................118
Section 12.01. Intent of Parties; Reasonableness...........................................118
Section 12.02. Additional Representations and Warranties of the Trustee....................118
Section 12.03. Information to be Provided by the Trustee...................................119

Section 12.04. Report on Assessment of Compliance and Attestation........................120

Section 12.05. Indemnification; Remedies....................................................120

</TABLE>


<PAGE>


EXHIBITS

| | |
|---|---|
| EXHIBIT A-1 | FORM OF CLASS A CERTIFICATE |
| EXHIBIT A-2 | FORM OF CLASS SB CERTIFICATE |
| EXHIBIT B | FORM OF CLASS R CERTIFICATE |
| EXHIBIT C | FORM OF CUSTODIAL AGREEMENT |
| EXHIBIT D | MORTGAGE LOAN SCHEDULE |
| EXHIBIT E | FORM OF REQUEST FOR RELEASE |
| EXHIBIT F | [RESERVED] |
| EXHIBIT G-1 | FORM OF TRANSFER AFFIDAVIT AND AGREEMENT |
| EXHIBIT G-2 | FORM OF TRANSFEROR CERTIFICATE |
| EXHIBIT H | FORM OF INVESTOR REPRESENTATION LETTER |
| EXHIBIT I | FORM OF TRANSFEROR REPRESENTATION LETTER |
| EXHIBIT J | [RESERVED] |
| EXHIBIT K | [RESERVED] |
| EXHIBIT L | FORM OF LENDER CERTIFICATION FOR ASSIGNMENT OF MORTGAGE LOAN |
| EXHIBIT M | FORM OF RULE 144A INVESTMENT REPRESENTATION |
| EXHIBIT N | [RESERVED] |
| EXHIBIT O | SERVICING CRITERIA |
| EXHIBIT P-1 | FORM OF FORM 10-K CERTIFICATION |
| EXHIBIT P-2 | FORM OF BACK-UP CERTIFICATE TO FORM 10-K CERTIFICATION |
| EXHIBIT Q | [RESERVED] |
| EXHIBIT R | ASSIGNMENT AGREEMENT |


<PAGE>


        This is a Pooling and Servicing Agreement, effective as of
January 1, 2006, among RESIDENTIAL FUNDING MORTGAGE SECURITIES II, INC., as the
company (together with its permitted successors and assigns, the "Company"),
RESIDENTIAL FUNDING CORPORATION, as master servicer (together with its permitted
successors and assigns, the "Master Servicer"), and JPMORGAN CHASE BANK, N.A., a
national banking association, as Trustee (together with its permitted successors
and assigns, the "Trustee").


                      PRELIMINARY STATEMENT

        The Company intends to sell home equity loan pass-through
certificates (collectively, the "Certificates"), to be issued hereunder in
multiple classes, which in the aggregate will evidence the entire beneficial
ownership interest in the Mortgage Loans (as defined herein).


                            REMIC I

        As provided herein, the REMIC Administrator will make an election to
treat the segregated pool of assets consisting of the Mortgage Loans and certain
other related assets subject to this Agreement as a real estate mortgage
investment conduit (a "REMIC") for federal income tax purposes, and such
segregated pool of assets will be designated as "REMIC I." The Class R-I
Certificates will represent the sole Class of "residual interests" in REMIC I
for purposes of the REMIC Provisions (as defined herein) under federal income
tax law. The following table irrevocably sets forth the designation, remittance
rate (the "Uncertificated REMIC I Pass-Through Rate") and initial Uncertificated
Principal Balance for each of the "regular interests" in REMIC I (the "REMIC I
Regular Interests"). The "latest possible maturity date" (determined solely for
purposes of satisfying Treasury regulation Section 1.860G-1(a)(4)(iii)) for each
REMIC I Regular Interest shall be the Maturity Date. None of the REMIC I Regular
Interests will be certificated.

<TABLE>
<CAPTION>

| Designation | Uncertificated REMIC I Pass-Through Rate | Initial Uncertificated Principal Balance | Latest Possible Maturity Date |
|---|---|---|---|
| <S> | <C> | <C> | <C> <C> |
| LT1 | Variable(1) | $    463,686,316.78 | February 25, 2036 |

| | | | | |
|---|---|---|---|---|
| LT2 | Variable(1) | $ | 14,044.78 | February 25, 2036 |
| LT3 | Variable(1) | $ | 32,331.72 | February 25, 2036 |
| LT4 | Variable(1) | $ | 32,331.72 | February 25, 2036 |

</TABLE>

--------------------
(1) Calculated as provided in the definition of Uncertificated REMIC I Pass-Through Rate.


REMIC II

        As provided herein, the REMIC Administrator will make an election to treat the segregated pool of assets consisting of the REMIC I Regular Interests as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as REMIC II. The Class R-II Certificates will represent the sole Class of "residual interests" in REMIC II for purposes of the REMIC Provisions under federal income tax law. The following table irrevocably sets forth the designation, Pass-Through Rate, aggregate Initial Certificate Principal Balance, certain features, month of Final Scheduled Distribution Date and initial ratings for each Class of Certificates comprising the interests representing "regular interests" in REMIC II. The "latest possible maturity date" (determined solely for purposes of satisfying Treasury Regulation Section 1.860G-1(a)(4)(iii)) for each Class of REMIC II Regular Interests shall be the Maturity Date.


<TABLE>
<CAPTION>

| Designation | Pass-Through Initial Rate | Aggregate Certificate Principal Balance | Month of Final Scheduled Distribution Date | Initial Ratings Moodys/S&P |
|---|---|---|---|---|
| Features | | | | |
| <S>          <C> | Adjustable | <C> $ 282,669,000.00 | <C>   <C> November 25, 2020 | Aaa/AAA |
| Class A-1(1) Senior/Adjustable Rate | Rate(2) | | | |
| Class A-2(1) Senior/Fixed Rate | 5.19% | $ 42,249,000.00 | November 25, 2020 | Aaa/AAA |
| Class A-3(1) Senior/Fixed Rate | 5.23% | $ 47,465,000.00 | February 25, 2022 | Aaa/AAA |
| Class A-4(1) (3) Senior/Fixed Rate | 5.49% | $ 42,917,000.00 | February 25, 2036 | Aaa/AAA |
| Class A-5(1) Senior/Lockout/ | 5.31% | $ 46,144,000.00 | February 25, 2036 | Aaa/AAA |
| Fixed Rate | | | | |
| Class SB(4) Subordinate | N/A | $ 2,321,025.26 | February 25, 2036 | N/A |
| Class R-I Residual | N/A | N/A | --- | N/A |
| Class R-II Residual | N/A | N/A | --- | N/A |

</TABLE>

(1)     Subject to a cap as described in the definition of "Pass-Through Rate" herein.
(2)     The Pass-Through Rate on the Class A-1 Certificates on any Distribution Date will be equal to the lesser of (a) LIBOR plus 0.11%; and (b) the Net WAC Rate.
(3)     Starting on the second Distribution Date after the Step-Up Date, the Pass-Through Rate indicated above will increase by a per annum rate equal to 0.50%.
(4)     The Class SB Certificates will accrue interest as described in the definition of Accrued Certificate Interest. The Class SB Certificates will not accrue interest on their Certificate Principal Balance. The Class SB Certificates shall be comprised of two regular interests in REMIC II, REMIC II Regular Interest SB-IO and REMIC II Regular Interest SB-PO, as defined herein.

        The Mortgage Loans have an aggregate Cut-off Date Principal Balance equal to $463,765,025.26. The Mortgage Loans are conventional, fixed rate, closed-end, primarily second lien home equity mortgage loans with either fully amortizing or balloon payment features, having terms to maturity at

origination or modification of approximately 5, 7, 10, 15, 20 or 25 years.

In consideration of the mutual agreements herein contained, the Company, the Master Servicer and the Trustee agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01  Definitions.

Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Article.

Accrued Certificate Interest: With respect to each Distribution Date and the Class A Certificates, one month's interest accrued during the related Interest Accrual Period at the related Pass-Through Rate on the Certificate Principal Balance thereof immediately prior to such Distribution Date. In each case Accrued Certificate Interest on any Class of Class A Certificates will be reduced by the amount of (i) Prepayment Interest Shortfalls allocated thereto (to the extent not offset by Excess Interest as provided in Section 4.02(g)) and (ii) Relief Act Shortfalls allocated thereto, with reductions described in clauses (i) and (ii) allocated among the Class A Certificates on a pro rata basis in proportion to the Accrued Certificate Interest which would have resulted absent such reductions. With respect to each Distribution Date and the Class SB Certificates, interest accrued during the related Interest Accrual Period at the related Pass-Through Rate on the Notional Amount thereof immediately prior to such Distribution Date. In addition, Accrued Certificate Interest with respect to each Distribution Date, as to the Class SB Certificates, shall be reduced by an amount equal to the Realized Losses allocated to the Excess Interest pursuant to Section 4.02(g) hereof and further reduced by Prepayment Interest Shortfalls paid from Excess Interest pursuant to Section 4.02(g). Accrued Certificate Interest on the Class A Certificates (other than the Class A-1 Certificates) and the Class SB Certificates will be calculated on the basis of a 360-day year, consisting of twelve 30-day months. Accrued Certificate Interest for the Class A-1 Certificates will be calculated on the basis of the actual number of days in the related Interest Accrual Period and a 360-day year. Prepayment Interest Shortfalls on each Distribution Date will be allocated to each Class of Certificates on a pro rata basis in accordance with the amount of Accrued Certificate Interest which would have resulted absent such shortfalls.

Adjusted Mortgage Rate: With respect to any Mortgage Loan and any date of determination, the Mortgage Rate borne by the related Mortgage Note, less the rate at which the related Subservicing Fee accrues.

Affiliate: With respect to any Person, any other Person controlling, controlled by or under common control with such first Person. For the purposes of this definition, "control" means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

Agreement: This Pooling and Servicing Agreement and all amendments hereof and supplements hereto.

Amount Held for Future Distribution: As to any Distribution Date, the total of the amounts held in the Custodial Account at the close of business on the preceding Determination Date on account of (i) Liquidation Proceeds, REO Proceeds, Insurance Proceeds, Principal Prepayments, Mortgage Loan purchases made pursuant to Section 2.02, 2.03 or 4.07 and Mortgage Loan substitutions made pursuant to Section 2.03 received in the month of such Distribution Date (other than such Liquidation Proceeds, REO Proceeds, Insurance Proceeds and purchase proceeds that the Master Servicer has deemed to have been received in the preceding month in accordance with Section 3.07(b)) and (ii) payments which represent early receipt of scheduled payments of principal and interest due on a date or dates subsequent to the related Due Date.

Appraised Value: With respect to any Mortgaged Property, the lesser of (i) the appraised value of such Mortgaged Property based upon the appraisal made at the time of the origination of the related Mortgage Loan, and (ii) the sales price of the Mortgaged Property at such time of origination, except in the case of a Mortgaged Property securing a refinanced or modified Mortgage Loan as to which it is either the appraised value based upon the appraisal made at the time of origination of the loan which was refinanced or modified or the appraised value determined in an appraisal at the time of refinancing or modification, as the case may be.

Assignment: An assignment of the Mortgage, notice of transfer or equivalent instrument, in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect of

record the sale of the Mortgage Loan to the Trustee for the benefit of Certificateholders, which assignment, notice of transfer or equivalent instrument may be in the form of one or more blanket assignments covering Mortgages secured by Mortgaged Properties located in the same county, if permitted by law and accompanied by an Opinion of Counsel to that effect.

Assignment Agreement: The Assignment and Assumption Agreement, dated the Closing Date, between Residential Funding and the Company relating to the transfer and assignment of the Mortgage Loans, attached hereto as Exhibit R.

Available Distribution Amount: As to any Distribution Date, an amount equal to (a) the sum of (without duplication) (i) payments of principal and interest on the Mortgage Loans actually received by the Master Servicer or Subservicer during the related Collection Period, (ii) Principal Prepayments, Insurance Proceeds, Liquidation Proceeds, REO Proceeds and the proceeds of the purchase of any Mortgage Loan pursuant to Sections 2.02, 2.03 and 4.07 received during the related Collection Period and any amount deposited in the Custodial Account pursuant to Section 2.03(b) in connection with the substitution of a Mortgage Loan, (iii) amounts deposited in the Custodial Account in connection with the substitution of Qualified Substitute Mortgage Loans, (iv) any amount deposited in the Certificate Account pursuant to the second paragraph of Section 3.11(a), (v) any amount deposited in the Certificate Account pursuant to Section 4.07 or 9.01 and (vi) any amounts payable under the Policy, reduced by (b) the sum as of the close of business on the last day of the related Collection Period of (x) the Amount Held for Future Distribution and (y) amounts permitted to be withdrawn by the Master Servicer from the Custodial Account in respect of the Mortgage Loans pursuant to clauses (ii)-(ix), inclusive, of Section 3.10(a).

Bankruptcy Code: The Bankruptcy Code of 1978, as amended.

Book-Entry Certificate: Any Certificate registered in the name of the Depository or its nominee.

Business Day: Any day other than (i) a Saturday or a Sunday or (ii) a day on which banking institutions in the State of New York, the State of California, State of Texas, State of Pennsylvania, State of Minnesota or the State of Illinois (and such other state or states in which the Custodial Account or the Certificate Account are at the time located) are required or authorized by law or executive order to be closed.

Calendar Quarter: A Calendar Quarter shall consist of one of the following time periods in any given year: January 1 through March 31, April 1 through June 30, July 1 through September 30, and October 1 through December 31.

Cash Liquidation: With respect to any defaulted Mortgage Loan other than a Mortgage Loan as to which an REO Acquisition occurred, a determination by the Master Servicer that it has received all Insurance Proceeds, Liquidation Proceeds and other payments or cash recoveries which the Master Servicer reasonably and in good faith expects to be finally recoverable with respect to such Mortgage Loan.

Certificate: Any Class A Certificate, Class SB Certificate or Class R Certificate.

Certificate Account: The separate account or accounts created and maintained pursuant to Section 4.01, which shall be entitled "JPMorgan Chase Bank, N.A., as trustee, in trust for the registered holders of Residential Funding Mortgage Securities II, Inc., Home Equity Loan Pass-Through Certificates, Series 2006-HSA1 and Financial Guaranty Insurance Company" which account shall be held for the benefit of the Certificateholders and the Credit Enhancer and which must be an Eligible Account. Any such account or accounts created and maintained subsequent to the Closing Date shall be subject to the approval of the Credit Enhancer, which approval shall not be unreasonably withheld.

Certificate Account Deposit Date: As to any Distribution Date, the Business Day prior thereto.

Certificateholder or Holder: The Person in whose name a Certificate is registered in the Certificate Register, except that neither a Disqualified Organization nor a Non-United States Person shall be a holder of a Class R Certificate for any purpose hereof. Solely for the purpose of giving any consent or direction pursuant to this Agreement, any Certificate, other than a Class R Certificate, registered in the name of the Company, the Master Servicer or any Subservicer or any Affiliate thereof shall be deemed not to be outstanding and the Percentage Interest or Voting Rights evidenced thereby shall not be taken into account in determining whether the requisite amount of Percentage Interests or Voting Rights necessary to effect any such consent or direction has been obtained. All references herein to "Holders" or "Certificateholders" shall reflect the rights of Certificate Owners as they may indirectly exercise such rights through the Depository and participating members thereof, except as

otherwise specified herein; provided, however, that the Trustee shall be required to recognize as a "Holder" or "Certificateholder" only the Person in whose name a Certificate is registered in the Certificate Register. Unless otherwise indicated in this Agreement, the Custodial Agreement or the Assignment Agreement, whenever reference is made to the actions taken by the Trustee on behalf of the Certificateholders, such reference to Certificateholders shall include the Credit Enhancer as long as there is no Credit Enhancer Default.

Certificate Owner: With respect to a Book-Entry Certificate, the Person who is the beneficial owner of such Certificate, as reflected on the books of an indirect participating brokerage firm for which a Depository Participant acts as agent, if any, and otherwise on the books of a Depository Participant, if any, and otherwise on the books of the Depository.

Certificate Principal Balance: With respect to any Class A Certificate, on any date of determination, an amount equal to (i) the Initial Certificate Principal Balance of such Certificate as specified on the face thereof, minus (ii) the sum of (x) the aggregate of all amounts previously distributed with respect to such Certificate (or any predecessor Certificate), including principal distributions made from payments on the Policy, and applied to reduce the Certificate Principal Balance thereof pursuant to Section 4.02(c) and (y) the aggregate of all reductions in Certificate Principal Balance deemed to have occurred in connection with Realized Losses which were previously allocated to such Certificate (or any predecessor Certificate) pursuant to Section 4.05, unless these amounts have been paid under the Policy. With respect to each Class SB Certificate, on any date of determination, an amount equal to the Percentage Interest evidenced by such Certificate times an amount equal to the excess, if any, of (A) the then aggregate Principal Balance of the Mortgage Loans over (B) the then aggregate Certificate Principal Balance of the Class A Certificates then outstanding. The Class R Certificates will not have a Certificate Principal Balance.

Certificate Register and Certificate Registrar: The register maintained and the registrar appointed pursuant to Section 5.02.

Class: Collectively, all of the Certificates or uncertificated interests bearing the same designation.

Class A Certificates: Any one of the Class A-1, Class A-2, Class A-3, Class A-4 and Class A-5 Certificates in the form attached hereto as Exhibit A-1.

Class A Interest Distribution Amount: As defined in Section 4.02(c)(1).

Class A Principal Distribution Amount: With respect to any Distribution Date, the sum of the Principal Collection Distribution Amount and the Overcollateralization Increase Amount.

Class A-1 Certificate: Any one of the Class A-1 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A-1, senior to the Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of the Mortgage Loans as set forth in Section 4.05, and evidencing an interest designated as a "regular interest" in REMIC II for purposes of the REMIC Provisions.

Class A-2 Certificate: Any one of the Class A-2 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A-1, senior to the Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of the Mortgage Loans as set forth in Section 4.05, and evidencing an interest designated as a "regular interest" in REMIC II for purposes of the REMIC Provisions.

Class A-3 Certificate: Any one of the Class A-3 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A-1, senior to the Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of the Mortgage Loans as set forth in Section 4.05, and evidencing an interest designated as a "regular interest" in REMIC II for purposes of the REMIC Provisions.

Class A-4 Certificate: Any one of the Class A-4 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A-1, senior to the Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of the Mortgage Loans as set forth in Section 4.05, and evidencing an interest designated as a "regular interest" in REMIC II for purposes of the REMIC Provisions.

Class A-5 Certificate: Any one of the Class A-5 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the

form annexed hereto as Exhibit A-1, senior to Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of the Mortgage Loans as set forth in Section 4.05, and evidencing an interest designated as a "regular interest" in REMIC II for purposes of the REMIC Provisions.

Class A-5 Lockout Distribution Amount: For any Distribution Date, the product of (i) the Class A-5 Lockout Percentage for such Distribution Date and (ii) the Class A-5 Pro Rata Distribution Amount for such Distribution Date. In no event shall the Class A-5 Lockout Distribution Amount for a Distribution Date exceed the Class A Principal Distribution Amount for that Distribution Date.

Class A-5 Lockout Percentage: For each Distribution Date, the applicable percentage set forth below:

<PAGE>

| DISTRIBUTION DATES | LOCKOUT PERCENTAGE |
|---|---|

| DISTRIBUTION DATES | |
|---|---|
| February 2006 through and including January 2009 | 0% |
| February 2009 through and including January 2011 | 45% |
| February 2011 through and including January 2012 | 80% |
| February 2012 through and including January 2013 | 100% |
| February 2013 and thereafter | 300% |

Class A-5 Pro Rata Distribution Amount: For any Distribution Date, an amount equal to the product of (x) a fraction, the numerator of which is the Certificate Principal Balance of the Class A-5 Certificates immediately prior to that Distribution Date and the denominator of which is the aggregate Certificate Principal Balance of the Class A Certificates immediately prior to that Distribution Date and (y) the Class A Principal Distribution Amount for that Distribution Date.

Class R Certificate: Any one of the Class R-I Certificates or Class R-II Certificates.

Class R-I Certificate: Any one of the Class R-I Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit B and evidencing an interest designated as a "residual interest" in REMIC I for purposes of the REMIC Provisions.

Class R-II Certificate: Any one of the Class R-II Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit B and evidencing an interest designated as a "residual interest" in REMIC II for purposes of the REMIC Provisions.

Class SB Certificate: Any one of the Class SB Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A-4, subordinate to the Class A Certificates with respect to distributions and the allocation of Realized Losses in respect of the Mortgage Loans as set forth in Section 4.05, and evidencing an interest designated as a "regular interest" in REMIC II for purposes of the REMIC Provisions.

Closing Date: January 27, 2006.

Code: The Internal Revenue Code of 1986.

Collection Period: For any Distribution Date, the calendar month preceding the month in which such Distribution Date occurs.

Combined Loan-to-Value Ratio: With respect to any Mortgage Loan, the ratio, expressed as a percentage, of (A) the sum of (i) the original principal balance of such Mortgage Loan and (ii) any outstanding principal balance, at the time of origination of such Mortgage Loan, of all other mortgage loans, if any, secured by senior or subordinate liens on the related Mortgaged Property, to (B) the Appraised Value.

Commission: The Securities and Exchange Commission.
----------

Corporate Trust Office: The principal office of the Trustee at which at any particular time its corporate trust business with respect to this Agreement

shall be administered, which office at the time of the execution of this instrument is located at 600 Travis Street, 9th Floor, Houston, Texas 77002, Attention: RFMSII, Series 2006-HSA1.

Credit Enhancer: Financial Guaranty Insurance Company, or any successor thereto.

Credit Enhancer Default: If the Credit Enhancer fails to make a payment required under the Policy in accordance with its terms.

Credit Enhancer Premium Rate: The Premium Rate as specified in the Insurance Agreement with respect to the Policy.

Credit Repository: Equifax, Transunion and Experian, or their successors in interest.

Curtailment: Any Principal Prepayment made by a Mortgagor which is not a Principal Prepayment in Full.

Custodial Account: The custodial account or accounts created and maintained pursuant to Section 3.07 in the name of a depository institution, as custodian for the holders of the Certificates, for the holders of certain other interests in mortgage loans serviced or sold by the Master Servicer and for the Master Servicer, into which the amounts set forth in Section 3.07 shall be deposited directly. Any such account or accounts shall be an Eligible Account.

Custodial Agreement: An agreement that may be entered into among the Company, the Master Servicer, the Trustee and a Custodian in substantially the form of Exhibit C hereto.

Custodian: Wells Fargo Bank, N.A., or any successor custodian appointed pursuant to a Custodial Agreement and reasonably acceptable to the Credit Enhancer.

Cut-off Date: January 1, 2006.

Cut-off Date Principal Balance: As to any Mortgage Loan, the actual unpaid principal balance thereof as of the close of business on the day prior to the Cut-off Date.

Debt Service Reduction: With respect to any Mortgage Loan, a reduction in the scheduled Monthly Payment for such Mortgage Loan by a court of competent jurisdiction in a proceeding under the Bankruptcy Code, except such a reduction constituting a Deficient Valuation or any reduction that results in a permanent forgiveness of principal.

Deficiency Amount: With respect to any Distribution Date and each Class of the Class A Certificates, an amount, if any, equal to the sum of (1) the excess, if any, of the Accrued Certificate Interest on such Class of Class A Certificates on such Distribution Date over the portion of the amounts available for distribution to such Class of Class A Certificates on such Distribution Date and (2) (i) with respect to any Distribution Date that is not the Distribution Date in February 2036, the principal portion of any Realized Losses allocated to the Class A Certificates, if any, on such Distribution Date, after application of Excess Interest with respect to any Realized Losses and the reduction of the Overcollateralization Amount to zero, and (ii) on the Distribution Date in February 2036, the aggregate Certificate Principal Balance of each Class of Class A Certificates (after giving effect to all distributions to be made thereon on such Distribution Date other than any portion thereof consisting of an Insured Payment payable as principal on the Class A Certificates).

Deficient Valuation: With respect to any Mortgage Loan, a valuation by a court of competent jurisdiction of the Mortgaged Property in an amount less than the then outstanding indebtedness under the Mortgage Loan, or any reduction in the amount of principal to be paid in connection with any scheduled Monthly Payment that constitutes a permanent forgiveness of principal, which valuation or reduction results from a proceeding under the Bankruptcy Code.

Definitive Certificate: Any definitive, fully registered Certificate.

Deleted Mortgage Loan: A Mortgage Loan replaced or to be replaced with a Qualified Substitute Mortgage Loan.

Delinquency Percentage: With respect to any Distribution Date, the percentage equivalent of a fraction (A) the numerator of which is the Principal Balance of Mortgage Loans that are Delinquent for 60 days or more as of such Distribution Date and (B) the denominator of which is the aggregate Principal Balance of the Mortgage Loans as of the beginning of the related Collection Period, expressed as a percentage.

Delinquent: As used herein, a Mortgage Loan is considered to be: "30 to

59 days" or "30 or more days" delinquent when a payment due on any scheduled due date remains unpaid as of the close of business on the next following monthly scheduled due date; "60 to 89 days" or "60 or more days" delinquent when a payment due on any scheduled due date remains unpaid as of the close of business on the second following monthly scheduled due date; and so on. The determination as to whether a Mortgage Loan falls into these categories is made as of the close of business on the last business day of each month. For example, a Mortgage Loan with a payment due on July 1 that remained unpaid as of the close of business on August 31, the Mortgage Loan would then be considered to be 30 to 59 days delinquent. Delinquency information as of the Cut-off Date is determined and prepared as of the close of business on the last business day immediately prior to the Cut-off Date.

Depository: The Depository Trust Company, or any successor Depository hereafter named. The nominee of the initial Depository for purposes of registering those Certificates that are to be Book-Entry Certificates is Cede & Co. The Depository shall at all times be a "clearing corporation" as defined in Section 8-102(3) of the Uniform Commercial Code of the State of New York and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended.

Depository Participant: A broker, dealer, bank or other financial institution or other Person for whom from time to time a Depository effects book-entry transfers and pledges of securities deposited with the Depository.

Derivative Contract: Any ISDA Master Agreement, together with the related Schedule and Confirmation, entered into by the Trustee and a Derivative Counterparty in accordance with Section 4.09.

Derivative Counterparty: Any counterparty to a Derivative Contract as provided in Section 4.09

Destroyed Mortgage Note: A Mortgage Note the original of which was permanently lost or destroyed and has not been replaced.

Determination Date: With respect to any Distribution Date, the 20th day (or if such 20th day is not a Business Day, the Business Day immediately following such 20th day) of the month of the related Distribution Date.

Disqualified Organization: Any organization defined as a "disqualified organization" under Section 860E(e)(5) of the Code, including, if not otherwise included, any of the following: (i) the United States, any State or political subdivision thereof, any possession of the United States, or any agency or instrumentality of any of the foregoing (other than an instrumentality which is a corporation if all of its activities are subject to tax and, except for Freddie Mac, a majority of its board of directors is not selected by such governmental unit), (ii) a foreign government, any international organization, or any agency or instrumentality of any of the foregoing, (iii) any organization (other than certain farmers' cooperatives described in Section 521 of the Code) which is exempt from the tax imposed by Chapter 1 of the Code (including the tax imposed by Section 511 of the Code on unrelated business taxable income) and (iv) rural electric and telephone cooperatives described in Section 1381(a)(2)(C) of the Code. A Disqualified Organization also includes any "electing large partnership," as defined in Section 775(a) of the Code and any other Person so designated by the Trustee based upon an Opinion of Counsel that the holding of an Ownership Interest in a Class R Certificate by such Person may cause any REMIC or any Person having an Ownership Interest in any Class of Certificates (other than such Person) to incur a liability for any federal tax imposed under the Code that would not otherwise be imposed but for the Transfer of an Ownership Interest in a Class R Certificate to such Person. The terms "United States," "State" and "international organization" shall have the meanings set forth in Section 7701 of the Code or successor provisions.

Distribution Date: The 25th day of any month beginning in the month immediately following the month of the initial issuance of the Certificates or, if such 25th day is not a Business Day, the Business Day immediately following such 25th day.

Due Date: With respect to any Distribution Date and any Mortgage Loan, the day of the month of the related Collection Period the Monthly Payment is due as set forth in the related Mortgage Note.

Eligible Account: An account that is any of the following: (i) maintained with a depository institution the debt obligations of which have been rated by each Rating Agency in its highest rating available, or (ii) an account or accounts in a depository institution in which such accounts are fully insured to the limits established by the FDIC, provided that any deposits not so insured shall, to the extent acceptable to each Rating Agency, as evidenced in writing, be maintained such that (as evidenced by an Opinion of Counsel delivered to the Trustee and each Rating Agency) the registered Holders of Certificates have a claim with respect to the funds in such account or a perfected first security

interest against any collateral (which will be limited to Permitted Investments) securing such funds that is superior to claims of any other depositors or creditors of the depository institution with which such account is maintained, or (iii) in the case of the Custodial Account, a trust account or accounts maintained in the corporate trust department of U.S. Bank National Association, or (iv) in the case of the Certificate Account, a trust account or accounts maintained in the corporate trust division of JPMorgan Chase Bank, N.A., or (v) an account or accounts of a depository institution acceptable to each Rating Agency (as evidenced in writing by each Rating Agency that use of any such account as the Custodial Account or the Certificate Account will not reduce the rating assigned to any Class of Certificates by such Rating Agency below the lower of the then-current rating or the rating assigned to such Certificates as of the Closing Date by such Rating Agency).

ERISA: The Employee Retirement Income Security Act of 1974, as amended.

Event of Default: As defined in Section 7.01.

Excess Interest: As of any Distribution Date, the excess of (x) the Available Distribution Amount over (y) the sum of (1) the Interest Distribution Amount for such Distribution Date and (2) the Principal Remittance Amount for that Distribution Date. Excess Interest shall be allocated on each Distribution Date in accordance with the priorities set forth in Section 4.02(g).

Exchange Act: The Securities Exchange Act of 1934, as amended.

Fannie Mae: Federal National Mortgage Association, a federally chartered and privately owned corporation organized and existing under the Federal National Mortgage Association Charter Act, or any successor thereto.

FASIT: A "financial asset securitization investment trust" within the meaning of Section 860L of the Code.

FDIC: Federal Deposit Insurance Corporation or any successor thereto.

FHA: The Federal Housing Administration, or its successor.

Final Distribution Date: The Distribution Date on which the final distribution in respect of the Certificates will be made pursuant to Section 9.01, which Final Distribution Date shall in no event be later than the end of the 90-day liquidation period described in Section 9.02.

Final Scheduled Distribution Date: Solely for purposes of the face of the Certificates, as follows: with respect to the Class A-1 Certificates and Class A-2 Certificates, November 25, 2020; with respect to the Class A-3 Certificates, February 25, 2022, and with respect to the Class A-4, Class A-5 and Class SB Certificates, February 25, 2036. No event of default under this Agreement will arise or become applicable solely by reason of the failure to retire the entire Certificate Principal Balance of any Class of Class A Certificates or Class SB Certificates on or before its Final Scheduled Distribution Date.

Foreclosure Profits: With respect to any Distribution Date or related Determination Date and any Mortgage Loan, the excess, if any, of Liquidation Proceeds, Insurance Proceeds and REO Proceeds (net of all amounts reimbursable therefrom pursuant to Section 3.10(a)(ii)) in respect of each Mortgage Loan or REO Property for which a Cash Liquidation or REO Disposition occurred in the related Collection Period over the sum of the unpaid principal balance of such Mortgage Loan or REO Property (determined, in the case of an REO Disposition, in accordance with Section 3.14) plus accrued and unpaid interest at the Mortgage Rate on such unpaid principal balance from the Due Date to which interest was last paid by the Mortgagor to the first day of the month following the month in which such Cash Liquidation or REO Disposition occurred.

Form 10-K Certification: As defined in Section 4.03(f).

Freddie Mac: Freddie Mac, a corporate instrumentality of the United States created and existing under Title III of the Emergency Home Finance Act of 1970, as amended, or any successor thereto.

HUD: The United States Department of Housing and Urban Development.

Independent: When used with respect to any specified Person, means such a Person who (i) is in fact independent of the Company, the Master Servicer and the Trustee, or any Affiliate thereof, (ii) does not have any direct financial interest or any material indirect financial interest in the Company, the Master Servicer or the Trustee or in an Affiliate thereof, and (iii) is not connected with the Company, the Master Servicer or the Trustee as an officer, employee, promoter, underwriter, trustee, partner, director or person performing similar functions.

Initial Certificate Principal Balance: With respect to each Class of Certificates (other than the Class R Certificates), the Certificate Principal Balance of such Class of Certificates as of the Cut-off Date as set forth in the Preliminary Statement hereto.

Insurance Account: The separate account or accounts created and maintained pursuant to Section 4.10, which shall be entitled "JPMorgan Chase Bank, N.A., as trustee, in trust for the registered holders of Residential Funding Mortgage Securities II, Inc., Home Equity Loan Pass-Through Certificates, Series 2006-HSA1," and which must be an Eligible Account.

Insurance Agreement: The Insurance and Indemnity Agreement, dated as of January 27, 2006, among the Master Servicer, the Seller, the Company, the Trustee and the Credit Enhancer, including any amendments and supplements thereto.

Insurance Proceeds: Proceeds paid in respect of the Mortgage Loans pursuant to any insurance policy covering a Mortgage Loan, to the extent such proceeds are payable to the mortgagee under the Mortgage, any Subservicer, the Master Servicer or the Trustee and are not applied to the restoration of the related Mortgaged Property or released to the Mortgagor in accordance with the procedures that the Master Servicer would follow in servicing mortgage loans held for its own account.

Insured Payment: The Insured Payment as defined in the Policy.

Interest Accrual Period: With respect to any Certificate (other than the Class A-1 Certificates) and any Distribution Date, the calendar month preceding the month in which such Distribution Date occurs. The Interest Accrual Period for the Class A-1 Certificates shall be (a) for the Distribution Date in February 2006, the period commencing on the Closing Date and ending on the day preceding the Distribution Date in February 2006, and (b) with respect to any Distribution Date after the Distribution Date in February 2006, the period commencing on the Distribution Date in the month immediately preceding the month in which such Distribution Date occurs and ending on the day preceding such Distribution Date.

Interest Distribution Amount: For any Distribution Date, the amount payable pursuant to Section 4.02(c)(1).

Interim Certification: As defined in Section 2.02.

LIBOR: With respect to any Distribution Date, the arithmetic mean of the London interbank offered rate quotations for one-month U.S. Dollar deposits, expressed on a per annum basis, determined in accordance with Section 1.02.

LIBOR Business Day: As defined in Section 1.02.

LIBOR Rate Adjustment Date: As defined in Section 1.02.

Limited Repurchase Right Holder: RFC Asset Holdings II, Inc., or its successor.

Liquidated Mortgage Loan: With respect to any Distribution Date, any Mortgage Loan in respect of which the Master Servicer has determined, in accordance with the servicing procedures specified herein, as of the end of the related Collection Period, that substantially all Liquidation Proceeds which it reasonably expects to recover, if any, with respect to the disposition of the related Mortgaged Property have been recovered. In addition, the Master Servicer will treat any Mortgage Loan that is 180 days or more delinquent as having been finally liquidated.

Liquidation Expenses: Out-of-pocket expenses (exclusive of overhead) which are incurred by or on behalf of the Master Servicer in connection with the liquidation of any Mortgage Loan and not recovered under any insurance policy, such expenses including, without limitation, legal fees and expenses, any unreimbursed amount expended (including, without limitation, amounts advanced to correct defaults on any loan which is senior to such Mortgage Loan) respecting the related Mortgage Loan and any related and unreimbursed expenditures for real estate property taxes or for property acquisition, restoration, preservation or disposition, or insurance against casualty loss or damage.

Liquidation Proceeds: Amounts (other than Insurance Proceeds) received by the Master Servicer in connection with the taking of an entire Mortgaged Property by exercise of the power of eminent domain or condemnation or in connection with the liquidation of a defaulted Mortgage Loan through trustee's sale, foreclosure sale or otherwise, other than REO Proceeds.

Marker Rate: With respect to the Class SB Certificates and any Distribution Date, a per annum rate equal to two (2) times the weighted average of the Uncertificated REMIC II Pass-Through Rates for REMIC II Regular Interest

LT2 and REMIC II Regular Interest LT3.

  Maturity Date: With respect to each Class of Certificates representing ownership of REMIC II Regular Interests or REMIC I Regular Interests issued by each of REMIC I and REMIC II the latest possible maturity date, solely for purposes of Section 1.860G-1(a)(4)(iii) of the Treasury Regulations, by which the Certificate Principal Balance of each such Class of Certificates representing a regular interest in the Trust Fund would be reduced to zero, which is, for each such regular interest, February 25, 2036, which is the Distribution Date occurring in the month following the last scheduled monthly payment of the Mortgage Loans.

  MERS: Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

  MERS(R) System: The system of recording transfers of Mortgages electronically maintained by MERS.

  MIN: The Mortgage Identification Number for Mortgage Loans registered with MERS on the MERS(R) System.

  MOM Loan: With respect to any Mortgage Loan, MERS acting as the mortgagee of such Mortgage Loan, solely as nominee for the originator of such Mortgage Loan and its successors and assigns, at the origination thereof.

  Monthly Payment: With respect to any Mortgage Loan (including any REO Property) and any Due Date, the payment of principal and interest received thereon in accordance with the amortization schedule at the time applicable thereto (after adjustment, if any, for Curtailments and for Deficient Valuations occurring prior to such Due Date but before any adjustment to such amortization schedule by reason of any bankruptcy, other than a Deficient Valuation, or similar proceeding or any moratorium or similar waiver or grace period).

  Moody's: Moody's Investors Service, Inc., or its successor in interest.

  Mortgage: With respect to each Mortgage Note related to a Mortgage Loan, the mortgage, deed of trust or other comparable instrument creating a first or second lien on an estate in fee simple or leasehold interest in real property securing a Mortgage Note.

  Mortgage File: The mortgage documents listed in Section 2.01 pertaining to a particular Mortgage Loan and any additional documents required to be added to the Mortgage File pursuant to this Agreement.

  Mortgage Loans: Such of the mortgage loans transferred and assigned to the Trustee pursuant to Section 2.01 as from time to time are held or deemed to be held as a part of the Trust Fund, the Mortgage Loans originally so held being identified in the initial Mortgage Loan Schedule, and Qualified Substitute Mortgage Loans held or deemed held as part of the Trust Fund including, without limitation, each related Mortgage Note, Mortgage and Mortgage File and all rights appertaining thereto.

  Mortgage Loan Schedule: The list of the Mortgage Loans attached hereto as Exhibit D (as amended from time to time to reflect the addition of Qualified Substitute Mortgage Loans), which lists shall set forth at a minimum the following information as to each Mortgage Loan in the related Loan Group:

    (i) the Mortgage Loan identifying number ("RFC LOAN #");

    (ii) the state, city and zip code of the Mortgaged Property;

    (iii) the maturity of the Mortgage Note ("MATURITY DATE");

    (iv) the Mortgage Rate ("CUR RATE");

    (v) the Principal Balance at origination ("ORG AMT");

    (vi) the type of property securing the Mortgage Note ("PROPERTY TYPE");

    (vii) the appraised value ("APPRSL");

(viii)   the initial scheduled monthly payment of principal, if any, and interest ("ORIGINAL P & I");

(ix)   the Cut-off Date Loan Principal Balance ("CUT-OFF BAL");

(x)   the Combined Loan-to-Value Ratio at origination ("CLTV");

(xi)   the date of the Mortgage Note ("NOTE DATE");

(xii)                        the original term to maturity of the Mortgage Loan
                             ("ORIGINAL TERM");

(xiii)                       under the column "OCCP CODE," a code indicating whether
                             the Mortgage Loan is secured by a non-owner occupied
                             residence;

(xiv)                        the Principal Balance of any Mortgage Loan senior thereto
                             ("SR BAL");

(xv)                         the Credit Score ("CR SCORE");

(xvi)                        the debt to income ratio ("DTI");

(xvii)                       product code ("PRODUCT CODE");

(xviii)                      loan purpose ("PURPOSE");

(xix)                        the lien position of the related Mortgage ("LIEN");

(xx)                         the Subservicer loan number (SERVICER LOAN #); and

(xxi)                        the remaining term of the Mortgage Loan (REMAINING TERM).

Such schedule may consist of multiple reports that collectively set forth all of
the information required.

Mortgage Note: The originally executed note or other evidence of
indebtedness evidencing the indebtedness of a Mortgagor under a Mortgage Loan,
together with any modification thereto.

Mortgage Rate: As to any Mortgage Loan, the interest rate borne by the
related Mortgage Note, or any modification thereto.

Mortgaged Property: The underlying real property securing a Mortgage
Loan.

Mortgagor:  The obligor on a Mortgage Note.

Net Liquidation Proceeds:  With respect to any Liquidated Mortgage Loan,
Liquidation Proceeds net of Liquidation Expenses.

Net Mortgage Rate:  With respect to each Mortgage Loan,  the per annum
rate equal to the Adjusted Mortgage Rate minus (x) the per annum rate at which
the Servicing Fee accrues and (y) the Credit Enhancer Premium Rate.

Net WAC Cap Shortfall:  With respect to any Distribution Date and any
Class of Class A Certificates, the excess, if any, of (x) interest that would
have accrued on such Class of Class A Certificates at the applicable
Pass-Through Rate without application of the Net WAC Rate over (y) interest
accrued thereon at the Net WAC Rate.

Net WAC Rate:  With respect to any Distribution Date, a per annum rate
equal to the weighted average of the Net Mortgage Rates of the Mortgage Loans as
of the first day of the month preceding the month in which such Distribution
Date occurs. With respect to the Class A-1 Certificates, the Net WAC Rate is
further adjusted by multiplying the Net WAC Rate by a fraction, the numerator of
which is 30 and the denominator of which is the actual number of days in the
related Interest Accrual Period. The foregoing rate is equal to the weighted
average of the Uncertificated REMIC I Pass-Through Rates with respect to the
REMIC I Regular Interests, weighted in each case by their respective
Uncertificated Principal Balances.

Non-Primary Residence Loans: The Mortgage Loans designated as secured by
second or vacation residences, or by non-owner occupied residences, on the
Mortgage Loan Schedule.

Non-United States Person:  Any Person other than a United States Person.

Nonsubserviced Mortgage Loan:  Any Mortgage Loan that, at the time of
reference thereto, is not subject to a Subservicing Agreement.

Notice: A Notice of Nonpayment and Demand for Insured Payment, a form of
which is attached as Exhibit A to the Policy.

Notional Amount:  With respect to the Class SB Certificates or the REMIC
II Regular Interest SB-IO, immediately prior to any Distribution Date, the
aggregate of the Uncertificated Principal Balances of the REMIC II Regular
Interests.

Officers' Certificate: A certificate signed by the Chairman of the Board, the President or a Vice President or Assistant Vice President, or a Managing Director or Director, and by the Treasurer, the Secretary, or one of the Assistant Treasurers or Assistant Secretaries of the Company or the Master Servicer, as the case may be, and delivered to the Trustee, as required by this Agreement.

Opinion of Counsel: A written opinion of counsel acceptable to the Trustee and the Master Servicer, who may be counsel for the Company or the Master Servicer, provided that any opinion of counsel (i) referred to in the definition of "Disqualified Organization" or (ii) relating to the qualification of REMIC I or REMIC II as REMICs or compliance with the REMIC Provisions must, unless otherwise specified, be an opinion of Independent counsel.

Outstanding Mortgage Loan: As to any Due Date, a Mortgage Loan (including an REO Property) which was not the subject of a Principal Prepayment in Full, Cash Liquidation or REO Disposition and which was not purchased, deleted or substituted for prior to such Due Date pursuant to Section 2.02, 2.03 or 4.07.

Overcollateralization Amount: With respect to any Distribution Date, the excess, if any, of (a) the aggregate Principal Balances of the Mortgage Loans as of the last day of the related Collection Period, over (b) the aggregate Certificate Principal Balance of the Class A Certificates immediately prior to that Distribution Date, less amounts distributable to the Class A Certificates from the Principal Remittance Amount for such Distribution Date and Excess Interest available to pay any Realized Loss Distribution Amount for such Distribution Date.

Overcollateralization Floor: An amount equal to 0.50% of the aggregate Cut-off Date Principal Balance of the Mortgage Loans.

Overcollateralization Increase Amount: With respect to any Distribution Date, an amount equal to the lesser of (i) the Excess Interest available to pay any Overcollateralization Increase Amount on that Distribution Date and (ii) the excess, if any, of (x) the Required Overcollateralization Amount for that Distribution Date over (y) the Overcollateralization Amount for that Distribution Date.

Ownership Interest: As to any Certificate, any ownership or security interest in such Certificate, including any interest in such Certificate as the Holder thereof and any other interest therein, whether direct or indirect, legal or beneficial, as owner or as pledgee.

Pass-Through Rate:

With respect to the Class A-1 Certificates, (1) a per annum rate equal to LIBOR plus 0.11%, or, (2) the Net WAC Rate, if less;

With respect to the Class A-2 Certificates, 5.19% per annum or the Net WAC Rate, if less;

With respect to the Class A-3 Certificates, 5.23% per annum or the Net WAC Rate, if less;

With respect to the Class A-4 Certificates, in the case of any Distribution Date up to and including the first Distribution Date after the Step-Up Date, 5.49% per annum, and in the case of any Distribution Date after the first Distribution Date after the Step-Up Date, 5.99% per annum, or the Net WAC Rate, if less; and

With respect to the Class A-5 Certificates, 5.31% per annum or the Net WAC Rate, if less.

With respect to the Class SB Certificates or the REMIC II Regular Interest SB-IO and any Distribution Date, a rate per annum equal to the percentage equivalent of a fraction, the numerator of which is the sum of the amounts calculated pursuant to clauses (i) through (iii) below, and the denominator of which is the aggregate principal balance of the REMIC I Regular Interests relating to the Mortgage Loans. For purposes of calculating the Pass-Through Rate for the Class SB Certificates, the numerator is equal to the sum of the following components:

(i) the Uncertificated REMIC I Pass-Through Rate for REMIC I Regular Interest LT1 minus the Marker Rate, applied to a notional amount equal to the Uncertificated Principal Balance of REMIC I Regular Interest LT1;

(ii) the Uncertificated REMIC I Pass-Through Rate for REMIC I Regular Interest LT2 minus the Marker Rate, applied to a notional amount equal to the Uncertificated Principal Balance of REMIC I Regular Interest LT2; and

(iii) the Uncertificated REMIC I Pass-Through Rate for REMIC I Regular Interest LT4 minus twice the Marker Rate, applied to a notional amount equal to the Uncertificated Principal Balance of REMIC I Regular Interest LT4.

Paying Agent: JPMorgan Chase Bank, N.A. or any successor Paying Agent appointed by the Trustee.

Percentage Interest: With respect to any Class A Certificate, the undivided percentage ownership interest in the related Class evidenced by such Certificate, which percentage ownership interest shall be equal to the Initial Certificate Principal Balance thereof divided by the aggregate Initial Certificate Principal Balance of all of the Certificates of the same Class. The Percentage Interest with respect to a Class SB or Class R Certificate shall be stated on the face thereof.

Permitted Investments: One or more of the following:

(i) obligations of or guaranteed as to principal and interest by the United States or any agency or instrumentality thereof when such obligations are backed by the full faith and credit of the United States;

(ii) repurchase agreements on obligations specified in clause (i) maturing not more than one month from the date of acquisition thereof, provided that the unsecured obligations of the party agreeing to repurchase such obligations are at the time rated by each Rating Agency in its highest short-term rating available;

(iii) federal funds, certificates of deposit, demand deposits, time deposits and bankers' acceptances (which shall each have an original maturity of not more than 90 days and, in the case of bankers' acceptances, shall in no event have an original maturity of more than 365 days or a remaining maturity of more than 30 days) denominated in United States dollars of any U.S. depository institution or trust company incorporated under the laws of the United States or any state thereof or of any domestic branch of a foreign depository institution or trust company; provided that the debt obligations of such depository institution or trust company at the date of acquisition thereof have been rated by each Rating Agency in its highest short-term rating available; and, provided further that, if the original maturity of such short-term obligations of a domestic branch of a foreign depository institution or trust company shall exceed 30 days, the short-term rating of such institution shall be A-1+ in the case of Standard & Poor's if Standard & Poor's is a Rating Agency;

(iv) commercial paper and demand notes (having original maturities of not more than 365 days) of any corporation incorporated under the laws of the United States or any state thereof which on the date of acquisition has been rated by each Rating Agency in its highest short-term rating available; provided that such commercial paper and demand notes shall have a remaining maturity of not more than 30 days;

(v) a money market fund or a qualified investment fund rated by each Rating Agency in its highest long-term rating available (which may be managed by the Trustee or one of its Affiliates); and

(vi) other obligations or securities that are acceptable to each Rating Agency and the Credit Enhancer as a Permitted Investment hereunder and will not reduce the rating assigned to any Class of Certificates by such Rating Agency below the then-current rating assigned to such Certificates by such Rating Agency, as evidenced in writing;

provided, however, that no instrument shall be a Permitted Investment if it represents, either (1) the right to receive only interest payments with respect to the underlying debt instrument or (2) the right to receive both principal and interest payments derived from obligations underlying such instrument and the principal and interest payments with respect to such instrument provide a yield to maturity greater than 120% of the yield to maturity at par of such underlying obligations. References herein to the highest rating available on unsecured long-term debt shall mean AAA in the case of Standard & Poor's and Aaa in the case of Moody's, and for purposes of this Agreement, any references herein to the highest rating available on unsecured commercial paper and short-term debt obligations shall mean the following: A-1 in the case of Standard & Poor's and P-1 in the case of Moody's; provided, however, that any Permitted Investment that is a short-term debt obligation rated A-1 by Standard & Poor's must satisfy the following additional conditions: (i) the total amount of debt from A-1 issuers must be limited to the investment of monthly principal and interest payments (assuming fully amortizing

collateral);  (ii) the total amount of A-1 Certificates must not represent more than 20% of the aggregate outstanding Certificate Principal Balance of the Certificates and each investment must not mature beyond 30 days; (iii) the terms of the debt must have a predetermined fixed dollar amount of principal due at maturity that cannot vary; and (iv) if the investments may be liquidated prior to their maturity or are being relied on to meet a certain yield, interest must be tied to a single interest rate index plus a single fixed spread (if any) and must move proportionately with that index. Any Permitted Investment may be purchased by or through the Trustee or its Affiliates.

Permitted Transferee: Any Transferee of a Class R Certificate, other than a Disqualified Organization or Non-United States Person.

Person: Any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

Policy: The financial guaranty insurance policy provided by the Credit Enhancer, dated as of January 27, 2006, with respect to the Class A Certificates.

Pool Principal Balance: As to any date of determination, the aggregate Principal Balances of the Mortgage Loans as of the last day of the Collection Period preceding the month of such date of determination.

Premium: As defined in the Insurance Agreement.

Prepayment Assumption: With respect to the Class A Certificates and Class SB Certificates, the prepayment assumption to be used for determining the accrual of original issue discount and premium and market discount on such Certificates for federal income tax purposes, which assumes a constant prepayment rate of 15% per annum of the then outstanding principal balance of the Mortgage Loans in the first month of the life of the Mortgage Loans, and an additional approximate 2.2727% per annum in each month thereafter until the twelfth month, and then beginning in the twelfth month and in each month thereafter until the twenty-fourth month, a constant prepayment rate of 40% per annum each month. Beginning in the twenty-fourth month, the prepayment assumption assumes a constant prepayment rate of 40% per annum of the then outstanding principal balance of the Mortgage Loans, decreasing approximately 0.4167% per annum in each month thereafter until the thirty-sixth month, and then beginning in the thirty-sixth month and in each month thereafter during the life of the Mortgage Loans, a constant prepayment rate of 35% per annum each month.

Prepayment Interest Shortfall: As to any Distribution Date and any Mortgage Loan (other than a Mortgage Loan relating to an REO Property) that was the subject of (a) a Principal Prepayment in Full during the related Collection Period, an amount equal to the excess of one month's interest at the Net Mortgage Rate on the unpaid principal balance of such Mortgage Loan as of the most recent Due Date over the amount of interest (adjusted to the Net Mortgage Rate) paid by the Mortgagor in such Collection Period to the date of such Principal Prepayment in Full or (b) a Curtailment during the prior calendar month, an amount equal to one month's interest at the Net Mortgage Rate on the amount of such Curtailment.

Principal Balance: As to any Outstanding Mortgage Loan, the unpaid principal balance as of the Cut-off Date, minus all collections credited against the principal balance of the Mortgage Loan in accordance with the related Mortgage Note prior to that date, and as to any Liquidated Mortgage Loan, $0.00.

Principal Collection Distribution Amount. With respect to any Distribution Date, the lesser of (a) the excess of (i) the Available Distribution Amount (other than amounts payable under the Policy) over (ii) the Interest Distribution Amount and (b) the sum of:

> (i) the principal portion of each Monthly Payment received with respect to the related Collection Period on each Outstanding Mortgage Loan;

> (ii) the Principal Balance of any Mortgage Loan repurchased during the related Collection Period (or deemed to have been so repurchased in accordance with Section 3.07(b)) pursuant to Section 2.02, 2.03, 2.05 or 4.07 and the amount of any shortfall deposited in the Custodial Account in connection with the substitution of a Deleted Mortgage Loan pursuant to Section 2.03 or 2.05 during the related Collection Period;

> (iii) the principal portion of all other unscheduled collections on the Mortgage Loans (including, without limitation,

Principal Prepayments, Curtailments, Insurance Proceeds, Liquidation Proceeds and REO Proceeds) received during the related Collection Period (or deemed to have been so received) to the extent not distributed on the preceding Distribution Date; and

    (iv) the Realized Loss Distribution Amount;

provided however, on any Distribution Date on which the Overcollateralization Amount that would result without application of this proviso exceeds the Required Overcollateralization Amount, the Principal Collection Distribution Amount shall be reduced by the amount of such excess to an amount not less than zero.

Principal Prepayment: Any payment of principal or other recovery on a Mortgage Loan, including a recovery that takes the form of Liquidation Proceeds or Insurance Proceeds, which is received in advance of its scheduled Due Date and is not accompanied by an amount as to interest representing scheduled interest on such payment due on any date or dates in any month or months subsequent to the month of prepayment.

Principal Prepayment in Full: Any Principal Prepayment made by a Mortgagor of the entire principal balance of a Mortgage Loan.

Principal Remittance Amount. With respect to any Distribution Date, the sum of the amounts described in clauses (b)(i), (ii) and (iii) of the definition of Principal Collection Distribution Amount for that Distribution Date.

Program Guide: Together, Residential Funding Corporation's Seller Guide and Servicing Guide, as in effect from time to time.

Purchase Price: With respect to any Mortgage Loan (or REO Property) required to be or otherwise purchased on any date pursuant to Section 2.02, 2.03 or 4.07, an amount equal to the sum of (i) 100% of the Principal Balance thereof and (ii) unpaid accrued interest at the Adjusted Mortgage Rate (or at the Net Mortgage Rate plus the Credit Enhancer Premium Rate in the case of a purchase made by the Master Servicer) on the Principal Balance thereof to the first day of the month following the month of purchase from the Due Date to which interest was last paid by the Mortgagor.

Qualified Substitute Mortgage Loan: A Mortgage Loan substituted by Residential Funding or the Company for a Deleted Mortgage Loan which must, on the date of such substitution, as confirmed in an Officers' Certificate delivered to the Trustee, (i) have an outstanding principal balance, after deduction of the principal portion of the monthly payment received in the month of substitution (or in the case of a substitution of more than one Mortgage Loan for a Deleted Mortgage Loan, an aggregate outstanding principal balance, after such deduction), not in excess of the principal balance of the Deleted Mortgage Loan as of the last day of the related Collection Period (the amount of any shortfall to be deposited by Residential Funding in the Custodial Account in the month of substitution); (ii) have a Mortgage Rate and a Net Mortgage Rate no lower than and not more than 1% per annum higher than the Mortgage Rate and Net Mortgage Rate, respectively, of the Deleted Mortgage Loan as of the date of substitution; (iii) have a Combined Loan-to-Value Ratio at the time of substitution no higher than that of the Deleted Mortgage Loan at the time of substitution; (iv) have a remaining term to stated maturity not greater than (and not more than one year less than) that of the Deleted Mortgage Loan; and (v) comply with each representation and warranty set forth in Sections 2.03 and 2.04 hereof and Section 4 of the Assignment Agreement (other than the representations and warranties set forth therein with respect to the number of loans (including the related percentage) in excess of zero which meet or do not meet specified criteria).

Rating Agency: Each of Moody's and Standard & Poor's. If any agency or a successor is no longer in existence, "Rating Agency" shall be such statistical credit rating agency, or other comparable Person, designated by the Company, notice of which designation shall be given to the Trustee and the Master Servicer.

Realized Loss: With respect to each Mortgage Loan (or REO Property) as to which a Cash Liquidation or REO Disposition has occurred, an amount (not less than zero) equal to (i) the principal balance of the Mortgage Loan (or REO Property) as of the date of Cash Liquidation or REO Disposition plus accrued and unpaid interest thereon, minus (ii) the proceeds, if any, received during the month in which such Cash Liquidation (or REO Disposition) occurred, to the extent applied as recoveries to principal of the Mortgage Loan, net of the portion thereof reimbursable to the Master Servicer or any Subservicer with respect to related expenses as to which the Master Servicer or Subservicer is entitled to reimbursement thereunder but which have not been previously reimbursed. With respect to each Mortgage Loan which has become the subject of a Deficient Valuation, the difference between the principal balance of the

Mortgage Loan outstanding immediately prior to such Deficient Valuation and the principal balance of the Mortgage Loan as reduced by the Deficient Valuation. With respect to each Mortgage Loan which has become the object of a Debt Service Reduction, the amount of such Debt Service Reduction. Notwithstanding the above, neither a Deficient Valuation nor a Debt Service Reduction shall be deemed a Realized Loss hereunder so long as the Master Servicer has notified the Trustee in writing that the Master Servicer is diligently pursuing any remedies that may exist in connection with the representations and warranties made regarding the related Mortgage Loan and the related Mortgage Loan is not in default with regard to payments due thereunder.

Realized Loss Distribution Amount: With respect to any Distribution Date, an amount equal to the lesser of (x) Excess Interest plus any draw on the Policy in respect of Realized Losses on the Mortgage Loans and (y) (A) 100% of the principal portion of the Realized Losses incurred with respect to the Mortgage Loans during the related Collection Period, plus (B) any Realized Losses remaining undistributed from any preceding Distribution Date; provided that any Realized Losses described in clause (B) will not be required to be paid to the extent that the applicable Realized Loss was paid on the Class A Certificates by Excess Interest, or a draw on the Policy, or was reflected in the reduction of the Overcollateralization Amount.

Record Date: With respect to each Distribution Date and any Certificates, other than the Class A-1 Certificates, the close of business on the last Business Day of the month next preceding the month in which the related Distribution Date occurs. With respect to the Class A-1 Certificates and any Distribution Date, the close of business on the day prior to that Distribution Date.

Reference Bank Rate: As defined in Section 1.02.

Regular Certificates: The Class A Certificates and Class SB Certificates.

Regular Interest: Any one of the REMIC regular interests in the Trust Fund.

Regulation AB: Subpart 229.1100 - Asset Backed Securities (Regulation AB), 17 C.F.R.

ss.ss.229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531 (January 7, 2005)) or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

Relief Act Shortfalls: With respect to any Distribution Date, for any Mortgage Loan as to which there has been a reduction in the amount of interest collectible thereon for the related Collection Period as a result of the application of the Servicemembers Civil Relief Act or any other similar federal or state law, the shortfall, if any, equal to (i) one month's interest on the Principal Balance of such Mortgage Loan at the applicable Mortgage Rate, without application of such Act, over (ii) the interest collectible on such Mortgage Loan during such Collection Period.

REMIC: A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code. As used herein, the term "REMIC" shall mean REMIC I or REMIC II.

REMIC Administrator: Residential Funding Corporation. If Residential Funding Corporation is found by a court of competent jurisdiction to no longer be able to fulfill its obligations as REMIC Administrator under this Agreement the Master Servicer or Trustee acting as Master Servicer shall appoint a successor REMIC Administrator, subject to assumption of the REMIC Administrator obligations under this Agreement.

REMIC I: The segregated pool of assets, with respect to which a REMIC election is to be made, consisting of:

(i)    the Mortgage Loans and the related Mortgage Files;

(ii)    all payments and collections in respect of the Mortgage Loans received on or after the Cut-off Date as shall be on deposit in the Custodial Account or in the Certificate Account and identified as belonging to the Trust Fund;

(iii)    property which secured a Mortgage Loan and which has been acquired for the benefit of the Certificateholders by foreclosure or deed in lieu of foreclosure;

(iv)   any insurance policies relating to the Mortgage Loans; and

(v)   all proceeds of clauses (i) through (iv) above.

REMIC I Principal Reduction Amounts: For any Distribution Date, the amounts by which the principal balances of the REMIC I Regular Interests LT1, LT2, LT3 and LT4 respectively will be reduced on such Distribution Date by the allocation of Realized Losses and the distribution of principal, determined as follows:

For purposes of the succeeding formulas the following symbols shall have the meanings set forth below:

$Y_1$   = the principal balance of the REMIC I Regular Interest LT1 after distributions on the prior Distribution Date.

$Y_2$   = the principal balance of the REMIC I Regular Interest LT2 after distributions on the prior Distribution Date.

$Y_3$   = the principal balance of the REMIC I Regular Interest LT3 after distributions on the prior Distribution Date.

$Y_4$   = the principal balance of the REMIC I Regular Interest LT4 after distributions on the prior Distribution Date (note: $Y_3 = Y_4$).

$(DELTA)Y_1$ = the REMIC I Regular Interest LT1 Principal Reduction Amount.

$(DELTA)Y_2$ = the REMIC I Regular Interest LT2 Principal Reduction Amount.

$(DELTA)Y_3$ = the REMIC I Regular Interest LT3 Principal Reduction Amount.

$(DELTA)Y_4$ = the REMIC I Regular Interest LT4 Principal Reduction Amount.

$P_0$   = the aggregate principal balance of the REMIC I Regular Interest LT1, REMIC I Regular Interest LT2, REMIC I Regular Interest LT3, and REMIC I Regular Interest LT4 after distributions and the allocation of Realized Losses on the prior Distribution Date.

$P_1$   = the aggregate principal balance of the REMIC I Regular Interest LT1, REMIC I Regular Interest LT2, REMIC I Regular Interest LT3 and REMIC I Regular Interest LT4 after distributions and the allocation of Realized Losses to be made on such Distribution Date.

$(DELTA)P = P_0 - P_1$ = the aggregate of the REMIC I Regular Interest LT1, REMIC I Regular Interest LT2, REMIC I Regular Interest LT3 and REMIC I Regular Interest LT4 Principal Reduction Amounts.

       =the aggregate of the principal portions of Realized Losses to be allocated to, and the principal distributions to be made on, the Certificates on such Distribution Date (including distributions of accrued and unpaid interest on the Class SB Certificates for prior Distribution Dates).

$R_0$   = the Net WAC Rate (stated as a monthly rate) after giving effect to amounts distributed and Realized Losses allocated on the prior Distribution Date.

$R_1$   = the Net WAC Rate (stated as a monthly rate) after giving effect to amounts to be distributed and Realized Losses to be allocated on such Distribution Date.

$(alpha) = (Y_2 + Y_3)/P_0$. The initial value of $(alpha)$ on the Closing Date for use on the first Distribution Date shall be 0.0001.

$(gamma)_0$ = the lesser of (A) the sum for all Classes of Certificates other than the Class SB Certificates of (x) the product for each Class of (i) the monthly interest rate for such Class applicable for distributions to be made on such Distribution Date, as limited by the Net WAC Rate if applicable, and (ii) the aggregate Certificate Principal Balance for such Class after distributions and the allocation of Realized Losses on the prior Distribution Date and (y) any Net WAC Cap Shortfall for such class remaining unpaid after the distributions and the allocation of Realized Losses on the prior Distribution Date and (B) $R_0 * P_0$.

$(gamma)_1$ = the lesser of (A) the sum for all Classes of Certificates other than the Class SB Certificates of (x) the product for each Class of (i) the monthly interest rate for such Class applicable for distributions to be made on the next succeeding Distribution Date, as limited by the Net WAC Rate if applicable, and (ii) the

aggregate Certificate Principal Balance for such Class after distributions and the allocation of Realized Losses to be made on such Distribution Date and (y) any Net WAC Cap Shortfall for such Class remaining unpaid after the distributions and the allocations on such Distribution Date and (B) R1*P1.

Then, based on the foregoing definitions:

$(\Delta)Y1 = (\Delta)P - (\Delta)Y2 - (\Delta)Y3 - (\Delta)Y4;$

$(\Delta)Y2 = (a/2)\{( (\gamma)0R1 - (\gamma)1R0)/R0R1\};$

$(\Delta)Y3 = (\alpha)(\Delta)P - (\Delta)Y2;$ and

$(\Delta)Y4 = (\Delta)Y3.$

if both $(\Delta)Y2$ and $(\Delta)Y3$, as so determined, are non-negative numbers. Otherwise:

(1) If $(\Delta)Y2$, as so determined, is negative, then

$(\Delta)Y2 = 0;$

$(\Delta)Y3 = \{2(\alpha)(\Delta)PY2R1R0 - (\alpha)(2)P0(\alpha)(2)P0)\}/\{2(\alpha)Y2R1R0 - (\alpha)((\gamma)0R1 - (\gamma)1R0)\};$

$(\Delta)Y4 = (\Delta)Y3;$ and

$(\Delta)Y1 = (\Delta)P - (\Delta)Y2 - (\Delta)Y3 - (\Delta)Y4.$

(2) If $(\Delta)Y3$, as so determined, is negative, then

$(\Delta)Y3 = 0;$

$(\Delta)Y2 = \{(\alpha)(2)P0((\gamma)0R1 - (\gamma)1R0) - 2(\alpha)(\Delta)PY2R1R0/\{2(\alpha)Y2R1R0 - 2(\alpha)(\Delta)PR1R1R0 + (\alpha)((\gamma)0R1 - (\gamma)1R0)\};$

$(\Delta)Y4 = (\Delta)Y3;$ and

$(\Delta)Y1 = (\Delta)P - (\Delta)Y2 - (\Delta)Y3 - (\Delta)Y4.$

REMIC I Realized Losses: For any Distribution Date, Realized Losses on the Mortgage Loans for the related Due Period shall be allocated, as follows: The Interest Realized Losses, if any, shall be allocated pro rata to accrued interest on the REMIC I Regular Interest to the extent of such accrued interest. Any remaining Interest Realized Losses and any Principal Realized Losses shall be treated as Principal Realized Losses and allocated (i) to the REMIC I Regular Interest LT2, REMIC I Regular Interest LT3 and REMIC I Regular Interest LT4 REMIC I Regular Interests pro rata according to their respective Principal Reduction Amounts, provided that such allocation to each of the REMIC I Regular Interest LT2, REMIC I Regular Interest LT3 and REMIC I Regular Interest LT4 shall not exceed their respective Principal Reduction Amounts for such Distribution Date, and (ii) any Realized Losses not allocated to either the REMIC I Regular Interest LT2, REMIC I Regular Interest LT3, or REMIC I Regular Interest LT4 pursuant to the proviso of clause (i) shall be allocated to the REMIC I Regular Interest LT1.

REMIC I Regular Interest LT1: A regular interest in REMIC I that is held as an asset of REMIC II, that has an initial principal balance equal to the related Uncertificated Principal Balance, that bears interest at the related Uncertificated REMIC I Pass-Through Rate, and that has such other terms as are described herein.

REMIC I Regular Interest LT1 Principal Distribution Amount: For any Distribution Date, the excess, if any, of the REMIC I Regular Interest LT1 Principal Reduction Amount for such Distribution Date over the Realized Losses allocated to the REMIC I Regular Interest LT1 on such Distribution Date.

REMIC I Regular Interest LT2: A regular interest in REMIC I that is held as an asset of REMIC II, that has an initial principal balance equal to the related Uncertificated Principal Balance, that bears interest at the related Uncertificated REMIC I Pass-Through Rate, and that has such other terms as are described herein.

REMIC I Regular Interest LT2 Principal Distribution Amount: For any Distribution Date, the excess, if any, of the REMIC I Regular Interest LT2 Principal Reduction Amount for such Distribution Date over the Realized Losses allocated to the REMIC I Regular Interest LT2 on such Distribution Date.

REMIC I Regular Interest LT3: A regular interest in REMIC I that is held

as an asset of REMIC II, that has an initial principal balance equal to the related Uncertificated Principal Balance, that bears interest at the related Uncertificated REMIC I Pass-Through Rate, and that has such other terms as are described herein.

REMIC I Regular Interest LT3 Principal Distribution Amount: For any Distribution Date, the excess, if any, of the REMIC I Regular Interest LT3 Principal Reduction Amount for such Distribution Date over the Realized Losses allocated to the REMIC I Regular Interest LT3 on such Distribution Date.

REMIC I Regular Interest LT4: A regular interest in REMIC I that is held as an asset of REMIC II, that has an initial principal balance equal to the related Uncertificated Principal Balance, that bears interest at the related Uncertificated REMIC I Pass-Through Rate, and that has such other terms as are described herein.

REMIC I Regular Interest LT4 Principal Distribution Amount: For any Distribution Date, the excess, if any, of the REMIC I Regular Interest LT4 Principal Reduction Amount for such Distribution Date over the Realized Losses allocated to the REMIC I Regular Interest LT4 on such Distribution Date.

REMIC I Regular Interests: REMIC I Regular Interests LT1, LT2, LT3 and LT4.

REMIC II: The segregated pool of assets subject hereto, constituting a portion of the primary trust created hereby and to be administered hereunder, with respect to which a separate REMIC election is to be made, consisting of the REMIC I Regular Interests.

REMIC II Regular Interest SB-PO: A separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest SB-PO shall have no entitlement to interest, and shall be entitled to distributions of principal subject to the terms and conditions hereof, in aggregate amount equal to the initial Certificate Principal Balance of the Class SB Certificates as set forth in the Preliminary Statement hereto.

REMIC II Regular Interest SB-IO: A separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a Regular Interest in REMIC II. REMIC II Regular Interest SB-IO shall have no entitlement to principal, and shall be entitled to distributions of interest subject to the terms and conditions hereof, in aggregate amount equal to the interest distributable with respect to the Class SB Certificates pursuant to the terms and conditions hereof.

REMIC II Regular Interests: REMIC II Regular Interests SB-IO and SB-PO, together with the Class A-1, Class A-2, Class A-3, Class A-4 and Class A-5 Certificates.

REMIC Provisions: Provisions of the federal income tax law relating to real estate mortgage investment conduits, which appear at Sections 860A through 860G of Subchapter M of Chapter 1 of the Code, and related provisions, and temporary and final regulations (or, to the extent not inconsistent with such temporary or final regulations, proposed regulations) and published rulings, notices and announcements promulgated thereunder, as the foregoing may be in effect from time to time.

REO Acquisition: The acquisition by the Master Servicer on behalf of the Trustee for the benefit of the Certificateholders of any REO Property pursuant to Section 3.13.

REO Disposition: With respect to any REO Property, a determination by the Master Servicer that it has received substantially all Insurance Proceeds, Liquidation Proceeds, REO Proceeds and other payments and recoveries (including proceeds of a final sale) which the Master Servicer expects to be finally recoverable from the sale or other disposition of the REO Property.

REO Imputed Interest: With respect to any REO Property, for any period, an amount equivalent to interest (at a rate equal to the Net Mortgage Rate that would have been applicable to the related Mortgage Loan had it been outstanding) on the unpaid principal balance of the Mortgage Loan as of the date of acquisition thereof for such period.

REO Proceeds: Proceeds, net of expenses, received in respect of any REO Property (including, without limitation, proceeds from the rental of the related Mortgaged Property) which proceeds are required to be deposited into the Custodial Account only upon the related REO Disposition.

REO Property: A Mortgaged Property acquired by the Master Servicer on behalf of the Trust Fund for the benefit of the Certificateholders and the Credit Enhancer through foreclosure or deed in lieu of foreclosure in connection

with a defaulted Mortgage Loan.

Request for Release: A request for release, the form of which is attached as Exhibit E hereto or an electronic request in a form acceptable to the Custodian.

Required Insurance Policy: With respect to any Mortgage Loan, any insurance policy which is required to be maintained from time to time under this Agreement, the Program Guide or the related Subservicing Agreement in respect of such Mortgage Loan.

Required Overcollateralization Amount: With respect to any Distribution Date prior to the Stepdown Date, an amount equal to 3.15% of the aggregate Principal Balance of the Mortgage Loans as of the Cut-off Date. With respect to any Distribution Date on or after the Stepdown Date, the lesser of (a) the initial Required Overcollateralization Amount and (b) the greater of (x) 6.30% of the aggregate Principal Balance of the Mortgage Loans after applying payments received in the related Collection Period and (y) the Overcollateralization Floor; provided that, if a Trigger Event has occurred and is continuing on such Distribution Date, the Required Overcollateralization Amount will equal the Required Overcollateralization Amount for the immediately preceding Distribution Date. The Required Overcollateralization Amount may be reduced at any time without Certificateholder consent, with the prior written consent of the Credit Enhancer so long as written confirmation is obtained from each Rating Agency that the reduction will not reduce the rating assigned to any Class of Certificates by that rating agency below the lower of the then-current rating or the rating assigned to those Certificates as of the Closing Date by that Rating Agency without taking into account the Policy.

Residential Funding: Residential Funding Corporation, a Delaware corporation, in its capacity as seller of the Mortgage Loans to the Company and any successor thereto.

Responsible Officer: When used with respect to the Trustee, any officer of the Corporate Trust Department of the Trustee, including any Senior Vice President, any Vice President, any Assistant Vice President, any Assistant Secretary, any Trust Officer or Assistant Trust Officer with particular responsibility for this transaction, or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers to whom, with respect to a particular matter, such matter is referred.

Rolling Three Month Delinquency Percentage: With respect to any Distribution Date and the Mortgage Loans, the arithmetic average of the Delinquency Percentages determined for such Distribution Date and for each of the two preceding Distribution Dates.

Rule 144A: Rule 144A under the Securities Act of 1933, as in effect from time to time.

Securitization Transaction: Any transaction involving a sale or other transfer of mortgage loans directly or indirectly to an issuing entity in connection with an issuance of publicly offered or privately placed, rated or unrated mortgage-backed securities.

Seller: With respect to any Mortgage Loan, a Person, including any Subservicer, that executed a Seller's Agreement applicable to such Mortgage Loan.

Seller's Agreement: An agreement for the origination and sale of Mortgage Loans generally in the form of the seller contract referred to or contained in the Program Guide, or in such other form as has been approved by the Master Servicer and the Company.

Servicing Accounts: The account or accounts created and maintained pursuant to Section 3.08.

Servicing Advances: All customary, reasonable and necessary "out of pocket" costs and expenses incurred in connection with a default, delinquency or other unanticipated event by the Master Servicer or a Subservicer in the performance of its servicing obligations, including, but not limited to, the cost of (i) the preservation, restoration and protection of a Mortgaged Property, (ii) any enforcement or judicial proceedings, including foreclosures, including any expenses incurred in relation to any such proceedings that result from the Mortgage Loan being registered on the MERS(R) System, (iii) the management and liquidation of any REO Property and (iv) compliance with the obligations under Sections 3.01, 3.08, 3.11(a) and 3.13, including, if the Master Servicer or any Affiliate of the Master Servicer provides services such as appraisals and brokerage services that are customarily provided by Persons other than servicers of mortgage loans, reasonable compensation for such services.

Servicing Criteria:  The "servicing criteria" set forth in Item 1122(d) of Regulation AB, as such may be amended from time to time.

Servicing Fee: With respect to any Mortgage Loan and Distribution Date, the fee payable monthly to the Master Servicer in respect of master servicing compensation that accrues at an annual rate of 0.08%.

Servicing Modification: Any reduction of the interest rate on or the outstanding principal balance of a Mortgage Loan that is in default, or for which, in the judgment of the Master Servicer, default is reasonably foreseeable, pursuant to a modification of such Mortgage Loan in accordance with Section 3.07(a).

Servicing Officer: Any officer of the Master Servicer involved in, or responsible for, the administration and servicing of the Mortgage Loans whose name and specimen signature appear on a list of servicing officers furnished to the Trustee by the Master Servicer, as such list may from time to time be amended.

Servicing Trigger: As of any Distribution Date, for purposes of Section 7.05 hereof, the occurrence of any of the following scenarios:

(a) the Sixty-Plus Delinquency Percentage is greater than 27.00% for the then-current Distribution Date; or

(b) on or after the Distribution Date in July 2008, the aggregate amount of Realized Losses on the Mortgage Loans as a percentage of the Cut-Off Date Balance exceeds the applicable amount set forth below:

July 2008 to December 2008:  2.00% with respect to July 2008, plus an additional 1/6th of 1.50% for each month thereafter.

January 2009 to December 2009:  3.50% with respect to January 2009, plus an additional 1/12th of 2.00% for each month thereafter.

January 2010 to December 2010:  5.50% with respect to January 2010, plus an additional 1/12th of 1.25% for each month thereafter.

January 2010 to December 2011:  6.75% with respect to January 2010, plus an additional 1/12th of 0.75% for each month thereafter.

January 2011 and thereafter:                 7.50%.

Sixty-Plus Delinquency Percentage: With respect to any Distribution Date and the Mortgage Loans, the arithmetic average, for each of the three Distribution Dates ending with such Distribution Date, of the fraction, expressed as a percentage, equal to (x) the aggregate Principal Balance of the Mortgage Loans that are 60 or more days delinquent in payment of principal and interest for that Distribution Date, including Mortgage Loans in foreclosure and REO, over (y) the aggregate Principal Balance of all of the Mortgage Loans immediately preceding that Distribution Date.

Standard & Poor's: Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or its successor in interest.

Startup Date:  The day designated as such pursuant to Article X hereof.

Stated Value: For any Mortgage Loan, the value of the related Mortgaged Property as stated by the related Mortgagor in his or her loan application.

Step-Up Date: The second Distribution Date on which the principal balance (after giving effect to distributions to be made on such Distribution Date) of the Mortgage Loans is less than 10% of the Cut-off Date Principal Balance.

Stepdown Date: The later to occur of (x) the Distribution Date in August 2008 and (y) the first Distribution Date on which the aggregate Principal Balance of the Mortgage Loans after applying payments received in the related Collection Period is less than 50% of the aggregate Principal Balance of the Mortgage Loans as of the Cut-off Date.

Subserviced Mortgage Loan: Any Mortgage Loan that, at the time of reference thereto, is subject to a Subservicing Agreement.

Subservicer: Any Person with whom the Master Servicer has entered into a Subservicing Agreement and who generally satisfied the requirements set forth in the Program Guide in respect of the qualification of a Subservicer as of the date of its approval as a Subservicer by the Master Servicer.

Subservicing Account: An account established by a Subservicer in

accordance with Section 3.08.

Subservicing Agreement: The written contract between the Master Servicer and any Subservicer relating to servicing and administration of certain Mortgage Loans as provided in Section 3.02, generally in the form of the servicer contract referred to or contained in the Program Guide or in such other form as has been approved by the Master Servicer and the Company.

Subservicing Fee: As to any Mortgage Loan, the fee payable monthly to the related Subservicer (or, in the case of a Nonsubserviced Mortgage Loan, to the Master Servicer) in respect of subservicing and other compensation that accrues with respect to each Distribution Date at an annual rate of 0.50%.

Tax Returns: The federal income tax return on Internal Revenue Service Form 1066, U.S. Real Estate Mortgage Investment Conduit Income Tax Return, including Schedule Q thereto, Quarterly Notice to Residual Interest Holders of REMIC Taxable Income or Net Loss Allocation, or any successor forms, to be filed on behalf of REMIC I and REMIC II due to their classification as REMICs under the REMIC Provisions, together with any and all other information, reports or returns that may be required to be furnished to the Certificateholders or filed with the Internal Revenue Service or any other governmental taxing authority under any applicable provisions of federal, state or local tax laws.

Telerate Screen Page 3750: As defined in Section 1.02.

Transfer: Any direct or indirect transfer, sale, pledge, hypothecation or other form of assignment of any Ownership Interest in a Certificate.

Transfer Affidavit and Agreement: As defined in Section 5.02(g).

Transferee: Any Person who is acquiring by Transfer any Ownership Interest in a Certificate.

Transferor: Any Person who is disposing by Transfer of any Ownership Interest in a Certificate.

Trigger Event: A Trigger Event is in effect with respect to any Distribution Date on or after the Stepdown Date if any of the following conditions are met:

(i) if the Distribution Date is occurring on or after the Distribution Date in August 2008 and before the Distribution Date in February 2009, the aggregate amount of Realized Losses on the Mortgage Loans since the Cut-off Date exceeds 1.25% plus 1/6th of 0.60% of the aggregate Principal Balance of the Mortgage Loans as of the Cut-off Date;

(ii) if the Distribution Date is occurring on or after the Distribution Date in February 2009 and before the Distribution Date in February 2010, the aggregate amount of Realized Losses on the Mortgage Loans since the Cut-off Date exceeds 1.85% plus 1/12th of 0.40% of the aggregate Principal Balance of the Mortgage Loans as of the Cut-off Date;

(iii) if the Distribution Date is occurring on or after the Distribution Date in February 2010 and before the Distribution Date in February 2011, the aggregate amount of Realized Losses on the Mortgage Loans since the Cut-off Date exceeds 2.25% plus 1/12th of 0.25% of the aggregate Principal Balance of the Mortgage Loans as of the Cut-off Date;

(iv) if the Distribution Date is occurring on or after the Distribution Date in February 2011 and before the Distribution Date in February 2012, the aggregate amount of Realized Losses on the Mortgage Loans since the Cut-off Date exceeds 2.50% plus 1/12th of 0.25% of the aggregate Principal Balance of the Mortgage Loans as of the Cut-off Date;

(v) if the Distribution Date is occurring on or after the Distribution Date in February 2012, the aggregate amount of Realized Losses on the Mortgage Loans since the Cut-off Date exceeds 2.75% of the aggregate Principal Balance of the Mortgage Loans as of the Cut-off Date; or

(vi) if on any Distribution Date on or after the Stepdown Date, the Rolling Three Month Delinquency Percentage is equal to or in excess of 3.25%.

Trust Fund: Collectively, the assets of REMIC I and REMIC II and the Policy.

Uncertificated Accrued Interest: With respect to any Uncertificated Regular Interest for any Distribution Date, one month's interest at the related Uncertificated REMIC I Pass-Through Rate for such Distribution Date, accrued on the Uncertificated Principal Balance or Uncertificated Notional Amount, as applicable, immediately prior to such Distribution Date. Uncertificated Accrued Interest for the Uncertificated Regular Interests shall accrue on the basis of a

360-day year consisting of twelve 30-day months. For purposes of calculating the amount of Uncertificated Accrued Interest for the REMIC I Regular Interests for any Distribution Date, any Prepayment Interest Shortfalls relating to the Mortgage Loans for any Distribution Date shall be allocated among REMIC I Regular Interests LT1, LT2, LT3 and LT4, pro rata based on, and to the extent of, Uncertificated Accrued Interest, as calculated without application of this sentence. Uncertificated Interest on REMIC II Regular Interest SB-PO shall be zero. Uncertificated Interest on the REMIC II Regular Interest SB-IO for each Distribution Date shall equal Accrued Certificate Interest for the Class SB Certificates.

Uncertificated Notional Amount: With respect to REMIC II Regular Interest SB-IO, the Notional Amount for such Class.

Uncertificated Principal Balance: The principal amount of any Uncertificated Regular Interest outstanding as of any date of determination. The Uncertificated Principal Balance of each REMIC Regular Interest shall never be less than zero. With respect to the REMIC II Regular Interest SB-PO the initial amount set forth with respect thereto in the Preliminary Statement as reduced by distributions deemed made in respect thereof pursuant to Section 4.02 and Realized Losses allocated thereto pursuant to Section 4.05.

Uncertificated REMIC I Pass-Through Rate: With respect to REMIC I Regular Interest LT1 and REMIC I Regular Interest LT2, and any Distribution Date, a per annum rate equal to the Net WAC Rate; with respect to REMIC I Regular Interest LT3 and any Distribution Date, 0.00%; and with respect to REMIC I Regular Interest LT4 and any Distribution Date, a per annum rate equal to twice the Net WAC Rate.

Uncertificated Regular Interests: The REMIC I Regular Interests.

Uniform Single Attestation Program for Mortgage Bankers: The Uniform Single Attestation Program for Mortgage Bankers, as published by the Mortgage Bankers Association of America and effective with respect to fiscal periods ending on or after December 15, 1995.

Uninsured Cause: Any cause of damage to property subject to a Mortgage such that the complete restoration of such property is not fully reimbursable by the hazard insurance policies.

United States Person: A citizen or resident of the United States, a corporation, partnership or other entity (treated as a corporation or partnership for United States federal income tax purposes) created or organized in, or under the laws of, the United States, any state thereof, or the District of Columbia (except in the case of a partnership, to the extent provided in Treasury regulations), provided that, for purposes solely of the restrictions on the transfer of Class R Certificates, no partnership or other entity treated as a partnership for United States federal income tax purposes shall be treated as a United States Person unless all persons that own an interest in such partnership either directly or through any entity that is not a corporation for United States federal income tax purposes are required by the applicable operative agreement to be United States Persons, or an estate that is described in Section 7701(a)(30)(D) of the Code, or a trust that is described in Section 7701(a)(30)(E) of the Code.

Voting Rights: The portion of the voting rights of all of the Certificates which is allocated to any Certificate. 98.00% of all of the Voting Rights shall be allocated among Holders of the Class A Certificates, in proportion to their then outstanding Certificate Principal Balances of their respective Certificates; 1.0% of all of the Voting Rights shall be allocated among the Holders of the Class SB Certificates; and 0.5% and 0.5% of all Voting Rights will be allocated among holders of the Class R-I Certificates and the Class R-II Certificates, respectively, in proportion to the Percentage Interests evidenced by their respective Certificates provided, that as long as there is no Credit Enhancer Default, the Voting Rights of the Class A Certificateholders may be exercised by the Credit Enhancer without the consent of such Holders and may only be exercised by such Holders with the prior written consent of the Credit Enhancer.

Weighted Average Net Mortgage Rate: For any Distribution Date, the weighted average of the Net Mortgage Rates of the Mortgage Loans as of the first day of the month preceding the month in which such Distribution Date occurs.

Section 1.02  Determination of LIBOR.

LIBOR applicable to the calculation of the Pass-Through Rates on the Class A-1 Certificates, if any, for any Interest Accrual Period (including the initial Interest Accrual Period) will be determined as described below:

On each LIBOR Rate Adjustment Date, LIBOR shall be established by the Trustee and, as to any Interest Accrual Period, will equal the rate for one month United States dollar deposits that appears on the Telerate Screen Page

3750 of the Moneyline Telerate Capital Markets as of 11:00 a.m., London time, on the second LIBOR Business Day prior to the first day of such Interest Accrual Period ("LIBOR Rate Adjustment Date"). "Telerate Screen Page 3750" means the display designated as page 3750 on the Telerate Service (or such other page as may replace page 3750 on that service for the purpose of displaying London interbank offered rates of major banks). If such rate does not appear on such page (or such other page as may replace that page on that service, or if such service is no longer offered, LIBOR shall be so established by use of such other service for displaying LIBOR or comparable rates as may be selected by the Trustee after consultation with the Master Servicer), the rate will be the Reference Bank Rate. The "Reference Bank Rate" will be determined on the basis of the rates at which deposits in U.S. Dollars are offered by the reference banks (which shall be any three major banks that are engaged in transactions in the London interbank market, selected by the Trustee after consultation with the Master Servicer) as of 11:00 a.m., London time, on the LIBOR Rate Adjustment Date to prime banks in the London interbank market for a period of one month in amounts approximately equal to the Certificate Principal Balance of the Class A-1 Certificates then outstanding. The Trustee will request the principal London office of each of the reference banks to provide a quotation of its rate. If at least two such quotations are provided, the rate will be the arithmetic mean of the quotations rounded up to the next multiple of 1/16%. If on such date fewer than two quotations are provided as requested, the rate will be the arithmetic mean of the rates quoted by one or more major banks in New York City, selected by the Trustee after consultation with the Master Servicer, as of 11:00 a.m., New York City time, on such date for loans in U.S. Dollars to leading European banks for a period of one month in amounts approximately equal to, with respect to the Class A-1 Certificates, the Certificate Principal Balance of the Class A-1 Certificates then outstanding. If no such quotations can be obtained, the rate will be LIBOR for the prior Distribution Date, provided however, if, under the priorities described above, LIBOR for a Distribution Date would be based on LIBOR for the previous Distribution Date for the third consecutive Distribution Date, the Trustee shall select an alternative comparable index (over which the Trustee has no control), used for determining one-month Eurodollar lending rates that is calculated and published (or otherwise made available) by an independent party. "LIBOR Business Day" means any day other than (i) a Saturday or a Sunday or (ii) a day on which banking institutions in the city of London, England are required or authorized by law to be closed.

The establishment of LIBOR by the Trustee on any LIBOR Rate Adjustment Date and the Trustee's subsequent calculation of the Pass-Through Rates applicable to the Class A-1 Certificates for the relevant Interest Accrual Period, in the absence of manifest error, will be final and binding.

Promptly following each LIBOR Rate Adjustment Date the Trustee shall supply the Master Servicer with the results of its determination of LIBOR on such date. Furthermore, the Trustee will supply to any Certificateholder so requesting by calling the Bondholder Inquiry Line at (800) 275-2048 the Pass-Through Rates on the Class A-1 Certificates for the current and the immediately preceding Interest Accrual Period.

ARTICLE II

CONVEYANCE OF MORTGAGE LOANS;
ORIGINAL ISSUANCE OF CERTIFICATES

Section 2.01  Conveyance of Mortgage Loans.

(a) The Company, concurrently with the execution and delivery hereof, does hereby assign to the Trustee without recourse all the right, title and interest of the Company in and to the Mortgage Loans, including all interest and principal received on or with respect to the Mortgage Loans on or after the Cut-off Date.

(b) In connection with such assignment and contemporaneously with the delivery of this Agreement, and except as set forth in Section 2.01(c) below, the Company does hereby deliver to, and deposit with, the Trustee, or to and with one or more Custodians, as the duly appointed agent or agents of the Trustee for such purpose, the following documents or instruments (or copies thereof as permitted by this Section) with respect to each Mortgage Loan so assigned:

(i) The original Mortgage Note, endorsed without recourse to the order of the Trustee and showing an unbroken chain of endorsements from the originator thereof to the Person endorsing it to the Trustee, or with respect to any Destroyed Mortgage Note, an original lost note affidavit from the related Seller or Residential Funding stating that the original Mortgage Note was lost, misplaced or destroyed, together with a copy of the related Mortgage Note;

(ii) The original Mortgage, noting the presence of the MIN of the Mortgage Loan and language indicating that the Mortgage Loan is a MOM

Loan if the Mortgage Loan is a Mortgage with evidence of recording indicated thereon or a copy of the Mortgage with evidence of recording indicated thereon;

   (iii)  Unless the Mortgage Loan is registered on the MERS(R) System, an original Assignment of the Mortgage to the Trustee with evidence of recording indicated thereon or a copy of such assignment with evidence of recording indicated thereon;

   (iv)  The original recorded assignment or assignments of the Mortgage showing an unbroken chain of title from the originator to the Person assigning it to the Trustee (or to MERS, if the Mortgage Loan is registered on the MERS(R) System and noting the presence of a MIN) with evidence of recordation noted thereon or attached thereto, or a copy of such assignment or assignments of the Mortgage with evidence of recording indicated thereon; and

   (v)  The original of each modification, assumption agreement or preferred loan agreement, if any, relating to such Mortgage Loan or a copy of each modification, assumption agreement or preferred loan agreement.

   (c) The Company may, in lieu of delivering the original of the documents set forth in Section 2.01(b)(ii), (iii), (iv) and (v) (or copies thereof as permitted by Section 2.01(b)) to the Trustee or the Custodian or Custodians, deliver such documents to the Master Servicer, and the Master Servicer shall hold such documents in trust for the use and benefit of all present and future Certificateholders until such time as is set forth in the next sentence. Within thirty Business Days following the earlier of (i) the receipt of the original of each of the documents or instruments set forth in Section 2.01(b)(ii), (iii), (iv) and (v) (or copies thereof as permitted by such Section) for any Mortgage Loan and (ii) a written request by the Trustee to deliver those documents with respect to any or all of the Mortgage Loans then being held by the Master Servicer, the Master Servicer shall deliver a complete set of such documents to the Trustee or the Custodian or Custodians that are the duly appointed agent or agents of the Trustee.

   (d) Notwithstanding the provisions of Section 2.01(c), in the event that in connection with any Mortgage Loan the Company cannot deliver the original of the Mortgage, any assignment, modification, assumption agreement or preferred loan agreement (or copy thereof as permitted by Section 2.01(b)) with evidence of recording thereon concurrently with the execution and delivery of this Agreement because of (i) a delay caused by the public recording office where such Mortgage, assignment, modification, assumption agreement or preferred loan agreement as the case may be, has been delivered for recordation, or (ii) a delay in the receipt of certain information necessary to prepare the related assignments, the Company shall deliver or cause to be delivered to the Trustee or the respective Custodian a copy of such Mortgage, assignment, modification, assumption agreement or preferred loan agreement.

   The Company shall promptly cause to be recorded in the appropriate public office for real property records the Assignment referred to in clause (iii) of Section 2.01(b), except (a) in states where, in the Opinion of Counsel acceptable to the Credit Enhancer, the Trustee and the Master Servicer, such recording is not required to protect the Trustee's interests in the Mortgage Loan against the claim of any subsequent transferee or any successor to or creditor of the Company or the originator of such Mortgage Loan or (b) if MERS is identified on the Mortgage or on a properly recorded assignment of the Mortgage as the mortgagee of record solely as nominee for the Seller and its successors and assigns. If any Assignment is lost or returned unrecorded to the Company because of any defect therein, the Company shall prepare a substitute Assignment or cure such defect, as the case may be, and cause such Assignment to be recorded in accordance with this paragraph. The Company shall promptly deliver or cause to be delivered to the Trustee or the respective Custodian such Mortgage or Assignment (or copy thereof as permitted by Section 2.01(b)) with evidence of recording indicated thereon at the time specified in Section 2.01(c).

   If the Company delivers to the Trustee or Custodian any Mortgage Note or Assignment of Mortgage in blank, the Company shall, or shall cause the Custodian to, complete the endorsement of the Mortgage Note and the Assignment of Mortgage in the name of the Trustee in conjunction with the Interim Certification issued by the Custodian, as contemplated by Section 2.02.

   Any of the items set forth in Sections 2.01(b)(ii), (iii), (iv) and (v) and that may be delivered as a copy rather than the original may be delivered to the Trustee or the Custodian.

   In connection with the assignment of any Mortgage Loan registered on the MERS(R) System, the Company further agrees that it will cause, at the Company's own expense, within 30 Business Days after the Closing Date, the MERS(R) System

to indicate that such Mortgage Loans have been assigned by the Company to the Trustee in accordance with this Agreement for the benefit of the Certificateholders by including (or deleting, in the case of Mortgage Loans which are repurchased in accordance with this Agreement) in such computer files (a) the code in the field which identifies the specific Trustee and (b) the code in the field "Pool Field" which identifies the series of the Certificates issued in connection with such Mortgage Loans. The Company further agrees that it will not, and will not permit the Master Servicer to, and the Master Servicer agrees that it will not, alter the codes referenced in this paragraph with respect to any Mortgage Loan during the term of this Agreement unless and until such Mortgage Loan is repurchased in accordance with the terms of this Agreement.

(e) It is intended that the conveyances by the Company to the Trustee of the Mortgage Loans as provided for in this Section 2.01 and the Uncertificated REMIC I Regular Interests be construed as a sale by the Company to the Trustee of the Mortgage Loans and the Uncertificated REMIC I Regular Interests for the benefit of the Certificateholders. Further, it is not intended that any such conveyance be deemed to be a pledge of the Mortgage Loans and the Uncertificated REMIC I Regular Interests by the Company to the Trustee to secure a debt or other obligation of the Company. Nonetheless, (a) this Agreement is intended to be and hereby is a security agreement within the meaning of Articles 8 and 9 of the New York Uniform Commercial Code and the Uniform Commercial Code of any other applicable jurisdiction; (b) the conveyances provided for in this Section 2.01 shall be deemed to be (1) a grant by the Company to the Trustee of a security interest in all of the Company's right (including the power to convey title thereto), title and interest, whether now owned or hereafter acquired, in and to (A) the Mortgage Loans, including the related Mortgage Note, the Mortgage, any insurance policies and all other documents in the related Mortgage File, (B) all amounts payable pursuant to the Mortgage Loans in accordance with the terms thereof, (C) the Uncertificated REMIC I Regular Interests any and all general intangibles, payment intangibles, accounts, chattel paper, instruments, documents, money, deposit accounts, certificates of deposit, goods, letters of credit, advices of credit and investment property and other property of whatever kind or description now existing or hereafter acquired consisting of, arising from or relating to any of the foregoing, and (D) all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, including without limitation all amounts from time to time held or invested in the Certificate Account or the Custodial Account, whether in the form of cash, instruments, securities or other property and (2) an assignment by the Company to the Trustee of any security interest in any and all of Residential Funding's right (including the power to convey title thereto), title and interest, whether now owned or hereafter acquired, in and to the property described in the foregoing clauses (1)(A), (B), (C) and (D) granted by Residential Funding to the Company pursuant to the Assignment Agreement; (c) the possession by the Trustee, the Custodian or any other agent of the Trustee of Mortgage Notes or such other items of property as constitute instruments, money, payment intangibles, negotiable documents, goods, deposit accounts, letters of credit, advices of credit, investment property, certificated securities or chattel paper shall be deemed to be "possession by the secured party," or possession by a purchaser or a person designated by such secured party, for purposes of perfecting the security interest pursuant to the Minnesota Uniform Commercial Code and the Uniform Commercial Code of any other applicable jurisdiction as in effect (including, without limitation, Sections 8-106, 9-313 and 9-106 thereof); and (d) notifications to persons holding such property, and acknowledgments, receipts or confirmations from persons holding such property, shall be deemed notifications to, or acknowledgments, receipts or confirmations from, securities intermediaries, bailees or agents of, or persons holding for, (as applicable) the Trustee for the purpose of perfecting such security interest under applicable law.

The Company and, at the Company's direction, Residential Funding and the Trustee shall, to the extent consistent with this Agreement, take such reasonable actions as may be necessary to ensure that, if this Agreement were deemed to create a security interest in the Mortgage Loans and the Uncertificated REMIC I Regular Interests and the other property described above, such security interest would be deemed to be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of this Agreement. Without limiting the generality of the foregoing, the Company shall prepare and deliver to the Trustee not less than 15 days prior to any filing date and the Trustee shall forward for filing, or shall cause to be forwarded for filing, at the expense of the Company, all filings necessary to maintain the effectiveness of any original filings necessary under the Uniform Commercial Code as in effect in any jurisdiction to perfect the Trustee's security interest in or lien on the Mortgage Loans and the Uncertificated REMIC I Regular Interests, as evidenced by an Officer's Certificate of the Company, with a copy delivered to the Credit Enhancer, including without limitation (x) continuation statements, and (y) such other statements as may be occasioned by (1) any change of name of Residential Funding, the Company or the Trustee (such preparation and filing shall be at the expense of the Trustee, if occasioned by a change in the Trustee's name), (2) any change of location of the place of business or the chief executive office of Residential Funding or the Company,

(3) any transfer of any interest of Residential Funding or the Company in any Mortgage Loan or (4) any transfer of any interest of Residential Funding or the Company in any Uncertificated REMIC I Regular Interests.

Section 2.02  Acceptance by Trustee.

The Trustee acknowledges receipt (or, with respect to Mortgage Loans subject to a Custodial Agreement, and based solely upon a receipt or certification executed by the Custodian, receipt by the respective Custodian as the duly appointed agent of the Trustee) of the documents referred to in Section 2.01(b)(i) above (except that for purposes of such acknowledgement only, a Mortgage Note may be endorsed in blank) and declares that it, or a Custodian as its agent, holds and will hold such documents and the other documents constituting a part of the Mortgage Files delivered to it, or a Custodian as its agent, in trust for the use and benefit of all present and future Certificateholders and the Credit Enhancer. The Trustee or Custodian (such Custodian being so obligated under a Custodial Agreement) agrees, for the benefit of Certificateholders and the Credit Enhancer, to review each Mortgage File delivered to it pursuant to Section 2.01(b) within 45 days after the Closing Date to ascertain that all required documents (specifically as set forth in Section 2.01(b)), have been executed and received, and that such documents relate to the Mortgage Loans identified on the Mortgage Loan Schedule, as supplemented, that have been conveyed to it, and to deliver to the Trustee a certificate (the "Interim Certification") to the effect that all documents required to be delivered pursuant to Section 2.01(b) above have been executed and received and that such documents relate to the Mortgage Loans identified on the Mortgage Loan Schedule, except for any exceptions listed on Schedule A attached to such Interim Certification. Upon delivery of the Mortgage Files by the Company or the Master Servicer, the Trustee shall acknowledge receipt (or, with respect to Mortgage Loans subject to a Custodial Agreement, and based solely upon a receipt or certification executed by the Custodian, receipt by the respective Custodian as the duly appointed agent of the Trustee) of the documents referred to in Section 2.01(c) above.

If the Custodian, as the Trustee's agent, finds any document or documents constituting a part of a Mortgage File to be missing or defective, upon receipt of notification from the Custodian as specified in the succeeding sentence, the Trustee shall promptly so notify or cause the Custodian to so notify the Master Servicer, Residential Funding, and the Company. Pursuant to Section 2.3 of the Custodial Agreement, the Custodian will notify the Master Servicer, the Company and the Trustee of any such omission or defect found by it in respect of any Mortgage File held by it in respect of the items received by it pursuant to the Custodial Agreement. If such omission or defect materially and adversely affects the interests in the related Mortgage Loan of the Certificateholders or the Credit Enhancer, the Master Servicer shall promptly notify Residential Funding of such omission or defect and request that Residential Funding correct or cure such omission or defect within 60 days from the date the Master Servicer was notified of such omission or defect and, if Residential Funding does not correct or cure such omission or defect within such period, that Residential Funding purchase such Mortgage Loan from the Trust Fund at its Purchase Price, in either case within 90 days from the date the Master Servicer was notified of such omission or defect; provided that if the omission or defect would cause the Mortgage Loan to be other than a "qualified mortgage" as defined in Section 860G(a)(3) of the Code, any such cure or repurchase must occur within 90 days from the date such breach was discovered. The Purchase Price for any such Mortgage Loan shall be deposited or caused to be deposited by the Master Servicer in the Custodial Account maintained by it pursuant to Section 3.07 and, upon receipt by the Trustee of written notification of such deposit signed by a Servicing Officer, the Trustee or any Custodian, as the case may be, shall release to Residential Funding the related Mortgage File and the Trustee shall execute and deliver such instruments of transfer or assignment prepared by the Master Servicer, in each case without recourse, as shall be necessary to vest in Residential Funding or its designee, as the case may be, any Mortgage Loan released pursuant hereto and thereafter such Mortgage Loan shall not be part of the Trust Fund. In furtherance of the foregoing and Section 2.05, if Residential Funding at the time that it repurchases the Mortgage Loan is not a member of MERS and the Mortgage is registered on the MERS(R) System, the Master Servicer, at its own expense and without any right of reimbursement, shall cause MERS to execute and deliver an assignment of the Mortgage in recordable form to transfer the Mortgage from MERS to Residential Funding and shall cause such Mortgage to be removed from registration on the MERS(R) System in accordance with MERS' rules and regulations. It is understood and agreed that the obligation of Residential Funding to so cure or purchase any Mortgage Loan as to which a material and adverse defect in or omission of a constituent document exists shall constitute the sole remedy respecting such defect or omission available to Certificateholders or the Trustee on behalf of Certificateholders (except for the Credit Enhancer's rights under the Insurance Agreement)..

Section 2.03  Representations, Warranties and Covenants of the Master Servicer and the Company.

(a) The Master Servicer hereby represents and warrants to the Trustee for the benefit of the Certificateholders and the Credit Enhancer that:

(i) The Master Servicer is a corporation duly organized, validly existing and in good standing under the laws governing its creation and existence and is or will be in compliance with the laws of each state in which any Mortgaged Property is located to the extent necessary to ensure the enforceability of each Mortgage Loan in accordance with the terms of this Agreement;

(ii) The execution and delivery of this Agreement by the Master Servicer and its performance and compliance with the terms of this Agreement will not violate the Master Servicer's Certificate of Incorporation or Bylaws or constitute a material default (or an event which, with notice or lapse of time, or both, would constitute a material default) under, or result in the material breach of, any material contract, agreement or other instrument to which the Master Servicer is a party or which may be applicable to the Master Servicer or any of its assets;

(iii) This Agreement, assuming due authorization, execution and delivery by the Trustee and the Company, constitutes a valid, legal and binding obligation of the Master Servicer, enforceable against it in accordance with the terms hereof subject to applicable bankruptcy, insolvency, reorganization, moratorium and other laws affecting the enforcement of creditors' rights generally and to general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law;

(iv) The Master Servicer is not in default with respect to any order or decree of any court or any order, regulation or demand of any federal, state, municipal or governmental agency, which default might have consequences that would materially and adversely affect the condition (financial or other) or operations of the Master Servicer or its properties or might have consequences that would materially adversely affect its performance hereunder;

(v) No litigation is pending or, to the best of the Master Servicer's knowledge, threatened against the Master Servicer which would prohibit its entering into this Agreement or performing its obligations under this Agreement;

(vi) The Master Servicer will comply in all material respects in the performance of this Agreement with all reasonable rules and requirements of each insurer under each Required Insurance Policy;

(vii) No information, certificate of an officer, statement furnished in writing or report delivered to the Company, any Affiliate of the Company or the Trustee by the Master Servicer will, to the knowledge of the Master Servicer, contain any untrue statement of a material fact or omit a material fact necessary to make the information, certificate, statement or report not misleading;

(viii) The Master Servicer has examined each existing, and will examine each new, Subservicing Agreement and is or will be familiar with the terms thereof. The terms of each existing Subservicing Agreement and each designated Subservicer are acceptable to the Master Servicer and any new Subservicing Agreements will comply with the provisions of Section 3.02;

(ix) The Master Servicer is a member of MERS in good standing, and will comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS; and

(x) The Servicing Guide of the Master Servicer requires that the Subservicer for each Mortgage Loan accurately and fully reports its borrower credit files to each of the Credit Repositories in a timely manner.

It is understood and agreed that the representations and warranties set forth in this Section 2.03(a) shall survive delivery of the respective Mortgage Files to the Trustee or any Custodian.

Upon discovery by either the Company, the Master Servicer, the Credit Enhancer, the Trustee or any Custodian of a breach of any representation or warranty set forth in this Section 2.03(a) which materially and adversely affects the interests of the Certificateholders or the Credit Enhancer in any Mortgage Loan, the party discovering such breach shall give prompt written notice to such other parties (any Custodian being so obligated under a Custodial

Agreement).  Within 90 days of its  discovery or its receipt of notice of such breach, the Master Servicer shall either (i) cure such breach in all material respects or (ii) to the extent  that such breach is with  respect to a Mortgage Loan or a related  document, purchase  such Mortgage Loan from the Trust Fund at the Purchase Price and in the  manner set forth in Section 2.02; provided that if the omission  or defect  would cause  the  Mortgage  Loan to be other  than a "qualified mortgage" as defined in Section 860G(a)(3) of the Code, any such cure or repurchase must occur  within 90 days from the date  such breach was discovered.  The obligation of the Master  Servicer to cure such breach or to so purchase  such Mortgage  Loan shall  constitute  the sole remedy in respect of a breach of a  representation  and warranty set forth in this  Section  2.03(a) available  to  the  Certificateholders  or  the  Trustee  on behalf of the Certificateholders  (except for the Credit  Enhancer's rights under Section 3.03 of the Insurance Agreement).

(b) The Company  hereby  represents  and warrants to the Trustee for the benefit of the Certificateholders and the Credit Enhancer that as of the Closing Date (or,  if otherwise  specified below, as of the date so specified):  (i) immediately  prior to the conveyance  of the Mortgage  Loans to the Trustee, the Company  had good title to, and was the sole owner of, each  Mortgage  Loan free and clear of any pledge,  lien,  encumbrance  or security  interest  (other than rights to  servicing  and related  compensation)  and such  conveyance  validly transfers  ownership of the Mortgage  Loans to the Trustee free and clear of any pledge,  lien,  encumbrance  or security  interest;  and (ii) each Mortgage Loan constitutes a qualified  mortgage  under Section  860G(a)(3)(A)  of the Code and Treasury Regulations Section 1.860G-2(a)(1).

It is  understood  and agreed  that the  representations  and warranties  set forth in this  Section  2.03(b)  shall  survive  delivery of the respective Mortgage Files to the Trustee or any Custodian.

Upon discovery by any of the Company,  the Master  Servicer,  the Credit Enhancer,  the Trustee or any Custodian of a breach of any of the representations and warranties  set forth in this Section 2.03(b) which  materially and adversely affects the interests of the  Certificateholders  or the Credit  Enhancer in any Mortgage  Loan, the party discovering  such breach  shall give prompt  written notice to the other  parties and the Credit  Enhancer  (any  Custodian  being so obligated under a Custodial Agreement);  provided, however, that in the event of a breach of the  representation  and warranty set forth in Section  2.03(b)(ii), the party  discovering  such breach  shall give such notice  within five days of discovery.  Within 90 days of its  discovery or its receipt of notice of breach, the Company  shall either (i) cure such breach in material  respects or (ii) purchase such Mortgage Loan from the Trust Fund at the Purchase Price and in the manner set forth in  Section  2.02;  provided  that the Company  shall have the option to  substitute  a Qualified  Substitute  Mortgage  Loan or Loans for such Mortgage Loan if such substitution occurs within two years following the Closing Date;  provided  that if the omission or defect would cause the Mortgage Loan to be other  than a  "qualified  mortgage" as defined in Section  860G(a)(3)  of the Code, any such cure,  repurchase or substitution  must occur within 90 days from the date such breach was discovered.  Any such substitution shall be effected by the Company under the same terms and  conditions as provided in Section 2.04 for substitutions  by Residential  Funding.  It is  understood  and agreed  that the obligation  of the Company to cure such breach or to so purchase or  substitute for any Mortgage  Loan as to which such a breach has occurred and is  continuing shall  constitute  the sole remedy  respecting  such breach  available  to the Certificateholders  (other than the Credit Enhancer) or the Trustee on behalf of the Certificateholders (other than the Credit Enhancer).

Section 2.04.  Representations and Warranties of Residential Funding.

The Company,  as assignee of  Residential  Funding under the  Assignment Agreement,  hereby  assigns  to  the  Trustee  for  the  benefit  of  the Certificateholders  and the Credit Enhancer all of its right, title and interest in respect of the Assignment  Agreement  applicable to a Mortgage Loan and as to the extent set forth in the  Assignment  Agreement.  Insofar as the  Assignment Agreement  relates to the  representations  and  warranties  made by Residential Funding in respect of such  Mortgage  Loan and any remedies  provided  thereunder for any breach of such  representations  and warranties,  such right,  title and interest may be enforced by the Master  Servicer on behalf of the  Trustee,  the Credit Enhancer and the  Certificateholders.  Upon the discovery by the Company, the Master  Servicer,  the Credit  Enhancer,  the Trustee or any  Custodian of a breach  of any of the  representations  and  warranties  made in the Assignment Agreement  in respect of any  Mortgage  Loan or of any  Repurchase  Event  which materially and adversely affects the interests of the  Certificateholders or the Credit  Enhancer in such Mortgage Loan, the party  discovering  such breach shall give prompt  written  notice to the other  parties and the Credit  Enhancer  (any Custodian being so obligated under a Custodial  Agreement).  The Master  Servicer shall promptly notify Residential Funding of such breach or Repurchase Event and request that Residential Funding either (i) cure such breach or Repurchase Event in all material  respects  within 90 days from the date the Master  Servicer was notified of such breach or Repurchase  Event or (ii)  purchase such Mortgage Loan

from the Trust Fund at the Purchase Price and in the manner set forth in Section
2.02; provided that Residential Funding shall have the option to substitute a
Qualified Substitute Mortgage Loan or Loans for such Mortgage Loan if such
substitution occurs within two years following the Closing Date; provided that
if the breach would cause the Mortgage Loan to be other than a "qualified
mortgage" as defined in Section 860G(a)(3) of the Code, any such cure or
substitution must occur within 90 days from the date the breach was discovered.
If the breach of representation and warranty that gave rise to the obligation to
repurchase or substitute a Mortgage Loan pursuant to Section 4 of the Assignment
Agreement was the representation and warranty set forth in clause (h) of Section
4 thereof, then the Master Servicer shall request that Residential Funding pay
to the Trust Fund, concurrently with and in addition to the remedies provided in
the preceding sentence, an amount equal to any liability, penalty or expense
that was actually incurred and paid out of or on behalf of the Trust Fund, and
that directly resulted from such breach, or if incurred and paid by the Trust
Fund thereafter, concurrently with such payment. In the event that Residential
Funding elects to substitute a Qualified Substitute Mortgage Loan or Loans for a
Deleted Mortgage Loan pursuant to this Section 2.04, Residential Funding shall
deliver to the Trustee for the benefit of the Certificateholders with respect to
such Qualified Substitute Mortgage Loan or Loans, the original Mortgage Note,
the Mortgage, an Assignment of the Mortgage in recordable form, and such other
documents and agreements as are required by Section 2.01, with the Mortgage Note
endorsed as required by Section 2.01. No substitution will be made in any
calendar month after the Determination Date for such month. Monthly Payments
received with respect to Qualified Substitute Mortgage Loans in the month of
substitution shall not be part of the Trust Fund and will be retained by the
Master Servicer and remitted by the Master Servicer to Residential Funding on
the next succeeding Distribution Date. For the month of substitution,
distributions to Certificateholders will include the Monthly Payment received on
a Deleted Mortgage Loan for such month and thereafter Residential Funding shall
be entitled to retain all amounts received in respect of such Deleted Mortgage
Loan. The Master Servicer shall amend or cause to be amended the Mortgage Loan
Schedule for the benefit of the Certificateholders to reflect the removal of
such Deleted Mortgage Loan and the substitution of the Qualified Substitute
Mortgage Loan or Loans and the Master Servicer shall deliver the amended
Mortgage Loan Schedule to the Trustee. Upon such substitution, the Qualified
Substitute Mortgage Loan or Loans shall be subject to the terms of this
Agreement and the related Subservicing Agreement in all respects, Residential
Funding shall be deemed to have made the representations and warranties with
respect to the Qualified Substitute Mortgage Loan (other than those of a
statistical nature) contained in the Assignment Agreement as of the date of
substitution, and the covenants, representations and warranties set forth in
Section 2.03(b).

In connection with the substitution of one or more Qualified Substitute
Mortgage Loans for one or more Deleted Mortgage Loans, the Master Servicer will
determine the amount (if any) by which the aggregate principal balance of all
such Qualified Substitute Mortgage Loans as of the date of substitution is less
than the aggregate principal balance of all such Deleted Mortgage Loans (in each
case after application of the principal portion of the Monthly Payments received
in the month of substitution that are to be distributed to Certificateholders in
the month of substitution). Residential Funding shall deposit the amount of such
shortfall into the Custodial Account on the day of substitution, without any
reimbursement therefor. Residential Funding shall give notice in writing to the
Trustee of such event, which notice shall be accompanied by an Officers'
Certificate as to the calculation of such shortfall and (subject to Section
10.01(f)) by an Opinion of Counsel to the effect that such substitution will not
cause (a) any federal tax to be imposed on the Trust Fund, including without
limitation, any federal tax imposed on "prohibited transactions" under Section
860F(a)(1) of the Code or on "contributions after the startup date" under
Section 860G(d)(1) of the Code or (b) any portion of REMIC I or REMIC II to fail
to qualify as a REMIC at any time that any Certificate is outstanding.

It is understood and agreed that the obligation of Residential Funding
to cure such breach or purchase or to substitute for such Mortgage Loan as to
which such a breach has occurred and is continuing and to make any additional
payments required under the Assignment Agreement in connection with a breach of
the representation and warranty in clause (h) of Section 4 thereof shall
constitute the sole remedy respecting such breach available to the
Certificateholders (other than the Credit Enhancer) or the Trustee on behalf of
the Certificateholders (other than the Credit Enhancer). If the Master Servicer
is Residential Funding, then the Trustee shall also have the right and, upon
written direction of the Credit Enhancer, the obligation, to give the
notification and require the purchase or substitution provided for in the second
preceding paragraph in the event of such a breach of a representation or
warranty made by Residential Funding in the Assignment Agreement. In connection
with the purchase of or substitution for any such Mortgage Loan by Residential
Funding, the Trustee shall assign to Residential Funding all of the Trustee's
right, title and interest in respect of the Assignment Agreement applicable to
such Mortgage Loan.

Section 2.05 Execution and Authentication of Certificates; Conveyance of Uncertificated REMIC Regular Interests.

(a) The Trustee acknowledges the assignment to it of the Mortgage Loans and the delivery of the Mortgage Files to it, or any Custodian on its behalf, subject to any exceptions noted, together with the assignment to it of all other assets included in the Trust Fund, receipt of which is hereby acknowledged. Concurrently with such delivery and in exchange therefor, the Trustee, pursuant to the written request of the Company executed by an officer of the Company has executed and caused to be authenticated and delivered to or upon the order of the Company the Certificates in authorized denominations which evidence ownership of the entire Trust Fund.

(b) The Company, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse all the right, title and interest of the Company in and to the REMIC I Regular Interests for the benefit of the holders of the Regular Certificates and the Class R-II Certificates. The Trustee acknowledges receipt of the REMIC I Regular Interests (each of which are uncertificated) and declares that it holds and will hold the same in trust for the exclusive use and benefit of the holders of the Regular Certificates and the Class R-II Certificates. The interests evidenced by the Class R-II Certificates, together with the Regular Certificates, constitute the entire beneficial ownership interest in REMIC II.

Section 2.06. Purposes and Powers of the Trust.

The purpose of the trust, as created hereunder, is to engage in the following activities:

(a) to sell the Certificates to the Company in exchange for the Mortgage Loans;

(b) to enter into and perform its obligations under this Agreement;

(c) to engage in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith; and

(d) subject to compliance with this Agreement, to engage in such other activities as may be required in connection with conservation of the Trust Fund and the making of distributions to the Certificateholders.

The trust is hereby authorized to engage in the foregoing activities. Notwithstanding the provisions of Section 11.01, the trust shall not engage in any activity other than in connection with the foregoing or other than as required or authorized by the terms of this Agreement while any Certificate is outstanding, and this Section 2.06 may not be amended, without the consent of the Certificateholders evidencing a majority of the aggregate Voting Rights of the Certificates.

Section 2.07. Agreement Regarding Ability to Disclose.

The Company, the Master Servicer and the Trustee hereby agree that, notwithstanding any other express or implied agreement to the contrary, any and all Persons, and any of their respective employees, representatives, and other agents may disclose, immediately upon commencement of discussions, to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to any of them relating to such tax treatment and tax structure. For purposes of this paragraph, the terms "tax," "tax treatment," "tax structure," and "tax benefit" are defined under treasury regulation ss. 1.6011-4(c).

ARTICLE III

ADMINISTRATION AND SERVICING
OF MORTGAGE LOANS

Section 3.01 The Master Servicer to Act as Servicer.

(a) The Master Servicer shall service and administer the Mortgage Loans in accordance with the terms of this Agreement and the respective Mortgage Loans, following such procedures as it would employ in its good faith business judgment and which are normal and usual in its general mortgage servicing activities, and shall have full power and authority, acting alone or through Subservicers as provided in Section 3.02, to do any and all things which it may deem necessary or desirable in connection with such servicing and administration. Without limiting the generality of the foregoing, the Master Servicer in its own name or in the name of a Subservicer is hereby authorized and empowered by the Trustee when the Master Servicer or the Subservicer, as the case may be, believes it appropriate in its best judgment, to execute and

deliver, on behalf of the Certificateholders, the Trustee or any of them, any and all instruments of satisfaction or cancellation, or of partial or full release or discharge, or of consent to assumption or modification in connection with a proposed conveyance, or of assignment of any Mortgage and Mortgage Note in connection with the repurchase of a Mortgage Loan and all other comparable instruments, or with respect to the modification or re-recording of a Mortgage for the purpose of correcting the Mortgage, the subordination of the lien of the Mortgage in favor of a public utility company or government agency or unit with powers of eminent domain, the taking of a deed in lieu of foreclosure, the commencement, prosecution or completion of judicial or non-judicial foreclosure, the conveyance of a Mortgaged Property to the related insurer, the acquisition of any property acquired by foreclosure or deed in lieu of foreclosure, or the management, marketing and conveyance of any property acquired by foreclosure or deed in lieu of foreclosure with respect to the Mortgage Loans and with respect to the Mortgaged Properties. The Master Servicer further is authorized and empowered by the Trustee, on behalf of the Certificateholders and the Trustee, in its own name or in the name of the Subservicer, when the Master Servicer or the Subservicer, as the case may be, believes it appropriate in its best judgment to register any Mortgage Loan on the MERS(R) System, or cause the removal from the registration of any Mortgage Loan on the MERS(R) System, to execute and deliver, on behalf of the Trustee and the Certificateholders or any of them, any and all instruments of assignment and other comparable instruments with respect to such assignment or re-recording of a Mortgage in the name of MERS, solely as nominee for the Trustee and its successors and assigns. Any expenses incurred in connection with the actions described in the preceding sentence shall be borne by the Master Servicer in accordance with Section 3.16(c), with no right of reimbursement; provided, that if, as a result of MERS discontinuing or becoming unable to continue operations in connection with the MERS(R) System, it becomes necessary to remove any Mortgage Loan from registration on the MERS(R) System and to arrange for the assignment of the related Mortgages to the Trustee, then any related expenses shall be reimbursable to the Master Servicer as set forth in Section 3.10(a)(ii). Notwithstanding the foregoing, subject to Section 3.07(a), the Master Servicer shall not permit any modification with respect to any Mortgage Loan that would both constitute a sale or exchange of such Mortgage Loan within the meaning of Section 1001 of the Code and any proposed, temporary or final regulations promulgated thereunder (other than in connection with a proposed conveyance or assumption of such Mortgage Loan that is treated as a Principal Prepayment in Full pursuant to Section 3.12(d) hereof) and cause any REMIC created hereunder) to fail to qualify as a REMIC under the Code. The Trustee shall furnish the Master Servicer with any powers of attorney and other documents necessary or appropriate to enable the Master Servicer to service and administer the Mortgage Loans. The Trustee shall not be liable for any action taken by the Master Servicer or any Subservicer pursuant to such powers of attorney or other documents. In servicing and administering any Nonsubserviced Mortgage Loan, the Master Servicer shall, to the extent not inconsistent with this Agreement, comply with the Program Guide as if it were the originator of such Mortgage Loan and had retained the servicing rights and obligations in respect thereof. In connection with servicing and administering the Mortgage Loans, the Master Servicer and any Affiliate of the Master Servicer (i) may perform services such as appraisals and brokerage services that are not customarily provided by servicers of mortgage loans, and shall be entitled to reasonable compensation therefor in accordance with Section 3.10 and (ii) may, at its own discretion and on behalf of the Trustee, obtain credit information in the form of a "credit score" from a credit repository.

If the Mortgage relating to a Mortgage Loan did not have a lien senior to the Mortgage Loan on the related Mortgaged Property as of the Cut-off Date, then the Master Servicer, in such capacity, may not consent to the placing of a lien senior to that of the Mortgage on the related Mortgaged Property. If the Mortgage relating to a Mortgage Loan had a lien senior to the Mortgage Loan on the related Mortgaged Property as of the Cut-off Date, then the Master Servicer, in such capacity, may consent to the refinancing of such prior senior lien, provided that the following requirements are met:

(i) (A) the Mortgagor's debt-to-income ratio resulting from such refinancing is less than the original debt-to-income ratio as set forth on the Mortgage Loan Schedule; provided, however, that in no instance shall the resulting Combined Loan-to-Value Ratio of such Mortgage Loan be higher than that permitted by the Program Guide; or (B) the resulting Combined Loan-to-Value Ratio of such Mortgage Loan is no higher than the Combined Loan-to-Value Ratio prior to such refinancing; provided, however, if such refinanced mortgage loan is a "rate and term" mortgage loan (meaning, the Mortgagor does not receive any cash from the refinancing), the Combined Loan-to-Value Ratio may increase to the extent of either (a) the reasonable closing costs of such refinancing or (b) any decrease in the value of the related Mortgaged Property, if the Mortgagor is in good standing as defined by the

(ii) the interest rate, or, in the case of an adjustable rate existing senior lien, the maximum interest rate, for the loan evidencing the refinanced senior lien is no more than 2.0% higher than the interest rate or the maximum interest rate, as the case may be, on the loan evidencing the existing senior lien immediately prior to the date of such refinancing; provided, however (a) if the loan evidencing the existing senior lien prior to the date of refinancing has an adjustable rate and the loan evidencing the refinanced senior lien has a fixed rate, then the current interest rate on the loan evidencing the refinanced senior lien may be up to 2.0% higher than the then-current loan rate of the loan evidencing the existing senior lien and (b) if the loan evidencing the existing senior lien prior to the date of refinancing has a fixed rate and the loan evidencing the refinanced senior lien has an adjustable rate, then the maximum interest rate on the loan evidencing the refinanced senior lien shall be less than or equal to (x) the interest rate on the loan evidencing the existing senior lien prior to the date of refinancing plus (y) 2.0%; and

(iii) the loan evidencing the refinanced senior lien is not subject to negative amortization.

(b) All costs incurred by the Master Servicer or by Subservicers in effecting the timely payment of taxes and assessments on the properties subject to the Mortgage Loans shall not, for the purpose of calculating monthly distributions to Certificateholders, be added to the amount owing under the related Mortgage Loans, notwithstanding that the terms of such Mortgage Loan so permit, and such costs shall be recoverable to the extent permitted by Section 3.10(a)(ii).

(c) The relationship of the Master Servicer (and of any successor to the Master Servicer) to the Company under this Agreement is intended by the parties to be that of an independent contractor and not that of a joint venturer, partner or agent.

(d) The Master Servicer shall comply with the terms of Section 9 of the Assignment Agreement.

Section    3.02 Subservicing Agreements Between Master Servicer and Subservicers; Enforcement of Subservicers' Obligations.

(a) The Master Servicer may continue in effect Subservicing Agreements entered into by Residential Funding and Subservicers prior to the execution and delivery of this Agreement, and may enter into new Subservicing Agreements with Subservicers, for the servicing and administration of all or some of the Mortgage Loans. Each Subservicer shall be either (i) an institution the accounts of which are insured by the FDIC or (ii) another entity that engages in the business of originating or servicing mortgage loans, and in either case shall be authorized to transact business in the state or states in which the related Mortgaged Properties it is to service are situated, if and to the extent required by applicable law to enable the Subservicer to perform its obligations hereunder and under the Subservicing Agreement, and in either case shall be a Freddie Mac, Fannie Mae or HUD approved mortgage servicer. Each Subservicer of a Mortgage Loan shall be entitled to receive and retain, as provided in the related Subservicing Agreement and in Section 3.07, the related Subservicing Fee from payments of interest received on such Mortgage Loan after payment of all amounts required to be remitted to the Master Servicer in respect of such Mortgage Loan. For any Mortgage Loan that is a Nonsubserviced Mortgage Loan, the Master Servicer shall be entitled to receive and retain an amount equal to the Subservicing Fee from payments of interest. Unless the context otherwise requires, references in this Agreement to actions taken or to be taken by the Master Servicer in servicing the Mortgage Loans include actions taken or to be taken by a Subservicer on behalf of the Master Servicer. Each Subservicing Agreement will be upon such terms and conditions as are generally required by, permitted by or consistent with the Program Guide and are not inconsistent with this Agreement and as the Master Servicer and the Subservicer have agreed. With the approval of the Master Servicer, a Subservicer may delegate its servicing obligations to third-party servicers, but such Subservicer will remain obligated under the related Subservicing Agreement. The Master Servicer and a Subservicer may enter into amendments thereto or a different form of Subservicing Agreement, and the form referred to or included in the Program Guide is merely provided for information and shall not be deemed to limit in any respect the discretion of the Master Servicer to modify or enter into different Subservicing Agreements; provided, however, that any such amendments or different forms shall be consistent with and not violate the provisions of either this Agreement or the Program Guide in a manner which would materially and adversely affect the

interests of the Certificateholders or the Credit Enhancer. The Program Guide and any other Subservicing Agreement entered into between the Master Servicer and any Subservicer shall require the Subservicer to accurately and fully report its borrower credit files to each of the Credit Repositories in a timely manner.

(b) As part of its servicing activities hereunder, the Master Servicer, for the benefit of the Trustee, the Certificateholders and the Credit Enhancer, shall use its best reasonable efforts to enforce the obligations of each Subservicer under the related Subservicing Agreement, to the extent that the non-performance of any such obligation would have a material and adverse effect on a Mortgage Loan. Such enforcement, including, without limitation, the legal prosecution of claims, termination of Subservicing Agreements as appropriate, and the pursuit of other appropriate remedies, shall be in such form and carried out to such an extent and at such time as the Master Servicer would employ in its good faith business judgment and which are normal and usual in its general mortgage servicing activities. The Master Servicer shall pay the costs of such enforcement at its own expense, and shall be reimbursed therefor only (i) from a general recovery resulting from such enforcement to the extent, if any, that such recovery exceeds all amounts due in respect of the related Mortgage Loan or (ii) from a specific recovery of costs, expenses or attorneys fees against the party against whom such enforcement is directed.

Section 3.03  Successor Subservicers.

The Master Servicer shall be entitled to terminate any Subservicing Agreement that may exist in accordance with the terms and conditions of such Subservicing Agreement and without any limitation by virtue of this Agreement; provided, however, that in the event of termination of any Subservicing Agreement by the Master Servicer or the Subservicer, the Master Servicer shall either act as servicer of the related Mortgage Loan or enter into a Subservicing Agreement with a successor Subservicer which will be bound by the terms of the related Subservicing Agreement. If the Master Servicer or any Affiliate of Residential Funding acts as servicer, it will not assume liability for the representations and warranties of the Subservicer which it replaces. If the Master Servicer enters into a Subservicing Agreement with a successor Subservicer, the Master Servicer shall use reasonable efforts to have the successor Subservicer assume liability for the representations and warranties made by the terminated Subservicer in respect of the related Mortgage Loans and, in the event of any such assumption by the successor Subservicer, the Master Servicer may, in the exercise of its business judgment, release the terminated Subservicer from liability for such representations and warranties.

Section 3.04  Liability of the Master Servicer.

Notwithstanding any Subservicing Agreement, any of the provisions of this Agreement relating to agreements or arrangements between the Master Servicer or a Subservicer or reference to actions taken through a Subservicer or otherwise, the Master Servicer shall remain obligated and liable to the Trustee, Certificateholders and the Credit Enhancer for the servicing and administering of the Mortgage Loans in accordance with the provisions of Section 3.01 without diminution of such obligation or liability by virtue of such Subservicing Agreements or arrangements or by virtue of indemnification from the Subservicer or the Company and to the same extent and under the same terms and conditions as if the Master Servicer alone were servicing and administering the Mortgage Loans. The Master Servicer shall be entitled to enter into any agreement with a Subservicer or Seller for indemnification of the Master Servicer and nothing contained in this Agreement shall be deemed to limit or modify such indemnification.

Section 3.05 No Contractual Relationship Between Subservicer and Trustee, Credit Enhancer or Certificateholders.

Any Subservicing Agreement that may be entered into and any other transactions or services relating to the Mortgage Loans involving a Subservicer in its capacity as such and not as an originator shall be deemed to be between the Subservicer and the Master Servicer alone and the Trustee, the Credit Enhancer and Certificateholders shall not be deemed parties thereto and shall have no claims, rights, obligations, duties or liabilities with respect to the Subservicer in its capacity as such except as set forth in Section 3.06.

Section 3.06  Assumption or Termination of Subservicing Agreements by Trustee.

(a) In the event the Master Servicer shall for any reason no longer be the master servicer (including by reason of an Event of Default), the Trustee, as successor Master Servicer, its designee or its successor shall thereupon assume all of the rights and obligations of the Master Servicer under each Subservicing Agreement that may have been entered into. The Trustee, its designee or the successor servicer for the Trustee shall be deemed to have assumed all of the Master Servicer's interest therein and to have replaced the Master Servicer as a party to the Subservicing Agreement to the same extent as

if the Subservicing Agreement had been assigned to the assuming party except that the Master Servicer shall not thereby be relieved of any liability or obligations under the Subservicing Agreement.

(b) The Master Servicer shall, upon request of the Trustee but at the expense of the Master Servicer, deliver to the assuming party all documents and records relating to each Subservicing Agreement and the Mortgage Loans then being serviced and an accounting of amounts collected and held by it and otherwise use its best efforts to effect the orderly and efficient transfer of each Subservicing Agreement to the assuming party.

(c) Unless a Credit Enhancer Default exists, the Master Servicer will, if it is authorized to do so under the relevant Subservicing Agreement, upon request of the Credit Enhancer at a time when the Credit Enhancer may remove the Master Servicer under the terms hereof, terminate any Subservicing Agreement.

Section 3.07 Collection of Certain Mortgage Loan Payments; Deposits to Custodial Account.

(a) The Master Servicer shall make reasonable efforts to collect all payments called for under the terms and provisions of the Mortgage Loans, and shall, to the extent such procedures shall be consistent with this Agreement, follow such collection procedures as it would employ in its good faith business judgment and which are normal and usual in its general mortgage servicing activities. Consistent with the foregoing, the Master Servicer may in its discretion (subject to the terms and conditions of the Assignment Agreement) (i) waive any late payment charge or any prepayment charge or penalty interest in connection with the prepayment of a Mortgage Loan and (ii) extend the Due Date for payments due on a Mortgage Loan in accordance with the Program Guide; provided, however, that the Master Servicer shall first determine that any such waiver or extension will not materially adversely affect the lien of the related Mortgage. Notwithstanding anything in this Section to the contrary, the Master Servicer or any Subservicer shall not enforce any prepayment charge to the extent that such enforcement would violate any applicable law. Consistent with the terms of this Agreement, the Master Servicer may also waive, modify or vary any term of any Mortgage Loan or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to any Mortgagor if in the Master Servicer's determination such waiver, modification, postponement or indulgence is not materially adverse to the interests of the Certificateholders or the Credit Enhancer (taking into account any estimated Realized Loss that might result absent such action), provided, however, that the Master Servicer may not modify materially or permit any Subservicer to modify any Mortgage Loan, including without limitation any modification that would change the Mortgage Rate, forgive the payment of any principal or interest (unless in connection with the liquidation of the related Mortgage Loan or except in connection with prepayments to the extent that such reamortization is not inconsistent with the terms of the Mortgage Loan), capitalize any amounts owing on the Mortgage Loan by adding such amount to the outstanding principal balance of the Mortgage Loan, or extend the final maturity date of such Mortgage Loan, unless such Mortgage Loan is in default or, in the judgment of the Master Servicer, such default is reasonably foreseeable. In connection with any Curtailment of a Mortgage Loan, the Master Servicer, to the extent not inconsistent with the terms of the Mortgage Note and local law and practice, may permit the Mortgage Loan to be re-amortized such that the Monthly Payment is recalculated as an amount that will fully amortize the remaining principal balance thereof by the original maturity date based on the original Mortgage Rate; provided, that such re-amortization shall not be permitted if it would constitute a reissuance of the Mortgage Loan for federal income tax purposes.

(b) The Master Servicer shall establish and maintain a Custodial Account in which the Master Servicer shall deposit or cause to be deposited on a daily basis, except as otherwise specifically provided herein, the following payments and collections remitted by Subservicers or received by it in respect of the Mortgage Loans on or after the Cut-off Date:

(i) All payments on account of principal, including Principal Prepayments made by Mortgagors on the Mortgage Loans or of any REO Proceeds received in connection with an REO Property for which an REO Disposition has occurred;

(ii) All payments on account of interest at the Adjusted Mortgage Rate on the Mortgage Loans, or of any REO Proceeds received in connection with an REO Property for which an REO Disposition has occurred;

(iii) Insurance Proceeds and Liquidation Proceeds (net of any related expenses of the Subservicer);

(iv) All proceeds of any Mortgage Loans purchased pursuant to Section 2.02, 2.03, 2.04 or 4.07 (including amounts received from Residential Funding pursuant to the last paragraph of Section 4 of the

Assignment Agreement in respect of any liability, penalty or expense that resulted from a breach of the representation and warranty set forth in clause (h) of Section 4 of the Assignment Agreement) and all amounts required to be deposited in connection with the substitution of a Qualified Substitute Mortgage Loan pursuant to Section 2.03 or 2.04; and

(v) Any amounts required to be deposited pursuant to Section 3.07(c) and any payments or collections received in the nature of prepayment charges.

The foregoing requirements for deposit in the Custodial Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments on the Mortgage Loans which are not part of the Trust Fund (consisting of payments in respect of principal and interest on the Mortgage Loans received prior to the Cut-off Date) and payments or collections consisting of late payment charges or assumption fees may but need not be deposited by the Master Servicer in the Custodial Account. In the event any amount not required to be deposited in the Custodial Account is so deposited, the Master Servicer may at any time withdraw such amount from the Custodial Account, any provision herein to the contrary notwithstanding. The Custodial Account may contain funds that belong to one or more trust funds created for mortgage pass-through certificates of other series and may contain other funds respecting payments on mortgage loans belonging to the Master Servicer or serviced or master serviced by it on behalf of others. Notwithstanding such commingling of funds, the Master Servicer shall keep records that accurately reflect the funds on deposit in the Custodial Account that have been identified by it as being attributable to the Mortgage Loans.

With respect to Insurance Proceeds, Liquidation Proceeds, REO Proceeds and the proceeds of the purchase of any Mortgage Loan pursuant to Sections 2.02, 2.03, 2.04 and 4.07 received in any calendar month, the Master Servicer may elect to treat such amounts as included in the Available Distribution Amount for the Distribution Date in the month of receipt, but is not obligated to do so. If the Master Servicer so elects, such amounts will be deemed to have been received (and any related Realized Loss shall be deemed to have occurred) on the last day of the month prior to the receipt thereof.

(c) The Master Servicer shall use its best efforts to cause the institution maintaining the Custodial Account to invest the funds in the Custodial Account attributable to the Mortgage Loans in Permitted Investments which shall mature not later than the Certificate Account Deposit Date next following the date of such investment (with the exception of the Amount Held for Future Distribution) and which shall not be sold or disposed of prior to their maturities. All income and gain realized from any such investment shall be for the benefit of the Master Servicer as additional servicing compensation and shall be subject to its withdrawal or order from time to time. The amount of any losses incurred in respect of any such investments attributable to the investment of amounts in respect of the Mortgage Loans shall be deposited in the Custodial Account by the Master Servicer out of its own funds immediately as realized without any right of reimbursement.

(d) The Master Servicer shall give notice to the Trustee and the Company of any change in the location of the Custodial Account and the location of the Certificate Account prior to the use thereof.

Section 3.08  Subservicing Accounts; Servicing Accounts.

(a) In those cases where a Subservicer is servicing a Mortgage Loan pursuant to a Subservicing Agreement, the Master Servicer shall cause the Subservicer, pursuant to the Subservicing Agreement, to establish and maintain one or more Subservicing Accounts which shall be an Eligible Account or, if such account is not an Eligible Account, shall generally satisfy the requirements of the Program Guide and be otherwise acceptable to the Master Servicer, the Credit Enhancer and each Rating Agency. The Subservicer will be required thereby to deposit into the Subservicing Account on a daily basis all proceeds of Mortgage Loans received by the Subservicer, less its Subservicing Fees and unreimbursed advances and expenses, to the extent permitted by the Subservicing Agreement. If the Subservicing Account is not an Eligible Account, the Master Servicer shall be deemed to have received such monies upon receipt thereof by the Subservicer. The Subservicer shall not be required to deposit in the Subservicing Account payments or collections in the nature of late charges or assumption fees, or payments or collections received in the nature of prepayment charges to the extent that the Subservicer is entitled to retain such amounts pursuant to the Subservicing Agreement. On or before the date specified in the Program Guide, but in no event later than the Determination Date, the Master Servicer shall cause the Subservicer, pursuant to the Subservicing Agreement, to remit to the Master Servicer for deposit in the Custodial Account all funds held in the Subservicing Account with respect to each Mortgage Loan serviced by such Subservicer that are required to be remitted to the Master Servicer.

(b) In addition to the Custodial Account and the Certificate Account,

the Master Servicer shall for any Nonsubserviced Mortgage Loan, and shall cause the Subservicers for Subserviced Mortgage Loans to, establish and maintain one or more Servicing Accounts and deposit and retain therein all collections from the Mortgagors for the payment of taxes, assessments, hazard insurance premiums, or comparable items for the account of the Mortgagors. Each Servicing Account shall satisfy the requirements for a Subservicing Account and, to the extent permitted by the Program Guide or as is otherwise acceptable to the Master Servicer, may also function as a Subservicing Account. Withdrawals of amounts related to the Mortgage Loans from the Servicing Accounts may be made only to effect timely payment of taxes, assessments, hazard insurance premiums, or comparable items, to reimburse the Master Servicer or Subservicer out of related collections for any payments made pursuant to Section 3.11(a) (with respect to hazard insurance), to refund to any Mortgagors any sums as may be determined to be overages, to pay interest, if required, to Mortgagors on balances in the Servicing Account or to clear and terminate the Servicing Account at the termination of this Agreement in accordance with Section 9.01 or in accordance with the Program Guide. As part of its servicing duties, the Master Servicer shall, and the Subservicers will, pursuant to the Subservicing Agreements, be required to pay to the Mortgagors interest on funds in this account to the extent required by law.

Section 3.09 Access to Certain Documentation and Information Regarding the Mortgage Loans.

In the event that compliance with this Section 3.09 shall make any Class of Certificates legal for investment by federally insured savings and loan associations, the Master Servicer shall provide, or cause the Subservicers to provide, to the Trustee, the Office of Thrift Supervision or the FDIC and the supervisory agents and examiners thereof access to the documentation regarding the Mortgage Loans required by applicable regulations of the Office of Thrift Supervision, such access being afforded without charge but only upon reasonable request and during normal business hours at the offices designated by the Master Servicer. The Master Servicer shall permit such representatives to photocopy any such documentation and shall provide equipment for that purpose at a charge reasonably approximating the cost of such photocopying to the Master Servicer.

Section 3.10 Permitted Withdrawals from the Custodial Account.

(a) The Master Servicer may, from time to time as provided herein, make withdrawals from the Custodial Account of amounts on deposit therein pursuant to Section 3.07 that are attributable to the Mortgage Loans for the following purposes:

(i) to make deposits into the Certificate Account in the amounts and in the manner provided for in Section 4.01;

(ii) to reimburse itself or the related Subservicer for previously unreimbursed advances or expenses made pursuant to Sections 3.01, 3.08, 3.11(a) and 3.13 or otherwise reimbursable pursuant to the terms of this Agreement, such withdrawal right being limited to amounts received on the related Mortgage Loans (including, for this purpose, REO Proceeds, Insurance Proceeds, Liquidation Proceeds and proceeds from the purchase of a Mortgage Loan pursuant to Section 2.02, 2.03 or 4.07) which represent recoveries of amounts in respect of which such advances were made in the case of Servicing Advances;

(iii) to pay to itself or the related Subservicer (if not previously retained by such Subservicer) out of each payment received by the Master Servicer on account of interest on a Mortgage Loan as contemplated by Sections 3.13 and 3.15, an amount equal to that remaining portion of any such payment as to interest (but not in excess of the Servicing Fee and the Subservicing Fee, if not previously retained) which, when deducted, will result in the remaining amount of such interest being interest at a rate per annum equal to the Net Mortgage Rate on the amount specified in the amortization schedule of the related Mortgage Loan as the principal balance thereof at the beginning of the period respecting which such interest was paid after giving effect to any previous Curtailments;

(iv) to pay to itself as additional servicing compensation any interest or investment income earned on funds and other property deposited in or credited to the Custodial Account that it is entitled to withdraw pursuant to Section 3.07(c);

(v) to pay to itself as additional servicing compensation any Foreclosure Profits;

(vi) to pay to itself, a Subservicer, Residential Funding, the Company or any other appropriate Person, as the case may be, with respect to each Mortgage Loan or property acquired in respect thereof that has been purchased or otherwise transferred pursuant to Sections

2.02, 2.03, 4.07 or 9.01, all amounts credited thereon and not required to be distributed to Certificateholders as of the date on which the related principal balance or Purchase Price is determined;

(vii) to reimburse itself or the Company for expenses incurred by and reimbursable to it or the Company pursuant to Sections 3.13(c), 6.03, 10.01 or otherwise, or in connection with enforcing any repurchase, substitution or indemnification obligation of any Seller (other than the Company or an Affiliate of the Company) pursuant to the related Seller's Agreement;

(viii) to reimburse itself for amounts expended by it (a) pursuant to Section 3.13 in good faith in connection with the restoration of property damaged by an Uninsured Cause, and (b) in connection with the liquidation of a Mortgage Loan or disposition of an REO Property to the extent not otherwise reimbursed pursuant to clause (ii) or (vii) above; and

(ix) to withdraw any amount deposited in the Custodial Account that was not required to be deposited therein pursuant to Section 3.07, including any payoff fees or penalties or any other additional amounts payable to the Master Servicer or Subservicer pursuant to the terms of the Mortgage Note.

(b) Since, in connection with withdrawals pursuant to clauses (ii), (iii), (v) and (vi), the Master Servicer's entitlement thereto is limited to collections or other recoveries on the related Mortgage Loan, the Master Servicer shall keep and maintain separate accounting, on a Mortgage Loan by Mortgage Loan basis, for the purpose of justifying any withdrawal from the Custodial Account pursuant to such clauses. Notwithstanding any other provision of this Agreement, the Master Servicer shall be entitled to reimburse itself for any previously unreimbursed expenses incurred pursuant to Section 3.10 or otherwise reimbursable pursuant to the terms of this Agreement that the Master Servicer determines to be otherwise nonrecoverable (except with respect to any Mortgage Loan as to which the Purchase Price has been paid), by withdrawal from the Custodial Account of amounts on deposit therein attributable to the Mortgage Loans on any Business Day prior to the Distribution Date succeeding the date of such determination.

Section 3.11 Maintenance of Fire Insurance and Omissions and Fidelity Coverage.

(a) The Master Servicer shall cause to be maintained for each Mortgage Loan fire insurance with extended coverage in an amount which is equal to the lesser of the combined principal balance owing on such Mortgage Loan and any mortgage loan senior to such Mortgage Loan from time to time or 100 percent of the insurable value of the improvements; provided, however, that such coverage may not be less than the minimum amount required to fully compensate for any loss or damage on a replacement cost basis. To the extent it may do so without breaching the related Subservicing Agreement, the Master Servicer shall replace any Subservicer that does not cause such insurance, to the extent it is available, to be maintained. The Master Servicer shall also cause to be maintained on property acquired upon foreclosure, or deed in lieu of foreclosure, of any Mortgage Loan, fire insurance with extended coverage in an amount which is at least equal to the amount necessary to avoid the application of any co-insurance clause contained in the related hazard insurance policy. Pursuant to Section 3.07, any amounts collected by the Master Servicer under any such policies (other than amounts to be applied to the restoration or repair of the related Mortgaged Property or property thus acquired or amounts released to the Mortgagor in accordance with the Master Servicer's normal servicing procedures) shall be deposited in the Custodial Account, subject to withdrawal pursuant to Section 3.10. Any cost incurred by the Master Servicer in maintaining any such insurance shall not, for the purpose of calculating monthly distributions to Certificateholders, be added to the amount owing under the Mortgage Loan, notwithstanding that the terms of the Mortgage Loan so permit. Such costs shall be recoverable by the Master Servicer out of related late payments by the Mortgagor or out of Insurance Proceeds and Liquidation Proceeds to the extent permitted by Section 3.10. It is understood and agreed that no earthquake or other additional insurance is to be required of any Mortgagor or maintained on property acquired in respect of a Mortgage Loan other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance. Whenever the improvements securing a Mortgage Loan are located at the time of origination of such Mortgage Loan in a federally designated special flood hazard area, the Master Servicer shall cause flood insurance (to the extent available) to be maintained in respect thereof. Such flood insurance shall be in an amount equal to the lesser of (i) the amount required to compensate for any loss or damage to the Mortgaged Property on a replacement cost basis and (ii) the maximum amount of such insurance available for the related Mortgaged Property under the national flood insurance program (assuming that the area in which such Mortgaged Property is located is participating in such program).

In the event that the Master Servicer shall obtain and maintain a blanket fire insurance policy with extended coverage insuring against hazard losses on all of the Mortgage Loans, it shall conclusively be deemed to have satisfied its obligations as set forth in the first sentence of this Section 3.11(a), it being understood and agreed that such policy may contain a deductible clause, in which case the Master Servicer shall, in the event that there shall not have been maintained on the related Mortgaged Property a policy complying with the first sentence of this Section 3.11(a) and there shall have been a loss which would have been covered by such policy, deposit in the Certificate Account the amount not otherwise payable under the blanket policy because of such deductible clause. Any such deposit by the Master Servicer shall be made on the Certificate Account Deposit Date next preceding the Distribution Date which occurs in the month following the month in which payments under any such policy would have been deposited in the Custodial Account. In connection with its activities as administrator and servicer of the Mortgage Loans, the Master Servicer agrees to present, on behalf of itself, the Trustee and Certificateholders, claims under any such blanket policy.

(b) The Master Servicer shall obtain and maintain at its own expense and keep in full force and effect throughout the term of this Agreement a blanket fidelity bond and an errors and omissions insurance policy covering the Master Servicer's officers and employees and other persons acting on behalf of the Master Servicer in connection with its activities under this Agreement. The amount of coverage shall be at least equal to the coverage that would be required by Fannie Mae or Freddie Mac, whichever is greater, with respect to the Master Servicer if the Master Servicer were servicing and administering the Mortgage Loans for Fannie Mae or Freddie Mac. In the event that any such bond or policy ceases to be in effect, the Master Servicer shall obtain a comparable replacement bond or policy from an issuer or insurer, as the case may be, meeting the requirements, if any, of the Program Guide and acceptable to the Company. Coverage of the Master Servicer under a policy or bond obtained by an Affiliate of the Master Servicer and providing the coverage required by this Section 3.11(b) shall satisfy the requirements of this Section 3.11(b).

Section 3.12  Enforcement of Due-on-Sale Clauses; Assumption and Modification Agreements; Certain Assignments.

(a) When any Mortgaged Property is conveyed by the Mortgagor, the Master Servicer or Subservicer, to the extent it has knowledge of such conveyance, shall enforce any due-on-sale clause contained in any Mortgage Note or Mortgage, to the extent permitted under applicable law and governmental regulations, but only to the extent that such enforcement will not adversely affect or jeopardize coverage under any Required Insurance Policy. Notwithstanding the foregoing:

(i) the Master Servicer shall not be deemed to be in default under this Section 3.12(a) by reason of any transfer or assumption which the Master Servicer is restricted by law from preventing; and

(ii) if the Master Servicer determines that it is reasonably likely that any Mortgagor will bring, or if any Mortgagor does bring, legal action to declare invalid or otherwise avoid enforcement of a due-on-sale clause contained in any Mortgage Note or Mortgage, the Master Servicer shall not be required to enforce the due-on-sale clause or to contest such action.

(b) Subject to the Master Servicer's duty to enforce any due-on-sale clause to the extent set forth in Section 3.12(a), in any case in which a Mortgaged Property is to be conveyed to a Person by a Mortgagor, and such Person is to enter into an assumption or modification agreement or supplement to the Mortgage Note or Mortgage which requires the signature of the Trustee, or if an instrument of release signed by the Trustee is required releasing the Mortgagor from liability on the Mortgage Loan, the Master Servicer is authorized, subject to the requirements of the sentence next following, to execute and deliver, on behalf of the Trustee, the assumption agreement with the Person to whom the Mortgaged Property is to be conveyed and such modification agreement or supplement to the Mortgage Note or Mortgage or other instruments as are reasonable or necessary to carry out the terms of the Mortgage Note or Mortgage or otherwise to comply with any applicable laws regarding assumptions or the transfer of the Mortgaged Property to such Person; provided, however, none of such terms and requirements shall both constitute a "significant modification" effecting an exchange or reissuance of such Mortgage Loan under the Code (or final, temporary or proposed Treasury regulations promulgated thereunder) and cause any of REMIC I or REMIC II to fail to qualify as REMICs under the Code or the imposition of any tax on "prohibited transactions" or (ii) constitute "contributions" after the start-up date under the REMIC Provisions. The Master Servicer shall execute and deliver such documents only if it reasonably determines that (i) its execution and delivery thereof will not conflict with or violate any terms of this Agreement or cause the unpaid balance and interest on the Mortgage Loan to be uncollectible in whole or in part, (ii) any required consents of insurers under any Required Insurance Policies have been obtained

and (iii) subsequent to the closing of the transaction involving the assumption or transfer (A) such transaction will not adversely affect the coverage under any Required Insurance Policies, (B) the Mortgage Loan will fully amortize over the remaining term thereof, (C) no material term of the Mortgage Loan (including the interest rate on the Mortgage Loan) will be altered nor will the term of the Mortgage Loan be changed and (D) if the seller/transferor of the Mortgaged Property is to be released from liability on the Mortgage Loan, such release will not (based on the Master Servicer's or Subservicer's good faith determination) adversely affect the collectability of the Mortgage Loan. Upon receipt of appropriate instructions from the Master Servicer in accordance with the foregoing, the Trustee shall execute any necessary instruments prepared by the Master Servicer for such assumption or substitution of liability as directed in writing by the Master Servicer. Upon the closing of the transactions contemplated by such documents, the Master Servicer shall cause the originals or true and correct copies of the assumption agreement, the release (if any), or the modification or supplement to the Mortgage Note or Mortgage to be delivered to the Trustee or the Custodian and deposited with the Mortgage File for such Mortgage Loan. Any fee collected by the Master Servicer or such related Subservicer for entering into an assumption or substitution of liability agreement will be retained by the Master Servicer or such Subservicer as additional servicing compensation.

(c) The Master Servicer or the related Subservicer, as the case may be, shall be entitled to approve a request from a Mortgagor for a partial release of the related Mortgaged Property, the granting of an easement thereon in favor of another Person, any alteration or demolition of the related Mortgaged Property or other similar matters if it has determined, exercising its good faith business judgment in the same manner as it would if it were the owner of the related Mortgage Loan, that the security for, and the timely and full collectability of, such Mortgage Loan would not be adversely affected thereby and that each of REMIC I or REMIC II would not fail to continue to qualify as a REMIC under the Code as a result thereof and (subject to Section 10.01(f)) that no tax on "prohibited transactions" or "contributions" after the startup day would be imposed on any of REMIC I or REMIC II as a result thereof. A partial release pursuant to this Section 3.12 shall be permitted only if the Combined Loan-to-Value Ratio for such Mortgage Loan after such partial release does not exceed the Combined Loan-to-Value Ratio for such Mortgage Loan as of the Cut-off Date. Any fee collected by the Master Servicer or the related Subservicer for processing such a request will be retained by the Master Servicer or such Subservicer as additional servicing compensation.

(d) Subject to any other applicable terms and conditions of this Agreement, the Trustee and Master Servicer shall be entitled to approve an assignment in lieu of satisfaction with respect to any Mortgage Loan, provided the obligee with respect to such Mortgage Loan following such proposed assignment provides the Trustee and Master Servicer with a "Lender Certification for Assignment of Mortgage Loan" in the form attached hereto as Exhibit L, in form and substance satisfactory to the Trustee and Master Servicer, providing the following: (i) that the Mortgage Loan is secured by Mortgaged Property located in a jurisdiction in which an assignment in lieu of satisfaction is required to preserve lien priority, minimize or avoid mortgage recording taxes or otherwise comply with, or facilitate a refinancing under, the laws of such jurisdiction; (ii) that the substance of the assignment is, and is intended to be, a refinancing of such Mortgage Loan and that the form of the transaction is solely to comply with, or facilitate the transaction under, such local laws; (iii) that the Mortgage Loan following the proposed assignment will have a rate of interest at least 0.25 percent below or above the rate of interest on such Mortgage Loan prior to such proposed assignment; and (iv) that such assignment is at the request of the borrower under the related Mortgage Loan. Upon approval of an assignment in lieu of satisfaction with respect to any Mortgage Loan, the Master Servicer shall receive cash in an amount equal to the unpaid principal balance of and accrued interest on such Mortgage Loan and the Master Servicer shall treat such amount as a Principal Prepayment in Full with respect to such Mortgage Loan for all purposes hereof.

Section 3.13    Realization Upon Defaulted Mortgage Loans.

(a) In the event of default on any of the Mortgage Loans, the Master Servicer shall decide whether to (i) foreclose upon the Mortgaged Properties securing such Mortgage Loans (which may include an REO Acquisition), (ii) write off the unpaid principal balance of the Mortgage Loans as bad debt, (iii) take a deed in lieu of foreclosure, (iv) accept a short sale, (v) arrange for a repayment plan, (vi) agree to a modification in accordance with this Agreement or (vii) take an unsecured note, in each case subject to the rights of any related first lienholder. In connection with such foreclosure or other conversion, the Master Servicer shall follow such practices (including, in the case of any default on a related senior mortgage loan, the advancing of funds to correct such default if deemed to be appropriate by the Master Servicer) and procedures as it shall deem necessary or advisable, as shall be normal and usual in its general mortgage servicing activities and as shall be required or permitted by the Program Guide; provided that the Master Servicer shall not be

liable in any respect hereunder if the Master Servicer is acting in connection
with any such foreclosure or other conversion or action in a manner that is
consistent with the provisions of this Agreement. The Master Servicer, however,
shall not be required to expend its own funds or incur other reimbursable
charges in connection with any foreclosure, or attempted foreclosure which is
not completed, or towards the correction of any default on a related senior
mortgage loan or towards the restoration of any property unless it shall
determine (i) that such restoration and/or foreclosure will increase the
proceeds of liquidation of the Mortgage Loan to Holders of Certificates of one
or more Classes after reimbursement to itself for such expenses or charges and
(ii) that such expenses and charges will be recoverable to it through
Liquidation Proceeds, Insurance Proceeds, or REO Proceeds (respecting which it
shall have priority for purposes of withdrawals from the Custodial Account
pursuant to Section 3.10, whether or not such expenses and charges are actually
recoverable from related Liquidation Proceeds, Insurance Proceeds or REO
Proceeds). In the event of such a determination by the Master Servicer pursuant
to this Section 3.13(a), the Master Servicer shall be entitled to reimbursement
of its funds so expended pursuant to Section 3.10. In addition, the Master
Servicer may pursue any remedies that may be available in connection with a
breach of a representation and warranty with respect to any such Mortgage Loan
in accordance with Sections 2.03. However, the Master Servicer is not required
to continue to pursue both foreclosure (or similar remedies) with respect to the
Mortgage Loans and remedies in connection with a breach of a representation and
warranty if the Master Servicer determines in its reasonable discretion that one
such remedy is more likely to result in a greater recovery as to the Mortgage
Loan. Upon the occurrence of a Cash Liquidation or REO Disposition, following
the deposit in the Custodial Account of all Insurance Proceeds, Liquidation
Proceeds and other payments and recoveries referred to in the definition of
"Cash Liquidation" or "REO Disposition," as applicable, upon receipt by the
Trustee of written notification of such deposit signed by a Servicing Officer,
the Trustee or any Custodian, as the case may be, shall release to the Master
Servicer the related Mortgage File and the Trustee shall execute and deliver
such instruments of transfer or assignment prepared by the Master Servicer, in
each case without recourse, representation or warranty as shall be necessary to
vest in the Master Servicer or its designee, as the case may be, the related
Mortgage Loan, and thereafter such Mortgage Loan shall not be part of the Trust
Fund. Notwithstanding the foregoing or any other provision of this Agreement, in
the Master Servicer's sole discretion with respect to any defaulted Mortgage
Loan or REO Property as to either of the following provisions, (i) a Cash
Liquidation or REO Disposition may be deemed to have occurred if substantially
all amounts expected by the Master Servicer to be received in connection with
the related defaulted Mortgage Loan or REO Property have been received;
provided, however, a Cash Liquidation or REO Disposition shall be deemed to have
occurred with respect to any Mortgage Loan that is 180 days or more delinquent
as of the end of the related Collection Period; provided further, however, any
subsequent collections with respect to any such Mortgage Loan shall be deposited
to the Custodial Account, and (ii) for purposes of determining the amount of any
Liquidation Proceeds, Insurance Proceeds, REO Proceeds or any other unscheduled
collections or the amount of any Realized Loss, the Master Servicer may take
into account minimal amounts of additional receipts expected to be received or
any estimated additional liquidation expenses expected to be incurred in
connection with the related defaulted Mortgage Loan or REO Property.

(b) In the event that title to any Mortgaged Property is acquired by the
Trust Fund as an REO Property by foreclosure or by deed in lieu of foreclosure,
the deed or certificate of sale shall be issued to the Trustee or to its nominee
on behalf of Certificateholders. Notwithstanding any such acquisition of title
and cancellation of the related Mortgage Loan, such REO Property shall (except
as otherwise expressly provided herein) be considered to be an Outstanding
Mortgage Loan held in the Trust Fund until such time as the REO Property shall
be sold. Consistent with the foregoing for purposes of all calculations
hereunder so long as such REO Property shall be considered to be an Outstanding
Mortgage Loan it shall be assumed that, notwithstanding that the indebtedness
evidenced by the related Mortgage Note shall have been discharged, such Mortgage
Note and the related amortization schedule in effect at the time of any such
acquisition of title (after giving effect to any previous Curtailments and
before any adjustment thereto by reason of any bankruptcy or similar proceeding
or any moratorium or similar waiver or grace period) remain in effect.

(c) In the event that the Trust Fund acquires any REO Property as
aforesaid or otherwise in connection with a default or imminent default on a
Mortgage Loan, the Master Servicer on behalf of the Trust Fund shall dispose of
such REO Property as soon as practicable, giving due consideration to the
interests of the Certificateholders, but in all cases within three full years
after the taxable year of its acquisition by the Trust Fund for purposes of
Section 860G(a)(8) of the Code (or such shorter period as may be necessary under
applicable state (including any state in which such property is located) law to
maintain the status of each of REMIC I or REMIC II as a REMIC under applicable
state law and avoid taxes resulting from such property failing to be foreclosure
property under applicable state law) or, at the expense of the Trust Fund,
request, more than 60 days before the day on which such grace period would

otherwise expire, an extension of such grant period unless the Master Servicer (subject to Section 10.01(f)) obtains for the Trustee and the Credit Enhancer an Opinion of Counsel, addressed to the Trustee, the Credit Enhancer and the Master Servicer, to the effect that the holding by the Trust Fund of such REO Property subsequent to such period will not result in the imposition of taxes on "prohibited transactions" as defined in Section 860F of the Code or cause the Trust Fund to fail to qualify as a REMIC (for federal (or any applicable State or local) income tax purposes) at any time that any Certificates are outstanding, in which case the Trust Fund may continue to hold such REO Property (subject to any conditions contained in such Opinion of Counsel). The Master Servicer shall be entitled to be reimbursed from the Custodial Account for any costs incurred in obtaining such Opinion of Counsel, as provided in Section 3.10. Notwithstanding any other provision of this Agreement, no REO Property acquired by the Trust Fund shall be rented (or allowed to continue to be rented) or otherwise used by or on behalf of the Trust Fund in such a manner or pursuant to any terms that would (i) cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code or (ii) subject REMIC I or REMIC II to the imposition of any federal income taxes on the income earned from such REO Property, including any taxes imposed by reason of Section 860G(c) of the Code, unless the Master Servicer has agreed to indemnify and hold harmless the Trust Fund with respect to the imposition of any such taxes.

(d) Liquidation Proceeds with respect to a Liquidated Mortgage Loan will be applied in the following order of priority: first, to reimburse the Master Servicer or the related Subservicer in accordance with Section 3.10(a)(ii) for any Liquidation Expenses; second, to the Master Servicer or the related Subservicer, all unpaid Servicing Fees through the date of receipt of the final Liquidation Proceeds; third, to the Certificateholders as a recovery of principal on the Mortgage Loan (or REO Property), up to an amount equal to the Principal Balance of the related Mortgage Loan immediately prior to the date it became a Liquidated Mortgage Loan; fourth, to the Certificateholders to the extent of accrued and unpaid interest on the Mortgage Loans at the Net Mortgage Rate through the date of receipt of the final Liquidation Proceeds; and fifth, to Foreclosure Profits.

Proceeds and other recoveries from a Mortgage Loan after it becomes a Liquidated Mortgage Loan will be applied in the following order of priority: first, to reimburse the Master Servicer or the related Subservicer in accordance with Section 3.10(a)(ii) for any expenses previously unreimbursed from Liquidation Proceeds or otherwise; second, to the Master Servicer or the related Subservicer, all unpaid Servicing Fees payable thereto through the date of receipt of the proceeds previously unreimbursed from Liquidation Proceeds or otherwise; third, to the Certificateholders to the extent of accrued and unpaid interest on the Mortgage Loans, up to an amount equal to the sum of (a) the Principal Balance of the related Mortgage Loan immediately prior to the date it became a Liquidated Mortgage Loan, less any Net Liquidation Proceeds previously received with respect to such Mortgage Loan and applied as a recovery of principal, and (b) accrued and unpaid interest on the related Mortgage Loan at the Net Mortgage Rate through the date of receipt of the proceeds; and fourth, to Foreclosure Profits.

(e) In the event of a default on a Mortgage Loan one or more of whose obligors is a Non-United States Person, in connection with any foreclosure or acquisition of a deed in lieu of foreclosure (together, "foreclosure") in respect of such Mortgage Loan, the Master Servicer will cause compliance with the provisions of Treasury Regulation Section 1.1445-2(d)(3) (or any successor thereto) necessary to assure that no withholding tax obligation arises with respect to the proceeds of such foreclosure except to the extent, if any, that proceeds of such foreclosure are required to be remitted to the obligors on such Mortgage Loan.

Section 3.14   Trustee to Cooperate; Release of Mortgage Files.

(a) Upon becoming aware of the payment in full of any Mortgage Loan, or upon the receipt by the Master Servicer of a notification that payment in full will be escrowed in a manner customary for such purposes, or that substantially all Liquidation Proceeds which have been determined by the Master Servicer in its reasonable judgment to be finally recoverable have been recovered, the Master Servicer will immediately notify the Trustee (if it holds the related Mortgage File) or the Custodian by a certification of a Servicing Officer (which certification shall include a statement to the effect that all amounts received or to be received in connection with such payment or Liquidation Proceeds which are required to be deposited in the Custodial Account pursuant to Section 3.07 have been or will be so deposited), substantially in the form attached hereto as Exhibit E, or, in the case of the Custodian, an electronic request in a form acceptable to the Custodian, requesting delivery to it of the Mortgage File. Upon receipt of such certification and request, the Trustee shall promptly release, or cause the Custodian to release, the related Mortgage File to the Master Servicer. The Master Servicer is authorized to execute and deliver to the Mortgagor the request for reconveyance, deed of reconveyance or release or

satisfaction of mortgage or such instrument necessary to release the lien of the Mortgage, together with the Mortgage Note with, as appropriate, written evidence of cancellation thereon and to cause the removal from the registration on the MERS(R) System of such Mortgage and to execute and deliver, on behalf of the Trustee and the Certificateholders or any of them, any and all instruments of satisfaction or cancellation or of partial or full release, including any applicable UCC termination statements. No expenses incurred in connection with any instrument of satisfaction or deed of reconveyance shall be chargeable to the Custodial Account or the Certificate Account.

(b) From time to time as is appropriate for the servicing or foreclosure of any Mortgage Loan, the Master Servicer shall deliver to the Custodian, with a copy to the Trustee, a certificate of a Servicing Officer substantially in the form attached as Exhibit E hereto, or, in the case of a Custodian, an electronic request in a form acceptable to the Custodian, requesting that possession of all, or any document constituting part of, the Mortgage File be released to the Master Servicer and certifying as to the reason for such release and that such release will not invalidate any insurance coverage provided in respect of the Mortgage Loan under any Required Insurance Policy. Upon receipt of the foregoing, the Trustee shall deliver, or cause the Custodian to deliver, the Mortgage File or any document therein to the Master Servicer. The Master Servicer shall cause each Mortgage File or any document therein so released to be returned to the Trustee, or the Custodian as agent for the Trustee when the need therefor by the Master Servicer no longer exists, unless (i) the Mortgage Loan has been liquidated and the Liquidation Proceeds relating to the Mortgage Loan have been deposited in the Custodial Account or (ii) the Mortgage File or such document has been delivered directly or through a Subservicer to an attorney, or to a public trustee or other public official as required by law, for purposes of initiating or pursuing legal action or other proceedings for the foreclosure of the Mortgaged Property either judicially or non-judicially, and the Master Servicer has delivered directly or through a Subservicer to the Trustee a certificate of a Servicing Officer certifying as to the name and address of the Person to which such Mortgage File or such document was delivered and the purpose or purposes of such delivery. In the event of the liquidation of a Mortgage Loan, the Trustee shall deliver the Request for Release with respect thereto to the Master Servicer upon the Trustee's receipt of notification from the Master Servicer of the deposit of the related Liquidation Proceeds in the Custodial Account.

(c) The Trustee or the Master Servicer on the Trustee's behalf shall execute and deliver to the Master Servicer, if necessary, any court pleadings, requests for trustee's sale or other documents necessary to the foreclosure or trustee's sale in respect of a Mortgaged Property or to any legal action brought to obtain judgment against any Mortgagor on the Mortgage Note or Mortgage or to obtain a deficiency judgment, or to enforce any other remedies or rights provided by the Mortgage Note or Mortgage or otherwise available at law or in equity. Together with such documents or pleadings (if signed by the Trustee), the Master Servicer shall deliver to the Trustee a certificate of a Servicing Officer requesting that such pleadings or documents be executed by the Trustee and certifying as to the reason such documents or pleadings are required and that the execution and delivery thereof by the Trustee will not invalidate any insurance coverage under any Required Insurance Policy or invalidate or otherwise affect the lien of the Mortgage, except for the termination of such a lien upon completion of the foreclosure or trustee's sale.

Section 3.15  Servicing and Other Compensation.

(a) The Master Servicer, as compensation for its activities hereunder, shall be entitled to receive on each Distribution Date the amounts provided for by clauses (iii), (iv), (v) and (vi) of Section 3.10(a). The amount of servicing compensation provided for in such clauses shall be accounted for on a Mortgage Loan-by-Mortgage Loan basis. Subject to Section 3.13(d), in the event that Liquidation Proceeds, Insurance Proceeds and REO Proceeds (net of amounts reimbursable therefrom pursuant to Section 3.10(a)(ii)) in respect of a Cash Liquidation or REO Disposition exceed the unpaid principal balance of such Mortgage Loan plus unpaid interest accrued thereon (including REO Imputed Interest) at a per annum rate equal to the related Net Mortgage Rate, the Master Servicer shall be entitled to retain therefrom and to pay to itself and/or the related Subservicer, any Foreclosure Profits and any Servicing Fee or Subservicing Fee considered to be accrued but unpaid.

(b) Additional servicing compensation in the form of late payment charges, assumption fees, investment income on amounts in the Custodial Account or the Certificate Account or otherwise shall be retained by the Master Servicer or the Subservicer to the extent provided herein.

(c) The Master Servicer shall be required to pay, or cause to be paid, all expenses incurred by it in connection with its servicing activities hereunder and shall not be entitled to reimbursement therefor except as specifically provided in Sections 3.10 and 3.13.

(d) The Master Servicer's right to receive servicing compensation may not be transferred in whole or in part except in connection with the transfer of all of its responsibilities and obligations of the Master Servicer under this Agreement.

Section 3.16 Reports to the Trustee and the Company.

Not later than fifteen days after each Distribution Date, the Master Servicer shall forward to the Trustee, the Credit Enhancer and the Company a statement, certified by a Servicing Officer, setting forth the status of the Custodial Account as of the close of business on such Distribution Date as it relates to the Mortgage Loans and showing, for the period covered by such statement, the aggregate of deposits in or withdrawals from the Custodial Account in respect of the Mortgage Loans for each category of deposit specified in Section 3.07 and each category of withdrawal specified in Section 3.10.

Section 3.17 Annual Statement as to Compliance and Servicing Assessment.
------------------------------------------------------------

The Master Servicer shall deliver to the Company, the Credit Enhancer and the Trustee on or before the earlier of (a) March 31 of each year or (b) with respect to any calendar year during which the Company's annual report on Form 10-K is required to be filed in accordance with the Exchange Act and the rules and regulations of the Commission, the date on which the annual report on Form 10-K is required to be filed in accordance with the Exchange Act and the rules and regulations of the Commission, a servicer compliance certificate, signed by an authorized officer of the Master Servicer, as described in Item 1123 of Regulation AB, to the effect that:

(i) A review of the Master Servicer's activities during the reporting period and of its performance under this Agreement has been made under such officer's supervision.

(ii) To the best of such officer's knowledge, based on such review, the Master Servicer has fulfilled all of its obligations under this Agreement in all materials respects throughout the reporting period or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure known to such officer and the nature and status thereof.

The Master Servicer shall use commercially reasonable efforts to obtain from all other parties participating in the servicing function any additional certifications required under Item 1123 of Regulation AB to the extent required to be included in a Report on Form 10-K; provided, however, that a failure to obtain such certifications shall not be a breach of the Master Servicer's duties hereunder if any such party fails to deliver such a certification.

Section 3.18 Annual Independent Public Accountants' Servicing Report.
------------------------------------------------------------

On or before the earlier of (a) March 31 of each year or (b) with respect to any calendar year during which the Company's annual report on Form 10-K is required to be filed in accordance with the Exchange Act and the rules and regulations of the Commission, the date on which the annual report is required to be filed in accordance with the Exchange Act and the rules and regulations of the Commission, the Master Servicer at its expense shall cause a firm of independent public accountants, which shall be members of the American Institute of Certified Public Accountants, to furnish a report to the Company, the Credit Enhancer and the Trustee the attestation required under Item 1122(b) of Regulation AB. In rendering such statement, such firm may rely, as to matters relating to the direct servicing of mortgage loans by Subservicers, upon comparable statements for examinations conducted by independent public accountants substantially in accordance with standards established by the American Institute of Certified Public Accountants (rendered within one year of such statement) with respect to such Subservicers.

Section 3.19 Rights of the Company in Respect of the Master Servicer.

The Master Servicer shall afford the Company and the Trustee, upon reasonable notice, during normal business hours access to all records maintained by the Master Servicer in respect of its rights and obligations hereunder and access to officers of the Master Servicer responsible for such obligations. Upon request, the Master Servicer shall furnish the Company with its most recent financial statements and such other information as the Master Servicer possesses regarding its business, affairs, property and condition, financial or otherwise. The Master Servicer shall also cooperate with all reasonable requests for information including, but not limited to, notices, tapes and copies of files, regarding itself, the Mortgage Loans or the Certificates from any Person or Persons identified by the Company or Residential Funding. The Credit Enhancer hereby is so identified. The Company may, but is not obligated to, enforce the obligations of the Master Servicer hereunder and may, but is not obligated to, perform, or cause a designee to perform, any defaulted obligation of the Master

Servicer hereunder or exercise the rights of Master Servicer hereunder; provided that the Master Servicer shall not be relieved of any of its obligations hereunder by virtue of such performance by the Company or its designee. Neither the Company nor the Trustee shall have the responsibility or liability for any action or failure to act by the Master Servicer and the Company is not obligated to supervise the performance of the Master Servicer under this Agreement or otherwise.

ARTICLE IV

PAYMENTS TO CERTIFICATEHOLDERS

Section 4.01  Certificate Account.

(a) The Master Servicer acting as agent of the Trustee shall establish and maintain a Certificate Account in which the Master Servicer shall cause to be deposited on behalf of the Trustee on or before 2:00 P.M. New York time on each Certificate Account Deposit Date by wire transfer of immediately available funds an amount equal to the sum of (i) any amount required to be deposited in the Certificate Account pursuant to Section 3.11(a), (ii) any amount required to be deposited in the Certificate Account pursuant to Section 4.07, (iii) any amount required to be paid pursuant to Section 9.01, (iv) all other amounts constituting the Available Distribution Amount for the immediately succeeding Distribution Date and (v) without duplication, an amount equal to the Premium for the Policy payable for such Distribution Date, and (vi) any payments or collections in the nature of prepayment charges received on the Mortgage Loans by the Master Servicer in respect of the related Collection Period. In addition, as and to the extent required pursuant to Section 4.10(b), the Trustee shall withdraw from the Insurance Account any Insured Payment then on deposit in the Insurance Account and deposit such amount into the Certificate Account.

(b) On each Distribution Date, after making any distributions in respect of the Class A Interest Distribution Amount and the Principal Collection Distribution Amount, the Trustee shall withdraw from the Certificate Account and pay to the Credit Enhancer, by wire transfer of immediately available funds to the Credit Enhancer, the Premium for the Policy for such Distribution Date.

(c) Upon written request from the Master Servicer, the Trustee shall invest or cause the institution maintaining the Certificate Account to invest the funds in the Certificate Account in Permitted Investments designated in the name of the Trustee for the benefit of the Certificateholders and the Credit Enhancer, which shall mature not later than the Business Day next preceding the Distribution Date next following the date of such investment (except that (i) if such Permitted Investment is an obligation of the institution that maintains such account or fund for which such institution serves as custodian, then such Permitted Investment may mature on such Distribution Date and (ii) any other investment may mature on such Distribution Date if the Trustee shall advance funds on such Distribution Date to the Certificate Account in the amount payable on such investment on such Distribution Date, pending receipt thereof to the extent necessary to make distributions on the Certificates) and shall not be sold or disposed of prior to maturity. All income and gain realized from any such investment shall be for the benefit of the Master Servicer and shall be subject to its withdrawal or order from time to time. The amount of any losses incurred in respect of any such investments shall be deposited in the Certificate Account by the Master Servicer out of its own funds immediately as realized without any right of reimbursement.

Section 4.02  Distributions.

(a) On each Distribution Date, the Trustee (or the Paying Agent on behalf of the Trustee) shall allocate and distribute the Available Distribution Amount, if any, for such date to the interests issued in respect of REMIC I and REMIC II as specified in this Section.

(b) (1) On each Distribution Date, the following amounts, in the following order of priority, shall be distributed by REMIC I to REMIC II on account of the REMIC I Regular Interests:

(i) to the Holders of REMIC I Regular Interest LT1, REMIC I Regular Interest LT2, REMIC I Regular Interest LT3 and REMIC I Regular Interest LT4, pro rata, in an amount equal to(A) their Uncertificated Accrued Interest for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from previous Distribution Dates; and

(ii) on each Distribution Date, to the Holders of REMIC I Regular Interests, in an amount equal to the remainder of the Available Distribution Amount after the distributions made pursuant to clause (i) above, allocated as follows (except as provided below):

(A) to the Holders of the REMIC I Regular Interest LT2, REMIC I Regular Interest LT3 and REMIC I Regular Interest LT4, their respective Principal Distribution Amounts;

(B) to the Holders of the REMIC I Regular Interest LT1 any remainder until the Uncertificated Principal Balance thereof is reduced to zero;

(C) any remainder to the Holders of the REMIC I Regular Interest LT2, REMIC I Regular Interest LT3 and REMIC I Regular Interest LT4 pro rata according to their respective Uncertificated Principal Balances as reduced by the distributions deemed made pursuant to (i) above, until their respective Uncertificated Principal Balances are reduced to zero; and

(D) any remaining amounts to the Holders of the Class R-I Certificates.

(2) Notwithstanding the distributions described in this Section 4.02(b), distribution of funds from the Certificate Account shall be made only in accordance with Section 4.02(c).

(c) On each Distribution Date, the Master Servicer on behalf of the Trustee or the Paying Agent appointed by the Trustee, shall distribute to each Certificateholder of record on the next preceding Record Date (other than as provided in Section 9.01 respecting the final distribution) either in immediately available funds (by wire transfer or otherwise) to the account of such Certificateholder at a bank or other entity having appropriate facilities therefor, if such Certificateholder has so notified the Master Servicer or the Paying Agent, as the case may be, or, if such Certificateholder has not so notified the Master Servicer or the Paying Agent by the Record Date, by check mailed to such Certificateholder at the address of such Holder appearing in the Certificate Register such Certificateholder's share (which share with respect to each Class of Certificates, shall be based on the aggregate of the Percentage Interests represented by Certificates of the applicable Class held by such Holder of the following amounts), in the following order of priority, in each case to the extent of the Available Distribution Amount:

(1) to the Class A Certificateholders, Accrued Certificate Interest payable on such Certificates with respect to such Distribution Date, plus any Accrued Certificate Interest remaining unpaid from any prior Distribution Date (the "Class A Interest Distribution Amount"), with such amount allocated among the Class A Certificateholders on a pro rata basis in proportion to Accrued Certificate Interest owed pursuant to this clause (1) to each such Class;

(2) from the amount, if any, of the Available Distribution Amount remaining after the foregoing distributions, the Class A Principal Distribution Amount, which shall be distributed: first, to the Class A-5 Certificates, in an amount equal to the Class A-5 Lockout Distribution Amount for that Distribution Date, until the Certificate Principal Balance of the Class A-5 Certificates has been reduced to zero; second, to the Class A-1 Certificateholders, until the Certificate Principal Balance of the Class A-1 Certificates has been reduced to zero; third, to Class A-2 Certificateholders, until the Certificate Principal Balance of the Class A-2 Certificates has been reduced to zero; fourth, to the Class A-3 Certificateholders, until the Certificate Principal Balance of the Class A-3 Certificates has been reduced to zero; fifth, to the Class A-4 Certificateholders, until the Certificate Principal Balance of the Class A-4 Certificates has been reduced to zero; and sixth, to the Class A-5 Certificateholders, until the Certificate Principal Balance of the Class A-5 Certificates has been reduced to zero;

(3) to the Class A Certificateholders and the Credit Enhancer from the amount, if any, of the Available Distribution Amount remaining after the foregoing distributions, the amounts set forth in Section 4.02(g) to the extent not distributed pursuant to the preceding paragraphs of this subsection 4.02(c);

(4) to the Class SB Certificates, from the amount, if any, of the Available Distribution Amount remaining after the foregoing distributions, Accrued Certificate Interest thereon and the amount of any Overcollateralization Reduction Amount for such Distribution Date, amounts payable to the Class SB Certificateholders pursuant to this clause (5) being deemed paid: first, in respect of the REMIC II Regular Interest SB-IO in respect of Accrued Certificate Interest thereon for the current Distribution Date; second, in respect of the REMIC II Regular Interest SB-PO in reduction of the principal balance thereof until such principal balance is reduced to zero; and third, in respect of the REMIC II Regular Interest SB-IO in respect of unpaid Accrued Certificate Interest thereon for prior Distribution Dates and in addition to the foregoing to the Class SB Certificateholders, the amount

of any payments or collections on account of prepayment charges received on the Mortgage Loans by the Master Servicer in respect of the related Collection Period; and

    (6) to the Class R-II Certificateholders, the balance, if any, of the Available Distribution Amount.

    (d) In addition to the foregoing distributions, with respect to any Mortgage Loan that was previously the subject of a Cash Liquidation or an REO Disposition that resulted in a Realized Loss, in the event that within three years of the date on which such Realized Loss was determined to have occurred the Master Servicer receives amounts, which the Master Servicer reasonably believes to represent subsequent recoveries (net of any related liquidation expenses), or determines that it holds surplus amounts previously reserved to cover estimated expenses, specifically related to such Mortgage Loan, the Master Servicer shall distribute such amounts to the applicable Certificateholders of the Class or Classes to which such Realized Loss was allocated (with the amounts to be distributed allocated among such Classes in the same proportions as such Realized Loss was allocated), and within each such Class to the Certificateholders of record as of the Record Date immediately preceding the date of such distribution (or if such Class of Certificates is no longer outstanding, to the Certificateholders of record at the time that such Realized Loss was allocated); provided that no such distribution to any Class of Certificates of subsequent recoveries related to a Mortgage Loan shall exceed, either individually or in the aggregate and together with any other amounts paid in reimbursements therefor, the amount of the related Realized Loss that was allocated to such Class of Certificates.

    (e) Each distribution with respect to a Book-Entry Certificate shall be paid to the Depository, as Holder thereof, and the Depository shall be responsible for crediting the amount of such distribution to the accounts of its Depository Participants in accordance with its normal procedures. Each Depository Participant shall be responsible for disbursing such distribution to the Certificate Owners that it represents and to each indirect participating brokerage firm (a "brokerage firm" or "indirect participating firm") for which it acts as agent. Each brokerage firm shall be responsible for disbursing funds to the Certificate Owners that it represents. None of the Trustee, the Certificate Registrar, the Company, the Credit Enhancer or the Master Servicer shall have any responsibility therefor except as otherwise provided by this Agreement or applicable law.

    (f) Except as otherwise provided in Section 9.01, if the Master Servicer anticipates that a final distribution with respect to any Class of Certificates will be made on the next Distribution Date, the Master Servicer shall, no later than the Determination Date in the month of such final distribution, notify the Trustee, and the Trustee shall, no later than two (2) Business Days after such Determination Date, mail on such date to each Holder of such Class of Certificates a notice to the effect that: (i) the Trustee anticipates that the final distribution with respect to such Class of Certificates will be made on such Distribution Date but only upon presentation and surrender of such Certificates at the office of the Trustee or as otherwise specified therein, and (ii) no interest shall accrue on such Certificates from and after the end of the prior calendar month. In the event that Certificateholders required to surrender their Certificates pursuant to Section 9.01(c) do not surrender their Certificates for final cancellation, the Trustee shall cause funds distributable with respect to such Certificates to be withdrawn from the Certificate Account and credited to a separate escrow account for the benefit of such Certificateholders as provided in Section 9.01(d).

    (g) Excess Interest will be allocated on any Distribution Date first, to pay the holders of the Class A Certificates the Realized Loss Distribution Amount for such Distribution Date, as part of the Principal Collection Distribution Amount, second, to the Credit Enhancer, the amount of the Premium for the Policy and any previously unpaid premiums for the Policy, with interest thereon as provided in the Insurance Agreement, third to the Credit Enhancer, to reimburse it for prior draws made on the Policy with interest thereon as provided in the Insurance Agreement, fourth, to pay any Overcollateralization Increase Amount, as part of the Principal Collection Distribution Amount, fifth, to the Credit Enhancer, any other amounts owed to the Credit Enhancer pursuant to the Insurance Agreement, sixth, to pay to the holders of the Class A Certificates pro rata based on Accrued Certificate Interest, the amount of any Prepayment Interest Shortfalls allocable thereto with respect to the Mortgage Loans on that Distribution Date, seventh, to pay to the holders of the Class A Certificates pro rata based on Accrued Certificate Interest, the amount of any unpaid Prepayment Interest Shortfalls allocated thereto on prior Distribution Dates, together with interest thereon at the related Pass-Through Rate, eighth, to the holders of the Class A Certificates, their respective amounts of Net WAC Cap Shortfalls for such Distribution Date, if any, and respective amounts of Net WAC Cap Shortfalls for any previous Distribution Date and not previously paid, if any, plus interest on any previously unpaid amount from the date of the shortfall at the applicable Pass-Through Rate (as adjusted from time to time),

on a pro rata basis in accordance with their respective amounts of Net WAC Cap Shortfalls remaining unpaid, ninth, to the holders of the Class A Certificates, any Relief Act Shortfalls with respect to the Mortgage Loans incurred during the related Collection Period, on a pro rata basis in accordance with the amount of accrued interest payable on that Class for such Distribution Date, and tenth, to pay to the holders of the Class SB Certificates any balance remaining, in accordance with the terms of Section 4.02(c)(4).

Section 4.03  Statements to Certificateholders.
------------------------------

(a)  Concurrently with each distribution charged to the Certificate Account and with respect to each Distribution Date the Master Servicer shall forward to the Trustee and the Trustee shall forward by mail or otherwise make available electronically on its website at www.jpmorgan.com/sfr to each Holder, the Credit Enhancer and the Company a statement setting forth the following information as to each Class of Certificates to the extent applicable:

(i)  the applicable Record Date, Determination Date and Distribution Date, and the date on which the applicable Interest Accrual Period commenced;

(ii)  the aggregate amount of payments received with respect to the Mortgage Loans, including prepayment amounts;

(iii)  the Servicing Fee and Subservicing Fee payable to the Master Servicer and the Subservicer;

(iv)  the amount of any other fees or expenses paid, and the identity of the party receiving such fees or expenses;

(v)  (a) the amount of such distribution to the Certificateholders of such Class applied to reduce the Certificate Principal Balance thereof, and (b) the aggregate amount included therein representing Principal Prepayments;

(vi)  the amount of such distribution to Holders of such Class of Certificates allocable to interest ;

(vii)  if the distribution to the Holders of such Class of Certificates is less than the full amount that would be distributable to such Holders if there were sufficient funds available therefor, the amount of the shortfall;

(viii)  the aggregate Certificate Principal Balance of each Class of the Certificates, after giving effect to the amounts distributed on such Distribution Date, separately identifying any reduction thereof due to Realized Losses other than pursuant to an actual distribution of principal;

(ix)  the aggregate Certificate Principal Balance of the Class A Certificates as of the Closing Date;

(x)  the number and Principal Balance of the Mortgage Loans after giving effect to the distribution of principal on such Distribution Date and the number of Mortgage Loans at the beginning and end of the related Collection Period;

(xi)  on the basis of the most recent reports furnished to it by Subservicers, the number and aggregate principal balances of Mortgage Loans that are Delinquent (A) 30-59 days, (B) 60-89 days and (C) 90 or more days and the number and aggregate principal balance of Mortgage Loans that are in foreclosure;

(xii)  the amount, terms and general purpose of any Advance by the Master Servicer pursuant to Section 3.01 and the amount of all Advances that have been reimbursed during the related Collection Period;

(xiii)  any material modifications, extensions or waivers to the terms of the Mortgage Loans during the Collection Period or that have cumulatively become material over time;

(xiv)  any material breaches of Mortgage Loan representations or warranties or covenants in the Agreement;

(xv)  the number, aggregate principal balance of any REO Properties;

(xvi)  the aggregate Accrued Certificate Interest remaining unpaid, if any, for each Class of Certificates, after giving effect to the distribution made on such Distribution Date;

(xvii) the aggregate amount of any Insured Payment paid on such Distribution Date and the portion paid to each Class A Certificate, the amount of any reimbursement payment made to the Credit Enhancer on such Distribution Date pursuant to Section 4.02(g);

(xviii) the Pass-Through Rate on each Class of Certificates and the Net WAC Rate, and with respect to the Class A-1 Certificates, the Pass-Through Rate for such Distribution Date;

(xix) the aggregate amount of Realized Losses for such Distribution Date and the aggregate amount of Realized Losses on the Mortgage Loans incurred since the Cut-off Date and the aggregate percentage of Realized Losses on the Mortgage Loans incurred since the Cut-off Date;

(xx) the weighted average remaining term to maturity of the Mortgage Loans after giving effect to the amounts distributed on such Distribution Date;

(xxi) the Weighted Average Net Mortgage Rates of the Mortgage Loans after giving effect to the amounts distributed on such Distribution Date; and

(xxii) the Overcollateralization Amount and the Required Overcollateralization Amount following such Distribution Date.

In the case of information furnished pursuant to clauses (i) and (ii) above, the amounts shall be expressed as a dollar amount per Certificate with a $1,000 denomination. In addition to the statement provided to the Trustee as set forth in this Section 4.03(a), the Master Servicer shall provide to any manager of a trust fund consisting of some or all of the Certificates, upon reasonable request, such additional information as is reasonably obtainable by the Master Servicer at no additional expense to the Master Servicer.

(b) Within a reasonable period of time after it receives a written request from a Holder of a Certificate, other than a Class R Certificate, the Master Servicer shall prepare, or cause to be prepared, and the Trustee shall forward, or cause to be forwarded, to each Person who at any time during the calendar year was the Holder of a Certificate, other than a Class R Certificate, a statement containing the information set forth in clauses (i) and (ii) of subsection (a) above aggregated for such calendar year or applicable portion thereof during which such Person was a Certificateholder. Such obligation of the Master Servicer and the Trustee shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Master Servicer and the Trustee pursuant to any requirements of the Code.

(c) Within a reasonable period of time after it receives a written request from any Holder of a Class R Certificate, the Master Servicer shall prepare, or cause to be prepared, and the Trustee shall forward, or cause to be forwarded, to each Person who at any time during the calendar year was the Holder of a Class R Certificate, a statement containing the applicable distribution information provided pursuant to this Section 4.03 aggregated for such calendar year or applicable portion thereof during which such Person was the Holder of a Class R Certificate. Such obligation of the Master Servicer shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Master Servicer and the Trustee pursuant to any requirements of the Code.

(d) Upon the written request of any Certificateholder, the Master Servicer, as soon as reasonably practicable, shall provide the requesting Certificateholder with such information as is necessary and appropriate, in the Master Servicer's sole discretion, for purposes of satisfying applicable reporting requirements under Rule 144A.

(e) The Master Servicer shall, on behalf of the Company and in respect of the Trust Fund, sign and cause to be filed with the Commission any periodic reports required to be filed under the provisions of the Exchange Act, and the rules and regulations of the Commission thereunder, including without limitation, reports on Form 10-K, Form 10-D and Form 8-K. In connection with the preparation and filing of such periodic reports, the Trustee shall timely provide to the Master Servicer (I) a list of Certificateholders as shown on the Certificate Register as of the end of each calendar year, (II) copies of all pleadings, other legal process and any other documents relating to any claims, charges or complaints involving the Trustee, as trustee hereunder, or the Trust Fund that are received by the Trustee, (III) notice of all matters that, to the actual knowledge of a Responsible Officer of the Trustee, have been submitted to a vote of the Certificateholders, other than those matters that have been submitted to a vote of the Certificateholders at the request of the Company or the Master Servicer, and (IV) notice of any failure of the Trustee to make any distribution to the Certificateholders as required pursuant to this Agreement.

Neither the Master Servicer nor the Trustee shall have any liability with respect to the Master Servicer's failure to properly prepare or file such periodic reports resulting from or relating to the Master Servicer's inability or failure to obtain any information not resulting from the Master Servicer's own negligence or willful misconduct.

(f) Any Form 10-K filed with the Commission in connection with this Section 4.03 shall include, with respect to the Certificates relating to such 10-K:

(i) A certification, signed by the senior officer in charge of the servicing functions of the Master Servicer, in the form attached as Exhibit P-1 hereto or such other form as may be required or permitted by the Commission (the "Form 10-K Certification"), in compliance with Rules 13a-14 and 15d-14 under the Exchange Act and any additional directives of the Commission.

(ii) A report regarding its assessment of compliance during the preceding calendar year with all applicable servicing criteria set forth in relevant Commission regulations with respect to mortgage-backed securities transactions taken as a whole involving the Master Servicer that are backed by the same types of assets as those backing the certificates, as well as similar reports on assessment of compliance received from other parties participating in the servicing function as required by relevant Commission regulations, as described in Item 1122(a) of Regulation AB. The Master Servicer shall obtain from all other parties participating in the servicing function any required assessments.

(iii) With respect to each assessment report described immediately above, a report by a registered public accounting firm that attests to, and reports on, the assessment made by the asserting party, as set forth in relevant Commission regulations, as described in Regulation 1122(b) of Regulation AB and Section 3.18.

(iv) The servicer compliance certificate required to be delivered pursuant Section 3.17.

(g) In connection with the Form 10-K Certification, the Trustee shall provide the Master Servicer with a back-up certification substantially in the form attached hereto as Exhibit P-2.

(h) This Section 4.03 may be amended in accordance with this Agreement without the consent of the Certificateholders.

(i) The Trustee shall make available on the Trustee's internet website each of the reports filed with the Commission by or on behalf of the Depositor under the Exchange Act, as soon as reasonably practicable upon delivery of such reports to the Trustee.

Section 4.04 Distribution of Reports to the Trustee and the Company.

(a) Prior to the close of business on the Business Day next succeeding each Determination Date, the Master Servicer shall furnish a written statement to the Trustee (which may be in a mutually agreeable electronic format), the Credit Enhancer, any Paying Agent and the Company (the information in such statement to be made available to Certificateholders by the Master Servicer on request) setting forth (i) the Available Distribution Amount, (ii) the amounts required to be withdrawn from the Custodial Account and deposited into the Certificate Account on the immediately succeeding Certificate Account Deposit Date pursuant to clause (iii) of Section 4.01(a) and (iii) the amount of Prepayment Interest Shortfalls, (iv) the Premium for the Policy and, if the Master Servicer determines that an Insured Payment exists for such Distribution Date, the amounts needed to complete the Notice related to such Insured Payment, and (v) the amount, if any, payable to the Trustee by a Derivative Counterparty. The determination by the Master Servicer of such amounts shall, in the absence of obvious error, be presumptively deemed to be correct for all purposes hereunder and the Trustee shall be protected in relying upon the same, absent manifest error, without any independent check or verification.

The Trustee shall deposit all funds it receives pursuant to this Section 4.04 into the Certificate Account.

Section 4.05 Allocation of Realized Losses.

(a) Prior to each Distribution Date, the Master Servicer shall determine the total amount of Realized Losses, if any, that resulted from any Cash Liquidation, Servicing Modifications, Debt Service Reduction, Deficient Valuation or REO Disposition that occurred during the related Collection Period. The amount of each Realized Loss shall be evidenced by an Officers' Certificate. The principal portion of all Realized Losses on the Mortgage Loans shall be allocated as follows: first, to the Excess Interest, by increasing the amount of clause (iv) of the definition of Principal Collection Distribution Amount,

second, by reduction of the Overcollateralization Amount, until such amount has been reduced to zero; and thereafter, to the Class A Certificates on a pro rata basis, based on their respective aggregate Certificate Principal Balances.

(b) Any allocation of the principal portion of Realized Losses (other than Debt Service Reductions) to the Class A Certificates shall be made by reducing the Certificate Principal Balance thereof by the amount so allocated, which allocation shall be deemed to have occurred on such Distribution Date. Allocations of the interest portions of Realized Losses shall be made by operation of the definition of "Accrued Certificate Interest" and by operation of the priority of payment provisions of Section 4.02(c). All Realized Losses and all other losses allocated to a Class of Certificates hereunder will be allocated among the Certificates of such Class in proportion to the Percentage Interests evidenced thereby

(c) All Realized Losses on the Mortgage Loans shall be allocated on each Distribution Date to the REMIC I Regular Interests as provided in the definition of REMIC I Realized Losses.

(d) Realized Losses allocated to the Excess Interest or the Overcollateralization Amount pursuant to paragraphs (a) or (b) of this section, the definition of Accrued Certificate Interest and the operation of Section 4.02(c) shall be deemed allocated to the Class SB Certificates. Realized Losses allocated to the Class SB Certificates shall, to the extent such Realized Losses represent Realized Losses on an interest portion, be allocated to the REMIC II Regular Interest SB-IO. Realized Losses allocated to the Excess Interest pursuant to paragraph (a) shall be deemed to reduce Accrued Certificate Interest on the REMIC II Regular Interest SB-IO. Realized Losses allocated to the Overcollateralization Amount pursuant to paragraph (a) shall be deemed first to reduce the principal balance of the REMIC II Regular Interest SB-PO until such principal balance shall have been reduced to zero and thereafter to reduce accrued and unpaid interest on the REMIC II Regular Interest SB-IO.

Section 4.06 Reports of Foreclosures and Abandonment of Mortgaged Property.

The Master Servicer or the Subservicers shall file information returns with respect to the receipt of mortgage interest received in a trade or business, the reports of foreclosures and abandonments of any Mortgaged Property and the informational returns relating to cancellation of indebtedness income with respect to any Mortgaged Property required by Sections 6050H, 6050J and 6050P of the Code, respectively, and deliver to the Trustee an Officers' Certificate on or before March 31 of each year, beginning with the first March 31 that occurs at least six months after the Cut off Date, stating that such reports have been filed. Such reports shall be in form and substance sufficient to meet the reporting requirements imposed by such Sections 6050H, 6050J and 6050P of the Code.

Section 4.07 Optional Purchase of Defaulted Mortgage Loans.
------------------------------------------------

As to any Mortgage Loan which is delinquent in payment by 90 days or more, the Master Servicer may, at its option, purchase such Mortgage Loan from the Trustee at the Purchase Price therefor; provided, that any such Mortgage Loan that becomes 90 days or more delinquent during any given Calendar Quarter shall only be eligible for purchase pursuant to this Section 4.07 during the period beginning on the first Business Day of the following Calendar Quarter, and ending at the close of business on the second-to-last Business Day of such following Calendar Quarter; and provided further, that such Mortgage Loan is 90 days or more delinquent at the time of repurchase. Such option if not exercised shall not thereafter be reinstated as to any Mortgage Loan, unless the delinquency is cured and the Mortgage Loan thereafter again becomes delinquent in payment by 90 days or more in a subsequent Calendar Quarter. If at any time the Master Servicer makes a payment to the Certificate Account covering the amount of the Purchase Price for such a Mortgage Loan, and the Master Servicer provides to the Trustee a certification signed by a Servicing Officer stating that the amount of such payment has been deposited in the Certificate Account, then the Trustee shall execute the assignment of such Mortgage Loan prepared by the Master Servicer at the request of the Master Servicer without recourse, representation or warranty to the Master Servicer which shall succeed to all the Trustee's right, title and interest in and to such Mortgage Loan, and all security and documents relative thereto. Such assignment shall be an assignment outright and not for security. The Master Servicer will thereupon own such Mortgage, and all such security and documents, free of any further obligation to the Trustee or the Certificateholders with respect thereto.

Section 4.08: Limited Mortgage Loan Repurchase Right.
------------------------------------------------

The Limited Repurchase Right Holder will have the option at any time to purchase any of the Mortgage Loans from the Trustee at the Purchase Price, up to

a maximum of five Mortgage Loans. In the event such this option is exercised as
to any five Mortgage Loans in the aggregate, this option will thereupon
terminate. If at any time the Limited Repurchase Right Holder makes a payment to
the Certificate Account covering the amount of the Purchase Price for such a
Mortgage Loan, and the Limited Repurchase Right Holder provides to the Trustee a
certification signed by a Servicing Officer stating that the amount of such
payment has been deposited in the Certificate Account, then the Trustee shall
execute the assignment of such Mortgage Loan at the request of the Limited
Repurchase Right Holder without recourse to the Limited Repurchase Right Holder
which shall succeed to all the Trustee's right, title and interest in and to
such Mortgage Loan, and all security and documents relative thereto. Such
assignment shall be an assignment outright and not for security. The Limited
Repurchase Right Holder will thereupon own such Mortgage, and all such security
and documents, free of any further obligation to the Trustee or the
Certificateholders with respect thereto. Any tax on "prohibited transactions"
(as defined in Section 860F(a)(2) of the Code) imposed on any REMIC resulting
from the exercise of the optional repurchase in this Section 4.08 shall in no
event be payable by the Trustee.

Section 4.09. Derivative Contracts.
---------------------

(a) The Trustee shall, at the written direction of the Master Servicer,
on behalf of the Trust Fund, enter into Derivative Contracts, solely for the
benefit of the Class SB Certificates. Any such Derivative Contract shall
constitute a fully prepaid agreement. The Master Servicer shall determine, in
its sole discretion, whether any Derivative Contract conforms to the
requirements of clauses (b) and (c) of this Section 4.09. Any acquisition of a
Derivative Contract shall be accompanied by an appropriate amendment to this
Agreement, including an Opinion of Counsel, as provided in Section 11.01, and
either (i) an Opinion of Counsel to the effect that the existence of the
Derivative Contract will not adversely affect the availability of the exemptive
relief afforded under ERISA by U.S. Department of Labor Prohibited Transaction
Exemption ("PTE") 94-29, as most recently amended, 67 Fed. Reg. 54487 (Aug. 22,
2002), to the Holders of the Class A Certificates, as of the date the Derivative
Contract is acquired by the Trustee; or (ii) the consent of each holder of a
Class A Certificate to the acquisition of such Derivative Contract. All
collections, proceeds and other amounts in respect of the Derivative Contracts
payable by the Derivative Counterparty shall be distributed to the Class SB
Certificates on the Distribution Date following receipt thereof by the Trustee.
In no event shall such an instrument constitute a part of any REMIC created
hereunder. In addition, in the event any such instrument is deposited, the Trust
Fund shall be deemed to be divided into two separate and discrete sub-trusts.
The assets of one such sub-trust shall consist of all the assets of the Trust
Fund other than such instrument and the assets of the other sub-trust shall
consist solely of such instrument.

(b) Any Derivative Contract that provides for any payment obligation on
the part of the Trust Fund must (i) be without recourse to the assets of the
Trust Fund, (ii) contain a non-petition covenant provision from the Derivative
Counterparty, (iii) limit payment dates thereunder to Distribution Dates and
(iv) contain a provision limiting any cash payments due to the Derivative
Counterparty on any day under such Derivative Contract solely to funds available
therefor in the Certificate Account to make payments to the Holders of the Class
SB Certificates on such Distribution Date.

(c) Each Derivative Contract must (i) provide for the direct payment of
any amounts by the Derivative Counterparty thereunder to the Certificate Account
at least one Business Day prior to the related Distribution Date, (ii) contain
an assignment of all of the Trust Fund's rights (but none of its obligations)
under such Derivative Contract to the Trustee on behalf the Class SB
Certificates and shall include an express consent of the Derivative Counterparty
to such assignment, (iii) provide that in the event of the occurrence of an
Event of Default, such Derivative Contract shall terminate upon the direction of
a majority Percentage Interest of the Class SB Certificates, and (iv) prohibit
the Derivative Counterparty from "setting-off" or "netting" other obligations of
the Trust Fund and its Affiliates against such Derivative Counterparty's payment
obligations thereunder.

Section 4.10. The Policy.
----------

(a) If pursuant to Section 4.04(a)(iv), the Master Servicer determines
and notifies a Responsible Officer of the Trustee in writing that an Insured
Payment is required and the amount of such Insured Payment for any Distribution
Date, the Trustee shall complete the Notice and submit such Notice in accordance
with the Policy to the Credit Enhancer no later than 12:00 P.M., New York City
time, on the second Business Day immediately preceding each Distribution Date,
as a claim for an Insured Payment in an amount equal to such Insured Payment.

(b) The Trustee shall establish and maintain the Insurance Account on

behalf of the Holders of the Class A Certificates. Upon receipt of an Insured Payment from the Credit Enhancer on behalf of the Class A Certificates, the Trustee shall deposit such Insured Payment in the Insurance Account. All amounts on deposit in the Insurance Account shall remain uninvested with no liability for interest or other compensation thereon. On each Distribution Date, the Trustee shall transfer any Insured Payment then on deposit in the Insurance Account to the Certificate Account and distribute such Insured Payment pursuant to Section 4.02.

(c) The Trustee shall (i) receive as attorney-in-fact of each Class A Certificateholder any Insured Payment from the Credit Enhancer and (ii) distribute such Insured Payment to the Class A Certificates as set forth in subsection (b) above. Insured Payments disbursed by the Trustee from proceeds of the Policy shall not be considered payment by the Trust Fund with respect to the Class A Certificates, nor shall such disbursement of such Insured Payments discharge the obligations of the Trust Fund with respect to the amounts thereof, and the Credit Enhancer shall become owner of such amounts to the extent covered by such Insured Payments as the deemed assignee of such Class A Certificateholders. The Trustee hereby agrees on behalf of each Class A Certificateholder (and each Class A Certificateholder, by its acceptance of its Class A Certificates, as applicable, hereby agrees) for the benefit of the Credit Enhancer that the Trustee shall recognize that to the extent the Credit Enhancer pays Insured Payments, either directly or indirectly (as by paying through the Trustee), to the Class A Certificates, the Credit Enhancer will be entitled to be subrogated to the rights of the Class A Certificateholders to the extent of such payments.

ARTICLE V

THE CERTIFICATES

Section 5.01  The Certificates.

(a) The Class A Certificates, Class SB Certificates and Class R Certificates shall be substantially in the forms set forth in Exhibits A-1, A-2 and B, respectively, and shall, on original issue, be executed and delivered by the Trustee to the Certificate Registrar for authentication and delivery to or upon the order of the Company upon receipt by the Trustee or one or more Custodians of the documents specified in Section 2.01. The Class A Certificates shall be issuable in minimum dollar denominations of $100,000 by Certificate Principal Balance, and integral multiples of $1 in excess thereof. The Class SB Certificates shall be issuable in registered, certificated form in minimum percentage interests of 5.00% and integral multiples of 0.01% in excess thereof. Each Class of Class R Certificates shall be issued in registered, certificated form in minimum percentage interests of 20.00% and integral multiples of 0.01% in excess thereof; provided, however, that one Class R Certificate of each Class will be issuable to the REMIC Administrator as "tax matters person" pursuant to Section 10.01(c) in a minimum denomination representing a Percentage Interest of not less than 0.01%.

The Certificates shall be executed by manual or facsimile signature on behalf of an authorized officer of the Trustee. Certificates bearing the manual or facsimile signatures of individuals who were at any time the proper officers of the Trustee shall bind the Trustee, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Certificate or did not hold such offices at the date of such Certificates. No Certificate shall be entitled to any benefit under this Agreement, or be valid for any purpose, unless there appears on such Certificate a certificate of authentication substantially in the form provided for herein executed by the Certificate Registrar by manual signature, and such certificate upon any Certificate shall be conclusive evidence, and the only evidence, that such Certificate has been duly authenticated and delivered hereunder. All Certificates shall be dated the date of their authentication.

(b) The Class A Certificates shall initially be issued as one or more Certificates registered in the name of the Depository or its nominee and, except as provided below, registration of such Certificates may not be transferred by the Trustee except to another Depository that agrees to hold such Certificates for the respective Certificate Owners with Ownership Interests therein. The Certificate Owners shall hold their respective Ownership Interests in and to each of the Class A Certificates, through the book-entry facilities of the Depository and, except as provided below, shall not be entitled to Definitive Certificates in respect of such Ownership Interests. All transfers by Certificate Owners of their respective Ownership Interests in the Book-Entry Certificates shall be made in accordance with the procedures established by the Depository Participant or brokerage firm representing such Certificate Owner. Each Depository Participant shall transfer the Ownership Interests only in the Book-Entry Certificates of Certificate Owners it represents or of brokerage firms for which it acts as agent in accordance with the Depository's normal

procedures.

The Trustee, the Master Servicer and the Company may for all purposes (including the making of payments due on the respective Classes of Book-Entry Certificates) deal with the Depository as the authorized representative of the Certificate Owners with respect to the respective Classes of Book-Entry Certificates for the purposes of exercising the rights of Certificateholders hereunder. The rights of Certificate Owners with respect to the respective Classes of Book-Entry Certificates shall be limited to those established by law and agreements between such Certificate Owners and the Depository Participants and brokerage firms representing such Certificate Owners. Multiple requests and directions from, and votes of, the Depository as Holder of any Class of Book-Entry Certificates with respect to any particular matter shall not be deemed inconsistent if they are made with respect to different Certificate Owners. The Trustee may establish a reasonable record date in connection with solicitations of consents from or voting by Certificateholders and shall give notice to the Depository of such record date.

If with respect to any Book-Entry Certificate (i)(A) the Company advises the Trustee in writing that the Depository is no longer willing or able to properly discharge its responsibilities as Depository with respect to such Book-Entry Certificate and (B) the Company is unable to locate a qualified successor, or (ii) (A) the Company at its option advises the Trustee in writing that it elects to terminate the book-entry system for such Book-Entry Certificate through the Depository and (B) upon receipt of notice from the Depository of the Company's election to terminate the book-entry system for such Book-Entry Certificate, the Depository Participants holding beneficial interests in such Book-Entry Certificates agree to initiate such termination, the Trustee shall notify all Certificate Owners of such Book-Entry Certificate, through the Depository, of the occurrence of any such event and of the availability of Definitive Certificates to Certificate Owners requesting the same. Upon surrender to the Trustee of the Book-Entry Certificates by the Depository, accompanied by registration instructions from the Depository for registration of transfer, the Trustee shall issue the Definitive Certificates.

In addition, if an Event of Default has occurred and is continuing, each Certificate Owner materially adversely affected thereby may at its option request a Definitive Certificate evidencing such Certificate Owner's Percentage Interest in the related Class of Certificates. In order to make such request, such Certificate Owner shall, subject to the rules and procedures of the Depository, provide the Depository or the related Depository Participant with directions for the Certificate Registrar to exchange or cause the exchange of the Certificate Owner's interest in such Class of Certificates for an equivalent Percentage Interest in fully registered definitive form. Upon receipt by the Certificate Registrar of instructions from the Depository directing the Certificate Registrar to effect such exchange (such instructions to contain information regarding the Class of Certificates and the Certificate Principal Balance being exchanged, the Depository Participant account to be debited with the decrease, the registered holder of and delivery instructions for the Definitive Certificate, and any other information reasonably required by the Certificate Registrar), (i) the Certificate Registrar shall instruct the Depository to reduce the related Depository Participant's account by the aggregate Certificate Principal Balance of the Definitive Certificate, (ii) the Trustee shall execute and the Certificate Registrar shall authenticate and deliver, in accordance with the registration and delivery instructions provided by the Depository, a Definitive Certificate evidencing such Certificate Owner's Percentage Interest in such Class of Certificates and (iii) the Trustee shall execute and the Certificate Registrar shall authenticate a new Book Entry Certificate reflecting the reduction in the aggregate Certificate Principal Balance of such Class of Certificates by the amount of the Definitive Certificates.

Neither the Company, the Master Servicer nor the Trustee shall be liable for any actions taken by the Depository or its nominee, including, without limitation, any delay in delivery of any instructions required under this Section 5.01 and may conclusively rely on, and shall be protected in relying on, such instructions. Upon the issuance of Definitive Certificates, the Trustee and the Master Servicer shall recognize the Holders of the Definitive Certificates as Certificateholders hereunder.

(c) Each of the Certificates is intended to be a "security" governed by Article 8 of the Uniform Commercial Code as in effect in the State of New York and any other applicable jurisdiction, to the extent that any of such laws may be applicable.

Section 5.02 Registration of Transfer and Exchange of Certificates.
-------------------------------------------------------

(a) The Trustee shall cause to be kept at one of the offices or agencies to be appointed by the Trustee in accordance with the provisions of Section 8.12 a Certificate Register in which, subject to such reasonable regulations as it

may prescribe, the Trustee shall provide for registration of Certificates and of transfers and exchanges of Certificates as herein provided. The Trustee is initially appointed Certificate Registrar for the purpose of registering Certificates and transfers and exchanges of Certificates as herein provided. The Certificate Registrar, or the Trustee, shall provide the Master Servicer with a certified list of Certificateholders as of each Record Date prior to the related Determination Date.

(b) Upon surrender for registration of transfer of any Certificate at any office or agency of the Trustee maintained for such purpose pursuant to Section 8.12 and, in the case of any Class SB Certificate or Class R Certificate, upon satisfaction of the conditions set forth below, the Trustee shall execute and the Certificate Registrar shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Certificates of a like Class and aggregate Percentage Interest.

(c) At the option of the Certificateholders, Certificates may be exchanged for other Certificates of authorized denominations of a like Class and aggregate Percentage Interest, upon surrender of the Certificates to be exchanged at any such office or agency. Whenever any Certificates are so surrendered for exchange the Trustee shall execute and the Certificate Registrar shall authenticate and deliver the Certificates of such Class which the Certificateholder making the exchange is entitled to receive. Every Certificate presented or surrendered for transfer or exchange shall (if so required by the Trustee or the Certificate Registrar) be duly endorsed by, or be accompanied by a written instrument of transfer in form satisfactory to the Trustee and the Certificate Registrar duly executed by, the Holder thereof or his attorney duly authorized in writing.

(d) No transfer, sale, pledge or other disposition of a Class SB Certificate or Class R Certificate shall be made unless such transfer, sale, pledge or other disposition is exempt from the registration requirements of the Securities Act of 1933 (the "1933 Act"), as amended, and any applicable state securities laws or is made in accordance with said Act and laws. In the event that a transfer of a Class SB Certificate or Class R Certificate is to be made either (i)(A) the Trustee shall require a written Opinion of Counsel acceptable to and in form and substance satisfactory to the Trustee and the Company that such transfer may be made pursuant to an exemption, describing the applicable exemption and the basis therefor, from said Act and laws or is being made pursuant to said Act and laws, which Opinion of Counsel shall not be an expense of the Trustee, the Company or the Master Servicer (except that, if such transfer is made by the Company or the Master Servicer or any Affiliate thereof, the Company or the Master Servicer shall provide such Opinion of Counsel at their own expense); provided that such Opinion of Counsel will not be required in connection with the initial transfer of any such Certificate by the Company or any Affiliate thereof to the Company or an Affiliate of the Company and (B) the Trustee shall require the transferee to execute a representation letter, substantially in the form of Exhibit H hereto, and the Trustee shall require the transferor to execute a representation letter, substantially in the form of Exhibit I hereto, each acceptable to and in form and substance satisfactory to the Company and the Trustee certifying to the Company and the Trustee the facts surrounding such transfer, which representation letters shall not be an expense of the Trustee, the Company or the Master Servicer; provided, however, that such representation letters will not be required in connection with any transfer of any such Certificate by the Company or any Affiliate thereof to the Company or an Affiliate of the Company, and the Trustee shall be entitled to conclusively rely upon a representation (which, upon the request of the Trustee, shall be a written representation) from the Company, of the status of such transferee as an Affiliate of the Company or (ii) the prospective transferee of such a Certificate shall be required to provide the Trustee, the Company and the Master Servicer with an investment letter substantially in the form of Exhibit M attached hereto (or such other form as the Company in its sole discretion deems acceptable), which investment letter shall not be an expense of the Trustee, the Company or the Master Servicer, and which investment letter states that, among other things, such transferee (A) is a "qualified institutional buyer" as defined under Rule 144A, acting for its own account or the accounts of other "qualified institutional buyers" as defined under Rule 144A, and (B) is aware that the proposed transferor intends to rely on the exemption from registration requirements under the Securities Act of 1933, as amended, provided by Rule 144A. The Holder of any such Certificate desiring to effect any such transfer, sale, pledge or other disposition shall, and does hereby agree to, indemnify the Trustee, the Company, the Credit Enhancer, the Master Servicer and the Certificate Registrar against any liability that may result if the transfer, sale, pledge or other disposition is not so exempt or is not made in accordance with such federal and state laws.

(e) [Reserved]

(f) In the case of any Class SB Certificate or Class R Certificate presented for registration in the name of any Person, either (i) the Trustee shall require an Opinion of Counsel acceptable to and in form and substance

satisfactory to the Trustee, the Company, the Credit Enhancer and the Master Servicer to the effect that the purchase or holding of such Class SB Certificate or Class R Certificate is permissible under applicable law, will not constitute or result in any non-exempt prohibited transaction under Section 406 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Code (or comparable provisions of any subsequent enactments), and will not subject the Trustee, the Company, the Master Servicer, the Credit Enhancer or the Trust Fund to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in this Agreement, which Opinion of Counsel shall not be an expense of the Trustee, the Company, the Master Servicer, the Credit Enhancer or the Trust Fund or (ii) the prospective transferee shall be required to provide the Trustee, the Company, the Credit Enhancer and the Master Servicer with a certification to the effect set forth in Exhibit H or Exhibit M (with respect to a Class SB Certificate) or in paragraph fourteen of Exhibit G-1 (with respect to a Class R Certificate), which the Trustee may rely upon without further inquiry or investigation, or such other certifications as the Trustee may deem desirable or necessary in order to establish that such transferee or the Person in whose name such registration is requested is not an employee benefit plan or other plan subject to the prohibited transaction provisions of ERISA or Section 4975 of the Code, or any Person (including an insurance company investing its general accounts, an investment manager, a named fiduciary or a trustee of any such plan) who is using "plan assets" of any such plan to effect such acquisition.

(g) (i) Each Person who has or who acquires any Ownership Interest in a Class R Certificate shall be deemed by the acceptance or acquisition of such Ownership Interest to have agreed to be bound by the following provisions and to have irrevocably authorized the Trustee or its designee under clause (iii)(A) below to deliver payments to a Person other than such Person and to negotiate the terms of any mandatory sale under clause (iii)(B) below and to execute all instruments of transfer and to do all other things necessary in connection with any such sale. The rights of each Person acquiring any Ownership Interest in a Class R Certificate are expressly subject to the following provisions:

(A) Each Person holding or acquiring any Ownership Interest in a Class R Certificate shall be a Permitted Transferee and shall promptly notify the Trustee of any change or impending change in its status as a Permitted Transferee.

(B) In connection with any proposed Transfer of any Ownership Interest in a Class R Certificate, the Trustee shall require delivery to it, and shall not register the Transfer of any Class R Certificate until its receipt of, (I) an affidavit and agreement (a "Transfer Affidavit and Agreement," in the form attached hereto as Exhibit G-1) from the proposed Transferee, in form and substance satisfactory to the Master Servicer, representing and warranting, among other things, that it is a Permitted Transferee, that it is not acquiring its Ownership Interest in the Class R Certificate that is the subject of the proposed Transfer as a nominee, trustee or agent for any Person who is not a Permitted Transferee, that for so long as it retains its Ownership Interest in a Class R Certificate, it will endeavor to remain a Permitted Transferee, and that it has reviewed the provisions of this Section 5.02(g) and agrees to be bound by them, and (II) a certificate, in the form attached hereto as Exhibit G-2, from the Holder wishing to transfer the Class R Certificate, in form and substance satisfactory to the Master Servicer, representing and warranting, among other things, that no purpose of the proposed Transfer is to impede the assessment or collection of tax.

(C) Notwithstanding the delivery of a Transfer Affidavit and Agreement by a proposed Transferee under clause (B) above, if a Responsible Officer of the Trustee who is assigned to this Agreement has actual knowledge that the proposed Transferee is not a Permitted Transferee, no Transfer of an Ownership Interest in a Class R Certificate to such proposed Transferee shall be effected.

(D) Each Person holding or acquiring any Ownership Interest in a Class R Certificate shall agree (x) to require a Transfer Affidavit and Agreement from any other Person to whom such Person attempts to transfer its Ownership Interest in a Class R Certificate and (y) not to transfer its Ownership Interest unless it provides a certificate to the Trustee in the form attached hereto as Exhibit G-2.

(E) Each Person holding or acquiring an Ownership Interest in a Class R Certificate, by purchasing an Ownership Interest in such Certificate, agrees to give the Trustee written notice that it is a "pass-through interest holder" within the meaning of Temporary Treasury Regulations Section 1.67-3T(a)(2)(i)(A) immediately upon acquiring an Ownership Interest in a Class R Certificate, if it is, or is holding an Ownership Interest in a Class R Certificate on behalf of, a

(ii) The Trustee will register the Transfer of any Class R Certificate only if it shall have received the Transfer Affidavit and Agreement, a certificate of the Holder requesting such transfer in the form attached hereto as Exhibit G-2 and all of such other documents as shall have been reasonably required by the Trustee as a condition to such registration. Transfers of the Class R Certificates to Non-United States Persons and Disqualified Organizations (as defined in Section 860E(e)(5) of the Code) are prohibited.

(iii) (A) If any Disqualified Organization shall become a holder of a Class R Certificate, then the last preceding Permitted Transferee shall be restored, to the extent permitted by law, to all rights and obligations as Holder thereof retroactive to the date of registration of such Transfer of such Class R Certificate. If a Non-United States Person shall become a holder of a Class R Certificate, then the last preceding United States Person shall be restored, to the extent permitted by law, to all rights and obligations as Holder thereof retroactive to the date of registration of such Transfer of such Class R Certificate. If a transfer of a Class R Certificate is disregarded pursuant to the provisions of Treasury Regulations Section 1.860E-1 or Section 1.860G-3, then the last preceding Permitted Transferee shall be restored, to the extent permitted by law, to all rights and obligations as Holder thereof retroactive to the date of registration of such Transfer of such Class R Certificate. The Trustee shall be under no liability to any Person for any registration of Transfer of a Class R Certificate that is in fact not permitted by this Section 5.02(g) or for making any payments due on such Certificate to the holder thereof or for taking any other action with respect to such holder under the provisions of this Agreement.

(B) If any purported Transferee shall become a Holder of a Class R Certificate in violation of the restrictions in this Section 5.02(g) and to the extent that the retroactive restoration of the rights of the Holder of such Class R Certificate as described in clause (iii)(A) above shall be invalid, illegal or unenforceable, then the Master Servicer shall have the right, without notice to the holder or any prior holder of such Class R Certificate, to sell such Class R Certificate to a purchaser selected by the Master Servicer on such terms as the Master Servicer may choose. Such purported Transferee shall promptly endorse and deliver each Class R Certificate in accordance with the instructions of the Master Servicer. Such purchaser may be the Master Servicer itself or any Affiliate of the Master Servicer. The proceeds of such sale, net of the commissions (which may include commissions payable to the Master Servicer or its Affiliates), expenses and taxes due, if any, will be remitted by the Master Servicer to such purported Transferee. The terms and conditions of any sale under this clause (iii)(B) shall be determined in the sole discretion of the Master Servicer, and neither the Master Servicer nor the Trustee shall be liable to any Person having an Ownership Interest in a Class R Certificate as a result of the Master Servicer's exercise of such discretion.

(iv) The Master Servicer, on behalf of the Trustee, shall make available, upon written request from the Trustee, all information necessary to compute any tax imposed (A) as a result of the Transfer of an Ownership Interest in a Class R Certificate to any Person who is a Disqualified Organization, including the information regarding "excess inclusions" of such Class R Certificates required to be provided to the Internal Revenue Service and certain Persons as described in Treasury Regulations Sections 1.860D-1(b)(5) and 1.860E-2(a)(5), and (B) as a result of any regulated investment company, real estate investment trust, common trust fund, partnership, trust, estate or organization described in Section 1381 of the Code that holds an Ownership Interest in a Class R Certificate having as among its record holders at any time any Person who is a Disqualified Organization. Reasonable compensation for providing such information may be required by the Master Servicer from such Person.

(v) The provisions of this Section 5.02(g) set forth prior to this clause (v) may be modified, added to or eliminated, provided that there shall have been delivered to the Trustee the following:

(A) written consent of the Credit Enhancer and written notification from each Rating Agency to the effect that the modification, addition to or elimination of such provisions will not cause such Rating Agency to downgrade its then-current ratings, if any, of the Class A Certificates below the lower of the then-current rating or the rating assigned to such Certificates as of the Closing Date by such Rating Agency; and

(B) subject to Section 10.01(g), a certificate of the Master Servicer stating that the Master Servicer has received an Opinion of Counsel, in form and substance satisfactory to the Master Servicer, to the effect that such modification, addition to or absence of such

provisions will not cause any of REMIC I or REMIC II to cease to qualify as a REMIC and will not cause (x) any of REMIC I or REMIC II to be subject to an entity-level tax caused by the Transfer of any Class R Certificate to a Person that is a Disqualified Organization or (y) a Certificateholder or another Person to be subject to a REMIC-related tax caused by the Transfer of a Class R Certificate to a Person that is not a Permitted Transferee.

(h) No service charge shall be made for any transfer or exchange of Certificates of any Class, but the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Certificates.

(i) All Certificates surrendered for transfer and exchange shall be destroyed by the Certificate Registrar.

Section 5.03  Mutilated, Destroyed, Lost or Stolen Certificates.
-----------------------------------------------------

If (i) any mutilated Certificate is surrendered to the Certificate Registrar, or the Trustee and the Certificate Registrar receive evidence to their satisfaction of the destruction, loss or theft of any Certificate, and (ii) there is delivered to the Trustee and the Certificate Registrar such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the Trustee or the Certificate Registrar that such Certificate has been acquired by a bona fide purchaser, the Trustee shall execute and the Certificate Registrar shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a new Certificate of like tenor, Class and Percentage Interest but bearing a number not contemporaneously outstanding. Upon the issuance of any new Certificate under this Section, the Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee and the Certificate Registrar) connected therewith. Any duplicate Certificate issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the Trust Fund, as if originally issued, whether or not the lost, stolen or destroyed Certificate shall be found at any time.

Section 5.04  Persons Deemed Owners.

Prior to due presentation of a Certificate for registration of transfer, the Company, the Master Servicer, the Trustee, the Credit Enhancer, the Certificate Registrar and any agent of the Company, the Master Servicer, the Trustee, the Credit Enhancer or the Certificate Registrar may treat the Person in whose name any Certificate is registered as the owner of such Certificate for the purpose of receiving distributions pursuant to Section 4.02 and for all other purposes whatsoever, except as and to the extent provided in the definition of "Certificateholder", and in Section 4.08, and neither the Company, the Master Servicer, the Credit Enhancer, the Trustee, the Certificate Registrar nor any agent of the Company, the Master Servicer, the Credit Enhancer, the Trustee or the Certificate Registrar shall be affected by notice to the contrary except as provided in Section 5.02(g).

Section 5.05  Appointment of Paying Agent.

The Trustee may appoint a Paying Agent for the purpose of making distributions to Certificateholders pursuant to Section 4.02. In the event of any such appointment, on or prior to each Distribution Date the Master Servicer on behalf of the Trustee shall deposit or cause to be deposited with the Paying Agent a sum sufficient to make the payments to Certificateholders in the amounts and in the manner provided for in Section 4.02, such sum to be held in trust for the benefit of Certificateholders.

The Trustee shall cause each Paying Agent to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee that such Paying Agent will hold all sums held by it for the payment to Certificateholders in trust for the benefit of the Certificateholders entitled thereto until such sums shall be paid to such Certificateholders. Any sums so held by such Paying Agent shall be held only in Eligible Accounts to the extent such sums are not distributed to the Certificateholders on the date of receipt by such Paying Agent.

ARTICLE VI

THE COMPANY AND THE MASTER SERVICER

Section 6.01 Respective Liabilities of the Company and the Master Servicer.

The Company and the Master Servicer shall each be liable in accordance herewith only to the extent of the obligations specifically and respectively

imposed upon and undertaken by the Company as Master Servicer herein. By way of illustration and not limitation, the Company is not liable for the servicing and administration of the Mortgage Loans, nor is it obligated by Sections 7.01 or 10.01 to assume any obligations of the Master Servicer or to appoint a designee to assume such obligations, nor is it liable for any other obligation hereunder that it may, but is not obligated to, assume unless it elects to assume such obligation in accordance herewith.

Section          6.02 Merger or Consolidation of the Company or the Master Servicer; Assignment of Rights and Delegation of Duties by Master Servicer.

(a) The Company and the Master Servicer will each keep in full effect its existence, rights and franchises as a corporation under the laws of the state of its incorporation, and will each obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement, the Certificates or any of the Mortgage Loans and to perform its respective duties under this Agreement.

(b) Any Person into which the Company or the Master Servicer may be merged or consolidated, or any corporation resulting from any merger or consolidation to which the Company or the Master Servicer shall be a party, or any Person succeeding to the business of the Company or the Master Servicer, shall be the successor of the Company or the Master Servicer, as the case may be, hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding; provided, however, that the successor or surviving Person to the Master Servicer shall be qualified to service mortgage loans on behalf of Fannie Mae or Freddie Mac; and provided further that each Rating Agency's ratings, if any, of the Class A Certificates in effect immediately prior to such merger or consolidation (without taking into account the Policy)will not be qualified, reduced or withdrawn as a result thereof (as evidenced by a letter to such effect from each Rating Agency).

(c) Notwithstanding anything else in this Section 6.02 and Section 6.04 to the contrary, the Master Servicer may assign its rights and delegate its duties and obligations under this Agreement; provided that the Person accepting such assignment or delegation shall be a Person which is qualified to service mortgage loans on behalf of Fannie Mae or Freddie Mac, is reasonably satisfactory to the Trustee, the Credit Enhancer and the Company, is willing to service the Mortgage Loans and executes and delivers to the Company, the Credit Enhancer and the Trustee an agreement, in form and substance reasonably satisfactory to the Company, the Credit Enhancer and the Trustee, which contains an assumption by such Person of the due and punctual performance and observance of each covenant and condition to be performed or observed by the Master Servicer under this Agreement; provided further that each Rating Agency's rating of the Classes of Certificates that have been rated in effect immediately prior to such assignment and delegation (without taking into account the Policy) will not be qualified, reduced or withdrawn as a result of such assignment and delegation (as evidenced by a letter to such effect from each Rating Agency). In the case of any such assignment and delegation, the Master Servicer shall be released from its obligations under this Agreement, except that the Master Servicer shall remain liable for all liabilities and obligations incurred by it as Master Servicer hereunder prior to the satisfaction of the conditions to such assignment and delegation set forth in the next preceding sentence. Notwithstanding the foregoing, in the event of a pledge or assignment by the Master Servicer solely of its rights to purchase all assets of the Trust Fund under Section 9.01(a) (or, if so specified in Section 9.01(a), its rights to purchase the Mortgage Loans and property acquired related to such Mortgage Loans or its rights to purchase the Certificates related thereto), the provisos of the first sentence of this paragraph will not apply.

Section          6.03 Limitation on Liability of the Company, the Master Servicer and Others.

Neither the Company, the Master Servicer nor any of the directors, officers, employees or agents of the Company or the Master Servicer shall be under any liability to the Trust Fund or the Certificateholders for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment; provided, however, that this provision shall not protect the Company, the Master Servicer or any such Person against any breach of warranties, representations or covenants made herein or any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties hereunder. The Company, the Master Servicer and any director, officer, employee or agent of the Company or the Master Servicer may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder. The Company, the Master Servicer and any director, officer, employee or agent of the Company or the Master Servicer shall be indemnified by the Trust

Fund and held harmless against any loss, liability or expense incurred in connection with any legal action relating to this Agreement or the Certificates, other than any loss, liability or expense related to any specific Mortgage Loan or Mortgage Loans (except as any such loss, liability or expense shall be otherwise reimbursable pursuant to this Agreement) and any loss, liability or expense incurred by reason of willful misfeasance, bad faith or gross negligence in the performance of duties hereunder or by reason of reckless disregard of obligations and duties hereunder.

Neither the Company nor the Master Servicer shall be under any obligation to appear in, prosecute or defend any legal or administrative action, proceeding, hearing or examination that is not incidental to its respective duties under this Agreement and which in its opinion may involve it in any expense or liability; provided, however, that the Company or the Master Servicer may in its discretion undertake any such action, proceeding, hearing or examination that it may deem necessary or desirable in respect to this Agreement and the rights and duties of the parties hereto and the interests of the Certificateholders or the Credit Enhancer hereunder. In such event, the legal expenses and costs of such action, proceeding, hearing or examination and any liability resulting therefrom shall be expenses, costs and liabilities of the Trust Fund, and the Company and the Master Servicer shall be entitled to be reimbursed therefor out of amounts attributable to the Mortgage Loans on deposit in the Custodial Account as provided by Section 3.10 and, on the Distribution Date(s) following such reimbursement, the aggregate of such expenses and costs shall be allocated in reduction of the Accrued Certificate Interest on each Class entitled thereto in the same manner as if such expenses and costs constituted a Prepayment Interest Shortfall.

Section 6.04   Company and Master Servicer Not to Resign.
-----------------------------------------

Subject to the provisions of Section 6.02, neither the Company nor the Master Servicer shall resign from its respective obligations and duties hereby imposed on it except upon determination that its duties hereunder are no longer permissible under applicable law. Any such determination permitting the resignation of the Company or the Master Servicer shall be evidenced by an Opinion of Counsel (at the expense of the resigning party) to such effect delivered to the Trustee and the Credit Enhancer. No such resignation by the Master Servicer shall become effective until the Trustee or a successor servicer shall have assumed the Master Servicer's responsibilities and obligations in accordance with Section 7.02.


ARTICLE VII

DEFAULT

Section 7.01   Events of Default.

Event of Default, wherever used herein, means any one of the following events (whatever reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(i) the Master Servicer shall fail to distribute or cause to be distributed to Holders of Certificates of any Class any distribution required to be made under the terms of the Certificates of such Class and this Agreement and, in either case, such failure shall continue unremedied for a period of 5 days after the date upon which written notice of such failure, requiring such failure to be remedied, shall have been given to the Master Servicer by the Trustee, the Credit Enhancer or the Company or to the Master Servicer, the Company and the Trustee by the Holders of Certificates of such Class evidencing Percentage Interests aggregating not less than 25%; or

(ii) the Master Servicer shall fail to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in the Certificates of any Class or in this Agreement and such failure shall continue unremedied for a period of 30 days (except that such number of days shall be 15 in the case of a failure to pay the premium for any Required Insurance Policy) after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Master Servicer by the Trustee, the Credit Enhancer or the Company, or to the Master Servicer, the Company and the Trustee by the Holders of Certificates of any Class evidencing, as to such Class, Percentage Interests aggregating not less than 25%; or

(iii) a decree or order of a court or agency or supervisory

authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law or appointing a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Master Servicer and such decree or order shall have remained in force undischarged or unstayed for a period of 60 days; or

(iv) the Master Servicer shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities, or similar proceedings of, or relating to, the Master Servicer or of, or relating to, all or substantially all of the property of the Master Servicer; or

(v) the Master Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of, or commence a voluntary case under, any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations.

If an Event of Default shall occur, then, and in each and every such case, so long as such Event of Default shall not have been remedied, either the Company or the Trustee shall at the written direction of the Credit Enhancer (unless a Credit Enhancer Default is continuing, in which case at the direction of the Holders of Certificates entitled to at least 51% of the Voting Rights), by notice in writing to the Master Servicer (and to the Company and the Credit Enhancer if given by the Trustee or to the Master Servicer, the Trustee and the Credit Enhancer if given by the Company), terminate all of the rights and obligations of the Master Servicer under this Agreement and in and to the Mortgage Loans and the proceeds thereof, other than its rights as a Certificateholder hereunder; provided, however, that the successor to the Master Servicer appointed pursuant to Section 7.02 shall have accepted the duties of Master Servicer effective upon the resignation of the Master Servicer. On or after the receipt by the Master Servicer of such written notice, all authority and power of the Master Servicer under this Agreement, whether with respect to the Certificates (other than as a Holder thereof) or the Mortgage Loans or otherwise, shall subject to Section 7.02 pass to and be vested in the Trustee or the Trustee's designee appointed pursuant to Section 7.02; and, without limitation, the Trustee is hereby authorized and empowered to execute and deliver, on behalf of the Master Servicer, as attorney-in-fact or otherwise, any and all documents and other instruments, and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Mortgage Loans and related documents, or otherwise. The Master Servicer agrees to cooperate with the Trustee in effecting the termination of the Master Servicer's responsibilities and rights hereunder, including, without limitation, the transfer to the Trustee or its designee for administration by it of all cash amounts which shall at the time be credited to the Custodial Account or the Certificate Account or thereafter be received with respect to the Mortgage Loans. No such termination shall release the Master Servicer for any liability that it would otherwise have hereunder for any act or omission prior to the effective time of such termination.

Notwithstanding any termination of the activities of Residential Funding in its capacity as Master Servicer hereunder, Residential Funding shall be entitled to receive, out of any late collection of a Monthly Payment on a Mortgage Loan which was due prior to the notice terminating Residential Funding's rights and obligations as Master Servicer hereunder and received after such notice, that portion to which Residential Funding would have been entitled pursuant to Sections 3.10(a)(ii), (vi) and (vii) as well as its Servicing Fee in respect thereof, and any other amounts payable to Residential Funding hereunder the entitlement to which arose prior to the termination of its activities hereunder. Upon the termination of Residential Funding as Master Servicer hereunder, the Company shall deliver to the Trustee a copy of the Program Guide and upon the request of the Credit Enhancer, a copy of the Program Guide to the Credit Enhancer.

Section 7.02 Trustee or Company to Act; Appointment of Successor.
-------------------------------------------------------

(a) On and after the time the Master Servicer receives a notice of termination pursuant to Section 7.01 or resigns in accordance with Section 6.04, so long as no Credit Enhancer Default exists, the Credit Enhancer may appoint a successor Master Servicer, and if the Credit Enhancer fails to do so within 30 days or a Credit Enhancer Default exists, the Trustee or, upon notice to the Credit Enhancer and the Company and with the Company's consent and, so long as no Credit Enhancer Default exists, the Credit Enhancer's consent (which consent shall not be unreasonably withheld) a designee (which meets the standards set forth below) of the Trustee, shall be the successor in all respects to the Master Servicer in its capacity as servicer under this Agreement and the

transactions set forth or provided for herein shall be subject to all the responsibilities, duties and liabilities relating thereto placed on the Master Servicer (except for the responsibilities, duties and liabilities contained in Sections 2.02 and 2.03(a), excluding the duty to notify related Subservicers as set forth in such Sections, and its obligations to deposit amounts in respect of losses incurred prior to such notice or termination on the investment of funds in the Custodial Account or the Certificate Account pursuant to Sections 3.07(c) and 4.01(c) by the terms and provisions hereof); provided, however, that any failure to perform such duties or responsibilities caused by the preceding Master Servicer's failure to provide information required by Section 4.04 shall not be considered a default by the Trustee hereunder as successor Master Servicer. As compensation therefor, the Trustee as successor Master Servicer shall be entitled to all funds relating to the Mortgage Loans which the Master Servicer would have been entitled to charge to the Custodial Account or the Certificate Account if the Master Servicer had continued to act hereunder and, in addition, shall be entitled to the income from any Permitted Investments made with amounts attributable to the Mortgage Loans held in the Custodial Account or the Certificate Account. If the Trustee has become the successor to the Master Servicer in accordance with Section 6.04 or Section 7.01, then notwithstanding the above, so long as no Credit Enhancer Default exists, the Credit Enhancer may appoint a successor Master Servicer, and if the Credit Enhancer fails to do so within 30 days or a Credit Enhancer Default exists, the Trustee may, if it shall be unwilling to so act, or shall, if it is unable to so act, appoint, or petition a court of competent jurisdiction to appoint, any established housing and home finance institution, which is also a Fannie Mae- or Freddie Mac-approved mortgage loan or home equity loan servicing institution, having a net worth of not less than $10,000,000 as the successor to the Master Servicer hereunder in the assumption of all or any part of the responsibilities, duties or liabilities of the Master Servicer hereunder. Pending appointment of a successor to the Master Servicer hereunder, the Trustee shall become successor to the Master Servicer and shall act in such capacity as hereinabove provided. In connection with such appointment and assumption, the Trustee may make such arrangements for the compensation of such successor out of payments on Mortgage Loans as it and such successor shall agree; provided, however, that no such compensation shall be in excess of that permitted the initial Master Servicer hereunder. The Company, the Trustee, the Custodian and such successor shall take such action, consistent with this Agreement, as shall be necessary to effectuate any such succession. The Servicing Fee for any successor Master Servicer appointed pursuant to this Section 7.02 will be lowered with respect to those Mortgage Loans, if any, where the Subservicing Fee accrues at a rate of less than 0.20% per annum in the event that the successor Master Servicer is not servicing such Mortgage Loans directly and it is necessary to raise the related Subservicing Fee to a rate of 0.20% per annum in order to hire a Subservicer with respect to such Mortgage Loans.

(b) In connection with the termination or resignation of the Master Servicer hereunder, either (i) the successor Master Servicer, including the Trustee if the Trustee is acting as successor Master Servicer, shall represent and warrant that it is a member of MERS in good standing and shall agree to comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS, in which case the predecessor Master Servicer shall cooperate with the successor Master Servicer in causing MERS to revise its records to reflect the transfer of servicing to the successor Master Servicer as necessary under MERS' rules and regulations, or (ii) the predecessor Master Servicer shall cooperate with the successor Master Servicer in causing MERS to execute and deliver an assignment of Mortgage in recordable form to transfer the Mortgage from MERS to the Trustee and to execute and deliver such other notices, documents and other instruments as may be necessary or desirable to effect a transfer of such Mortgage Loan or servicing of such Mortgage Loan on the MERS(R) System to the successor Master Servicer. The predecessor Master Servicer shall file or cause to be filed any such assignment in the appropriate recording office. The predecessor Master Servicer shall bear any and all fees of MERS, costs of preparing any assignments of Mortgage, and fees and costs of filing any assignments of Mortgage that may be required under this subsection (b). The successor Master Servicer shall cause such assignment to be delivered to the Trustee or the Custodian promptly upon receipt of the original with evidence of recording thereon or a copy certified by the public recording office in which such assignment was recorded.

Section 7.03    Notification to Certificateholders.
                ----------------------------------

(a) Upon any such termination or appointment of a successor to the Master Servicer, the Trustee shall give prompt written notice thereof to the Credit Enhancer and to the Certificateholders, at their respective addresses appearing in the Certificate Register.

(b) Within 60 days after the occurrence of any Event of Default, the Trustee shall transmit by mail to all Holders of Certificates and the Credit Enhancer notice of each such Event of Default hereunder known to the Trustee,

unless such Event of Default shall have been cured or waived as provided in Section 7.04 hereof.

Section 7.04  Waiver of Events of Default.

The Credit Enhancer or the Holders representing at least 66% of the Voting Rights of Certificates affected by a default or Event of Default hereunder, with the written consent of the Credit Enhancer, which consent shall not be unreasonably withheld, may waive any default or Event of Default; provided, however, that (a) a default or Event of Default under clause (i) of Section 7.01 may be waived with the written consent of the Credit Enhancer, only by all of the Holders of Certificates affected by such default or Event of Default (which Voting Rights of the Class A Certificateholders may be exercised by the Credit Enhancer without the consent of such Holders and may only be exercised by such Holders with the prior written consent of the Credit Enhancer so long as there is no Credit Enhancer Default) and (b) no waiver pursuant to this Section 7.04 shall affect the Holders of Certificates in the manner set forth in Section 11.01(b)(i), (ii) or (iii). Upon any such waiver of a default or Event of Default by the Credit Enhancer or the Holders representing the requisite percentage of Voting Rights of Certificates affected by such default or Event of Default with the consent of the Credit Enhancer, which consent shall not be unreasonably withheld, such default or Event of Default shall cease to exist and shall be deemed to have been remedied for every purpose hereunder. No such waiver shall extend to any subsequent or other default or Event of Default or impair any right consequent thereon except to the extent expressly so waived.

Section 7.05  Servicing Trigger; Removal of Master Servicer .
             -------------------------------------------------

(a) Upon determination by the Credit Enhancer that a Servicing Trigger has occurred, the Credit Enhancer shall give written notice of such Servicing Trigger to the Master Servicer, the Depositor, the Trustee and to each Rating Agency.

(b) At any time after such determination and while a Servicing Trigger is continuing, the Credit Enhancer may direct the Trustee in writing to remove the Master Servicer if the Credit Enhancer makes a determination that the manner of master servicing was a factor contributing to the size of the delinquencies or losses incurred in the Trust Fund.

(c) Upon receipt of directions to remove the Master Servicer pursuant to the preceding clause (b), the Trustee shall notify the Master Servicer that it has been terminated and the Master Servicer shall be terminated in the same manner as specified in Sections 7.01 and 7.02.

(d) After notice of occurrence of a Servicing Trigger has been given and while a Servicing Trigger is continuing, until and unless the Master Servicer has been removed as provided in clause (b), the Master Servicer covenants and agrees to act as the Master Servicer for a term from the occurrence of the Servicing Trigger to the end of the calendar quarter in which such Servicing Trigger occurs, which term may at the Credit Enhancer's discretion be extended by written notice to the Trustee and the Master Servicer for successive terms of three (3) calendar months each, until the termination of the Trust Fund. The Master Servicer will, upon the receipt of each such notice of extension (a "Master Servicer Extension Notice") become bound for the duration of the term covered by such Master Servicer Extension Notice to continue as Master Servicer subject to and in accordance with this Agreement. If, as of the fifteenth (15th) day prior to the last day of any term as the Master Servicer, the Trustee shall not have received any Master Servicer Extension Notice from the Credit Enhancer, the Trustee shall, within five (5) days thereafter, give written notice of such nonreceipt to the Credit Enhancer and the Master Servicer. If any such term expires without a Master Servicer Extension Notice then the Trustee shall act as successor Master Servicer as provided in Section 7.02.

(e) No provision of this Section 7.05 shall have the effect of limiting the rights of the Depositor, the Trustee, the Certificateholders or the Credit Enhancer under Section 7.01.

ARTICLE VIII

CONCERNING THE TRUSTEE

Section 8.01  Duties of Trustee.

(a) The Trustee, prior to the occurrence of an Event of Default and after the curing or waiver of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Agreement. In case an Event of Default has occurred (which has not been cured or waived), the Trustee shall exercise such of the rights and powers

vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent investor would exercise or use under the circumstances in the conduct of such investor's own affairs.

(b) The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Trustee which are specifically required to be furnished pursuant to any provision of this Agreement, shall examine them to determine whether they conform to the requirements of this Agreement. The Trustee shall notify the Certificateholders and the Credit Enhancer of any such documents which do not materially conform to the requirements of this Agreement in the event that the Trustee, after so requesting, does not receive satisfactorily corrected documents.

The Trustee shall forward or cause to be forwarded in a timely fashion the notices, reports and statements required to be forwarded by the Trustee pursuant to Sections 4.03, 7.03 and 10.01. The Trustee shall furnish in a timely fashion to the Master Servicer such information in the Trustee's possession as the Master Servicer may reasonably request from time to time for the Master Servicer to fulfill its duties as set forth in this Agreement and the Trustee shall furnish in a timely fashion to the Credit Enhancer such information in its possession as the Credit Enhancer may reasonably request from time to time for the Credit Enhancer to protect its interests and to fulfill its duties under the Policy. The Trustee covenants and agrees that it shall perform its obligations hereunder in a manner so as to maintain the status of each of REMIC I and REMIC II as a REMIC under the REMIC Provisions and (subject to Section 10.01(f)) to prevent the imposition of any federal, state or local income, prohibited transaction, contribution or other tax on the Trust Fund to the extent that maintaining such status and avoiding such taxes are reasonably within the control of the Trustee and are reasonably within the scope of its duties under this Agreement.

(c) No provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct; provided, however, that:

(i) Prior to the occurrence of an Event of Default, and after the curing or waiver of all such Events of Default which may have occurred, the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee and, in the absence of bad faith on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee by the Company or the Master Servicer and which on their face, do not contradict the requirements of this Agreement;

(ii) The Trustee shall not be liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts;

(iii) The Trustee shall not be liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Credit Enhancer or the Certificateholders holding Certificates which evidence Percentage Interests aggregating not less than 25% of the affected Classes as to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Agreement;

(iv) The Trustee shall not be charged with knowledge of any default (other than a default in payment to the Trustee) specified in clauses (i) and (ii) of Section 7.01 or an Event of Default under clauses (iii), (iv) and (v) of Section 7.01 unless a Responsible Officer of the Trustee assigned to and working in the Corporate Trust Office obtains actual knowledge of such failure or event or the Trustee receives written notice of such failure or event at its Corporate Trust Office from the Master Servicer, the Credit Enhancer, the Company or any Certificateholder; and

(v) Except to the extent provided in Section 7.02, no provision in this Agreement shall require the Trustee to expend or risk its own funds or otherwise incur any personal financial liability in the performance of any of its duties as Trustee hereunder, or in the exercise of any of its rights or powers, if the Trustee shall have reasonable grounds for believing that repayment of funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(d) The Trustee shall timely pay, from its own funds, the amount of any and all federal, state and local taxes imposed on the Trust Fund or its assets or transactions including, without limitation, (A) "prohibited transaction" penalty taxes as defined in Section 860F of the Code, if, when and as the same shall be due and payable, (B) any tax on contributions to a REMIC after the Closing Date imposed by Section 860G(d) of the Code and (C) any tax on "net income from foreclosure property" as defined in Section 860G(c) of the Code, but only if such taxes arise out of a breach by the Trustee of its obligations hereunder, which breach constitutes negligence or willful misconduct of the Trustee.

Section 8.02    Certain Matters Affecting the Trustee.
                ------------------------------------

(a) Except as otherwise provided in Section 8.01:

        (i) The Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, Officers' Certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

        (ii) The Trustee may consult with counsel, and any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such Opinion of Counsel;

        (iii) The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Agreement or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of the Credit Enhancer or any of the Certificateholders, pursuant to the provisions of this Agreement, unless (a) the Credit Enhancer or such Certificateholders, as applicable, shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which may be incurred therein or thereby and (b) so long as no Credit Enhancer Default exists, the Credit Enhancer has given its consent; nothing contained herein shall, however, relieve the Trustee of the obligation, upon the occurrence of an Event of Default (which has not been cured), to exercise such of the rights and powers vested in it by this Agreement, and to use the same degree of care and skill in their exercise as a prudent investor would exercise or use under the circumstances in the conduct of such investor's own affairs;

        (iv) The Trustee shall not be liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement;

        (v) Prior to the occurrence of an Event of Default hereunder and after the curing of all Events of Default which may have occurred, the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing so to do by the Credit Enhancer or the Holders of Certificates of any Class evidencing, as to such Class, Percentage Interests, aggregating not less than 50% with the written consent of the Credit Enhancer; provided, however, that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not reasonably assured to the Trustee by the security afforded to it by the terms of this Agreement, the Trustee may require reasonable indemnity against such expense or liability as a condition to so proceeding. The reasonable expense of every such examination shall be paid by the Master Servicer, if an Event of Default shall have occurred and is continuing, and otherwise by the Certificateholder requesting the investigation (or the Credit Enhancer, if the Credit Enhancer requested the investigation);

        (vi) The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys provided that the Trustee shall remain liable for any acts of such agents or attorneys; and

        (vii) To the extent authorized under the Code and the regulations promulgated thereunder, each Holder of a Class R Certificate hereby irrevocably appoints and authorizes the Trustee to be its attorney-in-fact for purposes of signing any Tax Returns required to be filed on behalf of the Trust Fund. The Trustee shall sign on behalf of

the Trust Fund and deliver to the Master Servicer in a timely manner any Tax Returns prepared by or on behalf of the Master Servicer that the Trustee is required to sign as determined by the Master Servicer pursuant to applicable federal, state or local tax laws, provided that the Master Servicer shall indemnify the Trustee for signing any such Tax Returns that contain errors or omissions.

(b) Following the issuance of the Certificates (and except as provided for in Section 2.04), the Trustee shall not accept any contribution of assets to the Trust Fund unless (subject to Section 10.01(f)) it shall have obtained or been furnished with an Opinion of Counsel to the effect that such contribution will not (i) cause any of REMIC I or REMIC II to fail to qualify as a REMIC at any time that any Certificates are outstanding or (ii) cause the Trust Fund to be subject to any federal tax as a result of such contribution (including the imposition of any federal tax on "prohibited transactions" imposed under Section 860F(a) of the Code).

Section 8.03 Trustee Not Liable for Certificates or Mortgage Loans.
--------------------------------------------------------

The recitals contained herein and in the Certificates (other than the execution of the Certificates and relating to the acceptance and receipt of the Mortgage Loans) shall be taken as the statements of the Company or the Master Servicer as the case may be, and the Trustee assumes no responsibility for their correctness. The Trustee makes no representations as to the validity or sufficiency of this Agreement or of the Certificates (except that the Certificates shall be duly and validly executed and authenticated by it as Certificate Registrar) or of any Mortgage Loan or related document, or of MERS or the MERS(R) System.. Except as otherwise provided herein, the Trustee shall not be accountable for the use or application by the Company or the Master Servicer of any of the Certificates or of the proceeds of such Certificates, or for the use or application of any funds paid to the Company or the Master Servicer in respect of the Mortgage Loans or deposited in or withdrawn from the Custodial Account or the Certificate Account by the Company or the Master Servicer.

Section 8.04  Trustee May Own Certificates.

The Trustee in its individual or any other capacity may become the owner or pledgee of Certificates with the same rights it would have if it were not Trustee.

Section 8.05  Master Servicer to Pay Trustee's Fees and Expenses; Indemnification.

(a) The Master Servicer covenants and agrees to pay to the Trustee and any co-trustee from time to time, and the Trustee and any co-trustee shall be entitled to, reasonable compensation (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by each of them in the execution of the trusts hereby created and in the exercise and performance of any of the powers and duties hereunder of the Trustee and any co-trustee, and the Master Servicer will pay or reimburse the Trustee and any co-trustee upon request for all reasonable expenses, disbursements and advances incurred or made by the Trustee or any co-trustee in accordance with any of the provisions of this Agreement (including the reasonable compensation and the expenses and disbursements of its counsel and of all persons not regularly in its employ, and the expenses incurred by the Trustee or any co-trustee in connection with the appointment of an office or agency pursuant to Section 8.12) except any such expense, disbursement or advance as may arise from its negligence or bad faith.

(b) The Master Servicer agrees to indemnify the Trustee for, and to hold the Trustee harmless against, any loss, liability or expense incurred without negligence or willful misconduct on its part, arising out of, or in connection with, the acceptance and administration of the Trust Fund and the administration of the Custodial Account, including the costs and expenses (including reasonable legal fees and expenses) of defending itself against any claim in connection with the exercise or performance of any of its powers or duties under this Agreement, provided that:

(i) with respect to any such claim, the Trustee shall have given the Master Servicer written notice thereof promptly after the Trustee shall have actual knowledge thereof;

(ii) while maintaining control over its own defense, the Trustee shall cooperate and consult fully with the Master Servicer in preparing such defense; and

(iii) notwithstanding anything in this Agreement to the contrary, the Master Servicer shall not be liable for settlement of any claim by the Trustee entered into without the prior consent of the Master

Servicer which consent shall not be unreasonably withheld.

No termination of this Agreement shall affect the obligations created by this Section 8.05(b) of the Master Servicer to indemnify the Trustee under the conditions and to the extent set forth herein.

Notwithstanding the foregoing, the indemnification provided by the Master Servicer in this Section 8.05(b) shall not pertain to any loss, liability or expense of the Trustee, including the costs and expenses of defending itself against any claim, incurred in connection with any actions taken by the Trustee at the direction of Certificateholders pursuant to the terms of this Agreement.

Section 8.06   Eligibility Requirements for Trustee.
-------------------------------------

The Trustee hereunder shall at all times be a national banking association or a New York banking corporation having its principal office in a state and city acceptable to the Company and organized and doing business under the laws of such state or the United States of America, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal or state authority. If such corporation or national banking association publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. In case at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, the Trustee shall resign immediately in the manner and with the effect specified in Section 8.07.

Section 8.07 Resignation and Removal of the Trustee.

(a) The Trustee may at any time resign and be discharged from the trusts hereby created by giving written notice thereof to the Company, the Master Servicer and the Credit Enhancer. Upon receiving such notice of resignation, the Company shall promptly appoint a successor trustee acceptable to the Credit Enhancer by written instrument, in duplicate, one copy of which instrument shall be delivered to the resigning Trustee and one copy to the successor trustee. If no successor trustee shall have been so appointed and have accepted appointment within 30 days after the giving of such notice of resignation then the Credit Enhancer may appoint a successor trustee and if the Credit Enhancer fails to do so within 30 days, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee.

(b) If at any time the Trustee shall cease to be eligible in accordance with the provisions of Section 8.06 and shall fail to resign after written request therefor by the Credit Enhancer or the Company with the consent of the Credit Enhancer, which such consent shall not be unreasonably withheld, or if at any time the Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then the Credit Enhancer or the Company (with the consent of the Credit Enhancer, which such consent shall not be unreasonably withheld), may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, one copy of which instrument shall be delivered to the Trustee so removed and one copy to the successor trustee. In addition, in the event that the Credit Enhancer or the Company determines that the Trustee has failed (i) to make a required claim under the Policy of which it has been notified pursuant to Section 4.10(a) or failed to distribute or cause to be distributed to Certificateholders any amount required to be distributed hereunder (including any Insured Payment), if such amount is held by the Trustee or its Paying Agent (other than the Master Servicer or the Company) for distribution or (ii) to otherwise observe or perform in any material respect any of its covenants, agreements or obligations hereunder, and such failure shall continue unremedied for a period of 5 days (in respect of clause (i) above) or 30 days (in respect of clause (ii) above) after the date on which written notice of such failure, requiring that the same be remedied, shall have been given to the Trustee by the Company or the Credit Enhancer, then the Company with the consent of the Credit Enhancer, which consent shall not be unreasonably withheld, may remove the Trustee and appoint a successor trustee by written instrument delivered as provided in the preceding sentence. In connection with the appointment of a successor trustee pursuant to the preceding sentence, the Company shall, on or before the date on which any such appointment becomes effective, obtain from each Rating Agency written confirmation that the appointment of any such successor trustee will not result in the reduction of the ratings on any Class of the Certificates below the lesser of the then current or original ratings on such Certificates (without taking into account the Policy).

(c) During the continuance of a Credit Enhancer Default, the Holders of Certificates entitled to at least 51% of the Voting Rights may at any time

remove the Trustee and appoint a successor thereby written instrument or
instruments, in triplicate, signed by such Holders or their attorneys-in-fact
duly authorized, one complete set of which instruments shall be delivered to the
Company, one complete set to the Trustee so removed and one complete set to the
successor so appointed.

(d) Any resignation or removal of the Trustee and appointment of a
successor trustee pursuant to any of the provisions of this Section shall become
effective upon acceptance of appointment by the successor trustee as provided in
Section 8.08.

Section 8.08   Successor Trustee.

(a) Any successor trustee appointed as provided in Section 8.07 shall
execute, acknowledge and deliver to the Company, the Credit Enhancer and its
predecessor trustee an instrument accepting such appointment hereunder, and
thereupon the resignation or removal of the predecessor trustee shall become
effective and such successor trustee shall become effective and such successor
trustee, without any further act, deed or conveyance, shall become fully vested
with all the rights, powers, duties and obligations of its predecessor
hereunder, with the like effect as if originally named as trustee herein. The
predecessor trustee shall deliver to the successor trustee all Mortgage Files
and related documents and statements held by it hereunder (other than any
Mortgage Files at the time held by a Custodian, which shall become the agent of
any successor trustee hereunder), and the Company, the Master Servicer and the
predecessor trustee shall execute and deliver such instruments and do such other
things as may reasonably be required for more fully and certainly vesting and
confirming in the successor trustee all such rights, powers, duties and
obligations.

(b) No successor trustee shall accept appointment as provided in this
Section unless at the time of such acceptance such successor trustee shall be
eligible under the provisions of Section 8.06.

(c) Upon acceptance of appointment by a successor trustee as provided in
this Section, the Company shall mail notice of the succession of such trustee
hereunder to all Holders of Certificates at their addresses as shown in the
Certificate Register. If the Company fails to mail such notice within 10 days
after acceptance of appointment by the successor trustee, the successor trustee
shall cause such notice to be mailed at the expense of the Company.

Section 8.09   Merger or Consolidation of Trustee.
               -----------------------------------

Any corporation or national banking association into which the Trustee
may be merged or converted or with which it may be consolidated or any
corporation or national banking association resulting from any merger,
conversion or consolidation to which the Trustee shall be a party, or any
corporation or national banking association succeeding to the business of the
Trustee, shall be the successor of the Trustee hereunder, provided such
corporation or national banking association shall be eligible under the
provisions of Section 8.06, without the execution or filing of any paper or any
further act on the part of any of the parties hereto, anything herein to the
contrary notwithstanding. The Trustee shall mail notice of any such merger or
consolidation to the Certificateholders at their address as shown in the
Certificate Register.

Section 8.10 Appointment of Co-Trustee or Separate Trustee.

(a) Notwithstanding any other provisions hereof, at any time, for the
purpose of meeting any legal requirements of any jurisdiction in which any part
of the Trust Fund or property securing the same may at the time be located, the
Master Servicer and the Trustee acting jointly shall have the power and shall
execute and deliver all instruments to appoint one or more Persons approved by
the Trustee to act as co-trustee or co-trustees, jointly with the Trustee, or
separate trustee or separate trustees, of all or any part of the Trust Fund, and
to vest in such Person or Persons, in such capacity, such title to the Trust
Fund, or any part thereof, and, subject to the other provisions of this Section
8.10, such powers, duties, obligations, rights and trusts as the Master Servicer
and the Trustee may consider necessary or desirable. If the Master Servicer
shall not have joined in such appointment within 15 days after the receipt by it
of a request so so do, or in case an Event of Default shall have occurred and be
continuing, the Trustee alone shall have the power to make such appointment. No
co-trustee or separate trustee hereunder shall be required to meet the terms of
eligibility as a successor trustee under Section 8.06 hereunder and no notice to
Holders of Certificates of the appointment of co-trustee(s) or separate
trustee(s) shall be required under Section 8.08 hereof.

(b) In the case of any appointment of a co-trustee or separate trustee
pursuant to this Section 8.10 all rights, powers, duties and obligations
conferred or imposed upon the Trustee shall be conferred or imposed upon and

exercised or performed by the Trustee, and separate trustee or co-trustee jointly, except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed (whether as Trustee hereunder or as successor to the Master Servicer hereunder), the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the Trust Fund or any portion thereof in any such jurisdiction) shall be exercised and performed by such separate trustee or co-trustee at the direction of the Trustee.

(c) Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Agreement and the conditions of this Article VIII. Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Agreement, specifically including every provision of this Agreement relating to the conduct of, affecting the liability of, or affording protection to, the Trustee. Every such instrument shall be filed with the Trustee.

(d) Any separate trustee or co-trustee may, at any time, constitute the Trustee, its agent or attorney-in-fact, with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf and in its name. If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

Section 8.11  Appointment of Custodians.

The Trustee may, with the consent of the Master Servicer, the Credit Enhancer and the Company, or shall, at the direction of the Master Servicer, the Credit Enhancer and the Company, appoint one or more Custodians who are not Affiliates of the Company or the Master Servicer to hold all or a portion of the Mortgage Files as agent for the Trustee, by entering into a Custodial Agreement. The Trustee is hereby directed to enter into a Custodial Agreement with Wells Fargo Bank, N.A. Subject to Article VIII, the Trustee agrees to comply with the terms of each Custodial Agreement and to enforce the terms and provisions thereof against the Custodian for the benefit of the Certificateholders. Each Custodian shall be a depository institution subject to supervision by federal or state authority, shall have a combined capital and surplus of at least $15,000,000 and shall be qualified to do business in the jurisdiction in which it holds any Mortgage File. Each Custodial Agreement may be amended only as provided in Section 11.01. The Trustee shall notify the Certificateholders of the appointment of any Custodian (other than the Custodian appointed as of the Closing Date) pursuant to this Section 8.11.

Section 8.12  Appointment of Office or Agency.
                --------------------------------

The Trustee will maintain an office or agency in the City of New York where Certificates may be surrendered for registration of transfer or exchange. The Trustee initially designates its offices located at 600 Travis Street, 9th Floor, Houston, Texas 77002 for the purpose of keeping the Certificate Register. The Trustee will maintain an office at the address stated in Section 11.05(c) hereof where notices and demands to or upon the Trustee in respect of this Agreement may be served.


ARTICLE IX

TERMINATION

Section        9.01 Optional Purchase by the Master Servicer of All Certificates; Termination Upon Purchase by the Master Servicer or Liquidation of All Mortgage Loans.

(a) Subject to Section 9.02, the respective obligations and responsibilities of the Company, the Master Servicer and the Trustee created hereby in respect of the Certificates (other than the obligation of the Trustee to make certain payments after the Final Distribution Date to Certificateholders and the Credit Enhancer and the obligation of the Company to send certain notices as hereinafter set forth) shall terminate upon the last action required to be taken by the Trustee on the Final Distribution Date pursuant to this Article IX following the earlier of:

(i) the later of the final payment or other liquidation of the last Mortgage Loan remaining in the Trust Fund or the disposition of all

property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan, or

(ii) the purchase by the Master Servicer of all Mortgage Loans and all property acquired in respect of any Mortgage Loan remaining in the Trust Fund at a price equal to 100% of the unpaid principal balance of each Mortgage Loan or, if less than such unpaid principal balance, the fair market value of any REO Property if such fair market value is less than such unpaid principal balance on the day of purchase, plus accrued interest on each Mortgage Loan at the Net Mortgage Rate to, but not including, the first day of the month in which such purchase price is distributed, including payments of any amounts due to the Credit Enhancer pursuant to the Insurance Agreement; provided, however, that in no event shall the trust created hereby continue beyond the expiration of 21 years from the death of the last survivor of the descendants of Joseph P. Kennedy, the late ambassador of the United States to the Court of St. James, living on the date hereof; and provided further that the purchase price set forth above shall be increased as is necessary, as determined by the Master Servicer, to avoid disqualification of any of REMIC I or REMIC II as a REMIC .

The purchase price paid by the Master Servicer pursuant to Section 9.01(a)(ii) shall also include any amounts owed by Residential Funding pursuant to the last paragraph of Section 4 of the Assignment Agreement in respect of any liability, penalty or expense that resulted from a breach of the representation and warranty set forth in clause (h) of Section 4 of the Assignment Agreement that remain unpaid on the date of such purchase.

The right of the Master Servicer to purchase all the assets of the Trust Fund relating to the Mortgage Loans pursuant to clause (ii) above is conditioned upon the Pool Principal Balance, after giving effect to distributions to be made on such Distribution Date, being less than ten percent of the Cut-off Date Principal Balance of the Mortgage Loans. In addition, the Master Servicer shall provide to the Trustee the certification required by Section 3.14 and the Trustee and any Custodian shall, promptly following payment of the purchase price, release to the Master Servicer the Mortgage Files pertaining to the Mortgage Loans being purchased. No purchase pursuant to clause (ii) of this Section 9.01(a) is permitted if it would result in a draw on the Policy, or would result in any amounts owing to the Credit Enhancer remaining unreimbursed, unless, in either case, the Credit Enhancer consents in writing.

In addition to the foregoing, on any Distribution Date on which the Pool Principal Balance is less than ten percent of the Cut-off Date Principal Balance of the Mortgage Loans, the Master Servicer shall have the right, at its option, to purchase the Class A Certificates in whole, but not in part, at a price equal to the outstanding Certificate Principal Balance of such Certificates plus the sum of one month's Accrued Certificate Interest thereon for the related Interest Accrual Period and any previously unpaid Accrued Certificate Interest and any unpaid Prepayment Interest Shortfalls plus accrued interest thereon at the related Pass-Through Rate. If the Master Servicer exercises this right to purchase the outstanding Certificates, the Master Servicer will promptly terminate the respective obligations and responsibilities created hereby in respect of the Certificates pursuant to this Article IX.

(b) The Master Servicer shall give the Trustee and the Credit Enhancer not less than 60 days' prior notice of the Distribution Date on which the Master Servicer anticipates that the final distribution will be made to Certificateholders (whether as a result of the exercise by the Master Servicer of its right to purchase the assets of the Trust Fund or otherwise) or on which the Master Servicer anticipates that the Certificates will be purchased (as a result of the exercise by the Master Servicer to purchase the outstanding Certificates). Notice of any termination, specifying the anticipated Final Distribution Date (which shall be a date that would otherwise be a Distribution Date) upon which the Certificateholders may surrender their Certificates to the Trustee for payment of the final distribution and cancellation or notice of any purchase of the outstanding Certificates, specifying the Distribution Date upon which the Holders may surrender their Certificates to the Trustee for payment, shall be given promptly by the Master Servicer (if it is exercising its right to purchase the assets of the Trust Fund or to purchase the outstanding Certificates), or by the Trustee (in any other case) by letter to Certificateholders (with a copy to the Certificate Registrar, the Credit Enhancer and each Rating Agency) mailed not earlier than the 15th day and not later than the 25th day of the month next preceding the month of such final distribution specifying:

(i) the anticipated Final Distribution Date upon which final payment of the Certificates is anticipated to be made upon presentation and surrender of Certificates at the office or agency of the Trustee therein designated or, in the case of the purchase by the Master Servicer of the outstanding Certificates, the Distribution Date on which such purchase is to be made,

(ii) the amount of any such final payment or, in the case of the purchase of the outstanding Certificates, the purchase price, in either case, if known, and

(iii) that the Record Date otherwise applicable to such Distribution Date is not applicable, and that payment will be made only upon presentation and surrender of the Certificates at the office or agency of the Trustee therein specified.

If the Master Servicer or the Trustee is obligated to give notice to Certificateholders as aforesaid, it shall give such notice to the Certificate Registrar at the time such notice is given to Certificateholders and, if the Master Servicer is exercising its rights to purchase the outstanding Certificates, it shall give such notice to each Rating Agency at the time such notice is given to Certificateholders. As a result of the exercise by the Master Servicer of its right to purchase the assets of the Trust Fund, the Master Servicer shall deposit in the Certificate Account, before the Final Distribution Date in immediately available funds an amount equal to the purchase price for the assets of the Trust Fund, computed as provided above. As a result of the exercise by the Master Servicer of its right to purchase the outstanding Certificates, the Master Servicer shall deposit in an Eligible Account, established by the Master Servicer on behalf of the Trustee and separate from the Certificate Account in the name of the Trustee in trust for the registered holders of the Certificates, before the Distribution Date on which such purchase is to occur in immediately available funds an amount equal to the purchase price for the Certificates, computed as above provided, and provide notice of such deposit to the Trustee and the Credit Enhancer. The Trustee will withdraw from such account the amount specified in subsection (c) below and distribute such amount to the Certificateholders as specified in subsection (c) below. The Master Servicer shall provide to the Trustee written notification of any change to the anticipated Final Distribution Date as soon as practicable. If the Trust Fund is not terminated on the anticipated Final Distribution Date, for any reason, the Trustee shall promptly mail notice thereof to each affected Certificateholder.

(c) Upon presentation and surrender of the Certificates by the Certificateholders, the Trustee shall distribute to the Certificateholders (i) the amount otherwise distributable on such Distribution Date in accordance with Section 4.02, if not in connection with the Master Servicer's election to repurchase the assets of the Trust Fund or the outstanding Certificates, or (ii) if the Master Servicer elected to so repurchase the assets of the Trust Fund or the outstanding Certificates, an amount equal to the price paid pursuant to Section 9.01(a), as follows: first, to the Class A Certificates on a pro rata basis, the outstanding Certificate Principal Balance thereof plus Accrued Certificate Interest thereon for the related Interest Accrual Period and any previously unpaid Accrued Certificate Interest and any unpaid Prepayment Interest Shortfalls and accrued interest thereon at the applicable Pass-Through Rate, second, to the Credit Enhancer, the amount of any cumulative Insured Payments by the Credit Enhancer under the Policy to the extent not previously reimbursed and any other amounts owed to the Credit Enhancer under the Insurance Agreement, and third, to the Class SB Certificates.

(d) In the event that any Certificateholders shall not surrender their Certificates for final payment and cancellation on or before the Final Distribution Date, the Trustee shall on such date cause all funds in the Certificate Account not distributed in final distribution to Certificateholders to be withdrawn therefrom and credited to the remaining Certificateholders by depositing such funds in a separate escrow account for the benefit of such Certificateholders, and the Master Servicer (if it exercised its right to purchase the assets of the Trust Fund), or the Trustee (in any other case) shall give a second written notice to the remaining Certificateholders to surrender their Certificates for cancellation and receive the final distribution with respect thereto. If within six months after the second notice any Certificate shall not have been surrendered for cancellation, the Trustee shall take appropriate steps as directed by the Master Servicer to contact the remaining Certificateholders concerning surrender of their Certificates. The costs and expenses of maintaining the escrow account and of contacting Certificateholders shall be paid out of the assets which remain in the escrow account. If within nine months after the second notice any Certificates shall not have been surrendered for cancellation, the Trustee shall pay to the Master Servicer all amounts distributable to the holders thereof and the Master Servicer shall thereafter hold such amounts until distributed to such Holders. No interest shall accrue or be payable to any Certificateholder on any amount held in the escrow account or by the Master Servicer as a result of such Certificateholder's failure to surrender its Certificate(s) for final payment thereof in accordance with this Section 9.01 and the Certificateholders shall look only to the Master Servicer for such payment.

(e) If any Certificateholders do not surrender their Certificates on or before the Distribution Date on which a purchase of the outstanding Certificates

is to be made, the Trustee shall on such date withdraw all funds in the Eligible Account established by the Master Servicer deposited therein by the Master Servicer pursuant to Section 9.01(b) to be withdrawn therefrom and deposited in a separate escrow account for the benefit of such Certificateholders, and the Master Servicer shall give a second written notice to such Certificateholders to surrender their Certificates for payment of the purchase price therefor. If within six months after the second notice any Certificate shall not have been surrendered for cancellation, the Trustee shall take appropriate steps as directed by the Master Servicer to contact the Holders of such Certificates concerning surrender of their Certificates. The costs and expenses of maintaining the escrow account and of contacting Certificateholders shall be paid out of the assets which remain in the escrow account. If within nine months after the second notice any Certificates shall not have been surrendered for cancellation in accordance with this Section 9.01, the Trustee shall pay to the Master Servicer all amounts distributable to the Holders thereof and shall have no further obligation or liability therefor and the Master Servicer shall thereafter hold such amounts until distributed to such Holders. No interest shall accrue or be payable to any Certificateholder on any amount held in the escrow account or by the Master Servicer as a result of such Certificateholder's failure to surrender its Certificate(s) for payment in accordance with this Section 9.01. Any Certificate that is not surrendered on the Distribution Date on which a purchase pursuant to this Section 9.01 occurs as provided above will be deemed to have been purchased and the Holder as of such date will have no rights with respect thereto except to receive the purchase price therefor minus any costs and expenses associated with such escrow account and notices allocated thereto. Any Certificates so purchased or deemed to have been purchased on such Distribution Date shall remain outstanding hereunder. The Master Servicer shall be for all purposes the Holder thereof as of such date.

Section 9.02    Additional Termination Requirements.
------------------------------------

(a) Each of REMIC I and REMIC II, as the case may be, shall be terminated in accordance with the following additional requirements, unless the Trustee, the Credit Enhancer and the Master Servicer have received an Opinion of Counsel (which Opinion of Counsel shall not be an expense of the Trustee or the Credit Enhancer) to the effect that the failure of any of REMIC I and REMIC II, as the case may be, to comply with the requirements of this Section 9.02 will not (i) result in the imposition on the Trust Fund of taxes on "prohibited transactions," as described in Section 860F of the Code, or (ii) cause any of REMIC I or REMIC II to fail to qualify as a REMIC at any time that any Certificate is outstanding:

(i) The Master Servicer shall establish a 90-day liquidation period for each of REMIC I and REMIC II and specify the first day of such period in a statement attached to the Trust Fund's final Tax Return pursuant to Treasury regulations 1.860F-1. The Master Servicer also shall satisfy all of the requirements of a qualified liquidation for each of REMIC I and REMIC II under Section 860F of the Code and the regulations thereunder;

(ii) The Master Servicer shall notify the Trustee at the commencement of such 90-day liquidation period and, at or prior to the time of making of the final payment on the Certificates, the Trustee shall sell or otherwise dispose of all of the remaining assets of the Trust Fund in accordance with the terms hereof; and

(iii) If the Master Servicer or the Company is exercising its right to purchase the assets of the Trust Fund, the Master Servicer shall, during the 90-day liquidation period and at or prior to the Final Distribution Date, purchase all of the assets of the Trust Fund for cash.

(b) Each Holder of a Certificate and the Trustee hereby irrevocably approves and appoints the Master Servicer as its attorney-in-fact to adopt a plan of complete liquidation for each of REMIC I and REMIC II at the expense of the Trust Fund in accordance with the terms and conditions of this Agreement.

ARTICLE X

REMIC PROVISIONS

Section 10.01 REMIC Administration.

(a) The REMIC Administrator shall make an election to treat each of REMIC I and REMIC II as a REMIC under the Code and, if necessary, under applicable state law. Such election will be made on Form 1066 or other appropriate federal tax or information return (including Form 8811) or any appropriate state return for the taxable year ending on the last day of the calendar year in which the Certificates are issued. The REMIC I Regular Interests shall be designated as the "regular interests" and the Class R-I

Certificates shall be designated as the sole Class of "residual interests" in REMIC I. The Class A-1, Class A-2, Class A-3, Class A-4, Class A-5 and Class SB Certificates shall be designated as the "regular interests" and the Class R-II Certificates shall be designated as the sole Class of "residual interests" in REMIC II. The REMIC Administrator and the Trustee shall not permit the creation of any "interests" (within the meaning of Section 860G of the Code) in REMIC I or REMIC II other than the REMIC I Regular Interests and the Certificates.

(b) The Closing Date is hereby designated as the "startup day" of each of REMIC I and REMIC II within the meaning of Section 860G(a)(9) of the Code.

(c) The REMIC Administrator shall hold a Class R Certificate in each REMIC representing at least a 0.01% Percentage Interest of the Class R Certificates in each REMIC, and shall be designated as "the tax matters person" with respect to each of REMIC I and REMIC II in the manner provided under Treasury regulations section 1.860F-4(d) and Treasury regulations section 301.6231(a)(7)-1. The REMIC Administrator, as tax matters person, shall (i) act on behalf of each of REMIC I and REMIC II in relation to any tax matter or controversy involving the Trust Fund and (ii) represent the Trust Fund in any administrative or judicial proceeding relating to an examination or audit by any governmental taxing authority with respect thereto. The legal expenses, including without limitation attorneys' or accountants' fees, and costs of any such proceeding and any liability resulting therefrom shall be expenses of the Trust Fund and the REMIC Administrator shall be entitled to reimbursement therefor out of amounts attributable to the Mortgage Loans on deposit in the Custodial Account as provided by Section 3.10 unless such legal expenses and costs are incurred by reason of the REMIC Administrator's willful misfeasance, bad faith or gross negligence. If the REMIC Administrator is no longer the Master Servicer hereunder, at its option the REMIC Administrator may continue its duties as REMIC Administrator and shall be paid reasonable compensation not to exceed $3,000 per year by any successor Master Servicer hereunder for so acting as the REMIC Administrator.

(d) The REMIC Administrator shall prepare or cause to be prepared all of the Tax Returns that it determines are required with respect to the REMICs created hereunder and deliver such Tax Returns in a timely manner to the Trustee and the Trustee shall sign and file such Tax Returns in a timely manner. The expenses of preparing such returns shall be borne by the REMIC Administrator without any right of reimbursement therefor. The REMIC Administrator agrees to indemnify and hold harmless the Trustee with respect to any tax or liability arising from the Trustee's signing of Tax Returns that contain errors or omissions. The Trustee and Master Servicer shall promptly provide the REMIC Administrator with such information as the REMIC Administrator may from time to time request for the purpose of enabling the REMIC Administrator to prepare Tax Returns.

(e) The REMIC Administrator shall provide (i) to any Transferor of a Class R Certificate such information as is necessary for the application of any tax relating to the transfer of a Class R Certificate to any Person who is not a Permitted Transferee, (ii) to the Trustee and the Trustee shall forward to the Certificateholders such information or reports as are required by the Code or the REMIC Provisions including reports relating to interest, original issue discount and market discount or premium (using the Prepayment Assumption) and (iii) to the Internal Revenue Service the name, title, address and telephone number of the person who will serve as the representative of each REMIC created hereunder.

(f) The Master Servicer and the REMIC Administrator shall take such actions and shall cause each REMIC created hereunder to take such actions as are reasonably within the Master Servicer's or the REMIC Administrator's control and the scope of its duties more specifically set forth herein as shall be necessary or desirable to maintain the status thereof as a REMIC under the REMIC Provisions (and the Trustee shall assist the Master Servicer and the REMIC Administrator, to the extent reasonably requested by the Master Servicer and the REMIC Administrator to do so). In performing their duties as more specifically set forth herein, the Master Servicer and the REMIC Administrator shall not knowingly or intentionally take any action, cause the Trust Fund to take any action or fail to take (or fail to cause to be taken) any action reasonably within their respective control and the scope of duties more specifically set forth herein, that, under the REMIC Provisions, if taken or not taken, as the case may be, could (i) endanger the status of any of REMIC I or REMIC II as a REMIC or (ii) result in the imposition of a tax upon any of REMIC I or REMIC II (including but not limited to the tax on prohibited transactions as defined in Section 860F(a)(2) of the Code (except as provided in Section 2.04) and the tax on contributions to a REMIC set forth in Section 860G(d) of the Code) (either such event, in the absence of an Opinion of Counsel or the indemnification referred to in this sentence, an "Adverse REMIC Event") unless the Credit Enhancer and the Master Servicer or the REMIC Administrator, as applicable, has received an Opinion of Counsel (at the expense of the party seeking to take such action or, if such party fails to pay such expense, and the Master Servicer or the REMIC Administrator, as applicable, determines that taking such action is in

the best interest of the Trust Fund and the Certificateholders (and is not
adverse to the interests of the Credit Enhancer), at the expense of the Trust
Fund, but in no event at the expense of the Master Servicer, the REMIC
Administrator or the Trustee) to the effect that the contemplated action will
not, with respect to the Trust Fund created hereunder, endanger such status or,
unless the Master Servicer or the REMIC Administrator or both, as applicable,
determine in its or their sole discretion to indemnify the Trust Fund against
the imposition of such a tax, result in the imposition of such a tax. Wherever
in this Agreement a contemplated action may not be taken because the timing of
such action might result in the imposition of a tax on the Trust Fund, or may
only be taken pursuant to an Opinion of Counsel that such action would not
impose a tax on the Trust Fund, such action may nonetheless be taken provided
that the indemnity given in the preceding sentence with respect to any taxes
that might be imposed on the Trust Fund has been given and that all other
preconditions to the taking of such action have been satisfied. The Trustee
shall not take or fail to take any action (whether or not authorized hereunder)
as to which the Master Servicer or the REMIC Administrator, as applicable, has
advised it in writing that it has received an Opinion of Counsel to the effect
that an Adverse REMIC Event could occur with respect to such action or failure
to take such action. In addition, prior to taking any action with respect to the
Trust Fund or its assets, or causing the Trust Fund to take any action, which is
not expressly permitted under the terms of this Agreement, the Trustee will
consult with the Credit Enhancer and the Master Servicer or the REMIC
Administrator, as applicable, or its designee, in writing, with respect to
whether such action could cause an Adverse REMIC Event to occur with respect to
the Trust Fund, and the Trustee shall not take any such action or cause the
Trust Fund to take any such action as to which the Master Servicer or the REMIC
Administrator, as applicable, has advised it in writing that an Adverse REMIC
Event could occur. The Master Servicer or the REMIC Administrator, as
applicable, may consult with counsel to make such written advice, and the cost
of same shall be borne by the party seeking to take the action not expressly
permitted by this Agreement, but in no event at the expense of the Master
Servicer or the REMIC Administrator. At all times as may be required by the
Code, the Master Servicer or the REMIC Administrator, as applicable, will to the
extent within its control and the scope of its duties more specifically set
forth herein, maintain substantially all of the assets of the REMIC as
"qualified mortgages" as defined in Section 860G(a)(3) of the Code and
"permitted investments" as defined in Section 860G(a)(5) of the Code.

(g) In the event that any tax is imposed on "prohibited transactions" of
any REMIC created hereunder as defined in Section 860F(a)(2) of the Code, on
"net income from foreclosure property" of any REMIC as defined in Section
860G(c) of the Code, on any contributions to any REMIC after the startup day
therefor pursuant to Section 860G(d) of the Code, or any other tax imposed by
the Code or any applicable provisions of state or local tax laws, such tax shall
be charged (i) to the Master Servicer, if such tax arises out of or results from
a breach by the Master Servicer of any of its obligations under this Agreement
or the Master Servicer has in its sole discretion determined to indemnify the
Trust Fund against such tax, (ii) to the Trustee, if such tax arises out of or
results from a breach by the Trustee of any of its obligations under this
Article X, or (iii) otherwise against amounts on deposit in the Custodial
Account as provided by Section 3.10 and on the Distribution Date(s) following
such reimbursement the aggregate of such taxes shall be allocated in reduction
of the Accrued Certificate Interest on each Class entitled thereto in the same
manner as if such taxes constituted a Prepayment Interest Shortfall.

(h) The Trustee and the Master Servicer shall, for federal income tax
purposes, maintain books and records with respect to each REMIC on a calendar
year and on an accrual basis or as otherwise may be required by the REMIC
Provisions.

(i) Following the startup day, neither the Master Servicer nor the
Trustee shall accept any contributions of assets to any REMIC unless (subject to
Section 10.01(f)) the Master Servicer, the Credit Enhancer and the Trustee shall
have received an Opinion of Counsel (at the expense of the party seeking to make
such contribution) to the effect that the inclusion of such assets in any REMIC
will not cause any of REMIC I or REMIC II to fail to qualify as a REMIC at any
time that any Certificates are outstanding or subject any such REMIC to any tax
under the REMIC Provisions or other applicable provisions of federal, state and
local law or ordinances.

(j) Neither the Master Servicer nor the Trustee shall (subject to
Section 10.01(f)) enter into any arrangement by which any of REMIC I or REMIC II
will receive a fee or other compensation for services nor permit any of REMIC I
or REMIC II to receive any income from assets other than "qualified mortgages"
as defined in Section 860G(a)(3) of the Code or "permitted investments" as
defined in Section 860G(a)(5) of the Code.

(k) Solely for the purposes of Section 1.860G-1(a)(4)(iii) of the Treasury
Regulations, the "latest possible maturity date" by which the principal
balance of each regular interest in each REMIC would be reduced to zero is

February 25, 2036, which is the Distribution Date in the month following the latest scheduled maturity of any Mortgage Loan.

(l) Within 30 days after the Closing Date, the REMIC Administrator shall prepare and file with the Internal Revenue Service Form 8811, "Information Return for Real Estate Mortgage Investment Conduits (REMIC) and Issuers of Collateralized Debt Obligations" for the Trust Fund.

(m) Neither the Trustee nor the Master Servicer shall sell, dispose of or substitute for any of the Mortgage Loans (except in connection with (i) the default, imminent default or foreclosure of a Mortgage Loan, including but not limited to, the acquisition or sale of a Mortgaged Property acquired by deed in lieu of foreclosure, (ii) the bankruptcy of the Trust Fund, (iii) the termination of any REMIC pursuant to Article IX of this Agreement or (iv) a purchase of Mortgage Loans pursuant to Article II or III of this Agreement) or acquire any assets for any REMIC, or sell or dispose of any investments in the Custodial Account or the Certificate Account for gain or accept any contributions to any REMIC after the Closing Date unless it and the Credit Enhancer have received an Opinion of Counsel that such sale, disposition, substitution or acquisition will not (a) affect adversely the status of any of REMIC I or REMIC II as a REMIC or (b) unless the Master Servicer has determined in its sole discretion to indemnify the Trust Fund against such tax, cause any REMIC to be subject to a tax on "prohibited transactions" or "contributions" pursuant to the REMIC Provisions.

Section 10.02 Master Servicer, REMIC Administrator and Trustee Indemnification.

(a) The Trustee agrees to indemnify the Trust Fund, the Credit Enhancer, the Company, the REMIC Administrator and the Master Servicer for any taxes and costs including, without limitation, any reasonable attorneys fees imposed on or incurred by the Trust Fund, the Credit Enhancer, the Company or the Master Servicer, as a result of a breach of the Trustee's covenants set forth in Article VIII or this Article X. In the event that Residential Funding is no longer the Master Servicer, the Trustee shall indemnify Residential Funding for any taxes and costs including, without limitation, any reasonable attorneys fees imposed on or incurred by Residential Funding as a result of a breach of the Trustee's covenants set forth in Article VIII or this Article X.

(b) The REMIC Administrator agrees to indemnify the Trust Fund, the Company, the Credit Enhancer, the Master Servicer and the Trustee for any taxes and costs (including, without limitation, any reasonable attorneys' fees) imposed on or incurred by the Trust Fund, the Credit Enhancer, the Company, the Master Servicer or the Trustee, as a result of a breach of the REMIC Administrator's covenants set forth in this Article X with respect to compliance with the REMIC Provisions, including without limitation, any penalties arising from the Trustee's execution of Tax Returns prepared by the REMIC Administrator that contain errors or omissions; provided, however, that such liability will not be imposed to the extent such breach is a result of an error or omission in information provided to the REMIC Administrator by the Master Servicer in which case Section 10.02(c) will apply.

(c) The Master Servicer agrees to indemnify the Trust Fund, the Credit Enhancer, the Company, the REMIC Administrator and the Trustee for any taxes and costs (including, without limitation, any reasonable attorneys' fees) imposed on or incurred by the Trust Fund, the Credit Enhancer, the Company, the REMIC Administrator or the Trustee, as a result of a breach of the Master Servicer's covenants set forth in this Article X or in Article III with respect to compliance with the REMIC Provisions, including without limitation, any penalties arising from the Trustee's execution of Tax Returns prepared by the Master Servicer that contain errors or omissions.

ARTICLE XI

MISCELLANEOUS PROVISIONS

Section 11.01 Amendment.

(a) This Agreement or any Custodial Agreement may be amended from time to time by the Company, the Master Servicer and the Trustee, with the consent of the Credit Enhancer but without the consent of any of the Certificateholders:

(i) to cure any ambiguity,

(ii) to correct or supplement any provisions herein or therein, which may be inconsistent with any other provisions herein or therein or to correct any error,

(iii) to modify, eliminate or add to any of its provisions to such extent as shall be necessary or desirable to maintain the qualification of REMIC I or REMIC II as REMICs at all times that any

Certificate is outstanding or to further minimize the risk of the imposition of any tax on the Trust Fund pursuant to the Code that would be a claim against the Trust Fund, provided that the Trustee has received an Opinion of Counsel to the effect that (A) such action is necessary or desirable to maintain such qualification or to avoid or minimize the risk of the imposition of any such tax and (B) such action will not adversely affect in any material respect the interests of any Certificateholder,

(iv) to change the timing and/or nature of deposits into the Custodial Account or the Certificate Account or to change the name in which the Custodial Account is maintained, provided that (A) the Certificate Account Deposit Date shall in no event be later than the related Distribution Date, (B) such change shall not, as evidenced by an Opinion of Counsel, adversely affect in any material respect the interests of any Certificateholder and (C) such change shall not result in a reduction of the rating assigned to any Class of Certificates below the lower of the then-current rating or the rating assigned to such Certificates as of the Closing Date (without taking into account the Policy), after notice to Moody's or as evidenced by a letter from Standard & Poor's to such effect,

(v) to modify, eliminate or add to the provisions of Section 5.02(g) or any other provision hereof restricting transfer of the Class R Certificates by virtue of their being the "residual interests" in the Trust Fund provided that (A) such change shall not result in reduction of the rating assigned to any such Class of Certificates below the lower of the then-current rating or the rating assigned to such Certificates as of the Closing Date, as evidenced by a letter from each Rating Agency to such effect, and (B) such change shall not (subject to Section 10.01(f)), as evidenced by an Opinion of Counsel (at the expense of the party seeking so to modify, eliminate or add such provisions), cause the Trust Fund or any of the Certificateholders (other than the transferor) to be subject to a federal tax caused by a transfer to a Person that is not a Permitted Transferee, or

(vi) to make any other provisions with respect to matters or questions arising under this Agreement or such Custodial Agreement which shall not be materially inconsistent with the provisions of this Agreement, provided that such action shall not, as evidenced by an Opinion of Counsel, adversely affect in any material respect the interests of any Certificateholder and is authorized or permitted under Section 11.09(d).

(b) This Agreement or any Custodial Agreement may also be amended from time to time by the Company, the Master Servicer and the Trustee and the Holders of Certificates evidencing in the aggregate not less than 66% of the Percentage Interests of each Class of Certificates affected thereby for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement or such Custodial Agreement or of modifying in any manner the rights of the Holders of Certificates of such Class; provided, however, that no such amendment shall:

(i) reduce in any manner the amount of, or delay the timing of, payments which are required to be distributed on any Certificate without the consent of the Holder of such Certificate, or

(ii) adversely affect in any material respect the interest of the Holders of Certificates of any Class in a manner other than as described in clause (i) hereof without the consent of Holders of Certificates of such Class evidencing, as to such Class, Percentage Interests aggregating not less than 66%, or

(iii) reduce the aforesaid percentage of Certificates of any Class the Holders of which are required to consent to any such amendment, in any such case without the consent of the Holders of all Certificates of such Class then outstanding.

(c) Notwithstanding any contrary provision of this Agreement, the Trustee shall not consent to any amendment to this Agreement unless it and the Credit Enhancer shall have first received an Opinion of Counsel (subject to Section 10.01(f) and at the expense of the party seeking such amendment) to the effect that such amendment or the exercise of any power granted to the Master Servicer, the Company or the Trustee in accordance with such amendment is permitted pursuant to the provisions of this Agreement and will not result in the imposition of a federal tax on the Trust Fund or cause REMIC I or REMIC II to fail to qualify as REMICs at any time that any Certificate is outstanding. The Trustee may but shall not be obligated to enter into any amendment pursuant to this Section that affects its rights, duties and immunities and this agreement or otherwise; provided however, such consent shall not be unreasonably withheld.

(d) Promptly after the execution of any such amendment the Trustee shall furnish written notification of the substance of such amendment to each Certificateholder. It shall not be necessary for the consent of Certificateholders under this Section 11.01 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent shall approve the substance thereof. The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Certificateholders shall be subject to such reasonable regulations as the Trustee may prescribe.

(e) The Company shall have the option, in its sole discretion, to obtain and deliver to the Trustee any corporate guaranty, payment obligation, irrevocable letter of credit, surety bond, insurance policy or similar instrument or a reserve fund, or any combination of the foregoing, for the purpose of protecting the Holders of the Class R Certificates against any or all Realized Losses or other shortfalls. Any such instrument or fund shall be held by the Trustee for the benefit of the Class R Certificateholders, but shall not be and shall not be deemed to be under any circumstances included in the REMIC. To the extent that any such instrument or fund constitutes a reserve fund for federal income tax purposes, (i) any reserve fund so established shall be an outside reserve fund and not an asset of the REMIC, (ii) any such reserve fund shall be owned by the Company, and (iii) amounts transferred by the REMIC to any such reserve fund shall be treated as amounts distributed by the REMIC to the Company or any successor, all within the meaning of Treasury regulations Section 1.860G-2(h) in effect as of the Cut-off Date. In connection with the provision of any such instrument or fund, this Agreement and any provision hereof may be modified, added to, deleted or otherwise amended in any manner that is related or incidental to such instrument or fund or the establishment or administration thereof, such amendment to be made by written instrument executed or consented to by the Company and such related insurer but without the consent of any Certificateholder and without the consent of the Master Servicer or the Trustee being required unless any such amendment would impose any additional obligation on, or otherwise adversely affect the interests of the Certificateholders, the Credit Enhancer, the Master Servicer or the Trustee, as applicable; provided that the Company obtains (subject to Section 10.01(f)) an Opinion of Counsel (which need not be an opinion of Independent counsel) to the effect that any such amendment will not cause (a) any federal tax to be imposed on the Trust Fund, including without limitation, any federal tax imposed on "prohibited transactions" under Section 860F(a)(1) of the Code or on "contributions after the startup date" under Section 860G(d)(1) of the Code and (b) any of REMIC I or REMIC II to fail to qualify as a REMIC at any time that any Certificate is outstanding.

(f) In addition to the foregoing, any amendment of Section 4.08 of this Agreement shall require the consent of the Limited Repurchase Right Holder as a third-party beneficiary of Section 4.08 of this Agreement.

Section 11.02 Recordation of Agreement; Counterparts.
                -----------------------------------------

(a) To the extent permitted by applicable law, this Agreement is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any or all of the properties subject to the Mortgages are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Master Servicer and at its expense on direction by the Trustee (pursuant to the request of the Credit Enhancer or Holders of Certificates entitled to at least 25% of the Voting Rights), but only upon direction accompanied by an Opinion of Counsel to the effect that such recordation materially and beneficially affects the interests of the Certificateholders or the Credit Enhancer.

(b) For the purpose of facilitating the recordation of this Agreement as herein provided and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

Section 11.03 Limitation on Rights of Certificateholders.
                -------------------------------------------

(a) The death or incapacity of any Certificateholder shall not operate to terminate this Agreement or the Trust Fund, nor entitle such Certificateholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust Fund, nor otherwise affect the rights, obligations and liabilities of any of the parties hereto.

(b) No Certificateholder shall have any right to vote (except as expressly provided herein) or in any manner otherwise control the operation and management of the Trust Fund, or the obligations of the parties hereto, nor shall anything herein set forth, or contained in the terms of the Certificates,

be construed so as to constitute the Certificateholders from time to time as partners or members of an association; nor shall any Certificateholder be under any liability to any third person by reason of any action taken by the parties to this Agreement pursuant to any provision hereof.

(c) No Certificateholder shall have any right by virtue of any provision of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee and the Credit Enhancer a written notice of default and of the continuance thereof, as hereinbefore provided, and unless also the Holders of Certificates of any Class evidencing in the aggregate not less than 25% of the related Percentage Interests of such Class, shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby, the Credit Enhancer shall have given its written consent and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding it being understood and intended, and being expressly covenanted by each Certificateholder with every other Certificateholder and the Trustee, that no one or more Holders of Certificates of any Class shall have any right in any manner whatever by virtue of any provision of this Agreement to affect, disturb or prejudice the rights of the Holders of any other of such Certificates of such Class or any other Class, or to obtain or seek to obtain priority over or preference to any other such Holder, or to enforce any right under this Agreement, except in the manner herein provided and for the common benefit of Certificateholders of such Class or all Classes, as the case may be. For the protection and enforcement of the provisions of this Section 11.03, each and every Certificateholder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

Section 11.04 Governing Law.

This agreement and the Certificates shall be governed by and construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws, without regard to the conflict of laws principles thereof, other than Sections 5-1401 and 5-1402 of the New York General Obligations Law.

Section 11.05 Notices.

All demands and notices hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by registered mail, postage prepaid (except for notices to the Trustee which shall be deemed to have been duly given only when received), to (a) in the case of the Company, 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota 55437, Attention: President, or such other address as may hereafter be furnished to the Master Servicer and the Trustee in writing by the Company, (b) in the case of the Master Servicer, 2255 North Ontario Street, Burbank, California 91504-3120, Attention: Bond Administration or such other address as may be hereafter furnished to the Company and the Trustee by the Master Servicer in writing, (c) in the case of the Trustee, 600 Travis Street, 9th Floor, Houston, Texas 77002, Attention: RFMSII Series 2006-HSA1 Trust or such other address as may hereafter be furnished to the Company and the Master Servicer in writing by the Trustee, (d) in the case of Moody's, 99 Church Street, New York, New York 10007, Attention: ABS Monitoring Department, or such other address as may hereafter be furnished to the Company, the Trustee and the Master Servicer in writing by Moody's, (e) in the case of Standard & Poor's, 55 Water Street, New York, New York 10041 Attention: Mortgage Surveillance or such other address as may be hereafter furnished to the Company, the Trustee and the Master Servicer by Standard & Poor's, and (f) in the case of the Credit Enhancer, 125 Park Avenue, New York, New York 10017, Attention: Structured Finance Surveillance, or such other address as may be hereafter furnished to the Company, the Trustee and the Master Servicer in writing by the Credit Enhancer. Any notice required or permitted to be mailed to a Certificateholder shall be given by first class mail, postage prepaid, at the address of such holder as shown in the Certificate Register. Any notice so mailed within the time prescribed in this Agreement shall be conclusively presumed to have been duly given, whether or not the Certificateholder receives such notice.

Section 11.06 Notices to Rating Agency and the Credit Enhancer.
-------------------------------------------------

The Company, the Master Servicer or the Trustee, as applicable, shall notify each Rating Agency, the Credit Enhancer and each Subservicer at such time as it is otherwise required pursuant to this Agreement to give notice of the occurrence of, any of the events described in clause (a), (b), (c), (d), (g), (h), (i) or (j) below or provide a copy to each Rating Agency and the Credit Enhancer at such time as otherwise required to be delivered pursuant to this Agreement of any of the statements described in clauses (f) and (i) below:

(a) a material change or amendment to this Agreement,

(b) the occurrence of an Event of Default,

(c) the termination or appointment of a successor Master Servicer or Trustee or a change in the majority ownership of the Trustee,

(d) the filing of any claim under the Master Servicer's blanket fidelity bond and the errors and omissions insurance policy required by Section 3.11 or the cancellation or modification of coverage under any such instrument,

(e) the statement required to be delivered to the Holders of each Class of Certificates pursuant to Section 4.03,

(f) the statements required to be delivered pursuant to Sections 3.17 and 3.18,

(g) a change in the location of the Custodial Account or the Certificate Account,

(h) the occurrence of the Final Distribution Date, and

(i) the purchase of or substitution for any Mortgage Loan,

provided, however, that with respect to notice of the occurrence of the events described in clause (d), (g) or (h) above, the Master Servicer shall provide prompt written notice to each Rating Agency, the Credit Enhancer and the Subservicer of any such event known to the Master Servicer.

Section 11.07 Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or of the Certificates or the rights of the Holders thereof or the Credit Enhancer.

Section 11.08 Supplemental Provisions for Resecuritization.
-----------------------------------------------

(a) This Agreement may be supplemented by means of the addition of a separate Article hereto (a "Supplemental Article") for the purpose of resecuritizing any of the Certificates issued hereunder, under the following circumstances. With respect to any Class or Classes of Certificates issued hereunder, or any portion of any such Class, as to which the Company or any of its Affiliates (or any designee thereof) is the registered Holder (the "Resecuritized Certificates"), the Company may deposit such Resecuritized Certificates into a new REMIC, grantor trust, FASIT or custodial arrangement (a "Restructuring Vehicle") to be held by the Trustee pursuant to a Supplemental Article. The instrument adopting such Supplemental Article shall be executed by the Company, the Master Servicer and the Trustee; provided, that neither the Master Servicer nor the Trustee shall withhold their consent thereto if their respective interests would not be materially adversely affected thereby. To the extent that the terms of the Supplemental Article do not in any way affect any provisions of this Agreement as to any of the Certificates initially issued hereunder, the adoption of the Supplemental Article shall not constitute an "amendment" of this Agreement.

Each Supplemental Article shall set forth all necessary provisions relating to the holding of the Resecuritized Certificates by the Trustee, the establishment of the Restructuring Vehicle, the issuing of various classes of new certificates by the Restructuring Vehicle and the distributions to be made thereon, and any other provisions necessary to the purposes thereof. In connection with each Supplemental Article, the Company shall deliver to the Trustee an Opinion of Counsel to the effect that (i) the Restructuring Vehicle will qualify as a REMIC, grantor trust, FASIT or other entity not subject to taxation for federal income tax purposes and (ii) the adoption of the Supplemental Article will not endanger the status of REMIC I or REMIC II as a REMIC or (subject to Section 10.01(f)) result in the imposition of a tax upon the Trust Fund (including but not limited to the tax on prohibited transactions as defined in Section 860F(a)(2) of the Code and the tax on contributions to a REMIC as set forth in Section 860(G)(d) of the Code).

Section 11.09 [Reserved].

Section 11.10 No Petition.

The Trustee agrees that it will not petition or otherwise invoke or

cause the Trust Fund or any  Certificateholder to petition or otherwise invoke the  process  of  any  court  or  governmental  authority  for  the  purpose  of instituting against or joining any other person in instituting against the Trust Fund  any  bankruptcy,  reorganization,  arrangement,  insolvency  or  liquidation proceeding, or other proceeding under any federal or state bankruptcy or similar law in connection with any obligation  with respect to the  Certificates or this Agreement.

Section 11.11.Third-Party Beneficiary.

The  Limited  Repurchase  Right  Holder  is  an  express  third-party beneficiary  of  Section  4.08  of  this  Agreement,  and shall  have the right to enforce the related provisions of Section 4.08 of this Agreement as if it were a party hereto.

Section 11.12.Rights of the Credit Enhancer.

(a) The Credit  Enhancer is an express  third-party  beneficiary of this Agreement.

(b) The  Trustee  shall  provide  to the Credit  Enhancer  copies of any report, notice, Opinion of Counsel,  Officers' Certificate,  request for consent or request for  amendment  to any  document  related  hereto  promptly  upon the Trustee's production or receipt thereof.

(c) Unless a Credit Enhancer Default exists, the Trustee and the Company shall not agree to any amendment to this Agreement without first having obtained the prior written consent of the Credit Enhancer.

(d) So long as there does not exist a failure by the Credit  Enhancer to make a required payment under either Policy,  the Credit Enhancer shall have the right to exercise  all rights of the Holders of the Class A  Certificates  under this  Agreement  without  any  consent  of such  Holders,  and such Holders  may exercise such rights only with the prior written consent of the Credit Enhancer, except as provided herein.

(e) The Credit  Enhancer  shall not be entitled  to exercise  any of its rights  hereunder  so long as there  exists  a failure by the Credit  Enhancer to make a required payment under the Policy.

ARTICLE XII
COMPLIANCE WITH REGULATION AB

Section 12.01.Intent of Parties; Reasonableness.
----------------------------------

The Company,  the Trustee and the Master Servicer  acknowledge and agree that the purpose of this Article XII is to facilitate  compliance by the Company with the  provisions of Regulation AB and related rules and  regulations  of the Commission.  The Company  shall not  exercise  its right to request  delivery of information  or other  performance  under  these  provisions  other than in good faith, or for purposes other than compliance with the 1933 Act, the Exchange Act and the  rules  and  regulations  of the  Commission  under the 1933 Act and the Exchange  Act.  Each of the Master  Servicer and the Trustee  acknowledges  that interpretations  of the  requirements  of  Regulation  AB may change  over time, whether due to  interpretive  guidance  provided by the Commission  or its staff, consensus among participants in the mortgage-backed  securities markets,  advice of counsel, or otherwise,  and agrees to comply with reasonable requests made by the Company in good faith for delivery of information  under these provisions on the basis of  evolving  interpretations  of Regulation  AB.  Each of the Master Servicer and the Trustee shall cooperate  reasonably with the Company to deliver to the Company  (including  any of its  assignees  or  designees),  any and all disclosure,  statements,  reports,  certifications,  records and any other information necessary in the reasonable, good faith determination of the Company to permit the Company to comply with the provisions of Regulation AB.

Section 12.02.Additional Representations and Warranties of the Trustee.

(a) The Trustee  shall be deemed to  represent  to the Company as of the date  hereof and on each date on which  information  is provided to the Company under Sections 12.01,  12.02(b) or 12.03 that, except as disclosed in writing to the Company prior to such date: (i) it is not aware and has not received  notice that any default,  early amortization or other performance  triggering event has occurred as to any other  Securitization  Transaction  due to any default of the Trustee;  (ii) there are no aspects of its financial  condition that could have a material  adverse  effect on the  performance  by it of its trustee  obligations under this  Agreement;  (iii)  there  are no  material  legal  or governmental proceedings  pending  (or known to be  contemplated)  against  it that  would be material to Certificateholders;  (iv) there are no relationships or transactions (as  described  in Item 1119(b) of  Regulation  AB) relating to the Trustee with respect to the  Company  or any  sponsor,  issuing  entity,  servicer,  trustee,

originator, significant obligor, enhancement or support provider or other
material transaction party (as each of such terms are used in Regulation AB)
relating to the Securitization Transaction contemplated by the Agreement, as
identified by the Company to the Trustee in writing as of the Closing Date
(each, a "Transaction Party") that are outside the ordinary course of business
or on terms other than would be obtained in an arm's length transaction with an
unrelated third party, apart from the Securitization Transaction, and that are
material to the investors' understanding of the Certificates; and (v) the
Trustee is not an affiliate of any Transaction Party (as contemplated by Item
1119(a) of Regulation AB). The Company shall notify the Trustee of any change in
the identity of a Transaction Party after the Closing Date.

(b) If so requested by the Company on any date following the Closing
Date, the Trustee shall, within five Business Days following such request,
confirm in writing the accuracy of the representations and warranties set forth
in paragraph (a) of this Section or, if any such representation and warranty is
not accurate as of the date of such confirmation, provide the pertinent facts,
in writing, to the Company. Any such request from the Company shall not be given
more than once each calendar quarter, unless the Company shall have a reasonable
basis for a determination that any of the representations and warranties may not
be accurate.

Section 12.03. Information to be Provided by the Trustee.

(a) For so long as the Company is subject to Exchange Act reporting
requirements with respect to the Trust Fund, for the purpose of satisfying the
Company's reporting obligation under the Exchange Act with respect to any class
of Certificates, the Trustee shall provide to the Company a written description
of (a) any litigation or governmental proceedings pending against the Trustee as
of the last day of each calendar month that would be material to
Certificateholders, and (b) any affiliations or relationships (as described in
Item 1119 of Regulation AB) that develop following the Closing Date between the
Trustee and any Transaction Party of the type described in Section 12.02(a)(iv)
or 12.02(a)(v) as of the last day of each calendar year. Any descriptions
required with respect to legal proceedings, as well as updates to previously
provided descriptions, under this Section 12.03 shall be given no later than
five Business Days prior to the Determination Date following the month in which
the relevant event occurs, and any notices and descriptions required with
respect to affiliations, as well as updates to previously provided descriptions,
under this Section 12.03 shall be given no later than January 31 of the calendar
year following the year in which the relevant event occurs. As of the related
Distribution Date with respect to each Report on Form 10-D with respect to the
Certificates filed by or on behalf of the Depositor, and as of March 15
preceding the date each Report on Form 10-K with respect to the Certificates is
filed, the Trustee will be deemed to represent that any information previously
provided by the Trustee under this Article XII is materially correct and does
not have any material omissions unless the Trustee has provided an update to
such information. The Company will allow the Trustee to review any disclosure
relating to material litigation against the Trustee prior to filing such
disclosure with the Commission to the extent the Company changes the information
provided by the Trustee.

Section 12.04. Report on Assessment of Compliance and Attestation.

On or before March 15 of each calendar year, for so long as the Company
is subject to Exchange Act reporting requirements with respect to the Trust
Fund, the Trustee shall:

(a) deliver to the Company a report (in form and substance reasonably
satisfactory to the Company) regarding the Trustee's assessment of compliance
with the Servicing Criteria during the immediately preceding calendar year, as
required under Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122 of
Regulation AB. Such report shall be signed by an authorized officer of the
Trustee, and shall address each of the Servicing Criteria specified on Exhibit O
hereto; and

(b) deliver to the Company a report of a registered public accounting
firm satisfying the requirements of Rule 2-01 of Regulation S-X under the
Securities Act and the Exchange Act that attests to, and reports on, the
assessment of compliance made by the Trustee and delivered pursuant to the
preceding paragraph. Such attestation shall be in accordance with Rules
1-02(a)(3) and 2-02(g) of Regulation S-X under the 1933 Act and the Exchange
Act.

Section 12.05. Indemnification; Remedies.

(a) The Trustee shall indemnify the Company, each affiliate of the
Company, the Master Servicer and each affiliate of the Master Servicer, and the
respective present and former directors, officers, employees and agents of each
of the foregoing, and shall hold each of them harmless from and against any
losses, damages, penalties, fines, forfeitures, legal fees and expenses and

related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon:

(i) (A) any untrue statement of a material fact contained or alleged to be contained in any information, report, certification or other material provided under this Article XII (other than the attestation delivered under Section 12.04(b)) by the Trustee (collectively, the "Trustee Information"), or (B) the omission or alleged omission to state in the Trustee Information a material fact required to be stated in the Trustee Information or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; or

(ii) any failure by the Trustee to deliver any information, report, certification, or other material when and as required under this Article XII, other than a failure by the Trustee to deliver an accountants' attestation under Section 12.04(b);

provided, however, that in no event will the Trustee be liable for any consequential, indirect or punitive damages pursuant to this Section 12.05(a), even if advised of the possibility of such damages.

(b) In the case of any failure of performance described in clause (ii) of Section 12.05(a), the Trustee shall (i) promptly reimburse the Company for all costs reasonably incurred by the Company in order to obtain the information, report, certification, accountants' attestation or other material not delivered as required by the Trustee and (ii) cooperate with the Company to mitigate any damages that may result from such failure.

(c) The Company and the Master Servicer shall indemnify the Trustee, each affiliate of the Trustee or each Person who controls the Trustee (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act); and the respective present and former directors, officers, employees and agents of the Trustee, and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon (i) any untrue statement of a material fact contained or alleged to be contained in any information provided under this Agreement by or on behalf of the Company or Master Servicer for inclusion in any report filed with Commission under the Exchange Act (collectively, the "RFC Information"), or (ii) the omission or alleged omission to state in the RFC Information a material fact required to be stated in the RFC Information or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, however, that in no event will the Company or the Master Servicer be liable for any consequential, indirect or punitive damages pursuant to this Section 12.05(c), even if advised of the possibility of such damages.

<PAGE>

IN WITNESS WHEREOF, the Company, the Master Servicer and the Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized and their respective seals, duly attested, to be hereunto affixed, all as of the date and year first above written.

RESIDENTIAL FUNDING MORTGAGE SECURITIES II, INC.

[Seal]

By:/s/Tim Jacobson
    Name:  Tim Jacobson
    Title: Vice President

Attest:  /s/Benita Bjorgo
        Name:   Benita Bjorgo
        Title:  Vice President

RESIDENTIAL FUNDING CORPORATION

[Seal]

By: /s/Benita Bjorgo
    Name:  Benita Bjorgo
    Title: Associate

Attest: /s/Tim Jacobson
        Name:   Tim Jacobson

                          JPMORGAN CHASE BANK, N.A.,
                                   as Trustee

[Seal]

                          By: /s/Joanne Murray
                              Name:  Joanne Murray
                              Title: Asst. Vice President


Attest: /s/ Mudassir Mohamed
          Name:  Mudassir Mohamed
          Title: Trust Officer

<PAGE>


STATE OF MINNESOTA      )
                              ) ss.:
COUNTY OF HENNEPIN      )


        On the 27th day of January, 2006 before me, a notary public in and for
said State, personally appeared__Tim Jacobson__, known to me to be a(n)_Vice
President__ of Residential Funding Mortgage Securities II, Inc., one of the
corporations that executed the within instrument, and also known to me to be the
person who executed it on behalf of said corporation, and acknowledged to me
that such corporation executed the within instrument.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official
seal the day and year in this certificate first above written.

                                        /s/Amy Olson
                                             Notary Public
[Notarial Seal]




STATE OF MINNESOTA      )
                              ) ss.:
COUNTY OF HENNEPIN      )


        On the 27th day of January, 2006 before me, a notary public in and for
said State, personally appeared___Benita Bjorgo__, known to me to be
a(n)__Associate___ of Residential Funding Corporation, one of the corporations
that executed the within instrument, and also known to me to be the person who
executed it on behalf of said corporation, and acknowledged to me that such
corporation executed the within instrument.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official
seal the day and year in this certificate first above written.

                                        /s/Amy Olson
                                             Notary Public
[Notarial Seal]

<PAGE>


STATE OF TEXAS          )
                              ) ss.:
COUNTY OF HARRIS        )


        On the 27th day of January, 2006 before me, a notary public in and for
said State, personally appeared ___Joanne Murray_____, known to me to be a(n)
___Asst. V.P.____ of JPMorgan Chase Bank, N.A., a national banking association
that executed the within instrument, and also known to me to be the person who
executed it on behalf of said association, and acknowledged to me that such

national banking association executed the within instrument.

        IN WITNESS WHEREOF,  I have hereunto set my hand and affixed my official
seal the day and year in this certificate first above written.

                                             /s/Amy Olson
                                                    Notary Public
[Notarial Seal]


<PAGE>


                              EXHIBIT A-1

                     FORM OF CLASS A-[_] CERTIFICATE

        SOLELY FOR U.S.  FEDERAL  INCOME TAX  PURPOSES,  THIS  CERTIFICATE  IS A
"REGULAR  INTEREST"  IN A "REAL  ESTATE  MORTGAGE  INVESTMENT  CONDUIT," AS THOSE
TERMS ARE  DEFINED,  RESPECTIVELY,  IN  SECTIONS  860G AND 860D OF THE  INTERNAL
REVENUE CODE OF 1986.

        UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED  REPRESENTATIVE OF
THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION  ("DTC"),  TO ISSUER OR ITS
AGENT FOR REGISTRATION OF TRANSFER,  EXCHANGE,  OR PAYMENT,  AND ANY CERTIFICATE
ISSUED  IS  REGISTERED  IN THE NAME OF CEDE & CO.  OR IN SUCH  OTHER  NAME AS IS
REQUESTED  BY AN  AUTHORIZED  REPRESENTATIVE  OF DTC (AND ANY PAYMENT IS MADE TO
CEDE & CO.  OR TO SUCH  OTHER  ENTITY AS IS  REQUESTED  BY AN  AUTHORIZED
REPRESENTATIVE  OF DTC), ANY TRANSFER,  PLEDGE, OR OTHER USE HEREOF FOR VALUE OR
OTHERWISE  BY OR TO ANY PERSON IS  WRONGFUL  INASMUCH AS THE  REGISTERED  OWNER
HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.




<PAGE>




Certificate No.                      %  Pass-Through Rate
Class [A-__] Senior

Date of Pooling and Servicing
Agreement:
January 1, 2006                      Percentage Interest: _____%

                                     Aggregate Initial Certificate Principal
                                     Balance
                                     of Class [A-__] Certificates


First Distribution Date:
February 27, 2006                    $_____

                                     Initial Certificate Principal
Master Servicer:                     Balance of this Certificate
Residential Funding                  $_____
Corporation


Assumed Final
Distribution Date:                              CUSIP
[-------------]


               HOME EQUITY LOAN PASS-THROUGH CERTIFICATE

                          SERIES 2006-HSA1

evidencing a percentage interest in any distributions  allocable to the Class A-
Certificates  with respect to the Trust Fund  consisting  primarily of a pool of
closed end, fixed interest rate,  fully-amortizing and balloon payment,  one- to
four-family,  primarily  second  lien home  equity  mortgage  loans  sold  by
RESIDENTIAL FUNDING MORTGAGE SECURITIES II, INC.

        This  Certificate  is payable  solely from the assets of the Trust Fund,
and does not  represent  an  obligation  of or interest in  Residential  Funding
Mortgage  Securities II, Inc., the Master Servicer, the Trustee referred to below

or GMAC Mortgage Group, Inc. or any of their affiliates. Neither this Certificate nor the underlying Mortgage Loans are guaranteed or insured by any governmental agency or instrumentality or by Residential Funding Mortgage Securities II, Inc., the Master Servicer, the Trustee or GMAC Mortgage Group, Inc. or any of their affiliates. None of Residential Funding Mortgage Securities II, Inc., the Master Servicer, GMAC Mortgage Group, Inc. or any of their affiliates will have any obligation with respect to any certificate or other obligation secured by or payable from payments on the Certificates.

This certifies that CEDE & CO. is the registered owner of the Percentage Interest evidenced by this Certificate (obtained by dividing the Initial Certificate Principal Balance of this Certificate by the aggregate Initial Certificate Principal Balance of all Class A- Certificates, both as specified above) in certain distributions with respect to the Trust Fund consisting primarily of an interest in a pool of closed end, fixed interest rate, fully-amortizing and balloon payment, one- to four-family, primarily second lien home equity mortgage loans (the "Mortgage Loans"), formed and sold by Residential Funding Mortgage Securities II, Inc. (hereinafter called the "Company", which term includes any successor entity under the Agreement referred to below). The Trust Fund was created pursuant to a Pooling and Servicing Agreement dated as specified above (the "Agreement") among the Company, the Master Servicer and JPMorgan Chase Bank, N.A., as trustee (the "Trustee"), a summary of certain of the pertinent provisions of which is set forth hereafter. To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

Pursuant to the terms of the Agreement, a distribution will be made on the 25th day of each month or, if such 25th day is not a Business Day, the Business Day immediately following (the "Distribution Date"), commencing as described in the Agreement, to the Person in whose name this Certificate is registered at the close of business on the last day (or if such last day is not a Business Day, the Business Day immediately preceding such last day) of the month immediately preceding the month of such distribution, or, for so long as this Certificate is a Book-Entry Certificate, as of the Business Day immediately preceding such Distribution Date (the "Record Date"), from the Available Distribution Amount in an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount (of interest and principal, if any) required to be distributed to Holders of Class A- Certificates on such Distribution Date. The Pass-Through Rate on this Certificate is subject to the Net WAC Rate set forth in the Agreement.

Distributions on this Certificate will be made either by the Master Servicer acting on behalf of the Trustee or by a Paying Agent appointed by the Trustee in immediately available funds (by wire transfer or otherwise) for the account of the Person entitled thereto if such Person shall have so notified the Master Servicer or such Paying Agent, or by check mailed to the address of the Person entitled thereto, as such name and address shall appear on the Certificate Register.

Notwithstanding the above, the final distribution on this Certificate will be made after due notice of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Trustee for that purpose in the City and State of New York. The Initial Certificate Principal Balance of this Certificate is set forth above. The Certificate Principal Balance hereof will be reduced to the extent of distributions allocable to principal and any Realized Losses allocable hereto.

This Certificate is one of a duly authorized issue of Certificates issued in several Classes designated as Home Equity Loan Pass-Through Certificates of the Series specified hereon (herein collectively called the "Certificates").

The Certificates are limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth herein and in the Agreement.

As provided in the Agreement, withdrawals from the Custodial Account and/or the Certificate Account created for the benefit of Certificateholders may be made by the Master Servicer from time to time for purposes other than distributions to Certificateholders, such purposes including without limitation reimbursement to the Company and the Master Servicer of certain expenses incurred by either of them.

The Agreement permits, with certain exceptions therein provided, the amendment of the Agreement and the modification of the rights and obligations of the Company, the Master Servicer and the Trustee and the rights of the Certificateholders under the Agreement from time to time by the Company, the Master Servicer and the Trustee with the consent of the Holders of Certificates

evidencing in the aggregate not less than that Percentage Interests of each Class of Certificates affected thereby. Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange herefor or in lieu hereof whether or not notation of such consent is made upon the Certificate. The Agreement also permits the amendment thereof in certain circumstances without the consent of the Holders of any of the Certificates and, in certain additional circumstances, without the consent of the Holders of certain Classes of Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable in the Certificate Register upon surrender of this Certificate for registration of transfer at the offices or agencies appointed by the Trustee in the City and State of New York, duly endorsed by, or accompanied by an assignment in the form below or other written instrument of transfer in form satisfactory to the Trustee and the Certificate Registrar duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates of authorized denominations evidencing the same Class and aggregate Percentage Interest will be issued to the designated transferee or transferees.

The Certificates are issuable only as registered Certificates without coupons in Classes and in denominations specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, Certificates are exchangeable for new Certificates of authorized denominations evidencing the same Class and aggregate Percentage Interest, as requested by the Holder surrendering the same.

No service charge will be made for any such registration of transfer or exchange, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company, the Master Servicer, the Trustee and the Certificate Registrar and any agent of the Company, the Master Servicer, the Trustee or the Certificate Registrar may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and neither the Company, the Master Servicer, the Trustee nor any such agent shall be affected by notice to the contrary.

This Certificate shall be governed by and construed in accordance with the laws of the State of New York.

The obligations created by the Agreement in respect of the Certificates and the Trust Fund created thereby shall terminate upon the payment to Certificateholders of all amounts held by or on behalf of the Trustee and required to be paid to them pursuant to the Agreement following the earlier of (i) the maturity or other liquidation of the last Mortgage Loan subject thereto or the disposition of all property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan and (ii) the purchase by the Master Servicer from the Trust Fund of all remaining Mortgage Loans and all property acquired in respect of such Mortgage Loans, thereby effecting early retirement of the Certificates. The Agreement permits, but does not require, the Master Servicer to (i) purchase at a price determined as provided in the Agreement all remaining Mortgage Loans and all property acquired in respect of any Mortgage Loan or (ii) purchase in whole, but not in part, all of the Certificates from the Holders thereof; provided, that any such option may only be exercised if the Pool Principal Balance of the Mortgage Loans as of the Distribution Date upon which the proceeds of any such purchase are distributed is less than ten percent of the Cut-off Date Principal Balance of the Mortgage Loans.

Unless the certificate of authentication hereon has been executed by the Certificate Registrar, by manual signature, this Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose.

<PAGE>

IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly executed.

Dated: January 27, 2006           JPMORGAN CHASE BANK, N.A., as Trustee

                          By: _____
                               Authorized Signatory

CERTIFICATE OF AUTHENTICATION

This is one of the Class A- Certificates referred to in the within-mentioned Agreement.

JPMORGAN CHASE BANK, N.A., as Certificate Registrar

By:
    ------------------------------------------
              Authorized Signatory

<PAGE>

ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto _____(Please print or typewrite name and address including postal zip code of assignee) a Percentage Interest evidenced by the within Home Equity Loan Pass-Through Certificate and hereby authorizes the transfer of registration of such interest to assignee on the Certificate Register of the Trust Fund.

I (We) further direct the Certificate Registrar to issue a new Certificate of a like denomination and Class, to the above named assignee and deliver such Certificate to the following address:_____

Dated:_____          _____
                                    Signature by or on behalf of assignor

                                    _____
                                          Signature Guaranteed

DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____ for the account of _____ account number _____, or, if mailed by check, to _____.

Applicable statements should be mailed to _____.

This information is provided by _____, the assignee named above, or_____, as its agent.

<PAGE>

EXHIBIT A-2

FORM OF CLASS SB CERTIFICATE

THIS CERTIFICATE IS SUBORDINATED IN RIGHT OF PAYMENT TO THE CLASS A CERTIFICATES AS DESCRIBED IN THE AGREEMENT (AS DEFINED HEREIN).

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986.

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE RESOLD OR TRANSFERRED UNLESS IT IS REGISTERED PURSUANT TO SUCH ACT AND LAWS OR IS SOLD OR TRANSFERRED IN TRANSACTIONS WHICH ARE EXEMPT FROM REGISTRATION UNDER SUCH ACT AND UNDER APPLICABLE STATE LAW AND IS TRANSFERRED IN ACCORDANCE WITH THE PROVISIONS OF SECTION 5.02 OF THE POOLING AND SERVICING AGREEMENT (THE

"AGREEMENT").

NO TRANSFER OF THIS CERTIFICATE OR ANY INTEREST HEREIN SHALL BE MADE TO ANY PLAN SUBJECT TO TITLE I OF ERISA OR SECTION 4975 OF THE CODE, ANY PERSON ACTING, DIRECTLY OR INDIRECTLY, ON BEHALF OF ANY SUCH PLAN OR ANY PERSON ACQUIRING SUCH CERTIFICATES WITH "PLAN ASSETS" OF A PLAN WITHIN THE MEANING OF THE DEPARTMENT OF LABOR REGULATION PROMULGATED AT 29 C.F.R. ss. 2510.3-101 UNLESS THE DEPOSITOR, THE TRUSTEE AND THE MASTER SERVICER ARE PROVIDED WITH AN OPINION OF COUNSEL WHICH ESTABLISHES TO THE SATISFACTION OF THE DEPOSITOR, THE TRUSTEE AND THE MASTER SERVICER THAT THE PURCHASE OF THIS CERTIFICATE IS PERMISSIBLE UNDER APPLICABLE LAW, WILL NOT CONSTITUTE OR RESULT IN ANY PROHIBITED TRANSACTION UNDER ERISA OR SECTION 4975 OF THE CODE AND WILL NOT SUBJECT THE DEPOSITOR, THE MASTER SERVICER, THE TRUSTEE OR THE TRUST FUND TO ANY OBLIGATION OR LIABILITY (INCLUDING OBLIGATIONS OR LIABILITIES UNDER ERISA OR SECTION 4975 OF THE CODE) IN ADDITION TO THOSE UNDERTAKEN IN THE AGREEMENT, WHICH OPINION OF COUNSEL SHALL NOT BE AN EXPENSE OF THE DEPOSITOR, THE MASTER SERVICER, THE TRUSTEE OR THE TRUST FUND.

<PAGE>
<TABLE>

<S>                                          <C>
Certificate No. 1

Class SB Subordinate

Date of Pooling and Servicing              Percentage Interest: 100%
and Cut-off Date:
January 1, 2006

First Distribution Date:                   Aggregate Initial Certificate Principal Balance
February 27, 2006                          of the Class SB Certificates:
                                           $-----------

Master Servicer:                           Initial Certificate Principal Balance
Residential Funding Corporation            of this Certificate: $_____

Final Scheduled Distribution Date:         CUSIP:  _____
[_____]
</TABLE>

HOME EQUITY LOAN PASS-THROUGH CERTIFICATES
SERIES 2006-HSA1

evidencing a percentage interest in the distributions allocable to the Class SB Certificates with respect to a Trust Fund consisting primarily of a pool closed end, fixed interest rate, fully-amortizing and balloon payment, one-to-four-family, primarily second lien home equity mortgage loans sold by RESIDENTIAL FUNDING MORTGAGE SECURITIES II, INC.

This Certificate is payable solely from the assets of the Trust Fund, and does not represent an obligation of or interest in Residential Funding Mortgage Securities II, Inc., the Master Servicer, the Trustee referred to below or any of their affiliates. Neither this Certificate nor the underlying Mortgage Loans are guaranteed or insured by any governmental agency or instrumentality or by Residential Funding Mortgage Securities II, Inc., the Master Servicer, the Trustee or any of their affiliates. None of Residential Funding Mortgage Securities II, Inc., the Master Servicer or any of their affiliates will have any obligation with respect to any certificate or other obligation secured by or payable from payments on the Certificates.

This certifies that PRAMWAVE & CO. is the registered owner of the Percentage Interest evidenced by this Certificate in certain distributions with respect to the Trust Fund consisting primarily of an interest in a pool of closed end, fixed interest rate, fully-amortizing and balloon payment, one-to-four-family, primarily second lien home equity mortgage loans (the "Mortgage Loans"), sold by Residential Funding Mortgage Securities II, Inc. (hereinafter called the "Company ," which term includes any successor entity under the Agreement referred to below). The Trust Fund was created pursuant to a Pooling and Servicing Agreement dated as specified above (the "Agreement") among the Company, the Master Servicer and JPMorgan Chase Bank, N.A., as trustee (the "Trustee"), a summary of certain of the pertinent provisions of which is set

forth hereafter. To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

Pursuant to the terms of the Agreement, a distribution will be made on the 25th day of each month or, if such 25th day is not a Business Day, the Business Day immediately following (the "Distribution Date"), commencing as described in the Agreement, to the Person in whose name this Certificate is registered at the close of business on the last day (or if such last day is not a Business Day, the Business Day immediately preceding such last day) of the month immediately preceding the month of such distribution (the "Record Date"), from the Available Distribution Amount in an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount of interest and principal, if any, required to be distributed to Holders of Class SB Certificates on such Distribution Date.

Distributions on this Certificate will be made either by the Master Servicer acting on behalf of the Trustee or by a Paying Agent appointed by the Trustee in immediately available funds (by wire transfer or otherwise) for the account of the Person entitled thereto if such Person shall have so notified the Master Servicer or such Paying Agent, or by check mailed to the address of the Person entitled thereto, as such name and address shall appear on the Certificate Register.

Notwithstanding the above, the final distribution on this Certificate will be made after due notice of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Trustee for that purpose in the City and State of New York. The Notional Amount of this Class SB Certificate as of any date of determination will be calculated as described in the Agreement. The Notional Amount hereof will be reduced by interest shortfalls on the Mortgage Loans including any Prepayment Interest Shortfalls not covered by Excess Interest, and the interest portion of any Realized Losses incurred in respect thereof. This Class SB Certificate will accrue interest at the Pass-Through Rate on the Notional Amount as indicated in the definition of Accrued Certificate Interest in the Agreement. This Class SB Certificate will not accrue interest on its Certificate Principal Balance.

No transfer of this Class SB Certificate will be made unless such transfer is exempt from the registration requirements of the Securities Act of 1933, as amended, and any applicable state securities laws or is made in accordance with said Act and laws. In the event that such a transfer is to be made, (i) the Trustee or the Company may require an opinion of counsel acceptable to and in form and substance satisfactory to the Trustee and the Company that such transfer is exempt (describing the applicable exemption and the basis therefor) from or is being made pursuant to the registration requirements of the Securities Act of 1933, as amended, and of any applicable statute of any state and (ii) the transferee shall execute an investment letter in the form described by the Agreement. The Holder hereof desiring to effect such transfer shall, and does hereby agree to, indemnify the Trustee, the Company, the Master Servicer and the Certificate Registrar acting on behalf of the Trustee against any liability that may result if the transfer is not so exempt or is not made in accordance with such Federal and state laws.

No transfer of this Certificate or any interest herein shall be made unless the Company, the Trustee and the Master Servicer are provided with (i) an Opinion of Counsel which establishes to the satisfaction of the Company, the Trustee and the Master Servicer that the purchase of this Certificate is permissible under applicable law, will not constitute or result in any prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Company, the Master Servicer, the Trustee or the Trust Fund to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in the Agreement, which Opinion of Counsel shall not be an expense of the Company, the Master Servicer, the Trustee or the Trust Fund or (ii) a representation letter, in the form as described by the Agreement, stating that the transferee is not an employee benefit or other plan subject to the prohibited transaction provisions of ERISA or Section 4975 of the Code (a "Plan"), or any other person (including an investment manager, a named fiduciary or a trustee of any Plan) acting, directly or indirectly, on behalf of or purchasing any Certificate with "plan assets" of any Plan.

This Certificate is one of a duly authorized issue of Certificates issued in several Classes designated as Home Equity Loan Pass-Through Certificates of the Series specified hereon (herein collectively called the "Certificates").

The Certificates are limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth herein and in the Agreement.

As provided in the Agreement, withdrawals from the Custodial Account and/or the Certificate Account created for the benefit of Certificateholders may be made by the Master Servicer from time to time for purposes other than distributions to Certificateholders, such purposes including without limitation reimbursement to the Company and the Master Servicer of certain expenses incurred by either of them.

The Agreement permits, with certain exceptions therein provided, the amendment of the Agreement and the modification of the rights and obligations of the Company, the Master Servicer and the Trustee and the rights of the Certificateholders under the Agreement from time to time by the Company, the Master Servicer and the Trustee with the consent of the Holders of Certificates evidencing in the aggregate not less than 66% of the Percentage Interests of each Class of Certificates affected thereby. Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange herefor or in lieu hereof whether or not notation of such consent is made upon the Certificate. The Agreement also permits the amendment thereof in certain circumstances without the consent of the Holders of any of the Certificates and, in certain additional circumstances, without the consent of the Holders of certain Classes of Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable in the Certificate Register upon surrender of this Certificate for registration of transfer at the offices or agencies appointed by the Trustee in the City and State of New York, duly endorsed by, or accompanied by an assignment in the form below or other written instrument of transfer in form satisfactory to the Trustee and the Certificate Registrar duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates of authorized denominations evidencing the same Class and aggregate Percentage Interest will be issued to the designated transferee or transferees.

The Certificates are issuable only as registered Certificates without coupons in Classes and in denominations specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, Certificates are exchangeable for new Certificates of authorized denominations evidencing the same Class and aggregate Percentage Interest, as requested by the Holder surrendering the same.

No service charge will be made for any such registration of transfer or exchange, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company, the Master Servicer, the Trustee, the Certificate Registrar and any agent of the Company, the Master Servicer, the Trustee or the Certificate Registrar may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and neither the Company, the Master Servicer, the Trustee nor any such agent shall be affected by notice to the contrary.

This Certificate shall be governed by and construed in accordance with the laws of the State of New York.

The obligations created by the Agreement in respect of the Certificates and the Trust Fund created thereby shall terminate upon the payment to Certificateholders of all amounts held by or on behalf of the Trustee and required to be paid to them pursuant to the Agreement following the earlier of (i) the maturity or other liquidation of the last Mortgage Loan subject thereto or the disposition of all property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan, and (ii) the purchase by the Master Servicer from the Trust Fund of all remaining Mortgage Loans and all property acquired in respect of such Mortgage Loans, thereby effecting early retirement of the Certificates. The Agreement permits, but does not require, the Master Servicer (i) to purchase, at a price determined as provided in the Agreement, all remaining Mortgage Loans and all property acquired in respect of any Mortgage Loan or (ii) to purchase in whole, but not in part, all of the Class A and Class SB Certificates from the Holders thereof; provided, that any such option may only be exercised if the aggregate principal balance of the Mortgage Loans as of the Distribution Date upon which the proceeds of any such purchase are distributed is less than ten percent of the Cut-off Date Principal Balance of the Mortgage Loans.

Unless the certificate of authentication hereon has been executed by the Certificate Registrar, by manual signature, this Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose.

<PAGE>

IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly executed.

Dated: January 27, 2006            JPMORGAN CHASE BANK, N.A., as Trustee

By:
    ----------------------------------------
        Authorized Signatory

## CERTIFICATE OF AUTHENTICATION

This is one of the Class A- Certificates referred to in the within-mentioned Agreement.

JPMORGAN CHASE BANK, N.A., as Certificate Registrar

By:
    ----------------------------------------
        Authorized Signatory

<PAGE>

## ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto _____ (Please print or typewrite name and address including postal zip code of assignee) a Percentage Interest evidenced by the within Home Equity Loan Pass-Through Certificate and hereby authorizes the transfer of registration of such interest to assignee on the Certificate Register of the Trust Fund.

I (We) further direct the Certificate Registrar to issue a new Certificate of a like denomination and Class, to the above named assignee and deliver such Certificate to the following address:_____

Dated:_____            _____
                                    Signature by or on behalf of assignor

                                    _____
                                        Signature Guaranteed

## DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____ for the account of _____ account number _____, or, if mailed by check, to _____.

Applicable statements should be mailed to _____.

This information is provided by _____, the assignee named above, or_____, as its agent.

<PAGE>

EXHIBIT B

THE CLASS [R-I] [R-II] CERTIFICATE WILL NOT BE ENTITLED TO PAYMENTS CONSTITUTING THE AVAILABLE DISTRIBUTION AMOUNT UNTIL SUCH TIME AS DESCRIBED IN THE POOLING AND SERVICING AGREEMENT REFERRED TO HEREIN (THE "AGREEMENT").

THIS CLASS [R-I] [R-II] CERTIFICATE IS SUBORDINATE TO THE CLASS A CERTIFICATES, TO THE EXTENT DESCRIBED HEREIN AND IN THE AGREEMENT.

THIS CERTIFICATE MAY NOT BE HELD BY OR TRANSFERRED TO A NON-UNITED STATES PERSON OR A DISQUALIFIED ORGANIZATION (AS DEFINED BELOW).

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE IS A "RESIDUAL INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT" AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986 (THE "CODE").

THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE RESOLD OR TRANSFERRED UNLESS IT IS REGISTERED PURSUANT TO SUCH ACT AND LAWS OR IS SOLD OR TRANSFERRED IN TRANSACTIONS WHICH ARE EXEMPT FROM REGISTRATION UNDER SUCH ACT AND UNDER APPLICABLE STATE LAW AND IS TRANSFERRED IN ACCORDANCE WITH THE PROVISIONS OF SECTION 5.02 OF THE POOLING AND SERVICING AGREEMENT (THE "AGREEMENT").

NO TRANSFER OF THIS CERTIFICATE MAY BE MADE TO ANY PERSON, UNLESS THE TRANSFEREE PROVIDES EITHER A CERTIFICATION PURSUANT TO SECTION 5.02(f) OF THE AGREEMENT OR AN OPINION OF COUNSEL SATISFACTORY TO THE MASTER SERVICER, THE COMPANY AND THE TRUSTEE THAT THE PURCHASE OF THIS CERTIFICATE WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR SECTION 4975 OF THE CODE AND WILL NOT SUBJECT THE MASTER SERVICER, THE COMPANY OR THE TRUSTEE TO ANY OBLIGATION OR LIABILITY IN ADDITION TO THOSE UNDERTAKEN IN THE AGREEMENT.

ANY RESALE, TRANSFER OR OTHER DISPOSITION OF THIS CERTIFICATE MAY BE MADE ONLY IF THE PROPOSED TRANSFEREE PROVIDES A TRANSFER AFFIDAVIT TO THE MASTER SERVICER AND THE TRUSTEE THAT (1) SUCH TRANSFEREE IS NOT (A) THE UNITED STATES, ANY STATE OR POLITICAL SUBDIVISION THEREOF, ANY POSSESSION OF THE UNITED STATES, OR ANY AGENCY OR INSTRUMENTALITY OF ANY OF THE FOREGOING (OTHER THAN AN INSTRUMENTALITY WHICH IS A CORPORATION IF ALL OF ITS ACTIVITIES ARE SUBJECT TO TAX AND EXCEPT FOR FREDDIE MAC, A MAJORITY OF ITS BOARD OF DIRECTORS IS NOT SELECTED BY SUCH GOVERNMENTAL UNIT), (B) A FOREIGN GOVERNMENT, ANY INTERNATIONAL ORGANIZATION, OR ANY AGENCY OR INSTRUMENTALITY OF EITHER OF THE FOREGOING, (C) ANY ORGANIZATION (OTHER THAN CERTAIN FARMERS' COOPERATIVES DESCRIBED IN SECTION 521 OF THE CODE) WHICH IS EXEMPT FROM THE TAX IMPOSED BY CHAPTER 1 OF THE CODE UNLESS SUCH ORGANIZATION IS SUBJECT TO THE TAX IMPOSED BY SECTION 511 OF THE CODE (INCLUDING THE TAX IMPOSED BY SECTION 511 OF THE CODE ON UNRELATED BUSINESS TAXABLE INCOME), (D) RURAL ELECTRIC AND TELEPHONE COOPERATIVES DESCRIBED IN SECTION 1381(a)(2)(C) OF THE CODE, (E) AN ELECTING LARGE PARTNERSHIP UNDER SECTION 775(a) OF THE CODE (ANY SUCH PERSON DESCRIBED IN THE FOREGOING CLAUSES (A), (B), (C), (D) OR (E) BEING HEREIN REFERRED TO AS A "DISQUALIFIED ORGANIZATION"), OR (F) AN AGENT OF A DISQUALIFIED ORGANIZATION, (2) NO PURPOSE OF SUCH TRANSFER IS TO IMPEDE THE ASSESSMENT OR COLLECTION OF TAX AND (3) SUCH TRANSFEREE SATISFIES CERTAIN ADDITIONAL CONDITIONS RELATING TO THE FINANCIAL CONDITION OF THE PROPOSED TRANSFEREE. NOTWITHSTANDING THE REGISTRATION IN THE CERTIFICATE REGISTER OR ANY TRANSFER, SALE OR OTHER DISPOSITION OF THIS CERTIFICATE TO A DISQUALIFIED ORGANIZATION OR AN AGENT OF A DISQUALIFIED ORGANIZATION, SUCH REGISTRATION SHALL BE DEEMED TO BE OF NO LEGAL FORCE OR EFFECT WHATSOEVER AND SUCH PERSON SHALL NOT BE DEEMED TO BE A CERTIFICATEHOLDER FOR ANY PURPOSE HEREUNDER, INCLUDING, BUT NOT LIMITED TO, THE RECEIPT OF DISTRIBUTIONS ON THIS CERTIFICATE. EACH HOLDER OF THIS CERTIFICATE BY ACCEPTANCE OF THIS CERTIFICATE SHALL BE DEEMED TO HAVE CONSENTED TO THE PROVISIONS OF THIS PARAGRAPH.

Class [R-I][R-II]                       Certificate No.
Residual

Date of Pooling and Servicing
Agreement and Cut-off Date:
January 1, 2006                         Percentage Interest:              %
                                                        ----------------

First Distribution Date:
February 27, 2006
                                        Initial Certificate
                                        Principal Balance of this Certificate: $0.00

Master Servicer:
Residential Funding Corporation

Assumed Final Distribution Date:      CUSIP:
[_____]

HOME EQUITY LOAN PASS-THROUGH CERTIFICATE

SERIES 2006-HSA1

evidencing a percentage interest in any distributions allocable to the Class [R-I][R-II] Certificates with respect to the Trust Fund consisting primarily of a pool of closed end, fixed interest rate, fully-amortizing and balloon payment, one- to four-family, primarily second lien home equity mortgage loans sold by RESIDENTIAL FUNDING MORTGAGE SECURITIES II, INC.

This Certificate is payable solely from the assets of the Trust Fund and does not represent an obligation of or interest in Residential Funding Mortgage Securities II, Inc., the Master Servicer, the Trustee referred to below, GMAC Mortgage Group, Inc. or any of their affiliates. Neither this Certificate nor the underlying Mortgage Loans are guaranteed or insured by any governmental agency or instrumentality or by Residential Funding Mortgage Securities II, Inc., the Master Servicer, the Trustee, GMAC Mortgage Group, Inc. or any of their affiliates. None of the Company, the Master Servicer, GMAC Mortgage Group, Inc. or any of their affiliates will have any obligation with respect to any certificate or other obligation secured by or payable from payments on the Certificates.

This certifies that RESIDENTIAL FUNDING CORPORATION is the registered owner of the Percentage Interest evidenced by this Certificate (as specified above) in certain distributions with respect to the Trust Fund consisting primarily of a pool of closed end, fixed interest rate, fully-amortizing and balloon payment, one- to four-family, primarily second lien home equity mortgage loans (the "Mortgage Loans") sold by Residential Funding Mortgage Securities II, Inc. (hereinafter called the "Company," which term includes any successor entity under the Agreement referred to below). The Trust Fund was created pursuant to a Pooling and Servicing Agreement dated as specified above (the "Agreement") among the Company, the Master Servicer and JPMorgan Chase Bank, N.A., as trustee (the "Trustee"), a summary of certain of the pertinent provisions of which is set forth hereafter. To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

Pursuant to the terms of the Agreement, a distribution will be made on the 25th day of each month or, if such 25th day is not a Business Day, the Business Day immediately following (the "Distribution Date"), commencing as described in the Agreement, to the Person in whose name this Certificate is registered at the close of business on the last day (or if such last day is not a Business Day, the Business Day immediately preceding such last day) of the month immediately preceding the month of such distribution, or, for so long as this Certificate is a Book-Entry Certificate, as of the Business Day immediately preceding such Distribution Date (the "Record Date"), from the Available Distribution Amount in an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount required to be distributed to Holders of Class [R-I][R-II] Certificates on such Distribution Date.

Each Holder of this Certificate will be deemed to have agreed to be bound by the restrictions set forth in the Agreement to the effect that (i) each person holding or acquiring any Ownership Interest in this Certificate must be a United States Person and a Permitted Transferee, (ii) the transfer of any Ownership Interest in this Certificate will be conditioned upon the delivery to the Trustee of, among other things, an affidavit to the effect that it is a United States Person and Permitted Transferee, (iii) any attempted or purported transfer of any Ownership Interest in this Certificate in violation of such restrictions will be absolutely null and void and will vest no rights in the purported transferee, and (iv) if any person other than a United States Person and a Permitted Transferee acquires any Ownership Interest in this Certificate in violation of such restrictions, then the Company will have the right, in its sole discretion and without notice to the Holder of this Certificate, to sell this Certificate to a purchaser selected by the Company, which purchaser may be the Company, or any affiliate of the Company, on such terms and conditions as the Company may choose.

Notwithstanding the above, the final distribution on this Certificate will be made after due notice of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Trustee for that purpose in the City and State of New York. The Holder of this Certificate may have additional obligations with respect to this Certificate, including tax liabilities.

No transfer of this Class R-[I][II] Certificate will be made unless such

transfer is exempt from the registration requirements of the Securities Act of 1933, as amended, and any applicable state securities laws or is made in accordance with said Act and laws. In the event that such a transfer is to be made, (i) the Trustee or the Company may require an opinion of counsel acceptable to and in form and substance satisfactory to the Trustee and the Company that such transfer is exempt (describing the applicable exemption and the basis therefor) from or is being made pursuant to the registration requirements of the Securities Act of 1933, as amended, and of any applicable statute of any state and (ii) the transferee shall execute an investment letter in the form described by the Agreement. The Holder hereof desiring to effect such transfer shall, and does hereby agree to, indemnify the Trustee, the Company, the Master Servicer and the Certificate Registrar acting on behalf of the Trustee against any liability that may result if the transfer is not so exempt or is not made in accordance with such Federal and state laws.

No transfer of this Certificate or any interest herein shall be made unless the Company, the Trustee and the Master Servicers are provided with (i) an Opinion of Counsel which establishes to the satisfaction of the Company, the Trustee and the Master Servicers that the purchase of this Certificate is permissible under applicable law, will not constitute or result in any prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Company, the Master Servicer, the Trustee or the Trust Fund to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in the Agreement, which Opinion of Counsel shall not be an expense of the Company, the Master Servicer, the Trustee or the Trust Fund, or (ii) a representation letter, in the form as described by the Agreement, stating that the transferee is not an employee benefit or other plan subject to the prohibited transaction provisions of ERISA or Section 4975 of the Code (a "Plan"), or any other person (including an investment manager, a named fiduciary or a trustee of any Plan) acting, directly or indirectly, on behalf of or purchasing any Certificate with "plan assets" of any Plan.

This Certificate is one of a duly authorized issue of Certificates issued in several Classes designated as Home Equity Loan Pass-Through Certificates of the Series specified hereon (herein collectively called the "Certificates").

The Certificates are limited in right of payment to certain collections and recoveries respecting the Mortgage Loans, all as more specifically set forth herein and in the Agreement.

As provided in the Agreement, withdrawals from the Custodial Account and/or the Certificate Account created for the benefit of Certificateholders may be made by the Master Servicer from time to time for purposes other than distributions to Certificateholders, such purposes including without limitation reimbursement to the Company and the Master Servicer of certain expenses incurred by either of them.

The Agreement permits, with certain exceptions therein provided, the amendment of the Agreement and the modification of the rights and obligations of the Company, the Master Servicer and the Trustee and the rights of the Certificateholders under the Agreement from time to time by the Company, the Master Servicer and the Trustee with the consent of the Holders of Certificates evidencing in the aggregate not less than 66% of the Percentage Interests of each Class of Certificates affected thereby. Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange herefor or in lieu hereof whether or not notation of such consent is made upon the Certificate. The Agreement also permits the amendment thereof in certain circumstances without the consent of the Holders of any of the Certificates and, in certain additional circumstances, without the consent of the Holders of certain Classes of Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable in the Certificate Register upon surrender of this Certificate for registration of transfer at the offices or agencies appointed by the Trustee in the City and State of New York, duly endorsed by, or accompanied by an assignment in the form below or other written instrument of transfer in form satisfactory to the Trustee and the Certificate Registrar duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates of authorized denominations evidencing the same Class and aggregate Percentage Interest will be issued to the designated transferee or transferees.

The Certificates are issuable only as registered Certificates without coupons in Classes and in denominations specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, Certificates are exchangeable for new Certificates of authorized denominations evidencing the same Class and aggregate Percentage Interest, as requested by the Holder surrendering the same.

No service charge will be made for any such registration of transfer or exchange, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Company, the Master Servicer, the Trustee and the Certificate Registrar and any agent of the Company, the Master Servicer, the Trustee or the Certificate Registrar may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and neither the Company, the Master Servicer, the Trustee nor any such agent shall be affected by notice to the contrary.

This Certificate shall be governed by and construed in accordance with the laws of the State of New York.

The obligations created by the Agreement in respect of the Certificates and the Trust Fund created thereby shall terminate upon the payment to Certificateholders of all amounts held by or on behalf of the Trustee and required to be paid to them pursuant to the Agreement following the earlier of (i) the maturity or other liquidation of the last Mortgage Loan subject thereto or the disposition of all property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan, and (ii) the purchase by the Master Servicer from the Trust Fund of all remaining Mortgage Loans and all property acquired in respect of such Mortgage Loans, thereby effecting early retirement of the Certificates. The Agreement permits, but does not require, the Master Servicer (i) to purchase, at a price determined as provided in the Agreement, all remaining Mortgage Loans and all property acquired in respect of any Mortgage Loan or (ii) to purchase in whole, but not in part, all of the Certificates from the Holders thereof; provided, that any such option may only be exercised if the Pool Principal Balance of the Mortgage Loans as of the Distribution Date upon which the proceeds of any such purchase are distributed is less than ten percent of the Cut-off Date Principal Balance of the Mortgage Loans.

Unless the certificate of authentication hereon has been executed by the Certificate Registrar, by manual signature, this Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose.


<PAGE>


IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly executed.

Dated: January 27, 2006          JPMORGAN CHASE BANK, N.A., as Trustee



                              By:
                                 ---------------------------------------
                                   Authorized Signatory


                    CERTIFICATE OF AUTHENTICATION

This is one of the Class A- Certificates referred to in the within-mentioned Agreement.



                              JPMORGAN CHASE BANK, N.A., as Certificate
                              Registrar


                              By:
                                 ---------------------------------------
                                   Authorized Signatory


<PAGE>


                              ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto                                                          (Please

print or typewrite name and address including zip code of assignee) a
Percentage Interest evidenced by the within Home Equity Loan Pass-Through
Certificate and hereby authorizes the transfer of registration of such interest
to assignee on the Certificate Register of the Trust Fund.

        I (We) further direct the Certificate Registrar to issue a new
Certificate of a like denomination and Class, to the above named assignee and
deliver such Certificate to the following
address:_____

Dated:_____          _____
                                  Signature by or on behalf of assignor


                                  _____
                                  Signature Guaranteed


                      DISTRIBUTION INSTRUCTIONS

        The assignee should include the following for purposes of distribution:

        Distributions shall be made, by wire transfer or otherwise, in
immediately available funds to _____ for the account of _____
account number _____, or, if mailed by check, to _____.

        Applicable statements should be mailed to _____.

        This information is provided by _____, the assignee named above,
or_____, as its agent.



<PAGE>

                            EXHIBIT C

                    FORM OF CUSTODIAL AGREEMENT

                        CUSTODIAL AGREEMENT


        THIS CUSTODIAL AGREEMENT (as amended and supplemented from time
to time, the "Agreement"), dated as of January 1, 2006, by and among JPMORGAN
CHASE BANK, N.A., as Trustee (including its successors under the Pooling
Agreement defined below, the "Trustee"), RESIDENTIAL FUNDING MORTGAGE SECURITIES
II, INC. (together with any successor in interest, the "Company"), RESIDENTIAL
FUNDING CORPORATION, as master servicer (together with any successor in interest
or successor under the Pooling Agreement referred to below, the "Master
Servicer"), and WELLS FARGO BANK, NATIONAL ASSOCIATION (together with any
successor in interest or any successor appointed hereunder, the "Custodian").

                W I T N E S S E T H   T H A T :
                - - - - - - - - - -- - - -

        WHEREAS, the Company, the Master Servicer, and the Trustee have
entered into a Pooling and Servicing Agreement, dated as of January 1, 2006,
relating to the issuance of Residential Funding Mortgage Securities II, Inc.,
Home Equity Loan Pass-Through Certificates, Series 2006-HSA1 (as in effect on
the date of this Agreement, the "Original Pooling Agreement," and as amended and
supplemented from time to time, the "Pooling Agreement"); and

        WHEREAS, the Custodian has agreed to act as agent for the Trustee
for the purposes of receiving and holding certain documents and other
instruments delivered by the Company and the Master Servicer under the Pooling
Agreement, all upon the terms and conditions and subject to the limitations
hereinafter set forth;

        NOW, THEREFORE, in consideration of the premises and the mutual
covenants and agreements hereinafter set forth, the Trustee, the Company, the
Master Servicer and the Custodian hereby agree as follows:


                            ARTICLE I
                            Definitions


        Capitalized terms used in this Agreement and not defined herein
shall have the meanings assigned in the Original Pooling Agreement, unless

ARTICLE II
Custody of Mortgage Documents

Section 2.1.  Custodian to Act as Agent; Acceptance of Mortgage Files.  The Custodian, as the duly appointed agent of the Trustee for these purposes, acknowledges receipt of the Mortgage Files relating to the Mortgage Loans identified on the schedule attached hereto (the "Mortgage Files") and declares that it holds and will hold the Mortgage Files as agent solely for the Trustee, in trust, for the use and benefit of all present and future Certificateholders.

Section 2.2.  Recordation of Assignments.  If any Mortgage File includes one or more assignments of the related Mortgages to the Trustee that have not been recorded, each such assignment shall be delivered by the Custodian to the Company for the purpose of recording it in the appropriate public office for real property records, and the Company, at no expense to the Custodian, shall promptly cause to be recorded in the appropriate public office for real property records each such assignment and, upon receipt thereof from such public office, shall return each such assignment to the Custodian.

Section 2.3.  Review of Mortgage Files.
------------------------

(a) On or prior to the Closing Date, the Custodian shall deliver to the Trustee and the Credit Enhancer an Initial Certification in the form annexed hereto as Exhibit One evidencing receipt of a Mortgage File for each Mortgage Loan listed on the Schedule attached hereto (the "Mortgage Loan Schedule"). The parties hereto acknowledge that certain documents referred to in Subsection 2.01(b)(i) of the Pooling Agreement may be missing on or prior to the Closing Date and such missing documents shall be listed on Schedule A to Exhibit One.

(b) Within 45 days after the Closing Date, the Custodian agrees, for the benefit of Certificateholders, to review each Mortgage File, and to deliver to the Trustee an Interim Certification in the form annexed hereto as Exhibit Two to the effect that all documents required to be delivered pursuant to Section 2.01(b) of the Pooling Agreement have been executed and received and that such documents relate to the Mortgage Loans identified on the Mortgage Loan Schedule, except for any exceptions listed on Schedule A attached to such Interim Certification. For purposes of such review, the Custodian shall compare the following information in each Mortgage File to the corresponding information in the Mortgage Loan Schedule:  (i) the loan number, (ii) the borrower name and (iii) the original principal balance. In the event that any Mortgage Note or Assignment of Mortgage has been delivered to the Custodian by the Company in blank, the Custodian, upon the direction of the Company, shall cause each such Mortgage Note to be endorsed to the Trustee and each such Assignment of Mortgage to be completed in the name of the Trustee prior to the date on which such Interim Certification is delivered to the Trustee. Within 45 days of receipt of the documents required to be delivered pursuant to Section 2.01(c) of the Pooling Agreement, the Custodian agrees, for the benefit of the Certificateholders and the Credit Enhancer, to review each such document, and upon the written request of the Trustee to deliver to the Trustee and the Credit Enhancer an updated Schedule A to the Interim Certification. The Custodian shall be under no duty or obligation to inspect, review or examine said documents, instruments, certificates or other papers to determine that the same are genuine, enforceable, or appropriate for the represented purpose or that they have actually been recorded or that they are other than what they purport to be on their face, or that the MIN is accurate. If in performing the review required by this Section 2.3 the Custodian finds any document or documents constituting a part of a Mortgage File to be missing or defective in respect of the items reviewed as described in Section 2.3(b), the Custodian shall promptly so notify the Company, the Master Servicer, the Trustee and the Credit Enhancer.

(c) Upon receipt of all documents required to be in the Mortgage Files the Custodian shall deliver to the Trustee and the Credit Enhancer a Final Certification in the form annexed hereto as Exhibit Three evidencing the completeness of the Mortgage Files.

Upon receipt of written request from the Trustee, the Company or the Master Servicer, the Custodian shall as soon as practicable supply the Trustee with a list of all of the documents relating to the Mortgage Loans required to be delivered pursuant to Section 2.01(b) of the Pooling Agreement not then contained in the Mortgage Files.

Section 2.4.  Notification of Breaches of Representations and Warranties. If the Custodian discovers, in the course of performing its custodial functions, a breach of a representation or warranty made by the Master Servicer or the Company as set forth in the Pooling Agreement with respect to a

Mortgage Loan relating to a Mortgage File, the Custodian shall give prompt written notice to the Company, the Master Servicer, the Trustee and the Credit Enhancer.

Section 2.5. Custodian to Cooperate; Release of Mortgage Files. Upon the repurchase or substitution of any Mortgage Loan pursuant to Article II of the Pooling Agreement or payment in full of any Mortgage Loan, or the receipt by the Master Servicer of a notification that payment in full will be escrowed in a manner customary for such purposes, the Master Servicer shall immediately notify the Custodian by delivering to the Custodian a Request for Release (in the form of Exhibit Four attached hereto or a mutually acceptable electronic form) and shall request delivery to it of the Mortgage File. The Custodian agrees, upon receipt of such Request for Release, promptly to release to the Master Servicer the related Mortgage File.

Upon receipt of a Request for Release from the Master Servicer, signed by a Servicing Officer, that (i) the Master Servicer or a Subservicer, as the case may be, has made a deposit into the Certificate Account in payment for the purchase of the related Mortgage Loan in an amount equal to the Purchase Price for such Mortgage Loan or (ii) the Company has chosen to substitute a Qualified Substitute Mortgage Loan for such Mortgage Loan, the Custodian shall promptly release to the Master Servicer the related Mortgage File.

Upon written notification of a substitution, the Master Servicer shall deliver to the Custodian and the Custodian agrees to accept the Mortgage Note and other documents constituting the Mortgage File with respect to any Qualified Substitute Mortgage Loan, upon receiving written notification from the Master Servicer of such substitution.

From time to time as is appropriate for the servicing or foreclosures of any Mortgage Loan, including, for this purpose, collection under any Mortgage Pool Insurance Policy, the Master Servicer shall deliver to the Custodian a Request for Release certifying as to the reason for such release. Upon receipt of the foregoing, the Custodian shall deliver the Mortgage File or such document to the Master Servicer. All Mortgage Files so released to the Master Servicer shall be held by it in trust for the Trustee for the use and benefit of all present and future Certificateholders. The Master Servicer shall cause each Mortgage File or any document therein so released to be returned to the Custodian when the need therefor by the Master Servicer no longer exists, unless (i) the Mortgage Loan has been liquidated and the Liquidation Proceeds relating to the Mortgage Loan have been deposited in the Custodial Account or (ii) the Mortgage File or such document has been delivered to an attorney, or to a public trustee or other public official as required by law, for purposes of initiating or pursuing legal action or other proceedings for the foreclosure of the Mortgaged Property either judicially or non-judicially, and the Master Servicer has delivered to the Custodian an updated Request for Release signed by a Servicing Officer certifying as to the name and address of the Person to which such Mortgage File or such document was delivered and the purpose or purposes of such delivery. Immediately upon receipt of any Mortgage File returned to the Custodian by the Master Servicer, the Custodian shall deliver a signed acknowledgement to the Master Servicer, confirming receipt of such Mortgage File.

Upon the written request of the Master Servicer, the Custodian will send to the Master Servicer copies of any documents contained in the Mortgage File.

Section 2.6. Assumption Agreements. In the event that any assumption agreement or substitution of liability agreement is entered into with respect to any Mortgage Loan subject to this Agreement in accordance with the terms and provisions of the Pooling Agreement, the Master Servicer shall notify the Custodian that such assumption or substitution agreement has been completed by forwarding to the Custodian the original of such assumption or substitution agreement, which shall be added to the related Mortgage File and, for all purposes, shall be considered a part of such Mortgage File to the same extent as all other documents and instruments constituting parts thereof.

ARTICLE III
Concerning the Custodian

Section 3.1. Custodian a Bailee and Agent of the Trustee. With respect to each Mortgage Note, Mortgage and other documents constituting each Mortgage File which are delivered to the Custodian, the Custodian is exclusively the bailee and agent of the Trustee and has no instructions to hold any Mortgage Note or Mortgage for the benefit of any person other than the Trustee, holds such documents for the benefit of Certificateholders and undertakes to perform such duties and only such duties as are specifically set forth in this Agreement. Except upon compliance with the provisions of Section 2.5 of this Agreement, no Mortgage Note, Mortgage or other document constituting a part of a Mortgage File shall be delivered by the Custodian to the Company or the Master

Servicer or otherwise released from the possession of the Custodian.

The Master Servicer shall promptly notify the Custodian in writing if it shall no longer be a member of MERS, or if it otherwise shall no longer be capable of registering and recording Mortgage Loans using MERS. In addition, the Master Servicer shall (i) promptly notify the Custodian in writing when a MERS Mortgage Loan is no longer registered with and recorded under MERS and (ii) concurrently with any such deregistration of a MERS Mortgage Loan, prepare, execute and record an original assignment from MERS to the Trustee and deliver such assignment to the Custodian.

Section 3.2. Indemnification. The Company hereby agrees to indemnify and hold the Custodian harmless from and against all claims, liabilities, losses, actions, suits or proceedings at law or in equity, or any other expenses, fees or charges of any character or nature, which the Custodian may incur or with which the Custodian may be threatened by reason of its acting as custodian under this Agreement, including indemnification of the Custodian against any and all expenses, including attorney's fees if counsel for the Custodian has been approved by the Company, and the cost of defending any action, suit or proceedings or resisting any claim. Notwithstanding the foregoing, it is specifically understood and agreed that in the event any such claim, liability, loss, action, suit or proceeding or other expense, fee or charge shall have been caused by reason of any negligent act, negligent failure to act or willful misconduct on the part of the Custodian, or which shall constitute a willful breach of its duties hereunder, the indemnification provisions of this Agreement shall not apply.

Section 3.3. Custodian May Own Certificates. The Custodian in its individual or any other capacity may become the owner or pledgee of Certificates with the same rights it would have if it were not Custodian.

Section 3.4. Master Servicer to Pay Custodian's Fees and Expenses. The Master Servicer covenants and agrees to pay to the Custodian from time to time, and the Custodian shall be entitled to, reasonable compensation for all services rendered by it in the exercise and performance of any of the powers and duties hereunder of the Custodian, and the Master Servicer shall pay or reimburse the Custodian upon its request for all reasonable expenses, disbursements and advances incurred or made by the Custodian in accordance with any of the provisions of this Agreement (including the reasonable compensation and the expenses and disbursements of its counsel and of all persons not regularly in its employ), except any such expense, disbursement or advance as may arise from its negligence or bad faith.

Section 3.5. Custodian May Resign; Trustee May Remove Custodian. The Custodian may resign from the obligations and duties hereby imposed upon it as such obligations and duties relate to its acting as Custodian of the Mortgage Loans. Upon receiving such notice of resignation, the Trustee shall either take custody of the Mortgage Files itself and give prompt notice thereof to the Company, the Master Servicer and the Custodian, or promptly appoint a successor Custodian by written instrument, in duplicate, one copy of which instrument shall be delivered to the resigning Custodian and one copy to the successor Custodian. If the Trustee shall not have taken custody of the Mortgage Files and no successor Custodian shall have been so appointed and have accepted appointment within 30 days after the giving of such notice of resignation, the resigning Custodian may petition any court of competent jurisdiction for the appointment of a successor Custodian.

The Trustee may remove the Custodian at any time. In such event, the Trustee shall appoint, or petition a court of competent jurisdiction to appoint, a successor Custodian hereunder. Any successor Custodian shall be a depository institution subject to supervision or examination by federal or state authority and shall be able to satisfy the other requirements contained in Section 3.7 and shall be unaffiliated with the Master Servicer or the Company.

Any resignation or removal of the Custodian and appointment of a successor Custodian pursuant to any of the provisions of this Section 3.5 shall become effective upon acceptance of appointment by the successor Custodian. The Trustee shall give prompt notice to the Company and the Master Servicer of the appointment of any successor Custodian. No successor Custodian shall be appointed by the Trustee without the prior approval of the Company and the Master Servicer.

Section 3.6. Merger or Consolidation of Custodian. Any Person into which the Custodian may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Custodian shall be a party, or any Person succeeding to the business of the Custodian, shall be the successor of the Custodian hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding; provided that such successor is a depository institution subject to supervision or examination by federal or state authority and is able

to satisfy the other requirements contained in Section 3.7 and is unaffiliated with the Master Servicer or the Company.

Section 3.7. Representations of the Custodian. The Custodian hereby represents that it is a depository institution subject to supervision or examination by a federal or state authority, has a combined capital and surplus of at least $15,000,000 and is qualified to do business in the jurisdictions in which it will hold any Mortgage File.

ARTICLE IV

Compliance with Regulation AB

Section 4.1. Intent of the Parties; Reasonableness. The parties hereto acknowledge and agree that the purpose of this Article IV is to facilitate compliance by the Company with the provisions of Regulation AB and related rules and regulations of the Commission. The Company shall not exercise its right to request delivery of information or other performance under these provisions other than in good faith, or for purposes other than compliance with the Securities Act, the Exchange Act and the rules and regulations of the Commission under the Securities Act and the Exchange Act. Each of the parties hereto acknowledges that interpretations of the requirements of Regulation AB may change over time, whether due to interpretive guidance provided by the Commission or its staff, consensus among participants in the mortgage-backed securities markets, advice of counsel, or otherwise, and agrees to comply with requests made by the Company in good faith for delivery of information under these provisions on the basis of evolving interpretations of Regulation AB. The Custodian shall cooperate reasonably with the Company to deliver to the Company (including any of its assignees or designees), any and all disclosure, statements, reports, certifications, records and any other information necessary in the reasonable, good faith determination of the Company to permit the Company to comply with the provisions of Regulation AB.

Section 4.2. Additional Representations and Warranties of the Custodian.

(a) The Custodian hereby represents and warrants that the information set forth under the caption "Pooling and Servicing Agreement - Custodial Arrangements" in the Prospectus Supplement (the "Custodian Disclosure") in the Preliminary Prospectus Supplement dated January 19, 2006 and the Prospectus Supplement dated January 25, 2006 relating to the Certificates does not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(b) The Custodian shall be deemed to represent to the Company as of the date hereof and on each date on which information is provided to the Company under Section 4.3 that, except as disclosed in writing to the Company prior to such date: (i) there are no aspects of its financial condition that could have a material adverse effect on the performance by it of its Custodian obligations under this Agreement or any other Securitization Transaction as to which it is the custodian; (ii) there are no material legal or governmental proceedings pending (or known to be contemplated) against it; and (iii) there are no affiliations, relationships or transactions relating to the Custodian with respect to the Company or any sponsor, issuing entity, servicer, trustee, originator, significant obligor, enhancement or support provider or other material transaction party (as such terms are used in Regulation AB) relating to the Securitization Transaction contemplated by the Agreement, as identified by the Company to the Custodian in writing as of the Closing Date (each, a "Transaction Party").

(c) If so requested by the Company on any date following the Closing Date, the Custodian shall, within five Business Days following such request, confirm in writing the accuracy of the representations and warranties set forth in paragraph (a) of this Section or, if any such representation and warranty is not accurate as of the date of such confirmation, provide reasonably adequate disclosure of the pertinent facts, in writing, to the requesting party. Any such request from the Company shall not be given more than once each calendar quarter, unless the Company shall have a reasonable basis for a determination that any of the representations and warranties may not be accurate.

Section 4.3. Additional Information to Be Provided by the Custodian. For so long as the Certificates are outstanding, for the purpose of satisfying the Company's reporting obligation under the Exchange Act with respect to any class of Certificates, the Custodian shall (a) notify the Company in writing of any material litigation or governmental proceedings pending against the Custodian that would be material to Certificateholders, and (b) provide to the Company a written description of such proceedings. Any notices and descriptions required under this Section 4.3 shall be given no later than

five Business Days prior to the Determination Date following the month in which
the Custodian has knowledge of the occurrence of the relevant event.  As of the
date the Company or Master  Servicer files each Report on Form 10-D or Form 10-K
with respect to the Certificates, the Custodian will be deemed to represent that
any  information  previously  provided  under  this  Section  4.3,  if  any,  is
materially correct and does not have any material omissions unless the Custodian
has provided an update to such information.

Section 4.4. Report on Assessment of Compliance and  Attestation.
On or before March 15 of each calendar year, the Custodian shall:

(a)  deliver  to  the  Company  a report  (in form  and  substance
reasonably  satisfactory  to  the  Company) regarding the Custodian's assessment of
compliance  with the Servicing Criteria during the immediately preceding calendar
year,  as  required  under  Rules  13a-18 and 15d-18 of  the  Exchange Act and Item
1122 of Regulation  AB. Such report shall be addressed to the Company and signed
by an  authorized  officer  of  the  Custodian,  and  shall  address  each of the
Servicing  Criteria  specified on a certification  substantially  in the form of
Exhibit Five hereto; and

(b)  deliver  to  the  Company  a report  of  a registered  public
accounting  firm reasonably acceptable  to the Company that attests to, and
reports on, the  assessment  of  compliance  made  by the Custodian and delivered
pursuant to the preceding  paragraph.  Such attestation  shall be in accordance
with Rules 1-02(a)(3) and 2-02(g) of Regulation S-X under the Securities Act and
the Exchange Act.

Section 4.5.  Indemnification; Remedies.

(a) The Custodian shall indemnify the Company,  each affiliate of
the Company,  the Master  Servicer and each broker dealer acting as underwriter,
placement  agent or initial  purchaser  of the  Certificates  or each Person who
controls any of such parties (within the meaning of Section 15 of the Securities
Act and Section 20 of the Exchange Act);  and the respective  present and former
directors,  officers,  employees and agents of each of the foregoing,  and shall
hold each of them harmless  from and against any  losses,  damages,  penalties,
fines,  forfeitures,  legal fees and expenses and related costs, judgments,  and
any other costs,  fees and expenses that any of them may sustain  arising out of
or based upon:

(i)(A) any untrue  statement  of a material  fact  contained  or
alleged to be contained in the Custodian Disclosure and any information, report,
certification,  accountants'  attestation or other material  provided under this
Article  IV by or on  behalf  of the  Custodian  (collectively,  the  "Custodian
Information"), or (B) the omission or alleged omission to state in the Custodian
Information a material  fact required to be stated in the Custodian  Information
or  necessary  in order  to make the  statements  therein,  in the  light of the
circumstances under which they were made, not misleading; or

(ii) any failure by the  Custodian to deliver any  information,  report,
certification,  accountants'  attestation or other material when and as required
under this Article IV.

(b).  In the case of any failure of performance described in clause
(ii) of Section 4.5(a),  the Custodian shall promptly  reimburse the Company for
all costs reasonably incurred by the Company in order to obtain the information,
report,  certification,  accountants'  letter or other material not delivered as
required by the Custodian.

ARTICLE V
Miscellaneous Provisions

Section 5.1. Notices. All notices, requests, consents and demands
and other communications  required under this Agreement or pursuant to any other
instrument  or document  delivered  hereunder  shall be in writing  and,  unless
otherwise  specifically  provided,  may be delivered personally,  by telegram or
telex,  or by registered or certified  mail,  postage prepaid,  return  receipt
requested,  at the  addresses  specified on the  signature  page hereof (unless
changed by the particular party whose address is stated herein by similar notice
in writing), in which case the notice will be deemed delivered when received.

Section  5.2.  Amendments.  No  modification  or  amendment of or
supplement to this Agreement  shall be valid or effective  unless the same is in
writing and signed by all parties  hereto,  and neither the Company,  the Master
Servicer nor the Trustee shall enter into any amendment of or supplement to this
Agreement except as permitted by the Pooling  Agreement.  The Trustee shall give
prompt  notice to the  Custodian of any  amendment  or  supplement to the Pooling
Agreement and furnish the Custodian with written copies thereof.

Section  5.3.  Governing  Law.  This  Agreement  shall be deemed a

contract made under the laws of the State of New York and shall be construed and enforced in accordance with and governed by the laws of the State of New York.

Section 5.4. Recordation of Agreement. To the extent permitted by applicable law, this Agreement is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any or all of the properties subject to the Mortgages are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Master Servicer and at its expense on direction by the Trustee (pursuant to the request of holders of Certificates evidencing undivided interests in the aggregate of not less than 25% of the Trust Fund), but only upon direction accompanied by an Opinion of Counsel reasonably satisfactory to the Master Servicer to the effect that the failure to effect such recordation is likely to materially and adversely affect the interests of the Certificateholders.

For the purpose of facilitating the recordation of this Agreement as herein provided and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

Section 5.5. Severability of Provisions. If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or of the Certificates or the rights of the holders thereof.

<PAGE>

IN WITNESS WHEREOF, this Agreement is executed as of the date first above written.

Address:                              JPMORGAN CHASE BANK, N.A.,
                                          as Trustee
600 Travis Street, 9th Floor
Houston, Texas 77002

                              By:
                                 --------------------------------
                                 Name:
                                 Title:


Address:                      RESIDENTIAL FUNDING MORTGAGE SECURITIES II, INC.
8400 Normandale Lake Boulevard
Suite 250
Minneapolis, Minnesota 55437

                              By:
                                 --------------------------------
                                 Name:
                                 Title:

Address:        as Master Servicer    RESIDENTIAL FUNDING CORPORATION,
8400 Normandale Lake Boulevard
Suite 250
Minneapolis, Minnesota 55437

                              By:
                                 --------------------------------
                                 Name:
                                 Title:

Address:                      WELLS FARGO BANK, NATIONAL ASSOCIATION

Mortgage Document Custody
One Meridian Crossings, Lower Level
Richfield, Minnesota  55423

                              By:

                                        Name:  H.A. Nelson
                                        Title:   Assistant Vice President

<PAGE>

STATE OF TEXAS                          )
                                        ) ss.:
COUNTY OF  HARRIS                       )


          On the 27th day of January,  2006,  before me, a notary public in
and for said State, personally appeared _____,  known to me
to be a(n) _____ of JPMorgan Chase Bank, N.A., a national banking
association that executed the within instrument,  and also known to me to be the
person who  executed  it on behalf of said  national  banking  association,  and
acknowledged  to me that such national  banking  association  executed  the within
instrument.

          IN WITNESS  WHEREOF,  I have  hereunto set my hand and affixed my
official seal the day and year in this certificate first above written.



                                        Notary Public

[Notarial Seal]


<PAGE>

STATE OF MINNESOTA     )
                                ) ss.:
COUNTY OF HENNEPIN     )


          On the 27th day of January,  2006,  before me, a notary public in
and for  said  State,  personally  appeared  H.A.  Nelson,  known to me to be an
Assistant Vice President of Wells Fargo Bank, National  Association,  a national
association that executed the within instrument,  and also known to me to be the
person who executed it on behalf of said national association,  and acknowledged
to me that such national banking association executed the within instrument.

          IN WITNESS  WHEREOF,  I have  hereunto set my hand and affixed my
official seal the day and year in this certificate first above written.



                                        Notary Public

[Notarial Seal]


<PAGE>

STATE OF MINNESOTA     )
                                ) ss.:
COUNTY OF HENNEPIN     )


          On the 27th day of January,  2006,  before me, a notary public in
and for said State,  personally  appeared_____,  known to me to be a(n)
_____ of Residential  Funding Mortgage  Securities II, Inc., one of the
corporations that executed the within instrument, and also known to me to be the
person who executed it on behalf of said  corporation,  and  acknowledged  to me
that such corporation executed the within instrument.

          IN WITNESS  WHEREOF,  I have  hereunto set my hand and affixed my
official seal the day and year in this certificate first above written.

Notary Public

[Notarial Seal]

STATE OF MINNESOTA      )
                        ) ss.:
COUNTY OF HENNEPIN      )


            On the 27th day of January, 2006, before me, a notary public in
and for said State, personally appeared_____, known to me to be a(n)
_____ of Residential Funding Corporation, one of the corporations that
executed the within instrument, and also known to me to be the person who
executed it on behalf of said corporation, and acknowledged to me that such
corporation executed the within instrument.

            IN WITNESS WHEREOF, I have hereunto set my hand and affixed my
official seal the day and year in this certificate first above written.




                                                Notary Public

[Notarial Seal]

<PAGE>


                              EXHIBIT ONE

                  FORM OF CUSTODIAN INITIAL CERTIFICATION


                            January 27, 2006


JPMorgan Chase Bank, N.A.
600 Travis Street, 9th Floor
Houston, Texas 77002
Attention:  RFMSII Series 2006-HSA1 Trust

Financial Guaranty Insurance Company
125 Park Avenue
New York, New York 10017


Re:     Custodial Agreement dated as of January 1, 2006, by and among JPMorgan
        Chase Bank, N.A., Residential Funding Mortgage Securities II, Inc.,
        Residential Funding Corporation and Wells Fargo Bank, National
        Association, relating to Home Equity Loan Pass-Through Certificates,
        Series 2006-HSA1

Ladies and Gentlemen:

            In accordance with Section 2.3 of the above-captioned Custodial
Agreement, and subject to Section 2.02 of the Pooling Agreement, the
undersigned, as Custodian, hereby certifies that it has received a Mortgage File
(which contains an original Mortgage Note or an original lost note affidavit
with a copy of the related Mortgage Note) to the extent required in Section
2.01(b) of the Pooling Agreement with respect to each Mortgage Loan listed in
the Mortgage Loan Schedule, with any exceptions listed on Schedule A attached
hereto.

            Capitalized words and phrases used herein shall have the
respective meanings assigned to them in the above-captioned Custodial Agreement.

                        WELLS FARGO BANK, NATIONAL ASSOCIATION


                        By: _____
                        Name: _____

\<PAGE\>

EXHIBIT TWO

FORM OF CUSTODIAN INTERIM CERTIFICATION


[date]


JPMorgan Chase Bank, N.A.
600 Travis Street, 9th Floor
Houston, Texas 77002
Attention:  RFMSII Series 2006-HSA1 Trust

Financial Guaranty Insurance Company
125 Park Avenue
New York, New York 10017


Re:     Custodial  Agreement  dated  as  of  January  1,  2006,  by  and  among  JPMorgan
        Chase  Bank,  N.A.,  Residential  Funding  Mortgage  Securities  II,  Inc.,
        Residential   Funding   Corporation   and   Wells   Fargo   Bank,   National
        Association,  relating to Home  Equity  Loan  Pass-Through  Certificates,
        Series 2006-HSA1

Ladies and Gentlemen:

        In accordance with Section 2.3 of the  above-captioned  Custodial
Agreement, the undersigned,  as Custodian, hereby certifies that it has received
a  Mortgage  File to the extent  required  pursuant  to  Section  2.01(b) of the
Pooling Agreement with respect to each Mortgage Loan listed in the Mortgage Loan
Schedule,  and it has reviewed the Mortgage  File and the Mortgage Loan Schedule
and has determined that: all required  documents have been executed and received
and that such documents  relate to the Mortgage Loans identified on the Mortgage
Loan Schedule, with any exceptions listed on Schedule A attached hereto.

        Capitalized    words   and   phrases   used   herein   shall   have   the
respective meanings assigned to them in the above-captioned Custodial Agreement.


                    WELLS FARGO BANK, NATIONAL ASSOCIATION


                    By:
                        --------------------------------------
                    Name:
                    Title:


\<PAGE\>


EXHIBIT THREE
FORM OF CUSTODIAN FINAL CERTIFICATION


[date]


JPMorgan Chase Bank, N.A.
600 Travis Street, 9th Floor
Houston, Texas 77002
Attention:  RFMSII Series 2006-HSA1 Trust

Financial Guaranty Insurance Company
125 Park Avenue
New York, New York 10017

Re:      Custodial  Agreement  dated  as of January 1, 2006, by and among JPMorgan
         Chase  Bank,  N.A.,  Residential  Funding  Mortgage  Securities II, Inc.,
         Residential  Funding  Corporation  and  Wells  Fargo  Bank,  National
         Association,  relating to Home Equity  Loan  Pass-Through  Certificates,
         Series 2006-HSA1

Ladies and Gentlemen:

        In  accordance  with  Section  2.3  of the  above-captioned  Custodial
Agreement, the undersigned,  as Custodian, hereby certifies that it has received
a Mortgage  File with respect to each  Mortgage Loan listed in the Mortgage Loan
Schedule and it has reviewed the Mortgage  File and the Mortgage  Loan  Schedule
and has determined that: all required  documents  referred to in Section 2.01(b)
of the Pooling Agreement have been executed and received and that such documents
relate to the Mortgage Loans identified on the Mortgage Loan Schedule.

        Capitalized  words  and  phrases  used  herein  shall  have  the  respective
meanings assigned to them in the above-captioned Custodial Agreement.


                        WELLS FARGO BANK, NATIONAL ASSOCIATION


                        By:
                           --------------------------------------
                        Name:
                        Title:


<PAGE>


                        EXHIBIT FOUR
                 FORM OF REQUEST FOR RELEASE

DATE:

TO:

RE:            REQUEST FOR RELEASE OF DOCUMENTS

In connection with the  administration of the pool of Mortgage Loans held by you
for the  referenced  pool, we request  the  release  of  the  Mortgage  Loan File
described below.

Pooling and Servicing Agreement Dated:
Series #:
Account #:
Pool #:
Loan #:
MIN#:
Borrower Name(s):
Reason for Document Request: (circle one)   Mortgage Loan Prepaid in Full
                                            Mortgage Loan Repurchased

"We hereby  certify  that all amounts  received or to be received in  connection
with such  payments  which are required to be deposited  have been or will be so
deposited as provided in the Pooling and Servicing Agreement."

Residential Funding Corporation
Authorized Signature

*************************************************************************

TO  CUSTODIAN/TRUSTEE:  Please acknowledge this request, and check off documents
being  enclosed  with a copy of this form.  You should retain this form for your
files in accordance with the terms of the Pooling and Servicing Agreement.

Enclosed Documents:            [ ] Promissory Note
                               [ ] Mortgage or Deed of Trust
                               [ ] Assignment(s) of Mortgage or Deed of Trust
                               [ ] Title Insurance Policy
                               [ ] Other:


Name

Title

<PAGE>

<TABLE>
<CAPTION>

| Reference | Servicing Criteria<br>Criteria | Applicable<br>Servicing<br>Criteria |
|-----------|------------------------------|--------------------------------------|
| | **General Servicing Considerations** | |
| <C>      <C> | | |
| 1122(d)(1)(i) | Policies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements. | |
| 1122(d)(1)(ii) | If any material servicing activities are outsourced to third parties, policies and procedures are instituted to monitor the third party's performance and compliance with such servicing activities. | |
| 1122(d)(1)(iii) | Any requirements in the transaction agreements to maintain a back-up servicer for the pool assets are maintained. | |
| 1122(d)(1)(iv) | A fidelity bond and errors and omissions policy is in effect on the party participating in the servicing function throughout the reporting period in the amount of coverage required by and otherwise in accordance with the terms of the transaction agreements. | |
| | **Cash Collection and Administration** | |
| 1122(d)(2)(i) | Payments on pool assets are deposited into the appropriate custodial bank accounts and related bank clearing accounts no more than two business days following receipt, or such other number of days specified in the transaction agreements. | |
| 1122(d)(2)(ii) | Disbursements made via wire transfer on behalf of an obligor or to an investor are made only by authorized personnel. | |
| 1122(d)(2)(iii) | Advances of funds or guarantees regarding collections, cash flows or distributions, and any interest or other fees charged for such advances, are made, reviewed and approved as specified in the transaction agreements. | |
| 1122(d)(2)(iv) | The related accounts for the transaction, such as cash reserve accounts or accounts established as a form of overcollateralization, are separately maintained (e.g., with respect to commingling of cash) as set forth in the transaction agreements. | |
| 1122(d)(2)(v) | Each custodial account is maintained at a federally insured depository institution as set forth in the transaction agreements. For purposes of this criterion, "federally insured depository institution" with respect to a foreign financial institution means a foreign financial institution that meets the | |

requirements of Rule 13k-1(b)(3) of the Securities
Exchange Act.

---

| 1122(d)(2)(vi) | Unissued checks are safeguarded so as to prevent unauthorized access. | |

---

| 1122(d)(2)(vii) | Reconciliations are prepared on a monthly basis for all asset-backed securities related bank accounts, including custodial accounts and related bank clearing accounts. These reconciliations are (A) mathematically accurate; (B) prepared within 30 calendar days after the bank statement cutoff date, or such other number of days specified in the transaction agreements; (C) reviewed and approved by someone other than the person who prepared the reconciliation; and (D) contain explanations for reconciling items. These reconciling items are resolved within 90 calendar days of their original identification, or such other number of days specified in the transaction agreements. | |

---

### Investor Remittances and Reporting

---

| 1122(d)(3)(i) | Reports to investors, including those to be filed with the Commission, are maintained in accordance with the transaction agreements and applicable Commission requirements. Specifically, such reports (A) are prepared in accordance with timeframes and other terms set forth in the transaction agreements; (B) provide information calculated in accordance with the terms specified in the transaction agreements; (C) are filed with the Commission as required by its rules and regulations; and (D) agree with investors' or the trustee's records as to the total unpaid principal balance and number of pool assets serviced by the servicer. | |

---

| 1122(d)(3)(ii) | Amounts due to investors are allocated and remitted in accordance with timeframes, distribution priority and other terms set forth in the transaction agreements. | |

---

| 1122(d)(3)(iii) | Disbursements made to an investor are posted within two business days to the servicer's investor records, or such other number of days specified in the transaction agreements. | |

---

| 1122(d)(3)(iv) | Amounts remitted to investors per the investor reports agree with cancelled checks, or other form of payment, or custodial bank statements. | |

---

### Pool Asset Administration

---

| 1122(d)(4)(i) | Collateral or security on pool assets is maintained as required by the transaction agreements or related asset pool documents. | \|X\| |

---

| 1122(d)(4)(ii) | Pool assets and related documents are safeguarded as required by the transaction agreements | \|X\| |

---

| 1122(d)(4)(iii) | Any additions, removals or substitutions to the asset pool are made, reviewed and approved in accordance with any conditions or requirements in the transaction agreements. | |

---

| 1122(d)(4)(iv) | Payments on pool assets, including any payoffs, made in accordance with the related pool asset documents are posted to the servicer's obligor records maintained no more than two business days after receipt, or such other number of days specified in the transaction agreements, and allocated to principal, | |

interest or other items mentioned) in accordance
with the related pool asset documents.

---

| | |
|---|---|
| 1122(d)(4)(v) | The servicer's records regarding the pool assets agree with the servicer's records with respect to an obligor's unpaid principal balance. |

---

| | |
|---|---|
| 1122(d)(4)(vi) | Changes with respect to the terms or status of an obligor's pool asset  (e.g., loan modifications or re-agings) are made, reviewed and approved by authorized personnel in accordance with the transaction agreements and related pool asset documents. |

---

| | |
|---|---|
| 1122(d)(4)(vii) | Loss mitigation or recovery actions (e.g., forbearance plans, modifications and deeds in lieu of foreclosure, foreclosures and repossessions, as applicable) are initiated, conducted and concluded in accordance with the timeframes or other requirements established by the transaction agreements. |

---

| | |
|---|---|
| 1122(d)(4)(viii) | Records documenting collection efforts are maintained during the period a pool asset is delinquent in accordance with the transaction agreements. Such records are maintained on at least a monthly basis, or such other period specified in the transaction agreements, and describe the entity's activities in monitoring delinquent pool assets including, for example, phone calls, letters and payment rescheduling plans in cases where delinquency is deemed temporary (e.g., illness or unemployment). |

---

| | |
|---|---|
| 1122(d)(4)(ix) | Adjustments to interest rates or rates of return for pool assets with variable rates are computed based on the related pool asset documents. |

---

| | |
|---|---|
| 1122(d)(4)(x) | Regarding any funds held in trust for an obligor (such as escrow accounts): (A) such funds are analyzed, in accordance with the obligor's pool asset documents, on at least an annual basis, or such other period specified in the transaction agreements; (B) interest on such funds is paid, or credited, to obligors in accordance with applicable pool asset documents and state laws; and (C) such funds are returned to the obligor within 30 calendar days of full repayment of the related pool asset, or such other number of days specified in the transaction agreements. |

---

| | |
|---|---|
| 1122(d)(4)(xi) | Payments made on behalf of an obligor (such as tax or insurance payments) are made on or before the related penalty or expiration dates, as indicated on the appropriate bills or notices for such payments, provided that such support has been received by the servicer at least 30 calendar days prior to these dates, or such other number of days specified in the transaction agreements. |

---

| | |
|---|---|
| 1122(d)(4)(xii) | Any late payment penalties in connection with any payment to be made on behalf of an obligor are paid from the servicer's funds and not charged to the obligor, unless the late payment was due to the obligor's error or omission. |

---

| | |
|---|---|
| 1122(d)(4)(xiii) | Disbursements made on behalf of an obligor are posted within two business days to the obligor's records maintained by the servicer, or such other number of days specified in the transaction agreements. |

---

| | |
|---|---|
| 1122(d)(4)(xiv) | Delinquencies, charge-offs and uncollectible accounts are recognized and recorded in accordance with the transaction agreements. |

```
----------------  ------------------------------------------------  ------------------
----------------  ------------------------------------------------  ------------------
1122(d)(4)(xv)    Any external enhancement or other support, identified
                  in Item 1114(a)(1) through (3) or Item 1115 of
                  Regulation AB, is maintained as set forth in the
                  transaction agreements.
----------------  ------------------------------------------------  ------------------
----------------  ------------------------------------------------  ------------------

----------------  ------------------------------------------------  ------------------
```

</TABLE>

<PAGE>


EXHIBIT D

MORTGAGE LOAN SCHEDULE

(AVAILABLE UPON REQUEST)


<PAGE>


EXHIBIT E

FORM OF REQUEST FOR RELEASE

DATE:

TO:

RE:              REQUEST FOR RELEASE OF DOCUMENTS

In connection with the  administration of the pool of Mortgage Loans held by you
for the  referenced  pool,  we request  the  release of the  Mortgage  Loan File
described below.

Pooling and Servicing Agreement Dated:
Series   #:

Account  #:

Pool     #:

Loan     #:

MIN#:

Borrower Name(s):

Reason for Document Request: (circle one)    Mortgage Loan Prepaid in Full
                                             Mortgage Loan Repurchased

"We hereby  certify  that all amounts  received or to be received in  connection
with such  payments  which are required to be deposited  have been or will be so
deposited as provided in the Pooling and Servicing Agreement."

Residential Funding Corporation
Authorized Signature

*************************************************************************

TO  CUSTODIAN/TRUSTEE:  Please acknowledge this request, and check off documents
being  enclosed  with a copy of this form.  You should retain this form for your
files in accordance with the terms of the Pooling and Servicing Agreement.

Enclosed Documents:          [ ] Promissory Note
                             [ ] Mortgage or Deed of Trust
                             [ ] Assignment(s) of Mortgage or Deed of Trust
                             [ ] Title Insurance Policy
                             [ ] Other:

Name

Title

Date

<PAGE>

EXHIBIT F

[RESERVED]

<PAGE>

EXHIBIT G-1

FORM OF TRANSFER AFFIDAVIT AND AGREEMENT

STATE OF          )
                         ) ss.:
COUNTY OF        )

[NAME OF OFFICER], being first duly sworn, deposes and says:

1. That he/she is [Title of Officer] of [Name of Owner] (record or beneficial owner of the Home Equity Loan Pass-Through Certificates, Series 2006-HSA1 Class [R-I][R-II] (the "Owner")), a [savings institution] [corporation] duly organized and existing under the laws of [the State of ] [the United States], on behalf of which he/she makes this affidavit and agreement.

2. That the Owner (i) is not and will not be, as of January 27, 2006, a "disqualified organization" or an electing large partnership as of [date of transfer] within the meanings of Section 860E(e)(5) and Section 775, respectively, of the Internal Revenue Code of 1986, as amended (the "Code") or an electing large partnership under Section 775(a) of the Code, (ii) will endeavor to remain other than a disqualified organization for so long as it retains its ownership interest in the Class [R-I][R-II] Certificates, and (iii) is acquiring the Class [R-I][R-II] Certificates for its own account or for the account of another Owner from which it has received an affidavit and agreement in substantially the same form as this affidavit and agreement. (For this purpose, a "disqualified organization" means an electing large partnership under Section 775 of the Code, the United States, any state or political subdivision thereof, any agency or instrumentality of any of the foregoing (other than an instrumentality all of the activities of which are subject to tax and, except for the Federal Home Loan Mortgage Corporation, a majority of whose board of directors is not selected by any such governmental entity) or any foreign government, international organization or any agency or instrumentality of such foreign government or organization, any rural electric or telephone cooperative, or any organization (other than certain farmers' cooperatives) that is generally exempt from federal income tax unless such organization is subject to the tax on unrelated business taxable income).

3. That the Owner is aware (i) of the tax that would be imposed on transfers of Class [R-I][R-II] Certificates to disqualified organizations or electing large partnerships, under the Code, that applies to all transfers of Class [R-I][R-II] Certificates after March 31, 1988; (ii) that such tax would be on the transferor (or, with respect to transfers to electing large partnerships, on each such partnership) or, if such transfer is through an agent (which person includes a broker, nominee or middleman) for a disqualified organization, on the agent; (iii) that the person (other than with respect to transfers to electing large partnerships) otherwise liable for the tax shall be relieved of liability for the tax if the transferee furnishes to such person an affidavit that the transferee is not a disqualified organization and, at the time of transfer, such person does not have actual knowledge that the affidavit is false; and (iv) that the Class [R-I][R-II] Certificates may be "noneconomic residual interests" within the meaning of Treasury Regulations promulgated pursuant to the Code and that the transferor of a noneconomic residual interest will remain liable for any taxes due with respect to the income on such residual interest, unless no significant purpose of the transfer was to impede the assessment or collection of tax.

4. That the Owner is aware that no tax is imposed on a "pass-through entity" holding Class [R-I][R-II] Certificates if the pass-through entity is an electing large partnership under Section 775 of the Code if at any time during the taxable year of the pass-through entity a disqualified organization is the record holder of an interest in such entity. (For this purpose, a "pass through entity" includes a regulated investment company, a real estate investment trust or common trust fund, a partnership, trust or estate, and certain cooperatives.)

5. The Owner is a citizen or resident of the United States, a corporation, partnership or other entity created or organized in, or under the laws of, the United States or any political subdivision thereof (except in the case of a partnership, to the extent provided in Treasury regulations), or an estate that is described in Section 7701(a)(30)(D) of the Code, or a trust that is described in Section 7701(a)(30)(E) of the Code.

6. That the Owner is aware that the Trustee will not register the transfer of any Class [R-I][R-II] Certificates unless the transferee, or the transferee's agent, delivers to it an affidavit and agreement, among other things, in substantially the same form as this affidavit and agreement. The Owner expressly agrees that it will not consummate any such transfer if it knows or believes that any of the representations contained in such affidavit and agreement are false.

7. That the Owner has reviewed the restrictions set forth on the face of the Class [R-I][R-II] Certificates and the provisions of Section 5.02(g) of the Pooling and Servicing Agreement under which the Class [R-I][R-II] Certificates were issued (in particular, clause (iii)(A) and (iii)(B) of Section 5.02(g) which authorize the Trustee to deliver payments to a person other than the Owner and negotiate a mandatory sale by the Trustee in the event the Owner holds such Certificates in violation of Section 5.02(g)). The Owner expressly agrees to be bound by and to comply with such restrictions and provisions.

8. That the Owner consents to any additional restrictions or arrangements that shall be deemed necessary upon advice of counsel to constitute a reasonable arrangement to ensure that the Class [R-I][R-II] Certificates will only be owned, directly or indirectly, by an Owner that is not a disqualified organization.

9. The Owner's Taxpayer Identification Number is _____.

10. This affidavit and agreement relates only to the Class [R-I][R-II] Certificates held by the Owner and not to any other holder of the Class [R-I][R-II] Certificates. The Owner understands that the liabilities described herein relate only to the Class [R-I][R-II] Certificates.

11. That no purpose of the Owner relating to the transfer of any of the Class [R-I][R-II] Certificates by the Owner is or will be to impede the assessment or collection of any tax.

12. That the Owner has no present knowledge or expectation that it will be unable to pay any United States taxes owed by it so long as any of the Certificates remain outstanding. In this regard, the Owner hereby represents to and for the benefit of the person from whom it acquired the Class [R-I][R-II] Certificate that the Owner intends to pay taxes associated with holding such Class [R-I][R-II] Certificate as they become due, fully understanding that it may incur tax liabilities in excess of any cash flows generated by the Class [R-I][R-II] Certificate.

13. That the Owner has no present knowledge or expectation that it will become insolvent or subject to a bankruptcy proceeding for so long as any of the Class [R-I][R-II] Certificates remain outstanding.

14. The Purchaser is not an employee benefit plan or other plan subject to the prohibited transaction provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), or an investment manager, named fiduciary or a trustee of any such plan, or any other Person acting, directly or indirectly, on behalf of or purchasing any Certificate with "plan assets" of any such plan within the meaning of the Department of Labor regulation at 29 C.F.R. ss. 2510.3-101.


<PAGE>


IN WITNESS WHEREOF, the Owner has caused this instrument to be executed on its behalf, pursuant to the authority of its Board of Directors, by its [Title of Officer] and its corporate seal to be hereunto attached, attested by its [Assistant] Secretary, this day of , 200 .

[NAME OF OWNER]

                                    By:
                                         --------------------------------
                                         [Name of Officer]
                                         [Title of Officer]

[Corporate Seal]

ATTEST:



[Assistant] Secretary

            Personally   appeared  before me the  above-named  [Name of Officer],
known  or  proved  to me to be  the  same  person  who  executed  the  foregoing
instrument  and to be the  [Title of Officer]  of the Owner, and acknowledged to me
that he executed  the same as his free act and deed and the free act and deed of
the Owner.

            Subscribed and sworn before me this _____day of _____, 200-___.




                                    NOTARY PUBLIC


                                    COUNTY OF
                                    STATE OF

                                    My  Commission  expires the _____ day of _____,
                                    20____.




<PAGE>


                            EXHIBIT G-2

                    FORM OF TRANSFEROR CERTIFICATE


                                              , 20
                            ------------   ----


Residential Funding Mortgage Securities II, Inc.
8400 Normandale Lake Boulevard, Suite 250
Minneapolis, Minnesota 55437

JPMorgan Chase Bank, N.A.
600 Travis Street, 9th Floor
Houston, Texas 77002
Attention:  RFMSII Series 2006-HSA1 Trust


            Re:   Home Equity Loan Pass-Through Certificates,
                  Series 2006-HSA1, Class [R-I][R-II]

Ladies and Gentlemen:

            This letter is delivered to you in  connection  with the transfer
by (the  "Seller")  to (the  "Purchaser")  of $  Initial  Certificate  Principal
Balance of Home Equity Loan Pass-Through  Certificates,  Series 2006-HSA1, Class
[R-I][R-II]  (the  "Certificates"),  pursuant to Section 5.02 of the Pooling and
Servicing  Agreement  (the  "Pooling and Servicing  Agreement"),  dated as of January
1, 2006, among Residential  Funding Mortgage Securities II, Inc., as seller (the
"Company"),  Residential  Funding  Corporation,  as master servicer,  and JPMorgan
Chase Bank,  N.A.,  as trustee  (the  "Trustee").  All terms used herein and not
otherwise defined shall have the meanings set forth in the Pooling and Servicing
Agreement.  The  Seller  hereby  certifies,  represents  and  warrants  to,  and

covenants with, the Company and the Trustee that:

    1. No purpose of the Seller relating to the transfer of the Certificate by the Seller to the Purchaser is or will be to impede the assessment or collection of any tax.

    2. The Seller understands that the Purchaser has delivered to the Trustee and the Master Servicer a transfer affidavit and agreement in the form attached to the Pooling and Servicing Agreement as Exhibit G-1. The Seller does not know or believe that any representation contained therein is false.

    3. The Seller, at the time of the transfer, has conducted a reasonable investigation of the financial condition of the Purchaser as contemplated by Treasury Regulations Section 1.860E-1(c)(4)(i) and, as a result of that investigation, the Seller has determined that the Purchaser has historically paid its debts as they become due and has found no significant evidence to indicate that the Purchaser will not continue to pay its debts as they become due in the future. The Seller understands that the transfer of a Class [R-I][R-II] Certificate may not be respected for United States income tax purposes (and the Seller may continue to be liable for United States income taxes associated therewith) unless the Seller has conducted such an investigation.

    4. The Seller has no actual knowledge that the proposed Transferee is not both a United States Person and a Permitted Transferee.

Very truly yours,

(Seller)

By:  ----------------------------------------
     [Name of Officer]
     [Title of Officer]

<PAGE>


EXHIBIT H

FORM OF INVESTOR REPRESENTATION LETTER

_____ , 20 ____


Residential Funding Mortgage Securities II, Inc.
8400 Normandale Lake Boulevard, Suite 250
Minneapolis, MN 55437

Residential Funding Corporation
8400 Normandale Lake Boulevard, Suite 250
Minneapolis, MN 55437

JPMorgan Chase Bank, N.A.
600 Travis Street, 9th Floor
Houston, Texas 77002
Attention:  RFMSII Series 2006-HSA1 Trust

     RE:   Home Equity Loan Pass-Through Certificates,
           Series 2006-HSA1, [Class SB]

Ladies and Gentlemen:

    (the "Purchaser") intends to purchase from (the "Seller") a $[_____] initial Certificate Principal Balance of Home Equity Loan Pass-Through Certificates, Series 2006-HSA1, Class (the "Certificates"), issued pursuant to the Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"), dated as of January 1, 2006 among Residential Funding Mortgage Securities II, Inc., as seller (the "Company"), Residential Funding Corporation, as master servicer (the "Master Servicer"), and JPMorgan Chase Bank, N.A., as trustee (the "Trustee"). All terms used herein and not otherwise defined shall have the meanings set forth in the Pooling and Servicing Agreement. The Purchaser hereby certifies, represents and warrants to, and covenants with, the Company, the Trustee and the Master Servicer that:

1. The Purchaser understands that (a) the Certificates have not been and will not be registered or qualified under the Securities Act of 1933, as amended (the "Act") or any state securities law, (b) the Company is not required to so register or qualify the Certificates, (c) the Certificates may be resold only if registered and qualified pursuant to the provisions of the Act or any state securities law, or if an exemption from such registration and qualification is available, (d) the Pooling and Servicing Agreement contains restrictions regarding the transfer of the Certificates and (e) the Certificates will bear a legend to the foregoing effect.

2. The Purchaser is acquiring the Certificates for its own account for investment only and not with a view to or for sale in connection with any distribution thereof in any manner that would violate the Act or any applicable state securities laws.

3. The Purchaser is (a) a substantial, sophisticated institutional investor having such knowledge and experience in financial and business matters, and, in particular, in such matters related to securities similar to the Certificates, such that it is capable of evaluating the merits and risks of investment in the Certificates, (b) able to bear the economic risks of such an investment and (c) an "accredited investor" within the meaning of Rule 501(a) promulgated pursuant to the Act.

4. The Purchaser has been furnished with, and has had an opportunity to review (a) [a copy of the Private Placement Memorandum, dated _____, 20 __, relating to the Certificates (b)] a copy of the Pooling and Servicing Agreement and [b] [c] such other information concerning the Certificates, the Mortgage Loans and the Company as has been requested by the Purchaser from the Company or the Seller and is relevant to the Purchaser's decision to purchase the Certificates. The Purchaser has had any questions arising from such review answered by the Company or the Seller to the satisfaction of the Purchaser. [If the Purchaser did not purchase the Certificates from the Seller in connection with the initial distribution of the Certificates and was provided with a copy of the Private Placement Memorandum (the "Memorandum") relating to the original sale (the "Original Sale") of the Certificates by the Company, the Purchaser acknowledges that such Memorandum was provided to it by the Seller, that the Memorandum was prepared by the Company solely for use in connection with the Original Sale and the Company did not participate in or facilitate in any way the purchase of the Certificates by the Purchaser from the Seller, and the Purchaser agrees that it will look solely to the Seller and not to the Company with respect to any damage, liability, claim or expense arising out of, resulting from or in connection with (a) error or omission, or alleged error or omission, contained in the Memorandum, or (b) any information, development or event arising after the date of the Memorandum.]

5.    The Purchaser has not and will not nor has it authorized or will it authorize any person to (a) offer, pledge, sell, dispose of or otherwise transfer any Certificate, any interest in any Certificate or any other similar security to any person in any manner, (b) solicit any offer to buy or to accept a pledge, disposition of other transfer of any Certificate, any interest in any Certificate or any other similar security from any person in any manner, (c) otherwise approach or negotiate with respect to any Certificate, any interest in any Certificate or any other similar security with any person in any manner, (d) make any general solicitation by means of general advertising or in any other manner or (e) take any other action, that (as to any of (a) through (e) above) would constitute a distribution of any Certificate under the Act, that would render the disposition of any Certificate a violation of Section 5 of the Act or any state securities law, or that would require registration or qualification pursuant thereto. The Purchaser will not sell or otherwise transfer any of the Certificates, except in compliance with the provisions of the Pooling and Servicing Agreement.

6.    The Purchaser

(a) is not an employee benefit plan or other plan subject to the prohibited transaction provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Internal Revenue Code of 1986, as amended (a "Plan"), or any other person (including an investment manager, named fiduciary or a trustee of any Plan), acting, directly or indirectly, on behalf of or purchasing any Certificate with "plan assets" of any Plan within the meaning of the Department of Labor regulation at 29 C.F.R. ss. 2510.3-101; or

(b) has provided the Trustee, the Company and the Master Servicer with an opinion of counsel acceptable to and in form and substance satisfactory to the Trustee, the Company and the Master Servicer to the effect that the purchase of Certificates is permissible under applicable law, will not constitute or result in any non-exempt prohibited transaction under ERISA or Section 4975 of the Code and will not subject the Trustee, the Company or the Master Servicer to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in the Pooling and Servicing Agreement.

In addition, the Purchaser hereby certifies, represents and warrants to, and covenants with, the Company, the Trustee and the Master Servicer that the Purchaser will not transfer such Certificates to any Plan or person unless such Plan or person meets the requirements set forth in either 6(a) or (b) above.

Very truly yours,

By:
    ------------------------------
        Name:
        Title:

<PAGE>

EXHIBIT I

FORM OF TRANSFEROR REPRESENTATION LETTER

_____ , 20 ____

Residential Funding Mortgage Securities II, Inc.
8400 Normandale Lake Boulevard
Suite 250
Minneapolis, MN 55437

JPMorgan Chase Bank, N.A.
600 Travis Street, 9th Floor
Houston, Texas 77002
Attention:  RFMSII Series 2006-HSA1 Trust

Re:    Home Equity Loan Pass-Through Certificates, Series 2006-HSA1, [Class SB]

Ladies and Gentlemen:

In connection with the sale by (the "Seller") to (the "Purchaser") of a ____% Percentage Interest of Home Equity Loan Pass-Through Certificates, Series 2006-HSA1, Class (the "Certificates"), issued pursuant to the Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"), dated as of January 1, 2006 among Residential Funding Mortgage Securities II, Inc., as seller (the "Company"), Residential Funding Corporation, as master servicer, and JPMorgan Chase Bank, N.A., as trustee (the "Trustee"). The Seller hereby certifies, represents and warrants to, and covenants with, the Company and the Trustee that:

Neither the Seller nor anyone acting on its behalf has (a) offered, pledged, sold, disposed of or otherwise transferred any Certificate, any interest in any Certificate or any other similar security to any person in any manner, (b) has solicited any offer to buy or to accept a pledge, disposition or other transfer of any Certificate, any interest in any Certificate or any other similar security from any person in any manner, (c) has otherwise approached or negotiated with respect to any Certificate, any interest in any Certificate or any other similar security with any person in any manner, (d) has made any general solicitation by means of general advertising or in any other manner, or (e) has taken any other action, that (as to any of (a) through (e) above) would constitute a distribution of the Certificates under the Securities Act of 1933 (the "Act"), that would render the disposition of any Certificate a violation of Section 5 of the Act or any state securities law, or that would require registration or qualification pursuant thereto.

The Seller will not act, in any manner set forth in the foregoing sentence with

respect to any Certificate. The Seller has agreed it will not sell or otherwise
transfer any of the Certificates, except in compliance with the provisions of
the Pooling and Servicing Agreement.

Very truly yours,

(Seller)

By:  ----------------------------------------
     Name:
     Title:

<PAGE>

EXHIBIT J

[RESERVED]

<PAGE>

EXHIBIT K

[RESERVED]

<PAGE>

EXHIBIT L

FORM OF LENDER CERTIFICATION FOR ASSIGNMENT OF
MORTGAGE LOAN

----------, 20----

Residential Funding Mortgage Securities II, Inc.
8400 Normandale Lake Boulevard
Suite 600
Minneapolis, Minnesota 55437

JPMorgan Chase Bank, N.A.
600 Travis Street, 9th Floor
Houston, Texas 77002
Attention:  RFMSII Series 2006-HSA1 Trust

            Re:   Home Equity Loan Pass-Through Certificates,
                  Series 2006-HSA1, Assignment of Mortgage Loan

Ladies and Gentlemen:

          This letter is delivered to you in connection with the assignment
by (the "Trustee") to (the "Lender") of (the "Mortgage Loan") pursuant to
Section 3.12(d) of the Pooling and Servicing Agreement (the "Pooling and
Servicing Agreement"), dated as of January 1, 2006 among Residential Funding
Mortgage Securities II, Inc., as seller (the "Company"), Residential Funding
Corporation, as master servicer, and the Trustee. All terms used herein and not
otherwise defined shall have the meanings set forth in the Pooling and Servicing
Agreement. The Lender hereby certifies, represents and warrants to, and
covenants with, the Master Servicer and the Trustee that:

          (i) the Mortgage Loan is secured by Mortgaged Property located in
a jurisdiction in which an assignment in lieu of satisfaction is required to
preserve lien priority, minimize or avoid mortgage recording taxes or otherwise
comply with, or facilitate a refinancing under, the laws of such jurisdiction;

          (ii) the substance of the assignment is, and is intended to be, a

refinancing of such Mortgage Loan and the proposed transaction is solely to comply with, or facilitate the transaction under, such local laws;

(iii) the Mortgage Loan following the proposed assignment will be modified to have a rate of interest at least 0.25 percent below or above the rate of interest on such Mortgage Loan prior to such proposed assignment; and

(iv) such assignment is at the request of the borrower under the related Mortgage Loan.

Very truly yours,

(Lender)

By:
          -------------------------------------------
          Name:
          Title:

<PAGE>

EXHIBIT M

FORM OF RULE 144A INVESTMENT REPRESENTATION

Description of Rule 144A Securities, including numbers:

=================================================
=================================================

The undersigned seller, as registered holder (the "Seller"), intends to transfer the Rule 144A Securities described above to the undersigned buyer (the "Buyer").

1. In connection with such transfer and in accordance with the agreements pursuant to which the Rule 144A Securities were issued, the Seller hereby certifies the following facts: Neither the Seller nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security to, or solicited any offer to buy or accept a transfer, pledge or other disposition of the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security from, or otherwise approached or negotiated with respect to the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security with, any person in any manner, or made any general solicitation by means of general advertising or in any other manner, or taken any other action, that would constitute a distribution of the Rule 144A Securities under the Securities Act of 1933, as amended (the "1933 Act"), or that would render the disposition of the Rule 144A Securities a violation of Section 5 of the 1933 Act or require registration pursuant thereto, and that the Seller has not offered the Rule 144A Securities to any person other than the Buyer or another "qualified institutional buyer" as defined in Rule 144A under the 1933 Act.

2. The Buyer warrants and represents to, and covenants with, the Seller, the Trustee and the Master Servicer (as defined in the Pooling and Servicing Agreement (the "Agreement"), dated as of January 1, 2006 among Residential Funding Corporation as Master Servicer, Residential Funding Mortgage Securities II, Inc. as depositor pursuant to Section 5.02 of the Agreement and JPMorgan Chase Bank, N.A. as trustee, as follows:

a. The Buyer understands that the Rule 144A Securities have not been registered under the 1933 Act or the securities laws of any state.

b. The Buyer considers itself a substantial, sophisticated institutional investor having such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Rule 144A Securities.

c. The Buyer has been furnished with all information regarding the Rule 144A Securities that it has requested from the Seller, the Trustee or the Servicer.

d. Neither the Buyer nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of the Rule 144A Securities,

any interest in the Rule 144A Securities or any other similar security to, or solicited any offer to buy or accept a transfer, pledge or other disposition of the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security from, or otherwise approached or negotiated with respect to the Rule 144A Securities, any interest in the Rule 144A Securities or any other similar security with, any person in any manner, or made any general solicitation by means of general advertising or in any other manner, or taken any other action, that would constitute a distribution of the Rule 144A Securities under the 1933 Act or that would render the disposition of the Rule 144A Securities a violation of Section 5 of the 1933 Act or require registration pursuant thereto, nor will it act, nor has it authorized or will it authorize any person to act, in such manner with respect to the Rule 144A Securities.

e. The Buyer is a "qualified institutional buyer" as that term is defined in Rule 144A under the 1933 Act and has completed either of the forms of certification to that effect attached hereto as Annex 1 or Annex 2. The Buyer is aware that the sale to it is being made in reliance on Rule 144A. The Buyer is acquiring the Rule 144A Securities for its own account or the accounts of other qualified institutional buyers, understands that such Rule 144A Securities may be resold, pledged or transferred only (i) to a person reasonably believed to be a qualified institutional buyer that purchases for its own account or for the account of a qualified institutional buyer to whom notice is given that the resale, pledge or transfer is being made in reliance on Rule 144A, or (ii) pursuant to another exemption from registration under the 1933 Act.

3. The Purchaser is not an employee benefit plan or other plan subject to the prohibited transaction provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), or an investment manager, named fiduciary or a trustee of any such plan, or any other Person acting, directly or indirectly, on behalf of or purchasing any Certificate with "plan assets" of any such plan within the meaning of the Department of Labor regulation at 29 C.F.R. ss. 2510.3-101.

4. This document may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same document.


IN WITNESS WHEREOF, each of the parties has executed this document as of the date set forth below.


PRINT NAME OF SELLER                    PRINT NAME OF BUYER

By:                                     By:
----------------------------------      ----------------------------
    Name:                                   Name:
    Title:                                  Title:


Taxpayer Identification No              Taxpayer Identification No


Date:                                   Date:
    ----------------------------------      _____


<PAGE>


ANNEX 1 TO EXHIBIT M

QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A

[For Buyers Other Than Registered Investment Companies]

The undersigned hereby certifies as follows in connection with the Rule 144A Investment Representation to which this Certification is attached:

1. As indicated below, the undersigned is the President, Chief Financial Officer, Senior Vice President or other executive officer of the Buyer.

2. In connection with purchases of the Buyer, the Buyer is a "qualified institutional buyer" as that term is defined in Rule 144A under the Securities Act of 1933 ("Rule 144A") because (i) the Buyer owned and/or invested on a discretionary basis $ in securities (except for the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being calculated in accordance with Rule 144A) and (ii) the Buyer satisfies the criteria in the category marked below.

Corporation, etc. The Buyer is a corporation (other than a bank, savings and loan association or similar institution), Massachusetts or similar business trust, partnership, or charitable organization described in Section 501(c)(3) of the Internal Revenue Code.

Bank. The Buyer (a) is a national bank or banking institution organized under the laws of any State, territory or the District of Columbia, the business of which is substantially confined to banking and is supervised by the State or territorial banking commission or similar official or is a foreign bank or equivalent institution, and (b) has an audited net worth of at least $25,000,000 as demonstrated in its latest annual financial statements, a copy of which is attached hereto.

Savings and Loan . The Buyer (a) is a savings and loan association, building and loan association, cooperative bank, homestead association or similar institution, which is supervised and examined by a State or Federal authority having supervision over any such institutions or is a foreign savings and loan association or equivalent institution and (b) has an audited net worth of at least $25,000,000 as demonstrated in its latest annual financial statements.

Broker-Dealer. The Buyer is a dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

Insurance Depositor. The Buyer is an insurance company whose primary and predominant business activity is the writing of insurance or the reinsuring of risks underwritten by insurance companies and which is subject to supervision by the insurance commissioner or a similar official or agency of a State or territory or the District of Columbia.

State or Local Plan. The Buyer is a plan established and maintained by a State, its political subdivisions, or any agency or instrumentality of the State or its political subdivisions, for the benefit of its employees.

ERISA Plan. The Buyer is an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974.

Investment Adviser. The Buyer is an investment adviser registered under the Investment Advisers Act of 1940.

SBIC The Buyer is a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958.

Business Development Company. The Buyer is a business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

Trust Fund . The Buyer is a trust fund whose trustee is a bank or trust company and whose participants are exclusively (a) plans established and maintained by a State, its political subdivisions, or any agency or instrumentality of the State or its political subdivisions, for the benefit of its employees, or (b) employee benefit plans within the meaning of Title I of the Employee Retirement Income Security Act of 1974, but is not a trust fund that includes as participants individual retirement accounts or H.R. 10 plans.

3. The term "securities" as used herein does not include (i) securities of issuers that are affiliated with the Buyer, (ii) securities that are part of an unsold allotment to or subscription by the Buyer, if the Buyer is a dealer, (iii) bank deposit notes and certificates of deposit, (iv) loan participations, (v) repurchase agreements, (vi) securities owned but subject to

a repurchase agreement and (vii) currency, interest rate and commodity swaps.

4. For purposes of determining the aggregate amount of securities owned and/or invested on a discretionary basis by the Buyer, the Buyer used the cost of such securities to the Buyer and did not include any of the securities referred to in the preceding paragraph. Further, in determining such aggregate amount, the Buyer may have included securities owned by subsidiaries of the Buyer, but only if such subsidiaries are consolidated with the Buyer in its financial statements prepared in accordance with generally accepted accounting principles and if the investments of such subsidiaries are managed under the Buyer's direction. However, such securities were not included if the Buyer is a majority-owned, consolidated subsidiary of another enterprise and the Buyer is not itself a reporting company under the Securities Exchange Act of 1934.

5. The Buyer acknowledges that it is familiar with Rule 144A and understands that the seller to it and other parties related to the Certificates are relying and will continue to rely on the statements made herein because one or more sales to the Buyer may be in reliance on Rule 144A.

Will the Buyer be purchasing the Rule 144A
------   ------                   Securities only for the Buyer's own account?
Yes      No

6. If the answer to the foregoing question is "no", the Buyer agrees that, in connection with any purchase of securities sold to the Buyer for the account of a third party (including any separate account) in reliance on Rule 144A, the Buyer will only purchase for the account of a third party that at the time is a "qualified institutional buyer" within the meaning of Rule 144A. In addition, the Buyer agrees that the Buyer will not purchase securities for a third party unless the Buyer has obtained a current representation letter from such third party or taken other appropriate steps contemplated by Rule 144A to conclude that such third party independently meets the definition of "qualified institutional buyer" set forth in Rule 144A.

7. The Buyer will notify each of the parties to which this certification is made of any changes in the information and conclusions herein. Until such notice is given, the Buyer's purchase of Rule 144A Securities will constitute a reaffirmation of this certification as of the date of such purchase.

Print Name of Buyer

By:
    ---------------------------------------
    Name:
    Title:

<PAGE>

ANNEX 2 TO EXHIBIT M

QUALIFIED INSTITUTIONAL BUYER STATUS UNDER SEC RULE 144A

[For Buyers That Are Registered Investment Companies]

The undersigned hereby certifies as follows in connection with the Rule 144A Investment Representation to which this Certification is attached:

1. As indicated below, the undersigned is the President, Chief Financial Officer or Senior Vice President of the Buyer or, if the Buyer is a "qualified institutional buyer" as that term is defined in Rule 144A under the Securities Act of 1933 ("Rule 144A") because Buyer is part of a Family of Investment Companies (as defined below), is such an officer of the Adviser.

2. In connection with purchases by Buyer, the Buyer is a "qualified institutional buyer" as defined in SEC Rule 144A because (i) the Buyer is an investment company registered under the Investment Company Act of 1940, and (ii) as marked below, the Buyer alone, or the Buyer's Family of Investment Companies, owned at least $100,000,000 in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year. For purposes of determining the amount of securities owned by the Buyer or the Buyer's Family of Investment Companies, the cost of such securities was used.

The Buyer owned $ in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being

calculated in accordance with Rule 144A).

The Buyer is part of a Family of Investment Companies which owned in the aggregate $ in securities (other than the excluded securities referred to below) as of the end of the Buyer's most recent fiscal year (such amount being calculated in accordance with Rule 144A).

     3. The term "Family of Investment Companies" as used herein means two or more registered investment companies (or series thereof) that have the same investment adviser or investment advisers that are affiliated (by virtue of being majority owned subsidiaries of the same parent or because one investment adviser is a majority owned subsidiary of the other).

     4. The term "securities" as used herein does not include (i) securities of issuers that are affiliated with the Buyer or are part of the Buyer's Family of Investment Companies, (ii) bank deposit notes and certificates of deposit, (iii) loan participations, (iv) repurchase agreements, (v) securities owned but subject to a repurchase agreement and (vi) currency, interest rate and commodity swaps.

     5. The Buyer is familiar with Rule 144A and understands that each of the parties to which this certification is made are relying and will continue to rely on the statements made herein because one or more sales to the Buyer will be in reliance on Rule 144A. In addition, the Buyer will only purchase for the Buyer's own account.

     6. The undersigned will notify each of the parties to which this certification is made of any changes in the information and conclusions herein. Until such notice, the Buyer's purchase of Rule 144A Securities will constitute a reaffirmation of this certification by the undersigned as of the date of such purchase.


```
                              Print Name of Buyer


                       By: 
                          ------------------------------
                            Name:
                            Title:

            IF AN ADVISER:


                              Print Name of Buyer


                           Date:
                          ------------------------------
```

<PAGE>

EXHIBIT N

[RESERVED]


<PAGE>

EXHIBIT O

SERVICING CRITERIA

SERVICING CRITERIA TO BE ADDRESSED IN ASSESSMENT OF COMPLIANCE

     The assessment of compliance to be delivered by the Trustee shall address, at a minimum, the criteria identified as below as "Applicable Servicing Criteria":

<TABLE>
<CAPTION>

APPLICABLE

| REFERENCE | CRITERIA | |
|-----------|----------|---|

### GENERAL SERVICING CONSIDERATIONS

<C>        <C>

**1122(d)(1)(i)** — Policies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements.

**1122(d)(1)(ii)** — If any material servicing activities are outsourced to third parties, policies and procedures are instituted to monitor the third party's performance and compliance with such servicing activities.

**1122(d)(1)(iii)** — Any requirements in the transaction agreements to maintain a back-up servicer for the pool assets are maintained.

**1122(d)(1)(iv)** — A fidelity bond and errors and omissions policy is in effect on the party participating in the servicing function throughout the reporting period in the amount of coverage required by and otherwise in accordance with the terms of the transaction agreements.

### CASH COLLECTION AND ADMINISTRATION

**1122(d)(2)(i)** Payments on pool assets are deposited into the |X| (as to appropriate custodial bank accounts and related bank clearing accounts no more than two business days following receipt, or such other number of days accounts held by specified in the transaction agreements. Trustee)

**1122(d)(2)(ii)** — Disbursements made via wire transfer on behalf of an |X| (as to obligor or to an investor are made only by authorized investors only) personnel.

**1122(d)(2)(iii)** — Advances of funds or guarantees regarding collections, cash flows or distributions, and any interest or other fees charged for such advances, are made, reviewed and approved as specified in the transaction agreements.

The related accounts for the transaction, such as cash reserve accounts or accounts established as a form of overcollateralization, are separately maintained |X| (as to accounts held by (e.g., with respect to commingling of cash) as set Trustee) **1122(d)(2)(iv)** forth in the transaction agreements.

**1122(d)(2)(v)** — Each custodial account is maintained at a federally insured depository institution as set forth in the transaction agreements. For purposes of this criterion, "federally insured depository institution" with respect to a foreign financial institution means a foreign financial institution that meets the requirements of Rule 13k-1(b)(1) of the Securities Exchange Act.

**1122(d)(2)(vi)** — Unissued checks are safeguarded so as to prevent unauthorized access.

**1122(d)(2)(vii)** — Reconciliations are prepared on a monthly basis for all asset-backed securities related bank accounts, including custodial accounts and related bank clearing accounts. These reconciliations are (A) mathematically accurate; (B) prepared within 30 calendar days after the bank statement cutoff date, or such other number of days specified in the transaction agreements; (C) reviewed and approved by someone other than

the person who prepared the reconciliation; and (D) contain explanations for reconciling items. These reconciling items are resolved within 90 calendar days of their original identification, or such other number of days specified in the transaction agreements.

---

## INVESTOR REMITTANCES AND REPORTING

---

**1122(d)(3)(i)** Reports to investors, including those to be filed with the Commission, are maintained in accordance with the transaction agreements and applicable Commission requirements. Specifically, such reports (A) are prepared in accordance with timeframes and other terms set forth in the transaction agreements; (B) provide information calculated in accordance with the terms specified in the transaction agreements; (C) are filed with the Commission as required by its rules and regulations; and (D) agree with investors' or the trustee's records as to the total unpaid principal balance and number of pool assets serviced by the servicer.

---

**1122(d)(3)(ii)** Amounts due to investors are allocated and remitted in accordance with timeframes, distribution priority and other terms set forth in the transaction agreements.    |X|

---

Disbursements made to an investor are posted within two business days to the servicer's investor records, or such other number of days specified in the |X|
**1122(d)(3)(iii)** transaction agreements.

---

Amounts remitted to investors per the investor reports agree with cancelled checks, or other form of payment,    |X|
**1122(d)(3)(iv)** or custodial bank statements.

---

## POOL ASSET ADMINISTRATION

---

**1122(d)(4)(i)** Collateral or security on pool assets is maintained as required by the transaction agreements or related asset pool documents.

---

**1122(d)(4)(ii)** Pool assets and related documents are safeguarded as required by the transaction agreements

---

**1122(d)(4)(iii)** Any additions, removals or substitutions to the asset pool are made, reviewed and approved in accordance with any conditions or requirements in the transaction agreements.

---

**1122(d)(4)(iv)** Payments on pool assets, including any payoffs, made in accordance with the related pool asset documents are posted to the servicer's obligor records maintained no more than two business days after receipt, or such other number of days specified in the transaction agreements, and allocated to principal, interest or other items (e.g., escrow) in accordance with the related pool asset documents.

---

**1122(d)(4)(v)** The servicer's records regarding the pool assets agree with the servicer's records with respect to an obligor's unpaid principal balance.

---

**1122(d)(4)(vi)** Changes with respect to the terms or status of an obligor's pool asset (e.g., loan modifications or re-agings) are made, reviewed and approved by authorized personnel in accordance with the transaction agreements and related pool asset documents.

---

**1122(d)(4)(vii)** Loss mitigation or recovery actions (e.g., forbearance plans, modifications and deeds in lieu of foreclosure, foreclosures and repossessions, as applicable) are initiated, conducted and concluded in accordance with the timeframes or other

requirements established by the transaction agreements.

| | |
|---|---|
| 1122(d)(4)(viii) | Records documenting collection efforts are maintained during the period a pool asset is delinquent in accordance with the transaction agreements. Such records are maintained on at least a monthly basis, or such other period specified in the transaction agreements, and describe the entity's activities in monitoring delinquent pool assets including, for example, phone calls, letters and payment rescheduling plans in cases where delinquency is deemed temporary (e.g., illness or unemployment). |
| 1122(d)(4)(ix) | Adjustments to interest rates or rates of return for pool assets with variable rates are computed based on the related pool asset documents. |
| 1122(d)(4)(x) | Regarding any funds held in trust for an obligor (such as escrow accounts): (A) such funds are analyzed, in accordance with the obligor's pool asset documents, on at least an annual basis, or such other period specified in the transaction agreements; (B) interest on such funds is paid, or credited, to obligors in accordance with applicable pool asset documents and state laws; and (C) such funds are returned to the obligor within 30 calendar days of full repayment of the related pool asset, or such other number of days specified in the transaction agreements. |
| 1122(d)(4)(xi) | Payments made on behalf of an obligor (such as tax or insurance payments) are made on or before the related penalty or expiration dates, as indicated on the appropriate bills or notices for such payments, provided that such support has been received by the servicer at least 30 calendar days prior to these dates, or such other number of days specified in the transaction agreements. |
| 1122(d)(4)(xii) | Any late payment penalties in connection with any payment to be made on behalf of an obligor are paid from the servicer's funds and not charged to the obligor, unless the late payment was due to the obligor's error or omission. |
| 1122(d)(4)(xiii) | Disbursements made on behalf of an obligor are posted within two business days to the obligor's records maintained by the servicer, or such other number of days specified in the transaction agreements. |
| 1122(d)(4)(xiv) | Delinquencies, charge-offs and uncollectible accounts are recognized and recorded in accordance with the transaction agreements. |
| 1122(d)(4)(xv) | Any external enhancement or other support, identified in Item 1114(a)(1) through (3) or Item 1115 of Regulation AB, is maintained as set forth in the |X| transaction agreements. |

</TABLE>

<PAGE>

EXHIBIT P-1

FORM OF FORM 10-K CERTIFICATION

I, [identify the certifying individual], certify that:

1. I have reviewed the annual report on Form 10-K for the fiscal year [_____], and all reports on Form 8-K containing distribution or servicing reports filed in respect of periods included in the year covered by that annual report, of the trust (the "Trust") created pursuant to the Pooling and Servicing Agreement dated as of January 1, 2006 (the "P&S Agreement") among Residential Funding Mortgage Securities II, Inc. (the "Company"), Residential Funding Corporation (the "Master Servicer") and JPMorgan Chase Bank, N.A. (the "Trustee");

2. Based on my knowledge, the information in these reports, taken as a whole, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading as of the last day of the period covered by this annual report;

3. Based on my knowledge, the servicing information required to be provided to the Trustee by the Master Servicer under the P&S Agreement for inclusion in these reports is included in these reports;

4. I am responsible for reviewing the activities performed by the Master Servicer under the P&S Agreement and based upon my knowledge and the annual compliance review required under the P&S Agreement, and, except as disclosed in the reports, the Master Servicer has fulfilled its obligations under the P&S Agreement; and

5. The reports disclose all significant deficiencies relating to the Master Servicer's compliance with the minimum servicing standards based upon the report provided by an independent public accountant, after conducting a review in compliance with the Uniform Single Attestation Program for Mortgage Bankers as set forth in the P&S Agreement, that is included in these reports.

      In giving the certifications above, I have reasonably relied on the information provided to me by the following unaffiliated parties: [the Trustee].

      IN WITNESS WHEREOF, I have duly executed this certificate as of _____, 20__.


                              ----------------------------
                              Name:
                              Title:


      *         to be signed by the senior officer in charge of the
                servicing functions of the Master Servicer



<PAGE>


                              EXHIBIT P-2

            FORM OF BACK-UP CERTIFICATE TO FORM 10-K CERTIFICATION

      The undersigned, a Responsible Officer of [_____] (the "Trustee") certifies that:

1.    The Trustee has performed all of the duties specifically required to be performed by it pursuant to the provisions of the Pooling and Servicing Agreement dated as of January 1, 2006 (the "Agreement") by and among Residential Funding Mortgage Securities II, Inc., as company, Residential Funding Corporation, as master servicer, and the Trustee in accordance with the standards set forth therein.

2.    Based on my knowledge, the list of Certificateholders as shown on the Certificate Register as of the end of each calendar year that is provided by the Trustee pursuant to Section 4.03(e)(I) of the Agreement is accurate as of the last day of the 20[ ] calendar year.

      Capitalized terms used and not defined herein shall have the meanings given such terms in the Agreement.

      IN WITNESS WHEREOF, I have duly executed this certificate as of _____, 20__.


                              ---------------------
                              Name:
                              Title:

<PAGE>

EXHIBIT Q

[RESERVED]


<PAGE>


EXHIBIT R

ASSIGNMENT AGREEMENT

[ON FILE WITH THE TRUSTEE]

</TEXT>
</DOCUMENT>