Joseph T. Baio
Mary Eaton
Emma J. James
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

*Attorneys for Monarch Alternative Capital LP,
Stonehill Capital Management LLC, and Bayview Fund
Management LLC, each in its capacity as
investment advisor to certain funds, and for CQS ABS Master
Fund Limited and CQS ABS Alpha Master
Fund Limited.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

_____

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Residential Capital, LLC, *et al.*, | ) | Case No. 12-12020 (MG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |

**MONARCH ALTERNATIVE CAPITAL LP, STONEHILL CAPITAL MANAGEMENT
LLC, CQS ABS ALPHA MASTER FUND LIMITED, CQS ABS MASTER FUND
LIMITED, AND BAYVIEW FUND MANAGEMENT LLC'S
MOTION *IN LIMINE* TO PRECLUDE EVIDENCE ON THE DEBTORS'
9019 MOTION CONCERNING THE NEGOTIATIONS LEADING UP
TO THE FGIC SETTLEMENT AGREEMENT AND THE
CONCLUSORY STATEMENTS OFFERED BY THE FGIC TRUSTEES
AND OTHERS ABOUT THE NATURE OF THOSE NEGOTIATIONS
(*IN LIMINE* MOTION FIVE)**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

Monarch Alternative Capital LP, Stonehill Capital Management LLC, and Bayview Fund Management LLC, each in its capacity as investment advisor to certain funds, and CQS ABS Alpha Master Fund Limited and CQS ABS Master Fund Limited (collectively, the "**Investors**") hereby file this motion *in limine* to preclude the FGIC Trustees, FGIC, the Debtors and any other parties (collectively, the "**Moving Parties**") who have joined in the Debtors' Motion Pursuant to Fed. Rule of. Bankruptcy Procedure 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors (the "**9019 Motion**").

**PRELIMINARY STATEMENT**

At every turn, the Moving Parties have successfully blocked the Investors' attempts to learn about *anything* that was discussed, exchanged, proposed, considered, or evaluated by any of parties to the Mediation, including the negotiations that eventually culminated in the FGIC Settlement Agreement and the Commutation of Policies that the Moving Parties seek to impose on the Investors. The Moving Parties have objected to every document request relating to the negotiations leading up to the FGIC Settlement Agreement and have refused to allow any witness to answer any questions as to anything that happened or was discussed by anyone during the Mediation period.

At the same time, the Moving Parties are seeking Findings from this Court that go to the heart of the Mediation process and the conduct of the parties – particularly the FGIC Trustees – leading up to the execution of the Settlement Agreement. The Moving Parties have asked this Court to determine, among other thing*s*, that (a) the Settlement Agreement, including the Commutation agreed to by the FGIC Trustees, is in the *best interests* of the investors in each

of the FGIC Insured Trusts (including the Investors), and (b) the Trustees acted reasonably, in good faith, and in the best interests of all investors in the FGIC Insured Trusts in entering into the Settlement Agreement.

Having succeeded in their efforts to shield their pre-Settlement Agreement conduct from the Investors, however, the Moving Parties should be precluded from offering any argument or evidence at the hearing on the 9019 Motion concerning the Mediation and any testimony about the parties' conduct during those negotiations. As a matter of fundamental fairness and under relevant law, the Moving Parties cannot simultaneously invoke the "mediation privilege" to block discovery about their conduct and then testify about that conduct in an effort to prove that they are entitled to the Findings.

## BACKGROUND

The Proposed Order presented by the Moving Parties asks this Court to approve the Settlement Agreement and find that (1) the Settlement Agreement is in the best interest of the Investors, and (2) the Trustees "acted reasonably, in good faith and in the best interests of the Investors . . . in agreeing to the Settlement Agreement."[1] In order to test these proposed findings, the Court recognized that the Investors were entitled to "fulsome" discovery in connection with the 9019 Motion.[2]

On June 13 and 26, 2013, the Investors served document requests and notices of depositions on the Moving Parties and others to secure information necessary to contest the adverse Findings sought by the Moving Parties against the Investors and to bolster the factual basis for the Investors' objection to the 9019 Motion. Without exception, the recipients of those

---

[1]    Proposed Order at 2 [Dkt. No. 3929-1].

[2]    June 17, 2013 Hearing Tr. 45:17-18 (Declaration of Mary Eaton ("Eaton Decl.") Ex. 1).

- 3 -

document demands refused to turn over a single scrap of paper relating to the negotiations among the parties to the FGIC Settlement Agreement, the draft terms of any proposals that were considered or exchanged, the Trustees' claimed attempts to serve the interests of the Investors in those negotiations, or the benefits received by other parties to the detriment of the Investors' interests.[3] Indeed, the Moving Parties did not even itemize those "mediation privileged" documents on any of their privilege logs on the basis that it was supposedly "too burdensome" to do so, thus depriving the Investors of any insight whatsoever into the mediation process and, in particular, the negotiations over the FGIC Settlement Agreement that allegedly took place within the mediation context.[4]

Similarly, at every deposition, the Moving Parties and others refused to let witnesses testify about anything that involved the negotiations among the parties or anything else that otherwise preceded the execution of the Settlement Agreement.[5] For example, the following exchange occurred at the deposition of the Trustee representative for BNY, Mr. Robert Major:

Q. And was there any proposal prior to [the May, 2013 proposal]?

---

[3] *See, e.g., Debtors' Responses and Objections to Monarch Alternative Capital LP and Stonehill Capital Management LLC's First Request for the Production of Documents to Residential Capital, LLC* dated June 20, 2013 (Eaton Decl. Ex. 15) at 5 (objecting to request No. 3, calling for documents concerning any determination that the FGIC Settlement Agreement was in Investors' best interests); *Financial Guaranty Insurance Company's Supplemental Responses and Objections to Monarch Alternative Capital LP and Stonehill Capital Management LLC's First Request for Production of Documents* dated June 23, 2013 (Eaton Decl. Ex. 16) at 12-13; 19-20 (objecting to request No. 15, calling for versions of the FGIC Settlement Agreement, and to request No. 45, calling for versions of the PSA); *The Trustees' Objections and Responses to Monarch Alternative Capital LP and Stonehill Capital Management LLC's Supplemental Request for the Production of Documents to the Trustees* dated June 28, 2013 (Eaton Decl. Ex. 17) at 12-13 (objecting to request No. 57, calling for documents concerning the proposed findings in the Proposed PSA Order and Proposed 9019 Order).

[4] Eaton Decl. ¶ 3.

[5] The only exception is the disclosure of certain portions of the work done by Duff & Phelps that the FGIC Trustees rely upon to justify their entering into the FGIC Settlement Agreement. In their separate *In Limine* Motion, the Investors have moved to preclude the testimony of the Duff & Phelps' representative based on the failure to produce, or untimely production of, various work papers generated by Duff & Phelps in connection with their work for the FGIC Trustees.

- 4 -

>MR. ESPANA: Objection. I'm instructing him not to answer based on the mediation privilege.
>
>BY MR. BAIO: Q. One way or the other, I'm not asking what it was, was there a prior proposal?
>
>MR. ESPANA: I'm instructing him not to answer.[6]

The following question led to the same instruction:

>Q. Well, give me examples of some of the hard-fought exchanges that you engaged in that benefited the investors.
>
>MR. ESPANA: I'm instructing the witness not to answer. You can answer generally in describing why you thought there were hard-fought negotiations, but don't go into the substance.
>
>MR. BAIO: Just so I'm clear, I'm asking about the substance because it's the only way that I can test whether it was hard fought.
>
>MR. ESPANA: Then I'm instructing you not to answer.[7]

Ms. Mamta Scott, Trustee representative for U.S. Bank, similarly refused to answer relevant questions about anything concerning the evolving terms of the proposed Settlement Agreement, if there were any, during the purportedly "hard-fought" negotiations:

>Q. Okay. Did the FGIC settlement agreement, as presented to U.S. Bank, change from the time it was first presented to U.S. Bank through the time it was executed?
>
>MR. KOTWICK: Objection. I'm going to direct the witness not to answer to the extent that those discussions or any changes, if any, would have occurred during the mediation process, which is subject to the mediation order.

---

[6] Transcript of Deposition of Robert Major at 66:5-14, July 17, 2013 (Eaton Decl. Ex. 7) [hereinafter "Major Tr."].

[7] *Id.* at 156:10-23.

- 5 -

A. I can't answer the question.[8]

FGIC followed the same tack during the deposition of its CEO, John S. Dubel, refusing to let the witness testify about anything relating to the substantive negotiations or evolving terms of the Settlement Agreement:

> Q. Who brought up the concept of commutation in those discussions?
>
> MR. SIDMAN: Objection. I'm going to instruct the – my client not to answer on the – on the basis of the mediation privilege.
> . . . .
>
> Q. When was the first such term sheet, if you can recall?
>
> MR. SIDMAN: I'm going to object and instruct the witness not to answer that question on the basis of mediation privilege.[9]

On July 16 and 24, 2013, the Investors moved to compel the production of documents and testimony that the Moving Parties refused to provide based on the claimed "mediation privilege."[10] The Court denied those applications, and the Moving Parties have continued to withhold documents and testimony that in any way relate to the Mediation, the substance of what the FGIC Trustees did to protect the interests of their beneficiaries, or the negotiations between the parties to the Settlement Agreement.

Notwithstanding their successful efforts to prevent any relevant discovery about their pre-Settlement Agreement conduct, the Moving Parties have recently filed papers replete with unsubstantiated and self-serving conclusions (in place of actual evidence) to prove their

---

[8] Transcript of Deposition of Mamta Scott at 35:9-19, July 18, 2013 (Eaton Decl. Ex. 8) [hereinafter "Scott Tr."]..

[9] Transcript of Deposition of John S. Dubel at 157:3-8, 162:5-9, July 10, 2013 (Eaton Decl. Ex. 4) [hereinafter "Dubel Tr."].

[10] Letter Brief of Mary Eaton, dated July 16, 2013, [Dkt. No. 4253]; Letter Brief of Mary Eaton, dated July 24, 2013, (Eaton Decl. Ex. 34)

supposed "good faith" and the purported fulfillment of their fiduciary duties to the very beneficiaries they have successfully kept in the dark. Using remarkably similar language, the Moving Parties have repeated a common, conclusory mantra in an attempt to justify the requested Findings. According to the Debtors, for example:

> The evidence will further establish that all parties to the Settlement Agreement negotiated in good faith, with each party advocating for their own interest and for the interests of the parties they represent. This includes the FGIC Trustees, who were representing the interest of the investors in the FGIC Insured Trusts, including the Investor Objecting Parties here.[11]

The Trustees offer a similar self-laudatory conclusion in their Omnibus Reply Brief:

> The Settlement Agreement, which represents a reasonable settlement of the FGIC Insured Trusts' claims against FGIC, is the result of hard fought, arm's-length negotiations among sophisticated parties. . . .
>
> [The Settlement Agreement] must be understood as the product of heavily negotiated, arm's-length negotiations conducted among sophisticated parties with differing and conflicting interests, under the close supervision and guidance of the Mediator.[12]

And FGIC itself, one of the true beneficiaries of a windfall under the Settlement Agreement, chimes in with same conclusion:

> The negotiations leading up to the Settlement Agreement—a cornerstone to the PSA — were an important part of the process and similarly rigorous. . . . The evidence makes clear that the Settlement Agreement—and the Global Plan Agreement of which it is a part—were both the product of months of arm's-length negotiations conducted among sophisticated parties with differing

---

[11] Debtor's Omnibus Reply in Further Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors at ¶ 7, [Dkt. No. 4474].

[12] Statement of the FGIC Trustees (I) in Support of the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors and (II) in Reply to Certain Objections Thereto at ¶¶ 28 & 31, [Dkt. No. 4475].

- 7 -

and conflicting interests, under the close supervision and guidance of a sitting bankruptcy judge as part of a publicly disclosed mediation.[13]

The Investors have no idea what "evidence" of good faith the Moving Parties are referring to, what evidence there is of what the FGIC Trustees actually did to serve the best interests of the Investors, and whether there were any negotiations at all around the give-ups that the Investors will be required to suffer under the Settlement Agreement. The declarations submitted by the Moving Parties in support of their direct case are devoid of any such evidence. Instead, the declarants merely parrot the self-serving conclusions offered up by their counsel in the Moving Parties' Reply Briefs, identifying the length of the Mediation and the parties to it without so much as a hint as to what substantively occurred.

For example, FGIC's representative, Mr. Dubel, offered the following in his declaration of direct testimony:

> ***Without revealing the substance of the negotiations***, however, I can describe in general terms the process of the mediation, the participants, and the good faith, arm's-length nature of the negotiations.[14]

Mr. Major, BNY's declarant, says (and doesn't say) much the same thing, only Mr. Major uses more words:

> ***The communications and analyses relating to negotiations conducted during the Plan Mediation are confidential by law and pursuant to court order, and therefore cannot be disclosed in detail.*** In general, however, the integrated, global settlement associated with the Plan Support Agreement (including the FGIC Settlement Agreement) is now part of the ResCap Plan, and must be understood as the product of intense, arm's-length negotiations conducted among sophisticated parties with differing and

---

[13]   Financial Guaranty Insurance Company's Reply in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Individual Investors pp. 10-11, [Dkt. No. 4476].

[14]   Direct Testimony of John S. Dubel ¶ 10 (July 31, 2013) (emphasis added) [Dkt. No. 4436].

- 8 -

>conflicting interests, under the close supervision and guidance of a sitting bankruptcy judge.[15]

The other declarations offered by the Moving Parties are similarly lacking in any substantive information or evidence of actual negotiations.[16]

## ARGUMENT

The Moving Parties made a tactical choice in litigating their 9019 Motion, and now, under the law, they must live with the consequences of that choice. Their choice was to deny the Investors any discovery relating to the settlement negotiations that occurred during the Mediation. Having denied such discovery, the Moving Parties "cannot at one and the same time . . . rely on information about the settlement negotiations" to meet their burden of proving that they conducted those negotiation in good faith and in the best interests of the Investors. *In re MSTG, Inc.*, 675 F.3d 1337, 1348 (Fed. Cir. 2012); *accord*, *U.S. v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) (the attorney-client privilege may not be used as both a sword at trial and a shield in discovery); *RMD Sports Group, Inc.*, 277 B.R. 415 (N.D. Ga. 2002) (applying the *Bilzerian* "sword and shield" analysis in the context of an asserted mediation privilege).

As the Court has held in this very case in the context of the attorney-client privilege, "[t]he rationale for this rule is simple: 'A [party] may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes.'" *ResCap RMBS Preclusion Order*, 491 B.R. 63, 68 (S.D.N.Y. 2013) (quoting *Trouble v. The Wet Seal, Inc.*, 179 F. Supp. 2d 291, 304 (S.D.N.Y. 2001)). By that same reasoning, the Moving Parties should be precluded from offering testimony and unsupported

---

[15] Direct Testimony of Robert Major ¶ 21 (July 31, 2013) (emphasis added) [Dkt. No. 4438].

[16] Direct Testimony of Mary L. Sohlberg ¶ 15 (July 31, 2013) [Dkt. No. 4442]; Direct Testimony of Mamta K. Scott ¶ 18 (July 31, 2013) [Dkt. No. 4444]; Direct Testimony of Lewis Kruger ¶¶ 5, 57 (July 31, 2013) [Dkt. No. 4431].

- 9 -

conclusions about the Mediation process, the conduct of the parties leading up to the execution of the Settlement Agreement, or the purportedly "intense" and "hard-fought" negotiations involving the FGIC Trustees as a basis for the requested Findings that the Trustees acted in "good faith" and in the best interests of the FGIC Trusts and the Investors. In particular, and without limiting the breadth of the relief requested by this motion, the Investors submit that the following statements contained in the various declarations offered by the Moving Parties should not be admitted into evidence:

- Paragraphs 4, 6, 9-16, and 18 of the Witness Statement of John S. Dubel, July 31, 2013, and such exhibits thereto as are referred to in those paragraphs;

- Paragraphs 6-9, and 14-20 of the Declaration of Mary L. Sohlberg, July 31, 2013, as Officer of Wells Fargo Bank, N.A., RMBS Trustee, and such exhibits thereto as are referred to in those paragraphs;

- Paragraphs 7-9, 12, 17-21, and 23-24 of the Declaration of Mamta K. Scott, July 31, 2013, as Officer of U.S. Bank, as RMBS Trustee, and such exhibits thereto as are referred to in those paragraphs;

- Paragraphs 8-10, 15, 20-24, 26-27, and 29 of the Declaration of Robert H. Major, v as Officer of the Bank of New York Mellon Trust Company, N.A., as Trustee or Indenture Trustee, and such exhibits thereto as are referred to in those paragraphs; and

- Paragraphs 5, 14-15, 25-26, 28, 35-39, 41-42, and 57-59 of the Direct Testimony of Lewis Kruger, July 31, 2013, and such exhibits thereto as are referred to in those paragraphs.

In the recently-decided *MSTG* case, the Court of Appeals for the Federal Circuit considered whether to grant a writ of mandamus sought by MSTG to overturn the district court's order compelling the production of documents and testimony specifically relating to settlement negotiations that led up to the signing of a settlement agreement. The Court noted that MSTG's expert had relied on information about the settlement discussions in reaching his conclusions about an appropriate discount rate to be used in setting a reasonable royalty rate. In denying the request for relief, the Court noted the following:

> As a matter of fairness MSTG cannot at one and the same time have its expert rely on information about the settlement negotiations and deny discovery as to those same negotiations.

675 F.3d at 1348. As a matter of fairness to the Investors here, the Moving Parties cannot at one and the same time extol their own purported conduct during the allegedly "intense" and "hard-fought" settlement negotiations and deny the Investors any discovery as to those same negotiations. Using the language employed by a different court, the Moving Parties "cannot 'eat [their] cake and have it too, have it both ways, or stack the deck" against the Investors. *Driscoll v. Morris*, 11 F.R.D. 459, 463-64 (D. Conn. 1986) (citations omitted).

The Moving Parties' attempt to have it both ways is particularly egregious in light of the breadth of their successful invocation of a mediation privilege. In their refusal to produce or log a single document or allow deponents to answer any questions relating to the negotiation of the FGIC Settlement Agreement, the Moving Parties have taken the position that "anything … discussed that had any relation to a potential resolution of a Chapter 11 case," fell within the rubric of the mediation process, and was thus privileged.[17] While the Investors argued that the mediation privilege, to the extent it exists at all, is not that broad as a matter of law, and that the

---

[17] Deposition of Lewis Kruger at 52:22-53:2. *See also id*. at 49:17-50:16, 51:25-52:10. (Eaton Decl. Ex. 5).

- 11 -

Court should not permit the Mediation Order to be used as a tool of oppression, the Court disagreed.[18]

Having successfully used the mediation privilege to shield from discovery any inquiry even remotely related to the Settlement Agreement, and to block disclosure of any materials relating at all to the resolution of the bankruptcy case, the Moving Parties should be precluded from referring to those purportedly protected communications and documents as a sword to meet their burden of showing that they acted "reasonably," "in good faith," and "in the best interests" of the Investors.

## CONCLUSION

WHEREFORE, the Investors respectfully request that the Court enter an Order precluding the Moving Parties from offering any evidence concerning the negotiations leading to the FGIC Settlement Agreement, the conduct of the FGIC Trustees during those negotiations, the role of "sophisticated counsel" in advising the Settling Parties, and further precluding testimony containing conclusory statements about hard fought and arms-length negotiations among the Moving Parties at the hearing regarding the 9019 Motion to be held on August 16 and August 19, 2013.

---

[18] *See* Letter Brief of Mary Eaton, dated July 16, 2013 (citing *Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086 (LBS), 2012 WL 4793870, at *2 & n.3 (S.D.N.Y. Oct. 9, 2012)). [Dkt. No. 4253].

Dated: August 7, 2013
New York, New York

        WILLKIE FARR & GALLAGHER LLP

        By: /s/ Joseph T. Baio
            Joseph T. Baio

        Mary Eaton
        Emma J. James
        787 Seventh Avenue
        New York, New York 10019
        (212) 728-8000

*Attorneys for Monarch Alternative Capital LP, Stonehill Capital Management LLC, and Bayview Fund Management LLC, each in its capacity as investment advisor to certain funds, and for CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited.*