Joseph T. Baio
Mary Eaton
Emma J. James
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

*Attorneys for Monarch Alternative Capital LP,
Stonehill Capital Management LLC, and Bayview Fund
Management LLC, each in its capacity as
investment advisor to certain funds, and for CQS ABS Master
Fund Limited and CQS ABS Alpha Master
Fund Limited.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

_____
                                    )
In re:                              )    Chapter 11
                                    )
Residential Capital, LLC, *et al*., )    Case No. 12-12020 (MG)
                                    )
                     Debtors.       )    Jointly Administered
_____ )


**MONARCH ALTERNATIVE CAPITAL LP, STONEHILL CAPITAL MANAGEMENT
LLC, CQS ABS ALPHA MASTER FUND LIMITED, CQS ABS MASTER FUND
LIMITED, AND BAYVIEW FUND MANAGEMENT LLC'S
MOTION *IN LIMINE* TO PRECLUDE THE TRUSTEES FROM OFFERING ANY
EVIDENCE OF THEIR RELIANCE ON COUNSEL IN SUPPORT OF DEBTORS' 9019
MOTION (*IN LIMINE* MOTION FOUR)**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

Monarch Alternative Capital LP, Stonehill Capital Management LLC, and Bayview Fund Management LLC, each in its capacity as investment advisor to certain funds, and CQS ABS Alpha Master Fund Limited and CQS ABS Master Fund Limited (collectively, the "**Investors**") hereby file this motion *in limine* to preclude the FGIC Trustees (the "**Trustees**") from offering any evidence of their reliance on counsel in support of the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement (the "**Settlement Agreement**" or "**Settlement**") Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors (the "**9019 Motion**") and the findings (the "**Findings**" or the "**Exculpatory Findings**") contained in the Proposed Order filed with that motion (the "**Proposed Order**").

## PRELIMINARY STATEMENT

In the Proposed Order, the Trustees ask this Court to find that the Trustees "acted reasonably," in "good faith," and in the "best interests" of the Trusts and the Investors[1] in approving the Settlement Agreement. The reason the Trustees have sought these Exculpatory Findings could not be more transparent: through the Findings, the Trustees hope to preclude their beneficiaries from ever challenging the conduct of the Trustees in any court at any time and thus to insulate the Trustees from liability for disenfranchising their beneficiaries, whose interests they were duty-bound to preserve and protect.

It would be one thing, of course, if the Trustees had been willing to expose their decision-making process to the scrutiny of the full light of day. If that were the case, the Trustees might be entitled to the relief they seek if the evidence, in fact, supported it. Here,

---

[1] Proposed Order at 2 [Dkt. No. 2929-1].

however, the Trustees seek to have this Court make factual findings regarding the "care" they supposedly exercised in reaching their determination without any meaningful disclosure regarding the process they followed or the basis for the decision they made. Specifically, after consistently blocking any inquiry into so-called "privileged" discussions with their attorneys regarding the Settlement, the Trustees nevertheless wish to offer evidence that they relied on the recommendations of counsel in approving the Agreement. That should not be permitted. Established law unambiguously prohibits the use of the privilege as both a sword and a shield in cases just like this.

Nor may the Trustees assert that they believed in "good faith" that the FGIC Settlement Agreement was in the Investors' best interests while cloaking the advice they received on this very issue behind a claim of privilege. Under *Bilzerian* and its progeny, Second Circuit law is clear that a party may not assert that it believed it acted in good faith and simultaneously claim privilege to block inquiry into the party's state of mind. By asking this Court to find that they acted in "good faith" without any discovery into the advice they were given about the Settlement, the Trustees have done exactly what the law prohibits. The Trustees should therefore be barred from introducing any argument or evidence of their "good faith" at the 9019 Motion hearing on August 16 and 19, 2013.

## BACKGROUND

Under the Proposed Order, the Trustees seek a judicial finding that (1) the Settlement Agreement is in the best interest of the Investors, and (2) the Trustees "acted reasonably, in good faith and in the best interests of the Investors . . . in agreeing to the Settlement Agreement."[2] In order to test these proposed findings, the Court made clear that the

---

[2] Proposed Order at 2 [Dkt. No. 3929-1].

Investors were entitled to "fulsome" discovery in connection with the 9019 Motion.[3] As the following history of discovery in these proceedings shows, that simply did not happen.

**1.  The Trustees Invoked Privilege to Block Any Disclosure Of The Advice They Received With Respect To The FGIC Settlement Agreement.**

Beginning on June 13, 2013, at the outset of discovery in this matter, the Investors served the Trustees with a number of documents requests, seeking the production of various categories of documents directly relevant to the issues in dispute, including:

- All documents concerning the FGIC Settlement Agreement (No. 15);

- All versions of the FGIC Settlement Agreement (No. 15);

- Any opinion of counsel rendered to the Trustees in connection with the FGIC Settlement Agreement (Supp. No. 53);

- All documents concerning any determination by the Trustees that the Commutation amount provided for in the FGIC Settlement Agreement constituted adequate consideration for the commutation of the policies (No. 5);

- All documents supporting any determination by the Trustees that entry into the FGIC Settlement Agreement is in the best interests of the holders of the FGIC-wrapped securities (No. 3);

- Any determination by the Trustees that entry into the FGIC Settlement Agreement did not require the consent of the Holders under the Governing Agreements (Supp. No. 6);

- All documents concerning any projection, analysis or estimate of the liabilities from which FGIC would be released under the FGIC Settlement Agreement (Supp. No. 37);

- All documents concerning any valuation of the claims asserted by FGIC in the Chapter 11 cases (No. 27);

- Documents concerning any recovery by the Trusts or the Holders in the Rehabilitation Action (No. 31); and

- All documents concerning the Proposed Exculpatory Findings (Supp. No. 57).

---

[3]   June 17, 2013 Hearing Tr. 45:17-18.

- 4 -

The Trustees objected to each and every one of these requests on the grounds that (among other things) they called for the production of documents protected from disclosure under the "attorney-client privilege." To the extent they agreed to produce any documents at all, the Trustees only agreed to produce documents responsive to the requests that were "non-privileged." Subject to those objections, the Trustees only produced approximately 60 documents, which consisted almost entirely of documents filed publicly in the court file or otherwise freely available from public sources. In other words, the Trustees claimed the privilege over just about every document that was responsive to the requests.

Given their sweeping privilege objections, we expected to receive lengthy privilege logs, fully itemizing the documents that had been withheld from production. To be sure, there were some entries on the Trustees' privilege logs that made clear they were withholding communications between the Trustees and their Trustees' outside counsel regarding matters directly pertinent to the issues to be tried, such as documents concerning the "FGIC settlement agreement" or "Duff & Phelps analysis of FGIC settlement proposal and communication."[4] But it quickly became evident that the Trustees' logs did not tell the whole story. For one thing, the Trustees unilaterally used May 23, 2013 as a cut-off date for their production – the date the FGIC Settlement Agreement was allegedly signed – even though the proposed Exculpatory Findings were not finalized or filed with the court until roughly two weeks later. *See* Exhibit 2 to the Debtors' 9019 Motion. Likewise, none of the documents protected by the so-called "mediation privilege" or otherwise subject to this Court's Mediation Order were

---

[4] *See* The Bank of New York Mellon and The Bank of New York Mellon Trust Co., N.A.'s First Privilege Log, July 5, 2013 (Declaration of Mary Eaton ("Eaton Decl.), Ex. 18); Privilege Log of U.S. National Bank, (Eaton Decl. Ex. 21); Wells Fargo Bank, N.A.'s First Privilege Log (Eaton Decl. Ex. 20); FGIC's Privilege Log, July 7, 2013 (Eaton Decl. Ex. 19); Debtors' Privilege Log (Eaton Decl. Ex. 22); Supplemental Debtors' Privilege Log, July 10, 2013 (Eaton Decl. Ex. 23); Debtor's Supplemental Privilege Log, July 15, 2013 (Eaton Decl. Ex. 24); Debtors' Redaction Log, July 16, 2013 (Eaton Decl. Ex. 25).

- 5 -

logged even if (it appears) the documents were otherwise claimed to be protected under the attorney client privilege as well.[5]  As a result, therefore, numerous additional "privileged" documents concerning the negotiation of the FGIC Settlement Agreement and the proposed Exculpatory Findings have been neither produced nor logged.

The Trustees' determination to block all discovery on the grounds of privilege did not end with their document production, however.  In addition to withholding relevant documents, the Trustees also refused to answer proper questions about the critical issues in dispute during their depositions.  For example, the during the Rule 30(b)(6) deposition of Wells Fargo, the designated witness (Mary Sohlberg) was asked about statements made in the Trustees' joinder, in particular paragraph 34.[6]  But the witness was instructed not to answer questions about that paragraph – the subject of which was also covered in her own sworn statements – because, among other things, those matters were immune from discovery under the attorney-client privilege:

> Q.  Did Wells Fargo negotiate the amount of the lump-sum payment?
>
> MR. JOHNSON:  Objection to form; calls for a legal conclusion.  And, Miss Sohlberg, I direct you not to answer on the basis that doing so would implicate both the attorney-client privilege and the mediation privilege.
>
> BY MS. EATON:  Q.  Are you going to follow your counsel's instruction?
>
> A.  Yes.

---

[5]   *Id.* For example, only communications between attorneys and their clients were logged, not communications between attorneys and representatives or agents of their clients that would likewise be subject to the attorney-client privilege.

[6]   *See* Sohlberg Dep. at 85:14-86:15 (Eaton Decl. Ex. 6).

> Q. Were the negotiations over the FGIC settlement agreement hard fought?
>
> MR. JOHNSON: Objection to form. And, Miss Sohlberg, in answering that question, I direct you not to disclose any attorney-client privileged information that you might have received.
>
> THE WITNESS: I don't know.[7]

Bank of New York's 30(b)(6) witness (Robert Major) was also instructed by counsel not to answer similar questions:

> Q. You testified you had the right to enter into the settlement agreement just earlier. If you believe you were entitled to enter into the ResCap settlement agreement, why do you need these findings in C and D, from your perspective?
>
> MR. ESPANA: I'm just going to caution you, if your answer entails communications that you had with counsel, then I'm instructing you not to answer.
>
> THE WITNESS: It does.
>
> MR. ESPANA: I instruct you not to answer.

2.  **Despite Asserting Privilege, Trustees Rely on Communications with Counsel to Justify the Findings in the FGIC Settlement Agreement**

While precluding any discovery into the facts surrounding their approval of the Settlement Agreement and the proposed Exculpatory Findings related thereto, at deposition, the Trustees testified unequivocally that they approved the Settlement Agreement based on the recommendations of their advisors – including their legal counsel. For instance, when asked about the basis for the Trustee's view that the Settlement Agreement was in the best interests of the Investors, the Rule 30(b)(6) designee of the Bank of New York (Robert Major) testified as follows:

> Q. If you look at the second page of this proposed order, Item C states, "The settlement agreement and the transactions

---

[7] Sohlberg Dep. at 80:20-81:15 (Eaton Decl., Ex. 6.)

> contemplated thereby, including the releases given therein, are in the best interests of the debtors, their estates, their creditors, the investors in each trust, each such trust, the trustees and all other parties in interest." Do you see that?
>
> A. Yes.
>
> Q. Do you believe that the settlement agreement and the transactions contemplated thereby, including about the releases therein, are in the best interests of the investors in each trust?
>
> A. Yes.
>
> Q. And what do you base that conclusion on?
>
> A. **I base that conclusion on the recommendation of our financial adviser, the recommendation of our legal advisers, and the analysis of our financial adviser that the settlement was reasonable.**
>
> Q. Anything else?
>
> A. No.[8]

When questioned further about his conclusions, Mr. Major did not waver from his testimony that they were based on the legal advice the Bank of New York received:

> Mr. Baio: You also said that you based your conclusion that the settlement was in the best interests of the investors based on legal advice that you received; is that correct?
>
> Mr. Espana: Objection; mischaracterizes the witness' testimony.
>
> Mr. Baio: Is that accurate or not?
>
> Mr. Major: Yes.
>
> Mr. Baio: And who provided that legal advice?
>
> Mr. Major: My outside counsel.
>
> \* \* \*
>
> Mr. Baio: [Y]ou did you rely on whatever it was that [counsel] told you in reaching your conclusion that the settlement is in the best interests of the invests of the investors; is that correct?

---

[8] Major Dep. at 14:3-15:3 (Eaton Decl., Ex. 7)(emphasis added).

- 8 -

    Mr. Major: Yes.[9]

Similarly, U.S. Bank's Rule 30(b)(6) designee (Mamta Scott), was clear in her assertion that U.S Bank acted in good faith with respect to the Settlement because it "worked with counsel."[10] Wells Fargo's Rule 30(b)(6) representative, Ms. Sohlberg, likewise stated that counsel directed Wells Fargo "with respect to the negotiations during the mediation process."[11]

    The Trustees' memoranda of law and other court filings only confirm that, notwithstanding their invocation of the attorney client privilege throughout the discovery process, the Trustees intend to prove that they acted reasonably and in good faith in approving the Settlement Agreement **because they sought and received the advice of counsel** and that therefore they are entitled to the Exculpatory Findings set forth in the Proposed Order.

    For example, in their Joinder filed in support of Debtors' motion to approve the Plan Support Agreement ("PSA Motion"), the Trustees made clear that they relied on counsel's advice in approving the Settlement Agreement (which was incorporated into the PSA). Mr. Major, for instance, explained that Trustees' retained Duff & Phelps, "after consultation with counsel," because it "determined that it was appropriate and prudent to retain one or more experts to assist Trustees' in the Chapter 11 Cases."[12] Mr. Major also noted that BNY relied on "consultation with counsel" to determine "that it was appropriate and prudent to jointly retain an agent, together with the other similarly situated RMBS Trustees, to coordinate and facilitate notice to

---

[9]   Major Deposition Tr. at 18:15-19:13; *see also* Major Deposition Tr. at 29:12-30:5 (Eaton Decl., Ex. 7).

[10]   Scott Deposition Tr. at 134:13-135:2 ("Q: Is it your understanding that U.S. Bank has acted in good faith with respect to the commutation agreement? A: Yes. Q: And have you acted in good faith towards Freddie Mac? A: Yes. Q: And why do you believe that to be the case? A: We were approached with the settlement, the FGIC settlement. We engaged Duff & Phelps to do the analysis. We worked with counsel. We worked with the other trustees. We provided notice. I mean, this – all of this was part of the mediation process which demands acting in good faith.") (Eaton Decl., Ex. 8).

[11]   Sohlberg Dep. 66:12-15 (Eaton Decl., Ex. 6).

[12]   Declaration of Robert H. Major [Dkt. No. 3940-1] at 10.

- 9 -

the Holders."[13] Ms. Sohlberg made nearly identical statements in her declaration.[14] Drawing on these declarations, the Trustees' urged the Court to find that "the RMBS Trustees, **in consultation with their financial and legal advisors**, have acted reasonably and in good faith in determining that the Agreement and the RMBS Settlement subsumed therein in the best interests of the Investors."[15] This Court was persuaded. In granting the PSA Motion, the Court found that the fact that Trustees had relied on the advice of counsel was evidence that Trustees acted in good faith in entering into the PSA:

> The RMBS Trustees acted prudently, *considered the advice of Duff and the RMBS Trustees' legal advisors*, and considered the potential litigation outcomes if no settlement was reached. Based on the evidence in the record, the Court has no difficulty in concluding that the RMBS Trustees reached their decisions to sign and support the PSA in good faith and in what they believed was the best interests of the investors.[16]

3. **Despite Asserting Privilege, Trustees Rely on Communications with Counsel to Justify the Findings in the FGIC Settlement Agreement**

On July 17, the Investors drew the Court's attention to the fact that the Trustees were claiming that they relied on the recommendations of their counsel while simultaneously blocking any inquiry into the basis for recommendations. The Court made clear that if a party "is going to have a reliance on advice-of-counsel defense, they're going to have to produce the advice they gave."[17] Not surprisingly, in their most recent filings, the Trustees now seek to

---

[13] *Id.* at 29.

[14] Declaration of Mary L. Sohlberg [Dkt. No. 3940-6] at 26 ("Following the filing of the initial RMBS 9019 Motion, after consultation with counsel, Wells Fargo determined that it was appropriate and prudent to jointly retain an agent together with the other similarly situated RMBS Trustees to coordinate and facilitate notice to the Holders . . . .").

[15] Trustees' Joinder to Debtors' PSA Motion [Dkt. 3940] at 20.

[16] PSA Opinion [Dkt. No. 4102] at 45 (emphasis added).

[17] July 17, 2013 Hr'g Tr. 37:22-24.

- 10 -

12-12020-mg    Doc 4680    Filed 08/15/13    Entered 08/15/13 00:09:05    Main Document
              Pg 11 of 20

downplay the critical role their counsel played and pretend to walk away from the unequivocal sworn statements they previously made.[18] For instance, whereas Mr. Major testified previously and unambiguously that BNY Mellon entered into the FGIC Settlement Agreement based on the "recommendation of counsel," under the heading "Other Factors Evidencing Reasonableness of BNY Mellon's Conduct," his declarations now states:

> BNY Mellon took into consideration in forming its views of the Settlement Proposal that U.S. Bank and Wells Fargo **and their counsel** were coming to similar conclusions regarding the benefits of the FGIC Settlement Agreement as compared to the Projected Payments to the FGIC Insured Trusts under the Rehabilitation Plan."[19]

The Trustees' efforts to "dance between the raindrops" is doomed to failure, however, given the unconstested and incontestable record facts about how the FGIC Settlement Agreement was reached. For instance, each of the Trustee representatives has submitted sworn statements that the negotiation of the FGIC Settlement Agreement was "hard fought" and at "arm's-length" and that the Trustees were represented throughout that process by "experienced counsel."[20] To the extent there were any negotiations over the terms of the FGIC Settlement Agreement, however, they were conducted by counsel to the Trustees, not by the Trustees,[21] who remained on the sidelines throughout process and who gave their imprimatur only after the

---

[18]   Presumably, that is because the Court warned them that they could not both invoke the privilege and rely upon advice of counsel at the same time. *Id.*

[19]   Major Decl. at 12-13 [Dkt. No. 4438.] The exact same paragraph appears in Wells Fargo's direct testimony (with appropriate name changes) under the heading, "Other Factors Evidencing Reasonableness of Wells Fargo's Conduct." Sohlberg Decl. at 8 ("Wells Fargo took into consideration in forming its views of the Settlement Proposal that BNY Mellon and U.S. Bank and their counsel were coming to similar conclusions regarding the benefits of the FGIC Settlement Agreement as compared to the Projected Payments to the FGIC Trusts under the Rehabilitation Plan.") [Dkt. No. 4442.]

[20]   Scott Direct ¶ 18 [Dkt. No. 4444]; Sohlberg Direct ¶¶ 14-15 [Dkt. No. 4442]; Major Direct ¶¶ 20-21 [Dkt. No. 4438].

[21]   Dubel Direct ¶ 11 [Dkt. No. 4436]; Kruger Direct ¶¶ 42, 56 [Dkt. No. 4431].

Agreement was already a done deal and only after the briefest consideration.[22] Given their almost complete abdication of any role in the negotiations, the Trustees could not possibly have acted reasonably or in good faith in approving the FGIC Settlement Agreement without relying on counsel.

### 4. Debtors Also Rely on the Advice of Counsel While Refusing to Produce Documents Counsel Considered In Forming His Opinion

Debtors rely on the testimony of Jeffrey A. Lipps, "primary counsel representing certain of Debtors in RMBS litigation," as support for the 9019 Motion and approval of the Settlement and Findings.[23] Mr. Lipps offers "expert testimony," regarding the "legal uncertainty" and "expense of resolution" associated with litigating the claims and liabilities covered by the Settlement Agreement.[24] However, despite relying on Mr. Lipps' testimony, Debtors have refused to produce the documents considered by Mr. Lipps in forming his opinions.

On July 19, 2013, after Debtors' failed to produce an expert report or any underlying documentation by the court specified deadline, Investors informed Debtors that they had failed to comply with Fed. R. Civ. P. 26 and that it was Investors' position that Mr. Lipps should be precluded from testifying as an expert.[25] In response, Debtors insisted that they were not required to comply with Rule 26 and would not be providing Investors with any documentation to support Mr. Lipps' expert testimony aside from his expert declaration, filed June 7, 2013.[26]

---

[22]  Major Tr. 58:19-60:1 (Eaton Decl. Ex. 7); Sohlberg Tr. 136:15-137:13 (Eaton Decl. Ex. 6); Scott Tr. 108:19-109:21 (Eaton Decl. Ex. 8).

[23]  Direct Testimony of Jeffrey A. Lipps at 1-2 [Dkt. No. 12-12020].

[24]  *Id.* at 1-2, 5-57.

[25]  July 19, 2013 Email from M. Eaton to J.A. Lawrence (Eaton Decl., Ex. 26).

[26]  July 20, 2013 Email from J.A. Lawrence to M. Eaton (Eaton Decl., Ex. 27).

Two days before Mr. Lipps' scheduled deposition, Investors again asked Debtors' to produce all documents considered or relied upon by Mr. Lipps.[27] Debtor's responded that "almost all of the documents referenced in Mr. Lipps' Declaration" had been produced.[28]

On July 25, 2013, after hearing argument on a discovery dispute, this Court held that the parties were required to produce all documents either considered or relied upon by their experts, as well as their experts' work papers.[29] After the hearing, Investors' asked Debtors' to confirm that, consistent with the Court's order, Debtors had produced all documents considered or relied by Mr. Lipps, as well as any of Mr. Lipps' work papers.[30] Investors also asked that Debtors disclose whether any documents (aside from those already listed on Proponents' privilege logs)[31] were withheld on privilege grounds.[32] Debtors never responded to these requests.

**ARGUMENT**

5. **The Trustees Should Be Precluded From Offering Any Argument Or Evidence That They Relied On The Recommendation Of Counsel In Determining To Approve The FGIC Settlement Agreement.**

In this Circuit, it has long been settled law that "'the attorney-client privilege cannot at once be used as a shield and a sword.'" ResCap RMBS Preclusion Order, 491 B.R. at 68 (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991)). "The rationale for this rule is simple: 'A [party] may not use the privilege to prejudice his opponent's case or to

---

[27] July 21, 2013 Email from E. James to J.A. Lawrence (Eaton Decl., Ex. 30).

[28] July 22, 2013 Email from J.A. Lawrence to E. James (Eaton Decl., Ex. 31).

[29] July 25, 2013 Hearing Tr. at 32-37 (Eaton Decl., Ex. 3).

[30] August 5, 2013 Email chain between M. Eaton, J.A. Lawrence, and others (Eaton Decl., Ex. 36).

[31] Debtors' FGIC 9019 Motion – Privilege Log at 1 (Eaton Decl., Ex. 22); *see also* FGIC's Privilege Log Related to the FGIC 9019 Motion at 26-28 (Eaton Decl., Ex. 19).

[32] 8/5/2013 Email chain between M. Eaton, J.A. Lawrence, and others (Eaton Decl., Ex. 36).

- 13 -

disclosure some selected communications for self-serving purposes.'" *Id.* Therefore, courts have repeatedly held that a party that blocks its adversary from conducting discovery into communications with counsel may not advance reliance on counsel as a defense or justification for its actions. *Trouble*, 179 F. Supp. 2d at 304 (precluding party from referring to advice of counsel because defendant waived advice of counsel defense "by objecting, based on the attorney-client privilege, to [plaintiff's] discovery requests"); *McLean v. Garage Mgmt. Corp.*, No. 10 Civ. 3950, 2012 WL 1358739, at *7 (S.D.N.Y. Apr. 19, 2012) (precluding party from offering defense based on good faith reliance on the advice of counsel after previous invocation of attorney-client privilege).

This Court's decision on an earlier discovery dispute illustrates the point. During a deposition in connection to Debtors' motion to approve the RMBS Settlement, Debtors' counsel consistently invoked the attorney-client privilege, instructing Debtors' witness not to reveal the substance of his communications with counsel concerning the settlement, despite the witness' testimony that he "relied" on the advice of counsel in approving the settlement. The Court held that counsel's invocation of the privilege under these circumstances precluded Debtors from introducing evidence of its reliance on counsel to demonstrate that it exercised "due care":

> The consequences of failing to make *full* disclosure of the advice that was given is that Debtors are now precluded from offering *any* evidence of the legal advice provided to the Debtors' officers and directors that was considered in connection with the decision to enter into the RMBS Trust settlement. . . . [A]fter having asserted the attorney-client privilege throughout discovery, the Debtors cannot now introduce the substance of whatever advice it sought and received in order to demonstrate that it exercised proper business judgment in approving the RMBS Trust Settlement, even for the purpose of rebutting a "due care" challenge.

ResCap RMBS Preclusion Order, 491 B.R. at 70-72.

*Chesapeake Corp. v. Shore*, 771 A.2d 293, 301 (Del. Ch. 2000), is similarly on point. There, defendants invoked the attorney-client privilege to block discovery on much of the professional advice they received in taking action as corporate board members. Defendants then later "attempted to use some of this concealed advice as a sword," arguing that the board had considered information that the opposing party had been prevented from discovering. *Id.* Calling this tactic "inequitable," the court refused to consider any evidence of the advice given to the board:

> One would think that a board having [a burden of showing the reasonableness of their process and also of the result that they reached] would want to expose their deliberative process to full view, but they are not legally required to do so. The defendants are the masters of the evidence they will present in their defense, but they must accept the consequences of their tactical choice. Here the defendants' tactical decision to bar on privileg[e] grounds discovery into what the board was advised was their fiduciary duty and into the content of the board's deliberations will in turn preclude them from proving those deliberations at trial to defend their position that their decision was reasonable and made with due care.

*Id.* at n.8 (citations omitted)

In sum, having chosen to shield from discovery their attorney-client communications that informed Trustees' decision to approve the Settlement, the Trustees cannot now offer any argument or evidence that they relied on counsels' recommendations in determining to approve the FGIC Settlement Agreement.

**6.     The Trustees Should Be Precluded From Offering Any Argument Or Evidence That They Acted In Good Faith In Determining To Approve The FGIC Settlement Agreement.**

But even if the Trustees had not expressly stated that they relied on counsel in reaching their determinations – which they did – they should still be precluded from proving that

- 15 -

they acted reasonably and in good faith because they sought guidance from their legal advisors before approving the FGIC Settlement Agreement.

In this Circuit, the rule is well-established that a waiver of the privilege need not be express. Rather, the privilege may "implicitly be waived" when a party "asserts a claim that in fairness requires examination of protected communications." *Bilzerian*, 926 F.2d at 1292. In *In re County of Erie*, 546 F.3d 222 (2d Cir. 2008), the Second Circuit reaffirmed *Bilzerian*, holding that the "assertion of a good-faith defense involves an inquiry into state of mind, which typically calls forth the possibility of implied waiver of the attorney-client privilege." *Id*. at 228-29. The court in *Pereira v. United Jersey Bank* made clear that where "counsel played a major role" in the decision-making process at issue, a party:

> cannot be permitted, on the one hand, to argue that it acted in good faith and without an improper motive and then, on the other hand, to deny . . . access to the advice given by counsel where that advice . . . played a substantial and significant role in formulating the actions taken by [the defendant].

1997 WL 773716, at *6 (S.D.N.Y. Dec. 11, 1997); s*ee also Arista Records*, 2011 WL 1642434, at *3 ("Plaintiffs are correct that a party may not assert that it believed its conduct was lawful, and simultaneously claim privilege to block inquiry into the basis for the party's state of mind or belief") ; *Trouble*, 179 F. Supp. 2d at 304 (holding that, if plaintiff alleges bad faith at trial, defendant may not refer to any evidence of advice of counsel in response by failing to disclose such information during discovery).

The Trustees have stated to this Court – and no doubt will say again in opposition to this motion – that they are not testifying about their "good faith" based on communications with counsel, but rather some belief about how they have met their contractual and common law

12-12020-mg    Doc 4680    Filed 08/15/13    Entered 08/15/13 00:09:05    Main Document
Pg 17 of 20

obligations as fiduciaries independent of what their lawyers told them.[33] Following *Erie*, courts repeatedly have rejected this type of tactic to end-run *Bilzerian*:

> [A] party need not explicitly rely upon advice of counsel to implicate privileged communications. Instead, advice of counsel may be placed in issue where, for example, a party's state of mind, such as his good faith belief in the lawfulness of his conduct, is relied upon in support of a claim of defense. Because legal advice that a party received may well demonstrate the falsity of its claim of good faith belief, waiver in these instances arises as a matter of fairness, that is, it would be unfair to allow a party to 'use[ ] an assertion of fact to influence the decision maker while denying its adversary access to privileged material potentially capable of rebutting the assertion.'

*Leviton Mfg. Co. v. Greenberg Traurig LLP*, 2010 WL 4983183, at *3 (S.D.N.Y. Dec. 6, 2010) (quoting *John Doe Co. v. United States*, 350 F.3d 299, 306 (2d Cir. 2003)). And even if a defendant is "not claiming reliance on the advice of his attorney," a plaintiff would be entitled to communications relating to such advice if the defendant's "testimony implicated such advice, that is, if it turned out that he had received advice as to the legality of his actions from the attorney." *Bodega Invs., LLC v. United States*, 2009 WL 2634765, at *3 (S.D.N.Y. Aug. 21, 2009) (discussing *Erie* and *Bilzerian*). This is true "even if the privilege holder does not attempt to make use of a privileged communication; he may waive the privilege if he makes factual assertions the truth of which can only be assessed by examination of the privileged communication." *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 470 (S.D.N.Y. 1996). *See also Pall Corp. v. Cuno Inc.*, 268 F.R.D. 167, 169, (E.D.N.Y. 2010) (courts "frequently conclude

---

[33] July 17, 2013 Hrg. Tr. 38: 8-11 ("I understand what you're saying, but he had an obligation to do a whole bunch of things and check boxes. That doesn't mean that this is a matter of reliance on the attorney advice here.")(Eaton Decl. Ex. 1).

that a party waives the protection of the attorney client privilege when the party voluntarily injects into suit a question that turns on state of mind").[34]

By insisting that this Court issue an order containing the Exculpatory Findings as a condition to their approval of the FGIC Settlement Agreement – including the Finding that they acted in "good faith" – the Trustees elected to put their state of mind at issue in this dispute. That necessarily implicated the substance of their communications with counsel, on whom they relied throughout the process to guide them to what became the final result: the forced commutation of the FGIC policies that were for the benefit of the Investors without their consent at a bargain basement price.  The Trustees' repeated invocation of the privilege to block any inquiry into that advice has unfairly deprived the Investors of the information they need to test the validity of the Trustees' "good faith" defense.  As a consequence, the Trustees cannot now offer any argument or evidence concerning their "good faith" belief that the FGIC Settlement Agreement was in the best interests of the Trusts or the Investors.

### 7. For the Same Reasons, Debtors Should Be Precluded From Relying on Counsels' Expert Testimony

For the reasons explained more fully above, Debtors have waived their attorney-client privilege with respect to the risk and expense associated with litigating the claims and liabilities covered by the Settlement Agreement, because they put the advice of counsel directly at issue by offering counsel as an expert witness.  ResCap RMBS Preclusion Order, 491 B.R. at

---

[34] *See also, e.g., Bank Brussels Lambert*, 1996 WL 173138, at *4 ("A party does not have to use the phrase 'reliance on counsel' to put in issue attorney-client communications."); *In re Human Tissue Prods. Liab. Litig.*, 255 F.R.D. 151, 160 (D.N.J. 2008) (although defendant "represent[s]" that it is "not relying on the advice of counsel or any other privileged communication . . . in support of its good faith immunity defense" such "reliance is implicit to [the good faith] defense"); *Abbott Labs. v. Baxter Travenol Labs., Inc.*, 676 F. Supp. 831, 832-33 (N.D. Ill. 1987) ("reliance on advice of counsel" is "as a practical matter, absolutely essential to the good faith defense"); *Oxyn Telecomms., Inc. v. Onse Telecom*, 2003 WL 660848, at *6 (S.D.N.Y. Feb. 27, 2003) ("[I]f a defendant asserts his reliance on advice of counsel, or asserts good faith in either a claim or a defense, the basis for that reliance, and the state of his knowledge, including legal advice from counsel, will be subject to disclosure.").

71; *Aristocrat Leisure*, 2009 WL 3111766, at *16-17; *see also* 7/25/2013 Hearing Tr. at 32-37 (information in documents relied upon or considered by an expert, or contained in an expert's work papers, "is discoverable, even if it results from an attorney-client privileged communication"). However, despite their waiver, Debtors have blocked discovery into the documents relied upon or considered by Mr. Lipps, as well as into Mr. Lipps' work papers. This is impermissible and warrants the preclusion of Mr. Lipps' testimony. *See* ResCap RMBS Preclusion Order, 491 B.R. at 68-72; *Trouble*, 179 F. Supp. 2d at 304; *McLean*, 2012 WL 1358739, at *7; *Arista Records*, 2011 WL 1642434, at *2-3; *Chesapeake Corp.*, 771 A.2d at 301.

## CONCLUSION

WHEREFORE, the Investors respectfully request that the Court enter an order (1) precluding the Trustees from introducing at the hearing of the 9019 Motion any argument or evidence of (i) Trustees' reliance on the recommendations of their counsel with respect to the FGIC Settlement Agreement, (ii) the Trustees' good faith belief that the FGIC Settlement Agreement was in the best interests of the Trusts or the Investors; (iii) any testimony from Mr. Lipps or (iv) any documents considered, relied up, or prepared by Mr. Lipps.

Dated: August 7, 2013
      New York, New York

                             WILLKIE FARR & GALLAGHER LLP

                             By: /s/ Joseph T. Baio
                                   Joseph T. Baio

                             Mary Eaton
                             Emma J. James
                             787 Seventh Avenue
                             New York, New York 10019
                             (212) 728-8000

*Attorneys for Monarch Alternative Capital LP, Stonehill Capital Management LLC, and Bayview Fund Management LLC, each in its capacity as investment advisor to certain funds, and for CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited.*