# **EXHIBIT 7**

Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------)
IN RE:                  )   Case No. 12-12020
                        )          (MG)
RESIDENTIAL CAPITAL,    )
LLC, et al.,            )   Chapter 11
        Debtors.        )   Adminstered Jointly
------------------------)


                July 17, 2013
                 9:08 a.m.


        DEPOSITION of ROBERT MAJOR,
30(b)(6) witness on behalf of Bank of New York
Mellon, pursuant to Notice, held at the offices
of Wilkie Farr & Gallagher, LLP, 787 Seventh
Avenue, New York, New York, before Eileen
Mulvenna, CSR/RMR/CRR, Certified Shorthand
Reporter, Registered Merit Reporter, Certified
Realtime Reporter and Notary Public of the State
of New York.

Page 14

1                    Robert Major
2        A.     I don't believe so.
3        Q.     If you look at the second page of
4   this proposed order, Item C states, "The
5   settlement agreement and the transactions
6   contemplated thereby, including the releases
7   given therein, are in the best interests of the
8   debtors, their estates, their creditors, the
9   investors in each trust, each such trust, the
10  trustees and all other parties in interest."
11             Do you see that?
12       A.     Yes.
13       Q.     Do you believe that the settlement
14  agreement and the transactions contemplated
15  thereby, including about the releases therein,
16  are in the best interests of the investors in
17  each trust?
18       A.     Yes.
19       Q.     And what do you base that conclusion
20  on?
21       A.     I base that conclusion on the
22  recommendation of our financial adviser, the
23  recommendation of our legal advisers, and the
24  analysis of our financial adviser that the
25  settlement was reasonable.

```
 1                      Robert Major
 2        Q.      Anything else?
 3        A.      No.
 4        Q.      So let's take them one at a time.
 5                Your conclusion that the settlement
 6   agreement and the releases are in the best
 7   interests of the investors in each trust are
 8   based first on recommendations of your financial
 9   advisers.
10                To whom are you referring?
11        A.      Duff & Phelps.
12        Q.      And when did they provide you the
13   recommendation that you identified?
14        A.      On May 15, 2013.
15        Q.      And was that in person?
16        A.      It was in a report delivered that
17   date.
18        Q.      And was it delivered to you?
19        A.      Yes.
20        Q.      Was it a draft report or a final
21   report?
22        A.      A final report.
23        Q.      Did you also see a draft report?
24        A.      Yes.
25        Q.      And at the time that the final
```

Page 18

1            Robert Major
2    A.    No.
3    Q.    February of this year?
4    A.    No. I think the first one I
5 attended was in April.
6    Q.    We'll come back to that.
7          So when you stated that you relied
8 upon the recommendation of your investment
9 advisers, you were referring to the
10 recommendation that was made by Duff & Phelps
11 orally to you on May 13 and the written report
12 that they provided to you on May 15th; is that
13 correct?
14    A.    That is correct.
15    Q.    You also said that you based your
16 conclusion that the settlement was in the best
17 interests of the investors based on legal advice
18 that you received; is that correct?
19         MR. ESPANA:   Objection;
20    mischaracterizes the witness' testimony.
21 BY MR. BAIO:
22    Q.    Is that accurate or not?
23    A.    Yes.
24    Q.    And who provided that legal advice?
25    A.    My outside counsel.

```
                                                    Page 19

 1                      Robert Major
 2       Q.      When did they provide it?
 3       A.      On or around May 15th.
 4       Q.      And what did they say?
 5               MR. ESPANA:  Objection.
 6               I'm instructing the witness not to
 7       disclose privileged information.
 8  BY MR. BAIO:
 9       Q.      But you did rely on whatever it was
10  that they told you in reaching your conclusion
11  that the settlement is in the best interests of
12  the investors; is that correct?
13       A.      Yes.
14       Q.      You then made reference again to
15  financial advisers.  Is there a third component
16  of what you relied on in reaching the conclusion
17  that the settlement was in the best interests of
18  the investors?
19       A.      I don't know what you mean by "third
20  component."
21               MR. BAIO:  How do I go back?
22               (Discussion off the record.)
23  BY MR. BAIO:
24       Q.      When I asked you what you based that
25  conclusion on, and I'm on line 12 of page 17,
```

```
                                              Page 29
1                        Robert Major
2              THE WITNESS:  I don't believe the
3         investors were -- which investors are you
4         referring to?
5  BY MR. BAIO:
6         Q.    The investors in the trusts.
7         A.    That are parties to the settlement
8  agreement or just in general?
9         Q.    No, in general.
10        A.    I don't believe they gave any
11 releases.
12        Q.    In D in this proposed order, there
13 is the following language:  "The trustees acted
14 reasonably, in good faith and in the best
15 interests of the investors in each trust and each
16 such trust in agreeing to the settlement
17 agreement."
18              Do you see that?
19        A.    I do.
20        Q.    Do you believe that is accurate?
21        A.    Yes.
22        Q.    What do you base that conclusion on?
23        A.    The same factors that I've stated
24 before, the advice of our professionals and the
25 fact that the trustees did not benefit in their
```

1         Robert Major
2   individual -- or individually -- individual
3   entities of the trusts did not benefit in this
4   settlement at all; it was just in our capacities
5   as trustees.
6          Q.     But you did benefit in your capacity
7   as trustees; correct?
8          A.     Yes.
9          Q.     Including securing releases?
10         A.     Yes.
11                MR. BAIO:  I'm going to ask the
12         reporter to mark as the next exhibit a
13         multipage document with the Bates
14         Nos. BNYM-MS079 through 088.
15                (Major Exhibit 4, Bates Nos. BNYM-MS
16         0000079 through 88, E-mail Chain with
17         attachments, marked for identification.)
18  BY MR. BAIO:
19         Q.     Have you seen Exhibit 4 before?
20         A.     Yes.
21         Q.     What is it?
22         A.     It is an e-mail from my outside
23  counsel to me with the proposed FGIC analysis --
24  proposed FGIC settlement analysis of Duff &
25  Phelps attached.

1                    Robert Major
2        Q.    So at a 10 percent discount rate
3   under the base scenario, the recoveries would be
4   30 percent?
5        A.    Yes.
6        Q.    And at 15 percent discount rate, it
7   would be 28.5 percent?
8        A.    Yes.
9        Q.    And at a 20 percent discount rate,
10  it would be 27 percent; is that what you
11  understand this to mean?
12       A.    Yes.
13       Q.    The numbers that are under the
14  stress scenario are what the percentage
15  recoveries are estimated to be under those
16  assumptions, that is the stress scenario
17  assumptions; correct?
18       A.    Correct.
19       Q.    Did you ask Duff & Phelps what they
20  thought the appropriate discount rate should be?
21       A.    No.
22       Q.    Did you ask them to run any numbers
23  as to what the present value of those future
24  income streams plus the initial CPP would be at a
25  discount rate lower than 10 percent?

1                      Robert Major
2          A.    No.
3          Q.    Did they tell you that a discount
4     rate lower than 10 percent would be
5     inappropriate?
6          A.    No.
7          Q.    Did you believe that a discount rate
8     of less than 10 percent would be inappropriate?
9          A.    I didn't consider that.
10         Q.    You didn't consider the
11    appropriateness of the discount rate yourself?
12         A.    No.
13         Q.    And you didn't ask anyone what is
14    the appropriate discount rate?
15         A.    No.
16         Q.    Did you ask anyone are these
17    discount rates too high?
18         A.    No.
19         Q.    Did Duff & Phelps say anything about
20    the propriety of using these discount rates?
21         A.    Not to my knowledge.
22         Q.    And you didn't ask?
23         A.    No.
24         Q.    And no one asked, as far as you
25    know?

Page 60

1                    Robert Major
2       A.      As far as I know.
3       Q.      Did you ask Duff & Phelps why
4    there's a base-case scenario and a stress
5    scenario?
6       A.      No.
7       Q.      Did you ever learn why those two
8    scenarios were presented to you?
9       A.      Did I learn why?
10      Q.      Yes.
11      A.      I drew my own conclusions as to
12   why -- these were part of disclosures made in
13   support of the FGIC plan, and I assumed that they
14   were -- made to help the creditors of FGIC
15   evaluate the proposal of -- you know, at the time
16   the FGIC plan was being considered.
17      Q.      And did you use those scenarios to
18   evaluate the plan at the time it was being
19   considered?
20      A.      Did I consider --
21      Q.      As a representative of a trustee,
22   did you consider those numbers in any respect to
23   the scenarios?
24              MR. ESPANA:  I want to raise an
25         objection; outside the scope of the

```
                                                        Page 66
 1                       Robert Major
 2    proposed in late March, so far as you know;
 3    correct?
 4           A.      Correct.
 5           Q.      And was there any proposal prior to
 6    that?
 7                   MR. ESPANA:  Objection.
 8                   I'm instructing him not to answer
 9           based on the mediation privilege.
10    BY MR. BAIO:
11           Q.      One way or the other, I'm not asking
12    what it was, was there a prior proposal?
13                   MR. ESPANA:  I'm instructing him not
14           to answer.
15    BY MR. BAIO:
16           Q.      Do you understand that there were
17    actually negotiations involving the trustees or
18    their representatives prior to March -- prior to
19    late March of 2013?
20                   MR. ESPANA:  Objection to form;
21           vague.
22    BY MR. BAIO:
23           Q.      In the mediation.
24           A.      Yes.
25           Q.      They were involved in the
```

Page 156

Robert Major

| | |
|---|---|
| 1 | |
| 2 | parties were very complex. And resolution |
| 3 | was very important in the context of the |
| 4 | mediation and also vis-a-vis between FGIC |
| 5 | and the trustees. |
| 6 | BY MR. BAIO: |
| 7 | Q.    And do you intend to testify about |
| 8 | the hard-fought negotiations at the hearing? |
| 9 | A.    If I'm called to testify, yes. |
| 10 | Q.    Well, give me examples of some of |
| 11 | the hard-fought exchanges that you engaged in |
| 12 | that benefited the investors. |
| 13 | MR. ESPANA:  I'm instructing the |
| 14 | witness not to answer.  You can answer |
| 15 | generally in describing why you thought |
| 16 | there were hard-fought negotiations, but |
| 17 | don't go into the substance. |
| 18 | MR. BAIO:  Just so I'm clear, I'm |
| 19 | asking about the substance because it's the |
| 20 | only way that I can test whether it was |
| 21 | hard fought. |
| 22 | MR. ESPANA:  Then I'm instructing |
| 23 | you not to answer. |
| 24 | MR. BAIO:  Let's take a few minutes. |
| 25 | (Recess from the record.) |

```
                                              Page 203
 1                    Robert Major
 2    the findings that the --
 3         A.     I think you mean C and D.
 4         Q.     I mean C and D.  Thank you.
 5                -- that the trustees acted in good
 6    faith and invested for some investors, in
 7    paragraph D and, in paragraph C, that the
 8    settlement agreement was in the best interests
 9    of, among other parties, including investors.
10                You're familiar with those
11    paragraphs; is that correct?
12         A.     Yes.
13         Q.     You testified you had the right to
14    enter into the settlement agreement just earlier.
15                If you believe you were entitled to
16    enter into the ResCap settlement agreement, why
17    do you need these findings in C and D, from your
18    perspective?
19                MR. ESPANA:  I'm just going to
20           caution you, if your answer entails
21           communications that you had with counsel,
22           then I'm instructing you not to answer.
23                THE WITNESS:  It does.
24                MR. ESPANA:  I instruct you not to
25           answer.
```