# **EXHIBIT 9**

Page 1

```
 1
 2            UNITED STATES DISTRICT COURT
 3            SOUTHERN DISTRICT OF NEW YORK
 4   IN RE:                         )
     RESIDENTIAL CAPITAL, LLC,      )Civil Action No.
 5   et al.,                        )12-12020 (MG)
                   Debtors,         )
 6                                  )
     -------------------------------)
 7
 8
 9
10
11
12      CONFIDENTIAL DEPOSITION OF JEFFREY A. LIPPS
13                  New York, New York
14               Tuesday, July 23, 2013
15
16
17
18
19
20
21
22
23
24   Reported by:
     JOMANNA DeROSA, CSR
25   JOB NO. 64088
```

1             J. LIPPS - CONFIDENTIAL
2        Monarch, Stonehill, Bayview, and CQS.
3             Q.    Mr. Lipps, do you understand that
4    your Declaration that was filed with the Court in
5    connection with Debtors 9019 motion pursuant to
6    Federal Rules of Bankruptcy Procedure 9019 for
7    approval of the Settlement Agreement among the
8    Debtors FGIC, the FGIC trustees, and certain
9    institutional investors has been resubmitted by
10   Debtors in connection with my clients' objections
11   to the 9019 motion?
12            A.    Are you just asking me if I filed a
13   Declaration?
14            Q.    I'm asking if you understand that
15   that Declaration has been submitted as an Expert
16   Declaration in connection with the objections to
17   the 9019 motion?
18            A.    I understand my Declaration has
19   been filed in connection with the 9019.
20            Q.    And, Mr. Lipps, can you tell us
21   what your expert qualifications are?
22            A.    Well, I think I've set forth in the
23   Declaration my experiences.  For purposes of the
24   opinions that I'm offering here, I think my
25   qualifications are based on my experience as a

Page 8

 1                J. LIPPS - CONFIDENTIAL

 2   commercial litigator for now 32 years.  The last

 3   three years of which -- or I guess two years

 4   before the filing of the bankruptcy and the year

 5   after I have been actively involved with respect

 6   to RMBS securitizations, and rep and warranty

 7   claims, as well as PLS claims.  So, I have had

 8   substantial experience in the area.

 9                     And as part of my ongoing

10   assistance with the Debtors' counsel, I continue

11   to stay abreast of what is developing in the law

12   with respect to the legal issues, and I have

13   direct experience in terms of representing the

14   Debtors and some of the non-Debtors pre-petition

15   in these cases, and have a very good understanding

16   of what the complexities are in terms of the

17   discovery that will be encountered, as well as the

18   legal issues that you have to confront in these

19   kinds of claims.

20          Q.    So, is it fair that you have

21   submitted a Declaration as an expert in the

22   litigation of complex commercial disputes with

23   specific subject matter expertise in the body of

24   law that is developed in disputes regarding the

25   sale of residential mortgage-backed securities or

1                J. LIPPS - CONFIDENTIAL
2           A.    I joined a firm then called Frost &
3    Jacobs in Cincinnati, and did litigation for them
4    for about six years, and then Jones Day extended
5    me an offer to move from Cincinnati up to
6    Columbus, and I began handling litigation in the
7    Columbus office nationally for Jones Day until
8    1994 when I left and started what's now Carpenter
9    Lipps & Leland.
10          Q.    And that's where you are currently?
11          A.    Correct.
12          Q.    And when was the first time, for
13   any entity, that you were involved in an RMBS
14   litigation?
15          A.    It would be in March or April of
16   2010.  I was hired to represent the RFC entity in
17   the MBIA case, the GMAC Mortgage entity in the
18   MBIA case, and then ResCap and the various
19   affiliates involved in the securitizations at
20   issue in the New Jersey Carpenters suit.
21               MS. JAMES:  I'm handing to the
22        Court Reporter a document to mark as Exhibit
23        1.  And I'll state for the record that this
24        document was filed in the bankruptcy case,
25        Docket No. 3929-4, and it's captioned

1                J. LIPPS - CONFIDENTIAL
2    mean the period of time before ResCap filed its
3    Chapter 11 petition?
4           A.    It would have been prior to May
5    14th.
6           Q.    2012?
7           A.    2012.
8           Q.    At the time that those cases were
9    stayed, what progress had been made in connection
10   with discovery?
11          A.    Nothing.  We hadn't even answered.
12          Q.    So, there was no progress in
13   connection with the FGIC claims or the FGIC
14   lawsuits?
15              MR. KERR:  Objection.
16              MS. JAMES:  I'll rephrase it.
17       That's fair.
18          Q.    There had been no progress as to
19   discovery in connection with the FGIC lawsuits
20   filed against Debtors?
21          A.    That's probably fair.  I know under
22   the Federal Rules you can't start discovery until
23   after you have your Rule 16 conference, as I
24   recall, and we were going to test the pleadings in
25   various regards with a Motion to Dismiss was our

Pg 7 of 20

Page 21

```
 1                J. LIPPS - CONFIDENTIAL
 2    plan at the time, and under Judge Crotty's
 3    procedure we had to send a letter and get -- and
 4    go through a pre-motion conference.  And that's
 5    what I referenced before that had been continued,
 6    as I recall, prior to May 14th.
 7          Q.    If you look at Paragraph 7 of your
 8    Expert Declaration, you write that:
 9                "I currently represent or have
10    represented, over the past several years, a number
11    of the Debtor entities, including Residential
12    Capital, LLC, Residential Funding Co., and GMAC
13    Mortgage, LLC."
14                And then you say:
15                "Four non-debtor affiliated
16    entities."
17                What do you mean -- what are the
18    names of those non-Debtor affiliated entities that
19    you refer to in Paragraph 7?
20          A.    AFI, Ally Financial, GMAC Holding,
21    Ally Bank, and what's now called Ally Securities,
22    the broker-dealer.  Those are the four entities
23    that at different times in different suits I had
24    represented them.
25          Q.    And although these entities are not
```

Page 32

1                J. LIPPS - CONFIDENTIAL
2    claims, no.
3            Q.    If I can ask you to take a look at
4    paragraph 14 of your declaration, and I'm looking
5    specifically at the end of that paragraph where
6    you write, "It is my opinion that the settlement
7    of the claims and liabilities released by the FGIC
8    Settlement Agreement would remove a significant
9    risk of an unfavorable legal outcome and the
10   necessity of incurring the significant expense of
11   litigating these claims to final resolution."
12               Did I read that correctly?
13           A.    You did.
14           Q.    What do you mean when you say
15   "would remove a significant risk of an unfavorable
16   legal outcome"?
17           A.    Well, I believe that the claims and
18   liabilities released by the FGIC Settlement
19   Agreement were expressed in quite a few proofs of
20   claims that were filed by both the trustees and
21   FGIC that would have necessitated resolution
22   through some contested proceeding, if you didn't
23   have a settlement.
24           Q.    Referring to the claims brought by
25   FGIC against the Debtor-related entities, the

1                J. LIPPS - CONFIDENTIAL
2     suits filed by FGIC against the Debtor, regarding
3     reps and warranties, what's your understanding of
4     the amount of those claims?
5                    MR. KERR:  So I'm clear, are you
6          talking about pre-petition claims?
7                    MS. JAMES:  I am.  I apologize.  I
8          shouldn't say Debtor.  Against ResCap and
9          ResCap-related entities.
10           A.    I don't think they were quantified
11    a dollar amount.  I don't think we were at that
12    point.
13           Q.    What was your understanding of the
14    exposure of ResCap and ResCap-related entities
15    under these claims?
16                   MR. KERR:  Objection.
17                   THE WITNESS:  Can I hear that
18         again?
19                   (The requested portion of the
20         record was read.)
21           A.    Again, I don't know that I ever got
22    to the point in that case where we quantified
23    anything that would allow me to answer that
24    question other than to indicate that I knew there
25    were 20 some securitizations that were at issue,

1                J. LIPPS - CONFIDENTIAL
2     and I can't remember at this point what the total
3     outstanding was on it.
4                You know, FGIC wasn't just pure rep
5     and warranty claims.  They were also asserting a
6     number of tort claims, and they were asserting
7     aiding and abetting claims and trying to pierce
8     the corporate veil.  So from the standpoint of
9     where I sat when I was defending those
10    pre-petition, we were just basically looking at in
11    terms of initial outstanding balances on the
12    securitizations was the outer limits of what we
13    were doing.  Plus, I guess, punitive damages if
14    somebody could prove a fraud claim.
15         Q.    In your expert declaration where
16    you write that the "settlement of claims and
17    liabilities released by the FGIC Settlement
18    Agreement would remove a significant risk," you're
19    not opining as to the monetary amount associated
20    with that risk?
21         A.    What I evaluated was the claims
22    that were being asserted or would be asserted --
23    actually, let me step back.
24                What I was evaluating was the
25    claims that were being released, and I did have

1              J. LIPPS - CONFIDENTIAL
2    knowledge of both the claims that had been
3    asserted in the complaints, as well as the proofs
4    of claim, and that is what I was looking at in
5    terms of complexity in offering my opinion on
6    that.
7              Now, there is a little bit of a
8    monetary component because I know what the burdens
9    were in terms of the expense associated with
10   defending a claim.  So to an extent, I am offering
11   some view on cost associated with defending these
12   claims.  But as to the settlement of the legal
13   outcome, no, I'm not opining as to a specific
14   dollar amount.
15             Does that answer what you asked?
16        Q.   It does.  I'm going to ask you a
17   few more questions, if I may.  You just said that
18   you had knowledge of the claims asserted in the
19   Complaint, as well as the proofs of claim.
20             Are you aware of the aggregate
21   amount of those claims asserted in the Complaint,
22   as well as the proofs of claim?
23        A.   Again, I'm not sure an aggregate
24   amount was put in the Complaint, but the proof of
25   claims, obviously, had an aggregate amount.  For

```
 1                J. LIPPS - CONFIDENTIAL
 2   some reason, I can't remember the exact amount,
 3   but it may be somewhere -- I want to say the
 4   trustees were asserting claims around eight
 5   billion maybe, and five billion was the amount
 6   being asserted by FGIC, but I could be off on
 7   that.  I just know there's a lot of claims that
 8   have been filed that aggregate into numbers that
 9   were at least north of a billion.
10           Q.    Going back to your declaration,
11   your second opinion, which is captured in bullet
12   point two on page 2, you discuss the expense of
13   resolution of the claims and liabilities covered
14   by the FGIC Settlement Agreement, and you opine
15   that resolving those claims would be, and I'm
16   quoting, "enormously expensive."
17                Did you put a dollar figure on the
18   expense associated with resolving the claims and
19   liabilities covered by the FGIC Settlement
20   Agreement?
21           A.    I don't think I've ever attached a
22   specific dollar figure to it.
23           Q.    And when you wrote "enormously
24   expensive," did you have a dollar figure in mind?
25           A.    No, there's not a dollar figure
```

```
 1                 J. LIPPS - CONFIDENTIAL
 2    attached to the use of enormous.  It's my
 3    midwestern style.
 4            Q.    In considering the concept of the
 5    resolution of claims being "enormously expensive,"
 6    did you consider that the potential losses that
 7    may be incurred by the Debtors, ResCap and its
 8    related entities, if it were to lose the cases
 9    brought by FGIC?
10                 MR. KERR:  Objection.
11            A.    Well, I was aware of what was being
12    claimed in the proofs of claim, and I was also
13    aware of what the outer limits were of -- outer
14    limits based on the securitizations.
15                 I think in one of the complaints,
16    just by way of example, FGIC asserted there was a
17    97 percent breach rate.  So you could basically
18    take the initial outstanding balance and take 97
19    percent of that and say that's the outer limit if
20    they're right and they hit.  So to that extent,
21    yes, I was taking into account the outer limits of
22    exposure that could happen.
23            Q.    Could you turn to paragraph 134 of
24    your declaration?  And paragraph 134 appears under
25    a heading Outcomes in Other Monoline Litigations.
```

```
 1                J. LIPPS - CONFIDENTIAL
 2           Q.    Other than those two things, what
 3   else?   Just let me know.
 4                MR. KERR:  Objection.
 5           A.    Do you want me to read through the
 6   qualifications for you?  Look, I've been
 7   litigating RMBS-related claims since 2010 for the
 8   Debtors, former officers and directors, and
 9   certain affiliated non-Debtor entities.  I've been
10   a litigator in commercial matters for 32 years.  I
11   understand as a result of that experience how
12   cases proceed from filing to ultimate disposition
13   either by way of settlement or trial with appeals
14   involved in it.  You have to take it into account
15   when you're trying to assess legal uncertainties.
16                I have firsthand experience in
17   litigating in the RMBS context for the Debtors a
18   number of the issues that are presented in my
19   analysis.  I've looked at what other courts have
20   done in other cases on those issues.  I've tried
21   to understand what the distinctions were between
22   them, and I can only do that by virtue of my
23   experience as a litigator and my experience as
24   somebody specifically on this.
25                I've looked at and lived with for
```

1            J. LIPPS - CONFIDENTIAL
2        FGIC settlement.  You're free to testify about
3        that.  That's fine.
4            Q.   What did anybody tell you about
5   what the assignment was?
6            A.   I had already offered a Declaration
7   that related to the RMBS Trust Settlement.  So, I
8   had an expectation going in that they would want
9   me to look at uncertainties, risks associated with
10  those claims that were being resolved in the
11  settlement, and I had an expectation that they
12  would ask me to offer some opinions related to the
13  costs associated with it.
14            So, going in I had the expectation
15  that they wanted me to look at the settlement,
16  look at the claims that were being released, and
17  advise them as to whether I could offer some
18  opinions related to that.
19            What I didn't know is whether or
20  not they wanted me to offer an opinion on range of
21  reasonableness or things like that, and in the
22  best interest.  And ultimately I did not include
23  that in the report.  I certainly have some views
24  on it.
25           Q.   Did they ask you to provide opinion

1              J. LIPPS - CONFIDENTIAL
2    testimony on range of reasonableness?
3         A.    No.
4         Q.    And what about best interests?
5         A.    No.  They asked me to offer the
6    opinions I could offer on the matters that I
7    identified.
8         Q.    And did they tell you anything else
9    at that meeting about what the scope of your
10   assignment was?
11        A.    No, I don't think they ever really
12   told me what the scope of the assignment was.  I
13   think we identified the issues that they felt
14   opinion testimony would be helpful on in the
15   context of the 9019, and I defined the scope of
16   what I was going to do from that point going
17   forward.
18        Q.    And did they tell you what the
19   timing was for the assignment?
20        A.    I seem to recall under the
21   Settlement Agreement there was a need for a
22   filing, June 7th.
23        Q.    And did you express any concerns at
24   that meeting with respect to whether you would
25   have enough time to form your independent opinions

1                J. LIPPS - CONFIDENTIAL

2            A.    I have been involved since I've

3    been special counsel in consulting with Morrison

4    and Foerster regarding discovery plans that would

5    be associated with potential challenges to proofs

6    of claim.

7            Q.    Anything related to RMBS claims?

8            A.    That would be what I was dealing

9    with was PLS and -- or private label securities

10   claims by security holders and RMBS.

11           Q.    And what was your role in those

12   discussions?

13           A.    Meetings and discussions with them

14   and sharing the experiences and advice that I have

15   and providing recommendations on types of

16   discovery to pursue against RMBS and/or PLS proof

17   of claim claimants and assessing whether we file

18   an adversary and seek discovery in that context or

19   whether we try and do it informally or through a

20   2004.

21           Q.    Other than as special counsel to

22   the Debtors, have you ever been involved in

23   preparing a discovery plan for the litigation of a

24   proof of claim?

25           A.    The only other context that I could

1                J. LIPPS - CONFIDENTIAL

2          Q.    When was the first time you

3    reviewed the claims that either FGIC or the FGIC

4    wrapped trust asserted against ResCap, LLC?

5          A.    When was the bar date?  Probably

6    about the bar date.

7          Q.    And what do you understand to be

8    the nature of the claims that those entities have

9    asserted against ResCap, LLC?

10         A.    I understand them to be in the

11   nature of aiding and abetting and piercing the

12   corporate veil.

13         Q.    And do you understand alter ego

14   claims might also have been asserted?

15         A.    Yes, alter ego.  I'm sorry I think

16   of piercing --

17         Q.    Sure.

18               Did you perform any analysis of

19   those claims in connection with forming the

20   opinions you expressed in Lipps No. 1?

21         A.    I did not get down into an

22   allocation and an assessment of allocation at

23   various entity levels.  I was looking at the

24   aggregate.  I was looking at the aggregate of the

25   claims that were being released.  But, I mean, I

1                J. LIPPS - CONFIDENTIAL

2    have at different times looked at aiding and

3    abetting claims, alter ego, piercing the corporate

4    veil.

5            Q.    As they relate to claims asserted

6    by RMBS claimants against ResCap, LLC?

7            A.    Yes.

8            Q.    I'm going to come back to that in a

9    second.  With respect to Lipps No. 1, though, you

10   note in footnote No. 3 that the underlying fraud

11   claims and misrepresentation claims are beyond the

12   scope of your report.  Right?

13               MR. KERR:  Objection.

14           A.    I don't know that I said they're

15   beyond the scope of it.  I think I said I could

16   look at the riskier claim, the rep and warranty

17   claim, at least I think that's the way I described

18   it, and support my conclusion with an analysis of

19   that.

20           Q.    Okay.  And so did you perform any

21   analysis of any tort-based claims in forming the

22   opinions expressed in Lipps No. 1?

23           A.    Beyond what I put in that footnote,

24   no.

25           Q.    And you don't mention aiding or

Page 164

1              J. LIPPS - CONFIDENTIAL
2    abetting, piercing the corporate veil or alter ego
3    anywhere in Lipps No. 1.  Why is that?
4         A.    For purposes of offering my
5    opinion, I didn't need to concern myself with
6    allocation between the various entities.
7         Q.    Why do you say that?
8         A.    I was more interested in what
9    claims were being released and who was being
10   released of those claims.  And as I understood it
11   ResCap, GMAC Mortgage, RFC were receiving releases
12   from FGIC of all claims that they could have
13   against them and from the trustees on the
14   origination-based claims.
15        Q.    Do you express anywhere in Lipps
16   No. 1 your views of the costs for ResCap, LLC, to
17   litigate aiding and abetting, piercing the
18   corporate veil and alter ego claims?
19        A.    I did not specifically isolate
20   costs associated with litigating those issues.
21        Q.    And do you express anywhere in
22   Lipps No. 1 any risks associated with ResCap, LLC,
23   litigating aiding and abetting, piercing the
24   corporate veil and alter ego claims?
25        A.    Yes, I would say I do.