# **EXHIBIT 10**

12-12020-mg   Doc 4681-10   Filed 08/15/13   Entered 08/15/13 01:22:14   Exhibit 10
Pg 1 of 15

Page 1

```
             UNITED STATES BANKRUPTCY COURT
              SOUTHERN DISTRICT OF NEW YORK


IN RE:                         )    No. 12-12020 (MG)
                               )
RESIDENTIAL CAPITAL, LLC,      )    Chapter 11
et al.,                        )    Administered
              Debtors.         )    Jointly
-----------------------------  )




                     July 24, 2013
                     8:08 a.m.


       Deposition of ALLEN M. PFEIFFER, held
   at the offices of Willkie, Farr & Gallagher
   LLP, 767 Seventh Avenue, New York, New York,
   before Laurie A. Collins, a Registered
   Professional Reporter and Notary Public of the
   State of New York.
```

Page 115

1                Pfeiffer - Confidential
2   to be a billion dollars, but I'm not -- I'm not
3   exactly sure at this moment.
4        Q.    And did you attempt to put any
5   percentage recovery on that and incorporate it in
6   your analysis?
7        A.    We did not.
8        Q.    So you counted it at zero?
9        MR. KOH:   Objection.
10       MR. SIDMAN:   Objection.
11       A.    We considered it to be a potential
12  upside that's not estimable and probable in the
13  same way that Lazard considered it to be a
14  potential upside, if not estimable and probable,
15  and put it in the category of unknowns, similar
16  to, as I related to earlier, the various downsides
17  that are -- that also were not included as actual
18  claims that would impact the cash flows.
19       Q.    And why would any recoveries be a
20  potential upside to the investors?
21       A.    To the extent that there is a recovery,
22  the -- there's more cash available to be
23  distributed as projected payments to the
24  policyholders.
25       Q.    And the more the policyholders would

Page 122

1       Pfeiffer - Confidential
2  likelihood that the $92 million would be reduced
3  by a meaningful amount. I don't -- I didn't say
4  it would be zero; I just think that absent the
5  plan support agreement that amount would be highly
6  questionable and likely reduced in a meaningful
7  way.
8       Q.   And do you have any work papers that
9  show the calculation of your likelihood
10 estimation?
11          MR. KOH:   Objection.
12      A.   We have -- we have spent significant
13 time over many months estimating the rep and
14 warranty claims, and the rep and warranty claims
15 as a whole, and the rep and warranty claims that
16 would be applicable to these 47 trusts as we
17 estimate an allocation of those amounts.
18          So in the context of advising the RMBS
19 trustees over time, we certainly would have run
20 various scenarios that have different recoveries,
21 and those recoveries would flow in an allocation
22 to the 47 trusts.
23          But we did not separately estimate a
24 different number that comes to mind other than the
25 92 million, which is a result of the current plan

Page 123

1         Pfeiffer - Confidential
2    support agreement.
3         Q.   Let me break that into pieces, because
4    I have very specific questions as to it.
5             First, are there any documents that
6    reflect your calculation and estimation that there
7    would be a likelihood that the $92 million would
8    be reduced by a meaningful amount in the absence
9    of the settlement and the plan support agreement
10   approval?
11            MR. KOTWICK:  Objection.
12       Q.   Any documents?
13            MR. KOTWICK:  Objection to the form.
14       A.   There -- I don't have a particular
15   document in mind, but over many months we have
16   documented and analyzed recoveries that are
17   different from the ultimate recovery that was
18   received in the plan support agreement.
19       Q.   And are there documents that reflect
20   what you just described?  You said you did work
21   for many months.  Are there documents that reflect
22   that work?
23       A.   We continuously modeled different
24   assumptions on recovery and allocation, and my
25   understanding is that all that work on analysis

```
                                              Page 131
 1              Pfeiffer - Confidential
 2   And that is what paragraph 59 points out.
 3        Q.    Now, you did not identify the
 4   consideration contained in paragraph 59 when you
 5   made your presentation to the trustees; correct?
 6              MR. KOTWICK:  Objection to the form,
 7        asked and answered.
 8              MR. KOH:  Objection.
 9        A.    We did -- we did discuss that in the
10   presentation on March -- on May 15th, and it is
11   referenced as one of the -- or the first benefit
12   listed as a benefit for the acceptance of the FGIC
13   settlement proposal.
14        Q.    In your report in paragraph 59 you say,
15   "While not part of D&P's May 15, 2013,
16   presentation to the FGIC trustees, I understand
17   that," and then you identify these claims.
18              What did you mean when you wrote,
19   "while not part of D&P's May 15, 2013,
20   presentation to the FGIC trustees"?
21        A.    What that means is that at May 15th of
22   2013 we had not quantified the $92 million number.
23   The $92 million number was one that can only be
24   quantified at the conclusion of the mediation
25   sessions and after we had concluded our allocation
```

1              Pfeiffer - Confidential
2      of the recoveries from the R&W claims.
3          Q.     And are there documents that reflect
4      the work that you just described?
5          A.     I don't understand the question.
6          Q.     You said that as of May 15th, 2013, we
7      had not quantified the $92 million number.  But it
8      was one that you calculated thereafter; correct?
9          A.     That's correct.
10         Q.     Are there documents that reflect that
11     calculation?
12         A.     There's an allocation schedule that is
13     provided in connection with the plan support
14     agreement and with -- in connection with the
15     disclosure statements.  And if you do the
16     arithmetic to add the 47 insured trusts' recovery,
17     you would -- you would arrive at a number which is
18     approximately $92 million.
19         Q.     My question is do you have work papers
20     or documents that reflect that calculation.
21         A.     I think I just answered that the
22     document that reflects that calculation is the --
23     the document is the schedule that accompanies the
24     disclosure statement that was provided recently.
25         Q.     So you don't have any document at

```
                                                    Page 197
 1                  Pfeiffer - Confidential
 2        A.    Yes.
 3        Q.    Where did you get that data from?
 4        A.    INtex.
 5        Q.    And what did you do on INtex in order
 6   to secure that information?  How did you go about
 7   it?
 8        A.    My team -- you know, if you have the
 9   trust information, then you could put that into
10   INtex and it will tell you the balance of the
11   active loans.
12        Q.    And your team ran these -- the analysis
13   that's identified in paragraphs 34 and the
14   following paragraphs; is that correct?
15        A.    Yes.
16        Q.    Did you retain any of the analyses that
17   your team did in connection with that evaluation?
18        A.    Yes.
19        Q.    And did you provide it to us?
20        A.    I believe we did, yes.
21        Q.    In what form?
22        A.    I believe in Excel.
23        Q.    And that Excel the INtex -- INtex, is
24   that the word -- the INtex analyses that your team
25   provided or that your team undertook?
```

Page 198

1          Pfeiffer - Confidential
2          MR. KOTWICK:  Objection to form.
3          A.    It provides the -- it provides the
4    results of our claim analysis on a -- on a trust-
5    by-trust basis and the results as summarized on
6    page 8 and 9 of the presentation.  It provides
7    more detail with respect to the range of claim
8    estimates that we came up with.
9          Q.    And if you look at the chart on page 8
10   of your May 15th presentation, there are a series
11   of percentages in the low case and the high case.
12   Let's take the low case first.  65 percent, 80
13   percent, 86 percent, do you see those numbers?
14         A.    I do.
15         Q.    Where did they come from?
16         A.    Those are the same numbers we described
17   earlier, that as of the end of 2012 the accrued
18   and unpaid amount as $753 million.  And therefore
19   the notional claim for these ResCap insured --
20   FGIC-insured trusts at the end of 2012 was 753.
21   Then as we described earlier, you know, it's 789
22   or whatever it is as of March.
23         Then you project that claim amount
24   through the next five years, and it's projected,
25   as you see here on the page, that the number will

Page 199

1        Pfeiffer - Confidential
2   increase between 2013 and 2017 but an additional
3   $173 million. And therefore that brings the
4   cumulative claim from 65 percent up to 80 percent.
5        And those numbers were all derived and
6   calculated consistent with the description that is
7   provided in the section of the report we were just
8   looking at, paragraph 34 through 40.
9        Q.   In paragraph 36 there's a references to
10  roll rate transition matrices. Are those also
11  found on INtex?
12       A.   No, you have to provide that as an
13  input to INtex.
14       Q.   And would that be based on assumptions,
15  that is, the input that you and your team put in,
16  is that based on any assumptions?
17       A.   Yes.
18       Q.   What assumptions?
19       A.   Well, as described, you have -- the
20  roll rate transition matrices are -- they're used
21  to calculate, as it says in paragraph 36, monthly
22  prepayment and default rates for each trust.
23       So you look at prepayment and default
24  rates for each trusts historically, and then you
25  look at rolling that forward to determine what you

1           Pfeiffer - Confidential
2    would expect to see in the coming years. So
3    that's what's referred to as the roll rate
4    matrices, and that's -- those rates are referred
5    to as the conditional prepayment rates and
6    conditional default rates. And you take those
7    estimates and put them into INtex to arrive at an
8    estimate claim, projected claim.
9           Q.    You then have, in paragraph 37,
10   prepared forecast cash flows under various
11   scenarios. Do you see that?
12          A.    Yes.
13          Q.    And that's the high and the low
14   scenarios that you and your team generated; is
15   that correct?
16          A.    Yes.
17          Q.    What were those high and low scenarios
18   based on?
19          A.    Based on taking those results, results
20   that came out of our model, with the various rates
21   that we just described. It results in a
22   particular forecast. And those forecasts are
23   based on, as I described, the CPR and CDR severity
24   assumptions.
25                And cognizant of the fact that there's

1                Pfeiffer - Confidential
2   some estimation involved in those forecasts, in
3   order to arrive at a low and a high range, we
4   stress -- we apply a sensitivity to those
5   assumptions by taking 10 percent off the bottom
6   and adding 10 percent to the top for each of these
7   assumptions.  So you see that described in
8   paragraph 37.
9        Q.    And what did you base those assumptions
10  on, the high case and low case?  Why 10 percent as
11  opposed to some other number?
12       A.    Our judgment is that it makes sense to
13  provide some sensitivity to those numbers, and 10
14  percent variance was consistent with what we did
15  for many other clients facing similar
16  circumstances.
17             I note, by the way, that this is
18  exactly what we did for estimating losses for all
19  the trusts, not just the FGIC wrapped trusts, but
20  all the 392 trusts that were part of the 9019
21  settlement and estimating claims for the
22  nonsettling -- additional and nonsettling trusts.
23             We used the same exact methodology.  We
24  did not change our methodology relative to looking
25  at the settlement proposal; rather, we just took

1          Pfeiffer - Confidential
2   that information and looked at the 47 trusts that
3   are the focus of the settlement to look at what
4   the expected losses -- claims might be.
5       Q.    And do you have documents that reflect
6   the analysis that you did with respect to the more
7   than 47 trusts, the entire population?
8       A.    Yes.
9       Q.    And have you provided them to us?
10      A.    I don't think so, no.
11            MR. BAIO:  We're asking for them now.
12            MR. GELFARB:  Freddie Mac joins in that
13      request.
14            MR. KOH:  We'll consider your request.
15      Q.    In paragraph 39 you then say, "D&P then
16  applied the assumptions resulting from the above-
17  described methodology."
18            Do you see that?
19      A.    Yes.
20      Q.    So those are assumptions that result
21  from this analysis; is that correct?
22      A.    Paragraph 39 refers to applies
23  assumptions from the above-described methodology
24  on a trust-by-trust basis according to the trusts'
25  payment structures, kind of the waterfall within

Page 203

1                  Pfeiffer - Confidential

2 the trusts.

3      Q.     But the result of the above-described
4 methodology is to generate assumptions that are
5 then applied on a trust-by-trust basis; is that
6 correct?

7           MR. KOH:    Objection, form.

8      A.     There's an assumed level of claim
9 amount for each trust, and those assumptions are
10 then used -- there's assumed levels of claims --
11 claim amounts for each trusts are then analyzed
12 further on a -- within each trust on a tranche --
13 if you look at the payment structures within the
14 trust.

15      Q.     And based on that analysis, you came up
16 with a $409 million estimated policy claim amount
17 in the low case and 793 million in the high case;
18 is that correct?

19      A.     That's correct as of December 31st,
20 2012.

21      Q.     Have you updated any of that data?

22      A.     Not at the time of this report.

23      Q.     How about since the time of the report?

24      A.     I think we're continually looking at
25 it.

```
                                                Page 204
 1                  Pfeiffer - Confidential
 2         Q.    And have you come up with any numbers
 3   as a result of that continuing to look at it?
 4         A.    No conclusions have been arrived at
 5   that are different than this estimated range.
 6         Q.    Have the numbers gone up or down?
 7         MR. KOH:   Objection.
 8         Q.    Based on whatever your ongoing analysis
 9   is.
10         MR. KOH:   Objection.
11         A.    They have not gone up or down.  We have
12   not concluded on a different number.
13         Q.    Let's go to the discount rate.  I'd
14   like you to look at paragraphs 52 and those that
15   follow.  I'll ask you questions about it.
16               The first question is in paragraph 53
17   is it accurate that you attempted to determine an
18   appropriate and reasonable rate at which to
19   discount future cash flows?
20         A.    Yes.
21         Q.    And relied on your experience,
22   independent sources of discount rate calculations,
23   namely Ibbotson; is that correct?
24         A.    Yes.
25         Q.    And you selected the SIC -- is it SIC
```