**<u>EXHIBIT 11</u>**

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

     SOUTHERN DISTRICT OF NEW YORK

3    Case No. 12-120202(MG)

     Chapter 11

4    Administered Jointly

5    -----------------------------------x

6    IN RE:

7       RESIDENTIAL CAPITAL, LLC, et al.,

8                 Debtors.

9    -----------------------------------x

10                   July 26, 2013

11                   8:35 a.m.

12

13         Deposition of S.P. KOTHARI, Ph.D.,

14   pursuant to Notice, held at the offices of

15   Willkie, Farr & Gallagher LLP, 787 Seventh

16   Avenue, New York, New York, before Todd

17   DeSimone, a Registered Professional

18   Reporter and Notary Public of the State of

19   New York.

20

21

22

23

24

25

Page 42

                        KOTHARI

1

2    to why the trustees asked you to offer an

3    opinion on those subjects?

4        A.        I have a general understanding.

5        Q.        Please tell us what your

6    understanding is.

7        A.        That the proposal is on the

8    table, and there are some parties

9    objecting to it, and the matter will go to

10   court and the counsel wanted my expert

11   opinion on these four issues.

12       Q.        Now, counsel did not ask you

13   for an expert opinion on the appropriate

14   discount rate to use in analyzing the

15   expected payouts to the ResCap

16   policyholders under FGIC's rehabilitation

17   plan; is that right?

18       A.        That is correct.  The counsel

19   asked me that item 1 with respect to

20   discount rates.

21       Q.        Right.  That is the

22   reasonableness of the discount rate used

23   by Duff & Phelps in its analysis, right?

24       A.        That is correct.

25       Q.        But you could, based on your

Page 43

1                       KOTHARI

2    expertise, render an opinion on the

3    appropriate discount rate to use in

4    analyzing the expected payouts to the

5    ResCap policyholders under FGIC's

6    rehabilitation plan, correct?

7             MR. JOHNSON:  Objection to

8    form.

9        A.         I could, but I was not asked

10   to.

11       Q.         Let's go to (ii).  You were

12   asked to offer an opinion on the

13   reasonableness of the conclusion by Duff &

14   Phelps that the lump sum cash payment

15   under the FGIC settlement agreement is

16   within the range of present values of the

17   expected payouts to the ResCap

18   policyholders under FGIC's rehabilitation

19   plan, correct?

20       A.         That is correct.

21       Q.         You were not yourself asked to

22   analyze whether that lump sum cash payment

23   was within the range of present values of

24   the expected payouts to ResCap

25   policyholders under the FGIC

1                    KOTHARI

2    rehabilitation plan, correct?

3         A.        That is, again, you know, I

4    will ask what is said in (ii).

5         Q.        Right.  So you were not asked

6    yourself to assess whether the lump sum

7    cash payment referenced in this paragraph

8    was reasonable, right?

9         A.        It sounds like a play on words,

10   but I was asked to comment on the

11   reasonableness of the conclusion by Duff &

12   Phelps.

13        Q.        Right.  And not to do an

14   analysis like Duff & Phelps itself had

15   done, right?

16        A.        That is correct.

17        Q.        But based on your expertise you

18   could have conducted an analysis of

19   whether the lump sum cash payment under

20   the FGIC settlement agreement was within

21   the range of present values of the

22   expected payouts to ResCap policyholders

23   under FGIC's rehabilitation plan, correct?

24                  MR. JOHNSON:  Objection to

25   form.

Page 47

1                          KOTHARI

2        Q.         What are the other parts?

3        A.         As I said earlier, it is about

4    discount rates and my own discussions with

5    some executives at Duff & Phelps and

6    information that is provided in support of

7    my opinion in this report.

8        Q.         Did you reach an opinion,

9    whether reflected in Exhibit 1 or not, as

10   to the substance of Duff & Phelps'

11   conclusions?

12                  MR. JOHNSON:  Objection to

13   form.

14       A.         Can you refine "substance"?

15       Q.         As opposed to process.

16                  MR. JOHNSON:  Objection to

17   form.

18       A.         Discount rate is part of

19   substance, so there are some -- process is

20   only part of the basis of my conclusion.

21   I did not independently verify cash flow

22   forecasts.  So that's the sense in which

23   my rendering of opinion on the

24   reasonableness of Duff & Phelps is based

25   in part on the process that they followed

Page 55

```
 1                    KOTHARI
 2    question, sir.  But let's try it again.
 3              If you had been engaged by the
 4    trustees to give them advice about whether
 5    to approve the FGIC settlement agreement
 6    based on what you know, would you have
 7    advised them that the amount of the
 8    commutation payment was reasonable?
 9              MR. JOHNSON:  Objection to
10    form.
11        A.      That is a different question
12    that I have not been asked to analyze.
13        Q.      So sitting here today you don't
14    have an opinion on that, correct?
15        A.      That is correct.
16        Q.      Do you have an opinion sitting
17    here today as to whether it was reasonable
18    for the policies on the FGIC wrapped
19    securities to be commuted pursuant to the
20    terms of the FGIC settlement agreement?
21              MR. JOHNSON:  Objection to
22    form.
23        A.      Please would you repeat that
24    question.
25              (The record was read.)
```

Page 56

1                    KOTHARI

2       A.       I did not study that question.

3       Q.       Do you have an opinion sitting

4  here today as to whether the trustees

5  acted reasonably in approving the FGIC

6  settlement agreement?

7                 MR. JOHNSON:   Objection to

8  form.

9       A.       I did not study that question.

10      Q.       So the answer is you don't have

11  an opinion sitting here today, right?

12                MR. JOHNSON:   Objection to

13  form.

14      A.       I don't have an opinion.

15      Q.       Sitting here today do you have

16  an opinion as to whether the FGIC

17  settlement agreement was in the best

18  interests of investors in the FGIC wrapped

19  trusts?

20      A.       I do not have an opinion.

21      Q.       Sitting here today, do you have

22  an opinion as to whether the trustees

23  acted in good faith in approving the FGIC

24  settlement agreement?

25      A.       I do not have an opinion.

Page 61

1                    KOTHARI

2      A.       Can you refine "complex"?

3      Q.       Do you have an understanding

4  yourself of the word "complex"?

5      A.       Yes.

6      Q.       Using your own understanding of

7  the word "complex," in your view are the

8  concepts and analyses reflected in Exhibit

9  2 complex?

10                 MR. JOHNSON:  Objection to

11  form.

12      A.       So my understanding of complex

13  is broad in the sense that some things are

14  mathematically very complex.  There are

15  degrees of mathematics that might be

16  involved.  This doesn't strike me from

17  that standpoint mathematically very

18  complex.  But there is a fair bit of

19  detail in this.  So to the extent that a

20  lot of details are part of the definition

21  of complex, this is quite complex.

22      Q.       Did you understand that Duff &

23  Phelps had relied upon FGIC to supply

24  certain information that Duff & Phelps

25  utilized in preparing its analysis?

Page 62

1                    KOTHARI

2       A.        I do.

3       Q.        And you understood that at

4  least in some respects Duff & Phelps did

5  not do its own analysis in reaching the

6  conclusions reflected on Exhibit 2?

7                MR. JOHNSON:  Objection to

8  form.

9       A.        If use of information is

10  synonymous with analysis, then I agree

11  with your characterization.

12      Q.        Do you think it was reasonable

13  for Duff & Phelps to have relied on the

14  information supplied by FGIC and others

15  without verifying that information?

16                MR. JOHNSON:  Objection to

17  form.  Assumes facts not in evidence.

18      A.        The process that Duff & Phelps

19  follow by way of getting some information

20  from FGIC and some other sources and

21  modeling using their own expertise, my

22  conclusion is that combination of the

23  processes they followed was reasonable.

24      Q.        With respect to the information

25  that Duff & Phelps got from FGIC and

Page 64

1                        KOTHARI

2        Q.        And did Duff & Phelps verify

3    the accuracy of that information?

4                   MR. JOHNSON:  Objection to

5    form.

6                   MR. SIDMAN:  Objection to form.

7        A.        I don't believe they did, but I

8    do not know for a fact.

9        Q.        So they may have verified that

10   information and may not have verified that

11   information?

12                  MR. JOHNSON:  Objection to

13   form.

14       A.        Verification could imply each

15   and every piece of information, or

16   assessing reasonableness of information.

17   So sitting here I do not know whether they

18   verified.  I do think they ascertained the

19   reasonableness of the information and the

20   sources.

21       Q.        You don't know what information

22   they verified, correct?

23                  MR. JOHNSON:  Objection to

24   form.

25                  MR. SIDMAN:  Objection.

Page 66

1              KOTHARI

2  in Exhibit 2 without verifying the

3  information Duff & Phelps was supplied

4  with by third parties?

5              MR. JOHNSON:   Objection to

6  form.   Assumes facts not in evidence.

7              MR. SIDMAN:   Same objection.

8      A.        Duff & Phelps did not by

9  themselves have the information about the

10  cash flows, the claims for policyholders

11  and the cash flows that they might

12  receive.   So that basic information they

13  obtained from FGIC and from Lazard and

14  used that.   I thought it was reasonable

15  because I did not believe there is any

16  incentive for FGIC or Lazard to distort

17  that information that they supplied to

18  Duff & Phelps.   And that is the reason I

19  thought relying on that information

20  supplied by FGIC and Lazard was reasonable

21  in the analysis Duff & Phelps performed.

22      Q.        Did you verify any of the

23  information that Duff & Phelps relied on

24  from FGIC and others in rendering the

25  opinions reflected in Exhibit 1?

Page 67

1                    KOTHARI
2              MR. JOHNSON:  Objection to
3    form.
4        A.      I did not.
5              THE WITNESS:  Can we take a
6    break?
7              MS. EATON:  Absolutely, sure.
8              (Recess taken.)
9    BY MS. EATON:
10       Q.      I have a few questions for you
11   now about item 5 of your report which you
12   will find on pages 11 through 13.  You are
13   aware that in reaching its conclusions
14   Duff & Phelps did not include -- let me
15   start over.  I bungled that question.
16              Did Duff & Phelps take into
17   account potential litigation recoveries in
18   rendering its recommendation to the
19   trustees?
20       A.      What I know is that the
21   projections and calculations that Duff &
22   Phelps have, the analysis that was
23   provided, that did not include
24   litigation-related cash flows.  Whether
25   they considered and chose not to include

Page 68

```
 1                    KOTHARI
 2   is something I do not know of.
 3        Q.        You do not know whether Duff &
 4   Phelps considered whether to include
 5   potential litigation recoveries in
 6   conducting its analysis?
 7        A.        What I know is that in the end
 8   it did not include those and I agree with
 9   that conclusion.
10        Q.        Why did you reach the opinion
11   that it was reasonable for Duff & Phelps
12   not to include potential recoveries
13   associated with pending litigation in
14   making its recommendation with respect to
15   the FGIC settlement agreement to the
16   trustees?
17        A.        For a number of reasons, and
18   the reasons are listed in Section 5 of the
19   report.  First, I noticed that there was
20   some -- in some litigations FGIC is a
21   plaintiff and in some litigations FGIC is
22   a defendant and there is considerable
23   uncertainty with respect to the dollar
24   amount both in terms of inflows and
25   outflows as a result of being a plaintiff
```

Page 69

KOTHARI

1
2  or defendant, and the timing of settlement
3  of those lawsuits and the uncertainty
4  associated with what the outcome would be.
5      Q.        Anything else?
6      A.        I also looked at FGIC's own
7  footnote disclosure and that indicates
8  uncertainty about the outcome and FGIC too
9  lists how it is a defendant as well as
10 plaintiff in a number of litigation
11 matters.
12     Q.        Anything else?
13     A.        I also reviewed the declaration
14 prepared by Mr. Lipps and he talks about
15 the uncertainty as well as he mentions and
16 I also independently recognize that to
17 litigate these matters, it can be costly.
18 So time is not the only factor, but on top
19 of that is cost.  So the net inflow as
20 well as outflow from these litigation
21 matters would be affected.
22     Q.        Anything else?
23     A.        I looked at some of the reports
24 from the NERA Economic Consulting as well
25 as Cornerstone Research just as examples

Page 79

1                    KOTHARI

2   impression I received from those is that

3   there is some possibility of recovering

4   some litigation proceeds from settlement

5   from those claims, but my general

6   impression upon reviewing those is that

7   there isn't anything definite yet that has

8   risen to the level of being disclosed as

9   definitive settlement on the horizon, in

10  the financial statements of FGIC either.

11      Q.      Are you done?

12      A.      Yes.

13      Q.      What were the causes of action

14  that FGIC was asserting in those claims?

15              MR. JOHNSON:  Objection to

16  form.

17              MR. SIDMAN:  Objection to form.

18      A.      There might have been multiple

19  causes, but one cause that comes to mind

20  is some representation and warranties,

21  breach of those.

22      Q.      Anything else?

23      A.      I haven't, in preparing for the

24  deposition today, I haven't gone through

25  one by one, so I cannot sitting here give

Page 80

1          KOTHARI

2   you details of other causes.

3          Q.        And you did not go through

4   those one by one in rendering your opinion

5   that attempting to quantify the recoveries

6   in those cases would be speculative,

7   correct?

8                MR. JOHNSON:  Objection to

9   form.

10               MR. SIDMAN:   Objection.

11         A.       I did not go through one by

12  one.  The opinion I'm rendering is based

13  on the collective assessment that I

14  thought related on the basis of various

15  sources of information and the fact that

16  there are several cases in which FGIC is a

17  plaintiff as well as several cases in

18  which FGIC is a defendant, so there are

19  offsetting cash flow possibilities, none

20  of which has risen to any level of degree

21  of certainty.

22         Q.       I understand that's your

23  opinion, sir, but if you wouldn't mind

24  answering the questions I'm actually

25  asking you, I would appreciate it.

Page 83

1              KOTHARI

2          MR. JOHNSON:  Ms. Eaton, no

3   need to be nasty.  That tone of voice is

4   unnecessary, argumentative and improper.

5      A.      So the reason I did not and

6   that is because you limited it to

7   plaintiffs.  My opinion is not based on

8   only FGIC as a plaintiff, therefore your

9   question could not have been answered

10  without reference to the totality, at

11  least that's how I understood.

12              I'm making every effort to

13  listen to your question carefully and

14  answer as accurately as possible.

15  However, at times your questions seem to

16  need me to include something beyond, as in

17  this case, not just as a plaintiff, but

18  also as a defendant, because it went to

19  the opinion about the speculative -- the

20  speculative part is overall opinion.

21      Q.      Can you identify any other

22  cause of action FGIC asserted in those

23  cases besides a claim for breach of

24  representations and warranties?

25      A.      So are we still on only

Page 84

KOTHARI

1
2  plaintiffs side?

3      Q.      Yes.   I want to know what they
4  were suing for.  Do you know?  Did you
5  know at the time you rendered your report?

6              MR. JOHNSON:   Objection to
7  form.

8      A.      I have given you an example.
9  So I do not know all of the reasons.

10     Q.      Do you know what damages FGIC
11 was seeking in those cases?

12     A.      I know in one matter it was to
13 the tune of a billion dollars.

14     Q.      Do you know what the total
15 damages FGIC was seeking in those cases?

16     A.      I do not know that.

17     Q.      Do you know what stage each of
18 those cases were at at the time you
19 rendered your opinion?

20     A.      I do not know the stage each of
21 the cases was.

22     Q.      Did you know whether there had
23 been any developments in the law that were
24 favorable to FGIC with respect to those
25 claims at the time you rendered your

Page 85

1                        KOTHARI
2    opinion?
3                    MR. JOHNSON:  Objection to
4    form.
5                    MR. SIDMAN:  Objection.
6        A.        I haven't studied that.
7        Q.        Did you undertake an analysis
8    of the strengths of the claims FGIC was
9    asserting from a factual point of view?
10                   MR. JOHNSON:  Objection to
11   form.
12       A.        I did not.
13       Q.        Did you compare in any way the
14   claims that FGIC was asserting with the
15   outcomes in cases commenced by other
16   monoline insurers making the same claims?
17                   MR. JOHNSON:  Objection to
18   form.
19                   MR. SIDMAN:  Objection.
20       A.        I'm generally aware of some of
21   the claims that some monoline insurers
22   have made.
23       Q.        Okay.  And did you compare
24   those claims to the claims that FGIC was
25   asserting?

Page 86

1                    KOTHARI

2        A.        I did not compare those claims.

3        Q.        Did you consider any verdicts

4   or settlements in those other cases?

5                    MR. JOHNSON:  Objection to

6   form.

7                    THE WITNESS:  Can you repeat

8   the question.  I'm sorry.

9                    (The record was read.)

10       A.        In overall reaching the

11  conclusion, I did consider, yes.

12       Q.        So did you consider the fact

13  that Assured obtained a verdict of $90

14  million in its claims against Flagstar?

15                   MR. JOHNSON:  Objection to

16  form.

17       A.        I cannot recall the specifics,

18  but I considered that in some cases there

19  has been a settlement.

20       Q.        Please identify for us what

21  verdicts or settlements you considered in

22  rendering your opinion on this subject as

23  reflected in Exhibit 1?

24       A.        Sitting here I recall

25  discussing with my team about Bank of

1                    KOTHARI

2    America and I think that is because of

3    their acquisition of Countrywide, the

4    settlement that they had.

5         Q.        What did you and your team

6    discuss in that regard?

7         A.        We discussed how by being

8    plaintiff there is some potential for FGIC

9    to recover some inflows from being a

10   plaintiff and some exposure that FGIC

11   faces by way of outflows as a result of

12   other litigation.

13        Q.        And how did that relate to the

14   Bank of America settlement?

15        A.        How did what relate to the Bank

16   of America settlement?

17        Q.        You discussed with your team

18   the settlement in the Bank of America

19   case, right?

20        A.        Correct.

21        Q.        What did you and your team

22   discuss about the settlement in the Bank

23   of America case?

24        A.        Other things equal, the

25   settlement in Bank of America case we

Page 88

1                    KOTHARI

2    thought makes it more likely than not in

3    the litigation matters that FGIC has, and

4    equally it makes it more likely than not

5    in the litigation matters in which FGIC is

6    a defendant that it might lose.  So that's

7    the nature of the discussion that we had.

8        Q.        How did the settlement in the

9    Bank of America case make it more likely

10   than not that FGIC might win on its

11   claims?

12       A.        To the extent that it has

13   similar claims, then it has -- the fact

14   that in some prior settlements it has --

15   the settlement has been unfavorable to, in

16   that case, to Bank of America and to

17   Countrywide, that to the extent that there

18   are similar claims being made against some

19   other banks by FGIC it would have -- the

20   probability increases that they would

21   receive some payment.

22       Q.        Did you make an assessment of

23   the probability that FGIC would prevail

24   based on your analysis of the Bank of

25   America settlement?

Page 89

1                          KOTHARI
2                  MR. SIDMAN:    Objection.
3      A.          I did not have information to
4    make a quantitative analysis.
5      Q.          Did you and your team conclude
6    that the likelihood of FGIC prevailing on
7    its claims was zero?
8                  MR. JOHNSON:    Objection to
9    form.
10     A.          We did not perform any
11   quantitative analysis.
12     Q.          How much was the Bank of
13   America settlement that you and your team
14   considered?
15     A.          I cannot recall sitting here,
16   but I think Bank of America has been on
17   more than one case.    I don't recall
18   sitting here the dollar amount.
19     Q.          Bank of America has entered
20   into more than one settlement in respect
21   of RMBS securitization claims, correct?
22     A.          That's my understanding.
23     Q.          And did you consider all of
24   those settlements in reaching the
25   conclusions reflected in part 5 of your

Page 90

                         KOTHARI

1
2   report?
3               MR. JOHNSON:  Objection to
4   form.
5       A.      Only generally qualitatively I
6   considered, not quantitatively.
7       Q.      So you didn't consider, for
8   example, the amount of the claims made by
9   plaintiffs in those cases versus the
10  amount of recoveries received by way of
11  settlement?
12      A.      I have a general understanding
13  of that.
14      Q.      And what was the percentage
15  recovery by way of settlement in those
16  cases; do you know?
17              MR. JOHNSON:  Objection to
18  form.
19      A.      If I recall, it was in the
20  neighborhood of 25 percent.
21      Q.      Would it be fair to conclude
22  that if FGIC had settled its claims that
23  the settlement amount would have been
24  roughly in the 25 percent range?
25              MR. JOHNSON:  Objection to

Page 94

1                    KOTHARI

2        Q.        What connection, if any, is

3    there between the $206 million claim and

4    the claims that FGIC has asserted for

5    breaches of representations and warranties

6    in other matters?

7                    MR. SIDMAN:  Objection to form.

8                    MR. JOHNSON:  Objection to

9    form.

10       A.        Well, if the settlement is not

11   accepted, then FGIC would experience all

12   the cash inflows and outflows, and in

13   those cash inflows and outflows there

14   would be any cash flow that comes from

15   this settlement or any other inflows as

16   well as outflows.  That's the sense in

17   which I would imagine that would be

18   relevant.  But that's not the question

19   that I was asked to examine.

20       Q.        So in rendering your opinion,

21   if I understand your testimony correctly,

22   you did not consider the $206 million

23   contemplated by the deal documents that

24   FGIC is projected to obtain?

25                    MR. JOHNSON:  Objection to

Page 95

1                    KOTHARI

2    form.

3              MR. DEVORE:    Objection to form.

4              MR. SIDMAN:    Objection.

5        A.        I did not consider because it

6    is not relevant to determining whether the

7    $253 million settlement is reasonable or

8    not.

9        Q.        Is it relevant to determining

10   whether the value to be attributed to

11   FGIC's claims as plaintiff was zero?

12             MR. DEVORE:    I object to form.

13             MR. JOHNSON:    Objection to

14   form.

15             MR. SIDMAN:    Objection.

16       A.        I did not examine that

17   question.  The question that I examined

18   was whether overall cash flows from

19   litigation, do they rise to the level of

20   definitiveness to have been included in

21   the analysis, and since I determined that

22   collectively those were speculative and

23   therefore should have been appropriately

24   ignored, I did not factor in the specific

25   $206 million amount that you referred to.

Page 96

1                    KOTHARI

2       Q.        Now, you said you read

3  Mr. Lipps' declaration, right?

4       A.        Yes.

5       Q.        Did you have any discussions

6  with Mr. Lipps?

7       A.        I did not.

8       Q.        Do you know who Mr. Lipps is?

9       A.        I can't remember the details as

10 to who Mr. Lipps is.

11      Q.        Is Mr. Lipps an expert in

12 litigation recoveries?

13                MR. JOHNSON:  Objection to

14 form.

15      A.        If you say so.

16      Q.        I'm asking you.

17      A.        I cannot recall.

18      Q.        Is Mr. Lipps an expert in

19 anything as far as you know?

20                MR. DEVORE:  Objection to form.

21                MR. JOHNSON:  Objection to

22 form.

23                MR. SIDMAN:  Objection.  Calls

24 for a legal conclusion.

25      A.        I did not study or make that

Page 97

1                       KOTHARI
2    determination.
3          Q.         Did you understand that
4    Mr. Lipps is counsel for the debtors in
5    certain cases?
6          A.         That is my general
7    understanding.
8          Q.         And do you understand why
9    Mr. Lipps prepared his declaration?
10         A.         I don't recall the details of
11   that.
12         Q.         Did you understand that the
13   declaration was filed in court?
14         A.         I presume so.  I did not focus
15   on those types of issues.  I focused
16   mainly on what Mr. Lipps had to say about
17   the legal settlement issues, legal issues.
18         Q.         You understood that Mr. Lipps
19   had concluded that the claims asserted by
20   FGIC posed a significant risk of an
21   unfavorable legal outcome for the debtors?
22         A.         Okay.
23         Q.         Did you understand that?
24         A.         I did not -- I don't have a
25   specific understanding of that particular

Page 106

1                    KOTHARI

2   that time to settlement can take many

3   years."

4               Do you see that?

5      A.      I do.

6      Q.      What did you mean when you said

7   that FGIC's outstanding legal proceedings

8   are not directly analogous to securities

9   class action lawsuits?

10     A.      My understanding is that many

11  of the lawsuits that FGIC has, those are

12  not class action lawsuits, so that is the

13  sense in which they are not directly

14  analogous to the litigation that is in the

15  NERA report and Cornerstone report.

16     Q.      In what respects are the FGIC

17  claims in any way analogous to securities

18  class action lawsuits?

19     A.      These are large, complex

20  matters that are litigated in court and

21  there is the general similarity between

22  litigation in class action versus these

23  types of litigations.

24               So these are not class actions,

25  but there are other dimensions of

Page 107

1             KOTHARI

2   similarity in the litigation that FGIC is

3   facing and class action litigation

4   lawsuits.

5       Q.      What are those other dimensions

6   of similarity?

7       A.      I say those by way of general

8   description, that there would be some

9   discovery, there would be expert reports

10  written, there would be depositions taken,

11  so on and so forth, and that process tends

12  to be time consuming and outcomes are

13  uncertain, so there are similarities in

14  the litigation process for securities

15  litigation and the litigation that FGIC is

16  facing.

17      Q.      Did you consider whether the

18  litigation that FGIC was engaged in as

19  plaintiff was analogous to any other sorts

20  of lawsuits apart from securities class

21  action lawsuits?

22              MR. JOHNSON:  Objection to

23  form.

24      A.      I did not.

25      Q.      And why didn't you do that?

Page 117

1                    KOTHARI

2    "Under the base scenario, the ResCap

3    sponsored RMBS trust policyholders may

4    receive approximately 220 to $340 million

5    on a net present value basis."

6                    Do you see that?

7        A.        I do.

8        Q.        Did you discuss with Duff &

9    Phelps what the expected range of payouts

10   under the FGIC rehabilitation plan would

11   be?

12       A.        Not specifically.

13       Q.        Did you speak with them about

14   it generally?

15       A.        The cash flow forecast under

16   different scenarios represent the expected

17   cash flows.  As I said before, the

18   information for those projections came

19   from FGIC, from Lazard, and the model that

20   they used.  I did not discuss anything

21   beyond that.

22       Q.        Paragraph 6 of your report, you

23   conclude that "it was reasonable for Duff

24   & Phelps to conclude that the lump sum

25   payment under the May 23, 2013 settlement

Page 132

1                         KOTHARI

2         A.        It is the amount that FGIC is

3    expected to pay -- 253 is the lump sum

4    that FGIC will pay policyholders, yes.

5         Q.        It is the lump sum contemplated

6    by the FGIC settlement agreement?

7         A.        Yes.

8         Q.        Do you know how that $253

9    million lump sum was derived?

10        A.        I do not know that.

11        Q.        Is that something that you

12   considered in rendering your opinions?

13        A.        I did not.

14        Q.        Please turn to page 5 of

15   Exhibit 2.

16        A.        Okay.

17        Q.        Did you review this page of the

18   Duff & Phelps report in connection with

19   rendering your opinions?

20        A.        I developed a general

21   understanding of what this is, but I don't

22   believe this has a direct connection to my

23   opinion.

24        Q.        What was your general

25   understanding?

Page 134

KOTHARI

1
2  main assumptions."  Do you see that?

3      A.      I do.

4      Q.      Then under item J, it says

5  "haircut of 40 percent of unpaid payout

6  claim estimates."  Do you see that?

7      A.      I do.

8      Q.      Do you know what that refers

9  to?

10     A.      An unpaid claim, I would just

11 literally be reading back that assumption,

12 that they are assuming there would be a

13 haircut of 40 percent.

14     Q.      A haircut on what; do you know?

15     A.      Unpaid claim estimates,

16 policyholders' claim estimates.

17     Q.      Is that something that you took

18 into consideration in rendering your

19 opinions?

20     A.      The cash flow forecasts, I took

21 those from -- the entire chain from FGIC,

22 Lazard, Duff & Phelps, as given to me, so

23 therefore I did not go into questioning

24 the assumption of 40 percent haircut.

25     Q.      And that is not something that

Page 135

1                    KOTHARI

2   I take it you discussed with anyone, the

3   40 percent haircut?

4        A.        I did not discuss that, no.

5        Q.        You understood that Duff &

6   Phelps used a range of discount rates in

7   conducting its analysis?

8        A.        Yes, I do.

9        Q.        And you developed an opinion on

10  that subject, correct?

11       A.        I did.

12       Q.        What was your opinion on that

13  subject?

14       A.        The range of 10 to 20 percent

15  discount rate that they used was

16  reasonable given my expertise on

17  calculation of discount rates.

18       Q.        Do you know how Duff & Phelps

19  developed that range of discount rates?

20       A.        I did not know at the time I

21  was preparing the report, but my

22  understanding, again, it is a general

23  understanding, is that they used the same

24  10 to 20 percent that Lazard had used.

25       Q.        Do you know why Duff & Phelps

Page 136

KOTHARI

1

2  used the same discount rate range as

3  Lazard?

4      A.      I do not.

5      Q.      Do you think it was appropriate

6  for Duff & Phelps in conducting its

7  analysis not to develop its own range of

8  discount rates?

9              MR. JOHNSON:  Objection to

10  form.

11      A.      I have not studied that

12  question.

13      Q.      You didn't think about it at

14  all?

15      A.      I was asked to comment on was

16  the use of 10 to 20 percent reasonable,

17  and I thoroughly analyzed that issue and

18  reached the conclusion that that seems a

19  reasonable range.

20      Q.      You did not yourself calculate

21  a discount rate, right?

22      A.      I asked what would be a

23  reasonable range of discount rate to be

24  used in this, and I came away saying that

25  20 percent -- 10 to 20 percent is a

Page 137

1              KOTHARI

2    supportable range, is logical to use a

3    range of that nature for discounting cash

4    flows that have been discounted here.

5         Q.        At paragraph 9 of your report,

6    you say "To evaluate whether this discount

7    rate is reasonable, I referred to the 2013

8    edition of the Ibbotson Cost of Capital

9    Yearbook (Ibbotson), an annual publication

10   that provides discount rate data for over

11   400 industries."

12             Do you see that?

13        A.        I do.

14        Q.        Did you use -- in developing

15   your opinion that that discount rate range

16   was reasonable, did you use any other

17   source apart from Ibbotson?

18        A.        I did not.

19        Q.        The Ibbotson cost of capital

20   yearbook, is that a tool you use in the

21   conduct of your work generally?

22             MR. JOHNSON:   Objection to

23   form.

24        A.        I used it in the past.  I have

25   used it in my classroom.  But it is not

Page 140

1                    KOTHARI

2  would turn out to be more or less the same

3  as what Ibbotson reports because those are

4  the techniques that have been developed in

5  academic literature.

6                    Ibbotson simply is providing a

7  service of calculating those betas using

8  those approaches and summarizing them in

9  one place.

10      Q.         Do you agree or disagree with

11  the following statement:  On an individual

12  company basis, the models utilized in

13  Ibbotson may provide information that is

14  inaccurate or misleading?

15      A.         I do not agree with that.

16      Q.         Do you agree or disagree with

17  the following statement:  Depending on

18  individual company circumstances, all of

19  the assumptions underlying Ibbotson's

20  models might not apply?

21                    MR. JOHNSON:  Objection to

22  form.

23      A.         It is possible.

24      Q.         Possible that you agree?

25      A.         Depending on the circumstances,

```
                         KOTHARI
 1
 2   of the haircut to be consistent with what
 3   FGIC's settlement proposal was?
 4             MR. SIDMAN:   Objection.
 5             MR. JOHNSON:   Objection to
 6   form, foundation, vague.
 7       A.       As I said, I have taken the
 8   cash flows to be given from Lazard and
 9   from FGIC and from Duff & Phelps.   I
10   didn't look into the veracity or accuracy
11   of those projected cash flows.
12       Q.       Is the haircut consistent with
13   the plan?
14             MR. SIDMAN:   Objection to form.
15             MR. JOHNSON:   Objection to
16   form.   Calls for a legal conclusion.
17             MR. SIDMAN:   Which plan?
18       A.       I wasn't asked to opine on that
19   issue either.
20       Q.       Well, you read the FGIC
21   rehabilitation plan; did you not?
22       A.       I read it, but not with an eye
23   or with the level of detail to focus on
24   the haircut.
25       Q.       Do you consider it reasonable
```