# EXHIBIT 40

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

RESIDENTIAL CAPITAL, LLC, *et al.*,

Debtors.

Case No. 12-12020 (MG)
Chapter 11
Jointly Administered

## EXPERT REPORT OF ALLEN M. PFEIFFER

### July 19, 2013

By: _____

*Allen M. Pfeiffer*

# TABLE OF CONTENTS

I.      EXPERT WITNESS DISCLOSURE AND STATEMENT OF BACKGROUND AND
        QUALIFICATIONS ................................................................................................... 3

II.     SCOPE OF WORK ..................................................................................................... 5

III.    SUMMARY OF CONCLUSIONS ............................................................................... 7

IV.     D&P'S ROLE AS FINANCIAL ADVISOR ................................................................. 8

V.      SUMMARY OF THE REHABILITATION PLAN ...................................................... 9

VI.     SUMMARY OF THE FGIC COMMUTATION CONTAINED IN THE SETTLEMENT
        AGREEMENT ........................................................................................................... 14

VII.    CALCULATION OF CASH FLOWS FROM THE REHABILITATION PLAN .................... 16

VIII.   UNCERTAINTY OF PROJECTED CASHFLOWS UNDER THE REHABILITATION
        PLAN ....................................................................................................................... 20

IX.     ADDITIONAL BENEFITS OF THE SETTLEMENT AGREEMENT OVER THE
        REHABILITATION PLAN ........................................................................................ 25

X.      POTENTIAL BENEFITS OF THE SETTLEMENT AGREEMENT FROM THE PLAN
        SUPPORT AGREEMENT .......................................................................................... 26

XI.     CONCLUSIONS ....................................................................................................... 28

XII.    RESERVATION OF RIGHTS AND COMPENSATION DISCLOSURE ............................... 29

# LIST OF ATTACHMENTS

ATTACHMENT I:    CURRICULUM VITAE OF ALLEN M. PFEIFFER

ATTACHMENT II:   DOCUMENTS AND SOURCES CONSIDERED

ATTACHMENT III: FGIC COMMUTATION PROPOSAL DISCUSSION MATERIALS:
                 DATED MAY 15, 2013

## I.    EXPERT WITNESS DISCLOSURE AND STATEMENT OF BACKGROUND AND QUALIFICATIONS

1.    I, Allen M. Pfeiffer, have been asked by the **FGIC Trustees**[1] to serve as an expert witness in connection with the FGIC Trustees' **Joinder**[2] to *Debtors' Motion Pursuant to Fed. R. Bankr, P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* (the "**FGIC Motion**") [Docket No. 3929].

2.    I am a Managing Director in the New York, NY and the Morristown, NJ offices of Duff & Phelps, LLC ("**D&P**"). I am the Global Service Leader of Dispute Consulting-Complex Valuation and Bankruptcy Litigation. D&P is a leading financial advisory and investment banking firm offering an array of services in the areas of valuation, investment banking and transaction advice, and dispute consulting.

3.    I have more than seventeen years of valuation, solvency, damages cash flow assessment and capital structure analysis experience and have led hundreds of engagements related to the valuation of an entire business, a security, an interest in a business, or an asset. During my professional career, the New York Supreme Court, the United States Bankruptcy Court, the American Arbitration Association, and arbitrators operating under the rules of the International Chamber of Commerce have accepted me as a valuation and cash flow expert. In addition to my testifying experience, I have worked as a lead consultant to attorneys and corporations in the context of solvency and many other valuation and corporate finance matters. I also led the team of financial advisors to Anton Valukus, who served as the Examiner in the Lehman Brothers bankruptcy case.

---

[1]    The FGIC Trustees are The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., U.S. Bank National Association and Wells Fargo Bank, N.A., each solely in their respective capacities as trustees or indenture trustees for the FGIC Insured Trusts.

[2]    *Joinder of FGIC Trustees to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, The FGIC Trustees and Certain Institutional Investors* [Docket No. 3982]

4.     My Residential Mortgage-Backed Securities ("**RMBS**") experience includes serving as a consultant on the valuation and cash flows as part of a solvency matter related to a multi-billion-dollar, leading financial services company. I have been retained to advise on the valuation of RMBS securities as part of the reorganization of an international, multi-billion-dollar financial services entity, and I have served as a debtor advisor in litigation related to the reorganization of a leading residential lender, and lead advisor on the solvency of a large, residential real estate subsidiary. In addition, I have been a consultant to a bank trustee in a multi-billion-dollar repurchase claim matter related to a bank merger, and, in another matter, advised the trustees in a multi-billion-dollar repurchase claim matter associated with a bankruptcy.

5.     While all the conclusions set forth in this Report derive from work performed by me, or performed under my direction, my conclusions relied, in part, on the input of two my colleagues at D&P, John W. Schrader, a Managing Director in the New York Office of D&P and Brendan Murphy, a Director in the New York Office of D&P.

6.     Mr. Schrader possesses over 21 years of Financial Advisory and Investment Banking experience centered on Collateralized Debt Obligations ("CDOs") and various structured products, including RMBS. Mr. Schrader also served as the global head of Mortgage Market Risk and Securitized Products for a leading investment bank. Mr. Schrader has estimated a range of reasonable mortgage repurchase liabilities in association with bankruptcies, has valued and assessed modeling and loan surveillance platforms for numerous domestic and internal whole-loan investments pertaining to performing, re-performing, and non performing mortgages, and has assisted various hedge funds and private equity firms in assessing value and measuring risk associated with structured

products (specifically, CDOs, RMBS, Commercial Mortgage-Backed Securities, and Asset-Backed Securities, among others).

7.      Mr. Murphy is a Director in the Global Restructuring Advisory group at D&P with over twelve years of experience in bankruptcy and restructuring. His experience includes corporation and asset appraisal — including debt restructuring, liquidation analysis, extensive valuation, and capital refinancing. His Chapter 11 experience includes Plan development and creditor negotiations, business plan / capital structure assessment, distressed M&A (via §363 sales), capital raising (DIP / Exit financing), and operational turnarounds (cash flow / liquidity management). He has executed over 37 distressed transactions throughout all phases of financial restructurings and represented clients within all levels of the capital structure, both in- and out-of-court.

8.      My resume and testimony experience, for at least the past four years, and publications, for at least the last ten years, are attached to this report as **Attachment I**.


## II.      SCOPE OF WORK

9.      My assignment is to assess the reasonableness, from a financial perspective and from the perspective of the **FGIC Insured Trusts**,[3] of the **Settlement Agreement**,[4] which provides for, among other things, a lump sum payment by FGIC to the FGIC Insured Trusts (the "**Commutation Payment**") in satisfaction of any obligations of FGIC to

---

[3]     The "FGIC Insured Trusts" are the 47 RMBS Trusts listed on Exhibit B to the Settlement Agreement, certain tranches of which are insured by FGIC.

[4]     Capitalized terms not defined in this Report shall have the meanings ascribed to them in the FGIC Motion or the Settlement Agreement, as applicable.

make payments in the future (the "**Projected Payments**") to the FGIC Insured Trusts

under FGIC' **Rehabilitation Plan** (as that term is defined below) (the "**Commutation**"[5]).

10.     In performing the analyses, I, and/or others at D&P working under my direction, have

reviewed, among other information, the following:

- The Settlement Agreement;

- The Plan Support Agreement;

- The Rehabilitation Plan (including the exhibits and attachments thereto);

- The Disclosure Statement for the Rehabilitation Plan, filed on September 27, 2012

  (the "**FGIC Disclosure Statement**");

- Affidavit of Michael W. Miller[6] submitted on December 12, 2012, in Further

  Support of Approval of First Amended Plan of Rehabilitation (the "**Miller**

  **Affidavit**");

- The governing agreements for the FGIC Insured Trusts (the "**Governing**

  **Agreements**");

- Ibbotson Cost of Capital Yearbook 2012 and 2013 ("**Ibbotson**");

- ResCap's Vision Database[7];

- Intex[8];

- Bloomberg[9];

---

[5]   I understand that FGIC has stated that the Settlement Agreement does not effect a "commutation" of any insurance policies, a point on which I have no opinion. Any payment does not constitute a Commutation Payment. This Report only uses the terms Commutation and Commutation Payment for convenience, as these terms were commonly used during negotiation discussions.

[6]   Mr. Miller is the Director of the Financial Institutions Group at Lazard Freres & Co. LLC ("**Lazard**").

[7]   The Vision database is ResCap's (now Ocwen's) investor services website and can be found at investor.gmacrfc.com/vision/.

[8]   Intex is a subscription based 3rd party application that models the deal structure and rules that govern cash flow distribution as defined in the governing documents.  It also maintains monthly updated collateral files for each deal, that may be at the loan level or based on summarized or aggregate data, depending on whether or not the Servicer of a deal furnishes then with servicing files.

- Interview with Tim Travers (FGIC's Chief Restructuring Officer);

- Interview with certain Lazard personnel;

- Additional publicly-available documents related to the FGIC Rehabilitation (fully listed in **Attachment II**).

11.     **Attachment II** lists all of the documents that were reviewed and / or considered in forming the basis for my conclusions. I reserve the right to update **Attachment II** as additional documentation is reviewed and / or considered.

## III.    SUMMARY OF CONCLUSIONS

12.     Conclusion 1: Under the Settlement Agreement, the FGIC Insured Trusts forgo uncertain Projected Payments and receive the lump sum Commutation Payment upon execution of the Settlement Agreement. The Commutation Payment mitigates downside risk to Investors by securing a known payment to Investors following approval of the Settlement Agreement by the Bankruptcy Court and the Rehabilitation Court (and assuming that all conditions precedent to the Effective Date are satisfied or waived). Following an independent analysis performed by me, and those working under my direction, it is my conclusion that the Commutation Payment amount of approximately $253.3 million falls within a reasonable range, given the expected cash flows associated with the Projected Payments.

13.     Conclusion 2: From a financial perspective, it is my conclusion that it was reasonable for the FGIC Trustees to agree to the Settlement Agreement and thereby accept the Commutation Payment over the Projected Payments. While I do not conclude that

---

[9] Bloomberg is an industry-standard source for financial data, including data on the FGIC Insured Trusts.

acceptance of the Commutation Payment inevitably will be a superior result for all

Investors; given the overall risks, benefits, and uncertainties involving both the

Commutation Payment and the Projected Payments, and, given that the Settlement

Agreement is an integral part of the Plan Support Agreement that may result in the

confirmation of a Plan that produces additional value for Investors in the FGIC Insured

Trusts, it is my opinion that a decision by the FGIC Trustees to enter into the Settlement

Agreement, and thus accept the Commutation Payment in lieu of the Projected Payments,

was reasonable.


## IV.    D&P'S ROLE AS FINANCIAL ADVISOR

14.    The conclusions presented in this Report result, in part, from work done by D&P in its

role as Financial Advisor to the FGIC Trustees. In late March 2013, as part of the

mediation (the "**Mediation**") overseen by the Court-appointed Mediator, Judge James M.

Peck, the FGIC Trustees received a proposal for the commutation of insurance policies

issued by FGIC to the FGIC Insured Trusts (the "**Proposal**"). D&P was asked by the

FGIC Trustees to advise them regarding D&P's assessment of the reasonableness, risks,

and benefits of accepting the Proposal. Based, in part, on confidential information

communicated by FGIC's Chief Restructuring Officer and Lazard, Financial Advisors to

Weil, Gotshal & Manges, LLP, counsel to the New York Liquidation Bureau ("**NYLB**"),

D&P performed an independent financial analysis to determine a reasonable range of the

value of Projected Payments to the FGIC Insured Trusts based on the Rehabilitation Plan.

D&P presented the analysis on an ongoing basis to the FGIC Trustees during the

Mediation and provided guidance that, from a financial perspective, the Commutation

Payment falls within a range of reasonableness relative to the Projected Payments under

Rehabilitation Plan. **Attachment III** contains the presentation given to the Trustees on May 15, 2013. The presentation gives background information about the Rehabilitation Plan, financial considerations covering the Proposal and the Rehabilitation Plan, and reviews FGIC's own calculations leading to a payment amount of $253.3 million It also presents D&P's independent analysis of the Projected Payments and the Commutation. It is important to note that the guidance provided by D&P was based on information received from FGIC and Lazard; however, the conclusions reached by D&P resulted from its own independent analysis of that information and publicly available information.

## V.    SUMMARY OF THE REHABILITATION PLAN

### (i)    Background

15.    In January 2008, FGIC voluntarily ceased writing policies for new or additional risks, stopped paying dividends or other distributions to its shareholders, and reduced its operating expenditures. Despite these measures, FGIC's quarterly statement for the period ending September 30, 2009 reflected a deficit in Policyholders'[10] surplus of approximately $866 million, and an impairment of its required minimum surplus to Policyholders of approximately $932 million.[11] As a result, on November 24, 2009, the New York State Department of Financial Services ("**NYSDFS**") issued a 1310 Order, requiring FGIC to suspend payment of all Claims and prohibited FGIC from writing new Policies.

---

[10]    All capitalized terms first used in this section of the Report have the meaning given in the Rehabilitation Plan or the FGIC Disclosure Statement, as applicable.

[11]    FGIC Disclosure Statement, p 10.

16.    On June 28, 2012, the Superintendent of Financial Services of the State of New York was

appointed rehabilitator (the "**Rehabilitator**") of FGIC by the Supreme Court of the State

of New York to oversee FGIC's rehabilitation proceeding (the "**Rehabilitation**

**Proceeding**"). On September 27, 2012, the Rehabilitator filed a proposed Plan of

Rehabilitation and a disclosure statement for FGIC, both dated September 27, 2012, in

the Rehabilitation Proceeding. Subsequently, the proposed Plan of Rehabilitation was

amended on December 12, 2012, April 12, 2013, and June 4, 2013 (as amended, the

"**Rehabilitation Plan**").

### (ii)    Goal of the Rehabilitation Plan

17.    The stated goal of the Rehabilitation Plan is to treat FGIC's Policyholders in a fair and

equitable manner in order to remove the causes and conditions that made the

Rehabilitation Proceeding necessary.[12] The Rehabilitation Plan provides for all of the

value of FGIC, other than administrative expenses and certain other costs, to go to

FGIC's Policyholders until the Policyholders are paid in full. No claimants junior to the

Policyholders will receive any payment until the Policyholders are paid in full in

accordance with the terms of the Rehabilitation Plan.

### (iii)    Distribution Methodology Under the Rehabilitation Plan

18.    FGIC's outstanding Policies have scheduled remaining terms that do not expire for as

long as another 40 years.[13] Consequently, FGIC expects to receive Policy Claims over an

extended period, defined in the Rehabilitation Plan as the "**Run-Off Period**." Conversely,

certain Policyholders either have Policy Claims that are accrued and unpaid since the

---

[12]    Memorandum of Law in Support of Approval of Plan of Rehabilitation for FGIC (Oct. 25, 2012), p. 1.
[13]    Miller Affidavit at Exhibit II, p 6.

entry of the 1310 Order on November 24, 2009 ("**Accrued and Unpaid Claims**") or have Policy Claims that are likely to materialize within the first five years post-emergence.[14]

19.     The Rehabilitation Plan includes certain policy modifications to provide FGIC the ability to pay a certain Cash Payment Percentage (the "**CPP**") of each Permitted Policy Claim, in cash, with the remainder of the Permitted Policy Claim treated as a Deferred Payment Obligation (the "**DPO**"). The DPO accrues interest at a rate of three percent per annum (the "**DPO Accretion**") on a simple (non-compounding) basis.

20.     Additionally, the Rehabilitation Plan provides for an initial, partial cash payment, based on the initial CPP, of then-Permitted Policy Claims, no later than 150 days after the effective date of the Rehabilitation Plan. The Rehabilitator estimates that the total distributable value will provide all Policyholders with the same CPP of their Permitted Policy Claim on a nominal basis (*i.e.*, excluding the time value of money).

21.     The Rehabilitation Plan also provides for an annual, or possibly more frequent, adjustment of the CPP, based on an assessment of FGIC's financial condition. The Restructured Policy Terms attached to the Rehabilitation Plan provides that each CPP Revaluation will include certain updates, revisions, corrections, or other modifications that are necessary to correct any errors, reflect events that have occurred, or are reasonably likely to occur, and ensure that the CPP is set at a level consistent with the Run-Off Principles. These modifications are then used to determine the amount (if any) of Excess Cash available to recalculate the CPP and determine the amount of DPO Accretion that may be paid.

---

[14]     Miller Affidavit at p 10.

22.    Upon a CPP Upward Adjustment, the DPO Accretion Payable Amount will be distributed,
pro rata, based on the outstanding DPO Accretion for each Policy. With respect to the
DPO, the Rehabilitator makes no assurances as to if, when, or in what amounts, FGIC
may ultimately make cash payments with respect to any DPO. Additionally, the
Rehabilitator expects that the DPO Accretion Payment Amounts will be a fraction of the
outstanding DPO Accretion. However, the Rehabilitator makes no assurances as to if,
when, or in what amounts, FGIC may ultimately make cash payments with respect to any
DPO Accretion.[15]

23.    The distribution method outlined in the Restructured Policy Terms provides certain
reserve mechanisms to prevent potential overpayments on Policy Claims that have
already materialized. To the extent that overpayments on a particular Policy Claim are
unable to be offset against projected losses, certain Policyholders with unrealized,
projected claims may be disenfranchised in the event that the actual distributable value of
the estate is unable to be equally distributed to all Policyholders via the CPP.

**(iv)    Estimated Recoveries to Policyholders**

24.    The Miller Affidavit includes the updated projections for the Run-Off Period (the
"**Updated Run-Off Projections**") under both the Base and Stress Scenarios (as defined
in the Rehabilitation Plan). The Updated Run-Off Projections estimate the initial CPP
will be 17.25 percent. Subsequently, pursuant to the Plan Approval Order dated June 11,
2013, an initial CPP of 17.25 percent was approved. The initial CPP is subject to
adjustment by the Rehabilitator in his sole discretion on or before the Effective Date.[16]

---

[15]    Rehabilitation Plan at Exhibit B, B-2.
[16]    FGIC Plan Approval Order dated June 11, 2013 at p. 6.

25.     The Updated Run-Off Projections offers different projections of the CPP under the Stress

Scenario and under the Base Scenario. Under the Stress Scenario, the CPP is held

constant at 17.25 percent, until a final distribution of all available assets to holders of

policy claims permitted under the Rehabilitation Plan. Assuming a discount rate range of

10 to 20 percent, the present value of recoveries to such Policyholders under the Stress

Scenario is 17 to 18 percent, and a lower percentage of the notional (non-discounted) all

Permitted Policy Claims.

26.     Under the Base Scenario, in which the losses are lower than those projected under the

Stress Scenario, the CPP is estimated to increase every year until 2043.[17] Each

Policyholder is projected to receive a nominal recovery of 38.6 percent of their Permitted

Policy Claims by 2052 based on the final CPP estimate included in the Updated Run-Off

Projections. The nominal recovery on an aggregate basis for all Policyholders is

estimated to be 45 percent, that is, after taking into effect the recoveries on the DPO

Accretion. According to Lazard, the net present value of aggregate recoveries divided by

the net present value of all Permitted Policy Claims are estimated to be 27 to 30 percent

under the Rehabilitation Plan using a 10 to 20 percent discount rate range.[18] D&P

calculated this range for the FGIC Insured Trusts to be 18 to 23 percent on a notional

basis and 22 to 28 percent on a discounted basis (See Table 1).

---

[17]    Miller Affidavit, p. 20.
[18]    Miller Affidavit, p. 8.

## VI.    SUMMARY OF THE COMMUTATION PAYMENT CONTAINED IN THE SETTLEMENT AGREEMENT

### (i)    Background on FGIC's Proofs of Claims

27.    On November 16, 2012, FGIC filed proofs of claims in the Chapter 11 Bankruptcy against Residential Capital, LLC ("**ResCap**"), GMAC Mortgage, LLC ("**GMACM**") and Residential Funding Company, LLC ("**RFC**") (collectively, the "**Debtors**") in an amount of at least $1.85 billion at each debtor entity, in connection with the pre-petition litigation (collectively, the "**FGIC Claims**"). I understand the FGIC Claims against the multiple Debtor entities are generally similar to each other and allege that: (i) RFC and GMACM breached various representations, warranties and/or covenants in the FGIC Trusts' Governing Agreements, (ii) FGIC was fraudulently induced to issue the Policies in connection with most of the FGIC Insured Trusts, and (iii) ResCap is liable for the alleged breaches and fraud of GMACM and RFC under an alter ego liability theory. FGIC also asserted claims related to the Debtors' alleged deficient servicing of the mortgage loans in the FGIC Insured Trusts and based on the Debtors' alleged failure to provide FGIC access to certain information in accordance with the RMBS Trusts' Governing Agreements. FGIC further sought indemnification for "any and all claims, losses, liabilities, demands, damages, costs, or expenses of any nature arising out of or relating to the breach" of the Governing Agreements. [19]

---

[19]    Declaration of Lewis Kruger in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 For Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees, and Certain Institutional Investors [Docket No. 3929-3].

### (ii)    Estimate of the Commuted Claims

28.    As of March 31, 2013, FGIC represented to, among others, the FGIC Trustees that it had

paid approximately $343 million in claims to the FGIC Insured Trusts under the Policies.

Based on the proof of claims, FGIC represented that the estimate of accrued and unpaid

and projected claims related to the FGIC Insured Trusts was approximately $1.27 billion.

Of this amount, FGIC represented that the accrued and unpaid claims since the entry of

the 1310 Order through March 31, 2013 was $789 million. Omitting the settlement,

discharge, and release of the policies (*i.e.*, a status quo situation), FGIC estimated

projected losses related to the FGIC Insured Trusts to be approximately $481 million.[20]

### (iii)    Commutation Payment Proposed by FGIC

29.    The Settlement Agreement, among other things, provides a lump-sum Commutation

Payment of $253.3 million to be paid to the FGIC Insured Trusts in commutation of the

Policies and in exchange for FGIC's ability to assert a $596.5 million total general

unsecured claim in the ResCap Chapter 11 Bankruptcy cases.[21]

30.    I reviewed FGIC's explanation of the Commutation Payment and understand it as

follows[22]: FGIC's calculations show, based on the Updated Run-Off Projections and the

Base Scenario, that the Commutation Payment incorporates an initial CPP of 17.25

percent and an overall estimated recovery of 28.5 percent (the "**Base Case Payout**"),

which reflects the time-affected recovery percentage based on the midpoint discount rate

of 15 percent. With respect to the accrued and unpaid claims, FGIC explains that the

---

[20]    See Attachment III.
[21]    See Attachment III.
[22]    This section is meant to recap FGIC's calculations resulting in a $253.3 million lump-sum cash payment amount. The conclusions set forth in this Report do not depend on or result from FGIC's calculations or methodologies.

consideration amount equals the sum of (i) the aggregate claims multiplied by the initial

CPP plus (ii) the aggregate claims multiplied by the incremental spread between the Base

Case Payout and the initial CPP multiplied by an assumed reduction percentage of 40

percent. With respect to the projected claims, FGIC explains that the amount of the

Commutation Payment equals the aggregate claims multiplied by the Base Case Payout

multiplied by an assumed discount of 40 percent.[23]


## VII.    CALCULATION OF PROJECTED CASH FLOWS FROM THE REHABILITATION PLAN

31.    In this section, I explain the inputs and assumptions used to determine a reasonable range

of the value of Projected Payments to the Policyholder of FGIC Insured Trusts based on

the Rehabilitation Plan.[24] The main components of the Policy Claims under the

Rehabilitation Plan are the Accrued and Unpaid Claims and the projected Policy Claims.

32.    While the aggregate projected Policy Claims against FGIC have been provided on a

summary level in the Miller Affidavit, to date, neither FGIC or its advisors, nor the

Rehabilitator or its advisors, have disclosed the timing of the projected Policy Claims for

the FGIC Insured Trusts. Due to the lack of supporting information to the Updated Run-

Off Projections, it was necessary for D&P to estimate the Policy Claims specifically

---

[23]    I have not reviewed the analysis behind the 40 percent reduction in the payments related to the (i) spread
between the Base Case Payout and initial CPP multiplied by the accrued and unpaid claims and (ii) the Base
Case Payout multiplied by the projected claims.  However, I generally understand this 40 percent reduction to
reflect a discount for receiving the Commutation Payment upon execution of the Settlement Agreement, in
consideration of the timing of claims and payments specifically relating to the FGIC Insured Trusts' Policy
Claims under the Rehabilitation Plan. The analysis performed by D&P does not employ this assumed reduction
as D&P incorporates the timing of claims and payments related to the Policy Claims of the FGIC Insured Trusts.
See Attachment III.

[24]    The inputs and assumptions detailed in this section were current at the time D&P made its recommendation to
the FGIC Trustees. I understand that some of the inputs and assumptions have changed in later versions of the
Plan. At this time, none of these changes alter the conclusions set forth in this Report.

arising from the FGIC Insured Trusts in order to understand the timing of the relevant

claims and the associated recoveries.

### (i)     Accrued and Unpaid Claims

33.     As stated above, on November 24, 2009, the NYSDFS placed FGIC into Rehabilitation,

ordering FGIC to suspend paying all claims. Since entering into Rehabilitation, FGIC has

continued to receive claims on its outstanding policies. These Accrued and Unpaid

Claims will become payable, according to the Plan, upon FGIC's exit from Rehabilitation.

The total Accrued and Unpaid Claims for the FGIC Insured Trusts on December 31, 2012

was $753 million. This claim amount represents the total of the principal loss and interest

shortfalls to the insured tranches within the FGIC Insured Trusts.[25] This information is

reported monthly in Intex, confirmed, where available, to the applicable remittance

reports, and aggregated by D&P.

### (ii)    Projected Claims

34.     Similar to the Accrued and Unpaid Claims resulting from principal loss and interest

shortfalls, the projected claims result from future estimated principal loss and interest

shortfalls. The initial step in calculating the future shortfalls is estimating projected

collateral performance.

35.     To do this, using the balance of active loans to provide the total population of loans, I

determined collateral loss projections on the FGIC Insured Trusts on a trust-by-trust basis.

In order to have a more robust and statistically meaningful loss estimation, trusts were

classified into cohorts by product type and vintage. Product types include Prime, Alt-A,

---

[25]    See Attachment III.

Subprime, Pay Option ARM, Closed-End Seconds, and Open-End Seconds. Vintages include 2004 and prior, 2004, 2005, 2006, and 2007. Product types are subsequently broken into 12 "sub-cohorts," facilitating additional precision.

36.    Roll rate transition matrices based off of all RFC and GMACM issued Trusts are used to calculate monthly prepayment and default rates for each Trust, through the remaining life of the underlying mortgages as of December 31, 2012. These rates, known as Conditional Prepayment Rates ("**CPR**") and Conditional Default Rates ("**CDR**"), were used, along with other estimates, as inputs into Intex.

37.    D&P prepared forecasted cash flows under various scenarios to observe the sensitivities of loss forecasts associated with changes in CPR, CDR, and severity assumptions. The high collateral loss scenario applies 110 percent (of the base case) to defaults, 90 percent to prepayments, and 110 percent to severity. The low collateral loss scenario applies 90 perent (of the base case) to defaults, 110 percent to prepayments, and 90 percent to severity.

38.    Severity rates reflect the percentage of loss on the remaining unpaid principal balance at the time a loan is liquidated. As an example, a borrower default where the unpaid principal balance upon liquidation is $100,000 and there is a net recovery of $75,000 the severity rate is 25 percent. Severity rates are used to reflect current market conditions in loss estimates. The range of projected severity was calculated at the sub-cohort level following the review of third-party research and observed experience for each Trust. D&P calculated severity rates at the sub-cohort level.

39.    D&P then applied the assumptions resulting from the above described methodology on a trust-by-trust basis according to each trusts' payment structures as defined by its

Governing Documents, the result of which is the projected shortfalls at a tranche level on a monthly basis and thus the Trusts' claim.

40.     D&P estimated that the Policy Claims for the FGIC Insured Trusts will be approximately $409 million in the low case to $793 million in the high case, in each case on a nominal basis.

41.     Accordingly, D&P estimated the total Policy Claims for FGIC Insured Trusts including both the Accrued and Unpaid and the Projected Claims to be approximately $1,162 million in the low case to $1,546 million in the high case, in each case on a nominal basis.[26]

### (iii)     Projected Nominal Recoveries

42.     The Base and Stress Scenarios included in the Miller Affidavit contain summary financials for the Updated Run-Off Period on a 5-year basis (as opposed to on an annual basis). Certain cash flow assumptions were extrapolated from the Base Scenario in order to determine the projected nominal cash flows to the Policyholders for the FGIC Insured Trusts. D&P then applied the low and high projected loss estimates for the FGIC Insured Trusts to the distribution methodology outlined in the Rehabilitation Plan.

43.     The CPP was calculated on an annual basis, and the projected CPP amounts were then applied to both D&P's low and high loss projection estimates to determine the initial CPP payment, the catch-up CPP payment, and the corresponding changes in the DPO. With respect to the estimated DPO Accretion Payments, the implied Aggregate DPO Accretion Payment under the Base Scenario was distributed on a pro rata basis to the FGIC Insured Trusts based on the outstanding calculated DPO Accretion.

---

[26]    See Attachment III.

## VIII.    UNCERTAINTY OF PROJECTED CASHFLOWS UNDER THE REHABILITATION PLAN

### (i)    Uncertainty of the Input Data and Sources

44.    The actual recoveries to FGIC's Policyholders may differ materially from the estimated recoveries provided in the Miller Affidavit due to the ongoing changes to the complex assumptions underlying the Updated Run-Off Projections. While the Updated Run-Off Projections were revised to reflect certain changes related to premiums and commutation transactions, the underlying financial data driving the Updated Run-Off Projections are dated as of December 2011. As such, subsequent analyses derived from the projections included in the Miller Affidavit, also do not reflect the actual results for 2012 or the potential resulting impacts to the forecasted recoveries.

45.    Due to a lack of independent means to verify the confidential information and data provided in the Miller Affidavit, D&P has not verified the projections, assumptions or analyses prepared by FGIC and its advisors and the NYLB and its advisors. D&P relied on the projections prepared by FGIC and its advisors, as we believe the analyses were reasonably prepared in good faith and on a basis reflecting the best current available information as to the future operating and financial performance during the Run-Off Period.

### (ii)    Uncertainty of the Aggregate Distributable Value

46.    The aggregate distributable value available to FGIC's Policyholders may differ materially from the projected amounts included in the Updated Run-Off Projections and the Base Scenario due to differences in realized investment returns, collection of premiums, reinsurance, salvage, reimbursements and other amounts due to FGIC, availability and utilization of NOLs, and operating expenses.

47.   Per the Miller Affidavit, the included gross investment income post-Effective Date is
      expected to be 3.25 percent. Additionally, the management fees are assumed to be 9.75
      basis points of invested assets per year. However, FGIC's actual investment income or
      expenses may potentially materially deviate from the assumptions included in the
      Updated Run-Off Projections. The resulting deviations could significantly reduce
      recoveries for Policyholders under the Rehabilitation Plan.[27]

48.   The Rehabilitation Plan requires that Policyholders continue to make premium payments
      even though it is highly likely, and possibly, a near economic certainty that FGIC will not
      pay 100 percent of claims filed by Policyholders in cash. The Plan also prohibits the
      exercise of rights to setoff premiums, reimbursements, and other amounts against policy
      claims, not giving effect to the modification, therefore, pursuant to the Plan.[28] With
      respect to required premium payments, if Policyholders choose to setoff premiums, the
      estimated total collections over the Run-Off Period would be reduced. The Updated Run-
      Off Projections included a ten percent reduction to expected premium streams; however,
      to the extent that the actual unpaid installment premiums exceed these levels, the CPP
      may also decrease.[29]

49.   For the tax-related payments and projections, the Updated Run-Off Projections assume
      that FGIC will not generate taxable income post-Effective Date and the income expected
      to be generated on the Effective Date will be offset by existing NOL balances of $5.3
      billion.[30] In exchange for the ability to use the NOLs, FGIC plans to pay FGIC Corp. $11
      million. However, the preservation and usage of the NOLs and the payment to FGIC

---

[27]   Miller Affidavit at Exhibit I, p. 3.
[28]   Miller Affidavit, p. 10.
[29]   Miller Affidavit, p. 10.
[30]   FGIC Disclosure Statement, p. 15.

Corp. is subject to a number of unknown outcomes including receipt of a private letter

ruling from the IRS.

**(iii)    Uncertainty of the Expected Timing and Magnitude of the Aggregate Policy
Claims**

50.      The expected timing and magnitude of the various policy claims are uncertain and

volatile, in part, because of certain long-dated policies with large projected loss amounts.

The potential magnitude of these policy claims are evident when comparing the aggregate

claims under the Base Scenario versus the Stress Scenario where the projected losses are

approximately 85 percent higher.[31]

51.      Additionally, at the time of my analysis, there were certain novation and commutation

agreements still pending which could significantly increase the pool of projected losses.

The Rehabilitator also requested the Court to approve the then-pending Novation

Agreement between FGIC and National Public, and affiliate of MBIA Insurance

Corporation, to novate the National Public Reinsured Policies from FGIC to National

Public. Under the then-pending Novation Agreement, National Public would replace

FGIC as the party obligated to make payments with respect to claims under National

Public Reinsured Policies, which had approximately $110.5 billion par of coverage

outstanding as of November 30, 2012.[32] In the absence of the novation, the CPP would

need to take into account potential losses under the National Public Reinsured Policies,

just as it does potential losses under other FGIC Policies. As a result, proceeding without

the novation would have resulted in an immediate reduction to the initial CPP (down

from 17.25percent to 15.75 percent), as well as ongoing downward pressure on future

---

[31]    Miller Affidavit at p. 6-7.
[32]    Miller Affidavit at p 6-7.

CPP revaluations.[33] As part of the Rehabilitation Plan, the Rehabilitator was also seeking court approval of certain "CDS Commutation Agreements" which provide for FGIC to terminate its obligations under certain policies it issued to counterparties to credit default swaps ("CDS") entered into by FGIC Credit Products LLC ("FGIC CP"), a subsidiary of FGIC, and for FGIC CP to terminate its obligations under the CDS. The Updated Run-Off Projections assume that the six, then-pending, CDS Commutation Agreements that were executed will be approved by the Court and the payments will be made post-Effective Date. If the CDS Commutations pending approval were not approved, the initial CPP would have been lowered to 15.5 percent.[34]

### (iv)  Present Value and Discount Rate Associated with the Nominal Cash Flows

52.   As detailed above, there are significant components of the Rehabilitation Plan that may materially change the timing and amount of cash flows available to be paid to all of FGIC's Policyholders. In addition, there are certain aspects of the Rehabilitation Plan that adversely affect the Policyholders of FGIC Insured Trusts. Specifically, a significant portion of cash distributions on account of the CPP and the DPO Accretion are significantly back-ended, even though a majority of the claims (*i.e.,* greater than 70 percent) are expected to arise in the first five years.[35]

53.   In order to determine the present value of the cash flows under the Rehabilitation Plan, I examined the structure and timing of the plan as well as the available information on the expected ability of FGIC to meet its payment obligations to determine an appropriate and reasonable rate at which to discount any future cash flows. To do this, I relied on my

---

[33]   Miller Affidavit at p 12.
[34]   Miller Affidavit at p 3.
[35]   See Attachment III.

years of experience in determining discount rates, and I reviewed independent sources of

discount rate calculations, namely Ibbotson. Specifically, I reviewed the Cost of Equity

Capital and the Weighted Average Cost of Capital for Standard Industrial Classification

("**SIC**") 635 (Surety Insurance) and SIC 63 (Insurance Carriers), because companies in

these industrial classifications generally face similar financial burdens as FGIC. While

my analysis did not use specific values from Ibbotson, they served to inform a range of

reasonable discount rates for future cash flows under the Rehabilitation Plan. The median

values for the discount rates ranged from about 9 percent to 19 percent.[36] Given that

FGIC's future payments may be riskier than the SIC's average level of risk, and that

under the Rehabilitation Plan FGIC would not receive the revenue from writing new

policies, the values presented in Ibbotson may serve as a conservative estimate of an

appropriate discount rate.

54.    Based on the structure and the riskiness of payment of the Rehabilitation Plan and the

cost of capital for the industry detailed above, I conclude that a discount rate for future

cash flows under the Rehabilitation Plan of 10 to 20 percent is a reasonable range. Such a

range takes into account that due to the riskiness of future payments there is a risk that

the cash flows under the Rehabilitation Plan could total less than the Commutation

Payment amount of $253.3 million.

**(v)    Exclusion of Potential and Unknown Value of Pending Litigation**

55.    The Updated Run-Off Projections included in the Miller Affidavit exclude potential

recoveries from pending RMBS litigation[37] proceedings due to the uncertainty of the

---

[36]    Ibbotson, SIC 63 and SIC 635, March 13, 2013.
[37]    A list of the pending RMBS litigations is included in Exhibit C of the Rehabilitation Plan.

probability, magnitude, and timing of any litigation recoveries. Additionally, FGIC has

not incorporated potential proceeds from the pending RMBS litigation proceedings in its

financial statements. Lazard and FGIC, who are likely to be in the best position to

estimate such recoveries, deemed that, "these recoveries are not sufficiently probable and

estimable." I have no knowledge or reliable data available to estimate potential recoveries

from RMBS litigation. As a result, I have not included any estimates of recoveries from

pending RMBS litigation, because any such estimation would be speculative.

56.    Similarly to excluding any speculative litigation recoveries, I have chosen to follow Lazard's and

FGIC's judgment and exclude from my analysis any estimates on potential litigation losses by

FGIC for the same reasons: that any such losses are impossible to reliably estimate.


## IX.    ADDITIONAL BENEFITS OF THE SETTLEMENT AGREEMENT OVER THE REHABILITATION PLAN

57.    In addition to the $253.3 million Commutation Payment, the FGIC Insured Trusts would

no longer need to pay future policy premiums of approximately $18.3 million, on a

present value basis[38]. Including the value of these waived policy premiums, the value of

the Settlement Agreement to the FGIC Insured Trusts increases to approximately $272

million. Along the same lines, the Settlement Agreement will allow any excess spread

(and any reimbursements arising from excess spread) to be distributed to the security

holders of the respective Trusts. That is, any incremental interest provided by the

underlying collateral over the interest paid to the security holders of the trusts go directly

---

[38]    Affirmation of Gary T. Holtzer, Case No. 401265-2012 [Docket #3929-10].

to the securities, rather than reimbursing FGIC, resulting in a potential benefit to

Policyholders in addition to Commutation Payment amount of $272 million.[39]


**X.    POTENTIAL BENEFITS OF THE SETTLEMENT AGREEMENT FROM THE PLAN SUPPORT AGREEMENT**

58.    The approval of the Settlement Agreement is a condition to the effectiveness of the Plan

Support Agreement, and it is my understanding that without the FGIC Trustees'

acceptance of the Settlement Agreement, FGIC would not have entered into the Plan

Support Agreement.

59.    Among other things, the Plan Support Agreement provides for a substantial contribution

from Ally Financial (approximately $2.1 billion), which, together with other assets of the

Debtors, will be available for distributed creditors, including the FGIC Insured Trusts. In

the absence of the Plan Support Agreement (which, I understand, is dependent on the

approval of the Settlement Agreement[40]), additional costs related to the extended

litigation and administration would likely burden the Estate, which would in turn

decrease recoveries to the FGIC Insured Trusts. While not part of D&P's May 15, 2013

presentation to the FGIC Trustees, I understand that the Plan Support Agreement

provides that the FGIC Insured Trusts will have allowed claims in the contemplated

ResCap Plan of Liquidation. In that regard, if the ResCap Plan of Liquidation

contemplated by the Plan Support Agreement is confirmed, an additional estimated $92

million in value will be distributed to the FGIC Insured Trusts. This additional value

(which would not necessarily be available absent the FGIC Trustees acceptance of the

---

[39]    See Attachment III.
[40]    Plan Term Sheet (Exhibit A to PSA) at page 16.

Settlement Agreement) would increase the total potential value of the Settlement

Agreement to the FGIC Insured Trusts to approximately $364 million.

**(i)      Comparison of Projected Recoveries under the Rehabilitation Plan Versus the Expected Value to the FGIC Insured Trusts Under the Settlement Agreement**

60.      A comparison of the recoveries under the Rehabilitation Plan versus the Settlement

Agreement based on the range of D&P's claims estimates presented in Table 1. Based on

the calculations described above, D&P calculated the range of recoveries under the Base

Case Scenario of the Rehabilitation Plan to be $217 to $340 million, indicating a

recovery of 19 to 22 percent on a nominal basis and 24 to 28 percent on a discounted

basis for FGIC Insured Trusts. This range of recoveries implies that accepting a

Commutation Payment of $253.3 million with a value of $272 million, including the

foregone premiums is a reasonable decision, from a financial perspective, by the FGIC

Trustees.

## Table 1: Comparison of Recoveries to Policyholders of FGIC Insured Trusts

($ in millions)

| | | D&P Claims Estimates | |
| --- | --- | --- | --- |
| | | Low Case | High Case |
| **Policy Claims for FGIC Insured Trusts** | **D&P Claims Estimates** | | |
| | Accrued and Unpaid Claims (as of 12/31/12) | $753 – | $753 |
| | Projected Claims | 409 – | 794 |
| | **Total Policy Claims for FGIC Insured Trusts** | **$1,162 –** | **$1,546** |
| **Rehabilitation Plan** | Discount Rate Applied | 20% – | 10% |
| | Net Present Value of Policy Claims | $921 – | $1,226 |
| | **Recovery to Policyholders – $** | **$217 –** | **$340** |
| | ***Recovery to Policyholders – %*** | | |
| | ***Based on Nominal Claim*** | *19% –* | *22%* |
| | ***Based on Discount Claim*** | *24% –* | *28%* |
| **Commutation Proposal** | **Value of the Commutation** | | |
| | Cash Settlement | $253 | |
| | Plus: Waived Premiums | 18 | |
| | **Recovery to Policyholders – $** | $272 | |
| | ***Recovery to Policyholders – %*** | | |
| | ***Based on Nominal Claim*** | *23% –* | *18%* |
| | ***Based on Discount Claim*** | *29% –* | *22%* |
| | **Value of the Commutation Plus Additional Benefits** | | |
| | Plus: "Additional Benefits" per PSA | $92 | |
| | **Recovery to Policyholders** | $364 | |
| | ***Recovery to Policyholders – %*** | | |
| | ***Based on Nominal Claim*** | *31% –* | *24%* |
| | ***Based on Discount Claim*** | *39% –* | *30%* |

## XI.    CONCLUSIONS

61.    As documented above, the value to Policyholders under the Rehabilitation Plan is

uncertain. While in some scenarios the total net present value of the Projected Payments

may be greater than the Commutation Payment, there are numerous factors that may

cause the net present value of Projected Payments to be far lower than the Commutation

Payment.

62.    Because of these uncertainties, accepting the Settlement Agreement and the

Commutation Payment — and all the benefits of certainty in amount, timing, and

likelihood of payment — is a reasonable decision, from a financial standpoint, on the part

of the FGIC Trustees.

## XII.    RESERVATION OF RIGHTS AND COMPENSATION DISCLOSURE

63.    Although my study is based upon the current record, and I am in a position to render

conclusions at this time based upon such information, the study is ongoing, and expert

witness deposition testimony has not been completed. Accordingly, I reserve the right to

revise or expand any expert conclusions to reflect any additional conclusions that I may

formulate based upon newly acquired information or arising from reflection and

reconsideration of the conclusions based upon views expressed by expert witnesses, if

any, and upon further study and information, including, among other things, documentary

and testimonial evidence introduced subsequently.

64.    D&P charges rates of $130 – $835 per hour for my professional services and the services

of supporting staff in this matter. D&P has no financial interest in the outcome of this

matter.

65.    This report is not to be reproduced, distributed, disclosed or used for any purposes other

than the above-referenced proceedings without prior written approval.

# ATTACHMENT I



*Mr. Allen M. Pfeiffer*
*Managing Director*
*Duff & Phelps, LLC*

# PROFESSIONAL CREDENTIALS

*Allen Pfeiffer is a Managing Director in the NY and NJ  office of Duff & Phelps, and is the Global Service Leader of Dispute Consulting-Complex Valuation and Bankruptcy Litigation.  Mr. Pfeiffer has more than eighteen years of valuation, solvency, cash flow assessment and capital structure analysis experience and has led hundreds of engagements related to the valuation of an entire business, a security, an interest in a business or an asset.*

*Professional*
*Experience*

- Mr. Pfeiffer has advised both foreign and domestic buyers, sellers, joint venture partners, hedge funds, private equity funds, plaintiffs and defendants in mergers and acquisitions/corporate finance situations with regard to business valuation, strategic planning, raising financing, spin-offs, transaction support, bankruptcy, litigation, tax, financial reporting, solvency, valuing derivatives, fairness opinions, IP holding companies, restructurings and capital structure analysis.
- The New York Supreme Court, the United States Bankruptcy Court, the American Arbitration Association and arbitrators operating under the rules of the International Chamber of Commerce have accepted Mr. Pfeiffer as a valuation and cash flow expert. In addition to his testifying experience, he has worked often as a lead consultant to attorneys in the context of retrospective solvency and many other valuation and corporate finance matters.  Mr. Pfeiffer also led the team as the financial advisors to the Bankruptcy Examiner for Lehman Brothers (Anton Valukas).
- Mr. Pfeiffer was a Managing Director with Standard & Poor's Corporate Value Consulting at the time of its merger with Duff & Phelps in September 2005 and was a member of the CVC practice of PricewaterhouseCoopers LLP at the time of its sale to Standard & Poor's.  Prior to joining Coopers & Lybrand in 1995, and prior to receiving his MBA finance at Columbia Business School, Mr. Pfeiffer worked for an affiliate of Alex Brown and worked as an actuarial analyst at Kwasha Lipton, a benefit consulting firm. Mr. Pfeiffer successfully completed four professional exams within his tenure as an actuary: multivariable calculus, probability theory, mathematical statistics and numerical equations.

**Selected Experience – Bankruptcy Litigation:**

- Financial advisor to RMBS Trustees in ResCap bankruptcy.
- Retained by Trustees in multi-billion dollar repurchase/put back claim in a major bankruptcy matter.
- Lead consultant to bank trustee related to multi-billion repurchase/ put-back claim associated with a bank merger.
- Lead financial advisor to the Bankruptcy Examiner for Lehman Brothers (Anton Valukas). Advised the attorneys relating to broad-reaching issues such as: valuation, solvency analysis, avoidance actions, dealings with secured lenders and the Barclays transaction. This led to a 2,200 page report released by the Examiner.
- Leading analysis of solvency for a fraudulent conveyance lawsuit filed against a leading company related to a former multi-billion dollar real estate subsidiary company claiming damages in excess of $1 billion.
- Project lead in assisting the Administrator of a UK entity with an independent third-party evaluation of historical valuation methodologies for a portfolio of 5,000+ assets as well as independent historical valuations on highly illiquid assets. The work resulted in the full recovery and fair distribution to represented creditors in one of the largest bankruptcy filings in US history
- Testified as an expert witness in Philadelphia Bankruptcy Court (Oct. 2003) on behalf of secured lenders regarding the solvency of a manufacturer of technology;

*Professional
Experience*
*(continued)*

**Selected Experience – Bankruptcy Litigation – (continued):**

- Testified in deposition as an expert witness in defense of an investment bank related to alleged damages in association with advice regarding the timing of a restructuring/bankruptcy of a mobile home manufacturer;

- Testified in deposition as an expert witness on the reasonableness of a business case and budget for a large retailer in a bankruptcy/contract dispute;

- Testified in arbitration on behalf of a tractor company in a dispute regarding the value of recovered assets in bankruptcy;

- Testified in deposition as an expert witness on behalf of a large cable company (MSO) against its joint venture partner with regard to cable systems in Puerto Rico;

- Led analysis of solvency at various transaction dates for a multi-billion dollar commercial real estate finance company in bankruptcy;

- Advised the U.S. government related to the viability of a proposed reorganization plan;

- Led analysis of solvency for a fraudulent conveyance lawsuit filed against a leading global company by a former subsidiary claiming damages in excess of $2 billion;

- Advised counsel for a multi-national bank in defense of their investment banking work performed for a multi-billion dollar planned joint venture;

- Advised counsel and several hedge funds on the valuation of the derivative features attached to convertible bonds for purposes of arriving at OID (original issues discount) in bankruptcy litigation;

- Led analysis with respect to solvency and valuation issues related to the merger and refinancing of a corporate finance advisory firm;

- Advised on the valuation of a hedge fund relative to the reasonableness of a major transaction prior to the filing for bankruptcy;

- Advised counsel with respect to solvency in large anticipated litigation against group of pre-petition lenders to an international financial services company that spiraled into bankruptcy after fraud was detected;

- Led the retrospective solvency analysis of a supermarket business at various dates for a private equity fund and assisted counsel and insurance companies in effectuating a successful mediation;

- Led the analysis of a preference case filed against a private equity firm and related to the bankruptcy filing of a large financial services company; analyzed convertible preferred stock, produced expert report and rebuttal report and assisted attorneys in deposition preparation;

- Led analysis of solvency for a large fraudulent conveyance lawsuit filed against an international consumer products company; produced expert report and rebuttal report, assisted attorneys in preparation for depositions, drafting of certain motions, development of case strategy, preparation for and participation in trial and post-trial submissions;

- Led analysis of solvency for a preference lawsuit related to a multi-billion dollar pharmaceutical distribution company; produced expert report and rebuttal report, assisted attorneys in preparation for depositions, drafting of certain motions, development of case strategy and preparation for trial;

- Advised on a retrospective solvency analysis for a large retailer in a preference action.

*Professional
Experience
(continued)*

**Selected Experience – Complex Litigation:**

- Retained to provide the analysis of damages sustained by a new private equity advisory firm that was spun out of one of the largest banks. The analysis focused on the compensation lost by the private equity firm due to the poor decision making by the larger bank post the spin-off transaction.

- Testified in trial with respect to the value of the founder's ownership interest in a technology company in conjunction with a matrimonial action;

- Testified as an expert witness in arbitration, International Chamber of Commerce (Sept. 2002) regarding the valuation of a minority interest in a European Internet service provider; also quantified damages;

- Testified as an expert witness in New York Supreme Court (Nov. 2002) regarding the value of the unregistered shares of a public Internet company; both sides in case unanimously accepted the testimony;

- Testified as an expert witness in arbitration (AAA) related to fair and reasonable terms and fair market value associated with a long-term agreement between a cable company and a content provider (Feb. 2004);

- Testified as an expert witness in deposition and at a hearing. Produced an expert report on diminution of enterprise value, damages and lost profits to a cruise business due to the outbreak of disease caused by a vendor;

- Testified as a fact witness in deposition and advised counsel on behalf of private equity firm and a multi-billion dollar chemical company relating to an acquisition. Assessed the pro forma financial outlook and solvency of the combined entity;

- Testified in arbitration for a hedge fund related to the capital adequacy of the fund, reasonableness of projections and economic uncertainty in 2008;

- Advised a law firm in defense of a damages claim of lost income by a private equity firm from an alleged reduction of capital commitments from investors;

- Advised counsel related to the valuation of a multi-billion dollar leasing company;

- Advised counsel related to damages associated with a failed telecommunications joint venture;

- Advised counsel related to the value of the common equity of a technology company for a Delaware shareholder action;

- Advised counsel on the appropriate financing terms for a telecommunications transaction in preparation for a potential litigation;

- Led the analysis of damages sustained by a leading communications company in connection with a malpractice claim related to a multi-billion dollar transaction;

- Led the assessment of damages for an early-stage cable television company;

- Advised counsel on the relative value of two contracts and related clauses in the cable and entertainment industry;

- Advised counsel on the appropriate care, transaction price and valuation methodologies in defense of a lead advisor investment bank in the technology and consumer product industry; produced expert report and rebuttal report and assisted attorneys in depositions;

- Advised majority shareholder group related to disputed terms of the purchase of controlling voting shares in a large Canadian company with dual-class ownership structure;

- Advised governmental agency relating to insider trading probe;

- Advised counsel relative to damages associated with a hedge fund (fund of funds);

*Professional*
*Experience*
*(continued)*

**Selected Experience – Complex Litigation – (continued):**

- Advised counsel in preparation of a preliminary injunction hearing regarding the financial position of a regional airline company post-termination of a contract with a national airline;
- Advised counsel with respect to theories related to damages on a high profile insurance matter;
- Led the analysis of value provided by executives in managing large company-invested hedge funds;
- Led the analysis of a multitude of derivative transactions for a litigation;
- Advised counsel with respect to solvency and litigation issues in a large planned spin-off of a subsidiary;
- Led the analysis of the value of divisions of a large consumer products company in defense of an IRS probe related to a tax-free spin-off;
- Led the analysis of a merger between two market-leading companies and provided a retrospective fairness opinion; conversion ratio  Mr. Pfeiffer was challenged by a group of shareholders;
- Led the analysis of whether a material adverse change clause applied to the circumstances associated with the decline in 2000 venture capital funding levels;
- Advised a utilities company on the issuance of new securities – debt vs. equity considerations for cost of capital purposes in arbitration;
- Led analysis of a shareholder oppression lawsuit filed in New Jersey regarding the valuation of a privately held trucking company;
- Assisted attorneys in the valuation of a manufacturing company in a purchase price dispute;
- Advised plaintiff on the value of complex options and warrants for purposes of assessing damages in litigation.

**Selected Experience – Corporate Finance:**

*Transaction Advisory:*

- Advised an international private equity fund on the value of a major real estate subsidiary to be spun-off and the value of options held.
- Advised by large telecommunications company to value certain tangible and intangible assets related to an acquisition of a controlling stake in a company;
- Advising the board of a publicly traded company regarding company and broad economic trends in the mobile telecommunications industry;
- Advised an investment firm with respect to the price paid for an ownership interest in a telecommunications company, associated warrants and other deal terms;
- Advised the board of an international bank regarding the fairness of a bank merger;
- Advised on many buy-side valuation issues as part of due diligence efforts for a major telecommunications company;
- Advised the board of a public company related to the fairness of a reverse merger transaction;
- Advised government ministers in their consideration of the privatization of a telecommunications company, a bank and an airline;
- Advised and presented to the board of directors and senior management of a leading technology company on the value of its total intellectual property portfolio for the application of the Delaware Law capital surplus test;
- Advised special committee of the board and largest minority shareholder with respect to the value of intellectual property of a technology company that received a buyout offer determined to be inadequate by the special committee;

*Professional
Experience
(continued)*

**Selected Experience – Corporate Finance – (continued):**

- Advised a technology company in its negotiations with several international top-tier companies and several venture capital firms;
- Advised a technology company on valuation of the various levels of preferred stock prior to its successful initial public offering;
- Advised a technology company on the benefits of spin-off vs. divestiture;
- Advised on terms of transaction and negotiated on behalf of a technology company;
- Advised on valuation of subsidiary of a technology company for issuance of executive warrants;
- Advised on transactions and valuation matters related to more than ten major Israeli companies;
- Advised shareholder and founder on the value of his company for purposes of put option rights;
- Advised a large private equity fund with respect to the value of their illiquid investments for a corporate reorganization;
- Advised a large equity hedge fund with respect to the value of a partnership interest;
- Advised hedge fund executives on the discount associated with shares contributed to a GRAT;
- Advised the board of directors of a leading international company with respect to potential responses to a potential hostile takeover bid;
- Advised a private equity firm on the value of the intellectual property of a large electronics equipment manufacturer for purposes of refinancing;
- Advised a large hedge fund with respect to due diligence and the value of loan collateral;

*Transaction Advisory:*

- Advised on the issuance of a solvency opinion for "RemainCo" relative to two of the largest spin-offs in history;
- Assisted in the issuance of transaction opinions for several large transactions;
- Advised an international entertainment conglomerate with respect to pre-deal due diligence and valuation analysis;
- Provided independent valuation assessment of investments to board of directors of a major investment fund;
- Sell-side advisory work for a major international IT services company;
- Advised in the successful resolution of a joint venture in a buy/sell option discrepancy;
- For several companies, advised on the value of common shares for issuance of new warrants to management;
- Advised on the restructuring of five distinct businesses owned in a holding company;
- Advised on numerous fairness opinions as a member of review committees in Duff & Phelps and Standard & Poor's Corporate Value Consulting.

*Strategic Planning:*

- Advised a telecommunications company relative to financial planning and funding for the launching of a CLEC business;
- Advised a private equity fund focused on technology and telecommunications with respect to the components of several transactions and assessing the value of its common stock;
- Advised on new e-commerce business opportunities and capital investments within large multi-national corporations;
- Advised a subsidiary of an international entertainment conglomerate with respect to the value of its contingent liabilities;
- Developed business case, strategy and valuations for many late stage start-ups;

*Professional
Experience
(continued)*

**Selected Experience – Corporate Finance – (continued):**

- Corporate Finance liaison with the PwC Israel office;
- Valuation and advisory work associated with a dramatic operational turnaround of a multi-billion dollar company on behalf of an LBO fund over three years;
- Utilized real option valuation metrics to solve complex and uncertain value propositions;
- Advised on the strategic modeling and valuation regarding the combination of major professional sports teams in a joint venture.

**Selected Experience – Valuation for Tax Restructuring and Reporting:**

- Valued dozens of subsidiaries worldwide in connection with the spin-off of major technology businesses for determining tax gain/loss;
- Led numerous tax restructuring engagements for a multi-billion dollar telecommunications company;
- Analyzing broker quote information in determining whether loans, after modifications, are considered publicly traded under the tax rules;
- Advised the owners of a sports team related to the allocation of purchase price to the sports arena for tax purposes;
- Valuation of the subsidiaries and assets of a chemical company as part of the consideration of the tax structure of a large contemplated transaction;
- Valuation of worldwide subsidiaries of a biotech company for the planning of intellectual property holding company restructuring;
- Determined the value of restricted stock discount and/or lack of marketability discount for dozens of companies;
- Valued several businesses for estate tax purposes.

**Selected Experience – Valuation for Financial Reporting:**

- Valuation of the common equity and an embedded derivative for a privately held, telecommunications software company;
- Valued the Series C Preferred Stock of an independent marketer of natural gas and electricity;
- Led dozens of engagements related to purchase price allocations and intangible asset impairments - SFAS 141/SFAS 142, SFAS 121, SFAS 133 and APB 16;
- Participated on PwC task force committee to communicate with the SEC on the valuation of In-Process Research and Development;
- Drafted numerous SEC response letters for several major companies on valuation issues, in all cases avoiding financial restatements;
- Numerous engagements related to valuation of options in connection with SFAS 123 and as components of purchase price;
- Assessed discounts for blockage, minority holdings, lack of marketability and restricted stock.

*Professional*
*Experience*
*(continued)*

**Presentations and Articles:**

- Strategic Advisory Board member ABI VALCON 2012-2014
- Panelist ABI VALCON February 2012 "Amend and Pretend:  The Role of Accounting Rules, Bank Regulatory concerns and Market Values".
- Visiting Lecturer at Sy Syms Executive MBA program "Fundamentals of Valuation and Common Pitfalls"
- Lectured at several conferences in 2011 "Lessons Learned from Lehman Brothers Failure"
- Visiting Lecturer at Yeshiva University - "Security Analysis and Valuation", March 2009;
- Presented as part of a 2008 TMA panel in a conference entitles "Valuation: A Minefield for the Expert and Counsel"
- Authored 2006 Financier Worldwide article titled "Inadequate capital: examining the tests for fraudulent conveyance"
- Led development and presented many Continuing Learning Education courses for attorneys regarding legal and financial analysis issues related to fairness opinions, valuation, expert witnesses and fraudulent conveyance;
- Led PwC's and S&P's internal training programs in corporate finance and valuation each year from 1997 through 2002;
- For S&P in 2004-2005, designed curriculum for national training and analysis of complex client issues along with New York University professor Dr. Aswath Damodaran;
- Presented various topics at industry, accounting and valuation seminars and conferences; participant in ALI-ABA conferences, ABI conferences and other industry conferences;

**Trial and Arbitration Testimony:**

- ***Aris Multi-Strategy Fund, L.P. v. Quantek Opportunity Fund, L.P., et al***
  American Arbitration Association, New York
  Case No. 13 181 02839 03
  April 2011

  - Testified in arbitration for a hedge fund related to the capital adequacy of the fund, reasonableness of projections and economic uncertainty in 2008.

- ***Lee v. Chou***
  Supreme Court of the State of New York, County of New York
  Index No. 350601/03
  October 2006

  - Testimony in a matrimonial action on behalf of the Defendant with respect to the value of Plaintiff's ownership interest in a business that he founded.

- ***Suraleb, Inc. v. Production Association "Minsk Tractor Works", Republic of Belarus.***
  Arbitration Institute of the Stockholm Chamber of Commerce
  December 2005

  - Testimony in arbitration on behalf of the Respondent, Minsk Tractor Works, as an expert witness related to the value of recovered assets in bankruptcy.

*Mr. Allen M. Pfeiffer*
*Managing Director*
**Page 8**

*Professional*
*Experience*
*(continued)*

**Trial and Arbitration Testimony – (continued):**

- ***CSC Holdings, Inc. v. Yankees Entertainment and Sports Network, LLC***
  American Arbitration Association, New York
  Case No. 13 181 02839 03
  February 2004

  - Testimony on behalf of the Claimant as an expert witness related to fair and reasonable terms and fair market value associated with a long-term agreement between Cablevision and YES Network.

- ***Official Committee of Unsecured Creditors (Exide Technologies), v. Credit Suisse First Boston***
  United States Bankruptcy Court, District of Delaware
  Case No. 02-11125
  October 2003

  - Testimony on behalf of the Defendant on the solvency of Exide Technologies in a fraudulent conveyance lawsuit.

- ***Commonwealth Associates, LP v. Smartserv Online, Inc.***
  Supreme Court of the State of New York, Southern District
  Index No. 600869/00
  November 2002

  - Testimony on behalf of the Plaintiff of restricted shares in a publicly traded Internet company.

- ***Banestyrelsen et al. v. France Telecom***
  International Chamber of Commerce
  Case No. 11351
  September 2002

  - Testimony on behalf of the Plaintiff of a minority equity investment in an international Internet service provider.

**Deposition Testimony:**

- ***NAF Holding, LLC v. Li & Fung (Trading) Ltd.***
  United States District Court, Southern District of New York
  Civil Action No. 10 Civ. 05762
  April 2012

  - Deposition testimony on behalf of the Plaintiff in a commercial dispute relating to lost profits pertaining to an unconsummated disputed transaction.

- ***Hexion Specialty Chemicals, Inc.; et. al. v. Huntsman Corp.***
  The Court of Chancery of the State of Delaware
  Civil Action No. 3841
  August 2008

  - Deposition testimony as a fact witness on behalf of the plaintiff assessing the pro forma financial outlook and solvency of the combined entity.

- ***OHC Liquidation Trust v. Credit Suisse First Boston, et al.***
  United States District Court for the District of Delaware
  Case No. 07-799
  March 2008

  - Deposition testimony on behalf of the Defense as an expert witness related to alleged damages in association with advice regarding the timing of a restructuring/bankruptcy of a mobile home manufacturer.

**Deposition Testimony – (continued):**

- ***In re: Adelphia Communications Corp., et al.***
  United States Bankruptcy Court, Southern District of New York
  Case No. 02-41729
  March 2006

  - Deposition testimony on behalf of the Debtors as an expert witness related to the value of a cable company in conjunction with the failed buyout of a joint venture partner.

- ***Celebrity Cruises, Inc., et al. v. Essef Corp., et al.***
  United States District Court, Southern District of New York
  Case No. 96-Civ-3135
  July 2005

  - Deposition and hearing testimony on behalf of the Plaintiff as an expert witness on diminution of enterprise value, damages and lost profits related to disease outbreak in the cruise industry.

- ***In re: Footstar, Inc., et al.***
  United States Bankruptcy Court, Southern District of New York
  Case No. 04-22350
  June 2005

  - Deposition testimony on behalf of Kmart Corporation, Respondent, as an expert witness related to reasonableness of income projections, in dispute against Footstar, Inc., et al. as Debtors.

*Education*

M.B.A. - Finance, *with distinct honors*, Columbia Business School

B.A. - Economics and Mathematics, *cum laude*, Yeshiva University

# ATTACHMENT II

**List of Documents Considered**

| Number | Date | Document |
|---|---|---|
| 1 | 6/11/2012 | Order to Show Cause |
| 2 | 6/11/2012 | Verified Petition with Exhibits A to E |
| 3 | 6/11/2012 | Memorandum of Law in Support of Verified Petition of the Superintendent of Financial Services of the State of New York |
| 4 | | Order of Rehabilitation |
| 5 | 6/28/2012 | Omnibus Reply Memorandum of Law in Further Support of the Verified Petition of the Superintendent of Financial Services of the State of New York with exhibits 1 and 2 |
| 6 | 9/14/2012 | Novation Agreement between FGIC and National Public Finance Guarantee Corp. |
| 7 | 9/27/2012 | Affirmation of Gary T. Holtzer with Exhibits A, B, D, E |
| 8 | 9/28/2012 | Order to Show Cause |
| 9 | 10/8/2012 | Amended and Restated Charter of FGIC |
| 10 | 10/8/2012 | FGIC Form of Amended and Restated By-laws |
| 11 | 10/11/2012 | Affirmation of Harold S. Horwich in Support of Plan Approval |
| 12 | 10/25/2012 | Memorandum of Law in Support of Approval of Plan of Rehabilitation for FGIC |
| 13 | 11/14/2012 | Plan Supplement Index with attachments D through L |
| 14 | | Revised Proposed Plan Approval Order |
| 15 | | Blackline of Revised Proposed Plan Approval Order |
| 16 | 11/19/2012 | Objection of Trustees Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas to the Proposed Plan of Rehabilitation for FGIC with Exhibit A |
| 17 | 11/19/2012 | Objection to the Proposed Plan of Rehabilitation of Wells Fargo Bank, N.A., in its Capacity as Trustee for Certain RMBS Certificateholders and on Behalf of the Certificateholders and Noteholders for such Trusts and Transactions with Appendix |
| 18 | 11/19/2012 | Objection of U.S. Bank National Association and U.S. Bank Trust National Association, each in its Capacity as Trustee, to the Plan of Rehabilitation dated September 27, 2012 with Affidavit and Exhibits A to D in Support |
| 19 | 11/19/2012 | Objection of the Bank of New York Mellon and the Bank of New York Mellon Trust Company N.A. as Trustee to the Proposed Plan of Rehabilitation with Affidavit and Exhibits A to E in Support |
| 20 | 11/19/2012 | Objection and Joinder of Aurelius Capital Management, LP to (1) the Objection of U.S. Bank National Association and U.S. Bank Trust National Association to the Plan of Rehabilitation dated September 27, 2012 and (2) the Objections of the Bank of New York Mellon and the Bank of New York Mellon Trust Company, N.A. to the Proposed Plan of Rehabilitation |

**List of Documents Considered**

| Number | Date | Document |
|---|---|---|
| 21 | 11/19/2012 | Objection of Assured Guaranty Corp., Assured Guaranty Re Ltd. and Assured Guaranty Re Overseas Ltd. to Plan of Rehabilitation Proposed by Benjamin M. Lawsky, Superintendent of Financial Services of the State of New York, as Rehabilitator of FGIC with Affidavit and Exhibits A to B in Support |
| 22 | 11/19/2012 | Objection of CQS ABS Master Fund Ltd., CQS Select ABS Master Fund Ltd. and CQS ABS Alpha Master Fund Ltd. to Plan of Rehabilitation for FGIC with Appendices A to G in Support |
| 23 | 11/19/2012 | Conditional Objection of Jefferson County, Alabama to the Plan of Rehabilitation for FGIC with exhibits A and B in support |
| 24 | 11/19/2012 | Objections of Certain Jefferson County Warrantholders to Plan of Rehabilitation with Affirmation and Exhibits A and B in Support |
| 25 | 11/19/2012 | Limited Objection of Children's Health Partnership Holdings Pty Ltd as Trustee of the CHP Holdings Unit Trust to Plan of Rehabilitation for FGIC with Affirmation and Exhibits A and B in Support |
| 26 | 11/20/2012 | Interim Order Extending Plan Supplement Deadline |
| 27 | 12/6/2012 | Notice of Entry attaching Order Approving the Settlement Commutation and Release Agreement between FGIC and American Overseas Reinsurance Co. Ltd. |
| 28 | | Plan Approval Blackline |
| 29 | 12/12/2012 | Plan Approval Order |
| 30 | 12/12/2012 | First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company |
| 31 | | First Amended Plan Blackline |
| 32 | 12/12/2012 | Attachment D Schedule of Terminated Contracts and Leases |
| 33 | | FGIC Proof of Policy Claim Form |
| 34 | | Redline Proof of Policy Claim Form |
| 35 | 12/12/2012 | Omnibus Reply Memorandum of Law in Further Support of Approval of First Amended Plan of Rehabilitation for FGIC. |
| 36 | 12/12/2012 | Affidavit of Michael W. Miller in Further Support of Approval of First Amended Plan of Rehabilitation |
| 37 | 12/12/2012 | Affidavit of John S. Dubel in Further Support of Approval of First Amended Plan of Rehabilitation |
| 38 | 12/3/2012 | Notice of Withdrawal of Conditional Objection of Jefferson County, Alabama to the Plan of Rehabilitation |
| 39 | 12/10/2012 | Notice of Withdrawal of Objection of Assured Guaranty Corp., Assured Guaranty Re Ltd. and Assured Guaranty Re Overseas Ltd. to Plan of Rehabilitation |
| 40 | | Exhibit 1A: Omnibus Response Chart |
| 41 | 12/19/2012 | Order by Doris Ling-Cohan |
| 42 | 1/7/2013 | CDS Notice of Entry |
| 43 | 1/7/2013 | AAArdvark Notice of Entry |

**List of Documents Considered**

| Number | Date | Document |
|---|---|---|
| 44 | 1/18/2013 | Court Order dated January 18, 2013 |
| 45 | 1/24/2013 | Court Order dated January 24, 2013 |
| 46 | 1/22/2012 | Amended objection of Deutsche Bank to the First Amended Proposed Plan of Rehabilitation |
| 47 | 1/22/2012 | Amended objection of Wells Fargo to the First Amended Proposed Plan of Rehabilitation |
| 48 | 1/22/2012 | Amended objection of US Bank to the First Amended Proposed Plan of Rehabilitation |
| 49 | 1/22/2012 | Amended objection of Aurelius to the First Amended Proposed Plan of Rehabilitation |
| 50 | 1/22/2012 | Amended objection of BNY to the First Amended Proposed Plan of Rehabilitation |
| 51 | 1/22/2012 | Amended objection of CQS to the First Amended Proposed Plan of Rehabilitation |
| 52 | 1/22/2012 | Amended objection of Jeffco Holders to the First Amended Proposed Plan of Rehabilitation |
| 53 | 1/25/2013 | Weil Gotshal letter to Honorable Doris Ling-Cohan |
| 54 | 1/25/2013 | Amended Omnibus Reply Memorandum of Law in Further Support of Approval of First Amended Plan of Rehabilitation for FGIC |
| 55 | 1/22/2012 | Amended limited objections of Children's Health Partnership to the First Amended Proposed Plan of Rehabilitation |
| 56 | 1/22/2013 | Weil Gotshal submission on standard |
| 57 | 1/22/2013 | Trustee Objectors submission on standard |
| 58 | 1/22/2013 | CQS submission on standard |
| 59 | 1/22/2013 | Jeffco Warrantholders submission on standard |
| 60 | | Attachment E Proof of Policy Claim Form |
| 61 | 1/22/2013 | Aurelius submission on standard |
| 62 | 1/22/2013 | Children's Health Partnership submission on standard |
| 63 | | Attachment F Instructions for Completing Proof of Policy Claim Form |
| 64 | | Attachment E-1 Blackline of Proof of Policy Claim Form |
| 65 | | Attachment F-1 Blackline of Proof of Policy Claim Form |
| 66 | 1/28/2013 | Order adjourning hearing date |
| 67 | 1/28/2013 | Order amending 1/24/2013 order |
| 68 | 1/25/2013 | Weil Gotshal letter to Wells Fargo regarding plan sections. |
| 69 | 1/25/2013 | Weil Gotshal letter to BNY regarding plan sections. |
| 70 | 2/11/2013 | Weil Gotshal letter to Justice Ling-Cohan regarding remaining issues. |
| 71 | 2/11/2013 | Exhibit 1C Amended Omnibus Response Chart |
| 72 | 2/14/2013 | Order setting status conference |
| 73 | 2/19/2013 | Interim scheduling order |

Docs Considered: Sheet1 (2)

**List of Documents Considered**

| Number | Date | Document |
|--------|------|----------|
| 74 | 2/14/2013 | Weil Gotshal draft revisions of First Amended Plan for Rehabilitation |
| 75 | 2/5/2013 | Proposed revisions to proof of policy claim form |
| 76 | 3/15/2013 | Syncora notice of entry |
| 77 | 3/15/2013 | Munich notice of entry |
| 78 | 3/11/2013 | Weil Gotshal draft revisions of Plan Approval Order |
| 79 | 4/5/2013 | Freddie Mac statement of non-objection |
| 80 | 4/12/2013 | Weil Gotshal enclosing clean and redlines of First Amended Plan of Rehabilitation and proof of policy claim form |
| 81 | 4/12/2013 | Clean First Amended Plan of Rehabilitation |
| 82 | 4/12/2013 | Blackline of revised proof of policy claim form |
| 83 | 4/12/2013 | Clean revised proof of policy claim form |
| 84 | 4/12/2013 | Wells Fargo notice of withdrawal of objections |
| 85 | 4/12/2013 | BNY notice of withdrawal of objections |
| 86 | 4/12/2013 | Deutsche Bank notice of withdrawal of objections |
| 87 | 4/12/2013 | U.S. Bank notice of withdrawal of objections |
| 88 | 4/16/2013 | Weil Gotshal letter to court regarding termination agreement and deed of release |
| 89 | 4/23/2013 | Scheduling order |
| 90 | 4/26/2013 | Children's Health Partnership notice of entry |
| 91 | 4/25/2013 | Children's Health Partnership notice of withdrawal of objections |
| 92 | 2012 | Ibbotson Cost of Captial Yearbook 2012 |
| 93 | 2013 | Ibbotson Cost of Captial Yearbook 2013 |
| 94 | 6/4/2013 | Revised Proposed Plan Approval Order, Filed June 4, 2013 |
| 95 | 6/4/2013 | Blackline of Revised Proposed Plan Approval Order, Filed June 4, 2013 |
| 96 | 6/4/2013 | Blackline of First Amended Plan of Rehabilitation, Filed June 4, 2013 |
| 97 | 6/4/2013 | Letter to Rehabilitation Court, Dated June 4, 2013 |
| 98 | 6/5/2013 | Letter to the Rehabilitation Court, Dated June 5, 2013 |
| 99 | 6/11/2013 | Plan Approval Order |
| 100 | 6/11/2013 | Notice of Plan Approval |
| 101 | 6/4/2013 | Notice of Withdrawal of Objections of Aurelius Capital Management, LP to Plan of Rehabilitation for Financial Guaranty Insurance Company Subject to Entry of Revised Plan Approval Order |

Docs Considered: Sheet1 (2)

**List of Documents Considered**

| Number | Date | Document |
|---|---|---|
| 102 | 6/4/2013 | Notice of Withdrawal of Objections of CQS ABS Master Fund, Ltd., CQS Select ABS Master Fund Ltd. and CQS ABS Alpha Master Fund Ltd. to Plan of Rehabilitation for Financial Guaranty Insurance Company Subject to Entry of Revised Plan Approval Order |
| 103 | 5/31/2013 | Letter Withdrawing Objections of Certain Jefferson County Warrantholders to Plan of Rehabilitation |
| 104 | 5/31/2013 | Affirmation in Support of Rehabilitators Motion for an Order (i) approving that certain Stipulation Regarding Treatment under Plan of Rehabilitation for Financial Guaranty Insurance Company among the Rehabilitator of Financial Guaranty Insurance Company, Financial Guaranty Insurance Company, The Bank of New York Mellon, as successor trustee, The Bank of New York Mellon, as fiscal agent, and certain Jefferson County Warrantholders, dated May 31, 2013, and (ii) amending, to the extent necessary to give effect to the Stipulation, FGIC's obligations under the JeffCo Warrant Policies |
| 105 | 5/31/2013 | Stipulation Regarding Treatment under Plan of Rehabilitation for Financial Guaranty Insurance Company among the Rehabilitator of Financial Guaranty Insurance Company, Financial Guaranty Insurance Company, The Bank of New York Mellon, as successor trustee, The Bank of New York Mellon, as fiscal agent, and certain Jefferson County Warrantholders, dated May 31, 2013 |
| 106 | 6/11/2013 | Signed Order to Show Cause, dated June 11, 2013, Setting the Hearing Date, and Certain Deadlines, for Approval of the Stipulation and Setting Forth the Treatment of JeffCo Control Rights |
| 107 | 5/14/2013 | 2013 Q1 FGIC Statement (PDF) |
| 108 | N/A | March 31, 2013 FGIC Quarterly Operating Review (PDF) |
| 109 | 5/10/2013 | 2013 1st Quarter FGIC Statutory-Basis Financial Statements (PDF) |
| 110 | 6/11/2013 | Interim Order, dated June 11, 2013, regarding ResCap Trustees' Compliance with Order to Show Cause Notice Provision |
| 111 | 5/31/2013 | Affirmation in Support of Rehabilitators Motion for an Order (i) approving that certain Stipulation Regarding Treatment under Plan of Rehabilitation for Financial Guaranty Insurance Company among the Rehabilitator of Financial Guaranty Insurance Company, Financial Guaranty Insurance Company, The Bank of New York Mellon, as successor trustee, The Bank of New York Mellon, as fiscal agent, and certain Jefferson County Warrantholders, dated May 31, 2013, and (ii) amending, to the extent necessary to give effect to the Stipulation, FGIC's obligations under the JeffCo Warrant Policies |
| 112 | 5/31/2013 | Stipulation Regarding Treatment under Plan of Rehabilitation for Financial Guaranty Insurance Company among the Rehabilitator of Financial Guaranty Insurance Company, Financial Guaranty Insurance Company, The Bank of New York Mellon, as successor trustee, The Bank of New York Mellon, as fiscal agent, and certain Jefferson County Warrantholders, dated May 31, 2013 |
| 113 | 6/11/2013 | Signed Order to Show Cause, dated June 11, 2013, Setting the Hearing Date, and Certain Deadlines, for Approval of the Stipulation and Setting Forth the Treatment of JeffCo Control Rights |

**List of Documents Considered**

| Number | Date | Document |
|--------|------|----------|
| 114 | 7/12/2013 | Termination Agreement by and Among FGIC, The Bank of New York Mellon in various capacities, the Company and Other Parties |
| 115 | 7/12/2013 | Order Approving FGIC's Execution and Performance of Certain Agreements Related to the Chapter 9 Case of Jefferson County, Alabama |
| 116 | 6/7/2013 | NOTICE OF HEARING ON DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF THE SETTLEMENT AGREEMENT AMONG THE DEBTORS, FGIC, THE FGIC TRUSTEES AND CERTAIN INSTITUTIONAL INVESTORS |
| 117 | 6/14/2013 | JOINDER OF FGIC TRUSTEES TO THE DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF THE SETTLEMENT AGREEMENT AMONG THE DEBTORS, FGIC, THE FGIC TRUSTEES AND CERTAIN INSTITUTIONAL INVESTORS |
| 118 | 6/14/2013 | JOINDER OF FGIC TRUSTEES TO THE DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF THE SETTLEMENT AGREEMENT AMONG THE DEBTORS, FGIC, THE FGIC TRUSTEES AND CERTAIN INSTITUTIONAL INVESTORS |
| 119 | 6/19/2013 | RESERVATION OF RIGHTS WITH RESPECT TO DEBTORS' MOTION FOR AN ORDER UNDER BANKRUPTCY CODE SECTIONS 105(A) AND 363(B) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER A PLAN SUPPORT AGREEMENT WITH ALLY FINANCIAL INC., THE CREDITORS' COMMITTEE, AND CERTAIN CONSENTING CLAIMANTS |
| 120 | 6/19/2013 | JOINDER OF FEDERAL HOME LOAN MORTGAGE CORPORATION TO MONARCH ALTERNATIVE CAPITAL LP AND STONEHILL CAPITAL MANAGEMENT LLC'S RESERVATION OF RIGHTS WITH RESPECT TO DEBTORS' MOTION FOR AN ORDER UNDER BANKRUPTCY CODE SECTIONS 105(A) AND 363(B) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER A PLAN SUPPORT AGREEMENT WITH ALLY FINANCIAL INC., THE CREDITORS' COMMITTEE, AND CERTAIN CONSENTING CLAIMANTS |

Docs Considered: Sheet1 (2)

**List of Documents Considered**

| Number | Date | Document |
|--------|------|----------|
| 121 | 6/19/2013 | OBJECTION OF THE AD HOC GROUP OF JUNIOR SECURED NOTEHOLDERS TO THE DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF THE SETTLEMENT AGREEMENT AMONG THE DEBTORS, FGIC, THE FGIC TRUSTEES AND CERTAIN INSTITUTIONAL INVESTORS |
| 122 | 6/19/2013 | OMNIBUS REPLY OF CERTAIN RMBS TRUSTEES TO RESPONSES TO THE DEBTORS' MOTION FOR AN ORDER UNDER BANKRUPTCY CODE SECTIONS 105(a) AND 363(b) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER A PLAN SUPPORT AGREEMENT WITH ALLY FINANCIAL INC., THE CREDITORS' COMMITTEE, AND CERTAIN CONSENTING CLAIMANTS |
| 123 | 6/25/2013 | STATEMENT OF THE STEERING COMMITTEE GROUP OF RMBS HOLDERS IN SUPPORT OF THE OMNIBUS REPLY OF CERTAIN RMBS TRUSTEES TO RESPONSES TO THE DEBTORS' MOTION FOR AN ORDER UNDER BANKRUPTCY CODE SECTIONS 105(a) AND 363(b) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER A PLAN SUPPORT AGREEMENT WITH ALLY FINANCIAL INC., THE CREDITORS' COMMITTEE, AND CERTAIN CONSENTING CLAIMANTS |
| 124 | 5/10/2013 | S TATUTORY - B ASIS FINANCIAL S TATEMENTS AND OTHER FINANCIAL INFORMATION Financial Guaranty Insurance Company Years Ended December 31, 2012 and 2011 With Report of Independent Auditors |
| 125 | 5/14/2013 | 2012 FGIC Statement |
| 126 | 12/14/2012 | S TATUTORY - B ASIS FINANCIAL S TATEMENTS Financial Guaranty Insurance Company September 30, 2012 |

# ATTACHMENT III



**RESCAP**

# Residential Capital, LLC

## FGIC Commutation Proposal Discussion Materials

**May 15, 2013**



*Duff & Phelps Securities, LLC is a FINRA Registered Broker-Dealer*

*C O N F I D E N T I A L*
*Attorney-Client Privilege*

AMSTERDAM • ATLANTA • AUSTIN • BOSTON • CHICAGO • CINCINNATI • DALLAS • DENVER • DETROIT • HOUSTON • LONDON • LOS ANGELES • MORRISTOWN
MUNICH • NEW YORK • NEWPORT BEACH • PARIS • PHILADELPHIA • PLANO • SAN FRANCISCO • SEATTLE • SHANGHAI • SILICON VALLEY • TOKYO • TORONTO • WASHINGTON D.C.

# Executive Summary

**In late March, FGIC delivered a commutation proposal ("Proposal") to the Steering Committee Group of RMBS Holders for ResCap sponsored trusts to provide a global resolution regarding the pending RMBS litigation.  The Proposal from FGIC sets forth a lump sum cash consideration paid to the policyholders of the ResCap-related wrapped trusts in exchange for the ability to assert a general unsecured claim in the ResCap bankruptcy cases.**

- On June 11, 2012, Benjamin Lawsky, Superintendent of Financial Services of the State of New York (the "Rehabilitator"), filed a rehabilitation petition on behalf of FGIC with the Supreme Court of the State of New York.

  – The Rehabilitator filed an initial Plan of Rehabilitation for FGIC on September 27, 2012 and filed the First Amended Plan of Rehabilitation on December 12, 2012.

  – In connection with the First Amended Plan of Rehabilitation, Lazard, as financial advisor to the New York Liquidation Bureau, submitted an affidavit which contained revised projections.

  – The Rehabilitator filed a revised First Amended Plan of Rehabilitation for FGIC on April 12, 2013 (the "Plan") which is expected to be heard on June 11, 2013.

- Based on the current Plan, holders of permitted policy claims ("Policyholders") would receive (i) an upfront Cash Payment in an amount equal to a specified cash payout percentage upon the initial incurrence of the policy claim and (ii) additional catch-up payments through a ratable payout mechanism as set forth in the Plan.

  – In the revised Base Scenario, the Policyholders would receive an initial recovery of ~17.25% and then a subsequent distribution of up to 28.5% on their claim (based on a net present value of the distributions discounted at an illustrative rate of 15%).

- In connection with the Plan, FGIC presented the Proposal to the Steering Committee Group of RMBS Holders for ResCap trusts in late March.

  – The Proposal provides a cash payout from FGIC of approximately **$253 million** to the ResCap-related RMBS Policyholders in exchange for FGIC to have the right to assert a **~$597 million claim** in the ResCap case.

*Privileged & Confidential - Attorney Work Product*
2

# Executive Summary (cont'd)

**Based on D&P's loss estimates of the wrapped portion of the ResCap-sponsored RMBS trusts, the cash commutation proposal provided by FGIC is within the range of expected payments under the Plan of Rehabilitation on discounted cash flow basis.**

| | FGIC Settlement Proposal | FGIC Plan | |
|---|---|---|---|
| **Considerations** (***Benefits*** and ***Risks***) | ■ RMBS Policyholders would receive approximately **$253 million** upon plan confirmation (on or around December 2013).<br><br>■ ***Benefit:*** Provides a global resolution on outstanding ResCap RMBS litigation issues.<br><br>■ ***Benefit:*** One-time cash payment made to ResCap RMBS Policyholders upon plan confirmation.<br><br>■ ***Benefit:*** ResCap RMBS Trusts will not need to pay future premiums.<br><br>■ ***Risk:*** Potential risk of relinquished upside economics in the event that the Base Scenario under the Plan is met and correspondingly exceeded. | ■ RMBS Policyholders would receive approximately **$150 million** upon plan confirmation (on or around December 2013); remainder of the payments will be made over 40 years.<br><br>■ ***Benefit / Risk:*** RMBS Policyholders bear the exposure to upside opportunity (benefit) and downside (risk) related to size of actual claim pool(s) and cash flows.<br><br>■ ***Risk:*** A significant portion of cash distributions from Deferred Payout Obligations and other true-up payments are significantly back-ended, although a majority of the claims are expected to arise in the first five years (>70%).<br><br>■ ***Risk:*** Outstanding ResCap RMBS litigation issues would need to be resolved separately.<br><br>■ ***Risk:*** Recoveries are based on stale financial projections and claim estimates; updated estimates have not yet been provided. | |
| | | **Base Scenario** | **Stress Scenario** |
| **Cash Payments (NPV for the Plan)** | **$253 million** | ~$220 to $340 million[a] | ~$190 to $250 million[a][b] |
| **Duff & Phelps' Recommendation** | **X** | *Settlement Proposal is within the range of reasonableness under either scenario(s). Distributions are subject to additional unforeseen risks not identified above.* | |

a) Range reflects 10% to 20% discount rate applied to the projected payouts.
b) Reflects 17-18% recovery on D&P's low and high loss estimates.
   Note: D&P has not estimated projected losses that correspond to the underlying macro assumptions as assumed under the Stress Scenario (per the Lazard Affidavit).

*Privileged & Confidential - Attorney Work Product*

1

# FGIC Settlement Proposal

# FGIC Settlement Proposal – Commutation and Claim

($ in millions)

**The Proposal outlines a cash payment of approximately $253 million by FGIC upon emergence in exchange for the ability for FGIC to assert approximately $597 million of allowed claims at Rescap.**

- The following Proposal is based on the following three main assumptions:

  - **[A]** Initial Cash Payment Percentage of 17.25% (based on the updated Stress Scenario pursuant to the Plan),

  - **[B]** Base Case Payout to policyholders of 28.5% (based on the updated Base scenario pursuant to the Plan assuming a 15% discount rate), and

  - **[J]** Haircut of 40% on unpaid payout claim estimates.

- In consideration for the cash commutation payment of approximately $253 million, FGIC in return would receive a claim in the Rescap case for the sum of the (i) payouts made to date related to the RFC- and GMACM-sponsored trusts and (ii) the cash commutation.

| Information Points | | |
|---|---|---|
| **Initial Cash Payment Percentage (CPP)** | **17.25%** | **[A]** |
| **Base Case Payout (NPV @ 15.0%)** | **28.50%** | **[B]** |
| | | |
| ResCap Sponsored RMBS Claim (Per FGIC) | $1,850.0 | |
| Less: Cost, Interest, etc. | (236.0) | |
| Total Projected Claims in POC | 1,614.0 | |
| Claims Paid to Date | 344.0 | [C] |
| Estimated Unpaid Claims | 1,270.0 | |
| Accrued and Unpaid ("A&U") Claims (as of 3/31/13) | 789.0 | [D] |
| Future Estimated Claims | $481.0 | [E] |

| Commutation Consideration | | |
|---|---|---|
| Claims - A&U - Cash at Initial CPP | $136.1 | [F] = [A] x [D] |
| | | |
| Claims - A&U - Base Case Payout less Initial CPP | $88.8 | [G] = [B] x [D] - [F] |
| Claims - Future Estimated Claims at Base Case Payout | 137.1 | [H] = [B] x [E] |
| Subtotal | $225.8 | [I] = [G] + [H] |
| | | |
| **Factor % of Unpaid Payout** | **60.0%** | [J] |
| Value Attributable to Estimated Unpaid Claims | $135.5 | [K] = [I] x [J] |
| | | |
| Total Value to Trusts | $271.6 | [L] = [F] + [K] |
| Less: Premiums waived by FGIC and retained by Trusts | 18.3 | [M] |
| **Cash Commutation paid by FGIC** | **$253.3** | [N] = [L] - [M] |

| FGIC Allowed Claims | | |
|---|---|---|
| Prior Claims Paid | $344.0 | [C] |
| Cash Commutation | 253.3 | [N] |
| **Amount of FGIC Allowed Claim** | **$597.3** | **[C] + [N]** |

*Privileged & Confidential - Attorney Work Product*

5

2

# Plan of Rehabilitation

# FGIC Plan of Rehabilitation – Summary

**The current Plan of Rehabilitation provides all of the value of FGIC, after the payment of certain administrative expenses and other costs, to be ratably distributed to the all of FGIC's Policyholders in a fair and equitable manner.**

- Per Lazard's Affidavit filed on December 12, 2012, the Policyholders are projected to receive a recovery of approximately 27-30% in the Base Scenario and 17-18% in the Stress Scenario (assuming a discount rate of approximately 10-20% on the distributions).

- The Policyholders would receive: **(1)** an initial cash payout percentage ("CPP") of 17.25% on accrued but unpaid claims on the effective date, **(2)** an updated initial CPP on future claims as they arise, **(3)** true-up payments for any upward changes in the CPP, and **(4)** pro rata distribution of excess cash after accounting for appropriate reserves.

  – The Policyholders would receive distributions on an annual basis based on the updated Base and Stress Scenarios or if there an significant cash inflow event as further outlined in the Plan.

| | Base Scenario | Stress Scenario |
|---|---|---|
| **Summary** | ■ FGIC's current expectation of future Claims, investment performance, recoveries, financial markets and other factors of relevance to CPP Revaluations based on circumstances, events and projections that FGIC anticipates are reasonably likely to occur. | ■ Non-catastrophic scenario envisioning a severe economic recession that is accompanied by:<br>– (i) sharp declines in home prices and the financial markets (e.g., approximately 30% decrease from peak home values),<br>– (ii) significant unemployment (e.g., approximately 5% increase in unemployment rates),<br>– (iii) high mortgage default rates, and<br>– (iv) other negative economic indicators of potential relevance to FGIC's insured exposures. |
| **Notional Claims** | $6.3 billion | $11.7 billion |
| **Total Payments** | $2.8 billion | $2.6 billion |
| **Initial CPP** | 17.25% | 17.25% |
| **Nominal Recovery** | 45% | 23% |
| **10% Discount Rate** | 30% | 18% |
| **15% Discount Rate** | 28.5% | 17% |
| **20% Discount Rate** | 27% | 17% |

# FGIC Plan of Rehabilitation – Base vs. Stress Scenario

($ in millions)

**FGIC's total notional claims estimates is approximately $6.3 billion in the base case and $11.7 billion in the stress case.**

- Based on D&P loss estimates of approximately $1.2 billion to $1.5 billion, the Policyholders for the ResCap-sponsored RMBS trusts may potentially represent 10% to 24% of the overall pool.

- A majority of the claims for the Policyholders of Rescap-sponsored RMBS trusts are expected to arise within the next 5 years.

| | | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | 38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **All FGIC Policyholders (Lazard Affidavit)** | **BASE SCENARIO** | | | | | | | | | | |
| | **Notional Claims - All** | $2,133 | $1,655 | $585 | $229 | $160 | $948 | $600 | $6 | -- | $6,316 |
| | *Ending CPP* | 17% | 23% | 26% | 29% | 31% | 34% | 37% | 37% | 39% | |
| | Total Payments | ($368) | ($516) | ($297) | ($197) | ($195) | ($536) | ($498) | ($2) | ($227) | ($2,840) |
| | **STRESS SCENARIO** | | | | | | | | | | |
| | **Notional Claims - All** | $2,399 | $3,874 | $1,247 | $675 | $637 | $1,696 | $1,130 | $12 | -- | $11,670 |
| | *Ending CPP* | 17% | 17% | 17% | 17% | 17% | 17% | 17% | 17% | 20% | |
| | Total Payments | ($414) | ($668) | ($215) | ($116) | ($110) | ($293) | ($195) | ($2) | ($629) | ($2,642) |
| | **VARIANCE** | | | | | | | | | | |
| | **Notional Claims - All** | $266 | $2,219 | $662 | $446 | $477 | $748 | $530 | $6 | -- | $5,354 |
| | *Ending CPP* | (0%) | (6%) | (9%) | (11%) | (13%) | (16%) | (19%) | (19%) | (18%) | |
| | Total Payments | ($46) | ($152) | $82 | $81 | $85 | $243 | $303 | -- | ($402) | $198 |
| **Claims for Policyholders of ResCap-Related RMBS Trusts (Per D&P's Estimates)** | **LOW CASE** | | | | | | | | | | |
| | **Notional Claims - ResCap** | $753 | $173 | $69 | $53 | $74 | $40 | ($0) | ($0) | $0 | $1,162 |
| | % Cumulative | 65% | 80% | 86% | 90% | 97% | 100% | 100% | 100% | 100% | 100% |
| | % of Total Notional Claims | | | | | | | | | | |
| | Base Case | 35% | 10% | 12% | 23% | 46% | 4% | NM | NM | NM | 18% |
| | Stress Case[a] | 31% | 4% | 6% | 8% | 12% | 2% | NM | NM | NM | 10% |
| | **HIGH CASE** | | | | | | | | | | |
| | **Notional Claims - ResCap** | $753 | $386 | $124 | $115 | $110 | $59 | $0 | ($0) | $0 | $1,546 |
| | % Cumulative | 49% | 74% | 82% | 89% | 96% | 100% | 100% | 100% | 100% | 100% |
| | % of Total Notional Claims | | | | | | | | | | |
| | Base Case | 35% | 23% | 21% | 50% | 69% | 6% | 0% | NM | NM | 24% |
| | Stress Case[a] | 31% | 10% | 10% | 17% | 17% | 3% | 0% | NM | NM | 13% |

(a)   D&P has not estimated projected losses that reflect the same underlying macro assumptions as the Stress Scenario included in the Affidavit.

*Privileged & Confidential - Attorney Work Product*

# FGIC Plan of Rehabilitation – ResCap Trust Policyholders

**($ in millions)**

**Under the Base Scenario, the ResCap-Sponsored RMBS Trust Policyholders may receive approximately $220-$340 million on a net present value basis.**

| Plan of Rehabilitation – Base Scenario | Initial | '14 - '17 | '18-'52 | Total Recovery | | | Notes |
|---|---|---|---|---|---|---|---|
| | | | | | Recovery % Based on: | | |
| | | | | | % Notional | % Discounted | |
| **LOW CASE** | | | | | | | |
| **Notional Claims - ResCap** | **$814** | **$112** | **$236** | **$1,162** | | | [A] |
| Nominal Cash Flow | | | | | | | |
| Initial CPP Payments | $150 | $23 | $67 | $240 | | | |
| Catch-Up CPP Payments | -- | 40 | 164 | 204 | | | |
| Subtotal | 150 | 63 | 231 | 444 | | | |
| Portion of DPO Accretion Payout | -- | 4 | 70 | 74 | | | |
| Total Payout | $150 | $67 | $301 | $518 | 45% | | [B] |
| Discounted Cash Flows | | | | | | | |
| 10% | $150 | $53 | $65 | $268 | 23% | 27% | [C] |
| 15% | 150 | 48 | 38 | 235 | 20% | 25% | |
| 20% | 150 | 43 | 24 | 217 | 19% | 24% | |
| **HIGH CASE** | | | | | | | |
| **Notional Claims - ResCap** | **$888** | **$251** | **$408** | **$1,546** | | | [A] |
| Nominal Cash Flow | | | | | | | |
| Initial CPP Payments | $163 | $52 | $114 | $330 | | | |
| Catch-Up CPP Payments | -- | 46 | 214 | 261 | | | |
| Subtotal | 163 | 99 | 328 | 590 | | | |
| Portion of DPO Accretion Payout | -- | 5 | 89 | 94 | | | |
| Total Payout | $163 | $103 | $418 | $684 | 44% | | [B] |
| Discounted Cash Flows | | | | | | | |
| 10% | $163 | $82 | $93 | $339 | 22% | 28% | [C] |
| 15% | 163 | 74 | 54 | 292 | 19% | 25% | |
| 20% | 163 | 68 | 35 | 266 | 17% | 24% | |

**[A]** A majority of the notional claims for the ResCap RMBS Trust Policyholders are presented within the first 5 years post-emergence in both the low and high cases.

**[B]** However, the nominal cash flows to the Policyholders are mostly back-ended due to the true-up payments related to the projected CPP increases and the payments on account of the DPO accretion.

**[C]** When applying a 10-20% discount rate to the recovery cash flow stream, the illustrative recovery estimates are approximately $220-$340 million which implies a recovery rate of approximately 17-23% based on the notional claim amount and 24-28% based on the discounted claim amount.

Note:  Assumes emergence occurs at the end of 2013.

*Privileged & Confidential - Attorney Work Product*