# **Exhibit 2**

1                       Goldstein
2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    -------------------------------x
     IN RE:
4    RESIDENTIAL CAPITAL, LLC,
5    et al.,              Civil Action No.
                          12-12020 (MG)
6
                       Debtors.
7    -------------------------------x
8
9         CHARLES RONALD GOLDSTEIN
10            New York, New York
11          Friday, July 26, 2013
12
13
14
15
16
17
18
19
20
21
22   Reported by:  Steven Neil Cohen, RPR
23   Job No. 64091
24
25

## Page 126

1    Goldstein
2    of the analysis.
3    BY MR. KOTWICK:
4        Q.   Could you tell me again what your
5    best -- what your idea of a best case
6    scenario would include?
7        A.   Again I --
8            MR. BAIO:  Object to the form.
9            THE WITNESS:  I haven't even seen
10       their decisions on parameters in the
11       model to know which default rates and
12       what they have done with the economy,
13       the recoveries from foreclosure
14       proceedings and all of that that
15       require, so I haven't seen those inputs
16       to then change those inputs to develop
17       what would be a better case than the
18       base case.
19   BY MR. KOTWICK:
20       Q.   Have you ever seen rehabilitation
21   plans other than in the FGIC rehabilitation
22   proceeding?
23       A.   Yes.  I actually am the bankruptcy
24   trustee for an insurance holding company and
25   had one such proceeding in the state of

## Page 127

1    Goldstein
2    Louisiana.
3        Q.   In that proceeding was there a
4    rehabilitation plan put forward?
5        A.   No.  I mean there was a plan, yes,
6    there was a plan put forth but it was a
7    quickly liquidating plan.
8        Q.   Did that quickly liquidating plan
9    provide for a best case scenario?
10       A.   It was not a -- the cash flows
11   associated with that portfolio were not --
12   did not have the 40-year runoff that we have
13   in this particular matter.
14       Q.   Are you aware of any analogous
15   situation of the FGIC rehab proceeding in
16   which a rehabilitation plan provided a best
17   case scenario?
18       A.   I guess maybe we need to be clear.
19   I don't think you understand the way we do
20   it and you just want to ask the question
21   again.
22            I am not saying that FGIC is
23   required to do that.
24            What I am saying is that Duff &
25   Phelps and that the trustees should consider

## Page 128

1        Goldstein
2    what other -- what are we missing, what is
3    it that is not included in these two cases,
4    the stress and the base case that might be
5    something I should think about.
6            And in those items or the items I
7    mentioned throughout the deposition that
8    they should have put together as well as
9    the -- those parameters as to the economy,
10   housing values and the like that are inputs
11   into the models that could generate a --
12   maybe a more favorable scenario so that at
13   least the parties could consider that or the
14   trustees would be able to consider that.
15       Q.   Going back to paragraph 27, page
16   10.
17       A.   Yes.
18       Q.   At the end of that last sentence
19   you make a reference to "The base scenario
20   excluded recoveries that FGIC expects to
21   receive in the normal course of operations,
22   refer to paragraph 29 below."
23            If you refer to paragraph 29 that
24   paragraph begins," According to FGIC's own
25   regulatory filings FGIC has projected more

## Page 129

1        Goldstein
2    than $1 billion in gross recoveries from
3    various loss mitigation activities such as
4    the pursuit of litigation claims."
5            Is that what you believe and what
6    you reference in paragraph 27 as being
7    excluded from the base case?
8            MR. BAIO:  Object to the form.
9            THE WITNESS:  I believe that all
10       of those potential litigation recoveries
11       have been excluded other than
12       reinsurance recoveries.
13           Most of the -- when you read the
14       statutory or the regulatory requirements
15       and the assessment of that line item it
16       includes subrogation claims and
17       reinsurance claims and I think we saw in
18       the model that there is about
19       $200 million or so of reinsurance
20       claims.
21           The $800 million or so of the
22       subrogation claims or the types of
23       claims we are talking about were
24       estimated and in the regulatory filing.
25           So those are the only two types

Page 130

1  Goldstein
2  that there could be per their standard
3  and the claims that are listed there are
4  subject to review by the parties
5  providing that number so that it
6  provides guidance in the regs to say it
7  is -- we understand these things are
8  judgmental and that we want the
9  fiduciaries or whoever is preparing
10 those items to develop a scenario or a
11 range but those ranges need to be within
12 some sort of reasonable range and that
13 is the expectation of arriving at that
14 number.
15 BY MR. KOTWICK:
16    Q.   You referred to various regulatory
17 filings and regulations.
18       Are you familiar with the
19 regulations governing FGIC's financial
20 statements?
21       MR. BAIO:  Object to the form.
22       THE WITNESS:  Yes.  I have read
23 the sections that I believe relate to
24 their filings and particularly in
25 relation to the $1 billion that is

Page 131

1  Goldstein
2  listed in those schedules.
3  BY MR. KOTWICK:
4    Q.   When you say "those schedules,"
5  let me mark for identification as Goldstein
6  Exhibit 7, a document entitled "Quarterly
7  Statement of the Financial Guarantee
8  Insurance Company in Rehabilitation as of
9  March 31, 2013."
10       (Document entitled "Quarterly
11 Statement of the Financial Guarantee
12 Insurance Company in Rehabilitation as of
13 March 31, 2013" was marked Goldstein Exhibit
14 7 for identification)
15 BY MR. KOTWICK:
16    Q.   Mr. Goldstein, the reporter has
17 handed you what has been marked for
18 identification as Goldstein 7.
19       I am looking at your report and
20 the footnote in paragraph 29 to the
21 $1 billion in gross recoveries sentence.
22       It refers to the quarterly
23 statement of the Financial Guaranty
24 Insurance Company as of March 31, 2013, page
25 6.16.

Page 132

1  Goldstein
2       Is that the document that we have
3  now marked as Goldstein 7?
4    A.   That is that document, yes.
5    Q.   And if you refer to page 6.16
6  where on that page is the reference to the
7  $1 billion in gross recoveries from various
8  loss mitigation activities that you refer to
9  in your report?
10   A.   If you go to the middle below
11 where it says "gross loss reserves," do you
12 see that, it says "less"?
13   Q.   Okay.
14   A.   "Gross projected recoveries."
15   Q.   That number is a billion 58
16 million 632 dollars?
17   A.   Yes.
18   Q.   What do you understand that number
19 to represent?
20   A.   It represents management's
21 estimate of two types of recoveries.
22       One, as I mentioned before,
23 subrogation rights.
24       And, secondly, related to
25 reinsurance claims.

Page 133

1  Goldstein
2    Q.   What is the basis of your
3  understanding?
4    A.   The regulations as I think it is
5  referred SAP 62.
6        I did not bring those pages with
7  me but it discusses the basis upon which
8  those responsible parties need to judge
9  particular recoveries and how they should go
10 about doing that.
11   Q.   In your report you state that the
12 $1 billion in gross recoveries are from
13 various loss mitigation activities.
14       Is that the same as the
15 subrogation and reinsurance issues you just
16 raised?
17   A.   Yes.
18   Q.   Your understanding is that FGIC
19 has excluded that billion 58 million 632
20 number -- dollar number, from their base
21 case analysis?
22       MR. BAIO:  Object to the form.
23       THE WITNESS:  The -- I think I
24 mentioned earlier that we did identify
25 and subsequently provided information

Page 134

1  Goldstein
2  about $200 million of reinsurance
3  proceeds. But the remainder, yes.
4  BY MR. KOTWICK:
5  Q. So 800 million is the remainder
6  approximately?
7  A. Yes.
8  Q. Your understanding is that
9  $800 million was excluded from the base case
10 scenario?
11     MR. BAIO: Object to the form.
12     THE WITNESS: I have seen no proof
13 that it is included.
14 BY MR. KOTWICK:
15 Q. You have testified previously to a
16 certain extent about various litigation
17 recoveries.
18     I refer you to paragraph 28 now in
19 your report.
20 A. Yes.
21 Q. That paragraph starts, "The FGIC
22 settlement excludes contingent assets such
23 as potential recoveries from pending
24 litigation that relate to allegations of
25 fraud and other causes of action in

Page 135

1  Goldstein
2  connection with the RMBS transactions."
3     It is your opinion that FGIC's
4  analysis as well as Duff & Phelps' analysis
5  should have included the value of certain
6  potential litigation recoveries in their
7  analysis?
8  A. It should have an assessment of it
9  and if there was value then it should have
10 been included, absolutely.
11 Q. To what extent don't you believe
12 they assessed the value of those
13 litigations?
14     MR. BAIO: Object to the form.
15 BY MR. KOTWICK:
16 Q. To what extent don't you believe
17 that FGIC assessed the value potential value
18 of those litigations?
19     MR. BAIO: Same objection.
20     THE WITNESS: I think FGIC has
21 estimated it and we see a portion of it
22 in their filing.
23 BY MR. KOTWICK:
24 Q. You are referring to the billion
25 58 million number that you testified to?

Page 136

1  Goldstein
2  A. Yes. However in the Duff & Phelps
3  and I think in their offer it explicitly
4  removes that potential upside for the
5  holders and is offering the 253 million in
6  complete release of all other rights to any
7  other funds.
8  Q. You agree that in order to include
9  potential recoveries in the base case those
10 recoveries would have to be both probable
11 and estimable?
12     MR. BAIO: Object to the form.
13     THE WITNESS: When I read the
14 standard it is not -- estimable and
15 probable is the accounting term for the
16 recording of a liability.
17     In this particular case this is an
18 asset and those have different standards
19 and the standards required for the
20 regulator or for the entity is dictated
21 in the writeup and I went through that a
22 little bit before that you sort of get a
23 range of recoveries and you look at your
24 probability of success just like I
25 described as people should have done as

Page 137

1  Goldstein
2  any fiduciary would when you look at
3  litigation likelihood of success. Cost
4  of getting there coming up with a net
5  amount.
6     That is also a requirement in the
7  regulations that is done prior to, in a
8  consideration of that particular value
9  that is provided.
10 BY MR. KOTWICK:
11 Q. What is your experience in valuing
12 potential recoveries in impending
13 litigations?
14 A. I have made career of it.
15 Q. With respect to the AFI litigation
16 that you reference on page 11, paragraph 28,
17 Romanette ii, did you form an opinion
18 concerning FGIC's recovery against AFI in
19 the AFI litigation?
20 A. I have not.
21 Q. Have you undertaken any legal
22 analysis of the strengths and weaknesses of
23 the claims in that litigation?
24 A. I have not.
25 Q. So you have no opinion as to what,

35 (Pages 134 to 137)