# EXHIBIT 1

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Charles L. Kerr
J. Alexander Lawrence
Kayvan B. Sadeghi
James A. Newton

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |

## <u>AMENDED DIRECT TESTIMONY OF JEFFREY A. LIPPS</u>

I, Jeffrey A. Lipps, under penalty of perjury, testify as follows:

REDACTED

REDACTED

## <u>SUMMARY OF QUALIFICATIONS</u>

5.      I am a founding partner of Carpenter Lipps & Leland LLP in Columbus, Ohio

(the "Firm"), which is a litigation boutique with a national practice.  I was a partner at Jones Day

before becoming a partner in the Firm.

6.      I have over thirty years' experience as a trial lawyer representing and counseling

clients in complex commercial litigation matters, including commercial disputes, class action

litigation, securities litigation, procurement matters, and bankruptcy litigation.  I have handled

cases in state and federal courts in over a dozen states.

7.      I currently represent or have represented over the past several years a number of

the debtor entities, including Residential Capital LLC ("ResCap"), Residential Funding Co.,

LLC ("RFC"), and GMAC Mortgage, LLC ("GMACM"), four non-debtor affiliated entities, and

several individual former directors and officers of debtor entities in over a dozen separate

lawsuits involving certain debtor entities' issuance of RMBS.  I have been representing various

defendants in these matters since the spring of 2010.

8.      Among the suits in which I represented the Debtors in prepetition litigation were

the twelve cases brought by FGIC against various debtors and affiliated entities (involving

twenty securitizations, and coordinated before Judge Crotty under the lead case *Financial

Guaranty Insurance Co. v. GMAC Mortgage, LLC*, No. 11-CV-09729-PAC (S.D.N.Y.)).[1] I had

also represented the Debtors in *MBIA Insurance Corp. v. Residential Funding Co., LLC*, No.

603552/2008 (Sup. Ct., N.Y. Cnty.) (involving five securitizations), and *MBIA Insurance Corp.*

---

[1] Debtors' Exhibits 8 through 19 are copies of the complaints and/or amended complaints from those twelve cases,
all of which are publicly filed and obtained from the ECF website for the United States District Court for the
Southern District of New York.

*v. GMAC Mortgage, LLC*, No. 600837/2010 (Sup. Ct., N.Y. Cnty.) (involving three securitizations). Each of these cases involved claims of breaches of representations and warranties, and related claims of alleged failure to repurchase loans pursuant to the terms of the applicable contracts. Our Firm was counsel of record in all of these cases.

9.      In addition, prepetition the Debtors frequently called upon me and my Firm to evaluate various issues relating to repurchase demands or alleged breaches of representations and warranties that were not yet in litigation.

10.      My Firm has also been retained as special litigation counsel in these bankruptcy cases. Among the litigation matters for which we were retained was to litigate monoline proofs of claim. In connection with those matters, we analyzed the proofs of claim filed by FGIC and the other monolines and actively participated in developing the strategy to litigate monoline proofs of claim. We collaborated with Morrison & Foerster LLP ("Morrison & Foerster") in making initial document requests to FGIC and responding to FGIC's initial document requests to the Debtors. In connection with the court appointed examiner's investigation of the Debtors, my firm was also asked by Morrison & Foerster to assist in responding to the examiner's questions regarding the Debtors' securitization processes, and his request for submissions regarding the validity of various third-party claims. These included claims that were or would have been asserted by the monolines, trustees, and various investors.

11.      I was also proffered by the Debtors as an expert witness in the planned hearing on the Debtors' motion under Bankruptcy Rule 9019 to approve two settlements regarding the Debtors' contractual liabilities to securitization trusts formed between 2004 and 2007, which involved potential liabilities substantially identical to those at issue here.

12.     As part of our Firm's representation of the Debtors in these matters, I have

conducted extensive factual and legal analysis of the claims and defenses in these types of

"representation and warranty" cases, monitored the development of the law around the country in

this area of the law, and assessed the Debtors' exposure in these types of cases.  This analysis has

included close review of the publicly available papers relating to settlements of representation

and warranty claims involving monoline insurers, as well as the Bank of America and Lehman

Brothers settlements of representation and warranty claims brought by trustees.  Over the last

three years of representing the Debtors in RMBS litigation, I have obtained substantial subject

matter expertise in the highly specific legal jurisprudence that has developed around disputes

regarding the sale of RMBS.

13.     I am also deeply familiar with the Debtors' history and practices with respect to

RMBS securitizations.  In the two MBIA Insurance Corp. ("MBIA") cases, which are directly

analogous to the FGIC claims settled here, the parties engaged in extensive fact discovery

involving the exchange and analysis of millions of pages of discovery material and the

completion of dozens of depositions as of the petition date, and had begun expert discovery with

an exchange of initial expert reports in the *MBIA Insurance Corp. v. Residential Funding Co.*

case.  In addition, we had evaluated and made initial letter submissions in the FGIC group of

cases relating to motion to dismiss arguments, and FGIC, likewise, had submitted a letter

outlining a proposed early summary judgment motion.

14.                                             REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

127.    In general, based on my evaluation of the factual record developed so far, I

believe the Debtors have very strong factual defenses and solid witnesses.  None of the over

sixty witnesses deposed in the *MBIA Insurance Corp. v. Residential Funding Co., LLC*, No.

603552/2008 (Sup. Ct., N.Y. Cnty.) case, for example, testified to anything resembling fraud or

knowing misrepresentation in any of the Debtors' practices.  Many described good attention to

internal controls, and a meaningful effort and genuine desire to be transparent with the Investors

about the risks of the investments.

128.                                    REDACTED


129.    For one, there has been tremendous attrition among the Debtors' employees since

the key events occurring from 2004 through about 2008.  For example, of the seventy-six

witnesses deposed in the two MBIA cases as of the petition date, many of whom would also be

witnesses as to the FGIC Insured Trusts, 80% were former employees.  Many who were current

employees at the time of their deposition have since left the company, most recently to go to

Ocwen or Greentree as a result of the Debtors' recent asset sales.  At present, *none* of the key

RFC capital markets employees who worked on the securitizations at issue remains a current

employee of the Debtors.  Most of these former employees reside in Minnesota and

Pennsylvania, beyond the reach of a New York court trial subpoena.  A few reside as far away as California and Texas.  Almost none left the company with any ongoing contractual obligation to cooperate with future litigation.

130.    Moreover, most of the former employee witnesses were involuntarily terminated as part of a series of mass layoffs beginning in 2007.  Thus, many have a limited sense of loyalty to the Debtors, and while they may have been willing to appear voluntarily once for a deposition to avoid being served with a deposition subpoena, garnering their cooperation for future depositions, let alone trial testimony in another state, would undoubtedly be challenging.  Thus, presenting evidence live at trial—which, from my perspective as a trial lawyer, is almost always more meaningful than reading a dry transcript or even replaying videotaped testimony—would be a challenge.

131.    Another challenge is posed by the nature of these securitizations, each of which contains thousands of individual loans.  Indeed, over 185,000 loans are at issue in the FGIC Insured Trusts.  As noted above, it has always been the Debtors' position that a repurchase claim requires a loan-by-loan evaluation of *which* loans to repurchase.  Plaintiffs in both securitization and representation and warranty cases have argued, with some limited success to date, that a statistical sampling approach is acceptable.[45]  Regardless of whether statistical sampling can reliably be used to assess breaches and calculate damages, however, it is clear most judges would not permit the presentation of evidence on thousands of individual loans one by one.

132.                                        REDACTED

---

[45] *See MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/2008, 2010 N.Y. Misc. LEXIS 6182, at *8-18 (Sup. Ct., N.Y. Cnty. Dec. 22, 2010) (permitting statistical sampling); *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 11 Civ. 6189 (DLC), 2012 U.S. Dist. LEXIS 173768 (S.D.N.Y. Dec. 3, 2012) (same).

REDACTED

REDACTED

REDACTED

141.    The anticipated scope of discovery would likely involve tens of millions of pages

of documents and hundreds of days of deposition testimony from current and former employees

of the debtor entities.  My opinion is based on the Firm's work preparing to litigate with FGIC

(including the initial exchange of document requests between the parties in these bankruptcy

proceedings), my experience in litigation with MBIA on similar claims to those being asserted

by FGIC, and my knowledge regarding the extensive discovery which has occurred in other

cases involving monoline insurers.

142.    The Firm represents debtor entities RFC and GMACM in MBIA's lawsuits

against each. *MBIA Insurance Corp. v. Residential Funding Co., LLC*, No. 603552/2008 (Sup.

Ct., N.Y. Cnty.) and *MBIA Insurance Corp. v. GMAC Mortgage, LLC*, No. 600837/2010 (Sup.

Ct., N.Y. Cnty.)  The enormous fact discovery in MBIA's lawsuits is indicative of the potential

discovery burden in litigating these claims.

143.    MBIA's case against RFC was filed in 2008, but discovery was still ongoing on

the Petition Date in certain matters.  The case involves just five securitizations made up of loans

issued by RFC in less than a year.  Still, RFC has produced more than a million pages of

documents, over 63,000 mortgage loan files, and one terabyte of data.

144.    In addition, MBIA has taken over eighty days of depositions of current or former

RFC, GMACM, or ResCap personnel.  RFC has taken fifty days of depositions of current or

former MBIA personnel.  Ten expert reports have been exchanged, and rebuttal reports were

anticipated.

145.    Fact discovery in MBIA's lawsuit against GMACM was also ongoing when the

bankruptcy case was filed.  That case involves just three securitizations issued by GMACM.

GMACM has already produced more than a million pages of documents and additional

electronic records.  The court previously cited to this discovery as showing the likely burden of

discovery of other cases in deciding to extend the automatic stay to stop the litigation being

pursue pursued by Western & Southern.  *See* July 10, 2012 Transcript in *In re Residential

Capital, LLC*, Adv. Proc. No. 12-0167 at 137 ("The debtors have provided specific samples of

cases that involved a small number of securitizations, but still produced millions of pages in

discovery and upwards of eighty days' worth depositions from the debtors' current and former

employees.")

146.     If anything, litigating FGIC's claims would pose a greater burden than the MBIA

cases.  The FGIC Insured Trusts consist of a larger number of securitizations, and a more diverse

array of securitization and loan types than the MBIA cases involved.  Prior to the entry into the

FGIC Settlement Agreement, the Debtors and FGIC had exchanged initial document requests in

these bankruptcy proceedings.  FGIC served the Debtors with no less than **117 document**

**requests**, including a request for all loan files in connection with the twenty (20) FGIC Insured

Trusts at issue in the prepetition litigation and six (6) additional FGIC Insured Trusts.  The

Debtors and FGIC had multiple meet and confers regarding the Debtors' document requests to

FGIC and the Debtors had provided FGIC an initial set of document search terms and custodians

for FGIC to use in searching its materials.  While FGIC had not yet provided the Debtors with

search terms or custodians, the Debtors had started to analyze the likely custodians for FGIC's

discovery requests, and preliminarily identified over sixty potential custodians among the parties.

147.     Additional complications would be posed in comparison to the MBIA litigation

because of the fact that the Investors and the FGIC Trustees also have claims against the Debtors

based on FGIC's failure to make payments since November 2009 on its policies, which could

impose additional demands on the Debtors.  It is quite possible if no settlement is reached with

FGIC that the FGIC Trustees and/or the Investors would serve their own unique document

requests on the Debtors.  Deposition discovery would also likely be more involved, with more

parties actively participating.

148.     As shown in the chart below, considering only the twenty FGIC Insured Trusts at

issue in the prepetition litigation rather than all of the forty-seven FGIC Insured Trusts covered

by the FGIC Settlement Agreement, FGIC's claims involve more securitizations, more loans,

more shelves, a greater timeframe and a far wider variety of mortgage products than were

involved in the MBIA cases

| | FGIC Cases Filed Prepetition | Combined MBIA Cases |
|---|---|---|
| **No. of Securitizations** | 20 Securitizations | 8 Securitizations |
| **No. of Loans at Closing**[47] | >185,000 Loans | 120,476 Loans |
| **No. of Product Shelves** | 4 Product Shelves (GMACM, RASC, RAMP, and RFMSII) | 2 Product Shelves (GMACM and RFMSII) |
| **Approximate Time Periods For Offerings** | RFC :      1.5 years (9/23/05 – 3/30/07) GMACM:  2 years, 3 months (3/29/05 – 6/28/07) | RFC:      10 months (7/28/06 – 5/30/07) GMACM:  2 years, 5 months (10/28/04 – 3/29/07) |
| **Loan Types** | • Adjustable rate home equity revolving credit line loans (HELOCs) and closed-end home equity loans (CESs)<br><br>• Fixed-rate and adjustable-rate first lien and junior lien mortgage loans<br><br>• Loans acquired through AlterNet and Negotiated Conduit Asset programs<br><br>• Fixed-rate second loans acquired through the 125% home equity loan program | • Fixed and adjustable rate home equity revolving credit line loans (HELOCs) and closed-end home equity loans (CESs) |

Given the over one hundred document requests already served by FGIC and the larger number of

securitizations, mortgage loans and mortgage products involved, discovery regarding the FGIC

Insured Trusts would likely be even more complicated than discovery in the two MBIA cases.

Many of the relevant document custodians and witnesses for litigating the issues covered by the

FGIC Settlement Agreement were not involved in the MBIA cases.  Some of the relevant

---

[47] Certain of the GMACM sponsored securitizations insured by FGIC and MBIA permitted additional loans to be added to a securitization post-closing.  As a result, the number of loans that were part of the securitizations at any point would be greater than the number of loans included at closing.

custodians have never had their emails restored as part of any prior litigation involving the Debtors.  Restoring documents from backup tapes for these custodians would be a time-consuming and expensive process.  In addition, producing the loan files for this large number of securitizations would be time-consuming and expensive, particularly given the complications posed by the sale of the Debtors' servicing platform.

## EFFECT OF BANKRUPTCY ON LITIGATION COSTS

REDACTED

150.    Aside from the complications created by the complex legal and factual issues described above, it is also difficult to precisely forecast the costs of such litigation because one of the more significant drivers of the costs would be how many loan files are produced and how many loan files are reunderwritten by the parties' experts.  FGIC's initial document requests to the Debtors included a request for all of the relevant loan files —over 185,000 loans.  Complying with this request would be very expensive; even at a ballpark estimate of $35 per loan file (which the Debtors have previously used as an average per-file cost) that would be approximately $6.5 million.  Reunderwriting of loan files is also a very expensive exercise.  How many loans the Debtors would need to reunderwrite would be driven in part by how many loans FGIC decided to

reunderwrite.  Based on the record in other monoline cases, FGIC's experts would likely submit reports analyzing breaches on thousands of individual loans, which the Debtors would need to rebut on an individual basis.

151.    Even the limited file review that was conducted in connection with the prior Rule 9019 RMBS settlement motion with certain institutional investors led to a file review that lasted several months and cost the Debtors millions of dollars.  A file review and associated expert reports of the scope that would likely be required to litigate FGIC's claims would be substantially more expensive.

152.    These expenses do not even include the costs associated with collecting, reviewing for privilege and producing email and other relevant documents, which the Court is well aware can be extremely costly.  *See* July 10, 2012 Hearing Transcript at 136-38, *In re Residential Capital, LLC v. Allstate Insurance Co*, Adv. Proc. 12-01671-mg (Bankr. S.D.N.Y.). Such discovery could resemble, or even exceed in scope, the expensive discovery conducted in connection with the Examiner's investigation.  That discovery required many months to complete and cost the Debtors' estates many millions of dollars.

153.    An additional factor which complicates the forecasting of litigation expenses is the fact that the Debtors are also faced with the claims of the FGIC Trustees.  This poses a significant complication for the litigation and it is impossible to accurately assess the impact of that on the Debtors' litigation costs based on the available information    REDACTED
REDACTED

154.    In my deposition, counsel to the Ad Hoc Group asked whether claims estimation under section 502(c) of the Bankruptcy Code could reduce the litigation costs.  Section 502(c) gives a bankruptcy court discretion as to when and how to estimate claims.  *See In re Chemtura Corp.,* 448 B.R. 635, 649 (Bankr. S.D.N.Y. 2011).  In estimating claims, courts in the Southern District of New York have chosen to "estimate the expected value of a claim based on the probability of the success of various potential outcomes if decided on the merits."  *Id.* at 650. Thus, while estimation might streamline somewhat the ultimate hearing and briefing on the claims of FGIC and the FGIC Trustees, getting to that point would still require extensive and expensive fact and expert discovery.

## **CONCLUSION**

155.                              REDACTED

I declare under penalty of perjury that the foregoing is true and correct.

Executed the 31st day of July, 2013, at St. Louis, Missouri.


_____/s/ Jeffrey A. Lipps_____
Jeffrey A. Lipps