**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DECLARATION OF GINA HEALY IN SUPPORT OF FEDERAL HOME LOAN
MORTGAGE CORPORATION'S OBJECTION TO DEBTORS' MOTION PURSUANT
TO FED R. R BANKR. P.  9019 FOR APPROVAL OF THE SETTLEMENT
AGREEMENT AMONG THE DEBTORS, FGIC, THE FGIC TRUSTEES AND
CERTAIN INSTITUTIONAL INVESTORS**

Gina Healy declares, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:[1]

1.      My name is Gina Healy, and I am over 21 years of age.  I am of sound mind and,
if called to testify, I will attest to the facts described herein.

2.      I am Vice President of Credit Risk Management, Mortgage Insurance and Credit
Workout/Restructuring at Federal Home Loan Mortgage Corporation in conservatorship
("Freddie Mac"), where I have been employed since 2004.  I am responsible for managing credit
risk and counterparty eligibility requirements for mortgage insurers and negotiating workouts
and restructurings for special assets across the company.  I hold the Chartered Financial Analyst
designation (CFA) and am a Certified Public Accountant (CPA Inactive).

3.      I submit this Declaration in support of Freddie Mac's objection (the "Objection")
to the *Debtors' Motion Pursuant to Fed. Bankr. P. 9019 for Approval of the Settlement
Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors.*

---

[1] This Declaration and accompanying exhibits have been filed publicly in redacted form pursuant to this Court's July 16, 2013, *Order Regarding the Exchange of Confidential Information* (the "Confidentiality Order") [ECF No. 4249]. Non-redacted copies of this Declaration will be delivered to the Court and served upon the parties covered by the Confidentiality Order.

4.       Freddie Mac is a corporate instrumentality of the United States of America, chartered by Congress.  Congress created Freddie Mac for the purpose of increasing the funds available to homebuyers through the creation of a secondary mortgage market for the purchase and sale of conventional residential mortgage loans.  On September 6, 2008, the Director of the Federal Housing Finance Agency (the "FHFA" or the "Conservator") placed Freddie Mac into conservatorship pursuant to express authority granted under the Housing and Economic Recovery Act of 2008 to preserve and conserve Freddie Mac's assets and property.  As Conservator, FHFA immediately succeeded to "all rights, titles, powers and privileges" of Freddie Mac.

5.       Freddie Mac holds over $3.055 billion in original face amount of various tranches of residential mortgage-backed securities ("RMBS") held in nine of the ResCap trusts (the "FGIC-Insured Trusts") covered by the  policies (the "Policies") issued by Federal Guaranty Insurance Company ("FGIC"), the payment of principal and interest due being guaranteed by FGIC. Freddie Mac's holdings in the FGIC-Insured Trusts are summarized in the chart below::

**Freddie Mac's Holdings of FGIC-Insured RMBS**

| CUSIP | Original Face Amount of Holdings | Current Face Amount of Holdings | Description of RMBS Instrument | FGIC Trustee |
|---|---|---|---|---|
| 7609854V0 | $175,000,000 | $8,412,245 | RAMP 2004-RZ2 AII | BONY/Mellon |
| 7609857G0 | $346,990,000 | $17,844,376 | RAMP 2004-RS7 A2A | BONY/Mellon |
| 76110WB88 | $337,500,000 | $16,900,180 | RASC 2004-KS7 A2A | BONY/Mellon |
| 76112BL99 | $494,922,000 | $97,343,261 | RAMP 2005-RS9 AII | BONY/Mellon |
| 361856BG1 | $123,222,000 | $3,221,145 | GMACM 2001-HE2 IIA7 | BONY/Mellon |
| 38012EAA3 | $646,768,000 | $135,182,334 | GMACM 2006-HE5 1A1 | BONY/Mellon |
| 74924XAE5 | $326,812,000 | $122,091,499 | RASC 2007-EMX1 A2 | U.S. Bank |
| 76112BR36 | $405,004,000 | $87,242,343 | RAMP 2005-NC1 AII | U.S. Bank |
| 76112BR85 | $199,376,000 | $ 34,284,787 | RAMP 2005-EFC7 A2 | U.S. Bank |
| TOTALS | $3,055,594,000 | $522,522,170 | | |

6.      Freddie Mac has long-outstanding policy claims against FGIC based upon the failure of principal and interest payments under certain of the FGIC-Insured Trusts and under policies issued by FGIC.  Freddie Mac expects to have significant policy claims against FGIC for principal and interest shortfalls with respect to the FGIC-Insured Trusts in both the near and long-term future.

7.      On account of the underperformance of the trust collateral, Freddie Mac has not received the principal and interest payments that it should have received from the above-listed FGIC-Insured Trusts.  In turn, claims are presented by the trustees of the FGIC-Insured Trusts (the "FGIC Trustees") to FGIC to cover the principal and interest shortfalls as required by the Policies.  FGIC, however, has not made any payments under any of the Policies since approximately November of 2009.  As a result, Freddie Mac has long had outstanding claims that remain unpaid under the Policies, and Freddie Mac also expects to have significant and continuing policy claims against FGIC for principal and interest shortfalls in both the near and long-term future.

8.      Beginning in 2010, a steering committee of long- and short-dated policyholders (the "Steering Committee") commenced negotiations with a then insolvent FGIC concerning a plan of rehabilitation.  It is my understanding that the proposed plan was designed as a prepackaged plan that permitted FGIC to emerge from rehabilitation without paying its policyholders in full.  Additionally, the plan provided that policyholders would receive the same CPP, whether their claims were long- or short-dated.  Freddie Mac was a key participant in these negotiations and was actively in discussions with both the Steering Committee and FGIC.  John Dubel, FGIC's Chief Executive Officer, participated in all of these negotiations and was very much concerned that long- and short-dated policyholders' claims be treated equally.

9.    Following the appointment of the Rehabilitator—and after a lengthy period for the Rehabilitator to retain professionals—the discussions between the Rehabilitator/FGIC, Freddie Mac, and the Steering Committee centered primarily upon (i) FGIC's attempt to control put-back rights and breach of representation and warranty claims held by the FGIC-Insured Trusts and (ii) the design and structure of certain deferred payment obligations. As a result of these negotiations, the Steering Committee was able to preserve the FGIC-Insured Trusts' rights as provided inn Section 3.7 of the plan to assert put-back claims against, among others, certain sponsors and other third parties, and provide investors that held at least 25% of the outstanding FGIC-wrapped securities issue the right to veto any settlement on FGIC's RMBS-related claims that sought to bind the FGIC Trustees. The negotiations culminated in January of 2011 in a term sheet specifying the terms and conditions of FGIC's Rehabilitation Plan.[2]

10.    During his negotiations with the Steering Committee, Mr. Dubel never discussed the possibility of commuting out the FGIC policies insuring holders of FGIC-wrapped RMBS. Rather, the discussions concerning commutation focused solely on commuting the claims collateralized-debt security ("CDS") holders and reinsurance commutation/termination or novation, because the amount of these claims and the potential priority of such claims had the greatest impact on RMBS holder recoveries.

11.    Discussions in earnest between the Rehabilitation/FGIC with the FGIC Trustees did not commence until after the Rehabilitation Plan was initially filed in September of 2012. Freddie Mac and other Steering Committee members sought to facilitate these discussions. In order to participate in these discussions, FGIC Trustees requested that Freddie Mac provide them with information concerning Freddie Mac's holdings, which it did in mid-January of 2013.

---

[2] A copy of such term sheet is attached hereto as Exhibit A.

Freddie Mac also signed a confidentiality agreement with Bank of New York ("BONY") and the Rehabilitator. Discussions with BONY centered, for the most part, on the preservation of the FGIC Trustees' setoff rights under the plan.

12.    On approximately October 12, 2012, I participated in a call with the Rehabilitator's/FGIC's Counsel and Mr. Dubel, among others, concerning offsets for FGIC reimbursement claims that FGIC would assert against the initial CPP, as well as potential offsets on future recoveries.[3] These discussions were critical in Freddie Mac's determination not to object to the Rehabilitation Plan. During these discussions, Mr. Dubel walked us through the offsets that FGIC might claim against the initial CPP payments due Freddie Mac. Based upon this analysis, Freddie Mac determined that (i) the offsets were not material and (ii) none of such offsets affected the FGIC-Insured Trusts pertaining to Freddie Mac. Based upon these discussions, Freddie Mac determined not to file an objection to the proposed Rehabilitation Plan. There was never any discussion concerning offsets other than the FGIC reimbursement claims—and certainly no discussions concerning commutation of the Policies. This understanding was memorialized in the attached publicly disclosed schedule.

13.    I understand based upon disclosures in the FGIC's rehabilitation proceeding pending in state court in New York (the "Rehabilitation Proceeding") that the above-captioned debtors and debtors-in-possession, FGIC, the trustees of the Trusts (the "FGIC Trustees"), and certain institutional investors have agreed to enter into the a settlement agreement (the "Settlement Agreement"), which I understand effectively terminates the Policies in exchange for a one-time payment of $253.3 million (the "FGIC Commutation"). The FGIC Trustees neither obtained nor solicited Freddie Mac's consent to enter into the Settlement Agreement, and, upon

---

[3] FGIC's offsets against initial CPP filed publicly is attached hereto as Exhibit B.

information and belief, none of the holders of the FGIC-insured RMBS were consulted on the proposed commutation of their claims against FGIC and no vote has been offered.

14.    Despite our attorney's requests to FGIC, I have received no information or data indicating that the terms of the Settlement Agreement, including the FGIC Commutation, are in the best interests of Freddie Mac, a major holder of the of FGIC-insured RMBS.

15.    The only available evidence indicates that the Settlement Agreement is not in the Freddie Mac's best interest.  FGIC's most recent financial disclosures in the Rehabilitation Proceeding project that policyholders will receive present-value recoveries on FGIC policy claims in the amount of 27-30 cents on the dollar before any litigation recoveries.  Under the FGIC Commutation—which contemplates a $253.3 million payment by FGIC (plus foregone insurance premiums of $18.3 million) to the insured trusts to cover approximately $1.27 billion of unpaid present and anticipated future claims against FGIC—I understand that holders of FGIC-insured RMBS will only receive approximately 21.4 cents on the dollar.

16.    The 21.4% recovery is not acceptable for Freddie Mac given Freddie Mac's understanding that, under the Rehabilitation Plan, Freddie Mac is to receive a present-value recovery of 27 to 30 cents on the dollar.  Indeed, even the "Disclosure Statement" filed in the FGIC Rehabilitation proceeding, which I have reviewed, makes reference only the commutation of CDS contracts and in no way discusses the commutation/termination of the Policies guaranteeing the payment of principal and interest on Freddie Mac's FGIC-wrapped ResCap RMBS.[4]  For example, the Disclosure Statement states:

> The initial CPP will depend on several factors, including (i) actual or anticipated changes in the assumptions underlying the Run-Off Projections (including those relating to developments in actual or anticipated losses under FGIC's Policies or

---

[4] The Disclosure Statement is attached hereto as Exhibit C.

other financial circumstances or events), (ii) whether the Novation Agreement is approved by the Court, (iii) whether the two CDS Commutation Agreements executed thus far are approved by the Court, (iv) whether additional CDS Commutation Agreements are executed and approved by the Court (and the terms thereof), (v) whether the Reinsurance Commutation Agreement executed with AORe is approved by the Court and, if approved, whether FGIC receives the payment contemplated thereby, (vi) whether additional Reinsurance Commutation Agreements are executed and approved by the Court (and the terms thereof), (vii) whether FGIC receives the payments contemplated by any additional Reinsurance Commutation Agreements and (viii) other events and circumstances that may be beyond the Rehabilitator's control.[5]

Additionally, page 3 of the Disclosure Statement lists only CDS commutations and reinsurance novations; on my review, nowhere in the Disclosure Statement is the commutation/termination of the Policies mentioned. As a result of the successful commutation of the CDS holders' and reinsurance claims the Rehabilitator/FGIC informed the Steering Committee and Freddie Mac that the initial CPP amount would be increased from approximately 13 to 14% to 15% and than in December 2012 to 17.25.

17.    Based upon reviewing the Disclosure Statement and conversations with Mr. Dubel, it was also my understanding that the Rehabilitation Plan must be "fair and equitable" to all beneficiaries of FGIC policies, whether long- or short-dated, and that claimants under FGIC-issued policies (including the Policies at issue here) would be treated the same whether their claims arose today or years from now. Indeed, the Disclosure Statement provides, on pages 20-21, as follows:

> Provisions of the Plan relevant to the Policy Restructuring are in the Restructured Policy Terms. The Restructured Policy Terms include the mechanism for paying Permitted Policy Claims, as well as procedures for revaluating FGIC's financial condition to determine whether additional Cash payments may be made on account of Permitted Policy Claims. **Consistent with the goal of the Plan, the Rehabilitator developed the Restructured Policy Terms to maximize the extent to which FGIC's Policyholders are treated in a fair and equitable**

---

[5] Disclosure Statement at 23.

**manner. The Restructured Policy Terms are designed to address challenges the Rehabilitator faced in achieving this goal.**

\*       \*       \*

First, because FGIC likely will not have sufficient assets to pay in full in Cash all Policy Claims that have arisen but have not been paid or that are expected to arise over the Run-Off Period, which may last 40 years, the Restructured Policy Terms provide for payment of only a portion of each Permitted Policy Claim in Cash. **FGIC will satisfy the remainder of each Permitted Policy Claim through future payments on account of a DPO for the related Policy, to the extent payable under the Plan. FGIC will track DPOs on a Policy-by-Policy basis, and will reduce each DPO by the amount of any Cash payments or Deemed Cash** Payments made with respect to Permitted Policy Claims under the related Policy, as discussed below. These contingent additional payments under DPOs will be payable only if, when and to the extent FGIC determines, in consultation with a third-party firm and with NYSDFS approval, that it has sufficient assets to pay in Cash an increased portion of each previously Permitted Policy Claim and each Policy Claim it expects to permit in a Stress Scenario during the Run-Off Period.

**This approach is designed so that all of FGIC's Policyholders receive the same percentage (or CPP) of Cash on account of their Permitted Policy Claims, whether arising in the next five years or in the next few decades.**

18.     Although I understood that Freddie Mac would not receive 100 cents on the dollar from FGIC as the insurer/guarantor of the FGIC-wrapped ResCap RMBS in Freddie Mac's portfolio, Freddie Mac's impetus for approving the Rehabilitation Plan was the understanding from the Affidavit of Michael W. Miller in Support of the Rehabilitation Plan (the "Miller Affidavit") that FGIC policyholders would very likely recover 27-30 cents and, more importantly, that the Rehabilitation Plan would be revised on an annual basis where, as the estate increases its recoveries, the payout to all FGIC policyholders would be on a pro rata basis. Freddie Mac would not have approved the Rehabilitation Plan had we known that the Policies would be commuted for a one-time lump sum payment resulting in an approximately 21.4% recovery.

19.     I declare under penalty of perjury that the information set forth in this Declaration

is true and correct to the best of my knowledge, information, and belief.

Dated: July 31, 2013
        Washington, D.C.

                                /s/ Gina Healy
                                Gina Healy

# EXHIBIT A

CONFIDENTIAL
EXEMPT FROM DISCLOSURE UNDER
PUBLIC OFFICERS LAW SECTIONS 89(5) and 87(2)[1]

# New York State Insurance Department

# FGIC Surplus Restoration Plan Update

# Policyholder Group Steering Committee Discussions

# January 19, 2011

[1] *This document, including all annexes hereto and any other materials submitted in connection herewith (the "Confidential Information"), is strictly confidential and proprietary and its contents constitute trade secrets and proprietary commercial and financial information. Financial Guaranty Insurance Company ("FGIC") hereby claims exemption of the Confidential Information from disclosure pursuant to Sections 89(5) and 87(2) of the Public Officers Law. FGIC also hereby requests that the Department deny any request for disclosure of Confidential Information on the basis that (i) such material constitutes trade and business secrets of FGIC and/or (ii) disclosure would cause substantial injury to the competitive position of FGIC. The Confidential Information should not be reproduced and it should not be shared directly or indirectly with any persons outside the required insurance regulatory process in the State of New York.*



**FGIC Surplus Restoration Plan**
**Term Sheet for Policyholders Steering Committee**
**January 19, 2011**

| | |
|---|---|
| *Policy Modifications* | ■ As part of the restructuring. FGIC's existing policies will be modified to provide that accrued claims and future claims (upon submission), will be paid in cash based upon the below defined CPP and the remainder of any such claims shall be considered DPOs, as defined below.<br><br>■ Policyholders are still obligated to pay premiums unless trust documents otherwise provide. |
| *Cash component* | ■ The portion of each claim payment that is made in cash is defined as the cash payment percentage ("CPP"). If FGIC has not previously requested Trustees to apply CPP payments to current period claims, then when a CPP payment is made (including with respect to any equalization adjustment), FGIC shall request the Trustee to apply the payment for the current period claims.<br><br>■ The CPP will be 15½% (subject to reset up or down based on the revaluation methodology described below). Distribution on claims accrued since November 2009 will be paid at the CPP of 15½%. Initial payment to be made within 2 business days of the effective date of the plan (the "Effective Date"). |
| *Deferred policy obligation component* | ■ The portion of each claim that is not paid in cash shall be deferred and paid as hereinafter provided. FGIC's obligations with respect to such deferred policy obligations are referred to as "DPOs". |
| *DPO structure* | ■ DPOs will accrete on a quarterly basis in the following manner: (i) from the Effective Date through the quarter ending December 31, 2011 at a rate equal to the 10 year treasury yield on the Effective Date, unless the duration of FGIC's expected liabilities is less than 10 years, in which case the accretion rate will be equal to the on-the-run treasury yield most closely matching the duration of FGIC's expected liabilities, and (ii) commencing with the quarter commencing January 1, 2012, the rate of return on FGIC's invested assets over the preceding four calendar quarters, to be reevaluated quarterly, provided that for periods referencing portfolio performance, prior to October 1, 2011, the Treasury rate used in (i) above shall be used in lieu of the rate of return on FGIC's invested assets. |
| *DPO cash payments* | ■ DPOs will receive distributions from time to time at such times as the CPP shall be adjusted upward. Distributions shall be made so as to true up cash payments on prior claims.<br><br>■ In the event that there are cash flows or other funds available from an underlying FGIC-insured transaction that exceed the amounts then currently due and payable on the related FGIC-insured obligations (assuming that FGIC had performed its policy |

**FGIC Surplus Restoration Plan**
**Term Sheet for Policyholders Steering Committee**
**January 19, 2011**

| | |
|---|---|
| | obligations (including having paid all claims in full in cash), and after giving pro forma effect to such assumption), such excess amounts will be paid to bondholders or certificateholders by the trustee and shall reduce the outstanding DPOs relating to the FGIC policy for such transaction to the extent of such payment. |
| *CPP revaluation* | ■ Annually within thirty (30) days after FGIC's audited statutory financial statements for the prior fiscal year have been filed with the NYSID. |
| | ■ FGIC Board of Directors to appoint an independent and impartial firm, to perform a stress loss analysis in a manner consistent with the original stress model which will be used in the CPP revaluation process. |
| | ■ In connection with the initial CPP calculation and each CPP revaluation, a run-off model assumption will be that FGIC must maintain invested assets throughout the run-off period in an aggregate amount not less than the greater of (i) $65 million and (ii) the statutory capital and surplus minimum then applicable to New York-domiciled financial guaranty insurance companies. |
| | ■ FGIC's Board of Directors shall have the right, at any time, to cause a CPP revaluation to be performed if in its opinion FGIC's insured portfolio performance has materially deteriorated and a downward adjust in the CPP may be warranted. |
| *First CPP revaluation* | ■ The first CPP revaluation will commence after fiscal year 2011. |
| | ■ For the first CPP revaluation, the same run-off model and related assumptions that were used in the initial CPP calculation will be used, except that: (i) FGIC's cash and investments will be updated to reflect the actual cash and investments as of the date of the first revaluation (the "Revaluation Date"), (ii) FGIC's projected installment premiums will be determined based on FGIC's insured portfolio as of the Revaluation Date but will be calculated going forward in the same manner, with the same discounts and with the same other assumptions used in the initial CPP calculation, (iii) the same projected operating expenses for the remaining periods as were used in the initial CPP calculation will be used, (iv) the revised CPP calculation shall give effect to applicable true-up payments on outstanding DPOs, and (v) stress losses will be determined as follows: (A) For RMBS and other transactions that were assigned Credit-based losses in the initial NewOak analysis based on quantitative analysis, the same models, methodologies and assumptions as were used in such initial NewOak analysis will be used but will be applied to the related mortgage loan and other portfolios as they exist as of the |

FGIC Surplus Restoration Plan
Term Sheet for Policyholders Steering Committee
January 19, 2011

|  | Revaluation Date. The Revaluation Date shall be Year "1" in the modeling of the stress losses for such transactions assuming that the original stress loss model was done as of Year "0"; and (B) For other transactions that were assigned Credit-based losses (e.g., Jeffco, Detroit) and for transactions that were assigned Risk-based losses in the initial NewOak analysis, the same stress losses will be used but will be proportionately reduced by any principal amortization, any other identified principal reductions (such as commutations) or actual modification or restructuring of a policy that reduces FGIC's obligations thereunder since the initial NewOak analysis through the Revaluation Date. The Revaluation Date shall be Year "0" for purposes of spreading such stress losses (reduced as applicable), year by year, ratably in accordance with the initial NewOak analysis. |
|---|---|
| *Special revaluation events* | ■ If, within six months of the last CPP revaluation, FGIC receives in excess of $100 million in the aggregate of cash recoveries that were not considered in the most recent CPP revaluation, then the most recent CPP revaluation shall be updated to give effect to the full amount of such cash recoveries but without updating or otherwise changing any of the other original assumptions, inputs and methodologies. Thereafter claims will be paid in cash based on the adjusted CPP determined by such revaluation. Distributions shall also be made on DPOs so as to true up cash payments on prior claims.<br><br>■ Any cash recoveries received after six months of the last CPP revaluation will be considered on the date of the next CPP revaluation. |
| *Equalization adjustment* | ■ To the extent the CPP is reset downward based on the CPP revaluation methodology described above, there shall be an equalization adjustment that will apply to CUSIPs that received any prior cash policy payments. Such adjustment will be made only out of the CPP with respect to future claims with respect to such CUSIPs, which are presented on such policies after the CPP is reset downward and will continue until the cumulative CPP on such CUSIPs has been equalized. If, prior to the date of any claims payment requiring an equalization adjustment, a trustee has not made current information with respect to a FGIC-insured transaction available to FGIC, which is sufficient to enable FGIC to determine an equalization adjustment on a CUSIP level basis for such transaction as provided in the preceding sentence, then FGIC shall promptly make demand on the trustee for such information, FGIC will make such equalization adjustment on a policy-level basis and FGIC shall pay such pending claims (as adjusted by such equalization adjustment). In the event that the trustee fails to provide such information within 60 days of such |

**FGIC Surplus Restoration Plan**
**Term Sheet for Policyholders Steering Committee**
**January 19, 2011**

| | |
|---|---|
| | claim payment, FGIC shall make a good faith estimate of the equalization adjustment on a CUSIP level basis and shall make any applicable payments to the trust with respect thereto. In the event that necessary information becomes available so that an adjustment can be made on a CUSIP level basis with actual information, then FGIC shall make any necessary adjustments to its prior estimated or policy-level basis payments. Any underpaid amounts with respect to particular CUSIPs shall be paid to the trust, and any overpayments with respect to particular CUSIPs shall be recouped out of subsequent claim payments with respect to such CUSIPs. In making any equalization adjustment (including any estimation of an equalization adjustment), FGIC shall be entitled to rely on information made available by the trustees (without liability and without any responsibility to verify or take any other action with respect to such information) and FGIC shall have no liability for any failure by a trustee to provide information or for FGIC's failure to accurately estimate an equalization adjustment. FGIC's only liability and responsibility in connection with any failure of FGIC to accurately make an equalization adjustment shall be, in the case of any underpayments with respect to particular CUSIPs, to pay such underpaid amounts to the applicable trust and, in the case of any overpayments to particular CUSIPs, to recoup such overpayments out of subsequent claim payments with respect to such CUSIPs.<br><br>■ For the avoidance of doubt, there shall be no "clawback" of cash payments previously made on policies. |
| *Security interest* | ■ FGIC will attempt to create a security interest in all assets in favor of policyholders to secure FGIC's CPP obligations. |
| *CDS Counterparties* | ■ The legal and financial advisors to the Steering Committee will have the ability to review and verify the commutations and/or drop-down agreements/structures associated with FGIC's CDS counterparty exposure. |
| *Governance* | ■ Corporate governance provisions to be acceptable to all Steering Committee members. |
| *Other* | ■ FGIC will provide public disclosure on its website of information with respect to FGIC and outstanding DPOs (on a policy by policy basis), from time to time.<br><br>■ Implementation of plan will cure Enhancer Defaults under trust documents and other transaction documents for all purposes except that trustees shall allocate the proceeds from trust property between or among the classes of insured securities and FGIC, on the basis that FGIC has not paid all its policy claims, unless and |

**FGIC Surplus Restoration Plan**
**Term Sheet for Policyholders Steering Committee**
**January 19, 2011**

|  | until such time as FGIC shall have paid all policy claims (including all DPOs) in cash. |
|---|---|
|  | ■ FGIC will continue to prosecute and manage litigation regarding RMBS origination and other claims with recoveries to be received by FGIC or bondholders, as appropriate. |
|  | ■ As part of and at the completion of the restructuring, FGIC will make a one-time payment of $[x.x] million to fund a trust to be established for the purpose of defraying costs associated with enabling bondholders and certificateholders to understand the value of their FGIC-insured securities. The trust shall be unaffiliated with FGIC and will be for the benefit of all FGIC insured bondholders and certificateholders. FGIC shall have no involvement with the terms or administration of the trust, no responsibilities, obligations or liabilities to the trust or trustee and no interest in the trust assets. |
|  | ■ FGIC and the Steering Committee shall cooperate in coordinating with the Trustees to ensure the implementation of the terms stated herein. |
|  | ■ FGIC will use commercially reasonable efforts to request or cause transaction trustees to make available in their investor reports for bondholders or certificate holders information concerning payments and obligations of such transaction trusts at a CUSIP level.  FGIC will have no liability or responsibility for the completeness and accuracy of information published or provided by transaction trustees or other third parties or for any failure of any trustee or other third party to publish or provide information. FGIC will not publish any such information on its website. |
|  | ■ FGIC will not have any responsibility or liability for any allocation, payment or distribution of cash flows, recoveries or other funds, or any other action, by any trustee. |
|  | ■ Means of implementing the plan will be acceptable to Steering Committee. |
|  | ■ All agreements evidencing the transactions and actions contemplated hereby, except those relating to the CDS Counterparties, shall be subject to documentation in form and substance satisfactory to each member of the Steering Committee. |
|  | ■  FGIC will pay all accrued expenses of Steering Committee. |

# EXHIBIT B

## Exhibit 1

**Preliminary Analysis of FGIC Payments Not Paid to FGIC and
Resulting Reductions of Cash Payments on Certain Permitted Policy Claims**

**Preliminary Analysis of FGIC Payments Not Paid to FGIC and
Resulting Reductions of Cash Payments on Certain Permitted Policy Claims[1]**

The attached charts reflect FGIC's preliminary estimates of FGIC Payments not paid to FGIC and resulting reductions against projected initial Cash payments on account of certain Permitted Policy Claims and, to the extent applicable, subsequent Cash payments with respect to such Claims, in each case pursuant to the application of Section 1.4(A) of the Restructured Policy Terms.

In developing these preliminary estimates, FGIC (i) reviewed all Policies to assess whether there are any premiums due and payable to FGIC, which had not been paid to FGIC, and (ii) reviewed and analyzed the Policies and underlying servicer or trustee reports and Transaction Documents available to FGIC, as of September 30, 2012, in respect of over one hundred forty (140) transactions where FGIC has paid or received Claims, including over one hundred twenty (120) transactions that FGIC has classified as RMBS, to assess whether there are any reimbursements due and payable to FGIC and to what extent such amounts would be due and payable to FGIC within the meaning of FGIC Payments, which have not been paid to FGIC. Of these transactions, FGIC identified eighteen (18) transactions where amounts constituting FGIC Payments (i.e., premiums and/or reimbursements) should have been paid to FGIC by the trustees pursuant to the Transaction Documents but were not. Such identified transactions may be categorized as follows:

- For four (4) of these transactions, FGIC believes that the applicable trustees likely have set aside or escrowed unpaid FGIC Payments. Pursuant to the Plan, such trustees will be obligated to turn over to FGIC such unpaid amounts within five (5) Business Days of the Effective Date. Assuming compliance by the trustees with such requirement, there will be no unpaid FGIC Payments to offset against the initial Cash payments in respect of related Permitted Policy Claims (and this assumption is reflected in the attached charts) (See Schedule A);

- For four (4) of the identified transactions, FGIC believes that the applicable trustees likely distributed the FGIC Payment amounts to the underlying holders. For these transactions, pursuant to Section 1.4(A) of the Restructured Policy Terms, FGIC will offset such amounts against the Cash payments FGIC otherwise would have paid on related Permitted Policy Claims (See Schedule B); and

- For the remaining ten (10) transactions, FGIC has been unable, to date, to determine whether the applicable trustees have set aside the unpaid FGIC Payment amounts, or whether they have distributed such amounts to the

---

[1] Capitalized terms not defined herein or in the attached charts have the meanings ascribed to them in the Plan of Rehabilitation for Financial Guaranty Insurance Company, dated September 27, 2012 (as may be amended or supplemented).

underlying holders (in the attached charts it has been assumed that these amounts have been distributed to the underlying holders) (See Schedule C).

The attached charts identify which of the eighteen (18) transactions fall within each of the above-described categories. Each of the transactions is shown on a Policy-level basis, rather than a CUSIP-level basis. Many of the numbers reflected on the attached charts have been rounded.

With respect to the balance of the transactions analyzed by FGIC, FGIC believes, based upon its preliminary analysis, that no FGIC Payments are due and owing to FGIC as of September 30, 2012 with respect to those transactions.

Please note that the estimates set forth in the attached charts and summarized herein are based on FGIC's preliminary analysis as of September 30, 2012, are based in part upon information provided by third parties (including in trustee and servicer reports), and are subject to adjustment and correction based upon, without limitation, FGIC's continued investigation into and refinement of the underlying data, as well as any additional FGIC Payment amounts or Claims that have arisen or may arise subsequent to September 30, 2012. In addition, the analysis does not take into account, among other things, (i) errors (if any) that trustees or servicers may have made in interpreting the Transaction Documents or applying or distributing funds, (ii) incorrect or missing information in the trustee or servicer reports, (iii) Plan-imposed limitations on what may constitute a Permitted Claim (for which the information called for by the Proof of Policy Claim Form, to be completed and submitted following the Effective Date, will be required), or (iv) changes to the CPP. Accordingly, the amounts listed in the "Initial Cash Payment to Policyholder" column are not necessarily the amounts that ultimately will be paid pursuant to the Plan.

Schedule A

Dated 11/14/2012
Data as of 9/30/2012

Subject to Qualifications Contained in Attached Cover Sheets          Preliminary Estimates - Subject to Change

Unpaid FGIC Payments Due to FGIC as of 9-30-12

| CUSIP | FGIC Description | Unpaid Premiums | Unpaid Reimbursements | Total Premiums and Reimbursements Due to FGIC | Post 1310 Order Unpaid Claims as of 9-30-12 | Initial Cash Calculation at 15% CPP | Reduction to Initial Cash Calculation for Unpaid FGIC Payments | Initial Cash Payment to Policyholder | Balance to be Reduced from Future Cash Payments |
|---|---|---|---|---|---|---|---|---|---|
| **Transactions where it appears unpaid FGIC Payments due to FGIC have been set aside by the trustees** | | | | | | | | | |
| 040104MX6 040104MY4 | ARSI 2005-W1 / AMLT | 1,340,000 | 12,360,000 | 13,700,000 | 26,216,083 | 3,932,412 | | 3,932,412 | |
| 45254NKQ9 45254NKR7 45254NKS5 | IMM 2004-8 2A1 / Impac 2004-8 | 350,000 | 6,990,000 | 7,340,000 | 9,514,297 | 1,427,145 | | 1,427,145 | |
| 45254NLJ4 45254NLK1 45254NLL9 | IMM 2004-10 1A1 / Impac 2004-10 | 860,000 | 14,340,000 | 15,200,000 | 15,222,225 | 2,283,334 | | 2,283,334 | |
| 45254NLZ8 45254NMA2 | IMM 2004-11 1A1 / Impac 2004-11 | - | 7,410,000 | 7,410,000 | 8,906,788 | 1,336,018 | | 1,336,018 | |
| | Total | 2,550,000 | 41,100,000 | 43,650,000 | 59,859,393 | 8,978,909 | - | 8,978,909 | - |

Schedule B

Dated 11/14/2012
Data as of 9/30/2012

Subject to Qualifications Contained in Attached Cover Sheets          Preliminary Estimates - Subject to Change

Unpaid FGIC Payments Due to FGIC as of 9-30-12

| CUSIP | FGIC Description | Unpaid Premiums | Unpaid Reimbursements | Total Premiums and Reimbursements Due to FGIC | Post 1310 Order Unpaid Claims as of 9-30-12 | Initial Cash Calculation at 15% CPP | Reduction to Initial Cash Calculation for Unpaid FGIC Payments | Initial Cash Payment to Policyholder | Balance to be Reduced from Future Cash Payments |
|---|---|---|---|---|---|---|---|---|---|
| **Transactions where it appears unpaid FGIC Payments due to FGIC have been passed through to holders by trustees** | | | | | | | | | |
| 126685DV5 126685DW3 126685DX1 126685DY9 126685DZ6 | CWHEQ 2006-S2 | - | 7,640,000 | 7,640,000 | 111,317,220 | 16,697,583 | 7,640,000 | 9,057,583 | - |
| 23242MAA9 23242MAB7 23242MAC5 23242MAD3 23242MAE1 | CWHEQ 2006-S3 | - | 13,330,000 | 13,330,000 | 128,424,707 | 19,263,706 | 13,330,000 | 5,933,706 | - |
| 126683AA9 126683AB7 126683AC5 126683AD3 126683AE1 126683AF8 | CWHEQ 2006-S5 | - | 14,070,000 | 14,070,000 | 155,433,080 | 23,314,962 | 14,070,000 | 9,244,962 | - |
| 43709KAA7 | IndyMac INDS 2006-2B | 990,000 | 16,980,000 | 17,970,000 | 72,713,857 | 10,907,079 | 10,907,079 | - | 7,062,921 |
| | Total | 990,000 | 52,020,000 | 53,010,000 | 467,888,863 | 70,183,329 | 45,947,079 | 24,236,251 | 7,062,921 |

**Schedule C**

Dated 11/14/2012
Data as of 9/30/2012

**Subject to Qualifications Contained in Attached Cover Sheets**    **Preliminary Estimates - Subject to Change**

Unpaid FGIC Payments Due to FGIC as of 9-30-12

| CUSIP | FGIC Description | Unpaid Premiums | Unpaid Reimbursements | Total Premiums and Reimbursements Due to FGIC | Post 1310 Order Unpaid Claims as of 9-30-12 | Initial Cash Calculation at 15% CPP | Reduction to Initial Cash Calculation for Unpaid FGIC Payments | Initial Cash Payment to Policyholder | Balance to be Reduced from Future Cash Payments |
|---|---|---|---|---|---|---|---|---|---|
| | **Transactions where it is uncertain if unpaid FGIC Payments due to FGIC have been set aside by the trustees** | | | | | | | | |
| 02660TDZ3 | American Home Mortg 2005-1 | 110,000 | – | 110,000 | 5,197,593 | 779,639 | 110,000 | 669,639 | – |
| 02660TEV1 | American Home Mortg 2005-2 | 210,000 | – | 210,000 | 11,015,910 | 1,652,387 | 210,000 | 1,442,387 | – |
| 748351AE3 748351AF0 | Ameriquest 2005-X2 | 230,000 | – | 230,000 | 1,280,847 | 192,127 | 192,127 | – | 37,873 |
| 361856EA1 361856EB9 361856EC7 361856ED5 361856EE3 361856EF0 | GMACM 2005-HE1 | – | 200,000 | 200,000 | 24,450,334 | 3,667,550 | 200,000 | 3,467,550 | – |
| 36185MAA0 36185MAB8 36185MAC6 36185MAD4 36185MAE2 36185MAF9 | GMACM 2005-HE2 | 100,000 | – | 100,000 | 1,783,116 | 267,467 | 100,000 | 167,467 | – |
| 361856ER4 | GMACM 2006-HE1 | – | 250,000 | 250,000 | 69,710,686 | 10,456,603 | 250,000 | 10,206,603 | – |

Dated 11/14/2012
Data as of 9/30/2012

**Subject to Qualifications Contained in Attached Cover Sheets**          **Preliminary Estimates – Subject to Change**

Unpaid FGIC Payments Due to FGIC as of 9-30-12

| CUSIP | FGIC Description | Unpaid Premiums | Unpaid Reimbursements | Total Premiums and Reimbursements Due to FGIC | Post 1310 Order Unpaid Claims as of 9-30-12 | Initial Cash Calculation at 15% CPP | Reduction to Initial Cash Calculation for Unpaid FGIC Payments | Initial Cash Payment to Policyholder | Balance to be Reduced from Future Cash Payments |
|---|---|---|---|---|---|---|---|---|---|
| **Transactions where it is uncertain if unpaid FGIC Payments due to FGIC have been set aside by the trustees (cont'd)** | | | | | | | | | |
| 36185HEF6 36185HEG4 36185HEH2 36185HEJ8 36185HEK5 | GMACM 2006-HLTV1 | 70,000 | - | 70,000 | 10,152 | 1,523 | 1,523 | - | 68,477 |
| 437089AA3 437089AB1 437089AC9 437089AD7 437089AE5 | IndyMac INDS 2006-1 | 580,000 | – | 580,000 | 49,241,947 | 7,386,292 | 580,000 | 6,806,292 | – |
| 456606MZ2 | IndyMac 2006-H1 | 480,000 | - | 480,000 | 40,735,618 | 6,110,343 | 480,000 | 5,630,343 | - |
| 76110VQY7 RFC4HS3VF | RFMSII 2004-HS3 | 100,000 | - | 100,000 | 1,048,792 | 157,319 | 100,000 | 57,319 | - |
| | Total | 1,880,000 | 450,000 | 2,330,000 | 204,474,997 | 30,671,250 | 2,223,650 | 28,447,600 | 106,350 |

# EXHIBIT C

## Exhibit D

### Disclosure Statement

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

|  |  |  |
|---|---|---|
| In the Matter of the Rehabilitation of | : | Index No. 401265/2012 |
|  | : | **DISCLOSURE STATEMENT** |
| FINANCIAL GUARANTY INSURANCE | : | **FOR PLAN OF REHABILITATION** |
| COMPANY. | : | **FOR FINANCIAL GUARANTY** |
|  | : | **INSURANCE COMPANY** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Weil, Gotshal & Manges LLP
Gary T. Holtzer
Joseph T. Verdesca
767 Fifth Avenue
New York, NY 10153

*Attorneys for the Superintendent of Financial
Services of the State of New York, as Rehabilitator
of Financial Guaranty Insurance Company*

# TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................................... 1

II.  BACKGROUND ................................................................................................... 5

    A.    Corporate Structure ................................................................................... 5

    B.    Overview of FGIC .................................................................................... 6

III.  OVERVIEW OF THE PLAN ................................................................................ 7

    A.    Summary of Plan Treatment of Claims and Equity Interests ................... 7

    B.    Approval of Plan/Objection Deadline ...................................................... 9

IV.  KEY EVENTS LEADING TO THE
COMMENCEMENT OF THE REHABILITATION PROCEEDING ........................................ 10

    A.    Background .............................................................................................. 10

    B.    Pre-Filing Actions ................................................................................... 11

        1.    Commencement of Run-Off ...................................................... 11

        2.    Loss Mitigation Measures ......................................................... 11

        3.    Expense Reduction Measures .................................................... 12

        4.    Suspension of Claims Payments ................................................ 12

        5.    Surplus Restoration Plan and Related Exchange Offer .............. 13

        6.    Formation of Ad Hoc Instrument Holder Group ........................ 13

        7.    Pursuit of Claims Against Third Parties ..................................... 14

        8.    FGIC UK Separation ................................................................. 15

        9.    Sponsorship of FGIC Corp. Chapter 11 Plan ............................ 15

        10.    FGIC Proposed Plan .................................................................. 16

V.  SIGNIFICANT POST-FILING ACTIONS ......................................................... 16

    A.    Order to Show Cause ............................................................................... 16

    B.    Order of Rehabilitation ........................................................................... 16

    C.    Loss Mitigation Efforts .......................................................................... 17

        1.    Novation of National Public Reinsured Policies ....................... 17

        2.    CDS Commutation Agreements ................................................. 18

        3.    Reinsurance Commutation Agreement ...................................... 19

    D.    Discussions Concerning the Plan with Various Constituents ................... 19

# TABLE OF CONTENTS
## (continued)

Page

VI. THE PLAN ....................................................................................................... 20

    A.    Treatment of Claims and Equity Interests ................................................ 20

    B.    Means of Implementation ........................................................................... 20

        1.    Policy Restructuring ...................................................................... 20

        2.    Approval of Novation Agreement and Novation of Reinsurance ................... 30

        3.    Approval of CDS Commutation Agreements ................................................ 31

        4.    Corporate Governance .................................................................... 31

        5.    Continued Oversight by NYSDFS ................................................. 32

        6.    No Defaults Arising from Rehabilitation or Rehabilitation Circumstances ...... 32

        7.    Reinsurance Payable in Full Irrespective of Policy Restructuring ................... 32

        8.    Control Rights ................................................................................ 32

    C.    Claim Administration and Distributions ................................................... 33

        1.    Claim Administration Generally .................................................... 33

        2.    Submission of Claims .................................................................... 33

        3.    Reconciliation of Claims ................................................................ 34

        4.    Procedures for Reconciling Disputed Claims ................................. 34

        5.    Payment of Claims ........................................................................ 34

        6.    Alternative Resolutions of Claims ................................................. 35

        7.    Setoffs .......................................................................................... 35

        8.    Certain Claims Not Permitted ........................................................ 35

        9.    Address or Account for Delivery of Distributions/Unclaimed Distributions ........................................................................... 35

        10.    Time Bar to Cash Payments ......................................................... 35

        11.    Rights of Subrogation ................................................................... 36

    D.    Contracts and Leases ................................................................................. 36

        1.    Treatment of Contracts and Leases ............................................... 36

        2.    Bar Date for Filing Proofs of Claim Relating to Contracts and Leases Terminated Pursuant to the Plan or During the Rehabilitation Proceeding ....... 36

    E.    Effective Date ........................................................................................... 36

        1.    Conditions Precedent to the Effective Date ................................... 36

ii

# TABLE OF CONTENTS
## (continued)

Page

2. Notification of Effective Date ..................................................... 36

3. Waiver of Conditions ................................................................... 37

F. Effect of Effective Date ........................................................................ 37

1. Discharge ...................................................................................... 37

2. Releases ........................................................................................ 37

3. Exculpation .................................................................................. 37

4. No Liability for Information Provided by Trustees ....................... 38

5. Indemnity ..................................................................................... 38

6. Termination of Rehabilitation Proceeding .................................... 38

7. Termination of Duties of Rehabilitator ......................................... 38

8. Injunctive Relief ........................................................................... 38

9. Preservation of Causes of Action ................................................. 39

10. Limitations on Operations Following Effective Date .................... 39

11. Reporting ...................................................................................... 39

G. Retention of Jurisdiction ..................................................................... 39

H. Miscellaneous Provisions .................................................................... 40

VII. FEASIBILITY/RECOVERY ANALYSIS ..................................................... 40

A. General Assets Available to Pay Liabilities ......................................... 40

1. Investments .................................................................................. 40

2. Premiums ...................................................................................... 41

3. Potential Future Assets Available to Pay Liabilities ..................... 42

B. Significant Liabilities ........................................................................... 42

1. RMBS Exposure ........................................................................... 42

2. CDO Exposure .............................................................................. 43

3. U.S. Public Finance Exposure ....................................................... 43

4. International Finance Exposure ..................................................... 44

C. Loss Reserves ...................................................................................... 45

D. Reinsurance .......................................................................................... 46

E. Rehabilitator's Recovery Analysis ....................................................... 48

# TABLE OF CONTENTS
## (continued)

Page

    F.      Alternative Options Considered ................................................................ 49

VIII.  LIQUIDATION ANALYSIS ................................................................ 52

IX.  CERTAIN FACTORS TO BE CONSIDERED ............................................ 53

    A.      Risks Relating to Plan Implementation .................................................... 53

        1.      Risk of Non-Approval, Withdrawal or Modification of the Plan.................. 53

        2.      Risk of Non-Occurrence of the Effective Date ............................................ 54

        3.      Risk of Conversion into a Liquidation ......................................................... 54

        4.      Risk of Subsequent Article 74 Proceedings ................................................ 54

    B.      Risks Relating to Creditors' Recoveries Under the Plan ........................... 54

        1.      Claims Could Be More than Projected ........................................................ 54

        2.      CPP May Be Adjusted Downward ............................................................... 55

        3.      Risks Relating to Run-Off Projections......................................................... 55

        4.      Risks Relating to Use of Net Operating Losses ........................................... 55

        5.      Risks Relating to Investment Income and Expenses .................................... 56

        6.      Risks Relating to Reinsurance ..................................................................... 56

        7.      Risks Relating to Termination Payment Claims .......................................... 56

    C.      Other Considerations .................................................................................. 57

        1.      No Duty to Update........................................................................................ 57

        2.      Risks Relating to Potential Recharacterization of the Policies .................... 58

        3.      Unanticipated Developments........................................................................ 58

X.  CONCLUSION ......................................................................................... 59

## **LIST OF EXHIBITS**

Exhibit A   Plan of Rehabilitation

Exhibit B   Organizational Chart

Exhibit C   Run-Off Projections

Exhibit D   Liquidation Analysis

Exhibit E   Restructured Policy Terms:  Illustrative Example

## DOCUMENTS AVAILABLE ON
## THE POLICYHOLDER INFORMATION CENTER

The following documents, among other pleadings from the Rehabilitation Proceeding, are (or will be) available on the Policyholder Information Center:

1.    Plan of Rehabilitation and Exhibits

2.    Plan Supplement

        a.   Form of Amended and Restated Charter
        b.   Form of Amended and Restated By-Laws
        c.   Novation Agreement
        d.   Schedule of Terminated Contracts and Leases
        e.   Proof of Policy Claim Form

3.    Disclosure Statement and Exhibits

4.    List of Initial Directors and Officers

5.    Order of Rehabilitation

6.    Order to Show Cause

# I.

## INTRODUCTION

On June 28, 2012, the Superintendent of Financial Services of the State of New York was appointed rehabilitator (the "**Rehabilitator**") of Financial Guaranty Insurance Company ("**FGIC**") by the Supreme Court of the State of New York, which is overseeing FGIC's rehabilitation proceeding (the "**Rehabilitation Proceeding**").  On September 27, 2012, the Rehabilitator filed a proposed Plan of Rehabilitation for FGIC, dated September 27, 2012 (attached hereto as Exhibit A) (the "**Plan**") and this disclosure statement, dated September 27, 2012 (the "**Disclosure Statement**"), in the Rehabilitation Proceeding.  The Rehabilitator also intends to file documents that implement the Plan in one or more filings called the "Plan Supplement."

The goal of the Plan is to treat FGIC's Policyholders[1] in a fair and equitable manner while at the same time removing the causes and conditions that made the Rehabilitation Proceeding necessary.  The Plan provides for all of the value of FGIC, other than administrative expenses and certain other costs, to go to FGIC's Policyholders until Policyholders are paid in full.  No claimants junior to Policyholders will receive any payment until Policyholders are paid in full in accordance with the terms of the Plan.

This Disclosure Statement describes the Plan, explains FGIC's current and projected financial outlook, outlines the alternatives to the Plan the Rehabilitator considered and explains the principal reasons the Rehabilitator selected the Plan, identifies material risk factors associated with the Plan and discusses the ways in which the Plan is expected to provide for greater recoveries to Policyholders than a liquidation of FGIC.  Although the New York Insurance Law (the "**NYIL**") does not require a disclosure statement or permit FGIC's Policyholders or other creditors to vote on the Plan, given the size, complexity and unique circumstances surrounding the Rehabilitation of FGIC, the Rehabilitator voluntarily prepared this Disclosure Statement to aid the Court, Policyholders and other Persons in understanding the terms of the Plan.

Since November 2009, FGIC has worked with its primary regulator, the New York State Department of Financial Services ("**NYSDFS**"),[2] and then with the Rehabilitator to restructure FGIC.  These efforts included extensive discussions with Policyholders, the Indenture Trustees (defined below), holders of Instruments insured by FGIC and other counterparties to FGIC's material agreements.  FGIC's restructuring efforts also included resolving with its parent, FGIC Corporation ("**FGIC Corp.**"), issues raised concerning FGIC's continued use of

---

[1] Capitalized terms not defined herein have the meanings ascribed to such terms in the Plan.

[2] Prior to October 3, 2011, the New York State Insurance Department ("**NYID**") was the primary regulator for FGIC.  As of October 3, 2011, the NYID and the New York State Banking Department were consolidated and merged into the NYSDFS, and the functions and authority of the NYID were transferred to the NYSDFS.  References in this Disclosure Statement or the Plan to any actions taken by the NYSDFS prior to October 3, 2011 refer to such actions taken by the NYID during that time.

significant tax attributes within their consolidated tax group (including approximately $5.3 billion of net operating loss carryforwards ("**NOLs**") attributable to FGIC).  The Plan represents, in the Rehabilitator's judgment, a fair and equitable approach to balancing the interests of all of FGIC's constituents under the circumstances.  Additionally, certain holders of Instruments insured by FGIC have agreed to support or not object to the Plan.

In connection with an anticipated proceeding under Article 74 of the NYIL involving FGIC, the New York Liquidation Bureau (the "**NYLB**"), in its capacity as the entity that would carry out the responsibilities of the to-be-appointed Rehabilitator, retained Weil, Gotshal & Manges LLP ("**Weil**") as its counsel.  Weil subsequently engaged the financial advisory firm Lazard Frères & Co. LLC ("**Lazard**") and the independent research firm Municipal Market Advisors ("**MMA**") as Weil's consultants to assist it in providing legal services to the NYLB and, following entry of an order placing FGIC in the Rehabilitation Proceeding, the Rehabilitator.

The Rehabilitator faced several key challenges in determining how to rehabilitate FGIC.  First and foremost, as of March 31, 2012, FGIC's statutory liabilities exceeded its statutory assets by approximately $3.7 billion.  FGIC's outstanding Policies have scheduled remaining terms that, in some cases, do not expire for another 40 years and, as such, Policy Claims are expected to be received over an extended period, defined in the Plan as the Run-Off Period.  Based on the Rehabilitator's projections, FGIC will not have enough assets to pay in full in Cash Policy Claims expected to be Permitted under the Plan over the Run-Off Period.  Second, FGIC has a diverse group of insureds, which includes Policyholders with Policy Claims likely to materialize in the next five years as compared to Policy Claims of other Policyholders that may not arise for decades.  Similarly, some Policyholders likely will never have Policy Claims, while some have Policy Claims that have accrued and remain unpaid since November 2009.  Third, FGIC could face in excess of $3 billion in early termination payment claims (the "**Termination Payment Claims**") under Policies FGIC issued to insure obligations of its subsidiary, FGIC Credit Products LLC ("**FGIC CP**").

The Plan addresses these challenges.  First, central to the Plan are proposed modifications to FGIC's Policies, which are in the "**Restructured Policy Terms**" attached to the Plan as Exhibit B.  Under the Restructured Policy Terms, each Policy will be modified to provide that FGIC will pay a certain percentage (the CPP, as defined in the Plan) of each Permitted Policy Claim in Cash with the remainder of the Permitted Policy Claim (after accounting for Deemed Cash Payments, as defined in the Plan and described below) treated as a deferred payment obligation (a DPO, as defined in the Plan) paid if and to the extent Excess Cash becomes available.  The Rehabilitator estimates that the initial CPP will be 15%, but, as set forth in the Run-Off Projections attached hereto as Exhibit C, that the average ultimate recovery to Policyholders will be approximately 24% to 25% of each Permitted Policy Claim on a net present value basis using a discount rate of 20% and 10%.

Second, the Rehabilitator has designed the Plan to address the potential competing interests of FGIC's Policyholders with Claims in the short term as compared to others with Claims not anticipated for decades.  The Plan provides for a quick, partial payment in Cash based on the initial CPP of then-Permitted Policy Claims no later than 150 days after the Effective Date.  It is intended that sufficient assets be retained by FGIC using assumptions designed to

protect Policyholders with future anticipated Claims so that all Policyholders will receive the same CPP of their Permitted Policy Claims (ignoring the time value of money) regardless of whether their Claims arise two years or 30 years after the Effective Date.  The Plan provides for an annual (and potentially more frequent) reassessment of FGIC's financial condition by a third party firm based on actual results and changing conditions from which adjustments to the CPP may be made.

Third, in an effort to mitigate FGIC's liabilities and increase recoveries for Policyholders, as part of the Plan, the Rehabilitator is seeking approval of certain settlements with counterparties to FGIC Contracts.  There are two forms of settlements:  a "novation" with National Public Finance Guarantee Corporation ("**National Public**") and "commutations" (the "**CDS Commutation Agreements**") with credit default swap ("**CDS**") counterparties (the "**CDS Counterparties**").[3]  Consummation of the transactions contemplated in these agreements is subject to Court approval.  The Novation Agreement (defined below) with National Public, an affiliate of MBIA Insurance Corporation ("**MBIA**"), eliminates FGIC's exposure to Policies having an aggregate par outstanding as of December 31, 2011 of approximately $138 billion.  A copy of the Novation Agreement is included in the Plan Supplement filed contemporaneously herewith.  In addition, two CDS Commutation Agreements have been executed (each of which is subject to approval by the Court) that will enable FGIC to resolve potential exposure of more than $3.8 billion (as of March 31, 2012) total net par in force ("**NPIF**") and to avoid potentially lengthy and costly litigation over the allowability and treatment of approximately $1.5 billion (as of March 31, 2012) in potential Termination Payment Claims.  Payments by FGIC under these CDS Commutation Agreements will result in the cancellation or "tearing up" of FGIC's Policies related to that exposure for less than what these CDS Counterparties are projected to have received under the Plan on account of Policy Claims for realized "Credit Events" (as defined in the relevant CDS, or similar term provided therein) that the Rehabilitator projects would have been asserted against FGIC if the CDS with such CDS Counterparties were not "torn up" or terminated early.  Copies (in certain instances, in redacted form) of the two executed CDS Commutation Agreements, and any additional CDS Commutation Agreements executed by FGIC, will be filed in an update to the Plan Supplement.

On the Effective Date, FGIC will emerge from this Rehabilitation Proceeding as a solvent insurance company under the NYIL by restructuring its Policies and consummating the commutation and novation transactions described above.  FGIC's return to statutory solvency, together with other protections afforded by the Plan, enables the Rehabilitator to recommend terminating the Rehabilitation Proceeding once the Plan becomes effective.  The Plan also provides for enhanced NYSDFS oversight of FGIC post-emergence and injunctive relief to protect FGIC and other Persons from violations of the Plan's provisions.  Termination of the Rehabilitation Proceeding will avoid significant administrative burden associated with an ongoing Article 74 proceeding for the benefit of all of FGIC's Policyholders.

\*       \*       \*

---

[3] The Rehabilitator has also sought Court approval of an agreement to commute certain reinsurance transactions, a third type of settlement, as described in greater detail in Section V.C.3 below.

## DISCLAIMER

This Disclosure Statement was prepared based on information available to FGIC and/or the Rehabilitator, including information provided by FGIC to the Rehabilitator (as certified in a certificate on file with the Rehabilitator).  Neither the Rehabilitator nor FGIC make any warranty, express or implied, as to the accuracy or completeness of the information contained herein.  In particular, events and forces beyond the control of the Rehabilitator and FGIC may alter the assumptions upon which the disclosures in this Disclosure Statement are based.  This Disclosure Statement does not reflect any events that may occur subsequent to the date hereof.  Such events may have a material impact on the information contained in this Disclosure Statement and any recovery that may be received by creditors of FGIC.  The Rehabilitator does not intend to update this Disclosure Statement (including the Run-Off Projections, Liquidation Analysis and other financial information as well as underlying assumptions), and therefore the financial information and projections set forth herein may become outdated.

Neither the Rehabilitator nor FGIC is offering legal, business, financial, tax or other advice to any Person herein, and neither the Plan nor the Disclosure Statement should be considered to contain any advice or instruction concerning such matters.  The reader should consult with his or her legal, business, financial, tax and other advisors as to any matters concerning the Plan and the Rehabilitation Proceeding.

Neither the Plan nor this Disclosure Statement is required to be prepared in accordance with federal or state securities laws, the NYIL or other applicable law.  The Rehabilitator undertakes no obligation to file a plan of liquidation or rehabilitation or disclosure statement thereto in any other Article 74 proceeding, including any subsequent Article 74 proceeding involving FGIC.  None of the United States Securities and Exchange Commission ("**SEC**"), any state securities commission or any similar Governmental Body has approved this Disclosure Statement or the Plan or has opined on the accuracy or adequacy of the statements contained herein.  None of the financial information in this Disclosure Statement (including the Run-Off Projections and the Liquidation Analysis) was prepared to comply with published guidelines of the SEC, the American Institute of Certified Public Accountants, U.S. Generally Accepted Accounting Principles or statutory accounting principles prescribed or permitted by the NYSDFS.

This Disclosure Statement may not be relied upon for any purpose (including to trade, buy or sell claims or securities) other than to obtain information about the Plan and the Rehabilitation Proceeding.  Nothing contained herein constitutes an admission of any fact or any party's liability with regard to any Claim or litigation, including, but not limited to, the Rehabilitation Proceeding and any other proceeding involving the Rehabilitator, FGIC or its affiliates, or any other party, or any proceeding with respect to any legal effect of the transactions contemplated by the Plan.  Nothing contained herein constitutes an admission of, or can be deemed evidence of, the tax or other legal effects of the Plan on FGIC or on holders of Claims or Equity Interests.  Statements as to the rationale underlying the treatment of Claims and Equity Interests under the Plan are not intended to, and will not, waive, compromise or limit any of FGIC's rights or Causes of Action.

The Plan and this Disclosure Statement may contain certain statements that are, or may be deemed to be, "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Any such forward-looking statements (including the Run-Off Projections and Liquidation Analysis) are based upon a variety of estimates and assumptions that, though considered reasonable by the Rehabilitator, may not be realized, and are inherently subject to significant business, economic and competitive uncertainties and contingencies.  Some assumptions inevitably will not materialize and events and circumstances occurring subsequent to the date on which the statements were prepared may be significantly different from those assumed, or may be unanticipated, and thus may affect financial results in a material and possibly adverse manner.  The statements, therefore, may not be relied upon as a guaranty or other assurance of the actual results that will occur.

**To ensure compliance with Internal Revenue Service ("IRS") Circular 230, holders of Claims and Equity Interests are hereby notified that:  (a) any discussion of United States federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Equity Interests for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (b) such discussion is written in connection with the promotion or marketing of the transactions or matters addressed herein; and (c) holders of Claims or Equity Interests should seek advice based on their particular circumstances from an independent tax advisor.**

The Plan summaries and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan and the exhibits annexed thereto.  The interpretation provisions set forth in Section 9.14 of the Plan apply to this Disclosure Statement. In the event of any conflict between the descriptions set forth in this Disclosure Statement and the terms of the Plan, the terms of the Plan will govern.  Summaries of certain provisions of agreements referred to in this Disclosure Statement do not purport to be complete and are subject to, and are qualified in their entirety by reference to, the full text of the applicable agreement, including the definitions of terms contained in such agreement.

## II.

## BACKGROUND

### A.    CORPORATE STRUCTURE

FGIC is a direct, wholly owned subsidiary of FGIC Corp., a Delaware corporation.  FGIC Corp. is a debtor under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), but is not a party to the Rehabilitation Proceeding.  FGIC also has outstanding preferred stock (the "**Preferred Stock**") that is held by third parties.

FGIC is the parent company of FGIC UK Limited ("**FGIC UK**"), a wholly-owned United Kingdom insurance company.  On July 1, 2009, FGIC UK filed a voluntary variation of permission with the UK Financial Services Authority (the "**FSA**"), its principal regulator, to remove its ability to write new insurance contracts, which the FSA approved on July 10, 2009.  FGIC UK is not a party to the Rehabilitation Proceeding.

FGIC is also the sole member of FGIC CP, a Delaware limited liability company. FGIC CP entered into CDS contracts with certain buyers of credit protection, the CDS Counterparties. FGIC issued financial guaranty insurance policies to the CDS Counterparties under the vast majority of FGIC CP's CDS contracts, which policies insure FGIC CP's payment obligations under such CDS. Although FGIC CP is not a party to the Rehabilitation Proceeding, certain orders of the Court and provisions of the Plan apply to FGIC CP.

Attached hereto as Exhibit B is an organizational chart outlining the relationships between FGIC, FGIC Corp. and various subsidiaries and affiliates as of the date hereof.

## B.    OVERVIEW OF FGIC

FGIC, originally formed under the name "Switzerland General Insurance Corporation of New York," was incorporated in the State of New York as a stock insurance company on April 10, 1972. As a New York-domiciled insurance company, FGIC's primary regulator is the NYSDFS.

Beginning in 1983 and through January 2008, FGIC (and FGIC UK) guaranteed the timely payment of principal and interest on public finance, structured finance and other financial obligations by issuing insurance policies thereon. FGIC provided credit enhancement for domestic and international securities, including newly-issued securities and securities trading in the secondary market. FGIC also entered into reinsurance transactions pursuant to which other insurance companies (the "**Reinsurers**") agreed to reimburse FGIC for a specified portion of the claims and loss adjustment expenses paid by FGIC in connection with the reinsured Policies, in consideration for a portion of the related premiums received by FGIC. The reinsurance did not alter FGIC's primary obligations to the Policyholders, and as a result FGIC remained liable for all Claims under such Policies.

FGIC's business falls within three general categories: (i) public finance; (ii) structured finance; and (iii) international. Within its public finance business, FGIC insured the payment of principal and interest with respect to United States municipal bond obligations. Within its structured finance business, FGIC insured various structured finance obligations, including, without limitation, residential mortgage-backed securities ("**RMBS**"), asset-backed securities ("**ABS**"), collateralized debt obligations ("**CDO**") including CDO of ABS ("**ABS CDO**") and collateralized loan obligations ("**CLO**"). Such insurance was effected through financial guaranty insurance policies insuring the payment of principal, interest and other amounts payable on specific securities and other financial obligations, including policies insuring payment by FGIC CP of its payment obligations under CDS contracts pursuant to which FGIC CP provided credit protection (which CDS contracts in turn typically referenced specific obligations and "Credit Events" (as defined in the relevant CDS, or similar term provided therein)). Within its international business, FGIC and FGIC UK insured structured finance and other types of obligations, including project finance, utility, corporate and sovereign debt.

FGIC previously was licensed to engage in the financial guaranty insurance business in, and is subject to the insurance regulation and supervision by, all 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, the United Kingdom (through a branch and FGIC UK) and France (through a branch). As of August 31,

2012, as a result of FGIC's financial condition, FGIC's license to write financial guaranty insurance was suspended by state insurance departments or voluntarily surrendered or limited by FGIC in the following thirty-two (32) states:  Alabama, Alaska, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Iowa, Indiana, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Mississippi, Missouri, Nevada, New Hampshire, North Carolina, North Dakota, Ohio, Oregon, South Carolina, Tennessee, Utah, Virginia, Washington, West Virginia and Wyoming.

## III.

## OVERVIEW OF THE PLAN

### A.    SUMMARY OF PLAN TREATMENT OF CLAIMS AND EQUITY INTERESTS

Other than Claims (including Policy Claims) paid in full prior to the Commencement Date, the Plan will be the exclusive means for resolving and paying (i) all Policy Claims, whenever arising, (ii) all other Claims arising during, or relating to, the period prior to the Effective Date and (iii) all Equity Interests in existence as of the Commencement Date.  Claims arising during or relating to the period on and after the Effective Date (other than Policy Claims) are not covered by the Plan and will be resolved and paid by FGIC in the ordinary course of business.  The following table lists the categories of Claims and Equity Interests that are treated by the Plan and summarizes the treatment for each category.

| CATEGORY | DESIGNATION | TREATMENT | TOTAL AMOUNT OF CLAIMS[4] | ESTIMATED RECOVERIES |
|---|---|---|---|---|
| A | Secured Claims | Permitted Secured Claims will be paid in full solely from the collateral securing such Claims. | $0 | N/A |
| B | Administrative Expense Claims | Permitted Administrative Expense Claims will be paid in full in Cash. | $16.9 million[5] | 100% |

---

[4] The amounts set forth herein are based on the Rehabilitator's estimation of all existing and anticipated Claims in each category and do not reflect the actual amounts of Claims in each category that may exist, arise or be Permitted.

[5] Estimated for the period from the date of the filing of this Disclosure Statement through December 31, 2012, the anticipated Effective Date.

| CATEGORY | DESIGNATION | TREATMENT | TOTAL AMOUNT OF CLAIMS[4] | ESTIMATED RECOVERIES |
|---|---|---|---|---|
| C | Policy Claims | Holders of Permitted Policy Claims will receive (i) an upfront Cash payment equal to a specified percentage of each Permitted Policy Claim based on the CPP at the time of payment and (ii) a DPO with respect to such Policy equal to the remainder of such Permitted Policy Claim. | $9.3 billion - $15.3 billion[6] | 24%-25%[7] |
| D | Non-Policy Claims | Holders of Permitted Non-Policy Claims will receive, on a pro rata basis, Cash, as and when available, until all such Claims are paid in full.  Permitted Non-Policy Claims will not be entitled to any distributions until all actual and expected Permitted Claims in Categories A through C are paid in full in Cash or fully reserved for. | Not estimable at this time. | 0% |

---

[6] This range of estimated Policy Claims is based on the Base Scenario and Stress Scenario, respectively, as set forth in the Run-Off Projections, attached as Exhibit C hereto.

[7] As set forth in greater detail in the Run-Off Projections attached hereto as Exhibit C, this range of estimated recoveries for holders of Permitted Policy Claims is based on a discount rate of 20% and 10%, in the Base Scenario.

| CATEGORY | DESIGNATION | TREATMENT | TOTAL AMOUNT OF CLAIMS[4] | ESTIMATED RECOVERIES |
|---|---|---|---|---|
| E | Late-Filed Claims | Holders of Permitted Late-Filed Claims will receive, on a pro rata basis, Cash, as and when available, until all such Claims are paid in full.  Permitted Late-Filed Claims will not be entitled to any distributions until all actual and expected Permitted Claims in Categories A through D are paid in full in Cash or fully reserved for. | Not estimable at this time. | 0% |
| F | Equity Interests | Equity Interests will remain in existence unaffected by the Plan.  Holders of Equity Interests will not be entitled to any distributions, dividends or other payments on account of their Equity Interests until all actual and expected Permitted Claims in Categories A through E are paid in full in Cash or fully reserved for. | N/A | 0% |

**B.    APPROVAL OF PLAN/OBJECTION DEADLINE**

The Rehabilitator has filed a proposed order to show cause (the "**Scheduling Order**"), requesting that the Court set a hearing on December 18, 2012 at 2:15 p.m. to consider approval of the Plan.  The Rehabilitator intends to provide notice of the filing of the Plan, the Rehabilitator's request for the Court to approve the Plan and the means for obtaining more detailed information regarding the Rehabilitation Proceeding, including copies of relevant documents, by (i) posting the Scheduling Order and supporting papers on the Policyholder Information Center, (ii) publishing notice of the hearing to approve the Plan in The Wall Street Journal and The Bond Buyer and (iii) mailing notice of the hearing to approve the Plan to all known Policyholders and other claimants (other than those who requested to stop receiving notices relating to the Rehabilitation Proceeding).

In the Scheduling Order, the Rehabilitator proposed deadlines and procedures for filing updates to the Plan Supplement, objections to the Plan and replies to such objections.  A copy of the Scheduling Order, as well as certain other pleadings filed with the Court by the

Rehabilitator in the Rehabilitation Proceeding, may be viewed at the Policyholder Information Center.

**IV.**

**KEY EVENTS LEADING TO THE
COMMENCEMENT OF THE REHABILITATION PROCEEDING**

**A.    BACKGROUND**

Since the fourth quarter of 2007, FGIC's business, results of operations and financial condition have been adversely affected by, among other things, significant losses on certain policies issued by FGIC relating to RMBS and ABS CDO backed primarily by subprime RMBS.  Because of a dramatic, sustained increase in payment defaults on the U.S. residential mortgage loans collateralizing these securities, there have been, and are expected to be, substantial shortfalls in funds available to make required payments on such securities, which shortfalls are guaranteed by FGIC.  As a result, during the several years prior to November 2009, FGIC paid Policy Claims far in excess of historical levels.  Since November 2009, FGIC has continued to receive (but has not paid due to the 1310 Order, discussed below) Policy Claims far exceeding such historical levels.

These losses on FGIC's Policies substantially reduced FGIC's statutory policyholders' surplus.[8]  FGIC, as a financial guaranty insurance company also licensed to transact credit insurance and act as a surety, must maintain a policyholders' surplus of at least $66.4 million.  FGIC's Quarterly Statement for the period ending September 30, 2009 reflected a deficit in policyholders' surplus of approximately $866 million, and an impairment of its required minimum surplus to policyholders of approximately $932 million.  FGIC's Quarterly Statement for the period ending March 31, 2012 indicated that FGIC's policyholders' surplus deficit had deteriorated to approximately $3.7 billion, consisting of admitted assets of approximately $2.1 billion and liabilities (including contingency reserves) of approximately $5.8 billion.  This deficit has not materially improved at the time of the filing of this Disclosure Statement.

---

[8] Under Section 6902(b)(1) of the NYIL, an insurer must comply with certain surplus requirements to engage in the financial guaranty insurance business:  it (i) must have paid-in capital of at least $2.5 million, (ii) must have paid-in surplus of at least $72.5 million and (iii) thereafter, must maintain a minimum surplus to policyholders of at least $65 million.  Pursuant to Section 6903(a)(1) of the NYIL, financial guaranty insurance companies are additionally required to maintain contingency reserves sufficient to protect policyholders against the effects of excessive losses that may occur during adverse economic cycles.  The total contingency reserves required are calculated as the greater of 50% of premiums written or, for specific categories of guaranties, the amount prescribed under the statute.

B.   PRE-FILING ACTIONS

1.   **Commencement of Run-Off**

In January 2008, to preserve capital, FGIC voluntarily ceased writing Policies for new or additional risks and stopped paying dividends or other distributions to its shareholders.

Since January 2008, FGIC has sought to improve its financial position and liquidity, reduce the size and volatility of its insured portfolio, restore its statutory surplus position to the statutorily mandated amount and pursue loss mitigation strategies, including the remediation or commutation of certain CDS, RMBS, ABS CDO and CLO transactions. FGIC's loss mitigation strategies have been designed to (i) minimize its Claims payments, (ii) maximize its recoveries and (iii) mitigate its expected losses, including by (a) seeking to enforce obligations of third parties to repurchase ineligible mortgage loans and properly service the mortgage loan pools and (b) pursuing litigation or arbitration proceedings to recover losses already incurred by FGIC or to mitigate future losses that FGIC may incur.

2.   **Loss Mitigation Measures**

During the time period from January 2008, when FGIC ceased writing new business, through the Commencement Date, FGIC completed loss mitigation transactions and took other affirmative steps to mitigate potential losses, including the following transactions, which reduced FGIC's incurred losses by over $3.0 billion:

(a)   From January 2008 through July 2009, FGIC completed consensual commutation and termination transactions with eight CDS Counterparties to eliminate its insured exposure to ABS CDO with total NPIF of approximately $9.4 billion. These transactions enabled FGIC to obtain an aggregate surplus benefit of over $1.8 billion and to eliminate its exposure to further adverse loss developments and potential claims for significant Termination Payment Claims (whether calculated on the basis of "Market Quotation," "Loss," "Close-out Amount," or other methodologies) under those transactions where FGIC had insured CDS relating to such ABS CDO;

(b)   As discussed in Section V.C.1 below, in September 2008, FGIC entered into the National Public Reinsurance Transaction (as defined below), which increased its surplus by approximately $534 million;

(c)   In the fourth quarter of 2008, FGIC issued Preferred Stock under a "soft capital" facility in exchange for a Cash purchase price of $300 million, which increased FGIC's surplus by an equal amount;

(d)   From September 2008 through August 2009, FGIC mitigated its insured exposure on FGIC-insured RMBS with total NPIF of approximately $538 million by either purchasing such RMBS (in the secondary market) or entering into private capital markets transactions where it purchased the right to receive the future Claims payments made by FGIC with respect to the subject RMBS. These transactions enabled FGIC to obtain an aggregate surplus benefit of approximately $129 million and to eliminate its exposure to further adverse loss developments on these RMBS. With respect to any purchased RMBS, FGIC is entitled to

11

receive its proportionate share of all future cash flows from such RMBS.  Through June 30, 2012, FGIC has received about $52.3 million of these cash flow payments from the purchased RMBS;

(e)    From January 2008 through the Commencement Date, FGIC eliminated its insured exposure on Policies insuring CDS referencing CLO or other structured finance credits with over $13.1 billion of NPIF, by negotiating, entering into and completing consensual commutation and termination agreements pursuant to which FGIC was paid $6.3 million.  FGIC also eliminated its exposure to potential significant Termination Payment Claims under these FGIC-insured CDS transactions;

(f)    From January 2008 through the Commencement Date, FGIC recovered over $207 million from (i) mortgage loan originators based on claims that mortgage loans were ineligible for inclusion in certain FGIC-insured RMBS transactions, and (ii) enforcing the terms of mortgage pool insurance policies that provided credit enhancement for FGIC-insured RMBS transactions; and

(g)    From January 2008 through the Commencement Date, FGIC exercised its rights under several FGIC-insured RMBS with an original balance of approximately $6.4 billion to transfer the servicing functions to entities that FGIC believes will provide a higher level of servicing, thereby mitigating potential losses.  FGIC also took remediation measures with respect to several other FGIC-insured RMBS transactions.

###    3.    Expense Reduction Measures

During the time period from January 2008, when FGIC ceased writing new business, through the Commencement Date, FGIC took the following measures to reduce, defray and control its expenses:

(a)    FGIC reduced its employee count from a peak of 225 in late 2007 to 52, a decrease of more than 75%;

(b)    FGIC subleased approximately 75% of its leased office space in its New York City headquarters; and

(c)    FGIC, which had maintained offices in London, England and Sydney, Australia, closed its offices in London and Sydney and eliminated or reduced related expenses.  The London office lease was terminated in August 2009, with only a representative presence retained to satisfy U.K. insurance regulatory requirements.  The Sydney office was closed in December 2008.

###    4.    Suspension of Claims Payments

On November 24, 2009, the NYDFS issued the 1310 Order.  Section 1310 of the NYIL addresses the impairment of a domestic stock insurer that lacks sufficient surplus of assets in excess of its liabilities (as discussed above).

The 1310 Order required FGIC to suspend payment of all Claims and prohibited FGIC from writing new Policies.  In accordance with the 1310 Order, FGIC suspended all Claim payments in November 2009.  FGIC previously had ceased writing new Policies in January 2008.  The 1310 Order also directed FGIC to submit to the NYSDFS by January 5, 2010, a plan to eliminate the impairment of FGIC's policyholders' surplus and to remove the impairment of its capital and return to compliance with its minimum policyholders' surplus requirement by June 15, 2010.  Under the 1310 Order, FGIC was allowed to operate only in the ordinary course of business and as necessary to effectuate the plan it was developing to eliminate impairment of FGIC's policyholders' surplus.  The 1310 Order did not preclude the Superintendent from seeking rehabilitation or liquidation of FGIC at any time.

### 5.  Surplus Restoration Plan and Related Exchange Offer

On December 22, 2009, FGIC submitted to the NYSDFS a proposed surplus restoration plan (as amended and restated, the "**Surplus Restoration Plan**").  The Surplus Restoration Plan included three key loss mitigation components:

(a)  Remediating a substantial portion of FGIC's exposure to RMBS and ABS CDO insured by FGIC and for which it established statutory loss reserves, including by "stripping" FGIC insurance on all or a portion of such RMBS and ABS CDO through consensual remediation transactions and an exchange offer (the "**Offer**");

(b)  Commuting, terminating, restructuring or reinsuring a substantial portion of FGIC's remaining exposure to ABS CDO and other obligations for which it established loss reserves, including RMBS insured by FGIC in the secondary market, through consensual transactions; and

(c)  Mitigating FGIC's existing exposure to Termination Payment Claims under FGIC-insured CDS pursuant to consensual transactions with the CDS Counterparties.

Although FGIC reached definitive agreements or agreements in principle with CDS Counterparties and other policy beneficiaries to effectuate certain of the loss mitigation transactions under the Surplus Restoration Plan, the transactions were conditioned on successfully closing the Offer.  The Offer did not receive participation from holders sufficient to satisfy the conditions necessary to complete the Offer.  The Surplus Restoration Plan was therefore not implemented and FGIC was unable to remove the impairment of its capital as required by the 1310 Order.

### 6.  Formation of Ad Hoc Instrument Holder Group

As a consequence of its inability to gain the necessary level of participation in the Offer, in November 2010, FGIC began discussions with a group of certain holders of Instruments insured by FGIC (the "**Ad Hoc Instrument Holder Group**") in connection with its effort to, along with the NYSDFS, develop a plan of rehabilitation to restore FGIC to statutory solvency and to restructure FGIC's liabilities in a manner that is fair and equitable to its Policyholders and other creditors.  The Ad Hoc Instrument Holder Group has been actively involved in discussing various aspects of the Plan, initially with FGIC, and then with the Rehabilitator.

7.    **Pursuit of Claims Against Third Parties**

FGIC commenced lawsuits and arbitration proceedings as part of its loss mitigation and recovery efforts, including the following proceedings (collectively, the "**Material Litigation**"). More information about the Material Litigation is set forth in FGIC's Quarterly Statement for the period ending March 31, 2012 and in FGIC's Annual or Quarterly Statements for prior periods, available at http://www.fgic.com/investorrelations/financialreports/.

(a)    In December 2009, FGIC filed a suit in the Supreme Court of the State of New York against Countrywide Home Loans, Inc. ("**Countrywide**") alleging fraud and negligent misrepresentation by Countrywide in the origination of several RMBS transactions that closed in 2006 and 2007, and breach of contract in connection with Countrywide's failure to repurchase certain mortgage loans as provided by the operational agreements for those RMBS transactions, as well as a number of other RMBS transactions that closed in the period from 2004 to 2005 (the "**Countrywide Litigation**"). In April 2010, FGIC amended its complaint to add certain affiliates of Countrywide as defendants, including Bank of America Corp. ("**Bank of America**"). FGIC's complaint in the Countrywide Litigation alleges damages to FGIC in excess of $1 billion and is pending;

(b)    In December 2009, FGIC and FGIC UK filed a complaint against IKB Deutsche Industriebank AG ("**IKB**") and others in the Commercial Court in London, England alleging that IKB had engaged in a fraudulent scheme which induced FGIC UK to enter into a commitment agreement to provide, under certain conditions, a financial guaranty to Havenrock II Limited, a special purpose vehicle created by IKB covering up to $1.875 billion of losses on a $2.5 billion reference portfolio of ABS CDO and other securities. The lawsuit sought in excess of $200 million in damages. In September 2011, FGIC and FGIC UK settled their claims against IKB. In March 2008, FGIC and FGIC UK filed suit in the Commercial Court in London, England against Credit Agricole Corporate and Investment Bank (*fka* "**Calyon**"), in connection with the foregoing commitment agreement, requesting a declaratory judgment to the effect that FGIC UK was not at risk with respect to a substantial portion of the reference portfolio of ABS CDO and other securities. In August 2008, FGIC, FGIC UK and Calyon settled all their respective claims relating to such commitment agreement; and

(c)    On November 29, 2011, December 15, 2011 and December 27, 2011, FGIC filed various complaints in the Supreme Court of the State of New York, and on January 31, 2012, March 5, 2012, March 6, 2012, March 12, 2012 and March 13, 2012, FGIC filed complaints in the United States District Court for the Southern District of New York, all against Ally Financial, Inc. (f/k/a GMAC LLC) ("**Ally**"), Ally Bank (f/k/a GMAC Bank) and/or certain of Ally's affiliates, including Residential Capital, LLC (f/k/a Residential Capital Corporation) ("**ResCap**"), Residential Funding Company LLC (f/k/a Residential Funding Corporation) ("**RFC**"), and GMAC Mortgage LLC (f/k/a GMAC Mortgage Corporation) ("**GMACM**") in connection with financial guaranty insurance policies FGIC issued to enhance the ratings and marketability of securities issued pursuant to RMBS transactions sponsored by RFC or GMACM, valued at over $10 billion. The complaints allege breaches of contract, fraudulent inducement, aiding and abetting fraudulent inducement, and tortious interference with contract. On May 14, 2012, defendants ResCap, RFC and GMACM filed for bankruptcy protection under chapter 11 of the Bankruptcy Code, which automatically stayed FGIC's

actions against those defendants.  The claims against non-debtor defendants have also been stayed.

The Rehabilitator and FGIC continue to review potential claims against third parties, including originators, servicers, investment managers and rating agencies, to recover damages for losses suffered by FGIC in connection with its insurance of ABS and RMBS.

While FGIC may recover substantial amounts from litigations and arbitrations and from demands FGIC has made on third parties to repurchase breaching mortgage loans and properly service mortgage loan pools, FGIC has not included any potential recoveries therefrom in the determination of its statutory loss reserve (except for expected recoveries from certain mortgage insurance-related claims) because these recoveries are not sufficiently probable and estimable at this time.

### 8.    FGIC UK Separation

In June 2011, FGIC and FGIC UK entered into a Deed of Termination which terminated the Reinsurance Agreement dated March 31, 2004 and the Excess of Loss Reinsurance Agreement dated March 31, 2004 under which FGIC had provided reinsurance on financial guarantees or policies written by FGIC UK, and released each other from all present and future claims and liabilities under such agreements.  Pursuant to the Deed of Termination, FGIC was relieved of its reinsurance obligations in respect of approximately $8 billion of par exposure and permitted to retain 100% of all premiums (net of ceding commissions) previously paid to FGIC.

### 9.    Sponsorship of FGIC Corp. Chapter 11 Plan

On August 3, 2010, FGIC Corp. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), Case No. 10-14215(SMB) (the "**Chapter 11 Case**").  On April 23, 2012, the Bankruptcy Court confirmed FGIC Corp.'s chapter 11 plan (the "**FGIC Corp. Plan**").  The FGIC Corp. Plan incorporates the terms of a Plan Sponsor Agreement that FGIC, with the authorization of the NYSDFS, executed with FGIC Corp. on February 3, 2012 (the "**Plan Sponsor Agreement**") and the Bankruptcy Court approved on February 28, 2012. Pursuant to the Plan Sponsor Agreement, FGIC will pay $11 million to FGIC Corp. and, in exchange, FGIC Corp. will assume the Amended and Restated Income Tax Allocation Agreement (the "**Amended TAA**"), effective as of the effective date of the FGIC Corp. Plan. The Amended TAA is designed to protect certain tax attributes of FGIC, including credits, losses, deductions (including any foreign tax credits, alternative minimum credits, NOLs and net capital losses), deferred deductions, tax basis in assets and any other tax attribute (collectively, the "**Tax Attributes**").  The Tax Attributes are valuable and as of December 31, 2011 include approximately $5.3 billion of NOLs attributable to FGIC.  FGIC's obligation to pay $11 million to FGIC Corp. is, however, subject to a number of conditions relating to the preservation of these valuable Tax Attributes, including receipt of a private letter ruling pursuant to its request for the same from the IRS.  As discussed in Section VI.E.1 hereof, receipt of this private letter ruling is also one of the conditions precedent to effectiveness of the Plan.  However, as discussed in

Section IX.B.4 below, the IRS, in its sole and absolute discretion, may decline to issue a favorable private letter ruling.

### 10. FGIC Proposed Plan

In the first quarter of 2011, FGIC presented to the NYSDFS a proposed plan of rehabilitation (the "**FGIC Proposed Plan**") that it negotiated with the Ad Hoc Instrument Holder Group.  The Plan filed with the Court and described in this Disclosure Statement is based on the FGIC Proposed Plan, but modified to best provide, in the Rehabilitator's view, fair and equitable treatment of FGIC's Policyholders and other claimants.

### V.

### SIGNIFICANT POST-FILING ACTIONS

### A. ORDER TO SHOW CAUSE

On June 11, 2012, the Superintendent filed a verified petition (the "**Rehabilitation Petition**") and a proposed order to show cause why FGIC should not be placed into rehabilitation.  FGIC consented to the relief requested therein.  On June 11, 2012, the Court entered the order to show cause (the "**Order to Show Cause**"), which set June 28, 2012 as the date of the hearing to consider entry of the Order of Rehabilitation.  The Order to Show Cause provided injunctive relief similar to that set forth in the Order of Rehabilitation, described below.  The Order to Show Cause is available at the Policyholder Information Center.

### B. ORDER OF REHABILITATION

Four corporate Trustees for certain Instruments insured by FGIC filed objections to certain provisions of the injunctive relief requested in the Rehabilitation Petition:  (i) US Bank National Association and US Bank Trust National Association (collectively, "**US Bank**"); (ii) Bank of New York Mellon ("**BNY**"); (iii) Wells Fargo Bank, N.A. ("**Wells Fargo**"); and (iv) Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas (collectively, "**Deutsche Bank**" and, together with US Bank, BNY, and Wells Fargo, the "**Indenture Trustees**").  Through discussions with counsel for the Indenture Trustees, all objections were consensually resolved prior to the hearing on June 28, 2012, at which the Court issued the Order of Rehabilitation.

The Order of Rehabilitation appointed the Rehabilitator as rehabilitator of FGIC and directed the Rehabilitator to take possession of FGIC's property, conduct FGIC's business and take steps to remove the causes and conditions that made the Rehabilitation Proceeding necessary.  The broad powers granted to the Rehabilitator under Article 74 of the NYIL include the ability to borrow money, sell or use assets, sell or compromise claims and avoid certain transfers.  In addition to the other powers granted to the Rehabilitator, Section 7422 of the NYIL provides that the Rehabilitator may appoint special deputies, as well as counsel, clerks and assistants.  The Rehabilitator has authorized employees of the NYLB to assist him in the administration of the Rehabilitation Proceeding.

As provided in more detail therein, the Order of Rehabilitation also enjoined and restrained all Persons from taking certain actions for the duration of the Rehabilitation Proceeding, including (i) transacting FGIC's business, (ii) wasting or disposing of FGIC's property, (iii) interfering with the Rehabilitator's possession, control or management of FGIC's property, (iv) disclosing any non-public information that is proprietary to FGIC, (v) commencing, continuing, advancing or otherwise prosecuting any Legal Proceedings against the FGIC Parties and certain other Persons and (vi) paying any Claims or performing any obligations of the FGIC Parties without the consent of the Rehabilitator (or his designee).  The Order of Rehabilitation also provided additional injunctive relief tailored to the unique circumstances of a financial guaranty insurance company such as FGIC.  This relief, among other things, barred all Persons from (i) withholding or setting off FGIC Payments owed to the FGIC Parties, (ii) terminating FGIC Contracts and asserting Termination Payment Claims against the FGIC Parties and (iii) exercising or otherwise interfering with FGIC Rights, in each case despite contractual *ipso facto* provisions in certain FGIC Contracts and related Transaction Documents that might otherwise modify the FGIC Parties' rights as a result of the Rehabilitation Circumstances or Rehabilitation Proceeding.

The Order of Rehabilitation is available at the Policyholder Information Center.  Persons that violate the injunctive relief in the Order to Show Cause or Order of Rehabilitation may be subject to sanctions, may not be entitled to Claims payments under the Plan and may be subject to partial or full disapproval of their Claims.  The injunctive relief in the Order of Rehabilitation will be superseded by injunctive relief set forth in Section 7.8 of the Plan.

## C.   LOSS MITIGATION EFFORTS

### 1.   Novation of National Public Reinsured Policies

In September 2008, FGIC entered into an agreement with MBIA, pursuant to which FGIC ceded to MBIA exposure under policies covering U.S. public finance credits with total NPIF of approximately $188 billion, of which $138 billion remained outstanding as of December 31, 2011 (collectively, the "**National Public Reinsured Policies**").  Shortly thereafter, National Public, an affiliate of MBIA, replaced MBIA as the party to such transaction and assumed MBIA's obligations thereunder (the "**National Public Reinsurance Transaction**").  Key features of the National Public Reinsurance Transaction included:

(a)   National Public agreed to pay on behalf of FGIC all obligations under the National Public Reinsured Policies (subject to certain limited exceptions);

(b)   Policyholders under the National Public Reinsured Policies were allowed to bring Claims directly against National Public without filing a Claim against FGIC (sometimes referred to as a "cut-through" feature);

(c)   National Public agreed to perform all services necessary for administration of the National Public Reinsured Policies, including policyholder service, billing and claims handling;

(d)   FGIC (rather than National Public) remained as the issuer of the National Public Reinsured Policies and continued to be primarily liable to pay claims under the National Public Reinsured Policies; and

(e)   FGIC retained the right, in its sole discretion, to terminate the National Public Reinsurance Transaction and "reassume" the rights and obligations under the National Public Reinsured Policies back from National Public, and to receive the related net unearned premiums and any ceded loss reserves as of such date (the "**FGIC Reassumption Right**"), upon the occurrence of certain events, including if National Public's credit rating is downgraded below (i) BBB- (as measured by Standard & Poor's Financial Services LLC ("**S&P**")) or (ii) Baa3 (as measured by Moody's Investors Services, Inc. ("**Moody's**")).

FGIC and National Public have agreed to novate the National Public Reinsured Policies from FGIC to National Public (the "**Proposed Novation**") under the Novation Agreement, dated as of September 14, 2012 (the "**Novation Agreement**").  Consummation of the Proposed Novation remains subject to approval by the Court of the Proposed Novation. Should the Proposed Novation be approved by the Court, the Proposed Novation would (i) bind FGIC's Policyholders and all other Persons and (ii) result in the following:

(a)   National Public (rather than FGIC) would thereafter be the issuer of the National Public Reinsured Policies and would be directly responsible for all obligations under the National Public Reinsured Policies;

(b)   National Public (rather than FGIC) would have all rights under or with respect to the National Public Reinsured Policies;

(c)   National Public would continue to perform all services necessary for administration of the National Public Reinsured Policies, including policyholder service, billing and claims handling;

(d)   Policyholders under the National Public Reinsured Policies would remain entitled to bring Claims directly against National Public, but would no longer be entitled to file Claims against FGIC (which would be released from all obligations thereunder); and

(e)   The FGIC Reassumption Right would terminate.

In connection with seeking the Court's approval of the Proposed Novation, the Rehabilitator has also requested the Court to approve FGIC's novation to National Public of all reinsurance or any portion thereof covering the National Public Reinsured Policies that is in existence as of the Effective Date (after giving effect to any Reinsurance Commutation Agreements (as defined below)).  Should such novation be approved by the Court, all such reinsurance (or such portions thereof) would automatically and without further action by any Person be novated to National Public effective as of the Effective Date.

2.    **CDS Commutation Agreements**

Following entry of the Order of Rehabilitation, the Rehabilitator continued negotiations with the CDS Counterparties and, to date, CDS Commutation Agreements have

been executed with two such counterparties. These CDS Commutation Agreements will terminate FGIC CP-issued CDS and related FGIC-issued Policies in exchange for payments by FGIC aggregating approximately $51.5 million. As of March 31, 2012, the exposure to be commuted constitutes approximately $3.8 billion NPIF, represents approximately $293 million of statutory loss reserves and carries aggregate estimated exposure to potential Termination Payment Claims of approximately $1.5 billion. Payments by FGIC under these CDS Commutation Agreements will result in the cancellation or "tearing up" of FGIC's Policies related to that exposure for less than what these CDS Counterparties are projected to have received under the Plan on account of Policy Claims for realized credit events that the Rehabilitator projects would have been asserted against FGIC if the CDS with such CDS Counterparties were not "torn up" or terminated early. The Rehabilitator is also continuing negotiations with other CDS Counterparties and is seeking to execute additional CDS Commutation Agreements between FGIC and such counterparties. Consummation of the transactions contemplated by the CDS Commutation Agreements requires (or will require) approval by the Court. The Rehabilitator will file all executed CDS Commutation Agreements with the Court (potentially in redacted form) in an update to the Plan Supplement in accordance with the deadlines set forth in the Scheduling Order.

### 3.    **Reinsurance Commutation Agreement**

Following entry of the Order of Rehabilitation, the Rehabilitator negotiated a settlement, commutation and release agreement with American Overseas Reinsurance Company Limited, a Bermuda reinsurance company formerly known as RAM Reinsurance Company Limited ("**AORe**"), pursuant to which, as of August 20, 2012, FGIC and AORe agreed to commute and settle all of their obligations to one another under various reinsurance agreements effective upon AORe's payment to FGIC of approximately $64.8 million, subject to Court approval (which is currently pending). The Rehabilitator may seek Court approval of agreements with other Reinsurers to commute and settle FGIC's and such Reinsurer's obligations to one another (collectively, with the AORe agreement, the "**Reinsurance Commutation Agreements**").

### D.    DISCUSSIONS CONCERNING THE PLAN WITH VARIOUS CONSTITUENTS

Following the issuance of the Order of Rehabilitation, the Rehabilitator engaged in discussions with various parties, including the Ad Hoc Instrument Holder Group, an ad hoc group of CDS Counterparties and the Indenture Trustees that had initially objected to certain provisions of the injunctive relief requested in the Rehabilitation Petition. Following their review and discussion with the Rehabilitator, certain members of the Ad Hoc Instrument Holder Group have agreed to support or not object to the Plan.

# VI.

# THE PLAN

## A.   TREATMENT OF CLAIMS AND EQUITY INTERESTS

Article I of the Plan designates six categories of Claims and Equity Interests, as listed on the chart in Section III.A above.  This categorization was in part designed to ensure that Policyholders, other creditors and holders of Equity Interests receive no less than what they would receive in a liquidation of FGIC.

Accordingly, Article II of the Plan provides that, unless the holder of a Permitted Claim and FGIC agree to different treatment pursuant to Section 4.8 of the Plan, holders of Permitted Secured Claims (if any) and Permitted Administrative Expense Claims (if any) will be paid in full.  Further, as described in greater detail in Section VI.B.1 below, holders of Permitted Policy Claims will receive only (i) an upfront Cash payment equal to a specified percentage of each Permitted Policy Claim based on the CPP at the time of payment and (ii) additional payments under a DPO with respect to such Policy to the extent payable pursuant to the Plan, which DPO will be equal to the remainder of the Permitted Policy Claim (subject to increases and reductions described below).  Holders of Permitted Non-Policy Claims and Permitted Late-Filed Claims will receive, on a pro rata basis, Cash, if FGIC determines, with the express written consent of the NYSDFS, that all actual and expected Permitted Policy Claims (and, in the case of Permitted Late-Filed Claims, all actual and expected Permitted Non-Policy Claims) have been paid in full or fully reserved for.  Finally, Equity Interests will remain in existence but will not receive any distribution, dividends or other payments unless FGIC determines, with the express written consent of the NYSDFS, that all Permitted Late-Filed Claims have been paid in full or fully reserved for.  The Rehabilitator does not expect FGIC to make any distributions pursuant to the Plan on account of Non-Policy Claims, Late-Filed Claims or Equity Interests.

## B.   MEANS OF IMPLEMENTATION

### 1.   Policy Restructuring

As of the Effective Date and without any further action by the Rehabilitator, FGIC, the Superintendent, the Court, the Policyholders or any other Person, all Policies in force as of the Effective Date (except for the Policies novated or terminated by the Novation Agreement or the CDS Commutation Agreements) will be restructured pursuant to the Plan.  The Plan will become part of each continuing Policy and will supersede any provision of any such Policy that is inconsistent with the Plan.  The Plan will govern the treatment of all Policy Claims that FGIC had not paid in full as of the Commencement Date and all Policy Claims thereafter arising.  FGIC will not have any obligation or liability to make any payments with respect to any Policy, except as set forth in the Plan.

Provisions of the Plan relevant to the Policy Restructuring are in the Restructured Policy Terms.  The Restructured Policy Terms include the mechanism for paying Permitted Policy Claims, as well as procedures for revaluating FGIC's financial condition to determine whether additional Cash payments may be made on account of Permitted Policy Claims.

Consistent with the goal of the Plan, the Rehabilitator developed the Restructured Policy Terms to maximize the extent to which FGIC's Policyholders are treated in a fair and equitable manner. The Restructured Policy Terms are designed to address challenges the Rehabilitator faced in achieving this goal.

*CPP/DPO Structure.* First, because FGIC likely will not have sufficient assets to pay in full in Cash all Policy Claims that have arisen but have not been paid or that are expected to arise over the Run-Off Period, which may last 40 years, the Restructured Policy Terms provide for payment of only a portion of each Permitted Policy Claim in Cash. FGIC will satisfy the remainder of each Permitted Policy Claim through future payments on account of a DPO for the related Policy, to the extent payable under the Plan. FGIC will track DPOs on a Policy-by-Policy basis, and will reduce each DPO by the amount of any Cash payments or Deemed Cash Payments made with respect to Permitted Policy Claims under the related Policy, as discussed below. These contingent additional payments under DPOs will be payable only if, when and to the extent FGIC determines, in consultation with a third-party firm and with NYSDFS approval, that it has sufficient assets to pay in Cash an increased portion of each previously Permitted Policy Claim and each Policy Claim it expects to permit in a Stress Scenario during the Run-Off Period.

This approach is designed so that all of FGIC's Policyholders receive the same percentage (or CPP) of Cash on account of their Permitted Policy Claims, whether arising in the next five years or in the next few decades. The Rehabilitator, in consultation with Lazard, will set the initial CPP based on assumptions intended to enable FGIC to pay at least the initial CPP of all Policy Claims Permitted over the Run-Off Period. However, the Rehabilitator expects the CPP to increase over time. To compensate Policyholders with Claims Permitted in the near term for receiving a lower initial Cash payment because of this approach, the Restructured Policy Terms provide for DPO Accretion, which is discussed below.

*Turnover of FGIC Payments.* Second, the Restructured Policy Terms require all FGIC Payment Payors to pay in Cash in full all FGIC Payments, as defined in the Plan, owed or that would have been owed to FGIC. The definition of FGIC Payments captures (i) all premiums, fees or other charges, (ii) all expense reimbursements, (iii) to the extent FGIC paid one or more Policy Claims in full under the applicable Policy prior to November 24, 2009 for which it has not yet been reimbursed, all recoveries, reimbursements, settlements and other amounts (other than proceeds of Trust Loan Repurchase Obligations) up to the amount of such reimbursement and (iv) the then-current CPP of all recoveries, reimbursements, settlements and other amounts (other than proceeds of Trust Loan Repurchase Obligations) with respect to Policies for which there are no unreimbursed Policy Claims that were paid in full prior to November 24, 2009, in all cases payable to the FGIC Parties under the terms of or in connection with the relevant Policy or related Transaction Documents, as if (x) the Plan been in effect at all times from and after the issuance of the 1310 Order and (y) FGIC at all times paid all Policy Claims in full in Cash. With respect to clauses (iii) and (iv), many of FGIC's Policies and related Transaction Documents tie certain amounts in respect of recoveries, reimbursements, settlements and other amounts owed to FGIC under such Policies to the amount of Cash payments FGIC makes with respect to Policy Claims thereunder. The Rehabilitator believes it is fair and equitable to require FGIC Payment Payors to pay the then-current CPP portion of the recoveries, reimbursements, settlements and other amounts (other than proceeds of Trust Loan

21

Repurchase Obligations) that would otherwise have been owed to FGIC under Policies because FGIC will pay only the CPP of such Policy Claims. However, since FGIC paid all Policy Claims in full prior to the issuance of the 1310 Order, FGIC should be entitled to receive 100% of such amounts until it is reimbursed in full for payments with respect to such Policy Claims, as previously described. Proceeds of Trust Loan Repurchase Obligations will be subject to application and distribution solely in accordance with Sections 3.7(a)(iii) and 3.7(b)(iv) of the Plan, as described in Section VI.B.8 below.

*FGIC's Right to Setoff Against Unpaid FGIC Payments.* Third, if a Policyholder (or other FGIC Payment Payor) fails to pay all FGIC Payments owed to FGIC Parties, the Restructured Policy Terms modify FGIC's obligations so that all Policyholders are treated fairly and equitably. For example, the Restructured Policy Terms provide that FGIC will reduce Cash payments it would owe in respect of a Policy by the amount of unpaid FGIC Payments relating to such Policy (referred to in the Plan as "Deemed Cash Payments"). In addition, FGIC's DPO with respect to a Policy is defined to exclude both Cash payments and Deemed Cash Payments that FGIC makes with respect to Permitted Policy Claims under such Policy. Giving FGIC the right to setoff its payment obligations against unpaid FGIC Payments and excluding Deemed Cash Payments from FGIC's deferred payment obligations prevents certain Policyholders from gaining an unfair advantage to the detriment of other Policyholders by withholding FGIC Payments in violation of the Restructured Policy Terms.

*Cash Payment Adjustments.* Fourth, as the Rehabilitator expects the CPP to increase over time, a Policyholder may receive additional Cash payments from FGIC on account of Permitted Policy Claims under a Policy *after* such Policyholder pays certain FGIC Payments (*e.g.* recoveries, reimbursements, settlements or other amounts) based on the previous CPP. The Restructured Policy Terms reduce Cash payments FGIC owes to such Policyholder to account for the greater amount of FGIC Payments FGIC would have received had the increased CPP been in effect when such FGIC Payments were made. In the unlikely event CPP decreases, the Restructured Policy Terms also provide for the adjustment of Cash payments owed by FGIC to account for overpayment of FGIC Payments.

*DPO Reduction for Certain Paid Losses.* Fifth, Policyholders (or other holders of Instruments insured by FGIC) may, pursuant to their related Transaction Documents, receive recoveries on account of losses insured by FGIC that would have been payable to the FGIC Parties had FGIC been paying all Permitted Policy Claims in full in Cash. The Restructured Policy Terms reduce DPOs with respect to such Policies by the amount of those recoveries. This reduction is designed to treat all Policyholders fairly and equitably by preventing Policyholders from looking to FGIC for recoveries on losses where such Policyholders have already received recoveries from another source for the same losses.

*No Termination Payment Claims or Loss of FGIC Rights.* Sixth, certain FGIC Contracts and Transaction Documents give Policyholders or CDS Counterparties the right to use the Rehabilitation or Rehabilitation Circumstances as grounds for taking various actions, including (i) terminating a FGIC Contract and asserting a Termination Payment Claim or (ii) exercising or otherwise interfering with FGIC Rights. Such *ipso facto* provisions would allow certain Policyholders to benefit from the financial condition of the FGIC Parties and/or the commencement of the Rehabilitation Proceeding, to the detriment of other Policyholders.

Accordingly, the injunctive relief set forth in Section 7.8 of the Plan prohibits any Person from taking such actions. However, if any Person attempts to terminate a FGIC Contract and assert a Termination Payment Claim or exercise FGIC Rights in violation of the injunctive relief in the Plan, the Restructured Policy Terms provide that FGIC may declare a Policy Crystallization Event, as defined in the Plan. The concept of a Policy Crystallization Event is intended to put FGIC in no worse a position than it would have been in had the injunctive relief not been violated. This declaration of a Policy Crystallization Event enables FGIC to determine its anticipated payment obligations under the applicable Policy for the remainder of the expected duration of the Policy, ignoring any actual or anticipated effects of the actions that gave rise to the Policy Crystallization Event.

The following mechanics in the Restructured Policy Terms are described more fully below: (i) the payment of a portion of each Permitted Policy Claim in Cash; (ii) the satisfaction of the remainder of each Permitted Policy Claim through a DPO for the related Policy which will entitle the holder of such Policy to contingent additional payments and the calculation of such DPO; (iii) the accrual, calculation and payment of DPO Accretion; (iv) the requirement to make certain payments to FGIC and adjustments thereto; (v) the conduct of annual CPP Revaluations; and (vi) FGIC's right to declare a Policy Crystallization Event. An illustrative example of how Permitted Policy Claims will be paid pursuant to the Restructured Policy Terms is attached hereto as Exhibit E.

(a) CPP

Section 1.1 of the Restructured Policy Terms sets forth FGIC's obligation to pay in Cash a percentage (the CPP) of each Permitted Policy Claim and provides the mechanics for establishing the CPP and calculating the initial CPP payment for each Permitted Policy Claim.

The Rehabilitator will set the initial CPP. The Rehabilitator currently expects an initial CPP of 15% based on assumptions designed to maximize fair and equitable treatment of all Permitted Policy Claims, no matter when arising. The initial CPP will depend on several factors, including (i) actual or anticipated changes in the assumptions underlying the Run-Off Projections (including those relating to developments in actual or anticipated losses under FGIC's Policies or other financial circumstances or events), (ii) whether the Novation Agreement is approved by the Court, (iii) whether the two CDS Commutation Agreements executed thus far are approved by the Court, (iv) whether additional CDS Commutation Agreements are executed and approved by the Court (and the terms thereof), (v) whether the Reinsurance Commutation Agreement executed with AORe is approved by the Court and, if approved, whether FGIC receives the payment contemplated thereby, (vi) whether additional Reinsurance Commutation Agreements are executed and approved by the Court (and the terms thereof), (vii) whether FGIC receives the payments contemplated by any additional Reinsurance Commutation Agreements and (viii) other events and circumstances that may be beyond the Rehabilitator's control. While the Rehabilitator currently anticipates that the initial CPP will be 15%, as set forth above, no assurance can be given as to what the initial CPP ultimately will be. The CPP will be subject to adjustment pursuant to annual CPP Revaluations, as described in subsection (e) of this Section VI.B.1. The Rehabilitator currently anticipates that the CPP will ultimately increase to 30.4% using assumptions described in the Run-Off Projections, attached

hereto as Exhibit C.[9]  However, the ultimate CPP may be materially higher or lower than that percentage, and no assurance can be given as to what the ultimate CPP will be.

Within 60 days of the Claims Resubmission Deadline, FGIC will begin making Cash payments with respect to each Policy Claim that has been Permitted by then, in an amount equal to the product of the initial CPP and the Permitted Policy Claim, unless such Cash payment is adjusted pursuant to Sections 1.4 or 1.5 of the Restructured Policy Terms, as described in subsections (d) and (e) of this Section VI.B.1.  Each subsequently Permitted Policy Claim will be paid promptly following FGIC's determination that the Policy Claim is Permitted.

(b) DPO

The remaining amount of each Permitted Policy Claim not paid in Cash (or Deemed Cash Payments) will be satisfied through a DPO for the related Policy, which will entitle the holder of such Policy to contingent additional payments.  A DPO will only be payable if and when there is a CPP Upward Adjustment pursuant to Section 1.5(C) of the Restructured Policy Terms, as described in subsection (e) of this Section VI.B.1.  The Rehabilitator makes no assurances as to if, when or in what amounts FGIC may ultimately make Cash payments with respect to any DPO.  Further, Section 3.2 of the Restructured Policy Terms provides that a DPO is not a separate security issued by FGIC or any of its affiliates, cannot be represented by any certificate or other instrument issued by FGIC or any of its affiliates, and does not represent any ownership in FGIC or any of its affiliates.  In addition, Section 3.2 of the Restructured Policy Terms provides that FGIC will not be required to make any payments with respect to any DPO other than to the holder of the related Policy.

Section 1.2 of the Restructured Policy Terms sets forth the circumstances under which the DPO for a Policy will be increased or decreased.  First, a DPO for a Policy will be reduced by any amounts, whenever arising, that (i) would have been payable to the FGIC Parties under such Policy or any related Transaction Document from and after the Effective Date (giving effect to Section 3.5 of the Plan, which essentially cures any purported default based on the Rehabilitation or the Rehabilitation Circumstances), assuming that FGIC had paid all Permitted Policy Claims in full in Cash (rather than as contemplated in the Restructured Policy Terms) and without duplication of any DPO reductions pursuant to Section 1.4 or 1.5 of the Restructured Policy Terms, as described in subsections (d) and (e) of this Section VI.B.1 and (ii) were instead paid to holders of any Instrument insured by such Policy.  This reduction is intended to avoid overcompensating any Policy Payee that has already received a recovery on account of a loss insured by FGIC.  Further, DPO will be increased or reduced to account for unpaid FGIC Payments and CPP Adjustments pursuant to Sections 1.4 and 1.5 of the Restructured Policy Terms, as described in subsections (d) and (e) of this Section VI.B.1, and may otherwise be reduced pursuant to the Plan, including pursuant to Section 4.7(B) thereof.

---

[9] See Section VII.E hereof for a discussion of expected ultimate recoveries.

(c) DPO Accretion

        Section 1.3 of the Restructured Policy Terms governs the accrual, calculation and payment of DPO Accretion.  Each Policy will accrue DPO Accretion at a rate of 3% per year (on a daily basis on the basis of a 365-day year).  DPO Accretion will be calculated based on a Policy's DPO as of (i) the preceding June 30 or (ii) for the first year in which there is a DPO under such Policy, the first date there is such DPO (the "**First Payment Date**").  DPO Accretion for a Policy will begin accruing on the First Payment Date and continue until such time (if ever) as the DPO for such Policy is permanently reduced to zero.  All DPO Accretion will be calculated on a simple basis rather than a compound basis (*i.e.*, no DPO Accretion will accrete based on accumulated DPO Accretion).  No DPO Accretion will be added to a DPO, but will be recorded separately for each Policy in FGIC's books and records.

        Section 1.3(B) of the Restructured Policy Terms provides that, if there is a CPP Upward Adjustment pursuant to Section 1.5(C) of the Restructured Policy Terms, as described in subsection (e) of this Section VI.B.1, on the applicable DPO Payment Date FGIC will make Cash payments with respect to outstanding DPO Accretion.  The amounts of such Cash payments (the DPO Accretion Payment Amounts) will be calculated as part of the CPP Revaluation that led to the CPP Upward Adjustment, as described in greater detail in subsection (e) below.  The Rehabilitator expects that the DPO Accretion Payment Amounts will be a fraction of the outstanding DPO Accretion.  However, the Rehabilitator makes no assurances as to if, when or in what amounts FGIC may ultimately make Cash payments with respect to any DPO Accretion.  Further, Section 3.2 of the Restructured Policy Terms provides that DPO Accretion is not a separate security issued by FGIC or any of its affiliates, cannot be represented by any certificate or other instrument issued by FGIC or any of its affiliates, and does not represent any ownership in FGIC or any of its affiliates.  In addition, Section 3.2 of the Restructured Policy Terms provides that FGIC will not be required to make any payments with respect to any DPO Accretion other than to the holder of the related Policy.

(d) FGIC Payments

        Section 1.4 of the Restructured Policy Terms establishes FGIC's right to set off unpaid FGIC Payments and FGIC's obligation to account for the effect of CPP Adjustments on FGIC Payments.  Section 1.4(A) of the Restructured Policy Terms requires all FGIC Payment Payors to pay in Cash to the FGIC Parties all FGIC Payments that would have been payable had the Plan been in effect at all times from and after the issuance of the 1310 Order, when due, or if such FGIC Payment would have been due prior to the Effective Date, by the fifth Business Day following the Effective Date.  This requirement is intended to prevent certain Policyholders from gaining an unfair advantage to the detriment of other Policyholders by withholding FGIC Payments based on the Rehabilitation or the Rehabilitation Circumstances.

        Section 1.4(A) of the Restructured Policy Terms also provides that if FGIC determines in good faith that all or a portion of any FGIC Payment has not been paid to the FGIC Parties when due, FGIC will (i) upon such determination, decrease the DPO for the applicable Policy by the amount of such unpaid FGIC Payment, (ii) reduce any Cash payments that would otherwise be payable by FGIC in respect of the applicable Policy as such Cash payments become due and (iii) increase the DPO for the applicable Policy as Cash payments are reduced pursuant

25

to clause (ii). This mechanism is intended to account for unpaid FGIC Payments during those periods (if any) that the amount of Cash payments payable by FGIC with respect to a Policy is not sufficient to offset the amount of unpaid FGIC Payments with respect to such Policy.

Finally, if FGIC has already reduced the amount of a Policy Claim that it ultimately Permitted by the amount of a FGIC Payment (that went to the Policyholder instead of FGIC), that FGIC Payment will not be subject to Section 1.4(A) of the Restructured Policy Terms (it being understood that FGIC will not be required to make any such reduction).

Section 1.4(B) of the Restructured Policy Terms provides the actions FGIC will take to account for the underpayment (or overpayment) of FGIC Payments resulting from CPP Adjustments. Since the definition of FGIC Payments includes *all* premiums, fees, other charges and expense reimbursements, and 100% of recoveries, reimbursements, settlements and other amounts (other than proceeds from Trust Loan Repurchase Obligations) with respect to Policies as to which FGIC has paid one or more Policy Claims in full prior to the 1310 Order, until FGIC is reimbursed in full for such payments, such amounts will not be affected by the adjustments described below.

First, within a commercially reasonable time after each CPP Adjustment, FGIC will determine, on a Policy-by-Policy basis, the amount of FGIC Payments that would have been payable to the FGIC Parties had FGIC paid all Permitted Policy Claims from and after the Effective Date based on the Adjusted CPP (the "**Adjusted FGIC Payments**").

Second, if the Adjusted FGIC Payments for a Policy are greater than the FGIC Payments that were owed to the FGIC Parties under the CPP in effect prior to the CPP Adjustment (meaning the applicable FGIC Payment Payor underpaid, after giving effect to the CPP Adjustment), FGIC will promptly notify the related Policy Payee of such FGIC Payment Deficiency. To account for the FGIC Payment Deficiency, FGIC will (i) reduce the DPO for the applicable Policy by the amount of such FGIC Payment Deficiency, (ii) reduce any subsequent Cash payments that otherwise would be payable by FGIC in respect of such Policy as such Cash payments become due (until such reduction equals the FGIC Payment Deficiency) and (iii) increase the DPO for the applicable Policy as Cash payments are reduced pursuant to clause (ii). This mechanism is intended to account for a FGIC Payment Deficiency during those periods (if any) that the amount of Cash payments payable by FGIC with respect to a Policy is not sufficient to offset the amount of FGIC Payment Deficiency with respect to such Policy.

Third, conversely, if the Adjusted FGIC Payments for a Policy are less than the FGIC Payments that were owed to the FGIC Parties under the CPP in effect prior to the CPP Adjustment (meaning the applicable FGIC Payment Payor overpaid), FGIC will promptly notify the related Policy Payee of such FGIC Payment Excess. To account for the FGIC Payment Excess, FGIC will (i) offset any reductions to subsequent Cash payments by FGIC in respect of such Policy (until such offset equals the FGIC Payment Excess) and (ii) reduce the DPO by the amount of any offset made pursuant to clause (i).

Fourth, FGIC will recalculate a FGIC Payment Deficiency or FGIC Payment Excess to account for any FGIC Payment that becomes payable to the FGIC Parties after

determination of such FGIC Payment Deficiency or FGIC Payment Excess, but before the next CPP Adjustment.

These four steps are intended, in connection with any CPP Adjustment, to place FGIC and each Policyholder, Policy Payee and FGIC Policy Payor in substantially the same economic position (ignoring the time value of money), on a Policy-by-Policy basis, that each party would have been in had FGIC paid all Permitted Policy Claims based on the Adjusted CPP from and after the Effective Date.

Finally, Section 1.4(B) of the Restructured Policy Terms does not apply to FGIC Payments related to Policy Claims that were paid in full prior to the 1310 Order.  The definition of FGIC Payments indicates that, with respect to such Policy Claims, FGIC is entitled to all of the recoveries, reimbursements, settlements and other amounts (other than proceeds from Trust Loan Repurchase Obligations) payable to the FGIC Parties under such Policies or related Transaction Documents, until it has been reimbursed in full.

(e)  CPP Revaluation

Section 1.5 of the Restructured Policy Terms sets forth the terms and conditions governing CPP Revaluations, including (i) the frequency of CPP Revaluations, (ii) the engagement and role of a CPP Revaluation Firm, (iii) CPP Adjustments, (iv) cessation of CPP Upward Adjustments and (v) the Final CPP Revaluation.

Section 1.5(A) of the Restructured Policy Terms provides that, commencing in 2014, FGIC will conduct a CPP Revaluation (to determine whether the CPP should remain the same or be adjusted upward or downward) on an annual basis by June 30 of each year (or as soon as practicable thereafter).  In addition, if FGIC receives within six months after the effective date of a CPP Revaluation or the Effective Date Cash recoveries aggregating $100 million or more than the related Cash recovery amounts, if any, predicted in the Run-Off Projections underlying such CPP Revaluation, the Board will decide whether to (i) update the latest CPP Revaluation, taking into account the new Cash recoveries, but without updating or otherwise changing any of the Base Scenario, Stress Scenario, Run-Off Projections, Run-Off Data, Minimum Cash Buffer or Run-Off Assumptions used in the latest CPP Revaluation or (ii) conduct a new CPP Revaluation as soon as practicable.  If the Board decides to update the latest CPP Revaluation, instead of conducting a new one, it will provide NYSDFS with written notice of the results of the updated CPP Revaluation.  However, FGIC will not conduct any CPP Revaluation if the NYSDFS directs it in writing to refrain from doing so.

Section 1.5(B) of the Restructured Policy Terms provides that FGIC will engage a CPP Revaluation Firm to conduct each CPP Revaluation.  As part of each CPP Revaluation, the CPP Revaluation Firm will review certain components of its model that will help it determine whether to recommend a CPP Adjustment.  These components include the then-current Base Scenario, Stress Scenario, Run-Off Projections, Run-Off Data, Minimum Cash Buffer and Run-Off Assumptions.  The CPP Revaluation Firm will propose any updates, revisions, corrections or other modifications to these components that, in its professional opinion, are necessary or advisable to correct any errors, reflect events that have occurred or are reasonably likely to occur

27

and ensure that the CPP is set at a level consistent with the Run-Off Principles (the "**Proposed Refinements**").

Giving effect to the Proposed Refinements, the CPP Revaluation Firm will then determine the amount (if any) of Excess Cash, which amount shall be used to recalculate the CPP and determine the amount of accretion that may be paid on the outstanding DPOs. Excess Cash is the amount of Cash available after assuming FGIC has (i) paid certain operating expenses, (ii) paid the then-current CPP of all Policy Claims that were Permitted on or prior to the date of determination, (iii) paid the then-current CPP of all Policy Claims projected to be Permitted in a Stress Scenario from and after such date through the remainder of the Run-Off Period and (iv) set aside the Minimum Cash Buffer. The Minimum Cash Buffer is meant to reduce the chance of unforeseen negative events or circumstances (including higher-than-expected losses and lower-than-expected investment performance) prejudicing holders of Policy Claims that have not yet arisen.

The CPP Revaluation Firm will then allocate the Excess Cash *pari passu* and on a pro rata basis among the (i) outstanding DPO Accretion Amounts for all Policies as of the date of determination, (ii) DPO for all Policy Claims that were Permitted on or prior to such date and (iii) DPO (based on the CPP in effect immediately prior to the date of the related CPP Revaluation) for all Policy Claims projected to be Permitted in a Stress Scenario from and after such date through the remainder of the Run-Off Period, in each case disregarding any reductions to DPO made pursuant to Sections 1.4(A) and 1.4(B)(ii) of the Restructured Policy Terms, as described in subsection (d) of this Section VI.B.1. The CPP Revaluation Firm will recalculate the CPP based on the amount of Excess Cash allocated to make payments with respect to DPO pursuant to clauses (ii) and (iii). If there is a CPP Upward Adjustment, the amount of Excess Cash allocated to make payments with respect to outstanding DPO Accretion Amounts pursuant to clause (i) will be distributed pro rata among all Policies with outstanding DPO Accretion Amounts (which pro rata distribution will be the DPO Accretion Payment Amount for each Policy, referenced in Section 1.3(B) of the Restructured Policy Terms and subsection (c) of this Section VI.B.1).

Section 1.5(C) of the Restructured Policy Terms provides that the Board will review the results of each CPP Revaluation within 30 days following completion thereof, including the CPP Revaluation Firm's Proposed Refinements, Excess Cash calculation and CPP recalculation. The Board will determine whether (i) any or all of the Proposed Refinements should be adopted in whole or in part and (ii) the CPP should remain the same or be adjusted upward or downward. The CPP Revaluation Firm will recalculate the CPP based on the Board's determinations, if necessary. FGIC will promptly convey in writing the Board's determinations with respect to the Proposed Refinements and the CPP to the NYSDFS for approval. FGIC will make no changes to the Run-Off Data (other than corrections), Run-Off Projections, Run-Off Assumptions, Stress Scenario, Minimum Cash Buffer or CPP unless and until such change has been approved by the NYSDFS.

If the NYSDFS approves a CPP Upward Adjustment, on the related DPO Payment Date FGIC will, with respect to any Policy as to which FGIC paid any Cash from and after the Effective Date but prior to the CPP Upward Adjustment, pay the Policy Payee Cash in an amount equal to the product of (i) the Adjusted CPP minus the CPP in effect immediately

prior to such CPP Upward Adjustment and (ii) the Aggregate Claims amount for such Policy less the amounts (if any) by which the DPO was reduced for such Policy pursuant to Section 1.2(i) of the Restructured Policy Terms (to account for payments a Policyholder already received from other sources on account of the loss insured by such Policy). This "catch-up" payment is intended to provide holders of such Policies the recoveries they would have received had the Adjusted CPP been in effect on the previous DPO Payment Date(s). FGIC will also reduce the DPO of any such Policy by the amount of such "catch-up" payments.

In the event of a CPP Downward Adjustment, any future Cash payments that would otherwise be payable by FGIC for Policies to which FGIC paid any Cash from and after the Effective Date but prior to the CPP Adjustment, based on a higher CPP (each an, "**Overpaid Policy**") will be subject to an Equalization Adjustment. The Equalization Adjustment will reduce (including to zero) the amount of Cash that would otherwise be payable by FGIC with respect to each Overpaid Policy until such time as the Aggregate Cash Payments Amount for each Overpaid Policy equals the amount of Cash that FGIC would have paid if the (downwardly) Adjusted CPP had been in effect from and after the Effective Date (including DPO Accretion Payment Amounts).

As there are significant costs involved in conducting CPP Revaluations, to help ensure that FGIC will have adequate assets to pay the Permitted Policy Claims of long-term Policyholders, Section 1.5(D) of the Restructured Policy Terms provides that once FGIC reasonably determines that approximately 90% or more of the total anticipated Policy Claims are no longer subject to contingencies or other developments (other than the passage of time and/or the submission of a valid request for payment thereof), FGIC may halt CPP Revaluations, unless (i) the value of FGIC's remaining admitted Cash, Cash equivalents, bonds and short-term investments exceeds 200% of the anticipated amount of remaining anticipated Policy Claims multiplied by the CPP then in effect, (ii) NYSDFS requests that FGIC continue to conduct CPP Revaluations or (iii) FGIC deems it prudent to continue conducting CPP Revaluations and NYSDFS approves. Section 1.5(E) of the Restructured Policy Terms provides that, once FGIC has reasonably determined that 100% of the total anticipated Policy Claims are no longer subject to contingencies or other developments (other than the passage of time and/or the submission of a valid Claim), FGIC will conduct the Final CPP Revaluation to distribute the aggregate amount of FGIC's remaining assets (less projected expenses) pro rata based on the outstanding DPO and DPO Accretion in respect of all Policies.

(f)  Policy Crystallization Events

Article II of the Restructured Policy Terms sets forth the terms and conditions governing the declaration of a Policy Crystallization Event and the effect of such declaration. Section 2.1 of the Restructured Policy Terms provides that if any Person (other than the FGIC Parties), notwithstanding the injunctive relief and other terms and conditions in the Plan, (i) exercises, seeks to exercise or in any manner fails to honor the FGIC Parties' exclusive authority to exercise FGIC Rights or otherwise fails to comply with the injunctive relief set forth in Section 7.8(e) of the Plan, (ii) exercises or seeks to exercise any Rehabilitation-Triggered Rights, (iii) declares or seeks to declare a Rehabilitation-Related Default or (iv) interferes or seeks to interfere with the FGIC Parties' pursuit of FGIC Direct Claims (clauses (i) through (iv) collectively, "**Purported FGIC Loss of Rights**"), FGIC may declare with respect to such Policy

a Policy Crystallization Event. Section 2.1 of the Restructured Policy Terms also provides that the exercise by any Person of its rights, if any, under and in accordance with Section 3.7 of the Plan will not constitute a Purported FGIC Loss of Rights.

To declare a Policy Crystallization Event, first, FGIC will provide a Purported FGIC Loss of Rights Notice to such person within 60 days after FGIC becomes actually aware of the Purported Loss of Rights. If such Person fails to cure the Purported FGIC Loss of Rights within 30 days after FGIC sends the Purported FGIC Loss of Rights Notice, FGIC may declare a Policy Crystallization Event by providing a Policy Crystallization Event Notice within 30 days after the expiration of the 30 – day cure period.

Section 2.2 of the Restructured Policy Terms provides that, after FGIC declares a Policy Crystallization Event, FGIC will determine its anticipated payment obligations under the Policy for the remainder of the expected duration of the Policy (collectively, the "**Estimated Payment Obligations**") and the date on which each Estimated Payment Obligation is expected to arise (the "**Estimated Payment Schedule**"), ignoring any actual or anticipated effects of the Purported FGIC Loss of Rights that gave rise to the Policy Crystallization Event. FGIC will determine the Estimated Payment Obligations and Estimated Payment Schedules for the Policy based on the reserve and related assumptions, calculations and projections FGIC used in estimating losses for such Policy in connection with its most recent quarterly statutory financial statement. For the avoidance of doubt, the Estimated Payment Obligations will not include any amount in respect of termination of a CDS or other swap agreement in contravention of the Plan (whether calculated on the basis of "Market Quotation," "Loss," "Close-out Amount" or other methodologies). In respect of each Policy for which a Policy Crystallization Event has been declared, a Claim will be deemed to have been made as of each date on which (i) an Estimated Payment Obligation was anticipated by FGIC to be due based on the Estimated Payment Schedule and (ii) a Claim is properly submitted by the Policyholder, in an amount equal to (a) the lesser of (x) the aggregate Estimated Payment Obligations that were anticipated to be due and (y) the aggregate amount of all Claims property submitted, in each case with respect to events occurring from and after the Policy Crystallization Event Effective Date through and including such date *minus* (b) the aggregate amount of all previously Permitted Policy Claims for such Policy with respect to events occurring from and after the Policy Crystallization Event Effective Date through and including such date.

No Claims will be Permitted with respect to a Policy for which a Policy Crystallization Event has been declared except for those described in the immediately preceding paragraph. The intent of the Policy Crystallization Event concept is to put FGIC in no worse a position than it would have been in had the Purported FGIC Loss of Rights not occurred.

## 2.    Approval of Novation Agreement and Novation of Reinsurance

As part of the approval of the Plan, the Rehabilitator is seeking the Court's approval of the Novation Agreement described in Section V.C.1 above, pursuant to which FGIC will novate to National Public the Policies that National Public currently reinsures on a 100% "cut-through" reinsurance basis. As a result, such Policies will constitute direct insurance policies of National Public rather than Policies of FGIC. In conjunction with the novation of the National Public Reinsured Policies, the Rehabilitator is also seeking the Court's approval of the

novation to National Public of all reinsurance or any portion thereof covering the National Public Reinsured Policies that is in existence as of the Effective Date (after giving effect to any Reinsurance Commutation Agreements).

The Novation Agreement will enable FGIC to avoid holding additional assets to protect against potential Policy Claims under the National Public Reinsured Policies in a Stress Scenario should National Public be unwilling or unable to meet its obligations.  In such a situation, and in light of the large potential exposure under the National Public Reinsured Policies (approximately $138 billion in aggregate par outstanding as of December 31, 2011), even a small increase in relative losses thereunder could result in significant exposure to FGIC. Under the Run-Off Projections, such additional loss exposure would approximate $17.7 billion. As a result of the Novation Agreement, FGIC will avoid that risk, resulting in a higher initial CPP and increased overall recoveries for Policyholders.

### 3.    Approval of CDS Commutation Agreements

As described in Section V.C.1 hereof, as part of approval of the Plan, the Rehabilitator is seeking the Court's approval of two CDS Commutation Agreements.  The Rehabilitator is continuing negotiations with other CDS Counterparties in an effort to execute additional CDS Commutation Agreements between FGIC and such counterparties.  The Rehabilitator will file all executed CDS Commutation Agreements with the Court (potentially in redacted form) in an update to the Plan Supplement in accordance with the deadlines set forth in the Scheduling Order.  Effectiveness of each CDS Commutation Agreement is (or will be) conditioned on, among other things, approval thereof by the Court.

Pursuant to the two CDS Commutation Agreements executed thus far, in exchange for payments by FGIC aggregating approximately $51.5 million, FGIC will (i) eliminate all its insured exposure (approximately $3.8 billion NPIF) with respect to the CDS and certain other obligations covered by such CDS Commutation Agreements, (ii) significantly reduce its statutory loss reserves (by approximately $293 million) and (iii) avoid any uncertainty, delay and costs that could arise from litigating approximately $1.5 billion in potential Termination Payment Claims that may arise under such CDS.  The CDS Counterparties commuting their Policies pursuant to these CDS Commutation Agreements will receive a Cash payment on or about the Effective Date in an amount less than what such counterparties are projected to have received under the Plan on account of Policy Claims for realized "Credit Events" (as defined in the relevant CDS, or similar term provided therein) that the Rehabilitator projects would have been asserted against FGIC if the CDS with such CDS Counterparties were not "torn up" or terminated early.

### 4.    Corporate Governance

The Plan contemplates that, upon termination of the Rehabilitation Proceeding, a new board of directors of FGIC will be appointed that will take over control of FGIC.  The Rehabilitator will post a List of Initial Directors and Officers on the Policyholder Information Center before the Effective Date.  In addition, the Rehabilitator has proposed certain changes to FGIC's corporate governance structure, which will be reflected in the Form of Amended and Restated Charter (the "**Charter**") and the Form of Amended and Restated By-Laws (the "**By-**

31

**Laws**") that will be filed in an update to the Plan Supplement.  Among other things, the Charter and By-Laws will provide that FGIC's board of directors will consist of seven members, each serving staggered three-year terms, no less than five of whom will be Independent (as such term is defined in the Charter).  It is anticipated that management of FGIC will receive incentive compensation based on FGIC's performance after the Effective Date.

### 5.    Continued Oversight by NYSDFS

Sections 3.2 and 3.3 of the Plan provide that FGIC will administer and implement the Plan from and after the Effective Date subject to, among other things, the continued oversight of the NYSDFS, including the limitations on FGIC's operations and reporting requirements described in Sections 7.10 and 7.11 of the Plan and any guidelines or directions issued by the NYSDFS.

### 6.    No Defaults Arising from Rehabilitation or Rehabilitation Circumstances

Section 3.5 of the Plan, among other things, cures, or deems not to have occurred, any defaults under FGIC Contracts or Transaction Documents arising from the Rehabilitation or the Rehabilitation Circumstances (including lack of payment or performance by the FGIC Parties), subject to (i) Section 3.7 of the Plan (described below) and (ii) an exception set forth in Section 3.5 of the Plan for the determination of priority of distributions between and among Instruments insured by a Policy, during any period of time in which a Claim has been submitted in accordance with the Plan with respect to such Policy and such Claim has not been satisfied in full in Cash and/or Deemed Cash Payments.

### 7.    Reinsurance Payable in Full Irrespective of Policy Restructuring

Section 3.6(a) of the Plan provides that, irrespective of the Policy Restructuring and regardless of the amount FGIC pays in Cash on account of Permitted Policy Claims, Reinsurers must pay FGIC in full, in Cash, the entire reinsured amount of each Permitted Policy Claim.  Section 3.6(b) of the Plan provides that Section 3.6(a) of the Plan does not apply to reinsurance covering, in whole or in part, the National Public Reinsurance Policies, which reinsurance automatically will be novated to National Public, as explained in Section V.C.1 above.

### 8.    Control Rights

Section 3.7 of the Plan provides exceptions to Section 3.5 (and certain other provisions) of the Plan for holders of Instruments insured by FGIC Policies and issued directly in connection with any RMBS transaction, during any period of time in which an outstanding DPO exists with respect to such Policies.  For example, subject to certain restrictions set forth in Section 3.7 of the Plan, such holders will be entitled to exercise certain rights and remedies related to Trust Loan Repurchase Obligations that are provided for under the express terms and conditions of the Transaction Documents relating to such Instruments (assuming solely for the purposes of determining these rights that FGIC has not complied with its payment obligations under such Policy).  Section 3.7 of the Plan further provides that, subject to certain restrictions set forth therein, FGIC also retains certain rights and remedies it may have under such Policies or related Transaction Documents with respect to Trust Loan Repurchase Obligations, and

establishes a process for resolving certain conflicts that may arise between such holders and FGIC with respect to the exercise of such rights and remedies.  In addition, as mentioned above, proceeds from Trust Loan Repurchase Obligations will not be treated as FGIC Payments, as such term is defined in the Plan and described in Section VI.B.1 above.  Instead, Sections 3.7(a)(iii) and 3.7(b)(iv) of the Plan provide that such proceeds will be applied and distributed in accordance with the express terms and conditions of the relevant Transaction Documents assuming, solely for the purposes of determining FGIC's priority with respect to receipt of such proceeds, that FGIC has not complied with its payment obligations under the relevant Policy.

## C.   CLAIM ADMINISTRATION AND DISTRIBUTIONS

### 1.   Claim Administration Generally

Section 4.1 of the Plan provides that, after the Effective Date, FGIC will be responsible for resolving all Claims not resolved prior to the Effective Date in compliance with the Plan and any NYSDFS Guidelines.

### 2.   Submission of Claims

#### (a)   Secured Claims and Administrative Expense Claims

Section 4.2(A) of the Plan requires all Secured Claims and Administrative Expense Claims to be submitted to FGIC in writing in the ordinary course of business and pursuant to the underlying FGIC Contracts (if applicable) giving rise to such Claims.

#### (b)   Policy Claims

Section 4.3(A) of the Plan requires holders of Policy Claims to submit a Proof of Policy Claim Form (in a form that will be filed as part of an update to the Plan Supplement) in addition to any information required by the applicable Policies for submission of Claims thereunder.  Section 4.3(A) of the Plan also establishes Policy Claim submission deadlines, including a Claims Resubmission Deadline for Policy Claims previously submitted to FGIC that remain unpaid in whole or in part as of the Effective Date.  The Plan requires the resubmission of such Policy Claims to facilitate and expedite the Claims reconciliation process by requiring the holders of such Policy Claims to disclose additional information about their Policy Claims to enable FGIC to determine whether any portions thereof should not be Permitted pursuant to Section 4.10 of the Plan.  Policy Claims not timely submitted pursuant to Section 4.3(A) of the Plan will be treated as Late-Filed Claims.  On and after the Novation Effective Date (as defined in the Novation Agreement), claims arising under the National Public Reinsured Policies should be submitted directly to National Public, and not to FGIC, regardless of when such claims arose.

#### (c)   Non-Policy Claims

Section 4.4(A) of the Plan establishes the Bar Date for submitting Non-Policy Claims and provides that all Non-Policy Claims not submitted by the Bar Date will be treated as Late-Filed Claims.  Unlike Policy Claims, Non-Policy Claims submitted to FGIC or the Rehabilitator prior to the Effective Date that remain unpaid as of the Effective Date need not be resubmitted.

### 3.    Reconciliation of Claims

Article IV of the Plan requires FGIC to evaluate each submitted Secured Claim, Administrative Expense Claim and Policy Claim to determine whether and to what extent such Claim should be Permitted. However, FGIC will not be required to evaluate any Non-Policy Claim or Late-Filed Claim until it determines, in consultation with the NYSDFS, that there is a substantial likelihood that sufficient assets will be available to make a distribution on account of Non-Policy Claims or Late-Filed Claims, as applicable. If FGIC determines that all or part of a Claim should not be Permitted, such Claim will constitute a Disputed Claim and be resolved pursuant to Section 4.6 of the Plan.

### 4.    Procedures for Reconciling Disputed Claims

Section 4.6 of the Plan establishes the procedures for reconciling Disputed Claims, including listing non-exclusive grounds on which FGIC may object to a Claim, providing a deadline for FGIC to object to properly submitted Claims, listing the information that must be included in a Response and noting the Response Deadline, the deadline for a FGIC Claim Determination and the deadline for challenging a FGIC Claim Determination in a court of competent jurisdiction. To facilitate and expedite the Claims resolution process, Section 4.6 of the Plan establishes a two-stage dispute resolution process. In the first stage, FGIC and a holder of a Disputed Claim will have an opportunity to resolve the Disputed Claim consensually before seeking court adjudication of the Disputed Claim. If court adjudication is required, it will take place in a court of competent jurisdiction, unless adjudication of the Disputed Claim involves the interpretation, implementation or enforcement of the Plan, in which case the dispute must be resolved in the Court. In addition, if a court renders a judgment in favor of FGIC or the holder of a Disputed Claim, the prevailing party in such challenge will be entitled to recover reasonable attorneys' fees and costs from the other party.

### 5.    Payment of Claims

(a)    Payment of Claims Generally

Promptly following the date, and only to the extent, a Claim is Permitted, FGIC will pay the Claim pursuant to Section 4.7 of the Plan. If a portion of a Claim is disputed, FGIC will have no obligation to pay any portion of the Claim unless and until the Claim is Permitted, pursuant to Section 4.6 of the Plan.

(b)    No Duplicative Recovery

Section 4.7(B) of the Plan provides that no holder of a Claim will be entitled to receive distributions on account of its Permitted Claim that exceed 100% of the amount of such Permitted Claim; *provided*, *however*, that this will not limit the payment of any DPO Accretion by FGIC in accordance with the provisions of the Plan. Furthermore, if and to the extent that the holder of a Permitted Claim receives payment in full or in part on account of such Permitted Claim from a Non-FGIC Payor, FGIC will reduce (i) the DPO with respect to a Permitted Policy Claim and (ii) distributions on account of a Permitted Claim (other than a Permitted Policy Claim); *provided*, *however*, FGIC will not reduce DPO or distributions, as applicable, to the relevant Non-FGIC Payor on account of such Permitted Claim if and to the extent such Non-

FGIC Payor becomes a subrogee of the holder of such Permitted Claim as a result of such payment; and *provided, further*, that this sentence will not modify any terms of the Plan regarding FGIC Payments.

### 6.    <u>Alternative Resolutions of Claims</u>

Section 4.8 of the Plan allows FGIC to, after the Effective Date and without further Court approval, resolve any Claim through a consensual Alternative Resolution as long as FGIC (i) determines in its reasonable business judgment that the Alternative Resolution is fair and equitable to Policyholders generally and not reasonably likely to result in a reduction of the CPP and (ii) provides NYSDFS notice pursuant to Section 7.10(d) of the Plan.

### 7.    <u>Setoffs</u>

Unless otherwise specified in the Plan, including in Section 4.7(B) thereof and the Restructured Policy Terms, Section 4.9 of the Plan generally authorizes FGIC to set off a Permitted Claim, or distributions owed under the Plan on account of such Permitted Claim, against any amounts FGIC reasonably determines to be owed to it under Causes of Action FGIC may have against the holder of such Permitted Claim.

### 8.    <u>Certain Claims Not Permitted</u>

Section 4.10 of the Plan lists types of Claims that will not be Permitted, including, among other things, post-Commencement Date interest on Claims, interest on the amount of any interest, principal or other amounts payable in respect of an insured obligation, which was the subject of a Permitted Policy Claim and satisfied with DPO rather than Cash pursuant to Section 2.3 the Plan, Duplicative Claims and Termination Payment Claims asserted in violation of the injunctive relief in the Plan.

### 9.    <u>Address or Account for Delivery of Distributions/Unclaimed Distributions</u>

Section 4.11 of the Plan provides that FGIC will make distributions under the Plan to a holder of a Permitted Policy Claim at the address or account of such holder, as set forth on the Proof of Claim or Proof of Policy Claim Form submitted by such holder, as applicable. Section 4.11 of the Plan also governs FGIC's obligations with respect to, and the treatment, of undeliverable distributions.

### 10.    <u>Time Bar to Cash Payments</u>

Section 4.12 of the Plan provides that any checks issued in respect of Permitted Claims will be null and void if not negotiated within 180 days after the date of issuance thereof, and establishes that requests for reissuance of any voided check must be made directly to FGIC by the holder of the Permitted Claim to whom such check was originally issued, before the applicable distribution becomes abandoned property under then-applicable law.

11.     **Rights of Subrogation**

       Section 4.13 of the Plan provides that any contractual right to subrogation that FGIC may have under a Policy or related FGIC Contract or Transaction Document will be for an amount equal to the amount in Cash that FGIC ultimately pays thereunder or with respect thereto, including with respect to any Permitted Policy Claims under such Policy (excluding DPO Accretion payments).

**D.**     **CONTRACTS AND LEASES**

    1.     **Treatment of Contracts and Leases**

       The Rehabilitator has determined to terminate as of the Effective Date the contracts and leases on the Schedule of Terminated Contracts and Leases that will be included in the Plan Supplement. Section 5.1 of the Plan provides that all contracts and leases not listed on Schedule of Terminated Contracts and Leases, or terminated during the Rehabilitation Proceeding, will continue in full force and effect after the Effective Date. All contracts and leases listed on the Schedule of Terminated Contracts and Leases will terminate as of the Effective Date.

    2.     **Bar Date for Filing Proofs of Claim Relating to Contracts and Leases Terminated Pursuant to the Plan or During the Rehabilitation Proceeding**

       Section 5.3 of the Plan establishes procedures and deadlines for submitting a Claim arising out of the termination of a contract or lease pursuant to the Plan or during the Rehabilitation Proceeding. All such Claims will be treated as Non-Policy Claims under the Plan.

**E.**     **EFFECTIVE DATE**

    1.     **Conditions Precedent to the Effective Date**

       The Effective Date will not occur and the Plan will not become effective unless and until the nine conditions precedent listed in Section 6.1 of the Plan are satisfied in full or waived by the Rehabilitator. These conditions precedent include, among other things, that the Plan Approval Order is signed and becomes a Final Order, the Court approves the Novation Agreement and each CDS Commutation Agreement, the FGIC Corp. Plan becomes effective and the Rehabilitator or FGIC receives certain requested rulings from taxing authorities, in form and substance satisfactory to the Rehabilitator in his sole discretion. Additional information about the tax rulings is set forth in Section IX.B.4 hereof.

    2.     **Notification of Effective Date**

       Pursuant to Section 6.2 of the Plan, on the occurrence of the Effective Date, the Rehabilitator will file a notice with the Court and post a notice on the Policyholder Information Center indicating the occurrence of the Effective Date.

3. **Waiver of Conditions**

Section 6.3 of the Plan authorizes the Rehabilitator to waive any of the conditions precedent listed in Section 6.1 of the Plan, except for the requirement in Section 6.1(a) thereof that the Plan Approval Order be signed.

F. **EFFECT OF EFFECTIVE DATE**

1. **Discharge**

Section 7.1 of the Plan provides that Permitted Claims will be treated solely pursuant to the Plan and such treatment will effect a full and complete release, discharge and termination of any liens or other claims, interests or encumbrances upon the FGIC Parties with respect to such Permitted Claims. Further, all liens and other claims, interests and encumbrances upon the FGIC Parties with respect to any Claim or portion thereof that is not Permitted will be released, discharged and terminated.

2. **Releases**

Section 7.2 of the Plan provides that FGIC Parties will release the following Persons unconditionally and forever from any and all Causes of Action arising on or prior to the Commencement Date from or relating to the operation of FGIC or the Rehabilitation Proceeding: (i) the NYLB, (ii) the NYSDFS, (iii) the Rehabilitator, (iv) the Representatives and employees of each of the NYLB, the NYSDFS and the Rehabilitator, and any advisors retained by the Representatives of the foregoing, (v) the Representatives of FGIC and any advisors retained by any of such Representatives, in each case solely with respect to services provided on or after November 24, 2009 and (vi) those directors, officers, and employees of the FGIC Parties who served or were employed by the FGIC Parties in such capacity on or after November 24, 2009. The releases, however, do not apply to acts or omissions determined by a Final Order to constitute willful misconduct, gross negligence, intentional fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages or *ultra vires* acts.

3. **Exculpation**

Section 7.3 of the Plan exculpates the following Persons as of the Effective Date from any and all Causes of Action based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or after November 24, 2009 and arising out of, in connection with or otherwise relating to the Rehabilitation Proceeding, the Disclosure Statement, the Plan or any agreement entered into as part of or pursuant to the Plan: (i) the FGIC Parties; (ii) the NYLB; (iii) the NYSDFS; (iv) the Rehabilitator; (v) the Representatives and employees of each of the FGIC Parties, the NYLB, the NYSDFS and the Rehabilitator, and any advisors retained by the Representatives of the foregoing; and (vi) directors and officers of the FGIC Parties. The exculpation, however, does not apply to acts or omissions determined by a Final Order to constitute willful misconduct, gross negligence, intentional fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages or *ultra vires* acts.

4. **No Liability for Information Provided by Trustees**

The Exculpated Parties will not be subject to liability for certain actions taken or not taken by corporate or other trustees or other Persons, as set forth in Section 7.4 of the Plan.

5. **Indemnity**

Pursuant to Section 7.5 of the Plan, FGIC will indemnify and hold harmless the following Persons against any and all Losses arising from any Released Causes of Action or Exculpated Causes of Action, other than to the extent such Losses result from willful misconduct, gross negligence, intentional fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages or *ultra vires* acts:  (i) the NYLB; (ii) the NYSDFS; (iii) the Rehabilitator; (iv) the respective Representatives of each of the NYLB, the NYSDFS and the Rehabilitator and any advisors retained by the Representatives of the foregoing; and (v) those directors, officers and employees of the FGIC Parties who served or were employed by the FGIC Parties in such capacity on or after November 24, 2009.  In addition, Section 7.5 of the Plan provides that, subject to certain restrictions set forth therein, FGIC will indemnify any Indemnified Trustee for Losses incurred by the Indemnified Trustee arising from its compliance with the express terms and conditions of the Plan or with any direction given to it by FGIC pursuant to the relevant FGIC Contract or Transaction Document.

6. **Termination of Rehabilitation Proceeding**

Section 7.6 of the Plan provides for the termination of the Rehabilitation Proceeding on the Effective Date, at which point the 1310 Order will be lifted and FGIC will resume possession of its property and the conduct of its business, subject to the limitations described in the Plan.

7. **Termination of Duties of Rehabilitator**

Pursuant to Section 7.7 of the Plan, on the Effective Date, the Rehabilitator and his employees and appointed agents will be discharged of their duties with respect to all matters related to the rehabilitation of FGIC and will have no liability for actions taken by FGIC after the Effective Date.

8. **Injunctive Relief**

The injunctive relief in Section 7.8 of the Plan prohibits all Persons from taking a number of actions from and after the Effective Date, including, among other things (i) prosecuting any Legal Proceeding against the FGIC Parties and certain other Persons relating to the Rehabilitation Proceeding, the Rehabilitation Circumstances, any Policy Claim, any other Claim that arose during or relates to the period prior to the Effective Date or any Equity Interests in existence as of the Commencement Date, in each case other than to enforce the terms of the Plan, challenge a FGIC Claim Determination or challenge FGIC's declaration of a Policy Crystallization Event, (ii) withholding or setting-off any FGIC Payments or reinsurance obligations owed (or that would be owed but for the Rehabilitation or Rehabilitation Circumstances), (iii) terminating a FGIC Contract or Transaction Document (including a CDS) on the basis of the Rehabilitation or Rehabilitation Circumstances and/or asserting a Termination

Payment Claim (whether calculated on the basis of "Market Quotation," "Loss," "Close-out Amount" or other methodologies), (iv) exercising or otherwise interfering with FGIC Rights, subject to Section 3.7 of the Plan, (v) seeking to acquire, acquiring or exercising voting or other corporate governance rights pursuant to or under the Preferred Stock and (vi) pursuing any Released Cause of Action or Exculpated Cause of Action.

### 9.    Preservation of Causes of Action

Section 7.9 of the Plan authorizes (but does not require) FGIC to prosecute, settle, release, compromise or enforce any and all Causes of Action not released or exculpated pursuant to the Plan, but requires FGIC to (i) provide to the NYSDFS 30 days' written notice (or such advance notice as the NYSDFS may agree to) before settling, releasing or compromising any Causes of Action where FGIC's claims would be expected to exceed $25 million (or such other amount as the NYSDFS may agree to) and (ii) obtain prior written approval from the NYSDFS if any such settlement, release or compromise would result in a payment by FGIC of $10 million (or such other amount as the NYSDFS may agree to) or more.

### 10.    Limitations on Operations Following Effective Date

Section 7.10 of the Plan sets forth limitations on FGIC's operations following the Effective Date that will apply until such time (if ever) as the NYSDFS grants written approval to remove them. The limitations, among other things, restrict FGIC's ability to (i) issue new insurance policies or provide new reinsurance, (ii) pay dividends, distributions or other payments on account of any Equity Interest, (iii) sell, reinsure or otherwise transfer 5% or more of its Admitted Assets, (iv) execute changes to its corporate governance structure or amend its Charter or By-laws or (v) effectuate a CPP Adjustment, each without the prior express written approval of the NYSDFS. Section 7.10 of the Plan also requires FGIC to provide the NYSDFS with 30 days' written notice (or such advance notice as the NYSDFS may agree to) before it may (a) effectuate an Alternative Transaction pursuant to Section 4.8 of the Plan that would extinguish or reduce any FGIC liability by more than $25 million (or such other amount as the NYSDFS may agree to) or (b) permit any Claim in an amount exceeding $10 million (or such other amount as the NYSDFS may agree to). In addition, Section 7.10 of the Plan requires FGIC to obtain the prior written approval of the NYSDFS for any Alternative Transaction that would result in a payment by FGIC of $10 million (or such other amount as the NYSDFS may agree to) or more.

### 11.    Reporting

Section 7.11(A) of the Plan requires FGIC to file annual reports on the status of the Rehabilitation with the NYSDFS and on the Policyholder Information Center. Further, FGIC must deliver to the NYSDFS annual and quarterly reports related to the Run-Off Projections pursuant to Section 7.11(B) of the Plan.

### G.    RETENTION OF JURISDICTION

Section 8.1 of the Plan provides that after the Effective Date and termination of the Rehabilitation Proceeding the Court will have exclusive jurisdiction over all matters arising out of or related to the Rehabilitation Proceeding and the Plan, including jurisdiction to, among

other things, (i) consider disputes relating to Claims and Equity Interests, including Objections and FGIC Claim Determinations with respect thereto, in each case to the extent such consideration involves the interpretation, implementation or enforcement of the Plan, (ii) determine disputes involving interpreting, implementing or enforcing the Plan, the Plan Approval Order, any transactions or payments contemplated by the Plan, any agreement, instrument or other document governing or relating to any of the foregoing or any settlement approved by the Court and (iii) interpret, enforce and determine all questions and disputes regarding the injunctions, releases, exculpations and indemnifications provided for in the Plan, the Plan Approval Order or the NYIL.

## H.   MISCELLANEOUS PROVISIONS

The Miscellaneous Provisions in Article IX of the Plan provide that, among other things (i) only the NYSDFS may modify the Plan and only to the extent it determines necessary for the fair and equitable treatment of Policyholders in general; *provided*, *however*, that the NYSDFS will obtain prior Court approval for any material modification and (ii) if any provision of the Plan is determined to be unenforceable, the provision will be deemed deleted and the determination of unenforceability will not limit or affect the enforceability and operative effect of any other provision of the Plan, *provided*, *however*, that the NYSDFS may revoke the Plan, subject to Court approval, if the NYSDFS determines that the unenforceable provision of the Plan is so material to the Plan that the Rehabilitator would have withdrawn the Plan had such determination been made prior to the Effective Date.

## VII.

## FEASIBILITY/RECOVERY ANALYSIS

With the assistance of his financial advisors and based on financial reports prepared by FGIC and its advisors and extensive discussions with FGIC's senior management and Weil, the Rehabilitator has set forth below a detailed report on the assets and liabilities of FGIC, followed by an analysis of the Rehabilitator's projected recoveries for holders of Policy Claims under assumptions designed to ensure, in the Rehabilitator's judgment, that the Plan is feasible and fair to all Policyholders.  The Rehabilitator has also provided a summary of the alternative options he considered in concluding that the Plan is feasible and the best way to provide fair and equitable treatment to all Policyholders.

## A.   GENERAL ASSETS AVAILABLE TO PAY LIABILITIES

### 1.   Investments

As of March 31, 2012, under statutory accounting principles, FGIC's investment portfolio had a carrying value of approximately $2.093 billion and was composed almost entirely of fixed income securities having a weighted average credit quality of "Aa2" and "AA" by Moody's and S&P, respectively.  FGIC's investment policy is designed to preserve capital, maintain appropriate liquidity and optimize after-tax investment income.  FGIC entered into an agreement with MacKay Shields ("**MacKay**"), an affiliate of New York Life Insurance

Company, for MacKay to act as investment manager and to manage the bulk of FGIC's investment portfolio commencing September 9, 2009.

The following table summarizes the composition of FGIC's Cash and investments at fair value:[10]

|  | As of March 31, 2012 ($ in millions) |
|---|---|
| Cash ............................................................. | $3.9 |
| Long-Term investments: | |
| Municipal obligations ..................................... | $590.1 |
| U.S. government obligations........................... | $49.6 |
| Foreign government obligations ..................... | $34.6 |
| Mortgage and asset-backed securities ............. | $346.6 |
| Corporate........................................................ | $124.6 |
| Other .............................................................. | $7.2 |
| Subtotal .......................................................... | $1,152.7 |
| Short-term investments ................................... | $936.0 |
| **Total** .............................................................. | $2,092.6 |

## 2.    Premiums

The tables below present (i) statutory unearned premiums and the net present value of installment premiums FGIC expects to collect, in each case net of reinsurance, as of March 31, 2012, by business segment and (ii) the gross installment premiums FGIC expects to collect over the estimated term of the related Policies, as of March 31, 2012, by year.  The expected installment premiums are based on various prepayment and collection assumptions as of March 31, 2012 and actual installment premiums collected could differ materially.  In addition, the premium amounts in the tables below do not give effect to Policy or reinsurance terminations that have occurred or may occur subsequent to March 31, 2012, including pursuant to the CDS Commutation Agreements and Reinsurance Commutation Agreement, which could change such amounts.

| Business Segment ($ in millions) | Statutory Unearned Premiums | Net Present Value of Installment Premiums[(1)] | Total Expected Future Installments (Gross Value) |
|---|---|---|---|
| Public Finance | $145.5 | $63.4 | $105.2 |
| RMBS | $1.0 | $76.4 | $97.6 |
| Structured Finance (other than RMBS) | $1.2 | $60.4 | $82.1 |
| International | $13.9 | $51.2 | $80.6 |
| **Total** | $161.6 | $251.2 | $365.5 |

(1)  Net Present Value of Installment Premiums is calculated using FGIC's expected premium schedule, discounted at 5%.

_____

[10] The entries in the charts in this Section VII may not add up to the totals reflected therein because of rounding.

| | Total Expected Future Installments (Gross Value) |
|---|---|
| **Three months ended:** | |
| December 31, 2012 | $28.95 |
| **Twelve months ended** | |
| December 31, 2013 | $37.72 |
| December 31, 2014 | $31.69 |
| **Five years ended:** | |
| December 31, 2019 | $104.33 |
| December 31, 2024 | $63.86 |
| December 31, 2029 | $47.43 |
| December 31, 2034 | $34.08 |
| December 31, 2039 | $11.13 |
| December 31, 2044 | $4.81 |
| December 31, 2049 | $1.42 |
| December 31, 2054 | $0.06 |

### 3.    Potential Future Assets Available to Pay Liabilities

Certain additional assets may become available in the future to pay FGIC's liabilities. These assets include FGIC's equity interest in FGIC UK and recoveries from Material Litigation.  However, the value of potential additional assets, if any, is uncertain and not estimable.

### B.    SIGNIFICANT LIABILITIES

As of March 31, 2012, FGIC's total gross principal amount of outstanding insured obligations was approximately $177.1 billion and, after giving effect to amounts ceded (on an indemnity reinsurance basis) to various reinsurers, FGIC's total NPIF was approximately $40.1 billion.

### 1.    RMBS Exposure

As of March 31, 2012, FGIC's NPIF, after giving effect to reinsurance, for RMBS totaled approximately $14.1 billion, representing approximately 35.2% of FGIC's NPIF of all liabilities at such date.  The RMBS exposure consisted of various collateral types as set forth in the table below.

| Collateral Type | Number of policies outstanding | NPIF ($ in millions) | % of Total NPIF |
|---|---|---|---|
| Alternative-A Paper ("Alt-A") (1st lien) | 20 | $1,034.8 | 2.6% |
| Home Equity Line of Credit ("HELOC") | 44 | $4,164.3 | 10.4% |
| High Loan-to-Value ("LTV") | 13 | $857.5 | 2.1% |
| Closed end second mortgages | 26 | $3,799.8 | 9.5% |
| Subprime (1st lien) | 73 | $4,073.7 | 10.2% |
| Prime (1st lien) | 6 | $179.1 | 0.4% |
| **Total** | 182 | $14,109.3 | 35.2% |

## 2.    CDO Exposure

As of March 31, 2012, FGIC's NPIF, after giving effect to reinsurance, for CDO, by underlying collateral, totaled approximately $4.7601 billion, as reflected in the following table, representing approximately 11.9% of FGIC's NPIF of all liabilities at such date.  FGIC insured the CDO directly where the form of credit enhancement is noted as (FG) in the following table and in all other cases insured CDS written by FGIC CP, which provided credit protection on the CDO:

| Underlying Collateral (Form of credit enhancement) | Number of transactions | NPIF ($ in millions) | % of Total NPIF |
|---|---|---|---|
| ABS CDO High Grade ABS | 2 | $1,231.7 | 3.1% |
| CLO High Yield Loans | 16 | $2,854.4 | 7.1% |
| CLO High Yield Loans (FG) | 1 | $145.9 | 0.36% |
| ABS CDO Mezzanine ABS | 1 | $181.0 | 0.45% |
| ABS CDO Mezzanine ABS (FG) | 1 | $203.5 | 0.51% |
| CLO International | 1 | $143.6 | 0.36% |
| **Total** | 22 | $4,760.1 | 11.9% |

## 3.    U.S. Public Finance Exposure

As of March 31, 2012, FGIC had approximately 6,090 outstanding Policies insuring the payment of the principal of, and interest on, U.S. public finance obligations with an aggregate outstanding principal amount of approximately $147.9 billion.  FGIC's NPIF, after giving effect to reinsurance, for U.S. public finance obligations totaled approximately $12.3 billion, representing approximately 30.6% of FGIC's NPIF of all liabilities at such date.  The following table presents FGIC's NPIF after giving effect to ceded reinsurance, by risk category, as of March 31, 2012:

| Insured Portfolio by Bond Type | NPIF ($ in millions) | % of Total NPIF |
|---|---|---|
| General obligation | $3,250.6 | 8.1% |
| Leases | $1,778.4 | 4.4% |
| Healthcare | $325.7 | 0.8% |
| Other Tax Backed | $1,362.7 | 3.4% |
| Global Utilities | $2,333.4 | 5.8% |
| Transportation | $86.7 | 0.2% |
| Higher Education | $66.7 | 0.2% |
| Project Finance | $716.7 | 1.8% |
| Housing | $753.5 | 1.9% |
| Other Public Finance | $1,601.2 | 4.0% |
| **Total U.S. Public Finance** | $12,275.6 | 30.6% |

As of March 31, 2012, in addition to the National Public Reinsurance Transaction described in Section IV.B.2(c) hereof, FGIC had approximately $12.6 billion of par outstanding exposure ceded to other Reinsurers, which are not included in the table above.  These other reinsurance transactions have not relieved FGIC of its direct liability to its Policyholders, and there can be no assurance that these other reinsurers will pay their respective reinsurance obligations on a timely basis or at all.  Should the Novation Agreement not be approved by the Court and any of the Reinsurers be unable or unwilling to perform under their reinsurance obligations, FGIC would bear the liability for these losses and could, therefore, have direct exposure with respect to up to an additional $135.1 billion in outstanding principal obligations, which are not included in the table above.

4.      **International Finance Exposure**

As of March 31, 2012, FGIC's NPIF, after giving effect to reinsurance, for international finance obligations totaled approximately $4.4 billion, representing approximately 11.0% of FGIC's NPIF of all liabilities at such date.  The international finance exposure by risk category is set forth in the table below.  FGIC insured all of these exposures directly, except for the CLO where FGIC insured CDS written by FGIC CP, which provided credit protection on the CLO.  This table does not include any exposures insured by FGIC UK.

| Insured Portfolio by Bond Type | NPIF ($ in millions) [1] | % of Total NPIF |
|---|---|---|
| Corporate Obligation | $241.2 | 0.6% |
| Sovereign | $139.2 | 0.3% |
| Sub-Sovereign | $268.4 | 0.7% |
| Utility | $570.8 | 1.4% |
| Toll Road | $13.3 | 0.0% |
| Project Finance | $2,709.9 | 6.8% |
| CLO | $143.6 | 0.4% |
| Other Structured Finance | $336.3 | 0.8% |
| **Total International Finance** | $4,422.7 | 11.0% |

## C.    LOSS RESERVES

FGIC has established its loss reserves based on the impact that the performance of the collateral or revenue stream for the respective transactions has on FGIC's obligation to support the scheduled debt service of such transactions.  Reserves at March 31, 2012 relate predominantly to RMBS transactions.

Loss and loss adjustment expense reserves at March 31, 2012 do not reflect the potential impact, if any, of ongoing loss mitigation efforts, except for certain mortgage insurance-related claims.  FGIC believes that the reserve for estimated losses as of March 31, 2012 makes adequate provision for expected future net claims.  However, the establishment of the appropriate level of reserves is an inherently uncertain process involving numerous estimates and subjective judgments by management.  Small changes in the assumptions underlying these estimates could result in significant changes in FGIC's loss expectations.  Further deterioration in the performance of RMBS, ABS CDO, and other securities insured by FGIC or that are referenced in CDS insured by FGIC could lead to the establishment of additional loss reserves and further loss or reduction to income.  The loss reserves for FGIC's insurance on CDS contracts recorded in its statutory financial statements at March 31, 2012 reflect only the actual credit impairment projected by FGIC and do not reflect any other amounts for potential Termination Payment Claims that could become payable under FGIC-insured CDS.

The following table presents FGIC's statutory loss and loss adjustment expense reserves, net of reinsurance, as of March 31, 2012, by business segment and inclusive of any related reserves for FGIC's insurance on CDS contracts:

| Business Segment | Total NPIF ($ in millions) | Loss and Loss Adjustment Expenses Reserves ($ in millions) |
|---|---|---|
| Public Finance | $12,275.6 | $89.0 |
| RMBS | $14,109.3 | $3,458.3 |
| Structured Finance (other than RMBS) | $9,317.0 | $1,602.6 |
| International | $4,422.7 | |
| ULAE | | $7.6 |
| Total | $40,124.7 | $5,157.5 |

## D.    REINSURANCE

FGIC used reinsurance to (i) increase its capacity to write insurance for obligations of large, frequent issuers, (ii) meet internal, rating agency, or regulatory single risk limits, (iii) enable it to diversify risk and (iv) manage rating agency and regulatory capital requirements.  FGIC arranged reinsurance on both a facultative (transaction-by-transaction) basis and on a treaty (multiple transactions of a specified type) basis.

As a result of the National Public Reinsurance Transaction described in Section IV.B.2(c) above, FGIC (i) increased its statutory policyholders' surplus by approximately $534 million (comprised of a ceding commission of approximately $197 million paid by MBIA to FGIC and release of approximately $337 million of contingency reserves maintained by FGIC), while reducing overall exposure and (ii) is not required to maintain any unearned premium, contingency or loss or loss adjustment expense reserves on the Policies for which FGIC has ceded exposure to National Public.  If the Court approves the Proposed Novation, FGIC will be relieved of its direct liability to its Policyholders under the policies ceded pursuant to the National Public Reinsurance Transaction.  Should the Proposed Novation not be approved by the Court, and should National Public be unable or unwilling to perform under the National Public Reinsurance Transaction, FGIC would bear the full liability to pay in accordance with the Plan all Permitted Claims made by Policyholders under the National Public Reinsured Policies and would have to separately seek to enforce its rights and remedies against National Public in respect of these losses.

As of March 31, 2012, in addition to the National Public Reinsurance Transaction, FGIC had approximately $3.9 billion of par outstanding exposure ceded to other Reinsurers representing approximately 8.9% of FGIC's total gross par outstanding exposure (excluding the gross par outstanding associated with the National Public Reinsurance Transaction, and after giving effect to reinsurance commutations and terminations through March 31, 2012).  Pursuant to such reinsurance, approximately 2.9%, or $145.5 million, of FGIC's gross statutory loss reserves are ceded to Reinsurers, and 39.3% of the ceded loss reserves are with Reinsurers that are rated, as of March 31, 2012, at least investment grade.  There can be no assurance that any of the Reinsurers will pay their respective reinsurance obligations on a timely basis or at all and, should any of the Reinsurers be unable or unwilling to perform under their reinsurance obligations, FGIC would bear the liability to pay in accordance

46

with the Plan all Permitted Claims made by Policyholders under the reinsured Policies and would have to separately seek to enforce its rights and remedies against the defaulting Reinsurer in respect of these losses.

As of March 31, 2012 (after giving effect to reinsurance commutations and terminations through such date), the composition of gross par outstanding ceded to Reinsurers was as follows:

| Reinsurer | Reinsurer Rating [1] | Ceded Gross Par Outstanding ($ in millions) | Public Finance FGIC Retained ($ in millions) | Public Finance National Public Reinsurance Transaction ($ in millions) | RMBS ($ in millions) | Structured Finance (other than RMBS) ($ in millions) | International Finance ($ in millions) |
|---|---|---|---|---|---|---|---|
| National Public Finance Guarantee Corp. | BBB/Baa2 | $123,484.5 | | $123,484.5 | | | |
| Assured Guaranty Re Ltd. | AA-/A1 | $5,473.7 | $1,021.9 | $3,733.4 | $86.3 | $632.1 | |
| American Overseas Reinsurance Company Ltd. (f/k/a RAM Reinsurance Company Ltd) | Withdrawn | $4,542.4 | $457.2 | $3,680.5 | $86.1 | $119.8 | $198.8 |
| Assured Guaranty Corp. | AA-/Aa3 | $1,928.3 | $428.1 | $1,494.2 | $0.4 | $0.0 | $5.5 |
| Radian Asset Assurance Inc. | BB-/Ba1 | $765.3 | $635.1 | | $46.7 | $0.0 | $83.5 |
| Assured Guaranty Re Overseas Ltd. | AA-/Aa3 | $99.2 | $1.6 | $97.3 | $0.2 | | |
| American Reinsurance Company | AA-/Aa3 | $53.6 | $50.8 | | $2.8 | | |
| Syncora Guarantee Inc. | Withdrawn/Ca | $45.1 | | | | | $45.1 |
| Other | | $95.8 | $4.5 | $55.5 | $2.1 | $0.0 | $33.8 |
| **Total:** | | $136,488.0 | $2,599.2 | $132,545.5 | $224.7 | $752.0 | $366.7 |

(1) Source: Individual company websites and rating agency reports.

FGIC evaluated the financial condition of its Reinsurers and recorded an allowance for unrecoverable reinsurance of $1.4 million for a Reinsurer that is rated below investment grade at March 31, 2012. This allowance was calculated based on Moody's probability of default table. Under most of FGIC's reinsurance agreements, FGIC has the right to reassume the exposure ceded to a Reinsurer (and receive all the remaining unearned premiums ceded and any ceded loss and loss adjustment expense reserves) in the event of a specified ratings downgrade of the reinsurer or the occurrence of certain other events. In certain of these cases, FGIC also has the right to impose additional ceding commissions following a Reinsurer's ratings downgrade. Reinsurers' obligations to FGIC are not affected by FGIC's deficit in policyholders' surplus. In addition, as described in greater detail in Section V.C.3 above, the Rehabilitator executed a Reinsurance Commutation Agreement with AORe, a Reinsurer, which, subject to Court approval, will terminate the related reinsurance agreements and will result in a payment to FGIC of approximately $64.8 million.

E.      **R**EHABILITATOR'S **R**ECOVERY **A**NALYSIS

In seeking to ensure that the Plan is viable and provides fair and equitable results to FGIC's Policyholders, the Rehabilitator has relied on the Run-Off Projections. The Run-Off Projections project FGIC's cash flows from January 1, 2012 through December 31, 2052 (the time at which the last of FGIC's insured risks matures on the basis of the Run-Off Assumptions) (the Run-Off Period). Among other things, the Run-Off Projections form the basis for setting the amount of the initial CPP. Exhibit C hereto contains a summary of the Run-Off Projections, Run-Off Assumptions and calculation of initial CPP. Using a discount rate of 20% and 10%, the Run-Off Projections indicate that Policyholders are expected to receive present value recoveries of approximately 24% to 25% in the Base Scenario.

Lazard worked with FGIC to prepare the Run-Off Projections and Run-Off Assumptions based on its own models. In connection therewith, Lazard also reviewed and considered input from MMA, Weil, the run-off projections prepared by FGIC and its advisors, including Blackstone Advisory Partners L.P., and stress case assumptions for FGIC's insured portfolio developed by NewOak Capital Advisors LLC ("**NewOak**"), an independent financial advisor retained by counsel to FGIC. Consistent with the terms of its engagement, Lazard did not undertake any independent tax analysis, but rather relied on tax information described in this Disclosure Statement and the assumptions provided by the FGIC Parties, their advisors and other advisors to the NYLB. The Run-Off Assumptions include factors relevant to the Run-Off Projections (giving effect to the transactions and other actions contemplated by the Plan, including the two CDS Commutation Agreements executed thus far and the Reinsurance Commutation Agreement with AORe), such as the expected timing and magnitude of losses under Policies, returns on FGIC's investment portfolio, collection and recovery of premiums, reinsurance, salvage, reimbursements and other amounts due to FGIC, availability and utilization of NOLs and operating expenses. The Run-Off Assumptions reflect a level of conservatism the Rehabilitator views as prudent in light of the level of uncertainty as to the expected timing and magnitude of Policy Claims that will arise during the Run-Off Period given the volatility of the types of risks insured by FGIC, balanced against the goal of paying as much as possible on Permitted Policy Claims as quickly as possible.

48

The Run-Off Projections are run for both a Stress Scenario and a Base Scenario. As shown on Exhibit C hereto, the Run-Off Projections indicate that even in the Stress Scenario utilized by the Rehabilitator in formulating the Plan FGIC should be able to pay the initial CPP on all Permitted Policy Claims regardless of when such Claims arise, while maintaining a moderate Cash buffer intended to protect against potential adverse deviations from the Stress Scenario assumptions.

While the initial CPP and all subsequent revisions to the CPP will be based on a Stress Scenario, the Run-Off Assumptions will be adjusted over time (pursuant to the CPP Revaluation process) to reflect FGIC's actual experience.  Should FGIC's experience prove more favorable than the Stress Scenario utilized by the Rehabilitator in formulating the Plan, which the Rehabilitator expects, the CPP will increase over time and additional amounts (including on account of DPO Accretion) will be paid out to holders of Permitted Policy Claims.  The Base Case Run-Off Projections included in Exhibit C portray FGIC's expected performance during the Run-Off Period, including expected aggregate payments on Policy Claims.

## F.    ALTERNATIVE OPTIONS CONSIDERED

**Goal of the Plan**.  The Rehabilitator's goal in this Rehabilitation Proceeding is to treat FGIC's Policyholders in a fair and equitable manner while at the same time removing the causes and conditions that made the Rehabilitation Proceeding necessary.

**Means of Achieving Goal**.  The Rehabilitator evaluated several means of achieving this goal, including the Plan, a liquidation of FGIC, an extended rehabilitation of FGIC (with and without modification of Policies), potential outsourcing of administrative services and a potential merger, sale, reinsurance or similar transaction.  In addition, the Rehabilitator considered variations of features in the Plan (including how Policies are restructured, the methodology in setting CPP, treatment of FGIC Rights and FGIC Payments, accretion on DPO, scope and duration of injunctive relief and other matters), as well as features not included therein (such as segregation of assets and liabilities between entities, inclusion of opt-out provisions and deferral of accretion payments).

**Considerations Taken Into Account**.  In evaluating the best means of achieving the goal described above, the Rehabilitator took into account numerous considerations, including:

- accounting for differing relative interests of holders and beneficiaries of various types of risks insured by Policies;

- preserving and maximizing assets of the estate;

- minimizing expenses of the estate;

- minimizing the risk of failure of the Plan;

- maintaining sufficient flexibility within the Plan to address unforeseen events; and

- preserving to the greatest extent possible existing insurance coverage by FGIC.

**Timing of Claims**.  In reviewing alternative means of crafting a fair and equitable outcome for FGIC's creditors, the Rehabilitator determined that Policy Claims, whenever arising, should receive payments under the Plan.  In addition to Policy Claims already made, significant additional Policy Claims are expected to arise over the Run-Off Period, which may last 40 years.  Policy Claims are expected to fall into one of the three following timing groups:

- Policy Claims already made (aggregating as of December 31, 2011 approximately $1.7 billion);

- Policy Claims anticipated to be made by December 31, 2022 (estimated as of December 31, 2011 to aggregate approximately $8.1 billion under the Stress Scenario or $4.7 under the Base Scenario); and

- Policy Claims anticipated to be made by December 31, 2052 (estimated as of December 31, 2011 to aggregate approximately $15.3 billion under the Stress Scenario or $9.3 under the Base Scenario).

The anticipated amount and timing of such Policy Claims in both the Base Scenario and the Stress Scenario used by the Rehabilitator in formulation of the Plan is set forth below:





**Rejection of Alternatives**.  The Rehabilitator ultimately rejected each alternative to the Plan and the variations on the Plan as not representing the best approach to satisfying the goal of this Rehabilitation Proceeding.  For example, the Rehabilitator rejected a liquidation of FGIC because (among other things) it would result in significantly lower recoveries to Policyholders.[11]  No merger, sale, reinsurance or outsourcing transaction that would inure to the benefit of FGIC's Policyholders appeared viable to the Rehabilitator.  The Rehabilitator rejected allowing Policyholders to opt-out of the Policy Restructuring as a matter of right (rather than by means of individually negotiated commutations) due to concerns (among others) over adverse selection to the detriment of other Policyholders.  The Rehabilitator also considered numerous additional variations of Plan features, all of which were rejected as not being fair and equitable to all Policyholders.

**The Plan Is the Best Option**.  The Rehabilitator has determined that the Plan presents the best approach to treating FGIC's Policyholders in a fair and equitable manner, while at the same time removing the causes and conditions that made the Rehabilitation Proceeding necessary.  Such determination is based upon the Rehabilitator's review of the alternatives and variations described above, extensive legal, financial and strategic input from the Rehabilitator's advisors, FGIC, and the Ad Hoc Instrument Holder Group, and consideration of proposals made by third parties, among other things.  The Rehabilitator's determination is further supported by the following features of the Plan:

- **Superior to Alternatives**.  Payments on Permitted Policy Claims under the Plan are expected to be made sooner, and in greater amounts, than would be the case should FGIC remain in an extended rehabilitation proceeding, and creditors will receive under the Plan at least (and likely more than) what they would have received in a liquidation of FGIC;

---

[11] Additional detail about a potential liquidation of FGIC is set forth in Section VIII hereof and in the Liquidation Analysis set forth on Exhibit D hereto.

- **Quick Initial Payments.**  The Plan provides for initial partial payments to Policyholders with accrued, but unpaid, Permitted Policy Claims as quickly as practicable and in an amount as large as practicable while still allowing sufficient resources to remain in FGIC to pay comparable partial payments on expected future Policy Claims;

- **Prevention of Prejudice to Holders of Future Policy Claims.**  Given the extended period of time (approximately 40 years) over which Policy Claims against FGIC are expected to arise and the significant amount of such Policy Claims that are not expected to arise until near the end of such period, the Plan is based on assumptions intended to preclude unanticipated events from prejudicing Policyholders whose Policy Claims may not arise for some time;

- **Periodic Supplemental Payments**.  The Plan provides for periodic reassessment of assumptions that were used to calculate the initial partial payments based on actual results and changing conditions, thus enabling FGIC to pay additional amounts to Policyholders who already received partial payments, without prejudicing Policyholders with future Claims;

- **Continuation of Insurance Coverage**.  While FGIC's obligation to pay Policy Claims will be modified as a result of the Policy Restructuring, the Plan contemplates that coverage under FGIC's Policies will nonetheless continue (including with respect to Policies under which Policy Claims have not yet arisen and are not expected to arise for a long period of time);

- **Return to Solvency**.  The Plan returns FGIC to statutory solvency through restructuring FGIC's Policies to modify FGIC's liability thereunder to pay in Cash only a specified portion of each Permitted Policy Claim in accordance with the methodology described above (with any unpaid portion only becoming a liability of FGIC to the extent that FGIC has the resources to pay such amounts in accordance with the methodology described above); and

- **Quick Exit from Rehabilitation**.  The Plan minimizes administrative costs, and thus increases recoveries for Policyholders, by allowing FGIC to emerge from the Rehabilitation Proceeding upon the Effective Date, from which time it will be subject to enhanced NYDFS oversight.

## VIII.

## LIQUIDATION ANALYSIS

As referenced in Section VII.F above, the Rehabilitator considered liquidation of FGIC as one alternative to the Plan.  For the reasons discussed below, the Rehabilitator rejected liquidation because it would result in significantly lower recoveries for Policyholders than the rehabilitation contemplated by the Plan.  In reaching this conclusion, the Rehabilitator compared the recoveries that Policyholders should receive on account of Permitted Policy Claims under the Plan, as set forth in the Run-Off Projections attached hereto as Exhibit C, and in a liquidation of

FGIC, as set forth in the summary of the Rehabilitator's liquidation analysis (the "**Liquidation Analysis**"), attached hereto as Exhibit D.

In calculating recoveries Policyholders would receive in a hypothetical liquidation in the Liquidation Analysis, the Rehabilitator assumed a bar date for claims at year-end 2052 (coinciding with maturity of the longest-dated Policy), with interim distributions on claims as described in the Liquidation Analysis. The timing and amount of such interim distributions are intended to be consistent with liquidations of other insurers.[12]  Based on the Run-Off Projections and the Liquidation Analysis, Policyholders should receive present value recoveries of approximately 24% to 25% of Permitted Policy Claims under the Plan, rather than only approximately 9.3% to 15.9% thereof in a liquidation.[13]  Thus, the Plan is designed to provide significantly greater recoveries to Policyholders than they would receive in a liquidation.

## IX.

## CERTAIN FACTORS TO BE CONSIDERED

**THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN.  THESE FACTORS ARE NOT THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

A.    RISKS RELATING TO PLAN IMPLEMENTATION

1.    **Risk of Non-Approval, Withdrawal or Modification of the Plan**

Although the Rehabilitator believes that the implementation of the Plan, including consummation of the transactions contemplated by the Novation Agreement and the CDS Commutation Agreements, is fair and equitable and in the best interests of Policyholders and other creditors, there can be no assurance that the Court will reach the same conclusion, that modifications of the Plan may not be required for approval of the Plan, that approval of the Plan will not be overturned on appeal or that the Rehabilitator may not of his own initiative withdraw or modify the Plan for any reason.  Any modifications of the Plan or failure of the Court to approve any of the Novation Agreement, the CDS Commutation Agreements or the Reinsurance

---

[12] The Rehabilitator ruled out an immediate liquidation of FGIC that would result in termination of all Policies in force as of the Effective Date, with no provision for payment of future losses, because this approach would be prejudicial to the substantial number of FGIC's Policyholders with respect to which the Rehabilitator expects Policy Claims to arise in the future.

[13] The range of recoveries under the Plan or in a liquidation provided herein are calculated on a net present value basis using discount rates of 20% and 10%.  While the nominal amount of recoveries shown by the Liquidation Analysis as being payable in a liquidation (67.9% in the Base Scenario) exceeds the nominal amount of recoveries under the Plan as shown by the Run-Off Projections (34% in the Base Scenario), use of such undiscounted figures does not properly portray the actual value of such recoveries given the significantly longer delay in payment of recoveries in a liquidation.

Commutation Agreement with AORe could substantially reduce the initial CPP and cause payments on account of Permitted Claims to be substantially reduced and/or delayed.

### 2.    Risk of Non-Occurrence of the Effective Date

Although the Rehabilitator believes that the Effective Date should occur promptly after the Court approves the Plan, there can be no assurance as to such timing.  Events that may delay the Effective Date include appeals of the Plan Approval Order and failure of any other conditions to the Effective Date in Section 6.1 of the Plan.

### 3.    Risk of Conversion into a Liquidation

If the Rehabilitator at any time prior to the Effective Date determines that efforts to rehabilitate FGIC would be futile, whether pursuant to the Plan or otherwise, the Rehabilitator may seek to convert FGIC's Rehabilitation Proceeding into a liquidation proceeding under Article 74 of the NYIL.  The Liquidation Analysis in Exhibit D outlines potential effects of such a liquidation on the recoveries of FGIC creditors.

### 4.    Risk of Subsequent Article 74 Proceedings

If the Plan is determined at any point in the future following the Effective Date to no longer be feasible, the Superintendent may file a petition seeking an order placing FGIC into a subsequent Article 74 proceeding.  Such a proceeding could be either a rehabilitation or liquidation proceeding and could materially alter the manner in which FGIC's creditors are treated, including with respect to their Claims, DPO, DPO Accretion and Policy terms.

### B.    RISKS RELATING TO CREDITORS' RECOVERIES UNDER THE PLAN

### 1.    Claims Could Be More than Projected

The amount of Permitted Claims could be significantly more than projected, which could cause Cash payments on account of Permitted Claims to be substantially reduced and/or delayed.  FGIC is currently a defendant in a number of litigations, and may become a defendant in additional litigations in the future; an adverse judgment in any such litigations could increase the amount of Permitted Claims, thus potentially resulting in a decrease of the CPP and significantly lower ultimate recoveries for Policyholders than those reflected in the Run-Off Projections.  Further, judgments entered in certain existing or future litigations (even if FGIC is not a defendant therein) may result in an increase in the amount of Permitted Claims, thus also potentially resulting in a decrease of the CPP and significantly lower ultimate recoveries for Policyholders than those reflected in the Run-Off Projections.  On September 6, 2012, a complaint was filed against FGIC and a number of other defendants in the United States Bankruptcy Court for the Northern District of Alabama, styled *Bennett v. Jefferson County, Alabama (In re Jefferson Debtor-County, Alabama)*, Case No. 11-05736-TBB9, Adversary No. 12-00120 (the "**Jefferson County Case**") seeking, among other things, to invalidate certain warrants insured by FGIC.  If successful, the Jefferson County Case could result in a significant increase in Policy Claims being asserted against FGIC.  The Rehabilitator and its advisors are reviewing the impact of the Jefferson County Case on the Run-Off Projections and will continue

to monitor it.  The CPP may be reduced at any time, subject to the relevant provisions of the Plan, as a result of litigation currently pending or that may be commenced in the future.

### 2. CPP May Be Adjusted Downward

As set forth in the Restructured Policy Terms, FGIC, in consultation with the NYSDFS, may from time to time adjust the CPP downward.  Such CPP downward adjustments could be caused by a number of factors that could cause results to differ materially from those in the Run-Off Projections including, but not limited to, expected timing and magnitude of losses under Policies, returns on FGIC's investment portfolio, collection and recovery of premium, reinsurance, salvage, reimbursements and other amounts due to FGIC, availability and utilization of NOLs and operating expenses.  Reference is made to the Run-Off Projections contained in Exhibit C hereto for additional information and disclaimers regarding such analyses.

### 3. Risks Relating to Run-Off Projections

The Run-Off Projections are inherently uncertain and, though considered reasonable by the Rehabilitator as of the date hereof, are subject to a wide variety of significant business, economic, competitive and political risks and uncertainties.  The Run-Off Projections are not necessarily indicative of FGIC's future financial position or results of operations, which may vary significantly from those set forth therein.  Consequently, the Run-Off Projections should not be regarded as the representation of the Rehabilitator, his advisors or any other Person that the projected financial position or results of operations can or will be achieved.  The Run-Off Projections may contain certain statements that are, or may be deemed, "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Many factors could cause actual results to differ materially from those in the Run-Off Projections.  Such factors include expected timing and magnitude of losses under Policies, returns on FGIC's investment portfolio, collection and recovery of premium, reinsurance, salvage, reimbursements and other amounts due to FGIC, availability and utilization of NOLs and operating expenses.  Reference is made to the Run-Off Projections contained in Exhibit C hereto for additional information and disclaimers regarding such analyses.

### 4. Risks Relating to Use of Net Operating Losses

FGIC expects that the Plan becoming effective will result in significant immediate taxable income, but that such income will be offset with NOLs and will not result in material tax liability for FGIC.  In addition, FGIC expects that a significant portion of these NOLs will remain after the Plan becomes effective to offset taxable income that may arise in the future as the Plan is implemented over time.  This expectation as to the availability of NOLs both at the time of and after the Plan becomes effective is based on interpretations and applications of tax law rules that are not free from doubt.  It is possible that facts or circumstances existing prior to the Effective Date could cause FGIC's NOLs to become subject to limitation, reduced or otherwise unavailable for use (either in whole or in part) to offset FGIC's taxable income arising in connection with or after the Plan becomes effective.  FGIC has requested certain rulings, and plans to request additional rulings, from the IRS as to certain of these issues; it remains possible that the IRS, it is sole and absolute discretion, may decline to issue a favorable ruling or rulings on one or more of the issues that underlie FGIC's expectations regarding the tax consequences of

the Plan and FGIC's tax profile thereafter. The estimates of CPP and Policyholder recoveries in this Disclosure Statement were formulated based on, and assuming, the availability and planned use of such NOLs. Should the IRS not issue a favorable ruling or if the NOLs become unavailable for use, the Rehabilitator may elect to withdraw the Plan or to proceed with the Plan, in which case both the initial CPP and ultimate recoveries for holders of Permitted Policy Claims under the Plan may be significantly reduced.

### 5.    Risks Relating to Investment Income and Expenses

The estimates of CPP and Policyholder recoveries in this Disclosure Statement were formulated based on, and assuming, that FGIC's gross investment income post-Effective Date will be 2.30% in 2012 and 3.25% thereafter, and that FGIC will incur certain expenses, as set forth in the Run-Off Projections. However, there can be no assurance that FGIC's actual investment income or expenses will not deviate substantially from those assumed in the Run-Off Projections. Any such deviation could significantly reduce recoveries for holders of Permitted Policy Claims under the Plan.

### 6.    Risks Relating to Reinsurance

The reinsurance transactions described in this Disclosure Statement have not relieved FGIC of its direct liability to its Policyholders for the reinsured portion of its Policies. (However, assuming the Novation Agreement is approved by the Court, FGIC will be relieved of all its obligations with respect to the National Public Reinsured Policies.) There can be no assurance that Reinsurers will pay their respective reinsurance obligations on a timely basis or at all. Regardless of whether FGIC can successfully collect the full amount or any portion of reinsurance from any of the Reinsurers, FGIC would remain fully liable to pay Policyholders for all reinsured losses in accordance with the Plan.

### 7.    Risks Relating to Termination Payment Claims

Upon certain events of default or termination events under the CDS insured by FGIC, the CDS may automatically terminate or the relevant CDS Counterparty may have the right to unilaterally terminate the transactions under the relevant CDS contract and in either case assert a Termination Payment Claim against FGIC CP, the payment of which FGIC guaranteed under the related Policy. Such an automatic or early termination may result in Termination Payment Claims that are calculated based on "market quotation" or "loss" or similar methodologies.[14] The Rehabilitator has determined that payment by FGIC of Claims computed

---

[14] The "market quotation" methodology typically calculates an amount based on quotations received from dealers in the relevant market that the CDS Counterparty would have to pay to such dealer to have such dealer assume FGIC CP's position in the CDS and, thereby, preserve for such CDS Counterparty the economic equivalent of future payments under the CDS had such CDS not been terminated early. The "loss" methodology typically is a general indemnification measure based on an amount that the CDS Counterparty reasonably determines in good faith to be its total losses and costs (or gains) in connection with the terminated CDS, including any loss of bargain, cost of funding or, at the election of the CDS Counterparty, but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting therefrom).

on the basis of such methodologies (as opposed to payment of Claims based on "Credit Events" (as defined in the relevant CDS, or similar term provided therein) under CDS not arising from the automatic or early termination thereof) would be inconsistent with the goal of the Rehabilitation Proceeding, namely, treating FGIC's Policyholders in a fair and equitable manner while at the same time removing the causes and conditions that made the Rehabilitation Proceeding necessary.

One CDS Counterparty has unilaterally terminated its CDS due to the Rehabilitation Circumstances prior to commencement of the Rehabilitation Proceeding, and has asserted a Termination Payment Claim against FGIC CP. Other CDS Counterparties may seek to terminate their CDS contracts and assert Termination Payment Claims against FGIC CP and related Claims against FGIC, due to the Rehabilitation Circumstances or the Rehabilitation Proceeding.

While FGIC has entered into CDS Commutation Agreements with two CDS Counterparties (as further described in Sections V.C.1 and VI.B.2 hereof), the potential Termination Payment Claims that could be brought under the CDS to be so commuted represent approximately 50% of the total Termination Payment Claims that CDS Counterparties might seek to assert against FGIC.

The Order of Rehabilitation enjoins the automatic or early termination of CDS contracts on the basis of the Rehabilitation Proceeding or the Rehabilitation Circumstances and the assertion of Termination Payment Claims relating to any such termination for the duration of the Rehabilitation Proceeding. In addition, the Plan continues such injunctive relief on a permanent basis and provides that such Claims will not be Permitted under the Plan. No assurance can be given, however, that the treatment of Termination Payment Claims contemplated by the Plan will be approved by the Court and, if not approved, whether Termination Payment Claims will be paid *pari passu* with Permitted Policy Claims. Should the proposed treatment not be approved, FGIC's aggregate exposure to potential Termination Payment Claims could exceed $1.5 billion, after giving effect to the CDS Commutation Agreements executed to date, resulting in lower recoveries for Policyholders and potentially a decrease in CPP.

## C.    OTHER CONSIDERATIONS

### 1.    No Duty to Update

This Disclosure Statement does not reflect any events that may occur subsequent to the date hereof. Such events may have a material impact on the information contained in this Disclosure Statement and any recovery that may be received by creditors of FGIC. The Rehabilitator does not intend to update any of the information contained in this document (including the Run-Off Projections, Liquidation Analysis and other financial information, as well as underlying assumptions).

2.    **Risks Relating to Potential Recharacterization of the Policies**

It is possible that all or a portion of FGIC's Policies that are amended pursuant to the Plan may no longer be treated as "insurance" for U.S. federal income tax purposes.  If all or a portion of the Policies ceased to be so treated, FGIC may recognize more taxable income upon and subsequent to the consummation of the Plan than is projected, and may have less or insufficient NOLs to shelter such income.  The estimates of CPP and Policyholder recoveries in this Disclosure Statement were formulated based on, and assuming, the availability and planned use of such NOLs.  Such occurrence could significantly reduce recoveries for holders of Permitted Policy Claims under the Plan.  FGIC intends to request a ruling from the IRS that the reformed Policies will continue to qualify as insurance for U.S. federal income tax purposes and, as a result, will be governed by the certain tax rules of the Internal Revenue Code applicable to insurance companies.  However, it is possible the IRS will not issue a favorable ruling.

3.    **Unanticipated Developments**

Although potential changes in law or regulation, regulatory action, unanticipated administrative developments or interpretation and other factors may be beyond the Rehabilitator's or FGIC's control, and although their impacts may not be ascertainable in advance, they could have a significant impact on FGIC and FGIC's estate, and/or the implementation of the Plan, including, without limitation, by increasing in the costs of administration of the Rehabilitation Proceeding or implementation of the Plan by FGIC and resulting in a corresponding reduction in the value of the assets of FGIC's estate that are distributable to holders of Claims.

# X.

## CONCLUSION

The Rehabilitator believes that the Plan represents the most value to holders of Permitted Claims, and approval and implementation of the Plan is in the best interests of all Policyholders and other claimants.

Dated: September 21, 2012
New York, New York

_____

Peter A. Giacone
*Chief Financial Officer and Agent of the*
*Superintendent of Financial Services of the*
*State of New York, as Rehabilitator of*
*Financial Guaranty Insurance Company*

**Exhibit A**

**(Plan of Rehabilitation)**

(See Affirmation, Exhibit B)

**Exhibit B**

**(Organizational Chart)**



## FGIC Corporation Structure

Last modified March 28, 2012.

All ownership interests are 100%.

\* In process of being dissolved.

\*\* Formed in June 2010 in anticipation of Surplus Restoration Plan. Currently not active or licensed.

**Exhibit C**

**(Run-Off Projections)**

## RUN-OFF PROJECTIONS[1]

In developing the Plan and determining whether the Plan is fair and equitable to all of FGIC's Policyholders, the Rehabilitator analyzed FGIC's ability to satisfy its financial obligations while maintaining the minimum policyholders' surplus for a financial guaranty insurance company under Section 6902(b)(1) of the NYIL.  The Rehabilitator prepared the Run-Off Projections in August 2012 for projecting losses under FGIC-insured Policies under a Base Scenario and a Stress Scenario from January 1, 2012 through the scheduled maturity of FGIC's last Policy in 2052.  The Run-Off Projections are based on FGIC's income statement, balance sheet and cash flows as of December 31, 2011.  The Run-Off Projections and the key assumptions on which they are based are set forth below.

The Run-Off Projections assume that the Plan will be implemented on its stated terms.  The Run-Off Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in housing and financial markets, interest rates and employment rates.  Accordingly, the estimates and assumptions underlying the Run-Off Projections are inherently uncertain and subject to significant business, economic and other uncertainties.  Therefore, the Run-Off Projections are not necessarily indicative of current values or future performance of FGIC, which may be significantly less or more favorable than set forth herein.

THE REHABILITATOR PREPARED THE RUN-OFF PROJECTIONS WITH THE ASSISTANCE OF PROFESSIONAL ADVISORS.  THE REHABILITATOR DID NOT PREPARE THE RUN-OFF PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION.

MOREOVER, THE RUN-OFF PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE REHABILITATOR OR FGIC, INCLUDING RISKS RELATING TO PLAN IMPLEMENTATION, CREDITORS' RECOVERIES UNDER THE PLAN AND CERTAIN OTHER RISK FACTORS, AS DETAILED IN SECTION IX OF THE DISCLOSURE STATEMENT.  POLICYHOLDERS AND OTHER PARTIES IN INTEREST ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTIES OF FUTURE PERFORMANCE OR RECOVERIES.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING

---

[1] Capitalized terms not defined herein have the meanings ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

STATEMENTS, AND THE REHABILITATOR AND FGIC UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE RUN-OFF PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE REHABILITATOR, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE REHABILITATOR OR FGIC.  THE REHABILITATOR CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE RUN-OFF PROJECTIONS OR TO FGIC'S ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT.  MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE REHABILITATOR PREPARED THESE RUN-OFF PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE REHABILITATOR AND FGIC, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE RUN-OFF PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.  THEREFORE, THE RUN-OFF PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  IN CONSIDERING THE PROJECTED RECOVERIES UNDER THE PLAN, POLICYHOLDERS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE RUN-OFF PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

The Run-Off Projections should be read in conjunction with the key assumptions set forth below, as well as the other assumptions, qualifications, explanations and risk factors set forth in the Disclosure Statement and the Plan (including the Plan Supplement), in their entirety, and the historical financial statements (including the notes and schedules thereto) and other financial information posted at www.fgic.com/investorrelations/financialreports/.

***Key Assumptions***

**A.    General**

1.    *Plan Effective Date:* The Run-Off Projections assume the Effective Date will be December 31, 2012.

2.    *Business Operations:*  The Run-Off Projections assume that FGIC will not write any new insurance policies throughout the Run-Off Period.

3.      All dollar amounts are in millions, unless otherwise specified.

**B.      Additional Transactions**

1.      *Novation of National Public Reinsured Policies:* The Run-Off Projections assume consummation of the novation to National Public of the National Public Reinsured Policies.

2.      *CDS Commutations:* With the exception of Policies that are covered by the two CDS Commutation Agreements that have already been executed, as described in Section V.C.2 of the Disclosure Statement, the Run-Off Projections assume that commutations of other CDS Policies do not occur.

3.      *Reinsurance Commutations:* The Run-Off Projections assume consummation of the Reinsurance Commutation Agreement with AORe.

**C.      Losses and Claims Payments**

1.      *Losses:* The Run-Off Projections are based on two scenarios for projected losses under FGIC's Policies: the Base Scenario and the Stress Scenario, each as described in the Plan, the Disclosure Statement and herein.

2.      *CPP:* Under the Stress Scenario, the Run-Off Projections assume that the CPP is held constant at 15.00% until final distribution of all available assets to holders of Permitted Policy Claims. Based on the mechanism described in the Plan, the CPP is expected to increase in the Base Scenario as losses are realized at levels below those projected in the Stress Scenario.  Accordingly, the Run-Off Projections assume that in the Base Scenario, CPP is increased every year until 2043.  By 2022, the CPP is expected to be 21.2% in the Base Scenario.

**D.      Revenues and Expenses**

1.      *Investment Income:* The Run-Off Projections assume that gross investment income post-Effective Date is 2.30% in 2012 and will be 3.25% thereafter.  Management fees are assumed to be 9.75 basis points of invested assets per year.

2.      *Premiums:* The Run-Off Projections assume premiums on existing installment Policies are collected as scheduled and that unearned premiums will not be returned.  However, a 10% reduction in expected premium collection is assumed in the Run-Off Projections to take into consideration potential shortfalls.

3.      *Reinsurance:* The Base Scenario assumes that reinsurance on Policy Claims that is not commuted will be collected from U.S.-domiciled investment grade Reinsurers in full and from non-U.S.-domiciled Reinsurers up to the amount of collateral posted if losses on reinsured policies are realized.  The Stress Scenario assumes that reinsurance on Policy Claims that is not commuted will not be collected due to the implied amount of losses

Reinsurers would likely experience under the Stress Scenario and the possibility that the reinsurers would have inadequate claims paying resources. In both scenarios, it is assumed that FGIC continues paying installment premiums to Reinsurers.

4.  *Commutation Payments*: As described in the Disclosure Statement, the Run-Off Projections assume that the two CDS Commutation Agreements that have already been executed and the Reinsurance Commutation Agreement are approved by the Court and are (for the purposes of the Run-Off Projections only, since the commutation agreements may require earlier payment) paid post-Effective Date.

5.  *Taxes:* The Run-Off Projections assume that FGIC will not generate taxable income post-Effective Date. Income is expected to be generated on the Effective Date, but existing NOL balances are expected to be sufficient to fully offset income recognized on both a regular and AMT tax basis.

6.  *Contribution Amount*: The $11 million payment to FGIC Corp pursuant to the Plan Sponsor Agreement (the "**Contribution Amount**"), which is described in Section IV.B.9 of the Disclosure Statement, is assumed to be made in the Run-Off Projections on the Effective Date.

7.  *Operating Expenses:* The Run-Off Projections assume approximately $592 million of operating expenses through 2052 (this represents net present value of $177 million as of December 2012 at a 15% discount rate), excluding rehabilitation proceeding –related professional fees and other costs.

8.  *Rehabilitation Proceeding-Related Professional Fees and Other Costs:* The Run-Off Projections assume approximately $22 million in non-contingent costs, and $18 million in costs contingent on the occurrence of certain milestones, in each case related to the preparation for and administration of the Rehabilitation Proceeding, including attorneys' fees, financial advisor fees and restructuring incentive bonuses for certain key FGIC employees, all of which were or are assumed to be incurred or paid in 2012.

9.  *Reserves and Valuation Allowances*: For statutory accounting purposes, FGIC will continue to account for the Policies, as restructured, as insurance policies. Upon the Effective Date, FGIC will reduce its statutory reserves to reflect the ultimate amount of cash payments expected to be made with respect to its Policies less an amount to be determined that will permit FGIC to maintain a certain minimum positive statutory surplus. In the event that FGIC determines that the ultimate amount of cash payments that are expected to be made with respect to its Policies has increased, FGIC will increase its statutory reserve in accordance with statutory accounting principles.

10. *Other:* The Run-Off Projections do not include proceeds from any recoveries from Material Litigation, which are described in Section IV.B.7 of the Disclosure Statement, due to the uncertainty regarding such recoveries today. The Projections also do not include any value associated with FGIC's equity interest in FGIC UK.

**E.      Recoveries**

1.      *Calculation of Recoveries:* Recoveries for Policyholders are based on cash flows expected to be received as a result of CPP payments and distributions on account of DPO Accretion.  All cash flows are discounted to the time Policy Claims are expected to be Permitted.  The present value of these cash flows is then shown as a percentage of Permitted Policy Claims to calculate recoveries.  The recoveries shown below are average recoveries for all Permitted Policy Claims, including Permitted Policy Claims that already accrued and are unpaid and all Policy Claims that are expected to be received and Permitted through the maturity of the last policy in 2052.  Expected recoveries are shown in both the Base Scenario and the Stress Scenario.

*Base Scenario Illustrative Projected Financial*

| KEY FINANCIAL METRICS: BASE SCENARIO | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Balance Sheet** | | | | | | | | | | |
| Invested Assets Ending Balance | $1,674 | $1,479 | $1,379 | $1,366 | $1,340 | $986 | $558 | $500 | -- | NA |
| **Claim Payments (Cash)** | | | | | | | | | | |
| Initial CPP Payments 1 | ($322) | ($293) | ($168) | ($100) | ($80) | ($317) | ($396) | ($96) | ($231) | ($2,004) |
| Payments on Account of CPP's Upward Adj. & DPO Accretion | -- | (132) | (114) | (107) | (124) | (184) | (226) | -- | (285) | (1,173) |
| **Other** | | | | | | | | | | |
| Notional Claims | (2,149) | (1,767) | (827) | (450) | (340) | (1,209) | (1,401) | (336) | (808) | (9,288) |
| Ending CPP | 15.0% | 18.9% | 21.2% | 22.9% | 24.5% | 26.6% | 28.6% | 28.6% | 30.4% | |

| SUMMARY INCOME STATEMENT: BASE SCENARIO | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Premiums Earned | $53 | $171 | $109 | $71 | $65 | $35 | $17 | $5 | $0 | $526 |
| Net Investment Income | 40 | 248 | 224 | 216 | 215 | 199 | 146 | 85 | 69 | 1,443 |
| **Total Revenue** | **$93** | **$419** | **$333** | **$287** | **$280** | **$235** | **$163** | **$91** | **$69** | **$1,969** |
| Losses & Loss Adjustment Expense | $3,178 | ($291) | ($239) | ($228) | ($215) | ($166) | ($116) | ($41) | ($16) | $1,866 |
| Operating Expenses | (68) | (128) | (94) | (59) | (65) | (69) | (48) | (50) | (53) | (632) |
| **Total Expenses** | **$3,110** | **($419)** | **($333)** | **($287)** | **($280)** | **($235)** | **($163)** | **($91)** | **($69)** | **$1,234** |
| **Net Income Before Taxes** | **$3,203** | **--** | **--** | **--** | **--** | **--** | **--** | **--** | **--** | **$3,203** |
| Taxes | -- | -- | -- | -- | -- | -- | -- | -- | -- | |
| **Net Income** | **$3,203** | **--** | **--** | **--** | **--** | **--** | **--** | **--** | **--** | **$3,203** |

| SUMMARY BALANCE SHEET: BASE SCENARIO | 2011 | 2012 | 2017 | 2022 | 2027 | 2032 | 2037 | 2042 | 2047 | 2052 |
|---|---|---|---|---|---|---|---|---|---|---|
| Invested Assets | $2,033 | $1,674 | $1,479 | $1,379 | $1,366 | $1,340 | $986 | $558 | $500 | -- |
| Other Assets | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | -- |
| **Total Assets** | **$2,049** | **$1,690** | **$1,496** | **$1,396** | **$1,382** | **$1,357** | **$1,003** | **$575** | **$517** | **--** |
| Unearned Premium Reserve | $171 | $158 | $118 | $82 | $60 | $33 | $14 | $3 | $0 | |
| Loss Reserves (expected CPP and DPO distributions) | 5,422 | 1,445 | 1,297 | 1,237 | 1,249 | 1,254 | 922 | 506 | 452 | -- |
| Other Liabilities | 24 | 22 | 16 | 11 | 8 | 5 | 2 | 0 | 0 | -- |
| Statutory Surplus | (3,567) | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | -- |
| **Liabilities and Equity** | **$2,049** | **$1,690** | **$1,496** | **$1,396** | **$1,382** | **$1,357** | **$1,003** | **$575** | **$517** | **--** |

| SUMMARY CASH FLOWS: BASE SCENARIO | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash from Net Installment Premiums | $23 | $86 | $49 | $35 | $29 | $15 | $6 | $2 | $0 | $245 |
| Cash from Investment Income | 40 | 248 | 224 | 216 | 215 | 199 | 146 | 85 | 69 | 1,443 |
| Operating Expenses | (68) | (128) | (94) | (59) | (65) | (69) | (48) | (50) | (53) | (632) |
| Initial CPP Payments 1 | (322) | (293) | (168) | (100) | (80) | (317) | (396) | (96) | (231) | (2,004) |
| Payments on Account of CPP's Upward Adj. & DPO Accretion | -- | (132) | (114) | (107) | (124) | (184) | (226) | -- | (285) | (1,173) |
| Commutation Payments | 14 | -- | -- | -- | -- | -- | -- | -- | -- | 14 |
| Reinsurance Payments Received | 33 | 24 | 3 | 1 | 0 | 2 | 90 | 0 | -- | 153 |
| Contribution Amount | (11) | -- | -- | -- | -- | -- | -- | -- | -- | (11) |
| Loss Adjustment Expense | (68) | -- | -- | -- | -- | -- | -- | -- | -- | (68) |
| **Operating Cash Flow** | **($359)** | **($195)** | **($100)** | **($13)** | **($25)** | **($354)** | **($428)** | **($58)** | **($500)** | **($2,033)** |
| **Change in Invested Assets** | **$359** | **$195** | **$100** | **$13** | **$25** | **$354** | **$428** | **$58** | **$500** | **$2,033** |

| AVERAGE POLICYHOLDER RECOVERIES: BASE SCENARIO | |
|---|---|
| Nominal Recovery | 34% |
| 10% Discount Rate | 25% |
| 15% Discount Rate | 24% |
| 20% Discount Rate | 24% |

[1]"Initial CPP Payments" are CPP payments on Policy Claims first Permitted in the stated time period.

## *Stress Scenario Illustrative Projected Financials*

### KEY FINANCIAL METRICS: STRESS SCENARIO

| | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Balance Sheet** | | | | | | | | | | |
| Invested Assets Ending Balance | $1,633 | $1,196 | $1,094 | $1,098 | $1,104 | $908 | $713 | $718 | -- | NA |
| **Claim Payments (Cash)** | | | | | | | | | | |
| Initial CPP Payments 1 | ($363) | ($612) | ($235) | ($144) | ($134) | ($310) | ($295) | ($61) | ($139) | ($2,293) |
| Payments on Account of CPP's Upward Adj. & DPO Accretion | -- | -- | -- | -- | -- | -- | -- | -- | (630) | (630) |
| **Other** | | | | | | | | | | |
| Notional Claims | (2,417) | (4,080) | (1,569) | (961) | (893) | (2,068) | (1,964) | (407) | (928) | (15,288) |
| Ending CPP | 15.0% | 15.0% | 15.0% | 15.0% | 15.0% | 15.0% | 15.0% | 15.0% | 17.3% | |

### SUMMARY INCOME STATEMENT: STRESS SCENARIO

| | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Premiums Earned | $53 | $171 | $109 | $71 | $65 | $35 | $17 | $5 | $0 | $526 |
| Net Investment Income | 40 | 216 | 179 | 172 | 175 | 168 | 142 | 114 | 103 | 1,309 |
| **Total Revenue** | **$93** | **$387** | **$287** | **$244** | **$240** | **$203** | **$159** | **$119** | **$103** | **$1,835** |
| | | | | | | | | | | |
| Losses & Loss Adjustment Expense | $3,178 | ($259) | ($194) | ($185) | ($175) | ($135) | ($111) | ($69) | ($51) | $2,000 |
| Operating Expenses | (68) | (128) | (94) | (59) | (65) | (69) | (48) | (50) | (53) | (632) |
| **Total Expenses** | **$3,110** | **($387)** | **($287)** | **($244)** | **($240)** | **($203)** | **($159)** | **($119)** | **($103)** | **$1,368** |
| | | | | | | | | | | |
| **Net Income Before Taxes** | **$3,203** | **--** | **--** | **--** | **--** | **--** | **--** | **--** | **--** | **$3,203** |
| | | | | | | | | | | |
| Taxes | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| | | | | | | | | | | |
| **Net Income** | **$3,203** | **--** | **--** | **--** | **--** | **--** | **--** | **--** | **--** | **$3,203** |

### SUMMARY BALANCE SHEET: STRESS SCENARIO

| | 2011 | 2012 | 2017 | 2022 | 2027 | 2032 | 2037 | 2042 | 2047 | 2052 |
|---|---|---|---|---|---|---|---|---|---|---|
| Invested Assets | $2,033 | $1,633 | $1,196 | $1,094 | $1,098 | $1,104 | $908 | $713 | $718 | -- |
| Other Assets | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | -- |
| **Total Assets** | **$2,049** | **$1,650** | **$1,212** | **$1,111** | **$1,115** | **$1,121** | **$925** | **$730** | **$735** | **--** |
| | | | | | | | | | | |
| Unearned Premium Reserve | $171 | $158 | $118 | $82 | $60 | $33 | $14 | $3 | $0 | -- |
| Loss Reserves (expected CPP and DPO distributions) | 5,422 | 1,404 | 1,013 | 952 | 982 | 1,018 | 844 | 662 | 670 | -- |
| Other Liabilities | 24 | 22 | 16 | 11 | 8 | 5 | 2 | 0 | 0 | -- |
| Statutory Surplus | (3,567) | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | -- |
| **Liabilities and Equity** | **$2,049** | **$1,650** | **$1,212** | **$1,111** | **$1,115** | **$1,121** | **$925** | **$730** | **$735** | **--** |

### SUMMARY CASH FLOWS: STRESS SCENARIO

| | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash from Net Installment Premiums | $23 | $86 | $49 | $35 | $29 | $15 | $6 | $2 | $0 | $245 |
| Cash from Investment Income | 40 | 216 | 179 | 172 | 175 | 168 | 142 | 114 | 103 | 1,309 |
| Operating Expenses | (68) | (128) | (94) | (59) | (65) | (69) | (48) | (50) | (53) | (632) |
| Initial CPP Payments 1 | (363) | (612) | (235) | (144) | (134) | (310) | (295) | (61) | (139) | (2,293) |
| Payments on Account of CPP's Upward Adj. & DPO Accretion | -- | -- | -- | -- | -- | -- | -- | -- | (630) | (630) |
| Commutation Payments | 14 | -- | -- | -- | -- | -- | -- | -- | -- | 14 |
| Reinsurance Payments Received | 33 | -- | -- | -- | -- | -- | -- | -- | -- | 33 |
| Contribution Amount | (11) | -- | -- | -- | -- | -- | -- | -- | -- | (11) |
| Loss Adjustment Expense | (68) | -- | -- | -- | -- | -- | -- | -- | -- | (68) |
| **Operating Cash Flow** | **($399)** | **($438)** | **($101)** | **$4** | **$6** | **($196)** | **($195)** | **$5** | **($718)** | **($2,033)** |
| | | | | | | | | | | |
| **Change in Invested Assets** | **$399** | **$438** | **$101** | **($4)** | **($6)** | **$196** | **$195** | **($5)** | **$718** | **$2,033** |

### AVERAGE POLICYHOLDER RECOVERIES: STRESS SCENARIO

| | |
|---|---|
| Nominal Recovery | 19% |
| 10% Discount Rate | 16% |
| 15% Discount Rate | 15% |
| 20% Discount Rate | 15% |

[1]"Initial CPP Payments" are CPP payments on Policy Claims first Permitted in the stated time period.

**Exhibit D**

**(Liquidation Analysis)**

# LIQUIDATION ANALYSIS[1]

Consistent with the Rehabilitator's goal for the Rehabilitation Proceeding, the Rehabilitator has determined that Policyholders should receive substantially greater recoveries under the Plan than they would receive in a liquidation of FGIC. To make this determination, the Rehabilitator prepared this Liquidation Analysis, which shows the estimated recoveries Policyholders would receive in a hypothetical liquidation of FGIC in an Article 74 liquidation proceeding.

The Liquidation Analysis is based on FGIC's income statement, balance sheet and cash flows as of December 31, 2011. The Liquidation Analysis reflects the estimated Cash proceeds, net of liquidation-related costs, available to FGIC's Policyholders if FGIC were liquidated in an Article 74 liquidation proceeding. The Liquidation Analysis contains estimates and assumptions that, although developed in consultation with FGIC and the Rehabilitator's advisors and considered reasonable by the Rehabilitator, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Rehabilitator or FGIC. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RECOVERIES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF FGIC WERE, IN FACT, THE SUBJECT OF AN ARTICLE 74 LIQUIDATION PROCEEDING, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

The Liquidation Analysis is a hypothetical exercise that has been prepared for the sole purpose of generating a good faith estimate of the recoveries that would be realized by FGIC's Policyholders if FGIC were to be liquidated in accordance with Article 74 of the NYIL. THE LIQUIDATION ANALYSIS IS NOT INTENDED TO, AND SHOULD NOT, BE USED FOR ANY OTHER PURPOSE.

THE REHABILITATOR PREPARED THE LIQUIDATION ANALYSIS WITH THE ASSISTANCE OF PROFESSIONAL ADVISORS. THE REHABILITATOR DID NOT PREPARE THE LIQUIDATION ANALYSIS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION.

MOREOVER, THE LIQUIDATION ANALYSIS CONTAINS CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE REHABILITATOR OR FGIC, INCLUDING RISKS RELATING TO PLAN IMPLEMENTATION, CREDITORS' RECOVERIES UNDER THE PLAN AND CERTAIN

---

[1] Capitalized terms not defined herein have the meanings ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

OTHER RISK FACTORS, AS DETAILED IN SECTION IX OF THE DISCLOSURE STATEMENT.  POLICYHOLDERS AND OTHER PARTIES IN INTEREST ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTIES OF FUTURE PERFORMANCE OR RECOVERIES.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE REHABILITATOR AND FGIC UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE LIQUIDATION ANALYSIS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, IS NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE REHABILITATOR, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE REHABILITATOR OR FGIC.  THE REHABILITATOR CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE LIQUIDATION ANALYSIS.  SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT.  MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE REHABILITATOR PREPARED THE LIQUIDATION ANALYSIS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE REHABILITATOR AND FGIC, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE LIQUIDATION ANALYSIS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.  THEREFORE, THE LIQUIDATION ANALYSIS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WOULD OCCUR IN A HYPOTHETICAL LIQUIDATION.  IN CONSIDERING THE PROJECTED RECOVERIES UNDER THE PLAN AND IN A HYPOTHETICAL LIQUIDATION, POLICYHOLDERS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE LIQUIDATION ANALYSIS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

The Liquidation Analysis should be read in conjunction with the key assumptions set forth below, as well as the other assumptions, qualifications and explanations set forth in the Disclosure Statement and the Plan (including the Plan Supplement), in their entirety, and the historical financial statements (including the notes and schedules thereto) and other financial information posted at www.fgic.com/investorrelations/financialreports/.

*Key Assumptions*

**A.    General**

1.    *Business Operations:*  The Liquidation Analysis assumes that FGIC will not write any new insurance policies throughout the Run-Off Period.

2.    *Timing of Liquidation:* The Liquidation Analysis assumes that the bar date for Claims and final distribution date are at year end 2052, which coincides with maturity of the longest-dated FGIC Policy.

3.    All dollar amounts are in millions, unless otherwise specified.

**B.    Additional Transactions**

1.    *Novation of National Public Reinsured Policies:* The Liquidation Analysis assumes that the novation to National Public of the National Public Reinsured Policies will take place in a liquidation.

2.    *CDS Commutations:*  With the exception of Policies that are covered by the two CDS Commutation Agreements that have already been executed, as described in Section V.C.2 of the Disclosure Statement, the Liquidation Analysis assumes that commutations of other CDS Policies do not occur.

3.    *Reinsurance Commutations:* The Liquidation Analysis assumes consummation of the Reinsurance Commutation Agreement with AORe.

**C.    Losses and Claims Payments**

1.    *Claims Payments:* The Liquidation Analysis assumes that all Policy Claims that would have been Permitted under the Plan will be allowed by the liquidator (each, an "**Allowed Policy Claim**") and paid *pari passu*.  Although FGIC's final distribution of assets in the Liquidation Analysis is assumed to occur at the end of 2052, the Liquidation Analysis assumes several payments to Policyholders prior to final liquidation based on the Rehabilitator's experience and practice in other Article 74 liquidation proceedings.  The first distribution is assumed to occur in 2027, 15 years after FGIC is placed into liquidation, and subsequent distributions occur every five years thereafter.  The payments are based on FGIC's distributable resources at the time of the payments.  Distributable resources are based on assets at the time of distribution less projected future expenses.  The maximum payment as a percentage of Allowed Policy Claims is then defined as distributable resources at time of payment divided by the sum of (a) Allowed Policy Claims realized to date and (b) total future Allowed Policy Claims expected to arise under a Stress Scenario.  Distributions are made on Allowed Policy Claims based on the Allowed Policy Claim amount multiplied by 15% of the maximum payment percentage in 2027, 20% of the maximum payment percentage in 2032, 25% of the maximum payment percentage in 2037, 30% of the maximum payment percentage in 2042, and 35% of the maximum payment percentage in 2047.  All remaining assets are distributed

in a final liquidation in 2052. At each distribution date, Allowed Policy Claims that have previously received payments receive the difference between the new payment percentage and the prior payment percentage in effect when their last distribution was received. Newly arisen Allowed Policy Claims receive the full payment percentage in effect at the time. All Allowed Policy Claims would receive the same nominal recovery (*i.e.*, undiscounted cash flows received as a percentage of their original Policy Claim) because there is no interest accrual on unpaid Policy Claims.

2.    *Losses:* The Liquidation Analysis is based on two scenarios for determining losses under FGIC Policies, the Base Scenario and the Stress Scenario, each as described in the Plan, the Disclosure Statement and herein.

## D.    Revenues and Expenses

1.    *Investment Income:* The Liquidation Analysis assumes gross investment income post-transaction to be 2.3% in 2012 and 3.25% thereafter. Management fees are assumed to be 9.75 basis points of invested assets per year.

2.    *Premiums:* The Liquidation Analysis assumes premiums on existing installment policies to be collected as scheduled and that unearned premiums will not be returned. However, a 10% reduction in expected premiums collection is assumed in the Liquidation Analysis to take into consideration potential shortfalls.

3.    *Reinsurance:* The Base Scenario assumes that reinsurance on Policy Claims that is not commuted will be collected from U.S.-domiciled investment grade Reinsurers in full and from non-U.S.-domiciled Reinsurers up to the amount of collateral posted if losses on reinsured policies are realized. The Stress Scenario assumes that reinsurance on Policy Claims that is not commuted will not be collected due to the implied amount of losses Reinsurers would likely experience under the Stress Scenario and the possibility that the Reinsurers would have inadequate claims-paying resources.

4.    *Taxes:* The Liquidation Analysis assumes that the Contribution Amount - the $11 million payment to FGIC Corp. pursuant to the Plan Sponsor Agreement - will be paid. Pretax income is expected to be realized in both the Base Scenario and Stress Scenario and the Liquidation Analysis assumes that existing NOLs are available and utilized going forward as income is generated. NOLs are assumed to expire 20 years after they are generated. Although NOLs are projected to be sufficient to offset taxable income in the Base Scenario and the Stress Scenario, if actual losses in liquidation are lower than what is projected in these two scenarios, material Cash tax payments may be required.

5.    *Operating Expenses:* The Liquidation Analysis assumes a total of approximately $533 million of operating expenses through 2052 (which amount is 10% less than operating expenses projected to be incurred under the Plan), excluding professional, NYLB and other expenses

6. *Professional, NYLB and Other Expenses:* The Liquidation Analysis assumes, over the Run-Off Period, approximately $49.5 million for professional expenses (comprised of approximately $30 million paid and to be paid in 2012, the year FGIC would enter liquidation, and approximately $0.5 million per year from 2013 to 2051), approximately $288 million for expenses related to NYLB operations (comprised of approximately $5 million per year for the first 10 years, and then increasing by 3% each year until 2052) and approximately $5 million for other expenses associated with winding down FGIC's business at the end of the Run-Off Period.

7. *Other:* The Liquidation Analysis does not assume any proceeds from any recoveries from Material Litigation or any value associated with FGIC's equity interest in FGIC UK because the Run-Off Projections do not assume any proceeds from any recoveries from Material Litigation or any value associated with FGIC's equity interest in FGIC UK under the Plan.

**E.   Recoveries**

1. *Calculation of Recoveries:* Recoveries for Policyholders are based on cash flows received as a result of interim and final distributions. All cash flows received are discounted to the time the Policy Claim would be allowed by the liquidator. The recoveries shown below are average recoveries for all Allowed Policy Claims, including Allowed Policy Claims that already accrued and are unpaid and all Policy Claims that the Rehabilitator expects would be received and allowed by the liquidator through maturity of the last Policy in 2052. Expected recoveries are shown in both the Base Scenario and the Stress Scenario.

   Nominal recoveries to Policyholders in a liquidation, as reflected below, are higher than nominal recoveries expected under the Plan because, in a liquidation, most of FGIC's assets would be distributed to Policyholders at the conclusion of the liquidation in 2052, allowing FGIC's assets to accrue investment income for another forty years. However, using an appropriate discount rate to account for the time value of money reveals that actual recoveries in a liquidation would be significantly lower than under the Plan.

*Illustrative Projected Liquidation Recovery*

| AVERAGE POLICYHOLDER LIQUIDATION RECOVERIES | | |
|---|---|---|
| | **Base Scenario** | **Stress Scenario** |
| Nominal Recovery | 67.9% | 39.2% |
| 10%  Discount Rate | 15.9% | 8.6% |
| 15%  Discount Rate | 11.5% | 6.1% |
| 20%  Discount Rate | 9.3% | 4.8% |

**Exhibit E**

**(Restructured Policy Terms:  Illustrative Example)**

## Illustrative Example

This illustrative example (the "**Example**") is intended to provide a simplified example of how Permitted Policy Claims will be treated pursuant to the Plan.  For purposes of simplicity, this Example assumes that FGIC has issued only two Policies, with one Policyholder for each Policy (Policyholder 1 and Policyholder 2), and that only one Policy Claim is Permitted (in different years) with respect to each Policy.  The Example shows the calculation and progression of the DPO, DPO Accretion and FGIC Payments over the course of five years, during which there is an increase in the CPP.

**NOTE:**  AMOUNTS USED IN THIS EXAMPLE ARE REPRESENTATIVE ONLY, DO NOT REFLECT ANY ACTUAL CLAIMS AND ARE BASED ON ASSUMPTIONS THAT MAY NOT BE APPLICABLE TO ANY PARTICULAR POLICY.  THE CALCULATIONS OF DPO ACCRETION AMOUNTS ARE MADE ON THE BASIS THAT ANY ADJUSTMENT OR OTHER CHANGE TO DPO OCCURS PRIOR TO THE CALCULATION IN ANY GIVEN YEAR OR YEAR END WHICH MAY NOT REFLECT WHAT MAY ACTUALLY OCCUR.  THE CALCULATIONS OF DPO ARE MADE ON THE BASIS THAT ANY FGIC PAYMENTS OR CERTIFICATEHOLDER PAYMENTS (AS HEREINAFTER DEFINED) ARISE PRIOR TO THE CALCULATION IN ANY GIVEN YEAR WHICH MAY NOT REFLECT WHAT MAY ACTUALLY OCCUR.  THIS EXAMPLE DOES NOT CONTEMPLATE A CPP DOWNWARD ADJUSTMENT AND THERE CAN BE NO GUARANTY THAT SUCH CPP DOWNWARD ADJUSTMENT DOES NOT OCCUR.  CAPITALIZED TERMS NOT DEFINED HEREIN HAVE THE MEANING ASCRIBED TO THEM IN THE PLAN.

### Year One

**Overview:**  In Year One Policyholder 1 has a Permitted Policy Claim and accrues one year of DPO Accretion.  Policyholder 2 has no Permitted Policy Claim in Year One.  The CPP remains unchanged in Year One.  There are no FGIC Payments owed or Certificateholder Payments (as hereinafter defined) recovered by either Policyholder during Year One.

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | **Claims Permitted During Year One** | | |
| 1. | Permitted Policy Claim – Policyholder 1 | $100 | Policyholder 1 filed a Policy Claim that was Permitted in accordance with the Plan in Year One in the amount of $100. |
| 2. | Permitted Policy Claim – Policyholder 2 | $0 | Policyholder 2 has no Policy Claims that were Permitted in Year One. |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | | **Cash Payments** | |
| 3. | CPP | 10% | This is the initial CPP assumed by this Example. |
| 4. | Cash payment to Policyholder 1 *(attributable to Permitted Policy Claim rather than to DPO Accretion)* | $10 | This is calculated by multiplying: <br> • the CPP in Line 3 (10%) by <br> • the Permitted Policy Claim in Line 1 ($100), <br> and subtracting from such product any FGIC Payments in Lines 9 ($0) and 10 ($0) to the extent that they have not been paid to FGIC. |
| 5. | Cash payment to Policyholder 2 *(attributable to Permitted Policy Claim rather than to DPO Accretion)* | $0 | As Policyholder 2 has no Permitted Policy Claims in Year One, there is no Cash payment. |
| | | **DPO** | |
| 6. | DPO for Policyholder 1 at end of Year One | $90 | DPO is the amount left after deducting Cash payments and Deemed Cash Payments made in respect of Permitted Policy Claims under a Policy from the aggregate Permitted Policy Claims under such Policy. DPO is further reduced by (i) FGIC Payments with respect to such Policy that are not paid to FGIC and (ii) Certificateholder Payments.  For purposes of this Example, "**Certificateholder Payments**" means any amounts recovered by a Policyholder with respect to such Policy that are paid to certificateholders instead of to FGIC and that would have been payable to FGIC had FGIC paid all Permitted Policy Claims under such Policy in full in the absence of the Policy Restructuring as specified in Lines 8, 25, 26, 45, 62 and 80. <br><br> On the date of Cash payment in Line 4, DPO is calculated by subtracting from the amount of the Permitted Policy Claim in Line 1 ($100) the sum of: <br> • the Cash payment paid by FGIC with respect to the Permitted Policy Claim in Line 4 ($10) and <br> • the amount of the Certificateholder Payments by |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | | | Policyholder 1 in Line 8 ($0). |
| | | | At the end of Year One there have been no further Permitted Policy Claims by Policyholder 1 and the DPO stays at $90. |
| 7. | DPO for Policyholder 2 at end of Year One | $0 | As Policyholder 2 has no Permitted Policy Claims in Year One, there is no DPO. |
| 8. | Certificateholder Payments during Year One | $0 | This Example assumes that no such amounts exist with respect to Policies of either Policyholder in Year One. |
| **FGIC Payments** | | | |
| 9. | FGIC Payments payable to FGIC during Year One | $0 | This Example assumes that no such amounts exist with respect to Policies of either Policyholder in Year One. |
| 10. | FGIC Payments payable to FGIC during prior periods to the extent they have not previously been applied to reduce cash payments that would otherwise be payable by FGIC on account of Permitted Policy Claims | $0 | This Example assumes that no such amounts exist with respect to Policies of either Policyholder. |
| **DPO Accretion** | | | |
| 11. | DPO Accretion Rate | 3% | This is the rate fixed by the terms of the Plan. |
| 12. | DPO Accretion Amount for Policyholder 1 at end of Year One | $2.70 | This is calculated by multiplying:<br>• the DPO at end of Year One in Line 6 ($90) by<br>• the DPO Accretion Rate in Line 11 (3%). |
| 13. | DPO Accretion Amount for Policyholder 2 at end of Year One | $0 | As Policyholder 2 has no DPO at end of Year One, there is no DPO Accretion. |
| 14. | DPO Accretion Payable Amount | $0 | There are no amounts available to pay DPO Accretion because the CPP has not increased in Year One. |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| 15. | DPO Accretion Payment Amount for Policyholder 1 and Policyholder 2 | $0 | In respect of any particular Policy this amount is based upon a pro rata share of the DPO Accretion Payable Amount set forth in Line 14 ($0) based upon the DPO Accretion Amount related to such Policy. |
| **Period Summary** | | | |
| 16. | Total Cash paid to Policyholder 1 during Year One | $10 | This is calculated by adding:<br>• the cash payment attributable to the Permitted Policy Claim in Line 4 ($10) plus<br>• the DPO Accretion Payment Amount for Policyholder 1 in Line 15 ($0). |
| 17. | Total Cash paid to Policyholder 2 during Year One | $0 | This is calculated by adding:<br>• the Cash payment attributable to the Permitted Policy Claim in Line 5 ($0) plus<br>• the DPO Accretion Payment Amount for Policyholder 2 in Line 15 ($0). |
| 18. | Total DPO and DPO Accretion Amount for Policy of Policyholder 1 as of the end of Year One | $92.70 | This is calculated by adding:<br>• the DPO at end of Year One in Line 6 ($90) plus<br>• the DPO Accretion Amount in Line 12 ($2.70) |
| 19. | Total DPO and DPO Accretion Amount for Policy of Policyholder 2 as of the end of Year One | $0 | This is calculated by adding:<br>• the DPO at end of Year One in Line 7 ($0) plus<br>• the DPO Accretion Amount in Line 13 ($0) |

### Year Two

**Overview:**  In Year Two CPP remains unchanged.  Neither Policyholder has additional Policy Claims Permitted in Year Two.  There is are Certificateholder Payments, a FGIC Payment and DPO Accretion in respect of Policyholder 1.

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| **Claims Permitted During Year Two** | | | |
| 20. | Permitted Policy Claims | $0 | Neither Policyholder has any Policy Claims that |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | | | were Permitted in Year Two. |
| **Cash Payments** | | | |
| 21. | CPP | 10% | This is the initial CPP assumed by this Example and it has not changed in Year Two. |
| 22. | Cash payments to Policyholder 1 and Policyholder 2 *(attributable to Policy Claim rather than to DPO Accretion)* | $0 | As no Policy Claims were Permitted in Year Two for either Policyholder, there are no Cash payments in Year Two to either Policyholder on account of Policy Claims. |
| **DPO** | | | |
| 23. | DPO for Policyholder 1 at end of Year Two | $81 | DPO is the amount left after deducting Cash payments and Deemed Cash Payments made in respect of Permitted Policy Claims under a Policy from the aggregate Permitted Policy Claims under such Policy.  DPO is further reduced by (i) FGIC Payments with respect to such Policy that are not paid to FGIC and (ii) Certificateholder Payments. At the end of Year Two the DPO for Policyholder 1 is calculated by: <ul><li>the aggregate Policy Claims made by Policyholder 1 from Line 1 ($100) and Line 20 ($0), minus</li><li>any amount of such Policy Claims paid in Cash from Line 4 ($10) and Line 22 ($0), less</li><li>any Certificateholder Payments made by Policyholder 1 in Line 8 ($0) and Line 25 ($9).</li></ul> |
| 24. | DPO for Policyholder 2 at end of Year Two | $0 | As Policyholder 2 has no Permitted Policy Claims, there is no DPO. |
| 25. | Certificateholder Payments recovered by Policyholder 1 during Year Two | $9 | This Example assumes that in Year Two, Policyholder 1 receives a recovery of $10 (and that FGIC has not paid any Claims with respect to the relevant Policy prior to the 1310 Order).  The Plan provides that the current CPP percentage of |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | | | this recovery is payable to FGIC as a FGIC Payment (see Line 27 below).  As set forth in Line 27, $1 of this recovery is a FGIC Payment that is assumed to be paid by Policyholder 1 to FGIC and $9 of this recovery is assumed to be paid by Policyholder 1 to certificateholders.  The form of recovery in this Example is not proceeds of Trust Loan Repurchase Obligations. |
| 26. | Certificateholder Payments recovered by Policyholder 2 during Year Two | $0 | This Example assumes that no such amounts exist with respect to the Policy of this Policyholder. |
| **Required Payments** | | | |
| 27. | FGIC Payments payable to FGIC during Year Two | $1 | As discussed in Line 25, this Example assumes that in Year Two, Policyholder 1 receives a recovery of $10.  The Plan provides that the current CPP percentage of this recovery is payable to FGIC as a FGIC Payment.  FGIC Payment during Year Two is calculated by multiplying: <ul><li>the amount of the recovery Policyholder 1 receives during Year Two ($10) by</li><li>the CPP in Line 21 (10%).</li></ul> |
| 28. | FGIC Payments payable to FGIC during prior periods to the extent they have not previously been applied to reduce cash payments that would otherwise be payable by FGIC for Policy Claims | $0 | No such amounts arose with respect to this Policy during prior periods. |
| **DPO Accretion** | | | |
| 29. | DPO Accretion Rate | 3% | This is the rate fixed by the terms of the Plan. |
| 30. | DPO Accretion Amount for Policyholder 1 at end of Year Two | $5.13 | This is calculated by multiplying: <ul><li>the DPO at end of Year Two for Policyholder 1 in Line 23 ($81) by</li><li>the DPO Accretion Rate in Line 29 (3%)</li></ul> |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | | | (the result of which is $2.43), and adding the DPO Accretion Amount at end of Year One in Line 12 ($2.70). |
| 31. | DPO Accretion Amount for Policyholder 2 at end of Year Two | $0 | As Policyholder 2 has no DPO at end of Year Two, there is no DPO Accretion. |
| 32. | DPO Accretion Payable Amount | $0 | There are no amounts available to pay DPO Accretion because the CPP has not increased in Year Two. |
| 33. | DPO Accretion Payment Amount for Policyholder 1 and Policyholder 2 | $0 | In respect of any particular Policy this amount is based upon a pro rata share of the DPO Accretion Payable Amount set forth in Line 32 ($0) based upon the DPO Accretion Amount related to such Policy. |
| | **Period Summary** | | |
| 34. | Total Cash paid to Policyholder 1 during Year Two | $0 | This is calculated by adding: <ul><li>the Cash payments to Policyholder 1 in Line 22 ($0) plus</li><li>the DPO Accretion Payment Amount for Policyholder 1 in Line 33 ($0).</li></ul> |
| 35. | Total Cash paid to Policyholder 2 during Year Two | $0 | This is calculated by adding: <ul><li>the Cash payment to Policyholder 2 in Line 22 ($0) plus</li><li>the DPO Accretion Payment Amount for Policyholder 2 in Line 33 ($0).</li></ul> |
| 36. | Total DPO and DPO Accretion Amount for Policy of Policyholder 1 as of the end Year Two | $86.13 | This is calculated by adding: <ul><li>the DPO at end of Year Two in Line 23 ($81) plus</li><li>the DPO Accretion Amount in Line 30 ($5.13).</li></ul> |
| 37. | Total DPO and DPO Accretion Amount for Policy of Policyholder 2 as of the end of | $0 | This is calculated by adding: <ul><li>the DPO at end of Year Two in Line 24</li></ul> |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
|  | Year Two | | ($0) plus<br><br>• the DPO Accretion Amount in Line 31 ($0). |

### Year Three

**Overview:** In Year Three CPP remains unchanged. There are no additional Policy Claims Permitted in respect of Policyholder 1. Policyholder 2 has its first Policy Claim Permitted in Year Three. Neither Policyholder owes any FGIC Payments or recovers any Certificateholder Payments in Year Three.

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | **Claims Permitted in Year Three** | | |
| 38. | Permitted Policy Claim – Policyholder 1 | $0 | Policyholder 1 has no Policy Claims that were Permitted in Year Three. |
| 39. | Permitted Policy Claim – Policyholder 2 | $100 | Policyholder 2 filed a Policy Claim that was Permitted in accordance with the Plan in Year Three in the amount of $100. |
| | **Cash Payments** | | |
| 40. | CPP | 10% | This is the initial CPP assumed by this Example. |
| 41. | Cash payment to Policyholder 1<br><br>*(attributable to Policy Claim rather than to DPO Accretion)* | $0 | As no Policy Claims were Permitted in Year Three for Policyholder 1, there is no Cash payment in Year Three to Policyholder 1 on account of Policy Claims. |
| 42. | Cash payment to Policyholder 2<br><br>*(attributable to Policy Claim rather than to DPO Accretion)* | $10 | This is calculated by multiplying:<br><br>• the CPP in Line 40 (10%) by<br><br>• the Permitted Policy Claim in Line 39 ($100),<br><br>and subtracting from such product any FGIC Payments in Lines 46 ($0) and 47 ($0) to the extent that they have not been paid to FGIC. |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | **DPO** | | |
| 43. | DPO for Policyholder 1 at end of Year Three | $81 | DPO is the amount left after deducting cash payments and deemed cash payments made in respect of Permitted Policy Claims under a Policy from the aggregate Permitted Policy Claims under such Policy.  DPO is further reduced by (i) FGIC Payments with respect to such Policy that are not paid to FGIC and (ii) Certificateholder Payments. <br><br> At the end of Year Three the DPO for Policyholder 1 is calculated by: <br><br> • the aggregate Policy Claims made by Policyholder 1 from Line 1 ($100), Line 20 ($0) and Line 38 ($0), minus <br><br> • any amount of such Policy Claims paid in Cash from Line 4 ($10), Line 22 ($0) and Line 41 ($0), less <br><br> • any Certificateholder Payments made by Policyholder 1 in Line 8 ($0), Line 25 ($9) and Line 45 ($0). |
| 44. | DPO for Policyholder 2 at end of Year Three | $90 | On the date of Cash payment in Line 42, DPO is calculated by subtracting from the amount of the Permitted Policy Claim in Line 39 ($100) the sum of: <br><br> • the cash payment paid by FGIC with respect to the Permitted Policy Claim in Line 42 ($10) and <br><br> • the amount of the Certificateholder Payments by Policyholder 2 in Line 45 ($0). <br><br> At the end of Year Three there have been no further Permitted Policy Claims by Policyholder 2 and the DPO stays at $90. |
| 45. | Certificateholder Payments recovered by Policyholders during Year Three | $0 | This Example assumes that no such amounts exist with respect to Policies of either Policyholder in Year Three. |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| **FGIC Payments** | | | |
| 46. | FGIC Payments payable to FGIC during Year Three | $0 | This Example assumes that no such amounts exist with respect to Policies of either Policyholder in Year Three. |
| 47. | FGIC Payments payable to FGIC during prior periods to the extent they have not previously been applied to reduce cash payments that would otherwise be payable by FGIC on account of Permitted Policy Claims | $0 | This Example assumes that no such amounts exist with respect to Policies of either Policyholder. |
| **DPO Accretion** | | | |
| 48. | DPO Accretion Rate | 3% | This is the rate fixed by the terms of the Plan. |
| 49. | DPO Accretion Amount in respect of Policyholder 1 at end of Year Three | $7.56 | This is calculated by multiplying:<br><br>• the DPO at end of Year Three in Line 43 ($81) by<br><br>• the DPO Accretion Rate in Line 48 (3%) (the result of which is $2.43),<br><br>and adding the DPO Accretion Amount at end of Year Two in Line 30 ($5.13). |
| 50. | DPO Accretion Amount in respect of Policyholder 2 at end of Year Three | $2.70 | This is calculated by multiplying:<br><br>• the DPO at end of Year Three in Line 44 ($90) by<br><br>• the DPO Accretion Rate in Line 48 (3%),<br><br>and adding the DPO Accretion Amount at end of Year Two in Line 31 ($0). |
| 51. | DPO Accretion Payable Amount | $0 | There are no amounts available to pay DPO Accretion because the CPP has not increased in Year Three. |
| 52. | DPO Accretion Payment Amount for Policyholder 1 and Policyholder 2 | $0 | In respect of any particular Policy this amount is based upon a pro rata share of the DPO Accretion Payable Amount set forth in Line 51 ($0) based upon the DPO Accretion Amount related to such |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | | | Policy. |
| **Period Summary** | | | |
| 53. | Total Cash paid to Policyholder 1 during Year Three | $0 | This is calculated by adding:<br>• the Cash payments to Policyholder 1 in Line 41 ($0) plus<br>• the DPO Accretion Payment Amount for Policyholder 1 in Line 52 ($0). |
| 54. | Total Cash paid to Policyholder 2 during Year Three | $10 | This is calculated by adding:<br>• the Cash payment to Policyholder 2 in Line 42 ($10) plus<br>• the DPO Accretion Payment Amount for Policyholder 2 in Line 52 ($0). |
| 55. | Total DPO and DPO Accretion Amount for Policy of Policyholder 1 as of the end Year Three | $88.56 | This is calculated by adding:<br>• the DPO at end of Year Three in Line 43 ($81) plus<br>• the DPO Accretion Amount in Line 49 ($7.56). |
| 56. | Total DPO and DPO Accretion Amount for Policy of Policyholder 2 as of the end of Year Three | $92.70 | This is calculated by adding:<br>• the DPO at end of Year Three in Line 44 ($90) plus<br>• the DPO Accretion Amount in Line 50 ($2.70). |

**Year Four**

**Overview:**  In Year Four CPP remains unchanged.  There are no additional Policy Claims Permitted in respect of Policyholder 1 or Policyholder 2.  Neither Policyholder owes any FGIC Payments or recovers any Certificateholder Payments in Year Four.  The only change is an accrual of DPO Accretion.

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | **Claims Permitted in Year Four** | | |
| 57. | Permitted Policy Claims | $0 | Neither Policyholder has any Policy Claims that were Permitted in Year Four. |
| | **Cash Payments** | | |
| 58. | CPP | 10% | This is the initial CPP assumed by this Example. |
| 59. | Cash payments to Policyholder 1 and Policyholder 2 <br><br> *(attributable to Policy Claim rather than to DPO Accretion)* | $0 | As no Policy Claims were Permitted in Year Four for either Policyholder, there are no Cash payments in Year Four to either Policyholder on account of Policy Claims. |
| | **DPO** | | |
| 60. | DPO for Policyholder 1 at end of Year Four | $81 | DPO is the amount left after deducting cash payments and deemed cash payments made in respect of Permitted Policy Claims under a Policy from the aggregate Permitted Policy Claims under such Policy.  DPO is further reduced by (i) FGIC Payments with respect to such Policy that are not paid to FGIC and (ii) Certificateholder Payments. <br><br> At the end of Year Four the DPO for Policyholder 1 is calculated by: <br><br> • the aggregate Policy Claims made by Policyholder 1 from Line 1 ($100), Line 20 ($0), Line 38 ($0) and Line 57 ($0), minus <br><br> • any amount of such Policy Claims paid in Cash from Line 4 ($10), Line 22 ($0), Line 41 ($0) and Line 59 ($0), less <br><br> • any Certificateholder Payments made by Policyholder 1 in Line 8 ($0), Line 25 ($9), Line 45 ($0) and Line 62 ($0). |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| 61. | DPO for Policyholder 2 at end of Year Four | $90 | At the end of Year Four the DPO for Policyholder 2 is calculated by: <br><br>• the aggregate Policy Claims made by Policyholder 2 from Line 2 ($0), Line 20 ($0), Line 39 ($100) and Line 57 ($0), minus<br><br>• any amount of such Policy Claims paid in Cash from Line 5 ($0), Line 22 ($0), Line 42 ($10) and Line 59 ($0), less<br><br>• any Certificateholder Payments made by Policyholder 2 in Line 8 ($0), Line 26 ($0), Line 45 ($0) and Line 62 ($0). |
| 62. | Certificateholder Payments recovered by Policyholders during Year Four | $0 | This Example assumes that no such amounts exist with respect to Policies of either Policyholder in Year Four. |
| **FGIC Payments** | | | |
| 63. | FGIC Payments payable to FGIC during Year Four | $0 | This Example assumes that no such amounts exist with respect to Policies of either Policyholder in Year Four. |
| 64. | FGIC Payments payable to FGIC during prior periods to the extent they have not previously been applied to reduce cash payments that would otherwise be payable by FGIC on account of Permitted Policy Claims | $0 | This Example assumes that no such amounts exist with respect to Policies of either Policyholder. |
| **DPO Accretion** | | | |
| 65. | DPO Accretion Rate | 3% | This is the rate fixed by the terms of the Plan. |
| 66. | DPO Accretion Amount in respect of Policyholder 1 at end of Year Four | $9.99 | This is calculated by multiplying:<br><br>• the DPO at end of Year Four in Line 60 ($81) by<br><br>• the DPO Accretion Rate in Line 65 (3%) (the result of which is $2.43) |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | | | and adding the DPO Accretion Amount at end of Year Three in Line 49 ($7.56). |
| 67. | DPO Accretion Amount in respect of Policyholder 2 at end of Year Four | $5.40 | This is calculated by multiplying: <br>• the DPO at end of Year Four in Line 61 ($90) by <br>• the DPO Accretion Rate in Line 48 (3%) (the result of which is $2.70), <br>and adding the DPO Accretion Amount at end of Year Three in Line 50 ($2.70). |
| 68. | DPO Accretion Payable Amount | $0 | There are no amounts available to pay DPO Accretion because the CPP has not increased in Year Four. |
| 69. | DPO Accretion Payment Amount for Policyholder 1 and Policyholder 2 | $0 | In respect of any particular Policy this amount is based upon a pro rata share of the DPO Accretion Payable Amount set forth in Line 68 ($0) based upon the DPO Accretion Amount related to such Policy. |
| **Period Summary** | | | |
| 70. | Total Cash paid to Policyholder 1 during Year Four | $0 | This is calculated by adding: <br>• the Cash payments to Policyholder 1 in Line 59 ($0) plus <br>• the DPO Accretion Payment Amount for Policyholder 1 in Line 69 ($0). |
| 71. | Total Cash paid to Policyholder 2 during Year Four | $0 | This is calculated by adding: <br>• the Cash payment to Policyholder 2 in Line 59 ($0) plus <br>• the DPO Accretion Payment Amount for Policyholder 2 in Line 69 ($0). |
| 72. | Total DPO and DPO Accretion Amount for Policy of Policyholder 1 as of the end Year Four | $90.99 | This is calculated by adding: <br>• the DPO at end of Year Four in Line 60 ($81) plus <br>• the DPO Accretion Amount in Line 66 |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | | | ($9.99). |
| 73. | Total DPO and DPO Accretion Amount for Policy of Policyholder 2 as of the end of Year Four | $95.40 | This is calculated by adding:<br>• the DPO at end of Year Four in Line 61 ($90) plus<br>• the DPO Accretion Amount in Line 67 ($5.40). |

**Year Five**

**Overview:** In Year Five there is an increase in CPP. There are no additional Policy Claims Permitted in respect of Policyholder 1 or Policyholder 2. Neither Policyholder recovers any Certificateholder Payments in Year Five, but Policyholder 1 does owe an additional FGIC Payment as a result of an increase in the CPP.

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | **Claims Permitted in Year Five** | | |
| 74. | Permitted Policy Claims | $0 | Neither Policyholder has any Policy Claims that were Permitted in Year Five. |
| | **Cash Payments** | | |
| 75. | CPP | 15% | There is an increase in CPP in Year Five. |
| 76. | Cash payments to Policyholder 1 *(attributable to Policy Claim rather than to DPO Accretion)* | $4.05 | Even though no Policy Claims were Permitted in Year Five for Policyholder 1, the increase in CPP results in a payment in respect of the Policy Claims previously Permitted in Year One. This is calculated by:<br>• the difference between the CPP in Year Five in Line 75 (15%) and the CPP in Year Four in Line 58 (10%), which equals 5%, multiplied by<br>• the original amount of all Permitted Policy Claims for Policyholder 1 (in this case, $100 from Line 1) less all Certificateholder Payments by Policyholder 1 (in this case, |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | | | $9 from Line 25) ($91 x 5% = $4.55). |
| | | | This amount is then further reduced by the FGIC Payments by Policyholder 1 in Line 81 ($0.50). For purposes of this Example, it is assumed that Policyholder 1 does not pay the FGIC Payment in Line 81 in Cash and instead FGIC sets off this amount from this Cash payment. |
| 77. | Cash payments to Policyholder 2 *(attributable to Policy Claim rather than to DPO Accretion)* | $5 | Even though there are no Policy Claims in Year Five for Policyholder 2, the increase in CPP will result in a payment in respect of the Policy Claim previously Permitted in Year Three. This is calculated by:<br><br>• the difference between the CPP in Year Five in Line 75 (15%) and the CPP in Year Four in Line 58 (10%), which equals 5%, multiplied by<br><br>• the original amount of all Permitted Policy Claims for Policyholder 2 (in this case, $100 from Line 39) less all Certificateholder Payments by Policyholder 2 ($0) ($100 x 5% = $5). |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | **DPO** | | |
| 78. | DPO for Policyholder 1 at end of Year Five | $76.95 | DPO is the amount left after deducting cash payments and deemed cash payments made in respect of Permitted Policy Claims under a Policy from the aggregate Permitted Policy Claims under such Policy.  DPO is further reduced by (i) FGIC Payments with respect to such Policy that are not paid to FGIC and (ii) Certificateholder Payments.<br><br>At the end of Year Five the DPO for Policyholder 1 is calculated by:<br><br>• the aggregate Policy Claims made by Policyholder 1 from Line 1 ($100), Line 20 ($0), Line 38 ($0), Line 57 ($0) and Line 74 ($0), minus<br><br>• any amount of such Policy Claims paid in Cash from Line 4 ($10), Line 22 ($0), Line 41 ($0), Line 59 ($0) and Line 76 ($4.05), less<br><br>• any Certificateholder Payments made by Policyholder 1 in Line 8 ($0), Line 25 ($9), Line 45 ($0), Line 62 ($0) and Line 80 ($0). |
| 79. | DPO for Policyholder 2 at end of Year Five | $85 | At the end of Year Four the DPO for Policyholder 2 is calculated by:<br><br>• the aggregate Policy Claims made by Policyholder 2 from Line 2 ($0), Line 20 ($0), Line 39 ($100), Line 57 ($0) and Line 74 ($0), minus<br><br>• any amount of such Policy Claims paid in Cash from Line 5 ($0), Line 22 ($0), Line 42 ($10), Line 59 ($0) and Line 77 ($5), less<br><br>• any Certificateholder Payments made by Policyholder 2 in Line 8 ($0), Line 26 ($0), Line 45 ($0), Line 62 ($0) and Line 80 ($0). |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| 80. | Certificateholder Payments recovered by Policyholders during Year Five | $0 | This Example assumes that no such amounts exist with respect to Policies of either Policyholder in Year Five. |
| **FGIC Payments** | | | |
| 81. | FGIC Payments payable to FGIC by Policyholder 1 during Year Five | $.50 | Because of the increase in CPP in Year Five, prior FGIC Payments must be adjusted to determine the amount of FGIC Payments that Policyholder 1 should have paid to FGIC had the CPP been 15% at the time of the FGIC Payment.  This is calculated by multiplying:<br><br>• the difference between the CPP in Year Five in Line 75 (15%) and the CPP in Year Four in Line 58 (10%), which equals 5%, and<br><br>• The recovery Policyholder 1 recovered in Year 2 ($10) that is assumed in Lines 25 and 27. |
| 82. | FGIC Payments payable to FGIC by Policyholder 2 during Year Five | $0 | This Example assumes that no such amounts exist with respect to the Policy of Policyholder 2 in Year Five. |
| 83. | FGIC Payments payable to FGIC during prior periods to the extent they have not previously been applied to reduce cash payments that would otherwise be payable by FGIC on account of Permitted Policy Claims | $0 | This Example assumes that no such amounts exist with respect to Policies of either Policyholder. |
| **DPO Accretion** | | | |
| 84. | DPO Accretion Rate | 3% | This is the rate fixed by the terms of the Plan. |
| 85. | DPO Accretion Amount in respect of Policyholder 1 at end of Year Five | $10.48 | At the time of calculation of DPO Accretion Payment Amount, this is calculated by multiplying:<br><br>• the DPO at end of Year Five in Line 78 ($76.95) by |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
|  |  |  | • the DPO Accretion Rate in Line 84 (3%) (the result of which is $2.31), |
|  |  |  | and adding the DPO Accretion Amount at end of Year Four in Line 66 ($9.99), for a total of $12.30. |
|  |  |  | At the end of Year Five, this amount is reduced by the DPO Accretion Payable Amount that is paid in Cash in Line 88 in respect of Policyholder 1 ($1.82). |
| 86. | DPO Accretion Amount in respect of Policyholder 2 at end of Year Five | $6.77 | At the time of calculation of DPO Accretion Payment Amount, this is calculated by multiplying:
• the DPO at end of Year Five in Line 79 ($85) by
• the DPO Accretion Rate in Line 84 (3%) (the result of which is $2.55),
and adding the DPO Accretion Amount at end of Year Four in Line 67 ($5.40), for a total of $7.95.
At the end of year Five, this amount is reduced by the DPO Accretion Payable Amount that is paid in Cash in Line 89 in respect of Policyholder 2 ($1.18). |
| 87. | DPO Accretion Payable Amount | $3 | This is the amount of DPO Accretion Payable Amount that is assumed by this Example to be available to pay DPO Accretion.
The DPO Accretion Payable Amount is the amount determined by multiplying the Excess Cash determined in the CPP Revaluation conducted in Year Five by the quotient obtained from:
• dividing the Aggregate DPO Accretion Amount for all Policies accrued up to and including Year Five by
• the sum of (a) the Aggregate DPO Accretion Amount for all Policies accrued up to and including Year Five, (b) the DPO for all Policy Claims that were Permitted on or prior to the end of Year Five and (c) |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
|  |  |  | the DPO for Policy Claims projected to be Permitted in a Stress Scenario after Year Five. |
| 88. | DPO Accretion Payment Amount for Policyholder 1 | $1.82 | This is calculated by multiplying the DPO Accretion Payable Amount specified in Line 87 ($3) by:<br><br>• the End of Year Four DPO Accretion Amount in Line 66 ($9.99) plus<br><br>• the amount obtained by multiplying the End of Year Five DPO in Line 78 ($76.95) by the DPO Accretion Rate in Line 84 (3%) ($2.31),<br><br>divided by:<br><br>• the End of Year Four DPO Accretion Amount in Line 66 ($9.99) plus<br><br>• the amount obtained by multiplying the End of Year Five DPO in Line 78 ($76.50) by the DPO Accretion Rate in Line 84 (3%) ($2.31) plus<br><br>• the End of Year Four DPO Accretion Amount for Policyholder 2 in Line 67 ($5.40) plus<br><br>• the amount obtained by multiplying the End of Year Five DPO for Policyholder 2 in Line 79 ($85) by the DPO Accretion Rate in Line 84 (3%) ($2.55). |
| 89. | DPO Accretion Payment Amount for Policyholder 2 | $1.18 | This is calculated by multiplying the DPO Accretion Payable Amount specified in Line 87 ($3) by:<br><br>• the End of Year Four DPO Accretion Amount in Line 67 ($5.40) plus<br><br>• the amount obtained by multiplying the End of Year Five DPO in Line 79 ($85) by the DPO Accretion Rate in Line 84 (3%) ($2.55),<br><br>divided by: |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | | | • the End of Year Four DPO Accretion Amount in Line 67 ($5.40) plus |
| | | | • the amount obtained by multiplying the End of Year Five DPO in Line 79 ($85) by the DPO Accretion Rate in Line 84 (3%) ($2.55) plus |
| | | | • the End of Year Four DPO Accretion Amount for Policyholder 1 in Line 66 ($9.99) plus |
| | | | • the amount obtained by multiplying the End of Year Five DPO for Policyholder 1 in Line 78 ($76.95) by the DPO Accretion Rate in Line 84 (3%) ($2.31). |
| **Period Summary** | | | |
| 90. | Total Cash paid to Policyholder 1 during Year Five | $5.87 | This is calculated by adding:<br>• the Cash payments to Policyholder 1 in Line 76 ($4.05) plus<br>• the DPO Accretion Payment Amount for Policyholder 1 in Line 88 ($1.82). |
| 91. | Total Cash paid to Policyholder 2 during Year Five | $6.18 | This is calculated by adding:<br>• the Cash payment to Policyholder 2 in Line 77 ($5) plus<br>• the DPO Accretion Payment Amount for Policyholder 2 in Line 89 ($1.18). |
| 92. | Total DPO and DPO Accretion Amount for Policy of Policyholder 1 as of the end Year Five | $87.43 | This is calculated by adding:<br>• the DPO at end of Year Five in Line 78 ($76.95) plus<br>• the DPO Accretion Amount in Line 85 ($10.48). |
| 93. | Total DPO and DPO Accretion Amount for Policy of Policyholder 2 as of the end of Year Five | $91.77 | This is calculated by adding:<br>• the DPO at end of Year Five in Line 79 ($85) plus<br>• the DPO Accretion Amount in Line 86 |

EX.E-21

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
|      |      |        | ($6.77).    |