**DECHERT LLP**
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., as Trustee of Certain Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as Trustee of Certain Mortgage Backed Securities Trusts*

**SEWARD & KISSEL LLP**
Mark D. Kotwick
Brian P. Maloney
Ryan Suser
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association, as Trustee of Certain Mortgage-Backed Securities Trusts*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) **Case No. 12-12020 (MG)** |
| **RESIDENTIAL CAPITAL, LLC,** *et al.*, | ) |
| | ) **Chapter 11** |
| Debtors. | ) |
| | ) **Jointly Administered** |

**NOTICE OF FILING OF UNREDACTED DECLARATION OF**
**ROBERT H. MAJOR, AS OFFICER OF THE BANK OF NEW YORK**
**MELLON TRUST COMPANY, N.A., RMBS TRUSTEE, IN SUPPORT OF**
**DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019**

   **PLEASE TAKE NOTICE** that The Bank of New York Mellon, The Bank of New

York Mellon Trust Company, N.A. (collectively, "BNY Mellon"), U.S. Bank National

Association ("U.S. Bank"), and Wells Fargo Bank, N.A. ("Wells Fargo"), solely in their respective capacities as trustee or indenture trustee for certain mortgage backed securities trusts (collectively, the "FGIC Trustees") hereby file the unredacted version of the *Declaration of Robert H. Major, as Officer of the Bank of New York Mellon Trust Company, N.A., RMBS Trustee in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019* (the "**Declaration**"). The Declaration was previously filed in redacted form on July 31, 2013 (Docket No. 4438), pursuant to the Court's *Order Regarding Exchange of Confidential Information* (Docket No. 4249) (the "**Confidentiality Order**").

Dated:  New York, New York
       August 15, 2013

**DECHERT LLP**
By: /s/ Glenn E. Siegel
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., as Trustee of Certain Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
By: /s/ John C. Weitnauer
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as Trustee of Certain Mortgage Backed Securities Trusts*

**SEWARD & KISSEL LLP**
By: /s/ Mark D. Kotwick
Mark D. Kotwick
Ronald L. Cohen
Arlene R. Alves
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association, as Trustee of Certain Mortgage-Backed Securities Trusts*

**DECHERT LLP**
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon and The
Bank of New York Mellon Trust Company, N.A., as
Trustee of Certain Mortgage-Backed Securities Trusts*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | ) |
| | ) **Case No. 12-12020 (MG)** |
| **RESIDENTIAL CAPITAL, LLC,** *et al.*, | ) |
| | ) **Chapter 11** |
| **Debtors.** | ) |
| | ) **Jointly Administered** |

**DECLARATION OF ROBERT H. MAJOR, AS OFFICER OF
THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,
<u>AS TRUSTEE OR INDENTURE TRUSTEE</u>**

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

I, Robert H. Major, hereby declare, pursuant to 28 U.S.C. § 1746, that the following is

true and correct to the best of my knowledge, information, and belief:

1.      I am employed by The Bank of New York Mellon Trust Company, N.A. ("**<u>BNY</u>**

**<u>Mellon Trust Company</u>**") and am authorized to conduct certain activities on behalf of The Bank

of New York Mellon, including the authorization to make this Declaration on behalf of both

BNY Mellon Trust Company and The Bank of New York Mellon (collectively, "**<u>BNY Mellon</u>**").

My current title at BNY Mellon Trust Company is Vice President.  Unless otherwise indicated, I

have personal knowledge of the facts set forth herein, except as to certain matters that I believe

to be true based on (i) information provided by Duff & Phelps, LLC ("**Duff & Phelps**"), the

FGIC Trustees' financial advisor in the Chapter 11 Cases, (ii) information about positions of

parties in these Chapter 11 Cases contained in pleadings that I reviewed, or reported to me by

counsel, or learned during my participation in the Plan Mediation (defined below); and (iii) my

review of business records of BNY Mellon.

2.      I have been employed by BNY Mellon Trust Company in this capacity since

2006.  My responsibilities as Vice President include the administration of defaulted and

distressed structured finance transactions for which BNY Mellon acts as trustee, including,

among other things, consulting with counsel, declaring events of default, sending notices of

default and other significant events, communicating with transaction parties and investors, and,

in connection with the foregoing and in consultation with investors, exercising remedies.

3.      This Declaration is submitted in support of the Debtors' Motion Pursuant to Fed.

R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the

FGIC Trustees, and Certain Individual Investors, dated June 7, 2013 [ECF No. 3929] (the

"**FGIC Motion**").[1]  The **FGIC Trustees**[2] filed a Joinder to the FGIC Motion [ECF No. 3982].

---

[1]    I have previously submitted a declaration, dated June 10, 2013 (the "**Major PSA Declaration**") in support of the (a) Joinder of Certain RMBS Trustees to Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors Committee and Certain Consenting Claimants (the "**PSA Joinder**") [ECF No. 3940-1] and (b) Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors Committee and Certain Consenting Claimants (the "**PSA Motion**") [ECF No. 3814].

[2]    The FGIC Trustees are BNY Mellon, U.S. Bank National Association ("**U.S. Bank**") and Wells Fargo Bank, N.A. ("**Wells Fargo**"), each solely in their respective capacities as trustees or indenture trustees for certain FGIC Insured Trusts.

The FGIC Motion seeks the entry of an order approving the **FGIC Settlement Agreement**[3] attached as Exhibit 2 to the FGIC Motion [ECF No. 3929-2].  The FGIC Settlement Agreement, dated May 23, 2013, is among the Debtors, FGIC, the FGIC Trustees and the Institutional Investors.

    *A.*       *Introduction and Overview*

             **BNY Mellon Trust Company's Role as Trustee of Certain Trusts**

    4.       The FGIC Trustees serve as trustees or indenture trustees of the **FGIC Insured Trusts**, all of which were established before 2008.  The FGIC Insured Trusts issued residential mortgage backed securities ("**RMBS**") or similar securities.  FGIC, a monoline financial guaranty insurance company, issued irrevocable insurance policies (the "**FGIC Policies**") for certain classes of the securities (the "**Securities**") issued by the FGIC Insured Trusts, thereby guaranteeing the payment of principal and interest due on the Securities.  At the same time, FGIC entered into an Insurance and Indemnity Agreement with one or more of the Debtors in connection with each of the FGIC Insured Trusts (the "**Insurance Agreements**").  Pursuant to the Insurance Agreements, a Debtor party agreed, among other things, to reimburse FGIC for certain payments FGIC made under the Policies that resulted from the applicable Debtor's failure to repurchase or substitute mortgage loans that breached one or more representations or warranties contained in the applicable Governing Agreements.

---

[3]    Capitalized terms used in this declaration but not defined herein have the meanings ascribed to them in the FGIC Motion.  For the convenience of the reader, in some cases, definitions found in the FGIC Motion are repeated here.

5.      BNY Mellon Trust Company serves as Trustee or Indenture Trustee in respect of thirty-one of the forty-seven FGIC Insured Trusts that are the subject of the FGIC Settlement Agreement (collectively, the "**BNY Mellon FGIC Trusts**").[4]

### The FGIC Rehabilitation Proceeding

6.      In or about June 2012, the Superintendent of Financial Services of the State of New York filed a rehabilitation petition on behalf of FGIC in the Supreme Court of the State of New York, County of New York (the "**Rehabilitation Court**"), and was subsequently appointed by the Rehabilitation Court as rehabilitator (the "**Rehabilitator**") in that proceeding (the "**FGIC Rehabilitation Proceeding**").  As a result of an injunction entered by the Rehabilitation Court, the FGIC Insured Trusts were obligated to continue to pay premiums under the FGIC Policies, but FGIC was relieved of its obligations to pay claims made under those same policies.

7.      On September 27, 2012, the Rehabilitator filed a proposed Plan of Rehabilitation for FGIC (as amended, the "**Rehabilitation Plan**"), which was approved by the Rehabilitation Court on June 11, 2013.  The Rehabilitation Plan does not provide for full payment of the claims of policyholders; rather, it contemplates partial distributions to all of FGIC's policyholders, including the FGIC Insured Trusts, on account of present and future claims, over a period of up to forty years.

---

[4]      Attached as **Exhibit 116** is a sample Indenture that governs one of the BNY Mellon FGIC Trusts. Exhibit 116 is indicative of the Indentures that govern certain of the BNY Mellon FGIC Trusts.  Attached as **Exhibit 118** is a sample Pooling and Servicing Agreement that governs one of the BNY Mellon FGIC Trusts.  Exhibit 118 is indicative of the Pooling and Servicing Agreements that govern certain of the BNY Mellon FGIC Trusts.

**The FGIC Settlement Agreement**

8.       During the mediation process in these Chapter 11 Cases, the FGIC Trustees were

asked to consider a settlement proposal between the Steering Committee Group,[5] FGIC and

MBIA (the "**Settlement Proposal**").  The Settlement Proposal included, among other things, a

lump sum payment by FGIC to the FGIC Insured Trusts (the "**Commutation Payment**") in

satisfaction of any obligations of FGIC to make payments in the future (the "**Projected**

**Payments**") to the FGIC Insured Trusts under FGIC's Rehabilitation Plan.  Ultimately, the terms

of the Settlement Proposal, including the Commutation Payment, became the basis of the FGIC

Settlement Agreement.  Throughout the mediation process, the FGIC Trustees were represented

by counsel.  Duff & Phelps was also present at many of the mediation sessions, including those

concerning the negotiation of the FGIC Settlement Agreement. In the final FGIC Settlement

Agreement, the Commutation Payment was fixed at $253.3 million.

9.       The FGIC Trustees requested that their financial advisor in these Chapter 11

Cases, Duff & Phelps, review the financial terms of the Settlement Proposal and, in particular,

analyze the value of the Projected Payments under the Rehabilitation Plan with the Commutation

Payment and other value to the FGIC Insured Trusts under the FGIC Settlement Agreements.

Duff & Phelps did so, and as described in further detail below, in reliance on their analysis and

recommendation, BNY Mellon determined in good faith that entering into the FGIC Settlement

Agreement was in the best interests of the FGIC Insured Trusts.  BNY Mellon understood that

the other FGIC Trustees reached the same conclusion.

---

[5]     The Steering Committee Group was a group of institutional investors in the Original Settling Trusts,
including FGIC Insured Trusts, represented by Gibbs & Bruns LLP.  The Talcott Franklin Group was
another group of institutional investors in Original Settling Trusts, including FGIC Insured Trusts,
represented by Talcott Franklin P.C.  The Steering Committee Group, together with the Talcott Franklin
Group, are referred to collectively as the "Institutional Investors."

10.    While the FGIC Trustees considered the merits of the FGIC Settlement Agreement on a stand-alone basis, it is also an integral part of a Plan Support Agreement[6] that paves the way for confirmation of a Chapter 11 bankruptcy plan that will produce additional value for Investors in the FGIC Insured Trusts.  Specifically, under the Plan Support Agreement and the global settlement it embodies, the FGIC Insured Trusts will receive a significant distribution, estimated now to be approximately $92 million, from the Debtors' bankruptcy estate on account of representation and warranty claims against the Debtors.  The FGIC Trustees also considered this value in weighing whether to accept the FGIC Settlement Agreement.

**The Proofs of Claim and the Notice of Cure Claims**

11.    On or about March 1, 2013, BNY Mellon filed proofs of claim  against each applicable Debtor [Proof of Claim Nos. 6760, 6764, 6759. 6777, 6761, 6763, 6767, 6762, 6765, 6768, 6774, 6772, 6766, 6769, 6758, 6773, 6775 and 6776] (the "**Proofs of Claim**") asserting, among other things: (a) the Servicing Claims; (b) the Repurchase Claims and other breach of representations and warranties claims; (c) claims for indemnification under the Transaction Documents; and (d) claims for fraud and/or negligent misrepresentation arising from the conduct of the Debtors acting as Seller under the Transaction Documents.  The Proofs of Claim asserted claims for all of the BNY Mellon RMBS Trusts,[7] including the BNY Mellon FGIC Trusts.

---

[6]    "Plan Support Agreement means, collectively, the Plan Support Agreement and Plan Term Sheet, each dated May 13, 2013, and the Supplemental Plan Term Sheet, dated May 2013.  On June 26, 2013, the Court entered an order granting Debtors' request to enter into the Plan Support Agreement.  *See Order Granting Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into a Plan Support Agreement with Ally Financial Inc., The Creditors' Committee, and Certain Consenting Claimants* [ECF No. 4098].

[7]    The "BNY Mellon RMBS Trusts" are the residential mortgage backed trusts described in the Proofs of Claim.

12.     On April 16, 2013, BNY Mellon filed a Notice of Cure Claim of the Bank of New York Mellon Trust Company N.A., as Trustee [ECF No. 3456] and a Notice of Cure Claim of The Bank of New York Mellon, as Trustee [ECF No. 3457] (the "**Notices of Cure Claim**") asserting claims arising from Debtors' failure to perform its obligations as Servicer under the Transaction Documents, including but not limited to misapplication of payments, wrongful foreclosure, improper loss mitigation practices, and unreasonably long foreclosure timing caused by improper servicing practices.  The Notice of Cure Claim applies to all BNY Mellon RMBS Trusts with Cure Claims, including BNY Mellon FGIC Trusts.

### The RMBS 9019 Motion

13.     Shortly after these Chapter 11 Cases were filed, the Debtors filed a motion, which was later amended (as amended, the "**RMBS 9019 Motion**"),[8] seeking approval of the Debtors' agreements (collectively, as amended the "**RMBS Settlement Agreement**"[9]) with two groups of institutional investors.  The RMBS Settlement Agreement relates to the Repurchase Claims of 392 RMBS trusts (the "**Original Settling Trusts**").

14.     Under the RMBS Settlement Agreement, among other things, AFI would contribute $750 million to the Debtors' estates and the Original Settling Trusts would have been

---

[8]  *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 320], as amended and supplemented by *Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements* [ECF No. 1176] and the *Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements*.  [ECF No. 1887].

[9]  The Third and Amended and Restated Settlement Agreements can be found at Exhibits 1 and 2 of the *Declaration of LaShann M. DeArcy in Further Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Settlement Agreements*.  [ECF No. 3222].

granted an allowed aggregate claim of up to $8.7 billion (the "**Allowed Claim**").[10]  FGIC, among

others, opposed the RMBS Settlement Agreement, resulting in substantial litigation and

uncertainty, including with respect to the size of the AFI contribution to the Debtors' estates; the

size and priority of the Original Settling Trusts' Repurchase Claims; and the validity, priority

and relationship of those claims to the claims asserted by FGIC and other monoline insurers.

> **B.**    ***The FGIC Trustees Acted Reasonably and in Good Faith in Agreeing to Enter Into the FGIC Settlement Agreement***

15.    The process by which the FGIC Trustees determined to enter into the FGIC

Settlement Agreement demonstrates that they acted reasonably and in good faith.

### BNY Mellon's Retention of Qualified Professionals and Experts

16.    BNY Mellon retained and has been advised throughout these Chapter 11 Cases,

including in connection with its consideration of the FGIC Settlement Agreement, by Dechert

LLP, an experienced and knowledgeable law firm.

17.    The analysis and comparison of the value of the Projected Payments to the FGIC

Insured Trusts under the Rehabilitation Plan with the Commutation Payment and other value to

the FGIC Insured Trusts under the FGIC Settlement Agreement involved sophisticated financial

modeling and a level expertise beyond that possessed by BNY Mellon, as Trustee.  The

Transaction Documents expressly contemplate in these circumstances that the FGIC Trustees,

including BNY Mellon, are entitled to rely on the advice of an expert in evaluating the

alternatives.

---

[10]    The RMBS 9019 Motion provided that "[w]hile the [Original Settlement Agreement] was negotiated by the Institutional Investors, the Trustees of each of the [Original Settling] Trusts will also evaluate the reasonableness of the settlement and can accept or reject the proposed compromise on behalf of each Trust."  *See* ECF No. 320 at ¶4.

18.    At the outset of these Chapter 11 Cases, BNY Mellon and three other RMBS

Trustees (Deutsche Bank,[11] US Bank and Wells Fargo), after a rigorous selection process,

retained Duff & Phelps as their financial advisor.  Duff & Phelps was selected over four other

qualified candidates based on (a) the firm's experience in handling similar types of engagements

involving the evaluation of mortgage loan servicing agreements and loan origination agreements,

bankruptcy litigation, restructuring, asset valuation, complex securitizations and RMBS loan

repurchase actions and (b) the depth of resources available to the firm, including advisory

services about bankruptcy issues generally.

19.    Duff & Phelps was uniquely situated to provide the FGIC Trustees with advice

concerning the economic terms of the Settlement Proposal and the Projected Payments under the

Rehabilitation Plan.  Not only is Duff & Phelps a well-respected financial advisor with expertise

in financial modeling and cash flow projections, but it has substantial experience in these

Chapter 11 Cases through its work on behalf of the RMBS Trustees.  Their work has included:

- Conducting a sampling review of more than 6,500 mortgage loan files provided by
  the Debtors in an effort to identify breaches of representations and warranties, and
  using statistical methodologies to estimate the incidence of those breaches across the
  population of mortgage loans in the Original Settling Trusts.  Duff & Phelps also used
  historical information and financial analysis to calculate the total present and
  projected future losses experienced by the Original Settling Trusts, including the
  forty-seven FGIC Insured Trusts.

- Evaluating the methodology in the RMBS Settlement Agreement regarding allocation
  to each of the Original Settling Trusts of the Allowed Claim which, in response to
  suggestions by Duff & Phelps, which, after lengthy discussions with the Steering
  Committee Consenting Claimants and the Debtors, was modified at Duff & Phelps'
  suggestion to provide for the Allowed Claim to be allocated pro rata based on
  differences among the Original Settling in the incidence of breaches of

---

[11]    "Deutsche Bank" means Deutsche Bank National Trust Company and Deutsche Bank Trust Company
Americas, each solely in its capacity as trustee, indenture trustee, securities administrator, co-
administrator, paying agent, grantor trustee, custodian and/or similar agency capacities in respect of
certain of the Settling Trusts.

representations and warranties, as revealed by additional loan sampling and statistical work to be performed by Duff & Phelps.

- Identifying RMBS trusts in addition to the Original Settling Trusts with RMBS Trust Claims (the "**Additional Settling Trusts**," together with the Original Settling Trusts, the "**Settling Trusts**"), and quantifying those claims so the Additional Settling Trusts could receive treatment that is consistent with the treatment being accorded to the like claims of the Original Settling Trusts.

- Analyzing potential liabilities arising from the Debtors' multiple roles as Servicer in the securitization process in order to assist the RMBS Trustees in quantifying potential Servicing Claims so that the Settling Trusts, including all forty-seven of the FGIC Insured Trusts, could receive an allowed claim on account of those claims.

**The Plan Mediation**

20.     The FGIC Settlement Agreement was agreed to as part of an extensive mediation with numerous interested parties in these Chapter 11 Cases in an effort to reach a consensual Chapter 11 Plan (the "**Plan Mediation**").  The Plan Mediation occurred over the course of some five months beginning in December 2012 and was overseen by a sitting Bankruptcy Judge, the Honorable James M. Peck.

21.     The communications and analyses relating to negotiations conducted during the Plan Mediation are confidential by law and pursuant to court order,[12] and therefore cannot be disclosed in detail.  In general, however, the integrated, global settlement associated with the Plan Support Agreement (including the FGIC Settlement Agreement) is now part of the ResCap Plan, and must be understood as the product of intense, arm's-length negotiations conducted among sophisticated parties with differing and conflicting interests, under the close supervision and guidance of a sitting bankruptcy judge.

---

[12]     *See* December 26, 2012 Order Appointing Mediator [ECF No.2519].

**Participation of the Institutional Investors**

22.     In evaluating the Settlement Proposal, the FGIC Trustees, including BNY Mellon, considered that the Institutional Investors (which included investors in the FGIC Insured Trusts) actively participated in the Plan Mediation and supported the Settlement Proposal, ultimately becoming signatories to the FGIC Settlement Agreement.  Because of the confidentiality provisions of the Mediation Order, the FGIC Trustees were unable to raise the Settlement Proposal with investors in the FGIC Insured Trusts who were not participants in the Plan Mediation.  That the Plan Mediation was occurring, however, was not confidential.

**Notice to Investors in the FGIC Insured Trusts of the FGIC Settlement Agreement**

23.     One of the reasons that the FGIC Settlement Agreement is now before this Court is that none of the FGIC Trustees would agree to the Settlement Proposal unless investors in the FGIC Insured Trusts were provided a full and fair opportunity to voice any objections they may have to such a settlement, including that the FGIC Settlement Agreement is not in the best interest of investors, and to be heard with respect to any such objections.  The FGIC Trustees insisted that the FGIC Settlement Agreement require that prompt notice be given with respect to the FGIC Settlement Agreement[13] and require approval of the FGIC Settlement Agreement by the Bankruptcy Court.[14]

---

[13]    Section 4.02 of the FGIC Settlement Agreement provides:

    Within seven (7) Business Days following execution by all Parties of this Agreement, the Debtors shall file the 9019 Motion with the Bankruptcy Court and otherwise use commercially reasonable efforts to promptly obtain the Bankruptcy Court Order.  Upon obtaining knowledge of the issuance of the Bankruptcy Court Order, the Debtors shall promptly notify the other Parties.

[14]    Section 6.01 of the FGIC Settlement Agreement provides that a condition precedent to the effectiveness of the FGIC Settlement Agreement is the signing of orders approving the Settlement Agreement by both the Bankruptcy Court and the Rehabilitation Court and that such orders shall become final.  The FGIC

24.     From BNY Mellon's perspective, it was essential for the FGIC Settlement Agreement to provide investors with notice and the opportunity to object.  Absent such provisions, BNY Mellon would not have agreed to the FGIC Settlement Agreement, and would not have determined that entering into the FGIC Settlement Agreement was in the best interests of the FGIC Insured Trusts and their investors.

**Other Factors Evidencing Reasonableness of BNY Mellon's Conduct**

25.     BNY Mellon also had the benefit of sitting on the Official Committee of Unsecured Creditors in the Chapter 11 Cases.  My role as BNY Mellon's representative on that committee gave me an additional perspective of the overall bankruptcy proceedings and allowed BNY Mellon to better evaluate the Settlement Proposal in the larger picture of the Chapter 11 Cases and understand the relative risks and benefits of proceeding under the FGIC Settlement Agreement or the Rehabilitation Plan.

26.     Finally, BNY Mellon and its counsel had the benefit of the views of the other two FGIC Trustees and their counsel in considering the Settlement Proposal.  Like BNY Mellon, U.S. Bank and Wells Fargo are two of the largest and most sophisticated financial institutions in the country and were represented by experienced counsel in this matter.  The three FGIC Trustees, although similarly situated and assisted by the same financial advisor, independently considered the Settlement Proposal.  BNY Mellon took into consideration in forming its views of

---

Settlement Agreement must also be approved by the Rehabilitation Court after notice.  Section 4.01 of the FGIC Settlement Agreement provides:

Within three (3) Business Days following execution by all Parties of this Agreement, the Rehabilitator, on behalf of FGIC, shall file the Affirmation with the Rehabilitation Court and otherwise use commercially reasonable efforts to obtain the Rehabilitation Court Order. The Rehabilitator shall endeavor to schedule the hearing on the Rehabilitation Court Order for a date that is no less than thirty-seven (37) days after the filing of the Affirmation. Upon obtaining knowledge of the issuance of the Rehabilitation Court Order, the Rehabilitator, on behalf of FGIC, shall promptly notify the other Parties.

the Settlement Proposal that U.S. Bank and Wells Fargo and their counsel were coming to
similar conclusions regarding the benefits of the FGIC Settlement Agreement as compared to the
Projected Payments to the FGIC Insured Trusts under the Rehabilitation Plan.

C.    *The FGIC Settlement Agreement is in the Best Interests of the FGIC Insured
Trusts and the Investors in Those Trusts*

**Consideration of the FGIC Settlement Agreement and the Duff Report**

27.    As mentioned above, in the context of the Plan Mediation, the FGIC Trustees
were asked to consider a Settlement Proposal that included, among other things, FGIC making
the Commutation Payment in lieu of the Projected Payments contemplated under the
Rehabilitation Plan.

28.    The FGIC Trustees requested that Duff & Phelps analyze and compare the
economic terms of the Commutation Payment against the Projected Payments under the
Rehabilitation Plan and provide a recommendation to the FGIC Trustees.  Duff & Phelps was not
asked to analyze how the amount of the Commutation Payment was determined, but rather how
the Commutation Payment and the broader Settlement Proposal compared to the Projected
Payments under the Rehabilitation Plan.

29.    In conducting its analysis, I understand that Duff & Phelps reviewed and analyzed
publicly available information and also signed a confidentiality agreement with FGIC pursuant to
which I understand that they had the opportunity to speak to FGIC's Chief Restructuring Officer
and Lazard Freres & Co. LLC ("**Lazard**"), the financial advisors to the FGIC Rehabilitator and
to receive additional information concerning the Rehabilitation Plan.  Duff & Phelps also
considered certain information provided by parties to the Plan Mediation.

13

30.     On or about May 8, 2013, I received from my counsel, which played an active role in considering the Settlement Proposal, draft discussion materials prepared by Duff & Phelps setting forth its analysis of the Settlement Proposal, a copy of which is attached hereto as **Exhibit 119**. I had several questions about that analysis, all of which were answered by Duff & Phelps.

31.     Subsequently, on or about May 13, 2013, Duff & Phelps made a presentation to the FGIC Trustees and their counsel concerning the Settlement Proposal.  The presentation took place in New York and lasted about an hour.  I participated telephonically and viewed a presentation via a "webex."  Accordingly, I was able to view the PowerPoint slides Duff & Phelps had prepared concerning its presentation while participating via a conference call. Although I was not physically present at the presentation, BNY Mellon's attorneys attended.

32.     During the presentation, representatives from Duff & Phelps walked the FGIC Trustees and their counsel through their analysis, using as a reference its PowerPoint slides. During the presentation, questions were posed to Duff & Phelps, all of which, to my recollection, were answered.

33.     At the time of presentation, I was able to follow and understand Duff & Phelps' analysis.  My primary focus was on the conclusion concerning how the Commutation Payment, together with the other value to the FGIC Insured Trusts under the Settlement Agreement, compared to the Projected Payments under the Rehabilitation Plan.

34.     On or about May 15, 2013, Duff & Phelps issued the final version of their report to the FGIC Trustees, a copy of which is attached hereto as **Exhibit 123** (the "**Duff Report**").

14

The Duff Report was substantially similar to the draft materials I had received on May 10 and the materials presented during the May 13 presentation.

35.    In the final Duff Report, Duff & Phelps reduced to writing their conclusion that the $253.3 million Commutation Payment is within the reasonable range of the present value of the Projected Payments under the Rehabilitation Plan.  That conclusion had been presented during the May 13 presentation.  It also identifies the value associated with not having to pay premiums on the FGIC Policies going forward, as well as the fact that the FGIC Settlement Agreement, as part of the global settlement embodied in the Plan Support Agreement, resolves various outstanding disputes in the Chapter 11 Cases, including various potential litigations and inter-creditor disputes in the Chapter 11 Cases.

36.    The Duff Report states that it is Duff & Phelps' recommendation that the Settlement Proposal, and specifically the Commutation Payment, is within the range of reasonableness of the estimated Projected Payments under the Rehabilitation Plan.

**The Merits of the FGIC Settlement Agreement on a Stand-Alone Basis**

37.    It was significant to me that the $253.3 million Commutation Payment was a fixed amount, while the estimated $150 million initial Projected Payment to the FGIC Insured Trusts was estimated and subject to change at the discretion of the Rehabilitator following the effective date of the Rehabilitation Plan.  In addition, while I understood there was the potential for future Projected Payments in excess of the Commutation Payment, there was no certainty of the amount of any future Projected Payments, or the timing of such payments.  In fact, I understand there is a risk that future Projected Payments may fall short of the amount of the Commutation Payment.  My concern over the uncertainty of payments from FGIC was informed

by, among other things, the fact that, (i) although the FGIC Insured Trusts continue to pay premiums under the FGIC Policies, they have received no payment on any claims made under the policies since late 2009 and (ii) FGIC was exposed to potentially large future claims relating to, among other things, municipal bonds that would have the effect of diluting the Projected Payments.  The Settlement Proposal eliminated the risk and uncertainty associated with the Projected Payments in exchange for a certain recovery.

38.      I also found significant that the Commutation Payment, by itself, was within the reasonable range of the estimated total Projected Payments under the Rehabilitation Plan ($190 million to $340 million).  The Duff Report, however, also makes clear that there was value to the FGIC Insured Trusts in the Settlement Proposal in addition to the Commutation Payment.  Specifically, as a result of the termination of the FGIC Policies under the FGIC Settlement Agreement, the FGIC Insured Trusts would be relieved from the payment of future premiums, estimated to be some $18 million in present value.  I also understood under the Settlement Proposal that FGIC would forego its right to receive certain reimbursement amounts from the FGIC Insured Trusts pursuant to the waterfall provisions under the relevant Governing Documents, which would provide additional, although at the time unquantified, future value to the FGIC Insured Trusts.

39.      Given Duff & Phelps' expertise and extensive experience in the Chapter 11 Cases, their access to FGIC and Lazard in connection with analyzing the Settlement Proposal and their May 13 presentation and the Duff Report, I had no reason to question the accuracy of Duff & Phelps' analysis, and nothing that has transpired since that time has changed my view in that regard.

**The Additional Value to the FGIC Insured Trusts Under the ResCap Plan**

40.    In addition to the stand-alone benefits, the FGIC Settlement Agreement is an integral component of the Plan Support Agreement (and now proposed ResCap Plan) which resolves the claims of substantially all of the major constituents in these Chapter 11 Cases and confers many benefits upon the Debtors' creditors, including the FGIC Insured Trusts.  If the ResCap Plan is confirmed, these benefits include, among other things, that the FGIC Insured Trusts will receive a significant distribution from the Debtors' bankruptcy estate, contemplated to be in excess of $90 million, on account of representation and warranty claims against the Debtors.  In the absence of the Plan Support Agreement and ResCap Plan (if approved), there is no assurance that these trusts would have received anything in respect of their claims against the Debtors.

41.    It is an express condition of the Plan Support Agreement that both the Bankruptcy Court and the Rehabilitation Court approve the FGIC Settlement Agreement.  Without the FGIC Settlement Agreement, the global settlement embodied in the Plan Support Agreement, including the favorable claim treatment of the FGIC Insured Trusts, would collapse.  The FGIC Insured Trusts would not receive the contemplated $90+ million distribution from the Debtors' bankruptcy estate if the FGIC Settlement Agreement was rejected in favor of proceeding under the Rehabilitation Plan.

42.    In the absence of the FGIC Settlement Agreement and the global settlement embodied in the Plan Support Agreement, the value of any future recovery, if any, by the FGIC Insured Trusts in the Chapter 11 Cases is highly uncertain.

17

- First, the proposed ResCap Plan secures the contribution by AFI to the Debtors' estates of $2.1 billion in value, which is a substantial portion of the assets that will be distributed to the creditors of the Debtors' estates (including the FGIC Insured Trusts).

- Second, at the time of the Plan Mediation, the Chapter 11 Cases were facing several potentially lengthy and expensive litigations that could have significantly diminished the recoveries of the Settling Trusts, including the FGIC Insured Trusts.

   - The proposed ResCap Plan fixes claims that the FGIC Trustees expect would otherwise be contested in time-consuming and uncertain proceedings. In the absence of the global settlement embodied in the Plan Support Agreement, the RMBS 9019 would likely require a lengthy and expensive hearing, the outcome of which is uncertain. If the Court declined to grant the RMBS 9019 Motion, the allowance of Repurchase Claims of the Original Settling Trusts (including thirty-seven FGIC Insured Trusts) would be left to the expensive and uncertain process of claims litigation. Allowance of the RMBS Trust Claims, as contemplated by the proposed ResCap Plan, offers the benefits of allowance consistent with the RMBS 9019 Motion without the risks attendant to that contested matter.

   - The proposed ResCap Plan also allows the Repurchase Claims of the Additional Settling Trusts, including ten FGIC Insured Trusts, without the expense, delay and uncertainty associated with analyzing, asserting and litigating those claims, which otherwise would occur absent a global settlement.

   - The proposed ResCap Plan allows the Servicing Claims of the Settling Trusts, including all of the FGIC Insured Trusts. The presentation of those claims otherwise would have required further discovery and analysis, likely leading to litigation over both the quantification of the claims and their relative priority.

- Third, many of the contentious and complicated inter-creditor issues in these cases are resolved by the proposed ResCap Plan, including disputes over the priority of claims asserted by FGIC and the other Monolines and by certain other securities claimants. In particular, both the amount of FGIC's claims and the relationship between those claims and the claims of the FGIC Insured Trusts are the subject of disputes, and the resolution of all those disputes through litigation presents both a general risk of delay and expense to all stakeholders as well as a specific risk to the FGIC Insured Trusts of dilution.

- Fourth, the ever mounting costs of administration of these Chapter 11 Cases threaten to erode any distribution to unsecured creditors (including the FGIC Insured Trusts). The proposed ResCap Plan effectively abates the continued accrual of such costs, thus increasing the amount of ultimate recoveries to all creditors, including the FGIC Insured Trusts.

43.    For the reasons described above, and based on the analysis provided by Duff &

Phelps, BNY Mellon concluded that the FGIC Settlement Agreement was reasonable and in the

best interests of the FGIC Insured Trusts and their investors and agreed to accept it on behalf of the FGIC Insured Trusts.

> **D.    *Notice to Investors in the BNY Mellon FGIC Insured Trusts of the FGIC Settlement Agreement was Sufficient***

44.    Notice of the FGIC Settlement Agreement, including notice of the FGIC Settlement Agreement by the FGIC Trustees, including BNY Mellon, is sufficient and effective to put the parties in interest in these Chapter 11 Cases, including the investors in the FGIC Insured Trusts, on notice of the FGIC Settlement Agreement.

45.    BNY Mellon has regularly provided to investors in the BNY Mellon RMBS Trusts, including the BNY Mellon FGIC Trusts, notice of matters related to significant events in the these Chapter 11 Cases.  Following the filing of the RMBS 9019 Motion, BNY Mellon, together with Deutsche Bank, US Bank and Wells Fargo, jointly retained an agent, The Garden City Group, Inc. ("**GCG**"), to coordinate and facilitate notice to investors regarding important events in the Chapter 11 Cases.

46.    On behalf of the RMBS Trustees, GCG provided certain administrative services in connection with noticing various investors, including the coordination and facilitation of the dissemination of notices to the various investors at the direction and on behalf of the RMBS Trustees, and in connection with the creation and maintenance of a website for investors that provides, among other things, contact information for the RMBS Trustees significant relevant developments in the Chapter 11 Cases, links to relevant documents filed in the Chapter 11 Cases, and upcoming Court deadlines and hearing dates (the "**RMBS Trustee Website**").

47.    GCG distributed to various investors and published on the RMBS Trustee Website various notices.  Among those notices was a notice dated May 24, 2013 entitled "Time

Sensitive Notice Regarding (a) Plan Support Agreement Among ResCap Debtors and the RMBS

Trustees, Among Others, and (b) Settlement Agreement Among the Debtors, Financial Guaranty

Insurance Company and Certain of the RMBS Trustees," a copy of which is attached hereto as

**Exhibit 128**. This notice, among other things, described the terms of the PSA and the Term

Sheets, as well as the RMBS Settlement and the FGIC Settlement Agreement and the process by

which Holders could object to them.

48.     In addition, on June 4, 2013, BNY Mellon distributed a "Time Sensitive Notice

Regarding Settlement Agreement Among the ResCap Debtors, Financial Guaranty Insurance

Company and the FGIC Trustees" (the "**Holder FGIC Settlement Notice**"), dated June 4, 2013,

a copy of which is attached hereto as **Exhibit 129**. The Holder FGIC Settlement Notice was

provided by BNY Mellon to the investors in the eight BNY Mellon FGIC Trusts. The Holder

FGIC Settlement Notice provided additional information to the investors in those trusts regarding

the Rehabilitation Proceeding, the FGIC Settlement Agreement, their rights thereunder, the

process for investors to object to the FGIC Settlement Agreement in the Rehabilitation

Proceeding and how to obtain information on the cash amount FGIC will pay to a particular

trust. The Holder FGIC Settlement Notice and certain pleadings in the FGIC Rehabilitation

Proceeding have also been posted on the RMBS Trustee Website.

49.     As part of the notice process, and in order to provide additional information to

investors in the FGIC Insured Trusts concerning the FGIC Settlement Agreement, the FGIC

Trustees agreed to make available to those investors information concerning the allocable share

of the Commutation Payment that each such FGIC Insured Trust would receive under the FGIC

Settlement Agreement.

50.    Finally, the schedules attached to the Disclosure Statement filed with ResCap
Plan provide information concerning the estimated recoveries of the FGIC Insured Trusts on
account of Repurchase Claims and Servicing Claims against the Debtors.

**E.    *Continued Assessment of the Reasonableness of the FGIC Settlement
Agreement***

51.    Shortly after the FGIC Settlement Agreement became public, certain investors
indicated their intent to object to the FGIC Settlement Agreement.  As a result, the FGIC
Trustees have continued to assess the reasonableness of the FGIC Settlement Agreement.  The
Objectors[15] have asserted that the FGIC Settlement Agreement is not in their best interest or in
the best interests of the FGIC Insured Trusts because, in their view, the FGIC Insured Trusts
would receive greater recoveries under the Rehabilitation Plan.

52.    The FGIC Trustees asked Duff & Phelps to evaluate and consider the assertions
of the Objectors.  Duff & Phelps has done so and its conclusions are presented in the Expert
Report of Allen M. Pfeiffer dated July 19, 2013 (the "**Pfeiffer Expert Report**").  Additionally,
the FGIC Trustees consulted S.P. Kothari, currently the Gordon Y. Billard Professor in
Management at the Sloan School of Management at the Massachusetts Institute of Technology
("**MIT**") as well as Deputy Dean of MIT's Sloan School of Management.  S.P. Kothari presented
an expert report, also dated July 19, 2013 (the "**Kothari Expert Report**").

53.    I have reviewed and considered both the Pfeiffer Expert Report and the Kothari
Expert Report and they confirm the conclusions set forth in the Duff Report.  As a result, I

---

[15]    The "Objectors" are CQS ABS Master Fund Limited, CQS ABS Alpha Master Fund Limited, Bayview
Fund Management LLC, Monarch Alternative Capital LP, Stonehill Capital Management LLC and
Federal Home Loan Mortgage Corporation in conservatorship.

continue to believe that the FGIC Settlement Agreement is reasonable and in the best interests of the FGIC Insured Trusts and their investors.

54.     In addition to consulting with experts, in continuing to assess whether the Settlement Agreement is in the best interests of the investors, I have considered how recent events might impact payments under the Rehabilitation Plan.  In particular, I have considered how the recent bankruptcy of the City of Detroit might impact the amount of future claims made against FGIC.  FGIC has insured a number of municipal bonds issued by the City of Detroit.[16] Future claims related to missed payments on those bonds will increase the number of claims against FGIC, which will likely dilute the expected recoveries under the Rehabilitation Plan.

[signature on following page]

---

[16]     *See* Financial Guaranty Insurance Company, Quarterly Operating Review First Quarter 2013 at 9 *available at http://www.fgic.com/investorrelations/financialreports/qor2013q1.pdf*, attached hereto as **Exhibit 170**.

Dated this 31st day of July, 2013

Robert H. Major