**Exhibit 116**

**EXECUTION COPY**

GMACM HOME EQUITY LOAN TRUST 2006-HE2,

Issuer,

and

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION,

Indenture Trustee

———————————————

INDENTURE

———————————————

Dated as of June 29, 2006

GMACM HOME EQUITY LOAN-BACKED TERM NOTES

US_WEST:260042806.5

## RECONCILIATION AND TIE BETWEEN TRUST INDENTURE ACT OF 1939 AND INDENTURE PROVISIONS[*]

| Trust Indenture Act Section | Indenture Section |
|---|---|
| 310(a)(1) | 6.11 |
| (a)(2) | 6.11 |
| (a)(3) | 6.10 |
| (a)(4) | Not Applicable |
| (a)(5) | 6.11 |
| (b) | 6.08, 6.11 |
| (c) | Not Applicable |
| 311(a) | 6.12 |
| (b) | 6.12 |
| (c) | Not Applicable |
| 312(a) | 7.01, 7.02(a) |
| (b) | 7.02(b) |
| (c) | 7.02(c) |
| 313(a) | 7.04 |
| (b) | 7.04 |
| (c) | 7.03(a)(iii), 7.04 |
| (d) | 7.04 |
| 314(a) | 3.10, 7.03(a) |
| (b) | 3.07 |
| (c)(1) | 8.05(c), 10.01(a) |
| (c)(2) | 8.05(c), 10.01(a) |
| (c)(3) | Not Applicable |
| (d)(1) | 8.05(c), 10.01(b) |
| (d)(2) | 8.05(c), 10.01(b) |
| (d)(3) | 8.05(c), 10.01(b) |
| (e) | 10.01(a) |
| 315(a) | 6.01(b) |
| (b) | 6.05 |
| (c) | 6.01(a) |
| (d) | 6.01(c) |
| (d)(1) | 6.01(c) |
| (d)(2) | 6.01(c) |
| (d)(3) | 6.01(c) |
| (e) | 5.13 |
| 316(a)(1)(A) | 5.11 |
| 316(a)(1)(B) | 5.12 |
| 316(a)(2) | Not Applicable |
| 316(b) | 5.07 |
| 317(a)(1) | 5.04 |
| 317(a)(2) | 5.03(d) |
| 317(b) | 3.03(a) |
| 318(a) | 10.07 |

---

[*]This reconciliation and tie shall not, for any purpose, be deemed to be part of the within indenture.

US_WEST:260042806.5

CONFIDENTIAL

This Indenture, dated as of June 29, 2006, is between GMACM Home Equity Loan Trust 2006-HE2, a Delaware statutory trust, as issuer (the "Issuer"), and JPMorgan Chase Bank, National Association, as indenture trustee (the "Indenture Trustee").

## WITNESSETH:

Each party hereto agrees as follows for the benefit of the other party and for the equal and ratable benefit of the Noteholders and the Enhancer of the Issuer's Series 2006-HE2 GMACM Home Equity Loan-Backed Term Notes (the "Notes").

## GRANTING CLAUSE:

The Issuer hereby Grants to the Indenture Trustee on the Closing Date, as trustee for the benefit of the Noteholders and the Enhancer, all of the Issuer's right, title and interest in and to all accounts, chattel paper, general intangibles, contract rights, payment intangibles, certificates of deposit, deposit accounts, instruments, documents, letters of credit, money, advices of credit, investment property, goods and other property consisting of, arising under or related to whether now existing or hereafter created in any of the following: (a) the Initial Mortgage Loans and any Subsequent Mortgage Loans, and all monies due or to become due thereunder; (b) the Custodial Account, Note Payment Account, Pre-Funding Account and Capitalized Interest Account, and all funds on deposit or credited thereto from time to time; (c) all hazard insurance policies; and (d) all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing and all payments on or under, and all proceeds of every kind and nature whatsoever in respect of, any or all of the foregoing and all payments on or under, and all proceeds of every kind and nature whatsoever in the conversion thereof, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, checks, deposit accounts, rights to payment of any and every kind, and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing (collectively, the "Trust Estate" or the "Collateral").

The foregoing Grant is made in trust to secure the payment of principal of and interest on, and any other amounts owing in respect of, the Notes, equally and ratably without prejudice, priority or distinction, and to secure compliance with the provisions of this Indenture, all as provided in this Indenture.

The foregoing Grant shall inure to the benefit of the Enhancer in respect of draws made on the Policy and amounts owing from time to time pursuant to the Insurance Agreement (regardless of whether such amounts relate to the Notes or the Certificates), and such Grant shall continue in full force and effect for the benefit of the Enhancer until all such amounts owing to it have been repaid in full.

The Indenture Trustee, as trustee on behalf of the Noteholders, acknowledges such Grant, accepts the trust under this Indenture in accordance with the provisions hereof and agrees to perform its duties as Indenture Trustee as required herein.

US_WEST:260042806.5

1

ARTICLE I

Definitions

Section 1.01    <u>Definitions</u>.    For all purposes of this Indenture, except as otherwise expressly provided herein or unless the context otherwise requires, capitalized terms not otherwise defined herein shall have the meanings assigned to such terms in the Definitions attached hereto as Appendix A, which is incorporated by reference herein.  All other capitalized terms used herein shall have the meanings specified herein.

Section 1.02    <u>Incorporation by Reference of Trust Indenture Act</u>.    Whenever this Indenture refers to a provision of the Trust Indenture Act (the "TIA"), such provision is incorporated by reference in and made a part of this Indenture.  The following TIA terms used in this Indenture have the following meanings:

"Commission" means the Securities and Exchange Commission.

"indenture securities" means the Notes.

"indenture security holder" means a Noteholder.

"indenture to be qualified" means this Indenture.

"indenture trustee" or "institutional trustee" means the Indenture Trustee.

"obligor" on the indenture securities means the Issuer and any other obligor on the indenture securities.

All other TIA terms used in this Indenture that are defined by TIA, defined by TIA reference to another statute or defined by Commission rule have the meaning assigned to them by such definitions.

Section 1.03    <u>Rules of Construction</u>. Unless the context otherwise requires:

(a) a term has the meaning assigned to it;

(b) an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect from time to time;

(c) "or" includes "and/or";

(d) "including" means "including without limitation";

(e) words in the singular include the plural and words in the plural include the singular;

(f) the term "proceeds" has the meaning ascribed thereto in the UCC; and

CONFIDENTIAL                                                    RC_FGIC9019_00002756

(g) any agreement, instrument or statute defined or referred to herein or in any instrument or certificate delivered in connection herewith means such agreement, instrument or statute as from time to time amended, modified or supplemented and includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein; references to a Person are also to its permitted successors and assigns.

## ARTICLE II

### Original Issuance of Notes

Section 2.01    Form.    The Notes, together with the Indenture Trustee's certificate of authentication, shall be in substantially the form set forth in Exhibit A, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may, consistently herewith, be determined by the officers executing the Notes, as evidenced by their execution thereof. Any portion of the text of any Note may be set forth on the reverse thereof, with an appropriate reference thereto on the face of such Note.

The Notes shall be typewritten, printed, lithographed or engraved or produced by any combination of these methods, all as determined by the Authorized Officers executing such Notes, as evidenced by their execution of such Notes.

The terms of the Notes set forth in Exhibit A are part of the terms of this Indenture.

Section 2.02    Execution, Authentication and Delivery.    The Notes shall be executed on behalf of the Issuer by any of its Authorized Officers. The signature of any such Authorized Officer on the Notes may be manual or facsimile.

Notes bearing the manual or facsimile signature of individuals who were at any time Authorized Officers of the Issuer shall bind the Issuer, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such offices at the date of such Notes.

The Indenture Trustee shall upon Issuer Request authenticate and deliver Notes for original issue in an amount equal to the Initial Aggregate Note Balance. The Class A-1, Class A-2, Class A-3 and Class A-4 Notes shall have initial principal or notional amounts of the Initial Class A-1 Note Balance, Initial Class A-2 Note Balance, Initial Class A-3 Note Balance and Initial Class A-4 Note Balance, respectively.

Each Note shall be dated the date of its authentication. The Notes shall be issuable as registered Book-Entry Notes, and the Notes shall be issuable in minimum denominations of $25,000 and integral multiples of $1,000 in excess thereof.

No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a certificate of authentication substantially in the form provided for herein executed by the Indenture Trustee by the manual signature of one of its

CONFIDENTIAL                                                            RC_FGIC9019_00002757

authorized signatories, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

## ARTICLE III

### Covenants

Section 3.01    Collection of Payments with Respect to the Mortgage Loans.    The Indenture Trustee shall establish and maintain with itself the Note Payment Account in which the Indenture Trustee shall, subject to the terms of this paragraph, deposit, on the same day as it is received from the Servicer, each remittance received by the Indenture Trustee with respect to the Mortgage Loans.  The Indenture Trustee shall make all payments of principal of and interest on the Notes, subject to Section 3.03 as provided in Section 3.05 herein from monies on deposit in the Note Payment Account.

Section 3.02    Maintenance of Office or Agency.    The Issuer will maintain in the City of New York, New York, an office or agency where, subject to satisfaction of conditions set forth herein, Notes may be surrendered for registration of transfer or exchange, and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served.  The Issuer hereby initially appoints the Indenture Trustee to serve as its agent for the foregoing purposes.  If at any time the Issuer shall fail to maintain any such office or agency or shall fail to furnish the Indenture Trustee with the address thereof, such surrenders, notices and demands may be made or served at the Corporate Trust Office, and the Issuer hereby appoints the Indenture Trustee as its agent to receive all such surrenders, notices and demands.

Section 3.03    Money for Payments to Be Held in Trust; Paying Agent.    As provided in Section 3.01, all payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from the Note Payment Account pursuant to Section 3.01 shall be made on behalf of the Issuer by the Indenture Trustee or by the Paying Agent, and no amounts so withdrawn from the Note Payment Account for payments of Notes shall be paid over to the Issuer except as provided in this Section 3.03.  The Issuer hereby appoints the Indenture Trustee to act as initial Paying Agent hereunder.  The Issuer will cause each Paying Agent other than the Indenture Trustee to execute and deliver to the Indenture Trustee an instrument in which such Paying Agent shall agree with the Indenture Trustee (and if the Indenture Trustee acts as Paying Agent, it hereby so agrees), subject to the provisions of this Section 3.03, that such Paying Agent will:

(a)    hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

(b)    give the Indenture Trustee and the Enhancer written notice of any default by the Issuer of which it has actual knowledge in the making of any payment required to be made with respect to the Notes;

CONFIDENTIAL                                                                            RC_FGIC9019_00002758

(c)    at any time during the continuance of any such default, upon the written request of the Indenture Trustee, forthwith pay to the Indenture Trustee all sums so held in trust by such Paying Agent;

(d)    immediately resign as Paying Agent and forthwith pay to the Indenture Trustee all sums held by it in trust for the payment of Notes, if at any time it ceases to meet the standards required to be met by a Paying Agent at the time of its appointment;

(e)    comply with all requirements of the Code with respect to the withholding from any payments made by it on any Notes of any applicable withholding taxes imposed thereon and with respect to any applicable reporting requirements in connection therewith; and

(f)    deliver to the Indenture Trustee a copy of the statement to Noteholders prepared with respect to each Payment Date by the Servicer pursuant to Section 4.01 of the Servicing Agreement.

The Issuer may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, by Issuer Request direct any Paying Agent to pay to the Indenture Trustee all sums held in trust by such Paying Agent, such sums to be held by the Indenture Trustee upon the same trusts as those upon which the sums were held by such Paying Agent; and upon such payment by any Paying Agent to the Indenture Trustee, such Paying Agent shall be released from all further liability with respect to such money.

Subject to applicable laws with respect to escheat of funds, any money held by the Indenture Trustee or any Paying Agent in trust for the payment of any amount due with respect to any Note and remaining unclaimed for one year after such amount has become due and payable shall be discharged from such trust and be paid to the Issuer on Issuer Request; and the Noteholder of such Note shall thereafter, as an unsecured general creditor, look only to the Issuer for payment thereof (but only to the extent of the amounts so paid to the Issuer), and all liability of the Indenture Trustee or such Paying Agent with respect to such trust money shall thereupon cease; provided, however, that the Indenture Trustee or such Paying Agent, before being required to make any such repayment, shall at the expense and direction of the Issuer cause to be published once, in an Authorized Newspaper, notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such publication, any unclaimed balance of such money then remaining will be repaid to the Issuer. The Indenture Trustee may also adopt and employ, at the expense and direction of the Issuer, any other reasonable means of notification of such repayment (including, but not limited to, mailing notice of such repayment to the Enhancer and Noteholders of the Notes which have been called but have not been surrendered for redemption or whose right to or interest in monies due and payable but not claimed is determinable from the records of the Indenture Trustee or of any Paying Agent, at the last address of record for each such Noteholder).

Section 3.04  Existence.  The Issuer will keep in full effect its existence, rights and franchises as a statutory trust under the laws of the State of Delaware (unless it becomes, or any successor Issuer hereunder is or becomes, organized under the laws of any other state or of the United States of America, in which case the Issuer will keep in full effect its existence, rights and

CONFIDENTIAL                                                    RC_FGIC9019_00002759

franchises under the laws of such other jurisdiction) and will obtain and preserve its qualification to do business in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Indenture, the Notes, the Mortgage Loans and each other instrument or agreement included in the Trust Estate.

Section 3.05    Priority of Distributions; Defaulted Interest.

(a) In accordance with Section 3.03(a) of the Servicing Agreement, the priority of distributions on each Payment Date from Principal Collections and Interest Collections with respect to the Mortgage Loans, any optional advance of delinquent principal or interest on the Mortgage Loans made by the Servicer in respect of the related Collection Period, any Policy Draw Amount deposited into the Note Payment Account (to be applied solely with respect to the payment of amounts described in clauses (i) and (vi) under this Section 3.05(a)), and any amounts transferred to the Note Payment Account from the Pre-Funding Account and Capitalized Interest Account pursuant to Sections 3.18 and 3.19 of the Servicing Agreement, is as follows:

(i) from Interest Collections, to the Enhancer, the amount of the premium for the Policy and any unpaid premium for the Policy from prior Payment Dates, with interest thereon as provided in the Insurance Agreement;

(ii) from Interest Collections, any Capitalized Interest Requirement pursuant to Section 3.19(b) of the Servicing Agreement and any Policy Draw Amount with respect to the Notes deposited into the Note Payment Account on such Payment Date pursuant to Section 3.28(a)(ii), to the Note Payment Account, for payment by the Paying Agent to the Noteholders, interest for the related Interest Period at the related Note Rate on the related Note Balance immediately prior to such Payment Date, excluding any Relief Act Shortfalls allocated thereto pursuant to Section 3.05(f), plus any such amount remaining unpaid from prior Payment Dates;

(iii) from Principal Collections, for payment by the Paying Agent to the Noteholders, as a distribution of principal on the Notes, the Principal Distribution Amount for such Payment Date to be allocated to each Class of Notes as described in Section 3.05(b) below, until the Note Balances thereof have been reduced to zero;

(iv) from Excess Spread, for payment by the Paying Agent to each Class of Notes, as a distribution of principal on the Notes, in the priority set forth in section 3.05(b), an amount equal to the Liquidation Loss Distribution Amount (excluding Liquidation Loss Amounts that have been allocated to the reduction of the Note Balance of the Notes pursuant to Section 3.05(c) hereof) until the Note Balance of each Class of Notes has been reduced to zero;

(v) to the Enhancer, to reimburse it for prior draws made on the Policy, with interest thereon as provided in the Insurance Agreement;

(vi) from Excess Spread, or payment by the Paying Agent to the Noteholders of the Class of Notes in the priority set forth in Section 3.05(b), the

CONFIDENTIAL                                                                      RC_FGIC9019_00002760

Overcollateralization Increase Amount, if any, until the Note Balance of each Class of Notes has been reduced to zero;

(vii)    to the Enhancer, any amounts owed to the Enhancer pursuant to the Insurance Agreement other than amounts specified in clauses (i) or (vi) above;

(viii)    to the Indenture Trustee, any amounts owing to the Indenture Trustee pursuant to Section 6.07 to the extent remaining unpaid; and

(ix)    any remaining amount, to the Distribution Account, for distribution to the holders of the Certificates by the Certificate Paying Agent in accordance with the Trust Agreement;

provided, that on the Final Payment Date, the amount that is required to be paid pursuant to clause (iii) above shall be equal to the Note Balance immediately prior to such Payment Date.

Amounts distributed to the Noteholders pursuant to the above clauses (ii), (iii), (iv) and (vi) from Interest Collections, Principal Collections and the Policy Draw Amount shall be treated for tax purposes as distributions with respect to the REMIC II Regular Interests A-1, A-2, A-3 and A-4, respectively. Amounts distributed pursuant to clause (ix) shall be treated as having been distributed to the REMIC II Regular Interest SB-IO.

On each Payment Date, the Paying Agent shall apply, from amounts on deposit in the Note Payment Account, and in accordance with the Servicing Certificate, the amounts set forth above in the order of priority set forth in Section 3.05(a).

Amounts paid to Noteholders shall be paid in respect of the Notes in accordance with the applicable percentage as set forth in Section 3.05(e). Interest on the Notes will be computed on the basis of a 360-day year consisting of twelve 30-day months. Any installment of interest or principal payable on any Note that is punctually paid or duly provided for by the Issuer on the applicable Payment Date shall be paid to the Noteholder of record thereof on the immediately preceding Record Date by wire transfer to an account specified in writing by such Noteholder reasonably satisfactory to the Indenture Trustee, or by check or money order mailed to such Noteholder at such Noteholder's address appearing in the Note Register, the amount required to be distributed to such Noteholder on such Payment Date pursuant to such Noteholder's Notes; provided, that the Indenture Trustee shall not pay to any such Noteholder any amounts required to be withheld from a payment to such Noteholder by the Code.

(b) The Principal Distribution Amount distributable pursuant to Section 3.05(a)(iii), Liquidation Loss Distribution Amounts distributable to the holders of the Notes pursuant to Section 3.05(a)(iv) and Overcollateralization Increase Amounts distributable to the holders of the Notes pursuant to Section 3.05(a)(vi) will be to the Class A-1, Class A-2, Class A-3 and Class A-4 Notes, in that order, in each case until the Note Balance thereof has been reduced to zero;

(c) Principal of each Note shall be due and payable in full on the Final Payment Date as provided in the applicable form of Note set forth in Exhibits A. All principal payments

CONFIDENTIAL                                                            RC_FGIC9019_00002761

on the Notes shall be made in accordance with the priorities set forth in Sections 3.05(a) and 3.05(b) to the Noteholders entitled thereto in accordance with the related Percentage Interests represented thereby.  Upon written notice to the Indenture Trustee by the Issuer, the Indenture Trustee shall notify the Person in the name of which a Note is registered at the close of business on the Record Date preceding the Final Payment Date or other final Payment Date, as applicable. Such notice shall be mailed no later than five Business Days prior to the Final Payment Date or such other final Payment Date and, unless such Note is then a Book-Entry Note, shall specify that payment of the principal amount and any interest due with respect to such Note at the Final Payment Date or such other final Payment Date will be payable only upon presentation and surrender of such Note, and shall specify the place where such Note may be presented and surrendered for such final payment.

On each Payment Date, the Overcollateralization Amount available to cover any Liquidation Loss Amounts on such Payment Date shall be deemed to be reduced by an amount equal to such Liquidation Loss Amounts (except to the extent that such Liquidation Loss Amounts were covered on such Payment Date by a payment in respect of Liquidation Loss Amounts).

(d) With respect to any Payment Date, interest payments on the Notes will be reduced by any Relief Act Shortfalls for the related Collection Period on a pro rata basis in accordance with the amount of interest payable on the Notes on such Payment Date, absent such reduction.

CONFIDENTIAL                                                                 RC_FGIC9019_00002762

Section 3.06    Protection of Trust Estate.

(a)    The Issuer shall from time to time execute and deliver all such supplements and amendments hereto and all such financing statements, continuation statements, instruments of further assurance and other instruments, and will take such other action necessary or advisable to:

(i)    maintain or preserve the lien and security interest (and the priority thereof) of this Indenture or carry out more effectively the purposes hereof;

(ii)    perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture;

(iii)    cause the Trust to enforce any of the Mortgage Loans; or

(iv)    preserve and defend title to the Trust Estate and the rights of the Indenture Trustee and the Noteholders in such Trust Estate against the claims of all persons and parties.

(b)    Except as otherwise provided in this Indenture, the Indenture Trustee shall not remove any portion of the Trust Estate that consists of money or is evidenced by an instrument, certificate or other writing from the jurisdiction in which it was held at the date of the most recent Opinion of Counsel delivered pursuant to Section 3.07 (or from the jurisdiction in which it was held as described in the Opinion of Counsel delivered at the Closing Date pursuant to Section 3.07, if no Opinion of Counsel has yet been delivered pursuant to Section 3.07) unless the Indenture Trustee shall have first received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property will continue to be maintained after giving effect to such action or actions.

The Issuer hereby designates the Indenture Trustee its agent and attorney-in-fact to execute any financing statement, continuation statement or other instrument required to be executed pursuant to this Section 3.06.

Section 3.07    Opinions as to Trust Estate.

On the Closing Date, the Issuer shall furnish to the Indenture Trustee and the Owner Trustee an Opinion of Counsel at the expense of the Issuer stating that, upon delivery of the Mortgage Notes relating to the Initial Mortgage Loans to the Indenture Trustee or the Custodian in the State of Pennsylvania, the Indenture Trustee will have a perfected, first priority security interest in such Mortgage Loans.

On or before December 31st in each calendar year, beginning in 2006, the Issuer shall furnish to the Indenture Trustee an Opinion of Counsel at the expense of the Issuer either stating that, in the opinion of such counsel, no further action is necessary to maintain a perfected, first priority security interest in the Mortgage Loans until December 31 in the following calendar year or, if any such action is required to maintain such security interest in the Mortgage Loans, such Opinion of Counsel shall also describe the recording, filing, re-recording and refiling of this

CONFIDENTIAL                                                                                  RC_FGIC9019_00002763

Indenture, any indentures supplemental hereto and any other requisite documents and the execution and filing of any financing statements and continuation statements that will, in the opinion of such counsel, be required to maintain the security interest in the Mortgage Loans until December 31 in the following calendar year.

Section 3.08    Performance of Obligations; Servicing Agreement.

(a)    The Issuer shall punctually perform and observe all of its obligations and agreements contained in this Indenture, the Basic Documents and in the instruments and agreements included in the Trust Estate.

(b)    The Issuer may contract with other Persons to assist it in performing its duties under this Indenture, and any performance of such duties by a Person identified to the Indenture Trustee in an Officer's Certificate of the Issuer shall be deemed to be action taken by the Issuer.

(c)    The Issuer shall not take any action or permit any action to be taken by others that would release any Person from any of such Person's covenants or obligations under any of the documents relating to the Mortgage Loans or under any instrument included in the Trust Estate, or that would result in the amendment, hypothecation, subordination, termination or discharge of, or impair the validity or effectiveness of, any of the documents relating to the Mortgage Loans or any such instrument, except such actions as the Servicer is expressly permitted to take in the Servicing Agreement.

(d)    The Issuer may retain an administrator and may enter into contracts with other Persons for the performance of the Issuer's obligations hereunder, and performance of such obligations by such Persons shall be deemed to be performance of such obligations by the Issuer.

Section 3.09    Negative Covenants.    So long as any Notes are Outstanding, the Issuer shall not:

(a)    except as expressly permitted by this Indenture, sell, transfer, exchange or otherwise dispose of the Trust Estate, unless directed to do so in writing by the Indenture Trustee pursuant to Section 5.04 hereof;

(b)    claim any credit on, or make any deduction from the principal or interest payable in respect of, the Notes (other than amounts properly withheld from such payments under the Code) or assert any claim against any present or former Noteholder by reason of the payment of the taxes levied or assessed upon any part of the Trust Estate;

(c)    (i) permit the validity or effectiveness of this Indenture to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to the Notes under this Indenture except as may be expressly permitted hereby, (ii) permit any lien, charge, excise, claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Trust Estate or

CONFIDENTIAL                                                    RC_FGIC9019_00002764

any part thereof or any interest therein or the proceeds thereof or (iii) permit the lien of this Indenture not to constitute a valid first priority security interest in the Trust Estate; or

(d)    impair or cause to be impaired the Issuer's interest in the Mortgage Loans, the Purchase Agreement or in any other Basic Document, if any such action would materially and adversely affect the interests of the Noteholders or the Enhancer.

Section 3.10    Annual Statement as to Compliance.    The Issuer shall deliver to the Indenture Trustee, within 120 days after the end of each fiscal year of the Issuer (commencing with the fiscal year ending on December 31, 2006), an Officer's Certificate stating, as to the Authorized Officer signing such Officer's Certificate, that:

(a)    a review of the activities of the Issuer during such year and of its performance under this Indenture and the Trust Agreement has been made under such Authorized Officer's supervision; and

(b)    to the best of such Authorized Officer's knowledge, based on such review, the Issuer has complied with all conditions and covenants under this Indenture and the provisions of the Trust Agreement throughout such year, or, if there has been a default in its compliance with any such condition or covenant, specifying each such default known to such Authorized Officer and the nature and status thereof.

Section 3.11    Recordation of Assignments.    The Issuer shall enforce the obligation, if any, of the Sellers under the Purchase Agreement to submit or cause to be submitted for recordation all Assignments of Mortgages within 60 days of receipt of recording information by the Servicer.

Section 3.12    Representations and Warranties Concerning the Mortgage Loans.    The Indenture Trustee, as pledgee of the Mortgage Loans, shall have the benefit of (i) the representations and warranties made by GMACM in Section 3.1(a) and Section 3.1(b) of the Purchase Agreement, (ii) the benefit of the representations and warranties made by WG Trust 2003 in Section 3.1(d) of the Purchase Agreement and (iii) the benefit of the representations and warranties made by GMACM or WG Trust 2003, as applicable, in Section 2 of any Subsequent Transfer Agreement, in each case, concerning the Mortgage Loans and the right to enforce the remedies against GMACM or WG Trust 2003 provided in Section 3.1(e) of the Purchase Agreement, as applicable, to the same extent as though such representations and warranties were made directly to the Indenture Trustee.

Section 3.13    Assignee of Record of the Mortgage Loans.    As pledgee of the Mortgage Loans, the Indenture Trustee shall hold title to the Mortgage Loans by being named as payee in the endorsements or assignments of the Mortgage Notes and assignee in the Assignments of Mortgage to be delivered under Section 2.1 of the Purchase Agreement.    Except as expressly provided in the Purchase Agreement or in the Servicing Agreement with respect to any specific Mortgage Loan, the Indenture Trustee shall not execute any endorsement or assignment or otherwise release or transfer such title to any of the Mortgage Loans until such time as the remaining Trust Estate may be released pursuant to Section 8.05(b).    The Indenture Trustee's

CONFIDENTIAL                                                      RC_FGIC9019_00002765

holding of such title shall in all respects be subject to its fiduciary obligations to the Noteholders hereunder.

Section 3.14    <u>Servicer as Agent and Bailee of the Indenture Trustee</u>.    Solely for purposes of perfection under Section 9-313 or 9-314 of the UCC or other similar applicable law, rule or regulation of the state in which such property is held by the Servicer, the Issuer and the Indenture Trustee hereby acknowledge that the Servicer is acting as agent and bailee of the Indenture Trustee in holding amounts on deposit in the Custodial Account pursuant to Section 3.02 of the Servicing Agreement that are allocable to the Mortgage Loans, as well as the agent and bailee of the Indenture Trustee in holding any Related Documents released to the Servicer pursuant to Section 3.06(c) of the Servicing Agreement, and any other items constituting a part of the Trust Estate which from time to time come into the possession of the Servicer.    It is intended that, by the Servicer's acceptance of such agency pursuant to Section 3.02 of the Servicing Agreement, the Indenture Trustee, as a pledgee of the Mortgage Loans, will be deemed to have possession of such Related Documents, such monies and such other items for purposes of Section 9-313 or 9-314 of the UCC of the state in which such property is held by the Servicer.

Section 3.15    <u>Investment Company Act</u>.    The Issuer shall not become an "investment company" or under the "control" of an "investment company" as such terms are defined in the Investment Company Act of 1940, as amended (or any successor or amendatory statute), and the rules and regulations thereunder (taking into account not only the general definition of the term "investment company" but also any available exceptions to such general definition); provided, however, that the Issuer shall be in compliance with this Section 3.15 if it shall have obtained an order exempting it from regulation as an "investment company" so long as it is in compliance with the conditions imposed in such order.

Section 3.16    <u>Issuer May Consolidate, etc.</u>

(a)    The Issuer shall not consolidate or merge with or into any other Person, unless:

(i)    the Person (if other than the Issuer) formed by or surviving such consolidation or merger shall be a Person organized and existing under the laws of the United States of America or any state or the District of Columbia and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Indenture Trustee, in form reasonably satisfactory to the Indenture Trustee, the due and punctual payment of the principal of and interest on all Notes and to the Certificate Paying Agent, on behalf of the Certificateholders and the performance or observance of every agreement and covenant of this Indenture on the part of the Issuer to be performed or observed, all as provided herein;

(ii)    immediately after giving effect to such transaction, no Event of Default shall have occurred and be continuing;

CONFIDENTIAL                                                        RC_FGIC9019_00002766

(iii)    the Enhancer shall have consented thereto and each Rating Agency shall have notified the Issuer that such transaction will not cause a Rating Event, without taking into account the Policy;

(iv)    the Issuer shall have received an Opinion of Counsel (and shall have delivered copies thereof to the Indenture Trustee and the Enhancer) to the effect that such transaction will not have any material adverse tax consequence to the Issuer, any Noteholder or any Certificateholder;

(v)    any action that is necessary to maintain the lien and security interest created by this Indenture shall have been taken; and

(vi)    the Issuer shall have delivered to the Indenture Trustee an Officer's Certificate and an Opinion of Counsel each stating that such consolidation or merger and such supplemental indenture comply with this Article III and that all conditions precedent herein provided for relating to such transaction have been complied with (including any filing required by the Exchange Act).

(b)    The Issuer shall not convey or transfer any of its properties or assets, including those included in the Trust Estate, to any Person, unless:

(i)    the Person that acquires by conveyance or transfer the properties and assets of the Issuer the conveyance or transfer of which is hereby restricted shall (A) be a United States citizen or a Person organized and existing under the laws of the United States of America or any state, (B) expressly assumes, by an indenture supplemental hereto, executed and delivered to the Indenture Trustee, in form satisfactory to the Indenture Trustee, the due and punctual payment of the principal of and interest on all Notes and the performance or observance of every agreement and covenant of this Indenture on the part of the Issuer to be performed or observed, all as provided herein, (C) expressly agrees by means of such supplemental indenture that all right, title and interest so conveyed or transferred shall be subject and subordinate to the rights of Noteholders of the Notes, (D) unless otherwise provided in such supplemental indenture, expressly agrees to indemnify, defend and hold harmless the Issuer against and from any loss, liability or expense arising under or related to this Indenture and the Notes and (E) expressly agrees by means of such supplemental indenture that such Person (or if a group of Persons, then one specified Person) shall make all filings with the Commission (and any other appropriate Person) required by the Exchange Act in connection with the Notes;

(ii)    immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing;

(iii)    the Enhancer shall have consented thereto, and each Rating Agency shall have notified the Issuer that such transaction will not cause a Rating Event, if determined without regard to the Policy;

CONFIDENTIAL                                                RC_FGIC9019_00002767

(iv)    the Issuer shall have received an Opinion of Counsel (and shall have delivered copies thereof to the Indenture Trustee) to the effect that such transaction will not have any material adverse tax consequence to the Issuer or any Noteholder;

(v)    any action that is necessary to maintain the lien and security interest created by this Indenture shall have been taken; and

(vi)    the Issuer shall have delivered to the Indenture Trustee an Officer's Certificate and an Opinion of Counsel each stating that such conveyance or transfer and such supplemental indenture comply with this Article III and that all conditions precedent herein provided for relating to such transaction have been complied with (including any filing required by the Exchange Act).

Section 3.17    Successor or Transferee.

(a) Upon any consolidation or merger of the Issuer in accordance with Section 3.16(a), the Person formed by or surviving such consolidation or merger (if other than the Issuer) shall succeed to, and be substituted for, and may exercise every right and power of, the Issuer under this Indenture with the same effect as if such Person had been named as the Issuer herein.

(b) Upon a conveyance or transfer of all the assets and properties of the Issuer pursuant to Section 3.16(b), the Issuer shall be released from every covenant and agreement of this Indenture to be observed or performed on the part of the Issuer with respect to the Notes immediately upon the delivery of written notice to the Indenture Trustee of such conveyance or transfer.

Section 3.18    No Other Business.  The Issuer shall not engage in any business other than financing, purchasing, owning and selling and managing the Mortgage Loans and the issuance of the Notes and Certificates in the manner contemplated by this Indenture and the Basic Documents and all activities incidental thereto.

Section 3.19    No Borrowing.  The Issuer shall not issue, incur, assume, guarantee or otherwise become liable, directly or indirectly, for any indebtedness except for the Notes.

Section 3.20    Guarantees, Loans, Advances and Other Liabilities.  Except as contemplated by this Indenture or the other Basic Documents, the Issuer shall not make any loan or advance or credit to, or guarantee (directly or indirectly or by an instrument having the effect of assuring another's payment or performance on any obligation or capability of so doing or otherwise), endorse or otherwise become contingently liable, directly or indirectly, in connection with the obligations, stocks or dividends of, or own, purchase, repurchase or acquire (or agree contingently to do so) any stock, obligations, assets or securities of, or any other interest in, or make any capital contribution to, any other Person.

Section 3.21    Capital Expenditures.  The Issuer shall not make any expenditure (by long-term or operating lease or otherwise) for capital assets (either realty or personalty).

CONFIDENTIAL                                                    RC_FGIC9019_00002768

Section 3.22   <u>Owner Trustee Not Liable for Certificates or Related Documents</u>.   The recitals contained herein shall be taken as the statements of the Issuer, and the Owner Trustee and the Indenture Trustee assume no responsibility for the correctness of the recitals contained herein.  The Owner Trustee and the Indenture Trustee make no representations as to the validity or sufficiency of this Indenture or any other Basic Document, of the Certificates (other than the signatures of the Owner Trustee or the Indenture Trustee on the Certificates) or the Notes, or of any Related Documents.  The Owner Trustee and the Indenture Trustee shall at no time have any responsibility or liability with respect to the sufficiency of the Trust Estate or its ability to generate the payments to be distributed to Certificateholders under the Trust Agreement or the Noteholders under this Indenture, including, the compliance by the Depositor or the Sellers with any warranty or representation made under any Basic Document or in any related document or the accuracy of any such warranty or representation, or any action of the Certificate Paying Agent, the Certificate Registrar or any other person taken in the name of the Owner Trustee or the Indenture Trustee.

Section 3.23   <u>Restricted Payments</u>.   The Issuer shall not, directly or indirectly, (i) pay any dividend or make any distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, to the Owner Trustee or any owner of a beneficial interest in the Issuer or otherwise with respect to any ownership or equity interest or security in or of the Issuer, (ii) redeem, purchase, retire or otherwise acquire for value any such ownership or equity interest or security or (iii) set aside or otherwise segregate any amounts for any such purpose; provided, however, that the Issuer may make, or cause to be made, (x) distributions to the Owner Trustee and the Certificateholders as contemplated by, and to the extent funds are available for such purpose under, the Trust Agreement and (y) payments to the Servicer pursuant to the terms of the Servicing Agreement.  The Issuer will not, directly or indirectly, make payments to or distributions from the Custodial Account except in accordance with this Indenture and the other Basic Documents.

Section 3.24   <u>Notice of Events of Default</u>.   The Issuer shall give the Indenture Trustee, the Enhancer and the Rating Agencies prompt written notice of each Event of Default hereunder and under the Trust Agreement.

Section 3.25   <u>Further Instruments and Acts</u>.   Upon request of the Indenture Trustee, the Issuer shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purposes of this Indenture.

Section 3.26   <u>Statements to Noteholders</u>.   On each Payment Date, each of the Indenture Trustee and the Certificate Registrar shall make available to the Depositor, the Owner Trustee, each Rating Agency, each Noteholder and each Certificateholder, with a copy to the Enhancer, the Servicing Certificate provided to the Indenture Trustee by the Servicer relating to such Payment Date and delivered pursuant to Section 4.01 of the Servicing Agreement.

The Indenture Trustee will make the Servicing Certificate (and, at its option, any additional files containing the same information in an alternative format) available each month to Securityholders and the Enhancer, and other parties to this Indenture via the Indenture Trustee's internet website.   The Indenture Trustee's internet website shall initially be located at

CONFIDENTIAL                                                                        RC_FGIC9019_00002769

"www.jpmorgan.com/sfr." Assistance in using the website can be obtained by calling the Indenture Trustee's customer service desk at (877) 722-1095. Parties that are unable to use the above distribution options are entitled to have a paper copy mailed to them via first class mail by calling the customer service desk and indicating such. The Indenture Trustee shall have the right to change the way the statement to Securityholders are distributed in order to make such distribution more convenient or more accessible to the above parties and the Indenture Trustee shall provide timely and adequate notification to all above parties regarding any such changes.

Section 3.28   Payments under the Policy.

(a) (i)   If the Servicing Certificate specifies a Policy Draw Amount for any Payment Date, the Indenture Trustee shall make a draw on the Policy in an amount specified in the Servicing Certificate for such Payment Date or, if no amount is specified, the Indenture Trustee shall make a draw on the Policy in the amount by which the amount on deposit in the Note Payment Account is less than interest due on the Notes on such Payment Date.

(ii)   The Indenture Trustee shall deposit or cause to be deposited such Policy Draw Amount into the Note Payment Account on such Payment Date to the extent such amount relates to clause (a) of the definition of "Deficiency Amount" or clause (b) of the definition of "Insured Payment".

(b) The Indenture Trustee shall submit, if a Policy Draw Amount is specified in any statement to Securityholders prepared pursuant to Section 4.01 of the Servicing Agreement, the Notice (in the form attached as Exhibit A to the Policy) to the Enhancer no later than 12:00 noon, New York City time, on the second (2nd) Business Day prior to the applicable Payment Date.

Section 3.29   Replacement/Additional Enhancement.   The Issuer (or the Servicer on its behalf) may, at its expense, in accordance with and upon satisfaction of the conditions set forth herein, but shall not be required to, obtain a surety bond, letter of credit, guaranty or reserve account as a Permitted Investment for amounts on deposit in the Capitalized Interest Account, or may arrange for any other form of additional credit enhancement; provided, that after prior notice thereto, no Rating Agency shall have informed the Issuer that a Rating Event would occur as a result thereof (without taking the Policy into account); and provided further, that the issuer of any such instrument or facility and the timing and mechanism for drawing on such additional enhancement shall be acceptable to the Indenture Trustee and the Enhancer. It shall be a condition to procurement of any such additional credit enhancement that there be delivered to the Indenture Trustee and the Enhancer (a) an Opinion of Counsel, acceptable in form to the Indenture Trustee and the Enhancer, from counsel to the provider of such additional credit enhancement with respect to the enforceability thereof and such other matters as the Indenture Trustee or the Enhancer may require and (b) an Opinion of Counsel to the effect that the procurement of such additional enhancement would not (i) adversely affect in any material respect the tax status of the Notes or the Certificates or (ii) cause the Issuer to be taxable as an association (or a publicly traded partnership) for federal income tax purposes or to be classified as a taxable mortgage pool within the meaning of Section 7701(i) of the Code.

CONFIDENTIAL                                                    RC_FGIC9019_00002770

Section 3.30    Additional Representations of Issuer.

The Issuer hereby represents and warrants to the Indenture Trustee that as of the Closing Date (which representations and warranties shall survive the execution of this Indenture):

(a) This Indenture creates a valid and continuing security interest (as defined in the applicable UCC) in the Mortgage Notes in favor of the Indenture Trustee, which security interest is prior to all other Liens (except as expressly permitted otherwise in this Indenture), and is enforceable as such as against creditors of and purchasers from the Issuer.

(b) The Mortgage Notes constitute "instruments" within the meaning of the applicable UCC.

(c) The Issuer owns and has good and marketable title to the Mortgage Notes free and clear of any Lien of any Person.

(d) The original executed copy of each Mortgage Note (except for any Mortgage Note with respect to which a Lost Note Affidavit has been delivered to the Custodian) has been delivered to the Custodian.

(e) The Issuer has received a written acknowledgment from the Custodian that the Custodian is acting solely as agent of the Indenture Trustee for the benefit of the Noteholders and the Enhancer.

(f) Other than the security interest granted to the Indenture Trustee pursuant to this Indenture, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Mortgage Notes. The Issuer has not authorized the filing of and is not aware of any financing statements against the Issuer that include a description of collateral covering the Mortgage Notes other than any financing statement relating to the security interest granted to the Indenture Trustee hereunder or any security interest that has been terminated. The Issuer is not aware of any judgment or tax lien filings against the Issuer.

(g) None of the Mortgage Notes has any marks or notations indicating that they have been pledged, assigned or otherwise conveyed to any Person other than the Indenture Trustee, except for (i) any endorsements that are part of a complete chain of endorsements from the originator of the Mortgage Note to the Indenture Trustee, and (ii) any marks or notations pertaining to Liens that have been terminated or released.

(h) None of the provisions of this Section 3.30 shall be waived without the prior written confirmation from Standard & Poor's that such waiver shall not result in a reduction or withdrawal of the then-current rating of the Notes.

CONFIDENTIAL

ARTICLE IV

The Notes; Satisfaction And Discharge Of Indenture

Section 4.01    The Notes

(a) The Notes shall be registered in the name of a nominee designated by the Depository. Beneficial Owners will hold interests in the Notes through the book-entry facilities of the Depository in minimum initial Note Balances of $25,000 and integral multiples of $1,000 in excess thereof.

The Indenture Trustee may for all purposes (including the making of payments due on the Notes) deal with the Depository as the authorized representative of the Beneficial Owners with respect to the Notes for the purposes of exercising the rights of Noteholders of Notes hereunder. Except as provided in the next succeeding paragraph of this Section 4.01, the rights of Beneficial Owners with respect to the Notes shall be limited to those established by law and agreements between such Beneficial Owners and the Depository and Depository Participants. Except as provided in Section 4.08, Beneficial Owners shall not be entitled to definitive certificates for the Notes as to which they are the Beneficial Owners. Requests and directions from, and votes of, the Depository as Noteholder of the Notes shall not be deemed inconsistent if they are made with respect to different Beneficial Owners. The Indenture Trustee may establish a reasonable record date in connection with solicitations of consents from or voting by Noteholders and give notice to the Depository of such record date. Without the consent of the Issuer and the Indenture Trustee, no Term Note may be transferred by the Depository except to a successor Depository that agrees to hold such Note for the account of the Beneficial Owners.

In the event the Depository Trust Company resigns or is removed as Depository, the Indenture Trustee, at the request of the Servicer and with the approval of the Issuer may appoint a successor Depository. If no successor Depository has been appointed within 30 days of the effective date of the Depository's resignation or removal, each Beneficial Owner shall be entitled to certificates representing the Notes it beneficially owns in the manner prescribed in Section 4.08.

The Notes shall, on original issue, be executed on behalf of the Issuer by the Owner Trustee, not in its individual capacity but solely as Owner Trustee and upon Issuer Order, authenticated by the Note Registrar and delivered by the Indenture Trustee to or upon the order of the Issuer.

Section 4.02    Registration of and Limitations on Transfer and Exchange of Notes; Appointment of Certificate Registrar. The Issuer shall cause to be kept at the Indenture Trustee's Corporate Trust Office a Note Register in which, subject to such reasonable regulations as it may prescribe, the Note Registrar shall provide for the registration of Notes and of transfers and exchanges of Notes as herein provided. The Issuer hereby appoints the Indenture Trustee as the initial Note Registrar.

CONFIDENTIAL                                           RC_FGIC9019_00002772

Subject to the restrictions and limitations set forth below, upon surrender for registration of transfer of any Note at the Corporate Trust Office, the Issuer shall execute, and the Note Registrar shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes in authorized initial Note Balances evidencing the same aggregate Percentage Interests.

Subject to the foregoing, at the option of the Noteholders, Notes may be exchanged for other Notes of like tenor, in each case in authorized initial Note Balances evidencing the same aggregate Percentage Interests, upon surrender of the Notes to be exchanged at the Corporate Trust Office of the Note Registrar. Whenever any Notes are so surrendered for exchange, the Issuer shall execute and the Note Registrar shall authenticate and deliver the Notes which the Noteholder making the exchange is entitled to receive. Each Note presented or surrendered for registration of transfer or exchange shall (if so required by the Note Registrar) be duly endorsed by, or be accompanied by a written instrument of transfer in form reasonably satisfactory to the Note Registrar duly executed by, the Noteholder thereof or his attorney duly authorized in writing with such signature guaranteed by a commercial bank or trust company located or having a correspondent located in The City of New York. Notes delivered upon any such transfer or exchange will evidence the same obligations, and will be entitled to the same rights and privileges, as the Notes surrendered.

No service charge shall be imposed for any registration of transfer or exchange of Notes, but the Note Registrar shall require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any registration of transfer or exchange of Notes.

All Notes surrendered for registration of transfer and exchange shall be cancelled by the Note Registrar and delivered to the Indenture Trustee for subsequent destruction without liability on the part of either.

The Issuer hereby appoints the Indenture Trustee as Certificate Registrar to keep at its Corporate Trust Office a Certificate Register pursuant to Section 3.09 of the Trust Agreement in which, subject to such reasonable regulations as it may prescribe, the Certificate Registrar shall provide for the registration of Certificates and of transfers and exchanges thereof pursuant to Section 3.05 of the Trust Agreement. The Indenture Trustee hereby accepts such appointment.

Each purchaser of a Note, by its acceptance of the Note, shall be deemed to have represented that the acquisition of such Note by the purchaser does not constitute or give rise to a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code, for which no statutory, regulatory or administrative exemption is available.

Section 4.03    Mutilated, Destroyed, Lost or Stolen Notes. If (i) any mutilated Note is surrendered to the Indenture Trustee, or the Indenture Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Note, and (ii) there is delivered to the Indenture Trustee such security or indemnity as may be required by it and the Issuer to hold the Issuer and the Indenture Trustee harmless, then, in the absence of notice to the Issuer, the Note Registrar or the Indenture Trustee that such Note has been acquired by a bona fide purchaser, and provided that the requirements of Section 8 405 of the UCC are met, the Issuer shall execute,

CONFIDENTIAL                                                          RC_FGIC9019_00002773

and upon its request the Indenture Trustee shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Note, a replacement Note of the same class; provided, however, that if any such destroyed, lost or stolen Note, but not a mutilated Note, shall have become or within seven days shall be due and payable, instead of issuing a replacement Note, the Issuer may pay such destroyed, lost or stolen Note when so due or payable without surrender thereof. If, after the delivery of such replacement Note or payment of a destroyed, lost or stolen Note pursuant to the proviso to the preceding sentence, a bona fide purchaser of the original Note in lieu of which such replacement Note was issued presents for payment such original Note, the Issuer and the Indenture Trustee shall be entitled to recover such replacement Note (or such payment) from the Person to whom it was delivered or any Person taking such replacement Note from such Person to whom such replacement Note was delivered or any assignee of such Person, except a bona fide purchaser, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Issuer or the Indenture Trustee in connection therewith.

Upon the issuance of any replacement Note under this Section 4.03, the Issuer may require the payment by the Noteholder of such Note of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other reasonable expenses (including the fees and expenses of the Indenture Trustee) connected therewith.

Every replacement Note issued pursuant to this Section 4.03 in replacement of any mutilated, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Issuer, whether or not the mutilated, destroyed, lost or stolen Note shall be at any time enforceable by anyone, and shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Notes duly issued hereunder.

The provisions of this Section 4.03 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes.

Section 4.04    Persons Deemed Owners.  Prior to due presentment for registration of transfer of any Note, the Issuer, the Indenture Trustee and any agent of the Issuer or the Indenture Trustee may treat the Person in whose name any Note is registered (as of the day of determination) as the owner of such Note for the purpose of receiving payments of principal of and interest, if any, on such Note and for all other purposes whatsoever, whether or not such Note be overdue, and none of the Issuer, the Indenture Trustee or any agent of the Issuer or the Indenture Trustee shall be affected by notice to the contrary.

Section 4.05    Cancellation.  All Notes surrendered for payment, registration of transfer, exchange or redemption shall, if surrendered to any Person other than the Indenture Trustee, be delivered to the Indenture Trustee and shall be promptly cancelled by the Indenture Trustee. The Issuer may at any time deliver to the Indenture Trustee for cancellation any Notes previously authenticated and delivered hereunder which the Issuer may have acquired in any manner whatsoever, and all Notes so delivered shall be promptly cancelled by the Indenture Trustee. No Notes shall be authenticated in lieu of or in exchange for any Notes cancelled as provided in this Section 4.05, except as expressly permitted by this Indenture. All cancelled Notes may be held

CONFIDENTIAL                                                    RC_FGIC9019_00002774

or disposed of by the Indenture Trustee in accordance with its standard retention or disposal policy as in effect at the time unless the Issuer shall direct by an Issuer Request that they be destroyed or returned to it; provided, however, that such Issuer Request is timely and the Notes have not been previously disposed of by the Indenture Trustee.

Section 4.06  Book-Entry Notes.  The Notes, upon original issuance, shall be issued in the form of typewritten Notes representing the Book-Entry Notes, to be delivered to The Depository Trust Company, the initial Depository, by, or on behalf of, the Issuer.  Such Notes shall initially be registered on the Note Register in the name of Cede & Co., the nominee of the initial Depository, and no Beneficial Owner shall receive a Definitive Note representing such Beneficial Owner's interest in such Note, except as provided in Section 4.08.  Unless and until definitive, fully registered Notes (the "Definitive Notes") have been issued to Beneficial Owners pursuant to Section 4.08:

(a) the provisions of this Section 4.06 shall be in full force and effect;

(b) the Note Registrar and the Indenture Trustee shall be entitled to deal with the Depository for all purposes of this Indenture (including the payment of principal of and interest on the Notes and the giving of instructions or directions hereunder) as the sole holder of the Notes, and shall have no obligation to the Beneficial Owners;

(c) to the extent that the provisions of this Section 4.06 conflict with any other provisions of this Indenture, the provisions of this Section 4.06 shall control;

(d) the rights of Beneficial Owners shall be exercised only through the Depository and shall be limited to those established by law and agreements between such Owners of Notes and the Depository or the Depository Participants.  Unless and until Definitive Notes are issued pursuant to Section 4.08, the initial Depository will make book-entry transfers among the Depository Participants and receive and transmit payments of principal of and interest on the Notes to such Depository Participants; and

(e) whenever this Indenture requires or permits actions to be taken based upon instructions or directions of Noteholders of Notes evidencing a specified percentage of the Note Balances of the Notes, the Depository shall be deemed to represent such percentage only to the extent that it has received instructions to such effect from Beneficial Owners or Depository Participants owning or representing, respectively, such required percentage of the beneficial interest in the Notes and has delivered such instructions to the Indenture Trustee.

Section 4.07   Notices to Depository.  Whenever a notice or other communication to the Noteholders of the Notes is required under this Indenture, unless and until Definitive Notes shall have been issued to Beneficial Owners pursuant to Section 4.08, the Indenture Trustee shall give all such notices and communications specified herein to be given to Noteholders of the Notes to the Depository, and shall have no obligation to the Beneficial Owners.

Section 4.08   Definitive Notes.  If (i) the Depositor determines that the Depository is no longer willing or able to properly discharge its responsibilities with respect to the Notes and the Depositor is unable to locate a qualified successor, (ii) the Depositor, with the prior consent of

CONFIDENTIAL                                                                RC_FGIC9019_00002775

the Beneficial Owners, notifies the Indenture Trustee and the Depository that it has elected to terminate the book-entry system through the Depository, or (iii) after the occurrence of an Event of Default, Beneficial Owners of Notes representing beneficial interests aggregating at least a majority of the aggregate Term Note Balance of the Notes advise the Depository in writing that the continuation of a book-entry system through the Depository is no longer in the best interests of the Beneficial Owners, then the Depository shall notify all Beneficial Owners and the Indenture Trustee of the occurrence of any such event and of the availability of Definitive Notes to Beneficial Owners requesting the same. Upon surrender by the Depository to the Indenture Trustee of the typewritten Notes representing the Book-Entry Notes by the Depository (or Percentage Interest of the Book-Entry Notes being transferred pursuant to clause (iii) above), accompanied by registration instructions, the Issuer shall execute and the Indenture Trustee shall authenticate the Definitive Notes in accordance with the instructions of the Depository. None of the Issuer, the Note Registrar or the Indenture Trustee shall be liable for any delay in delivery of such instructions, and each may conclusively rely on, and shall be protected in relying on, such instructions. Upon the issuance of Definitive Notes, the Indenture Trustee shall recognize the Noteholders of the Definitive Notes as Noteholders.

Section 4.09    Tax Treatment. The Issuer has entered into this Indenture, and the Notes will be issued, with the intention that, for federal, state and local income, single business and franchise tax purposes, the Notes will qualify as regular interests in a REMIC as defined in the Code, which will be treated as indebtedness for purposes of such taxes. The Issuer, by entering into this Indenture, and each Noteholder, by its acceptance of its Note (and each Beneficial Owner by its acceptance of an interest in the applicable Book-Entry Note), agree to treat the Notes for federal, state and local income, single business and franchise tax purposes as regular interests in a REMIC as defined in the Code, which will be treated as indebtedness for purposes of such taxes.

Section 4.10    Satisfaction and Discharge of Indenture. This Indenture shall cease to be of further effect with respect to the Notes except as to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, destroyed, lost or stolen Notes, (iii) rights of Noteholders to receive payments of principal thereof and interest thereon, (iv) Sections 3.03, 3.04, 3.06, 3.09, 3.16, 3.18 and 3.19, (v) the rights, obligations and immunities of the Indenture Trustee hereunder (including the rights of the Indenture Trustee under Section 6.07 and the obligations of the Indenture Trustee under Section 4.11) and (vi) the rights of Noteholders as beneficiaries hereof with respect to the property so deposited with the Indenture Trustee payable to all or any of them, and the Indenture Trustee, on written demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture with respect to the Notes, when:

(A)    either:

(1) all Notes theretofore authenticated and delivered (other than (i) Notes that have been destroyed, lost or stolen and that have been replaced or paid as provided in Section 4.03 and (ii) Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged

CONFIDENTIAL                                                                                    RC_FGIC9019_00002776

from such trust, as provided in Section 3.03) have been delivered to the Indenture Trustee for cancellation; or

(2) all Notes not theretofore delivered to the Indenture Trustee for cancellation:

a) have become due and payable;

b) will become due and payable at the Final Payment Date within one year; or

c) have been declared immediately due and payable pursuant to Section 5.02.

and the Issuer, in the case of (a) and (b) above, has irrevocably deposited or caused to be irrevocably deposited with the Indenture Trustee cash or direct obligations of or obligations guaranteed by the United States of America (which will mature prior to the date such amounts are payable), in trust for such purpose, in an amount sufficient to pay and discharge the entire indebtedness on such Notes and Certificates then Outstanding not theretofore delivered to the Indenture Trustee for cancellation when due on the Final Payment Date;

(B)    the Issuer has paid or caused to be paid all other sums payable hereunder and under the Insurance Agreement by the Issuer; and

(C)    the Issuer has delivered to the Indenture Trustee and the Enhancer an Officer's Certificate and an Opinion of Counsel, each meeting the applicable requirements of Section 10.01 and each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with and, if the Opinion of Counsel relates to a deposit made in connection with Section 4.10(A)(2)b. above, such opinion shall further be to the effect that such deposit will not have any material adverse tax consequences to the Issuer, any Noteholders or any Certificateholders.

Section 4.11    Application of Trust Money.    All monies deposited with the Indenture Trustee pursuant to Section 4.10 hereof shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent or Certificate Paying Agent, as the Indenture Trustee may determine, to the Securityholders of Securities, of all sums due and to become due thereon for principal and interest; but such monies need not be segregated from other funds except to the extent required herein or required by law.

Section 4.12    Subrogation and Cooperation.    The Issuer and the Indenture Trustee acknowledge that (i) to the extent the Enhancer makes payments under the Policy on account of principal of or interest on the Notes, the Enhancer will be fully subrogated to the rights the Noteholders to receive such principal and interest, and (ii) the Enhancer shall be paid such

CONFIDENTIAL                                    RC_FGIC9019_00002777

principal and interest only from the sources and in the manner provided herein and in the Insurance Agreement for the payment of such principal and interest.

The Indenture Trustee shall cooperate in all respects with any reasonable request by the Enhancer for action to preserve or enforce the Enhancer's rights or interest under this Indenture or the Insurance Agreement, consistent with this Indenture and without limiting the rights of the Noteholders as otherwise set forth in the Indenture, including upon the occurrence and continuance of a default under the Insurance Agreement, a request (which request shall be in writing) to take any one or more of the following actions:

(i)     institute Proceedings for the collection of all amounts then payable on the Notes or under this Indenture in respect to the Notes and all amounts payable under the Insurance Agreement and to enforce any judgment obtained and collect from the Issuer monies adjudged due;

(ii)     sell the Trust Estate or any portion thereof or rights or interest therein, at one or more public or private Sales (as defined in Section 5.15 hereof) called and conducted in any manner permitted by law;

(iii)     file or record all assignments that have not previously been recorded;

(iv)     institute Proceedings from time to time for the complete or partial foreclosure of this Indenture; and

(v)     exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Enhancer hereunder.

Following the payment in full of the Notes, the Enhancer shall continue to have all rights and privileges provided to it under this Section and in all other provisions of this Indenture, until all amounts owing to the Enhancer have been paid in full.

Section 4.13    Repayment of Monies Held by Paying Agent.    In connection with the satisfaction and discharge of this Indenture with respect to the Notes, all monies then held by any Paying Agent (other than the Indenture Trustee) under the provisions of this Indenture with respect to such Notes shall, upon demand of the Issuer, be paid to the Indenture Trustee to be held and applied according to Section 3.05; and thereupon, such Paying Agent shall be released from all further liability with respect to such monies.

Section 4.14    Temporary Notes.    Pending the preparation of any Definitive Notes, the Issuer may execute and upon its written direction, the Indenture Trustee may authenticate and make available for delivery, temporary Notes that are printed, lithographed, typewritten, photocopied or otherwise produced, in any denomination, substantially of the tenor of the Definitive Notes in lieu of which they are issued and with such appropriate insertions, omissions, substitutions and other variations as the officers executing such Notes may determine, as evidenced by their execution of such Notes.

CONFIDENTIAL                                                          RC_FGIC9019_00002778

If temporary Notes are issued, the Issuer will cause Definitive Notes to be prepared without unreasonable delay. After the preparation of the Definitive Notes, the temporary Notes shall be exchangeable for Definitive Notes upon surrender of the temporary Notes at the office or agency of the Indenture Trustee, without charge to the Noteholder. Upon surrender for cancellation of any one or more temporary Notes, the Issuer shall execute and the Indenture Trustee shall authenticate and make available for delivery, in exchange therefor, Definitive Notes of authorized denominations and of like tenor and aggregate principal amount. Until so exchanged, such temporary Notes shall in all respects be entitled to the same benefits under this Indenture as Definitive Notes.

## ARTICLE V

### Default And Remedies

Section 5.01    Events of Default.   The Issuer shall deliver to the Indenture Trustee and the Enhancer, within five days after learning of the occurrence of any event that with the giving of notice and the lapse of time would become an Event of Default under clause (c) of the definition of "Event of Default" written notice in the form of an Officer's Certificate of its status and what action the Issuer is taking or proposes to take with respect thereto.

Section 5.02    Acceleration of Maturity; Rescission and Annulment.   If an Event of Default shall occur and be continuing, then and in every such case the Indenture Trustee, acting at the direction of the Enhancer or the Noteholders of Notes representing not less than a majority of the aggregate Note Balance of the Notes, with the written consent of the Enhancer (so long as no Enhancer Default exists), may declare the Notes to be immediately due and payable by a notice in writing to the Issuer (and to the Indenture Trustee if given by Noteholders); and upon any such declaration, the unpaid principal amount of the Notes, together with accrued and unpaid interest thereon through the date of acceleration, shall become immediately due and payable.

At any time after such declaration of acceleration of maturity with respect to an Event of Default has been made and before a judgment or decree for payment of the money due has been obtained by the Indenture Trustee as hereinafter provided in this Article V, the Enhancer or the Noteholders of Notes representing a majority of the aggregate Note Balance of the Notes, with the written consent of the Enhancer, by written notice to the Issuer and the Indenture Trustee, may in writing waive the related Event of Default and rescind and annul such declaration and its consequences if:

(a) the Issuer has paid or deposited with the Indenture Trustee a sum sufficient to pay:

(i)    all payments of principal of and interest on the Notes and all other amounts that would then be due hereunder or upon the Notes if the Event of Default giving rise to such acceleration had not occurred;

CONFIDENTIAL

(ii)    all sums paid or advanced by the Indenture Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Indenture Trustee and its agents and counsel; and

(iii)    all Events of Default, other than the nonpayment of the principal of the Notes that has become due solely by such acceleration, have been cured or waived as provided in Section 5.12.

No such rescission shall affect any subsequent default or impair any right consequent thereto.

Section 5.03    Collection of Indebtedness and Suits for Enforcement by Indenture Trustee.

(a) The Issuer covenants that if default in the payment of (i) any interest on any Note when the same becomes due and payable, and such default continues for a period of five days, or (ii) the principal of or any installment of the principal of any Note when the same becomes due and payable, the Issuer shall, upon demand of the Indenture Trustee, pay to it, for the benefit of the Noteholders, the entire amount then due and payable on the Notes for principal and interest, with interest on the overdue principal, and in addition thereto such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Indenture Trustee and its agents and counsel.

(b) In case the Issuer shall fail forthwith to pay such amounts upon such demand, the Indenture Trustee, in its own name and as trustee of an express trust, subject to the provisions of Section 10.17 hereof, may institute a Proceeding for the collection of the sums so due and unpaid, and may prosecute such Proceeding to judgment or final decree, and may enforce the same against the Issuer or other obligor on the Notes and collect in the manner provided by law out of the property of the Issuer or other obligor on the Notes, wherever situated, the monies adjudged or decreed to be payable.

(c) If an Event of Default shall occur and be continuing, the Indenture Trustee, subject to the provisions of Section 10.17 hereof, may, as more particularly provided in Section 5.04, in its discretion proceed to protect and enforce its rights and the rights of the Noteholders by such appropriate Proceedings as the Indenture Trustee shall deem most effective to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Indenture Trustee by this Indenture or by law.

(d) If there shall be pending, relative to the Issuer or any other obligor on the Notes or any Person having or claiming an ownership interest in the Trust Estate, Proceedings under Title 11 of the United States Code or any other applicable federal or state bankruptcy, insolvency or other similar law, or if a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken

US_WEST:260042806.5                          26

possession of the Issuer or its property or such other obligor or Person, or if there shall be any other comparable judicial Proceedings relative to the Issuer or other any other obligor on the Notes, or relative to the creditors or property of the Issuer or such other obligor, then the Indenture Trustee, irrespective of whether the principal of any Notes shall then be due and payable as therein expressed or by declaration or otherwise, and irrespective of whether the Indenture Trustee shall have made any demand pursuant to the provisions of this Section, shall be entitled and empowered, by intervention in such Proceedings or otherwise:

> (i)     to file and prove a claim or claims for the entire amount of principal and interest owing and unpaid in respect of the Notes and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Indenture Trustee (including any claim for reasonable compensation to the Indenture Trustee and each predecessor Indenture Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Indenture Trustee and each predecessor Indenture Trustee, except as a result of negligence, willful misconduct or bad faith) and of the Noteholders allowed in such Proceedings;

> (ii)    unless prohibited by applicable law and regulations, to vote on behalf of the Noteholders in any election of a trustee, a standby trustee or Person performing similar functions in any such Proceedings;

> (iii)   to collect and receive any monies or other property payable or deliverable on any such claims and to distribute all amounts received with respect to the claims of the Noteholders and of the Indenture Trustee on their behalf; and

> (iv)    to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Indenture Trustee or the Noteholders allowed in any judicial proceedings relative to the Issuer, its creditors and its property;

and any trustee, receiver, liquidator, custodian or other similar official in any such Proceeding is hereby authorized by each of such Noteholders to make payments to the Indenture Trustee, and, in the event the Indenture Trustee shall consent to the making of payments directly to such Noteholders, to pay to the Indenture Trustee such amounts as shall be sufficient to cover reasonable compensation to the Indenture Trustee, each predecessor Indenture Trustee and their respective agents, attorneys and counsel, and all other expenses and liabilities incurred, and all advances made, by the Indenture Trustee and each predecessor Indenture Trustee, except as a result of negligence, willful misconduct or bad faith.

> (e) Nothing herein contained shall be deemed to authorize the Indenture Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Noteholder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Noteholder thereof or to authorize the Indenture Trustee to vote in respect of the claim of any Noteholder in any such proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

CONFIDENTIAL                                          RC_FGIC9019_00002781

(f) All rights of action and of asserting claims under this Indenture, or under any of the Notes, may be enforced by the Indenture Trustee without the possession of any of the Notes or the production thereof in any trial or other Proceedings relative thereto, and any such action or proceedings instituted by the Indenture Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment, subject to the payment of the expenses, disbursements and compensation of the Indenture Trustee, each predecessor Indenture Trustee and their respective agents and attorneys, shall be for the ratable benefit of the Holders of the Notes.

(g) In any Proceedings to which the Indenture Trustee shall be a party (including any Proceedings involving the interpretation of any provision of this Indenture), the Indenture Trustee shall be held to represent all Noteholders, and it shall not be necessary to make any Noteholder a party to any such Proceedings.

Section 5.04    Remedies; Priorities.

(a) If an Event of Default shall have occurred and be continuing, then the Indenture Trustee, subject to the provisions of Section 10.17 hereof, with the written consent of the Enhancer may, or, at the written direction of the Enhancer, shall, do one or more of the following, in each case subject to Section 5.05:

(i)    institute Proceedings in its own name and as trustee of an express trust for the collection of all amounts then payable on the Notes or under this Indenture with respect thereto, whether by declaration or otherwise, and all amounts payable under the Insurance Agreement, enforce any judgment obtained, and collect from the Issuer and any other obligor on the Notes monies adjudged due;

(ii)    institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Trust Estate;

(iii)    exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Indenture Trustee and the Noteholders; and

(iv)    sell the Trust Estate or any portion thereof or rights or interest therein, at one or more public or private sales called and conducted in any manner permitted by law;

provided, however, that the Indenture Trustee may not sell or otherwise liquidate the Trust Estate following an Event of Default, unless (A) the Indenture Trustee obtains the consent of the Enhancer (or if an Enhancer Default has occurred and is continuing, the Noteholders of 100% of the aggregate Note Balance of the Notes), (B) the proceeds of such sale or liquidation distributable to Noteholders are sufficient to discharge in full all amounts then due and unpaid upon the Notes for principal and interest and to reimburse the Enhancer for any amounts drawn under the Policy and any other amounts due the Enhancer under the Insurance Agreement or (C) the Indenture Trustee determines that the Mortgage Loans will not continue to provide sufficient funds for the payment of principal of and interest on the Notes as they would have become due if

US_WEST:260042806.5                    28

                                                            RC_FGIC9019_00002782

the Notes had not been declared due and payable, and the Indenture Trustee obtains the consent of the Enhancer (or if an Enhancer Default has occurred and is continuing, and the Noteholders of 66 2/3% of the aggregate Note Balance of the Notes).  In determining such sufficiency or insufficiency with respect to clause (B) and (C) above, the Indenture Trustee may, but need not, obtain and rely, and shall be protected in relying in good faith, upon an opinion of an Independent investment banking or accounting firm of national reputation as to the feasibility of such proposed action and as to the sufficiency of the Trust Estate for such purpose. Notwithstanding the foregoing, provided that a Servicing Default shall not have occurred, any Sale (as defined in Section 5.15 hereof) of the Trust Estate shall be made subject to the continued servicing of the Mortgage Loans by the Servicer as provided in the Servicing Agreement. Notwithstanding any sale of the Mortgage Loans pursuant to this Section 5.04(a), the Indenture Trustee shall, for so long as any principal or accrued interest on the Notes remains unpaid, continue to act as Indenture Trustee hereunder and to draw amounts payable under the Policy in accordance with its terms.

(b) If the Indenture Trustee collects any money or property pursuant to this Article V, it shall pay out such money or property in the following order:

FIRST:    to the Indenture Trustee for amounts due under Section 6.07;

SECOND:    to the Noteholders for amounts due and unpaid on the related Notes for interest, including accrued and unpaid interest on the Notes for any prior Payment Date, ratably, without preference or priority of any kind, according to the amounts due and payable on such Notes for interest from amounts available in the Trust Estate for such Noteholders;

THIRD:    to the Noteholders for amounts due and unpaid on the related Notes for principal, ratably, without preference or priority of any kind, according to the amounts due and payable on such Notes for principal, from amounts available in the Trust Estate for such Noteholders, until the respective Note Balances of such Notes have been reduced to zero;

FOURTH:    to the payment of all amounts due and owing the Enhancer under the Insurance Agreement; and

FIFTH:    to the Certificate Paying Agent for amounts due under Article VIII of the Trust Agreement; and

SEVENTH:    to the payment of the remainder, if any, to the Issuer or any other person legally entitled thereto.

The Indenture Trustee may fix a record date and payment date for any payment to Noteholders pursuant to this Section 5.04.  At least 15 days before such record date, the Indenture Trustee shall mail to each Noteholder a notice that states the record date, the payment date and the amount to be paid.

CONFIDENTIAL                                        RC_FGIC9019_00002783

Section 5.05    Optional Preservation of the Trust Estate.  If the Notes have been declared due and payable under Section 5.02 following an Event of Default and such declaration and its consequences have not been rescinded and annulled, the Indenture Trustee may, but need not (but shall at the written direction of the Enhancer so long as no Enhancer default exists), elect to take and maintain possession of the Trust Estate.  It is the desire of the parties hereto and the Noteholders that there be at all times sufficient funds for the payment of principal of and interest on the Notes and other obligations of the Issuer including payment to the Enhancer, and the Indenture Trustee shall take such desire into account when determining whether or not to take and maintain possession of the Trust Estate.  In determining whether to take and maintain possession of the Trust Estate, the Indenture Trustee may, but need not, obtain and rely, and shall be protected in relying in good faith, upon an opinion of an Independent investment banking or accounting firm of national reputation as to the feasibility of such proposed action and as to the sufficiency of the Trust Estate for such purpose.

Section 5.06    Limitation of Suits.  No Noteholder shall have any right to institute any Proceeding, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless and subject to the provisions of Section 10.17 hereof:

(a) such Noteholder shall have previously given written notice to the Indenture Trustee of a continuing Event of Default;

(b) the Noteholders of not less than 25% of the aggregate Note Balance of the Notes shall have made written request to the Indenture Trustee to institute such Proceeding in respect of such Event of Default in its own name as Indenture Trustee hereunder;

(c) such Noteholder or Noteholders shall have offered the Indenture Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred by it  in complying with such request;

(d) the Indenture Trustee for 60 days after its receipt of such notice, request and offer of indemnity shall have failed to institute such Proceedings; and

(e) no direction inconsistent with such written request shall have been given to the Indenture Trustee during such 60-day period by the Noteholders of a majority of the aggregate Note Balance of the Notes or by the Enhancer.

It is understood and intended that no Noteholder shall have any right in any manner whatever by virtue of, or by availing itself of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Noteholders or to obtain or to seek to obtain priority or preference over any other Noteholders or to enforce any right under this Indenture, except in the manner herein provided.

In the event the Indenture Trustee shall receive conflicting or inconsistent requests and indemnity from two or more groups of Noteholders, each representing less than a majority of the aggregate Note Balance of the Notes, the Indenture Trustee shall act at the direction of the group of Noteholders with the greater Note Balance.  In the event that the Indenture Trustee shall

CONFIDENTIAL                                                                  RC_FGIC9019_00002784

receive conflicting or inconsistent requests and indemnity from two or more groups of Noteholders representing the same Note Balance, then the Indenture Trustee in its sole discretion may determine what action, if any, shall be taken, notwithstanding any other provisions of this Indenture.

Section 5.07    Unconditional Rights of Noteholders to Receive Principal and Interest. Subject to the provisions of this Indenture, the Noteholder of any Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest, if any, on such Note on or after the respective due dates thereof expressed in such Note or in this Indenture and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Noteholder.

Section 5.08    Restoration of Rights and Remedies.    If the Indenture Trustee or any Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason or has been determined adversely to the Indenture Trustee or to such Noteholder, then and in every such case the Issuer, the Indenture Trustee and the Noteholders shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Indenture Trustee and the Noteholders shall continue as though no such Proceeding had been instituted.

Section 5.09    Rights and Remedies Cumulative.    No right or remedy herein conferred upon or reserved to the Indenture Trustee, the Enhancer or the Noteholders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law, in equity or otherwise.    The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 5.10    Delay or Omission Not a Waiver.    No delay or omission of the Indenture Trustee, the Enhancer or any Noteholder to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.    Every right and remedy given by this Article V or by law to the Indenture Trustee or to the Noteholders may be exercised from time to time, and as often as may be deemed expedient, by the Indenture Trustee or by the Noteholders, as the case may be.

Section 5.11    Control by Enhancer or Noteholders.    The Enhancer (so long as no Enhancer Default exists) or the Noteholders of a majority of the aggregate Note Balance of Notes with the consent of the Enhancer, shall have the right to direct the time, method and place of conducting any Proceeding for any remedy available to the Indenture Trustee with respect to the Notes or exercising any trust or power conferred on the Indenture Trustee, provided that:

(a)    such direction shall not be in conflict with any rule of law or with this Indenture;

CONFIDENTIAL                                                            RC_FGIC9019_00002785

(b) subject to the express terms of Section 5.04, any direction to the Indenture Trustee to sell or liquidate the Trust Estate shall be by the Enhancer (so long as no Enhancer Default exists) or by the Noteholders of Notes representing not less than 100% of the aggregate Note Balance of the Notes with the consent of the Enhancer;

(c) if the conditions set forth in Section 5.05 shall have been satisfied and the Indenture Trustee elects to retain the Trust Estate pursuant to such Section, then any direction to the Indenture Trustee by Noteholders of Notes representing less than 100% of the aggregate Note Balance of the Notes to sell or liquidate the Trust Estate shall be of no force and effect; and

(d) the Indenture Trustee may take any other action deemed proper by the Indenture Trustee that is not inconsistent with such direction.

Notwithstanding the rights of Noteholders set forth in this Section, subject to Section 6.01, the Indenture Trustee need not take any action that it determines (in its sole discretion) might involve it in liability or might materially adversely affect the rights of any Noteholders not consenting to such action, unless the Trustee has received satisfactory indemnity from the Enhancer or a Noteholder.

Section 5.12    Waiver of Past Defaults.  Prior to the declaration of the acceleration of the maturity of the Notes as provided in Section 5.02, the Enhancer (so long as no Enhancer Default exists) or the Noteholders of not less than a majority of the aggregate Note Balance of the Notes, with the consent of the Enhancer, may waive any past Event of Default and its consequences, except an Event of Default (a) with respect to payment of principal of or interest on any of the Notes or (b) in respect of a covenant or provision hereof that cannot be modified or amended without the consent of the Noteholder of each Note.  In the case of any such waiver, the Issuer, the Indenture Trustee and the Noteholders shall be restored to their respective former positions and rights hereunder; but no such waiver shall extend to any subsequent or other Event of Default or impair any right consequent thereto.

Upon any such waiver, any Event of Default arising therefrom shall be deemed to have been cured and not to have occurred, for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Event of Default or impair any right consequent thereto.

Section 5.13    Undertaking for Costs.  All parties to this Indenture agree, and each Noteholder by such Noteholder's acceptance of the related Note shall be deemed to have agreed, that any court may in its discretion require, in any Proceeding for the enforcement of any right or remedy under this Indenture, or in any Proceeding against the Indenture Trustee for any action taken, suffered or omitted by it as Indenture Trustee, the filing by any party litigant in such Proceeding of an undertaking to pay the costs of such Proceeding, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such Proceeding, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 5.13 shall not apply to (a) any Proceeding instituted by the Indenture Trustee, (b) any Proceeding instituted by any Noteholder, or group of Noteholders, in each case holding in the aggregate more than 10% of the aggregate Note Balance of the Notes or (c) any Proceeding instituted by any Noteholder for the

CONFIDENTIAL                                                        RC_FGIC9019_00002786

enforcement of the payment of principal of or interest on any Note on or after the respective due dates expressed in such Note and in this Indenture.

Section 5.14    Waiver of Stay or Extension Laws.    The Issuer covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead or in any manner whatsoever, claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Issuer (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not hinder, delay or impede the execution of any power herein granted to the Indenture Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 5.15    Sale of Trust Estate.

(a) The power to effect any sale or other disposition (a "Sale") of any portion of the Trust Estate pursuant to Section 5.04 is expressly subject to the provisions of Section 5.05 and this Section 5.15.  The power to effect any such Sale shall not be exhausted by any one or more Sales as to any portion of the Trust Estate remaining unsold, but shall continue unimpaired until the entire Trust Estate shall have been sold or all amounts payable on the Notes and under this Indenture and under the Insurance Agreement shall have been paid.  The Indenture Trustee may from time to time postpone any public Sale by public announcement made at the time and place of such Sale.  The Indenture Trustee hereby expressly waives its right to any amount fixed by law as compensation for any Sale.

(b) The Indenture Trustee shall not in any private Sale sell the Trust Estate, or any portion thereof, unless:

(i)    the Enhancer direct(s) the Indenture Trustee in writing to make such Sale in accordance with the provisions of Section 5.04,

(ii)    the proceeds of such Sale would be not less than the entire amount that would be payable to the Noteholders under the Notes, the Certificateholders under the Certificates and the Enhancer in respect of amounts drawn under the Policy and any other amounts due the Enhancer under the Insurance Agreement, in full payment thereof in accordance with Section 5.02, on the Payment Date next succeeding the date of such Sale, or

(iii)    the Indenture Trustee determines, in its sole discretion, that the conditions for retention of the Trust Estate set forth in Section 5.05 cannot be satisfied (in making any such determination, the Indenture Trustee may rely and shall be protected in relying in good faith upon an opinion of an Independent investment banking firm obtained and delivered as provided in Section 5.05), and the Enhancer consents to such Sale.

The purchase by the Indenture Trustee of all or any portion of the Trust Estate at a private Sale shall not be deemed a Sale or other disposition thereof for purposes of this Section 5.15(b).

CONFIDENTIAL                                                              RC_FGIC9019_00002787

(c) Unless the Noteholders and the Enhancer shall have otherwise consented or directed the Indenture Trustee, at any public Sale of all or any portion of the Trust Estate at which a minimum bid equal to or greater than the amount described in paragraph (ii) of Section 5.15(b) has not been established by the Indenture Trustee and no Person bids an amount equal to or greater than such amount, then the Indenture Trustee shall bid an amount at least $1.00 more than the highest other bid, which bid shall be subject to the provisions of Section 5.15(d)(ii) herein.

(d) In connection with a Sale of all or any portion of the Trust Estate:

(i)    any Noteholder may bid for and, with the consent of the Enhancer, purchase the property offered for sale, and upon compliance with the terms of sale may hold, retain and possess and dispose of such property, without further accountability, and may, in paying the purchase money therefor, deliver any Notes or claims for interest thereon in lieu of cash up to the amount which shall, upon distribution of the net proceeds of such sale, be payable thereon, and such Notes, in case the amounts so payable thereon shall be less than the amount due thereon, shall be returned to the Noteholders thereof after being appropriately stamped to show such partial payment;

(ii)    the Indenture Trustee may bid for and acquire the property offered for Sale in connection with any Sale thereof and, subject to any requirements of, and to the extent permitted by, applicable law in connection therewith, may purchase all or any portion of the Trust Estate in a private sale. In lieu of paying cash therefor, the Indenture Trustee may make settlement for the purchase price by crediting the gross Sale price against the sum of (A) the amount that would be distributable to the Noteholders and the Certificateholders and amounts owing to the Enhancer as a result of such Sale in accordance with Section 5.04(b) on the Payment Date next succeeding the date of such Sale and (B) the expenses of the Sale and of any Proceedings in connection therewith that are reimbursable to it, without being required to produce the Notes in order to complete any such Sale or in order for the net Sale price to be credited against such Notes, and any property so acquired by the Indenture Trustee shall be held and dealt with by it in accordance with the provisions of this Indenture;

(iii)    the Indenture Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Trust Estate in connection with a Sale thereof;

(iv)    the Indenture Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer and convey its interest in any portion of the Trust Estate in connection with a Sale thereof, and to take all action necessary to effect such Sale; and

(v)    no purchaser or transferee at such a Sale shall be bound to ascertain the Indenture Trustee's authority, inquire into the satisfaction of any conditions precedent or see to the application of any monies.

CONFIDENTIAL                                                          RC_FGIC9019_00002788

Section 5.16    Action on Notes.    The Indenture Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking, obtaining or application of any other relief under or with respect to this Indenture.    Neither the lien of this Indenture nor any rights or remedies of the Indenture Trustee or the Noteholders shall be impaired by the recovery of any judgment by the Indenture Trustee against the Issuer or by the levy of any execution under such judgment upon any portion of the Trust Estate or upon any of the assets of the Issuer.    Any money or property collected by the Indenture Trustee shall be applied in accordance with Section 5.04(b).

Section 5.17    Performance and Enforcement of Certain Obligations.

(a) Promptly following a written request from the Enhancer or the Indenture Trustee (with the written consent of the Enhancer), the Issuer, in its capacity as owner of the Mortgage Loans, shall, with the written consent of the Enhancer, take all such lawful action as the Indenture Trustee may request to cause the Issuer to compel or secure the performance and observance by the Sellers and the Servicer, as applicable, of each of their obligations to the Issuer under or in connection with the Purchase Agreement and the Servicing Agreement, and to exercise any and all rights, remedies, powers and privileges lawfully available to the Issuer under or in connection with the Purchase Agreement and the Servicing Agreement to the extent and in the manner directed by the Indenture Trustee, as pledgee of the Mortgage Loans, including the transmission of notices of default on the part of the Sellers or the Servicer thereunder and the institution of legal or administrative actions or proceedings to compel or secure performance by the Sellers or the Servicer of each of their obligations under the Purchase Agreement and the Servicing Agreement.

(b) If an Event of Default shall have occurred and be continuing, the Indenture Trustee, as pledgee of the Mortgage Loans, subject to the rights of the Enhancer under the Servicing Agreement, may, and at the direction (which direction shall be in writing or by telephone (confirmed in writing promptly thereafter)) of the Noteholders of 66 2/3% of the aggregate Note Balance of the Notes, shall, exercise all rights, remedies, powers, privileges and claims of the Issuer against the Sellers or the Servicer under or in connection with the Purchase Agreement and the Servicing Agreement, including the right or power to take any action to compel or secure performance or observance by the Sellers or the Servicer, as the case may be, of each of their obligations to the Issuer thereunder and to give any consent, request, notice, direction, approval, extension or waiver under the Purchase Agreement and the Servicing Agreement, as the case may be, and any right of the Issuer to take such action shall not be suspended.    In connection therewith, as determined by the Indenture Trustee, the Issuer shall take all actions necessary to effect the transfer of the Mortgage Loans to the Indenture Trustee.

CONFIDENTIAL                                    RC_FGIC9019_00002789

ARTICLE VI

The Indenture Trustee

Section 6.01    Duties of Indenture Trustee.

(a) If an Event of Default shall have occurred and be continuing, the Indenture Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent Person would exercise or use under the circumstances in the conduct of such Person's own affairs.

(b) Except during the continuance of an Event of Default:

(i)    the Indenture Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Indenture Trustee; and

(ii)    in the absence of bad faith on its part, the Indenture Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates, reports or opinions furnished to the Indenture Trustee and conforming to the requirements of this Indenture; provided, however, that the Indenture Trustee shall examine the certificates, reports and opinions to determine whether or not they conform to the requirements of this Indenture.

(c) The Indenture Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i)    this paragraph does not limit the effect of Section 6.01(a);

(ii)    the Indenture Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer unless it is proved that the Indenture Trustee was negligent in ascertaining the pertinent facts; and

(iii)    the Indenture Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 5.11 or any direction from the Enhancer that the Enhancer is entitled to give under any of the Basic Documents.

(d) The Indenture Trustee shall not be liable for interest on any money received by it except as the Indenture Trustee may agree in writing with the Issuer.

(e) Money held in trust by the Indenture Trustee need not be segregated from other funds except to the extent required by law or the terms of this Indenture or the Trust Agreement.

(f) No provision of this Indenture shall require the Indenture Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties

CONFIDENTIAL    RC_FGIC9019_00002790

hereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(g) Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Indenture Trustee shall be subject to the provisions of this Section and to the provisions of TIA.

(h) With respect to each Payment Date, on the Business Day following the related Determination Date, the Indenture Trustee shall forward or cause to be forwarded by mail, or other mutually agreed-upon method, to the Enhancer and the Servicer, a statement setting forth, to the extent applicable, during the Pre-Funding Period, the Pre-Funded Amount as of such Determination Date and any transfers of funds in connection therewith.

(i) The Indenture Trustee hereby accepts appointment as Certificate Paying Agent under the Trust Agreement and agrees to be bound by the provisions of the Trust Agreement relating to the Certificate Paying Agent. The Indenture Trustee hereby agrees to be bound by the provisions of Article IX of the Trust Agreement.

(j) The Indenture Trustee shall not be required to take notice or be deemed to have notice or knowledge of any Event of Default (except for an Event of Default specified in clause (a) of the definition thereof) unless a Responsible Officer of the Indenture Trustee shall have received written notice or have actual knowledge thereof. In the absence of receipt of such notice or such knowledge, the Indenture Trustee may conclusively assume that there is no default or Event of Default.

(k) The Indenture Trustee shall have no duty to see to any recording or filing of any financing statement or continuation statement evidencing a security interest or to see to the maintenance of any such recording or filing or to any rerecording or refiling of any thereof.

Section 6.02    Rights of Indenture Trustee.

(a) The Indenture Trustee may rely and shall be protected in acting or refraining from acting in good faith upon any resolution, Officer's Certificate, opinion of counsel, certificate of auditors, or any other certificate, statement, instrument, report, notice, consent or other document believed by it to be genuine and to have been signed or presented by the proper person. The Indenture Trustee need not investigate any fact or matter stated in any such document.

(b) Before the Indenture Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel. The Indenture Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on any such Officer's Certificate or Opinion of Counsel.

(c) The Indenture Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys or a custodian or nominee, and the Indenture Trustee shall not be responsible for any misconduct or negligence

CONFIDENTIAL                                                    RC_FGIC9019_00002791

on the part of, or for the supervision of, any such agent, attorney, custodian or nominee appointed with due care by it hereunder.

(d) The Indenture Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers; provided, however, that the Indenture Trustee's conduct does not constitute willful misconduct, negligence or bad faith.

(e) The Indenture Trustee may consult with counsel, and the advice or opinion of counsel with respect to legal matters relating to this Indenture and the Notes shall be full and complete authorization and protection from liability in respect to any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such counsel.

(f) The Indenture Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Indenture, unless it shall be proved that the Indenture Trustee was negligent in ascertaining the pertinent facts.

(g) Prior to the occurrence of an Event of Default hereunder, and after the curing or waiver of all Events of Default that may have occurred, the Indenture Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by the Enhancer or the Noteholders representing a majority of the aggregate Note Balance; provided, however, that if the payment within a reasonable time to the Indenture Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Indenture Trustee, not assured to the Indenture Trustee by the security afforded to it by the terms of this Indenture, the Indenture Trustee may require indemnity satisfactory to the Indenture Trustee against such cost, expense or liability as a condition to taking any such action.

(h) The Indenture Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Indenture or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of any of the Enhancer or the Noteholders, pursuant to the provisions of this Indenture, unless the Enhancer or the Noteholders shall have offered to the Indenture Trustee reasonable security or indemnity against the costs, expenses and liabilities which may be incurred therein or thereby; nothing contained herein shall, however, relieve the Indenture Trustee of the obligation, upon the occurrence of an Event of Default (which has not been cured or waived), to exercise such of the rights and powers vested in it by this Indenture, and to use the same degree of care and skill in their exercise as a prudent investor would exercise or use under the circumstances in the conduct of such investor's own affairs.

Section 6.03    Individual Rights of Indenture Trustee.    The Indenture Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Indenture

CONFIDENTIAL                                                                                                          RC_FGIC9019_00002792

Trustee. Any Note Registrar, co-registrar or co-paying agent may do the same with like rights. However, the Indenture Trustee must comply with Sections 6.11 and 6.12.

Section 6.04    Indenture Trustee's Disclaimer.    The Indenture Trustee shall not be (i) responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, (ii) accountable for the Issuer's use of the proceeds from the Notes or (iii) responsible for any statement of the Issuer in this Indenture or in any document issued in connection with the sale of the Notes or in the Notes, other than the Indenture Trustee's certificate of authentication thereon.

Section 6.05    Notice of Event of Default.    If an Event of Default shall occur and be continuing, and if such Event of Default is known to a Responsible Officer of the Indenture Trustee, then the Indenture Trustee shall give prompt notice thereof to the Enhancer.    The Indenture Trustee shall mail to each Noteholder notice of such Event of Default within 90 days after it occurs.    Except in the case of an Event of Default with respect to the payment of principal of or interest on any Note, the Indenture Trustee may withhold such notice if and so long as a committee of its Responsible Officers in good faith determines that withholding such notice is in the interests of the Noteholders.

Section 6.06    Reports by Indenture Trustee to Noteholders.    The Indenture Trustee shall deliver to each Noteholder such information as may be required to enable such Noteholder to prepare its federal and state income tax returns.    In addition, upon Issuer Request, the Indenture Trustee shall promptly furnish such information reasonably requested by the Issuer that is reasonably available to the Indenture Trustee to enable the Issuer to perform its federal and state income tax reporting obligations.

Section 6.07    Compensation and Indemnity.    The Indenture Trustee shall be compensated and indemnified by the Servicer in accordance with Section 6.06 of the Servicing Agreement.    All amounts owing the Indenture Trustee hereunder in excess of such amount, as well as any amount owed to the Indenture Trustee in accordance with Section 6.06 of the Servicing Agreement, to the extent the Servicer has failed to pay such amount, shall be paid solely as provided in Section 3.05 hereof (subject to the priorities set forth therein). The Indenture Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.    The Issuer shall reimburse the Indenture Trustee for all reasonable out-of-pocket expenses incurred or made by it, including costs of collection, in addition to the compensation for its services.    Such expenses shall include the reasonable compensation, expenses, disbursements and advances of the Indenture Trustee's agents, counsel, accountants and experts.    The Issuer shall indemnify the Indenture Trustee against any and all loss, liability or expense (including attorneys' fees) incurred by it in connection with the administration of this trust and the performance of its duties hereunder.    The Indenture Trustee shall notify the Issuer promptly of any claim for which it may seek indemnity.    Failure by the Indenture Trustee to so notify the Issuer shall not relieve the Issuer of its obligations hereunder.    The Issuer shall defend any such claim, and the Indenture Trustee may have separate counsel and the Issuer shall pay the fees and expenses of such counsel.    The Issuer is not obligated to reimburse any expense or indemnify against any loss, liability or expense incurred by the Indenture Trustee through the Indenture Trustee's own willful misconduct, negligence or bad faith.

CONFIDENTIAL                                                                                    RC_FGIC9019_00002793

The Issuer's payment obligations to the Indenture Trustee pursuant to this Section 6.07 shall survive the discharge of this Indenture or the termination or resignation of the Indenture Trustee. When the Indenture Trustee incurs expenses after the occurrence of an Event of Default specified in clause (c) or (d) of the definition thereof with respect to the Issuer, such expenses are intended to constitute expenses of administration under Title 11 of the United States Code or any other applicable federal or state bankruptcy, insolvency or similar law.

Section 6.08    Replacement of Indenture Trustee.    No resignation or removal of the Indenture Trustee and no appointment of a successor Indenture Trustee shall become effective until the acceptance of appointment by the successor Indenture Trustee pursuant to this Section 6.08. The Indenture Trustee may resign at any time by so notifying the Issuer and the Enhancer. The Enhancer or the Noteholders of a majority of the aggregate Note Balance of the Notes may remove the Indenture Trustee by so notifying the Indenture Trustee and the Enhancer (if given by such Noteholders) and may appoint a successor Indenture Trustee. Unless a Servicer Default has occurred and is continuing, the appointment of any successor Indenture Trustee shall be subject to the prior written approval of the Servicer. The Issuer shall remove the Indenture Trustee if:

(a) the Indenture Trustee fails to comply with Section 6.11;

(b) the Indenture Trustee is adjudged a bankrupt or insolvent;

(c) a receiver or other public officer takes charge of the Indenture Trustee or its property; or

(d) the Indenture Trustee otherwise becomes incapable of fulfilling its duties under the Basic Documents.

If the Indenture Trustee resigns or is removed or if a vacancy exists in the office of the Indenture Trustee for any reason (the Indenture Trustee in such event being referred to herein as the retiring Indenture Trustee), the Issuer shall promptly appoint a successor Indenture Trustee with the consent of the Enhancer, which consent shall not be unreasonably withheld. In addition, the Indenture Trustee shall resign to avoid being directly or indirectly controlled by the Issuer.

A successor Indenture Trustee shall deliver a written acceptance of its appointment to the retiring Indenture Trustee and to the Issuer. Thereupon, the resignation or removal of the retiring Indenture Trustee shall become effective, and the successor Indenture Trustee shall have all the rights, powers and duties of the Indenture Trustee under this Indenture. The successor Indenture Trustee shall mail a notice of its succession to the Noteholders. The retiring Indenture Trustee shall promptly transfer all property held by it as Indenture Trustee to the successor Indenture Trustee.

If a successor Indenture Trustee does not take office within 60 days after the retiring Indenture Trustee resigns or is removed, then the retiring Indenture Trustee, the Issuer or the Noteholders of a majority of aggregate Note Balance of the Notes may petition any court of competent jurisdiction for the appointment of a successor Indenture Trustee.

CONFIDENTIAL                                                        RC_FGIC9019_00002794

If the Indenture Trustee fails to comply with Section 6.11, any Noteholder may petition any court of competent jurisdiction for the removal of the Indenture Trustee and the appointment of a successor Indenture Trustee.

Notwithstanding the replacement of the Indenture Trustee pursuant to this Section, the Issuer's obligations under Section 6.07 shall continue for the benefit of the retiring Indenture Trustee.

Section 6.09    Successor Indenture Trustee by Merger.    If the Indenture Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, then the resulting, surviving or transferee corporation without any further act shall be the successor Indenture Trustee; provided, that such corporation or banking association shall be otherwise qualified and eligible under Section 6.11.  The Indenture Trustee shall provide the Rating Agencies with written notice of any such transaction occurring after the Closing Date.

If at the time of any such succession by merger, conversion or consolidation, any of the Notes shall have been authenticated but not delivered, then any such successor to the Indenture Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated.  If at such time any of the Notes shall not have been authenticated, any successor to the Indenture Trustee may authenticate such Notes either in the name of any predecessor hereunder or in the name of the successor to the Indenture Trustee; and in all such cases, such certificates shall have the full force that it is anywhere in the Notes or in this Indenture provided that the certificate of the Indenture Trustee shall have.

Section 6.10    Appointment of Co-Indenture Trustee or Separate Indenture Trustee.

(a) Notwithstanding any other provisions of this Indenture, at any time, for the purpose of meeting any legal requirement of any jurisdiction in which any part of the Trust Estate may at such time be located, the Indenture Trustee shall have the power and may execute and deliver all instruments to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees, of all or any part of the Issuer, and to vest in such Person or Persons, in such capacity and for the benefit of the Noteholders and the Enhancer, such title to the Trust Estate, or any part thereof, and, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the Indenture Trustee may consider necessary or desirable.  No co trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 6.11, and no notice to Noteholders of the appointment of any co trustee or separate trustee shall be required under Section 6.08 hereof.

(b) Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)    all rights, powers, duties and obligations conferred or imposed upon the Indenture Trustee shall be conferred or imposed upon and exercised or performed by the Indenture Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act

CONFIDENTIAL                                                    RC_FGIC9019_00002795

separately without the Indenture Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Indenture Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the Trust Estate or any portion thereof in any such jurisdiction) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Indenture Trustee;

(ii)     no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

(iii)     the Indenture Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c) Any notice, request or other writing given to the Indenture Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them.  Every instrument appointing any separate trustee or co-trustee shall refer to this Indenture and the conditions of this Article VI.  Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Indenture Trustee or separately, as may be provided therein, subject to all the provisions of this Indenture, specifically including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection to, the Indenture Trustee.  Every such instrument shall be filed with the Indenture Trustee.

(d) Any separate trustee or co-trustee may at any time constitute the Indenture Trustee, its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Indenture on its behalf and in its name.  If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Indenture Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

Section 6.11  Eligibility; Disqualification.   The Indenture Trustee shall at all times satisfy the requirements of TIA § 310(a).  The Indenture Trustee shall have a combined capital and surplus of at least $50,000,000 as set forth in its most recent published annual report of condition and it or its parent shall have a long-term debt rating of "A" or better by Moody's.  The Indenture Trustee shall comply with TIA § 310(b); provided, however, that there shall be excluded from the operation of TIA § 310(b)(1) any indenture or indentures under which other securities of the Issuer are outstanding if the requirements for such exclusion set forth in TIA § 310(b)(1) are met.

Section 6.12  Preferential Collection of Claims Against Issuer.   The Indenture Trustee shall comply with TIA § 311(a), excluding any creditor relationship listed in TIA § 311(b).  An Indenture Trustee that has resigned or been removed shall be subject to TIA § 311(a) to the extent indicated.

CONFIDENTIAL                                                           RC_FGIC9019_00002796

Section 6.13    <u>Representations and Warranties</u>.  The Indenture Trustee hereby represents and warrants that:

(a)  The Indenture Trustee is duly organized, validly existing and in good standing as a national banking association with power and authority to own its properties and to conduct its business as such properties are currently owned and such business is currently conducted.

(b)  The Indenture Trustee has the power and authority to execute and deliver this Indenture and to carry out its terms; and the execution, delivery and performance of this Indenture have been duly authorized by the Indenture Trustee by all necessary corporate action.

(c)  The consummation of the transactions contemplated by this Indenture and the fulfillment of the terms hereof do not conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time) a default under, the articles of organization or bylaws of the Indenture Trustee or any agreement or other instrument to which the Indenture Trustee is a party or by which it is bound.

(d)  To the Indenture Trustee's best knowledge, there are no Proceedings or investigations pending or threatened before any court, regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Indenture Trustee or its properties (A) asserting the invalidity of this Indenture, (B) seeking to prevent the consummation of any of the transactions contemplated by this Indenture or (C) seeking any determination or ruling that might materially and adversely affect the performance by the Indenture Trustee of its obligations under, or the validity or enforceability of, this Indenture.

(e)  The Indenture Trustee does not have notice of any adverse claim (as such terms are used in Section 8-302 of the UCC in effect in the State of Delaware) with respect to the Mortgage Loans.

Section 6.14    <u>Directions to Indenture Trustee</u>.  The Indenture Trustee is hereby directed:

(a)  to accept the pledge of the Mortgage Loans and hold the assets of the Trust in trust for the Noteholders and the Enhancer;

(b)  to authenticate and deliver the Notes substantially in the form prescribed by Exhibit A in accordance with the terms of this Indenture; and

(c)  to take all other actions as shall be required to be taken by the terms of this Indenture.

Section 6.15    <u>Indenture Trustee May Own Securities</u>.  The Indenture Trustee, in its individual or any other capacity, may become the owner or pledgee of Securities with the same rights it would have if it were not Indenture Trustee.

ARTICLE VII

Noteholders' Lists and Reports

CONFIDENTIAL                                                    RC_FGIC9019_00002797

Section 7.01    Issuer to Furnish Indenture Trustee Names and Addresses of Noteholders.
The Issuer shall furnish or cause to be furnished to the Indenture Trustee (a) not more than five days after each Record Date, a list, in such form as the Indenture Trustee may reasonably require, of the names and addresses of the Noteholders as of such Record Date, and (b) at such other times as the Indenture Trustee and the Enhancer may request in writing, within 30 days after receipt by the Issuer of any such request, a list of similar form and content as of a date not more than 10 days prior to the time such list is furnished; provided, however, that for so long as the Indenture Trustee is the Note Registrar, no such list need be furnished.

Section 7.02    Preservation of Information; Communications to Noteholders.

(a) The Indenture Trustee shall preserve, in as current a form as is reasonably practicable, the names and addresses of the Noteholders contained in the most recent list furnished to the Indenture Trustee as provided in Section 7.01 and the names and addresses of the Noteholders received by the Indenture Trustee in its capacity as Note Registrar.   The Indenture Trustee may destroy any list furnished to it as provided in such Section 7.01 upon receipt of a new list so furnished.

(b) Noteholders may communicate pursuant to TIA § 312(b) with other Noteholders and the Enhancer with respect to their rights under this Indenture or under the Notes.

(c) The Issuer, the Indenture Trustee and the Note Registrar shall have the protection of TIA § 312(c).

Section 7.03    Reports by Issuer.

(a) The Issuer shall:

(i)    file with the Indenture Trustee, within 15 days after the Issuer is required to file the same with the Commission, copies of the annual reports and the information, documents and other reports (or copies of such portions of any of the foregoing as the Commission may from time to time by rules and regulations prescribe) that the Issuer may be required to file with the Commission pursuant to Section 13 or 15(d) of the Exchange Act;

(ii)    file with the Indenture Trustee and the Commission, in accordance with rules and regulations prescribed from time to time by the Commission, such additional information, documents and reports with respect to compliance by the Issuer with the conditions and covenants of this Indenture as may be required from time to time by such rules and regulations; and

(iii)    supply to the Indenture Trustee (and the Indenture Trustee shall transmit by mail to all Noteholders described in TIA § 313(c)) such summaries of any information, documents and reports required to be filed by the Issuer pursuant to clauses (i) and (ii) of this Section 7.03(a) and by rules and regulations prescribed from time to time by the Commission.

CONFIDENTIAL                                        RC_FGIC9019_00002798

(b) Unless the Issuer otherwise determines, the fiscal year of the Issuer shall end on December 31 of each year.

Section 7.04    Reports by Indenture Trustee.  If required by TIA § 313(a), within 60 days after each January 1, beginning with January 1, 2007, the Indenture Trustee shall make available to each Noteholder as required by TIA § 313(c) and to the Enhancer a brief report dated as of such date that complies with TIA § 313(a).  The Indenture Trustee also shall comply with TIA § 313(b).

A copy of each report at the time of its distribution to Noteholders shall be filed by the Indenture Trustee with the Commission, if required, and each stock exchange, if any, on which the Notes are listed.  The Issuer shall notify the Indenture Trustee if and when the Notes are listed on any stock exchange.

Section 7.05    Exchange Act Reporting. In connection with the preparation and filing of periodic reports by the Servicer pursuant to Article IV of the Servicing Agreement, the Indenture Trustee shall timely provide to the Servicer (I) a list of Holders as shown on the Note Register or Certificate Register as of the end of each calendar year, (II) copies of all pleadings, other legal process and any other documents relating to any claims, charges or complaints involving the Indenture Trustee, as indenture trustee hereunder, or the Trust Estate that are received by the Indenture Trustee, (III) notice of all matters that, to the actual knowledge of a Responsible Officer of the Indenture Trustee, have been submitted to a vote of the Holders, other than those matters that have been submitted to a vote of the Holders at the request of the Depositor or the Servicer, and (IV) notice of any failure of the Indenture Trustee to make any payment to the Holders as required pursuant to this Indenture.  The Indenture Trustee shall not have any liability with respect to the Servicer's failure to properly prepare or file such periodic reports and the Servicer shall not have any liability with respect to such failure resulting from or relating to the Servicer's inability or failure to obtain any information not resulting from the Servicer's own negligence or willful misconduct.

ARTICLE VIII

Accounts, Disbursements and Releases

Section 8.01    Collection of Money.  Except as otherwise expressly provided herein, the Indenture Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all money and other property payable to or receivable by the Indenture Trustee pursuant to this Indenture.   The Indenture Trustee shall apply all such money received by it as provided in this Indenture.  Except as otherwise expressly provided in this Indenture, if any default occurs in the making of any payment or performance under any agreement or instrument that is part of the Trust Estate, the Indenture Trustee may take such action as may be appropriate to enforce such payment or performance, including the institution and prosecution of appropriate Proceedings.   Any such action shall be without prejudice to any right to claim a Default or Event of Default under this Indenture and any right to proceed thereafter as provided in Article V.

CONFIDENTIAL    RC_FGIC9019_00002799

Section 8.02    Trust Accounts.

(a) On or prior to the Closing Date, the Issuer shall cause the Indenture Trustee to establish and maintain, in the name of the Indenture Trustee, for the benefit of the Noteholders, the Certificate Paying Agent, on behalf of the Certificateholders, and the Enhancer, the Note Payment Account as provided in Section 3.01 of this Indenture.

(b) All monies deposited from time to time in the Note Payment Account pursuant to the Servicing Agreement and all deposits therein pursuant to this Indenture are for the benefit of the Noteholders, the Enhancer and the Certificate Paying Agent, on behalf of the Certificateholders, and all investments made with such monies, including all income or other gain from such investments, are for the benefit of the Servicer as provided in Section 5.01 of the Servicing Agreement.

On each Payment Date, the Indenture Trustee shall distribute all amounts on deposit in the Note Payment Account to the Noteholders in respect of the Notes and, in its capacity as Certificate Paying Agent, to the Certificateholders from the Distribution Account in the order of priority set forth in Section 3.05 (except as otherwise provided in Section 5.04(b)) and in accordance with the Servicing Certificate.

The Indenture Trustee shall invest any funds in the Note Payment Account in Permitted Investments selected in writing by the Servicer maturing no later than the Business Day preceding the next succeeding Payment Date (except that any investment in the institution with which the Note Payment Account is maintained may mature on such Payment Date) and shall not be sold or disposed of prior to the maturity. In addition, such Permitted Investments shall not be purchased at a price in excess of par. The Indenture Trustee shall have no liability whatsoever for investment losses on Permitted Investments, if such investments are made in accordance with the provisions of this Indenture and the Indenture Trustee is not the obligor under the Permitted Investment.

Section 8.03    Officer's Certificate.    The Indenture Trustee shall receive at least seven days' notice when requested by the Issuer to take any action pursuant to Section 8.05(a), accompanied by copies of any instruments to be executed, and the Indenture Trustee shall also require, as a condition to such action, an Officer's Certificate, in form and substance satisfactory to the Indenture Trustee, stating the legal effect of any such action, outlining the steps required to complete the same, and concluding that all conditions precedent to the taking of such action have been complied with.

Section 8.04    Termination Upon Distribution to Noteholders.    This Indenture and the respective obligations and responsibilities of the Issuer and the Indenture Trustee created hereby shall terminate upon the distribution to the Noteholders, the Certificate Paying Agent on behalf of the Certificateholders and the Indenture Trustee of all amounts required to be distributed pursuant to Article III and the distribution to the Credit Enhancer of all amounts owing to it; provided, however, that in no event shall the trust created hereby continue beyond the expiration of 21 years from the death of the survivor of the descendants of Joseph P. Kennedy, the late ambassador of the United States to the Court of St. James's, living on the date hereof.

CONFIDENTIAL                                                                    RC_FGIC9019_00002800

Section 8.05    Release of Trust Estate.

(a) Subject to the payment of its fees, expenses and indemnification, the Indenture Trustee may, and when required by the provisions of this Indenture or the Servicing Agreement, shall, execute instruments to release property from the lien of this Indenture, or convey the Indenture Trustee's interest in the same, in a manner and under circumstances that are not inconsistent with the provisions of this Indenture. No Person relying upon an instrument executed by the Indenture Trustee as provided in Article VIII hereunder shall be bound to ascertain the Indenture Trustee's authority, inquire into the satisfaction of any conditions precedent, or see to the application of any monies.

(b) The Indenture Trustee shall, at such time as (i) there are no Notes Outstanding, (ii) all sums due the Indenture Trustee pursuant to this Indenture have been paid and (iii) all sums due the Enhancer have been paid and the Policy has been returned to the Credit Enhancer, release any remaining portion of the Trust Estate that secured the Notes from the lien of this Indenture.

(c) The Indenture Trustee shall release property from the lien of this Indenture pursuant to this Section 8.05 only upon receipt of an Issuer Request accompanied by an Officers' Certificate and a letter from the Enhancer stating that the Enhancer has no objection to such request from the Issuer.

(d) The Indenture Trustee shall, at the request of the Issuer or the Depositor, surrender the Policy to the Enhancer for cancellation, upon final payment of principal of and interest on the Notes.

Section 8.06    Surrender of Notes Upon Final Payment.    By acceptance of any Note, the Noteholder thereof agrees to surrender such Note to the Indenture Trustee promptly, prior to such Noteholder's receipt of the final payment thereon.

ARTICLE IX

Supplemental Indentures

Section 9.01    Supplemental Indentures Without Consent of Noteholders.

(a) Without the consent of the Noteholders of any Notes, but with prior notice to the Rating Agencies and the prior written consent of the Enhancer (which consent shall not be unreasonably withheld and so long as no Enhancer Default exists), the Issuer and the Indenture Trustee, when authorized by an Issuer Request, at any time and from time to time, may enter into one or more indentures supplemental hereto (which shall conform to the provisions of the Trust Indenture Act as in force at the date of the execution thereof), in form satisfactory to the Indenture Trustee, for any of the following purposes:

(i)    to correct or amplify the description of any property at any time subject to the lien of this Indenture, or better to assure, convey and confirm unto the

CONFIDENTIAL    RC_FGIC9019_00002801

Indenture Trustee any property subject or required to be subjected to the lien of this Indenture, or to subject to the lien of this Indenture additional property;

(ii)    to evidence the succession, in compliance with the applicable provisions hereof, of another Person to the Issuer, and the assumption by any such successor of the covenants of the Issuer herein and in the Notes contained;

(iii)    to add to the covenants of the Issuer, for the benefit of the Noteholders or the Enhancer, or to surrender any right or power herein conferred upon the Issuer;

(iv)    to convey, transfer, assign, mortgage or pledge any property to or with the Indenture Trustee;

(v)    to cure any ambiguity, to correct any error or to correct or supplement any provision herein or in any supplemental indenture that may be inconsistent with any other provision herein or in any supplemental indenture;

(vi)    to make any other provisions with respect to matters or questions arising under this Indenture or in any supplemental indenture; provided, that such action shall not materially and adversely affect the interests of the Noteholders or the Enhancer (as evidenced by an Opinion of Counsel);

(vii)    to evidence and provide for the acceptance of the appointment hereunder by a successor trustee with respect to the Notes and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the trusts hereunder by more than one trustee, pursuant to the requirements of Article VI; or

(viii)    to modify, eliminate or add to the provisions of this Indenture to such extent as shall be necessary to effect the qualification of this Indenture under TIA or under any similar federal statute hereafter enacted and to add to this Indenture such other provisions as may be expressly required by TIA;

provided, however, that no such supplemental indenture shall be entered into unless the Indenture Trustee shall have received an Opinion of Counsel to the effect that the execution of such supplemental indenture will not give rise to any material adverse tax consequence to the Noteholders, including any Adverse REMIC Event.

The Indenture Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be therein contained.

(b) The Issuer and the Indenture Trustee, when authorized by an Issuer Request, may, without the consent of any Noteholder but with prior notice to the Rating Agencies and the Enhancer, enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or of modifying in any manner the rights of the Noteholders under this Indenture;

CONFIDENTIAL

provided, however, that such action shall not, as evidenced by an Opinion of Counsel, (i) adversely affect in any material respect the interests of any Noteholder or the Enhancer or (ii) cause the Issuer to be subject to an entity level tax.

Section 9.02    Supplemental Indentures With Consent of Noteholders.    The Issuer and the Indenture Trustee, when authorized by an Issuer Request, may, with prior notice to the Rating Agencies and with the consent of the Enhancer and the Noteholders of not less than a majority of the Note Balances affected thereby, by Act (as defined in Section 10.03 hereof) of such Noteholders delivered to the Issuer and the Indenture Trustee, enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or of modifying in any manner the rights of the Noteholders under this Indenture; provided, however, that no such supplemental indenture shall, without the consent of the Noteholder of each Note affected thereby:

(a) change the date of payment of any installment of principal of or interest on any Note, or reduce the principal amount thereof or the Note Rate thereon, change the provisions of this Indenture relating to the application of collections on, or the proceeds of the sale of, the Trust Estate to payment of principal of or interest on the Notes, or change any place of payment where, or the coin or currency in which, any Note or the interest thereon is payable, or impair the right to institute suit for the enforcement of the provisions of this Indenture requiring the application of funds available therefor, as provided in Article V, to the payment of any such amount due on the Notes on or after the respective due dates thereof;

(b) reduce the percentage of the Note Balances, the consent of the Noteholders of which is required for any such supplemental indenture, or the consent of the Noteholders of which is required for any waiver of compliance with certain provisions of this Indenture or certain defaults hereunder and their consequences provided for in this Indenture;

(c) modify or alter the provisions of the proviso to the definition of the term "Outstanding" or modify or alter the exception in the definition of the term "Noteholder";

(d) reduce the percentage of the aggregate Note Balance of the Notes required to direct the Indenture Trustee to direct the Issuer to sell or liquidate the Trust Estate pursuant to Section 5.04;

(e) modify any provision of this Section 9.02 except to increase any percentage specified herein or to provide that certain additional provisions of this Indenture or the other Basic Documents cannot be modified or waived without the consent of the Noteholder of each Note affected thereby;

(f) modify any of the provisions of this Indenture in such manner as to affect the calculation of the amount of any payment of interest or principal due on any Note on any Payment Date (including the calculation of any of the individual components of such calculation); or

(g) permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Trust Estate or, except as otherwise permitted or

CONFIDENTIAL                                    RC_FGIC9019_00002803

contemplated herein, terminate the lien of this Indenture on any property at any time subject hereto or deprive the Noteholder of any Note of the security provided by the lien of this Indenture; and provided further, that such action shall not, as evidenced by an Opinion of Counsel, cause the Issuer to be subject to an entity level tax or cause any Adverse REMIC Event.

The Indenture Trustee may in its discretion determine whether or not any Notes would be affected by any supplemental indenture and any such determination shall be conclusive upon the Noteholders of all Notes, whether theretofore or thereafter authenticated and delivered hereunder.  The Indenture Trustee shall not be liable for any such determination made in good faith.

It shall not be necessary for any Act (as defined in Section 10.03 hereof) of Noteholders under this Section 9.02 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act shall approve the substance thereof.

Promptly after the execution by the Issuer and the Indenture Trustee of any supplemental indenture pursuant to this Section 9.02, the Indenture Trustee shall mail to the Noteholders of the Notes to which such amendment or supplemental indenture relates a notice setting forth in general terms the substance of such supplemental indenture.  Any failure of the Indenture Trustee to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

Section 9.03    Execution of Supplemental Indentures.  In executing, or permitting the additional trusts created by, any supplemental indenture permitted by this Article IX or the modification thereby of the trusts created by this Indenture, the Indenture Trustee shall be entitled to receive and, subject to Sections 6.01 and 6.02, shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture.  The Indenture Trustee may, but shall not be obligated to, enter into any such supplemental indenture that affects the Indenture Trustee's own rights, duties, liabilities or immunities under this Indenture or otherwise.

Section 9.04    Effect of Supplemental Indenture.    Upon the execution of any supplemental indenture pursuant to the provisions hereof, this Indenture shall be and shall be deemed to be modified and amended in accordance therewith with respect to the Notes affected thereby, and the respective rights, limitations of rights, obligations, duties, liabilities and immunities under this Indenture of the Indenture Trustee, the Issuer, the Enhancer and the Noteholders shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications and amendments, and all the terms and conditions of any such supplemental indenture shall be and be deemed to be part of the terms and conditions of this Indenture for any and all purposes.

Section 9.05    Conformity with Trust Indenture Act.  Every amendment of this Indenture and every supplemental indenture executed pursuant to this Article IX shall conform to the requirements of TIA as in effect at the time of such amendment or supplement so long as this Indenture shall then be qualified under TIA.

US_WEST:260042806.5

50

CONFIDENTIAL

RC_FGIC9019_00002804

Section 9.06    Reference in Notes to Supplemental Indentures.  Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Article IX may, and if required by the Indenture Trustee, shall, bear a notation in form approved by the Indenture Trustee as to any matter provided for in such supplemental indenture.  If the Issuer or the Indenture Trustee shall so determine, new Notes so modified as to conform, in the opinion of the Indenture Trustee and the Issuer, to any such supplemental indenture may be prepared and executed by the Issuer and authenticated and delivered by the Indenture Trustee in exchange for Outstanding Notes.

## ARTICLE X

### Miscellaneous

Section 10.01  Compliance Certificates and Opinions, etc.

(a) Upon any application or request by the Issuer to the Indenture Trustee to take any action under any provision of this Indenture, the Issuer shall furnish to the Indenture Trustee and to the Enhancer (i) an Officer's Certificate stating that all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with and (ii) an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent, if any, have been complied with, except that, in the case of any such application or request as to which the furnishing of such documents is specifically required by any provision of this Indenture, no additional certificate or opinion need be furnished.

Every certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture shall include:

(i)    a statement that each signatory of such certificate or opinion has read or has caused to be read such covenant or condition and the definitions herein relating thereto;

(ii)    a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(iii)    a statement that, in the opinion of each such signatory, such signatory has made such examination or investigation as is necessary to enable such signatory to express an informed opinion as to whether or not such covenant or condition has been complied with;

(iv)    a statement as to whether, in the opinion of each such signatory, such condition or covenant has been complied with; and

(v)    if the signer of such certificate or opinion is required to be Independent, the statement required by the definition of the term "Independent."

CONFIDENTIAL                                                    RC_FGIC9019_00002805

(b) (i) Prior to the deposit of any Collateral or other property or securities with the Indenture Trustee that is to be made the basis for the release of any property or securities subject to the lien of this Indenture, the Issuer shall, in addition to any obligation imposed in Section 10.01(a) or elsewhere in this Indenture, furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of each person signing such certificate as to the fair value (within 90 days of such deposit) to the Issuer of the Collateral or other property or securities to be so deposited.

(ii)    Whenever the Issuer is required to furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of any signer thereof as to the matters described in clause (i) above, the Issuer shall also deliver to the Indenture Trustee an Independent Certificate as to the same matters, if the fair value to the Issuer of the securities to be so deposited and of all other such securities made the basis of any such withdrawal or release since the commencement of the then-current fiscal year of the Issuer, as set forth in the certificates delivered pursuant to clause (i) above and this clause (ii), is 10% or more of the aggregate Note Balance of the Notes, but such a certificate need not be furnished with respect to any securities so deposited, if the fair value thereof to the Issuer as set forth in the related Officer's Certificate is less than $25,000 or less than one percent of the aggregate Note Balance of the Notes.

(iii)    Whenever any property or securities are to be released from the lien of this Indenture, the Issuer shall furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of each person signing such certificate as to the fair value (within 90 days of such release) of the property or securities proposed to be released and stating that in the opinion of such person the proposed release will not impair the security under this Indenture in contravention of the provisions hereof.

(iv)    Whenever the Issuer is required to furnish to the Indenture Trustee an Officer's Certificate certifying or stating the opinion of any signer thereof as to the matters described in clause (iii) above, the Issuer shall also furnish to the Indenture Trustee an Independent Certificate as to the same matters if the fair value of the property or securities and of all other property, other than property as contemplated by clause (v) below or securities released from the lien of this Indenture since the commencement of the then-current calendar year, as set forth in the certificates required by clause (iii) above and this clause (iv), equals 10% or more of the aggregate Note Balance of the Notes, but such certificate need not be furnished in the case of any release of property or securities if the fair value thereof as set forth in the related Officer's Certificate is less than $25,000 or less than one percent of the aggregate Note Balance of the Notes.

(v)    Notwithstanding the foregoing, this Section 10.01(b) shall not apply to (A) collection upon, sales or other dispositions of the Mortgage Loans as and to the extent permitted or required by the Basic Documents or (B) the making of cash payments out of the Note Payment Account as and to the extent permitted or required by the Basic Documents, so long as the Issuer shall deliver to the Indenture Trustee every six months, commencing December 31, 2006, an Officer's Certificate of the Issuer stating that all the dispositions of Collateral described in clauses (A) or (B) above that occurred

CONFIDENTIAL                                                            RC_FGIC9019_00002806

during the preceding six calendar months (or such longer period, in the case of the first such Officer's Certificate) were permitted or required by the Basic Documents and that the proceeds thereof were applied in accordance with the Basic Documents.

Section 10.02  Form of Documents Delivered to Indenture Trustee.

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Authorized Officer of the Issuer may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous.  Any such certificate of an Authorized Officer or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an officer or officers of any Seller or the Issuer, stating that the information with respect to such factual matters is in the possession of any Seller or the Issuer, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever in this Indenture, in connection with any application or certificate or report to the Indenture Trustee, it is provided that the Issuer shall deliver any document as a condition of the granting of such application, or as evidence of the Issuer's compliance with any term hereof, it is intended that the truth and accuracy, at the time of the granting of such application or at the effective date of such certificate or report (as the case may be), of the facts and opinions stated in such document shall in such case be conditions precedent to the right of the Issuer to have such application granted or to the sufficiency of such certificate or report.  The foregoing shall not, however, be construed to affect the Indenture Trustee's right to rely upon the truth and accuracy of any statement or opinion contained in any such document as provided in Article VI.

Section 10.03  Acts of Noteholders.

(a) Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Noteholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Noteholders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the Indenture Trustee, and, where it is hereby expressly required, to the Issuer.  Such

CONFIDENTIAL                                                RC_FGIC9019_00002807

instrument or instruments (and the action embodied therein and evidenced thereby) are herein
sometimes referred to as the "Act" of the Noteholders signing such instrument or instruments.
Proof of execution of any such instrument or of a writing appointing any such agent shall be
sufficient for any purpose of this Indenture and (subject to Section 6.01) conclusive in favor of
the Indenture Trustee and the Issuer, if made in the manner provided in this Section 10.03.

(b) The fact and date of the execution by any person of any such instrument or
writing may be proved in any manner that the Indenture Trustee deems sufficient.

(c) The ownership of Notes shall be proved by the Note Register.

(d) Any request, demand, authorization, direction, notice, consent, waiver or other
action by the Noteholder of any Note shall bind the Noteholder of every Note issued upon the
registration thereof or in exchange therefor or in lieu thereof, in respect of anything done,
omitted or suffered to be done by the Indenture Trustee or the Issuer in reliance thereon, whether
or not notation of such action is made upon such Note.

Section 10.04 <u>Notices, etc., to Indenture Trustee, Issuer, Enhancer and Rating Agencies</u>.
Any request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders or
other documents provided or permitted by this Indenture shall be in writing and if such request,
demand, authorization, direction, notice, consent, waiver or Act of Noteholders is to be made
upon, given or furnished to or filed with:

(a) the Indenture Trustee by any Noteholder or by the Issuer shall be sufficient for
every purpose hereunder if made, given, furnished or filed in writing to or with the Indenture
Trustee at its Corporate Trust Office with a copy to JPMorgan Chase Bank, National
Association, 227 W. Monroe Street, Chicago, Illinois 60606. The Indenture Trustee shall
promptly transmit any notice received by it from the Noteholders to the Issuer,

(b) the Issuer by the Indenture Trustee or by any Noteholder shall be sufficient for
every purpose hereunder if in writing and mailed first-class, postage prepaid to the Issuer
addressed to: GMACM Home Equity Loan Trust 2006-HE2, in care of the Owner Trustee, or at
any other address previously furnished in writing to the Indenture Trustee by the Issuer. The
Issuer shall promptly transmit any notice received by it from the Noteholders to the Indenture
Trustee, or

(c) the Enhancer by the Issuer, the Indenture Trustee or by any Noteholders shall
be sufficient for every purpose hereunder to in writing and mailed, first-class postage pre-paid, or
personally delivered or telecopied to: Financial Guaranty Insurance Company, 125 Park Avenue,
New York, New York 10017, Attention: Structured Finance Surveillance (GMACM Home
Equity Loan Trust 2006-HE2), telecopier number (212) 312-3220. The Enhancer shall promptly
transmit any notice received by it from the Issuer, the Indenture Trustee or the Noteholders to the
Issuer or Indenture Trustee, as the case may be.

Notices required to be given to the Rating Agencies by the Issuer, the Indenture Trustee
or the Owner Trustee shall be in writing, personally delivered or mailed by certified mail, return
receipt requested, to (i) in the case of Moody's, at the following address: Moody's Investors

CONFIDENTIAL                                                    RC_FGIC9019_00002808

Service, Inc., ABS Monitoring Department, 99 Church Street, New York, New York 10007 and (ii) in the case of Standard & Poor's, at the following address:  Standard & Poor's, 55 Water Street, New York, New York 10041-0003, Attention:  Asset Backed Surveillance Department; or, as to each of the foregoing Persons, at such other address as shall be designated by written notice to the other foregoing Persons.

Section 10.05  <u>Notices to Noteholders; Waiver</u>.  Where this Indenture provides for a Notice, certificate, opinion, report or similar delivery to be given to any transaction party or to a Rating Agency, a copy of such document shall be contemporaneously sent to the Enhancer. Where this Indenture provides for notice to Noteholders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, first-class, postage prepaid to each Noteholder affected by such event, at such Person's address as it appears on the Note Register, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice.  In any case where notice to Noteholders is given by mail, neither the failure to mail such notice nor any defect in any notice so mailed to any particular Noteholder shall affect the sufficiency of such notice with respect to other Noteholders, and any notice that is mailed in the manner herein provided shall conclusively be presumed to have been duly given regardless of whether such notice is in fact actually received.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  Waivers of notice by Noteholders shall be filed with the Indenture Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such a waiver.

In case, by reason of the suspension of regular mail service as a result of a strike, work stoppage or similar activity, it shall be impractical to mail notice of any event to Noteholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be satisfactory to the Indenture Trustee shall be deemed to be a sufficient giving of such notice.

Where this Indenture provides for notice to the Rating Agencies, failure to give such notice shall not affect any other rights or obligations created hereunder, and shall not under any circumstance constitute an Event of Default.

Section 10.06  <u>Alternate Payment and Notice Provisions</u>.  Notwithstanding any provision of this Indenture or any of the Notes to the contrary, the Issuer may enter into any agreement with any Noteholder providing for a method of payment, or notice by the Indenture Trustee to such Noteholder, that is different from the methods provided for in this Indenture for such payments or notices.  The Issuer shall furnish to the Indenture Trustee a copy of each such agreement and the Indenture Trustee shall cause payments to be made and notices to be given in accordance with such agreements.

Section 10.07  <u>Conflict with Trust Indenture Act</u>.  If any provision hereof limits, qualifies or conflicts with another provision hereof that is required to be included in this Indenture by any of the provisions of TIA, such required provision shall control.

CONFIDENTIAL                                                                              RC_FGIC9019_00002809

The provisions of TIA §§ 310 through 317 that impose duties on any Person (including the provisions automatically deemed included herein unless expressly excluded by this Indenture) are a part of and govern this Indenture, whether or not physically contained herein.

Section 10.08 <u>Effect of Headings</u>. The Article and Section headings herein are for convenience only and shall not affect the construction hereof.

Section 10.09 <u>Successors and Assigns</u>. All covenants and agreements in this Indenture and the Notes by the Issuer shall bind its successors and assigns, whether so expressed or not. All agreements of the Indenture Trustee in this Indenture shall bind its successors, co-trustees and agents.

Section 10.10 <u>Severability</u>. In case any provision in this Indenture or in the Notes shall be held invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby.

Section 10.11 <u>Benefits of Indenture</u>. Nothing in this Indenture or in the Notes, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, and the Noteholders, the Enhancer, and any other party secured hereunder, and any other Person with an ownership interest in any part of the Trust Estate, any benefit or any legal or equitable right, remedy or claim under this Indenture. The Enhancer shall be a third party beneficiary of this Indenture.

Section 10.12 <u>Legal Holidays</u>. In any case where the date on which any payment is due shall not be a Business Day, then (notwithstanding any other provision of the Notes or this Indenture) payment need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the date on which nominally due, and no interest shall accrue for the period from and after any such nominal date.

Section 10.13 <u>GOVERNING LAW</u>. THIS AGREEMENT AND THE NOTES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICT OF LAW PRINCIPLES THEREOF, OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

Section 10.14 <u>Counterparts</u>. This Indenture may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 10.15 <u>Recording of Indenture</u>. If this Indenture is subject to recording in any appropriate public recording offices, such recording is to be effected by the Issuer and at its expense accompanied by an Opinion of Counsel (which counsel shall be reasonably acceptable to the Indenture Trustee) to the effect that such recording is necessary either for the protection of the Noteholders or any other Person secured hereunder or for the enforcement of any right or remedy granted to the Indenture Trustee under this Indenture.

CONFIDENTIAL                                                    RC_FGIC9019_00002810

Section 10.16 <u>Issuer Obligation</u>.  No recourse may be taken, directly or indirectly, with respect to the obligations of the Issuer, the Owner Trustee or the Indenture Trustee on the Notes or under this Indenture or any certificate or other writing delivered in connection herewith or therewith, against (i) the Indenture Trustee or the Owner Trustee in its individual capacity, (ii) any owner of a beneficial interest in the Issuer or (iii) any partner, owner, beneficiary, agent, officer, director, employee or agent of the Indenture Trustee or the Owner Trustee in its individual capacity, any holder of a beneficial interest in the Issuer, the Owner Trustee or the Indenture Trustee or of any successor or assign of the Indenture Trustee or the Owner Trustee in its individual capacity, except as any such Person may have expressly agreed (it being understood that the Indenture Trustee and the Owner Trustee have no such obligations in their respective individual capacities), and except that any such partner, owner or beneficiary shall be fully liable, to the extent provided by applicable law, for any unpaid consideration for stock, unpaid capital contribution or failure to pay any installment or call owing to such entity.  For all purposes of this Indenture, in the performance of any duties or obligations of the Issuer hereunder, the Owner Trustee shall be subject to, and entitled to the benefits of, the terms and provisions of Articles VI, VII and VIII of the Trust Agreement.

Section 10.17 <u>No Petition</u>.  The Indenture Trustee, by entering into this Indenture, and each Noteholder, by its acceptance of a Note, hereby covenant and agree that they will not at any time institute against the Depositor or the Issuer, or join in any institution against the Depositor or the Issuer of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy or similar law in connection with any obligations relating to the Notes, this Indenture or any of the other Basic Documents.

Section 10.18 <u>Inspection</u>.  The Issuer agrees that, on reasonable prior notice, it shall permit any representative of the Indenture Trustee, during the Issuer's normal business hours, to examine all the books of account, records, reports and other papers of the Issuer, to make copies and extracts therefrom, to cause such books to be audited by Independent certified public accountants, and to discuss the Issuer's affairs, finances and accounts with the Issuer's officers, employees, and Independent certified public accountants, all at such reasonable times and as often as may be reasonably requested.  The Indenture Trustee shall and shall cause its representatives to hold in confidence all such information except to the extent disclosure may be required by law (and all reasonable applications for confidential treatment are unavailing) and except to the extent that the Indenture Trustee may reasonably determine that such disclosure is consistent with its obligations hereunder.

## ARTICLE XI

## REMIC Provisions

Section 11.01 <u>REMIC Administration</u>.

(a)  The REMIC Administrator shall make an election to treat the Trust Estate, as set forth in Section 2.06 of the Trust Agreement, as two REMICs under the Code and, if necessary, under applicable state law, in accordance with Section 2.06 of the Trust Agreement.

CONFIDENTIAL                                                          RC_FGIC9019_00002811

Such election will be made on Form 1066 or other appropriate federal tax or information return (including Form 8811) or any appropriate state return for the taxable year ending on the last day of the calendar year in which the Securities are issued.  For the purposes of the REMIC elections in respect of the Trust Estate, Securities and interests to be designated as the "regular interests" and the sole class of "residual interests" in each REMIC will be set forth in Section 11.03.  The REMIC Administrator and the Indenture Trustee shall not permit the creation of any "interests" (within the meaning of Section 860G of the Code) in each REMIC elected in respect of the Trust Fund other than the "regular interests" and "residual interests" so designated.

(b) The Closing Date is hereby designated as the "startup day" of each of REMIC I and REMIC II as designated in Section 11.03 below, and the Trust Estate within the meaning of Section 860G(a)(9) of the Code.

(c) GMAC Mortgage Corporation shall hold a Class R Certificate representing at least a 0.01% Percentage Interest in each Class of the Class R Certificates and shall be designated as "the tax matters person" with respect to each REMIC in the manner provided under Treasury regulations §1.860F-4(d) and Treasury regulations §301.6231(a)(7)-1.  The REMIC Administrator, on behalf of the Tax Matters Partner, shall (i) act on behalf of each REMIC in relation to any tax matter or controversy involving the Trust Estate and (ii) represent the Trust Estate in any administrative or judicial proceeding relating to an examination or audit by any governmental taxing authority with respect thereto.  The legal expenses, including without limitation attorneys' or accountants' fees, and costs of any such proceeding and any liability resulting therefrom shall be expenses of the Trust Estate and the REMIC Administrator shall be entitled to reimbursement therefor out of amounts attributable to the Mortgage Loans on deposit in the Custodial Account unless such legal expenses and costs are incurred by reason of the REMIC Administrator's willful misfeasance, bad faith or gross negligence.

(d) The REMIC Administrator shall prepare or cause to be prepared all of the Tax Returns that it determines are required with respect to each REMIC created hereunder and, if approval therefore is received from the applicable District Director of the Internal Revenue Service, shall sign and file such returns in a timely manner and, otherwise, shall, shall deliver such Tax Returns in a timely manner to the Owner Trustee, if the Owner Trustee is required to sign such returns in accordance with Section 5.03 of the Trust Agreement, and shall sign (if the Owner Trustee is not so required) and file such Tax Returns in a timely manner.  The expenses of preparing such returns shall be borne by the REMIC Administrator without any right of reimbursement therefor.  The REMIC Administrator agrees to indemnify and hold harmless the Owner Trustee with respect to any tax or liability arising from the Owner Trustee's signing of Tax Returns that contain errors or omissions.  The Indenture Trustee and Servicer shall promptly provide the REMIC Administrator with such information as the REMIC Administrator may from time to time request for the purpose of enabling the REMIC Administrator to prepare Tax Returns.

(e) The REMIC Administrator shall provide (i) to any Transferor of a Class R Certificate such information as is necessary for the application of any tax relating to the transfer of a Class R Certificate to any Person who is not a Permitted Transferee, (ii) to the Indenture Trustee, and the Indenture Trustee shall forward to the Noteholders and the Certificateholders,

CONFIDENTIAL                                                                          RC_FGIC9019_00002812

such information or reports as are required by the Code or the REMIC Provisions including reports relating to interest, original issue discount and market discount or premium (using the Prepayment Assumption) and (iii) to the Internal Revenue Service the name, title, address and telephone number of the person who will serve as the representative of each REMIC.

(f) The Servicer and the REMIC Administrator shall take such actions and shall cause each REMIC created hereunder to take such actions as are reasonably within the Servicer's or the REMIC Administrator's control and the scope of its duties more specifically set forth herein as shall be necessary or desirable to maintain the status of each REMIC as a REMIC under the REMIC Provisions (and the Indenture Trustee shall assist the Servicer and the REMIC Administrator, to the extent reasonably requested by the Servicer and the REMIC Administrator to do so). The Servicer and the REMIC Administrator shall not knowingly or intentionally take any action, cause the Trust Estate to take any action or fail to take (or fail to cause to be taken) any action reasonably within their respective control that, under the REMIC Provisions, if taken or not taken, as the case may be, could (i) endanger the status of any portion of any of the REMICs as a REMIC or (ii) result in the imposition of a tax upon any of the REMICs (including but not limited to the tax on prohibited transactions as defined in Section 860F(a)(2) of the Code and the tax on contributions to a REMIC set forth in Section 860G(d) of the Code) (either such event, in the absence of an Opinion of Counsel or the indemnification referred to in this sentence, an "Adverse REMIC Event") unless the Servicer or the REMIC Administrator, as applicable, has received an Opinion of Counsel (at the expense of the party seeking to take such action or, if such party fails to pay such expense, and the Servicer or the REMIC Administrator, as applicable, determines that taking such action is in the best interest of the Trust Estate and the Noteholders and the Certificateholders, at the expense of the Trust Estate, but in no event at the expense of the Servicer, the REMIC Administrator, the Owner Trustee or the Indenture Trustee) to the effect that the contemplated action will not, with respect to each REMIC created hereunder, endanger such status or, unless the Servicer, the REMIC Administrator or both, as applicable, determine in its or their sole discretion to indemnify the Trust Estate against the imposition of such a tax, result in the imposition of such a tax. Wherever in this Agreement a contemplated action may not be taken because the timing of such action might result in the imposition of a tax on the Trust Estate, or may only be taken pursuant to an Opinion of Counsel that such action would not impose a tax on the Trust Estate, such action may nonetheless be taken provided that the indemnity given in the preceding sentence with respect to any taxes that might be imposed on the Trust Estate has been given and that all other preconditions to the taking of such action have been satisfied. The Indenture Trustee shall not take or fail to take any action (whether or not authorized hereunder) as to which the Servicer or the REMIC Administrator, as applicable, has advised it in writing that it has received an Opinion of Counsel to the effect that an Adverse REMIC Event could occur with respect to such action. In addition, prior to taking any action with respect to any of the REMICs created hereunder or any related assets thereof, or causing any of the REMICs to take any action, which is not expressly permitted under the terms of this Agreement, the Indenture Trustee will consult with the Servicer or the REMIC Administrator, as applicable, or its designee, in writing, with respect to whether such action could cause an Adverse REMIC Event to occur with respect to any of the REMICs, and the Indenture Trustee shall not take any such action or cause either REMIC to take any such action as to which the Servicer or the REMIC Administrator, as applicable, has advised it in writing that an Adverse REMIC Event could occur. The Servicer or

CONFIDENTIAL                                                          RC_FGIC9019_00002813

the REMIC Administrator, as applicable, may consult with counsel to make such written advice, and the cost of same shall be borne by the party seeking to take the action not expressly permitted by this Agreement, but in no event at the expense of the Servicer or the REMIC Administrator.  At all times as may be required by the Code, the Servicer will to the extent within its control and the scope of its duties more specifically set forth herein, maintain substantially all of the assets of each REMIC created hereunder as "qualified mortgages" as defined in Section 860G(a)(3) of the Code and "permitted investments" as defined in Section 860G(a)(5) of the Code.

(g) In the event that any tax is imposed on "prohibited transactions" of any of the REMICs created hereunder as defined in Section 860F(a)(2) of the Code, on "net income from foreclosure property" of any of the REMICs as defined in Section 860G(c) of the Code, on any contributions to any of the REMICs after the Startup Day therefor pursuant to Section 860G(d) of the Code, or any other tax is imposed by the Code or any applicable provisions of state or local tax laws, such tax shall be charged (i) to the Servicer, if such tax arises out of or results from a breach by the Servicer of any of its obligations under this Agreement or the Servicer has in its sole discretion determined to indemnify the Trust Estate against such tax, (ii) to the Indenture Trustee, if such tax arises out of or results from a breach by the Trustee of any of its obligations under this Article XI, or (iii) otherwise against amounts on deposit in the Custodial Account and on the Payment Date(s) following such reimbursement the aggregate of such taxes shall be allocated in reduction of the accrued interest due on each Class entitled thereto on a pro rata basis.

(h) The Indenture Trustee and the Servicer shall, for federal income tax purposes, maintain books and records with respect to each REMIC created hereunder on a calendar year and on an accrual basis or as otherwise may be required by the REMIC Provisions.

(i) Following the Startup Day, neither the Servicer nor the Indenture Trustee shall accept any contributions of assets to any of the REMICs created hereunder unless (subject to Section 11.01(f)) the Servicer and the Indenture Trustee shall have received an Opinion of Counsel (at the expense of the party seeking to make such contribution) to the effect that the inclusion of such assets in such REMIC will not cause any of the REMICs to fail to qualify as a REMIC at any time that any Notes or Certificates are outstanding or subject any of the REMICs to any tax under the REMIC Provisions or other applicable provisions of federal, state and local law or ordinances.

(j) Neither the Servicer nor the Trustee shall (subject to Section 11.01(f)) enter into any arrangement by which any of the REMICs created hereunder will receive a fee or other compensation for services nor permit any of the REMICs to receive any income from assets other than "qualified mortgages" as defined in Section 860G(a)(3) of the Code or "permitted investments" as defined in Section 860G(a)(5) of the Code.

(k) Solely for the purposes of Section 1.860G-1(a)(4)(iii) of the Treasury Regulations, the "latest possible maturity date" by which the Certificate Principal Balance of each Class of Notes and Certificates representing a regular interest in the applicable REMIC is the Final Payment Date.

CONFIDENTIAL                                                              RC_FGIC9019_00002814

(l) Within 30 days after the Closing Date, the REMIC Administrator shall prepare and file with the Internal Revenue Service Form 8811, "Information Return for Real Estate Mortgage Investment Conduits (REMIC) and Issuers of Collateralized Debt Obligations" for each REMIC created hereunder.

(m)Neither the Indenture Trustee nor the Servicer shall sell, dispose of or substitute for any of the Mortgage Loans (except in connection with (i) the default, imminent default or foreclosure of a Mortgage Loan, including but not limited to, the acquisition or sale of a Mortgaged Property acquired by deed in lieu of foreclosure, (ii) the bankruptcy of any of the REMICs created hereunder, (iii) the termination of the applicable REMIC pursuant to Section 8.02 of the Trust Agreement or (iv) a purchase of Mortgage Loans pursuant to the Purchase Agreement) nor acquire any assets for any of the REMICs, nor sell or dispose of any investments in the Custodial Account or the Payment Account for gain nor accept any contributions to any of the REMICs after the Closing Date unless it has received an Opinion of Counsel that such sale, disposition, substitution or acquisition will not (a) affect adversely the status of any of the REMICs as a REMIC or (b) unless the Servicer has determined in its sole discretion to indemnify the Trust Estate against such tax, cause any REMIC to be subject to a tax on "prohibited transactions" or "contributions" pursuant to the REMIC Provisions.

(n) The Indenture Trustee will apply for an employer identification number from the Internal Revenue Service on a Form SS-4 or any other acceptable method for all tax entities.

Section 11.02  Servicer, REMIC Administrator and Indenture Trustee Indemnification.

The Indenture Trustee agrees to indemnify the Trust Estate, the REMIC Administrator and the Servicer for any taxes and costs including, without limitation, any reasonable attorneys fees imposed on or incurred by the Trust Estate or the Servicer, as a result of a breach of the Indenture Trustee's covenants set forth in Article VIII or this Article XI.

The REMIC Administrator agrees to indemnify the Trust Estate, the Servicer, the Depositor, the Owner Trustee and the Indenture Trustee for any taxes and costs (including, without limitation, any reasonable attorneys' fees) imposed on or incurred by the Trust Estate, the Depositor, GMACM Mortgage Corporation, the Servicer, the Owner Trustee or the Indenture Trustee, as a result of a breach of the REMIC Administrator's covenants set forth in this Article XI with respect to compliance with the REMIC Provisions, including without limitation, any penalties arising from the Owner Trustee's execution of Tax Returns prepared by the REMIC Administrator that contain errors or omissions; provided, however, that such liability will not be imposed to the extent such breach is a result of an error or omission in information provided to the REMIC Administrator by the Servicer in which case Section 11.02(c) will apply.

The Servicer agrees to indemnify the Trust Estate, the REMIC Administrator, the Owner Trustee and the Indenture Trustee for any taxes and costs (including, without limitation, any reasonable attorneys' fees) imposed on or incurred by the Trust Estate, the REMIC Administrator, the Owner Trustee or the Indenture Trustee, as a result of a breach of the Servicer's covenants set forth in this Article XI or in Article III with respect to compliance with the REMIC Provisions, including without limitation, any penalties arising from the Indenture

CONFIDENTIAL                                                                 RC_FGIC9019_00002815

Trustee's execution of Tax Returns prepared by the Servicer that contain errors or omissions.

Section 11.03  <u>Designation of REMIC(s)</u>.

The REMIC Administrator will make an election to treat the entire segregated pool of assets described in the definition of Trust Estate (but excluding the Pre-Funding Account and the Capitalized Interest Account), and subject to this Agreement (including the Mortgage Loans, as set forth in Section 2.06 of the Trust Agreement ) as a REMIC ("REMIC I") and will make an election to treat the pool of assets comprised of the REMIC I Regular Interests as a REMIC ("REMIC II") for federal income tax purposes.

The REMIC I Regular Interests will be "regular interests" in REMIC I and the Class R-I Certificates will be the sole class of "residual interests" in REMIC I for purposes of the REMIC Provisions under the federal income tax law.

The REMIC II Regular Interests will be "regular interests" in REMIC II and the Class R-II Certificates will be the sole class of "residual interests" therein for purposes of the REMIC Provisions (as defined herein) under federal income tax law.

US_WEST:260042806.5

62

RC_FGIC9019_00002816

IN WITNESS WHEREOF, the Issuer and the Indenture Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the day and year first above written.

GMACM HOME EQUITY LOAN TRUST 2006-HE2, as Issuer

By:   WILMINGTON TRUST COMPANY, not in its individual capacity but solely as Owner Trustee

By:   _____
      Name:
      Title:

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, as Indenture Trustee

By:   _____
      Name:
      Title:

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION
hereby accepts appointment as Paying Agent pursuant to Section 3.03 hereof and as Note Registrar pursuant to Section 4.02 hereof.

By:   _____
      Name:
      Title:

Signatures and Seals

CONFIDENTIAL                                     RC_FGIC9019_00002817

STATE OF _____  )
                           )    ss.:
COUNTY OF _____  )

      On this ___ day of June 2006, before me personally appeared _____, to me known, who being by me duly sworn, did depose and say, that he/she resides at _____, that he/she is the _____ of Wilmington Trust Company, the Owner Trustee, one of the corporations described in and which executed the above instrument; that he/she knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation; and that he/she signed his/her name thereto by like order.

_____
            Notary Public

Acknowledgements

CONFIDENTIAL

STATE OF _____          )
                                   ) ss.:
COUNTY OF _____           )

On this ___ day of June 2006, before me personally appeared _____, to me known, who being by me duly sworn, did depose and say, that he/she resides at _____; that he/she is the _____ of JPMorgan Chase Bank, National Association as Indenture Trustee, one of the corporations described in and which executed the above instrument; that he/she knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation; and that he/she signed his/her name thereto by like order.

_____
                Notary Public

NOTORIAL SEAL

US_WEST:260042806.5

                        65

EXHIBIT A-1
FORM OF CLASS A-1, CLASS A-2, CLASS A-3 AND CLASS A-4 NOTE

UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS NOTE IS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT" AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986 (THE "CODE").

THE PRINCIPAL OF THIS NOTE IS PAYABLE IN INSTALLMENTS AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF.

THIS NOTE DOES NOT REPRESENT AN INTEREST IN OR OBLIGATION OF THE SELLERS, THE DEPOSITOR, THE SERVICER, THE INDENTURE TRUSTEE, THE OWNER TRUSTEE OR GMAC MORTGAGE GROUP, INC. OR ANY OF THEIR RESPECTIVE AFFILIATES, EXCEPT AS EXPRESSLY PROVIDED IN THE INDENTURE OR THE OTHER BASIC DOCUMENTS.

THE HOLDER OF THIS NOTE IS DEEMED TO HAVE REPRESENTED THAT THE ACQUISITION OF THIS NOTE BY THE HOLDER DOES NOT CONSTITUTE OR GIVE RISE TO A PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE, FOR WHICH NO STATUTORY, REGULATORY OR ADMINISTRATIVE EXEMPTION IS AVAILABLE.

GMACM Home Equity Loan-Backed Term Note, Class A-[__]

Registered

Initial Note Balance:  $[   ]

No. A-[__]-__

Note Rate:  [____%]

CUSIP NO. [  ]

CONFIDENTIAL                                                 RC_FGIC9019_00002820

## GMACM HOME EQUITY LOAN TRUST 2006-HE2

GMACM Home Equity Loan Trust 2006-HE2, a statutory trust duly organized and existing under the laws of the State of Delaware (herein referred to as the "Issuer"), for value received, hereby promises to pay to Cede & Co. or its registered assigns, the principal sum of [_____] Dollars ($[_____]), payable on each Payment Date in an amount equal to the pro rata portion allocable hereto (based on the Initial Note Balance specified above and the Initial Note Balance of all A-[__] Notes) of the aggregate amount, if any, payable from the Note Payment Account in respect of principal of the Class A-[__] Notes (the "Notes") pursuant to Section 3.05 of the indenture dated as of June 29, 2006 (the "Indenture"), between the Issuer and JPMorgan Chase Bank, National Association as indenture trustee (the "Indenture Trustee"); *provided, however,* that the entire unpaid principal amount of this Note shall be due and payable on the Payment Date in May 2036, to the extent not previously paid on a prior Payment Date.  Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in Appendix A to the Indenture.

Interest on the Notes will be paid monthly on each Payment Date at the Note Rate for the related Class of Notes for the Interest Period.

This Note is entitled to the benefits of an irrevocable and unconditional financial guaranty insurance policy issued by Financial Guaranty Insurance Company (the "Enhancer").

Principal of and interest on this Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.  All payments made by the Issuer with respect to this Note shall be applied first to interest due and payable on this Note as provided above and then to the unpaid principal of this Note.

Unless the certificate of authentication hereon has been executed by the Indenture Trustee whose name appears below by manual signature, this Note shall not be entitled to any benefit under the Indenture referred to herein, or be valid or obligatory for any purpose.

This Note is one of a duly authorized issue of Notes of the Issuer, designated as its GMACM Home Equity Loan-Backed Term Notes, Series 2006-HE2 (the "Series 2006-HE2 Notes"), all issued under the Indenture, to which Indenture and all indentures supplemental thereto reference is hereby made for a statement of the respective rights and obligations thereunder of the Issuer, the Indenture Trustee and the Noteholders of the Series 2006-HE2 Notes.  The Series 2006-HE2 Notes are subject to all terms of the Indenture.

The Series 2006-HE2 Notes are and will be equally and ratably secured by the collateral pledged as security therefor as provided in the Indenture.

Principal of and interest on this Note will be payable on each Payment Date, commencing on July 25, 2006, as described in the Indenture.  "Payment Date" means the twenty-fifth day of each month, or, if any such date is not a Business Day, then the next succeeding Business Day.

The entire unpaid principal amount of this Note shall be due and payable in full on the Payment Date in May 2036 pursuant to the Indenture, to the extent not previously paid on a prior

A-2

Payment Date.  Notwithstanding the foregoing, if an Event of Default shall have occurred and be continuing, then the Indenture Trustee, the Enhancer or the Noteholders of Notes representing not less than a majority of the aggregate Voting Rights of the Notes, with the consent of the Enhancer, may declare the Notes to be immediately due and payable in the manner provided in Section 5.02 of the Indenture.  All principal payments on the Notes shall be made pro rata to the Noteholders of Notes entitled thereto.

Any installment of interest or principal, if any, payable on any Note that is punctually paid or duly provided for by the Issuer on the applicable Payment Date shall be paid to the related Noteholder on the preceding Record Date, by wire transfer to an account specified in writing by such Noteholder reasonably satisfactory to the Indenture Trustee as of the preceding Record Date or, if no such instructions have been delivered to the Indenture Trustee, by check or money order to such Noteholder mailed to such Noteholder's address as it appears in the Note Register, the amount required to be distributed to such Noteholder on such Payment Date pursuant to such Noteholder's Notes; *provided, however,* that the Indenture Trustee shall not pay to such Noteholder any amount required to be withheld from a payment to such Noteholder by the Code.  Any reduction in the principal amount of this Note (or any one or more predecessor Notes) effected by any payments made on any Payment Date shall be binding upon all future Noteholders of this Note and of any Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof, whether or not noted hereon.  If funds are expected to be available, as provided in the Indenture, for payment in full of the then remaining unpaid principal amount of this Note on a Payment Date, then the Indenture Trustee, in the name of and on behalf of the Issuer, will notify the Person who was the registered Noteholder hereof as of the Record Date preceding such Payment Date by notice mailed or transmitted by facsimile prior to such Payment Date, and the amount then due and payable shall be payable only upon presentation and surrender of this Note at the address specified in such notice of final payment.

As provided in the Indenture and subject to certain limitations set forth therein, the transfer of this Note may be registered on the Note Register upon surrender of this Note for registration of transfer at the Corporate Trust Office of the Indenture Trustee, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Indenture Trustee duly executed by, the Noteholder hereof or such Noteholder's attorney duly authorized in writing, with such signature guaranteed by an "eligible guarantor institution" meeting the requirements of the Note Registrar, which requirements include membership or participation in the Securities Transfer Agent's Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Note Registrar in addition to, or in substitution for, STAMP, all in accordance with the Exchange Act, and thereupon one or more new Notes in authorized denominations and in the same aggregate principal amount will be issued to the designated transferee or transferees.  No service charge will be charged for any registration of transfer or exchange of this Note, but the Note Registrar shall require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any registration of transfer or exchange of this Note.

Each Noteholder or Beneficial Owner of a Note, by its acceptance of a Note, or, in the case of a Beneficial Owner of a Note, a beneficial interest in a Note, covenants and agrees that no recourse may be taken, directly or indirectly, with respect to the obligations of the Issuer, the

CONFIDENTIAL

Owner Trustee, the Sellers, the Servicer, the Depositor or the Indenture Trustee on the Notes or under the Indenture or any certificate or other writing delivered in connection therewith, against (i) the Indenture Trustee or the Owner Trustee in its individual capacity, (ii) any owner of a beneficial interest in the Issuer or (iii) any partner, owner, beneficiary, agent, officer, director or employee of the Indenture Trustee or the Owner Trustee in its individual capacity, any holder of a beneficial interest in the Issuer, the Owner Trustee or the Indenture Trustee or of any successor or assign of the Indenture Trustee or the Owner Trustee in its individual capacity, except as any such Person may have expressly agreed and except that any such partner, owner or beneficiary shall be fully liable, to the extent provided by applicable law for any unpaid consideration for stock, unpaid capital contribution or failure to pay any installment or call owing to such entity.

Each Noteholder or Beneficial Owner of a Note, by its acceptance of a Note or, in the case of a Beneficial Owner of a Note, a beneficial interest in a Note, covenants and agrees by accepting the benefits of the Indenture that such Noteholder or Beneficial Owner will not at any time institute against the Depositor, the Sellers, the Servicer, GMAC Mortgage Group, Inc. or the Issuer, or join in any institution against the Depositor, the Sellers, the Servicer, GMAC Mortgage Group, Inc. or the Issuer of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under any United States federal or state bankruptcy or similar law in connection with any obligations relating to the Notes, the Indenture or the other Basic Documents.

Prior to the due presentment for registration of transfer of this Note, the Issuer, the Indenture Trustee and any agent of the Issuer or the Indenture Trustee may treat the Person in the name of which this Note is registered (as of the day of determination or as of such other date as may be specified in the Indenture) as the owner hereof for all purposes, whether or not this Note be overdue, and none of the Issuer, the Indenture Trustee or any such agent shall be affected by notice to the contrary.

The Indenture permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Issuer and the Indenture Trustee and the rights of the Noteholders of the Series 2006-HE2 Notes under the Indenture at any time by the Issuer and the Indenture Trustee with the consent of the Enhancer and the Noteholders of Notes representing a majority of the aggregate Voting Rights of the Notes then Outstanding and with prior notice to the Rating Agencies. The Indenture also contains provisions permitting the Noteholders of Notes representing specified percentages of the Voting Rights of the Series 2006-HE2 Notes, on behalf of the Noteholders of all Series 2006-HE2 Notes, to waive compliance by the Issuer with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Noteholder of this Note (or any one of more predecessor Notes) shall be conclusive and binding upon such Noteholder and upon all future Noteholders of this Note and of any Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof whether or not notation of such consent or waiver is made upon this Note. The Indenture also permits the Issuer and the Indenture Trustee to amend or waive certain terms and conditions set forth in the Indenture without the consent of Noteholders of the Series 2006-HE2 Notes issued thereunder but with prior notice to the Rating Agencies and the Enhancer.

CONFIDENTIAL                                RC_FGIC9019_00002823

The term "Issuer" as used in this Note includes any successor or the Issuer under the Indenture.

The Issuer is permitted by the Indenture, under certain circumstances, to merge or consolidate, subject to the rights of the Indenture Trustee and the Noteholders of Notes under the Indenture.

The Notes are issuable only in registered form in denominations as provided in the Indenture, subject to certain limitations therein set forth.

This Note and the Indenture shall be construed in accordance with the laws of the State of New York, without reference to its conflicts of law provisions, and the obligations, rights and remedies of the parties hereunder and thereunder shall be determined in accordance with such laws.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligation of the Issuer, which is absolute and unconditional, to pay the principal of and interest on this Note at the times, place and rate, and in the coin or currency herein prescribed.

Anything herein to the contrary notwithstanding, except as expressly provided in the Basic Documents, none of Wilmington Trust Company in its individual capacity, JPMorgan Chase Bank, National Association, in its individual capacity, any owner of a beneficial interest in the Issuer, or any of their respective partners, beneficiaries, agents, officers, directors, employees or successors or assigns shall be personally liable for, nor shall recourse be had to any of them for, the payment of principal of or interest on this Note or the performance of, or the failure to perform, any of the covenants, obligations or indemnifications contained in the Indenture. The Noteholder of this Note, by its acceptance hereof, agrees that, except as expressly provided in the Basic Documents, in the case of an Event of Default under the Indenture, such Noteholder shall have no claim against any of the foregoing for any deficiency, loss or claim therefrom; *provided, however,* that nothing contained herein shall be taken to prevent recourse to, and enforcement against, the assets of the Issuer for any and all liabilities, obligations and undertakings contained in the Indenture or in this Note.

[Signature Page Follows]

CONFIDENTIAL    RC_FGIC9019_00002824

IN WITNESS WHEREOF, the Owner Trustee, on behalf of the Issuer and not in its individual capacity, has caused this Note to be duly executed.

GMACM HOME EQUITY LOAN TRUST 2006-HE2

By:  WILMINGTON TRUST COMPANY, not in its individual capacity but solely as Owner Trustee

Dated:  June 29, 2006

By:  _____
         Authorized Signatory

CERTIFICATE OF AUTHENTICATION

This is one of the Notes referred to in the within-mentioned Indenture.

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION
not in its individual capacity but solely as Indenture Trustee

By:  _____
         Authorized Signatory

Dated: June 29, 2006

CONFIDENTIAL

## ASSIGNMENT

Social Security or taxpayer I.D. or other identifying number of assignee: _____

    FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfer unto

_____
*(name and address of assignee)*

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints

_____,

attorney, to transfer said Note on the books kept for registration thereof, with full power of substitution in the premises.

Dated: _____        _____ */

                                   Signature Guaranteed:

                                   _____ */

---

\*      NOTICE: The signature to this assignment must correspond with the name of the registered owner as it appears on the face of the within Note in every particular, without alteration, enlargement or any change whatever. Such signature must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Note Registrar, which requirements include membership or participation in STAMP or such other "signature guarantee program" as may be determined by the Note Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

CONFIDENTIAL                RC_FGIC9019_00002826

# TABLE OF CONTENTS

**Page**

ARTICLE I       Definitions ............................................................................. 2

    Section 1.01    Definitions ................................................................. 2

    Section 1.02    Incorporation by Reference of Trust Indenture Act ........... 2

    Section 1.03    Rules of Construction ................................................. 2

ARTICLE II      Original Issuance of Notes ..................................................... 3

    Section 2.01    Form ......................................................................... 3

    Section 2.02    Execution, Authentication and Delivery ......................... 3

ARTICLE III     Covenants .......................................................................... 4

    Section 3.01    Collection of Payments with Respect to the Mortgage Loans ............ 4

    Section 3.02    Maintenance of Office or Agency ................................. 4

    Section 3.03    Money for Payments to Be Held in Trust; Paying Agent ................... 4

    Section 3.04    Existence .................................................................. 6

    Section 3.05    Priority of Distributions; Defaulted Interest ................... 6

    Section 3.06    Protection of Trust Estate ........................................... 9

    Section 3.07    Opinions as to Trust Estate ........................................ 9

    Section 3.08    Performance of Obligations; Servicing Agreement ......... 10

    Section 3.09    Negative Covenants ................................................. 10

    Section 3.10    Annual Statement as to Compliance ........................... 11

    Section 3.11    Recordation of Assignments ...................................... 11

    Section 3.12    Representations and Warranties Concerning the Mortgage
                  Loans ...................................................................... 11

    Section 3.13    Assignee of Record of the Mortgage Loans .................... 11

    Section 3.14    Servicer as Agent and Bailee of the Indenture Trustee ................... 12

    Section 3.15    Investment Company Act ........................................... 12

    Section 3.16    Issuer May Consolidate, etc. ...................................... 12

    Section 3.17    Successor or Transferee ............................................ 14

    Section 3.18    No Other Business .................................................... 14

    Section 3.19    No Borrowing ......................................................... 14

    Section 3.20    Guarantees, Loans, Advances and Other Liabilities ......... 14

    Section 3.21    Capital Expenditures ................................................ 14

CONFIDENTIAL                                                    RC_FGIC9019_00002827

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| Section 3.22 | Owner Trustee Not Liable for Certificates or Related Documents | 14 |
| Section 3.23 | Restricted Payments | 15 |
| Section 3.24 | Notice of Events of Default | 15 |
| Section 3.25 | Further Instruments and Acts | 15 |
| Section 3.26 | Statements to Noteholders | 15 |
| Section 3.27 | Determination of Note Rate | 16 |
| Section 3.28 | Payments under the Policy | 16 |
| Section 3.29 | Replacement/Additional Enhancement | 16 |
| Section 3.30 | Additional Representations of Issuer | 17 |
| ARTICLE IV | The Notes; Satisfaction And Discharge Of Indenture | 18 |
| Section 4.01 | The Notes | 18 |
| Section 4.02 | Registration of and Limitations on Transfer and Exchange of Notes; Appointment of Certificate Registrar | 18 |
| Section 4.03 | Mutilated, Destroyed, Lost or Stolen Notes | 19 |
| Section 4.04 | Persons Deemed Owners | 20 |
| Section 4.05 | Cancellation | 20 |
| Section 4.06 | Book-Entry Notes | 21 |
| Section 4.07 | Notices to Depository | 21 |
| Section 4.08 | Definitive Notes | 22 |
| Section 4.09 | Tax Treatment | 22 |
| Section 4.10 | Satisfaction and Discharge of Indenture | 22 |
| Section 4.11 | Application of Trust Money | 23 |
| Section 4.12 | Subrogation and Cooperation | 23 |
| Section 4.13 | Repayment of Monies Held by Paying Agent | 24 |
| Section 4.14 | Temporary Notes | 24 |
| ARTICLE V | Default And Remedies | 25 |
| Section 5.01 | Events of Default | 25 |
| Section 5.02 | Acceleration of Maturity; Rescission and Annulment | 25 |
| Section 5.03 | Collection of Indebtedness and Suits for Enforcement by Indenture Trustee | 26 |

CONFIDENTIAL    RC_FGIC9019_00002828

# TABLE OF CONTENTS
(continued)

**Page**

Section 5.04    Remedies; Priorities .................................................... 28

Section 5.05    Optional Preservation of the Trust Estate ......................... 30

Section 5.06    Limitation of Suits ...................................................... 30

Section 5.07    Unconditional Rights of Noteholders to Receive Principal and Interest ..................................................................... 31

Section 5.08    Restoration of Rights and Remedies ................................ 31

Section 5.09    Rights and Remedies Cumulative ................................... 31

Section 5.10    Delay or Omission Not a Waiver .................................... 31

Section 5.11    Control by Enhancer or Noteholders ............................... 31

Section 5.12    Waiver of Past Defaults ............................................... 32

Section 5.13    Undertaking for Costs .................................................. 32

Section 5.14    Waiver of Stay or Extension Laws .................................. 33

Section 5.15    Sale of Trust Estate .................................................... 33

Section 5.16    Action on Notes ......................................................... 35

Section 5.17    Performance and Enforcement of Certain Obligations .......... 35

ARTICLE VI        The Indenture Trustee ...................................... 36

Section 6.01    Duties of Indenture Trustee ......................................... 36

Section 6.02    Rights of Indenture Trustee ......................................... 37

Section 6.03    Individual Rights of Indenture Trustee ............................ 39

Section 6.04    Indenture Trustee's Disclaimer ..................................... 39

Section 6.05    Notice of Event of Default ............................................ 39

Section 6.06    Reports by Indenture Trustee to Noteholders .................... 39

Section 6.07    Compensation and Indemnity ....................................... 39

Section 6.08    Replacement of Indenture Trustee ................................. 40

Section 6.09    Successor Indenture Trustee by Merger .......................... 41

Section 6.10    Appointment of Co-Indenture Trustee or Separate Indenture Trustee ..................................................................... 41

Section 6.11    Eligibility; Disqualification ........................................... 42

Section 6.12    Preferential Collection of Claims Against Issuer ................ 43

Section 6.13    Representations and Warranties .................................... 43

Section 6.14    Directions to Indenture Trustee ..................................... 43

CONFIDENTIAL                                                    RC_FGIC9019_00002829

## TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| Section 6.15 | Indenture Trustee May Own Securities | 44 |
| ARTICLE VII | Noteholders' Lists and Reports | 44 |
| Section 7.01 | Issuer to Furnish Indenture Trustee Names and Addresses of Noteholders | 44 |
| Section 7.02 | Preservation of Information; Communications to Noteholders | 44 |
| Section 7.03 | Reports by Issuer | 44 |
| Section 7.04 | Reports by Indenture Trustee | 45 |
| Section 7.05 | Exchange Act Reporting | 45 |
| ARTICLE VIII | Accounts, Disbursements and Releases | 45 |
| Section 8.01 | Collection of Money | 45 |
| Section 8.02 | Trust Accounts | 46 |
| Section 8.03 | Officer's Certificate | 46 |
| Section 8.04 | Termination Upon Distribution to Noteholders | 47 |
| Section 8.05 | Release of Trust Estate | 47 |
| Section 8.06 | Surrender of Notes Upon Final Payment | 47 |
| ARTICLE IX | Supplemental Indentures | 47 |
| Section 9.01 | Supplemental Indentures Without Consent of Noteholders | 47 |
| Section 9.02 | Supplemental Indentures With Consent of Noteholders | 49 |
| Section 9.03 | Execution of Supplemental Indentures | 50 |
| Section 9.04 | Effect of Supplemental Indenture | 50 |
| Section 9.05 | Conformity with Trust Indenture Act | 51 |
| Section 9.06 | Reference in Notes to Supplemental Indentures | 51 |
| ARTICLE X | Miscellaneous | 51 |
| Section 10.01 | Compliance Certificates and Opinions, etc. | 51 |
| Section 10.02 | Form of Documents Delivered to Indenture Trustee | 53 |
| Section 10.03 | Acts of Noteholders | 54 |
| Section 10.04 | Notices, etc., to Indenture Trustee, Issuer, Enhancer and Rating Agencies | 54 |
| Section 10.05 | Notices to Noteholders; Waiver | 55 |
| Section 10.06 | Alternate Payment and Notice Provisions | 55 |
| Section 10.07 | Conflict with Trust Indenture Act | 56 |

CONFIDENTIAL

# TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| Section 10.08 | Effect of Headings | 56 |
| Section 10.09 | Successors and Assigns | 56 |
| Section 10.10 | Severability | 56 |
| Section 10.11 | Benefits of Indenture | 56 |
| Section 10.12 | Legal Holidays | 56 |
| Section 10.13 | GOVERNING LAW | 56 |
| Section 10.14 | Counterparts | 57 |
| Section 10.15 | Recording of Indenture | 57 |
| Section 10.16 | Issuer Obligation | 57 |
| Section 10.17 | No Petition | 57 |
| Section 10.18 | Inspection | 57 |

EXHIBITS
| | | |
|---|---|---|
| Exhibit A | - | Form of Notes |
| Exhibit B | - | Form of 144A Investment Representation |
| Exhibit C | - | Form of Investor Representation Letter |
| Exhibit D | - | Form of Transferor Certificate |
| Appendix A | - | Definitions |

CONFIDENTIAL                                                        RC_FGIC9019_00002831

**Exhibit 118**

**EXECUTION COPY**

RESIDENTIAL ASSET SECURITIES CORPORATION,

Depositor,

RESIDENTIAL FUNDING CORPORATION,

Master Servicer,

and

JPMORGAN CHASE BANK

Trustee

POOLING AND SERVICING AGREEMENT

Dated as of July 1, 2004

Home Equity Mortgage Asset-Backed Pass-Through Certificates

Series 2004-KS7

DOCSLA1:476701.5

# TABLE OF CONTENTS

**Page**

ARTICLE I      DEFINITIONS...................................................................................4

      Section 1.01.      Definitions ...................................................................4

      Section 1.02.      Determination of LIBOR.......................................51

ARTICLE II     CONVEYANCE OF MORTGAGE LOANS; ORIGINAL ISSUANCE OF
           CERTIFICATES............................................................................52

      Section 2.01.      Conveyance of Mortgage Loans ............................52

      Section 2.02.      Acceptance by Trustee............................................55

      Section 2.03.      Representations, Warranties and Covenants of the Master Servicer
                        and the Depositor....................................................56

      Section 2.04.      Representations and Warranties of Sellers ............58

      Section 2.05.      Execution and Authentication of Certificates; Conveyance of
                        Uncertificated REMIC Regular Interests. ...............60

      Section 2.06.      Purposes and Powers of the Trust ..........................61

ARTICLE III     ADMINISTRATION AND SERVICING OF MORTGAGE LOANS.........................62

      Section 3.01.      Master Servicer to Act as Servicer .........................62

      Section 3.02.      Subservicing Agreements Between Master Servicer and
                        Subservicers; Enforcement of Subservicers' Obligations ..........64

      Section 3.03.      Successor Subservicers ...........................................65

      Section 3.04.      Liability of the Master Servicer ..............................65

      Section 3.05.      No Contractual Relationship Between Subservicer and Trustee or
                        Certificateholders ...................................................66

      Section 3.06.      Assumption or Termination of Subservicing Agreements by Trustee.........66

      Section 3.07.      Collection of Certain Mortgage Loan Payments; Deposits to
                        Custodial Account ...................................................66

      Section 3.08.      Subservicing Accounts; Servicing Accounts............69

      Section 3.09.      Access to Certain Documentation and Information Regarding the
                        Mortgage Loans ......................................................70

      Section 3.10.      Permitted Withdrawals from the Custodial Account ................70

      Section 3.11.      Maintenance of MI Policy and Primary Insurance Coverage....................72

      Section 3.12.      Maintenance of Fire Insurance and Omissions and Fidelity Coverage........73

      Section 3.13.      Enforcement of Due-on-Sale Clauses; Assumption and Modification
                        Agreements; Certain Assignments ..........................74

      Section 3.14.      Realization Upon Defaulted Mortgage Loans ..........76

      Section 3.15.      Trustee to Cooperate; Release of Mortgage Files .....................78

      Section 3.16.      Servicing and Other Compensation; Compensating Interest.....................79

CONFIDENTIAL

## TABLE OF CONTENTS
(continued)

Page

Section 3.17.    Reports to the Trustee and the Depositor ................................................ 80

Section 3.18.    Annual Statement as to Compliance ....................................................... 80

Section 3.19.    Annual Independent Public Accountants' Servicing Report ...................... 81

Section 3.20.    Right of the Depositor in Respect of the Master Servicer ......................... 81

Section 3.21.    Duties of the Trustee Under the MI Policy .............................................. 82

Section 3.22.    Advance Facility ................................................................................... 82

ARTICLE IV    PAYMENTS TO CERTIFICATEHOLDERS ............................................. 83

Section 4.01.    Certificate Account ............................................................................... 83

Section 4.02.    Distributions ........................................................................................ 83

Section 4.03.    Statements to Certificateholders; Statements to Rating Agencies;
Exchange Act Reporting ....................................................................... 92

Section 4.04.    Distribution of Reports to the Trustee and the Depositor; Advances
by the Master Servicer .......................................................................... 95

Section 4.05.    Allocation of Realized Losses ................................................................ 96

Section 4.06.    Reports of Foreclosures and Abandonment of Mortgaged Property ........... 99

Section 4.07.    Optional Purchase of Defaulted Mortgage Loans ..................................... 99

Section 4.08.    Limited Mortgage Loan Repurchase Right .............................................. 99

Section 4.09.    Mortgage Insurance Premium Taxes Reserve Fund ................................ 100

Section 4.10.    Hedge Agreement ............................................................................... 100

Section 4.11.    Derivative Contracts ........................................................................... 101

Section 4.12.    The Certificate Guaranty Insurance Policy ............................................ 101

ARTICLE V    THE CERTIFICATES ......................................................................... 103

Section 5.01.    The Certificates .................................................................................. 103

Section 5.02.    Registration of Transfer and Exchange of Certificates ............................ 104

Section 5.03.    Mutilated, Destroyed, Lost or Stolen Certificates ................................... 109

Section 5.04.    Persons Deemed Owners ..................................................................... 109

Section 5.05.    Appointment of Paying Agent .............................................................. 109

ARTICLE VI    THE DEPOSITOR AND THE MASTER SERVICER ................................ 110

Section 6.01.    Respective Liabilities of the Depositor and the Master Servicer ............... 110

Section 6.02.    Merger or Consolidation of the Depositor or the Master Servicer;
Assignment of Rights and Delegation of Duties by Master Servicer ........ 110

Section 6.03.    Limitation on Liability of the Depositor, the Master Servicer and
Others ............................................................................................... 111

Section 6.04.    Depositor and Master Servicer Not to Resign ....................................... 111

DOCSLA1:476701.5

-ii-

## TABLE OF CONTENTS
(continued)

Page

ARTICLE VII  DEFAULT ................................................................................................ 112

    Section 7.01.    Events of Default ................................................................................ 112

    Section 7.02.    Trustee or Depositor to Act; Appointment of Successor ........................ 113

    Section 7.03.    Notification to Certificateholders ......................................................... 115

    Section 7.04.    Waiver of Events of Default ................................................................ 115

    Section 7.05.    Servicing Trigger; Removal of Master Servicer ..................................... 115

ARTICLE VIII CONCERNING THE TRUSTEE ............................................................. 117

    Section 8.01.    Duties of Trustee ................................................................................ 117

    Section 8.02.    Certain Matters Affecting the Trustee .................................................. 118

    Section 8.03.    Trustee Not Liable for Certificates or Mortgage Loans .......................... 119

    Section 8.04.    Trustee May Own Certificates ............................................................. 120

    Section 8.05.    Master Servicer to Pay Trustee's Fees and Expenses;
                     Indemnification .................................................................................. 120

    Section 8.06.    Eligibility Requirements for Trustee ..................................................... 121

    Section 8.07.    Resignation and Removal of the Trustee ............................................... 121

    Section 8.08.    Successor Trustee .............................................................................. 122

    Section 8.09.    Merger or Consolidation of Trustee ..................................................... 122

    Section 8.10.    Appointment of Co-Trustee or Separate Trustee .................................... 123

    Section 8.11.    Appointment of Custodians ................................................................. 123

    Section 8.12.    Appointment of Office or Agency ........................................................ 124

    Section 8.13.    DTC Letter of Representations ............................................................. 124

ARTICLE IX  TERMINATION ...................................................................................... 124

    Section 9.01.    Termination Upon Purchase by the Master Servicer or Liquidation of
                     All Mortgage Loans ........................................................................... 124

    Section 9.02.    Additional Termination Requirements ................................................... 128

ARTICLE X  REMIC PROVISIONS ............................................................................. 129

    Section 10.01.    REMIC Administration ....................................................................... 129

    Section 10.02.    Master Servicer, REMIC Administrator and Trustee Indemnification ...... 132

ARTICLE XI  MISCELLANEOUS PROVISIONS .......................................................... 133

    Section 11.01.    Amendment ....................................................................................... 133

    Section 11.02.    Recordation of Agreement; Counterparts .............................................. 135

    Section 11.03.    Limitation on Rights of Certificateholders ............................................. 135

    Section 11.04.    Governing Law .................................................................................. 136

CONFIDENTIAL                                    RC_FGIC9019_00018124

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| Section 11.05. | Notices | 136 |
| Section 11.06. | Notices to Rating Agencies and the Certificate Insurer | 137 |
| Section 11.07. | Severability of Provisions | 138 |
| Section 11.08. | Supplemental Provisions for Resecuritization | 138 |
| Section 11.09. | Third-Party Beneficiary | 138 |
| Section 11.10. | Rights of the Certificate Insurer | 138 |
| Exhibit A | Form of Class A Certificate | A-1 |
| Exhibit B | [Reserved] | B-1 |
| Exhibit C | Form of Class SB Certificate | C-1 |
| Exhibit D | Form of Class R Certificate | D-1 |
| Exhibit E | Form of Custodial Agreement | E-1 |
| Exhibit F-1 | Group I Loan Schedule | F-1-1 |
| Exhibit F-2 | Group II-A Loan Schedule | F-2-1 |
| Exhibit F-3 | Group II-B Loan Schedule | F-3-1 |
| Exhibit G | Forms of Request for Release | G-1 |
| Exhibit H-1 | Form of Transfer Affidavit and Agreement | H-1-1 |
| Exhibit H-2 | Form of Transferor Certificate | H-2-1 |
| Exhibit I | Form of Investor Representation Letter | I-1 |
| Exhibit J | Form of Transferor Representation Letter | J-1 |
| Exhibit K | Text of Amendment to Pooling and Servicing Agreement Pursuant to Section 11.01(e) for a Limited Guaranty | K-1 |
| Exhibit L | Form of Limited Guaranty | L-1 |
| Exhibit M | Form of Lender Certification for Assignment of Mortgage Loan | M-1 |
| Exhibit N | Form of Rule 144A Investment Representation | N-1 |
| Exhibit O | [Reserved] | O-1 |
| Exhibit P | Form of ERISA Letter | P-1 |
| Exhibit Q-1 | Group I Policy | Q-1 |
| Exhibit Q-2 | Group II Policy | Q-1 |
| Exhibit R | Assignment Agreement | R-1 |
| Exhibit S | MI Policy | S-1 |
| Exhibit T-1 | Form of 10-K Certification | T-1-1 |
| Exhibit T-2 | Form of Back-Up Certification | T-2-1 |
| Exhibit U | Information to be Provided by the Master Servicer to the Rating Agencies Relating to Reportable Modified Mortgage Loans | U-1 |

CONFIDENTIAL

RC_FGIC9019_00018125

This Pooling and Servicing Agreement, effective as of July 1, 2004, among RESIDENTIAL ASSET SECURITIES CORPORATION, as the depositor (together with its permitted successors and assigns, the "Depositor"), RESIDENTIAL FUNDING CORPORATION, as master servicer (together with its permitted successors and assigns, the "Master Servicer"), and JPMORGAN CHASE BANK, a New York banking corporation, as trustee (together with its permitted successors and assigns, the "Trustee").

## PRELIMINARY STATEMENT:

The Depositor intends to sell mortgage asset-backed pass-through certificates (collectively, the "Certificates"), to be issued hereunder in fifteen Classes, which in the aggregate will evidence the entire beneficial ownership interest in the Mortgage Loans (as defined herein) and certain other related assets.

## REMIC I

As provided herein, the REMIC Administrator will make an election to treat the segregated pool of assets consisting of the Group I Loans and certain other related assets (exclusive of the Mortgage Insurance Premium Taxes Reserve Fund and the Hedge Agreement) subject to this Agreement as a real estate mortgage investment conduit (a "REMIC") for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC I." The Class R-I Certificates will represent the sole Class of "residual interests" in REMIC I for purposes of the REMIC Provisions (as defined herein) under federal income tax law. The following table irrevocably sets forth the designation, remittance rate (the "Uncertificated REMIC I Pass-Through Rate") and initial Uncertificated Principal Balance for each of the "regular interests" in REMIC I (the "REMIC I Regular Interests"). The "latest possible maturity date" (determined solely for purposes of satisfying Treasury regulation Section 1.860G-1(a)(4)(iii)) for each REMIC I Regular Interest shall be the Maturity Date. None of the REMIC I Regular Interests will be certificated.

| Designation | Uncertificated REMIC I Pass-Through Rate | Initial Uncertificated REMIC I Principal Balance | Latest Possible Maturity Date |
|---|---|---|---|
| LT1 | Variable[1] | $174,969,892.62 | August 25, 2034 |
| LT2 | Variable[1] | $4,825.08 | August 25, 2034 |
| LT3 | 0.00% | $12,674.93 | August 25, 2034 |
| LT4 | Variable[1] | $12,674.93 | August 25, 2034 |

(1)  Calculated as provided in the definition of Uncertificated REMIC I Pass-Through Rate.

CONFIDENTIAL

## REMIC II

As provided herein, the REMIC Administrator will make an election to treat the segregated pool of assets consisting of the Group II Loans and certain other related assets (exclusive of the Mortgage Insurance Premium Taxes Reserve Fund and the Hedge Agreement) subject to this Agreement as a real estate mortgage investment conduit (a "REMIC") for federal income tax purposes, and such segregated pool of assets will be designated as "REMIC II." The Class R-II Certificates will represent the sole Class of "residual interests" in REMIC II for purposes of the REMIC Provisions (as defined herein) under federal income tax law. The following table irrevocably sets forth the designation, remittance rate (the "Uncertificated REMIC II Pass-Through Rate") and initial Uncertificated Principal Balance for each of the "regular interests" in REMIC II (the "REMIC II Regular Interests"). The "latest possible maturity date" (determined solely for purposes of satisfying Treasury regulation Section 1.860G-1(a)(4)(iii)) for each REMIC II Regular Interest shall be the Maturity Date. None of the REMIC II Regular Interests will be certificated.

| Designation | Uncertificated REMIC II Pass-Through Rate | Initial Uncertificated REMIC II Principal Balance | Latest Possible Maturity Date |
|---|---|---|---|
| LT5 | Variable[1] | $674,876,258.54 | August 25, 2034 |
| LT6 | Variable[1] | $11,127.87 | August 25, 2034 |
| LT7 | 0.00% | $56,372.14 | August 25, 2034 |
| LT8 | Variable[1] | $56,372.14 | August 25, 2034 |

(1)  Calculated as provided in the definition of Uncertificated REMIC II Pass-Through Rate.

## REMIC III

As provided herein, the REMIC Administrator will elect to treat the segregated pool of assets consisting of the REMIC I Regular Interests and REMIC II Regular Interests as a REMIC for federal income tax purposes, and such segregated pool of assets will be designated as REMIC III. The Class R-III Certificates will represent the sole Class of "residual interests" in REMIC III for purposes of the REMIC Provisions under federal income tax law. The following table irrevocably sets forth the designation, Pass-Through Rate, aggregate Initial Certificate Principal Balance, certain features, month of Final Scheduled Distribution Date and initial ratings for each Class of Certificates comprising the interests representing "regular interests" in REMIC III. The "latest possible maturity date" (determined solely for purposes of satisfying Treasury Regulation Section 1.860G-1(a)(4)(iii)) for each Class of REMIC III Regular Certificates shall be the Maturity Date.

CONFIDENTIAL    RC_FGIC9019_00018127

| Designation | Type | Pass-Through Rate | Aggregate Initial Certificate Principal Balance | Features | Month of Final Scheduled Distribution Date | Initial Ratings | |
|---|---|---|---|---|---|---|---|
| | | | | | | S&P | Moody's |
| Class A-I-1 | Regular | Adjustable(1) | $ 61,900,000.00 | Senior/Adjustable Rate | October 2021 | AAA | Aaa |
| Class A-I-2 | Regular | 3.510%(2) | $ 13,200,000.00 | Senior/Fixed Rate | May 2024 | AAA | Aaa |
| Class A-I-3 | Regular | 4.050%(2) | $ 37,300,000.00 | Senior/Fixed Rate | August 2029 | AAA | Aaa |
| Class A-I-4 | Regular | 5.050%(2) | $ 23,900,000.00 | Senior/Fixed Rate | January 2032 | AAA | Aaa |
| Class A-I-5 | Regular | 5.690%(2)(3) | $ 21,200,000.00 | Senior/Fixed Rate | August 2034 | AAA | Aaa |
| Class A-I-6 | Regular | 5.070%(2) | $ 17,500,000.00 | Senior/Fixed Rate/Lockout | August 2034 | AAA | Aaa |
| Class A-II-A | Regular(4) | Adjustable(5) | $337,500,000.00 | Senior/Adjustable Rate | August 2034 | AAA | Aaa |
| Class A-II-B1 | Regular(4) | Adjustable(5) | $130,680,000.00 | Senior/Adjustable Rate | November 2024 | AAA | Aaa |
| Class A-II-B2 | Regular(4) | Adjustable(5) | $173,420,000.00 | Senior/Adjustable Rate | May 2033 | AAA | Aaa |
| Class A-II-B3 | Regular(4) | Adjustable(5) | $ 33,400,000.00 | Senior/Adjustable Rate | August 2034 | AAA | Aaa |
| Class SB-I | Regular (6) | (6) | $ 67.56 | Subordinate | August 2034 | N/R | N/R |
| Class SB-II | Regular (6) | (6) | $ 130.70 | Subordinate | August 2034 | N/R | N/R |

(1)  The REMIC III Regular Interest ownership of which is represented by the Class A-I-1 Certificates will accrue interest at a per annum rate equal to LIBOR plus 0.150%, subject to a payment cap as described in the definition of "Pass-Through Rate" herein and the provisions for the payment of Group I Net WAC Cap Shortfalls herein.

(2)  The REMIC III Regular Interests ownership of which is represented by the Class A-I-2, Class A-I-3, Class A-I-4, Class A-I-5 and Class A-I-6 Certificates are subject to a payment cap as described in the definition of "Pass-Through Rate" herein and the provisions for the payment of Group I Net WAC Cap Shortfalls herein.

(3)  Beginning on the second Distribution Date after the first possible Group I Optional Termination Date, the fixed rate portion of the Pass-Through Rate for the Class A-I-5 Certificates will increase by 0.50% per annum.

(4)  The Class A-II Certificates will represent ownership of the REMIC III Regular Interests together with certain rights to payments to be made from amounts received under the Hedge Agreement which will be deemed made for federal income tax purposes outside of REMIC III by the holder of the Class SB-II Certificates as the owner of the Hedge Agreement.

(5)  The REMIC III Regular Interests ownership of which is represented by the Class A-II Certificates will accrue interest at a per annum rate equal to the lesser of (i) LIBOR plus the applicable Margin and (ii) the Group II Weighted Average Maximum Net Mortgage Rate multiplied by a fraction whose numerator is 30 and whose denominator is the actual number of days in the related Interest Accrual Period, each subject to a payment cap as described in the definition of "Pass-Through Rate" and the provisions for the payment of Group II Basis Risk Shortfalls herein.  The Class A-II Certificates will also entitle their holders to certain payments from the Holder of the SB-II Certificates from amounts received under the Hedge Agreement, which will not be a part of their ownership of the REMIC III Regular Interests.

(6)  The Class SB Certificates will accrue interest as described in the definition of Accrued Certificate Interest.  The Class SB Certificates will not accrue interest on their Certificate Principal Balance.  The Class SB-I Certificates and Class SB-II Certificates will each be comprised of two REMIC III regular interests, a principal only regular interest designated SB-I-PO and SB-II-PO, respectively, and an interest only regular interest designated SB-I-IO and SB-II-IO, respectively, which will be entitled to distributions as set forth herein. The rights of the Holder of the Class SB-II Certificates to payments from the Hedge Agreement shall be outside and apart from its rights under the REMIC III Regular Interests SB-II-IO and SB-II-PO.

CONFIDENTIAL                                                          RC_FGIC9019_00018128

In consideration of the mutual agreements herein contained, the Depositor, the Master Servicer and the Trustee agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01.   Definitions.

Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Article.

Accrued Certificate Interest:  With respect to each Distribution Date and each Class of Class A Certificates, interest accrued during the related Interest Accrual Period on the Certificate Principal Balance thereof immediately prior to such Distribution Date at the related Pass-Through Rate for that Distribution Date, less any interest shortfalls on the related Mortgage Loans not covered by Excess Cash Flow pursuant to Section 4.02, including Relief Act Shortfalls and Prepayment Interest Shortfalls, to the extent not covered by Compensating Interest pursuant to Section 3.16, but excluding the interest portion of Realized Losses, with all such reductions allocated on the Group I Loans to the Class A-I Certificates on a pro rata basis, allocated on the Group II-A Loans to the Class A-II-A Certificates and allocated on the Group II-B Loans to the Class A-II-B Certificates on a pro rata basis, in each case in accordance with the amount of Accrued Certificate Interest which would have been due absent such reductions.

Accrued Certificate Interest on each Class of Class A-II Certificates for any Distribution Date shall also be reduced by any interest shortfalls resulting from the failure of the Hedge Agreement Provider to make the required Hedge Payment for such Distribution Date, with all such reductions allocated to the Class A-II Certificates on a pro rata basis, based on the portion of the Hedge Payment each such Class was entitled to, but did not receive, on such Distribution Date.

Accrued Certificate Interest for any Distribution Date shall further be reduced by the interest portion of Realized Losses allocated to any Class of Certificates pursuant to Section 4.05.

Accrued Certificate Interest on the Class A-I Certificates (other than the Class A-I-1 Certificates) shall accrue interest on the basis of a 360 day year consisting of twelve 30-day months.   Accrued Certificate Interest on the Class A-I-1 Certificates and Class A-II Certificates shall accrue on the basis of a 360-day year and the actual number of days in the related Interest Accrual Period.

With respect to each Distribution Date and each Class of Class SB Certificates, interest accrued during the preceding Interest Accrual Period at the related Pass-Through Rate on the notional amount as specified in the definition of Pass-Through Rate, immediately prior to such Distribution Date in each case, reduced by any interest shortfalls with respect to the Mortgage Loans in the related Loan Group including Prepayment Interest Shortfalls to the extent not covered by Compensating Interest pursuant to Section 3.16 or by Excess Cash Flow pursuant to Section 4.02(c)(ix), (x), (xi) and (xii) and Section 4.02(d)(x), (xi), (xii) and (xiii).  Accrued Certificate Interest on the Class SB Certificates shall accrue on the basis of a 360-day year and the actual number of days in the related Interest Accrual Period.

Adjusted Mortgage Rate:  With respect to any Mortgage Loan and any date of determination, the Mortgage Rate borne by the related Mortgage Note, less the rate at which the related Subservicing Fee accrues.

CONFIDENTIAL                                                                    RC_FGIC9019_00018129

Adjustment Date:  With respect to each Group II Loan, each date set forth in the related Mortgage Note on which an adjustment to the interest rate on such Mortgage Loan becomes effective.

Advance:  With respect to any Mortgage Loan, any advance made by the Master Servicer, pursuant to Section 4.04.

Affiliate:  With respect to any Person, any other Person controlling, controlled by or under common control with such first Person.  For purposes of this definition, "control" means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

Agreement:  This Pooling and Servicing Agreement and all amendments hereof and supplements hereto.

Amount Held for Future Distribution:  With respect to any Distribution Date, the total of the amounts held in the Custodial Account at the close of business on the preceding Determination Date on account of (i) Liquidation Proceeds, Subsequent Recoveries, Insurance Proceeds, REO Proceeds, Principal Prepayments, Mortgage Loan purchases made pursuant to Section 2.02, 2.03, 2.04, 4.07 or 4.08 and Mortgage Loan substitutions made pursuant to Section 2.03 or 2.04 received or made in the month of such Distribution Date (other than such Liquidation Proceeds, Insurance Proceeds, REO Proceeds and purchases of Mortgage Loans that the Master Servicer has deemed to have been received in the preceding month in accordance with Section 3.07(b)) and (ii) payments which represent early receipt of scheduled payments of principal and interest due on a date or dates subsequent to the Due Date in the related Due Period.

Appraised Value:  With respect to any Mortgaged Property, the lesser of (i) the appraised value of such Mortgaged Property based upon the appraisal made at the time of the origination of the related Mortgage Loan, and (ii) the sales price of the Mortgaged Property at such time of origination, except in the case of a Mortgaged Property securing a refinanced or modified Mortgage Loan as to which it is either the appraised value based upon the appraisal made at the time of origination of the loan which was refinanced or modified or the appraised value determined in an appraisal at the time of refinancing or modification, as the case may be.

Assignment:  An assignment of the Mortgage, notice of transfer or equivalent instrument, in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect of record the sale of the Mortgage Loan to the Trustee for the benefit of Certificateholders, which assignment, notice of transfer or equivalent instrument may be in the form of one or more blanket assignments covering Mortgages secured by Mortgaged Properties located in the same county, if permitted by law and accompanied by an Opinion of Counsel to that effect.

Assignment Agreement:  The Assignment and Assumption Agreement, dated the Closing Date, between Residential Funding and the Depositor relating to the transfer and assignment of the Mortgage Loans, attached hereto as Exhibit R.

Balloon Loan:  Each of the Mortgage Loans having an original term to maturity that is shorter than the related amortization term.

Balloon Payment:  With respect to any Balloon Loan, the related Monthly Payment payable on the stated maturity date of such Balloon Loan.

CONFIDENTIAL                                                              RC_FGIC9019_00018130

Bankruptcy Code: The Bankruptcy Code of 1978, as amended.

Book-Entry Certificate: Any Certificate registered in the name of the Depository or its nominee.

Business Day: Any day other than (i) a Saturday or a Sunday or (ii) a day on which banking institutions in the State of California, the State of Minnesota, the State of Texas, the State of New York or the State of Illinois (and such other state or states in which the Custodial Account or the Certificate Account are at the time located) are required or authorized by law or executive order to be closed.

Capitalization Reimbursement Amount: With respect to either Loan Group and any Distribution Date, the amount of Advances or Servicing Advances that were added to the Stated Principal Balance of the Mortgage Loans in such Loan Group during the prior calendar month and reimbursed to the Master Servicer or Subservicer on or prior to such Distribution Date pursuant to Section 3.10(a)(vii).

Cash Liquidation: With respect to any defaulted Mortgage Loan other than a Mortgage Loan as to which an REO Acquisition occurred, a determination by the Master Servicer that it has received all Insurance Proceeds, Liquidation Proceeds and other payments or cash recoveries which the Master Servicer reasonably and in good faith expects to be finally recoverable with respect to such Mortgage Loan.

Certificate: Any Class A Certificate, Class SB Certificate or Class R Certificate.

Certificate Account: The account or accounts created and maintained pursuant to Section 4.01, which shall be entitled "JPMorgan Chase Bank, as trustee, in trust for the registered holders of Residential Asset Securities Corporation, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2004-KS7 and Financial Guaranty Insurance Company" and which account shall be held for the benefit of the Certificateholders and the Certificate Insurer and which must be an Eligible Account. Any such account or accounts created and maintained subsequent to the Closing Date shall be subject to the approval of the Certificate Insurer, which approval shall not be unreasonably withheld.

Certificate Account Deposit Date: With respect to any Distribution Date, the Business Day prior thereto.

Certificateholder or Holder: The Person in whose name a Certificate is registered in the Certificate Register, except that neither a Disqualified Organization nor a Non-United States Person shall be a holder of a Class R Certificate for any purpose hereof. Solely for the purpose of giving any consent or direction pursuant to this Agreement, any Certificate, other than a Class R Certificate, registered in the name of the Depositor, the Master Servicer or any Subservicer or any Affiliate thereof shall be deemed not to be outstanding and the Percentage Interest or Voting Rights evidenced thereby shall not be taken into account in determining whether the requisite amount of Percentage Interests or Voting Rights necessary to effect any such consent or direction has been obtained. All references herein to "Holders" or "Certificateholders" shall reflect the rights of Certificate Owners as they may indirectly exercise such rights through the Depository and participating members thereof, except as otherwise specified herein; *provided, however*, that the Trustee shall be required to recognize as a "Holder" or "Certificateholder" only the Person in whose name a Certificate is registered in the Certificate Register. Unless otherwise indicated in this Agreement, the Custodial Agreement or the Assignment Agreement, whenever reference is made to the actions taken by the Trustee on behalf of the Certificateholders, such reference to Certificateholders shall include the Certificate Insurer as long as there is no Certificate Insurer Default.

Certificate Guaranty Insurance Policy: Each of the Group I Policy and Group II Policy, as applicable.

CONFIDENTIAL                                                                    RC_FGIC9019_00018131

Certificate Insurer:    Financial Guaranty Insurance Company, a New York-domiciled stock insurance corporation or its successors in interest.

Certificate Insurer Account:    An account of the Certificate Insurer maintained at JPMorgan Chase Bank (ABA No. 021000021), Account No. 904951812, Attention: Policy No. 04030022 and Policy No. 04030023, or such other account as may be designated by the Certificate Insurer to the Trustee in writing not less than five Business Days prior to the related Distribution Date.

Certificate Insurer Default:    The existence and continuance of any of the following:  (a) a failure by the Certificate Insurer to make a payment required under either Certificate Guaranty Insurance Policy in accordance with its terms; or (b)(i) the Certificate Insurer (A) files any petition or commences any case or proceeding under any provision or chapter of the Bankruptcy Code or any other similar federal or state law relating to insolvency, bankruptcy, rehabilitation, liquidation or reorganization, (B) makes a general assignment for the benefit of its creditors, or (C) has an order for relief entered against it under the Bankruptcy Code or any other similar federal or state law relating to insolvency, bankruptcy, rehabilitation, liquidation or reorganization which is final and nonappealable; or (ii) a court of competent jurisdiction, the New York insurance department or other competent regulatory authority enters a final and nonappealable order, judgment or decree (A) appointing a custodian, trustee, agent or receiver for the Certificate Insurer or for all or any material portion of its property or (B) authorizing the taking of possession by a custodian, trustee, agent or receiver of the Certificate Insurer (or the taking of possession of all or any material portion of the property of the Certificate Insurer).

Certificate Insurer Premium:    The premium payable in accordance with the Group I Policy or Group II Policy, as applicable, which shall be payable in accordance with Section 4.02 in an amount equal to (i) on the first Distribution Date, an amount calculated by multiplying the Certificate Insurer Premium Rate converted to a daily rate by the aggregate initial Certificate Principal Balance of the Class A-I Certificates or Class A-II Certificates, as applicable, for the number of days from and including the Closing Date to but excluding the first Distribution Date, and (ii) for subsequent Distribution Dates, one twelfth of the product of (A) the Premium Percentage and (B) the aggregate Certificate Principal Balance of the Class A-I Certificates or Class A-II Certificates, as applicable, on the previous Distribution Date (after giving effect to any distributions of principal to be made on such previous Distribution Date).

Certificate Insurer Premium Modified Rate:    With respect to any Distribution Date, (i) in the case of the Group I Policy, the Certificate Insurer Premium Rate for the Class A-I Certificates times a fraction equal to (x) the aggregate Certificate Principal Balance of the Class A-I Certificates as of such date over (y) the aggregate Stated Principal Balance of the Group I Loans as of such date, or (ii) in the case of the Group II Policy, the Certificate Insurer Premium Rate for the Class A-II Certificates times a fraction equal to (x) the aggregate Certificate Principal Balance of the Class A-II Certificates as of such date over (y) the aggregate Stated Principal Balance of the Group II Loans as of such date.

Certificate Insurer Premium Rate:    Shall have the meaning assigned to the term "Premium Percentage" in the Insurance Agreement.

Certificate Owner:    With respect to a Book-Entry Certificate, the Person who is the beneficial owner of such Certificate, as reflected on the books of an indirect participating brokerage firm for which a Depository Participant acts as agent, if any, and otherwise on the books of a Depository Participant, if any, and otherwise on the books of the Depository.

Certificate Principal Balance:    With respect to any Class A Certificate, on any date of determination, an amount equal to (i) the Initial Certificate Principal Balance of such Certificate as specified on the face thereof, minus (ii) the sum of (x) the aggregate of all amounts previously distributed

CONFIDENTIAL                                                                    RC_FGIC9019_00018132

with respect to such Certificate (or any predecessor Certificate) and applied to reduce the Certificate Principal Balance thereof (including such amounts paid pursuant to the related Certificate Guaranty Insurance Policy) pursuant to Sections 4.02(c) and Section 4.02(d) and (y) the aggregate of all reductions in Certificate Principal Balance deemed to have occurred in connection with Realized Losses which were previously allocated to such Certificate (or any predecessor Certificate) pursuant to Section 4.05 (other than any such amounts included in an Insured Payment and paid pursuant to the related Certificate Guaranty Insurance Policy). With respect to each Class SB-I Certificate, on any date of determination, an amount equal to the Percentage Interest evidenced by such Certificate multiplied by an amount equal to (i) the excess, if any, of (A) the then aggregate Stated Principal Balance of the Group I Loans over (B) the then aggregate Certificate Principal Balance of the Class A-I Certificates then outstanding, which represents the sum of (i) the Initial Principal Balance of the REMIC III Regular Interest SB-I-PO, as reduced by Realized Losses allocated thereto and payments deemed made thereon, and (ii) accrued and unpaid interest on the REMIC III Regular Interest SB-I-IO, as reduced by Realized Losses allocated thereto. With respect to each Class SB-II Certificate, on any date of determination, an amount equal to the Percentage Interest evidenced by such Certificate multiplied by an amount equal to (i) the excess, if any, of (A) the then aggregate Stated Principal Balance of the Group II Loans over (B) the then aggregate Certificate Principal Balance of the Class A-II Certificates then outstanding, which represents the sum of (i) the Initial Principal Balance of the REMIC III Regular Interest SB-II-PO, as reduced by Realized Losses allocated thereto and payments deemed made thereon, and (ii) accrued and unpaid interest on the REMIC III Regular Interest SB-II-IO, as reduced by Realized Losses allocated thereto. The Class R Certificates will not have a Certificate Principal Balance.

Certificate Register and Certificate Registrar: The register maintained and the registrar appointed pursuant to Section 5.02.

Class: Collectively, all of the Certificates or uncertificated interests bearing the same designation.

Class A Certificates: Collectively, the Class A-I Certificates and Class A-II Certificates.

Class A-I Certificates: Collectively, the Class A-I-1 Certificates, Class A-I-2 Certificates, Class A-I-3 Certificates, Class A-I-4 Certificates, Class A-I-5 Certificates and Class A-I-6 Certificates.

Class A-I-1 Certificate: Any one of the Class A-I-1 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A, senior to the Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of Group I Loans as set forth in Section 4.05, and evidencing an interest designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions.

Class A-I-2 Certificate: Any one of the Class A-I-2 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A, senior to the Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of Group I Loans as set forth in Section 4.05, and evidencing an interest designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions.

Class A-I-3 Certificate: Any one of the Class A-I-3 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A, senior to the Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of Group I Loans as set forth in Section 4.05, and evidencing an interest designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions.

CONFIDENTIAL                                                                    RC_FGIC9019_00018133

Class A-I-4 Certificate:  Any one of the Class A-I-4 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A, senior to the Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of Group I Loans as set forth in Section 4.05, and evidencing an interest designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions.

Class A-I-5 Certificate:  Any one of the Class A-I-5 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A, senior to the Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of Group I Loans as set forth in Section 4.05, and evidencing an interest designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions.

Class A-I-6 Certificate:  Any one of the Class A-I-6 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A, senior to the Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of Group I Loans as set forth in Section 4.05, and evidencing an interest designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions.

Class A-I-6 Lockout Distribution Amount:  For any Distribution Date, the product of (x) the Class A-I-6 Lockout Percentage for that Distribution Date and (y) the Class A-I-6 Pro Rata Distribution Amount for that Distribution Date.  In no event shall the Class A-I-6 Lockout Distribution Amount for a Distribution Date exceed the Group I Principal Distribution Amount for that Distribution Date or the Certificate Principal Balance of the Class A-I-6 Certificates immediately prior to such Distribution Date.

Class A-I-6 Lockout Percentage:  For each Distribution Date, the applicable percentage set forth below:

(i)  for any Distribution Date from August 2004 through and including July 2007, 0%;

(ii)  for any Distribution Date from August 2007 through and including July 2009, 45%;

(iii)  for any Distribution Date from August 2009 through and including July 2010, 80%;

(iv)  for any Distribution Date from August 2010 through and including July 2011, 100%; and

(v)  for any Distribution Date from August 2011 and thereafter, 300%.

Class A-I-6 Pro Rata Distribution Amount:  For any Distribution Date, an amount equal to the product of (x) a fraction, the numerator of which is the Certificate Principal Balance of the Class A-I-6 Certificates immediately prior to that Distribution Date and the denominator of which is the aggregate Certificate Principal Balance of the Class A-I Certificates immediately prior to that Distribution Date and (y) the Group I Principal Distribution Amount for that Distribution Date.

Class A-II Certificates:  Collectively, the Class A-II-A Certificates and Class A-II-B Certificates.

Class A-II Interest Distribution Amount:  With respect to each Class of Class A-II Certificates and any Distribution Date, the amount available for payment of Accrued Certificate Interest thereon for that Distribution Date plus Accrued Certificate Interest thereon remaining unpaid from any prior Distribution Date shall be paid from the Group II Interest Remittance Amount and Group II Principal Remittance Amount, in the following priority:

CONFIDENTIAL                                                    RC_FGIC9019_00018134

(i) *first*, concurrently, to the Class A-II-A Certificates from the Group II Interest Remittance Amount derived from the Group II-A Loans and to the Class A-II-B Certificates, pro rata, based upon the amount of Accrued Certificate Interest due thereon, from the Group II Interest Remittance Amount derived from the Group II-B Loans;

(ii) *second*, to the Class A-II-A Certificates from the Group II Interest Remittance Amount derived from the Group II-B Loans or to the Class A-II-B Certificates, pro rata, based upon the amount of Accrued Certificate Interest due thereon, from the Group II Interest Remittance Amount derived from the Group II-A Loans, in each case after taking into account any payments made in clause (i) above;

(iii) *third*, concurrently, to the Class A-II-A Certificates from the Group II Principal Remittance Amount derived from the Group II-A Loans and to the Class A-II-B Certificates, pro rata, based upon the amount of Accrued Certificate Interest due thereon, from the Group II Principal Remittance Amount derived from the Group II-B Loans, in each case after taking into account any payments made in clauses (i) and (ii) above; and

(iv) *fourth*, to the Class A-II-A Certificates from the Group II Principal Remittance Amount derived from the Group II-B Loans or to the Class A-II-B Certificates, pro rata, based upon the amount of Accrued Certificate Interest due thereon, from the Group II Principal Remittance Amount derived from the Group II-A Loans, in each case after taking into account any payments made in clauses (i), (ii) and (iii) above.

Class A-II Principal Allocation Amount:  With respect to any Distribution Date, the sum of (a) the Group II Principal Remittance Amount for that Distribution Date and (b) the principal portion of any Realized Losses incurred (or deemed to have been incurred) on the Group II Loans in the calendar month preceding such Distribution Date to the extent covered by Excess Cash Flow for such Distribution Date; *provided*, that on any Distribution Date on which there is insufficient Excess Cash Flow to cover all Realized Losses incurred (or deemed to have been incurred) on the Group II Loans in the calendar month preceding such Distribution Date, in determining the Class A-II-A Principal Distribution Amount and Class A-II-B Principal Distribution Amount, the available Excess Cash Flow will be allocated to the Class A-II-A Certificates and Class A-II-B Certificates, pro rata, based on the principal portion of Realized Losses on the Group II-A Loans and Group II-B Loans, respectively.

Class A-II-A Certificate:  Any one of the Class A-II-A Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A, senior to the Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of Group II-A Loans as set forth in Section 4.05, and evidencing (i) an interest designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions and (ii) the right to receive payments under the Hedge Agreement.

Class A-II-A Margin:  Initially, 0.290% per annum, and on any Distribution Date or on or after the second Distribution Date after the first possible Group II Optional Termination Date, 0.580% per annum.

Class A-II-A Principal Distribution Amount:  For any Distribution Date, the product of (x) the Group II Principal Distribution Amount for such Distribution Date and (y) a fraction, the numerator of which is the portion of the Class A-II Principal Allocation Amount related to the Group II-A Loans for such Distribution Date and the denominator of which is the Class A-II Principal Allocation Amount for all of the Group II Loans for such Distribution Date.

CONFIDENTIAL                                                          RC_FGIC9019_00018135

Class A-II-B Principal Distribution Amount:  For any Distribution Date, the product of (x) the Group II Principal Distribution Amount for such Distribution Date and (y) a fraction, the numerator of which is the portion of the Class A-II Principal Allocation Amount related to the Group II-B Loans for such Distribution Date and the denominator of which is the Class A-II Principal Allocation Amount for all of the Group II Loans for such Distribution Date.

Class A-II-B1 Certificate:  Any one of the Class A-II-B1 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A, senior to the Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of Group II-B Loans as set forth in Section 4.05, and evidencing (i) an interest designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions and (ii) the right to receive payments under the Hedge Agreement.

Class A-II-B1 Margin:  Initially, 0.1.40% per annum, and on any Distribution Date on or after the second Distribution Date after the first possible Group II Optional Termination Date, 0.280% per annum.

Class A-II-B2 Certificate:  Any one of the Class A-II-B2 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A, senior to the Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of Group II-B Loans as set forth in Section 4.05, and evidencing (i) an interest designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions and (ii) the right to receive payments under the Hedge Agreement.

Class A-II-B2 Margin:  Initially, 0.270% per annum, and on any Distribution Date on or after the second Distribution Date after the first possible Group II Optional Termination Date, 0.540% per annum.

Class A-II-B3 Certificate:  Any one of the Class A-II-B3 Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit A, senior to the Class SB Certificates and Class R Certificates with respect to distributions and the allocation of Realized Losses in respect of Group II-B Loans as set forth in Section 4.05, and evidencing (i) an interest designated as a "regular interest" in REMIC III for purposes of the REMIC Provisions and (ii) the right to receive payments under the Hedge Agreement.

Class A-II-B3 Margin:  Initially, 0.440% per annum, and on any Distribution Date on or after the second Distribution Date after the first possible Group II Optional Termination Date, 0.880% per annum.

Class R Certificate:    Collectively, the Class R-I Certificates, Class R-II Certificates and Class R-III Certificates.

Class R-I Certificate:  Any one of the Class R-I Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit D and evidencing an interest designated as a "residual interest" in REMIC I for purposes of the REMIC Provisions.

Class R-II Certificate:  Any one of the Class R-II Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit D and evidencing an interest designated as a "residual interest" in REMIC II for purposes of the REMIC Provisions.

Class R-III Certificate:  Any one of the Class R-III Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit D and

CONFIDENTIAL                                                            RC_FGIC9019_00018136

evidencing an interest designated as a "residual interest" in REMIC III for purposes of the REMIC Provisions.

Class SB Certificate: Collectively, the Class SB-I Certificates and Class SB-II Certificates.

Class SB-I Certificate: Any one of the Class SB-I Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit B, subordinate to the Class A Certificates with respect to distributions and the allocation of Realized Losses as set forth in Section 4.05, and evidencing an interest comprised of "regular interests" in REMIC III for purposes of the REMIC Provisions.

Class SB-II Certificate: Any one of the Class SB-II Certificates executed by the Trustee and authenticated by the Certificate Registrar substantially in the form annexed hereto as Exhibit B, subordinate to the Class A Certificates with respect to distributions and the allocation of Realized Losses as set forth in Section 4.05, and evidencing an interest comprised of "regular interests" in REMIC III together with certain rights to payments under the Hedge Agreement for purposes of the REMIC Provisions.

Closing Date: July 29, 2004.

Code: The Internal Revenue Code of 1986.

Commission: The Securities and Exchange Commission.

Compensating Interest: With respect to any Distribution Date, any amount paid by the Master Servicer in accordance with Section 3.16(f).

Corporate Trust Office: The principal office of the Trustee at which at any particular time its corporate trust business with respect to this Agreement shall be administered, which office at the date of the execution of this instrument is located at JPMorgan Chase Bank, 4 New York Plaza, 6th Floor, New York, New York 10004, Attn: Institutional Trust Services/Global Debt, RASC 2004-KS7.

Credit Repository: Equifax, Transunion and Experian, or their successors in interest.

Curtailment: Any Principal Prepayment made by a Mortgagor which is not a Principal Prepayment in Full.

Custodial Account: The custodial account or accounts created and maintained pursuant to Section 3.07 in the name of a depository institution, as custodian for the holders of the Certificates and the Certificate Insurer, for the holders of certain other interests in mortgage loans serviced or sold by the Master Servicer and for the Master Servicer, into which the amounts set forth in Section 3.07 shall be deposited directly. Any such account or accounts shall be an Eligible Account.

Custodial Agreement: An agreement that may be entered into among the Depositor, the Master Servicer, the Trustee and a Custodian in substantially the form of Exhibit E hereto.

Custodian: Wells Fargo Bank, N.A., or any successor custodian appointed pursuant to a Custodial Agreement and reasonably acceptable to the Certificate Insurer.

Cut-off Date: July 1, 2004.

CONFIDENTIAL                                                              RC_FGIC9019_00018137

Cut-off Date Principal Balance:  With respect to any Mortgage Loan, the unpaid principal balance thereof at the Cut-off Date after giving effect to all installments of principal due on or prior  thereto (or due in the month of the Cut-off Date), whether or not received.

Debt Service Reduction:  With respect to any Mortgage Loan, a reduction in the scheduled Monthly Payment for such Mortgage Loan by a court of competent jurisdiction in a proceeding under the Bankruptcy Code, except such a reduction constituting a Deficient Valuation or any reduction that results in a permanent forgiveness of principal.

Deficient Valuation:  With respect to any Mortgage Loan, a valuation by a court of competent jurisdiction of the Mortgaged Property in an amount less than the then outstanding indebtedness under the Mortgage Loan, or any reduction in the amount of principal to be paid in connection with any scheduled Monthly Payment that constitutes a permanent forgiveness of principal, which valuation or reduction results from a proceeding under the Bankruptcy Code.

Definitive Certificate:  Any definitive, fully registered Certificate.

Deleted Mortgage Loan:  A Mortgage Loan replaced or to be replaced with a Qualified Substitute Mortgage Loan.

Delinquent:  As used herein, a Mortgage Loan is considered to be: "30 to 59 days" or "30 or more days" delinquent when a payment due on any scheduled due date remains unpaid as of the close of business on the next following monthly scheduled due date; "60 to 89 days" or "60 or more days" delinquent when a payment due on any scheduled due date remains unpaid as of the close of business on the second following monthly scheduled due date; and so on.  The determination as to whether a Mortgage Loan falls into these categories is made as of the close of business on the last business day of each month.  For example, a Mortgage Loan with a payment due on July 1 that remained unpaid as of the close of business on August 31 would then be considered to be 30 to 59 days delinquent.  Delinquency information as of the Cut-off Date is determined and prepared as of the close of business on the last business day immediately prior to the Cut-off Date.

Delinquency Ratio:  With respect to any Due Period and the Mortgage Loans, the percentage equivalent of a fraction (a) the numerator of which equals the sum of (i) 100% of the aggregate Stated Principal Balance of all Mortgage Loans that are 90 or more days Delinquent, (ii) 75% of the aggregate Stated Principal Balance of all Mortgage Loans that are in foreclosure and (iii) 100% of the aggregate Stated Principal Balance of all Mortgage Loans that are converted to REO Properties, in each case as of the last day of the related Due Period and (b) the denominator of which is the aggregate Stated Principal Balance of the Mortgage Loans as of the last day of such Due Period.

Depositor:  As defined in the preamble hereto.

Depository:  The Depository Trust Company, or any successor Depository hereafter named.  The nominee of the initial Depository for purposes of registering those Certificates that are to be Book-Entry Certificates is Cede & Co.  The Depository shall at all times be a "clearing corporation" as defined in Section 8-102(a)(5) of the Uniform Commercial Code of the State of New York and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act.

Depository Participant:  A broker, dealer, bank or other financial institution or other Person for whom from time to time a Depository effects book-entry transfers and pledges of securities deposited with the Depository.

CONFIDENTIAL                                                     RC_FGIC9019_00018138

Derivative Contract:   Any ISDA Master Agreement, together with the related Schedule and Confirmation, entered into by the Trustee and a Derivative Counterparty in accordance with Section 4.11.

Derivative Counterparty:   Any counterparty to a Derivative Contract as provided in Section 4.11.

Destroyed Mortgage Note:   A Mortgage Note the original of which was permanently lost or destroyed and has not been replaced.

Determination Date:   With respect to any Distribution Date, the 20th day (or if such 20th day is not a Business Day, the Business Day immediately following such 20th day) of the month of the related Distribution Date.

Disqualified Organization:   Any organization defined as a "disqualified organization" under Section 860E(e)(5) of the Code, including, if not otherwise included, any of the following:  (i) the United States, any State or political subdivision thereof, any possession of the United States, or any agency or instrumentality of any of the foregoing (other than an instrumentality which is a corporation if all of its activities are subject to tax and, except for Freddie Mac, a majority of its board of directors is not selected by such governmental unit), (ii) a foreign government, any international organization, or any agency or instrumentality of any of the foregoing, (iii) any organization (other than certain farmers' cooperatives described in Section 521 of the Code) which is exempt from the tax imposed by Chapter 1 of the Code (including the tax imposed by Section 511 of the Code on unrelated business taxable income) and (iv) rural electric and telephone cooperatives described in Section 1381(a)(2)(C) of the Code.   A Disqualified Organization also includes any "electing large partnership," as defined in Section 775(a) of the Code and any other Person so designated by the Trustee based upon an Opinion of Counsel that the holding of an Ownership Interest in a Class R Certificate by such Person may cause either REMIC or any Person having an Ownership Interest in any Class of Certificates (other than such Person) to incur a liability for any federal tax imposed under the Code that would not otherwise be imposed but for the Transfer of an Ownership Interest in a Class R Certificate to such Person.   The terms "United States," "State" and "international organization" shall have the meanings set forth in Section 7701 of the Code or successor provisions.

Distribution Date:   The 25th day of any month beginning in August 2004 or, if such 25th day is not a Business Day, the Business Day immediately following such 25th day.

DTC Letter:   The Letter of Representations, dated July 27, 2004, among the Trustee on behalf of the Trust Fund, JPMorgan Chase Bank, in its individual capacity as agent thereunder and the Depository.

Due Date:   With respect to any Distribution Date and any Mortgage Loan, the day during the related Due Period on which the Monthly Payment is due.

Due Period:   With respect to any Distribution Date, the calendar month of such Distribution Date.

Eligible Account:   An account that is any of the following:  (i) maintained with a depository institution the debt obligations of which have been rated by each Rating Agency in its highest rating available, or (ii) an account or accounts in a depository institution in which such accounts are fully insured to the limits established by the FDIC, *provided* that any deposits not so insured shall, to the extent acceptable to each Rating Agency, as evidenced in writing, be maintained such that (as evidenced by an Opinion of Counsel delivered to the Trustee and each Rating Agency) the registered Holders of Certificates have a claim with respect to the funds in such account or a perfected first security interest against any collateral (which shall be limited to Permitted Investments) securing such funds that is superior to claims of any other depositors or creditors of the depository institution with which such

CONFIDENTIAL                                                                RC_FGIC9019_00018139

account is maintained, or (iii) in the case of the Custodial Account, a trust account or accounts maintained in the corporate trust department of JPMorgan Chase Bank, or (iv) in the case of the Certificate Account, the Insurance Account or the Mortgage Insurance Premium Taxes Reserve Fund, a trust account or accounts maintained in the corporate trust division of JPMorgan Chase Bank, or (v) an account or accounts of a depository institution acceptable to each Rating Agency (as evidenced in writing by each Rating Agency that use of any such account as the Custodial Account or the Certificate Account will not reduce the rating assigned to any Class of Certificates by such Rating Agency below the lower of the then-current rating or the rating assigned to such Certificates as of the Closing Date by such Rating Agency).

Eligible Master Servicing Compensation:  With respect to any Distribution Date and each Loan Group, the lesser of (a) one-twelfth of 0.125% of the Stated Principal Balance of the related Mortgage Loans immediately preceding such Distribution Date and (b) the sum of the Servicing Fee and all income and gain on amounts held in the Custodial Account and the Certificate Account and payable to the Certificateholders with respect to such Distribution Date, in each case with respect to the related Loan Group; *provided* that for purposes of this definition the amount of the Servicing Fee will not be reduced pursuant to Section 7.02(a) except as may be required pursuant to the last sentence of such Section.

ERISA:  The Employee Retirement Income Security Act of 1974, as amended.

Event of Default:  As defined in Section 7.01.

Excess Cash Flow:  Any Group I Excess Cash Flow or Group II Excess Cash Flow, as applicable.

Excess Realized Loss:  With respect to Loan Group I, any Realized Loss on a Group I Loan to the extent that the amount of such Realized Loss, plus the aggregate amount of such Realized Losses on all of the Group I Loans since the Cut-off Date, is in excess of 15.0% of the Group I Cut-off Date Balance if there is a MI Policy Provider Default under the MI Policy, and 11.5% of the Group I Cut-off Date Balance if there is no MI Policy Provider Default under the MI Policy.  With respect to Loan Group II, any Realized Loss on a Group II Loan to the extent that the amount of such Realized Loss, plus the aggregate amount of such Realized Losses on all of the Group II Loans since the Cut-off Date, is in excess of 18.5% of the Group II Cut-off Date Balance if there is a MI Policy Provider Default under the MI Policy, and 10.5% of the Group II Cut-off Date Balance if there is no MI Policy Provider Default under the MI Policy.

Exchange Act:  The Securities Exchange Act of 1934, as amended.

Expense Fee Rate:  With respect to any Mortgage Loan as of any date of determination, the sum of the applicable Servicing Fee Rate, the per annum rate at which the applicable Subservicing Fee accrues and, where applicable, the Mortgage Insurance Premium Rate.

Fannie Mae:  Fannie Mae, a federally chartered and privately owned corporation organized and existing under the Federal National Mortgage Association Charter Act, or any successor thereto.

FASIT:  A "financial asset securitization investment trust" within the meaning of Section 860L of the Code.

FDIC:  Federal Deposit Insurance Corporation or any successor thereto.

CONFIDENTIAL

Final Distribution Date: The Distribution Date on which the final distribution in respect of the Certificates will be made pursuant to Section 9.01, which Final Distribution Date shall in no event be later than the end of the 90-day liquidation period described in Section 9.02.

Final Scheduled Distribution Date: Solely for purposes of the face of the Certificates, as follows: with respect to the Class A-I-1 Certificates, October 25, 2021; with respect to the Class A-I-2 Certificates, May 25, 2024; with respect to the Class A-I-3 Certificates, August 25, 2029; with respect to the Class A-I-4 Certificates, January 25, 2032; with respect to the Class A-II-B1 Certificates, November 25, 2024; with respect to the Class A-II-B2 Certificates, May 25, 2033; and with respect to the Class A-I-5 Certificates, Class A-I-6 Certificates, Class A-II-A Certificates and Class A-II-B3 Certificates, August 25, 2034. No event of default under this Agreement will arise or become applicable solely by reason of the failure to retire the entire Certificate Principal Balance of any Class of Class A Certificates on or before its Final Scheduled Distribution Date.

Fitch: Fitch, Ratings, or its successors in interest.

Foreclosure Profits: With respect to any Distribution Date or related Determination Date and any Mortgage Loan, the excess, if any, of Liquidation Proceeds, Insurance Proceeds and REO Proceeds (net of all amounts reimbursable therefrom pursuant to Section 3.10(a)(ii)) in respect of each Mortgage Loan or REO Property for which a Cash Liquidation or REO Disposition occurred in the related Prepayment Period over the sum of the unpaid principal balance of such Mortgage Loan or REO Property (determined, in the case of an REO Disposition, in accordance with Section 3.14) plus accrued and unpaid interest at the Mortgage Rate on such unpaid principal balance from the Due Date to which interest was last paid by the Mortgagor to the first day of the month following the month in which such Cash Liquidation or REO Disposition occurred.

Form 10-K Certification: As defined in Section 4.03(e).

Formula Rate: With respect to the Class A-I Certificates, a per annum rate equal to:

(i)    with respect to the Class A-I-1 Certificates, LIBOR plus 0.150%;

(ii)    with respect to the Class A-I-2 Certificates, 3.510%;

(iii)    with respect to the Class A-I-3 Certificates, 4.050%;

(iv)    with respect to the Class A-I-4 Certificates, 5.050%;

(v)    with respect to the Class A-I-5 Certificates and any Distribution Date occurring prior to the second Distribution Date following the first possible Group I Optional Termination Date, 5.690%, and with respect to any Distribution Date occurring on or after the second Distribution Date following the first possible Group I Optional Termination Date, 6.190%; and

(vi)    with respect to the Class A-I-6 Certificates, 5.070%.

Freddie Mac: Freddie Mac, a corporate instrumentality of the United States created and existing under Title III of the Emergency Home Finance Act of 1970, as amended, or any successor thereto.

Gross Margin: With respect to each Group II Loan, the fixed percentage set forth in the related Mortgage Note and indicated on the Mortgage Loan Schedule as the "NOTE MARGIN," which

CONFIDENTIAL

percentage is added to the related Index on each Adjustment Date to determine (subject to rounding in accordance with the related Mortgage Note, the Periodic Cap, the Maximum Mortgage Rate and the Minimum Mortgage Rate) the interest rate to be borne by such Mortgage Loan until the next Adjustment Date.

Group I Available Distribution Amount:  With respect to any Distribution Date, an amount equal to (a) the sum of (i) the amount relating to the Group I Loans on deposit in the Custodial Account as of the close of business on the immediately preceding Determination Date, including any Subsequent Recoveries, and amounts deposited in the Custodial Account in connection with the substitution of Qualified Substitute Mortgage Loans that are Group I Loans, (ii) the amount of any Advance made on the immediately preceding Certificate Account Deposit Date with respect to the Group I Loans, (iii) any amount deposited in the Certificate Account on the related Certificate Account Deposit Date pursuant to the second paragraph of Section 3.12(a) in respect of the Group I Loans, (iv) any amount that the Master Servicer is not permitted to withdraw from the Custodial Account pursuant to Section 3.16(e) in respect of the Group I Loans, (v) any amount deposited in the Certificate Account pursuant to Section 4.07 or 9.01 in respect of the Group I Loans and (vi) amounts on deposit in the Certificate Account in respect of an Insured Payment pursuant to Section 4.12(b) allocable to the Class A-I Certificates in accordance with the terms of the Group I Policy, reduced by (b) the sum as of the close of business on the immediately preceding Determination Date of (i) the Mortgage Insurance Premium payable in respect of the Group I Loans to the MI Policy Provider, (ii) any payments or collections consisting of prepayment charges on the Group I Loans that were received during the related Prepayment Period, (iii) the Amount Held for Future Distribution with respect to the Group I Loans, (iv) amounts permitted to be withdrawn by the Master Servicer from the Custodial Account in respect of the Group I Loans pursuant to clauses (ii)-(x), inclusive, of Section 3.10(a) and (v) the Certificate Insurer Premium payable with respect to the Class A-I Certificates.

Group I Certificates:  The Class A-I Certificates and Class SB-I Certificates.

Group I Cumulative Insurance Payments:  As of any time of determination, the aggregate amount of all Insured Payments previously paid by the Certificate Insurer under the Group I Policy in respect of the Class A-I Certificates (other than those attributable to Excess Realized Losses) minus (a) the aggregate of all payments previously made to the Certificate Insurer pursuant to Sections 4.02(c)(v) and 4.02(d)(vii) hereof as reimbursement for such Insured Payments, plus (b) interest thereon from the date such amounts became due until paid in full, at a rate of interest equal to the rate set forth in the Insurance Agreement.

Group I Cut-off Date Balance:  $175,000,067.56.

Group I Excess Cash Flow:  With respect to any Distribution Date, an amount equal to the sum of (A) the excess of (i) the Group I Available Distribution Amount for that Distribution Date over (ii) the sum of (a) the Group I Interest Distribution Amount for that Distribution Date and (b) the Group I Principal Remittance Amount for that Distribution Date to the extent not applied to pay interest on the Class A-I Certificates on such Distribution Date and (B) the Group I Overcollateralization Reduction Amount, if any, for that Distribution Date.

Group I Excess Overcollateralization Amount:  With respect to any Distribution Date, the excess, if any, of (a) the Group I Overcollateralization Amount on such Distribution Date over (b) the Group I Required Overcollateralization Amount for such Distribution Date.

Group I Interest Distribution Amount:  For any Distribution Date, the amounts payable pursuant to Section 4.02(c)(i).

CONFIDENTIAL                                                                    RC_FGIC9019_00018142

Group I Loan:  The Mortgage Loans designated on the Mortgage Loan Schedule attached hereto as Exhibit F-1.  The Group I Loans relate to the Class A-I Certificates and Class SB-I Certificates.

Group I Net WAC Cap Rate:  With respect to any Distribution Date, a per annum rate equal to the weighted average of the Net Mortgage Rates (or, if applicable, the Modified Net Mortgage Rates) on the Group I Loans using the Net Mortgage Rates in effect for the Monthly Payments due on such Mortgage Loans during the related Due Period, weighted on the basis of the respective Stated Principal Balances thereof for such Distribution Date (and in the case of the Class A-I-1 Certificates, multiplied by a fraction, the numerator of which is equal to 30 and the denominator of which is equal to the actual number of days in the related Interest Accrual Period).

Group I Net WAC Cap Shortfalls:  With respect to each Class of the Class A-I Certificates and each Distribution Date, the sum of (a) with respect to any Distribution Date on which the Group I Net WAC Cap Rate is used to determine the Pass-Through Rate of such Class, an amount equal the excess of (i) Accrued Certificate Interest for such Class calculated at the related Formula Rate, over (ii) Accrued Certificate Interest for such Class calculated using the Group I Net WAC Cap Rate, (b) any shortfalls for such Certificates calculated pursuant to clause (a) above remaining unpaid from prior Distribution Dates, and (c) one month's interest on the amount in clause (b) above (based on the number of days in the preceding Interest Accrual Period) at a per annum rate equal to the related Pass-Through Rate.

Group I Optional Termination Date:  Any Distribution Date on or after which the Stated Principal Balance (after giving effect to distributions to be made on such Distribution Date) of the Group I Loans is less than 10.00% of the Group I Cut-off Date Balance.

Group I Overcollateralization Amount:  With respect to any Distribution Date, the excess, if any, of (a) the aggregate Stated Principal Balance of the Group I Loans before giving effect to distributions of principal to be made on such Distribution Date over (b) the aggregate Certificate Principal Balance of the Class A-I Certificates immediately prior to such date.

Group I Overcollateralization Floor:  With respect to the Group I Loans, an amount equal to the product of (a) 0.50% and (b) the Group I Cut-off Date Balance.

Group I Overcollateralization Increase Amount:  With respect to any Distribution Date, the lesser of (a) the sum of (1) the Group I Excess Cash Flow for such Distribution Date available to make payments pursuant to Section 4.02(c)(vii) and (2) the Group II Excess Cash Flow for such Distribution Date available to make payments pursuant to Section 4.02(d)(ix), and (b) the excess of (1) the Group I Required Overcollateralization Amount for such Distribution Date over (2) the Group I Overcollateralization Amount for such Distribution Date.

Group I Overcollateralization Reduction Amount:  With respect to any Distribution Date, to the extent the Group I Excess Overcollateralization Amount is, after taking into account all other distributions to be made on such Distribution Date, greater than zero, the Group I Overcollateralization Reduction Amount shall be equal to the lesser of (i) the Group I Excess Overcollateralization Amount for that Distribution Date and (ii) the Group I Principal Remittance Amount for such Distribution Date.

Group I Policy:  The Certificate Guaranty Insurance Policy No. 04030022 issued by the Certificate Insurer in respect of the Class A-I Certificates, a copy of which is attached hereto as Exhibit Q-1.

Group I Principal Distribution Amount:  With respect to any Distribution Date, the lesser of (a) the sum of (i) the excess of (x) the Group I Available Distribution Amount over (y) the Group I

CONFIDENTIAL                                                              RC_FGIC9019_00018143

Interest Distribution Amount, and (ii) any Group II Excess Cash Flow used to pay principal on the Class A-I Certificates pursuant to Section 4.02(d), and (b) the sum of:

(i)    the principal portion of each Monthly Payment received or Advanced with respect to the related Due Period on each Outstanding Mortgage Loan that is a Group I Loan;

(ii)   the Stated Principal Balance of any Group I Loan repurchased during the related Prepayment Period (or deemed to have been so repurchased in accordance with Section 3.07(b)) pursuant to Section 2.02, 2.03, 2.04 or 4.07 and the amount of any shortfall deposited in the Custodial Account in connection with the substitution of a Deleted Mortgage Loan that is a Group I Loan pursuant to Section 2.03 or 2.04 during the related Prepayment Period;

(iii)  the principal portion of all other unscheduled collections, other than Subsequent Recoveries, on the Group I Loans (including, without limitation, Principal Prepayments in Full, Curtailments, Insurance Proceeds, Liquidation Proceeds and REO Proceeds) received during the related Prepayment Period (or deemed to have been so received) to the extent applied by the Master Servicer as recoveries of principal of the Group I Loans pursuant to Section 3.14;

(iv)   the principal portion of any Realized Losses (other than any Group I Excess Realized Losses) incurred (or deemed to have been incurred) on any Group I Loans in the calendar month preceding such Distribution Date to the extent covered by Excess Cash Flow for such Distribution Date; and

(v)    the Group I Overcollateralization Increase Amount for such Distribution Date to the extent covered by Excess Cash Flow for such Distribution Date after the allocation of Excess Cash Flow pursuant to clause (vi) of Section 4.02(c);

*minus*

(vi)   (A) the amount of any Group I Overcollateralization Reduction Amount for such Distribution Date and (B) the amount of any Capitalization Reimbursement Amount relating to the Group I Loans for such Distribution Date.

Group I Principal Remittance Amount:   With respect to any Distribution Date, all amounts described in clauses (b)(i) through (iii) of the definition of Group I Principal Distribution Amount for that Distribution Date.

CONFIDENTIAL                                                       RC_FGIC9019_00018144

Group I Required Overcollateralization Amount: With respect to any Distribution Date, (a) prior to the Group I Stepdown Date, an amount equal to 2.40% of the aggregate Stated Principal Balance of the Group I Loans as of the Cut-off Date, (b) on or after the Group I Stepdown Date provided a Group I Trigger Event is not in effect, the greater of (i) an amount equal to 4.80% of the aggregate outstanding Stated Principal Balance of the Group I Loans after giving effect to distributions made on that Distribution Date and (ii) the Group I Overcollateralization Floor and (c) on or after the Group I Stepdown Date if a Group I Trigger Event is in effect, an amount equal to the Group I Required Overcollateralization Amount from the immediately preceding Distribution Date. The Group I Required Overcollateralization Amount may be reduced at any time without Certificateholder consent, with the prior written consent of the Certificate Insurer and notification to the Rating Agencies.

Group I Stepdown Date: The Distribution Date that is the later to occur of (a) the Distribution Date in February 2007 and (b) the first Distribution Date on which the aggregate Stated Principal Balance of the Group I Loans as of the end of the related Due Period is less than 50% of the Group I Cut-off Date Balance.

Group I Trigger Event: A Group I Trigger Event is in effect with respect to any Distribution Date on or after the Group I Stepdown Date if either (a) the Rolling Three-Month Delinquency Ratio for the Group I Loans equals or exceeds 16.00%, (b) the aggregate Realized Losses on the Group I Mortgage Loans exceed (i) with respect to the 31st through the 36th Distribution Dates, inclusive, 1.00% of the aggregate Group I Cut-off Date Balance, (ii) with respect to the 37th through the 48th Distribution Dates, inclusive, 1.25% of the aggregate Group I Cut-off Date Balance, (iii) with respect to the 49th through the 60th Distribution Dates, inclusive, 2.25% of the aggregate Group I Cut-off Date Balance, (iv) with respect to the 61st through the 72nd Distribution Dates, inclusive, 2.75% of the aggregate Group I Cut-off Date Balance, and (iv) with respect to all Distribution Dates thereafter, 3.00% of the aggregate Group I Cut-off Date Balance, or (c) upon the occurrence of payment by the Certificate Insurer of any Insured Payment under the Group I Policy.

Group II-A Loan: The Mortgage Loans designated as Group II-A Loans on the Mortgage Loan Schedule attached hereto as Exhibit F-2.

Group II Available Distribution Amount: With respect to any Distribution Date, an amount equal to (a) the sum of (i) the amount relating to the Group II Loans on deposit in the Custodial Account as of the close of business on the immediately preceding Determination Date, including any Subsequent Recoveries, and amounts deposited in the Custodial Account in connection with the substitution of Qualified Substitute Mortgage Loans that are Group II Loans, (ii) the amount of any Advance made on the immediately preceding Certificate Account Deposit Date with respect to the Group II Loans, (iii) any amount deposited in the Certificate Account on the related Certificate Account Deposit Date pursuant to the second paragraph of Section 3.12(a) in respect of the Group II Loans, (iv) any amount that the Master Servicer is not permitted to withdraw from the Custodial Account pursuant to Section 3.16(e) in respect of the Group II Loans, (v) any amount deposited in the Certificate Account pursuant to Section 4.07, 4.08 or 9.01 in respect of the Group II Loans and (vi) amounts on deposit in the Certificate Account in respect of an Insured Payment pursuant to Section 4.12(b) allocable to the Class A-II Certificates in accordance with the terms of the Group II Policy, reduced by (b) the sum as of the close of business on the immediately preceding Determination Date of (i) the Mortgage Insurance Premium payable in respect of the Group II Loans to the MI Policy Provider, (ii) any payments or collections consisting of prepayment charges on the Group II Loans that were received during the related Prepayment Period, (iii) the Amount Held for Future Distribution with respect to the Group II Loans, (iv) amounts permitted to be withdrawn by the Master Servicer from the Custodial Account in respect of the Group II Loans pursuant to clauses (ii)-(x), inclusive, of Section 3.10(a) and (v) the Certificate Insurer Premium payable with respect to the Class A-II Certificates.

CONFIDENTIAL                                                                    RC_FGIC9019_00018145

Group II Basis Risk Shortfalls:  With respect to each Class of the Class A-II Certificates and any Distribution Date, the sum of (a) with respect to any Distribution Date on which the Group II Net WAC Cap Rate is used to determine the Pass-Through Rate of such Class, an amount equal to the sum of (i) the excess of (x) Accrued Certificate Interest for such Class calculated at a per annum rate equal to LIBOR plus the related Margin for such Distribution Date; *provided* that this rate is no greater than the Group II Weighted Average Maximum Net Mortgage Rate, over (y) Accrued Certificate Interest for such Class calculated using the Group II Net WAC Cap Rate, and (ii) an amount equal to any reduction in the Accrued Certificate Interest of such Class due to the failure of the Hedge Agreement Provider to make any required Hedge Payment with respect to such Distribution Date, (b) any shortfalls for such Class calculated pursuant to clause (a) above remaining unpaid from prior Distribution Dates, and (c) one month's interest on the amount in clause (b) (based on the number of days in the preceding Interest Accrual Period) at a per annum rate equal to the lesser of (i) LIBOR plus the related Margin for such Distribution Date and (ii) the Group II Weighted Average Maximum Net Mortgage Rate.

Group II-B Loan:  The Mortgage Loans designated as Group II-B Loans on the Mortgage Loan Schedule attached hereto as Exhibit F-3.

Group II Certificates:  The Class A-II Certificates and Class SB-II Certificates.

Group II Cumulative Insurance Payments:  As of any time of determination, the aggregate amount of all Insured Payments previously paid by the Certificate Insurer under the Group II Policy in respect of the Class A-II Certificates (other than those attributable to Excess Realized Losses) minus (a) the aggregate of all payments previously made to the Certificate Insurer pursuant to Sections 4.02(c)(vi) and 4.02(d)(vi) hereof as reimbursement for such Insured Payments, plus (b) interest thereon from the date such amounts became due until paid in full, at a rate of interest equal to the rate set forth in the Insurance Agreement.

Group II Cut-off Date Balance:  $675,000,130.70.

Group II Excess Cash Flow:  With respect to any Distribution Date, an amount equal to the sum of (A) the excess of (i) the Group II Available Distribution Amount for that Distribution Date increased by the amount, if any, paid from the Hedge Payment for that Distribution Date pursuant to Section 4.02(d)(ii) over (ii) the sum of (a) the Group II Interest Distribution Amount for that Distribution Date and (b) the Group II Principal Remittance Amount for that Distribution Date to the extent not applied to pay interest on the Class A-II Certificates on such Distribution Date and (B) the Group II Overcollateralization Reduction Amount, if any, for that Distribution Date.

Group II Excess Overcollateralization Amount:  With respect to any Distribution Date, the excess, if any, of (a) the Group II Overcollateralization Amount on such Distribution Date over (b) the Group II Required Overcollateralization Amount for such Distribution Date.

Group II Interest Distribution Amount:  For any Distribution Date, the amounts payable pursuant to Section 4.02(d)(i) and (ii).

Group II Interest Remittance Amount:  With respect to any Distribution Date, the portion of the Group II Available Distribution Amount for that Distribution Date attributable to interest received or advanced with respect to the Group II Loans.

Group II Loans:  The Mortgage Loans designated on the Mortgage Loan Schedule attached hereto as Exhibit F-2 and Exhibit F-3, consisting of two sub-groups of mortgage loans referred to as the

CONFIDENTIAL                                                              RC_FGIC9019_00018146

Group II-A Loans and the Group II-B Loans.  The Group II Loans relate to the Class A-II Certificates and Class SB-II Certificates.

Group II Net WAC Cap Rate:  With respect to any Distribution Date, the sum of (a) the product of (i) a per annum rate equal to the weighted average of the Net Mortgage Rates (or, if applicable, the Modified Net Mortgage Rates) on the Group II Loans using the Net Mortgage Rates in effect for the Monthly Payments due on such Mortgage Loans during the related Due Period, weighted on the basis of the respective Stated Principal Balances thereof for such Distribution Date and (ii) a fraction equal to 30 divided by the actual number of days in the related Interest Accrual Period, and (b) a per annum rate equal to (i) the amount, if any, required to be paid under the Hedge Agreement, with respect to such Distribution Date divided by (ii) the aggregate Stated Principal Balances of the Group II Loans multiplied by a fraction, the numerator of which is 30, and the denominator of which is the actual number of days in the related Interest Accrual Period; *provided, however*, that the Group II Net WAC Cap Rate shall never be greater than the Group II Weighted Average Maximum Net Mortgage Rate for the related Distribution Date.

Group II Optional Termination Date:  Any Distribution Date on or after which the Stated Principal Balance (after giving effect to distributions to be made on such Distribution Date) of the Group II Loans is less than 10.00% of the Group II Cut-off Date Balance.

Group II Overcollateralization Amount:  With respect to any Distribution Date, the excess, if any, of (a) the aggregate Stated Principal Balance of the Group II Loans before giving effect to distributions of principal to be made on such Distribution Date over (b) the aggregate Certificate Principal Balance of the Class A-II Certificates immediately prior to such date.

Group II Overcollateralization Floor:  With respect to the Group II Loans, an amount equal to the product of (a) 0.50% and (b) the Group II Cut-off Date Balance.

Group II Overcollateralization Increase Amount:  With respect to any Distribution Date, the lesser of (a) the sum of (1) the Group II Excess Cash Flow for such Distribution Date available to make payments pursuant to Section 4.02(d)(viii) and (2) the Group I Excess Cash Flow for such Distribution Date available to make payments pursuant to Section 4.02(c)(viii), and (b) the excess of (1) the Group II Required Overcollateralization Amount for such Distribution Date over (2) the Group II Overcollateralization Amount for such Distribution Date; *provided*, that until the Distribution Date in February 2005, the Group II Overcollateralization Increase Amount shall be $0.

Group II Overcollateralization Reduction Amount:  With respect to any Distribution Date, to the extent the Group II Excess Overcollateralization Amount is, after taking into account all other distributions to be made on such Distribution Date, greater than zero, the Group II Overcollateralization Reduction Amount shall be equal to the lesser of (i) the Group II Excess Overcollateralization Amount for that Distribution Date and (ii) the Group II Principal Remittance Amount on such Distribution Date.

Group II Policy:  The Certificate Guaranty Insurance Policy No. 04030023 issued by the Certificate Insurer in respect of the Class A-II Certificates, a copy of which is attached hereto as Exhibit Q-2.

CONFIDENTIAL                                                                                  RC_FGIC9019_00018147

Group II Principal Distribution Amount:  With respect to any Distribution Date, the lesser of (a) the sum of (i) the excess of (x) the Group II Available Distribution Amount over (y) the Group II Interest Distribution Amount, and (ii) any Group I Excess Cash Flow used to pay principal on the Class A-II Certificates pursuant to Section 4.02(c), and (b) the sum of:

(i)    the principal portion of each Monthly Payment received or Advanced with respect to the related Due Period on each Outstanding Mortgage Loan that is a Group II Loan;

(ii)   the Stated Principal Balance of any Group II Loan repurchased during the related Prepayment Period (or deemed to have been so repurchased in accordance with Section 3.07(b)) pursuant to Section 2.02, 2.03, 2.04, 4.07 or 4.08 and the amount of any shortfall deposited in the Custodial Account in connection with the substitution of a Deleted Mortgage Loan that is a Group II Loan pursuant to Section 2.03 or 2.04 during the related Prepayment Period;

(iii)  the principal portion of all other unscheduled collections, other than Subsequent Recoveries, on the Group II Loans (including, without limitation, Principal Prepayments in Full, Curtailments, Insurance Proceeds, Liquidation Proceeds and REO Proceeds) received during the related Prepayment Period (or deemed to have been so received) to the extent applied by the Master Servicer as recoveries of principal of the Group II Loans pursuant to Section 3.14;

(iv)   the principal portion of any Realized Losses (other than any Group II Excess Realized Losses) incurred (or deemed to have been incurred) on any Group II Loans in the calendar month preceding such Distribution Date to the extent covered by Excess Cash Flow for such Distribution Date; and

(v)    the Group II Overcollateralization Increase Amount for such Distribution Date to the extent covered by Excess Cash Flow for such Distribution Date after the allocation of Excess Cash Flow pursuant to clause (vii) of Section 4.02(d);

*minus*

(vi)   (A) the amount of any Group II Overcollateralization Reduction Amount for such Distribution Date and (B) the amount of any Capitalization Reimbursement Amount relating to the Group II Loans for such Distribution Date.

Group II Principal Remittance Amount:  With respect to any Distribution Date, all amounts described in clauses (b)(i) through (iii) of the definition of Group II Principal Distribution Amount for that Distribution Date.

Group II REMIC Interest Amount:  For any Distribution Date and each Class of Class A-II Certificates, the Accrued Certificate Interest for such Class reduced by the portion thereof attributable to the excess, if any, of the related Pass-Through Rate over the related Group II REMIC Net WAC Rate.

Group II REMIC Net WAC Rate:  For any Distribution Date, a per annum rate equal to the weighted average of the Net Mortgage Rates (or, if applicable, the Modified Net Mortgage Rates) on the Group II Loans using the Net Mortgage Rates in effect for the Monthly Payments due on such Mortgage Loans during the related Due Period, weighted on the basis of the respective Stated Principal Balances thereof for such Distribution Date and (ii) a fraction equal to 30 divided by the actual number of days in the related Interest Accrual Period.

CONFIDENTIAL                                                           RC_FGIC9019_00018148

Group II Required Overcollateralization Amount:  With respect to any Distribution Date prior to the Distribution Date in February 2005, the initial Group II Overcollateralization Amount.  With respect to any Distribution Date occuring on or after the Distribution Date in February 2005, the Group II Overcollateralization Floor.  The Group II Required Overcollateralization Amount may be reduced at any time without Certificateholder consent, with the prior written consent of the Certificate Insurer and notification to the Rating Agencies.

Group II Weighted Average Maximum Net Mortgage Rate:  With respect to any Distribution Date, the product of (a) the weighted average of the Maximum Net Mortgage Rates on the Group II Loans, weighted on the basis of the Stated Principal Balances thereof as of the beginning of the related Due Period and (b) a fraction, the numerator of which is 30, and the denominator of which is the actual number of days in the related Interest Accrual Period.

Hedge Agreement:  The confirmation, dated as of the Closing Date, between the Trustee and the Hedge Agreement Provider, or any replacement, substitute, collateral or other arrangement in lieu thereof.

Hedge Agreement Provider:  Bear Stearns Financial Products Inc., and its successors and assigns or any party to any replacement, substitute, collateral or other arrangement in lieu thereof.

Hedge Payment:  For any Distribution Date, the payment, if any, due under the Hedge Agreement in respect of such Distribution Date.

Hedge Shortfall Amount:  For any Distribution Date, the amount, if any, by which the payment on the Class A-II Certificates pursuant to Section 4.02(d)(ii) is paid from the Hedge Payment for such Distribution Date pursuant to the provisions thereof or would have been so paid but for the failure of the Hedge Agreement Provider to make a payment required under the Hedge Agreement.

Hedge Shortfall Carry-Forward Amount:  For any Distribution Date, the aggregate Hedge Shortfall Amounts for prior Distribution Dates to the extent not reimbursed to the Class SB-II Certificates pursuant to Section 4.02(d)(xix).

HUD:  The United States Department of Housing and Urban Development.

Independent:  When used with respect to any specified Person, means such a Person who (i) is in fact independent of the Depositor, the Master Servicer and the Trustee, or any Affiliate thereof, (ii) does not have any direct financial interest or any material indirect financial interest in the Depositor, the Master Servicer or the Trustee or in an Affiliate thereof, and (iii) is not connected with the Depositor, the Master Servicer or the Trustee as an officer, employee, promoter, underwriter, trustee, partner, director or person performing similar functions.

Index:  With respect to any Group II Loan and as to any Adjustment Date therefor, the related index as stated in the related Mortgage Note.

Initial Certificate Principal Balance:  With respect to each Class of Certificates (other than the Class R Certificates), the Certificate Principal Balance of such Class of Certificates as of the Cut-off Date as set forth in the Preliminary Statement hereto.

Insurance Account:  The account or accounts created and maintained pursuant to Section 4.12, which shall be entitled "JPMorgan Chase Bank, as trustee, in trust for the registered holders of Residential Asset Securities Corporation, Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2004-KS7," and which must be an Eligible Account.

CONFIDENTIAL                                                                      RC_FGIC9019_00018149

Insurance Agreement:  The Insurance and Indemnity Agreement, dated as of July 29, 2004, among the Certificate Insurer, the Trustee, the Master Servicer and the Depositor.

Insurance Proceeds:  Proceeds paid in respect of the Mortgage Loans pursuant to the MI Policy and any Primary Insurance Policy or any other related insurance policy covering a Mortgage Loan, to the extent such proceeds are payable to the mortgagee under the Mortgage, any Subservicer, the Master Servicer or the Trustee and are not applied to the restoration of the related Mortgaged Property or released to the Mortgagor in accordance with the procedures that the Master Servicer would follow in servicing mortgage loans held for its own account.

Insured Payment:  As defined in each Certificate Guaranty Insurance Policy.

Interest Accrual Period:  With respect to the Class A-I Certificates (other than the Class A-I-1 Certificates) and any Distribution Date, the prior calendar month.  With respect to the Class A-I-1 Certificates, Class A-II Certificates and Class SB Certificates (i) with respect to the Distribution Date in August 2004, the period commencing the Closing Date and ending on the day preceding the Distribution Date in August 2004, and (ii) with respect to any Distribution Date after the Distribution Date in August 2004, the period commencing on the Distribution Date in the month immediately preceding the month in which such Distribution Date occurs and ending on the day preceding such Distribution Date.

Interim Certification:  As defined in Section 2.02.

Late Collections:  With respect to any Mortgage Loan, all amounts received during any Due Period, whether as late payments of Monthly Payments or as Insurance Proceeds, Liquidation Proceeds or otherwise, which represent late payments or collections of Monthly Payments due but delinquent for a previous Due Period and not previously recovered.

LIBOR:  With respect to any Distribution Date, the arithmetic mean of the London interbank offered rate quotations for one-month U.S. Dollar deposits, expressed on a per annum basis, determined in accordance with Section 1.02.

LIBOR Business Day:  Any day other than (i) a Saturday or Sunday or (ii) a day on which banking institutions in London, England are required or authorized by law to be closed.

LIBOR Certificates:  The Class A-I-1 Certificates and Class A-II Certificates.

LIBOR Rate Adjustment Date:  With respect to each Distribution Date, the second LIBOR Business Day immediately preceding the commencement of the related Interest Accrual Period.

Limited Repurchase Right Holder:  RFC Asset Holdings II, Inc., or its successor.

Liquidation Proceeds:  Amounts (other than Insurance Proceeds) received by the Master Servicer in connection with the taking of an entire Mortgaged Property by exercise of the power of eminent domain or condemnation or in connection with the liquidation of a defaulted Mortgage Loan through trustee's sale, foreclosure sale or otherwise, other than REO Proceeds and Subsequent Recoveries.

Loan Group:  Loan Group I or Loan Group II, as applicable.

Loan Group I:  The Mortgage Loans designated on the Mortgage Loan Schedule attached hereto as Exhibit F-1.

CONFIDENTIAL                                                                                          RC_FGIC9019_00018150

Loan Group II:  The Mortgage Loans designated on the Mortgage Loan Schedule attached hereto as Exhibit F-2 and Exhibit F-3, consisting of two sub-groups of mortgage loans referred to as Loan Group II-A and Loan Group II-B.

Loan-to-Value Ratio:  As of any date, the fraction, expressed as a percentage, the numerator of which is the current principal balance of the related Mortgage Loan at the date of determination and the denominator of which is the Appraised Value of the related Mortgaged Property.

Margin:    The Class A-II-A Margin, Class A-II-B1 Margin, Class A-II-B2 Margin or Class A-II-B3 Margin, as applicable.

Marker Rate:  With respect to the Class SB-I Certificates and any Distribution Date, a per annum rate equal to two (2) times the weighted average of the Uncertificated REMIC I Pass-Through Rates for REMIC I Regular Interest LT2 and REMIC I Regular Interest LT3.  With respect to the Class SB-II Certificates and any Distribution Date, a per annum rate equal to two (2) times the weighted average of the Uncertificated REMIC II Pass-Through Rates for REMIC II Regular Interest LT6 and REMIC II Regular Interest LT7.

Master Servicer:  As defined in the preamble hereto.

Maturity Date:  With respect to each Class of Certificates representing ownership of regular interests or Uncertificated Regular Interest issued by each of REMIC I, REMIC II and REMIC III the latest possible maturity date, solely for purposes of Section 1.860G-1(a)(4)(iii) of the Treasury Regulations, by which the Certificate Principal Balance of each such Class of Certificates representing a regular interest in the Trust Fund would be reduced to zero, which is, for each such regular interest, August 25, 2034, which is the Distribution Date occurring in the month following the last scheduled monthly payment of the Group I Loans and the Group II Loans.

Maximum Mortgage Rate:  With respect to any Group II Loan, the per annum rate indicated on the Mortgage Loan Schedule as the "NOTE CEILING," which rate is the maximum interest rate that may be applicable to such Group II Loan at any time during the life of such Mortgage Loan.

Maximum Net Mortgage Rate:  With respect to any Group II Loan and any date of determination, the Maximum Mortgage Rate minus the Expense Fee Rate.

MERS:  Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

MERS® System:  The system of recording transfers of Mortgages electronically maintained by MERS.

MIN:  The Mortgage Identification Number for Mortgage Loans registered with MERS on the MERS® System.

Minimum Mortgage Rate:  With respect to any Group II Loan, a per annum rate equal to the greater of (i) the Note Margin and (ii) the rate indicated on the Mortgage Loan Schedule as the "NOTE FLOOR," which rate may be applicable to such Group II Loan at any time during the life of such Group II Loan.

MI Policy:  The bulk primary mortgage insurance policy issued by the MI Policy Provider on the Cut-off Date, substantially in the form attached hereto as Exhibit S.

CONFIDENTIAL                                                                    RC_FGIC9019_00018151

MI Policy Provider:  PMI Mortgage Insurance Co., an Arizona stock insurance corporation, or any successor thereto.

MI Policy Provider Default:  An event of default by the MI Policy Provider under Section 2.8(b) of the Endorsement to the Mortgage Guaranty Master Policy (which is part of the MI Policy) or other event which would result in the cancellation of coverage for all of the Mortgage Loans then covered by the MI Policy.

Modified Mortgage Loan:  Any Mortgage Loan that has been the subject of a Servicing Modification.

Modified Net Mortgage Rate:  With respect to any Mortgage Loan that is the subject of a Servicing Modification, the Net Mortgage Rate minus the rate per annum by which the Mortgage Rate on such Mortgage Loan was reduced.

MOM Loan:  With respect to any Mortgage Loan, MERS acting as the mortgagee of such Mortgage Loan, solely as nominee for the originator of such Mortgage Loan and its successors and assigns, at the origination thereof.

Monthly Payment:  With respect to any Mortgage Loan (including any REO Property) and the Due Date in any Due Period, the payment of principal and interest due thereon in accordance with the amortization schedule at the time applicable thereto (after adjustment, if any, for Curtailments and for Deficient Valuations occurring prior to such Due Date but before any adjustment to such amortization schedule by reason of any bankruptcy, other than a Deficient Valuation, or similar proceeding or any moratorium or similar waiver or grace period and before any Servicing Modification that constitutes a reduction of the interest rate on such Mortgage Loan).

Moody's:  Moody's Investors Service, Inc., or its successors in interest.

Mortgage:  With respect to each Mortgage Note, the mortgage, deed of trust or other comparable instrument creating a first or junior lien on an estate in fee simple or leasehold interest in real property securing a Mortgage Note.

Mortgage File:  The mortgage documents listed in Section 2.01 pertaining to a particular Mortgage Loan and any additional documents required to be added to the Mortgage File pursuant to this Agreement.

Mortgage Insurance Premium:  With respect to the Mortgage Loans and any Distribution Date, the aggregate amount payable to the MI Policy Provider under the MI Policy.

Mortgage Insurance Premium Rate:  With respect to each Mortgage Loan covered by the MI Policy, the applicable loan-level rate per annum set forth in the schedule endorsement to the MI Policy.

Mortgage Insurance Premium Taxes Reserve Fund:  An "outside reserve fund" within the meaning of Treasury regulation Section 1.860G-2(h), which is not an asset of any REMIC, and which is established and maintained pursuant to Section 4.09.  Ownership of the Mortgage Insurance Premium Taxes Reserve Fund shall be held by Residential Funding.

Mortgage Insurance Premium Taxes Reserve Fund Deposit:  With respect to the Mortgage Insurance Premium Taxes Reserve Fund, an amount equal to $13,300.00, which the Trustee shall deposit

CONFIDENTIAL                                                                                RC_FGIC9019_00018152

into the Trust Fund pursuant to Section 4.09 hereof. Also, the Depositor may make additional deposits into the Mortgage Insurance Premium Taxes Reserve Fund after the Closing Date, which shall be included in the Mortgage Insurance Premium Taxes Reserve Fund Deposit and any such deposit shall be treated as an advance on behalf of the Trust reimbursable to the Depositor pursuant to Section 4.02(c)(xvii) and Section 4.02(d)(xviii).

Mortgage Insurance Premium Taxes Reserve Fund Residual Right: The right to distributions from the Mortgage Insurance Premium Taxes Reserve Fund as described in Section 4.09 hereof. Residential Funding as owner of the Mortgage Insurance Premium Taxes Reserve Fund also shall be the holder of the Mortgage Insurance Premium Taxes Reserve Fund Residual Right.

Mortgage Loans: Such of the mortgage loans transferred and assigned to the Trustee pursuant to Section 2.01 as from time to time are held or deemed to be held as a part of the Trust Fund, the Mortgage Loans originally so held being identified in the initial Mortgage Loan Schedule, and Qualified Substitute Mortgage Loans held or deemed held as part of the Trust Fund including, without limitation, each related Mortgage Note, Mortgage and Mortgage File and all rights appertaining thereto.

Mortgage Loan Schedule: The lists of the Mortgage Loans attached hereto as Exhibit F-1, Exhibit F-2 and Exhibit F-3 (as amended from time to time to reflect the addition of Qualified Substitute Mortgage Loans), which lists shall set forth at a minimum the following information as to each Mortgage Loan:

 (i) the Mortgage Loan identifying number ("RFC LOAN #");

 (ii) [reserved];

 (iii) the maturity of the Mortgage Note ("MATURITY  DATE," or "MATURITY DT");

 (iv) for the Group II Loans, the Mortgage Rate as of origination ("ORIG RATE");

 (v) the Mortgage Rate as of the Cut-off Date ("CURR RATE");

 (vi) the Net Mortgage Rate as of the Cut-off Date ("CURR NET");

 (vii) the scheduled monthly payment of principal, if any, and interest as of the Cut-off Date ("ORIGINAL P & I" or "CURRENT P & I");

 (viii) the Cut-off Date Principal Balance ("PRINCIPAL BAL");

 (ix) the Loan-to-Value Ratio at origination ("LTV");

 (x) a code "T," "BT" or "CT" under the column "LN FEATURE," indicating that the Mortgage Loan is secured by a second or vacation residence (the absence of any such code means the Mortgage Loan is secured by a primary residence);

 (xi) a code "N" under the column "OCCP CODE," indicating that the Mortgage Loan is secured by a non-owner occupied residence (the absence of any such code means the Mortgage Loan is secured by an owner occupied residence);

 (xii) for the Group II Loans, the Maximum Mortgage Rate ("NOTE CEILING");

 (xiii) for the Group II Loans, the maximum Net Mortgage Rate ("NET CEILING");

CONFIDENTIAL                    RC_FGIC9019_00018153

(xiv)  for the Group II Loans, the Note Margin ("NOTE MARGIN");

(xv)  for the Group II Loans, the first Adjustment Date after the Cut-off Date ("NXT INT CHG DT");

(xvi)  for the Group II Loans, the Periodic Cap ("PERIODIC DECR" or "PERIODIC INCR");

(xvii)  whether the Mortgage Loan is covered by the MI Policy ("CODE 34"), the absence of such code representing that the Mortgage Loan is not covered by the MI Policy; and

(xviii) for the Group II Loans, the rounding of the semi-annual or annual adjustment to the Mortgage Rate ("NOTE METHOD").

Such schedules may consist of multiple reports that collectively set forth all of the information required.

Mortgage Note:  The originally executed note or other evidence of indebtedness evidencing the indebtedness of a Mortgagor under a Mortgage Loan, together with any modification thereto.

Mortgage Rate:  With respect to any Mortgage Loan, the interest rate borne by the related Mortgage Note, or any modification thereto other than a Servicing Modification.  The Mortgage Rate on the Group II Loans will adjust on each Adjustment Date to equal the sum (rounded to the nearest multiple of one-eighth of one percent (0.125%) or up to the nearest one-eighth of one percent, which are indicated by a "U" on the Mortgage Loan Schedule, except in the case of the Group II Loans indicated by an "X" on the Mortgage Loan Schedule under the heading "NOTE METHOD"), of the related Index plus the Note Margin, in each case subject to the applicable Periodic Cap, Maximum Mortgage Rate and Minimum Mortgage Rate.

Mortgaged Property:  The underlying real property securing a Mortgage Loan.

Mortgagor:  The obligor on a Mortgage Note.

Net Mortgage Rate:  With respect to any Mortgage Loan as of any date of determination, a per annum rate equal to the Mortgage Rate for such Mortgage Loan as of such date minus the related Expense Fee Rate and minus the applicable Certificate Insurer Premium Modified Rate.

Non-United States Person:  Any Person other than a United States Person.

Nonrecoverable Advance:  Any Advance previously made or proposed to be made by the Master Servicer or Subservicer in respect of a Mortgage Loan (other than a Deleted Mortgage Loan) which, in the good faith judgment of the Master Servicer, will not, or, in the case of a proposed Advance, would not, be ultimately recoverable by the Master Servicer from related Late Collections, Insurance Proceeds, Liquidation Proceeds or REO Proceeds.  To the extent that any Mortgagor is not obligated under the related Mortgage documents to pay or reimburse any portion of any Servicing Advances that are outstanding with respect to the related Mortgage Loan as a result of a modification of such Mortgage Loan by the Master Servicer, which forgives amounts which the Master Servicer or Subservicer had previously advanced, and the Master Servicer determines that no other source of payment or reimbursement for such advances is available to it, such Servicing Advances shall be deemed to be Nonrecoverable Advances.  The determination by the Master Servicer that it has made a Nonrecoverable Advance shall be evidenced by a certificate of a Servicing Officer, Responsible Officer or Vice President or its equivalent or senior officer of the Master Servicer, delivered to the Depositor, the Trustee, the

CONFIDENTIAL                                                                        RC_FGIC9019_00018154

Certificate Insurer and the Master Servicer setting forth such determination, which shall include any other information or reports obtained by the Master Servicer such as property operating statements, rent rolls, property inspection reports and engineering reports, which may support such determinations. Notwithstanding the above, the Trustee shall be entitled to rely upon any determination by the Master Servicer that any Advance previously made is a Nonrecoverable Advance or that any proposed Advance, if made, would constitute a Nonrecoverable Advance.

Nonsubserviced Mortgage Loan:  Any Mortgage Loan that, at the time of reference thereto, is not subject to a Subservicing Agreement.

Note Margin:  With respect to each Group II Loan, the fixed percentage set forth in the related Mortgage Note and indicated on the Mortgage Loan Schedule as the "NOTE MARGIN," which percentage is added to the Index on each Adjustment Date to determine (subject to rounding in accordance with the related Mortgage Note, the Periodic Cap, the Maximum Mortgage Rate and the Minimum Mortgage Rate) the interest rate to be borne by such Group II Loan until the next Adjustment Date.

Notice:  As defined in Section 4.04.

Officers' Certificate:  A certificate signed by the Chairman of the Board, the President, a Vice President, Assistant Vice President, Director, Managing Director, the Treasurer, the Secretary, an Assistant Treasurer or an Assistant Secretary of the Depositor or the Master Servicer, as the case may be, and delivered to the Trustee and the Certificate Insurer, as required by this Agreement.

Opinion of Counsel:  A written opinion of counsel acceptable to the Trustee, the Certificate Insurer and the Master Servicer, who may be counsel for the Depositor or the Master Servicer, *provided* that any opinion of counsel (i) referred to in the definition of "Disqualified Organization" or (ii) relating to the qualification of REMIC I, REMIC II or REMIC III as REMICs or compliance with the REMIC Provisions must, unless otherwise specified, be an opinion of Independent counsel.

Outstanding Mortgage Loan:  With respect to the Due Date in any Due Period, a Mortgage Loan (including an REO Property) that was not the subject of a Principal Prepayment in Full, Cash Liquidation or REO Disposition and that was not purchased, deleted or substituted for prior to such Due Date pursuant to Section 2.02, 2.03, 2.04, 4.07 or 4.08.

Ownership Interest:  With respect to any Certificate, any ownership or security interest in such Certificate, including any interest in such Certificate as the Holder thereof and any other interest therein, whether direct or indirect, legal or beneficial, as owner or as pledgee.

Pass-Through Rate:  With respect to the Class A-I Certificates, the lesser of (i) the related Formula Rate and (ii) the Group I Net WAC Cap Rate.

With respect to each Class of Class A-II Certificates and any Distribution Date, the lesser of (i) LIBOR plus the related Margin and (ii) the Group II Net WAC Cap Rate.

With respect to the Class SB-I Certificates and any Distribution Date or the REMIC III Regular Interest SB-I-IO, a per annum rate equal to the percentage equivalent of a fraction, the numerator of which is the sum of the amounts calculated pursuant to clauses (i) through (iii) below, and the denominator of which is the aggregate principal balance of the REMIC I Regular Interests.  For purposes of calculating the Pass-Through Rate for the Class SB-I Certificates, the numerator is equal to the sum of the following components:

CONFIDENTIAL                                                                    RC_FGIC9019_00018155

(i)   the Uncertificated Pass-Through Rate for REMIC I Regular Interest LT1 minus the related Marker Rate, applied to a notional amount equal to the Uncertificated Principal Balance of REMIC I Regular Interest LT1;

(ii)   the Uncertificated Pass-Through Rate for REMIC I Regular Interest LT2 minus the related Marker Rate, applied to a notional amount equal to the Uncertificated Principal Balance of REMIC I Regular Interest LT2; and

(iii)   the Uncertificated Pass-Through Rate for REMIC I Regular Interest LT4 minus twice the related Marker Rate, applied to a notional amount equal to the Uncertificated Principal Balance of REMIC I Regular Interest LT4.

With respect to the Class SB-II Certificates and any Distribution Date or the REMIC III Regular Interest SB-II-IO, a per annum rate equal to the percentage equivalent of a fraction, the numerator of which is the sum of the amounts calculated pursuant to clauses (i) through (iii) below, and the denominator of which is the aggregate principal balance of the REMIC II Regular Interests. For purposes of calculating the Pass-Through Rate for the Class SB-II Certificates, the numerator is equal to the sum of the following components:

(i)   the Uncertificated Pass-Through Rate for REMIC II Regular Interest LT5 minus the related Marker Rate, applied to a notional amount equal to the Uncertificated Principal Balance of REMIC II Regular Interest LT5;

(ii)   the Uncertificated Pass-Through Rate for REMIC II Regular Interest LT6 minus the related Marker Rate, applied to a notional amount equal to the Uncertificated Principal Balance of REMIC II Regular Interest LT6; and

(iii)   the Uncertificated Pass-Through Rate for REMIC II Regular Interest LT8 minus twice the related Marker Rate, applied to a notional amount equal to the Uncertificated Principal Balance of REMIC II Regular Interest LT8.

Paying Agent:  JPMorgan Chase Bank or any successor Paying Agent appointed by the Trustee.

Percentage Interest:  With respect to any Class A Certificate, the undivided percentage ownership interest in the related Class evidenced by such Certificate, which percentage ownership interest shall be equal to the Initial Certificate Principal Balance thereof divided by the aggregate Initial Certificate Principal Balance of all of the Certificates of the same Class.  The Percentage Interest with respect to a Class SB Certificate or Class R Certificate shall be stated on the face thereof.

Periodic Cap:  With respect to each Group II Loan, the periodic rate cap that limits the increase or the decrease of the related Mortgage Rate on any Adjustment Date pursuant to the terms of the related Mortgage Note.

Permitted Investments:  One or more of the following:

(i)   obligations of or guaranteed as to principal and interest by the United States or any agency or instrumentality thereof when such obligations are backed by the full faith and credit of the United States;

(ii)   repurchase agreements on obligations specified in clause (i) maturing not more than one month from the date of acquisition thereof, *provided* that the unsecured obligations of the

CONFIDENTIAL                                                                                     RC_FGIC9019_00018156

party agreeing to repurchase such obligations are at the time rated by each Rating Agency in its highest short-term rating available;

(iii) federal funds, certificates of deposit, demand deposits, time deposits and bankers' acceptances (which shall each have an original maturity of not more than 90 days and, in the case of bankers' acceptances, shall in no event have an original maturity of more than 365 days or a remaining maturity of more than 30 days) denominated in United States dollars of any U.S. depository institution or trust company incorporated under the laws of the United States or any state thereof or of any domestic branch of a foreign depository institution or trust company; *provided* that the debt obligations of such depository institution or trust company at the date of acquisition thereof have been rated by each Rating Agency in its highest short-term rating available;

(iv) commercial paper and demand notes (having original maturities of not more than 365 days) of any corporation incorporated under the laws of the United States or any state thereof which on the date of acquisition has been rated by each Rating Agency in its highest short-term rating available; *provided* that such commercial paper and demand notes shall have a remaining maturity of not more than 30 days;

(v) a money market fund or a qualified investment fund rated by each Rating Agency in its highest long-term rating available; and

(vi) other obligations or securities that are acceptable to each Rating Agency and the Certificate Insurer as a Permitted Investment hereunder and will not reduce the rating assigned to any Class of Certificates by such Rating Agency below the lower of the then-current rating or the rating assigned to such Certificates as of the Closing Date by such Rating Agency, as evidenced in writing;

*provided, however*, that no instrument shall be a Permitted Investment if it represents, either (1) the right to receive only interest payments with respect to the underlying debt instrument or (2) the right to receive both principal and interest payments derived from obligations underlying such instrument and the principal and interest payments with respect to such instrument provide a yield to maturity greater than 120% of the yield to maturity at par of such underlying obligations. References herein to the highest rating available on unsecured long-term debt shall mean AAA in the case of Fitch, AAA in the case of Standard & Poor's and Aaa in the case of Moody's, and references herein to the highest rating available on unsecured commercial paper and short-term debt obligations shall mean A1+ in the case of Fitch, A-1+ in the case of Standard & Poor's and P-1 in the case of Moody's.

Permitted Transferee:   Any Transferee of a Class R Certificate, other than a Disqualified Organization or Non-United States Person.

Person:   Any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

Prepayment Assumption:   With respect to the Class A-I Certificates, the prepayment assumption to be used for determining the accrual of original issue discount and premium and market discount on such Certificates for federal income tax purposes, which assumes a constant prepayment rate of one-tenth of 23% per annum of the then outstanding Stated Principal Balance of the Group I Loans in the first month of the life of such Group I Loans and an additional one-tenth of 23% per annum in each month thereafter until the tenth month, and beginning in the tenth month and in each month thereafter during the

CONFIDENTIAL                                    RC_FGIC9019_00018157

life of the Group I Loans, a constant prepayment rate of 23% per annum each month ("23% HEP"). With respect to the Class A-II Certificates, a prepayment assumption of 2% of the constant prepayment rate in month one, increasing by approximately 2.545% from month 2 until month 12, a constant prepayment rate of 30% from month 12 to month 22, a constant prepayment rate of 50% from month 23 to month 27, and a constant prepayment rate of 35% thereafter, used for determining the accrual of original issue discount and premium and market discount on the Class A-II Certificates for federal income tax purposes. The constant prepayment rate assumes that the stated percentage of the outstanding Stated Principal Balance of the Group II Loans is prepaid over the course of a year.

Prepayment Interest Shortfall:  With respect to any Distribution Date and any Mortgage Loan (other than a Mortgage Loan relating to an REO Property) that was the subject of (a) a Principal Prepayment in Full during the related Prepayment Period, an amount equal to the excess of one month's interest at the related Net Mortgage Rate (or Modified Net Mortgage Rate in the case of a Modified Mortgage Loan) on the Stated Principal Balance of such Mortgage Loan over the amount of interest (adjusted to the related Net Mortgage Rate (or Modified Net Mortgage Rate in the case of a Modified Mortgage Loan)) paid by the Mortgagor for such Prepayment Period to the date of such Principal Prepayment in Full or (b) a Curtailment during the prior calendar month, an amount equal to one month's interest at the related Net Mortgage Rate (or Modified Net Mortgage Rate in the case of a Modified Mortgage Loan) on the amount of such Curtailment.

Prepayment Period:  With respect to any Distribution Date, the calendar month preceding the month of distribution.

Primary Insurance Policy:  Each primary policy of mortgage guaranty insurance as indicated by a numeric code on the Mortgage Loan Schedule with the exception of code "A23," "A34" or "A96" under the column "MI CO CODE."

Principal Prepayment:  Any payment of principal or other recovery on a Mortgage Loan, including a recovery that takes the form of Liquidation Proceeds or Insurance Proceeds, which is received in advance of its scheduled Due Date and is not accompanied by an amount as to interest representing scheduled interest on such payment due on any date or dates in any month or months subsequent to the month of prepayment.

Principal Prepayment in Full:  Any Principal Prepayment made by a Mortgagor of the entire principal balance of a Mortgage Loan.

Program Guide:  The AlterNet Seller Guide as incorporated into the Residential Funding Seller Guide for mortgage collateral sellers that participate in Residential Funding's AlterNet Mortgage Program, and Residential Funding's Servicing Guide and any other subservicing arrangements which Residential Funding has arranged to accommodate the servicing of the Mortgage Loans and in each case all supplements and amendments thereto published by Residential Funding.

Purchase Price:  With respect to any Mortgage Loan (or REO Property) required to be or otherwise purchased on any date pursuant to Section 2.02, 2.03, 2.04, 4.07 or 4.08, an amount equal to the sum of (i) (a) if such Mortgage Loan (or REO Property) is being purchased pursuant to Sections 2.02, 2.03, 2.04 or 4.07 of this Agreement, 100% of the Stated Principal Balance thereof plus the principal portion of any related unreimbursed Advances or (b) if such Mortgage Loan (or REO Property) is being purchased pursuant to Section 4.08 of this Agreement, the greater of (1) 100% of the Stated Principal Balance thereof plus the principal portion of any related unreimbursed Advances of such Mortgage Loan (or REO Property) and (2) the fair market value thereof plus the principal portion of any related unreimbursed Advances and (ii) unpaid accrued interest at either (a) the Adjusted Mortgage Rate (or

CONFIDENTIAL                                                                   RC_FGIC9019_00018158

Modified Net Mortgage Rate in the case of a Modified Mortgage Loan) plus the rate per annum at which the Servicing Fee, the related Mortgage Insurance Premium Rate, if any, and the applicable Certificate Insurer Premium Modified Rate, is calculated, or (b) in the case of a purchase made by the Master Servicer, at the Net Mortgage Rate (or Modified Net Mortgage Rate in the case of a Modified Mortgage Loan) plus the related Mortgage Insurance Premium Rate, if any, and the applicable Certificate Insurer Premium Modified Rate, in each case on the Stated Principal Balance thereof to the first day of the month following the month of purchase from the Due Date to which interest was last paid by the Mortgagor.

Qualified Substitute Mortgage Loan:  A Mortgage Loan substituted by Residential Funding or the Depositor for a Deleted Mortgage Loan which must, on the date of such substitution, as confirmed in an Officers' Certificate delivered to the Trustee, (i) have an outstanding principal balance, after deduction of the principal portion of the monthly payment due in the month of substitution (or in the case of a substitution of more than one Mortgage Loan for a Deleted Mortgage Loan, an aggregate outstanding principal balance, after such deduction), not in excess of the Stated Principal Balance of the Deleted Mortgage Loan (the amount of any shortfall to be deposited by Residential Funding, in the Custodial Account in the month of substitution); (ii) have a Mortgage Rate and a Net Mortgage Rate no lower than and not more than 1% per annum higher than the Mortgage Rate and Net Mortgage Rate, respectively, of the Deleted Mortgage Loan as of the date of substitution; (iii) have a Loan-to-Value Ratio at the time of substitution no higher than that of the Deleted Mortgage Loan at the time of substitution; (iv) have a remaining term to stated maturity not greater than (and not more than one year less than) that of the Deleted Mortgage Loan; (v) comply with each representation and warranty set forth in Sections 2.03 and 2.04 hereof and Section 4 of the Assignment Agreement (other than the representations and warranties set forth therein with respect to the number of loans (including the related percentage) in excess of zero which meet or do not meet a specified criteria); (vi) not be 30 days or more Delinquent; (vii) not be subject to the requirements of HOEPA (as defined in the Assignment Agreement); (viii) have a policy of title insurance, in the form and amount that is in material compliance with the Program Guide, that was effective as of the closing of such Mortgage Loan, is valid and binding, and remains in full force and effect, unless the Mortgage Property is located in the State of Iowa where an attorney's certificate has been provided as described in the Program Guide; (ix) if the Deleted Loan is not a Balloon Loan, not be a Balloon Loan; (x) have a Mortgage Rate that adjusts with the same frequency and based upon the same Index as that of the Deleted Mortgage Loan; (xi) have a Note Margin not less than that of the Deleted Mortgage Loan; (xii) have a Periodic Rate Cap that is equal to that of the Deleted Mortgage Loan; and (xiii) have a next Adjustment Date no later than that of the Deleted Mortgage Loan.

Rating Agency:  Standard & Poor's and Moody's.  If any agency or a successor is no longer in existence, "Rating Agency" shall be such statistical credit rating agency, or other comparable Person, designated by the Depositor, notice of which designation shall be given to the Trustee and the Master Servicer.

Realized Loss:  With respect to each Mortgage Loan (or REO Property) as to which a Cash Liquidation or REO Disposition has occurred, an amount (not less than zero) equal to (i) the Stated Principal Balance of the Mortgage Loan (or REO Property) as of the date of Cash Liquidation or REO Disposition, plus (ii) interest (and REO Imputed Interest, if any) at the Net Mortgage Rate plus the applicable Mortgage Insurance Premium Rate, if any, and plus the applicable Certificate Insurer Premium Modified Rate, in each case from the Due Date as to which interest was last paid or advanced to Certificateholders up to the last day of the month in which the Cash Liquidation (or REO Disposition) occurred on the Stated Principal Balance of such Mortgage Loan (or REO Property) outstanding during each Due Period that such interest was not paid or advanced, minus (iii) the proceeds, if any, received during the month in which such Cash Liquidation (or REO Disposition) occurred, to the extent applied as recoveries of interest at the Net Mortgage Rate plus the applicable Mortgage Insurance Premium Rate, if any, plus the applicable Certificate Insurer Premium Modified Rate, and to principal of the Mortgage

CONFIDENTIAL                                                              RC_FGIC9019_00018159

Loan, net of the portion thereof reimbursable to the Master Servicer or any Subservicer with respect to related Advances, Servicing Advances or other expenses as to which the Master Servicer or Subservicer is entitled to reimbursement thereunder but which have not been previously reimbursed. With respect to each Mortgage Loan which is the subject of a Servicing Modification, (a) (1) the amount by which the interest portion of a Monthly Payment or the principal balance of such Mortgage Loan was reduced or (2) the sum of any other amounts owing under the Mortgage Loan that were forgiven and that constitute Servicing Advances that are reimbursable to the Master Servicer or a Subservicer, and (b) any such amount with respect to a Monthly Payment that was or would have been due in the month immediately following the month in which a Principal Prepayment or the Purchase Price of such Mortgage Loan is received or is deemed to have been received. With respect to each Mortgage Loan which has become the subject of a Deficient Valuation, the difference between the principal balance of the Mortgage Loan outstanding immediately prior to such Deficient Valuation and the principal balance of the Mortgage Loan as reduced by the Deficient Valuation. With respect to each Mortgage Loan which has become the object of a Debt Service Reduction, the amount of such Debt Service Reduction. Notwithstanding the above, neither a Deficient Valuation nor a Debt Service Reduction shall be deemed a Realized Loss hereunder so long as the Master Servicer has notified the Trustee in writing that the Master Servicer is diligently pursuing any remedies that may exist in connection with the representations and warranties made regarding the related Mortgage Loan and either (A) the related Mortgage Loan is not in default with regard to payments due thereunder or (B) delinquent payments of principal and interest under the related Mortgage Loan and the related portion of the Mortgage Insurance Premium, if applicable, and any premiums on any applicable primary hazard insurance policy and any related escrow payments in respect of such Mortgage Loan are being advanced on a current basis by the Master Servicer or a Subservicer, in either case without giving effect to any Debt Service Reduction.

Realized Losses allocated to the Class SB Certificates shall be allocated first to the REMIC III Regular Interest SB-IO in reduction of the accrued but unpaid interest thereon until such accrued and unpaid interest shall have been reduced to zero and then to the REMIC III Regular Interest SB-PO in reduction of the Principal Balance thereof.

Record Date: With respect to each Distribution Date and the LIBOR Certificates, the Business Day immediately preceding such Distribution Date. With respect to each Distribution Date and the Certificates (other than the LIBOR Certificates), the close of business on the last Business Day of the month next preceding the month in which the related Distribution Date occurs, except in the case of the first Record Date which shall be the Closing Date.

Regular Certificates: The Class A Certificates and Class SB Certificates.

Regular Interest: Any one of the regular interests in the Trust Fund.

Relief Act: The Servicemembers Civil Relief Act, formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940.

Relief Act Shortfalls: Interest shortfalls on the Mortgage Loans resulting from the Relief Act or similar legislation or regulations.

REMIC: A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code. As used herein, the term "REMIC" shall mean REMIC I, REMIC II or REMIC III.

REMIC Administrator: Residential Funding Corporation. If Residential Funding Corporation is found by a court of competent jurisdiction to no longer be able to fulfill its obligations as REMIC Administrator under this Agreement the Master Servicer or Trustee acting as successor Master Servicer

CONFIDENTIAL                                                                    RC_FGIC9019_00018160

shall appoint a successor REMIC Administrator, acceptable to the Certificate Insurer, subject to assumption of the REMIC Administrator obligations under this Agreement.

REMIC I:  The segregated pool of assets subject hereto (exclusive of the Mortgage Insurance Premium Taxes Reserve Fund and the Hedge Agreement, which are not assets of any REMIC), constituting a portion of the primary trust created hereby and to be administered hereunder, with respect to which a separate REMIC election is to be made (other than the items in clause (v) and the proceeds thereof), consisting of: (i) the Group I Loans and the related Mortgage Files; (ii) all payments on and collections in respect of the Group I Loans due after the Cut-off Date (other than Monthly Payments due in the month of the Cut-off Date) as shall be on deposit in the Custodial Account or in the Certificate Account and identified as belonging to the Trust Fund; (iii) property which secured a Group I Loan and which has been acquired for the benefit of the Certificateholders by foreclosure or deed in lieu of foreclosure; (iv) the hazard insurance policies, Primary Insurance Policies and rights under the MI Policy pertaining to the Group I Loans, if any; and (v) all proceeds of clauses (i) through (iv) above.

REMIC I Principal Reduction Amounts:  For any Distribution Date, the amounts by which the principal balances of the REMIC I Regular Interests LT1, LT2, LT3 and LT4, respectively, will be reduced on such Distribution Date by the allocation of Realized Losses and the distribution of principal, determined as follows:

For purposes of the succeeding formulas the following symbols shall have the meanings set forth below:

$Y_1 =$    the principal balance of the REMIC I Regular Interest LT1 after distributions on the prior Distribution Date.

$Y_2 =$    the principal balance of the REMIC I Regular Interest LT2 after distributions on the prior Distribution Date.

$Y_3 =$    the principal balance of the REMIC I Regular Interest LT3 after distributions on the prior Distribution Date.

$Y_4 =$    the principal balance of the REMIC I Regular Interest LT4 after distributions on the prior Distribution Date (note:  $Y_3 = Y_4$).

$? Y_1 =$  the REMIC I Regular Interest LT1 Principal Reduction Amount.

$? Y_2 =$  the REMIC I Regular Interest LT2 Principal Reduction Amount.

$? Y_3 =$  the REMIC I Regular Interest LT3 Principal Reduction Amount.

$? Y_4 =$  the REMIC I Regular Interest LT4 Principal Reduction Amount.

$P_0 =$    the aggregate principal balance of the REMIC I Regular Interests LT1, LT2, LT3 and LT4 after distributions and the allocation of Realized Losses on the prior Distribution Date.

$P_1 =$    the aggregate principal balance of the REMIC I Regular Interests LT1, LT2, LT3 and LT4 after distributions and the allocation of Realized Losses to be made on such Distribution Date.

$? P =$   $P_0 - P_1 =$ the aggregate of the REMIC I Regular Interests LT1, LT2, LT3 and LT4 Principal Reduction Amounts.

CONFIDENTIAL

= the aggregate of the principal portions of Realized Losses to be allocated to, and the principal distributions to be made on, the Group I Certificates on such Distribution Date (including distributions of accrued and unpaid interest on the Class SB-I Certificates for prior Distribution Dates).

$R_0$ = the Group I Net WAC Cap Rate (stated as a monthly rate) after giving effect to amounts distributed and Realized Losses allocated on the prior Distribution Date.

$R_1$ = the Group I Net WAC Cap Rate (stated as a monthly rate) after giving effect to amounts to be distributed and Realized Losses to be allocated on such Distribution Date.

a = $(Y_2 + Y_3)/P_0$. The initial value of a on the Closing Date for use on the first Distribution Date shall be 0.0001.

$?_0$ = the lesser of (A) the sum of (x) the sum for all Classes of Group I Certificates, other than the Class SB-I Certificates, of the product for each Class of (i) the monthly interest rate (as limited by the Group I Net WAC Cap Rate, if applicable) for such Class applicable for distributions to be made on such Distribution Date and (ii) the aggregate Certificate Principal Balance for such Class after distributions and the allocation of Realized Losses on the prior Distribution Date and (y) the aggregate Group I Net WAC Cap Shortfalls for such Distribution Date and (B) $R_0*P_0$.

$?_1$ = the lesser of (A) the sum of (x) the sum for all Classes of Group I Certificates, other than the Class SB-I Certificates, of the product for each Class of (i) the monthly interest rate (as limited by the Net WAC Cap Rate, if applicable) for such Class applicable for distributions to be made on the next succeeding Distribution Date and (ii) the aggregate Certificate Principal Balance for such Class after distributions and the allocation of Realized Losses to be made on such Distribution Date and (y) the aggregate Group I Net WAC Cap Shortfalls for the next succeeding Distribution Date and (B) $R_1*P_1$.

Then, based on the foregoing definitions:

$? Y_1$ = $? P - ? Y_2 - ? Y_3 - ? Y_4$;

$? Y_2$ = $(a/2)\{( ?_0 R_1 - ?_1 R_0)/R_0 R_1\}$;

$? Y_3$ = $a? P - ? Y_2$; and

$? Y_4$ = $? Y_3$.

if both $?Y_2$ and $?Y_3$, as so determined, are non-negative numbers. Otherwise:

(1)    If $?Y_2$, as so determined, is negative, then

$? Y_2 = 0$;

$? Y_3 = a\{?_1 R_0 P_0 - ?_0 R_1 P_1\}/\{?_1 R_0\}$;

$? Y_4 = ?Y_3$; and

$? Y_1 = ?P - ? Y_2 - ? Y_3 - ? Y_4$.

(2)    If $?Y_3$, as so determined, is negative, then

$? Y_3 = 0$;

CONFIDENTIAL

RC_FGIC9019_00018162

$$? Y_2 = a\{?_1 R_0 P_0 - ?_0 R_1 P_1\}/\{2R_1 R_0 P_1 - ?_1 R_0\};$$

$$? Y_4 = ? Y_3; \text{ and}$$

$$? Y_1 = ? P - ? Y_2 - ? Y_3 - ? Y_4.$$

REMIC I Realized Losses: For any Distribution Date, Realized Losses on the Group I Mortgage Loans for the related Due Period shall be allocated, as follows: (i) the interest portion of Realized Losses, if any, shall be allocated pro rata to accrued interest on the REMIC I Regular Interests to the extent of such accrued interest, and (ii) any remaining interest portions of Realized Losses and any principal portions of Realized Losses shall be treated as principal portions of Realized Losses and allocated (i) to the REMIC I Regular Interest LT2, REMIC I Regular Interest LT3 and REMIC I Regular Interest LT4, pro rata according to their respective Principal Reduction Amounts, provided that such allocation to each of the REMIC I Regular Interest LT2, REMIC I Regular Interest LT3 and REMIC I Regular Interest LT4 shall not exceed their respective Principal Reduction Amounts for such Distribution Date, and (ii) any Realized Losses not allocated to any of REMIC I Regular Interest LT2, REMIC I Regular Interest LT3 or REMIC I Regular Interest LT4 pursuant to the proviso of clause (i) above shall be allocated to the REMIC I Regular Interest LT1.

REMIC I Regular Interests: REMIC I Regular Interest LT1, REMIC I Regular Interest LT2, REMIC I Regular Interest LT3 and REMIC I Regular Interest LT4.

REMIC I Regular Interest LT1: A regular interest in REMIC I that is held as an asset of REMIC III, that has an initial principal balance equal to the related Uncertificated Principal Balance, that bears interest at the related Uncertificated REMIC I Pass-Through Rate, and that has such other terms as are described herein.

REMIC I Regular Interest LT1 Principal Distribution Amount: For any Distribution Date, the excess, if any, of the REMIC I Regular Interest LT1 Principal Reduction Amount for such Distribution Date over the Realized Losses allocated to the REMIC I Regular Interest LT1 on such Distribution Date.

REMIC I Regular Interest LT2: A regular interest in REMIC I that is held as an asset of REMIC III, that has an initial principal balance equal to the related Uncertificated Principal Balance, that bears interest at the related Uncertificated REMIC I Pass-Through Rate, and that has such other terms as are described herein.

REMIC I Regular Interest LT2 Principal Distribution Amount: For any Distribution Date, the excess, if any, of the REMIC I Regular Interest LT2 Principal Reduction Amount for such Distribution Date over the Realized Losses allocated to the REMIC I Regular Interest LT2 on such Distribution Date.

REMIC I Regular Interest LT3: A regular interest in REMIC I that is held as an asset of REMIC III, that has an initial principal balance equal to the related Uncertificated Principal Balance, that bears interest at the related Uncertificated REMIC I Pass-Through Rate, and that has such other terms as are described herein.

REMIC I Regular Interest LT3 Principal Distribution Amount: For any Distribution Date, the excess, if any, of the REMIC I Regular Interest LT3 Principal Reduction Amount for such Distribution Date over the Realized Losses allocated to the REMIC I Regular Interest LT3 on such Distribution Date.

REMIC I Regular Interest LT4: A regular interest in REMIC I that is held as an asset of REMIC III, that has an initial principal balance equal to the related Uncertificated Principal Balance, that

CONFIDENTIAL

bears interest at the related Uncertificated REMIC I Pass-Through Rate, and that has such other terms as are described herein.

REMIC I Regular Interest LT4 Principal Distribution Amount: For any Distribution Date, the excess, if any, of the REMIC I Regular Interest LT4 Principal Reduction Amount for such Distribution Date over the Realized Losses allocated to the REMIC I Regular Interest LT4 on such Distribution Date.

REMIC II:  The segregated pool of assets subject hereto (exclusive of the Mortgage Insurance Premium Taxes Reserve Fund and the Hedge Agreement, which are not assets of any REMIC), constituting a portion of the primary trust created hereby and to be administered hereunder, with respect to which a separate REMIC election is to be made (other than the items in clause (v) and the proceeds thereof), consisting of: (i) the Group II Loans and the related Mortgage Files; (ii) all payments on and collections in respect of the Group II Loans due after the Cut-off Date (other than Monthly Payments due in the month of the Cut-off Date) as shall be on deposit in the Custodial Account or in the Certificate Account and identified as belonging to the Trust Fund; (iii) property which secured a Group II Loan and which has been acquired for the benefit of the Certificateholders by foreclosure or deed in lieu of foreclosure; (iv) the hazard insurance policies and Primary Insurance Policies pertaining to the Group II Loans, if any; and (v) all proceeds of clauses (i) through (iv) above.

REMIC II Principal Reduction Amounts:  For any Distribution Date, the amounts by which the principal balances of the REMIC II Regular Interests LT5, LT6, LT7 and LT8, respectively, will be reduced on such Distribution Date by the allocation of Realized Losses and the distribution of principal, determined as follows:

For purposes of the succeeding formulas the following symbols shall have the meanings set forth below:

$Y_5 =$    the principal balance of the REMIC II Regular Interest LT5 after distributions on the prior Distribution Date.

$Y_6 =$    the principal balance of the REMIC II Regular Interest LT6 after distributions on the prior Distribution Date.

$Y_7 =$    the principal balance of the REMIC II Regular Interest LT7 after distributions on the prior Distribution Date.

$Y_8 =$    the principal balance of the REMIC II Regular Interest LT8 after distributions on the prior Distribution Date (note:  $Y_7 = Y_8$).

$? Y_5 =$  the REMIC II Regular Interest LT5 Principal Reduction Amount.

$? Y_6 =$  the REMIC II Regular Interest LT6 Principal Reduction Amount.

$? Y_7 =$  the REMIC II Regular Interest LT7 Principal Reduction Amount.

$? Y_8 =$  the REMIC II Regular Interest LT8 Principal Reduction Amount.

$Q_0 =$    the aggregate principal balance of the REMIC II Regular Interests LT5, LT6, LT7 and LT8 after distributions and the allocation of Realized Losses on the prior Distribution Date.

CONFIDENTIAL                                                    RC_FGIC9019_00018164

$Q_1$ =    the aggregate principal balance of the REMIC II Regular Interests LT5, LT6, LT7 and LT8 after distributions and the allocation of Realized Losses to be made on such Distribution Date.

$?Q$ =    $Q_0 - Q_1$ = the aggregate of the REMIC II Regular Interests LT5, LT6, LT7 and LT8 Principal Reduction Amounts.

=    the aggregate of the principal portions of Realized Losses to be allocated to, and the principal distributions to be made on, the Group II Certificates on such Distribution Date (including distributions of accrued and unpaid interest on the Class SB-II Certificates for prior Distribution Dates).

$S_0$ =    the Group II REMIC Net WAC Rate (stated as a monthly rate) after giving effect to amounts distributed and Realized Losses allocated on the prior Distribution Date.

$S_1$ =    the Group II REMIC Net WAC Rate (stated as a monthly rate) after giving effect to amounts to be distributed and Realized Losses to be allocated on such Distribution Date.

ß =    $(Y_6 + Y_7)/Q_0$. The initial value of ß on the Closing Date for use on the first Distribution Date shall be 0.0001.

$G_0$ =    the lesser of (A) the sum of (x) the sum for all Classes of Group II Certificates other than the Class SB-II Certificates of the product for each Class of (i) the monthly interest rate (as limited by the Group II Net REMIC WAC Cap Rate, if applicable) for such Class applicable for distributions to be made on such Distribution Date and (ii) the aggregate Certificate Principal Balance for such Class after distributions and the allocation of Realized Losses on the prior Distribution Date and (y) the aggregate Group II Basis Risk Shortfalls for such Distribution Date and (B) $S_0 * Q_0$.

$G_1$ =    the lesser of (A) the sum of (x) the sum for all Classes of Group II Certificates other than the Class SB-II Certificates of the product for each Class of (i) the monthly interest rate (as limited by the Group II Net REMIC WAC Cap Rate, if applicable) for such Class applicable for distributions to be made on the next succeeding Distribution Date and (ii) the aggregate Certificate Principal Balance for such Class after distributions and the allocation of Realized Losses to be made on such Distribution Date and (y) the aggregate Group II Basis Risk Shortfalls for the next succeeding Distribution Date and (B) $S_1 * Q_1$.

Then, based on the foregoing definitions:

$?Y_5$ =    $?Q - ?Y_6 - ?Y_7 - ?Y_8$;

$?Y_6$ =    $(ß/2)\{(G_1 S_1 - G_1 S_0)/S_0 S_1\}$;

$?Y_7$ =    $ß?Q - ?Y_6$; and

$?Y_8$ =    $?Y_7$.

if both $?Y_6$ and $?Y_7$, as so determined, are non-negative numbers. Otherwise:

(1)    If $?Y_6$, as so determined, is negative, then

$?Y_6 = 0$;

$?Y_7 = ß\{G_1 S_0 Q_0 - G_0 S_1 Q_1\}/\{G_1 S_0\}$;

$?Y_8 = ?Y_7$; and

CONFIDENTIAL                                        RC_FGIC9019_00018165

$?Y_5 = ?Q - ?Y_6 - ?Y_7 - ?Y_8$.

(2)      If $?Y_7$, as so determined, is negative, then

$?Y_7 = 0$;

$?Y_6 = ß\{G_1S_0Q_0 - G_0S_1Q_1\}/\{2S_1S_0Q_1 - G_1S_0\}$;

$?Y_8 = ?Y_7$; and

$?Y_5 = ?Q - ?Y_6 - ?Y_7 - ?Y_8$.

REMIC II Realized Losses: For any Distribution Date, Realized Losses on the Group II Mortgage Loans for the related Due Period shall be allocated, as follows: (i) the interest portion of Realized Losses, if any, shall be allocated pro rata to accrued interest on the REMIC II Regular Interests to the extent of such accrued interest, and (ii) any remaining interest portions of Realized Losses and any principal portions of Realized Losses shall be treated as principal portions of Realized Losses and allocated (i) to the REMIC II Regular Interest LT6, REMIC II Regular Interest LT7 and REMIC I Regular Interest LT8, pro rata according to their respective Principal Reduction Amounts, provided that such allocation to each of the REMIC II Regular Interest LT6, REMIC II Regular Interest LT7 and REMIC II Regular Interest LT8 shall not exceed their respective Principal Reduction Amounts for such Distribution Date, and (ii) any Realized Losses not allocated to any of REMIC II Regular Interest LT6, REMIC II Regular Interest LT7 or REMIC II Regular Interest LT8 pursuant to the proviso of clause (i) above shall be allocated to the REMIC II Regular Interest LT5.

REMIC II Regular Interests: REMIC II Regular Interest LT5, REMIC II Regular Interest LT6, REMIC II Regular Interest LT7 and REMIC II Regular Interest LT8.

REMIC II Regular Interest LT5: A regular interest in REMIC II that is held as an asset of REMIC III, that has an initial principal balance equal to the related Uncertificated Principal Balance, that bears interest at the related Uncertificated REMIC II Pass-Through Rate, and that has such other terms as are described herein.

REMIC II Regular Interest LT5 Principal Distribution Amount: For any Distribution Date, the excess, if any, of the REMIC II Regular Interest LT5 Principal Reduction Amount for such Distribution Date over the Realized Losses allocated to the REMIC II Regular Interest LT5 on such Distribution Date.

REMIC II Regular Interest LT6: A regular interest in REMIC II that is held as an asset of REMIC III, that has an initial principal balance equal to the related Uncertificated Principal Balance, that bears interest at the related Uncertificated REMIC II Pass-Through Rate, and that has such other terms as are described herein.

REMIC II Regular Interest LT6 Principal Distribution Amount: For any Distribution Date, the excess, if any, of the REMIC II Regular Interest LT6 Principal Reduction Amount for such Distribution Date over the Realized Losses allocated to the REMIC II Regular Interest LT6 on such Distribution Date.

REMIC II Regular Interest LT7: A regular interest in REMIC II that is held as an asset of REMIC III, that has an initial principal balance equal to the related Uncertificated Principal Balance, that bears interest at the related Uncertificated REMIC II Pass-Through Rate, and that has such other terms as are described herein.

CONFIDENTIAL                                                        RC_FGIC9019_00018166

REMIC II Regular Interest LT7 Principal Distribution Amount: For any Distribution Date, the excess, if any, of the REMIC II Regular Interest LT7 Principal Reduction Amount for such Distribution Date over the Realized Losses allocated to the REMIC II Regular Interest LT7 on such Distribution Date.

REMIC II Regular Interest LT8: A regular interest in REMIC II that is held as an asset of REMIC III, that has an initial principal balance equal to the related Uncertificated Principal Balance, that bears interest at the related Uncertificated REMIC II Pass-Through Rate, and that has such other terms as are described herein.

REMIC II Regular Interest LT8 Principal Distribution Amount: For any Distribution Date, the excess, if any, of the REMIC II Regular Interest LT8 Principal Reduction Amount for such Distribution Date over the Realized Losses allocated to the REMIC II Regular Interest LT8 on such Distribution Date.

REMIC III: The segregated pool of assets subject hereto, constituting a portion of the primary trust created hereby and to be administered hereunder, with respect to which a separate REMIC election is to be made, consisting of the REMIC I Regular Interests and REMIC II Regular Interests.

REMIC III Regular Interest A-II-A: A regular interest in REMIC III which is has a principal balance equal to the principal balance of the Class A-II-A Certificates and which is entitled to interest at a rate equal to the lesser of (i) LIBOR plus the Class A-II-A Margin and (ii) the Group II Weighted Average Maximum Net Mortgage Rate multiplied by a fraction whose numerator is 30 and whose denominator is the actual number of days in the related Interest Accrual Period, accruing during each Accrual Period for the Class A-II-A Certificates on the basis of a year of 360 days and the actual number of days in such Accrual Period. Interest accrued in any Accrual Period and not paid on the related Distribution Date shall carry forward to each succeeding Distribution Date without interest until paid.

REMIC III Regular Interest A-II-B1: A regular interest in REMIC III which is has a principal balance equal to the principal balance of the Class A-II-B1 Certificates and which is entitled to interest at a rate equal to the lesser of (i) LIBOR plus the Class A-II-B1 Margin and (ii) the Group II Weighted Average Maximum Net Mortgage Rate multiplied by a fraction whose numerator is 30 and whose denominator is the actual number of days in the related Interest Accrual Period, accruing during each Accrual Period for the Class A-II-B1 Certificates on the basis of a year of 360 days and the actual number of days in such Accrual Period. Interest accrued in any Accrual Period and not paid on the related Distribution Date shall carry forward to each succeeding Distribution Date without interest until paid.

REMIC III Regular Interest A-II-B2: A regular interest in REMIC III which is has a principal balance equal to the principal balance of the Class A-II-B2 Certificates and which is entitled to interest at a rate equal to the lesser of (i) LIBOR plus the Class A-II-B2 Margin and (ii) the Group II Weighted Average Maximum Net Mortgage Rate multiplied by a fraction whose numerator is 30 and whose denominator is the actual number of days in the related Interest Accrual Period, accruing during each Accrual Period for the Class A-II-B2 Certificates on the basis of a year of 360 days and the actual number of days in such Accrual Period. Interest accrued in any Accrual Period and not paid on the related Distribution Date shall carry forward to each succeeding Distribution Date without interest until paid.

REMIC III Regular Interest A-II-B3: A regular interest in REMIC III which is has a principal balance equal to the principal balance of the Class A-II-B3 Certificates and which is entitled to interest at a rate equal to the lesser of (i) LIBOR plus the Class A-II-B3 Margin and (ii) the Group II Weighted Average Maximum Net Mortgage Rate multiplied by a fraction whose numerator is 30 and whose denominator is the actual number of days in the related Interest Accrual Period, accruing during each Accrual Period for the Class A-II-B3 Certificates on the basis of a year of 360 days and the actual number

CONFIDENTIAL                                                    RC_FGIC9019_00018167

of days in such Accrual Period. Interest accrued in any Accrual Period and not paid on the related Distribution Date shall carry forward to each succeeding Distribution Date without interest until paid.

REMIC Provisions:  Provisions of the federal income tax law relating to real estate mortgage investment conduits, which appear at Sections 860A through 860G of Subchapter M of Chapter 1 of the Code, and related provisions, and temporary and final regulations (or, to the extent not inconsistent with such temporary or final regulations, proposed regulations) and published rulings, notices and announcements promulgated thereunder, as the foregoing may be in effect from time to time.

REO Acquisition:  The acquisition by the Master Servicer on behalf of the Trustee for the benefit of the Certificateholders of any REO Property pursuant to Section 3.14.

REO Disposition:  With respect to any REO Property, a determination by the Master Servicer that it has received substantially all Insurance Proceeds, Liquidation Proceeds, REO Proceeds and other payments and recoveries (including proceeds of a final sale) which the Master Servicer expects to be finally recoverable from the sale or other disposition of the REO Property.

REO Imputed Interest:  With respect to any REO Property, for any period, an amount equivalent to interest (at a rate equal to the sum of the Net Mortgage Rate, the Mortgage Insurance Premium Rate, if any, and the applicable Certificate Insurer Premium Modified Rate, that would have been applicable to the related Mortgage Loan had it been outstanding) on the unpaid principal balance of the Mortgage Loan as of the date of acquisition thereof for such period.

REO Proceeds:  Proceeds, net of expenses, received in respect of any REO Property (including, without limitation, proceeds from the rental of the related Mortgaged Property) which proceeds are required to be deposited into the Custodial Account only upon the related REO Disposition.

REO Property:  A Mortgaged Property acquired by the Master Servicer on behalf of the Trustee for the benefit of the Certificateholders and the Certificate Insurer through foreclosure or deed in lieu of foreclosure in connection with a defaulted Mortgage Loan.

Reportable Modified Mortgage Loan:  Any Mortgage Loan that (a) has been subject to an interest rate reduction, (b) has been subject to a term extension or (c) has had amounts owing on such Mortgage Loan capitalized by adding such amount to the Stated Principal Balance of such Mortgage Loan; *provided, however*, that a Mortgage Loan modified in accordance with (a) above for a temporary period shall not be a Reportable Modified Mortgage Loan if such Mortgage Loan has not been delinquent in payments of principal and interest for six months since the date of such modification if that interest rate reduction is not made permanent thereafter.

Repurchase Event:  As defined in the Assignment Agreement.

Request for Release:  A request for release, the forms of which are attached as Exhibit G hereto, or an electronic request in a form acceptable to the Custodian.

Required Insurance Policy:  With respect to any Mortgage Loan, any insurance policy which is required to be maintained from time to time under this Agreement, the Program Guide or the related Subservicing Agreement in respect of such Mortgage Loan.

Residential Funding:  Residential Funding Corporation, a Delaware corporation, in its capacity as seller of the Mortgage Loans to the Depositor and any successor thereto.

CONFIDENTIAL                                                    RC_FGIC9019_00018168

Responsible Officer:  When used with respect to the Trustee, any officer of the Corporate Trust Department of the Trustee, including any Senior Vice President, any Vice President, any Assistant Vice President, any Assistant Secretary, any Trust Officer or Assistant Trust Officer, or any other officer of the Trustee, in each case, with direct responsibility for the administration of this Agreement.

Rolling Three-Month Delinquency Ratio:  As of any Distribution Date, the fraction, expressed as a percentage, equal to the average of the Delinquency Ratio for the Mortgage Loans for each of the three (or one and two, in the case of the first and second Distribution Dates) immediately preceding Due Periods.

Rule 144A:  Rule 144A under the Securities Act of 1933, as in effect from time to time.

Seller:  With respect to any Mortgage Loan, a Person, including any Subservicer, that executed a Seller's Agreement applicable to such Mortgage Loan.

Seller's Agreement:  An agreement for the origination and sale of Mortgage Loans generally in the form of the seller contract referred to or contained in the Program Guide, or in such other form as has been approved by the Master Servicer and the Depositor, each containing representations and warranties in respect of one or more Mortgage Loans.

Servicing Accounts:  The account or accounts created and maintained pursuant to Section 3.08.

Servicing Advances:  All customary, reasonable and necessary "out of pocket" costs and expenses incurred in connection with a default, delinquency or other unanticipated event by the Master Servicer or a Subservicer in the performance of its servicing obligations, including, but not limited to, the cost of (i) the preservation, restoration and protection of a Mortgaged Property or, with respect to a cooperative loan, the related cooperative apartment, (ii) any enforcement or judicial proceedings, including foreclosures, including any expenses incurred in relation to any such proceedings that result from the Mortgage Loan being registered on the MERS® System, (iii) the management and liquidation of any REO Property, (iv) any mitigation procedures implemented in accordance with Section 3.07, and (v) compliance with the obligations under Sections 3.01, 3.08, 3.11, 3.12(a) and 3.14, including, if the Master Servicer or any Affiliate of the Master Servicer provides services such as appraisals and brokerage services that are customarily provided by Persons other than servicers of mortgage loans, reasonable compensation for such services.

Servicing Fee:  With respect to any Mortgage Loan and Distribution Date, the fee payable monthly to the Master Servicer in respect of master servicing compensation that accrues at an annual rate equal to the Servicing Fee Rate multiplied by the Stated Principal Balance of such Mortgage Loan as of the related Due Date in the related Due Period, as may be adjusted pursuant to Section 3.16(e).

Servicing Fee Rate:  With respect to any Mortgage Loan, the per annum rate designated on the Mortgage Loan Schedule as the "MSTR SERV FEE," as may be adjusted with respect to successor Master Servicers as provided in Section 7.02, which rate shall never be greater than the Mortgage Rate of such Mortgage Loan.

Servicing Modification:  Any reduction of the interest rate on or the Stated Principal Balance of a Mortgage Loan, any extension of the final maturity date of a Mortgage Loan, and any increase to the Stated Principal Balance of a Mortgage Loan by adding to the Stated Principal Balance unpaid principal and interest and other amounts owing under the Mortgage Loan, in each case pursuant to a modification of a Mortgage Loan that is in default, or for which, in the judgment of the Master Servicer, default is reasonably foreseeable in accordance with Section 3.07(a).

CONFIDENTIAL                                                                                RC_FGIC9019_00018169

Servicing Officer:   Any officer of the Master Servicer involved in, or responsible for, the administration and servicing of the Mortgage Loans whose name and specimen signature appear on a list of servicing officers furnished to the Trustee by the Master Servicer on the Closing Date, as such list may from time to time be amended.

Servicing Trigger:   As of any Distribution Date, for purposes of Section 7.05 hereof, the occurrence of any of the following scenarios:

(a)      the Rolling Three-Month Delinquency Ratio is greater than 20.00% for the then-current Distribution Date; or

(b)      the aggregate Realized Losses on the Mortgage Loans exceed (i) with respect to the 31st through the 36th Distribution Dates, inclusive, 2.00% of the aggregate Cut-off Date Principal Balance, (ii) with respect to the 37th through the 48th Distribution Dates, inclusive, 3.00% of the aggregate Cut-off Date Principal Balance, (iii) with respect to the 49th through 60th Distribution Dates, inclusive, 4.00%, and (iv) with respect to all Distribution Dates thereafter, 5.00% of the aggregate Cut-off Date Principal Balance.

Standard & Poor's:   Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. or its successors in interest.

Startup Date:   The day designated as such pursuant to Article X hereof.

Stated Principal Balance:   With respect to any Mortgage Loan or related REO Property, at any given time, (i) the sum of (a) the Cut-off Date Principal Balance of the Mortgage Loan and (b) any amount by which the Stated Principal Balance of the Mortgage Loan has been increased pursuant to a Servicing Modification, minus (ii) the sum of (a) the principal portion of the Monthly Payments due with respect to such Mortgage Loan or REO Property during each Due Period ending with the Due Period relating to the most recent Distribution Date which were received or with respect to which an Advance was made, (b) all Principal Prepayments with respect to such Mortgage Loan or REO Property, and all Insurance Proceeds, Liquidation Proceeds and REO Proceeds, to the extent applied by the Master Servicer as recoveries of principal in accordance with Section 3.14 with respect to such Mortgage Loan or REO Property, in each case which were distributed pursuant to Section 4.02 on any previous Distribution Date, and (c) any Realized Loss incurred with respect to such Mortgage Loan allocated to Certificateholders with respect thereto for any previous Distribution Date.

Sub-Group:   Each sub-group of Loan Group II referred to as Loan Group II-A and Loan Group II-B.

Subordination:   The provisions described in Section 4.05 relating to the allocation of Realized Losses.

Subsequent Recoveries:   As of any Distribution Date, amounts received by the Master Servicer (net of any related expenses permitted to be reimbursed pursuant to Section 3.10) or surplus amounts held by the Master Servicer to cover estimated expenses (including, but not limited to, recoveries in respect of the representations and warranties made by the related Seller pursuant to the applicable Seller's Agreement and assigned to the Trustee pursuant to Section 2.04) specifically related to a Mortgage Loan that was the subject of a Cash Liquidation or an REO Disposition prior to the related Prepayment Period that resulted in a Realized Loss.

CONFIDENTIAL                                                                    RC_FGIC9019_00018170

Subserviced Mortgage Loan:  Any Mortgage Loan that, at the time of reference thereto, is subject to a Subservicing Agreement.

Subservicer:  Any Person with whom the Master Servicer has entered into a Subservicing Agreement and who generally satisfied the requirements set forth in the Program Guide in respect of the qualification of a Subservicer as of the date of its approval as a Subservicer by the Master Servicer.

Subservicer Advance:  Any delinquent installment of principal and interest on a Mortgage Loan which is advanced by the related Subservicer (net of its Subservicing Fee) pursuant to the Subservicing Agreement.

Subservicing Account:  An account established by a Subservicer in accordance with Section 3.08.

Subservicing Agreement:  The written contract between the Master Servicer and any Subservicer relating to servicing and administration of certain Mortgage Loans as provided in Section 3.02, generally in the form of the servicer contract referred to or contained in the Program Guide or in such other form as has been approved by the Master Servicer and the Depositor.

Subservicing Fee:  With respect to any Mortgage Loan, the fee payable monthly to the related Subservicer (or, in the case of a Nonsubserviced Mortgage Loan, to the Master Servicer) in respect of subservicing and other compensation that accrues with respect to each Distribution Date at an annual rate designated as "SUBSERV FEE" on the Mortgage Loan Schedule.

Tax Returns:  The federal income tax return on Internal Revenue Service Form 1066, U.S. Real Estate Mortgage Investment Conduit Income Tax Return, including Schedule Q thereto, Quarterly Notice to Residual Interest Holders of REMIC Taxable Income or Net Loss Allocation, or any successor forms, to be filed on behalf of REMIC I, REMIC II and REMIC III due to their classification as REMICs under the REMIC Provisions, together with any and all other information, reports or returns that may be required to be furnished to the Certificateholders or filed with the Internal Revenue Service or any other governmental taxing authority under any applicable provisions of federal, state or local tax laws.

Transfer:  Any direct or indirect transfer, sale, pledge, hypothecation or other form of assignment of any Ownership Interest in a Certificate.

Transferee:  Any Person who is acquiring by Transfer any Ownership Interest in a Certificate.

Transferor:  Any Person who is disposing by Transfer of any Ownership Interest in a Certificate.

Trustee:  As defined in the preamble hereto.

Trust Fund:  The segregated pool of assets subject hereto, consisting of:  (i) the Mortgage Loans and the related Mortgage Files; (ii) all payments on and collections in respect of the Mortgage Loans due after the Cut-off Date (other than Monthly Payments due in the month of the Cut-off Date) as shall be on deposit in the Custodial Account or in the Certificate Account and identified as belonging to the Trust Fund; (iii) property which secured a Mortgage Loan and which has been acquired for the benefit of the Certificateholders by foreclosure or deed in lieu of foreclosure; (iv) the hazard insurance policies and Primary Insurance Policies pertaining to the Mortgage Loans, if any, and rights under the MI Policy pertaining to certain Mortgage Loans, if any; and (v) all proceeds of clauses (i) through (iv) above.

Twelve-Month Loss Amount:  With respect to any Distribution Date, an amount equal to the aggregate of all Realized Losses on the Mortgage Loans during the 12 preceding Due Periods.

CONFIDENTIAL                                                                                    RC_FGIC9019_00018171

Uniform Single Attestation Program for Mortgage Bankers:  The Uniform Single Attestation Program for Mortgage Bankers, as published by the Mortgage Bankers Association of America and effective with respect to fiscal periods ending on or after December 15, 1995.

Uncertificated Accrued Interest:  With respect to any Uncertificated Regular Interest for any Distribution Date, one month's interest at the related Uncertificated Pass-Through Rate for such Distribution Date, accrued on the Uncertificated Principal Balance or Uncertificated Notional Amount, as applicable, immediately prior to such Distribution Date. Uncertificated Accrued Interest for the Uncertificated Regular Interests shall accrue on the basis of a 360-day year consisting of twelve 30-day months. For purposes of calculating the amount of Uncertificated Accrued Interest for the REMIC I Regular Interest for any Distribution Date, any Prepayment Interest Shortfalls (to the extent not covered by Compensating Interest) relating to the Group I Loans for any Distribution Date shall be allocated among REMIC I Regular Interests LT1, LT2, LT3 and LT4, pro rata, based on, and to the extent of, Uncertificated Accrued Interest, as calculated without application of this sentence.  For purposes of calculating the amount of Uncertificated Accrued Interest for the REMIC II Regular Interest for any Distribution Date, any Prepayment Interest Shortfalls (to the extent not covered by Compensating Interest) relating to the Group II Loans for any Distribution Date shall be allocated among REMIC II Regular Interests LT5, LT6, LT7 and LT8, pro rata, based on, and to the extent of, Uncertificated Accrued Interest, as calculated without application of this sentence.  Uncertificated Accrued Interest on the REMIC III Regular Interest SB-I-PO and SB-II-PO shall be zero.  Uncertificated Accrued Interest on the REMIC III Regular Interest SB-I-IO for each Distribution Date shall equal Accrued Certificate Interest for the Class SB-I Certificates and Uncertificated Accrued Interest on the REMIC III Regular Interest SB-II-IO for each Distribution Date shall equal Accrued Certificate Interest for the Class SB-II Certificates.

Uncertificated Notional Amount:  With respect to REMIC III Regular Interest SB-I-IO or REMIC III Regular Interest SB-II-IO, the notional amount for such Class.

Uncertificated Pass-Through Rate:  The Uncertificated REMIC I Pass-Through Rate or Uncertificated REMIC II Pass-Through Rate, as applicable.

Uncertificated Principal Balance:  The principal amount of any Uncertificated Regular Interest outstanding as of any date of determination. The Uncertificated Principal Balance of each REMIC Regular Interest shall never be less than zero.  With respect to the REMIC III Regular Interest SB-I-PO or REMIC III Regular Interest SB-II-PO, the initial amount set forth with respect thereto in the Preliminary Statement as reduced by distributions deemed made in respect thereof pursuant to Section 4.02 and Realized Losses allocated thereto pursuant to Section 4.05.

Uncertificated Regular Interests:  The REMIC I Regular Interests, the REMIC II Regular Interests, the REMIC III Regular Interest SB-I-PO, the REMIC III Regular Interest SB-II-PO, the REMIC III Regular Interest SB-I-IO and the REMIC III Regular Interest SB-II-IO.

Uncertificated REMIC I Pass-Through Rate:  With respect to the REMIC I Regular Interest LT1 and the REMIC I Regular Interest LT2 and any Distribution Date, a per annum rate equal to the Group I Net WAC Cap Rate for that Distribution Date.  With respect to the REMIC I Regular Interest LT3 and any Distribution Date, 0.00%.  With respect to the REMIC I Regular Interest LT4 and any Distribution Date, a per annum rate equal to twice the Group I Net WAC Cap Rate for that Distribution Date.

Uncertificated REMIC II Pass-Through Rate:  With respect to the REMIC II Regular Interest LT7 and any Distribution Date, 0.00%.  With respect to the REMIC II Regular Interest LT5 and the REMIC II Regular Interest LT6 and any Distribution Date, a per annum rate equal to the Group II REMIC Net WAC

CONFIDENTIAL                                                                    RC_FGIC9019_00018172

Rate for that Distribution Date. With respect to the REMIC II Regular Interest LT8 and any Distribution Date, a per annum rate equal to twice the Group II REMIC Net WAC Rate for that Distribution Date.

Uninsured Cause: Any cause of damage to property subject to a Mortgage such that the complete restoration of such property is not fully reimbursable by the hazard insurance policies.

United States Person: A citizen or resident of the United States, a corporation, partnership or other entity (treated as a corporation or partnership for United States federal income tax purposes) created or organized in, or under the laws of, the United States, any state thereof, or the District of Columbia (except in the case of a partnership, to the extent provided in Treasury regulations) *provided* that, for purposes solely of the restrictions on the transfer of Class R Certificates, no partnership or other entity treated as a partnership for United States federal income tax purposes shall be treated as a United States Person unless all persons that own an interest in such partnership either directly or through any entity that is not a corporation for United States federal income tax purposes are required by the applicable operative agreement to be United States Persons, or an estate that is described in Section 7701(a)(30)(D) of the Code, or a trust that is described in Section 7701(a)(30)(E) of the Code.

Voting Rights: The portion of the voting rights of all of the Certificates which is allocated to any Certificate. 98.00% of all of the Voting Rights shall be allocated among Holders of the Class A Certificates, in proportion to the outstanding Certificate Principal Balances of their respective Certificates; 1% of all of the Voting Rights shall be allocated to the Holders of the Class SB Certificates, and 0.33%, 0.33% and 0.34% of all of the Voting Rights shall be allocated to the Holders of the Class R-I Certificates, Class R-II Certificates and Class R-III Certificates, respectively; in each case to be allocated among the Certificates of such Class in accordance with their respective Percentage Interest; *provided*, that as long as there is no Certificate Insurer Default, the Voting Rights of the Class A Certificateholders may be exercised by the Certificate Insurer without the consent of such Holders and may only be exercised by such Holders with the prior written consent of the Certificate Insurer.

CONFIDENTIAL                                                                    RC_FGIC9019_00018173

Section 1.02.    Determination of LIBOR.

LIBOR applicable to the calculation of the Pass-Through Rate on the LIBOR Certificates for any Interest Accrual Period will be determined as of each LIBOR Rate Adjustment Date. On each LIBOR Rate Adjustment Date, or if such LIBOR Rate Adjustment Date is not a Business Day, then on the next succeeding Business Day, LIBOR shall be established by the Trustee and, as to any Interest Accrual Period, will equal the rate for one month United States dollar deposits that appears on the Telerate Screen Page 3750 as of 11:00 a.m., London time, on such LIBOR Rate Adjustment Date. "Telerate Screen Page 3750" means the display designated as page 3750 on the Bridge Telerate Service (or such other page as may replace page 3750 on that service for the purpose of displaying London interbank offered rates of major banks). If such rate does not appear on such page (or such other page as may replace that page on that service, or if such service is no longer offered, LIBOR shall be so established by use of such other service for displaying LIBOR or comparable rates as may be selected by the Trustee after consultation with the Master Servicer), the rate will be the Reference Bank Rate. The "Reference Bank Rate" will be determined on the basis of the rates at which deposits in U.S. Dollars are offered by the reference banks (which shall be any three major banks that are engaged in transactions in the London interbank market, selected by the Trustee after consultation with the Master Servicer) as of 11:00 a.m., London time, on the LIBOR Rate Adjustment Date to prime banks in the London interbank market for a period of one month in amounts approximately equal to the aggregate Certificate Principal Balance of the LIBOR Certificates then outstanding. The Trustee will request the principal London office of each of the reference banks to provide a quotation of its rate. If at least two such quotations are provided, the rate will be the arithmetic mean of the quotations rounded up to the next multiple of 1/16%. If on such date fewer than two quotations are provided as requested, the rate will be the arithmetic mean of the rates quoted by one or more major banks in New York City, selected by the Trustee after consultation with the Master Servicer, as of 11:00 a.m., New York City time, on such date for loans in U.S. Dollars to leading European banks for a period of one month in amounts approximately equal to the aggregate Certificate Principal Balance of the LIBOR Certificates then outstanding. If no such quotations can be obtained, the rate will be LIBOR for the prior Distribution Date; provided however, if, under the priorities described above, LIBOR for a Distribution Date would be based on LIBOR for the previous Distribution Date for the third consecutive Distribution Date, the Trustee, shall select an alternative comparable index (over which the Trustee has no control), used for determining one-month Eurodollar lending rates that is calculated and published (or otherwise made available) by an independent party. The establishment of LIBOR by the Trustee on any LIBOR Rate Adjustment Date and the Trustee's subsequent calculation of the Pass-Through Rate applicable to the LIBOR Certificates for the relevant Interest Accrual Period, in the absence of manifest error, will be final and binding. Promptly following each LIBOR Rate Adjustment Date the Trustee shall supply the Master Servicer with the results of its determination of LIBOR on such date. Furthermore, the Trustee will supply to any Certificateholder so requesting by calling the Bondholder Inquiry Line at 1-800-275-2048 the Pass-Through Rate on the LIBOR Certificates for the current and the immediately preceding Interest Accrual Period.

CONFIDENTIAL                                                        RC_FGIC9019_00018174

## ARTICLE II
## CONVEYANCE OF MORTGAGE LOANS;
## ORIGINAL ISSUANCE OF CERTIFICATES

Section 2.01.    Conveyance of Mortgage Loans.

(a)    The Depositor, concurrently with the execution and delivery hereof, does hereby assign to the Trustee in respect of the Trust Fund without recourse all the right, title and interest of the Depositor in and to (i) the Mortgage Loans, including all interest and principal on or with respect to the Mortgage Loans due on or after the Cut-off Date (other than Monthly Payments due in the month of the Cut-off Date); (ii) the Mortgage Insurance Premium Taxes Reserve Fund Deposit; and (iii) all proceeds of the foregoing.

(b)    In connection with such assignment, and contemporaneously with the delivery of this Agreement, the Depositor delivered or caused to be delivered hereunder to the Trustee, each of the Certificate Guaranty Insurance Policies, the Hedge Agreement (the delivery of which shall evidence that the fixed payment for the Hedge Agreement has been paid and the Trustee and the Trust Fund shall have no further payment obligation thereunder and that such fixed payment has been authorized hereby) and the MI Policy, and except as set forth in Section 2.01(c) below and subject to Section 2.01(d) below, the Depositor does hereby deliver to, and deposit with, the Trustee, or to and with one or more Custodians, as the duly appointed agent or agents of the Trustee for such purpose, the following documents or instruments (or copies thereof as permitted by this Section) with respect to each Mortgage Loan so assigned:

(i)    The original Mortgage Note, endorsed without recourse to the order of the Trustee and showing an unbroken chain of endorsements from the originator thereof to the Person endorsing it to the Trustee, or with respect to any Destroyed Mortgage Note, an original lost note affidavit from the related Seller or Residential Funding stating that the original Mortgage Note was lost, misplaced or destroyed, together with a copy of the related Mortgage Note;

(ii)    The original Mortgage, noting the presence of the MIN of the Mortgage Loan and language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan, with evidence of recording indicated thereon or, if the original Mortgage has not yet been returned from the public recording office, a copy of the original Mortgage with evidence of recording indicated thereon;

(iii)    Unless the Mortgage Loan is registered on the MERS® System, the assignment (which may be included in one or more blanket assignments if permitted by applicable law) of the Mortgage to the Trustee with evidence of recording indicated thereon or a copy of such assignment with evidence of recording indicated thereon;

(iv)    The original recorded assignment or assignments of the Mortgage showing an unbroken chain of title from the originator to the Person assigning it to the Trustee (or to MERS, if the Mortgage Loan is registered on the MERS® System and noting the presence of a MIN) with evidence of recordation noted thereon or attached thereto, or a copy of such assignment or assignments of the Mortgage with evidence of recording indicated thereon; and

(v)    The original of each modification, assumption agreement or preferred loan agreement, if any, relating to such Mortgage Loan, or a copy of each modification, assumption agreement or preferred loan agreement.

CONFIDENTIAL                                                                          RC_FGIC9019_00018175

The Depositor may, in lieu of delivering the original of the documents set forth in Section 2.01(b)(ii), (iii), (iv) and (v) (or copies thereof as permitted by Section 2.01(b)) to the Trustee or the Custodian or Custodians, deliver such documents to the Master Servicer, and the Master Servicer shall hold such documents in trust for the use and benefit of all present and future Certificateholders until such time as is set forth in the next sentence. Within thirty Business Days following the earlier of (i) the receipt of the original of all of the documents or instruments set forth in Section 2.01(b)(ii), (iii), (iv) and (v) (or copies thereof as permitted by such Section) for any Mortgage Loan and (ii) a written request by the Trustee to deliver those documents with respect to any or all of the Mortgage Loans then being held by the Master Servicer, the Master Servicer shall deliver a complete set of such documents to the Trustee or the Custodian or Custodians that are the duly appointed agent or agents of the Trustee.

(c)    Notwithstanding the provisions of Section 2.01(b), in the event that in connection with any Mortgage Loan, if the Depositor cannot deliver the original of the Mortgage, any assignment, modification, assumption agreement or preferred loan agreement (or copy thereof as permitted by Section 2.01(b)) with evidence of recording thereon concurrently with the execution and delivery of this Agreement because of (i) a delay caused by the public recording office where such Mortgage, assignment, modification, assumption agreement or preferred loan agreement as the case may be, has been delivered for recordation, or (ii) a delay in the receipt of certain information necessary to prepare the related assignments, the Depositor shall deliver or cause to be delivered to the Trustee or the respective Custodian a copy of such Mortgage, assignment, modification, assumption agreement or preferred loan agreement.

The Depositor shall promptly cause to be recorded in the appropriate public office for real property records the Assignment referred to in clause (iii) of Section 2.01(b), except (a) in states where, in the opinion of counsel acceptable to the Trustee, the Certificate Insurer and the Master Servicer, such recording is not required to protect the Trustee's interests in the Mortgage Loan or (b) if MERS is identified on the Mortgage or on a properly recorded assignment of the Mortgage, as applicable, as the mortgagee of record solely as nominee for Residential Funding and its successors and assigns. If any Assignment is lost or returned unrecorded to the Depositor because of any defect therein, the Depositor shall prepare a substitute Assignment or cure such defect, as the case may be, and cause such Assignment to be recorded in accordance with this paragraph. The Depositor shall promptly deliver or cause to be delivered to the Trustee or the respective Custodian such Mortgage or Assignment, as applicable (or copy thereof as permitted by Section 2.01(b)), with evidence of recording indicated thereon upon receipt thereof from the public recording office or from the related Subservicer or Seller.

If the Depositor delivers to the Trustee or Custodian any Mortgage Note or Assignment of Mortgage in blank, the Depositor shall, or shall cause the Custodian to, complete the endorsement of the Mortgage Note and the Assignment of Mortgage in the name of the Trustee in conjunction with the Interim Certification issued by the Custodian, as contemplated by Section 2.02.

Any of the items set forth in Sections 2.01(b)(ii), (iii), (iv) and (v) and that may be delivered as a copy rather than the original may be delivered to the Trustee or the Custodian.

In connection with the assignment of any Mortgage Loan registered on the MERS® System, the Depositor further agrees that it will cause, at the Depositor's own expense, within 30 Business Days after the Closing Date, the MERS® System to indicate that such Mortgage Loans have been assigned by the Depositor to the Trustee in accordance with this Agreement for the benefit of the Certificateholders by including (or deleting, in the case of Mortgage Loans which are repurchased in accordance with this Agreement) in such computer files (a) the code in the field which identifies the specific Trustee and (b) the code in the field "Pool Field" which identifies the series of the Certificates issued in connection with such Mortgage Loans. The Depositor further agrees that it will not, and will not permit the Master

CONFIDENTIAL                                                                RC_FGIC9019_00018176

Servicer to, and the Master Servicer agrees that it will not, alter the codes referenced in this paragraph with respect to any Mortgage Loan during the term of this Agreement unless and until such Mortgage Loan is repurchased in accordance with the terms of this Agreement.

(d)    It is intended that the conveyances by the Depositor to the Trustee of the Mortgage Loans as provided for in this Section 2.01 and the Uncertificated Regular Interests be construed as a sale by the Depositor to the Trustee of the Mortgage Loans and the Uncertificated Regular Interests for the benefit of the Certificateholders.  Further, it is not intended that any such conveyance be deemed to be a pledge of the Mortgage Loans and the Uncertificated Regular Interests by the Depositor to the Trustee to secure a debt or other obligation of the Depositor.  Nonetheless, (a) this Agreement is intended to be and hereby is a security agreement within the meaning of Articles 8 and 9 of the New York Uniform Commercial Code and the Uniform Commercial Code of any other applicable jurisdiction; (b) the conveyances provided for in this Section 2.01 shall be deemed to be (1) a grant by the Depositor to the Trustee of a security interest in all of the Depositor's right (including the power to convey title thereto), title and interest, whether now owned or hereafter acquired, in and to (A) the Mortgage Loans, including the related Mortgage Note, the Mortgage, any insurance policies and all other documents in the related Mortgage File, (B) all amounts payable pursuant to the Mortgage Loans in accordance with the terms thereof, (C) any Uncertificated Regular Interests and any and all general intangibles, payment intangibles, accounts, chattel paper, instruments, documents, money, deposit accounts, certificates of deposit, goods, letters of credit, advices of credit and investment property and other property of whatever kind or description now existing or hereafter acquired consisting of, arising from or relating to any of the foregoing, and (D) all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, including without limitation all amounts from time to time held or invested in the Certificate Account or the Custodial Account, whether in the form of cash, instruments, securities or other property and (2) an assignment by the Depositor to the Trustee of any security interest in any and all of Residential Funding's right (including the power to convey title thereto), title and interest, whether now owned or hereafter acquired, in and to the property described in the foregoing clauses (1)(A), (B), (C) and (D) granted by Residential Funding to the Depositor pursuant to the Assignment Agreement; (c) the possession by the Trustee, the Custodian or any other agent of the Trustee of Mortgage Notes or such other items of property as constitute instruments, money, payment intangibles, negotiable documents, goods, deposit accounts, letters of credit, advices of credit, investment property, certificated securities or chattel paper shall be deemed to be "possession by the secured party," or possession by a purchaser or a person designated by such secured party, for purposes of perfecting the security interest pursuant to the Minnesota Uniform Commercial Code and the Uniform Commercial Code of any other applicable jurisdiction as in effect (including, without limitation, Sections 8-106, 9-313 and 9-106 thereof); and (d) notifications to persons holding such property, and acknowledgments, receipts or confirmations from persons holding such property, shall be deemed notifications to, or acknowledgments, receipts or confirmations from, securities intermediaries, bailees or agents of, or persons holding for, (as applicable) the Trustee for the purpose of perfecting such security interest under applicable law.

The Depositor and, at the Depositor's direction, Residential Funding and the Trustee shall, to the extent consistent with this Agreement, take such reasonable actions as may be necessary to ensure that, if this Agreement were deemed to create a security interest in the Mortgage Loans and the Uncertificated Regular Interests and the other property described above, such security interest would be deemed to be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of this Agreement. Without limiting the generality of the foregoing, the Depositor shall prepare and deliver to the Trustee not less than 15 days prior to any filing date and, the Trustee shall forward for filing, or shall cause to be forwarded for filing, at the expense of the Depositor, all filings necessary to maintain the effectiveness of any original filings necessary under the Uniform Commercial Code as in effect in any jurisdiction to perfect the Trustee's security interest in or lien on the Mortgage Loans and the Uncertificated Regular Interests, as evidenced by an Officers Certificate of the Depositor, with a copy

CONFIDENTIAL                                                                    RC_FGIC9019_00018177

delivered to the Certificate Insurer, including without limitation (x) continuation statements, and (y) such other statements as may be occasioned by (1) any change of name of Residential Funding, the Depositor or the Trustee (such preparation and filing shall be at the expense of the Trustee, if occasioned by a change in the Trustee's name), (2) any change of location of the place of business or the chief executive office of Residential Funding or the Depositor, (3) any transfer of any interest of Residential Funding or the Depositor in any Mortgage Loan or (4) any transfer of any interest of Residential Funding or the Depositor in any Uncertificated Regular Interests.

Section 2.02.    Acceptance by Trustee.

The Trustee acknowledges receipt (or, with respect to Mortgage Loans subject to a Custodial Agreement, and based solely upon a receipt or certification executed by the Custodian, receipt by the respective Custodian as the duly appointed agent of the Trustee) of the documents referred to in Section 2.01(b)(i) above (except that for purposes of such acknowledgement only, a Mortgage Note may be endorsed in blank and an Assignment of Mortgage may be in blank) and declares that it, or a Custodian as its agent, holds and will hold such documents and the other documents constituting a part of the Mortgage Files delivered to it, or a Custodian as its agent, in trust for the use and benefit of all present and future Certificateholders and the Certificate Insurer. The Trustee or Custodian (such Custodian being so obligated under a Custodial Agreement) agrees, for the benefit of Certificateholders and the Certificate Insurer, to review each Mortgage File delivered to it pursuant to Section 2.01(b) within 90 days after the Closing Date to ascertain that all required documents (specifically as set forth in Section 2.01(b)), have been executed and received, and that such documents relate to the Mortgage Loans identified on the Mortgage Loan Schedule, as supplemented, that have been conveyed to it, and to deliver to the Trustee a certificate (the "Interim Certification") to the effect that all documents required to be delivered pursuant to Section 2.01(b) above have been executed and received and that such documents relate to the Mortgage Loans identified on the Mortgage Loan Schedule, except for any exceptions listed on Schedule A attached to such Interim Certification. Upon delivery of the Mortgage Files by the Depositor or the Master Servicer, the Trustee shall acknowledge receipt (or, with respect to Mortgage Loans subject to a Custodial Agreement, and based solely upon a receipt or certification executed by the Custodian, receipt by the respective Custodian as the duly appointed agent of the Trustee) of the documents referred to in Section 2.01(b) above.

If the Custodian, as the Trustee's agent, finds any document or documents constituting a part of a Mortgage File to be missing or defective, upon receipt of notification from the Custodian as specified in the succeeding sentence, the Trustee shall promptly so notify or cause the Custodian to notify the Master Servicer and the Depositor. Pursuant to Section 2.03 of the Custodial Agreement, the Custodian will notify the Master Servicer, the Depositor and the Trustee of any such omission or defect found by it in respect of any Mortgage File held by it in respect of the items received by it pursuant to the Custodial Agreement. If such omission or defect materially and adversely affects the interests in the related Mortgage Loan of the Certificateholders or the Certificate Insurer, the Master Servicer shall promptly notify the related Subservicer or Seller of such omission or defect and request that such Subservicer or Seller correct or cure such omission or defect within 60 days from the date the Master Servicer was notified of such omission or defect and, if such Subservicer or Seller does not correct or cure such omission or defect within such period, that such Subservicer or Seller purchase such Mortgage Loan from the Trust Fund at its Purchase Price, in either case within 90 days from the date the Master Servicer was notified of such omission or defect; provided that if the omission or defect would cause the Mortgage Loan to be other than a "qualified mortgage" as defined in Section 860G(a)(3) of the Code, any such cure or repurchase must occur within 90 days from the date such breach was discovered. The Purchase Price for any such Mortgage Loan shall be deposited or caused to be deposited by the Master Servicer in the Custodial Account maintained by it pursuant to Section 3.07 and, upon receipt by the Trustee of written notification of such deposit signed by a Servicing Officer, the Trustee or any Custodian, as the case may

CONFIDENTIAL                                                  RC_FGIC9019_00018178

be, shall release to the Master Servicer the related Mortgage File and the Trustee shall execute and deliver such instruments of transfer or assignment prepared by the Master Servicer, in each case without recourse, as shall be necessary to vest in the Subservicer or Seller or its designee, as the case may be, any Mortgage Loan released pursuant hereto and thereafter such Mortgage Loan shall not be part of the Trust Fund. In furtherance of the foregoing and Section 2.04, if the Subservicer or Seller or Residential Funding that repurchases the Mortgage Loan is not a member of MERS and the Mortgage is registered on the MERS® System, the Master Servicer, at its own expense and without any right of reimbursement, shall cause MERS to execute and deliver an assignment of the Mortgage in recordable form to transfer the Mortgage from MERS to such Subservicer or Seller or Residential Funding and shall cause such Mortgage to be removed from registration on the MERS® System in accordance with MERS' rules and regulations. It is understood and agreed that the obligation of the Subservicer or Seller, to so cure or purchase any Mortgage Loan as to which a material and adverse defect in or omission of a constituent document exists shall constitute the sole remedy respecting such defect or omission available to Certificateholders or the Trustee on behalf of Certificateholders (except for the Certificate Insurer's rights under the Insurance Agreement).

Section 2.03.    Representations, Warranties and Covenants of the Master Servicer and the Depositor.

(a)    The Master Servicer hereby represents and warrants to the Trustee for the benefit of the Certificateholders and the Certificate Insurer that:

(i)    The Master Servicer is a corporation duly organized, validly existing and in good standing under the laws governing its creation and existence and is or will be in compliance with the laws of each state in which any Mortgaged Property is located to the extent necessary to ensure the enforceability of each Mortgage Loan in accordance with the terms of this Agreement;

(ii)    The execution and delivery of this Agreement by the Master Servicer and its performance and compliance with the terms of this Agreement will not violate the Master Servicer's Certificate of Incorporation or Bylaws or constitute a material default (or an event which, with notice or lapse of time, or both, would constitute a material default) under, or result in the material breach of, any material contract, agreement or other instrument to which the Master Servicer is a party or which may be applicable to the Master Servicer or any of its assets;

(iii)    This Agreement, assuming due authorization, execution and delivery by the Trustee and the Depositor, constitutes a valid, legal and binding obligation of the Master Servicer, enforceable against it in accordance with the terms hereof subject to applicable bankruptcy, insolvency, reorganization, moratorium and other laws affecting the enforcement of creditors' rights generally and to general principles of equity, regardless of whether such enforcement is considered in a proceeding in equity or at law;

(iv)    The Master Servicer is not in default with respect to any order or decree of any court or any order, regulation or demand of any federal, state, municipal or governmental agency, which default might have consequences that would materially and adversely affect the condition (financial or other) or operations of the Master Servicer or its properties or might have consequences that would materially adversely affect its performance hereunder;

(v)    No litigation is pending or, to the best of the Master Servicer's knowledge, threatened against the Master Servicer which would prohibit its entering into this Agreement or performing its obligations under this Agreement;

CONFIDENTIAL                                                                    RC_FGIC9019_00018179

      (vi)    The Master Servicer will comply in all material respects in the performance of this Agreement with all reasonable rules and requirements of each insurer under each Required Insurance Policy;

      (vii)    No information, certificate of an officer, statement furnished in writing or report delivered to the Depositor, any Affiliate of the Depositor or the Trustee by the Master Servicer will, to the knowledge of the Master Servicer, contain any untrue statement of a material fact or omit a material fact necessary to make the information, certificate, statement or report not misleading;

      (viii)    The Master Servicer has examined each existing, and will examine each new, Subservicing Agreement and is or will be familiar with the terms thereof. The terms of each existing Subservicing Agreement and each designated Subservicer are acceptable to the Master Servicer and any new Subservicing Agreements will comply with the provisions of Section 3.02;

      (ix)    The Master Servicer is a member of MERS in good standing, and will comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS; and

      (x)    The Servicing Guide of the Master Servicer requires that the Subservicer for each Mortgage Loan accurately and fully reports its borrower credit files to each of the Credit Repositories in a timely manner.

It is understood and agreed that the representations and warranties set forth in this Section 2.03(a) shall survive delivery of the respective Mortgage Files to the Trustee or any Custodian. Upon discovery by either the Depositor, the Master Servicer, the Certificate Insurer, the Trustee or any Custodian of a breach of any representation or warranty set forth in this Section 2.03(a) which materially and adversely affects the interests of the Certificateholders or the Certificate Insurer in any Mortgage Loan, the party discovering such breach shall give prompt written notice to the other parties (any Custodian being so obligated under a Custodial Agreement). Within 90 days of its discovery or its receipt of notice of such breach, the Master Servicer shall either (i) cure such breach in all material respects or (ii) to the extent that such breach is with respect to a Mortgage Loan or a related document, purchase such Mortgage Loan from the Trust Fund at the Purchase Price and in the manner set forth in Section 2.02; provided that if the breach would cause the Mortgage Loan to be other than a "qualified mortgage" as defined in Section 860G(a)(3) of the Code, any such cure or repurchase must occur within 90 days from the date such breach was discovered. The obligation of the Master Servicer to cure such breach or to so purchase such Mortgage Loan shall constitute the sole remedy in respect of a breach of a representation and warranty set forth in this Section 2.03(a) available to the Certificateholders or the Trustee on behalf of the Certificateholders (except for the Certificate Insurer's rights under Section 3.03 of the Insurance Agreement).

      (b)    The Depositor hereby represents and warrants to the Trustee for the benefit of the Certificateholders and the Certificate Insurer that as of the Closing Date (or, if otherwise specified below, as of the date so specified): (i) immediately prior to the conveyance of the Mortgage Loans to the Trustee, the Depositor had good title to, and was the sole owner of, each Mortgage Loan free and clear of any pledge, lien, encumbrance or security interest (other than rights to servicing and related compensation) and such conveyance validly transfers ownership of the Mortgage Loans to the Trustee free and clear of any pledge, lien, encumbrance or security interest; and (ii) each Mortgage Loan constitutes a qualified mortgage under Section 860G(a)(3)(A) of the Code and Treasury Regulations Section 1.860G-2(a)(1).

CONFIDENTIAL                        RC_FGIC9019_00018180

It is understood and agreed that the representations and warranties set forth in this Section 2.03(b) shall survive delivery of the respective Mortgage Files to the Trustee or any Custodian.

Upon discovery by any of the Depositor, the Master Servicer, the Certificate Insurer, the Trustee or any Custodian of a breach of any of the representations and warranties set forth in this Section 2.03(b) which materially and adversely affects the interests of the Certificateholders or the Certificate Insurer in any Mortgage Loan, the party discovering such breach shall give prompt written notice to the other parties and the Certificate Insurer (any Custodian being so obligated under a Custodial Agreement); *provided, however*, that in the event of a breach of the representation and warranty set forth in Section 2.03(b)(ii), the party discovering such breach shall give such notice within five days of discovery. Within 90 days of its discovery or its receipt of notice of breach, the Depositor shall either (i) cure such breach in all material respects or (ii) purchase such Mortgage Loan from the Trust Fund at the Purchase Price and in the manner set forth in Section 2.02; provided that the Depositor shall have the option to substitute a Qualified Substitute Mortgage Loan or Loans for such Mortgage Loan if such substitution occurs within two years following the Closing Date; provided that if the omission or defect would cause the Mortgage Loan to be other than a "qualified mortgage" as defined in Section 860G(a)(3) of the Code, any such cure, substitution or repurchase must occur within 90 days from the date such breach was discovered. Any such substitution shall be effected by the Depositor under the same terms and conditions as provided in Section 2.04 for substitutions by Residential Funding. It is understood and agreed that the obligation of the Depositor to cure such breach or to so purchase or substitute for any Mortgage Loan as to which such a breach has occurred and is continuing shall constitute the sole remedy respecting such breach available to the Certificateholders (other than the Certificate Insurer) or the Trustee on behalf of the Certificateholders (other than the Certificate Insurer). Notwithstanding the foregoing, the Depositor shall not be required to cure breaches or purchase or substitute for Mortgage Loans as provided in this Section 2.03(b) if the substance of the breach of a representation set forth above also constitutes fraud in the origination of the Mortgage Loan.

Section 2.04.    Representations and Warranties of Sellers.

The Depositor, as assignee of Residential Funding under the Assignment Agreement, hereby assigns to the Trustee for the benefit of the Certificateholders all of its right, title and interest in respect of the Assignment Agreement and each Seller's Agreement applicable to a Mortgage Loan as and to the extent set forth in the Assignment Agreement. Insofar as the Assignment Agreement or such Seller's Agreement relates to the representations and warranties made by Residential Funding or the related Seller in respect of such Mortgage Loan and any remedies provided thereunder for any breach of such representations and warranties, such right, title and interest may be enforced by the Master Servicer on behalf of the Trustee, the Certificate Insurer and the Certificateholders. Upon the discovery by the Depositor, the Master Servicer, the Certificate Insurer, the Trustee or any Custodian of a breach of any of the representations and warranties made in a Seller's Agreement or the Assignment Agreement in respect of any Mortgage Loan or of any Repurchase Event which materially and adversely affects the interests of the Certificateholders or the Certificate Insurer in such Mortgage Loan, the party discovering such breach shall give prompt written notice to the other parties and the Certificate Insurer (any Custodian being so obligated under a Custodial Agreement). The Master Servicer shall promptly notify the related Seller and Residential Funding of such breach or Repurchase Event and request that such Seller or Residential Funding either (i) cure such breach or Repurchase Event in all material respects within 90 days from the date the Master Servicer was notified of such breach or Repurchase Event or (ii) purchase such Mortgage Loan from the Trust Fund at the Purchase Price and in the manner set forth in Section 2.02.

Upon the discovery by the Depositor, the Master Servicer, the Trustee, or any Custodian of a breach of any of such representations and warranties set forth in the Assignment Agreement in respect of any Mortgage Loan which materially and adversely affects the interests of the Certificateholders or the

CONFIDENTIAL                                                      RC_FGIC9019_00018181

Certificate Insurer in such Mortgage Loan, the party discovering such breach shall give prompt written notice to the other parties (any Custodian being so obligated under a Custodial Agreement) at the same time as notice is given pursuant to the preceding paragraph of any corresponding breach of representation or warranty made in Seller's Agreement. The Master Servicer shall promptly notify Residential Funding of such breach of a representation or warranty set forth in the Assignment Agreement and request that Residential Funding either (i) cure such breach in all material respects within 90 days from the date the Master Servicer was notified of such breach or (ii) purchase such Mortgage Loan from the Trust Fund within 90 days of the date of such written notice of such breach at the Purchase Price and in the manner set forth in Section 2.02, but only if the Mortgage Loan has not been purchased by the Seller due to a breach of representation and warranty of the related Seller's Agreement as set forth in the preceding paragraph; provided that Residential Funding shall have the option to substitute a Qualified Substitute Mortgage Loan or Loans for such Mortgage Loan if such substitution occurs within two years following the Closing Date; provided that if the breach would cause the Mortgage Loan to be other than a "qualified mortgage" as defined in Section 860G(a)(3) of the Code, any such cure or substitution must occur within 90 days from the date the breach was discovered. If the breach of representation and warranty that gave rise to the obligation to repurchase or substitute a Mortgage Loan pursuant to Section 4 of the Assignment Agreement was the representation and warranty set forth in clause (xlvii) of Section 4 thereof, then the Master Servicer shall request that Residential Funding pay to the Trust Fund, concurrently with and in addition to the remedies provided in the preceding sentence, an amount equal to any liability, penalty or expense that was actually incurred and paid out of or on behalf of the Trust Fund, and that directly resulted from such breach, or if incurred and paid by the Trust Fund thereafter, concurrently with such payment. In the event that Residential Funding elects to substitute a Qualified Substitute Mortgage Loan or Loans for a Deleted Mortgage Loan pursuant to this Section 2.04, Residential Funding shall deliver to the Trustee for the benefit of the Certificateholders with respect to such Qualified Substitute Mortgage Loan or Loans, the original Mortgage Note, the Mortgage, an Assignment of the Mortgage in recordable form, and such other documents and agreements as are required by Section 2.01, with the Mortgage Note endorsed as required by Section 2.01. No substitution will be made in any calendar month after the Determination Date for such month. Monthly Payments due with respect to Qualified Substitute Mortgage Loans in the month of substitution shall not be part of the Trust Fund and will be retained by the Master Servicer and remitted by the Master Servicer to Residential Funding on the next succeeding Distribution Date. For the month of substitution, distributions to the Certificateholders will include the Monthly Payment due on a Deleted Mortgage Loan for such month and thereafter Residential Funding shall be entitled to retain all amounts received in respect of such Deleted Mortgage Loan. The Master Servicer shall amend or cause to be amended the Mortgage Loan Schedule for the benefit of the Certificateholders to reflect the removal of such Deleted Mortgage Loan and the substitution of the Qualified Substitute Mortgage Loan or Loans and the Master Servicer shall deliver the amended Mortgage Loan Schedule to the Trustee. Upon such substitution, the Qualified Substitute Mortgage Loan or Loans shall be subject to the terms of this Agreement and the related Subservicing Agreement in all respects, the related Seller shall be deemed to have made the representations and warranties with respect to the Qualified Substitute Mortgage Loan made in the related Seller Agreements as of the date of substitution, Residential Funding shall be deemed to have made the representations and warranties with respect to the Qualified Substitute Mortgage Loan (other than those of a statistical nature) contained in the Assignment Agreement as of the date of substitution, and the covenants, representations and warranties set forth in this Section 2.04, and in Section 2.03(b) hereof.

In connection with the substitution of one or more Qualified Substitute Mortgage Loans for one or more Deleted Mortgage Loans, the Master Servicer will determine the amount (if any) by which the aggregate principal balance of all such Qualified Substitute Mortgage Loans as of the date of substitution is less than the aggregate Stated Principal Balance of all such Deleted Mortgage Loans (in each case after application of the principal portion of the Monthly Payments due in the month of substitution that are to be distributed to the Certificateholders in the month of substitution). Residential Funding shall deposit or

CONFIDENTIAL                                                                              RC_FGIC9019_00018182

cause the related Seller to deposit the amount of such shortfall into the Custodial Account on the day of substitution, without any reimbursement therefor. Residential Funding shall give notice in writing to the Trustee of such event, which notice shall be accompanied by an Officers' Certificate as to the calculation of such shortfall and (subject to Section 10.01(f) by an Opinion of Counsel to the effect that such substitution will not cause (a) any federal tax to be imposed on the Trust Fund, including without limitation, any federal tax imposed on "prohibited transactions" under Section 860F(a)(1) of the Code or on "contributions after the startup date" under Section 860G(d)(1) of the Code or (b) any portion of any REMIC created hereunder to fail to qualify as a REMIC at any time that any Certificate is outstanding.

It is understood and agreed that the obligation of the Seller or Residential Funding, as the case may be, to cure such breach or purchase (and in the case of Residential Funding to substitute for) such Mortgage Loan as to which such a breach has occurred and is continuing and to make any additional payments required under the Assignment Agreement in connection with a breach of the representation and warranty in clause (xlvii) of Section 4 thereof shall constitute the sole remedy respecting such breach available to the Certificateholders (other than the Certificate Insurer) or the Trustee on behalf of the Certificateholders (other than the Certificate Insurer). If the Master Servicer is Residential Funding, then the Trustee shall also have the right to give the notification and require the purchase or substitution provided for in the second preceding paragraph in the event of such a breach of a representation or warranty made by Residential Funding in the Assignment Agreement. In connection with the purchase of or substitution for any such Mortgage Loan by Residential Funding, the Trustee shall assign to Residential Funding all of the right, title and interest in respect of the Seller's Agreement and the Assignment Agreement applicable to such Mortgage Loan.

Section 2.05.    Execution and Authentication of Certificates; Conveyance of Uncertificated REMIC Regular Interests.

(a)    The Trustee acknowledges the assignment to it of the Mortgage Loans and the delivery of the Mortgage Files to it, or any Custodian on its behalf, subject to any exceptions noted, together with the assignment to it of all other assets included in the Trust Fund, receipt of which is hereby acknowledged. Concurrently with such delivery and in exchange therefor, the Trustee, pursuant to the written request of the Depositor executed by an officer of the Depositor, has executed and caused to be authenticated and delivered to or upon the order of the Depositor the Certificates in authorized denominations which evidence ownership of the entire Trust Fund.

(b)    The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse all the right, title and interest of the Depositor in and to the REMIC I Regular Interests and the REMIC II Regular Interests for the benefit of the holders of the Regular Certificates and the Class R-III certificates. The Trustee acknowledges receipt of the REMIC I Regular Interests and the REMIC II Regular Interests (each of which are uncertificated) and declares that it holds and will hold the same in trust for the exclusive use and benefit of the holders of the Regular Certificates and the Class R-III Certificates. The interests evidenced by the Class R-III Certificate, together with the Regular Certificates, constitute the entire beneficial ownership interest in REMIC III.

CONFIDENTIAL                                                                          RC_FGIC9019_00018183

Section 2.06.    <u>Purposes and Powers of the Trust</u>.

The purpose of the trust, as created hereunder, is to engage in the following activities:

(a)    to sell the Certificates to the Depositor in exchange for the Mortgage Loans;

(b)    to enter into and perform its obligations under this Agreement;

(c)    to engage in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith; and

(d)    subject to compliance with this Agreement, to engage in such other activities as may be required in connection with conservation of the Trust Fund and the making of distributions to the Certificateholders.

The trust is hereby authorized to engage in the foregoing activities.  Notwithstanding the provisions of Section 11.01, the trust shall not engage in any activity other than in connection with the foregoing or other than as required or authorized by the terms of this Agreement while any Certificate is outstanding, and this Section 2.06 may not be amended, without the consent of the Certificateholders evidencing a majority of the aggregate Voting Rights of the Certificates.

CONFIDENTIAL                                                                                            RC_FGIC9019_00018184

## ARTICLE III
## ADMINISTRATION AND SERVICING OF MORTGAGE LOANS

Section 3.01.    <u>Master Servicer to Act as Servicer</u>.

(a)    The Master Servicer shall service and administer the Mortgage Loans in accordance with the terms of this Agreement and the respective Mortgage Loans, following such procedures as it would employ in its good faith business judgment and which are normal and usual in its general mortgage servicing activities, and shall have full power and authority, acting alone or through Subservicers as provided in Section 3.02, to do any and all things which it may deem necessary or desirable in connection with such servicing and administration. Without limiting the generality of the foregoing, the Master Servicer in its own name or in the name of a Subservicer is hereby authorized and empowered by the Trustee when the Master Servicer or the Subservicer, as the case may be, believes it appropriate in its best judgment, to execute and deliver, on behalf of the Certificateholders and the Trustee or any of them, any and all instruments of satisfaction or cancellation, or of partial or full release or discharge, or of consent to assumption or modification in connection with a proposed conveyance, or of assignment of any Mortgage and Mortgage Note in connection with the repurchase of a Mortgage Loan and all other comparable instruments, or with respect to the modification or re-recording of a Mortgage for the purpose of correcting the Mortgage, the subordination of the lien of the Mortgage in favor of a public utility company or government agency or unit with powers of eminent domain, the taking of a deed in lieu of foreclosure, the completion of judicial or non-judicial foreclosure, the conveyance of a Mortgaged Property to the related insurer, the acquisition of any property acquired by foreclosure or deed in lieu of foreclosure, or the management, marketing and conveyance of any property acquired by foreclosure or deed in lieu of foreclosure with respect to the Mortgage Loans and with respect to the Mortgaged Properties. The Master Servicer further is authorized and empowered by the Trustee, on behalf of the Certificateholders and the Trustee, in its own name or in the name of the Subservicer, when the Master Servicer or the Subservicer, as the case may be, believes it is appropriate in its best judgment to register any Mortgage Loan on the MERS® System, or cause the removal from the registration of any Mortgage Loan on the MERS® System, to execute and deliver, on behalf of the Trustee and the Certificateholders or any of them, any and all instruments of assignment and other comparable instruments with respect to such assignment or re-recording of a Mortgage in the name of MERS, solely as nominee for the Trustee and its successors and assigns. Any expenses incurred in connection with the actions described in the preceding sentence shall be borne by the Master Servicer in accordance with Section 3.16(c), with no right of reimbursement; provided, that if, as a result of MERS discontinuing or becoming unable to continue operations in connection with the MERS® System, it becomes necessary to remove any Mortgage Loan from registration on the MERS® System and to arrange for the assignment of the related Mortgages to the Trustee, then any related expenses shall be reimbursable to the Master Servicer as set forth in Section 3.10(a)(ii). Notwithstanding the foregoing, subject to Section 3.07(a), the Master Servicer shall not permit any modification with respect to any Mortgage Loan that would both constitute a sale or exchange of such Mortgage Loan within the meaning of Section 1001 of the Code and any proposed, temporary or final regulations promulgated thereunder (other than in connection with a proposed conveyance or assumption of such Mortgage Loan that is treated as a Principal Prepayment in Full pursuant to Section 3.13(d) hereof) and cause any REMIC created hereunder to fail to qualify as a REMIC under the Code. The Trustee shall furnish the Master Servicer with any powers of attorney and other documents necessary or appropriate to enable the Master Servicer to service and administer the Mortgage Loans. The Trustee shall not be liable for any action taken by the Master Servicer or any Subservicer pursuant to such powers of attorney or other documents. In servicing and administering any Nonsubserviced Mortgage Loan, the Master Servicer shall, to the extent not inconsistent with this Agreement, comply with the Program Guide as if it were the originator of such Mortgage Loan and had retained the servicing rights and obligations in respect thereof.

CONFIDENTIAL                                        RC_FGIC9019_00018185

If the Mortgage relating to a Mortgage Loan did not have a lien senior to the Mortgage Loan on the related Mortgaged Property as of the Cut-off Date, then the Master Servicer, in such capacity, may not consent to the placing of a lien senior to that of the Mortgage on the related Mortgaged Property. If the Mortgage relating to a Mortgage Loan had a lien senior to the Mortgage Loan on the related Mortgaged Property as of the Cut-off Date, then the Master Servicer, in such capacity, may consent to the refinancing of the prior senior lien, provided that the following requirements are met:

(i)    (A)    the Mortgagor's debt-to-income ratio resulting from such refinancing is less than the original debt-to-income ratio as set forth on the Mortgage Loan Schedule; provided, however, that in no instance shall the resulting Combined Loan-to-Value Ratio ("Combined Loan-to-Value Ratio") of such Mortgage Loan be higher than that permitted by the Program Guide; or

(B)    the resulting Combined Loan-to-Value Ratio of such Mortgage Loan is no higher than the Combined Loan-to-Value Ratio prior to such refinancing; provided, however, if such refinanced mortgage loan is a "rate and term" mortgage loan (meaning, the Mortgagor does not receive any cash from the refinancing), the Combined Loan-to-Value Ratio may increase to the extent of either (x) the reasonable closing costs of such refinancing or (y) any decrease in the value of the related Mortgaged Property, if the Mortgagor is in good standing as defined by the Program Guide;

(ii)    the interest rate, or, in the case of an adjustable rate existing senior lien, the maximum interest rate, for the loan evidencing the refinanced senior lien is no more than 2.0% higher than the interest rate or the maximum interest rate, as the case may be, on the loan evidencing the existing senior lien immediately prior to the date of such refinancing; provided, however (A) if the loan evidencing the existing senior lien prior to the date of refinancing has an adjustable rate and the loan evidencing the refinanced senior lien has a fixed rate, then the current interest rate on the loan evidencing the refinanced senior lien may be up to 2.0% higher than the then-current loan rate of the loan evidencing the existing senior lien and (B) if the loan evidencing the existing senior lien prior to the date of refinancing has a fixed rate and the loan evidencing the refinanced senior lien has an adjustable rate, then the maximum interest rate on the loan evidencing the refinanced senior lien shall be less than or equal to (x) the interest rate on the loan evidencing the existing senior lien prior to the date of refinancing plus (y) 2.0%; and

(iii)    the loan evidencing the refinanced senior lien is not subject to negative amortization.

(b)    The Master Servicer shall, to the extent consistent with the servicing standards set forth herein, take whatever actions as may be necessary to file a claim under or enforce or allow the Trustee to file a claim under or enforce any title insurance policy with respect to any Mortgage Loan including, without limitation, joining in or causing any Seller or Subservicer (or any other party in possession of any title insurance policy) to join in any claims process, negotiations, actions or proceedings necessary to make a claim under or enforce any title insurance policy. Notwithstanding anything in this Agreement to the contrary, the Master Servicer shall not (unless the Mortgagor is in default with respect to the Mortgage Loan or such default is, in the judgment of the Master Servicer, reasonably foreseeable) make or permit any modification, waiver, or amendment of any term of any Mortgage Loan that would both (i) effect an exchange or reissuance of such Mortgage Loan under Section 1001 of the Code (or final, temporary or proposed Treasury regulations promulgated thereunder) (other than in connection with a proposed conveyance or assumption of such Mortgage Loan that is treated as a Principal Prepayment in Full pursuant to Section 3.13(d) hereof) and (ii) cause any REMIC formed hereunder to fail to qualify as a

CONFIDENTIAL                                                    RC_FGIC9019_00018186

REMIC under the Code or the imposition of any tax on "prohibited transactions" or "contributions" after the startup date under the REMIC Provisions.

(c)    In connection with servicing and administering the Mortgage Loans, the Master Servicer and any Affiliate of the Master Servicer (i) may perform services such as appraisals and brokerage services that are customarily provided by Persons other than servicers of mortgage loans, and shall be entitled to reasonable compensation therefor in accordance with Section 3.10 and (ii) may, at its own discretion and on behalf of the Trustee, obtain credit information in the form of a "credit score" from a credit repository.

(d)    All costs incurred by the Master Servicer or by Subservicers in effecting the timely payment of taxes and assessments on the properties subject to the Mortgage Loans shall not, for the purpose of calculating monthly distributions to the Certificateholders, be added to the amount owing under the related Mortgage Loans, notwithstanding that the terms of such Mortgage Loan so permit, and such costs shall be recoverable to the extent permitted by Section 3.10(a)(ii).

(e)    The Master Servicer may enter into one or more agreements in connection with the offering of pass-through certificates evidencing interests in one or more of the Certificates providing for the payment by the Master Servicer of amounts received by the Master Servicer as servicing compensation hereunder and required to cover certain Prepayment Interest Shortfalls on the Mortgage Loans, which payment obligation will thereafter be an obligation of the Master Servicer hereunder.

(f)    The relationship of the Master Servicer (and of any successor to the Master Servicer) to the Depositor under this Agreement is intended by the parties to be that of an independent contractor and not that of a joint venturer, partner or agent.

(g)    The Master Servicer shall comply with the terms of Section 9 of the Assignment Agreement.

Section 3.02.    Subservicing Agreements Between Master Servicer and Subservicers;
Enforcement of Subservicers' Obligations.

(a)    The Master Servicer may continue in effect Subservicing Agreements entered into by Residential Funding and Subservicers prior to the execution and delivery of this Agreement, and may enter into new Subservicing Agreements with Subservicers, for the servicing and administration of all or some of the Mortgage Loans. Each Subservicer shall be either (i) an institution the accounts of which are insured by the FDIC or (ii) another entity that engages in the business of originating or servicing mortgage loans, and in either case shall be authorized to transact business in the state or states in which the related Mortgaged Properties it is to service are situated, if and to the extent required by applicable law to enable the Subservicer to perform its obligations hereunder and under the Subservicing Agreement, and in either case shall be a Freddie Mac, Fannie Mae or HUD approved mortgage servicer. Each Subservicer of a Mortgage Loan shall be entitled to receive and retain, as provided in the related Subservicing Agreement and in Section 3.07, the related Subservicing Fee from payments of interest received on such Mortgage Loan after payment of all amounts required to be remitted to the Master Servicer in respect of such Mortgage Loan. For any Mortgage Loan that is a Nonsubserviced Mortgage Loan, the Master Servicer shall be entitled to receive and retain an amount equal to the Subservicing Fee from payments of interest. Unless the context otherwise requires, references in this Agreement to actions taken or to be taken by the Master Servicer in servicing the Mortgage Loans include actions taken or to be taken by a Subservicer on behalf of the Master Servicer. Each Subservicing Agreement will be upon such terms and conditions as are generally required by, permitted by or consistent with the Program Guide and are not inconsistent with this Agreement and as the Master Servicer and the Subservicer have agreed.

CONFIDENTIAL                                                                    RC_FGIC9019_00018187

With the approval of the Master Servicer, a Subservicer may delegate its servicing obligations to third-party servicers, but such Subservicer will remain obligated under the related Subservicing Agreement. The Master Servicer and a Subservicer may enter into amendments thereto or a different form of Subservicing Agreement, and the form referred to or included in the Program Guide is merely provided for information and shall not be deemed to limit in any respect the discretion of the Master Servicer to modify or enter into different Subservicing Agreements; provided, however, that any such amendments or different forms shall be consistent with and not violate the provisions of either this Agreement or the Program Guide in a manner which would materially and adversely affect the interests of the Certificateholders or the Certificate Insurer. The Program Guide and any other Subservicing Agreement entered into between the Master Servicer and any Subservicer shall require the Subservicer to accurately and fully report its borrower credit files to each of the Credit Repositories in a timely manner.

(b)        As part of its servicing activities hereunder, the Master Servicer, for the benefit of the Trustee, the Certificateholders and the Certificate Insurer, shall use its best reasonable efforts to enforce the obligations of each Subservicer under the related Subservicing Agreement and of each Seller under the related Seller's Agreement, to the extent that the non-performance of any such obligation would have a material and adverse effect on a Mortgage Loan, including, without limitation, the obligation to purchase a Mortgage Loan on account of defective documentation, as described in Section 2.02, or on account of a breach of a representation or warranty, as described in Section 2.04. Such enforcement, including, without limitation, the legal prosecution of claims, termination of Subservicing Agreements or Seller's Agreements, as appropriate, and the pursuit of other appropriate remedies, shall be in such form and carried out to such an extent and at such time as the Master Servicer would employ in its good faith business judgment and which are normal and usual in its general mortgage servicing activities. The Master Servicer shall pay the costs of such enforcement at its own expense, and shall be reimbursed therefor only (i) from a general recovery resulting from such enforcement to the extent, if any, that such recovery exceeds all amounts due in respect of the related Mortgage Loan or (ii) from a specific recovery of costs, expenses or attorneys fees against the party against whom such enforcement is directed. For purposes of clarification only, the parties agree that the foregoing is not intended to, and does not, limit the ability of the Master Servicer to be reimbursed for expenses that are incurred in connection with the enforcement of a Seller's obligations and are reimbursable pursuant to Section 3.10(a)(vii).

Section 3.03.    Successor Subservicers.

The Master Servicer shall be entitled to terminate any Subservicing Agreement that may exist in accordance with the terms and conditions of such Subservicing Agreement and without any limitation by virtue of this Agreement; provided, however, that in the event of termination of any Subservicing Agreement by the Master Servicer or the Subservicer, the Master Servicer shall either act as servicer of the related Mortgage Loan or enter into a Subservicing Agreement with a successor Subservicer which will be bound by the terms of the related Subservicing Agreement. If the Master Servicer or any Affiliate of Residential Funding acts as servicer, it will not assume liability for the representations and warranties of the Subservicer which it replaces. If the Master Servicer enters into a Subservicing Agreement with a successor Subservicer, the Master Servicer shall use reasonable efforts to have the successor Subservicer assume liability for the representations and warranties made by the terminated Subservicer in respect of the related Mortgage Loans and, in the event of any such assumption by the successor Subservicer, the Master Servicer may, in the exercise of its business judgment, release the terminated Subservicer from liability for such representations and warranties.

Section 3.04.    Liability of the Master Servicer.

Notwithstanding any Subservicing Agreement, any of the provisions of this Agreement relating to agreements or arrangements between the Master Servicer or a Subservicer or reference to actions taken

CONFIDENTIAL                                                                RC_FGIC9019_00018188

through a Subservicer or otherwise, the Master Servicer shall remain obligated and liable to the Trustee, the Certificate Insurer and Certificateholders for the servicing and administering of the Mortgage Loans in accordance with the provisions of Section 3.01 without diminution of such obligation or liability by virtue of such Subservicing Agreements or arrangements or by virtue of indemnification from the Subservicer or the Depositor and to the same extent and under the same terms and conditions as if the Master Servicer alone were servicing and administering the Mortgage Loans.  The Master Servicer shall be entitled to enter into any agreement with a Subservicer or Seller for indemnification of the Master Servicer and nothing contained in this Agreement shall be deemed to limit or modify such indemnification.

Section 3.05.    No Contractual Relationship Between Subservicer and Trustee or Certificateholders.

Any Subservicing Agreement that may be entered into and any other transactions or services relating to the Mortgage Loans involving a Subservicer in its capacity as such and not as an originator shall be deemed to be between the Subservicer and the Master Servicer alone and the Trustee and Certificateholders shall not be deemed parties thereto and shall have no claims, rights, obligations, duties or liabilities with respect to the Subservicer in its capacity as such except as set forth in Section 3.06.  The foregoing provision shall not in any way limit a Subservicer's obligation to cure an omission or defect or to repurchase a Mortgage Loan as referred to in Section 2.02 hereof.

Section 3.06.    Assumption or Termination of Subservicing Agreements by Trustee.

(a)    In the event the Master Servicer shall for any reason no longer be the master servicer (including by reason of an Event of Default), the Trustee, as successor Master Servicer, its designee or its successor shall thereupon assume all of the rights and obligations of the Master Servicer under each Subservicing Agreement that may have been entered into.  The Trustee, its designee or the successor servicer for the Trustee shall be deemed to have assumed all of the Master Servicer's interest therein and to have replaced the Master Servicer as a party to the Subservicing Agreement to the same extent as if the Subservicing Agreement had been assigned to the assuming party except that the Master Servicer shall not thereby be relieved of any liability or obligations under the Subservicing Agreement.

(b)    The Master Servicer shall, upon request of the Trustee but at the expense of the Master Servicer, deliver to the assuming party all documents and records relating to each Subservicing Agreement and the Mortgage Loans then being serviced and an accounting of amounts collected and held by it and otherwise use its best efforts to effect the orderly and efficient transfer of each Subservicing Agreement to the assuming party.

(c)    Unless a Certificate Insurer Default exists, the Master Servicer will, if it is authorized to do so under the relevant Subservicing Agreement, upon request of the Certificate Insurer at a time when the Certificate Insurer may remove the Master Servicer under the terms hereof, terminate any Subservicing Agreement.

Section 3.07.    Collection of Certain Mortgage Loan Payments; Deposits to Custodial Account.

(a)    The Master Servicer shall make reasonable efforts to collect all payments called for under the terms and provisions of the Mortgage Loans, and shall, to the extent such procedures shall be consistent with this Agreement and the terms and provisions of any related Primary Insurance Policy, follow such collection procedures as it would employ in its good faith business judgment and which are normal and usual in its general mortgage servicing activities.  Consistent with the foregoing, the Master Servicer may in its discretion (subject to the terms and conditions of the Assignment Agreement) (i) waive any late payment charge or any prepayment charge or penalty interest in connection with the

CONFIDENTIAL                                                                        RC_FGIC9019_00018189

prepayment of a Mortgage Loan and (ii) extend the Due Date for payments due on a Mortgage Loan in accordance with the Program Guide, provided, however, that the Master Servicer shall first determine that any such waiver or extension will not impair the coverage of any related Primary Insurance Policy or the MI Policy or materially adversely affect the lien of the related Mortgage. Notwithstanding anything in this Section to the contrary, the Master Servicer or any Subservicer shall not enforce any prepayment charge to the extent that such enforcement would violate any applicable law. In the event of any such arrangement, the Master Servicer shall make timely advances on the related Mortgage Loan during the scheduled period in accordance with the amortization schedule of such Mortgage Loan without modification thereof by reason of such arrangements unless otherwise agreed to by the Holders of the Classes of Certificates affected thereby; provided, however, that no such extension shall be made if any advance would be a Nonrecoverable Advance. Consistent with the terms of this Agreement, the Master Servicer may also waive, modify or vary any term of any Mortgage Loan or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to any Mortgagor if in the Master Servicer's determination such waiver, modification, postponement or indulgence is not materially adverse to the interests of the Certificateholders or the Certificate Insurer (taking into account any estimated Realized Loss that might result absent such action), provided, however, that the Master Servicer may not modify materially or permit any Subservicer to modify any Mortgage Loan, including without limitation any modification that would change the Mortgage Rate, forgive the payment of any principal or interest (unless in connection with the liquidation of the related Mortgage Loan or except in connection with prepayments to the extent that such reamortization is not inconsistent with the terms of the Mortgage Loan), capitalize any amounts owing on the Mortgage Loan by adding such amount to the outstanding principal balance of the Mortgage Loan, or extend the final maturity date of such Mortgage Loan, unless such Mortgage Loan is in default or, in the judgment of the Master Servicer, such default is reasonably foreseeable. No such modification shall reduce the Mortgage Rate on a Mortgage Loan below the greater of (A) one-half of the Mortgage Rate as in effect on the Cut-off Date and (B) one-half of the Mortgage Rate as in effect on the date of such modification, but not less than the sum of the Servicing Fee Rate, the related Mortgage Insurance Premium Rate, if any, the applicable Certificate Insurer Premium Modified Rate and the per annum rate at which the Subservicing Fee accrues. The final maturity date for any Mortgage Loan shall not be extended beyond the Maturity Date. Also, the aggregate principal balance of all Reportable Modified Mortgage Loans subject to Servicing Modifications (measured at the time of the Servicing Modification and after giving effect to any Servicing Modification) can be no more than five percent of the aggregate principal balance of the Mortgage Loans as of the Cut-off Date, unless such limit is increased from time to time with the consent of the MI Policy Provider and each Rating Agency provides written confirmation that an increase in excess of that limit will not reduce the rating assigned to any Class of Certificates by such Rating Agency below the lower of the then-current rating or the rating assigned to such Certificates as of the Closing Date by such Rating Agency (without regard to the related Certificate Guaranty Insurance Policy). In addition, any amounts owing on a Mortgage Loan added to the outstanding principal balance of such Mortgage Loan must be fully amortized over the term of such Mortgage Loan, and such amounts may be added to the outstanding principal balance of a Mortgage Loan only once during the life of such Mortgage Loan. Also, the addition of such amounts described in the preceding sentence shall be implemented in accordance with the Program Guide and may be implemented only by Subservicers that have been approved by the Master Servicer for such purposes. In connection with any Curtailment of a Mortgage Loan, the Master Servicer, to the extent not inconsistent with the terms of the Mortgage Note and local law and practice, may permit the Mortgage Loan to be re-amortized such that the Monthly Payment is recalculated as an amount that will fully amortize the remaining principal balance thereof by the original maturity date based on the original Mortgage Rate; provided, that such reamortization shall not be permitted if it would constitute a reissuance of the Mortgage Loan for federal income tax purposes.

(b)    The Master Servicer shall establish and maintain a Custodial Account in which the Master Servicer shall deposit or cause to be deposited on a daily basis, except as otherwise specifically

CONFIDENTIAL                                                              RC_FGIC9019_00018190

provided herein, the following payments and collections remitted by Subservicers or received by it in respect of the Mortgage Loans subsequent to the Cut-off Date (other than in respect of Monthly Payments due prior to or in the month of the Cut-off Date):

(i)      All payments on account of principal, including Principal Prepayments made by Mortgagors on the Mortgage Loans and the principal component of any Subservicer Advance or of any REO Proceeds received in connection with an REO Property for which an REO Disposition has occurred;

(ii)     All payments on account of interest at the Adjusted Mortgage Rate on the Mortgage Loans, including the interest component of any Subservicer Advance or of any REO Proceeds received in connection with an REO Property for which an REO Disposition has occurred;

(iii)    Insurance Proceeds, Subsequent Recoveries and Liquidation Proceeds (net of any related expenses of the Subservicer);

(iv)    All proceeds of any Mortgage Loans purchased pursuant to Section 2.02, 2.03, 2.04, 4.07 or 4.08 (including amounts received from Residential Funding pursuant to the last paragraph of Section 4 of the Assignment Agreement in respect of any liability, penalty or expense that resulted from a breach of the representation and warranty set forth in clause (xlvii) of Section 4 of the Assignment Agreement) and all amounts required to be deposited in connection with the substitution of a Qualified Substitute Mortgage Loan pursuant to Section 2.03 or 2.04; and

(v)     Any amounts required to be deposited pursuant to Section 3.07(c) and any payments or collections received in the nature of prepayment charges.

The foregoing requirements for deposit in the Custodial Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments on the Mortgage Loans which are not part of the Trust Fund (consisting of Monthly Payments due before or in the month of the Cut-off Date) and payments or collections consisting of late payment charges or assumption fees may but need not be deposited by the Master Servicer in the Custodial Account. In the event any amount not required to be deposited in the Custodial Account is so deposited, the Master Servicer may at any time withdraw such amount from the Custodial Account, any provision herein to the contrary notwithstanding. The Custodial Account may contain funds that belong to one or more trust funds created for mortgage pass-through certificates of other series and may contain other funds respecting payments on mortgage loans belonging to the Master Servicer or serviced or master serviced by it on behalf of others. Notwithstanding such commingling of funds, the Master Servicer shall keep records that accurately reflect the funds on deposit in the Custodial Account that have been identified by it as being attributable to the Mortgage Loans. With respect to Insurance Proceeds, Liquidation Proceeds, REO Proceeds, Subsequent Recoveries and the proceeds of the purchase of any Mortgage Loan pursuant to Sections 2.02, 2.03, 2.04, 4.07 and 4.08 received in any calendar month, the Master Servicer may elect to treat such amounts as included in the Group I Available Distribution Amount or Group II Available Distribution Amount, as applicable, for the Distribution Date in the month of receipt, but is not obligated to do so. If the Master Servicer so elects, such amounts will be deemed to have been received (and any related Realized Loss shall be deemed to have occurred) on the last day of the month prior to the receipt thereof.

(c)      The Master Servicer shall use its best efforts to cause the institution maintaining the Custodial Account to invest the funds in the Custodial Account attributable to the Mortgage Loans in Permitted Investments which shall mature not later than the Certificate Account Deposit Date next

CONFIDENTIAL                                                                                  RC_FGIC9019_00018191

following the date of such investment (with the exception of the Amount Held for Future Distribution) and which shall not be sold or disposed of prior to their maturities. All income and gain realized from any such investment shall be for the benefit of the Master Servicer as additional servicing compensation and shall be subject to its withdrawal or order from time to time. The amount of any losses incurred in respect of any such investments attributable to the investment of amounts in respect of the Mortgage Loans shall be deposited in the Custodial Account by the Master Servicer out of its own funds immediately as realized.

(d)    The Master Servicer shall give notice to the Trustee and the Depositor of any change in the location of the Custodial Account and the location of the Certificate Account prior to the use thereof.

Section 3.08.    Subservicing Accounts; Servicing Accounts.

(a)    In those cases where a Subservicer is servicing a Mortgage Loan pursuant to a Subservicing Agreement, the Master Servicer shall cause the Subservicer, pursuant to the Subservicing Agreement, to establish and maintain one or more Subservicing Accounts which shall be an Eligible Account or, if such account is not an Eligible Account, shall generally satisfy the requirements of the Program Guide and be otherwise acceptable to the Master Servicer, the Certificate Insurer and each Rating Agency. The Subservicer will be required thereby to deposit into the Subservicing Account on a daily basis all proceeds of Mortgage Loans received by the Subservicer, less its Subservicing Fees and unreimbursed advances and expenses, to the extent permitted by the Subservicing Agreement. If the Subservicing Account is not an Eligible Account, the Master Servicer shall be deemed to have received such monies upon receipt thereof by the Subservicer. The Subservicer shall not be required to deposit in the Subservicing Account payments or collections in the nature of late charges or assumption fees, or payments or collections received in the nature of prepayment charges to the extent that the Subservicer is entitled to retain such amounts pursuant to the Subservicing Agreement. On or before the date specified in the Program Guide, but in no event later than the Determination Date, the Master Servicer shall cause the Subservicer, pursuant to the Subservicing Agreement, to remit to the Master Servicer for deposit in the Custodial Account all funds held in the Subservicing Account with respect to each Mortgage Loan serviced by such Subservicer that are required to be remitted to the Master Servicer. The Subservicer will also be required, pursuant to the Subservicing Agreement, to advance on such scheduled date of remittance amounts equal to any scheduled monthly installments of principal and interest less its Subservicing Fees on any Mortgage Loans for which payment was not received by the Subservicer. This obligation to advance with respect to each Mortgage Loan will continue up to and including the first of the month following the date on which the related Mortgaged Property is sold at a foreclosure sale or is acquired by the Trust Fund by deed in lieu of foreclosure or otherwise. All such advances received by the Master Servicer shall be deposited promptly by it in the Custodial Account.

(b)    The Subservicer may also be required, pursuant to the Subservicing Agreement, to remit to the Master Servicer for deposit in the Custodial Account interest at the Adjusted Mortgage Rate (or Modified Net Mortgage Rate plus the rate per annum at which the Servicing Fee and the related Mortgage Insurance Premium Rate, if any, plus the applicable Certificate Insurer Premium Modified Rate, accrues in the case of a Modified Mortgage Loan) on any Curtailment received by such Subservicer in respect of a Mortgage Loan from the related Mortgagor during any month that is to be applied by the Subservicer to reduce the unpaid principal balance of the related Mortgage Loan as of the first day of such month, from the date of application of such Curtailment to the first day of the following month. Any amounts paid by a Subservicer pursuant to the preceding sentence shall be for the benefit of the Master Servicer as additional servicing compensation and shall be subject to its withdrawal or order from time to time pursuant to Sections 3.10(a)(iv) and (v).

CONFIDENTIAL                                                      RC_FGIC9019_00018192

(c)    In addition to the Custodial Account and the Certificate Account, the Master Servicer shall for any Nonsubserviced Mortgage Loan, and shall cause the Subservicers for Subserviced Mortgage Loans to, establish and maintain one or more Servicing Accounts and deposit and retain therein all collections from the Mortgagors (or advances from Subservicers) for the payment of taxes, assessments, hazard insurance premiums, Primary Insurance Policy premiums, if applicable, the Mortgage Insurance Premium, if applicable, or comparable items for the account of the Mortgagors.  Each Servicing Account shall satisfy the requirements for a Subservicing Account and, to the extent permitted by the Program Guide or as is otherwise acceptable to the Master Servicer, may also function as a Subservicing Account. Withdrawals of amounts related to the Mortgage Loans from the Servicing Accounts may be made only to effect timely payment of taxes, assessments, hazard insurance premiums, Primary Insurance Policy premiums, if applicable, the Mortgage Insurance Premium, if applicable, or comparable items, to reimburse the Master Servicer or Subservicer out of related collections for any payments made pursuant to Sections 3.11 (with respect to the Primary Insurance Policy) and 3.12(a) (with respect to hazard insurance), to refund to any Mortgagors any sums as may be determined to be overages, to pay interest, if required, to Mortgagors on balances in the Servicing Account or to clear and terminate the Servicing Account at the termination of this Agreement in accordance with Section 9.01 or in accordance with the Program Guide.  As part of its servicing duties, the Master Servicer shall, and the Subservicers will, pursuant to the Subservicing Agreements, be required to pay to the Mortgagors interest on funds in this account to the extent required by law.

(d)    The Master Servicer shall advance the payments referred to in the preceding subsection that are not timely paid by the Mortgagors or advanced by the Subservicers on the date when the tax, premium or other cost for which such payment is intended is due, but the Master Servicer shall be required so to advance only to the extent that such advances, in the good faith judgment of the Master Servicer, will be recoverable by the Master Servicer out of Insurance Proceeds, Liquidation Proceeds or otherwise.

Section 3.09.    Access to Certain Documentation and Information Regarding the Mortgage Loans.

In the event that compliance with this Section 3.09 shall make any Class of Certificates legal for investment by federally insured savings and loan associations, the Master Servicer shall provide, or cause the Subservicers to provide, to the Trustee, the Office of Thrift Supervision or the FDIC and the supervisory agents and examiners thereof access to the documentation regarding the Mortgage Loans required by applicable regulations of the Office of Thrift Supervision, such access being afforded without charge but only upon reasonable request and during normal business hours at the offices designated by the Master Servicer.  The Master Servicer shall permit such representatives to photocopy any such documentation and shall provide equipment for that purpose at a charge reasonably approximating the cost of such photocopying to the Master Servicer.

Section 3.10.    Permitted Withdrawals from the Custodial Account.

(a)    The Master Servicer may, from time to time as provided herein, make withdrawals from the Custodial Account of amounts on deposit therein pursuant to Section 3.07 that are attributable to the Mortgage Loans for the following purposes:

(i)    to make deposits into the Certificate Account in the amounts and in the manner provided for in Section 4.01;

(ii)    to reimburse itself or the related Subservicer for previously unreimbursed Advances, Servicing Advances or other expenses made pursuant to Sections 3.01, 3.07(a), 3.08,

CONFIDENTIAL                                                                    RC_FGIC9019_00018193

3.11, 3.12(a), 3.14 and 4.04 or otherwise reimbursable pursuant to the terms of this Agreement, such withdrawal right being limited to amounts received on the related Mortgage Loans (including, for this purpose, REO Proceeds, Insurance Proceeds, Liquidation Proceeds and proceeds from the purchase of a Mortgage Loan pursuant to Section 2.02, 2.03, 2.04, 4.07 or 4.08) which represent (A) Late Collections of Monthly Payments for which any such advance was made in the case of Subservicer Advances or Advances pursuant to Section 4.04 and (B) recoveries of amounts in respect of which such advances were made in the case of Servicing Advances;

(iii)    to pay to itself or the related Subservicer (if not previously retained by such Subservicer) out of each payment received by the Master Servicer on account of interest on a Mortgage Loan as contemplated by Sections 3.14 and 3.16, an amount equal to that remaining portion of any such payment as to interest (but not in excess of the Servicing Fee and the Subservicing Fee, if not previously retained) which, when deducted, will result in the remaining amount of such interest being interest at a rate per annum equal to the Net Mortgage Rate (or Modified Net Mortgage Rate in the case of a Modified Mortgage Loan) plus the applicable Mortgage Insurance Premium Rate, if any, plus the applicable Certificate Insurer Premium Modified Rate, on the amount specified in the amortization schedule of the related Mortgage Loan as the principal balance thereof at the beginning of the period respecting which such interest was paid after giving effect to any previous Curtailments;

(iv)    to pay to itself as additional servicing compensation any interest or investment income earned on funds or other property deposited in or credited to the Custodial Account that it is entitled to withdraw pursuant to Section 3.07(c);

(v)    to pay to itself as additional servicing compensation any Foreclosure Profits, and any amounts remitted by Subservicers as interest in respect of Curtailments pursuant to Section 3.08(b);

(vi)    to pay to itself, a Subservicer, a Seller, Residential Funding, the Depositor or any other appropriate Person, as the case may be, with respect to each Mortgage Loan or property acquired in respect thereof that has been purchased or otherwise transferred pursuant to Section 2.02, 2.03, 2.04, 4.07, 4.08 or 9.01, all amounts received thereon and not required to be distributed to Certificateholders as of the date on which the related Stated Principal Balance or Purchase Price is determined;

(vii)    to reimburse itself or the related Subservicer for any Nonrecoverable Advance or Advances in the manner and to the extent provided in subsection (c) below, and any Advance or Servicing Advance made in connection with a modified Mortgage Loan that is in default or, in the judgment of the Master Servicer, default is reasonably foreseeable pursuant to Section 3.07(a), to the extent the amount of the Advance or Servicing Advance was added to the Stated Principal Balance of the Mortgage Loan in a prior calendar month;

(viii)    to reimburse itself or the Depositor for expenses incurred by and reimbursable to it or the Depositor pursuant to Section 3.01(a), 3.11, 3.13, 3.14(c), 6.03, 10.01 or otherwise, or in connection with enforcing any repurchase, substitution or indemnification obligation of any Seller (other than the Depositor or an Affiliate of the Depositor) pursuant to the related Seller's Agreement;

(ix)    to reimburse itself for amounts expended by it (a) pursuant to Section 3.14 in good faith in connection with the restoration of property damaged by an Uninsured Cause, and

CONFIDENTIAL                                                    RC_FGIC9019_00018194

(b) in connection with the liquidation of a Mortgage Loan or disposition of an REO Property to the extent not otherwise reimbursed pursuant to clause (ii) or (viii) above; and

(x)     to withdraw any amount deposited in the Custodial Account that was not required to be deposited therein pursuant to Section 3.07, including any payoff fees or penalties or any other additional amounts payable to the Master Servicer or Subservicer pursuant to the terms of the Mortgage Note.

(b)     Since, in connection with withdrawals pursuant to clauses (ii), (iii), (v) and (vi), the Master Servicer's entitlement thereto is limited to collections or other recoveries on the related Mortgage Loan, the Master Servicer shall keep and maintain separate accounting, on a Mortgage Loan by Mortgage Loan basis, for the purpose of justifying any withdrawal from the Custodial Account pursuant to such clauses.

(c)     The Master Servicer shall be entitled to reimburse itself or the related Subservicer for any advance made in respect of a Mortgage Loan that the Master Servicer determines to be a Nonrecoverable Advance by withdrawal from the Custodial Account of amounts on deposit therein attributable to the Mortgage Loans on any Certificate Account Deposit Date succeeding the date of such determination. Such right of reimbursement in respect of a Nonrecoverable Advance relating to an Advance made pursuant to Section 4.04 on any such Certificate Account Deposit Date shall be limited to an amount not exceeding the portion of such advance previously paid to Certificateholders (and not theretofore reimbursed to the Master Servicer or the related Subservicer).

Section 3.11.     Maintenance of MI Policy and Primary Insurance Coverage.

(a)     The Master Servicer shall not take, or permit any Subservicer to take, any action which would result in noncoverage under the MI Policy or any applicable Primary Insurance Policy of any loss which, but for the actions of the Master Servicer or Subservicer, would have been covered thereunder. To the extent coverage is available, the Master Servicer shall keep or cause to be kept in full force and effect each such Primary Insurance Policy until the principal balance of the related Mortgage Loan secured by a Mortgaged Property is reduced to 80% or less of the Appraised Value at origination in the case of such a Mortgage Loan having a Loan-to-Value Ratio at origination in excess of 80%, provided that such Primary Insurance Policy was in place as of the Cut-off Date and the Master Servicer had knowledge of such Primary Insurance Policy. The Master Servicer shall not cancel or refuse to renew any such Primary Insurance Policy applicable to a Nonsubserviced Mortgage Loan, or consent to any Subservicer canceling or refusing to renew any such Primary Insurance Policy applicable to a Mortgage Loan subserviced by it, that is in effect at the date of the initial issuance of the Certificates and is required to be kept in force hereunder unless the replacement Primary Insurance Policy for such canceled or non-renewed policy is maintained with an insurer whose claims-paying ability is acceptable to each Rating Agency for mortgage pass-through certificates having a rating equal to or better than the lower of the then-current rating or the rating assigned to the Certificates as of the Closing Date by such Rating Agency. The Master Servicer shall keep or cause to be kept in full force and effect the MI Policy, except as provided in Section 3.11(c).

(b)     In connection with its activities as administrator and servicer of the Mortgage Loans, the Master Servicer agrees to present or to cause the related Subservicer to present, on behalf of the Master Servicer, the Subservicer, if any, the Trustee and Certificateholders, claims to the MI Policy Provider under the MI Policy and to the insurer under any Primary Insurance Policies, in a timely manner in accordance with such policies, and, in this regard, to take or cause to be taken such reasonable action as shall be necessary to permit recovery under the MI Policy and any Primary Insurance Policies respecting defaulted Mortgage Loans. Pursuant to Section 3.07, any Insurance Proceeds collected by or remitted to the Master Servicer under the MI Policy or any Primary Insurance Policies shall be deposited in the

CONFIDENTIAL                                                                        RC_FGIC9019_00018195

Custodial Account, subject to withdrawal pursuant to Section 3.10. In addition, the Master Servicer shall deposit any refunds of any Mortgage Insurance Premiums into the Custodial Account for inclusion in the Group I Available Distribution Amount or Group II Available Distribution Amount, as applicable, for the following Distribution Date.

(c)       In the event of a MI Policy Provider Default, if the MI Policy may be terminated without payment of any further premium for such policy, the Master Servicer shall use its best efforts to replace such policy with a substitute policy at a premium rate which is no greater than the premium rate that is charged under the MI Policy and with coverage for losses in amounts substantially similar to those under the MI Policy. Any substitute policy shall be entered into only with the written consent of the Certificate Insurer.

Section 3.12.    Maintenance of Fire Insurance and Omissions and Fidelity Coverage.

(a)       The Master Servicer shall cause to be maintained for each Mortgage Loan fire insurance with extended coverage in an amount which is equal to the lesser of the principal balance owing on such Mortgage Loan (together with the principal balance of any mortgage loan secured by a lien that is senior to the Mortgage Loan) or 100% of the insurable value of the improvements; *provided, however,* that such coverage may not be less than the minimum amount required to fully compensate for any loss or damage on a replacement cost basis. To the extent it may do so without breaching the related Subservicing Agreement, the Master Servicer shall replace any Subservicer that does not cause such insurance, to the extent it is available, to be maintained. The Master Servicer shall also cause to be maintained on property acquired upon foreclosure, or deed in lieu of foreclosure, of any Mortgage Loan, fire insurance with extended coverage in an amount which is at least equal to the amount necessary to avoid the application of any co-insurance clause contained in the related hazard insurance policy. Pursuant to Section 3.07, any amounts collected by the Master Servicer under any such policies (other than amounts to be applied to the restoration or repair of the related Mortgaged Property or property thus acquired or amounts released to the Mortgagor in accordance with the Master Servicer's normal servicing procedures) shall be deposited in the Custodial Account, subject to withdrawal pursuant to Section 3.10. Any cost incurred by the Master Servicer in maintaining any such insurance shall not, for the purpose of calculating monthly distributions to Certificateholders, be added to the amount owing under the Mortgage Loan, notwithstanding that the terms of the Mortgage Loan so permit. Such costs shall be recoverable by the Master Servicer out of related late payments by the Mortgagor or out of Insurance Proceeds and Liquidation Proceeds to the extent permitted by Section 3.10. It is understood and agreed that no earthquake or other additional insurance is to be required of any Mortgagor or maintained on property acquired in respect of a Mortgage Loan other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance. Whenever the improvements securing a Mortgage Loan are located at the time of origination of such Mortgage Loan in a federally designated special flood hazard area, the Master Servicer shall cause flood insurance (to the extent available) to be maintained in respect thereof. Such flood insurance shall be in an amount equal to the lesser of (i) the amount required to compensate for any loss or damage to the Mortgaged Property on a replacement cost basis and (ii) the maximum amount of such insurance available for the related Mortgaged Property under the national flood insurance program (assuming that the area in which such Mortgaged Property is located is participating in such program).

In the event that the Master Servicer shall obtain and maintain a blanket fire insurance policy with extended coverage insuring against hazard losses on all of the Mortgage Loans, it shall conclusively be deemed to have satisfied its obligations as set forth in the first sentence of this Section 3.12(a), it being understood and agreed that such policy may contain a deductible clause, in which case the Master Servicer shall, in the event that there shall not have been maintained on the related Mortgaged Property a policy complying with the first sentence of this Section 3.12(a) and there shall have been a loss which

CONFIDENTIAL                                                        RC_FGIC9019_00018196

would have been covered by such policy, deposit in the Certificate Account the amount not otherwise payable under the blanket policy because of such deductible clause. Any such deposit by the Master Servicer shall be made on the Certificate Account Deposit Date next preceding the Distribution Date which occurs in the month following the month in which payments under any such policy would have been deposited in the Custodial Account. In connection with its activities as administrator and servicer of the Mortgage Loans, the Master Servicer agrees to present, on behalf of itself, the Trustee and Certificateholders, claims under any such blanket policy.

(b)       The Master Servicer shall obtain and maintain at its own expense and keep in full force and effect throughout the term of this Agreement a blanket fidelity bond and an errors and omissions insurance policy covering the Master Servicer's officers and employees and other persons acting on behalf of the Master Servicer in connection with its activities under this Agreement. The amount of coverage shall be at least equal to the coverage that would be required by Fannie Mae or Freddie Mac, whichever is greater, with respect to the Master Servicer if the Master Servicer were servicing and administering the Mortgage Loans for Fannie Mae or Freddie Mac. In the event that any such bond or policy ceases to be in effect, the Master Servicer shall obtain a comparable replacement bond or policy from an issuer or insurer, as the case may be, meeting the requirements, if any, of the Program Guide and acceptable to the Depositor. Coverage of the Master Servicer under a policy or bond obtained by an Affiliate of the Master Servicer and providing the coverage required by this Section 3.12(b) shall satisfy the requirements of this Section 3.12(b).

Section 3.13.    Enforcement of Due-on-Sale Clauses; Assumption and Modification Agreements; Certain Assignments.

(a)       When any Mortgaged Property is conveyed by the Mortgagor, the Master Servicer or Subservicer, to the extent it has knowledge of such conveyance, shall enforce any due-on-sale clause contained in any Mortgage Note or Mortgage, to the extent permitted under applicable law and governmental regulations, but only to the extent that such enforcement will not adversely affect or jeopardize coverage under any Required Insurance Policy. Notwithstanding the foregoing: (i) the Master Servicer shall not be deemed to be in default under this Section 3.13(a) by reason of any transfer or assumption which the Master Servicer is restricted by law from preventing; and (ii) if the Master Servicer determines that it is reasonably likely that any Mortgagor will bring, or if any Mortgagor does bring, legal action to declare invalid or otherwise avoid enforcement of a due-on-sale clause contained in any Mortgage Note or Mortgage, the Master Servicer shall not be required to enforce the due-on-sale clause or to contest such action.

(b)       Subject to the Master Servicer's duty to enforce any due-on-sale clause to the extent set forth in Section 3.13(a), in any case in which a Mortgaged Property is to be conveyed to a Person by a Mortgagor, and such Person is to enter into an assumption or modification agreement or supplement to the Mortgage Note or Mortgage which requires the signature of the Trustee, or if an instrument of release signed by the Trustee is required releasing the Mortgagor from liability on the Mortgage Loan, the Master Servicer is authorized, subject to the requirements of the sentence next following, to execute and deliver, on behalf of the Trustee, the assumption agreement with the Person to whom the Mortgaged Property is to be conveyed and such modification agreement or supplement to the Mortgage Note or Mortgage or other instruments as are reasonable or necessary to carry out the terms of the Mortgage Note or Mortgage or otherwise to comply with any applicable laws regarding assumptions or the transfer of the Mortgaged Property to such Person; *provided, however*, none of such terms and requirements shall both constitute a "significant modification" effecting an exchange or reissuance of such Mortgage Loan under the Code (or final, temporary or proposed Treasury regulations promulgated thereunder) and cause any REMIC created hereunder to fail to qualify as a REMIC under the Code or the imposition of any tax on "prohibited transactions" or "contributions" after the Startup Date under the REMIC Provisions. The Master Servicer

CONFIDENTIAL                                                                    RC_FGIC9019_00018197

shall execute and deliver such documents only if it reasonably determines that (i) its execution and delivery thereof will not conflict with or violate any terms of this Agreement or cause the unpaid balance and interest on the Mortgage Loan to be uncollectible in whole or in part, (ii) any required consents of insurers under any Required Insurance Policies have been obtained and (iii) subsequent to the closing of the transaction involving the assumption or transfer (A) the Mortgage Loan will continue to be secured by a first mortgage lien (or, with respect to any junior lien, a junior lien of the same priority in relation to any senior lien on such Mortgage Loan) pursuant to the terms of the Mortgage, (B) such transaction will not adversely affect the coverage under any Required Insurance Policies, (C) the Mortgage Loan will fully amortize over the remaining term thereof, (D) no material term of the Mortgage Loan (including the interest rate on the Mortgage Loan) will be altered nor will the term of the Mortgage Loan be changed and (E) if the seller/transferor of the Mortgaged Property is to be released from liability on the Mortgage Loan, the buyer/transferee of the Mortgaged Property would be qualified to assume the Mortgage Loan based on generally comparable credit quality and such release will not (based on the Master Servicer's or Subservicer's good faith determination) adversely affect the collectability of the Mortgage Loan.  Upon receipt of appropriate instructions from the Master Servicer in accordance with the foregoing, the Trustee shall execute any necessary instruments for such assumption or substitution of liability as directed by the Master Servicer.  Upon the closing of the transactions contemplated by such documents, the Master Servicer shall cause the originals or true and correct copies of the assumption agreement, the release (if any), or the modification or supplement to the Mortgage Note or Mortgage to be delivered to the Trustee or the Custodian and deposited with the Mortgage File for such Mortgage Loan.  Any fee collected by the Master Servicer or such related Subservicer for entering into an assumption or substitution of liability agreement will be retained by the Master Servicer or such Subservicer as additional servicing compensation.

(c)      The Master Servicer or the related Subservicer, as the case may be, shall be entitled to approve a request from a Mortgagor for a partial release of the related Mortgaged Property, the granting of an easement therein in favor of another Person, any alteration or demolition of the related Mortgaged Property or other similar matters if it has determined, exercising its good faith business judgment in the same manner as it would if it were the owner of the related Mortgage Loan, that the security for, and the timely and full collectability of, such Mortgage Loan would not be adversely affected thereby and that any REMIC created hereunder would not fail to continue to qualify as a REMIC under the Code as a result thereof and (subject to Section 10.01(f)) that no tax on "prohibited transactions" or "contributions" after the Startup Date would be imposed on any REMIC created hereunder as a result thereof.  Any fee collected by the Master Servicer or the related Subservicer for processing such a request will be retained by the Master Servicer or such Subservicer as additional servicing compensation.

(d)      Subject to any other applicable terms and conditions of this Agreement, the Trustee and Master Servicer shall be entitled to approve an assignment in lieu of satisfaction with respect to any Mortgage Loan, provided the obligee with respect to such Mortgage Loan following such proposed assignment provides the Trustee and Master Servicer with a "Lender Certification for Assignment of Mortgage Loan" in the form attached hereto as Exhibit M, in form and substance satisfactory to the Trustee and Master Servicer, providing the following:  (i) that the Mortgage Loan is secured by Mortgaged Property located in a jurisdiction in which an assignment in lieu of satisfaction is required to preserve lien priority, minimize or avoid mortgage recording taxes or otherwise comply with, or facilitate a refinancing under, the laws of such jurisdiction; (ii) that the substance of the assignment is, and is intended to be, a refinancing of such Mortgage Loan and that the form of the transaction is solely to comply with, or facilitate the transaction under, such local laws; (iii) that the Mortgage Loan following the proposed assignment will have a rate of interest more than the greater of (A) 3% and (B) 5% of the annual yield of the unmodified Mortgage Loan, below or above the rate of interest on such Mortgage Loan prior to such proposed assignment; and (iv) that such assignment is at the request of the borrower under the related Mortgage Loan.  Upon approval of an assignment in lieu of satisfaction with respect to

CONFIDENTIAL                                                                                RC_FGIC9019_00018198

any Mortgage Loan, the Master Servicer shall receive cash in an amount equal to the unpaid principal balance of and accrued interest on such Mortgage Loan and the Master Servicer shall treat such amount as a Principal Prepayment in Full with respect to such Mortgage Loan for all purposes hereof.

Section 3.14.    Realization Upon Defaulted Mortgage Loans.

(a)    The Master Servicer shall foreclose upon or otherwise comparably convert (which may include an REO Acquisition) the ownership of properties securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments pursuant to Section 3.07. Alternatively, the Master Servicer may take other actions in respect of a defaulted Mortgage Loan, which may include (i) accepting a short sale (a payoff of the Mortgage Loan for an amount less than the total amount contractually owed in order to facilitate a sale of the Mortgaged Property by the Mortgagor) or permitting a short refinancing (a payoff of the Mortgage Loan for an amount less than the total amount contractually owed in order to facilitate refinancing transactions by the Mortgagor not involving a sale of the Mortgaged Property), (ii) arranging for a repayment plan or (iii) agreeing to a modification in accordance with Section 3.07. In connection with such foreclosure or other conversion or action, the Master Servicer shall, consistent with Section 3.11, follow such practices and procedures as it shall deem necessary or advisable, as shall be normal and usual in its general mortgage servicing activities and as shall be required or permitted by the Program Guide; provided that the Master Servicer shall not be liable in any respect hereunder if the Master Servicer is acting in connection with any such foreclosure or other conversion or action in a manner that is consistent with the provisions of this Agreement. The Master Servicer, however, shall not be required to expend its own funds or incur other reimbursable charges in connection with any foreclosure, or attempted foreclosure which is not completed, or towards the correction of any default on a related senior mortgage loan, or towards the restoration of any property unless it shall determine (i) that such restoration and/or foreclosure will increase the proceeds of liquidation of the Mortgage Loan to Holders of Certificates of one or more Classes or the Certificate Insurer after reimbursement to itself for such expenses or charges and (ii) that such expenses and charges will be recoverable to it through Liquidation Proceeds, Insurance Proceeds, or REO Proceeds (respecting which it shall have priority for purposes of withdrawals from the Custodial Account pursuant to Section 3.10, whether or not such expenses and charges are actually recoverable from related Liquidation Proceeds, Insurance Proceeds or REO Proceeds). In the event of such a determination by the Master Servicer pursuant to this Section 3.14(a), the Master Servicer shall be entitled to reimbursement of its funds so expended pursuant to Section 3.10. In addition, the Master Servicer may pursue any remedies that may be available in connection with a breach of a representation and warranty with respect to any such Mortgage Loan in accordance with Sections 2.03 and 2.04. However, the Master Servicer is not required to continue to pursue both foreclosure (or similar remedies) with respect to the Mortgage Loans and remedies in connection with a breach of a representation and warranty if the Master Servicer determines in its reasonable discretion that one such remedy is more likely to result in a greater recovery as to the Mortgage Loan. Upon the occurrence of a Cash Liquidation or REO Disposition, following the deposit in the Custodial Account of all Insurance Proceeds, Liquidation Proceeds and other payments and recoveries referred to in the definition of "Cash Liquidation" or "REO Disposition," as applicable, upon receipt by the Trustee of written notification of such deposit signed by a Servicing Officer, the Trustee or any Custodian, as the case may be, shall release to the Master Servicer the related Mortgage File and the Trustee shall execute and deliver such instruments of transfer or assignment prepared by the Master Servicer, in each case without recourse, as shall be necessary to vest in the Master Servicer or its designee, as the case may be, the related Mortgage Loan, and thereafter such Mortgage Loan shall not be part of the Trust Fund. Notwithstanding the foregoing or any other provision of this Agreement, in the Master Servicer's sole discretion with respect to any defaulted Mortgage Loan or REO Property as to either of the following provisions, (i) a Cash Liquidation or REO Disposition may be deemed to have occurred if substantially all amounts expected by the Master Servicer to be received in connection with the related defaulted Mortgage Loan or REO

CONFIDENTIAL

Property have been received, and (ii) for purposes of determining the amount of any Liquidation Proceeds, Insurance Proceeds, REO Proceeds or other unscheduled collections or the amount of any Realized Loss, the Master Servicer may take into account minimal amounts of additional receipts expected to be received or any estimated additional liquidation expenses expected to be incurred in connection with the related defaulted Mortgage Loan or REO Property.

(b)    In the event that title to any Mortgaged Property is acquired by the Trust Fund as an REO Property by foreclosure or by deed in lieu of foreclosure, the deed or certificate of sale shall be issued to the Trustee or to its nominee on behalf of Certificateholders. Notwithstanding any such acquisition of title and cancellation of the related Mortgage Loan, such REO Property shall (except as otherwise expressly provided herein) be considered to be an Outstanding Mortgage Loan held in the Trust Fund until such time as the REO Property shall be sold. Consistent with the foregoing for purposes of all calculations hereunder so long as such REO Property shall be considered to be an Outstanding Mortgage Loan it shall be assumed that, notwithstanding that the indebtedness evidenced by the related Mortgage Note shall have been discharged, such Mortgage Note and the related amortization schedule in effect at the time of any such acquisition of title (after giving effect to any previous Curtailments and before any adjustment thereto by reason of any bankruptcy or similar proceeding or any moratorium or similar waiver or grace period) remain in effect.

(c)    In the event that the Trust Fund acquires any REO Property as aforesaid or otherwise in connection with a default or imminent default on a Mortgage Loan, the Master Servicer on behalf of the Trust Fund shall dispose of such REO Property as soon as practicable, giving due consideration to the interests of the Certificateholders and the Certificate Insurer, but in all cases, within three full years after the taxable year of its acquisition by the Trust Fund for purposes of Section 860G(a)(8) of the Code (or such shorter period as may be necessary under applicable state (including any state in which such property is located) law to maintain the status of each REMIC created hereunder as a REMIC under applicable state law and avoid taxes resulting from such property failing to be foreclosure property under applicable state law) or, at the expense of the Trust Fund, request, more than 60 days before the day on which such grace period would otherwise expire, an extension of such grace period unless the Master Servicer (subject to Section 10.01(f)) obtains for the Trustee and the Certificate Insurer an Opinion of Counsel, addressed to the Trustee, the Certificate Insurer and the Master Servicer, to the effect that the holding by the Trust Fund of such REO Property subsequent to such period will not result in the imposition of taxes on "prohibited transactions" as defined in Section 860F of the Code or cause any REMIC created hereunder to fail to qualify as a REMIC (for federal (or any applicable State or local) income tax purposes) at any time that any Certificates are outstanding, in which case the Trust Fund may continue to hold such REO Property (subject to any conditions contained in such Opinion of Counsel). The Master Servicer shall be entitled to be reimbursed from the Custodial Account for any costs incurred in obtaining such Opinion of Counsel, as provided in Section 3.10. Notwithstanding any other provision of this Agreement, no REO Property acquired by the Trust Fund shall be rented (or allowed to continue to be rented) or otherwise used by or on behalf of the Trust Fund in such a manner or pursuant to any terms that would (i) cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code or (ii) subject any REMIC created hereunder to the imposition of any federal income taxes on the income earned from such REO Property, including any taxes imposed by reason of Section 860G(c) of the Code, unless the Master Servicer has agreed to indemnify and hold harmless the Trust Fund with respect to the imposition of any such taxes.

(d)    The proceeds of any Cash Liquidation, REO Disposition or purchase or repurchase of any Mortgage Loan pursuant to the terms of this Agreement, as well as any recovery (other than Subsequent Recoveries) resulting from a collection of Liquidation Proceeds, Insurance Proceeds or REO Proceeds, will be applied in the following order of priority: *first*, to reimburse the Master Servicer or the related Subservicer in accordance with Section 3.10(a)(ii); *second*, to the Certificateholders to the extent of

CONFIDENTIAL                                                                          RC_FGIC9019_00018200

accrued and unpaid interest on the Mortgage Loan, and any related REO Imputed Interest, at the Net Mortgage Rate (or the Modified Net Mortgage Rate in the case of a Modified Mortgage Loan), to the Due Date in the related Due Period prior to the Distribution Date on which such amounts are to be distributed; *third*, to the Certificateholders as a recovery of principal on the Mortgage Loan (or REO Property); *fourth*, to all Servicing Fees and Subservicing Fees payable therefrom (and the Master Servicer and the Subservicer shall have no claims for any deficiencies with respect to such fees which result from the foregoing allocation); *fifth*, to the Certificate Insurer for reimbursement for any payments made pursuant to the applicable Certificate Guaranty Insurance Policy to the extent not reimbursed pursuant to Section 4.02(c)(v) or (vi), or 4.02(d)(vi) or (vii); and *sixth*, to Foreclosure Profits.

(e)    In the event of a default on a Mortgage Loan one or more of whose obligors is not a United States Person, in connection with any foreclosure or acquisition of a deed in lieu of foreclosure (together, "foreclosure") in respect of such Mortgage Loan, the Master Servicer will cause compliance with the provisions of Treasury Regulation Section 1.1445-2(d)(3) (or any successor thereto) necessary to assure that no withholding tax obligation arises with respect to the proceeds of such foreclosure except to the extent, if any, that proceeds of such foreclosure are required to be remitted to the obligors on such Mortgage Loan.

Section 3.15.    Trustee to Cooperate; Release of Mortgage Files.

(a)    Upon becoming aware of the payment in full of any Mortgage Loan, or upon the receipt by the Master Servicer of a notification that payment in full will be escrowed in a manner customary for such purposes, the Master Servicer will immediately notify the Trustee (if it holds the related Mortgage File) or the Custodian by a certification of a Servicing Officer (which certification shall include a statement to the effect that all amounts received or to be received in connection with such payment which are required to be deposited in the Custodial Account pursuant to Section 3.07 have been or will be so deposited), substantially in one of the forms attached hereto as Exhibit G, or, in the case of a Custodian, an electronic request in a form acceptable to the Custodian, requesting delivery to it of the Mortgage File. Upon receipt of such certification and request, the Trustee shall promptly release, or cause the Custodian to release, the related Mortgage File to the Master Servicer. The Master Servicer is authorized to execute and deliver to the Mortgagor the request for reconveyance, deed of reconveyance or release or satisfaction of mortgage or such instrument releasing the lien of the Mortgage, together with the Mortgage Note with, as appropriate, written evidence of cancellation thereon and to cause the removal from the registration on the MERS® System of such Mortgage and to execute and deliver, on behalf of the Trustee and the Certificateholders or any of them, any and all instruments of satisfaction or cancellation or of partial or full release, including any applicable UCC termination statements. No expenses incurred in connection with any instrument of satisfaction or deed of reconveyance shall be chargeable to the Custodial Account or the Certificate Account.

(b)    From time to time as is appropriate for the servicing or foreclosure of any Mortgage Loan, the Master Servicer shall deliver to the Custodian, with a copy to the Trustee, a certificate of a Servicing Officer substantially in one of the forms attached as Exhibit G hereto, or, in the case of a Custodian, an electronic request in a form acceptable to the Custodian, requesting that possession of all, or any document constituting part of, the Mortgage File be released to the Master Servicer and certifying as to the reason for such release and that such release will not invalidate any insurance coverage provided in respect of the Mortgage Loan under any Required Insurance Policy. Upon receipt of the foregoing, the Trustee shall deliver, or cause the Custodian to deliver, the Mortgage File or any document therein to the Master Servicer. The Master Servicer shall cause each Mortgage File or any document therein so released to be returned to the Trustee, or the Custodian as agent for the Trustee when the need therefor by the Master Servicer no longer exists, unless (i) the Mortgage Loan has been liquidated and the Liquidation Proceeds relating to the Mortgage Loan have been deposited in the Custodial Account or

CONFIDENTIAL                                                    RC_FGIC9019_00018201

(ii) the Mortgage File or such document has been delivered directly or through a Subservicer to an attorney, or to a public trustee or other public official as required by law, for purposes of initiating or pursuing legal action or other proceedings for the foreclosure of the Mortgaged Property either judicially or non-judicially, and the Master Servicer has delivered directly or through a Subservicer to the Trustee a certificate of a Servicing Officer certifying as to the name and address of the Person to which such Mortgage File or such document was delivered and the purpose or purposes of such delivery. In the event of the liquidation of a Mortgage Loan, the Trustee shall deliver the Request for Release with respect thereto to the Master Servicer upon the Trustee's receipt of notification from the Master Servicer of the deposit of the related Liquidation Proceeds in the Custodial Account.

(c)     The Trustee or the Master Servicer on the Trustee's behalf shall execute and deliver to the Master Servicer, if necessary, any court pleadings, requests for trustee's sale or other documents necessary to the foreclosure or trustee's sale in respect of a Mortgaged Property or to any legal action brought to obtain judgment against any Mortgagor on the Mortgage Note or Mortgage or to obtain a deficiency judgment, or to enforce any other remedies or rights provided by the Mortgage Note or Mortgage or otherwise available at law or in equity. Together with such documents or pleadings (if signed by the Trustee), the Master Servicer shall deliver to the Trustee a certificate of a Servicing Officer requesting that such pleadings or documents be executed by the Trustee and certifying as to the reason such documents or pleadings are required and that the execution and delivery thereof by the Trustee will not invalidate any insurance coverage under any Required Insurance Policy or invalidate or otherwise affect the lien of the Mortgage, except for the termination of such a lien upon completion of the foreclosure or trustee's sale.

Section 3.16.     Servicing and Other Compensation; Compensating Interest.

(a)     The Master Servicer, as compensation for its activities hereunder, shall be entitled to receive on each Distribution Date the amounts provided for by clauses (iii), (iv), (v) and (vi) of Section 3.10(a), subject to clause (e) below. The amount of servicing compensation provided for in such clauses shall be accounted for on a Mortgage Loan-by-Mortgage Loan basis. In the event that Liquidation Proceeds, Insurance Proceeds and REO Proceeds (net of amounts reimbursable therefrom pursuant to Section 3.10(a)(ii)) in respect of a Cash Liquidation or REO Disposition exceed the unpaid principal balance of such Mortgage Loan plus unpaid interest accrued thereon (including REO Imputed Interest) at a per annum rate equal to the related Net Mortgage Rate (or the Modified Net Mortgage Rate in the case of a Modified Mortgage Loan) plus the Mortgage Insurance Premium Rate, if applicable, plus the applicable Certificate Insurer Premium Modified Rate, the Master Servicer shall be entitled to retain therefrom and to pay to itself and/or the related Subservicer, any Foreclosure Profits and any Servicing Fee or Subservicing Fee considered to be accrued but unpaid.

(b)     Additional servicing compensation in the form of assumption fees, late payment charges, investment income on amounts in the Custodial Account or the Certificate Account or otherwise shall be retained by the Master Servicer or the Subservicer to the extent provided herein, subject to clause (e) below. Prepayment charges shall be deposited into the Certificate Account and shall be paid on each Distribution Date to the holders of the related Class SB Certificates.

(c)     The Master Servicer shall be required to pay, or cause to be paid, all expenses incurred by it in connection with its servicing activities hereunder (including payment of premiums for the Primary Insurance Policies, if any, to the extent such premiums are not required to be paid by the related Mortgagors, and the fees and expenses of the Trustee and any Custodian) and shall not be entitled to reimbursement therefor except as specifically provided in Sections 3.10 and 3.14.

CONFIDENTIAL                                                          RC_FGIC9019_00018202

(d)      The Master Servicer's right to receive servicing compensation may not be transferred in whole or in part except in connection with the transfer of all of its responsibilities and obligations of the Master Servicer under this Agreement.

(e)      Notwithstanding clauses (a) and (b) above, the amount of servicing compensation that the Master Servicer shall be entitled to receive for its activities hereunder for the period ending on each Distribution Date shall be reduced (but not below zero) by the amount of Compensating Interest (if any) for such Distribution Date used to cover Prepayment Interest Shortfalls as provided in Section 3.16(f) below. Such reduction shall be applied during such period as follows: first, to any Servicing Fee or Subservicing Fee to which the Master Servicer is entitled pursuant to Section 3.10(a)(iii); and second, to any income or gain realized from any investment of funds held in the Custodial Account or the Certificate Account to which the Master Servicer is entitled pursuant to Sections 3.07(c) or 4.01(c), respectively.  In making such reduction, the Master Servicer shall not withdraw from the Custodial Account any such amount representing all or a portion of the Servicing Fee to which it is entitled pursuant to Section 3.10(a)(iii); and (ii) shall not withdraw from the Custodial Account or Certificate Account any such amount to which it is entitled pursuant to Section 3.07(c) or 4.01(c).

(f)      With respect to any Distribution Date, Prepayment Interest Shortfalls on the Mortgage Loans will be covered first, by the Master Servicer, but only to the extent such Prepayment Interest Shortfalls do not exceed Eligible Master Servicing Compensation.

(g)      With respect to any Distribution Date, Compensating Interest derived from a particular Loan Group shall be used on such Distribution Date to cover any Prepayment Interest Shortfalls in such Loan Group and then to cover any Prepayment Interest Shortfalls on the other Loan Group in the same manner and priority as Excess Cash Flow would cover such shortfalls pursuant to Section 4.02.

Section 3.17.    Reports to the Trustee and the Depositor.

Not later than fifteen days after each Distribution Date, the Master Servicer shall forward to the Trustee, the Certificate Insurer and the Depositor a statement, certified by a Servicing Officer, setting forth the status of the Custodial Account as of the close of business on such Distribution Date as it relates to the Mortgage Loans and showing, for the period covered by such statement, the aggregate of deposits in or withdrawals from the Custodial Account in respect of the Mortgage Loans for each category of deposit specified in Section 3.07 and each category of withdrawal specified in Section 3.10.

Section 3.18.    Annual Statement as to Compliance.

The Master Servicer will deliver to the Depositor, the Trustee and the Certificate Insurer on or before the earlier of (a) March 31 of each year, beginning with the first March 31 that occurs at least six months after the Cut-off Date or (b) with respect to any calendar year during which the Depositor's annual report on Form 10-K is required to be filed in accordance with the Exchange Act and the rules and regulations of the Commission, on or before the date on which the annual report on Form 10-K is required to be filed in accordance with the Exchange Act and the rules and regulations of the Commission, an Officers' Certificate stating, as to each signer thereof, that (i) a review of the activities of the Master Servicer during the preceding calendar year related to its servicing of mortgage loans and of its performance under the pooling and servicing agreements, including this Agreement, has been made under such officers' supervision, (ii) to the best of such officers' knowledge, based on such review, the Master Servicer has complied in all material respects with the minimum servicing standards set forth in the Uniform Single Attestation Program for Mortgage Bankers and has fulfilled all of its material obligations relating to this Agreement in all material respects throughout such year, or, if there has been material noncompliance with such servicing standards or a default in the fulfillment in all material respects of any

CONFIDENTIAL                                                                    RC_FGIC9019_00018203

such obligation relating to this Agreement, such statement shall include a description of such noncompliance or specify each such default, as the case may be, known to such officer and the nature and status thereof and (iii) to the best of such officers' knowledge, each Subservicer has complied in all material respects with the minimum servicing standards set forth in the Uniform Single Attestation Program for Mortgage Bankers and has fulfilled all of its material obligations under its Subservicing Agreement in all material respects throughout such year, or, if there has been material noncompliance with such servicing standards or a material default in the fulfillment of such obligations relating to this Agreement, such statement shall include a description of such noncompliance or specify each such default, as the case may be, known to such officer and the nature and status thereof.

Section 3.19.    Annual Independent Public Accountants' Servicing Report.

On or before the earlier of (a) March 31 of each year, beginning with the first March 31 that occurs at least six months after the Cut-off Date, or (b) with respect to any calendar year during which the Depositor's annual report on Form 10-K is required to be filed in accordance with the Exchange Act and the rules and regulations of the Commission, on or before the date on which the annual report is required to be filed in accordance with the Exchange Act and the rules and regulations of the Commission, the Master Servicer at its expense shall cause a firm of independent public accountants, which shall be members of the American Institute of Certified Public Accountants, to furnish a report to the Depositor, the Trustee and the Certificate Insurer stating its opinion that, on the basis of an examination conducted by such firm substantially in accordance with standards established by the American Institute of Certified Public Accountants, the assertions made pursuant to Section 3.18 regarding compliance with the minimum servicing standards set forth in the Uniform Single Attestation Program for Mortgage Bankers during the preceding calendar year are fairly stated in all material respects, subject to such exceptions and other qualifications that, in the opinion of such firm, such accounting standards require it to report. In rendering such statement, such firm may rely, as to matters relating to the direct servicing of mortgage loans by Subservicers, upon comparable statements for examinations conducted by independent public accountants substantially in accordance with standards established by the American Institute of Certified Public Accountants (rendered within one year of such statement) with respect to such Subservicers.

Section 3.20.    Right of the Depositor in Respect of the Master Servicer.

The Master Servicer shall afford the Depositor and the Trustee, upon reasonable notice, during normal business hours access to all records maintained by the Master Servicer in respect of its rights and obligations hereunder and access to officers of the Master Servicer responsible for such obligations. Upon request, the Master Servicer shall furnish the Depositor with its most recent financial statements and such other information as the Master Servicer possesses regarding its business, affairs, property and condition, financial or otherwise. The Master Servicer shall also cooperate with all reasonable requests for information including, but not limited to, notices, tapes and copies of files, regarding itself, the Mortgage Loans or the Certificates from any Person or Persons identified by the Depositor or Residential Funding. The Certificate Insurer hereby is so identified. The Depositor may enforce the obligation of the Master Servicer hereunder and may, but it is not obligated to, perform or cause a designee to perform, any defaulted obligation of the Master Servicer hereunder or exercise the rights of the Master Servicer hereunder; provided that the Master Servicer shall not be relieved of any of its obligations hereunder by virtue of such performance by the Depositor or its designee. Neither the Depositor nor the Trustee shall have the responsibility or liability for any action or failure to act by the Master Servicer and the Depositor is not obligated to supervise the performance of the Master Servicer under this Agreement or otherwise.

CONFIDENTIAL                                                        RC_FGIC9019_00018204

Section 3.21.    Duties of Trustee Under MI Policy.

(a)    The Trustee hereby shall accept and hold the MI Policy on behalf of the Trust and to be the named insured under the MI Policy.  The Trustee shall hold the MI Policy at its Corporate Trust Office.

(b)    On each Distribution Date, the Trustee shall pay the premium for the MI Policy out of amounts on deposit in the Certificate Account.  All claims under the MI Policy shall be made by the Master Servicer on behalf of the Trustee and any funds received by the Master Servicer with respect to the MI Policy will be deemed to have been received by the Master Servicer on behalf of the Trustee. Regardless, any funds received by the Trustee under the MI Policy shall be remitted to the Trustee within two Business Days for deposit to the Certificate Account.

(c)    In the event of a MI Policy Provider Default under the MI Policy, the MI Policy Provider may be terminated by the Trustee on behalf of the Trust only if the Trustee is so directed in writing by the Certificate Insurer and the Master Servicer.

Section 3.22.    Advance Facility.

(a)    The Master Servicer is hereby authorized to enter into a financing or other facility (any such arrangement, an "Advance Facility") under which (1) the Master Servicer sells, assigns or pledges to another Person (an "Advancing Person") the Master Servicer's rights under this Agreement to be reimbursed for any Advances or Servicing Advances and/or (2) an Advancing Person agrees to fund some or all Advances and/or Servicing Advances required to be made by the Master Servicer pursuant to this Agreement.  No consent of the Depositor, the Trustee, the Certificateholders or any other party shall be required before the Master Servicer may enter into an Advance Facility.  Notwithstanding the existence of any Advance Facility under which an Advancing Person agrees to fund Advances and/or Servicing Advances on the Master Servicer's behalf, the Master Servicer  shall remain obligated pursuant to this Agreement to make Advances and Servicing Advances pursuant to and as required by this Agreement. If the Master Servicer enters into an Advance Facility, and for so long as an Advancing Person remains entitled to receive reimbursement for any Advances including Nonrecoverable Advances ("Advance Reimbursement Amounts") and/or Servicing Advances including Nonrecoverable Advances ("Servicing Advance Reimbursement Amounts" and together with Advance Reimbursement Amounts, "Reimbursement Amounts") (in each case to the extent such type of Reimbursement Amount is included in the Advance Facility), as applicable, pursuant to this Agreement, then the Master Servicer shall identify such Reimbursement Amounts consistent with the reimbursement rights set forth in Section 3.10(a)(ii) and (vii) and remit such Reimbursement Amounts in accordance with this Section 3.22 or otherwise in accordance with the documentation establishing the Advance Facility to such Advancing Person or to a trustee, agent or custodian (an "Advance Facility Trustee") designated by such Advancing Person in an Advance Facility Notice described below in Section 3.22(b).  Notwithstanding the foregoing, if so required pursuant to the terms of the Advance Facility, the Master Servicer may direct, and if so directed in writing, the Trustee is hereby authorized to and shall pay to the Advance Facility Trustee the Reimbursement Amounts identified pursuant to the preceding sentence.  An Advancing Person whose obligations hereunder are limited to the funding of Advances and/or Servicing Advances shall not be required to meet the qualifications of a Master Servicer or a Subservicer pursuant to Section 3.02(a) or 6.02(c) hereof and shall not be deemed to be a Subservicer under this Agreement.  Notwithstanding anything to the contrary herein, in no event shall Advance Reimbursement Amounts or Servicing Advance Reimbursement Amounts be included in the Available Distribution Amount or distributed to Certificateholders.

CONFIDENTIAL                                                                            RC_FGIC9019_00018205

(b)    If the Master Servicer enters into an Advance Facility and makes the election set forth in Section 3.22(a), the Master Servicer and the related Advancing Person shall deliver to the Certificate Insurer and the Trustee a written notice and payment instruction (an "Advance Facility Notice"), providing the Trustee with written payment instructions as to where to remit Advance Reimbursement Amounts and/or Servicing Advance Reimbursement Amounts (each to the extent such type of Reimbursement Amount is included within the Advance Facility) on subsequent Distribution Dates. The payment instruction shall require the applicable Reimbursement Amounts to be distributed to the Advancing Person or to an Advance Facility Trustee designated in the Advance Facility Notice. An Advance Facility Notice may only be terminated by the joint written direction of the Master Servicer and the related Advancing Person (and any related Advance Facility Trustee. The Master Servicer shall provide the Certificate Insurer with notice of any termination of any Advance Facility pursuant to this Section 3.22(b).

(c)    Reimbursement Amounts shall consist solely of amounts in respect of Advances and/or Servicing Advances made with respect to the Mortgage Loans for which the Master Servicer would be permitted to reimburse itself in accordance with Section 3.10(a)(ii) and (vii) hereof, assuming the Master Servicer or the Advancing Person had made the related Advance(s) and/or Servicing Advance(s). Notwithstanding the foregoing, except with respect to reimbursement of Nonrecoverable Advances as set forth in Section 3.10(c) of this Agreement, no Person shall be entitled to reimbursement from funds held in the Collection Account for future distribution to Certificateholders pursuant to this Agreement. Neither the Depositor nor the Trustee shall have any duty or liability with respect to the calculation of any Reimbursement Amount, nor shall the Depositor or the Trustee have any responsibility to track or monitor the administration of the Advance Facility and the Depositor shall not have any responsibility to track, monitor or verify the payment of Reimbursement Amounts to the related Advancing Person or Advance Facility Trustee. The Master Servicer shall maintain and provide to any successor master servicer a detailed accounting on a loan-by-loan basis as to amounts advanced by, sold, pledged or assigned to, and reimbursed to any Advancing Person. The successor master servicer shall be entitled to rely on any such information provided by the Master Servicer and the successor master servicer shall not be liable for any errors in such information.

(d)    Upon the direction of and at the expense of the Master Servicer, the Trustee agrees to execute such acknowledgments, certificates, and other documents reasonably satisfactory to the Trustee provided by the Master Servicer and reasonable satisfactory to the Trustee recognizing the interests of any Advancing Person or Advance Facility Trustee in such Reimbursement Amounts as the Master Servicer may cause to be made subject to Advance Facilities pursuant to this Section 3.22, and such other documents in connection with such Advance Facility as may be reasonably requested from time to time by any Advancing Person or Advance Facility Trustee and reasonably satisfactory to the Trustee.

(e)    Reimbursement Amounts collected with respect to each Mortgage Loan shall be allocated to outstanding unreimbursed Advances or Servicing Advances (as the case may be) made with respect to that Mortgage Loan on a "first-in, first out" ("FIFO") basis, subject to the qualifications set forth below:

(i)    Any successor Master Servicer to Residential Funding (a "Successor Master Servicer") and the Advancing Person or Advance Facility Trustee shall be required to apply all amounts available in accordance with this Section 3.22(e) to the reimbursement of Advances and Servicing Advances in the manner provided for herein; provided, however, that after the succession of a Successor Master Servicer, (A) to the extent that any Advances or Servicing Advances with respect to any particular Mortgage Loan are reimbursed from payments or recoveries, if any, from the related Mortgagor, and Liquidation Proceeds or Insurance Proceeds, if any, with respect to that Mortgage Loan, reimbursement shall be made, first, to the Advancing Person or Advance Facility Trustee in respect of Advances and/or Servicing Advances related to that Mortgage Loan to the extent of the interest of the Advancing Person or

CONFIDENTIAL

Advance Facility Trustee in such Advances and/or Servicing Advances, second to the Master Servicer in respect of Advances and/or Servicing Advances related to that Mortgage Loan in excess of those in which the Advancing Person or Advance Facility Trustee Person has an interest, and third, to the Successor Master Servicer in respect of any other Advances and/or Servicing Advances related to that Mortgage Loan, from such sources as and when collected, and (B) reimbursements of Advances and Servicing Advances that are Nonrecoverable Advances shall be made pro rata to the Advancing Person or Advance Facility Trustee, on the one hand, and any such Successor Master Servicer, on the other hand, on the basis of the respective aggregate outstanding unreimbursed Advances and Servicing Advances that are Nonrecoverable Advances owed to the Advancing Person, Advance Facility Trustee or Master Servicer pursuant to this Agreement, on the one hand, and any such Successor Master Servicer, on the other hand, and without regard to the date on which any such Advances or Servicing Advances shall have been made. In the event that, as a result of the FIFO allocation made pursuant to this Section 3.22(e), some or all of a Reimbursement Amount paid to the Advancing Person or Advance Facility Trustee relates to Advances or Servicing Advances that were made by a Person other than Residential Funding or the Advancing Person or Advance Facility Trustee, then the Advancing Person or Advance Facility Trustee shall be required to remit any portion of such Reimbursement Amount to the Person entitled to such portion of such Reimbursement Amount. Without limiting the generality of the foregoing, Residential Funding shall remain entitled to be reimbursed by the Advancing Person or Advance Facility Trustee for all Advances and Servicing Advances funded by Residential Funding to the extent the related Reimbursement Amount(s) have not been assigned or pledged to an Advancing Person or Advance Facility Trustee. The documentation establishing any Advance Facility shall require Residential Funding to provide to the related Advancing Person or Advance Facility Trustee loan by loan information with respect to each Reimbursement Amount distributed to such Advancing Person or Advance Facility Trustee on each date of remittance thereof to such Advancing Person or Advance Facility Trustee, to enable the Advancing Person or Advance Facility Trustee to make the FIFO allocation of each Reimbursement Amount with respect to each Mortgage Loan.

(ii)    By way of illustration, and not by way of limiting the generality of the foregoing, if the Master Servicer resigns or is terminated at a time when the Master Servicer is a party to an Advance Facility, and is replaced by a Successor Master Servicer, and the Successor Master Servicer directly funds Advances or Servicing Advances with respect to a Mortgage Loan and does not assign or pledge the related Reimbursement Amounts to the related Advancing Person or Advance Facility Trustee, then all payments and recoveries received from the related Mortgagor or received in the form of Liquidation Proceeds with respect to such Mortgage Loan (including Insurance Proceeds collected in connection with a liquidation of such Mortgage Loan) will be allocated first to the Advancing Person or Advance Facility Trustee until the related Reimbursement Amounts attributable to such Mortgage Loan that are owed to the Master Servicer and the Advancing Person, which were made prior to any Advances or Servicing Advances made by the Successor Master Servicer, have been reimbursed in full, at which point the Successor Master Servicer shall be entitled to retain all related Reimbursement Amounts subsequently collected with respect to that Mortgage Loan pursuant to Section 3.10 of this Agreement. To the extent that the Advances or Servicing Advances are Nonrecoverable Advances to be reimbursed on an aggregate basis pursuant to Section 3.10 of this Agreement, the reimbursement paid in this manner will be made pro rata to the Advancing Person or Advance Facility Trustee, on the one hand, and the Successor Master Servicer, on the other hand, as described in clause (i)(B) above.

(f)    The Master Servicer shall remain entitled to be reimbursed for all Advances and Servicing Advances funded by the Master Servicer to the extent the related rights to be reimbursed therefor have not been sold, assigned or pledged to an Advancing Person.

(g)    Any amendment to this Section 3.22 or to any other provision of this Agreement that may be necessary or appropriate to effect the terms of an Advance Facility as described generally in this

CONFIDENTIAL

Section 3.22, including amendments to add provisions relating to a successor master servicer, may be entered into by the Trustee, Certificate Insurer, the Depositor and the Master Servicer without the consent of any Certificateholder, with written confirmation from each Rating Agency that the amendment will not result in the reduction of the ratings on any class of the Certificates below the lesser of the then current or original ratings on such Certificates and delivery of an Opinion of Counsel as required under Section 11.01(c), notwithstanding anything to the contrary in Section 11.01 of or elsewhere in this Agreement.

(h)    Any rights of set-off that the Trust Fund, the Trustee, the Depositor, any Successor Master Servicer or any other Person might otherwise have against the Master Servicer under this Agreement shall not attach to any rights to be reimbursed for Advances or Servicing Advances that have been sold, transferred, pledged, conveyed or assigned to any Advancing Person.

(i)    At any time when an Advancing Person shall have ceased funding Advances and/or Servicing Advances (as the case may be) and the Advancing Person or related Advance Facility Trustee shall have received Reimbursement Amounts sufficient in the aggregate to reimburse all Advances and/or Servicing Advances (as the case may be) the right to reimbursement for which were assigned to the Advancing Person, then upon the delivery of a written notice signed by the Advancing Person and the Master Servicer or its successor or assign) to the Trustee terminating the Advance Facility Notice (the "Notice of Facility Termination"), the Master Servicer or its Successor Master Servicer shall again be entitled to withdraw and retain the related Reimbursement Amounts from the Custodial Account pursuant to Section 3.10.

(j)    After delivery of any Advance Facility Notice, and until any such Advance Facility Notice has been terminated by a Notice of Facility Termination, this Section 3.22 may not be amended or otherwise modified without the prior written consent of the related Advancing Person.

CONFIDENTIAL                RC_FGIC9019_00018208

## ARTICLE IV

## PAYMENTS TO CERTIFICATEHOLDERS

Section 4.01.    Certificate Account.

(a)    The Master Servicer acting as agent of the Trustee shall establish and maintain a Certificate Account in which the Master Servicer shall deposit or cause to be deposited on behalf of the Trustee on or before 2:00 P.M. New York time on each Certificate Account Deposit Date by wire transfer of immediately available funds an amount equal to the sum of (i) any Advance for the immediately succeeding Distribution Date, (ii) any amount required to be deposited in the Certificate Account pursuant to Section 3.12(a), (iii) any amount required to be deposited in the Certificate Account pursuant to Section 3.16(e), 4.07 or 4.08, (iv) any amount required to be paid pursuant to Section 9.01, (v) an amount equal to the Certificate Insurer Premium payable on such Distribution Date, (vi) an amount equal to the Mortgage Insurance Premium payable on such Distribution Date and (vii) other amounts constituting the Group I Available Distribution Amount or Group II Available Distribution Amount, as applicable, for the immediately succeeding Distribution Date. In addition, as and to the extent required pursuant to Section 4.12(b), the Trustee shall withdraw from the Insurance Account any Insured Payment then on deposit in the Insurance Account and deposit such amount into the Certificate Account.

(b)    On each Distribution Date, prior to making any other distributions referred to in Section 4.02 herein, the Trustee shall withdraw from the Certificate Account and pay to the Certificate Insurer, by wire transfer of immediately available funds to the Certificate Insurer Account, the Certificate Insurer Premium for such Distribution Date. In addition, on each Distribution Date, prior to making any other distributions referred to in Section 4.02 herein, the Trustee shall withdraw from the Certificate Account and pay to the MI Policy Provider, by wire transfer of immediately available funds, the Mortgage Insurance Premium for such Distribution Date.

(c)    The Trustee shall, upon written request from the Master Servicer, invest or cause the institution maintaining the Certificate Account to invest the funds in the Certificate Account in Permitted Investments designated in the name of the Trustee for the benefit of the Certificateholders and the Certificate Insurer, which shall mature not later than the Business Day next preceding the Distribution Date next following the date of such investment (except that (i) if such Permitted Investment is an obligation of the institution that maintains such account or fund for which such institution serves as custodian, then such Permitted Investment may mature on such Distribution Date and (ii) any other investment may mature on such Distribution Date if the Trustee shall advance funds on such Distribution Date to the Certificate Account in the amount payable on such investment on such Distribution Date, pending receipt thereof to the extent necessary to make distributions on the Certificates) and shall not be sold or disposed of prior to maturity. All income and gain realized from any such investment shall be for the benefit of the Master Servicer and shall be subject to its withdrawal or order from time to time. The amount of any losses incurred in respect of any such investments shall be deposited in the Certificate Account by the Master Servicer out of its own funds immediately as realized.

Section 4.02.    Distributions.

(a)    On each Distribution Date, the Trustee (or the Paying Agent on behalf of the Trustee) shall allocate and distribute the Group I Available Distribution Amount and Group II Available Distribution Amount (in each case, to the extent on deposit in the Certificate Account) for such date to the interests issued in respect of each REMIC as specified in this Section.

CONFIDENTIAL                                                                              RC_FGIC9019_00018209

(b)    (1)    On each Distribution Date, the following amounts, in the following order of priority, shall be distributed by REMIC I to REMIC III on account of the REMIC I Regular Interests:

(i)    to the extent of the Group I Available Distribution Amount, to REMIC III as the holder of REMIC I Regular Interest LT1, REMIC I Regular Interest LT2, REMIC I Regular Interest LT3 and REMIC I Regular Interest LT4, pro rata, in an amount equal to (A) their Uncertificated Accrued Interest for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from previous Distribution Dates; and

(ii)    on each Distribution Date, to REMIC III as the holder of the REMIC I Regular Interests, in an amount equal to the remainder of the Group I Available Distribution Amount after the distributions made pursuant to clause (i) above, allocated as follows (except as provided below):

(A)    in respect of the REMIC I Regular Interest LT2, REMIC I Regular Interest LT3 and REMIC I Regular Interest LT4, their respective Principal Distribution Amounts;

(B)    in respect of the REMIC I Regular Interest LT1 any remainder until the Uncertificated Principal Balance thereof is reduced to zero;

(C)    any remainder in respect of the REMIC I Regular Interest LT2, REMIC I Regular Interest LT3 and REMIC I Regular Interest LT4, pro rata according to their respective Uncertificated Principal Balances as reduced by the distributions deemed made pursuant to (i) above, until their respective Uncertificated Principal Balances are reduced to zero; and

(D)    any remaining amounts to the Holders of the Class R-I Certificates.

(2)    On each Distribution Date, the following amounts, in the following order of priority, shall be distributed by REMIC II to REMIC III on account of the REMIC I Regular Interests:

(i)    to the extent of the Group II Available Distribution Amount, to REMIC III as the holder of REMIC II Regular Interest LT5, REMIC II Regular Interest LT6, REMIC II Regular Interest LT7 and REMIC II Regular Interest LT8, pro rata, in an amount equal to (A) their Uncertificated Accrued Interest for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from previous Distribution Dates; and

(ii)    on each Distribution Date, to REMIC III as the holder of the REMIC II Regular Interests, in an amount equal to the remainder of the Group II Available Distribution Amount after the distributions made pursuant to clause (i) above, allocated as follows (except as provided below):

(A)    in respect of the REMIC II Regular Interest LT6, REMIC II Regular Interest LT7 and REMIC II Regular Interest LT8, their respective Principal Distribution Amounts;

CONFIDENTIAL                                                                      RC_FGIC9019_00018210

(B)      in respect of the REMIC II Regular Interest LT5 any remainder until the Uncertificated Principal Balance thereof is reduced to zero;

(C)      any remainder in respect of the REMIC II Regular Interest LT6, REMIC II Regular Interest LT7 and REMIC II Regular Interest LT8, pro rata according to their respective Uncertificated Principal Balances as reduced by the distributions deemed made pursuant to (i) above, until their respective Uncertificated Principal Balances are reduced to zero; and

(D)      any remaining amounts to the Holders of the Class R-II Certificates.

(3) Notwithstanding the distributions on the REMIC Regular Interests described in this Section 4.02(b), distribution of funds from the Certificate Account shall be made only in accordance with Sections 4.02(c) and (d).

(c)      On each Distribution Date (x) the Master Servicer on behalf of the Trustee or (y) the Paying Agent appointed by the Trustee, shall distribute to each Certificateholder of record on the next preceding Record Date (other than as provided in Section 9.01 respecting the final distribution) either in immediately available funds (by wire transfer or otherwise) to the account of such Certificateholder at a bank or other entity having appropriate facilities therefor, if such Certificateholder has so notified the Master Servicer or the Paying Agent, as the case may be, or, if such Certificateholder has not so notified the Master Servicer or the Paying Agent by the Record Date, by check mailed to such Certificateholder at the address of such Holder appearing in the Certificate Register such Certificateholder's share (which share with respect to each Class of Certificates, shall be based on the aggregate of the Percentage Interests represented by Certificates of the applicable Class held by such Holder of the following amounts), in the following order of priority, in each case to the extent of the Group I Available Distribution Amount on deposit in the Certificate Account (or, with respect to clause (xviii)(B) below, to the extent of prepayment charges on deposit in the Certificate Account):

(i)      to the Class A-I Certificateholders, the related Accrued Certificate Interest payable on such Certificates with respect to such Distribution Date, plus any related Accrued Certificate Interest remaining unpaid from any prior Distribution Date, which amount shall be allocated to the Class A-I Certificateholders on a pro rata basis, based upon the amount of Accrued Certificate Interest due thereon;

(ii)      to the Class A-I Certificateholders, from the amount, if any, of the Group I Available Distribution Amount remaining after the foregoing distributions, the Group I Principal Distribution Amount (other than the amounts described in clauses (b)(iv) and (v) of the definition thereof), which amount shall be allocated in the manner and priority set forth in Section 4.02(e) below, until the aggregate Certificate Principal Balance of each Class of Class A-I Certificates has been reduced to zero;

(iii)      to the Class A-I Certificateholders, from the Group I Excess Cash Flow, an amount equal to the principal portion of Realized Losses (other than Excess Realized Losses) on the Group I Loans during the immediately preceding Due Period, which amount shall be included in the Group I Principal Distribution Amount and allocated in the manner and priority set forth in Section 4.02(e) below until the aggregate Certificate Principal Balance of each Class of Class A-I Certificates has been reduced to zero;

CONFIDENTIAL                                                    RC_FGIC9019_00018211

(iv)    to the Class A-II Certificateholders, from the amount, if any, of the Group I Excess Cash Flow remaining after the foregoing distributions, an amount equal to the principal portion of Realized Losses (other than Excess Realized Losses) on the Group II Loans during the immediately preceding Due Period, to the extent not covered by distributions of the Group II Excess Cash Flow on such Distribution Date, which amount shall be included in the Group II Principal Distribution Amount and allocated in the manner and priority set forth in Section 4.02(f) below, until the aggregate Certificate Principal Balance of each Class of Class A-II Certificates has been reduced to zero;

(v)    to the Certificate Insurer, from the amount, if any, of the Group I Excess Cash Flow remaining after the foregoing distributions, the amount of any Group I Cumulative Insurance Payments;

(vi)    to the Certificate Insurer, from the amount, if any, of the Group I Excess Cash Flow remaining after the foregoing distributions, the amount of any Group II Cumulative Insurance Payments, to the extent not covered by distributions of the Group II Excess Cash Flow on such Distribution Date;

(vii)    to the Class A-I Certificateholders, from the amount, f any, of the Group I Excess Cash Flow remaining after the foregoing distributions, the Group I Overcollateralization Increase Amount, which amount shall be included in the Group I Principal Distribution Amount and allocated in the manner and priority set forth in Section 4.02(e) below, until the aggregate Certificate Principal Balance of each Class of Class A-I Certificates has been reduced to zero;

(viii)    to the Class A-II Certificateholders, from the amount, if any, of the Group I Excess Cash Flow remaining after the foregoing distributions, the Group II Overcollateralization Increase Amount for such Distribution Date, to the extent not covered by distributions of the Group II Excess Cash Flow on such Distribution Date, which amount shall be included in the Group II Principal Distribution Amount and allocated in the manner and priority set forth in Section 4.02(f) below, until the aggregate Certificate Principal Balance of each Class of Class A-II Certificates has been reduced to zero;

(ix)    to the Class A-I Certificateholders, from the amount, if any, of the Group I Excess Cash Flow remaining after the foregoing distributions, the amount of any related Prepayment Interest Shortfalls with respect to the Group I Loans for that Distribution Date, to the extent not covered by Compensating Interest on such Distribution Date, which amount shall be allocated to the Class A-I Certificateholders on a pro rata basis, based on the amount of Prepayment Interest Shortfalls allocated thereto for such Distribution Date;

(x)    beginning on the Distribution Date in February 2005, to the Class A-II Certificateholders, from the amount, if any, of the Group I Excess Cash Flow remaining after the foregoing distributions, the amount of any related Prepayment Interest Shortfalls with respect to the Group II Loans for that Distribution Date, to the extent not covered by Compensating Interest and distributions of the Group II Excess Cash Flow on such Distribution Date, which amount shall be allocated to the Class A-II Certificateholders on a pro rata basis, based on the amount of Prepayment Interest Shortfalls allocated thereto for such Distribution Date;

(xi)    to the Class A-I Certificateholders, from the amount, if any, of the Group I Excess Cash Flow remaining after the foregoing distributions, the amount of any Prepayment Interest Shortfalls allocated thereto remaining unpaid from prior Distribution Dates together with interest thereon at the related Pass-Through Rates, which amount shall be allocated to the

CONFIDENTIAL                                                                    RC_FGIC9019_00018212

Class A-I Certificateholders on a pro rata basis, based on the amount of Prepayment Interest Shortfalls allocated thereto and remaining unpaid;

(xii)    to the Class A-II Certificateholders, from the amount, if any, of the Group I Excess Cash Flow remaining after the foregoing distributions, the amount of any Prepayment Interest Shortfalls allocated thereto remaining unpaid from prior Distribution Dates together with interest thereon at the related Pass-Through Rates, to the extent not covered by distributions of the Group II Excess Cash Flow on such Distribution Date, which amount shall be allocated to the Class A-II Certificateholders on a pro rata basis, based on the amount of Prepayment Interest Shortfalls allocated thereto and remaining unpaid;

(xiii)    to the Class A-I Certificateholders, from the amount, if any, of the Group I Excess Cash Flow remaining after the foregoing distributions, the amount of any Group I Net WAC Cap Shortfalls on such Certificates, which amount shall be allocated to the Class A-I Certificateholders on a pro rata basis, based on their respective Group I Net WAC Cap Shortfalls;

(xiv)    (xii)    to the Class A-II Certificateholders, from the amount, if any, of the Group I Excess Cash Flow remaining after the foregoing distributions, the amount of any Group II Basis Risk Shortfalls on such Certificates to the extent not covered by distributions of the Group II Excess Cash Flow or the Hedge Payment on such Distribution Date, which amount shall be allocated to the Class A-II Certificateholders on a pro rata basis, based on their respective Group II Basis Risk Shortfalls;

(xv)    to the Class A-I Certificateholders, from the amount, if any, of the Group I Excess Cash Flow remaining after the foregoing distributions, the amount of any Relief Act Shortfalls allocated to such Certificates with respect to the Group I Loans for that Distribution Date, which amount shall be allocated to the Class A-I Certificateholders on a pro rata basis, based on the amount of Relief Act Shortfalls allocated thereto for that Distribution Date;

(xvi)    to the Class A-II Certificateholders, from the amount, if any, of the Group I Excess Cash Flow remaining after the foregoing distributions, the amount of any Relief Act Shortfalls allocated to such Certificates with respect to the Group II Loans for that Distribution Date, to the extent not covered by distributions of the Group II Excess Cash Flow on such Distribution Date, which amount shall be allocated to the Class A-II Certificateholders on a pro rata basis, based on the amount of Relief Act Shortfalls allocated thereto for that Distribution Date;

(xvii)    to the Depositor, for any amounts advanced with respect to Mortgage Insurance Premium Taxes Reserve Fund Deposit, from the amount, if any, of the Group I Excess Cash Flow remaining after the foregoing distributions;

(xviii)    to the Class SB-I Certificates, (A) from the amount, if any, of the Group I Excess Cash Flow remaining after the foregoing distributions, the sum of (I) Accrued Certificate Interest thereon, (II) the amount of any Group I Overcollateralization Reduction Amount for such Distribution Date and (III) for any Distribution Date after the Certificate Principal Balance of each Class of Class A Certificates has been reduced to zero, the Group I Overcollateralization Amount, and (B) from prepayment charges on deposit in the Certificate Account, any prepayment charges received on the Group I Loans during the related Prepayment Period; and

(xix)    to the Class R-III Certificateholders, the balance, if any, of the Group I Excess Cash Flow.

CONFIDENTIAL                                                    RC_FGIC9019_00018213

(d)     On each Distribution Date (x) the Master Servicer on behalf of the Trustee or (y) the Paying Agent appointed by the Trustee, shall distribute to each Certificateholder of record on the next preceding Record Date (other than as provided in Section 9.01 respecting the final distribution) either in immediately available funds (by wire transfer or otherwise) to the account of such Certificateholder at a bank or other entity having appropriate facilities therefor, if such Certificateholder has so notified the Master Servicer or the Paying Agent, as the case may be, or, if such Certificateholder has not so notified the Master Servicer or the Paying Agent by the Record Date, by check mailed to such Certificateholder at the address of such Holder appearing in the Certificate Register such Certificateholder's share (which share with respect to each Class of Certificates, shall be based on the aggregate of the Percentage Interests represented by Certificates of the applicable Class held by such Holder of the following amounts), in the following order of priority, in each case to the extent of the Group II Available Distribution Amount on deposit in the Certificate Account (except, with respect to clause (i) below, to the extent of the Class A-II Interest Distribution Amount, with respect to clauses (ii), (xiv) and (xix) below, to the extent of the remaining Group II Available Distribution Amount plus the remaining Hedge Payment or, with respect to clause (xix)(B) below, to the extent of prepayment charges on deposit in the Certificate Account):

(i)     to the Class A-II Certificateholders, the Group II REMIC Interest Amount payable on the Class A-II Certificates with respect to such Distribution Date, plus any related amounts accrued pursuant to this clause (i) but remaining unpaid from any prior Distribution Date, which amount shall be allocated to the Class A-II Certificateholders on a pro rata basis, based upon the amount of Group II REMIC Interest Amount due thereon, being paid from and in reduction of the Group II Available Distribution Amount for such Distribution Date;

(ii)     to the Class A-II Certificateholders, the related Accrued Certificate Interest in excess of the Group II REMIC Interest Amount, which amount shall be allocated to the Class A-II Certificateholders on a pro rata basis, based upon the amount of the related Accrued Certificate Interest in excess of the Group II REMIC Interest Amount due thereon, being paid from and in reduction of the Hedge Payment for such Distribution Date;

(iii)     to the Class A-II Certificateholders, from the amount, if any, of the Group II Available Distribution Amount remaining after the foregoing distributions, the Group II Principal Distribution Amount (other than the amounts described in clauses (b)(iv) and (v) of the definition thereof), which amount shall be allocated in the manner and priority set forth in Section 4.02(f) below, until the aggregate Certificate Principal Balance of each Class of Class A-II Certificates has been reduced to zero;

(iv)     to the Class A-II Certificateholders, from the Group II Excess Cash Flow, an amount equal to the principal portion of Realized Losses (other than Excess Realized Losses) on the Group II Loans during the immediately preceding Due Period, which amount shall be included in the Group II Principal Distribution Amount and allocated in the manner and priority set forth in Section 4.02(f) below, until the aggregate Certificate Principal Balance of each Class of Class A-II Certificates has been reduced to zero;

(v)     to the Class A-I Certificateholders, from the amount, if any, of the Group II Excess Cash Flow remaining after the foregoing distributions, an amount equal to the principal portion of Realized Losses (other than Excess Realized Losses) on the Group I Loans during the immediately preceding Due Period, to the extent not covered by distributions of the Group I Excess Cash Flow on such Distribution Date, which amount shall be included in the Group I Principal Distribution Amount and allocated in the manner and priority set forth in Section 4.02(e) below, until the aggregate Certificate Principal Balance of each Class of Class A-I Certificates has been reduced to zero;

CONFIDENTIAL    RC_FGIC9019_00018214

(vi)    to the Certificate Insurer, from the amount, if any, of the Group II Excess Cash Flow remaining after the foregoing distributions, the amount of any Group II Cumulative Insurance Payments;

(vii)    to the Certificate Insurer, from the amount, if any, of the Group II Excess Cash Flow remaining after the foregoing distributions, the amount of any Group I Cumulative Insurance Payments, to the extent not covered by distributions of the Group I Excess Cash Flow on such Distribution Date;

(viii)    to the Class A-II Certificateholders, from the amount, if any, of the Group II Excess Cash Flow remaining after the foregoing distributions, the Group II Overcollateralization Increase Amount, which amount shall be included in the Group II Principal Distribution Amount and allocated in the manner and priority set forth in Section 4.02(f) below, until the aggregate Certificate Principal Balance of each Class of Class A-II Certificates has been reduced to zero;

(ix)    beginning on the Distribution Date in February 2005, to the Class A-I Certificateholders, from the amount, if any, of the Group I Excess Cash Flow remaining after the foregoing distributions, the Group I Overcollateralization Increase Amount for such Distribution Date, to the extent not covered by distributions of the Group I Excess Cash Flow on such Distribution Date, which amount shall be included in the Group I Principal Distribution Amount and allocated in the manner and priority set forth in Section 4.02(e) below, until the aggregate Certificate Principal Balance of each Class of Class A-I Certificates has been reduced to zero;

(x)    to the Class A-II Certificateholders, from the amount, if any, of the Group II Excess Cash Flow remaining after the foregoing distributions, the amount of any related Prepayment Interest Shortfalls with respect to the Group II Loans for that Distribution Date, to the extent not covered by Compensating Interest on such Distribution Date, which amount shall be allocated to the Class A-II Certificateholders on a pro rata basis, based on the amount of Prepayment Interest Shortfalls allocated thereto for such Distribution Date;

(xi)    to the Class A-I Certificateholders, from the amount, if any, of the Group II Excess Cash Flow remaining after the foregoing distributions, the amount of any related Prepayment Interest Shortfalls with respect to the Group I Loans for that Distribution Date, to the extent not covered by Compensating Interest and distributions of the Group I Excess Cash Flow on such Distribution Date, which amount shall be allocated to the Class A-I Certificateholders on a pro rata basis, based on the amount of Prepayment Interest Shortfalls allocated thereto for such Distribution Date;

(xii)    to the Class A-II Certificateholders, from the amount, if any, of the Group II Excess Cash Flow remaining after the foregoing distributions, the amount of any Prepayment Interest Shortfalls allocated thereto remaining unpaid from prior Distribution Dates together with interest thereon at the related Pass-Through Rates, which amount shall be allocated to the Class A-II Certificateholders on a pro rata basis, based on the amount of Prepayment Interest Shortfalls allocated thereto and remaining unpaid;

(xiii)    to the Class A-I Certificateholders, from the amount, if any, of the Group II Excess Cash Flow remaining after the foregoing distributions, the amount of any Prepayment Interest Shortfalls allocated thereto remaining unpaid from prior Distribution Dates together with interest thereon at the related Pass-Through Rates, to the extent not covered by distributions of the Group I Excess Cash Flow on such Distribution Date, which amount shall be allocated to the

CONFIDENTIAL                                                    RC_FGIC9019_00018215

Class A-I Certificateholders on a pro rata basis, based on the amount of Prepayment Interest Shortfalls allocated thereto and remaining unpaid;

(xiv)    to the Class A-II Certificateholders, from the amount, if any, of the Group II Excess Cash Flow remaining after the foregoing distributions, the amount of any Group II Basis Risk Shortfalls on such Certificates, which amount shall be allocated to the Class A-II Certificateholders on a pro rata basis, based on their respective Group II Basis Risk Shortfalls, in each case being paid from and in reduction of first, the Hedge Payment for such Distribution Date and second, the Group II Available Distribution Amount for such Distribution Date;

(xv)    to the Class A-I Certificateholders, from the amount, if any, of the Group II Excess Cash Flow remaining after the foregoing distributions, the amount of any Group I Net WAC Cap Shortfalls on such Certificates, to the extent not covered by distributions of the Group I Excess Cash Flow on such Distribution Date, which amount shall be allocated to the Class A-I Certificateholders on a pro rata basis, based on their respective Group I Net WAC Cap Shortfalls;

(xvi)    to the Class A-II Certificateholders, from the amount, if any, of the Group II Excess Cash Flow remaining after the foregoing distributions, the amount of any Relief Act Shortfalls allocated to such Certificates with respect to the Group II Loans for that Distribution Date, which amount shall be allocated to the Class A-II Certificateholders on a pro rata basis, based on the amount of Relief Act Shortfalls allocated thereto for that Distribution Date;

(xvii)    to the Class A-I Certificateholders, from the amount, if any, of the Group II Excess Cash Flow remaining after the foregoing distributions, the amount of any Relief Act Shortfalls allocated to such Certificates with respect to the Group I Loans for that Distribution Date, to the extent not covered by distributions of the Group I Excess Cash Flow on such Distribution Date, which amount shall be allocated to the Class A-I Certificateholders on a pro rata basis, based on the amount of Relief Act Shortfalls allocated thereto for that Distribution Date;

(xviii)    to the Depositor, for any amounts advanced with respect to Mortgage Insurance Premium Taxes Reserve Fund Deposit, from the amount, if any, of Group II Excess Cash Flow remaining after the foregoing distributions;

(xix)    to the Class SB-II Certificates, (A) from the amount, if any, of the Group II Excess Cash Flow remaining after the foregoing distributions, the sum of (I) Accrued Certificate Interest thereon, (II) the amount of any Group II Overcollateralization Reduction Amount for such Distribution Date, (III) the amount of any Hedge Shortfall Amount for such Distribution Date, (IV) the amount of any Hedge Shortfall Carry-Forward Amount for such Distribution Date and (V) for any Distribution Date after the Certificate Principal Balance of each Class of Class A Certificates has been reduced to zero, the Group II Overcollateralization Amount, (B) from prepayment charges on deposit in the Certificate Account, any prepayment charges received on the Group II Loans during the related Prepayment Period and (C) from the Hedge Payment, if any, the amount of such Hedge Payment remaining after the foregoing distributions; and

(xx)    to the Class R-III Certificateholders, the balance, if any, of the Group II Excess Cash Flow.

CONFIDENTIAL                                                    RC_FGIC9019_00018216

(e)     The Group I Principal Distribution Amount payable to the Class A-I Certificateholders shall be distributed as follows:

(i)     *first*, to the to the Class A-I-6 Certificates, an amount equal to the Class A-I-6 Lockout Distribution Amount for that Distribution Date, until the Certificate Principal Balance of the Class A-I-6 Certificates has been reduced to zero; and

(ii)     *second*, to the Class A-I-1, Class A-I-2, Class A-I-3, Class A-I-4, Class A-I-5 and Class A-I-6 Certificates, in that order, in each case until the Certificate Principal Balance thereof has been reduced to zero.

(f)     The Group II Principal Distribution Amount payable to the Class A-II Certificateholders shall be distributed as follows:

(i)     *first*, concurrently, (1) the Class A-II-A Principal Distribution Amount shall be distributed to the Class A-II-A Certificates, until the Certificate Principal Balance thereof has been reduced to zero and (2) the Class A-II-B Principal Distribution Amount shall be distributed sequentially, to the Class A-II-B1 Certificates, Class A-II-B2 Certificates and Class A-II-B3 Certificates, in that order, in each case until the Certificate Principal Balance thereof has been reduced to zero; and

(ii)     *second*, any remaining Class A-II-B Principal Distribution Amount shall be distributed to the Class A-II-A Certificates, until the Certificate Principal Balance thereof has been reduced to zero, or any remaining Class A-II-A Principal Distribution Amount shall be distributed sequentially, to the Class A-II-B1 Certificates, Class A-II-B2 Certificates and Class A-II-B3 Certificates, in that order, in each case until the Certificate Principal Balance thereof has been reduced to zero.

(g)     Notwithstanding the foregoing clauses (c), (d), (e) and (f), upon the reduction of the Certificate Principal Balance of a Class of Class A Certificates to zero, such Class of Certificates will not be entitled to further distributions pursuant to Section 4.02.

(h)     Each distribution with respect to a Book-Entry Certificate shall be paid to the Depository, as Holder thereof, and the Depository shall be responsible for crediting the amount of such distribution to the accounts of its Depository Participants in accordance with its normal procedures. Each Depository Participant shall be responsible for disbursing such distribution to the Certificate Owners that it represents and to each indirect participating brokerage firm (a "brokerage firm" or "indirect participating firm") for which it acts as agent. Each brokerage firm shall be responsible for disbursing funds to the Certificate Owners that it represents. None of the Trustee, the Certificate Registrar, the Certificate Insurer, the Depositor or the Master Servicer shall have any responsibility therefor except as otherwise provided by this Agreement or applicable law.

(i)     Except as otherwise provided in Section 9.01, if the Master Servicer anticipates that a final distribution with respect to any Class of Certificates will be made on the next Distribution Date, the Master Servicer shall, no later than the Determination Date in the month of such final distribution, notify the Trustee and the Trustee shall, no later than two (2) Business Days after such Determination Date, mail on such date to each Holder of such Class of Certificates a notice to the effect that: (i) the Trustee anticipates that the final distribution with respect to such Class of Certificates will be made on such Distribution Date but only upon presentation and surrender of such Certificates at the office of the Trustee or as otherwise specified therein, and (ii) no interest shall accrue on such Certificates from and after the end of the prior calendar month. In the event that Certificateholders required to surrender their

CONFIDENTIAL                                                        RC_FGIC9019_00018217

Certificates pursuant to Section 9.01(c) do not surrender their Certificates for final cancellation, the Trustee shall cause funds distributable with respect to such Certificates to be withdrawn from the Certificate Account and credited to a separate escrow account for the benefit of such Certificateholders as provided in Section 9.01(d).

Section 4.03.    Statements to Certificateholders; Statements to Rating Agencies; Exchange Act Reporting.

(a)    Concurrently with each distribution charged to the Certificate Account and with respect to each Distribution Date the Master Servicer shall forward to the Trustee and the Trustee shall forward by mail or otherwise make available electronically on its website (which may be obtained by any Certificateholder by telephoning the Trustee at (877) 722-1095 to each Holder, the Certificate Insurer and the Depositor a statement setting forth the following information as to each Class of Certificates, in each case to the extent applicable:

(i)    (A)    the amount of such distribution to the Certificateholders of such Class applied to reduce the Certificate Principal Balance thereof, and (B) the aggregate amount included therein representing Principal Prepayments;

(ii)    the amount of such distribution to Holders of such Class of Certificates allocable to interest;

(iii)    if the distribution to the Holders of such Class of Certificates is less than the full amount that would be distributable to such Holders if there were sufficient funds available therefor, the amount of the shortfall;

(iv)    the amount of any Advance by the Master Servicer with respect to the Group I Loans and Group II Loans pursuant to Section 4.04;

(v)    the number and aggregate Stated Principal Balance of the Group I Loans, the Group II Loans and the Mortgage Loans in the aggregate after giving effect to the distribution of principal on such Distribution Date;

(vi)    the aggregate Certificate Principal Balance of each Class of the Certificates, after giving effect to the amounts distributed on such Distribution Date, separately identifying any reduction thereof due to Realized Losses other than pursuant to an actual distribution of principal;

(vii)    on the basis of the most recent reports furnished to it by Subservicers, (A) the number and aggregate principal balances of Group I Loans and Group II Loans that are Delinquent (1) 30-59 days, (2) 60-89 days and (3) 90 or more days and the number and aggregate principal balance of Group I Loans and Group II Loans that are in foreclosure, (B) the number and aggregate principal balances of the Group I Loans, Group II Loans and the Mortgage Loans in the aggregate that are Reportable Modified Mortgage Loans that are in foreclosure and are REO Property, indicating in each case capitalized Mortgage Loans, other Servicing Modifications and totals, and (C) for all Reportable Modified Mortgage Loans, the number and aggregate principal balances of the Group I Loans, Group II Loans and the Mortgage Loans in the aggregate that have been liquidated, the subject of pay-offs and that have been repurchased by the Master Servicer or Seller;

(viii)    the number, aggregate principal balance and book value of any REO Properties with respect to the Group I Loans and Group II Loans;

CONFIDENTIAL                                                                    RC_FGIC9019_00018218

(ix)    the aggregate Accrued Certificate Interest remaining unpaid, if any, for each Class of Certificates, after giving effect to the distribution made on such Distribution Date;

(x)    the aggregate amount of Realized Losses with respect to the Group I Loans and Group II Loans for such Distribution Date and the aggregate amount of Realized Losses with respect to the Group I Loans and Group II Loans incurred since the Cut-off Date;

(xi)    with respect to the related Due Period, (A) the number of Mortgage Loans for which a payment was made by the MI Policy Provider under the MI Policy since the Closing Date and the aggregate amount of any such payments, (B) the number of Mortgage Loans for which a claim has been presented to the MI Policy Provider under the MI Policy since the Closing Date and the aggregate amount of any such outstanding claims, and (C) the number of Mortgage Loans for which a claim was presented to the MI Policy Provider under the MI Policy since the Closing Date which claim was denied by the MI Policy Provider and the aggregate amount of any such denied claims;

(xii)    the aggregate amount of any Insured Payment paid on such Distribution Date and the portion paid to each Class A Certificate, the amount of any reimbursement payment made to the Certificate Insurer on such Distribution Date pursuant to Section 4.02(c)(v) and (vi) and (d)(vi) and (vii) from each Loan Group and the amount of Group I Cumulative Insurance Payments and Group II Cumulative Insurance Payments after giving effect to any such Insured Payment or any such reimbursement payment to the Certificate Insurer;

(xiii)    the Pass-Through Rate on each Class of Certificates, the Group I Net WAC Cap Rate and Group II Net WAC Cap Rate and the Group II Weighted Average Maximum Net Mortgage Rate;

(xiv)    the Group II Basis Risk Shortfalls, the Group I Net WAC Cap Shortfalls, the Group I Prepayment Interest Shortfalls and the Group II Prepayment Interest Shortfalls;

(xv)    the Group I Overcollateralization Amount, the Group II Overcollateralization Amount, the Group I Required Overcollateralization Amount and the Group II Required Overcollateralization Amount following such Distribution Date;

(xvi)    the number and aggregate principal balance of the Group I Loans and Group II Loans repurchased under Section 4.07 or 4.08;

(xvii)    the aggregate amount of any recoveries with respect to the Group I Loans and Group II Loans on previously foreclosed loans from Residential Funding due to a breach of representation or warranty;

(xviii)    the weighted average remaining term to maturity of the Group I Loans or Group II Loans after giving effect to the amounts distributed on such Distribution Date;

(xix)    the weighted average Mortgage Rates of the Group I Loans or Group II Loans after giving effect to the amounts distributed on such Distribution Date;

(xx)    the amount, if any, required to be paid under the Hedge Agreement for such Distribution Date and any shortfall in amounts previously required to be paid under the Hedge Agreement for prior Distribution Dates;

CONFIDENTIAL                                                                    RC_FGIC9019_00018219

(xxi)    the current Rolling Three-Month Delinquency Ratio;

(xxii)    the occurrence of the Group I Stepdown Date;

(xxiii)    the amount, if any, required to be paid under any Derivative Contract entered into pursuant to Section 4.11 hereof; and

(xxiv)    the aggregate amount of Realized Losses since the Cut-off Date for the Group I Loans and the Group II Loans.

In the case of information furnished pursuant to clauses (i) and (ii) above, the amounts shall be expressed as a dollar amount per Certificate with a $1,000 denomination.  In addition to the statement provided to the Trustee as set forth in this Section 4.03(a), the Master Servicer shall provide to any manager of a trust fund consisting of some or all of the Certificates, upon reasonable request, such additional information as is reasonably obtainable by the Master Servicer at no additional expense to the Master Servicer.  Also, at the request of a Rating Agency, the Master Servicer shall provide the information relating to the Reportable Modified Mortgage Loans substantially in the form attached hereto as Exhibit U to such Rating Agency within a reasonable period of time; *provided*, *however*, that the Master Servicer shall not be required to provide such information more than four times in a calendar year to any Rating Agency.

(b)    Within a reasonable period of time after the end of each calendar year, the Master Servicer shall prepare, or cause to be prepared, and the Trustee shall forward, or cause to be forwarded, upon the Trustee's receipt thereof, to each Person who at any time during the calendar year was the Holder of a Certificate, other than a Class R Certificate, a statement containing the information set forth in clauses (i) and (ii) of subsection (a) above aggregated for such calendar year or applicable portion thereof during which such Person was a Certificateholder.  Such obligation of the Master Servicer and Trustee shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Master Servicer and Trustee pursuant to any requirements of the Code.

(c)    Within a reasonable period of time after the end of each calendar year, the Master Servicer shall prepare, or cause to be prepared, and the Trustee shall forward, or cause to be forwarded, to each Person who at any time during the calendar year was the Holder of a Class R Certificate, a statement containing the applicable distribution information provided pursuant to this Section 4.03 aggregated for such calendar year or applicable portion thereof during which such Person was the Holder of a Class R Certificate.  Such obligation of the Master Servicer shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Master Servicer and forwarded by the Trustee pursuant to any requirements of the Code.

(d)    As soon as reasonably practicable, upon the written request of any Class SB Certificate or Class R Certificateholder, the Master Servicer shall provide the requesting Certificateholder with such information as is necessary and appropriate, in the Master Servicer's sole discretion, for purposes of satisfying applicable reporting requirements under Rule 144A.

(e)    The Master Servicer shall, on behalf of the Depositor and in respect of the Trust Fund, sign and cause to be filed with the Commission any periodic reports required to be filed under the provisions of the Exchange Act, and the rules and regulations of the Commission thereunder.  In connection with the preparation and filing of such periodic reports, the Trustee shall timely provide to the Master Servicer (I) a list of Certificateholders as shown on the Certificate Register as of the end of each calendar year, (II) copies of all pleadings, other legal process and any other documents relating to any claims, charges or complaints involving the Trustee, as trustee hereunder, or the Trust Fund that are

CONFIDENTIAL                                                       RC_FGIC9019_00018220

received by the Trustee, (III) notice of all matters that, to the actual knowledge of a Responsible Officer of the Trustee, have been submitted to a vote of the Certificateholders, other than those matters that have been submitted to a vote of the Certificateholders at the request of the Depositor or the Master Servicer, and (IV) notice of any failure of the Trustee to make any distribution to the Certificateholders as required pursuant to this Agreement. Neither the Master Servicer nor the Trustee shall have any liability with respect to the Master Servicer's failure to properly prepare or file such periodic reports resulting from or relating to the Master Servicer's inability or failure to obtain any information not resulting from the Master Servicer's own negligence or willful misconduct. Any Form 10-K filed with the Commission in connection with this clause (e) shall include a certification, signed by the senior officer in charge of the servicing functions of the Master Servicer, in the form attached as Exhibit T-1 hereto or such other form as may be required or permitted by the Commission (the "Form 10-K Certification"), in compliance with Rule 13a-14 and 15d-14 under the Exchange Act and any additional directives of the Commission. This Section 4.03(e) may be amended in accordance with this Agreement without the consent of the Certificateholders. In connection with the Form 10-K Certification, the Trustee shall provide the Master Servicer with a back-up certification substantially in the form attached hereto as Exhibit T-2.

Section 4.04.    Distribution of Reports to the Trustee and the Depositor; Advances by the Master Servicer.

(a)    Prior to the close of business on the Business Day next succeeding each Determination Date, the Master Servicer shall furnish a written statement (which may be in a mutually agreeable electronic format) to the Trustee, the Certificate Insurer, any Paying Agent and the Depositor (the information in such statement to be made available to Certificateholders by the Master Servicer on request) (provided that the Master Servicer will use its best efforts to deliver such written statement not later than 12:00 p.m. New York time on the second Business Day prior to the Distribution Date) setting forth (i) the Group I Available Distribution Amount and Group II Available Distribution Amount, (ii) the amounts required to be withdrawn from the Custodial Account and deposited into the Certificate Account on the immediately succeeding Certificate Account Deposit Date pursuant to clause (iii) of Section 4.01(a), (iii) the Mortgage Insurance Premium for such Distribution Date, (iv) the amounts required to be withdrawn from the Mortgage Insurance Premium Taxes Reserve Fund pursuant to Section 4.09, (v) the amount of Prepayment Interest Shortfalls, Group I Net WAC Cap Shortfalls and Group II Basis Risk Shortfalls, (vi) the Hedge Payment, if any, for such Distribution Date, (vii) the Certificate Insurer Premium and, if the Master Servicer determines that an Insured Payment exists for such Distribution Date, the amount necessary to complete the notice in the form of Exhibit A to the related Certificate Guaranty Insurance Policy (the "Notice"), and (viii) the amount, if any, payable to the Trustee by a Derivative Counterparty. The determination by the Master Servicer of such amounts shall, in the absence of obvious error, be presumptively deemed to be correct for all purposes hereunder and the Trustee shall be protected in relying upon the same without any independent check or verification.

(b)    On or before 2:00 P.M. New York time on each Certificate Account Deposit Date, the Master Servicer shall either (i) remit to the Trustee for deposit in the Certificate Account from its own funds, or funds received therefor from the Subservicers, an amount equal to the Advances to be made by the Master Servicer in respect of the related Distribution Date, which shall be in an aggregate amount equal to the sum of (A) the aggregate amount of Monthly Payments other than Balloon Payments (with each interest portion thereof adjusted to a per annum rate equal to the Net Mortgage Rate plus the applicable Mortgage Insurance Premium Rate, if any, plus the applicable Certificate Insurer Premium Modified Rate), less the amount of any related Servicing Modifications, Debt Service Reductions or Relief Act Shortfalls, on the Outstanding Mortgage Loans as of the related Due Date in the related Due Period, which Monthly Payments were due during the related Due Period and not received as of the close of business as of the related Determination Date; provided that no Advance shall be made if it would be a Nonrecoverable Advance and (B) with respect to each Balloon Loan delinquent in respect of its Balloon

CONFIDENTIAL                                                          RC_FGIC9019_00018221

Payment as of the close of business on the related Determination Date, an amount equal to the assumed Monthly Payment (with each interest portion thereof adjusted to a per annum rate equal to the Net Mortgage Rate plus the applicable Mortgage Insurance Premium Rate, if any, plus the applicable Certificate Insurer Premium Modified Rate) that would have been due on the related Due Date based on the original amortization schedule for such Balloon Loan until such Balloon Loan is finally liquidated, over any payments of interest or principal (with each interest portion thereof adjusted to a per annum rate equal to the Net Mortgage Rate plus the applicable Mortgage Insurance Premium Rate, if any, plus the applicable Certificate Insurer Premium Modified Rate) received from the related Mortgagor as of the close of business on the related Determination Date and allocable to the Due Date during the related Due Period for each month until such Balloon Loan is finally liquidated, (ii) withdraw from amounts on deposit in the Custodial Account and remit to the Trustee for deposit in the Certificate Account all or a portion of the Amount Held for Future Distribution in discharge of any such Advance, or (iii) make advances in the form of any combination of clauses (i) and (ii) aggregating the amount of such Advance. Any portion of the Amount Held for Future Distribution so used shall be replaced by the Master Servicer by deposit in the Certificate Account on or before 11:00 A.M. New York time on any future Certificate Account Deposit Date to the extent that funds attributable to the Mortgage Loans that are available in the Custodial Account for deposit in the Certificate Account on such Certificate Account Deposit Date shall be less than payments to Certificateholders required to be made on the following Distribution Date. The Master Servicer shall be entitled to use any Advance made by a Subservicer as described in Section 3.07(b) that has been deposited in the Custodial Account on or before such Distribution Date as part of the Advance made by the Master Servicer pursuant to this Section 4.04. The determination by the Master Servicer that it has made a Nonrecoverable Advance or that any proposed Advance, if made, would constitute a Nonrecoverable Advance, shall be evidenced by a certificate of a Servicing Officer delivered to the Depositor, the Certificate Insurer and the Trustee. In the event that the Master Servicer determines as of the Business Day preceding any Certificate Account Deposit Date that it will be unable to deposit in the Certificate Account an amount equal to the Advance required to be made for the immediately succeeding Distribution Date, it shall give notice to the Trustee and the Certificate Insurer of its inability to advance (such notice may be given by telecopy), not later than 3:00 P.M., New York time, on such Business Day, specifying the portion of such amount that it will be unable to deposit. Not later than 3:00 P.M., New York time, on the Certificate Account Deposit Date the Trustee shall, unless by 12:00 Noon, New York time, on such day the Trustee shall have been notified in writing (by telecopy) that the Master Servicer shall have directly or indirectly deposited in the Certificate Account such portion of the amount of the Advance as to which the Master Servicer shall have given notice pursuant to the preceding sentence, pursuant to Section 7.01, (a) terminate all of the rights and obligations of the Master Servicer under this Agreement in accordance with Section 7.01 and (b) assume the rights and obligations of the Master Servicer hereunder, including the obligation to deposit in the Certificate Account an amount equal to the Advance for the immediately succeeding Distribution Date. The Trustee shall deposit all funds it receives pursuant to this Section 4.04(b) into the Certificate Account.

Section 4.05.    Allocation of Realized Losses.

(a)    Prior to each Distribution Date, the Master Servicer shall determine the total amount of Realized Losses, if any, that resulted from any Cash Liquidation, Servicing Modifications, Debt Service Reduction, Deficient Valuation or REO Disposition that occurred during the related Prepayment Period or, in the case of a Servicing Modification that constitutes a reduction of the interest rate on a Mortgage Loan, the amount of the reduction in the interest portion of the Monthly Payment due in the month in which such Distribution Date occurs. The amount of each Realized Loss shall be evidenced by an Officers' Certificate.

CONFIDENTIAL                                                                    RC_FGIC9019_00018222

(1)    (A)    All Realized Losses on the Group I Loans (other than Excess Realized Losses) shall be allocated as follows:

> *first*, to Excess Cash Flow in the amounts and priority as provided in Section 4.02;

> *second*, in reduction of the Group I Overcollateralization Amount, until such amount has been reduced to zero; and

> *third*, on any Distribution Date on which, and to the extent that, the aggregate Certificate Principal Balance of the Class A Certificates exceeds the aggregate Stated Principal Balance of the Mortgage Loans after application of all payments to be made on such Distribution Date pursuant to Section 4.02, to the Class A-I Certificates on a pro rata basis, based on their then outstanding Certificate Principal Balances prior to giving effect to distributions to be made on such Distribution Date, until the aggregate Certificate Principal Balance of each such Class has been reduced to zero; *provided*, that any allocation of a Realized Loss (other than Excess Realized Losses) to a Class A-I Certificate will be covered by the related Certificate Guaranty Insurance Policy, in accordance with its terms and any such Insured Payment shall be distributed to the Class A-I Certificates in accordance with the priorities set forth in Section 4.02(e) and any allocation of Realized Losses shall be deemed to be reallocated in accordance with the distribution of the Insured Payment.

(B)    Any Excess Realized Losses on the Group I Loans will be covered by the Group I Policy, in accordance with its terms and any such Insured Payment shall be distributed to the Class A-I Certificates in accordance with the priorities set forth in Section 4.02(e) as though such amounts were included in the Group I Principal Distribution Amount and any allocation of Excess Realized Losses shall be deemed to be reallocated in accordance with the distribution of the Insured Payment; *provided*, that if a Certificate Insurer Default exists, Excess Realized Losses on the Group I Loans will be allocated to the Class A-I Certificates on a pro rata basis, based on their then outstanding Certificate Principal Balances prior to giving effect to distributions to be made on such Distribution Date, in an amount equal to the product of (a) the Excess Realized Losses on the Group I Loans and (b) the fraction, expressed as a percentage, the numerator of which is (x) the Certificate Principal Balance of the Class A-I Certificates, and the denominator of which is (y) the aggregate Stated Principal Balance of the Group I Loans, and the remainder of such losses shall be allocated to the Group I Overcollateralization Amount in reduction of the amount thereof.

(2)    (A)    All Realized Losses on the Group II Loans (other than Excess Realized Losses) shall be allocated as follows:

> *first*, to Excess Cash Flow in the amounts and priority as provided in Section 4.02;

> *second*, in reduction of the Group II Overcollateralization Amount, until such amount has been reduced to zero; and

CONFIDENTIAL                                         RC_FGIC9019_00018223

*third*, on any Distribution Date on which, and to the extent that, the aggregate Certificate Principal Balance of the Class A Certificates exceeds the aggregate Stated Principal Balance of the Mortgage Loans after application of all payments to be made on such Distribution Date pursuant to Section 4.02, to the Class A-II-A Certificates, Realized Losses on the Group II-A Loans (other than Excess Realized Losses) and to the Class A-II-B Certificates on a pro rata basis, Realized Losses on the Group II-B Loans (other than Excess Realized Losses), in each case until the aggregate Certificate Principal Balance of each such Class has been reduced to zero; *provided*, that any allocation of a Realized Loss (other than Excess Realized Losses) to a Class A-II Certificate will be covered by the related Certificate Guaranty Insurance Policy, in accordance with its terms and any such Insured Payment shall be distributed to the Class A-II Certificates in accordance with the priorities set forth in Section 4.02(f) and any allocation of Realized Losses shall be deemed to be reallocated in accordance with the distribution of the Insured Payment.

(B)    Any Excess Realized Losses on the Group II Loans will be covered by the Group II Policy, in accordance with its terms and any such Insured Payment shall be distributed to the Class A-II Certificates in accordance with the priorities set forth in Section 4.02(f) as though such amounts were included in the Group II Principal Distribution Amount allocable to the Group II-A Loans or Group II-B Loans, as applicable, and any allocation of Excess Realized Losses shall be deemed to be reallocated in accordance with the distribution of the Insured Payment; *provided*, that if a Certificate Insurer Default exists, Excess Realized Losses on the Group II-A Loans will be allocated to the Class A-II-A Certificates, in an amount equal to the product of (a) the Excess Realized Losses on the Group II-A Loans and (b) the fraction, expressed as a percentage, the numerator of which is (x) the Certificate Principal Balance of such Class, and the denominator of which is (y) the aggregate Stated Principal Balance of the Group II-A Loans, and the remainder of such losses shall be allocated to the Group II Overcollateralization Amount in reduction of the amount thereof and Excess Realized Losses on the Group II-B Loans will be allocated to the Class A-II-B Certificates on a pro rata basis, in an amount equal to the product of (a) the Excess Realized Losses on the Group II-B Loans and (b) the fraction, expressed as a percentage, the numerator of which is (x) the Certificate Principal Balance of such Class, and the denominator of which is (y) the aggregate Stated Principal Balance of the Group II-B Loans, and the remainder of such losses shall be allocated to the Group II Overcollateralization Amount in reduction of the amount thereof.

(b)    Any allocation of the principal portion of Realized Losses (other than Debt Service Reductions) to the Class A Certificates shall be made by reducing the Certificate Principal Balance thereof by the amount so allocated, which allocation shall be deemed to have occurred on such Distribution Date; *provided*, that no such reduction shall reduce the aggregate Certificate Principal Balance of the Certificates below the aggregate Stated Principal Balance of the Mortgage Loans. Allocations of the interest portions of Realized Losses (other than any interest rate reduction resulting from a Servicing Modification) shall be made by operation of the definition of "Accrued Certificate Interest" for each Class for such Distribution Date. Allocations of the interest portion of a Realized Loss resulting from an interest rate reduction in connection with a Servicing Modification shall be made by operation of the priority of payment provisions of Section 4.02(c) and (d). Allocations of the principal

CONFIDENTIAL                                                          RC_FGIC9019_00018224

portion of Debt Service Reductions shall be made by operation of the priority of payment provisions of Section 4.02(c) and (d). All Realized Losses and all other losses allocated to a Class of Certificates hereunder will be allocated among the Certificates of such Class in proportion to the Percentage Interests evidenced thereby.

(c)    All Realized Losses on the Group I Loans shall be allocated on each Distribution Date to the REMIC I Regular Interests and REMIC III Regular Interests as provided in the definitions of REMIC I Realized Losses and REMIC III Realized Losses.

(d)    All Realized Losses on the Group II Loans shall be allocated on each Distribution Date to the REMIC II Regular Interests and REMIC III Regular Interests as provided in the definitions of REMIC II Realized Losses and REMIC III Realized Losses.

(e)    Realized Losses allocated to the Group I Excess Cash Flow, Group II Excess Cash Flow, Group I Overcollateralization Amount or the Group II Overcollateralization Amount pursuant to paragraphs (a) or (b) of this section, the definition of Accrued Certificate Interest and the operation of Section 4.02(c) and (d) shall be deemed allocated to the Class SB Certificates. Realized Losses allocated to the Class SB Certificates shall, to the extent such Realized Losses represent Realized Losses on an interest portion, be allocated to the REMIC III Regular Interest SB-IO. Realized Losses allocated to the Excess Cash Flow pursuant to paragraph (a) shall be deemed to reduce Accrued Certificate Interest on the REMIC III Regular Interest SB-IO. Realized Losses allocated to the Overcollateralization Amount pursuant to paragraph (a) shall be deemed first to reduce the principal balance of the REMIC III Regular Interest SB-PO until such principal balance shall have been reduced to zero and thereafter to reduce accrued and unpaid interest on the REMIC III Regular Interest SB-IO.

Section 4.06.    Reports of Foreclosures and Abandonment of Mortgaged Property.

The Master Servicer or the Subservicers shall file information returns with respect to the receipt of mortgage interest received in a trade or business, the reports of foreclosures and abandonments of any Mortgaged Property and the informational returns relating to cancellation of indebtedness income with respect to any Mortgaged Property required by Sections 6050H, 6050J and 6050P of the Code, respectively, and deliver to the Trustee an Officers' Certificate on or before March 31 of each year, commencing in 2005, stating that such reports have been filed. Such reports shall be in form and substance sufficient to meet the reporting requirements imposed by such Sections 6050H, 6050J and 6050P of the Code.

Section 4.07.    Optional Purchase of Defaulted Mortgage Loans.

(a)    With respect to any Mortgage Loan which is delinquent in payment by 90 days or more, the Master Servicer may, at its option, purchase such Mortgage Loan from the Trustee at the Purchase Price therefor; provided, that such Mortgage Loan is 90 days or more delinquent at the time of repurchase.

(b)    If at any time the Master Servicer makes a payment to the Certificate Account covering the amount of the Purchase Price for such a Mortgage Loan as provided in clause (a) above, and the Master Servicer provides to the Trustee a certification signed by a Servicing Officer stating that the amount of such payment has been deposited in the Certificate Account, then the Trustee shall execute the assignment of such Mortgage Loan at the request of the Master Servicer without recourse to the Master Servicer which shall succeed to all the Trustee's right, title and interest in and to such Mortgage Loan, and all security and documents relative thereto. Such assignment shall be an assignment outright and not

CONFIDENTIAL

for security. The Master Servicer will thereupon own such Mortgage, and all such security and documents, free of any further obligation to the Trustee or the Certificateholders with respect thereto.

Section 4.08.    Limited Mortgage Loan Repurchase Right.

The Limited Repurchase Right Holder will have the option at any time to purchase any of the Mortgage Loans from the Trustee at the Purchase Price, up to a maximum of five Mortgage Loans. In the event that this option is exercised as to any five Mortgage Loans in the aggregate, this option will thereupon terminate. If at any time the Limited Repurchase Right Holder makes a payment to the Certificate Account covering the amount of the Purchase Price for such a Mortgage Loan, and the Limited Repurchase Right Holder provides to the Trustee a certification signed by a Servicing Officer stating that the amount of such payment has been deposited in the Certificate Account, then the Trustee shall execute the assignment of such Mortgage Loan at the request of the Limited Repurchase Right Holder without recourse to the Limited Repurchase Right Holder which shall succeed to all the Trustee's right, title and interest in and to such Mortgage Loan, and all security and documents relative thereto. Such assignment shall be an assignment outright and not for security. The Limited Repurchase Right Holder will thereupon own such Mortgage, and all such security and documents, free of any further obligation to the Trustee or the Certificateholders with respect thereto. Any tax on "prohibited transactions" (as defined in Section 860F(a)(2) of the Code) imposed on any REMIC resulting from the exercise of the optional repurchase in this Section 4.08 shall in no event be payable by the Trustee or the Certificate Insurer.

Section 4.09.    Mortgage Insurance Premium Taxes Reserve Fund.

(a)    On the Closing Date, the Trustee shall establish and maintain in its name, in trust for the benefit of Residential Funding, the Mortgage Insurance Premium Taxes Reserve Fund. In addition, on the Closing Date, the Trustee shall deposit into the Mortgage Insurance Premium Taxes Reserve Fund the Mortgage Insurance Premium Taxes Reserve Fund Deposit to the extent received by the Trustee from the Depositor. No later than two business days prior to each Distribution Date, the Master Servicer shall notify the Trustee and, consistent with directions the Master Servicer provides the Trustee for the Distribution Date, to the extent required, the Trustee shall make withdrawals from the Mortgage Insurance Premium Taxes Reserve Fund and use the amounts in the Mortgage Insurance Premium Taxes Reserve Fund solely to pay to the MI Policy Provider any taxes then due and owing on such Distribution Date in connection with any Premium paid under the MI Policy related to Mortgage Loans in the States of Kentucky or West Virginia. Upon receipt of notice by the Trustee from the Master Servicer of a notification that the MI Policy no longer covers any Mortgage Loans in the State of Kentucky or West Virginia, the Trustee shall withdraw from the Mortgage Insurance Premium Taxes Reserve Fund all remaining amounts on deposit, if any, and distribute them to the holder of the Mortgage Insurance Premium Reserve Fund Residual Right.

(b)    The Mortgage Insurance Premium Taxes Reserve Fund shall be an Eligible Account. Amounts held in the Mortgage Insurance Premium Taxes Reserve Fund from time to time shall continue to constitute assets of the Trust Fund, but not of the REMICs, until released from the Mortgage Insurance Premium Taxes Reserve Fund pursuant to this Section 4.09. The Mortgage Insurance Premium Taxes Reserve Fund constitutes an "outside reserve fund" within the meaning of Treasury Regulation §1.860G-2(h) and is not an asset of the REMICs. Residential Funding shall be the owner of the Mortgage Insurance Premium Taxes Reserve Fund, including the income from investment thereof. The Trustee shall keep records that accurately reflect the amounts on deposit in the Mortgage Insurance Premium Taxes Reserve Fund. The Trustee shall, at the direction of the Master Servicer, invest amounts on deposit in the Mortgage Insurance Premium Taxes Reserve Fund in Permitted Investments. In the absence of written direction to the Trustee from the Master Servicer, all funds in the Mortgage Insurance Premium Taxes Reserve Fund shall remain uninvested.

CONFIDENTIAL                                                    RC_FGIC9019_00018226

(c)    The owner of the Mortgage Insurance Premium Taxes Reserve Fund shall be Residential Funding. Residential Funding, as the owner of the Mortgage Insurance Premium Taxes Reserve Fund, also shall own the  Mortgage Insurance Premium Taxes Reserve Fund Residual Right.

Section 4.10.    Hedge Agreement.

(a)    In the event that the Trustee does not receive by the Business Day preceding a Distribution Date the amount as specified by the Master Servicer pursuant to Section 4.04(a)(vi) hereof as the amount to be paid with respect to such Distribution Date by the Hedge Agreement Provider under the Hedge Agreement, the Trustee shall enforce the obligation of the Hedge Agreement Provider thereunder. The parties hereto acknowledge that the Hedge Agreement Provider shall be making all calculations, and determine the amounts to be paid, under the Hedge Agreement.  Absent manifest error, the Trustee may conclusively rely on such calculations and determination and any notice received by it from the Master Servicer pursuant to Section 4.04(a)(vi) hereof.

(b)    The Trustee shall deposit or cause to be deposited any amount received under the Hedge Agreement into the Certificate Account on the date such amount is received from the Hedge Agreement Provider under the Hedge Agreement (including termination payments, if any). All payments received under the Hedge Agreement shall be distributed in accordance with the priorities set forth in Section 4.02(d) hereof.

(c)    In the event that the Hedge Agreement, or any replacement thereof, terminates prior to the March 2006 payment date required thereunder, the Master Servicer, but at no expense to the Master Servicer, on behalf of the Trustee, to the extent that the termination value under such Hedge Agreement is sufficient therefor and only to the extent of the termination payment received from the Hedge Agreement Provider, shall (i) cause a new hedge counterparty to assume the obligations of such terminated hedge counterparty or (ii) cause a new hedge counterparty to enter into a new interest rate hedge agreement with the Trust Fund having substantially similar terms as those set forth in the terminated hedge agreement.

Section 4.11.    Derivative Contracts.

(a)    The Trustee shall, at the direction of the Master Servicer, on behalf of the Trust Fund, enter into Derivative Contracts, solely for the benefit of the Class SB Certificates.  Any such Derivative Contract shall constitute a fully prepaid agreement.  The Master Servicer shall determine, in its sole discretion, whether any Derivative Contract conforms to the requirements of Section 4.11(b) and (c).  Any acquisition of a Derivative Contract shall be accompanied by an appropriate amendment to this Agreement, including an Opinion of Counsel, as provided in Section 11.01, and either (i) an Opinion of Counsel to the effect that the existence of the Derivative Contract will not adversely affect the availability of the exemptive relief afforded under ERISA by U.S. Department of Labor Prohibited Transaction Exemption ("PTE") 94-29, as most recently amended, 67 Fed. Reg. 54487 (Aug. 22, 2002), to the Holders of the Class A Certificates, as of the date the Derivative Contract is acquired by the Trustee; or (ii) the consent of each holder of a Class A Certificate to the acquisition of such Derivative Contract.  All collections, proceeds and other amounts in respect of the Derivative Contracts payable by the Derivative Counterparty shall be distributed to the Class SB Certificates on the Distribution Date following receipt thereof by the Trustee.  In no event shall such an instrument constitute a part of any REMIC created hereunder.  In addition, in the event any such instrument is deposited, the Trust Fund shall be deemed to be divided into two separate and discrete sub-trusts.  The assets of one such sub-trust shall consist of all the assets of the Trust Fund other than such instrument and the assets of the other sub-trust shall consist solely of such instrument.

CONFIDENTIAL                                                            RC_FGIC9019_00018227

(b)    Any Derivative Contract that provides for any payment obligation on the part of the Trust Fund must (i) be without recourse to the assets of the Trust Fund, (ii) contain a non-petition covenant provision from the Derivative Counterparty, (iii) limit payment dates thereunder to Distribution Dates and (iv) contain a provision limiting any cash payments due to the Derivative Counterparty on any day under such Derivative Contract solely to funds available therefor in the Certificate Account to make payments to the Holders of the Class SB Certificates on such Distribution Date.

(c)    Each Derivative Contract must (i) provide for the direct payment of any amounts by the Derivative Counterparty thereunder to the Certificate Account at least one Business Day prior to the related Distribution Date, (ii) contain an assignment of all of the Trust Fund's rights (but none of its obligations) under such Derivative Contract to the Trustee on behalf the Class SB Certificates and shall include an express consent to the Derivative Counterparty to such assignment, (iii) provide that in the event of the occurrence of an Event of Default, such Derivative Contract shall terminate upon the direction of a majority Percentage Interest of the Class SB Certificates, and (iv) prohibit the Derivative Counterparty from "setting-off" or "netting" other obligations of the Trust Fund and its Affiliates against such Derivative Counterparty's payment obligations thereunder.

Section 4.12.    The Certificate Guaranty Insurance Policies.

(a)    If pursuant to Section 4.04(a)(vii), the Master Servicer determines and notifies a Responsible Officer of the Trustee in writing that an Insured Payment exists and the amount of such Insured Payment for any Distribution Date, the Trustee shall complete the Notice and submit such Notice in accordance with the related Certificate Guaranty Insurance Policy to the Certificate Insurer no later than 12:00 P.M., New York City time, on the second Business Day immediately preceding each Distribution Date, as a claim for an Insured Payment in an amount equal to such Insured Payment.

(b)    The Trustee shall establish and maintain the Insurance Account on behalf of the Holders of the Class A Certificates. Upon receipt of an Insured Payment from the Certificate Insurer on behalf of the Class A Certificates, the Trustee shall deposit such Insured Payment in the Insurance Account. All amounts on deposit in the Insurance Account shall remain uninvested with no liability for interest or other compensation thereon. On each Distribution Date, the Trustee shall transfer any Insured Payment then on deposit in the Insurance Account to the Certificate Account and distribute such Insured Payment pursuant to Section 4.02.

(c)    The Trustee shall (i) receive as attorney-in-fact of each Class A Certificateholder any Insured Payment from the Certificate Insurer and (ii) distribute such Insured Payment to the Class A Certificates as set forth in subsection (b) above. Insured Payments disbursed by the Trustee from proceeds of the related Certificate Guaranty Insurance Policy shall not be considered payment by the Trust Fund with respect to the Class A Certificates, nor shall such disbursement of such Insured Payments discharge the obligations of the Trust Fund with respect to the amounts thereof, and the Certificate Insurer shall become owner of such amounts to the extent covered by such Insured Payments as the deemed assignee of such Class A Certificateholders. The Trustee hereby agrees on behalf of each Class A Certificateholder (and each Class A Certificateholder, by its acceptance of its Class A Certificates, as applicable, hereby agrees) for the benefit of the Certificate Insurer that the Trustee shall recognize that to the extent the Certificate Insurer pays Insured Payments, either directly or indirectly (as by paying through the Trustee), to the Class A Certificates, the Certificate Insurer will be entitled to be subrogated to the rights of the Class A Certificateholders to the extent of such payments.

CONFIDENTIAL                                                    RC_FGIC9019_00018228

**ARTICLE V**

**THE CERTIFICATES**

Section 5.01.    The Certificates.

(a)    The Class A Certificates, Class SB Certificates and Class R Certificates shall be substantially in the forms set forth in Exhibits A, B, C and D, respectively, and shall, on original issue, be executed and delivered by the Trustee to the Certificate Registrar for authentication and delivery to or upon the order of the Depositor upon receipt by the Trustee or one or more Custodians of the documents specified in Section 2.01. The Class A Certificates shall be issuable in minimum dollar denominations of $25,000 and integral multiples of $1 in excess thereof. The Class SB Certificates shall be issuable in registered, certificated form in minimum percentage interests of 5.00% and integral multiples of 0.01% in excess thereof. Each Class of Class R Certificates shall be issued in registered, certificated form in minimum percentage interests of 20.00% and integral multiples of 0.01% in excess thereof; *provided, however*, that one Class R Certificate of each Class will be issuable to the REMIC Administrator as "tax matters person" pursuant to Section 10.01(c) in a minimum denomination representing a Percentage Interest of not less than 0.01%. The Certificates shall be executed by manual or facsimile signature on behalf of an authorized officer of the Trustee. Certificates bearing the manual or facsimile signatures of individuals who were at any time the proper officers of the Trustee shall bind the Trustee, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Certificate or did not hold such offices at the date of such Certificates. No Certificate shall be entitled to any benefit under this Agreement, or be valid for any purpose, unless there appears on such Certificate a certificate of authentication substantially in the form provided for herein executed by the Certificate Registrar by manual signature, and such certificate upon any Certificate shall be conclusive evidence, and the only evidence, that such Certificate has been duly authenticated and delivered hereunder. All Certificates shall be dated the date of their authentication.

(b)    The Class A Certificates shall initially be issued as one or more Certificates registered in the name of the Depository or its nominee and, except as provided below, registration of such Certificates may not be transferred by the Trustee except to another Depository that agrees to hold such Certificates for the respective Certificate Owners with Ownership Interests therein. The Certificate Owners shall hold their respective Ownership Interests in and to each Class A Certificate through the book-entry facilities of the Depository and, except as provided below, shall not be entitled to Definitive Certificates in respect of such Ownership Interests. All transfers by Certificate Owners of their respective Ownership Interests in the Book-Entry Certificates shall be made in accordance with the procedures established by the Depository Participant or brokerage firm representing such Certificate Owner. Each Depository Participant shall transfer the Ownership Interests only in the Book-Entry Certificates of Certificate Owners it represents or of brokerage firms for which it acts as agent in accordance with the Depository's normal procedures.

The Trustee, the Master Servicer and the Depositor may for all purposes (including the making of payments due on the respective Classes of Book-Entry Certificates) deal with the Depository as the authorized representative of the Certificate Owners with respect to the respective Classes of Book-Entry Certificates for the purposes of exercising the rights of Certificateholders hereunder. The rights of Certificate Owners with respect to the respective Classes of Book-Entry Certificates shall be limited to those established by law and agreements between such Certificate Owners and the Depository Participants and brokerage firms representing such Certificate Owners. Multiple requests and directions from, and votes of, the Depository as Holder of any Class of Book-Entry Certificates with respect to any particular matter shall not be deemed inconsistent if they are made with respect to different Certificate Owners. The Trustee may establish a reasonable record date in connection with solicitations of consents

CONFIDENTIAL                                                                           RC_FGIC9019_00018229

from or voting by Certificateholders and shall give notice to the Depository of such record date. If (i)(A) the Depositor advises the Trustee in writing that the Depository is no longer willing or able to properly discharge its responsibilities as Depository and (B) the Depositor is unable to locate a qualified successor or (ii) the Depositor at its option advises the Trustee in writing that it elects to terminate the book-entry system through the Depository, the Trustee shall notify all Certificate Owners, through the Depository, of the occurrence of any such event and of the availability of Definitive Certificates to Certificate Owners requesting the same. Upon surrender to the Trustee of the Book-Entry Certificates by the Depository, accompanied by registration instructions from the Depository for registration of transfer, the Trustee shall issue the Definitive Certificates.

In addition, if an Event of Default has occurred and is continuing, each Certificate Owner materially adversely affected thereby may at its option request a Definitive Certificate evidencing such Certificate Owner's Percentage Interest in the related Class of Certificates. In order to make such request, such Certificate Owner shall, subject to the rules and procedures of the Depository, provide the Depository or the related Depository Participant with directions for the Certificate Registrar to exchange or cause the exchange of the Certificate Owner's interest in such Class of Certificates for an equivalent Percentage Interest in fully registered definitive form. Upon receipt by the Certificate Registrar of instructions from the Depository directing the Certificate Registrar to effect such exchange (such instructions to contain information regarding the Class of Certificates and the Certificate Principal Balance being exchanged, the Depository Participant account to be debited with the decrease, the registered holder of and delivery instructions for the Definitive Certificate, and any other information reasonably required by the Certificate Registrar), (i) the Certificate Registrar shall instruct the Depository to reduce the related Depository Participant's account by the aggregate Certificate Principal Balance of the Definitive Certificate, (ii) the Trustee shall execute and the Certificate Registrar shall authenticate and deliver, in accordance with the registration and delivery instructions provided by the Depository, a Definitive Certificate evidencing such Certificate Owner's Percentage Interest in such Class of Certificates and (iii) the Trustee shall execute and the Certificate Registrar shall authenticate a new Book-Entry Certificate reflecting the reduction in the aggregate Certificate Principal Balance of such Class of Certificates by the amount of the Definitive Certificates.

Neither the Depositor, the Master Servicer nor the Trustee shall be liable for any actions taken by the Depository or its nominee, including, without limitation, any delay in delivery of any instructions required under this section and may conclusively rely on, and shall be protected in relying on, such instructions. Upon the issuance of Definitive Certificates, the Trustee and the Master Servicer shall recognize the Holders of the Definitive Certificates as Certificateholders hereunder.

(c)    Each of the Certificates is intended to be a "security" governed by Article 8 of the Uniform Commercial Code as in effect in the State of New York and any other applicable jurisdiction, to the extent that any of such laws may be applicable.

Section 5.02.    Registration of Transfer and Exchange of Certificates.

(a)    The Trustee shall cause to be kept at one of the offices or agencies to be appointed by the Trustee in accordance with the provisions of Section 8.12 a Certificate Register in which, subject to such reasonable regulations as it may prescribe, the Trustee shall provide for the registration of Certificates and of transfers and exchanges of Certificates as herein provided. The Trustee is initially appointed Certificate Registrar for the purpose of registering Certificates and transfers and exchanges of Certificates as herein provided. The Certificate Registrar, or the Trustee, shall provide the Master Servicer with a certified list of Certificateholders as of each Record Date prior to the related Determination Date.

CONFIDENTIAL                                                    RC_FGIC9019_00018230

(b)        Upon surrender for registration of transfer of any Certificate at any office or agency of the Trustee maintained for such purpose pursuant to Section 8.12 and, in the case of any Class SB Certificate or Class R Certificate, upon satisfaction of the conditions set forth below, the Trustee shall execute and the Certificate Registrar shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Certificates of a like Class and aggregate Percentage Interest.

(c)        At the option of the Certificateholders, Certificates may be exchanged for other Certificates of authorized denominations of a like Class and aggregate Percentage Interest, upon surrender of the Certificates to be exchanged at any such office or agency.  Whenever any Certificates are so surrendered for exchange the Trustee shall execute and the Certificate Registrar shall authenticate and deliver the Certificates of such Class which the Certificateholder making the exchange is entitled to receive.  Every Certificate presented or surrendered for transfer or exchange shall (if so required by the Trustee or the Certificate Registrar) be duly endorsed by, or be accompanied by a written instrument of transfer in form satisfactory to the Trustee and the Certificate Registrar duly executed by, the Holder thereof or his attorney duly authorized in writing.

(d)        No transfer, sale, pledge or other disposition of a Class SB Certificate or Class R Certificate shall be made unless such transfer, sale, pledge or other disposition is exempt from the registration requirements of the Securities Act of 1933, as amended (the "1933 Act"), and any applicable state securities laws or is made in accordance with said Act and laws.  Except as otherwise provided in this Section 5.02(d), in the event that a transfer of a Class SB Certificate or Class R Certificate is to be made, (i) unless the Depositor directs the Trustee otherwise, the Trustee shall require a written Opinion of Counsel acceptable to and in form and substance satisfactory to the Trustee and the Depositor that such transfer may be made pursuant to an exemption, describing the applicable exemption and the basis therefor, from said Act and laws or is being made pursuant to said Act and laws, which Opinion of Counsel shall not be an expense of the Trustee, the Trust Fund, the Depositor or the Master Servicer, and (ii) the Trustee shall require the transferee to execute a representation letter, substantially in the form of Exhibit I hereto, and the Trustee shall require the transferor to execute a representation letter, substantially in the form of Exhibit J hereto, each acceptable to and in form and substance satisfactory to the Depositor and the Trustee certifying to the Depositor and the Trustee the facts surrounding such transfer, which representation letters shall not be an expense of the Trustee, the Trust Fund, the Depositor or the Master Servicer.  In lieu of the requirements set forth in the preceding sentence, transfers of Class SB Certificates or Class R Certificates may be made in accordance with this Section 5.02(d) if the prospective transferee of such a Certificate provides the Trustee and the Master Servicer with an investment letter substantially in the form of Exhibit N attached hereto, which investment letter shall not be an expense of the Trustee, the Depositor, or the Master Servicer, and which investment letter states that, among other things, such transferee (i) is a "qualified institutional buyer" as defined under Rule 144A, acting for its own account or the accounts of other "qualified institutional buyers" as defined under Rule 144A, and (ii) is aware that the proposed transferor intends to rely on the exemption from registration requirements under the 1933 Act provided by Rule 144A.  The Holder of a Class SB Certificate or Class R Certificate desiring to effect any transfer, sale, pledge or other disposition shall, and does hereby agree to, indemnify the Trustee, the Depositor, the Certificate Insurer, the Master Servicer and the Certificate Registrar against any liability that may result if the transfer, sale, pledge or other disposition is not so exempt or is not made in accordance with such federal and state laws and this Agreement.

(e)        In the case of any Class SB Certificate or Class R Certificate presented for registration in the name of any Person, either (i) the Trustee shall require an Opinion of Counsel acceptable to and in form and substance satisfactory to the Trustee, the Depositor, the Certificate Insurer and the Master Servicer to the effect that the purchase or holding of such Class SB Certificate or Class R Certificate is permissible under applicable law, will not constitute or result in any non-exempt prohibited transaction

CONFIDENTIAL                                                    RC_FGIC9019_00018231

under Section 406 of ERISA or Section 4975 of the Code (or comparable provisions of any subsequent enactments), and will not subject the Trustee, the Depositor, the Master Servicer, the Certificate Insurer or the Trust Fund to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in this Agreement, which Opinion of Counsel shall not be an expense of the Trustee, the Depositor, the Master Servicer, the Certificate Insurer or the Trust Fund, or (ii) the prospective transferee shall be required to provide the Trustee, the Depositor, the Certificate Insurer and the Master Servicer with a certification to the effect set forth in Exhibit P (with respect to a Class SB Certificate) or in paragraph fifteen of Exhibit H-1 (with respect to a Class R Certificate), which the Trustee may rely upon without further inquiry or investigation, or such other certifications as the Trustee may deem desirable or necessary in order to establish that such transferee or the Person in whose name such registration is requested is not an employee benefit plan or other plan or arrangement subject to the prohibited transaction provisions of ERISA or Section 4975 of the Code, or any Person (including an insurance company investing its general accounts, an investment manager, a named fiduciary or a trustee of any such plan) who is using "plan assets" of any such plan to effect such acquisition.

(f)    (i)    Each Person who has or who acquires any Ownership Interest in a Class R Certificate shall be deemed by the acceptance or acquisition of such Ownership Interest to have agreed to be bound by the following provisions and to have irrevocably authorized the Trustee or its designee under clause (iii)(A) below to deliver payments to a Person other than such Person and to negotiate the terms of any mandatory sale under clause (iii)(B) below and to execute all instruments of transfer and to do all other things necessary in connection with any such sale. The rights of each Person acquiring any Ownership Interest in a Class R Certificate are expressly subject to the following provisions:

(A)    Each Person holding or acquiring any Ownership Interest in a Class R Certificate shall be a Permitted Transferee and shall promptly notify the Trustee of any change or impending change in its status as a Permitted Transferee.

(B)    In connection with any proposed Transfer of any Ownership Interest in a Class R Certificate, the Trustee shall require delivery to it, and shall not register the Transfer of any Class R Certificate until its receipt of,

(I)    an affidavit and agreement (a "Transfer Affidavit and Agreement," in the form attached hereto as Exhibit H-1) from the proposed Transferee, in form and substance satisfactory to the Master Servicer, representing and warranting, among other things, that it is a Permitted Transferee, that it is not acquiring its Ownership Interest in the Class R Certificate that is the subject of the proposed Transfer as a nominee, trustee or agent for any Person who is not a Permitted Transferee, that for so long as it retains its Ownership Interest in a Class R Certificate, it will endeavor to remain a Permitted Transferee, and that it has reviewed the provisions of this Section 5.02(f) and agrees to be bound by them, and

(II)    a certificate, in the form attached hereto as Exhibit H-2, from the Holder wishing to transfer the Class R Certificate, in form and substance satisfactory to the Master Servicer, representing and warranting, among other things, that no purpose of the proposed Transfer is to impede the assessment or collection of tax.

(C)    Notwithstanding the delivery of a Transfer Affidavit and Agreement by a proposed Transferee under clause (B) above, if a Responsible Officer of the

CONFIDENTIAL                                                                          RC_FGIC9019_00018232

Trustee who is assigned to this Agreement has actual knowledge that the proposed Transferee is not a Permitted Transferee, no Transfer of an Ownership Interest in a Class R Certificate to such proposed Transferee shall be effected.

(D)    Each Person holding or acquiring any Ownership Interest in a Class R Certificate shall agree (x) to require a Transfer Affidavit and Agreement from any other Person to whom such Person attempts to transfer its Ownership Interest in a Class R Certificate and (y) not to transfer its Ownership Interest unless it provides a certificate to the Trustee in the form attached hereto as Exhibit H-2.

(E)    Each Person holding or acquiring an Ownership Interest in a Class R Certificate, by purchasing an Ownership Interest in such Certificate, agrees to give the Trustee written notice that it is a "pass-through interest holder" within the meaning of Temporary Treasury Regulations Section 1.67-3T(a)(2)(i)(A) immediately upon acquiring an Ownership Interest in a Class R Certificate, if it is, or is holding an Ownership Interest in a Class R Certificate on behalf of, a "pass-through interest holder."

(ii)    The Trustee will register the Transfer of any Class R Certificate only if it shall have received the Transfer Affidavit and Agreement, a certificate of the Holder requesting such transfer in the form attached hereto as Exhibit H-2 and all of such other documents as shall have been reasonably required by the Trustee as a condition to such registration. Transfers of the Class R Certificates to Non-United States Persons and Disqualified Organizations (as defined in Section 860E(e)(5) of the Code) are prohibited.

(A)    If any Disqualified Organization shall become a holder of a Class R Certificate, then the last preceding Permitted Transferee shall be restored, to the extent permitted by law, to all rights and obligations as Holder thereof retroactive to the date of registration of such Transfer of such Class R Certificate. If a Non-United States Person shall become a holder of a Class R Certificate, then the last preceding United States Person shall be restored, to the extent permitted by law, to all rights and obligations as Holder thereof retroactive to the date of registration of such Transfer of such Class R Certificate. If a transfer of a Class R Certificate is disregarded pursuant to the provisions of Treasury Regulations Section 1.860E-1 or Section 1.860G-3, then the last preceding Permitted Transferee shall be restored, to the extent permitted by law, to all rights and obligations as Holder thereof retroactive to the date of registration of such Transfer of such Class R Certificate. The Trustee shall be under no liability to any Person for any registration of Transfer of a Class R Certificate that is in fact not permitted by this Section 5.02(f) or for making any payments due on such Certificate to the holder thereof or for taking any other action with respect to such holder under the provisions of this Agreement.

(B)    If any purported Transferee shall become a Holder of a Class R Certificate in violation of the restrictions in this Section 5.02(f) and to the extent that the retroactive restoration of the rights of the Holder of such Class R Certificate as described in clause (iii)(A) above shall be invalid, illegal or unenforceable, then the Master Servicer shall have the right, without notice to the holder or any prior holder of such Class R Certificate, to sell such Class R Certificate to a purchaser selected by the Master Servicer on such terms as the Master Servicer may choose. Such purported Transferee shall promptly endorse and deliver each Class R Certificate in accordance with the instructions of the Master Servicer. Such purchaser may be the

CONFIDENTIAL                                                    RC_FGIC9019_00018233

Master Servicer itself or any Affiliate of the Master Servicer. The proceeds of such sale, net of the commissions (which may include commissions payable to the Master Servicer or its Affiliates), expenses and taxes due, if any, will be remitted by the Master Servicer to such purported Transferee. The terms and conditions of any sale under this clause (iii)(B) shall be determined in the sole discretion of the Master Servicer, and the Master Servicer shall not be liable to any Person having an Ownership Interest in a Class R Certificate as a result of its exercise of such discretion.

(iii)    The Master Servicer, on behalf of the Trustee, shall make available, upon written request from the Trustee, all information necessary to compute any tax imposed

(A)    as a result of the Transfer of an Ownership Interest in a Class R Certificate to any Person who is a Disqualified Organization, including the information regarding "excess inclusions" of such Class R Certificates required to be provided to the Internal Revenue Service and certain Persons as described in Treasury Regulations Sections 1.860D-1(b)(5) and 1.860E-2(a)(5), and

(B)    as a result of any regulated investment company, real estate investment trust, common trust fund, partnership, trust, estate or organization described in Section 1381 of the Code that holds an Ownership Interest in a Class R Certificate having as among its record holders at any time any Person who is a Disqualified Organization. Reasonable compensation for providing such information may be required by the Master Servicer from such Person.

(iv)    The provisions of this Section 5.02(f) set forth prior to this clause (v) may be modified, added to or eliminated, *provided* that there shall have been delivered to the Trustee the following:

(A)    Written consent of the Certificate Insurer and notification from each Rating Agency to the effect that the modification, addition to or elimination of such provisions will not cause such Rating Agency to downgrade its then-current ratings, if any, of the Class A Certificates below the lower of the then-current rating or the rating assigned to such Certificates as of the Closing Date by such Rating Agency; and

(B)    a certificate of the Master Servicer stating that the Master Servicer has received an Opinion of Counsel, in form and substance satisfactory to the Master Servicer, to the effect that such modification, addition to or absence of such provisions will not cause any REMIC created hereunder to cease to qualify as a REMIC and will not cause (x) any REMIC created hereunder to be subject to an entity-level tax caused by the Transfer of any Class R Certificate to a Person that is a Disqualified Organization or (y) a Certificateholder or another Person to be subject to a REMIC-related tax caused by the Transfer of a Class R Certificate to a Person that is not a Permitted Transferee.

(g)    No service charge shall be made for any transfer or exchange of Certificates of any Class, but the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Certificates.

CONFIDENTIAL                                                                    RC_FGIC9019_00018234

(h)     All Certificates surrendered for transfer and exchange shall be destroyed by the Certificate Registrar.

Section 5.03.    Mutilated, Destroyed, Lost or Stolen Certificates.

If (i) any mutilated Certificate is surrendered to the Certificate Registrar, or the Trustee and the Certificate Registrar receive evidence to their satisfaction of the destruction, loss or theft of any Certificate, and (ii) there is delivered to the Trustee and the Certificate Registrar such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the Trustee or the Certificate Registrar that such Certificate has been acquired by a bona fide purchaser, the Trustee shall execute and the Certificate Registrar shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a new Certificate of like tenor, Class and Percentage Interest but bearing a number not contemporaneously outstanding.  Upon the issuance of any new Certificate under this Section, the Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee and the Certificate Registrar) connected therewith.  Any duplicate Certificate issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the Trust Fund, as if originally issued, whether or not the lost, stolen or destroyed Certificate shall be found at any time.

Section 5.04.    Persons Deemed Owners.

Prior to due presentation of a Certificate for registration of transfer, the Depositor, the Master Servicer, the Certificate Insurer, the Trustee, the Certificate Registrar and any agent of the Depositor, the Master Servicer, the Certificate Insurer, the Trustee or the Certificate Registrar may treat the Person in whose name any Certificate is registered as the owner of such Certificate for the purpose of receiving distributions pursuant to Section 4.02 and for all other purposes whatsoever, except as and to the extent provided in the definition of "Certificateholder" and in Section 4.09, and neither the Depositor, the Master Servicer, the Certificate Insurer, the Trustee, the Certificate Registrar nor any agent of the Depositor, the Master Servicer, the Trustee or the Certificate Registrar shall be affected by notice to the contrary except as provided in Section 5.02(f).

Section 5.05.    Appointment of Paying Agent.

The Trustee may, with the consent of the Certificate Insurer (so long as no Certificate Insurer Default exists), which consent shall not be unreasonably withheld, appoint a Paying Agent for the purpose of making distributions to Certificateholders pursuant to Section 4.02.  In the event of any such appointment, on or prior to each Distribution Date the Master Servicer on behalf of the Trustee shall deposit or cause to be deposited with the Paying Agent a sum sufficient to make the payments to Certificateholders in the amounts and in the manner provided for in Section 4.02, such sum to be held in trust for the benefit of Certificateholders.  The Trustee shall cause each Paying Agent to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee that such Paying Agent will hold all sums held by it for the payment to Certificateholders in trust for the benefit of the Certificateholders entitled thereto until such sums shall be paid to such Certificateholders.  Any sums so held by such Paying Agent shall be held only in Eligible Accounts to the extent such sums are not distributed to the Certificateholders on the date of receipt by such Paying Agent.

CONFIDENTIAL                                                                  RC_FGIC9019_00018235

## ARTICLE VI

## THE DEPOSITOR AND THE MASTER SERVICER

Section 6.01.    Respective Liabilities of the Depositor and the Master Servicer.

The Depositor and the Master Servicer shall each be liable in accordance herewith only to the extent of the obligations specifically and respectively imposed upon and undertaken by the Depositor and the Master Servicer herein.  By way of illustration and not limitation, the Depositor is not liable for the servicing and administration of the Mortgage Loans, nor is it obligated by Section 7.01 or Section 10.01 to assume any obligations of the Master Servicer or to appoint a designee to assume such obligations, nor is it liable for any other obligation hereunder that it may, but is not obligated to, assume unless it elects to assume such obligation in accordance herewith.

Section 6.02.    Merger or Consolidation of the Depositor or the Master Servicer; Assignment of Rights and Delegation of Duties by Master Servicer.

(a)    The Depositor and the Master Servicer will each keep in full effect its existence, rights and franchises as a corporation under the laws of the state of its incorporation, and will each obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement, the Certificates or any of the Mortgage Loans and to perform its respective duties under this Agreement.

(b)    Any Person into which the Depositor or the Master Servicer may be merged or consolidated, or any corporation resulting from any merger or consolidation to which the Depositor or the Master Servicer shall be a party, or any Person succeeding to the business of the Depositor or the Master Servicer, shall be the successor of the Depositor or the Master Servicer, as the case may be, hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding; *provided, however*, that the successor or surviving Person to the Master Servicer shall be qualified to service mortgage loans on behalf of Fannie Mae or Freddie Mac; and *provided further* that each Rating Agency's ratings, if any, of the Class A Certificates in effect immediately prior to such merger or consolidation (without taking into account the related Certificate Guaranty Insurance Policy) will not be qualified, reduced or withdrawn as a result thereof (as evidenced by a letter to such effect from each Rating Agency).

(c)    Notwithstanding anything else in this Section 6.02 and Section 6.04 to the contrary, the Master Servicer may assign its rights and delegate its duties and obligations under this Agreement; *provided* that the Person accepting such assignment or delegation shall be a Person which is qualified to service mortgage loans on behalf of Fannie Mae or Freddie Mac, is reasonably satisfactory to the Trustee, the Certificate Insurer and the Depositor, is willing to service the Mortgage Loans and executes and delivers to the Depositor, the Certificate Insurer and the Trustee an agreement, in form and substance reasonably satisfactory to the Depositor, the Certificate Insurer and the Trustee, which contains an assumption by such Person of the due and punctual performance and observance of each covenant and condition to be performed or observed by the Master Servicer under this Agreement; *provided, further,* that each Rating Agency's rating of the Classes of Certificates that have been rated in effect immediately prior to such assignment and delegation (without taking into account the related Certificate Guaranty Insurance Policy) will not be qualified, reduced or withdrawn as a result of such assignment and delegation (as evidenced by a letter to such effect from each Rating Agency).  In the case of any such assignment and delegation, the Master Servicer shall be released from its obligations under this Agreement, except that the Master Servicer shall remain liable for all liabilities and obligations incurred

CONFIDENTIAL                                                                        RC_FGIC9019_00018236

by it as Master Servicer hereunder prior to the satisfaction of the conditions to such assignment and delegation set forth in the next preceding sentence.

Section 6.03.    <u>Limitation on Liability of the Depositor, the Master Servicer and Others</u>.

Neither the Depositor, the Master Servicer nor any of the directors, officers, employees or agents of the Depositor or the Master Servicer shall be under any liability to the Trust Fund or the Certificateholders for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment; *provided, however*, that this provision shall not protect the Depositor, the Master Servicer or any such Person against any breach of warranties or representations made herein or any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties hereunder.   The Depositor, the Master Servicer and any director, officer, employee or agent of the Depositor or the Master Servicer may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder. The Depositor, the Master Servicer and any director, officer, employee or agent of the Depositor or the Master Servicer shall be indemnified by the Trust Fund and held harmless against any loss, liability or expense incurred in connection with any legal action relating to this Agreement or the Certificates, other than any loss, liability or expense related to any specific Mortgage Loan or Mortgage Loans (except as any such loss, liability or expense shall be otherwise reimbursable pursuant to this Agreement) and any loss, liability or expense incurred by reason of willful misfeasance, bad faith or gross negligence in the performance of duties hereunder or by reason of reckless disregard of obligations and duties hereunder. Neither the Depositor nor the Master Servicer shall be under any obligation to appear in, prosecute or defend any legal or administrative action, proceeding, hearing or examination that is not incidental to its respective duties under this Agreement and which in its opinion may involve it in any expense or liability; *provided, however*, that the Depositor σ the Master Servicer may in its discretion undertake any such action, proceeding, hearing or examination that it may deem necessary or desirable in respect to this Agreement and the rights and duties of the parties hereto and the interests of the Certificateholders or the Certificate Insurer hereunder.   In such event, the legal expenses and costs of such action, proceeding, hearing or examination and any liability resulting therefrom shall be expenses, costs and liabilities of the Trust Fund, and the Depositor and the Master Servicer shall be entitled to be reimbursed therefor out of amounts attributable to the Mortgage Loans on deposit in the Custodial Account as provided by Section 3.10 and, on the Distribution Date(s) following such reimbursement, the aggregate of such expenses and costs shall be allocated in reduction of the Accrued Certificate Interest on each Class entitled thereto in the same manner as if such expenses and costs constituted a Prepayment Interest Shortfall.

Section 6.04.    <u>Depositor and Master Servicer Not to Resign</u>.

Subject to the provisions of Section 6.02, neither the Depositor nor the Master Servicer shall resign from its respective obligations and duties hereby imposed on it except upon determination that its duties hereunder are no longer permissible under applicable law.   Any such determination permitting the resignation of the Depositor or the Master Servicer shall be evidenced by an Opinion of Counsel (at the expense of the resigning party) to such effect delivered to the Trustee and the Certificate Insurer.   No such resignation by the Master Servicer shall become effective until the Trustee or a successor servicer shall have assumed the Master Servicer's responsibilities and obligations in accordance with Section 7.02.

CONFIDENTIAL                                                                      RC_FGIC9019_00018237

# ARTICLE VII

## DEFAULT

Section 7.01.    Events of Default.

Event of Default, wherever used herein, means any one of the following events (whatever reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(i)    the Master Servicer shall fail to distribute or cause to be distributed to Holders of Certificates of any Class any distribution required to be made under the terms of the Certificates of such Class and this Agreement and, in either case, such failure shall continue unremedied for a period of 5 days after the date upon which written notice of such failure, requiring such failure to be remedied, shall have been given to the Master Servicer by the Trustee, the Certificate Insurer or the Depositor or to the Master Servicer, the Depositor and the Trustee by the Holders of Certificates of such Class evidencing Percentage Interests aggregating not less than 25%; or

(ii)    the Master Servicer shall fail to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in the Certificates of any Class or in this Agreement and such failure shall continue unremedied for a period of 30 days (except that such number of days shall be 15 in the case of a failure to pay the premium for any Required Insurance Policy) after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Master Servicer by the Trustee, the Certificate Insurer or the Depositor, or to the Master Servicer, the Depositor and the Trustee by the Holders of Certificates of any Class evidencing, as to such Class, Percentage Interests aggregating not less than 25%; or

(iii)    a decree or order of a court or agency or supervisory authority having jurisdiction in the premises in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law or appointing a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Master Servicer and such decree or order shall have remained in force undischarged or unstayed for a period of 60 days; or

(iv)    the Master Servicer shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities, or similar proceedings of, or relating to, the Master Servicer or of, or relating to, all or substantially all of the property of the Master Servicer; or

(v)    the Master Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of, or commence a voluntary case under, any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

(vi)    the Master Servicer shall notify the Trustee pursuant to Section 4.04(b) that it is unable to deposit in the Certificate Account an amount equal to the Advance.

CONFIDENTIAL                                                                    RC_FGIC9019_00018238

If an Event of Default described in clauses (i)-(v) of this Section shall occur, then, and in each and every such case, so long as such Event of Default shall not have been remedied, either the Depositor or the Trustee shall at the direction of the Certificate Insurer (unless a Certificate Insurer Default is continuing, in which case at the direction of Holders of Certificates entitled to at least 51% of the Voting Rights), by notice in writing to the Master Servicer (and to the Depositor and the Certificate Insurer if given by the Trustee or to the Trustee and the Certificate Insurer if given by the Depositor), terminate all of the rights and obligations of the Master Servicer under this Agreement and in and to the Mortgage Loans and the proceeds thereof, other than its rights as a Certificateholder hereunder; *provided, however,* that a successor to the Master Servicer is appointed pursuant to Section 7.02 and such successor Master Servicer shall have accepted the duties of Master Servicer effective upon the resignation of the Master Servicer. If an Event of Default described in clause (vi) hereof shall occur, the Trustee with the consent of the Certificate Insurer shall, by notice to the Master Servicer, the Certificate Insurer and the Depositor, immediately terminate all of the rights and obligations of the Master Servicer under this Agreement and in and to the Mortgage Loans and the proceeds thereof, other than its rights as a Certificateholder hereunder as provided in Section 4.04(b). On or after the receipt by the Master Servicer of such written notice, all authority and power of the Master Servicer under this Agreement, whether with respect to the Certificates (other than as a Holder thereof) or the Mortgage Loans or otherwise, shall subject to Section 7.02, pass to and be vested in the Trustee or the Trustee's designee appointed pursuant to Section 7.02; and, without limitation, the Trustee is hereby authorized and empowered to execute and deliver, on behalf of the Master Servicer, as attorney-in-fact or otherwise, any and all documents and other instruments, and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Mortgage Loans and related documents, or otherwise. The Master Servicer agrees to cooperate with the Trustee in effecting the termination of the Master Servicer's responsibilities and rights hereunder, including, without limitation, the transfer to the Trustee or its designee for administration by it of all cash amounts which shall at the time be credited to the Custodial Account or the Certificate Account or thereafter be received with respect to the Mortgage Loans. No such termination shall release the Master Servicer for any liability that it would otherwise have hereunder for any act or omission prior to the effective time of such termination. Notwithstanding any termination of the activities of Residential Funding in its capacity as Master Servicer hereunder, Residential Funding shall be entitled to receive, out of any late collection of a Monthly Payment on a Mortgage Loan which was due prior to the notice terminating Residential Funding's rights and obligations as Master Servicer hereunder and received after such notice, that portion to which Residential Funding would have been entitled pursuant to Sections 3.10(a)(ii), (vi) and (vii) as well as its Servicing Fee in respect thereof, and any other amounts payable to Residential Funding hereunder the entitlement to which arose prior to the termination of its activities hereunder. Upon the termination of Residential Funding as Master Servicer hereunder the Depositor shall deliver to the Trustee, as successor Master Servicer, a copy of the Program Guide and upon the request of the Certificate Insurer, a copy of the Program Guide to the Certificate Insurer.

Section 7.02.    Trustee or Depositor to Act; Appointment of Successor.

(a)    On and after the time the Master Servicer receives a notice of termination pursuant to Section 7.01 or resigns in accordance with Section 6.04, so long as no Certificate Insurer Default exists, the Certificate Insurer may appoint a successor Master Servicer, and if the Certificate Insurer fails to do so within 30 days or a Certificate Insurer Default exists, the Trustee or, upon notice to the Certificate Insurer and the Depositor and with the Depositor's consent and, so long as no Certificate Insurer Default exists, the Certificate Insurer's consent (which consent shall not be unreasonably withheld) a designee (which meets the standards set forth below) of the Trustee, shall be the successor in all respects to the Master Servicer in its capacity as servicer under this Agreement and the transactions set forth or provided for herein and shall be subject to all the responsibilities, duties and liabilities relating thereto placed on the Master Servicer (except for the responsibilities, duties and liabilities contained in Sections 2.02 and

CONFIDENTIAL                                                                    RC_FGIC9019_00018239

2.03(a), excluding the duty to notify related Subservicers as set forth in such Sections, and its obligations to deposit amounts in respect of losses incurred prior to such notice or termination on the investment of funds in the Custodial Account or the Certificate Account pursuant to Sections 3.07(c) and 4.01(c) by the terms and provisions hereof); *provided, however,* that any failure to perform such duties or responsibilities caused by the preceding Master Servicer's failure to provide information required by Section 4.04 shall not be considered a default by the Trustee hereunder, as successor Master Servicer. As compensation therefor, the Trustee, as successor Master Servicer, shall be entitled to all funds relating to the Mortgage Loans which the Master Servicer would have been entitled to charge to the Custodial Account or the Certificate Account if the Master Servicer had continued to act hereunder and, in addition, shall be entitled to the income from any Permitted Investments made with amounts attributable to the Mortgage Loans held in the Custodial Account or the Certificate Account. If the Trustee has become the successor to the Master Servicer in accordance with Section 6.04 or Section 7.01, then notwithstanding the above, the Certificate Insurer may appoint a successor Master Servicer and if the Certificate Insurer fails to do so within 30 days, the Trustee may, if it shall be unwilling to so act, or shall, if it is unable to so act, appoint, or petition a court of competent jurisdiction to appoint, any established housing and home finance institution, which is also a Fannie Mae or Freddie Mac-approved mortgage servicing institution, having a net worth of not less than $10,000,000 as the successor to the Master Servicer hereunder in the assumption of all or any part of the responsibilities, duties or liabilities of the Master Servicer hereunder. Pending appointment of a successor to the Master Servicer hereunder, the Trustee shall become successor to the Master Servicer and shall act in such capacity as hereinabove provided. In connection with such appointment and assumption, the Trustee may make such arrangements for the compensation of such successor out of payments on Mortgage Loans as it and such successor shall agree; provided, however, that no such compensation shall be in excess of that permitted the initial Master Servicer hereunder. The Depositor, the Trustee, the Custodian and such successor shall take such action, consistent with this Agreement, as shall be necessary to effectuate any such succession. The Servicing Fee for any successor Master Servicer appointed pursuant to this Section 7.02 will be lowered with respect to those Mortgage Loans, if any, where the Subservicing Fee accrues at a rate of less than 0.50% per annum in the event that the successor Master Servicer is not servicing such Mortgage Loans directly and it is necessary to raise the related Subservicing Fee to a rate of 0.50% per annum in order to hire a Subservicer with respect to such Mortgage Loans.

(b)     In connection with the termination or resignation of the Master Servicer hereunder, either (i) the successor Master Servicer, including the Trustee if the Trustee is acting as successor Master Servicer, shall represent and warrant that it is a member of MERS in good standing and shall agree to comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS, in which case the predecessor Master Servicer shall cooperate with the successor Master Servicer in causing MERS to revise its records to reflect the transfer of servicing to the successor Master Servicer as necessary under MERS' rules and regulations, or (ii) the predecessor Master Servicer shall cooperate with the successor Master Servicer in causing MERS to execute and deliver an assignment of Mortgage in recordable form to transfer the Mortgage from MERS to the Trustee and to execute and deliver such other notices, documents and other instruments as may be necessary or desirable to effect a transfer of such Mortgage Loan or servicing of such Mortgage Loan on the MERS® System to the successor Master Servicer. The predecessor Master Servicer shall file or cause to be filed any such assignment in the appropriate recording office. The predecessor Master Servicer shall bear any and all fees of MERS, costs of preparing any assignments of Mortgage, and fees and costs of filing any assignments of Mortgage that may be required under this subsection (b). The successor Master Servicer shall cause such assignment to be delivered to the Trustee or the Custodian promptly upon receipt of the original with evidence of recording thereon or a copy certified by the public recording office in which such assignment was recorded.

CONFIDENTIAL                                                      RC_FGIC9019_00018240

Section 7.03.    Notification to Certificateholders.

(a)    Upon any such termination or appointment of a successor to the Master Servicer, the Trustee shall give prompt written notice thereof to the Certificate Insurer and to the Certificateholders at their respective addresses appearing in the Certificate Register.

(b)    Within 60 days after the occurrence of any Event of Default, the Trustee shall transmit by mail to all Holders of Certificates and the Certificate Insurer notice of each such Event of Default hereunder known to the Trustee, unless such Event of Default shall have been cured or waived as provided in Section 7.04 hereof.

Section 7.04.    Waiver of Events of Default.

The Certificate Insurer or the Holders representing at least 66% of the Voting Rights of Certificates affected by a default or Event of Default hereunder, with the written consent of the Certificate Insurer, which consent shall not be unreasonably withheld, may waive any default or Event of Default; *provided, however*, that (a) a default or Event of Default under clause (i) of Section 7.01 may be waived with the written consent of the Certificate Insurer, only by all of the Holders of Certificates affected by such default or Event of Default (which Voting Rights of the Class A Certificateholders may be exercised by the Certificate Insurer without the consent of such Holders and may only be exercised by such Holders with the prior written consent of the Certificate Insurer so long as there is no Certificate Insurer Default) and (b) no waiver pursuant to this Section 7.04 shall affect the Holders of Certificates in the manner set forth in Section 11.01(b)(i), (ii) or (iii). Upon any such waiver of a default or Event of Default by the Certificate Insurer or the Holders representing the requisite percentage of Voting Rights of Certificates affected by such default or Event of Default with the consent of the Certificate Insurer, which consent shall not be unreasonably withheld, such default or Event of Default shall cease to exist and shall be deemed to have been remedied for every purpose hereunder. No such waiver shall extend to any subsequent or other default or Event of Default or impair any right consequent thereon except to the extent expressly so waived.

Section 7.05.    Servicing Trigger; Removal of Master Servicer.

(a)    Upon determination by the Certificate Insurer that a Servicing Trigger has occurred, the Certificate Insurer shall give written notice of such Servicing Trigger to the Master Servicer, the Depositor, the Trustee and to each Rating Agency.

(b)    At any time after such determination and while a Servicing Trigger is continuing, the Certificate Insurer may direct the Trustee in writing to remove the Master Servicer if the Certificate Insurer makes a determination that the manner of master servicing was a factor contributing to the size of the delinquencies or losses incurred in the Trust Fund.

(c)    Upon receipt of directions to remove the Master Servicer pursuant to the preceding clause (b), the Trustee shall notify the Master Servicer that it has been terminated and the Master Servicer shall be terminated in the same manner as specified in Sections 7.01 and 7.02.

(d)    After notice of occurrence of a Servicing Trigger has been given and while a Servicing Trigger is continuing, until and unless the Master Servicer has been removed as provided in clause (b), the Master Servicer covenants and agrees to act as the Master Servicer for a term from the occurrence of the Servicing Trigger to the end of the calendar quarter in which such Servicing Trigger occurs, which term may at the Certificate Insurer's discretion be extended by written notice to the Trustee and the Master Servicer for successive terms of three (3) calendar months each, until the termination of the Trust

CONFIDENTIAL    RC_FGIC9019_00018241

Fund. The Master Servicer will, upon the receipt of each such notice of extension (a "Master Servicer Extension Notice") become bound for the duration of the term covered by such Master Servicer Extension Notice to continue as Master Servicer subject to and in accordance with this Agreement. If, as of the fifteenth (15th) day prior to the last day of any term as the Master Servicer, the Trustee shall not have received any Master Servicer Extension Notice from the Certificate Insurer, the Trustee shall, within five (5) days thereafter, give written notice of such nonreceipt to the Certificate Insurer and the Master Servicer. If any such term expires without a Master Servicer Extension Notice then the Trustee shall act as successor Master Servicer as provided in Section 7.02.

(e)     No provision of this Section 7.05 shall have the effect of limiting the rights of the Depositor, the Trustee, the Certificateholders or the Certificate Insurer under Section 7.01.

CONFIDENTIAL                                                      RC_FGIC9019_00018242

## ARTICLE VIII

### CONCERNING THE TRUSTEE

Section 8.01.    Duties of Trustee.

(a)    The Trustee, prior to the occurrence of an Event of Default and after the curing of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Agreement.  In case an Event of Default has occurred (which has not been cured or waived), the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent investor would exercise or use under the circumstances in the conduct of such investor's own affairs.

(b)    The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Trustee which are specifically required to be furnished pursuant to any provision of this Agreement, shall examine them to determine whether they conform to the requirements of this Agreement.  The Trustee shall notify the Certificate Insurer and Certificateholders of any such documents which do not materially conform to the requirements of this Agreement in the event that the Trustee, after so requesting, does not receive satisfactorily corrected documents.  The Trustee shall forward or cause to be forwarded in a timely fashion the notices, reports and statements required to be forwarded by the Trustee pursuant to Sections 4.03 7.03, and 10.01.  The Trustee shall furnish in a timely fashion to the Master Servicer such information as the Master Servicer may reasonably request from time to time for the Master Servicer to fulfill its duties as set forth in this Agreement and the Trustee shall furnish in a timely fashion to the Certificate Insurer such information in its possession as the Certificate Insurer may reasonably request from time to time for the Certificate Insurer to protect its interests and to fulfill its duties under the related Certificate Guaranty Insurance Policy.  The Trustee covenants and agrees that it shall perform its obligations hereunder in a manner so as to maintain the status of each REMIC created hereunder as a REMIC under the REMIC Provisions and to (subject to Section 10.01(f)) prevent the imposition of any federal, state or local income, prohibited transaction, contribution or other tax on the Trust Fund to the extent that maintaining such status and avoiding such taxes are reasonably within the control of the Trustee and are reasonably within the scope of its duties under this Agreement.

(c)    No provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct; *provided, however*, that:

(i)    Prior to the occurrence of an Event of Default, and after the curing or waiver of all such Events of Default which may have occurred, the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee and, in the absence of bad faith on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee by the Depositor or the Master Servicer and which on their face, do not contradict the requirements of this Agreement;

(ii)    The Trustee shall not be personally liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts;

CONFIDENTIAL                                                          RC_FGIC9019_00018243

(iii)    The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Certificate Insurer or the Certificateholders holding Certificates which evidence, Percentage Interests aggregating not less than 25% of the affected Classes as to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Agreement;

(iv)    The Trustee shall not be charged with knowledge of any default (other than a default in payment to the Trustee) specified in clauses (i) and (ii) of Section 7.01 or an Event of Default under clauses (iii), (iv) and (v) of Section 7.01 unless a Responsible Officer of the Trustee assigned to and working in the Corporate Trust Office obtains actual knowledge of such failure or event or the Trustee receives written notice of such failure or event at its Corporate Trust Office from the Master Servicer, the Certificate Insurer, the Depositor or any Certificateholder; and

(v)    Except to the extent provided in Section 7.02, no provision in this Agreement shall require the Trustee to expend or risk its own funds (including, without limitation, the making of any Advance) or otherwise incur any personal financial liability in the performance of any of its duties as Trustee hereunder, or in the exercise of any of its rights or powers, if the Trustee shall have reasonable grounds for believing that repayment of funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(d)    The Trustee shall timely pay, from its own funds, the amount of any and all federal, state and local taxes imposed on the Trust Fund or its assets or transactions including, without limitation, (A) "prohibited transaction" penalty taxes as defined in Section 860F of the Code, if, when and as the same shall be due and payable, (B) any tax on contributions to a REMIC after the Closing Date imposed by Section 860G(d) of the Code and (C) any tax on "net income from foreclosure property" as defined in Section 860G(c) of the Code, but only if such taxes arise out of a breach by the Trustee of its obligations hereunder, which breach constitutes negligence or willful misconduct of the Trustee.

Section 8.02.    Certain Matters Affecting the Trustee.

(a)    Except as otherwise provided in Section 8.01:

(i)    The Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, Officer's Certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(ii)    The Trustee may consult with counsel and any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such Opinion of Counsel;

(iii)    The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Agreement or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of any of the Certificateholders or the Certificate Insurer pursuant to the provisions of this Agreement, unless such Certificateholders or the Certificate Insurer, as applicable, shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which may be incurred therein or thereby and the Certificate Insurer has given its consent; nothing contained herein shall, however, relieve the

CONFIDENTIAL                                                            RC_FGIC9019_00018244

Trustee of the obligation, upon the occurrence of an Event of Default (which has not been cured), to exercise such of the rights and powers vested in it by this Agreement, and to use the same degree of care and skill in their exercise as a prudent investor would exercise or use under the circumstances in the conduct of such investor's own affairs;

(iv)    The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement;

(v)    Prior to the occurrence of an Event of Default hereunder and after the curing of all Events of Default which may have occurred, the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing so to do by the Certificate Insurer or the Holders of Certificates of any Class evidencing, as to such Class, Percentage Interests, aggregating not less than 50%, with the written consent of the Certificate Insurer; *provided, however*, that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not reasonably assured to the Trustee by the security afforded to it by the terms of this Agreement, the Trustee may require reasonable indemnity against such expense or liability as a condition to so proceeding. The reasonable expense of every such examination shall be paid by the Master Servicer, if an Event of Default shall have occurred and is continuing, and otherwise by the Certificateholder or the Certificate Insurer requesting the investigation;

(vi)    The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys provided that the Trustee shall remain liable for any acts of such agents or attorneys; and

(vii)    To the extent authorized under the Code and the regulations promulgated thereunder, each Holder of a Class R Certificate hereby irrevocably appoints and authorizes the Trustee to be its attorney-in-fact for purposes of signing any Tax Returns required to be filed on behalf of the Trust Fund. The Trustee shall sign on behalf of the Trust Fund and deliver to the Master Servicer in a timely manner any Tax Returns prepared by or on behalf of the Master Servicer that the Trustee is required to sign as determined by the Master Servicer pursuant to applicable federal, state or local tax laws, *provided* that the Master Servicer shall indemnify the Trustee for signing any such Tax Returns that contain errors or omissions.

(b)    Following the issuance of the Certificates (and except as provided for in Section 2.04), the Trustee shall not accept any contribution of assets to the Trust Fund unless (subject to Section 10.01(f)) it shall have obtained or been furnished with an Opinion of Counsel to the effect that such contribution will not (i) cause any REMIC created hereunder to fail to qualify as a REMIC at any time that any Certificates are outstanding or (ii) cause the Trust Fund to be subject to any federal tax as a result of such contribution (including the imposition of any federal tax on "prohibited transactions" imposed under Section 860F(a) of the Code).

Section 8.03.    <u>Trustee Not Liable for Certificates or Mortgage Loans</u>.

The recitals contained herein and in the Certificates (other than the execution of the Certificates and relating to the acceptance and receipt of the Mortgage Loans) shall be taken as the statements of the Depositor or the Master Servicer as the case may be, and the Trustee assumes no responsibility for their correctness. The Trustee makes no representations as to the validity or sufficiency of this Agreement or

CONFIDENTIAL                                                          RC_FGIC9019_00018245

of the Certificates (except that the Certificates shall be duly and validly executed and authenticated by it as Certificate Registrar) or of any Mortgage Loan or related document, or of MERS or the MERS® System.  Except as otherwise provided herein, the Trustee shall not be accountable for the use or application by the Depositor or the Master Servicer of any of the Certificates or of the proceeds of such Certificates, or for the use or application of any funds paid to the Depositor or the Master Servicer in respect of the Mortgage Loans or deposited in or withdrawn from the Custodial Account or the Certificate Account by the Depositor or the Master Servicer.

Section 8.04.    Trustee May Own Certificates.

The Trustee in its individual or any other capacity may become the owner or pledgee of Certificates with the same rights it would have if it were not Trustee.

Section 8.05.    Master Servicer to Pay Trustee's Fees and Expenses; Indemnification.

(a)    The Master Servicer covenants and agrees to pay to the Trustee and any co-trustee from time to time, and the Trustee and any co-trustee shall be entitled to, reasonable compensation (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by each of them in the execution of the trusts hereby created and in the exercise and performance of any of the powers and duties hereunder of the Trustee and any co-trustee, and the Master Servicer will pay or reimburse the Trustee and any co-trustee upon request for all reasonable expenses, disbursements and advances incurred or made by the Trustee or any co-trustee in accordance with any of the provisions of this Agreement (including the reasonable compensation and the expenses and disbursements of its counsel and of all persons not regularly in its employ, and the expenses incurred by the Trustee or any co-trustee in connection with the appointment of an office or agency pursuant to Section 8.12) except any such expense, disbursement or advance as may arise from its negligence or bad faith.

(b)    The Master Servicer agrees to indemnify the Trustee for, and to hold the Trustee harmless against, any loss, liability or expense incurred without negligence or willful misconduct on its part, arising out of, or in connection with, the acceptance and administration of the Trust Fund, including its obligation to execute the DTC Letter in its individual capacity, and including the costs and expenses (including reasonable legal fees and expenses) of defending itself against any claim in connection with the exercise or performance of any of its powers or duties under this Agreement, *provided*, that:

(i)    with respect to any such claim, the Trustee shall have given the Master Servicer written notice thereof promptly after the Trustee shall have actual knowledge thereof;

(ii)    while maintaining control over its own defense, the Trustee shall cooperate and consult fully with the Master Servicer in preparing such defense; and

(iii)    notwithstanding anything in this Agreement to the contrary, the Master Servicer shall not be liable for settlement of any claim by the Trustee entered into without the prior consent of the Master Servicer which consent shall not be unreasonably withheld.  No termination of this Agreement shall affect the obligations created by this Section 8.05(b) of the Master Servicer to indemnify the Trustee under the conditions and to the extent set forth herein. Notwithstanding the foregoing, the indemnification provided by the Master Servicer in this Section 8.05(b) shall not pertain to any loss, liability or expense of the Trustee, including the costs and expenses of defending itself against any claim, incurred in connection with any actions taken by the Trustee at the direction of Certificateholders pursuant to the terms of this Agreement.

CONFIDENTIAL                                              RC_FGIC9019_00018246

Section 8.06.    <u>Eligibility Requirements for Trustee</u>.

The Trustee hereunder shall at all times be a national banking association or a New York banking corporation having its principal office in a state and city acceptable to the Depositor and organized and doing business under the laws of such state or the United States of America, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal or state authority. If such corporation or national banking association publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for purposes of this Section the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. In case at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, the Trustee shall resign immediately in the manner and with the effect specified in Section 8.07.

Section 8.07.    <u>Resignation and Removal of the Trustee</u>.

(a)    The Trustee may at any time resign and be discharged from the trusts hereby created by giving written notice thereof to the Depositor, the Master Servicer and the Certificate Insurer. Upon receiving such notice of resignation, the Depositor shall promptly appoint a successor trustee acceptable to the Certificate Insurer by written instrument, in duplicate, one copy of which instrument shall be delivered to the resigning Trustee and one copy to the successor trustee. If no successor trustee shall have been so appointed and have accepted appointment within 30 days after the giving of such notice of resignation then the Certificate Insurer may appoint a successor trustee and if the Certificate Insurer fails to do so within 30 days, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee.

(b)    If at any time the Trustee shall cease to be eligible in accordance with the provisions of Section 8.06 and shall fail to resign after written request therefor by the Certificate Insurer or the Depositor with the consent of the Certificate Insurer, which such consent shall not be unreasonably withheld, or if at any time the Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then the Certificate Insurer or the Depositor with the consent of the Certificate Insurer, which such consent shall not be unreasonably withheld, may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, one copy of which instrument shall be delivered to the Trustee so removed and one copy to the successor trustee. In addition, in the event that the Certificate Insurer or the Depositor determines that the Trustee has failed (i) to make a required claim under the related Certificate Guaranty Insurance Policy of which it has been notified pursuant to Section 4.12(a) or failed to distribute or cause to be distributed to Certificateholders any amount required to be distributed hereunder (including any Insured Payment), if such amount is held by the Trustee or its Paying Agent (other than the Master Servicer or the Depositor) for distribution or (ii) to otherwise observe or perform in any material respect any of its covenants, agreements or obligations hereunder, and such failure shall continue unremedied for a period of 5 days (in respect of clause (i) above) or 30 days (in respect of clause (ii) above) after the date on which written notice of such failure, requiring that the same be remedied, shall have been given to the Trustee by the Depositor or the Certificate Insurer, then the Depositor with the consent of the Certificate Insurer, which consent shall not be unreasonably withheld, may remove the Trustee and appoint a successor trustee by written instrument delivered as provided in the preceding sentence. In connection with the appointment of a successor trustee pursuant to the preceding sentence, the Depositor shall, on or before the date on which any such appointment becomes effective, obtain from each Rating Agency written confirmation that the appointment of any such successor trustee will not result in the reduction of the ratings on any Class of the Certificates below the lesser of the then current or

CONFIDENTIAL                                                    RC_FGIC9019_00018247

original ratings on such Certificates (without taking into account the related Certificate Guaranty Insurance Policy).

(c)     During the continuance of a Certificate Insurer Default, the Holders of Certificates entitled to at least 51% of the Voting Rights may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, in triplicate, signed by such Holders or their attorneys-in-fact duly authorized, one complete set of which instruments shall be delivered to the Depositor, one complete set to the Trustee so removed and one complete set to the successor so appointed.

(d)     Any resignation or removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section shall become effective upon acceptance of appointment by the successor trustee as provided in Section 8.08.

Section 8.08.     Successor Trustee.

(a)     Any successor trustee appointed as provided in Section 8.07 shall execute, acknowledge and deliver to the Depositor and the Certificate Insurer and to its predecessor trustee an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as trustee herein.  The predecessor trustee shall deliver to the successor trustee all Mortgage Files and related documents and statements held by it hereunder (other than any Mortgage Files at the time held by a Custodian, which shall become the agent of any successor trustee hereunder), and the Depositor, the Master Servicer and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

(b)     No successor trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor trustee shall be eligible under the provisions of Section 8.06.

(c)     Upon acceptance of appointment by a successor trustee as provided in this Section, the Depositor shall mail notice of the succession of such trustee hereunder to all Holders of Certificates at their addresses as shown in the Certificate Register.  If the Depositor fails to mail such notice within 10 days after acceptance of appointment by the successor trustee, the successor trustee shall cause such notice to be mailed at the expense of the Depositor.

Section 8.09.     Merger or Consolidation of Trustee.

Any corporation or national banking association into which the Trustee may be merged or converted or with which it may be consolidated or any corporation or national banking association resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation or national banking association succeeding to the business of the Trustee, shall be the successor of the Trustee hereunder, *provided* such corporation or national banking association shall be eligible under the provisions of Section 8.06, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.  The Trustee shall mail notice of any such merger or consolidation to the Certificateholders at their address as shown in the Certificate Register.

CONFIDENTIAL                                                                        RC_FGIC9019_00018248

Section 8.10.    Appointment of Co-Trustee or Separate Trustee.

(a)    Notwithstanding any other provisions hereof, at any time, for the purpose of meeting any legal requirements of any jurisdiction in which any part of the Trust Fund or property securing the same may at the time be located, the Master Servicer and the Trustee acting jointly shall have the power and shall execute and deliver all instruments to appoint one or more Persons approved by the Trustee to act as co-trustee or co-trustees, jointly with the Trustee, or separate trustee or separate trustees, of all or any part of the Trust Fund, and to vest in such Person or Persons, in such capacity, such title to the Trust Fund, or any part thereof, and, subject to the other provisions of this Section 8.10, such powers, duties, obligations, rights and trusts as the Master Servicer and the Trustee may consider necessary or desirable. If the Master Servicer shall not have joined in such appointment within 15 days after the receipt by it of a request so to do, or in case an Event of Default shall have occurred and be continuing, the Trustee alone shall have the power to make such appointment. No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 8.06 hereunder and no notice to Holders of Certificates of the appointment of co-trustee(s) or separate trustee(s) shall be required under Section 8.08 hereof.

(b)    In the case of any appointment of a co-trustee or separate trustee pursuant to this Section 8.10 all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee, and such separate trustee or co-trustee jointly, except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed (whether as Trustee hereunder or as successor to the Master Servicer hereunder), the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the Trust Fund or any portion thereof in any such jurisdiction) shall be exercised and performed by such separate trustee or co-trustee at the direction of the Trustee.

(c)    Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Agreement and the conditions of this Article VIII. Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Agreement, specifically including every provision of this Agreement relating to the conduct of, affecting the liability of, or affording protection to, the Trustee. Every such instrument shall be filed with the Trustee.

(d)    Any separate trustee or co-trustee may, at any time, constitute the Trustee, its agent or attorney-in-fact, with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf and in its name. If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

Section 8.11.    Appointment of Custodians.

The Trustee may, with the consent of the Master Servicer, the Certificate Insurer and the Depositor, appoint one or more Custodians who are not Affiliates of the Depositor or the Master Servicer to hold all or a portion of the Mortgage Files as agent for the Trustee, by entering into a Custodial Agreement. Subject to Article VIII, the Trustee agrees to comply with the terms of each Custodial Agreement and to enforce the terms and provisions thereof against the Custodian for the benefit of the

CONFIDENTIAL                                                                                    RC_FGIC9019_00018249

Certificateholders. Each Custodian shall be a depository institution subject to supervision by federal or state authority, shall have a combined capital and surplus of at least $15,000,000 and shall be qualified to do business in the jurisdiction in which it holds any Mortgage File. Each Custodial Agreement may be amended only as provided in Section 11.01. The Trustee shall notify the Certificateholders of the appointment of any Custodian (other than the Custodian appointed as of the Closing Date) pursuant to this Section 8.11.

Section 8.12.    Appointment of Office or Agency.

The Trustee shall maintain an office or agency in the City of New York where Certificates may be surrendered for registration of transfer or exchange. The Trustee initially designates its offices located at 4 New York Plaza, 6th Floor, New York, New York 10004 for the purpose of keeping the Certificate Register. The Trustee shall maintain an office at the address stated in Section 11.05(c) hereof where notices and demands to or upon the Trustee in respect of this Agreement may be served.

Section 8.13.    DTC Letter of Representations.

The Trustee is hereby authorized and directed to, and agrees that it shall, enter into the DTC Letter on behalf of the Trust Fund and in its individual capacity as agent thereunder.

## ARTICLE IX

## TERMINATION

Section 9.01.    Termination Upon Purchase by the Master Servicer or Liquidation of All Mortgage Loans.

(a)    Subject to Section 9.02, the respective obligations and responsibilities of the Depositor, the Master Servicer and the Trustee created hereby in respect of the Certificates (other than the obligation of the Trustee to make certain payments after the Final Distribution Date to Certificateholders and the obligation of the Depositor to send certain notices as hereinafter set forth) shall terminate upon the last action required to be taken by the Trustee on the Final Distribution Date pursuant to this Article IX following the earlier of:

(i)    the later of the final payment or other liquidation (or any Advance with respect thereto) of the last Mortgage Loan remaining in the Trust Fund or the disposition of all property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan, or

(ii)    the purchase by the Master Servicer of all Group I Loans and all property acquired in respect of any Group I Loan remaining in the Trust Fund (other than the Trust Fund's interest in the related Certificate Guaranty Insurance Policy and the MI Policy) and the purchase by the Master Servicer of all Group II Loans and all property acquired in respect of any Group II Loan remaining in the Trust Fund (other than the Trust Fund's interest in the related Certificate Guaranty Insurance Policy and the MI Policy), in each case, at a price equal to 100% of the unpaid principal balance of each Mortgage Loan (or, if less than such unpaid principal balance, the fair market value of the related underlying property of such Mortgage Loan with respect to Mortgage Loans as to which title has been acquired if such fair market value is less than such unpaid principal balance) (net of any unreimbursed Advances attributable to principal) on the day of repurchase, plus accrued interest thereon at the Net Mortgage Rate (or Modified Net Mortgage Rate in the case of any Modified Mortgage Loan), plus the applicable Mortgage Insurance Premium Rate, if any, plus the applicable Certificate Insurer Premium Modified Rate, to, but not

CONFIDENTIAL

RC_FGIC9019_00018250

including, the first day of the month in which such repurchase price is distributed, including the payment of any amounts due to the Certificate Insurer pursuant to the Insurance Agreement; *provided, however*, that in no event shall the trust created hereby continue beyond the expiration of 21 years from the death of the last survivor of the descendants of Joseph P. Kennedy, the late ambassador of the United States to the Court of St. James, living on the date hereof; and *provided further*, that the purchase price set forth above shall be increased as is necessary, as determined by the Master Servicer, to avoid disqualification of any REMIC created hereunder as a REMIC. The purchase price paid by the Master Servicer pursuant to this Section 9.01(a)(ii) shall also include any amounts owed by Residential Funding pursuant to the last paragraph of Section 4 of the Assignment Agreement in respect of any liability, penalty or expense that resulted from a breach of the representation and warranty set forth in clause (xlvii) of Section 4 of the Assignment Agreement that remain unpaid on the date of such purchase.

The right of the Master Servicer to purchase all of the Group I Loans pursuant to clause (ii) above is conditioned upon the date of such purchase occurring on or after the Group I Optional Termination Date. The right of the Master Servicer to purchase all of the Group II Loans pursuant to clause (ii) above is conditioned upon the date of such purchase occurring on or after the Group II Optional Termination Date. If such right is exercised by the Master Servicer, the Master Servicer shall be deemed to have been reimbursed for the full amount of any unreimbursed Advances theretofore made by it with respect to the Mortgage Loans being purchased. In addition, the Master Servicer shall provide to the Trustee the certification required by Section 3.15 and the Trustee and any Custodian shall, promptly following payment of the purchase price, release to the Master Servicer the Mortgage Files pertaining to the Mortgage Loans being purchased. No purchase pursuant to clause (ii) of this Section 9.01(a) is permitted if it would result in a draw on either Certificate Guaranty Insurance Policy, unless the Certificate Insurer consents in writing.

In addition to the foregoing, on any Distribution Date on or after the Group I Optional Termination Date, the Master Servicer shall have the right, at its option, to purchase the Class A-I Certificates in whole, but not in part, at a price equal to the sum of the outstanding Certificate Principal Balance of such Certificates plus the sum of one month's Accrued Certificate Interest thereon, any previously unpaid Accrued Certificate Interest, and any unpaid Prepayment Interest Shortfall previously allocated thereto and, in the case of Prepayment Interest Shortfalls, accrued interest thereon at the applicable Pass-Through Rate and the payment of any amounts due to the Certificate Insurer under the Insurance Agreement. On any Distribution Date on or after the Group II Optional Termination Date, the Master Servicer shall have the right, at its option, to purchase the Class A-II Certificates in whole, but not in part, at a price equal to the sum of the outstanding Certificate Principal Balance of such Certificates plus the sum of one month's Accrued Certificate Interest thereon, any previously unpaid Accrued Certificate Interest, and any unpaid Prepayment Interest Shortfall previously allocated thereto and, in the case of Prepayment Interest Shortfalls, accrued interest thereon at the applicable Pass-Through Rate, and the payment of any amounts due to the Certificate Insurer under the Insurance Agreement; *provided, however*, that no optional purchase of the Group I Loans, Group II Loans, Class A-I Certificates or Class A-II Certificates will be permitted if it would result in a draw under the Certificate Guaranty Insurance Policy for the related Loan Group, or the Certificate Insurer could show a reasonable probability that it would result in a draw under the Certificate Guaranty Insurance Policy for the non-related Loan Group, in each case, unless the Certificate Insurer consents to the termination in writing. If the Master Servicer exercises this right to purchase the outstanding Class A-I Certificates or Class A-II Certificates, the Master Servicer will promptly terminate the respective obligations and responsibilities created hereby in respect of these Certificates pursuant to this Article IX.

(b)    The Master Servicer shall give the Trustee and the Certificate Insurer not less than 60 days' prior notice of the Distribution Date on which the Master Servicer anticipates that the final

CONFIDENTIAL                                    RC_FGIC9019_00018251

distribution will be made to Certificateholders (whether as a result of the exercise by the Master Servicer of its right to purchase the assets of the related Loan Group or otherwise) or on which the Master Servicer anticipates that the Certificates will be purchased (as a result of the exercise by the Master Servicer to purchase the outstanding Certificates).   Notice of any termination, specifying the anticipated Final Distribution Date (which shall be a date that would otherwise be a Distribution Date) upon which the Certificateholders may surrender their Certificates to the Trustee (if so required by the terms hereof) for payment of the final distribution and cancellation or notice of any purchase of the outstanding Certificates, specifying the Distribution Date upon which the Holders may surrender their Certificates to the Trustee for payment, shall (i) be given promptly to the Trustee by the Master Servicer (if it is exercising its right to purchase the assets of the related Loan Group or to purchase the related outstanding Certificates) and the Trustee shall then promptly deliver such notice to the Certificateholders, or (ii) be given promptly by the Trustee (in any other case) directly to the Certificateholders.  Each notice given pursuant to the preceding sentence shall be by letter addressed to the Certificateholders (with a copy to the Certificate Registrar and the Certificate Insurer) mailed not earlier than the 15th day and not later than the 25th day of the month next preceding the month of such final distribution specifying:

       (i)     the anticipated Final Distribution Date upon which final payment of the Certificates is anticipated to be made upon presentation and surrender of Certificates at the office or agency of the Trustee therein designated where required pursuant to this Agreement or, in the case of the purchase by the Master Servicer of the outstanding Certificates, the Distribution Date on which such purchase is made,

       (ii)    the amount of any such final payment or, in the case of the purchase of the outstanding Certificates, the purchase price, in either case, if known, and

       (iii)   that the Record Date otherwise applicable to such Distribution Date is not applicable, and that payment will be made only upon presentation and surrender of the Certificates at the office or agency of the Trustee therein specified.

If the Master Servicer is obligated to give notice to Certificateholders as required above, it shall give such notice to the Certificate Registrar at the time such notice is given to Certificateholders.  In the event such notice is given by the Master Servicer, the Master Servicer shall deposit in the Certificate Account before the Final Distribution Date in immediately available funds an amount equal to the purchase price for the assets of the related Loan Group computed as above provided.  As a result of the exercise by the Master Servicer of its right to purchase the outstanding Certificates, the Master Servicer shall deposit in an Eligible Account, established by the Master Servicer on behalf of the Trustee and separate from the Certificate Account, in the name of the Trustee in trust for the registered holders of the Certificates, before the Distribution Date on which such purchase is to occur, in immediately available funds, an amount equal to the purchase price for the Certificates computed as provided above, and provide notice of such deposit to the Trustee and the Certificate Insurer.  The Trustee shall withdraw from such account the amount specified in subsection (c) below and distribute such amount to the Certificateholders as specified in subsection (c) below.  The Master Servicer shall provide to the Trustee written notification of any change to the anticipated Final Distribution Date as soon as practicable.  If the Trust Fund is not terminated on the anticipated Final Distribution Date, for any reason, the Trustee shall promptly mail notice thereof to each affected Certificateholder.

       (c)    Upon presentation and surrender of the Class A-I Certificates by the Certificateholders thereof, the Trustee shall distribute to such Certificateholders (i) the amount otherwise distributable on such Distribution Date, if not in connection with the Master Servicer's election to repurchase the Group I Loans or the outstanding Class A-I Certificates, or (ii) if the Master Servicer elected to so repurchase the Group I Loans or the outstanding Class A-I Certificates, an amount equal to the price paid pursuant to

CONFIDENTIAL
RC_FGIC9019_00018252

Section 9.01(a) as follows: first, with respect to the Class A-I Certificates, pari passu, the outstanding Certificate Principal Balance thereof, plus Accrued Certificate Interest thereon for the related Interest Accrual Period and any previously unpaid Accrued Certificate Interest, any unpaid Prepayment Interest Shortfalls and, in the case of Prepayment Interest Shortfalls, accrued interest thereon at the applicable Pass-Through Rate second, to the Certificate Insurer, any amounts owed to it pursuant to the Insurance Agreement, and third, to the Class SB-I Certificates.  Upon presentation and surrender of the Class A-II Certificates by the Certificateholders thereof, the Trustee shall distribute to such Certificateholders (i) the amount otherwise distributable on such Distribution Date, if not in connection with the Master Servicer's election to repurchase the Group II Loans or the outstanding Class A-II Certificates, or (ii) if the Master Servicer elected to so repurchase the Group II Loans or the outstanding Class A-II Certificates, an amount equal to the price paid pursuant to Section 9.01(a) as follows: first, with respect to the Class A-II Certificates, pari passu, the outstanding Certificate Principal Balance thereof, plus Accrued Certificate Interest thereon for the related Interest Accrual Period and any previously unpaid Accrued Certificate Interest, any unpaid Prepayment Interest Shortfalls and, in the case of Prepayment Interest Shortfalls, accrued interest thereon at the applicable Pass-Through Rate, second, to the Certificate Insurer, any amounts owed to it pursuant to the Insurance Agreement, and third, to the Class SB-II Certificates.

(d)    In the event that any Certificateholders shall not surrender their Certificates for final payment and cancellation on or before the Final Distribution Date, the Trustee shall on such date cause all funds in the Certificate Account not distributed in final distribution to Certificateholders to be withdrawn therefrom and credited to the remaining Certificateholders by depositing such funds in a separate escrow account for the benefit of such Certificateholders, and the Master Servicer (if it exercised its right to purchase the assets of the related Loan Group), or the Trustee (in any other case) shall give a second written notice to the remaining Certificateholders to surrender their Certificates for cancellation and receive the final distribution with respect thereto.  If within six months after the second notice any Certificate shall not have been surrendered for cancellation, the Trustee shall take appropriate steps as directed by the Master Servicer to contact the remaining Certificateholders concerning surrender of their Certificates.    The costs and expenses of maintaining the escrow account and of contacting Certificateholders shall be paid out of the assets which remain in the escrow account.  If within nine months after the second notice any Certificates shall not have been surrendered for cancellation, the Trustee shall pay to the Master Servicer all amounts distributable to the holders thereof and the Master Servicer shall thereafter hold such amounts until distributed to such Holders.  No interest shall accrue or be payable to any Certificateholder on any amount held in the escrow account or by the Master Servicer as a result of such Certificateholder's failure to surrender its Certificate(s) for final payment thereof in accordance with this Section 9.01 and the Certificateholders shall look only to the Master Servicer for such payment.

(e)    If any Certificateholders do not surrender their Certificates on or before the Distribution Date on which a purchase of the outstanding Certificates is to be made, the Trustee shall on such date cause all funds in the Eligible Account established by the Master Servicer deposited therein by the Master Servicer pursuant to Section 9.01(b) to be withdrawn therefrom and deposited in a separate escrow account for the benefit of such Certificateholders, and the Master Servicer shall give a second written notice to such Certificateholders to surrender their Certificates for payment of the purchase price therefor.  If within six months after the second notice any Certificate shall not have been surrendered for cancellation, the Trustee shall take appropriate steps as directed by the Master Servicer to contact the Holders of such Certificates concerning surrender of their Certificates.  The costs and expenses of maintaining the escrow account and of contacting Certificateholders shall be paid out of the assets which remain in the escrow account.  If within nine months after the second notice any Certificates shall not have been surrendered for cancellation in accordance with this Section 9.01, the Trustee shall pay to the Master Servicer all amounts distributable to the Holders thereof and shall have no further obligation or liability therefor and the Master Servicer shall thereafter hold such amounts until distributed to such

CONFIDENTIAL                                                                    RC_FGIC9019_00018253

Holders. No interest shall accrue or be payable to any Certificateholder on any amount held in the escrow account or by the Master Servicer as a result of such Certificateholder's failure to surrender its Certificate(s) for payment in accordance with this Section 9.01. Any Certificate that is not surrendered on the Distribution Date on which a purchase pursuant to this Section 9.01 occurs as provided above will be deemed to have been purchased and the Holder as of such date will have no rights with respect thereto except to receive the purchase price therefor minus any costs and expenses associated with such escrow account and notices allocated thereto. Any Certificates so purchased or deemed to have been purchased on such Distribution Date shall remain outstanding hereunder. The Master Servicer shall be for all purposes the Holder thereof as of such date.

Section 9.02.    Additional Termination Requirements.

(a)    Each of REMIC I, REMIC II and REMIC III as the case may be, shall be terminated in accordance with the following additional requirements, unless the Trustee, the Certificate Insurer and the Master Servicer have received an Opinion of Counsel (which Opinion of Counsel shall not be an expense of the Trustee or the Certificate Insurer) to the effect that the failure of any REMIC created hereunder to comply with the requirements of this Section 9.02 will not (i) result in the imposition on the Trust Fund of taxes on "prohibited transactions," as described in Section 860F of the Code, or (ii) cause any REMIC created hereunder to fail to qualify as a REMIC at any time that any Certificate is outstanding:

(i)    The Master Servicer shall establish a 90-day liquidation period for each of REMIC I, REMIC II and REMIC III, and specify the first day of such period in a statement attached to the Trust Fund's final Tax Return pursuant to Treasury regulations §1.860F-1. The Master Servicer also shall satisfy all of the requirements of a qualified liquidation for each of REMIC I, REMIC II and REMIC III, under Section 860F of the Code and the regulations thereunder;;

(ii)    The Master Servicer shall notify the Trustee at the commencement of such 90-day liquidation period and, at or prior to the time of making of the final payment on the Certificates, the Trustee shall sell or otherwise dispose of all of the remaining assets of the Trust Fund in accordance with the terms hereof; and

(iii)    If the Master Servicer is exercising its right to purchase the assets of the Trust Fund, the Master Servicer shall, during the 90-day liquidation period and at or prior to the Final Distribution Date, purchase all of the assets of the Trust Fund for cash;

(b)    Each Holder of a Certificate and the Trustee hereby irrevocably approves and appoints the Master Servicer as its attorney-in-fact to adopt a plan of complete liquidation for each of REMIC I, REMIC II and REMIC III at the expense of the Trust Fund in accordance with the terms and conditions of this Agreement.

CONFIDENTIAL                                                                RC_FGIC9019_00018254

# ARTICLE X

## REMIC PROVISIONS

Section 10.01.  <u>REMIC Administration</u>.

(a)    The REMIC Administrator shall make an election to treat each of REMIC I, REMIC II and REMIC III as a REMIC under the Code and, if necessary, under applicable state law.  Such election will be made on Form 1066 or other appropriate federal tax or information return (including Form 8811) or any appropriate state return for the taxable year ending on the last day of the calendar year in which the Certificates are issued.  The REMIC I Regular Interests shall be designated as the "regular interests" and the Class R-I Certificates shall be designated as the sole Class of "residual interests" in REMIC I.  The REMIC II Regular Interests shall be designated as the "regular interests" and the Class R-II Certificates shall be designated as the sole Class of "residual interests" in REMIC II.  The Class A-I Certificates, Class A-II Certificates and Class SB Certificates shall be designated as the "regular interests" in REMIC III and the Class R-III Certificates shall be designated the sole Class of "residual interests" in REMIC III.  The REMIC Administrator and the Trustee shall not permit the creation of any "interests" (within the meaning of Section 860G of the Code) in the REMIC other than the Certificates.

(b)    The Closing Date is hereby designated as the "startup day" of each of REMIC I, REMIC II and REMIC III within the meaning of Section 860G(a)(9) of the Code (the "Startup Date").

(c)    The REMIC Administrator shall hold a Class R Certificate in each REMIC representing a 0.01% Percentage Interest of the Class R Certificates in each REMIC and shall be designated as the "tax matters person" with respect to each of REMIC I, REMIC II and REMIC III in the manner provided under Treasury regulations Section 1.860F-4(d) and Treasury regulations Section 301.6231(a)(7)-1.  The REMIC Administrator, as tax matters person, shall (i) act on behalf of each of REMIC I, REMIC II and REMIC III in relation to any tax matter or controversy involving the Trust Fund and (ii) represent the Trust Fund in any administrative or judicial proceeding relating to an examination or audit by any governmental taxing authority with respect thereto.  The legal expenses, including without limitation attorneys' or accountants' fees, and costs of any such proceeding and any liability resulting therefrom shall be expenses of the Trust Fund and the REMIC Administrator shall be entitled to reimbursement therefor out of amounts attributable to the Mortgage Loans on deposit in the Custodial Account as provided by Section 3.10 unless such legal expenses and costs are incurred by reason of the REMIC Administrator's willful misfeasance, bad faith or gross negligence.  If the REMIC Administrator is no longer the Master Servicer hereunder, at its option the REMIC Administrator may continue its duties as REMIC Administrator and shall be paid reasonable compensation not to exceed $3,000 per year by any successor Master Servicer hereunder for so acting as the REMIC Administrator.

(d)    The REMIC Administrator shall prepare or cause to be prepared all of the Tax Returns that it determines are required with respect to the REMICs created hereunder and deliver such Tax Returns in a timely manner to the Trustee and the Trustee shall sign and file such Tax Returns in a timely manner.  The expenses of preparing such returns shall be borne by the REMIC Administrator without any right of reimbursement therefor.  The REMIC Administrator agrees to indemnify and hold harmless the Trustee with respect to any tax or liability arising from the Trustee's signing of Tax Returns that contain errors or omissions.  The Trustee and Master Servicer shall promptly provide the REMIC Administrator with such information as the REMIC Administrator may from time to time request for the purpose of enabling the REMIC Administrator to prepare Tax Returns.

(e)    The REMIC Administrator shall provide (i) to any Transferor of a Class R Certificate such information as is necessary for the application of any tax relating to the transfer of a Class R

CONFIDENTIAL                                                                    RC_FGIC9019_00018255

Certificate to any Person who is not a Permitted Transferee, (ii) to the Trustee and the Trustee shall forward to the Certificateholders such information or reports as are required by the Code or the REMIC Provisions including reports relating to interest, original issue discount, if any, and market discount or premium (using the Prepayment Assumption) and (iii) to the Internal Revenue Service the name, title, address and telephone number of the person who will serve as the representative of each REMIC created hereunder.

(f)     The Master Servicer and the REMIC Administrator shall take such actions and shall cause each REMIC created hereunder to take such actions as are reasonably within the Master Servicer's or the REMIC Administrator's control and the scope of its duties more specifically set forth herein as shall be necessary or desirable to maintain the status thereof as a REMIC under the REMIC Provisions (and the Trustee shall assist the Master Servicer and the REMIC Administrator, to the extent reasonably requested by the Master Servicer and the REMIC Administrator to do so).  In performing their duties as more specifically set forth herein, the Master Servicer and the REMIC Administrator shall not knowingly or intentionally take any action, cause the Trust Fund to take any action or fail to take (or fail to cause to be taken) any action reasonably within their respective control and the scope of duties more specifically set forth herein, that, under the REMIC Provisions, if taken or not taken, as the case may be, could (i) endanger the status of any REMIC created hereunder as a REMIC or (ii) result in the imposition of a tax upon any REMIC created hereunder (including but not limited to the tax on prohibited transactions as defined in Section 860F(a)(2) of the Code (except as provided in Section 2.04) and the tax on contributions to a REMIC set forth in Section 860G(d) of the Code) (either such event, in the absence of an Opinion of Counsel or the indemnification referred to in this sentence, an "Adverse REMIC Event") unless the Certificate Insurer and the Master Servicer or the REMIC Administrator, as applicable, have received an Opinion of Counsel (at the expense of the party seeking to take such action or, if such party fails to pay such expense, and the Master Servicer or the REMIC Administrator, as applicable, determines that taking such action is in the best interest of the Trust Fund and the Certificateholders and is not adverse to the interests of the Certificate Insurer, at the expense of the Trust Fund, but in no event at the expense of the Master Servicer, the REMIC Administrator or the Trustee) to the effect that the contemplated action will not, with respect to the Trust Fund created hereunder, endanger such status or, unless the Master Servicer or the REMIC Administrator or both, as applicable, determine in its or their sole discretion to indemnify the Trust Fund against the imposition of such a tax, result in the imposition of such a tax.  Wherever in this Agreement a contemplated action may not be taken because the timing of such action might result in the imposition of a tax on the Trust Fund, or may only be taken pursuant to an Opinion of Counsel that such action would not impose a tax on the Trust Fund, such action may nonetheless be taken provided that the indemnity given in the preceding sentence with respect to any taxes that might be imposed on the Trust Fund has been given and that all other preconditions to the taking of such action have been satisfied.  The Trustee shall not take or fail to take any action (whether or not authorized hereunder) as to which the Master Servicer or the REMIC Administrator, as applicable, has advised it in writing that it has received an Opinion of Counsel to the effect that an Adverse REMIC Event could occur with respect to such action or inaction, as the case may be.  In addition, prior to taking any action with respect to the Trust Fund or its assets, or causing the Trust Fund to take any action, which is not expressly permitted under the terms of this Agreement, the Trustee will consult with the Certificate Insurer and the Master Servicer or the REMIC Administrator, as applicable, or its designee, in writing, with respect to whether such action could cause an Adverse REMIC Event to occur with respect to the Trust Fund and the Trustee shall not take any such action or cause the Trust Fund to take any such action as to which the Master Servicer or the REMIC Administrator, as applicable, has advised it in writing that an Adverse REMIC Event could occur.  The Master Servicer or the REMIC Administrator, as applicable, may consult with counsel to make such written advice, and the cost of same shall be borne by the party seeking to take the action not expressly permitted by this Agreement, but in no event at the expense of the Master Servicer or the REMIC Administrator.  At all times as may be required by the Code, the Master Servicer or the REMIC Administrator, as applicable, will to the extent within its control and the scope of

CONFIDENTIAL                                                                        RC_FGIC9019_00018256

its duties more specifically set forth herein, maintain substantially all of the assets of the REMIC as "qualified mortgages" as defined in Section 860G(a)(3) of the Code and "permitted investments" as defined in Section 860G(a)(5) of the Code.

(g)    In the event that any tax is imposed on "prohibited transactions" of any REMIC created hereunder as defined in Section 860F(a)(2) of the Code, on "net income from foreclosure property" of any REMIC as defined in Section 860G(c) of the Code, on any contributions to any REMIC after the Startup Date therefor pursuant to Section 860G(d) of the Code, or any other tax imposed by the Code or any applicable provisions of state or local tax laws, such tax shall be charged (i) to the Master Servicer, if such tax arises out of or results from a breach by the Master Servicer of any of its obligations under this Agreement or the Master Servicer in its role as Master Servicer or REMIC Administrator has in its sole discretion determined to indemnify the Trust Fund against such tax, (ii) to the Trustee, if such tax arises out of or results from a breach by he Trustee of any of its obligations under this Article X, or (iii) otherwise against amounts on deposit in the Custodial Account as provided by Section 3.10 and on the Distribution Date(s) following such reimbursement the aggregate of such taxes shall be allocated in reduction of the Accrued Certificate Interest on each Class entitled thereto in the same manner as if such taxes constituted a Prepayment Interest Shortfall.

(h)    The Trustee and the Master Servicer shall, for federal income tax purposes, maintain books and records with respect to each REMIC on a calendar year and on an accrual basis or as otherwise may be required by the REMIC Provisions.

(i)    Following the Startup Date, neither the Master Servicer nor the Trustee shall accept any contributions of assets to any REMIC unless (subject to Section 10.01(f)) the Master Servicer, the Certificate Insurer and the Trustee shall have received an Opinion of Counsel (at the expense of the party seeking to make such contribution) to the effect that the inclusion of such assets in any REMIC will not cause any REMIC created hereunder to fail to qualify as a REMIC at any time that any Certificates are outstanding or subject any such REMIC to any tax under the REMIC Provisions or other applicable provisions of federal, state and local law or ordinances.

(j)    Neither the Master Servicer nor the Trustee shall (subject to Section 10.01(f)) enter into any arrangement by which any REMIC created hereunder will receive a fee or other compensation for services nor permit any REMIC created hereunder to receive any income from assets other than "qualified mortgages" as defined in Section 860G(a)(3) of the Code or "permitted investments" as defined in Section 860G(a)(5) of the Code.

(k)    Solely for the purposes of Section 1.860G-1(a)(4)(iii) of the Treasury Regulations, the "latest possible maturity date" by which the principal balance of each regular interest in each REMIC would be reduced to zero is August 25, 2034, which is the Distribution Date in the month following the last scheduled payment on any Mortgage Loan.

(l)    Within 30 days after the Closing Date, the REMIC Administrator shall prepare and file with the Internal Revenue Service Form 8811, "Information Return for Real Estate Mortgage Investment Conduits (REMIC) and Issuers of Collateralized Debt Obligations" for the Trust Fund.

(m)    Neither the Trustee nor the Master Servicer shall sell, dispose of or substitute for any of the Mortgage Loans (except in connection with (i) the default, imminent default or foreclosure of a Mortgage Loan, including but not limited to, the acquisition or sale of a Mortgaged Property acquired by deed in lieu of foreclosure, (ii) the bankruptcy of the Trust Fund, (iii) the termination of any REMIC pursuant to Article IX of this Agreement or (iv) a purchase of Mortgage Loans pursuant to Article II or III of this Agreement) or acquire any assets for any REMIC or sell or dispose of any investments in the

CONFIDENTIAL                                                              RC_FGIC9019_00018257

Custodial Account or the Certificate Account for gain, or accept any contributions to any REMIC after the Closing Date unless the Certificate Insurer and Master Servicer or Trustee, as applicable, have received an Opinion of Counsel that such sale, disposition, substitution or acquisition will not (a) affect adversely the status of any REMIC created hereunder as a REMIC or (b) unless the Master Servicer has determined in its sole discretion to indemnify the Trust Fund against such tax, cause any REMIC to be subject to a tax on "prohibited transactions" or "contributions" pursuant to the REMIC Provisions. The Trustee shall treat the Mortgage Insurance Premium Taxes Reserve Fund as an outside reserve fund within the meaning of Treasury Regulation 1.860G-2(h).

Section 10.02.    Master Servicer, REMIC Administrator and Trustee Indemnification.

(a)    The Trustee agrees to indemnify the Trust Fund, the Certificate Insurer, the Depositor, the REMIC Administrator and the Master Servicer for any taxes and costs including, without limitation, any reasonable attorneys fees imposed on or incurred by the Trust Fund, the Certificate Insurer, the Depositor or the Master Servicer, as a result of a breach of the Trustee's covenants set forth in Article VIII or this Article X. In the event that Residential Funding is no longer the Master Servicer, the Trustee shall indemnify Residential Funding for any taxes and costs including, without limitation, any reasonable attorneys fees imposed on or incurred by Residential Funding as a result of a breach of the Trustee's covenants set forth in Article VIII or this Article X.

(b)    The REMIC Administrator agrees to indemnify the Trust Fund, the Certificate Insurer, the Depositor, the Master Servicer and the Trustee for any taxes and costs (including, without limitation, any reasonable attorneys' fees) imposed on or incurred by the Trust Fund, the Certificate Insurer, the Depositor, the Master Servicer or the Trustee, as a result of a breach of the REMIC Administrator's covenants set forth in this Article X with respect to compliance with the REMIC Provisions, including without limitation, any penalties arising from the Trustee's execution of Tax Returns prepared by the REMIC Administrator that contain errors or omissions; provided, however, that such liability will not be imposed to the extent such breach is a result of an error or omission in information provided to the REMIC Administrator by the Master Servicer in which case Section 10.02(c) will apply.

(c)    The Master Servicer agrees to indemnify the Trust Fund, the Certificate Insurer, the Depositor, the REMIC Administrator and the Trustee for any taxes and costs (including, without limitation, any reasonable attorneys' fees) imposed on or incurred by the Trust Fund, the Certificate Insurer, the Depositor, the REMIC Administrator or the Trustee, as a result of a breach of the Master Servicer's covenants set forth in this Article X or in Article III with respect to compliance with the REMIC Provisions, including without limitation, any penalties arising from the Trustee's execution of Tax Returns prepared by the Master Servicer that contain errors or omissions.

CONFIDENTIAL                                                                         RC_FGIC9019_00018258

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

Section 11.01.    <u>Amendment</u>.  Subject to Section 11.10(c) hereof:

(a)    This Agreement or any Custodial Agreement may be amended from time to time by the Depositor, the Master Servicer and the Trustee, without the consent of any of the Certificateholders:

(i)    to cure any ambiguity,

(ii)    to correct or supplement any provisions herein or therein, which may be inconsistent with any other provisions herein or therein or to correct any error,

(iii)    to modify, eliminate or add to any of its provisions to such extent as shall be necessary or desirable to maintain the qualification of any REMIC created hereunder as a REMIC at all times that any Certificate is outstanding or to avoid or minimize the risk of the imposition of any tax on the Trust Fund pursuant to the Code that would be a claim against the Trust Fund, *provided* that the Trustee has received an Opinion of Counsel to the effect that (A) such action is necessary or desirable to maintain such qualification or to avoid or minimize the risk of the imposition of any such tax and (B) such action will not adversely affect in any material respect the interests of any Certificateholder,

(iv)    to change the timing and/or nature of deposits into the Custodial Account or the Certificate Account or to change the name in which the Custodial Account is maintained, *provided* that (A) the Certificate Account Deposit Date shall in no event be later than the related Distribution Date, (B) such change shall not, as evidenced by an Opinion of Counsel, adversely affect in any material respect the interests of any Certificateholder and (C) such change shall not result in a reduction of the rating assigned to any Class of Certificates below the lower of the then-current rating or the rating assigned to such Certificates as of the Closing Date (without taking into account the related Certificate Guaranty Insurance Policy), as evidenced by a letter from each Rating Agency to such effect,

(v)    to modify, eliminate or add to the provisions of Section 5.02(f) or any other provision hereof restricting transfer of the Class R Certificates by virtue of their being the "residual interests" in the Trust Fund *provided* that (A) such change shall not result in reduction of the rating assigned to any such Class of Certificates below the lower of the then-current rating or the rating assigned to such Certificates as of the Closing Date, as evidenced by a letter from each Rating Agency to such effect, and (B) such change shall not (subject to Section 10.01(f)), as evidenced by an Opinion of Counsel (at the expense of the party seeking so to modify, eliminate or add such provisions), cause the Trust Fund or any of the Certificateholders (other than the transferor) to be subject to a federal tax caused by a transfer to a Person that is not a Permitted Transferee, or

(vi)    to make any other provisions with respect to matters or questions arising under this Agreement or such Custodial Agreement which shall not be materially inconsistent with the provisions of this Agreement, *provided* that such action shall not, as evidenced by an Opinion of Counsel, adversely affect in any material respect the interests of any Certificateholder and is authorized or permitted under Section 11.01.

CONFIDENTIAL                                                    RC_FGIC9019_00018259

(b)    This Agreement or any Custodial Agreement may also be amended from time to time by the Depositor, the Master Servicer, the Trustee and the Holders of Certificates evidencing in the aggregate not less than 66% of the Percentage Interests of each Class of Certificates affected thereby for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement or such Custodial Agreement or of modifying in any manner the rights of the Holders of Certificates of such Class; *provided, however*, that no such amendment shall:

(i)    reduce in any manner the amount of, or delay the timing of, payments which are required to be distributed on any Certificate without the consent of the Holder of such Certificate,

(ii)    adversely affect in any material respect the interest of the Holders of Certificates of any Class in a manner other than as described in clause (i) hereof without the consent of Holders of Certificates of such Class evidencing, as to such Class, Percentage Interests aggregating not less than 66%, or

(iii)    reduce the aforesaid percentage of Certificates of any Class the Holders of which are required to consent to any such amendment, in any such case without the consent of the Holders of all Certificates of such Class then outstanding.

(c)    Notwithstanding any contrary provision of this Agreement, the Trustee shall not consent to any amendment to this Agreement unless the Trustee and the Certificate Insurer shall have first received an Opinion of Counsel (at the expense of the party seeking such amendment) to the effect that such amendment or the exercise of any power granted to the Master Servicer, the Depositor or the Trustee in accordance with such amendment will not result in the imposition of a federal tax on the Trust Fund or cause any REMIC created hereunder to fail to qualify as a REMIC at any time that any Certificate is outstanding; *provided*, that if the indemnity described in Section 10.01(f) with respect to any taxes that might be imposed on the Trust Fund has been given, the Trustee shall not require the delivery to it of the Opinion of Counsel described in this Section 11.01(c). The Trustee may but shall not be obligated to enter into any amendment pursuant to this Section that affects its rights, duties and immunities and this Agreement or otherwise; *provided, however*, such consent shall not be unreasonably withheld.

(d)    Promptly after the execution of any such amendment the Trustee shall furnish written notification of the substance of such amendment to each Certificateholder. It shall not be necessary for the consent of Certificateholders under this Section 11.01 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent shall approve the substance thereof. The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Certificateholders shall be subject to such reasonable regulations as the Trustee may prescribe.

(e)    The Depositor shall have the option, in its sole discretion, to obtain and deliver to the Trustee any corporate guaranty, payment obligation, irrevocable letter of credit, surety bond, insurance policy or similar instrument or a reserve fund, or any combination of the foregoing, for the purpose of protecting the Holders of the Class R Certificates against any or all Realized Losses or other shortfalls. Any such instrument or fund shall be held by the Trustee for the benefit of the Class R Certificateholders, but shall not be and shall not be deemed to be under any circumstances included in the REMIC. To the extent that any such instrument or fund constitutes a reserve fund for federal income tax purposes, (i) any reserve fund so established shall be an outside reserve fund and not an asset of the REMIC, (ii) any such reserve fund shall be owned by the Depositor, and (iii) amounts transferred by the REMIC to any such reserve fund shall be treated as amounts distributed by the REMIC to the Depositor or any successor, all within the meaning of Treasury regulations Section 1.860G-2(h) in effect as of the Cut-off Date. In connection with the provision of any such instrument or fund, this Agreement and any provision hereof may be modified, added to, deleted or otherwise amended in any manner that is related or incidental to

CONFIDENTIAL                                                      RC_FGIC9019_00018260

such instrument or fund or the establishment or administration thereof, such amendment to be made by written instrument executed or consented to by the Depositor and such related insurer but without the consent of any Certificateholder and without the consent of the Master Servicer or the Trustee being required unless any such amendment would impose any additional obligation on, or otherwise adversely affect the interests of the Certificateholders or the Certificate Insurer, the Master Servicer or the Trustee, as applicable; *provided* that the Depositor obtains an Opinion of Counsel (which need not be an opinion of Independent counsel) to the effect that any such amendment will not cause (a) any federal tax to be imposed on the Trust Fund, including without limitation, any federal tax imposed on "prohibited transactions" under Section 860F(a)(1) of the Code or on "contributions after the startup date" under Section 860G(d)(1) of the Code and (b) any REMIC created hereunder to fail to qualify as a REMIC at any time that any Certificate is outstanding. In the event that the Depositor elects to provide such coverage in the form of a limited guaranty provided by General Motors Acceptance Corporation, the Depositor may elect that the text of such amendment to this Agreement shall be substantially in the form attached hereto as Exhibit K (in which case Residential Funding's Subordinate Certificate Loss Obligation as described in such exhibit shall be established by Residential Funding's consent to such amendment) and that the limited guaranty shall be executed in the form attached hereto as Exhibit L, with such changes as the Depositor shall deem to be appropriate; it being understood that the Trustee has reviewed and approved the content of such forms and that the Trustee's consent or approval to the use thereof is not required.

(f)    In addition to the foregoing, any amendment of Section 4.08 of this Agreement shall require the consent of the Limited Repurchase Right Holder as third-party beneficiary.

Section 11.02.    Recordation of Agreement; Counterparts.

(a)    To the extent permitted by applicable law, this Agreement is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any or all of the properties subject to the Mortgages are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Master Servicer and at its expense on direction by the Trustee (pursuant to the request of the Certificate Insurer or the Holders of Certificates entitled to at least 25% of the Voting Rights), but only upon direction accompanied by an Opinion of Counsel to the effect that such recordation materially and beneficially affects the interests of the Certificateholders or the Certificate Insurer.

(b)    For the purpose of facilitating the recordation of this Agreement as herein provided and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

Section 11.03.    Limitation on Rights of Certificateholders.

(a)    The death or incapacity of any Certificateholder shall not operate to terminate this Agreement or the Trust Fund, nor entitle such Certificateholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust Fund, nor otherwise affect the rights, obligations and liabilities of any of the parties hereto.

(b)    No Certificateholder shall have any right to vote (except as expressly provided herein) or in any manner otherwise control the operation and management of the Trust Fund, or the obligations of the parties hereto, nor shall anything herein set forth, or contained in the terms of the Certificates, be construed so as to constitute the Certificateholders from time to time as partners or members of an

CONFIDENTIAL                                                                    RC_FGIC9019_00018261

association; nor shall any Certificateholder be under any liability to any third person by reason of any action taken by the parties to this Agreement pursuant to any provision hereof.

(c)    No Certificateholder shall have any right by virtue of any provision of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee and the Certificate Insurer a written notice of default and of the continuance thereof, as hereinbefore provided, and unless also the Holders of Certificates of any Class evidencing in the aggregate not less than 25% of the related Percentage Interests of such Class, shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby, and the Certificate Insurer shall have given its written consent and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding it being understood and intended, and being expressly covenanted by each Certificateholder with every other Certificateholder and the Trustee, that no one or more Holders of Certificates of any Class shall have any right in any manner whatever by virtue of any provision of this Agreement to affect, disturb or prejudice the rights of the Holders of any other of such Certificates of such Class or any other Class, or to obtain or seek to obtain priority over or preference to any other such Holder, or to enforce any right under this Agreement, except in the manner herein provided and for the common benefit of Certificateholders of such Class or all Classes, as the case may be. For the protection and enforcement of the provisions of this Section 11.03, each and every Certificateholder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

Section 11.04.    Governing Law.

This agreement and the Certificates shall be governed by and construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

Section 11.05.    Notices.

All demands and notices hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by registered mail, postage prepaid (except for notices to the Trustee which shall be deemed to have been duly given only when received), to (a) in the case of the Depositor, 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota 55437, Attention: President (RASC), or such other address as may hereafter be furnished to the Master Servicer and the Trustee in writing by the Depositor; (b) in the case of the Master Servicer, 2255 North Ontario Street, Burbank, California 91504-3120, Attention: Bond Administration or such other address as may be hereafter furnished to the Depositor and the Trustee by the Master Servicer in writing; (c) in the case of the Trustee, the Corporate Trust Office or such other address as may hereafter be furnished to the Depositor and the Master Servicer in writing by the Trustee; (d) in the case of Standard & Poor's, 55 Water Street, New York, New York 10041; Attention: Mortgage Surveillance or such other address as may be hereafter furnished to the Depositor, Trustee and Master Servicer by Standard & Poor's; (e) Moody's, 99 Church Street, New York, New York 10007, Attention: ABS Monitoring Department, or such other address as may be hereafter furnished to the Depositor, the Trustee and the Master Servicer in writing by Moody's, (f) in the case of the Hedge Agreement Provider, Bear Stearns Financial Products Inc., 383 Madison Avenue-Suite 2700, New York, New York 10179, or such other address as may be hereafter furnished to the Depositor, the Trustee and the Master Servicer in writing by the Hedge Agreement Provider, (g) in the case of the MI Policy Provider, PMI Mortgage Insurance Co., PMI Plaza, 3003 Oak Road, Walnut Creek, California 94597, or such other address as may be hereafter furnished to the Depositor, the Trustee and the Master Servicer in writing by the MI Policy Provider, and (h) in the

CONFIDENTIAL                                                           RC_FGIC9019_00018262

case of the Certificate Insurer, 125 Park Avenue, New York, New York 10017, Attention: Research and Risk Management, or such other address as may be hereafter furnished to the Depositor, the Trustee and the Master Servicer in writing by the Certificate Insurer. Any notice required or permitted to be mailed to a Certificateholder shall be given by first class mail, postage prepaid, at the address of such holder as shown in the Certificate Register. Any notice so mailed within the time prescribed in this Agreement shall be conclusively presumed to have been duly given, whether or not the Certificateholder receives such notice.

Section 11.06.  Notices to Rating Agencies and the Certificate Insurer.

The Depositor, the Master Servicer or the Trustee, as applicable, shall notify each Rating Agency, the Certificate Insurer and each Subservicer at such time as it is otherwise required pursuant to this Agreement to give notice of the occurrence of, any of the events described in clause (a), (b), (c), (d), (g), (h), (i) or (j) below or provide a copy to each Rating Agency, the Certificate Insurer and each Subservicer at such time as otherwise required to be delivered pursuant to this Agreement of any of the statements described in clauses (e) and (f) below:

(a)    a material change or amendment to this Agreement,

(b)    the occurrence of an Event of Default,

(c)    the termination or appointment of a successor Master Servicer or Trustee or a change in the majority ownership of the Trustee,

(d)    the filing of any claim under the Master Servicer's blanket fidelity bond and the errors and omissions insurance policy required by Section 3.12 or the cancellation or modification of coverage under any such instrument,

(e)    the statement required to be delivered to the Holders of each Class of Certificates pursuant to Section 4.03,

(f)    the statements required to be delivered pursuant to Sections 3.18 and 3.19,

(g)    a change in the location of the Custodial Account or the Certificate Account,

(h)    the occurrence of any monthly cash flow shortfall to the Holders of any Class of Certificates resulting from the failure by the Master Servicer to make an Advance pursuant to Section 4.04,

(i)    the occurrence of the Final Distribution Date, and

(j)    the repurchase of or substitution for any Mortgage Loan, *provided, however*, that with respect to notice of the occurrence of the events described in clauses (d), (g) or (h) above, the Master Servicer shall provide prompt written notice to each Rating Agency, the Certificate Insurer and the related Subservicer of any such event known to the Master Servicer. In addition to the above delivery requirements, the Depositor, the Master Servicer or the Trustee, as applicable, shall provide a copy to the Certificate Insurer, at such time as it otherwise is required to deliver pursuant to this Agreement, of any other written confirmation, written notice or legal opinion.

CONFIDENTIAL                                        RC_FGIC9019_00018263

Section 11.07.    Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or of the Certificates or the rights of the Holders thereof or the Certificate Insurer.

Section 11.08.    Supplemental Provisions for Resecuritization.

(a)    This Agreement may be supplemented by means of the addition of a separate Article hereto (a "Supplemental Article") for the purpose of resecuritizing any of the Certificates issued hereunder, under the following circumstances.  With respect to any Class or Classes of Certificates issued hereunder, or any portion of any such Class, as to which the Depositor or any of its Affiliates (or any designee thereof) is the registered Holder (the "Resecuritized Certificates"), the Depositor may deposit such Resecuritized Certificates into a new REMIC, grantor trust, FASIT or custodial arrangement (a "Restructuring Vehicle") to be held by the Trustee pursuant to a Supplemental Article.  The instrument adopting such Supplemental Article shall be executed by the Depositor, the Master Servicer and the Trustee; *provided*, that neither the Master Servicer nor the Trustee shall withhold their consent thereto if their respective interests would not be materially adversely affected thereby.  To the extent that the terms of the Supplemental Article do not in any way affect any provisions of this Agreement as to any of the Certificates initially issued hereunder, the adoption of the Supplemental Article shall not constitute an "amendment" of this Agreement.  Each Supplemental Article shall set forth all necessary provisions relating to the holding of the Resecuritized Certificates by the Trustee, the establishment of the Restructuring Vehicle, the issuing of various classes of new certificates by the Restructuring Vehicle and the distributions to be made thereon, and any other provisions necessary to the purposes thereof.  In connection with each Supplemental Article, the Depositor shall deliver to the Trustee an Opinion of Counsel to the effect that (i) the Restructuring Vehicle will qualify as a REMIC, grantor trust, FASIT or other entity not subject to taxation for federal income tax purposes and (ii) the adoption of the Supplemental Article will not endanger the status of any REMIC created hereunder as a REMIC or result in the imposition of a tax upon the Trust Fund (including but not limited to the tax on prohibited transaction as defined in Section 860F(a)(2) of the Code and the tax on contributions to a REMIC as set forth in Section 860G(d) of the Code.

Section 11.09.    Third-Party Beneficiary.

The Limited Repurchase Right Holder is an express third-party beneficiary of Section 4.08 of this Agreement, and shall have the right to enforce the related provisions of Section 4.08 of this Agreement as if it were a party hereto.

Section 11.10.    Rights of the Certificate Insurer.

(a)    The Certificate Insurer is an express third-party beneficiary of this Agreement.

(b)    The Trustee shall provide to the Certificate Insurer copies of any report, notice, Opinion of Counsel, Officers' Certificate, request for consent or request for amendment to any document related hereto promptly upon the Trustee's production or receipt thereof.

(c)    Unless a Certificate Insurer Default exists, the Trustee and the Depositor shall not agree to any amendment to this Agreement without first having obtained the prior written consent of the Certificate Insurer.

CONFIDENTIAL                                                                    RC_FGIC9019_00018264

(d)      So long as there does not exist a failure by the Certificate Insurer to make a required payment under either Certificate Guaranty Insurance Policy, the Certificate Insurer shall have the right to exercise all rights of the Holders of the Class A Certificates under this Agreement without any consent of such Holders, and such Holders may exercise such rights only with the prior written consent of the Certificate Insurer, except as provided herein.

(e)      The Certificate Insurer shall not be entitled to exercise any of its rights hereunder so long as there exists a failure by the Certificate Insurer to make a required payment under either Certificate Guaranty Insurance Policy.

CONFIDENTIAL                                                                RC_FGIC9019_00018265

IN WITNESS WHEREOF, the Depositor, the Master Servicer and the Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized and their respective seals, duly attested, to be hereunto affixed, all as of the day and year first above written.

[Seal]                                          RESIDENTIAL ASSET SECURITIES
                                                CORPORATION


Attest:_____          By:_____
        Name:                                    Name: Benita Bjorgo
        Title:                                   Title:  Vice President


[Seal]                                          RESIDENTIAL FUNDING CORPORATION


Attest:_____          By:_____
        Name:                                    Name: Julie Steinhagen
        Title:                                   Title:  Director


[Seal]                                          JPMORGAN CHASE BANK
                                                as Trustee


Attest:_____          By:_____
        Name:                                    Name:
        Title:                                   Title:


DOCSLA1:476701.5

STATE OF MINNESOTA          )
                           ) ss.:
COUNTY OF HENNEPIN          )

On the _____ day of _____, 2004 before me, a notary public in and for said State, personally appeared Benita Bjorgo, known to me to be a Vice President of Residential Asset Securities Corporation, one of the corporations that executed the within instrument, and also known to me to be the person who executed it on behalf of said corporation, and acknowledged to me that such corporation executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

Notary Public

_____

[Notarial Seal]

DOCSLA1:476701.5

STATE OF MINNESOTA     )
                                 ) ss.:
COUNTY OF HENNEPIN    )

On the _____ day of _____, 2004 before me, a notary  public in and for said State, personally appeared Julie Steinhagen, known to me to be a Director of Residential Funding Corporation, one of the corporations that executed the within instrument, and also known to me to be the person who executed it on behalf of said corporation, and acknowledged to me that such corporation executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

Notary Public

_____

[Notarial Seal]

DOCSLA1:476701.5

CONFIDENTIAL

STATE OF                    )
                           ) ss.:
COUNTY OF                   )

On the ____ day of _____, 2004 before me, a notary  public in and for said State, personally appeared _____, known to me to be a _____ of JPMorgan Chase Bank, a New York banking corporation that executed the within instrument, and also known to me to be the person who executed it on behalf of said banking corporation and acknowledged to me that such banking corporation executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

Notary Public

_____

[Notarial Seal]

DOCSLA1:476701.5

**<u>Exhibit 119</u>**

| | |
|---|---|
| **From:** | Siegel, Glenn |
| **To:** | Major, Robert H |
| **Sent:** | 5/8/2013 11:44:02 AM |
| **Subject:** | FW: ResCap / FGIC Proposal (D&P Summary) |
| **Attachments:** | ResCap_FGIC Commutation Proposal_D&P Summary.pdf |

As discussed

Glenn E. Siegel
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036-6797
Phone: 212.698.3569
Cell: 917.270.3415
Fax:  212.314.0069
E-mail: glenn.siegel@dechert.com

**From:** Murphy, Brendan [mailto:Brendan.Murphy@duffandphelps.com]
**Sent:** Monday, May 06, 2013 4:54 PM
**To:** Johnson, Michael; Siegel, Glenn
**Cc:** Murphy, Brendan; Pfeiffer, Allen; Chong, Alice; Messenger, Zachary; Parekh, Charles
**Subject:** ResCap / FGIC Proposal (D&P Summary)

*__Privileged and Confidential / Attorney-Client Work Product__*



**Brendan J. Murphy**
Director, Restructuring & Special Situations

T  +1 212 277 0138
M +1 713 628 0216
F  +1 917 267 7073

55 East 52nd Street
Floor 31
New York, NY 10055

This email is confidential and subject to important disclaimers and conditions, including those regarding

CONFIDENTIAL

EXHIBIT 4
WIT: MAJOR
DATE: 7-17-13
E. MULVENNA, CSR/RMR/CRR

BNYM-MS 0000079
**BNYM-MS 0000079**

confidentiality, legal privilege and certain legal entity disclaimers, available at
http://www.duffandphelps.com/disclosure. Circular 230 Disclosure: Any advice contained in this email (including any
attachments unless expressly stated otherwise) is not intended or written to be used, and cannot be used, for purposes of
avoiding tax penalties that may be imposed on any taxpayer.


This e-mail is from Dechert LLP, a law firm, and may contain information that is confidential or privileged. If you are
not the intended recipient, do not read, copy or distribute the e-mail or any attachments. Instead, please notify the
sender and delete the e-mail and any attachments. Thank you.

CONFIDENTIAL

BNYM-MS 0000080

BNYM-MS 0000080

# DUFF&PHELPS

# RESCAP

## Residential Capital, LLC

FGIC Commutation Proposal
Discussion Materials

*DRAFT – Subject to Change*

May 2013

*CONFIDENTIAL*
*Attorney-Client Privilege*

**DUFF&PHELPS**
*Duff & Phelps Securities, LLC is a FINRA Registered Broker-Dealer*

AMSTERDAM • ATLANTA • AUSTIN • BOSTON • CHICAGO • CINCINNATI • DALLAS • DENVER • DETROIT • HOUSTON • LONDON • LOS ANGELES • MORRISTOWN
MUNICH • NEW YORK • NEWPORT BEACH • PARIS • PHILADELPHIA • PLANO • SAN FRANCISCO • SEATTLE • SHANGHAI • SILICON VALLEY • TOKYO • TORONTO • WASHINGTON D.C.

CONFIDENTIAL

BNYM-MS 0000081

# Situation Overview

- **In late March, FGIC delivered a commutation proposal ("Proposal") to the Steering Committee Group of RMBS Holders for ResCap-related trusts to provide a global resolution regarding the pending RMBS litigation. The Proposal from FGIC sets forth a lump sum cash consideration paid to the policyholders of the Rescap-related wrapped trusts in exchange for the ability to assert a general unsecured claim in the Rescap bankruptcy cases.**

- On June 11, 2012, Benjamin Lawsky, Superintendent of Financial Services of the State of New York (the "Rehabilitator"), filed a rehabilitation petition on behalf of FGIC with the Supreme Court of the State of New York.

  – The Rehabilitator filed an initial Plan of Rehabilitation for FGIC on September 27, 2012 and filed the First Amended Plan of Rehabilitation on December 12, 2012.

  – In connection with the First Amended Plan of Rehabilitation, Lazard, as financial advisor to the New York Liquidation Bureau, submitted an affidavit which contained revised projections.

  – The Rehabilitator filed a revised First Amended Plan of Rehabilitation for FGIC on April 12, 2013 (the "Plan") which is expected to be heard on June 11, 2013.

- Based on the current Plan, holders of permitted policy claims ("Policyholders") would receive (i) an upfront Cash Payment in an amount equal to a specified cash payout percentage upon the initial incurrence of the policy claim and (ii) additional catch-up payments through a ratable payout mechanism as set forth in the Plan.

  – In the revised Base Scenario, the Policyholders would receive a recovery of 28.5% on their claim (based on a net present value of the distributions discounted at an illustrative rate of 15%).

- In connection with the Plan, FGIC has presented the Proposal to the Steering Committee Group of RMBS Holders for ResCap-related RMBS trusts in late March.

  – The Proposal provides a cash payout from FGIC of approximately $253 million to the ResCap-related RMBS Policyholders in exchange for approximately $597 million of claims asserted in the ResCap case by FGIC.

- The following materials provide initial observations regarding the potential recoveries, timing, and risks to the Rescap-related RMBS Policyholders for both the current Plan and the Proposal.

DRAFT - Privileged & Confidential - Attorney Work Product

CONFIDENTIAL

# FGIC Proposal – Commutation and Claim

($ in millions)

**The Proposal outlines a cash payment of approximately $253 million by FGIC upon emergence in exchange for the ability for FGIC to assert approximately $597 million of allowed claims at Rescap.**

- The following Proposal is based on the following three main assumptions:

  - **[A]** Initial Cash Payment Percentage of 17.25% (based on the updated Stress Scenario pursuant to the Plan),

  - **[B]** Base Case Payout to policyholders of 28.5% (based on the updated Base scenario pursuant to the Plan assuming a 15% discount rate), and

  - **[J]** Haircut of 40% on unpaid payout claim estimates.

- In consideration for the cash commutation payment of approximately $253 million, FGIC in return would receive a claim in the Rescap case for the sum of the (i) payouts made to date related to the RFC- and GMACM-sponsored trusts and (ii) the cash commutation.

## Information Points

| | | |
|---|---|---|
| Initial Cash Payment Percentage (CPP) | 17.25% | [A] |
| Base Case Payout (NPV @ 15.0%) | 28.50% | [B] |
| FGIC - Ch. 11 Proof of Claim (POC) Amount | $1,850.0 | |
| Less: Cost, Interest, etc. | (236.0) | |
| Total Projected Claims in POC | 1,614.0 | |
| Claims Paid to Date | 344.0 | [C] |
| Estimated Unpaid Claims | 1,270.0 | [D] |
| Accrued and Unpaid ("A&U") Claims (as of 3/31/13) | 789.0 | [D] |
| Future Estimated Claims | $481.0 | [E] |

## Commutation Consideration

| | | |
|---|---|---|
| Claims - A&U - Cash at Initial CPP | $136.1 | [F] = [A] x [D] |
| Claims - A&U - Base Case Payout less Initial CPP | $88.8 | [G] = [B] x [D] - [F] |
| Claims - Future Estimated Claims at Base Case Payout | 137.1 | [H] = [B] x [E] |
| Subtotal | $225.8 | [I] = [G] + [H] |
| Factor % for Unpaid Payout | 60.0% | [J] |
| Value Attributable to Estimated Unpaid Claims | $135.5 | [K] = [I] x [J] |
| Total Value to Trusts | $271.6 | [L] = [F] + [K] |
| Less: Premiums waived by FGIC and retained by Trusts | 18.3 | [M] |
| Cash Commutation Payment | $253.3 | [N] = [L] - [M] |

## FGIC Allowed Claims

| | | |
|---|---|---|
| Prior Claims Paid | $344.0 | [C] |
| Cash Commutation | 253.3 | [N] |
| Total FGIC Claim Amount | $597.3 | [O] = [C] + [N] |

DRAFT - Privileged & Confidential - Attorney Work Product

CONFIDENTIAL

# FGIC Plan of Rehabilitation – Summary

The current Plan of Rehabilitation provides all of the value of FGIC, after the payment of certain administrative expenses and other costs, to be ratably distributed to the all of FGIC's Policyholders in a fair and equitable manner.

- Per Lazard's Affidavit filed on December 12, 2012, the Policyholders are projected to receive a recovery of approximately 27-30% in the Base Scenario and 17-18% in the Stress Scenario (assuming a discount rate of approximately 10-20% on the distributions).

- The Policyholders would receive an initial cash payout percentage ("CPP") of 17.25% on accrued but unpaid claims on the effective date, an updated initial CPP on future claims as they arise, true-up payments for any upward changes in the CPP, and pro rata distribution of excess cash after accounting for appropriate reserves.

  – The Policyholders would receive distributions on an annual basis based on the updated Base and Stress Scenarios or if there an significant cash inflow event as further outlined in the Plan.

| | Base Scenario | Stress Scenario |
|---|---|---|
| Summary | FGIC's current expectation of future claims, investment performance, recoveries, financial markets and other factors of relevance to CPP. Revaluation's based on circumstances, events and projections that FGIC anticipates are reasonably likely to occur. | Non-catastrophic scenario envisioning a severe economic recession that is accompanied by (i) sharp declines in home prices and the financial markets (e.g., approximately 30% decrease from peak home values); (ii) significant unemployment (e.g., approximately 5% increase in unemployment rates); (iii) high mortgage default rates; and (iv) other negative economic indicators of potential relevance to FGIC's insured exposures. |
| Notional Claims | $6.3 billion | $11.7 billion |
| Total Payments | $2.8 billion | $2.6 billion |
| Initial CPP | 17.25% | 17.25% |
| Nominal Recovery | 45% | 23% |
| 10% Discount Rate | 30% | 18% |
| 15% Discount Rate | 28.5% | 17% |
| 20% Discount Rate | 27% | 17% |

DRAFT - Privileged & Confidential - Attorney Work Product

CONFIDENTIAL

4

BNYM-MS 0000084

BNYM-MS 0000084

# FGIC Plan of Rehabilitation – Base vs. Stress Scenario

($ in millions)

- FGIC's total notional claims estimates is approximately $6.3 billion in the base case and $11.7 billion in the stress case.
- Based on D&P loss estimates of approximately $1.1 billion to $1.5 billion, the Policyholders for the ResCap-related RMBS trusts may potentially represent 10% to 24% of the overall pool.
- A majority of the claims for the Policyholders of Rescap-related RMBS trusts are expected to arise in the next 5 years.

| | | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **All FGIC Policyholders (Lazard Affidavit)** | **BASE SCENARIO** | | | | | | | | | | |
| | Notional Claims - All | $2,133 | $1,655 | $585 | $229 | $160 | $948 | $600 | $6 | -- | $6,316 |
| | *Ending CPP* | *17%* | *23%* | *26%* | *29%* | *31%* | *34%* | *37%* | *37%* | *39%* | |
| | Total Payments | ($368) | ($516) | ($297) | ($197) | ($195) | ($536) | ($498) | ($2) | ($227) | ($2,840) |
| | **STRESS SCENARIO** | | | | | | | | | | |
| | Notional Claims - All | $2,399 | $3,874 | $1,247 | $675 | $637 | $1,696 | $1,130 | $12 | -- | $11,670 |
| | *Ending CPP* | *17%* | *17%* | *17%* | *17%* | *17%* | *17%* | *17%* | *17%* | *20%* | |
| | Total Payments | ($414) | ($668) | ($215) | ($116) | ($110) | ($293) | ($195) | ($2) | ($629) | ($2,642) |
| | **VARIANCE** | | | | | | | | | | |
| | Notional Claims - All | $266 | $2,219 | $662 | $446 | $477 | $748 | $530 | $6 | -- | $5,354 |
| | *Ending CPP* | *(0%)* | *(6%)* | *(9%)* | *(11%)* | *(13%)* | *(16%)* | *(19%)* | *(19%)* | *(18%)* | |
| | Total Payments | ($46) | ($152) | $82 | $81 | $85 | $243 | $303 | | ($402) | $198 |
| **Claims for Policyholders of ResCap-Related RMBS Trusts (Per D&P's Estimates)** | **LOW CASE** | | | | | | | | | | |
| | Notional Claims - ResCap | $709 | $152 | $74 | $54 | $74 | $56 | ($4) | ($1) | | $1,113 |
| | *% Cumulative* | *64%* | *77%* | *84%* | *89%* | *95%* | *100%* | *100%* | *100%* | | *100%* |
| | % of Total Notional Claims | | | | | | | | | | |
| | *Base Case* | *33%* | *9%* | *13%* | *23%* | *46%* | *6%* | *NM* | *NM* | | *18%* |
| | *Stress Case* | *30%* | *4%* | *6%* | *8%* | *12%* | *3%* | *NM* | *NM* | | *10%* |
| | **HIGH CASE** | | | | | | | | | | |
| | Notional Claims - ResCap | $709 | $341 | $139 | $113 | $115 | $78 | ($3) | ($1) | | $1,491 |
| | *% Cumulative* | *48%* | *70%* | *80%* | *87%* | *95%* | *100%* | *100%* | *100%* | | *100%* |
| | % of Total Notional Claims | | | | | | | | | | |
| | *Base Case* | *33%* | *21%* | *24%* | *49%* | *72%* | *8%* | *NM* | *NM* | | *24%* |
| | *Stress Case* | *30%* | *9%* | *11%* | *17%* | *18%* | *5%* | *NM* | *NM* | | *13%* |

DRAFT - Privileged & Confidential - Attorney Work Product

CONFIDENTIAL

BNYM-MS 0000085

# FGIC Plan of Rehabilitation – ResCap Trust Policyholders

($ in millions)

Under the Base Scenario, the ResCap RMBS Trust Policyholders may receive approximately $200-$320 million on a net present value basis.

| | Initial | '14 - '17 | '18-'52 | Total Recovery | Recovery % Based on: % Notional | % Discounted | Notes |
|---|---|---|---|---|---|---|---|
| **LOW CASE** | | | | | | | |
| **Notional Claims - ResCap** | $709 | $162 | $253 | $1,113 | | | [A] |
| **Nominal Cash Flow** | | | | | | | |
| Initial CPP Payments | $130 | $32 | $72 | $234 | | | |
| Catch-Up CPP Payments | – | 36 | 160 | 196 | | | |
| Subtotal | 130 | 67 | 232 | 430 | | | |
| Portion of DPO Accretion Payout | – | 4 | 85 | 88 | | | |
| Total Payout | $130 | $71 | $317 | $518 | | 47% | [B] |
| **Discounted Cash Flows** | | | | | | | |
| 10% | $130 | $56 | $64 | $251 | 23% | 28% | [C] |
| 15% | 130 | 51 | 37 | 218 | 20% | 25% | |
| 20% | 130 | 46 | 23 | 200 | 18% | 24% | |
| **HIGH CASE** | | | | | | | |
| **Notional Claims - ResCap** | $709 | $341 | $441 | $1,491 | | | [A] |
| **Nominal Cash Flow** | | | | | | | |
| Initial CPP Payments | $130 | $71 | $124 | $325 | | | |
| Catch-Up CPP Payments | – | 40 | 210 | 250 | | | |
| Subtotal | 130 | 111 | 334 | 575 | | | |
| Portion of DPO Accretion Payout | – | 4 | 108 | 112 | | | |
| Total Payout | $130 | $115 | $442 | $687 | | 46% | [B] |
| **Discounted Cash Flows** | | | | | | | |
| 10% | $130 | $92 | $93 | $316 | 21% | 28% | [C] |
| 15% | 130 | 83 | 54 | 268 | 18% | 25% | |
| 20% | 130 | 76 | 35 | 241 | 16% | 24% | |

[A] A majority of the notional claims for the ResCap RMBS Trust Policyholders are presented within the first 5 years post-emergence in both the low and high cases.

[B] However, the nominal cash flows to the Policyholders are mostly back-ended due to the true-up payments related to the projected CPP increases and the payments on account of the DPO accretion.

[C] When applying a 10-20% discount rate to the recovery cash flow stream, the illustrative recovery estimates are approximately $200-$320 million which implies a recovery rate of approximately 16-23% based on the notional claim amount and 24-28% based on the discounted claim amount.

DRAFT - Privileged & Confidential - Attorney Work Product

6

BNYM-MS 0000086

CONFIDENTIAL

# Comparison Between Commutation Proposal and Plan

**The following table outlines the various considerations, risks and economics associated with the Proposal and the Plan.**

- The payment and recovery estimates are based on D&P's assessment of the accrued and unpaid claims to date and projected claims for both a low and high case.

| | Proposal[a] | Plan[b] | |
|---|---|---|---|
| **Considerations and Risks** | ▪ Provides a global resolution on outstanding ResCap RMBS litigation issues.<br>▪ One-time payment made to ResCap RMBS Policyholders upon plan confirmation (payout expected to occur on December 2013)<br>▪ ResCap RMBS Trusts will not need to pay future premiums<br>▪ Potential risk of relinquished upside economics in the event that the Base Scenario under the Plan is met and exceeded<br>▪ Proposal terms subject to approval from the Rehabilitator and the New York Insurance Bureau | ▪ Outstanding ResCap RMBS litigation issues would need to be resolved separately<br>▪ RMBS Policyholders would receive approximately $130 million upon plan confirmation (payout expected to occur on December 2013); remainder to be made over 40 years<br>▪ Recoveries based on financial projections and claim estimates from December 2011; updates have not yet been provided<br>▪ RMBS Policyholders bear the exposure to upside opportunity and downside risk related to size of actual claim pool and cash flows versus the original projections<br>▪ Recoveries may be influenced by other commutation proposals that are currently pending | |
| | | Base Scenario | Stress Scenario |
| **NPV of Payments** | $220-$285 million | $200-$320 million | $190-$250 million |
| **Nominal Recovery** | ~19-20% | N/M | N/M |
| **10-20% Discount Rate[b]** | N/A | 24-28% | 17-18% |

(a) Based on D&P's low and high claims estimates. Variance between NPV of payments due to the difference in starting claim amounts.

(b) Discrepancy between the stated discounted recovery per the estimates provided in the Lazard Affidavit is primarily due to the adjustments that are made to calculate recoveries on an annual basis versus the 5-year basis shown in the revised Scenarios.

DRAFT - Privileged & Confidential - Attorney Work Product

CONFIDENTIAL

7

# Next Steps and Follow-up Questions

**Prior to the confirmation hearing currently set for June 11, 2013, additional follow-up discussions on the commutation Proposal will likely be centered around the following key issues:**

- Base case payout assumption of 28.5% included in the Proposal;

- Factor of unpaid payout assumption of 60% included in the Proposal;

- Resolution regarding the accrued and unpaid claims to date;

- Resolution regarding the projected claim estimates;

- FGIC Allowed Claim in the ResCap cases (i.e., detail regarding the amount asserted to certain debtor entities);

- Timing and probability of receiving approval from the Rehabilitator and NYLB; and

- Timing of commutation related to overall FGIC rehabilitation proceeding.

DRAFT - Privileged & Confidential - Attorney Work Product

CONFIDENTIAL

8

BNYM-MS 0000088

## Exhibit 123



# ResCap

## Residential Capital, LLC

FGIC Commutation Proposal
Discussion Materials

**May 15, 2013**



*Duff & Phelps Securities, LLC is a FINRA Registered Broker-Dealer*

*C O N F I D E N T I A L*
*Attorney-Client Privilege*

AMSTERDAM • ATLANTA • AUSTIN • BOSTON • CHICAGO • CINCINNATI • DALLAS • DENVER • DETROIT • HOUSTON • LONDON • LOS ANGELES • MORRISTOWN
MUNICH • NEW YORK • NEWPORT BEACH • PARIS • PHILADELPHIA • PLANO • SAN FRANCISCO • SEATTLE • SHANGHAI • SILICON VALLEY • TOKYO • TORONTO • WASHINGTON D.C.

# Executive Summary

**In late March, FGIC delivered a commutation proposal ("Proposal") to the Steering Committee Group of RMBS Holders for ResCap sponsored trusts to provide a global resolution regarding the pending RMBS litigation.  The Proposal from FGIC sets forth a lump sum cash consideration paid to the policyholders of the ResCap-related wrapped trusts in exchange for the ability to assert a general unsecured claim in the ResCap bankruptcy cases.**

- On June 11, 2012, Benjamin Lawsky, Superintendent of Financial Services of the State of New York (the "Rehabilitator"), filed a rehabilitation petition on behalf of FGIC with the Supreme Court of the State of New York.

  - The Rehabilitator filed an initial Plan of Rehabilitation for FGIC on September 27, 2012 and filed the First Amended Plan of Rehabilitation on December 12, 2012.

  - In connection with the First Amended Plan of Rehabilitation, Lazard, as financial advisor to the New York Liquidation Bureau, submitted an affidavit which contained revised projections.

  - The Rehabilitator filed a revised First Amended Plan of Rehabilitation for FGIC on April 12, 2013 (the "Plan") which is expected to be heard on June 11, 2013.

- Based on the current Plan, holders of permitted policy claims ("Policyholders") would receive (i) an upfront Cash Payment in an amount equal to a specified cash payout percentage upon the initial incurrence of the policy claim and (ii) additional catch-up payments through a ratable payout mechanism as set forth in the Plan.

  - In the revised Base Scenario, the Policyholders would receive an initial recovery of ~17.25% and then a subsequent distribution of up to 28.5% on their claim (based on a net present value of the distributions discounted at an illustrative rate of 15%).

- In connection with the Plan, FGIC presented the Proposal to the Steering Committee Group of RMBS Holders for ResCap trusts in late March.

  - The Proposal provides a cash payout from FGIC of approximately **$253 million** to the ResCap-related RMBS Policyholders in exchange for FGIC to have the right to assert a **~$597 million claim** in the ResCap case.

*Privileged & Confidential - Attorney Work Product*

CONFIDENTIAL

# Executive Summary (cont'd)

**Based on D&P's loss estimates of the wrapped portion of the ResCap-sponsored RMBS trusts, the cash commutation proposal provided by FGIC is within the range of expected payments under the Plan of Rehabilitation on discounted cash flow basis.**

| | FGIC Settlement Proposal | FGIC Plan | |
|---|---|---|---|
| **Considerations** (_**Benefits**_ **and** _**Risks**_) | ▪ RMBS Policyholders would receive approximately **$253 million** upon plan confirmation (on or around December 2013). <br><br>▪ _**Benefit:**_ Provides a global resolution on outstanding ResCap RMBS litigation issues. <br><br>▪ _**Benefit:**_ One-time cash payment made to ResCap RMBS Policyholders upon plan confirmation. <br><br>▪ _**Benefit:**_ ResCap RMBS Trusts will not need to pay future premiums. <br><br>▪ _**Risk:**_ Potential risk of relinquished upside economics in the event that the Base Scenario under the Plan is met and correspondingly exceeded. | ▪ RMBS Policyholders would receive approximately **$150 million** upon plan confirmation (on or around December 2013); remainder of the payments will be made over 40 years. <br><br>▪ _**Benefit / Risk:**_ RMBS Policyholders bear the exposure to upside opportunity (benefit) and downside (risk) related to size of actual claim pool(s) and cash flows. <br><br>▪ _**Risk:**_ A significant portion of cash distributions from Deferred Payout Obligations and other true-up payments are significantly back-ended, although a majority of the claims are expected to arise in the first five years (>70%). <br><br>▪ _**Risk:**_ Outstanding ResCap RMBS litigation issues would need to be resolved separately. <br><br>▪ _**Risk:**_ Recoveries are based on stale financial projections and claim estimates; updated estimates have not yet been provided. | |
| | | **Base Scenario** | **Stress Scenario** |
| **Cash Payments (NPV for the Plan)** | **$253 million** | **~$220 to $340 million**[a] | **~$190 to $250 million**[a][b] |
| **Duff & Phelps' Recommendation** | **X** | _Settlement Proposal is within the range of reasonableness under either scenario(s). Distributions are subject to additional unforeseen risks not identified above._ | |

a) Range reflects 10% to 20% discount rate applied to the projected payouts.
b) Reflects 17-18% recovery on D&P's low and high loss estimates.
Note: D&P has not estimated projected losses that correspond to the underlying macro assumptions as assumed under the Stress Scenario (per the Lazard Affidavit).

_Privileged & Confidential - Attorney Work Product_
CONFIDENTIAL

1

# FGIC Settlement Proposal

CONFIDENTIAL

TR-MS000004

# FGIC Settlement Proposal – Commutation and Claim

($ in millions)

**The Proposal outlines a cash payment of approximately $253 million by FGIC upon emergence in exchange for the ability for FGIC to assert approximately $597 million of allowed claims at Rescap.**

- The following Proposal is based on the following three main assumptions:

  – **[A]** Initial Cash Payment Percentage of 17.25% (based on the updated Stress Scenario pursuant to the Plan),

  – **[B]** Base Case Payout to policyholders of 28.5% (based on the updated Base scenario pursuant to the Plan assuming a 15% discount rate), and

  – **[J]** Haircut of 40% on unpaid payout claim estimates.

- In consideration for the cash commutation payment of approximately $253 million, FGIC in return would receive a claim in the Rescap case for the sum of the (i) payouts made to date related to the RFC- and GMACM-sponsored trusts and (ii) the cash commutation.

| Information Points | | |
|---|---|---|
| Initial Cash Payment Percentage (CPP) | 17.25% | [A] |
| Base Case Payout (NPV @ 15.0%) | 28.50% | [B] |
| | | |
| ResCap Sponsored RMBS Claim (Per FGIC) | $1,850.0 | |
| Less: Cost, Interest, etc. | (236.0) | |
| Total Projected Claims in POC | 1,614.0 | |
| Claims Paid to Date | 344.0 | [C] |
| Estimated Unpaid Claims | 1,270.0 | |
| Accrued and Unpaid ("A&U") Claims (as of 3/31/13) | 789.0 | [D] |
| Future Estimated Claims | $481.0 | [E] |

| Commutation Consideration | | |
|---|---|---|
| Claims - A&U - Cash at Initial CPP | $136.1 | [F] = [A] x [D] |
| | | |
| Claims - A&U - Base Case Payout less Initial CPP | $88.8 | [G] = [B] x [D] - [F] |
| Claims - Future Estimated Claims at Base Case Payout | 137.1 | [H] = [B] x [E] |
| Subtotal | $225.8 | [I] = [G] + [H] |
| | | |
| Factor % of Unpaid Payout | 60.0% | [J] |
| Value Attributable to Estimated Unpaid Claims | $135.5 | [K] = [I] x [J] |
| | | |
| Total Value to Trusts | $271.6 | [L] = [F] + [K] |
| Less: Premiums waived by FGIC and retained by Trusts | 18.3 | [M] |
| Cash Commutation paid by FGIC | $253.3 | [N] = [L] - [M] |

| FGIC Allowed Claims | | |
|---|---|---|
| | | |
| Prior Claims Paid | $344.0 | [C] |
| Cash Commutation | 253.3 | [N] |
| Amount of FGIC Allowed Claim | $597.3 | [C] + [N] |

*Privileged & Confidential - Attorney Work Product*
CONFIDENTIAL

TR-MS000005

2

# Plan of Rehabilitation

CONFIDENTIAL

TR-MS000006

# FGIC Plan of Rehabilitation – Summary

**The current Plan of Rehabilitation provides all of the value of FGIC, after the payment of certain administrative expenses and other costs, to be ratably distributed to the all of FGIC's Policyholders in a fair and equitable manner.**

- Per Lazard's Affidavit filed on December 12, 2012, the Policyholders are projected to receive a recovery of approximately 27-30% in the Base Scenario and 17-18% in the Stress Scenario (assuming a discount rate of approximately 10-20% on the distributions).

- The Policyholders would receive: **(1)** an initial cash payout percentage ("CPP") of 17.25% on accrued but unpaid claims on the effective date, **(2)** an updated initial CPP on future claims as they arise, **(3)** true-up payments for any upward changes in the CPP, and **(4)** pro rata distribution of excess cash after accounting for appropriate reserves.

  - The Policyholders would receive distributions on an annual basis based on the updated Base and Stress Scenarios or if there an significant cash inflow event as further outlined in the Plan.

| | Base Scenario | Stress Scenario |
|---|---|---|
| **Summary** | ▪ FGIC's current expectation of future Claims, investment performance, recoveries, financial markets and other factors of relevance to CPP Revaluations based on circumstances, events and projections that FGIC anticipates are reasonably likely to occur. | ▪ Non-catastrophic scenario envisioning a severe economic recession that is accompanied by: <br>– (i) sharp declines in home prices and the financial markets (e.g., approximately 30% decrease from peak home values), <br>– (ii) significant unemployment (e.g., approximately 5% increase in unemployment rates), <br>– (iii) high mortgage default rates, and <br>– (iv) other negative economic indicators of potential relevance to FGIC's insured exposures. |
| **Notional Claims** | $6.3 billion | $11.7 billion |
| **Total Payments** | $2.8 billion | $2.6 billion |
| **Initial CPP** | 17.25% | 17.25% |
| **Nominal Recovery** | 45% | 23% |
| **10% Discount Rate** | 30% | 18% |
| **15% Discount Rate** | 28.5% | 17% |
| **20% Discount Rate** | 27% | 17% |

*Privileged & Confidential - Attorney Work Product*

TR-MS000007

# FGIC Plan of Rehabilitation – Base vs. Stress Scenario

**($ in millions)**

**FGIC's total notional claims estimates is approximately $6.3 billion in the base case and $11.7 billion in the stress case.**

- Based on D&P loss estimates of approximately $1.2 billion to $1.5 billion, the Policyholders for the ResCap-sponsored RMBS trusts may potentially represent 10% to 24% of the overall pool.

- A majority of the claims for the Policyholders of Rescap-sponsored RMBS trusts are expected to arise within the next 5 years.

| | | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | 38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **All FGIC Policyholders (Lazard Affidavit)** | **BASE SCENARIO** | | | | | | | | | | |
| | **Notional Claims - All** | $2,133 | $1,655 | $585 | $229 | $160 | $948 | $600 | $6 | -- | **$6,316** |
| | *Ending CPP* | *17%* | *23%* | *26%* | *29%* | *31%* | *34%* | *37%* | *37%* | *39%* | |
| | Total Payments | ($368) | ($516) | ($297) | ($197) | ($195) | ($536) | ($498) | ($2) | ($227) | ($2,840) |
| | **STRESS SCENARIO** | | | | | | | | | | |
| | **Notional Claims - All** | $2,399 | $3,874 | $1,247 | $675 | $637 | $1,696 | $1,130 | $12 | -- | **$11,670** |
| | *Ending CPP* | *17%* | *17%* | *17%* | *17%* | *17%* | *17%* | *17%* | *17%* | *20%* | |
| | Total Payments | ($414) | ($668) | ($215) | ($116) | ($110) | ($293) | ($195) | ($2) | ($629) | ($2,642) |
| | **VARIANCE** | | | | | | | | | | |
| | **Notional Claims - All** | $266 | $2,219 | $662 | $446 | $477 | $748 | $530 | $6 | -- | $5,354 |
| | *Ending CPP* | *(0%)* | *(6%)* | *(9%)* | *(11%)* | *(13%)* | *(16%)* | *(19%)* | *(19%)* | *(18%)* | |
| | Total Payments | ($46) | ($152) | $82 | $81 | $85 | $243 | $303 | -- | ($402) | $198 |
| **Claims for Policyholders of ResCap-Related RMBS Trusts (Per D&P's Estimates)** | **LOW CASE** | | | | | | | | | | |
| | **Notional Claims - ResCap** | $753 | $173 | $69 | $53 | $74 | $40 | ($0) | ($0) | $0 | **$1,162** |
| | *% Cumulative* | *65%* | *80%* | *86%* | *90%* | *97%* | *100%* | *100%* | *100%* | *100%* | *100%* |
| | % of Total Notional Claims | | | | | | | | | | |
| | *Base Case* | *35%* | *10%* | *12%* | *23%* | *46%* | *4%* | *NM* | *NM* | *NM* | *18%* |
| | *Stress Case[a]* | *31%* | *4%* | *6%* | *8%* | *12%* | *2%* | *NM* | *NM* | *NM* | *10%* |
| | **HIGH CASE** | | | | | | | | | | |
| | **Notional Claims - ResCap** | $753 | $386 | $124 | $115 | $110 | $59 | $0 | ($0) | $0 | **$1,546** |
| | *% Cumulative* | *49%* | *74%* | *82%* | *89%* | *96%* | *100%* | *100%* | *100%* | *100%* | *100%* |
| | % of Total Notional Claims | | | | | | | | | | |
| | *Base Case* | *35%* | *23%* | *21%* | *50%* | *69%* | *6%* | *0%* | *NM* | *NM* | *24%* |
| | *Stress Case[a]* | *31%* | *10%* | *10%* | *17%* | *17%* | *3%* | *0%* | *NM* | *NM* | *13%* |

(a)   D&P has not estimated projected losses that reflect the same underlying macro assumptions as the Stress Scenario included in the Affidavit.

*Privileged & Confidential - Attorney Work Product*

CONFIDENTIAL

# FGIC Plan of Rehabilitation – ResCap Trust Policyholders

**($ in millions)**

**Under the Base Scenario, the ResCap-Sponsored RMBS Trust Policyholders may receive approximately $220-$340 million on a net present value basis.**

| Plan of Rehabilitation – Base Scenario | Initial | '14 - '17 | '18-'52 | Total Recovery | Recovery % Based on: % Notional | Recovery % Based on: % Discounted | Notes |
|---|---|---|---|---|---|---|---|
| **LOW CASE** | | | | | | | |
| **Notional Claims - ResCap** | **$814** | **$112** | **$236** | **$1,162** | | | **[A]** |
| Nominal Cash Flow | | | | | | | |
| Initial CPP Payments | $150 | $23 | $67 | $240 | | | |
| Catch-Up CPP Payments | -- | 40 | 164 | 204 | | | |
| Subtotal | 150 | 63 | 231 | 444 | | | |
| Portion of DPO Accretion Payout | -- | 4 | 70 | 74 | | | |
| Total Payout | $150 | $67 | $301 | $518 | 45% | | **[B]** |
| Discounted Cash Flows | | | | | | | |
| 10% | $150 | $53 | $65 | $268 | 23% | 27% | **[C]** |
| 15% | 150 | 48 | 38 | 235 | 20% | 25% | |
| 20% | 150 | 43 | 24 | 217 | 19% | 24% | |
| **HIGH CASE** | | | | | | | |
| **Notional Claims - ResCap** | **$888** | **$251** | **$408** | **$1,546** | | | **[A]** |
| Nominal Cash Flow | | | | | | | |
| Initial CPP Payments | $163 | $52 | $114 | $330 | | | |
| Catch-Up CPP Payments | -- | 46 | 214 | 261 | | | |
| Subtotal | 163 | 99 | 328 | 590 | | | |
| Portion of DPO Accretion Payout | -- | 5 | 89 | 94 | | | |
| Total Payout | $163 | $103 | $418 | $684 | 44% | | **[B]** |
| Discounted Cash Flows | | | | | | | |
| 10% | $163 | $82 | $93 | $339 | 22% | 28% | **[C]** |
| 15% | 163 | 74 | 54 | 292 | 19% | 25% | |
| 20% | 163 | 68 | 35 | 266 | 17% | 24% | |

**[A]** A majority of the notional claims for the ResCap RMBS Trust Policyholders are presented within the first 5 years post-emergence in both the low and high cases.

**[B]** However, the nominal cash flows to the Policyholders are mostly back-ended due to the true-up payments related to the projected CPP increases and the payments on account of the DPO accretion.

**[C]** When applying a 10-20% discount rate to the recovery cash flow stream, the illustrative recovery estimates are approximately $220-$340 million which implies a recovery rate of approximately 17-23% based on the notional claim amount and 24-28% based on the discounted claim amount.

Note: Assumes emergence occurs at the end of 2013.

*Privileged & Confidential - Attorney Work Product*

**CONFIDENTIAL**

TR-MS000009

**Exhibit 128**

**TIME SENSITIVE NOTICE
REGARDING (A) PLAN SUPPORT AGREEMENT AMONG THE RESCAP DEBTORS
AND THE RMBS TRUSTEES, AMONG OTHERS, AND (B) SETTLEMENT
AGREEMENT AMONG THE DEBTORS, FINANCIAL GUARANTY INSURANCE
COMPANY AND CERTAIN OF THE RMBS TRUSTEES**

**NOTICE IS HEREBY GIVEN BY:**

**THE BANK OF NEW YORK MELLON,
THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,
DEUTSCHE BANK NATIONAL TRUST COMPANY,
DEUTSCHE BANK TRUST COMPANY AMERICAS,
U.S. BANK NATIONAL ASSOCIATION,
WELLS FARGO BANK, N.A.,
HSBC BANK USA, N.A., AND
LAW DEBENTURE TRUST COMPANY OF NEW YORK**

**IN THEIR SEVERAL CAPACITIES AS TRUSTEES, MASTER SERVICERS, AND/OR
INDENTURE TRUSTEES OR SEPARATE TRUSTEES (COLLECTIVELY, THE
"RMBS TRUSTEES" AND EACH, AN "RMBS TRUSTEE"), TO THE HOLDERS (THE
"CERTIFICATEHOLDERS") OF CERTIFICATES, NOTES OR OTHER SECURITIES
(COLLECTIVELY, THE "CERTIFICATES") UNDER THE RESIDENTIAL
MORTGAGE-BACKED SECURITIZATION TRUSTS IDENTIFIED ON SCHEDULE A
AT http://www.rescaprmbssettlement.com (COLLECTIVELY, THE "TRUSTS" AND
EACH A "TRUST").**

**THIS NOTICE CONTAINS IMPORTANT TIME-SENSITIVE INFORMATION FOR
CERTIFICATEHOLDERS AND OTHER PERSONS POTENTIALLY INTERESTED IN
THE TRUSTS.  ALL DEPOSITORIES, CUSTODIANS AND OTHER
INTERMEDIARIES RECEIVING THIS NOTICE, AS APPLICABLE, ARE
REQUESTED TO EXPEDITE ITS RE-TRANSMITTAL TO CERTIFICATEHOLDERS
IN A TIMELY MANNER.**

Dated:  May 24, 2013

This notice (the "**Notice**") is given to you by the RMBS Trustees under the Pooling and
Servicing Agreements (including Series Supplements and Standard Terms of Pooling and
Servicing Agreements), Indentures and related Servicing Agreements (collectively, the
"**Governing Agreements**") governing the Trusts.  Capitalized terms used but not defined herein
shall have the meanings assigned to them in the Governing Agreements.

**THIS NOTICE CONCERNS PROPOSED SETTLEMENTS IN A PLAN SUPPORT AGREEMENT, INCLUDING:[1]**

**1) A SETTLEMENT OF ALL THE TRUSTS' CLAIMS AGAINST THE DEBTORS IN THE CHAPTER 11 CASES, AND AFI, INCLUDING, WITHOUT LIMITATION, AND WHERE APPLICABLE, CLAIMS RELATING TO THE ORIGINATION AND SALE BY A DEBTOR OF MORTGAGE LOANS TO THE TRUSTS, AND CLAIMS ARISING OUT OF A DEBTOR'S SERVICING OF THE MORTGAGE LOANS; AND**

**2) A SETTLEMENT OF, AMONG OTHER THINGS, THE CLAIMS OF CERTAIN OF THE TRUSTS AGAINST FINANCIAL GUARANTY INSURANCE CORPORATION ("FGIC") UNDER THE INSURANCE POLICIES ISSUED BY FGIC IN RESPECT OF THE TRUSTS. A LIST OF THOSE TRUSTS AFFECTED BY THE FGIC SETTLEMENT IS AVAILABLE AT http://www.rescaprmbssettlement.com AS SCHEDULE B.**

**IF CERTIFICATEHOLDERS DO NOT OBJECT TO THESE SETTLEMENTS BEFORE THE DEADLINE OF JUNE 19, 2013 AT 4:00 P.M. (PREVAILING EASTERN TIME) TO OBJECT TO THE PLAN SUPPORT AGREEMENT MOTION, SUCH CERTIFICATEHOLDERS MAY BE PRECLUDED FROM OBJECTING TO THE PLAN AND THE BANKRUPTCY COURT MAY FIND THAT SUCH CERTIFICATEHOLDERS DO NOT HAVE STANDING TO OBJECT.**

**EACH OF THE PROPOSED SETTLEMENTS, IF APPROVED BY THE BANKRUPTCY COURT, AND ADDITIONALLY IN THE CASE OF THE FGIC SETTLEMENT AGREEMENT, BY THE NEW YORK STATE SUPREME COURT, WOULD BIND EACH APPLICABLE TRUST AND THE RELATED CERTIFICATEHOLDERS. THE PROPOSED SETTLEMENTS MATERIALLY AFFECT THE INTERESTS OF CERTIFICATEHOLDERS. THE RMBS TRUSTEES THEREFORE RESPECTFULLY REQUEST THAT ALL CERTIFICATEHOLDERS AND OTHER NOTICE RECIPIENTS READ THIS NOTICE AND RELATED MATERIALS CAREFULLY IN CONSULTATION WITH THEIR LEGAL AND FINANCIAL ADVISORS.**

## I.    Background -- Residential Capital Bankruptcy Filing

On May 14, 2012, Residential Capital, LLC, and certain of its direct and indirect subsidiaries (collectively, "**ResCap**" or the "**Debtors**") filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") (*In re Residential Capital, LLC*, Case No. 12-12020 (MG) and related cases) (collectively, the "**Chapter 11 Cases**"). To obtain information regarding the Chapter 11 Cases, please see Section VI, below.

## II.    The Plan Support Agreement and Term Sheets

On May 13, 2013, the Debtors, Ally Financial Inc. ("**AFI**"), the Official Committee of Unsecured Creditors (the "**Committee**"), and the Consenting Claimants (as defined in the Plan Support Agreement, which defined term includes the RMBS Trustees; collectively with the Debtors, AFI, and the Committee, the "**Plan Support Agreement Parties**") entered into the Plan Support Agreement

---

[1]    Terms not otherwise defined in these initial summary paragraphs are defined below.

(the "**Plan Support Agreement**") pursuant to which the Plan Support Agreement Parties agreed to the terms of a consensual Chapter 11 plan of reorganization (the "**Plan**") and resolution of all claims and disputes between them as set forth in the Plan Term Sheet (the "**Plan Term Sheet**") and the Supplemental Term Sheet[2] (the "**Supplemental Term Sheet**," together with the Plan Term Sheet, the "**Term Sheets**") attached respectively as Exhibits A and B to the Plan Support Agreement. Copies of the Plan Support Agreement and the Term Sheets are available at **http://www.rescaprmbssettlement.com** or from The Garden City Group ("**GCG**") by contacting GCG in the manner described in Section VI, below.

The Plan Support Agreement and the Term Sheets provide for a payment by AFI to the Debtors' estates and its creditors totaling $2.1 billion and for an agreed upon division of that amount, as well as ResCap's other available assets, among all ResCap creditors. More specifically with respect to the Trusts, the Plan Support Agreement and Term Sheets settle (a) the claims of those Trusts (the "**Original Settlement Trusts**") that were originally included in the RMBS Trust Settlement Agreements, dated May 13, 2012, as amended, against the Debtors arising, among other things, from the origination and sale by the Debtors of mortgage loans (the "**Buyback Claims**"), (b) the Buyback Claims, if any, held by those Trusts that are not Original Settlement Trusts (the "**Additional Settlement Trusts**"), and (c) claims held by certain of the Trusts against the Debtors relating to alleged defaults under any servicing agreements or other executory contracts that were assumed by the Debtors and assigned to Ocwen Loan Servicing LLC or other successor servicers, if any, pursuant to the Bankruptcy Court's orders approving the sale of the Debtors' mortgage servicing rights or similar orders regarding the assignment or other disposition of such agreements (the "**Cure Claims**," and together with the Buyback Claims, the "**Claims**"). All the Claims that the Trusts have against AFI and ResCap will be released under the Plan in exchange for the consideration to be received pursuant to the Plan.

If the Plan Support Agreement is approved by the Bankruptcy Court, the RMBS Trustees will vote in favor of the Plan on behalf of each Trust, and the Certificateholders will be precluded from providing contrary direction to the RMBS Trustees with respect to the Plan.

**Under the Plan, if confirmed, all entities, including the Trusts, will be permanently enjoined after the effective date of the Plan, from commencing any actions against any of the Plan Support Agreement Parties with respect to the Claims. Pursuant to the Plan Support Agreement, it is contemplated that the Bankruptcy Court's order approving the Plan Support Agreement will contain findings that (a) the Plan Support Agreement, the Term Sheets, the RMBS Settlement (as defined in the Plan Support Agreement), and the FGIC Settlement Agreement contemplated thereunder are in the best interests of the investors in each of the RMBS Trusts, each such RMBS Trust and the RMBS Trustees, (b) the RMBS Trustees have acted reasonably, in good faith and in the best interests of the investors in each RMBS Trust and each such RMBS Trust in agreeing to the Plan Support Agreement, the Term Sheets, the RMBS Settlement, and the FGIC Settlement Agreement contemplated thereunder, and (c) the RMBS Trustees' notice of the Plan Support Agreement, the RMBS Settlement, the Term Sheets, and the FGIC Settlement Agreement was sufficient and effective. It is further contemplated that the order confirming the Plan will contain exculpatory provisions barring any entity from making any claim against the**

---

[2]    The Supplemental Tern Sheet was agreed to by the Plan Support Agreement Parties on May 23, 2013, as contemplated by the Plan Term Sheet.

**Plan Support Agreement Parties, including the RMBS Trustees, arising from their agreement to enter into the Plan Support Agreement, their consent to the terms in the Terms Sheets, or their agreement to support the Plan.**

The Supplemental Term Sheet sets forth the approximate percentage of ResCap assets and the amounts contributed by AFI that will be distributed under the Plan for the benefit of all the Trusts that have Claims.[3]  The allocation of such settlement amounts among the Trusts (the "**Allocation**") shall be determined by the RMBS Trustees pursuant to the advice of Duff & Phelps, LLC ("**Duff & Phelps**"), the primary financial advisor retained by the RMBS Trustees, and upon which advice the RMBS Trustees shall exclusively rely upon for the determination of the Allocation.  For all Trusts other than the Original Settlement Trusts, the Buyback Claims will be subject to further review, including objections as to the existence or amount of such claims asserted by the Institutional Investors (as defined in the Plan Support Agreement).

Information concerning the methodology to be used by Duff & Phelps to perform the Allocation can be found in Annex III and Schedule A to Annex III to the Supplemental Term Sheet, as amended from time to time.  Pursuant to the Allocation, the percent recovery on the Claims of any Trust will likely vary materially from, and in all cases be lower than, the recovery of other claims allowed against the relevant Debtors' estates.  This variation will be caused by a number of factors including, but not limited to: (i) the inclusion in the Allocation of the claims of the Additional Settlement Trusts and the inclusion of Cure Claims, none of which were fully factored into the Debtors' claims models, but which are, as a result of the settlement under the Plan Support Agreement, required to be paid out of the fixed aggregate allowed claims and recoveries to be received by the Trusts, and (ii) the determinations made, and to be made, by Duff & Phelps as required by the RMBS Trust Allocation Protocol attached to the Supplemental Term Sheet as Annex III, including Schedule A thereto.

*Please note that, based on each Trust's Governing Agreements and the facts and circumstances surrounding each Trust, each Trust has its own unique claim against one or more of the Debtors.  As a result, not all Trusts will be allocated amounts in respect of Cure Claims and not all Additional Settlement Trusts will be allocated amounts in respect of Buyback Claims. Further, the amounts available for distribution from the estate of each Debtor will differ.  Thus, the amounts recovered by each Trust may vary considerably, and some Trusts may not be entitled to any recovery, including certain Trusts that are subject to insurance policies issued by certain monoline insurance companies.*

On May 23, 2013, the Debtors filed with the Bankruptcy Court a motion to approve the Plan Support Agreement (the "**Plan Support Agreement Motion**") and to authorize the RMBS Trustees and ResCap to enter into the Plan Support Agreement. Pursuant to the Term Sheets, the Bankruptcy Court is to enter an order approving the Plan Support Agreement by no later than July 3, 2013.  **The hearing on the Plan Support Agreement Motion is scheduled for June 26, 2013 at 10:00 a.m. (prevailing Eastern Time), and objections, if any, must be filed and served by June 19, 2013 at 4:00 p.m. (prevailing Eastern Time).**  The Plan Support Agreement Motion and any notices and pleadings regarding same are available or will be available shortly after they are filed at **http://www.rescaprmbssettlement.com**, or by contacting

---

[3]   Trusts for which an RMBS Trustee acts as master servicer and for which no other RMBS Trustee acts as trustee are identified on Schedule A by an asterisk. Pursuant to the Plan Support Agreement, any allowed Buyback Claims that any such Trusts may have will be included in, and treated consistently with, the Plan Support Agreement. Certificateholders of such Trusts should contact their trustees with respect to matters described in this Notice.

GCG in the manner described in Section VI, below.  The RMBS Trustees intend to provide evidence to support certain findings in the proposed order approving  the Plan Support Agreement Motion.  To the extent filed, the RMBS Trustees' additional evidence will be available at **http://www.rescaprmbssettlement.com** and from GCG not less than fourteen  (14) days before the hearing on the Plan Support Agreement Motion.

**Pursuant to the Plan Support Agreement, if Certificateholders do not desire the Trusts in which they hold Certificates to be bound by the Plan Support Agreement and the Term Sheets, they have the option, if they meet the requirements set forth in the applicable Governing Agreements, to issue a direction, which shall include an indemnity satisfactory to the applicable RMBS Trustee, directing the RMBS Trustee to withdraw its execution of the Plan Support Agreement in respect of the applicable Trust.  Any direction and indemnity must be in a form satisfactory to the applicable RMBS Trustee and must be received by such RMBS Trustee on or before June 19, 2013.  Any Certificateholder that intends to issue such a direction is strongly urged to contact the relevant RMBS Trustee as soon as possible.  If the Plan Support Agreement is approved by the Bankruptcy Court, the RMBS Trustees will vote in favor of the Plan on behalf of each Trust, and the Certificateholders will be precluded from providing contrary direction to the RMBS Trustees with respect to the Plan.**

Upon acceptance by the RMBS Trustee of any Trust of a valid and satisfactory direction to withdraw its execution of the Plan Support Agreement, that RMBS Trustee shall withdraw its execution of the Plan Support Agreement on behalf of such Trust and such Trust will no longer be subject to the Plan Support Agreement.  **The relevant RMBS Trustee may determine not to accept such an instruction for a number of reasons, including, but not limited to, its determination that (a) Certificateholders having greater voting rights in such Trust have indicated, in a manner satisfactory to such RMBS Trustee, their support for the Plan Support Agreement, (b) the indemnification tendered is insufficient in any respect, or (c) the direction tendered is not in the best interests of the Trust.  Any claims of a withdrawing Trust against the Debtors must be pursued individually against the appropriate Debtors**.

**Even if the Certificateholders provide a valid direction to the RMBS Trustees to withdraw their execution of the Plan Support Agreement in respect of the applicable Trust, the Plan Proponents (as defined in the Plan Support Agreement) may still seek confirmation of the Plan that provides the same treatment of that Trust's Claims as set forth in the Plan Support Agreement.  Certificateholders who provide a valid direction to the RMBS Trustees to withdraw their execution of the Plan Support Agreement will maintain their ability to object to the treatment of the applicable Trust's Claims under the Plan, although the Bankruptcy Court may find that such Certificateholders lack standing to object.**

**Certificateholders may also individually object to the Plan Support Agreement by filing and serving an objection to the Plan Support Agreement Motion by June 19, 2013 at 4:00 p.m. (prevailing Eastern Time) pursuant to the terms of the Plan Support Agreement Motion and any accompanying notices filed regarding the Plan Support Agreement Motion**.

*If a Certificateholder (a) does not file a timely objection to the Plan Support Agreement, (b) files a timely objection that is overruled by the Bankruptcy Court, or (c) does not timely issue a valid direction and indemnity to its respective RMBS Trustee to withdraw its execution of the Plan Support Agreement with respect to any Trust, and the Plan Support Agreement is approved by the Bankruptcy Court, the Certificateholder will be bound by the the Plan Support Agreement and the Plan once it is confirmed and becomes effective, including with respect to its recovery, if any, in respect of its Certificates pursuant to the Allocation and with respect to the releases as set forth in the Term Sheets.*

**CERTIFICATEHOLDERS ARE URGED TO REVIEW THE PLAN SUPPORT AGREEMENT AND TERM SHEETS CAREFULLY AND TO CONSULT WITH THEIR ADVISORS.**

### III.    The FGIC Settlement Agreement

The Plan Support Agreement incorporates a settlement agreement (the "**FGIC Settlement Agreement**") dated May 23, 2013, pursuant to which ResCap, FGIC, The Bank of New York Mellon and the Bank of New York Mellon Trust Company, N.A., US Bank National Association, Wells Fargo Bank, N.A., and Law Debenture Trust Company of New York (collectively, the "**FGIC Trustees**") as trustees or separate trustees under certain Trusts (the "**FGIC Trusts**") as set forth in the FGIC Settlement Agreement (as defined below) (collectively, the "**FGIC Settlement Parties**") settled their claims against each other, including the claims of the FGIC Trusts against FGIC for claims under the insurance policies issued by FGIC (the "**Policies**") in respect of the FGIC Trusts.[4]  Pursuant to the terms of the FGIC Settlement Agreement, among other things, (a) each FGIC Settlement Party shall release the other FGIC Settlement Parties in respect of the Policies and other Policy Agreements (as defined in the FGIC Settlement Agreement), (b) FGIC will pay to the FGIC Trusts certain amounts in settlement of the FGIC Trusts' claims against FGIC as set forth in the FGIC Settlement Agreement, (c) the FGIC Trustees shall release the Debtors in respect of Origination-Related Provisions (as defined in the FGIC Settlement Agreement), (d) the Policies and other Policy Agreements will be commuted, (e) FGIC will not be liable for any further payments under the Policies and other Policy Agreements, and (f) the FGIC Trusts will no longer make premium, reimbursement, or other payments to FGIC.  Copies of the FGIC Settlement will be made available on or after May 29, 2013 at **http://www.rescaprmbssettlement.com** or from GCG by contacting GCG in the manner described in Section VI, below.

By May 29, 2013, an affirmation (the "**Affirmation**") in support of a motion seeking approval of the FGIC Settlement Agreement will be filed in the New York State Supreme Court with jurisdiction over FGIC's rehabilitation proceeding (the "**State Court**"), and by June 4, 2013, a motion to approve the FGIC Settlement Agreement (the "**FGIC Motion**") will be filed in the Bankruptcy Court.  The FGIC Settlement Agreement shall not become effective unless and until it is approved by the Bankruptcy Court and the State Court.  In the Bankruptcy Court, the notice filed regarding the FGIC Motion will include the hearing date on the FGIC Motion and the

---

[4]  The Supplemental Term Sheet sets forth the  terms of any settlements with the other monoline insurance companies that are among the Plan Support Agreement Parties.  To the extent monoline insurance companies are not parties to the Plan Support Agreement, the Trusts reserve any and all claims against them.

procedures for objecting to same.  The FGIC Settlement Agreement, the FGIC Motion, the Affirmation, and any notices will be available once they have been filed at **http://www.rescaprmbssettlement.com** or from GCG by contacting GCG in the manner described in Section VI, below.

**Any Certificateholder of a FGIC Trust may object to the approval of the FGIC Settlement Agreement in the Bankruptcy Court pursuant to the terms of the FGIC Motion.  Any Certificateholder of a FGIC Trust also might have an opportunity in the State Court to object to the Affirmation and approval of the FGIC Settlement Agreement.**

*If a Certificateholder of a FGIC Trust does not file a timely objection to the FGIC Settlement Agreement Motion or if such Certificateholder's timely objection is overruled, so long as the FGIC Settlement Agreement  and the Plan Support Agreement are approved by the Bankruptcy Court and the State Court, and the Bankruptcy Court confirms the Plan, such Certificateholder will be bound by the terms of the FGIC Settlement Agreement.*

**CERTIFICATEHOLDERS OF A FGIC TRUST ARE URGED TO CAREFULLY REVIEW THE FGIC SETTLEMENT AGREEMENT ONCE IT IS AVAILABLE AND TO CONSULT WITH THEIR ADVISORS.**

### IV.   Other RMBS Trusts that Have an Insurance Policy with a Monoline Insurance Company.

Pursuant to the Plan Support Agreement and the Term Sheets, any RMBS Trust that has an insurance policy with a Monoline (as defined in the Plan Support Agreement) reserves the ability to enforce its rights, in the Bankruptcy Court or otherwise, against any Monoline (other than FGIC) that does not, in the future, perform in accordance with an insurance policy for the benefit of that Trust.

### V.   This Notice Is a Summary.

This Notice is not intended as, nor does not provide, a detailed restatement of the Plan Support Agreement, the Term Sheets, the RMBS Settlement or the FGIC Settlement Agreement, relevant law or relevant legal procedures.  The RMBS Trustees, do not intend to send any further notices with respect to the matters addressed herein, and Certificateholders and other potentially interested persons are urged to review carefully the Plan Support Agreement, the Term Sheets, the FGIC Settlement Agreement, any related notices, and other related pleadings that have been filed, and that subsequently may be filed, in the Chapter 11 Cases, and to consult with their own legal and financial advisors.

### VI.   Other Sources of Information.

The Committee appointed in the Chapter 11 Cases has established an official website (the "**Committee Website**"), on which basic information concerning the Chapter 11 Cases has been posted, including, but not limited to, relevant contact information, upcoming dates and deadlines, statements and schedules filed by ResCap and a list of answers to frequently asked questions. The Committee Website can be reached at **http://dm.epiq11.com/RES/Project**.

7

Information relevant to the Plan Support Agreement Motion, the Plan, the Affirmation, the FGIC
Settlement Agreement, and any notices thereof will be available at
**http://www.rescaprmbssettlement.com,** which will be updated regularly with related material
documents filed or orders entered by the Bankruptcy Court or the State Court.  If a
Certificateholder has any questions or would like to request copies of any of the relevant
documents, Certificateholders may call GCG at (866) 241-7538 in the United States, +1 (202)
470-4565 outside the United States, or send an email to **questions@
rescaprmbssettlement.com**.

Certificateholders may also obtain any documents filed with the Bankruptcy Court in the Chapter
11 Cases by visiting ResCap's claims agent website at **http://www.kccllc.net/rescap,** or by
logging on to PACER at **https://www.uscourts.gov** (a small fee is charged for this service).
Documents filed in the Chapter 11 Cases may also be viewed during normal business hours at
the Clerk's Office of the Bankruptcy Court, located at One Bowling Green, New York, New
York 10004.

Inquiries with respect to any particular Trust for which The Bank of New York Mellon, The
Bank of New York Mellon Trust Company, N.A., Deutsche Bank National Trust Company,
Deutsche Bank Trust Company Americas, or US Bank National Association, Wells Fargo Bank,
N.A., serves as RMBS Trustee may be directed to the RMBS Trustee for such Trust using the
"RMBS Trustee Contact Information" for such RMBS Trustee at
**http://www.rescaprmbssettlement.com**.  With respect to those Trusts for which HSBC Bank
USA, N.A. serves as RMBS Trustee, inquiries may be directed to
**US.CTLA.Structured.Unit@us.hsbc.com**.  With respect to those Trusts for which Law
Debenture Trust Company of New York serves as RMBS Trustee, inquires may be directed to
**nytrustco@lawdeb.com**.  **With respect to all other trusts, Certificateholders of those trusts
should refer to their respective Governing Agreements for contact information.**

### VII.    Other Matters.

Certificateholders and other persons interested in the Trusts should not rely on the RMBS
Trustees, or on counsel or other advisors retained by the RMBS Trustees, as their sole source of
information.

Please note that the foregoing is not intended and should not be construed as investment,
accounting, financial, legal or tax advice by or on behalf of the RMBS Trustees, or their
directors, officers, affiliates, agents, attorneys or employees. Each person or entity receiving this
Notice should seek the advice of its own advisers in respect of the matters set forth herein.

Please be further advised that each of the RMBS Trustees reserves all of the rights, powers,
claims and remedies available to it under the Governing Agreements and applicable law. No
delay or forbearance by an RMBS Trustee to exercise any right or remedy accruing upon the
occurrence of a default, or otherwise under the terms of the Governing Agreements, other
documentation relating thereto or under applicable law, shall impair any such right or remedy or
constitute a waiver thereof or acquiescence therein.

Each of the RMBS Trustees expressly reserves its rights under each applicable Governing Agreement, including without limitation, its right to recover in full its fees and costs (including, without limitation, fees and costs incurred or to be incurred by such RMBS Trustee in performing its duties, indemnities owing or to become owing to such RMBS Trustee, compensation for such RMBS Trustee's time spent and reimbursement for fees and costs of counsel and other agents it employs in performing its duties or to pursue remedies) and its right, prior to exercising any rights or powers in connection with any applicable Governing Agreement at the request or direction of any Certificateholder, to receive security or indemnity satisfactory to it against all costs, expenses and liabilities which might be incurred in compliance therewith, and all rights that may be available to it under applicable law or otherwise.

Please be advised that with respect to any particular inquiry from individual Certificateholders, an RMBS Trustee may conclude that a specific response to such inquiry is not consistent with requirements under applicable law and regulation of equal and full dissemination of information to all Certificateholders.

THE BANK OF NEW YORK MELLON, THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., DEUTSCHE BANK NATIONAL TRUST COMPANY, DEUTSCHE BANK TRUST COMPANY AMERICAS, U.S. BANK NATIONAL ASSOCIATION, WELLS FARGO BANK, N.A., HSBC BANK USA, N.A., AND LAW DEBENTURE TRUST COMPANY OF NEW YORK, severally, as trustees, master servicers, and/or indenture trustees or separate trustees of the Trusts

**<u>Exhibit 129</u>**

**TIME SENSITIVE NOTICE
REGARDING SETTLEMENT AGREEMENT AMONG THE RESCAP DEBTORS,
FINANCIAL GUARANTY INSURANCE COMPANY AND THE FGIC TRUSTEES**

**NOTICE IS HEREBY GIVEN BY:**

**THE BANK OF NEW YORK MELLON,
THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,
U.S. BANK NATIONAL ASSOCIATION,
WELLS FARGO BANK, N.A., AND
LAW DEBENTURE TRUST COMPANY OF NEW YORK**

**IN THEIR SEVERAL CAPACITIES AS TRUSTEES, INDENTURE TRUSTEES
AND/OR SEPARATE TRUSTEES (COLLECTIVELY, THE "FGIC TRUSTEES" AND
EACH, AN "FGIC TRUSTEE"), TO THE HOLDERS (THE
"CERTIFICATEHOLDERS") OF CERTIFICATES, NOTES OR OTHER SECURITIES
(COLLECTIVELY, THE "CERTIFICATES") UNDER THE RESIDENTIAL
MORTGAGE-BACKED SECURITIZATION TRUSTS IDENTIFIED ON SCHEDULE A
TO THIS NOTICE (COLLECTIVELY, THE "FGIC TRUSTS" AND EACH A "FGIC
TRUST").**

**THIS NOTICE CONTAINS IMPORTANT TIME-SENSITIVE INFORMATION FOR
CERTIFICATEHOLDERS AND OTHER PERSONS POTENTIALLY INTERESTED IN
THE FGIC TRUSTS.  ALL DEPOSITORIES, CUSTODIANS AND OTHER
INTERMEDIARIES RECEIVING THIS NOTICE, AS APPLICABLE, ARE
REQUESTED TO EXPEDITE ITS RE-TRANSMITTAL TO CERTIFICATEHOLDERS
IN A TIMELY MANNER.  FAILURE TO ACT PROMPTLY IN COMPLIANCE WITH
THIS PARAGRAPH MAY IMPAIR THE ABILITY OF THE CERTIFICATEHOLDERS
ON WHOSE BEHALF SUCH INTERMEDIARIES ACT TO CONSIDER THE
MATTERS DESCRIBED IN THIS NOTICE IN A TIMELY FASHION.**

Dated:  June 4, 2013

This notice (the "**Notice**") is given to you by the FGIC Trustees under the Pooling and Servicing
Agreements (including Series Supplements and Standard Terms of Pooling and Servicing
Agreements), and Indentures and related Servicing Agreements (collectively, the "**Governing
Agreements**") governing the FGIC Trusts.  This Notice incorporates by reference the notice
given by the RMBS Trustees (as defined therein) regarding (A) the Plan Support Agreement,
dated May 13, 2013 (the "**Plan Support Agreement**"), among the ResCap Debtors and the
RMBS Trustees (including the FGIC Trustees), among others, and (B) the Settlement Agreement
among the Debtors, Financial Guaranty Insurance Company and Certain of the RMBS
Trustees(including the FGIC Trustees), dated May 24, 2013 (the "**May 24 Notice**").  In the event
of any inconsistencies between the May 24 Notice and this Notice, this Notice shall govern.

Capitalized terms used but not defined herein shall have the meanings assigned to them in the Governing Agreements or in the FGIC Settlement Agreement, as defined below.

**THIS NOTICE CONCERNS A PROPOSED SETTLEMENT OF, AMONG OTHER THINGS, THE PRESENT AND FUTURE CLAIMS OF THE FGIC TRUSTS AGAINST FINANCIAL GUARANTY INSURANCE CORPORATION ("FGIC") UNDER THE INSURANCE POLICIES (THE "POLICIES") ISSUED BY FGIC IN RESPECT OF THE TRUSTS.[1]**

**IF THE FGIC SETTLEMENT AGREEMENT IS APPROVED BY THE STATE COURT AND THE BANKRUPTCY COURT, IT WILL BIND EACH APPLICABLE FGIC TRUST AND THE RELATED CERTIFICATEHOLDERS. THE PROPOSED FGIC SETTLEMENT AGREEMENT MATERIALLY AFFECTS THE INTERESTS OF THE CERTIFICATEHOLDERS. THE FGIC TRUSTEES THEREFORE RESPECTFULLY REQUEST THAT ALL CERTIFICATEHOLDERS AND OTHER NOTICE RECIPIENTS READ THIS NOTICE AND RELATED MATERIALS CAREFULLY IN CONSULTATION WITH THEIR LEGAL AND FINANCIAL ADVISORS. CERTIFICATEHOLDERS THAT DO NOT WANT THE FGIC SETTLEMENT AGREEMENT TO BECOME EFFECTIVE SHOULD CONSIDER OBJECTING TO ITS APPROVAL IN THE STATE COURT ON OR BEFORE THE DEADLINE OF JULY 16, 2013 AT 3:00 P.M. (PREVAILING EASTERN TIME) AND/OR IN THE BANKRUPTCY COURT ON OR BEFORE THE DEADLINE THAT WILL BE SET ONCE THE NOTICE OF THE MOTION TO APPROVE THE FGIC SETTLEMENT AGREEMENT IS FILED (SUCH NOTICE IS EXPECTED TO BE FILED ON OR BEFORE JUNE 7, 2013).[2]**

## I.    Background--ResCap Bankruptcy Filing and FGIC Rehabilitation Proceeding.

On May 14, 2012, Residential Capital, LLC, and certain of its direct and indirect subsidiaries (collectively, "**ResCap**" or the "**Debtors**") filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") (*In re Residential Capital, LLC*, Case No. 12-12020 (MG) and related cases) (collectively, the "**Chapter 11 Cases**"). To obtain information regarding the Chapter 11 Cases, please see Section VI, below.

Pursuant to an order dated June 28, 2012, the Supreme Court of the State of New York (the "**State Court**") appointed Benjamin M. Lawsky, Superintendent of Financial Services of the State of New York, as rehabilitator (the "**Rehabilitator**") of FGIC in the rehabilitation proceeding styled *In the Matter of the Rehabilitation of Financial Guaranty Insurance Company*, Index No. 401265/2012 (the "**Rehabilitation Proceeding**").

---

[1]  Terms not otherwise defined in these initial summary paragraphs are defined below.
[2]  When the notice of the motion seeking Bankruptcy Court approval of the FGIC Settlement Agreement (the "**FGIC Motion**") is filed with the Bankruptcy Court, it will be available at **http://www.rescaprmbssettlement.com**, or from The Garden City Group ("**GCG**") by contacting GCG in the manner described in Section VI, below, and other means as set forth in Section VI. Any Certificateholder of a FGIC Trust may object to the approval of the FGIC Settlement Agreement in the Bankruptcy Court pursuant to the terms of the FGIC Motion.

2

## II.    The FGIC Settlement Agreement.

On May 23, 2013, ResCap, FGIC, and the FGIC Trustees as trustees or separate trustees under the FGIC Trusts, and certain other parties (collectively, the "**FGIC Settlement Parties**") entered into a settlement agreement (the "**FGIC Settlement Agreement**") pursuant to which the FGIC Settlement Parties settled their claims against each other, including the claims of the FGIC Trusts against FGIC for claims under the Policies under which FGIC insured the payment of principal and interest owing on certain of the Certificates.  According to the terms of the FGIC Settlement Agreement, among other things, (a) each FGIC Settlement Party shall release the other FGIC Settlement Parties in respect of the Policies and other Policy Agreements (as defined in the FGIC Settlement Agreement), including the release by the FGIC Trusts of current claims in the amount of at least $789 million, and future claims against FGIC, (b) FGIC will pay to the FGIC Trusts for distribution to Certificateholders holding Certificates insured by the Policies cash in the aggregate amount of $253.3 million in settlement of the FGIC Trusts' claims against FGIC, (c) the FGIC Trustees shall release the Debtors in respect of Origination-Related Provisions (as defined in the FGIC Settlement Agreement), (d) FGIC will not be liable for any further payments under the Policies and other Policy Agreements, and (e) the FGIC Trusts will no longer make premium, reimbursement, or other payments to FGIC.[3]  Copies of the FGIC Settlement may be obtained at **http://www.rescaprmbssettlement.com, at www.fgicrehabilitation.com** or from GCG by contacting GCG in the manner described in Section VI, below.

In accordance with the allocation methodology set forth in Exhibit F to the FGIC Settlement Agreement, the FGIC Trustees, in consultation with their advisors, will have sole and exclusive authority to determine the share of the $253.3 million payable to each FGIC Trust and the allocation of such share among the CUSIPs issued by each such FGIC Trust that are insured by a Policy.  On or before July 3, 2013, the FGIC Trustees will notify FGIC in writing of the cash amount that FGIC shall pay to each FGIC Trust once the FGIC settlement is effective.

**As of July 3, 2013, the FGIC Trustees will make available to any Certificateholders holding Certificates insured by a Policy information as to the cash amount that FGIC will pay to the FGIC Trust(s) that issued such Certificates, _provided_ that any such Certificateholder submits a proper request for such information to the FGIC Trustee(s) for such FGIC Trust(s), and provides appropriate verification of its holdings.**

---

[3]    Pursuant to the FGIC Settlement Agreement, FGIC will receive an allowed claim against certain of the Debtors in the aggregate amount of (i) approximately $934 million, if the chapter 11 plan contemplated by the Plan Support Agreement attached to the FGIC Settlement Agreement as Exhibit C goes effective, or (ii) $596.5 million, if the Plan Support Agreement is terminated in accordance with its terms and the chapter 11 plan contemplated thereby does not go effective, subject to FGIC's right to assert a claim against each of three of the Debtors, in each case up to the amount of $596.5 million.  FGIC has agreed under the Plan Support Agreement to cap its recovery from ResCap under (i), above, to $206.5 million.  For more information on the Plan Support Agreement, please review the May 24 Notice.

**CERTIFICATEHOLDERS OF A FGIC TRUST ARE URGED TO REVIEW
CAREFULLY THE FGIC SETTLEMENT AGREEMENT AND TO CONSULT WITH
THEIR ADVISORS.**

    **III.**    **The Rehabilitation Proceeding and Related Deadlines.**

On May 29, 2013, an affirmation (the "**Affirmation**") in support of the Rehabilitator's motion
for an order approving the FGIC Settlement Agreement and relevant portions of the Plan Support
Agreement was filed in the State Court.  On May 30, 2013, the State Court entered an order to
show cause (the "Order to Show Cause") setting forth a schedule of deadlines and the date of a
hearing to consider approval of the FGIC Settlement Agreement and relevant portions of the Plan
Support Agreement (the "**State Court Hearing**").  Copies of the Affirmation and the Order to
Show Cause may be obtained at **www.fgicrehabilitation.com**, at
**http://www.rescaprmbssettlement.com** or from GCG by contacting GCG in the manner
described in Section VI, below.  Pursuant to the Order to Show Cause, the State Court Hearing
will take place on August 6, 2013 at 10:00 a.m. at IAS Part 36, Room 428, thereof, at the
Courthouse located at 60 Centre Street, New York, New York.

**Any Certificateholder objecting to any aspect of the FGIC Settlement Agreement must file
an objection with the State Court, and serve a copy of such objection via email upon
gary.holtzer@weil.com and joseph.verdesca@weil.com, attorneys for the Rehabilitator, so
that such objection is received on or before July 16, 2013 at 3:00p.m. (the "State Court
Objection Deadline").**

If no objection is filed on or before the State Court Objection Deadline, pursuant to the Order to
Show Cause, the State Court may approve the FGIC Settlement Agreement without holding the
State Court Hearing.[4]

    **IV.**    **Certificateholders Can Object to the FGIC Settlement Agreement.**

*Any Certificateholder objecting to any aspect of the FGIC Settlement Agreement can file an
objection with the Bankruptcy Court as set forth in footnote 2, above, and/or in the State
Court as set forth in Section III, above.  If a Certificateholder of a FGIC Trust does not file a
timely objection to the FGIC Settlement Agreement in the Bankruptcy Court or Rehabilitation
Proceeding or if such Certificateholder's timely objection(s) are overruled, so long as the
FGIC Settlement Agreement is approved by the Bankruptcy Court and the State Court, such
Certificateholder will be bound by the terms of the FGIC Settlement Agreement.[5]  If approved*

---

[4]  As noted in footnote 2, above, Certificateholders of a FGIC Trust may also object to the FGIC Motion in the
Bankruptcy Court.

[5] Note that Bankruptcy Court approval of a plan of reorganization for the Debtors is *not* a condition to the
effectiveness of the FGIC Settlement Agreement.  By its terms, the FGIC Settlement Agreement will become
effective if and when both the Bankruptcy Court and the Rehabilitation Court have entered final orders approving it.
The May 24 Notice incorrectly stated that the Bankruptcy Court approval of a plan of reorganization for the Debtors
was a condition to the effectiveness of the FGIC Settlement Agreement.

*by the Bankruptcy Court and the State Court, all Certificateholders holding Certificates insured by FGIC's Policies, and any other persons or entities who received this Notice, will be bound by the FGIC Settlement Agreement and the settlements, releases and discharges contained therein, regardless of whether any Certificateholder or other person or entity appeared before the Bankruptcy Court and/or at the State Court Hearing or submitted an objection.*

*Certificateholders should review with their advisors the relevant Governing Agreements and any applicable orders that have been entered by the State Court, including the Order of Rehabilitation, dated June 28, 2012, to determine what legal position, if any, they intend to assert.*

### V.    This Notice Is a Summary.

This Notice is not intended as, nor does it provide, a detailed restatement of the FGIC Settlement Agreement, relevant law or relevant legal procedures. The FGIC Trustees do not intend to send any further notices with respect to the matters addressed herein, and Certificateholders and other potentially interested persons are urged to review carefully the FGIC Settlement Agreement, any related notices, and other related pleadings that have been filed, and that subsequently may be filed, in the Chapter 11 Cases and in the Rehabilitation Proceeding, and to consult with their own legal and financial advisors.

### VI.    Other Sources of Information.

Information relevant to the FGIC Settlement Agreement, the Plan Support Agreement, and any notices thereof will be available at **http://www.rescaprmbssettlement.com,** which will be updated regularly with related material documents filed or orders entered by the Bankruptcy Court and the State Court. Certificateholders may also access documents filed in the Rehabilitation Proceeding at **www.fgicrehabilitation.com**. If a Certificateholder has any questions or would like to request copies of any of the relevant documents, Certificateholders may call GCG at (866) 241-7538 in the United States, +1 (202) 470-4565 outside the United States, or send an email to **questions@ rescaprmbssettlement.com**.

Certificateholders may also obtain any documents filed with the Bankruptcy Court in the Chapter 11 Cases by visiting ResCap's claims agent website at **http://www.kccllc.net/rescap,** or by logging on to PACER at **https://www.uscourts.gov** (a small fee is charged for this service). Documents filed in the Chapter 11 Cases may also be viewed during normal business hours at the Clerk's Office of the Bankruptcy Court, located at One Bowling Green, New York, New York 10004.

The Committee appointed in the Chapter 11 Cases has established an official website (the "**Committee Website**"), on which basic information concerning the Chapter 11 Cases has been posted, including, but not limited to, relevant contact information, upcoming dates and deadlines, statements and schedules filed by ResCap and a list of answers to frequently asked questions. The Committee Website can be reached at **http://dm.epiq11.com/RES/Project**.

5

Inquiries with respect to any particular FGIC Trust for which The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., U.S. Bank National Association, or Wells Fargo Bank, N.A. serves as FGIC Trustee may be directed to the FGIC Trustee for such FGIC Trust using the "RMBS Trustee Contact Information" for such FGIC Trustee at **http://www.rescaprmbssettlement.com**.  With respect to those FGIC Trusts for which Law Debenture Trust Company of New York serves as separate FGIC Trustee, inquiries may be directed to **nytrustco@lawdeb.com.**  With respect to all other trusts, Certificateholders of those trusts should refer to their respective Governing Agreements for contact information.

## VII.    Other Matters.

Certificateholders and other persons interested in the FGIC Trusts should not rely on the FGIC Trustees, or on counsel or other advisors retained by the FGIC Trustees, as their sole source of information.

Please note that the foregoing is not intended and should not be construed as investment, accounting, financial, legal or tax advice by or on behalf of the FGIC Trustees, or their directors, officers, affiliates, agents, attorneys or employees. Each person or entity receiving this Notice should seek the advice of its own advisers in respect of the matters set forth herein.

Please be further advised that each of the FGIC Trustees reserves all of the rights, powers, claims and remedies available to it under the Governing Agreements and applicable law. No delay or forbearance by an FGIC Trustee to exercise any right or remedy accruing upon the occurrence of a default, or otherwise under the terms of the Governing Agreements, other documentation relating thereto or under applicable law, shall impair any such right or remedy or constitute a waiver thereof or acquiescence therein.

Each of the FGIC Trustees expressly reserves its rights under each applicable Governing Agreement, including without limitation, its right to recover in full its fees and costs (including, without limitation, fees and costs incurred or to be incurred by such FGIC Trustee in performing its duties, indemnities owing or to become owing to such FGIC Trustee, compensation for such FGIC Trustee's time spent and reimbursement for fees and costs of counsel and other agents it employs in performing its duties or to pursue remedies) and its right, prior to exercising any rights or powers in connection with any applicable Governing Agreement at the request or direction of any Certificateholder, to receive security or indemnity satisfactory to it against all costs, expenses and liabilities which might be incurred in compliance therewith, and all rights that may be available to it under applicable law or otherwise.

SK 03687 0119 1385897 v5

Please be advised that with respect to any particular inquiry from individual Certificateholders, a FGIC Trustee may conclude that a specific response to such inquiry is not consistent with requirements under applicable law and regulation of equal and full dissemination of information to all Certificateholders.

THE BANK OF NEW YORK MELLON, THE BANK OF NEW
YORK MELLON TRUST COMPANY, N.A., U.S. BANK
NATIONAL ASSOCIATION, WELLS FARGO BANK, N.A.,
AND LAW DEBENTURE TRUST COMPANY OF NEW YORK,
severally, as trustees, and/or indenture trustees or separate trustees
of the FGIC Trusts

7

**Exhibit 170**

# Financial Guaranty Insurance Company

Quarterly Operating Review
First Quarter 2013





**FGIC**
**Quarterly Operating Review**
**First Quarter 2013**

## Company Profile

Financial Guaranty Insurance Company (the "Company" or "FGIC"), a wholly owned subsidiary of FGIC Corporation ("FGIC Corp."),  is a New York stock insurance corporation regulated by the New York State Department of Financial Services (the "NYSDFS"), which assumed the functions and authority of the New York State Insurance Department (the "NYSID") on October 3, 2011. The Company provided financial guaranty insurance and other forms of credit enhancement for public finance and structured finance obligations.

On June 28, 2012, the Supreme Court of New York signed an order of Rehabilitation appointing the Superintendent of the New York State Department of Financial Services ("the Superintendent") as Rehabilitator of FGIC.  On September 27, 2012, the Superintendent filed a proposed Plan of Rehabilitation for FGIC with the Supreme Court of the State of New York. Additional information about the rehabilitation proceeding is available at www.fgicrehabilitation.com

This Operating Review should be read in conjunction with the Statutory-Basis Financial Statements of FGIC and the Statutory Statements of FGIC filed with the NYSDFS.  These can be accessed at www.fgic.com/investorrelations/financialreports/.

**Company Contact Information**
Investor Relations
(212) 312-2776
www.fgic.com

Financial Guaranty Insurance Company
125 Park Avenue
New York, NY 10017
(212) 312-3000
(800) 352-0001
www.fgic.com

© 2013 Financial Guaranty Insurance Company



**FGIC**
**Quarterly Operating Review**
**First Quarter 2013**

**Table of Contents**

Annual Financial and Statistical Data. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

Selected Statutory Financial Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

Future Premium Collection. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

Investment Portfolio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

Loss and Loss Adjustment Expenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

Insured Portfolio by Bond Type. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

RMBS Exposure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

CDO Exposure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8

Top Fifty U.S. Public Finance Exposures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9

Top Fifteen U.S. Structured Finance Exposures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10

Reinsurer Exposure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11

Net Debt Service Amortization. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12



## ANNUAL FINANCIAL AND STATISTICAL DATA [1]
(Dollars in Millions)

|  | 2012 | 2011 | 2010 |
|---|---|---|---|
| **Summary of Statutory (SAP) Income Data:** | | | |
| Gross direct and assumed premiums written. . . . . . . . . . . . . . . $ | 46.7 $ | 58.7 $ | 89.6 |
| Net premiums earned. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 70.9 | 131.1 | 97.6 |
| Net investment income. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 47.0 | 38.0 | 45.3 |
| Losses and loss adjustment expenses incurred. . . . . . . . . . . . | 977.6 | (1,381.6) | (943.1) |
| Ceding commission (expense) income. . . . . . . . . . . . . . . . . . . | (8.0) | (3.4) | 1.0 |
| Operating expenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (45.5) | (53.2) | (66.5) |
| Net loss. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,066.5 | (1,248.7) | (790.2) |
| **Summary of SAP Balance Sheet Data:** | | | |
| Total cash and investments. . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,003.5 | 2,032.5 | 1,884.0 |
| Total assets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,020.8 | 2,049.3 | 1,898.9 |
| Unearned premium reserve. . . . . . . . . . . . . . . . . . . . . . . . . . . | 172.2 | 170.7 | 230.7 |
| Loss and loss adjustment expense reserve. . . . . . . . . . . . . . . | 3,896.4 | 4,992.9 | 3,541.6 |
| Contingency reserves. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 543.8 | 429.1 | 321.1 |
| Redeemable preferred stock. . . . . . . . . . . . . . . . . . . . . . . . . . | 300.0 | 300.0 | 300.0 |
| Total capital and (deficit) surplus. . . . . . . . . . . . . . . . . . . . . . . | (2,610.9) | (3,567.1) | (2,227.1) |
| **Summary of Other Statutory Data:** | | | |
| Net par outstanding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 31,440.4 | 42,259.4 | 55,553.8 |
| Net debt service outstanding. . . . . . . . . . . . . . . . . . . . . . . . . $ | 46,538.2 $ | 60,001.6 $ | 86,798.0 |

[1]   Certain prior year amounts have been reclassified to conform to the 2012 presentation.



# SELECTED FINANCIAL INFORMATION [(1)]

(Dollars in Millions)

|  | Three Months Ended | | Year End |
|---|---|---|---|
|  | 2013 | 2012 | 2012 |
| **SAP Statements of Operations:** | | | |
| Gross direct and assumed premiums written. | $     9.2 | $     12.2 | $     46.7 |
| Net premiums written (2). | 19.6 | 13.3 | 72.4 |
| Net premiums earned. | 21.4 | 22.4 | 70.9 |
| Losses and loss adjustment (expenses)/releases incurred. | (109.2) | (169.3) | 977.6 |
| Operating expenses. | (10.1) | (15.3) | (45.5) |
| Ceding commission (expense) income. | (0.2) | (0.3) | (8.0) |
| Underwriting loss. | (98.1) | (162.5) | 995.0 |
| Net investment income | 12.2 | 11.1 | 47.0 |
| Net investment realized gains. | (3.3) | (0.4) | 5.2 |
| Other income. | 2.8 | 4.6 | 19.0 |
| Gain (Loss) before income taxes. | (86.4) | (147.2) | 1,066.1 |
| Income tax (benefit) expense | 0.1 | (0.5) | (0.3) |
| Net gain (loss) | (86.5) | (146.7) | 1,066.5 |
| | | | |
| **SAP Statements of Changes in Capital and Surplus:** | | | |
| Balance at January 1, | (2,610.9) | (3,567.1) | (3,567.1) |
| Net gain (loss). | (86.5) | (146.7) | 1,066.5 |
| Change in non-admitted assets. | (1.2) | 0.1 | 2.0 |
| Change in contingency reserves. | (26.2) | (29.3) | (114.8) |
| Change in net unrealized (losses) gains | 2.8 | - | - |
| Other changes in capital and surplus (3). | (4.1) | 0.5 | 2.5 |
| Balance at End of Period. | (2,726.1) | (3,742.5) | (2,610.9) |
| **SAP Balance Sheet:** | | | |
| Total cash and investments | 2,056.8 | 2,036.2 | 2,003.5 |
| Accrued investment income. | 17.5 | 14.0 | 14.4 |
| Other assets. | 3.3 | 3.9 | 3.0 |
| Total assets | 2,077.5 | 2,054.0 | 2,020.8 |
| | | | |
| Unearned premiums. | 170.4 | 161.6 | 172.2 |
| Loss and loss adjustment expense reserves. | 4,044.3 | 5,157.5 | 3,896.4 |
| Contingency reserves. | 570.0 | 458.3 | 543.8 |
| Other liabilities. | 18.8 | 19.1 | 19.3 |
| Total liabilities. | 4,803.5 | 5,796.5 | 4,631.7 |
| Common stock. | 15.0 | 15.0 | 15.0 |
| Redeemable preferred stock | 300.0 | 300.0 | 300.0 |
| Paid-in surplus. | 439.9 | 439.9 | 439.9 |
| Unassigned deficit. | (3,481.0) | (4,497.4) | (3,365.8) |
| Total capital and deficit. | (2,726.1) | (3,742.5) | (2,610.9) |

[(1)]    Certain prior year amounts have been reclassified to conform to the 2013 presentation.

[(2)]    Gross direct and assumed premiums written less written premiums ceded to reinsurers.

[(3)]    Other changes include changes in foreign exchange and changes in the provision for unauthorized reinsurance.

Financial Guaranty Insurance Company
Quarterly Operating Review
First Quarter 2013



# FUTURE PREMIUMS TO BE COLLECTED [1]

(Dollars in Millions)

| | Premium Expected to be collected as of March 31, 2013 |
| --- | --- |
| **Nine months ended:** | |
| December 31, 2013 | 23.06 |
| December 31, 2014 | 29.91 |
| December 31, 2015 | 25.45 |
| December 31, 2016 | 22.03 |
| **Five years ended:** | |
| December 31, 2021 | 78.66 |
| December 31, 2026 | 53.47 |
| December 31, 2031 | 40.26 |
| December 31, 2036 | 20.88 |
| December 31, 2041 | 6.65 |
| December 31, 2046 | 2.73 |
| December 31, 2051 | 0.01 |

[1] The Company's expected premium reflects the impact of transactions closed prior to March 31, 2013; however it does not reflect the potential impact, if any, of ongoing commutation, settlement and restructuring efforts by the Company subsequent to March 31, 2013.

Financial Guaranty Insurance Company
Quarterly Operating Review
First Quarter 2013



## INVESTMENT PORTFOLIO
### (Dollars in Millions)

| | March 31, 2013 | December 31, 2012 |
|---|---|---|
| **Fixed income securities:** [1] | | |
| Long-Term | | |
| Municipal obligations | $845.0 | $776.9 |
| U.S. government obligations | 48.2 | 49.1 |
| Foreign government obligations | 30.8 | 32.4 |
| Mortgage and asset-backed securities | 435.0 | 383.8 |
| Corporate | 176.6 | 152.3 |
| Other | - | - |
| Subtotal | 1,535.6 | 1,394.5 |
| Short-term | 581.6 | 676.7 |
| Total | $2,117.2 | $2,071.1 |

| Rating [2] | March 31, 2013 | December 31, 2012 |
|---|---|---|
| AAA | 19.5% | 21.9% |
| AA | 63.1% | 60.7% |
| A | 17.3% | 16.9% |
| BBB | 0.1% | 0.5% |
| NIG | 0.0% | 0.0% |
| NR | 0.0% | 0.0% |
| | 100.0% | 100.0% |

[1] Investment values reflect fair market value.

[2] Ratings represent S&P classifications. If unavailable, Moody's ratings are used.

Financial Guaranty Insurance Company
Quarterly Operating Review
First Quarter 2013



**STATUTORY LOSS AND LOSS ADJUSTMENT EXPENSE RESERVES**
(Dollars in Millions)

| | March 31, 2013 | December 31, 2012 |
|---|---|---|
| Loss & LAE Reserve, net balance at beginning of period. . . . | $3,896.4 | $4,992.9 |
| **Incurred Related To** | | |
| Current Period. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - | 2.7 |
| Prior Periods. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 109.2 | (980.3) |
| Total Incurred. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 109.2 | (977.6) |
| **Paid (Recoveries) Related To** | | |
| Current Period. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - | - |
| Prior Periods. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (38.6) | 118.9 |
| Total Paid (recoveries). . . . . . . . . . . . . . . . . . . . . . . . . | (38.6) | 118.9 |
| Loss & LAE Reserve, net balance at end of period. . . . . . . . | $4,044.3 | $3,896.4 |

Financial Guaranty Insurance Company
Quarterly Operating Review
First Quarter 2013



## INSURED PORTFOLIO BY BOND TYPE AND GEOGRAPHY

(Dollars in Millions)

**Net Par Outstanding (1)**
**March 31, 2013**

| | $ | % of Total | Financial Guaranty |
|---|---|---|---|
| **Insured Portfolio by Bond Type** | | | |
| **Public Finance** | | | |
| General obligation. . . . . . . . . . . . . . | $3,039.5 | 9.6% | $3,039.5 |
| Leases. . . . . . . . . . . . . . . . . . . . . . | $1,747.9 | 5.5% | $1,747.9 |
| Healthcare. . . . . . . . . . . . . . . . . . . . | $277.4 | 0.9% | $277.4 |
| Other Tax Back. . . . . . . . . . . . . . . . . | $1,033.0 | 3.3% | $1,033.0 |
| Global Utilities. . . . . . . . . . . . . . . . . | $2,034.2 | 6.4% | $2,034.2 |
| Transportation. . . . . . . . . . . . . . . . . . | $4.1 | 0.0% | $4.1 |
| Higher Education. . . . . . . . . . . . . . . . | $62.4 | 0.2% | $62.4 |
| Project Finance. . . . . . . . . . . . . . . . . | $692.7 | 2.2% | $692.7 |
| Housing. . . . . . . . . . . . . . . . . . . . . . | $619.6 | 2.0% | $619.6 |
| Other Public Finance. . . . . . . . . . . . . | $2,318.3 | 7.3% | $2,318.3 |
| Total U.S Public Finance. . . . . . . . . . . | 11,829.0 | 37.4% | 11,829.0 |
| | | | |
| **Structured Finance** | | | |
| AUTO ABS. . . . . . . . . . . . . . . . . . . . | 5.8 | 0.0% | 5.8 |
| CDO – ABS. . . . . . . . . . . . . . . . . . . . | 201.3 | 0.6% | 201.3 |
| CDO/CLO. . . . . . . . . . . . . . . . . . . . . | 144.3 | 0.5% | 144.3 |
| Insurance. . . . . . . . . . . . . . . . . . . . . | 181.0 | 0.6% | 181.0 |
| Other Structured Finance. . . . . . . . . | 381.4 | 1.2% | 381.4 |
| Pooled Aircraft/Aircraft Engines. . . . | 1,597.6 | 5.1% | 1,597.6 |
| Receivables. . . . . . . . . . . . . . . . . . . | 86.1 | 0.3% | 86.1 |
| RMBS. . . . . . . . . . . . . . . . . . . . . . . . | 12,523.0 | 39.6% | 12,523.0 |
| Student Loan. . . . . . . . . . . . . . . . . . | 250.0 | 0.8% | 250.0 |
| Total U.S Structured Finance. . . . . . . . | 15,370.4 | 48.6% | 15,370.4 |
| | | | |
| **International Finance (2)** | | | |
| Airports. . . . . . . . . . . . . . . . . . . . . . | 0.0 | 0.0% | 0.0 |
| Corporate Obligation. . . . . . . . . . . . . | 237.5 | 0.8% | 237.5 |
| Sovereign. . . . . . . . . . . . . . . . . . . . . | 143.2 | 0.5% | 143.2 |
| Sub-Sovereign. . . . . . . . . . . . . . . . . | 274.4 | 0.9% | 274.4 |
| Utility. . . . . . . . . . . . . . . . . . . . . . . . | 561.8 | 1.8% | 561.8 |
| Toll Road. . . . . . . . . . . . . . . . . . . . . | 12.8 | 0.0% | 12.8 |
| Project Finance. . . . . . . . . . . . . . . . . | 2,943.3 | 9.3% | 2,943.3 |
| CDO/CLO. . . . . . . . . . . . . . . . . . . . . | - | 0.0% | - |
| Other Structured Finance. . . . . . . . . | 222.1 | 0.7% | 222.1 |
| Total International. . . . . . . . . . . . . . . . | 4,395.2 | 13.9% | 4,395.2 |
| | | | |
| Total. . . . . . . . . . . . . . . . . . . . . | $31,594.7 | 100.0% | $31,594.7 |

(1) The Company's exposure reflects the impact of transactions closed prior to March 31, 2013; however it does not reflect the potential impact, if any, of ongoing commutation, settlement and restructuring efforts by the Company subsequent to March 31, 2013.

(2) USD equivalent using March 31, 2013 exchange rates.

Financial Guaranty Insurance Company
Quarterly Operating Review
First Quarter 2013



**RMBS Exposure**

(Dollars in Millions)

| | Pre-2004 | 2004 | 2005 | 2006 | 2007 | Total |
|---|---|---|---|---|---|---|
| **Alt-A (1st lien)** | | | | | | |
| Number of transactions. . . . . . . . . . | - | 4 | 6 | 5 | - | 15 |
| Net Par Outstanding (in $). . . . . . . . | - | 376.0 | 282.9 | 175.8 | - | 834.8 |
| **HELOC** | | | | | | |
| Number of transactions. . . . . . . . . . | 13 | 10 | 10 | 7 | 1 | 41 |
| Net Par Outstanding (in $). . . . . . . . | 137.7 | 560.4 | 1,099.8 | 1,479.7 | 352.5 | 3,630.1 |
| **High LTV** | | | | | | |
| Number of transactions. . . . . . . . . . | - | 5 | 2 | 5 | 1 | 13 |
| Net Par Outstanding (in $). . . . . . . . | - | 128.0 | 42.0 | 464.2 | 128.5 | 762.6 |
| **Closed end seconds** | | | | | | |
| Number of transactions. . . . . . . . . . | 5 | 2 | 5 | 13 | 1 | 26 |
| Net Par Outstanding (in $). . . . . . . . | 33.7 | 63.7 | 537.5 | 2,306.1 | 399.0 | 3,339.9 |
| **Subprime (1st lien)** | | | | | | |
| Number of transactions. . . . . . . . . . | 31 | 11 | 15 | 4 | 8 | 69 |
| Net Par Outstanding (in $). . . . . . . . | 262.4 | 589.1 | 1,319.6 | 262.5 | 1,295.0 | 3,728.6 |
| **Prime (1st lien)** | | | | | | |
| Number of transactions. . . . . . . . . . | 1 | - | 5 | 1 | - | 7 |
| Net Par Outstanding (in $). . . . . . . . | 0.2 | - | 172.1 | 54.7 | - | 227.0 |
| **Total** | | | | | | |
| Number of transactions. . . . . . . . . . | 50 | 32 | 43 | 35 | 11 | 171 |
| Net Par Outstanding . . . . . . . . . . . . | $  434.0 | $  1,717.2 | $  3,453.9 | $  4,742.9 | $  2,174.9 | $  12,523.0 |

Financial Guaranty Insurance Company
Quarterly Operating Review
First Quarter 2013



## CDO Exposure

(Dollars in Millions)

| | | 2006 | Total |
|---|---|---|---|
| **High Yield Loans (FG)** | | | |
| Number of transactions. . . . . . . . . . . | | 1 | 1 |
| Net Par Outstanding (in $). . . . . . . . . | | 144.3 | 144.3 |
| **Mezzanine ABS (FG)** | | | |
| Number of transactions. . . . . . . . . . . | | 1 | 1 |
| Net Par Outstanding (in $). . . . . . . . . | | 201.3 | 201.3 |
| **Total** | | | |
| Number of transactions. . . . . . . . . . . | | 2 | 2 |
| Net Par Outstanding. . . . . . . . . . . . . | $ | 345.6 | $ 345.6 |

Financial Guaranty Insurance Company
Quarterly Operating Review
First Quarter 2013



## TOP FIFTY U.S. PUBLIC FINANCE EXPOSURES [1]

(Dollars in Millions)

| Revenue Stream Name | Net AADS [2] Amount | Net Par Outstanding Amount | % of Total [3] |
|---|---|---|---|
| Jefferson County, AL Sewer Rev. | $ 100.3 | $1,426.2 | 4.5% |
| Los Angeles USD, CA GO. | 102.9 | 1,175.9 | 3.7% |
| Golden State Tobacco Securitiz Corp, CA Lease. | 64.6 | 996.6 | 3.2% |
| Detroit (City of), MI GO. | 101.4 | 925.0 | 2.9% |
| Hudson Yards Infrastructure Corp, NY. | 37.1 | 600.0 | 1.9% |
| Puerto Rico Commonwealth GO. | 77.0 | 534.0 | 1.7% |
| Puerto Rico Highway Transportation. | 48.8 | 483.2 | 1.5% |
| Yankee Ballpark LLC (NYC IDA). | 36.3 | 440.0 | 1.4% |
| Detroit (City of), MI Water Rev. | 38.7 | 377.9 | 1.2% |
| Puerto Rico Infras Fin Auth, PR, Spec Tax Rev. | 23.0 | 360.4 | 1.1% |
| Pacific Gas Electric Company. | 29.8 | 345.0 | 1.1% |
| Dayton Power Light Company. | 24.7 | 314.4 | 1.0% |
| Hawaiian Electric Company. | 18.3 | 262.0 | 0.8% |
| St. Joseph Health System. | 17.7 | 250.2 | 0.8% |
| California Housing Finance Agency - Single-Family. | 25.3 | 212.6 | 0.7% |
| Downtown Phoenix Hotel Corp Sr. Rev 05. | 10.2 | 155.2 | 0.5% |
| Illinois Housing Development Auth, IL Hsg. | 8.3 | 149.7 | 0.5% |
| Kansas City Power Light. | 14.1 | 146.5 | 0.5% |
| Brooklyn Union Gas Company. | 13.1 | 137.0 | 0.4% |
| Detroit, MI Sewer Disposal Rev. | 39.5 | 136.2 | 0.4% |
| Alaska Housing Finance Corpora. | 8.8 | 135.7 | 0.4% |
| CenterPoint Energy Houston Electric Company. | 14.6 | 127.4 | 0.4% |
| Palm Beach Cnty SD, FL GO. | 10.6 | 116.2 | 0.4% |
| NEW YORK ST POWER AUTH. | 7.1 | 112.0 | 0.4% |
| Southern California Edison Power Company. | 9.5 | 110.0 | 0.3% |
| Detroil (City of) School District, MI GO. | 50.2 | 108.3 | 0.3% |
| Green Stadco-New York Jets Stadium. | 28.1 | 97.5 | 0.3% |
| Puerto Rico Conv Ctr Dist Auth, PR Hotel Rev. | 9.0 | 97.1 | 0.3% |
| Nevada Power Company. | 6.7 | 92.5 | 0.3% |
| Sierra Pacific Power Company. | 6.6 | 89.8 | 0.3% |
| Entergy New Orleans, LA. | 6.8 | 75.0 | 0.2% |
| Louisiana Stad Expo District. | 20.9 | 72.7 | 0.2% |
| New Orleans (City of), LA GO. | 7.3 | 56.7 | 0.2% |
| Southwest Gas Corporation. | 10.7 | 56.1 | 0.2% |
| New Jersey HMFA, NJ Housing Rev. | 9.1 | 55.8 | 0.2% |
| Burbank RDA (Golden State Redev), CA. | 3.1 | 55.0 | 0.2% |
| New Orleans (City of), LA Sewerage Syst. | 8.8 | 54.3 | 0.2% |
| Massachusetts Commonwealth GO. | 10.4 | 53.3 | 0.2% |
| Indiana Michigan Power Co. | 5.1 | 50.0 | 0.2% |
| Rancho Calif, CA Water Dist Rev. | 4.0 | 46.9 | 0.1% |
| Elk River ISD #728, MN GO. | 4.2 | 44.6 | 0.1% |
| Dayton University, OH Mtg Rev. | 2.8 | 43.4 | 0.1% |
| Gulf Breeze, Florida 85B. | 9.0 | 41.9 | 0.1% |
| New York City, NY Muni Water Rev. | 6.4 | 39.2 | 0.1% |
| Wisconsin Power Light Company. | 5.8 | 39.1 | 0.1% |
| Interstate Power Light Company. | 5.1 | 38.4 | 0.1% |
| Acalanes Union HSD, CA GO. | 4.2 | 36.3 | 0.1% |
| Dormitory Auth of State of NY - CUNY Rev. | 3.1 | 35.1 | 0.1% |
| San Marcos Pub Fac Auth, CA Mello Roos Rev. | 2.3 | 30.2 | 0.1% |
| Banning (City of) Comm RDA, CA Ref TABs (Merged. | 1.8 | 28.3 | 0.1% |
| Total. | $1,113.0 | $11,466.5 | 36.3% |

[1] Excludes amounts ceded under reinsurance agreements including amounts reinsured by MBIA, under which MBIA reinsured certain policies covering approximately $104 billion of FGIC's gross U.S. public finance insured par outstanding as of 3-31-2013.

[2] Represents the net average annual debt service for which FGIC would be responsible in the event of a default.

[3] Represents percentage of total net par outstanding.

Financial Guaranty Insurance Company
Quarterly Operating Review
First Quarter 2013



## TOP U.S. STRUCTURED FINANCE EXPOSURES AND SERVICERS

(Dollars in Millions)

| | Net Par Outstanding | |
| --- | --- | --- |
| | March 31, 2013 | |
| | Amount | % of Total [1] |
| **Top Fifteen U.S. Structured Finance Exposures** | | |
| CWHEQ 2006-H | $ 678.6 | 2.1% |
| ACS 2007-1 Pass Through Trust | 623.4 | 2.0% |
| MSAC 2007-NC4 | 527.9 | 1.7% |
| GMACM Home Equity Loan Trust 2006-HE1 | 495.6 | 1.6% |
| Genesis Funding Limited | 490.1 | 1.6% |
| GMACM 2007-HE2 | 399.0 | 1.3% |
| TAL Advantage I LLC | 371.7 | 1.2% |
| CWHEQ 2007-C | 352.5 | 1.1% |
| Argent Mortgage Loan Trust 2005-W1 | 349.8 | 1.1% |
| Terwin Mortgage Trust 2006-8SL | 345.2 | 1.1% |
| RASPRO Trust 2005-1 | 300.0 | 0.9% |
| GMACM 2006-HE5 | 279.8 | 0.9% |
| RASC 2007-EMX1 | 266.2 | 0.8% |
| Ramp Series 2005-RS9 Trust | 256.9 | 0.8% |
| SLM Private Credit Student Loan Trust 2006-B | 250.0 | 0.8% |
| Total | $5,986.8 | 18.9% |

| | Net Par Outstanding | |
| --- | --- | --- |
| | March 31, 2013 | |
| | Amount | % of Total [1] |
| **Top Ten U.S. Structured Finance Servicers** | | |
| Residential Funding Company, LLC | $ 4,292.3 | 13.6% |
| Countrywide Home Loans | 3,107.0 | 9.8% |
| Green Tree Servicing LLC | 1,102.1 | 3.5% |
| Aircastle Limited | 859.3 | 2.7% |
| Saxon Mortgage Services, Inc. | 724.9 | 2.3% |
| Ameriquest Mortgage Company | 696.3 | 2.2% |
| Specialized Loan Servicing LLC | 499.3 | 1.6% |
| GE Commercial Aviation Services Limited | 490.1 | 1.6% |
| IndyMac Bank | 386.5 | 1.2% |
| TAL Advantage I LLC | 371.7 | 1.2% |
| Total | $12,529.5 | 39.7% |

[1] Represents percentage of total net par outstanding.



## TOP REINSURER EXPOSURES

(Dollars in Millions)

**Ceded Par Outstanding**
**March 31, 2013**

| Reinsurer | Reinsurer Rating [1] | Ceded Principal Outstanding | Public Finance (FGIC Retained) | Public Finance (MBIA Covered) | RMBS | Structured Finance (other than RMBS) | International |
|---|---|---|---|---|---|---|---|
| National Public Finance Guarantee Corp.. . . . . . . | BBB/Baa2 | $ 99,086.8 | - | $ 99,086.8 | - | - | - |
| Assured Guaranty Re Ltd . . . . . . . . . . . . . . . . . . . | AA-/Baa1 | $ 5,151.6 | 994.5 | 3,592.7 | 60.8 | 503.6 | - |
| Assured Guaranty Corp... . . . . . . . . . . . . . . . . . . | AA-/A3 | $ 1,211.5 | 336.5 | 870.9 | 0.3 | 0.0 | 3.8 |
| Assured Guaranty Re Overseas Ltd.. . . . . . . . . . | AA-/Baa1 | $ 41.6 | 1.3 | 40.2 | 0.2 | - | - |
| Toa Re America... . . . . . . . . . . . . . . . . . . . . . . . . | A+/NR | $ 48.9 | 6.8 | 42.1 | - | 0.0 | - |
| Other.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | $ 32.1 | 0.7 | 0.0 | 1.4 | 0.0 | 30.0 |
| Total. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | $105,572.5 | $1,339.8 | $103,632.6 | $62.7 | $503.7 | $33.8 |

[1]
Source S&P/Moody's: Individual company websites and rating agency reports.

Financial Guaranty Insurance Company
Quarterly Operating Review
First Quarter 2013



### NET DEBT SERVICE AMORTIZATION [1]

(Dollars in Millions)

| | March 31, 2013 | |
| --- | --- | --- |
| | Scheduled Net Debt Service Amortization | Ending Net Debt Service Outstanding |
| **Upfront Business:** | | |
| 2013 | $ 548.1 | $ 45,819.2 |
| 2014 | 647.6 | 45,171.5 |
| 2015 | 717.7 | 44,453.8 |
| 2016 | 683.5 | 43,770.3 |
| 2017 | 629.4 | 43,824.4 |
| 2013-2017 | 3,226.4 | 43,140.9 |
| 2018-2022 | 4,020.0 | 39,120.8 |
| 2023-2027 | 2,595.4 | 36,525.4 |
| 2028-2032 | 2,492.8 | 34,032.7 |
| After 2032 | 4,357.4 | 29,675.2 |
| Subtotal | 16,692.1 | |
| **Installment Business:** | | |
| U.S. Structured Finance | 17,316.5 | 12,358.7 |
| U.S. Public Finance | 7,143.5 | 5,215.2 |
| International | 5,215.2 | - |
| Total | $46,367.3 | |

[1] Depicts expected amortization of the total insured portfolio (principal and interest), assuming no refundings or calls through the contractual maturity date as of March 31, 2013.

Financial Guaranty Insurance Company
Quarterly Operating Review
First Quarter 2013