**DECHERT LLP**
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon
and The Bank of New York Mellon Trust
Company, N.A., as Trustee of Certain
Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as
Trustee of Certain Mortgage Backed
Securities Trusts*

**SEWARD & KISSEL LLP**
Mark D. Kotwick
Brian P. Maloney
Ryan Suser
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association,
as Trustee of Certain Mortgage-Backed
Securities Trusts*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Case No. 12-12020 (MG) |
| **RESIDENTIAL CAPITAL, LLC,** *et al.*, | ) |
| | ) **Chapter 11** |
| Debtors. | ) |
| | ) **Jointly Administered** |

### NOTICE OF FILING OF UNREDACTED DIRECT TESTIMONY DECLARATION OF ALLEN M. PFEIFFER, REGARDING DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF THE SETTLEMENT AGREEMENT AMONG THE DEBTORS, FGIC, THE FGIC TRUSTEES, AND CERTAIN INDIVIDUAL INVESTORS

**PLEASE TAKE NOTICE** that The Bank of New York Mellon, The Bank of New York

Mellon Trust Company, N.A. (collectively, "BNY Mellon"), U.S. Bank National Association

("U.S. Bank"), and Wells Fargo Bank, N.A. ("Wells Fargo"), solely in their respective capacities

as trustee or indenture trustee for certain mortgage backed securities trusts (collectively, the "FGIC Trustees") hereby file the unredacted version of the *Direct Testimony Declaration of Allen M. Pfeiffer* (the "**Declaration**").  The Declaration was previously filed in redacted form on July 31, 2013 (Docket No. 4440), pursuant to the Court's *Order Regarding Exchange of Confidential Information* (Docket No. 4249) (the "**Confidentiality Order**").

Dated:  New York, New York
      August 15, 2013

**DECHERT LLP**
By:  /s/ Glenn E. Siegel
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., as Trustee of Certain Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
By: /s/ John C. Weitnauer
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as Trustee of Certain Mortgage Backed Securities Trusts*

**SEWARD & KISSEL LLP**
By:  /s/ Mark D. Kotwick
Mark D. Kotwick
Ronald L. Cohen
Arlene R. Alves
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association, as Trustee of Certain Mortgage-Backed Securities Trusts*

**DECHERT LLP**
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
*Counsel to The Bank of New York Mellon and The
Bank of New York Mellon Trust Company, N.A., as
Trustee of Certain Mortgage-Backed Securities
Trusts*

**SEWARD & KISSEL LLP**
Mark D. Kotwick
Ronald L. Cohen
Arlene R. Alves
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421
*Counsel to U.S. Bank National Association, as
Trustee of Certain Mortgage-Backed Securities
Trusts*

**ALSTON & BIRD LLP**
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
*Counsel to Wells Fargo Bank, N.A., as Trustee of
Certain Mortgage Backed Securities Trusts*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>RESIDENTIAL CAPITAL, LLC, *et al.*,<br><div align="right">Debtors.</div> | Case No. 12-12020 (MG)<br>Chapter 11<br>Jointly Administered |

# DIRECT TESTIMONY OF ALLEN M. PFEIFFER

I, Allen M. Pfeiffer, under penalty of perjury, testify as follows:

1.      I have been asked by the **FGIC Trustees**[1] to serve as an expert witness in connection with the FGIC Trustees' **Joinder**[2] to Debtors' Motion Pursuant to Fed. R. Bankr, P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors (the "**FGIC Motion**") [Docket No. 3929].  This Declaration is filed in accordance with paragraph 12 of this Court's Scheduling Order [ECF No. 4168].  Parts I  through XII of this Declaration (beginning with paragraph 2 of Part I) are identical to my expert report dated and provided on July 19, 2013 (the "**Pfeiffer Report**" or "**my Report**") except that, in the last sentence of paragraph 26, I corrected a 3 typographical errors, changing (i) "18 to 24 percent" to read "19 to 24 percent" and (ii) "22 to 28 percent" to read "24 to 28 percent", in each case to match what is shown in Table 1, referenced in that sentence.  In this declaration I add the following new sections: in Part XIII, I address contentions contained in those portions of the **Freddie Mac Objection**[3] and the **Monarch Group Objection**[4] (collectively, the "**Objections**") that relate to the valuation issues addressed in my Report; and in Part XIV, I amend Attachment II (List of Documents Considered) of the Pfeiffer Report. Attachments I and III, as originally attached to my Report, are attached at the end of this

---

[1]      The FGIC Trustees are The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., U.S. Bank National Association and Wells Fargo Bank, N.A., each solely in their respective capacities as trustees or indenture trustees for the FGIC Insured Trusts.
[2]      Joinder of FGIC Trustees to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, The FGIC Trustees and Certain Institutional Investors [Docket No. 3982]
[3]      *Federal Home Loan Mortgage Corporation's Objection to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* [Docket No. 4406]
[4]      *Objection of Monarch Alternative Capital, LP, Stonehill Capital Management LLC, Bayview Fund Management LLC, CQS ABS Master Fund Limited and CQS ABS Alphas Master Fund Limited to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* [Docket No. 4400]

declaration, and the revised Attachment II is also attached.  The new entries on the

revised Attachment II begin at item 127; items 1 – 126 are the same items contained in

Attachment II to my Report as originally provided on July 19.


I.    EXPERT WITNESS DISCLOSURE AND STATEMENT OF BACKGROUND AND
      QUALIFICATIONS

2.    I am a Managing Director in the New York, NY and the Morristown, NJ offices of Duff

& Phelps, LLC ("**D&P**"). I am the Global Service Leader of Dispute Consulting-

Complex Valuation and Bankruptcy Litigation. D&P is a leading financial advisory and

investment banking firm offering an array of services in the areas of valuation,

investment banking and transaction advice, and dispute consulting.

3.    I have more than seventeen years of valuation, solvency, damages cash flow assessment

and capital structure analysis experience and have led hundreds of engagements related to

the valuation of an entire business, a security, an interest in a business, or an asset.

During my professional career, the New York Supreme Court, the United States

Bankruptcy Court, the American Arbitration Association, and arbitrators operating under

the rules of the International Chamber of Commerce have accepted me as a valuation and

cash flow expert. In addition to my testifying experience, I have worked as a lead

consultant to attorneys and corporations in the context of solvency and many other

valuation and corporate finance matters. I also led the team of financial advisors to Anton

Valukus, who served as the Examiner in the Lehman Brothers bankruptcy case.

4.    My Residential Mortgage-Backed Securities ("**RMBS**") experience includes serving as a

consultant on the valuation and cash flows as part of a solvency matter related to a multi-

billion-dollar, leading financial services company. I have been retained to advise on the

valuation of RMBS securities as part of the reorganization of an international, multi-billion-dollar financial services entity, and I have served as a debtor advisor in litigation related to the reorganization of a leading residential lender, and lead advisor on the solvency of a large, residential real estate subsidiary. In addition, I have been a consultant to a bank trustee in a multi-billion-dollar repurchase claim matter related to a bank merger, and, in another matter, advised the trustees in a multi-billion-dollar repurchase claim matter associated with a bankruptcy.

5.    While all the conclusions set forth in this Report derive from work performed by me, or performed under my direction, my conclusions relied, in part, on the input of two my colleagues at D&P, John W. Schrader, a Managing Director in the New York Office of D&P and Brendan Murphy, a Director in the New York Office of D&P.

6.    Mr. Schrader possesses over 21 years of Financial Advisory and Investment Banking experience centered on Collateralized Debt Obligations ("CDOs") and various structured products, including RMBS. Mr. Schrader also served as the global head of Mortgage Market Risk and Securitized Products for a leading investment bank. Mr. Schrader has estimated a range of reasonable mortgage repurchase liabilities in association with bankruptcies, has valued and assessed modeling and loan surveillance platforms for numerous domestic and internal whole-loan investments pertaining to performing, re-performing, and non performing mortgages, and has assisted various hedge funds and private equity firms in assessing value and measuring risk associated with structured products (specifically, CDOs, RMBS, Commercial Mortgage-Backed Securities, and Asset-Backed Securities, among others).

7.      Mr. Murphy is a Director in the Global Restructuring Advisory group at D&P with over

twelve years of experience in bankruptcy and restructuring. His experience includes

corporation and asset appraisal — including debt restructuring, liquidation analysis,

extensive valuation, and capital refinancing. His Chapter 11 experience includes Plan

development and creditor negotiations, business plan / capital structure assessment,

distressed M&A (via §363 sales), capital raising (DIP / Exit financing), and operational

turnarounds (cash flow / liquidity management). He has executed over 37 distressed

transactions throughout all phases of financial restructurings and represented clients

within all levels of the capital structure, both in- and out-of-court.

8.      My resume and testimony experience, for at least the past four years, and publications,

for at least the last ten years, are attached to this report as **Attachment I**.


II.     SCOPE OF WORK

9.      My assignment is to assess the reasonableness, from a financial perspective and from the

perspective of the **FGIC Insured Trusts**,[5] of the **Settlement Agreement**,[6] which

provides for, among other things, a lump sum payment by FGIC to the FGIC Insured

Trusts (the "**Commutation Payment**") in satisfaction of any obligations of FGIC to

make payments in the future (the "**Projected Payments**") to the FGIC Insured Trusts

under FGIC' **Rehabilitation Plan** (as that term is defined below) (the "**Commutation**"[7]).

---

[5]      The "FGIC Insured Trusts" are the 47 RMBS Trusts listed on Exhibit B to the Settlement Agreement,
certain tranches of which are insured by FGIC.
[6]      Capitalized terms not defined in this Report shall have the meanings ascribed to them in the FGIC Motion
or the Settlement Agreement, as applicable.
[7]      I understand that FGIC has stated that the Settlement Agreement does not effect a "commutation" of any
insurance policies, a point on which I have no opinion. Any payment does not constitute a Commutation Payment.
This Report only uses the terms Commutation and Commutation Payment for convenience, as these terms were
commonly used during negotiation discussions.

10.     In performing the analyses, I, and/or others at D&P working under my direction, have

reviewed, among other information, the following:

- The Settlement Agreement;

- The Plan Support Agreement;

- The Rehabilitation Plan (including the exhibits and attachments thereto);

- The Disclosure Statement for the Rehabilitation Plan, filed on September 27, 2012

  (the "**FGIC Disclosure Statement**");

- Affidavit of Michael W. Miller[8] submitted on December 12, 2012, in Further

  Support of Approval of First Amended Plan of Rehabilitation (the "**Miller**

  **Affidavit**");

- The governing agreements for the FGIC Insured Trusts (the "**Governing**

  **Agreements**");

- Ibbotson Cost of Capital Yearbook 2012 and 2013 ("**Ibbotson**");

- ResCap's Vision Database[9];

- Intex[10];

- Bloomberg[11];

- Interview with Tim Travers (FGIC's Chief Restructuring Officer);

- Interview with certain Lazard personnel;

---

[8]     Mr. Miller is the Director of the Financial Institutions Group at Lazard Freres & Co. LLC ("**Lazard**").
[9]     The Vision database is ResCap's (now Ocwen's) investor services website and can be found at investor.gmacrfc.com/vision/.
[10]     Intex is a subscription based 3rd party application that models the deal structure and rules that govern cash flow distribution as defined in the governing documents.  It also maintains monthly updated collateral files for each deal, that may be at the loan level or based on summarized or aggregate data, depending on whether or not the Servicer of a deal furnishes then with servicing files.
[11]     Bloomberg is an industry-standard source for financial data, including data on the FGIC Insured Trusts.

- Additional publicly-available documents related to the FGIC Rehabilitation (fully listed in **Attachment II**).

11. **Attachment II** lists all of the documents that were reviewed and / or considered in forming the basis for my conclusions. I reserve the right to update **Attachment II** as additional documentation is reviewed and / or considered.

III.    SUMMARY OF CONCLUSIONS

12. Conclusion 1: Under the Settlement Agreement, the FGIC Insured Trusts forgo uncertain Projected Payments and receive the lump sum Commutation Payment upon execution of the Settlement Agreement. The Commutation Payment mitigates downside risk to Investors by securing a known payment to Investors following approval of the Settlement Agreement by the Bankruptcy Court and the Rehabilitation Court (and assuming that all conditions precedent to the Effective Date are satisfied or waived). Following an independent analysis performed by me, and those working under my direction, it is my conclusion that the Commutation Payment amount of approximately $253.3 million falls within a reasonable range, given the expected cash flows associated with the Projected Payments.

13. Conclusion 2: From a financial perspective, it is my conclusion that it was reasonable for the FGIC Trustees to agree to the Settlement Agreement and thereby accept the Commutation Payment over the Projected Payments. While I do not conclude that acceptance of the Commutation Payment inevitably will be a superior result for all Investors; given the overall risks, benefits, and uncertainties involving both the Commutation Payment and the Projected Payments, and, given that the Settlement

Agreement is an integral part of the Plan Support Agreement that may result in the confirmation of a Plan that produces additional value for Investors in the FGIC Insured Trusts, it is my opinion that a decision by the FGIC Trustees to enter into the Settlement Agreement, and thus accept the Commutation Payment in lieu of the Projected Payments, was reasonable.

IV.    D&P'S ROLE AS FINANCIAL ADVISOR

14.    The conclusions presented in this Report result, in part, from work done by D&P in its role as Financial Advisor to the FGIC Trustees. In late March 2013, as part of the mediation (the "**Mediation**") overseen by the Court-appointed Mediator, Judge James M. Peck, the FGIC Trustees received a proposal for the commutation of insurance policies issued by FGIC to the FGIC Insured Trusts (the "**Proposal**"). D&P was asked by the FGIC Trustees to advise them regarding D&P's assessment of the reasonableness, risks, and benefits of accepting the Proposal. Based, in part, on confidential information communicated by FGIC's Chief Restructuring Officer and Lazard, Financial Advisors to Weil, Gotshal & Manges, LLP, counsel to the New York Liquidation Bureau ("**NYLB**"), D&P performed an independent financial analysis to determine a reasonable range of the value of Projected Payments to the FGIC Insured Trusts based on the Rehabilitation Plan. D&P presented the analysis on an ongoing basis to the FGIC Trustees during the Mediation and provided guidance that, from a financial perspective, the Commutation Payment falls within a range of reasonableness relative to the Projected Payments under Rehabilitation Plan. **Attachment III** contains the presentation given to the Trustees on May 15, 2013. The presentation gives background information about the Rehabilitation Plan, financial considerations covering the Proposal and the Rehabilitation Plan, and

reviews FGIC's own calculations leading to a payment amount of $253.3 million It also

presents D&P's independent analysis of the Projected Payments and the Commutation. It

is important to note that the guidance provided by D&P was based on information

received from FGIC and Lazard; however, the conclusions reached by D&P resulted

from its own independent analysis of that information and publicly available information.


V.    SUMMARY OF THE REHABILITATION PLAN

    (i)    Background

15.    In January 2008, FGIC voluntarily ceased writing policies for new or additional risks,

stopped paying dividends or other distributions to its shareholders, and reduced its

operating expenditures. Despite these measures, FGIC's quarterly statement for the

period ending September 30, 2009 reflected a deficit in Policyholders'[12] surplus of

approximately $866 million, and an impairment of its required minimum surplus to

Policyholders of approximately $932 million.[13] As a result, on November 24, 2009, the

New York State Department of Financial Services ("**NYSDFS**") issued a 1310 Order,

requiring FGIC to suspend payment of all Claims and prohibited FGIC from writing new

Policies.

16.    On June 28, 2012, the Superintendent of Financial Services of the State of New York was

appointed rehabilitator (the "**Rehabilitator**") of FGIC by the Supreme Court of the State

of New York to oversee FGIC's rehabilitation proceeding (the "**Rehabilitation

Proceeding**"). On September 27, 2012, the Rehabilitator filed a proposed Plan of

Rehabilitation and a disclosure statement for FGIC, both dated September 27, 2012, in

---

[12]    All capitalized terms first used in this section of the Report have the meaning given in the Rehabilitation
Plan or the FGIC Disclosure Statement, as applicable.
[13]    FGIC Disclosure Statement, p 10.

the Rehabilitation Proceeding. Subsequently, the proposed Plan of Rehabilitation was

amended on December 12, 2012, April 12, 2013, and June 4, 2013 (as amended, the

"**Rehabilitation Plan**").

(ii)    Goal of the Rehabilitation Plan

17.    The stated goal of the Rehabilitation Plan is to treat FGIC's Policyholders in a fair and

equitable manner in order to remove the causes and conditions that made the

Rehabilitation Proceeding necessary.[14] The Rehabilitation Plan provides for all of the

value of FGIC, other than administrative expenses and certain other costs, to go to

FGIC's Policyholders until the Policyholders are paid in full. No claimants junior to the

Policyholders will receive any payment until the Policyholders are paid in full in

accordance with the terms of the Rehabilitation Plan.

(iii)    Distribution Methodology Under the Rehabilitation Plan

18.    FGIC's outstanding Policies have scheduled remaining terms that do not expire for as

long as another 40 years.[15] Consequently, FGIC expects to receive Policy Claims over an

extended period, defined in the Rehabilitation Plan as the "**Run-Off Period**."

Conversely, certain Policyholders either have Policy Claims that are accrued and unpaid

since the entry of the 1310 Order on November 24, 2009 ("**Accrued and Unpaid**

**Claims**") or have Policy Claims that are likely to materialize within the first five years

post-emergence.[16]

19.    The Rehabilitation Plan includes certain policy modifications to provide FGIC the ability

to pay a certain Cash Payment Percentage (the "**CPP**") of each Permitted Policy Claim,

---

[14]    Memorandum of Law in Support of Approval of Plan of Rehabilitation for FGIC (Oct. 25, 2012), p. 1.
[15]    Miller Affidavit at Exhibit II, p 6.
[16]    Miller Affidavit at p 10.

in cash, with the remainder of the Permitted Policy Claim treated as a Deferred Payment

Obligation (the "**DPO**"). The DPO accrues interest at a rate of three percent per annum

(the "**DPO Accretion**") on a simple (non-compounding) basis.

20.     Additionally, the Rehabilitation Plan provides for an initial, partial cash payment, based

on the initial CPP, of then-Permitted Policy Claims, no later than 150 days after the

effective date of the Rehabilitation Plan. The Rehabilitator estimates that the total

distributable value will provide all Policyholders with the same CPP of their Permitted

Policy Claim on a nominal basis (*i.e.*, excluding the time value of money).

21.     The Rehabilitation Plan also provides for an annual, or possibly more frequent,

adjustment of the CPP, based on an assessment of FGIC's financial condition. The

Restructured Policy Terms attached to the Rehabilitation Plan provides that each CPP

Revaluation will include certain updates, revisions, corrections, or other modifications

that are necessary to correct any errors, reflect events that have occurred, or are

reasonably likely to occur, and ensure that the CPP is set at a level consistent with the

Run-Off Principles. These modifications are then used to determine the amount (if any)

of Excess Cash available to recalculate the CPP and determine the amount of DPO

Accretion that may be paid.

22.     Upon a CPP Upward Adjustment, the DPO Accretion Payable Amount will be

distributed, pro rata, based on the outstanding DPO Accretion for each Policy. With

respect to the DPO, the Rehabilitator makes no assurances as to if, when, or in what

amounts, FGIC may ultimately make cash payments with respect to any DPO.

Additionally, the Rehabilitator expects that the DPO Accretion Payment Amounts will be

a fraction of the outstanding DPO Accretion. However, the Rehabilitator makes no

11

assurances as to if, when, or in what amounts, FGIC may ultimately make cash payments

with respect to any DPO Accretion.[17]

23.    The distribution method outlined in the Restructured Policy Terms provides certain

reserve mechanisms to prevent potential overpayments on Policy Claims that have

already materialized. To the extent that overpayments on a particular Policy Claim are

unable to be offset against projected losses, certain Policyholders with unrealized,

projected claims may be disenfranchised in the event that the actual distributable value of

the estate is unable to be equally distributed to all Policyholders via the CPP.

(iv)    Estimated Recoveries to Policyholders

24.    The Miller Affidavit includes the updated projections for the Run-Off Period (the

"**Updated Run-Off Projections**") under both the Base and Stress Scenarios (as defined

in the Rehabilitation Plan). The Updated Run-Off Projections estimate the initial CPP

will be 17.25 percent. Subsequently, pursuant to the Plan Approval Order dated June 11,

2013, an initial CPP of 17.25 percent was approved. The initial CPP is subject to

adjustment by the Rehabilitator in his sole discretion on or before the Effective Date.[18]

25.    The Updated Run-Off Projections offers different projections of the CPP under the Stress

Scenario and under the Base Scenario. Under the Stress Scenario, the CPP is held

constant at 17.25 percent, until a final distribution of all available assets to holders of

policy claims permitted under the Rehabilitation Plan. Assuming a discount rate range of

10 to 20 percent, the present value of recoveries to such Policyholders under the Stress

---

[17]    Rehabilitation Plan at Exhibit B, B-2.
[18]    FGIC Plan Approval Order dated June 11, 2013 at p. 6.

Scenario is 17 to 18 percent, and a lower percentage of the notional (non-discounted) all

Permitted Policy Claims.

26.     Under the Base Scenario, in which the losses are lower than those projected under the

Stress Scenario, the CPP is estimated to increase every year until 2043.[19] Each

Policyholder is projected to receive a nominal recovery of 38.6 percent of their Permitted

Policy Claims by 2052 based on the final CPP estimate included in the Updated Run-Off

Projections. The nominal recovery on an aggregate basis for all Policyholders is

estimated to be 45 percent, that is, after taking into effect the recoveries on the DPO

Accretion. According to Lazard, the net present value of aggregate recoveries divided by

the net present value of all Permitted Policy Claims are estimated to be 27 to 30 percent

under the Rehabilitation Plan using a 10 to 20 percent discount rate range.[20] D&P

calculated this range for the FGIC Insured Trusts to be 18 to 23 percent on a notional

basis and 22 to 28 percent on a discounted basis (See Table 1).

---

[19]     Miller Affidavit, p. 20.
[20]     Miller Affidavit, p. 8.

VI.   SUMMARY OF THE COMMUTATION PAYMENT CONTAINED IN THE SETTLEMENT AGREEMENT

(i)      Background on FGIC's Proofs of Claims

27.   On November 16, 2012, FGIC filed proofs of claims in the Chapter 11 Bankruptcy against Residential Capital, LLC ("**ResCap**"), GMAC Mortgage, LLC ("**GMACM**") and Residential Funding Company, LLC ("**RFC**") (collectively, the "**Debtors**") in an amount of at least $1.85 billion at each debtor entity, in connection with the pre-petition litigation (collectively, the "**FGIC Claims**"). I understand the FGIC Claims against the multiple Debtor entities are generally similar to each other and allege that: (i) RFC and GMACM breached various representations, warranties and/or covenants in the FGIC Trusts' Governing Agreements, (ii) FGIC was fraudulently induced to issue the Policies in connection with most of the FGIC Insured Trusts, and (iii) ResCap is liable for the alleged breaches and fraud of GMACM and RFC under an alter ego liability theory. FGIC also asserted claims related to the Debtors' alleged deficient servicing of the mortgage loans in the FGIC Insured Trusts and based on the Debtors' alleged failure to provide FGIC access to certain information in accordance with the RMBS Trusts' Governing Agreements. FGIC further sought indemnification for "any and all claims, losses, liabilities, demands, damages, costs, or expenses of any nature arising out of or relating to the breach" of the Governing Agreements. [21]

---

[21]      Declaration of Lewis Kruger in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 For Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees, and Certain Institutional Investors [Docket No. 3929-3].

(ii)    Estimate of the Commuted Claims

28.    As of March 31, 2013, FGIC represented to, among others, the FGIC Trustees that it had

paid approximately $343 million in claims to the FGIC Insured Trusts under the Policies.

Based on the proof of claims, FGIC represented that the estimate of accrued and unpaid

and projected claims related to the FGIC Insured Trusts was approximately $1.27 billion.

Of this amount, FGIC represented that the accrued and unpaid claims since the entry of

the 1310 Order through March 31, 2013 was $789 million. Omitting the settlement,

discharge, and release of the policies (*i.e.*, a status quo situation), FGIC estimated

projected losses related to the FGIC Insured Trusts to be approximately $481 million.[22]

(iii)    Commutation Payment Proposed by FGIC

29.    The Settlement Agreement, among other things, provides a lump-sum Commutation

Payment of $253.3 million to be paid to the FGIC Insured Trusts in commutation of the

Policies and in exchange for FGIC's ability to assert a $596.5 million total general

unsecured claim in the ResCap Chapter 11 Bankruptcy cases.[23]

30.    I reviewed FGIC's explanation of the Commutation Payment and understand it as

follows[24]: FGIC's calculations show, based on the Updated Run-Off Projections and the

Base Scenario, that the Commutation Payment incorporates an initial CPP of 17.25

percent and an overall estimated recovery of 28.5 percent (the "**Base Case Payout**"),

which reflects the time-affected recovery percentage based on the midpoint discount rate

of 15 percent. With respect to the accrued and unpaid claims, FGIC explains that the

---

[22]    See Attachment III.
[23]    See Attachment III.
[24]    This section is meant to recap FGIC's calculations resulting in a $253.3 million lump-sum cash payment amount. The conclusions set forth in this Report do not depend on or result from FGIC's calculations or methodologies.

consideration amount equals the sum of (i) the aggregate claims multiplied by the initial

CPP plus (ii) the aggregate claims multiplied by the incremental spread between the Base

Case Payout and the initial CPP multiplied by an assumed reduction percentage of 40

percent. With respect to the projected claims, FGIC explains that the amount of the

Commutation Payment equals the aggregate claims multiplied by the Base Case Payout

multiplied by an assumed discount of 40 percent.[25]

## VII.    CALCULATION OF PROJECTED CASH FLOWS FROM THE REHABILITATION PLAN

31.    In this section, I explain the inputs and assumptions used to determine a reasonable range

of the value of Projected Payments to the Policyholder of FGIC Insured Trusts based on

the Rehabilitation Plan.[26] The main components of the Policy Claims under the

Rehabilitation Plan are the Accrued and Unpaid Claims and the projected Policy Claims.

32.    While the aggregate projected Policy Claims against FGIC have been provided on a

summary level in the Miller Affidavit, to date, neither FGIC or its advisors, nor the

Rehabilitator or its advisors, have disclosed the timing of the projected Policy Claims for

the FGIC Insured Trusts. Due to the lack of supporting information to the Updated Run-

Off Projections, it was necessary for D&P to estimate the Policy Claims specifically

---

[25]    I have not reviewed the analysis behind the 40 percent reduction in the payments related to the (i) spread between the Base Case Payout and initial CPP multiplied by the accrued and unpaid claims and (ii) the Base Case Payout multiplied by the projected claims.  However, I generally understand this 40 percent reduction to reflect a discount for receiving the Commutation Payment upon execution of the Settlement Agreement, in consideration of the timing of claims and payments specifically relating to the FGIC Insured Trusts' Policy Claims under the Rehabilitation Plan. The analysis performed by D&P does not employ this assumed reduction as D&P incorporates the timing of claims and payments related to the Policy Claims of the FGIC Insured Trusts. See Attachment III.
[26]    The inputs and assumptions detailed in this section were current at the time D&P made its recommendation to the FGIC Trustees. I understand that some of the inputs and assumptions have changed in later versions of the Plan. At this time, none of these changes alter the conclusions set forth in this Report.

arising from the FGIC Insured Trusts in order to understand the timing of the relevant

claims and the associated recoveries.

(i)    Accrued and Unpaid Claims

33.    As stated above, on November 24, 2009, the NYSDFS placed FGIC into Rehabilitation,

ordering FGIC to suspend paying all claims. Since entering into Rehabilitation, FGIC has

continued to receive claims on its outstanding policies. These Accrued and Unpaid

Claims will become payable, according to the Plan, upon FGIC's exit from

Rehabilitation. The total Accrued and Unpaid Claims for the FGIC Insured Trusts on

December 31, 2012 was $753 million. This claim amount represents the total of the

principal loss and interest shortfalls to the insured tranches within the FGIC Insured

Trusts.[27] This information is reported monthly in Intex, confirmed, where available, to the

applicable remittance reports, and aggregated by D&P.

(ii)    Projected Claims

34.    Similar to the Accrued and Unpaid Claims resulting from principal loss and interest

shortfalls, the projected claims result from future estimated principal loss and interest

shortfalls. The initial step in calculating the future shortfalls is estimating projected

collateral performance.

35.    To do this, using the balance of active loans to provide the total population of loans, I

determined collateral loss projections on the FGIC Insured Trusts on a trust-by-trust

basis. In order to have a more robust and statistically meaningful loss estimation, trusts

were classified into cohorts by product type and vintage. Product types include Prime,

---

[27]    See Attachment III.

Alt-A, Subprime, Pay Option ARM, Closed-End Seconds, and Open-End Seconds.
Vintages include 2004 and prior, 2004, 2005, 2006, and 2007. Product types are
subsequently broken into 12 "sub-cohorts," facilitating additional precision.

36.     Roll rate transition matrices based off of all RFC and GMACM issued Trusts are used to
calculate monthly prepayment and default rates for each Trust, through the remaining life
of the underlying mortgages as of December 31, 2012. These rates, known as Conditional
Prepayment Rates ("**CPR**") and Conditional Default Rates ("**CDR**"), were used, along
with other estimates, as inputs into Intex.

37.     D&P prepared forecasted cash flows under various scenarios to observe the sensitivities
of loss forecasts associated with changes in CPR, CDR, and severity assumptions. The
high collateral loss scenario applies 110 percent (of the base case) to defaults, 90 percent
to prepayments, and 110 percent to severity. The low collateral loss scenario applies 90
percent (of the base case) to defaults, 110 percent to prepayments, and 90 percent to
severity.

38.     Severity rates reflect the percentage of loss on the remaining unpaid principal balance at
the time a loan is liquidated. As an example, a borrower default where the unpaid
principal balance upon liquidation is $100,000 and there is a net recovery of $75,000 the
severity rate is 25 percent. Severity rates are used to reflect current market conditions in
loss estimates. The range of projected severity was calculated at the sub-cohort level
following the review of third-party research and observed experience for each Trust.
D&P calculated severity rates at the sub-cohort level.

39.     D&P then applied the assumptions resulting from the above described methodology on a
trust-by-trust basis according to each trusts' payment structures as defined by its

Governing Documents, the result of which is the projected shortfalls at a tranche level on a monthly basis and thus the Trusts' claim.

40. D&P estimated that the Policy Claims for the FGIC Insured Trusts will be approximately $409 million in the low case to $793 million in the high case, in each case on a nominal basis.

41. Accordingly, D&P estimated the total Policy Claims for FGIC Insured Trusts including both the Accrued and Unpaid and the Projected Claims to be approximately $1,162 million in the low case to $1,546 million in the high case, in each case on a nominal basis.[28]

(iii)    Projected Nominal Recoveries

42. The Base and Stress Scenarios included in the Miller Affidavit contain summary financials for the Updated Run-Off Period on a 5-year basis (as opposed to on an annual basis). Certain cash flow assumptions were extrapolated from the Base Scenario in order to determine the projected nominal cash flows to the Policyholders for the FGIC Insured Trusts. D&P then applied the low and high projected loss estimates for the FGIC Insured Trusts to the distribution methodology outlined in the Rehabilitation Plan.

43. The CPP was calculated on an annual basis, and the projected CPP amounts were then applied to both D&P's low and high loss projection estimates to determine the initial CPP payment, the catch-up CPP payment, and the corresponding changes in the DPO. With respect to the estimated DPO Accretion Payments, the implied Aggregate DPO Accretion Payment under the Base Scenario was distributed on a pro rata basis to the FGIC Insured Trusts based on the outstanding calculated DPO Accretion.

---

[28]    See Attachment III.

VIII.    UNCERTAINTY OF PROJECTED CASHFLOWS UNDER THE REHABILITATION
PLAN

(i)    Uncertainty of the Input Data and Sources

44.    The actual recoveries to FGIC's Policyholders may differ materially from the estimated

recoveries provided in the Miller Affidavit due to the ongoing changes to the complex

assumptions underlying the Updated Run-Off Projections. While the Updated Run-Off

Projections were revised to reflect certain changes related to premiums and commutation

transactions, the underlying financial data driving the Updated Run-Off Projections are

dated as of December 2011. As such, subsequent analyses derived from the projections

included in the Miller Affidavit, also do not reflect the actual results for 2012 or the

potential resulting impacts to the forecasted recoveries.

45.    Due to a lack of independent means to verify the confidential information and data

provided in the Miller Affidavit, D&P has not verified the projections, assumptions or

analyses prepared by FGIC and its advisors and the NYLB and its advisors. D&P relied

on the projections prepared by FGIC and its advisors, as we believe the analyses were

reasonably prepared in good faith and on a basis reflecting the best current available

information as to the future operating and financial performance during the Run-Off

Period.

(ii)    Uncertainty of the Aggregate Distributable Value

46.    The aggregate distributable value available to FGIC's Policyholders may differ materially

from the projected amounts included in the Updated Run-Off Projections and the Base

Scenario due to differences in realized investment returns, collection of premiums,

reinsurance, salvage, reimbursements and other amounts due to FGIC, availability and

utilization of NOLs, and operating expenses.

47.     Per the Miller Affidavit, the included gross investment income post-Effective Date is expected to be 3.25 percent. Additionally, the management fees are assumed to be 9.75 basis points of invested assets per year. However, FGIC's actual investment income or expenses may potentially materially deviate from the assumptions included in the Updated Run-Off Projections. The resulting deviations could significantly reduce recoveries for Policyholders under the Rehabilitation Plan.[29]

48.     The Rehabilitation Plan requires that Policyholders continue to make premium payments even though it is highly likely, and possibly, a near economic certainty that FGIC will not pay 100 percent of claims filed by Policyholders in cash. The Plan also prohibits the exercise of rights to setoff premiums, reimbursements, and other amounts against policy claims, not giving effect to the modification, therefore, pursuant to the Plan.[30] With respect to required premium payments, if Policyholders choose to setoff premiums, the estimated total collections over the Run-Off Period would be reduced. The Updated Run-Off Projections included a ten percent reduction to expected premium streams; however, to the extent that the actual unpaid installment premiums exceed these levels, the CPP may also decrease.[31]

49.     For the tax-related payments and projections, the Updated Run-Off Projections assume that FGIC will not generate taxable income post-Effective Date and the income expected to be generated on the Effective Date will be offset by existing NOL balances of $5.3 billion.[32] In exchange for the ability to use the NOLs, FGIC plans to pay FGIC Corp. $11 million. However, the preservation and usage of the NOLs and the payment to FGIC

---

[29]     Miller Affidavit at Exhibit I, p. 3.
[30]     Miller Affidavit, p. 10.
[31]     Miller Affidavit, p. 10.
[32]     FGIC Disclosure Statement, p. 15.

Corp. is subject to a number of unknown outcomes including receipt of a private letter

ruling from the IRS.

(iii)    Uncertainty of the Expected Timing and Magnitude of the Aggregate Policy
         Claims

50.    The expected timing and magnitude of the various policy claims are uncertain and

volatile, in part, because of certain long-dated policies with large projected loss amounts.

The potential magnitude of these policy claims are evident when comparing the aggregate

claims under the Base Scenario versus the Stress Scenario where the projected losses are

approximately 85 percent higher.[33]

51.    Additionally, at the time of my analysis, there were certain novation and commutation

agreements still pending which could significantly increase the pool of projected losses.

The Rehabilitator also requested the Court to approve the then-pending Novation

Agreement between FGIC and National Public, and affiliate of MBIA Insurance

Corporation, to novate the National Public Reinsured Policies from FGIC to National

Public. Under the then-pending Novation Agreement, National Public would replace

FGIC as the party obligated to make payments with respect to claims under National

Public Reinsured Policies, which had approximately $110.5 billion par of coverage

outstanding as of November 30, 2012.[34] In the absence of the novation, the CPP would

need to take into account potential losses under the National Public Reinsured Policies,

just as it does potential losses under other FGIC Policies. As a result, proceeding without

the novation would have resulted in an immediate reduction to the initial CPP (down

from 17.25 percent to 15.75 percent), as well as ongoing downward pressure on future

---

[33]    Miller Affidavit at p. 6-7.
[34]    Miller Affidavit at p 6-7.

CPP revaluations.[35] As part of the Rehabilitation Plan, the Rehabilitator was also seeking

court approval of certain "CDS Commutation Agreements" which provide for FGIC to

terminate its obligations under certain policies it issued to counterparties to credit default

swaps ("CDS") entered into by FGIC Credit Products LLC ("FGIC CP"), a subsidiary of

FGIC, and for FGIC CP to terminate its obligations under the CDS. The Updated Run-

Off Projections assume that the six, then-pending, CDS Commutation Agreements that

were executed will be approved by the Court and the payments will be made post-

Effective Date. If the CDS Commutations pending approval were not approved, the initial

CPP would have been lowered to 15.5 percent.[36]

(iv)    Present Value and Discount Rate Associated with the Nominal Cash Flows

52.    As detailed above, there are significant components of the Rehabilitation Plan that may

materially change the timing and amount of cash flows available to be paid to all of

FGIC's Policyholders. In addition, there are certain aspects of the Rehabilitation Plan that

adversely affect the Policyholders of FGIC Insured Trusts. Specifically, a significant

portion of cash distributions on account of the CPP and the DPO Accretion are

significantly back-ended, even though a majority of the claims (*i.e.,* greater than 70

percent) are expected to arise in the first five years.[37]

53.    In order to determine the present value of the cash flows under the Rehabilitation Plan, I

examined the structure and timing of the plan as well as the available information on the

expected ability of FGIC to meet its payment obligations to determine an appropriate and

reasonable rate at which to discount any future cash flows. To do this, I relied on my

---

[35]    Miller Affidavit at p 12.
[36]    Miller Affidavit at p 3.
[37]    See Attachment III.

years of experience in determining discount rates, and I reviewed independent sources of

discount rate calculations, namely Ibbotson. Specifically, I reviewed the Cost of Equity

Capital and the Weighted Average Cost of Capital for Standard Industrial Classification

("**SIC**") 635 (Surety Insurance) and SIC 63 (Insurance Carriers), because companies in

these industrial classifications generally face similar financial burdens as FGIC. While

my analysis did not use specific values from Ibbotson, they served to inform a range of

reasonable discount rates for future cash flows under the Rehabilitation Plan. The median

values for the discount rates ranged from about 9 percent to 19 percent.[38] Given that

FGIC's future payments may be riskier than the SIC's average level of risk, and that

under the Rehabilitation Plan FGIC would not receive the revenue from writing new

policies, the values presented in Ibbotson may serve as a conservative estimate of an

appropriate discount rate.

54.     Based on the structure and the riskiness of payment of the Rehabilitation Plan and the

cost of capital for the industry detailed above, I conclude that a discount rate for future

cash flows under the Rehabilitation Plan of 10 to 20 percent is a reasonable range. Such a

range takes into account that due to the riskiness of future payments there is a risk that

the cash flows under the Rehabilitation Plan could total less than the Commutation

Payment amount of $253.3 million.

    (v)     Exclusion of Potential and Unknown Value of Pending Litigation

55.     The Updated Run-Off Projections included in the Miller Affidavit exclude potential

recoveries from pending RMBS litigation[39] proceedings due to the uncertainty of the

---

[38]     Ibbotson, SIC 63 and SIC 635, March 13, 2013.
[39]     A list of the pending RMBS litigations is included in Exhibit C of the Rehabilitation Plan.

probability, magnitude, and timing of any litigation recoveries. Additionally, FGIC has

not incorporated potential proceeds from the pending RMBS litigation proceedings in its

financial statements. Lazard and FGIC, who are likely to be in the best position to

estimate such recoveries, deemed that, "these recoveries are not sufficiently probable and

estimable." I have no knowledge or reliable data available to estimate potential recoveries

from RMBS litigation. As a result, I have not included any estimates of recoveries from

pending RMBS litigation, because any such estimation would be speculative.

56.     Similarly to excluding any speculative litigation recoveries, I have chosen to follow

Lazard's and FGIC's judgment and exclude from my analysis any estimates on potential

litigation losses by FGIC for the same reasons: that any such losses are impossible to

reliably estimate.


IX.     ADDITIONAL BENEFITS OF THE SETTLEMENT AGREEMENT OVER THE
        REHABILITATION PLAN

57.     In addition to the $253.3 million Commutation Payment, the FGIC Insured Trusts would

no longer need to pay future policy premiums of approximately $18.3 million, on a

present value basis[40]. Including the value of these waived policy premiums, the value of

the Settlement Agreement to the FGIC Insured Trusts increases to approximately $272

million. Along the same lines, the Settlement Agreement will allow any excess spread

(and any reimbursements arising from excess spread) to be distributed to the security

holders of the respective Trusts. That is, any incremental interest provided by the

underlying collateral over the interest paid to the security holders of the trusts go directly

---

[40]     Affirmation of Gary T. Holtzer, Case No. 401265-2012 [Docket #3929-10].

to the securities, rather than reimbursing FGIC, resulting in a potential benefit to

Policyholders in addition to Commutation Payment amount of $272 million.[41]

(i)    Potential Benefits of the Settlement Agreement from the Plan Support Agreement

58.    The approval of the Settlement Agreement is a condition to the effectiveness of the Plan

Support Agreement, and it is my understanding that without the FGIC Trustees'

acceptance of the Settlement Agreement, FGIC would not have entered into the Plan

Support Agreement.

59.    Among other things, the Plan Support Agreement provides for a substantial contribution

from Ally Financial (approximately $2.1 billion), which, together with other assets of the

Debtors, will be available for distributed creditors, including the FGIC Insured Trusts. In

the absence of the Plan Support Agreement (which, I understand, is dependent on the

approval of the Settlement Agreement[42]), additional costs related to the extended

litigation and administration would likely burden the Estate, which would in turn

decrease recoveries to the FGIC Insured Trusts. While not part of D&P's May 15, 2013

presentation to the FGIC Trustees, I understand that the Plan Support Agreement

provides that the FGIC Insured Trusts will have allowed claims in the contemplated

ResCap Plan of Liquidation. In that regard, if the ResCap Plan of Liquidation

contemplated by the Plan Support Agreement is confirmed, an additional estimated $92

million in value will be distributed to the FGIC Insured Trusts. This additional value

(which would not necessarily be available absent the FGIC Trustees acceptance of the

---

[41]    See Attachment III.
[42]    Plan Term Sheet (Exhibit A to PSA) at page 16.

Settlement Agreement) would increase the total potential value of the Settlement

Agreement to the FGIC Insured Trusts to approximately $364 million.

(ii)    Comparison of Projected Recoveries under the Rehabilitation Plan Versus the
Expected Value to the FGIC Insured Trusts Under the Settlement Agreement

60.    A comparison of the recoveries under the Rehabilitation Plan versus the Settlement

Agreement based on the range of D&P's claims estimates presented in Table 1. Based on

the calculations described above, D&P calculated the range of recoveries under the Base

Case Scenario of the Rehabilitation Plan to be $217 to $340 million, indicating a

recovery of 19 to 22 percent on a nominal basis and 24 to 28 percent on a discounted

basis for FGIC Insured Trusts. This range of recoveries implies that accepting a

Commutation Payment of $253.3 million with a value of $272 million, including the

foregone premiums is a reasonable decision, from a financial perspective, by the FGIC

Trustees.

## Table 1: Comparison of Recoveries to Policyholders of FGIC Insured Trusts

($ in millions)

|  |  | D&P Claims Estimates | | |
|---|---|---|---|---|
|  |  | Low Case | | High Case |
| **Policy Claims for FGIC Insured Trusts** | **D&P Claims Estimates** | | | |
|  | Accrued and Unpaid Claims (as of 12/31/12) | $753 | – | $753 |
|  | Projected Claims | 409 | – | 794 |
|  | **Total Policy Claims for FGIC Insured Trusts** | **$1,162** | **–** | **$1,546** |
| **Rehabilitation Plan** | Discount Rate Applied | 20% | – | 10% |
|  | Net Present Value of Policy Claims | $921 | – | $1,226 |
|  | **Recovery to Policyholders – $** | **$217** | **–** | **$340** |
|  | ***Recovery to Policyholders – %*** | | | |
|  | ***Based on Nominal Claim*** | *19%* | *–* | *22%* |
|  | ***Based on Discount Claim*** | *24%* | *–* | *28%* |
| **Commutation Proposal** | **Value of the Commutation** | | | |
|  | Cash Settlement | | $253 | |
|  | Plus: Waived Premiums | | 18 | |
|  | **Recovery to Policyholders – $** | | **$272** | |
|  | ***Recovery to Policyholders – %*** | | | |
|  | ***Based on Nominal Claim*** | *23%* | *–* | *18%* |
|  | ***Based on Discount Claim*** | *29%* | *–* | *22%* |
|  | **Value of the Commutation Plus Additional Benefits** | | | |
|  | Plus: "Additional Benefits" per PSA | | $92 | |
|  | **Recovery to Policyholders** | | **$364** | |
|  | ***Recovery to Policyholders – %*** | | | |
|  | ***Based on Nominal Claim*** | *31%* | *–* | *24%* |
|  | ***Based on Discount Claim*** | *39%* | *–* | *30%* |

## X.    CONCLUSIONS

61.    As documented above, the value to Policyholders under the Rehabilitation Plan is uncertain. While in some scenarios the total net present value of the Projected Payments may be greater than the Commutation Payment, there are numerous factors that may cause the net present value of Projected Payments to be far lower than the Commutation Payment.

28

62.     Because of these uncertainties, accepting the Settlement Agreement and the

Commutation Payment — and all the benefits of certainty in amount, timing, and

likelihood of payment — is a reasonable decision, from a financial standpoint, on the part

of the FGIC Trustees.


XI.     RESERVATION OF RIGHTS AND COMPENSATION DISCLOSURE

63.     Although my study is based upon the current record, and I am in a position to render

conclusions at this time based upon such information, the study is ongoing, and expert

witness deposition testimony has not been completed. Accordingly, I reserve the right to

revise or expand any expert conclusions to reflect any additional conclusions that I may

formulate based upon newly acquired information or arising from reflection and

reconsideration of the conclusions based upon views expressed by expert witnesses, if

any, and upon further study and information, including, among other things, documentary

and testimonial evidence introduced subsequently.

64.     D&P charges rates of $130 – $835 per hour for my professional services and the services

of supporting staff in this matter. D&P has no financial interest in the outcome of this

matter.

65.     This report is not to be reproduced, distributed, disclosed or used for any purposes other

than the above-referenced proceedings without prior written approval.


XII.    RESPONSES TO FREDDIE MAC AND MONARCH GROUP OBJECTIONS

        (i)     Introduction

66.     I have reviewed the contentions in those portions of the Freddie Mac Objection and the

Monarch Group Objection that relate to the valuation issues addressed in my Report.  As

29

I explain in greater detail below, these contentions are fundamentally misguided and demonstrate a complete misunderstanding of the economics of the FGIC Plan and the Rehabilitation. The topics of these misguided contentions that I discuss are the following: (i) the "40% haircut," (ii) the "27 to 30 percent recovery" under the Rehabilitation Plan that the FGIC Trusts are supposedly forgoing, (iii) the "failure to include the upside potential" and (iv) the supposed error of applying the "highest discount rate to the most stable scenario."[43]

(ii)    The "40% Haircut"

67.    The Freddie Mac Objection repeatedly mentions the "40% haircut that FGIC provided in its analysis," and takes D&P to task for not "analyzing" it. *See, e.g.*, Freddie Mac Objection at ¶ 20; ¶ 22. The Monarch Group Objection calls it the "40% bargain barrel discount", Monarch Group Objection at ¶ 34, and asserts that the Trustees failed "to challenge FGIC's 40% haircut." *Id.* at ¶ 42.

68.    The Objections insinuate that the 40% haircut was somehow relevant to D&P's evaluation of the Commutation Proposal – it was not. The haircut shows up on one page of **Attachment III**, which is the presentation given to the Trustees on May 15, 2013. Among other things, the presentation reviews FGIC's own calculations leading to a payment amount of $253.3 million. Attachment III at p. 5. The numbers and text in the table on the right side of page 5 of Attachment III (other than the notes on the far right side, in the format [A], [B], etc.) came from FGIC. Those numbers included a "Factor %

---

[43]    I am commenting here only on the most egregious errors made by the Objections, and my decision not to comment on a point by point basis to the contents of either the Goldstein Report or the Gibson Report does not imply that I agree with any particular statement in either report.

of Unpaid Payout" of 60.0%, as to which, on the left hand side of the page, D&P gave a

shorthand description as a "Haircut of 40% on unpaid payout claim estimates."

69.    FGIC's 60% factor was one step in FGIC's calculation of its proposed Commutation

Payment of $253.3 million.  But FGIC's calculations behind its offer were irrelevant to

D&P's analysis of the proposed settlement.  What was important was this: was the

proposed Commutation Payment of $253.3 million within the range of reasonableness

when compared to the Projected Payments under the Plan of Rehabilitation?  As I have

explained above, the Commutation Payment was within the range of reasonableness, and

that is true regardless of how FGIC came up with the proposed Commutation Amount or

explained their calculation of that amount.

(iii)    The "27 to 30 percent recovery"

70.    The Freddie Mac Objection claims that:

> under the Rehabilitation Plan Investors *in each trust can look to have their claims
> paid by FGIC at the 27 to 30% rate* (the recovery range amount determined by
> the Rehabilitator's financial advisor in the Miller Affidavit).  That is because the
> risk is spread across FGIC's entire portfolio and not to any particular trust or
> group of trusts.

Freddie Mac Objection at ¶ 20 (emphasis added); *see also* Freddie Mac Objection at ¶ 46 - 47.

The Freddie Mac Objection goes on to complain that:

> Duff & Phelps' loss-rate models looked solely at the assets of the FGIC-Insured
> Trusts and did not take into account the rest of FGIC's portfolio.

*Id.*  What Freddie Mac fails to comprehend – despite putting words on the page that should have

made it plain to them when they read those words – is that treating "FGIC's entire portfolio" and

this "group of trusts" the same when projecting the present value of their respective recoveries is

just as sensible as saying that the pie will taste the same whether you use apples or oranges to

bake it.

31

71.    The Miller Affidavit does say that – *in the aggregate* – claims of policyholders can

expect a present value recovery of 27 – 30% as compared to the notional, or face amount,

of their claims.  This aggregate present value computation takes into account that FGIC

wrote insurance policies that provide coverage long into the future, and there are

policyholders that have no claims today, but are predicted to make claims for decades to

come.  FGIC's "Base Case" prediction of its notional claims of *all* policyholders is as

follows (and is also found at page 8 of Attachment III):

| Period | Notional Claims – All (in millions) |
|---|---|
| 2012 | $2,133 |
| 2013 – 2017 | $1,655 |
| 2018 – 2022 | $585 |
| 2023 – 2027 | $229 |
| 2028 – 2032 | $160 |
| 2033 – 2037 | $948 |
| 2038 – 2042 | $600 |
| 2043 – 2047 | $6 |
| 2048 – 2052 | $0 |
| Total | $6,316 |

These estimates demonstrate that *only 33.8%* of *all* claims have already been asserted, and that a

very significant amount and proportion of the claims of *all* policyholders continue to come into

existence for many decades in the future:

| Period | Notional Claims – All (in millions) | Cumulative Notional Claims | Percent of Total |
|---|---|---|---|
| 2012 | $2,133 | 2,133 | 33.8% |
| 2013 – 2017 | $1,655 | 3,788 | 60.0% |
| 2018 – 2022 | $585 | 4,373 | 69.2% |
| 2023 – 2027 | $229 | 4,602 | 72.9% |
| 2028 – 2032 | $160 | 4,762 | 75.4% |
| 2033 – 2037 | $948 | 5,710 | 90.4% |
| 2038 – 2042 | $600 | 6,310 | 99.9% |
| 2043 – 2047 | $6 | 6,316 | 100% |
| 2048 – 2052 | $0 | 6,316 | 100% |
| Total | $6,316 | | |

72.    In the meantime, the *payments* predicted to be made under the Base Case (also found at

page 8 of Attachment III) lag far behind the accrual of claims:

| Period | Payments | Cumulative Payments | Percent of Total Payments |
|---|---|---|---|
| 2012 | $368 | $368 | 13.0% |
| 2013 – 2017 | $516 | $884 | 31.2% |
| 2018 – 2022 | $297 | $1,181 | 41.6% |
| 2023 – 2027 | $197 | $1,378 | 48.6% |
| 2028 – 2032 | $195 | $1,573 | 55.5% |
| 2033 – 2037 | $536 | $2,109 | 74.4% |
| 2038 – 2042 | $498 | $2,607 | 91.9% |
| 2043 – 2047 | $2 | $2,609 | 92.0% |
| 2048 – 2052 | $227 | $2,836 | 100.0% |
| Total | | $2,836 | 100.0% |

73.    The aggregate present value of the distributions to *all* Policyholders as described in the

Miller Affidavit takes into account the period during which the claims are made and the

periods in which distributions are made on the claims that have been made by that period.

74.    While that approach is perfectly fine for describing the present value of distributions

predicted to be made on claims of *all Policyholders* over the life of the Rehabilitation

Plan, it does not tell us anything about the present value of the predicted distributions

under the Rehabilitation Plan *to the FGIC Insured Trusts*.  To calculate that range of

present values, one must estimate the amount of their claims and when those claims arise.

75.    D&P calculated those claims, using a Low Case and a High Case (both of which are

summarized at page 8 of Attachment III).  As an example, the Low Case shows quite

clearly that the claims of the FGIC Insured Trusts are "front-loaded" when compared to

the claims of *all* FGIC Policyholders:

| Period | Notional Claims – FGIC Trusts – Low Case (in millions) | Cumulative Notional Claims | Percent of Total |
|---|---|---|---|
| 2012 | $753 | $753 | 64.8% |
| 2013 – 2017 | $173 | $926 | 79.7% |
| 2018 – 2022 | $69 | $995 | 85.6% |
| 2023 – 2027 | $53 | $1,048 | 90.2% |
| 2028 – 2032 | $74 | $1,122 | 96.6% |
| 2033 – 2037 | $40 | $1,162 | 100.0% |
| 2038 – 2042 | $0 | $1,162 | 100.0% |
| 2043 – 2047 | $0 | $1,162 | 100.0% |
| 2048 – 2052 | $0 | $1,162 | 100.0% |
| Total | $1,162 | | |

76.     As these tables demonstrate, the ResCap Trusts' claims differ from the aggregate FGIC

claim in that the vast majority of claims have *already* accrued.  The import of this

difference in timing of when claims occur and can be asserted against FGIC is obvious:

the present value calculations for the Projected Payments to the Insured Trusts must be

different than the present value calculations for distributions on all claims of all

Policyholders.  While some payment on the *accrued, and soon to be accrued*, claims of

the Insured Trusts will be paid shortly after the Rehabilitation Plan goes effective, a

significant portion of the predicted payments on those claims will occur over a 40 year

period.  Thus, it is completely inappropriate to compare the "27 to 30%" present value

estimate that, in the aggregate, all Policyholders are predicted to get, to the ranges of

present values that D&P has calculated that the Insured Trusts would get under the

Rehabilitation Plan (see Table I of my report).

(iv)     "Failure to Include Upside Potential"

77.     Both Objections assert that D&P failed to consider the potential upside to Policyholders

under the Rehabilitation Plan.  *See, e.g.,* Monarch Objection at ¶ 7 and ¶ 38 and Freddie

Mac Objection at ¶ 1(d) and ¶ 47.  Both Objections assert that one such "upside" is the

ability to share in the distributions that FGIC expects to receive under the proposed

ResCap Chapter 11 Plan if there were no Settlement Agreement,[44] but there will be no

such proposed distribution to FGIC (or commutation) if the Settlement Agreement is not

approved, as the Plan Support Agreement will no longer be effective.   Monarch adds a

reference to claims asserted by FGIC against other parties.  Monarch Objection at n. 25.

78.     D&P did carefully consider FGIC's material litigation matters, and discussed them in our

conversations with FGIC and Lazard.  As I explain in my Report, see ¶ 55 above, D&P

fully understood that FGIC had not included these potential litigation recoveries in the

Base Case, because such recoveries are incapable of estimation.  D&P found no basis to

treat them in a contrary manner.

79.     Moreover, it makes no sense to include potential upsides but exclude potential

downsides.  D&P understood that the Base Case also excluded potential downsides to the

predicted recoveries to Policyholders, for the same basic reason – those downsides were

not capable of estimation.

80.     Finally, one of the individuals that submitted an expert report in this contested matter,

Charles R. Goldstein, claims that "[a]ccording to FGIC's own regulatory filings, FGIC

has projected more than $1 billion in gross recoveries from various loss mitigation

activities, such as pursuit of litigation claims."  Expert Witness Report of Charles R.

Goldstein" (the "**Goldstein Report**") at ¶ 29.[45]  Mr. Goldstein reference to this $1 billion

figure is misleading at best.  Based on D&P's understanding of FGIC's public filings, the

---

[44]      Freddie Mac Objection at ¶ 47, Monarch Objection at n. 24.
[45]       The Goldstein Report was marked as exhibit 6 during my deposition.  The regulatory filing referred to is
FGIC's quarterly report as of March 31, 2013.

$1 billion figure cannot be equated, even in a rough estimate, as a projection of future "upside" from litigation recoveries.

    (v)    Application of "Higher Discount Rate to Most Stable Scenario"

81.    The Monarch Objection states that:

> In establishing this supposed range of reasonableness, D&P (among other things) adjusted the total notional claim amount by creating a low claims scenario (assuming low default rates, high property value, and a stable economy, among other factors). When discounting expected claim payments under this more stable scenario, D&P utilized a 20% discount rate, which is the highest discount rate that was illustrated by FGIC, to establish a range with a low enough bottom end to include the Commutation Amount. *Using the highest discount rate in a scenario that expects the most stable economy* and other favorable conditions, however, makes no sense whatsoever.

Monarch Objection at ¶ 40 (emphasis added). But the high case and low case (see page 8 of Attachment III) do not reflect different sets of assumptions regarding macroeconomic conditions. Instead, the low case and high case of loss estimates represent a range of sensitivities to conditional prepayment rates, conditional default rates and severity assumptions for the Base Scenario Projections *and both cases reflect the same overall macroeconomic assumptions*. As such, the level of risk and uncertainty related to the payment stream to the FGIC Insured Trusts are the same for both the low and high loss estimate projections. Thus, the assertion that a higher discount rate of 20% should not be applied to the low case because the low case reflects a less risky scenario and a better economic outlook simply misunderstands what the high and low cases represent.

## XIII.   Amendment to Attachment II

82.    I hereby amend Attachment II to my Report by adding those documents listed beginning at line 127 of that Attachment.

This 31st day of July, 2013

_____

Allen M. Pfeiffer