**DECHERT LLP**
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon
and The Bank of New York Mellon Trust
Company, N.A., as Trustee of Certain
Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as
Trustee of Certain Mortgage Backed
Securities Trusts*

**SEWARD & KISSEL LLP**
Mark D. Kotwick
Brian P. Maloney
Ryan Suser
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association,
as Trustee of Certain Mortgage-Backed
Securities Trusts*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | ) |
| | ) **Case No. 12-12020 (MG)** |
| **RESIDENTIAL CAPITAL, LLC,** *et al.*, | ) |
| | ) **Chapter 11** |
| **Debtors.** | ) |
| | ) **Jointly Administered** |

**NOTICE OF FILING OF UNREDACTED DECLARATION OF
MARY L. SOHLBERG, AS OFFICER OF WELLS FARGO BANK,
N.A., RMBS TRUSTEE, IN SUPPORT OF DEBTORS' MOTION
PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL
OF THE SETTLEMENT AGREEMENT AMONG THE DEBTORS,
FGIC, THE FGIC TRUSTEES, AND CERTAIN INDIVIDUAL INVESTORS**

**PLEASE TAKE NOTICE** that The Bank of New York Mellon, The Bank of New

York Mellon Trust Company, N.A. (collectively, "BNY Mellon"), U.S. Bank National

Association ("U.S. Bank"), and Wells Fargo Bank, N.A. ("Wells Fargo"), solely in their respective capacities as trustee or indenture trustee for certain mortgage backed securities trusts (collectively, the "FGIC Trustees") hereby file the unredacted version of the *Declaration of Mary L. Sohlberg, as Officer of Wells Fargo Bank, N.A., RMBS Trustee* (the "**Declaration**"). The Declaration was previously filed in redacted form on July 31, 2013 (Docket No. 4442), pursuant to the Court's *Order Regarding Exchange of Confidential Information* (Docket No. 4249) (the "**Confidentiality Order**").

Dated:  New York, New York
        August 15, 2013

**DECHERT LLP**
By:  /s/ Glenn E. Siegel
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., as Trustee of Certain Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
By:  /s/ John C. Weitnauer
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as Trustee of Certain Mortgage Backed Securities Trusts*

**SEWARD & KISSEL LLP**
By:  /s/ Mark D. Kotwick
Mark D. Kotwick
Ronald L. Cohen
Arlene R. Alves
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association, as Trustee of Certain Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, New York 10016-1387
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as Trustee*
*of Certain Residential Mortgage Backed*
*Securities Trusts*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) **Case No. 12-12020 (MG)** |
| **RESIDENTIAL CAPITAL, LLC,** *et al.*, | ) |
| | ) **Chapter 11** |
| Debtors. | ) |
| | ) **Jointly Administered** |

**DECLARATION OF MARY L. SOHLBERG,**
**AS OFFICER OF WELLS FARGO BANK, N.A., RMBS TRUSTEE**

I, Mary L. Sohlberg, hereby declare, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information, and belief:

1.    I am employed by Wells Fargo Bank, N.A. ("**Wells Fargo**"), and my current title is Vice President.  I have personal knowledge of the facts set forth herein, except as to certain matters that I believe to be true based on (i) information provided by Duff & Phelps, LLC ("**Duff & Phelps**"), (ii) information about positions of parties in these Chapter 11 cases contained in pleadings that I reviewed, or reported to me by counsel, or learned during my participation in the Plan Mediation (defined below); and (iii) my review of business records of Wells Fargo.  This Declaration is submitted in support of the *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees, and*

*Certain Individual Investors* [ECF No. 3929] (the "**FGIC Motion**").[1]  The **FGIC Trustees**[2] filed

a Joinder to the FGIC Motion [ECF No. 3982].  The FGIC Motion seeks the entry of an order

approving the **FGIC Settlement Agreement**[3] attached as Exhibit 2 to the FGIC Motion [ECF

No. 3929-2].  The FGIC Settlement Agreement, dated May 23, 2013, is among the Debtors,

FGIC, the FGIC Trustees and the Institutional Investors[4].

A.    *Introduction and Overview*

      <u>**Wells Fargo's Role as Trustee of Certain FGIC Trusts**</u>

      2.     The FGIC Trustees serve as trustees or indenture trustees of the **FGIC Trusts**, all

of which were established before 2008.  The FGIC Trusts issued residential mortgage backed

securities ("**RMBS**") or similar securities.  FGIC, a monoline financial guaranty insurance

company, issued irrevocable insurance policies (the "**FGIC Policies**") for certain classes of the

securities (the "**Securities**") issued by the FGIC Trusts, thereby guaranteeing the payment of

principal and interest due on the Securities.  At the same time, FGIC entered into an Insurance

and Indemnity Agreement with one or more of the Debtors in connection with each of the FGIC

Trusts (the "**Insurance Agreements**").  Pursuant to the Insurance Agreements, the Debtor party

---

[1]      I have previously submitted a declaration, dated June 10, 2013 (the "**Sohlberg PSA Declaration**") in support of the (a) Joinder of Certain RMBS Trustees to Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors Committee and Certain Consenting Claimants (the "**PSA Joinder**")[ECF No. 3940] and (b) Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Ally Financial Inc., the Creditors Committee and Certain Consenting Claimants (the "**PSA Motion**")[ECF No. 3814].

[2]      The FGIC Trustees are The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A. (together, "**BNY Mellon**"), U.S. Bank National Association ("**U.S. Bank**") and Wells Fargo, each solely in their respective capacities as trustees or indenture trustees for certain FGIC Trusts.

[3]      Capitalized terms used in this declaration but not defined herein have the meanings ascribed to them in the FGIC Motion.  For the convenience of the reader, in some cases, definitions found in the FGIC Motion are repeated here.

[4]      The **Institutional Investors** consist of the Steering Committee Group, which was a group of institutional investors in Original Settling Trusts, including FGIC Trusts, represented by Gibbs & Bruns and the Talcott Franklin Group, another group of institutional investors in Original Settling Trusts, including FGIC Trusts, represented by Talcott Franklin P.C.

agreed, among other things, to reimburse FGIC for certain payments FGIC made under the

Policies that resulted from the applicable Debtor's failure to repurchase or substitute mortgage

loans that breached one or more representations or warranties contained in the applicable

Governing Agreements.

3.      Wells Fargo serves as indenture trustee in respect of eight of the forty-seven

FGIC Trusts that are the subject of the FGIC Settlement Agreement (collectively, the "**Wells**

**Fargo FGIC Trusts**").

### The FGIC Rehabilitation Proceeding

4.      In or about June 2012, the Superintendent of Financial Services of the State of

New York filed a rehabilitation petition on behalf of FGIC in the Supreme Court of the State of

New York, County of New York (the "**Rehabilitation Court**"), and was subsequently appointed

by the Rehabilitation Court as rehabilitator (the "**Rehabilitator**") in that proceeding (the "**FGIC**

**Rehabilitation Proceeding**").  As a result of an injunction entered by the Rehabilitation Court,

the FGIC Trusts were obligated to continue to pay premiums under the FGIC Policies, but FGIC

was relieved of its obligations to pay claims made under those same policies.

5.      On September 27, 2012, the Rehabilitator filed a proposed Plan of Rehabilitation

for FGIC, which was approved (as amended) by the Rehabilitation Court on June 11, 2013 (the

"**Rehabilitation Plan**").  The Rehabilitation Plan does not provide for full payment of the claims

of policyholders; rather, it contemplates partial distributions to all of FGIC's policyholders,

including the FGIC Trusts, on account of present and future claims, over a period of up to forty

years.

### The FGIC Settlement Agreement

6.      During the mediation in these Chapter 11 Cases, the FGIC Trustees were asked to

consider a settlement proposal (the "**Settlement Proposal**"). The Settlement Proposal included, among other things, a lump sum payment by FGIC to the FGIC Trusts (the "**Commutation Payment**") in satisfaction of any obligations of FGIC to make payments in the future to the FGIC Trusts under the Rehabilitation Plan (the "**Projected Payments**"). Ultimately, the terms of the Settlement Proposal, including the Commutation Payment, became the basis of the FGIC Settlement Agreement. In the final FGIC Settlement Agreement, the Commutation Payment was fixed at $253.3 million.

7.      The FGIC Trustees requested that their financial advisor in these Chapter 11 Cases, Duff & Phelps, LLC, review the financial terms of the Settlement Proposal and analyze and compare the value of the Projected Payments to the FGIC Trusts under the Rehabilitation Plan with the Commutation Payment and other value to the FGIC Trusts under the FGIC Settlement Agreement. Duff & Phelps did so, and as described in further detail below, in reliance upon their analysis and recommendation, Wells Fargo determined in good faith that entering into the FGIC Settlement Agreement was in the best interests of the Wells Fargo FGIC Trusts.

8.      While the FGIC Trustees considered the merits of the FGIC Settlement Agreement on a stand-alone basis, it is also an integral part of a Plan Support Agreement[5] that paves the way for confirmation of a Chapter 11 bankruptcy plan that will produce additional

---

[5]      "**Plan Support Agreement**" means, collectively, the Plan Support Agreement and Plan Term Sheet, each dated May 13, 2013, and the Supplemental Plan Term Sheet, dated May 2013. On June 26, 2013, the Court entered an order granting Debtors' request to enter into the Plan Support Agreement. *See Order Granting Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into a Plan Support Agreement with Ally Financial Inc., The Creditors' Committee, and Certain Consenting Claimants* [ECF No. 4098].

value for Investors in the FGIC Trusts.[6]  The additional benefits to the FGIC Trusts associated

with the proposed bankruptcy plan are discussed below.  The FGIC Trustees considered this

value as well in weighing whether to accept the FGIC Settlement Agreement.

**B.**    ***The FGIC Trustees Acted Reasonably and in Good Faith
        in Agreeing to the FGIC Settlement Agreement***

9.    The process by which the FGIC Trustees determined to enter into the FGIC

Settlement Agreement demonstrates that they acted reasonably and in good faith.

<u>**Wells Fargo's Retention of Qualified Professionals and Experts**</u>

10.    Wells Fargo retained and has been advised throughout these Chapter 11 Cases,

including in connection with its consideration of the FGIC Settlement Agreement, by Alston &

Bird LLP, an experienced and knowledgeable law firm.

11.    At the outset of these Chapter 11 Cases, Wells Fargo and three other RMBS

Trustees (Deutsche Bank,[7] U.S. Bank and BNY Mellon), after a rigorous selection process,

retained Duff & Phelps to advise them.  Duff & Phelps was selected over four other qualified

candidates based on (a) the firm's experience in handling similar types of engagements involving

the evaluation of mortgage loan servicing agreements and loan origination agreements,

bankruptcy litigation, restructuring, asset valuation, complex securitizations and RMBS loan

repurchase actions and (b) the depth of resources available to the firm, including advisory

services about bankruptcy issues generally.

12.    Duff & Phelps was uniquely situated to provide the FGIC Trustees with advice

concerning the economic terms of the Settlement Proposal and the Projected Payments under the

---

[6]    On July 3, 2013, a plan based on the Plan Support Agreement was filed (the "**ResCap Plan**") [ECF No. 4153].

[7]    "Deutsche Bank" means Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas, each solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, custodian and/or similar agency capacities in respect of certain of the Settling Trusts.

Rehabilitation Plan.  Not only is Duff & Phelps a well-respected financial advisor with expertise

in financial modeling and cash flow projections, but it has substantial experience in these

Chapter 11 Cases through its work on behalf of the RMBS Trustees.  Their work has included:

- Conducting a sampling review of more than 6,500 mortgage loan files provided by the Debtors in an effort to identify breaches of representations and warranties, and using statistical methodologies to estimate the incidence of those breaches across the population of mortgage loans in the Original Settling Trusts.  Duff & Phelps also used historical information and financial analysis to calculate the total present and projected future losses experienced by the Original Settling Trusts, including certain of the FGIC Trusts.

- Identifying RMBS trusts in addition to the Original Settling Trusts with RMBS Trust Claims (the "**Additional Settling Trusts**," together with the Original Settling Trusts, the "**Settling Trusts**"), and quantifying those claims so the Additional Settling Trusts could receive treatment that is consistent with the treatment being accorded to the like claims of the Original Settling Trusts.

- Analyzing potential liabilities arising from Debtors' multiple roles as Servicer in the securitization process in order to assist the RMBS Trustees in quantifying potential Servicing Claims so that the Settling Trusts could receive an allowed claim on account of those claims.

13.     It should be noted that the Governing Agreements for the Wells Fargo FGIC

Trusts explicitly permitted Wells Fargo to rely on agents such as Duff & Phelps in considering

whether or not to enter into the FGIC Settlement Agreement.  For example, one representative

trust indenture provides that Wells Fargo, as Trustee, "may execute any of the trusts or powers

[under the applicable Governing Agreements] or perform any duties [under the applicable

Governing Agreements] either directly or by or through agents . . . and [Wells Fargo, as Trustee,]

shall not be responsible for any misconduct or negligence on the part of, or for the supervisions

of, any such agent . . . appointed with due care by [Wells Fargo, as Trustee, under the applicable

Governing Agreements]."[8]

---

[8]     Section 6.02 of Indenture by and among GMACM Home Equity Loan Trust 2005-HE1, as Issuer, and Wells Fargo Bank, N.A., as Indenture Trustee, dated as of March 29, 2005, attached hereto as **Exhibit A**.  The

**The Plan Mediation**

14.     The FGIC Settlement Agreement was agreed to as part of an extensive mediation with numerous interested parties in these Chapter 11 Cases in an effort to reach a consensual Chapter 11 plan (the "**Plan Mediation**").  The Plan Mediation occurred over the course of some five months beginning in December 2012 and was overseen by sitting Bankruptcy Judge, the Honorable James M. Peck.

15.     The communications and analyses relating to negotiations conducted during the Plan Mediation are confidential by law and pursuant to court order,[9] and therefore cannot be disclosed in detail.  In general, however, the integrated, global settlement associated with the Plan Support Agreement (including the FGIC Settlement Agreement) is now part of the ResCap Plan, and must be understood as the product of arm's-length negotiations conducted among sophisticated parties with differing and conflicting interests, under the close supervision and guidance of a sitting bankruptcy judge.  My view of the Settlement Proposal was shaped, in part, by Judge Peck's involvement in the process of negotiating the FGIC Settlement Agreement.

**Participation of the Institutional Investors and the other FGIC Trustees**

16.     In evaluating the Settlement Proposal, the FGIC Trustees, including Wells Fargo, considered that the Institutional Investors (which included investors in the FGIC Trusts) actively participated in the Plan Mediation and supported the Settlement Proposal, ultimately becoming signatories to the FGIC Settlement Agreement.  Because of the confidentiality provisions of the Mediation Order, the FGIC Trustees were unable to raise the Settlement Proposal with investors in the FGIC Trusts who were not participants in the Plan Mediation.

---

Indenture attached hereto as Exhibit A is representative of other indentures under which Wells Fargo acts as indenture trustee in connection with FGIC Trusts.

[9]     *See December 26, 2012 Order Appointing Mediator* [ECF No.2519] (the "**Mediation Order**").

17.     Wells Fargo and its counsel had the benefit of the views of the other two FGIC Trustees and their counsel in considering the Settlement Proposal.  Like Wells Fargo, BNY Mellon and U.S. Bank are two of the largest and most sophisticated financial institutions in the country and were represented by experienced counsel in this matter.  The three FGIC Trustees, although similarly situated and assisted by the same financial advisor, independently considered the Settlement Proposal.  Wells Fargo took into consideration in forming its views of the Settlement Proposal that BNY Mellon and U.S. Bank and their counsel were coming to similar conclusions regarding the benefits of the FGIC Settlement Agreement as compared to the Projected Payments to the FGIC Trusts under the Rehabilitation Plan.

**Notice to the Investors in the FGIC Trusts of the FGIC Settlement Agreement**

18.     One of the reasons that the FGIC Settlement Agreement is now before this Court is that none of the FGIC Trustees would agree to the Settlement Proposal unless investors in the FGIC Trusts were provided a full and fair opportunity to voice any objections they may have to such a settlement – including that the FGIC Settlement Agreement is not in the best interest of investors - and be heard with respect to any such objections.  The FGIC Trustees insisted that the FGIC Settlement Agreement require prompt notice be given with respect to the FGIC Settlement Agreement[10] and require approval of the FGIC Settlement Agreement by the Bankruptcy Court.[11]

---

[10]     Section 4.02 of the FGIC Settlement Agreement provides:

Within seven (7) Business Days following execution by all Parties of this Agreement, the Debtors shall file the 9019 Motion with the Bankruptcy Court and otherwise use commercially reasonable efforts to promptly obtain the Bankruptcy Court Order.  Upon obtaining knowledge of the issuance of the Bankruptcy Court Order, the Debtors shall promptly notify the other Parties.

[11]     Section 6.01 of the FGIC Settlement Agreement provides that a condition precedent to the effectiveness of the FGIC Settlement Agreement is the signing of orders approving the FGIC Settlement Agreement by both the Bankruptcy Court and the Rehabilitation Court and that such orders shall become final.  The FGIC Settlement

8

19.     From Wells Fargo's perspective, it was essential for the FGIC Settlement

Agreement to provide investors with notice and opportunity to object to the FGIC Settlement

Agreement.  Absent such provisions, Wells Fargo would not have agreed to the FGIC Settlement

Agreement, and would not have determined that entering into the FGIC Settlement Agreement

was in the best interests of the FGIC Trusts and their investors.  At the end of this Declaration, I

describe in detail the notices the FGIC Trustees provided in respect of the FGIC Settlement

Agreement.

**C.     *The FGIC Settlement Agreement is in the Best Interests
        of the FGIC Trusts and the Investors in Those Trusts***

**<u>Consideration of the FGIC Settlement Agreement and the Duff Report</u>**

20.     As mentioned above, in the context of the Plan Mediation, the FGIC Trustees

were asked to consider a Settlement Proposal with FGIC that included, among other things,

FGIC making the Commutation Payment in lieu of the Projected Payments contemplated under

the Rehabilitation Plan.

21.     The FGIC Trustees requested that Duff & Phelps analyze the economic terms of

the Commutation Payment against the Projected Payments to the FGIC Trusts under the

Rehabilitation Plant and provide a recommendation to the FGIC Trustees.  Duff & Phelps was

not asked to analyze how the amount of the Commutation Payment was determined, but rather

how the Commutation Payment and the broader Settlement Proposal compared to the Projected

---

Agreement must also be approved by the Rehabilitation Court after notice.  Section 4.01 of the FGIC Settlement Agreement provides:

> Within three (3) Business Days following execution by all Parties of this Agreement, the Rehabilitator, on behalf of FGIC, shall file the Affirmation with the Rehabilitation Court and otherwise use commercially reasonable efforts to obtain the Rehabilitation Court Order. The Rehabilitator shall endeavor to schedule the hearing on the Rehabilitation Court Order for a date that is no less than thirty-seven (37) days after the filing of the Affirmation. Upon obtaining knowledge of the issuance of the Rehabilitation Court Order, the Rehabilitator, on behalf of FGIC, shall promptly notify the other Parties.

Payments under the Rehabilitation Plan.

22.    In conducting its analysis, I understand that Duff & Phelps reviewed and analyzed

publicly available information and also signed a confidentiality agreement with FGIC pursuant to

which I understood they had the opportunity to speak to FGIC's Chief Restructuring Officer and

Lazard Freres & Co. LLC ("**Lazard**"), the financial advisors to Weil, Gotshal & Manges, LLP,

counsel to the FGIC Rehabilitator, and to receive additional information concerning the

Rehabilitation Plan.

23.    On or about May 10, 2013, I received from my counsel draft discussion materials

prepared by Duff & Phelps setting forth its analysis of the Settlement Proposal, a copy of which

is attached hereto as **Exhibit B**.

24.    Subsequently, on or about May 13, 2013, Duff & Phelps made a presentation to

the FGIC Trustees and their counsel concerning the Settlement Proposal.  The presentation took

place in New York and lasted over an hour.  I participated in the presentation telephonically and

via a "webex."  Accordingly, I was able to view the discussion materials Duff had prepared

while participating via a conference call.  Although I was not physically present at the

presentation, Wells Fargo's attorneys attended.

25.    At the time of the presentation, I was able to follow and understand Duff &

Phelps' analysis at a high level.  I listened carefully to the Duff presentation, as reflected in the

notes I took during the meeting, a copy of which is attached hereto as **Exhibit C**.  Although I

cannot now recall many of the specific statements that were made, I recall coming away from the

meeting with confidence that Duff & Phelps had engaged in a thoughtful and thorough analysis,

which supported their conclusions and recommendation to the FGIC Trustees.

26.    On or about May 15, 2013, I received a final version of the Duff & Phelps

discussion materials concerning the Settlement Proposal, a copy of which is attached hereto as

**Exhibit D** (the "**Duff Report**").  The Duff Report was substantially similar to the draft

discussion materials I received on May 10 and the discussion materials used during the May 13

presentation.

27.     In the final Duff Report, Duff & Phelps reduced to writing (at page 3) their

conclusion that the $253.3 million Commutation Payment is within the reasonable range of the

estimated Projected Payments to the FGIC Trusts under the Rehabilitation Plan, which

conclusion had been presented orally during the May 13 presentation.  It also identifies the value

associated with not having to pay premiums on the FGIC Policies going forward, as well as the

fact that the FGIC Settlement Agreement, as part of the global settlement embodied in the Plan

Support Agreement, would resolve various outstanding litigation issues in the Chapter 11 Cases,

which includes the various potential litigations and inter-creditor disputes in the Chapter 11

Cases.  Duff and Phelps' observations and conclusion were an important consideration in my

determination that accepting the FGIC Settlement Agreement was in the best interests of the

FGIC Trusts and their investors.

### The Merits of the FGIC Settlement Agreement on a Stand-Alone Basis

28.     It was significant to me that the $253.3 million Commutation Payment was a

fixed amount, while the estimated $150 million initial Projected Payment to the FGIC Trusts was

estimated and subject to change at the discretion of the Rehabilitator following the effective date

of the Rehabilitation Plan.  In addition, while I understood there was the potential for future

Projected Payments in excess of the Commutation Payment, there was no certainty of the amount

of any future Projected Payments, or the timing of such payments.  In fact, I understand there is a

risk that future Projected Payments may fall short of the amount of the Commutation Payment.

My concern over the uncertainty of payments from FGIC was informed by the fact that, although the FGIC Trusts continue to pay premiums under the FGIC Policies, they have received no payment on any claims under the policies since late 2009. The Settlement Proposal eliminated the risk and uncertainty associated with the Projected Payments in exchange for a certain recovery.

29.     I also found significant that the Commutation Payment, by itself, was within the reasonable range of the estimated total Projected Payments to be received by the FGIC Trusts under the Rehabilitation Plan ($190 million to $340 million). The Duff Report, however, also makes clear that there was value to the FGIC Trusts in the Settlement Proposal in addition to the Commutation Payment. Specifically, as a result of the termination of the FGIC Policies under the FGIC Settlement Agreement, the FGIC Trusts would be relieved from the payment of future premiums, estimated to be some $18 million in present value. I also understood under the Settlement Proposal that FGIC would forego its right to receive certain reimbursement amounts from the FGIC Trusts pursuant to the waterfall provisions under the relevant Governing Documents, which would provide additional, although at the time unquantified, future value to the FGIC Trusts.

30.     Given Duff & Phelps' expertise and extensive experience in the Chapter 11 Cases, their access to FGIC and Lazard in analyzing the Settlement Proposal, and the strength of their May 13 presentation and the Duff Report, I had no reason to question the accuracy of Duff & Phelps' analysis, and nothing that has transpired since that time has changed my view in that regard.

### The Additional Value to the FGIC Trusts Under the ResCap Plan

31.     In addition to the stand-alone benefits, the FGIC Settlement Agreement is an

integral component of the Plan Support Agreement (and now proposed ResCap Plan) which resolves the claims of substantially all of the major constituents in these Chapter 11 Cases and confers many benefits upon the Debtors' creditors, including the FGIC Trusts.  If the ResCap Plan is confirmed, these benefits include, among other things, that the FGIC Trusts will receive a significant distribution from the Debtors' bankruptcy estate, contemplated to be in excess of $90 million, on account of representation and warranty claims against the Debtors.  In the absence of the Plan Support Agreement and ResCap Plan (if approved), there is no assurance that these trusts would have received anything in respect of their claims against the Debtors.

32.    It is an express condition of the Plan Support Agreement that both the Bankruptcy Court and the Rehabilitation Court approve the FGIC Settlement Agreement.  Without the FGIC Settlement Agreement, the global settlement embodied in the Plan Support Agreement, including the favorable claim treatment of the FGIC Trusts, would collapse.  The FGIC Trusts would not receive the contemplated $90+ million distribution from the Debtors' bankruptcy estate if the FGIC Settlement Agreement was rejected in favor of proceeding under the Rehabilitation Plan.

33.    In the absence of the FGIC Settlement Agreement and the global settlement embodied in the Plan Support Agreement, the value of any future recovery, if any, by the FGIC Trusts in the Chapter 11 Cases is highly uncertain.

- First, the proposed ResCap Plan secures the contribution by AFI to the Debtors' estates of $2.1 billion in value, which is the substantial portion of the assets that will be distributed to the creditors of the Debtors' estates (including the FGIC Trusts).

- Second, at the time of the Plan Mediation, the Chapter 11 Cases were facing several potentially lengthy and expensive litigations that could have significantly diminished the recoveries of the Settling Trusts, including the FGIC Trusts.

  - The proposed ResCap Plan fixes claims that the FGIC Trustees expect would otherwise be contested in time-consuming and uncertain proceedings.  In the absence of the global settlement associated with the Plan Support Agreement,

the RMBS 9019 Motion would likely require a lengthy and expensive hearing, the outcome of which is uncertain.  If the Court declined to grant the RMBS 9019 Motion, the allowance of Repurchase Claims of the Original Settling Trusts (including thirty-seven FGIC Trusts) would be left to the expensive and uncertain process of claims litigation.  Allowance of the RMBS Trust Claims, as contemplated by the proposed ResCap Plan, offers the benefits of allowance consistent with the RMBS 9019 Motion without the risks attendant to that contested matter.

- The proposed ResCap Plan allows the Repurchase Claims of the Additional Settling Trusts, including ten FGIC Trusts, without the expense, delay and uncertainty associated with analyzing, asserting and litigating those claims, which otherwise would occur absent a global settlement.

- The proposed ResCap Plan allows the Servicing Claims of the Settling Trusts, including certain FGIC Trusts.  The presentation of those claims otherwise would have required further discovery and analysis, likely leading to litigation over both the quantification of the claims and their relative priority.

- Third, many of the contentious and complicated inter-creditor issues in these cases are resolved by the proposed ResCap Plan, including disputes over the priority of claims asserted by FGIC and the other Monolines and by certain other securities claimants.  In particular, both the amount of the claims of FGIC and the relationship between those claims and the claims of the FGIC Trusts are the subject of disputes, and the resolution of all those disputes through litigation presents both a general risk of delay and expense to all stakeholders as well as a specific risk to the FGIC Trusts of dilution.

- Fourth, the ever-mounting costs of administration of these Chapter 11 Cases threaten to erode any distribution to unsecured creditors (including the FGIC Trusts).  The proposed ResCap Plan effectively abates the continued accrual of such costs, thus increasing the amount of ultimate recoveries to all creditors, including the FGIC Trusts.

### Continued Assessment of the Reasonableness of the FGIC Settlement Agreement

34.    Certain Objectors[12] have objected to the FGIC Settlement Agreement.  In light of those objections, the FGIC Trustees have continued to assess the reasonableness of the FGIC Settlement Agreement.  The Objectors have asserted that the FGIC Settlement Agreement is not

---

[12]    CQS ABS Master Fund Limited, CQS ABS Alpha Master Fund Limited, Bayview Fund Management LLC, Monarch Alternative Capital LP, Stonehill Capital Management LLC and Federal Home Loan Mortgage Corporation in conservatorship.

in their best interest or in the best interests of the FGIC Trusts because, in their view, the FGIC

Trusts would receive greater recoveries under the Rehabilitation Plan.

35.     The FGIC Trustees requested that Duff & Phelps evaluate and consider the bases

for these objections.  Duff & Phelps has done so, and its conclusions were presented to the FGIC

Trustees in the Expert Report of Allen M. Pfeiffer, dated July 19, 2013 (the "**Pfeiffer Expert**

**Report**").  The FGIC Trustees also consulted S.P. Kothari, Ph.D., currently the Gordon Y.

Billard Professor in Management at the Sloan School of Management at the Massachusetts

Institute of Technology ("**MIT**") as well as Deputy Dean of MIT's Sloan School of

Management, in connection with their assessment and evaluation of the objections raised by

Objectors to the FGIC Settlement Agreement.  The FGIC Trustees asked Dr. Kothari for his

expert opinion with respect to certain of the issues raised by the Objectors and to evaluate Duff

& Phelps' conclusion that the amount of the Commutation Payment is within the range of

present values of the expected payouts to the FGIC Trusts under the Rehabilitation Plan.  Dr.

Kothari presented the FGIC Trustees with his conclusions in the Expert Report of S.P. Kothari,

Ph.D., dated July 19, 2013 (the "**Kothari Expert Report**").

36.     I have reviewed and considered both the Pfeiffer Expert Report and the Kothari

Expert Report, and they confirm the conclusions set forth in the Duff Report that: (i) the

Commutation Payment, is within the range of reasonableness of the estimated Projected

Payments to the FGIC Trusts under the Rehabilitation Plan; (ii) as a result of the termination of

the FGIC Policies under the FGIC Settlement Agreement, the FGIC Trusts would be relieved

from the payment of future premiums, estimated to be some $18 million; and (iii) under the

FGIC Settlement Agreement, FGIC would forego its right to receive any and all reimbursements

from the FGIC Trusts pursuant to the waterfall provisions under the relevant Governing

Documents, which would provide additional, future value to the FGIC Trusts.  As a result, I

continue to believe that the FGIC Settlement Agreement is reasonable and in the best interests of

the FGIC Trusts and their investors.

**D.**     ***Notice to Investors in the Wells Fargo FGIC Trusts***
        ***of the FGIC Settlement Agreement was Sufficient***

37.     Notice of the FGIC Settlement Agreement, including notice of same by the FGIC

Trustees, including Wells Fargo, is sufficient and effective to put the parties-in-interest in these

Chapter 11 Cases, including the investors in the FGIC Trusts, on notice of the FGIC Settlement

Agreement.

38.     Wells Fargo has regularly provided to investors in the Wells Fargo RMBS Trusts,

including the Wells Fargo FGIC Trusts, notice of significant events in these Chapter 11 Cases.

Following the filing of the RMBS 9019 Motion, Wells Fargo, together with BNY Mellon,

Deutsche Bank and U.S. Bank, jointly retained an agent, The Garden City Group, Inc. ("**GCG**"),

to coordinate and facilitate notice to investors regarding important events in the Chapter 11

Cases.

39.     On behalf of the RMBS Trustees, GCG provided certain administrative services

in connection with noticing various investors, including the coordination and facilitation of the

dissemination of notices to the various investors at the direction and on behalf of the RMBS

Trustees, and in connection with the creation and maintenance of a website for investors that

provides, among other things, contact information for the RMBS Trustees significant relevant

developments in the Chapter 11 Cases, links to relevant documents filed in the Chapter 11 Cases,

and upcoming court deadlines and hearing dates (the "**RMBS Trustee Website**").

40.     As described in more detail in the Affidavit of Jose C. Fraga (the "**Fraga**

**Affidavit**")[13], GCG distributed to various investors and published on the RMBS Trustee Website various notices. Among those notice was a notice dated May 24, 2013 entitled "Time Sensitive Notice Regarding (a) Plan Support Agreement Among ResCap Debtors and the RMBS Trustees, Among Others, and (b) Settlement Agreement Among the Debtors, Financial Guaranty Insurance Company and Certain of the RMBS Trustees," a copy of which is attached hereto as **Exhibit E**. This notice, among other things, described the terms of the Plan Support Agreement and the FGIC Settlement Agreement and the process by which investors could object to them.

41.    In addition, on or about June 5, 2013, Wells Fargo distributed a "Time Sensitive Notice Regarding Settlement Agreement Among the ResCap Debtors, Financial Guaranty Insurance Company and the FGIC Trustees" (the "**Holder FGIC Settlement Notice**"), dated June 4, 2013, a copy of which is attached hereto as **Exhibit F**. The Holder FGIC Settlement Notice was provided by Wells Fargo to the investors in the eight Wells Fargo FGIC Trusts. The Holder FGIC Settlement Notice provided additional information to those investors regarding the Rehabilitation Proceeding, the FGIC Settlement Agreement, their rights thereunder, the process for investors to object to the FGIC Settlement Agreement in the Rehabilitation Proceeding and how to obtain information on the cash amount FGIC will pay to a particular trust. The Holder FGIC Settlement Notice and certain pleadings in the FGIC Rehabilitation Proceeding have also been posted on the RMBS Trustee Website.

42.    As part of the notice process, and in order to provide additional information to investors in the FGIC Trusts concerning the FGIC Settlement Agreement, the FGIC Trustees agreed to make available to those investors information concerning the allocable share of the Commutation Payment that each such FGIC Trust would receive under the FGIC Settlement

---

[13]    The Fraga Affidavit is Exhibit G to the PSA Joinder.

Agreement.

43.     Finally, the schedules attached to the Disclosure Statement filed with the ResCap

Plan provide information concerning the claims of the FGIC Trusts on account of Repurchase

Claims and Servicing Claims against the Debtors and other information from which recoveries to

the FGIC Trusts can be estimated.

*[signature on following page]*

Dated this 31st day of July, 2013

_____

Mary L. Sohlberg