**DECHERT LLP**
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon
and The Bank of New York Mellon Trust
Company, N.A., as Trustee of Certain
Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as
Trustee of Certain Mortgage Backed
Securities Trusts*

**SEWARD & KISSEL LLP**
Mark D. Kotwick
Brian P. Maloney
Ryan Suser
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association,
as Trustee of Certain Mortgage-Backed
Securities Trusts*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) **Case No. 12-12020 (MG)** |
| **RESIDENTIAL CAPITAL, LLC, *et al.*,** | ) |
| | ) **Chapter 11** |
| Debtors. | ) |
| | ) **Jointly Administered** |

**NOTICE OF FILING OF UNREDACTED FGIC TRUSTEES' RESPONSE TO
MOTION IN LIMINE OF MONARCH ALTERNATIVE CAPITAL LP,
STONEHILL CAPITAL MANAGEMENT LLC, CQS ABS
ALPHA MASTER FUND LIMITED, CQS ABS MASTER FUND
LIMITED AND BAYVIEW FUND MANAGEMENT LLC TO PRECLUDE
THE TESTIMONY OF S.P KOTHARI (IN LIMINE MOTION TWO)**

**PLEASE TAKE NOTICE** that The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A. (collectively, "BNY Mellon"), U.S. Bank National Association ("U.S. Bank"), and Wells Fargo Bank, N.A. ("Wells Fargo"), solely in their respective capacities as trustee or indenture trustee for certain mortgage backed securities trusts (collectively, the "FGIC Trustees") hereby file the unredacted version of the *FGIC Trustees' Response to Motion in Limine of Monarch Alternative Capital LP, Stonehill Capital Management LLC, CQS ABS Alpha Master Fund Limited, CQS ABS Master Fund Limited and Bayview Fund Management LLC to Preclude the Testimony of S.P Kothari (in Limine Motion Two).* (the "**Response**").  The Response was previously filed in redacted form on August 13, 2013 (Docket No. 4634), pursuant to the Court's *Order Regarding Exchange of Confidential Information* (Docket No. 4249) (the "**Confidentiality Order**").

*[Remainder of page intentionally left blank.]*

Dated: New York, New York
       August 15, 2013

**DECHERT LLP**
By: /s/ Glenn E. Siegel
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., as Trustee of Certain Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
By: /s/ John C. Weitnauer
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as Trustee of Certain Mortgage Backed Securities Trusts*

**SEWARD & KISSEL LLP**
By: /s/ Mark D. Kotwick
Mark D. Kotwick
Ronald L. Cohen
Arlene R. Alves
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association, as Trustee of Certain Mortgage-Backed Securities Trusts*

**DECHERT LLP**
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., as Trustee of Certain Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as Trustee of Certain Mortgage Backed Securities Trusts*

**SEWARD & KISSEL LLP**
Mark D. Kotwick
Jeffrey M. Dine
Ryan Suser
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association, as Trustee of Certain Mortgage-Backed Securities Trusts*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** ) | |
| ) | **Case No. 12-12020 (MG)** |
| **RESIDENTIAL CAPITAL, LLC, *et al.*,** ) | |
| ) | **Chapter 11** |
| **Debtors.** ) | **Jointly Administered** |

**FGIC TRUSTEES' RESPONSE TO MOTION *IN LIMINE***
**OF MONARCH ALTERNATIVE CAPITAL LP, STONEHILL CAPITAL**
**MANAGEMENT LLC, CQS ABS ALPHA MASTER FUND LIMITED, CQS ABS**
**MASTER FUND LIMITED AND BAYVIEW FUND MANAGEMENT LLC**
**TO PRECLUDE THE TESTIMONY OF S.P. KOTHARI (*IN LIMINE* MOTION TWO)**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................. 2

STATEMENT OF FACTS ...................................................................................................... 6

    A.    Dr. Kothari ................................................................................................. 6

    B.    The Duff Report ........................................................................................ 7

    C.    The Kothari Report ................................................................................... 8

ARGUMENT ........................................................................................................................... 9

I.    BECAUSE THE HEARING WILL BE WITHOUT A JURY, THE COURT
SHOULD SIMPLY WEIGH DR. KOTHARI'S EVIDENCE AT THE HEARING ........... 9

II.    DR. KOTHARI'S REPORT AND DIRECT TESTIMONY ARE RELIABLE
AND SHOULD BE ADMITTED ...................................................................................... 11

    A.    The FGIC And Lazard Data Underlying Dr. Kothari's Analysis Is The
Best Available And Dr. Kothari Reasonably Relied On It ......................... 11

    B.    Dr. Kothari's Approach To Determining The Reasonableness Of The
Commutation Amount Was Appropriate .................................................. 12

    C.    Dr. Kothari's Assessment Of The Discount Rate Range Applied By Duff
& Phelps Was Proper ............................................................................... 14

    D.    Dr. Kothari's Conclusion That Duff & Phelps Properly Excluded Potential
Litigation Recoveries From Its Analysis Is Well-Founded ....................... 16

    E.    Dr. Kothari Supported His Conclusion That Any Price Decline, Taken In
Isolation, Does Not Mean That The Settlement Is Unfavorable To Holders ............. 18

III.    DR. KOTHARI'S OPINION IS RELEVANT AND SHOULD BE CONSIDERED ........... 19

CONCLUSION ....................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bank of N.Y. Mellon Trust Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*,
910 F. Supp. 2d 629 (S.D.N.Y. 2012).................................................................19

*Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179 (2d Cir. 2001)....................................19

*Crown Cork & Seal Co. v. Credit Suisse First Boston Corp.*, No. 12-cv-05803,
2013 U.S. Dist. LEXIS 34368 (S.D.N.Y. Mar. 12, 2013) ............................................10, 12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)..............................10, 11, 19

*Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840 (6th Cir 2004) .............................................10

*Joseph S. v. Hogan*, 06 Civ. 1042, 2011 U.S. Dist. LEXIS 76762
(E.D.N.Y. July 15, 2011) ...................................................................... 3-4, 10, 11

*Kumho Tire Co., Ltd.  v. Carmichael*, 526 U.S. 137 (1999)..........................................................10

*Louis Vuitton Malletier v. Donney & Bourke, Inc.*, 525 F. Supp. 2d 558
(S.D.N.Y. 2007)........................................................................................10

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ...........................................................10

*Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76 (2d Cir. 1997)............................................................19

*TV Tokyo Corp. v. 4Kids Entm't, Inc. (In re 4Kids Entm't, Inc.)*, 463 B.R. 610
(Bankr. S.D.N.Y. 2011) ................................................................................9

*U.S. v. Brown*, 415 F.3d 1257 (11th Cir. 2005) ..........................................................................10

## OTHER AUTHORITIES

Committee Note to 2000 Amendment to Fed. R. Evid. 702..........................................................10

Fed. R. Evid. 401 ........................................................................................................19

Fed. R. Evid. 702 ........................................................................................................10

Fed. R. Evid. 704 .....................................................................................................6, 19

The **FGIC Trustees**[1] hereby submit this memorandum of law in response (the "**Response**") to the motion *in limine* ("***In Limine* Motion Two**" or the "**Motion**") of Monarch Alternative Capital LP, Stonehill Capital Management LLC, Bayview Fund Management LLC, CQS ABS Alpha Master Fund Limited and CQS ABS Master Fund Limited (collectively, the "**Objectors**") to preclude the expert testimony of Dr. S.P. Kothari ("**Dr. Kothari**"). The FGIC Trustees respectfully state as follows:

### PRELIMINARY STATEMENT

Dr. Kothari's expert testimony should be admitted. The Motion misstates the applicable law, misrepresents Dr. Kothari's work in forming his opinions and does not make a dent in his conclusions. Dr. Kothari is abundantly qualified to testify as an expert, his opinion is based upon reliable data and methodology and it is highly relevant to the matters at issue in the FGIC 9019 Motion.

In the course of evaluating the Settlement Agreement, the Trustees retained Duff & Phelps to evaluate its reasonableness, particularly with respect to the proposed lump sum cash payment therein (the "**Commutation Amount**"). Counsel for the FGIC Trustees subsequently retained Dr. Kothari to review certain aspects of Duff & Phelps's analysis. Dr. Kothari is a professor at the Sloan School of Management at the Massachusetts Institute of Technology ("MIT") who has extensive academic, professional and consulting expertise in accounting and valuation, a fact which the Objectors do not challenge.

---

[1]    The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A. (collectively, "**BNY Mellon**"), U.S. Bank National Association ("**U.S. Bank**") and Wells Fargo Bank, N.A. ("**Wells Fargo**"), solely in their respective capacities as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, custodian and/or other similar agencies or as master servicer for those forty-seven mortgage backed securities trusts (the "**FGIC Insured Trusts**") that are the subject of *Debtors' Motion Pursuant to Fed. R. Bankr, P. 9019 For Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* (the "**FGIC 9019 Motion**") [Docket No. 3929] pursuant to which the Debtors seek the entry of an order approving the Settlement Agreement (the "**Settlement Agreement**"), dated May 23, 2013, among the Debtors, Financial Guaranty Insurance Corporation ("**FGIC**"), the FGIC Trustees and the Institutional Investors..

Dr. Kothari was asked to offer an opinion on four issues: (i) the reasonableness of the discount rates used by Duff & Phelps in its analysis of expected payouts under the FGIC Rehabilitation Plan (the "**Projected Payments**"); (ii) the reasonableness of Duff & Phelps's conclusion that the Commutation Amount is within the range of present values of expected payouts to ResCap Policyholders under the FGIC Rehabilitation Plan; (iii) whether it was reasonable for Duff & Phelps not to include potential litigation recoveries by FGIC in its model estimating the Projected Payments under the FGIC Rehabilitation Plan; and (iv) whether alleged declines in value of some of the securities included in the settlement, after announcement of the Settlement Agreement, taken in isolation, could suggest that the Settlement Agreement is unfavorable to the holders of these securities.

Dr. Kothari found that: (i) the discount rates used by Duff & Phelps were reasonable; (ii) the conclusion that the Commutation Amount is within the range of present values of Projected Payments under the FGIC Rehabilitation Plan was reasonable; (iii) it was reasonable for Duff & Phelps not to include potential litigation recoveries in its model; and (iv) if there were price decreases in certain FGIC-wrapped securities, such declines would not, taken in isolation, suggest that the Settlement Agreement is unfavorable to the security holders.

The Objectors now seek to exclude Dr. Kothari's expert testimony as unreliable and unfounded.  To the contrary, Dr. Kothari's expert testimony as to each of his opinions was carefully and fully considered, and will be both relevant and reliable.

As a threshold matter, the Objectors misapply the standard for admission of expert testimony.  *Daubert* affords the Court in a bench trial the ability to relax its "gatekeeper" function and to "take in the evidence freely and separate helpful conclusions from ones that are not grounded in reliable methodology."  *Joseph S. v. Hogan*, 06 Civ. 1042, 2011 U.S. Dist.

- 3 -

LEXIS 76762, at *9 (E.D.N.Y. July 15, 2011).   The Objectors will have full opportunity to cross-examine Dr. Kothari at trial and introduce whatever evidence they believe contradicts his expert opinions.   The Court can consider this testimony and decide for itself the weight that testimony deserves.   For that reason alone, the Motion should be denied.   *See* Point I.

The Objectors' contention that Dr. Kothari "blindly" accepted the cash flow forecasts of FGIC and Lazard Frères & Co. LLC ("**Lazard**") is misplaced.   FGIC and Lazard enjoyed unique access to the information Dr. Kothari needed to consider.   That information was not available anywhere else, and both FGIC and Lazard had incentives to produce accurate information under the FGIC Rehabilitation Plan.   Further, unlike private litigants in a routine litigation, the FGIC rehabilitation proceeding is undertaken, pursuant to Article 74 of the New York Insurance Laws, under the auspices of the New State Department of Financial Services and the Supreme Court of the State of New York.   FGIC, as well as Lazard, are therefore under an obligation to act objectively for the benefit of FGIC's policyholders.   It was entirely appropriate for Dr. Kothari, employing his expert discretion, to rely upon FGIC and Lazard's financial projections.   *See* Point II.A.

The Objectors' argument that Dr. Kothari did not consider how the Commutation Amount was derived, and could not therefore make a determination about whether it was reasonable, is nonsense.   Dr. Kothari was not required to delve into whatever unknown "black box" FGIC used to arrive at its proposal – nor could he have.   Whether the Commutation Amount is reasonable has nothing to do with FGIC's rationale in making it.   *See* Point II.B.

The Objectors also unconvincingly seek to exclude Dr. Kothari's testimony concerning the reasonableness of the discount rate range of 10-20% used by Duff & Phelps to calculate the range of net present values of payout scenarios under the FGIC Rehabilitation Plan.

The Objectors suggest that Dr. Kothari was required to determine the basis Duff & Phelps used to establish the discount rates it applied.  As with the information underlying the calculation of the Commutation Amount, however, the basis for Duff & Phelps's use of particular discount rates has nothing to do with whether that range is objectively reasonable.  The Objectors also argue that Dr. Kothari's use of a leading treatise, the Ibbotson Cost of Capital 2013 Yearbook ("**Ibbotson**"),[2] was erroneous because Ibbotson disclaims use for companies in rehabilitation.  However, Ibbotson cautions users to do exactly what Dr. Kothari did – analyze the facts surrounding that company in making a cost of capital analysis.  Ibbotson at 5.  As Dr. Kothari explained, it would be appropriate to use a *higher* discount rate (which would have resulted in a lower net present value for proceeds received by policyholders under the FGIC Rehabilitation Plan) because a company in rehabilitation faces greater risk than a fully operating entity.  *See* Point II.C.

The Objectors disagree with Dr. Kothari's decision not to consider potential litigation recoveries by FGIC in his analysis.  Dr. Kothari, to be clear, excluded not only potential litigation recoveries by FGIC, but also its potential losses in the pending litigations against it.  Dr. Kothari's decision not to consider litigation recoveries and losses as uncertain and contingent is soundly based on analysis of FGIC's financials, consideration of the outstanding litigations and the analysis of other experts.  *See* Point II.D.

The Objectors' criticism that Dr. Kothari's opinion on the price decline of certain FGIC wrapped securities by ResCap and GMAC trusts is an *ipse dixit* conclusion is not well founded.  As Dr. Kothari discussed, there was no evidence of a price decline in the illiquid and non-public FGIC-wrapped trust notes after announcement of the settlement, and even if there had

---

[2] Relevant excerpts are annexed as Exhibit 1 to the Declaration of Jeffrey M. Dine dated August 13, 2013 ("**Dine Decl.**").

been a decline, there could be a number of causes other than a purported market belief that the Settlement Agreement undervalues the potential return on the notes.  *See* Point II.E.

   The Objectors last take the entirely unsupportable – indeed frivolous – position that Dr. Kothari's testimony should be barred as irrelevant because he does not opine on the ultimate issues of whether the Settlement Agreement is in the best interest of the investors or whether the FGIC Trustees acted in good faith.  The Objectors' position stands the Federal Rules of Evidence on their head.  Although Federal Rule of Evidence 704 abolished the "ultimate issue rule which had precluded experts from testifying about "ultimate issues," the Objectors seek to bar Dr. Kothari's testimony because he does *not* testify about the ultimate issue.  That position is utterly unsupportable.  Moreover, there is no question that Dr. Kothari's testimony that Duff & Phelps's analysis is reasonable, goes to *central matters* leading to the ultimate conclusion on the FGIC 9019 Motion, and will be helpful to the Court.  *See* Point III.

## STATEMENT OF FACTS

### A. Dr. Kothari

   Dr. Kothari is the Gordon Y Billard Professor in Management at the Sloan School of Management at the Massachusetts Institute of Technology ("**MIT**").  Expert Report of S.P. Kothari, Ph.D., dated July 19, 2013 (the "**Kothari Report**") (Dine Decl. Ex. 2), at ¶ 1 & Ex. 1. He is also the School's Deputy Dean.  *Id.*  Between 2008 and 2010, Dr. Kothari served as Global Head of Equity Research with Barclays Global Investors.  *Id.*  Previously he served on the faculty of the University of Rochester, while also holding visiting positions at MIT, the University of Technology in Sydney, Baruch College of the City University of New York, and the City University in London.  *Id.*  Dr. Kothari received his B.E. degree in Chemical Engineering from the Birla Institute of Technology and Science in 1979, his M.B.A. in

Accounting and Finance from the Indian Institute of Management in 1982, and his Ph.D. in Accounting from the University of Iowa in 1986.  *Id.*

Dr. Kothari is the co-editor of two books in the field of accounting and financial analysis – *Financial Statement Analysis*, published by McGraw-Hill, and *Contemporary Accounting Research: Synthesis and Critique*, published by North-Holland Publishing.  Kothari Report ¶ 2 & Ex. 1  Since 1997, he has also been an Editor of the *Journal of Accounting & Economics*, a leading academic journal in the field of accounting.  *Id.*

**B.    The Duff Report**

In determining whether to enter into the Settlement Agreement, the FGIC Trustees retained Duff & Phelps, a "sophisticated and competent financial advisor," to review and analyze the Settlement Agreement.  Reply ¶ 32.[3]  Duff & Phelps was asked, *inter alia*, to analyze and compare the economic terms of the Settlement Agreement against the Projected Payments under the FGIC Rehabilitation Plan, and to provide a recommendation to the FGIC Trustees.  *Id.*

In connection with the opinion rendered to the FGIC Trustees, Duff & Phelps issued a report dated May 15, 2013 (the "**Duff Report**", which Dr. Kothari produced as Kothari 000912-920 and which is attached as Exhibit 41 to the Declaration of Mary Eaton in Support of Investors' Motions in Limine ("**Eaton Decl.**") [Docket No. 4567].  The Duff Report advises that the Commutation Amount is within the reasonable range of the estimated Projected Payments under the FGIC Rehabilitation Plan.  Duff Report at 3.  It also identifies the value associated with not having to pay premiums on the FGIC Policies going forward, as well as the fact that the

---

[3] Full title: *Statement of the FGIC Trustees (I) In Support of The Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors and (II) in Reply to Certain Objections Thereto filed August 2, 2013* [Docket No. 4475] (the "Reply").

FGIC Settlement Agreement, as part of the global settlement embodied in the Plan Support Agreement, would resolve various outstanding issues in the Chapter 11 Cases, including potential litigation and inter-creditor disputes involving the FGIC Insured Trusts. *Id.*

The Duff Report states that it is Duff & Phelps's recommendation that the Settlement Proposal, and specifically the Commutation Payment, is within the range of reasonableness of the estimated Projected Payments under the FGIC Rehabilitation Plan.

C.    **The Kothari Report**

Dr. Kothari was retained by the FGIC Trustees to opine on the following issues:

- the reasonableness of the discount rates used by Duff & Phelps in its analysis of the Projected Payments under the FGIC Rehabilitation Plan;

- the reasonableness of the conclusion by Duff & Phelps that the Commutation Payment is within the range of present values under the FGIC Rehabilitation Plan;

- whether it was reasonable for Duff & Phelps not to include potential recoveries associated with pending litigation in its model estimating the Projected Payments under the FGIC Rehabilitation Plan; and

- to the extent that the prices of certain FGIC-wrapped securities issued by ResCap and GMAC trusts declined around the time of the Settlement Agreement, whether these price declines, taken in isolation, could suggest that the Settlement Agreement is unfavorable to the holders of these securities.

Kothari Report ¶ 5(i)-(iv). With respect to each, Dr. Kothari concluded as follows:

- The discount rate range used by Duff & Phelps was reasonable, based in part on Ibbotson, an annual publication that provides discount rate data for over 400 industries, and Dr. Kothari's professional opinion based on his experience in academia and in the private sector. Kothari Report ¶¶ 6; 8-13.

- It was reasonable for Duff & Phelps to conclude that the Commutation Amount was within the range of present values of the Projected Payments under the FGIC Rehabilitation Plan because it was based in large part on filed documents and

meetings with FGIC and Lazard, both of which had unique
access to information and incentives to provide accurate
financial projections. Kothari Report ¶¶ 6; 14-18.

- It was reasonable for Duff & Phelps not to include potential
recoveries *or losses* associated with pending litigation in which
FGIC was a party in its model because due to the high degree
of uncertainty associated with such litigation. Kothari Report
¶¶ 6; 19-25.

- That one cannot conclude from purported price declines, taken
in isolation, that the Settlement Agreement is unfavorable to
the holders because investors reaction to such new material
information will necessarily depend on the market's
expectations at the time of an announcement of those declines.

Kothari Report ¶¶ 6; 26.

Dr. Kothari's Report was served July 19, 2013. Dr. Kothari also produced

documents to the Objectors on the same day. Dr. Kothari was deposed by the Objectors on July

26, 2013.[4] On July 31, 2013, Dr. Kothari submitted a declaration [Docket No. 4443] ("**Kothari**

**Direct**"), which consists of the direct testimony Dr. Kothari will offer in this matter.

## ARGUMENT

### I.
### BECAUSE THE HEARING WILL BE WITHOUT A JURY, THE COURT SHOULD SIMPLY  WEIGH DR. KOTHARI'S EVIDENCE AT THE HEARING

In deciding whether to admit expert opinion, the Court must consider:

"(1) whether the witness is qualified as an expert to testify as to a particular matter; (2) whether

that opinion is based upon reliable data and methodology; and (3) whether the expert's testimony

is relevant." *TV Tokyo Corp. v. 4Kids Entm't, Inc. (In re 4Kids Entm't, Inc.)*, 463 B.R. 610, 677

(Bankr. S.D.N.Y. 2011). It should, as a general matter, "presume [such] expert evidence is

---

[4] Relevant excerpts of the transcript of his deposition ("**Kothari Dep. Tr.**") cited herein are annexed as Dine Decl.
Ex. 3.

reliable." *Crown Cork & Seal Co. v. Credit Suisse First Boston Corp.*, No. 12-cv-05803, 2013 U.S. Dist. LEXIS 34368, at *32 (S.D.N.Y. Mar. 12, 2013).

Since the Supreme Court's landmark *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), expert testimony has seldom been excluded in total. *See* Committee Note to 2000 Amendment to Fed. R. Evid. 702 ("A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."). This is because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof [that] are the traditional and appropriate means" of assessing such evidence. *Daubert*, 509 U.S. at 596.

Moreover, although the Objectors place great emphasis on the court's "gatekeeper [function] pursuant to *Daubert*" (*see, e.g.*, Motion at 5), it is well established that this function is much more "relaxed in a bench trial situation, where the judge is serving as factfinder." *U.S. v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005); *see also Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir 2004) ("The 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial."); *Louis Vuitton Malletier v. Donney & Bourke, Inc.*, 525 F. Supp. 2d 558, 629 (S.D.N.Y. 2007) (citing *Deal and Brown*). In this case, and unlike each of the cases cited by the Objectors on this point,[5] the Court will be the sole trier of fact and the role it would otherwise play as "gatekeeper" in preventing jury confusion under Federal Rule of Evidence 403 is of little importance here. *See Joseph S.*, 2011 U.S. Dist. LEXIS 76762, at *9 ("Indeed, without the risk of poisoning the jury with misleading expert testimony of

---

[5] *Daubert*, 509 U.S. at 584 (trial court granted summary judgment and excluded expert evidence upon concluding expert evidence was insufficient to create a "reasonably disputable jury issue"); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999) (trial court granted summary judgment and excluded expert evidence on the basis that it "fell outside the range where experts might reasonably differ, and where the jury must decide among the conflicting views of different experts"); *Nimely v. City of New York*, 414 F.3d 381, 384 (2d Cir. 2005) (appeal from jury verdict in favor of defendant).

limited probative value, . . . the Court can take in the evidence freely and separate helpful

conclusions from ones that are not grounded in reliable methodology." (citing *Daubert*, 509 U.S.

at 595)). "[T]he Court does not err in admitting the evidence subject to the ability later to

exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule

702." *Id.* at *8 (internal quotation marks omitted). For that reason alone, the Motion should be

denied.

## II.
## DR. KOTHARI'S REPORT AND DIRECT
## TESTIMONY ARE RELIABLE AND SHOULD BE ADMITTED

### A.    The FGIC And Lazard Data Underlying Dr. Kothari's Analysis Is The Best Available And Dr. Kothari Reasonably Relied On It

The Objectors question Dr. Kothari's reliance on cash flow projections provided

by FGIC and Lazard. Motion at 7. Dr. Kothari's use of this information was proper. As Dr.

Kothari states in his report, "[b]oth FGIC and Lazard had access to more information than Duff

& Phelps, and both parties had incentives to produce accurate financial projections under the

FGIC Rehabilitation Plan." Kothari Report ¶ 15; *see also* Kothari Decl. ¶ 17; Kothari Dep. Tr.

63:14-63:17. Lazard, together with FGIC and using internal information provided by FGIC,

prepared a liquidation analysis for the New York Liquidation Bureau, and was able to review and

comment on FGIC's run-off projections and assumptions, historical financial information,

internal projections, and a number of other unique sources. Affidavit of Michael W. Miller in

Further Support of Approval of First Amended Plan of Rehabilitation, dated December 12, 2012

(Dine Decl. Ex. 4) at ¶¶ 9-14. And with this in mind, Dr. Kothari still undertook to determine

whether FGIC and Lazard's information was reliable, as he explained in his deposition:

> So I went through step by step. So, first, the initial data that Duff
> & Phelps is using came from FGIC and Lazard and they don't have
> any reason to skew that information one way or the other.

Kothari Dep. Tr. 180:24-181:4.

Indeed, the Objectors themselves have acknowledged that Lazard's analysis was reasonable. Objector CQS's corporate representative testified that he *agreed* with the Lazard analyses with respect to projected losses, assumptions with respect to the base case scenario, and with respect to the stress case scenario. Transcript of July 12, 2013 Oral Rule 30(B)(6) Deposition of CQS ABS Alpha Master Fund Limited and CQS ABS Master Fund Limited by and Through its Designee David Williams (Dine Decl. Ex. 5) at 127:12-129:3.

Dr. Kothari was not under a duty to undertake an independent assessment of FGIC's underlying, internal data *ab initio*, but could consider FGIC and Lazard's analyses in the exercise of due skill and rigor. *See, e.g., Crown Cork & Seal Co.*, 2013 U.S. Dist. LEXIS 34368, at *41-42 (accepting proferred expert despite his failure to conduct any independent surveys or review additional literature, where the decisions to rely on pre-existing information reflected a "high level of intellectual rigor"). Dr. Kothari's reliance on information from FGIC and Lazard was proper and no basis for excluding his testimony.

**B.     Dr. Kothari's Approach To Determining**
**        The Reasonability Of The Commutation Amount Was Appropriate**

The Objectors argue that the Court should exclude Dr. Kothari's testimony because he did not "verify the method used [by FGIC] to arrive at the Commutation Payment Amount," and that he was bound to inquire into the reasons and rationale behind FGIC's proposed Commutation Amount. Motion at 7-8. Objectors cite no authority for this proposition. *FGIC's* rationale for proposing the Commutation Amount, in the course of a mediation, is of no relevance. FGIC's reasoning is a black box; all that matters is the number that comes out. The only question is whether that number is within a reasonable range of present value of the Projected Payments, or not.

The Objectors also claim that although "Dr. Kothari was aware that, in arriving at the Commutation Payment Amount, Duff & Phelps applied a 'haircut of 40% of unpaid payout claim estimates.'" Motion at 8.  The Objectors mistakenly add that "Dr. Kothari . . . did not discuss with anyone, nor did he give any consideration to, that 40% haircut."  *Id.* Objectors misstate the record.  Dr. Kothari's testimony Objectors purport to rely on for this argument (Motion at 8) was:

> Q. Then under item J [on page __ of the Duff & Phelps Report], it says 'haircut of 40 percent of unpaid payout claim estimates.  Do you see that?
>
> A. I do.
>
> Q. Do you know what that refers to?
>
> A. An unpaid claim, I would just literally be reading back that assumption, that they are assuming there would be a haircut of 40 percent.
>
> Q. A haircut on what; do you know?
>
> A. Unpaid claim estimates, policyholders' claim estimates.
>
> Q. Is that something that you took into consideration in rendering your opinions?
>
> A. The cash flow forecasts, I took those from – the entire chain from FGIC, Lazard, Duff & Phelps, as given to me, so therefore I did not go into questioning the assumption of 40 percent haircut.
>
> Q. And that is not something that I take it you discussed with anyone, the 40 percent haircut?
>
> A. I did not discuss that, no.

Kothari Dep. Tr. 134:4-135:4.  The 40% "haircut" appears at page 5 of the Duff Report.  It is clear from that page that the haircut was not something Duff & Phelps decided unilaterally to build into its analysis.  Reply ¶ 37 (citing Pfeiffer Declaration ¶¶ 68-69).  It was part of FGIC and Lazard's conditions that were built into FGIC's proposed settlement.  Reply ¶ 37.  It does

- 13 -

not affect the ultimate monetary value of the Commutation Payment.   Again, Dr. Kothari's

charge was to the reasonableness of Duff & Phelps's conclusions, not to second-guess the terms

of FGIC's proposal.

**C.     Dr. Kothari's Assessment Of The Discount
Rate Range Applied By Duff & Phelps Was Proper**

The Objectors next argue that Dr. Kothari erred by (i) not looking into the basis

for the discount rate range used by Duff & Phelps and (ii) considering the discount rates (capital

costs) from a well-recognized treatise in his analysis.   First, as with the Commutation Amount,

the Objectors argue that Dr. Kothari was obligated to determine how Duff & Phelps arrived at

the discount rate range it used.   But, as with the Commutation Amount, the discount rate range is

just a number.    Its derivation is irrelevant; all that matters is whether it was reasonable.

Moreover, as Objectors themselves admit, the discount rate range used by Duff & Phelps is the

same one that used by FGIC and Lazard.   Motion at 8-9.

The Objectors also argue that it was inappropriate for Dr. Kothari to utilize "cost

of capital" figures from the Ibbotson Cost of Capital Yearbook ("Ibbotson") in assessing the

discount rate range Duff & Phelps used in its analysis.   Motion at 9.   They argue that Dr.

Kothari:

> [I]gnored Ibbotson's warnings about using the book for companies
> in rehabilitation, such as FGIC.  Ibbotson does not include in its
> calculation of weighted average cost of capital companies in
> rehabilitation, and specifically warns that the financial
> performance of such companies 'would probably not be indicative
> of the financial performance of other companies in the industry.
> Dr. Kothari also expressly disregarded Ibbotson's warning that,
> "On an individual company basis, the models utilized in this book
> may provide information that is inaccurate or misleading."

*Id.*

The Objectors conflate two different concepts from Ibbotson. First, Ibbotson does not include in *its* analysis companies within a Standard Industry Classification (SIC) that have not reported dollar sales for the most recent fiscal year, or have not reported a stock price for the most recent month. Ibbotson at 7. The reason is that such companies may not be "continuing as a growing concern, or a financial restructuring may be underway." For that reason, "[t]he financial performance of such a company would probably not be indicative of the financial performance of other companies in the industry."[6] *Id.* That is, Ibbotson does not include them because inclusion might distort *Ibbotson's* analysis of cost of capital for that SIC. *Id.* That has no bearing on whether Ibbotson's completed analysis for a SIC is or is not applicable to an analysis of a particular company.

In fact, Ibbotson states its utility with respect to discount rate analysis. Ibbotson at 1 ("Equity investment analysts and portfolio strategists will find the book to be an effective tool in determining the pricing of various securities. Corporate treasury professionals will find the book to be an asset in determining appropriate discount rates for acquisition or capital expenditure projects."). Further, with respect to analyses of individual companies, Ibbotson states:

> On an individual company basis, the models utilized in this book may provide information that is inaccurate or misleading. *Any individual company cost of capital analysis should involve a careful analysis of all facts surrounding that company.* Depending on individual company circumstances, all of the assumptions underlying our models might not apply.

---

[6] Part of the reason Ibbotson does not include companies in rehabilitation in its WACC calculations is that these companies have no market capitalization data or stock returns, so one is unable to calculate a beta or WACC for these companies using stock-return data. Instead, an analyst must use comparable companies, taking into account the specific circumstances for the particular company, which is precisely Dr. Kothari's approach.

Ibbotson at 5 (emphasis added). That is, contrary to Objectors' assertion, Ibbotson does not

disclaim use of its models with respect to an individual company. Rather, it simply cautions the

analyst to carefully consider the particulars of the individual company in undertaking a cost of

capital analysis (including Ibbotson) for that company. And Dr. Kothari did that, using

Ibbotson's number as a base for his analysis that 10-20% was an appropriate discount range to

apply to FGIC. As he stated in his report:

> Although the range from Ibbotson is slightly below the discount
> rate range of 10 to 20 percent per annum used by Duff & Phelps in
> its analysis, my opinion is that FGIC, which is in a rehabilitation
> proceeding and admittedly insolvent, is likely to be *riskier* than a
> representative company in the surety insurance industry for several
> reasons.

Kothari Report ¶ 11 (emphasis added). Dr. Kothari explained the reasons for that assessment in

his report, in his deposition, and in his direct testimony. Kothari Report ¶ 12; Kothari Direct. ¶

14; Kothari Dep. Tr. 141:10-142:16. Dr. Kothari thus came to his own conclusions with respect

to the discount rate, considering factors that might affect the cost of capital model used by

Ibbotson.

**D.      Dr. Kothari's Conclusion That Duff & Phelps Properly Excluded
         Potential Litigation Recoveries From Its Analysis Is Well-Founded**

The Objectors argue that Dr. Kothari did not consider particular litigations in

which in coming to his conclusion that Duff & Phelps reasonably excluded them from its

analysis. Motion at 10-11. That is simply not true. Dr. Kothari reviewed, *inter alia*, the

Cornerstone and NERA analyses, on the Lipps Declaration, as well as the FGIC financial report

footnotes, among other items. Kothari Report ¶¶ 20-24; Kothari Dep. Tr. 49:16-50:9. He

considered potential litigation recoveries by FGIC as well as potential losses in actions in which

it is a Defendant. Kothari Dep. Tr. 49:12-15; Kothari Direct ¶ 26. He concluded that inclusion

of litigation, both by and against FGIC, was not justified because the outcome of those litigations

was uncertain. Kothari Report ¶ 24; Kothari Direct ¶ 26.  With respect to the "several factors that he would typically examine when projecting litigation recoveries" (Motion at 11), Dr. Kothari testified as follows:

> Q. Did you do any of those things in reaching your conclusion that it was reasonable for Duff & Phelps not to include potential recoveries associated with pending litigation in its model?
>
> A. Qualitatively, yes, I did consider all those factors because some of those underlie the assessment that is provided.  So I have relied on some assessment that has been provided by other experts, not just in the matter of litigation, but experts as, in general, as experts in the world.
>
> Q. What experts?
>
> A. So there is some financial reporting that has taken place.  That financial reporting goes through a process of the information that those lawyers for the company, accountants for the company, auditors for the company, managers of the company, and all of them are professional experts in their respective fields, their collective judgment is distilled in the information that is supplied in places like financial reports, and I have relied on that as one of the inputs.  That is the sense in which indirectly I have factored in all the items that you earlier listed.

Kothari Dep. Tr. 74:25-76:4.  The Objectors also assert that Dr. Kothari did not examine FGIC's asserted claims in detail, yet he testified that he considered the breach of representation and warranties claims, which are the principal claims brought by FGIC.  Kothari Dep. Tr. 79:18-21; 81:18-20.  And he testified again that he considered other litigations generally:

> To draw the conclusion, I developed a general understanding of what the causes are in various cases and I also determined that when you take the totality of the inflows and outflows that might be possible, the net effect is speculative.

Kothari Dep. Tr. 82:16-21.

Dr. Kothari's direct testimony reflects that he considered other outstanding litigations where FGIC was both a plaintiff and a defendant.  Kothari Direct ¶ 24.  Dr. Kothari

looked at complex securities litigations for confirmation of the simple and uncontroversial proposition that these recoveries or losses in complex litigation (such as the FGIC litigations) is both long and uncertain.  Kothari Direct ¶ 27.  The conclusion that he reached, that "attempting to quantify the highly uncertain litigation recoveries and losses in the Duff & Phelps model would be speculative" (Kothari Direct ¶ 26), is hardly radical or unsupported by the facts.

**E.      Dr. Kothari Supported His Conclusion That Any Price Decline,
Taken In Isolation, Does Not Mean That The Settlement Is Unfavorable To Holders**

The Objectors criticize as *ipse dixit* Dr. Kothari's opinion, that to the extent that prices of certain FGIC-wrapped securities may have declined around the  time of the Settlement Agreement, "one cannot conclude from these price declines, taken in isolation, that the settlement agreement is unfavorable to the holders of these securities."  Kothari Report ¶ 6.  Dr. Kothari's analysis was not conclusory.  As a threshold matter, the notes do not trade in a transparent market, but rely on specific quote requests to dealer-contacts. Kothari Direct ¶ 29. Notwithstanding the absence of evidence of price decline, Dr. Kothari stated a number of reasons for price changes in the market:

> Investor reaction to new material information about the future risk and/or cash flows to a security will depend on the market's expectations at the time of the news announcement.  Instead of conveying negative news about the size of the lump sum payment, the May 23, 2013 settlement agreement could have alternatively informed the market that expected payouts to ResCap Policyholders under FGIC's rehabilitation plan were lower than previously thought.  In addition, security prices can change due to market and industry factors, which must be controlled for before drawing any conclusion about a causal link between information events and security price changes.

Kothari Direct ¶ 29.

Dr. Kothari's analysis of the meaning of purported price changes is well taken and will be helpful to the Court.  It should be admitted.

## III.

### DR. KOTHARI'S OPINION IS RELEVANT AND SHOULD BE CONSIDERED

The Objectors argue that Dr. Kothari's testimony should be excluded because Dr. Kothari does not opine on the ultimate issues in this case, such as the good faith of the FGIC Trustees or whether the Settlement Agreement is in the best interests of investors.  Motion at 12-13.  The Objectors' argument is frivolous.  The Federal Rules of Evidence provide only that an expert opinion "*is not objectionable* just because it embraces an ultimate issue."  Fed. R. Evid. 704(a) (emphasis added).  The Objectors would flip the rule to require that an expert *must* express an opinion on the ultimate issue.  As *Daubert* holds and the Objectors acknowledge, in order to be admitted, expert testimony need only be *relevant*, in that it "'relate[s] to *any issue* in the case.'"  Motion at 12 (quoting *Daubert*, 509 U.S. at 591) (emphasis added); *see also Bank of N.Y. Mellon Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 641 (S.D.N.Y. 2012) (citing *Daubert*, 509 U.S. at 591).

Dr. Kothari's report and testimony, like any other evidence, is admissible if it is "relevant."  And in considering whether Dr. Kothari's opinion is relevant, the Court need only determine whether the expert's evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be" without that opinion.  *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (citing Fed. R. Evid. 401); *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997) (same).  The standard "is a liberal one."  117 F.3d at 80 (quoting *Daubert*, 509 U.S. at 587).  Here, Dr. Kothari's opinion bears on whether the Duff & Phelps' analysis of the settlement was reasonable, which makes it more probable that Duff & Phelps' analysis was in fact reasonable.  The reasonability of Duff & Phelps' analysis, of course, bears strongly on whether the settlement is within the range of reason and other ultimate issues.  The Court should hear his testimony.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the FGIC Trustees request that

the Court deny the Objectors' *In Limine* Motion Two to preclude the testimony of Dr. S.P.

Kothari, and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
      August 13, 2013

                                          Respectfully submitted,

**DECHERT LLP**
By: /s/ Glenn E. Siegel
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., as Trustee of Certain Mortgage-Backed Securities Trusts*

**SEWARD & KISSEL LLP**
By: /s/ Mark D. Kotwick
Mark D. Kotwick
Jeffrey M. Dine
Ryan Suser
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association, as Trustee of Certain Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
By: /s/ Martin G. Bunin
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as Trustee of Certain Mortgage Backed Securities Trusts*

SK 03687 0119 1406532 v3