# EXHIBIT 3

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

    SOUTHERN DISTRICT OF NEW YORK

3   Case No. 12-120202(MG)

    Chapter 11

4   Administered Jointly

5   ------------------------------------x

6   IN RE:

7      RESIDENTIAL CAPITAL, LLC, et al.,

8                  Debtors.

9   ------------------------------------x

10                 July 26, 2013

11                 8:35 a.m.

12

13       Deposition of S.P. KOTHARI, Ph.D.,

14   pursuant to Notice, held at the offices of

15   Willkie, Farr & Gallagher LLP, 787 Seventh

16   Avenue, New York, New York, before Todd

17   DeSimone, a Registered Professional

18   Reporter and Notary Public of the State of

19   New York.

20

21

22

23

24

25

```
 1
 2   A P P E A R A N C E S :
 3   WILLKIE FARR & GALLAGHER LLP
     787 Seventh Avenue
 4   New York, New York 10019
             Attorneys for Investors Monarch,
 5           Stonehill, Bayview and CQS
     BY:   MARY EATON, ESQ.
 6            meaton@willkie.com
           EMMA J. JAMES, ESQ.
 7            ejames@willkie.com
           PIA WILLIAMS, ESQ.
 8            pwilliams@willkie.com
 9
10
     ALSTON & BIRD LLP
11   90 Park Avenue
     New York, New York 10016
12           Attorneys for Wells Fargo as
             Trustee
13   BY:   MICHAEL E. JOHNSON, ESQ.
             michael.johnson@alston.com
14
15
16   DECHERT LLP
     1095 Avenue of the Americas
17   New York, New York 10036-6797
             Attorneys for Bank of New York
18           Mellon Trust Company, N.A. as
             Trustee or Investor Trustee
19   BY:   REBECCA S. KAHAN, ESQ.
             rebecca.kahan@dechert.com
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S:  (Continued)
 3   SEWARD & KISSEL LLP
     One Battery Park Plaza
 4   New York, New York 10004
          Attorneys for Law Debenture Trust
 5        Company of New York
     BY:  BENAY L. JOSSELSON, ESQ.
 6        josselson@sewkis.com
 7
 8
     SEWARD & KISSEL LLP
 9   One Battery Park Plaza
     New York, New York 10004
10        Attorneys for U.S. Bank
     BY:  LAURIE R. BINDER, ESQ.
11        binder@sewkis.com
12
13
14   JONES DAY
     222 East 41st Street
15   New York, New York 10017-6702
          Attorneys for Financial Guaranty
16        Insurance Company
     BY:  HOWARD F. SIDMAN, ESQ.
17        hfsidman@jonesday.com
18
19
     MORRISON & FOERSTER LLP
20   1290 Avenue of the Americas
     New York, New York 10104
21        Attorneys for Debtors
     BY:  ROBERT J. BAEHR, ESQ.
22        rbaehr@mofo.com
23
24
25
```

Page 4

```
 1
 2   A P P E A R A N C E S:   (Continued)
 3   ROPES & GRAY LLP
     800 Boylston Street
 4   Boston, Massachusetts 02199-3600
          Attorneys on Behalf of the Steering
 5        Committee of RMBS Investors
     BY:  ANDREW G. DEVORE, ESQ.
 6          andrew.devore@ropesgray.com
 7
 8
     McKOOL SMITH
 9   One Bryant Park
     47th Floor
10   New York, New York 10036
          Attorneys for Freddie Mac
11   BY:  PETER S. GOODMAN, ESQ.
            pgoodman@mckoolsmith.com
12
13
14   MOSS & KALISH, PLLC
     122 East 42nd Street
15   New York, New York 10168
          Attorneys for Freddie Mac
16   BY:  DAVID B. GELFARB, ESQ.
            gelfarb@mosskalish.com
17
18
19   KRAMER LEVIN NAFTALIS & FRANKEL LLP
     1177 Avenue of the Americas
20   New York, New York 10036
          Attorneys for the Official
21        Committee of the Unsecured
          Creditors
22   BY:  PHILIP S. KAUFMAN, ESQ.
            pkaufman@jonesday.com
23          (Via Telephone)
24
25
```

Page 5

1

2   A P P E A R A N C E S: (Continued)

3   WHITE & CASE LLP

    1155 Avenue of the Americas

4   New York, New York 10036

         Attorneys for Junior Secured

5        Noteholders

    BY:  VANESSA SODERBERG, ESQ.

6        vsoderberg@whitecase.com

         (Via telephone)

7

8

9   ALSO PRESENT:

10    SCOTT GIBSON, MountainView Capital

11    BARRY RIEGER, Protiviti

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 49

1                    KOTHARI

2  research with respect to the cash flow

3  projections.

4       Q.      You did independent research --

5  did you do independent research with

6  respect to other subjects addressed in

7  Exhibit 2?

8       A.      I did.

9       Q.      What were those subjects?

10      A.      Discount rate related issues.

11      Q.      Anything else?

12      A.      With respect to item 3, which

13 is litigation related recoveries, that is

14 something else that I did some independent

15 research.

16      Q.      That was reviewing the

17 Cornerstone and NERA analyses?

18      A.      That was part of it.

19      Q.      And reading Mr. Lipps'

20 declaration?

21      A.      That was part of it.

22      Q.      Anything else on that subject?

23      A.      Reviewing the financial report

24 footnotes by FGIC.  I have listed the

25 items I have reviewed in my report.

Page 50

1                        KOTHARI

2      Q.        I understand.  Did you review

3  all of the items yourself listed in I

4  guess it is Exhibit 2 to your report?  Did

5  you read everything itemized on that

6  exhibit?

7      A.        I certainly reviewed those.

8  Some of those documents I might not have

9  read line by line.

10     Q.        You did not develop your own

11 discount rate in connection with your

12 assignment here, did you?

13               MR. JOHNSON:  Objection to

14 form.

15     A.        No, I did not.

16     Q.        But that is something based on

17 your expertise you could have done?

18               MR. JOHNSON:  Objection to

19 form.

20     A.        I have the expertise in

21 calculating discount rates.

22     Q.        So the answer to my question is

23 yes?

24               MR. JOHNSON:  Objection to

25 form.

Page 63

                              KOTHARI

1
2    others that it did not verify, do you

3    think it was reasonable for FGIC to do

4    that?

5                   MR. SIDMAN:  Objection.

6                   MR. JOHNSON:  Objection to

7    form.  Assumes facts not in evidence.

8        A.        My general understanding is

9    Duff & Phelps obtained and used

10   information supplied by FGIC.  Also my

11   assessment is that FGIC had access to a

12   lot more information that Duff & Phelps

13   simply could not have had, so it was

14   reasonable to seek that information.  I

15   also determined that FGIC and Lazard

16   didn't have incentives to bias that

17   information.

18                   For all those reasons I thought

19   it was reasonable for Duff & Phelps to

20   have relied on the information that they

21   obtained from FGIC and some other sources.

22       Q.        Duff & Phelps obtained

23   information from FGIC and other sources,

24   right?

25       A.        That is correct.

Page 74

1                    KOTHARI

2      Q.        And would they also include the

3   strength of the claims from a factual

4   perspective?

5                 MR. JOHNSON:  Objection to

6   form.

7      A.        It is possible, yes.

8      Q.        It is more than possible, isn't

9   it, sir?  Isn't it the case that those are

10   the kinds of things that one would

11   consider in projecting the probable

12   outcome of a litigation?

13                 MR. JOHNSON:  Objection to

14   form, vague.

15      A.        The reason I say it is possible

16   is because not in every scenario each of

17   those factors would be applicable.

18      Q.        They may be applicable or

19   inapplicable, but one would consider

20   whether they were applicable or

21   inapplicable, right?

22                 MR. JOHNSON:  Objection to

23   form.

24      A.        Not necessarily.

25      Q.        Did you do any of those things

Page 75

KOTHARI

in reaching your conclusion that it was
reasonable for Duff & Phelps not to
include potential recoveries associated
with pending litigation in its model?

     A.        Qualitatively, yes, I did
consider all of those factors because some
of those underlie the assessment that is
provided.  So I have relied on some
assessment that has been provided by other
experts, not just in the matter of
litigation, but experts as, in general, as
experts in the world.

     Q.        What experts?

     A.        So there is some financial
reporting that has taken place.  That
financial reporting goes through a process
of the information that those lawyers for
the company, accountants for the company,
auditors for the company, managers of the
company, and all of them are professional
experts in their respective fields, their
collective judgment is distilled in the
information that is supplied in places
like financial reports, and I have relied

Page 76

```
 1                      KOTHARI
 2   on that as one of the inputs.  That is the
 3   sense in which indirectly I have factored
 4   in all the items that you earlier listed.
 5        Q.       So you factored in all of the
 6   items we discussed not directly but
 7   indirectly; is that your testimony?
 8        A.       That is correct.
 9        Q.       And you did so on the basis of
10   the information supplied in the March 31,
11   2003 statutory filing by FGIC as well as
12   the information contained in the
13   declaration prepared by Jeffrey Lipps,
14   correct?
15                 MR. JOHNSON:  Objection to
16   form.
17                 MR. SIDMAN:  Objection to form.
18        A.       All the inputs I have
19   considered are listed in 5.
20        Q.       And so we are clear about that,
21   those inputs are the March 31, 2013
22   statutory filing by FGIC, correct?
23        A.       Miller affidavit is there also.
24        Q.       I asked you about the statutory
25   filing.  That was one of the inputs that
```

Page 79

1                           KOTHARI

2    impression I received from those is that

3    there is some possibility of recovering

4    some litigation proceeds from settlement

5    from those claims, but my general

6    impression upon reviewing those is that

7    there isn't anything definite yet that has

8    risen to the level of being disclosed as

9    definitive settlement on the horizon, in

10   the financial statements of FGIC either.

11        Q.      Are you done?

12        A.      Yes.

13        Q.      What were the causes of action

14   that FGIC was asserting in those claims?

15             MR. JOHNSON:  Objection to

16   form.

17             MR. SIDMAN:  Objection to form.

18        A.      There might have been multiple

19   causes, but one cause that comes to mind

20   is some representation and warranties,

21   breach of those.

22        Q.      Anything else?

23        A.      I haven't, in preparing for the

24   deposition today, I haven't gone through

25   one by one, so I cannot sitting here give

```
1                    KOTHARI
2           MR. JOHNSON:  Objection to
3    form.  Argumentative.
4      Q.       Let's focus now on the
5    claims -- on the cases where FGIC is a
6    plaintiff and is asserting claims, okay?
7      A.       Okay.
8      Q.       We can deal with the cases
9    where FGIC is a defendant separately.  All
10   right?
11     A.       All right.
12     Q.       Did you know at the time that
13   you rendered your opinion what causes of
14   action FGIC was asserting in those cases?
15           MR. JOHNSON:  Objection to
16   form.  Asked and answered.
17           MR. SIDMAN:  Objection.
18     A.       In some of the cases the issue
19   was about breach of representations and
20   warranties.
21     Q.       Did you know at the time what
22   those causes of action were?
23           MR. JOHNSON:  Objection to
24   form.
25     A.       I gave you an example of one.
```

Page 82

                        KOTHARI

1

2      Q.       I understand you are giving me

3   an example.

4             I'm asking whether you knew at

5   the time that you concluded, and I'm

6   reading now from paragraph 24, that

7   attempting to quantify the highly

8   uncertain litigation recoveries in those

9   cases would be speculative?

10            MR. JOHNSON:  Objection to

11  form.

12     A.       Yes.

13     Q.       So you knew what all of the

14  causes of action were in all of those

15  cases?

16     A.       To draw the conclusion, I

17  developed a general understanding of what

18  the causes are in various cases and I also

19  determined that when you take the totality

20  of the inflows and outflows that might be

21  possible, the net effect is speculative.

22     Q.       Do you remember a minute ago I

23  said let's focus on the cases where FGIC

24  is a plaintiff?  Are you capable of doing

25  that, focusing on that set of cases?

Page 134

```
 1                    KOTHARI
 2  main assumptions."  Do you see that?
 3       A.        I do.
 4       Q.        Then under item J, it says
 5  "haircut of 40 percent of unpaid payout
 6  claim estimates."  Do you see that?
 7       A.        I do.
 8       Q.        Do you know what that refers
 9  to?
10       A.        An unpaid claim, I would just
11  literally be reading back that assumption,
12  that they are assuming there would be a
13  haircut of 40 percent.
14       Q.        A haircut on what; do you know?
15       A.        Unpaid claim estimates,
16  policyholders' claim estimates.
17       Q.        Is that something that you took
18  into consideration in rendering your
19  opinions?
20       A.        The cash flow forecasts, I took
21  those from -- the entire chain from FGIC,
22  Lazard, Duff & Phelps, as given to me, so
23  therefore I did not go into questioning
24  the assumption of 40 percent haircut.
25       Q.        And that is not something that
```

Page 135

1                    KOTHARI

2    I take it you discussed with anyone, the

3    40 percent haircut?

4         A.        I did not discuss that, no.

5         Q.        You understood that Duff &

6    Phelps used a range of discount rates in

7    conducting its analysis?

8         A.        Yes, I do.

9         Q.        And you developed an opinion on

10   that subject, correct?

11        A.        I did.

12        Q.        What was your opinion on that

13   subject?

14        A.        The range of 10 to 20 percent

15   discount rate that they used was

16   reasonable given my expertise on

17   calculation of discount rates.

18        Q.        Do you know how Duff & Phelps

19   developed that range of discount rates?

20        A.        I did not know at the time I

21   was preparing the report, but my

22   understanding, again, it is a general

23   understanding, is that they used the same

24   10 to 20 percent that Lazard had used.

25        Q.        Do you know why Duff & Phelps

Page 141

```
 1                    KOTHARI
 2   yes, I would agree.
 3        Q.       So you will agree that
 4   depending on the circumstances the
 5   assumptions underlying Ibbotson's models
 6   might not apply?
 7                MR. JOHNSON:   Objection to
 8   form.
 9        A.       Yes.
10        Q.       Do you know whether the models
11   utilized in Ibbotson -- I beg your pardon,
12   let me start over.
13                Do you know whether the
14   assumptions underlying Ibbotson's models
15   apply in the particular circumstances
16   here?
17        A.       The nature of business that
18   FGIC is engaged in and the industry that I
19   identified from the Ibbotson handbook, I
20   have every reason to believe that the
21   range in Ibbotson handbook for that surety
22   industry, I believe it is 635, is
23   applicable to the firm in question, which
24   is FGIC, and that's the sense in which the
25   circumstances and the assumptions are
```

Page 142

1               KOTHARI

2    applicable here.

3         Q.        Just so I understand, is it

4    your testimony that the assumptions

5    underlying Ibbotson's models for companies

6    falling in the SIC 635 category apply to

7    FGIC?

8         A.        In my report I also qualify how

9    the range might be in fact conservative in

10   the sense that FGIC, if anything, might be

11   riskier than indicated by industry 635.

12               But, that said, as a general

13   matter is that industry and that range, or

14   use of that range as a reasonable

15   approximation for FGIC, I agree with that

16   statement.

17        Q.        Now, in undertaking this

18   analysis, you use Ibbotson's estimates of

19   the weighted average cost of capital,

20   correct?

21        A.        That is correct.

22        Q.        And if you turn to Exhibit 3 to

23   your report, it appears to be a page out

24   of Ibbotson.

25        A.        Yes.

Page 180

1              KOTHARI

2    process that they had followed, and based

3    on my general understanding of this field,

4    if you will, was that process reasonable

5    or not, and based on all of that, the

6    analysis that I conducted, I reached the

7    conclusion that yes, it seemed reasonable.

8         Q.        But you yourself have no

9    experience using Intex to model

10   mortgage-backed security cash flows; is

11   that correct?

12                  MR. JOHNSON:  Objection, asked

13   and answered.

14        A.        That is correct.

15        Q.        Did you review the specific

16   assumptions, again, used by Duff & Phelps?

17        A.        I did not review the specific

18   assumptions.

19        Q.        If you did not review the

20   specific assumptions used and you did not

21   review the model settings, how do you

22   believe you can opine on the range of the

23   results that Duff & Phelps obtained?

24        A.        So I went through step by step.

25   So, first, the initial data that Duff &

1                    KOTHARI
2    Phelps is using came from FGIC and Lazard
3    and they don't have any reason to skew
4    that information one way or the other.
5               Then I ask well, is the
6    professional working on it?  What kind of
7    experience?  Has he been working in this
8    area?  He has been in the industry and as
9    a consultant.  I and my team, we said,
10   Intex, is that a model that gets used in
11   the industry?  And the answer is yes.
12              So the only leap of faith by
13   way of process that I wanted to make --
14   and I had conversation with John Schroeder
15   and I asked him how he developed some of
16   those forecasts and then he explained to
17   me how he has used some historical
18   experience of the mortgages, of those
19   claims, macroeconomic conditions, about
20   how they might affect the default rates or
21   claim phenomenon, behavior of claims.
22              Based on that process,
23   description, and discussion with him, I
24   reached the conclusion that that process
25   seems reasonable to me and didn't strike