**DECHERT LLP**
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon
and The Bank of New York Mellon Trust
Company, N.A., as Trustee of Certain
Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as
Trustee of Certain Mortgage Backed
Securities Trusts*

**SEWARD & KISSEL LLP**
Mark D. Kotwick
Brian P. Maloney
Ryan Suser
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association,
as Trustee of Certain Mortgage-Backed
Securities Trusts*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) **Case No. 12-12020 (MG)** |
| **RESIDENTIAL CAPITAL, LLC, *et al.*,** | ) |
| | ) **Chapter 11** |
| Debtors. | ) |
| | ) **Jointly Administered** |

## NOTICE OF FILING OF UNREDACTED FGIC TRUSTEES'
## RESPONSE TO MOTION IN LIMINE THREE (PFEIFFER TESTIMONY)

PLEASE TAKE NOTICE that The Bank of New York Mellon, The Bank of New

York Mellon Trust Company, N.A. (collectively, "BNY Mellon"), U.S. Bank National

Association ("U.S. Bank"), and Wells Fargo Bank, N.A. ("Wells Fargo"), solely in their

respective capacities as trustee or indenture trustee for certain mortgage backed securities trusts (collectively, the "FGIC Trustees") hereby file the unredacted version of the *FGIC Trustees' Response to Motion in Limine Three (Pfeiffer Testimony)* (the "**Response**"). The Response was previously filed in redacted form on August 13, 2013 (Docket No. 4629), pursuant to the Court's *Order Regarding Exchange of Confidential Information* (Docket No. 4249) (the "**Confidentiality Order**").

Dated:  New York, New York
       August 15, 2013

**DECHERT LLP**
By: /s/ Glenn E. Siegel
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., as Trustee of Certain Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
By: /s/ John C. Weitnauer
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as Trustee of Certain Mortgage Backed Securities Trusts*

**SEWARD & KISSEL LLP**
By: /s/ Mark D. Kotwick
Mark D. Kotwick
Ronald L. Cohen
Arlene R. Alves
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association, as Trustee of Certain Mortgage-Backed Securities Trusts*

**DECHERT LLP**
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., as Trustee of Certain Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
John C. Weitnauer (*pro hac vice*)
William Hao
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as Trustee of Certain Mortgage Backed Securities Trusts*

**SEWARD & KISSEL LLP**
Mark D. Kotwick
Brian P. Maloney
Ryan Suser
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association, as Trustee of Certain Mortgage-Backed Securities Trusts*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Case No. 12-12020 (MG) |
| **RESIDENTIAL CAPITAL, LLC,** *et al.*, | ) |
| | ) Chapter 11 |
| Debtors. | ) |
| | ) Jointly Administered |

## FGIC TRUSTEES' RESPONSE TO
## MOTION *IN LIMINE* THREE (PFEIFFER TESTIMONY)

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . .1

II.     FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

III.    THE OPINIONS EXPRESSED IN THE EXPERT REPORT AND THE
        "WORK PAPERS". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        A.      Comparison of the Present Value of the Projected Payments to the
                Commutation Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        B.      Duff & Phelps' Estimate of the Potential Value of the Chapter 11 Plan to the
                FGIC Insured Trusts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

IV.     THE PRODUCTION OF DOCUMENTS AND DISCLOSURES
        REGARDING THE DUFF PRESENTATION MATERIALS AND THE EXPERT
        REPORT FULLY COMPLIED WITH, AND WENT BEYOND
        THE REQUIREMENTS OF RULE 26. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*B.C.F. Oil Ref. v. Consolidated Edison Co.,*
      171 F.R.D. 57 (S.D.N.Y. 1997) ......................................................................................13

*Grdinich v. Bradlees,*
      187 F.R.D. 77 (S.D.N.Y. 1999) ......................................................................................15

*Harvey v. District of Columbia,*
      949 F. Supp. 874 (D.D.C. 1996) ....................................................................................14

*Hein v. Cuprum,*
      53 Fed. Appx. 134 (2d Cir. 2002) ..................................................................................15

*In re Commer. Money Ctr., Inc.,*
      248 F.R.D. 532 (N.D. Ohio 2008) ..................................................................................12

*In re Google Adwords Litigation,*
      No. C08-03369 JW (HRL), 2010 U.S. Dist. LEXIS 136757 (N.D. Cal. Dec. 8, 2010) ..........14

*Lorme v. Delta Air Lines, Inc.,*
      251 Fed. Appx. 691 (2d Cir. 2007) ................................................................................15

*McNerney v. Archer Daniels Midland Co.,*
      164 F.R.D. 584 (W.D.N.Y. 1995) ..................................................................................15

*Monaghan v. SZS 33 Assocs., L.P.,*
      148 F.R.D. 500 (S.D.N.Y. 1993) ....................................................................................16

*Rmed Int'l v. Sloan's Supermarkets,*
      No. 94 Civ. 5587 (PKL) (RLE), 2002 U.S. Dist. LEXIS 23829 (S.D.N.Y. Dec. 11,
      2002) ..............................................................................................................................16

*Thieriot v. Jaspan Schlesinger Hoffman LLP,*
      No. CV 07-5315 (TCP) (AKT), 2011 U.S. Dist. LEXIS 111566 (E.D.N.Y. Sept. 28,
      2011) ..............................................................................................................................14

*USA Gateway, Inc. v. Spring Travel,*
      No. 03 Civ. 4026 (JFK) (RLE), 2004 U.S. Dist. LEXIS 26139 (S.D.N.Y. Dec. 29,
      2004) ........................................................................................................................15, 16

*Ward v. Nat. Geographic Soc'y*
      No. 99 Civ. 12835, 2002 U.S. Dist. LEXIS 310 (S.D.N.Y. Jan. 11, 2002) ....................15

The **FGIC Trustees**[1] respond to **Motion *in Limine* Three**[2] – which seeks to preclude

Allen M. Pfeiffer ("**Mr. Pfeiffer**") from testifying as an expert witness – as follows:

## I.  Preliminary Statement

1.      The FGIC Trustees have fully complied with – and in fact, have gone far beyond

– the disclosure obligations required by Federal Rule of Civil Procedure 26[3] ("**Rule 26**"), both as

to (i) the "work papers" and to (ii) the calculation of $92 million in potential benefits to the FGIC

Insured Trusts under the Chapter 11 Plan proposed in this case.[4]  Accordingly, Motion *in Limine*

Three should be denied.

---

[1]      The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A. (collectively, "**BNY Mellon**"), U.S. Bank National Association ("**U.S. Bank**"), and Wells Fargo Bank, N.A. ("**Wells Fargo**"), solely in their respective capacities as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, custodian and/or other similar agencies or as master servicer for those certain forty-seven (47) mortgage backed securities trusts (the "**FGIC Insured Trusts**") that are the subject of *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 For Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* [Docket No. 3929] (the "**FGIC 9019 Motion**").

[2]      *Monarch Alternative Capital LP, Stonehill Capital Management LLC, CQS ABS Alpha Master Fund Limited, CQS ABS Master Fund Limited, and Bayview Fund Management LLC's Motion In Limine to Preclude the Testimony of Allen M. Pfeiffer Regarding the Debtors' 9019 Motion (Motion in Limine Three)* [Docket No. 4546]. A joinder was filed to Motion *In Limine* Three.  *Joinder of Federal Home Loan Mortgage Corporation to Five Motions In Limine.* [Docket No. 4576].  In this Response, the Movants are sometimes referred to as the "**Monarch Group**," and the Monarch Group and Freddie Mac are collectively referred to as the "**Objectors**."

[3]      While Bankruptcy Rule 9014 provides that certain portions of Rule 26, as incorporated into adversary proceedings by Bankruptcy Rule 7026, do not apply in contested matters, including subsections a(1), a(2), and a(3) regarding expert disclosures, the FGIC Trustees clearly understand that this Court expects expert disclosures in this contested matter to be governed by Rule 26.

[4]      Motion *in Limine* Three also mentions the "single document that FGIC disclosed ... that Duff considered" but had been withheld.  As this Court is aware, FGIC permitted the disclosure of this document during Mr. Pfeiffer's deposition.  *See* Pfeiffer Dep. Tr. 74:11 – 75:17 (a true and correct copy of Mr. Pfeiffer's July 24, 2013 deposition transcript is attached to the Declaration of William Hao in Support of the FGIC Trustees' Response to Motion *in Limine* Three (Pfeiffer Testimony) (the "**Hao Declaration**") as Ex. 2).

## II.  Factual Background

2.      In accordance with this Court's first Scheduling Order[5] applicable to this contested matter, the Expert Report of Allen M. Pfeiffer (the "**Expert Report**")[6] was provided to the Objectors on July 19, 2013.

3.      On July 23, 2013, three Excel workbooks – the **Settlement Proposal Workbook**,[7] the **Wrapped Deals Update Workbook**[8] and the **Non-Settlement Workbook**[9] (the "**Workbooks**") – were provided to the Objectors.[10]

4.      On July 24, 2014, the Objectors took Mr. Pfeiffer's deposition.

5.      On July 24, 2014, counsel for the Monarch Group delivered a letter to this Court asserting, among other things, that, "based on the testimony of Mr. Pfeiffer, the Objecting Parties have learned that there are numerous other documents that should have been produced." Specifically, counsel requested an order requiring the production of:

> all documents concerning (i) any *facts or data* that Duff & Phelps considered *in forming the opinions expressed in the D&P Consultancy Report and the D&P*

---

[5]      Scheduling Order [Docket No. 4168] at ¶ 9.

[6]      A true and correct copy of the Expert Report is attached to the Hao Declaration as Ex. 3.

[7]      The filename of the Settlement Proposal Workbook is "FGIC_Settlement Proposal_D&P Analysis_051513.xlsx." The Settlement Proposal Workbook was also previously produced to the Objectors on July 19, 2013. The version produced on July 23, 2013 includes the underlying "formulas" in the Excel spreadsheet.

[8]      The filename of the Wrapped Deals Update Workbook is "FGIC Wrapped Deals_Update_2013_04_10 - Update.xlsx."

[9]      The filename of the Non-Settlement CF Workbook is "Non-Settlement_Monoline Anlysis_Monthly CF - PIVOT.xlsx."

[10]      *See* Johnson July 22, 2013 Email (Hao Decl. Ex. 7 ); Maloney July 23, 2013 Email (Hao Decl. Ex. 8 ). This production was in addition to a large quantity of documents that had already produced to Objectors as part of the "fact discovery" in this contested matter. As this Court will recall, Duff & Phelps, LLC ("**Duff & Phelps**") was asked by the FGIC Trustees to advise them regarding the commutation proposal made by FGIC during the Mediation. In connection with that advice, Duff & Phelps prepared a PowerPoint presentation summarizing their analysis, which was shown to and discussed with the FGIC Trustees on May 13, 2012. A final version of that presentation was dated May 15, 2013 (a copy of that presentation is attached as Attachment III to the Pfeiffer Expert Report). Both the final version of the presentation, and the earlier drafts (collectively, the "**Duff Presentation Materials**") were produced to the Objectors. On July 8, 2013 over 3700 pages of non-privileged, publicly available documents Duff & Phelps considered in connection with the Duff Presentation Materials. *See* Koh July 8, 2013 Letters (Hao Decl. Exs. 4, 5). On July 21, 2013, an additional 1300 pages of documents representing the items listed as numbers 92 – 126 on Attachment II to the Pfeiffer Expert Report were produced to the Objectors. *See* Maloney July 21, 2013 Email (Hao Decl. Ex. 6) (providing instructions for access to production Bates stamped PFEIFFER 000001 – PFEIFFER 001357).

*Expert Report*, regardless of the source of those facts or data, (ii) any *assumptions that Duff & Phelps relied upon in forming the opinions* expressed in the D&P Consultancy Report and the D&P Expert Report, regardless of the source of those assumptions, (iii) *all work papers that Duff & Phelps generated in forming the opinions* expressed in the D&P Consultancy Report and the D&P Expert Report.

Letter from M. Eaton to Judge Glenn dated July 24, 2013 (the "**Letter**") at p. 5 (emphasis added).

6.      On July 25, 2013, this Court held a hearing (the "**Hearing**"), which had been convened:

[i]n connection with a dispute arising in connection with the FGIC 9019 settlement proceeding; [concerning] discovery from FGIC and Lazard regarding documents or information that FGIC asserts is protected by the mediation privilege.

Transcript of Hearing held July 25, 2013 (the "**Transcript**")[11] at 6:3-8.

7.      After some detailed discussion at the Hearing between the Court and Mr. Johnson, counsel for one of the FGIC Trustees (who was speaking on behalf of all of the FGIC Trustees) concerning documents or information provided by FGIC and considered by Duff,[12] Mr. Johnson turned to the "work paper" issue:

MR. JOHNSON:   Your Honor, from our perspective, the trustees have fully complied with the requirements of ... Rule 26(a)(2)(B) ... Your Honor, I think what this comes down to actually, but it's not very clear, I don't think, from the correspondence, is work papers. ... But in any event, Your Honor, while we have been clear in our position that work papers aren't covered by that Rule, we have turned over work papers. I brought today, Your Honor, a stack. It's very hard to print them out, because it's several Excel spreadsheets; but they're sitting there on the table, and you can see them.   Significant work papers have been disclosed already.

...

THE COURT: ... But you're representing that work papers have been produced and, if any more are identified, you'll produce them as well?

---

[11]      A true and correct copy of the transcript of the July 25 Hearing is attached to the Hao Declaration as Ex. 1.
[12]      Transcript 11:14-23; 12:1-22.

MR. JOHNSON:  Well, Your Honor, I think that we – the second part I think we might have a problem with. ... We have provided what we consider to be the primary work papers.  We don't know what further information they might be looking for, but there may be layers of information below that that we – that have not been produced.  For example, there may be spreadsheets that might feed into the base work paper documents that are documents.  And, Your Honor, quite honestly, producing that would be very, very cumbersome.  And again, we don't know if there's –

THE COURT: It's actually pretty easy; you produce worksheet -- Excel spreadsheets electronically; that's not very cumbersome.  *But that's not the issue that I consider before me today.*  ... And I know that Ms. Eaton's letter does address the work product issue, but I don't believe that's properly framed before me at this point.

Transcript 15:4 – 16:6; 17:2 – 25 (emphasis added).

8.      Towards the end of the Hearing, the "work paper" issue was referred to again:

MS. EATON:  Very well, Your Honor.  And with respect to the separate issue of the work papers that Your Honor indicated was not right –

THE COURT: That issue is not sufficiently presented to me at this point.  *Mr. Johnson has represented that some volume of work papers were provided.  You need to confer with him further.*  Hopefully, you'll resolve – be able to resolve this issue without further court intervention.

MS. EATON: Thank you, Your Honor.

Transcript 33:8-16 (emphasis added).

9.      Finally, at the conclusion of the hearing, the Court stated:

All right. Let me go back to the work product – the work papers issue. With respect to the work papers, I expect that you'll cooperate with Ms. Eaton and – so that you can assure her that the work papers have been provided to the extent that, as I indicated, discovery is permitted, disclosure is required with respect to any alternative analyses, testing methods or approaches to the issues on which the expert will be testifying.  *So if there are work papers that include such alternative analyses, testing methods or approaches to the issues on which the expert will be testifying, they must be produced.*  To the extent that the work papers reflect drafts of the expert report that has been provided, doesn't the Rule – the Rule was amended in 2010 to make clear that the drafts don't have to be provided.  So if the work papers reflect drafts of the report, they don't have to be provided.  *If they reflect alternative analyses, et cetera, that are not included in the report, they do have to be provided.*

Transcript 36:9 – 37:1 (emphasis added).

4

10.    The FGIC trustees believed (and still believe) that all "work papers" required by Rule 26 or by this Court's instructions at the Hearing were produced before Mr. Pfeiffer's deposition.[13]  Counsel for the FGIC Trustees repeatedly invited the Objectors to meet and confer, as the Court had instructed, about whether there were any such "work papers" that remained to be produced.[14]  In each instance, the Objectors either refused[15] or did not respond.

11.    Thus, the FGIC Trustees were left to guess at the scope of the documents being requested by the Objectors.  Consequently, in an email dated August 6, 2013, counsel for the FGIC Trustees notified the Objectors that they would be producing: (i) the **Non-Settlement Pool Policy Workbook**[16] and (ii) a hard drive (the "**Hard Drive**") containing several gigabytes of databases, as well as worksheets with calculations, tables of outputs, and modeling assumptions, relating to Duff & Phelps' work in calculating the Loss Information for all of the over 1,000 RMBS Trusts,[17] despite the fact that such documents were never considered by Mr. Pfeiffer in connection with the Expert Report, and are in fact several "levels" removed from the work papers Mr. Pfeiffer used in preparing the Expert Report.[18]  The Non-Settlement Pool Policy Workbook was produced the next day on August 7, 2013.[19]  Due to the large collective size of

---

[13]    The one-page document that had been withheld at FGIC's request was produced during Mr. Pfeiffer's deposition.  *See* Pfeiffer Dep. Tr. 74:11 – 75:17.

[14]    Johnson August 1, 2013 Email (Hao Decl. Ex. 9) ("we're prepared to meet-and-confer promptly after you specify in writing precisely what it is your clients are looking for.  That information is needed so that we can consider the request in advance with Duff & Phelps, facilitating a productive meet-and-confer call."); Johnson August 2, 2013 Email (Hao Decl. Ex. 11) ("Please let us know your availability to meet-and-confer by telephone on Monday afternoon or Tuesday.").

[15]    *See* Eaton August 1, 2013 Email (Hao Decl. Ex. 10) ("As for the meet-and-confer, here is our position (which you know full well because we have been telling you this for some time now): produce everything as required, and as Judge Glenn made clear.").

[16]    The filename of the Non-Settlement Pool Policy Workbook is "Non-Settlement_Cashflow_WithPoolPolicy.xlsx".

[17]    The August 6, 2013 email also notifies the Objectors of production concerning a separate issue described further below relating to a single Excel spreadsheet in connection with testimony set forth in the Pfeiffer Expert Report regarding the approximately $92 million in potential recovery for the FGIC Insured Trusts under the Proposed Plan, which analysis was not previously set forth in the Duff Presentation Materials.

[18]    *See* Johnson August 6, 2013 Email (Hao Decl. Ex. 12).

[19]    *See* Maloney August 7, 2013 Email (Hao Decl. Ex. 13).

the documents contained on the Hard Drive, copies of the Hard Drive were not available until

August 8, 2013, at which time they were produced to the Objectors.

### III.  The Opinions Expressed in the Expert Report and the "Work Papers"

A.    *Comparison of the Present Value of the Projected Payments to the Commutation Payment*

12.    Mr. Pfeiffer's assignment as an expert witness was:

to assess the reasonableness, from a financial perspective and from the perspective of the **FGIC Insured Trusts**, of the **Settlement Agreement**, which provides for, among other things, a lump sum payment by FGIC to the FGIC Insured Trusts (the "**Commutation Payment**") in satisfaction of any obligations of FGIC to make payments in the future (the "**Projected Payments**") to the FGIC Insured Trusts under FGIC'[s] **Rehabilitation Plan** ... (the "**Commutation**").[20]

13.    In the first of two conclusions contained in his Expert Report, Mr. Pfeiffer stated:

it is my conclusion that the Commutation Payment amount of approximately $253.3 million falls within a reasonable range, given the expected cash flows associated with the Projected Payments.[21]

14.    To arrive at this opinion, Mr. Pfeiffer compared the present value of the expected

recoveries under the Rehabilitation Plan (*i.e.*, the net present value of the payments on the claims

of the FGIC Insured Trusts) (the "**Range of Recoveries**") to the Settlement Agreement.  Mr.

Pfeiffer did so, as explained in the Expert Report:

A comparison of the recoveries under the Rehabilitation Plan versus the Settlement Agreement based on the range of D&P's claims estimates [is] presented in Table 1. ... D&P calculated the range of recoveries under the Base Case Scenario of the Rehabilitation Plan to be $217 to $340 million, indicating a recovery of 19 to 22 percent on a nominal basis and 24 to 28 percent on a discounted basis for FGIC Insured Trusts.  This range of recoveries implies that accepting a Commutation Payment of $253.3 million with a value of $272 million, including the foregone premiums is a reasonable decision, from a financial perspective, by the FGIC Trustees.[22]

---

[20]    Expert Report at pp. 5-6, (footnotes omitted).
[21]    Expert Report at p. 7, ¶ 12.
[22]    Expert Report at p. 27, ¶ 60.

15.     Table 1 of the Expert Report shows the Range of Recoveries on the "Total Policy Claims for FGIC Insured Trusts" (both the High Case and the Low Case) to be from $217 million to $340 million, and shows, in comparison, the Commutation Payment of $253 million.[23]

16.     As explained in the Declaration of Alice Chong,[24] a Senior Associate at Duff & Phelps, she was directed by Mr. Pfeiffer to determine the Range of Recoveries, and the only "work paper" that calculates the Range of Recoveries is the Settlement Proposal Workbook.[25] The calculation uses the "high" and "low" losses of the 47 FGIC Insured Trusts (already realized, as of December, 31 2012 and projected to occur thereafter) and calculates the present value of the projected payments on the claims for such losses from the FGIC Rehabilitation, at various discount rates.[26]    One of the primary disputes among the experts on the Range of Recovery issue is the discount rates that should be used to determine the present value of the Projected Payments.[27]

17.     The two other workbooks produced prior to the Pfeiffer deposition – the Wrapped Deals Update Workbook and the Non-Settlement CF Workbook (together, the "**Losses Workbooks**") – were used by Ms. Chong *as the source* for realized losses and projected future losses of the 47 FGIC Insured Trusts (the "**Loss Information**").[28]    Both of the Losses

---

[23]       The same information, rounded to a range of $220 million to $340 million, is contained in the Duff Presentation Materials.

[24]       The Declaration of Alice Chong dated August 13, 2013, is attached hereto as Exhibit A (the "**Chong Declaration**").

[25]       Chong Decl. ¶¶2, 3.

[26]       Chong Decl. ¶¶3,4.

[27]       *See Objection of Monarch Alternative Capital LP, Stonehill Capital Management LLC, Bayview Fund Management LLC, CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* [Docket No. 4400] ¶¶ 38-42; *Declaration of Charles R. Goldstein in Support of Objection of Monarch Alternative Capital LP, Stonehill Capital Management LLC, Bayview Fund Management LLC, CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited to Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* [Docket No. 4435] pp. 3-8, 12-14.

[28]       Chong Decl. ¶4.

Workbooks were created in connection with a *different* project at Duff & Phelps: calculating the "rep and warranty" claims of both the Original Settling Trusts and the Additional Settling Trusts.[29]  In connection with her assignment to assist Mr. Pfeiffer with the recommendations of Duff contained in the Duff Presentation Materials, Ms. Chong asked for workbooks containing loss information from the Duff team that was responsible for calculating such "rep and warranty" claims, and the Losses Workbooks were provided to her.[30]  She used the Losses Workbooks in connection with the Duff Presentation Materials, and used the same Losses Workbooks in connection with her assistance to Mr. Pfeiffer in preparing the Expert Report.[31]  As Ms. Chong explains in her declaration, Excel workbooks can contain information (for instance, a number) contained in another workbook.[32]  When one opens an Excel workbook that has a link to information contained in another workbook, Excel gives the choice of updating the linked information, or keeping the existing information.

18.    Ms. Chong never updated any of the Loss Information contained in the Losses Workbooks.

---

[29]    Chong Decl. ¶5. Early in the Debtors' Chapter 11 cases, the FGIC Trustees and Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas (collectively, the "**RMBS Trustees**"), retained Duff & Phelps as their financial advisors.  Among other things, Duff & Phelps analyzed the "rep and warranty" claims of the over one thousand residential mortgage-backed securities ("**RMBS**") trusts for which the RMBS Trustees serve as trustee (the "**RMBS Trusts**") against the Debtors, both in connection with their evaluation of the RMBS Settlement Motion filed by the Debtors on June 11, 2012, for the trusts covered by that motion (the "**Original Settling Trusts**") and the other trusts that the RMBS Trustees act for that also have similar claims.  The development of the rep and warranty claims for the RMBS Trusts was a comprehensive undertaking that involved the organization and normalization of tens of gigabytes of raw data into databases and the feeding of resulting inputs into a cash-flow modeling engine called Intex.  The loss information contained in the Losses Workbooks relating to the 47 FGIC Insured Trusts is but a small subset of the rep and warranty claim information produced by Duff & Phelps for the RMBS Trustees.  From the time they were first engaged by the RMBS Trustees, Duff & Phelps has continually analyzed and refined the rep and warranty claims, first in connection with the RMBS Settlement Motion and now in connection with analyzing the claims, and the recoveries, of the RMBS Trusts under the Proposed Plan.  John Schrader, a Managing Director, leads the Duff team that has been working on, and continues to work on, the rep and warranty claims.

[30]    Chong Decl. ¶5.

[31]    Chong Decl. ¶5.

[32]    Chong Decl. ¶6.

19.     The Losses Workbooks simply take the Loss Information generated from Duff &
Phelps' previous work for the RMBS Trustees on "rep and warranty" claims and, as noted above,
reflect the application of sensitivities relating to the "high" and "low" cases set forth in the Duff
Presentation Materials and the Expert Report.    Neither of the Losses Workbooks reflects any
"alternative analyses, testing methods or approaches" to any of the analysis set forth in the Duff
Presentation Materials or Expert Report.  Rather, the Loss Information is properly characterized
as an "assumption" or "source" that was fed into the Settlement Proposal Workbook.  As Ms.
Chong explains, her only use of the Losses Workbooks was to refer to the Loss Information that
they outputted, and neither the Losses Workbooks nor the Loss Information contained therein
were ever updated.[33]

20.     In any event, the Settlement Proposal Workbook *and* the Losses Workbooks were
provided to the Objectors prior to Mr. Pfeiffer's July 24 expert deposition.  Thus, they had all of
Duff & Phelps' work papers that are germane to the conclusions expressed in the Expert Report
– the Settlement Proposal Workbook – and more.

21.     For these reasons, the FGIC Trustees believed that there was no obligation, and it
simply made no sense, to consider any further or "deeper" layers of work papers that Duff &
Phelps created in the course of calculating the rep and warranty claims of over 1,000 trusts,
including the many gigabytes of information that related to the calculation of rep and warranty
claims.  Nevertheless, as explained below, after the utter failure of the Objectors to meet and
confer to hash these issues out, on August 7, 2013, the FGIC Trustees produced the Non-
Settlement Pool Policy Workbook and on August 8, 2013, produced the Hard Drive.

22.     As Ms. Chong explains in her declaration, she never referred to, reviewed, or
considered the Non-Settlement Pool Policy Workbook or the files on the Hard Drive to do any of

---

[33]     Chong Decl. ¶¶6, 7.

her work associated with the Expert Report or the Duff Presentation Materials.[34]  In addition, as

she further explains, the files contained on the Hard Drive allow anyone with a subscription to

Intex (like Duff & Phelps) to calculate projected future losses of RMBS trusts.[35]  Furthermore,

the Non-Settlement Pool Policy Workbook includes information "linked" to the Non-Settlement

CF Workbook, one of the Losses Workbook.  As Ms. Chong explains in her Declaration, she

never "updated" the Losses Workbooks and only referred to them for the Loss Information

utilized in calculating the Range of Recoveries.[36]  Moreover, neither the Non-Settlement Pool

Policy Workbook nor any of the files on the Hard Drive contains any "alternative analyses,

testing methods or approaches" to the analysis set forth in the Duff Presentation Materials or

Expert Report.[37]

B.     *Duff & Phelps' Estimate of the Potential Value of the Chapter 11 Plan to the FGIC
       Insured Trusts*

       23.     In his Expert Report, Mr. Pfeiffer further analyzed the proposed FGIC Settlement

Agreement in light of objections raised by the Objectors.  As a result, the Expert Report includes

an additional analysis that was not previously presented in the Duff Presentation Materials.  In

Part X of the Expert Report entitled "Potential Benefits of the Settlement Agreement from the

Plan Support Agreement," Mr. Pfeiffer opines that under the FGIC Settlement Agreement the

FGIC Insured Trusts will receive $92 million in distributions under the Proposed Plan, if that

Plan is confirmed, on account of their claims against the Debtors.  As stated in Part X of the

Pfeiffer Expert Report, and explained by Mr. Pfeiffer during his deposition, while it was

indicated in the Duff Presentation Materials that the FGIC Insured Trusts would receive a cash

payment if the Proposed Plan was confirmed (Duff Presentation Materials at 3 ("Benefit: One-

---

[34]     Chong Decl. ¶8.
[35]     Chong Decl. ¶8.
[36]     Chong Decl. ¶8.
[37]     Chong Decl. ¶8.

time cash payment made to ResCap RMBS Policyholders upon plan confirmation")) the quantification of the amount of that benefit was not presented in the Duff Presentation Materials.[38] Thus, the calculation of the potential $92 million benefit to the FGIC Insured Trusts was not a part of the Duff Presentation Materials and not subject to any discovery relating to the Duff Presentation Materials. While Mr. Pfeiffer's opinion regarding the potential $92 million benefit to the FGIC Insured Trusts was first disclosed in his expert report on July 19, 2013, as explained below, the calculation of the $92 million is largely derived from publicly available information contained in the Debtors' Disclosure Statement and the schedules thereto.

24.     Five days later, at Mr. Pfeiffer's July 24 deposition, counsel for the Objectors thoroughly questioned Mr. Pfeiffer regarding his opinion relating to the $92 million benefit to the FGIC Insured Trusts including the details of the assumptions underlying, the bases for, and the calculation of that amount.[39] As Mr. Pfeiffer testified during his expert deposition, the calculation of the $92 million set forth in the spreadsheet is largely derived from publicly available information contained in the Debtors' Disclosure Statement and the schedules of the RMBS Trusts' representation and warranty claims attached thereto.[40] In connection with that line of questioning, counsel for the Objectors requested[41] the production of any documents showing the math behind the calculation of the $92 million amount. In response, counsel for Duff & Phelps acknowledged the request and stated that they would consider it.[42] On August 7,

---

[38]     Pfeiffer Dep. Tr. 131:14-132:1.
[39]     Pfeiffer Dep. Tr. 119:7 – 133:22.
[40]     Pfeiffer Dep. Tr. 132:10 –18:

         Q. Are there documents that reflect that calculation?

         A. There's an allocation schedule that is provided in connection with the plan support agreement and with -- in connection with the disclosure statements. And if you do the arithmetic to add the 47 insured trusts' recovery, you would -- you would arrive at a number which is approximately $92 million.

[41]     Pfeiffer Dep. Tr.134:13 – 23.
[42]     Pfeiffer Dep. Tr. 134:24-25.

2013, a spreadsheet setting forth the calculation of the $92 million amount (the "**Calculation Spreadsheet**") was produced to the Objectors.[43]

## IV.  The Production of Documents and Disclosures Regarding the Duff Presentation Materials and the Expert Report Fully Complied With, and Went Beyond, the Requirements of Rule 26

25.    The sole basis for preclusion of Mr. Pfeifer's testimony advanced by the Objectors appears to be that Mr. Pfeiffer allegedly failed to disclose all "facts or data," including "assumptions" that he "considered" or "relied upon" in preparing his expert report.  *See* Pfeiffer *in Limine* Motion at 7-8 (citing Rule 26(a)(2)(B) and Rule 26(b)(4)).  As explained above, this contention is simply incorrect.  Some courts have defined the word "considered" under Rule 26 to encompass facts or data the expert "read or reviewed … before or in connection with formulating his or her opinion." *In re Commer. Money Ctr., Inc.*, 248 F.R.D. 532, 537 (N.D. Ohio 2008) (citing *Western Resources, Inc. v. Union Pac. R.R. Co.*, No. 00-2043-CM, 2002 U.S. Dist. LEXIS 1911, 2002 WL 181494, *9 (D. Kan. Jan. 31, 2002).  Even under this broad definition, the vast majority of documents that Mr. Pfeiffer "read or reviewed before or in connection with formulating his opinion," were produced to the Objectors by July 8, 2013,[44] well before Mr. Pfeiffer's expert deposition on July 24, 2013.  With only a single exception (the Calculation Spreadsheet), *all* documents considered, reviewed, read, or relied upon by Mr. Pfeiffer in connection with both the Duff Presentation Materials and his Expert Report were produced to the Objectors on or before the date of Mr. Pfeiffer's deposition.  Further, with the same exception, the documents produced *after* his deposition were *not* considered, reviewed, read, or relied upon by Mr. Pfeiffer in coming to his conclusions and opinions contained in the

---

[43]    *See* Maloney August 7, 2013 Email (Hao Decl. Ex. 13).
[44]    Koh July 8, 2013 Letters (Hao Decl. Exs. 4,5)

Expert Report, and do not contain any "alternative analyses" of the opinions expressed in the Expert Report.[45]  These documents were produced despite being well beyond the scope of the disclosures required under Rule 26 in the hopes that seeing this information would put to rest the "work paper" issue raised by the Objectors.  The factual basis for the Pfeiffer *in Limine* Motion is thus infirm and the motion should be denied.

26.     Objectors cite to *B.C.F. Oil Ref. v. Consolidated Edison Co.,* 171 F.R.D. 57 (S.D.N.Y. 1997), for the proposition that "*materials generated by the expert in connection with his report and expert testimony*, must be produced, and cannot be withheld on the ground that such materials are protected by the work product privilege because it is quite clear that Rule 26 does not include within the definition of work product documents generated or consulted by experts in connection with litigation."   Motion *In Limine* Three at 7 (internal quotations omitted).[46]  The FGIC Trustees *did produce the materials generated* in connection with the Expert Report – to wit, the Settlement Proposal Workbook – prior to Mr. Pfeiffer's deposition.[47] *In addition*, the FGIC Trustees produced documents *that provided information that was included* in *the materials generated* in connection with the Expert Report – to wit, the Losses Workbooks – prior to Mr. Pfeiffer's deposition.[48]   *Finally*, the FGIC Trustees produced documents *that provided information included* in documents *that provided information that was included* in *the materials generated* in connection with the Expert Report – to wit, the Non-Settlement Pool Policy Workbook and the workbooks and other files provided on the Hard Drive.

---

[45]     Chong Decl. ¶8.

[46]     *B.C.F.* related to Rule 26(b)(4) as it stood prior to the 2010 amendments to the Federal Rules of Civil Procedure.  After the 2010 amendments, however, Rule 26(b)(4) specifically provides that drafts of reports generated by experts are not subject to discovery.  *See* Rule 26(b)(4)(B) ("Rules 26(b)(3)(A) and (B) protect drafts of any report or disclosure required under Rule 26(a)(2), regardless of the form in which the draft is recorded."). Thus, the proposition for which the Objectors cite *B.C.F.* is no longer valid.

[47]     The FGIC Trustees have gone beyond what Rule 26 currently requires and have produced drafts of the Duff Presentation Materials.

[48]     Maloney July 23, 2013 Email (Hao Decl. Ex. 8)

27.     Everything considered by Mr. Pfeiffer – and then some – has been produced.  In the FGIC Trustees' view, the Losses Workbooks, the Non-Settlement Pool Policy Workbook and the files on the Hard Drive are well outside of the scope of Rule 26 disclosures and not subject to discovery.  *See, e.g., In re Google Adwords Litigation*, No. C08-03369 JW (HRL), 2010 U.S. Dist. LEXIS 136757, at *14 (N.D. Cal. Dec. 8, 2010) (holding that underlying data not subject to production under Rule 26 where expert only considered and relied upon aggregate data); *Thieriot v. Jaspan Schlesinger Hoffman LLP*, No. CV 07-5315 (TCP) (AKT), 2011 U.S. Dist. LEXIS 111566, at *12-14 (E.D.N.Y. Sept. 28, 2011) (holding that documents not actually considered by the expert were outside the scope of discovery under Rule 26(a)(2)(B)).

28.     The Objectors now charge the FGIC Trustees with producing too much, leaving them without the means to review such a volume of data.  Motion *in Limine* Three at 11 ("Trial is now only slightly over a week away and ... [i]t is impossible for the Investors to secure, load, review and absorb 'several gigabytes' of data ... and then re-depose Mr. Pfeiffer about that information.").  The FGIC Trustees submit that Objectors should not now be heard to complain regarding circumstances of their own creation.  *See Harvey v. District of Columbia*, 949 F. Supp. 874, 877 (D.D.C. 1996) (refusing to strike plaintiff's expert disclosure even though it was "woefully inadequate" because defendant failed to meet-and-confer in a timely manner, filed its motion to preclude the expert's report just a day before the discovery cut-off, was thus "utterly disingenuous" in claiming significant prejudice).  Accordingly, the FGIC Trustees submit that the Pfeiffer *in Limine* Motion must be denied.

29.     Finally, while the Objectors correctly point out in the Motion *in Limine* Three that Fed. R. Civ. P. 37(c)(1) states, in part, that: "If a party fails to provide information ... as required by Rule 26(a) ... the party is not allowed to use that information or witness to supply evidence ...

at a hearing, or at a trial, unless the failure was substantially justified or is harmless," Motion *in Limine* Three at 10, Objectors neglect to cite the rest of Fed. R. Civ. P. 37(c)(1), which states that "[i]n addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard ... may impose other appropriate sanctions ...." Fed. R. Civ. P. 37(c)(1).  In fact, the Court of Appeals for the Second Circuit has explained that "the premise ... that the preclusion sanction under Rule 37 is nearly automatic, is not correct."  *Lorme v. Delta Air Lines, Inc.*, 251 Fed. Appx. 691, 692 (2d Cir. 2007).  Instead, "even absent a finding of either substantial justification or harmlessness, 'the court does have discretion to impose other, less drastic, sanctions.'"  *Id.* (internal quotations omitted).  The Second Circuit has further noted that "Some trial courts in this Circuit have read a bad-faith requirement into Rule 37(c)(1), stating that the 'drastic remedy' of excluding expert testimony is not appropriate unless 'the party's conduct represents flagrant bad faith and callous disregard of the federal rules.'" *Hein v. Cuprum*, 53 Fed. Appx. 134, 137 (2d Cir. 2002) (quoting *McNerney v. Archer Daniels Midland Co.*, 164 F.R.D. 584, 587 (W.D.N.Y. 1995)) (citing, *inter alia*, Ward v. Nat. Geographic Soc'y, 2002 U.S. Dist. LEXIS 310, No. 99 Civ. 12385, 2002 WL 27777, at *2 (S.D.N.Y. Jan. 11, 2002); *Grdinich v. Bradlees*, 187 F.R.D. 77, 80 (S.D.N.Y. 1999)).

30.    In determining whether to preclude the testimony of an expert, courts in this Circuit generally consider a number of factors, which may include: "1) the history of the failure to comply with court orders; 2) whether the party violating the order was given ample time to respond; 3) the effectiveness of alternative sanctions; 4) whether the noncomplying party was warned of and given an opportunity to argue against the impending sanction; 5) the prejudice to the adversary caused by the failure to comply; 6) whether the documents at issue would normally be readily obtainable; and 7) the extent of the party's personal responsibility." *USA Gateway,*

*Inc. v. Spring Travel*, No. 03 Civ. 4026 (JFK) (RLE), 2004 U.S. Dist. LEXIS 26139, at *9-10

(S.D.N.Y. Dec. 29, 2004) (citing *Monaghan v. SZS 33 Assocs., L.P.*, 148 F.R.D. 500, 508-09

(S.D.N.Y. 1993)); *see also Rmed Int'l v. Sloan's Supermarkets*, No. 94 Civ. 5587 (PKL) (RLE),

2002 U.S. Dist. LEXIS 23829, at *12 (S.D.N.Y. Dec. 11, 2002); *Woodworker's Supply, Inc. v.*

*Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999) ("[T]he significance of

alleged Fed. R. Civ. P. 26 errors is assessed by considering (1) the prejudice to the impacted

party, (2) the ability to cure the prejudice, (3) the potential for trial disruption, and (4) the erring

party's bad faith or willfulness.").

31.     In light of the FGIC Trustees complete production of all documents that they

reasonably believed to be in full compliance with Rule 26, their efforts to engage in the meet and

confer process mandated by this Court after the "work papers" issue was brought to the Court's

attention, and their production of even more documents after the Objectors willfully refused to

participate in a Court directed meet and confer process, it is clear that the sanctions requested by

the Objectors are completely unjustified, even if this Court ultimately were to conclude that the

FGIC Trustees had a too narrow view of what needed to be produced.

32.     The single document that Mr. Pfeiffer created and considered in connection with

the Pfeiffer Expert Report that the Objectors did not receive prior to Mr. Pfeiffer's July 24, 2013

– the Calculation Spreadsheet, an Excel spreadsheet containing Mr. Pfeiffer's calculation of the

potential $92 million benefit to the FGIC Insured Trusts under the Proposed Plan – was produced

to the Objectors on August 7, 2013.  As Mr. Pfeiffer explained in his deposition, anyone could

refer to the schedules attached to the Proposed Plan, do the arithmetic, and arrive at

approximately the same number.[49]  Like any analysis of recoveries under a proposed plan, the

recoveries of the FGIC Insured Trusts are determined by the amounts of their allowed claims

---

[49] Pfeiffer Dep. Tr. 132:10 –18.

against certain Debtors multiplied by the projected recovery percentage of claims of that class against each such Debtor.  This document, containing information that will be contained in updated schedules to the Proposed Plan, was produced over a week before the scheduled trial in this contested matter and the Objectors still have the opportunity, if needed, to question Mr. Pfeiffer regarding the estimates contained in this document at trial.

33.    Furthermore, it is critical to note that Mr. Pfeiffer was already extensively questioned regarding his opinion on the additional $92 million benefit during his July 24 deposition.  For example, during the deposition counsel for the Objectors was able to explore Mr. Pfeiffer's calculation of the $92 million amount,[50] the basis for his opinion that if the FGIC Settlement Agreement was not approved, the recovery of the FGIC Insured Trusts under any plan would likely be significantly reduced,[51] the assumptions underlying his opinion relating to the potential $92 million benefit,[52] and his understanding regarding the interrelationship between the FGIC Settlement Agreement and approval of the Proposed Plan.[53]  It is difficult for the FGIC Trustees to conceive of any further information the Objectors could possibly seek regarding Mr. Pfeiffer's opinion on the $92 million benefit or what prejudice the Objectors could have possibly suffered in this regard.

34.    The FGIC Trustees respectfully submit that it is clear from the record that the FGIC Trustees have, at every step, proceeded in good faith and have attempted to consensually resolve any and all discovery disputes arising from this contested matter.  Further, the FGIC Trustees maintain that the Objectors cannot make a showing of any prejudice arising from the production of certain documents after Mr. Pfeiffer's July 24 deposition.  The Objectors

---

[50] Pfeiffer Dep. Tr. 132:10 – 133:22.
[51] Pfeiffer Dep. Tr. 121:21 – 122:7.
[52] Pfeiffer Dep. Tr. 124:16 – 125:11; 126:25 – 127:11.
[53] Pfeiffer Dep. Tr. 128:23 – 129:25.

themselves appear to recognize as such in their motion as they fail to allege any prejudice, and even state that "a finding of prejudice is not necessary here."  Motion *in Limine* Three at 3.

35.    For all these reasons, the FGIC Trustees believe that there is simply no justification for employing the "drastic remedy" of precluding Mr. Pfeiffer's expert testimony under Fed. R. Civ. P. 37(c)(1).

36.    Accordingly, the FGIC Trustees pray that this Court will deny Motion *in Limine* Three.

[<em>remainder of page intentionally left blank.</em>]

Dated:  New York, New York
       August 13, 2013

**DECHERT LLP**
By: /s/ Glenn E. Siegel
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon
and The Bank of New York Mellon Trust
Company, N.A., as Trustee of Certain
Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
By: /s/ John C. Weitnauer
John C. Weitnauer (*pro hac vice*)
William Hao
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

*Counsel to Wells Fargo Bank, N.A., as
Trustee of Certain Mortgage Backed
Securities Trusts*

**SEWARD & KISSEL LLP**
By: /s/ Mark D. Kotwick
Mark D. Kotwick
Brian P. Maloney
Ryan Suser
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association,
as Trustee of Certain Mortgage-Backed
Securities Trusts*

19