**MOSS & KALISH, PLLC**
David B. Gelfarb
122 East 42nd Street, Suite 2100
New York, New York 10168
Telephone:  212-867-4488
Facsimile:  212-983-5276

*Co-Counsel for Federal Home Loan Mortgage Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**FEDERAL HOME LOAN MORTGAGE CORPORATION'S OBJECTION TO
DEBTORS' MOTION PURSUANT TO FED R. R BANKR. P.  9019 FOR APPROVAL OF
THE SETTLEMENT AGREEMENT AMONG THE DEBTORS, FGIC, THE FGIC
TRUSTEES AND CERTAIN INSTITUTIONAL INVESTORS**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................- 1 -

FACTS .........................................................................................................................- 4 -

    1.    Freddie Mac's FGIC-Insured Mortgage-Backed
        Securities................................................................................- 4 -

    2.    FGIC's New York Insurance Rehabilitation
        Proceeding..............................................................................- 6 -

    3.    The 9019 Motion.....................................................................- 9 -

    4.    The Effects of the Settlement Agreement on
        Investor Recovery ...............................................................- 11 -

OBJECTION...............................................................................................................- 17 -

    1.    This Court Should not Make Findings Regarding
        the Rights and Obligations of Parties in the
        Rehabilitation Proceeding ....................................................- 17 -

    2.    The FGIC Trustees Did Not Obtain the Required
        Consent to Enter into the Settlement ...................................- 23 -

    3.    There Is No Basis for the Proposed Findings that
        the Settlement Agreement Is in the FGIC
        Beneficiaries' Best Interests ...............................................- 26 -

    4.    There Is No Basis for of the Proposed Findings that
        the FGIC Trustees  Acted in Good Faith .............................- 30 -

JOINDER ...................................................................................................................- 32 -

RESERVATION OF RIGHTS ...................................................................................- 32 -

CONCLUSION...........................................................................................................- 32 -

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Advanced Cellular Systems, Inc. v. Mayol,*
    235 B.R. 713 (Bankr. D.P.R. 1999) ....................................................................18

*Am. Deposit Corp. v. Schacht,*
    84 F.3d 834 (7th Cir. 1996) ...............................................................................18

*Davister Corp. v. United Republic Life Ins. Co.,*
    152 F.3d 1277 (10th Cir 1998) ..........................................................................18

*In re Amwest Ins. Group, Inc.,*
    285 B.R. 447 (Bankr. C.D. Cal. 2002)....................................................17, 18, 20

*In re Dalen,*
    259 B.R. 586 (Bankr. W.D. Mich. 2001) ...........................................................22

*In re Levine,*
    287 B.R. 683 (Bankr. E.D. Mich. 2003) .............................................................22

*In re N.Y. Title & Mortgage Co.,*
    281 N.Y.S. 715 (N.Y. Sup. Ct. 1935) ................................................................25

*In re Rosenberg,*
    No. 09-46326, 2010 Bankr. LEXIS 371 (Bankr. E.D.N.Y. Feb. 5, 2010).............22

*In re Smith,*
    926 F.2d 1027 (11th Cir. 1991) .........................................................................22

*In re Tronox, Inc.,*
    429 B.R. 73 (Bankr. S.D.N.Y. 2010) ..................................................................29

*Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating
    LLC),*
    478 F.3d 452 (2d Cir 2007)................................................................................17

*Munich Am. Reinsurance Co. v. Crawford,*
    141 F.3d 585 (5th Cir 1998) ..............................................................................17

*Policemen's Annuity & Benefit Fund of Chicago v. Bank of Am., N.A.,*
    No. 12-civ-2865, 2013 U.S. Dist. LEXIS 64499 (S.D.N.Y. May 6, 2013) .............23

*United States Dept. of Treasury v. Fabe*,
   508 U.S. 491 (1993) ............................................................................................... 18, 19, 20

STATUTES

11 U.S.C. § 109(b)(2) ...................................................................................................... 18, 19

12 U.S.C. § 4617(b)(2)(A)(i) ................................................................................................ 4

15 U.S.C. 1011-1015 .......................................................................................................... 17

15 U.S.C. § 77aaa, *et seq.* ................................................................................................... 22

15 U.S.C. § 77ppp(b) .......................................................................................................... 24

15 U.S.C. § 1012(b) ............................................................................................................ 17

OTHER AUTHORITIES

Rule 30(b)(6) ....................................................................................................................... 30

Bankruptcy Rule 9019 ................................................................................................ 16, 17, 22

Article VI of the U.S. Constitution ..................................................................................... 18

Federal Home Loan Mortgage Corporation in conservatorship ("Freddie Mac"), by and through its undersigned counsel, hereby files this (i) objection (the "Objection") to the *Debtors' Motion Pursuant to Fed. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* [ECF No. 3929] (the "9019 Motion").[1] In support hereof, Freddie Mac respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Freddie Mac does not object to the settlement agreement at issue in the 9019 Motion (the "Settlement Agreement") *per se*. Rather, Freddie Mac objects to the Settlement Agreement because:

> (a) The Settlement Agreement provides for the termination/commutation of certain policies (the "Policies") issued by Financial Guaranty Insurance Corporation ("FGIC") that insure/guarantee the payment of principal and interest on residential mortgaged backed securities originated and/or serviced by the Debtors (the "FGIC Commutation"). The FGIC Commutation will significantly and negatively impact Freddie Mac's recoveries in the FGIC Rehabilitation Proceeding (defined below).[2]

---

[1] This Objection and accompanying exhibits have been filed publicly in redacted form pursuant to this Court's July 16, 2013, *Order Regarding the Exchange of Confidential Information* (the "Confidentiality Order") [ECF No. 4249]. Non-redacted copies of this Objection will be delivered to the Court and served upon the parties covered by the Confidentiality Order. Copies of deposition transcripts cited herein will be made available to the parties covered by the Confidentiality Order upon request.

[2] In connection with the Debtors' mortgage servicing and origination businesses, two of the Debtors—GMAC Mortgage, LLC, and Residential Funding, LLC—acted as sponsor, depositor, master servicer, primary servicer, and/or subservicer in various transactions involving the securitization of residential mortgages through securitization trusts and the issuance of residential mortgage-backed securities ("RMBS," and the holders of FGIC-insured/wrapped ResCap RMBS, collectively, the "Investors"). Freddie Mac is one of the Investors.

(b) The findings in the proposed order (the "Proposed Order") include a finding that the trustees (the "FGIC Trustees") of certain trusts (the "FGIC-Insured Trusts") insured by the Policies acted "reasonably, in good faith" and discharged their fiduciary duties to act "in the best interest of" the beneficiaries of the FGIC-issued policies (the "FGIC Beneficiaries," which includes Freddie Mac) when the FGIC Trustees agreed—without the requisite consent of the FGIC Beneficiaries—to the FGIC Commutation (the "Proposed Findings"). The Trustees did not act in good faith or in the best interest of Freddie Mac when they agreed to the FGIC Commutation.

(c) The Proposed Findings are unusual for an indenture trustee to request, particularly where (i) the findings are meant to circumvent the FGIC Trustees' obligations to obtain consent from the FGIC Beneficiaries, as Investors in FGIC-insured RMBS and (ii) where the Court is not being asked to address the commutation itself but rather the propriety of the Debtors entry into the settlement.

(d) The FGIC Trustees cannot meet their burden to have such findings made by this Court. Even after three weeks discovery in this matter, neither the Debtors nor the FGIC Trustees have presented any reliable financial or other analysis to the Court—or to the FGIC Beneficiaries—to establish any net economic benefit from the FGIC Commutation to Freddie Mac or other investors. The FGIC Trustees negotiated the FGIC Commutation in secret, agreed to the proposed terms without providing any notice of their intentions while at the same time they actively worked with Freddie Mac and other large

Investors to better the terms of the Rehabilitation Plan so that it would provide some of the very same benefits that the trustees now seek to take away. To this day, the FGIC Trustees have failed to publically disclose any helpful or detailed financial information that might allow the FGIC Beneficiaries to determine whether the FGIC Commutation makes economic sense. FGIC, in its most illustrative financial disclosures, projected making payments on claims against FGIC-issued policies generally at a present value of 27-30 cents on the dollar, not including potential litigation recoveries.[3] Yet based upon the limited FGIC Commutation would provide a recovery on claims under the Policies of only approximately 21.4 cents on the dollar, and even that amount assumes that the liabilities for the FGIC-Insured Trusts will not exceed $1.27 billion.[4]

(e)  Irrespective of any collateral connection to the Settlement Agreement, the proposed FGIC Commutation implicates the rights and the obligations of the FGIC Beneficiaries, the FGIC Trustees, and FGIC—not the Debtors—in

---

[3] *Affidavit of Michael W. Miller in Further Support of Approval of First Amended Plan of Rehabilitation* (the "Miller Affidavit") ¶ 28, Ex. 1 p. 6. The Miller Affidavit is attached hereto as Exhibit A.

[4] Freddie Mac's best estimate of the recoveries under the Settlement Agreement is set forth in Exhibit B, a document FGIC supplied (after initially refusing on the ground of privilege, leading to a discovery conference on the subject being scheduled with this Court) setting forth FGIC's current estimation of claims against it under the Policies of $789 million, and projected future claims of $400 million. FGIC's estimation of these claims (the "FGIC Claims Analysis") is attached as Exhibit B hereto. Alan Pfeiffer, the FGIC Trustee's expert, sees projected claims rising to a level of $481. Ron D'Vari, the Debtors expert, sees future claims in the billions. The approval of the Settlement Agreement would settle all outstanding claims of holders of FGIC-wrapped for $253.3 million, and recoveries would total approximately 21.4 cents on the dollar given the information available in Exhibit B and in paragraphs 5 and 21 of the *Affirmation of Gary T. Holtzer* (the "Holtzer Affirmation"). The Holtzer Affirmation is attached hereto as Exhibit C. By FGIC's/the Rehabilitator's own numbers, this amounts to a reduction in Investors' recovers from approximately $112.9 million to $151.0 million under the Settlement Agreement versus the Rehabilitation Plan as approved by the N.Y. State Court. *See, infra*, ¶¶ 47-49.

FGIC's pending rehabilitation proceeding in New York state court under New York insurance law (the "FGIC Rehabilitation Proceeding"). Such rights and obligations—and how they were (not) satisfied—impact solely the Policies issued by FGIC, and this Court should not enter the Proposed Findings.

2.      In sum, governing law and the evidentiary record compel the Court to not enter the Proposed Findings and to the extent requested by the parties to not approve the commutation.

## FACTS

### 1. Freddie Mac's FGIC-Insured Mortgage-Backed Securities

3.      Freddie Mac is a corporate instrumentality of the United States of America, chartered by Congress under the Federal Home Loan Mortgage Corporation Act, Title III of the Emergency Home Finance Act of 1970, 12 U.S.C. §§ 1451-59. Congress created Freddie Mac for the purpose of increasing the funds available to homebuyers through the creation of a secondary mortgage market for the purchase and sale of conventional residential mortgage loans. On September 6, 2008, the Director of the Federal Housing Finance Agency (the "FHFA" or the "Conservator") placed Freddie Mac into conservatorship pursuant to express authority granted under the Housing and Economic Recovery Act of 2008 to preserve and conserve Freddie Mac's assets and property. As Conservator, FHFA immediately succeeded to "all rights, titles, powers and privileges" of Freddie Mac. *See* 12 U.S.C. § 4617(b)(2)(A)(i).[5]

4.      Freddie Mac is the single largest FGIC-wrapped security holder. Freddie Mac is also one of the largest—if not the largest—Investor in FGIC-wrapped ResCap RMBS.

---

[5] This Objection does not constitute the submission to this Court's jurisdiction by the FHFA.

5.    Prior to the Debtors' bankruptcy filing, certain of the Debtors originated and/or serviced residential mortgage loans that they contributed or otherwise sold to forty-seven trusts. These trusts then issued RMBS consisting of certificates collateralized by such residential mortgage loans. FGIC, a monoline financial guaranty insurance company, wrote the Policies, which insured the payment of principal and interest with respect to the securities issued by the FGIC-Insured Trusts. By "wrapping" the securities the FGIC-Insured Trusts issued, FGIC essentially guaranteed the payment of principal and interest due on such securities.

6.    Freddie Mac currently holds over $3.055 billion in original face amount of various tranches of RMBS held in nine of the ResCap Trusts covered by the Policies, the payment of principal and interest due being guaranteed by FGIC. Freddie Mac's holdings in the FGIC-Insured Trusts are summarized in the chart below:

**Freddie Mac's Holdings of FGIC-Insured RMBS**

| CUSIP | Original Face Amount of Holdings | Current Face Amount of Holdings | Description of RMBS Instrument | FGIC Trustee |
|-------|--------------------------------|--------------------------------|-------------------------------|--------------|
| 7609854V0 | $175,000,000 | $8,412,245 | RAMP 2004-RZ2 AII | BONY/Mellon |
| 7609857G0 | $346,990,000 | $17,844,376 | RAMP 2004-RS7 A2A | BONY/Mellon |
| 76110WB88 | $337,500,000 | $16,900,180 | RASC 2004-KS7 A2A | BONY/Mellon |
| 76112BL99 | $494,922,000 | $97,343,261 | RAMP 2005-RS9 AII | BONY/Mellon |
| 361856BG1 | $123,222,000 | $3,221,145 | GMACM 2001-HE2 IIA7 | BONY/Mellon |
| 38012EAA3 | $646,768,000 | $135,182,334 | GMACM 2006-HE5 1A1 | BONY/Mellon |
| 74924XAE5 | $326,812,000 | $122,091,499 | RASC 2007-EMX1 A2 | U.S. Bank |
| 76112BR36 | $405,004,000 | $87,242,343 | RAMP 2005-NC1 AII | U.S. Bank |
| 76112BR85 | $199,376,000 | $ 34,284,787 | RAMP 2005-EFC7 A2 | U.S. Bank |
| **TOTALS** | **$3,055,594,000** | **$522,522,170** | | |

7.    On account of the underperformance of the trust collateral, Freddie Mac has not received the principal and interest payments that it should have received from the above-listed FGIC-Insured Trusts. In turn, the trusts presented claims to FGIC to cover the principal and interest shortfalls as required by the Policies. FGIC, however, has not made any payments under

- 5 -

any of the Policies since approximately November of 2009—when the New York State

Department of Insurance (now the New York Department of Financial Services) issued a "1310

Order" that prevented FGIC from making payments on any policy claims until FGIC's financial

condition improved.  As a result, Freddie Mac has long outstanding claims that remain unpaid

under the Policies, and Freddie Mac also expects to have significant and continuing policy

claims against FGIC for principal and interest shortfalls in both the near and long-term future.

### 2.  FGIC's New York Insurance Rehabilitation Proceeding

8.      Beginning in 2010, a steering committee of long- and short-dated policyholders

(the "Steering Committee") commenced negotiations with a then insolvent FGIC concerning a

plan of rehabilitation.  The proposed plan was unprecedented under New York insurance law in

that it was designed as a prepackaged plan that permitted FGIC to emerge from rehabilitation

without paying its policyholders in full.  Additionally, the plan provided that policyholders

would receive the same CPP, whether their claims were long- or short-dated.  Freddie Mac

participated in these negotiations and was actively in discussions with both the Steering

Committee and FGIC.  John Dubel, FGIC's Chief Executive Officer, participated in all of these

negotiations and was very much concerned that long- and short-dated policyholders' claims be

treated equally.  The negotiations culminated in January of 2011 in a term sheet specifying the

terms and conditions of FGIC's rehabilitation plan (the "Rehabilitation Plan Term Sheet").[6]

9.      Much like the approved rehabilitation plan that the New York state court

overseeing FGIC's rehabilitation proceeding eventually approved, the Rehabilitation Plan Term

Sheet provided that each FGIC policyholder would receive its *pro rata* share of available cash,

---

[6] A copy of the Rehabilitation Plan Term Sheet is attached hereto as Exhibit D.

which was referred to as a CPP payment, plus a litigation upside to the extent FGIC realized

recoveries on its direct claims against sponsors of the FGIC-Insured Trusts and others for, *inter*

*alia*, claims for breach of representations and warranties. As the negotiators, including FGIC,

intended, the Rehabilitation Plan Term Sheet was designed so that policyholders would be

treated equally whether they were long- or short-dated policyholders.    Following the

appointment of the Rehabilitator—and after a lengthy period for the Rehabilitator to retain

professionals—the discussions between the Rehabilitator/FGIC, Freddie Mac, and the Steering

Committee centered primarily upon (i) FGIC's attempt to control put-back rights and breach of

representation and warranty claims held by the FGIC-Insured Trusts and (ii) the design and

structure of certain deferred payment obligations ("DPOs").  As a result of these negotiations, the

Steering Committee was able to preserve the FGIC-Insured Trusts' rights as provided inn

Section 3.7 of the plan to assert put-back claims against, among others, certain third-party

sponsors and provide investors that held at least 25% of the outstanding FGIC-wrapped

securities issue the right to veto any settlement on FGIC's RMBS-related claims that sought to

bind the FGIC Trustees.

10.    On June 11, 2012, after years of FGIC's not making any policy claims payments

with respect to the FGIC-Insured Trusts, the Superintendent of Financial Services of the State of

New York filed a petition in New York Supreme Court, New York County (the "N.Y. State

Court"), seeking an order appointing the Superintendent as FGIC's Rehabilitator pursuant to

New York insurance law.  The N.Y. State Court granted the petition on June 28, 2012,

commencing FGIC's rehabilitation proceeding (the "Rehabilitation Proceeding").    The

Rehabilitator, among other things, thereafter submitted to this Court a proposed plan of

rehabilitation for FGIC on September 27, 2012, which was amended on December 12, 2012.

The plan was subsequently modified, culminating in a version this Court approved on June 11, 2013. Over the course of approximately 2.5 years, Freddie Mac was closely involved in lengthy negotiations surrounding the structure of the eventual Rehabilitation Plan. The Rehabilitation Plan provides that the holders of FGIC policy claims will receive payments of 17.25% of the total amount of their claims against FGIC (the "Cash Payment Percentage" or "CPP"), which will be adjusted over time.

11.    As Mr. Dubel has admitted, during his negotiations with the Steering Committee, he never discussed the possibility of commuting out the FGIC policies insuring the Investors.[7] Rather, the discussions concerning commutation focused solely on commuting the claims collateralized-debt security ("CDS") holders and reinsurance commutation/termination or novation, because the amount of these claims and the potential priority of such claims had the greatest impact on RMBS holder recoveries.[8] Even the disclosure statement the Rehabilitator filed in conjunction with the Rehabilitation Plan makes reference only the commutation of CDS contracts.[9] In fact as a result of the successful commutation of the CDS holders' and reinsurance claims the Rehabilitator/FGIC informed the Steering Committee and Freddie Mac that the initial

---

[7] Deposition of John Dubel (the "Dubel Deposition") at 59:23-60:7 (July 10, 2013) (Q "And did—do you recall whether the [steering] committee asked you what you meant by commuting their policies?" A. "As I previously stated, we didn't have discussions about, specific discussions about commuting the RMBS security policies . . .").

[8] See Deposition of Gina Healy (the "Healy Deposition") at 15:12-18, 117: 8-19.

[9] The CDS holders claims for treatment as a policyholder entitled to priority treatment is seriously in doubt under New York insurance law. Nonetheless, FGIC negotiated settlements with each all of the CDS holders. This stands in sharp contrast to the unilateral commutation of the Policies. All of the CDS and reinsurance commutations were consensual, which is clearly not the case here with respect to the FGIC Commutation.

CPP amount would be increased from approximately 13 to 14% to 15% and than in December 2012 to 17.25.[10]

12.    Discussions in earnest between the Rehabilitation/FGIC with the FGIC Trustees did not commence until after the Rehabilitation Plan was initially filed in September of 2012. Freddie Mac and other Steering Committee members sought to facilitate these discussions.  In order to participate in these discussions, FGIC Trustees requested that Freddie Mac provide them with information concerning Freddie Mac's holdings, which it did in mid-January of 2013. Freddie Mac also signed a confidentiality agreement with Bank of New York ("BONY")and the Rehabilitator.  Discussions with BONY centered, for the most part, on the preservation of the FGIC Trustees' setoff rights under the plan.  FGIC, in its initial version of the Rehabilitation Plan filed in September of 2012 sought to thwart such setoff rights. Ironically, these negotiations resulted in preserving the FGIC Trustees' setoff rights against FGIC's claims against the FGIC-Insured Trusts and had a positive impact on Investor recoveries.   Unfortunately, the FGIC Trustees' annulled any positive gains to the Investors through their clandestine agreement to the FGIC Commutation.  Even with Freddie Mac's confidentiality agreement, at no time did BONY, FGIC, or any of the other FGIC Trustees mention anything to Freddie Mac about the FGIC Commutation.

### 3.  The 9019 Motion

13.    The 9019 Motion seeks the approval of the Settlement Agreement among (i) the Debtors, (ii) FGIC, (iii) the FGIC Trustees, and a group of various institutional investors holding

---

[10] Mr. Dubel often updated the Steering Committee on his progress commuting out the CDS claimants.  (*See* Healy Deposition at 115: 23-25, 116: 2-8, 119:6-13, 120:7-18, 123:7-15.)   Even following the appointment of the Rehabilitator, Mr. Dubel continued to update the Steering Committee. *Id.* at 121:12- 23.

RMBS. Unlike the Rehabilitation Proceeding, where major stakeholders actively participated in the negotiations surrounding the ultimate form of the Rehabilitation Plan, the negotiations surrounding the Settlement Agreement contemplated in the 9019 Motion were conducted in secret, with only the Debtors, FGIC, the Rehabilitator, and the FGIC Trustees invited to participate. (*See* 9019 Motion at pp. 1, 10.) Freddie Mac—though a major stakeholder in these cases—was not apprised of the negotiations surrounding the Settlement Agreement and was unaware that these parties were negotiating a Settlement Agreement that would substantially affect Freddie Mac's rights under the Policies.[11]   Indeed, Freddie Mac's counsel did not receive any notice about the settlement until shortly before the 9019 Motion was filed.  Freddie Mac itself did not learn of the settlement until its outside counsel informed the company about it.

14.     The proposed Settlement Agreement contains the following key elements:

- The settlement, discharge, and release of FGIC's obligations under the Policies in exchange for a bulk, cash payment from FGIC to the FGIC Trustees in the amount of $253.3 million and effectively commuted the policies, preventing any further claims against FGIC under the Policies, and eliminating obligations of the FGIC Trustees to pay future premiums. (*See* Settlement Agreement §§ 2.01(a)(i), (b), 2.02.)

- The Proposed Findings.

- The allowance of FGIC's claims against the Debtors for reimbursement under the Policies and on account of certain pre-petition litigation against the Debtors in an amount ranging from a minimum of $596.6 million in the event the Debtors' proposed Chapter 11 plan (the "Proposed Plan") does not go effective or $934 million should the Proposed Plan go effective. (Settlement Agreement § 3.01.)

---

[11] In fact, Freddie Mac was in discussions with the very same FGIC Trustees, FGIC, and the Rehabilitator's counsel concerning the FGIC Rehabilitation Plan and was never informed that Freddie Mac's recoveries under the Rehabilitation Plan were being effectively commuted/terminated as part of a settlement with the Debtors. Moreover, despite an agreement by counsel for FGIC/the Rehabilitator to provide Freddie Mac with all papers filed in the Rehabilitation Proceeding, Freddie Mac did not receive notice of various consensual CDS and/or reinsurance commutations, as well as other pleadings filed in the Rehabilitation Proceeding (Unlike the federal courts, pleadings are not, as a rule, available electronically on the N.Y. State Court dockets.) (*See* Exhibit E hereto, which is an email from the Rehabilitator's/FGIC's counsel noting that such documents would be made available to Freddie Mac.)

- The release of the remainder of FGIC's claims against the Debtors' estates and the bulk of the claims asserted by the FGIC Trustees on behalf of the FGIC-Insured Trusts. (Settlement Agreement §§ 2.01-2.02, 3.01-3.03.)

15.    The Settlement Agreement's ultimate effectiveness largely depends on two conditions precedent: the approval of the Settlement Agreement by this Court and the approval of the Settlement by the N.Y. State Court in the Rehabilitation Proceeding.[12] (*See* Settlement Agreement § 3.01; 9019 Motion ¶ 27.)

### 4. The Effects of the Settlement Agreement on Investor Recovery

16.    The Debtors originally scheduled a hearing on the 9019 Motion for June 26, 2013, with an objection deadline of June 19, which was extended with respect to Freddie Mac by agreement with the Debtors.    Freddie Mac found certain key elements of the Settlement Agreement and the 9019 Motion highly problematic within a few days following receipt and analysis.    Specifically, Freddie Mac objected to the FGIC Commutation and the Proposed Findings the FGIC Trustees are demanding this Court make, which would effectively bless their actions in commuting the Policies and confirm that such actions were reasonable, made in good faith, and in the best interest of the Investors.

17.    There has been absolutely no public disclosure by ResCap, FGIC/the Rehabilitator, or the FGIC Trustee in either in the 9019 Motion, submissions to the N.Y. State Court or in the disclosure statement accompanying the Debtors' joint Chapter 11 plan filed on July 4, 2013 [ECF No. 4147] on the dollar or percentage reduction this "haircut" would have on

---

[12] Although paragraph 22 of the 9019 Motion states that "The first element of the Settlement Agreement is a settlement, discharge and release of FGIC's obligations under the Policies, as approved by the Rehabilitation Court," the N.Y. State Court has *not* approved the Settlement.    The hearing on the approval of the Settlement in the Rehabilitation Proceeding is scheduled for August 6, 2013.    Freddie Mac filed its objection to the approval of the Settlement Agreement, insofar as it would approve the FGIC Commutation, in the N.Y. State Court on July 16, 2013.

Investor recovery. In fact, Freddie Mac has only received limited information on this issue—and then only through discovery—on the reduction of its recoveries under the FGIC Commutation versus the Rehabilitation Plan. In an initial report to the FGIC Trustees, Duff & Phelps—the FGIC Trustees' financial advisor—reported a reduction in the FGIC wrapped Rescap security holders recovery from 27 to 30 cent recovery (with a litigation recovery upside) to 19 to 20 cents not including potential litigation upside against non-ResCap parties.



CONFIDENTIAL

18.    But Duff & Phelps's analysis does not take into account any increase of the amount of estimated future claims that would further erode Investor recoveries. In other words if a particular ResCap Trust's estimated future claims are higher than expected Investors would still be entitled to the 27 to 30% recovery under the Rehabilitation Plan—all else being equal—because the risk is spread across FGIC's portfolio and not to any particular trust or group of trusts. Information on relative recoveries is available to FGIC, but when asked to disclose this amount John Dubel refused relying on baseless privilege claims:

Q. Have you had occasion to value how much more the non-ResCap Trusts will receive as a result of the ResCap settlement?

*       *       *

A. I've looked at that, yes.

Q. And you've looked at it, and did you come up with a number?

MR. SLACK: Let me—let me object to only—only to the extent that whatever analysis he's thinking about was done in furtherance of either the—the settlement or—or the plan, then I would instruct you not to answer on the basis of work—work product privilege and attorney-client and the mediation privilege.

MR. SIDMAN: Same objection. Same instruction.

Q. Are you following your counsel's instruction?

A. I'm following my counsel's instruction.

Q. So you—you will not answer that question?

A. I'm following my counsel's instruction.

Q. And just to be clear—

MR. SIDMAN: I am instructing the witness not to answer your question.[13]

19.    The final draft of the Duff & Phelps Report, submitted to the FGIC Trustees on May 15, 2013, recognizes that FGIC imposed an arbitrary "haircut" of 40% (amounting to an approximately $90.3 million reduction in Investor recovery) from what was provided under the Rehabilitation Plan:[14]

---

[13] Dubel Deposition, 138:3-139:10.

[14] The right hand side of the chart was presented to Duff & Phelps by FGIC. The commentary on the left side was provided by Duff & Phelps. The calculation on the right margin was supplied by McKool Smith.



20.    Rather than analyzing (or providing any reasonable detail or basis for) the 40%

haircut that FGIC provided in its analysis,[15] Duff & Phelps, through slight of hand, invented a

"range of reasonableness" analysis.  Duff & Phelps claims its analysis supports the fact that the

$253.3 million Commutation payment is reasonable when compared to the analysis in the Miller

Affidavit because it falls within the low and high estimated future claims of the FGIC-Insured

Trusts against FGIC.  Yet Duff & Phelps ignores the plain fact that if losses are within the higher

end of their range for a particular FGIC-Insured Trust, under the Rehabilitation Plan Investors in

such trust can look to have their claims paid by FGIC at the 27 to 30% rate (the recovery range

amount determined by the Rehabilitator's financial advisor in the Miller Affidavit).  That is

because the risk is spread across FGIC's entire portfolio and not to any particular trust or group

of trusts.  Even Mr. Kothari, the Trustee's expert, was forced to acknowledge this.  But if the

---

[15] See Exhibit B hereto, which is FGIC's analysis provided to Duff & Phelps, which served as the basis for the Duff
& Phelps Report.  Kothari Deposition at 175:8-18.

- 14 -

FGIC-Insured Trusts are limited to the $253.3 million commutation payment, Investors in the affected trusts recovery percentage would decline as a result of increased losses. So, rather than reducing risk of recoveries, the proposed FGIC Commutation actually works to increase risk to Investors as long as claims remain undetermined and may possibly rise in the future. Duff & Phelps's loss-rate models looked solely at the assets of the FGIC-Insured Trusts and did not take into account the rest of FGIC's portfolio. Mr. Pfeiffer (one of the FGIC Trustee's experts and an employee of Duff & Phelps) made clear that Duff & Phelps was provided solely with non-confidential public information and that their access to information from FGIC was limited only to such publically available information.[16]

21.    On its own, Freddie Mac's claims are significantly larger than the Institutional Investors insured claims. Nevertheless, while the Institutional Investors participated in the mediation, the FGIC Trustees failed to alert Freddie Mac to the possibility that their claims as Investors would be commuted and that the FGIC Commutation was under discussion in the mediation proceedings.[17] Moreover, while parties have thrown up a wall of silence and dubious claims of privilege, there is no evidence that the FGIC Trustees even mentioned to the mediator the need to discuss the FGIC Commutation with Freddie Mac or the Steering Committee. In fact, there is no evidence that the FGIC Trustees sought to negotiate the FGIC Commutation. Rather, discovery to date demonstrates that the Indenture Trustee's accepted the

---

[16] Deposition of Alan Pfeiffer (the "Pfeiffer Deposition") at 240:22-25, 241:1-16.

[17] Deposition of Robert Major (the "Major Deposition") at 182:24-184:25, 186:2-12, . Deposition of Manta Scott (the "Scott Deposition") at 123:7-21. 123:22-124:13, 136:4-9.

Rehabilitators'/FGIC's baseless 40% "haircut" proposed on the ResCap security holders without any counter proposal or negotiation.[18]

22.    Instead, the FGIC Trustees blindly followed Duff & Phelps's "range of reasonableness" analysis without even broaching the subject of what the 40% haircut was based on or without any further negotiations.[19]  Apparently, Duff & Phelps felt the need to have their math checked and sought validation of their arithmetic from Mr. Kothari, another expert the FGIC Trustees retained in this matter.  Mr. Kothari was asked to offer an opinion on the following points:

   (i) the reasonableness of the discount rates used by Duff & Phelps in its analysis of the expected payouts to ResCap Policyholders under FGIC's rehabilitation plan;

   (ii) the reasonableness of the conclusion by Duff & Phelps that the lump sum cash payment under the May 23, 2013 settlement agreement is within the range of present values of the expected payouts to ResCap Policyholders under FGIC's rehabilitation plan;

   (iii) whether it was reasonable for Duff & Phelps not to include potential recoveries associated with pending litigation in its model estimating the expected payouts to ResCap Policyholders under FGIC's rehabilitation plan; and

   (iv) to the extent that the prices of certain FGIC-wrapped securities issued by ResCap and GMAC trusts declined around the time of the May 23, 2013 settlement agreement, whether these price declines, taken in isolation, could suggest that the settlement agreement is unfavorable to the holders of these securities.[20]

Surprisingly, Mr. Kothari was not asked to review the haircut or the calculation of the haircut as analyzed by FGIC.  Mr. Kothari has no particular experience in RMBS modeling and relied on

---

[18] Major Deposition at 190:14-191:11; Scott Deposition at 43:20-45:23, 88:2-11, 94:4-9; Pfeiffer Deposition at 225:5-25, 226:2-5.

[19] Major Deposition at 190:14-191:11; Scott Deposition at 43:20-45:23, 88:2-11, 94:4-9.

[20] Expert Opinion of S.P. Kothari, at 3.

the assumptions made by Duff& Phelps in running their analysis.[21]  But Mr. Kothari's analysis

suffers from the same flaws as Duff & Phelps and therefore should not be considered by this

Court.

23.    In summary, the FGIC Trustees' participated in clandestine negotiations regarding

the FGIC Commutation and agreed to a 40% haircut without negotiation and without informing

Freddie Mac during a time when Freddie Mac was in regular discussions with them on the Plan

of Rehabilitation.  The FGIC Trustees' failure to keep Freddie Mac informed resulted in a

modification to the Plan of Rehabilitation that has, far from being in Investors' best interests,

resulted in significant economic harm to Freddie Mac and other Investors.  Accordingly, Freddie

Mac believes that the FGIC Trustees are not entitled to findings that (i) "The [FGIC] Trustees

acted reasonably, in good faith, without negligence and in the best interests of the Investors in

each Trust and each Such Trust in agreeing to the Settlement Agreement" and (ii) "The

Settlement Agreement and the transactions contemplated thereby, including the releases given

therein, are in the best interests of . . . the Investors in each such Trust . . . " set forth in Proposed

Order ¶¶ C and D.[22]

## OBJECTION

### 1.  This Court Should not Make Findings Regarding the Rights and Obligations of Parties in the Rehabilitation Proceeding

24.    The Debtors are seeking findings from this Court that the Settlement Agreement

is in the best interest of the FGIC Beneficiaries (as Investors).  Such findings are wholly

---

[21] Deposition of S.P. Kothari (the "Kothari Deposition") at 48:6-49:3.

[22] The Proposed Order, which incorporates the defined in the Settlement Agreement (footnote 1), defines "Trust" as the FGIC-Insured Trusts and the "Investors" in such "Trusts" as the holders of securities in each Trust.  (Settlement Agreement, Preamble, § 1.08.)

inappropriate here: what is in the best interests of the FGIC Beneficiaries is a matter to be

determined by the N.Y. State Court, not this Court.  Moreover, there is nothing in the record to

support such findings, and all the evidence uncovered to date suggests exactly the opposite.

Indeed, Freddie Mac will show that the evidence compels a conclusion diametrically opposed to

the Proposed Findings: the Settlement Agreement is not in the best interests of the FGIC

Beneficiaries; and the FGIC Trustees did not act reasonably, in good faith, without negligence

and in the FGIC Beneficiaries' best interests.

25.    As an initial matter, the cornerstone of the Settlement Agreement is the N.Y.

State Court's approval of the FGIC Commutation, which would prevent any Investor from

making claims additional against FGIC.  The FGIC Commutation is a matter solely between

FGIC and the FGIC Beneficiaries.  As this Court has recognized, the N.Y. State Court will

evaluate the Settlement Agreement under an entirely different standard than this Court.[23]  This

Court will consider whether the Settlement Agreement is in the best interests of the Debtors and

their creditors; the N.Y. State Court, by contrast, will address whether the Settlement Agreement

and, in particular, the FGIC Commutation, is appropriate with respect to FGIC's policyholders

and is not otherwise in violation of New York Insurance Law and the Rehabilitation Plan.  While

the findings this Court will be called to make with respect to the Debtors and their creditors, the

N.Y. State Court will focus particularly on the rights of the FGIC Beneficiaries.  *Compare*

*Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*, 478

F.3d 452, 462 (2d Cir 2007) (considering, *inter alia*, the "paramount interests of the [debtor's]

creditors" when determining whether to approve settlement under Bankruptcy Rule 9019), *with*

---

[23] *See Order Concerning the Use of Discovery Obtained in Connection with the Rule 9019 FGIC Settlement Hearing* [ECF No. 4191] ("All parties acknowledge that there are different standards for approval of the FGIC Settlement by each court.").

*Frontier Ins. Co.*, 36 Misc.3d 529, 541-42 (N.Y. Sup. Ct. 2012) (recognizing as relevant considerations whether a rehabilitation plan will provide claimants less favorable treatment than liquidation, and whether all policyholders/creditors of similar priority are treated the same).

26.    Furthermore, federal statutes and case law recognize that state statutes (such as New York's) granting jurisdiction over insurers' rehabilitation or liquidation proceedings reverse-preempt the exercise of jurisdiction by federal authorities or courts, including bankruptcy courts, because it would impede or supersede the state processes regulating the business of insurance. The McCarran-Ferguson Act, *codified as* 15 U.S.C. 1011-1015, exempts the business of insurance from most federal regulation, providing that "no Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . ." 15 U.S.C. § 1012(b); *see also, e.g.*, *In re Amwest Ins. Group, Inc.*, 285 B.R. 447, 451 (Bankr. C.D. Cal. 2002); *Munich Am. Reinsurance Co. v. Crawford,* 141 F.3d 585, 595 (5th Cir 1998); *Davister Corp. v. United Republic Life Ins. Co.,* 152 F.3d 1277, 1281 (10th Cir 1998); *Advanced Cellular Systems, Inc. v. Mayol,* 235 B.R. 713, 724-25 (Bankr. D.P.R. 1999).

27.    Specifically, the McCarran-Ferguson Act provides states with preemptive authority over the regulation of "the business of insurance." The McCarran-Ferguson Act "'overturned the normal legal rules of preemption' by imposing a rule 'that state laws enacted for the purpose of regulating the business of insurance do not yield to conflicting federal statutes unless the federal statute specifically provides otherwise.'" *Am. Deposit Corp. v. Schacht*, 84 F.3d 834, 837-38 (7th Cir. 1996) (quoting *United States Dep't. of Treasury v. Fabe*, 508 U.S. 491, 507 (1993)). In other words, the McCarran-Ferguson Act reverses the normal supremacy of

federal law over state law, so long as the activity in question falls under the heading of "the business of insurance." *Advanced Cellular*, 235 B.R. at 718.[24]

28.    Bankruptcy proceedings and insurance company insolvency proceedings are indeed similar in that their goal is either to reorganize or liquidate the debtor. *See Advanced Cellular*, 235 B.R. at 717-18. The object of both is to group the assets of the debtor or the insolvent insurance company into one estate for distribution to creditors according to certain priorities. *Amwest Ins. Group*, 285 B.R. at 452. But, while the Bankruptcy Code governs bankruptcy cases, which expressly exempts insurance companies from its reach (Bankruptcy Code § 109(b)(2)), state law governs insurance insolvency cases. *See id.* And while the focus of the Bankruptcy Code is upon *debtors and their creditors*, the focus of state insurance law is upon the relationship between the *insurance company and its policyholders. Id.*

29.    Courts consider a federal statue (such as the Bankruptcy Code) to be reverse-preempted under the McCarran-Ferguson Act if (i) the federal statute in question does not specifically relate to the business of insurance, (ii) the state statute was enacted for the purpose of regulating the business of insurance, and (iii) the federal statute would invalidate, impair or supersede the state statute. *Fabe*, 508 U.S. at 501. Courts have consistently held that "it is clear that the Bankruptcy Code in general . . . does not relate to the business of insurance." *Id.* (citing *Barnett Bank of Marion County v. Nelson*, 517 U.S. 25 (1996)) (bankruptcy statutes do not "specifically relate" to insurance). Further, the New York insurance law governing the FGIC Rehabilitation Proceeding does not merely have an impact on the insurance industry; it is aimed at it. As the Supreme Court held in *Fabe*, the liquidation and rehabilitation of insurance

---

[24] In effect, the McCarran-Ferguson Act reverses the ordinary rules of preemption, which holds that federal law preempts state law by virtue of the supremacy clause in Article VI of the U.S. Constitution. *Fabe*, 508 U.S. at 500.

companies is "integrally related to the performance of insurance contracts after bankruptcy," and

is thus "regulation of the business of insurance." *Fabe*, 508 U.S. at 504. The first two prongs

are therefore easily satisfied.

30.    This Court should defer the Proposed Findings related to Freddie Mac's FGIC-

insured RMBS to the N.Y. State Court presiding over the Rehabilitation Proceeding. Such

claims arise under the Policies and are against FGIC—an insurer who cannot be a debtor under

Bankruptcy Code § 109(b)(2)—and therefore must be resolved in the Rehabilitation Proceeding,

by the N.Y. State Court. *Fabe* is instructive. In that case, the U.S. Supreme Court dealt with a

conflict between application of claim priority contained in a state insurance insolvency law

statute and the priorities embedded in the Bankruptcy Code. Specifically, the U.S. Supreme

Court questioned whether the state insurance claim priority statute was preempted by the priority

scheme embedded in the Bankruptcy Code. The U.S. Supreme Court held that the state

insurance insolvency law reverse-preempted the Bankruptcy Code insofar as it protected

policyholders. *Fabe*, 508 U.S. at 508. In *Fabe*, the U.S. Supreme Court underscored that the

principal focus of the phrase "business of insurance" should be between the insurance company

and its policyholders. *Id.* at 501. Here, if this Court were to decide that the Settlement

Agreement is in the best interests of the FGIC Beneficiaries (and whether the Trustees acted

reasonably and in good faith in making that determination), this Court's determination would

likely conflict with the N.Y. State Court's ruling on the very same issue. Accordingly, such

findings by this Court would impair the progress of the Rehabilitation Proceeding.

31.    That is precisely the conclusion the *Amwest Insurance Group* court reached. In

that case, a bankrupt insurance holding company and its subsidiary insolvent insurance company

were both parties to a tax allocation agreement. The insurance holding company later became a

debtor under Chapter 11, and the insurance company was placed into rehabilitation under state law. The question before the court in *Amwest Insurance Group* was whether it should interpret the tax allocation agreement at issue and determine the allocation of a tax refund between the insolvent insurance company and another insurance-company subsidiary of the debtor. (The tax refund belonged to the insolvent insurance company—but was property of the holding company's bankruptcy estate because it was remitted to the holding company as parent.) *Amwest Ins. Group*, 285 B.R. at 453.

32.    Citing *Fabe*, the *Amwest Insurance Group* court declined to interpret the tax allocation agreement and allocate the tax refund because such "determination may conflict with the Liquidation Court's ruling regarding the tax allocation between Amwest and Far West [another insurance company subsidiary of the debtor]." *Id.* at 455. Accordingly, this Court should defer the Proposed Findings and FGIC Commutation to the New York State Court. These are matters affecting FGIC and its policyholders and are properly decided by the N.Y. State Court. Any order on the 9019 Motion should, at minimum, not include the Proposed Findings.

33.    The Proposed Findings in connection with the FGIC Trustees' agreeing to the FGIC Commutation are unusual for an indenture trustee to request here: this Court is not being asked to approve the FGIC Commutation. Rather, this Court is called to determine whether entering into the Settlement Agreement is in the best interests of the Debtors and their estates. The merits of the FGIC Commutation is not a matter before this Court, and this Court should defer to the N.Y. State Court on the Proposed Findings. The reality here is that the Proposed Findings have all the indicia of cover and are meant to circumvent the FGIC Trustees' obligations to obtain consent from the FGIC Beneficiaries, as Investors in FGIC-insured RMBS, before endorsing the FGIC Commutation.

- 22 -

### 2.  The FGIC Trustees Did Not Obtain the Required Consent to Enter into the Settlement

34.     In any event, the 9019 Motion should be denied and the Settlement Agreement should not be approved insofar as it incorporates the FGIC Commutation because the FGIC Trustees had no authority under the Transaction Documents or Trust Indenture Act § 316(b) to enter into the Settlement Agreement without the consent of the FGIC Beneficiaries.[25]  The FGIC Trustees neither obtained nor solicited such consent.  This Court should not approve a settlement that was entered into unlawfully or is otherwise contrary to public policy.  *In re Rosenberg*, No. 09-46326, 2010 Bankr. LEXIS 371, at *11 (Bankr. E.D.N.Y. Feb. 5, 2010) ("[P]arties cannot enter into a settlement that violates law or public policy"); *In re Levine*, 287 B.R. 683, 691 (Bankr. E.D. Mich. 2003) (declining to approve 9019 settlement because "[a] party simply cannot, through an agreement approved by a court, secure authority to engage in an activity which is not otherwise permitted by law."); *In re Dalen*, 259 B.R. 586, 611-13 (Bankr. W.D. Mich. 2001) (bankruptcy court should not approve settlements under Bankruptcy Rule 9019 that are illegal or against public policy) (citing *Williams v. Vukovich*, 720 F.2d 909, 920-21 (6th Cir. 1983)).   It is well established that "[s]ettlements are void against public policy . . . if they directly contravene a state or federal statute or policy."  *In re Smith*, 926 F.2d 1027, 1029 (11th Cir. 1991).

### a)  The Settlement Violates the Transaction Documents

35.     Nine separate FGIC-Insured Trusts issued Freddie Mac's FGIC-insured RMBS and also hold the residential mortgages backing such securities.  The FGIC Trustees for each of the nine FGIC-Insured Trusts have executed either an Indenture (in the case of two of the FGIC

---

[25] The Trust Indenture Act of 1939 (the "Trust Indenture Act") is codified as 15 U.S.C. § 77aaa, *et seq.*

Trustees) or are party to a PSA (in the case of the remaining seven). Each of the Governing

Trustee Documents provides that the FGIC Trustees may not take certain actions without the

express consent of varying percentages of the applicable Investors.

36.    By way of example, the section 9.02 of the Indenture for the GMACM Home

Equity Loan Trust 2001-HE2 § 9.02 provides, in pertinent part:

> Supplemental Indentures With Consent of Noteholders. The Issuer and the
> Indenture Trustee, when authorized by an Issuer Request, may, with prior notice
> to the Rating Agencies and with **the consent of** the Enhancer and **the
> Noteholders of not less than a majority of the Note Balances of each Class of
> Notes affected thereby**, by Act (as defined in Section 10.03 hereof) of such
> Noteholders delivered to the Issuer and the Indenture Trustee, **enter into an
> indenture or indentures supplemental hereto for the purpose of adding any
> provisions to, or changing in any manner or eliminating any of the provisions
> of, this Indenture or of modifying in any manner the rights of the
> Noteholders under this Indenture** [emphasis added] . . . .

37.    The FGIC Beneficiaries were never consulted on the proposed commutation of

their claims against FGIC and no vote has been offered. Furthermore, the FGIC Trustees have

not provided any evidence that the Policies are trust estate property that they have the unilateral

right to commute without the consent of each of the FGIC Beneficiaries.

38.    The other seven PSAs contain substantially similar provisions, the FGIC Trustees

breached each of those agreements for the same reasons.[26] In short, the FGIC Trustees willfully

took actions expressly prohibited under the Transaction Documents, breaching those documents.

The Settlement Agreement should not be approved for that reason alone.

## b) The Settlement Agreement Contravenes the Trust Indenture Act

---

[26] *See* PSAs for RASC 2004-KS7A2A, RASC 2007-EMX1A2 §§ 2.06, 3.14(d), and 4.02; PSAs for RAMP 2004-RZ2AII, RAMP 2005-RS9AII, RAMP 2005-NC1AII, RAMP 2005-EFC7A2 §§ 2.06; RAMP 2004-RS7A2A §§ 11.01(b). The relevant portions of these Transaction Documents will be available upon request.

39.    The FGIC Trustees also entered the Settlement Agreement in violation of Federal law.  As mentioned above, the relationship between the FGIC Trustees and the Investors is governed by the Indentures or the PSAs.  As such, the Trust Indenture Act governs these documents, whether they are Indentures or PSAs.  *See Policemen's Annuity & Benefit Fund of Chicago v. Bank of Am., N.A.*, No. 12-civ-2865, 2013 U.S. Dist. LEXIS 64499, at *25-26 (S.D.N.Y. May 6, 2013) (PSAs subject to the Trust Indenture Act).  Trust Indenture Act § 316(b) provides, in pertinent part:

> Prohibition of impairment of holder's right to payment.  Notwithstanding any other provision of the indenture to be qualified, **the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security**, on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, **shall not be impaired or affected without the consent of such holder** . . . .

15 U.S.C. § 77ppp(b) (emphasis added).

40.    Here, the FGIC Commutation impairs—or at the very least affects—the rights of Investors to receive the payment of principal and interest thereon.  Further, it is clear from the Rehabilitator's submission to the N.Y. State Court requesting approval of the Settlement Agreement that "[a]lthough the [FGIC] Trustees are the exclusive holders of the Policies, the Settlement Agreement and the proposed Court Order provide that the resolution set forth in the Settlement Agreement (once effective) will be binding on all Investors holding Securities insured by the Policies."[27]  Hence, the Settlement also impairs the rights of the FGIC Beneficiaries from asserting their rights to claim against the Policies to recover the principal and interest owed to them as Investors.

---

[27] Holtzer Affirmation ¶ 5.

41.    Because of the Settlement Agreement's effects on the rights of the FGIC
Beneficiaries, as Investors holding FGIC-insured RMBS, the FGIC Trustees were required to
obtain their consent (including Freddie Mac's) it seeks to bind to the Settlement Agreement.  The
FGIC Trustees' blanket approval of the Settlement Agreement to bind all Investors violates the
Trust Indenture Act, and this Court should not approve a Settlement Agreement that contravenes
Federal law.  Any commutation of the Policies and fixing of claims against FGIC should not be
effective against those parties that have not consented to such treatment.

### 3. There Is No Basis for the Proposed Findings that the Settlement Agreement Is in the FGIC Beneficiaries' Best Interests

42.    Even if this Court were to consider opining on the Proposed Findings, which it
should not, the record is also devoid of any evidence that the terms of the Settlement Agreement
are in the best interests of the Investors.  Not only is it disturbing that the Settlement Agreement
was negotiated in secret beginning in April—only to be made public to Freddie Mac shortly
before the Debtors filed the 9019 Motion—none of the parties to the Settlement have provided
*any* justification for or meaningful information about the economics of the Settlement
Agreement; indeed, the discovery taken in this matter has indicated that there is no such
justification.  Indeed, shortly after the Debtors filed the 9019 Motion, counsel for Freddie Mac
contacted the Rehabilitator's counsel directly to inquire why the Settlement was in Freddie
Mac's best interests.  The Rehabilitator's counsel refused to provide any such justification or
analysis. Discovery since taken in this matter has indicated that there is no such economic or
other justification for the commutation.

43.    If this Court were inclined to issue findings of fact on whether the FGIC
Commutation is in the best interests of the FGIC Beneficiaries, it should use the same framework
the N.Y. State Court will use in evaluating that question: whether the FGIC Commutation is "fair

- 26 -

and equitable" to all FGIC policyholders. *Frontier Ins. Co.*, 36 Misc.3d at 541-42 (recognizing

as relevant considerations whether a rehabilitation plan will provide claimants less favorable

treatment than liquidation, and whether all creditors of similar priority are treated the same); *In*

*re N.Y. Title & Mortgage Co.*, 281 N.Y.S. 715, 729 (N.Y. Sup. Ct. 1935). Indeed, throughout the

disclosure statement accompanying the Rehabilitation Plan (the "Disclosure Statement"[28]), the

Rehabilitator acknowledges that the FGIC Commutation must be "fair and equitable" to all FGIC

policyholders:

44.    Indeed, the Rehabilitator has acknowledged that the Rehabilitation Plan (and any

modifications thereto) is (and must be) "fair and equitable" to "FGIC Policyholders." Consider

Pages 20-21 of the Disclosure Statement, which was meant to provide adequate information on

the terms of the Rehabilitation Plan:

> Provisions of the Plan relevant to the Policy Restructuring are in the Restructured
> Policy Terms. The Restructured Policy Terms include the mechanism for paying
> Permitted Policy Claims, as well as procedures for revaluating FGIC's financial
> condition to determine whether additional Cash payments may be made on
> account of Permitted Policy Claims. **Consistent with the goal of the Plan, the**
> **Rehabilitator developed the Restructured Policy Terms to maximize the**
> **extent to which FGIC's Policyholders are treated in a fair and equitable**
> **manner. The Restructured Policy Terms are designed to address challenges**
> **the Rehabilitator faced in achieving this goal.**

Page 21 of the Disclosure Statement continues:

> First, because FGIC likely will not have sufficient assets to pay in full in Cash all
> Policy Claims that have arisen but have not been paid or that are expected to arise
> over the Run-Off Period, which may last 40 years, the Restructured Policy Terms
> provide for payment of only a portion of each Permitted Policy Claim in Cash.
> **FGIC will satisfy the remainder of each Permitted Policy Claim through**
> **future payments on account of a DPO for the related Policy, to the extent**
> **payable under the Plan. FGIC will track DPOs on a Policy-by-Policy basis,**
> **and will reduce each DPO by the amount of any Cash payments or Deemed**

---

[28] The Disclosure Statement accompanying the Rehabilitation Plan is attached hereto as Exhibit F.

**Cash** Payments made with respect to Permitted Policy Claims under the related Policy, as discussed below. These contingent additional payments under DPOs will be payable only if, when and to the extent FGIC determines, in consultation with a third-party firm and with NYSDFS approval, that it has sufficient assets to pay in Cash an increased portion of each previously Permitted Policy Claim and each Policy Claim it expects to permit in a Stress Scenario during the Run-Off Period.

**This approach is designed so that all of FGIC's Policyholders receive the same percentage (or CPP) of Cash on account of their Permitted Policy Claims, whether arising in the next five years or in the next few decades.**

45.    Yet the FGIC Commutation is diametrically opposed to the treatment of FGIC ResCap Security Holders set forth in the section of the Disclosure Statement quoted above and proposes to pay investors far less than the present value of their distribution under the Rehabilitation Plan.

46.    The only available evidence indicates that the Settlement Agreement is patently *not* in the FGIC Beneficiaries' best interest. As indicated above, FGIC's most recent financial disclosures in the Rehabilitation Proceeding project that policyholders will receive present-value recoveries on FGIC policy claims in the amount of 27-30 cents on the dollar before any litigation recoveries. Nothing to the contrary was disclosed to the Court at the June 11, 2013 hearing to approve the Rehabilitation Plan. (Miller Affidavit, Ex. 1 at 6.) Under the FGIC Commutation— which contemplates a $253.3 million payment by FGIC to the FGIC-Insured Trusts to cover approximately $1.27 billion of unpaid present and anticipated future claims against FGIC—the FGIC Beneficiaries will only receive approximately 21 cents on the dollar. (*See* Holtzer Aff. ¶¶ 5, 9-10.) This amounts to an inferior recovery of over $90 million, as is evident by the "haircut" in the Duff & Phelps Report proposed by FGIC. Using the Rehabilitators' and FGIC's estimates of FGIC's total estimated claims exposure set forth in the Holtzer Affidavit and the Duff & Phelps report, this exposure is estimated at $1.270 billion: $786 million in current claims plus

- 28 -

$489 million in estimated future claims. Such claims would be satisfied by a one-time payment of $253.3 million, a 21.4% recovery, once waived Policy premiums are taken into account.[29]

47.     By contrast, FGIC-Wrapped Holders generally would realize the following recoveries under the Rehabilitation Plan, as set forth in the Miller Affidavit:

**FGIC-Wrapped Holders' Aggregate Recoveries under the Rehabilitation Plan**

| Present Value of FGIC-Wrapped Holders' Losses | Base Scenario: 27% Recovery | Base Scenario: 28% Recovery | Base Scenario: 30% Recovery | ResCap Settlement: 21.4% Recovery |
|---|---|---|---|---|
| **$1,270,000,000** | $342,900,000 | $355,600,000 | $381,000,000 | $253,000,000 |
| **Plus "Litigation Upside"** | $41,300,000 | $41,300,000 | $41,300,000 | |
| **Plus Waived Policy Premiums** | | | | $18,000,000 |
| TOTAL | **$384,200,000** | **$386,900,000** | **$422,300,000** | **$271,300,000** |

48.     Investors' recoveries under the Rehabilitation Plan, as FGIC's own analysis demonstrates, provide a far better recovery than the $253.3 lump sum payment plus $18.3 million waived Policy premiums under the Settlement Agreement. The best evidence available to date overwhelmingly suggests that Rehabilitation Plan is in best interests of Investors generally given the highly disparate recoveries under the Rehabilitation Plan versus the Settlement Agreement.

---

[29] Dividing $1.27 billion of total claims into the $253.3 commutation payment plus the $18.3 million in waived premiums would provide for a recovery of approximately 21.4 cents on the dollar, using the numbers assumed by the Rehabilitator and the Trustees' expert, which appears to have generally incorporated the Rehabilitator's numbers in its analysis. *See FGIC Claims Analysis*, Exhibit. B; Duff & Phelps Report (attached hereto as Exhibit G) at 3; Holtzer Affirmation ¶¶ 5, 21.

49.    Accordingly, even if this Court were to reach the issue of whether the Settlement is in the best interests of the Investors—which it should not—all of the evidence available establishes that the Settlement is clearly *not* in the FGIC Beneficiaries' best interests as Investors.

### 4.    There Is No Basis for of the Proposed Findings that the FGIC Trustees Acted in Good Faith

50.    No basis exists for a finding that the FGIC Trustees acted in good faith.  The question of good faith is primarily one of fact, *In re Tronox, Inc.*, 429 B.R. 73, 93 (Bankr. S.D.N.Y. 2010), and all the facts here point to a clear lack of good faith on the FGIC Trustees' part.  Indeed, as set forth above, their entry into the Settlement Agreement without the requisite approval of the FGIC Beneficiaries is both a breach of the Transaction Documents and a violation of the Trust Indenture Act.  Under such circumstances, even if this Court were inclined to assess the FGIC Trustee's good faith the FGIC Trustees' conduct here militates strongly against any finding that the FGIC Trustees acted good faith when they entered into the Settlement Agreement.  Likewise, the evidence will show that the FGIC Trustees cannot meet its burden to support the Debtor's requested findings that the FGIC Trustees acted "reasonably," in "good faith" and in the "best interests" of the FGIC Beneficiaries.

51.    The FGIC Trustees negotiated the FGIC Commutation in secret without even attempting to involve major stakeholders (such as Freddie Mac) in the process.  The fact that certain Institutional Investors holdings less than 8% of investor claims were permitted to have a place at the table is of no import:  there is no indication that any of those Institutional Investors held significant amounts of FGIC-wrapped securities, and in any case, their involvement still would not justify freezing out other large Investors such as Freddie Mac known to the Trustees at the time of the mediation.  The FGIC Trustees—which were (and are) obligated to act as

fiduciaries for the Investors—simply agreed to the proposed terms of the Settlement Agreement without providing any notice to or obtaining the requisite consent of the FGIC Beneficiaries. The clandestine deal-making and the breach of their obligations to the FGIC Beneficiaries discuss above—falls well short of "reasonable" and "good faith" conduct.

52.    Had the FGIC Trustees evaluated the Disclosure Statement accompanying the Rehabilitation Plan, they would have understood that nowhere was a commutation of the Policies even discussed.    The only reference in the Disclosure Statement accompanying the Rehabilitation regarding the commutation of any FGIC-issued policies pertained to the consensual commutations of CDS policies and novations of reinsurance policies:

> The initial CPP will depend on several factors, including (i) actual or anticipated changes in the assumptions underlying the Run-Off Projections (including those relating to developments in actual or anticipated losses under FGIC's Policies or other financial circumstances or events), (ii) whether the Novation Agreement is approved by the Court, (iii) whether the two CDS Commutation Agreements executed thus far are approved by the Court, (iv) whether additional CDS Commutation Agreements are executed and approved by the Court (and the terms thereof), (v) whether the Reinsurance Commutation Agreement executed with AORe is approved by the Court and, if approved, whether FGIC receives the payment contemplated thereby, (vi) whether additional Reinsurance Commutation Agreements are executed and approved by the Court (and the terms thereof), (vii) whether FGIC receives the payments contemplated by any additional Reinsurance Commutation Agreements and (viii) other events and circumstances that may be beyond the Rehabilitator's control.[30]

Nowhere in is the Commutation of the Policies at issue here referenced or even adumbrated.

53.    Furthermore, the FGIC Trustees' alarming passivity and complete lack of interest in evaluating whether agreeing to the FGIC Commutation was in the best interests of the Investors when they executed the Settlement Agreement.  Through depositions of Rule 30(b)(6) witnesses of both of the FGIC Trustees, it became clear that the FGIC Trustees did absolutely no

---

[30] Disclosure Statement at 23.

analysis and instead blindly relied on the Duff & Phelps report without understanding or even questioning it.[31]    Moreover, the FGIC Trustees apparently did not counter the FGIC Commutation (*i.e.*, the 40% haircut) when it was proposed to them.  They apparently engaged in no negotiations at all concerning the commutation.  The FGIC Trustees merely accepted FGIC's first offer and completely froze Investors out of the process.  Such behavior is the antithesis of what is (and should be) expected of an indenture trustee, and this Court should not give its imprimatur to such conduct by awarding the FGIC Trustees a finding that "The [FGIC] Trustees acted reasonably, in good faith and in the best interests of the Investors in each Trust and each Such Trust in agreeing to the Settlement Agreement."

## JOINDER

54.    Freddie Mac hereby joins all other objections to the 9019 Motion to the extent such objections are not inconsistent herewith.

## RESERVATION OF RIGHTS

55.    Freddie Mac expressly reserves all of its rights to supplement this Objection and to object to the 9019 Motion on any other grounds.

## CONCLUSION

56.    For the reasons set forth above, Freddie Mac respectfully requests that the Court sustain the Objection, deny the Debtors' 9019 Motion, and decline to approve the Settlement Agreement insofar as it would give effect to the FGIC Commutation.  Freddie Mac also respectfully requests that the Court refrain from making findings that the FGIC Trustees acted in

---

[31] Major Deposition at 25:10-26:12, 49:13-24, 71:7-72:19, 77:21-78:4, 89:10-17, 100:21-101:8, 191:3-11; Scott Deposition at 43:11-19, 47:20-33, 81:4-7, 81:23-82:7, 85:4-15, 87:13-15, 94:4-9, 101:11-17, 106:2-9, 114:10-17, 115:9-12, 120:10-20, 126:18-127:9; Pfeiffer Deposition at 225:5-25, 226:2-25.

good faith and that the best interests of the FGIC Beneficiaries (as holders of the FGIC-insured

RMBS) have been served in any order on the 9019 Motion.

Dated:  July 29, 2013

Respectfully submitted,

**MOSS & KALISH, PLLC**

/s/ David B. Gelfarb
David B. Gelfarb
122 East 42nd Street, Suite 2100
New York, New York 10168
Telephone:  212-867-4488
Facsimile:  212-983-5276

*Co-Counsel for Federal Home Loan Mortgage Corporation*