# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In the Matter of the Rehabilitation of

FINANCIAL GUARANTY INSURANCE
COMPANY.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Index No. 401265/2012

Doris Ling-Cohen, J.

Motion Sequence No. 4

**AFFIDAVIT OF MICHAEL W. MILLER IN FURTHER SUPPORT OF APPROVAL OF FIRST AMENDED PLAN OF REHABILITATION**

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

Michael W. Miller, being duly sworn, deposes and says:

1.    I am a Director in the Financial Institutions Group of Lazard Frères & Co. LLC ("**Lazard**"), which maintains offices at 30 Rockefeller Plaza, New York, NY 10020. Lazard is an industry leader, among other areas, in providing financial advice to debtors, creditors, equity constituencies and government agencies in restructuring and reorganization cases and in providing financial advisory services to financial institutions, including insurance companies, worldwide.

2.    I hold a Bachelor's degree from Brigham Young University.  I am a Chartered Property and Casualty Underwriter (CPCU).  I am registered as an Investment Banking Representative (Series 79) and as a General Securities Representative (Series 7).

3.    I have been employed by Lazard since 2006. Prior to joining Lazard I worked in the insurance industry and also at a boutique investment bank that specialized in insurance advisory services.  Since 2004, I have provided financial advisory services to a variety

of financial institution clients located throughout the world on a number of matters. These matters have included execution of buy-side and sell-side transactions, capital structure and financing advisory, valuations, including fairness opinions, development of operating models, negotiation tactics and matters related to insurance rehabilitations, among other matters. I have also worked on numerous client engagements including the following selected transactions: PMI's divestiture of various assets, Legion (in Liquidation) sale of various assets, MUFJ's conversion of its preferred stock in Morgan Stanley, Santander's acquisition of Sovereign Bancorp, Tower Insurance's acquisition of Castlepoint, GMAC Insurance's acquisition of MEEMIC, TGA's sale to Hallmark, USI's sale to GS Capital Partners, among others.

4.    Lazard is the U.S. operating subsidiary of a preeminent international financial advisory and asset management firm. Lazard, together with its predecessors and affiliates, has been advising clients around the world for over 150 years. The current managing directors, directors, vice presidents, associates and analysts at Lazard have extensive experience working with financial services firms worldwide, including troubled companies in complex financial restructurings out-of-court and in chapter 11 proceedings. We have also served as an advisor to various governments and agencies. Since 1990, Lazard's professionals have been involved in over 500 restructurings, representing over $1 trillion in debtor assets.

5.    Lazard's Global Financial Institutions practice has advised on some of the most complex and industry defining transactions involving financial companies. Our leading global insurance practice has expertise in property & casualty, monoline, specialty and life insurance sectors. Lazard's senior bankers have advised on more than $100 billion of insurance transactions in recent years.

6.     This affidavit is submitted in further support of the Omnibus Reply Memorandum of Law in Further Support of Approval of First Amended Plan of Rehabilitation for FGIC dated December 12, 2012 (the "**Plan**").[1]  I am generally familiar with the terms and provisions of the Plan, the Disclosure Statement and the documents comprising the Plan Supplement.  Except as otherwise indicated, all statements set forth in this declaration are based on my personal knowledge, my review of relevant documents, the Lazard team's work on this project, or my opinion based upon experience, knowledge and information concerning FGIC's operations.  If called upon to testify, I can and will testify competently to the facts and opinions set forth herein.

7.     On September 22, 2011, Lazard was engaged as a financial advisor to assist in providing services for the New York Liquidation Bureau (the "**NYLB**") in connection with a potential rehabilitation of FGIC.  Since then, under the supervision of Ari Lefkovits, a Managing Director in the Restructuring Group, I have been an active member of the team of Lazard professionals who assisted in performing the financial advisory services for which Lazard was retained.

8.     As part of this engagement, Lazard assisted Weil, Gotshal & Manges and the NYLB in analyzing the financial aspects of the FGIC plan and developing a plan that met the NYLB's objectives, including providing for reasonable conservatism.

9.     Specifically, among other tasks, Lazard reviewed and commented on the Run-Off Projections and the Run-Off Assumptions prepared by FGIC.  In addition, Lazard

---

[1] Where I use terms not otherwise defined herein, I intend those terms to have the same meanings as in the Plan.

assisted the NYLB in preparation of the Liquidation Analysis which is discussed in more detail below.  In order to consider a liquidation as an alternative to the Plan, a Liquidation Analysis was prepared by the Rehabilitator, assisted by Lazard and other advisors to the Rehabilitator. Comparing indicative recoveries under the Plan to those under the Liquidation Analysis, and taking into account the discount rate analysis below, the Plan provides superior and more immediate recoveries to the policyholders than a liquidation.

10.    Lazard also reviewed and considered input from the independent research firm Municipal Market Advisors ("**MMA**"), which advised Weil and the NYLB on the expected losses under a Base and Stress Case scenario for FGIC's retained U.S. Public Finance book and the book reinsured by National Public Finance.  Lazard also relied on tax analysis provided by FGIC's advisors and the NYLB's advisors.

11.    The Run-Off Projections project FGIC's cash flows from January 1, 2012 through December 31, 2052 (the time at which the last of FGIC's insured risks matures on the basis of the Run-Off Assumptions) (the "**Run-Off Period**").  Among other things, the Run-Off Projections were an important component in estimating the amount of the initial CPP and the ultimate recoveries under the Plan.  Exhibit C to the Disclosure Statement contains a summary of the Run-Off Projections, Run-Off Assumptions and calculation of initial CPP.

12.    Lazard also reviewed run-off projections previously prepared by FGIC in consultation with its advisors, including Blackstone Advisory Partners L.P. ("**Blackstone**"), and stress case assumptions for FGIC's insured portfolio developed by NewOak Capital Advisors LLC ("**NewOak**"), an independent financial advisor retained by counsel to FGIC.

13.    Lazard did not independently verify the projections, assumptions or analyses prepared by FGIC or its advisors, the NYLB or its advisors, Blackstone or MMA in

4

connection with its services, including in connection with the assistance in preparation of the Run-Off Projections and Run-Off Assumptions. Lazard assumed that projections, assumptions and analyses prepared or provided by MMA, FGIC, the NYLB and other parties, as applicable, were reasonably prepared in good faith and on a basis reflecting the best currently available estimates and judgments as to the future operating and financial performance of FGIC during the Run-Off Period.

14.     Lazard also performed the following tasks:

➢ Reviewed certain recent historical financial information of FGIC;

➢ Reviewed certain internal, projected financial and operating data related to FGIC's business and its prospects, including FGIC's income statement, balance sheet and cash flows as of December 31, 2011;

➢ Met with and discussed FGIC's operations and future prospects with FGIC's management team and its advisors, including FGIC's advisors and other constituents;

➢ Considered certain economic and industry information relevant to FGIC's business;

➢ Reviewed the terms of the Plan, including the Restructured Policy Terms, the Disclosure Statement, the documents filed as part of the Plan Supplement and other filings made in the proceedings; and

➢ Performed such other analyses and investigations and considered such other information as Lazard deemed appropriate under the circumstances, including the development of two illustrative loss scenarios for the non-US Public Finance policies.

## Run-Off Analysis

15.    The Run-Off Assumptions include a level of conservative assumptions reflecting the level of uncertainty as to the expected timing and magnitude of Policy Claims (as detailed in the Plan) that could arise during the Run-Off Period. This uncertainty stems in part from the volatility of the types of risks insured by FGIC, and other plan variations that could arise over such an extended time horizon.

16.    The Run-Off Assumptions include factors relevant to the Run-Off Projections, including:

> ➢ Giving effect to the transactions and other actions contemplated by the Plan, including two CDS Commutation Agreements[2] executed and the Reinsurance Commutation Agreement with the RAM Reinsurance Company Limited ("**AORe**");

> ➢ The expected timing and magnitude of losses under Policies;

> ➢ Returns on FGIC's investment portfolio, collection and recovery of premiums, reinsurance, salvage, reimbursements and other amounts due to FGIC, availability and utilization of NOLs and operating expenses.

17.    As further described in Exhibit C to the Disclosure Statement, the Run-Off Projections were run for both a Stress Scenario and a Base Scenario. The Base Scenario Run-Off Projections included in Exhibit C portray FGIC's expected performance during the Run-Off Period, including expected aggregate payments on Policy Claims. The Stress Scenario Run-Off Projections, included in Exhibit C as well, portray a more conservative loss scenario envisioning a severe economic recession that is characterized by (i) sharp declines in home prices and the

---

[2] As explained in ¶ 21, since the filing of the Disclosure Statement, four additional commutations have been executed.

financial markets, (ii) significant unemployment, (iii) high mortgage default rates and (iv) other

negative economic indicators of potential relevance to FGIC's insured exposures.

18.     Based on the Run-Off Projections and the Stress Scenario utilized by the

Rehabilitator in formulating the Plan, FGIC should be able to pay the initial CPP on forecasted

Permitted Policy Claims, while maintaining a reasonable cash buffer intended to protect against

potential adverse deviations from the Stress Scenario assumptions.

19.     The Plan provides that while the initial CPP and subsequent revisions to

the CPP will be based on a forward looking Stress Scenario, the Run-Off Assumptions will be

adjusted over time (pursuant to the CPP Revaluation process) to reflect FGIC's actual

experience.  Should FGIC's experience prove more favorable than the Stress Scenario utilized by

the Rehabilitator in formulating the Plan, the CPP could increase over time and additional

amounts (including those related to DPO accretion) would be paid out to holders of Permitted

Policy Claims.

### Updated Projections

20.     In December 2012, FGIC provided an update to the Run-Off Projections

and Run-Off Assumptions (collectively the "**Updated Projections**"), to reflect certain

information that became available to FGIC since filing the Disclosure Statement, reflecting a

revised set of premium projections and certain commutation transactions, including

commutations approved by the Court.

21.     Up to the date of the filing of the Disclosure Statement, two CDS

Commutation Agreements had been executed.  Since the filing of the disclosure statement, four

additional CDS Commutation Agreements have been executed.  The Updated Run-Off

Projections assume these additional CDS Commutation Agreements are approved by the Court

and paid post-Effective Date.  The Updated Run-Off Projections also assume consummation of

7

the reinsurance commutation agreements executed with Radian Asset Assurance Inc. (**"Radian"**)

and Mitsui Sumitomo Insurance Company (**"Sumitomo"**) and the termination agreement

executed with AAArdvark II Funding Limited (**"AAArdvark"**) and other parties, all three of

which this Court approved after the Rehabilitator filed the Disclosure Statement. The amount of

premiums FGIC expects to collect was also updated, based on an updated forecast provided by

FGIC.

   22. Based on the Updated Run-Off Projections, the initial CPP is expected to

be 17.25%. The Updated Run-Off Projections assume that, under the Stress Scenario, the CPP is

held constant at 17.25% until a final distribution of all available assets to holders of policy

claims permitted under the Plan. Assuming an illustrative discount rate of 10%-20% the present

value to such policyholders of recoveries under the Stress Scenario is 17%-18%.

   23. Based on the Updated Run-Off Projections and the Base Scenario, in

which losses are lower than those projected under the Stress Scenario, the CPP is estimated to

increase every year until 2043, and that by 2022, the CPP is estimated to be 26.3%.

   24. Based on the Updated Run-Off Projections and Base Scenario loss

forecasts, average Permitted Policy Claim recoveries are estimated to be 27%-30% of Permitted

Policy Claims under the Plan using a 10%-20% illustrative discount rate.

   25. A copy of the Updated Run-Off Projections, including the key

assumptions made in connection therewith, is attached hereto as **Exhibit 1**.

<u>**Liquidation Analysis**</u>

   26. In order to consider a liquidation as an alternative to the Plan, a

Liquidation Analysis was prepared by the Rehabilitator, assisted by Lazard and other advisors to

the Rehabilitator. Comparing indicative recoveries under the Plan to those under the Liquidation

Analysis, and taking into account the discount rate analysis below, the Plan provides superior

and more immediate recoveries to the policyholders than a liquidation.

27.    Consistent with the Updated Run-Off Projections, the Liquidation

Analysis was updated.  The Updated Liquidation Analysis assumes consummation of all six CDS

Commutation Agreements, the reinsurance commutation agreements with Radian and Sumitomo,

and the termination agreement with AAArdvark.  The amount of premiums that FGIC would

receive in a liquidation has also been updated, to reflect the new projections and to assume that

policyholders are able to set off premium payments against policy claim payments owed by

FGIC pursuant to the Plan.

**TABLE A - RECOVERIES TO POLICYHOLDERS AT ILLUSTRATIVE DISCOUNT RATES**

| Loss Forecast | Base Case | | Stress Case | |
|---|---|---|---|---|
| Discount Rate | 20% | 10% | 20% | 10% |
| Updated Projections (Plan) | 27% | 30% | 17% | 18% |
| Updated Liquidation Analysis | 7% | 14% | 4% | 8% |
| *Recovery Benefit from Plan* | *20%* | *16%* | *13%* | *10%* |

28.    The Updated Liquidation Analysis indicates that under the Base Case,

policyholders would receive present value recoveries of approximately 7%-14% of Permitted

Policy Claims in a liquidation, compared to approximately 27%-30% of Permitted Policy Claims

under the Plan at a 10%-20% illustrative discount rate.

29.    The Updated Liquidation Analysis further indicates that under the Stress

Case, policyholders would receive present value recoveries of approximately 4%-8% of

Permitted Policy Claims in a liquidation, compared to approximately 17%-18% of Permitted

Policy Claims under the Plan at a 10%-20% illustrative discount rate.

30.    As further explained in the Liquidation Analysis attached to the Disclosure

Statement as Exhibit D, ¶ C.1., the timing and amount of interim cash distributions in a

hypothetical liquidation of FGIC reflect the NYLB's guidance and assumptions with respect to a hypothetical liquidation. As such, in a liquidation of FGIC, the first distribution of payments to policyholders occurs in 2027, fifteen years after FGIC is placed into liquidation. Subsequent distributions would occur every five years thereafter, with the final distribution occurring at the end of 2052. Maximum payments for each distribution are based on FGIC's estimated distributable resources (assets at the time of distribution less projected future claims) at the time of the payments.

31.    A copy of the Updated Liquidation Analysis, including the key assumptions made in connection therewith, is attached hereto as Exhibit 2.

### Required Payments of Premiums to FGIC

32.    Over the Run-Off Period, FGIC expects to collect $353 million in policy premiums, net of envisaged commutations. If policyholders are permitted to setoff premiums against policy claims not giving effect to the modification pursuant to the Plan, this would reduce FGIC's claims-paying resources by approximately $174 million.

33.    The estimated impact of the reduction in claims paying resources by allowing policyholders to setoff premiums owed to FGIC would lower the initial CPP from 17.25% to 16.25%. In addition, the present value of recoveries to policyholders as a whole would be reduced in this case to 26%-28% under the Base Scenario (as opposed to 27%-30%) and 16%-17% (as opposed to 17%-18%) under the Stress Scenario.

### Discount Rate Analysis

34.    For purposes of comparing policyholder recoveries under the Plan relative to those under a liquidation, Lazard analyzed the present value of projected claims payment cash flows under each scenario. The present value is calculated by estimating the cash flows to policyholders in each year and discounting them at a discount rate.

35.    A discount rate is used to adjust the riskiness and timing of cash flows. That is, a cash flow that is higher risk would have a greater discount rate than one at lower risk. A cash flow that is farther in the future would have a higher discount factor (but not necessarily a greater discount rate) because of the compounding effect of applying the same discount rate over a longer period of time, reflecting the time value of money.

36.    Based on the Updated Run-Off Projections, cash claims payments to policyholders under the Plan have a weighted average duration of approximately 18 years, whereas under the Updated Liquidation Analysis, cash claims payments to policyholders have a weighted average duration of approximately 36 years. The duration under the Updated Liquidation Analysis is greater primarily due to the NYLB's assumptions described previously with respect to cash distributions to claimants.

37.    If a discount rate of 3.6% or higher is used in the Base Case (3.5% or higher under the Stress Case), then the comparison shows that the Plan provides superior recoveries to policyholders relative to a liquidation, given the longer weighted average duration of claims payments under the liquidation. This means that regardless of whether the analysis uses an 8.5% discount rate, as suggested by one objector, or the illustrative 10-20% rate used in the present value analysis in the Disclosure Statement, the relevant conclusion is unchanged: the Plan provides superior recoveries to the policyholders relative to a liquidation.

38.    I believe that applying a discount rate of 3.6% or less would not be appropriate for the claims payments to FGIC policyholders. Under current market conditions, a discount rate of 3.6% may be appropriate for long-term debt of a strong, investment-grade company, but not for a set of cash flows that are higher risk, such as the FGIC policyholder claims. For example, a 3.6% discount rate is lower than the average current yield of an A-rated

11

30-year bond index, which is 4.1%, which is near historical lows.  Moreover, 3.6% is lower than the three-year average yield for the same A-rated index, which is 5.2%.

**National Public Novation**

39.    As long as the existing reinsurance agreement with National Public is in place, FGIC remains subject to its legal responsibilities as a primary insurance company with respect to the policies reinsured by National Public Finance.  Should National Public Finance be unable to meet its claims paying obligations on these policies, FGIC would have an obligation to make claims payments to these policyholders.  The potential exposure under the National Public Finance's Reinsured Policies is relatively large (approximately $138 billion in aggregate par outstanding as of December 31, 2011).  Pursuant to the Novation Agreement, FGIC is relieved of any liability under these policies and therefore, any potential claims arising from such policies would be excluded from Stress Case used to calculate the CPP and policyholder recoveries.  The Updated Run-Off Projections, and the resulting estimate for the initial CPP, assume this outcome.  Assuming that the Court were to deny approval of the Novation Agreement, such potential liabilities would need to be taken into account, and as such, it is estimated that the initial CPP would be reduced to approximately 15.75% (from 17.25%).

By: _____

Michael W. Miller

Sworn to before me this
12 day of December, 2012

Notary Public

LORI A. DOWE
Notary Public, State of New York
No. 4868323
Qualified in New York County
Commission Expires Aug. 18, 2014

13

Exhibit 1

(Updated Run-Off Projections)

### UPDATED RUN-OFF PROJECTIONS[1]

In developing the Plan and determining whether the Plan is fair and equitable to all of FGIC's Policyholders, the Rehabilitator analyzed FGIC's ability to satisfy its financial obligations while maintaining the minimum policyholders' surplus for a financial guaranty insurance company under Section 6902(b)(1) of the NYIL. The Rehabilitator updated the Run-Off Projections in December 2012 for projecting losses under FGIC-insured Policies under a Base Scenario and a Stress Scenario from January 1, 2012 through the scheduled maturity of FGIC's last Policy in 2052. The Updated Run-Off Projections are based on FGIC's income statement, balance sheet and cash flows as of December 31, 2011. The Updated Run-Off Projections and the key assumptions on which they are based are set forth below.

The Updated Run-Off Projections assume that the Plan will be implemented on its stated terms. The Updated Run-Off Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in housing and financial markets, interest rates and employment rates. Accordingly, the estimates and assumptions underlying the Updated Run-Off Projections are inherently uncertain and subject to significant business, economic and other uncertainties. Therefore, the Updated Run-Off Projections are not necessarily indicative of current values or future performance of FGIC, which may be significantly less or more favorable than set forth herein.

THE REHABILITATOR PREPARED THE UPDATED RUN-OFF PROJECTIONS WITH THE ASSISTANCE OF PROFESSIONAL ADVISORS. THE REHABILITATOR DID NOT PREPARE THE UPDATED RUN-OFF PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION.

MOREOVER, THE UPDATED RUN-OFF PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE REHABILITATOR OR FGIC, INCLUDING RISKS RELATING TO PLAN IMPLEMENTATION, CREDITORS' RECOVERIES UNDER THE PLAN AND CERTAIN OTHER RISK FACTORS, AS DETAILED IN SECTION IX OF THE DISCLOSURE STATEMENT. POLICYHOLDERS AND OTHER PARTIES IN INTEREST ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTIES OF FUTURE PERFORMANCE OR RECOVERIES. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING

---

[1] Capitalized terms not defined herein have the meanings ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

STATEMENTS, AND THE REHABILITATOR AND FGIC UNDERTAKE NO
OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE UPDATED RUN-OFF PROJECTIONS, WHILE PRESENTED WITH
NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF
ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY
THE REHABILITATOR, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT
TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL,
MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF
WHICH ARE BEYOND THE CONTROL OF THE REHABILITATOR OR FGIC. THE
REHABILITATOR CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE OR ARE
MADE AS TO THE ACCURACY OF THE UPDATED RUN-OFF PROJECTIONS OR TO
FGIC'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS
INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES
OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE REHABILITATOR
PREPARED THESE UPDATED RUN-OFF PROJECTIONS MAY BE DIFFERENT FROM
THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND
THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN
A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE
REHABILITATOR AND FGIC, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE
NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE UPDATED RUN-OFF
PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING
AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO
REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE
UPDATED RUN-OFF PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE
OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN
CONSIDERING THE PROJECTED RECOVERIES UNDER THE PLAN, POLICYHOLDERS
MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF
SUCH ASSUMPTIONS AND THE RELIABILITY OF THE UPDATED RUN-OFF
PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

The Updated Run-Off Projections should be read in conjunction with the key
assumptions set forth below, as well as the other assumptions, qualifications, explanations and
risk factors set forth in the Disclosure Statement and the Plan (including the Plan Supplement), in
their entirety, and the historical financial statements (including the notes and schedules thereto)
and other financial information posted at www.fgic.com/investorrelations/financialreports/.

*Key Assumptions*

A.   **General**

1.   *Plan Effective Date:* The Updated Run-Off Projections assume the Effective Date will be
     December 31, 2012.

2.   *Business Operations:* The Updated Run-Off Projections assume that FGIC will not write
     any new insurance policies throughout the Run-Off Period.

2

3.    All dollar amounts are in millions, unless otherwise specified.

**B.    Additional Transactions**

1.    *Novation of National Public Reinsured Policies:* The Updated Run-Off Projections assume consummation of the novation to National Public of the National Public Reinsured Policies.

2.    *Reinsurance Commutations:* The Updated Run-Off Projections assume consummation of the Reinsurance Commutation Agreement with AORe, Radian and Sumitomo.

3.    *CDS and Policies Commutations:* The Updated Run-Off Projections assume that commutations of certain Policies and CDS Policies submitted to Court occur.

**C.    Losses and Claims Payments**

1.    *Losses:* The Updated Run-Off Projections are based on two scenarios for projected losses under FGIC's Policies: the Base Scenario and the Stress Scenario, each as described in the Plan, the Disclosure Statement and herein.

2.    *CPP:* Under the Stress Scenario, the Updated Run-Off Projections assume that the CPP is held constant at 17.25% until final distribution of all available assets to holders of Permitted Policy Claims. Based on the mechanism described in the Plan, the CPP is expected to increase in the Base Scenario as losses are realized at levels below those projected in the Stress Scenario. Accordingly, the Updated Run-Off Projections assume that in the Base Scenario, CPP is increased every year until 2043. By 2022, the CPP is expected to be 26.3% in the Base Scenario. If the CDS Commutations pending approval were not approved, the initial CPP would have to be lowered to 15.5%. By 2022, under a Base Case, the CPP would be expected to be approximately 22%.

**D.    Revenues and Expenses**

1.    *Investment Income:* The Updated Run-Off Projections assume that gross investment income post-Effective Date is 2.30% in 2012 and will be 3.25% thereafter. Management fees are assumed to be 9.75 basis points of invested assets per year.

2.    *Premiums:* The Updated Run-Off Projections assume premiums on existing installment Policies are collected as scheduled and that unearned premiums will not be returned. However, a 10% reduction in expected premium collection is assumed in the Updated Run-Off Projections to take into consideration potential shortfalls. The Updated Run-Off Projections assumes that premiums will not be set-off against claims.

3.    *Reinsurance:* The Base Scenario assumes that reinsurance on Policy Claims that is not commuted will be collected from U.S.-domiciled investment grade Reinsurers in full and from non-U.S.-domiciled Reinsurers up to the amount of collateral posted if losses on

3

reinsured policies are realized. The Stress Scenario assumes that reinsurance on Policy Claims that is not commuted will not be collected due to the implied amount of losses Reinsurers would likely experience under the Stress Scenario and the possibility that the reinsurers would have inadequate claims paying resources. In both scenarios, it is assumed that FGIC continues paying installment premiums to Reinsurers.

4.  *Commutation Payments*: The Updated Run-Off Projections assume that the CDS Commutation Agreements and the Policies Commutation Agreements that have been executed by December 6th, 2012 and the Reinsurance Commutation Agreement are approved by the Court and are (for the purposes of the Updated Run-Off Projections only, since the commutation agreements may require earlier payment) paid post-Effective Date.

5.  *Taxes:* The Updated Run-Off Projections assume that FGIC will not generate taxable income post-Effective Date. Income is expected to be generated on the Effective Date, but existing NOL balances are expected to be sufficient to fully offset income recognized on both a regular and AMT tax basis.

6.  *Contribution Amount*: The $11 million payment to FGIC Corp pursuant to the Plan Sponsor Agreement (the "**Contribution Amount**"), which is described in Section IV.B.9 of the Disclosure Statement, is assumed to be made in the Updated Run-Off Projections on the Effective Date.

7.  *Operating Expenses:* The Updated Run-Off Projections assume approximately $592 million of operating expenses through 2052 (this represents net present value of $177 million as of December 2012 at a 15% discount rate), excluding rehabilitation proceeding –related professional fees and other costs.

8.  *Rehabilitation Proceeding-Related Professional Fees and Other Costs:* The Updated Run-Off Projections assume approximately $22 million in non-contingent costs, and $18 million in costs contingent on the occurrence of certain milestones, in each case related to the preparation for and administration of the Rehabilitation Proceeding, including attorneys' fees, financial advisor fees and restructuring incentive bonuses for certain key FGIC employees, all of which were or are assumed to be incurred or paid in 2012.

9.  *Reserves and Valuation Allowances*: For statutory accounting purposes, FGIC will continue to account for the Policies, as restructured, as insurance policies. Upon the Effective Date, FGIC will reduce its statutory reserves to reflect the ultimate amount of cash payments expected to be made with respect to its Policies less an amount to be determined that will permit FGIC to maintain a certain minimum positive statutory surplus. In the event that FGIC determines that the ultimate amount of cash payments that are expected to be made with respect to its Policies has increased, FGIC will increase its statutory reserve in accordance with statutory accounting principles.

10. *Other:* The Updated Run-Off Projections do not include proceeds from any recoveries from Material Litigation, which are described in Section IV.B.7 of the Disclosure

4

Statement, due to the uncertainty regarding such recoveries today.  The Projections also do not include any value associated with FGIC's equity interest in FGIC UK.

**E.    Recoveries**

1.    *Calculation of Recoveries:* Recoveries for Policyholders are based on cash flows expected to be received as a result of CPP payments and distributions on account of DPO Accretion.  All cash flows are discounted to the time Policy Claims are expected to be Permitted.  The present value of these cash flows is then shown as a percentage of Permitted Policy Claims to calculate recoveries.  The recoveries shown below are average recoveries for all Permitted Policy Claims, including Permitted Policy Claims that already accrued and are unpaid and all Policy Claims that are expected to be received and Permitted through the maturity of the last policy in 2052.  Expected recoveries are shown in both the Base Scenario and the Stress Scenario.

## *Updated Base Scenario Illustrative Projected Financial*

### KEY FINANCIAL METRICS: BASE CASE

| | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Balance Sheet** | | | | | | | | | | |
| Invested Assets Ending Balance | $1,571 | $1,285 | $1,149 | $1,114 | $1,058 | $619 | $256 | $246 | – | NA |
| | | | | | | | | | | |
| **Claim Payments (Cash)** | | | | | | | | | | |
| Initial CPP Payments 1 | ($368) | ($325) | ($146) | ($63) | ($47) | ($315) | ($217) | ($2) | ($0) | ($1,485) |
| Payments on Account of CPP's Upward Adj. & DPO Accretion | -- | (191) | (151) | (134) | (148) | (221) | (281) | -- | (227) | (1,355) |
| **Other** | | | | | | | | | | |
| Notional Claims | (2,153) | (1,655) | (585) | (229) | (160) | (948) | (600) | (6) | (0) | (6,316) |
| Ending CPP | 17.5% | 23.0% | 26.3% | 28.6% | 30.7% | 33.6% | 36.5% | 36.5% | 38.6% | |

### SUMMARY INCOME STATEMENT: BASE CASE

| | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Premiums Earned | $50 | $151 | $98 | $65 | $58 | $33 | $16 | $5 | $0 | $475 |
| Net Investment Income | 39 | 224 | 191 | 178 | 174 | 151 | 89 | 40 | 34 | 1,119 |
| Total Revenue | $89 | $375 | $289 | $243 | $232 | $184 | $105 | $44 | $34 | $1,594 |
| | | | | | | | | | | |
| Losses & Loss Adjustment Expense | $3,182 | ($240) | ($195) | ($183) | ($167) | ($115) | ($57) | $6 | $19 | $2,241 |
| Operating Expenses | (68) | (128) | (94) | (59) | (65) | (69) | (48) | (50) | (53) | (632) |
| Total Expenses | $3,114 | ($375) | ($789) | ($243) | ($232) | ($184) | ($105) | ($44) | ($34) | $1,609 |
| | | | | | | | | | | |
| Net Income Before Taxes | $3,203 | -- | -- | -- | -- | -- | -- | -- | -- | $3,203 |
| | | | | | | | | | | |
| Taxes | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| | | | | | | | | | | |
| Net Income | $3,203 | -- | -- | -- | -- | -- | -- | -- | -- | $3,203 |

### SUMMARY BALANCE SHEET: BASE CASE

| | 2011 | 2012 | 2017 | 2022 | 2027 | 2032 | 2037 | 2042 | 2047 | 2052 |
|---|---|---|---|---|---|---|---|---|---|---|
| Invested Assets | $2,033 | $1,571 | $1,285 | $1,149 | $1,114 | $1,058 | $619 | $256 | $246 | -- |
| Other Assets | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | -- |
| Total Assets | $2,049 | $1,588 | $1,302 | $1,166 | $1,131 | $1,075 | $636 | $273 | $263 | -- |
| | | | | | | | | | | |
| Unearned Premium Reserve | $171 | $158 | $118 | $82 | $60 | $33 | $14 | $3 | $0 | -- |
| Loss Reserves (expected CPP and DPO distributions) | 5,422 | 1,343 | 1,103 | 1,007 | 997 | 972 | 555 | 205 | 198 | -- |
| Other Liabilities | 24 | 22 | 16 | 11 | 8 | 5 | 2 | 0 | 0 | -- |
| Statutory Surplus | (3,567) | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | -- |
| Liabilities and Equity | $2,049 | $1,588 | $1,302 | $1,166 | $1,131 | $1,075 | $636 | $273 | $263 | -- |

### SUMMARY CASH FLOWS: BASE CASE

| | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash from Net Installment Premiums | $38 | $109 | $62 | $42 | $30 | $14 | $5 | $2 | $0 | $302 |
| Cash from Investment Income | 39 | 224 | 191 | 178 | 174 | 151 | 89 | 40 | 34 | 1,119 |
| Operating Expenses | (68) | (128) | (94) | (59) | (65) | (69) | (48) | (50) | (53) | (632) |
| Initial CPP Payments 1 | (368) | (325) | (146) | (63) | (47) | (315) | (217) | (2) | (0) | (1,464) |
| Payments on Account of CPP's Upward Adj. & DPO Accretion | -- | (191) | (151) | (134) | (148) | (221) | (281) | -- | (227) | (1,355) |
| Commutation Payments | (58) | -- | -- | -- | -- | -- | -- | -- | -- | (58) |
| Reinsurance Payments Received | 34 | 24 | 3 | 1 | 0 | 2 | 90 | 0 | -- | 153 |
| Contribution Amount | (11) | -- | -- | -- | -- | -- | -- | -- | -- | (11) |
| Loss Adjustment Expense | (68) | -- | -- | -- | -- | -- | -- | -- | -- | (68) |
| Operating Cash Flow | ($461) | ($286) | ($136) | ($35) | ($56) | ($439) | ($363) | ($10) | ($246) | ($2,033) |
| | | | | | | | | | | |
| Change in Invested Assets | $461 | $286 | $136 | $35 | $56 | $439 | $363 | $10 | $246 | $2,033 |

### ILLUSTRATIVE AVERAGE POLICYHOLDER RECOVERIES: BASE CASE

| | |
|---|---|
| Nominal Recovery | 45% |
| 10% Discount Rate | 30% |
| 15% Discount Rate | 28% |
| 20% Discount Rate | 27% |

[1]"Initial CPP Payments" are CPP payments on Policy Claims first Permitted in the stated time period.

## Updated Stress Scenario Illustrative Projected Financials

### KEY FINANCIAL METRICS: STRESS CASE

| | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Balance Sheet** | | | | | | | | | | |
| Invested Assets Ending Balance | $1,491 | $992 | $891 | $898 | $898 | $685 | $555 | $595 | -- | NA |
| | | | | | | | | | | |
| **Claim Payments (Cash)** | | | | | | | | | | |
| Initial CPP Payments 1 | ($414) | ($668) | ($215) | ($116) | ($110) | ($293) | ($195) | ($2) | ($0) | ($2,013) |
| Payments on Account of CPP's Upward Adj. & DPO Accretion | -- | -- | -- | -- | -- | -- | -- | -- | (629) | (629) |
| **Other** | | | | | | | | | | |
| Notional Claims | (2,399) | (3,874) | (1,247) | (675) | (637) | (1,696) | (1,130) | (12) | (0) | (11,671) |
| Ending CPP | 17.5% | 17.5% | 17.5% | 17.5% | 17.5% | 17.5% | 17.5% | 17.5% | 20.4% | |

### SUMMARY INCOME STATEMENT: STRESS CASE

| | 2012 | '13 -'17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Premiums Earned | $50 | $151 | $98 | $65 | $58 | $33 | $16 | $5 | $0 | $475 |
| Net Investment Income | 38 | 187 | 147 | 141 | 144 | 135 | 108 | 91 | 87 | 1,076 |
| Total Revenue | $88 | $338 | $245 | $205 | $202 | $168 | $124 | $95 | $87 | $1,551 |
| | | | | | | | | | | |
| Losses & Loss Adjustment Expense | $3,183 | ($231) | ($151) | ($146) | ($137) | ($99) | ($76) | ($45) | ($34) | $2,284 |
| Operating Expenses | (68) | (128) | (94) | (59) | (65) | (69) | (48) | (50) | (53) | (632) |
| Total Expenses | $3,115 | ($338) | ($245) | ($205) | ($202) | ($168) | ($124) | ($95) | ($87) | $1,652 |
| | | | | | | | | | | |
| Net Income Before Taxes | $3,203 | -- | -- | -- | -- | -- | -- | -- | -- | $3,203 |
| | | | | | | | | | | |
| Taxes | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| | | | | | | | | | | |
| Net Income | $3,203 | -- | -- | -- | -- | -- | -- | -- | -- | $3,203 |

### SUMMARY BALANCE SHEET: STRESS CASE

| | 2011 | 2012 | 2017 | 2022 | 2027 | 2032 | 2037 | 2042 | 2047 | 2052 |
|---|---|---|---|---|---|---|---|---|---|---|
| Invested Assets | $2,033 | $1,491 | $992 | $891 | $898 | $898 | $685 | $555 | $595 | -- |
| Other Assets | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | -- |
| Total Assets | $2,049 | $1,508 | $1,009 | $908 | $915 | $914 | $702 | $572 | $612 | -- |
| | | | | | | | | | | |
| Unearned Premium Reserve | $171 | $158 | $118 | $82 | $60 | $35 | $14 | $3 | $0 | -- |
| Loss Reserves (expected CPP and DPO distributions) | 5,422 | 1,262 | 810 | 749 | 781 | 812 | 621 | 505 | 547 | -- |
| Other Liabilities | 24 | 22 | 16 | 11 | 8 | 5 | 2 | 0 | 0 | -- |
| Statutory Surplus | (3,567) | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | -- |
| Liabilities and Equity | $2,049 | $1,508 | $1,009 | $908 | $915 | $914 | $702 | $572 | $612 | -- |

### SUMMARY CASH FLOWS: STRESS CASE

| | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash from Net Installment Premiums | $38 | $109 | $62 | $42 | $30 | $14 | $5 | $2 | $0 | $302 |
| Cash from Investment Income | 38 | 187 | 147 | 141 | 144 | 135 | 108 | 91 | 87 | 1,076 |
| Operating Expenses | (68) | (128) | (94) | (59) | (65) | (69) | (48) | (50) | (53) | (632) |
| Initial CPP Payments 1 | (414) | (668) | (215) | (116) | (110) | (295) | (195) | (2) | (0) | (2,013) |
| Payments on Account of CPP's Upward Adj. & DPO Accretion | -- | -- | -- | -- | -- | -- | -- | -- | (629) | (629) |
| Commutation Payments | (58) | -- | -- | -- | -- | -- | -- | -- | -- | (58) |
| Reinsurance Payments Received | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Contribution Amount | (11) | -- | -- | -- | -- | -- | -- | -- | -- | (11) |
| Loss Adjustment Expense | (68) | -- | -- | -- | -- | -- | -- | -- | -- | (68) |
| Operating Cash Flow | ($542) | ($499) | ($101) | $7 | ($1) | ($212) | ($130) | ($40) | ($595) | ($2,033) |
| | | | | | | | | | | |
| Change in Invested Assets | $542 | $499 | $101 | ($7) | $1 | $212 | $130 | ($40) | $595 | $2,033 |

### ILLUSTRATIVE AVERAGE POLICYHOLDER RECOVERIES: STRESS CASE

| | |
|---|---|
| Nominal Recovery | 25% |
| 10% Discount Rate | 18% |
| 15% Discount Rate | 17% |
| 20% Discount Rate | 17% |

1"Initial CPP Payments" are CPP payments on Policy Claims first Permitted in the stated time period.

**Exhibit 2**

(Updated Liquidation Analysis)

## UPDATED LIQUIDATION ANALYSIS[4]

Consistent with the Rehabilitator's goal for the Rehabilitation Proceeding, the Rehabilitator has determined that Policyholders should receive substantially greater recoveries under the Plan than they would receive in a liquidation of FGIC. To make this determination, the Rehabilitator prepared this Updated Liquidation Analysis, which shows the estimated recoveries Policyholders would receive in a hypothetical liquidation of FGIC in an Article 74 liquidation proceeding.

The Updated Liquidation Analysis is based on FGIC's income statement, balance sheet and cash flows as of December 31, 2011. The Updated Liquidation Analysis reflects the estimated Cash proceeds, net of liquidation-related costs, available to FGIC's Policyholders if FGIC were liquidated in an Article 74 liquidation proceeding. The Updated Liquidation Analysis contains estimates and assumptions that, although developed in consultation with FGIC and the Rehabilitator's advisors and considered reasonable by the Rehabilitator, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Rehabilitator or FGIC. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RECOVERIES REFLECTED IN THE UPDATED LIQUIDATION ANALYSIS WOULD BE REALIZED IF FGIC WERE, IN FACT, THE SUBJECT OF AN ARTICLE 74 LIQUIDATION PROCEEDING, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

The Updated Liquidation Analysis is a hypothetical exercise that has been prepared for the sole purpose of generating a good faith estimate of the recoveries that would be realized by FGIC's Policyholders if FGIC were to be liquidated in accordance with Article 74 of the NYIL. THE UPDATED LIQUIDATION ANALYSIS IS NOT INTENDED TO, AND SHOULD NOT, BE USED FOR ANY OTHER PURPOSE.

THE REHABILITATOR PREPARED THE UPDATED LIQUIDATION ANALYSIS WITH THE ASSISTANCE OF PROFESSIONAL ADVISORS. THE REHABILITATOR DID NOT PREPARE THE UPDATED LIQUIDATION ANALYSIS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION.

MOREOVER, THE UPDATED LIQUIDATION ANALYSIS CONTAINS CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE REHABILITATOR OR FGIC, INCLUDING RISKS RELATING TO PLAN IMPLEMENTATION, CREDITORS' RECOVERIES UNDER THE PLAN AND CERTAIN OTHER RISK FACTORS, AS DETAILED IN SECTION IX OF THE DISCLOSURE

---

[4] Capitalized terms not defined herein have the meanings ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

STATEMENT.  POLICYHOLDERS AND OTHER PARTIES IN INTEREST ARE
CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE
DATE MADE AND ARE NOT GUARANTIES OF FUTURE PERFORMANCE OR
RECOVERIES.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY
FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING
STATEMENTS, AND THE REHABILITATOR AND FGIC UNDERTAKE NO
OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

          THE UPDATED LIQUIDATION ANALYSIS, WHILE PRESENTED WITH
NUMERICAL SPECIFICITY, IS NECESSARILY BASED ON A VARIETY OF ESTIMATES
AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE
REHABILITATOR, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO
SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET
AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE
BEYOND THE CONTROL OF THE REHABILITATOR OR FGIC.  THE REHABILITATOR
CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE
ACCURACY OF THE UPDATED LIQUIDATION ANALYSIS.  SOME ASSUMPTIONS
INEVITABLY WILL BE INCORRECT.  MOREOVER, EVENTS AND CIRCUMSTANCES
OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE REHABILITATOR
PREPARED THE UPDATED LIQUIDATION ANALYSIS MAY BE DIFFERENT FROM
THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND
THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN
A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE
REHABILITATOR AND FGIC, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE
NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE UPDATED LIQUIDATION
ANALYSIS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING
AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO
REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.  THEREFORE, THE
UPDATED LIQUIDATION ANALYSIS MAY NOT BE RELIED UPON AS A GUARANTEE
OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WOULD OCCUR IN A
HYPOTHETICAL LIQUIDATION.  IN CONSIDERING THE PROJECTED RECOVERIES
UNDER THE PLAN AND IN A HYPOTHETICAL LIQUIDATION, POLICYHOLDERS
MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF
SUCH ASSUMPTIONS AND THE RELIABILITY OF THE UPDATED LIQUIDATION
ANALYSIS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

          The Updated Liquidation Analysis should be read in conjunction with the key
assumptions set forth below, as well as the other assumptions, qualifications and explanations set
forth in the Disclosure Statement and the Plan (including the Plan Supplement), in their entirety,
and the historical financial statements (including the notes and schedules thereto) and other
financial information posted at www.fgic.com/investorrelations/financialreports/.

*Key Assumptions*

A.    **General**

1.    *Business Operations:* The Updated Liquidation Analysis assumes that FGIC will not write any new insurance policies throughout the Run-Off Period.

2.    *Timing of Liquidation:* The Updated Liquidation Analysis assumes that the bar date for Claims and final distribution date are at year end 2052, which coincides with maturity of the longest-dated FGIC Policy.

3.    All dollar amounts are in millions, unless otherwise specified.

B.    **Additional Transactions**

1.    *Novation of National Public Reinsured Policies:* The Updated Liquidation Analysis assumes that the novation to National Public of the National Public Reinsured Policies will take place in a liquidation.

2.    *Reinsurance Commutations:* The Updated Liquidation Analysis assumes consummation of the Reinsurance Commutation Agreement with AORe, Radian and Sumitomo.

3.    *CDS and Policies Commutations:* The Updated Liquidation Analysis assumes that commutations of certain Policies and CDS Policies submitted to the Court are approved and occur.

C.    **Losses and Claims Payments**

1.    *Claims Payments:* The Updated Liquidation Analysis assumes that all Policy Claims that would have been Permitted under the Plan will be allowed by the liquidator (each, an "**Allowed Policy Claim**") and paid *pari passu*. Although FGIC's final distribution of assets in the Updated Liquidation Analysis is assumed to occur at the end of 2052, the Updated Liquidation Analysis assumes several payments to Policyholders prior to final liquidation based on the Rehabilitator's experience and practice in other Article 74 liquidation proceedings. The first distribution is assumed to occur in 2027, 15 years after FGIC is placed into liquidation, and subsequent distributions occur every five years thereafter. The payments are based on FGIC's distributable resources at the time of the payments. Distributable resources are based on assets at the time of distribution less projected future expenses. The maximum payment as a percentage of Allowed Policy Claims is then defined as distributable resources at time of payment divided by the sum of (a) Allowed Policy Claims realized to date and (b) total future Allowed Policy Claims expected to arise under a Stress Scenario. Distributions are made on Allowed Policy Claims based on the Allowed Policy Claim amount multiplied by 15% of the maximum payment percentage in 2027, 20% of the maximum payment percentage in 2032, 25% of the maximum payment percentage in 2037, 30% of the maximum payment percentage in 2042, and 35% of the maximum payment percentage in 2047. All remaining assets are distributed in a final liquidation in 2052. At each distribution date, Allowed Policy Claims that have previously received payments receive the difference between the new

4

payment percentage and the prior payment percentage in effect when their last
distribution was received.  Newly arisen Allowed Policy Claims receive the full payment
percentage in effect at the time.  All Allowed Policy Claims would receive the same
nominal recovery (*i.e.*, undiscounted cash flows received as a percentage of their original
Policy Claim) because there is no interest accrual on unpaid Policy Claims.

2.    *Losses:* The Updated Liquidation Analysis is based on two scenarios for determining
losses under FGIC Policies, the Base Scenario and the Stress Scenario, each as described
in the Plan, the Disclosure Statement and herein.

**D.    Revenues and Expenses**

1.    *Investment Income:* The Updated Liquidation Analysis assumes gross investment income
post-transaction to be 2.3% in 2012 and 3.25% thereafter.  Management fees are assumed
to be 9.75 basis points of invested assets per year.

2.    *Premiums:* The Updated Liquidation Analysis assumes premiums on existing installment
policies to be collected as scheduled if no claim is available to offset premium payment .
If claims are available to offset premium payments, the Updated Liquidation Analysis
assumes that premiums will not paid in cash and claims will be reduced accordingly. The
Updated Liquidation Analysis also assumes that unearned premiums will not be returned.
In Addition, a 10% reduction in expected premiums collection is assumed in the Updated
Liquidation Analysis to take into consideration potential shortfalls.

3.    *Reinsurance:* The Base Scenario assumes that reinsurance on Policy Claims that is not
commuted will be collected from U.S.-domiciled investment grade Reinsurers in full and
from non-U.S.-domiciled Reinsurers up to the amount of collateral posted if losses on
reinsured policies are realized.  The Stress Scenario assumes that reinsurance on Policy
Claims that is not commuted will not be collected due to the implied amount of losses
Reinsurers would likely experience under the Stress Scenario and the possibility that the
Reinsurers would have inadequate claims-paying resources.

4.    *Taxes:* The Updated Liquidation Analysis assumes that the Contribution Amount - the
$11 million payment to FGIC Corp. pursuant to the Plan Sponsor Agreement - will be
paid.  Pretax income is expected to be realized in both the Base Scenario and Stress
Scenario and the Updated Liquidation Analysis assumes that existing NOLs are available
and utilized going forward as income is generated.  NOLs are assumed to expire 20 years
after they are generated.  Although NOLs are projected to be sufficient to offset taxable
income in the Base Scenario and the Stress Scenario, if actual losses in liquidation are
lower than what is projected in these two scenarios, material Cash tax payments may be
required.

5.    *Operating Expenses:* The Updated Liquidation Analysis assumes a total of approximately
$533 million of operating expenses through 2052 (which amount is 10% less than
operating expenses projected to be incurred under the Plan), excluding professional,
NYLB and other expenses

5

6.    *Professional, NYLB and Other Expenses:* The Updated Liquidation Analysis assumes, over the Run-Off Period, approximately $49.5 million for professional expenses (comprised of approximately $30 million paid and to be paid in 2012, the year FGIC would enter liquidation, and approximately $0.5 million per year from 2013 to 2051), approximately $288 million for expenses related to NYLB operations (comprised of approximately $5 million per year for the first 10 years, and then increasing by 3% each year until 2052) and approximately $5 million for other expenses associated with winding down FGIC's business at the end of the Run-Off Period.

7.    *Other:* The Updated Liquidation Analysis does not assume any proceeds from any recoveries from Material Litigation or any value associated with FGIC's equity interest in FGIC UK because the Updated Run-Off Projections do not assume any proceeds from any recoveries from Material Litigation or any value associated with FGIC's equity interest in FGIC UK under the Plan.

**E.    Recoveries**

1.    *Calculation of Recoveries:* Recoveries for Policyholders are based on cash flows received as a result of interim and final distributions. All cash flows received are discounted to the time the Policy Claim would be allowed by the liquidator. The recoveries shown below are average recoveries for all Allowed Policy Claims, including Allowed Policy Claims that already accrued and are unpaid and all Policy Claims that the Rehabilitator expects would be received and allowed by the liquidator through maturity of the last Policy in 2052. Expected recoveries are shown in both the Base Scenario and the Stress Scenario.

Nominal recoveries to Policyholders in a liquidation, as reflected below, are higher than nominal recoveries expected under the Plan because, in a liquidation, most of FGIC's assets would be distributed to Policyholders at the conclusion of the liquidation in 2052, allowing FGIC's assets to accrue investment income for another forty years. However, using an appropriate discount rate to account for the time value of money reveals that actual recoveries in a liquidation would be significantly lower than under the Plan.

*Updated Illustrative Projected Liquidation Recovery*

| ILLUSTRATIVE AVERAGE POLICYHOLDER LIQUIDATION RECOVERIES | | |
|---|---|---|
| | Base Scenario | Stress Scenario |
| Nominal Recovery | 86% | 43% |
| 10% Discount Rate | 14% | 8% |
| 15% Discount Rate | 9% | 5% |
| 20% Discount Rate | 7% | 4% |

6

# EXHIBIT B

## Attorney Work Product - Prepared at the Request of Counsel - Subject to FRE 408

### FGIC/ResCap/Trusts Settlement

| | All Trusts | Non RMBS Investors Trusts | RMBS Investors Trusts |
|---|---|---|---|
| **Information Points:** | | | |
| Initial Cash Payment Percentage (CPP) | 17.25% | | |
| Base Case Payout -(NPV) | 28.50% | | |
| NPV Expected Premium | 18.3 | 0.3 | 18.0 |
| | | | |
| FGIC - C-11 Proof of Claim Amount | 1,850.0 | | |
| Less: Costs, Interest, etc | (236.0) | | |
| Total Projected Claims in POC | 1,614.0 | | |
| Claims - Paid to Date | 344.0 | - | 344.0 |
| Estimated Unpaid Claims | 1,270.0 | 2.5 | 1,267.5 |
| 3/31/13 Claims - Received and Unpaid (R&U) | 789.0 | 2.5 | 786.5 |
| Future Estimated Claims | 481.0 | - | 481.0 |
| **Commutation Consideration** | | | |
| Claims - R&U - Cash at Initial CPP | 136.1 | 0.4 | 135.7 |
| Claims - R&U - Base less Initial CPP | 88.8 | 0.3 | 88.5 |
| Claims - Future Estimated at Base | 137.1 | - | 137.1 |
| Factor % of Unpaid Payout | 60% | 60% | 60% |
| Value Attributable to Est. Unpaid Claims | 135.5 | 0.2 | 135.3 |
| | | | |
| **Total Value to Trusts** | 271.6 | 0.6 | 271.0 |
| Less:    Premiums waived by FGIC and retained by Trusts | 18.3 | 0.3 | 18.0 |
| Cash Commutation paid by FGIC | 253.3 | 0.3 | 253.0 |
| **FGIC Allowed Claim** | | | |
| Prior Claims Paid | 344.0 | - | 344.0 |
| Cash Commutation | 253.3 | 0.3 | 253.0 |
| Amount of FGIC Allowed Claim | 597.3 | 0.3 | 597.0 |
| % of Allowed Claim Realized | 36.0% | 36.0% | 36.0% |
| Max $ Realized by FGIC | 215.0 | 0.1 | 214.9 |
| **Net Cost to FGIC** | | | |
| Net Cost to FGIC | 56.6 | 0.5 | 56.1 |

# EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------ X
:    Index No. 401265/2012
:
In the Matter of the Rehabilitation of    :    Doris Ling-Cohan, J.
FINANCIAL GUARANTY INSURANCE    :
COMPANY.    :    Motion Sequence No. ____
:
:    **AFFIRMATION**
------------------------------------ X

       Gary T. Holtzer, an attorney duly admitted to practice law in the Courts of the

State of New York, respectfully affirms the truth of the following statements under penalty of

perjury pursuant to CPLR 2106:

       1.      I am a partner with Weil, Gotshal & Manges LLP, attorneys for Benjamin

M. Lawsky, Superintendent of Financial Services of the State of New York (the

"**Superintendent**"), as the court-appointed rehabilitator (the "**Rehabilitator**") of Financial

Guaranty Insurance Company ("**FGIC**").

       2.      I am fully familiar with all of the prior pleadings and proceedings that

have taken place in this matter.

       3.      I respectfully submit this affirmation in support of (i) the motion by the

Rehabilitator for an order pursuant to Section 7428 of the New York Insurance Law (the

"**NYIL**"), substantially in the form attached hereto as **Exhibit A** (the "**Court Order**"),

approving (a) that certain Settlement Agreement among Residential Capital, LLC and its fifty

direct and indirect subsidiaries listed on Exhibit A to the Settlement Agreement (collectively, the

"**Debtors**"), FGIC, The Bank of New York Mellon, The Bank of New York Mellon Trust

Company, N.A., Law Debenture Trust Company of New York, U.S. Bank National Association

and Wells Fargo Bank, N.A., each solely in their respective capacities as trustees, indenture

trustees or separate trustees (collectively, the "**Trustees**") under the Trusts,[1] and a group of

investors that hold Securities (defined below) issued by the Trusts and insured by FGIC (the

"**Institutional Investors**"[2] and, together with the Debtors, FGIC and the Trustees, the

"**Settlement Parties**"), dated as of May 23, 2013, a copy of which is attached hereto as

**Exhibit B** (the "**Settlement Agreement**"), and (b) that certain Plan Support Agreement entered

into among the Debtors, Ally Financial Inc. ("**AFI**"), on its own behalf and on behalf of its direct

and indirect subsidiaries excluding the Debtors, the Official Committee of Unsecured Creditors

of the Debtors (the "**Creditors' Committee**"), FGIC and the other Consenting Claimants (as

defined therein), dated May 13, 2013, a copy of which is attached hereto as **Exhibit C** (the "**Plan**

**Support Agreement**"), to the extent that such Plan Support Agreement relates to FGIC and

(ii) entry of the order to show cause filed contemporaneously herewith (the "**Order to Show**

**Cause**").

Upon information and belief affirmant further swears to the following:

## Background

4.    Prior to or during 2007, certain Debtors originated or acquired residential

mortgage loans that were contributed or sold to 47 Trusts pursuant to documents referred to as

the "Governing Agreements."   The Trusts issued securities, notes, bonds, certificates and/or

other instruments backed by the residential mortgage loans (the "**Securities**") to investors (the

---

[1]  Capitalized terms not defined herein have the meanings ascribed to them in the Settlement Agreement.

[2]  The Institutional Investors include:   AEGON USA Investment Management, LLC; Angelo, Gordon & Co., L.P.; Cascade Investment, LLC; Federal Home Loan Bank of Atlanta; Goldman Sachs Asset Management, L.P.; ING Investment Management Co. LLC; ING Investment Management, LLC; Bayerische Landesbank; BlackRock Financial Management Inc.; Kore Advisors, L.P.; Pacific Investment Management Company LLC; Metropolitan Life Insurance Company; Neuberger Berman Europe Limited; SNB StabFund; The TCW Group, Inc.; Teachers Insurance and Annuity Association of America; Thrivent Financial for Lutherans; Western Asset Management Company; and certain of their affiliates, either in their own capacities or as advisors or investment managers.

"**Investors**").    The Securities were issued in multiple series and tranches.    Pursuant to 60

Policies, FGIC insured the payment of principal and interest of certain of the Securities.

Pursuant to related Policy Agreements, certain Debtors agreed to reimburse FGIC for certain

claims paid under the Policies.

       5.      As of March 31, 2013, the aggregate par amount outstanding covered by

the Policies was approximately $4.9 billion.    As of such date, (i) FGIC had paid approximately

$343.2 million of claims under the Polices for which it has not yet been reimbursed,

(ii) approximately $789 million of additional claims had been asserted against FGIC that remain

unpaid and (iii) the present value of losses FGIC projected to arise under the Policies exceeded

$400 million.

       6.      In 2011 and 2012, FGIC commenced the Prepetition Litigation against

Residential Capital, LLC ("**ResCap, LLC**"), GMAC Mortgage, LLC ("**GMACM**"), and

Residential Funding Company, LLC ("**RFC**"), three of the Debtors, as well as AFI and Ally

Bank, two non-Debtor affiliates of ResCap, LLC, alleging, among other things, breaches of

contractual representations and warranties and fraudulent inducement relating to the Policy

Agreements and the Governing Agreements.

       7.      On May 14, 2012, the fifty-one Debtors commenced jointly administered

cases under chapter 11 of title 11 of the United States Code captioned *In re Residential Capital

LLC*, Ch. 11 Case No. 12-12020 (MG) (Bankr. S.D.N.Y. 2012) (the "**Chapter 11 Cases**"),

which cases are currently pending before the United States Bankruptcy Court for the Southern

District of New York (the "**Bankruptcy Court**").    The commencement of the Chapter 11 Cases

automatically stayed the Prepetition Litigation against the three Debtor-defendants.    On

November 16, 2012, FGIC filed proofs of claim in the Chapter 11 Cases against ResCap, LLC,

GMACM and RFC, the three Debtor-defendants in the Prepetition Litigation, in an aggregate

amount of at least $1.85 billion in connection with, among other things, the Prepetition Litigation

(collectively, the "**FGIC Claims**").

8.     On June 28, 2012, this Court signed an order pursuant to Section 7403(a)

of the NYIL (i) appointing the Superintendent as Rehabilitator of FGIC, (ii) directing the

Rehabilitator to take possession of the property and assets of FGIC and to conduct the business

thereof and (iii) directing the Rehabilitator to take steps toward the removal of the causes and

conditions that have made the above-captioned rehabilitation proceeding necessary.

### Resolution of Policy Claims and the FGIC Claims

9.     After his appointment, the Rehabilitator and the Settlement Parties

engaged in extensive negotiations in an effort to resolve the current and future claims against

FGIC under the Policies, as well as the FGIC Claims against ResCap, LLC, GMACM and RFC.

These discussions culminated in execution of the Settlement Agreement, which resolves the

Settlement Parties' respective rights, obligations and liabilities under or with respect to the

Policy Agreements, the Governing Agreements and the FGIC Claims on the terms and

conditions set forth in the Settlement Agreement, as described below.   The effectiveness and

consummation of the settlements, releases and other transactions contemplated by the Settlement

Agreement are expressly contingent on approval of the Settlement Agreement by this Court and

by the Bankruptcy Court.   Accordingly, the Debtors will file a motion pursuant to Fed. R.

Bankr. P. 9019 seeking an order of the Bankruptcy Court approving the Settlement Agreement.

*Policy Claims*

10.     Pursuant to the Settlement Agreement, the Trustees as policyholders will

fully and completely release and discharge FGIC from all obligations and liabilities under or

4

otherwise relating to the Policies, including the $789 million of existing unpaid claims, as well as

all future claims that may arise under the Policies.    In exchange, FGIC will (i) pay to the

Trustees, for distribution to Investors holding Securities insured by the Policies, an aggregate

amount in cash equal to $253.3 million (the "**Payment Amount**") and (ii) forgo future premiums

with respect to the Policies, which are projected to aggregate approximately $18.3 million.    The

Payment Amount plus the amount of premiums FGIC is forgoing is significantly less than the

amount of existing unpaid claims under the Policies plus the present value of the losses FGIC

currently expects to arise thereunder.

   11. Pursuant to the Settlement Agreement, the Trustees will determine the

portion of the Payment Amount that will be allocated to each Trust in accordance with the

methodology set forth in Exhibit F to the Settlement Agreement, and notify FGIC in writing of

such allocation on or before July 3, 2013.    In addition, the Trustees have represented that, as of

July 3, 2013, they will make available to any Investor holding Securities insured by a Policy the

portion of the Payment Amount that will be allocated to the Trust that issued such Securities,

provided that any such Investor submits a proper request for such information to the Trustee for

such Trust, and provides appropriate verification of its holdings, in accordance with the terms

and conditions of the relevant Governing Documents.

   12. Although the Trustees are the exclusive holders of the Policies, the

Settlement Agreement and the proposed Court Order provide that the resolution set forth in the

Settlement Agreement (once effective) will be binding on all Investors holding Securities insured

by the Policies, and any other persons or entities who are served with notice of this Affirmation

pursuant to the Order to Show Cause.    As a result, the Rehabilitator deemed it advisable to

serve all Investors (including those holding Securities insured by the Policies, as well as those

holding Securities that were not insured by FGIC) with notice of the Settlement Agreement and
to seek Court approval thereof.

*FGIC Claims*

13.    The Settlement Agreement also provides that the FGIC Claims will be
deemed allowed as general unsecured claims against each of ResCap, LLC, GMACM and RFC.
The amount of the FGIC Allowed Claims (as defined in the Settlement Agreement) depends on
whether the chapter 11 plan for the Debtors contemplated by the Plan Support Agreement (the
"**Proposed Chapter 11 Plan**") goes effective.   If the Proposed Chapter 11 Plan is confirmed by
the Bankruptcy Court and goes effective, the amount of the FGIC Allowed Claims will be the
aggregate and allocated amounts described in paragraph 2 of page 6 of the Supplemental Term
Sheet attached to the Plan Support Agreement as Exhibit B (the "**Supplemental Term Sheet**"),
as such amounts may be adjusted, amended or revised by agreement of the Debtors, the
Creditors' Committee and the other parties to the Plan Support Agreement.   The Supplemental
Term Sheet currently provides that the FGIC Claims will be allowed against ResCap, LLC in the
amount of $337.5 million, GMACM in the amount of $181.5 million and RFC in the amount of
$415 million, for a total FGIC Allowed Claims amount of $934 million, which is projected to
yield a recovery of approximately $206.5 million, or 8.7% of the Debtors' available estate assets,
as set forth on Annex I of the Supplemental Term Sheet.

14.    If, on the other hand, the Plan Support Agreement is terminated in
accordance with its terms or the Proposed Chapter 11 Plan does not go effective, the amount of
the FGIC Allowed Claims will be $596.5 million in the aggregate, which amount (i) is equal to
the sum of the $343.2 million of claims that FGIC previously paid under the Policies for which it
has not been reimbursed plus the $253.3 million Payment Amount it is paying on account of

6

current and projected future unpaid claims and (ii) will be allocated among ResCap, LLC, GMACM and RFC based on which of those Debtors would be obligated to reimburse FGIC for such payments.    In addition, FGIC will have the right to assert a general unsecured claim for up to $596.5 million against each of ResCap, LLC, GMACM and RFC (including any related FGIC Allowed Claim amount against such entity).    The Settlement Agreement also provides that if the Plan Support Agreement is terminated in accordance with its terms, the FGIC Allowed Claims will be treated *pari passu* with other unsecured claims allowed against ResCap, LLC, GMACM, and RFC in the Chapter 11 Cases.

15.    In exchange for the allowance and treatment of the FGIC Claims described above, FGIC will release and fully discharge the Debtors from all additional obligations and liabilities related to the FGIC Claims, including the Prepetition Litigation. Importantly, however, the Settlement Agreement is not intended to, and should not be construed as, a settlement, termination, release, discharge or waiver of any claims (including with respect to the Prepetition Litigation) FGIC may have against non-Debtor affiliates of ResCap, LLC (including AFI and Ally Bank) or such entities' Representatives, which claims are addressed in the Plan Support Agreement, as discussed below.

16.    At this time, no chapter 11 plan has been filed in the Chapter 11 Cases, and FGIC's projected recovery on account of the FGIC Allowed Claims is uncertain.    However, as explained herein, if the Proposed Chapter 11 Plan is filed pursuant to the Plan Support Agreement, and such plan is approved by the Bankruptcy Court and becomes effective, under the terms of that plan, FGIC's aggregate recovery on account of the FGIC Allowed Claims is projected to be approximately $206.5 million.[3]    The Settlement Agreement, however, is

---

[3] For the avoidance of doubt, in the event that the Plan Support Agreement terminates in accordance with its terms, FGIC reserves its right to seek a recovery of up to $596.5 million against each of ResCap LLC,

independent of and not contingent on the filing, approval or effectiveness of any chapter 11 plan

for the Debtors, pursuant to the Plan Support Agreement or otherwise, or FGIC receiving a

minimum recovery under any plan.

### Resolution of FGIC's Claims against AFI and Ally Bank

17.    As part of a lengthy Bankruptcy Court-ordered mediation that lasted for

several weeks under the guidance of the Honorable James M. Peck, United States Bankruptcy

Judge, Southern District of New York, FGIC engaged in extensive negotiations with the Debtors

and other key constituents in the Chapter 11 Cases (including AFI, the Creditors' Committee, the

other Settlement Parties and the other Consenting Claimants) in an effort to reach a global

resolution of the Chapter 11 Cases.    Due in large part to FGIC's agreement to settle the

approximately $1.85 billion of FGIC Claims pursuant to the terms and conditions of the

Settlement Agreement described above, the mediation successfully culminated in the consensual

execution of the Plan Support Agreement, which sets forth the terms of the Proposed Chapter 11

Plan.    Notably, pursuant to the Plan Support Agreement, AFI has agreed to contribute $1.95

billion in cash and $150 million of certain insurance settlement proceeds to the Debtors' estates

and creditors, for a total contribution of $2.1 billion.    In exchange, pursuant to the Proposed

Chapter 11 Plan, AFI and its non-Debtor affiliates, including Ally Bank, will be fully discharged

and released from any and all claims arising from or related to the Debtors, including FGIC's

Prepetition Litigation claims against AFI and Ally Bank.    As explained above, FGIC's recovery

under the Proposed Chapter 11 Plan (if such plan becomes effective) is projected to be

---

GMACM and RFC (subject to the terms and conditions of the Settlement Agreement), as well as to seek
maximum recovery on account of any claims it may have against non-Debtor affiliates of ResCap, LLC,
including AFI and Ally Bank.

approximately $206.5 million (which amount includes funds contributed by AFI), subject to

adjustment based on the amount of claims and expenses ultimately allowed against the Debtors.

18.     The effectiveness of the Proposed Chapter 11 Plan is contingent on,

among other things, this Court's approval of (i) the Settlement Agreement, including the

settlement and release of all present and future claims against FGIC under or related to the

Policies and (ii) FGIC's obligations and agreements pursuant to the Plan Support Agreement,

including FGIC's discharge and release of AFI and Ally Bank from any and all claims arising

from or related to the Debtors (including with respect to the Prepetition Litigation).    In

particular, the Plan Support Agreement may be terminated if this Court does not approve the

Settlement Agreement and the Plan Support Agreement on or before August 19, 2013.

Accordingly, it is imperative that the relief requested in this Affirmation be considered within the

timeframes set forth in the Order to Show Cause.

**Relief Requested**

19.     On behalf of the Rehabilitator, I respectfully request that the Court enter

the Court Order approving (i) the Settlement Agreement and the transactions contemplated

thereby and providing that the Settlement Agreement is binding on all Investors holding

Securities insured by the Policies and any other persons or entities who are served with notice of

this Affirmation pursuant to the Order to Show Cause and (ii) the Plan Support Agreement as it

relates to FGIC.    As discussed above, the key features of the Settlement Agreement are the

settlement and release of FGIC's obligations and liabilities under or with respect to the Policies

and the allowance of the FGIC Allowed Claims, in exchange for FGIC paying the Payment

Amount, forgoing future premiums with respect to the Policies and releasing the Debtors from

additional obligations and liabilities related to the FGIC Claims.    FGIC's rights and obligations

9

under the Plan Support Agreement include FGIC's release and discharge of AFI and Ally Bank

from all claims arising from or in any way related to the Debtors in exchange for FGIC's receipt

of approximately $206.5 million of plan value, including funds contributed by AFI, on account

of the FGIC Allowed Claims.

20.    Finally, I respectfully request that the Court enter the Order to Show

Cause, which sets the date for a hearing to consider entry of the Court Order (the "**Hearing**") and

deadline to object to the relief requested herein, and alternatively provides that the Court may

enter the Court Order without holding the Hearing if no objections are received.

### The Court Should Approve the Settlement Agreement

21.    The Rehabilitator, in consultation with his counsel, his counsel's financial

advisor, FGIC and FGIC's advisors, carefully reviewed the circumstances surrounding the

Settlement Agreement and respectfully recommends and requests that the Court approve the

Settlement Agreement and the transactions contemplated thereby for several reasons.    First,

consummation of the transactions contemplated by the Settlement Agreement would release

FGIC of its obligations and liabilities with respect to the Policy Agreements and the Governing

Agreements, including approximately $789 million in claims currently pending against FGIC, as

well as over $400 million of claims FGIC currently projects will arise under the Policies in the

future.    Second, the FGIC Claims would be deemed allowed against each of ResCap, LLC,

GMACM and RFC in the aggregate amount of (i) approximately $934 million, if the Proposed

Chapter 11 Plan goes effective or (ii)$596.5 million, if the Plan Support Agreement is terminated

in accordance with its terms or the Proposed Chapter 11 Plan does not go effective, subject to

FGIC's right to assert a claim against each of ResCap, LLC, GMACM and RFC, in each case up

to the amount of $596.5 million (including any related FGIC Allowed Claim amount against

such entity).    Finally, the Payment Amount that FGIC would be obligated to pay plus the

10

premium amount that FGIC would forgo in exchange is significantly less than the amount of

existing unpaid claims under the Policies plus the present value of the losses FGIC currently

expects to arise thereunder (in the absence of the Settlement Agreement).    Accordingly, the

Rehabilitator has determined that the settlement and release of FGIC's obligations and liabilities

under the Policies contemplated by the Settlement Agreement will result in greater value to

FGIC's policyholders and other claimants than leaving such obligations and liabilities in place.

22.    In addition, the Rehabilitator has determined that accepting the terms of

the FGIC Allowed Claims in exchange for the release of ResCap, LLC, GMACM and RFC from

any further or additional liability on account of the FGIC Claims, including the Prepetition

Litigation, has the substantial benefits described in the preceding paragraph and, in addition, will

avoid costly, protracted and uncertain litigation concerning such FGIC Claims.    The Prepetition

Litigation claims were filed from November 2011 through March 2012, and are comprised of

twelve separate federal court actions involving twenty distinct completed transactions over

approximately three years.    The Prepetition Litigations assert valuable but complicated claims

against three Debtor-defendants, as well as AFI and Ally Bank.    Litigating these claims would

be complicated, expensive and highly contentious, would require extensive motion practice and

discovery and could take at least another several years to finally resolve.    Moreover, the legal

framework by which the FGIC Claims would be decided is still developing, and while many

recent decisions in other similar cases have been favorable to FGIC's position, there would

always be uncertainty for FGIC in prosecuting the FGIC Claims.    Settling the FGIC Claims

pursuant to the terms of the Settlement Agreement eliminates these risks and uncertainties, as

well as the costs and delay attendant to a prolonged litigation, and will result in greater value to

FGIC's policyholders and other claimants than continuing to litigate such claims.

23.    Based on the foregoing, the Rehabilitator has determined that the Settlement Agreement is in the best interests of FGIC and its policyholders and other claimants and should be approved.

### The Court Should Approve the Plan Support Agreement

24.    The Rehabilitator, in consultation with his and FGIC's advisors, also carefully reviewed the circumstances surrounding the Plan Support Agreement, and respectfully recommends and requests that the Court approve the Plan Support Agreement, the incorporated Term Sheets (as defined therein) and the transactions contemplated thereby as they relate to FGIC.    Consummation of such transactions pursuant to the Proposed Chapter 11 Plan (if such plan is confirmed and goes effective) would result in (i) AFI contributing $2.1 billion of value to the Debtors' estates and creditors and (ii) FGIC receiving a recovery on account of the FGIC Allowed Claims of approximately $206.5 million, as explained in greater detail above.    Absent AFI's contribution, given the limited value in the Debtors' estates, FGIC's recovery on account of the FGIC Allowed Claims would be uncertain at best.    In addition, as set forth in greater detail above, continuing to pursue the Prepetition Litigation against AFI and Ally Bank would be complicated, expensive and highly contentious.    Accordingly, the Rehabilitator has determined that settling the Prepetition Litigation against AFI and Ally Bank pursuant to the terms and conditions of the Plan Support Agreement and the Term Sheets (as defined therein) as part of a global resolution of the Chapter 11 Cases will maximize FGIC's recovery on account of the FGIC Allowed Claims and result in greater value to FGIC's policyholders and other claimants than continuing to pursue such litigation.

25.    Based on the foregoing, the Rehabilitator has determined that the Plan Support Agreement is in the best interests of FGIC and its policyholders and other claimants and should be approved with respect to FGIC.

26.    The Rehabilitator also requests that this Court direct that service of notice of entry of the Court Order shall be made by the Rehabilitator posting such notice, together with a copy of the Court Order, at www.fgicrehabilitation.com.   Such service is reasonably calculated to fairly and timely apprise any and all interested persons or entities of entry of the Court Order, while keeping the method of notice efficient and cost effective.   Accordingly, such service should be deemed good and sufficient service.

### The Court Should Enter the Order to Show Cause

27.    The Rehabilitator further recommends and requests that the Court enter the Order to Show Cause which, among other things, sets August 6, 2013 as the date for the Hearing, which is approximately 70 days from the date hereof.   Such period will allow the Rehabilitator and the Trustees to provide sufficient notice of the Hearing and the objection deadline to all interested persons, including all Investors holding Securities insured by the Policies, and will provide such persons ample time to consider the relief requested herein.   In addition, scheduling the Hearing on August 6, 2013 will allow the Court to consider the relief requested prior to the August 19, 2013 deadline set forth in the Plan Support Agreement. Further, the Order to Show Cause provides for the Court to enter the Court Order without holding the Hearing if no objections are filed, avoiding the need to expend the Court's and the parties' time and resources on an uncontested matter.

28.    The Order to Show Cause also provides that service of the Order to Show Cause and the papers upon which it is granted shall be made by (i) the Rehabilitator posting true

13

# EXHIBIT D

CONFIDENTIAL
EXEMPT FROM DISCLOSURE UNDER
PUBLIC OFFICERS LAW SECTIONS 89(5) and 87(2)[1]

# New York State Insurance Department

# FGIC Surplus Restoration Plan Update

# Policyholder Group Steering Committee Discussions

# January 19, 2011

[1] *This document, including all annexes hereto and any other materials submitted in connection herewith (the "Confidential Information"), is strictly confidential and proprietary and its contents constitute trade secrets and proprietary commercial and financial information. Financial Guaranty Insurance Company ("FGIC") hereby claims exemption of the Confidential Information from disclosure pursuant to Sections 89(5) and 87(2) of the Public Officers Law. FGIC also hereby requests that the Department deny any request for disclosure of Confidential Information on the basis that (i) such material constitutes trade and business secrets of FGIC and/or (ii) disclosure would cause substantial injury to the competitive position of FGIC. The Confidential Information should not be reproduced and it should not be shared directly or indirectly with any persons outside the required insurance regulatory process in the State of New York.*



**FGIC Surplus Restoration Plan**
**Term Sheet for Policyholders Steering Committee**
**January 19, 2011**

| | |
|---|---|
| *Policy Modifications* | ■ As part of the restructuring. FGIC's existing policies will be modified to provide that accrued claims and future claims (upon submission), will be paid in cash based upon the below defined CPP and the remainder of any such claims shall be considered DPOs, as defined below.<br><br>■ Policyholders are still obligated to pay premiums unless trust documents otherwise provide. |
| *Cash component* | ■ The portion of each claim payment that is made in cash is defined as the cash payment percentage ("CPP"). If FGIC has not previously requested Trustees to apply CPP payments to current period claims, then when a CPP payment is made (including with respect to any equalization adjustment), FGIC shall request the Trustee to apply the payment for the current period claims.<br><br>■ The CPP will be 15½% (subject to reset up or down based on the revaluation methodology described below). Distribution on claims accrued since November 2009 will be paid at the CPP of 15½%. Initial payment to be made within 2 business days of the effective date of the plan (the "Effective Date"). |
| *Deferred policy obligation component* | ■ The portion of each claim that is not paid in cash shall be deferred and paid as hereinafter provided. FGIC's obligations with respect to such deferred policy obligations are referred to as "DPOs". |
| *DPO structure* | ■ DPOs will accrete on a quarterly basis in the following manner: (i) from the Effective Date through the quarter ending December 31, 2011 at a rate equal to the 10 year treasury yield on the Effective Date, unless the duration of FGIC's expected liabilities is less than 10 years, in which case the accretion rate will be equal to the on-the-run treasury yield most closely matching the duration of FGIC's expected liabilities, and (ii) commencing with the quarter commencing January 1, 2012, the rate of return on FGIC's invested assets over the preceding four calendar quarters, to be reevaluated quarterly, provided that for periods referencing portfolio performance, prior to October 1, 2011, the Treasury rate used in (i) above shall be used in lieu of the rate of return on FGIC's invested assets. |
| *DPO cash payments* | ■ DPOs will receive distributions from time to time at such times as the CPP shall be adjusted upward. Distributions shall be made so as to true up cash payments on prior claims.<br><br>■ In the event that there are cash flows or other funds available from an underlying FGIC-insured transaction that exceed the amounts then currently due and payable on the related FGIC-insured obligations (assuming that FGIC had performed its policy |

**FGIC Surplus Restoration Plan**
**Term Sheet for Policyholders Steering Committee**
**January 19, 2011**

| | |
|---|---|
| | obligations (including having paid all claims in full in cash), and after giving pro forma effect to such assumption), such excess amounts will be paid to bondholders or certificateholders by the trustee and shall reduce the outstanding DPOs relating to the FGIC policy for such transaction to the extent of such payment. |
| *CPP revaluation* | ■ Annually within thirty (30) days after FGIC's audited statutory financial statements for the prior fiscal year have been filed with the NYSID. <br><br> ■ FGIC Board of Directors to appoint an independent and impartial firm, to perform a stress loss analysis in a manner consistent with the original stress model which will be used in the CPP revaluation process. <br><br> ■ In connection with the initial CPP calculation and each CPP revaluation, a run-off model assumption will be that FGIC must maintain invested assets throughout the run-off period in an aggregate amount not less than the greater of (i) $65 million and (ii) the statutory capital and surplus minimum then applicable to New York-domiciled financial guaranty insurance companies. <br><br> ■ FGIC's Board of Directors shall have the right, at any time, to cause a CPP revaluation to be performed if in its opinion FGIC's insured portfolio performance has materially deteriorated and a downward adjust in the CPP may be warranted. |
| *First CPP revaluation* | ■ The first CPP revaluation will commence after fiscal year 2011. <br><br> ■ For the first CPP revaluation, the same run-off model and related assumptions that were used in the initial CPP calculation will be used, except that: (i) FGIC's cash and investments will be updated to reflect the actual cash and investments as of the date of the first revaluation (the "Revaluation Date"), (ii) FGIC's projected installment premiums will be determined based on FGIC's insured portfolio as of the Revaluation Date but will be calculated going forward in the same manner, with the same discounts and with the same other assumptions used in the initial CPP calculation, (iii) the same projected operating expenses for the remaining periods as were used in the initial CPP calculation will be used, (iv) the revised CPP calculation shall give effect to applicable true-up payments on outstanding DPOs, and (v) stress losses will be determined as follows: (A) For RMBS and other transactions that were assigned Credit-based losses in the initial NewOak analysis based on quantitative analysis, the same models, methodologies and assumptions as were used in such initial NewOak analysis will be used but will be applied to the related mortgage loan and other portfolios as they exist as of the |

**FGIC Surplus Restoration Plan**
**Term Sheet for Policyholders Steering Committee**
**January 19, 2011**

| | |
|---|---|
| | Revaluation Date. The Revaluation Date shall be Year "1" in the modeling of the stress losses for such transactions assuming that the original stress loss model was done as of Year "0"; and (B) For other transactions that were assigned Credit-based losses (e.g., Jeffco, Detroit) and for transactions that were assigned Risk-based losses in the initial NewOak analysis, the same stress losses will be used but will be proportionately reduced by any principal amortization, any other identified principal reductions (such as commutations) or actual modification or restructuring of a policy that reduces FGIC's obligations thereunder since the initial NewOak analysis through the Revaluation Date. The Revaluation Date shall be Year "0" for purposes of spreading such stress losses (reduced as applicable), year by year, ratably in accordance with the initial NewOak analysis. |
| *Special revaluation events* | ■ If, within six months of the last CPP revaluation, FGIC receives in excess of $100 million in the aggregate of cash recoveries that were not considered in the most recent CPP revaluation, then the most recent CPP revaluation shall be updated to give effect to the full amount of such cash recoveries but without updating or otherwise changing any of the other original assumptions, inputs and methodologies. Thereafter claims will be paid in cash based on the adjusted CPP determined by such revaluation. Distributions shall also be made on DPOs so as to true up cash payments on prior claims.<br><br>■ Any cash recoveries received after six months of the last CPP revaluation will be considered on the date of the next CPP revaluation. |
| *Equalization adjustment* | ■ To the extent the CPP is reset downward based on the CPP revaluation methodology described above, there shall be an equalization adjustment that will apply to CUSIPs that received any prior cash policy payments. Such adjustment will be made only out of the CPP with respect to future claims with respect to such CUSIPs, which are presented on such policies after the CPP is reset downward and will continue until the cumulative CPP on such CUSIPs has been equalized. If, prior to the date of any claims payment requiring an equalization adjustment, a trustee has not made current information with respect to a FGIC-insured transaction available to FGIC, which is sufficient to enable FGIC to determine an equalization adjustment on a CUSIP level basis for such transaction as provided in the preceding sentence, then FGIC shall promptly make demand on the trustee for such information, FGIC will make such equalization adjustment on a policy-level basis and FGIC shall pay such pending claims (as adjusted by such equalization adjustment). In the event that the trustee fails to provide such information within 60 days of such |

**FGIC Surplus Restoration Plan**
**Term Sheet for Policyholders Steering Committee**
**January 19, 2011**

| | |
|---|---|
| | claim payment, FGIC shall make a good faith estimate of the equalization adjustment on a CUSIP level basis and shall make any applicable payments to the trust with respect thereto. In the event that necessary information becomes available so that an adjustment can be made on a CUSIP level basis with actual information, then FGIC shall make any necessary adjustments to its prior estimated or policy-level basis payments. Any underpaid amounts with respect to particular CUSIPs shall be paid to the trust, and any overpayments with respect to particular CUSIPs shall be recouped out of subsequent claim payments with respect to such CUSIPs. In making any equalization adjustment (including any estimation of an equalization adjustment), FGIC shall be entitled to rely on information made available by the trustees (without liability and without any responsibility to verify or take any other action with respect to such information) and FGIC shall have no liability for any failure by a trustee to provide information or for FGIC's failure to accurately estimate an equalization adjustment. FGIC's only liability and responsibility in connection with any failure of FGIC to accurately make an equalization adjustment shall be, in the case of any underpayments with respect to particular CUSIPs, to pay such underpaid amounts to the applicable trust and, in the case of any overpayments to particular CUSIPs, to recoup such overpayments out of subsequent claim payments with respect to such CUSIPs.<br><br>■ For the avoidance of doubt, there shall be no "clawback" of cash payments previously made on policies. |
| *Security interest* | ■ FGIC will attempt to create a security interest in all assets in favor of policyholders to secure FGIC's CPP obligations. |
| *CDS Counterparties* | ■ The legal and financial advisors to the Steering Committee will have the ability to review and verify the commutations and/or drop-down agreements/structures associated with FGIC's CDS counterparty exposure. |
| *Governance* | ■ Corporate governance provisions to be acceptable to all Steering Committee members. |
| *Other* | ■ FGIC will provide public disclosure on its website of information with respect to FGIC and outstanding DPOs (on a policy by policy basis), from time to time.<br><br>■ Implementation of plan will cure Enhancer Defaults under trust documents and other transaction documents for all purposes except that trustees shall allocate the proceeds from trust property between or among the classes of insured securities and FGIC, on the basis that FGIC has not paid all its policy claims, unless and |

**FGIC Surplus Restoration Plan**
**Term Sheet for Policyholders Steering Committee**
**January 19, 2011**

until such time as FGIC shall have paid all policy claims
(including all DPOs) in cash.

- FGIC will continue to prosecute and manage litigation regarding
RMBS origination and other claims with recoveries to be received
by FGIC or bondholders, as appropriate.

- As part of and at the completion of the restructuring, FGIC will
make a one-time payment of $[x.x] million to fund a trust to be
established for the purpose of defraying costs associated with
enabling bondholders and certificateholders to understand the
value of their FGIC-insured securities. The trust shall be
unaffiliated with FGIC and will be for the benefit of all FGIC
insured bondholders and certificateholders. FGIC shall have no
involvement with the terms or administration of the trust, no
responsibilities, obligations or liabilities to the trust or trustee and
no interest in the trust assets.

- FGIC and the Steering Committee shall cooperate in coordinating
with the Trustees to ensure the implementation of the terms stated
herein.

- FGIC will use commercially reasonable efforts to request or cause
transaction trustees to make available in their investor reports for
bondholders or certificate holders information concerning
payments and obligations of such transaction trusts at a CUSIP
level. FGIC will have no liability or responsibility for the
completeness and accuracy of information published or provided
by transaction trustees or other third parties or for any failure of
any trustee or other third party to publish or provide information.
FGIC will not publish any such information on its website.

- FGIC will not have any responsibility or liability for any
allocation, payment or distribution of cash flows, recoveries or
other funds, or any other action, by any trustee.

- Means of implementing the plan will be acceptable to Steering
Committee.

- All agreements evidencing the transactions and actions
contemplated hereby, except those relating to the CDS
Counterparties, shall be subject to documentation in form and
substance satisfactory to each member of the Steering Committee.

- FGIC will pay all accrued expenses of Steering Committee.

# EXHIBIT E

**Michael R. Carney**

| | |
|---|---|
| **From:** | Vron, Victoria [Victoria.Vron@weil.com] |
| **Sent:** | Wednesday, November 14, 2012 4:55 PM |
| **To:** | John C. Briody |
| **Cc:** | Verdesca, Joseph; Peter Goodman; Holtzer, Gary; DiBlasi, Kelly |
| **Subject:** | RE: FGIC Rehabilitation |

Hi John,

Confirmed.

Vicky



**Victoria Vron**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Victoria.Vron@weil.com
+1 212 310 8078 Direct
+1 212 310 8007 Fax

---

**From:** John C. Briody [mailto:jbriody@McKoolSmith.com]
**Sent:** Wednesday, November 14, 2012 4:03 PM
**To:** Vron, Victoria
**Cc:** Verdesca, Joseph; Peter Goodman
**Subject:** FGIC Rehabilitation

Vicky:

Following up on our prior discussions, we understand that you will timely provide us with copies of all papers filed by the Rehabilitator with the Court in the rehabilitation proceeding (N.Y. Supreme, No. 401265/2012). Can you please confirm?

Regards,

John

John Briody | McKool Smith
1 Bryant Park, 47th Floor | New York, NY 10036
Telephone: 212.402.9438

NOTICE OF CONFIDENTIALITY:

The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

7/29/2013

# EXHIBIT F

Exhibit D

Disclosure Statement

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ........................................................................................................ 1

II. BACKGROUND ...................................................................................................... 5

    A.    Corporate Structure ...................................................................................... 5

    B.    Overview of FGIC ......................................................................................... 6

III. OVERVIEW OF THE PLAN ................................................................................ 7

    A.    Summary of Plan Treatment of Claims and Equity Interests ...................... 7

    B.    Approval of Plan/Objection Deadline ......................................................... 9

IV. KEY EVENTS LEADING TO THE
COMMENCEMENT OF THE REHABILITATION PROCEEDING ...................... 10

    A.    Background .................................................................................................. 10

    B.    Pre-Filing Actions ...................................................................................... 11

        1.        Commencement of Run-Off ............................................................ 11

        2.        Loss Mitigation Measures ............................................................... 11

        3.        Expense Reduction Measures .......................................................... 12

        4.        Suspension of Claims Payments ..................................................... 12

        5.        Surplus Restoration Plan and Related Exchange Offer.................... 13

        6.        Formation of Ad Hoc Instrument Holder Group.............................. 13

        7.        Pursuit of Claims Against Third Parties.......................................... 14

        8.        FGIC UK Separation ....................................................................... 15

        9.        Sponsorship of FGIC Corp. Chapter 11 Plan ................................. 15

        10.      FGIC Proposed Plan ........................................................................ 16

V. SIGNIFICANT POST-FILING ACTIONS ........................................................... 16

    A.    Order to Show Cause .................................................................................. 16

    B.    Order of Rehabilitation ............................................................................... 16

    C.    Loss Mitigation Efforts ............................................................................. 17

        1.        Novation of National Public Reinsured Policies............................. 17

        2.        CDS Commutation Agreements....................................................... 18

        3.        Reinsurance Commutation Agreement ............................................ 19

    D.    Discussions Concerning the Plan with Various Constituents ..................... 19

**TABLE OF CONTENTS**
(continued)

Page

2.    Notification of Effective Date................................................................. 36

3.    Waiver of Conditions............................................................................. 37

F.    Effect of Effective Date ................................................................................ 37

1.    Discharge............................................................................................... 37

2.    Releases................................................................................................. 37

3.    Exculpation............................................................................................ 37

4.    No Liability for Information Provided by Trustees ............................... 38

5.    Indemnity............................................................................................... 38

6.    Termination of Rehabilitation Proceeding ............................................ 38

7.    Termination of Duties of Rehabilitator ................................................. 38

8.    Injunctive Relief.................................................................................... 38

9.    Preservation of Causes of Action.......................................................... 39

10.   Limitations on Operations Following Effective Date............................ 39

11.   Reporting................................................................................................ 39

G.    Retention of Jurisdiction ............................................................................... 39

H.    Miscellaneous Provisions.............................................................................. 40

VII. FEASIBILITY/RECOVERY ANALYSIS................................................................ 40

A.    General Assets Available to Pay Liabilities ................................................. 40

1.    Investments............................................................................................ 40

2.    Premiums................................................................................................ 41

3.    Potential Future Assets Available to Pay Liabilities ............................ 42

B.    Significant Liabilities.................................................................................... 42

1.    RMBS Exposure..................................................................................... 42

2.    CDO Exposure........................................................................................ 43

3.    U.S. Public Finance Exposure ............................................................... 43

4.    International Finance Exposure .............................................................. 44

C.    Loss Reserves ................................................................................................ 45

D.    Reinsurance ................................................................................................... 46

E.    Rehabilitator's Recovery Analysis ............................................................... 48

### LIST OF EXHIBITS

Exhibit A   Plan of Rehabilitation

Exhibit B   Organizational Chart

Exhibit C   Run-Off Projections

Exhibit D   Liquidation Analysis

Exhibit E   Restructured Policy Terms:  Illustrative Example

# I.

## INTRODUCTION

On June 28, 2012, the Superintendent of Financial Services of the State of New York was appointed rehabilitator (the "**Rehabilitator**") of Financial Guaranty Insurance Company ("**FGIC**") by the Supreme Court of the State of New York, which is overseeing FGIC's rehabilitation proceeding (the "**Rehabilitation Proceeding**"). On September 27, 2012, the Rehabilitator filed a proposed Plan of Rehabilitation for FGIC, dated September 27, 2012 (attached hereto as Exhibit A) (the "**Plan**") and this disclosure statement, dated September 27, 2012 (the "**Disclosure Statement**"), in the Rehabilitation Proceeding. The Rehabilitator also intends to file documents that implement the Plan in one or more filings called the "Plan Supplement."

The goal of the Plan is to treat FGIC's Policyholders[1] in a fair and equitable manner while at the same time removing the causes and conditions that made the Rehabilitation Proceeding necessary. The Plan provides for all of the value of FGIC, other than administrative expenses and certain other costs, to go to FGIC's Policyholders until Policyholders are paid in full. No claimants junior to Policyholders will receive any payment until Policyholders are paid in full in accordance with the terms of the Plan.

This Disclosure Statement describes the Plan, explains FGIC's current and projected financial outlook, outlines the alternatives to the Plan the Rehabilitator considered and explains the principal reasons the Rehabilitator selected the Plan, identifies material risk factors associated with the Plan and discusses the ways in which the Plan is expected to provide for greater recoveries to Policyholders than a liquidation of FGIC. Although the New York Insurance Law (the "**NYIL**") does not require a disclosure statement or permit FGIC's Policyholders or other creditors to vote on the Plan, given the size, complexity and unique circumstances surrounding the Rehabilitation of FGIC, the Rehabilitator voluntarily prepared this Disclosure Statement to aid the Court, Policyholders and other Persons in understanding the terms of the Plan.

Since November 2009, FGIC has worked with its primary regulator, the New York State Department of Financial Services ("**NYSDFS**"),[2] and then with the Rehabilitator to restructure FGIC. These efforts included extensive discussions with Policyholders, the Indenture Trustees (defined below), holders of Instruments insured by FGIC and other counterparties to FGIC's material agreements. FGIC's restructuring efforts also included resolving with its parent, FGIC Corporation ("**FGIC Corp.**"), issues raised concerning FGIC's continued use of

---

[1] Capitalized terms not defined herein have the meanings ascribed to such terms in the Plan.

[2] Prior to October 3, 2011, the New York State Insurance Department ("**NYID**") was the primary regulator for FGIC. As of October 3, 2011, the NYID and the New York State Banking Department were consolidated and merged into the NYSDFS, and the functions and authority of the NYID were transferred to the NYSDFS. References in this Disclosure Statement or the Plan to any actions taken by the NYSDFS prior to October 3, 2011 refer to such actions taken by the NYID during that time.

protect Policyholders with future anticipated Claims so that all Policyholders will receive the same CPP of their Permitted Policy Claims (ignoring the time value of money) regardless of whether their Claims arise two years or 30 years after the Effective Date. The Plan provides for an annual (and potentially more frequent) reassessment of FGIC's financial condition by a third party firm based on actual results and changing conditions from which adjustments to the CPP may be made.

Third, in an effort to mitigate FGIC's liabilities and increase recoveries for Policyholders, as part of the Plan, the Rehabilitator is seeking approval of certain settlements with counterparties to FGIC Contracts. There are two forms of settlements: a "novation" with National Public Finance Guarantee Corporation ("**National Public**") and "commutations" (the "**CDS Commutation Agreements**") with credit default swap ("**CDS**") counterparties (the "**CDS Counterparties**").[3] Consummation of the transactions contemplated in these agreements is subject to Court approval. The Novation Agreement (defined below) with National Public, an affiliate of MBIA Insurance Corporation ("**MBIA**"), eliminates FGIC's exposure to Policies having an aggregate par outstanding as of December 31, 2011 of approximately $138 billion. A copy of the Novation Agreement is included in the Plan Supplement filed contemporaneously herewith. In addition, two CDS Commutation Agreements have been executed (each of which is subject to approval by the Court) that will enable FGIC to resolve potential exposure of more than $3.8 billion (as of March 31, 2012) total net par in force ("**NPIF**") and to avoid potentially lengthy and costly litigation over the allowability and treatment of approximately $1.5 billion (as of March 31, 2012) in potential Termination Payment Claims. Payments by FGIC under these CDS Commutation Agreements will result in the cancellation or "tearing up" of FGIC's Policies related to that exposure for less than what these CDS Counterparties are projected to have received under the Plan on account of Policy Claims for realized "Credit Events" (as defined in the relevant CDS, or similar term provided therein) that the Rehabilitator projects would have been asserted against FGIC if the CDS with such CDS Counterparties were not "torn up" or terminated early. Copies (in certain instances, in redacted form) of the two executed CDS Commutation Agreements, and any additional CDS Commutation Agreements executed by FGIC, will be filed in an update to the Plan Supplement.

On the Effective Date, FGIC will emerge from this Rehabilitation Proceeding as a solvent insurance company under the NYIL by restructuring its Policies and consummating the commutation and novation transactions described above. FGIC's return to statutory solvency, together with other protections afforded by the Plan, enables the Rehabilitator to recommend terminating the Rehabilitation Proceeding once the Plan becomes effective. The Plan also provides for enhanced NYSDFS oversight of FGIC post-emergence and injunctive relief to protect FGIC and other Persons from violations of the Plan's provisions. Termination of the Rehabilitation Proceeding will avoid significant administrative burden associated with an ongoing Article 74 proceeding for the benefit of all of FGIC's Policyholders.

\*        \*        \*

---

[3] The Rehabilitator has also sought Court approval of an agreement to commute certain reinsurance transactions, a third type of settlement, as described in greater detail in Section V.C.3 below.

The Plan and this Disclosure Statement may contain certain statements that are, or may be deemed to be, "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Any such forward-looking statements (including the Run-Off Projections and Liquidation Analysis) are based upon a variety of estimates and assumptions that, though considered reasonable by the Rehabilitator, may not be realized, and are inherently subject to significant business, economic and competitive uncertainties and contingencies. Some assumptions inevitably will not materialize and events and circumstances occurring subsequent to the date on which the statements were prepared may be significantly different from those assumed, or may be unanticipated, and thus may affect financial results in a material and possibly adverse manner. The statements, therefore, may not be relied upon as a guaranty or other assurance of the actual results that will occur.

**To ensure compliance with Internal Revenue Service ("IRS") Circular 230, holders of Claims and Equity Interests are hereby notified that: (a) any discussion of United States federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Equity Interests for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (b) such discussion is written in connection with the promotion or marketing of the transactions or matters addressed herein; and (c) holders of Claims or Equity Interests should seek advice based on their particular circumstances from an independent tax advisor.**

The Plan summaries and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan and the exhibits annexed thereto. The interpretation provisions set forth in Section 9.14 of the Plan apply to this Disclosure Statement. In the event of any conflict between the descriptions set forth in this Disclosure Statement and the terms of the Plan, the terms of the Plan will govern. Summaries of certain provisions of agreements referred to in this Disclosure Statement do not purport to be complete and are subject to, and are qualified in their entirety by reference to, the full text of the applicable agreement, including the definitions of terms contained in such agreement.

## II.

## BACKGROUND

### A.   CORPORATE STRUCTURE

FGIC is a direct, wholly owned subsidiary of FGIC Corp., a Delaware corporation. FGIC Corp. is a debtor under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), but is not a party to the Rehabilitation Proceeding. FGIC also has outstanding preferred stock (the "**Preferred Stock**") that is held by third parties.

FGIC is the parent company of FGIC UK Limited ("**FGIC UK**"), a wholly-owned United Kingdom insurance company. On July 1, 2009, FGIC UK filed a voluntary variation of permission with the UK Financial Services Authority (the "**FSA**"), its principal regulator, to remove its ability to write new insurance contracts, which the FSA approved on July 10, 2009. FGIC UK is not a party to the Rehabilitation Proceeding.

5

2012, as a result of FGIC's financial condition, FGIC's license to write financial guaranty insurance was suspended by state insurance departments or voluntarily surrendered or limited by FGIC in the following thirty-two (32) states: Alabama, Alaska, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Iowa, Indiana, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Mississippi, Missouri, Nevada, New Hampshire, North Carolina, North Dakota, Ohio, Oregon, South Carolina, Tennessee, Utah, Virginia, Washington, West Virginia and Wyoming.

## III.

### OVERVIEW OF THE PLAN

**A.    SUMMARY OF PLAN TREATMENT OF CLAIMS AND EQUITY INTERESTS**

Other than Claims (including Policy Claims) paid in full prior to the Commencement Date, the Plan will be the exclusive means for resolving and paying (i) all Policy Claims, whenever arising, (ii) all other Claims arising during, or relating to, the period prior to the Effective Date and (iii) all Equity Interests in existence as of the Commencement Date. Claims arising during or relating to the period on and after the Effective Date (other than Policy Claims) are not covered by the Plan and will be resolved and paid by FGIC in the ordinary course of business. The following table lists the categories of Claims and Equity Interests that are treated by the Plan and summarizes the treatment for each category.

| CATEGORY | DESIGNATION | TREATMENT | TOTAL AMOUNT OF CLAIMS[4] | ESTIMATED RECOVERIES |
|---|---|---|---|---|
| A | Secured Claims | Permitted Secured Claims will be paid in full solely from the collateral securing such Claims. | $0 | N/A |
| B | Administrative Expense Claims | Permitted Administrative Expense Claims will be paid in full in Cash. | $16.9 million[5] | 100% |

---

[4] The amounts set forth herein are based on the Rehabilitator's estimation of all existing and anticipated Claims in each category and do not reflect the actual amounts of Claims in each category that may exist, arise or be Permitted.

[5] Estimated for the period from the date of the filing of this Disclosure Statement through December 31, 2012, the anticipated Effective Date.

| CATEGORY | DESIGNATION | TREATMENT | TOTAL AMOUNT OF CLAIMS[4] | ESTIMATED RECOVERIES |
|---|---|---|---|---|
| E | Late-Filed Claims | Holders of Permitted Late-Filed Claims will receive, on a pro rata basis, Cash, as and when available, until all such Claims are paid in full.  Permitted Late-Filed Claims will not be entitled to any distributions until all actual and expected Permitted Claims in Categories A through D are paid in full in Cash or fully reserved for. | Not estimable at this time. | 0% |
| F | Equity Interests | Equity Interests will remain in existence unaffected by the Plan.  Holders of Equity Interests will not be entitled to any distributions, dividends or other payments on account of their Equity Interests until all actual and expected Permitted Claims in Categories A through E are paid in full in Cash or fully reserved for. | N/A | 0% |

**B.    APPROVAL OF PLAN/OBJECTION DEADLINE**

The Rehabilitator has filed a proposed order to show cause (the "**Scheduling Order**"), requesting that the Court set a hearing on December 18, 2012 at 2:15 p.m. to consider approval of the Plan.  The Rehabilitator intends to provide notice of the filing of the Plan, the Rehabilitator's request for the Court to approve the Plan and the means for obtaining more detailed information regarding the Rehabilitation Proceeding, including copies of relevant documents, by (i) posting the Scheduling Order and supporting papers on the Policyholder Information Center, (ii) publishing notice of the hearing to approve the Plan in The Wall Street Journal and The Bond Buyer and (iii) mailing notice of the hearing to approve the Plan to all known Policyholders and other claimants (other than those who requested to stop receiving notices relating to the Rehabilitation Proceeding).

In the Scheduling Order, the Rehabilitator proposed deadlines and procedures for filing updates to the Plan Supplement, objections to the Plan and replies to such objections.  A copy of the Scheduling Order, as well as certain other pleadings filed with the Court by the

B.    PRE-FILING ACTIONS

1.    **Commencement of Run-Off**

In January 2008, to preserve capital, FGIC voluntarily ceased writing Policies for new or additional risks and stopped paying dividends or other distributions to its shareholders.

Since January 2008, FGIC has sought to improve its financial position and liquidity, reduce the size and volatility of its insured portfolio, restore its statutory surplus position to the statutorily mandated amount and pursue loss mitigation strategies, including the remediation or commutation of certain CDS, RMBS, ABS CDO and CLO transactions. FGIC's loss mitigation strategies have been designed to (i) minimize its Claims payments, (ii) maximize its recoveries and (iii) mitigate its expected losses, including by (a) seeking to enforce obligations of third parties to repurchase ineligible mortgage loans and properly service the mortgage loan pools and (b) pursuing litigation or arbitration proceedings to recover losses already incurred by FGIC or to mitigate future losses that FGIC may incur.

2.    **Loss Mitigation Measures**

During the time period from January 2008, when FGIC ceased writing new business, through the Commencement Date, FGIC completed loss mitigation transactions and took other affirmative steps to mitigate potential losses, including the following transactions, which reduced FGIC's incurred losses by over $3.0 billion:

(a)   From January 2008 through July 2009, FGIC completed consensual commutation and termination transactions with eight CDS Counterparties to eliminate its insured exposure to ABS CDO with total NPIF of approximately $9.4 billion. These transactions enabled FGIC to obtain an aggregate surplus benefit of over $1.8 billion and to eliminate its exposure to further adverse loss developments and potential claims for significant Termination Payment Claims (whether calculated on the basis of "Market Quotation," "Loss," "Close-out Amount," or other methodologies) under those transactions where FGIC had insured CDS relating to such ABS CDO;

(b)   As discussed in Section V.C.1 below, in September 2008, FGIC entered into the National Public Reinsurance Transaction (as defined below), which increased its surplus by approximately $534 million;

(c)   In the fourth quarter of 2008, FGIC issued Preferred Stock under a "soft capital" facility in exchange for a Cash purchase price of $300 million, which increased FGIC's surplus by an equal amount;

(d)   From September 2008 through August 2009, FGIC mitigated its insured exposure on FGIC-insured RMBS with total NPIF of approximately $538 million by either purchasing such RMBS (in the secondary market) or entering into private capital markets transactions where it purchased the right to receive the future Claims payments made by FGIC with respect to the subject RMBS. These transactions enabled FGIC to obtain an aggregate surplus benefit of approximately $129 million and to eliminate its exposure to further adverse loss developments on these RMBS. With respect to any purchased RMBS, FGIC is entitled to

11

The 1310 Order required FGIC to suspend payment of all Claims and prohibited FGIC from writing new Policies. In accordance with the 1310 Order, FGIC suspended all Claim payments in November 2009. FGIC previously had ceased writing new Policies in January 2008. The 1310 Order also directed FGIC to submit to the NYSDFS by January 5, 2010, a plan to eliminate the impairment of FGIC's policyholders' surplus and to remove the impairment of its capital and return to compliance with its minimum policyholders' surplus requirement by June 15, 2010. Under the 1310 Order, FGIC was allowed to operate only in the ordinary course of business and as necessary to effectuate the plan it was developing to eliminate impairment of FGIC's policyholders' surplus. The 1310 Order did not preclude the Superintendent from seeking rehabilitation or liquidation of FGIC at any time.

5.    **Surplus Restoration Plan and Related Exchange Offer**

On December 22, 2009, FGIC submitted to the NYSDFS a proposed surplus restoration plan (as amended and restated, the "**Surplus Restoration Plan**"). The Surplus Restoration Plan included three key loss mitigation components:

(a)  Remediating a substantial portion of FGIC's exposure to RMBS and ABS CDO insured by FGIC and for which it established statutory loss reserves, including by "stripping" FGIC insurance on all or a portion of such RMBS and ABS CDO through consensual remediation transactions and an exchange offer (the "**Offer**");

(b)  Commuting, terminating, restructuring or reinsuring a substantial portion of FGIC's remaining exposure to ABS CDO and other obligations for which it established loss reserves, including RMBS insured by FGIC in the secondary market, through consensual transactions; and

(c)  Mitigating FGIC's existing exposure to Termination Payment Claims under FGIC-insured CDS pursuant to consensual transactions with the CDS Counterparties.

Although FGIC reached definitive agreements or agreements in principle with CDS Counterparties and other policy beneficiaries to effectuate certain of the loss mitigation transactions under the Surplus Restoration Plan, the transactions were conditioned on successfully closing the Offer. The Offer did not receive participation from holders sufficient to satisfy the conditions necessary to complete the Offer. The Surplus Restoration Plan was therefore not implemented and FGIC was unable to remove the impairment of its capital as required by the 1310 Order.

6.    **Formation of Ad Hoc Instrument Holder Group**

As a consequence of its inability to gain the necessary level of participation in the Offer, in November 2010, FGIC began discussions with a group of certain holders of Instruments insured by FGIC (the "**Ad Hoc Instrument Holder Group**") in connection with its effort to, along with the NYSDFS, develop a plan of rehabilitation to restore FGIC to statutory solvency and to restructure FGIC's liabilities in a manner that is fair and equitable to its Policyholders and other creditors. The Ad Hoc Instrument Holder Group has been actively involved in discussing various aspects of the Plan, initially with FGIC, and then with the Rehabilitator.

13

actions against those defendants. The claims against non-debtor defendants have also been stayed.

The Rehabilitator and FGIC continue to review potential claims against third parties, including originators, servicers, investment managers and rating agencies, to recover damages for losses suffered by FGIC in connection with its insurance of ABS and RMBS.

While FGIC may recover substantial amounts from litigations and arbitrations and from demands FGIC has made on third parties to repurchase breaching mortgage loans and properly service mortgage loan pools, FGIC has not included any potential recoveries therefrom in the determination of its statutory loss reserve (except for expected recoveries from certain mortgage insurance-related claims) because these recoveries are not sufficiently probable and estimable at this time.

## 8.    FGIC UK Separation

In June 2011, FGIC and FGIC UK entered into a Deed of Termination which terminated the Reinsurance Agreement dated March 31, 2004 and the Excess of Loss Reinsurance Agreement dated March 31, 2004 under which FGIC had provided reinsurance on financial guarantees or policies written by FGIC UK, and released each other from all present and future claims and liabilities under such agreements. Pursuant to the Deed of Termination, FGIC was relieved of its reinsurance obligations in respect of approximately $8 billion of par exposure and permitted to retain 100% of all premiums (net of ceding commissions) previously paid to FGIC.

## 9.    Sponsorship of FGIC Corp. Chapter 11 Plan

On August 3, 2010, FGIC Corp. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), Case No. 10-14215(SMB) (the "**Chapter 11 Case**"). On April 23, 2012, the Bankruptcy Court confirmed FGIC Corp.'s chapter 11 plan (the "**FGIC Corp. Plan**"). The FGIC Corp. Plan incorporates the terms of a Plan Sponsor Agreement that FGIC, with the authorization of the NYSDFS, executed with FGIC Corp. on February 3, 2012 (the "**Plan Sponsor Agreement**") and the Bankruptcy Court approved on February 28, 2012. Pursuant to the Plan Sponsor Agreement, FGIC will pay $11 million to FGIC Corp. and, in exchange, FGIC Corp. will assume the Amended and Restated Income Tax Allocation Agreement (the "**Amended TAA**"), effective as of the effective date of the FGIC Corp. Plan. The Amended TAA is designed to protect certain tax attributes of FGIC, including credits, losses, deductions (including any foreign tax credits, alternative minimum credits, NOLs and net capital losses), deferred deductions, tax basis in assets and any other tax attribute (collectively, the "**Tax Attributes**"). The Tax Attributes are valuable and as of December 31, 2011 include approximately $5.3 billion of NOLs attributable to FGIC. FGIC's obligation to pay $11 million to FGIC Corp. is, however, subject to a number of conditions relating to the preservation of these valuable Tax Attributes, including receipt of a private letter ruling pursuant to its request for the same from the IRS. As discussed in Section VI.E.1 hereof, receipt of this private letter ruling is also one of the conditions precedent to effectiveness of the Plan. However, as discussed in

As provided in more detail therein, the Order of Rehabilitation also enjoined and restrained all Persons from taking certain actions for the duration of the Rehabilitation Proceeding, including (i) transacting FGIC's business, (ii) wasting or disposing of FGIC's property, (iii) interfering with the Rehabilitator's possession, control or management of FGIC's property, (iv) disclosing any non-public information that is proprietary to FGIC, (v) commencing, continuing, advancing or otherwise prosecuting any Legal Proceedings against the FGIC Parties and certain other Persons and (vi) paying any Claims or performing any obligations of the FGIC Parties without the consent of the Rehabilitator (or his designee). The Order of Rehabilitation also provided additional injunctive relief tailored to the unique circumstances of a financial guaranty insurance company such as FGIC. This relief, among other things, barred all Persons from (i) withholding or setting off FGIC Payments owed to the FGIC Parties, (ii) terminating FGIC Contracts and asserting Termination Payment Claims against the FGIC Parties and (iii) exercising or otherwise interfering with FGIC Rights, in each case despite contractual *ipso facto* provisions in certain FGIC Contracts and related Transaction Documents that might otherwise modify the FGIC Parties' rights as a result of the Rehabilitation Circumstances or Rehabilitation Proceeding.

The Order of Rehabilitation is available at the Policyholder Information Center. Persons that violate the injunctive relief in the Order to Show Cause or Order of Rehabilitation may be subject to sanctions, may not be entitled to Claims payments under the Plan and may be subject to partial or full disapproval of their Claims. The injunctive relief in the Order of Rehabilitation will be superseded by injunctive relief set forth in Section 7.8 of the Plan.

C.    **LOSS MITIGATION EFFORTS**

1.    **Novation of National Public Reinsured Policies**

In September 2008, FGIC entered into an agreement with MBIA, pursuant to which FGIC ceded to MBIA exposure under policies covering U.S. public finance credits with total NPIF of approximately $188 billion, of which $138 billion remained outstanding as of December 31, 2011 (collectively, the "**National Public Reinsured Policies**"). Shortly thereafter, National Public, an affiliate of MBIA, replaced MBIA as the party to such transaction and assumed MBIA's obligations thereunder (the "**National Public Reinsurance Transaction**"). Key features of the National Public Reinsurance Transaction included:

(a)    National Public agreed to pay on behalf of FGIC all obligations under the National Public Reinsured Policies (subject to certain limited exceptions);

(b)    Policyholders under the National Public Reinsured Policies were allowed to bring Claims directly against National Public without filing a Claim against FGIC (sometimes referred to as a "cut-through" feature);

(c)    National Public agreed to perform all services necessary for administration of the National Public Reinsured Policies, including policyholder service, billing and claims handling;

been executed with two such counterparties. These CDS Commutation Agreements will terminate FGIC CP-issued CDS and related FGIC-issued Policies in exchange for payments by FGIC aggregating approximately $51.5 million. As of March 31, 2012, the exposure to be commuted constitutes approximately $3.8 billion NPIF, represents approximately $293 million of statutory loss reserves and carries aggregate estimated exposure to potential Termination Payment Claims of approximately $1.5 billion. Payments by FGIC under these CDS Commutation Agreements will result in the cancellation or "tearing up" of FGIC's Policies related to that exposure for less than what these CDS Counterparties are projected to have received under the Plan on account of Policy Claims for realized credit events that the Rehabilitator projects would have been asserted against FGIC if the CDS with such CDS Counterparties were not "torn up" or terminated early. The Rehabilitator is also continuing negotiations with other CDS Counterparties and is seeking to execute additional CDS Commutation Agreements between FGIC and such counterparties. Consummation of the transactions contemplated by the CDS Commutation Agreements requires (or will require) approval by the Court. The Rehabilitator will file all executed CDS Commutation Agreements with the Court (potentially in redacted form) in an update to the Plan Supplement in accordance with the deadlines set forth in the Scheduling Order.

### 3. **Reinsurance Commutation Agreement**

Following entry of the Order of Rehabilitation, the Rehabilitator negotiated a settlement, commutation and release agreement with American Overseas Reinsurance Company Limited, a Bermuda reinsurance company formerly known as RAM Reinsurance Company Limited ("**AORe**"), pursuant to which, as of August 20, 2012, FGIC and AORe agreed to commute and settle all of their obligations to one another under various reinsurance agreements effective upon AORe's payment to FGIC of approximately $64.8 million, subject to Court approval (which is currently pending). The Rehabilitator may seek Court approval of agreements with other Reinsurers to commute and settle FGIC's and such Reinsurer's obligations to one another (collectively, with the AORe agreement, the "**Reinsurance Commutation Agreements**").

### D. **DISCUSSIONS CONCERNING THE PLAN WITH VARIOUS CONSTITUENTS**

Following the issuance of the Order of Rehabilitation, the Rehabilitator engaged in discussions with various parties, including the Ad Hoc Instrument Holder Group, an ad hoc group of CDS Counterparties and the Indenture Trustees that had initially objected to certain provisions of the injunctive relief requested in the Rehabilitation Petition. Following their review and discussion with the Rehabilitator, certain members of the Ad Hoc Instrument Holder Group have agreed to support or not object to the Plan.

Consistent with the goal of the Plan, the Rehabilitator developed the Restructured Policy Terms to maximize the extent to which FGIC's Policyholders are treated in a fair and equitable manner. The Restructured Policy Terms are designed to address challenges the Rehabilitator faced in achieving this goal.

*CPP/DPO Structure.* First, because FGIC likely will not have sufficient assets to pay in full in Cash all Policy Claims that have arisen but have not been paid or that are expected to arise over the Run-Off Period, which may last 40 years, the Restructured Policy Terms provide for payment of only a portion of each Permitted Policy Claim in Cash. FGIC will satisfy the remainder of each Permitted Policy Claim through future payments on account of a DPO for the related Policy, to the extent payable under the Plan. FGIC will track DPOs on a Policy-by-Policy basis, and will reduce each DPO by the amount of any Cash payments or Deemed Cash Payments made with respect to Permitted Policy Claims under the related Policy, as discussed below. These contingent additional payments under DPOs will be payable only if, when and to the extent FGIC determines, in consultation with a third-party firm and with NYSDFS approval, that it has sufficient assets to pay in Cash an increased portion of each previously Permitted Policy Claim and each Policy Claim it expects to permit in a Stress Scenario during the Run-Off Period.

This approach is designed so that all of FGIC's Policyholders receive the same percentage (or CPP) of Cash on account of their Permitted Policy Claims, whether arising in the next five years or in the next few decades. The Rehabilitator, in consultation with Lazard, will set the initial CPP based on assumptions intended to enable FGIC to pay at least the initial CPP of all Policy Claims Permitted over the Run-Off Period. However, the Rehabilitator expects the CPP to increase over time. To compensate Policyholders with Claims Permitted in the near term for receiving a lower initial Cash payment because of this approach, the Restructured Policy Terms provide for DPO Accretion, which is discussed below.

*Turnover of FGIC Payments.* Second, the Restructured Policy Terms require all FGIC Payment Payors to pay in Cash in full all FGIC Payments, as defined in the Plan, owed or that would have been owed to FGIC. The definition of FGIC Payments captures (i) all premiums, fees or other charges, (ii) all expense reimbursements, (iii) to the extent FGIC paid one or more Policy Claims in full under the applicable Policy prior to November 24, 2009 for which it has not yet been reimbursed, all recoveries, reimbursements, settlements and other amounts (other than proceeds of Trust Loan Repurchase Obligations) up to the amount of such reimbursement and (iv) the then-current CPP of all recoveries, reimbursements, settlements and other amounts (other than proceeds of Trust Loan Repurchase Obligations) with respect to Policies for which there are no unreimbursed Policy Claims that were paid in full prior to November 24, 2009, in all cases payable to the FGIC Parties under the terms of or in connection with the relevant Policy or related Transaction Documents, as if (x) the Plan been in effect at all times from and after the issuance of the 1310 Order and (y) FGIC at all times paid all Policy Claims in full in Cash. With respect to clauses (iii) and (iv), many of FGIC's Policies and related Transaction Documents tie certain amounts in respect of recoveries, reimbursements, settlements and other amounts owed to FGIC under such Policies to the amount of Cash payments FGIC makes with respect to Policy Claims thereunder. The Rehabilitator believes it is fair and equitable to require FGIC Payment Payors to pay the then-current CPP portion of the recoveries, reimbursements, settlements and other amounts (other than proceeds of Trust Loan

21

Accordingly, the injunctive relief set forth in Section 7.8 of the Plan prohibits any Person from taking such actions. However, if any Person attempts to terminate a FGIC Contract and assert a Termination Payment Claim or exercise FGIC Rights in violation of the injunctive relief in the Plan, the Restructured Policy Terms provide that FGIC may declare a Policy Crystallization Event, as defined in the Plan. The concept of a Policy Crystallization Event is intended to put FGIC in no worse a position than it would have been in had the injunctive relief not been violated. This declaration of a Policy Crystallization Event enables FGIC to determine its anticipated payment obligations under the applicable Policy for the remainder of the expected duration of the Policy, ignoring any actual or anticipated effects of the actions that gave rise to the Policy Crystallization Event.

The following mechanics in the Restructured Policy Terms are described more fully below: (i) the payment of a portion of each Permitted Policy Claim in Cash; (ii) the satisfaction of the remainder of each Permitted Policy Claim through a DPO for the related Policy which will entitle the holder of such Policy to contingent additional payments and the calculation of such DPO; (iii) the accrual, calculation and payment of DPO Accretion; (iv) the requirement to make certain payments to FGIC and adjustments thereto; (v) the conduct of annual CPP Revaluations; and (vi) FGIC's right to declare a Policy Crystallization Event. An illustrative example of how Permitted Policy Claims will be paid pursuant to the Restructured Policy Terms is attached hereto as Exhibit E.

(a) CPP

Section 1.1 of the Restructured Policy Terms sets forth FGIC's obligation to pay in Cash a percentage (the CPP) of each Permitted Policy Claim and provides the mechanics for establishing the CPP and calculating the initial CPP payment for each Permitted Policy Claim.

The Rehabilitator will set the initial CPP. The Rehabilitator currently expects an initial CPP of 15% based on assumptions designed to maximize fair and equitable treatment of all Permitted Policy Claims, no matter when arising. The initial CPP will depend on several factors, including (i) actual or anticipated changes in the assumptions underlying the Run-Off Projections (including those relating to developments in actual or anticipated losses under FGIC's Policies or other financial circumstances or events), (ii) whether the Novation Agreement is approved by the Court, (iii) whether the two CDS Commutation Agreements executed thus far are approved by the Court, (iv) whether additional CDS Commutation Agreements are executed and approved by the Court (and the terms thereof), (v) whether the Reinsurance Commutation Agreement executed with AOR e is approved by the Court and, if approved, whether FGIC receives the payment contemplated thereby, (vi) whether additional Reinsurance Commutation Agreements are executed and approved by the Court (and the terms thereof), (vii) whether FGIC receives the payments contemplated by any additional Reinsurance Commutation Agreements and (viii) other events and circumstances that may be beyond the Rehabilitator's control. While the Rehabilitator currently anticipates that the initial CPP will be 15%, as set forth above, no assurance can be given as to what the initial CPP ultimately will be. The CPP will be subject to adjustment pursuant to annual CPP Revaluations, as described in subsection (e) of this Section VI.B.1. The Rehabilitator currently anticipates that the CPP will ultimately increase to 30.4% using assumptions described in the Run-Off Projections, attached

23

(c) DPO Accretion

Section 1.3 of the Restructured Policy Terms governs the accrual, calculation and payment of DPO Accretion. Each Policy will accrue DPO Accretion at a rate of 3% per year (on a daily basis on the basis of a 365-day year). DPO Accretion will be calculated based on a Policy's DPO as of (i) the preceding June 30 or (ii) for the first year in which there is a DPO under such Policy, the first date there is such DPO (the "**First Payment Date**"). DPO Accretion for a Policy will begin accruing on the First Payment Date and continue until such time (if ever) as the DPO for such Policy is permanently reduced to zero. All DPO Accretion will be calculated on a simple basis rather than a compound basis (*i.e.*, no DPO Accretion will accrete based on accumulated DPO Accretion). No DPO Accretion will be added to a DPO, but will be recorded separately for each Policy in FGIC's books and records.

Section 1.3(B) of the Restructured Policy Terms provides that, if there is a CPP Upward Adjustment pursuant to Section 1.5(C) of the Restructured Policy Terms, as described in subsection (e) of this Section VI.B.1, on the applicable DPO Payment Date FGIC will make Cash payments with respect to outstanding DPO Accretion. The amounts of such Cash payments (the DPO Accretion Payment Amounts) will be calculated as part of the CPP Revaluation that led to the CPP Upward Adjustment, as described in greater detail in subsection (e) below. The Rehabilitator expects that the DPO Accretion Payment Amounts will be a fraction of the outstanding DPO Accretion. However, the Rehabilitator makes no assurances as to if, when or in what amounts FGIC may ultimately make Cash payments with respect to any DPO Accretion. Further, Section 3.2 of the Restructured Policy Terms provides that DPO Accretion is not a separate security issued by FGIC or any of its affiliates, cannot be represented by any certificate or other instrument issued by FGIC or any of its affiliates, and does not represent any ownership in FGIC or any of its affiliates. In addition, Section 3.2 of the Restructured Policy Terms provides that FGIC will not be required to make any payments with respect to any DPO Accretion other than to the holder of the related Policy.

(d) FGIC Payments

Section 1.4 of the Restructured Policy Terms establishes FGIC's right to set off unpaid FGIC Payments and FGIC's obligation to account for the effect of CPP Adjustments on FGIC Payments. Section 1.4(A) of the Restructured Policy Terms requires all FGIC Payment Payors to pay in Cash to the FGIC Parties all FGIC Payments that would have been payable had the Plan been in effect at all times from and after the issuance of the 1310 Order, when due, or if such FGIC Payment would have been due prior to the Effective Date, by the fifth Business Day following the Effective Date. This requirement is intended to prevent certain Policyholders from gaining an unfair advantage to the detriment of other Policyholders by withholding FGIC Payments based on the Rehabilitation or the Rehabilitation Circumstances.

Section 1.4(A) of the Restructured Policy Terms also provides that if FGIC determines in good faith that all or a portion of any FGIC Payment has not been paid to the FGIC Parties when due, FGIC will (i) upon such determination, decrease the DPO for the applicable Policy by the amount of such unpaid FGIC Payment, (ii) reduce any Cash payments that would otherwise be payable by FGIC in respect of the applicable Policy as such Cash payments become due and (iii) increase the DPO for the applicable Policy as Cash payments are reduced pursuant

25

determination of such FGIC Payment Deficiency or FGIC Payment Excess, but before the next CPP Adjustment.

These four steps are intended, in connection with any CPP Adjustment, to place FGIC and each Policyholder, Policy Payee and FGIC Policy Payor in substantially the same economic position (ignoring the time value of money), on a Policy-by-Policy basis, that each party would have been in had FGIC paid all Permitted Policy Claims based on the Adjusted CPP from and after the Effective Date.

Finally, Section 1.4(B) of the Restructured Policy Terms does not apply to FGIC Payments related to Policy Claims that were paid in full prior to the 1310 Order. The definition of FGIC Payments indicates that, with respect to such Policy Claims, FGIC is entitled to all of the recoveries, reimbursements, settlements and other amounts (other than proceeds from Trust Loan Repurchase Obligations) payable to the FGIC Parties under such Policies or related Transaction Documents, until it has been reimbursed in full.

(e) CPP Revaluation

Section 1.5 of the Restructured Policy Terms sets forth the terms and conditions governing CPP Revaluations, including (i) the frequency of CPP Revaluations, (ii) the engagement and role of a CPP Revaluation Firm, (iii) CPP Adjustments, (iv) cessation of CPP Upward Adjustments and (v) the Final CPP Revaluation.

Section 1.5(A) of the Restructured Policy Terms provides that, commencing in 2014, FGIC will conduct a CPP Revaluation (to determine whether the CPP should remain the same or be adjusted upward or downward) on an annual basis by June 30 of each year (or as soon as practicable thereafter). In addition, if FGIC receives within six months after the effective date of a CPP Revaluation or the Effective Date Cash recoveries aggregating $100 million or more than the related Cash recovery amounts, if any, predicted in the Run-Off Projections underlying such CPP Revaluation, the Board will decide whether to (i) update the latest CPP Revaluation, taking into account the new Cash recoveries, but without updating or otherwise changing any of the Base Scenario, Stress Scenario, Run-Off Projections, Run-Off Data, Minimum Cash Buffer or Run-Off Assumptions used in the latest CPP Revaluation or (ii) conduct a new CPP Revaluation as soon as practicable. If the Board decides to update the latest CPP Revaluation, instead of conducting a new one, it will provide NYSDFS with written notice of the results of the updated CPP Revaluation. However, FGIC will not conduct any CPP Revaluation if the NYSDFS directs it in writing to refrain from doing so.

Section 1.5(B) of the Restructured Policy Terms provides that FGIC will engage a CPP Revaluation Firm to conduct each CPP Revaluation. As part of each CPP Revaluation, the CPP Revaluation Firm will review certain components of its model that will help it determine whether to recommend a CPP Adjustment. These components include the then-current Base Scenario, Stress Scenario, Run-Off Projections, Run-Off Data, Minimum Cash Buffer and Run-Off Assumptions. The CPP Revaluation Firm will propose any updates, revisions, corrections or other modifications to these components that, in its professional opinion, are necessary or advisable to correct any errors, reflect events that have occurred or are reasonably likely to occur

prior to such CPP Upward Adjustment and (ii) the Aggregate Claims amount for such Policy less the amounts (if any) by which the DPO was reduced for such Policy pursuant to Section 1.2(i) of the Restructured Policy Terms (to account for payments a Policyholder already received from other sources on account of the loss insured by such Policy). This "catch-up" payment is intended to provide holders of such Policies the recoveries they would have received had the Adjusted CPP been in effect on the previous DPO Payment Date(s). FGIC will also reduce the DPO of any such Policy by the amount of such "catch-up" payments.

In the event of a CPP Downward Adjustment, any future Cash payments that would otherwise be payable by FGIC for Policies to which FGIC paid any Cash from and after the Effective Date but prior to the CPP Adjustment, based on a higher CPP (each an, "**Overpaid Policy**") will be subject to an Equalization Adjustment. The Equalization Adjustment will reduce (including to zero) the amount of Cash that would otherwise be payable by FGIC with respect to each Overpaid Policy until such time as the Aggregate Cash Payments Amount for each Overpaid Policy equals the amount of Cash that FGIC would have paid if the (downwardly) Adjusted CPP had been in effect from and after the Effective Date (including DPO Accretion Payment Amounts).

As there are significant costs involved in conducting CPP Revaluations, to help ensure that FGIC will have adequate assets to pay the Permitted Policy Claims of long-term Policyholders, Section 1.5(D) of the Restructured Policy Terms provides that once FGIC reasonably determines that approximately 90% or more of the total anticipated Policy Claims are no longer subject to contingencies or other developments (other than the passage of time and/or the submission of a valid request for payment thereof), FGIC may halt CPP Revaluations, unless (i) the value of FGIC's remaining admitted Cash, Cash equivalents, bonds and short-term investments exceeds 200% of the anticipated amount of remaining anticipated Policy Claims multiplied by the CPP then in effect, (ii) NYSDFS requests that FGIC continue to conduct CPP Revaluations or (iii) FGIC deems it prudent to continue conducting CPP Revaluations and NYSDFS approves. Section 1.5(E) of the Restructured Policy Terms provides that, once FGIC has reasonably determined that 100% of the total anticipated Policy Claims are no longer subject to contingencies or other developments (other than the passage of time and/or the submission of a valid Claim), FGIC will conduct the Final CPP Revaluation to distribute the aggregate amount of FGIC's remaining assets (less projected expenses) pro rata based on the outstanding DPO and DPO Accretion in respect of all Policies.

(f) Policy Crystallization Events

Article II of the Restructured Policy Terms sets forth the terms and conditions governing the declaration of a Policy Crystallization Event and the effect of such declaration. Section 2.1 of the Restructured Policy Terms provides that if any Person (other than the FGIC Parties), notwithstanding the injunctive relief and other terms and conditions in the Plan, (i) exercises, seeks to exercise or in any manner fails to honor the FGIC Parties' exclusive authority to exercise FGIC Rights or otherwise fails to comply with the injunctive relief set forth in Section 7.8(e) of the Plan, (ii) exercises or seeks to exercise any Rehabilitation-Triggered Rights, (iii) declares or seeks to declare a Rehabilitation-Related Default or (iv) interferes or seeks to interfere with the FGIC Parties' pursuit of FGIC Direct Claims (clauses (i) through (iv) collectively, "**Purported FGIC Loss of Rights**"), FGIC may declare with respect to such Policy

29

novation to National Public of all reinsurance or any portion thereof covering the National Public Reinsured Policies that is in existence as of the Effective Date (after giving effect to any Reinsurance Commutation Agreements).

The Novation Agreement will enable FGIC to avoid holding additional assets to protect against potential Policy Claims under the National Public Reinsured Policies in a Stress Scenario should National Public be unwilling or unable to meet its obligations. In such a situation, and in light of the large potential exposure under the National Public Reinsured Policies (approximately $138 billion in aggregate par outstanding as of December 31, 2011), even a small increase in relative losses thereunder could result in significant exposure to FGIC. Under the Run-Off Projections, such additional loss exposure would approximate $17.7 billion. As a result of the Novation Agreement, FGIC will avoid that risk, resulting in a higher initial CPP and increased overall recoveries for Policyholders.

3.    **Approval of CDS Commutation Agreements**

As described in Section V.C.1 hereof, as part of approval of the Plan, the Rehabilitator is seeking the Court's approval of two CDS Commutation Agreements. The Rehabilitator is continuing negotiations with other CDS Counterparties in an effort to execute additional CDS Commutation Agreements between FGIC and such counterparties. The Rehabilitator will file all executed CDS Commutation Agreements with the Court (potentially in redacted form) in an update to the Plan Supplement in accordance with the deadlines set forth in the Scheduling Order. Effectiveness of each CDS Commutation Agreement is (or will be) conditioned on, among other things, approval thereof by the Court.

Pursuant to the two CDS Commutation Agreements executed thus far, in exchange for payments by FGIC aggregating approximately $51.5 million, FGIC will (i) eliminate all its insured exposure (approximately $3.8 billion NPIF) with respect to the CDS and certain other obligations covered by such CDS Commutation Agreements, (ii) significantly reduce its statutory loss reserves (by approximately $293 million) and (iii) avoid any uncertainty, delay and costs that could arise from litigating approximately $1.5 billion in potential Termination Payment Claims that may arise under such CDS. The CDS Counterparties commuting their Policies pursuant to these CDS Commutation Agreements will receive a Cash payment on or about the Effective Date in an amount less than what such counterparties are projected to have received under the Plan on account of Policy Claims for realized "Credit Events" (as defined in the relevant CDS, or similar term provided therein) that the Rehabilitator projects would have been asserted against FGIC if the CDS with such CDS Counterparties were not "torn up" or terminated early.

4.    **Corporate Governance**

The Plan contemplates that, upon termination of the Rehabilitation Proceeding, a new board of directors of FGIC will be appointed that will take over control of FGIC. The Rehabilitator will post a List of Initial Directors and Officers on the Policyholder Information Center before the Effective Date. In addition, the Rehabilitator has proposed certain changes to FGIC's corporate governance structure, which will be reflected in the Form of Amended and Restated Charter (the "**Charter**") and the Form of Amended and Restated By-Laws (the "**By-**

establishes a process for resolving certain conflicts that may arise between such holders and FGIC with respect to the exercise of such rights and remedies. In addition, as mentioned above, proceeds from Trust Loan Repurchase Obligations will not be treated as FGIC Payments, as such term is defined in the Plan and described in Section VI.B.1 above. Instead, Sections 3.7(a)(iii) and 3.7(b)(iv) of the Plan provide that such proceeds will be applied and distributed in accordance with the express terms and conditions of the relevant Transaction Documents assuming, solely for the purposes of determining FGIC's priority with respect to receipt of such proceeds, that FGIC has not complied with its payment obligations under the relevant Policy.

C.    **CLAIM ADMINISTRATION AND DISTRIBUTIONS**

1.    **Claim Administration Generally**

Section 4.1 of the Plan provides that, after the Effective Date, FGIC will be responsible for resolving all Claims not resolved prior to the Effective Date in compliance with the Plan and any NYSDFS Guidelines.

2.    **Submission of Claims**

(a)    Secured Claims and Administrative Expense Claims

Section 4.2(A) of the Plan requires all Secured Claims and Administrative Expense Claims to be submitted to FGIC in writing in the ordinary course of business and pursuant to the underlying FGIC Contracts (if applicable) giving rise to such Claims.

(b)    Policy Claims

Section 4.3(A) of the Plan requires holders of Policy Claims to submit a Proof of Policy Claim Form (in a form that will be filed as part of an update to the Plan Supplement) in addition to any information required by the applicable Policies for submission of Claims thereunder. Section 4.3(A) of the Plan also establishes Policy Claim submission deadlines, including a Claims Resubmission Deadline for Policy Claims previously submitted to FGIC that remain unpaid in whole or in part as of the Effective Date. The Plan requires the resubmission of such Policy Claims to facilitate and expedite the Claims reconciliation process by requiring the holders of such Policy Claims to disclose additional information about their Policy Claims to enable FGIC to determine whether any portions thereof should not be Permitted pursuant to Section 4.10 of the Plan. Policy Claims not timely submitted pursuant to Section 4.3(A) of the Plan will be treated as Late-Filed Claims. On and after the Novation Effective Date (as defined in the Novation Agreement), claims arising under the National Public Reinsured Policies should be submitted directly to National Public, and not to FGIC, regardless of when such claims arose.

(c)    Non-Policy Claims

Section 4.4(A) of the Plan establishes the Bar Date for submitting Non-Policy Claims and provides that all Non-Policy Claims not submitted by the Bar Date will be treated as Late-Filed Claims. Unlike Policy Claims, Non-Policy Claims submitted to FGIC or the Rehabilitator prior to the Effective Date that remain unpaid as of the Effective Date need not be resubmitted.

33

FGIC Payor becomes a subrogee of the holder of such Permitted Claim as a result of such payment; and *provided, further*, that this sentence will not modify any terms of the Plan regarding FGIC Payments.

      **6.**      **Alternative Resolutions of Claims**

Section 4.8 of the Plan allows FGIC to, after the Effective Date and without further Court approval, resolve any Claim through a consensual Alternative Resolution as long as FGIC (i) determines in its reasonable business judgment that the Alternative Resolution is fair and equitable to Policyholders generally and not reasonably likely to result in a reduction of the CPP and (ii) provides NYSDFS notice pursuant to Section 7.10(d) of the Plan.

      **7.**      **Setoffs**

Unless otherwise specified in the Plan, including in Section 4.7(B) thereof and the Restructured Policy Terms, Section 4.9 of the Plan generally authorizes FGIC to set off a Permitted Claim, or distributions owed under the Plan on account of such Permitted Claim, against any amounts FGIC reasonably determines to be owed to it under Causes of Action FGIC may have against the holder of such Permitted Claim.

      **8.**      **Certain Claims Not Permitted**

Section 4.10 of the Plan lists types of Claims that will not be Permitted, including, among other things, post-Commencement Date interest on Claims, interest on the amount of any interest, principal or other amounts payable in respect of an insured obligation, which was the subject of a Permitted Policy Claim and satisfied with DPO rather than Cash pursuant to Section 2.3 the Plan, Duplicative Claims and Termination Payment Claims asserted in violation of the injunctive relief in the Plan.

      **9.**      **Address or Account for Delivery of Distributions/Unclaimed Distributions**

Section 4.11 of the Plan provides that FGIC will make distributions under the Plan to a holder of a Permitted Policy Claim at the address or account of such holder, as set forth on the Proof of Claim or Proof of Policy Claim Form submitted by such holder, as applicable. Section 4.11 of the Plan also governs FGIC's obligations with respect to, and the treatment, of undeliverable distributions.

      **10.**      **Time Bar to Cash Payments**

Section 4.12 of the Plan provides that any checks issued in respect of Permitted Claims will be null and void if not negotiated within 180 days after the date of issuance thereof, and establishes that requests for reissuance of any voided check must be made directly to FGIC by the holder of the Permitted Claim to whom such check was originally issued, before the applicable distribution becomes abandoned property under then-applicable law.

3.    **Waiver of Conditions**

Section 6.3 of the Plan authorizes the Rehabilitator to waive any of the conditions precedent listed in Section 6.1 of the Plan, except for the requirement in Section 6.1(a) thereof that the Plan Approval Order be signed.

F.    **EFFECT OF EFFECTIVE DATE**

1.    **Discharge**

Section 7.1 of the Plan provides that Permitted Claims will be treated solely pursuant to the Plan and such treatment will effect a full and complete release, discharge and termination of any liens or other claims, interests or encumbrances upon the FGIC Parties with respect to such Permitted Claims. Further, all liens and other claims, interests and encumbrances upon the FGIC Parties with respect to any Claim or portion thereof that is not Permitted will be released, discharged and terminated.

2.    **Releases**

Section 7.2 of the Plan provides that FGIC Parties will release the following Persons unconditionally and forever from any and all Causes of Action arising on or prior to the Commencement Date from or relating to the operation of FGIC or the Rehabilitation Proceeding: (i) the NYLB, (ii) the NYSDFS, (iii) the Rehabilitator, (iv) the Representatives and employees of each of the NYLB, the NYSDFS and the Rehabilitator, and any advisors retained by the Representatives of the foregoing, (v) the Representatives of FGIC and any advisors retained by any of such Representatives, in each case solely with respect to services provided on or after November 24, 2009 and (vi) those directors, officers, and employees of the FGIC Parties who served or were employed by the FGIC Parties in such capacity on or after November 24, 2009. The releases, however, do not apply to acts or omissions determined by a Final Order to constitute willful misconduct, gross negligence, intentional fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages or *ultra vires* acts.

3.    **Exculpation**

Section 7.3 of the Plan exculpates the following Persons as of the Effective Date from any and all Causes of Action based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or after November 24, 2009 and arising out of, in connection with or otherwise relating to the Rehabilitation Proceeding, the Disclosure Statement, the Plan or any agreement entered into as part of or pursuant to the Plan: (i) the FGIC Parties; (ii) the NYLB; (iii) the NYSDFS; (iv) the Rehabilitator; (v) the Representatives and employees of each of the FGIC Parties, the NYLB, the NYSDFS and the Rehabilitator, and any advisors retained by the Representatives of the foregoing; and (vi) directors and officers of the FGIC Parties. The exculpation, however, does not apply to acts or omissions determined by a Final Order to constitute willful misconduct, gross negligence, intentional fraud, criminal conduct, intentional unauthorized misuse of confidential information that causes damages or *ultra vires* acts.

Payment Claim (whether calculated on the basis of "Market Quotation," "Loss," "Close-out Amount" or other methodologies), (iv) exercising or otherwise interfering with FGIC Rights, subject to Section 3.7 of the Plan, (v) seeking to acquire, acquiring or exercising voting or other corporate governance rights pursuant to or under the Preferred Stock and (vi) pursuing any Released Cause of Action or Exculpated Cause of Action.

9.    **Preservation of Causes of Action**

Section 7.9 of the Plan authorizes (but does not require) FGIC to prosecute, settle, release, compromise or enforce any and all Causes of Action not released or exculpated pursuant to the Plan, but requires FGIC to (i) provide to the NYSDFS 30 days' written notice (or such advance notice as the NYSDFS may agree to) before settling, releasing or compromising any Causes of Action where FGIC's claims would be expected to exceed $25 million (or such other amount as the NYSDFS may agree to) and (ii) obtain prior written approval from the NYSDFS if any such settlement, release or compromise would result in a payment by FGIC of $10 million (or such other amount as the NYSDFS may agree to) or more.

10.    **Limitations on Operations Following Effective Date**

Section 7.10 of the Plan sets forth limitations on FGIC's operations following the Effective Date that will apply until such time (if ever) as the NYSDFS grants written approval to remove them. The limitations, among other things, restrict FGIC's ability to (i) issue new insurance policies or provide new reinsurance, (ii) pay dividends, distributions or other payments on account of any Equity Interest, (iii) sell, reinsure or otherwise transfer 5% or more of its Admitted Assets, (iv) execute changes to its corporate governance structure or amend its Charter or By-laws or (v) effectuate a CPP Adjustment, each without the prior express written approval of the NYSDFS. Section 7.10 of the Plan also requires FGIC to provide the NYSDFS with 30 days' written notice (or such advance notice as the NYSDFS may agree to) before it may (a) effectuate an Alternative Transaction pursuant to Section 4.8 of the Plan that would extinguish or reduce any FGIC liability by more than $25 million (or such other amount as the NYSDFS may agree to) or (b) permit any Claim in an amount exceeding $10 million (or such other amount as the NYSDFS may agree to). In addition, Section 7.10 of the Plan requires FGIC to obtain the prior written approval of the NYSDFS for any Alternative Transaction that would result in a payment by FGIC of $10 million (or such other amount as the NYSDFS may agree to) or more.

11.    **Reporting**

Section 7.11(A) of the Plan requires FGIC to file annual reports on the status of the Rehabilitation with the NYSDFS and on the Policyholder Information Center. Further, FGIC must deliver to the NYSDFS annual and quarterly reports related to the Run-Off Projections pursuant to Section 7.11(B) of the Plan.

G.    **RETENTION OF JURISDICTION**

Section 8.1 of the Plan provides that after the Effective Date and termination of the Rehabilitation Proceeding the Court will have exclusive jurisdiction over all matters arising out of or related to the Rehabilitation Proceeding and the Plan, including jurisdiction to, among

Company, for MacKay to act as investment manager and to manage the bulk of FGIC's investment portfolio commencing September 9, 2009.

The following table summarizes the composition of FGIC's Cash and investments at fair value:[10]

|  | As of March 31, 2012 ($ in millions) |
| --- | --- |
| Cash | $3.9 |
| Long-Term investments: |  |
| Municipal obligations | $590.1 |
| U.S. government obligations | $49.6 |
| Foreign government obligations | $34.6 |
| Mortgage and asset-backed securities | $346.6 |
| Corporate | $124.6 |
| Other | $7.2 |
| Subtotal | $1,152.7 |
| Short-term investments | $936.0 |
| Total | $2,092.6 |

2.    **Premiums**

The tables below present (i) statutory unearned premiums and the net present value of installment premiums FGIC expects to collect, in each case net of reinsurance, as of March 31, 2012, by business segment and (ii) the gross installment premiums FGIC expects to collect over the estimated term of the related Policies, as of March 31, 2012, by year. The expected installment premiums are based on various prepayment and collection assumptions as of March 31, 2012 and actual installment premiums collected could differ materially. In addition, the premium amounts in the tables below do not give effect to Policy or reinsurance terminations that have occurred or may occur subsequent to March 31, 2012, including pursuant to the CDS Commutation Agreements and Reinsurance Commutation Agreement, which could change such amounts.

| Business Segment ($ in millions) | Statutory Unearned Premiums | Net Present Value of Installment Premiums[1] | Total Expected Future Installments (Gross Value) |
| --- | --- | --- | --- |
| Public Finance | $145.5 | $63.4 | $105.2 |
| RMBS | $1.0 | $76.4 | $97.6 |
| Structured Finance (other than RMBS) | $1.2 | $60.4 | $82.1 |
| International | $13.9 | $51.2 | $80.6 |
| Total | $161.6 | $251.2 | $365.5 |

(1)  Net Present Value of Installment Premiums is calculated using FGIC's expected premium schedule, discounted at 5%.

[10] The entries in the charts in this Section VII may not add up to the totals reflected therein because of rounding.

| Collateral Type | Number of policies outstanding | NPIF ($ in millions) | % of Total NPIF |
|---|---|---|---|
| Alternative-A Paper ("Alt-A") (1st lien) | 20 | $1,034.8 | 2.6% |
| Home Equity Line of Credit ("HELOC") | 44 | $4,164.3 | 10.4% |
| High Loan-to-Value ("LTV") | 13 | $857.5 | 2.1% |
| Closed end second mortgages | 26 | $3,799.8 | 9.5% |
| Subprime (1st lien) | 73 | $4,073.7 | 10.2% |
| Prime (1st lien) | 6 | $179.1 | 0.4% |
| **Total** | 182 | $14,109.3 | 35.2% |

2.    **CDO Exposure**

        As of March 31, 2012, FGIC's NPIF, after giving effect to reinsurance, for CDO, by underlying collateral, totaled approximately $4.7601 billion, as reflected in the following table, representing approximately 11.9% of FGIC's NPIF of all liabilities at such date. FGIC insured the CDO directly where the form of credit enhancement is noted as (FG) in the following table and in all other cases insured CDS written by FGIC CP, which provided credit protection on the CDO:

| Underlying Collateral (Form of credit enhancement) | Number of transactions | NPIF ($ in millions) | % of Total NPIF |
|---|---|---|---|
| ABS CDO High Grade ABS | 2 | $1,231.7 | 3.1% |
| CLO High Yield Loans | 16 | $2,854.4 | 7.1% |
| CLO High Yield Loans (FG) | 1 | $145.9 | 0.36% |
| ABS CDO Mezzanine ABS | 1 | $181.0 | 0.45% |
| ABS CDO Mezzanine ABS (FG) | 1 | $203.5 | 0.51% |
| CLO International | 1 | $143.6 | 0.36% |
| **Total** | 22 | $4,760.1 | 11.9% |

3.    **U.S. Public Finance Exposure**

        As of March 31, 2012, FGIC had approximately 6,090 outstanding Policies insuring the payment of the principal of, and interest on, U.S. public finance obligations with an aggregate outstanding principal amount of approximately $147.9 billion. FGIC's NPIF, after giving effect to reinsurance, for U.S. public finance obligations totaled approximately $12.3 billion, representing approximately 30.6% of FGIC's NPIF of all liabilities at such date. The following table presents FGIC's NPIF after giving effect to ceded reinsurance, by risk category, as of March 31, 2012:

43

| Insured Portfolio by Bond Type | NPIF ($ in millions) [1] | % of Total NPIF |
|---|---|---|
| Corporate Obligation | $241.2 | 0.6% |
| Sovereign | $139.2 | 0.3% |
| Sub-Sovereign | $268.4 | 0.7% |
| Utility | $570.8 | 1.4% |
| Toll Road | $13.3 | 0.0% |
| Project Finance | $2,709.9 | 6.8% |
| CLO | $143.6 | 0.4% |
| Other Structured Finance | $336.3 | 0.8% |
| **Total International Finance** | **$4,422.7** | **11.0%** |

C.    LOSS RESERVES

FGIC has established its loss reserves based on the impact that the performance of the collateral or revenue stream for the respective transactions has on FGIC's obligation to support the scheduled debt service of such transactions. Reserves at March 31, 2012 relate predominantly to RMBS transactions.

Loss and loss adjustment expense reserves at March 31, 2012 do not reflect the potential impact, if any, of ongoing loss mitigation efforts, except for certain mortgage insurance-related claims. FGIC believes that the reserve for estimated losses as of March 31, 2012 makes adequate provision for expected future net claims. However, the establishment of the appropriate level of reserves is an inherently uncertain process involving numerous estimates and subjective judgments by management. Small changes in the assumptions underlying these estimates could result in significant changes in FGIC's loss expectations. Further deterioration in the performance of RMBS, ABS CDO, and other securities insured by FGIC or that are referenced in CDS insured by FGIC could lead to the establishment of additional loss reserves and further loss or reduction to income. The loss reserves for FGIC's insurance on CDS contracts recorded in its statutory financial statements at March 31, 2012 reflect only the actual credit impairment projected by FGIC and do not reflect any other amounts for potential Termination Payment Claims that could become payable under FGIC-insured CDS.

The following table presents FGIC's statutory loss and loss adjustment expense reserves, net of reinsurance, as of March 31, 2012, by business segment and inclusive of any related reserves for FGIC's insurance on CDS contracts:

with the Plan all Permitted Claims made by Policyholders under the reinsured Policies and would have to separately seek to enforce its rights and remedies against the defaulting Reinsurer in respect of these losses.

As of March 31, 2012 (after giving effect to reinsurance commutations and terminations through such date), the composition of gross par outstanding ceded to Reinsurers was as follows:

| Reinsurer | Reinsurer Rating [1] | Ceded Gross Par Outstanding ($ in millions) | Public Finance FGIC Retained ($ in millions) | Public Finance National Public Reinsurance Transaction ($ in millions) | RMBS ($ in millions) | Structured Finance (other than RMBS) ($ in millions) | International Finance ($ in millions) |
|---|---|---|---|---|---|---|---|
| National Public Finance Guarantee Corp. | BBB/Baa2 | $123,484.5 | | $123,484.5 | | | |
| Assured Guaranty Re Ltd. | AA-/A1 | $5,473.7 | $1,021.9 | $3,733.4 | $86.3 | $632.1 | |
| American Overseas Reinsurance Company Ltd. (f/k/a RAM Reinsurance Company Ltd) | Withdrawn | $4,542.4 | $457.2 | $3,680.5 | $86.1 | $119.8 | $198.8 |
| Assured Guaranty Corp. | AA-/Aa3 | $1,928.3 | $428.1 | $1,494.2 | $0.4 | $0.0 | $5.5 |
| Radian Asset Assurance Inc. | BB-/Ba1 | $765.3 | $635.1 | | $46.7 | $0.0 | $83.5 |
| Assured Guaranty Re Overseas Ltd. | AA-/Aa3 | $99.2 | $1.6 | $97.3 | $0.2 | | |
| American Reinsurance Company | AA-/Aa3 | $53.6 | $50.8 | | $2.8 | | |
| Syncora Guarantee Inc. | Withdrawn/Ca | $45.1 | | | | | $45.1 |
| Other | | $95.8 | $4.5 | $55.5 | $2.1 | $0.0 | $33.8 |
| Total: | | $136,488.0 | $2,599.2 | $132,545.5 | $224.7 | $752.0 | $366.7 |

(1) Source: Individual company websites and rating agency reports.

The Run-Off Projections are run for both a Stress Scenario and a Base Scenario. As shown on Exhibit C hereto, the Run-Off Projections indicate that even in the Stress Scenario utilized by the Rehabilitator in formulating the Plan FGIC should be able to pay the initial CPP on all Permitted Policy Claims regardless of when such Claims arise, while maintaining a moderate Cash buffer intended to protect against potential adverse deviations from the Stress Scenario assumptions.

While the initial CPP and all subsequent revisions to the CPP will be based on a Stress Scenario, the Run-Off Assumptions will be adjusted over time (pursuant to the CPP Revaluation process) to reflect FGIC's actual experience. Should FGIC's experience prove more favorable than the Stress Scenario utilized by the Rehabilitator in formulating the Plan, which the Rehabilitator expects, the CPP will increase over time and additional amounts (including on account of DPO Accretion) will be paid out to holders of Permitted Policy Claims. The Base Case Run-Off Projections included in Exhibit C portray FGIC's expected performance during the Run-Off Period, including expected aggregate payments on Policy Claims.

## F.    ALTERNATIVE OPTIONS CONSIDERED

**Goal of the Plan**. The Rehabilitator's goal in this Rehabilitation Proceeding is to treat FGIC's Policyholders in a fair and equitable manner while at the same time removing the causes and conditions that made the Rehabilitation Proceeding necessary.

**Means of Achieving Goal**. The Rehabilitator evaluated several means of achieving this goal, including the Plan, a liquidation of FGIC, an extended rehabilitation of FGIC (with and without modification of Policies), potential outsourcing of administrative services and a potential merger, sale, reinsurance or similar transaction. In addition, the Rehabilitator considered variations of features in the Plan (including how Policies are restructured, the methodology in setting CPP, treatment of FGIC Rights and FGIC Payments, accretion on DPO, scope and duration of injunctive relief and other matters), as well as features not included therein (such as segregation of assets and liabilities between entities, inclusion of opt-out provisions and deferral of accretion payments).

**Considerations Taken Into Account**. In evaluating the best means of achieving the goal described above, the Rehabilitator took into account numerous considerations, including:

- accounting for differing relative interests of holders and beneficiaries of various types of risks insured by Policies;

- preserving and maximizing assets of the estate;

- minimizing expenses of the estate;

- minimizing the risk of failure of the Plan;

- maintaining sufficient flexibility within the Plan to address unforeseen events; and



**Rejection of Alternatives**. The Rehabilitator ultimately rejected each alternative to the Plan and the variations on the Plan as not representing the best approach to satisfying the goal of this Rehabilitation Proceeding. For example, the Rehabilitator rejected a liquidation of FGIC because (among other things) it would result in significantly lower recoveries to Policyholders.[11] No merger, sale, reinsurance or outsourcing transaction that would inure to the benefit of FGIC's Policyholders appeared viable to the Rehabilitator. The Rehabilitator rejected allowing Policyholders to opt-out of the Policy Restructuring as a matter of right (rather than by means of individually negotiated commutations) due to concerns (among others) over adverse selection to the detriment of other Policyholders. The Rehabilitator also considered numerous additional variations of Plan features, all of which were rejected as not being fair and equitable to all Policyholders.

**The Plan Is the Best Option**. The Rehabilitator has determined that the Plan presents the best approach to treating FGIC's Policyholders in a fair and equitable manner, while at the same time removing the causes and conditions that made the Rehabilitation Proceeding necessary. Such determination is based upon the Rehabilitator's review of the alternatives and variations described above, extensive legal, financial and strategic input from the Rehabilitator's advisors, FGIC, and the Ad Hoc Instrument Holder Group, and consideration of proposals made by third parties, among other things. The Rehabilitator's determination is further supported by the following features of the Plan:

- **Superior to Alternatives**. Payments on Permitted Policy Claims under the Plan are expected to be made sooner, and in greater amounts, than would be the case should FGIC remain in an extended rehabilitation proceeding, and creditors will receive under the Plan at least (and likely more than) what they would have received in a liquidation of FGIC;

---

[11] Additional detail about a potential liquidation of FGIC is set forth in Section VIII hereof and in the Liquidation Analysis set forth on Exhibit D hereto.

FGIC, as set forth in the summary of the Rehabilitator's liquidation analysis (the "**Liquidation Analysis**"), attached hereto as Exhibit D.

In calculating recoveries Policyholders would receive in a hypothetical liquidation in the Liquidation Analysis, the Rehabilitator assumed a bar date for claims at year-end 2052 (coinciding with maturity of the longest-dated Policy), with interim distributions on claims as described in the Liquidation Analysis. The timing and amount of such interim distributions are intended to be consistent with liquidations of other insurers.[12] Based on the Run-Off Projections and the Liquidation Analysis, Policyholders should receive present value recoveries of approximately 24% to 25% of Permitted Policy Claims under the Plan, rather than only approximately 9.3% to 15.9% thereof in a liquidation.[13] Thus, the Plan is designed to provide significantly greater recoveries to Policyholders than they would receive in a liquidation.

## IX.

## CERTAIN FACTORS TO BE CONSIDERED

**THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN. THESE FACTORS ARE NOT THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

A.    RISKS RELATING TO PLAN IMPLEMENTATION

1.    Risk of Non-Approval, Withdrawal or Modification of the Plan

Although the Rehabilitator believes that the implementation of the Plan, including consummation of the transactions contemplated by the Novation Agreement and the CDS Commutation Agreements, is fair and equitable and in the best interests of Policyholders and other creditors, there can be no assurance that the Court will reach the same conclusion, that modifications of the Plan may not be required for approval of the Plan, that approval of the Plan will not be overturned on appeal or that the Rehabilitator may not of his own initiative withdraw or modify the Plan for any reason. Any modifications of the Plan or failure of the Court to approve any of the Novation Agreement, the CDS Commutation Agreements or the Reinsurance

---

[12] The Rehabilitator ruled out an immediate liquidation of FGIC that would result in termination of all Policies in force as of the Effective Date, with no provision for payment of future losses, because this approach would be prejudicial to the substantial number of FGIC's Policyholders with respect to which the Rehabilitator expects Policy Claims to arise in the future.

[13] The range of recoveries under the Plan or in a liquidation provided herein are calculated on a net present value basis using discount rates of 20% and 10%. While the nominal amount of recoveries shown by the Liquidation Analysis as being payable in a liquidation (67.9% in the Base Scenario) exceeds the nominal amount of recoveries under the Plan as shown by the Run-Off Projections (34% in the Base Scenario), use of such undiscounted figures does not properly portray the actual value of such recoveries given the significantly longer delay in payment of recoveries in a liquidation.

to monitor it.  The CPP may be reduced at any time, subject to the relevant provisions of the Plan, as a result of litigation currently pending or that may be commenced in the future.

### 2.    CPP May Be Adjusted Downward

As set forth in the Restructured Policy Terms, FGIC, in consultation with the NYSDFS, may from time to time adjust the CPP downward.  Such CPP downward adjustments could be caused by a number of factors that could cause results to differ materially from those in the Run-Off Projections including, but not limited to, expected timing and magnitude of losses under Policies, returns on FGIC's investment portfolio, collection and recovery of premium, reinsurance, salvage, reimbursements and other amounts due to FGIC, availability and utilization of NOLs and operating expenses.  Reference is made to the Run-Off Projections contained in Exhibit C hereto for additional information and disclaimers regarding such analyses.

### 3.    Risks Relating to Run-Off Projections

The Run-Off Projections are inherently uncertain and, though considered reasonable by the Rehabilitator as of the date hereof, are subject to a wide variety of significant business, economic, competitive and political risks and uncertainties.  The Run-Off Projections are not necessarily indicative of FGIC's future financial position or results of operations, which may vary significantly from those set forth therein.  Consequently, the Run-Off Projections should not be regarded as the representation of the Rehabilitator, his advisors or any other Person that the projected financial position or results of operations can or will be achieved.  The Run-Off Projections may contain certain statements that are, or may be deemed, "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Many factors could cause actual results to differ materially from those in the Run-Off Projections.  Such factors include expected timing and magnitude of losses under Policies, returns on FGIC's investment portfolio, collection and recovery of premium, reinsurance, salvage, reimbursements and other amounts due to FGIC, availability and utilization of NOLs and operating expenses.  Reference is made to the Run-Off Projections contained in Exhibit C hereto for additional information and disclaimers regarding such analyses.

### 4.    Risks Relating to Use of Net Operating Losses

FGIC expects that the Plan becoming effective will result in significant immediate taxable income, but that such income will be offset with NOLs and will not result in material tax liability for FGIC.  In addition, FGIC expects that a significant portion of these NOLs will remain after the Plan becomes effective to offset taxable income that may arise in the future as the Plan is implemented over time.  This expectation as to the availability of NOLs both at the time of and after the Plan becomes effective is based on interpretations and applications of tax law rules that are not free from doubt.  It is possible that facts or circumstances existing prior to the Effective Date could cause FGIC's NOLs to become subject to limitation, reduced or otherwise unavailable for use (either in whole or in part) to offset FGIC's taxable income arising in connection with or after the Plan becomes effective.  FGIC has requested certain rulings, and plans to request additional rulings, from the IRS as to certain of these issues; it remains possible that the IRS, it is sole and absolute discretion, may decline to issue a favorable ruling or rulings on one or more of the issues that underlie FGIC's expectations regarding the tax consequences of

on the basis of such methodologies (as opposed to payment of Claims based on "Credit Events" (as defined in the relevant CDS, or similar term provided therein) under CDS not arising from the automatic or early termination thereof) would be inconsistent with the goal of the Rehabilitation Proceeding, namely, treating FGIC's Policyholders in a fair and equitable manner while at the same time removing the causes and conditions that made the Rehabilitation Proceeding necessary.

One CDS Counterparty has unilaterally terminated its CDS due to the Rehabilitation Circumstances prior to commencement of the Rehabilitation Proceeding, and has asserted a Termination Payment Claim against FGIC CP.  Other CDS Counterparties may seek to terminate their CDS contracts and assert Termination Payment Claims against FGIC CP and related Claims against FGIC, due to the Rehabilitation Circumstances or the Rehabilitation Proceeding.

While FGIC has entered into CDS Commutation Agreements with two CDS Counterparties (as further described in Sections V.C.1 and VI.B.2 hereof), the potential Termination Payment Claims that could be brought under the CDS to be so commuted represent approximately 50% of the total Termination Payment Claims that CDS Counterparties might seek to assert against FGIC. .

The Order of Rehabilitation enjoins the automatic or early termination of CDS contracts on the basis of the Rehabilitation Proceeding or the Rehabilitation Circumstances and the assertion of Termination Payment Claims relating to any such termination for the duration of the Rehabilitation Proceeding.  In addition, the Plan continues such injunctive relief on a permanent basis and provides that such Claims will not be Permitted under the Plan.  No assurance can be given, however, that the treatment of Termination Payment Claims contemplated by the Plan will be approved by the Court and, if not approved, whether Termination Payment Claims will be paid *pari passu* with Permitted Policy Claims.  Should the proposed treatment not be approved, FGIC's aggregate exposure to potential Termination Payment Claims could exceed $1.5 billion, after giving effect to the CDS Commutation Agreements executed to date, resulting in lower recoveries for Policyholders and potentially a decrease in CPP.

## C.    OTHER CONSIDERATIONS

### 1.    No Duty to Update

This Disclosure Statement does not reflect any events that may occur subsequent to the date hereof.  Such events may have a material impact on the information contained in this Disclosure Statement and any recovery that may be received by creditors of FGIC.  The Rehabilitator does not intend to update any of the information contained in this document (including the Run-Off Projections, Liquidation Analysis and other financial information, as well as underlying assumptions).

## X.

### CONCLUSION

The Rehabilitator believes that the Plan represents the most value to holders of Permitted Claims, and approval and implementation of the Plan is in the best interests of all Policyholders and other claimants.

Dated: September 11, 2012
     New York, New York

 

Peter A. Giacone
*Chief Financial Officer and Agent of the
Superintendent of Financial Services of the
State of New York, as Rehabilitator of
Financial Guaranty Insurance Company*

Exhibit B

(Organizational Chart)

Exhibit C

(Run-Off Projections)

STATEMENTS, AND THE REHABILITATOR AND FGIC UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE RUN-OFF PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE REHABILITATOR, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE REHABILITATOR OR FGIC.  THE REHABILITATOR CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE RUN-OFF PROJECTIONS OR TO FGIC'S ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT.  MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE REHABILITATOR PREPARED THESE RUN-OFF PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE REHABILITATOR AND FGIC, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE RUN-OFF PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.  THEREFORE, THE RUN-OFF PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  IN CONSIDERING THE PROJECTED RECOVERIES UNDER THE PLAN, POLICYHOLDERS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE RUN-OFF PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

The Run-Off Projections should be read in conjunction with the key assumptions set forth below, as well as the other assumptions, qualifications, explanations and risk factors set forth in the Disclosure Statement and the Plan (including the Plan Supplement), in their entirety, and the historical financial statements (including the notes and schedules thereto) and other financial information posted at www.fgic.com/investorrelations/financialreports/.

*Key Assumptions*

A.    **General**

1.    *Plan Effective Date:* The Run-Off Projections assume the Effective Date will be December 31, 2012.

2.    *Business Operations:*  The Run-Off Projections assume that FGIC will not write any new insurance policies throughout the Run-Off Period.

Reinsurers would likely experience under the Stress Scenario and the possibility that the reinsurers would have inadequate claims paying resources.  In both scenarios, it is assumed that FGIC continues paying installment premiums to Reinsurers.

4.    *Commutation Payments*: As described in the Disclosure Statement, the Run-Off Projections assume that the two CDS Commutation Agreements that have already been executed and the Reinsurance Commutation Agreement are approved by the Court and are (for the purposes of the Run-Off Projections only, since the commutation agreements may require earlier payment) paid post-Effective Date.

5.    *Taxes:* The Run-Off Projections assume that FGIC will not generate taxable income post-Effective Date.  Income is expected to be generated on the Effective Date, but existing NOL balances are expected to be sufficient to fully offset income recognized on both a regular and AMT tax basis.

6.    *Contribution Amount*: The $11 million payment to FGIC Corp pursuant to the Plan Sponsor Agreement (the "**Contribution Amount**"), which is described in Section IV.B.9 of the Disclosure Statement, is assumed to be made in the Run-Off Projections on the Effective Date.

7.    *Operating Expenses:* The Run-Off Projections assume approximately $592 million of operating expenses through 2052 (this represents net present value of $177 million as of December 2012 at a 15% discount rate), excluding rehabilitation proceeding –related professional fees and other costs.

8.    *Rehabilitation Proceeding-Related Professional Fees and Other Costs:* The Run-Off Projections assume approximately $22 million in non-contingent costs, and $18 million in costs contingent on the occurrence of certain milestones, in each case related to the preparation for and administration of the Rehabilitation Proceeding, including attorneys' fees, financial advisor fees and restructuring incentive bonuses for certain key FGIC employees, all of which were or are assumed to be incurred or paid in 2012.

9.    *Reserves and Valuation Allowances*: For statutory accounting purposes, FGIC will continue to account for the Policies, as restructured, as insurance policies.  Upon the Effective Date, FGIC will reduce its statutory reserves to reflect the ultimate amount of cash payments expected to be made with respect to its Policies less an amount to be determined that will permit FGIC to maintain a certain minimum positive statutory surplus.  In the event that FGIC determines that the ultimate amount of cash payments that are expected to be made with respect to its Policies has increased, FGIC will increase its statutory reserve in accordance with statutory accounting principles.

10.    *Other:* The Run-Off Projections do not include proceeds from any recoveries from Material Litigation, which are described in Section IV.B.7 of the Disclosure Statement, due to the uncertainty regarding such recoveries today.  The Projections also do not include any value associated with FGIC's equity interest in FGIC UK.

*Base Scenario Illustrative Projected Financial*

## KEY FINANCIAL METRICS: BASE SCENARIO

| | 2012 | '13 - '17 | '18 - '22 | '23 - '37 | '26 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Balance Sheet** | | | | | | | | | | |
| Invested Assets Ending Balance | $1,674 | $1,479 | $1,379 | $1,366 | $1,340 | $986 | $558 | $500 | -- | NA |
| | | | | | | | | | | |
| **Claim Payments (Cash)** | | | | | | | | | | |
| Initial CPP Payments 1 | ($322) | ($293) | ($168) | ($100) | ($80) | ($317) | ($396) | ($96) | ($231) | ($2,004) |
| Payments on Account of CPP's Upward Adj. & DPO Accretion | -- | (132) | (114) | (107) | (124) | (184) | (226) | -- | (285) | (1,173) |
| **Other** | | | | | | | | | | |
| Notional Claims | (2,149) | (1,767) | (827) | (450) | (340) | (1,209) | (1,401) | (336) | (808) | (9,288) |
| Ending CPP | 15.0% | 18.9% | 21.2% | 22.9% | 24.5% | 26.6% | 28.6% | 28.6% | 30.4% | |

## SUMMARY INCOME STATEMENT: BASE SCENARIO

| | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Premiums Earned | $53 | $171 | $109 | $71 | $65 | $35 | $17 | $5 | $0 | $526 |
| Net Investment Income | 40 | 248 | 224 | 216 | 215 | 199 | 146 | 85 | 69 | 1,443 |
| Total Revenue | $93 | $419 | $333 | $287 | $280 | $235 | $163 | $91 | $69 | $1,969 |
| | | | | | | | | | | |
| Losses & Loss Adjustment Expense | $3,178 | ($291) | ($239) | ($228) | ($215) | ($166) | ($116) | ($41) | ($16) | $1,866 |
| Operating Expenses | (68) | (128) | (94) | (59) | (65) | (69) | (48) | (50) | (53) | (632) |
| Total Expenses | $3,110 | ($419) | ($333) | ($287) | ($280) | ($235) | ($163) | ($91) | ($69) | $1,234 |
| | | | | | | | | | | |
| Net Income Before Taxes | $3,203 | -- | -- | -- | -- | -- | -- | -- | -- | $3,203 |
| | | | | | | | | | | |
| Taxes | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| | | | | | | | | | | |
| Net Income | $3,203 | -- | -- | -- | -- | -- | -- | -- | -- | $3,203 |

## SUMMARY BALANCE SHEET: BASE SCENARIO

| | 2011 | 2012 | 2017 | 2022 | 2027 | 2032 | 2037 | 2042 | 2047 | 2052 |
|---|---|---|---|---|---|---|---|---|---|---|
| Invested Assets | $2,033 | $1,674 | $1,479 | $1,379 | $1,366 | $1,340 | $986 | $558 | $500 | -- |
| Other Assets | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | -- |
| Total Assets | $2,049 | $1,690 | $1,496 | $1,396 | $1,382 | $1,357 | $1,003 | $575 | $517 | -- |
| | | | | | | | | | | |
| Unearned Premium Reserve | $171 | $158 | $118 | $82 | $60 | $33 | $14 | $3 | $0 | -- |
| Loss Reserves (expected CPP and DPO distributions) | 5,422 | 1,445 | 1,297 | 1,237 | 1,249 | 1,254 | 922 | 506 | 452 | -- |
| Other Liabilities | 24 | 22 | 16 | 11 | 8 | 5 | 2 | 0 | 0 | -- |
| Statutory Surplus | (3,567) | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | -- |
| Liabilities and Equity | $2,049 | $1,690 | $1,496 | $1,396 | $1,382 | $1,357 | $1,003 | $575 | $517 | -- |

## SUMMARY CASH FLOWS: BASE SCENARIO

| | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | '38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash from Net Installment Premiums | $23 | $86 | $49 | $35 | $29 | $15 | $6 | $2 | $0 | $245 |
| Cash from Investment Income | 40 | 248 | 224 | 216 | 215 | 199 | 146 | 85 | 69 | 1,443 |
| Operating Expenses | (68) | (128) | (94) | (59) | (65) | (69) | (48) | (50) | (53) | (632) |
| Initial CPP Payments 1 | (322) | (293) | (168) | (100) | (80) | (317) | (396) | (96) | (231) | (2,004) |
| Payments on Account of CPP's Upward Adj. & DPO Accretion | -- | (132) | (114) | (107) | (124) | (184) | (226) | -- | (285) | (1,173) |
| Commutation Payments | 14 | -- | -- | -- | -- | -- | -- | -- | -- | 14 |
| Reinsurance Payments Received | 33 | 24 | 3 | 1 | 0 | 2 | 90 | 0 | -- | 153 |
| Contribution Amount | (11) | -- | -- | -- | -- | -- | -- | -- | -- | (11) |
| Loss Adjustment Expense | (68) | -- | -- | -- | -- | -- | -- | -- | -- | (68) |
| Operating Cash Flow | ($359) | ($195) | ($100) | ($13) | ($25) | ($354) | ($428) | ($58) | ($500) | ($2,033) |
| | | | | | | | | | | |
| Change in Invested Assets | $359 | $195 | $100 | $13 | $25 | $354 | $428 | $58 | $500 | $2,033 |

## AVERAGE POLICYHOLDER RECOVERIES: BASE SCENARIO

| | |
|---|---|
| Nominal Recovery | 34% |
| 10% Discount Rate | 25% |
| 15% Discount Rate | 24% |
| 20% Discount Rate | 24% |

1"Initial CPP Payments" are CPP payments on Policy Claims first Permitted in the stated time period.

Exhibit D

(Liquidation Analysis)

OTHER RISK FACTORS, AS DETAILED IN SECTION IX OF THE DISCLOSURE
STATEMENT. POLICYHOLDERS AND OTHER PARTIES IN INTEREST ARE
CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE
DATE MADE AND ARE NOT GUARANTIES OF FUTURE PERFORMANCE OR
RECOVERIES. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY
FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING
STATEMENTS, AND THE REHABILITATOR AND FGIC UNDERTAKE NO
OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

　　　　　THE LIQUIDATION ANALYSIS, WHILE PRESENTED WITH NUMERICAL
SPECIFICITY, IS NECESSARILY BASED ON A VARIETY OF ESTIMATES AND
ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE
REHABILITATOR, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO
SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET
AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE
BEYOND THE CONTROL OF THE REHABILITATOR OR FGIC. THE REHABILITATOR
CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE
ACCURACY OF THE LIQUIDATION ANALYSIS. SOME ASSUMPTIONS INEVITABLY
WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING
SUBSEQUENT TO THE DATE ON WHICH THE REHABILITATOR PREPARED THE
LIQUIDATION ANALYSIS MAY BE DIFFERENT FROM THOSE ASSUMED, OR,
ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE
OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A
MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE
REHABILITATOR AND FGIC, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE
NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE LIQUIDATION
ANALYSIS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING
AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO
REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE
LIQUIDATION ANALYSIS MAY NOT BE RELIED UPON AS A GUARANTEE OR
OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WOULD OCCUR IN A
HYPOTHETICAL LIQUIDATION. IN CONSIDERING THE PROJECTED RECOVERIES
UNDER THE PLAN AND IN A HYPOTHETICAL LIQUIDATION, POLICYHOLDERS
MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF
SUCH ASSUMPTIONS AND THE RELIABILITY OF THE LIQUIDATION ANALYSIS
AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

　　　　　The Liquidation Analysis should be read in conjunction with the key assumptions
set forth below, as well as the other assumptions, qualifications and explanations set forth in the
Disclosure Statement and the Plan (including the Plan Supplement), in their entirety, and the
historical financial statements (including the notes and schedules thereto) and other financial
information posted at www.fgic.com/investorrelations/financialreports/.

in a final liquidation in 2052.  At each distribution date, Allowed Policy Claims that have previously received payments receive the difference between the new payment percentage and the prior payment percentage in effect when their last distribution was received.  Newly arisen Allowed Policy Claims receive the full payment percentage in effect at the time.  All Allowed Policy Claims would receive the same nominal recovery (*i.e.*, undiscounted cash flows received as a percentage of their original Policy Claim) because there is no interest accrual on unpaid Policy Claims.

2.    *Losses:* The Liquidation Analysis is based on two scenarios for determining losses under FGIC Policies, the Base Scenario and the Stress Scenario, each as described in the Plan, the Disclosure Statement and herein.

**D.    Revenues and Expenses**

1.    *Investment Income:* The Liquidation Analysis assumes gross investment income post-transaction to be 2.3% in 2012 and 3.25% thereafter.  Management fees are assumed to be 9.75 basis points of invested assets per year.

2.    *Premiums:* The Liquidation Analysis assumes premiums on existing installment policies to be collected as scheduled and that unearned premiums will not be returned.  However, a 10% reduction in expected premiums collection is assumed in the Liquidation Analysis to take into consideration potential shortfalls.

3.    *Reinsurance:* The Base Scenario assumes that reinsurance on Policy Claims that is not commuted will be collected from U.S.-domiciled investment grade Reinsurers in full and from non-U.S.-domiciled Reinsurers up to the amount of collateral posted if losses on reinsured policies are realized.  The Stress Scenario assumes that reinsurance on Policy Claims that is not commuted will not be collected due to the implied amount of losses Reinsurers would likely experience under the Stress Scenario and the possibility that the Reinsurers would have inadequate claims-paying resources.

4.    *Taxes:* The Liquidation Analysis assumes that the Contribution Amount - the $11 million payment to FGIC Corp. pursuant to the Plan Sponsor Agreement - will be paid.  Pretax income is expected to be realized in both the Base Scenario and Stress Scenario and the Liquidation Analysis assumes that existing NOLs are available and utilized going forward as income is generated.  NOLs are assumed to expire 20 years after they are generated.  Although NOLs are projected to be sufficient to offset taxable income in the Base Scenario and the Stress Scenario, if actual losses in liquidation are lower than what is projected in these two scenarios, material Cash tax payments may be required.

5.    *Operating Expenses:* The Liquidation Analysis assumes a total of approximately $533 million of operating expenses through 2052 (which amount is 10% less than operating expenses projected to be incurred under the Plan), excluding professional, NYLB and other expenses

Exhibit E

(Restructured Policy Terms:  Illustrative Example)

| Line | Item | Amount | Explanation |
|---|---|---|---|
| | | | **Cash Payments** |
| 3. | CPP | 10% | This is the initial CPP assumed by this Example. |
| 4. | Cash payment to Policyholder 1 *(attributable to Permitted Policy Claim rather than to DPO Accretion)* | $10 | This is calculated by multiplying: <br>• the CPP in Line 3 (10%) by <br>• the Permitted Policy Claim in Line 1 ($100), <br>and subtracting from such product any FGIC Payments in Lines 9 ($0) and 10 ($0) to the extent that they have not been paid to FGIC. |
| 5. | Cash payment to Policyholder 2 *(attributable to Permitted Policy Claim rather than to DPO Accretion)* | $0 | As Policyholder 2 has no Permitted Policy Claims in Year One, there is no Cash payment. |
| | | | **DPO** |
| 6. | DPO for Policyholder 1 at end of Year One | $90 | DPO is the amount left after deducting Cash payments and Deemed Cash Payments made in respect of Permitted Policy Claims under a Policy from the aggregate Permitted Policy Claims under such Policy. DPO is further reduced by (i) FGIC Payments with respect to such Policy that are not paid to FGIC and (ii) Certificateholder Payments.  For purposes of this Example, **"Certificateholder Payments"** means any amounts recovered by a Policyholder with respect to such Policy that are paid to certificateholders instead of to FGIC and that would have been payable to FGIC had FGIC paid all Permitted Policy Claims under such Policy in full in the absence of the Policy Restructuring as specified in Lines 8, 25, 26, 45, 62 and 80. <br>On the date of Cash payment in Line 4, DPO is calculated by subtracting from the amount of the Permitted Policy Claim in Line 1 ($100) the sum of: <br>• the Cash payment paid by FGIC with respect to the Permitted Policy Claim in Line 4 ($10) and <br>• the amount of the Certificateholder Payments by |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| 15. | DPO Accretion Payment Amount for Policyholder 1 and Policyholder 2 | $0 | In respect of any particular Policy this amount is based upon a pro rata share of the DPO Accretion Payable Amount set forth in Line 14 ($0) based upon the DPO Accretion Amount related to such Policy. |
| | | **Period Summary** | |
| 16. | Total Cash paid to Policyholder 1 during Year One | $10 | This is calculated by adding: <ul><li>the cash payment attributable to the Permitted Policy Claim in Line 4 ($10) plus</li><li>the DPO Accretion Payment Amount for Policyholder 1 in Line 15 ($0).</li></ul> |
| 17. | Total Cash paid to Policyholder 2 during Year One | $0 | This is calculated by adding: <ul><li>the Cash payment attributable to the Permitted Policy Claim in Line 5 ($0) plus</li><li>the DPO Accretion Payment Amount for Policyholder 2 in Line 15 ($0).</li></ul> |
| 18. | Total DPO and DPO Accretion Amount for Policy of Policyholder 1 as of the end of Year One | $92.70 | This is calculated by adding: <ul><li>the DPO at end of Year One in Line 6 ($90) plus</li><li>the DPO Accretion Amount in Line 12 ($2.70)</li></ul> |
| 19. | Total DPO and DPO Accretion Amount for Policy of Policyholder 2 as of the end of Year One | $0 | This is calculated by adding: <ul><li>the DPO at end of Year One in Line 7 ($0) plus</li><li>the DPO Accretion Amount in Line 13 ($0)</li></ul> |

### Year Two

**Overview:** In Year Two CPP remains unchanged. Neither Policyholder has additional Policy Claims Permitted in Year Two. There is are Certificateholder Payments, a FGIC Payment and DPO Accretion in respect of Policyholder 1.

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | | **Claims Permitted During Year Two** | |
| 20. | Permitted Policy Claims | $0 | Neither Policyholder has any Policy Claims that |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | | | this recovery is payable to FGIC as a FGIC Payment (see Line 27 below). As set forth in Line 27, $1 of this recovery is a FGIC Payment that is assumed to be paid by Policyholder 1 to FGIC and $9 of this recovery is assumed to be paid by Policyholder 1 to certificateholders. The form of recovery in this Example is not proceeds of Trust Loan Repurchase Obligations. |
| 26. | Certificateholder Payments recovered by Policyholder 2 during Year Two | $0 | This Example assumes that no such amounts exist with respect to the Policy of this Policyholder. |
| | **Required Payments** | | |
| 27. | FGIC Payments payable to FGIC during Year Two | $1 | As discussed in Line 25, this Example assumes that in Year Two, Policyholder 1 receives a recovery of $10. The Plan provides that the current CPP percentage of this recovery is payable to FGIC as a FGIC Payment. FGIC Payment during Year Two is calculated by multiplying: • the amount of the recovery Policyholder 1 receives during Year Two ($10) by • the CPP in Line 21 (10%). |
| 28. | FGIC Payments payable to FGIC during prior periods to the extent they have not previously been applied to reduce cash payments that would otherwise be payable by FGIC for Policy Claims | $0 | No such amounts arose with respect to this Policy during prior periods. |
| | **DPO Accretion** | | |
| 29. | DPO Accretion Rate | 3% | This is the rate fixed by the terms of the Plan. |
| 30. | DPO Accretion Amount for Policyholder 1 at end of Year Two | $5.13 | This is calculated by multiplying: • the DPO at end of Year Two for Policyholder 1 in Line 23 ($81) by • the DPO Accretion Rate in Line 29 (3%) |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
|  | Year Two |  | ($0) plus<br><br>• the DPO Accretion Amount in Line 31 ($0). |

### Year Three

**Overview:** In Year Three CPP remains unchanged.  There are no additional Policy Claims Permitted in respect of Policyholder 1.  Policyholder 2 has its first Policy Claim Permitted in Year Three.  Neither Policyholder owes any FGIC Payments or recovers any Certificateholder Payments in Year Three.

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | | | **Claims Permitted in Year Three** |
| 38. | Permitted Policy Claim – Policyholder 1 | $0 | Policyholder 1 has no Policy Claims that were Permitted in Year Three. |
| 39. | Permitted Policy Claim – Policyholder 2 | $100 | Policyholder 2 filed a Policy Claim that was Permitted in accordance with the Plan in Year Three in the amount of $100. |
| | | | **Cash Payments** |
| 40. | CPP | 10% | This is the initial CPP assumed by this Example. |
| 41. | Cash payment to Policyholder 1<br><br>*(attributable to Policy Claim rather than to DPO Accretion)* | $0 | As no Policy Claims were Permitted in Year Three for Policyholder 1, there is no Cash payment in Year Three to Policyholder 1 on account of Policy Claims. |
| 42. | Cash payment to Policyholder 2<br><br>*(attributable to Policy Claim rather than to DPO Accretion)* | $10 | This is calculated by multiplying:<br><br>• the CPP in Line 40 (10%) by<br>• the Permitted Policy Claim in Line 39 ($100),<br><br>and subtracting from such product any FGIC Payments in Lines 46 ($0) and 47 ($0) to the extent that they have not been paid to FGIC. |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | **FGIC Payments** | | |
| 46. | FGIC Payments payable to FGIC during Year Three | $0 | This Example assumes that no such amounts exist with respect to Policies of either Policyholder in Year Three. |
| 47. | FGIC Payments payable to FGIC during prior periods to the extent they have not previously been applied to reduce cash payments that would otherwise be payable by FGIC on account of Permitted Policy Claims | $0 | This Example assumes that no such amounts exist with respect to Policies of either Policyholder. |
| | **DPO Accretion** | | |
| 48. | DPO Accretion Rate | 3% | This is the rate fixed by the terms of the Plan. |
| 49. | DPO Accretion Amount in respect of Policyholder 1 at end of Year Three | $7.56 | This is calculated by multiplying: <ul><li>the DPO at end of Year Three in Line 43 ($81) by</li><li>the DPO Accretion Rate in Line 48 (3%) (the result of which is $2.43),</li></ul> and adding the DPO Accretion Amount at end of Year Two in Line 30 ($5.13). |
| 50. | DPO Accretion Amount in respect of Policyholder 2 at end of Year Three | $2.70 | This is calculated by multiplying: <ul><li>the DPO at end of Year Three in Line 44 ($90) by</li><li>the DPO Accretion Rate in Line 48 (3%),</li></ul> and adding the DPO Accretion Amount at end of Year Two in Line 31 ($0). |
| 51. | DPO Accretion Payable Amount | $0 | There are no amounts available to pay DPO Accretion because the CPP has not increased in Year Three. |
| 52. | DPO Accretion Payment Amount for Policyholder 1 and Policyholder 2 | $0 | In respect of any particular Policy this amount is based upon a pro rata share of the DPO Accretion Payable Amount set forth in Line 51 ($0) based upon the DPO Accretion Amount related to such |

Year Four

**Overview:** In Year Four CPP remains unchanged. There are no additional Policy Claims Permitted in respect of Policyholder 1 or Policyholder 2. Neither Policyholder owes any FGIC Payments or recovers any Certificateholder Payments in Year Four. The only change is an accrual of DPO Accretion.

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | | | **Claims Permitted in Year Four** |
| 57. | Permitted Policy Claims | $0 | Neither Policyholder has any Policy Claims that were Permitted in Year Four. |
| | | | **Cash Payments** |
| 58. | CPP | 10% | This is the initial CPP assumed by this Example. |
| 59. | Cash payments to Policyholder 1 and Policyholder 2 *(attributable to Policy Claim rather than to DPO Accretion)* | $0 | As no Policy Claims were Permitted in Year Four for either Policyholder, there are no Cash payments in Year Four to either Policyholder on account of Policy Claims. |
| | | | **DPO** |
| 60. | DPO for Policyholder 1 at end of Year Four | $81 | DPO is the amount left after deducting cash payments and deemed cash payments made in respect of Permitted Policy Claims under a Policy from the aggregate Permitted Policy Claims under such Policy. DPO is further reduced by (i) FGIC Payments with respect to such Policy that are not paid to FGIC and (ii) Certificateholder Payments. At the end of Year Four the DPO for Policyholder 1 is calculated by: • the aggregate Policy Claims made by Policyholder 1 from Line 1 ($100), Line 20 ($0), Line 38 ($0) and Line 57 ($0), minus • any amount of such Policy Claims paid in Cash from Line 4 ($10), Line 22 ($0), Line 41 ($0) and Line 59 ($0), less • any Certificateholder Payments made by Policyholder 1 in Line 8 ($0), Line 25 ($9), Line 45 ($0) and Line 62 ($0). |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| | | | and adding the DPO Accretion Amount at end of Year Three in Line 49 ($7.56). |
| 67. | DPO Accretion Amount in respect of Policyholder 2 at end of Year Four | $5.40 | This is calculated by multiplying:<br><br>• the DPO at end of Year Four in Line 61 ($90) by<br><br>• the DPO Accretion Rate in Line 48 (3%) (the result of which is $2.70),<br><br>and adding the DPO Accretion Amount at end of Year Three in Line 50 ($2.70). |
| 68. | DPO Accretion Payable Amount | $0 | There are no amounts available to pay DPO Accretion because the CPP has not increased in Year Four. |
| 69. | DPO Accretion Payment Amount for Policyholder 1 and Policyholder 2 | $0 | In respect of any particular Policy this amount is based upon a pro rata share of the DPO Accretion Payable Amount set forth in Line 68 ($0) based upon the DPO Accretion Amount related to such Policy. |
| Period Summary | | | |
| 70. | Total Cash paid to Policyholder 1 during Year Four | $0 | This is calculated by adding:<br><br>• the Cash payments to Policyholder 1 in Line 59 ($0) plus<br><br>• the DPO Accretion Payment Amount for Policyholder 1 in Line 69 ($0). |
| 71. | Total Cash paid to Policyholder 2 during Year Four | $0 | This is calculated by adding:<br><br>• the Cash payment to Policyholder 2 in Line 59 ($0) plus<br><br>• the DPO Accretion Payment Amount for Policyholder 2 in Line 69 ($0). |
| 72. | Total DPO and DPO Accretion Amount for Policy of Policyholder 1 as of the end Year Four | $90.99 | This is calculated by adding:<br><br>• the DPO at end of Year Four in Line 60 ($81) plus<br><br>• the DPO Accretion Amount in Line 66 |

EX.E-14

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
|  |  |  | $9 from Line 25) ($91 x 5% = $4.55). This amount is then further reduced by the FGIC Payments by Policyholder 1 in Line 81 ($0.50). For purposes of this Example, it is assumed that Policyholder 1 does not pay the FGIC Payment in Line 81 in Cash and instead FGIC sets off this amount from this Cash payment. |
| 77. | Cash payments to Policyholder 2 *(attributable to Policy Claim rather than to DPO Accretion)* | $5 | Even though there are no Policy Claims in Year Five for Policyholder 2, the increase in CPP will result in a payment in respect of the Policy Claim previously Permitted in Year Three. This is calculated by:<br><br>• the difference between the CPP in Year Five in Line 75 (15%) and the CPP in Year Four in Line 58 (10%), which equals 5%, multiplied by<br><br>• the original amount of all Permitted Policy Claims for Policyholder 2 (in this case, $100 from Line 39) less all Certificateholder Payments by Policyholder 2 ($0) ($100 x 5% = $5). |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
| 80. | Certificateholder Payments recovered by Policyholders during Year Five | $0 | This Example assumes that no such amounts exist with respect to Policies of either Policyholder in Year Five. |
| **FGIC Payments** | | | |
| 81. | FGIC Payments payable to FGIC by Policyholder 1 during Year Five | $.50 | Because of the increase in CPP in Year Five, prior FGIC Payments must be adjusted to determine the amount of FGIC Payments that Policyholder 1 should have paid to FGIC had the CPP been 15% at the time of the FGIC Payment.  This is calculated by multiplying: <ul><li>the difference between the CPP in Year Five in Line 75 (15%) and the CPP in Year Four in Line 58 (10%), which equals 5%, and</li><li>The recovery Policyholder 1 recovered in Year 2 ($10) that is assumed in Lines 25 and 27.</li></ul> |
| 82. | FGIC Payments payable to FGIC by Policyholder 2 during Year Five | $0 | This Example assumes that no such amounts exist with respect to the Policy of Policyholder 2 in Year Five. |
| 83. | FGIC Payments payable to FGIC during prior periods to the extent they have not previously been applied to reduce cash payments that would otherwise be payable by FGIC on account of Permitted Policy Claims | $0 | This Example assumes that no such amounts exist with respect to Policies of either Policyholder. |
| **DPO Accretion** | | | |
| 84. | DPO Accretion Rate | 3% | This is the rate fixed by the terms of the Plan. |
| 85. | DPO Accretion Amount in respect of Policyholder 1 at end of Year Five | $10.48 | At the time of calculation of DPO Accretion Payment Amount, this is calculated by multiplying: <ul><li>the DPO at end of Year Five in Line 78 ($76.95) by</li></ul> |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
|  |  |  | the DPO for Policy Claims projected to be Permitted in a Stress Scenario after Year Five. |
| 88. | DPO Accretion Payment Amount for Policyholder 1 | $1.82 | This is calculated by multiplying the DPO Accretion Payable Amount specified in Line 87 ($3) by: <br><br> • the End of Year Four DPO Accretion Amount in Line 66 ($9.99) plus <br><br> • the amount obtained by multiplying the End of Year Five DPO in Line 78 ($76.95) by the DPO Accretion Rate in Line 84 (3%) ($2.31), <br><br> divided by: <br><br> • the End of Year Four DPO Accretion Amount in Line 66 ($9.99) plus <br><br> • the amount obtained by multiplying the End of Year Five DPO in Line 78 ($76.50) by the DPO Accretion Rate in Line 84 (3%) ($2.31) plus <br><br> • the End of Year Four DPO Accretion Amount for Policyholder 2 in Line 67 ($5.40) plus <br><br> • the amount obtained by multiplying the End of Year Five DPO for Policyholder 2 in Line 79 ($85) by the DPO Accretion Rate in Line 84 (3%) ($2.55). |
| 89. | DPO Accretion Payment Amount for Policyholder 2 | $1.18 | This is calculated by multiplying the DPO Accretion Payable Amount specified in Line 87 ($3) by: <br><br> • the End of Year Four DPO Accretion Amount in Line 67 ($5.40) plus <br><br> • the amount obtained by multiplying the End of Year Five DPO in Line 79 ($85) by the DPO Accretion Rate in Line 84 (3%) ($2.55), <br><br> divided by: |

| Line | Item | Amount | Explanation |
|------|------|--------|-------------|
|      |      |        | ($6.77).    |