# EXHIBIT 2

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3           SOUTHERN DISTRICT OF NEW YORK

4

5   IN RE:                 )   No. 12-12020 (MG)

                           )

6   RESIDENTIAL CAPITAL, LLC,  )   Chapter 11

    et al.,                )   Administered

7           Debtors.       )   Jointly

    ------------------------  )

8

9

10

11

12

13              July 24, 2013

14               8:08 a.m.

15

16        Deposition of ALLEN M. PFEIFFER, held

17     at the offices of Willkie, Farr & Gallagher

18     LLP, 767 Seventh Avenue, New York, New York,

19     before Laurie A. Collins, a Registered

20     Professional Reporter and Notary Public of the

21     State of New York.

22

23

24

25

Page 2

```
1
2  A P P E A R A N C E S :
3
4      WILLKIE, FARR & GALLAGHER LLP
5      Attorneys for Investors
6      Monarch, Stonehill, Bayview, and CQS
7          The Equitable Center
8          787 Seventh Avenue
9          New York, New York 10019-6099
10     BY:   JOSEPH T. BAIO, ESQ.
11          jbaio@willkie.com
12          EMMA J. JAMES, ESQ.
13          ejames@willkie.com
14          ARTHUR BILLER, ESQ.
15          abiller@willkie.com
16
17     ALSTON & BIRD LLP
18     Attorneys for Wells Fargo as Trustee
19          One Atlantic Center
20          1201 West Peachtree Street
21          Atlanta, Georgia 30309-3424
22     BY:   JOHN C. WEITNAUER, ESQ.
23          kit.weitnauer@alston.com
24
25
```

Page 3

```
1
2  A P P E A R A N C E S (continued):
3
4      DECHERT LLP
5      Attorneys for Bank of New York
6      Mellon Trust Company, N.A., as Trustee
7      or Investor Trustee
8          1095 Avenue of the Americas
9          New York, New York 10036-6797
10     BY:   GLENN E. SIEGEL, ESQ.
11          glenn.siegel@dechert.com
12
13     SEWARD & KISSELL, LLP
14     Attorneys for Law Debenture Trust
15     Company of New York
16          One Battery Park Plaza
17          New York, New York 10004
18     BY:   MARK D. KOTWICK, ESQ.
19          kotwick@sewkis.com
20          DALE C. CHRISTENSEN, JR., ESQ.
21          christensen@sewkis.com
22
23
24
25
```

Page 4

```
1
2  A P P E A R A N C E S (continued):
3
4      KRAMER LEVIN NAFTALIS & FRANKEL LLP
5      Attorneys for the Official Committee
6      of the Unsecured Creditors
7          1177 Avenue of the Americas
8          New York, New York 10036
9      BY:   ADINA C. LEVINE, ESQ.
10          alevine@kramerlevin.com
11          (via teleconference)
12
13     JONES DAY
14     Attorneys for Financial Guaranty
15     Insurance Company
16          222 East 41st Street
17          New York, New York 10017-6702
18     BY:   HOWARD F. SIDMAN, ESQ.
19          hfsidman@jonesday.com
20          RICHARD L. WYNNE, ESQ.
21          rlwynne@jonesday.com
22          (via teleconference)
23
24
25
```

Page 5

```
1
2  A P P E A R A N C E S (continued):
3
4      MORRISON & FOERSTER LLP
5      Attorneys for Debtors
6          1290 Avenue of the Americas
7          New York, New York 10104-0050
8      BY:   CHARLES L. KERR, ESQ.
9          ckerr@mofo.com
10
11     ROPES & GRAY LLP
12     Attorneys for Steering Committee
13     of RMBS Investors
14          Prudential Tower
15          800 Boylston Street
16          Boston, Massachusetts 02199-3600
17     BY:   ANDREW G. DEVORE, ESQ.
18          andrew.devore@ropesgray.com
19
20     McKOOL SMITH, P.C.
21     Attorneys for Freddie Mac
22          One Bryant Park, 47th Floor
23          New York, New York 10036
24     BY:   PETER S. GOODMAN, ESQ.
25          pgoodman@mckoolsmith.com
```

2 (Pages 2 - 5)

Page 6

1
2 A P P E A R A N C E S (continued)
3
4     MOSS & KALISH PLLC
5     Attorneys for Freddie Mac
6         122 East 42nd Street, Suite 2100
7         New York, New York 10168
8     BY:   DAVID B. GELFARB, ESQ.
9         gelfarb@mosskalish.com
10
11    MEISTER SEELIG & FEIN LLP
12    Attorneys for Duff & Phelps and Witness
13        2 Grand Central Tower
14        140 East 45th Street, 19th Floor
15        New York, New York 10017
16    BY:   HOWARD S. KOH, ESQ.
17        hsk@msf-law.com
18
19 ALSO PRESENT:
20    BARRY RIEGER (Protiviti)
21    SCOTT GIBSON (MountainView Capital)
22
23
24
25

Page 7

1
2 A L L E N   M.   P F E I F F E R ,
3     called as a witness, having affirmed to tell
4     the truth, was examined and testified as
5     follows:
6 EXAMINATION BY
7 MR. BAIO:
8     Q.   What is your name?
9     A.   My name is Allen Pfeiffer.
10    Q.   Where do you work?
11    A.   I work at Duff & Phelps.
12        MR. BAIO:  We're going to start by
13    introducing the various counsel.  My name is
14    Joe Baio.  I represent various investors in
15    this matter.  They have been identified in the
16    record.
17        And I'll ask everyone to identify
18    themselves, going to the left.
19        MR. RIEGER:  My name is Barry Rieger.
20    I work with Protiviti.
21        MR. BILLER:  Arthur Biller, Willkie
22    Farr.
23        MS. JAMES:  Emma James, Willkie Farr.
24        MR. GELFARB:  David Gelfarb, Moss &
25    Kalish.

Page 8

1        Pfeiffer
2        MR. GIBSON:  Scott Gibson, MountainView
3    Capital.
4        MR. SIDMAN:  Howard Sidman, Jones Day.
5        MR. DEVORE:  Andrew Devore, Ropes &
6    Gray.
7        MR. CHRISTENSEN:  Dale Christensen,
8    Seward & Kissel, for Law Debenture.
9        MR. SIEGEL:  Glenn Siegel, Dechert.
10       MR. KERR:  Charles Kerr, Morrison &
11   Foerster, on behalf of U.S. Bank as trustee.
12       MR. KOTWICK:  Mark Kotwick, Seward &
13   Kissel on behalf of U.S. Bank as trustee.
14       MR. WEITNAUER:  Kit Weitnauer, Alston &
15   Bird.
16       MR. KOH:  Howard Koh, Meister Seelig &
17   Fein, on behalf of Duff & Phelps.
18       MR. BAIO:  I'm going to ask the
19   reporter to mark as the first exhibit, a
20   multipage --
21       MS. LEVINE:  I'm sorry.
22       MR. BAIO:  I'm sorry.  Go ahead.
23       MS. LEVINE:  Let me introduce myself on
24   the phone.  Adina Levine from Kramer Levin
25   representing the unsecured creditors.

Page 9

1        Pfeiffer
2        MR. BAIO:  Is anyone else on the phone?
3        MR. WYNNE:  Rick Wynne from Jones Day.
4        MR. BAIO:  Anyone else?
5        All right.  I'm going to ask the
6    reporter to mark as the first exhibit,
7    Pfeiffer 1, a multipage document identified
8    expert report of Allen M. Pfeiffer.
9        (Pfeiffer Exhibit 1, expert report of
10   Pfeiffer, marked for identification.)
11       Q.   Mr. Pfeiffer, can you tell me what
12   Exhibit 1 is?
13       A.   It is the expert report dated -- it's
14   my expert report dated July 19th, 2013.
15       Q.   Did you prepare any part of it?
16       A.   I did.
17       Q.   What part?
18       A.   I'm responsible for all of it.
19       Q.   Can you look toward the back of Exhibit
20   1.  There is a document identified behind
21   Attachment 3 which bears the title "ResCap" on the
22   left-hand side, "Duff & Phelps" on the right-hand
23   side, is dated May 15th, 2013, and headed
24   "Residential Capital, LLC."
25       Do you see that?

3 (Pages 6 - 9)

Page 10

Pfeiffer

2  A.  I do.
3  Q.  And what is that document and the pages
4 that follow to the end of Exhibit 1?
5  A.  This document is the written
6 presentation that was shared with the RMBS
7 trustees on May 15th, 2013, related to the FGIC
8 commutation proposal.
9  Q.  And did you prepare this Attachment 3
10 to Exhibit 1?
11  A.  I am responsible for it as well.
12  Q.  Who else participated in the
13 preparation of it?
14  A.  Members of my team at Duff & Phelps.
15  Q.  Anyone outside of Duff & Phelps?
16  A.  The source of some of the information
17 is -- some of the -- some of the information is
18 sourced from outside of Duff & Phelps, but Duff &
19 Phelps actually put together the PowerPoint
20 slides.
21  Q.  And when -- and who -- strike that.
22  Who were the sources of the other
23 information that is incorporated in -- we'll call
24 it the May 15th report.  Is that fair?  You'll
25 know what I'm referring to?

Page 11

Pfeiffer

2  A.  I'd call it the May 15th presentation,
3 okay.
4  Q.  Okay, the May 15th presentation.
5  Who were the other sources of
6 information contained in the May 15th
7 presentation?
8  A.  FGIC and Lazard and of course all the
9 public sources that we used to -- as inputs to our
10 analysis as well.
11  Q.  Where did the presentation occur on May
12 15th?
13  A.  This is the written product that was
14 sent to the trustees and their counsel on May
15 15th.  The actual presentation itself occurred two
16 days earlier on May 13th, and it was a telephonic
17 conference.
18  Q.  Who was present at the May 13th
19 telephonic conference?
20  A.  A lot of people.
21  Q.  Was any part of it in a conference
22 room?
23  A.  Duff & Phelps employees were in
24 conference rooms, but I can't be sure where the
25 trustees or counsel for the trustees were sitting.

Page 12

Pfeiffer

2  (Mr. Goodman joins proceedings.)
3  Q.  Which trustees were present, so far as
4 you know?  And I'm talking about the May 13th
5 teleconference.
6  A.  My understanding is that all of the
7 trustees were present.
8  Q.  Was anyone else present besides the
9 trustees and their counsel, so far as you know?
10  A.  My understanding and recollection is
11 that it was only the trustees, trustees' counsel
12 and Duff & Phelps employees.  However, when we
13 define the trustees' counsel and -- well, the
14 trustees' counsel, I think that the trustees are
15 defined in my report and defined in this matter as
16 limited to Wells Fargo and Bank of New York and
17 U.S. Bank.
18  I don't recall and I'm not sure if the
19 other trustees related to the RMBS trustee matter
20 for ResCap more broadly.  I can't recall if they
21 were on the phone.
22  Q.  Is there a list or a record of who
23 attended, so far as you know?
24  A.  Not as far as I know, no.
25  Q.  You haven't seen anything that

Page 13

Pfeiffer

2 identifies who was present?
3  A.  No.
4  Q.  How long did the teleconference take
5 place?
6  A.  The teleconference was somewhere
7 between an hour and an hour and a half.
8  Q.  Did you do most of the talking?
9  A.  No.
10  Q.  Who did most of the talking?
11  A.  My colleagues.
12  Q.  Which colleagues?
13  A.  Brendan Murphy and Alice Chong.  There
14 were several other colleagues besides me that
15 likely spoke as well.
16  Q.  Did you say anything during the
17 teleconference on May 13th?
18  A.  I did.
19  Q.  And without telling me what it is for
20 now, can you recall what you said as opposed to
21 what others said?
22  A.  I can't recall precisely what I said,
23 no.
24  Q.  Did the trustees say anything during
25 the May 13th teleconference?

4 (Pages 10 - 13)

Page 14

Pfeiffer

1    Pfeiffer
2    A.  I can't recall exactly, but I believe
3 they did.
4    Q.  Do you recall whether any asked
5 questions?
6    A.  I recall there were -- there were --
7 there was a lot of discussion and a number of
8 questions.  I don't recall exactly who asked what
9 questions.
10    Q.  Now, at the -- or during the May 13th
11 teleconference, is it correct that the May 15th,
12 2013, presentation was not in the hands of the
13 trustees during that teleconference; is that
14 correct?
15    A.  The almost precisely exactly -- almost
16 exact presentation was in their hands.  It was
17 only subsequently updated to take off the word
18 "draft" and small edits like that, no -- but the
19 substance of our presentation was in their hands.
20    Q.  And some of the numbers changed from
21 the draft to the final; is that correct?
22    MR. KOTWICK:  Objection to the form.
23    A.  Some of the numbers changed from the
24 initial draft to the final, but the numbers did
25 not change between May 13th and May 15th.  There

Page 15

1 was a WebEx.  I shouldn't refer to it as a
2 teleconference.  I apologize for that.  It was a
3 WebEx.  So it was presented on people's screen as
4 well.
5    And so that presentation is
6 substantially the same as the one that you have in
7 front of you dated May 15th, and the numbers did
8 not change between what was on the WebEx and the
9 May 15th date.
10    Q.  How many drafts are there of this
11 report that is Attachment 3 to Exhibit 1?
12    MR. KOTWICK:  Objection to the form.
13    A.  The only ones that I'm aware of are the
14 two drafts that -- one is dated I believe May 6th,
15 and then there was the draft that was as of May
16 13th or 14th.  Other drafts were, you know,
17 written over, and I don't have them.
18    Q.  The May 6th draft, do you know if that
19 was produced to us?
20    A.  I believe it was.
21    Q.  And is it the same number of pages,
22 nine pages, similar layout?
23    MR. KOTWICK:  Objection to the form.
24    A.  I think it might have been ten pages.

Page 16

Pfeiffer

1    Pfeiffer
2 And the layout is similar, but some of the pages
3 are in different order.
4    Q.  Did you or anyone, so far as you know,
5 provide the May 6th draft of the commutation
6 proposal discussion materials to anyone?
7    A.  Can you repeat that question, please?
8    Q.  I'll do it.
9    Did you give the May 6th draft to
10 anyone?
11    MR. KOTWICK:  Objection to form.
12    A.  Yes.
13    Q.  Whom?
14    A.  We shared it with counsel.
15    Q.  Your own counsel or other counsel?
16    A.  We shared it with counsel for the RMBS
17 trustees.
18    Q.  Then did you receive comments on it?
19    A.  We had discussion around that draft.
20    Q.  That draft, did it reflect the same
21 settlement offer by FGIC as appears in this
22 Attachment 3 to Exhibit 1?
23    MR. SIDMAN:  Objection to form.
24    A.  I believe it substantially did, yes.
25    Q.  Did you prepare any draft version of

Page 17

1 the May 15th presentation that encompassed a
2 different settlement offer by FGIC?
3    A.  I don't believe so.
4    Q.  Did you do any analysis on any
5 settlement offer made by FGIC other than the one
6 that appears in the May 15th presentation?
7    MR. KOH:  Objection to form.
8    A.  I don't believe so.
9    Q.  And when did you receive the FGIC
10 proposals?
11    A.  Sometime in March of 2013.
12    Q.  Late March?
13    A.  Yes.
14    Q.  How did you get it?
15    A.  We received it via e-mail.
16    Q.  And the proposal that you received in
17 late March, that was the same as the proposal
18 that's embraced and included in your May 15th
19 presentation; is that correct?
20    MR. KOH:  Objection to form.
21    A.  Substantially the same, yes.
22    Q.  When you say "substantially," was there
23 anything different that you can recall?
24    A.  I don't recall any differences.

5 (Pages 14 - 17)

Page 18

1          Pfeiffer
2     Q.   Can you turn to page 5 of the May 15th
3  presentation which appears in Exhibit 1.
4     A.   If I can qualify my last answer, the
5  number is what I'm focused on when I say
6  "substantially the same."  It is the same.  I'm
7  not now recalling exactly to what extent the
8  trustees retained certain rights, you know, and
9  when that was documented and how that related to
10  what was discussed in March or April or May
11  relative to the final settlement agreement that
12  was signed.
13     Q.   What rights are you referring to in
14  your response?
15     A.   The trustees -- first of all, the
16  premiums being waived; second, their rights to
17  future recoveries; their -- their rights to the
18  R&W -- the recoveries associated with R&W claims.
19     Q.   Anything else?
20     A.   Those are all that come to mind right
21  now.
22     Q.   And when you say the number remain the
23  same, are you referring to the commutation amount
24  of $253.3 million?
25     A.   Yes.

Page 19

1          Pfeiffer
2     Q.   And you said you received the proposal
3  in March in e-mail form or from an e-mail; is that
4  correct?
5     A.   Yes.
6     Q.   Have you produced that?
7     A.   If we produced the e-mail, I don't -- I
8  don't know.  You'd have to ask counsel.
9     Q.   How about the attachment, did you
10  produce the attachment that embodied the proposal
11  in late March of 2013?
12          MR. KOH:  Objection to form.
13     A.   My understanding is that page 5 -- the
14  right side of page 5 is the -- is the content of
15  the attachment that was included in the e-mail in
16  March of 2013.
17     Q.   Were there any other terms of the
18  proposed settlement included in that document,
19  including whether premiums would be waived, the
20  extent to which the trustees would have rights to
21  future recoveries, and the like?
22          MR. SIDMAN:  Counsel, I'm going to
23     object to this question on the grounds that it
24     encompasses -- it relates to information that
25     is protected by the mediation order in this

Page 20

1  case.
2
3          We have, through conversations over the
4  last few days, tried to make a particular
5  document available to you and your colleagues
6  so that you could conduct this examination
7  with the full disclosure, while at the same
8  time protecting our obligations and our rights
9  under the mediation order in this case.
10          I'm not going to go into the back-and-
11  forth.  We made an offer, you declined to
12  accept it, we are where we are.  The issue is
13  now in front of the court.
14          MR. BAIO:  Yes.
15          MR. SIDMAN:  I want to make clear for
16  the record the offer is still open.  If you
17  choose to accept it, you can have the document
18  and we can proceed with the deposition in full
19  disclosure.
20          At this point, based on the fact that
21  the issue is pending before the court and the
22  fact that we have made the offer and you
23  declined to accept it, we are where we are,
24  and you have to proceed with the deposition on
25  that basis.

Page 21

1          Pfeiffer
2          MR. BAIO:  Right.  We also made an
3  offer that we would accept it under the terms
4  of the confidentiality order that covers every
5  other document in this case.  You have refused
6  that.
7          We continue to leave that open and are
8  prepared to proceed.  You've decided not to.
9  It is before the court.  But it takes two not
10  to tango, and you're not agreeing.
11          We don't have to put any more on the
12  record.
13          MR. SIDMAN:  Right.
14          MR. BAIO:  It is what it is.  I'm just
15  asking questions now about a document.  I'm
16  not sure whether it is the same document.  I
17  just want to know what he understands has been
18  produced, what he received, so that we can
19  have an effective cross-examination.
20          MR. SIDMAN:  I understand.  And you can
21  ask your questions.  But I'm instructing the
22  witness not to answer questions with respect
23  to that particular document.  Take whatever --
24  make whatever judgments you want to based on
25  my instruction.

6 (Pages 18 - 21)

Page 22

1           Pfeiffer
2       MR. BAIO:  Can we go back to the
3  question.
4       (Record read as follows:  Were there any
5  other terms of the proposed settlement
6  included in that document, including whether
7  premiums would be waived, the extent to which
8  the trustees would have rights to future
9  recoveries, and the like?)
10      MR. SIDMAN:  Same instruction.
11      MR. KOH:  In light of that instruction,
12  I'm going to direct Mr. Pfeiffer not to answer
13  that question.
14      MR. BAIO:  Okay.
15      MR. GOODMAN:  So there's two
16  instructions.
17      MR. BAIO:  Wow.
18   Q.   The document you referred to that you
19  had received in late March that embraced the
20  settlement proposal, it did include the
21  calculations that appear in one form or another on
22  page 5 of the May 15th presentation; is that
23  correct?
24      MR. KOH:  Objection to form.
25      MR. SIDMAN:  Hold on.

Page 23

1           Pfeiffer
2       (Pause.)
3       MR. SIDMAN:  Same instruction.  He
4  can't answer that.
5       MR. KOH:  Same direction.
6   Q.   Did the proposal about which you have
7  been testifying include the three main assumptions
8  that appear on this page?
9       MR. SIDMAN:  Same instruction.
10      MR. KOH:  And same direction.
11   Q.   Did it include any discussion of a
12  haircut?
13      MR. SIDMAN:  Same instruction.
14      MR. KOH:  And same direction.
15   Q.   Did you follow up with anyone at FGIC
16  following your receipt of that document about the
17  subjects addressed in the document?
18      MR. SIDMAN:  Same instruction.
19      MR. KOH:  Same direction.
20   Q.   Did you do any analysis of that
21  document that you received in late March of 2013?
22      MR. SIDMAN:  You can answer.
23   A.   Yes.
24   Q.   What did you do?
25   A.   We did an analysis of the proposal from

Page 24

1  an economic perspective relative to the expected
2  payments that would result from the rehabilitation
3  plan.
4   Q.   And that's in connection with the
5  proposal that you received in late March of 2013;
6  is that correct?
7   A.   Yes.
8   Q.   Is that proposal that you analyzed
9  without any subsequent changes; is that correct?
10   A.   I don't understand your question.
11   Q.   Did you do an analysis of that proposal
12  that you received itself without there having been
13  any changes to that proposal?  In other words, is
14  there an analysis that you did of that proposal
15  independent from anything that occurred
16  thereafter?
17      MR. SIDMAN:  Objection to form.
18   A.   I'm not trying to be difficult, but I
19  don't understand the question.
20   Q.   The proposal that you received had
21  certain terms, that is, the proposal that you
22  received in March of 2013; correct?
23   A.   Correct.
24   Q.   And you analyzed and evaluated those

Page 25

1           Pfeiffer
2  terms; correct?
3   A.   Yes.
4   Q.   And is that evaluation in any document?
5   A.   The evaluation is in the document that
6  we've been discussing, the presentation dated May
7  15th, and the underlying analysis that has been
8  shared with you that goes behind this presentation
9  and the draft of the presentation that we
10  discussed a few minutes ago.
11   Q.   Did you do any analysis of a proposal
12  by FGIC which did not include a waiver of the
13  premium payment?
14   A.   I don't believe so.
15   Q.   So whatever analyses that you did, you
16  did not consider and evaluate any proposal that
17  did not include the waiver of the premium payment;
18  is that correct?
19      MR. KOH:  Objection.
20      You may answer.
21   A.   I recall now that the initial proposal
22  included a waiving of the premium payments.
23   Q.   And what about rights to future
24  recoveries, did the initial proposal include any
25  such rights?

7 (Pages 22 - 25)

Page 26

Pfeiffer

1 
2     MR. KOTWICK: Objection to form.
3     A.   I don't recall.
4     Q.   Did you do any analysis or review of
5 any proposal that did not include the trusts
6 having retained any rights to future recoveries?
7     A.   Our initial analysis was focused on the
8 271 as compared to the expected payments from the
9 rehabilitation plan.
10        Over the many weeks that we looked at
11 the proposal and provided further analysis, we
12 then included in our discussion and in our
13 analysis the potential recoveries and the rights
14 that they have -- that the trustees have to the
15 recovery on the R&W claim.
16     Q.   And that's embodied in your report --
17 is that correct? -- that is, Exhibit 1?
18     A.   It is -- it was referenced in our -- in
19 our Web conference, teleconference, on the 13th,
20 and it is referred to in our report.
21     Q.   Where?
22     A.   It is referred to on page 3 as a
23 benefit that is listed on the second bullet point
24 on the left that the FGIC settlement proposal
25 provides a benefit in that it provides a global

Page 27

Pfeiffer

1 
2 resolution on outstanding ResCap RMBS litigation
3 issues.
4     Q.   Does that appear anywhere else, that
5 benefit, in this document?
6     MR. KOH: Objection.
7     A.   Well, it appears on the right side as a
8 risk with respect to the FGIC plan, that if the
9 settlement proposal is not accepted that the risk
10 would be that the outstanding ResCap RMBS
11 litigation issues would need to be resolved
12 separately.
13     Q.   Okay. Can you go back to page 5 of
14 Attachment 3 to Exhibit 1. And what is this page
15 showing?
16     A.   This page outlines the proposal as
17 received from FGIC.
18     Q.   And who prepared this page?
19     MR. KOTWICK: Objection to form.
20     A.   Duff & Phelps put the words on the
21 computer and the words that you see in front of
22 you in PowerPoint on this page. However, the
23 inputs, the analysis, the calculations, are not
24 Duff & Phelps calculations. These are all
25 calculations that were specifically received from

Page 28

Pfeiffer

1 
2 FGIC in their proposal.
3     Q.   And that would be in the proposal that
4 you received in late March of 2013; is that
5 correct?
6     A.   I believe so.
7     Q.   You'll see that the first line
8 underneath the heading says, "The proposal
9 outlines a cash payment of approximately $253
10 million by FGIC upon emergence in exchange for the
11 ability of FGIC to assert approximately $597
12 million of allowed claims at ResCap."
13        Do you see that?
14     A.   I do.
15     Q.   Did you understand in March and in May
16 of 2003 that that was an accurate statement of the
17 proposal?
18     MR. KOH: Objection.
19     MR. SIDMAN: Objection to form.
20     A.   I understood it to be an accurate
21 statement.
22     Q.   And you didn't call up or contact
23 anybody at FGIC to say that you disagreed with
24 that; is that correct?
25     MR. SIDMAN: Objection. I'm trying to

Page 29

Pfeiffer

1 
2 be helpful here and allow you to conduct your
3 examination, but once again I'm going to
4 instruct the witness not to respond to
5 questions that deal with communications with
6 FGIC in connection with -- in connection with
7 information provided on this particular page,
8 because that information is protected by the
9 mediation order.
10     MR. BAIO: Okay. I think just to
11 shorten things, because we only have so much
12 time, it would be useful if you say,
13 "Objection, mediation," and then direct him
14 not to answer, because these speeches are not
15 so helpful.
16     MR. KOH: Same direction.
17     Q.   So he's instructing you not to answer,
18 and your counsel is directing you not to answer.
19        Well, did you have any contact with
20 FGIC or any individuals at FGIC following the
21 receipt of the March 2013 communication?
22     A.   Members of my team at Duff & Phelps did
23 have conversations with FGIC and their advisors
24 subsequent to March 2013.
25     Q.   And that included the CFO of FGIC;

8 (Pages 26 - 29)

Page 30

1          Pfeiffer
2 correct?
3          MR. KOTWICK:  Objection to the form.
4          MR. SIDMAN:  Objection to the form.
5     A.   Correct.
6     Q.   Who else at FGIC did members of your
7 team talk to following the receipt of the March
8 2013 proposal?
9     A.   I don't recall the names right now.
10    Q.   Can you turn to page 8 of Exhibit 1,
11 paragraph 14.  You can read the entire paragraph
12 to yourself, but I'm going to draw your attention
13 to the middle of paragraph 14 in Exhibit 1 which
14 states, "Based in part on confidential information
15 communicated by FGIC's chief restructuring officer
16 and Lazard, financial advisors to Weil, Gotshal &
17 Manges, LLP, counsel to the New York liquidation
18 bureau, D&P performed an independent financial
19 analysis to determine a reasonable range of the
20 value of projected payments to the FGIC ensured
21 trusts based on the rehabilitation plan."
22          Do you see that?
23    A.   I do.
24    Q.   What is the confidential information
25 that was communicated to you in connection with

Page 31

1          Pfeiffer
2 the analysis that you performed?
3          MR. SIDMAN:  Objection.  Can we -- I
4     know you have a limited time.  I want to make
5     sure we do this effectively.  I want to confer
6     with my colleagues for one second on this
7     particular question --
8          MR. BAIO:  Oh, sure.
9          MR. SIDMAN:  -- so we can resolve this
10    issue.  Or if you want, we can proceed to
11    something else and we can do it on a break.
12    Whatever is easier for you.
13         MR. WEITNAUER:  Take a short break.
14         MR. BAIO:  Yeah, take the short break
15    now.
16         (Recess taken from 8:43 to 8:49.)
17         MR. BAIO:  All right.  We're back on.
18    Q.   The question is what was the
19 confidential information that was communicated to
20 you in connection with the analysis that you
21 performed.  And I'm pointing you to that paragraph
22 14.
23         MR. SIDMAN:  The only instruction would
24    be that this part of the deposition will be
25    designated as confidential --

Page 32

1          Pfeiffer
2          MR. BAIO:  Okay.
3          MR. SIDMAN:  -- in accordance with the
4    confidentiality order.
5          (The following portion has been deemed
6    confidential and bound under separate cover.)

Page 33

1          Pfeiffer - Confidential
2     A.   We had discussion with FGIC and Lazard
3 with respect to some further detail associated
4 with the rehabilitation plan.
5     Q.   And were those communications in
6 writing?
7     A.   They did not -- I don't believe that
8 they provided us anything in writing.
9     Q.   Did you provide them anything in
10 writing?  And by "you" I mean Duff & Phelps.
11    A.   We entered the meeting with a list of
12 topics to discuss with them.  I don't know if that
13 was provided to them or not.
14    Q.   Did you produce the list to us?
15    A.   I believe we did.
16    Q.   Okay.
17         MR. BAIO:  And we request it if we
18    didn't get it.  I don't know whether we have
19    that list.
20         MR. KOH:  I believe you do.
21         MR. BAIO:  Okay.
22    Q.   And did they provide responses to the
23 documents -- to the questions that appeared on the
24 list?
25         MR. KOH:  Objection to form.

9 (Pages 30 - 33)

Page 34

Pfeiffer - Confidential

1
2      Go ahead.
3      A.    They provided responses but not in
4 writing.
5      Q.    Did anyone on your team write the
6 responses down?
7      A.    Not that I know of.
8      Q.    Do you recall what the questions were?
9           MR. KOH:  Objection to form.
10          Go ahead.
11     A.    I think the discussion was consistent
12 with the outline of topics that you've seen on
13 that one page of agenda items.
14     Q.    And what in confidential information
15 did you receive that you then incorporated into
16 your independent financial analysis?
17     A.    The understanding with regard to how
18 the CPP and DPO works.
19     Q.    Where are you looking?
20     A.    I'm looking at our presentation dated
21 May 15th, 2013 and --
22     Q.    Which page?
23     A.    Well, I'm not looking at any particular
24 page right this moment.
25     Q.    Okay.

Page 35

Pfeiffer - Confidential

1
2      A.    I would say broadly that the -- that
3 our knowledge of the plan was enhanced by that
4 conversation.  And the understanding as to how the
5 calculations on page 5 of our presentation were
6 derived by FGIC and -- but in response to your
7 question about the confidential information, I
8 can't point to a specific number or fact that
9 is -- that is in this presentation as a result of
10 that meeting with Lazard and FGIC.
11     Q.    You responded that your knowledge of
12 the plan was enhanced by the conversation.  How
13 so?
14     A.    Well, we understood better how the CPP
15 works, the adjustments up or down, how the DPO
16 works, the DPO accretion, the discount rate range.
17 We understood the differences between the base
18 case and the stress case.  We understood the
19 assumptions underlying the claims that are
20 incorporated in the plan, understood what's
21 included and not included in those projected
22 payments, and the potential recoveries that FGIC
23 would have.
24     Q.    How did you understand better, as a
25 result of the meeting, how the CPP works?

Page 36

Pfeiffer - Confidential

1
2      A.    I think that generally we got a better
3 understanding of the timing, the reserves, the
4 manner in which the CPP may be adjusted upward or
5 downward.
6      Q.    So prior to the meeting, you had less
7 of an understanding; after the meeting you
8 understood those matters better.  Is that fair?
9      A.    Yes.
10     Q.    How long did that meeting take place,
11 or those meetings?  Strike that.
12          Was there more than one meeting?
13     A.    My understanding is there was one
14 in-person meeting and there were telephone
15 conversations as well.
16     Q.    And so far as you know, there are no
17 records of those telephone communications, that
18 is, what was said by the parties to the telephone
19 communications; is that correct?
20     A.    There's no written record of the
21 conversation, but there is -- there are likely
22 phone records that would support the fact there
23 was a phone conversation.
24     Q.    Are there e-mail communications that
25 you know of identifying what was learned during

Page 37

Pfeiffer - Confidential

1
2 those conversations?
3      A.    Not that I know of.
4      Q.    Were you communicating with other
5 colleagues at Duff & Phelps by e-mail about the
6 communications and information that you were
7 receiving from either FGIC or Lazard?
8      A.    Not that I recall.
9      Q.    Did you have any e-mail communications
10 with your colleagues in connection with the
11 analysis that you undertook starting in late March
12 of 2013 up through the end of May 2013?
13     A.    Yes.
14          MR. KOTWICK:  Object to the form.
15     Q.    And did those e-mail communications
16 identify any of the confidential information that
17 was communicated to Duff & Phelps by either FGIC's
18 chief restructuring officer or Lazard or the
19 financial advisors to Weil, Gotshal?
20     A.    To the extent that we learned more
21 about the plan in those confidential
22 communications and those -- and that knowledge is
23 presented on -- in this presentation as of May
24 15th and the draft presentations on May 6th, those
25 may have been communicated with me via e-mail as

10 (Pages 34 - 37)

Page 38

1            Pfeiffer - Confidential
2  well.
3      Q.   Do you know if those e-mails have been
4  produced?
5      A.   I believe you have received -- I don't
6  know for sure, but I believe that you have
7  received the e-mail that reflects the draft
8  communication of our -- of our results as of May
9  6th.  And the confidential understanding that we
10 received from FGIC is incorporated in that draft
11 presentation.
12     Q.   But I'm asking whether, if you know,
13 the e-mails that identified the confidential
14 information that was communicated to Duff & Phelps
15 by either FGIC's chief restructuring officer or
16 Lazard have been produced.
17        MR. KOH:  Objection.
18        MR. KOTWICK:  Objection to form,
19     misstates prior testimony.
20     A.   I don't believe that there was any
21 e-mail that identifies in particular any
22 confidential information.
23     Q.   Okay.
24        Looking back at paragraph 14 in Exhibit
25 1, you say, Based in part on confidential

Page 39

1            Pfeiffer - Confidential
2  information communicated by FGIC's chief
3  restructuring officer, D&P performed its analysis
4  to determine a reasonable range.
5        Do you see that language?
6      A.   I do.
7      Q.   What confidential information was
8  communicated by FGIC's chief restructuring officer
9  that you then used or that D&P used to perform its
10 financial analysis?
11        MR. SIDMAN:  Objection, asked and
12     answered.
13     A.   As I said previously, my understanding
14 is that it was a broader and enhanced
15 understanding of the rehabilitation plan that was
16 communicated by FGIC's chief restructuring officer
17 and Lazard, and that is what is referred to in
18 paragraph 14 of the report that you have in front
19 of you.
20     Q.   Did FGIC's chief restructuring officer
21 provide answers to questions that you and your
22 colleagues posed?
23     A.   To some of the questions, yes.
24     Q.   Did they refuse to answer other
25 questions?

Page 40

1            Pfeiffer - Confidential
2      A.   They refused to provide us some detail
3  that we -- that -- that we asked for, yes.
4      Q.   What detail did you ask for that FGIC's
5  chief restructuring officer refused to provide
6  you?
7      A.   I wouldn't pin it on FGIC's chief
8  restructuring officer, but I would say that the
9  members of the meeting, including FGIC's chief
10 restructuring officer, Lazard, and Weil, Gotshal
11 did not provide us the detailed model that went
12 behind the rehabilitation plan.
13     Q.   Did they tell you why they wouldn't
14 give it to you?
15     A.   I don't recall.
16     Q.   Who asked for it?
17     A.   Members of my team.
18     Q.   And you were told that FGIC refused to
19 provide that; is that correct?
20        MR. SIDMAN:  Objection.
21     A.   I wouldn't choose the word "refused."
22 I would say that they -- they did not provide it.
23     Q.   Is there any other confidential
24 information that you requested that FGIC did not
25 provide?

Page 41

1            Pfeiffer - Confidential
2      A.   Along the same lines, we did not
3  receive extensive, detailed understanding of the
4  claim assumptions, the assumptions that underlie
5  the rehabilitation plan.
6      Q.   Did you ask for such information?
7      A.   We would have liked to have seen that
8  information.
9      Q.   Did you ask for it?
10     A.   I believe we did.
11     Q.   And did FGIC refuse to provide it?
12        MR. SIDMAN:  Objection.
13     A.   I believe they were trying to be
14 helpful in answering a lot of our questions with
15 regard to what was included in the claim
16 assumptions and what was not included.  But they
17 didn't provide the actual numbers, and they did
18 not provide significant detail with regard to
19 every assumption.
20     Q.   And did you ask for significant detail
21 with respect to every assumption?
22        MR. SIDMAN:  Objection.
23     A.   As technical people and as advisors, we
24 always like to get as much of the underlying
25 numbers as we can get.  We had a discussion about

11 (Pages 38 - 41)

Page 42

Pfeiffer - Confidential

1    Pfeiffer - Confidential
2  what was appropriate, what was available to us,
3  and we appreciated the meeting we had and the
4  conversation we had.  But as I previously
5  testified, we did not get the actual spreadsheets
6  behind the rehabilitation plan.
7      Q.   Did you ask for them?
8      A.   As I said before, I believe we did.
9      Q.   Who?
10     A.   Members of my team.
11     Q.   What is the basis of your belief?
12         MR. SIDMAN:  Objection.
13     A.   My belief is based on the conversations
14  I've had with my team.
15     Q.   You said, "As technical people and as
16  advisors, we always like to get as much of the
17  underlying numbers as we can get."
18         Why is that?
19     A.   Primarily because we don't then have to
20  re-create the numbers and spend the time to
21  re-create the numbers in Excel by ourselves and go
22  into INtex and do more analysis with respect to
23  claims as well.
24     Q.   Let's go back to page 5 of Attachment 3
25  in Exhibit 1.

Page 43

1    Pfeiffer - Confidential
2         Is it fair and accurate to say at least
3  so far the information that appears on this page
4  was provided by FGIC?  Page 5.
5         MR. SIDMAN:  Objection, asked and
6      answered.
7         Can you please repeat the question?
8      Q.   The information that appears on page 5
9  was provided by FGIC?
10         MR. KOTWICK:  Objection to form.
11     A.   As I testified earlier, the numbers
12  on this page are from FGIC.  The calculations are
13  from FGIC.  The layout of the numbers I believe is
14  from FGIC.  The words on the page in terms of the
15  letters to the right of the page -- A, B, C,
16  through the letter N -- are additions that were
17  provided by Duff & Phelps to allow for the reader
18  to better understand the numbers themselves.
19     Q.   Okay.  What else did Duff & Phelps
20  supply, other than the format, in connection with
21  page 5 of the May 15th presentation?
22         MR. SIDMAN:  Objection to form.
23     A.   My understanding is that we did not
24  even provide the format in terms of the way the
25  numbers and lines associated with those numbers

Page 44

1    Pfeiffer - Confidential
2  are laid out.  And as I said before, we added the
3  letters and the description of what those letters
4  mean on the left.  That's what Duff & Phelps
5  added.
6      Q.   And why did you provide this to the
7  trustees in connection with the presentations that
8  you made?  And by "this" I mean page 5.
9      A.   We provided it purely to provide -- to
10  provide additional context to the trustees and
11  counsel in understanding the settlement proposal.
12     Q.   If you look on the left side of page 5,
13  it states in the first bullet:  "The following
14  proposal is based on the following three main
15  assumptions, colon."
16         Do you see that?
17     A.   I do.
18     Q.   Those assumptions were assumptions by
19  FGIC; is that correct?
20     A.   Yes.
21     Q.   And the first assumption under the
22  first dash beneath that language is "initial cash
23  payment percentages of 17.25 percent (based on the
24  updated stress scenario pursuant to the plan)."
25         Do you see that?

Page 45

1    Pfeiffer - Confidential
2      A.   I do.
3      Q.   And that was provided by FGIC; is that
4  correct?
5      A.   The assumption is from FGIC, yes.
6      Q.   Yes.
7         And did you conclude that that
8  assumption is reasonable?
9         MR. KOTWICK:  Objection to the form.
10         MR. SIDMAN:  Objection to the form.
11     A.   We drew no conclusions on this page
12  with respect to the reasonableness of any
13  assumptions.
14     Q.   Did you evaluate whether that
15  assumption was reasonable?
16         MR. KOTWICK:  Objection to the form.
17         MR. SIDMAN:  Objection.
18     A.   It wasn't the scope -- it was not the
19  scope of our analysis to evaluate whether any
20  particular assumption by FGIC was reasonable.
21  However, we looked at the reasonableness of the
22  plan overall.
23     Q.   Right.  I'm not asking about the plan
24  overall right now; I'm asking about that
25  assumption.

Page 46

Pfeiffer - Confidential
2          Did you do any evaluation as to whether
3    that assumption was reasonable?
4          MR. KOTWICK:  Objection to the form.
5          MR. SIDMAN:  Objection.
6    A.    Our analysis was not focused on whether
7    17.25 initial CPP was reasonable as compared to
8    16.25 or 18.25.  It was not the focus of our
9    analysis.
10    Q.    Therefore you didn't conclude that it
11    was unreasonable; is that correct?
12          MR. KOTWICK:  Objection to form.
13          MR. SIDMAN:  Objection.
14    A.    That's correct.
15    Q.    The next dash states, "B, base case
16    payout to policyholders of 28.5 percent based on
17    the updated base scenario pursuant to the plan
18    assuming a 15 percent discount rate, paren."
19          Do you see that?
20    A.    I do.
21    Q.    What is your understanding as to what
22    FGIC was referring to when it talked about a base
23    case payout?
24          MR. SIDMAN:  Objection to form.
25    A.    My understanding is that a base case

Page 47

Pfeiffer - Confidential
2    payout refers to the payout to policyholders over
3    the next 40 -- approximately 40 years.  And that
4    payout under the base case means under the base
5    case of assumptions as reflected in the
6    rehabilitation plan.
7    Q.    And do you understand that FGIC also
8    employed a stress case?
9          MR. SIDMAN:  Objection to form.
10    A.    I do.
11    Q.    And indeed it's referred to in the
12    first assumption -- is that correct? -- updated
13    stress scenario?
14    A.    Yes.
15    Q.    What is your understanding as to what
16    the stress scenario was, or stress case?
17    A.    The stress scenario relates to a more
18    stressed economic environment, including
19    assumptions for higher unemployment and a weaker
20    real estate market and additional claims made to
21    FGIC.
22    Q.    And what is your understanding as to
23    why FGIC had a base case and a stress case
24    identified in the rehabilitation plan?
25          MR. SIDMAN:  Objection to form.

Page 48

Pfeiffer - Confidential
2    A.    My understanding is that when one
3    presents a plan and FGIC, in presenting its
4    rehabilitation plan, must be prudent and present
5    not only their base case but some estimation of a
6    stress case for a number of reasons, which include
7    to provide full context and disclosure to the
8    readers of that plan; and second, in this case to
9    ensure that the initial cash payment percentage is
10    consistent with the stress scenario.
11    Q.    And where did you get -- come to your
12    understanding that FGIC, in presenting its
13    rehabilitation plan, must be prudent?
14    A.    From my experience in reviewing plans
15    of rehabilitation and reorganization and from my
16    experience in working with many corporations in
17    presenting their plans, it is -- it is -- it is
18    typical to present more than one scenario to
19    provide the reader that kind of additional
20    context.
21    Q.    And did you reach any conclusion as to
22    whether FGIC or the rehabilitators were not being
23    prudent in presenting their base case and their
24    stress case in the rehabilitation plan?
25          MR. SIDMAN:  Objection to form.

Page 49

Pfeiffer - Confidential
2          MR. KOTWICK:  Objection to form.
3    Q.    Okay.  So the question was -- and there
4    were objections -- did you reach any conclusion as
5    to whether FGIC or the rehabilitator were not
6    being prudent in presenting their base case and
7    their stress case in the rehabilitation plan.
8          MR. KOH:  Objection.
9          Go ahead.
10    A.    No, we did not reach any conclusion
11    that they were not prudent in presenting their
12    plans.
13    Q.    Did you believe that they presented the
14    stress case and the base case in good faith?
15          MR. SIDMAN:  Objection.
16    A.    Yes.
17    Q.    Did you have any reason to believe that
18    the information contained in the base case and the
19    stress case was inaccurate?
20          MR. SIDMAN:  Objection.
21    A.    No.
22    Q.    Do you have an understanding as to why
23    FGIC or the rehabilitators did not prepare and
24    present an upside case?
25          MR. SIDMAN:  Objection.

13 (Pages 46 - 49)

Page 50

1                  Pfeiffer - Confidential
2            MR. KOH:  Objection.
3      A.    Yes.
4      Q.    Why is that?
5      A.    I don't think it would be as
6  instructive to the reader of the rehabilitation
7  plan as the two scenarios that were presented.
8      Q.    And why is that?
9      A.    I think that the base case is presented
10  for obvious reasons.  It's the base case.  And as
11  I mentioned earlier, the stress case was needed in
12  order to ensure that the initial CPP percentage
13  was not too large.
14      Q.    And do you believe that -- strike that.
15            You said that the base case is for
16  obvious reasons the base case.  What do you mean
17  by that?
18      A.    I mean that in presenting a plan you're
19  going to start with your base case.
20      Q.    Is a base case, in your understanding,
21  the case that FGIC believes is the most likely to
22  occur?
23            MR. SIDMAN:  Objection to form.
24            MR. KOTWICK:  Objection to form.
25            MR. KOH:  Objection.

Page 51

1                  Pfeiffer - Confidential
2      A.    I would characterize it not as most
3  likely to occur because in any projection there is
4  undoubtedly going to be variance from that
5  projection as time unfolds.  So I would say it is
6  the expected case.
7      Q.    And when you say "expected," is it your
8  understanding that it was expected by FGIC and the
9  rehabilitators more so than the stress case?
10            MR. SIDMAN:  Objection to form.
11            MR. KOH:  Objection.
12      A.    Yes.
13      Q.    Now, going back to page 5, the
14  assumption used by FGIC in its base case -- strike
15  that.
16            The assumption used by FGIC in the
17  calculation that appears on page 5 was based on
18  the base case payout to policyholders based on a
19  15 percent discount rate; is that correct?
20            MR. SIDMAN:  Objection to form.
21      A.    FGIC presented -- FGIC and Lazard
22  presented a 28.5 percent base case payout number
23  based on what they presented to be a discount rate
24  of 15 percent.
25      Q.    Did you understand that the 15 percent

Page 52

1                  Pfeiffer - Confidential
2  was arrived at by FGIC as the midpoint between the
3  10 percent and the 20 percent discount rates that
4  were used in their various analyses?
5            MR. SIDMAN:  Objection to form.
6      A.    My understanding is that FGIC and
7  Lazard arrived at 15 percent as the midpoint
8  between 10 and 20 percent.
9      Q.    Did they tell you that they thought
10  that was reasonable?
11            MR. SIDMAN:  Objection.
12      A.    Yes.
13      Q.    And they said it was reasonable in
14  their view?
15      A.    Yes.
16      Q.    And did you say that was unreasonable?
17      A.    No.
18      Q.    Did you conclude that it was
19  unreasonable?
20      A.    No.
21      Q.    Did you challenge their use of it in
22  this calculation?
23            MR. KOTWICK:  Objection to the form.
24      A.    I wouldn't use the term "challenge."
25  We discussed their use of the range of discount

Page 53

1                  Pfeiffer - Confidential
2  rates with FGIC and Lazard.
3      Q.    Did you believe they should use a
4  different discount rate?
5      A.    No.
6      Q.    And you didn't tell them they should
7  use a different discount rate; correct?
8      A.    We did not tell them what discount rate
9  to use, no.
10      Q.    And do you believe that using a 15
11  percent discount rate on the base case payout, the
12  result would be a 28.5 percent calculation?
13            MR. SIDMAN:  Objection to form.
14            MR. SIEGEL:  I'm sorry, I don't know if
15  the witness understands the question.
16            MR. BAIO:  You have an objection?
17  Object to form and we'll move on.  Okay?
18            MR. SIEGEL:  Object to form.
19      A.    I could not replicate the 28.5 percent
20  payout based on a 15 percent discount rate.  But
21  my understanding is that that is what FGIC -- what
22  FGIC's model resulted in.
23      Q.    And do you believe that they were
24  accurately conveying to you what their model
25  resulted in?

14 (Pages 50 - 53)

Page 54

1         Pfeiffer - Confidential
2         MR. SIDMAN:  Objection.
3      A.   I believe that they were accurately in
4  good faith presenting what the -- what resulted
5  from their model.
6      Q.   Let's look at the chart on the right
7  where it says information points.  Do you see
8  that?
9      A.   I do.
10     Q.   And under the words "information
11 points," the first two entries include the first
12 two assumptions -- is that correct? -- that is, a
13 17.25 percent CPP and a base case payout of 28.5
14 percent; is that correct?
15     A.   That's what it says.
16     Q.   Okay.  And if those assumptions are
17 different, then some of the numbers that follow
18 would be different; correct?
19         MR. SIDMAN:  Objection.
20         MR. KOTWICK:  Objection to form.
21     A.   If those numbers were different, some
22 of the numbers that follow would be different.
23     Q.   The first line under what I've read
24 says, "ResCap-sponsored RMBS claim per FGIC."
25         Do you see that?

Page 55

1         Pfeiffer - Confidential
2      A.   I do.
3      Q.   What is your understanding as to what
4  that is?
5      A.   A proof of claim was filed by FGIC in
6  late 2012, and in that proof of claim there's a
7  $1.85 billion number.
8      Q.   And how did FGIC derive that number, if
9  you know?
10         MR. KOH:  Objection.
11     A.   My understanding of that number and its
12 derivation is listed in my report in paragraph 27.
13     Q.   Thank you.
14         Can you look at paragraph 17 in your
15 report?
16     A.   Yes.
17     Q.   The heading leading up to that is "goal
18 of the rehabilitation plan."  Do you see that?
19 You state, "The stated goal of the rehabilitation
20 plan is to treat FGIC's policyholders in a fair
21 and equitable manner in order to remove the causes
22 and conditions that made the rehabilitation
23 proceeding necessary."
24         Do you see that?
25     A.   I do.

Page 56

1         Pfeiffer - Confidential
2      Q.   Where did you get that understanding?
3      A.   As footnoted in the report, it is from
4  a memorandum of law in support of the approval of
5  the plan of rehabilitation for FGIC dated October
6  25th, 2012.
7      Q.   And did you reach a conclusion as to
8  whether the rehabilitation plan that was proposed
9  as amended by FGIC was presented in a fair and
10 equitable manner in order to remove the causes and
11 conditions that made the rehabilitation proceeding
12 necessary?
13         MR. KOH:  Objection.
14         MR. SIDMAN:  Objection to form.
15     A.   It was not the scope of our assignment
16 to draw conclusions with respect to that.
17     Q.   Well, did you reach a conclusion as to
18 whether FGIC and the rehabilitators acted in good
19 faith in presenting the rehabilitation plan?
20         MR. KOH:  Objection.
21         MR. KOTWICK:  Objection to form.
22         MR. SIDMAN:  Objection.
23     A.   We believe they acted in good faith.
24     Q.   And do you believe they acted in a fair
25 and equitable manner toward policyholders?

Page 57

1         Pfeiffer - Confidential
2         MR. KOTWICK:  Objection to form.
3         MR. KOH:  Objection.
4      A.   I believe they made a good-faith
5  attempt to treat FGIC's policyholders in a fair
6  and equitable manner.
7      Q.   Your next sentence in paragraph 17
8  states, "The rehabilitation plan provides for all
9  of the value of FGIC, other than administrative
10 expenses and certain other costs, to go to FGIC
11 policyholders until the policyholders are paid in
12 full."
13         Do you see that?
14     A.   I do.
15     Q.   And that is your understanding;
16 correct?
17     A.   Yes.
18     Q.   And where did you get that
19 understanding?
20     A.   From the rehabilitation plan.
21     Q.   You then go on to state, "No claimants
22 junior to the policyholders will receive any
23 payment until the policyholders are paid in full
24 in accordance with the terms of the rehabilitation
25 plan."

15 (Pages 54 - 57)

Page 58

1           Pfeiffer - Confidential
2        Do you see that?
3     A.   I do.
4     Q.   Did you believe that was accurate at
5  the time you wrote this and today?
6        MR. KOTWICK:  Objection to form.
7     A.   Yes.
8     Q.   All right.  So going back to page 5 of
9  your May 15th presentation.  Do you believe that
10 FGIC identified the ResCap-sponsored RMBS claim in
11 good faith, that is, the 1 million 850 -- I'm
12 sorry, 1 billion 850 thousand dollars?
13       MR. SIDMAN:  Objection.
14       MR. KOTWICK:  Objection to form.
15    A.   I would correct your question, if you
16 don't mind.
17    Q.   Please do.  Not at all.
18    A.   I think it's 1 billion 850 million.
19    Q.   Okay.
20    A.   But other than that, I believe they
21 presented it in good faith.
22    Q.   Then it says less cost, interest,
23 et cetera.  What is your understanding as to what
24 that reflects?
25    A.   Exactly what the words imply.

Page 59

1           Pfeiffer - Confidential
2     Q.   What is the "et cetera"?
3     A.   Nothing comes to mind right now.
4     Q.   So those costs and interest and
5  whatever other factors should be reduced from the
6  ResCap-sponsored RMBS claim number; is that
7  correct?
8        MR. KOH:  Objection.
9     A.   Yes.
10    Q.   Why is that?
11    A.   Because the projected claim is the 1.85
12 of damage less the cost and interest associated
13 with that damage -- or claim, I should say, not
14 damage.  They are not entitled to project a
15 claim -- to actually project a claim of the costs
16 and the interest.
17    Q.   And do you believe that FGIC in good
18 faith estimated the costs and interest factors and
19 other factors that should be reduced -- should be
20 deducted from the RMBS claim to identify a total
21 projected claim number?
22       MR. KOTWICK:  Objection.
23       MR. SIDMAN:  Objection.
24    A.   Yes.
25    Q.   Did you ask the FGIC folks or the

Page 60

1           Pfeiffer - Confidential
2  rehabilitator how they arrived at the 1 million --
3  1 billion 850 million dollar figure?
4     A.   I believe we did.
5     Q.   Did you get a satisfactory answer?
6        MR. SIDMAN:  Objection.
7        MR. KOH:  Objection.
8     A.   Broadly speaking, we did.
9     Q.   Did you think that there was anything
10 unreasonable about their analysis?
11    A.   No.
12       MR. SIDMAN:  Objection.
13    Q.   So the item total projected claims in
14 POC, the third line in the chart we've been
15 addressing, what is your understanding as to what
16 that is?
17    A.   POC is the proof of claim.
18    Q.   Yes.
19    A.   And my understanding is that is from
20 the proof of claim that, as I mentioned earlier,
21 is described --
22    Q.   Paragraph 27?
23    A.   -- in paragraph 27 as dated November
24 16th, 2012.  My understanding is that is the
25 beginning basis for the numbers that are presented

Page 61

1           Pfeiffer - Confidential
2  on this page.
3     Q.   Okay.  And you believe that number was
4  generated by FGIC in good faith; correct?
5        MR. SIDMAN:  Objection.
6     A.   Yes.
7     Q.   The next entry is claims paid to date,
8  and it identifies a figure of $344 million.  Do
9  you see that?
10    A.   I do.
11    Q.   What is that?
12    A.   That represents the claims -- the
13 claims that were already paid by FGIC to the -- to
14 the trust -- to the investors that were wrapped by
15 FGIC as of March 31st, 2013.  It's the claims that
16 were paid from the beginning through the date in
17 which FGIC stopped making payments.
18    Q.   And based on the work that you did, do
19 you believe that that's an accurate number for the
20 claims that were paid to date on the date that you
21 identified?
22    A.   My understanding is that the number is
23 343 or 344.  It's roughly accurate, yes.
24    Q.   And you understand how that was
25 derived; correct?  You understand what FGIC did in

16 (Pages 58 - 61)

Page 62

Pfeiffer - Confidential

1          Pfeiffer - Confidential
2  order to reach the conclusion that the number was
3  around 344 million?
4          MR. KOTWICK:  Objection.
5          MR. KOH:  Objection.
6          MR. SIDMAN:  Objection.
7      A.   Yes.
8      Q.   So that was then deducted from the
9  total projected claims in the proof of claim to
10  arrive at estimated unpaid claims; is that
11  correct?
12     A.   That is correct.
13     Q.   And the estimated unpaid claims number
14  is 1 billion 270 million dollars?
15     A.   That's correct.
16     Q.   And you believe that FGIC and the
17  rehabilitators arrived at that number in good
18  faith; correct?
19     A.   Yes.
20     Q.   And in your meetings with -- your
21  meetings or the meetings of your colleagues with
22  FGIC or Lazard, did you or anyone state that that
23  number is inaccurate?
24     A.   No.
25     Q.   Next there is the accrued and unpaid AU

Page 63

1          Pfeiffer - Confidential
2  claims as of 3/31/13.  Do you see that?
3      A.   I do.
4      Q.   And what does that number reflect?
5      A.   That reflects that as of March 31st,
6  2013, there's $789 million of accrued and unpaid,
7  "accrued and unpaid" meaning that from the date
8  that FGIC stopped making payments through March
9  31st, 2013, losses accrued and FGIC did not make
10  payments that they were obligated to make
11  corresponds to those losses.
12     Q.   And did FGIC identify for you, FGIC or
13  the rehabilitator, how they arrived at the number
14  of $789 million as accrued and unpaid claims as of
15  3/31/13?
16     A.   Yes.
17     Q.   And how did they arrive at that number?
18         MR. KOH:  Objection.
19     A.   They arrived at that number by going
20  back and looking at the losses in the various 47
21  insured trusts and compiling those numbers.  It's
22  consistent with our calculations of the accrued
23  and unpaid amounts.
24     Q.   So you agree with that calculation; is
25  that correct?

Page 64

Pfeiffer - Confidential

1          Pfeiffer - Confidential
2      A.   We tested it by looking at the same 47
3  trusts' accrued and unpaid amounts as of December
4  of 2012 and arrived at a number that is slightly
5  lower than the 789, which provided us comfort that
6  the 789 is an accurate number.
7      Q.   And the final line in page -- in the
8  chart on page 5, the upper chart, is future
9  estimated claims.  Do you see that?
10     A.   I do.
11     Q.   And what is your understanding as to
12  what the number 481 reflects?
13     A.   The losses of principal and interest in
14  these 47 trusts subsequent to March 31st, 2013,
15  were approximated to be, in nominal dollars, $481
16  million.
17     Q.   Did FGIC provide you information as to
18  how they reached that number?
19     A.   We had discussions around how they
20  reached that number.
21     Q.   What is your understanding as to how
22  they reached that number?
23     A.   They reached that number by looking at
24  the historical performance related to those trusts
25  and projected forward that performance to arrive

Page 65

1          Pfeiffer - Confidential
2  at an estimate of future claims.
3      Q.   And do you believe that they arrived at
4  that estimated number for future claims in good
5  faith?
6      A.   Yes.
7      Q.   Do you believe the number is accurate?
8      A.   I believe it represents a number that
9  is within the range of what could be an accurate
10  assessment.
11     Q.   So then let's go to commutation
12  considerations.  Can you tell me when the first
13  line, claims A&U cash at initial CPP, is?
14     A.   Yes.
15     Q.   What is it?
16     A.   FGIC, in providing this number,
17  calculates the 17.25 percent of the $789 million
18  of accrued and unpaid claims as of March 31st,
19  2013.
20     Q.   And that amount is $136.1 million?
21     A.   Yes.
22     Q.   Do you believe that number is accurate?
23     A.   I believe it's substantially accurate.
24  I can do the exact math.  But it's -- if not
25  accurate, it's close to accurate.

17 (Pages 62 - 65)

Page 66

Pfeiffer - Confidential

1
2     Q.    And this is an amount that the trust
3  would receive as an initial CPP; is that correct?
4          MR. KOTWICK:  Objection to form.
5          MR. SIDMAN:  Objection.
6          MR. KOH:  Objection.
7     A.    When you say "the trust," I'm not
8  understanding what you mean.
9     Q.    Who would receive this $136 million
10  figure under the rehabilitation plan?
11    A.    The investors in the 47 insured trusts.
12    Q.    Okay.  And that's under the plan based
13  on these calculations; correct?
14          MR. KOTWICK:  Objection to form.
15    A.    Yes.
16    Q.    What is the next entry: claims A&U
17  base case payout less initial CPP?
18    A.    This is an amount of payout on the
19  accrued and unpaid claims that would be paid to
20  the 47 insured trusts over time subsequent to the
21  initial CPP.
22    Q.    And that is a FGIC calculation;
23  correct?
24    A.    Every -- every one of these numbers is
25  a FGIC calculation.

Page 67

Pfeiffer - Confidential

1
2     Q.    And do you believe that that
3  calculation is reasonable?
4          MR. KOTWICK:  Objection to form.
5          MR. SIDMAN:  Objection.
6          MR. KOH:  Objection.
7     A.    I believe it was provided in good
8  faith.
9     Q.    You can't say whether you view it as
10  reasonable?
11    A.    We did not make a separate
12  determination as to whether the $88.8 million
13  number was reasonable.
14    Q.    Did you believe that FGIC or the
15  rehabilitator had an incentive to overstate that
16  number?
17          MR. SIDMAN:  Objection.
18    A.    No.
19    Q.    You believe they had an incentive to
20  understate that number?
21          MR. SIDMAN:  Objection.
22    A.    No.
23    Q.    The next amount is claims, future
24  estimated claims, at base case payout of 137.1
25  million.  Do you see that?

Page 68

Pfeiffer - Confidential

1
2     A.    Yes.
3     Q.    What is your understanding as to what
4  that reflects?
5     A.    That reflects the portion of the future
6  estimated claims that would be paid out to the 47
7  insured trusts.
8     Q.    And how was it that FGIC or the
9  rehabilitator reached the conclusion that $137.1
10  million is appropriate in identifying the future
11  estimated claims of the base case payout?
12          MR. KOH:  Objection.
13          MR. SIDMAN:  Objection to form.
14    A.    You have to ask FGIC that, I'm sorry.
15    Q.    What is your understanding as to the
16  FGIC analysis that went into reaching the $137.1
17  million figure for future estimated base claims?
18          MR. KOTWICK:  Objection to form.
19          MR. SIDMAN:  Objection.
20    A.    My understanding is that the claims are
21  made at a point in time as they occur, as the
22  losses occur, as losses are accrued over time.
23  And then the -- then FGIC calculated, based on the
24  CPP, the timing in which those claims would be
25  paid in a recovery to the 47 insured trusts.  And

Page 69

Pfeiffer - Confidential

1
2  FGIC estimated the payout based on a range of
3  discount rates as we discussed earlier.
4     Q.    Does this figure include a range of
5  discount rates or a fixed discount rate at 15
6  percent?
7          MR. SIDMAN:  Objection.
8     A.    This figure of 137 is based on the
9  midpoint of those ranges of 15 percent.
10    Q.    Okay.  And do you believe that the
11  calculation that was done by FGIC and/or the
12  rehabilitator was done in good faith?
13          MR. SIDMAN:  Objection.
14    A.    I do.
15    Q.    And do you believe it was reasonable?
16          MR. KOTWICK:  Objection to form.
17    A.    We did not make a separate
18  determination as to whether the number 137 was
19  reasonable.
20    Q.    And that's because you weren't asked
21  to?
22    A.    That's correct.
23    Q.    And do you know of any reason why FGIC
24  or the rehabilitator would either overstate or
25  understate that number?

18 (Pages 66 - 69)

Page 70

1          Pfeiffer - Confidential
2     A.   I know of no such reason.
3     Q.   There then is the total of the claims
4 AU base case payout less initial CPP, and the
5 future estimated claims at base case payout, that
6 is, the sum of the 88.8 million and the 137.1
7 million.
8          Do you see that?
9     A.   I do.
10    Q.   That's $225.8 million; correct?
11    A.   Correct.
12    Q.   And what does that number reflect, so
13 far as you understand according to FGIC?
14         MR. KOH:   Objection.
15         MR. SIDMAN:   Objection to form.
16    A.   That represents the total of the
17 payment as of -- as -- the initial payment -- the
18 initial cash payment percentage plus the value
19 associated with the payment subsequent to the
20 initial CPP.
21    Q.   And to that, in order to determine what
22 the full consideration is that would be received
23 by the inventors in the 47 trusts, do you add the
24 136.1, the initial CPP?
25         MR. KOTWICK:   Objection to the form.

Page 71

1          Pfeiffer - Confidential
2          MR. SIDMAN:   Objection to the form.
3     A.   Can you repeat the question, please?
4     Q.   Yes.  In order to determine what the
5 complete consideration is under the plan, based on
6 these calculations, do you add 136.1 to 225.8?
7     A.   I'm sorry, can you repeat the first
8 part of that question?
9          (Record read as follows:  And to that,
10   in order to determine what the full
11   consideration is that would be received by the
12   inventors in the 47 trusts, do you add the
13   136.1, the initial CPP?)
14    A.   I think it depends how you refer to the
15 word "consideration."
16    Q.   How about payment?
17    A.   The nominal dollars of the payment is
18 not reflected by these numbers.
19    Q.   Right.  These are the discounted
20 numbers -- correct? -- assuming a 15 percent
21 discount rate?
22    A.   The future payments are discounted by
23 the 15 percent discount rate.
24    Q.   So the sum of the cash at initial CPP
25 of 136.1 plus the 225.8 million, which reflects

Page 72

1          Pfeiffer - Confidential
2 estimated future payments discounted, tells you on
3 a discounted basis how much the investors would
4 receive under this scenario; is that correct?
5          MR. SIDMAN:   Objection to form.
6     A.   It tells you -- it tells you -- really,
7 I mean, it's 136 plus 225.  As we discussed, it
8 is -- reflects some level of discount associated
9 with the future payments.  I don't know how to
10 more accurately described what FGIC did.
11    Q.   What is your understanding as to what
12 they did?  What does the sum reflect?  What does
13 136.1 plus 225.8 reflect?
14         MR. SIDMAN:   Objection.
15         MR. KOH:   Objection.
16    Q.   As you understand it.
17    A.   I would not -- I would not add those
18 two numbers to reflect on anything.  And as
19 they're presented here, they're not added either.
20    Q.   Okay.
21    A.   So I wouldn't -- I wouldn't have taken
22 that step of adding those two numbers.
23    Q.   Is it your understanding that the 136
24 represents the cash at the initial CPP that the
25 investors in the 47 trusts would receive under the

Page 73

1          Pfeiffer - Confidential
2 plan --
3     A.   Yes.
4     Q.   -- based on these calculations?  Is it
5 your understanding that the 225.8 million is
6 FGIC's estimation under the assumptions identified
7 here of what the investors in the 47 trusts would
8 receive over time, discounted by 15 percent?
9          MR. SIDMAN:   Objection to form.
10         MR. KOTWICK:   Objection to form.
11    A.   Yes, except it's not just -- you just
12 discount the number by 15 percent.  That's not the
13 way the discount rate calculations work but...
14    Q.   They used a 15 percent discount rate.
15 Is that more accurate?
16    A.   Yes.
17    Q.   And the answer to the question is that
18 that's what the 225.8 represents?
19         MR. SIDMAN:   Objection to form.
20    A.   It's been represented to us, as you see
21 on the letters to the right, that that's what
22 FGIC's calculations were meant to represent.
23    Q.   And you think that FGIC did that in
24 good faith?
25         MR. SIDMAN:   Objection.

19 (Pages 70 - 73)

Page 74

Pfeiffer - Confidential

1
2    A.    I think that FGIC presented these
3    numbers to us in good faith, yes.
4    Q.    And FGIC had no incentive to overstate
5    that number?
6        MR. SIDMAN:  Objection.
7    Q.    So far as you know?
8    A.    No.
9        MR. BAIO:  Let's take a short break.
10        (Recess taken from 9:58 to 10:21.)
11        MR. SIDMAN:  Earlier today and over the
12    last few days, there have been discussions
13    with respect to a particular document that has
14    been withheld because that document was
15    created in connection with the mediation that
16    led to the eventual FGIC settlement in this
17    case.  It was withheld on the basis that it
18    was within the confidentiality provisions of
19    the mediation order in this case.
20        However, in light of the testimony of
21    Mr. Pfeiffer today that he relied on the
22    information contained in this particular
23    document that I'm going to produce in a
24    minute, which -- in connection with his
25    preparation of the expert report of Allen M.

Page 75

Pfeiffer - Confidential

1
2    Pfeiffer dated July 19th, 2013, we have
3    agreed -- we will agree to produce this
4    document.
5        We still believe that the document
6    itself is subject to the confidentiality
7    provisions of the mediation order, and we
8    reserve our rights in that regard.  And to the
9    extent -- and we're still going to seek relief
10    from the court to give us comfort and
11    protection with respect to the production of
12    this document and that it's not a waiver of or
13    violation of that mediation order.
14        We are designating it highly
15    confidential in this matter, and we will still
16    follow up with the court to resolve this
17    issue.
18        MR. SIEGEL:  Just one thing with regard
19    to that.  Given the fact the court has asked
20    us all to submit letter briefs by 5 o'clock
21    today, it might be useful for us to know --
22    and I don't know if you know at this moment;
23    we have people running around doing things --
24    we should know whether or not this alters your
25    view on what it is that we ought to get from

Page 76

Pfeiffer - Confidential

1
2    the court and whether or not we can do
3    something this afternoon.
4        MR. BAIO:  Fair enough.  I have no idea
5    right now, but we will consider and get back
6    to you.  We don't want to waste the time of
7    the attorneys or the court, if it can be
8    avoided.
9        MR. SIEGEL:  Exactly.
10        MR. BAIO:  We're with you on that.
11        I have been handed a bunch of copies of
12    a single-page document, and that's the
13    document that you're referring to?
14        MR. SIDMAN:  Yes.
15        MR. BAIO:  And we of course reserve all
16    of our rights in connection with the use of
17    the document, and we will be asking questions
18    about it during this deposition.  Thank you.
19        MR. SIDMAN:  Right.
20        MR. GOODMAN:  Can we get a copy?
21        MR. BAIO:  Sure.  Yeah.
22        I'm going to ask the reporter to mark
23    as the next exhibit a two-page document with
24    the Bates number DUFF-MS 00001 to 00002.  That
25    will be Pfeiffer Exhibit 2.

Page 77

Pfeiffer - Confidential

1
2        (Pfeiffer Exhibit 2, e-mail from D&P to
3    Travers, Bates-stamped DUFF-MS 00001 to 00002,
4    marked for identification.)
5        (Discussion off the record.)
6    Q.    Mr. Pfeiffer, have you seen Exhibit 2
7    before?
8    A.    Yes.
9    Q.    What is it?
10    A.    It is an e-mail sent by a member of my
11    team at Duff & Phelps to Tim Travers at FGIC
12    related to the initial diligence discussion topics
13    in advance of the meeting with FGIC and Lazard.
14    Q.    And when was the meeting with FGIC and
15    Lazard?
16    A.    The beginning of April 2013.
17    Q.    And is the list of diligence discussion
18    topics on the second page of this exhibit?
19    A.    It is.
20    Q.    Who prepared them?
21    A.    Members of my team.
22    Q.    Did you participate in preparing them?
23    A.    I had input.
24    Q.    And you sent this to FGIC prior to the
25    meeting in early April with the FGIC

20 (Pages 74 - 77)

Page 78

Pfeiffer - Confidential

1       Pfeiffer - Confidential
2 representatives; is that correct?
3     A.   My understanding is that it was sent to
4 FGIC prior to the meeting.
5     Q.   Was there a rehabilitator
6 representative at the meeting as well as FGIC, if
7 you know?
8     A.   I don't know.
9     Q.   Were you at the meeting?
10     A.   I was not.
11     Q.   Who was at the meeting?
12     A.   Brendan Murphy, Alice Chong, and I'm
13 not sure if there was a third member of our team
14 there.
15     Q.   And who was there -- who else was
16 there, so far as you understand?
17     A.   My understanding is that Tim Travers
18 was there.
19     Q.   Who is he?
20     A.   From FGIC.  Members of the Lazard team
21 were there, and counsel for the trustees were
22 there.  Counsel was there, I should say.
23     Q.   One person?
24     A.   No, but I used the word "counsel" as a
25 singular term.

Page 79

1       Pfeiffer - Confidential
2     Q.   I see.  Sometimes it's a plural term.
3     A.   That's true.
4         I think that more than one person was
5 there from counsel.
6     Q.   And were the diligence discussion
7 topics discussed at the meeting that you didn't
8 attend, so far as you understand?
9     A.   Yes.
10     Q.   And were answers given to the questions
11 that were posed?
12     A.   Yes.
13     Q.   Were those answers communicated to you?
14     A.   Yes.
15     Q.   Let's take the first bullet:  high-
16 level difference and assumptions between base
17 scenario and stress scenarios.  Do you see that?
18     A.   Yes.
19     Q.   And then there are three circles
20 beneath that.  Were those discussed, that is, the
21 bullet and the language that appears next to the
22 three circles, at the meeting, so far as you know?
23         MR. SIDMAN:  Counsel --
24         MR. KOH:  Objection.
25         MR. SIDMAN:  Counsel, to the extent

Page 80

Pfeiffer - Confidential

1 that Mr. Pfeiffer relied on this information
2 in connection with producing his report, I'll
3 allow him to answer it; if he did not, then
4 I'm going to instruct him not to answer in
5 connection with the confidentiality provisions
6 of the mediation order.
7     Q.   Well, sir, did you rely on any --
8         MR. KOH:  Just a moment.  Mr. Pfeiffer,
9 did you understand Mr. Sidman's instructions?
10         THE WITNESS:  Yes.
11         MR. KOH:  You may answer.  My objection
12 on other grounds to the form stand for the
13 record, please.
14         MR. BAIO:  I'm sorry, say that again?
15         MR. KOH:  I had made an objection to
16 form, and I would like that to continue.
17         MR. BAIO:  Oh, okay.
18     Q.   Well, you had said earlier that as a
19 result of the meeting you got certain
20 clarification and a deeper understanding of some
21 of the analyses that were undertaken by FGIC in
22 connection with the calculations that appear on
23 page 5; correct?
24     A.   I think that our meeting was focused

Page 81

1       Pfeiffer - Confidential
2 not on page 5 in particular but on the
3 rehabilitation plan.
4     Q.   And you received information as a
5 result of the meeting with the FGIC folks that you
6 incorporated in your analysis that appears in the
7 report, which is marked as Exhibit 1; correct?
8     A.   Correct.
9     Q.   The first bullet:  a high-level
10 difference in assumption between base scenario and
11 stress scenario and then three circles.  What did
12 your colleagues learn about that, to the extent
13 you know?
14         MR. SIDMAN:  Same instruction.
15         MR. BAIO:  Not to answer?
16         MR. SIDMAN:  No, to answer only to the
17 extent he used that information in connection
18 with the report or relied on that information
19 in connection with the report.
20         MR. BAIO:  Well, we know he relied on
21 information that was received to include in
22 the report, but fine.
23     Q.   Did they give you any clarifications on
24 the base scenario and stress scenario at that
25 meeting?

21 (Pages 78 - 81)

Page 82

1              Pfeiffer - Confidential
2          MR. KOH:  Objection to form.
3          Go ahead.
4      A.   Yes.
5      Q.   What did they tell you?
6          MR. KOH:  Objection to form.
7          Go ahead.
8      A.   They provided a general -- better
9  understanding of the macroeconomic factors and how
10 those factors are utilized in the base scenario
11 versus the stress scenario.
12         And, as listed here on the discussion
13 topics, they provided responses to our question
14 related to Jefferson County case and related to
15 the performance of regional economies.
16     Q.   And what did they say in that regard?
17         MR. KOH:  Objection.
18         Go ahead and answer.
19     A.   They provided additional context with
20 regard to the macroeconomic factors for the base
21 and the stress scenario, and they told us that
22 there is not a specific assumption incorporated in
23 the rehabilitation plan with respect to claims
24 resulting from the Jefferson County case.
25     Q.   What was the Jefferson County case?

Page 83

1              Pfeiffer - Confidential
2      A.   It's a case that Jefferson County has
3  brought against FGIC.
4      Q.   Did your colleagues tell you, in words
5  or substance, that FGIC was forthcoming in
6  responding to this question, or these questions?
7          MR. SIDMAN:  Objection to form.
8      A.   FGIC was forthcoming in response to
9  these questions.
10     Q.   There's a reference to the performance
11 of regional economies, such as Detroit and Puerto
12 Rico.  Do you see that?
13     A.   I do.
14     Q.   And what is your understanding as to
15 what the responses were on that?
16         MR. SIDMAN:  Same instruction.
17     A.   My understanding is that the response
18 was that there was no -- there was no assumption
19 of a significant change in the regional economies
20 baked into the rehabilitation plan.  So the recent
21 filing in Detroit, as an example, that meaningful
22 downside scenario was not baked into the
23 rehabilitation plan.
24         And therefore there is additional risk
25 associated with the plan and the projected

Page 84

1              Pfeiffer - Confidential
2  payments resulting from that plan because the
3  types of issues described in this discussion topic
4  page, including the Jefferson County case and
5  regional economies like Detroit, were not included
6  explicitly in the plan.
7      Q.   Were such events included in the stress
8  scenario, so far as you understand?
9      A.   No.
10     Q.   There's then detail of CPP schedule
11 under the base scenario by year.  Did your
12 colleagues receive what they believed were good-
13 faith responses to that inquiry?
14         MR. SIDMAN:  Same instruction.
15     A.   No.
16     Q.   They did not receive good-faith
17 responses to that request.  Is that your
18 testimony?
19     A.   My testimony is that we were told in
20 good faith that they will not provide us the year-
21 by-year schedule.
22     Q.   And did they tell you why they wouldn't
23 give you the year-by-year schedule?
24     A.   I assume it was confidential or work
25 product or both.

Page 85

1              Pfeiffer - Confidential
2      Q.   But did they say that, so far as you
3  know from your colleagues who were there?
4      A.   I don't know.
5      Q.   Did they provide you other confidential
6  information?
7          MR. SIDMAN:  Objection.
8      A.   As described today, they provided us
9  additional context and enhanced understanding --
10 an enhanced understanding of the plan that
11 included confidential references.
12     Q.   The next bullet is magnitude of risks
13 associated with the scenarios including, and then
14 there are a series of open circles.  Do you see
15 that?
16     A.   I do.
17     Q.   First, did they -- the FGIC
18 representatives respond to the inquiries on those
19 subjects, so far as you know?
20         MR. SIDMAN:  Same instruction with
21 respect to this entire bullet section.
22     A.   Yes.
23     Q.   And did your colleagues conclude, as
24 they reported to you, that the responses were in
25 good faith?

22 (Pages 82 - 85)

Page 86

1          Pfeiffer - Confidential
2     A.    Yes.
3     Q.    And did the FGIC folks withhold
4 anything in response to these questions, so far as
5 you know?
6     A.    No.
7     Q.    They did not, so far as you know?
8     A.    They did not withhold responses with
9 regard to these questions, as far as I know.
10    Q.    Do you know what any of the responses
11 were in connection with the open circles?
12    A.    Yes.
13    Q.    What are they?  Go through them in
14 order.
15    A.    They provided some additional context
16 with regard to the risk associated with the
17 projected investment income, that although the
18 plan assumes a 3.25 targeted annual return there
19 is risk associated with that number.  The number
20 may not reach 3.25, and if it does not reach 3.25,
21 the cash flow available to make payments to
22 investors would be reduced.
23         The same is true with --
24    Q.    I'm sorry, we're going to go through
25 each one, but I want to go one at a time.

Page 87

1          Pfeiffer - Confidential
2     A.    Okay.  That's the first one.
3     Q.    Did they quantify the risk in any way
4 that the targeted annual returns or potential
5 increases would not equal 3.25 percent?
6     A.    No.
7     Q.    Did they identify any scenario in which
8 the amount could exceed the targeted annual
9 returns?
10    A.    No.
11    Q.    Did they say that the 3.25 percent was
12 reasonable?
13    A.    I don't recall if they used that term.
14    Q.    Did you understand that they believed
15 that the 3.25 percent figure was reasonable in
16 that context?
17         MR. KOTWICK:  Objection to the form.
18         MR. SIDMAN:  Objection to the form.
19         MR. KOH:  Objection.
20    A.    Yes.
21    Q.    You understood that, that they thought
22 it was a reasonable number; correct?
23    A.    Yes.
24    Q.    Let's go to the next one, collection of
25 premiums above the 10 percent reduction

Page 88

1          Pfeiffer - Confidential
2 assumption.  What is that and what did you learn
3 from your colleagues about the discussion on that
4 subject?
5     A.    I understood that there was risk
6 associated with the collection of payments.  These
7 are payments -- they are premium payments made --
8 expected to be made to FGIC despite the fact that
9 FGIC was not performing for these trusts.  And
10 therefore there was risk that the collection
11 amounts would not amount to the premium
12 collections that are included in the
13 rehabilitation plan.
14    Q.    And the rehabilitation plan itself
15 contemplated a 10 percent reduction assumption in
16 connection with the collection of premiums; is
17 that correct?
18    A.    That is correct.
19    Q.    Did you think that was a reasonable
20 assumption?
21    A.    I thought that there was risk
22 associated with that assumption, similar to the
23 way that we felt that there was risk associated
24 with the projected investment income assumption.
25    Q.    Did you quantify the risk:  more likely

Page 89

1          Pfeiffer - Confidential
2 than not, anything along those lines?
3     A.    No.
4     Q.    Just that there was risk that in fact
5 the collection of premiums could be lower by FGIC;
6 is that correct?
7     A.    Yes.
8     Q.    And what standard did you use?  "Could
9 be" meaning a 1 percent chance?  a 20 percent
10 chance?  What standard did you use in evaluating
11 that there was a risk that the collection of
12 premiums would be less?
13         MR. KOH:  Objection to form.
14    A.    We did not use any particular standard,
15 just had a conversation about it and discussed it
16 internally as well and believed that while the 10
17 percent reduction is an assumption that's made in
18 the plan it could very well be that the reduction
19 in premiums collected could be 20, 30, 40 percent.
20 We didn't -- we didn't quantify the reduction
21 further than that, and we didn't spend significant
22 amount of time analyzing that issue.
23    Q.    Now, to the extent that the collection
24 of premiums went down, that would mean that the
25 payment of premiums went down -- correct? -- by

Page 90

1          Pfeiffer - Confidential
2 the paying parties?
3     A.    That would mean that the trusts would
4 be paying less.
5     Q.    And they could be paying as little as
6 zero?
7     A.    That's correct.
8     Q.    But you believed that FGIC and the
9 rehabilitator believed in good faith that the 10
10 percent reduction assumption was reasonable; is
11 that correct?
12    A.    I believe that that was their good-
13 faith estimate, yes.
14    Q.    And as a general matter, their
15 estimates, you believe, were made in good faith;
16 is that correct?
17    A.    Yes.
18    Q.    Consistent with whatever the statutory
19 requirements were under the relevant statutes; is
20 that correct?
21         MR. KOH:  Objection.
22         MR. KOTWICK:  Objection to form.
23         MR. SIDMAN:  Objection.
24    A.    I believe their estimates were made in
25 good faith.

Page 91

1          Pfeiffer - Confidential
2     Q.    Why don't we go through the rest of
3 those open circles.  Tell me what you learned from
4 your colleagues in connection with the
5 conversations with FGIC, starting with increases
6 in operating expenses and continuing down.
7         MR. SIDMAN:  Same ongoing instruction
8     in connection with this line of questioning.
9     A.    With respect to the third subbullet --
10    Q.    Yes.
11    A.    -- we had discussion around the fact
12 that there was a risk associated with the fact
13 that the operating expenses, as projected in the
14 plan, could increase.  And while they were
15 comfortable with the level of operating expenses
16 in the plan, there was -- there was a risk that
17 they were going to be higher.
18    Q.    Did they quantify that risk?
19    A.    Not in the conversations we had with
20 them.
21    Q.    Did you ever learn that they quantified
22 that risk?
23    A.    I do not know.
24    Q.    Did you and your colleagues quantify
25 that risk, percentage of likelihood?

Page 92

1          Pfeiffer - Confidential
2     A.    No.
3     Q.    You just determined that it could be
4 higher?
5         MR. SIDMAN:  Objection to form.
6     Q.    Those expenses?
7     A.    We noted that it could be -- there's a
8 risk it could be higher.
9     Q.    Was there a potential benefit that they
10 could be lower?
11    A.    There's always that possibility, but I
12 would say in connection with all these subbullets
13 they're identified by FGIC as risks.  And we also
14 thought there was more downside possibilities than
15 there was upside.
16    Q.    Did you base that on your judgment?
17    A.    Yes.
18    Q.    Continue.
19    A.    The limitations or reduction of the NOL
20 usage is -- we had a discussion about the fact
21 that the plan assumes that they would continue to
22 be able to use the NOLs.  It's elaborated on in my
23 report along with the other risks that are listed
24 on this page.
25         But we had a discussion about the fact

Page 93

1          Pfeiffer - Confidential
2 that if they get a ruling that does not allow them
3 to use this NOL that would create additional
4 downside risk associated with the cash flows
5 projected in the rehabilitation plan.
6     Q.    Did they put any percentages on that
7 risk?
8         MR. KOH:  Objection.
9     Q.    Or quantify it in any way?
10         MR. KOH:  Objection.
11    A.    There are some quantifications of that
12 risk that are referred to in paragraph 49 of my
13 expert report.  There was no further
14 quantification beyond that.
15    Q.    No percentages of likelihood of
16 outcomes; is that correct?
17    A.    That's correct.
18    Q.    Going back to Exhibit 2.  There are
19 three more open circles.  Can you go through them
20 and tell me the information that you or your
21 colleagues learned in connection with the
22 communications with FGIC on those subjects at the
23 April meeting?
24         MR. SIDMAN:  Same instruction.
25    A.    My understanding is that we discussed

24 (Pages 90 - 93)

Page 94

Pfeiffer - Confidential

1          Pfeiffer - Confidential
2 the reinsurance and the other commutations as
3 summarized in paragraph 51 of my expert report.
4     Q.   Is it your general understanding that
5 in connection with other commutations FGIC enters
6 into agreements for commutation when it believes
7 that the amount paid is more than offset by the
8 amount that it does not have to pay in the future?
9       MR. KOH:  Objection.
10       MR. SIDMAN:  Objection to form.
11     Q.   I'll try it again.
12       Looking at your paragraph 51, you are
13 identifying six -- you identify at the end of it
14 six then-pending CDS commutation agreements that
15 were executed.  Do you see that?
16     A.   Yes.
17     Q.   As a result of those commutations,
18 which were approved -- were they approved, first
19 of all?
20     A.   Yes.
21     Q.   And is it your evaluation that as a
22 result of those commutations FGIC's ability to pay
23 an initial CPP increased, decreased, or remained
24 the same?
25     A.   My understanding is that the plan --

Page 95

1          Pfeiffer - Confidential
2 the rehabilitation plan assumed that the
3 commutations were to be approved, and therefore
4 the approval itself did not impact the forecasts
5 provided in the rehabilitation plan.
6     Q.   It did not have any negative impact;
7 correct?
8     A.   The approval did not have any negative
9 impact, no.
10     Q.   Let's continue back with the open
11 circles.  Let me know what else you or your
12 colleagues learned in the conversations with FGIC
13 in April of 2013 on the subjects identified that
14 you used in your analysis.
15     A.   That's -- I think I fairly summarized
16 what we learned on the first three bullet points.
17     Q.   And I'm talking about the last three;
18 right?  Is that what we're up to?
19     A.   I think we're up to discount rate, but
20 if you want to --
21     Q.   You identified all of these?  Were
22 anything else that you learned on reinsurance
23 payments received, commutation payment amounts,
24 and loss adjustment expense estimate?
25     A.   I have nothing else to --

Page 96

1          Pfeiffer - Confidential
2     Q.   Add?
3     A.   -- to add.
4     Q.   So there was nothing else said about
5 loss adjustment expense estimates in the meeting
6 that you incorporated in your evaluation?
7       MR. SIDMAN:  Objection to form.
8     A.   Not that I recall.
9     Q.   So the discussions regarding the
10 illustrative discount rate of 10 to 20 percent,
11 what did you discuss and what did you learn as a
12 result of those discussions?
13       MR. SIDMAN:  Same instruction with
14    respect to these questions and this bullet.
15    Do you understand my instruction?
16       THE WITNESS:  If you would like to
17    repeat it, you can.
18       MR. SIDMAN:  That's fine.  I only ask
19    that you provide information that you relied
20    on in connection with preparing your analysis
21    that is reflected in the Exhibit 1, the expert
22    report of Allen Pfeiffer.
23     Q.   With that whatever it is, can you
24 answer the question?
25     A.   I can.

Page 97

1          Pfeiffer - Confidential
2     Q.   Okay.  What's the answer?
3     A.   We had discussion around why FGIC and
4 Lazard in particular believed the discount rate of
5 10 to 20 percent was a reasonable discount rate.
6     Q.   And what did you learn in that regard?
7     A.   We learned that they had a high degree
8 of comfort with regard to its reasonableness.
9     Q.   And what did they say in that regard
10 that led you to the conclusion that they had a
11 high degree of confidence in that range?
12       MR. KOTWICK:  Objection to form.
13     A.   They said that an investor would
14 require a rate of return well in excess of 10
15 percent for the types of cash flows that are
16 projected in the rehabilitation plan, given the
17 level of uncertainty associated with those cash
18 flows.
19     Q.   Did they say anything else?
20     A.   There was certainly discussion around
21 the subject, but I think that what I've just
22 stated fairly summarizes their viewpoint with
23 regard to discount rate and how it's reflective of
24 the level of risk associated with the cash flows
25 and the, therefore, expected return that an

25 (Pages 94 - 97)

Page 98

1           Pfeiffer - Confidential
2  investor would require in receipt for those
3  expected cash flows.
4      Q.   What about the next bullet: updates,
5  if any, on the following unknown amounts. The
6  first open circle is potential proceeds and timing
7  related to material litigation, excluding ResCap-
8  related.
9           First, why was ResCap-related excluded?
10          MR. SIDMAN:  Same instruction with
11  respect to this bullet point and all the
12  bullet points underlying this bullet point.
13          MR. KOH:  And I object to the form of
14  the question.
15          MR. SIDMAN:  Object to the form.
16     A.   The ResCap-related litigation was
17  excluded I believe because we don't need to -- we
18  didn't think it was appropriate for them to be
19  providing additional context in this meeting on
20  the ResCap-related litigation.
21     Q.   Why is that?
22     A.   I'm not sure.
23     Q.   Did you make the decision to exclude
24  the ResCap-related material litigation from this
25  inquiry?

Page 99

1           Pfeiffer - Confidential
2          MR. KOTWICK:  I'm going to object to
3  the form and instruct the witness in his
4  answer to exclude any communications, if any,
5  he might have had with his counsel or the
6  trustees' counsel concerning that matter.
7          MR. BAIO:  On what basis do you
8  instruct him?
9          MR. KOTWICK:  Certainly, with respect
10  to his counsel, the attorney-client privilege,
11  and, to the extent that he had communications
12  with the trustees' counsel, work product.  You
13  can ask him if he had any communication.  I
14  don't know that he did.  But I would ask him
15  to exclude, to the extent he did have those
16  communications.
17         MR. BAIO:  Well, I'm just asking
18  whether he made the decision.  We know it's
19  excluded.  I don't really see where that's
20  implicating the attorney-client privilege of
21  anyone.
22         MR. KOH:  May I have the question
23  again, please.
24         MR. BAIO:  Okay.
25         (Record read as follows:  Did you make

Page 100

1           Pfeiffer - Confidential
2  the decision to exclude the ResCap-related
3  material litigation from this inquiry?)
4          MR. KOH:  Why don't you answer that
5  question "yes" or "no."
6      A.   I don't believe I did, no.
7      Q.   What was said at the meeting about
8  potential proceeds and timing related to material
9  litigation, excluding the ResCap-related matter?
10         MR. SIDMAN:  Counsel, this is also --
11  in addition to the mediation order, there are
12  also confidentiality issues relating to offers
13  and offers of settlement in connection with
14  potential resolution of ongoing litigation.
15  And I just don't -- sitting here right now in
16  response to your question, I don't know what
17  was said with respect to that.
18         But I also know that -- I believe that
19  there was a confidentiality agreement entered
20  into in connection with this meeting that
21  we're talking about.  I don't want the witness
22  to reveal anything that is confidential with
23  respect to those particular discussions.
24         And so we can either take a break now
25  and I can talk to him about it outside or you

Page 101

1           Pfeiffer - Confidential
2  can move on and we can do it at the next
3  available break and have a response for you
4  then.
5          MR. BAIO:  I don't want to belabor the
6  record.  This is about discussion topics
7  relating to valuation issues.  And, you know,
8  we have a confidentiality agreement in this
9  case, and it's an order.
10         If they said something about potential
11  proceeds affecting recoveries or not affecting
12  recoveries, I think it's critical and that you
13  can't have it both ways.
14         But all of that having been said, let
15  me just pose the question.  You do your -- you
16  instruct however you want -- okay? -- and then
17  we'll take a break later and come back to it.
18     Q.   Independent from what you were told,
19  were you told anything about the discussion of
20  potential proceeds and timing related to material
21  litigation that came up during the meeting with
22  FGIC in April of 2013?
23     A.   Yes.
24     Q.   And what were you told?
25         MR. SIDMAN:  In light of my previous

Page 102

1        Pfeiffer - Confidential
2    statement, I instruct him not to answer that
3    question.  We're happy to revisit it on a
4    break.
5        Q.   And the same question with respect to
6    the potential proceeds and timing from FGIC U.K.
7    separation.  First, were you informed of whatever
8    was discussed on that subject in the April 13,
9    2013, meeting?
10       A.   I don't recall conversation about that
11   topic.
12       Q.   Let's go back to page 5 of Attachment 3
13   to Exhibit 1, the May 15th presentation, about
14   which you've been providing some testimony.
15   You'll see that another assumption, on the
16   left-hand side with the letter J, is, quote,
17   haircut of 40 percent on unpaid payout claim
18   estimates.
19       Do you see that?
20       A.   Yes.
21       Q.   Who selected the word "haircut"?
22       MR. SIDMAN:  Objection.
23       A.   I don't know.
24       Q.   Is it your understanding that FGIC
25   called it a haircut?

Page 103

1        Pfeiffer - Confidential
2        MR. SIDMAN:  Objection.
3        A.   I don't know.
4        Q.   And finally, did Duff & Phelps select
5    the word "haircut" to articulate this assumption?
6        MR. SIDMAN:  Objection.
7        A.   I don't know how the term "haircut"
8    came about.
9        Q.   And what is your understanding as to
10   what the haircut is?
11       A.   Well, the 40 percent, from a -- from a
12   mathematical and technical perspective, the
13   haircut of 40 percent -- 40 percent is the inverse
14   of the 60 percent.  1 minus 60 percent is 40
15   percent.  So the factor provided in the schedule
16   of 60 percent is -- the 60 percent times the 225
17   equals the 135.5, and therefore the factor allows
18   for a reduction of 40 percent.
19       That's what's meant by the haircut.
20       Q.   And did FGIC identify for you the basis
21   for the haircut assumption?
22       MR. SIDMAN:  Objection to the form.
23       A.   Yes.
24       Q.   What did they say as to why they were
25   applying -- or employing a haircut assumption of

Page 104

1        Pfeiffer - Confidential
2    40 percent on unpaid payout claim estimates?
3        A.   So consistent with what I have listed
4    in my expert report -- I believe it's in Footnote
5    23 on page 16 -- that our general understanding as
6    a result of that conversation with FGIC is that
7    the 40 percent reduction reflects a discount for
8    receiving the commutation payment upon execution
9    of a settlement agreement in consideration of a
10   timing of claims and payments specifically related
11   to FGIC-insured trust policy claims under the
12   rehab plan.
13       Q.   And what is your understanding as to
14   what that means?
15       A.   My understanding is that these
16   FGIC-insured trust policy claims were claims that
17   were front loaded, meaning they were closer to the
18   initial date than the average claims in the
19   rehabilitation plan.  They were more in the next
20   few years than they were in the outer years of the
21   plan.
22       So because those claims were front-
23   loaded and the recoveries or payments under the
24   rehab plan were extended well beyond that into the
25   outer years, there is an additional discount

Page 105

1        Pfeiffer - Confidential
2    applied in consideration of the timing of those
3    claims relative to the timing of the payments.
4        Q.   Did they tell you or provide you
5    information as to how they calculated the 40
6    percent other than what you just testified to?
7        A.   Not that I recall.
8        Q.   Did you ask them:  Can you show us your
9    calculation as to the timing of payments that
10   would justify this 40 percent figure?
11       A.   I don't know if we asked them for that.
12       Q.   They didn't give it to you; is that
13   correct?
14       MR. SIDMAN:  Objection.
15       A.   We did not receive any quantification
16   related to the 40 percent or the 60 percent
17   factor.
18       Q.   Did you see the 40 percent or 60
19   percent factor anywhere in the rehabilitation
20   plan?
21       A.   No.
22       Q.   Did you do any analysis to determine
23   whether this discount -- this haircut assumption
24   of a 40 percent reduction to reflect a discount
25   was reasonable?

27 (Pages 102 - 105)

Page 106

1        Pfeiffer - Confidential
2      A.    In considering the reasonableness of
3  the commutation proposal compared to the projected
4  payments, we certainly considered the present
5  value of those payments, and incorporated in that
6  analysis and in our reasonableness test, we
7  therefore assessed the reasonableness of the
8  discounted amounts as provided by FGIC as well.
9      Q.    Well, in Footnote 23 your first
10  sentence says, "I have not reviewed the analysis
11  behind the 40 percent reduction in the payments
12  related to the, i, spread between the base case
13  payout and initial CPP multiplied by the accrued
14  and unpaid claims; and, ii, the base case payout
15  multiplied by the projected claims."
16      Do you see that?
17      A.    I do.
18      Q.    And that's accurate; correct?
19      A.    Yes.
20      Q.    And in the concluding sentence you
21  state, "The analysis performed by D&P does not
22  employ this assumed reduction as D&P incorporates
23  the timing of claims and payments related to
24  policy claims of the FGIC-insured trusts."  See
25  Attachment 3.

Page 107

1        Pfeiffer - Confidential
2      That was also correct and accurate at
3  the time you wrote this report; correct?
4      A.    Yes.
5      Q.    And it still is accurate?
6      A.    Yes, it is.
7      Q.    In Footnote 24 -- never mind.  I'll get
8  to that later.
9      MR. BAIO:  I'm going to ask the
10  reporter to mark as Pfeiffer Exhibit 3 the
11  one-page chart that was handed to us today.
12      MR. SIDMAN:  For the record, that
13  document, as I stated earlier, is marked
14  highly confidential --
15      MR. BAIO:  Yes.
16      MR. SIDMAN:  -- and subject to all the
17  discussions we've had on the record previously
18  and all reservation of rights from both sides.
19      MR. BAIO:  Thank you.  Good.  I'm
20  writing "highly confidential" on it.
21      MR. SIDMAN:  There it is.
22      (Pfeiffer Exhibit 3, chart, marked for
23  identification.)
24      Q.    What is Exhibit 3?
25      A.    Exhibit 3 is what was sent to us as

Page 108

1        Pfeiffer - Confidential
2  a -- as part of the settlement offer in March of
3  2013.
4      Q.    Was this the first settlement offer
5  that you saw?
6      MR. KOH:  Objection.
7      A.    I believe so.
8      Q.    And is it your understanding that it's
9  the first settlement offer that was made to the
10  trees?
11      MR. SIDMAN:  Objection.
12      MR. KOTWICK:  Objection to form.
13      MR. SIDMAN:  I'm going to instruct him
14  not to answer that question on the grounds
15  that it's -- it involves and is covered by the
16  confidentiality provisions of the mediation
17  order.
18      MR. KOH:  I will give the same
19  instruction.
20      Q.    This appears to be dated at the bottom
21  3/26/13, 7:27 p.m.  Do you see that?
22      A.    I do.
23      Q.    Had you received any proposal or
24  summary of proposal prior to that date?
25      A.    I don't think we did, no.

Page 109

1        Pfeiffer - Confidential
2      Q.    Was there anything else attached to
3  this one-page sheet when you received the proposal
4  embodied in this one-page sheet?
5      A.    No.
6      Q.    And can you walk us through this as to
7  what you understand this document to show?
8      A.    I think this document shows the precise
9  numbers that are listed on page 5 of the
10  presentation that is included as Attachment 3 to
11  my report.
12      Q.    There is at the bottom something called
13  net cost to FGIC.  Do you see that?
14      A.    I do.
15      Q.    What is your understanding as to what
16  that reflects?
17      MR. SIDMAN:  Same instruction with
18  respect to this line.
19      MR. BAIO:  You mean --
20      MR. SIDMAN:  He didn't rely on it in
21  connection with the report.
22      Q.    First, do you have an understanding as
23  to what it reflects?
24      A.    As I sit here today, I do not know.
25      Q.    What about the percentage of allowed

Page 110

1         Pfeiffer - Confidential
2  claim realized, the 36 percent, and the maximum
3  dollars realized by FGIC, what is your -- do you
4  have an understanding as to what that reflects?
5      A.   Yes.
6      Q.   And what is that understanding?
7         MR. SIDMAN:  Same instruction to the
8  witness.
9      A.   My understanding now -- by the way,
10 after you asked the question, I now understand the
11 last line too.
12     Q.   Okay.
13     A.   -- the 36 percent times the amount of
14 the claim equals the dollars realized by FGIC.  So
15 597.3 times 36 percent -- I don't have my
16 calculator on me, but it seems to be accurate that
17 it's 215 million.  And then the 56.6 is the 271.6,
18 which is the value to the trusts, minus the 215,
19 which is the net cost to FGIC.
20     Q.   You'll notice at the top there is --
21 there are three headings:  All trusts, non-RMBS
22 investor trusts, and RMBS investor trusts.  Do you
23 see that?
24     A.   I do.
25     Q.   And what does each refer to?

Page 111

1         Pfeiffer - Confidential
2         MR. KOH:  Objection.
3         You may answer.
4      A.   I know what the words mean, but I was
5  not focused on those two columns, and I am not --
6  I have nothing to offer about those.
7      Q.   Do you have an understanding as to what
8  the non-RMBS investors trusts refers to in this
9  context of this document?
10        MR. KOH:  Objection.
11        MR. SIDMAN:  Objection, asked and
12 answered.
13     A.   No.
14     Q.   Do you have an understanding as to what
15 RMBS investors trusts refers to in the context of
16 this document?
17        MR. SIDMAN:  Objection.
18        MR. KOH:  Objection.
19        MR. SIDMAN:  Asked and answered.
20     A.   As I stated, I know what the words
21 mean, I know all trusts and then there are
22 certain trusts that are RMBS trusts and certain
23 that are -- a very small portion that are non-RMBS
24 investor trusts.  But other than that I can't
25 provide any additional context.

Page 112

1         Pfeiffer - Confidential
2         MR. BAIO:  All right.  Let's take a
3  short break.  You can inquire on the other
4  subject, and we'll continue shortly.
5         (Recess taken from 11:16 to 11:34.)
6         MR. SIDMAN:  Counsel, in the last line
7  of questioning, you had asked Mr. Pfeiffer
8  about some information he had received in
9  connection with a meeting he had with various
10 individuals that related to potential proceeds
11 and timing related to material litigation,
12 excluding ResCap-related litigation.
13        I had instructed the witness not to
14 answer because I was unclear as to whether or
15 not the information was subject to other
16 confidentiality agreements not at issue in
17 this case.
18        I have had a chance to confer with my
19 colleagues, and I will remove that instruction
20 and allow the witness to answer the questions,
21 if any, you want to raise.
22        MR. BAIO:  Okay.
23     Q.   Mr. Pfeiffer, can you look at -- once
24 again at Exhibit 2.
25     A.   Yes.

Page 113

1         Pfeiffer - Confidential
2      Q.   There's a reference in the final bullet
3  of the second page of that document to updates, if
4  any, on the following unknown amounts, including
5  potential proceeds and timing related to material
6  litigation excluding ResCap-related.
7         Do you see that?
8      A.   Yes.
9      Q.   And what did you learn about the
10 discussions with FGIC in connection with that
11 matter?
12     A.   We learned that FGIC and Lazard --
13 consistent with what is referenced in the Lazard
14 affidavit, FGIC and Lazard felt that it would not
15 be possible to accurately assess and estimate the
16 potential proceeds and timing related to material
17 litigation.
18        And those amounts, if any, were
19 therefore not included in the rehabilitation plan
20 in the same way that the estimated permitted
21 claims for Jefferson County and regional economies
22 and other downside risks were also not included in
23 the rehabilitation plan because they too were very
24 difficult to estimate in terms of the proceeds and
25 the timing.

29 (Pages 110 - 113)

Page 114

1          Pfeiffer - Confidential
2      Q.   What were the material litigations that
3  were being discussed -- or that were discussed at
4  that April 2013 meeting?
5      A.   We did not discuss in particular any of
6  the actual litigations themselves, but it's my
7  understanding that by and large Countrywide was
8  the -- was the material litigation that is
9  referred to in this bullet point.
10     Q.   What is your understanding as to what
11 the Countrywide litigation is about and what the
12 amount of the claim is, if you have an
13 understanding?
14         MR. SIDMAN:  Objection to the form.
15     A.   My understanding is that FGIC alleges
16 certain issues with respect to the underwriting at
17 Countrywide and the litigation surrounds the
18 damage associated with that alleged inappropriate
19 underwriting standards.
20     Q.   You understand what the amount of the
21 claim is that's been advanced or alleged?
22     A.   You know, in all these litigations,
23 there's an alleged amount, which often has very
24 little association with the actual value of a
25 litigation.  My understanding is that it's alleged

Page 115

1          Pfeiffer - Confidential
2  to be a billion dollars, but I'm not -- I'm not
3  exactly sure at this moment.
4      Q.   And did you attempt to put any
5  percentage recovery on that and incorporate it in
6  your analysis?
7      A.   We did not.
8      Q.   So you counted it at zero?
9          MR. KOH:  Objection.
10         MR. SIDMAN:  Objection.
11     A.   We considered it to be a potential
12 upside that's not estimable and probable in the
13 same way that Lazard considered it to be a
14 potential upside, if not estimable and probable,
15 and put it in the category of unknowns, similar
16 to, as I related to earlier, the various downsides
17 that are -- that also were not included as actual
18 claims that would impact the cash flows.
19     Q.   And why would any recoveries be a
20 potential upside to the investors?
21     A.   To the extent that there is a recovery,
22 the -- there's more cash available to be
23 distributed as projected payments to the
24 policyholders.
25     Q.   And the more the policyholders would

Page 116

1          Pfeiffer - Confidential
2  receive; correct?
3          MR. SIDMAN:  Objection.
4      A.   Potentially.
5      Q.   Assuming that there are recoveries,
6  those recoveries would pass through to the
7  investors; is that correct?
8          MR. SIDMAN:  Objection.
9      A.   There is a -- there is a significant
10 amount of mechanics that have to be satisfied
11 before it is paid off to -- before it is paid out
12 to investors, including reserves that would impact
13 the timing of such distributions.
14         And obviously the -- there may be --
15 there might be other offsetting expenses that
16 could diminish the impact of any such ultimate
17 recovery as a result of any potential litigation.
18 But if there were no other offsetting expenses and
19 all you have is additional proceeds, then
20 eventually, subject to the limitations of the plan
21 in terms of how the CPP works and the reserves and
22 so on, ultimately an amount would be paid out to
23 the trusts in the form of a recovery.
24     Q.   And that's true so long as the
25 recoveries under the material litigation exceed

Page 117

1          Pfeiffer - Confidential
2  the costs; isn't that correct?  There would be
3  some distribution to or payment to the
4  policyholders?
5          MR. SIDMAN:  Objection.
6          MR. KOTWICK:  Objection to the form.
7      A.   If the amount recovered exceeds the
8  costs, there would, at some point in time, all
9  things remaining equal, be distribution to the
10 policyholders.
11     Q.   Are you aware of any settlements of
12 claims by FGIC against other parties that have
13 generated or will generate money for FGIC?
14         MR. KOH:  Objection.
15         MR. KOTWICK:  Objection to form.
16         MR. SIDMAN:  Objection to form.
17     A.   I'm aware of the ResCap -- the ResCap
18 settlement.
19     Q.   What is the amount that would be
20 generated if the ResCap settlement goes forward?
21         MR. SIDMAN:  Objection to form.
22     A.   If the plan is confirmed, the
23 settlement provides for approximately $200
24 million.
25     Q.   And if the plan is not confirmed, is it

30 (Pages 114 - 117)

Page 118

1          Pfeiffer - Confidential
2  your understanding the settlement goes away?
3      A.    My understanding is that $200 million
4  goes away, yes.
5      Q.    Are you aware of any other settlements
6  that FGIC has entered into that have yielded
7  recoveries, of material litigation?
8          MR. KOTWICK:  Objection to the form.
9          MR. SIDMAN:  Objection to the form.
10     A.    Not at this time, no.
11     Q.    Can we go back to page 5 of your May
12  15th presentation.  If you look at the left-hand
13  side at the bottom bullet, it states, "In
14  consideration for the cash commutation payment of
15  approximately $253 million, FGIC in return would
16  receive a claim in the ResCap case for the sum of,
17  i, payouts made to date related to the RFC-and
18  GMACM-sponsored trust; and, ii, the cash
19  commutation."
20          Do you see that?
21     A.    I do.
22     Q.    Where did you get that information
23  from?
24     A.    It's -- it's right here on the page.
25  It's -- as we discussed earlier, it's also

Page 119

1          Pfeiffer - Confidential
2  referenced in Exhibit 3 that was sent to us in
3  March.
4      Q.    So that was unchanged between March and
5  May 15th; correct?
6      A.    I believe it has remained unchanged.
7      Q.    Were any of the terms unchanged between
8  March and May 15th?
9          MR. KOTWICK:  Objection to form.
10          MR. SIDMAN:  Objection.
11     A.    As I mentioned earlier, to the extent
12  that there are additional recoveries, the trusts
13  are entitled to those additional recoveries.  And
14  as I also mentioned earlier, the trusts are
15  entitled -- and the investors -- when I say
16  "trusts," I mean the trusts and the investors, are
17  also entitled to the -- to their pro rata share of
18  the reps and warranty claim that would be received
19  by the trusts as a result of the plan settlement
20  agreement.
21          And I don't recall at this time to what
22  extent those issues were discussed or made final
23  at the time of the initial proposal discussion in
24  March and April.
25     Q.    What were the additional recoveries

Page 120

1          Pfeiffer - Confidential
2  that you referred to in your testimony that may
3  not have been included in the initial proposal as
4  reflected in the March 26th, 2013, document,
5  Exhibit 3?
6      A.    To the extent that there are recoveries
7  that are -- that FGIC recovers -- makes recoveries
8  that are particular -- if there are recoveries
9  that are particular to these trusts, those amounts
10  would go directly to the investors in the trusts
11  and not kept by FGIC.
12     Q.    What recoveries are you referring to?
13     A.    The recoveries have not yet occurred.
14  But if such recoveries were to occur.
15     Q.    But recoveries for what?  For the
16  material litigations?
17     A.    No.
18     Q.    What recoveries are you referring to,
19  then?
20     A.    I'm referring to recoveries that are
21  specific to the -- to these trusts.
22     Q.    Do you discuss those recoveries in your
23  report?
24     A.    I believe we did in Section X.
25     Q.    Paragraph 10?

Page 121

1          Pfeiffer - Confidential
2      A.    I'm sorry, Section -- Roman numeral X
3  and paragraph -- page 26.
4      Q.    Are you talking about paragraph 59?
5      A.    I am.
6      Q.    And is it your testimony that under the
7  settlement and plan support agreement the
8  trustees -- I'm sorry, the investors will recover
9  an additional estimated $92 million in value and
10  they will not in the absence of the settlement?
11          MR. KOTWICK:  Objection to form.
12          MR. SIDMAN:  Objection to form.
13          MR. KERR:  Objection.
14     A.    In the absence of the settlement, they
15  would be back to square one where they would have
16  to -- they would have to be part of the litigation
17  and all the proceedings and motions that would
18  ensue.  And it is unknown to what extent they
19  would recover a part, if any, of that $92 million
20  in value.
21     Q.    You're not suggesting that an
22  appropriate valuation in the absence of the plan
23  and settlement is zero for that, are you?
24     A.    I'm suggesting that there is -- there
25  would be -- in our estimation there would be a

31 (Pages 118 - 121)

Page 122

1          Pfeiffer - Confidential
2 likelihood that the $92 million would be reduced
3 by a meaningful amount. I don't -- I didn't say
4 it would be zero; I just think that absent the
5 plan support agreement that amount would be highly
6 questionable and likely reduced in a meaningful
7 way.
8     Q.    And do you have any work papers that
9 show the calculation of your likelihood
10 estimation?
11         MR. KOH: Objection.
12    A.    We have -- we have spent significant
13 time over many months estimating the rep and
14 warranty claims, and the rep and warranty claims
15 as a whole, and the rep and warranty claims that
16 would be applicable to these 47 trusts as we
17 estimate an allocation of those amounts.
18         So in the context of advising the RMBS
19 trustees over time, we certainly would have run
20 various scenarios that have different recoveries,
21 and those recoveries would flow in an allocation
22 to the 47 trusts.
23         But we did not separately estimate a
24 different number that comes to mind other than the
25 92 million, which is a result of the current plan

Page 123

1          Pfeiffer - Confidential
2 support agreement.
3     Q.    Let me break that into pieces, because
4 I have very specific questions as to it.
5         First, are there any documents that
6 reflect your calculation and estimation that there
7 would be a likelihood that the $92 million would
8 be reduced by a meaningful amount in the absence
9 of the settlement and the plan support agreement
10 approval?
11        MR. KOTWICK: Objection.
12    Q.    Any documents?
13        MR. KOTWICK: Objection to the form.
14    A.    There -- I don't have a particular
15 document in mind, but over many months we have
16 documented and analyzed recoveries that are
17 different from the ultimate recovery that was
18 received in the plan support agreement.
19    Q.    And are there documents that reflect
20 what you just described? You said you did work
21 for many months. Are there documents that reflect
22 that work?
23    A.    We continuously modeled different
24 assumptions on recovery and allocation, and my
25 understanding is that all that work on analysis

Page 124

1          Pfeiffer - Confidential
2 has been superseded and updated to now currently
3 reflect the amounts that are consistent with the
4 current plan support agreement that is subject to
5 confirmation.
6     Q.    Again, I'm going to try it again. Are
7 there documents that reflect the calculations that
8 you did to reach the conclusion that there would
9 be a likelihood that the $92 million would be
10 reduced by a meaningful amount? Can I see some
11 pieces of paper that would show that estimation?
12        MR. KOH: Objection.
13        MR. KOTWICK: Objection to form.
14        MR. SIDMAN: Objection.
15    A.    Not that comes to mind, no.
16    Q.    What assumptions did you include in
17 reaching that estimation that there was a
18 likelihood that the $92 million would be reduced
19 by a meaningful amount?
20        (Mr. Gibson leaves proceedings.)
21    A.    As I -- as I said, we spent significant
22 amount of time advising the RMBS trustees, and in
23 our final estimation, in sitting through mediation
24 and in providing significant analysis leading up
25 to the mediation, it was our view that if the

Page 125

1          Pfeiffer - Confidential
2 medication was not successful and therefore the
3 recovery that came out of the mediation for the
4 trustees, which includes the 47 insured trusts, if
5 that mediation was not successful, the mediation
6 and the plan support agreement resulting in
7 approximately $92 million of value to the FGIC-
8 insured trusts, if that was not successful, we
9 believed and we advised the RMBS trustees and
10 their counsel that we believed the alternative
11 would be a significantly reduced outcome.
12    Q.    I've heard the conclusion three or four
13 times now. We want to test your conclusions so
14 there's no confusion. We need data to evaluate
15 whether you just made it up or whether you have a
16 basis.
17        I'm asking you whether there are
18 documents that I can look at and use to evaluate
19 whether your conclusion that there is a likelihood
20 that the $92 million would be reduced by a
21 meaningful amount, are there documents that I can
22 use to test that conclusion.
23        MR. KOTWICK: Objection.
24        MR. WEITNAUER: Objection, asked and
25    answered.

32 (Pages 122 - 125)

Page 126

1          Pfeiffer - Confidential
2          MR. SIDMAN:  Objection.
3     Q.   Go ahead.
4     A.   I think I answered that question
5 already.  You asked almost the same exact
6 question.  I said I do not have a document in mind
7 that I can produce to you that substantiates a
8 different number or a likelihood of a different
9 number.
10    Q.   Okay, next.  What assumptions did you
11 include to reach the conclusion that there was a
12 likelihood that the $292 million identified in
13 your report would be reduced by a meaningful
14 amount in the absence of approval of the plan
15 support agreement and the settlement agreement?
16 What assumptions did you include?
17    A.   Well, the -- some of the major
18 assumptions included the fact that Allied was
19 contributing $2.1 billion as part of the mediation
20 and the fact that the mediation -- successful
21 conclusion of the mediation allowed for a
22 significant reduction in litigation costs that
23 would result if the mediation was not successful
24 and the plan support agreement was not successful.
25    Q.   What other assumptions did you include

Page 127

1          Pfeiffer - Confidential
2 in the estimation that there would be a likelihood
3 that the $92 million would be reduced by a
4 meaningful amount?
5     A.   I think that litigation costs and the
6 lack of a $2.1 billion contribution from Allied
7 are the two biggest assumptions that underlie my
8 conclusion that the -- that but for the plan
9 support agreement that $92 million value to be
10 distributed to FGIC-insured trusts would go down
11 by a material amount.
12    Q.   And is it your understanding that the
13 $92 million to be distributed to the FGIC-insured
14 trusts gets to the FGIC-insured trusts in
15 connection with the settlement, a FGIC settlement
16 agreement?
17         MR. KOTWICK:  Objection to the form.
18         MR. KOH:  Objection.
19         Go ahead.
20    A.   My understanding is that the -- as
21 referenced in the plan term sheet, which is
22 Exhibit A to the PSA, that the plan -- that this
23 commutation settlement is an integral part of the
24 plan support agreement; and if not for the
25 proposal, the plan support agreement would be an

Page 128

1          Pfeiffer - Confidential
2 issue.
3     Q.   My question is a different one, I
4 believe, and that is under the settlement
5 agreement is it correct that the investors will
6 receive $253 million payment.
7     A.   Yes.
8     Q.   And is it your testimony that in
9 addition to that they will receive $92 million
10 above and beyond that, under the terms of the
11 settlement agreement?
12         MR. KOTWICK:  Objection to form.
13         MR. SIDMAN:  Objection Kerr objection.
14    A.   My testimony is that under the terms of
15 a settlement agreement, if the plan is otherwise
16 confirmed, that they would receive an additional
17 approximately $92 million of value as a result of
18 the plan support agreement.
19    Q.   And when you say "the plan approved,"
20 you mean the ultimate plan of reorganization?  Is
21 that what you're referring to?
22    A.   Yes.
23    Q.   And that may be approved independent
24 from whether the settlement goes forward or not;
25 is that correct?

Page 129

1          Pfeiffer - Confidential
2          MR. KOTWICK:  Objection to the form.
3          MR. KOH:  Objection.
4          MR. SIDMAN:  Objection.
5     A.   As I referred to earlier, my
6 understanding is that the plan support agreement
7 cannot go forward without the FGIC settlement
8 agreement as part of it.
9     Q.   But the plan can go forward; correct?
10         MR. KOTWICK:  Objection to form.
11         MR. KOH:  Objection.
12         MR. KOTWICK:  Asked and answered.
13    A.   I think I answered the question.
14    Q.   You can't answer that one separately,
15 whether the plan can go forward in the absence of
16 a settlement?
17         MR. WEITNAUER:  Which plan?
18         MR. BAIO:  An ultimate plan of
19 reorganization.
20    A.   The plan support agreement that we are
21 all talking about here --
22    Q.   Yes.
23    A.   -- that is subject to confirmation
24 cannot go forward without the FGIC settlement
25 agreement as part of it.

33 (Pages 126 - 129)

Page 130

1          Pfeiffer - Confidential
2      Q.    But the recoveries that the investors
3  would be entitled to for these claims identified
4  in paragraph 59 would continue to survive;
5  correct?
6          MR. KOH:  Objection.
7          MR. KOTWICK:  Objection to form.
8          MR. SIDMAN:  Objection.
9      Q.    It's just that you don't know what the
10  amount would be?
11          MR. KOH:  Objection.
12          MR. KOTWICK:  Objection.
13          MR. KOH:  It's argumentative, calls for
14  a legal conclusion.
15      A.    Can you repeat the question, please?
16      Q.    Yes.  The $92 million entitlement just
17  doesn't disappear; correct?
18          MR. KOTWICK:  Objection.
19          MR. KOH:  Objection.
20          MR. SIDMAN:  Objection.
21      Q.    In the absence of a settlement?
22          MR. KOTWICK:  Objection to form.
23      A.    In the absence of a settlement, the $92
24  million disappears and the negotiation and the
25  litigation and the claim start from square one.

Page 131

1          Pfeiffer - Confidential
2  And that is what paragraph 59 points out.
3      Q.    Now, you did not identify the
4  consideration contained in paragraph 59 when you
5  made your presentation to the trustees; correct?
6          MR. KOTWICK:  Objection to the form,
7  asked and answered.
8          MR. KOH:  Objection.
9      A.    We did -- we did discuss that in the
10  presentation on March -- on May 15th, and it is
11  referenced as one of the -- or the first benefit
12  listed as a benefit for the acceptance of the FGIC
13  settlement proposal.
14      Q.    In your report in paragraph 59 you say,
15  "While not part of D&P's May 15, 2013,
16  presentation to the FGIC trustees, I understand
17  that," and then you identify these claims.
18          What did you mean when you wrote,
19  "while not part of D&P's May 15, 2013,
20  presentation to the FGIC trustees"?
21      A.    What that means is that at May 15th of
22  2013 we had not quantified the $92 million number.
23  The $92 million number was one that can only be
24  quantified at the conclusion of the mediation
25  sessions and after we had concluded our allocation

Page 132

1          Pfeiffer - Confidential
2  of the recoveries from the R&W claims.
3      Q.    And are there documents that reflect
4  the work that you just described?
5      A.    I don't understand the question.
6      Q.    You said that as of May 15th, 2013, we
7  had not quantified the $92 million number.  But it
8  was one that you calculated thereafter; correct?
9      A.    That's correct.
10      Q.    Are there documents that reflect that
11  calculation?
12      A.    There's an allocation schedule that is
13  provided in connection with the plan support
14  agreement and with -- in connection with the
15  disclosure statements.  And if you do the
16  arithmetic to add the 47 insured trusts' recovery,
17  you would -- you would arrive at a number which is
18  approximately $92 million.
19      Q.    My question is do you have work papers
20  or documents that reflect that calculation.
21      A.    I think I just answered that the
22  document that reflects that calculation is the --
23  the document is the schedule that accompanies the
24  disclosure statement that was provided recently.
25      Q.    So you don't have any document at

Page 133

1          Pfeiffer - Confidential
2  Duff & Phelps that does that calculation, takes
3  the information from one document and generates
4  the $92 million?  Is that your testimony?
5          MR. KOH:  Objection.
6          MR. KOTWICK:  Objection to form.
7          MR. SIDMAN:  Objection, asked and
8  answered.
9      A.    We were -- Duff & Phelps provided the
10  numbers that were presented in the schedules or
11  that were attached to the disclosure statement.
12      Q.    And there's a document that reflects
13  that -- correct? -- other than the disclosure
14  statement?
15          MR. KOTWICK:  Objection to form.
16          MR. KOH:  Objection.
17      A.    The schedules have numbers on them.
18      Q.    Yes.
19      A.    And those numbers are provided for each
20  trust.  One can therefore do the calculation based
21  on those numbers to arrive at an estimate that
22  would be consistent with the $92 million number.
23      Q.    Did you do that calculation?
24      A.    Yes.
25      Q.    And is that embodied in any document

34 (Pages 130 - 133)

Page 134

Pfeiffer - Confidential

1          Pfeiffer - Confidential
2   other than what you've testified to, the actual
3   calculation?
4       A.   Yes.
5       Q.   Did you provide it to us?
6       A.   I understand that you have the
7   schedules, the disclosure statement, and so we
8   provided that to you.  If you're asking if we
9   provided a summary of the $92 million and how that
10  number is -- how we add up to that number, I don't
11  know.  You'd have to ask counsel if that was
12  provided to you.
13      Q.   I want to know about your calculation
14  document, not the publicly available documents.
15  Do you know if you produced it?
16          MR. KOTWICK:  Objection, asked and
17  answered.
18      A.   I don't know if we produced it.
19      Q.   Okay.  I request it.
20      A.   You have to request counsel.
21      Q.   I don't think you have.  I request it.
22          MR. GELFARB:  On behalf of Freddie Mac,
23  we request production as well.
24          MR. KOH:  We will consider your request
25  and get back to you.

Page 135

1          Pfeiffer - Confidential
2       Q.   Are there any other additional
3   recoveries that you were referring to when you
4   identified additional consideration that might be
5   received by the investors since the March 26,
6   2013, proposal was received by you?
7       A.   As I -- as I mentioned earlier, the
8   plan support agreement -- the plan support
9   agreement makes clear that to the extent there are
10  additional -- other recoveries at that the trust
11  is entitled -- these trusts are entitled to such
12  recoveries.
13      Q.   And what are you referring to there?
14  What other recoveries?
15      A.   I'm not able to provide you the
16  specific circumstances and amounts of what those
17  recoveries would be, but to the extent that there
18  is additional benefit, the trusts are entitled to
19  it.
20      Q.   You did not quantify those additional
21  benefits, did you?
22      A.   We did not.
23      Q.   And they are not identified in your
24  report; is that correct?
25      A.   Unless -- I mean, I would only refer to

Page 136

1          Pfeiffer - Confidential
2   the fact that it says "among other things" in the
3   first three words of paragraph 59.  But we did not
4   quantify it in the report.
5       Q.   And as you sit here today, can you tell
6   me what those other things are, with any
7   specificity?
8       A.   Only with what -- only what I referred
9   to in response to your prior question.
10          I could provide a little bit more
11  clarity, now that I think about it for an extra
12  minute.
13          To the extent that there are ultimately
14  gains, the trusts would be entitled to those
15  gains, or write-ups.  You know, we typically think
16  of loss of principal and interest.  But to the
17  extent that the -- that there are write-ups
18  instead of write-downs, the trusts would be
19  entitled to those write-ups in the future and not
20  FGIC.
21      Q.   And that would be under the settlement
22  agreement?  Is that your testimony?
23      A.   Yes.
24      Q.   Were you an expert witness in the
25  Celebrity Cruises case?

Page 137

1          Pfeiffer - Confidential
2       A.   I was.
3       Q.   And what were you retained to do in
4   that case?
5       A.   I was retained to assess the damages
6   associated with the Legionnaire's disease that
7   impacted Celebrity Cruise Lines.
8       Q.   And who retained you?
9       A.   I was retained by a law firm --
10  Celebrity Cruise Lines and counsel at Hill Betts.
11      Q.   And is it accurate that after making a
12  series of adjustments you calculated that
13  Celebrity suffered total loss of profits of
14  approximately $92 million?
15      A.   I don't recall the number.
16          MR. BAIO:  I'm going to ask the
17  reporter to mark as the next exhibit the
18  reported decision in Celebrity Cruises, Inc.
19          MR. KERR:  Is there a citation for
20  that?
21          MR. BAIO:  Yes.  434 F. Supp 2d 169,
22  May 12th, 2006.
23      Q.   Do you recall who the judge was?
24      A.   I do not recall.
25      Q.   Was it Magistrate Judge Francis?

35 (Pages 134 - 137)

Page 138

Pfeiffer - Confidential

1
2    A.   I think so, yes.
3         MR. BAIO:  Let's mark this as Exhibit
4    4.
5         (Pfeiffer Exhibit 4, reported decision
6    in Celebrity Cruises, Inc., marked for
7    identification.)
8    Q.   Can you look at page 13 of this
9    printout.  You'll see that there's reference to
10   your name, Allen Pfeiffer?  Do you see that?
11   A.   I do.
12   Q.   And it states in I think it is the
13   second sentence:  "After making a series of
14   adjustments, Mr. Pfeiffer calculated that
15   Celebrity suffered total lost profits of
16   approximately $92 million."
17        Do you see that?
18   A.   I do.
19   Q.   Does that refresh your recollection as
20   to what you calculated in that case?
21   A.   That's one aspect of my analysis, but
22   yes.
23   Q.   And another aspect of your analysis was
24   you deducted from that amount $11 million
25   attributable to direct lost revenue, out-of-pocket

Page 139

Pfeiffer - Confidential

1
2    costs, and brand repair expense items included in
3    certain categories; is that correct?
4    A.   Yes.
5    Q.   And is it accurate to state that the
6    court rejected your analysis in that case?
7    A.   Yes.
8    Q.   And what is your understanding as to
9    why the court rejected your analysis in that case?
10        MR. KOH:  Objection.
11   A.   My understanding is that in the context
12   of a Dalbert motion -- Dalbert motions were filed
13   with respect to the seven witnesses that --
14   actually more than seven, I'm sorry.  It's ten
15   witnesses that were proffered in this case as
16   experts to assess damages.
17        And prior to the hearing in front of a
18   jury, the judge excluded all but one of the
19   plaintiff's experts.  And I was one of the
20   plaintiff experts that was excluded from
21   testifying in front of the jury.
22        So Celebrity was the plaintiff.  All
23   the experts were excluded except for one, and my
24   understanding is that the judge ruled that our
25   assumptions were flawed or not reliable primarily

Page 140

Pfeiffer - Confidential

1
2    because, if not exclusively because, the
3    assumptions that we used differed from the one
4    expert that was not excluded.
5         So they didn't want there to be --
6    Judge Francis did not want there to be seven,
7    eight, nine, ten experts providing different
8    damage calculations, and therefore he found one
9    expert that used assumptions that were different
10   from all the others, accepted that one expert, and
11   excluded all the others as -- as not reliable and
12   flawed because the assumptions were inconsistent
13   with the other expert.
14   Q.   You were one of the experts whose
15   methodology was found to be flawed; correct?
16   A.   Correct.
17   Q.   And to use Judge Francis's words -- and
18   I'm quoting from page 14 -- he said that your
19   analysis suffers from the same fatal flaws as
20   another expert's methodology, "reliance on
21   projections that were not borne out in reality,
22   period."
23        Do you see that?
24   A.   Where are you reading from exactly, I'm
25   sorry?

Page 141

Pfeiffer - Confidential

1
2    Q.   If you go to page 13, the second full
3    paragraph starts, "This analysis suffers from the
4    same fatal flaws Dr. Lassiter's methodology,
5    reliance on projections that were not borne out in
6    reality."
7         Do you see that?
8    A.   I see that, page 14, yes.
9    Q.   And it's your understanding that that's
10   what the judge's conclusion was; correct?
11        MR. KOH:  Objection.
12   Q.   You relied on projections that were not
13   borne out in reality?
14        MR. KOH:  Objection.
15   A.   That's correct.  As I described before,
16   one of the experts showed the projections relative
17   to what was -- what actually occurred and
18   therefore adjusted the projections in light of
19   that.  The experts, not just me, but all the other
20   experts did not do that, and therefore the judge
21   concluded that our analysis suffered from that
22   flaw.
23   Q.   And if you look at the end of the
24   judge's criticisms of your analysis, it states --
25   and I'm on page 14, that last paragraph before the

36 (Pages 138 - 141)

Page 142

Pfeiffer - Confidential
1        Pfeiffer - Confidential
2    next expert's name -- it states, "Mr. Pfeiffer
3    failed to justify in his final analysis his choice
4    of a, quote, reasonable rate of return by, for
5    example, comparing it to rates of returns for
6    comparable companies."
7        Do you see that?
8        MR. KOH:  Objection.
9    A.  I do.
10    Q.   And that was the judge's conclusion; is
11   that correct?
12    A.  Yes, it was.
13    Q.   And he goes on to state, "Since none of
14   the individual components of Mr. Pfeiffer's
15   analysis is reliable, the average is likewise
16   flawed and his expert opinion will not be
17   admitted."
18        Do you see that?
19    A.  I do.
20    Q.   And that was the judge's ruling; isn't
21   that right?
22    A.   Yes, as I described to you, the
23   projections -- the components of -- the component
24   referred to here, the projections, he did not
25   accept the reliability of those projections and

Page 143

1        Pfeiffer - Confidential
2    excluded testimony based on them.
3    Q.   Did you, in this case, Celebrity
4    Cruises, do the comparison that the judge asserts
5    you did not, that is, comparing it to rates of
6    returns for comparable companies?  Did you in fact
7    do such an analysis in that case?
8    A.   You know, I don't recall.  I would
9    assume that I did.  I don't -- I don't recall.
10    Q.   Well, did the attorneys appeal this
11   decision, if you know?
12    A.   You know, the attorneys were -- I don't
13   believe they appealed, and I believe they got a
14   result in trial that was consistent with my
15   opinion.
16    Q.   But they got --
17    A.   They were satisfied with the conclusion
18   of the case, and they were satisfied with my
19   involvement and my testimony as well.
20    Q.   But they got that result without your
21   participation; correct?
22        MR. KOH:  Objection.
23    A.   My participation was in an earlier
24   hearing in front of the judge, and my expert
25   report was part of that process.  The ruling from

Page 144

1        Pfeiffer - Confidential
2    the jury did not include my -- my analysis.  And
3    so I don't know to what extent the expert -- the
4    one expert who survived, I don't know to what
5    extent he incorporated elements of my analysis and
6    whether that was heard in front of the jury.
7    Q.   That's what you don't know?
8    A.   I don't know, but I'm told that
9    elements of my analysis were helpful to the expert
10   that ultimately testified in front of the jury.
11    Q.   But you didn't testify in front of the
12   jury; correct?
13    A.   I did not.
14        MR. BAIO:  All right.  Let's take a
15   lunch break.
16        (Time noted:  12:26 p.m.)
17
18
19
20
21
22
23
24
25

Page 145

1
2    A F T E R N O O N   S E S S I O N
3        (Time noted:  1:14 p.m.)
4        (Mr. Devore leaves proceedings.)
5 A L L E N   M.   P F E I F F E R,
6    resumed as a witness, having been previously
7    affirmed by the notary public, was examined
8    and testified further as follows:
9 EXAMINATION CONTINUED BY
10 MR. BAIO:
11    Q.   Can you look at Exhibit 1, please.  I'd
12   like to draw your attention to paragraph 9, scope
13   of work.  It states in paragraph 9 that your,
14   "assignment is to assess the reasonableness from a
15   financial perspective and from the perspective of
16   the FGIC-insured trusts of the settlement
17   agreement which provides for, among other things,
18   a lump-sum payment by FGIC to the FGIC-insured
19   trusts" (the commutation payment) in satisfaction
20   of any obligations of FGIC to make payments in the
21   future (the projected payments) to the FGIC-
22   insured trusts under the FGIC rehabilitation plan
23   as that term is defined below (the commutation)."
24        Do you see that language?
25    A.   Yes.

37 (Pages 142 - 145)

Page 146

1          Pfeiffer - Confidential
2     Q.    And does that accurately reflect what
3  your assignment was in this matter --
4     A.    Yes.
5     Q.    -- at least with respect to this
6  report?
7     A.    Yes.
8     Q.    What did you mean by the word
9  "reasonableness" in that -- what did you -- what
10  did you mean by the word "reasonableness" in the
11  scope of work and the assignment that you
12  undertook?
13     A.    What I meant is that when you compare
14  the commutation payment and all the other benefits
15  associated with the settlement agreement, if you
16  compare that to the range of outcomes that one may
17  expect from the projected payments under the rehab
18  plan, are they reasonably close to one another,
19  meaning do the range of the expected payments --
20  when you look at that range, is this conclusion,
21  is this proposal, within that range.
22     Q.    And when you say "within that range,"
23  do you mean anywhere within that range?
24     A.    "Reasonable" to me means reasonably
25  within that range.  And it's not just a number

Page 147

1          Pfeiffer - Confidential
2  that I'm looking at; it's also in consideration of
3  all the other risks and benefits associated with
4  the proposal.
5     Q.    You were doing your analysis from a
6  financial perspective; correct?
7     A.    Correct.
8     Q.    Not from any other perspective?
9     A.    Correct.
10     Q.    And when you say -- and I need to go --
11  when you state that you were going to make the
12  comparison "to the range of outcomes that one may
13  expect from the projected payments under the rehab
14  plan," what did you mean by "range of outcomes"?
15     A.    What I mean is that there's -- there's
16  various cases -- in this case there are two
17  different projections:  There's a base case and a
18  stress case.  There's different discount rates,
19  among other assumptions that need to be made.
20          And so when you model out the rehab
21  plan -- the rehab plan's expected payments, you
22  will arrive, we will arrive, we have arrived at a
23  range of results.
24          And so we compare the commutation
25  payment along with the other benefits to that

Page 148

1          Pfeiffer - Confidential
2  range in determining reasonableness.
3     Q.    And the range includes positives and
4  negatives -- is that correct? -- positives for the
5  investors and negatives for the investors in
6  establishing the range?
7          MR. KOTWICK:  Objection to the form.
8     A.    There's -- the range includes
9  assumptions that have upside and downside risks,
10  benefits, quantifiable benefits, less quantifiable
11  benefits.  It considers a lot of factors.
12     Q.    And when you use the term "expect from
13  the projected payments," what standard did you use
14  to determine whether something could be expected
15  in establishing the range?
16     A.    We looked at the base case and the
17  stress case.  We noted all the risks associated
18  with the cash flows and the uncertainties of the
19  cash flows and, with our significant amount of
20  expertise in looking at cash flows, then
21  determined to what extent we can get comfortable
22  with an expected case and the discount rate
23  associated with those expected cash flows in that
24  expected case.
25     Q.    And when you are using the word

Page 149

1          Pfeiffer - Confidential
2  "expected," do you mean reasonably expected?
3     A.    I think that's fair.
4     Q.    Now, you were not asked to assess
5  whether the settlement agreement was in the best
6  interest of the FGIC-insured trusts; correct?
7     A.    Correct.
8     Q.    And you were not asked whether the
9  settlement agreement was in the best interest of
10  the investors; is that correct?
11     A.    That's correct.
12     Q.    And you did not provide any opinion to
13  your clients, to the trustees, as to whether the
14  settlement, the proposed settlement, was in the
15  best interest of the insured trusts; correct?
16     A.    Correct.  Our assignment was to provide
17  them a view as to the reasonableness of the offer
18  and advise them relative to the risks and the
19  benefits of that proposal.  And it was the
20  trustees who then determined if in light of that
21  if the proposal was in their best interests or
22  not.
23     Q.    So just to have a clear answer to my
24  question, you did not provide any opinion to the
25  trustees as to whether the proposed settlement was

38 (Pages 146 - 149)

Page 150

1          Pfeiffer - Confidential
2  in the best interest of the insured trusts;
3  correct?
4          MR. SIDMAN:  Objection.
5          MR. KOH:  Objection.
6      A.   You have used the word "any" in your
7  question, and that is the reason why I qualified
8  my answer.  We did not provide an opinion relative
9  to what's in their best interests.  That was not
10  our mandate.  However, we did provide input with
11  respect to much of the questions that they might
12  ask in determining what is in their best interest.
13         So we provided a lot of input, and we
14  provided clearly an opinion on the reasonableness
15  of the offer.  But we did not tell them how to,
16  you know -- what to do in terms of determining
17  what's in their best interests.
18     Q.   I understand.  I'm not asking what you
19  didn't tell them; I'm asking -- and this is a
20  different question -- did you advise the trustees
21  that the settlement agreement was in the best
22  interest of the investors in the FGIC-insured
23  trusts.
24         MR. KOTWICK:  Objection to form.
25         MR. SIDMAN:  Objection.

Page 151

1          Pfeiffer - Confidential
2      A.   That was not our mandate, no.
3      Q.   And you didn't tell them that; correct?
4      A.   We did not tell them what's in the best
5  interest of the trusts.
6      Q.   If you look at the summary of
7  conclusions, you'll see in paragraph 12 on page 7
8  you state conclusion one.  First, was that -- is
9  that your conclusion as a result of the work that
10  you undertook, that is, one of your two
11  conclusions?
12     A.   Yes.
13     Q.   Did you communicate that conclusion to
14  the trustees when you made the presentation to the
15  trustees?
16     A.   Yes.
17     Q.   And the conclusion that you reach at
18  the end of that sentence, of those sentences, is
19  "It is my conclusion that the commutation payment
20  amount of approximately 253.3 million falls within
21  a reasonable range given the expected cash flows
22  associated with the projected payments."
23         Do you see that?
24     A.   Yes.
25     Q.   And that is your opinion; is that

Page 152

1          Pfeiffer - Confidential
2  correct?
3      A.   Yes.
4      Q.   Why does it fall within the reasonable
5  range, in your view?
6          MR. KOTWICK:  Objection to form.
7      A.   It falls within it.
8      Q.   Does it fall within the low end of the
9  reasonable range?
10         MR. KOTWICK:  Objection to form.
11     A.   I think -- after considering all the
12  risks and benefits associated with the plan and
13  the uncertainties with regard to the cash flows
14  and the consideration of both the base case and
15  the stress case, I think it falls comfortably in
16  the middle of the range.
17     Q.   So you didn't conclude that it falls
18  within the high end of the range; correct?
19         MR. KOTWICK:  Objection to form.
20         MR. SIDMAN:  Objection to form.
21     A.   We made no such conclusion as to
22  exactly where within the range it falls.
23     Q.   And you did not tell the trustees where
24  in the range you believed the settlement proposal
25  fell, the commutation payment; correct?

Page 153

1          Pfeiffer - Confidential
2      A.   Correct.
3      Q.   Your conclusion two is "From a
4  financial perspective, it is my conclusion that it
5  was reasonable for the FGIC trustees to agree to
6  the settlement agreement and thereby accept the
7  commutation payment over the projected payments."
8         Do you see that?
9      A.   Yes.
10     Q.   And did you tell that to the trustees?
11     A.   No.  This is a subsequent conclusion.
12     Q.   When were you asked to undertake that
13  analysis that led to the conclusion?
14     A.   Well, subsequent to their agreeing --
15  to the trustees agreeing to a settlement
16  agreement, I am now opining that it is my
17  conclusion that it was reasonable for the trustees
18  to agree to the settlement agreement.  So I was
19  asked to provide a view on that sometime between
20  the end of May and today.
21     Q.   What did you do, after you were asked
22  to opine on that subject, to give you the ability
23  to opine on that subject?
24     A.   Reviewed all the same information we
25  had prior to the -- prior to the May 15th

39 (Pages 150 - 153)

Page 154

1          Pfeiffer - Confidential
2  presentation, considered everything that happened
3  between May 15th and the date of the settlement
4  agreement, which I believe was May 23rd,
5  considered the results of the mediation and the
6  plan support agreement, considered anything that
7  had happened between May and today.
8          And I have -- after consideration of
9  all those factors, I am here today to reconfirm
10  our conclusion that it was reasonable for the FGIC
11  trustees to agree to the settlement agreement.
12      Q.    What things occurred after May 15th
13  that you included in your analysis that led to
14  this conclusion?
15      A.    Well, for one, as we mentioned earlier,
16  the mediation was successful, which led to a plan
17  support agreement, which led to significant
18  benefit associated with the settlement agreement
19  in that it's an integral part of the plan support
20  agreement, which I think provides value to the 47
21  insured trusts.
22      Q.    What else?
23      A.    We've also had the opportunity to
24  revisit and focus more on the rehabilitation plan,
25  the discount rate, and the underlying assumptions.

Page 155

1          Pfeiffer - Confidential
2  And that additional analysis and support after May
3  15th, provided for more comfort.
4          And we also had the opportunity to meet
5  with Monarch and Stonehill, heard their viewpoint,
6  considered that viewpoint, and, you know, all that
7  subsequent information contributes to our current
8  conclusion -- my current conclusion that it was
9  reasonable to agree to the settlement agreement.
10      Q.    And were you present at the meeting
11  with Monarch and Stonehill?
12      A.    I was.
13      Q.    And what did you learn during that
14  meeting?
15      A.    I learned during that meeting that they
16  had a different perspective on the expected -- or
17  I call projected payments relative to the
18  settlement agreement.
19      Q.    And what did they say in that regard?
20      A.    They said they expected to get a lot of
21  value out of the payments from the rehabilitation
22  plan, and they felt that value exceeded the
23  commutation proposal.
24      Q.    Did they tell you why they reached that
25  conclusion?

Page 156

1          Pfeiffer - Confidential
2      A.    Yes.
3      Q.    What did they say?
4      A.    Their focus was on a trading analysis
5  that when they looked at how these securities
6  traded that they priced in a certain amount of
7  value from the rehabilitation plan and that that
8  amount was, in their estimation, higher than the
9  commutation proposal.
10      Q.    Did they describe for you how they did
11  that trading analysis?
12      A.    Not in much detail, no.
13      Q.    Did they do it in any detail?
14      A.    Not really, no.
15      Q.    Did you ask any questions about their
16  trading analysis?
17      A.    Yes, I did.
18      Q.    What did you ask, and what did they
19  say?
20      A.    We asked how they arrived at their
21  conclusions, and they basically described that
22  they backed out the value in the security -- in
23  the securities that they held.  They backed out
24  the value associated with the actual collateral.
25          And what was left from their

Page 157

1          Pfeiffer - Confidential
2  perspective was cents on the dollar associated
3  with the rehabilitation plan and that their
4  estimate of what that was worth was greater than
5  the estimate of the commutation proposal.
6          They didn't want to provide the actual
7  analysis or worksheets that backed up that
8  assessment.
9      Q.    Did you ask for them?
10      A.    We did.
11      Q.    Did you respond to their statements in
12  the meeting as to their view of the value under
13  the plan as opposed to the commutation agreement?
14      A.    We were -- we were, by and large, in a
15  listening mode.
16      Q.    Did you say anything?
17      A.    Yes.
18      Q.    What did you say?
19      A.    We explained how we got to our
20  conclusion.
21      Q.    And did you say anything about their
22  conclusion to them?
23      A.    That we were happy to see more.
24      Q.    Did you get input from any other
25  investors besides Monarch and Stonehill?

40 (Pages 154 - 157)

Page 158

1                Pfeiffer - Confidential
2          MR. KOTWICK:  Objection to the form.
3      A.    At that meeting?
4      Q.    No, at any time?
5      A.    Well, subsequent to that date, we have
6  received objections and expert reports that seem
7  to reflect the view of Freddie, among others.
8      Q.    Have you reviewed those reports and
9  objections?
10     A.    I have.
11     Q.    And have you incorporated them in the
12  evaluations that you undertook that led to what
13  you've said today?
14          MR. KOH:  Objection.
15          MR. SIDMAN:  Objection to form.
16     A.    I have incorporated everything that I
17  have learned from those expert reports and
18  objections, and my opinion remains the same today
19  as it was at the time of my expert report on July
20  19th.
21     Q.    If you look at page 7, paragraph 13,
22  you go on to state, "While I do not conclude that
23  acceptance of the commutation payment inevitably
24  will be a superior result for all investors" --
25  and I'm going to stop right there.

Page 159

1                Pfeiffer - Confidential
2          What do you mean by "inevitably"?  With
3  an absolute certainty?
4      A.    Yes.
5      Q.    Did you do any evaluation of the
6  likelihood that investors would receive a greater
7  recovery under the rehabilitation plan as opposed
8  to the settlement agreement?
9      A.    We don't do likelihood analysis as you
10  described.
11     Q.    So you didn't do that?
12     A.    We did provide a range of estimates, as
13  you see in our report and in our presentation, and
14  that is the way we look at the potential that the
15  result will be superior or inferior to the
16  commutation payment.
17     Q.    Well, my question to you is did you do
18  any evaluation of the likelihood that investors
19  would receive more under the rehabilitation plan
20  than they would under the settlement agreement.
21     A.    No.
22     Q.    You were not asked to do that?
23     A.    No.
24     Q.    And you reached your conclusions
25  without doing any such evaluation; correct?

Page 160

1                Pfeiffer - Confidential
2      A.    We did not evaluate likelihoods, no.
3      Q.    As you sit here today, can you say what
4  the likelihood is that investors would receive a
5  higher recovery under the rehabilitation plan as
6  opposed to the settlement agreement?
7      A.    No.
8      Q.    Is it your understanding that under the
9  settlement agreement the FGIC trusts release all
10  claims against ResCap other than payments
11  contemplated by the proposed ResCap plan?
12          MR. KOH:  Objection.
13          MR. KOTWICK:  Objection.
14     A.    Can you restate the question, please?
15     Q.    Yes.  Is it your understanding that
16  under the proposed settlement agreement the FGIC
17  trusts release all claims against ResCap other
18  than payments contemplated by the proposed ResCap
19  plan?
20          MR. KOH:  Objection.
21          MR. KOTWICK:  Objection.
22     A.    Sounds too much like a lawyer question.
23  I can't answer it.
24     Q.    Okay.  So you don't know whether under
25  the proposed settlement agreement the FGIC trusts

Page 161

1                Pfeiffer - Confidential
2  release their claims against ResCap other than
3  what they would get under the plan?
4          MR. KOTWICK:  Objection.
5          MR. KOH:  Objection.
6          MR. SIDMAN:  Objection.
7      A.    Can you say that again, please?
8      Q.    You don't know whether under the --
9  it's not there.  Is it your understanding that
10  under the proposed settlement agreement the FGIC
11  trusts release all claims against ResCap other
12  than the payments contemplated by the proposed
13  ResCap plan?
14          MR. KOH:  Objection.
15          MR. SIDMAN:  Objection.
16     A.    There's too many legal conclusions that
17  I would have to make in answering that question.
18  My understanding is consistent with the settlement
19  agreement and the subsequent plan support
20  agreement, and the rights and what's waived are
21  spelled out clearly in those agreements.  And I'm
22  not here to provide, you know that, that kind of
23  legal interpretation.
24     Q.    What is your understanding as to what
25  claims the FGIC trust will release under the

41 (Pages 158 - 161)

Page 162

1        Pfeiffer - Confidential
2  settlement agreement, if you have any
3  understanding?
4        MR. KOH:  Objection.
5        A.  My understanding is that they will
6  release the claims that they have for accrued and
7  unpaid amounts and future losses of principal and
8  interest associated with these trusts.  They will
9  not be making those claims to FGIC because instead
10  in return they have received the up-front payment
11  as described in the investment agreement.
12        Q.  Now, I want you to assume that the
13  settlement agreement is approved but the proposed
14  ResCap plan is not.  Okay.  Do you have those two
15  things in your head?
16        A.  Yes.
17        Q.  Under that circumstance the FGIC trusts
18  received zero recovery from ResCap; correct?
19        MR. KOTWICK:  Objection.
20        MR. SIDMAN:  Objection.
21        MR. KOH:  Objection.
22        Q.  If you know.
23        A.  That is not necessarily the case.
24        Q.  Okay.  And why do you say that?
25        A.  They would have a claim, a rep and

Page 163

1        Pfeiffer - Confidential
2  warranty claim, against ResCap, and they may or
3  may not be entitled to a certain amount -- or
4  recover a certain amount from that claim, even if
5  the plan support agreement was not confirmed.
6        Q.  So it's your understanding that that
7  rep and warranty claim is not being released under
8  the settlement agreement; is that correct?
9        MR. KOTWICK:  Objection.
10        MR. KOH:  Objection.
11        A.  My understanding is that it is -- the
12  plan support agreement and the settlement
13  agreement are intertwined in that sense, that
14  there is an understanding that the settlement
15  agreement is part of the plan support agreement
16  and that they maintain their rights to the rep and
17  warranty claim.
18        Q.  I'm asking a different question.  I
19  want you -- you understand that the settlement
20  agreement can be approved but that the ResCap plan
21  may not be approved?  Do you understand that?
22        A.  That is a possibility.
23        MR. KOH:  Objection.
24        Q.  That is what I want you to assume.
25        A.  Okay.

Page 164

1        Pfeiffer - Confidential
2        Q.  Under that scenario is it your
3  understanding that the FGIC trusts will not
4  receive any recovery from ResCap?
5        A.  I answered that question already.
6        Q.  And what is the answer?
7        MR. KOTWICK:  Objection to form.
8        MR. KOH:  Objection.
9        A.  Not necessarily.
10        Q.  Okay.  So that's your understanding.
11        Did you calculate the value of the
12  claims against ResCap that the FGIC trusts are
13  releasing under the release provision?
14        MR. KOTWICK:  Object to form.
15        A.  I don't know.
16        Q.  I want you to assume again that the
17  settlement agreement is approved but the ResCap
18  plan is not.  Under that circumstance or that
19  combination of circumstances, is it true and
20  accurate that the FGIC trusts will only receive
21  the $253.3 million commutation amount with no
22  other recoveries from either FGIC or ResCap?
23        MR. KOTWICK:  Objection to form.
24        MR. KOH:  Objection.
25        MR. SIDMAN:  Objection.

Page 165

1        Pfeiffer - Confidential
2        A.  I understand that to be the same
3  question you asked me earlier, and the answer is
4  not necessarily.
5        Q.  Well, the earlier question was only
6  against ResCap.  Now I added FGIC.  We can take
7  them separately to avoid compounding.
8        A.  Okay.  I answered the question as
9  regards ResCap.
10        Q.  Yes.
11        A.  Not necessarily.  They could still
12  recover in some other plan.  If it's not this plan
13  support agreement or some other reorganization
14  plan of ResCap, they could still recover
15  something.
16        Q.  What do you base that on?
17        A.  That they have a claim and they're not
18  giving up that rep and warranty claim.  So if it's
19  not negotiated in terms of the recovery as built
20  into the current plan support agreement, that plan
21  support agreement is not confirmed, that claim
22  still exists and they could pursue that claim as
23  part of the reorganization process.
24        Q.  And have you estimated the value of
25  that claim?  And that's against ResCap.

42 (Pages 162 - 165)

Page 166

1          Pfeiffer - Confidential
2          MR. WEITNAUER:  Object to form.
3     A.   I have estimated it based on the
4 current plan support agreement that's in place at
5 $92 million.  And absent a different set of
6 circumstances, I would say the value is $92
7 million.
8          But if that plan support agreement went
9 away, as we discussed earlier, I think the
10 value -- the value -- the likely recovery and
11 therefore value associated with that claim would
12 be diminished.
13    Q.   And assuming, again, that the
14 settlement agreement is approved but the ResCap
15 plan is not approved, is it your understanding
16 that the FGIC trusts will only receive the $253.3
17 million commutation amount with no other
18 recoveries from FGIC?
19          MR. KOTWICK:  Objection to form.
20          MR. KOH:  Objection.
21          MR. SIDMAN:  Objection.
22    A.   Not necessarily.
23    Q.   And why do you say that?
24    A.   As I mentioned earlier, there could be
25 instances where there's additional recovery to the

Page 167

1          Pfeiffer - Confidential
2 trusts.
3     Q.   From FGIC?
4     A.   I don't know how they -- I don't know
5 how they'd flow, whether from FGIC or not.  But it
6 would be from a -- if a loan -- a loan is presumed
7 to have a certain loss and then the homeowner
8 subsequently makes certain payments that creates
9 in essence a write-up and additional recovery to
10 the trust that the trusts would be -- would be
11 able to receive.
12          And I don't know if that goes through
13 FGIC or directly to the trusts, but that would
14 provide a circumstance in which the trusts can
15 ultimately receive more than the $253 million.
16    Q.   And it's your understanding that the
17 trusts do not release or waive those claims to the
18 extent they are against FGIC under the settlement
19 agreement.  Is that your testimony?
20    A.   I would not refer to them as claims; I
21 would refer to them as recoveries.
22    Q.   Okay.  And those recoveries are not
23 waived under the settlement agreement against
24 FGIC.  Is that your testimony?
25          MR. KOH:  Objection.

Page 168

1          Pfeiffer - Confidential
2     A.   That's my understanding.
3     Q.   Let's look at the D&P role as financial
4 advisor, paragraph 14.
5     A.   Okay.
6     Q.   We talked a little bit about the
7 confidential information sentence.  Let's go to
8 the next one:  D&P performed an independent
9 financial analysis to determine a reasonable range
10 of the value of projected payments to the
11 FGIC-insured trusts based on the rehabilitation
12 plan.
13          What did you mean by "projected
14 payments" there?  What are the components of the
15 projected payments?
16    A.   Well, there's a -- there's payments
17 that are made out of the plan to all the
18 policyholders, and a certain portion of those
19 payments are made to the FGIC-insured trusts.  And
20 so what I mean here is that we determine the value
21 of such payments on a present value basis.
22    Q.   And what are the components of payments
23 that you included which you applied the present
24 value analysis to?
25    A.   There's the CPP --

Page 169

1          Pfeiffer - Confidential
2     Q.   Yes.
3     A.   -- the initial CPP.
4     Q.   Yes.
5     A.   And then there's the additional CPP
6 after the initial payment.  And then on top of
7 that there's a DPO accretion amount.  Those are
8 the -- those are the -- those are the components
9 of the projected payments.
10    Q.   No other components?
11    A.   Well, I should add there's a netting of
12 those components for the payments that the trusts
13 would make to the -- to FGIC, the premium
14 payments -- the premiums that would need to be
15 made by the trusts to FGIC are a component of that
16 cash flow that gets netted out against those
17 payments.
18    Q.   Okay.  Anything else?
19    A.   Not that comes to mind right now.
20    Q.   You go on to state, "D&P presented the
21 analysis on an ongoing basis to the FGIC trustees
22 during the mediation."
23          Do you see that language?
24    A.   I do.
25    Q.   Did you meet with the trustees more

43 (Pages 166 - 169)

Page 170

1            Pfeiffer - Confidential
2  than once?
3            MR. KOTWICK:  Objection to form.
4       A.   We met with trustees' counsel more than
5  once.
6       Q.   Okay.  I'm literally using the term you
7  used in your document, "FGIC trustees."  I
8  understand you might have met with FGIC trustees'
9  counsel.
10           Did you meet with or have a
11 conversation with the FGIC trustees more than what
12 you've testified to, the conference call that you
13 identified?
14           MR. WEITNAUER:  Object to form.
15      A.   I don't recall if the trustees were
16 part of any of the conversations that we have with
17 trustee counsel.
18      Q.   But with trustee counsel you did
19 provide the analysis on some ongoing basis;
20 correct?
21      A.   Yes.
22      Q.   And you did that in writing, among
23 other things?
24           MR. KOTWICK:  Objection to form.
25      A.   In writing upon -- and in addition to

Page 171

1            Pfeiffer - Confidential
2  other things, yes, meaning telephone conversations
3  and in-person meetings.
4       Q.   You go on to refer to -- you'll see on
5  the carryover page 9, Attachment 3.  And you
6  state, "The presentation gives background
7  information about the rehabilitation plan,
8  financial considerations concerning the proposal
9  and the rehabilitation plan, and reviews FGIC's
10 own calculations leading to a payment amount of
11 $253.3 million."
12           Do you see that?
13      A.   I do.  I don't want to belabor the
14 point, but you did read one of the words
15 incorrectly.
16      Q.   I apologize.  Which one?
17      A.   You read the word "covering" as
18 "concerning."
19      Q.   I see.  Let's try it again.  "The
20 presentation gives background information about
21 the rehabilitation plan, financial considerations
22 covering the proposal in the rehabilitation plan,
23 and reviews FGIC's own calculations leading to a
24 payment amount of $253.3 million."
25           Do you see that?

Page 172

1            Pfeiffer - Confidential
2       A.   Yes.
3       Q.   And that FGIC's own calculation leading
4  to a payment amount of $253.3 million is what's on
5  page 5 of your report dated May 15th, 2013;
6  correct?
7       A.   Correct.
8       Q.   You then go on to say, "It also
9  presents D&P's independent analysis of the
10 projected payments and the commutation.  It is
11 important to note that the guidance provided by
12 D&P was based on information received from FGIC
13 and Lazard."
14           I'll put a close quote there because I
15 want to ask you what information was it that
16 constituted the guidance that was provided to you
17 that you used to reach the conclusions that you've
18 identified.
19      A.   The information that we received from
20 FGIC and Lazard includes the projections, the
21 rehab plan, and the discussions we had with them
22 with respect to such plan.
23      Q.   Anything else?
24      A.   I think we adequately discussed that
25 earlier in reference to the diligence discussion

Page 173

1            Pfeiffer - Confidential
2  topics that are summarized in Exhibit 2.  And we
3  also had several other phone conversations with
4  them to understand further, but that's -- that's
5  what's referred to here in the sentence in terms
6  of the information received from FGIC and Lazard.
7       Q.   That information -- did it include
8  documents in addition to what you just identified?
9       A.   No.
10      Q.   So you know that -- well, strike that.
11           It says the conclusions reached by D&P
12 resulted from its own independent analysis of that
13 information and publicly available information.
14           Do you see that?
15      A.   Yes.
16      Q.   And that's accurate; correct?
17      A.   Yes.
18      Q.   Look at paragraph 25 of your report.
19      A.   Okay.
20      Q.   The updated runoff projections you
21 referred to there were provided by FGIC and
22 Lazard?
23      A.   Yes.
24      Q.   And the 17 to 18 percent figure and the
25 lower percentage of the notional nondiscounted

44 (Pages 170 - 173)

Page 174

Pfeiffer - Confidential

1          Pfeiffer - Confidential
2  amounts were from Lazard and FGIC as well?
3      A.   Yes.
4      Q.   Except for the last sentence in
5  paragraph 26, is all of the information provided
6  by Lazard or FGIC?
7      A.   Yes.
8      Q.   So is it correct that "According to
9  Lazard, the net present value of aggregate
10  recoveries divided by the net present value of all
11  permitted policy claims are estimated to be 27 to
12  30 percent under rehabilitation plan using a 10 to
13  20 percent discount range"?
14          Is that correct?
15      A.   Yes.
16      Q.   And did you think that was a reasonable
17  range?
18      A.   I don't understand your question.
19      Q.   Did you believe that the range of 27 to
20  30 percent provided by Lazard was reasonable?
21          MR. KOTWICK:  Objection to the form.
22          MR. KOH:  Objection.
23          MR. SIDMAN:  Objection.
24      A.   I think Lazard made a reasonable
25  attempt to take the base-case scenario and

Page 175

1          Pfeiffer - Confidential
2  discount them back to arrive at a conclusion
3  relative to the net present value to the aggregate
4  recoveries -- the aggregate recoveries divided by
5  the net present value of all permitted policy
6  claims.
7          I don't have an opinion relative to
8  whether 27 to 30 percent is reasonable or not.
9      Q.   You did no analysis to determine
10  whether that was reasonable; is that correct?
11      A.   No, my focus was on the FGIC-insured
12  trusts.
13      Q.   And do you think that their calculation
14  was made in good faith?
15      A.   Yes.
16      Q.   You then did a calculation for the
17  FGIC-insured trusts as described in the last
18  sentence; is that correct?
19      A.   That's correct, although the sentence
20  has a typo in it.
21      Q.   The 28 percent should be 29?
22      A.   I think the 18 to 23 should be --
23  should be 19 to 22, and the 22 to 28 should be 24
24  to 28.
25      Q.   And you were referring to the table on

Page 176

Pfeiffer - Confidential

1          Pfeiffer - Confidential
2  page 28 in doing that correction; is that correct?
3      A.   Yes.
4      Q.   Where do you get the numbers from the
5  chart on 28, Table 1, which led you to correct
6  what appears in paragraph 26?
7      A.   If you look at page 28 and you look at
8  the first shaded box, referring to the
9  rehabilitation plan, so you'll see on the right
10  side of that box there's recovery amounts of 217
11  to 340.
12          Then when you take those dollar amounts
13  and translate them to percentages, it results in
14  the range that's directly below that of 19 to 22
15  percent on a nominal claim basis and 24 to 28
16  percent on the discounted claim basis.  And those
17  are the numbers that should be in paragraph -- the
18  end of paragraph 26.
19      Q.   Are there any other changes in this
20  report that you want to make today?
21      A.   No.
22      Q.   Can you turn to paragraph 31 under the
23  heading "calculation of projected cash flows from
24  the rehabilitation plan."
25          MR. KOTWICK:  Joe, if we're going to

Page 177

1          Pfeiffer - Confidential
2  change subjects, can we take a quick break,
3  five minutes?
4          MR. BAIO:  I'm okay with that.  The
5  witness needs to hustle.  That's why I'm
6  hustling.  That's fine.  Let's take the five.
7          MR. KOTWICK:  I appreciate that.
8          (Recess taken from 2:04 to 2:13.)
9      Q.   Going back to paragraph 12 in your
10  report, Exhibit 1.
11      A.   Going backwards now?
12          MR. KOTWICK:  I thought we were making
13  progress.
14      A.   Okay.
15      Q.   You state at the end that it is your
16  conclusion that the commutation payment amount of
17  approximately $25.3 million falls within a
18  reasonable range given the expected cash flows
19  associated with the projected payments.
20          What is your reasonable range?
21          MR. KOTWICK:  Objection to form.
22          MR. SIDMAN:  Objection to form.  You
23  also misstated the amount.
24          MR. BAIO:  Sorry.  I'll do it again.
25      Q.   "It is my conclusion that the

45 (Pages 174 - 177)

Page 178

1    Pfeiffer - Confidential
2 commutation amount of approximately $253.3 million
3 falls within a reasonable range given the expected
4 cash flows associated with the projected
5 payments."
6       What is the reasonable range that you
7 came up with?
8    A.    I wouldn't define the range as a
9 specific number with a beginning and an end.  If
10 you look at our presentation, you'll note numbers,
11 but I don't -- that's not really the range that's
12 referred to in this paragraph.  The reference here
13 is that it is within the range of reasonableness
14 in a more qualitative way than a quantitative way.
15    Q.    So you didn't formulate a reasonable
16 range in a dollar amount?  Is that your testimony?
17    A.    My testimony is, as I stated a moment
18 ago, that I concluded a range with respect to
19 purely the dollar amounts as reflected on page 3
20 but --
21    Q.    And what is that range?  I just want to
22 get that.  Then you can add whatever you want to
23 it.  But what is the range?
24    A.    There's a range of -- the range on page
25 3 is the range of the present value of the

Page 179

1    Pfeiffer - Confidential
2 projected payments under the two different plans.
3 And that -- those numbers are 190 to 340.
4 However, that is not the range that is referred to
5 in paragraph 12.
6    Q.    What range is referred to in paragraph
7 12?
8    A.    Paragraph 12 is a reference to the fact
9 that 253 falls within a reasonable range.
10 Probably could have written it as falls within a
11 range of reasonableness, meaning that when you
12 consider not just the numbers that I referred to
13 on page 3 of Attachment 3 but also all the other
14 risks and benefits, 253 is within the range of
15 reasonableness.
16    Q.    So you can't identify a reasonable
17 range in a fixed dollar amount, starting point and
18 concluding point?  Is that your testimony?
19       MR. SIDMAN:  Objection to form.
20       MR. KOH:  Objection.
21    A.    My testimony is that I would not put a
22 range, meaning I would not say that if the number
23 was 195 that's within a range and 330 is within a
24 range.  I didn't view it that way because I'm not
25 focused on the range that's on page 3.  I'm

Page 180

1    Pfeiffer - Confidential
2 focused on the range of reasonableness in
3 consideration of not just the cash payments as
4 outlined towards the bottom of page 3 of the
5 Attachment 3 but also the risks and benefits that
6 are -- that are incorporated on that page.
7    Q.    And you didn't quantify those risks and
8 benefits; is that correct?
9       MR. KOH:  Objection to form.
10       Go ahead.
11    A.    That's correct, as of May 15th, as of
12 this presentation, with certain exceptions.  As of
13 May 15th, we did quantify the benefit of not
14 having to pay future premiums.  That's worth $18
15 million, approximately $18 million.  So that was
16 quantified --
17    Q.    Okay.
18    A.    -- and included in our analysis.
19       Then subsequent to that presentation,
20 we also quantified the $92 million of benefit to
21 the trusts associated with the plan settlement
22 agreement that would come to the trusts based on
23 the rep and warranty claims.
24    Q.    But the 92 million would be on the left
25 side under your analysis -- correct? -- not on the

Page 181

1    Pfeiffer - Confidential
2 right side?
3       MR. KOH:  Objection to form.
4    Q.    That was in your analysis it somehow
5 increases the $253 million cash payment.  Does it
6 also ripple through the base scenario and stress
7 scenario in the absence of the plan -- the absence
8 of the settlement agreement?
9       MR. KOTWICK:  Objection to the form.
10       MR. SIDMAN:  Objection to form.
11       MR. KOH:  Same objection.
12    A.    The $92 million does not impact the
13 cash payments that would be provided under the
14 FGIC plan that result in the net present value
15 that's estimated on page 3.
16       So the range that you see on page 3 on
17 the right side of the page would not be impacted
18 by the $92 million.
19    Q.    Under your analysis?
20    A.    Under my analysis, yes.
21    Q.    Would a commutation payment of $240
22 million have fallen within what you view as a
23 reasonable range?
24       MR. KOTWICK:  Objection.
25    A.    We were not asked to draw that

46 (Pages 178 - 181)

Page 182

1           Pfeiffer - Confidential
2 conclusion.
3       Q.   And you cannot say under oath whether
4 in your view $240 million would fall within a
5 reasonable range?
6           MR. KOH:  Objection.
7           MR. KOTWICK:  Objection.
8       Q.   Is that correct?
9       A.   It likely would have, but we would have
10 to consider -- consider it and meet with -- and
11 meet with my colleagues and make a determination.
12 We as a firm and I sitting here today have not
13 drawn that conclusion relative to any other number
14 except for the 253 and the terms of the proposal
15 as they're stated here today.
16      Q.   How about a $190 million payment, would
17 that fall within a reasonable range, based on all
18 the work that you did for the months and months
19 that you worked as a commutation payment, compared
20 to everything that you know and all the work that
21 you've done?
22          MR. KOH:  Objection.
23          MR. KOTWICK:  Objection to form.
24      Q.   Is that a reasonable settlement amount?
25          MR. SIDMAN:  Objection.

Page 183

1           Pfeiffer - Confidential
2       A.   Similar to the answer that I gave you
3 on the $240 million, we have not been asked nor
4 have I spent the time to assess a $190 million
5 proposal.
6       Q.   And as you sit here today, based on
7 everything that you know and all the information
8 that you have absorbed in the months you have
9 worked on this, you cannot say whether $190
10 million falls within a reasonable range in your
11 estimation; is that correct?
12          MR. KOH:  Objection.
13          MR. KOTWICK:  Objection.
14          MR. SIDMAN:  Objection.
15      A.   I could tell you that we likely would
16 think that $190 million is not within a reasonable
17 range.  However, I have not done the analysis to
18 fully -- to fully appreciate the benefits of $190
19 million relative -- and all the other dollars that
20 would come along with that relative to the
21 rehabilitation plan.
22          So I'm not in a position right now to
23 draw a firm conclusion with respect to any other
24 number except to the 253.
25      Q.   I'm just talking about the left-hand

Page 184

1           Pfeiffer - Confidential
2 side, the amount of the payment.  All other things
3 remaining equal, can you testify today that $190
4 million falls within the range of reasonableness?
5           MR. KOH:  Objection.
6           MR. KOTWICK:  Objection.
7           MR. SIDMAN:  Objection.
8       Q.   "Yes" or "no"?
9       A.   I think I answered that $190 million
10 was not considered by us as a proposal, and we
11 have not made a determination with respect to its
12 reasonableness.
13      Q.   So you can't say, as you sit here,
14 based on everything that you've done, whether in
15 your view $190 million would fall within a
16 reasonable range; is that correct?
17          MR. KOH:  Objection.
18          MR. SIDMAN:  Objection.
19      A.   That's correct.  I can guess, but I
20 would not have done the work, and I have not made
21 a determination with respect to that number or 240
22 million or any other number besides 253.
23      Q.   How about $150 million, as a
24 commutation payment.  As you sit here today and
25 based on all the information that you've done and

Page 185

1           Pfeiffer - Confidential
2 all the data you've absorbed and all the analyses
3 you've performed, can you say whether $150 million
4 would fall within the reasonable range of a
5 settlement?
6           MR. KOTWICK:  Objection to form.
7           MR. KOH:  Objection.
8           MR. SIDMAN:  Objection.
9       A.   When you get to 150 million, I am much
10 more confident that it is not within a reasonable
11 range given the fact the initial CPP is
12 approximately $150 million.
13      Q.   How about $160 million, what's your
14 view of that number?  Slightly more than the
15 initial CPP under certain scenarios.  Do you have
16 a view as to whether that falls within a range of
17 reasonableness?
18          MR. KOTWICK:  Objection to the form.
19      A.   I'd rather not get drawn into a
20 discussion about 160, 170, 180, 190, 200.  Like I
21 said, we did not establish a range in that way
22 that anything outside this range is reasonable
23 and -- is unreasonable and in the range is
24 reasonable, because there are a lot of other
25 considerations beyond those numbers.

47 (Pages 182 - 185)

Page 186

Pfeiffer - Confidential

1          Pfeiffer - Confidential
2          So my answer for 160 is the same answer
3   as I gave you for 190 and the same answer as I
4   gave you for 140.
5          Having said that, the closer you get to
6   150 the more likely I am to tell you that the
7   commutation proposal at that number is not
8   reasonable.
9       Q.   Well, what is the payment anticipated
10  under the rehabilitation plan as the initial CPP?
11      A.   In our estimation it's approximately
12  $150 million.
13      Q.   And with that you can't say, as you sit
14  here today, whether an additional $10 million of
15  an initial payment added to the 150 for a total of
16  160 falls within the range of reasonableness in
17  your view based on the estimations and the
18  evaluations that you did?
19          MR. KOH:  Objection.
20          MR. KOTWICK:  Objection to form, asked
21  and answered.
22      Q.   Is that correct?
23          MR. SIDMAN:  Objection.
24      A.   As I said before, the closer the number
25  gets to 150, the lower it gets, the more likely I

Page 187

1          Pfeiffer - Confidential
2   am to determine that the number is not reasonable.
3   We have not done that analysis, you know.
4          And we can go over and over again the
5   same question with regard to all different
6   numbers.  My answer will be the same, that as the
7   number goes lower and lower, it's less likely
8   reasonable.  As the number gets higher and higher,
9   it's going to be more reasonable.
10         The only number that we made a
11  determination on is 253 and the other benefits
12  associated with that, including the waived
13  premiums and the fact there's a global resolution
14  and all the other ResCap-related litigation
15  issues.
16         And so my answer hasn't changed.
17      Q.   What work would you have to do to be
18  able to address whether a payment of $160 million
19  would fall within a reasonable range?
20          MR. KOTWICK:  Objection to the form.
21      A.   We have to consider the fact that $160
22  million is well south of the present value of the
23  expected payments for the rehabilitation plan.
24  And so since the number is south of the expected
25  payments, we would have to consider all the risks

Page 188

1          Pfeiffer - Confidential
2   associated with the plan and whether the trusts
3   are likely to get an additional $10 million out of
4   that plan and whether on the other side the
5   benefits of the waived premiums of 18 million and
6   the -- and the fact that they're part of an
7   integrated plan which allows the resolution of all
8   the ResCap litigation -- and as I mentioned
9   earlier the $92 million -- whether how that value
10  offsets the potential cash flows from the
11  rehabilitation plan with all the risks inherent in
12  those cash flows.
13      Q.   Well, you've already evaluated the
14  potential cash flows from the rehabilitation plan;
15  correct?  Those don't change?
16      A.   We've evaluated the present value of
17  the cash flows based on our estimation of the
18  claims that we would put forth and the cash
19  available under the rehabilitation plan.
20      Q.   And that doesn't change.  You don't
21  need to do any further analysis; is that correct?
22      A.   We don't need to do any further
23  analysis to arrive at the conclusions that are on
24  page -- the right side of page 3 in my attachment.
25  However, if you are to ask me about a number

Page 189

1          Pfeiffer - Confidential
2   outside the range, outside these numbers that are
3   on the right side, so outside the 190 or outside
4   the 340, I would then have to consider the risks
5   associated with the cash flows -- well, is it
6   possible that the cash flows would get worse than
7   the stress scenario and is it possible that the
8   benefits that I'm getting by the proposal,
9   including the premiums and the inclusion in the
10  plan settlement agreement, offset the fact that,
11  you know, the hypothetical proposal as you
12  presented it is below the range of the present
13  value associated with the cash flows from the
14  plan.
15      Q.   160 is below 190.  Am I right about
16  that?
17      A.   You are correct about that.
18      Q.   Okay.  And are you at all concerned
19  that the range that you came up with is 190 to
20  340, that it's so wide?  Do you have any concerns
21  about that?
22          MR. SIDMAN:  Objection to form.
23      A.   I do not, no.
24          MR. BAIO:  I'm going to ask the
25  reporter to mark as the next exhibit a

48 (Pages 186 - 189)

Page 190

1          Pfeiffer - Confidential
2    multipage document with the Bates numbers
3    PFEIFFER 400 to PFEIFFER 437.
4          (Pfeiffer Exhibit 5, FGIC financial
5    statements as of 3/31/13, Bates-stamped
6    PFEIFFER 400 to PFEIFFER 437, marked for
7    identification.)
8    Q.    Have you seen Exhibit 5 before?
9    A.    I have.
10   Q.    What is it?
11   A.    The financial statements for FGIC as of
12   March 31st, 2013.
13   Q.    What is it your understanding as to
14   what the information contained in this document
15   represents, in general?
16   A.    It represents the balance sheet
17   statement of operations and statement of cash
18   flows and the notes associated to all those
19   financial statements for FGIC as of March 31st,
20   2013.
21   Q.    Are these the financial statements for
22   FGIC for that period on a statutory basis, or is
23   that your understanding?
24   A.    Yes.
25        MR. KOH:  Objection.

Page 191

1          Pfeiffer - Confidential
2    Q.    What is your understanding as to
3    statutory basis?  What does that mean to you?
4    A.    Meets the requirements.
5    Q.    And are they different from GAAP, so
6    far as you understand?
7          (Pause.)
8    Q.    I withdraw the question, if it's that
9    complicated.
10        Can you turn to page 29.  Are you on
11   29?
12   A.    No, I was still trying to point you to
13   the paper -- pages in this financial statements
14   that describe the differences between GAAP and
15   statutory statements.
16   Q.    I withdraw that question.
17   A.    Now you're asking me about page 29.
18   Q.    Yep.  I'm trying to move it along?
19        MR. WEITNAUER:  Bates number 29?
20        MR. BAIO:  No, Bates number 430.
21        MR. WEITNAUER:  Okay.
22   A.    Okay.
23   Q.    You see a chart risk category 4?
24   A.    I do.
25   Q.    There is a reference to gross projected

Page 192

1          Pfeiffer - Confidential
2    recoveries of 1 million -- 1 billion, sorry, 58
3    million 632.
4    Q.    Do you see that number?
5    A.    I do.
6    Q.    Do you know what that reflects?
7    A.    I know what's described on the next
8    page as to what it's meant to reflect, yes.
9    Q.    And what is your understanding as to
10   what that reflects, that 1 billion 58 million 632
11   dollar figure?
12        MR. KOTWICK:  Objection to form.
13   Q.    632,000 dollar figure?
14   A.    It is meant to describe gross projected
15   recoveries, and those are referenced on the top of
16   page 30.  I'm aware of the fact that one of the
17   plaintiff's experts mischaracterized this as an
18   estimation for material litigation, and I'm
19   confident that that's not what this represents.
20        Rather, it represents total gross
21   projected recoveries that -- again, we can read
22   the paragraph if you'd like.  But it says that --
23   it says that it can include claims for breaches of
24   reps and warranties by the originator or others,
25   obtaining appraisals of collateral or reviews of

Page 193

1          Pfeiffer - Confidential
2    loan files, enforcing collateral provisions and
3    covenants of a servicing or others, more frequent
4    meetings with the issuer or servicer, evaluating
5    the financial position of the originator or
6    servicer, renegotiation of financial covenants,
7    triggers or terms of servicing, enforcing rights
8    to remove and replace the servicer, evaluation of
9    restructuring plans or bankruptcy proceedings, and
10   in some cases litigation or arbitration as and
11   where appropriate.
12   Q.    And do you know the extent to which it
13   includes amounts estimated for recoveries for
14   breach of representation and warranty claims by
15   the originator or others?
16   A.    I do not.
17   Q.    Do you know the extent to which it
18   includes an evaluation of restructuring plans or
19   bankruptcy proceedings or in some cases litigation
20   or arbitration?
21   A.    I do not.
22   Q.    Do you know what the components are on
23   the dollar basis of the 1 billion 58 million
24   dollar figure?
25   A.    I do not know the specific components,

49 (Pages 190 - 193)

Page 194

1          Pfeiffer - Confidential
2 no.
3     Q.    Did you include that figure, that is,
4 that amount, the billion 58 million 632 thousand
5 dollars in your evaluations of potential
6 recoveries in the absence of a settlement
7 agreement?
8     A.    It's my understanding that it's already
9 included -- the great majority of it if not all of
10 it is already included in the FGIC rehabilitation
11 plan, the cash flows that are provided in the --
12 provided for in the affidavit and described in the
13 affidavit by Mr. Miller of Lazard.
14     Q.    And what is your understanding based
15 on?
16     A.    Based on the fact that Lazard told us
17 that they can make no estimation of the litigation
18 recoveries and therefore these litigation
19 recoveries -- if an amount of this 1058632 was to
20 be litigation recoveries, they would have provided
21 us that estimate.
22         And from an accounting perspective,
23 they specifically noted that they were not able to
24 make that.  It's not probable and estimable.  And
25 therefore all other considerations are included in

Page 195

1          Pfeiffer - Confidential
2 the rehabilitation plan as provided by FGIC and
3 described by Lazard.  And therefore, you know,
4 it's my estimation that it includes all such
5 potential recoveries.
6         And to the extent that the recovery is
7 the type that is recoverable by the trusts, the
8 trusts themselves would still be the beneficiary
9 of those recoveries even after the settlement
10 agreement is agreed upon.
11     Q.    That's your understanding?
12     A.    Yes.
13     Q.    And that's how you get the $92 million,
14 or that's where it's derived from?  Is that
15 correct or not?
16         MR. KOTWICK:  Objection.
17         MR. WEITNAUER:  Objection.
18         MR. KOH:  Object.
19         MR. SIDMAN:  Objection.
20     A.    No, the $92 million is something else.
21     Q.    Can you look at your presentation of
22 March 15th, 2013 --
23         MR. KERR:  You said May 15th?
24         MR. BAIO:  Did I say March?  I mean
25 May.

Page 196

1          Pfeiffer - Confidential
2     Q.    -- which is attached as Exhibit 1.  If
3 you look at page 9 under A, the report states, "A
4 majority of the notional claims for the ResCap
5 RMBS trust policyholders are presented within the
6 first five years post emergence in both high" --
7 "both low and high cases."
8         Do you see that language?
9     A.    I do.
10     Q.    Where did you get that from?
11     A.    We estimated claims on an annual basis,
12 and we added up the first five years of those
13 projected claims and noted that the majority of
14 the claims are in those first five years.
15     Q.    What data did you use to do that
16 analysis?
17     A.    The claims are estimated as described
18 in my report on -- in Section 7, starting on page
19 16.  It describes how we went about projecting
20 claims.  Beginning in paragraph 34, I should say,
21 on page 17.
22     Q.    It says that you used, in paragraph 35,
23 the balance of active loans to provide the total
24 population of loans.
25         Do you see that?

Page 197

1          Pfeiffer - Confidential
2     A.    Yes.
3     Q.    Where did you get that data from?
4     A.    INtex.
5     Q.    And what did you do on INtex in order
6 to secure that information?  How did you go about
7 it?
8     A.    My team -- you know, if you have the
9 trust information, then you could put that into
10 INtex and it will tell you the balance of the
11 active loans.
12     Q.    And your team ran these -- the analysis
13 that's identified in paragraphs 34 and the
14 following paragraphs; is that correct?
15     A.    Yes.
16     Q.    Did you retain any of the analyses that
17 your team did in connection with that evaluation?
18     A.    Yes.
19     Q.    And did you provide it to us?
20     A.    I believe we did, yes.
21     Q.    In what form?
22     A.    I believe in Excel.
23     Q.    And that Excel the INtex -- INtex, is
24 that the word -- the INtex analyses that your team
25 provided or that your team undertook?

50 (Pages 194 - 197)

Page 198

1      Pfeiffer - Confidential
2      MR. KOTWICK:  Objection to form.
3      A.   It provides the -- it provides the
4 results of our claim analysis on a -- on a trust-
5 by-trust basis and the results as summarized on
6 page 8 and 9 of the presentation.  It provides
7 more detail with respect to the range of claim
8 estimates that we came up with.
9      Q.   And if you look at the chart on page 8
10 of your May 15th presentation, there are a series
11 of percentages in the low case and the high case.
12 Let's take the low case first.  65 percent, 80
13 percent, 86 percent, do you see those numbers?
14      A.   I do.
15      Q.   Where did they come from?
16      A.   Those are the same numbers we described
17 earlier, that as of the end of 2012 the accrued
18 and unpaid amount as $753 million.  And therefore
19 the notional claim for these ResCap insured --
20 FGIC-insured trusts at the end of 2012 was 753.
21 Then as we described earlier, you know, it's 789
22 or whatever it is as of March.
23      Then you project that claim amount
24 through the next five years, and it's projected,
25 as you see here on the page, that the number will

Page 199

1      Pfeiffer - Confidential
2 increase between 2013 and 2017 but an additional
3 $173 million.  And therefore that brings the
4 cumulative claim from 65 percent up to 80 percent.
5      And those numbers were all derived and
6 calculated consistent with the description that is
7 provided in the section of the report we were just
8 looking at, paragraph 34 through 40.
9      Q.   In paragraph 36 there's a references to
10 roll rate transition matrices.  Are those also
11 found on INtex?
12      A.   No, you have to provide that as an
13 input to INtex.
14      Q.   And would that be based on assumptions,
15 that is, the input that you and your team put in,
16 is that based on any assumptions?
17      A.   Yes.
18      Q.   What assumptions?
19      A.   Well, as described, you have -- the
20 roll rate transition matrices are -- they're used
21 to calculate, as it says in paragraph 36, monthly
22 prepayment and default rates for each trust.
23      So you look at prepayment and default
24 rates for each trusts historically, and then you
25 look at rolling that forward to determine what you

Page 200

1      Pfeiffer - Confidential
2 would expect to see in the coming years.  So
3 that's what's referred to as the roll rate
4 matrices, and that's -- those rates are referred
5 to as the conditional prepayment rates and
6 conditional default rates.  And you take those
7 estimates and put them into INtex to arrive at an
8 estimate claim, projected claim.
9      Q.   You then have, in paragraph 37,
10 prepared forecast cash flows under various
11 scenarios.  Do you see that?
12      A.   Yes.
13      Q.   And that's the high and the low
14 scenarios that you and your team generated; is
15 that correct?
16      A.   Yes.
17      Q.   What were those high and low scenarios
18 based on?
19      A.   Based on taking those results, results
20 that came out of our model, with the various rates
21 that we just described.  It results in a
22 particular forecast.  And those forecasts are
23 based on, as I described, the CPR and CDR severity
24 assumptions.
25      And cognizant of the fact that there's

Page 201

1      Pfeiffer - Confidential
2 some estimation involved in those forecasts, in
3 order to arrive at a low and a high range, we
4 stress -- we apply a sensitivity to those
5 assumptions by taking 10 percent off the bottom
6 and adding 10 percent to the top for each of these
7 assumptions.  So you see that described in
8 paragraph 37.
9      Q.   And what did you base those assumptions
10 on, the high case and low case?  Why 10 percent as
11 opposed to some other number?
12      A.   Our judgment is that it makes sense to
13 provide some sensitivity to those numbers, and 10
14 percent variance was consistent with what we did
15 for many other clients facing similar
16 circumstances.
17      I note, by the way, that this is
18 exactly what we did for estimating losses for all
19 the trusts, not just the FGIC wrapped trusts, but
20 all the 392 trusts that were part of the 9019
21 settlement and estimating claims for the
22 nonsettling -- additional and nonsettling trusts.
23      We used the same exact methodology.  We
24 did not change our methodology relative to looking
25 at the settlement proposal; rather, we just took

51 (Pages 198 - 201)

Page 202

Pfeiffer - Confidential
2 that information and looked at the 47 trusts that
3 are the focus of the settlement to look at what
4 the expected losses -- claims might be.
5     Q.    And do you have documents that reflect
6 the analysis that you did with respect to the more
7 than 47 trusts, the entire population?
8     A.    Yes.
9     Q.    And have you provided them to us?
10    A.    I don't think so, no.
11        MR. BAIO:  We're asking for them now.
12        MR. GELFARB:  Freddie Mac joins in that
13 request.
14        MR. KOH:  We'll consider your request.
15    Q.    In paragraph 39 you then say, "D&P then
16 applied the assumptions resulting from the above-
17 described methodology."
18        Do you see that?
19    A.    Yes.
20    Q.    So those are assumptions that result
21 from this analysis; is that correct?
22    A.    Paragraph 39 refers to applies
23 assumptions from the above-described methodology
24 on a trust-by-trust basis according to the trusts'
25 payment structures, kind of the waterfall within

Page 203

Pfeiffer - Confidential
2 the trusts.
3     Q.    But the result of the above-described
4 methodology is to generate assumptions that are
5 then applied on a trust-by-trust basis; is that
6 correct?
7        MR. KOH:  Objection, form.
8     A.    There's an assumed level of claim
9 amount for each trust, and those assumptions are
10 then used -- there's assumed levels of claims --
11 claim amounts for each trusts are then analyzed
12 further on a -- within each trust on a tranche --
13 if you look at the payment structures within the
14 trust.
15    Q.    And based on that analysis, you came up
16 with a $409 million estimated policy claim amount
17 in the low case and 793 million in the high case;
18 is that correct?
19    A.    That's correct as of December 31st,
20 2012.
21    Q.    Have you updated any of that data?
22    A.    Not at the time of this report.
23    Q.    How about since the time of the report?
24    A.    I think we're continually looking at
25 it.

Page 204

Pfeiffer - Confidential
2     Q.    And have you come up with any numbers
3 as a result of that continuing to look at it?
4     A.    No conclusions have been arrived at
5 that are different than this estimated range.
6     Q.    Have the numbers gone up or down?
7        MR. KOH:  Objection.
8     Q.    Based on whatever your ongoing analysis
9 is.
10        MR. KOH:  Objection.
11    A.    They have not gone up or down.  We have
12 not concluded on a different number.
13    Q.    Let's go to the discount rate.  I'd
14 like you to look at paragraphs 52 and those that
15 follow.  I'll ask you questions about it.
16        The first question is in paragraph 53
17 is it accurate that you attempted to determine an
18 appropriate and reasonable rate at which to
19 discount future cash flows?
20    A.    Yes.
21    Q.    And relied on your experience,
22 independent sources of discount rate calculations,
23 namely Ibbotson; is that correct?
24    A.    Yes.
25    Q.    And you selected the SIC -- is it SIC

Page 205

Pfeiffer - Confidential
2 codes?  What do you call them?
3     A.    I call them SIC.
4     Q.    SIC for surety insurance and insurance
5 carriers; correct?
6     A.    Correct.
7     Q.    Why did you include those?
8     A.    They seemed to be most closely
9 correlated with the industry that FGIC operates
10 in.
11    Q.    Did you consider or test any other SIC
12 besides surety insurance and insurance carriers to
13 evaluate an appropriate discount rate?
14    A.    No.
15    Q.    Did you consider the fact that FGIC is
16 no longer writing business in evaluating whether
17 the discount rate should be higher or lower than
18 these percentages?
19    A.    Yes.
20    Q.    And what did you conclude?
21    A.    That because they are no longer writing
22 policies that they don't have that stability of
23 cash flows or ability to generate additional cash
24 flows from that stream, and associated with that
25 their rehabilitation subject to all kinds of

Page 206

Pfeiffer - Confidential
1
2 uncertainties.
3        And we felt the risk -- given their
4 current predicament their risk and therefore the
5 discount rate range would be higher, likely, than
6 the average range that you'd find in Ibbotson.
7    Q.   In the Ibbotson analysis that you
8 performed, did you view any one of those entities
9 that resulted from your analysis as an outlier?
10    A.   We did not -- we did not look at an
11 entity-by-entity basis to look at which ones would
12 be outliers.
13    Q.   You did not do that?
14    A.   No.
15    Q.   So you don't know whether the 19
16 percent figure is the result of an outlier?
17        MR. SIDMAN:  Objection.
18        MR. KOTWICK:  Objection to the form.
19    A.   It was more important for us to look at
20 the general range.  We did pay specific attention
21 to MBIA and its beta on the higher end of that
22 range, didn't -- we didn't go about analyzing each
23 company within that range to determine whether
24 it's an outlier or not.
25    Q.   Did you consider -- strike that.

Page 207

Pfeiffer - Confidential
1
2
3        MR. BAIO:  Let's take a short break.  I
4 want to look at my notes, and we'll see where
5 we are.
6        (Recess taken from 2:56 to 3:03.)
7        MR. BAIO:  Let's mark as the next
8 exhibit, Exhibit 6, the expert witness report
9 of Charles Goldstein.
10        (Pfeiffer Exhibit 6, expert report of
11 Goldstein, marked for identification.)
12    Q.   Have you seen Exhibit 6 before?
13    A.   I have.
14    Q.   Have you read it?
15    A.   I've reviewed it.
16    Q.   Okay.
17    A.   I don't think I read every word, but I
18 did review it.
19    Q.   Can you look at paragraph 29?
20    A.   Okay.
21    Q.   Do you believe that anything in
22 paragraph 29 is inaccurate?
23        MR. KOTWICK:  Objection.
24    A.   Yes.
25    Q.   What?

Page 208

Pfeiffer - Confidential
1
2    A.   I think that the first sentence refers
3 to the regulatory filings and refers to the
4 billion dollars in gross recoveries as resulting
5 from various loss mediation activities.
6        If you look at the financial statements
7 themselves, they are not characterized as simply
8 loss mediation activities such as the pursuit of
9 litigation claims.  Rather, it is described as
10 gross projected recoveries.
11    Q.   And in your view they are not loss
12 mediation activities that are identified in the
13 paragraph that you drew my attention to; is that
14 correct?
15    A.   What I am saying, to be accurate, is
16 it's misrepresented here as simply loss mediation
17 activities such as the pursuit of litigation
18 claims, as if to say that it's basically I'm going
19 to take it as -- he's going to take it --
20 Mr. Goldstein is going to take it as if it is
21 litigation claims.
22        And I read the financial statements
23 very differently.
24    Q.   So you read that sentence that
25 Mr. Goldstein is referring only to litigation

Page 209

Pfeiffer - Confidential
1
2 claims?
3    A.   I read it in connection with the
4 section that it's in, and the fact that it follows
5 paragraph 28 and the paragraphs right before it
6 that refer to -- that refer to material litigation
7 that the insinuation, if not the exact statement,
8 here is that the billion dollars relates to
9 litigation claims.
10        And I don't see that to be accurate and
11 nor do I think that's what's represented in the
12 financial statements.
13    Q.   Is there anything else inaccurate in
14 that paragraph?
15        MR. WEITNAUER:  Objection.
16        MR. KOTWICK:  Objection to the form.
17    A.   Yes.
18    Q.   What?
19    A.   I don't know how Mr. Goldstein would
20 know that these recoveries were not included in
21 our assessment of whether the 253 was within the
22 range of reasonableness.
23    Q.   Do you believe that the recoveries were
24 included in your assessment of whether the 253 was
25 within the range of reasonableness?

53 (Pages 206 - 209)

Page 210

Pfeiffer - Confidential
2    A.   My understanding is that the great
3 majority, if not all, the gross projected
4 recoveries are included in the cash flows that
5 were provided as part of the rehabilitation plan.
6    Q.   And have you confirmed that with FGIC
7 or Lazard?
8    A.   I have not spoken to FGIC and Lazard
9 about that.
10   Q.   Have you learned that FGIC and Lazard
11 believe that it is included in their evaluation?
12   A.   I have learned from our -- from our
13 analysis and assessment of the situation and going
14 back to the -- what was discussed in that meeting
15 that everything's included in the plan except for
16 the various items that we discussed earlier,
17 including material litigation on both the
18 plaintiff and the defense side, and those that are
19 not included because they weren't estimable and
20 probable.
21       And therefore the number that's
22 reflected in the financial statements is not -- it
23 seems to me that would be the kind of number that
24 is included in the rehabilitation plan.
25       MR. BAIO:  I pass the witness, as we

Page 211

Pfeiffer - Confidential
2 say.
3       MR. GOODMAN:  Can we just go off the
4 record while we set up, please.
5       (Pause.)
6 EXAMINATION BY
7 MR. GELFARB:
8    Q.   Good afternoon, Mr. Pfeiffer.
9    A.   Good afternoon.
10   Q.   My name is David Gelfarb.  I represent
11 Freddie Mac in this matter as co-counsel.
12       Do you understand that you're still
13 under oath?
14   A.   I do.
15   Q.   Prior to this action, how many cases
16 were you involved in that implicated residential
17 mortgage-backed securities?
18   A.   Somewhere between five and ten.
19   Q.   Have you testified at trial in any
20 matters involving residential mortgage-backed
21 securities?
22       MR. GELFARB:  Please note for the
23   record that the witness is looking at his
24   report.
25       (Pause.)

Page 212

Pfeiffer - Confidential
2    A.   I don't recall if in one of the
3 depositions I provided related to Oakwood, which
4 is a liquidation trust in the real estate sector.
5 I don't recall whether I testified in that matter
6 in deposition with respect to RMBS at all.
7       In addition I testified last year --
8 no, two years ago in an arbitration related to a
9 hedge fund, and that hedge fund -- that hedge
10 fund's assets included RMBS securities.
11   Q.   Which hedge fund was that?
12   A.   Aris.  It's listed in my -- on my
13 résumé.  And I don't recall to what extent I got
14 into the value of the RMBS securities.
15   Q.   Which one is that, since I see
16 deposition you have a bunch on page 8 going
17 through to page 9?
18   A.   Look on page 7 before that, before
19 deposition is a list at trial.
20   Q.   Do any of the cases on page 8 or 9 for
21 which you indicate deposition testimony involved
22 RMBS?
23   A.   As I just mentioned, on page 7 the Aris
24 case may have involved RMBS, and the case on page
25 9 -- 8 on the bottom, which is OHC Liquidation

Page 213

Pfeiffer - Confidential
2 Trust versus Credit Suisse where I worked on
3 behalf of Credit Suisse.  I testified on behalf of
4 Credit Suisse in that matter.  I don't recall
5 precisely to what extent RMBS was involved in that
6 case either.
7    Q.   So can you just summarize, please, for
8 which cases you actually testified at trial?  You
9 understand the difference between a trial and
10 deposition?
11   A.   I do understand, yes.
12   Q.   So which ones did you testify at trial,
13 actually testify at trial?
14   A.   If you look at my résumé, page 7, trial
15 and arbitration testimony, so that one, two,
16 three, four, five, six -- those seven cases were
17 either trials or arbitrations.
18   Q.   And which of them involved residential
19 mortgage-backed securities?
20   A.   I think I just testified to the fact
21 that the case listed first, Aris, may have
22 involved RMBS securities.
23   Q.   Have you ever been involved in a case
24 before that involved a commutation of insurance
25 policies?

54 (Pages 210 - 213)

Page 214

Pfeiffer - Confidential
2    A.    I don't believe so.
3    Q.    What documents did you review in order
4  to prepare for today's deposition?
5    A.    I reviewed my report.  I reviewed the
6  model that was provided to you in connection with
7  this deposition, the underlying support documents
8  and model that was provided to you.  And I
9  reviewed the plaintiff expert reports, reviewed
10  FGIC financial statements, and reviewed the
11  rehabilitation plan, the affidavit of Mr. Miller,
12  some of the disclosure statement.
13        That fairly summarizes the kind of
14  documents I looked at.
15    Q.    Did you review the expert declaration
16  of Mr. Gibson?
17    A.    I did.
18    Q.    Did you have any opinions on the
19  reasonableness of his conclusions?
20    A.    I -- my review was somewhat cursory,
21  but my conclusion, based on that cursory review,
22  was that the expert has either been misinformed or
23  has made certain mistakes with respect to his
24  analysis.
25    Q.    How do you understand Mr. Gibson to

Page 215

Pfeiffer - Confidential
2  have been misinformed?
3    A.    I understood that his assessment of the
4  claims didn't seem consistent with what I would
5  expect.  His reference to the commutation relative
6  to that claim amount and his comparison of that
7  percentage to the Lazard percentages were I think
8  inappropriately compared.
9        And if you put the report in front of
10  me, it could perhaps remind me of a few other
11  observations.
12    Q.    I believe you said he was misinformed
13  and there was some other difficulty with his
14  report.  Did your prior answer, Mr. Pfeiffer,
15  include where you believe Mr. Gibson made certain
16  mistakes with with respect to his analysis?
17    A.    Yes, I think the way he describes the
18  commutation, I think he might refer to it as 21
19  cents or 21.4 cents or whatever number he used in
20  there.  You know, that reference compared to the
21  27 to 30 cents that he takes from Lazard I believe
22  to be an inaccurate comparison.
23    Q.    Do you know whether you yourself ever
24  prepared an analysis that included a 21 --
25  approximately 21 cent payment under the

Page 216

Pfeiffer - Confidential
2  commutation plan?
3        MR. KOH:  Objection to form.
4    A.    I think we provided to you all the
5  analysis that we've conducted with respect to the
6  commutation.  I don't recall a reference to 21
7  cents specifically.
8        MR. GELFARB:  Let's go off to for a
9  second.
10        (Pause.)
11        (Pfeiffer Exhibit 7, draft
12  presentation, marked for identification.)
13    Q.    Mr. Pfeiffer, can you identify what's
14  been marked as Exhibit 7?
15    A.    Yes.
16    Q.    And what is Exhibit 7?
17    A.    This is an earlier draft of the
18  presentation I believe that was shared on May 5th
19  or 6th, 2013.
20    Q.    Who was it shared with?
21        MR. KOH:  Objection.
22        Go ahead and answer.
23    A.    It was shared initially with counsel
24  for the trustees, and I believe that the trustees
25  shared it with -- the trustees' counsel shared it

Page 217

Pfeiffer - Confidential
2  with the trustees as well.
3    Q.    You see on page 7 there's an entry,
4  nominal recovery?
5    A.    I do.
6    Q.    And what is the amount of the nominal
7  recovery?
8    A.    It says 19 to 20 percent.
9    Q.    And what does that represent?
10    A.    That likely represents the 220 to 285
11  on the box on top of it compared to -- you know, I
12  don't know.
13    Q.    Okay.  So sitting here today you're not
14  certain as to what the 19 to 20 percent
15  represents, Mr. Pfeiffer?
16    A.    It's purported to represent a NOL
17  analytical recovery, but I cannot -- I cannot
18  re-create the math for you at this time.
19    Q.    Was this document prepared under your
20  supervision?
21    A.    Yes, it was.
22    Q.    Is there any reason why in the May 15th
23  analysis there's no similar entry for a percentage
24  representing a nominal recovery?
25    A.    I think that we determined that there

55 (Pages 214 - 217)

Page 218

1        Pfeiffer - Confidential
2 was a better way to present the numbers.
3     Q.   Now let's go to page 7, paragraph 12,
4 of your report.  Now, earlier Mr. Baio was
5 discussing with you the concept of the 253.3
6 million and the reasonable range.  Do you recall
7 that?
8     A.   Yes.
9     Q.   Now, just so I understand this, there's
10 no particular numerical range that encompasses
11 that 253.3 million, is there?
12        MR. KOH: Objection.
13        Go ahead.
14     A.   There are numerical ranges that are
15 part of our assessment of the 253.3, and those
16 numerical ranges are provided for on page 3 of
17 Attachment 3 of the report, the information piece
18 presentation.  Those are numerical ranges, but
19 that's not the full scope of our consideration
20 with respect to our conclusion and the resulting
21 range of the 253.3.
22     Q.   I understand that you put ranges on
23 page 3:  one for the base scenario and there's one
24 for the stress scenario.  And we'll set aside who
25 computed those numbers.  But those numbers exist.

Page 219

1        Pfeiffer - Confidential
2 Okay.
3        My question is is the 253.3 supposed to
4 fall into a range bordered by 190 and 240 or is it
5 supposed to be somewhere else or is there no
6 numerical range within which it falls.
7        MR. KOH: Objection.
8     A.   It's not supposed to fall anywhere;
9 it's supposed to be considered as a payment in
10 comparison to the alternative, which is to receive
11 projected payments under the plan.
12     Q.   Now, in your other engagements, whether
13 with Duff & Phelps or otherwise, have you ever had
14 reason in a report to place a specific number, for
15 example, as the 253.3 is here, within a range that
16 is not bordered on the low end or high end by two
17 other numbers?
18        MR. KOTWICK: Object to form.
19        MR. KOH: Same objection.
20        THE WITNESS: Can you read back the
21 question, please.
22        (Record read.)
23        THE WITNESS: Yes.
24     Q.   And when did you do that?
25     A.   We often are looking at whether a

Page 220

1        Pfeiffer - Confidential
2 number is within a range of reasonableness or we
3 often provide our clients with a range of
4 reasonable estimates for value.  And sometimes
5 those numbers are bound by a low and a high end of
6 the range.  It's very clear.
7        And other times there are additional,
8 less quantifiable benefits that make the range
9 something that has to be considered -- the numeric
10 and the soft benefits have to be considered in
11 conjunction with each other.
12     Q.   Okay.  So in this case, however, there
13 is no range of reasonable estimates for value, is
14 there?
15     A.   I think I described earlier that
16 there's a range of present values of the cash
17 flows that result from the FGIC plan, and those
18 are described on page 3.  And then in looking at
19 that relative to the 253, you consider those
20 numbers as well as the other risks and benefits
21 associated with the proposal and the plan.
22     Q.   Can you give me -- or can you provide
23 an estimate of what the $253.3 million represents
24 as a percentage of the trusts' claims?
25        MR. KOTWICK: Objection.

Page 221

1        Pfeiffer - Confidential
2     A.   Yes.
3     Q.   And what is that percentage?
4     A.   The 253 plus the 18 million is 271
5 million.
6     Q.   Right.
7     A.   And I can compute that number relative
8 to the nominal amount of the claims or the present
9 value of the claims and arrive at various numbers.
10 And those are -- based on our estimation of the
11 claims, those numbers are estimated in Table 1 of
12 my report.
13     Q.   And that's on page 28?
14     A.   Yes.
15     Q.   And what is the amount of the -- for
16 the commutation proposal as discounted, it's 22 to
17 29?
18     A.   Yes.
19     Q.   In your report there's a footnote which
20 discusses the 40 percent haircut; correct?
21     A.   Yes.
22     Q.   Okay.  That's Footnote 23 on page 16.
23        Now, did you testify earlier that one
24 of the reasons -- not the only reason but perhaps
25 one of the reasons for the haircut was the idea

Page 222

Pfeiffer - Confidential

1       Pfeiffer - Confidential
2  that a lot of the claims were going to arise in
3  later years but the payment would come up soon?
4       MR. KOH:  Objection.
5       MR. KOTWICK:  Objection.
6  A.  No.
7  Q.  Can you take me through what your
8  analysis was with respect to the justification for
9  a haircut in terms of when the majority of claims
10 were going to arise?
11 A.  Yes.  This haircut is not our number,
12 and we did not calculate it.  But as described to
13 us by Lazard and FGIC, the claims will be front-
14 loaded, the payments subsequent to that, and I
15 think in your question you might have reversed the
16 two.
17      But basically the claims will arise
18 more in the near term, and the payments, the CPP,
19 the payments as projected in the plan are over
20 many more years.
21 Q.  Right.  So then if that's the case, as
22 you say, the claims are front-loaded, wouldn't it
23 justify a lesser haircut?  In other words, if the
24 claims occur in the near future, wouldn't one
25 thing that you would want to be paid in the near

Page 223

1       Pfeiffer - Confidential
2  future for claims that arise in the near future?
3       MR. KOTWICK:  Objection to the form.
4  A.  The way this plan works, that's not --
5  that's not what occurs.  What occurs is that
6  irrespective of -- even if your claim amount is
7  early on, you still have to wait for the -- for
8  the plan to allow you to receive your percentage.
9  And so you don't get the cash quicker all because
10 you have a claim earlier.
11 Q.  That may be, but wouldn't it justify a
12 lower discount rate?  If someone is going to
13 get -- excuse me, a lower haircut.  If someone is
14 going to incur a loss sooner, wouldn't you expect
15 the haircut to be less than if they were going to
16 incur a loss way, way down the road?
17      MR. KOH:  Objection.
18      MR. KOTWICK:  Objection to form.
19 A.  No, I think you're misunderstanding the
20 terms.
21 Q.  Explain -- give me your explanation of
22 it, please.
23 A.  Okay.  The trust incurs a loss and has
24 a claim.  That claim on a nominal basis on day one
25 might be worth a dollar, on a nominal basis is

Page 224

1       Pfeiffer - Confidential
2  worth a dollar.  But because the payments on that
3  claim are substantially in the future, the value
4  that I'm going to receive from that claim today --
5  on present value terms, the value that I'm going
6  to receive from those payments are going to be
7  well less than a dollar because I have to wait
8  three, four, five years to receive a portion -- a
9  recovery on the dollar of that claim.
10      So I might receive on a nominal basis
11 45 cents on the dollar; but because I have to wait
12 more years in order to receive that payment, the
13 present value is diminished.
14 Q.  Now, FGIC here offered a present value
15 analysis, did they not?  In other words, the
16 payments are being discounted?
17 A.  FGIC offered a present value analysis
18 for the plan overall, not for the FGIC-insured
19 trusts in particular.  So our job was to take the
20 FGIC-insured trusts and provide a present value
21 analysis for those.
22 Q.  Isn't there a requirement that all
23 policyholders be treated fairly and equitably?
24 A.  On --
25      MR. KOH:  Objection.

Page 225

1       Pfeiffer - Confidential
2       Go ahead and answer.
3  A.  On a nominal basis, that's correct; but
4  on a present value basis, it's not.
5  Q.  When you learned of the 40 percent
6  discount, did you express any surprise to FGIC
7  and/or Lazard?
8  A.  We expressed a desire to understand all
9  the inputs for everything they provided to us and
10 everything that was publicly available, but our
11 focus was not at all on that 40 percent discount;
12 our focus was on the 253 relative to our
13 assessment of the claims and how they would be
14 treated in the context of the projected payments
15 under the rehabilitation plan.
16 Q.  Did you suggest that the 40 percent be
17 either increased or decreased?
18 A.  No.
19 Q.  Did the trustees ever suggest to you
20 that the 40 percent should be higher or lower or
21 should stay the same?
22 A.  No.
23 Q.  Did the trustees ask whether this 40
24 percent discount was justifiable in your
25 discussions with them during that Web conference?

57 (Pages 222 - 225)

Page 226

1          Pfeiffer - Confidential
2      A.    When the trustees asked about the 40
3   percent, we described it in connection with what
4   FGIC told us, as I just told you.  However, we
5   made sure the conversation related -- instead of
6   to the 40 percent, which is a FGIC-derived number,
7   we made sure the conversation turned instead to
8   the 253 relative to the present value of the
9   projected payments as we described them.
10      Q.    Now, the security holders would do
11  better with a 20 percent haircut; correct?
12          MR. KOTWICK:  Objection to the form.
13          MR. KOH:  Objection.
14      A.    We didn't look at the numbers in the
15  context of a haircut.  The security holders would
16  do better if they got 263 rather than 253 and
17  would do better yet if they got 283.  They would
18  do worse if they got 243.  How that number came
19  about is less of an issue for us, actually not an
20  issue for us whatsoever.
21      Q.    In your capacity as a financial
22  advisor, you would not give advice on the
23  reasonableness of that 40 percent haircut; is that
24  correct?
25      A.    That's correct.

Page 227

1          Pfeiffer - Confidential
2      Q.    Can you turn to paragraph 34 of your
3   report.  Now, you made an estimate of the future
4   projected claims; correct?
5      A.    Yes.
6      Q.    And you also projected future
7   collateral performance?
8      A.    We projected security rates.
9      Q.    Did you go through all 47 trusts in
10  estimating the future projected claims?
11      A.    Yes.
12      Q.    Okay.  And when you say that you
13  determined -- did you determine monthly prepayment
14  rates?
15      A.    Yes.
16      Q.    And how did you do that?
17      A.    By looking at historical monthly
18  prepayment rates and projecting forward what one
19  would expect based on that.
20      Q.    And what service did you use to do
21  that?
22      A.    We have a significant -- a team with
23  significant expertise in that regard.  We've done
24  this for many clients.  And as I mentioned
25  earlier, we also provided those assumptions and

Page 228

1          Pfeiffer - Confidential
2   inputs into INtex to provide to us more color.
3      Q.    Now, what do you mean in paragraph 35
4   by the phrase a more robust loss estimation?  What
5   does that mean?
6      A.    It means that instead of just providing
7   for blanket assumptions with respect to
8   transition, roll rates, and CPR, CDR, severity,
9   and so on, what we did was we looked at it on a
10  cohort -- classified it into cohorts, product
11  types, and vintages, so that we estimated for each
12  cohort a different set of assumptions.
13      Q.    Did you analyze CPR for all 47 trusts
14  separately?
15      A.    We analyzed CPR for each of those
16  cohorts separately, and each of those trusts fit
17  into a particular cohort.  And therefore each
18  trust would have its own CPR and CDR.
19      Q.    What do you mean by the term
20  "sub-cohort"?
21      A.    If you look at page 17 going into page
22  18, there are six categories:  prime, all A,
23  subprime, pay option arm, closed-end seconds, and
24  open-end seconds.  And so in creating sub-cohorts,
25  we split subprime, for example, into additional

Page 229

1          Pfeiffer - Confidential
2   categories.  And we split -- we might have had two
3   categories for pay option arms.
4      Q.    Now, what is pay option arm?  What
5   would be the sub-cohorts?  The sub-cohorts were
6   not by year?  There was not '04 sub-cohorts and
7   '05 sub-cohorts?
8      A.    That's an additional, meaning there are
9   six types and there are four vintages.  So 6 times
10  4 is 24.  So there are 24 cohorts.  So there's a
11  pay option arm 2004 cohort, a pay option arm 2005
12  cohort, a pay option arm 2006 cohort, and a pay
13  option arm 2007 cohort.  And we do the same thing
14  for each of the product types.  And then within
15  the product types we also had sub-cohorts that
16  were analyzed.
17      Q.    Now, besides INtex did you create your
18  own model in determining expected losses on the --
19  to be suffered by the trusts?
20      A.    We used the information we had and
21  created our own model for -- aided by INtex, but
22  we created our own model, yes.
23      Q.    Which employees at your firm worked on
24  creating that model?
25      A.    John Schrader led that team, and John

58 (Pages 226 - 229)

Page 230

1        Pfeiffer - Confidential
2  was supported by a number of other employees.
3        MR. CHRISTENSEN:  How much of the 35 do
4  we have left?
5        THE REPORTER:  We're like two, three
6  minutes over, actually.
7        MR. CHRISTENSEN:  Oh, okay.
8     Q.   Did you consider using servicer advance
9  rates in connection with determining losses to the
10  trusts?
11     A.   I don't know.
12     Q.   Do you know what servicer advance rates
13  are?
14     A.   I know what servicer advance rates are,
15  yes.
16     Q.   So you don't know whether you used
17  those in your work determining losses.  Okay.
18        Did you consider cash flow triggers?
19     A.   I don't know.
20     Q.   You do know what cash flow triggers are
21  in terms of RMBS; correct?
22     A.   I have a general understanding of what
23  it is, yes.
24     Q.   In your view does INtex have
25  limitations in modeling losses going out 30, 40

Page 231

1        Pfeiffer - Confidential
2  years?
3     A.   My understanding is that whatever
4  limitations INtex has we allowed for and
5  supplemented based on our own model and
6  experience.
7     Q.   How did you determine severity rates?
8     A.   We looked at -- we looked at the
9  historical severity rates for these types of --
10  for the cohorts, and we looked at market estimates
11  with respect to severity rates going forward.
12     Q.   What services were those?
13     A.   I don't recall referring to a service.
14     Q.   Did you use any third-party research in
15  determining severity rates?
16     A.   We -- my team reviewed third-party
17  research, yes.
18     Q.   Whose research?
19     A.   I can't tell you all the -- all the
20  research they looked into, but they looked at all
21  the available market research.
22     Q.   Did you consider housing price
23  appreciation?
24     A.   Yes.
25     Q.   And how did you do that?

Page 232

1        Pfeiffer - Confidential
2     A.   That would impact your severity rates.
3     Q.   And what about occupancy rates?
4     A.   We considered occupancy rates in the
5  same way.
6     Q.   And what about loan-to-value
7  information?
8     A.   Of course.
9     Q.   And FICO scores?
10     A.   Of course.
11     Q.   Now, is it correct that you estimated
12  the claims to range from 409 million to 793
13  million in your report?
14        MR. KOTWICK:  Objection to form.
15        MR. KOH:  Objection.
16     A.   That's projected claims.
17     Q.   Now, is there any relationship between
18  that 409 to 794 range and your opinion as to
19  reasonableness that is set forth in your
20  conclusions, in the conclusions of your report?
21        MR. KOH:  Can I hear the question
22  again, please.
23     Q.   Sure.  Is there any relationship
24  between that 409 million to 794 million range and
25  your opinions as to reasonableness that is set

Page 233

1        Pfeiffer - Confidential
2  forth in the conclusions at the beginning of your
3  report?
4     A.   Yes.
5     Q.   And what is that relationship?
6     A.   The range of projected claims impacts
7  the total amount of the notional claims, which
8  impacts the extent to which the 47 wrapped trusts
9  will get a recovery from the rehabilitation plan.
10     Q.   Now, did you consider the range of 409
11  million to 793 million to be just unacceptably
12  wide in connection with giving an opinion as to
13  the reasonableness of the $253 million payment?
14     A.   We considered it to be an acceptable
15  range.
16     Q.   So you were able to give a range as to
17  the acceptability of the 253 million even though
18  the range of payments under the FGIC
19  rehabilitation plan was affected by that 409 to
20  793 million dollar spread; correct?
21     A.   We were able to give an opinion, yes.
22     Q.   What was that opinion?
23        MR. WEITNAUER:  Asked and answered.
24     A.   That opinion was that the commutation
25  proposal is provided by FGIC is within the range

59 (Pages 230 - 233)

Page 234

Pfeiffer - Confidential

2 of expected payments under the plan of rehab on a
3 discounted cash flow basis.
4    Q.    Now, do you see in paragraph 36 you use
5 roll rate transition matrices and it says, Based
6 off of all RFC and GMACM-issued trusts?
7    A.    I'm sorry, what paragraph is that?
8    Q.    Thirty-six.
9    A.    Okay.  What's your question?
10    Q.    All right.  You've had an opportunity
11 to look at paragraph 36?
12    A.    Yes.
13    Q.    All right.  Do you consider the RFC and
14 GMACM trusts representative of the ResCap trusts
15 at issue in this case?
16        MR. WEITNAUER:  Objection to form.
17    A.    I don't understand the question.
18    Q.    Did you do roll rate transition
19 matrices for ResCap trusts?
20        MR. WEITNAUER:  Object to form.
21    A.    We did roll rate matrices for ResCap
22 trusts, yes.
23    Q.    All of the ResCap trusts, all 47?
24    A.    No, all 392.
25    Q.    And that includes, then, the 47 that

Page 235

Pfeiffer - Confidential

2 you've been discussing earlier?
3    A.    Yes.
4        MR. KOTWICK:  I'm going to object.  I
5    think we've gone beyond the six hours.  We
6    haven't drawn a hard deadline.  I understand
7    the witness does have commitments, so I ask
8    that you try to finish the questioning.
9        MR. CHRISTENSEN:  I have to leave by 4
10    for a conference call.
11        MR. KOTWICK:  We did start early.  We
12    did agree to go six hours to accommodate you
13    guys.  I think we need to wrap up.
14        MR. GELFARB:  We'll be done very soon.
15        MR. SIDMAN:  I may have a clarification
16    question or two so...
17        MR. GELFARB:  Hold on.
18    Q.    Can I direct your attention, please, to
19 page 8 of your May 15th report.  Have you had a
20 chance to look at that?
21    A.    Yes.
22    Q.    Do you see that in the notional claims
23 under ResCap you have 80 percent of all the claims
24 within -- accruing by 2017?
25    A.    Yes.

Page 236

Pfeiffer - Confidential

2    Q.    And in the high case you have 74
3 percent accruing by 2017?
4    A.    Yes.
5    Q.    All right.  And do you see that under
6 the notional claims Lazard has it at 23 percent
7 for up to 2017 for the base and 17 percent for the
8 stress?  Do you see that?
9    A.    Yes.
10    Q.    Can you tell me why there's such --
11 apparently such a difference in the amount of
12 cumulative claims for your work versus Lazard's
13 work?
14    A.    Because you're comparing apples to
15 oranges.  The numbers on the bottom are claims,
16 and therefore, you know, it starts at 65, goes to
17 80, and necessarily has to go to 100; right?
18    Q.    Yes.
19    A.    The numbers you looked at before,
20 Lazard, that's not percent of claims received;
21 rather that is the CPP.  So as you know, as you
22 likely know, the CPP starts at 17.25.  That's why
23 it says 17 percent.
24        And under the base case it's projected
25 to go up to 38.5, I believe.  That's why it says

Page 237

Pfeiffer - Confidential

2 39 percent there.  And under the stress scenario
3 it starts at 17.  Pretty much the CPP remains at
4 17, bumps up a little bit to 20 at the end.
5        But it's not -- it's not -- you can't
6 compare -- your question didn't make any sense to
7 me.
8    Q.    All right.  Well, that's fine.
9        Now, in paragraph 48 you say that --
10 you seem to raise a fear or a concern that the
11 policyholders will stop paying premiums; is that
12 correct?
13    A.    I wouldn't call it a fear or concern; I
14 would say it's one of the uncertainties that's
15 mentioned.
16    Q.    Okay.  Do you know whether the
17 rehabilitation plan actually prohibits the
18 offsetting of premium payments?
19    A.    I think that's actually listed in the
20 actual paragraph.  It says, The plan prohibits the
21 exercise of rights to set off premiums,
22 reimbursements, and other amounts against the
23 policy.
24    Q.    So why do you consider that a risk?  If
25 the agreement which is being so ordered by a court

60 (Pages 234 - 237)

Page 238

Pfeiffer - Confidential
1          Pfeiffer - Confidential
2 and entered by a court prohibits the setoff, why
3 do you raise that as an issue with respect to
4 determining whether the commutation payment is
5 reasonable?
6     A.   Well --
7          MR. KOH:  Objection.
8          Go ahead.
9     A.   Well, even Lazard readily incorporates
10 a 10 percent reduction to the expected premium
11 streams.  And it's certainly fair to be concerned
12 that the 10 percent might go higher.  These are
13 policyholders that are not -- that are paying
14 premiums for -- to FGIC even though FGIC is not
15 performing under the plan -- not performing.
16          And therefore, to the extent that the
17 premiums exceed the amount that a policyholder
18 expects to receive, I think there's certainly a
19 risk that the premiums will stop being paid.
20     Q.   All right.  Notwithstanding that may
21 violate a court order?
22          MR. KOH:  Objection.
23     A.   Notwithstanding --
24          MR. KOH:  Go ahead and answer.
25     A.   Yes.

Page 239

1          Pfeiffer - Confidential
2     Q.   Do you think that that possibility has
3 been incorporated into the discount rates that
4 Lazard was using --
5          MR. KOH:  Objection.
6          MR. KOTWICK:  Objection.
7     Q.   -- in the FGIC rehabilitation plan?
8     A.   I think all the uncertainties are part
9 of the consideration and factors that are -- that
10 are a basis for assessing a discount rate.
11     Q.   Okay.  So do you consider these risks
12 to be something to be concerned about above and
13 beyond what's incorporated within the discount
14 rates that either you or Lazard applied to the
15 FGIC rehabilitation plan?
16          MR. KOTWICK:  Objection to form.
17          MR. KOH:  Objection.
18     A.   I think these considerations speak to
19 the appropriateness of a discount rate.  The
20 uncertainties speak to the appropriateness of a
21 discount rate, the uncertainty of the cash flow.
22 And to the extent that it is possible that the
23 cash flows themselves are also going to be
24 drastically different, as you see in the stress
25 case, I think that the discount rate does not

Page 240

1          Pfeiffer - Confidential
2 capture that.
3          MR. KOH:  All right.  We've allowed --
4          MR. GELFARB:  That's fine.  I will pass
5 to my colleague, who I think may have
6 disappeared.
7          MR. KOH:  Why don't you give us two
8 minutes.  I don't know if Mr. Sidman is going
9 to have any questions or not.  Let's establish
10 that.  Thank you for wrapping up.  I know both
11 the witness and I have appointments that we're
12 running late for.
13          (Pause.)
14 EXAMINATION BY
15 MR. SIDMAN:
16     Q.   Mr. Pfeiffer, earlier today you were
17 testifying with respect to information that you
18 received from FGIC and Lazard in connection with a
19 meeting you had with them.  Do you recall that
20 testimony?
21     A.   Yes.
22     Q.   In connection with your meetings -- not
23 focusing on FGIC, we're just focusing on Lazard.
24 In connection with your meetings with Lazard or
25 your team's meetings with Lazard, did you -- do

Page 241

1          Pfeiffer - Confidential
2 you recall or do you know if you or Duff received
3 any nonpublic information from Lazard in those
4 meetings?
5          MR. BAIO:  Object to the form.
6     A.   I don't recall any specific
7 confidential information that we received from
8 Lazard in particular.
9     Q.   So sitting here now you can't identify
10 any confidential information received by Lazard?
11          MR. BAIO:  Object to the form.
12     A.   That's correct.  Lazard helped us
13 understand the plan, and with that kind of access
14 we had to Lazard, the descriptions we assumed to
15 be confidential.  But I don't recall them
16 providing any specific information.
17          MR. SIDMAN:  Thank you.
18          MR. BAIO:  No questions.
19          MR. KOH:  Thank you.  This
20 deposition --
21          MR. GELFARB:  Hold on.
22          (Discussion off the record.)
23 EXAMINATION CONTINUED BY
24 MR. GELFARB:
25     Q.   Did you just discuss with any counsel

61 (Pages 238 - 241)

Page 242

1                Pfeiffer - Confidential
2  the issue of the disclosure of public information
3  during the break?  Excuse me, the disclosure of --
4  other than with this counsel, Mr. Hao, did you
5  discuss with any counsel other than Mr. Hao --
6           MR. KOH:  Koh.
7        Q.    -- the issue of the disclosure of
8  nonpublic information to you by either Lazard or
9  FGIC?
10       A.    I had -- I had conversations with
11  Mr. Koh.
12       Q.    Only with Mr. Koh?
13       A.    Well, Mr. -- Mr. Sidman was there as
14  well.  And my response, although very quick, was
15  consistent with what I just described on the
16  record.
17       Q.    And what did you advise Mr. Koh and
18  Mr. Sidman?
19       A.    I just hold you that I had said exactly
20  what I said on the record, was that I didn't -- I
21  don't recall anything specific that I received
22  from Lazard.
23       Q.    And what did they say to you before you
24  told them that?
25           MR. KOH:  Objection.

Page 243

1                Pfeiffer - Confidential
2           MR. SIDMAN:  Objection.
3        A.    They simply asked if there's a -- if I
4  recall conversations with Lazard separate from
5  FGIC and whether I think that Lazard as opposed to
6  FGIC provided confidential information.
7        Q.    And did Lazard ever throughout the
8  course of your engagement as a financial advisor,
9  as an expert, convey to you what you deemed to be
10  nonpublic information?
11           MR. KOTWICK:  Objection, asked and
12       answered.
13       A.    I think, as I said earlier, they helped
14  us to understand the plan and other than that they
15  did not convey to us anything specifically marked
16  confidential that I recall.
17           (Continued on following page.)
18
19
20
21
22
23
24
25

Page 244

1                Pfeiffer - Confidential
2           MR. GELFARB:  All right.  Nothing
3  further.  Thank you.
4           MR. KOH:  Does anybody else have
5  anything?  Then this deposition is concluded.
6           (Time noted:  4:06 p.m.)
7
8  _____
9       ALLEN M. PFEIFFER
10
11  Subscribed and affirmed to before me
12  this ____ day of _____, 2013.
13
14  _____
15       Notary Public
16
17
18
19
20
21
22
23
24
25

Page 245

1
2           C E R T I F I C A T E
3  STATE OF NEW YORK    )
4                       : ss.
5  COUNTY OF NEW YORK   )
6
7        I, LAURIE A. COLLINS, a Registered
8  Professional Reporter and Notary Public within
9  and for the State of New York, do hereby
10  certify:
11       That ALLEN M. PFEIFFER, the witness
12  whose deposition is hereinbefore set forth,
13  affirmed to tell the truth and that such
14  deposition is a true record of the testimony
15  given by the witness.
16       I further certify that I am not related
17  to any of the parties to this action by blood
18  or marriage, and that I am in no way
19  interested in the outcome of this matter.
20       IN WITNESS WHEREOF, I have hereunto set
21  my hand this 24th day of July, 2013.
22
23  _____
24       LAURIE A. COLLINS, RPR
25

62 (Pages 242 - 245)

Page 246

1
2  - - - - - - - - - - I N D E X - - - - - - - - - -
3
4  WITNESS:          EXAMINATION BY:        PAGE
5  Allen M.        Mr. Baio                7
6  Pfeiffer        Mr. Gelfarb          211,
7                              241
8              Mr. Sidman           240
9
10  - - - - - - - - - - - - - - - - - - - EXHIBITS - - - - - - - - - - - - - - - - - -
11  PFEIFFER NO.        DESCRIPTION          PAGE
12
13  Exhibit 1, expert report of Pfeiffer      9
14  Exhibit 2, e-mail from D&P to Travers,    77
15  Bates-stamped DUFF-MS 00001 to 00002
16  Exhibit 3, chart                107
17  Exhibit 4, reported decision in        138
18  Celebrity Cruises, Inc.
19  Exhibit 5, FGIC financial statements as   190
20  of 3/31/13, Bates-stamped PFEIFFER 400
21  to PFEIFFER 437
22  Exhibit 6, expert report of Goldstein    207
23  Exhibit 7, draft presentation        216
24
25

Page 247

1
2        ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS
3        1250 Broadway
        New York, New York 10001
4        (212) 279-9424
5  CASE:  IN RE RESIDENTIAL CAPITAL
  DEPOSITION DATE:  July 24, 2013
6  DEPONENT:  Allen M. Pfeiffer
7  PAGE/LINE(S)/   CHANGE        REASON
8  ____/_____/_____/_____
9  ____/_____/_____/_____
10  ____/_____/_____/_____
11  ____/_____/_____/_____
12  ____/_____/_____/_____
13  ____/_____/_____/_____
14  ____/_____/_____/_____
15  ____/_____/_____/_____
16  ____/_____/_____/_____
17  ____/_____/_____/_____
18  ____/_____/_____/_____
19  ____/_____/_____/_____
20
  _____
21      ALLEN M. PFEIFFER
22
  SUBSCRIBED AND AFFIRMED BEFORE ME
23  THIS _____ DAY OF _____, 2013.
24
  _____  _____
25  (NOTARY PUBLIC)  MY COMMISSION EXPIRES:

63 (Pages 246 - 247)

**[& - 2013]**                                                              Page 1

| & |
|---|
| **&**  1:17 2:4,17 3:13 4:4 5:4,11 6:4,11,12 7:11,24 8:5,8,10,12 8:14,16,17 9:22 10:14,15,18,18 11:23 12:12 27:20 27:24 29:22 30:16 33:10 37:5,17 38:14 43:17,19 44:4 77:11 103:4 133:2,9 219:13 |

| 0 |
|---|
| **00001**  76:24 77:3 246:15 |
| **00002**  76:24 77:3 246:15 |
| **02199-3600**  5:16 |
| **04**  229:6 |
| **05**  229:7 |

| 1 |
|---|
| **1**  9:7,9,12,20 10:4 10:10 15:12 16:22 18:3 26:17 27:14 30:10,13 38:25 42:25 58:11,12,18 60:2,3 62:14 81:7 89:9 96:21 102:13 103:14 145:11 176:5 177:10 192:2 192:2,10 193:23 196:2 221:11 246:13 |
| **1.85**  55:7 59:11 |
| **10**  52:3,8 87:25 88:15 89:16 90:9 96:10 97:5,14 120:25 174:12 186:14 188:3 201:5 201:6,10,13 238:10 238:12 |
| **100**  236:17 |

**10001**  247:3
**10004**  3:17
**10017**  6:15
**10017-6702**  4:17
**10019-6099**  2:9
**10036**  4:8 5:23
**10036-6797**  3:9
**10104-0050**  5:7
**10168**  6:7
**1058632**  194:19
**107**  246:16
**1095**  3:8
**10:21**  74:10
**11**  1:6 138:24
**1177**  4:7
**11:16**  112:5
**11:34**  112:5
**12**  151:7 177:9 179:5,7,8 218:3
**12-12020**  1:5
**1201**  2:20
**122**  6:6
**1250**  247:3
**1290**  5:6
**12:26**  144:16
**12th**  137:22
**13**  102:8 138:8 141:2 158:21
**135.5**  103:17
**136**  66:9 72:7,23
**136.1**  65:20 70:24 71:6,13,25 72:13
**137**  69:8,18
**137.1**  67:24 68:9,16 70:6
**138**  246:17
**13th**  11:16,18 12:4 13:17,25 14:10,25 15:17 26:19
**14**  30:11,13 31:22 38:24 39:18 140:18 141:8,25 168:4
**140**  6:14 186:4
**14th**  15:17

**15**  46:18 51:19,24 51:25 52:7 53:10,20 69:5,9 71:20,23 73:8,12,14 131:15 131:19
**150**  184:23 185:3,9 185:12 186:6,12,15 186:25
**15th**  9:23 10:7,24 11:2,4,6,12,15 14:11,25 15:8,10 17:2,7,19 18:2 22:22 25:7 34:21 37:24 43:21 58:9 102:13 118:12 119:5,8 131:10,21 132:6 153:25 154:3 154:12 155:3 172:5 180:11,13 195:22 195:23 198:10 217:22 235:19
**16**  104:5 196:19 221:22
**16.25**  46:8
**160**  185:13,20 186:2 186:16 187:18,21 189:15
**169**  137:21
**16h**  60:24
**17**  55:14 57:7 173:24 196:21 228:21 236:7,23 237:3,4
**17.25**  44:23 46:7 54:13 65:17
**17.25.**  236:22
**170**  185:20
**173**  199:3
**18**  173:24 175:22 180:14,15 188:5 221:4 228:22
**18.25.**  46:8
**180**  185:20
**19**  175:23 176:14 206:15 217:8,14

**190**  179:3 182:16 183:4,9,16,18 184:3 184:9,15 185:20 186:3 189:3,15,19 219:4 246:19
**195**  179:23
**19th**  6:14 9:14 75:2 158:20
**1:14**  145:3

| 2 |
|---|
| **2**  6:13 76:25 77:2,6 93:18 112:24 173:2 246:14 |
| **2.1**  126:19 127:6 |
| **20**  52:3,8 89:9,19 96:10 97:5 174:13 217:8,14 226:11 237:4 |
| **200**  117:23 118:3 185:20 |
| **2003**  28:16 |
| **2004**  229:11 |
| **2005**  229:11 |
| **2006**  137:22 229:12 |
| **2007**  229:13 |
| **2012**  55:6 56:6 60:24 64:4 198:17 198:20 203:20 |
| **2013**  1:13 9:14,23 10:7 14:12 17:12 19:11,16 23:21 24:6 24:23 28:4 29:21,24 30:8 34:21 37:12,12 61:15 63:6,9 64:14 65:19 75:2 77:16 95:13 101:22 102:9 108:3 114:4 120:4 131:15,19,22 132:6 135:6 172:5 190:12 190:20 195:22 199:2 216:19 244:12 245:21 247:5,23 |

**[2017 - 6]**                                                                    Page 2

**2017**   199:2 235:24
  236:3,7
**207**   246:22
**21**   215:18,24,25
  216:6
**21.4**   215:19
**2100**   6:6
**211**   246:6
**212**   247:4
**215**   110:17,18
**216**   246:23
**217**   176:10
**22**   175:23,23 176:14
  221:16
**220**   217:10
**222**   4:16
**225**   72:7 103:16
**225.8**   70:10 71:6,25
  72:13 73:5,18
**23**   104:5 106:9
  175:22 221:22
  236:6
**23rd**   154:4
**24**   1:13 107:7
  175:23 176:15
  229:10,10 247:5
**240**   181:21 182:4
  183:3 184:21 219:4
  246:8
**241**   246:7
**243**   226:18
**24th**   245:21
**25**   173:18
**25.3**   177:17
**253**   28:9 118:15
  128:6 167:15 179:9
  179:14 181:5
  182:14 183:24
  184:22 187:11
  209:21,24 220:19
  221:4 225:12 226:8
  226:16 233:13,17
**253.3**   18:24 151:20
  164:21 166:16
  171:11,24 172:4

**178:2** 218:5,11,15
  219:3,15 220:23
**253.3.**   218:21
**25th**   56:6
**26**   121:3 135:5
  174:5 176:6,18
**263**   226:16
**26th**   120:4
**27**   55:12 60:22,23
  174:11,19 175:8
  215:21
**270**   62:14
**271**   26:8 221:4
**271.6**   110:17
**279-9424**   247:4
**28**   175:21,23,24
  176:2,5,7,15 209:5
  221:13
**28.5**   46:16 51:22
  53:12,19 54:13
**283**   226:17
**285**   217:10
**29**   175:21 191:10,11
  191:17,19 207:19
  207:22 221:17
**292**   126:12
**2:04**   177:8
**2:13**   177:8
**2:56**   207:6
**2d**   137:21

**3**

**3**   9:21 10:9 15:12
  16:22 26:22 27:14
  42:24 102:12
  106:25 107:10,22
  107:24,25 109:10
  119:2 120:5 171:5
  178:19,25 179:13
  179:13,25 180:4,5
  181:15,16 188:24
  218:16,17,23
  220:18 246:16
**3.25**   86:18,20,20
  87:5,11,15

**3/26/13**   108:21
**3/31/13**   63:2,15
  190:5 246:20
**30**   89:19 174:12,20
  175:8 192:16
  215:21 230:25
**30309-3424**   2:21
**31**   176:22
**31st**   61:15 63:5,9
  64:14 65:18 190:12
  190:19 203:19
**330**   179:23
**34**   196:20 197:13
  199:8 227:2
**340**   176:11 179:3
  189:4,20
**343**   61:23
**344**   61:8,23 62:3
**35**   196:22 228:3
  230:3
**36**   110:2,13,15
  199:9,21 234:4,11
**37**   200:9 201:8
**38.5**   236:25
**39**   202:15,22 237:2
**392**   201:20 234:24
**3:03**   207:6

**4**

**4**   138:4,5 191:23
  229:10 235:9
  246:17
**40**   47:3,3 89:19
  102:17 103:11,13
  103:13,14,18 104:2
  104:7 105:5,10,16
  105:18,24 106:11
  199:8 221:20 225:5
  225:11,16,20,23
  226:2,6,23 230:25
**400**   190:3,6 246:20
**409**   203:16 232:12
  232:18,24 233:10
  233:19

**41st**   4:16
**42nd**   6:6
**430**   191:20
**434**   137:21
**437**   190:3,6 246:21
**45**   224:11
**45th**   6:14
**47**   63:20 64:2,14
  66:11,20 68:6,25
  70:23 71:12 72:25
  73:7 122:16,22
  125:4 132:16
  154:20 202:2,7
  227:9 228:13 233:8
  234:23,25
**47th**   5:22
**48**   237:9
**481**   64:12,15
**49**   93:12
**4:06**   244:6

**5**

**5**   18:2 19:13,14
  22:22 27:13 35:5
  42:24 43:4,8,21
  44:8,12 51:13,17
  58:8 64:8 75:20
  80:24 81:2 102:12
  109:9 118:11 172:5
  190:4,8 246:19
**51**   94:3,12
**52**   204:14
**53**   204:16
**56.6**   110:17
**58**   192:2,10 193:23
  194:4
**59**   121:4 130:4
  131:2,4,14 136:3
**597**   28:11
**597.3**   110:15
**5th**   216:18

**6**

**6**   207:8,10,12 229:9
  246:22

**[60 - affirmed]**                                                                           Page 3

**60**  103:14,14,16,16
    105:16,18
**632**  192:3,10 194:4
**632,000**  192:13
**65**  198:12 199:4
    236:16
**6th**  15:15,19 16:5,9
    37:24 38:9 216:19

**7**

**7**  151:7 158:21
    196:18 212:18,23
    213:14 216:11,14
    216:16 217:3 218:3
    246:5,23
**74**  236:2
**753**  198:18,20
**767**  1:18
**77**  246:14
**787**  2:8
**789**  63:6,14 64:5,6
    65:17 198:21
**793**  203:17 232:12
    233:11,20
**794**  232:18,24
**7:27**  108:21

**8**

**8**  30:10 198:6,9
    212:16,20,25
    235:19
**80**  198:12 199:4
    235:23 236:17
**800**  5:15
**850**  58:11,12,18
    60:3
**86**  198:13
**88.8**  67:12 70:6
**8:08**  1:14
**8:43**  31:16
**8:49**  31:16

**9**

**9**  145:12,13 171:5
    196:3 198:6 212:17
    212:20,25 246:13

**9019**  201:20
**92**  121:9,19 122:2
    122:25 123:7 124:9
    124:18 125:7,20
    127:3,9,13 128:9,17
    130:16,23 131:22
    131:23 132:7,18
    133:4,22 134:9
    137:14 138:16
    166:5,6 180:20,24
    181:12,18 188:9
    195:13,20
**9:58**  74:10

**a**

**a&u**  65:13 66:16
**a.m.**  1:14
**ability**  28:11 94:22
    153:22 205:23
**abiller**  2:15
**able**  92:22 135:15
    167:11 187:18
    194:23 233:16,21
**absence**  121:10,14
    121:22 123:8
    126:14 129:15
    130:21,23 181:7,7
    194:6
**absent**  122:4 166:5
**absolute**  159:3
**absorbed**  183:8
    185:2
**accept**  20:12,17,23
    21:3 142:25 153:6
**acceptability**  233:17
**acceptable**  233:14
**acceptance**  131:12
    158:23
**accepted**  27:9
    140:10
**access**  241:13
**accommodate**
    235:12
**accompanies**  132:23

**accounting**  194:22
**accretion**  35:16
    169:7
**accrued**  62:25 63:6
    63:7,9,14,22 64:3
    65:18 66:19 68:22
    106:13 162:6
    198:17
**accruing**  235:24
    236:3
**accurate**  28:16,20
    43:2 58:4 61:19,23
    64:6 65:7,9,22,23
    65:25,25 73:15
    106:18 107:2,5
    110:16 137:11
    139:5 164:20
    173:16 204:17
    208:15 209:10
**accurately**  53:24
    54:3 72:10 113:15
    146:2
**acted**  56:18,23,24
**action**  211:15
    245:17
**active**  196:23
    197:11
**activities**  208:5,8,12
    208:17
**actual**  11:15 41:17
    42:5 114:6,24
    115:17 134:2
    156:24 157:6
    237:20
**add**  70:23 71:6,12
    72:17 96:2,3 132:16
    134:10 169:11
    178:22
**added**  44:2,5 72:19
    165:6 186:15
    196:12
**adding**  72:22 201:6
**addition**  100:11
    128:9 170:25 173:8
    212:7

**additional**  44:10
    47:20 48:19 82:19
    83:24 85:9 86:15
    93:3 98:19 104:25
    111:25 116:19
    119:12,13,25 121:9
    128:16 135:2,4,10
    135:18,20 155:2
    166:25 167:9 169:5
    186:14 188:3 199:2
    201:22 205:23
    220:7 228:25 229:8
**additions**  43:16
**address**  187:18
**addressed**  23:17
**addressing**  60:15
**adequately**  172:24
**adina**  4:9 8:24
**adjusted**  36:4
    141:18
**adjustment**  95:24
    96:5
**adjustments**  35:15
    137:12 138:14
**administered**  1:6
**administrative**  57:9
**admitted**  142:17
**advance**  77:13
    230:8,12,14
**advanced**  114:21
**advice**  226:22
**advise**  149:18
    150:20 242:17
**advised**  125:9
**advising**  122:18
    124:22
**advisor**  168:4
    226:22 243:8
**advisors**  29:23
    30:16 37:19 41:23
    42:16
**affidavit**  113:14
    194:12,13 214:11
**affirmed**  7:3 145:7
    244:11 245:13

[affirmed - anybody]    Page 4

247:22
**afternoon** 76:3
211:8,9
**agenda** 34:13
**aggregate** 174:9
175:3,4
**ago** 25:10 178:18
212:8
**agree** 63:24 75:3
153:5,18 154:11
155:9 235:12
**agreed** 75:3 195:10
**agreeing** 21:10
153:14,15
**agreement** 18:11
100:19 101:8 104:9
119:20 121:7 122:5
123:2,9,18 124:4
125:6 126:15,15,24
127:9,16,24,25
128:5,11,15,18
129:6,8,20,25
132:14 135:8,9
136:22 145:17
146:15 149:5,9
150:21 153:6,16,18
154:4,6,11,17,18,20
155:9,18 157:13
159:8,20 160:6,9,16
160:25 161:10,19
161:20 162:2,11,13
163:5,8,12,13,15,15
163:20 164:17
165:13,20,21 166:4
166:8,14 167:19,23
180:22 181:8
189:10 194:7
195:10 237:25
**agreements** 94:6,14
112:16 161:21
**ahead** 8:22 34:2,10
49:9 82:3,7,18
126:3 127:19
180:10 216:22
218:13 225:2 238:8

238:24
**aided** 229:21
**al** 1:6
**alevine** 4:10
**alice** 13:13 78:12
**alleged** 114:18,21,23
114:25
**alleges** 114:15
**allen** 1:16 7:9 9:8
74:25 96:22 138:10
244:9 245:11 246:5
247:6,21
**allied** 126:18 127:6
**allocation** 122:17,21
123:24 131:25
132:12
**allow** 29:2 43:17
80:4 93:2 112:20
223:8
**allowed** 28:12
109:25 126:21
231:4 240:3
**allows** 103:17 188:7
**alston** 2:17 8:14
**alston.com** 2:23
**alternative** 125:10
219:10
**alters** 75:24
**amended** 56:9
**americas** 3:8 4:7 5:6
**amount** 18:23 65:20
66:2,18 67:23 87:8
88:11 89:22 94:7,8
110:13 114:12,20
114:23 116:10,22
117:7,19 122:3,5
123:8 124:10,19,22
125:21 126:14
127:4,11 130:10
138:24 148:19
151:20 156:6,8
163:3,4 164:21
166:17 169:7
171:10,24 172:4
177:16,23 178:2,16

179:17 182:24
184:2 194:4,19
198:18,23 203:9,16
215:6 217:6 221:8
221:15 223:6 233:7
236:11 238:17
**amounts** 63:23 64:3
88:11 95:23 98:5
106:8 113:4,18
120:9 122:17 124:3
135:16 162:7 174:2
176:10,12 178:19
193:13 203:11
237:22
**analyses** 25:15 52:4
80:22 185:2 197:16
197:24
**analysis** 11:10 17:5
23:20,25 24:12,15
25:7,11 26:4,7,11
26:13 27:23 30:19
31:2,20 34:16 37:11
39:3,10 42:22 45:19
46:6,9 60:10 68:16
81:6 95:14 96:20
105:22 106:6,10,21
115:6 123:25
124:24 138:21,23
139:6,9 140:19
141:3,21,24 142:3
142:15 143:7 144:2
144:5,9 147:5
153:13 154:13
155:2 156:4,11,16
157:7 159:9 168:9
168:24 169:21
170:19 172:9
173:12 175:9
180:18,25 181:4,19
181:20 183:17
187:3 188:21,23
196:16 197:12
198:4 202:6,21
203:15 204:8 206:7
206:9 210:13

214:24 215:16,24
216:5 217:23 222:8
224:15,17,21
**analytical** 217:17
**analyze** 228:13
**analyzed** 24:9,25
123:16 203:11
228:15 229:16
**analyzing** 89:22
206:22
**andrew** 5:17 8:5
**andrew.devore** 5:18
**annual** 86:18 87:4,8
196:11
**answer** 18:4 21:22
22:12 23:4,22 25:20
29:14,17,18 39:24
60:5 73:17 80:4,5
80:12 81:15,16
82:18 96:24 97:2
99:4 100:4 102:2
108:14 111:3
112:14,20 129:14
149:23 150:8
160:23 164:6 165:3
183:2 186:2,2,3
187:6,16 215:14
216:22 225:2
238:24
**answered** 39:12
43:6 111:12,19
125:25 126:4
129:12,13 131:7
132:21 133:8
134:17 164:5 165:8
184:9 186:21
233:23 243:12
**answering** 41:14
161:17
**answers** 39:21 79:10
79:13
**anticipated** 186:9
**anybody** 28:23
244:4

apologize  15:3
  171:16
apparently  236:11
appeal  143:10
appealed  143:13
appear  22:21 23:8
  27:4 80:23
appeared  33:23
appears  16:21 17:7
  18:3 27:7 43:3,8
  51:17 79:21 81:6
  108:20 176:6
apples  236:14
applicable  122:16
applied  105:2
  168:23 202:16
  203:5 239:14
applies  202:22
apply  201:4
applying  103:25
appointments
  240:11
appraisals  192:25
appreciate  177:7
  183:18
appreciated  42:3
appreciation  231:23
appropriate  42:2
  68:10 98:18 121:22
  193:11 204:18
  205:13
appropriateness
  239:19,20
approval  56:4 95:4
  95:8 123:10 126:14
approved  94:18,18
  95:3 128:19,23
  162:13 163:20,21
  164:17 166:14,15
approximated  64:15
approximately  28:9
  28:11 47:3 117:23
  118:15 125:7
  128:17 132:18
  137:14 138:16

151:20 177:17
  178:2 180:15
  185:12 186:11
  215:25
april  18:10 77:16,25
  93:23 95:13 101:22
  102:8 114:4 119:24
arbitration  193:10
  193:20 212:8
  213:15
arbitrations  213:17
argumentative
  130:13
aris  212:12,23
  213:21
arithmetic  132:16
arm  228:23 229:4
  229:11,11,12,13
arms  229:3
arrive  62:10 63:17
  64:25 132:17
  133:21 147:22,22
  175:2 188:23 200:7
  201:3 221:9
arrived  52:2,7 60:2
  62:17 63:13,19 64:4
  65:3 147:22 156:20
  204:4
arthur  2:14 7:21
articulate  103:5
aside  218:24
asked  14:4,8 39:11
  40:3,16 43:5 69:20
  75:19 105:11
  110:10 111:11,19
  112:7 125:24 126:5
  129:12 131:7 133:7
  134:16 149:4,8
  153:12,19,21
  156:20 159:22
  165:3 181:25 183:3
  186:20 226:2
  233:23 243:3,11
asking  21:15 38:12
  45:23,24 76:17

99:17 125:17 134:8
  150:18,19 163:18
  191:17 202:11
aspect  138:21,23
assert  28:11
asserts  143:4
assess  113:15 137:5
  139:16 145:14
  149:4 183:4
assessed  106:7
assessing  239:10
assessment  65:10
  157:8 209:21,24
  210:13 215:3
  218:15 225:13
assets  212:10
assignment  56:15
  145:14 146:3,11
  149:16
associated  18:18
  33:3 43:25 59:12
  70:19 72:8 83:25
  85:13 86:16,19 88:6
  88:22,23 91:12 93:4
  97:17,24 114:18
  137:6 146:15 147:3
  148:17,23 151:22
  152:12 154:18
  156:24 157:2 162:8
  166:11 177:19
  178:4 180:21
  187:12 188:2 189:5
  189:13 190:18
  205:24 220:21
association  114:24
assume  84:24 143:9
  162:12 163:24
  164:16
assumed  95:2
  106:22 203:8,10
  241:14
assumes  86:18
  92:21
assuming  46:18
  71:20 116:5 166:13

assumption  41:19
  41:21 44:21 45:5,8
  45:15,20,25 46:3
  47:12 51:14,16
  81:10 82:22 83:18
  88:2,15,20,22,24
  89:17 90:10 102:15
  103:5,21,25 105:23
assumptions  23:7
  35:19 41:4,4,16
  44:15,18,18 45:13
  47:5,19 54:12,16
  73:6 79:16 123:24
  124:16 126:10,16
  126:18,25 127:7
  139:25 140:3,9,12
  147:19 148:9
  154:25 199:14,16
  199:18 200:24
  201:5,7,9 202:16,20
  202:23 203:4,9
  227:25 228:7,12
atlanta  2:21
atlantic  2:19
attached  109:2
  133:11 196:2
attachment  9:21
  10:9 15:12 16:22
  19:9,10,15 27:14
  42:24 102:12
  106:25 109:10
  171:5 179:13 180:5
  188:24 218:17
attempt  57:5 115:4
  174:25
attempted  204:17
attend  79:8
attended  12:23
attention  30:12
  145:12 206:20
  208:13 235:18
attorney  99:10,20
attorneys  2:5,18 3:5
  3:14 4:5,14 5:5,12
  5:21 6:5,12 76:7

143:10,12
**attributable** 138:25
**au** 62:25 70:4
**available** 20:5 42:2
86:21 101:3 115:22
134:14 173:13
188:19 225:10
231:21
**avenue** 1:18 2:8 3:8
4:7 5:6
**average** 104:18
142:15 206:6
**avoid** 165:7
**avoided** 76:8
**aware** 15:14 117:11
117:17 118:5
192:16

**b**

**b** 6:8 43:15 46:15
**back** 9:19 20:10
22:2 27:13 31:17
38:24 42:24 51:13
58:8 63:20 76:5
93:18 95:10 101:17
102:12 118:11
121:15 134:25
175:2 177:9 210:14
219:20
**backed** 156:22,23
157:7 211:17,20
213:19
**background** 171:6
171:20
**backwards** 177:11
**baio** 2:10 7:7,12,14
8:18,22 9:2,4 20:14
21:2,14 22:2,14,17
29:10 31:8,14,17
32:2 33:17,21 53:16
74:9 76:4,10,15,21
80:15,18 81:15,20
99:7,17,24 101:5
107:9,15,19 109:19
112:2,22 129:18

137:16,21 138:3
144:14 145:10
177:4,24 189:24
191:20 195:24
202:11 207:3,7
210:25 218:4 241:5
241:11,18 246:5
**baked** 83:20,22
**balance** 190:16
196:23 197:10
**bank** 3:5 8:11,13
12:16,17
**bankruptcy** 1:2
193:9,19
**barry** 6:20 7:19
**base** 35:17 46:15,17
46:22,25 47:4,4,23
48:5,23 49:6,14,18
50:9,10,15,16,19,20
51:14,18,22 53:11
54:13 66:17 67:24
68:11,17 70:4,5
79:16 81:10,24
82:10,20 84:11
92:16 106:12,14
147:17 148:16
152:14 165:16
174:25 181:6 201:9
218:23 236:7,24
**based** 20:20 21:24
30:14,21 38:25
42:13 44:14,23
46:16 51:17,18,23
53:20 61:18 66:12
68:23 69:2,8 71:5
73:4 133:20 143:2
166:3 168:11
172:12 180:22
182:17 183:6
184:14,25 186:17
188:17 194:14,16
199:14,16 200:18
200:19,23 203:15
204:8 214:21
221:10 227:19

231:5 234:5
**basically** 156:21
208:18 222:17
**basis** 20:25 42:11
60:25 72:3 74:17
99:7 103:20 125:16
168:21 169:21
170:19 176:15,16
190:22 191:3
193:23 196:11
198:5 202:24 203:5
206:11 223:24,25
224:10 225:3,4
234:3 239:10
**bates** 76:24 77:3
190:2,5 191:19,20
246:15,20
**battery** 3:16
**bayview** 2:6
**bears** 9:21
**beginning** 60:25
61:16 77:16 178:9
196:20 233:2
**behalf** 8:11,13,17
134:22 213:3,3
**belabor** 101:5
171:13
**belief** 42:11,13
**believe** 14:2 15:15
15:21 16:24 17:4,9
25:14 28:6 33:7,15
33:20 38:5,6,20
41:10,13 42:8 43:13
49:13,17 50:14 53:3
53:10,23 54:3 56:23
56:24 57:4 58:4,9
58:20 59:17 60:4
61:3,19 62:16 65:3
65:7,8,22,23 67:2,7
67:14,19 69:10,15
75:5 90:12,15,24
98:17 100:6,18
104:4 108:7 119:6
120:24 128:4
143:13,13 154:4

174:19 197:20,22
207:21 209:23
210:11 214:2
215:12,15,21
216:18,24 236:25
**believed** 84:12
87:14 89:16 90:8,9
97:4 125:9,10
152:24
**believes** 50:21 94:6
**beneath** 44:22 79:20
**beneficiary** 195:8
**benefit** 26:23,25
27:5 92:9 131:11,12
135:18 154:18
180:13,20
**benefits** 135:21
146:14 147:3,25
148:10,10,11
149:19 152:12
179:14 180:5,8
183:18 187:11
188:5 189:8 220:8
220:10,20
**best** 149:5,9,15,21
150:2,9,12,17,21
151:4
**beta** 206:21
**better** 35:14,24 36:2
36:8 43:18 82:8
218:2 226:11,16,17
**betts** 137:10
**beyond** 93:14
104:24 128:10
185:25 235:5
239:13
**biggest** 127:7
**biller** 2:14 7:21,21
**billion** 55:7 58:12
58:18 60:3 62:14
115:2 126:19 127:6
192:2,10 193:23
194:4 208:4 209:8
**bird** 2:17 8:15

**bit** 136:10 168:6
237:4
**blanket** 228:7
**blood** 245:17
**bordered** 219:4,16
**borne** 140:21 141:5
141:13
**boston** 5:16
**bottom** 108:20
109:12 118:13
180:4 201:5 212:25
236:15
**bound** 32:6 220:5
**box** 176:8,10 217:11
**boylston** 5:15
**brand** 139:2
**breach** 193:14
**breaches** 192:23
**break** 31:11,13,14
74:9 100:24 101:3
101:17 102:4 112:3
123:3 144:15 177:2
207:3 242:3
**brendan** 13:13
78:12
**briefs** 75:20
**brings** 199:3
**broader** 39:14
**broadly** 12:20 35:2
60:8
**broadway** 247:3
**brought** 83:3
**bryant** 5:22
**built** 165:19
**bullet** 26:23 44:13
79:15,21 81:9 85:12
85:21 95:16 96:14
98:4,11,12,12 113:2
114:9 118:13
**bumps** 237:4
**bunch** 76:11 212:16
**bureau** 30:18
**business** 205:16

**c**

**c** 2:2,22 3:2,20 4:2,9
5:2 6:2 43:15 245:2
245:2
**calculate** 164:11
199:21 222:12
**calculated** 68:23
105:5 132:8 137:12
138:14,20 199:6
**calculates** 65:17
**calculation** 51:17
52:22 53:12 63:24
66:22,25 67:3 69:11
105:9 122:9 123:6
132:11,20,22 133:2
133:20,23 134:3,13
172:3 175:13,16
176:23
**calculations** 22:21
27:23,24,25 35:5
43:12 63:22 66:13
71:6 73:4,13,22
80:23 124:7 140:8
171:10,23 204:22
**calculator** 110:16
**call** 10:23 11:2
28:22 155:17
170:12 205:2,3
235:10 237:13
**called** 7:3 102:25
109:12
**calls** 130:13
**capacity** 226:21
**capital** 1:6 6:21 8:3
9:24 247:5
**capture** 240:2
**carriers** 205:5,12
**carryover** 171:5
**case** 20:2,9 21:5
35:18,18 46:15,23
46:25 47:4,5,8,16
47:23,23 48:5,6,8
48:23,24 49:6,7,14
49:14,18,19,24 50:9

50:10,11,15,16,19
50:20,21 51:6,9,14
51:18,22 53:11
54:13 66:17 67:24
68:11 70:4,5 74:17
74:19 82:14,24,25
83:2 84:4 101:9
106:12,14 112:17
118:16 136:25
137:4 138:20 139:6
139:9,15 143:3,7,18
147:16,17,18
148:16,17,22,24
152:14,15 162:23
174:25 198:11,11
198:12 201:10,10
203:17,17 212:24
212:24 213:6,21,23
220:12 222:17
234:15 236:2,24
239:25 247:5
**cases** 147:16 193:10
193:19 196:7
211:15 212:20
213:8,16
**cash** 28:9 44:22 48:9
65:13 70:18 71:24
72:24 86:21 93:4
97:15,17,24 98:3
115:18,22 118:14
118:18 148:18,19
148:20,23 151:21
152:13 169:16
176:23 177:18
178:4 180:3 181:5
181:13 188:10,12
188:14,17,18 189:5
189:6,13 190:17
194:11 200:10
204:19 205:23,23
210:4 220:16 223:9
230:18,20 234:3
239:21,23
**categories** 139:3
228:22 229:2,3

**category** 115:15
191:23
**causes** 55:21 56:10
**cdr** 200:23 228:8,18
**cds** 94:14
**celebrity** 136:25
137:7,10,13,18
138:6,15 139:22
143:3 246:18
**cent** 215:25
**center** 2:7,19
**central** 6:13
**cents** 157:2 215:19
215:19,21 216:7
224:11
**certain** 18:8 24:22
57:10 80:20 111:22
111:22 114:16
139:3 156:6 163:3,4
167:7,8 168:18
180:12 185:15
214:23 215:15
217:14
**certainly** 97:20 99:9
106:4 122:19
238:11,18
**certainty** 159:3
**certify** 245:10,16
**cetera** 58:23 59:2
**cfo** 29:25
**challenge** 52:21,24
**chance** 89:9,10
112:18 235:20
**change** 14:25 15:9
83:19 177:2 188:15
188:20 201:24
247:7
**changed** 14:20,23
187:16
**changes** 24:10,14
176:19
**chapter** 1:6
**characterize** 51:2
**characterized** 208:7

charles 5:8 8:10 207:9
chart 54:6 60:14 64:8,8 107:11,22 176:5 191:23 198:9 246:16
chief 30:15 37:18 38:15 39:2,8,16,20 40:5,7,9
choice 142:3
chong 13:13 78:12
choose 20:17 40:21
christensen 3:20,21 8:7,7 230:3,7 235:9
circle 98:6
circles 79:19,22 81:11 85:14 86:11 91:3 93:19 95:11
circumstance 162:17 164:18 167:14
circumstances 135:16 164:19 166:6 201:16
citation 137:19
ckerr 5:9
claim 26:15 41:4,15 54:24 55:5,6 58:10 59:6,11,13,15,15,20 59:21 60:17,20 62:9 102:17 104:2 110:2 110:14 114:12,21 118:16 119:18 130:25 162:25 163:2,4,7,17 165:17 165:18,21,22,25 166:11 176:15,16 198:4,7,19,23 199:4 200:8,8 203:8,11,16 215:6 223:6,10,24 223:24 224:3,4,9
claimants 57:21
claims 18:18 28:12 35:19 42:23 47:20 60:13 61:7,12,13,15

61:20 62:9,10,13 63:2,14 64:9 65:2,4 65:13,18 66:16,19 67:23,24 68:6,11,17 68:20,24 70:3,5 82:23 104:10,11,16 104:16,18,22 105:3 106:14,15,23,24 113:21 115:18 117:12 122:14,14 122:15 130:3 131:17 132:2 160:10,17 161:2,11 161:25 162:6,9 164:12 167:17,20 174:11 175:6 180:23 188:18 192:23 193:14 196:4,11,13,14,17 196:20 201:21 202:4 203:10 208:9 208:18,21 209:2,9 215:4 220:24 221:8 221:9,11 222:2,9,13 222:17,22,24 223:2 225:13 227:4,10 232:12,16 233:6,7 235:22,23 236:6,12 236:15,20
clarification 80:21 235:15
clarifications 81:23
clarity 136:11
classified 228:10
clear 20:15 135:9 149:23 220:6
clearly 150:14 161:21
client 99:10,20
clients 149:13 201:15 220:3 227:24
close 65:25 146:18 172:14

closed 228:23
closely 205:8
closer 104:17 186:5 186:24
codes 205:2
cognizant 200:25
cohort 228:10,12,17 228:20 229:11,12 229:12,13
cohorts 228:10,16 228:24 229:5,5,6,7 229:10,15 231:10
collateral 156:24 192:25 193:2 227:7
colleague 240:5
colleagues 13:11,12 13:14 20:5 31:6 37:5,10 39:22 62:21 81:12 83:4 84:12 85:3,23 88:3 91:4 91:24 93:21 95:12 112:19 182:11
collected 89:19
collection 87:24 88:6,10,16 89:5,11 89:23
collections 88:12
collins 1:19 245:7 245:24
colon 44:15
color 228:2
columns 111:5
combination 164:19
come 18:20 48:11 101:17 180:22 183:20 198:15 204:2 222:3
comes 59:3 122:24 124:15 169:19
comfort 64:5 75:10 97:8 155:3
comfortable 91:15 148:21
comfortably 152:15

coming 200:2
comments 16:18
commission 247:25
commitments 235:7
committee 4:5 5:12
communicate 151:13
communicated 30:15,25 31:19 37:17,25 38:14 39:2 39:8,16 79:13
communicating 37:4
communication 29:21 38:8 99:13
communications 29:5 33:5 36:17,19 36:24 37:6,9,15,22 93:22 99:4,11,16
commutation 10:8 16:5 18:23 65:11 94:6,14 95:23 104:8 106:3 118:14,19 127:23 145:19,23 146:14 147:24 151:19 152:25 153:7 155:23 156:9 157:5,13 158:23 159:16 164:21 166:17 172:10 177:16 178:2 181:21 182:19 184:24 186:7 213:24 215:5,18 216:2,6 221:16 233:24 238:4
commutations 94:2 94:5,17,22 95:3
companies 142:6 143:6
company 3:6,15 4:15 206:23
comparable 142:6 143:6

compare 146:13,16
147:24 237:6
compared 26:8 46:7
106:3 182:19 215:8
215:20 217:11
comparing 142:5
143:5 236:14
comparison 143:4
147:12 215:6,22
219:10
compiling 63:21
complete 71:5
complicated 191:9
component 142:23
169:15
components 142:14
142:23 168:14,22
169:8,10,12 193:22
193:25
compounding 165:7
compute 221:7
computed 218:25
computer 27:21
concept 218:5
concern 237:10,13
concerned 189:18
238:11 239:12
concerning 99:6
171:8,18
concerns 189:20
conclude 45:7 46:10
52:18 85:23 152:17
158:22 205:20
concluded 131:25
141:21 178:18
204:12 244:5
concluding 106:20
179:18
conclusion 48:21
49:4,10 56:7,17
62:2 68:9 97:10
124:8 125:12,19,22
126:11,21 127:8
130:14 131:24
141:10 142:10

143:17 146:20
151:8,9,13,17,19
152:21 153:3,4,11
153:13,17 154:10
154:14 155:8,8,25
157:20,22 175:2
177:16,25 182:2,13
183:23 214:21
218:20
conclusions 45:11
56:16 125:13 151:7
151:11 156:21
159:24 161:16
172:17 173:11
188:23 204:4
214:19 232:20,20
233:2
conditional 200:5,6
conditions 55:22
56:11
conduct 20:6 29:2
conducted 216:5
confer 31:5 112:18
conference 11:17,19
11:21,24 26:19
170:12 225:25
235:10
confidence 97:11
confident 185:10
192:19
confidential 30:14
30:24 31:19,25 32:6
33:1 34:1,14 35:1,7
36:1 37:1,16,21
38:1,9,13,22,25
39:1,7 40:1,23 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1,15 76:1

77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
84:24 85:1,5,11
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1,22
101:1 102:1 103:1
104:1 105:1 106:1
107:1,14,20 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1,7 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1

215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1,7
241:10,15 242:1
243:1,6,16 244:1
confidentiality 21:4
32:4 74:18 75:6
80:6 100:12,19
101:8 108:16
112:16
confirmation 124:5
129:23
confirmed 117:22
117:25 128:16
163:5 165:21 210:6
confusion 125:14
conjunction 220:11
connection 24:5
29:6,6 30:25 31:20
37:10 43:20 44:7
74:15,24 76:16 80:3
80:6,23 81:17,19
86:11 88:16 91:4,8
92:12 93:21 94:5
96:20 100:13,20
109:21 112:9
113:10 127:15
132:13,14 197:17
209:3 214:6 226:3
230:9 233:12
240:18,22,24
consider 25:16 76:5
134:24 179:12
182:10,10 187:21
187:25 189:4
202:14 205:11,15
206:25 220:19
230:8,18 231:22
233:10 234:13

237:24 239:11
**consideration** 70:22
71:5,11,15 104:9
105:2 118:14 131:4
135:4 147:2 152:14
154:8 180:3 218:19
239:9
**considerations**
65:12 171:8,21
185:25 194:25
239:18
**considered** 106:4
115:11,13 154:2,5,6
155:6 184:10 219:9
220:9,10 232:4
233:14
**considering** 106:2
152:11
**considers** 148:11
**consistent** 34:11
48:10 63:22 90:18
104:3 113:13 124:3
133:22 143:14
161:19 199:6
201:14 215:4
242:15
**constituted** 172:16
**contact** 28:22 29:19
**contained** 11:6
49:18 74:22 131:4
190:14
**contemplated** 88:15
160:11,18 161:12
**content** 19:14
**context** 44:10 48:7
48:20 82:19 85:9
86:15 87:16 98:19
111:9,15,25 122:18
139:11 225:14
226:15
**continually** 203:24
**continue** 21:7 80:17
92:18,21 95:10
112:4 130:4

**continued** 3:2 4:2
5:2 6:2 145:9
241:23 243:17
**continuing** 91:6
204:3
**continuously** 123:23
**contributes** 155:7
**contributing** 126:19
**contribution** 127:6
**conversation** 35:4
35:12 36:21,23 42:4
89:15 102:10 104:6
170:11 226:5,7
**conversations** 20:3
29:23 36:15 37:2
42:13 91:5,19 95:12
170:16 171:2 173:3
242:10 243:4
**convey** 243:9,15
**conveying** 53:24
**copies** 76:11
**copy** 76:20
**corporations** 48:16
**correct** 14:11,14,21
17:20 19:4 22:23
24:7,10,23,24 25:2
25:18 26:17 28:5,24
30:2,5 36:19 40:19
44:19 45:4 46:11,14
47:12 51:19 53:7
54:12,14,18 57:16
58:15 59:7 61:4,25
62:11,12,15,18
63:25 66:3,13,23
69:22 70:10,11
71:20 72:4 78:2
80:24 81:7,8 87:22
88:17,18 89:6,25
90:7,11,16,20 93:16
93:17 95:7 105:13
106:18 107:2,3
116:2,7 117:2 119:5
128:5,25 129:9
130:5,17 131:5
132:8,9 133:13

135:24 139:3
140:15,16 141:10
141:15 142:11
143:21 144:12
147:6,7,9 148:4
149:6,7,10,11,15,16
150:3 151:3 152:2
152:18,25 153:2
159:25 162:18
163:8 170:20 172:6
172:7 173:16 174:8
174:14 175:10,18
175:19 176:2,5
180:8,11,25 182:8
183:11 184:16,19
186:22 188:15,21
189:17 195:15
197:14 200:15
202:21 203:6,18,19
204:23 205:5,6
208:14 221:20
225:3 226:11,24,25
227:4 230:21
232:11 233:20
237:12 241:12
**correction** 176:2
**correlated** 205:9
**corresponds** 63:11
**cost** 58:22 59:12
109:13 110:19
**costs** 57:10 59:4,15
59:18 117:2,8
126:22 127:5 139:2
**counsel** 7:13 11:14
11:25 12:9,11,13,14
16:14,15,15,16 19:8
19:22 29:18 30:17
44:11 78:21,22,24
79:5,23,25 99:5,6
99:10,12 100:10
112:6 125:10
134:11,20 137:10
170:4,9,17,18
211:11 216:23,25
241:25 242:4,5

**counted** 115:8
**countrywide** 114:7
114:11,17
**county** 82:14,24,25
83:2 84:4 113:21
245:5
**course** 11:8 76:15
232:8,10 243:8
**court** 1:2 20:13,21
21:9 75:10,16,19
76:2,7 139:6,9
237:25 238:2,21
**covenants** 193:3,6
**cover** 32:6
**covered** 108:15
**covering** 171:17,22
**covers** 21:4
**cpp** 34:18 35:14,25
36:4 46:7 50:12
54:13 65:13 66:3,17
66:21 68:24 70:4,20
70:24 71:13,24
72:24 84:10 94:23
106:13 116:21
168:25 169:3,5
185:11,15 186:10
222:18 236:21,22
237:3
**cpr** 200:23 228:8,13
228:15,18
**cqs** 2:6
**create** 42:20,21 93:3
217:18 229:17
**created** 74:15
229:21,22
**creates** 167:8
**creating** 228:24
229:24
**credit** 213:2,3,4
**creditors** 4:6 8:25
**critical** 101:12
**criticisms** 141:24
**cross** 21:19
**cruise** 137:7,10

[cruises - discount]                                                                                          Page 11

**cruises**  136:25 137:18 138:6 143:4 246:18
**cumulative**  199:4 236:12
**current**  122:25 124:4 155:7,8 165:20 166:4 206:4
**currently**  124:2
**cursory**  214:20,21

**d**

**d**  3:18 246:2
**d&p**  30:18 39:3,9 77:2 106:21,22 168:3,8 169:20 172:12 173:11 202:15 246:14
**d&p's**  131:15,19 172:9
**dalbert**  139:12,12
**dale**  3:20 8:7
**damage**  59:12,13,14 114:18 140:8
**damages**  137:5 139:16
**dash**  44:22 46:15
**data**  125:14 185:2 196:15 197:3 203:21
**date**  15:10 61:7,16 61:20,20 63:7 104:18 108:24 118:17 154:3 158:5 247:5
**dated**  9:13,14,23 15:8,15 25:6 34:20 56:5 60:23 75:2 108:20 172:5
**david**  6:8 7:24 211:10
**day**  4:13 8:4 9:3 223:24 244:12 245:21 247:23

**days**  11:16 20:4 74:12
**deadline**  235:6
**deal**  29:5
**debenture**  3:14 8:8
**debtors**  1:7 5:5
**december**  64:3 203:19
**dechert**  3:4 8:9
**dechert.com**  3:11
**decided**  21:8
**decision**  98:23 99:18 100:2 137:18 138:5 143:11 246:17
**declaration**  214:15
**declined**  20:11,23
**decreased**  94:23 225:17
**deducted**  59:20 62:8 138:24
**deemed**  32:5 243:9
**deeper**  80:21
**default**  199:22,23 200:6
**defense**  210:18
**define**  12:13 178:8
**defined**  12:15,15 145:23
**degree**  97:7,11
**depends**  71:14
**deponent**  247:6
**deposition**  1:16 20:18,24 31:24 76:18 212:6,16,19 212:21 213:10 214:4,7 241:20 244:5 245:12,14 247:5
**depositions**  212:3
**derivation**  55:12
**derive**  55:8
**derived**  35:6 61:25 195:14 199:5 226:6
**describe**  156:10 191:14 192:14

**described**  60:21 72:10 84:3 85:8 123:20 132:4 141:15 142:22 156:21 159:10 162:11 175:17 192:7 194:12 195:3 196:17 198:16,21 199:19 200:21,23 201:7 202:17,23 203:3 208:9 220:15 220:18 222:12 226:3,9 242:15
**describes**  196:19 215:17
**description**  44:3 199:6 246:11
**descriptions**  241:14
**designated**  31:25
**designating**  75:14
**desire**  225:8
**despite**  88:8
**detail**  33:3 40:2,4 41:18,20 84:10 156:12,13 198:7
**detailed**  40:11 41:3
**determination**  67:12 69:18 182:11 184:11,21 187:11
**determine**  30:19 39:4 70:21 71:4,10 105:22 148:14 168:9,20 175:9 187:2 199:25 204:17 206:23 227:13 231:7
**determined**  92:3 148:21 149:20 217:25 227:13
**determining**  148:2 150:12,16 229:18 230:9,17 231:15 238:4
**detroit**  83:11,21 84:5

**devore**  5:17 8:5,5 145:4
**differed**  140:3
**difference**  79:16 81:10 213:9 236:11
**differences**  17:25 35:17 191:14
**different**  16:3 17:3 17:24 53:4,7 54:17 54:18,21,22 122:20 122:24 123:17,23 126:8,8 128:3 140:7 140:9 147:17,18 150:20 155:16 163:18 166:5 179:2 187:5 191:5 204:5 204:12 228:12 239:24
**differently**  208:23
**difficult**  24:19 113:24
**difficulty**  215:13
**diligence**  77:12,17 79:6 172:25
**diminish**  116:16
**diminished**  166:12 224:13
**direct**  22:12 29:13 138:25 235:18
**directing**  29:18
**direction**  23:5,10,14 23:19 29:16
**directly**  120:10 167:13 176:14
**disagreed**  28:23
**disappear**  130:17
**disappeared**  240:6
**disappears**  130:24
**disclosure**  20:7,19 48:7 132:15,24 133:11,13 134:7 214:12 242:2,3,7
**discount**  35:16 46:18 51:19,23 52:3 52:25 53:4,7,8,11

[discount - engagements]                                                          Page 12

53:20 69:3,5,5
71:21,23 72:8 73:12
73:13,14 95:19
96:10 97:4,5,23
104:7,25 105:23,24
147:18 148:22
154:25 174:13
175:2 204:13,19,22
205:13,17 206:5
223:12 225:6,11,24
239:3,10,13,19,21
239:25
**discounted** 71:19,22
72:2,3 73:8 106:8
176:16 221:16
224:16 234:3
**discuss** 33:12 96:11
114:5 120:22 131:9
241:25 242:5
**discussed** 18:10
25:10 52:25 69:3
72:7 79:7,20 89:15
93:25 102:8 114:3,3
118:25 119:22
166:9 172:24
210:14,16
**discusses** 221:20
**discussing** 25:6
218:5 235:2
**discussion** 14:7 16:6
16:19 23:11 26:12
33:2 34:11 41:25
77:5,12,17 79:6
82:12 84:3 88:3
91:11 92:20,25 97:3
97:20 101:6,19
119:23 172:25
185:20 241:22
**discussions** 64:19
74:12 96:9,12
100:23 107:17
113:10 172:21
225:25
**disease** 137:6

**distributed** 115:23
127:10,13
**distribution** 117:3,9
**distributions** 116:13
**district** 1:3
**divided** 174:10
175:4
**document** 9:7,20
10:3,5 19:18 20:5
20:17 21:5,15,16,23
22:6,18 23:16,17,21
25:4,5 27:5 74:13
74:14,23 75:4,5,12
76:12,13,17,23
107:13 109:7,8
111:9,16 113:3
120:4 123:15 126:6
132:22,23,25 133:3
133:12,25 134:14
170:7 190:2,14
217:19
**documented** 18:9
123:16
**documents** 33:23
123:5,12,19,21
124:7 125:18,21
132:3,10,20 134:14
173:8 202:5 214:3,7
214:14
**doing** 75:23 147:5
159:25 176:2
**dollar** 60:3 157:2
176:12 178:16,19
179:17 192:11,13
193:23,24 223:25
224:2,7,9,11 233:20
**dollars** 58:12 62:14
64:15 71:17 110:3
110:14 115:2
183:19 194:5 208:4
209:8
**downs** 136:18
**downside** 83:22
92:14 93:4 113:22
148:9

**downsides** 115:16
**downward** 36:5
**dpo** 34:18 35:15,16
169:7
**dr** 141:4
**draft** 14:18,21,24
15:16,19 16:5,9,19
16:20,25 25:9 37:24
38:7,10 216:11,17
246:23
**drafts** 15:11,15,17
**drastically** 239:24
**draw** 30:12 56:16
145:12 181:25
183:23
**drawn** 182:13
185:19 235:6
**drew** 45:11 208:13
**duff** 6:12 7:11 8:17
9:22 10:14,15,18,18
11:23 12:12 27:20
27:24 29:22 33:10
37:5,17 38:14 43:17
43:19 44:4 76:24
77:3,11 103:4 133:2
133:9 219:13 241:2
246:15

**e**

**e** 2:2,2 3:2,2,10 4:2,2
5:2,2 6:2,2 7:2,2,2
17:16 19:3,3,7,15
36:24 37:5,9,15,25
38:3,7,13,21 77:2
77:10 145:2,2,5,5,5
245:2,2 246:2,14
**earlier** 11:16 43:11
50:11 60:20 69:3
74:11 80:19 107:13
115:16 118:25
119:11,14 129:5
135:7 143:23
154:15 165:3,5
166:9,24 172:25
188:9 198:17,21

210:16 216:17
218:4 220:15
221:23 223:10
227:25 235:2
240:16 243:13
**early** 77:25 223:7
235:11
**easier** 31:12
**east** 4:16 6:6,14
**economic** 24:2
47:18
**economies** 82:15
83:11,19 84:5
113:21
**edits** 14:18
**effective** 21:19
**effectively** 31:5
**eight** 140:7
**either** 37:7,17 38:15
69:24 72:19 100:24
164:22 213:6,17
214:22 225:17
239:14 242:8
**ejames** 2:13
**elaborated** 92:22
**elements** 144:5,9
**embodied** 19:10
26:16 109:4 133:25
**embraced** 17:19
22:19
**emergence** 28:10
196:6
**emma** 2:12 7:23
**employ** 106:22
**employed** 47:8
**employees** 11:23
12:12 229:23 230:2
**employing** 103:25
**encompassed** 17:2
**encompasses** 19:24
218:10
**enforcing** 193:2,7
**engagement** 243:8
**engagements** 219:12

[enhanced - expert]                                                                Page 13

enhanced  35:3,12
  39:14 85:9,10
ensue  121:18
ensure  48:9 50:12
ensured  30:20
entered  33:11
  100:19 118:6 238:2
enters  94:5
entire  30:11 85:21
  202:7
entities  206:8
entitled  59:14
  119:13,15,17 130:3
  135:11,11,18
  136:14,19 163:3
entitlement  130:16
entity  206:11,11
entries  54:11
entry  61:7 66:16
  217:3,23
environment  47:18
equal  87:5 117:9
  184:3
equals  103:17
  110:14
equitable  2:7 55:21
  56:10,25 57:6
equitably  224:23
errata  247:2
esq  2:10,12,14,22
  3:10,18,20 4:9,18
  4:20 5:8,17,24 6:8
  6:16
essence  167:9
establish  185:21
  240:9
establishing  148:6
  148:15
estate  47:20 212:4
estimable  115:12,14
  194:24 210:19
estimate  65:2 90:13
  95:24 113:15,24
  122:17,23 133:21
  157:4,5 194:21

200:8 220:23 227:3
estimated  59:18
  62:10,13 64:9 65:4
  67:24 68:6,11,17
  69:2 70:5 72:2
  113:20 121:9
  165:24 166:3
  174:11 181:15
  193:13 196:11,17
  203:16 204:5
  221:11 228:11
  232:11
estimates  90:15,24
  96:5 102:18 104:2
  159:12 198:8 200:7
  220:4,13 231:10
estimating  122:13
  201:18,21 227:10
estimation  48:5 73:6
  121:25 122:10
  123:6 124:11,17,23
  127:2 156:8 183:11
  186:11 188:17
  192:18 194:17
  195:4 201:2 221:10
  228:4
estimations  186:17
et  1:6 58:23 59:2
evaluate  25:16
  45:14,19 125:14,18
  160:2 205:13
evaluated  24:25
  188:13,16
evaluating  89:10
  193:4 205:16
evaluation  25:4,5
  46:2 94:21 96:6
  159:5,18,25 193:8
  193:18 197:17
  210:11
evaluations  158:12
  186:18 194:5
events  84:7
eventual  74:16

eventually  116:20
everything's  210:15
exact  14:16 65:24
  126:5 201:23 209:7
exactly  14:2,8,15
  18:7 58:25 76:9
  115:3 140:24
  152:22 201:18
  242:19
examination  7:6
  20:6 21:19 29:3
  145:9 211:6 240:14
  241:23 246:4
examined  7:4 145:7
example  83:21
  142:5 219:15
  228:25
exceed  87:8 116:25
  238:17
exceeded  155:22
exceeds  117:7
excel  42:21 197:22
  197:23
exceptions  180:12
excess  97:14
exchange  28:10
exclude  98:23 99:4
  99:15 100:2
excluded  98:9,17
  99:19 139:18,20,23
  140:4,11 143:2
excluding  98:7
  100:9 112:12 113:6
exclusively  140:2
excuse  223:13 242:3
executed  94:15
execution  104:8
exercise  237:21
exhibit  8:19 9:6,9,12
  9:19 10:4,10 15:12
  16:22 18:3 26:17
  27:14 30:10,13
  38:24 42:25 76:23
  76:25 77:2,6,18
  81:7 93:18 96:21

102:13 107:10,22
  107:24,25 112:24
  119:2 120:5 127:22
  137:17 138:3,5
  145:11 173:2
  177:10 189:25
  190:4,8 196:2 207:8
  207:8,10,12 216:11
  216:14,16 246:13
  246:14,16,17,19,22
  246:23
exhibits  246:10
exist  218:25
exists  165:22
expect  146:17
  147:13 148:12
  200:2 215:5 223:14
  227:19
expected  24:2 26:8
  51:6,7,8 88:8 97:25
  98:3 146:19 147:21
  148:14,22,23,24
  149:2,2 151:21
  155:16,20 177:18
  178:3 187:23,24
  202:4 229:18 234:2
  238:10
expects  238:18
expense  95:24 96:5
  139:2
expenses  57:10 91:6
  91:13,15 92:6
  116:15,18
experience  48:14,16
  204:21 231:6
expert  9:8,9,13,14
  74:25 93:13 94:3
  96:21 104:4 136:24
  140:4,9,10,13
  142:16 143:24
  144:3,4,9 158:6,17
  158:19 207:8,10
  214:9,15,22 243:9
  246:13,22

**expert's** 140:20
142:2
**expertise** 148:20
227:23
**experts** 139:16,19
139:20,23 140:7,14
141:16,19,20
192:17
**expires** 247:25
**explain** 223:21
**explained** 157:19
**explanation** 223:21
**explicitly** 84:6
**express** 225:6
**expressed** 225:8
**extended** 104:24
**extensive** 41:3
**extent** 18:7 19:20
22:7 37:20 75:9
79:25 81:12,17
89:23 99:11,15
115:21 119:11,22
120:6 121:18 135:9
135:17 136:13,17
144:3,5 148:21
167:18 193:12,17
195:6 212:13 213:5
233:8 238:16
239:22
**extra** 136:11

**f**

**f** 4:18 7:2,2,2 137:21
145:2,5,5,5 245:2
**facing** 201:15
**fact** 20:20,22 35:8
36:22 75:19 88:8
89:4 91:11,12 92:20
92:25 126:18,20
136:2 143:6 179:8
185:11 187:13,21
188:6 189:10
192:16 194:16
200:25 205:15
209:4 213:20

**factor** 103:15,17
105:17,19
**factors** 59:5,18,19
82:9,10,20 148:11
154:9 239:9
**failed** 142:3
**fair** 10:24 36:8 43:2
55:20 56:9,24 57:5
76:4 149:3 238:11
**fairly** 95:15 97:22
214:13 224:23
**faith** 49:14 54:4
56:19,23 57:4 58:11
58:21 59:18 61:4
62:18 65:5 67:8
69:12 73:24 74:3
84:13,16,20 85:25
90:9,13,15,25
175:14
**fall** 152:4,8 182:4,17
184:15 185:4
187:19 219:4,8
**fallen** 181:22
**falls** 151:20 152:7
152:15,17,22
177:17 178:3 179:9
179:10 183:10
184:4 185:16
186:16 219:6
**far** 12:3,9,23,24
16:4 36:16 43:3
70:13 74:7 78:16
79:8,22 84:8 85:2
85:19 86:4,7,9
191:6
**fargo** 2:18 12:16
**farr** 1:17 2:4 7:22
7:23
**fatal** 140:19 141:4
**fear** 237:10,13
**fein** 6:11 8:17
**fell** 152:25
**felt** 88:23 113:14
155:22 206:3

**fgic** 10:7 11:8 16:21
17:3,6,10 23:15
25:12 26:24 27:8,17
28:2,10,11,23 29:6
29:20,20,23,25 30:6
30:20 33:2 35:6,10
35:22 37:7 38:10
40:18,24 41:11 43:4
43:9,12,13,14 44:19
45:3,5,20 46:22
47:7,21,23 48:3,12
48:22 49:5,23 50:21
51:8,14,16,21,21
52:2,6 53:2,21
54:24 55:5,8 56:5,9
56:18 57:9,10 58:10
59:17,25 61:4,13,15
61:17,25 62:16,22
63:8,9,12,12 64:17
65:16 66:22,25
67:14 68:8,14,16,23
69:2,11,23 70:13
72:10 73:23 74:2,4
74:16 77:11,13,14
77:24,25 78:4,6,20
80:22 81:5 83:3,5,8
85:17 86:3 88:8,9
89:5 90:8 91:5
92:13 93:22 94:5
95:12 97:3 101:22
102:6,24 103:20
104:6,11,16 106:8
106:24 109:13
110:3,14,19 113:10
113:12,14 114:15
117:12,13 118:6,15
120:7,11 125:7
127:10,13,14,15
129:7,24 131:12,16
131:20 136:20
145:16,18,18,20,21
145:22 149:6
150:22 153:5
154:10 160:9,16,25
161:10,25 162:9,17

164:3,12,20,22
165:6 166:16,18
167:3,5,13,18,24
168:11,19 169:13
169:15,21 170:7,8
170:11 172:12,20
173:6,21 174:2,6
175:11,17 181:14
190:4,11,19,22
194:10 195:2
198:20 201:19
205:9,15 210:6,8,10
214:10 220:17
222:13 224:14,17
224:18,20 225:6
226:4,6 233:18,25
238:14,14 239:7,15
240:18,23 242:9
243:5,6 246:19
**fgic's** 30:15 37:17
38:15 39:2,8,16,20
40:4,7,9 53:22
55:20 57:5 73:6,22
94:22 171:9,23
172:3
**fico** 232:9
**figure** 60:3 61:8
66:10 68:17 69:4,8
87:15 105:10
173:24 192:11,13
193:24 194:3
206:16
**filed** 55:5 139:12
**files** 193:2
**filing** 83:21
**filings** 208:3
**final** 14:21,24 18:11
64:7 113:2 119:22
124:23 142:3
**finally** 103:4
**financial** 4:14 30:16
30:18 34:16 37:19
39:10 145:15 147:6
153:4 168:3,9 171:8
171:21 190:4,11,19

190:21 191:13
193:5,6 208:6,22
209:12 210:22
214:10 226:21
243:8 246:19
**find**  206:6
**fine**  81:22 96:18
177:6 237:8 240:4
**finish**  235:8
**firm**  137:9 182:12
183:23 229:23
**first**  8:19 9:6 18:15
28:7 44:13,21,22
47:12 54:11,11,23
65:12 71:7 79:15
81:9 85:17 87:2
94:18 95:16 98:6,9
102:7 106:9 108:4,9
109:22 123:5
131:11 136:3 151:8
176:8 196:6,12,14
198:12 204:16
208:2 213:21
**fit**  228:16
**five**  177:3,6 196:6
196:12,14 198:24
211:18 213:16
224:8
**fixed**  69:5 179:17
**flaw**  141:22
**flawed**  139:25
140:12,15 142:16
**flaws**  140:19 141:4
**floor**  5:22 6:14
**flow**  86:21 122:21
167:5 169:16
230:18,20 234:3
239:21
**flows**  93:4 97:15,18
97:24 98:3 115:18
148:18,19,20,23
151:21 152:13
176:23 177:18
178:4 188:10,12,14
188:17 189:5,6,13

190:18 194:11
200:10 204:19
205:23,24 210:4
220:17 239:23
**focus**  46:8 154:24
156:4 175:11 202:3
225:11,12
**focused**  18:5 26:7
46:6 80:25 111:5
179:25 180:2
**focusing**  240:23,23
**foerster**  5:4 8:11
**folks**  59:25 81:5
86:3
**follow**  10:4 23:15
54:17,22 75:16
204:15
**following**  23:16
29:20 30:7 32:5
44:13,14 98:5 113:4
197:14 243:17
**follows**  7:5 22:4
71:9 99:25 145:8
209:4
**footnote**  104:4
106:9 107:7 221:19
221:22
**footnoted**  56:3
**forecast**  200:10,22
**forecasts**  95:4
200:22 201:2
**form**  14:22 15:13,24
16:11,23 17:8,21
19:3,12 22:21,24
24:18 26:2 27:19
28:19 30:3,4 33:25
34:9 37:14 38:18
43:10,22 45:9,16
46:4,12,24 47:9,25
48:25 49:2 50:23,24
51:10,20 52:5,23
53:13,17,18 54:20
56:14,21 57:2 58:6
58:14 66:4,14 67:4
68:13,19 69:16

70:15,25 71:2 72:5
73:9,10,19 80:13,17
82:2,6 83:7 87:17
87:18 89:13 90:22
92:5 94:10 96:7
97:12 98:13,15 99:3
103:22 108:12
114:14 116:23
117:6,15,16,21
118:8,9 119:9
121:11,12 123:13
124:13 127:17
128:12 129:2,10
130:7,22 131:6
133:6,15 148:7
150:24 152:6,10,19
152:20 158:2,15
164:7,14,23 166:2
166:19 170:3,14,24
174:21 177:21,22
179:19 180:9 181:3
181:9,10 182:23
185:6,18 186:20
187:20 189:22
192:12 197:21
198:2 203:7 206:18
209:16 216:3
219:18 223:3,18
226:12 232:14
234:16,20 239:16
241:5,11
**format**  43:20,24
**formulate**  178:15
**forth**  20:11 188:18
232:19 233:2
245:12
**forthcoming**  83:5,8
**forward**  64:25
117:20 128:24
129:7,9,15,24
199:25 227:18
231:11
**found**  140:8,15
199:11

**four**  125:12 213:16
224:8 229:9
**francis**  137:25 140:6
**francis's**  140:17
**frankel**  4:4
**freddie**  5:21 6:5
134:22 158:7
202:12 211:11
**frequent**  193:3
**front**  15:8 20:13
27:21 39:18 104:17
104:22 139:17,21
143:24 144:6,10,11
162:10 215:9
222:13,22
**full**  20:7,18 48:7
57:12,23 70:22
71:10 141:2 218:19
**fully**  183:18,18
**fund**  212:9,9,11
**fund's**  212:10
**further**  26:11 33:3
89:21 93:13 145:8
173:4 188:21,22
203:12 244:3
245:16
**future**  18:17 19:21
22:8 25:23 26:6
64:8 65:2,4 67:23
68:5,10,17 70:5
71:22 72:2,9 94:8
136:19 145:21
162:7 180:14
204:19 222:24
223:2,2 224:3 227:3
227:6,10

| g |
| --- |

**g**  5:17
**gaap**  191:5,14
**gains**  136:14,15
**gallagher**  1:17 2:4
**gelfarb**  6:8,9 7:24
7:24 134:22 202:12
211:7,10,22 216:8

235:14,17 240:4
241:21,24 244:2
246:6
**general**  82:8 90:14
94:4 104:5 190:15
206:20 230:22
**generally**  36:2
**generate**  117:13
203:4 205:23
**generated**  61:4
117:13,20 200:14
**generates**  133:3
**georgia**  2:21
**getting**  189:8
**gibson**  6:21 8:2,2
124:20 214:16,25
215:15
**give**  16:9 40:14
75:10 81:23 84:23
105:12 108:18
153:22 220:22
223:21 226:22
233:16,21 240:7
**given**  75:19 79:10
97:16 151:21
177:18 178:3
185:11 206:3
245:15
**gives**  171:6,20
**giving**  165:18
233:12
**glenn**  3:10 8:9
**glenn.siegel**  3:11
**global**  26:25 187:13
**gmacm**  118:18
234:6,14
**go**  8:22 20:10 22:2
27:13 34:2,10 42:21
42:24 49:9 57:10,21
65:11 82:3,7,18
86:13,24,25 87:24
91:2 93:19 102:12
118:11 120:10
126:3 127:10,19
129:7,9,15,24 141:2

147:10 158:22
168:7 169:20 171:4
172:8 180:10 187:4
197:6 204:13
206:22 211:3 216:8
216:22 218:3,13
225:2 227:9 235:12
236:17,25 238:8,12
238:24
**goal**  55:17,19
**goes**  25:8 117:20
118:2,4 128:24
142:13 167:12
187:7 236:16
**going**  7:12,18 8:18
9:5 19:22 20:10
22:12 29:3 30:12
50:19 51:4,13 58:8
63:19 74:23 75:9
76:22 80:5 86:24
91:17 93:18 99:2
107:9 108:13 124:6
137:16 147:11
158:25 176:25
177:9,11 187:9
189:24 208:18,19
208:20 210:13
212:16 222:2,10
223:12,14,15 224:4
224:5,6 228:21
230:25 231:11
235:4 239:23 240:8
**goldstein**  207:9,11
208:20,25 209:19
246:22
**good**  49:14 54:4
56:18,23 57:4 58:11
58:21 59:17 61:4
62:17 65:4 67:7
69:12 73:24 74:3
84:12,16,20 85:25
90:9,12,15,25
107:19 175:14
211:8,9

**goodman**  5:24 12:2
22:15 76:20 211:3
**gotshal**  30:16 37:19
40:10
**grand**  6:13
**gray**  5:11 8:6
**great**  194:9 210:2
**greater**  157:4 159:6
**gross**  191:25 192:14
192:20 208:4,10
210:3
**grounds**  19:23
80:13 108:14
**guaranty**  4:14
**guess**  184:19
**guidance**  172:11,16
**guys**  235:13

## h

**haircut**  23:12
102:17,21,25 103:5
103:7,10,13,19,21
103:25 105:23
221:20,25 222:9,11
222:23 223:13,15
226:11,15,23
**half**  13:7
**hand**  9:22,22 102:16
118:12 183:25
245:21
**handed**  76:11
107:11
**hands**  14:12,16,19
**hao**  242:4,5
**happened**  154:2,7
**happy**  102:3 157:23
**hard**  235:6
**head**  162:15
**headed**  9:23
**heading**  28:8 55:17
176:23
**headings**  110:21
**hear**  232:21
**heard**  125:12 144:6
155:5

**hearing**  139:17
143:24
**hedge**  212:9,9,9,11
**held**  1:16 156:23
**helped**  241:12
243:13
**helpful**  29:2,15
41:14 144:9
**hereinbefore**  245:12
**hereunto**  245:20
**hfsidman**  4:19
**high**  79:15 81:9 97:7
97:11 152:18 196:6
196:7 198:11
200:13,17 201:3,10
203:17 219:16
220:5 236:2
**higher**  47:19 91:17
92:4,8 156:8 160:5
187:8,8 205:17
206:5,21 225:20
238:12
**highly**  75:14 107:14
107:20 122:5
**hill**  137:10
**historical**  64:24
227:17 231:9
**historically**  199:24
**hold**  22:25 235:17
241:21 242:19
**holders**  226:10,15
**homeowner**  167:7
**hour**  13:7,7
**hours**  235:5,12
**housing**  231:22
**howard**  4:18 6:16
8:4,16
**hsk**  6:17
**hustle**  177:5
**hustling**  177:6
**hypothetical**  189:11

## i

**ibbotson**  204:23
206:6,7

**idea**  76:4 221:25
**identification**  9:10
   77:4 107:23 138:7
   190:7 207:11
   216:12
**identified**  7:15 9:7
   9:20 38:13 47:24
   58:10 61:21 73:6
   92:13 95:13,21
   126:12 130:3 135:4
   135:23 170:13
   172:18 173:8
   197:13 208:12
**identifies**  13:2 38:21
   61:8
**identify**  7:17 37:16
   59:20 63:12 87:7
   94:13 103:20 131:3
   131:17 179:16
   216:13 241:9
**identifying**  36:25
   68:10 94:13
**ii**  106:14 118:18
**illustrative**  96:10
**impact**  95:4,6,9
   115:18 116:12,16
   181:12 232:2
**impacted**  137:7
   181:17
**impacts**  233:6,8
**implicated**  211:16
**implicating**  99:20
**imply**  58:25
**important**  172:11
   206:19
**inaccurate**  49:19
   62:23 207:22
   209:13 215:22
**inappropriate**
   114:18
**inappropriately**
   215:8
**incentive**  67:15,19
   74:4

**include**  22:20 23:7
   23:11 25:12,17,24
   26:5 48:6 54:11
   69:4 81:21 124:16
   126:11,16,25 144:2
   173:7 192:23 194:3
   205:7 215:15
**included**  17:19
   19:15,18 22:6 25:22
   26:12 29:25 35:21
   35:21 41:15,16 84:5
   84:7 85:11 88:12
   109:10 113:19,22
   115:17 120:3
   126:18 139:2
   154:13 168:23
   180:18 194:9,10,25
   209:20,24 210:4,11
   210:15,19,24
   212:10 215:24
**includes**  125:4
   148:3,8 172:20
   193:13,18 195:4
   234:25
**including**  19:19
   22:6 40:9 47:18
   84:4 85:13 113:4
   116:12 187:12
   189:9 210:17
**inclusion**  189:9
**income**  86:17 88:24
**inconsistent**  140:12
**incorporate**  115:5
**incorporated**  10:23
   34:15 35:20 38:10
   81:6 82:22 96:6
   106:5 144:5 158:11
   158:16 180:6 239:3
   239:13
**incorporates**  106:22
   238:9
**incorrectly**  171:15
**increase**  91:14
   199:2

**increased**  94:23
   225:17
**increases**  87:5 91:5
   181:5
**incur**  223:14,16
**incurs**  223:23
**independent**  24:16
   30:18 34:16 101:18
   128:23 168:8 172:9
   173:12 204:22
**indicate**  212:21
**individual**  142:14
**individuals**  29:20
   112:10
**industry**  205:9
**inevitably**  158:23
   159:2
**inferior**  159:15
**information**  10:16
   10:17,23 11:6 19:24
   29:7,8 30:14,24
   31:19 34:14 35:7
   37:6,16 38:14,22
   39:2,7 40:24 41:6,8
   43:3,8 49:18 54:7
   54:10 64:17 74:22
   80:2 81:4,17,18,21
   85:6 93:20 96:19
   105:5 112:8,15
   118:22 133:3
   153:24 155:7 168:7
   171:7,20 172:12,15
   172:19 173:6,7,13
   173:13 174:5 183:7
   184:25 190:14
   197:6,9 202:2
   218:17 229:20
   232:7 240:17 241:3
   241:7,10,16 242:2,8
   243:6,10
**informed**  102:7
**inherent**  188:11
**initial**  14:24 25:21
   25:24 26:7 44:22
   46:7 48:9 50:12

65:13 66:3,17,21
   70:4,17,18,20,24
   71:13,24 72:24
   77:12 94:23 104:18
   106:13 119:23
   120:3 169:3,6
   185:11,15 186:10
   186:15
**initially**  216:23
**input**  77:23 150:10
   150:13 157:24
   199:13,15
**inputs**  11:9 27:23
   225:9 228:2
**inquire**  112:3
**inquiries**  85:18
**inquiry**  84:13 98:25
   100:3
**insinuation**  209:7
**instances**  166:25
**instruct**  29:4 80:5
   99:3,8 101:16 102:2
   108:13
**instructed**  112:13
**instructing**  21:21
   29:17
**instruction**  21:25
   22:10,11 23:3,9,13
   23:18 31:23 81:14
   83:16 84:14 85:20
   91:7 93:24 96:13,15
   98:10 108:19
   109:17 110:7
   112:19
**instructions**  22:16
   80:10
**instructive**  50:6
**insurance**  4:15
   205:4,4,12,12
   213:24
**insured**  63:21 66:11
   66:20 68:7,25
   104:11,16 106:24
   125:4,8 127:10,13
   127:14 132:16

145:16,18,22 149:6
149:15 150:2,22
154:21 168:11,19
175:11,17 198:19
198:20 224:18,20
**integral**  127:23
154:19
**integrated**  188:7
**interest**  58:22 59:4
59:12,16,18 64:13
136:16 149:6,9,15
150:2,12,22 151:5
162:8
**interested**  245:19
**interests**  149:21
150:9,17
**internally**  89:16
**interpretation**
161:23
**intertwined**  163:13
**intex**  42:22 197:4,5
197:10,23,24
199:11,13 200:7
228:2 229:17,21
230:24 231:4
**introduce**  8:23
**introducing**  7:13
**inventors**  70:23
71:12
**inverse**  103:13
**investment**  86:17
88:24 162:11
**investor**  3:7 97:13
98:2 110:22,22
111:24
**investors**  2:5 5:13
7:14 61:14 66:11
72:3,25 73:7 86:22
111:8,15 115:20
116:7,12 119:15,16
120:10 121:8 128:5
130:2 135:5 148:5,5
149:10 150:22
157:25 158:24
159:6,18 160:4

**involved**  201:2
211:16 212:21,24
213:5,18,22,23,24
**involvement**  143:19
**involves**  108:15
**involving**  211:20
**irrespective**  223:6
**issue**  20:12,21 31:10
75:17 89:22 112:16
128:2 226:19,20
234:15 238:3 242:2
242:7
**issued**  234:6
**issuer**  193:4
**issues**  27:3,11 84:3
100:12 101:7
114:16 119:22
187:15
**item**  60:13
**items**  34:13 139:2
210:16

**j**

**j**  2:12 102:16
**james**  2:12 7:23,23
**jbaio**  2:11
**jefferson**  82:14,24
82:25 83:2 84:4
113:21
**job**  224:19
**joe**  7:14 176:25
**john**  2:22 229:25,25
**joins**  12:2 202:12
**jointly**  1:7
**jones**  4:13 8:4 9:3
**jonesday.com**  4:19
4:21
**joseph**  2:10
**jr**  3:20
**judge**  137:23,25
139:18,24 140:6,17
141:20 143:4,24
**judge's**  141:10,24
142:10,20

**judgment**  92:16
201:12
**judgments**  21:24
**july**  1:13 9:14 75:2
158:19 245:21
247:5
**junior**  57:22
**jury**  139:18,21
144:2,6,10,12
**justifiable**  225:24
**justification**  222:8
**justify**  105:10 142:3
222:23 223:11

**k**

**kalish**  6:4 7:25
**kept**  120:11
**kerr**  5:8 8:10,10
121:13 128:13
137:19 195:23
**kind**  48:19 161:22
202:25 210:23
214:13 241:13
**kinds**  205:25
**kissel**  8:8,13
**kissell**  3:13
**kit**  8:14
**kit.weitnauer**  2:23
**know**  10:25 12:4,9
12:23,24 15:17,19
16:4 18:8 19:8
21:17 31:4 33:12,18
34:7 36:16,25 37:3
38:3,6,12 53:14
55:9 69:23 70:2
72:9 74:7 75:21,22
75:22,24 78:7,8
79:22 81:13,20 85:3
85:4,19 86:5,7,9,10
91:23 95:11 99:14
99:18 100:16,18
101:7 102:23 103:3
103:7 105:11
109:24 111:4,20,21
114:22 130:9

134:11,13,15,18
136:15 143:8,11,12
144:3,4,7,8 150:16
155:6 160:24 161:8
161:22 162:22
164:15 167:4,4,12
173:10 182:20
183:7 187:3 189:11
192:6,7 193:12,17
193:22,25 195:3
197:8 198:21
206:15 209:19,20
215:20,23 217:11
217:12 230:11,12
230:14,16,19,20
236:16,21,22
237:16 240:8,10
241:2
**knowledge**  35:3,11
37:22
**koh**  6:16 8:16,16
17:8,21 19:12 22:11
22:24 23:5,10,14,19
25:19 27:6 28:18
29:16 33:20,25 34:9
38:17 49:8 50:2,25
51:11 55:10 56:13
56:20 57:3 59:8
60:7 62:5 63:18
66:6 67:6 68:12
70:14 72:15 79:24
80:9,12,16 82:2,6
82:17 87:19 89:13
90:21 93:8,10 94:9
98:13 99:22 100:4
108:6,18 111:2,10
111:18 115:9
117:14 122:11
124:12 127:18
129:3,11 130:6,11
130:13,19 131:8
133:5,16 134:24
139:10 141:11,14
142:8 143:22 150:5
158:14 160:12,20

161:5,14 162:4,21
163:10,23 164:8,24
166:20 167:25
174:22 179:20
180:9 181:3,11
182:6,22 183:12
184:5,17 185:7
186:19 190:25
195:18 202:14
203:7 204:7,10
216:3,21 218:12
219:7,19 222:4
223:17 224:25
226:13 232:15,21
238:7,22,24 239:5
239:17 240:3,7
241:19 242:6,6,11
242:12,17,25 244:4
**kotwick**  3:18,19
8:12,12 14:22 15:13
15:24 16:11 26:2
27:19 30:3 37:14
38:18 43:10 45:9,16
46:4,12 49:2 50:24
52:23 54:20 56:21
57:2 58:6,14 59:22
62:4 66:4,14 67:4
68:18 69:16 70:25
73:10 87:17 90:22
97:12 99:2,9 108:12
117:6,15 118:8
119:9 121:11
123:11,13 124:13
125:23 127:17
128:12 129:2,10,12
130:7,12,18,22
131:6 133:6,15
134:16 148:7
150:24 152:6,10,19
158:2 160:13,21
161:4 162:19 163:9
164:7,14,23 166:19
170:3,24 174:21
176:25 177:7,12,21
181:9,24 182:7,23

183:13 184:6 185:6
185:18 186:20
187:20 192:12
195:16 198:2
206:18 207:23
209:16 219:18
220:25 222:5 223:3
223:18 226:12
232:14 235:4,11
239:6,16 243:11
**kramer**  4:4 8:24
**kramerlevin.com**
4:10

**l**

**l**  4:20 5:8 7:2,2
145:5,5
**lack**  127:6
**laid**  44:2
**language**  39:5 44:22
79:21 145:24
169:23 196:8
**large**  50:13 114:7
157:14
**lassiter's**  141:4
**late**  17:13,18 19:11
22:19 23:21 24:6
28:4 37:11 55:6
240:12
**laurie**  1:19 245:7,24
**law**  3:14 8:8 56:4
137:9
**law.com**  6:17
**lawyer**  160:22
**layout**  15:23 16:2
43:13
**lazard**  11:8 30:16
33:2 35:10 37:7,18
38:16 39:17 40:10
51:21 52:7 53:2
62:22 77:13,15
78:20 97:4 113:12
113:13,14 115:13
172:13,20 173:6,22
174:2,6,9,20,24

194:13,16 195:3
210:7,8,10 215:7,21
222:13 225:7 236:6
236:20 238:9 239:4
239:14 240:18,23
240:24,25 241:3,8
241:10,12,14 242:8
242:22 243:4,5,7
**lazard's**  236:12
**leading**  55:17
124:24 171:10,23
172:3
**learn**  81:12 88:2
91:21 96:11 97:6
113:9 155:13
**learned**  36:25 37:20
91:3 93:21 95:12,16
95:22 97:7 113:12
155:15 158:17
210:10,12 225:5
**leave**  21:7 235:9
**leaves**  124:20 145:4
**led**  74:16 97:10
153:13 154:13,16
154:17 158:12
176:5 229:25
**left**  7:18 9:22 26:24
44:4,12 102:16
118:12 156:25
180:24 183:25
230:4
**legal**  130:14 161:16
161:23 247:2
**legionnaire's**  137:6
**lesser**  222:23
**letter**  43:16 75:20
102:16
**letters**  43:15 44:3,3
73:21
**level**  72:8 79:16 81:9
91:15 97:17,24
203:8
**levels**  203:10
**levin**  4:4 8:24

**levine**  4:9 8:21,23
8:24
**light**  22:11 74:20
101:25 141:18
149:20
**liked**  41:7
**likelihood**  91:25
93:15 122:2,9 123:7
124:9,18 125:19
126:8,12 127:2
159:6,9,18 160:4
**likelihoods**  160:2
**likewise**  142:15
**limitations**  92:19
116:20 230:25
231:4
**limited**  12:16 31:4
**line**  28:7 54:23
60:14 64:7 65:13
91:8 109:18 110:11
112:6 247:7
**lines**  41:2 43:25
89:2 137:7,10
**liquidation**  30:17
212:4,25
**list**  12:22 33:11,14
33:19,24 77:17
212:19
**listed**  26:23 55:12
82:12 92:23 104:3
109:9 131:12
212:12 213:21
237:19
**listening**  157:15
**literally**  170:6
**litigation**  27:2,11
98:7,16,20,24 100:3
100:9,14 101:21
112:11,12 113:6,17
114:8,11,17,25
116:17,25 118:7
121:16 126:22
127:5 130:25
187:14 188:8
192:18 193:10,19

[litigation - mediation]                                                                Page 20

194:17,18,20 208:9
208:17,21,25 209:6
209:9 210:17
**litigations**  114:2,6
  114:22 120:16
**little**  90:5 114:24
  136:10 168:6 237:4
**llc**  1:6 9:24
**llp**  1:18 2:4,17 3:4
  3:13 4:4 5:4,11 6:11
  30:17
**loaded**  104:17,23
  222:14,22
**loan**  167:6,6 193:2
  232:6
**loans**  196:23,24
  197:11
**long**  13:4 36:10
  116:24
**longer**  205:16,21
**look**  9:19 44:12 54:6
  55:14 112:23
  118:12 125:18
  138:8 141:23
  145:11 146:20
  151:6 158:21
  159:14 168:3
  173:18 176:7,7
  178:10 195:21
  196:3 198:9 199:23
  199:25 202:3
  203:13 204:3,14
  206:10,11,19 207:4
  207:19 208:6
  212:18 213:14
  226:14 228:21
  234:11 235:20
**looked**  26:10 45:21
  148:16 156:5 202:2
  214:14 228:9 231:8
  231:8,10,20,20
  236:19
**looking**  34:19,20,23
  38:24 63:20 64:2,23
  94:12 147:2 148:20

199:8 201:24
203:24 211:23
219:25 220:18
227:17
**loss**  95:24 96:5
  136:16 137:13
  167:7 208:5,8,11,16
  223:14,16,23 228:4
**losses**  63:9,11,20
  64:13 68:22,22
  162:7 201:18 202:4
  229:18 230:9,17,25
**lost**  138:15,25
**lot**  11:20 14:7 41:14
  148:11 150:13
  155:20 185:24
  222:2
**low**  152:8 196:7
  198:11,12 200:13
  200:17 201:3,10
  203:17 219:16
  220:5
**lower**  64:5 89:5
  92:10 173:25
  186:25 187:7,7
  205:17 223:12,13
  225:20
**lump**  145:18
**lunch**  144:15

## m

**m**  1:16 7:2 9:8 74:25
  145:5 244:9 245:11
  246:5 247:6,21
**mac**  5:21 6:5 134:22
  202:12 211:11
**macroeconomic**
  82:9,20
**magistrate**  137:25
**magnitude**  85:12
**mail**  17:16 19:3,3,7
  19:15 36:24 37:5,9
  37:15,25 38:7,21
  77:2,10 246:14

**mails**  38:3,13
**main**  23:7 44:14
**maintain**  163:16
**major**  126:17
**majority**  194:9
  196:4,13 210:3
  222:9
**making**  61:17 63:8
  137:11 138:13
  162:9 177:12
**mandate**  150:10
  151:2
**manges**  30:17
**manner**  36:4 55:21
  56:10,25 57:6
**march**  17:12,13,18
  18:10 19:3,11,16
  22:19 23:21 24:6,23
  28:4,15 29:21,24
  30:7 37:11 61:15
  63:5,8 64:14 65:18
  108:2 119:3,4,8,24
  120:4 131:10 135:5
  190:12,19 195:22
  195:24 198:22
**mark**  3:18 8:12,19
  9:6 76:22 107:10
  137:17 138:3
  189:25 207:7
**marked**  9:10 77:4
  81:7 107:13,22
  138:6 190:6 207:11
  216:12,14 243:15
**market**  47:20
  231:10,21
**marriage**  245:18
**massachusetts**  5:16
**material**  98:7,24
  100:3,8 101:20
  112:11 113:5,16
  114:2,8 116:25
  118:7 120:16
  127:11 192:18
  209:6 210:17

**materials**  16:6
**math**  65:24 217:18
**mathematical**
  103:12
**matrices**  199:10,20
  200:4 234:5,19,21
**matter**  7:15 12:15
  12:19 75:15 90:14
  99:6 100:9 113:11
  146:3 211:11 212:5
  213:4 245:19
**matters**  36:8 211:20
**maximum**  110:2
**mbia**  206:21
**mckool**  5:20
**mckoolsmith.com**
  5:25
**mean**  33:10 44:4,8
  50:16,18 66:8 72:7
  89:24 90:3 109:19
  111:4,21 119:16
  128:20 131:18
  135:25 146:8,10,23
  147:14,15 149:2
  159:2 168:13,20
  191:3 195:24 228:3
  228:5,19
**meaning**  63:7 89:9
  104:17 146:19
  171:2 179:11,22
  229:8
**meaningful**  83:21
  122:3,6 123:8
  124:10,19 125:21
  126:13 127:4
**means**  47:4 104:14
  131:21 146:24
  228:6
**meant**  73:22 103:19
  146:13 192:8,14
**mechanics**  116:10
**mediation**  19:25
  20:9 29:9,13 74:15
  74:19 75:7,13 80:7
  100:11 108:16

124:23,25 125:3,5,5
126:19,20,21,23
131:24 154:5,16
169:22 208:5,8,12
208:16
**medication**  125:2
**meet**  155:4 169:25
170:10 182:10,11
**meeting**  33:11 35:10
35:25 36:6,7,10,12
36:14 40:9 42:3
77:13,14,25 78:4,6
78:9,11 79:7,22
80:20,25 81:5,25
93:23 96:5 98:19
100:7,20 101:21
102:9 112:9 114:4
155:10,14,15
157:12 158:3
210:14 240:19
**meetings**  36:11
62:20,21,21 171:3
193:4 240:22,24,25
241:4
**meets**  191:4
**meister**  6:11 8:16
**mellon**  3:6
**member**  77:10
78:13
**members**  10:14
29:22 30:6 40:9,17
42:10 77:21 78:20
**memorandum**  56:4
**mentioned**  50:11
60:20 119:11,14
135:7 154:15
166:24 188:8
212:23 227:24
237:15
**met**  170:4,8
**methodology**  140:15
140:20 141:4
201:23,24 202:17
202:23 203:4

**mg**  1:5
**middle**  30:13 152:16
**midpoint**  52:2,7
69:9
**miller**  194:13
214:11
**million**  18:24 28:10
28:12 58:11,18 60:2
60:3 61:8 62:3,14
63:6,14 64:16 65:17
65:20 66:9 67:12,25
68:10,17 70:6,7,10
71:25 73:5 110:17
117:24 118:3,15
121:9,19 122:2,25
123:7 124:9,18
125:7,20 126:12
127:3,9,13 128:6,9
128:17 130:16,24
131:22,23 132:7,18
133:4,22 134:9
137:14 138:16,24
151:20 164:21
166:5,7,17 167:15
171:11,24 172:4
177:17 178:2
180:15,15,20,24
181:5,12,18,22
182:4,16 183:3,4,10
183:16,19 184:4,9
184:15,22,23 185:3
185:9,12,13 186:12
186:14 187:18,22
188:3,5,9 192:2,3
192:10 193:23
194:4 195:13,20
198:18 199:3
203:16,17 218:6,11
220:23 221:4,5
232:12,13,24,24
233:11,11,13,17,20
**mind**  18:20 58:16
59:3 107:7 122:24
123:15 124:15
126:6 169:19

**minus**  103:14
110:18
**minute**  74:24
136:12
**minutes**  25:10 177:3
230:6 240:8
**mischaracterized**
192:17
**misinformed**  214:22
215:2,12
**misrepresented**
208:16
**misstated**  177:23
**misstates**  38:19
**mistakes**  214:23
215:16
**misunderstanding**
223:19
**mode**  157:15
**model**  40:11 53:22
53:24 54:5 147:20
200:20 214:6,8
229:18,21,22,24
231:5
**modeled**  123:23
**modeling**  230:25
**mofo.com**  5:9
**moment**  34:24 75:22
80:9 115:3 178:17
**monarch**  2:6 155:5
155:11 157:25
**money**  117:13
**monthly**  199:21
227:13,17
**months**  122:13
123:15,21 182:18
182:18 183:8
**morrison**  5:4 8:10
**mortgage**  211:17,20
213:19
**moss**  6:4 7:24
**mosskalish.com**  6:9
**motion**  139:12
**motions**  121:17
139:12

**mountainview**  6:21
8:2
**move**  53:17 101:2
191:18
**msf**  6:17
**multipage**  8:20 9:7
190:2
**multiplied**  106:13
106:15
**murphy**  13:13 78:12

**n**

**n**  2:2 3:2 4:2 5:2 6:2
7:2 43:16 145:2,2,2
145:5 246:2
**n.a.**  3:6
**naftalis**  4:4
**name**  7:8,9,13,19
138:10 142:2
211:10
**names**  30:9
**near**  222:18,24,25
223:2
**necessarily**  162:23
164:9 165:4,11
166:22 236:17
**necessary**  55:23
56:12
**need**  27:11 98:17
125:14 147:10,19
169:14 188:21,22
235:13
**needed**  50:11
**needs**  177:5
**negative**  95:6,8
**negatives**  148:4,5
**negotiated**  165:19
**negotiation**  130:24
**net**  109:13 110:19
174:9,10 175:3,5
181:14
**netted**  169:16
**netting**  169:11
**never**  107:7

**new** 1:3,18,18,21
2:9,9 3:5,9,9,15,17
3:17 4:8,8,17,17 5:7
5:7,23,23 6:7,7,15
6:15 12:16 30:17
245:3,5,9 247:3,3
**nine** 15:23 140:7
**nol** 92:19 93:3
217:16
**nols** 92:22
**nominal** 64:15
71:17 176:15 217:4
217:6,24 221:8
223:24,25 224:10
225:3
**non** 110:21 111:8,23
**nondiscounted**
173:25
**nonpublic** 241:3
242:8 243:10
**nonsettling** 201:22
201:22
**notary** 1:20 145:7
244:15 245:8
247:25
**note** 172:11 178:10
201:17 211:22
**noted** 92:7 144:16
145:3 148:17
194:23 196:13
244:6
**notes** 190:18 207:4
**notice** 110:20
**notional** 173:25
196:4 198:19 233:7
235:22 236:6
**notwithstanding**
238:20,23
**november** 60:23
**number** 14:7 15:22
18:5,22 35:8 48:6
51:22 55:7,8,11
59:6,21 61:3,19,22
62:2,13,17,23 63:4
63:13,17,19 64:4,6

64:12,18,20,22,23
65:4,7,8,16,22
67:13,16,20 69:18
69:25 70:12 73:12
74:5 76:24 86:19,19
87:22 122:24 126:8
126:9 131:22,23
132:7,17 133:22
134:10,10 137:15
146:25 178:9
179:22 182:13
183:24 184:21,22
185:14 186:7,24
187:2,7,8,10,24
188:25 191:19,20
192:4 198:25
201:11 204:12
210:21,23 215:19
219:14 220:2 221:7
222:11 226:6,18
230:2
**numbers** 14:20,23
14:24 15:8 41:17,25
42:17,20,21 43:11
43:13,18,25,25
54:17,21,22 60:25
63:21 66:24 71:18
71:20 72:18,22 74:3
109:9 133:10,17,19
133:21 176:4,17
178:10 179:3,12
185:25 187:6 189:2
190:2 198:13,16
199:5 201:13 204:2
204:6 218:2,25,25
219:17 220:5,20
221:9,11 226:14
236:15,19
**numeral** 121:2
**numeric** 220:9
**numerical** 218:10
218:14,16,18 219:6

**o**

**o** 145:2,2,2
**o'clock** 75:20
**oakwood** 212:3
**oath** 182:3 211:13
**object** 19:23 37:14
53:17,18 98:13,15
99:2 164:14 166:2
170:14 195:18
219:18 234:20
235:4 241:5,11
**objection** 14:22
15:13,24 16:11,23
17:8,21 19:12 22:24
24:18 25:19 26:2
27:6,19 28:18,19,25
29:13 30:3,4 31:3
33:25 34:9 38:17,18
39:11 40:20 41:12
41:22 42:12 43:5,10
43:22 45:9,10,16,17
46:4,5,12,13,24
47:9,25 48:25 49:2
49:8,15,20,25 50:2
50:23,24,25 51:10
51:11,20 52:5,11,23
53:13,16 54:2,19,20
55:10 56:13,14,20
56:21,22 57:2,3
58:6,13,14 59:8,22
59:23 60:6,7,12
61:5 62:4,5,6 63:18
66:4,5,6,14 67:4,5,6
67:17,21 68:12,13
68:18,19 69:7,13,16
70:14,15,25 71:2
72:5,14,15 73:9,10
73:19,25 74:6 79:24
80:12,16 82:2,6,17
83:7 85:7 87:17,18
87:19 89:13 90:21
90:22,23 92:5 93:8
93:10 94:9,10 96:7
97:12 102:22 103:2

103:6,22 105:14
108:6,11,12 111:2
111:10,11,17,18
114:14 115:9,10
116:3,8 117:5,6,14
117:15,16,21 118:8
118:9 119:9,10
121:11,12,13
122:11 123:11,13
124:12,13,14
125:23,24 126:2
127:17,18 128:12
128:13,13 129:2,3,4
129:10,11 130:6,7,8
130:11,12,18,19,20
130:22 131:6,8
133:5,6,7,15,16
134:16 139:10
141:11,14 142:8
143:22 148:7 150:4
150:5,24,25 152:6
152:10,19,20 158:2
158:14,15 160:12
160:13,20,21 161:4
161:5,6,14,15 162:4
162:19,20,21 163:9
163:10,23 164:7,8
164:23,24,25
166:19,20,21
167:25 170:3,24
174:21,22,23
177:21,22 179:19
179:20 180:9 181:3
181:9,10,11,24
182:6,7,22,23,25
183:12,13,14 184:5
184:6,7,17,18 185:6
185:7,8,18 186:19
186:20,23 187:20
189:22 190:25
192:12 195:16,17
195:19 198:2 203:7
204:7,10 206:17,18
207:23 209:15,16
216:3,21 218:12

219:7,19 220:25
222:4,5 223:3,17,18
224:25 226:12,13
232:14,15 234:16
238:7,22 239:5,6,16
239:17 242:25
243:2,11
**objections** 49:4
158:6,9,18
**obligated** 63:10
**obligations** 20:8
145:20
**observations** 215:11
**obtaining** 192:25
**obvious** 50:10,16
**obviously** 116:14
**occupancy** 232:3,4
**occur** 11:11 50:22
51:3 68:21,22
120:14 222:24
**occurred** 11:15
24:16 120:13
141:17 154:12
**occurs** 223:5,5
**october** 56:5
**offer** 16:21 17:3,6
20:11,16,22 21:3
108:2,4,9 111:6
149:17 150:15
**offered** 224:14,17
**offers** 100:12,13
**officer** 30:15 37:18
38:15 39:3,8,16,20
40:5,8,10
**offices** 1:17
**official** 4:5
**offset** 94:7 189:10
**offsets** 188:10
**offsetting** 116:15,18
237:18
**oh** 31:8 80:18 230:7
**ohc** 212:25
**okay** 11:3,4 22:14
27:13 29:10 32:2
33:16,21 34:25

38:23 43:19 49:3
53:17 54:16 58:19
61:3 66:12 69:10
72:20 80:18 87:2
97:2 99:24 101:16
110:12 112:22
126:10 134:19
160:24 162:14,24
163:25 164:10
165:8 167:22 168:5
169:18 170:6
173:19 177:4,14
180:17 189:18
191:21,22 207:16
207:20 217:13
219:2 220:12
221:22 223:23
227:12 230:7,17
234:9 237:16
239:11
**once** 29:3 112:23
170:2,5
**ones** 15:14 206:11
213:12
**ongoing** 91:7 100:14
169:21 170:19
204:8
**open** 20:16 21:7
85:14 86:11 91:3
93:19 95:10 98:6
228:24
**operates** 205:9
**operating** 91:6,13
91:15
**operations** 190:17
**opine** 153:22,23
**opining** 153:16
**opinion** 142:16
143:15 149:12,24
150:8,14 151:25
158:18 175:7
232:18 233:12,21
233:22,24
**opinions** 214:18
232:25

**opportunity** 154:23
155:4 234:10
**opposed** 13:20
157:13 159:7 160:6
201:11 243:5
**option** 228:23 229:3
229:4,11,11,12,13
**oranges** 236:15
**order** 16:3 19:25
20:9 21:4 29:9 32:4
50:12 55:21 56:10
62:2 70:21 71:4,10
74:19 75:7,13 80:7
86:14 100:11 101:9
108:17 197:5 201:3
214:3 224:12
238:21
**ordered** 237:25
**originator** 192:24
193:5,15
**ought** 75:25
**outcome** 125:11
245:19
**outcomes** 93:16
146:16 147:12,14
**outer** 104:20,25
**outlier** 206:9,16,24
**outliers** 206:12
**outline** 34:12
**outlined** 180:4
**outlines** 27:16 28:9
**outside** 10:15,18
100:25 185:22
189:2,2,3,3
**outstanding** 27:2,10
**overall** 45:22,24
224:18
**overstate** 67:15
69:24 74:4

| p |
| --- |

**p** 2:2,2 3:2,2 4:2,2
5:2,2 6:2,2 7:2
145:5

**p.c.** 5:20
**p.m.** 108:21 144:16
145:3 244:6
**page** 18:2 19:13,14
22:22 23:8 26:22
27:13,14,16,18,22
29:7 30:10 34:13,22
34:24 35:5 42:24
43:3,4,8,12,14,15,21
44:8,12 45:11 51:13
51:17 58:8 61:2
64:7,8 76:12,23
77:18 80:24 81:2
84:4 92:24 102:12
104:5 107:11 109:3
109:4,9 113:3
118:11,24 121:3
138:8 140:18 141:2
141:8,25 151:7
158:21 171:5 172:5
176:2,7 178:19,24
179:13,25 180:4,6
181:15,16,17
188:24,24 191:10
191:17 192:8,16
196:3,18,21 198:6,9
198:25 212:16,17
212:18,20,23,24
213:14 217:3 218:3
218:16,23 220:18
221:13,22 228:21
228:21 235:19
243:17 246:4,11
247:7
**pages** 10:3 15:22,23
15:25 16:2 191:13
**paid** 57:11,23 61:7
61:13,16,20 66:19
68:6,25 94:7 116:11
116:11,22 222:25
238:19
**paper** 124:11
191:13
**papers** 122:8 132:19

**paragraph** 30:11,11
30:13 31:21 38:24
39:18 55:12,14 57:7
60:22,23 93:12 94:3
94:12 120:25 121:3
121:4 130:4 131:2,4
131:14 136:3 141:3
141:25 145:12,13
151:7 158:21 168:4
173:18 174:5 176:6
176:17,18,22 177:9
178:12 179:5,6,8
192:22 196:20,22
199:8,9,21 200:9
201:8 202:15,22
204:16 207:19,22
208:13 209:5,14
218:3 227:2 228:3
234:4,7,11 237:9,20
**paragraphs** 197:13
197:14 204:14
209:5
**paren** 46:18
**park** 3:16 5:22
**part** 9:15,17 11:21
30:14 31:24 38:25
71:8 108:2 121:16
121:19 126:19
127:23 129:8,25
131:15,19 143:25
154:19 163:15
165:23 170:16
188:6 201:20 210:5
218:15 239:8
**participate** 77:22
**participated** 10:12
**participation**
143:21,23
**particular** 20:4
21:23 29:7 31:7
34:23 38:21 45:20
74:13,22 81:2 89:14
97:4 100:23 114:5
120:8,9 123:14
200:22 218:10

224:19 228:17
241:8
**parties** 36:18 90:2
117:12 245:17
**party** 231:14,16
**pass** 116:6 210:25
240:4
**pause** 23:2 191:7
211:5,25 216:10
240:13
**pay** 94:8,22 180:14
206:20 228:23
229:3,4,11,11,12,12
**paying** 90:2,4,5
237:11 238:13
**payment** 25:13,17
28:9 44:23 48:9
57:23 70:17,17,18
70:19 71:16,17
89:25 95:23 104:8
117:3 118:14 128:6
145:18,19 146:14
147:25 151:19
152:25 153:7
158:23 159:16
162:10 169:6
171:10,24 172:4
177:16 181:5,21
182:16,19 184:2,24
186:9,15 187:18
202:25 203:13
215:25 219:9 222:3
224:12 233:13
238:4
**payments** 24:3
25:22 26:8 30:20
35:22 61:17 63:8,10
71:22 72:2,9 84:2
86:21 88:6,7,7
95:23 104:10,23
105:3,9 106:4,5,11
106:23 115:23
145:20,21 146:17
146:19 147:13,21
148:13 151:22

153:7 155:17,21
160:10,18 161:12
167:8 168:10,14,15
168:16,19,21,22
169:9,12,14,17
172:10 177:19
178:5 179:2 180:3
181:13 187:23,25
219:11 222:14,18
222:19 224:2,6,16
225:14 226:9
233:18 234:2
237:18
**payout** 46:16,23
47:2,2,4 51:18,22
53:11,20 54:13
66:17,18 67:24
68:11 69:2 70:4,5
102:17 104:2
106:13,14
**payouts** 118:17
**peachtree** 2:20
**pending** 20:21 94:14
**people** 11:20 41:23
42:15 75:23
**people's** 15:4
**percent** 44:23 46:16
46:18 51:19,22,24
51:25 52:3,3,7,8
53:11,12,19,20
54:13,14 65:17 69:6
69:9 71:20,23 73:8
73:12,14 87:5,11,15
87:25 88:15 89:9,9
89:17,19 90:10
96:10 97:5,15
102:17 103:11,13
103:13,14,14,15,16
103:16,18 104:2,7
105:6,10,16,16,18
105:19,24 106:11
110:2,13,15 173:24
174:12,13,20 175:8
175:21 176:15,16
198:12,13,13 199:4

199:4 201:5,6,10,14
206:16 217:8,14
221:20 225:5,11,16
225:20,24 226:3,6
226:11,23 235:23
236:3,6,7,20,23
237:2 238:10,12
**percentage** 48:9
50:12 70:18 91:25
109:25 115:5
173:25 215:7
217:23 220:24
221:3 223:8
**percentages** 44:23
93:6,15 176:13
198:11 205:18
215:7
**perform** 39:9
**performance** 64:24
64:25 82:15 83:10
227:7
**performed** 30:18
31:2,21 39:3 106:21
168:8 185:3 206:8
**performing** 88:9
238:15,15
**period** 140:22
190:22
**permitted** 113:20
174:11 175:5
**person** 36:14 78:23
79:4 171:3
**perspective** 24:2
103:12 145:15,15
147:6,8 153:4
155:16 157:2
194:22
**peter** 5:24
**pfeiffer** 1:16 7:9 8:1
9:1,7,8,9,10,11 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
22:12 23:1 24:1
25:1 26:1 27:1 28:1

**[pfeiffer - policies]**                                                    Page 25

29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1,21 75:1,2
76:1,25 77:1,2,6
78:1 79:1 80:1,2,9
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
96:22 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
107:10,22 108:1
109:1 110:1 111:1
112:1,7,23 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1,5,10,14 139:1
140:1 141:1 142:1,2
143:1 144:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1

174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1,3,3,4,6
190:6 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
207:10 208:1 209:1
210:1 211:1,8 212:1
213:1 214:1 215:1
215:14 216:1,11,13
217:1,15 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1,16 241:1
242:1 243:1 244:1,9
245:11 246:6,11,13
246:20,21 247:6,21
**pfeiffer's** 142:14
**pgoodman** 5:25
**phelps** 6:12 7:11
   8:17 9:22 10:14,15
   10:18,19 11:23
   12:12 27:20,24
   29:22 33:10 37:5,17
   38:14 43:17,19 44:4
   77:11 103:4 133:2,9
   219:13
**phone** 8:24 9:2
   12:21 36:22,23
   173:3
**phrase** 228:4
**piece** 218:17
**pieces** 123:3 124:11

**pin** 40:7
**place** 13:5 36:10
   166:4 219:14
**plaintiff** 139:20,22
   210:18 214:9
**plaintiff's** 139:19
   192:17
**plan** 24:4 26:9 27:8
   30:21 33:4 35:3,12
   35:20 37:21 39:15
   40:12 41:5 42:6
   44:24 45:22,23
   46:17 47:6,24 48:3
   48:4,8,13,24 49:7
   50:7,18 55:18,20
   56:5,8,19 57:8,20
   57:25 66:10,12 71:5
   73:2 81:3 82:23
   83:20,23,25 84:2,6
   85:10 86:18 88:13
   88:14 89:18 91:14
   91:16 92:21 93:5
   94:25 95:2,5 97:16
   104:12,19,21,24
   105:20 113:19,23
   116:20 117:22,25
   119:19 121:7,22
   122:5,25 123:9,18
   124:4 125:6 126:14
   126:24 127:8,21,22
   127:24,25 128:15
   128:18,19,20 129:6
   129:9,15,17,18,20
   132:13 135:8,8
   145:22 146:18
   147:14,21 152:12
   154:6,16,19,24
   155:22 156:7 157:3
   157:13 159:7,19
   160:5,11,19 161:3
   161:13,19 162:14
   163:5,12,15,20
   164:18 165:12,12
   165:14,20,20 166:4
   166:8,15 168:12,17

171:7,9,21,22
172:21,22 174:12
176:9,24 180:21
181:7,14 183:21
186:10 187:23
188:2,4,7,11,14,19
189:10,14 194:11
195:2 210:5,15,24
214:11 216:2
219:11 220:17,21
222:19 223:4,8
224:18 225:15
233:9,19 234:2
237:17,20 238:15
239:7,15 241:13
243:14
**plan's** 147:21
**plans** 48:14,17
   49:12 179:2 193:9
   193:18
**plaza** 3:16
**please** 16:7 43:7
   58:17 71:3 80:14
   99:23 130:15
   145:11 160:14
   161:7 211:4,22
   213:7 219:21
   223:22 232:22
   235:18
**pllc** 6:4
**plural** 79:2
**plus** 70:18 71:25
   72:7,13 221:4
**poc** 60:14,17
**pocket** 138:25
**point** 20:20 26:23
   35:8 68:21 98:11,12
   114:9 117:8 171:14
   179:17,18 191:12
**pointing** 31:21
**points** 54:7,11 95:16
   98:12 131:2
**policies** 205:22
   213:25

**policy** 104:11,16
106:24 174:11
175:5 203:16
237:23
**policyholder** 238:17
**policyholders** 46:16
47:2 51:18 55:20
56:25 57:5,11,11,22
57:23 115:24,25
117:4,10 168:18
196:5 224:23
237:11 238:13
**population** 196:24
202:7
**portion** 32:5 68:5
111:23 168:18
224:8
**pose** 101:15
**posed** 39:22 79:11
**position** 183:22
193:5
**positives** 148:3,4
**possibilities** 92:14
**possibility** 92:11
163:22 239:2
**possible** 113:15
189:6,7 239:22
**post** 196:6
**potential** 26:13
35:22 87:4 92:9
98:6 100:8,14
101:10,20 102:6
112:10 113:5,16
115:11,14,20
116:17 159:14
188:10,14 194:5
195:5
**potentially** 116:4
**powerpoint** 10:19
27:22
**precise** 109:8
**precisely** 13:22
14:15 213:5
**predicament** 206:4

**premium** 25:13,17
25:22 88:7,11
169:13 237:18
238:10
**premiums** 18:16
19:19 22:7 87:25
88:16 89:5,12,19,24
89:25 169:14
180:14 187:13
188:5 189:9 237:11
237:21 238:14,17
238:19
**preparation** 10:13
74:25
**prepare** 9:15 10:9
16:25 49:23 214:4
**prepared** 21:8 27:18
77:20 200:10
215:24 217:19
**preparing** 77:22
96:20
**prepayment** 199:22
199:23 200:5
227:13,18
**present** 6:19 11:18
12:3,7,8 13:2 48:4
48:18 49:24 106:4
155:10 168:21,23
174:9,10 175:3,5
178:25 181:14
187:22 188:16
189:12 218:2
220:16 221:8 224:5
224:13,14,17,20
225:4 226:8
**presentation** 10:6
11:2,4,7,11,15
14:12,16,19 15:6
17:2,7,20 18:3
22:22 25:6,8,9
34:20 35:5,9 37:23
38:11 43:21 58:9
102:13 109:10
118:12 131:5,10,16
131:20 151:14

154:2 159:13 171:6
171:20 178:10
180:12,19 195:21
198:6,10 216:12,18
218:18 246:23
**presentations** 37:24
44:7
**presented** 15:4
37:23 49:13 50:7,9
51:21,22,23 56:9
58:21 60:25 72:19
74:2 133:10 169:20
189:12 196:5
**presenting** 48:3,12
48:17,23 49:6,11
50:18 54:4 56:19
**presents** 48:3 172:9
**presumed** 167:6
**pretty** 237:3
**previous** 101:25
**previously** 39:13
42:4 107:17 145:6
**price** 231:22
**priced** 156:6
**primarily** 42:19
139:25
**prime** 228:22
**principal** 64:13
136:16 162:7
**printout** 138:9
**prior** 36:6 38:19
77:24 78:4 108:24
136:9 139:17
153:25,25 211:15
215:14
**privilege** 99:10,20
**pro** 119:17
**probable** 115:12,14
194:24 210:20
**probably** 179:10
**proceed** 20:18,24
21:8 31:10
**proceeding** 55:23
56:11

**proceedings** 12:2
121:17 124:20
145:4 193:9,19
**proceeds** 98:6 100:8
101:11,20 102:6
112:10 113:5,16,24
116:19
**process** 143:25
165:23
**produce** 19:10
33:14 74:23 75:3
126:7
**produced** 15:20
19:6,7 21:18 38:4
38:16 134:15,18
**producing** 80:3
**product** 11:13 84:25
99:12 228:10
229:14,15
**production** 75:11
134:23
**professional** 1:20
245:8
**proffered** 139:15
**profits** 137:13
138:15
**progress** 177:13
**prohibits** 237:17,20
238:2
**project** 59:14,15
198:23
**projected** 30:20
35:21 59:11,21
60:13 62:9 64:25
83:25 86:17 88:24
91:13 93:5 97:16
106:3,15 115:23
145:21 146:17
147:13 148:13
151:22 153:7
155:17 168:10,13
168:15 169:9
172:10 176:23
177:19 178:4 179:2
191:25 192:14,21

196:13 198:24
200:8 208:10 210:3
219:11 222:19
225:14 226:9 227:4
227:6,8,10 232:16
233:6 236:24
**projecting**  196:19
227:18
**projection**  51:3,5
**projections**  140:21
141:5,12,16,18
142:23,24,25
147:17 172:20
173:20
**proof**  55:5,6 60:17
60:20 62:9
**proposal**  10:8 16:6
17:17,18 19:2,10
22:20 23:6,25 24:6
24:9,12,14,15,21,22
25:11,16,21,24 26:5
26:11,24 27:9,16
28:2,3,8,17 30:8
44:11,14 106:3
108:23,24 109:3
119:23 120:3
127:25 131:13
135:6 146:21 147:4
149:19,21 152:24
155:23 156:9 157:5
171:8,22 182:14
183:5 184:10 186:7
189:8,11 201:25
220:21 221:16
233:25
**proposals**  17:11
**proposed**  19:18 22:5
56:8 149:14,25
160:11,16,18,25
161:10,12 162:13
**protected**  19:25
29:8
**protecting**  20:8
**protection**  75:11

**protiviti**  6:20 7:20
**provide**  16:5 33:9
33:22 39:21 40:2,5
40:11,19,22,25
41:11,17,18 43:24
44:6,9,10 48:7,19
64:17 84:20 85:5
96:19 105:4 111:25
134:5 135:15
136:10 149:12,16
149:24 150:8,10
153:19 157:6
159:12 161:22
167:14 170:19
196:23 197:19
199:12 201:13
220:3,22 224:20
228:2
**provided**  26:11 29:7
33:8,13 34:3 43:4,9
43:17 44:9 45:3
64:5 67:7 82:8,13
82:19 85:8 86:15
95:5 103:15 106:8
132:13,24 133:9,19
134:8,9,12 150:13
150:14 155:3
172:11,16 173:21
174:5,20 181:13
194:11,12,20 195:2
197:25 199:7 202:9
210:5 212:3 214:6,8
216:4 218:16 225:9
227:25 233:25
243:6
**provides**  26:25,25
57:8 117:23 145:17
154:20 198:3,3,6
**providing**  65:16
98:19 102:14
124:24 140:7 228:6
241:16
**provision**  164:13
**provisions**  74:18
75:7 80:6 108:16

193:2
**prudent**  48:4,13,23
49:6,11
**prudential**  5:14
**psa**  127:22
**public**  1:20 11:9
145:7 242:2 244:15
245:8 247:25
**publicly**  134:14
173:13 225:10
**puerto**  83:11
**purely**  44:9 178:19
**purported**  217:16
**pursuant**  44:24
46:17
**pursue**  165:22
**pursuit**  208:8,17
**put**  10:19 21:11
27:20 93:6 115:4,15
172:14 179:21
188:18 197:9
199:15 200:7 215:9
218:22

**q**

**qualified**  150:7
**qualify**  18:4
**qualitative**  178:14
**quantifiable**  148:10
148:10 220:8
**quantification**
93:14 105:15
**quantifications**
93:11
**quantified**  91:21
131:22,24 132:7
180:16,20
**quantify**  87:3 88:25
89:20 91:18,24 93:9
135:20 136:4 180:7
180:13
**quantitative**  178:14
**question**  16:7 19:23
22:3,13 24:11,20
31:7,18 35:7 43:7

49:3 53:15 58:15
71:3,8 73:17 82:13
83:6 96:24 98:14
99:22 100:5,16
101:15 102:3,5
108:14 110:10
126:4,6 128:3
129:13 130:15
132:5,19 136:9
149:24 150:7,20
159:17 160:14,22
161:17 163:18
164:5 165:3,5,8
174:18 187:5 191:8
191:16 204:16
219:3,21 222:15
232:21 234:9,17
235:16 237:6
**questionable**  122:6
**questioning**  91:8
112:7 235:8
**questions**  14:5,8,9
21:15,21,22 29:5
33:23 34:8 39:21,23
39:25 41:14 76:17
79:10 83:6,9 86:4,9
96:14 112:20 123:4
150:11 156:15
204:15 240:9
241:18
**quick**  177:2 242:14
**quicker**  223:9
**quote**  102:16 142:4
172:14
**quoting**  140:18

**r**

**r**  2:2 3:2 4:2 5:2 6:2
7:2 145:2,5 245:2
**r&w**  18:18,18 26:15
132:2
**raise**  112:21 237:10
238:3
**ran**  197:12

**[range - recoveries]**

**range** 30:19 35:16
39:4 52:25 65:9
69:2,4 97:11 146:16
146:19,20,21,22,23
146:25 147:12,14
147:23 148:2,3,6,8
148:15 151:21
152:5,9,16,18,22,24
159:12 168:9
174:13,17,19
176:14 177:18,20
178:3,6,8,11,13,16
178:18,21,23,24,24
178:25 179:4,6,9,11
179:14,17,22,23,24
179:25 180:2
181:16,23 182:5,17
183:10,17 184:4,16
185:4,11,16,21,22
185:23 186:16
187:19 189:2,12,19
198:7 201:3 204:5
206:5,6,20,22,23
209:22,25 218:6,10
218:21 219:4,6,15
220:2,3,6,8,13,16
232:12,18,24 233:6
233:10,15,16,18,25
**ranges** 69:9 218:14
218:16,18,22
**rata** 119:17
**rate** 35:16 46:18
51:19,23 53:4,7,8
53:11,20 69:5 71:21
71:23 73:13,14
95:19 96:10 97:4,5
97:14,23 142:4
148:22 154:25
199:10,20 200:3
204:13,18,22
205:13,17 206:5
223:12 234:5,18,21
239:10,19,21,25
**rates** 52:3 53:2 69:3
69:5 142:5 143:5

147:18 199:22,24
200:4,5,6,20 227:8
227:14,18 228:8
230:9,12,14 231:7,9
231:11,15 232:2,3,4
239:3,14
**reach** 48:21 49:4,10
56:7,17 62:2 86:20
86:20 124:8 126:11
151:17 172:17
**reached** 64:18,20,22
64:23 68:9 155:24
159:24 173:11
**reaching** 68:16
124:17
**read** 22:4 30:11
54:23 71:9 99:25
171:14,17 192:21
207:14,17 208:22
208:24 209:3
219:20,22
**reader** 43:17 48:19
50:6
**readers** 48:8
**readily** 238:9
**reading** 140:24
**real** 47:20 212:4
**reality** 140:21 141:6
141:13
**realized** 110:2,3,14
**really** 72:6 99:19
156:14 178:11
**reason** 49:17 69:23
70:2 150:7 217:22
219:14 221:24
247:7
**reasonable** 30:19
39:4 45:8,15,20
46:3,7 52:10,13
67:3,10,13 69:15,19
87:12,15,22 88:19
90:10 97:5 105:25
142:4 146:24
151:21 152:4,9
153:5,17 154:10

155:9 168:9 174:16
174:20,24 175:8,10
177:18,20 178:3,6
178:15 179:9,16
181:23 182:5,17,24
183:10,16 184:16
185:4,10,22,24
186:8 187:2,8,9,19
204:18 218:6 220:4
220:13 238:5
**reasonableness**
45:12,21 97:8 106:2
106:6,7 145:14
146:9,10 148:2
149:17 150:14
178:13 179:11,15
180:2 184:4,12
185:17 186:16
209:22,25 214:19
220:2 226:23
232:19,25 233:13
**reasonably** 146:18
146:24 149:2
**reasons** 48:6 50:10
50:16 221:24,25
**recall** 12:18,20
13:20,22 14:2,4,6,8
17:24,25 25:21 26:3
30:9 34:8 37:8
40:15 87:13 96:8
102:10 105:7
119:21 137:15,23
137:24 143:8,9
170:15 212:2,5,13
213:4 216:6 218:6
231:13 240:19
241:2,6,15 242:21
243:4,16
**recalling** 18:7
**receipt** 23:16 29:21
30:7 98:2
**receive** 16:18 17:10
34:15 41:3 57:22
66:3,9 72:4,25 73:8
84:12,16 105:15

116:2 118:16 128:6
128:9,16 159:6,19
160:4 164:4,20
166:16 167:11,15
219:10 223:8 224:4
224:6,8,10,12
238:18
**received** 17:16,17
19:2 21:18 22:19
23:21 24:6,13,21,23
27:17,25 28:4 38:5
38:7,10 70:22 71:11
81:4,21 95:23
108:23 109:3 112:8
119:18 123:18
135:5,6 158:6
162:10,18 172:12
172:19 173:6
236:20 240:18
241:2,7,10 242:21
**receiving** 37:7 104:8
**recess** 31:16 74:10
112:5 177:8 207:6
**recollection** 12:10
138:19
**reconfirm** 154:9
**record** 7:16 12:22
20:16 21:12 22:4
36:20 71:9 77:5
80:14 99:25 101:6
107:12,17 211:4,23
219:22 241:22
242:16,20 245:14
**records** 36:17,22
**recover** 121:8,19
163:4 165:12,14
**recoverable** 195:7
**recovered** 117:7
**recoveries** 18:17,18
19:21 22:9 25:24
26:6,13 35:22
101:11,12 104:23
115:19 116:5,6,25
118:7 119:12,13,25
120:6,7,8,12,13,14

120:15,18,20,22
122:20,21 123:16
130:2 132:2 135:3
135:10,12,14,17
164:22 166:18
167:21,22 174:10
175:4,4 192:2,15,21
193:13 194:6,18,19
194:20 195:5,9
208:4,10 209:20,23
210:4
**recovers** 120:7
**recovery** 26:15
68:25 115:5,21
116:17,23 123:17
123:24 125:3
132:16 159:7 160:5
162:18 164:4
165:19 166:10,25
167:9 176:10 195:6
217:4,7,17,24 224:9
233:9
**reduced** 59:5 86:22
122:2,6 123:8
124:10,18 125:11
125:20 126:13
127:3
**reducted** 59:19
**reduction** 87:25
88:15 89:17,18,20
90:10 92:19 103:18
104:7 105:24
106:11,22 126:22
238:10
**refer** 15:2 71:14
110:25 135:25
167:20,21 171:4
209:6,6 215:18
**reference** 83:10
113:2 138:9 172:25
178:12 179:8
191:25 215:5,20
216:6
**referenced** 26:18
113:13 119:2

127:21 131:11
192:15
**references** 85:11
199:9
**referred** 22:18
26:20,22 39:17
47:11 93:12 114:9
120:2 129:5 136:8
142:24 173:5,21
178:12 179:4,6,12
200:3,4
**referring** 10:25
18:13,23 46:22
76:13 120:12,18,20
128:21 135:3,13
175:25 176:8
208:25 231:13
**refers** 47:2 111:8,15
202:22 208:2,3
**reflect** 16:20 63:4
70:12 72:12,13,18
105:24 123:6,19,21
124:3,7 132:3,10,20
146:2 158:7 192:8
202:5
**reflected** 47:5 71:18
96:21 120:4 178:19
210:22
**reflective** 97:23
**reflects** 38:7 58:24
63:5 64:12 68:4,5
71:25 72:8 104:7
109:16,23 110:4
132:22 133:12
192:6,10
**refresh** 138:19
**refuse** 39:24 41:11
**refused** 21:5 40:2,5
40:18,21
**regard** 34:17 41:15
41:18 75:8,18 82:16
82:20 86:9,16 97:6
97:8,9,23 152:13
155:19 187:5
227:23

**regarding** 96:9
**regards** 165:9
**regional** 82:15
83:11,19 84:5
113:21
**registered** 1:19
245:7
**regulatory** 208:3
**rehab** 104:12,24
146:17 147:13,20
147:21 172:21
234:2
**rehabilitation** 24:3
26:9 30:21 33:4
39:15 40:12 41:5
42:6 47:6,24 48:4
48:13,15,24 49:7
50:6 55:18,19,22
56:5,8,11,19 57:8
57:20,24 66:10 81:3
82:23 83:20,23
88:13,14 93:5 95:2
95:5 97:16 104:19
105:19 113:19,23
145:22 154:24
155:21 156:7 157:3
159:7,19 160:5
168:11 171:7,9,21
171:22 174:12
176:9,24 183:21
186:10 187:23
188:11,14,19
194:10 195:2
205:25 210:5,24
214:11 225:15
233:9,19 237:17
239:7,15
**rehabilitator** 49:5
60:2 63:13 67:15
68:9 69:12,24 78:5
90:9
**rehabilitators** 48:22
49:23 51:9 56:18
62:17

**reimbursements**
237:22
**reinsurance** 94:2
95:22
**rejected** 139:6,9
**related** 10:7 12:19
18:9 64:24 77:12
82:14,14 98:7,8,9
98:16,20,24 100:2,8
100:9 101:20
104:10 105:16
106:12,23 112:10
112:11,12 113:5,6
113:16 115:16
118:17 187:14
212:3,8 226:5
245:16
**relates** 19:24 47:17
209:8
**relating** 100:12
101:7
**relationship** 232:17
232:23 233:5
**relative** 18:11 24:2
105:3 141:16
149:18 150:8
155:17 175:3,7
182:13 183:19,20
201:24 215:5
220:19 221:7
225:12 226:8
**release** 160:9,17
161:2,11,25 162:6
164:13 167:17
**released** 163:7
**releasing** 164:13
**relevant** 90:19
**reliability** 142:25
**reliable** 139:25
140:11 142:15
**reliance** 140:20
141:5
**relied** 74:21 80:2
81:18,20 96:19
141:12 204:21

**relief** 75:9
**rely** 80:8 109:20
**remain** 18:22
**remained** 94:23
  119:6
**remaining** 117:9
  184:3
**remains** 158:18
  237:3
**remind** 215:10
**remove** 55:21 56:10
  112:19 193:8
**renegotiation** 193:6
**reorganization**
  48:15 128:20
  129:19 165:13,23
**rep** 122:13,14,15
  162:25 163:7,16
  165:18 180:23
**repair** 139:2
**repeat** 16:7 43:7
  71:3,7 96:17 130:15
**replace** 193:8
**replicate** 53:19
**report** 9:8,9,13,14
  10:24 12:15 15:12
  26:16,20 39:18
  55:12,15 56:3 74:25
  80:3 81:7,18,19,22
  92:23 93:13 94:3
  96:22 104:4 107:3
  109:11,21 120:23
  126:13 131:14
  135:24 136:4
  143:25 146:6
  158:19 159:13
  172:5 173:18
  176:20 177:10
  196:3,18 199:7
  203:22,23 207:8,10
  211:24 214:5 215:9
  215:14 218:4,17
  219:14 221:12,19
  227:3 232:13,20
  233:3 235:19

  246:13,22
**reported** 85:24
  137:18 138:5
  246:17
**reporter** 1:20 8:19
  9:6 76:22 107:10
  137:17 189:25
  230:5 245:8
**reports** 158:6,8,17
  214:9
**represent** 7:14
  73:22 211:10 217:9
  217:16
**representation**
  193:14
**representative** 78:6
  234:14
**representatives** 78:2
  85:18
**represented** 73:20
  209:11
**representing** 8:25
  217:24
**represents** 61:12
  65:8 70:16 72:24
  73:18 190:15,16
  192:19,20 217:10
  217:15 220:23
**reps** 119:18 192:24
**request** 33:17 84:17
  134:19,20,21,23,24
  202:13,14
**requested** 40:24
**require** 97:14 98:2
**requirement** 224:22
**requirements** 90:19
  191:4
**rescap** 9:21 12:20
  27:2,10 28:12 54:24
  58:10 59:6 98:7,9
  98:16,20,24 100:2,9
  112:12 113:6
  117:17,17,20
  118:16 160:10,11
  160:17,18 161:2,11

  161:13 162:14,18
  163:2,20 164:4,12
  164:17,22 165:6,9
  165:14,25 166:14
  187:14 188:8 196:4
  198:19 234:14,19
  234:21,23 235:23
**research** 231:14,17
  231:18,20,21
**reservation** 107:18
**reserve** 75:8 76:15
**reserves** 36:3
  116:12,21
**residential** 1:6 9:24
  211:16,20 213:18
  247:5
**resolution** 27:2
  100:14 187:13
  188:7
**resolve** 31:9 75:16
**resolved** 27:11
**respect** 21:22 27:8
  33:3 41:21 42:22
  45:12 56:16 74:13
  75:11 82:23 85:21
  91:9 96:14 98:11
  99:9 100:17,23
  102:5 109:18
  114:16 139:13
  146:5 150:11
  172:22 178:18
  183:23 184:11,21
  198:7 202:6 212:6
  214:23 215:16
  216:5 218:20 222:8
  228:7 231:11 238:3
  240:17
**respond** 29:4 85:18
  157:11
**responded** 35:11
**responding** 83:6
**response** 18:14 35:6
  83:8,17 86:4 100:16
  101:3 136:9 242:14

**responses** 33:22
  34:3,6 82:13 83:15
  84:13,17 85:24 86:8
  86:10
**responsible** 9:18
  10:11
**rest** 91:2
**restate** 160:14
**restructuring** 30:15
  37:18 38:15 39:3,8
  39:16,20 40:5,8,10
  193:9,18
**result** 24:3 35:9,25
  53:12 80:20 81:5
  94:17,22 96:12
  104:6 116:17
  119:19 122:25
  126:23 128:17
  143:14,20 151:9
  158:24 159:15
  181:14 202:20
  203:3 204:3 206:16
  220:17
**resulted** 53:22,25
  54:4 173:12 206:9
**resulting** 82:24 84:2
  125:6 202:16 208:4
  218:20
**results** 38:8 147:23
  154:5 176:13 198:4
  198:5 200:19,19,21
**resumed** 145:6
**retain** 197:16
**retained** 18:8 26:6
  137:3,5,8,9
**return** 86:18 97:14
  97:25 118:15 142:4
  162:10
**returns** 87:4,9 142:5
  143:6
**reveal** 100:22
**revenue** 138:25
**reversed** 222:15
**review** 26:4 207:18
  214:3,15,20,21

**reviewed** 106:10
153:24 158:8
207:15 214:5,5,9,9
214:10 231:16
**reviewing** 48:14
**reviews** 171:9,23
192:25
**revisit** 102:3 154:24
**rfc** 118:17 234:6,13
**richard** 4:20
**rick** 9:3
**rico** 83:12
**rieger** 6:20 7:19,19
**right** 9:5,22 18:20
19:14 21:2,13 27:7
30:9 31:17 34:24
43:15 45:23,24 54:6
58:8 59:3 71:19
73:21 76:5,19 95:18
100:15 112:2
118:24 142:21
144:14 158:25
169:19 176:9 181:2
181:17 183:22
188:24 189:3,15
209:5 221:6 222:21
234:10,13 236:5,17
237:8 238:20 240:3
244:2
**rights** 18:8,13,16,17
19:20 20:8 22:8
25:23,25 26:6,13
75:8 76:16 107:18
161:20 163:16
193:7 237:21
**ripple** 181:6
**risk** 27:8,9 83:24
86:16,19 87:3 88:5
88:10,21,23,25 89:4
89:11 91:12,16,18
91:22,25 92:8 93:4
93:7,12 97:24
191:23 206:3,4
237:24 238:19

**risks** 85:12 92:13,23
113:22 147:3 148:9
148:17 149:18
152:12 179:14
180:5,7 187:25
188:11 189:4
220:20 239:11
**rlwynne** 4:21
**rmbs** 5:13 10:6
12:19 16:16 27:2,10
54:24 58:10 59:6,20
110:21,22 111:8,15
111:22,23 122:18
124:22 125:9 196:5
212:6,10,14,22,24
213:5,22 230:21
**road** 223:16
**robust** 228:4
**role** 168:3
**roll** 199:10,20 200:3
228:8 234:5,18,21
**rolling** 199:25
**roman** 121:2
**room** 11:22
**rooms** 11:24
**ropes** 5:11 8:5
**ropesgray.com** 5:18
**roughly** 61:23
**rpr** 245:24
**ruled** 139:24
**ruling** 93:2 142:20
143:25
**run** 122:19
**running** 75:23
240:12
**runoff** 173:20
**résumé** 212:13
213:14

**s**

**s** 2:2 3:2 4:2 5:2,24
6:2,16 145:2,2,2
247:7
**satisfaction** 145:19

**satisfactory** 60:5
**satisfied** 116:10
143:17,18
**saw** 108:5
**saying** 208:15
**says** 28:8 54:7,15,24
58:22 106:10 136:2
173:11 192:22,23
196:22 199:21
217:8 234:5 236:23
236:25 237:20
**scenario** 44:24
46:17 47:13,16,17
48:10,18 72:4 79:17
81:10,11,24,24
82:10,11,21 83:22
84:8,11 87:7 164:2
174:25 181:6,7
189:7 218:23,24
237:2
**scenarios** 50:7 79:17
85:13 122:20
185:15 200:11,14
200:17
**schedule** 84:10,21
84:23 103:15
132:12,23
**schedules** 133:10,17
134:7
**schrader** 229:25
**scope** 45:18,19
56:15 145:12
146:11 218:19
**scores** 232:9
**scott** 6:21 8:2
**screen** 15:4
**second** 18:16 26:23
31:6 48:8 77:18
113:3 138:13 141:2
216:9
**seconds** 228:23,24
**section** 85:21 120:24
121:2 196:18 199:7
209:4

**sector** 212:4
**secure** 197:6
**securities** 156:5,23
211:17,21 212:10
212:14 213:19,22
**security** 156:22
226:10,15 227:8
**see** 9:25 27:21 28:7
28:13 30:22 39:5
44:16,25 46:19 54:7
54:25 55:18,24
57:13 58:2 61:9
63:2 64:9 67:25
70:8 73:20 79:2,17
83:12 85:14 94:15
99:19 102:15,19
105:18 106:16,24
108:21 109:13
110:23 113:7
118:20 124:10
138:9,10,17 140:23
141:7,8 142:7,18
145:24 151:7,23
153:8 157:23
159:13 169:23
171:4,12,19,25
173:14 176:9
181:16 191:23
192:4 196:8,25
198:13,25 200:2,11
201:7 202:18 207:4
209:10 212:15
217:3 234:4 235:22
236:5,8 239:24
**seek** 75:9
**seelig** 6:11 8:16
**seen** 12:25 34:12
41:7 77:6 190:8
207:12
**select** 103:4
**selected** 102:21
204:25
**sense** 163:13 201:12
237:6

**sensitivity** 201:4,13
**sent** 11:14 77:10,24
    78:3 107:25 119:2
**sentence** 57:7
    106:10,20 138:13
    151:18 168:7 173:5
    174:4 175:18,19
    208:2,24
**sentences** 151:18
**separate** 32:6 67:11
    69:17 243:4
**separately** 27:12
    122:23 129:14
    165:7 228:14,16
**separation** 102:7
**series** 85:14 137:12
    138:13 198:10
**service** 227:20
    231:13
**servicer** 193:4,6,8
    230:8,12,14
**services** 231:12
**servicing** 193:3,7
**sessions** 131:25
**set** 166:5 211:4
    218:24 228:12
    232:19,25 237:21
    245:12,20
**setoff** 238:2
**settlement** 16:21
    17:3,6 18:11 19:18
    22:5,20 26:24 27:9
    44:11 74:16 100:13
    104:9 108:2,4,9
    117:18,20,23 118:2
    119:19 121:7,10,14
    121:23 123:9
    126:15 127:15,15
    127:23 128:4,11,15
    128:24 129:7,16,24
    130:21,23 131:13
    136:21 145:16
    146:15 149:5,9,14
    149:14,25 150:21
    152:24 153:6,15,18

154:3,11,18 155:9
155:18 159:8,20
160:6,9,16,25
161:10,18 162:2,13
163:8,12,14,19
164:17 166:14
167:18,23 180:21
181:8 182:24 185:5
189:10 194:6 195:9
201:21,25 202:3
**settlements** 117:11
    118:5
**seven** 139:13,14
    140:6 213:16
**seventh** 1:18 2:8
**severity** 200:23
    228:8 231:7,9,11,15
    232:2
**seward** 3:13 8:8,12
**sewkis.com** 3:19,21
**shaded** 176:8
**share** 119:17
**shared** 10:6 16:14
    16:16 25:8 216:18
    216:20,23,25,25
**sheet** 109:3,4 127:21
    190:16 247:2
**short** 31:13,14 74:9
    112:3 207:3
**shorten** 29:11
**shortly** 112:4
**show** 105:8 109:7
    122:9 124:11
**showed** 141:16
**showing** 27:15
**shows** 109:8
**sic** 204:25,25 205:3
    205:4,11
**side** 9:22,23 19:14
    27:7 44:12 102:16
    118:13 176:10
    180:25 181:2,17
    184:2 188:4,24
    189:3 210:18

**sides** 107:18
**sidman** 4:18 8:4,4
    16:23 19:22 20:15
    21:13,20 22:10,25
    23:3,9,13,18,22
    24:18 28:19,25 30:4
    31:3,9,23 32:3
    39:11 40:20 41:12
    41:22 42:12 43:5,22
    45:10,17 46:5,13,24
    47:9,25 48:25 49:15
    49:20,25 50:23
    51:10,20 52:5,11
    53:13 54:2,19 56:14
    56:22 58:13 59:23
    60:6,12 61:5 62:6
    66:5 67:5,17,21
    68:13,19 69:7,13
    70:15 71:2 72:5,14
    73:9,19,25 74:6,11
    76:14,19 79:23,25
    81:14,16 83:7,16
    84:14 85:7,20 87:18
    90:23 91:7 92:5
    93:24 94:10 96:7,13
    96:18 98:10,15
    100:10 101:25
    102:22 103:2,6,22
    105:14 107:12,16
    107:21 108:11,13
    109:17,20 110:7
    111:11,17,19 112:6
    114:14 115:10
    116:3,8 117:5,16,21
    118:9 119:10
    121:12 124:14
    126:2 128:13 129:4
    130:8,20 133:7
    150:4,25 152:20
    158:15 161:6,15
    162:20 164:25
    166:21 174:23
    177:22 179:19
    181:10 182:25
    183:14 184:7,18

185:8 186:23
189:22 195:19
206:17 235:15
240:8,15 241:17
242:13,18 243:2
246:8
**sidman's** 80:10
**siegel** 3:10 8:9,9
    53:14,18 75:18 76:9
**signed** 18:12
**significant** 41:18,20
    83:19 89:21 116:9
    122:12 124:21,24
    126:22 148:19
    154:17 227:22,23
**significantly** 125:11
**similar** 15:23 16:2
    88:22 115:15 183:2
    201:15 217:23
**simply** 208:7,16
    243:3
**single** 76:12
**singular** 78:25
**sir** 80:8
**sit** 109:24 136:5
    160:3 183:6 184:13
    184:24 186:13
**sitting** 11:25 100:15
    124:23 182:12
    217:13 241:9
**situation** 210:13
**six** 94:13,14 213:16
    228:22 229:9 234:8
    235:5,12
**slides** 10:20
**slightly** 64:4 185:14
**small** 14:18 111:23
**smith** 5:20
**soft** 220:10
**solutions** 247:2
**somewhat** 214:20
**soon** 222:3 235:14
**sooner** 223:14
**sorry** 8:21,22 53:14
    58:12 68:14 71:7

80:15 86:24 121:2,8
139:14 140:25
177:24 192:2 234:7
**sounds** 160:22
**source** 10:16
**sourced** 10:18
**sources** 10:22 11:5,9
204:22
**south** 187:22,24
**southern** 1:3
**speak** 239:18,20
**speaking** 60:8
**specific** 35:8 82:22
120:21 123:4
135:16 178:9
193:25 206:20
219:14 241:6,16
242:21
**specifically** 27:25
104:10 194:23
216:7 243:15
**specificity** 136:7
**speeches** 29:14
**spelled** 161:21
**spend** 42:20 89:21
**spent** 122:12 124:21
183:4
**split** 228:25 229:2
**spoke** 13:15
**spoken** 210:8
**sponsored** 54:24
58:10 59:6 118:18
**spread** 106:12
233:20
**spreadsheets** 42:5
**square** 121:15
130:25
**ss** 245:4
**stability** 205:22
**stamped** 77:3 190:5
246:15,20
**stand** 80:13
**standard** 89:8,10,14
148:13

**standards** 114:19
**start** 7:12 50:19
130:25 235:11
**starting** 37:11 91:5
179:17 196:18
**starts** 141:3 236:16
236:22 237:3
**state** 1:21 55:19
57:21 62:22 106:21
139:5 142:13
147:11 151:8
158:22 169:20
171:6 177:15 245:3
245:9
**stated** 55:19 97:22
107:13 111:20
178:17 182:15
**statement** 28:16,21
102:2 132:24
133:11,14 134:7
190:17,17 209:7
214:12
**statements** 132:15
157:11 190:5,11,19
190:21 191:13,15
208:6,22 209:12
210:22 214:10
246:19
**states** 1:2 30:14
44:13 46:15 57:8
118:13 138:12
141:24 142:2
145:13 196:3
**statutes** 90:19
**statutory** 90:18
190:22 191:3,15
**stay** 225:21
**steering** 5:12
**step** 72:22
**stonehill** 2:6 155:5
155:11 157:25
**stop** 158:25 237:11
238:19
**stopped** 61:17 63:8

**stream** 205:24
**streams** 238:11
**street** 2:20 4:16 5:15
6:6,14
**stress** 35:18 44:24
47:8,13,16,16,17,23
48:6,10,24 49:7,14
49:19 50:11 51:9
79:17 81:11,24
82:11,21 84:7
147:18 148:17
152:15 181:6 189:7
201:4 218:24 236:8
237:2 239:24
**stressed** 47:18
**strike** 10:21 36:11
50:14 51:14 173:10
206:25
**structures** 202:25
203:13
**sub** 228:20,24 229:5
229:5,6,7,15
**subbullet** 91:9
**subbullets** 92:12
**subject** 75:6 88:4
97:21 102:8 107:16
112:4,15 116:20
124:4 129:23
153:22,23 205:25
**subjects** 23:17 85:19
93:22 95:13 177:2
**submit** 75:20
**subprime** 228:23,25
**subscribed** 244:11
247:22
**subsequent** 24:10
29:24 64:14 66:20
70:19 153:11,14
155:7 158:5 161:19
180:19 222:14
**subsequently** 14:17
167:8
**substance** 14:19
83:5

**substantially** 15:7
16:24 17:22,23 18:6
65:23 224:3
**substantiates** 126:7
**successful** 125:2,5,8
126:20,23,24
154:16
**suffered** 137:13
138:15 141:21
229:19
**suffers** 140:19 141:3
**suggest** 225:16,19
**suggesting** 121:21
121:24
**suisse** 213:2,3,4
**suite** 6:6
**sum** 70:6 71:24
72:12 118:16
145:18
**summarize** 213:7
**summarized** 94:3
95:15 173:2 198:5
**summarizes** 97:22
214:13
**summary** 108:24
134:9 151:6
**superior** 158:24
159:15
**superseded** 124:2
**supervision** 217:20
**supp** 137:21
**supplemented** 231:5
**supply** 43:20
**support** 36:22 56:4
121:7 122:5 123:2,9
123:18 124:4 125:6
126:15,24 127:9,24
127:25 128:18
129:6,20 132:13
135:8,8 154:6,17,19
155:2 161:19 163:5
163:12,15 165:13
165:20,21 166:4,8
214:7

[supported - title]                                                                                             Page 34

supported 230:2
supposed 219:3,5,8
  219:9
sure 11:24 12:18
  21:16 31:5,8 38:6
  76:21 78:13 98:22
  115:3 226:5,7
  232:23
surety 205:4,12
surprise 225:6
surrounds 114:17
survive 130:4
survived 144:4

**t**

t 2:10 145:2 245:2,2
table 175:25 176:5
  221:11
take 13:4 14:17
  21:23 31:13,14
  36:10 74:9 79:15
  100:24 101:17
  112:2 144:14 165:6
  174:25 176:12
  177:2,6 198:12
  200:6 207:3 208:19
  208:19,20 222:7
  224:19
taken 31:16 72:21
  74:10 112:5 177:8
  207:6
takes 21:9 133:2
  215:21
talk 30:7 100:25
talked 46:22 168:6
talking 12:4 13:8,10
  95:17 100:21 121:4
  129:21 183:25
tango 21:10
targeted 86:18 87:4
  87:8
team 10:14 29:22
  30:7 34:5 40:17
  42:10,14 77:11,21
  78:13,20 197:8,12

197:17,24,25
  199:15 200:14
  227:22 229:25
  231:16
team's 240:25
technical 41:23
  42:15 103:12
teleconference 4:11
  4:22 12:5 13:4,6,17
  13:25 14:11,13 15:3
  26:19
telephone 36:14,17
  36:18 171:2
telephonic 11:16,19
tell 7:3 9:11 40:13
  52:9 53:6,8 65:12
  82:5 83:4 84:22
  91:3 93:20 105:4
  136:5 150:15,19
  151:3,4 152:23
  153:10 155:24
  183:15 186:6
  197:10 231:19
  236:10 245:13
telling 13:19
tells 72:2,6,6
ten 15:25 139:14
  140:7 211:18
term 52:24 78:25
  79:2 87:13 103:7
  127:21 145:23
  148:12 170:6
  222:18 228:19
terms 19:17 21:3
  22:5 24:22 25:2
  43:14,24 57:24
  113:24 116:21
  119:7 128:10,14
  150:16 165:19
  173:5 182:14 193:7
  222:9 223:20 224:5
  230:21
test 106:6 125:13,22
  205:11

tested 64:2
testified 7:4 42:5
  43:11 105:6 134:2
  144:10 145:8
  170:12 211:19
  212:5,7 213:3,8,20
testify 144:11 184:3
  213:12,13 221:23
testifying 23:7
  139:21 240:17
testimony 38:19
  74:20 84:18,19
  102:14 120:2 121:6
  128:8,14 133:4
  136:22 143:2,19
  167:19,24 178:16
  178:17 179:18,21
  212:21 213:15
  240:20 245:14
thank 55:13 76:18
  107:19 240:10
  241:17,19 244:3
thing 75:18 222:25
  229:13
things 29:11 75:23
  117:9 136:2,6
  145:17 154:12
  162:15 170:23
  171:2 184:2
think 12:14 15:25
  29:10 34:11 36:2
  50:5,9 58:18 60:9
  71:14 73:23 74:2
  79:4 80:25 88:19
  95:15,19 97:21
  98:18 101:12
  108:25 109:8 122:4
  126:4 127:5 129:13
  132:21 134:21
  136:11,15 138:2,12
  149:3 152:11,15
  154:20 166:9
  172:24 174:16,24
  175:13,22 183:16
  184:9 202:10

203:24 207:17
  208:2 209:11
  213:20 215:7,17,18
  216:4 217:25
  220:15 222:15
  223:19 235:5,13
  237:19 238:18
  239:2,8,18,25 240:5
  243:5,13
third 60:14 78:13
  91:9 231:14,16
thirty 234:8
thought 52:9 87:21
  88:21 92:14 177:12
thousand 58:12
  194:4
three 23:7 44:14
  79:19,22 81:11
  93:19 95:16,17
  110:21 125:12
  136:3 213:16 224:8
  230:5
tim 77:11 78:17
time 20:8 29:12 31:4
  42:20 51:5 58:5
  66:20 68:21,22 73:8
  76:6 86:25 89:22
  107:3 117:8 118:10
  119:21,23 122:13
  122:19 124:22
  144:16 145:3 158:4
  158:19 183:4
  203:22,23 217:18
  244:6
times 103:16 110:13
  110:15 125:13
  220:7 229:9
timing 36:3 68:24
  98:6 100:8 101:20
  102:6 104:10 105:2
  105:3,9 106:23
  112:11 113:5,16,25
  116:13
title 9:21

**today** 58:5 74:11,21
  75:21 85:8 107:11
  109:24 136:5
  153:20 154:7,9
  158:13,18 160:3
  176:20 182:12,15
  183:6 184:3,24
  186:14 217:13
  224:4 240:16
**today's** 214:4
**told** 40:18 82:21
  84:19 101:18,19,24
  144:8 194:16 226:4
  226:4 242:24
**top** 110:20 169:6
  192:15 201:6
  217:11
**topic** 84:3 102:11
**topics** 33:12 34:12
  77:12,18 79:7 82:13
  101:6 173:2
**total** 59:20 60:13
  62:9 70:3,16 137:13
  138:15 186:15
  192:20 196:23
  233:7
**tower** 5:14 6:13
**traded** 156:6
**trading** 156:4,11,16
**tranche** 203:12
**transition** 199:10,20
  228:8 234:5,18
**translate** 176:13
**travers** 77:3,11
  78:17 246:14
**treat** 55:20 57:5
**treated** 224:23
  225:14
**trees** 108:10
**trial** 143:14 211:19
  212:19 213:8,9,12
  213:13,14
**trials** 213:17
**tried** 20:4

**triggers** 193:7
  230:18,20
**true** 79:3 86:23
  116:24 164:19
  245:14
**trust** 3:6,14 61:14
  66:2,7 104:11,16
  118:18 133:20
  135:10 161:25
  167:10 196:5 197:9
  198:4,5 199:22
  202:24,24 203:5,5,9
  203:12,14 212:4
  213:2 223:23
  228:18
**trustee** 2:18 3:6,7
  8:11,13 12:19
  170:17,18
**trustees** 10:7 11:14
  11:25,25 12:3,7,9
  12:11,11,13,14,14
  12:19 13:24 14:13
  16:17 18:8,15 19:20
  22:8 26:14 44:7,10
  78:21 99:6,12 121:8
  122:19 124:22
  125:4,9 131:5,16,20
  149:13,20,25
  150:20 151:14,15
  152:23 153:5,10,15
  153:17 154:11
  169:21,25 170:4,7,8
  170:11,15 216:24
  216:24,25 217:2
  225:19,23 226:2
**trusts** 26:5 30:21
  63:21 64:3,14,24
  66:11,20 68:7,25
  70:23 71:12 72:25
  73:7 88:9 90:3
  106:24 110:18,21
  110:22,22 111:8,15
  111:21,22,22,24
  116:23 119:12,14
  119:16,16,19 120:9

120:10,21 122:16
  122:22 125:4,8
  127:10,14,14
  132:16 135:11,18
  136:14,18 145:16
  145:19,22 149:6,15
  150:2,23 151:5
  154:21 160:9,17,25
  161:11 162:8,17
  164:3,12,20 166:16
  167:2,10,13,14,17
  168:11,19 169:12
  169:15 175:12,17
  180:21,22 188:2
  195:7,8 198:20
  199:24 201:19,19
  201:20,22 202:2,7
  202:24 203:2,11
  220:24 224:19,20
  227:9 228:13,16
  229:19 230:10
  233:8 234:6,14,14
  234:19,22,23
**truth** 7:4 245:13
**try** 94:11 124:6
  171:19 235:8
**trying** 24:19 28:25
  41:13 191:12,18
**turn** 18:2 30:10
  176:22 191:10
  227:2
**turned** 226:7
**two** 11:15 15:15
  21:9 22:15 50:7
  54:11,12 72:18,22
  76:23 111:5 127:7
  147:16 151:10
  153:3 162:14 179:2
  212:8 213:15
  219:16 222:16
  229:2 230:5 235:16
  240:7
**type** 195:7
**types** 84:3 97:15
  228:11 229:9,14,15

231:9
**typical** 48:18
**typically** 136:15
**typo** 175:20

## u

**u.k.** 102:6
**u.s.** 8:11,13 12:17
**ultimate** 116:16
  123:17 128:20
  129:18
**ultimately** 116:22
  136:13 144:10
  167:15
**unacceptably**
  233:11
**uncertainties**
  148:18 152:13
  206:2 237:14 239:8
  239:20
**uncertainty** 97:17
  239:21
**unchanged** 119:4,6
  119:7
**unclear** 112:14
**underlie** 41:4 127:7
**underlying** 25:7
  35:19 41:24 42:17
  98:12 154:25 214:7
**underneath** 28:8
**understand** 21:20
  24:11,20 28:15
  35:24 43:18 47:7
  51:25 61:24,25
  70:13 72:16 78:16
  79:8 80:10 84:8
  87:14 96:15 109:7
  110:10 114:20
  131:16 132:5 134:6
  150:18 163:19,21
  165:2 170:8 173:4
  174:18 191:6
  211:12 213:9,11
  214:25 218:9,22
  225:8 234:17 235:6

241:13 243:14
**understanding** 12:6
  12:10 19:13 34:17
  35:4 36:3,7,13 38:9
  39:13,15 41:3 43:23
  44:11 46:21,25
  47:15,22 48:2,12
  49:22 50:20 51:8
  52:6 53:21 55:3,11
  56:2 57:15,19 58:23
  60:15,19,24 61:22
  64:11,21 66:8 68:3
  68:15,20 72:11,23
  73:5 78:3,17 80:21
  82:9 83:14,17 85:9
  85:10 93:25 94:4,25
  102:24 103:9 104:5
  104:13,15 108:8
  109:15,22 110:4,6,9
  111:7,14 114:7,10
  114:13,15,25 118:2
  118:3 123:25
  127:12,20 129:6
  139:8,11,24 141:9
  160:8,15 161:9,18
  161:24 162:3,5
  163:6,11,14 164:3
  164:10 166:15
  167:16 168:2
  190:13,23 191:2
  192:9 194:8,14
  195:11 210:2
  230:22 231:3
**understands** 21:17
  53:15
**understate** 67:20
  69:25
**understood** 28:20
  35:14,17,18,20 36:8
  87:21 88:5 215:3
**undertake** 153:12
**undertaken** 80:22
**undertook** 37:11
  146:12 151:10
  158:12 197:25

**underwriting**
  114:16,19
**undoubtedly** 51:4
**unemployment**
  47:19
**unfolds** 51:5
**united** 1:2
**unknown** 98:5
  113:4 121:18
**unknowns** 115:15
**unpaid** 62:10,13,25
  63:6,7,14,23 64:3
  65:18 66:19 102:17
  104:2 106:14 162:7
  198:18
**unreasonable** 46:11
  52:16,19 60:10
  185:23
**unsecured** 4:6 8:25
**updated** 14:17
  44:24 46:17 47:12
  124:2 173:20
  203:21
**updates** 98:4 113:3
**upper** 64:8
**ups** 136:15,17,19
**upside** 49:24 92:15
  115:12,14,20 148:9
**upward** 36:4
**usage** 92:20
**use** 52:21,24,25 53:3
  53:7,9 76:16 89:8
  89:10,14 92:22 93:3
  125:18,22 140:17
  148:12,13 196:15
  227:20 231:14
  234:4
**useful** 29:12 75:21
**utilized** 82:10

**v**

**valuation** 101:7
  121:22
**value** 30:20 57:9
  70:18 106:5 110:18

114:24 121:9,20
  125:7 127:9 128:17
  154:20 155:21,22
  156:7,22,24 157:12
  164:11 165:24
  166:6,10,10,11
  168:10,20,21,24
  174:9,10 175:3,5
  178:25 181:14
  187:22 188:9,16
  189:13 212:14
  220:4,13 221:9
  224:3,5,5,13,14,17
  224:20 225:4 226:8
  232:6
**values** 220:16
**variance** 51:4
  201:14
**various** 7:13,14 52:4
  63:20 112:9 115:16
  122:20 147:16
  200:10,20 208:5
  210:16 221:9
**veritext** 247:2
**version** 16:25
**versus** 82:11 213:2
  236:12
**view** 52:14 67:9
  75:25 124:25
  149:17 152:5
  153:19 157:12
  158:7 179:24
  181:22 182:4
  184:15 185:14,16
  186:17 206:8
  208:11 230:24
**viewpoint** 97:22
  155:5,6
**vintages** 228:11
  229:9
**violate** 238:21
**violation** 75:13

**w**

**wait** 223:7 224:7,11
**waive** 167:17
**waived** 18:16 19:19
  22:7 161:20 167:23
  187:12 188:5
**waiver** 25:12,17
  75:12
**waiving** 25:22
**walk** 109:6
**want** 20:15 21:17,24
  31:4,5,10 76:6
  86:25 95:20 100:21
  101:5,16 112:21
  125:13 134:13
  140:5,6 157:6
  162:12 163:19,24
  164:16 171:13
  172:15 176:20
  178:21,22 207:4
  222:25
**warranties** 192:24
**warranty** 119:18
  122:14,14,15 163:2
  163:7,17 165:18
  180:23 193:14
**waste** 76:6
**waterfall** 202:25
**way** 43:24 73:13
  87:3 88:23 93:9
  110:9 113:20
  115:13 122:7
  159:14 178:14,14
  179:24 185:21
  201:17 215:17
  218:2 223:4,16,16
  232:5 245:18
**ways** 101:13
**we've** 25:6 60:14
  107:17 154:23
  188:16 216:5
  227:23 235:5 240:3
**weaker** 47:19

**web**  26:19 225:25
**webex**  15:2,4,9
**weeks**  26:10
**weil**  30:16 37:19
   40:10
**weitnauer**  2:22 8:14
   8:14 31:13 125:24
   129:17 166:2
   170:14 191:19,21
   195:17 209:15
   233:23 234:16,20
**wells**  2:18 12:16
**went**  40:11 68:16
   89:24,25 166:8
   196:19
**west**  2:20
**whatsoever**  226:20
**whereof**  245:20
**wide**  189:20 233:12
**willkie**  1:17 2:4 7:21
   7:23
**willkie.com**  2:11,13
   2:15
**withdraw**  191:8,16
**withheld**  74:14,17
**withhold**  86:3,8
**witness**  6:12 7:3
   21:22 29:4 53:15
   80:11 96:16 99:3
   100:21 110:8
   112:13,20 136:24
   145:6 177:5 207:8
   210:25 211:23
   219:20,23 235:7
   240:11 245:11,15
   245:20 246:4
**witnesses**  139:13,15
**word**  14:17 40:21
   71:15 78:24 102:21
   103:5 146:8,10
   148:25 150:6
   171:17 197:24
   207:17
**words**  24:14 27:20
   27:21 43:14 54:10

58:25 83:4 111:4,20
   136:3 140:17
   171:14 222:23
   224:15
**work**  7:10,11,20
   61:18 73:13 84:24
   99:12 122:8 123:20
   123:22,25 132:4,19
   145:13 146:11
   151:9 182:18,20
   184:20 187:17
   230:17 236:12,13
**worked**  182:19
   183:9 213:2 229:23
**working**  48:16
**works**  34:18 35:15
   35:16,25 116:21
   223:4
**worksheets**  157:7
**worse**  189:6 226:18
**worth**  157:4 180:14
   223:25 224:2
**wow**  22:17
**wrap**  235:13
**wrapped**  61:14
   201:19 233:8
**wrapping**  240:10
**write**  34:5 136:15,17
   136:18,19 167:9
**writing**  33:6,8,10
   34:4 107:20 170:22
   170:25 205:16,21
**written**  10:5 11:13
   15:18 36:20 179:10
**wrote**  58:5 107:3
   131:18
**wynne**  4:20 9:3,3

| x |
|---|

**x**  120:24 121:2
   246:2

| y |
|---|

**yeah**  31:14 76:21
**year**  84:11,20,21,23
   84:23 212:7 229:6

**years**  47:3 104:20
   104:20,25 196:6,12
   196:14 198:24
   200:2 212:8 222:3
   222:20 224:8,12
   231:2
**yep**  191:18
**yielded**  118:6
**york**  1:3,18,18,21
   2:9,9 3:5,9,9,15,17
   3:17 4:8,8,17,17 5:7
   5:7,23,23 6:7,7,15
   6:15 12:16 30:17
   245:3,5,9 247:3,3

| z |
|---|

**zero**  90:6 115:8
   121:23 122:4
   162:18