Richard L. Wynne
Howard F. Sidman
JONES DAY
222 East 41st Street
New York, NY 10017.6702
Telephone:     212-326-3939
Facsimile:     212-755-7306

Attorneys for Creditor
*Financial Guaranty Insurance Company*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x
                                                        )
In re:                                                  )   Case No. 12-12020 (MG)
                                                        )
RESIDENTIAL CAPITAL, LLC, et al.,                       )   Chapter 11
                                                        )
       Debtors.                                         )   Jointly Administered
                                                        )
                                                        )
------------------------------------------------------- x

**FINANCIAL GUARANTY INSURANCE COMPANY'S REPLY IN SUPPORT OF
DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF
SETTLEMENT AGREEMENT AMONG THE DEBTORS, FGIC, THE FGIC
<u>TRUSTEES AND CERTAIN INDIVIDUAL INVESTORS</u>**

## TABLE OF CONTENTS

Page

Preliminary Statement ................................................................................................................... 1

ARGUMENT .................................................................................................................................. 4

I. THE SETTLEMENT AGREEMENT IS ECONOMICALLY FAIR TO THE INVESTOR OBJECTORS ......................................................................................................... 4

    A. The Investor Objectors' Expert Reports Fail To Account For All Sources Of Recovery Under The Settlement Agreement ...................................................... 5

    B. The Investor Objectors Fail To Recognize Risks Inherent In The Rehabilitation Plan ............................................................................................... 7

II. THE FGIC TRUSTEES ACTED IN GOOD FAITH .......................................................... 8

    A. The Settlement Agreement Was Not Negotiated In Secret .................................. 8

    B. The Settlement Agreement Was The Product Of Arms-Length Negotiations ........................................................................................................ 9

    C. The Investor Objectors Discussed The Rehabilitation Plan, And The Rehabilitation Plan Specifically Contemplates The Settlement Of Policies ....... 11

    D. The Investors Received Due Process ................................................................ 12

III. THE REHABILITATION COURT HAS RULED THAT IT EXPECTS THE OBJECTORS' CONCERNS TO BE ADDRESSED BY THIS COURT ........................ 14

IV. The Global Plan Agreement Would Not Have Been Possible, And Cannot Survive, Absent the Settlement Agreement ................................................................... 15

CONCLUSION ............................................................................................................................ 15

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Brown v. Ionescu*,
  2007 WL 683943 (S.D.N.Y. Mar. 1, 2007) ............................................................................ 13

*In re Rehabilitation of FGIC*,
  Case No. 401265/2012 (N.Y. Supreme Court) ................................................................. 8, 14

*McDonald v. Head Criminal Court Supervisor Officer*,
  850 F.2d 121, 124 (2d Cir. 1998) ......................................................................................... 13

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 9019 ................................................................................................................ 1

Reuters, *ResCap Examiner Delays Report to May 13, Amid Progress in Mediation*, May
  10, 2013 .................................................................................................................................. 9

Financial Guaranty Insurance Company ("FGIC") respectfully submits this reply in support of the *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement among the Debtors, FGIC, the FGIC Trustees and Certain Individual Investors* (Dkt. No. 3929) (the "FGIC 9019 Motion") and in opposition to the objections filed by the Investor Objectors[1] and the Junior Secured Noteholders ("JSNs").

### PRELIMINARY STATEMENT

In four separate briefs totaling over one hundred and ten pages, the Investor Objectors and JSNs do not seriously dispute that the Settlement Agreement[2]—negotiated alongside the Global Plan Agreement during a five-month, court-mandated mediation process—is fundamental to the success of the Global Plan Agreement and the $2.1 billion AFI plan contribution it provides for the benefit of creditors. Instead, the Investor Objectors and the JSNs advance a mélange of objections to the Settlement Agreement to further their own parochial interests. Nipping at the margins in a self-serving attempt to extract an enhanced recovery, the objectors overlook compelling evidence demonstrating the reasonableness of the Settlement Agreement and its fundamental importance to the largely consensual resolution of these cases.[3]

The Investor Objectors particularly challenge the Court's ability to find that the FGIC Trustees acted reasonably and in good faith in entering into the agreement. Their argument, threefold, is misplaced. *First,* the Investor Objectors contend it was unreasonable for the FGIC Trustees to enter into the Settlement Agreement when investors could receive more (over 40

---

[1] The Investor Objectors include CQS ABS Master Fund Limited, CQS ABS Alpha Master Fund Limited, Bayview Fund Management LLC, Monarch Alternative Capital LP ("Monarch"), Stonehill Capital Management LLC (collectively, the "Monarch Investors"), and Federal Home Loan Mortgage Corporation ("Freddie Mac").

[2] Capitalized terms not otherwise defined herein shall have the meanings given to them in the FGIC 9019 Motion.

[3] The Debtors, Official Creditors' Committee ("OCC") and FGIC Trustees have all filed briefs responding to the pending objections. FGIC hereby respectfully joins in those responsive briefs filed contemporaneously herewith, and will not reiterate their substance here. Rather, this brief addresses only those points that FGIC is uniquely able to address.

years) under the FGIC Plan of Rehabilitation (the "Rehabilitation Plan") (Sidman Decl., Ex. 1).[4] The Investor Objectors' argument—in essence an economic "bet" on the potential payout of the Rehabilitation Plan over the next 40 years as compared the more immediate benefits of the Settlement Agreement—is belied by evidence demonstrating that the Settlement Agreement affords the Investor Objectors (1) $271 million in immediate cash payment and the present value of insurance premium forgiveness, (2) another $92 million in plan proceeds if the proposed plan of reorganization on file in these cases (the "Plan") is confirmed and becomes effective, and (3) the right to retain for themselves any and all reimbursements (the "Reimbursements") from the FGIC Insured Trusts pursuant to the waterfall provisions under the governing documents of the various trusts (as such reimbursement rights may be modified pursuant to the FGIC Rehabilitation Plan). The evidence also shows that the unconsummated Rehabilitation Plan is subject to considerable short term risk, most significantly the recent downturn in the municipal markets. The record before the Court shows that the FGIC Trustees' agreement to the Settlement Agreement is reasonable.

*Second*, the Investor Objectors contend that the FGIC Trustees did not act in good faith in entering into and seeking approval of the Settlement Agreement. This argument also ignores the evidence, and is similarly without merit. As detailed in the Witness Statement of John S. Dubel ("Dubel Stmt.") (Dkt. No. 4436), the mediation process that led to the Settlement Agreement spanned five months, involved more than one hundred principals, lawyers and financial advisors (including, of course, the FGIC Trustees), and was highly publicized. The Investor Objectors did not participate. In fact, even though counsel now representing the Willkie Objectors signed a confidentiality agreement entitling them to receive information regarding the mediation

---

[4] References to "Sidman Decl." are to the accompanying Declaration of Howard F. Sidman in Support of Financial Guaranty Insurance Company's Reply in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 For Approval of Settlement Agreement Among the Debtors, FGIC, The FGIC Trustees and Certain Individual Investors.

negotiations (Sidman Decl., Ex. 2), the Willkie Objectors themselves each declined to sign individual confidentiality agreements. They instead remained willfully ignorant of the mediation process, free to trade in the Debtors' securities. While choosing to trade instead of participating in the mediation process is their right, these investors should not now be heard to complain they were excluded from the settlement process.

Furthermore, the evidence rebuts the misplaced notion that the Trustees and the Debtors relied solely on the "secret" mediation process when considering the Settlement Agreement. Rather, the record shows that the Trustees specifically engaged and relied upon the analysis of their financial advisors (who had already spent months analyzing the specifics of the RMBS claims and of each trust) with respect to the Settlement Agreement, and the Debtors relied on the analysis of their CRO, Lewis Kruger. Robert H. Major Decl. ¶¶ 9, 19 (Docket 4438); Kruger Direct Test. ¶ 2 (Dkt. No. 4431). The Investor Objectors were provided with the financial analysis upon which the Trustees relied, and were free to, and did, take additional discovery regarding both the Trustees' and Kruger's analysis of the Settlement Agreement.

Once the settlement was reached, the FGIC Trustees ensured that investors were provided with notice of the Settlement Agreement and were informed of their right to object in both this Court and the Rehabilitation Court. The FGIC Trustees then participated in a rigorous discovery process involving 16 depositions, over 45,000 pages of documents produced, six expert reports, and 125 pages of fact witness declarations. The overall court approval process will culminate in a hearing in the Rehabilitation Court and a two-day hearing in this Court. The FGIC Trustees have protected investor rights at every step in this process.

*Third*, the Investor Objectors contend that the Rehabilitation Court has exclusive jurisdiction under the McCarran-Ferguson Act to consider the Settlement Agreement. A recent ruling by the Rehabilitation Court, however, suggests that the State Court fully expects the

Bankruptcy Court to rule on the findings. Specifically, on July 31, 2013, Justice Ling-Cohen of the New York Supreme Court denied the Investors Objectors' request to intervene in the FGIC Rehabilitation, finding that "the Investors' specific concerns can be raised [in the Bankruptcy Court]."

The JSNs separately object that the Settlement Agreement is not in the best interests of the Debtors' estates. The Settlement Agreement will not impact the JSNs recovery, and their objection is woefully misplaced. The Global Plan Agreement—under which the estates will recover $2.1 billion from AFI and which allows the JSNs to be paid in full, in cash, on the Effective Date of the proposed Chapter 11 plan—would not exist without the Settlement Agreement. FGIC simply could not have agreed to the terms of the Global Plan Agreement—which pays FGIC just 11.2%, in the aggregate, on its asserted claims—without also resolving its ultimate liabilities to the FGIC Insured Trusts. Had FGIC been unable to so substantially reduce its claims, the proposed $2.1 billion AFI contribution would have been insufficient to satisfy creditor claims, and the attempted global settlement would have failed. If the Settlement Agreement is not approved, the Global Plan Agreement will terminate.

The Investor Objectors and the JSNs should not be permitted to destroy the hard-fought, complex global settlement achieved in these cases to further their narrow interests. The Court should grant the FGIC 9019 Motion, approve the Settlement Agreement, and allow the global settlement and plan process to proceed.

## ARGUMENT

### I. THE SETTLEMENT AGREEMENT IS ECONOMICALLY FAIR TO THE INVESTOR OBJECTORS

The Investor Objectors, relying on rushed, flawed and incomplete expert analyses, argue that they will receive less under the Settlement Agreement than they would otherwise receive over 40 years under the terms of the Rehabilitation Plan. Freddie Mac Obj. ¶¶ 42-49; Monarch

Obj. ¶¶ 34-42, 44-45. Their skewed analysis, however, ignores $92 million in cash proceeds they will receive if the Plan is confirmed and becomes effective, as well as the value of the Reimbursements. It also ignores the increasing risk that the downturn in the municipal bond market or other unforeseen events will cause the Rehabilitator to reduce the cash payment percentage (the "CPP") in advance of the Rehabilitation Plan's effective date. The Court should overrule these objections.[5]

### A. The Investor Objectors' Expert Reports Fail To Account For All Sources Of Recovery Under The Settlement Agreement

In concluding that the Settlement Agreement will result in inferior recoveries to investors in the FGIC Insured Trusts, the Investor Objectors' experts miss two substantial sources of value: (1) $92 million in RMBS Settlement recovery allocations upon the effective date of the proposed Rehabilitation Plan; and (2) unquantified Reimbursements that, absent the Settlement Agreement, would otherwise belong to FGIC. *See* Gibson Report (Sidman Decl., Ex. 3); *see also* Goldstein Report (Sidman Decl., Ex. 4).

#### 1. The Investor Objectors' Experts Miss $92 Million Of Settlement Recoveries Under The Global Plan Agreement

The Investor Objectors' experts all fail to recognize that if the Plan is confirmed, the RMBS Trustees will distribute approximately $92 million in Plan proceeds to investors in the FGIC Insured Trusts.[6] *See generally* Debtors' Disclosure Statement (Dkt. No. 4157); *see also* Pfeiffer Rep.¶ 59 (Sidman Decl., Ex. 5); Dubel Stmt. ¶ 24. The Global Plan Agreement and the Settlement Agreement each provide that these funds will be paid to FGIC Insured Trusts, and

---

[5] The reasonableness of the settlement is further evidenced by the fact that only a very limited number of investors in the FGIC Insured Trusts have expressed any dissatisfaction with or objection to the Trustees' execution of the Settlement Agreement.

[6] Specifically, if the Plan Support Agreement is approved, the Trustees will receive a total net distribution of approximately $698.7 million, representing recovery on a $7.301 billion allowed general unsecured claim granted collectively to the Trustees in exchange for a broad release of Debtors' liability on RMBS putback and related claims. *See* Debtors' Disclosure Statement at 27 and Ex. 6 (ResCap Recovery Analysis) (Dkt. No. 4157).

flow to the investors, notwithstanding the FGIC Insured Trusts' release of claims against the Debtors. Supplemental Term Sheet ¶ 10 (Dkt. No. 3814); Settlement Agreement § 2.01(a)(iv).

Annex III to the Supplemental Term Sheet (the "RMBS Trust Allocation Protocol"), in turn, provides that Trusts with unpaid financial guaranty insurance policy claims (like the FGIC Insured Trusts) will receive a *pro rata* share of the approximately $700 million distribution made by the Debtors to the Trustees. *See* Dkt. No. 3814. The Trustee's expert, Allen M. Pfeiffer of Duff & Phelps, calculates that distributions to the FGIC Insured Trusts under the RMBS Trust Allocation Protocol will equal approximately $92 million. Pfeiffer Rep. ¶ 57 (Sidman Decl., Ex. 5). As such, if the Plan is approved, the FGIC Insured Trusts will receive a significant distribution on their RMBS claims.[7]

### 2. Investor Objectors' Experts Miss The Import of Reimbursements

The Settlement Agreement entitles the FGIC Insured Trusts to collect Reimbursements that would not be recoverable to the FGIC Insured Trusts under the Rehabilitation Plan. Dubel Stmt. ¶¶ 28-29. In his report, Goldstein incorrectly refers to FGIC's March 31, 2013 quarterly statements as projecting more than $1 billion in gross recoveries from loss mitigation activities. Goldstein Rep. ¶ 29 (Sidman Decl., Ex. 4). FGIC, however, did not include in its March 31, 2013 quarterly statements any estimate of recoveries from loss mitigation activities, including litigation claims, as FGIC has not determined them to be probable and estimable. Dubel Stmt. ¶27. Instead, the approximately $1.06 billion projected recovery amount Goldstein refers to comprises recoveries that FGIC estimated it would receive through the waterfall provisions under the governing documents of the various trusts insured by FGIC from funds available from

---

[7] The Willkie Objectors, the only group to acknowledge the possibility of a recovery under the Plan, assert that "if [the plan] is not [confirmed], the FGIC Insured Trusts will apparently receive zero from the Debtors under the [FGIC] Settlement Agreement." Monarch Obj. at 16 n.17. The Settlement Agreement nowhere states, however, that the FGIC Insured Trusts will receive "zero" recovery from the Debtors in the event that the Settlement Agreement is approved but the Plan is not. And the Settlement Agreement does not preclude or in any way restrain the Trustees from exercising their discretion to allocate some portion of their RMBS recoveries to the FGIC Insured Trusts under this scenario.

-6-

projected collateral cash flows and projected payments from other providers of credit enhancement in the subject transactions. *Id.* Some of this amount would flow to the Objecting Investors under the following mechanics:

- The waterfall provisions of the governing agreements for the FGIC Insured Trusts provide for FGIC to receive funds available from projected collateral cash flows and payments of other providers of credit enhancement paid to the FGIC Insured Trusts. *See, e.g.*, 2006-HE3 Indenture §3.05(v) (Sidman Decl., Ex. 6). The FGIC March 31, 2013 quarterly statement Goldstein cites in his report projects that over the life of the transactions, these reimbursement payments will total $1.06 billion. Dubel Stmt. ¶ 27

- The FGIC Rehabilitation Plan, however, modified the waterfall provisions to limit FGIC's right to recover all reimbursements. Thus, under the Rehabilitation Plan, if $1.06 billion was received, FGIC would receive only approximately $300 million (using the base case present value payout percentage of 28.5%) and the remainder would be retained by the FGIC Insured Trusts. Dubel Stmt. ¶ 28.

- Under the Settlement Agreement, because approximately half of this $300 million in hypothetical reimbursements payable to FGIC by the FGIC Insured Trusts relates to ResCap insured Trusts, that half would now be payable to the FGIC Insured Trusts instead of FGIC pursuant to Section 2.01(b) of the Settlement Agreement. *Id.* ¶ 29; *see also* Pfeiffer Report ¶ 57 (Sidman Decl., Ex. 5).

In this way, the Settlement Agreement gives the Investor Objectors a right to Reimbursements they would not otherwise receive under the Rehabilitation Plan. *Id.*

### B.   The Investor Objectors Fail To Recognize Risks Inherent In The Rehabilitation Plan

The Investor Objectors paint solely an optimistic picture of their recoveries under the Rehabilitation Plan. Freddie Mac Obj. ¶¶ 42-49; Monarch Obj. ¶¶ 34-42, 44-45. While they "recognize that (the 'Cash Payment Percentage' or 'CPP'), will be adjusted over time," (Freddie Mac Obj. ¶ 10), their economic analysis gives no weight whatsoever to the substantial risk that the CPP is subject to significant *negative* adjustments over time. And the 40 year life of the Rehabilitation Plan is a long time. This substantial downside risk has already begun to materialize. Since the filing of FGIC's Disclosure Statement in the Rehabilitation Proceeding on

September 27, 2012, FGIC's portfolio has suffered dramatic negative impacts resulting from its exposure to municipal bonds issued by the City of Detroit. Dubel Stmt. ¶ 26.

FGIC's exposure to distressed municipalities, however, is by no means limited to FGIC-wrapped securities issued by Detroit, as approximately one third of FGIC's portfolio constitutes exposure to municipal bonds. *Id.* Many of these public finance exposures pose significant risks to FGIC, as recent months have seen a dramatic downgrading of a variety of FGIC-wrapped municipal bonds. Sidman Decl., Ex. 7.

If the significant downside risks presented by this municipal exposure materialize, the CPP—which, contrary to the Objector Investors' characterizations, is not fixed —could decrease, and recoveries due to all of FGIC's creditors and policyholders, and ultimately the Investor Objectors,[8] could be substantially reduced. The $253.3 million settlement payment, structured as a single, guaranteed lump sum, payable now and in cash (together with the potential $92 million in Plan proceeds along with the value of Reimbursements), protects investors in the FGIC Insured Trusts from this significant downside risk.[9] *Id.*

## II.    THE FGIC TRUSTEES ACTED IN GOOD FAITH

The Investor Objectors wrongly contend that FGIC Trustees acted in bad faith—engaging in "secret" negotiations intended to undermine their interest—in negotiating and seeking approval of the Settlement Agreement.

---

[8] The Investor Objectors, as purchasers of the securities issued by the FGIC Insured Trusts, are not FGIC policyholders, but merely beneficiaries of a policy held by the Trustees. Indeed, in the Rehabilitation Proceeding, the Rehabilitator argued successfully that the Investor Objectors are neither policyholders nor creditors of FGIC, and, on July 31, 2013, Justice Ling-Cohan issued an order denying the Investor Objectors' motion to intervene in the Rehabilitation Proceeding. Order Denying Motions to Intervene and Conduct Discovery, *In re Rehabilitation of FGIC*, Case No. 401265/2012 (N.Y. Supreme Court) (Sidman Decl., Ex. 8).

[9] The Settlement Agreement is also reasonable in light of the greater benefits to all parties involved—including the Investor Objectors—that result from the overall global settlement of a broad range of disputes, which includes the securing of a $2.1 billion contribution payment by AFI. The Investor Objectors will realize $92 million from the Plan if it is confirmed and becomes effective.

### A. The Settlement Agreement Was Not Negotiated In Secret

The Investor Objectors claim that the negotiations that led to the Settlement Agreement were conducted in secret. Freddie Mac Obj. ¶ 1(d), 12, 13, 23, 42, 51; *see also* Monarch Obj. ¶ 9-10, 25, Ex. C at ¶ 4. The evidence shows that the Settlement Agreement developed from a mediation process known to the public.

On December 26, 2012, the Court entered on its public, electronically available docket an Order Appointing Mediator ("Mediation Order") (Dkt. No. 2519) appointing the Honorable James Peck to act as global plan mediator. There have been at least 29 separate filings in these cases referring to, discussing, or otherwise addressing the mediation. *See* Sidman Decl., Ex. 9. Freddie Mac requested special notice in this case on the very first day of this case, and thus received all notices of the mediation and other related filings.[10] Monarch similarly requested special notice in October, 2012, and thus received all notices of the mediation as well. The media also provided extensive coverage of the mediation proceedings. Various publications, including *The Wall Street Journal* and *Reuters*, published at least a dozen reports regarding or referencing the mediation proceedings between December 2012 and May 2013.[11] *See* Sidman Decl., Ex. 10.

### B. The Settlement Agreement Was The Product Of Arms-Length Negotiations

Having skipped the global mediation process, the Investor Objectors show no appreciation for the complex negotiations that led to the Settlement Agreement. They carelessly launch allegations of bad faith, which are both internally inconsistent and without support in the record. For example, the Investor Objectors assert, when helpful to their argument, that the FGIC Trustees simply accepted the deal that was handed to them, no questions asked. Freddie

---

[10] Additionally, CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited were members of the Talcott Franklin Group, and received notice by virtue of service upon their counsel.

[11] It is also noteworthy that the highly anticipated Examiner's Report, which was completed on May 13, 2013, was delayed several times and not made public until June 26, 2013 in deference to the mediation process. *See* Reuters, *ResCap Examiner Delays Report to May 13, Amid Progress in Mediation*, May 10, 2013 (Sidman Decl., Ex. 11).

Mac ¶¶ 51, 53. But at the same time, in the same papers, the Investor Objectors charge repeatedly that the FGIC Trustees "*negotiated* the FGIC Commutation in secret." Freddie Mac ¶¶ 1(d), 39; Monarch Obj. ¶ 13 (emphasis added). There is no evidentiary support for either proposition.

While the Mediation Order prevents FGIC from disclosing the substantive details of the mediation proceedings, a witness statement from FGIC's Chief Executive Officer, John S. Dubel, and a timeline, provides an overview of the settlement process. Dkt. No. 4436. As summarized in Dubel's Witness Statement, while the Investor Objectors sat comfortably on the sidelines of these cases, dozens of creditors and creditor groups—including the Trustees and the Institutional Investors—spent literally hundreds of hours over the course of almost five months meeting negotiating the complex issues in these cases. Dubel Stmt. ¶ 16. The mediation ultimately involved 29 creditor or creditor group business representatives, represented by at least 75 attorneys and 36 financial advisors. Dubel Stmt. ¶ 16. The mediation process involved dozens of small group mediation meetings and conference calls, and culminated in a series of five all-hands mediation sessions. Dubel Stmt. ¶¶ 14-18, *id*. at Ex. D.

After nearly five months of this difficult and well-publicized mediation, AFI, the Debtors and the Debtors' primary creditor constituencies came to the unprecedented Global Plan Agreement. Under that agreement—memorialized in a Plan Support Agreement ("PSA")—the parties agreed that AFI would contribute $2.1 billion in value to the Debtors' estates, and the Debtors' assets (including the $2.1 billion AFI contribution) would be allocated amongst their various creditors. The parties to the mediation recognized that the Global Plan Agreement was the best settlement possible under the circumstances.[12]

---

[12] The success of the global mediation solved the ultimate chicken and egg problem of these cases, by having the Debtors, AFI and the creditor constituency agree simultaneously on both the size of the required AFI contribution in

The negotiations leading up to the Settlement Agreement—a cornerstone to the PSA—were an important part of the process and similarly rigorous. Judge Peck began meeting with individual parties in early-January 2013. In mid-January, the concept of settlement involving the Policies was first mentioned to FGIC. Dubel Stmt. Ex. D; Dubel Tr. 151:12-152:2 (Sidman Decl., Ex. 12). By early April, FGIC, MBIA, and the Steering Committee reached a tentative settlement proposal (the "Settlement Proposal"), under which FGIC would pay to the FGIC Insured Trusts a lump sum payment and forgo future premiums and Reimbursements with respect to the FGIC Policies. *See* Major Decl. ¶ 8 (Dkt. No. 4438); Dubel Stmt., Ex. D. Through dozens more meetings and at least five large group in-person mediation sessions with Judge Peck, the Settlement Proposal became the basis of the Settlement Agreement, which was signed on May 23, 2013 along with the PSA. Dubel Stmt. ¶¶ 14, 18.

The evidence makes clear that the Settlement Agreement—and the Global Plan Agreement of which it is a part—were both the product of months of arm's-length negotiations conducted among sophisticated parties with differing and conflicting interests, under the close supervision and guidance of a sitting bankruptcy judge as part of a publicly disclosed mediation.

### C. The Investor Objectors Discussed The Rehabilitation Plan, And The Rehabilitation Plan Specifically Contemplates The Settlement Of Policies

Contrary to their contention that Mr. Dubel "never discussed [with them] the possibility of commuting out the FGIC policies insuring the Investors" (Freddie Mac Obj. ¶ 11), the record makes clear that the Investor Objectors were on notice that the policies insuring the FGIC Insured Trusts were subject to future settlement or commutation. As a member of the steering committee instrumental in discussions regarding the FGIC Rehabilitation Plan (Healy Tr. 75:2-76:8 (Sidman Decl., Ex. 13); Freddie Mac Obj. ¶ 8), Freddie Mac communicated with Mr. Dubel

---

order for AFI to obtain the releases it sought, and the allocation of the Estate's proceeds to the creditors years of contentious and difficult litigation was avoided.

regarding FGIC's ability to commute or settle policies "from the time of the initial discussions about the proposal plan throughout the process." Dubel Tr. 54:22-55:16, 57:23-60:20 (Sidman Decl. Ex. 12) (Sidman Decl., Ex. 12). And while the Rehabilitation Plan is not yet in effect and the authority to settle policy claims remains with the Rehabilitator (who is granted broad powers to operate and conduct FGIC's business during the Rehabilitation Proceeding pursuant to the FGIC Order of Rehabilitation), when the Rehabilitation Plan becomes effective, its terms—as to which Freddie Mac was able to provide input—provide that FGIC may resolve claims "without further Court approval" through negotiation, settlement, commutation or "any similar transaction that results in the extinguishment or reduction of FGIC's liability, in respect of [] all or part of any Policy. . . ." Rehabilitation Plan § 4.8. The Rehabilitation Plan allows FGIC to take such actions without the consent of investors holding securities of policyholders whose policies are being settled. Moreover, even before the Settlement Agreement was executed, FGIC had agreed to various commutations on other matters, many of which were publicly disclosed on FGIC's Rehabilitation website.[13] In light of these facts, the proposed settlement could hardly have come as a shock.

      D.      **The Investors Received Due Process**

The Investor Objectors contend that in negotiating the Settlement Agreement, the Debtors, the Trustees, and FGIC deprived them of due process rights. They claim that the Debtors and the Trustees have "thrown up a wall of silence and dubious claims of privilege" to shield from their view information regarding the negotiation of the Settlement Agreement. Freddie Mac Obj. ¶ 21; Monarch Obj. ¶ 25. They claim that the parties "deliberately sought to establish an approval regime outside of the [rehabilitation] plan approval process in order to limit the rights of investors to contest the Trustees' actions." Monarch Obj. ¶ 25. And they contend

---

[13] *See* Sidman Decl, Ex. 14.

that they have not had a full and fair opportunity to be heard with respect to issues surrounding the Settlement Agreement. *Id*. These charges are wholly without merit.

First, FGIC, the FGIC Trustees and the Debtors have not withheld information from the Investor Objectors based on "mediation privilege." The parties have simply abided by the Mediation Order, which provides:

> [N]o person or party participating in the mediation . . . shall in any way disclose to any non-party or to any court, including, without limitation, in any pleading or other submission to any court, any such discussion, mediation statement, other document or information, correspondence, resolution, offer or counteroffer that may be made or provided in connection with the mediation, unless otherwise available and not subject to a separate confidentiality agreement that would prevent its disclosure or as authorized by this Court.

Dkt. No. 2519. At a hearing on July 25, 2013, in which the Investor Objectors sought to challenge the Mediation Order, the Court stated that the Investor Objectors could not "break into the mediation and find out everything that happened in a confidential mediation."[14] Case No. 12-12020, Hearing Tr. 26:9-11. Because the Investor Objectors did not participate in mediation, FGIC and the other parties to the mediation are precluded from sharing information that was disclosed or exchanged during the mediation process. There is no due process violation here. *See*, *e.g.*, *Brown v. Ionescu*, 2007 WL 683943, at *3 (S.D.N.Y. Mar. 1, 2007) ("all litigants . . . have an obligation to comply with court orders") (quoting *McDonald v. Head Criminal Court Supervisor Officer*, 850 F.2d 121, 124 (2d Cir. 1988)). While the details and substance of the settlement negotiations cannot be disclosed due to the Mediation Order, the Investor Objectors have had discovery concerning both (1) the Debtors' CRO's analysis of the Settlement, (2) and the Trustees economic analysis based upon the work of their financial advisors.

---

[14] The JSNs frivolously contend that the parties cannot use the fact of mediation to justify the reasonableness of the Settlement Agreement. JSN Obj. ¶¶ 28-32. The parties do not rely on the mediation, or information exchanged therein, to justify the reasonableness of the settlement. The evidence is that both the FGIC Trustees and the Debtors conducted an independent evaluation of the settlement.

-13-

Second, the parties to the Settlement Agreement have hardly created an alternative "approval regime" that deprives the Investor Objectors of their ability to contest the Settlement Agreement. Rather, the "approval regime" that exists—which requires that the Settlement Agreement be approved not only by the Rehabilitation Court, but also by this Court—gives the Investor Objectors two bites at the apple. If the FGIC Settlement is not approved by both this Court and the Rehabilitation Court, and if all of the required findings are not made, the Settlement Agreement and the Global Plan Agreement will fail. The Investor Objectors have had ample opportunity to contest the Settlement Agreement.

### III. THE REHABILITATION COURT HAS RULED THAT IT EXPECTS THE OBJECTORS' CONCERNS TO BE ADDRESSED BY THIS COURT

The Investor Objectors wrongly argue that the McCarran-Ferguson Act provides the Rehabilitation Court with exclusive jurisdiction over the Settlement Agreement.[15] On July 31, 2013, Justice Ling-Cohan ruled that based on the differences in the findings required by the State and Bankruptcy Courts, the Bankruptcy Court can and would be considering the Investor Objectors' objections:

> The Rehabilitator is tasked with ensuring that the best interests of FGIC's policyholders as a whole are served. *See Corcoran v Frank B. Hall & Co., Inc.*, 149 AD2d 165 (1st Dep't 1989). Thus, the standard to be applied in determining this Court's approval of the settlement is whether the Rehabilitator acted arbitrary and capriciously, and abused his discretion in determining that the settlement agreement is in the best interests of FGIC's policyholders as a whole. *Id*. **Such standard is different than that which the Bankruptcy court will employ and the Investors' specific concerns can be raised there**.

Sidman Decl., Ex. 8 at 2-3 (emphasis added). In light of Justice Ling-Cohan's decision, any continued argument that the Bankruptcy Court is precluded from considering the Settlement Agreement is frivolous.

---

[15] For a more extensive discussion of the inapplicability of the McCarran-Ferguson Act to this dispute, FGIC refers the Court to the OCC's and Debtors' responsive briefs.

-14-

**IV.    THE GLOBAL PLAN AGREEMENT WOULD NOT HAVE BEEN POSSIBLE, AND CANNOT SURVIVE, ABSENT THE SETTLEMENT AGREEMENT**

The JSNs object that the Settlement Agreement is not in the best interests of the Debtors' estates. This argument—particularly coming from the JSNs—is baffling. The Global Plan Agreement, and the $2.1 billion recovery it provides, hinges on approval of the Settlement Agreement. So critical is the Settlement Agreement to the Global Plan Agreement, that each of AFI, the OCC, and FGIC have the right to terminate the PSA if the Settlement Agreement is not approved by both this Court and the Rehabilitation Court by August 19, 2013. Plan Support Agreement §6.1(i) (Dkt. No. 3814); Plan Term Sheet at 4 (Dkt. No. 3814).

The cornerstone of the Settlement Agreement is the final liquidation and resolution of all present and future claims between and among FGIC, the FGIC Trustees and the Debtors. The finality the settlement affords was critical for FGIC, whose proofs of claim against the Debtors' estates for breach of various insurance agreements, were comprised, in part, of claims for reimbursement and indemnification of future amounts it would have to pay under the Policies. The final settlement of future claims under the Policies eliminates the possibility that FGIC will make any future payments to the FGIC Trustees under the Policies. This, in turn, eliminates FGIC's own future reimbursement and indemnification claims against the Debtors, and allows FGIC to accept a substantially reduced recovery under the proposed Global Plan Agreement (just 11.2% in the aggregate, as compared to the over 30% being paid to other unsecured creditors including monoline insurers.). In the context of these cases, where the parties fought over (and, in the case of the JSNs, continue to fight over) literally every available dollar, FGIC's ability to take hundreds of millions of dollars in claims off the table by virtue of the Settlement Agreement was critical in reaching the Global Plan Agreement.

**CONCLUSION**

For the foregoing reasons, the Court should approve the FGIC 9019 Motion.

Dated: August 2, 2013

                /s/ *Richard L. Wynne*
Richard L. Wynne
Howard F. Sidman
JONES DAY
222 East 41st Street
New York, NY 10017.6702
Telephone:    212-326-3939
Facsimile:    212-755-7306

Attorneys for Creditor
*Financial Guaranty Insurance Company*