Sidman Declaration Exhibit # 3

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## <u>DECLARATION OF SCOTT R. GIBSON</u>

Scott R. Gibson declares, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.      My name is Scott R. Gibson, and I am over 21 years of age. I am of sound mind, and I will attest to the facts described herein. I hold a Bachelor of Science degree from Lehigh University in Material Science and Engineering. I am a Senior Vice President, Independent Pricing Service & Analytics, at MountainView IPS, LLC ("MountainView IPS"), located at 999 18th Street, Suite 1001, Denver, Colorado 80202. MountainView IPS is a wholly owned subsidiary of MountainView Capital Holdings ("MountainView"). For 23 years, MountainView has been focusing on the diverse needs of participants in the fixed income capital markets and specializing in mortgage assets. With expertise in asset management, analytics, sales and trading, MountainView is uniquely qualified to create value for our clients in all market conditions. MountainView Capital Holdings offers a suite of services to institutional participants in the mortgage and fixed income capital markets. MountainView addresses their clients' needs through six wholly owned subsidiaries, including MountainView IPS.

2.      MountainView IPS is an independent pricing service ("IPS") that provides analytics and fair value pricing of residential mortgage-backed securities, commercial mortgage-backed securities, asset-backed securities, and residential whole loans. MountainView IPS also

provides cash-flow projections and stress/scenario testing.  As a market leading participant in the third-party valuation service sector, MountainView IPS, provides accurate third-party, fair market pricing of hard-to-value and other mortgage and asset-backed securities for fixed income managers and investors, leading investment and commercial banks, regulated savings and lending institutions, institutional investors, government agencies and service providers internationally.  The MountainView IPS pricing process incorporates a blend of market and credit research, internal and external pricing models, and specialist judgment to determine and verify the correct set of performance assumptions that drive an asset's cash flow and ultimate fair market value.

3.    The IPS valuation process captures collateral and structural performance for each individual bond or loan pool being valued, as well as the current market and credit considerations that will impact price. IPS provides full transparency of the inputs and assumptions used in the valuation process. The valuation methodology follows ASC 820-FAS 157 guidance for fair value measurements in accordance with generally accepted accounting principles (GAAP).

4.    Prior to joining MountainView IPS, I held executive positions at Clayton, IPS, LLC, and CoreBrand, LLC.  Throughout my fifteen-year career as a financial professional specializing fair value analysis, residential loan portfolio valuation, residential mortgage-backed securities ("RMBS") and asset-backed securities ("ABS") modeling, quantitative analysis, analytic processes development, and investment portfolio reporting, I have developed considerable experience in these fields.  I have been recognized for, among other things, significant contributions to residential loan portfolio valuation and RMBS/ABS modeling.

5.      I submit this declaration (the "Declaration") in support of the opposition of Federal Home Loan Mortgage Corporation ("Freddie Mac") to the *Debtors' Motion Pursuant to Fed. R. Bankr. P 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* dated June 7, 2013 [ECF No. 3929] (the "9019 Motion"). All facts set forth in this Declaration are based upon, among other things, (i) my personal knowledge; (ii) information supplied to me by (a) counsel for the Freddie Mac and (b) my colleagues; (iii) my review of relevant documents, including (a) deposition transcripts; (b) the 9019 Motion and the exhibits thereto; (c) the motion (Sequence No. 016, the "State Court Motion") of the rehabilitator (the "Rehabilitator") of Federal Guaranty Insurance Company ("FGIC") to approve a settlement agreement among the FGIC, Residential Capital, LLC ("ResCap," or the "Debtors"), and other parties (the "ResCap Settlement") in FGIC's rehabilitation proceeding in New York Supreme Court (the "Rehabilitation Proceeding"); and (d) FGIC's plan of rehabilitation and related documents (the "Rehabilitation Plan"); and (iv) my opinion based upon my experience and knowledge acquired over the fifteen years I have been involved as an professional in the IPS sector.

6.      Based upon my experience and the analysis set forth herein, I believe holders of FGIC-Insured ResCap RMBS (defined below) collectively would receive materially superior recoveries under the Rehabilitation Plan than under the Settlement Agreement.

## INTRODUCTION AND PURPOSE

7.      Prior to the commencement of the Rehabilitation Proceeding, certain of the Debtors originated and/or serviced residential mortgage loans that they contributed or otherwise sold to forty-seven trusts (the "FGIC-Insured Trusts"). These trusts then issued RMBS consisting of certificates collateralized by such residential mortgage loans. FGIC, a monoline

- 3 -

financial guaranty insurance company, wrote policies that insured the payment of principal and interest with respect to the securities issued by the FGIC-Insured Trusts; by "wrapping" the securities the FGIC-Insured Trusts issued, FGIC essentially guaranteed the payment of principal and interest due on such securities.

8.    FGIC has been unable to make payments under any of the Policies since approximately November of 2009 when the New York State Department of Insurance (now known as the New York Department of Financial Services) prevented FGIC from making payments on any policy claims.

9.    The Rehabilitation Plan provides that the holders of FGIC policy claims will receive payments of 17.25% of the total amount of their claims against FGIC (the "Cash Payment Percentage" or "CPP"), which will be adjusted over time. The financial disclosures in connection with the Rehabilitation Plan contemplate that the present value of recoveries under a "Base Scenario" will be between 27 and 30 cents on the dollar for FGIC policy claims. The Rehabilitation Plan contains mechanisms that will "true up" earlier-filed FGIC policy claims such that these earlier-dated claims may receive subsequent payments based upon subsequent increases to CPP.

10.    After the Rehabilitation Plan was approved, the Rehabilitator sought court approval of the ResCap Settlement, which, among other things, would provide for the commutation/termination of the Policies (the "FGIC Commutation") in exchange for a one-time, lump-sum payment of $253.3 million (the "FGIC Commutation Payment"), which would be distributed to holders (the "FGIC-Wrapped Holders") of FGIC-insured RMBS (the "FGIC-Wrapped Securities") originated by ResCap and certain of its affiliates.

11.    At the request of Freddie Mac's counsel (McKool Smith, P.C., and Moss

& Kalish, PLLC), MountainView IPS assessed the recoveries to FGIC-Wrapped Holders under

the Rehabilitation Plan *vis-à-vis* the ResCap Settlement.  While Freddie Mac did obtain limited

discovery from the trustees of the FGIC-Insured Trusts and their expert (the "Trustees"), the

Debtors, and FGIC, we did not receive enough material to complete an analysis that did not rely

primarily on publicly available documents.  Using publicly available information (and some of

the limited discovery we received from FGIC), we were able to complete an analysis that

demonstrated to us that the recoveries to FGIC-Wrapped Holders would be materially better

under the Rehabilitation Plan than under the ResCap Settlement.

## ANALYSIS

12.    To compare the recoveries of FGIC-Wrapped Holders under the ResCap

Settlement versus the Rehabilitation Plan, we first estimated the percentage recoveries under

each using the Rehabilitator's and/or FGIC's own numbers as to future claims under the Policies.

Then we applied this estimate of future claims to percentage recoveries under the ResCap

Settlement Agreement and under the Rehabilitation Plan.  We then calculated recoveries under

the ResCap Settlement versus the Rehabilitation Plan to our view of Freddie Mac's projected

losses with respect to the FGIC-Wrapped Securities it holds.  Next, we calculated recoveries

under the ResCap Settlement versus the Rehabilitation Plan to the projected losses to FGIC-

Wrapped Holders generally.  In both cases, we concluded that recoveries to FGIC-Wrapped

Holders under the Rehabilitation Plan are materially superior to recoveries under the Settlement

Agreement.  Our analysis is attached is summarized as Exhibit A to this Declaration.

**Percentage Recovery: ResCap Settlement**

13.    In analyzing the ResCap Settlement, we believe that FGIC-Wrapped

Holders generally will receive a recovery on their claims under the Policies approximately 20

cents on the dollar. The Affirmation of Gary T. Holtzer in Support of the ResCap Settlement (Exhibit 10 to the 9019 Motion, the "Holtzer Affirmation") estimates that there are $789 million in claims currently pending against FGIC, with additional claims in excess of $400 million that will arise under the Policies in the future, totaling approximately $1.2 billion in claims. (Holtzer Affirmation ¶¶ 5, 21.)

14.    In the report the Trustees allegedly relied upon by their advisor, Duff & Phelps, in assessing the ResCap Settlement Agreement and the FGIC Commutation (the "Duff & Phelps Report," Bates Nos. DUFF-MS 00011-19), claims currently pending against FGIC were estimated at $789 million, with expected future losses totaling an estimated $481 million, for a total expected claim against FGIC related to the FGIC-Insured Trusts for $1.27 billion. The FGIC Commutation would also provide that the FGIC-Insured Trusts would no longer be required to pay premiums on the Policies. The Trustees' expert estimates that the present value of Policy premiums waived by the FGIC and retained by the FGIC-Insured Trusts would total $18.3 million. (Duff & Phelps Report at 3.) This savings would be added to the FGIC Commutation Payment, as the forgone premiums would be an additional source of cash to be distributed to FGIC-Wrapped Holders.

15.    Dividing $1.27 billion of total claims into the $253.3 FGIC Commutation Payment plus the $18.3 million in waived premiums would provide for a recovery of approximately 21.4 cents on the dollar, using the numbers assumed by the Rehabilitator and the Trustees' expert, which appears to have generally incorporated the Rehabilitator's numbers in its analysis:

$$\frac{\$253,300,000(CommutationPayment) + \$18,300,000(WaivedPolicyPayments)}{\$1,270,000,000(PolicyClaims)} = 21.3858\%$$

(See Duff & Phelps Report at 3; Holtzer Affirmation ¶¶ 5, 21.)

16.    The approximate 21.4-cent recovery assumes that the FGIC's liabilities to the for the FGIC-Insured Trusts will not exceed $1.270 billion.    To date, neither FGIC nor the Rehabilitator has made any updated disclosures related to the magnitude of liabilities under the Policies.  Because we were not provided with information sufficient to form our own analysis of the magnitude of estimated claims against FGIC arising under the Policies, we used the numbers used in the Rehabilitator's and FGIC's own analysis (incorporated into the Duff & Phelps Report).

17.    Recoveries under the ResCap Settlement to FGIC-Wrapped Holders would not include the "litigation upside" of potential recoveries in FGIC's lawsuits/claims against ResCap and other mortgage servicers/originators for, among other things, breach of representations and warranties as to the value of the collateral securing the RMBS for which FGIC wrote policies.  As set forth paragraph 13 of the Holzer Affirmation, if the ResCap Settlement Agreement is approved, FGIC's direct claims against ResCap would be settled for an allowed, unsecured claim of $934 million, of which FGIC estimates it will receive a cash recovery of $206.5 million.  We assume that, if the ResCap Settlement is not approved, FGIC would receive at least $206.5 million on account of its direct claims against ResCap.  Any such recoveries would be distributed to satisfy the claims of all FGIC policyholders.

18.    As set forth in the Miller Affidavit, it is expected that there will be a total of approximately $6.3 billion in claims against FGIC.  (Miller Affidavit Ex. 1, p 6.)  Dividing this number into the $1.27 billion of the claims of FGIC-Wrapped Holders, we expect that, if the ResCap Settlement Agreement were not approved, FGIC-Wrapped Holders would receive a pro rata share of 20% of any litigation recoveries, for a total of at least $41.3 million on account of FGIC's litigation against ResCap.

- 7 -

**Percentage Recovery: Rehabilitation Plan**

19.    In assessing recoveries under the Rehabilitation Plan, we relied upon the *Affidavit of Michael W. Miller in Further Support of First Amended Plan of Rehabilitation* the "Miller Affidavit"), filed in the Rehabilitation Proceeding in connection with Motion Sequence No. 4.    The Rehabilitation Plan provides that the holders of FGIC policy claims will receive payments of 17.25% of the total amount of their claims against FGIC (the "Cash Payment Percentage" or "CPP"), which will be adjusted over time to account for runoff of exposure to future policy claims, the maintenance and appreciation of FGIC's, assets, as well as the actual realization of estimated claim under FGIC-issued policies.  (*See* Miller Affidavit ¶¶ 22-25.)

20.    The Miller Affidavit estimates that recoveries will be paid out, over time, from 2012 through 2052, though the majority of recoveries will be paid out through by 2017. (Miller Affidavit Ex. 1, p., 6.)  The Miller Affidavit contemplates that FGIC-Issued policy claims will be paid in two ways:  policyholders will receive CPP of varying percentages from 2012 through 2047, with deferred payment obligations ("DPO") to be paid through 2052 to the extent FGIC has excess cash available after all direct policy-related claims are paid.

21.    To account for the delayed payout through 2052, the Miller Affidavit discounts the payment streams to present value using discount rates of 10% through 20%.  The discount rate is meant to account for both the time horizon over which claims are paid, as well as to adjust for the riskiness of future cash flows.  This permits an "apples-to-apples" comparison with the ResCap Settlement recoveries, which would be paid out at once, as opposed to being paid over time.

22.    The Miller Affidavit estimates the present value of recoveries differ with respect to certain assumptions under two scenarios:  the "Base Scenario," which assumes

relatively smaller future claims under FGIC-issued policies on account of a more favorable

economic climate and a "Stress Scenario," which projects higher policy-related claims based on

an unfavorable economic climate.  For the reasons set forth below, we believe that the "Base

Scenario" is far more likely to occur.[1]

23.     Recoveries under the "Base Scenario" are estimated to be between 27 and

30 cents on the Dollar, depending on the discount rate used, as summarized below:

**Percentage Recovery under Rehabilitation Plan:  Base Scenario**

| Discount Rate | Percentage Recovery: Rehabilitation Plan |
|---|---|
| 10% | 30% |
| 15% | 28% |
| 20% | 27% |

24.     The "Base Scenario" assumes "FGIC's then-current expectation of future

Claims, investment performance, recoveries, financial markets and other factors of relevance to

CPP Revaluations bases on circumstances, events and projections that FGIC anticipates are

reasonably likely to occur."  (Rehabilitation Plan Ex. A, p. A-2.)  It my opinion that, if the

economy improves even more than is contemplated by the "Base Scenario," the present value of

cash payments would likely exceed the 27-30 cent range.

25.     By contrast, under the "Stress Scenario," the present value of recoveries

under the Rehabilitation Plan are estimated to be between 17 and 18 cents on the Dollar.  (Miller

Affidavit Ex. 1, p. 7.)  Unlike the "Base Scenario," the "Stress Scenario" assumes "a non-

---

[1] Indeed, the Base Scenario portrays FGIC's expected performance during the Run-Off Period,
including expected aggregate payments on policy claims. The Stress Scenario portrays a more
conservative loss scenario envisioning a severe economic recession characterized by sharp
declines in home prices and financial markets, significant unemployment, high mortgage default
rates, and other negative economic indicators.  As mentioned above, based on industry research
it is the opinion of IPS that the base case scenario is far more likely to occur than the stress case.

catastrophic scenario envisioning a severe economic recession that is accompanied by (i) sharp declines in home prices and the financial markets, (ii) significant unemployment, (iii) high mortgage default rates and (iv) other negative indicators of potential relevance to FGIC's insured exposures." (Rehabilitation Plan Ex. A, p. A-14.)

26.     Based on my assessment of current market conditions, we believe that the "Stress Scenario" by nature is extremely conservative, assuming an economic downturn equivalent to the 2008 economic crisis.  Given the rarity of such events, we believe that the "Base Scenario" is far more likely to occur in the future than the "Stress Scenario." Accordingly, we use the "Base Scenario" when assessing the recoveries to FGIC-Wrapped Holders under the Rehabilitation Plan.  Furthermore, we believe that the discount rates of 10% to 20% are sufficiently high to apply in the circumstances taking into account FGIC's portfolio.

**Freddie Mac's Recoveries:  ResCap Settlement versus Rehabilitation Plan**

27.     To understand Freddie Mac's recoveries under the ResCap Settlement versus the Rehabilitation Plan, we first estimated Freddie Mac's losses with respect to the FGIC-Wrapped Securities it holds.  Indeed, Freddie Mac's losses related to FGIC-Wrapped Securities are critical to our analysis here as they identical to Freddie Mac's future claims against the Policies: any loss to a FGIC-Wrapped Holder related to a FGIC-Wrapped Security translates directly to a loss to a claim under the Policies.

28.     Freddie Mac holds over $3.055 billion in original face amount of various tranches of RMBS held in nine of the ResCap Trusts covered by the Policies, the payment of principal and interest due being guaranteed by FGIC.  Freddie Mac's holdings in the FGIC-Insured Trusts are summarized in the chart below:

## Freddie Mac Holdings of FGIC-Insured RMBS

| CUSIP | Original Face Amount of Holdings | Current Face Amount of Holdings | Description of RMBS Instrument |
|---|---|---|---|
| 7609854V0 | $175,000,000 | $8,412,245 | RAMP 2004-RZ2 AII |
| 7609857G0 | $346,990,000 | $17,844,376 | RAMP 2004-RS7 A2A |
| 76110WB88 | $337,500,000 | $16,900,180 | RASC 2004-KS7 A2A |
| 76112BL99 | $494,922,000 | $97,343,261 | RAMP 2005-RS9 AII |
| 361856BG1 | $123,222,000 | $3,221,145 | GMACM 2001-HE2 IIA7 |
| 38012EAA3 | $646,768,000 | $135,182,334 | GMACM 2006-HE5 1A1 |
| 74924XAE5 | $326,812,000 | $122,091,499 | RASC 2007-EMX1 A2 |
| 76112BR36 | $405,004,000 | $87,242,343 | RAMP 2005-NC1 AII |
| 76112BR85 | $199,376,000 | $ 34,284,787 | RAMP 2005-EFC7 A2 |
| **TOTALS** | **$3,055,594,000** | **$522,522,170** | |

29.     For each collateral portfolio analyzed, IPS Analysts create CPR (prepay), CDR (default), and loss severity assumptions, along with any other assumptions needed on an individual security basis.  These assumptions are based on key characteristics of the collateral that are found in the data tape and/or deal documents.  IPS' key loan characteristics include FICO, LTV, Loan Type, Occupancy, Loan Purpose, Prepayment Penalties, Loan Balance, Performance History (if applicable), Seasoning (age of security), Housing Price Appreciation, Geographic Location, and any other applicable collateral characteristics.

30.     The assumptions (CPR, CDR, and Severity) are primarily derived from a combination of some or all of the following: industry performance research, internal expertise, Dealer market and sector research, Dealer performance assumptions (based on conversation and research reports), and the IPS database comparing market assumptions for similar collateral pools.  Changes in the IPS assumptions are driven by actual or forecasted changes in the condition of the underlying collateral, market expectations, and credit expectations.

31.     IPS utilizes Intex cash-flow models to perform our analysis.  IPS analysts estimate the projected principal, interest and losses expected for each security by inputting the

various collateral performance assumptions and deal cash flow model assumptions.

32.    The assumptions (CPR, CDR, and Severity) are primarily derived from a combination of some or all of the following: industry performance research, internal expertise, Dealer market and sector research, Dealer performance assumptions (based on conversation and research reports), and the IPS database comparing market assumptions for similar collateral pools.  Changes in the IPS assumptions are driven by actual or forecasted changes in the condition of the underlying collateral, market expectations, and credit expectations.

33.    IPS utilizes Intex cash-flow models to perform our analysis.  IPS analysts estimate the projected principal, interest and losses expected for each security by inputting the various collateral performance assumptions and deal cash flow model assumptions.

34.    We discounted these future losses using the same discount rates used in the Miller affidavit, i.e., discount rates of 10% to 20%.  Using these tools, we estimate that Freddie Mac will realize a present value of actual and estimated losses (the "Freddie Mac Losses") on the FGIC-Wrapped Securities it holds in as follows:

**Freddie Mac Losses**

| Discount Rate | Freddie Mac Losses |
|:---:|:---:|
| 10% | $113,822,080.12 |
| 15% | $108,208,256.17 |
| 20% | $104,106,608.76 |

35.    Under the ResCap Settlement (with a 21.4% total recovery, which includes waived Policy premiums) Freddie Mac would realize the following recoveries, given the range of discount rates used:

**Freddie Mac Recoveries under the ResCap Settlement**

| Present Value of Freddie Mac Future Losses | 21.4% Recovery under ResCap Settlement |
|---|---|
| 10% Discount Rate | $   29,091,998.18 |
| 15% Discount Rate | $   29,091,998.18 |
| 20% Discount Rate | $   29,091,998.18 |

36.    By contrast, Freddie Mac would realize  the following recoveries under the Rehabilitation Plan under the more likely Base Scenario, which also must be further adjusted to account for the pro rata distribution of the "litigation upside."  Freddie Mac's share of the litigation upside would be its pro rata share of the $41.3 million litigation upside to all FGIC-Wrapped Holders, which claims are estimated by the Rehabilitator and FGIC to be $1.27 billion:

**Freddie Mac Share of the Litigation Upside**

| Present Value of Freddie Mac Future Losses | Pro Rata Share of $1.27 Billion of Aggregate FGIC-Wrapped Holder Claims | Share of $41.3 Million "Litigation Upside" |
|---|---|---|
| 10% Discount Rate | 2.2838% | $1,172,904.00 |
| 15% Discount Rate | 2.1357% | $882,044.10 |
| 20% Discount Rate | 2.0906% | $863,417.8 |

37.    After calculating the above share of the "litigation upside" attributable to Freddie Mac if the ResCap Settlement is not approved, we estimate Freddie Mac's recoveries under the Rehabilitation Plan to be as follows:

**Freddie Mac Aggregate Recoveries under the Rehabilitation Plan**

| Present Value of Freddie Mac Future Losses | Base Scenario: 27% Recovery | Base Scenario: 28% Recovery | Base Scenario: 30% Recovery | Cf. ResCap Settlement: 21.4% Recovery |
|---|---|---|---|---|
| $11,691,176.84 (10% Discount Rate) | | | $40,783,175.03 | $ 29,091,998.18 |
| $8,972,298.51 (15% Discount Rate) | | $38,064,296.69 | | $ 29,091,998.18 |
| $7,612,859.34 (20% Discount Rate) | $36,704,857.52 | | | $ 29,091,998.18 |
| Plus "Litigation Upside" | $863,417.80 | $882,044.10 | $1,172,904.00 | |
| **TOTAL** | **$37,568,275.32** | **$38,946,340.79** | **$41,956,079.03** | |

38.    Freddie Mac's recoveries under the Rehabilitation Plan, as the Rehabilitator's advisors' estimates show, provide a far better recovery than under the ResCap Settlement, and the Rehabilitation Plan is accordingly in Freddie Mac's best interests given the highly disparate recoveries under the Rehabilitation Plan versus the ResCap Settlement. Indeed, as is the case with other FGIC-Wrapped Holders, Freddie Mac would receive a 21.4% recovery on its claims under the ResCap Settlement, but would do considerably better under the Rehabilitation Plan (the discount rates account for the riskiness of a payout over time), receiving a 27% to 30% projected recovery. Freddie Mac (which owns 100% of the in all but one of the FGIC-wrapped tranches it owns)  is therefore a good proxy for FGIC-Wrapped Holders generally, and, as is the case for Freddie Mac, the ResCap Settlement is likewise not in the best interests of FGIC-Wrapped Holders in the aggregate.

### FGIC-Wrapped Holders' Recoveries: ResCap Settlement versus Rehabilitation Plan

39.    To understand FGIC-Wrapped Holders' recoveries generally under the ResCap Settlement versus the Rehabilitation Plan, we used the Rehabilitators estimates of FGIC's total present value of estimated claims exposure set forth in the Holtzer Affidavit and the Duff & Phelps report.  As mentioned above, this exposure is estimated at $1.270 billion: $786 million in current claims plus $489 million in estimated future claims.[2]  Such claims would be satisfied by a one-time payment of $253.3 million, a 21.4% recovery (as mentioned above)

40.    By contrast, FGIC-Wrapped Holders generally would realize the following recoveries under the Rehabilitation Plan under the more likely Base Scenario:

### FGIC-Wrapped Holders' Aggregate Recoveries under the Rehabilitation Plan

| Present Value of FGIC-Wrapped Holders' Losses | Base Scenario: 27% Recovery | Base Scenario: 28% Recovery | Base Scenario: 30% Recovery | ResCap Settlement: 21.4% Recovery |
|---|---|---|---|---|
| $1,270,000,000 | $342,900,000 | $355,600,000 | $381,000,000 | $253,000,000 |
| Plus "Litigation Upside" | $41,300,000 | $41,300,000 | $41,300,000 | |
| Plus Waived Policy Premiums | | | | $18,000,000 |
| **TOTAL** | **$384 200,000** | **$386,900,000** | **$422,300,000** | **$271,300,000** |

41.    Like Freddie Mac's recoveries, FGIC-Wrapped Holders' recoveries under the Rehabilitation Plan, as the Rehabilitator's advisors estimates show, provide a far better recovery than the $253.3 lump sum payment plus $18.3 million waived Policy premiums under the ResCap Settlement.  As was the case with Freddie Mac individually, the Rehabilitation Plan is accordingly in best interests of FGIC-Wrapped Holders generally given the highly disparate

---

[2] It is unclear whether the $489 million is discounted to present value from the Holtzer Affirmation.

recoveries under the Rehabilitation Plan versus the ResCap Settlement.

## CONCLUSION

42.    In sum, based upon my experience and the analysis set forth above, I believe that it is reasonable to conclude that the FGIC-Wrapped Holders would receive materially superior recoveries under the Rehabilitation Plan than under the ResCap Settlement. It is therefore my conclusion that the ResCap Settlement is not in the best interests of the FGIC-Wrapped Holders.

## RESERVATION OF RIGHTS

43.    We reserve the right to amend and supplement this Declaration upon receipt of any new or updated information that may be produced either in documents and/or testimony in this matter.  In addition, we reserve the right to submit a rebuttal report and/or otherwise amend and/or supplement this Declaration at any time for any reason.

I declare under penalty of perjury that the information set forth in this Declaration is true and correct to the best of my knowledge, information, and belief.

Dated: July 19, 2013
       Denver, Colorado

                                        /s/ Scott R. Gibson
                                        Scott R. Gibson
                                        MountainView IPS, LLC
                                        999 18th Street, Suite 1001
                                        Denver, Colorado 80202

## Exhibit A

***Curriculum Vita*:  Scott R. Gibson**

# Scott R. Gibson

999 18th Street, Suite 1001
Denver, CO 80202
www.MV-IPS.com

sgibson@mv-ips.com
office: 303-633-4751
cell: 720.266.7016

## Profile

Finance professional with over 15 years of experience in Fair Value analysis, residential loan portfolio valuation, RMBS / ABS modeling, quantitative analysis, analytic processes development, and investment portfolio reporting. Recognized for significant contributions to valuation process improvements, cash-flow model development, and administration of valuation procedures. Established track record for conducting and supporting accurate Fair Value opinions in accordance with SFAS 157 / ASC 820 guidelines. Requested to present on industry conferences as an expert on residential loan and RMBS valuation and modeling methods.

| Residential Loan Valuation | VBA programming | INTEXdesktop/net |
|---|---|---|
| MBS, ABS, RMBS modeling | Valuation Process Development | Bloomberg |
| CDS analysis (single-name RMBS) | Access Database Design | Compass Analytics |

## Experience

**MountainView IPS, LLC., Denver, CO**  (2012-Current)
### SVP, IPS & Analytics
Director of MountainView Independent Pricing Service (IPS) business unit, responsible for overseeing all aspects of the valuation processes and procedures, valuation report presentation, and managing IPS personnel.
- **Valuation Experience:** Oversight of the IPS Fair Valuation process, presentation of valuation results and support of valuation for audit review. IPS conducted residential loan portfolio valuations for over $20 billion in un-paid principal balance (UPB), and in excess of 30,000 RMBS / ABS / CMBS securities valuations from 2011 to 2012. IPS business has been in existence as a third party pricing service since 2003.
- **Residential Loan Analysis:** Managed residential loan transition-rate modeling effort in support of improved residential loan performance forecasting methodology. Loan database consisted of over 23 million historical residential loan records spanning 10+ historical years.
- **Presentations:** Conducted residential loan and RMBS market performance presentation to Office of the Comptroller of the Currency (OCC) examiners.

**Clayton IPS, LLC., Denver, CO**  (2005-2012)
### VP, Director of Operations
Director of operations for Clayton IPS, responsible for developing valuation processes and procedures, new business development, valuation report presentation, and managing IPS personnel.
- **Sales:** From mid-year 2007 to year-end 2009, increased IPS client count and annual revenue by 313% and 233%, respectively.
- **Innovation:** Designed VBA automation for forecasting and stressing core residential loan collateral assumptions for use in cash-flow modeling. Conducted data process development for management of monthly portfolio valuations. Process improvements focused on maintaining consistency of analysis for all client portfolios accounting for cross-over of underlying collateral pools, enabled IPS to significantly grow client base, improve valuation accuracy and implement product specialization.
- **New Product Development:** Designed and developed stress test and portfolio reporting for improved client portfolio analysis. Researched Financial Accounting Standards Board (FASB) statements pertaining to valuation (SFAS 157) and recording of other than temporary impairments (OTTI; SFAS 115 and EITF 9920), developed IPS valuation methodology and documentation to adhere with new guidelines and provided OTTI analyses for the separation of credit loss from non-credit related write-downs.
- **Presentation:** Conducted comprehensive Fair Valuation methodology presentations to all new business clients, investors, major accounting firms and NCUA national examiners.

### Manager
Directed the Clayton IPS RMBS / ABS portfolio analytics and reporting group. Oversight and development for residential mortgage-backed securities (RMBS) portfolio analytics and reporting products. Developed database design, trustee remittance data acquisition process, and automated report generation process. Responsible for managing team of analysts, presenting portfolio analytics and new business development.

- **Innovation:** Created VBA programing to automate the data management and analytics required for residential mortgage-backed security (RMBS) portfolio performance reports.  Developed VBA program to manage download and monitoring of monthly remittance data acquisition.
- **CDS Analysis:** Designed Access database process for monitoring counterparty payments for single-name credit default swaps (CDS) backed by RMBS reference obligations.  Project consisted of CDS contract review, development of required analytics, data-table design and final report output.  Utilized by clients to verify counterparty payments and receivables for CDS portfolios on over 500 CDS contracts monthly.
- **RMBS Modeling:**  Managed Clayton's Bond Payment Shadowing (BPS) project consisting of excel based modeling of RMBS cash-flow / waterfall structures.  BPS was utilized to identify inaccuracies of Trustee remittance and analyze projected cash-flows.  Examples of model development included: interest rate cap/swap calculations, structural triggers analyses, and cross-collateralization modeling along with all other core modeling features.

**CoreBrand, LLC., Stamford, CT (1997-2002)**
### *Manager - Financial Analysis*
Managed the analytics group for a corporate communications consulting firm servicing Fortune 1000 companies. Designed and maintained database of proprietary corporate research and financial analytics, conducted statistical analysis and development of reporting deliverables. Position included presentation of analysis to executive boards of fortune 500 companies, statistical analysis, and supervision of annual strategic survey of 8000 executives of the top 20% revenue producing companies.

- **Innovation:** Revitalized and developed recognition for firm's proprietary database by refining our interactive executive survey and integrating corporate financial analytics.
- **Analysis Automation:** Designed multiple Excel based programs that automated data analysis and report generation, effectively reducing project completion cost by 65%.  Substantially improved analytical accuracy and efficiency.
- **New Product Development**: Designed and developed a syndicated financial industry annual report. Report automation improved internal revenue-to-project cost ratio by approx. 60%.
- **Sample Presentation/Client List:**  The Hartford, Thompson Financial, Texaco, ExxonMobil, Teco Energy, Southern Company, Cendant, Sharp Electronics, Eastman Chemical, Air Products & Chemicals, Fortune Brands and Hyperion Solutions.

### *Research Analyst*
Responsible for research and analysis of financial and survey driven data for 800 of the Fortune 1000 Companies. Utilized Visual Basic (VBA) programming to facilitate automation of Microsoft Excel based data analysis and report design. Analysis included database structure, process development, and report output design.

## Education
### *Lehigh University, Bethlehem, PA, B.S. Material Science & Engineering* (1997)
Project Lead on metallurgical fracture analyses and engineering projects.

## Presentation Experience
- Buying & Selling Distressed Mortgage Portfolios Forum 2013 – The Importance and Determination of Fair Value, New York NY
- OCC 2012 – Residential loan and RMBS market performance presentation
- ABS East Conference 2011– Fair Valuation Panel 2011, Orlando FL
- Legal Mediation 2011 – Presented residential loan valuation in support of counterparty litigation
- SEC Deposition 2010 – Provided testimony associated with IPS valuation methodology
- NCUA Examiners Conference 2009 – Presentation on Fair Valuation and RMBS modeling
- Clayton Holding Conference – CDS of ABS Modeling  Presentation, New York NY
- Denver University – Panel  Presentation on CDO structure and Valuation, Denver CO

## Legal Related Experience
- Expert Witness 2013 – Residential whole loan valuation and expert witness support
- Legal Mediation 2011 – Presented residential loan valuation in support of counterparty litigation
- SEC Deposition 2010 – Provided testimony associated with IPS valuation methodology

## Valuation Experience
RMBS / ABS / CMBS Valuations
- > 30,000 Securities Valuation since 2011
- IPS has provided Independent Fair Value analysis since 2003

Residential Whole Loan Valuations
- ~$20B in UPB (over past 2 years)
- ~$500mm UPB per month
- Bank M&A Valuation, Monthly loan portfolio valuations
- Counterparty Litigation Support – Sept 2011
    - $400mm UPB Residential Whole Loan Valuation
    - $228mm Reverse Mortgage Pool (Conducted Mediation Support with favorable outcome for Client)

Sidman Declaration Exhibit # 4

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In Re:** | Case No. 12-12020 (MG) |
| **Residential Capital, LLC, et al.,** | Chapter 11 |
| Debtors. | Jointly Administered |

# EXPERT WITNESS REPORT OF
# CHARLES R. GOLDSTEIN

## PURSUANT TO RULE 26(a)(2) OF THE
## FEDERAL RULES OF CIVIL PROCEDURE

## Table of Contents

I.    Assignment ................................................................................................................3

II.   Qualifications.............................................................................................................3

III.  Opinions.....................................................................................................................4

IV.   Key Points Supporting My Opinions..........................................................................4

        Cash Commutation Paid by FGIC .......................................................................5

        Comparative Analysis of the Rehabilitation Plan and the FGIC Settlement ............8

        D&P Report Does Not Include Upside Potential ..................................................10

V.    Data & Other Information Considered in Forming Opinions Expressed Herein...............13

VI.   Exhibits & Possible Revisions or Supplements to Report ................................................13

## EXHIBITS

**EXHIBIT A:**    Curriculum Vitae of Charles R. Goldstein

**EXHIBIT B:**    Documents Relied Upon

## I.    Assignment

1.    I was retained by Willkie Farr & Gallagher LLP ("Counsel") to provide an independent assessment of whether the FGIC Settlement was in the best interest of those who hold investments in certain ResCap Debtors' trusts (the "FGIC-ResCap Policyholders") from an economic perspective. In addition, I was also asked to assess and evaluate the opinion provided by Duff & Phelps Securities, LLC ("D&P") contained within the FGIC Commutation Proposal Discussion Materials dated May 15, 2013 (the "D&P Report"). D&P opined that the lump sum payment proposed in the FGIC Settlement[1] was "within the range of expected payments" compared to the net present value of the projected future payments to FGIC-ResCap Policyholders received from FGIC under the Rehabilitation Plan[2].

2.    I understand the Trustees relied upon D&P as the sole financial advisor to the Trustees when determining whether to accept or to reject the FGIC Settlement. To my knowledge, the D&P Report was the only financial analysis provided to the Trustees that compared the payment and recovery estimates under the proposed FGIC Settlement with those under the Rehabilitation Plan.

3.    A list of information, sources, and documents I considered in formulating my opinion is furnished in Exhibit B of this report ("Report"). Additionally, I have relied upon general consulting standards and principles, and my professional training and work experience to support my conclusions. These professional standards include Rule 102 Integrity and Objectivity and Rule 201 General Standards promulgated by the American Institute of Certified Public Accountants ("AICPA"), a professional trade organization responsible for establishing quality assurance standards for Certified Public Accountants and professionals involved in the audit, tax, and valuation consulting professions.

## II.    Qualifications

4.    I am a Managing Director and lead the Restructuring & Litigation Services practice area of Protiviti Inc. ("Protiviti"), a global consulting and internal audit firm with approximately 70 offices in 20 countries and which employs approximately 2,500 consultants. I have a Bachelor of Arts in Economics, a Masters of Business Administration and Juris Doctorate from University of Maryland. I am a Certified Public Accountant, a Certified Insolvency and Restructuring Advisor, Certified in Financial Forensics, a member of the American Bankruptcy Institute, a

---

[1] The proposed settlement agreement entered into among Residential Capital, LLC and its fifty direct or indirect subsidiaries listed on Exhibit A to the Settlement Agreement (collectively, the "ResCap Debtors"), Financial Guaranty Insurance Company ("FGIC"), the Trustees of the ResCap Trusts including The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., Law Debenture Trust Company of New York, U.S. Bank National Association and Wells Fargo, Bank, N.A., each solely in their respective capacities as trustees, indenture trustees or separate trustees (the "Trustees") and a group of investors that hold securities issued by the ResCap Trusts (collectively, the "Settling Parties"), dated as of May 23, 2013 (the "FGIC Settlement").
[2] The First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company (the "Rehabilitation Plan"). April 12, 2013.

member of the American Institute of Certified Public Accountants, and a member of the
Association of Insolvency & Restructuring Advisors.

5.  During my career, I have performed financial and accounting analyses and testified as an expert
    in a broad range of litigation matters involving forensic accounting, fraud, fraudulent
    conveyances, business valuation, breach of contract, lost profits, damages, intellectual property
    valuation, and bankruptcy. I have provided consulting services for companies and their counsel
    in a variety of industries including, but not limited to, insurance, financial institutions and funds,
    energy, healthcare, manufacturing, real estate, retail, technology and telecommunication. I have
    also served in several fiduciary roles including Chief Restructuring Officer, Chief Financial
    Officer, and Trustee to troubled companies or debtor organizations.

6.  I have attached as Exhibit A my current curriculum vitae providing a more detailed description
    of my experience and qualifications and a listing of my more recent trial and deposition
    testimony experience.

7.  Under my direction, I received assistance from the professional staff at Protiviti. My firm is
    compensated for my time at an hourly rate of $650 per hour. Our staff charges between $170
    and $650 per hour depending on their level within the firm. Our fees are not contingent on the
    outcome of this case or any other litigation matter.

## III.  Opinions

8.  Based on the information provided and in light of, among other things, the size of the initial CPP
    payment and the substantial contingent recoveries that are expected to be available to FGIC that
    were not included in FGIC's recovery analysis as value available to policyholders, the FGIC
    Settlement is not in the best interests of the FGIC-ResCap Policyholders from an economic
    perspective compared to the recoveries potentially available under the FGIC Rehabilitation Plan.
    See paragraphs 29 to 31 for a discussion of this calculation.

9.  It is my opinion that no third-party would be able to reasonably rely upon the D&P Report to
    develop a well-founded conclusion regarding the best interests of the FGIC-ResCap
    Policyholders in comparing the FGIC Settlement to the Rehabilitation Plan without being privy
    to substantially more complete and clearly sourced financial information. Based on the limited
    information provided in the D&P Report, it is my opinion that the calculation performed on
    pages 8 and 9 (collectively, the "FGIC-ResCap Claims Recovery"), pursuant to the terms of the
    Rehabilitation Plan, is structured inadequately, excludes necessary disclosures, and fails to
    consider the potential upside that is available to the FGIC-ResCap Policyholders in the
    Rehabilitation Plan.

## IV.  Key Points Supporting My Opinions

10. On May 15, 2013 D&P issued the D&P Report evaluating the proposed FGIC Settlement. As
    referenced above I understand that the Trustees relied upon D&P as the sole financial advisor to
    the Trustees when determining whether to accept or to reject the FGIC Settlement.

4

11. In my analysis of the D&P Report, I identified inconsistencies, omissions, and the absence of relevant information that is necessary to validate, recompute, and assess the conclusions derived by D&P. The D&P Report is comprised of three components: the Executive Summary, FGIC Settlement Proposal, and FGIC Plan of Rehabilitation.

12. The Executive Summary provides a comparison of the FGIC Settlement to the payouts provided under the Rehabilitation Plan. This comparison is misleading because it only provides one risk of the FGIC Settlement and many risks associated with the Rehabilitation Plan. One of the identified risks of the Rehabilitation Plan is the risk associated with outstanding FGIC-ResCap Residential Mortgage Backed Securities ("RMBS") litigation issues. This is inappropriately listed as a risk associated with Rehabilitation Plan, because recoveries from such litigation are not factored into the projected recoveries under the Rehabilitation Plan. In fact, pending litigation matters involve minimal downside, consisting solely of professional fees and a potentially significant upside benefit. The FGIC's own regulatory filings have projected the upside at more than $1 billion in gross recoveries for various loss mitigation activities, such as the pursuit of litigation claims[3].

13. The Executive Summary also states that both the FGIC Settlement and the Rehabilitation Plan include a large up-front payment to the FGIC-ResCap Policyholders on or around December 2013. The FGIC Settlement provides an up-front payment of $253.3 million and the Rehabilitation Plan provides an up-front payment of between $150 million and $163 million. The primary differentiating factor between the two options is the FGIC Settlement provides a greater incremental upfront payout of between $90.3 and $103.3 and the Rehabilitation Plan provides the future cash flows in outlying periods (with greater than 70% of claims expected to arise in the first five years)

14. The D&P Report did not provide a basis for the discount rate used in their analysis or an explanation supporting the decision to exclude potential recoveries from loss mitigation activities.

15. While the D&P Report cites stale financial projections and claims estimates as a risk for recoveries under the Rehabilitation Plan, market conditions such as residential home prices, unemployment rates, and residential mortgage default rates have improved indicating that the Rehabilitation Plan projections may have been more conservative than is acknowledged in the materials, provided by FGIC.

Cash Commutation Paid by FGIC

16. The FGIC Settlement Proposal section of the D&P Report incorporates a schedule summarizing the calculation of the $253.3 million cash commutation proposal (the "Cash Commutation Payment").

17. According to the D&P Report, the aforementioned terms of the FGIC Settlement were proposed and calculated as follows:

---

[3] See Quarterly Statement of the Financial Guaranty Insurance Company as of March 31, 2013, p. 6.16.

($'s in millions)

| Information Points | | |
|---|---|---|
| Initial Cash Payment Percentage (CPP) | 17.25% | [A] |
| Base Case Payout (NPV @15%) | 28.50% | [B] |
| ResCap Sponsored RMBS Claim (Per FGIC) | $ 1,850.0 | |
| Less: Cost, Interest, etc. | (236.0) | |
| Total Projected Claims in POC | 1,614.0 | |
| Claims Paid to Date | 344.0 | [C] |
| Estimated Unpaid Claims | 1,270.0 | |
| Accrued and Unpaid ("A&U") Claims (as of 3/31/13) | 789.0 | [D] |
| Future Estimated Claims | 481.0 | [E] |
| **Commutation Consideration** | | |
| Claims - A&U - Cash at Initial CPP | $ 136.1 | [F] = [A] x [D] |
| Claims - A&U - Base Case Payout less Initial CPP | 88.8 | [G] = [B] x [D] - [F] |
| Claims - Future Estimated Claims at Base Case Payout | 137.1 | [H] = [B] x [E] |
| Subtotal | $ 225.8 | [I] = [G] + [H] |
| Factor % of Unpaid Payout | 60.0% | [J] |
| Value Attributable to Estimated Unpaid Claims | $ 135.5 | [K] = [I] x [J] |
| Total Value to Trusts | 271.6 | [L] = [F] + [K] |
| Less: Premiums waived by FGIC and retained by Trusts | 18.3 | [M] |
| Cash Commutation paid by FGIC | $ 253.3 | [N] = [L] - [M] |
| **FGIC Allowed Claims** | | |
| Prior Claims Paid | $ 344.0 | [C] |
| Cash Commutation | 253.3 | [N] |
| Amount of FGIC Allowed Claim | $ 597.3 | [C] + [N] |

18. The calculation of the Cash Commutation Payment is based on several critical inputs and assumptions that are not identified and/or supported. These inputs and assumptions significantly impact the value of the Cash Commutation Payment. Key examples are presented below:

    i.    **Unsupported Discount Rate** - The 15% discount rate utilized in the Cash Commutation Payment calculation is not supported in the D&P Report. A discount rate, used for valuation purposes, is typically comprised of several components that are added together to determine an appropriate discount rate. The purpose of a discount rate is to reduce the value of projected cash flows to account for risk and uncertainty within the financial projections and can have a significant impact on the overall outcome of the calculation. I have seen no evidence that the discount rates that were used in the Cash Commutation Payment analysis have any validity.

    ii.    **Forty Percent Reduction of Future Payment** - The "Factor % of Unpaid Payout" (reference [J] in the figure) appears to be a forty percent reduction of the subtotal of: i) accrued and unpaid claims (less initial Cash Payout Percentage ("CPP"): and ii)

future estimated claims (together with part (i), the "Unpaid Payout"). The reduction is described in the D&P Report as a "Haircut of 40% on unpaid payout claim estimates". The "haircut" reduces the Cash Commutation Payment by approximately $90.4 million; however, it is not substantiated in the D&P Report. Applying a 40% "haircut", provides a Cash Commutation Payment of $253.3 million. Absent this unexplained "haircut", and accepting the other components of the calculation for the purposes of this analysis only, the Cash Commutation Payment would be a minimum of $343.7 million.

    iii.    **Exclusion of Contingent Assets** – As illustrated in the figure above, the Cash Commutation Payment is derived from, among other things, the present value of the base case payout (reference [B] in the figure) calculated in the Updated Run-Off Projections, attached as Exhibit 1 to the Affidavit of Michael W. Miller in Further Support of Approval of First Amended Plan of Rehabilitation (the "Miller Affidavit"). The base case payout is directly impacted by the assumptions that were incorporated into the Updated Run-Off Projections that the Rehabilitator and its advisors utilized to analyze FGIC's ability to satisfy its financial obligations while maintaining the minimum policyholders' surplus. The base case payout percentage assumptions contain several conservative components and fail to provide a probability weighted assessment of FGIC contingent assets. For example, the projected future cash payments within the Updated Run-Off Projections represent 45% of the notional claims, but do not include potential recoveries from pending litigation. These recoveries may provide for a substantial increase in the total cash payments to FGIC policyholders and thus result in a higher payout than the Cash Commutation Payment.

19. The FGIC Plan of Rehabilitation section of the D&P Report discusses several payout scenarios to FGIC ResCap Trust Policyholders. This section does not provide supporting underlying documentation or an explanation of the assumptions utilized in the calculation. In order to assess the conclusions of the FGIC-ResCap Claims Recovery, I would need, at a minimum, the following clarifications and supporting documents:

    i.    The "low case" and "high case" scenarios projected on an annual basis;

    ii.    Clarification of what the "low case" and "high case" scenarios represent, including the basis and reasoning for the distinctions;

    iii.    The assumptions and underlying data used to calculate the FGIC-ResCap notional claims and the timing of when the FGIC-ResCap claims will arise;

    iv.    The calculations supporting the initial CPP payments, the supplemental CPP payments and the DPO payouts; and

    v.    The rationale and calculation used to determine the reasonableness of a discount rate ranging from 10% to 20%.

20. The underlying data and assumptions used to prepare the FGIC-ResCap Claims Recovery may significantly impact the accuracy of the analysis and estimated value of the FGIC-ResCap

Claims. It is my opinion that no third-party would be able to reasonably rely upon the D&P Report to develop a well-founded conclusion relating to the best interests of the FGIC-ResCap Policyholders without being privy to additional information.

21. The absence of an explanation of the appropriate discount rate and the large variance between the discount rates used in the analysis indicates that D&P did not perform the necessary analysis to determine the appropriate discount rate. The impact on the net present value of the cash flow stream could vary significantly based on the results of the discount rate and this variance could alter the conclusions in the D&P Report.

22. The D&P Report utilizes a range of discount rates from 10% to 20% to calculate the FGIC-ResCap Claims Recovery. The D&P Report does not articulate the source of the range of discount rates. However, the same range of discount rates is used in the Miller Affidavit for illustrative purposes. The Miller Affidavit referenced multiple ranges of discount rates in their report from 3.5% to 20% and the only conclusion with regards to proper discount rates that should be utilized within the discounted cash flow calculation is "I believe that applying a discount rate of 3.6% or less would not be appropriate for the claims payment to FGIC policyholders".[4] It would not be an appropriate use of the Miller Affidavit to utilize the illustrative discount rates contained therein. At no point does the Miller Affidavit draw any conclusions as to the appropriate discount rate to present value the recoveries under the Rehabilitation Plan. As discussed earlier, a discount rate is typically comprised of several incremental components added together to build up to a final discount rate, none of which are discussed in the D&P Report.

23. In the projections for the FGIC-ResCap-sponsored RMBS trusts, the specific risks associated with the future cash flows are the risk free rate plus risk premiums such as the risks associated with default rates, loss severities and prepayment speeds. The D&P Report does not quantify the specific risk premiums associated with the components of the discount rates utilized in their analysis.

Comparative Analysis of the Rehabilitation Plan and the FGIC Settlement

24. I prepared the following comparative analysis that quantifies the impact of utilizing the notional claims in the FGIC-ResCap Claims Recovery and the base scenario payout percentage contemplated in the Rehabilitation Plan to determine if there is a discernible relationship between the findings contained in the D&P Report and the treatment of FGIC-ResCap Policyholders in the Rehabilitation Plan.

25. For comparative purposes only, I assumed the analyses prepared by D&P and Lazard in support of the FGIC Settlement and Rehabilitation Plan are accurate and correct and are appropriately relied upon in all material respects. As previously explained, I was not provided the information and support necessary to independently verify the analyses or their underlying assumptions.

---

[4] Affidavit of Michael W. Miller in Further Support of Approval of First Amended Plan of Rehabilitation. Page 11.

Furthermore, I have identified several inadequacies in various components of the D&P Report that call into question the reliability of the information contained therein.

| ($ in millions) | Rehabilitation Plan Base Case | | FGIC Settlement | |
|---|---|---|---|---|
| Total ResCap Claims | $ | 1,354 [1] | $ | 1,270 [2] |
| Payout (NPV @ 15%) | | 28.50% [3] | | 19.94% |
| Present Value of Claim \| Cash Commutation | $ | 386 | $ | 253 [4] |

[1]  Calculated as the average of the low case and high case ResCap notional claims included in the Duff & Phelps Report (pg. 8):

| | ResCap Notional Claims | |
|---|---|---|
| Low Case | $ | 1,162 |
| High Case | | 1,546 |
| Average | $ | 1,354 |

[2]  Estimated unpaid claims pursuant to the FGIC Commutation Proposal, D&P Report (pg. 5).

[3]  Present value of Base Case payout, discounted at 15%, as calculated in the Updated Base Case Scenario attached as Exhibit 1 to the Affidavit of Michael W. Miller in Further Support of Approval of First Amended Plan of Rehabilitation.

[4]  Cash commutation payment pursuant to the Settlement Agreement.

26. Based on the present value of the expected recoveries in the base case of the Rehabilitation Plan, FGIC-ResCap Policyholders should expect to receive approximately 28.5% of their projected total claims on a present value basis, utilizing the 15% discount rate relied upon in the Cash Commutation Payment calculation. Absent additional information or support regarding the timing of when FGIC-ResCap Claims may occur and assuming total FGIC-ResCap Claims of $1.35 billion, a FGIC-ResCap Policyholder should expect to receive the present value of total payments equaling approximately $386 million under the terms of the Rehabilitation Plan using such assumptions. The Cash Commutation Payment calculated in the FGIC Settlement is significantly less than $386 million calculated in the base case of the Rehabilitation Plan and no verifiable support was provided to warrant a reduction in the FGIC-ResCap Policyholder's expected payout.

D&P Report Does Not Include Upside Potential

27. The Cash Commutation Payment is structured as a one-time payment to be distributed to FGIC-ResCap Policyholders no later than three (3) business days after the effective date of the FGIC Settlement. As a result, FGIC-ResCap Policyholders will no longer be able to receive the potential upside benefits associated with the long-term payout structure of the Rehabilitation Plan. It is my understanding that FGIC may receive significant reimbursements from projected cash flows from the mortgage loans underlying the securities on which it has paid. In addition, neither Lazard, nor D&P, prepared a best case scenario illustrating further up-side potential, and the base scenario excluded recoveries that FGIC expects to receive in the normal course of operations; refer to paragraph 29 below.

28. The FGIC Settlement excludes contingent assets such as potential recoveries from pending litigation that relate to allegations of fraud and other causes of action in connection with RMBS transactions and the anticipated recovery in the ResCap Debtors' bankruptcy cases. Some of these contingent assets include:

    i.   On December 11, 2009 FGIC filed a complaint against Countrywide Home Loans, and amended the complaint on April 30, 2010, alleging that Countrywide "made material misstatements and omitted to disclose material facts known to them (but unknown to FGIC), concerning [various] securitizations" inducing FGIC to insure those securitizations, and 'breached certain representations and warranties.[5] The complaint goes on to state that "the substantial and excessive default rate on [various] securitizations, and FGIC's resulting damages, are not primarily attributable to any general decline in the overall housing market or the economy, but instead were caused by the fraudulent scheme of Countrywide…and the resulting poor quality of the related Mortgage Loans". FGIC alleges that its total claims paid and liabilities incurred or to be incurred because of Countrywide's fraud and breaches on the various securitizations will be in excess of $1B; with over $640M having been paid by FGIC as of the amended complaint date, plus other costs.

    Countrywide Home Loans and Bank of America have recently settled significant lawsuits with financial guaranty insurers on account of similar claims:
- Bank of America Corporation agreed to pay MBIA approximately $1.6 billion in cash during the period ended March 31, 2013.[6]
- Bank of America Corporation agreed to pay Assured Guaranty Ltd. $1.1 billion in cash by March 31, 2012.[7]
- Bank of America agreed to pay Syncora Holdings, Ltd., $375 million in cash.[8]

---

[5] Financial Guaranty Insurance Company v. Countrywide Home Loans, Inc., Supreme Court of New York, Index No. 650736/2009.
[6] Bank of America Corporation, Form 8-K, May 6, 2013, Press Release.
[7] *Assured Guaranty Ltd. Announces Settlement with Bank of America*, Assured Guaranty News, April 15, 2011.

ii.   On March 5, 2012, FGIC sued Ally Financial, Inc. alleging that the defendants fraudulently induced FGIC to insure $693M in residential mortgage-backed securities and that they misrepresented the quality of the loans backing the transaction.[9] FGIC alleges that the default rate was substantially higher than was anticipated and is now facing $27M in insurance claims with more expected.

On March 14, 2012, FGIC filed another lawsuit against Ally alleging that Ally fraudulently induced FGIC into insuring two sets of mortgage-backed securities worth a total of $1.87B by intentionally misrepresenting the quality of the underlying mortgage loan collateral.[10] FGIC alleges it has paid out millions of dollars in claims due to the delinquencies and defaults in connection with the securities.

The ResCap Debtors filed bankruptcy May 14, 2012, in part due to the magnitude of the Debtors' potential liability for representation and warranty claims in connection with mortgage loans sold by the Debtors and the significant time and defense costs in respect of defending such claims.[11]   The cornerstone of their Chapter 11 reorganization plan is the $2.1 billion which Ally Financial, Inc. will contribute to the ResCap Debtors in exchange for a release of claims that could be brought by ResCap creditors.[12] Under the ResCap Debtors' proposed bankruptcy plan, FGIC is expected to receive an aggregate recovery on account of FGIC Allowed Claims of approximately $206.5 million, which amount is not factored into the projected recoveries used to analyze the Cash Commutation Payment.[13]

iii.   On April 2, 2013, FGIC filed a complaint against Credit Suisse Securities LLC and DLJ Mortgage Capital.[14]  In this transaction, approximately 3,469 adjustable-rate home equity lines of credit with an aggregate unpaid principal balance of approximately $250 million served as collateral for approximately $244 million in mortgage-backed securities issued, whereby FGIC guaranteed the payment of principal and interest valued at approximately $240 million. FGIC's claim states that "Credit Suisse's pre-closing representations were fraudulent, the warranties it made in the insurance agreement were false, and it willfully disregarded and frustrated its contractual covenants" allowing for defaults "at remarkable rates, resulting in

---

[8] *Syncora Guarantee Settles its Countrywide Litigation*, July 17, 2012, Press Release.
[9] Financial Guaranty Insurance Company v. Ally Financial, Inc. F/K/A GMAC, LLC; Residential Capital, LLC; Residential Funding Company, LLC, Southern District of New York 12-CV-1601.
[10] Financial Guaranty Insurance Company v. Ally Financial, Inc. F/K/A GMAC, LLC; Residential Capital, LLC F/K/A Residential Capital Corporation; Ally Bank F/K/A GMAC Bank; GMAC Mortgage, LLC F/K/A GMAC Mortgage Corporation, Southern District Court of New York 12-CV-1818.
[11] Disclosure Statement. Docket #4157. Page 55.
[12] Disclosure Statement filed July 4, 2013.
[13] If the ResCap Debtors' chapter 11 plan does not become effective, the value of the FGIC recovery from the ResCap estate is uncertain.
[14] Financial Guaranty Insurance Company v. Credit Suisse Securities LLC and DLJ Mortgage Capital, Supreme Court of New York, Index No. 651178/2013.

losses…of over $67 million. As a result, FGIC has paid, or is obligated to pay, more than $41 million in claims…and is exposed to substantial future claim liability."

29. According to FGIC's own regulatory filings, FGIC has projected more than $1 billion in gross recoveries from various loss mitigation activities, such as the pursuit of litigation claims.[15] Those projected recoveries were reported by FGIC in its statutory financials filed with the Insurance Department of the State of New York in accordance with the Statement of Statutory Accounting Principles which requires (among other things) that such projections be conservative. These recoveries were not included in D&P's assessment of whether the $253.3 Cash Commutation Proposal is "within the range of reasonableness". If D&P's analysis was adjusted to incorporate these loss mitigation activities, the $253.3 million offer is not in the "range of reasonableness" and, therefore, not in the best interest of the FGIC-ResCap Policyholders. See paragraphs 30 and 31 for further explanation of this calculation.

30. For the purposes of this analysis only, I accepted the D&P Report's assumption that the allocation of ResCap sponsored RMBS trusts claims to the overall pool of claims is estimated appropriately at 10% to 24%. As previously explained, I was not provided the information necessary to independently verify these assumptions or their underlying support.

31. Applying the D&P assumptions regarding the allocation range to FGIC's projected gross recoveries yields an incremental value to the FGIC ResCap Policyholders between $105.9 million and $254.1 million. Incorporating such values into the range of values in the Base and Stress Scenario calculated by Duff & Phelps, the Cash Commutation of $253.3 is no longer in the range of expected payments. The adjusted Base Scenario ranges from $325 million to $594 million and the adjusted Stress Scenario ranges from $295 million to $504 million. See the following chart for calculations of these amounts.

---

[15] See Quarterly Statement of the Financial Guaranty Insurance Company as of March 31, 2013, p. 6.16.

| | 10% Allocation of ResCap Claims to Overall Pool of FGIC Claims | 24% Allocation of ResCap Claims to Overall Pool of FGIC Claims |
|---|---|---|
| Estimated Gross Expected Recoveries | $    1,058,632,000 | $    1,058,632,000 |
| D&P Report Allocation Percentage | 10.00% | 24.00% |
| ResCap Portion of FGIC Claims | $    105,863,200 | $    254,071,680 |
| **Base Case Analysis** | | |
| Low Range | $    220,000,000 | $    220,000,000 |
| ResCap Portion of FGIC Claims | 105,863,200 | 254,071,680 |
| Total | $    325,863,200 | $    474,071,680 |
| High Range | $    340,000,000 | $    340,000,000 |
| ResCap Portion of FGIC Claims | 105,863,200 | 254,071,680 |
| Total | $    445,863,200 | $    594,071,680 |
| **Stress Scenario Analysis** | | |
| Low Range | $    190,000,000 | $    190,000,000 |
| ResCap Portion of FGIC Claims | 105,863,200 | 254,071,680 |
| Total | $    295,863,200 | $    444,071,680 |
| High Range | $    250,000,000 | $    250,000,000 |
| ResCap Portion of FGIC Claims | 105,863,200 | 254,071,680 |
| Total | $    355,863,200 | $    504,071,680 |

32. The FGIC Settlement includes a release of all claims of policyholders under the FGIC Policies and FGIC-ResCap Policyholders would not receive additional upside from contingent assets of FGIC.

## V.    Data & Other Information Considered in Forming Opinions Expressed Herein

33. In arriving at the testimony outlined above, I have based my opinions on my expertise in accounting, finance, and damages analysis, and my assessment of the various documents. Please see Exhibit B for a listing of documents relied upon to formulate my opinion. I reserve the right to supplement, amend, or modify my opinions should further information become available.

## VI.    Exhibits & Possible Revisions or Supplements to Report

34. Exhibit A and Exhibit B are attached herein. I reserve the right to provide additional exhibits as and when they become available. I also reserve the right to supplement, amend, or modify my opinions based upon information that I have received and additional information I may receive

13

in the future, including any opinions expressed by the Investors, their representatives, or their experts.

**Respectfully submitted by:**

**Charles R. Goldstein**
**July 19, 2013**

# EXHIBIT A

# Charles R. Goldstein
## Managing Director
*Litigation, Restructuring & Investigative Services*

**Contact Information**
Direct:  410.454.6830
Mobile:  410.200.0557
Fax:  410.454.6801
E-mail:  charles.goldstein@protiviti.com

**Areas of Expertise**
- Litigation & Financial Investigation
- Corporate Restructuring & Recovery

**Industry Expertise**
- Healthcare
- Energy
- Retail
- Manufacturing
- Real Estate
- Technology

**Education & Certifications**
- BA, Economics, University of Maryland
- MBA, University of Maryland
- Juris Doctor, University of Maryland
- Certified Public Accountant (CPA)
- Certified Insolvency & Restructuring Advisor (CIRA)
- Certified in Financial Forensics (CFF)

**Professional Memberships**
- American Bankruptcy Institute
- American Institute of Certified Public Accountants
- Association of Insolvency & Restructuring Advisors
- Maryland Association of Certified Public Accountants

**Professional Experience**

Charles Goldstein is responsible for leading the company's Litigation, Restructuring, and Investigative practice as well as the Corporate Restructuring and Recovery service line. He has more than 20 years experience providing financial consulting services and expert testimony in a variety of areas including corporate restructuring, transaction services, bankruptcy consulting, financial investigations, and complex commercial litigation.

**Principal Areas of Practice**

- Provides restructuring, turnaround and crisis management services. He also provides financial advisory and investigative services to debtors, financial sponsors, secured and unsecured creditors, trustees, and other interested parties.
- Performs business valuations for use in commercial litigation and bankruptcy matters.
- Directs due diligence and consulting services for both buy and sell side engagements as well as loan collateral analysis for lenders.
- Directs financial forensic investigations where he provides investigative services, damage calculations and expert witness testimony in fraud, bankruptcy, and litigation matters.

**Major Litigation Projects**

- Served as financial expert for the Plaintiff in Stanley Goldberg, et al v. The State of Maryland regarding damages related to legislation impacting the value of land subject to ground rents.
- Serving as the financial advisor to the Unsecured Creditors' Committee and Trustee in Financial Mortgage Inc./Vijay K. Taneja a mortgage company/real estate developer. Conducting an extensive investigation into the activities of the debtors including the tracing of over $100 million of cash disbursements and providing expert testimony regarding lien positions.
- Provided an expert report to the Federal Trade Commission with regard to the activities of Ameridebt, a national debt counseling service. Charges brought by the FTC included misrepresentation and fraudulently transferring funds from a not-for-profit entity to a for-profit enterprise. Protiviti determined that over $170 million had been paid by consumers in initial and monthly "contributions" and that the owners of AmeriDebt benefited to an amount in excess of $50 million.
- Assisted the Trustee of the St. Vincent's Catholic Medical Center Litigation Trust in litigation against various parties for causes of action including allegations of: failure to properly and reasonably restructure and/or provide for a timely Chapter 11 bankruptcy filing; engaging in improper negotiations and sale during the active engagement; engaging in improper billing practices during the engagement; and improper accounting and/or reporting of financial conditions.
- Served as financial expert for the Plaintiff in Alliance Telecommunications Industry Solutions, Inc. vs. Edward A. Hall et al regarding damage calculation.
- Assisted international insurance company in its review of a criticized commercial loan portfolio.
- Served as financial expert to the defendant in Liberty Mutual et al vs. Citibank regarding internal controls.



## Charles R. Goldstein
### Managing Director
*Litigation, Restructuring & Investigative Services*

**Contact Information**
Direct:   410.454.6830
Mobile:  410.200.0557
Fax:      410.454.6801
E-mail:   charles.goldstein@protiviti.com

**Testimony**

- Hearing Testimony in re: Curtis Dixon Colgate, et al v The Disthene Group, Inc. (Case No. CL11-117) Circuit Court of Buckingham County, Virginia. Subject matter: approval of sale of Cavalier Hotel and settlement agreement (proffered) (testimony given in 2013).

- Deposition Testimony in re: K Capital Corporation v FDIC (Case No. 1:11-cv-01604-ELH) U.S. District Court, District of Maryland. Subject matter: action for recovery against K Bank receivership (testimony given in 2012).

- Deposition Testimony in re: Rothschild Capital Partners (Case No.      ) Circuit Court of Baltimore City, Maryland. Subject matter: damage analysis (testimony given in 2012).

- Hearing Testimony in re: The Disthene Group, Inc. (Case No. CL11-117) Circuit Court of Buckingham County, Virginia. Subject matter: appointment of receiver (testimony given in 2012).

- Hearing Testimony in re: Vijay K. Taneja, et al., (Bankruptcy Case No. 08-13293) U.S. Bankruptcy Court, Eastern District of Virginia. Subject matter: plan of reorganization testimony including substantive consolidation and support for elements of §1129 (testimony given in 2011).

- Deposition Testimony in re: Harvest Bank of Maryland  v. Countrywide Home Loans, Inc. (Case No. 8:09-cv-00176-RWT). U.S. District Court, District of Maryland Southern Division.  Subject matter: Damages related to the purchase of a residential real estate portfolio (testimony given in 2011).

- Deposition Testimony in re: Stanley Goldberg, et al. v. The State of Maryland (Case No. 02-C-07-126810 RP). Circuit Court for Anne Arundel County, Maryland.  Subject matter: Damages related to ownership of land subject to ground rents (testimony given in 2010).

- Hearing Testimony in re: Universal Marketing, Inc. (Bankruptcy Case No. 09-14504).  Eastern District of Pennsylvania Bankruptcy Court.  Subject matter: Substantive consolidation of non-debtor entities (testimony given in 2010).

- Hearing Testimony in re: National Energy & Gas Transmission, Inc., et al. (Bankruptcy Case No. 03-30459-PM).  U.S. Bankruptcy Court, District of Maryland.  Subject matter: Settlement with largest unsecured creditor (testimony given in 2010).

- Deposition & Hearing Testimony in re: Black Crow Media Group L.L.C., et al. (Bankruptcy Case No. 10-00172) U.S. Bankruptcy, Middle District of Florida.  Subject matter: motion to dismiss, motion to approve cash collateral, motion to approve debtor-in-possession financing (testimony given in 2010).

- Hearing Testimony in re: ADFITECH, Inc. (Bankruptcy Case No. 09-17788) U.S. Bankruptcy Court, District of Maryland. Subject matter: plan confirmation (testimony given in 2010).

- Hearing Testimony in re: Patterson Park Community Development Corporation (Bankruptcy Case No. 09-12545) U.S. Bankruptcy Court, District of Maryland. Subject matter: plan confirmation (testimony given in 2009).

*protiviti*

© 2012 Protiviti Inc.
CONFIDENTIAL

## Charles R. Goldstein
### Managing Director
*Litigation, Restructuring & Investigative Services*

**Contact Information**
Direct:   410.454.6830
Mobile:  410.200.0557
Fax:       410.454.6801
E-mail:   charles.goldstein@protiviti.com

**Testimony (continued)**

- Hearing & Deposition Testimony in re: Thornburg Mortgage, Inc. et al (Bankruptcy Case No. 09-17787). U.S. Bankruptcy Court, District of Maryland. Subject matter: motion to appoint a trustee (testimony given in 2009).

- Deposition Testimony in re: Financial Mortgage, Inc. / Vijay K. Taneja, et al. (Bankruptcy Case No. 08-13292). U.S. Bankruptcy Court, Eastern District of Virginia. Subject matter: lien positions (testimony given in 2009).

- Hearing Testimony in re: National Energy & Gas Transmission, Inc., et al. (Bankruptcy Case No. 05-32141). U.S. Bankruptcy Court, Western District of North Carolina. Subject matter: claims set-off issues (testimony given in 2008).

- Hearing Testimony in re: National Energy & Gas Transmission, Inc., et al. (Bankruptcy Case No. 03-30459-PM). U.S. Bankruptcy Court, District of Maryland. Subject matter: valuation of claim. (testimony given in 2008).

- Deposition Testimony in re: National Energy & Gas Transmission, Inc., et al. (Bankruptcy Case No. 03-30459-PM). U.S. Bankruptcy Court, District of Maryland. Subject matter: Contested issues re: Southaven Claims / Case distribution (testimony given in 2007).

- Hearing Testimony in re: National Energy & Gas Transmission, Inc., et al. (Bankruptcy Case No. 03-30459-PM). U.S. Bankruptcy Court, District of Maryland. Subject matter: Appropriateness of claims settlement (testimony given in 2007).

- Expert Testimony in re: Alliance for Telecommunications Industry Solutions, Inc. vs. Edward A. Hall et al (Civil Case No. 05-cv-0044-0). U.S. District Court, District of Maryland. Subject matter: Damage calculation (testimony given in 2006).

- Hearing Testimony in re: Porter-Hayden Company (Bankruptcy Case No. 02-54152). U.S. Bankruptcy Court, District of Maryland. Subject matter: Confirmation of the Plan of Reorganization for the Debtors (testimony given in 2006).

- Report submitted in re: Federal Trade Commission vs. AmeriDebt, A. Pukke, et al. (Case No. PJM-03-3317). U.S. District Court, District of Maryland. Subject matter: Litigation and consultant to Federal Trade Commission (report submitted in 2005).

- Trial and Deposition Testimony in re: Official Employment-Related Issues Committee of Enron vs. John J. Lavorato, et al (Bankruptcy Case No 03-3721) and Official Employment-Related Issues Committee of Enron vs. John D. Arnold, et al (Bankruptcy Case No. 03-3522). U.S. Bankruptcy Court, Southern District of Texas, Houston Division. Subject matter: Fraudulent transfers and Retention payments (testimony given in 2005).

- Hearing Testimony in re: Phyamerica Physician Group (Bankruptcy Case No. 02-6-7737). U.S. Bankruptcy Court, District of Maryland. Subject matter: Fraudulent transfers (testimony given in 2005)

- Hearing Testimony in re: National Energy & Gas Transmission, Inc., et al. (Bankruptcy Case No. 03-30459-PM). U.S. Bankruptcy Court, District of Maryland. Subject matter: Plan of Liquidation for ET Debtors and the Quantum Debtors (testimony given in 2005).

**protiviti®**

© 2012 Protiviti Inc.
CONFIDENTIAL

## Charles R. Goldstein
### Managing Director
*Litigation, Restructuring & Investigative Services*

**Contact Information**
Direct:  410.454.6830
Mobile:  410.200.0557
Fax:  410.454.6801
E-mail:  charles.goldstein@protiviti.com

**Papers, Publications and Presentations**

- "Considerations for Existing and Potential Directors and Officers of Financially Distressed Companies," February 27, 2012, Boardmember.com.

- Board Risk Oversight," November 8, 2011, speaker at the 2011 NACD Directorship Forum

- "Board Leadership During a Crisis Situation," April 8, 2011, presentation to The Directors' Institute at The University of Maryland.

- "Use of Financial Advisors in Chapter 11 Bankruptcy Proceedings," April 2010, April 2009, April 2008, October 2005, April 2004, November 2003, April 2003 and November 2002, Robert H. Smith School of Business, University of Maryland.

- "Corporate Restructuring: Pitfalls and Opportunities," October 2009 edition of The Metropolitan Corporate Counsel.

- "Considerations for General Counsel in an Era of Troubled Companies: Tripwires and Ethical Concerns," February 3, 2009, presentation to Association of Corporate Counsel, Chicago Chapter.

- "Challenges of Growing your Practice," June 4, 2008, presentation to the Association of Insolvency and Restructuring Advisors' 24th Annual Bankruptcy and Restructuring Conference.

- "Liquidation and Litigating Trust," May 2, 2008, presentation to the Maryland Bankruptcy Bar Association.

- "Use of Financial Advisors in Chapter 11 Bankruptcy Proceeding," April 2009 and April 2008, presentation at the University of Baltimore.

- "Maximizing Returns: When to Buy and Sell Distressed Debt," September 17, 2007, presentation to the Global Distressed Debt Investor Forum, New York, NY.

- "Financial Statements – Misstatements and Creditor Committee Reporting," June 8, 2007, presentation to the Association of Insolvency and Restructuring Advisors' 23rd Annual Bankruptcy and Restructuring Conference.

- "Fiduciary Duties of the Turn-Around Professional in the Zone of Insolvency," June 10, 2006, presentation to the Association of Insolvency and Restructuring Advisors' 22nd Annual Bankruptcy and Restructuring Conference.

**protiviti**

© 2012 Protiviti Inc.
CONFIDENTIAL

3

# EXHIBIT B

**EXHIBIT B**

| Count | Document Description |
|---|---|
| 1 | Disclosure Statement for Plan of Rehabilitation for Financial Guaranty Insurance Company, dated September 27, 2012 |
| 2 | Proposed Plan of Rehabilitation for Financial Guaranty Insurance Company, dated September 27, 2012 |
| 3 | First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, dated June 4, 2013 |
| 4 | Affidavit of Michael Miller in Further Support of Approval of First Amended Plan of Rehabilitation dated December 12, 2012 |
| 5 | Affidavit of Gary Holtzer, dated May 29, 2013 |
| 6 | Affirmation of Paul V. Shalhoub, date July 16, 2013 |
| 7 | Duff & Phelps Report dated May 15, 2013 |
| 8 | Affidavit of John S. Dubel, dated December 12, 2013 |
| 9 | Financial Guaranty Insurance Company Quarterly Statement dated March 31, 2013 |
| 10 | Deposition Transcript of David Williams, July 12, 2013 |
| 11 | Deposition Transcript of Lewis Kruger, July 11, 2013 |
| 12 | Deposition Transcript of Mary Sohlberg, July 16, 2013 |
| 13 | Deposition Transcript of John S. Dubel, July 10, 2013 |
| 14 | Declaration of Ron D'Vari, dated June 7, 2013 |
| 15 | Deposition Transcript of Robert Major, July 17, 2013 |
| 16 | Settlement Agreement between the Debtors, FGIC and Trustees dated May 23, 2013 |
| 17 | Quarterly Statement of the FGIC (in Rehabilitation) as of March 31, 2013 |
| 18 | Financial Guaranty Insurance Company v. Countrywide Home Loans, Inc., Supreme Court of New York, Index No. 650736/2009, Initial Complaint dated December 11, 2009 |
| 19 | Financial Guaranty Insurance Company v. Countrywide Home Loans, Inc., Supreme Court of New York, Index No. 650736/2009, Amended Complaint dated April 30, 2010 |
| 20 | Bank of America Corporation, Form 8-K, May 6, 2013 |
| 21 | Assured Guaranty Ltd. Announces Settlement with Bank of America, Assured Guaranty News, April 15, 2011 |
| 22 | Syncora Guarantee Settles its Countrywide Litigation, July 17, 2012, Press Release |
| 23 | FGIC v. Ally Financial, Inc., Southern District of New York 12-CV-1601 dated March 5, 2012 |
| 24 | FGIC v. Ally Financial, Inc., Southern District Court of New York 12-CV-1818 dated March 14, 2012 |
| 25 | Disclosure Statement for the Joint CH. 11 Plan Proposed by Residential Capital, LLC, Bankruptcy Court of the Southern District of New York, Case No. 12-12020 (MG), dated July 4, 2013 |
| 26 | Financial Guaranty Insurance Company v. Credit Suisse Securities LLC and DLJ Mortgage Capital, Supreme Court of New York, Index No. 651178/2013 |

Sidman Declaration Exhibit # 5

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:                                                    Case No. 12-12020 (MG)
RESIDENTIAL CAPITAL, LLC, *et al.*,                        Chapter 11
                                    Debtors.               Jointly Administered

## EXPERT REPORT OF ALLEN M. PFEIFFER
### July 19, 2013

By: _____
        *Allen M. Pfeiffer*

# TABLE OF CONTENTS

I.      EXPERT WITNESS DISCLOSURE AND STATEMENT OF BACKGROUND AND QUALIFICATIONS ........................................................................................................... 3

II.     SCOPE OF WORK ................................................................................................................. 5

III.    SUMMARY OF CONCLUSIONS ......................................................................................... 7

IV.     D&P'S ROLE AS FINANCIAL ADVISOR ......................................................................... 8

V.      SUMMARY OF THE REHABILITATION PLAN ............................................................... 9

VI.     SUMMARY OF THE FGIC COMMUTATION CONTAINED IN THE SETTLEMENT AGREEMENT ..................................................................................................................... 14

VII.    CALCULATION OF CASH FLOWS FROM THE REHABILITATION PLAN ................... 16

VIII.   UNCERTAINTY OF PROJECTED CASHFLOWS UNDER THE REHABILITATION PLAN ................................................................................................................................... 20

IX.     ADDITIONAL BENEFITS OF THE SETTLEMENT AGREEMENT OVER THE REHABILITATION PLAN ................................................................................................... 25

X.      POTENTIAL BENEFITS OF THE SETTLEMENT AGREEMENT FROM THE PLAN SUPPORT AGREEMENT ................................................................................................... 26

XI.     CONCLUSIONS ................................................................................................................... 28

XII.    RESERVATION OF RIGHTS AND COMPENSATION DISCLOSURE .............................. 29

# LIST OF ATTACHMENTS

ATTACHMENT I:    CURRICULUM VITAE OF ALLEN M. PFEIFFER

ATTACHMENT II:   DOCUMENTS AND SOURCES CONSIDERED

ATTACHMENT III: FGIC COMMUTATION PROPOSAL DISCUSSION MATERIALS:
                 DATED MAY 15, 2013

## I.    EXPERT WITNESS DISCLOSURE AND STATEMENT OF BACKGROUND AND QUALIFICATIONS

1.    I, Allen M. Pfeiffer, have been asked by the **FGIC Trustees**[1] to serve as an expert witness in connection with the FGIC Trustees' **Joinder**[2] to *Debtors' Motion Pursuant to Fed. R. Bankr, P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* (the "**FGIC Motion**") [Docket No. 3929].

2.    I am a Managing Director in the New York, NY and the Morristown, NJ offices of Duff & Phelps, LLC ("**D&P**"). I am the Global Service Leader of Dispute Consulting-Complex Valuation and Bankruptcy Litigation. D&P is a leading financial advisory and investment banking firm offering an array of services in the areas of valuation, investment banking and transaction advice, and dispute consulting.

3.    I have more than seventeen years of valuation, solvency, damages cash flow assessment and capital structure analysis experience and have led hundreds of engagements related to the valuation of an entire business, a security, an interest in a business, or an asset. During my professional career, the New York Supreme Court, the United States Bankruptcy Court, the American Arbitration Association, and arbitrators operating under the rules of the International Chamber of Commerce have accepted me as a valuation and cash flow expert. In addition to my testifying experience, I have worked as a lead consultant to attorneys and corporations in the context of solvency and many other valuation and corporate finance matters. I also led the team of financial advisors to Anton Valukus, who served as the Examiner in the Lehman Brothers bankruptcy case.

---

[1]    The FGIC Trustees are The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., U.S. Bank National Association and Wells Fargo Bank, N.A., each solely in their respective capacities as trustees or indenture trustees for the FGIC Insured Trusts.

[2]    *Joinder of FGIC Trustees to the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the Debtors, FGIC, The FGIC Trustees and Certain Institutional Investors* [Docket No. 3982]

4.    My Residential Mortgage-Backed Securities ("**RMBS**") experience includes serving as a consultant on the valuation and cash flows as part of a solvency matter related to a multi-billion-dollar, leading financial services company. I have been retained to advise on the valuation of RMBS securities as part of the reorganization of an international, multi-billion-dollar financial services entity, and I have served as a debtor advisor in litigation related to the reorganization of a leading residential lender, and lead advisor on the solvency of a large, residential real estate subsidiary. In addition, I have been a consultant to a bank trustee in a multi-billion-dollar repurchase claim matter related to a bank merger, and, in another matter, advised the trustees in a multi-billion-dollar repurchase claim matter associated with a bankruptcy.

5.    While all the conclusions set forth in this Report derive from work performed by me, or performed under my direction, my conclusions relied, in part, on the input of two my colleagues at D&P, John W. Schrader, a Managing Director in the New York Office of D&P and Brendan Murphy, a Director in the New York Office of D&P.

6.    Mr. Schrader possesses over 21 years of Financial Advisory and Investment Banking experience centered on Collateralized Debt Obligations ("CDOs") and various structured products, including RMBS. Mr. Schrader also served as the global head of Mortgage Market Risk and Securitized Products for a leading investment bank. Mr. Schrader has estimated a range of reasonable mortgage repurchase liabilities in association with bankruptcies, has valued and assessed modeling and loan surveillance platforms for numerous domestic and internal whole-loan investments pertaining to performing, re-performing, and non performing mortgages, and has assisted various hedge funds and private equity firms in assessing value and measuring risk associated with structured

products (specifically, CDOs, RMBS, Commercial Mortgage-Backed Securities, and Asset-Backed Securities, among others).

7.    Mr. Murphy is a Director in the Global Restructuring Advisory group at D&P with over twelve years of experience in bankruptcy and restructuring. His experience includes corporation and asset appraisal — including debt restructuring, liquidation analysis, extensive valuation, and capital refinancing. His Chapter 11 experience includes Plan development and creditor negotiations, business plan / capital structure assessment, distressed M&A (via §363 sales), capital raising (DIP / Exit financing), and operational turnarounds (cash flow / liquidity management). He has executed over 37 distressed transactions throughout all phases of financial restructurings and represented clients within all levels of the capital structure, both in- and out-of-court.

8.    My resume and testimony experience, for at least the past four years, and publications, for at least the last ten years, are attached to this report as **Attachment I**.


II.    **SCOPE OF WORK**

9.    My assignment is to assess the reasonableness, from a financial perspective and from the perspective of the **FGIC Insured Trusts**,[3] of the **Settlement Agreement**,[4] which provides for, among other things, a lump sum payment by FGIC to the FGIC Insured Trusts (the "**Commutation Payment**") in satisfaction of any obligations of FGIC to

---

[3]    The "FGIC Insured Trusts" are the 47 RMBS Trusts listed on Exhibit B to the Settlement Agreement, certain tranches of which are insured by FGIC.

[4]    Capitalized terms not defined in this Report shall have the meanings ascribed to them in the FGIC Motion or the Settlement Agreement, as applicable.

make payments in the future (the "**Projected Payments**") to the FGIC Insured Trusts

under FGIC' **Rehabilitation Plan** (as that term is defined below) (the "**Commutation**"[5]).

10.    In performing the analyses, I, and/or others at D&P working under my direction, have

reviewed, among other information, the following:

- The Settlement Agreement;

- The Plan Support Agreement;

- The Rehabilitation Plan (including the exhibits and attachments thereto);

- The Disclosure Statement for the Rehabilitation Plan, filed on September 27, 2012

  (the "**FGIC Disclosure Statement**");

- Affidavit of Michael W. Miller[6] submitted on December 12, 2012, in Further

  Support of Approval of First Amended Plan of Rehabilitation (the "**Miller**

  **Affidavit**");

- The governing agreements for the FGIC Insured Trusts (the "**Governing**

  **Agreements**");

- Ibbotson Cost of Capital Yearbook 2012 and 2013 ("**Ibbotson**");

- ResCap's Vision Database[7];

- Intex[8];

- Bloomberg[9];

---

[5]    I understand that FGIC has stated that the Settlement Agreement does not effect a "commutation" of any
insurance policies, a point on which I have no opinion. Any payment does not constitute a Commutation
Payment. This Report only uses the terms Commutation and Commutation Payment for convenience, as these
terms were commonly used during negotiation discussions.

[6]    Mr. Miller is the Director of the Financial Institutions Group at Lazard Freres & Co. LLC ("**Lazard**").

[7]    The Vision database is ResCap's (now Ocwen's) investor services website and can be found at
investor.gmacrfc.com/vision/.

[8]    Intex is a subscription based 3rd party application that models the deal structure and rules that govern cash flow
distribution as defined in the governing documents.  It also maintains monthly updated collateral files for each
deal, that may be at the loan level or based on summarized or aggregate data, depending on whether or not the
Servicer of a deal furnishes then with servicing files.

- Interview with Tim Travers (FGIC's Chief Restructuring Officer);

- Interview with certain Lazard personnel;

- Additional publicly-available documents related to the FGIC Rehabilitation (fully listed in **Attachment II**).

11.    **Attachment II** lists all of the documents that were reviewed and / or considered in forming the basis for my conclusions. I reserve the right to update **Attachment II** as additional documentation is reviewed and / or considered.

## III.    SUMMARY OF CONCLUSIONS

12.    <u>Conclusion 1:</u> Under the Settlement Agreement, the FGIC Insured Trusts forgo uncertain Projected Payments and receive the lump sum Commutation Payment upon execution of the Settlement Agreement. The Commutation Payment mitigates downside risk to Investors by securing a known payment to Investors following approval of the Settlement Agreement by the Bankruptcy Court and the Rehabilitation Court (and assuming that all conditions precedent to the Effective Date are satisfied or waived). Following an independent analysis performed by me, and those working under my direction, it is my conclusion that the Commutation Payment amount of approximately $253.3 million falls within a reasonable range, given the expected cash flows associated with the Projected Payments.

13.    <u>Conclusion 2:</u> From a financial perspective, it is my conclusion that it was reasonable for the FGIC Trustees to agree to the Settlement Agreement and thereby accept the Commutation Payment over the Projected Payments. While I do not conclude that

---

[9] Bloomberg is an industry-standard source for financial data, including data on the FGIC Insured Trusts.

acceptance of the Commutation Payment inevitably will be a superior result for all

Investors; given the overall risks, benefits, and uncertainties involving both the

Commutation Payment and the Projected Payments, and, given that the Settlement

Agreement is an integral part of the Plan Support Agreement that may result in the

confirmation of a Plan that produces additional value for Investors in the FGIC Insured

Trusts, it is my opinion that a decision by the FGIC Trustees to enter into the Settlement

Agreement, and thus accept the Commutation Payment in lieu of the Projected Payments,

was reasonable.


### IV.    D&P'S ROLE AS FINANCIAL ADVISOR

14.    The conclusions presented in this Report result, in part, from work done by D&P in its

role as Financial Advisor to the FGIC Trustees. In late March 2013, as part of the

mediation (the "**Mediation**") overseen by the Court-appointed Mediator, Judge James M.

Peck, the FGIC Trustees received a proposal for the commutation of insurance policies

issued by FGIC to the FGIC Insured Trusts (the "**Proposal**"). D&P was asked by the

FGIC Trustees to advise them regarding D&P's assessment of the reasonableness, risks,

and benefits of accepting the Proposal. Based, in part, on confidential information

communicated by FGIC's Chief Restructuring Officer and Lazard, Financial Advisors to

Weil, Gotshal & Manges, LLP, counsel to the New York Liquidation Bureau ("**NYLB**"),

D&P performed an independent financial analysis to determine a reasonable range of the

value of Projected Payments to the FGIC Insured Trusts based on the Rehabilitation Plan.

D&P presented the analysis on an ongoing basis to the FGIC Trustees during the

Mediation and provided guidance that, from a financial perspective, the Commutation

Payment falls within a range of reasonableness relative to the Projected Payments under

Rehabilitation Plan. **Attachment III** contains the presentation given to the Trustees on

May 15, 2013. The presentation gives background information about the Rehabilitation

Plan, financial considerations covering the Proposal and the Rehabilitation Plan, and

reviews FGIC's own calculations leading to a payment amount of $253.3 million It also

presents D&P's independent analysis of the Projected Payments and the Commutation. It

is important to note that the guidance provided by D&P was based on information

received from FGIC and Lazard; however, the conclusions reached by D&P resulted

from its own independent analysis of that information and publicly available information.


## V.    SUMMARY OF THE REHABILITATION PLAN

### (i)    Background

15.    In January 2008, FGIC voluntarily ceased writing policies for new or additional risks,

stopped paying dividends or other distributions to its shareholders, and reduced its

operating expenditures. Despite these measures, FGIC's quarterly statement for the

period ending September 30, 2009 reflected a deficit in Policyholders'[10] surplus of

approximately $866 million, and an impairment of its required minimum surplus to

Policyholders of approximately $932 million.[11] As a result, on November 24, 2009, the

New York State Department of Financial Services ("**NYSDFS**") issued a 1310 Order,

requiring FGIC to suspend payment of all Claims and prohibited FGIC from writing new

Policies.

---

[10]    All capitalized terms first used in this section of the Report have the meaning given in the Rehabilitation Plan or
the FGIC Disclosure Statement, as applicable.
[11]    FGIC Disclosure Statement, p 10.

16.    On June 28, 2012, the Superintendent of Financial Services of the State of New York was

appointed rehabilitator (the "**Rehabilitator**") of FGIC by the Supreme Court of the State

of New York to oversee FGIC's rehabilitation proceeding (the "**Rehabilitation**

**Proceeding**"). On September 27, 2012, the Rehabilitator filed a proposed Plan of

Rehabilitation and a disclosure statement for FGIC, both dated September 27, 2012, in

the Rehabilitation Proceeding. Subsequently, the proposed Plan of Rehabilitation was

amended on December 12, 2012, April 12, 2013, and June 4, 2013 (as amended, the

"**Rehabilitation Plan**").

### (ii)    Goal of the Rehabilitation Plan

17.    The stated goal of the Rehabilitation Plan is to treat FGIC's Policyholders in a fair and

equitable manner in order to remove the causes and conditions that made the

Rehabilitation Proceeding necessary.[12] The Rehabilitation Plan provides for all of the

value of FGIC, other than administrative expenses and certain other costs, to go to

FGIC's Policyholders until the Policyholders are paid in full. No claimants junior to the

Policyholders will receive any payment until the Policyholders are paid in full in

accordance with the terms of the Rehabilitation Plan.

### (iii)    Distribution Methodology Under the Rehabilitation Plan

18.    FGIC's outstanding Policies have scheduled remaining terms that do not expire for as

long as another 40 years.[13] Consequently, FGIC expects to receive Policy Claims over an

extended period, defined in the Rehabilitation Plan as the "**Run-Off Period**." Conversely,

certain Policyholders either have Policy Claims that are accrued and unpaid since the

---

[12]    Memorandum of Law in Support of Approval of Plan of Rehabilitation for FGIC (Oct. 25, 2012), p. 1.
[13]    Miller Affidavit at Exhibit II, p 6.

entry of the 1310 Order on November 24, 2009 ("**Accrued and Unpaid Claims**") or have Policy Claims that are likely to materialize within the first five years post-emergence.[14]

19.    The Rehabilitation Plan includes certain policy modifications to provide FGIC the ability to pay a certain Cash Payment Percentage (the "**CPP**") of each Permitted Policy Claim, in cash, with the remainder of the Permitted Policy Claim treated as a Deferred Payment Obligation (the "**DPO**"). The DPO accrues interest at a rate of three percent per annum (the "**DPO Accretion**") on a simple (non-compounding) basis.

20.    Additionally, the Rehabilitation Plan provides for an initial, partial cash payment, based on the initial CPP, of then-Permitted Policy Claims, no later than 150 days after the effective date of the Rehabilitation Plan. The Rehabilitator estimates that the total distributable value will provide all Policyholders with the same CPP of their Permitted Policy Claim on a nominal basis (*i.e.*, excluding the time value of money).

21.    The Rehabilitation Plan also provides for an annual, or possibly more frequent, adjustment of the CPP, based on an assessment of FGIC's financial condition. The Restructured Policy Terms attached to the Rehabilitation Plan provides that each CPP Revaluation will include certain updates, revisions, corrections, or other modifications that are necessary to correct any errors, reflect events that have occurred, or are reasonably likely to occur, and ensure that the CPP is set at a level consistent with the Run-Off Principles. These modifications are then used to determine the amount (if any) of Excess Cash available to recalculate the CPP and determine the amount of DPO Accretion that may be paid.

---

[14]    Miller Affidavit at p 10.

22.     Upon a CPP Upward Adjustment, the DPO Accretion Payable Amount will be distributed,
pro rata, based on the outstanding DPO Accretion for each Policy. With respect to the
DPO, the Rehabilitator makes no assurances as to if, when, or in what amounts, FGIC
may ultimately make cash payments with respect to any DPO. Additionally, the
Rehabilitator expects that the DPO Accretion Payment Amounts will be a fraction of the
outstanding DPO Accretion. However, the Rehabilitator makes no assurances as to if,
when, or in what amounts, FGIC may ultimately make cash payments with respect to any
DPO Accretion.[15]

23.     The distribution method outlined in the Restructured Policy Terms provides certain
reserve mechanisms to prevent potential overpayments on Policy Claims that have
already materialized. To the extent that overpayments on a particular Policy Claim are
unable to be offset against projected losses, certain Policyholders with unrealized,
projected claims may be disenfranchised in the event that the actual distributable value of
the estate is unable to be equally distributed to all Policyholders via the CPP.

**(iv)     Estimated Recoveries to Policyholders**

24.     The Miller Affidavit includes the updated projections for the Run-Off Period (the
"**Updated Run-Off Projections**") under both the Base and Stress Scenarios (as defined
in the Rehabilitation Plan). The Updated Run-Off Projections estimate the initial CPP
will be 17.25 percent. Subsequently, pursuant to the Plan Approval Order dated June 11,
2013, an initial CPP of 17.25 percent was approved. The initial CPP is subject to
adjustment by the Rehabilitator in his sole discretion on or before the Effective Date.[16]

---

[15]    Rehabilitation Plan at Exhibit B, B-2.
[16]    FGIC Plan Approval Order dated June 11, 2013 at p. 6.

25.     The Updated Run-Off Projections offers different projections of the CPP under the Stress

Scenario and under the Base Scenario. Under the Stress Scenario, the CPP is held

constant at 17.25 percent, until a final distribution of all available assets to holders of

policy claims permitted under the Rehabilitation Plan. Assuming a discount rate range of

10 to 20 percent, the present value of recoveries to such Policyholders under the Stress

Scenario is 17 to 18 percent, and a lower percentage of the notional (non-discounted) all

Permitted Policy Claims.

26.     Under the Base Scenario, in which the losses are lower than those projected under the

Stress Scenario, the CPP is estimated to increase every year until 2043.[17] Each

Policyholder is projected to receive a nominal recovery of 38.6 percent of their Permitted

Policy Claims by 2052 based on the final CPP estimate included in the Updated Run-Off

Projections. The nominal recovery on an aggregate basis for all Policyholders is

estimated to be 45 percent, that is, after taking into effect the recoveries on the DPO

Accretion. According to Lazard, the net present value of aggregate recoveries divided by

the net present value of all Permitted Policy Claims are estimated to be 27 to 30 percent

under the Rehabilitation Plan using a 10 to 20 percent discount rate range.[18] D&P

calculated this range for the FGIC Insured Trusts to be 18 to 23 percent on a notional

basis and 22 to 28 percent on a discounted basis (See Table 1).

---

[17]    Miller Affidavit, p. 20.
[18]    Miller Affidavit, p. 8.

## VI.   SUMMARY OF THE COMMUTATION PAYMENT CONTAINED IN THE SETTLEMENT AGREEMENT

### (i)   Background on FGIC's Proofs of Claims

27.   On November 16, 2012, FGIC filed proofs of claims in the Chapter 11 Bankruptcy against Residential Capital, LLC ("**ResCap**"), GMAC Mortgage, LLC ("**GMACM**") and Residential Funding Company, LLC ("**RFC**") (collectively, the "**Debtors**") in an amount of at least $1.85 billion at each debtor entity, in connection with the pre-petition litigation (collectively, the "**FGIC Claims**"). I understand the FGIC Claims against the multiple Debtor entities are generally similar to each other and allege that: (i) RFC and GMACM breached various representations, warranties and/or covenants in the FGIC Trusts' Governing Agreements, (ii) FGIC was fraudulently induced to issue the Policies in connection with most of the FGIC Insured Trusts, and (iii) ResCap is liable for the alleged breaches and fraud of GMACM and RFC under an alter ego liability theory. FGIC also asserted claims related to the Debtors' alleged deficient servicing of the mortgage loans in the FGIC Insured Trusts and based on the Debtors' alleged failure to provide FGIC access to certain information in accordance with the RMBS Trusts' Governing Agreements. FGIC further sought indemnification for "any and all claims, losses, liabilities, demands, damages, costs, or expenses of any nature arising out of or relating to the breach" of the Governing Agreements. [19]

---

[19]   Declaration of Lewis Kruger in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 For Approval of the Settlement Agreement Among the Debtors, FGIC, the FGIC Trustees, and Certain Institutional Investors [Docket No. 3929-3].

### (ii)   Estimate of the Commuted Claims

28.   As of March 31, 2013, FGIC represented to, among others, the FGIC Trustees that it had paid approximately $343 million in claims to the FGIC Insured Trusts under the Policies. Based on the proof of claims, FGIC represented that the estimate of accrued and unpaid and projected claims related to the FGIC Insured Trusts was approximately $1.27 billion. Of this amount, FGIC represented that the accrued and unpaid claims since the entry of the 1310 Order through March 31, 2013 was $789 million. Omitting the settlement, discharge, and release of the policies (*i.e.*, a status quo situation), FGIC estimated projected losses related to the FGIC Insured Trusts to be approximately $481 million.[20]

### (iii)   Commutation Payment Proposed by FGIC

29.   The Settlement Agreement, among other things, provides a lump-sum Commutation Payment of $253.3 million to be paid to the FGIC Insured Trusts in commutation of the Policies and in exchange for FGIC's ability to assert a $596.5 million total general unsecured claim in the ResCap Chapter 11 Bankruptcy cases.[21]

30.   I reviewed FGIC's explanation of the Commutation Payment and understand it as follows[22]: FGIC's calculations show, based on the Updated Run-Off Projections and the Base Scenario, that the Commutation Payment incorporates an initial CPP of 17.25 percent and an overall estimated recovery of 28.5 percent (the "**Base Case Payout**"), which reflects the time-affected recovery percentage based on the midpoint discount rate of 15 percent. With respect to the accrued and unpaid claims, FGIC explains that the

---

[20]   See Attachment III.
[21]   See Attachment III.
[22]   This section is meant to recap FGIC's calculations resulting in a $253.3 million lump-sum cash payment amount. The conclusions set forth in this Report do not depend on or result from FGIC's calculations or methodologies.

consideration amount equals the sum of (i) the aggregate claims multiplied by the initial CPP plus (ii) the aggregate claims multiplied by the incremental spread between the Base Case Payout and the initial CPP multiplied by an assumed reduction percentage of 40 percent. With respect to the projected claims, FGIC explains that the amount of the Commutation Payment equals the aggregate claims multiplied by the Base Case Payout multiplied by an assumed discount of 40 percent.[23]

## VII.    CALCULATION OF PROJECTED CASH FLOWS FROM THE REHABILITATION PLAN

31.    In this section, I explain the inputs and assumptions used to determine a reasonable range of the value of Projected Payments to the Policyholder of FGIC Insured Trusts based on the Rehabilitation Plan.[24] The main components of the Policy Claims under the Rehabilitation Plan are the Accrued and Unpaid Claims and the projected Policy Claims.

32.    While the aggregate projected Policy Claims against FGIC have been provided on a summary level in the Miller Affidavit, to date, neither FGIC or its advisors, nor the Rehabilitator or its advisors, have disclosed the timing of the projected Policy Claims for the FGIC Insured Trusts. Due to the lack of supporting information to the Updated Run-Off Projections, it was necessary for D&P to estimate the Policy Claims specifically

---

[23]    I have not reviewed the analysis behind the 40 percent reduction in the payments related to the (i) spread between the Base Case Payout and initial CPP multiplied by the accrued and unpaid claims and (ii) the Base Case Payout multiplied by the projected claims.  However, I generally understand this 40 percent reduction to reflect a discount for receiving the Commutation Payment upon execution of the Settlement Agreement, in consideration of the timing of claims and payments specifically relating to the FGIC Insured Trusts' Policy Claims under the Rehabilitation Plan. The analysis performed by D&P does not employ this assumed reduction as D&P incorporates the timing of claims and payments related to the Policy Claims of the FGIC Insured Trusts. See Attachment III.

[24]    The inputs and assumptions detailed in this section were current at the time D&P made its recommendation to the FGIC Trustees. I understand that some of the inputs and assumptions have changed in later versions of the Plan. At this time, none of these changes alter the conclusions set forth in this Report.

arising from the FGIC Insured Trusts in order to understand the timing of the relevant

claims and the associated recoveries.

### (i)    Accrued and Unpaid Claims

33.    As stated above, on November 24, 2009, the NYSDFS placed FGIC into Rehabilitation,

ordering FGIC to suspend paying all claims. Since entering into Rehabilitation, FGIC has

continued to receive claims on its outstanding policies. These Accrued and Unpaid

Claims will become payable, according to the Plan, upon FGIC's exit from Rehabilitation.

The total Accrued and Unpaid Claims for the FGIC Insured Trusts on December 31, 2012

was $753 million. This claim amount represents the total of the principal loss and interest

shortfalls to the insured tranches within the FGIC Insured Trusts.[25] This information is

reported monthly in Intex, confirmed, where available, to the applicable remittance

reports, and aggregated by D&P.

### (ii)    Projected Claims

34.    Similar to the Accrued and Unpaid Claims resulting from principal loss and interest

shortfalls, the projected claims result from future estimated principal loss and interest

shortfalls. The initial step in calculating the future shortfalls is estimating projected

collateral performance.

35.    To do this, using the balance of active loans to provide the total population of loans, I

determined collateral loss projections on the FGIC Insured Trusts on a trust-by-trust basis.

In order to have a more robust and statistically meaningful loss estimation, trusts were

classified into cohorts by product type and vintage. Product types include Prime, Alt-A,

---

[25]    See Attachment III.

Subprime, Pay Option ARM, Closed-End Seconds, and Open-End Seconds. Vintages

include 2004 and prior, 2004, 2005, 2006, and 2007. Product types are subsequently

broken into 12 "sub-cohorts," facilitating additional precision.

36.     Roll rate transition matrices based off of all RFC and GMACM issued Trusts are used to

calculate monthly prepayment and default rates for each Trust, through the remaining life

of the underlying mortgages as of December 31, 2012. These rates, known as Conditional

Prepayment Rates ("**CPR**") and Conditional Default Rates ("**CDR**"), were used, along

with other estimates, as inputs into Intex.

37.     D&P prepared forecasted cash flows under various scenarios to observe the sensitivities

of loss forecasts associated with changes in CPR, CDR, and severity assumptions. The

high collateral loss scenario applies 110 percent (of the base case) to defaults, 90 percent

to prepayments, and 110 percent to severity. The low collateral loss scenario applies 90

perent (of the base case) to defaults, 110 percent to prepayments, and 90 percent to

severity.

38.     Severity rates reflect the percentage of loss on the remaining unpaid principal balance at

the time a loan is liquidated. As an example, a borrower default where the unpaid

principal balance upon liquidation is $100,000 and there is a net recovery of $75,000 the

severity rate is 25 percent. Severity rates are used to reflect current market conditions in

loss estimates. The range of projected severity was calculated at the sub-cohort level

following the review of third-party research and observed experience for each Trust.

D&P calculated severity rates at the sub-cohort level.

39.     D&P then applied the assumptions resulting from the above described methodology on a

trust-by-trust basis according to each trusts' payment structures as defined by its

Governing Documents, the result of which is the projected shortfalls at a tranche level on a monthly basis and thus the Trusts' claim.

40.     D&P estimated that the Policy Claims for the FGIC Insured Trusts will be approximately $409 million in the low case to $793 million in the high case, in each case on a nominal basis.

41.     Accordingly, D&P estimated the total Policy Claims for FGIC Insured Trusts including both the Accrued and Unpaid and the Projected Claims to be approximately $1,162 million in the low case to $1,546 million in the high case, in each case on a nominal basis.[26]

**(iii)     Projected Nominal Recoveries**

42.     The Base and Stress Scenarios included in the Miller Affidavit contain summary financials for the Updated Run-Off Period on a 5-year basis (as opposed to on an annual basis). Certain cash flow assumptions were extrapolated from the Base Scenario in order to determine the projected nominal cash flows to the Policyholders for the FGIC Insured Trusts. D&P then applied the low and high projected loss estimates for the FGIC Insured Trusts to the distribution methodology outlined in the Rehabilitation Plan.

43.     The CPP was calculated on an annual basis, and the projected CPP amounts were then applied to both D&P's low and high loss projection estimates to determine the initial CPP payment, the catch-up CPP payment, and the corresponding changes in the DPO. With respect to the estimated DPO Accretion Payments, the implied Aggregate DPO Accretion Payment under the Base Scenario was distributed on a pro rata basis to the FGIC Insured Trusts based on the outstanding calculated DPO Accretion.

---

[26]     See Attachment III.

## VIII.  UNCERTAINTY OF PROJECTED CASHFLOWS UNDER THE REHABILITATION PLAN

### (i)  Uncertainty of the Input Data and Sources

44.  The actual recoveries to FGIC's Policyholders may differ materially from the estimated recoveries provided in the Miller Affidavit due to the ongoing changes to the complex assumptions underlying the Updated Run-Off Projections. While the Updated Run-Off Projections were revised to reflect certain changes related to premiums and commutation transactions, the underlying financial data driving the Updated Run-Off Projections are dated as of December 2011. As such, subsequent analyses derived from the projections included in the Miller Affidavit, also do not reflect the actual results for 2012 or the potential resulting impacts to the forecasted recoveries.

45.  Due to a lack of independent means to verify the confidential information and data provided in the Miller Affidavit, D&P has not verified the projections, assumptions or analyses prepared by FGIC and its advisors and the NYLB and its advisors. D&P relied on the projections prepared by FGIC and its advisors, as we believe the analyses were reasonably prepared in good faith and on a basis reflecting the best current available information as to the future operating and financial performance during the Run-Off Period.

### (ii)  Uncertainty of the Aggregate Distributable Value

46.  The aggregate distributable value available to FGIC's Policyholders may differ materially from the projected amounts included in the Updated Run-Off Projections and the Base Scenario due to differences in realized investment returns, collection of premiums, reinsurance, salvage, reimbursements and other amounts due to FGIC, availability and utilization of NOLs, and operating expenses.

47.     Per the Miller Affidavit, the included gross investment income post-Effective Date is

expected to be 3.25 percent. Additionally, the management fees are assumed to be 9.75

basis points of invested assets per year. However, FGIC's actual investment income or

expenses may potentially materially deviate from the assumptions included in the

Updated Run-Off Projections. The resulting deviations could significantly reduce

recoveries for Policyholders under the Rehabilitation Plan.[27]

48.     The Rehabilitation Plan requires that Policyholders continue to make premium payments

even though it is highly likely, and possibly, a near economic certainty that FGIC will not

pay 100 percent of claims filed by Policyholders in cash. The Plan also prohibits the

exercise of rights to setoff premiums, reimbursements, and other amounts against policy

claims, not giving effect to the modification, therefore, pursuant to the Plan.[28] With

respect to required premium payments, if Policyholders choose to setoff premiums, the

estimated total collections over the Run-Off Period would be reduced. The Updated Run-

Off Projections included a ten percent reduction to expected premium streams; however,

to the extent that the actual unpaid installment premiums exceed these levels, the CPP

may also decrease.[29]

49.     For the tax-related payments and projections, the Updated Run-Off Projections assume

that FGIC will not generate taxable income post-Effective Date and the income expected

to be generated on the Effective Date will be offset by existing NOL balances of $5.3

billion.[30] In exchange for the ability to use the NOLs, FGIC plans to pay FGIC Corp. $11

million. However, the preservation and usage of the NOLs and the payment to FGIC

---

[27]    Miller Affidavit at Exhibit I, p. 3.
[28]    Miller Affidavit, p. 10.
[29]    Miller Affidavit, p. 10.
[30]    FGIC Disclosure Statement, p. 15.

Corp. is subject to a number of unknown outcomes including receipt of a private letter

ruling from the IRS.

**(iii)    Uncertainty of the Expected Timing and Magnitude of the Aggregate Policy Claims**

50.    The expected timing and magnitude of the various policy claims are uncertain and

volatile, in part, because of certain long-dated policies with large projected loss amounts.

The potential magnitude of these policy claims are evident when comparing the aggregate

claims under the Base Scenario versus the Stress Scenario where the projected losses are

approximately 85 percent higher.[31]

51.    Additionally, at the time of my analysis, there were certain novation and commutation

agreements still pending which could significantly increase the pool of projected losses.

The Rehabilitator also requested the Court to approve the then-pending Novation

Agreement between FGIC and National Public, and affiliate of MBIA Insurance

Corporation, to novate the National Public Reinsured Policies from FGIC to National

Public. Under the then-pending Novation Agreement, National Public would replace

FGIC as the party obligated to make payments with respect to claims under National

Public Reinsured Policies, which had approximately $110.5 billion par of coverage

outstanding as of November 30, 2012.[32] In the absence of the novation, the CPP would

need to take into account potential losses under the National Public Reinsured Policies,

just as it does potential losses under other FGIC Policies. As a result, proceeding without

the novation would have resulted in an immediate reduction to the initial CPP (down

from 17.25percent to 15.75 percent), as well as ongoing downward pressure on future

---

[31]    Miller Affidavit at p. 6-7.
[32]    Miller Affidavit at p 6-7.

CPP revaluations.[33] As part of the Rehabilitation Plan, the Rehabilitator was also seeking

court approval of certain "CDS Commutation Agreements" which provide for FGIC to

terminate its obligations under certain policies it issued to counterparties to credit default

swaps ("CDS") entered into by FGIC Credit Products LLC ("FGIC CP"), a subsidiary of

FGIC, and for FGIC CP to terminate its obligations under the CDS. The Updated Run-

Off Projections assume that the six, then-pending, CDS Commutation Agreements that

were executed will be approved by the Court and the payments will be made post-

Effective Date. If the CDS Commutations pending approval were not approved, the initial

CPP would have been lowered to 15.5 percent.[34]

### (iv)    Present Value and Discount Rate Associated with the Nominal Cash Flows

52.    As detailed above, there are significant components of the Rehabilitation Plan that may

materially change the timing and amount of cash flows available to be paid to all of

FGIC's Policyholders. In addition, there are certain aspects of the Rehabilitation Plan that

adversely affect the Policyholders of FGIC Insured Trusts. Specifically, a significant

portion of cash distributions on account of the CPP and the DPO Accretion are

significantly back-ended, even though a majority of the claims (*i.e.,* greater than 70

percent) are expected to arise in the first five years.[35]

53.    In order to determine the present value of the cash flows under the Rehabilitation Plan, I

examined the structure and timing of the plan as well as the available information on the

expected ability of FGIC to meet its payment obligations to determine an appropriate and

reasonable rate at which to discount any future cash flows. To do this, I relied on my

---

[33]    Miller Affidavit at p 12.
[34]    Miller Affidavit at p 3.
[35]    See Attachment III.

years of experience in determining discount rates, and I reviewed independent sources of

discount rate calculations, namely Ibbotson. Specifically, I reviewed the Cost of Equity

Capital and the Weighted Average Cost of Capital for Standard Industrial Classification

("**SIC**") 635 (Surety Insurance) and SIC 63 (Insurance Carriers), because companies in

these industrial classifications generally face similar financial burdens as FGIC. While

my analysis did not use specific values from Ibbotson, they served to inform a range of

reasonable discount rates for future cash flows under the Rehabilitation Plan. The median

values for the discount rates ranged from about 9 percent to 19 percent.[36] Given that

FGIC's future payments may be riskier than the SIC's average level of risk, and that

under the Rehabilitation Plan FGIC would not receive the revenue from writing new

policies, the values presented in Ibbotson may serve as a conservative estimate of an

appropriate discount rate.

54.     Based on the structure and the riskiness of payment of the Rehabilitation Plan and the

cost of capital for the industry detailed above, I conclude that a discount rate for future

cash flows under the Rehabilitation Plan of 10 to 20 percent is a reasonable range. Such a

range takes into account that due to the riskiness of future payments there is a risk that

the cash flows under the Rehabilitation Plan could total less than the Commutation

Payment amount of $253.3 million.

### (v)     Exclusion of Potential and Unknown Value of Pending Litigation

55.     The Updated Run-Off Projections included in the Miller Affidavit exclude potential

recoveries from pending RMBS litigation[37] proceedings due to the uncertainty of the

---

[36]    Ibbotson, SIC 63 and SIC 635, March 13, 2013.
[37]    A list of the pending RMBS litigations is included in Exhibit C of the Rehabilitation Plan.

probability, magnitude, and timing of any litigation recoveries. Additionally, FGIC has

not incorporated potential proceeds from the pending RMBS litigation proceedings in its

financial statements. Lazard and FGIC, who are likely to be in the best position to

estimate such recoveries, deemed that, "these recoveries are not sufficiently probable and

estimable." I have no knowledge or reliable data available to estimate potential recoveries

from RMBS litigation. As a result, I have not included any estimates of recoveries from

pending RMBS litigation, because any such estimation would be speculative.

56.     Similarly to excluding any speculative litigation recoveries, I have chosen to follow Lazard's and

FGIC's judgment and exclude from my analysis any estimates on potential litigation losses by

FGIC for the same reasons: that any such losses are impossible to reliably estimate.


## IX.    ADDITIONAL BENEFITS OF THE SETTLEMENT AGREEMENT OVER THE REHABILITATION PLAN

57.     In addition to the $253.3 million Commutation Payment, the FGIC Insured Trusts would

no longer need to pay future policy premiums of approximately $18.3 million, on a

present value basis[38]. Including the value of these waived policy premiums, the value of

the Settlement Agreement to the FGIC Insured Trusts increases to approximately $272

million. Along the same lines, the Settlement Agreement will allow any excess spread

(and any reimbursements arising from excess spread) to be distributed to the security

holders of the respective Trusts. That is, any incremental interest provided by the

underlying collateral over the interest paid to the security holders of the trusts go directly

---

[38]    Affirmation of Gary T. Holtzer, Case No. 401265-2012 [Docket #3929-10].

to the securities, rather than reimbursing FGIC, resulting in a potential benefit to

Policyholders in addition to Commutation Payment amount of $272 million.[39]

## X.    POTENTIAL BENEFITS OF THE SETTLEMENT AGREEMENT FROM THE PLAN SUPPORT AGREEMENT

58.    The approval of the Settlement Agreement is a condition to the effectiveness of the Plan

Support Agreement, and it is my understanding that without the FGIC Trustees'

acceptance of the Settlement Agreement, FGIC would not have entered into the Plan

Support Agreement.

59.    Among other things, the Plan Support Agreement provides for a substantial contribution

from Ally Financial (approximately $2.1 billion), which, together with other assets of the

Debtors, will be available for distributed creditors, including the FGIC Insured Trusts. In

the absence of the Plan Support Agreement (which, I understand, is dependent on the

approval of the Settlement Agreement[40]), additional costs related to the extended

litigation and administration would likely burden the Estate, which would in turn

decrease recoveries to the FGIC Insured Trusts. While not part of D&P's May 15, 2013

presentation to the FGIC Trustees, I understand that the Plan Support Agreement

provides that the FGIC Insured Trusts will have allowed claims in the contemplated

ResCap Plan of Liquidation. In that regard, if the ResCap Plan of Liquidation

contemplated by the Plan Support Agreement is confirmed, an additional estimated $92

million in value will be distributed to the FGIC Insured Trusts. This additional value

(which would not necessarily be available absent the FGIC Trustees acceptance of the

---

[39]    See Attachment III.
[40]    Plan Term Sheet (Exhibit A to PSA) at page 16.

Settlement Agreement) would increase the total potential value of the Settlement

Agreement to the FGIC Insured Trusts to approximately $364 million.

**(i)     Comparison of Projected Recoveries under the Rehabilitation Plan Versus the Expected Value to the FGIC Insured Trusts Under the Settlement Agreement**

60.    A comparison of the recoveries under the Rehabilitation Plan versus the Settlement

Agreement based on the range of D&P's claims estimates presented in Table 1. Based on

the calculations described above, D&P calculated the range of recoveries under the Base

Case Scenario of the Rehabilitation Plan to be $217 to $340 million, indicating a

recovery of 19 to 22 percent on a nominal basis and 24 to 28 percent on a discounted

basis for FGIC Insured Trusts. This range of recoveries implies that accepting a

Commutation Payment of $253.3 million with a value of $272 million, including the

foregone premiums is a reasonable decision, from a financial perspective, by the FGIC

Trustees.

## Table 1: Comparison of Recoveries to Policyholders of FGIC Insured Trusts

($ in millions)

| | | D&P Claims Estimates | | |
| | | Low Case | | High Case |
|---|---|---|---|---|
| **Policy Claims for FGIC Insured Trusts** | **D&P Claims Estimates** | | | |
| | Accrued and Unpaid Claims (as of 12/31/12) | $753 | – | $753 |
| | Projected Claims | 409 | – | 794 |
| | **Total Policy Claims for FGIC Insured Trusts** | **$1,162** | – | **$1,546** |
| **Rehabilitation Plan** | Discount Rate Applied | 20% | – | 10% |
| | Net Present Value of Policy Claims | $921 | – | $1,226 |
| | **Recovery to Policyholders – $** | **$217** | – | **$340** |
| | *Recovery to Policyholders – %* | | | |
| | *Based on Nominal Claim* | *19%* | – | *22%* |
| | *Based on Discount Claim* | *24%* | – | *28%* |
| **Commutation Proposal** | **Value of the Commutation** | | | |
| | Cash Settlement | | $253 | |
| | Plus: Waived Premiums | | 18 | |
| | **Recovery to Policyholders – $** | | **$272** | |
| | *Recovery to Policyholders – %* | | | |
| | *Based on Nominal Claim* | *23%* | – | *18%* |
| | *Based on Discount Claim* | *29%* | – | *22%* |
| | **Value of the Commutation Plus Additional Benefits** | | | |
| | Plus: "Additional Benefits" per PSA | | $92 | |
| | **Recovery to Policyholders** | | **$364** | |
| | *Recovery to Policyholders – %* | | | |
| | *Based on Nominal Claim* | *31%* | – | *24%* |
| | *Based on Discount Claim* | *39%* | – | *30%* |

## XI.    CONCLUSIONS

61.    As documented above, the value to Policyholders under the Rehabilitation Plan is
uncertain. While in some scenarios the total net present value of the Projected Payments
may be greater than the Commutation Payment, there are numerous factors that may
cause the net present value of Projected Payments to be far lower than the Commutation
Payment.

62.     Because of these uncertainties, accepting the Settlement Agreement and the

Commutation Payment — and all the benefits of certainty in amount, timing, and

likelihood of payment — is a reasonable decision, from a financial standpoint, on the part

of the FGIC Trustees.

## XII.    RESERVATION OF RIGHTS AND COMPENSATION DISCLOSURE

63.     Although my study is based upon the current record, and I am in a position to render

conclusions at this time based upon such information, the study is ongoing, and expert

witness deposition testimony has not been completed. Accordingly, I reserve the right to

revise or expand any expert conclusions to reflect any additional conclusions that I may

formulate based upon newly acquired information or arising from reflection and

reconsideration of the conclusions based upon views expressed by expert witnesses, if

any, and upon further study and information, including, among other things, documentary

and testimonial evidence introduced subsequently.

64.     D&P charges rates of $130 – $835 per hour for my professional services and the services

of supporting staff in this matter. D&P has no financial interest in the outcome of this

matter.

65.     This report is not to be reproduced, distributed, disclosed or used for any purposes other

than the above-referenced proceedings without prior written approval.

# ATTACHMENT I



*Mr. Allen M. Pfeiffer*
*Managing Director*
*Duff & Phelps, LLC*

# PROFESSIONAL CREDENTIALS

*Allen Pfeiffer is a Managing Director in the NY and NJ office of Duff & Phelps, and is the Global Service Leader of Dispute Consulting-Complex Valuation and Bankruptcy Litigation. Mr. Pfeiffer has more than eighteen years of valuation, solvency, cash flow assessment and capital structure analysis experience and has led hundreds of engagements related to the valuation of an entire business, a security, an interest in a business or an asset.*

*Professional*
*Experience*

- Mr. Pfeiffer has advised both foreign and domestic buyers, sellers, joint venture partners, hedge funds, private equity funds, plaintiffs and defendants in mergers and acquisitions/corporate finance situations with regard to business valuation, strategic planning, raising financing, spin-offs, transaction support, bankruptcy, litigation, tax, financial reporting, solvency, valuing derivatives, fairness opinions, IP holding companies, restructurings and capital structure analysis.
- The New York Supreme Court, the United States Bankruptcy Court, the American Arbitration Association and arbitrators operating under the rules of the International Chamber of Commerce have accepted Mr. Pfeiffer as a valuation and cash flow expert. In addition to his testifying experience, he has worked often as a lead consultant to attorneys in the context of retrospective solvency and many other valuation and corporate finance matters. Mr. Pfeiffer also led the team as the financial advisors to the Bankruptcy Examiner for Lehman Brothers (Anton Valukas).
- Mr. Pfeiffer was a Managing Director with Standard & Poor's Corporate Value Consulting at the time of its merger with Duff & Phelps in September 2005 and was a member of the CVC practice of PricewaterhouseCoopers LLP at the time of its sale to Standard & Poor's. Prior to joining Coopers & Lybrand in 1995, and prior to receiving his MBA finance at Columbia Business School, Mr. Pfeiffer worked for an affiliate of Alex Brown and worked as an actuarial analyst at Kwasha Lipton, a benefit consulting firm. Mr. Pfeiffer successfully completed four professional exams within his tenure as an actuary: multivariable calculus, probability theory, mathematical statistics and numerical equations.

**Selected Experience – Bankruptcy Litigation:**

- Financial advisor to RMBS Trustees in ResCap bankruptcy.
- Retained by Trustees in multi-billion dollar repurchase/put back claim in a major bankruptcy matter.
- Lead consultant to bank trustee related to multi-billion repurchase/ put-back claim associated with a bank merger.
- Lead financial advisor to the Bankruptcy Examiner for Lehman Brothers (Anton Valukas). Advised the attorneys relating to broad-reaching issues such as: valuation, solvency analysis, avoidance actions, dealings with secured lenders and the Barclays transaction. This led to a 2,200 page report released by the Examiner.
- Leading analysis of solvency for a fraudulent conveyance lawsuit filed against a leading company related to a former multi-billion dollar real estate subsidiary company claiming damages in excess of $1 billion.
- Project lead in assisting the Administrator of a UK entity with an independent third-party evaluation of historical valuation methodologies for a portfolio of 5,000+ assets as well as independent historical valuations on highly illiquid assets. The work resulted in the full recovery and fair distribution to represented creditors in one of the largest bankruptcy filings in US history
- Testified as an expert witness in Philadelphia Bankruptcy Court (Oct. 2003) on behalf of secured lenders regarding the solvency of a manufacturer of technology;

*Phone:  973-775-8260 ♦ eFax:  973-792-8956 ♦ Mobile:  201-390-2004 ♦ E-mail:  allen.pfeiffer@duffandphelps.com*
*300 Headquarters Plaza, East Tower, 12th Floor, Morristown, NJ  07960*

*Professional*
*Experience*
*(continued)*

**Selected Experience – Bankruptcy Litigation – (continued):**

- Testified in deposition as an expert witness in defense of an investment bank related to alleged damages in association with advice regarding the timing of a restructuring/bankruptcy of a mobile home manufacturer;

- Testified in deposition as an expert witness on the reasonableness of a business case and budget for a large retailer in a bankruptcy/contract dispute;

- Testified in arbitration on behalf of a tractor company in a dispute regarding the value of recovered assets in bankruptcy;

- Testified in deposition as an expert witness on behalf of a large cable company (MSO) against its joint venture partner with regard to cable systems in Puerto Rico;

- Led analysis of solvency at various transaction dates for a multi-billion dollar commercial real estate finance company in bankruptcy;

- Advised the U.S. government related to the viability of a proposed reorganization plan;

- Led analysis of solvency for a fraudulent conveyance lawsuit filed against a leading global company by a former subsidiary claiming damages in excess of $2 billion;

- Advised counsel for a multi-national bank in defense of their investment banking work performed for a multi-billion dollar planned joint venture;

- Advised counsel and several hedge funds on the valuation of the derivative features attached to convertible bonds for purposes of arriving at OID (original issues discount) in bankruptcy litigation;

- Led analysis with respect to solvency and valuation issues related to the merger and refinancing of a corporate finance advisory firm;

- Advised on the valuation of a hedge fund relative to the reasonableness of a major transaction prior to the filing for bankruptcy;

- Advised counsel with respect to solvency in large anticipated litigation against group of pre-petition lenders to an international financial services company that spiraled into bankruptcy after fraud was detected;

- Led the retrospective solvency analysis of a supermarket business at various dates for a private equity fund and assisted counsel and insurance companies in effectuating a successful mediation;

- Led the analysis of a preference case filed against a private equity firm and related to the bankruptcy filing of a large financial services company; analyzed convertible preferred stock, produced expert report and rebuttal report and assisted attorneys in deposition preparation;

- Led analysis of solvency for a large fraudulent conveyance lawsuit filed against an international consumer products company; produced expert report and rebuttal report, assisted attorneys in preparation for depositions, drafting of certain motions, development of case strategy, preparation for and participation in trial and post-trial submissions;

- Led analysis of solvency for a preference lawsuit related to a multi-billion dollar pharmaceutical distribution company; produced expert report and rebuttal report, assisted attorneys in preparation for depositions, drafting of certain motions, development of case strategy and preparation for trial;

- Advised on a retrospective solvency analysis for a large retailer in a preference action.

*Professional
Experience
(continued)*

**Selected Experience – Complex Litigation:**

- Retained to provide the analysis of damages sustained by a new private equity advisory firm that was spun out of one of the largest banks. The analysis focused on the compensation lost by the private equity firm due to the poor decision making by the larger bank post the spin-off transaction.

- Testified in trial with respect to the value of the founder's ownership interest in a technology company in conjunction with a matrimonial action;

- Testified as an expert witness in arbitration, International Chamber of Commerce (Sept. 2002) regarding the valuation of a minority interest in a European Internet service provider; also quantified damages;

- Testified as an expert witness in New York Supreme Court (Nov. 2002) regarding the value of the unregistered shares of a public Internet company; both sides in case unanimously accepted the testimony;

- Testified as an expert witness in arbitration (AAA) related to fair and reasonable terms and fair market value associated with a long-term agreement between a cable company and a content provider (Feb. 2004);

- Testified as an expert witness in deposition and at a hearing. Produced an expert report on diminution of enterprise value, damages and lost profits to a cruise business due to the outbreak of disease caused by a vendor;

- Testified as a fact witness in deposition and advised counsel on behalf of private equity firm and a multi-billion dollar chemical company relating to an acquisition. Assessed the pro forma financial outlook and solvency of the combined entity;

- Testified in arbitration for a hedge fund related to the capital adequacy of the fund, reasonableness of projections and economic uncertainty in 2008;

- Advised a law firm in defense of a damages claim of lost income by a private equity firm from an alleged reduction of capital commitments from investors;

- Advised counsel related to the valuation of a multi-billion dollar leasing company;

- Advised counsel related to damages associated with a failed telecommunications joint venture;

- Advised counsel related to the value of the common equity of a technology company for a Delaware shareholder action;

- Advised counsel on the appropriate financing terms for a telecommunications transaction in preparation for a potential litigation;

- Led the analysis of damages sustained by a leading communications company in connection with a malpractice claim related to a multi-billion dollar transaction;

- Led the assessment of damages for an early-stage cable television company;

- Advised counsel on the relative value of two contracts and related clauses in the cable and entertainment industry;

- Advised counsel on the appropriate care, transaction price and valuation methodologies in defense of a lead advisor investment bank in the technology and consumer product industry; produced expert report and rebuttal report and assisted attorneys in depositions;

- Advised majority shareholder group related to disputed terms of the purchase of controlling voting shares in a large Canadian company with dual-class ownership structure;

- Advised governmental agency relating to insider trading probe;

- Advised counsel relative to damages associated with a hedge fund (fund of funds);

*Professional Experience (continued)*

**Selected Experience – Complex Litigation – (continued):**

- Advised counsel in preparation of a preliminary injunction hearing regarding the financial position of a regional airline company post-termination of a contract with a national airline;
- Advised counsel with respect to theories related to damages on a high profile insurance matter;
- Led the analysis of value provided by executives in managing large company-invested hedge funds;
- Led the analysis of a multitude of derivative transactions for a litigation;
- Advised counsel with respect to solvency and litigation issues in a large planned spin-off of a subsidiary;
- Led the analysis of the value of divisions of a large consumer products company in defense of an IRS probe related to a tax-free spin-off;
- Led the analysis of a merger between two market-leading companies and provided a retrospective fairness opinion; conversion ratio  Mr. Pfeiffer was challenged by a group of shareholders;
- Led the analysis of whether a material adverse change clause applied to the circumstances associated with the decline in 2000 venture capital funding levels;
- Advised a utilities company on the issuance of new securities – debt vs. equity considerations for cost of capital purposes in arbitration;
- Led analysis of a shareholder oppression lawsuit filed in New Jersey regarding the valuation of a privately held trucking company;
- Assisted attorneys in the valuation of a manufacturing company in a purchase price dispute;
- Advised plaintiff on the value of complex options and warrants for purposes of assessing damages in litigation.

**Selected Experience – Corporate Finance:**

*Transaction Advisory:*

- Advised an international private equity fund on the value of a major real estate subsidiary to be spun-off and the value of options held.
- Advised by large telecommunications company to value certain tangible and intangible assets related to an acquisition of a controlling stake in a company;
- Advising the board of a publicly traded company regarding company and broad economic trends in the mobile telecommunications industry;
- Advised an investment firm with respect to the price paid for an ownership interest in a telecommunications company, associated warrants and other deal terms;
- Advised the board of an international bank regarding the fairness of a bank merger;
- Advised on many buy-side valuation issues as part of due diligence efforts for a major telecommunications company;
- Advised the board of a public company related to the fairness of a reverse merger transaction;
- Advised government ministers in their consideration of the privatization of a telecommunications company, a bank and an airline;
- Advised and presented to the board of directors and senior management of a leading technology company on the value of its total intellectual property portfolio for the application of the Delaware Law capital surplus test;
- Advised special committee of the board and largest minority shareholder with respect to the value of intellectual property of a technology company that received a buyout offer determined to be inadequate by the special committee;

*Professional Experience (continued)*

**Selected Experience – Corporate Finance – (continued):**

- Advised a technology company in its negotiations with several international top-tier companies and several venture capital firms;
- Advised a technology company on valuation of the various levels of preferred stock prior to its successful initial public offering;
- Advised a technology company on the benefits of spin-off vs. divestiture;
- Advised on terms of transaction and negotiated on behalf of a technology company;
- Advised on valuation of subsidiary of a technology company for issuance of executive warrants;
- Advised on transactions and valuation matters related to more than ten major Israeli companies;
- Advised shareholder and founder on the value of his company for purposes of put option rights;
- Advised a large private equity fund with respect to the value of their illiquid investments for a corporate reorganization;
- Advised a large equity hedge fund with respect to the value of a partnership interest;
- Advised hedge fund executives on the discount associated with shares contributed to a GRAT;
- Advised the board of directors of a leading international company with respect to potential responses to a potential hostile takeover bid;
- Advised a private equity firm on the value of the intellectual property of a large electronics equipment manufacturer for purposes of refinancing;
- Advised a large hedge fund with respect to due diligence and the value of loan collateral;

*Transaction Advisory:*

- Advised on the issuance of a solvency opinion for "RemainCo" relative to two of the largest spin-offs in history;
- Assisted in the issuance of transaction opinions for several large transactions;
- Advised an international entertainment conglomerate with respect to pre-deal due diligence and valuation analysis;
- Provided independent valuation assessment of investments to board of directors of a major investment fund;
- Sell-side advisory work for a major international IT services company;
- Advised in the successful resolution of a joint venture in a buy/sell option discrepancy;
- For several companies, advised on the value of common shares for issuance of new warrants to management;
- Advised on the restructuring of five distinct businesses owned in a holding company;
- Advised on numerous fairness opinions as a member of review committees in Duff & Phelps and Standard & Poor's Corporate Value Consulting.

*Strategic Planning:*

- Advised a telecommunications company relative to financial planning and funding for the launching of a CLEC business;
- Advised a private equity fund focused on technology and telecommunications with respect to the components of several transactions and assessing the value of its common stock;
- Advised on new e-commerce business opportunities and capital investments within large multi-national corporations;
- Advised a subsidiary of an international entertainment conglomerate with respect to the value of its contingent liabilities;
- Developed business case, strategy and valuations for many late stage start-ups;

*Professional
Experience
(continued)*

**Selected Experience – Corporate Finance – (continued):**

- Corporate Finance liaison with the PwC Israel office;
- Valuation and advisory work associated with a dramatic operational turnaround of a multi-billion dollar company on behalf of an LBO fund over three years;
- Utilized real option valuation metrics to solve complex and uncertain value propositions;
- Advised on the strategic modeling and valuation regarding the combination of major professional sports teams in a joint venture.

**Selected Experience – Valuation for Tax Restructuring and Reporting:**

- Valued dozens of subsidiaries worldwide in connection with the spin-off of major technology businesses for determining tax gain/loss;
- Led numerous tax restructuring engagements for a multi-billion dollar telecommunications company;
- Analyzing broker quote information in determining whether loans, after modifications, are considered publicly traded under the tax rules;
- Advised the owners of a sports team related to the allocation of purchase price to the sports arena for tax purposes;
- Valuation of the subsidiaries and assets of a chemical company as part of the consideration of the tax structure of a large contemplated transaction;
- Valuation of worldwide subsidiaries of a biotech company for the planning of intellectual property holding company restructuring;
- Determined the value of restricted stock discount and/or lack of marketability discount for dozens of companies;
- Valued several businesses for estate tax purposes.

**Selected Experience – Valuation for Financial Reporting:**

- Valuation of the common equity and an embedded derivative for a privately held, telecommunications software company;
- Valued the Series C Preferred Stock of an independent marketer of natural gas and electricity;
- Led dozens of engagements related to purchase price allocations and intangible asset impairments - SFAS 141/SFAS 142, SFAS 121, SFAS 133 and APB 16;
- Participated on PwC task force committee to communicate with the SEC on the valuation of In-Process Research and Development;
- Drafted numerous SEC response letters for several major companies on valuation issues, in all cases avoiding financial restatements;
- Numerous engagements related to valuation of options in connection with SFAS 123 and as components of purchase price;
- Assessed discounts for blockage, minority holdings, lack of marketability and restricted stock.

*Professional*
*Experience*
*(continued)*

**Presentations and Articles:**

- Strategic Advisory Board member ABI VALCON 2012-2014
- Panelist ABI VALCON February 2012 "Amend and Pretend: The Role of Accounting Rules, Bank Regulatory concerns and Market Values".
- Visiting Lecturer at Sy Syms Executive MBA program "Fundamentals of Valuation and Common Pitfalls"
- Lectured at several conferences in 2011 "Lessons Learned from Lehman Brothers Failure"
- Visiting Lecturer at Yeshiva University - "Security Analysis and Valuation", March 2009;
- Presented as part of a 2008 TMA panel in a conference entitles "Valuation: A Minefield for the Expert and Counsel"
- Authored 2006 Financier Worldwide article titled "Inadequate capital: examining the tests for fraudulent conveyance"
- Led development and presented many Continuing Learning Education courses for attorneys regarding legal and financial analysis issues related to fairness opinions, valuation, expert witnesses and fraudulent conveyance;
- Led PwC's and S&P's internal training programs in corporate finance and valuation each year from 1997 through 2002;
- For S&P in 2004-2005, designed curriculum for national training and analysis of complex client issues along with New York University professor Dr. Aswath Damodaran;
- Presented various topics at industry, accounting and valuation seminars and conferences; participant in ALI-ABA conferences, ABI conferences and other industry conferences;

**Trial and Arbitration Testimony:**

- ***Aris Multi-Strategy Fund, L.P. v. Quantek Opportunity Fund, L.P., et al***
  American Arbitration Association, New York
  Case No. 13 181 02839 03
  April 2011

  - Testified in arbitration for a hedge fund related to the capital adequacy of the fund, reasonableness of projections and economic uncertainty in 2008.

- ***Lee v. Chou***
  Supreme Court of the State of New York, County of New York
  Index No. 350601/03
  October 2006

  - Testimony in a matrimonial action on behalf of the Defendant with respect to the value of Plaintiff's ownership interest in a business that he founded.

- ***Suraleb, Inc. v. Production Association "Minsk Tractor Works", Republic of Belarus.***
  Arbitration Institute of the Stockholm Chamber of Commerce
  December 2005

  - Testimony in arbitration on behalf of the Respondent, Minsk Tractor Works, as an expert witness related to the value of recovered assets in bankruptcy.

| | |
|---|---|
| *Professional*<br>*Experience*<br>*(continued)* | **Trial and Arbitration Testimony – (continued):** |

- ***CSC Holdings, Inc. v. Yankees Entertainment and Sports Network, LLC***
  American Arbitration Association, New York
  Case No. 13 181 02839 03
  February 2004

  - Testimony on behalf of the Claimant as an expert witness related to fair and reasonable terms and fair market value associated with a long-term agreement between Cablevision and YES Network.

- ***Official Committee of Unsecured Creditors (Exide Technologies), v. Credit Suisse First Boston***
  United States Bankruptcy Court, District of Delaware
  Case No. 02-11125
  October 2003

  - Testimony on behalf of the Defendant on the solvency of Exide Technologies in a fraudulent conveyance lawsuit.

- ***Commonwealth Associates, LP v. Smartserv Online, Inc.***
  Supreme Court of the State of New York, Southern District
  Index No. 600869/00
  November 2002

  - Testimony on behalf of the Plaintiff of restricted shares in a publicly traded Internet company.

- ***Banestyrelsen et al. v. France Telecom***
  International Chamber of Commerce
  Case No. 11351
  September 2002

  - Testimony on behalf of the Plaintiff of a minority equity investment in an international Internet service provider.

**Deposition Testimony:**

- ***NAF Holding, LLC v. Li & Fung (Trading) Ltd.***
  United States District Court, Southern District of New York
  Civil Action No. 10 Civ. 05762
  April 2012

  - Deposition testimony on behalf of the Plaintiff in a commercial dispute relating to lost profits pertaining to an unconsummated disputed transaction.

- ***Hexion Specialty Chemicals, Inc.; et. al. v. Huntsman Corp.***
  The Court of Chancery of the State of Delaware
  Civil Action No. 3841
  August 2008

  - Deposition testimony as a fact witness on behalf of the plaintiff assessing the pro forma financial outlook and solvency of the combined entity.

- ***OHC Liquidation Trust v. Credit Suisse First Boston, et al.***
  United States District Court for the District of Delaware
  Case No. 07-799
  March 2008

  - Deposition testimony on behalf of the Defense as an expert witness related to alleged damages in association with advice regarding the timing of a restructuring/bankruptcy of a mobile home manufacturer.

**Deposition Testimony – (continued):**

- ***In re:  Adelphia Communications Corp., et al.***
  United States Bankruptcy Court, Southern District of New York
  Case No. 02-41729
  March 2006

  - Deposition testimony on behalf of the Debtors as an expert witness related to the value of a cable company in conjunction with the failed buyout of a joint venture partner.

- ***Celebrity Cruises, Inc., et al. v. Essef Corp., et al.***
  United States District Court, Southern District of New York
  Case No. 96-Civ-3135
  July 2005

  - Deposition and hearing testimony on behalf of the Plaintiff as an expert witness on diminution of enterprise value, damages and lost profits related to disease outbreak in the cruise industry.

- ***In re: Footstar, Inc., et al.***
  United States Bankruptcy Court, Southern District of New York
  Case No. 04-22350
  June 2005

  - Deposition testimony on behalf of Kmart Corporation, Respondent, as an expert witness related to reasonableness of income projections, in dispute against Footstar, Inc., et al. as Debtors.

*Education*

M.B.A. - Finance, *with distinct honors*, Columbia Business School

B.A. - Economics and Mathematics, *cum laude*, Yeshiva University

# ATTACHMENT II

## List of Documents Considered

| Number | Date | Document |
|---|---|---|
| 1 | 6/11/2012 | Order to Show Cause |
| 2 | 6/11/2012 | Verified Petition with Exhibits A to E |
| 3 | 6/11/2012 | Memorandum of Law in Support of Verified Petition of the Superintendent of Financial Services of the State of New York |
| 4 | | Order of Rehabilitation |
| 5 | 6/28/2012 | Omnibus Reply Memorandum of Law in Further Support of the Verified Petition of the Superintendent of Financial Services of the State of New York with exhibits 1 and 2 |
| 6 | 9/14/2012 | Novation Agreement between FGIC and National Public Finance Guarantee Corp. |
| 7 | 9/27/2012 | Affirmation of Gary T. Holtzer with Exhibits A, B, D, E |
| 8 | 9/28/2012 | Order to Show Cause |
| 9 | 10/8/2012 | Amended and Restated Charter of FGIC |
| 10 | 10/8/2012 | FGIC Form of Amended and Restated By-laws |
| 11 | 10/11/2012 | Affirmation of Harold S. Horwich in Support of Plan Approval |
| 12 | 10/25/2012 | Memorandum of Law in Support of Approval of Plan of Rehabilitation for FGIC |
| 13 | 11/14/2012 | Plan Supplement Index with attachments D through L |
| 14 | | Revised Proposed Plan Approval Order |
| 15 | | Blackline of Revised Proposed Plan Approval Order |
| 16 | 11/19/2012 | Objection of Trustees Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas to the Proposed Plan of Rehabilitation for FGIC with Exhibit A |
| 17 | 11/19/2012 | Objection to the Proposed Plan of Rehabilitation of Wells Fargo Bank, N.A., in its Capacity as Trustee for Certain RMBS Certificateholders and on Behalf of the Certificateholders and Noteholders for such Trusts and Transactions with Appendix |
| 18 | 11/19/2012 | Objection of U.S. Bank National Association and U.S. Bank Trust National Association, each in its Capacity as Trustee, to the Plan of Rehabilitation dated September 27, 2012 with Affidavit and Exhibits A to D in Support |
| 19 | 11/19/2012 | Objection of the Bank of New York Mellon and the Bank of New York Mellon Trust Company N.A. as Trustee to the Proposed Plan of Rehabilitation with Affidavit and Exhibits A to E in Support |
| 20 | 11/19/2012 | Objection and Joinder of Aurelius Capital Management, LP to (1) the Objection of U.S. Bank National Association and U.S. Bank Trust National Association to the Plan of Rehabilitation dated September 27, 2012 and (2) the Objections of the Bank of New York Mellon and the Bank of New York Mellon Trust Company, N.A. to the Proposed Plan of Rehabilitation |

**List of Documents Considered**

| Number | Date | Document |
|---|---|---|
| 21 | 11/19/2012 | Objection of Assured Guaranty Corp., Assured Guaranty Re Ltd. and Assured Guaranty Re Overseas Ltd. to Plan of Rehabilitation Proposed by Benjamin M. Lawsky, Superintendent of Financial Services of the State of New York, as Rehabilitator of FGIC with Affidavit and Exhibits A to B in Support |
| 22 | 11/19/2012 | Objection of CQS ABS Master Fund Ltd., CQS Select ABS Master Fund Ltd. and CQS ABS Alpha Master Fund Ltd. to Plan of Rehabilitation for FGIC with Appendices A to G in Support |
| 23 | 11/19/2012 | Conditional Objection of Jefferson County, Alabama to the Plan of Rehabilitation for FGIC with exhibits A and B in support |
| 24 | 11/19/2012 | Objections of Certain Jefferson County Warrantholders to Plan of Rehabilitation with Affirmation and Exhibits A and B in Support |
| 25 | 11/19/2012 | Limited Objection of Children's Health Partnership Holdings Pty Ltd as Trustee of the CHP Holdings Unit Trust to Plan of Rehabilitation for FGIC with Affirmation and Exhibits A and B in Support |
| 26 | 11/20/2012 | Interim Order Extending Plan Supplement Deadline |
| 27 | 12/6/2012 | Notice of Entry attaching Order Approving the Settlement Commutation and Release Agreement between FGIC and American Overseas Reinsurance Co. Ltd. |
| 28 | | Plan Approval Blackline |
| 29 | 12/12/2012 | Plan Approval Order |
| 30 | 12/12/2012 | First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company |
| 31 | | First Amended Plan Blackline |
| 32 | 12/12/2012 | Attachment D Schedule of Terminated Contracts and Leases |
| 33 | | FGIC Proof of Policy Claim Form |
| 34 | | Redline Proof of Policy Claim Form |
| 35 | 12/12/2012 | Omnibus Reply Memorandum of Law in Further Support of Approval of First Amended Plan of Rehabilitation for FGIC. |
| 36 | 12/12/2012 | Affidavit of Michael W. Miller in Further Support of Approval of First Amended Plan of Rehabilitation |
| 37 | 12/12/2012 | Affidavit of John S. Dubel in Further Support of Approval of First Amended Plan of Rehabilitation |
| 38 | 12/3/2012 | Notice of Withdrawal of Conditional Objection of Jefferson County, Alabama to the Plan of Rehabilitation |
| 39 | 12/10/2012 | Notice of Withdrawal of Objection of Assured Guaranty Corp., Assured Guaranty Re Ltd. and Assured Guaranty Re Overseas Ltd. to Plan of Rehabilitation |
| 40 | | Exhibit 1A: Omnibus Response Chart |
| 41 | 12/19/2012 | Order by Doris Ling-Cohan |
| 42 | 1/7/2013 | CDS Notice of Entry |
| 43 | 1/7/2013 | AAArdvark Notice of Entry |

**List of Documents Considered**

| Number | Date | Document |
|---|---|---|
| 44 | 1/18/2013 | Court Order dated January 18, 2013 |
| 45 | 1/24/2013 | Court Order dated January 24, 2013 |
| 46 | 1/22/2012 | Amended objection of Deutsche Bank to the First Amended Proposed Plan of Rehabilitation |
| 47 | 1/22/2012 | Amended objection of Wells Fargo to the First Amended Proposed Plan of Rehabilitation |
| 48 | 1/22/2012 | Amended objection of US Bank to the First Amended Proposed Plan of Rehabilitation |
| 49 | 1/22/2012 | Amended objection of Aurelius to the First Amended Proposed Plan of Rehabilitation |
| 50 | 1/22/2012 | Amended objection of BNY to the First Amended Proposed Plan of Rehabilitation |
| 51 | 1/22/2012 | Amended objection of CQS to the First Amended Proposed Plan of Rehabilitation |
| 52 | 1/22/2012 | Amended objection of Jeffco Holders to the First Amended Proposed Plan of Rehabilitation |
| 53 | 1/25/2013 | Weil Gotshal letter to Honorable Doris Ling-Cohan |
| 54 | 1/25/2013 | Amended Omnibus Reply Memorandum of Law in Further Support of Approval of First Amended Plan of Rehabilitation for FGIC |
| 55 | 1/22/2012 | Amended limited objections of Children's Health Partnership to the First Amended Proposed Plan of Rehabilitation |
| 56 | 1/22/2013 | Weil Gotshal submission on standard |
| 57 | 1/22/2013 | Trustee Objectors submission on standard |
| 58 | 1/22/2013 | CQS submission on standard |
| 59 | 1/22/2013 | Jeffco Warrantholders submission on standard |
| 60 | | Attachment E Proof of Policy Claim Form |
| 61 | 1/22/2013 | Aurelius submission on standard |
| 62 | 1/22/2013 | Children's Health Partnership submission on standard |
| 63 | | Attachment F Instructions for Completing Proof of Policy Claim Form |
| 64 | | Attachment E-1 Blackline of Proof of Policy Claim Form |
| 65 | | Attachment F-1 Blackline of Proof of Policy Claim Form |
| 66 | 1/28/2013 | Order adjourning hearing date |
| 67 | 1/28/2013 | Order amending 1/24/2013 order |
| 68 | 1/25/2013 | Weil Gotshal letter to Wells Fargo regarding plan sections. |
| 69 | 1/25/2013 | Weil Gotshal letter to BNY regarding plan sections. |
| 70 | 2/11/2013 | Weil Gotshal letter to Justice Ling-Cohan regarding remaining issues. |
| 71 | 2/11/2013 | Exhibit 1C Amended Omnibus Response Chart |
| 72 | 2/14/2013 | Order setting status conference |
| 73 | 2/19/2013 | Interim scheduling order |

**List of Documents Considered**

| Number | Date | Document |
|---|---|---|
| 74 | 2/14/2013 | Weil Gotshal draft revisions of First Amended Plan for Rehabilitation |
| 75 | 2/5/2013 | Proposed revisions to proof of policy claim form |
| 76 | 3/15/2013 | Syncora notice of entry |
| 77 | 3/15/2013 | Munich notice of entry |
| 78 | 3/11/2013 | Weil Gotshal draft revisions of Plan Approval Order |
| 79 | 4/5/2013 | Freddie Mac statement of non-objection |
| 80 | 4/12/2013 | Weil Gotshal enclosing clean and redlines of First Amended Plan of Rehabilitation and proof of policy claim form |
| 81 | 4/12/2013 | Clean First Amended Plan of Rehabilitation |
| 82 | 4/12/2013 | Blackline of revised proof of policy claim form |
| 83 | 4/12/2013 | Clean revised proof of policy claim form |
| 84 | 4/12/2013 | Wells Fargo notice of withdrawal of objections |
| 85 | 4/12/2013 | BNY notice of withdrawal of objections |
| 86 | 4/12/2013 | Deutsche Bank notice of withdrawal of objections |
| 87 | 4/12/2013 | U.S. Bank notice of withdrawal of objections |
| 88 | 4/16/2013 | Weil Gotshal letter to court regarding termination agreement and deed of release |
| 89 | 4/23/2013 | Scheduling order |
| 90 | 4/26/2013 | Children's Health Partnership notice of entry |
| 91 | 4/25/2013 | Children's Health Partnership notice of withdrawal of objections |
| 92 | 2012 | Ibbotson Cost of Captial Yearbook 2012 |
| 93 | 2013 | Ibbotson Cost of Captial Yearbook 2013 |
| 94 | 6/4/2013 | Revised Proposed Plan Approval Order, Filed June 4, 2013 |
| 95 | 6/4/2013 | Blackline of Revised Proposed Plan Approval Order, Filed June 4, 2013 |
| 96 | 6/4/2013 | Blackline of First Amended Plan of Rehabilitation, Filed June 4, 2013 |
| 97 | 6/4/2013 | Letter to Rehabilitation Court, Dated June 4, 2013 |
| 98 | 6/5/2013 | Letter to the Rehabilitation Court, Dated June 5, 2013 |
| 99 | 6/11/2013 | Plan Approval Order |
| 100 | 6/11/2013 | Notice of Plan Approval |
| 101 | 6/4/2013 | Notice of Withdrawal of Objections of Aurelius Capital Management, LP to Plan of Rehabilitation for Financial Guaranty Insurance Company Subject to Entry of Revised Plan Approval Order |

Docs Considered: Sheet1 (2)

**List of Documents Considered**

| Number | Date | Document |
|---|---|---|
| 102 | 6/4/2013 | Notice of Withdrawal of Objections of CQS ABS Master Fund, Ltd., CQS Select ABS Master Fund Ltd. and CQS ABS Alpha Master Fund Ltd. to Plan of Rehabilitation for Financial Guaranty Insurance Company Subject to Entry of Revised Plan Approval Order |
| 103 | 5/31/2013 | Letter Withdrawing Objections of Certain Jefferson County Warrantholders to Plan of Rehabilitation |
| 104 | 5/31/2013 | Affirmation in Support of Rehabilitators Motion for an Order (i) approving that certain Stipulation Regarding Treatment under Plan of Rehabilitation for Financial Guaranty Insurance Company among the Rehabilitator of Financial Guaranty Insurance Company, Financial Guaranty Insurance Company, The Bank of New York Mellon, as successor trustee, The Bank of New York Mellon, as fiscal agent, and certain Jefferson County Warrantholders, dated May 31, 2013, and (ii) amending, to the extent necessary to give effect to the Stipulation, FGIC's obligations under the JeffCo Warrant Policies |
| 105 | 5/31/2013 | Stipulation Regarding Treatment under Plan of Rehabilitation for Financial Guaranty Insurance Company among the Rehabilitator of Financial Guaranty Insurance Company, Financial Guaranty Insurance Company, The Bank of New York Mellon, as successor trustee, The Bank of New York Mellon, as fiscal agent, and certain Jefferson County Warrantholders, dated May 31, 2013 |
| 106 | 6/11/2013 | Signed Order to Show Cause, dated June 11, 2013, Setting the Hearing Date, and Certain Deadlines, for Approval of the Stipulation and Setting Forth the Treatment of JeffCo Control Rights |
| 107 | 5/14/2013 | 2013 Q1 FGIC Statement (PDF) |
| 108 | N/A | March 31, 2013 FGIC Quarterly Operating Review (PDF) |
| 109 | 5/10/2013 | 2013 1st Quarter FGIC Statutory-Basis Financial Statements (PDF) |
| 110 | 6/11/2013 | Interim Order, dated June 11, 2013, regarding ResCap Trustees' Compliance with Order to Show Cause Notice Provision |
| 111 | 5/31/2013 | Affirmation in Support of Rehabilitators Motion for an Order (i) approving that certain Stipulation Regarding Treatment under Plan of Rehabilitation for Financial Guaranty Insurance Company among the Rehabilitator of Financial Guaranty Insurance Company, Financial Guaranty Insurance Company, The Bank of New York Mellon, as successor trustee, The Bank of New York Mellon, as fiscal agent, and certain Jefferson County Warrantholders, dated May 31, 2013, and (ii) amending, to the extent necessary to give effect to the Stipulation, FGIC's obligations under the JeffCo Warrant Policies |
| 112 | 5/31/2013 | Stipulation Regarding Treatment under Plan of Rehabilitation for Financial Guaranty Insurance Company among the Rehabilitator of Financial Guaranty Insurance Company, Financial Guaranty Insurance Company, The Bank of New York Mellon, as successor trustee, The Bank of New York Mellon, as fiscal agent, and certain Jefferson County Warrantholders, dated May 31, 2013 |
| 113 | 6/11/2013 | Signed Order to Show Cause, dated June 11, 2013, Setting the Hearing Date, and Certain Deadlines, for Approval of the Stipulation and Setting Forth the Treatment of JeffCo Control Rights |

Docs Considered: Sheet1 (2)

**List of Documents Considered**

| Number | Date | Document |
|--------|------|----------|
| 114 | 7/12/2013 | Termination Agreement by and Among FGIC, The Bank of New York Mellon in various capacities, the Company and Other Parties |
| 115 | 7/12/2013 | Order Approving FGIC's Execution and Performance of Certain Agreements Related to the Chapter 9 Case of Jefferson County, Alabama |
| 116 | 6/7/2013 | NOTICE OF HEARING ON DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF THE SETTLEMENT AGREEMENT AMONG THE DEBTORS, FGIC, THE FGIC TRUSTEES AND CERTAIN INSTITUTIONAL INVESTORS |
| 117 | 6/14/2013 | JOINDER OF FGIC TRUSTEES TO THE DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF THE SETTLEMENT AGREEMENT AMONG THE DEBTORS, FGIC, THE FGIC TRUSTEES AND CERTAIN INSTITUTIONAL INVESTORS |
| 118 | 6/14/2013 | JOINDER OF FGIC TRUSTEES TO THE DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF THE SETTLEMENT AGREEMENT AMONG THE DEBTORS, FGIC, THE FGIC TRUSTEES AND CERTAIN INSTITUTIONAL INVESTORS |
| 119 | 6/19/2013 | RESERVATION OF RIGHTS WITH RESPECT TO DEBTORS' MOTION FOR AN ORDER UNDER BANKRUPTCY CODE SECTIONS 105(A) AND 363(B) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER A PLAN SUPPORT AGREEMENT WITH ALLY FINANCIAL INC., THE CREDITORS' COMMITTEE, AND CERTAIN CONSENTING CLAIMANTS |
| 120 | 6/19/2013 | JOINDER OF FEDERAL HOME LOAN MORTGAGE CORPORATION TO MONARCH ALTERNATIVE CAPITAL LP AND STONEHILL CAPITAL MANAGEMENT LLC'S RESERVATION OF RIGHTS WITH RESPECT TO DEBTORS' MOTION FOR AN ORDER UNDER BANKRUPTCY CODE SECTIONS 105(A) AND 363(B) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER A PLAN SUPPORT AGREEMENT WITH ALLY FINANCIAL INC., THE CREDITORS' COMMITTEE, AND CERTAIN CONSENTING CLAIMANTS |

Docs Considered: Sheet1 (2)

**List of Documents Considered**

| Number | Date | Document |
|--------|------|----------|
| 121 | 6/19/2013 | OBJECTION OF THE AD HOC GROUP OF JUNIOR SECURED NOTEHOLDERS TO THE DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF THE SETTLEMENT AGREEMENT AMONG THE DEBTORS, FGIC, THE FGIC TRUSTEES AND CERTAIN INSTITUTIONAL INVESTORS |
| 122 | 6/19/2013 | OMNIBUS REPLY OF CERTAIN RMBS TRUSTEES TO RESPONSES TO THE DEBTORS' MOTION FOR AN ORDER UNDER BANKRUPTCY CODE SECTIONS 105(a) AND 363(b) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER A PLAN SUPPORT AGREEMENT WITH ALLY FINANCIAL INC., THE CREDITORS' COMMITTEE, AND CERTAIN CONSENTING CLAIMANTS |
| 123 | 6/25/2013 | STATEMENT OF THE STEERING COMMITTEE GROUP OF RMBS HOLDERS IN SUPPORT OF THE OMNIBUS REPLY OF CERTAIN RMBS TRUSTEES TO RESPONSES TO THE DEBTORS' MOTION FOR AN ORDER UNDER BANKRUPTCY CODE SECTIONS 105(a) AND 363(b) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER A PLAN SUPPORT AGREEMENT WITH ALLY FINANCIAL INC., THE CREDITORS' COMMITTEE, AND CERTAIN CONSENTING CLAIMANTS |
| 124 | 5/10/2013 | S TATUTORY - B ASIS FINANCIAL S TATEMENTS AND OTHER FINANCIAL INFORMATION Financial Guaranty Insurance Company Years Ended December 31, 2012 and 2011 With Report of Independent Auditors |
| 125 | 5/14/2013 | 2012 FGIC Statement |
| 126 | 12/14/2012 | S TATUTORY - B ASIS FINANCIAL S TATEMENTS Financial Guaranty Insurance Company September 30, 2012 |

Docs Considered: Sheet1 (2)

# ATTACHMENT III



**R E S C A P**

## Residential Capital, LLC

FGIC Commutation Proposal
Discussion Materials

**May 15, 2013**



*Duff & Phelps Securities, LLC is a FINRA Registered Broker-Dealer*

***C O N F I D E N T I A L***
***Attorney-Client Privilege***

**AMSTERDAM** • **ATLANTA** • **AUSTIN** • **BOSTON** • **CHICAGO** • **CINCINNATI** • **DALLAS** • **DENVER** • **DETROIT** • **HOUSTON** • **LONDON** • **LOS ANGELES** • **MORRISTOWN**
**MUNICH** • **NEW YORK** • **NEWPORT BEACH** • **PARIS** • **PHILADELPHIA** • **PLANO** • **SAN FRANCISCO** • **SEATTLE** • **SHANGHAI** • **SILICON VALLEY** • **TOKYO** • **TORONTO** • **WASHINGTON D.C.**

# Executive Summary

**In late March, FGIC delivered a commutation proposal ("Proposal") to the Steering Committee Group of RMBS Holders for ResCap sponsored trusts to provide a global resolution regarding the pending RMBS litigation. The Proposal from FGIC sets forth a lump sum cash consideration paid to the policyholders of the ResCap-related wrapped trusts in exchange for the ability to assert a general unsecured claim in the ResCap bankruptcy cases.**

- On June 11, 2012, Benjamin Lawsky, Superintendent of Financial Services of the State of New York (the "Rehabilitator"), filed a rehabilitation petition on behalf of FGIC with the Supreme Court of the State of New York.

  - The Rehabilitator filed an initial Plan of Rehabilitation for FGIC on September 27, 2012 and filed the First Amended Plan of Rehabilitation on December 12, 2012.

  - In connection with the First Amended Plan of Rehabilitation, Lazard, as financial advisor to the New York Liquidation Bureau, submitted an affidavit which contained revised projections.

  - The Rehabilitator filed a revised First Amended Plan of Rehabilitation for FGIC on April 12, 2013 (the "Plan") which is expected to be heard on June 11, 2013.

- Based on the current Plan, holders of permitted policy claims ("Policyholders") would receive (i) an upfront Cash Payment in an amount equal to a specified cash payout percentage upon the initial incurrence of the policy claim and (ii) additional catch-up payments through a ratable payout mechanism as set forth in the Plan.

  - In the revised Base Scenario, the Policyholders would receive an initial recovery of ~17.25% and then a subsequent distribution of up to 28.5% on their claim (based on a net present value of the distributions discounted at an illustrative rate of 15%).

- In connection with the Plan, FGIC presented the Proposal to the Steering Committee Group of RMBS Holders for ResCap trusts in late March.

  - The Proposal provides a cash payout from FGIC of approximately **$253 million** to the ResCap-related RMBS Policyholders in exchange for FGIC to have the right to assert a **~$597 million claim** in the ResCap case.

*Privileged & Confidential - Attorney Work Product*                                                                                                    2

# Executive Summary (cont'd)

**Based on D&P's loss estimates of the wrapped portion of the ResCap-sponsored RMBS trusts, the cash commutation proposal provided by FGIC is within the range of expected payments under the Plan of Rehabilitation on discounted cash flow basis.**

| | FGIC Settlement Proposal | FGIC Plan | |
|---|---|---|---|
| **Considerations** (***Benefits*** and ***Risks***) | ▪ RMBS Policyholders would receive approximately **$253 million** upon plan confirmation (on or around December 2013).<br><br>▪ ***Benefit:*** Provides a global resolution on outstanding ResCap RMBS litigation issues.<br><br>▪ ***Benefit:*** One-time cash payment made to ResCap RMBS Policyholders upon plan confirmation.<br><br>▪ ***Benefit:*** ResCap RMBS Trusts will not need to pay future premiums.<br><br>▪ ***Risk:*** Potential risk of relinquished upside economics in the event that the Base Scenario under the Plan is met and correspondingly exceeded. | ▪ RMBS Policyholders would receive approximately **$150 million** upon plan confirmation (on or around December 2013); remainder of the payments will be made over 40 years.<br><br>▪ ***Benefit / Risk:*** RMBS Policyholders bear the exposure to upside opportunity (benefit) and downside (risk) related to size of actual claim pool(s) and cash flows.<br><br>▪ ***Risk:*** A significant portion of cash distributions from Deferred Payout Obligations and other true-up payments are significantly back-ended, although a majority of the claims are expected to arise in the first five years (>70%).<br><br>▪ ***Risk:*** Outstanding ResCap RMBS litigation issues would need to be resolved separately.<br><br>▪ ***Risk:*** Recoveries are based on stale financial projections and claim estimates; updated estimates have not yet been provided. | |
| | | **Base Scenario** | **Stress Scenario** |
| **Cash Payments (NPV for the Plan)** | **$253 million** | ~$220 to $340 million[a] | ~$190 to $250 million[a][b] |
| **Duff & Phelps' Recommendation** | **X** | *Settlement Proposal is within the range of reasonableness under either scenario(s). Distributions are subject to additional unforeseen risks not identified above.* | |

a) Range reflects 10% to 20% discount rate applied to the projected payouts.
b) Reflects 17-18% recovery on D&P's low and high loss estimates.
   Note: D&P has not estimated projected losses that correspond to the underlying macro assumptions as assumed under the Stress Scenario (per the Lazard Affidavit).

*Privileged & Confidential - Attorney Work Product*

1

# FGIC Settlement Proposal

# FGIC Settlement Proposal – Commutation and Claim

($ in millions)

**The Proposal outlines a cash payment of approximately $253 million by FGIC upon emergence in exchange for the ability for FGIC to assert approximately $597 million of allowed claims at Rescap.**

- The following Proposal is based on the following three main assumptions:

  - **[A]** Initial Cash Payment Percentage of 17.25% (based on the updated Stress Scenario pursuant to the Plan),

  - **[B]** Base Case Payout to policyholders of 28.5% (based on the updated Base scenario pursuant to the Plan assuming a 15% discount rate), and

  - **[J]** Haircut of 40% on unpaid payout claim estimates.

- In consideration for the cash commutation payment of approximately $253 million, FGIC in return would receive a claim in the Rescap case for the sum of the (i) payouts made to date related to the RFC- and GMACM-sponsored trusts and (ii) the cash commutation.

| Information Points | | |
|---|---|---|
| Initial Cash Payment Percentage (CPP) | 17.25% | [A] |
| Base Case Payout (NPV @ 15.0%) | 28.50% | [B] |
| | | |
| ResCap Sponsored RMBS Claim (Per FGIC) | $1,850.0 | |
| Less: Cost, Interest, etc. | (236.0) | |
| Total Projected Claims in POC | 1,614.0 | |
| Claims Paid to Date | 344.0 | [C] |
| Estimated Unpaid Claims | 1,270.0 | |
| Accrued and Unpaid ("A&U") Claims (as of 3/31/13) | 789.0 | [D] |
| Future Estimated Claims | $481.0 | [E] |

| Commutation Consideration | | |
|---|---|---|
| Claims - A&U - Cash at Initial CPP | $136.1 | [F] = [A] x [D] |
| | | |
| Claims - A&U - Base Case Payout less Initial CPP | $88.8 | [G] = [B] x [D] - [F] |
| Claims - Future Estimated Claims at Base Case Payout | 137.1 | [H] = [B] x [E] |
| Subtotal | $225.8 | [I] = [G] + [H] |
| | | |
| Factor % of Unpaid Payout | 60.0% | [J] |
| Value Attributable to Estimated Unpaid Claims | $135.5 | [K] = [I] x [J] |
| | | |
| Total Value to Trusts | $271.6 | [L] = [F] + [K] |
| Less: Premiums waived by FGIC and retained by Trusts | 18.3 | [M] |
| Cash Commutation paid by FGIC | $253.3 | [N] = [L] - [M] |

| FGIC Allowed Claims | | |
|---|---|---|
| Prior Claims Paid | $344.0 | [C] |
| Cash Commutation | 253.3 | [N] |
| Amount of FGIC Allowed Claim | $597.3 | [C] + [N] |

*Privileged & Confidential - Attorney Work Product*

2

# Plan of Rehabilitation

# FGIC Plan of Rehabilitation – Summary

**The current Plan of Rehabilitation provides all of the value of FGIC, after the payment of certain administrative expenses and other costs, to be ratably distributed to the all of FGIC's Policyholders in a fair and equitable manner.**

- Per Lazard's Affidavit filed on December 12, 2012, the Policyholders are projected to receive a recovery of approximately 27-30% in the Base Scenario and 17-18% in the Stress Scenario (assuming a discount rate of approximately 10-20% on the distributions).

- The Policyholders would receive: **(1)** an initial cash payout percentage ("CPP") of 17.25% on accrued but unpaid claims on the effective date, **(2)** an updated initial CPP on future claims as they arise, **(3)** true-up payments for any upward changes in the CPP, and **(4)** pro rata distribution of excess cash after accounting for appropriate reserves.

  - The Policyholders would receive distributions on an annual basis based on the updated Base and Stress Scenarios or if there an significant cash inflow event as further outlined in the Plan.

| | Base Scenario | Stress Scenario |
|---|---|---|
| **Summary** | ▪ FGIC's current expectation of future Claims, investment performance, recoveries, financial markets and other factors of relevance to CPP Revaluations based on circumstances, events and projections that FGIC anticipates are reasonably likely to occur. | ▪ Non-catastrophic scenario envisioning a severe economic recession that is accompanied by:<br>– (i) sharp declines in home prices and the financial markets (e.g., approximately 30% decrease from peak home values),<br>– (ii) significant unemployment (e.g., approximately 5% increase in unemployment rates),<br>– (iii) high mortgage default rates, and<br>– (iv) other negative economic indicators of potential relevance to FGIC's insured exposures. |
| **Notional Claims** | $6.3 billion | $11.7 billion |
| **Total Payments** | $2.8 billion | $2.6 billion |
| **Initial CPP** | 17.25% | 17.25% |
| **Nominal Recovery** | 45% | 23% |
| **10% Discount Rate** | 30% | 18% |
| **15% Discount Rate** | 28.5% | 17% |
| **20% Discount Rate** | 27% | 17% |

# FGIC Plan of Rehabilitation – Base vs. Stress Scenario

**($ in millions)**

**FGIC's total notional claims estimates is approximately $6.3 billion in the base case and $11.7 billion in the stress case.**

- Based on D&P loss estimates of approximately $1.2 billion to $1.5 billion, the Policyholders for the ResCap-sponsored RMBS trusts may potentially represent 10% to 24% of the overall pool.

- A majority of the claims for the Policyholders of Rescap-sponsored RMBS trusts are expected to arise within the next 5 years.

| | | 2012 | '13 - '17 | '18 - '22 | '23 - '27 | '28 - '32 | '33 - '37 | 38 - '42 | '43 - '47 | '48 - '52 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **All FGIC Policyholders (Lazard Affidavit)** | **BASE SCENARIO** | | | | | | | | | | |
| | **Notional Claims - All** | $2,133 | $1,655 | $585 | $229 | $160 | $948 | $600 | $6 | -- | $6,316 |
| | *Ending CPP* | *17%* | *23%* | *26%* | *29%* | *31%* | *34%* | *37%* | *37%* | *39%* | |
| | Total Payments | ($368) | ($516) | ($297) | ($197) | ($195) | ($536) | ($498) | ($2) | ($227) | ($2,840) |
| | **STRESS SCENARIO** | | | | | | | | | | |
| | **Notional Claims - All** | $2,399 | $3,874 | $1,247 | $675 | $637 | $1,696 | $1,130 | $12 | -- | $11,670 |
| | *Ending CPP* | *17%* | *17%* | *17%* | *17%* | *17%* | *17%* | *17%* | *17%* | *20%* | |
| | Total Payments | ($414) | ($668) | ($215) | ($116) | ($110) | ($293) | ($195) | ($2) | ($629) | ($2,642) |
| | **VARIANCE** | | | | | | | | | | |
| | **Notional Claims - All** | $266 | $2,219 | $662 | $446 | $477 | $748 | $530 | $6 | -- | $5,354 |
| | *Ending CPP* | *(0%)* | *(6%)* | *(9%)* | *(11%)* | *(13%)* | *(16%)* | *(19%)* | *(19%)* | *(18%)* | |
| | Total Payments | ($46) | ($152) | $82 | $81 | $85 | $243 | $303 | -- | ($402) | $198 |
| **Claims for Policyholders of ResCap-Related RMBS Trusts (Per D&P's Estimates)** | **LOW CASE** | | | | | | | | | | |
| | **Notional Claims - ResCap** | $753 | $173 | $69 | $53 | $74 | $40 | ($0) | ($0) | $0 | $1,162 |
| | *% Cumulative* | *65%* | *80%* | *86%* | *90%* | *97%* | *100%* | *100%* | *100%* | *100%* | *100%* |
| | % of Total Notional Claims | | | | | | | | | | |
| | *Base Case* | *35%* | *10%* | *12%* | *23%* | *46%* | *4%* | *NM* | *NM* | *NM* | *18%* |
| | *Stress Case(a)* | *31%* | *4%* | *6%* | *8%* | *12%* | *2%* | *NM* | *NM* | *NM* | *10%* |
| | **HIGH CASE** | | | | | | | | | | |
| | **Notional Claims - ResCap** | $753 | $386 | $124 | $115 | $110 | $59 | $0 | ($0) | $0 | $1,546 |
| | *% Cumulative* | *49%* | *74%* | *82%* | *89%* | *96%* | *100%* | *100%* | *100%* | *100%* | *100%* |
| | % of Total Notional Claims | | | | | | | | | | |
| | *Base Case* | *35%* | *23%* | *21%* | *50%* | *69%* | *6%* | *0%* | *NM* | *NM* | *24%* |
| | *Stress Case(a)* | *31%* | *10%* | *10%* | *17%* | *17%* | *3%* | *0%* | *NM* | *NM* | *13%* |

(a)   D&P has not estimated projected losses that reflect the same underlying macro assumptions as the Stress Scenario included in the Affidavit.

*Privileged & Confidential - Attorney Work Product*

# FGIC Plan of Rehabilitation – ResCap Trust Policyholders

**($ in millions)**

**Under the Base Scenario, the ResCap-Sponsored RMBS Trust Policyholders may receive approximately $220-$340 million on a net present value basis.**

| Plan of Rehabilitation – Base Scenario | Initial | '14 - '17 | '18-'52 | Total Recovery | Recovery % Based on: % Notional | % Discounted | Notes |
|---|---|---|---|---|---|---|---|
| **LOW CASE** | | | | | | | |
| **Notional Claims - ResCap** | **$814** | **$112** | **$236** | **$1,162** | | | **[A]** |
| Nominal Cash Flow | | | | | | | |
| Initial CPP Payments | $150 | $23 | $67 | $240 | | | |
| Catch-Up CPP Payments | -- | 40 | 164 | 204 | | | |
| Subtotal | 150 | 63 | 231 | 444 | | | |
| Portion of DPO Accretion Payout | -- | 4 | 70 | 74 | | | |
| Total Payout | $150 | $67 | $301 | $518 | *45%* | | **[B]** |
| Discounted Cash Flows | | | | | | | |
| 10% | $150 | $53 | $65 | $268 | 23% | 27% | **[C]** |
| 15% | 150 | 48 | 38 | 235 | 20% | 25% | |
| 20% | 150 | 43 | 24 | 217 | 19% | 24% | |
| **HIGH CASE** | | | | | | | |
| **Notional Claims - ResCap** | **$888** | **$251** | **$408** | **$1,546** | | | **[A]** |
| Nominal Cash Flow | | | | | | | |
| Initial CPP Payments | $163 | $52 | $114 | $330 | | | |
| Catch-Up CPP Payments | -- | 46 | 214 | 261 | | | |
| Subtotal | 163 | 99 | 328 | 590 | | | |
| Portion of DPO Accretion Payout | -- | 5 | 89 | 94 | | | |
| Total Payout | $163 | $103 | $418 | $684 | *44%* | | **[B]** |
| Discounted Cash Flows | | | | | | | |
| 10% | $163 | $82 | $93 | $339 | 22% | 28% | **[C]** |
| 15% | 163 | 74 | 54 | 292 | 19% | 25% | |
| 20% | 163 | 68 | 35 | 266 | 17% | 24% | |

**[A]** A majority of the notional claims for the ResCap RMBS Trust Policyholders are presented within the first 5 years post-emergence in both the low and high cases.

**[B]** However, the nominal cash flows to the Policyholders are mostly back-ended due to the true-up payments related to the projected CPP increases and the payments on account of the DPO accretion.

**[C]** When applying a 10-20% discount rate to the recovery cash flow stream, the illustrative recovery estimates are approximately $220-$340 million which implies a recovery rate of approximately 17-23% based on the notional claim amount and 24-28% based on the discounted claim amount.

Note:  Assumes emergence occurs at the end of 2013.

*Privileged & Confidential - Attorney Work Product*