Sidman Declaration Exhibit # 7

**FGIC**

**TOP FIFTY U.S. PUBLIC FINANCE EXPOSURES**
(Dollars in Millions)

| | | June 30, 2013 | Moody's Rating Changes | | | | S&P Rating Changes | | | |
| | | Net Par Outstanding | Q4 2012 | | Q1 and Q2 2013 | | Q4 2012 | | Q1 and Q2 2013 | |
| | Revenue Stream Name | Amount | Change | New Rating | Change | New Rating | Change | New Rating | Change | New Rating |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Jefferson County, AL Sewer Rev. | $1,447.3 | | | Down | Ca | | | Down | D |
| 2 | Los Angeles USD, CA GO. | 1,175.9 | | | | | | | | |
| 3 | Golden State Tobacco Securitiz Corp, CA Lease. | 996.6 | | | | | | | Up | A- |
| 4 | Detroit (City of), MI GO. | 925.0 | Down | Caa1 | Down | Ca | | | Down | B |
| 5 | Hudson Yards Infrastructure Corp, NY. | 600.0 | | | | | | | | |
| 6 | Puerto Rico Commonwealth GO. | 534.0 | Down | Baa3 | | | | | Down | BBB- |
| 7 | Puerto Rico Highway Transportation. | 483.2 | Down | Baa3 | | | | | Down | BBB- |
| 8 | Yankee Ballpark LLC (NYC IDA). | 440.0 | | | | | | | | |
| 9 | Detroit (City of), MI Water Rev. | 377.9 | Down | Baa2 (Sr) | Down | B1 (Sr) | | | Down | BB- (Sr & Sub) |
| | | | | Baa3 (Sub) | | B2 (Sub) | | | | |
| 10 | Puerto Rico Infras Fin Auth, PR, Spec Tax Rev. | 360.4 | Down | Baa3 (Sub) | | | | | Down | BBB- |
| 11 | Pacific Gas Electric Company. | 345.0 | | | | | | | | |
| 12 | Dayton Power Light Company. | 314.4 | | | | | | | Down | BBB- |
| 13 | Hawaiian Electric Company. | 262.0 | | | | | | | | |
| 14 | St. Joseph Health System. | 250.2 | | | | | | | | |
| 15 | California Housing Finance Agency - Single-Family. | 210.3 | | | | | | | | |
| 16 | Downtown Phoenix Hotel Corp Sr. Rev 05. | 155.2 | | | | | | | | |
| 17 | Illinois Housing Development Auth, IL Hsg. | 140.2 | | | | | | | | |
| 18 | Brooklyn Union Gas Company. | 137.0 | | | | | | | | |
| 19 | Detroit, MI Sewer Disposal Rev. | 136.2 | Down | Baa3 | Down | B2 | | | | |
| 20 | Alaska Housing Finance Corpora. | 135.1 | | | | | | | | |
| 21 | CenterPoint Energy Houston Electric Company. | 127.4 | | | | | | | Up | A |
| 22 | Palm Beach Cnty SD, FL GO. | 116.2 | | | | | | | | |
| 23 | NEW YORK ST POWER AUTH. | 112.0 | | | | | | | | |
| 24 | Southern California Edison Power Company. | 110.0 | | | | | | | | |
| 25 | Green Stadco-New York Jets Stadium. | 97.5 | | | | | | | | |
| 26 | Puerto Rico Conv Ctr Dist Auth, PR Hotel Rev. | 97.1 | Down | Baa3 | | | | | Down | BBB- |
| 27 | Nevada Power Company. | 92.5 | | | | | | | Up | BBB+ |
| 28 | Sierra Pacific Power Company. | 89.8 | | | | | | | Up | BBB+ |
| 29 | Detroit (City of) School District, MI GO. | 83.2 | | | | | | | | |
| 30 | Entergy New Orleans, LA. | 75.0 | | | | | | | Up | A- |
| 31 | New Orleans (City of), LA GO. | 56.7 | | | | | | | | |
| 32 | Southwest Gas Corporation. | 56.1 | | | | | | | Up | A- |
| 33 | Burbank RDA (Golden State Redev), CA. | 55.0 | | | | | | | | |
| 34 | New Jersey HMFA, NJ Housing Rev. | 54.8 | | | | | | | | |
| 35 | Massachusetts Commonwealth GO. | 53.3 | | | | | | | | |
| 36 | Indiana Michigan Power Co. | 50.0 | | | | | | | | |
| 37 | New Orleans (City of), LA Sewerage Syst. | 48.1 | | | Down | Baa3 | | | | |
| 38 | Rancho Calif, CA Water Dist Rev. | 46.9 | | | | | | | | |
| 39 | Dayton University, OH Mtg Rev. | 43.4 | | | | | | | | |
| 40 | Gulf Breeze, Florida 85B. | 41.9 | | | | | | | | |
| 41 | New York City, NY Muni Water Rev. | 39.2 | | | | | | | | |
| 42 | Wisconsin Power Light Company. | 39.1 | | | | | | | Up | A |
| 43 | Interstate Power Light Company. | 38.4 | | | | | | | Up | A- |
| 44 | Elk River ISD #728, MN GO. | 36.6 | | | | | | | | |
| 45 | Acalanes Union HSD, CA GO. | 36.3 | | | | | | | | |
| 46 | Dormitory Auth of State of NY - CUNY Rev. | 35.1 | | | | | | | | |
| 47 | San Marcos Pub Fac Auth, CA Mello Roos Rev. | 30.2 | | | | | | | | |
| 48 | Banning (City of) Comm RDA, CA Ref TABs (Merged. | 28.3 | | | | | | | | |
| 49 | North Carolina Eastern Power R. | 28.0 | | | | | | | | |
| 50 | Central Unified SD, CA GO. | 24.3 | | | | | | | | |
| | Total. | $11,268.2 | | | | | | | | |

Sidman Declaration Exhibit # 8

SUPREME COURT OF THE STATE OF NEW YORK - NEW YORK COUNTY
PRESENT: Hon. Doris Ling-Cohan, Justice                    Part 36

In the Matter of
The Rehabilitation of                                      INDEX NO. 401265/12
FINANCIAL GUARANTY INSURANCE COMPANY                       MOTION SEQ. NO. 022

The following papers, numbered ___ were considered on this order to show cause:

| PAPERS | NUMBERED |
|---|---|
| Notice of Motion/Order to Show Cause, — Affidavits — Exhibits _____ | _1, 2, 3_ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits _____ | _____ |
| Cross-Motion: [ ] Yes   [ X ] No | _____ |

The court declines to sign this Order to Show Cause (OSC), brought by investors Monarch Alternative Capital LP, Stonehill Capital Management LLC, Bayview Fund Management LLC, CQS ABS Master Fund Limited, and CQS ABS Alpha Master Fund Limited (jointly "the Investors"), to: (1) intervene in this Rehabilitation proceeding pursuant to CPLR 1012(a)(2) or (3), or CPLR 1013; and (2) conduct limited and expedited discovery pursuant to CPLR 408.

Procedural History

This is a rehabilitation proceeding, brought under New York Insurance Law (NYIL) Article 74, in which a rehabilitator of Financial Guaranty Insurance Company (FGIC) was appointed without objection, by order dated June 28, 2012. Pursuant to such appointment, the rehabilitator proposed the Plan of Rehabilitation, and thereafter the First Amended Plan of Rehabilitation. Numerous objections to the proposed plan were filed with the court by interested parties. After much negotiation between the rehabilitator and the interested parties, all objections were settled or withdrawn prior to the hearing date scheduled for oral arguments on approval of the proposed plan. Thus, this court approved, without objection, the First Amended Plan of Rehabilitation for FGIC by order dated June 11, 2013.

FGIC currently seeks this Court's approval of a tentative settlement agreement (mot. seq. no. 016), negotiated in the Bankruptcy case of Residential Capital (Bankruptcy case), and entered into on May 23, 2013. Approval is also being sought in the Bankruptcy case, as approval by both courts is necessary. Three objections to such settlement agreement were received by the court on July 16, 2013. By this OSC, the Investors, having previously filed their objections, now move to intervene in this special proceeding, and seek limited discovery.

Intervention in Special Proceedings

The Court notes that it is undisputed that this Rehabilitation proceeding is a special proceeding governed

by Article 4 of the CPLR. As such, the court declines to sign the Investors' OSC to intervene in this proceeding, as CPLR 1012 and 1013 specifically govern intervention in *actions*, rather than special proceedings. In fact, both statutes specifically use the words "[u]pon timely motion, any person...[is] permitted to intervene in any action..." *See* CPLR 1012(a) and 1013. Thus, by the language employed, limiting intervention to an "action", such statutes are inapplicable here.

The Court notes that nowhere in NYIL Article 74, which governs this special proceeding, does it permit intervention. This is in contrast to Article 78 (which is also a special proceeding governed by CPLR Article 4), which does specifically provide for intervention: "[t]he court...may allow other interested persons to intervene." CPLR 7802(d). The absence of such corresponding language in the NYIL Article 74 rehabilitation statute indicates that the Legislature did not intend for intervention in such rehabilitation proceedings. Similarly, CPLR Article 52, a special proceeding, also specifically permits intervention in CPLR 5225, 5227, and 5239, unlike a rehabilitation proceeding. *See Breezevale Ltd. v Dickinson*, 262 AD2d 248 (1st Dep't 1999).

Moreover, the Investors filed objections with the court on July 16, 2013 (which they now seek to be deemed their proposed pleadings pursuant to CPLR 1014). The Investors need not seek intervention in this proceeding in order to voice their objections, as such objections were filed, received and shall be considered. As such, this OSC to intervene is deemed moot.

<u>Discovery in Special Proceedings</u>

Further, as to the request for limited discovery pursuant to CPLR 408, the Investors concede that there is no automatic right to discovery in special proceedings. Moreover, in seeking discovery, the Investors have failed to detail the discovery sought, or provide copies of any document demands, and, thus, this court is unable to determine whether such requested discovery is necessary and material, and narrowly tailored to clarify any allegedly disputed facts. *See New York University v Farkas*, 121 Misc.2d 643, 647 (Civ. Ct. N.Y. Cty 1983). Moreover, the Court notes that, according to movant, it is already engaging in ongoing discovery in the Bankruptcy case, and movant has not explained why discovery, if permitted here, would not be duplicative and merely serve to delay this summary proceeding.

<u>Standard to be Applied in Approving the Settlement Agreement</u>

The Investors claim that the proposed settlement agreement "is not fair and equitable to the Investors", and, thus should not be approved by this Court. However, such claim ignores the standard which must govern the decision-making of this Court on whether to approve the tentative settlement agreement. The Rehabilitator is tasked with ensuring that the best interests of FGIC's policyholders <u>as a whole</u> are served. *See Corcoran v Frank B. Hall & Co., Inc.*, 149 AD2d 165 (1st Dep't 1989). Thus, the standard to be applied in determining this Court's approval of the settlement is whether the Rehabilitator acted arbitrary and capriciously, and abused his discretion in determining that the settlement agreement is in

the best interests of FGIC's policyholders as a whole. *Id.* Such standard is different than that which the Bankruptcy court will employ and the Investors' specific concerns can be raised there.

Dated: _____7/31/13_____          _____

**DORIS LING-COHAN, J.S.C.**

**Check one:    [  ] FINAL DISPOSITION        [ X ] NON-FINAL DISPOSITION**
**Check if Appropriate:  [  ] DO NOT POST**
J:\OSC\Matter of FGIC – decline to sign, intervention and discovery.wpd

Sidman Declaration Exhibit # 9

| Ex # | Docket # | Date Filed | Pleading Title |
|---|---|---|---|
| | | | |
| **B.  Motion to Appoint Mediator and Related Pleadings** | | | |
| 252 | 2357 | 12/6/2012 | Notice Of Debtors' Motion For Appointment Of A Mediator |
| 253 | 2400 | 12/13/2012 | Limited Objection Of The Steering Committee Group Of RMBS Holders To Debtors' Motions (I) To Further Extend Their Exclusive Periods To File A Chapter 11 Plan And Solicit Acceptances Thereof, And (II) For Appointment Of A Mediator |
| 254 | 2403 | 12/13/2012 | Response Of AIG Asset Management (U.S.), LLC, The Allstate Entities, Massachusetts Mutual Life Insurance Company, And The Prudential Entities To Debtors' Motion For Appointment Of A Mediator |
| 255 | 2406 | 12/13/2012 | Omnibus Response Of Ad Hoc Group Of Junior Secured Noteholders To Debtors' Motion For The Entry Of An Order Extending Their Exclusive Periods To File A Chapter 11 Plan And Solicit Acceptances Thereof And Debtors' Motion For The Appointment |
| 256 | 2408 | 12/13/2012 | Statement Of Wilmington Trust, National Association In Respect Of The Debtors' Motions For Entry Of An Order Further Extending Their Exclusive Periods To File A Chapter 11 Plan And Solicit Acceptances Thereof And For Appointment Of A Mediator |
| 257 | 2418 | 12/14/2012 | Statement And Reservation Of Rights Of The Official Committee Of Unsecured Creditors With Respect To Debtors' Motion For Appointment Of A Mediator And Debtors' Motion For The Entry Of An Order Further Extending Their Exclusive Periods To File A Chapter 11 Plan And Solicit Acceptances Thereof |
| 258 | 2439 | 12/17/2012 | Joinder Of National Credit Union Administration Board To The Response Of AIG Asset Management (U.S.), LLC, The Allstate Entities, Massachusetts Mutual Life Insurance Company, And The Prudential Entities To Debtors' Motion For Appointment Of Mediator |
| 259 | 2441 | 12/18/2012 | Reply Of Ally Financial Inc. And Ally Bank In Support Of Debtors' Motion For The Entry Of An Order Further Extending Their Exclusive Periods To File A Chapter 11 Plan And Solicit Acceptances Thereof And Debtors' Motion For Appointment Of A Mediator |
| 260 | 2447 | 12/18/2012 | Debtors' Omnibus Reply To Responses To (I) Debtors' Motion For The Entry Of An Order Further Extending Their Exclusive Periods To File A Chapter 11 Plan And Solicit Acceptances Thereof And (II) Debtors' Motion For Appointment Of A Mediator |
| 261 | 2465 | 12/18/2012 | RMBS Trustees' Statement In Support Of Appointment Of A Mediator |
| 263 | 2523 | 12/20/2012 | Hearing Transcript - December 20, 3012  - Motion to Appoint Mediator |
| 262 | 2519 | 12/26/2012 | Order Appointing Mediator |
| 264 | 3101 | 3/5/2013 | Order Extending Appointment Of Hon. James M. Peck As Mediator |

| Ex # | Docket | Date Filed | Pleading Title | Statement |
|---|---|---|---|---|
| | | | | |
| **C. Pleadings Containing Statements Re Mediator or Mediation** | | | | |
| 265 | 2355 | 12/6/2012 | Notice Of Debtors' Motion For The Entry Of An Order Further Extending Their Exclusive Periods To File A Chapter 11 Plan And Solicit Acceptances Thereof | ¶ 11.  Additionally, as discussed below, the Debtors intend to request the appointment of a mediator to assist the plan negotiation process and ensure that those with a seat at the table are in the best position for disciplined, good faith discussions that are focused on the appropriate issues. The Debtors are optimistic that a plan mediator will aid in the negotiation of a consensual plan despite the divergent interests of the major stakeholders.<br><br>¶ 4.  Moreover, as the Court is aware and as noted above, the Debtors have on several occasions advised that they intend to request the appointment of a mediator to assist in the resolution of certain complex issues important to the confirmation of a Chapter 11 plan.  Various major stakeholders have advised the Debtors that they support a mediation process.  The appointment of a mediator will allow for an independent third party to ensure that parties are making material progress. The scope of the mediation would likely concern, but not be limited to, the amount and allocation of any proposed settlement with AFI and other interdebtor and intercreditor disputes. The Debtors believe the presence of a mediator will facilitate disciplined negotiations in connection with those issues.<br><br>¶ 55.  The Debtors have taken steps to put mechanisms in place, including providing information to all parties requesting a seat at the table, engaging in meaningful discussions with those parties and taking steps towards the appointment of a mediator, to help facilitate a consensual resolution of the issues. |
| 266 | 2459 | 12/18/2012 | Notice Of Proposed Fourth Revised Joint Omnibus Scheduling Order And Provisions For Other Relief Regarding Debtors' Motion Pursuant To Fed. R. Bankr. P. 9019 For Approval Of RMBS Trust Settlement Agreements | Page 5:  Whereas, the Debtors have requested certain changes to the schedule set out in the October 23, 2012, Scheduling Order in order, among other things, to facilitate mediation efforts; |
| 267 | 2528 | 12/27/2012 | Fourth Revised Joint Omnibus Scheduling Order And Provisions For Other Relief Regarding Debtors' Motion Pursuant To Fed. R. Bankr. P. 9019 For Approval Of RMBS Trust Settlement Agreements | Page 2:  Whereas, the Debtors have requested certain changes to the schedule set out in the October 23, 2012, Scheduling Order in order, among other things, to facilitate mediation efforts; |

| Ex # | Docket # | Date Filed | Pleading Title | Statement |
|------|----------|------------|----------------|-----------|
| 268 | 2887 | 2/11/2013 | Notice Of Debtors' Motion Pursuant To Sections 105(a) And 363(b) Of The Bankruptcy Code For An Order Authorizing The Debtors To Appoint Lewis Kruger As Chief Restructuring Officer | ¶ 3.  … The Debtors and their major stakeholders have been actively mediating important plan issues with the goal of achieving a consensual Chapter 11 plan. Because certain of the Debtors' creditors are critical of the Debtors' historical relationship with Ally Financial Inc. ("AFI"), the Debtors believe it is important to appoint an independent CRO to direct these plan discussions and lead the Debtors in the ongoing mediation.  As such, the CRO will: (i) lead the Debtors in plan mediation and assist in the formation of a Chapter 11 plan; (ii) assist in the resolution of inter-estate claims; ...

¶ 16. On December 26, 2012, the Court entered an order appointing the Honorable James M. Peck as mediator (the "Mediator") to assist in the structuring of a Chapter 11 plan and to assist in resolving other related disputes [Docket No. 2519].

¶ 19.  The Debtors believe that the CRO will be able to provide the necessary restructuring experience to spearhead aggressive plan negotiations, lead the Debtors in plan mediation, and perform the CRO Duties.

¶ 20.  The Debtors believe that the CRO will provide invaluable assistance during the ongoing mediation process and to lead the plan negotiations with the goal of reaching a consensual Chapter 11 plan. ...

¶ 25.  ... The Debtors believe that Mr. Kruger's vast restructuring experience will be invaluable in leading plan negotiations and in the ongoing mediation.

¶ 26.  The Debtors anticipate that the CRO will assist the remaining members of the Debtors' management team with the following responsibilities:
 - Communicate and negotiate with major stakeholders;
- Participate in plan mediation, plan-related negotiations and provide assistance in all aspects of the plan process; ...

West Declaration in support, ¶ 5.  ... However, the Board believes that a business level leader with significant restructuring experience to spearhead the plan negotiations process, including representing the Debtors in mediation, is necessary to reaching a consensual Chapter 11 plan.

Kruger Declaration in support, ¶ 4.  Upon information and belief, my responsibilities as CRO will include assisting the Debtors in reaching and confirming a consensual Chapter 11 plan by participating in plan mediation, leading plan discussions, ...

Kruger engagement letter, ¶ 1.a.iii.  The CRO shall participate in plan mediation efforts; |
| 269 | 2918 | 2/14/2013 | Notice Of Debtors' Motion For The Entry Of An Order Further Extending Their Exclusive Periods To File A Chapter 11 Plan And Solicit | ¶ 5.  Plan progress has gained momentum over the course of the Second Exclusivity Extension. Because the Debtors' major stakeholders hold divergent interests, the Debtors demonstrated initiative and requested the appointment of a sitting federal bankruptcy judge as mediator to assist the plan negotiations process. At the Second |

| Ex # | Docket # | Date Filed | Pleading Title | Statement |
|------|----------|------------|----------------|-----------|
|  |  |  | Acceptances Thereof | Exclusivity Hearing, the Court appointed the Honorable Judge James M. Peck as mediator (the "Mediator") for an initial term through and including February 28, 2013. Mediation commenced shortly after the Mediator was appointed.<br><br>¶ 10.  Progress has also been made in the context of the ongoing mediation. When the Debtors sought the appointment of a mediator, they wanted to put in place a mechanism in aid of the plan negotiations process. The Mediator was appointed on an interim basis, through and including February 28, 2013. While the mediation has not yet resulted in resolution of key plan issues thus far, it has been successful in getting creditor constituencies to the negotiating table and initiating meaningful settlement discussions.  ...<br><br>¶ 11.  The above-mentioned mediation sessions and daily discussions among key parties have prompted parties to begin negotiating the terms of a consensual plan.  ...<br><br>¶ 12.  The CRO will spearhead the plan process and provide the Debtors with an additional independent voice with restructuring expertise essential to negotiate and settle the complex issues necessary to forge a path to a consensual plan, including, but not limited to, (i) representing the Debtors in mediation and claims litigation, ...<br><br>¶ 24.  On December 26, 2012, the Court entered an order approving the appointment of the Mediator [Docket No. 2519].<br><br>¶ 40.  ... At the Second Exclusivity Hearing, the Court appointed the Mediator. Following his appointment, the Mediator met with the Debtors' major stakeholders.<br><br>¶ 42.  An extension of the Debtors' Exclusive Periods should be granted so that parties can continue to make progress in the mediation. The Debtors' key parties in interest consist of constituents with very different views. Negotiating a consensual Chapter 11 plan is not an easy task. Major stakeholders have participated in the mediation.  ... While mediation has not currently brought about consensus on plan issues, it has focused parties and forced them to engage in substantive negotiations.<br><br>¶ 43.  Even if mediation concludes without a consensual plan, the Court should extend the Exclusive Periods. Mediation has crystalized for the Debtors the discrete claim issues that must be addressed going forward. ...<br><br>¶ 54.  ... The Debtors believe that continuing the momentum garnered during the Second Exclusivity Extension and through the ongoing mediation is likely the only avenue for these estates to exit Chapter 11 pursuant to a confirmed plan. |

| Ex # | Docket # | Date Filed | Pleading Title | Statement |
|------|----------|------------|----------------|-----------|
| 270 | 2997 | 2/21/2013 | Objection Of Ad Hoc Group Of Junior Secured Noteholders To Debtors' Motion For The Entry Of An Order Further Extending Their Exclusive Periods To File A Chapter 11 Plan And Solicit Acceptances Thereof | Page 2:  A further extension of exclusivity, on the other hand, will only enshrine the status quo by encouraging parties to retrench, rather than reevaluate, their respective bargaining positions. For the past two months, the Ad Hoc Group has patiently participated in a plan mediation process that has, to date, not resulted in the global compromise envisioned by the Court at its inception. Perversely, these well-intentioned efforts to achieve consensus through mediation have seemingly emboldened certain parties to harden their negotiating positions, secure in the knowledge that the Debtors' present plan construct – with its non-consensual third party release provisions with Ally – remains the only show in town. Even the best efforts of a sitting bankruptcy judge and experienced and respected mediator have been unable to break this impasse.<br><br>Page 4: The Court implicitly relied on the Adelphia factor focusing on progress in plan negotiations in granting the Debtors most recent request for an extension of exclusivity, hoping that the simultaneous appointment of a mediator could spur a breakthrough. See Dec. 20 H'rg Tr. at 44:15-45:17 (Glenn, J.) (stating that debtors had satisfied Adelphia factors and focusing on progress of plan negotiations); Id. at 53:16 – 54:1 (Glenn, J.) (expressing hope that mediator could "close the gap" between negotiating parties). The Court also expressed hope that the prospect of "nuclear war" absent a global deal could spur progress by encouraging parties to compromise on their negotiating positions. See id. at 45:3-19 (Glenn, J.).<br><br>Page 4:  Mediation has not, to date, spawned any breakthrough. ... |
| 271 | 3042 | 2/26/2013 | Response Of The Official Committee Of Unsecured Creditors To Debtors' Motions For (I) Appointment Of A Chief Restructuring Officer And (II) Entry Of An Order Further Extending Their Exclusive Periods To File A Chapter 11 Plan And Solicit Acceptances Thereof | ¶ 2.  When the Debtors last sought an extension of exclusivity, the Debtors and the Committee were hopeful that the parties, with the assistance of Judge Peck, as mediator, could move towards a prompt consensual resolution of these cases. Until recently, there seemed to be reason for encouragement that the mediation would bear fruit. Unfortunately, that has not been the case. Despite the Committee's significant efforts over the past two months, the mediation has stalled. ....<br><br>¶ 3.  Coming close on the heels of the stalled mediation, the Motions were initially received with skepticism by the Committee. ,,,<br><br>¶ 6.  At around this same time, the Debtors filed their second motion for an extension of exclusivity. In connection with the resolution of that motion and an extension of the Debtors' exclusivity period to February 28, 2013, the Debtors and the Committee agreed to the appointment of a mediator, the Honorable Judge Peck (the "Mediator"). The parties also agreed to adjourn consideration of the Debtors' motion to approve the settlement relating to the claims of certain residential mortgage backed securities trusts (the "RMBS Trust Settlement") in order to permit the Mediator and the parties to explore a global resolution of the case.<br><br>¶ 7.  In part due to the appointment of the Mediator, the adjournment of the hearing on the RMBS Trust Settlement, and an agreement among all parties to work constructively |

| Ex # | Docket # | Date Filed | Pleading Title | Statement |
|------|----------|------------|----------------|-----------|
|      |          |            |                | towards a global resolution of these cases, the Committee and the Debtors ultimately determined to defer the issue of appointing a CRO.<br><br>¶ 8.  After the appointment of the Mediator, the Committee and Ally agreed to prepare comprehensive legal presentations regarding the arguments for and against estate claims and causes of action that could be brought against Ally. As this Court is aware, the Committee (in addition to the Examiner) has spent a significant amount of time investigating the causes of action—including reviewing millions of pages of documents and conducting extensive legal research—and developing a lengthy and thorough exposition of the claims. Through a series of meetings held on January 8, 9, and 17, 2013, the Committee's professionals delivered their oral and written presentation to the Mediator, Ally, and the Debtors, respectively. On January 22, 2013, Ally delivered an extensive responsive presentation to the Committee.<br><br>¶ 9.  Following this exchange of presentations, on January 30, 2013, the Committee provided Ally with a global settlement proposal contemplating estate and third party releases that the Committee believed would facilitate negotiation of a consensual chapter 11 plan. In early February, the Committee was informed that mediation was stalled.<br><br>¶ 12.  Now that the mediation has stalled and Ally appears to be unwilling to negotiate at this time, these cases are at an important juncture. ...<br><br>¶ 14.  Debtors' consent to standing. In light of the stalled mediation, the Debtors have agreed that they will consent to any motion made by the Committee seeking standing to pursue estate causes of action against Ally and its non-Debtor affiliates. ...  The Committee's standing motion will be based largely upon the extensive analysis it has already provided to the Debtors, Ally and others in connection with the mediation, as well as its continued review of the documents in the Examiner's depository.<br><br>Exhibit A, Terms of Agreement, ¶ 9. The CRO shall propose a framework for the prompt resolution of the major categories of disputed claims in the case, through negotiation (and possibly mediation) and, if necessary, through litigation. |

| Ex # | Docket # | Date Filed | Pleading Title | Statement |
|------|----------|------------|----------------|-----------|
| 272 | 3043 | | Statement Of Wilmington Trust, National Association In Respect Of The Debtors' Motions For Entry Of An Order Further Extending Their Exclusive Periods To File A Chapter 11 Plan And Solicit Acceptances Thereof And For Appointment Of Lewis Kruger As Chief Restructuring Officer | ¶ 2.  The Trustee remains concerned about the status of these cases, particularly the stalled mediation, and the multiple positions the Debtors have taken to the detriment of Residential Capital's creditors. ....<br><br>¶ 4.  ... The mediation ordered by the Court in December 2012 was intended to seek a consensual resolution of such claims, as well as other estate and third-party claims against AFI. Despite the efforts of the Committee and the Trustee to engage in a constructive dialogue, AFI is not engaging in dialogue. As a result, the mediation is stalled.  Absent significant progress in the mediation over the next 60 days, litigation against AFI and other third parties will be the clearest path toward a resolution of these cases. |
| 273 | 3074 | 3/1/2013 | Debtors' Omnibus Reply To Responses To (I) Debtors' Motion Pursuant To Sections 105(a) And 363(b) Of The Bankruptcy Code For An Order Authorizing The Debtors To Appoint Lewis Kruger As Chief Restructuring Officer And (II) Debtors' Motion For The Entry Of An Order Further Extending Their Exclusive Periods To File A Chapter 11 Plan And Solicit Acceptances Thereof | ¶ 2.  Under the guidance of the Mediator … Although the mediation has not been successful in global resolution of the AFI Settlement thus far, and despite conflicting suggestions made by parties in the Responses, progress has in fact been made under Judge Peck's watch, and mediation is ongoing. Whatever temporary hiccups may have occurred during the Mediator's initial term, the Debtors decline to cast blame on any stakeholder. The Mediator has continued to meet with various parties in interest, and the Debtors are hopeful that the continuing mediation will result in the resolution of important plan issues.<br><br>¶ 3.  Mr. Kruger will play a vital role in the ongoing mediation and plan process.<br><br>¶ 6.  ... In the Securities Objection, the JSBs promote the mediation, characterizing it as "ongoing" and request in the Securities Objection that the Court not "upset the nature of the ongoing plan mediation." See Securities Objection at 5.<br><br>¶ 9.  ... The statements made in the JSB Objection are in direct contradiction to the statements made in their Securities Objection filed just three days earlier, in which the JSBs recognize the efforts made in mediation. In the Securities Objection, the JSBs oppose the relief requested in the underlying motion so as not to "upset the nature of the ongoing plan mediation."   See Securities Objection at 5. They further state, that "Indeed, as part of the ongoing mediation process being administered by Judge Peck, there are ongoing discussions between the Debtors and their key creditor constituencies over multiple potential plan structures, and the precise contours of any plan of reorganization for these chapter 11 cases, to the extent such a plan ever arises, remain uncertain." See Securities Objection at 4. Conversely, in the JSB Objection, the JSBs belittle the efforts made during the mediation and state that a plan based on the AFI Settlement "remains the only show in town." See JSB Objection at 3.<br><br>¶ 10.  The JSBs also criticize the mediation because principals of the group have not participated. But that is of their own doing. The Mediator advised all potential participants to the mediation that anyone prepared to agree to the confidentiality of the mediation process could participate in the mediation. If principals decided not to |

| Ex # | Docket # | Date Filed | Pleading Title | Statement |
|------|----------|------------|----------------|-----------|
| | | | | participate, it was because they were unwilling to be bound by reasonable confidentiality restrictions, not because the Debtors failed to give them an opportunity to participate. Principals apparently want flexibility to continue to trade in and out of the Debtors' securities. Mediation, however, demands commitment to the plan process. |
| 274 | 3086 | 3/4/2013 | Statement Of Ally Financial Inc. And Ally Bank Regarding The Debtors' Motion For The Entry Of An Order Further Extending Their Exclusive Periods To File A Chapter 11 Plan And Solicit Acceptances Thereof And The Debtors' Motion For Appointment Of A Chief Restructuring Officer | ¶ 2.  Ally also believes that this Court's approval of a plan mediation process was very constructive. The appointment of Judge Peck as the mediator has been a positive and productive development, and Ally appreciates the hard work and substantial time that Judge Peck has devoted to these cases to date. Ally entered into and has participated in the plan mediation process in good faith. Both counsel for Ally and Ally's chief executive officer have met with Judge Peck on numerous occasions in person and by telephone. Ally understands from the Debtors that Judge Peck is willing to continue in this role, which will only benefit parties seeking a consensual conclusion to these cases.

¶ 4.  Yet, Ally is still hopeful that, with the assistance of the mediator, a largely consensual plan with full third-party releases can be accomplished ...

¶ 6.  Further, contrary to the statements made in the Responses, Ally has not disengaged from or "stalled" the mediation process. Rather, Ally has steadfastly maintained its willingness to continue negotiations and met with the mediator numerous times, as recently as last week. ...

¶ 9.  The Debtors now look to another third party — the proposed chief restructuring officer — to help them address chapter 11 plan issues and intercreditor disputes (but not manage the wind down of the estates' operations post-sale, it would appear). This is a confusing approach given the past two months of mediation and the significant time before then that the Debtors have had to address such issues. To be clear, Ally is supportive of the Debtors' request for a further extension of their statutory exclusivity periods and does not oppose the appointment of the chief restructuring officer. Ally hopes that the Debtors' appointment of the chief restructuring officer, coupled with the Debtors' counsel, their financial advisor, and the mediator, will finally enable the Debtors to advance the chapter 11 plan process, after spending so much time and money to get to this point. |
| 275 | 3119 | | Hearing Transcript - March , 2013 - Stat Conf re RMBS 9019 Motion | |
| 276 | 3120 | | Hearing Transcript - February 28, 2013 - Plan Status Update | |
| 277 | 3243 | | Hearing Transcript - March 5, 2013 - Appointment of CRO | |

| Ex # | Docket # | Date Filed | Pleading Title | Statement |
|---|---|---|---|---|
| 278 | 3345 | 4/2/2013 | Response Of The Official Committee Of Unsecured Creditors To The Motion By Ally Financial Inc. And Ally Bank For An Order Enforcing The Automatic Stay Pursuant To 11 U.S.C. § 362(A)(3) By (1) Enjoining Prosecution Of Alter Ego And Veil Piercing Claims In The Class Action Entitled *Landon Rothstein, Et Al. V. GMAC Mortgage, LLC, Et Al.*, And (2) Declaring Such Claims Void *Ab Initio* | ¶ 2. … Simultaneously, the parties – including the Debtors, AFI, the Committee, and certain major creditor constituencies – have been, with the assistance of the Honorable James M. Peck, as mediator, engaging in a mediation process, … <br><br> ¶ 7. Regardless of whether the automatic stay under section 362(a) applies in its own right to enjoin the Rothstein actions, the damaging impact allowing the Rothstein litigation to proceed could have on the bankruptcy proceedings at this time warrants an exercise of the Court's power under Section 105 of the Bankruptcy Code to extend the automatic stay to apply to the claims against AFI and its nondebtor affiliates pending the ongoing mediation process and investigations. ... <br><br> ¶ 10. Second, permitting the litigation to proceed would disrupt crucial efforts underway in these chapter 11 cases, including the substantial plan negotiation and mediation efforts expended by all parties in interest and major creditor constituents, as well as the efforts of the Committee and the Examiner to investigate claims and causes of action against AFI. The mediation process has largely revolved around a resolution of the primary disputes with AFI, ... <br><br> ¶ 11. ... Not only are settlement negotiations critical to the successful resolution of the chapter 11 cases, given that plan mediation and negotiations are focused on AFI-related issues including third-party claims against AFI similar to those asserted by the Rothstein Plaintiffs, if a global settlement is reached it may obviate the need for a determination on the Rothstein claims against AFI altogether. This reason alone warrants an extension of the automatic stay to the claims asserted by the Rothstein Plaintiffs against AFI on an interim basis pending the ongoing plan mediation and investigations. <br><br> ¶ 13. Here, each of these factors is satisfied and the Rothstein action should be stayed.  First, as noted above, the Committee and other parties in interest are engaging in plan mediation in an effort to reach a consensual chapter 11 plan, but are prepared to proceed with litigation if a consensus cannot be reached. ... <br><br> ¶ 14.  ...Allowing the action to go forward while AFI and third party claims against AFI are still under investigation and subject to an ongoing mediation process would be inappropriate, especially if the mediator is successful – … |
| 279 | 3485 | 4/19/2013 | Debtors' Motion For The Entry Of An Order Further Extending Their Exclusive Periods To File A Chapter 11 Plan And Solicit Acceptances Thereof | ¶ 2. Mr. Kruger has spearheaded the plan process on the Debtors' behalf and devised a work plan pursuant to which the Debtors and their creditors negotiated in earnest, shared information, and participated in mediation.  ... As set forth in the Kruger Declaration, during the Third Exclusivity Extension, Mr. Kruger and the Debtors' advisors have been participating in concurrent settlement discussions, both in and out of mediation,  ... <br><br> Fn. 3.  On December 20, 2012, the Court appointed the Honorable Judge James M. Peck as mediator (the "Mediator") for an initial term through and including February 28, |

| Ex # | Docket # | Date Filed | Pleading Title | Statement |
|------|----------|------------|----------------|-----------|
|      |          |            |                | 2013. Mediation commenced shortly after the Mediator was appointed. On March 5, 2013, the Court entered an Order extending the Mediator's term through and including May 31, 2013 [Docket No 3101].<br><br>¶ 3.  ... The Debtors and all of their major creditor constituencies are now busy preparing for a global mediation summit that Judge Peck has scheduled d for next week in an attempt to bring the parties together to reach consensus on the important issues. The Debtors are cautiously optimistic that the global mediation summit will drive creditors to compromise,  recognizing that the alternative is, as this Court put it, close to "nuclear war." …<br><br>¶ 6.  ... After consultation with the Mediator and the mediation parties, the Debtors have delayed filing these pleadings. However, if the global mediation summit does not result in consensus, the Debtors intend to file promptly these pleadings to request that the Court adjudicate the Gating Intercreditor Issues. Furthermore, the Mediator has agreed to assist the Debtors and the Creditors' Committee (defined below) to work together towards the achievement of a consensual Chapter 11 plan without any AFI Settlement.<br><br>¶ 23.   … As set forth in the Kruger Declaration, the roadmap involved: (a) the provision of updated business and financial information, (b) formal and informal meetings with creditors, and (c) mediation. …  The Debtors and their key creditor constituencies have continued to make progress in the ongoing mediation.<br><br>¶ 24.  As described in the Kruger Declaration, the provision of information, mediation, and the dedication to engaging parties in discussions on major plan issues are just some of the ways in which Mr. Kruger and the Debtors' advisors have sought to facilitate a plan process that involved informed substantive negotiations. ...<br><br>¶ 25.  ... During the Third Exclusivity Extension, creditor constituencies who previously refused to come to the table participated in mediation and have begun to recognize that compromise ...  The Debtors hope and expect that such a plan will be negotiated in earnest at the global mediation summit next week.<br><br>¶ 34.  ... In consultation with the Mediator, and at the request of parties in interest, the Debtors have not yet filed these pleadings. However, if these issues are not resolved in mediation, the Debtors will promptly file them. ...<br><br>¶ 41.  ... The Debtors believe that continuing the momentum garnered during the Third Exclusivity Extension and through the mediation is likely the only avenue for these estates to exit Chapter 11 pursuant to a confirmed plan. |

| Ex # | Docket # | Date Filed | Pleading Title | Statement |
|------|----------|------------|----------------|-----------|
| 280 | 3486 | 4/19/2013 | Declaration Of Lewis Kruger In Support Of Debtors' Motion For The Entry Of An Order Further Extending Their Exclusive Periods To File A Chapter 11 Plan And Solicit Acceptances Thereof | ¶ 5.  My Work Plan includes the following objectives: (a) to provide updated business and financial information to creditors, (b) to engage each of the Debtors' key stakeholders in substantive negotiations regarding major plan issues, and (c) to make progress in mediation. ...  While challenging in and of itself, I endeavored to do so without slowing down mediation or the plan process.<br><br>¶ 6.  ... Finally, mediation has taken on a bilateral approach. The Mediator has met with each of the Debtors' major creditors, resulting in serious consideration of a term sheet regarding potential plan structures. Judge Peck has scheduled global mediation sessions for next week in an effort to reach consensus on important plan considerations. ...<br><br>¶ 13.  The JSBs previously criticized the mediation because principals of that group had not participated ...<br><br>Page 6:  C. Plan Progress had Been Made in Mediation<br>¶ 17.  The final objective of the Work Plan was to continue making progress in the ongoing mediation. There is no question that mediation under Judge Peck's guidance has been productive and that progress has been made in mediation. It is my understanding that over the course of the Third Exclusivity Extension, Judge Peck has conducted numerous mediation sessions with each of the Debtors' key stakeholders. Since the March 5, 2013 Hearing, these negotiations have also been bilateral, and the parties have addressed the Gating Intercreditor Issues, in addition to the AFI Settlement. Judge Peck has scheduled "all hands on deck" mediation sessions for next week.<br><br>¶ 18.  In consultation with the Mediator, and at the request of parties in interest, the Debtors have delayed filing certain pleadings prepared by the Debtors seeking to resolve certain of the Gating Intercreditor Issues. If the global mediation session does not result in consensus, the Debtors intend to file promptly these pleadings to request that the Court adjudicate the Gating Intercreditor Issues. Furthermore, Judge Peck has agreed to assist the Debtors and the Creditors' Committee to work together towards a consensual Chapter 11 plan even if mediation does not result in an AFI Settlement.<br><br>¶ 19.  I believe that the Debtors and their key stakeholders have made substantial progress in mediation, resulting in significant movement toward global resolution of key plan issues and serious consideration of a term sheet regarding potential plan treatments.Fn 5.  As defined in the RMBS Trustees' Statement in Support of Appointment of a Mediator [Docket No. 2465]. Fn 6.  As defined in the Limited Objection of the Steering Group of RMBS Holders to Debtors' Motions (i) To Further Extend Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof, and (ii) for Appointment of a Mediator [Docket No. 2400]. |

| Ex # | Docket # | Date Filed | Pleading Title | Statement |
|------|----------|-----------|----------------|-----------|
| 281 | 3553 | 4/29/2013 | Objection Of The Ad Hoc Group Of Junior Secured Noteholders To Debtors' Motion For The Entry Of An Order Extending Their Exclusive Periods To File A Chapter 11 Plan And Solicit Acceptances Thereof | The terms "Mediator" or "Mediation" are stated approximately 72 times throughout this document . |
| 282 | 3563 | 4/30/2013 | Omnibus Objection Of The Ad Hoc Group Of Junior Secured Noteholders To (I) The Motion Of The Official Committee Of Unsecured Creditors For Entry Of An Order Authorizing The Committee To Prosecute And Settle Certain Claims On Behalf Of The Debtors' Estates And (II) The Motion Of Wilmington Trust, National Association, Solely In Its Capacity As Indenture Trustee For The Senior Unsecured Notes Issued By Residential Capital, LLC For An Order Authorizing It To Prosecute Claims And Other Causes Of Action On Behalf Of The Residential Capital, LLC Estate | Page 8.  Investing the Committee or Wilmington with authority to resist and thereby frustrate a settlement of the Estate Claims or Holdco Claims could impede the plan negotiation process and any further mediation efforts. … |
| 283 | 3568 | 5/1/2013 | [Wilmington Trust] Response To Debtors' Motion For The Entry Of An Order Further Extending Their Exclusive Period To File A Chapter 11 Plan And Solicit Acceptances Thereof | ¶ 1.  The Trustee generally supports the relief sought in the Motion because the Debtors, Ally Financial, Inc. ("Ally Financial"), the Trustee, and other significant creditor constituencies remain actively involved in the ongoing mediation and plan negotiations in order to reach a consensual resolution to these chapter 11 cases…. Given that the Court has already extended Judge Peck's term as mediator to and including May 31, 2013, and mediation and plan discussions are ongoing, the Trustee supports a limited extension of the exclusivity period for thirty (30) days. …<br><br>¶ 2.  In the event that mediation reaches an impasse or is otherwise terminated, the Trustee will revisit whether to seek to terminate, or oppose an extension of, exclusivity at that time. ... |

| Ex # | Docket # | Date Filed | Pleading Title | Statement |
|------|----------|------------|----------------|-----------|
| 284 | 3569 | 5/1/2013 | Statement Of The Official Committee Of Unsecured Creditors With Respect To The Debtors' Motion For The Entry Of An Order Further Extending Their Exclusive Periods To File A Chapter 11 Plan And Solicit Acceptances Thereof | ¶ 2.  These cases have made significant progress since the Debtors' last request for an extension of exclusivity. Judge Peck's prodigious efforts as mediator have moved the parties much closer to a global resolution that could be embodied in a confirmable chapter 11 plan. ...  But even if a global settlement ultimately cannot be reached, the considerable progress made through the mediation provides guidance for formulating, if necessary, a non-consensual plan that preserves claims against AFI.  Whichever path this case takes, another brief extension of exclusivity at this time is appropriate.<br><br>¶ 3.  Over the past two months, the parties—including, among others, the Debtors, the Committee, AFI, and representatives of certain major creditor constituencies—have worked diligently to prepare for and ultimately participate in the global mediation summit that took place last week. ... These discussions continued throughout the mediation summit, and, based on the substantial progress achieved towards full consensus, are continuing to date.  Recognizing the important role the mediation played in enabling this progress, additional plan mediation sessions have been scheduled for later this week in an attempt to resolve remaining plan issues.<br><br>¶ 4.  Terminating the Debtors' Exclusive Periods and allowing third parties to file competing plans while the mediation continues and the bankruptcy appears to be at an important turning point would be unproductive and could imperil the successful resolution of these cases. Indeed, competing plans filed by self-interested third parties could prematurely result in the litigation "Armageddon" this Court feared, as these plans will consume significant attention from estate professionals and likely will not fully or satisfactorily address the Gating Intercreditor Issues in a manner that the Court could approve. ...<br><br>¶ 5. The Committee recognizes this Court's hesitation expressed at the last exclusivity hearing regarding further exclusivity extensions, but submits that the progress made over the past two months through the mediation is precisely the type of showing that warrants an additional, incremental extension to facilitate the process while keeping the parties on a short leash. Importantly, no delay to the chapter 11 cases will result from such an extension. This is because the continued mediation sessions will yield one of two possible outcomes: either the parties will achieve a global resolution of the major outstanding issues over the next week and will use the additional thirty-day window to document and obtain the necessary approvals to implement this resolution, or the mediation will fail to produce consensus and a short extension of exclusivity will provide the Debtors, the Committee, and other parties with time to finalize a chapter 11 plan that contemplates litigation of certain outstanding issues ... |
| 285 | 3593 | 5/6/2013 | Debtors' Omnibus Reply To Responses To Debtors' Motion For The Entry Of An Order Further Extending Their Exclusive Periods To File A Chapter 11 Plan And Solicit Acceptances Thereof | ¶ 2.  ... The progress made in mediation and resulting support for a further extension of exclusivity should convince the Court that cause exists to extend exclusivity as requested herein …<br><br>¶ 3. At the last exclusivity hearing, the Debtors committed to make substantial progress in resolving major plan issues that stand in the way of achieving a consensual plan. Mr. |

| Ex # | Docket # | Date Filed | Pleading Title | Statement |
|------|----------|------------|----------------|-----------|
|      |          |            |                | Kruger and the Creditors' Committee have worked tirelessly to bring all parties to the table and participate in mediation. Under Judge Peck's watch, the ongoing mediation has galvanized the Debtors' creditors. ... These discussions are continuing in the ongoing mediation.<br><br>¶ 4. Mediation and the earnest plan negotiations must be allowed to continue because these mechanisms are the best chance for achieving a consensual plan ...<br><br>¶ 6. Even if mediation is not successful in the near term, the Debtors have commenced litigation ...<br><br>¶ 7. … That request is supported by the Creditors' Committee. The Debtors are hopeful that the ongoing mediation will result in consensus. …<br><br>¶ 15. It is not surprising that the Ad Hoc Group is dismissive of the efforts and achievements made in the mediation. Because the Ad Hoc Group believes that even without an AFI Settlement the Junior Secured Noteholders are oversecured, it has no reason to meaningfully participate in the mediation. The Ad Hoc Group acts like it is the only major creditor constituency. That the mediation was helpful for other participants should be clear to the Court from the support articulated in the Committee Statement and the Wilmington Trust Response.<br><br>¶ 16. With respect to the Ad Hoc Group's proposed confidentiality agreement, as the Ad Hoc Group is well aware, the Mediator was involved directly in discussions concerning its contents. All parties to the mediation, including the Mediator, believed that a form of confidentiality agreement similar to what was requested by the Ad Hoc Group would significantly chill those discussions and make ultimate resolution less likely because it would have required disclosure of the substance of negotiations occurring at the mediation. For the Ad Hoc Group to now accuse the Debtors of preventing discussions is a gross misrepresentation of the facts.<br><br>¶ 17. In addition, because the Ad Hoc Group has not yet expressed any willingness to meaningfully compromise their faulty assertions that they are entitled to postpetition interest, it was unclear to everyone involved in the mediation process what benefit would be achieved by entering into such a confidentiality agreement with the Ad Hoc Group. As noted by the Ad Hoc Group in the Ad Hoc Objection, the Debtors advised the Ad Hoc Group that if it appears a compromise with their group is possible, the form of confidentiality agreement can be negotiated at that point in order to finalize negotiations with principal involvement.<br><br>¶ 20. The allegation made in the Nora Objection that the Debtors have not engaged in plan negotiations with former or current homeowners is incorrect. First, borrower interests (including a member of the Creditors' Committee) have been represented in the mediation and plan discussions. ... |

| Ex # | Docket # | Date Filed | Pleading Title | Statement |
|------|----------|------------|----------------|-----------|
| 286 | 3594 | 5/6/2013 | Supplemental Declaration Of Lewis Kruger In Support Of Debtors' Motion For The Entry Of An Order Further Extending Their Exclusive Periods To File A Chapter 11 Plan And Solicit Acceptances Thereof | ¶ 5.  The Ad Hoc Group presents the Court with a distorted view of the mediation. Following his appointment as Mediator, Judge Peck worked tirelessly to guide the Debtors and their major stakeholders towards achieving consensus on major plan issues. Judge Peck was very clear in setting the rules for mediation. The Ad Hoc Group apparently does not like the rules established by Judge Peck for participation in the mediation and now blames the Debtors. Specifically, the Ad Hoc Group accuses the Debtors of failing to negotiate a confidentiality agreement with the principals of the Ad Hoc Group. As the Ad Hoc Group is well aware, the Mediator was involved directly in discussions concerning the contents of the confidentiality agreement. All parties to the mediation, including the Mediator, believed that a form of confidentiality agreement similar to what was requested by the Ad Hoc Group, which would have required disclosure of the substance of negotiations occurring at the mediation, would significantly chill those discussions and make ultimate resolution less likely ...<br><br>¶ 6.  Contrary to the Ad Hoc Group's description of the mediation, substantial progress in fact has been made in plan discussions. Moreover, since the filing of the Exclusivity Motion,  the Debtors have made further progress. Mediation and plan discussions have not been limited to "the resurrection of the plan construct contained in the original plan term sheet," as the Ad Hoc Group would have the Court believe. I have been involved in substantive discussions with the Creditors' Committee and other major creditors regarding alternative plan structures with as many consensual elements as possible. In the event that mediation does not result in global resolution, the Debtors are prepared to file a Chapter 11 plan prior to the expiration of their Exclusive Periods or shortly thereafter. While not desirable, the Debtors have prepared for that eventuality.<br><br>¶ 8.  ... Representatives of this creditor constituency, including a member of the Creditors' Committee, are participating in the mediation and plan discussions. |

| Ex # | Docket # | Date Filed | Pleading Title | Statement |
|------|----------|------------|----------------|-----------|
| 287 | 3599 | 5/6/2013 | Omnibus Reply Of The Official Committee Of Unsecured Creditors To Objections To Its Motion For Entry Of An Order Authorizing The Committee To Prosecute And Settle Certain Claims On Behalf Of The Debtors' Estates | ¶ 3.   The only real objections to the Motion are procedural - mainly as to its timing - but none of the Objectors explains why, if current mediation process fails, the cases are not best served by prompt commencement of litigation aimed at maximizing AFI's ultimate contribution to the Estates. The Committee has committed to await the Examiner's report before filing a complaint against the AFI Defendants.  Granting the Motion will not prematurely unleash litigation - it is merely a ministerial step to facilitate preparations for the inevitable next phase of these cases if the mediation is unsuccessful, a matter that should not be unnecessarily delayed in light of mounting administrative expenses in these cases.<br><br>¶ 14. AFI's principal articulated objection to the Motion is that it is "premature" because the mediation is ongoing and the Examiner's report forthcoming.  AFI Obj. at 6. Obviously a global settlement would moot this Motion; but the Motion assumes, to the contrary, that the mediation has not succeeded and that the parties and Court wish to press forward promptly to resolve outstanding disputes, maximize the value of the Estates, and conserve administrative costs flowing from further delay. And the Committee has already stated that no complaint will be filed before the Examiner issues his report. |
| 288 | 3602 | 5/6/2013 | Limited Objection And Response Of The Independent Directors Of Residential Capital, LLC To The Motion Of Wilmington Trust, National Association, For An Order Authorizing It To Prosecute Claims And Other Causes Of Action On Behalf Of The Residential Capital, LLC Estate | ¶ 9.   … In addition to the fact that Wilmington can state no colorable claim against the Independent Directors, the Motion should also be denied because it would be premature to grant the relief Wilmington seeks prior to the issuance of the Examiner's report and the conclusion of the ongoing plan mediation.<br><br>¶ 11. … This Court appointed the Honorable James M. Peck to serve as mediator, and through his prodigious efforts, the parties have made considerable progress in settlement negotiations. (See Decl. of Lewis Kruger in Supp. of Debtors' Exclusivity Mot., filed on Apr. 19, 2013 [Docket No. 3486]<br><br>¶ 19 ("I believe that the Debtors and their key stakeholders have made substantial progress in mediation, resulting in significant movement toward global resolution of key plan issues and serious consideration of a term sheet regarding potential plan treatments . . . ."). The mediation is continuing. … |
| 289 | 3605 | 5/6/2013 | Debtors' Supplemental Statement In Response To The Objections Of (I) Wilmington Trust, National Association, As Indenture Trustee For The Senior Unsecured Notes And (II) The Ad Hoc Group Of Junior Secured Noteholders To The Motion Of The Official Committee Of Unsecured Creditors For Entry Of An Order Authorizing The Committee To Prosecute And Settle Certain Claims On Behalf Of The Debtors' Estates | ¶ 5.   Second, to the extent the SUN Trustee seeks standing to pursue intercompany claims, the request is premature. Evaluation of possible intercompany claims should not occur until the Examiner has issued his report and the ongoing mediation and plan negotiations are completed. … |

| Ex # | Docket # | Date Filed | Pleading Title | Statement |
|------|----------|------------|----------------|-----------|
| 290 | 3637 | 5/7/2013 | Objection Of The Steering Committee Group Of RMBS Holders To The Motion Of Wilmington Trust, National Association, Solely In Its Capacity As Indenture Trustee For The Senior Unsecured Notes Issued By Residential Capital, LLC, For An Order Authorizing It To Prosecute Claims And Other Causes Of Action On Behalf Of The Residential Capital, LLC Estate | Page 2:  I. THE WTC MOTION IS PREMATURE DUE TO ONGOING PLAN MEDIATION AND THE FORTHCOMING EXAMINER'S REPORT.<br><br>¶ 1.  In light of the ongoing mediation, and a full year until the expiration of the twoyear period under section 546(a)(1)(A) to bring such claims, the extraordinary relief requested in the WTC Motion need not be granted at this time.  Indeed, Wilmington Trust, on behalf of the  Senior Unsecured Noteholders, does not owe any fiduciary duties to other creditors of HoldCo.<br><br>¶ 2.  In contrast, the Examiner's report, which will include an analysis of the claims Wilmington Trust seeks to prosecute, is scheduled to be released in the near-term. There simply is no need to authorize a single creditor to prosecute estate claims prior to the release and assessment of the Examiner's report, particularly when the report will provide the various partiesin mediation with an assessment of the strength of their respective litigation positions. The WTC Motion should be denied for these reasons alone. |
| 291 | 3677 | 5/10/2013 | Notice Of The Examiner Concerning Filing Of Report | Page 1:  On May 8, 2013, Arthur J. Gonzalez, the Court-appointed Examiner in these cases, filed a Notice [Docket No. 3654] stating his intention to file his report at noon on May 10, 2013 or as soon thereafter as practicable. The Mediator, the Honorable James M. Peck, thereafter informed the Examiner that progress is being made in the mediation and it is hoped that additional time will result in a consensual resolution of the ResCap bankruptcy cases. Further, the Mediator and the parties to the mediation believe that a short postponement in the filing of the report would assist the mediation process.<br><br>Page 2:  Based upon the foregoing, the Mediator, with the consent of the parties to the mediation and authorization of the Court, requested that the Examiner postpone the filing of the Report from Friday, May 10, 2013 to Monday, May 13, 2013. ... |
| 292 | 3697 | 5/13/2013 | Order Granting The Debtors' Application Pursuant To Section 105(a) Of The Bankruptcy Code Seeking Entry Of An Order Temporarily Sealing The Examiner Report | ¶ 4.  The contents of the negotiations shall continue to be kept confidential by the mediation parties until the meditation is complete. |
| 293 | 3739 | 5/15/2013 | Supplemental Order Granting The Debtors' Application Pursuant To Section 105(a) Of The Bankruptcy Code Seeking Entry Of An Order Temporarily Sealing The Examiner Report | ¶ 4.  The contents of the negotiations shall continue to be kept confidential by the mediation parties until the meditation is complete. |

| Ex # | Docket # | Date Filed | Pleading Title | Statement |
|------|----------|------------|----------------|-----------|
| 294 | 3793 | 5/20/2013 | Debtors' Reply In Support Of Debtors' Motion In Limine To Strike The Objection And Exclude The Evidence Of The Official Committee Of Unsecured Creditors In Opposition To The RMBS Trust Settlement | Page 5:  ... Thereafter, as this Court is aware, and weeks before the Debtors filed the instant Motion, Judge Peck was appointed as a mediator in these cases.  Since his appointment Judge Peck has conducted a mediation in an attempt to resolve global case issues that would then allow for a consensual plan of reorganization. These issues include the issues that are the subject of the 9019 Motion, and the Debtors and the Objectors, together with other parties, actively participated in the mediation efforts. As the Court is further aware, as a result of the mediation all of the parties who participated in the mediation have agreed to a resolution of all major case issues, including those encompassed by the 9019 Motion. ...<br><br>Page 15:  .. The Debtors waited to move to strike the Committee's Objection to the 9019 Motion until the Court's deadline for in limine motions because the Debtors believed it would be improvident to litigate these issues during the mediation; ... |

| Ex # | Docket | Date Filed | Pleading Title |
|------|--------|------------|----------------|
| | | | |
| **D. Notices of Appearance** | | | |
| 204 | 0008 | 5/14/2012 | Notice of Appearance and Demand for Service of Papers by McKool Smith P.C. and Freddie Mac on Behalf of Freddie Mac |
| 295 | 0033 | 5/14/2012 | Notice of Appearance and Demand for Service of Papers by Kasowitz, Benson, Torres & Friedman LLP on Behalf of the Federal Housing Finance Agency, as Conservator of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation |
| 296 | 1851 | 10/17/2012 | Notice of Appearance and Request for Service of Papers by Marc Abrams on Behalf of Monarch Alternative Capital LP |
| 297 | 4108 | 6/27/2013 | Notice of Appearance by David B. Gelfarb on Behalf of the Federal Home Loan Mortgage Corporation ("Freddie Mac") |
| 298 | 4185 | 7/9/2013 | Notice of Appearance and Request for Service of Papers by The Law Office of Thomas M. Mullaney on Behalf of CQS ABS Master Fund Ltd., and CQS ABS Alpha Master Fund Ltd. ("CQS") |
| 299 | 4116 | 6/28/2013 | Verified Statement of Willkie Farr & Gallagher LLP Pursuant To Federal Rule of Bankruptcy Procedure 2019 (representing Monarch Alternative Capital LP,  Stonehill Capital Management LLC and Bayview Fund Management LLC, each in its capacity as investment advisor to certain funds, and to CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited) |

Sidman Declaration Exhibit # 10

| Ex # | Date | Headline |
|---|---|---|
| | | |
| **A.  News Stories Re Mediator Appointment and/or Mediation** | | |
| 239 | 12/7/2012 | ResCap Wants Mediator to Break Logjam in Creditor Negotiations, *Automated Trader* |
| 240 | 12/20/2012 | ResCap Judge Approves Mediator for Ally Settlement Talks , *Bloomberg* |
| 241 | 12/31/2012 | ResCap Chapter 11:  Enter the Mediator, *ValueWalk* |
| 242 | 1/11/2013 | ResCap Creditor Hope, *New York Post* |
| 243 | 2/19/2013 | ResCap Creditors Press Ally for Larger Pact, *Wall Street Journal* |
| 244 | 4/26/2013 | ResCap Reorg Could Leave John Paulson Out In The Cold,   *New York Post* |
| 245 | 5/7/2013 | ResCap Wins More Time to File Exclusive Reorganization Plan,   *American Banker* |
| 248 | 5/10/2013 | Brief—ResCap Examiner Delays Report to May 13, Amid Progress in Mediation,   *Reuters* |
| 247 | 5/10/2013 | Update 1—ResCap Creditors, Ally Nearing Deal on Billions in Claims,   *Reuters* |
| 248 | 5/10/2013 | ResCap Creditors, Ally Nearing Deal on Billions in Claims*,   Yahoo News—Reuters* |
| 249 | 5/13/2013 | ResCap Examiner Probe of Ally May Alter Creditor Talks,   *Bloomberg* |
| 250 | 12/7/12 | Residential Capital Asks for Court-Appointed Mediator To Help Achieve Consensual Chapter 11 Plan  *Debtwire* |
| 250 | 12/20/12 | ResCap Exclusivity Extended to April, Judge Peck Appointed as Mediator  *Debtwire* |
| 250 | 3/5/13 | Residential Capital Judge Extends Mediator's Term Through May  *Debtwire* |
| 250 | 4/22/13 | ResCap Seeks Fourth Exclusive Period Extension Ahead of Global Mediation Summit  *Debtwire* |
| 250 | 5/10/13 | ResCap Independent Examiner Delays Report as Ally Moves Closer To Deal On Claims   *Debtwire* |

Sidman Declaration Exhibit # 11

Home        Mail        News        Sports        Finance        Weather        Games        Groups        Answers

Search News

ResCap creditors, Ally nearing deal on billions in claims

Like          Dislike

REUTERS

Tom Hals May 10, 2013



By Tom Hals

(Reuters) - Creditors of bankrupt Residential Capital LLC are nearing a deal to settle bil
claims against the mortgage lender's parent, Ally Financial Inc , a development that pro
much-anticipated report on ResCap's failure.

A mediator overseeing talks between Ally and ResCap creditors asked that an independe
postpone his report on claims that Ally should be held responsible for up to $25 billion o
according to a court filing.

That report was expected to be published on Friday at noon. The examiner's attorney sa
Manhattan bankruptcy court on Friday that the report will now be published at 3 p.m. on
"The mediator and the parties to the mediation believe that a short postponement in the
would assist the mediation process," Howard Seife of Chadbourne & Parke, who repres
said in the court filing.

Creditors of ResCap are pursuing billions of dollars of cash that Ally had raised by sellin
business and planned to use to repay the remaining $11 billion of a U.S. government ba
ResCap creditors have said Ally, which is about three-quarters owned by the U.S. gove
the hook for up to $25 billion owed to them by ResCap.

The examiner, former Manhattan bankruptcy judge Arthur Gonzalez, was appointed to i
of improper activity before the ResCap bankruptcy, including claims that Ally Bank was
from ResCap.

Gonzalez also examined the pre-bankruptcy deals between Ally, ResCap, Ally investor
Management LP and others, as well as the negotiations that led to Ally's initial propose
million. ResCap creditors rejected that offer as too low.

Reaching a deal is critical for Ally, which is struggling to put behind it the mortgage lend
focus on its core U.S. auto lending business. It is also looking to repay the U.S. governm
bailed out the company, formerly known as General Motors Acceptance Corp.

Ally and Kenneth Eckstein, an attorney for the unsecured creditors of ResCap, did not in
on Friday to a request for comment.

THE $80 MILLION REPORT

Examiners are only appointed in a small number of bankruptcy cases and their reports
of a court finding.

However, the reports can upend a bankruptcy that is near resolution as happened in the
Tribune Co. The newspaper publisher was bottled up in bankruptcy for two years after a
indications of fraudulent behavior in a leveraged buyout that creditors blamed for the co
Gonzalez's investigation has burned through more than $80 million of ResCap's money
interviewed more than 90 witnesses and reviewed 9 million pages of documents. Some
bankruptcy told Reuters there was a growing sense his report might be so thorough tha
both helped and hurt by his findings, lending support to a mediated settlement.

ResCap was once one of the largest U.S. subprime mortgage lenders in the United Stat
bankruptcy in May 2012 as litigation over soured mortgage bonds mounted.

(Reporting by Tom Hals in Wilmington, Delaware; Editing by Steve Orlofsky)

**Share this**   http://news.yahoo.com/rescap-creditors-ally-nearing   

Sponsored Links

**CHAPTER 7 MEANS TEST**          **GET THE VA HOME LOAN**
www.Chapter7.com                  www.VAMortgageCenter.cor
Determine If Chapter 7 Is an Option for You,   Get a Quote in 2 Minutes! VA
Complete a Free Evaluation        to $417,000 with $0 Down.

Explore More
Sharpton to rally in 100 cities over Martin
death
Associated Press
Rallies, marches follow Zimmerman verdict
Associated Press
Will the feds go after George Zimmerman?
The Week
Obama calls for calm after Zimmerman
acquittal; protests held
Reuters
Factbox: Reaction to the verdict in the
George Zimmerman trial
Reuters
A glance at Zimmerman trial, verdict, what's
next
Associated Press



**0 Comments**

Sign in to post a comment



(c) Copyright Thomson Reuters 2013. Check for restrictions at: http://about.reuters.com/

Copyright © 2013 Yahoo! Inc. All rights reserved.  | Yahoo! - ABC News Network
Help / Suggestions    Privacy Policy    About Our Ads    Terms of Service    Copyright/I

12-12020-mg     Doc 4709-5     Filed 08/15/13     Entered 08/15/13 16:21:46     Exhibits
7-14     Pg 33 of 53

12-12020-mg    Doc 4709-5    Filed 08/15/13    Entered 08/15/13 16:21:46    Exhibits
7-14    Pg 34 of 53

12-12020-mg     Doc 4709-5     Filed 08/15/13     Entered 08/15/13 16:21:46     Exhibits
7-14     Pg 35 of 53

12-12020-mg    Doc 4709-5    Filed 08/15/13    Entered 08/15/13 16:21:46    Exhibits
7-14    Pg 36 of 53

Home

U.S.

World

Politics

Tech

Science

Health

Odd News

Opinion

Local

Dear Abby

Comics

ABC News

Y! News Originals

Recommended

Shooting of Trayvo…

Barack Obama

Google

New York

Stock market

Sidman Declaration Exhibit # 12

Page 1

1

2                UNITED STATES DISTRICT COURT

3                SOUTHERN DISTRICT OF NEW YORK

4

5

6    IN RE:                          )

     RESIDENTIAL CAPITAL, LLC,       )

7    Et al.,                         )

                                     )Civil Action No.

8               Debtors,            )12-12020 (MG)

9

10

11

12

13

14        CONFIDENTIAL DEPOSITION OF JOHN S. DUBEL

15              New York, New York

16           Wednesday, July 10, 2013

17

18

19

20

21

22

23

24    Reported by:

     JOMANNA DeROSA, CSR

25    JOB NO. 63468

Page 54

```
 1          J. DUBEL - CONFIDENTIAL
 2          MR. SIDMAN:  Object to the form.
 3          You can answer.
 4     A.   No, you're not correct.
 5     Q.   Okay.  Why am I not correct?
 6     A.   The plan had provisions for FGIC to
 7  do any types of commutations with any parties, any
 8  policyholders that it had.
 9     Q.   Was there ever any discussions with
10  the informal policyholder groups with respect to
11  FGIC having the right to commute policies that
12  were issued to the trust that had --
13          MR. SIDMAN:  Object to --
14     Q.    -- that were dealing with the RMBS
15  securities?
16          MR. SIDMAN:  Object to the form.
17          You can answer.
18     A.   I'm sorry.  Go back and restate
19  that.  I apologize.  Just repeat it, please.  I'm
20  sorry.
21     Q.   That's fine.
22          Was there ever any discussions with
23  the informal policyholder group concerning FGIC
24  having the right to commute policies that were
25  issued to the trust dealing with the RMBS
```

Page 55

```
 1          J. DUBEL - CONFIDENTIAL
 2  securities?
 3     A.   Yes.
 4     Q.   When were those discussions?
 5     A.   From the time of the initial
 6  discussions about the proposal plan throughout the
 7  process.
 8     Q.   And who did you have those
 9  discussions with?
10     A.   It would have been members of the
11  ad hoc policy.  I think it was referred to as the
12  ad hoc -- I can't remember what the name -- the
13  official term was.  You might know because I think
14  your organization was part of it.  I don't
15  remember the official title of the group, but it
16  would have been members of that group.
17     Q.   And what did you tell those members
18  of that group with respect to your right to
19  commute the policies that insured their
20  securities?
21          MR. SLACK:  Can -- can we -- can we
22     go off the record, and -- and I've go to --
23     I've got to ask the witness a question and
24     make sure that we're -- we're able to answer
25     this question.
```

Page 56

```
 1          J. DUBEL - CONFIDENTIAL
 2          MR. GOODMAN:  Well, I -- let's go
 3     off the record, but -- are we off the record?
 4          THE VIDEOGRAPHER:  No, not yet.
 5          MR. GOODMAN:  Okay.  Let's go off
 6     the record.
 7          THE VIDEOGRAPHER:  This is the end
 8  of Videotape No. 1 of the deposition of John
 9  Dubel.  The time is July 10th, 2013, 2:49
10  p.m..
11          (Recess taken.)
12          THE VIDEOGRAPHER:  We're now on the
13  record beginning approximately 2:59 p.m., July
14  10th, 2013.  This will be Videotape No. 2 in
15  the deposition of John Dubel.
16          MR. SIDMAN:  Counsel, before we, I
17  wanted to just make a brief statement on the
18  record.  Before our first break, there were a
19  series of questions about communications
20  between FGIC and ad hoc policy in connection
21  with the initial claim.  It was my
22  understanding that those discussions were
23  pursuant to certain confidentialities, and we
24  do not know if those confidentiality
25  agreements are still in place or still
```

Page 57

```
 1          J. DUBEL - CONFIDENTIAL
 2  applicable.  So on that basis, we want to
 3  designate the instruction of those questions
 4  and answers with respect to the issue as
 5  confidential in terms of a confidentiality
 6  agreement, and if we later on learn that
 7  they're confidential, we will deal with that
 8  issue, but right now for purposes of this
 9  deposition moving forward, we want to
10  designate that the questions and answers
11  previously as confidential and any other
12  questions and answers with respect to that
13  issue confidential.
14          MR. GOODMAN:  Okay.  For now, I
15  would agree to your proposal.  I would ask
16  that you look at the confidentiality agreement
17  in the next two or three days and let us know
18  if you still have a concern with respect to
19  the issue that you just raised.
20          MR. SIDMAN:  We'll do our best to
21  do that.
22          MR. GOODMAN:  Okay.
23     Q.   Before we went off the record, we
24  were talking about the discussions that you had
25  with the Steering Committee regarding the right to
```

15  (Pages 54 to 57)

Page 58

1        J. DUBEL - CONFIDENTIAL
2   commute their policies, and I had asked you about
3   the nature of those discussions, and you were
4   about to answer, I believe, when we went on a
5   break.
6        A.   Yes, it was -- it would have been
7   the right to commute any policies, not just
8   specifically their policies, but any policies
9   that -- in fact, they weren't their policies.  I
10  think you're referring to them as their policies.
11  They would be policies with a trustee in those
12  particular situations if you're referring to RMBS
13  securitizations, but we would have the right -- we
14  discussed that we would have the right to commute
15  any policies that FGIC has.
16       Q.   And did the Committee -- Steering
17  Committee agree with you that you had the right to
18  commute the policies insuring the trusts that had
19  issued their securities?
20       A.   They agreed that -- they were in
21  full agreement that we should have the right to
22  commute any policies that -- that we could work
23  out arrangements with.
24       Q.   Including the policies insuring
25  their underlying securities in the trust?

Page 59

1        J. DUBEL - CONFIDENTIAL
2        MR. SIDMAN:  Objection to the form.
3        You can answer.
4        A.   I don't believe that we talked
5   about specific policies.  We talked about any
6   policies that FGIC had issued, and they were fully
7   supportive of us commuting any policies that FGIC
8   had -- had issued.
9        Q.   Do you recall who you had those
10  conversations with?
11       A.   It would have been members of
12  the -- we'll call it the ad hoc group because I
13  don't remember what their official, if there was
14  an official title, but I'll call it the ad hoc
15  group, the Steering Committee, the ad hoc group.
16  So it could have been somebody from Fir Tree, AIG,
17  MetLife, Citibank, New York Life, and I believe
18  that your client would have been involved in some
19  of those discussions.  Your client, as I
20  understand, was not necessarily part -- officially
21  part of that group but participated in all of
22  those discussions and -- that we had.
23       Q.   And did -- do you recall whether
24  the committee asked you what you meant by
25  commuting their policies?

Page 60

1        J. DUBEL - CONFIDENTIAL
2        MR. SIDMAN:  Objection to the form.
3        A.   As I previously stated, we didn't
4   have discussions about, specific discussions about
5   commuting RMBS security policies.  So if you were
6   referring to that before, the -- the group also
7   did hold other than RMBS securitization policies.
8        Q.   No, I'm just talking about RMBS
9   securities.
10       Did you have a discussion with the
11  Steering Committee about commuting specifically
12  RMBS policies?
13       MR. SIDMAN:  Objection to form.
14       You can answer.
15       A.   I don't recall having discussions
16  about those specific -- you know, the specifics of
17  the -- the policies that we would have discussed
18  other than there was some discussions pertaining
19  to CDOs and others but not specifically about
20  RMBS-related policies.
21       Q.   Thank you.  And what happened with
22  this initial plan?
23       A.   What do you mean by what happened
24  with it?
25       Q.   Did the New York State Department

Page 61

1        J. DUBEL - CONFIDENTIAL
2   of Finance approve the plan when they received it?
3   What was the next step?
4        A.   The next step was at, I'll call it,
5   the DFS, Department of Financial Services.  The
6   DFS, or whoever it was at the time, retained
7   counsel to -- to look at it and worked with the
8   New York Liquidation Bureau to determine if it was
9   something that would be something they would be
10  willing to work towards.
11       Q.   And was it something they were
12  willing to work towards?
13       A.   Yes.
14       Q.   At the time of the initial plan,
15  what was your title at FGIC?
16       A.   I was the chief executive officer.
17  I don't remember if I was the vice chairman of the
18  board at the time or not.  I subsequently became
19  the vice chairman of the board.
20       Q.   And with respect to the initial
21  plan, I think you mentioned earlier it required
22  FGIC to go through a rehabilitation process.  Is
23  that correct?
24       A.   That was the proposal, yes.
25       Q.   And did FGIC, in fact, go through a

16 (Pages 58 to 61)

Page 150

```
 1          J. DUBEL - CONFIDENTIAL
 2          MR. SIDMAN:  Objection to the form.
 3          You can answer.
 4      A.    Again, I have no idea when the
 5  other trustees had their communications.  I do
 6  know that I met with the Bank of New York.  There
 7  are multiple trustees.  There was one individual
 8  counsel from Bank of New York who was, I'll call
 9  it, leading the charge.  I don't know whether he
10  had official capacity to do that, but he was
11  acting as a spokesman or -- or that's how I viewed
12  it.  And I was acting on -- you know,
13  communicating with all the rest of the trustees,
14  and that was the person from -- counsel for Bank
15  of New York.
16      Q.    And who was that?
17      A.    It was Glen Segal from my -- Seward
18  & Kissel.
19      Q.    And did you in March of 2000 --
20      A.    I'm sorry.  Dechert.  Yeah, I'm
21  sorry.  Sorry.
22      Q.    And did you have written
23  communications back and forth with him?
24      A.    At various times, yes.
25      Q.    And did you initiate the contact
```

Page 151

```
 1          J. DUBEL - CONFIDENTIAL
 2  with him, or did he initiate the contact with you
 3  on the subject of the Settlement Agreement or what
 4  eventually became the Settlement Agreement?
 5          MR. SIDMAN:  Objection to the form.
 6      A.    I did not initiate the contact.
 7      Q.    Did he initiate the contact with
 8  you?
 9      A.    I don't know whether he initiated
10  it or somebody else, i.e., the Kathy Patrick, you
11  know, Group, I'll call it, had initiated that.
12      Q.    When did the subject of commutation
13  come up in connection with the discussions that
14  you were involved in that eventually led to the
15  Settlement Agreement?
16          MR. SIDMAN:  You are asking him the
17      date.  Right?  You're not asking him for the
18      substantive communications?
19          MR. BAIO:  No sub- -- I'm just
20      going dates at this point.
21      Q.    When did it come up?
22      A.    It would have come up as part of
23  the mediation process.  Initial first time that
24  there was a reference to it would have been the
25  middle of January, 14th or 15th, something along
```

Page 152

```
 1          J. DUBEL - CONFIDENTIAL
 2  those lines.
 3      Q.    So the subject of the commutation
 4  that is embodied eventually in the settlement
 5  agreement came up in some discussions as early as
 6  January of 2013.  Is that your testimony?
 7          MR. SIDMAN:  Object to the form.
 8          You can answer, if you can.
 9      A.    This is not -- the Settlement
10  Agreement is not a commutation.  I just want to
11  make sure that I don't misstate what you're
12  referring to.
13      Q.    Okay.
14      A.    It's a -- it's a settlement
15  agreement as opposed to a -- what I view as a
16  commutation.
17      Q.    Does the -- in -- in your view,
18  does the Settlement Agreement embrace the notion
19  of a commutation?
20      A.    No.
21      Q.    Okay.  You -- you said however that
22  the -- the notion of a commutation did come up in
23  discussions as early as January of 2013.  Is that
24  correct?
25      A.    That is correct.
```

Page 153

```
 1          J. DUBEL - CONFIDENTIAL
 2      Q.    With whom did those discussions
 3  come up?
 4      A.    As I mentioned earlier, it would
 5  have been Kathy Patrick, folks from MBIA or their
 6  representatives.
 7      Q.    Anyone else?
 8      A.    In that early time frame, I don't
 9  recall anyone else.
10      Q.    Okay.  And where -- where were
11  these communications occurring?  Were they on the
12  phone?  Were they in writing?  And that is
13  particularly about commutation.
14      A.    They would have probably been on
15  the phone or in person.
16      Q.    In person -- where did the
17  in-person meetings take place?
18      A.    We had numerous in-person meetings
19  at the offices of Kramer Levin who was counsel for
20  the official unsecured creditors committee, all as
21  part of the mediation process.
22      Q.    Okay.  Is that where pretty much
23  all of the meetings that took place face to face
24  occurred during that process?
25          MR. SIDMAN:  Object to the form.
```

Sidman Declaration Exhibit # 13

Page 1

1          CONFIDENTIAL - ATTORNEYS' EYES ONLY

2            UNITED STATES BANKRUPTCY COURT

3             SOUTHERN DISTRICT OF NEW YORK

4                Case No. 12-12020(MG)

5    _____

6    In re:                              )

7    RESIDENTIAL CAPITAL, LLC,           )

8    et al                               )

9                Debtors.                )

10   _____  )

11

12

13

14           DEPOSITION OF GINA HEALY

15              Washington, D.C.

16               July 17, 2013

17

18

19

20

21

22

23

24   Reported by:  Mary Ann Payonk, NCRR

25   Job No. 63492

Page 74

CONFIDENTIAL - ATTORNEYS' EYES ONLY
1    CONFIDENTIAL - ATTORNEYS' EYES ONLY
2    Q.  Had Freddie Mac had any
3    communications with any representatives of
4    Monarch or Stonehill prior to that time?
5    A.  No.
6    Q.  Had Freddie Mac had any
7    communications with any noteholders other than
8    its own people prior to that time?
9        MR. GOODMAN:  Objection to form.
10    A.  Not that I'm aware of.
11    Q.  Well --
12    A.  That goes for both of the questions.
13    Not that I'm aware of.  Monarch and Stonehill
14    contacted McKool, and that's how the call was
15    set up.
16    Q.  You testified about some involvement
17    with a steering committee.  Remember questions
18    about that?
19        MR. GOODMAN:  Objection to form.
20    Q.  Just trying to --
21    A.  What's your question?  I'm sorry.
22    Q.  There was some steering committee; is
23    that right?
24        MR. GOODMAN:  Objection to form.
25    A.  With FGIC.

Page 75

1    CONFIDENTIAL - ATTORNEYS' EYES ONLY
2    Q.  Right.  The steering committee had to
3    do with the rehabilitation of FGIC; is that
4    right?
5    A.  Yes.
6    Q.  And who were the participants in the
7    steering committee?
8    A.  It was the large holders, so Freddie
9    Mac, MetLife, AIG, Fir Tree, F-I-R T-R-E-E.
10        MR. GOODMAN:  Did you finish your
11    answer?
12    A.  And they were the larger
13    participants.  There were a number of others,
14    but they were the larger ones that I can
15    recall.
16    Q.  Okay.  When was the steering
17    committee formed?
18    A.  At the end -- during -- in the end of
19    2011 or -- right?  During 2011.  The plan I
20    believe went into effect first -- was proposed,
21    right, first quarter 2012, or initial draft of
22    the rehabilitation plan.
23    Q.  What was the function of the steering
24    committee as you understood it?
25    A.  Primarily to protect the interests of

Page 76

1    CONFIDENTIAL - ATTORNEYS' EYES ONLY
2    the policyholders, ensure there was a fair and
3    equitable allocation of the proceeds provided
4    by FGIC when we knew that FGIC was not going to
5    be able to fully honor its obligations.
6        The key premise was to make sure
7    there was a flexible plan that allowed for
8    participation by policyholders.
9        MR. GOODMAN:  Now I'm going to
10    caution the witness here to the extent
11    we get into any substantive
12    conversations, facts, theories, with
13    respect to the steering committee, we
14    are asserting a joint interest
15    privilege, and we have consulted counsel
16    to the steering committee and he agrees
17    with that.
18    Q.  Did the steering committee have
19    counsel?
20    A.  Yes.
21    Q.  When was counsel for the steering
22    committee selected?
23    A.  When I was part of it, there was
24    always a counsel, so --
25    Q.  That was Bingham?

Page 77

1    CONFIDENTIAL - ATTORNEYS' EYES ONLY
2    A.  Yes.
3    Q.  And that started sometime in 2011, to
4    your knowledge, that Bingham was doing work for
5    the steering committee?
6    A.  Yes.
7    Q.  And did the steering committee have a
8    financial advisor?
9    A.  Yes.
10    Q.  And who was that?
11    A.  I believe it was Rothschild.
12    Q.  And that financial advisor was in
13    place as of 2011, to your knowledge; is that
14    right?
15    A.  Yes, I believe they were, yes.
16    Q.  And the steering committee to your
17    knowledge was involved in negotiations on a
18    potential plan of rehabilitation for FGIC; is
19    that right?
20        MR. GOODMAN:  You can answer
21    generally there, but in terms of
22    specifics, I would caution the witness
23    not to go any further.
24    A.  In large terms, yes.
25    Q.  And that started as early as 2011; is

20  (Pages 74 to 77)

Sidman Declaration Exhibit # 14

# Financial Guaranty Insurance Company

## Rehabilitation Proceeding Website



Home

**Court Documents**

Important Dates and Additional Information

Frequently Asked Questions

Contact Information

Disclaimer

## Court Documents

**Order to Show Cause**

**Verified Petition**

**Memorandum of Law in Support of Verified Petition**

**Rehabilitation Order**

**Omnibus Reply of Superintendent in Support of Verified Petition**

## Plan Documents

- **Scheduling Order, dated September 28, 2012**

- **Scheduling Order, dated February 19, 2013**

- **Affirmation in Support of Plan Approval**

- **Exhibit A: Proposed Plan Approval Order**
  - **Revised Proposed Plan Approval Order**
  - **Blackline of Revised Proposed Plan Approval Order**
  - **Revised Proposed Plan Approval Order, Filed December 12, 2012**
  - **Blackline of Revised Proposed Plan Approval Order, Filed December 12, 2012**
  - **Proposed Plan Approval Order Revisions**
  - **Revised Proposed Plan Approval Order, Filed June 4, 2013**
  - **Blackline of Revised Proposed Plan Approval Order, Filed June 4, 2013**

- **Exhibit B: Plan of Rehabilitation, dated September 27, 2012**
  - **First Amended Plan of Rehabilitation, Dated December 12, 2012**
  - **Blackline of First Amended Plan of Rehabilitation, Filed December 12, 2012**
  - **Proposed Plan Revisions**
  - **First Amended Plan of Rehabilitation, Dated April 12, 2013**
  - **Blackline of First Amended Plan of Rehabilitation, Filed April 12, 2013**
  - **Notice of Plan Filing**
  - **First Amended Plan of Rehabilitation, Filed June 4, 2013**
  - **Blackline of First Amended Plan of Rehabilitation, Filed June 4, 2013**

- **Exhibit C: Plan Supplement**

- **Novation Agreement**

- **Form of Amended and Restated Charter**

- **Form of Amended and Restated By-Laws**

- **Schedule of Terminated Contracts and Leases**
  - **Revised Schedule of Terminated Contracts and Leases, Filed December 12, 2012**

- **Proof of Policy Claim Form**
  - **Revised Proof of Policy Claim Form, Filed December 12, 2012**
  - **Blackline of Proof of Policy Claim Form, Filed December 12, 2012**
  - **Revised Proof of Policy Claim Form, Filed January 25, 2013**
  - **Blackline of Proof of Policy Claim Form, Filed January 25, 2013**
  - **Proposed Revisions to Proof of Policy Claim Form**
  - **Revised Proof of Policy Claim Form, Filed April 12, 2013**
  - **Blackline of Proof of Policy Claim Form, Filed April 12, 2013**

- **Instructions for Completing Proof of Policy Claim Form**
  - **Revised Instructions for Completing Proof of Policy Claim Form, Filed January 25, 2013**
  - **Blackline of Revised Instructions, Filed January 25, 2013**

- **CDS Commutation Agreement 1**

- **CDS Commutation Agreement 2**

- **CDS Commutation Agreement 3**

- **CDS Commutation Agreement 4**

- **CDS Commutation Agreement 5**

- **CDS Commutation Agreement 6**

- **Interim Order Extending Deadline to File Updates to Plan Supplement**

- **Exhibit D: Disclosure Statement**

- **Exhibit E: Form of Notice of Plan Approval Hearing**

- **Exhibit 1: Preliminary Analysis of FGIC Payments Not Paid to FGIC**

- **Ad Hoc Instrument Holders' Affirmation in Support of Plan**

- **Memorandum of Law in Support of Plan**

- **Letter to BNY Regarding Plan Sections 3.7 and 7.8**

- **Letter to Wells Fargo Regarding Plan Sections 3.7 and 7.5**

- **Statement of Non-Objection by the Federal Home Loan Mortgage Corporation to the Revised Plan of Rehabilitation**

- **Letter to Rehabilitation Court, Dated April 12, 2013**

- **Letter to Rehabilitation Court, Dated April 16, 2013**

- **Letter to Rehabilitation Court, Dated June 4, 2013**

- **Letter to the Rehabilitation Court, Dated June 5, 2013**

# Plan Objections

- **Objection of the Trustees Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas to the Proposed Plan of Rehabilitation for Financial Guaranty Insurance Company**

  - **Amended Objection of Trustees Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas to the First Amended Proposed Plan of Rehabilitation for Financial Guaranty Insurance Company**

  - **Notice of Withdrawal of Trustees Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas' Objections to the Plan of Rehabilitation for Financial Guaranty Insurance Company**

- **Objection to the Proposed Plan of Rehabilitation of Wells Fargo, N.A., in its Capacity as Trustee for Certain RMBS Certificateholders and on Behalf of the Certificateholders and Noteholders for Such Trusts and Transactions**

  - **Amended Objection to the First Amended Proposed Plan of Rehabilitation of Wells Fargo Bank, N.A., in its Capacity as Trustee for Certain RMBS Certificateholders and on Behalf of the Certificateholders and Noteholders for Such Trusts and Transactions**

  - **Notice of Withdrawal of Amended Objections to the First Amended Proposed Plan of Rehabilitation of Wells Fargo Bank, N.A., in its Capacity as Trustee for Certain RMBS Certificateholders and on Behalf of the Certificateholders and Noteholders for such Trusts and Transactions**

- **Objection of U.S. Bank National Association and U.S. Bank Trust National Association, Each in Its Capacity as Trustee, to the Plan of Rehabilitation dated September 27, 2012**

  - **Amended Objection of U.S. Bank National Association and U.S. Bank Trust National Association, Each in its Capacity as Trustee, to Plan of Rehabilitation of Financial Guaranty Insurance Company**

  - **Notice of Withdrawal of Objections of U.S. Bank National Association and U.S. Bank Trust National Association, Each in its Capacity as Trustee, to Plan of Rehabilitation of Financial Guaranty Insurance Company**

- **Objections of The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., as Trustee to the Proposed Plan of Rehabilitation**

  - **Amended Objections and Memorandum of Law in Support of Amended Objections of The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., as Trustee to the Proposed Plan of Rehabilitation**

  - **Notice of Withdrawal of Objections of The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., as Trustee to the Proposed Plan of Rehabilitation**

- **Objection and Joinder of Aurelius Capital Management, LP to (I) the Objection of U.S. Bank National Association and U.S. Bank Trust National Association, Each in its Capacity as Trustee, to the Plan of Rehabilitation dated September 27, 2012, and (II) the Objections of the Bank of New York Mellon and the Bank of New York Mellon Trust Company, N.A., as**

Trustee to the Proposed Plan of Rehabilitation

- Amended Objection of Aurelius Capital Management, LP to the Proposed Plan of Rehabilitation and Joinder to the Amended Objections of the Bank of New York Mellon and the Bank of New York Mellon Trust Company, N.A., as Trustee to the Proposed Plan of Rehabilitation

  - Notice of Withdrawal of Objections of Aurelius Capital Management, LP to Plan of Rehabilitation for Financial Guaranty Insurance Company Subject to Entry of Revised Plan Approval Order

- Objection to Plan and Disclosure Statement of Rehabilitation for Financial Guaranty Insurance Company of Manufacturers and Traders Trust Company

- Objection of Assured Guaranty Corp., Assured Guaranty Re Ltd., and Assured Guaranty Re Overseas Ltd. to Plan of Rehabilitation Proposed by Benjamin M. Lawsky, Superintendent of Financial Services of the State of New York, as Rehabilitator of Financial Guaranty Insurance Company

  - Notice of Withdrawal of Objection of Assured Guaranty Corp., Assured Guaranty Re Ltd. and Assured Guaranty Re Overseas Ltd

  - Notice of Amendment of Stipulation

- Objection of CQS ABS Master Fund Ltd., CQS Select ABS Master Fund Ltd. and CQS ABS Alpha Master Fund Ltd. to Plan of Rehabilitation for Financial Guaranty Insurance Company

  - The Amended Objections of CQS ABS Master Fund Ltd., CQS Select ABS Master Fund Ltd., and CQS ABS Alpha Master Fund Ltd. to Plan of Rehabilitation for Financial Guaranty Insurance Company

  - Notice of Withdrawal of Objections of CQS ABS Master Fund, Ltd., CQS Select ABS Master Fund Ltd. and CQS ABS Alpha Master Fund Ltd. to Plan of Rehabilitation for Financial Guaranty Insurance Company Subject to Entry of Revised Plan Approval Order

- Conditional Objection of Jefferson County, Alabama to the Plan of Rehabilitation for Financial Guaranty Insurance Company

  - Notice of Withdrawal of Conditional Objection of Jefferson County, Alabama

- Objection of Certain Jefferson County Warrantholders to Plan of Rehabilitation

  - Amended Objections of Certain Jefferson County Warrantholders to Plan of Rehabilitation

  - Letter Withdrawing Objections of Certain Jefferson County Warrantholders to Plan of Rehabilitation

- Limited Objection of Childrens Health Partnership Holdings Pty Ltd as Trustee of the CHP Holdings Unit Trust to Plan of Rehabilitation for Financial Guaranty Insurance Company

  - Amended Limited Objection of Childrens Health Partnership Holdings Pty Ltd as Trustee of the CHP Holdings Unit Trust to Plan of Rehabilitation for Financial Guaranty Insurance Company

  - Notice of Withdrawal of Objections of Childrens Health Partnership Holdings Pty Ltd to Plan of Rehabilitation for Financial Guaranty Insurance Company

## Rehabilitator's Reply in Further Support of Plan

- Omnibus Reply Memorandum of Law in Further Support of Approval of First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, dated December 12, 2012

- Affidavit of Michael W. Miller, dated December 12, 2012

- Affidavit of John S. Dubel, dated December 12, 2012

- **Exhibit 1A**

- **Letter to the Court, dated January 25, 2013**

- **Amended Omnibus Reply Memorandum of Law in Further Support of Approval of First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company**

- **Letter to the Court, dated February 11, 2013**

- **Exhibit 1C - Amended Omnibus Response Chart, submitted February 11, 2013.**

## Submissions Regarding Standard for Plan Approval

- **Letter Submitted on Behalf of the Rehabilitator, dated January 22, 2013**

- **Trustee Objectors' Submission on Standard for Approval of Plan, dated January 22, 2013**

- **Memorandum of Jefferson County Warrantholders Concerning the Standard of Review Applicable to FGIC's Plan of Rehabilitation**

- **Letter Submitted on Behalf of CQS, dated January 22, 2013**

- **Letter Submitted on Behalf of CHP, dated January 22, 2013**

- **Joinder of Aurelius Capital Management, LP to the Trustees' Letter Brief Addressing the Legal Standard to be Applied by the Court in Determining Whether it Should Approve the Plan of Rehabilitation Filed by the Rehabilitator**

## Plan-Related Court Orders

- **Court Order Regarding Additional Pleadings, dated December 19, 2012**

- **Order Approving CDS Commutation Agreements**

- **Court Order dated January 18, 2013**

- **Court Order dated January 24, 2013**

  - **Court Order Amending Order dated January 24, 2013**

- **Court Order dated January 28, 2013**

- **Court Order dated February 14, 2013**

- **Court Order dated April 23, 2013**

- **Plan Approval Order dated June 11, 2013**

- **Notice of Plan Approval**

## Orders Approving Reinsurance Commutation Agreements

- **Settlement, Commutation and Release Agreement with Radian Asset Assurance Inc.**

- **Settlement, Commutation and Release Agreement with American Overseas Reinsurance Company Limited**

- **Settlement, Commutation and Release Agreement with Syncora Guarantee Inc.**

- **Settlement, Commutation and Release Agreement with Munich Reinsurance America, Inc.**

- **Settlement, Commutation and Release Agreement with Colisee RE, a French company, formerly known as AXA Re Finance Madeira Branch**

## Submissions and Orders Concerning Other Agreements

- **Affirmation in Support of Rehabilitator's Motion for Approval of (i) that certain Settlement Agreement among Residential Capital, LLC, FGIC, the Trustees and the Institutional Investors, dated May 23, 2013 and (ii) that certain Plan Support Agreement among Residential Capital, LLC, Ally Financial Inc., the Creditors' Committee, FGIC and the other Consenting Claims, dated May 13, 2013, to the extent the Plan Support Agreement relates to FGIC**

  - **Signed Order to Show Cause, dated May 30, 2013, Setting the Hearing Date, and Certain Deadlines, for Approval of the Settlement Agreement and the Plan Support Agreement**

  - **Revised Proposed Order Approving the Settlement Agreement and the Plan Support Agreement as it relates to FGIC**

  - **Interim Order, dated June 11, 2013, regarding ResCap Trustees' Compliance with Order to Show Cause Notice Provision**

  - **Objection of Monarch Alternative Capital LP, Stonehill Capital Management LLC, CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited to Rehabilitator's Motion for Order Pursuant to Section 7428 of New York Insurance Law Approving (I) that Certain Settlement Agreement Among the Debtors, FGIC, the Trustees and Certain Institutional Investors, dated May 23, 2013, and (II) that Certain Plan Support Agreement Among the Debtors, Ally Financial Inc., the Creditors' Committee, FGIC and the Other Consenting Claimants, dated May 13, 2013**

    - **Cover Letter**

    - **Affirmation of Paul V. Shalhoub in Support of Objection of Monarch Alternative Capital LP, Stonehill Capital Management LLC, CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited to Rehabilitator's Motion for Order Pursuant to Section 7428 of New York Insurance Law Approving (I) that Certain Settlement Agreement Among the Debtors, FGIC, the Trustees and Certain Institutional Investors, dated May 23, 2013, and (II) that Certain Plan Support Agreement Among the Debtors, Ally Financial Inc., the Creditors' Committee, FGIC and the Other Consenting Claimants, dated May 13, 2013**

    - **Exhibits (A–M)**

  - **Objection of Federal Home Loan Mortgage Corporation to the Commutation of Certain FGIC Policies and Certain Findings of Fact Sought by Rehabilitator of Financial Guaranty Insurance Company Set Forth in Affirmation, dated May 29, 2013**

    - **Affirmation of David Gelfarb in Support of Objection of Federal Home Loan Mortgage Corporation to the Commutation of Certain FGIC Policies and Certain Findings of Fact Sought by Rehabilitator of Financial Guaranty Insurance Company Set Forth in Affirmation, dated May 29, 2013**

    - **Affidavit of Gina Healy in Support of Objection of Federal Home Loan Mortgage Corporation to the Commutation of Certain FGIC Policies and Certain Findings of Fact Sought by Rehabilitator of Financial Guaranty Insurance Company Set Forth in Affirmation, dated May 29, 2013**

  - **Limited Objection of FYI Ltd., FFI Fund Ltd. and Olifant Fund, Ltd. to The Rehabilitator's Motion to (A) Approve Settlement Agreement and (B) Approve Plan Support Agreement and Request for Related Relief**

    - **Affidavit of Seth Robbins in Support of FYI Ltd., FFI Fund Ltd. and Olifant Fund, Ltd.'s Limited Objection to the Rehabilitator's Motion to (A) Approve Settlement Agreement and (B) Approve Plan Support Agreement and for Related Relief**

    - **Exhibits (A–E)**

- ○ **Omnibus Reply Memorandum of Law in Further Support of Approval of the Settlement Agreement**

- ○ **Affidavit of John S. Dubel**

  - ▪ **Exhibit A**

  - ▪ **Exhibit B**

  - ▪ **Exhibit C**

- ○ **Affirmation of Richard W. Slack in Support of the Rehabilitator's Omnibus Reply**

  - ▪ **Exhibit A**

  - ▪ **Exhibit B**

  - ▪ **Exhibit C**

  - ▪ **Exhibit D**

  - ▪ **Exhibit E**

  - ▪ **Order Denying Motions to Intervene and Conduct Discovery**

- • **Affirmation in Support of Rehabilitators Motion for an Order (i) approving that certain Stipulation Regarding Treatment under Plan of Rehabilitation for Financial Guaranty Insurance Company among the Rehabilitator of Financial Guaranty Insurance Company, Financial Guaranty Insurance Company, The Bank of New York Mellon, as successor trustee, The Bank of New York Mellon, as fiscal agent, and certain Jefferson County Warrantholders, dated May 31, 2013, and (ii) amending, to the extent necessary to give effect to the Stipulation, FGIC's obligations under the JeffCo Warrant Policies**

  - ○ **Stipulation Regarding Treatment under Plan of Rehabilitation for Financial Guaranty Insurance Company among the Rehabilitator of Financial Guaranty Insurance Company, Financial Guaranty Insurance Company, The Bank of New York Mellon, as successor trustee, The Bank of New York Mellon, as fiscal agent, and certain Jefferson County Warrantholders, dated May 31, 2013**

  - ○ **Signed Order to Show Cause, dated June 11, 2013, Setting the Hearing Date, and Certain Deadlines, for Approval of the Stipulation and Setting Forth the Treatment of JeffCo Control Rights**

  - ○ **Order Approving Stipulation Regarding Treatment under Plan of Rehabilitation among FGIC, The Bank of New York Mellon and certain Jefferson County Warrantholders**

- • **Termination Agreement by and Among FGIC, The Bank of New York Mellon in various capacities, the Company and Other Parties**

- • **Order Approving FGIC's Execution and Performance of Certain Agreements Related to the Chapter 9 Case of Jefferson County, Alabama**

- • **Termination Agreement with The Bank of New York Mellon, AAArdvark II Funding Limited and other parties**

- • **Termination Agreement with Ancora (RCH) Pty Ltd, Childrens Health Partnership Holdings Pty Ltd as trustee of the CHP Holdings Unit Trust, Childrens Health Partnership Pty Ltd as trustee of the CHP Unit Trust and other parties**

PRIVACY NOTICE    |    © 2013    **GCG**    |    ALL RIGHTS RESERVED