1           L. Kruger
2      Q.    What did you say to them in that
3  regard?
4            MR. KERR: Objection. Again, to the
5  extent you had discussions with the board
6  with counsel present, I will object to
7  privilege; but to the extent that you had
8  discussions without counsel present, you
9  can testify to that.
10     A.    They were all with counsel present.
11     Q.    You formed your own view about the
12 benefits of entering into this agreement for
13 the debtors; right?
14     A.    Yes, I did.
15     Q.    And in forming that view, you were
16 doing so in your capacity as chief
17 restructuring officer of the debtor's; correct?
18     A.    Correct.
19     Q.    And we've already established, I
20 think, that in that capacity you were not
21 serving the debtors in any kind of legal role;
22 right?
23     A.    Correct.
24     Q.    Okay.
25           So what did you tell the board of

1                          L. Kruger
2       directors about your view why entering into the
3       agreement was in the debtor's best interests?
4              MR. KERR:  And, again, if you had
5       conversations with the board with counsel
6       present, I'm going to assert a privilege.
7       To the extent you had conversations with
8       the board without counsel present, you can
9       answer the question.
10       A.    The only conversation I had with the
11      board were with counsel present.
12       Q.    In forming -- you had thoughts
13      internally about whether it was in the best
14      interests of the debtor's to enter into this
15      agreement; right?
16       A.    Yes.
17       Q.    What were your thoughts on that
18      subject?
19       A.    I thought that this agreement as part
20      of the overall global settlement agreement, was
21      sensible from the debtor's perspective, which
22      is my perspective, in that it eliminated from
23      the debtor's estates significant claims by the
24      trusts and by FGIC.
25              At the same time it was part of the

1                    L. Kruger

2       mosaic of the global settlement agreement,
3       which generated in my mind a significant
4       benefit to all of the debtor's estates and to
5       their creditors, as well, with the injection of
6       the Ally contribution, the elimination of
7       significant litigation, the shortening of the
8       time process of the Chapter 11 proceedings.
9               And for all those reasons, I thought
10      this was a sensible things for the debtors to
11      do.
12          Q.    And did you convey that view to the
13      board of directors?
14          A.    I don't recall.
15          Q.    Do you have any knowledge of the
16      basis on which the board of directors
17      authorized you to enter into the FGIC
18      Settlement Agreement on the debtor's behalf?
19          A.    As I said, in my engagement letter I
20      believe I have the authority to act on behalf
21      of the debtors with respect to Chapter 11
22      issues, disclosure statements and the like.  I
23      can refer to it, if you like.
24              And I think the board was merely
25      confirming my authority to do so.

1                    L. Kruger

2         Q.    Do you believe that you had authority
3    to enter into the FGIC Settlement Agreement
4    without the approval of the board of directors?
5         A.    I believe so.
6         Q.    Why then did the board of directors
7    pass a resolution authorizing you to sign the
8    agreement?
9               MR. KERR:  Objection.
10   BY MS. EATON:
11        Q.    Do you know?
12              MR. KERR:  Misstates --
13   mischaracterizes testimony.
14        A.    I reported to the board the results
15   of mediation as it progressed, and they
16   suggested that I continue on and authorized me
17   to continue on with the FGIC settlement.
18        Q.    At the time you got the authorization
19   from the board to execute the settlement, had
20   you seen a physical copy of a draft settlement
21   agreement?
22        A.    I don't recall.
23        Q.    Did you have an understanding at that
24   time as to what the material terms of the
25   agreement were to be?

1                    L. Kruger

2        Q.    Okay.

3              So, what you -- in other words, what

4     you had authorization to sign, whenever you got

5     that authorization, was essentially the same

6     deal that you actually signed?

7              MR. KERR:   Objection to form.

8        A.    Yes.

9        Q.    Is it correct that the only two

10    documents that you saw reflecting the agreement

11    or potential agreement were the physical

12    document that you signed, the agreement itself

13    that we've marked as Kruger Exhibit 1, and the

14    term sheet that you referenced earlier in your

15    testimony?

16             MR. KERR:   Objection.

17       A.    You're talking just about documents;

18    correct?

19       Q.    Yes.

20       A.    That's correct.

21       Q.    So the only two documents that you

22    saw that reflected the agreement, the potential

23    agreement, were those two documents, namely,

24    Kruger Exhibit 1 and the term sheet that you

25    referenced previously?

1                    L. Kruger
2            MR. KERR:  Objection.
3        A.    I'm trying to answer the question,
4   but in terms of documents, that's correct.
5        Q.    How about in terms other than
6   documents?
7        A.    Well, there were always conversations
8   during mediation about various aspects of the
9   mediation.
10       Q.    Including with respect to this
11  particular agreement or potential agreement?
12       A.    Yes.
13       Q.    But those discussions did not take
14  place before early April, if I understood your
15  testimony?
16           MR. WYNNE:  Objection.
17  Mischaracterizes testimony.
18       A.    That's not what I said.  I think I
19  said there were discussions in March, as I
20  recall.
21       Q.    You're right.  I apologize.
22             How many times during the mediation
23  process was the prospect of a FGIC settlement
24  discussed?
25       A.    I don't recall that.

1                        L. Kruger
2        Q.    Do you remember who discussed that
3    issue?  Just names, not what they said.
4        A.    Who discussed that issue with me?
5        Q.    At the mediation.  During the
6    mediation sessions -- let's back up.
7              During the mediation sessions, the
8    subject of an agreement or prospective
9    agreement with FGIC was discussed; correct?
10       A.    Yes.
11       Q.    And it was discussed more than one
12   time?
13       A.    Yes.
14       Q.    You can't remember how many times?
15       A.    Correct.
16       Q.    Do you remember who discussed that
17   issue during those sessions?
18             MR. KERR:  Objection.
19             Go ahead.
20       A.    Judge Peck.
21       Q.    Anyone else?
22       A.    Counsel for the trustees.
23       Q.    Anyone else?
24       A.    Not that I recall.
25       Q.    When you referred to "counsel for the

1                    L. Kruger

2    trustees," who were you referring to?
3        A.    Glenn Siegel at Dechert.
4        Q.    Anyone else?
5        A.    I don't recall anybody else.
6        Q.    How about Michael Johnson, did he
7    discuss that issue at all during the sessions?
8        A.    Not with me.
9        Q.    How about Mark Kotlick (phonetic)?
10       A.    Not with me.
11       Q.    Do you know whether any of those
12   individuals discussed the FGIC settlement or
13   potential FGIC settlement outside of these
14   mediation sessions?
15       A.    I have no idea.
16       Q.    Did you ever have any discussions
17   with -- strike that.
18             Did you participate in mediation
19   sessions outside of the presence of Judge Peck?
20       A.    Yes.
21       Q.    And during any of those sessions was
22   the subject of the FGIC Settlement Agreement
23   discussed?
24       A.    Yes.
25       Q.    Who was present at those discussions?

1          L. Kruger
2              MR. EGGERMANN: I'm going to
3     interpose an objection, in my view of the
4     dynamics that occurred during the mediation
5     were probably within the ambit of the
6     court's order. And a lot of the questions
7     that are being asked seems to be designed
8     to elicit the dynamics which, to me, are
9     not far off from the substance of the
10    mediation.
11    BY MS. EATON:
12         Q.    Would you answer the question,
13    please, Mr. --
14         A.    Do you want to repeat it again for
15    me.
16              MS. EATON: Could you read the
17    question back, please.
18              (The Record was Read.)
19    BY MS. EATON:
20         Q.    Who was present at those discussions?
21         A.    My counsel. In each session, I don't
22    recall. My counsel certainly in each session.
23         Q.    Was counsel for any of the trustees
24    present during those discussions?
25              MR. KERR: Objection.

1          L. Kruger

2     A.    I believe that counsel for the
3 trustees may have been present during some of
4 those sessions.
5     Q.    Was that Mr. Siegel that you're
6 referring to?
7     A.    Yes.
8     Q.    By the way, was Mr. Siegel
9 representing all of the trustees during those
10 discussions, do you know?
11     A.    I have no idea.
12     Q.    Well, did you have a sense of what
13 his role was?
14          MR. KERR: Objection.
15     A.    No.
16     Q.    You had no idea one way or the other
17 whether he was speaking only on behalf of the
18 Bank of New York or anybody else?
19          MR. KERR: Objection.
20     A.    I don't know.
21     Q.    You didn't inquire?
22     A.    No.
23     Q.    It didn't matter to you?
24     A.    No.
25          MR. KERR: Objection. Come on.

1            L. Kruger

2    BY MS. EATON:

3        Q.    Did you have any discussions about
4    the -- prior to May 23, 2013, did you have any
5    discussions with anyone, apart from your
6    outside counsel, about the commutation aspect
7    of the FGIC Settlement Agreement?
8        A.    Yes.
9        Q.    Who did you have those discussions
10   with?
11       A.    Judge Peck.
12       Q.    So you discussed the commutation
13   aspect of the agreement with Judge Peck?
14       A.    Yes.
15       Q.    Did you discuss the commutation
16   aspect of the agreement with anyone else,
17   again, leaving the debtor's counsel aside?
18       A.    Unsecured Creditors' Committee
19   counsel.
20       Q.    Who was that?
21       A.    Kramer Levin.
22       Q.    Anyone else?
23       A.    I think not.
24       Q.    How about Cathy Patrick?  Did you
25   ever discuss that issue with her?

1          L. Kruger

2      A.    I don't recall.
3      Q.    So maybe you did, maybe you didn't;
4  you just don't remember?
5          MR. KERR:  Objection.
6  BY MS. EATON:
7      Q.    I'm trying to clarify whether you
8  don't remember that having happened or you
9  don't remember one way or the other?
10     A.    I don't remember one way or the
11 other.
12     Q.    Was this more than one discussion,
13 was it one discussion, do you recall?
14     A.    Is your question how often I spoke to
15 Cathy Patrick?
16     Q.    No.  We were discussing whether you
17 had had any discussions about the commutation
18 aspect of the settlement agreement.  And I
19 asked you with whom did you have those
20 discussions, and you named a variety of people.
21          Was there more than one such
22 discussion?
23     A.    Yes.
24     Q.    And were the same people present at
25 each of those discussions?

1                    L. Kruger
2        A.    Certainly Unsecured Creditors'
3   Committee counsel, my own counsel.
4        Q.    Okay.
5              But not Judge Peck?
6        A.    I think you asked whether or not
7   these were conversations outside of the
8   presence of Judge Peck.
9        Q.    Actually, that's not my --
10       A.    I'm confused.
11       Q.    Okay.  That's fine.
12       A.    But if your question was Judge Peck
13  present at those.
14       Q.    Yes.
15       A.    Sometimes yes, sometimes no.
16       Q.    Sometimes yes, sometimes no.  Okay.
17             During those conversations when Judge
18  Peck was not present, what did you discuss with
19  the others about the commutation aspect of the
20  FGIC Settlement Agreement?
21             MR. KERR:  I'm going to object, and I
22  guess we -- that is within the
23  confidentiality order of the mediation.
24             And I'll direct the witness not to
25  answer.