1                         L. Kruger

2      BY MS. EATON:

3           Q.    Did you have any discussions about
4      any aspect of the FGIC Settlement Agreement
5      outside the mediation process, as you defined
6      it earlier in your testimony?
7           A.    No.
8           Q.    Was every discussion that you had
9      about the FGIC Settlement Agreement part of the
10     mediation process, so far as you understand?
11          A.    I believe so.
12          Q.    And that would include the
13     discussions that you had with the board of
14     directors of the debtor's, is that part of the
15     mediation process, too?
16          A.    I believe so.
17          Q.    Did you have any discussions about
18     the plan support agreement outside of the
19     mediation process?
20          A.    No.
21          Q.    Did you have any discussions with
22     anybody about the Chapter 11 cases more
23     generally outside of the mediation process?
24               MR. KERR:  Objection.  I'll let him
25     answer this question, but this deposition

1        L. Kruger
2    is about the FGIC settlement, not about
3    border plan issues.
4            So you can answer that question if
5    you can.
6            THE WITNESS: Could you read it for
7    me.
8            (The Record was Read.)
9    A.    Other than my counsel, no.
10   Q.    Did you draw any distinction in your
11   own mind between discussions during this period
12   of time, that is, between the time you were
13   appointed as chief restructuring officer and
14   May 23, 2013?
15           Let me back up so I get a clean
16   question.
17           My question that I'm about to ask you
18   relates to the period between the time that you
19   were appointed as chief restructuring officer
20   and May 23, 2013.
21           Okay?
22   A.    Okay.
23   Q.    That's the time period we're talking
24   about.
25           Did you draw any distinction in your

1          L. Kruger
2   own mind between discussions that were part of
3   the mediation process and discussions that were
4   not part of the mediation process?
5        A.   I think I had mediation conversations
6   and conversations with my counsel and advisors
7   and nothing else.
8        Q.   And they were all part of the
9   mediation process?
10       A.   I believe so.
11       Q.   And I may have asked you this
12  question before.  If I did, I apologize, but
13  even if I did, I don't think I quite got an
14  answer.
15            You used the phrase "mediation
16  process."  What does that phrase mean to you?
17       A.   It meant the process initiated by the
18  court who appointed Judge Peck as a mediator,
19  and meetings both with Judge Peck and without
20  Judge Peck as part of the process seeking a
21  global resolution of the issue.
22       Q.   So would it be fair to say anything
23  that you discussed that had any relation to a
24  potential resolution of a Chapter 11 cases fell
25  within the rubric of the mediation process?

1                  L. Kruger
2        A.    I believe so.
3        Q.    You had no role in negotiating any of
4    the terms of the FGIC Settlement Agreement; is
5    that correct?
6        A.    That is correct.
7        Q.    What analysis, if any, did you
8    undertake on behalf of the debtors to determine
9    whether the FGIC Settlement Agreement was in
10   their best interest?
11       A.    Well, I was aware of the fact that
12   the FGIC Settlement Agreement was part of the
13   global settlement agreement reached by the
14   various parties who were parties to the
15   mediation process.
16             And I recognized in reaching the
17   conclusion that I reached on behalf of the
18   debtors, which is the respective that I have
19   with respect to these issues, that reducing the
20   claims that might be asserted against the
21   debtors both by FGIC and by the trusts was a
22   significant step forward on behalf of the
23   debtor's estates, and as part of the overall
24   global settlement it enabled us to both achieve
25   an Ally contribution of significance, enabled

1                    L. Kruger
2       us to avoided significant litigation with
3       respect to the FGIC and the trusts, enabled us
4       to come to the conclusion where we might
5       actually accomplish a reorganization plan and
6       have that confirmed, rather than the
7       alternative, which looked to me to be an
8       endless litigation at great cost to the estate,
9       no Ally contribution and a diminution of value
10      to the creditors generally of the estates.
11         Q.    Did anyone on behalf of the debtors
12      perform any kind of economic analysis of the
13      impact of the FGIC Settlement Agreement?
14         A.    Sure.
15         Q.    Who did that?
16         A.    FTI and Centerview, my financial
17      advisors and the debtors.
18         Q.    Anyone else?
19         A.    No.
20         Q.    Did FTI analyze the impact of the
21      FGIC settlement agreement on anyone other than
22      the debtors?
23              MR. KERR:  I'm not sure I understood
24         the question.
25              Do you understand the question?

1          L. Kruger

2      topics, but so --

3          MR. SHORE:  Well, no, I called for a

4      30(b)6 witness.  I asked you who you were

5      going to provide.  You said Mr. Kruger.  So

6      I'm just -- he's here as a 30(b)6 witness

7      on behalf of each of those entities; right?

8          MR. KERR:  Correct.

9   BY MR. SHORE:

10     Q.   Okay.

11          And you're prepared to testify today

12     about each of the topics which are listed on

13     the last page of Kruger No. 11?

14     A.   Yes.

15     Q.   Okay.

16          Let me clear up an authority issue

17     from some questions from this morning.

18          With respect to GMACM, did you obtain

19     any specific authority from the board of GMACM

20     to negotiate the FGIC settlement?

21     A.   The board of -- I don't -- I believe

22     I had the authority under my engagement letter

23     to negotiate the FGIC settlement.  In addition

24     to that, the board of ResCap certainly gave me

25     that authority initially.

1                    L. Kruger

2         Q.    Okay.

3               And with respect to RFC, do you

4    recall getting a specific authorization from

5    the board of RFC to authorize -- authorizing

6    you to negotiate on behalf of RFC with respect

7    to the FGIC claims?

8         A.    No.

9         Q.    Okay.

10              And with respect to GMACM, did you

11   get a specific authorization from the board of

12   GMACM to execute the FGIC Settlement Agreement?

13        A.    No.

14        Q.    Okay.

15              And on behalf of ResCap, LLC -- I'm

16   sorry.  On behalf of RFC, did you get a

17   specific authorization from that board to

18   execute the FGIC Settlement Agreement?

19        A.    I don't know.

20        Q.    Did you seek authority or did

21   somebody seek authority on your behalf to sign

22   that agreement, the FGIC Settlement Agreement,

23   on behalf of GMACM and RFC?

24              MR. KERR:  Objection.

25        A.    I think I had that authority.

```
 1                    L. Kruger
 2        Q.    And that's based upon your engagement
 3   letter?
 4        A.    Yes.
 5        Q.    Any other thing you're relying upon
 6   to give your testimony with respect to
 7   authority?
 8        A.    I would say conversation with the
 9   board.
10        Q.    Which board?
11        A.    The board of ResCap.
12        Q.    Okay.
13              Have you ever met with the board of
14   GMACM in these cases?
15        A.    I don't know.
16        Q.    And do you recall ever meeting with
17   the board of RFC in these cases?
18        A.    I don't know.
19        Q.    Do you know who is on the board of
20   GMACM?
21        A.    No.
22        Q.    Do you know who is on the board of
23   RFC?
24        A.    No.
25        Q.    All right.
```

1                L. Kruger
2           Referring to 30(b)6, Topic 2, "Any
3    materials or analysis concerning
4    substantive" -- no, leave that aside.  I'm
5    sorry.
6           I want to focus first on your
7    personal diligence with respect to any FGIC
8    claims.
9           To date, have you read any of the
10   FGIC complaints that were filed prepetition?
11      A.   I've read one.
12      Q.   And which one was that?
13      A.   I don't recall which one.
14      Q.   And did you read that prior to or
15   after executing the settlement agreement?
16      A.   Prior to.
17      Q.   And what impact, if any, did your
18   reading of that complaint have on your decision
19   to execute the FGIC settlement agreement?
20      A.   It was one of a number of things that
21   I thought about in preparing and executing the
22   FGIC agreement.
23      Q.   And how did that play into your
24   decision?
25      A.   Well, I read it.  It set forth the

1                    L. Kruger

2      claims that were being made by FGIC. And those
3      informed me and they were part of the
4      considerations that I had in terms of
5      determining whether we should go forward with
6      the settlement agreement.
7           Q.    To date, have you read any of FGIC's
8      proofs of claim?
9           A.    I read one of FGIC's proofs of
10     claims, as well.
11          Q.    And did you read that prior to or
12     after the determination to settle?
13          A.    Prior to.
14          Q.    Okay.
15                And did you read any of the RMBS
16     trust claims, proofs of claim and they relate
17     to the FGIC wrapped trusts?
18          A.    No, I did not.
19          Q.    Okay.
20                And you haven't done that to date?
21          A.    No.
22          Q.    Did you do any independent legal
23     research into FGIC issues at all?
24                MR. KERR:  Objection.
25          A.    No.

1           L. Kruger

2           MR. KERR: Are you talking about
3      Mr. Kruger, personally?
4           MR. SHORE: Yes. Personally. I said
5      the, lead-in with all this, I just want his
6      personal diligence.
7           MR. KERR: All right.
8    BY MR. SHORE:
9        Q.   And have you done any personal legal
10   research into RMBS-related issues?
11       A.   No.
12       Q.   And did you have any experience in
13   dealing with RMBS-related issues in private
14   practice?
15       A.   No.
16       Q.   Did you talk to any existing ResCap
17   employees about facts in their possession
18   related to the FGIC complaint or the FGIC
19   proofs of claim?
20       A.   No.
21       Q.   Have you reviewed any prepetition
22   memoranda regarding the merits of the FGIC
23   claims which have been asserted?
24           MR. KERR: You can answer that "yes"
25       or "no."

1                       L. Kruger
2        A.    Yes.
3        Q.    Okay.
4              And what law firm had prepared that
5   memorandum?
6        A.    Morrison & Foerster.
7        Q.    And that was a memorandum that they
8   prepared prepetition with respect to the RMBS
9   claims?
10       A.    I believe so.
11       Q.    Have you reviewed any fact summaries
12  with respect to the claims asserted either in
13  the FGIC complaint that you read or the FGIC
14  proof of claim that you read?
15       A.    Fact summaries outside of the content
16  of those two documents.
17       Q.    Yes.
18       A.    I don't think so.
19       Q.    Okay.
20             And have you read any witness
21  interviews or reviewed any witness interviews
22  with respect to any of the facts that fall
23  within those two documents, being the proof of
24  claim that you reviewed and the complaint that
25  you reviewed?