1           J. LIPPS - CONFIDENTIAL
2   sections, I think, that gave me the -- I mean, I
3   would have looked at the listing of the trust, and
4   the suits to see -- because that's part of the
5   scope of the claims.
6           MR. CARNEY:  To the extent we have
7       any left, I will reserve my time, but that's
8       all I have for now.
9           (Recess taken.)
10  EXAMINATION BY
11  MR. SHORE:
12          Q.    Good afternoon.
13          A.    Good afternoon.
14          Q.    I'm Chris Shore from White & Case
15  on behalf of the Ad Hoc Group of Junior Secured
16  Notes.
17                You testified to a May 31 meeting.
18  Prior to that date had anybody talked to you about
19  preparing a Declaration in support of a FGIC
20  settlement?
21          A.    I may have had a brief call or an
22  e-mail just saying we'd like to meet with you.
23  There is a FGIC settlement, and we'd like to have
24  a discussion with you to see if you could offer
25  any opinions to assist in the 9019, but it would

1          J. LIPPS - CONFIDENTIAL

2   have been no more than a brief alerting me on what
3   one of the items of the meeting was, and
4   scheduling it.
5          Q.    And where did that meeting take
6   place?
7          A.    At the offices of Morrison &
8   Foerster.
9          Q.    And who was there?
10         A.    I remember Alex. Lawrence was
11  there. Rob Baehr was there. Jim Newton. There
12  was one other associate. I was there with my
13  partner, Jen Battle.
14         Q.    I'm sorry. Her name?
15         A.    Jen Battle, Jennifer Battle.
16         Q.    And how long did the meeting take
17  place?
18         A.    That portion of the discussion that
19  related to FGIC was fairly brief. I would say 15,
20  20 minutes.
21         Q.    What did anybody tell you about
22  what the assignment was?
23         MR. KERR:    And just so we're clear,
24  Chris, as he's testified, there were other
25  aspects. So, this is just the aspect of the

```
 1                  J. LIPPS - CONFIDENTIAL
 2           FGIC settlement.  You're free to testify about
 3           that.  That's fine.
 4                Q.    What did anybody tell you about
 5      what the assignment was?
 6                A.    I had already offered a Declaration
 7      that related to the RMBS Trust Settlement.  So, I
 8      had an expectation going in that they would want
 9      me to look at uncertainties, risks associated with
10      those claims that were being resolved in the
11      settlement, and I had an expectation that they
12      would ask me to offer some opinions related to the
13      costs associated with it.
14                      So, going in I had the expectation
15      that they wanted me to look at the settlement,
16      look at the claims that were being released, and
17      advise them as to whether I could offer some
18      opinions related to that.
19                      What I didn't know is whether or
20      not they wanted me to offer an opinion on range of
21      reasonableness or things like that, and in the
22      best interest.  And ultimately I did not include
23      that in the report.  I certainly have some views
24      on it.
25                Q.    Did they ask you to provide opinion
```

```
 1                  J. LIPPS - CONFIDENTIAL
 2      testimony on range of reasonableness?
 3            A.    No.
 4            Q.    And what about best interests?
 5            A.    No.  They asked me to offer the
 6      opinions I could offer on the matters that I
 7      identified.
 8            Q.    And did they tell you anything else
 9      at that meeting about what the scope of your
10      assignment was?
11            A.    No, I don't think they ever really
12      told me what the scope of the assignment was.  I
13      think we identified the issues that they felt
14      opinion testimony would be helpful on in the
15      context of the 9019, and I defined the scope of
16      what I was going to do from that point going
17      forward.
18            Q.    And did they tell you what the
19      timing was for the assignment?
20            A.    I seem to recall under the
21      Settlement Agreement there was a need for a
22      filing, June 7th.
23            Q.    And did you express any concerns at
24      that meeting with respect to whether you would
25      have enough time to form your independent opinions
```

1            J. LIPPS - CONFIDENTIAL

2       Settlement Agreement?

3            A.    I'm not aware of that.

4            Q.    Have you or anyone at your firm

5       represented trusts in connection with RMBS

6       litigation?

7            A.    I don't believe so.

8            Q.    Any monoline insurers?

9            A.    No.

10           Q.    Any security holders of any RMBS

11      trusts?

12           A.    No.

13           Q.    Where are you licensed to practice

14      law?

15           A.    Licensed in the state of Ohio in

16      all courts and in a number of federal courts

17      around the country.

18           Q.    Do you understand that Ohio law

19      governs any of the claims that have been asserted

20      by FGIC or the trusts that are being resolved with

21      the FGIC Settlement Agreement?

22           A.    There could be some Ohio law

23      issues, as I identified in my declaration, with

24      respect to loans and whether or not foreclosed

25      loans are loans that could be subject to

1              J. LIPPS - CONFIDENTIAL

2    repurchase.  That was one specific thing I looked

3    at that could be implicated.  But it's principally

4    New York law in terms of the governing documents

5    and the claims and Minnesota law, I think, has

6    been involved.

7              Q.   And what about any kind of fraud

8    claims or others that are addressed in footnote 3

9    to Lipps No. 1?

10             A.   Well, it could be.  There could be

11   other law that's applicable under the conflict of

12   law principles.

13             Q.   But you haven't done any analysis

14   as to which law would apply to the claims that

15   you're testifying to in connection with Lipps No.

16   1?

17             MR. KERR:  Objection.

18             A.   No, I think -- well, certainly with

19   respect to the FGIC claims, I think it is New York

20   law.

21             Q.   Okay.  And are you aware of whether

22   there are any New York licensed attorneys who

23   would be qualified to provide opinions with

24   respect to claims under New York law that are

25   discussed in Lipps No. 1?

1                J. LIPPS - CONFIDENTIAL

2           A.    I have.

3           Q.    And what cases were those?

4           A.    When I was at Jones Day, Jones Day

5   was in the Federated bankruptcy down in

6   Cincinnati, and I was one of the litigators that

7   was handling adversary proceedings to the extent

8   they needed litigation help.  I tried a case

9   against Justice on the -- whether takeover

10  expenses needed to be capitalized or whether they

11  could be expensed as ordinary necessary business

12  expenses, and that was important to get the

13  expense in order to restructure the company.

14              I've also been involved in some

15  bankruptcies related, specifically, for example,

16  to GMAC.  I think when it started it was GMAC.

17  But it was related to some odometer rollbacks by

18  one of the lessees on some commercial leases, and

19  that company filed bankruptcy, and we had to

20  proceed on some adversary proceedings associated

21  with that.  And I know I've been in bankruptcy

22  court on adversary proceedings on a few other

23  cases.

24          Q.    Have you ever appeared in a

25  bankruptcy court in connection with RMBS claims?

1                  J. LIPPS - CONFIDENTIAL

2                         MR. KERR:  Other than --

3             A.    Just in the context of my role as

4    special counsel here.

5             Q.    I want to focus now just on the

6    claims that are being allowed at GMAC Mortgage and

7    at RFC.  I asked you before whether you were asked

8    to opine on the range of reasonableness.

9                         Did anybody at MoFo or at the

10   Debtors ask you informally whether you had a view

11   as to whether the claims amounts set forth in the

12   FGIC Settlement Agreement were in the zone of

13   reasonableness as you understood it?

14                        MR. KERR:  Objection.

15            A.    Not that I recall.

16            Q.    And did you volunteer in connection

17   with your assignment, your views with respect to

18   whether or not the claims that were allowed fell

19   within some zone of reasonableness?

20            A.    With respect to FGIC, I wouldn't

21   know.

22            Q.    You didn't comment at any time as

23   special counsel as to whether you thought the

24   claims were too high, too low, just right?

25                        MR. KERR:  If you're asking him in

1              J. LIPPS - CONFIDENTIAL
2          the context in his role as an expert --
3                    MR. SHORE:    Let me rephrase the
4     question.
5               Q.    You were special counsel with
6     respect to the FGIC claims prior to the
7     settlement.    Right?
8               A.    In my role as special counsel for
9     the Debtors, I did have an occasion to look at the
10    and consult on the FGIC claims as well as the
11    trustee claims associated with FGIC wrapped trust.
12              Q.    Did you form any views as to what
13    the appropriate level of those claims were?   Yes
14    or no.
15                   MR. KERR:    Objection.
16              A.    No.
17              Q.    Well, you said before you had some
18    views as to -- I think you testified before that
19    you had some views with respect to whether the
20    allowed claims fall within the range of
21    reasonableness.
22              A.    But your question you just asked me
23    was bracketed in a different time period.
24              Q.    So as you sit here today do you
25    have views?

```
 1                J. LIPPS - CONFIDENTIAL
 2          A.    The amount of the allowed claim
 3   does fall within the range of reasonableness and
 4   is in the best interest of the state to resolve.
 5          Q.    But that's not an opinion you
 6   expressed in Lipps No. 1?
 7          A.    I was not asked to put that into a
 8   declaration and provide it to the Court.
 9          Q.    And so we're clear, whether you
10   were asked or not, those views are not expressed
11   in Lipps No. 1?
12          A.    I think the opinions that you just
13   asked me about that I offered you are not
14   contained within my declaration, which I believe
15   is marked as Lipps 1.
16          Q.    And so we're clear, as part of your
17   responsibilities in connection with fulfilling
18   your assignment for the preparation of Lipps No.
19   1, you did not express those views to the company,
20   that is the Debtors?
21          A.    What views?
22          Q.    The views that you said that they
23   fall within the range of reasonableness.
24          A.    No, I did not express those views
25   to the company.
```

```
 1                J. LIPPS - CONFIDENTIAL
 2        Q.    Do you know what Section 501B of
 3   the bankruptcy code is?
 4        A.    I've been advised of what it is.
 5        Q.    And when were you first advised
 6   with respect to Sectio 510B is?
 7        A.    Assuming I haven't ever encountered
 8   it in some of my other experiences, I know and
 9   became fairly familiar with it when AIG filed its
10   subordination motion.  I think it wound up being
11   taken off docket.
12        Q.    And what do you understand Section
13   501B in the bankruptcy code to address?
14              MR. KERR:  Objection.
15        A.    I think it addresses subordination
16   in association with sales of securities.
17        Q.    And do you understand it also to
18   apply to purchase of securities and recision of
19   any purchase or sale of securities?
20        A.    I'd have to look at it to know
21   whether that -- what you just said would be
22   accurate.
23        Q.    What, if any, portion of your
24   report takes into consideration -- of Lipps No. 1
25   takes into consideration the application of
```

```
1                    J. LIPPS - CONFIDENTIAL
2      Section 510B of the bankruptcy code to any of the
3      claims asserted against GMAC M or RFC that are
4      resolved in the FGIC Settlement Agreement?
5              A.      I did not analyze subordination
6      under 510B for purposes of offering my opinions.
7              Q.      Did you analyze any affirmative
8      defenses that any of the Debtors might have by
9      virtue of being Debtors that could be asserted in
10     response to claims that are being settled in the
11     FGIC Settlement Agreement?
12                     MR. KERR:  Objection.
13             A.      Either restate that or read it
14     back.
15             Q.      You set forth a number of defenses
16     in Lipps No. 1.
17             A.      Right.
18             Q.      Did you consider at all whether
19     GMAC M or RFC had any other defenses by virtue of
20     there being Debtors in pending bankruptcy cases?
21             A.      I was aware of that by virtue of
22     being in special counsel -- in my special counsel
23     role, and I certainly would know that adds
24     complexity and perhaps even uncertainty -- well, I
25     think it probably does add uncertainty as to how
```