1                       R. D'VARI

2          and answered.

3          A.    I have provided you what we

4    arrived on.   The analysis is very blind.   It

5    is only to the date you are looking at it and

6    what assumptions do we have, and we have

7    already provided you the inputs.   The inputs

8    were freshly calculated as of the analysis

9    date.

10         Q.    So a yes or no question.   Again,

11   this is my last question.

12              MR. LAWRENCE:   It is asked and

13   answered.

14              But if you can answer a yes or

15   no, you can.

16         A.    Sure.

17         Q.    My question is, so you are

18   testifying that you used nothing from the

19   FGIC engagement we have been discussing in

20   connection with the analysis in this

21   Declaration?

22         A.    Yes.

23              MR. CARNEY:  Okay.  With that, I

24      will yield the rest of the time.  If I

25      preserve any, I might have leftover.

1                    R. D'VARI

2            MR. SHORE:  But the engagement

3       letter doesn't tell me when the

4       witness started working on it.

5       Q.     How much time did you spend in

6  the preparation of D'Vari Number 5?

7       A.     The team?

8       Q.     You.

9       A.     Oh, myself?

10      Q.     Yes.

11      A.     The portion of the assignment

12  that relates to calculating the actual

13  numbers that goes into the report are not

14  really recorded per se.

15      Q.     How much time did you personally

16  spend on the preparation of the D'Vari

17  Number 5?

18      A.     I would say that would exceed,

19  perhaps, 20 or 30 hours.

20      Q.     And how much of that 20 to

21  30 hours was spent in forming the opinions

22  and how much was spent in drafting the

23  document?

24      A.     The drafting is not -- I have a

25  team.  You have to recognize the number of

1                       R. D'VARI

2      people involved here, at least we mentioned
3      four of them, including myself, would be
4      five, and the analysis -- there was quite a
5      bit of interaction by myself and the team in
6      terms of -- as a matter of fact, figuring out
7      the non-wrapped bonds and how to approach
8      those.  So there is a substantial amount of
9      time spent.
10          Q.    Let me ask my question again.
11     Can you breakdown the 20 to 30 hours in the
12     time you spent analyzing the issue and the
13     time you spent drafting the report?
14          A.    That was an estimate that I need
15     to verify and I will come back to you on
16     that, if you wish.
17              MR. LAWRENCE:  Dr. D'Vari, I
18     mean, you are here to testify to what
19     you can recall here today.  So that's
20     how this works.  So just testify to
21     what you can recall here today.  If
22     Mr. Shore has any requests to the
23     debtors, he will make those requests
24     to the debtors.  Just based on your
25     memory here today.

1                    R. D'VARI

2          A.    It would be, based on my memory,
3    it would have been more than 30, 40 hours.
4          Q.    So now we are at --
5          A.    That's just myself.
6          Q.    I am just asking for yourself.
7    How much time did you personally spend in the
8    preparation of D'Vari Number 5, both in doing
9    the analysis that's expressed therein and
10   drafting it?
11         A.    That's probably around 30 to 40,
12   as I said.  But again, totally an estimate.
13         Q.    In connection -- at any time
14   since being hired by ResCap, have you spoken
15   with ResCap management?
16         A.    No.
17         Q.    Have you ever spoken to the --
18   the board of directors of ResCap?
19         A.    No.
20         Q.    Have you ever spoken to
21   Lewis Kruger?
22         A.    No.
23         Q.    Do you know who Lewis Kruger is?
24         A.    No.
25         Q.    Did you ever speak to anybody

1                    R. D'VARI
2      representing the official committee of
3      unsecured creditors in ResCap?
4           A.    Unsecured credit committee.
5           Q.    That you know of.
6           A.    I don't know who they are, so I
7      can't tell you.
8           Q.    Have you ever spoken to anybody
9      at Kramer Levin with respect to the opinions
10     expressed in D'Vari Number 5?
11          A.    No.
12          Q.    How much have you charged the
13     estate for the preparation of D'Vari
14     Number 5?
15          A.    The total dollar amount?
16          Q.    The total.
17          A.    I can't -- I don't know the exact
18     numbers to state.  If you can -- you want to
19     bracket it?
20          Q.    Sure.  You can bracket it.
21          A.    Probably around 300 or 200.
22     Somewhere or that's --
23          Q.    When in relation to the signing
24     of D'Vari 5, which is June 7th, did you first
25     reach your conclusions that you are

```
1                    R. D'VARI
2       A.    I don't know.
3       Q.    When did you advise debtor's
4  counsel that you had worked for FGIC in
5  connection with the 47 trusts?
6             MR. LAWRENCE:  I will let you --
7  you can testify as to the timing of
8  the conversation with counsel but not
9  the substance of the conversation with
10 counsel.  So his question was when.
11      A.    When did I highlight that I had
12 worked previously for FGIC?
13      Q.    Yes.
14      A.    We never state that we've worked
15 with something.  You know, we typically,
16 initially, highlight that there may be a
17 conflict or not conflict and so on and so
18 forth.  It would be sometime during the
19 initial discussions of our engagement letter.
20      Q.    So you believe that you told
21 Morrison & Foerster that you had worked for
22 FGIC in connection with the 47 trusts prior
23 to executing the engagement letter?
24            MR. LAWRENCE:  I don't want you
25 to testify about the substance of
```

Page 184

1        R. D'VARI
2        conversations, but, Chris' question is
3        loaded with substance of conversation.
4        But if you want to answer as to a
5        timing of when prior work was
6        discussed, you can do that.
7        A.    It became apparent but not
8   necessarily, you know, directly a statement.
9   I am sorry, there is a public document that
10  is already out there that is one of the
11  exhibits that NewOak has prior to, to this.
12  It is public information, which is not a
13  confidential as to the fact that NewOak has
14  worked for FGIC at some point.  So we had
15  raised that as something that needs to be
16  valued.
17        Q.    Did you raise that before or
18  after the execution of the retention letter?
19        A.    No, it wasn't after.  It was not
20  after.
21        Q.    So you raised it before?
22        A.    Yes.
23        Q.    In your Declaration, Paragraph 2,
24  let me clear up some things.  Mr. Baio was
25  asking you about the questions, the aggregate

Confidential

Page 185

1              R. D'VARI
2  amount of the claims released by the FGIC
3  trustees.
4       A.    Yes.
5       Q.    In your testimony that was, as I
6  understand it, claims both against the
7  debtors and claims against FGIC, right?
8       A.    Again, I am not -- I haven't
9  studied the exact settlements.  For us, this
10 is the aggregate amount that the trustee had
11 claimed.  I don't know from who and when and
12 what.  That's a legal question.  All we are
13 saying, if that's the total aggregate, that
14 is an if, we don't know whether that is or
15 not, it is a given number, then you subtract
16 that number from the non-wrapped FGIC --
17 sorry, non-wrapped bonds by FGIC, you get to
18 this number which, if it is released, that
19 would be the number.  It is a simple math.
20      Q.    Right.  I want to be clear.  You
21 didn't review any of the FGIC insurance
22 policies, did you?
23      A.    No.
24      Q.    So you're not opining that the
25 FGIC trustees could make a claim under those

Confidential

Page 186

1              R. D'VARI

2     policies in the amount of $5 billion?

3         A.    Absolutely not.

4               MR. BAIO:  Object to the form.

5         Q.    You didn't look at any of the

6     individual reps and warranties that any of

7     the debtors made?

8         A.    No.

9         Q.    Okay.

10        A.    None of that are within the scope

11    of our opinion or we are not presenting any

12    opinion on that.

13        Q.    Right.  So you're not presenting

14    any opinion that that -- that the FGIC

15    trustees could present a valid claim under

16    any existing document in the amount of

17    $5 billion against the debtors?

18        A.    The answer to your question is

19    yes, we are not.  That's a double negative.

20        Q.    All right.

21        A.    It is a single negative.  Yes, we

22    are not saying that number represents

23    something we are opining on except the

24    difference of two numbers.

25        Q.    So when you use the word claim

Confidential

Page 187

1           R. D'VARI
2  here, is it fair to say what you are saying
3  is the trustees could write that down on a
4  piece of paper as an amount that they could
5  claim they lost?
6           MR. LAWRENCE:  Object.
7           MR. BAIO:  Object to the form.
8      A.   I go again, we are not saying
9  that this is a valid claim or not.  We are
10 saying if that is the total number, they are
11 claiming, if, if they release that -- I mean,
12 if the rest of this and you subtract it from
13 our total, then that's the number you get.
14 But there is no other representation or
15 opinion attached to that number.
16      Q.   Okay.  And by the way, you're not
17 expressing any opinion as to which of the
18 debtor entities the trustees could assert a
19 claim of $5 billion?
20      A.   Absolutely not.
21      Q.   All right.  Or the priority of
22 what that claim would be?
23      A.   Absolutely not.
24      Q.   And you're not opining as to the
25 basis for any of those claims, for example,

1                    R. D'VARI
2    ==you're not opining that they have fraud==
3    ==claims?==
4        ==A.    Absolutely not.==
5        ==Q.    Which could -- okay.  Or contract==
6    ==claims?==
7        ==A.    That is true, I am not claiming==
8    ==any of that.==
9        ==Q.    And you're not claiming that they==
10   ==have valid alter ego or aiding and abetting==
11   ==or piercing claims or anything else?==
12       ==A.    True, I am not claiming this.==
13       Q.    You used a valuation date of --
14   or a date of June 1, 2003.
15       A.    Right.
16             MR. BAIO:  2013.
17       Q.    As the analysis date of?
18             MR. LAWRENCE:  Just to clarify
19   the record, you said 2003 but I think
20   you mean 2013.
21       Q.    2013.
22       A.    2013, yes.
23       Q.    Why do you use that date?
24       A.    That was the recent date
25   available for us to do our analysis.