Richard M. Cieri
Ray C. Schrock
Noah J. Ornstein
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Jeffrey S. Powell
Daniel T. Donovan
Judson D. Brown
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Ste. 1200
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

*Counsel for Ally Financial, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**ALLY FINANCIAL, INC'S REPLY IN SUPPORT
OF THE PLAN PROPONENTS' MOTION FOR AN ORDER
APPROVING THE DISCLOSURE STATEMENT**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................1

RESPONSE..................................................................................................................................2

I.  Arguments That This Court Lacks Jurisdiction To Grant The Proposed
    Third-Party Releases Are Not Ripe—And Are Incorrect In Any Event. ............................2

    A.  The Debtors' Interest in Shared Insurance Policies that Cover the
        Third-Party Claims Establishes this Court's Jurisdiction. ........................................4

    B.  The Non-Debtor Ally Entities Have Indemnification Claims Against the
        Estates Based on the Claims Covered By the Third-Party Releases. .......................5

II. Requests That The Disclosure Statement Include Additional Information
    Regarding The Merits Of The Third-Party Releases Are Unwarranted. .............................6

III. Objections To The Propriety Of The Third-Party Releases Are Untimely—And
     Incorrect In Any Event.........................................................................................................7

CONCLUSION..........................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 1031 Tax Grp., LLC*,
  397 B.R. 670 (Bankr. S.D.N.Y. 2008) ............................................................................... 5

*In re Amanat*,
  338 B.R. 574 (Bankr. S.D.N.Y. 2005) ............................................................................... 6

*In re Charter Communications*,
  419 B.R. 221 (Bankr. S.D.N.Y. 2009) ....................................................................... passim

*In re Chemtura Corp.*,
  439 B.R. 561 (Bankr. S.D.N.Y. 2010) ............................................................................. 15

*In re Cuyahoga Equip. Corp.*,
  980 F.2d 110 (2d Cir. 1992) .............................................................................................. 4

*In re Dreier LLP*,
  429 B.R. 112 (Bankr. S.D.N.Y. 2010) ............................................................................... 4

*In re FairPoint Commc'ns, Inc.*,
  452 B.R. 21 (S.D.N.Y. 2011) ............................................................................................ 6

*In re Granite Broadcasting Corp.*,
  369 B.R. 120 (Bankr. S.D.N.Y. 2007) ............................................................................. 12

*In re Karta Corp.*,
  342 B.R. 45 (S.D.N.Y. 2006) .......................................................................................... 14

*In re Masterwear Corp.*,
  241 B.R. 511 (Bankr. S.D.N.Y. 1999) ............................................................................... 6

*In re Metro 885 Third Ave Leasehold, LLC*,
  2010 WL 6982778 (Bankr. S.D.N.Y. Dec. 22, 2010) ................................................ 15, 17

*In re Metromedia Fiber Network, Inc.*,
  416 F.3d 136 (2d Cir. 2005) ............................................................................................ 13

*In re Quigley Co.*,
  676 F.3d 45 (2d Cir. 2012) ................................................................................................ 3

*In re Residential Capital, LLC*,
  2013 WL 3286198 (Bankr. S.D.N.Y. June 27, 2013) ....................................................... 9

*In re Rickel & Assocs., Inc.*,
  272 B.R. 74 (Bankr. S.D.N.Y. 2002) .............................................................................. 13

*In re WorldCom, Inc. Sec. Litig.*,
   293 B.R. 308 (S.D.N.Y. 2003) ............................................................................................. 6

*In re XO Commc'ns, Inc.*,
   330 B.R. 394 (Bankr. S.D.N.Y. 2005) ........................................................................ 14, 17

*MacArthur Co. v. Johns-Manville Corp.*,
   837 F.2d 89 (2d Cir. 1988) ................................................................................................ 4

*Manville III*,
   517 F.3d 52 (2d Cir. 2008) ................................................................................................ 4

*Manville IV*,
   600 F.3d 135 (2d Cir. 2010) ......................................................................................... 3, 4

*Wiegand v. Tringali*,
   177 N.W. 2d 435 (Mich. Ct. App. 1970) ........................................................................ 11

**Statutes**

11 U.S.C. §§ 1128(b) ................................................................................................................ 2

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

Ally Financial Inc. ("**Ally**") hereby submits this omnibus reply (the "**Omnibus Reply**") in support of the *Plan Proponents' Motion for an Order (i) Approving Disclosure Statement; (ii) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan Proponents' Joint Chapter 11 Plan; (iii) Approving the Form of Ballots; (iv) Scheduling a Hearing on Confirmation of the Plan; (v) Approving Procedures for Notice of the Confirmation Hearing and for Filing Objections to Confirmation of the Plan; and (vi) Granting Related Relief* [ECF No. 4152] (the "**Motion**"),[1] and in response to (a) the Objection of the Ad Hoc Group of Junior Secured Noteholders (the "**JSNs**") to the Motion [ECF No. 4590] (the "**JSN Objection**") and (b) the Objection of the United States Trustee (the "**U.S. Trustee**") to the Motion [ECF No. 4596] (the "**U.S. Trustee Objection**"). In response to the objections and in support of the Motion, Ally respectfully states as follows:

## PRELIMINARY STATEMENT

Approval of the Disclosure Statement is the next critical step toward a successful resolution of these complex, contentious cases. Importantly, not a single creditor who filed an objection to the Disclosure Statement has requested that the Court not authorize the Plan Proponents to solicit votes on an approved Disclosure Statement—a testament to the strength of the Plan, its structured terms, and the overwhelming support for it. Indeed, at most, a small number of creditors, out of the thousands noticed for the Motion, requested that further information be included in the Disclosure Statement.

Ally files this reply to address arguments that the proposed third-party releases are inappropriate—either because the Court lacks jurisdiction to grant the releases or because they

---

[1] Capitalized terms used herein without definition shall have the meaning set forth in the Motion.

are unjustified on the merits—and that the Disclosure Statement's information concerning the releases is insufficient. First, objections to the propriety of the proposed third-party releases are not yet ripe. The only issue currently before the Court is whether the Disclosure Statement provides adequate information to creditors—not whether the proposed Plan, or its particular provisions, should be confirmed. But to be sure, the contention that the third-party releases are inappropriate is wrong on the merits: this Court plainly has jurisdiction to grant the releases, and they are particularly justified in light of the substantial contributions that Ally has provided, and has agreed to continue to provide, to the Debtors. Second, requests for the Disclosure Statement to include additional information regarding the third-party releases, including material from the Examiner's Report, should be denied. The Disclosure Statement, particularly as amended by the Plan Proponents, includes sufficient information regarding Ally's contributions and the proposed releases, and ample detail concerning the Examiner's Report's findings and conclusions, to enable a creditor to assess the merits of the proposed Plan.

## **RESPONSE**

**I.    Arguments That This Court Lacks Jurisdiction To Grant The Proposed Third-Party Releases Are Not Ripe—And Are Incorrect In Any Event.**

The U.S. Trustee asserts that this "Court does not have subject matter jurisdiction to approve th[e third-party release] provision." U.S. Trustee Objection at 19. As a threshold matter, the Court need not resolve that issue at this juncture—particularly because the U.S. Trustee does not assert that the Plan would be patently unconfirmable. The Debtors' are not currently seeking confirmation of a plan or even approval of third-party releases. When the Debtors' pursue confirmation of a plan that contains a third-party release, the U.S. Trustee and any creditor will have the opportunity to object to the plan and its particular provisions, including whether the Court has jurisdiction to grant third-party releases. *See* 11 U.S.C. §§ 1128(b),

2

1141(a), (d) ("plan becomes binding on creditors and other parties in interest … only on confirmation of the plan" and any "party in interest may object" to the plan). The Court does not need to resolve that issue now, in the context of the Plan Proponents' motion for approval of the Disclosure Statement.

In any event, as a substantive matter the U.S. Trustee's argument is premised on a mischaracterization of the law. The U.S. Trustee asserts that the Court lacks jurisdiction because the third-party release provision "seeks to release 'direct' (non-derivative) claims that non-debtor third-parties may have against other non-debtor third parties," citing the Second Circuit's decision in *Manville IV*. U.S. Trustee Objection at 19 (citing *Manville IV*, 600 F.3d 135, 153 (2d Cir. 2010)). None of the Second Circuit's decisions addressing bankruptcy court jurisdiction over third-party claims against non-debtors has held that the action must be derivative of a claim against the debtor in order for bankruptcy jurisdiction to exist—not *Manville III*, *Manville IV*, or any other decision. Indeed, in *In re Quigley Co.*, 676 F.3d 45 (2d Cir. 2012), the Second Circuit expressly rejected the U.S. Trustee's argument, stating: "[*Manville III*] did not impose a requirement that an action must … be derivative of the debtor's rights and liabilities for bankruptcy jurisdiction over the action to exist. Our more recent decision in *Manville IV* made more explicit the fact that in *Manville III* derivative liability was discussed not as an independent jurisdictional requirement …." *In re Quigley*, 676 F.3d at 57.

As the Second Circuit made clear in *Quigley*, "the touchstone for bankruptcy jurisdiction remains 'whether [the underlying lawsuit's] outcome might have any conceivable effect on the bankruptcy estate.'" *Id.* (quoting *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992)); *accord Manville III*, 517 F.3d 52, 66 (2d Cir. 2008); *In re Dreier LLP*, 429 B.R. 112, 128 (Bankr. S.D.N.Y. 2010). The third-party claims that the Plan proposes to release directly affect

3

the Debtors' estates in at least two independent ways. First, the non-debtor Ally entities and the Debtors share certain insurance policies that provide coverage for the third-party claims subject to the proposed release. The proceeds from these policies are an asset of the Debtors' estates, and allowing the third-party claims to continue would diminish that asset. Second, the non-debtor Ally entities have indemnification claims against the Debtors' estates on account of the third-party claims.

### A.  The Debtors' Interest in Shared Insurance Policies that Cover the Third-Party Claims Establishes this Court's Jurisdiction.

It is well settled that insurance policies and proceeds that cover both debtors and their non-debtor parents and affiliates are joint property of the debtors' estate and the non-debtor entities. *See In re Quigley*, 676 F.3d at 53-54, 57 (2d Cir. 2012); *Manville IV*, 600 F.3d at 152 ("[T]he insurance policies that Travelers issued to Manville are the estate's most valuable asset."); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92 (2d Cir. 1988) (agreeing with the "[n]umerous courts [that] have determined that a debtor's insurance policies are property of the estate"); *In re 1031 Tax Grp., LLC*, 397 B.R. 670, 677-78 (Bankr. S.D.N.Y. 2008) (Glenn, J.) (recognizing that shared Errors & Omissions policy was property of bankruptcy estate).

Here, Ally has Errors & Omissions insurance policies that provide shared coverage to the Debtors and the non-Debtor Ally entities. As this Court has already found, those shared policies and proceeds are assets of the Debtors' estates. *See* July 10, 2012 Hr'g Tr. at 125:19-21. As this Court further held, the shared insurance "is a wasting policy, meaning that every dollar spent of policy proceeds reduces the amount available for claims by the debtors." *Id.* at 138:7, 8-10; *see also In re Quigley*, 676 F.3d at 53, 58. If the third-party claims against the non-Debtor Ally entities were not released, the shared insurance policies and proceeds would be depleted, in turn reducing an asset of the Debtors' estates. *See* July 10, 2012 Hr'g Tr. at 125:19-21; *see also In re*

4

*Quigley*, 676 F.3d at 53, 58. This Court, therefore, has jurisdiction over the third-party claims in order to grant the third-party releases. *See In re Quigley*, 676 F.3d at 58 (holding that bankruptcy court had jurisdiction over third-party claims against a non-debtor because the non-debtor defendant shared insurance policies and proceeds with the debtor).

> B. **The Non-Debtor Ally Entities Have Indemnification Claims Against the Estates Based on the Claims Covered By the Third-Party Releases.**

The Court also has jurisdiction over the claims subject to the third-party releases because of the Debtors' indemnification obligations to the non-Debtor Ally entities. Courts in this district have consistently held that "a bankruptcy court has 'related to' jurisdiction over non-debtor litigation if the estate is obligated to indemnify or contribute to the losing party." *In re Amanat*, 338 B.R. 574, 579 (Bankr. S.D.N.Y. 2005); *accord In re FairPoint Commc'ns, Inc.*, 452 B.R. 21, 29 (S.D.N.Y. 2011); *In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 332-224 (S.D.N.Y. 2003); *In re Masterwear Corp.*, 241 B.R. 511, 516 (Bankr. S.D.N.Y. 1999) ("In litigation involving non-debtors, 'relatedness' often turns on the estate's obligation to indemnify the losing party. Where the obligation to indemnify is contractual and absolute, the third party litigation is 'related to' the bankruptcy case.").

The Debtors are contractually obligated to indemnify the non-debtor Ally entities for losses incurred in defending against the claims covered by the third-party releases. *See, e.g.*, Ally's Proofs of Claim, at Claim Nos. 3957-64, 3967-68, 3972-4009, 4011, 4013, 4015-16, 4018-20, 4022-26, 4028-31, 4033-37, 4039, 4041, 4043, 4045-55, 4057-59, 4061-63, 4065-73. The third-party release provision is specifically crafted to release only claims related to the Debtors' businesses. ResCap's Operating Agreement obligates the Debtors to indemnify the non-debtor Ally entities for all of those claims. In particular, the Operating Agreement states that "ResCap will, to the fullest extent permitted by law, indemnify, defend and hold harmless"

5

the non-debtor Ally entities "from and against any losses related to ResCap Indemnifiable Liabilities," which are "Liabilities that relate to, arise out of or result principally from" the "businesses and operations ... of ResCap or its Subsidiaries."  Operating Agreement §§ 1, 3(c). Moreover, the Underwriting Agreements between the Debtors and Ally Securities obligate the Debtors to indemnify Ally Securities for claims against it related to the Debtors' RMBS offerings.  In light of these contractual indemnification obligations to the non-Debtor Ally entities, the third-party claims will affect the *res* of the Debtors' estates—and the Court therefore has jurisdiction to grant the third-party releases.

## II. Requests That The Disclosure Statement Include Additional Information Regarding The Merits Of The Third-Party Releases Are Unwarranted.

The JSNs assert that the Disclosure Statement lacks sufficient information regarding the third-party releases in two respects:  first, because it does not "attempt to allocate [the] value [of the Ally contribution] between the two" releases, the debtor release and the third-party release; second, because it does not contain sufficient material from the Examiner's Report. JSN Objection at 19.  The Disclosure Statement need not be amended to include that information.

The JSNs' request for an allocation of the Ally contribution between the debtor release and the third-party release is misplaced.  Such an allocation is not necessary as a matter of fact or law for the Court—or a creditor—to determine whether the releases are appropriate.  Indeed, the JSNs cite no legal authority to suggest that the Disclosure Statement must allocate the Ally contribution between the releases.  Nor can they.  When analyzing the appropriateness of debtor and third-party releases, courts in this circuit do not segregate a non-debtor's contribution to the estate between the two proposed releases.  To the contrary, courts evaluate the non-debtor's total consideration and determine whether it warrants the proposed releases under the distinct legal

6

standards for each release. For example, in *In re Charter Communications*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009), the Bankruptcy Court considered proposed debtor and third-party releases to a non-debtor. *See id.* at 257. In approving each release, the Bankruptcy Court considered the totality of the non-debtor's substantial contributions and did not segregate that consideration into consideration for the debtor release and consideration for the non-debtor releases. *See id.*

The JSNs' assertion that the "Disclosure Statement should be amended to include material from the Examiner's Report" is similarly unwarranted. JSN Objection at 19. The Disclosure Statement provides more than adequate information concerning the Examiner's Report to allow a creditor to assess the merits of the proposed Plan. Indeed, the Disclosure Statement sets forth, in detail, the potential causes of action that the Examiner investigated, and the Report's conclusions concerning the success of those claims. *See* First Am. Disclosure Statement (which the Debtors are filing contemporaneously), at 71–74. It is inappropriate to cherry-pick portions of the Examiner's Report for inclusion in the Disclosure Statement, and distributing the entire 2,200-page Report with the Disclosure Statement is a waste of the estates' resources. At most, the Disclosure Statement should add a web address (URL) and hyperlink to the publicly available Examiner's Report, for creditors to access on their own. Anything more is unnecessary.

### III. Objections To The Propriety Of The Third-Party Releases Are Untimely—And Incorrect In Any Event.

The JSNs and the U.S. Trustee both object to the third-party releases, questioning whether they are "consistent with the Second Circuit's" case law on the issue, particularly in light of material in the Examiner's Report. U.S. Trustee Objection at 17; *see also* JSN Objection at 18-21. These objections are not ripe; they are confirmation, not disclosure statement, issues.

7

Indeed, the Court acknowledged as much in ruling on objections to the Debtors' PSA Motion. *In re Residential Capital, LLC*, 2013 WL 3286198, at *2, *21 (Bankr. S.D.N.Y. June 27, 2013) (refusing to analyze objections to the third-party release and stating that "[m]ost of the objections that have been made are confirmation objections not properly raised or considered at this time"); *see also* June 26, 2013 Hr'g Tr. at 99:12-16. The JSNs and the U.S. Trustee can object to the appropriateness of the third-party releases when the Plan Proponents pursue confirmation of the Plan, and the parties—and the Court—can address the issue on the merits at that time.

In any event, the material in the Examiner's Report that the JSNs cite does not warrant denial of the proposed third-party releases. While Ally does not intend to address at this time every potential argument that could be raised based on the Examiner's Report, it is important to dispose of the JSNs' primary assertion—that the releases are not warranted in light of the Examiner's Report's findings regarding a draft, unsigned tax allocation agreement between Ally and ResCap that was superseded by a revised, executed version. The JSNs' argument is flawed as a matter of fact and irrelevant as a matter of law.

As a matter of fact, the JSNs' assertion rests on a flawed premise—that the estates would "prevail [on] a claim for reimbursement under a Tax Allocation Agreement." JSN Objection at 19. To succeed on such a claim, a claimant must—but cannot—clear two separate hurdles. First, a claimant must successfully void or avoid the operative Tax Allocation Agreement between the parties—an agreement that does not call for Ally to "reimburse" ResCap for Ally's use of ResCap's losses for tax purposes. Such an effort would fail for numerous reasons, including that the agreement employs the approach preferred by auditors, including Deloitte, and federal regulators, including the SEC and the Department of the Treasury; it uses the approach required by GAAP accounting in the absence of a tax allocation agreement between parties;

8

ResCap received reasonably equivalent value in executing the Tax Allocation Agreement, particularly as compared to the previous operative tax agreement, executed in 2006; both sides received good and sufficient consideration in executing the Tax Allocation Agreement; and ResCap's board independently evaluated and approved the Tax Allocation Agreement.

Second, assuming a claimant could void or avoid the operative Tax Allocation Agreement, it must then establish that a previous draft of the Tax Allocation Agreement—which ResCap did not sign—is a valid and enforceable contract. That is a difficult burden for a claimant to carry, as the Examiner's Report acknowledges in concluding that the issue is "a close question." *See* Examiner's Report at I-14. Indeed, such a claim would fail. The parties did not intend to be bound by the draft agreement until it was fully executed by both sides. That never happened for legitimate business reasons, including that Ally's board had not approved the agreement or authorized Ally's management to execute it and that it would have led to an unprecedented windfall for ResCap. Because the parties never signed the draft agreement, and never intended to be bound by it, a claim to establish its enforceability would fail under established Michigan law that the Examiner did not even address. *See Wiegand v. Tringali*, 177 N.W. 2d 435, 437 (Mich. Ct. App. 1970) ("In cases where a writing which purports to evidence a contract between several named persons has been signed by less than all those named, it is often found that the signers did not intend to become contractually bound until all the apparent parties sign and deliver the writing.").

Even if a claimant could clear both hurdles—which it cannot—there is no "net benefit" or "windfall" to Ally as a result of the Ally settlement and the releases, as the JSNs allege. JSN Objection at 19-20. Any "tax benefits" that flow to Ally are unrelated to the settlement and releases. ResCap, like other Ally subsidiaries, is a disregarded entity for tax purposes. As a

9

result, any income or losses that ResCap generates are income or losses of Ally. Ally must report that income and loss on its tax filings, and Ally is required to pay any associated tax. Any "tax benefits" to Ally from ResCap's losses are Ally's to begin with—and are the result of ResCap's status as a disregarded entity for tax purposes, not the result of the settlement with the estates or the Plan's proposed releases.

Moreover, the JSNs' projection of "$2.2 billion in tax benefits for Ally"—insinuating, without stating, that those are the alleged damages to ResCap—is fundamentally flawed and, in all events, is overstated. JSN Objection at 19. First, the JSNs' projection assumes that Ally will immediately use all of the available ResCap losses to reduce Ally's taxable income, but that has not happened and will not happen by confirmation. In fact, there is no certainty that Ally would ever use all of the available ResCap losses, much less when it would do so—making any alleged "damage" to ResCap purely speculative. Second, the JSNs' projected $2.2 billion in potential damages to ResCap under the draft tax allocation agreement is premised on a circular and non-sensical application of the Ally Contribution to the calculation of Ally's "tax benefits." Under the JSNs' calculation, as Ally contributes more and more funds to the estates in a settlement (including to resolve any claim on account of the draft tax allocation agreement), the amount of ResCap's cancellation of debt income decreases and thus its net available losses increases—and as a result, the potential tax benefits to Ally, and the damages for that alleged tax claim, increases. That fact is made clear from the face of the JSNs' Exhibit D: when Ally's proposed contribution was $750 million, the Exhibit reflects potential tax benefits to Ally of $1.77 billion; when Ally's proposed contribution is increased to $2.2 billion, the Exhibit reflects potential tax benefits to Ally of $2.24 billion. *See* JSN Objection, Exhibit D at 2. In other words, under the JSNs' theory, for each additional dollar that Ally contributes to the estate in a

10

settlement, it owes the estate an additional 35 cents (assuming a 35% tax rate) in alleged damages on a claim pursuant to the unsigned and superseded draft tax allocation agreement. It cannot be that the more money Ally contributes to the estates in a settlement, the more it would owe the estates on an alleged tax reimbursement claim.

Further, the JSNs' argument—that if the settlement and releases are approved, Ally would receive "a windfall" based on the Examiner's Report's conclusions regarding the draft Tax Allocation Agreement—is irrelevant as a matter of law. As a threshold matter, the findings and conclusions in the Examiner's Report are not evidence—they are inadmissible hearsay. *See, e.g.*, *In re Granite Broadcasting Corp.*, 369 B.R. 120, 128 n.10 (Bankr. S.D.N.Y. 2007); *In re Rickel & Assocs., Inc.*, 272 B.R. 74, 87-88 (Bankr. S.D.N.Y. 2002). Moreover, in evaluating whether third-party releases are appropriate, courts in the Second Circuit do not consider ancillary, hypothetical benefits that may result to the non-debtor contributor—such as any potential tax benefits to Ally. In fact, courts do not even balance the value of the consideration being provided by the non-debtor against the value of the claims being released, much less the value of ancillary benefits that may result to the non-debtor. Indeed, the JSNs do not point to a single case in this Circuit in which the court weighed the value of the consideration given against the value of claims being released or the value of any ancillary benefits to the non-debtor. Nor can they, because that is not the law for determining the appropriateness of third-party releases.

Instead, in this Circuit, as *Metromedia* explained, third-party releases are justified in those "truly unusual circumstances" where the non-debtor beneficiary of the release provides substantial consideration "render[ing] the release terms important to success of the plan." *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142-43 (2d Cir. 2005). In several cases, courts in the Second Circuit have found third-party releases to be "important" where the non-debtor

11

provided the estate with substantial consideration that, in the context of the case, was indispensable to the success of the debtor's restructuring. For example, in *In re Charter*, the Bankruptcy Court approved a third-party release benefiting a non-debtor who voluntarily contributed "substantial financial and non-financial consideration" that "confer[red] billions of dollars in value [to the estate]." 419 B.R. 221 at 258-59. In addition to a financial contribution, the non-debtor also voluntarily agreed to undertake actions—which "no other party" could have done—that were essential to the debtor's plan. *Id.* at 259. Similarly, in *In re Karta Corp.*, 342 B.R. 45 (S.D.N.Y. 2006), the court granted a third-party release to a non-debtor who provided operational support on which the debtors relied given the "unique character" of their business. *Id.* at 55-56. The court considered it "beyond dispute" that the third-party releases were essential to the plan because, without the non-debtors' "significant contributions" to the estate, the debtors could not "fund the Plan or comply with other Plan obligations, and the Plan [would] unravel." *Id.* at 54-55.[2]

Here, Ally meets that legal standard justifying the proposed third-party releases. Ally has provided—and has agreed to continue providing—substantial consideration that is critical to the Debtors' successful restructuring. First and foremost, Ally has agreed to pay a total of $2.1 billion to the Debtors' estates, comprised of $1.95 billion in cash from Ally and $150 million to come from Ally's D&O and E&O insurance policies. Because of Ally's cash contribution, creditor recoveries increased materially; without it, the Debtors' would not have achieved a global settlement, and these cases would have devolved into all-out litigation. Ally's substantial cash contribution alone is sufficient consideration for the releases. *See In re Metro 885 Third Ave Leasehold, LLC*, 2010 WL 6982778 (Bankr. S.D.N.Y. Dec. 22, 2010) (approving

---

[2] *See also In re XO Commc'ns, Inc.*, 330 B.R. 394, 437-40 (Bankr. S.D.N.Y. 2005).

third-party releases where the non-debtor beneficiary of the releases waived claims worth more than $160 million, thereby increasing creditor recoveries).

In addition to this sizable cash contribution, Ally has also made other substantial contributions to the estates that were essential to the success of the Debtors' bankruptcy. Ally served as the stalking horse bidder for the Debtors' portfolio of held-for-sale mortgage loans; provided debtor-in-possession financing of $220 million that no other entity would offer; supported certain pension obligations; provided certain shared services during the bankruptcy proceedings and on a transition basis to the buyer of the Debtors' assets; provided funding and services—when no other entity would step forward—that have allowed the Debtors to continue originating mortgage loans during their bankruptcy; and permitted the Debtors to use Ally Bank's portfolio of loans so that the Debtors could satisfy their obligations to the DOJ. Far from the type of routine concessions that "creditors have to [make] in every chapter 11 case," *In re Chemtura Corp.*, 439 B.R. 561, 611 (Bankr. S.D.N.Y. 2010), Ally's staggering contributions have conferred "billions of dollars in value" on the estates and must be considered "very substantial consideration in a rare restructuring context." *In re Charter Commc'ns*, 419 B.R. at 259.

Ally's contributions to the estates throughout this bankruptcy proceeding are also essential to the success of the Debtors' Plan. In particular, Ally agreed to provide $2.1 billion in cash to the estates—a sum that will enable meaningful distributions to the estates' creditors and that ultimately led to a settlement amongst the Debtors' largest constituencies. Further, Ally provided funding so that the Debtors could continue originating mortgages—a task that no previous debtor has been able to do, and one the Debtors would have been unable to do absent Ally's support. The Debtors' ability to continue mortgage origination was essential to preserving

13

the value of the estates and achieving successful asset sales. Indeed, if Ally had not agreed to provide this funding and the Debtors were unable to continue originating mortgages, they would have been unable to continue their mortgage servicing business, greatly decreasing the value of the estates.

In sum, this case presents precisely the "unusual circumstances" that warrant a third-party release. These bankruptcy cases present novel circumstances. They are the first time that a subsidiary of a bank holding company has filed for bankruptcy as a going concern. They are the first time that a mortgage originator and servicer has been able to continue operations during bankruptcy and ultimately sell its assets as a going concern—all because of Ally's support. They are the first time in which a parent entity provided more than $2 billion in cash to an estate, providing meaningful recoveries for the Debtors' key constituents. And they are a rare instance in which the Federal Reserve and the FDIC have closely monitored bankruptcy proceedings—and Ally helped navigate those issues. Ally's substantial consideration has been—and will continue to be—essential to the Debtors' ability to consummate a plan. The truly unique circumstances of this case—including the fact that Ally is 74% owned by the United States Treasury, and thus the American taxpayers—and the substantial consideration that Ally has provided the Debtors' estates justify a third-party release. *See, e.g.*, *In re Metro 885*, 2010 WL 6982778, at *11 (granting third-party release where non-debtors' consideration facilitated the debtors' business objectives and was "essential to the success of the Plan"); *In re Charter Commc'ns*, 419 B.R. at 258, 260 (noting essential nature of non-debtors' consideration as "unusual circumstance[]" justifying third-party release); *In re XO Commc'ns*, 330 B.R. at 439-40 (non-debtor's voluntary consent to resolve certain litigation necessary for success of plan was "unique circumstance[]" warranting third-party release).

14

## **CONCLUSION**

For the foregoing reasons, Ally respectfully requests that the Court approve the Plan Proponents' Disclosure Statement.

| | |
|---|---|
| August 16, 2013<br>New York, New York | /s/ *Ray C. Schrock*<br>Richard M. Cieri<br>Ray C. Schrock<br>Noah Ornstein<br>KIRKLAND & ELLIS LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone: (212) 446-4800<br>Facsimile: (212) 446-4900<br><br>- and -<br><br>Jeffrey S. Powell<br>Daniel T. Donovan<br>Judson D. Brown<br>KIRKLAND & ELLIS LLP<br>655 15th Street, N.W., Ste. 1200<br>Washington, D.C. 20005<br>Telephone: (202) 879-5000<br>Facsimile: (202) 879-5200<br><br>*Counsel to Ally Financial Inc.* |