MORRISON & FOERSTER LLP
Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren
Jennifer L. Marines
1290 Avenue of the Americas
New York, New York 10104
Telephone:   (212) 468-8000
Facsimile:    (212) 468-7900

*Counsel for Debtors and Debtors-in Possession*

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
Stephen D. Zide
David E. Blabey, Jr.
1177 Avenue of the Americas
New York, New York 10036
Telephone:   (212) 715-9100
Facsimile:    (212) 715-8000

*Counsel for the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------ )
In re:                                          )      Case No. 12-12020 (MG)
                                                )
RESIDENTIAL CAPITAL, LLC, et al.,               )      Chapter 11
                                                )
                              Debtors.          )      Jointly Administered
------------------------------------------------ )

**PLAN PROPONENTS' OMNIBUS REPLY TO OBJECTIONS TO MOTION FOR AN
ORDER (I) APPROVING DISCLOSURE STATEMENT, (II) ESTABLISHING
PROCEDURES FOR SOLICITATION AND TABULATION OF VOTES TO
ACCEPT OR REJECT THE PLAN PROPONENTS' JOINT CHAPTER 11 PLAN,
(III) APPROVING THE FORM OF BALLOTS, (IV) SCHEDULING A HEARING
ON CONFIRMATION OF THE PLAN, (V) APPROVING PROCEDURES FOR
NOTICE OF THE CONFIRMATION HEARING AND FOR FILING OBJECTIONS
TO CONFIRMATION OF THE PLAN, AND (VI) GRANTING RELATED RELIEF**

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................... 2

BACKGROUND ......................................................................................... 7

REPLY ...................................................................................................... 7

I.  THE DISCLOSURE STATEMENT CONTAINS SUFFICIENT INFORMATION FOR A "HYPOTHETICAL INVESTOR" TO MAKE AN INFORMED JUDGMENT ON THE PLAN .................................... 7

II.  THE PLAN IS NOT PATENTLY UNCONFIRMABLE ..................... 9

III.  REPLY TO SPECIFIC OBJECTIONS ............................................. 10

    A.  The JSNs' Objection Should be Overruled.............................. 11

        a.  The Disclosure Statement Makes Clear That the Plan is Confirmable Even if the JSNs Are Determined to Be Oversecured ............................................................... 13

        b.  The Plan Proponents Will Include Additional Disclosure Concerning the Nature of the Dispute With the JSNs ................ 16

        c.  The Plan Proponents Will Include Additional Disclosure Concerning the JSNs' Views of the Global Settlement.............. 18

        d.  The Plan Proponents Will Include Additional Disclosure Concerning the JSNs' Views of the Ally Settlement.................. 19

        e.  The Disclosure Statement Contains Adequate Information Concerning the Treatment of the JSN Claims ........................... 22

    B.  The Disclosure Statement Has Been Modified to Address the FHFA's Disclosure Objections.............................................. 22

        a.  HERA is Unlikely to Impact Creditor Recoveries, But the Plan Proponents Have Revised the Disclosure Statement to Provide Requested Disclosures................................... 23

        b.  The Objections Premised on Allocation of the Ally Contribution Are Misplaced ................................................. 25

        c.  The Plan Proponents Have Provided Sufficient Disclosure Regarding Subordination of the FHFA's Claim .......................... 25

    C.  The U.S. Trustee's Objection Should be Overruled ................................ 26

        a.  The Plan's Fee and Expense Payment Provisions are Consistent With Applicable Law ................................................. 26

        b.  Disclosures Regarding Fees and Expenses, Partial Consolidation, Release and Exculpation Provisions, and UST Fees are Sufficient ............................................................. 28

KL2 2809490.16

# TABLE OF CONTENTS
### (continued)

**Page**

D.    The NCUAB Objection Should be Overruled ......................................... 32

E.    The Disclosure Statement Has Been Modified to Address the Concerns Raised by Freddie Mac Relating to the RMBS Trust Claims .................................................................................... 32

F.    Impac's Objection Relating to the Treatment of Executory Contracts is Premature and, if Necessary, the Plan Proponents Will Establish at the Confirmation Hearing that the Proposed Procedures are Appropriate ....................................................... 33

G.    Amherst's Objection Should be Overruled ............................................ 34

    a.    The Plan's Treatment of "Opt Out" Rights is Proper ................. 34

    b.    Amherst's Judicial Estoppel Argument is Unfounded ................ 36

    c.    Payment of the Allowed Fee Claim is Consistent With Applicable Law ...................................................................... 38

    d.    The Plan Proponents Will Provide Additional Disclosure Regarding the Allowed Fee Claim ............................................. 39

    e.    Amherst is Not Entitled to Vote on the Plan .............................. 39

H.    The Plan Has Been Modified to Further Explain the Treatment of Tax Claims ............................................................................... 39

I.    The Disclosure Statement Has Been Modified to Include Further Disclosure Relevant to Borrowers ......................................... 40

IV.    THE SOLICITATION PROCEDURES AND TABULATION PROCEDURES SHOULD BE APPROVED .................................................... 41

CONCLUSION ................................................................................................... 43

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

Abel v. Shugrue (In re Ionosphere Clubs, Inc.),
    179 B.R. 24 (S.D.N.Y. 1995)..................................................................................8

Cadle Co. v. PC Liquidation Corp. (In re PC Liquidation Corp.),
    383 B.R. 856 (E.D.N.Y. 2008) ...............................................................................9

In re Adelphia Commc'ns Corp.,
    441 B.R. 6 (Bankr. S.D.N.Y. 2010).......................................................................27

In re Arcapita Bank B.S.C.,
    Case. No. 12-11076 (Bankr. S.D.N.Y. Apr. 26, 2013) ..........................................31

In re Cardinal Congregate I,
    121 B.R. 760 (Bankr. S.D. Ohio 1990)..................................................................10

In re Chemtura Corp.,
    Case No. 09-11233 (Bankr. S.D.N.Y. July 21, 2010)............................................31

In re Copy Crafters Quickprint, Inc.,
    92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988) ............................................................31

In re Drexel Burnham Lambert Grp.,
    Case No. 90-10421, 1992 WL 62758 (Bankr. S.D.N.Y. Mar. 5, 1992) .................31

In re Eastern Maine Elec. Coop. Inc.,
    125 B.R. 329 (Bankr. D. Me. 1991)........................................................................10

In re Enron Corp.,
    326 B.R. 497 (S.D.N.Y. 2005)................................................................................31

In re General Maritime,
    Case No. 11-15285 (MG) (Bankr. S.D.N.Y. May 7, 2012).................................9, 31

In re Innkeepers USA Trust,
    448 B.R. 131 (Bankr. S.D.N.Y. 2011) ...................................................................31

In re Journal Register Co.,
    407 B.R. 520 (Bankr. S.D.N.Y. 2009) ...................................................................28

In re KM Allie of Nampa, LLC,
    No. 10-03056, 2011 WL 1434915 (Bankr. D. Idaho Apr. 14, 2011) .......................9

KL2 2809490.16

## TABLE OF AUTHORITIES
(continued)

**Page**

In re Lehman Bros. Holdings Inc.,
    487 B.R. 181 (Bankr. S.D.N.Y. 2013) ...................................................................................27

In re Monroe Well Serv., Inc.,
    80 B.R. 324 (Bankr. E.D. Pa. 1987) ....................................................................................10

In re New York City O.T.B.,
    Case No. 09-17121 (MG) (Bankr. S.D.N.Y. Dec. 1, 2010) ........................................10, 31, 42

In re Phoenix Petroleum Co.,
    278 B.R. 385 (Bankr. E.D. Pa. 2001) .................................................................................10

In re Residential Capital LLC,
    Case No. 12-12020, 2013 WL 3286198 (Bankr. S.D.N.Y. June 27, 2013) ...........................39

In re Scioto Valley Mortg. Co.,
    88 B.R. 168 (Bankr. S.D. Ohio 1988) ...............................................................................9, 32

In re Waterville Timeshare Grp.,
    67 B.R. 412 (Bankr. D.N.H. 1986) ......................................................................................9

JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter
    Commc'ns Operating, LLC),
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ...............................................................................42

Sewell v. 1999 Nat'l Ben. Fund for Health & Human Servs.,
    187 Fed. Appx. 36, 40 (2d Cir. 2006) ................................................................................42

**FEDERAL STATUTES**

11 U.S.C. § 330 ...............................................................................................................................29

11 U.S.C. § 363(e) ...........................................................................................................................16

11 U.S.C. § 503(b) ...........................................................................................................................27

11 U.S.C. § 510(b) ...........................................................................................................................43

11 U.S.C. § 552(b) ...........................................................................................................................17

11 U.S.C. § 1125 ...................................................................................................................6-9, 32, 41

11 U.S.C. § 1129(a)(4) .................................................................................................................28, 42

11 U.S.C. § 1129(b)(2)(A) ...............................................................................................................22

12 U.S.C. § 4617(b)(15) ............................................................................................................11, 22-24

**TABLE OF AUTHORITIES**
(continued)

**Page**

RULES

Fed. R. Bankr. P. 9019 ...........................................................................................................19, 28

OTHER AUTHORITIES

H.R. Rep. No. 595, 95th Cong., 1st Sess. 408-09 (1977) ..............................................................32

The debtors and debtors in possession in the above-captioned cases (each a "Debtor" and collectively the "Debtors")[1] and the Official Committee of Unsecured Creditors (the "Creditors' Committee," and together with the Debtors, the "Plan Proponents") hereby file this omnibus reply (the "Reply")[2] to objections (the "Objections") and reservations of rights interposed to the *Plan Proponents' Motion for an Order (I) Approving Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan Proponents' Joint Chapter 11 Plan, (III) Approving the Form of Ballots, (IV) Scheduling a Hearing on Confirmation of the Plan, (V) Approving Procedures for Notice of the Confirmation Hearing and for Filing Objections to Confirmation of the Plan, and (VI) Granting Related Relief* [Docket No. 4152] (the "Disclosure Statement Motion").  Exhibit 1 annexed hereto (the "Objections Chart") contains a summary of the Objections and reservations of rights, the Plan Proponents' responses, and references to the language added to the Disclosure Statement to address specific Objections.  Exhibit 2 annexed hereto contains a proposed revised confirmation schedule.  The Plan Proponents intend to file revised copies of the Plan and Disclosure Statement substantially contemporaneously hereto, along with comparisons to the previously-filed versions of those documents.[3]  The Plan Proponents respectfully request that the Court grant the Disclosure Statement Motion for the reasons set forth herein, in the Disclosure Statement Motion, and upon the record that will be presented at the Disclosure Statement Hearing.[4]

---

[1]    The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the *Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings*, filed on May 14, 2012 [Docket No. 6].

[2]    Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief requested in this Motion may refer to http://www.kccllc.net/rescap for additional information.

[3]    Unless otherwise noted, citations to the Plan and Disclosure Statement herein are to the revised versions of those documents.

[4]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Disclosure Statement Motion, the Disclosure Statement, or the Plan, as applicable.

1

## <u>PRELIMINARY STATEMENT</u>

1.      Approval of the Disclosure Statement marks an important step toward the

successful resolution of these complex cases through a largely consensual Plan.  Following the

Debtors' historic asset sales, the jointly proposed Plan is the result of months of extensive, hard-

fought, good-faith negotiations among the Debtors, the Creditors' Committee, Ally, and

numerous creditor constituencies holding diverse and often conflicting interests.  The Plan,

negotiation of which was presided over by the Honorable Judge James Peck and led by the

Debtors' Chief Restructuring Officer, Lewis Kruger, the Debtors, and the Creditors' Committee,

embodies the terms of a global settlement that provides for a $2.1 billion contribution from Ally

(the "<u>Ally Contribution</u>") and resolves complex and interrelated claims and disputes that would

have taken months, if not years, to resolve absent a global settlement, during which time creditor

recoveries would have dissipated.  No viable plan alternative exists without the Ally

Contribution, which is conditioned on the compromises contained in, and terms of, the Global

Settlement.

2.      Despite the clear benefits of the Plan, 20 Objections to the Disclosure

Statement were filed by various parties (the "<u>Objectors</u>").[5]  Of these, few raise any "patent

unconfirmability" objections and, indeed, only a handful purport to raise significant concerns

with respect to the adequacy of the Plan Proponents' disclosures.  The Plan Proponents believe

that the small number of Objections is remarkable given the complexity and size of these

Chapter 11 Cases—a testament to how successful the mediation process has been.  Since the

filing of the Objections, the Plan Proponents have worked diligently to address them, reaching

out to each of the Objectors and attempting to accommodate all reasonable requests for

---

[5]      Seven parties have filed reservations of rights not discussed herein, but noted in the Objections Chart.

additional disclosure. As reflected in Exhibit 1 annexed hereto, those efforts have resulted in a

number of modifications to the Disclosure Statement and Plan—modifications that the Plan

Proponents believe should be more than adequate to address all legitimate disclosure concerns.

        3.      Seven of the Objections are addressed in the body of this Reply – those of

the JSNs, the FHFA, the U.S. Trustee, the NCUAB, Freddie Mac, Impac, and Amherst (each as

defined below).[6] Of these, certain of the Objectors raise true disclosure objections, while others,

dissatisfied with their individual treatment, seek to derail implementation of the joint Plan by

raising disguised confirmation objections that should be deferred to confirmation. In addition to

these seven Objections, the Reply addresses certain minor Plan modifications and disclosures

regarding tax claims, Borrower Claims, and the Solicitation and Tabulation Procedures. The

remaining 13 Objections (and 7 reservations of rights) are addressed in the Objections Chart. To

the extent any requests for additional disclosures not discussed herein or in the Objections Chart

raise adequacy of disclosure issues, the Plan Proponents submit that the additional disclosures

requested are beyond the scope of the "adequate information" requirement and, in most cases,

appear to be relevant only to the party requesting the information and to be sought for purposes

other than providing a basis for a hypothetical investor's informed judgment about the Plan.

---

[6]    See *Objection of National Credit Union Administration Board to Disclosure Statement* [Docket No. 4509]; *Federal Home Loan Mortgage Corporation's Objection to the Disclosure Statement for the Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors* [Docket No. 4580]; *Objection of Impac Companies to Disclosure Statement for the Debtors' Joint Chapter 11 Plan Proposed by Residential Capital LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 4584]; *Objection of the Federal Housing Finance Agency to Approval of Proposed Disclosure Statement for the Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors* [Docket No. 4587]; *Objection of Ad Hoc Group of Junior Secured Noteholders to the Plan Proponents' Motion for an Order, Inter Alia, Approving the Disclosure Statement and Establishing Procedures For Solicitation and Tabulation of Votes to Accept or Reject the Plan Proponents' Joint Chapter 11 Plan* [Docket No. 4590]; *Limited Objection to Plan Proponents' Motion for an Order (I) Approving Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan Proponents' Joint Chapter 11 Plan, (III) Approving the Form of Ballots, (IV) Scheduling a Hearing on Confirmation of the Plan, (V) Approving Procedures for Notice of the Confirmation Hearing and for Filing Objections to Confirmation of the Plan, and (VI) Granting Related Relief* [Docket No. 4591]; *Objection of the United States Trustee to Plan Proponents' Disclosure Statement* [Docket No. 4596].

4.     Notably, the two most substantial Objections come from parties whose claims are largely unaffected by the Plan–the Junior Secured Noteholders (the "<u>JSNs</u>"), who are receiving payment in full on account of their prepetition claim plus postpetition interest to the extent the Court determines they are oversecured, and the Federal Housing Financing Agency (the "<u>FHFA</u>"), who is one of the few creditors whose claims against Ally will ride through the case unaffected by the Plan.  These Objections, to the extent not addressed by further disclosures, are a transparent attempt to litigate Plan treatment issues and should be dismissed as such.

5.     The JSNs raise a host of misplaced disclosure objections, arguing the merits of the litigation over their secured status, allocation of the Global Settlement, and the sufficiency of the Ally Contribution.  Their Objection seeks to use the Disclosure Statement hearing–and, indeed, the Disclosure Statement itself–as a dress rehearsal for the JSNs' objections to the Plan.  But rather than engage in lengthy and repetitive briefing on the merits (again), the Plan Proponents are prepared (again) to assure the JSNs that they need not, and should not, object to the Plan.  It has always been the case that the Plan will provide the JSNs with postpetition interest to the extent the Court determines they are so entitled regardless of whether such determination is made in the Phase I Adversary Proceeding or at confirmation.  Now, as discussed further below, the Plan and Disclosure Statement have been modified to make clear that even if the Court approves the waiver of Intercompany Balances and allocation of the Ally Contribution set forth in the Plan, the JSNs will be free to argue at confirmation that such waiver and/or allocation resulted in a diminution in the value of their Collateral, such that they are entitled to an adequate protection claim.  If their arguments are successful, the allowance of such a claim will not render the Plan unconfirmable.  These clarifications further de-risk the Plan and

permit the JSNs to litigate their entitlement to postpetition interest without seeking to "blow up" the Plan.[7]

6. The FHFA, which has chosen to avoid participation in these Chapter 11 Cases up to this point, objects to the Disclosure Statement to highlight its supposedly superior rights regarding the prosecution of fraudulent conveyances that are intentionally fraudulent as to the FHFA or Freddie Mac. This argument is a red herring because the Plan Proponents are unaware of any such intentional fraudulent transfers and because the Ally Contribution is not the result of a settlement of any particular claims or potential causes of action. Nevertheless, the Plan Proponents have agreed to make additional disclosures requested by the FHFA.

7. The remaining five objections referenced above are addressed as follows:

a. **U.S. Trustee**. The United States Trustee (the "U.S. Trustee") raises objections relating, primarily, to the disclosures concerning the payment of professional fees. The Plan Proponents have added significant additional disclosures concerning such fees, including a chart listing every professional to be paid in accordance with the Plan and the basis for such payments. In addition, the Plan Proponents have made additional disclosures to address the U.S. Trustee's objections concerning the adequacy of disclosure regarding substantive consolidation, releases, and the payment of U.S. Trustee fees.

b. **NCUAB**. The National Credit Union Administration Board, as liquidating agent for certain credit unions (the "NCUAB") – which does not hold a Private Securities Claim – primarily seeks additional information regarding the treatment of the Private Securities Claims. Notwithstanding the NCUAB's questionable standing to make such request, the Plan Proponents have provided substantial additional information concerning such claims and will provide further information in the Plan Supplement. In consensual resolution of the NCUAB's other requests, the Plan Proponents have also provided additional information regarding the NCUAB's own treatment and the Plan's judgment reduction provision.

c. **Freddie Mac**. Federal Home Loan Mortgage Corporation ("Freddie Mac"), a holder of ResCap RMBS, objected to the disclosures regarding the methodology for allocating the aggregate allowed claim for the RMBS Trusts, arguing it was impossible to determine how much each Trust was expected to receive. The Plan Proponents have revised the

---

[7]    The Plan Proponents have had several discussions with the JSNs in an effort to address the JSNs' Objection and the parties have exchanged drafts of proposed riders. The Plan Proponents are hopeful that they will resolve the JSNs' Objection prior to the Disclosure Statement Hearing.

Disclosure Statement to include additional information concerning the allocation, and it is the Plan Proponents' understanding that the additional disclosures should resolve Freddie Mac's objection.

d. **Impac**.  The Objection of Impac Funding Corporation and Impac Mortgage Holdings, Inc. (together, "Impac") challenges specific Plan provisions governing the assumption and rejection of executory contracts and asserts an objection more appropriate for the Confirmation Hearing.  It is expected that the Debtors will file a motion to assume and assign Impac's contracts well in advance of confirmation, such that its objection to the Plan will likely be rendered moot.  In any event, at confirmation the Plan Proponents will show that the procedures in the Plan relating to assumption or rejection of contracts are supported by law and consistent with procedures approved by this Court and others.

e. **Amherst**.  Amherst Advisory & Management, LLC ("Amherst"), an investment manager for investors in a single RMBS Trust, objects on the ground that the Plan supposedly deprives it of the right to "opt out of the RMBS Settlement."  As discussed below, this objection rests on a basic misunderstanding of the nature of the RMBS Settlement, which applies to all Trusts regardless of whether they are signatories to the Plan Support Agreement.  To the extent Amherst has standing, its objections are appropriately heard at confirmation and are premature at the Disclosure Statement stage.

8.      With respect to the remaining Objections, the Plan Proponents respectfully submit that any parochial request for extraneous disclosures made by the Objectors should be overruled.  As set forth below in Section I, approval of a disclosure statement does not require that a disclosure statement provide every scintilla of information relevant to any individual member of a voting class.  The Disclosure Statement, as revised, contains adequate information to enable "a hypothetical investor typical of the holders of claims or interests in the case[s] . . . to make an informed judgment about the plan . . . ," consistent with and as required by section 1125(a)(1) of the Bankruptcy Code.  Furthermore, as set forth in Section II below, any objection to the confirmability of the Plan is premature at this time.  The Plan is clearly not "patently unconfirmable," as some Objectors have argued.  The Plan Proponents fully appreciate their burden to provide the factual and legal support for confirmation of the Plan—and they will do so when seeking confirmation of the Plan.

9.      Accordingly, the Plan Proponents respectfully request that this Court
overrule any remaining Objections and approve the Disclosure Statement, the Solicitation
Procedures, Tabulation Procedures, and Confirmation Hearing procedures, including the revised
Plan Confirmation Schedule contained herein.

## BACKGROUND

10.     Since the filing of the Plan and Disclosure Statement, the Plan Proponents
have worked with the Objectors and other major parties in interest to revise the Disclosure
Statement and Plan to address various formal and informal requests for additional disclosure and
clarification.  The Plan Proponents believe that all of the Objections that truly concern disclosure
have been addressed by revisions to the Disclosure Statement.

11.     In addition, the Plan Proponents have modified the requested Plan
Confirmation Schedule.  Specifically, the Plan Proponents seek the Court's approval for the
revised schedule set forth on Exhibit 2 relating to confirmation of the Plan.

## REPLY

**I.      THE DISCLOSURE STATEMENT CONTAINS SUFFICIENT INFORMATION
FOR A "HYPOTHETICAL INVESTOR" TO MAKE AN INFORMED
JUDGMENT ON THE PLAN**

12.     Section 1125 of the Bankruptcy Code governs the postpetition disclosure
and solicitation of a chapter 11 plan and requires that the plan provide "adequate information"
such that a hypothetical investor can make an informed judgment about the plan.  11 U.S.C.
§ 1125(a); see also Transcript of Hearing, In re Residential Capital, LLC, Case No. 12-12020
(MG), dated June 26, 2013 (the "PSA Hearing Tr."), at 49:17-21 ("[M]ost of the objections [to
the approval of the Plan Support Agreement] that were asserted which I really take to be
disclosure statement or confirmation objections, with respect to disclosure statement objections,
adequate information being the essential test. . . .").  Courts have broad discretion in determining

whether a disclosure statement contains adequate information and employ a flexible approach

based on the unique facts and circumstances of each case.  See Abel v. Shugrue (In re Ionosphere

Clubs, Inc.), 179 B.R. 24, 29 (S.D.N.Y. 1995).

13.    The information contained in the Disclosure Statement is more than

sufficient to meet the requirements of section 1125 of the Bankruptcy Code.  As demonstrated in

the Disclosure Statement Motion, the Disclosure Statement contains a thorough description of

detailed information necessary for creditors to make an informed decision, including (i) the

Debtors' business operations, (ii) the events leading to these Chapter 11 Cases, (iii) the Debtors'

prepetition and post-petition activities, (iv) the mediation process undertaken by the Debtors, the

Creditors' Committee and the Debtors' major parties in interest, (v) the agreements reached

pursuant to the Global Settlement, (vi) the components of, and compromises embodied, in the

Plan, (vii) anticipated recoveries under the Plan, and (viii) certain financial and tax information

necessary for creditors to make an informed decision regarding the Plan.  (See Disclosure

Statement Motion ¶ 17.)  Additionally, as set forth in more detail below, the Plan Proponents

have added additional disclosures to address the Objections.

14.    Additional disclosures requested by the Objections but not addressed in

the Objections Chart appear to be relevant only to the parties requesting the information, are

beyond the scope of the "adequate information" requirement, and are being sought for reasons

other than to provide a basis for a hypothetical investor's informed judgment about the Plan.[8]  In

determining whether adequate information has been disclosed, the relevant consideration is

whether the disclosure is adequate to the class as a whole, not whether the disclosure satisfies

---

[8]    For example, the County of San Bernardino objected that the Disclosure Statement should contain a statement
to the effect that its specific tax claim would be paid.  See Limited Objection of County of San Bernardino,
California to Debtor's Disclosure Statement [Docket No.  4462], at 3.

8

each particular member of the class.  See Cadle Co. v. PC Liquidation Corp. (In re PC Liquidation Corp.), 383 B.R. 856, 865 (E.D.N.Y. 2008) ("what constitutes 'adequate information' in any particular situation is determined on a case-by-case basis . . . with the determination being largely within the discretion of the bankruptcy court").

15.    Moreover, extensive discussion of the merits of confirmation disputes is not appropriate in a disclosure statement; a disclosure statement is not a legal brief.  See Transcript of Hearing dated Feb. 28, 2012 at 60:20-21, In re General Maritime Corp., Case No. 11-15285 (MG) (Bankr. S.D.N.Y.) [Docket No. 530] ("A disclosure statement is not a legal brief."); In re KM Allie of Nampa, LLC, No. 10-03056, 2011 WL 1434915, at *7 (Bankr. D. Idaho Apr. 14, 2011) ("Utilizing a disclosure statement as a legal brief is improper.").

16.    In sum, the Disclosure Statement is more than sufficient to allow the "hypothetical investor" to understand its treatment under the Plan, the settlements embodied in the Plan, and the recovery scenarios for each of the Debtors' creditors upon consummation of the Plan.

## II.    THE PLAN IS NOT PATENTLY UNCONFIRMABLE

17.    Disclosure hearings anticipate, but do not preempt, confirmation hearings. The appropriate standard for approval of a disclosure statement is "adequate information," and confirmation issues should be determined at a hearing to consider confirmation of a chapter 11 plan in accordance with the procedures attendant to such a hearing.  See 11 U.S.C. § 1125(a)(1); In re Scioto Valley Mortg. Co., 88 B.R. 168, 172 (Bankr. S.D. Ohio 1988) ("If the creditors oppose their treatment in the plan, but the Disclosure Statement contains adequate information, issues respecting the plan's confirmability will await the hearing on confirmation."); In re Waterville Timeshare Grp., 67 B.R. 412, 413 (Bankr. D.N.H. 1986) ("[A]pproval of a disclosure statement is an interlocutory action in the progress of a Chapter 11 reorganization effort leading

to a confirmation hearing at which all parties have ample opportunity to object to confirmation of the plan."). The objections to a disclosure statement must be limited to defects that could not be overcome by creditor voting results. In re Monroe Well Serv., Inc., 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987); see also Order Regarding Motion to Approve Disclosure Statement at 3, In re New York City O.T.B., Case No. 09-17121 (MG) (Bankr. S.D.N.Y. Dec. 1, 2010) [Docket No. 234] ("Courts should not . . . turn the disclosure statement hearing into a hearing on confirmation; objections should be limited to those that cannot be cured by voting.").

18.    Courts have recognized that solicitation should be delayed only when the proposed plan is "facially" or "patently" unconfirmable and where, as a matter of law, the plan "is so fatally flawed that confirmation is impossible." See In re Cardinal Congregate I, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990). Moreover, "[s]uch action is discretionary and must be used carefully so as not to convert the disclosure statement hearing into a confirmation hearing, and to insure that due process concerns are protected." Id. (citations omitted). Accordingly, a "disclosure statement should be disapproved at the threshold only where the plan it describes displays fatal facial deficiencies or the stark absence of good faith." In re Phoenix Petroleum Co., 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) (quoting In re Eastern Maine Elec. Coop., Inc., 125 B.R. 329, 333 (Bankr. D. Me. 1991)). As demonstrated below, any Objections to confirmation of the Plan are premature: the Plan Proponents are entitled to have challenges to the Plan determined on the basis of an appropriate evidentiary and legal record, including the facts and circumstances developed up to and including the Confirmation Hearing.

## III.    REPLY TO SPECIFIC OBJECTIONS

19.    The Plan Proponents have revised the Disclosure Statement to address certain informal responses and filed Objections by providing a variety of additional explanations,

clarifications, and disclosures. These changes to the Disclosure Statement are set forth in the

Objections Chart. Among other things, the Disclosure Statement has been modified to:

a. More fully address the impact of the Plan Proponents' litigation with the JSNs, including addressing the litigation's potential impact on creditor recoveries by providing a range of recoveries to reflect potential outcomes.

b. Disclose the FHFA's position that it has a first priority right to recoveries on certain avoidance actions pursuant to section 4617(b)(15) of the Housing Recovery Act of 2008, and the FHFA's belief that its right to such recoveries could impact the scope of the Debtor Release contained in the Plan and potential recoveries to unsecured creditors, as well as the Plan Proponents' view as to such claims.

c. Identify the entities and individuals that will receive fees and expenses pursuant to the Plan and the authority pursuant to which they are being paid.

d. Update the discussion of the Private Securities Claims Trust to reflect developments with the Private Securities Claimants, who have agreed in principle to an allocation of the aggregate distribution earmarked for their claims and developed aspects of the Private Securities Claims Trust.

e. Provide additional information for Freddie Mac and other RMBS Investors on the expected recovery amount for each RMBS Trust and an illustrative calculation on a sample RMBS Trust so that they can understand how the expected recovery is computed by the Plan Proponents.

f. Include additional information relating to the treatment of Borrower Claims under the Plan and the potential recoveries to borrowers should the Plan be confirmed.

20.    The Objection Chart, annexed hereto as <u>Exhibit 1</u>, contains the Plan

Proponents' response to each specific Objection. In addition, certain individual Objections are

discussed below.

### A.    <u>The JSNs' Objection Should be Overruled</u>

21.    Notwithstanding that the JSNs will be paid in full on the Junior Secured

Notes Claims, representing their outstanding principal amount and prepetition interest, on the

Effective Date of the Plan, the JSNs have nonetheless filed an Objection to the Disclosure

Statement alleging that the Plan Proponents' disclosure regarding the JSNs' claims in the

Consolidated JSN Adversary Proceeding is inadequate. The Plan Proponents have repeatedly

assured the JSNs that to the extent the Court ultimately determines that they are oversecured and

entitled to postpetition interest, the Plan will provide for payment of such interest.[9]  Indeed, the

Plan and Disclosure Statement both contain language to this effect in unmistakable terms, and

further include details regarding the impact of such payments on the recoveries to other

claimants.[10]  The Plan Proponents have likewise made clear that is it not their intent to hold the

Court "hostage" by setting in motion a confirmation process that can succeed only if the JSNs

are not paid postpetition interest.[11]  Despite these repeated and documented assurances, rather

than simply litigating the discrete issues relevant to determination of their secured status, the

JSNs have made it their goal to derail the Plan, filing obstreperous objections and motions since

the announcement of the Global Settlement.  The JSNs' Objection, which inappropriately seeks

to turn the Disclosure Statement into a JSN advocacy piece, is the latest example.

22.    The Plan Proponents will not accept the JSNs' proposed Disclosure

Statement inserts wholesale, as they contain inappropriate and misleading advocacy, and flat-out

misstatements, regarding the treatment of intercompany claims, the Examiner's Report, and the

sufficiency and "allocation" of the Ally Contribution, among other issues.  Nevertheless, in an

effort to resolve the JSNs' Objection, the Plan Proponents have agreed to include language in the

Disclosure Statement stating, in unambiguous terms, that the Plan is confirmable if the JSNs are

---

[9]    See, e.g., Transcript of July 3, 2013 Hearing at 30:4-7; *Official Committee of Unsecured Creditors' Statement in Support of, and Response to Objections to, Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter into and Perform Under a Plan Support Agreement With Ally Financial Inc., the Creditors' Committee, and Certain Consenting Claimants* ¶¶ 28-29 [Docket No. 4064]; *Debtors' Objection to the Motion of the Ad Hoc Group of Junior Secured Noteholders for Entry of an Order (I) Directing Each of Debtors' Counsel, Including Morrison & Foerster, LLP, Official Committee Counsel, Including Kramer Levin Naftalis & Frankel LLP, and the Debtors' Management to Remain Strictly Neutral in Any Dispute Regarding Claims by and Between Any Debtors, (II) Ordering the Limited Disqualification of Each of the Foregoing to the Extent Necessary to Effectuate the Foregoing, and (III) Granting Related Relief* ¶ 18 [Docket No. 4368].

[10]   See, e.g., Plan Art. III.D.1(c)(ii); Disclosure Statement at 9-15 (see charts), 36-37, 103, 107.

[11]   Transcript of May 29, 2013 Hearing at 37:21-22.

determined to be oversecured, regardless of whether that determination comes as part of the

"Phase I" trial or later.  This statement should lay to rest, once and for all, the JSNs' preferred

excuse that they have no choice but to "blow up" the Plan.[12]  Further, as reflected in the

Objections Chart, the Plan Proponents have included in the Disclosure Statement versions of the

JSNs' proposed inserts that have been edited to be less misleading and lopsided than what the

JSNs proposed in the Exhibits to their Objection.

a.    The Disclosure Statement Makes Clear That the Plan is
Confirmable Even if the JSNs Are Determined to Be Oversecured

23.    The Plan and Disclosure Statement are clear that if the Court determines,

as part of the "Phase I" adversary proceeding, that the JSNs are oversecured and entitled to

postpetition interest, they will receive such interest–and the JSNs do not dispute this point.  (JSN

Obj. ¶ 11.)  The JSNs contend, however, that the Plan and Disclosure Statement do not clearly

provide for the recovery of postpetition interest in the event the JSNs are determined to be

oversecured and entitled to such interest at confirmation.  (JSN Obj. ¶ 12.)  In particular, they

question whether the Court can confirm the Plan if it determines, among other things, that (i) the

compromise of the Intercompany Balances results in the JSNs holding a claim for adequate

protection, or (ii) the JSNs' liens attach to some or all of the Ally Contribution.  (JSN Obj. ¶ 16.)

24.    The Plan Proponents do not believe that these outcomes are likely.  As set

forth in detail in the Disclosure Statement, the compromise of the Intercompany Balances as part

of the Global Settlement is reasonable and appropriate.  The Plan Proponents have made it clear

on numerous occasions (including at the hearing on approval of the Plan Support Agreement, the

hearing on the JSNs' motion for disqualification, and in the Disclosure Statement itself), that, in

---

[12]    See *Statement and Reservation of Rights of the Ad Hoc Group of Junior Secured Noteholders in Connection
With the Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the
Debtors to Enter into and Perform Under a Plan Support Agreement With Ally Financial Inc., the Creditors'
Committee, and Certain Consenting Claimants* ¶ 8 [Docket No. 4018]; PSA Hearing Tr. at 115:7-9.

13

coming to their decision to compromise the Intercompany Balances, the Debtors and the

Creditors' Committee carefully examined (i) the facts and records behind the balances, (ii) the

intercompany transactions that make up the balances, (iii) the approximately $16 billion in debt

forgiveness that could substantially if not entirely offset the intercompany balances, and

(iv) related issues such as substantive consolidation, recharacterization, and fraudulent

conveyances, to name a few.  Based on this analysis, along with the understanding that litigating

any (let alone all) of these issues would be highly complex, factually intensive, and cost the

Estates tens of millions of dollars and substantially delay the ability to confirm any plan, the

Debtors, with the support of the Creditors' Committee and the Consenting Claimants, determined

it was appropriate to compromise the Intercompany Balances as part of the Global Settlement.

(Disclosure Statement at 38-40.)

   25.  Nevertheless, to alleviate any concerns that the Plan may be

unconfirmable if the Court reaches certain conclusions concerning the Intercompany Balances

and the allocation of the Ally Contribution, the Plan Proponents have agreed to include

additional disclosures confirming the following:

  a. The compromise of the Intercompany Balances is an integral part of the
Global Settlement, and the Plan will not be confirmable if the compromise is
not approved.  However, if the Court determines that, as a result of the
compromise of such balances, the JSNs' aggregate collateral has suffered a
diminution in value from the Petition Date, the JSNs will be entitled to an
adequate protection claim in the amount of the decline.

  b. The allocation of the Ally Contribution among the Debtor estates is an integral
part of the Plan, and the Plan will not be confirmable if the Court determines
that such allocation if unreasonable.  However, if the Court determines that
the JSNs have a lien on all or a portion of the Ally Contribution or that, as a
result of the Plan's allocation of the Ally Contribution, the JSNs' aggregate
collateral has suffered a diminution in value from the Petition Date, the JSNs
will be entitled to such value without impacting the confirmability of the Plan.

26.     To be clear, the Debtors and the Creditors' Committee do not believe that the Court should entertain the JSNs' effort to obtain an adequate protection claim arising from the compromise of the Intercompany Balances, because, among other things: (i) the JSNs have never had any protectable property interest in the Intercompany Balances, as under the controlling documents the Debtors have at all times had the right to compromise, forgive, or otherwise dispose of Intercompany Balances, and did so consistently during the years leading up to the Petition Date; (ii) as the JSNs' counsel has noted, in the absence of the Global Settlement, the Intercompany Balances have little or no value, and certainly not enough to have rendered the JSNs oversecured; (iii) the value of the JSNs' collateral (including Intercompany Balances) at the Petition Date was substantially less than what they are receiving under the Plan, such that there is no basis for a finding of diminution in value; and (iv) litigation over such a putative adequate protection claim would improperly subvert much of the benefit of the compromise, by requiring precisely the same time-consuming and costly litigation the settlement was intended to avoid.[13]  The Plan Proponents expressly preserve and intend to advance these arguments, but in the event the Court disagrees and finds that the JSNs are entitled to an adequate protection claim on this issue, such a finding would not be inconsistent with the Plan and Global Settlement.

27.     These disclosures should assure the JSNs that they will have the opportunity to argue for a lien on the Ally Contribution or a diminution in the value of their collateral, and any resulting adequate protection claim, regardless of the Court's rulings at

---

[13]     At a hearing on July 30, 2013, counsel to the JSNs stated: "Before the Ally settlement occurred . . . there was a question as to whether unsecured creditors were going to get anything in the context of this case, or whether these cases were going to go into administrative insolvency, in which case, the intercompany claims don't matter.  They're not going to get paid any more than any other creditor was going to get paid."  Transcript of Hearing, In re Residential Capital, LLC, Case No. 12-12020 (MG), dated July 30, 2013, at 28:1-7.

confirmation on the compromise of Intercompany Balances and allocation (or lack thereof) of

the Ally Contribution.[14]

> b.      The Plan Proponents Will Include Additional Disclosure
>          Concerning the Nature of the Dispute With the JSNs

28.      The JSNs have requested extensive additional disclosures concerning their

views of the allocation of the Ally Contribution, their supposed entitlement to adequate

protection, the enforceability of intercompany claims, and the allocation of certain asset sale

proceeds.  (JSN Obj. at 8-16.)  Their proposed disclosures are inaccurate and misleading in

material respects, and reflect a degree of unbridled advocacy that is wholly inappropriate for

inclusion in a disclosure statement.

29.      First, contrary to the JSNs' arguments, there is no basis for allocating the

Ally Contribution to specific third party or estate causes of action–let alone allocating any

portion of it to potential causes of action on which the JSNs have asserted liens.  The Global

Settlement, as the Court well knows, was reached after months of negotiations among

approximately two dozen parties in interest, and was designed specifically to avoid the need to

adjudicate the multitude of complex intercreditor and interdebtor disputes that have been raised

in these cases.  To attempt to somehow "allocate" the proceeds of the Ally Contribution in these

circumstances to one claim or another or to one Debtor or another is contrary to the terms of the

Global Settlement, to the intent of all the parties to the settlement and to the compromises

achieved.  Indeed, it is folly to suggest that the Global Settlement, negotiated among so many

different parties in interest with such divergent views, represents any one party's view of the

merits of a particular claim.

---

[14]    This should likewise address the JSNs' premature contention (JSN Obj. ¶ 34) that the Plan fails to satisfy
section 363(e) of the Bankruptcy Code.

30.     Even if the Court were to undertake an allocation, there are additional
hurdles to the allocation of any part of the Ally Contribution to the JSNs' collateral.  The JSNs'
assertion that the Examiner concluded that the majority of the strongest claims against Ally
sounded in breach of contract and were thus part of the JSNs' collateral (JSN Obj. ¶¶ 22-25) is
simply incorrect.  As set forth in the Plan Proponents' briefs submitted in connection with the
pending motions to dismiss in the Consolidated JSN Adversary Proceeding, many of the claims
and causes of action that could have been asserted against Ally were tort or avoidance actions as
to which the JSNs did not have a lien.  Even the tax allocation agreement claim upon which the
JSNs place so much weight (JSN Obj. ¶ 23) is not a contract claim.  And the JSNs' discussion of
allocation (JSN Obj. ¶¶ 22-25) omits entirely any mention of the broad settlement of third-party
claims, which is an essential element of the Global Settlement, and upon which the JSNs, of
course, could have no lien.  Finally, even if the Court were to determine that the JSNs' liens
would otherwise have attached to some portion of the Ally Contribution, the Creditors'
Committee has available to it in this case compelling equitable arguments for not extending the
JSNs' liens to the Ally Contribution under section 552(b) of the Bankruptcy Code.

31.     Second, the JSNs flatly misstate the nature of the Plan Proponents'
contentions concerning the JSNs' alleged adequate protection claims.  Among other things, it is
*not* the Plan Proponents' contention that "the JSNs are not entitled to any adequate protection for
the post-petition diminution in value of their collateral" (JSN Obj. ¶ 26); rather, the Plan
Proponents contend that the JSNs cannot demonstrate that the aggregate value of their collateral
has declined in value from the Petition Date.

32.     Third, rather than succinctly stating their position with respect to the
various issues in dispute, the JSNs' proposed insert goes on at length for six pages, setting forth,

among other things, the legal bases for their arguments, a selection of quotes from parties involved in the Ocwen/Walter asset sales, and an elaborate chart that is duplicative of their textual arguments and appears to serve no purpose other than to disparage the Plan Proponents' arguments as to the value of the JSNs' collateral.  The proposed insert, in short, is a preview of the evidence and arguments the JSNs will likely raise in the Consolidated JSN Adversary Proceeding and at confirmation, from briefing to testimony to trial graphics.

33.     None of this is appropriate for inclusion in a Disclosure Statement.  As set forth in the Objections Chart, the Plan Proponents have included in the Disclosure Statement an appropriately revised version of the proposed insert annexed as Exhibit B to the JSNs' Objection.

c.     The Plan Proponents Will Include Additional Disclosure
Concerning the JSNs' Views of the Global Settlement

34.     The Global Settlement has unified the Debtors, the Creditors' Committee, and a large and diverse set of Consenting Claimants that previously held widely divergent views regarding the proper outcome of these cases.  The JSNs' request for further disclosures regarding the parties' views of the merits of the claims of the RMBS Trusts, Senior Unsecured Noteholders, and the monoline insurers (JSN Obj. at16-19) is designed with the transparent intent of undermining this unity of purpose.  (See, e.g., JSN Obj. ¶ 45 (requesting disclosures so as to determine "whether certain parties are receiving too much at the expense of other parties").)

35.     As set forth above, one of the chief virtues of the Global Settlement is that it avoids the need for extensive inter-creditor litigation concerning the merits of disputed claims. The Plan Proponents are prepared to defend the Global Settlement on the merits at confirmation, but they need not include a detailed discussion of the strengths and weaknesses of the various settled claims in the Disclosure Statement.  The Disclosure Statement explains, in succinct terms,

the general bases for the various aspects of the Global Settlement.[15]  The JSNs' attacks on the

Creditors' Committee are particularly misplaced.  (JSN Obj. ¶ 42 (asserting Committee changed

its position with respect to RMBS Trust claims).)  Settlement of the RMBS Trust claims in the

context of a plan has been the Committee's stated goal throughout these chapter 11 cases.[16]

36.    In sum, the JSNs' efforts to create divisions where none currently exist

should be rejected and their request for the Plan Proponents to insert any additional bases for the

allocation of consideration and allowance of Claims above and beyond that already included in

the Disclosure Statement should be denied.  Nonetheless, as set forth in the Objections Chart, the

Plan Proponents have included in the Disclosure Statement an edited version of the proposed

insert annexed as Exhibit C to the JSNs' Objection.  In addition, the Plan Proponents have

included additional disclosures concerning the merits of the settlement of the RMBS Trust

claims and monoline claims.

    d.    <u>The Plan Proponents Will Include Additional Disclosure
Concerning the JSNs' Views of the Ally Settlement</u>

37.    The JSNs contend that the Disclosure Statement does not contain

sufficient disclosures regarding the Ally Settlement, arguing, in particular, that the Disclosure

Statement does not adequately describe the Examiner Report, the justifications for the Third

Party Releases, or the allocation of the Ally Contribution, and that it fails to describe what will

---

[15]    <u>See</u>, <u>e.g.</u>, Disclosure Statement at 28 ("By way of example, litigation over the claims asserted by the RMBS
Trustees could require a Trust-by-Trust analysis of the claims and could last several years, presenting a
significant burden on the Debtors' Estates."), 29 ("The Debtors performed an analysis with respect to the MBIA
claims regarding estimated lifetime losses and determined, in an exercise of their business judgment, that a
settlement of the MBIA claims, as outlined in the Plan, represents a reasonable resolution of the novel and fact-
intensive issues that have already been the subject of years of litigation, and is in the best interest of the
Estates."), 37 & 80 (discussing claims of the Senior Unsecured Noteholders released by the Plan).

[16]    <u>See</u>, <u>e.g.</u>, *Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed.
R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements*, at 2 [Docket No. 2825] ("The
Committee believes that the best way to remedy this dislocation and maximize the prospects for a successful
resolution of these cases is to address the Trusts' claims through a global negotiation process, which would
encompass all major issues in the case and include all major creditor constituencies—with the assistance of an
independent fiduciary if the Court believes that would be beneficial.").

happen if the Global Settlement is not approved.  (JSN Obj. at 18-21.)  These objections are

meritless, not to mention misleading.  The Disclosure Statement contains a robust discussion of

each point.

38.    The Disclosure Statement contains a lengthy and balanced discussion of

the Examiner Report, including specific reference to the individual components of the $5.5

billion in potential claims on which the JSNs focus in their Objection.  (Disclosure Statement at

76-79; JSN Obj. ¶ 48.)  It is the JSNs' presentation of the claims in their Objection and proposed

rider that is misleading, if not flatly inaccurate.  The JSNs' statement that "[t]he Examiner's

Report concluded that the claims against Ally held by the Debtors had an aggregate value in

excess of **$5.5 billion**" (JSN Obj. ¶ 48 (emphasis in original)) ignores the fact–mentioned in the

Disclosure Statement–that of this total amount, the Examiner concluded that $2.36 billion related

to claims that were *more likely than not to fail*.  (Disclosure Statement at 68.)  And while that

leaves approximately $3.14 billion in claims that the Examiner concluded could succeed, $1.78

billion of this $3.14 billion related to claims that were a "close question."  Contrary to the JSNs'

insinuations, the Examiner's Report emphatically supports, rather than undermines, the

reasonableness of the Ally Contribution.[17]

39.    In addition, the Disclosure Statement contains a lengthy and prominent

discussion of the release of claims against the Ally Released Parties.  (Disclosure Statement at

21-25.)  It explains the claims released, the consideration for the releases, why subject matter

jurisdiction exists over the releases and why the applicable legal standards are met.  (Id.)  Short

of a brief, with citations to case law and evidence, it is not clear what else the Plan Proponents

could be expected to do to explain and justify the releases.  In addition, as discussed above, the

---

[17]    It bears noting that the JSNs are hardly the appropriate party to question the amount of the Ally Contribution,
the original constituency of the group (advised by its current advisers) having agreed to a contribution roughly
one third the size of the current contribution at the outset of these Chapter 11 Cases.

Plan Proponents do not believe it is necessary, appropriate, or even possible, to attempt to "allocate" the Ally Contribution.  The JSNs' positions with respect to the releases and allocation may differ from the Plan Proponents', but these are matters more appropriately resolved at confirmation.

40.     Finally, and relatedly, the JSNs are incorrect in their assertion (JSN Obj. ¶ 50) that the Disclosure Statement fails to describe adequately the consequences of the Court rejecting the Global Settlement and, in particular, the releases.  The Disclosure Statement contains a specific "Risk Factor" discussing the potential that the Plan Releases may not be approved by the Court.  (Disclosure Statement at 173).  In addition, the Disclosure Statement states that: "the Plan settles a variety of highly complex disputes" which, if not resolved, "would have led to years of costly litigation and resulted in significant uncertainty and delays in distributions to creditors" (Disclosure Statement at 2); "[a]bsent the Ally Contribution, the Global Settlement would not be possible" (id.); "Ally has insisted that the Releases are a condition to its agreement to make the Ally Contribution" (id. at 22-23); "the Releases are an essential component and critical to the success of the Plan" (id. at 23); and "without the Releases embodied in the Plan, creditors would receive only a small fraction of the anticipated distributions described herein" (id.).

41.     In sum, the JSNs' objections relating to the disclosures concerning the Ally Contribution, the Examiner's Report, and the releases are entirely misplaced.  Nevertheless, in an effort to resolve the Objection, as reflected in the Objections Chart, the Plan Proponents have included additional disclosures, including the addition of a "Risk Factor" concerning the consequences of a failure to obtain approval of the Global Settlement.

e.    The Disclosure Statement Contains Adequate Information
Concerning the Treatment of the JSN Claims

42.    The Disclosure Statement's description of the treatment of the JSNs'

claims is sufficient.  The JSNs object to the fact that the Plan Proponents have reserved the right

to pay postpetition interest (to the extent allowed) over time at the appropriate market rate, rather

than on the Effective Date of the Plan.  (JSN Obj. ¶¶ 53-56.)  However, the JSNs do not point to

any law requiring that payment of secured claims must be made on the Effective Date, and the

Plan Proponents are not aware of any such requirement.  Rather, section 1129(b)(2)(A) of the

Bankruptcy Code permits payment of secured claims over time, subject to satisfaction of the

criteria of one of the three subsections thereof.  Nor do the JSNs cite any case law requiring that

a Plan specify, in advance of confirmation, which of two alternative treatments will be applied to

a secured claim.  If either alternative would satisfy section 1129(b)(2)(A), then the JSNs have no

cause to object.  Whether their treatment does, in fact, ultimately satisfy the requirements of the

Bankruptcy Code is an issue for confirmation, and is premature at this juncture.  To address the

JSNs' concern that they do not know the appropriate payment period and interest rate (JSN Obj.

¶ 55), the Plan Proponents have indicated in the Disclosure Statement that they will provide that

information in the Plan Supplement, if applicable.

**B.    The Disclosure Statement Has Been Modified to Address the FHFA's
Disclosure Objections**

43.    The FHFA is getting uniquely favorable treatment under the Plan in that

the Plan Proponents, Ally, and the Consenting Claimants have agreed to carve out the FHFA

from the Third Party Releases.  Nonetheless, the FHFA objects that the Disclosure Statement

lacks adequate information because it: (i) fails to explain the impact of section 4617(b)(15) of the

Housing and Economic Recovery Act of 2008 ("HERA") on the Plan and potential recoveries to

unsecured creditors, (ii) does not describe the allocation of the Ally Contribution as between the

released estate causes of action and third party claims as well as among the Debtor Groups, and

(iii) does not disclose the timing or procedure by which the Plan Proponents may seek

subordination of the FHFA's claim.[18]  (FHFA Obj. ¶¶ 15-24.)  With the additional disclosures

discussed below, these objections should be overruled.

> a.    <u>HERA is Unlikely to Impact Creditor Recoveries, But the Plan
> Proponents Have Revised the Disclosure Statement to Provide
> Requested Disclosures</u>

44.    The Plan Proponents believe that HERA is not likely to impact recoveries

to creditors under the Plan because HERA (as applicable here) relates to the FHFA's right to

avoid transfers made with the intent to hinder, delay or defraud the FHFA or Freddie Mac, and

the Plan Proponents are not aware of any transfers made with the intent to hinder or defraud

FHFA or Freddie Mac.

45.    By way of background, the Plan provides that, with certain exceptions, the

Liquidating Trust will retain and may enforce all rights to pursue certain Causes of Action,

which likely include certain estate avoidance actions under the applicable provisions of the

Bankruptcy Code or state law.  (Plan, Art. IV.R (Preservation of Causes of Action).)  The Plan

further provides that any proceeds obtained by the Liquidating Trust on account of such Causes

of Action will inure to the benefit of general unsecured creditors.  (Plan, Art. III.D.)  However,

according to the FHFA, section 4617(b)(15) of HERA provides the FHFA with the ability to

"avoid intentional fraudulent transfers made by debtors of Freddie Mac" and to receive a

recovery on such transfers ahead of any party under the Bankruptcy Code (other than another

Federal agency) including, in this case, general unsecured creditors.  (FHFA Obj. ¶ 17); <u>see</u> 12

U.S.C. §§ 4617(b)(15)(A), (B), (D).

---

[18]    The FHFA also argues that it should be entitled to vote on the Plan.  (FHFA Obj. ¶ 25.)  This issue, and the Plan
Proponents' response, is discussed in Section IV below.

46.     Based on sections 4617(b)(15)(A), (B) and (D) of HERA, the FHFA argues that the Disclosure Statement cannot be approved until it explains the following:  (i) that the FHFA believes it is entitled to first priority recoveries on certain avoidance actions preserved by the Plan, (ii) that avoidance actions covered by section 4617(b)(15)(A) of HERA (i.e., intentional fraudulent conveyance actions relating to the transfers by debtors of Freddie Mac) are fully preserved and not released under the Plan, and (iii) parties being released by the Plan should be informed that they may still be liable as recipients of transfers they received that are covered by section 4617(b)(15)(A) of HERA.  (Id. ¶ 21.)

47.     The Plan Proponents emphasize that the applicable section of HERA relating to intentional fraudulent conveyances is limited to transfers made to intentionally defraud the *FHFA or Freddie Mac*—a limited set of circumstances not applicable here—and does not apply to other intentional fraudulent conveyance claims that will be preserved under the Plan and transferred to the Liquidating Trust.  See 12 U.S.C. § 4617(b)(15)(A) ("[The FHFA] . . . may avoid a transfer . . . that was made  . . . with the intent to hinder, delay, or defraud the regulated entity [here, Freddie Mac], the Agency [the FHFA], the conservator, or receiver.").  The Plan Proponents (as well as the Examiner) have conducted an intensive investigation of potential fraudulent conveyance claims and are not aware of **any** intentional fraudulent conveyances made to defraud the FHFA or Freddie Mac that the Debtors or the Liquidating Trust may bring.

48.     Nevertheless, as set forth in the Objections Chart, the Plan Proponents have added language to the Disclosure Statement to address the FHFA's objection.  The Plan Proponents submit that the additional language is sufficient to satisfy the FHFA's concerns

regarding HERA and preserves the FHFA's ability to raise the same issue in connection with

confirmation of the Plan.

b.      The Objections Premised on Allocation of the Ally Contribution
        Are Misplaced

49.     The FHFA requests disclosure concerning the allocation of the Ally

Contribution as between released estate causes of action and released third-party claims and as

between Debtor Groups.  (FHFA Obj. ¶¶ 22-23.)  As discussed above, however, the Plan

Proponents do not believe it is necessary, appropriate, or possible to attempt to "allocate" the

Ally Contribution.  Moreover, to the extent the FHFA's objection relates to purported claims as

to which it asserts a superior right of avoidance, the Plan Proponents, as noted, do not believe

any such causes of action exist.  In any event, the FHFA's objections to allocation are more

appropriately reserved for confirmation.

c.      The Plan Proponents Have Provided Sufficient Disclosure
        Regarding Subordination of the FHFA's Claim

50.     The FHFA objects to the disclosure concerning the subordination of its

claim, arguing that the Disclosure Statement does not adequately disclose the "timing or

procedure" by which the Plan Proponents will seek subordination.  (FHFA Obj. ¶ 24.)  The Plan

provides that a list of claims to be subordinated will be filed with the Plan Supplement.  (Plan

Art. III.E.)  As reflected in the Objections Chart, the Plan Proponents have amended the

Disclosure Statement to make clear that they will either include the FHFA on the list in the Plan

Supplement or seek to subordinate the FHFA's claim by separate adversary proceeding.  Because

the Plan Proponents have not yet taken any action to subordinate the FHFA's claim, no further

disclosure is possible.  The FHFA will be provided with notice and an opportunity to be heard if

and when the Plan Proponents seek such relief from the Court.

C.    **The U.S. Trustee's Objection Should be Overruled**

51.    The U.S. Trustee argues that the Plan is unconfirmable as written in light of certain provisions governing the payment of fees and expenses of professionals.  In addition, the U.S. Trustee requests additional disclosure concerning the payment of professional fees, the Third Party Releases, the partial consolidation of certain Debtor entities for purposes of distributions, and the payment of the U.S. Trustee fees.  The U.S. Trustee's confirmation objection is premature and in any event fails because it (i) misunderstands the nature of the fee and expense payments being made under the Plan, and (ii) misstates applicable law.  The U.S. Trustee's disclosure objections are misplaced because the Disclosure Statement contains adequate information; nevertheless, as discussed below and reflected in the Objections Chart, the Plan Proponents have made certain additional disclosures that should address the U.S. Trustee's concerns.

a.    The Plan's Fee and Expense Payment Provisions are Consistent With Applicable Law

52.    The U.S. Trustee objects to the Plan's provisions regarding payment of: (i) the fees and expenses of the Senior Unsecured Notes Indenture Trustee and its professionals; and (ii) the Allowed Fee Claim of the Steering Committee Consenting Claimants and the Talcott Franklin Consenting Claimants.  (U.S. Trustee Obj. at 1, 11, 13.)  These are premature confirmation objections not properly considered at this time.  In any event, the objections fail on the merits.[19]

---

[19]    The U.S. Trustee alleges that the Disclosure Statement is "replete with impermissible provisions authorizing the payment of fees and expenses to professionals," (U.S. Trustee Obj. at 8) but in spite of this broad statement, the U.S. Trustee  appears to object on patent unconfirmability grounds only to the payments to be made to the Senior Unsecured Notes Indenture Trustee and its professionals and the Allowed Fee Claim of the Steering Committee Consenting Claimants and the Talcott Franklin Consenting Claimants.  (See generally U.S. Trustee Obj. at 9-15 (referencing only such payments).)  The remainder of its fee-based objections are disclosure objections, and are addressed below.

53.    The objection to payment of the fees and expenses of the Senior

Unsecured Notes Indenture Trustee and its professionals is entirely misplaced because, contrary

to the U.S. Trustee's contention (U.S. Trustee Obj. at 11), it is not the case that all of the

Debtors' creditors bear such expenses.  In fact, the fees and expenses in question are to be paid in

accordance with the Senior Unsecured Notes Indenture Trustee's charging lien and will have no

impact on the recoveries of any creditors other than the Senior Unsecured Noteholders–a fact set

forth explicitly in the Disclosure Statement.  (Disclosure Statement at 127.)  The U.S. Trustee

cites no case law or statute prohibiting enforcement of a charging lien in a chapter 11 plan, and

the objection appears to be premised simply on a misunderstanding of the nature of the payments

at issue.

54.    The U.S. Trustee's objection to the Allowed Fee Claim is similarly

misplaced.  Like the indenture trustee fees and expenses, the payment of the Allowed Fee Claim

will have no impact on the recoveries of creditors other than the RMBS Trusts.  The Allowed

Fee Claim will be paid out of distributions paid on account of the RMBS Trust Claims and thus

is conceptually identical to the enforcement of a charging lien.  (Plan at 63.)

55.    Moreover, even if there were a principled basis for distinguishing the

Allowed Fee Claim from the payment of indenture trustee fees pursuant to a charging lien, the

U.S. Trustee's assertion that payments to be made under a chapter 11 plan must necessarily meet

the "substantial contribution" standards of section 503(b) of the Bankruptcy Code (U.S. Trustee

Obj. at 9-13) is incorrect as a matter of law.  As both Judge Gerber and Judge Peck have held,

the payment of professional fees and expenses pursuant to a chapter 11 plan need *not* meet those

standards.[20]  The U.S. Trustee may take issue with the <u>Adelphia</u> and <u>Lehman</u> decisions, but

---

[20]    See <u>In re Adelphia Commc'ns Corp.</u>, 441 B.R. 6, 9 (Bankr. S.D.N.Y. 2010); <u>In re Lehman Bros. Holdings Inc.</u>, 487 B.R. 181, 189-90 (Bankr. S.D.N.Y. 2013).

certainly the Plan Proponents' decision to structure a Plan in accordance with those holdings

does not render the Plan patently unconfirmable at the Disclosure Statement stage.

56.     Finally, the U.S. Trustee's contention that the Allowed Fee Claim violates

section 1129(a)(4) of the Bankruptcy Code (U.S. Trustee Obj. at 13-15) is likewise incorrect and,

in any event, premature.  Section 1129(a)(4) requires that certain payments to be made under a

chapter 11 plan must be approved by the court as reasonable.  11 U.S.C. § 1129(a)(4).  The Plan

Proponents do not concede that payments made pursuant to a Rule 9019 settlement are subject to

this provision, but in any event may choose to seek approval of the Allowed Fee Claim as

reasonable in connection with confirmation of the Plan.[21]  To question the Allowed Fee Claim's

reasonableness at this stage is premature.

> **b.      Disclosures Regarding Fees and Expenses, Partial Consolidation, Release and Exculpation Provisions, and UST Fees are Sufficient**

57.     The U.S. Trustee requests further disclosure concerning:  (i) "the identity

of all parties for which the Plan provides for reimbursement of fees and expenses and the legal

and factual bases for those not seeking prior Court approval for payment"; (ii) "the legal and

factual bases for the proposed partial substantive consolidation of the Debtors"; (iii) "the

proposed non-debtor third-party releases, exculpation provisions, limitations of liability and

injunction"; and (iv) "each Debtors' obligation to pay U.S. Trustee fees and to separately report

its disbursements."  (U.S. Trustee Obj. at 2.)  The Plan Proponents respond as follows:

> *(i)      Disclosures Regarding Fees and Expenses*

58.     The Plan Proponents believe that the Disclosure Statement contains

adequate information concerning the fee and expense payments to be made under the Plan.

---

[21]    See, e.g., In re Journal Register Co., 407 B.R. 520, 536-37 (Bankr. S.D.N.Y. 2009) (approving payments under
section 1129(a)(4) where disclosure statement and plan disclosed the payments, creditors' committee endorsed
the payments as reasonable, and debtors' chief operating officer testified without contradiction that payments
were reasonable).

Nevertheless, as set forth in the Objections Chart, in light of the U.S. Trustee's disclosure-based

objections (see U.S. Trustee Obj. at 7-8), the Plan Proponents have modified the Disclosure

Statement to provide a single "complete and comprehensive list" of the professionals to be paid

and the authority pursuant to which such payments will be made (i.e., section 330 of the

Bankruptcy Code or through the Plan).[22]

      59.     The Plan Proponents do not believe it is necessary to provide a detailed

discussion of the "applicable facts and legal standards supporting the proposed payments." (U.S.

Trustee Obj. at 8). The document in question is a Disclosure Statement, not a fee application,

and the most relevant information for voting purposes is who is going to be paid, and a short

statement of why they are being paid. The U.S. Trustee may believe that the facts and the law do

not justify payment of the fees and expenses in question, but that is an issue that it is free to raise

at confirmation or an applicable fee hearing. In response to this objection, as reflected in the

Objections Chart, the Plan Proponents have prepared a schedule of fees to be paid under the Plan

and the authority for such payments.[23]

            (ii)     *Disclosures Regarding Partial Consolidation*

      60.     The U.S. Trustee contends that the Disclosure Statement should be

amended "to contain information demonstrating that the proposed partial substantive

---

[22]    The U.S. Trustee also requested that the Disclosure Statement include the amounts to be paid to each of the professionals. However, since the total amounts paid to all professionals cannot be known at this time, the chart does not include such information. As the chart makes clear, however, substantially all of the professionals (other than those being paid out of the distribution to their holders, as discussed above) will only be paid upon approval of a Final Fee Application, which will detail the full amount sought by each professional. As to the amount of the Allowed Fee Claim, pursuant to the Plan, that will be disclosed in the Plan Supplement. In the meantime, the Plan Proponents have added to the Disclosure Statement the language from the Supplemental Term Sheet reflecting the division of the Allowed Fee Claim among the counsel to the Institutional Investors.

[23]    The Plan Proponents understand that the U.S. Trustee was concerned that the professionals retained by individual Committee members might be paid under the Plan; to the extent this was ambiguous, the schedule of fees clarifies which Creditors' Committee members professionals are being paid under the Plan pursuant to an order of the Court.

consolidation for Plan purposes meets [applicable] standards." (U.S. Trustee Obj. at 16.) The

Plan Proponents believe that the Disclosure Statement's original limited partial consolidation

discussion was sufficient and that there is no need in a disclosure statement–as opposed to a brief

in support of confirmation–to set forth in detail the legal and factual bases for such limited

consolidation. This is particularly true in the instant case, where, as noted in the Disclosure

Statement, the analysis undertaken by the Plan Proponents suggests that "no creditors are harmed

by the proposed grouping of the Debtors in to the Debtor Groups for distribution purposes under

the Plan." (Disclosure Statement at 38.) If an affected creditor disagrees with that analysis, the

Plan Proponents will address that creditor's concerns. In the absence of disagreement, the U.S.

Trustee's objection is academic, and to elaborate in the Disclosure Statement on the detailed

bases for the limited consolidation of the Debtors would result only in a needless expenditure of

time and resources.

61.    In the meantime, having revisited their analysis in light of the U.S.

Trustee's objection, the Plan Proponents have modified the Disclosure Statement and Plan to

carve out from the proposed limited consolidation a single Debtor estate that arguably is harmed

by the proposed limited consolidation. These revisions are reflected in the Objections Chart.

> (iii)    *Disclosures Regarding Third Party Release and*
> *Exculpation Provisions*

62.    The U.S. Trustee's objection to the release and exculpation provisions of

the Plan, though couched in terms of disclosure, is clearly a disguised confirmation objection.

(See, e.g., U.S. Trustee Obj. at 19 (". . . the Court does not have subject matter jurisdiction to

approve this provision . . .").) As such, the objection is premature.[24] The Plan Proponents will

---

[24]    See Transcript of Hearing at 19:8-9, In re Arcapita Bank B.S.C., Case. No. 12-11076 (Bankr. S.D.N.Y. Apr. 26,
2013) [Docket No. 1057] ("There was a lot about third party releases, obviously. And that's a plan issue.");
Order Regarding Motion to Approve Disclosure Statement, In re New York City O.T.B., Case No. 09-17121

demonstrate at confirmation that the release and exculpation provisions of the Plan are

appropriate and consistent with Second Circuit authority.

63.    To the extent the U.S. Trustee's objection relates to the adequacy of

disclosure, it is misplaced.  The Disclosure Statement contains a detailed discussion of the Third

Party Release that explains the bases of subject matter jurisdiction and justifies the release on the

merits.  (Disclosure Statement at 21-25 (explaining Ally's substantial contributions, the unique

circumstances of these Chapter 11 Cases, and the bases for subject matter jurisdiction)).  The

Disclosure Statement had not previously discussed the bases for the exculpation provisions, but,

as reflected in the Objections Chart, the Plan Proponents have now included a discussion.[25]  This

change should address the U.S. Trustee's objection.

*(iv)    Disclosures Regarding U.S. Trustee Fees*

64.    In response to the U.S. Trustee's objection regarding disclosures relating

to U.S. Trustee Fees, as reflected in the Objections Chart, the Plan Proponents have included

language requested by the U.S. Trustee clarifying the treatment of such fees.

---

(MG) (Bankr. S.D.N.Y. Dec. 1, 2010) [Docket No. 234] (noting Court lacked "sufficient factual or legal record"
to resolve objections to release and exculpation provisions at disclosure statement stage); In re Innkeepers USA
Trust, 448 B.R. 131, 148 (Bankr. S.D.N.Y. 2011) (holding that objections asserting that "release provisions
[were] overly broad and should not be approved absent the consent of each releasing party" were "best
categorized as confirmation objections"); Transcript of Hearing at 126:14-19, In re Chemtura Corp., Case No.
09-11233 (Bankr. S.D.N.Y. July 21, 2010) ("The propriety of a third party release . . . is a confirmation issue.");
In re Drexel Burnham Lambert Grp., Case No. 90-10421, 1992 WL 62758, at *1 (Bankr. S.D.N.Y. Mar. 5,
1992) (referencing court's earlier ruling that objections to plan's non-debtor release and injunction provisions
were in the nature of objections to confirmation).

[25]    Contrary to the U.S. Trustee's contentions, Second Circuit case law does provide a basis for exculpating parties
that are not estate fiduciaries where, as here, those parties were vital to the negotiation and implementation of a
largely consensual chapter 11 plan, and without which plan consummation would not be possible.  See, e.g.,
Drexel, 960 F.2d 285, 293 (2d Cir. 1992) (finding that where a debtor's plan of reorganization requires the
settlement of numerous, complex issues, protection of third parties against legal exposure may be a key
component of the settlement); see also In re Enron Corp., 326 B.R. 497, 503 (S.D.N.Y. 2005) (finding that
"without such protection from liability," key constituents might not actively participate in plan process or
"abandon efforts" to help a debtor "follow through on the plan and wind up its affairs").  Under similar
circumstances, this Court has recently approved chapter 11 plans exculpating the Creditors' Committee and its
members, indispensable creditor constituencies party to plan negotiations, and the plan sponsor, from liability
relating to the plan, disclosure statement, and chapter 11 cases.  See In re General Maritime, Case No. 11-15285
(MG) (Bankr. S.D.N.Y. May 7, 2012).

**D.**    **The NCUAB Objection Should be Overruled**

65.    The NCUAB raises seven objections to the Disclosure Statement, four of
which have been consensually resolved, and a fifth of which has been partially resolved.  The
remaining objections relate not to the adequacy of disclosure concerning the treatment of the
NCUAB's class (general unsecured claims), but rather the treatment of another class (Private
Securities Claims) to which the NCUAB has sought entry.  (See NCUAB Obj. at II.A, II.B.1,
and II.E.)  Yet as case law and legislative history make clear, a creditor has standing only to
object to the adequacy of disclosure concerning its own class; and the relevant benchmark is a
hypothetical class member, not a specific creditor's parochial interest in another class.[26]
Moreover, the NCUAB's classification – the grounds for which were fully disclosed – is an issue
for confirmation.

66.    Nevertheless, ample disclosures were added to the Disclosure Statement to
address the NCUAB's objections, as shown in the Objections Chart.  And even more detail
regarding the Private Securities Claims will be provided in the Plan Supplement, after the Private
Securities Claimants (who have recently agreed in principle to an allocation of the distribution
earmarked for their group) have had the opportunity to jointly develop aspects of the Private
Securities Claims Trust.

**E.**    **The Disclosure Statement Has Been Modified to Address the Concerns
Raised by Freddie Mac Relating to the RMBS Trust Claims**

67.    Freddie Mac objected to the Disclosure Statement on the grounds that
additional information on the treatment and projected recoveries of the RMBS Trusts was

---

[26]    See  H.R. Rep. No. 595, 95th Cong., 1st Sess. 408-09 (1977), *reprinted in* Vol. C Collier on Bankruptcy, App.
Pt. 4(d)(i) (Matthew Bender 16th Ed.); 11 U.S.C. § 1125(a)(1) ("adequate information" defined from the
perspective of "a hypothetical reasonable investor typical of claims or interests of the relevant class"); In re
Scioto Valley Mortg. Co., 88 B.R. at 171 ("a creditor only has standing to object adequacy of a disclosure
statement as to its own class and not as to the adequacy of the statement as it affects another class") (citing In re
Adana Mortgage Bankers, Inc., 14 B.R. 29, 30 (Bankr. N.D. Ga. 1981)).

required.  As set forth in the Objections Chart, the Plan Proponents have made significant

additional disclosures concerning such treatment and recoveries.  Although the Plan Proponents

are still in discussions with Freddie Mac, it is the understanding of the Plan Proponents that these

supplemental disclosures should consensually resolve Freddie Mac's objection.

>F.    **Impac's Objection Relating to the Treatment of Executory Contracts is Premature and, if Necessary, the Plan Proponents Will Establish at the <u>Confirmation Hearing that the Proposed Procedures are Appropriate</u>**

68.    The Objection filed by Impac addresses specific Plan provisions

governing the assumption and rejection of executory contracts and asserts an objection more

appropriate for the Confirmation Hearing.  At that time, if necessary, the Plan Proponents will

show that the procedures in the Plan relating to assumption or rejection of contracts are

supported by law and are consistent with procedures approved by this Court and others in this

district.  (<u>See</u> Objections Chart (providing overview of legal basis for Plan's provisions).)

69.    In any event, Impac's objection will likely soon be moot given the

Debtors' intention to file a motion to assume and assign the servicing related agreements with

Impac that form the basis for its Objection.  Thus, as to Impac, the Debtors do not anticipate the

need to extend any executory contract decision deadline pursuant to the Plan.  Furthermore, to

the extent the Debtors and Impac can agree on an appropriate cure amount, the Debtors will

promptly cure any defaults under the relevant contracts.[27]

---

[27]    Impac's accusations that the Debtors are seeking to hold Impac "hostage," or confirm a plan with "coercive" and "intimidat[ing]" effects on counterparties (Impac Obj. at ¶ 14) grossly mischaracterize the procedures set forth in the Plan and are entirely false.  In fact, the Debtors agree—and have suggested to Impac—that escrowing any disputed cure amounts (<u>id.</u>) until mutual resolution of the cure issues remains an appropriate resolution and would allow the Debtors to expediently assume and assign the relevant servicing contracts to Ocwen.

G.    **Amherst's Objection Should be Overruled**

70.    The RMBS Settlement has garnered the overwhelming support of the

Trusts whose claims it settles, as well as those Trusts' investors.  Only six of the more than 1,000

Trusts covered by the RMBS Settlement have opted out of the Plan Support Agreement, and not

a single Trust (including the opt-out Trusts) has filed an objection to the Disclosure Statement.

Indeed, only a single investor representative – Amherst – has filed a Disclosure Statement

objection.

71.    Amherst, an investment manager for investors in a single class of

securities issued by a single RMBS Trust (RALI 2006-QO7), objects to the treatment of its

Trust's claim under the Plan and to the payment of the Allowed Fee Claim.  These objections, of

course, are confirmation objections and will be dealt with at the appropriate time.  Nevertheless,

the Plan Proponents respond briefly below to the substance of Amherst's arguments.  Amherst

also raises a disclosure objection which, as discussed below, the Plan Proponents have addressed

through minor revisions to the Disclosure Statement.  Finally, the Plan Proponents respond to

Amherst's unfounded contention that it, rather than its Trust, should be entitled to vote on the

Plan.

a.    The Plan's Treatment of "Opt Out" Rights is Proper

72.    Amherst contends that the Plan inappropriately seeks to eliminate the right

of Amherst and its Trust to challenge the allowed claim amount fixed by Duff & Phelps for its

Trust under the RMBS Settlement, arguing that it should be permitted to "opt out of the RMBS

Settlement."  This argument rests on two fundamental misunderstandings.

73.    *First*, Amherst overlooks the fundamental distinction between opting out

of *the PSA* – which the PSA expressly permitted – and opting out of *treatment under the Plan*,

which a Trust is not permitted to do.  As the PSA states, a Trustee that has received a valid

direction from its Trust's investors had the right (though not the obligation) to opt out of the PSA – that is, the "right, for such RMBS Trust, to withdraw the execution of this [Plan Support] Agreement and the agreement [contained in the PSA] to vote in favor of the Plan."  *See* PSA § 5(c).  In other words, a Trust that has opted out of the PSA is no longer a signatory to that agreement and therefore is no longer *contractually* bound to vote in favor of and otherwise support the Plan and the RMBS settlement it embodies.  However, even an opt-out Trust *is* bound by the terms of the Plan – including the treatment the Plan provides the RMBS Trusts – if the Plan is confirmed in accordance with the requirements of the Bankruptcy Code.  Thus, an opt-out Trust (unlike a Trust that has not opted out) is free to vote against the Plan and to object to confirmation on any available ground, but if the Plan is confirmed, it has no special exemption from the Plan's terms by virtue of its opt-out status.

74.    *Second*, Amherst's discussion of the Trusts' opt-out rights confuses the power of a Trust's investors to *direct* action by the Trustee with their supposed (but in fact non-existent) power to *compel* Trustee action.  Amherst is correct that, under the governing agreements for its Trust, investors have the right to "direct" the Trustee to take certain actions (e.g., to opt out of the PSA).  But to direct is not the same as to compel:  While a valid direction has significant legal consequences,[28] the Trustee remains free to decline the direction.

75.    Indeed, Amherst appears to recognize that the Trustee's decision to decline its direction was consistent with its rights under the governing documents.  (*See* Amherst Obj. at 6:  "*as permitted* under Article 8 of the [PSA], the Trustee declined to comply with the Direction Letter or to direct [the trust's] withdrawal from the Support Agreement" (emphasis

---

[28]    For example, the documents governing Amherst's Trust exculpate the Trustee from potential liability to investors for actions taken in accordance with a valid direction.  See Standard Terms of Pooling and Servicing Agreement dated as of March 1, 2006 for Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, § 801(c)(iii).  In addition, investors who have given a valid direction are excused from the no-action clause that would otherwise bar them from taking action as Trust investors.  See id., § 11.03(c).

added).)  But Amherst fails to grasp the consequence of the Trustee's decision.  Specifically, as a result of the Trustee's decision to decline Amherst's opt-out direction, the Trust remains a party to the PSA, and consequently a party to the RMBS Settlement embodied in the Plan.  That settlement, rather than any estimation or other claims allowance proceeding, fixes the amount of the Trust's allowed claims.[29]

b.    <u>Amherst's Judicial Estoppel Argument is Unfounded</u>

76.    Amherst contends that the Debtors are judicially estopped from contesting Amherst's right to compel the Trustee to opt out of the settlement.  However, it is clear that neither of the two judicial estoppel requirements cited by Amherst is satisfied:  the Debtors' current position is not "clearly inconsistent" with its prior position, nor did the Debtors previously "succeed[] in persuading [the Court] to accept" an inconsistent prior position.  (See Amherst Obj. ¶ 11 (citing <u>Sewell v. 1199 Nat'l Ben. Fund for Health & Human Servs.</u>, 187 Fed. Appx. 36, 40 (2d Cir. 2006).)

77.    Amherst bases its judicial estoppel argument principally on a single sentence of Exhibit 1 to the Debtors' Omnibus Reply in Further Support of Debtors' Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter into and Perform Under a Plan Support Agreement With Ally Financial Inc., the Creditors' Committee and Certain Consenting Claimants (the "<u>PSA Reply</u>") [Docket No. 4066], which stated that "Amherst continues to have the ability to direct the RMBS Trustees to opt out of the RMBS Settlement."  (Amherst Obj. ¶ 3.)  But, apart from having been quoted out of context,[30] this statement was in no way inaccurate or inconsistent with the Debtors' current position.  As

---

[29]    Nevertheless, because the settlement contemplates a Bankruptcy Court finding that the settlement is fair to investors, the Trustees will present proof, at confirmation, that the RMBS Settlement is fair to all trusts and their investors, including Amherst and its Trust.

[30]    Amherst omits to mention that the Debtors' principal response to Amherst's PSA objection was that the "objection is premature and must be brought within the Plan confirmation process."  PSA Response, Ex. A, at 1.

36

discussed above, the ability to direct is not the same as the ability to compel.  As Amherst

acknowledges in its objection, the Trustee was "permitted" under the governing agreements to

decline to comply with its direction.  Exhibit 1 to the PSA Response did not purport to address

the various legal consequences of a direction or the circumstances in which the Trustees are

permitted to decline to honor a direction.  Thus, there is no inconsistency between the Debtors'

current and prior positions.

78.    Amherst's attempt to find inconsistency in the statement of counsel to the

Bank of New York Mellon Trust Company, N.A. at the PSA hearing is similarly misplaced.  As

counsel pointed out in the very passage quoted by Amherst, a valid direction by Amherst "would

*entitle* the trustee to withdraw that trust from the PSA . . . ."  As discussed, to be entitled to

withdraw from the PSA is very different from being compelled to withdraw.  While counsel did

not elaborate on this distinction at the PSA hearing, there could have been no possible confusion

on Amherst's part.  Just one month before that hearing, the Trustees had sent a notice (the "May

23 Notice") to all investors, including Amherst, addressing this distinction in detail.[31]  Among

other things, that notice specifically discussed the right of a Trustee to decline a valid opt-out

direction on a variety of grounds.  See May 23 Notice at 5 ("The relevant RMBS Trustee may

determine not to accept such an instruction for a number of reasons, including, but not limited to,

its determination that . . . the direction tendered is not in the best interests of the Trust.").

79.    It is, if anything, even clearer that the second judicial estoppel requirement

is not satisfied.  Amherst contends that "the Debtors assured AAM that the settlement would not

be binding on RALI 2006-Q07 should AAM elect to opt out of the RMBS Settlement . . . ," and

---

[31]    The notice is attached as Exhibit H to Exhibit G of the *Joinder of Certain RMBS Trustees to the Debtors'
Motion for an Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing the Debtors to Enter Into
and Perform Under a Plan Support Agreement With Ally Financial Inc., the Creditors' Committee, and Certain
Consenting Claimants* [Docket No. 3940].

that, "[b]ased on that commitment, AAM 'acquiesced' and discontinued prosecution of the PSA

Objection." (Amherst Obj. ¶ 12.)  However, not only was no such assurance given (as just

discussed); in addition, the reason for Amherst's "acquiescence" had nothing to do with any

imagined assurance concerning the power to opt out.  Rather, as Amherst's counsel stated at the

PSA hearing, Amherst was satisfied that the issues it was raising (like the issues it now raises in

its disclosure statement objection) were preserved for confirmation:  "Based on the statements

made in the debtors' and the committee's reply that the issues we've raised in our pleading are

reserved for confirmation, we don't need to -- . . . . We have nothing further to add."  (PSA

Hearing Tr. at 120.)  The Court's decision granting the PSA motion denied the objections of

Amherst and other objectors on the same ground:  "Other than as discussed above, all of the

objections raise issues that should be raised either in connection with a motion seeking approval

of a disclosure statement . . . or, more likely, at the time of confirmation."  In re Residential

Capital LLC, Case No. 12-12020, 2013 WL 3286198, at *21 (Bankr. S.D.N.Y. June 27, 2013).

> c.    Payment of the Allowed Fee Claim is Consistent With Applicable
> Law

80.    Amherst objects to payment of the Allowed Fee Claim on grounds similar

to the U.S. Trustee – namely, that it is "unclear what section of the Bankruptcy Code permits

such an allowance" and that the Disclosure Statement "fails to describe any contribution (much

less any substantial contribution) to the formation of the Plan."  (Amherst Obj. ¶ 16.)  This is a

premature confirmation objection and, for reasons discussed above (at ¶¶ 55-56), it is in any event

without merit.  The payment of the Allowed Fee Claim was negotiated with the Steering

Committee Group of Institutional Investors and is an important component of the RMBS

Settlement.  The treatment of the RMBS Trust Claims is a modification and extension of the

Original RMBS Settlement.  (See Disclosure Statement at 82.)  Under that settlement, the

counsel for the Institutional Investors were entitled to attorneys' fees.  Thus, it is appropriate to

apply that same agreement regarding fees to an expanded settlement that is embodied in the Plan

that benefits all RMBS Trusts with Recognized Claims.  As discussed above, the payment of

such fees, whether under a Plan or a 9019 Settlement, is appropriate and permissible.[32]

> d.    The Plan Proponents Will Provide Additional Disclosure
> Regarding the Allowed Fee Claim

81.    In response to Amherst's contention that the Disclosure Statement does

not adequately address the Allowed Fee Claim (Amherst Obj. ¶ 15), the Plan Proponents have

provided certain additional disclosures regarding the claim, as set forth in the Objections Chart.

> e.    Amherst is Not Entitled to Vote on the Plan

82.    For reasons similar to those discussed above, Amherst's contention (see

Amherst Obj. ¶¶ 18-19) that the Plan's voting procedures must be modified to permit Amherst to

vote on the Plan is also misplaced.  Amherst's direction to its Trustee, as noted, has been

declined, and  Amherst cites to no provision of the Trust's governing documents that would

require the Trustee to permit Amherst to vote on the Plan in these circumstances.  Under the

PSA, from which the Trust has not opted out, the Trust has committed to vote in favor of the

Plan.

**H.    The Plan Has Been Modified to Further Explain the Treatment of Tax
Claims**

83.    Generally speaking, the Taxing Authorities raise plan confirmation

objections relating to the treatment of real property taxes under the Plan and appear to request

---

[32]    Contrary to the implications of its objection (Amherst Obj. at n.5), counsel to Amherst is not similarly situated
to the counsel receiving the proceeds of the Allowed Fee Claim.  Unlike those counsel, Amherst played no role
in the negotiation of the RMBS Settlement or the Global Settlement and, in fact, continues to object to the Plan.
Amherst provides no legal basis for requiring the payment of its own attorneys' fees.

that their purported claims against the Debtors be specifically referenced in the Disclosure

Statement and be Allowed pursuant to the Plan.

84.     The Plan Proponents do not believe that the Plan and Disclosure Statement

must specifically identify either:  (i) the property taxes owed on each of the Debtors' properties,

or (ii) the applicable state law interest rates or lien retention and default provisions for each state

in which the Debtors may owe taxes.  However, the Plan and Disclosure Statement have been

modified to clarify the treatment of Priority Tax Claims and Administrative Claims to assure

compliance with the applicable provisions of the Bankruptcy Code.  (See Plan Art. II.C;

Disclosure Statement Art. V.A.3.)  To the extent that the Taxing Authorities have filed a valid

claim,[33] such claims will be dealt with during the claims resolution process and, to the extent

such claims are Allowed, they will receive a recovery in accordance with the applicable

provisions of the Plan.  The Plan Proponents submit that no further disclosures in the Disclosure

Statement or modifications to the Plan are necessary to satisfy the issues raised by the Taxing

Authorities.

**I.      The Disclosure Statement Has Been Modified to Include Further Disclosure
Relevant to Borrowers**

85.     A small number of borrowers have objected to approval of the Disclosure

Statement raising narrow issues relating to their treatment, and the treatment of borrowers more

generally, under the Plan.   Modifications to the Disclosure Statement have been made in several

places to provide borrowers with additional information with respect to their treatment under the

Plan and the potential recoveries to borrowers should the Plan be confirmed.  (See, e.g.,

Disclosure Statement Art. II.H).  Moreover, each borrower shall be provided with a plan support

---

[33]    Nassau County Treasurer filed a claim against the Debtors, Claim No. 6878 (the "Nassau County Claim").  The
Debtors have objected to the Nassau County Claim on the grounds that it contains insufficient documentation.
See Debtors' Fifteenth Omnibus Objection to Claims (No Liability – Insufficient Documentation Tax Claims)
[Docket No. 4149].

letter (the "Borrower Letter") that will, among other things, direct a borrower to the sections of

the Disclosure Statement dealing with the treatment of borrower claims.  The Borrower Letter

will also provide a borrower with an example of how an Allowed Borrower Claim will be treated

under the Plan.

With these modifications, the Plan Proponents submit that the Disclosure

Statement contains more than sufficient information for a "hypothetical investor" to make an

informed judgment about the Plan and complies with all aspects of section 1125 of the

Bankruptcy Code.  The Plan Proponents, therefore, respectfully request that the Court approve

the Disclosure Statement.

## IV.    THE SOLICITATION PROCEDURES AND TABULATION PROCEDURES SHOULD BE APPROVED

86.    Two parties—the JSNs and the FHFA—have raised issues with respect to

the Solicitation Procedures and the Tabulation Procedures.  The JSNs object to the provision in

the Disclosure Statement Approval Order stating that if "no holders of Claims eligible to vote in

a particular Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the

holders of such Claims in such Class."  (JSN Obj. at 22-24.)  The JSNs argue that while it may

be appropriate to deem such classes to accept for purposes of section 1129(a)(8), it is not

appropriate for purposes of section 1129(a)(10).  As an initial matter, the Disclosure Statement

Approval Order does not specify the implications of such a class being deemed to accept, and, as

an issue that could be rendered moot by the actual results of voting on the Plan, this is a classic

confirmation objection that need not be resolved at this time.[34]  The JSNs' objection, moreover,

assumes that affirmance of the Plan will require acceptance by at least one impaired class at each

---

[34]    See Order Regarding Motion to Approve Disclosure Statement at 3, In re New York City O.T.B., Case No. 09-17121 (MG) (Bankr. S.D.N.Y. Dec. 1, 2010) [Docket No. 234] (noting "objections [to the disclosure statement] should be limited to those that cannot be cured by voting") (citing In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988)).

Debtor.  (JSN Obj. ¶ 62.)  As the JSNs surely are aware, courts have held to the contrary.[35]  In

the absence of controlling authority rejecting the Plan's voting and tabulation construct–and the

existence of supportive authority–the Plan cannot be said to be patently unconfirmable at this

juncture.

87.     In any event, the Plan Proponents have addressed this objection by adding

a footnote in the Disclosure Statement and an ordered paragraph in the Proposed Order noting

that the JSNs have objected to this provision, that the Plan Proponents are prepared to establish

its appropriateness, if necessary, at the Confirmation Hearing, and that all rights of the JSNs to

object to this provision at the Confirmation Hearing are reserved.  The Plan Proponents submit

that the additional disclosure added to the Disclosure Statement is sufficient to defer the issue

until Plan confirmation.

88.     The FHFA has asserted an objection to the Solicitation Procedures (and

asserts that the Plan is unconfirmable) on the grounds that it should be entitled to vote on the

Plan because the Plan actually provides it with a recovery.  (FHFA Obj. at ¶ 25.)  In light of the

FHFA's objection, the Plan has been revised to provide that the FHFA is entitled to vote on the

Plan unless the Court determines that the FHFA Claims are subordinated pursuant to section

510(b) of the Bankruptcy Code, in which case the FHFA will be deemed to reject the Plan and

the votes of the FHFA will not be counted.  (Plan Art. III.D.)

89.     With these modifications, the Plan Proponents request that the Court

approve the Solicitation Procedures and Tabulation Procedures.

---

[35]    See, e.g., JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns
Operating, LLC), 419 B.R. 221, 266 (Bankr. S.D.N.Y. 2009).

## CONCLUSION

WHEREFORE, for the foregoing reasons, and the reasons set forth in the

Disclosure Statement Motion, the Plan Proponents respectfully request that the Court enter an

order granting the relief requested and such other or further relief as is just and proper.

Dated: August 16, 2013
      New York, New York

Respectfully submitted,

/s/ Lorenzo Marinuzzi
Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren
Jennifer L. Marines
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel for the Debtors and
Debtors in Possession*

-and-

KRAMER LEVIN NAFTALIS & FRANKEL
LLP
Kenneth H. Eckstein
Douglas H. Mannal
Stephen D. Zide
David E. Blabey, Jr.
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee
of Unsecured Creditors*