**Exhibit 10**

# EXHIBIT 10

## JSN's Position on Examiner's Report and Ally's Response

The Junior Secured Noteholders contend that the Examiner's Report concluded that the claims against Ally held by the Debtors had an aggregate value in excess of $5.5 billion, including (a) approximately $3.1 billion of Debtor claims which the Examiner concluded were likely or more likely than not to succeed and (b) another $2.4 billion of Debtor claims as to which the Examiner concluded were more likely than not to fail.[1] Given the supposed magnitude of these claims, the Junior Secured Noteholders question whether $2.1 billion is sufficient consideration to justify the Debtor Releases.

The Junior Secured Noteholders also observe that one of the principal claims the Examiner identified as one as to which the Debtors would be more likely than not to prevail is claim for reimbursement under a Tax Allocation Agreement.[2] As set forth in the Examiner's Report, the Debtors are parties to a Tax Allocation Agreement with Ally. According to the Junior Secured Noteholders if the Ally Contribution is made and the *status quo* is otherwise maintained, Ally would obtain more than **$2.2 billion** in tax benefits over time, to the extent Ally generates sufficient taxable income to utilize the Debtors' tax losses, as illustrated in the chart below.[3]

---

[1] See Examiner's Report at I-29–I-33.

[2] Examiner's Report at I-13, I-30, VII.K-31. The Examiner has calculated the amount of the benefit to be $1.77 billion at the time that Ally was proposing to contribute $750 million to the settlement. See Examiner's Report at VIIK-31. Also these estimated amounts do not take into consideration the likely state tax benefit that would increase the amounts owing to the Debtors under the Tax Allocation Agreement.

[3] Id. at VIIK-31.

|  | Examiner Report | Adjustment for Higher AFI Contribution | New POR |
|---|---|---|---|
| **Expected amount of cancellation of debt income (in millions)** | | | |
| ResCap tax liabilities | 10,154 | | 10,154 |
| Less: Creditors' expected recovery | (6,233) | (1,350) | (7,583) |
| **Cancellation of Debt Income** | **3,921** | **(1,350)** | **2,571** |
| **Amount of built-in losses expected to be realized by ResCap during the Chapter 11 Cases (in millions)** | | | |
| Creditors' expected Recovery | 6,233 | 1,350 | 7,583 |
| Less assumed contribution by AFI to creditors' recovery | (750) | (1,350) | (2,100) |
| Less tax basis in ResCap assets | (11,387) | | (11,387) |
| **Built-in losses Expected to be Realized by ResCap** | **(5,904)** | **0** | **(5,904)** |
| **Amount of ResCap tax benefits available for AFI's use (in millions)** | | | |
| ResCap NOLs generated (11/2/2009-12/31/2012) | 1,444 | | 1,444 |
| ResCap capital losses generated (11/2/2009-12/31/2012) | 1,629 | | 1,629 |
| ResCap losses to be realized during Chapter 11 cases | 5,904 | | 5,904 |
| Less: Expected amount of cancellation of debt income | (3,921) | 1,350 | (2,571) |
| **Tax Benefits to AFI** | **5,056** | **1,350** | **6,406** |
| Federal income tax rate | 35.0% | 35.0% | 35.0% |
| **Value of Tax Benefits to AFI** | **1,770** | **473** | **2,242** |

      Based on their analysis above, the Junior Secured Noteholders assert there is no net cost to Ally of making the Ally Contribution, only a net benefit of $300 million. In sum, the Junior Secured Noteholders argue that if the Tax Allocation Agreement is enforced as the Examiner suggested it should be, Ally is securing the release for no consideration (assuming that Ally can fully utilize the Debtors' tax losses).

The Junior Secured Noteholders further contend that even assuming that the Court were to determine that the Ally Contribution was sufficient to justify the Debtor Releases, there is a serious question as to whether the remainder of such contribution is "substantial" enough to justify the Third-Party Releases under <u>Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)</u>, 416 F.3d 136, 143 (2d Cir. 2005), the controlling precedent on third-party releases in the Second Circuit.

The Plan Proponents do not believe it is appropriate, or possible, to attempt to "allocate" any part of the $2.1 billion Ally Contribution to the Third-Party Releases. The Junior Secured Noteholders contend, however, that a material portion of the $2.1 billion contribution must be attributed to the Third-Party Releases. After factoring in such amount, the Junior Secured Noteholders assert significantly less than $2.1 billion is available to justify the Debtor Releases, calling into question whether Ally is contributing enough to obtain the benefit of either of these releases.

---

The Plan Proponents do not agree with the JSNs' view of the Examiner's Report. As set forth in detail in the Disclosure Statement, the Examiner's Report emphatically supports—and in no way undermines—the reasonableness of the Ally Contribution and the Global Settlement here. Indeed, the JSNs' characterization of the findings and conclusions in the Examiner's Report are flatly misleading and inaccurate. For example, the JSNs' assert that "[t]he Examiner's Report concluded that the claims against Ally held by the Debtors had an aggregate value in excess of $5.5 billion." *Objection of Ad Hoc Group of Junior Secured Noteholders to Plan Proponents' Motion for an Order, Inter Alia, Approving the Disclosure Statement and Establishing Procedures for Solicitation And Tabulation of Votes to Accept or Reject the Plan Proponents' Joint Chapter 11 Plan* [Docket No. 4590] (the "<u>JSN Objection</u>") at 19. But of that amount, the Examiner's Report found that $2.4 billion related to claims that were more likely than not to fail.

In addition to the above, in response to the JSNs assertions Ally separately notes that the JSNs also wholly fail to acknowledge that the Examiner's Report concluded the primary claims against Ally were likely to fail. While the Examiner's Report did identify certain claims against Ally that it concluded are more likely than not to prevail, Ally asserts, that all of those claims involve close questions of fact and law and are subject to strong defenses. In particular, the Examiner's Report identified up to $1.31 billion in damages with respect to claims on which it concluded that the Debtors' Estates are likely to prevail. Ally asserts that those claims are subject to substantial defenses, as to both liability and damages. For example, one of those claims—accounting for $566 million in potential damages—relates to the Debtors' prepetition repayments to AFI on a line of credit extended from Ally to the Debtors. The Examiner's Report found that such payments may be potential violations of the Minnesota Insider Preference statute, but Ally believes that it has strong defenses to those claims, including that the repayments were made in the ordinary course of business and that the claims are preempted by Section 546(e) of the Bankruptcy Code. Another of those claims relates to the allocation of revenue regarding certain mortgage loans, and accounts for $520 million in potential damages—but those claims, too, in Ally's view are subject to numerous contractual defenses on the law and the facts.

The Examiner's Report also identified up to $1.78 billion in potential damages with respect to claims that it conceded are close questions, but concluded that the Debtors' Estates are more likely than not to prevail. The bulk of those potential damages—$1.77 billion—relate to a tax allocation agreement between Ally and the Debtors. The JSNs spend substantial time discussing that alleged claim, and they recalculate the potential damages to be $2.2 billion.

Ally believes that the JSNs' argument—and their calculation of potential damages—is flawed as a matter of fact and irrelevant as a matter of law. According to Ally, as a matter of fact, the JSNs' assertion rests on a flawed premise—that the estates would "prevail [on] a claim for reimbursement under a Tax Allocation Agreement." JSN Objection at 19. Rather, Ally believes that to succeed on such a claim, a claimant must—but cannot—clear two separate hurdles. First, a claimant must successfully avoid the operative Tax Allocation Agreement between the parties—an agreement that does not call for Ally to "reimburse" ResCap for Ally's use of ResCap's losses for tax purposes. Ally believes that such an effort would fail for numerous reasons, including that the agreement employs the approach preferred by auditors, including Deloitte, and federal regulators, including the SEC and the Department of the Treasury; it uses the approach required by GAAP accounting in the absence of a tax allocation agreement between parties; ResCap received reasonably equivalent value in executing the Tax Allocation Agreement, particularly as compared to the previous operative tax agreement, executed in 2006; both sides received good and sufficient consideration; and ResCap's board independently evaluated and approved the Tax Allocation Agreement.

Second, Ally asserts that even assuming a claimant could avoid the operative Tax Allocation Agreement, it must then establish that a previous draft of the Tax Allocation Agreement—which ResCap did not sign—is a valid and enforceable contract, which is a difficult burden for a claimant to carry, as the Examiner's Report acknowledges in concluding that the issue is "a close question." *See* Examiner's Report at I-14. Indeed, Ally believes that such a claim would fail because the parties did not intend to be bound by the draft agreement until it was fully executed by both sides, which never happened for legitimate business reasons, including that Ally's board had not approved the agreement or authorized Ally's management to execute it and that it would have led to an unprecedented windfall for ResCap. Thus, Ally concludes that because the parties never signed the draft agreement, and never intended to be bound by it, a claim to establish its enforceability would fail under established Michigan law that the Examiner did not even address. *See Wiegand v. Tringali*, 177 N.W. 2d 435, 437 (Mich. Ct. App. 1970) ("In cases where a writing which purports to evidence a contract between several named persons has been signed by less than all those named, it is often found that the signers did not intend to become contractually bound until all the apparent parties sign and deliver the writing.").

Even if a claimant could clear both hurdles—which it cannot—Ally believes that there is no "net benefit" or "windfall" to Ally, as the JSNs allege. JSN Objection at 19-20. According to Ally, any "tax benefits" that flow to Ally are entirely unrelated to the Global Settlement and the proposed releases because ResCap, like other Ally subsidiaries, is a disregarded entity for tax purposes. As a result, any income or losses that ResCap generates are income or losses of Ally. Ally points out that because it must report that income and loss on its tax filings, and Ally is required to pay any associated tax, any "tax benefits" to Ally from ResCap's losses are Ally's to

begin with—and are the result of ResCap's status as a disregarded entity for tax purposes, not the result of any settlement with the Debtors' Estates or the Plan's proposed releases.

Moreover, Ally believes that the JSNs' projection of "$2.2 billion in tax benefits for Ally"—insinuating, without stating, that those are the alleged damages to ResCap—is fundamentally flawed and, in all events, is overstated. JSN Objection at 19. Specifically, Ally observes as follows:

1. The JSNs' projection assumes that Ally will immediately use all of the available ResCap losses to reduce Ally's taxable income, but that has not happened and will not happen by confirmation. In fact, there is no certainty that Ally would ever use all of the available ResCap losses, much less when it would do so—making any alleged "damage" to ResCap purely speculative.

2. The JSNs' projected $2.2 billion in potential damages to ResCap under the draft tax allocation agreement is premised on a circular and non-sensical application of the Ally settlement contribution to the calculation of Ally's "tax benefits." Under the JSNs' calculation, as Ally contributes more and more funds to the estates in a settlement (including to resolve any claim on account of the draft tax allocation agreement), the amount of ResCap's cancellation of debt income decreases and thus its net available losses increases—and as a result, the potential tax benefits to Ally, and the damages for that alleged tax claim, increases. That fact is made clear from the face of the JSNs' Exhibit D: when Ally's proposed contribution was $750 million, the Exhibit reflects potential tax benefits to Ally of $1.77 billion; when Ally's proposed contribution is increased to $2.2 billion, the Exhibit reflects potential tax benefits to Ally of $2.24 billion. *See* JSN Objection, Exhibit D at 2. In other words, under the JSNs' theory, for each additional dollar that Ally contributes to the estate in a settlement, it owes the estate an additional 35 cents (assuming a 35% tax rate) in alleged damages on a claim pursuant to the unsigned and superseded draft tax allocation agreement. It cannot be that the more money Ally contributes to the estates in a settlement, the more it would owe the estates on an alleged tax reimbursement claim.

Finally, with respect to the proposed third party releases, the JSNs' argument—that if the settlement and releases are approved, Ally would receive "a windfall" based on the Examiner's Report's conclusions regarding the draft Tax Allocation Agreement—is irrelevant as a matter of law. In evaluating whether third-party releases are appropriate, courts in the Second Circuit do not consider ancillary, hypothetical benefits that may result to the non-debtor recipient of the releases—such as any potential tax benefits to Ally. Indeed, the JSNs do not point to a single case in this Circuit in which the court weighed the value of the consideration given against the value of any ancillary benefits to the non-debtor. Nor can they, because that is not the law for determining the appropriateness of third-party releases.