**<u>Exhibit 1 to Revised Disclosure Statement</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) Case No. 12-12010 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | ) |
| | ) Chapter 11 |
| Debtors. | ) |
| | ) Jointly Administered |
| | ) |

---

**JOINT CHAPTER 11 PLAN PROPOSED BY RESIDENTIAL CAPITAL, LLC, et al.
AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

---

| | |
|---|---|
| MORRISON & FOERSTER LLP | KRAMER LEVIN NAFTALIS & FRANKEL LLP |
| Gary S. Lee | Kenneth H. Eckstein |
| Lorenzo Marinuzzi | Douglas H. Mannal |
| Todd M. Goren | Stephen D. Zide |
| Jennifer L. Marines | Rachael L. Ringer |
| 1290 Avenue of the Americas | 1177 Avenue of the Americas |
| New York, New York 10104 | New York, New York 10036 |
| Telephone:    (212) 468-8000 | Telephone: (212) 715-9100 |
| Facsimile:    (212) 468-7900 | Facsimile: (212) 715-8000 |
| | |
| *Counsel for Debtors and Debtors-in - Possession* | *Counsel for the Official Committee of Unsecured Creditors* |

Dated:  ~~July 3,~~ August 16, 2013
           New York, New York

THIS PLAN IS BEING SUBMITTED FOR APPROVAL BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE, 11 U.S.C. § 1125. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT. NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, OR A LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST.

TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINED TERMS, RULES OF CONSTRUCTION, COMPUTATION OF
TIME, AND GOVERNING LAW ........................................................................ 5

    A.    Defined Terms ......................................................................................... 5

    B.    Rules of Construction ......................................................................... 3436

    C.    Computation of Time .......................................................................... 3537

    D.    Governing Law ................................................................................... 3537

ARTICLE II. ADMINISTRATIVE CLAIMS, PROFESSIONAL CLAIMS, PRIORITY
TAX CLAIMS, AND U.S. TRUSTEE FEES ..................................................... 3537

    A.    Administrative Claims ........................................................................ 3537

    B.    Professional Claims ........................................................................... 3638

    C.    Priority Tax Claims ............................................................................ 3839

    D.    U.S. Trustee Fees ............................................................................... 3840

ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND
EQUITY INTERESTS ....................................................................................... 3840

    A.    Classification of Claims and Equity Interests .................................... 3840

    B.    Record Date for Claims ...................................................................... 3840

    C.    Summary of Classification and Class Identification ........................... 3941

    D.    Treatment of Claims and Equity Interests ......................................... 4143

    E.    Subordinated Claims .......................................................................... 5558

    F.    Distributions on Account of Allowed Claims and Interests ............... 5659

    G.    Elimination of Vacant Classes ........................................................... 5659

    H.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
Code .................................................................................................. 5659

ARTICLE IV. IMPLEMENTATION OF THE PLAN .............................................. 5760

    A.    Global Settlement ............................................................................... 5760

    B.    Ally Settlement .................................................................................. 5962

    C.    RMBS Settlement .............................................................................. 6164

    D.    Settlement of Monoline Claims. ........................................................ 6669

    E.    Private Securities Claims Trust ......................................................... 6770

    F.    Borrower Claims Trust ...................................................................... 6972

    G.    Settlement of Claims of Kessler Class Claimants .............................. 7275

| H. | NJ Carpenters Claims Settlement | ~~72~~76 |
| I. | Senior Unsecured Notes Settlement | ~~73~~76 |
| K. | Cancellation of Securities, Indentures, and Other Documents Evidencing Claims and Equity Interests | ~~73~~77 |
| L. | Treatment of Intercreditor Agreement | ~~74~~78 |
| M. | Compensation Order | ~~74~~78 |
| N. | Corporate Action | ~~74~~78 |
| O. | Dissolution of the Debtors | ~~75~~79 |
| P. | Effectuating Documents; Further Transactions | ~~75~~79 |
| Q. | Exemption from Certain Taxes and Fees | ~~76~~80 |
| R. | Preservation of Causes of Action | ~~76~~80 |

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ ~~77~~81

| A. | Rejection of Executory Contracts and Unexpired Leases | ~~77~~81 |
| B. | Assumption of Executory Contracts and Unexpired Leases | ~~78~~82 |
| C. | Contracts and Leases Entered Into After the Petition Date | ~~79~~83 |
| D. | Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases | ~~80~~84 |
| E. | Nonoccurrence of Effective Date | ~~80~~84 |
| F. | No Change in Control | ~~80~~84 |

ARTICLE VI. THE LIQUIDATING TRUST ........ ~~80~~84

| A. | Generally ~~80~~; Creation and Conversion | 84 |
| B. | Purpose of the Liquidating Trust | ~~81~~85 |
| C. | Transfer of Assets to the Liquidating Trust | ~~81~~85 |
| D. | Liquidating Trust Administrative Reserve~~81~~ and Administrative, Priority, Secured and Convenience Distribution Reserve | 85 |
| E. | Liquidating Trust Governance | ~~82~~86 |
| F. | Financial Statements/Reporting | ~~82~~87 |
| G. | Tax Treatment | ~~82~~87 |
| H. | Duration | ~~84~~89 |
| I. | Conflicting Terms | 89 |
| J. | Exculpation; Indemnification; Insurance | ~~84~~89 |

ARTICLE VII. PROVISIONS GOVERNING ISSUANCE OF UNITS AND OTHER DISTRIBUTIONS ........ ~~85~~90

A.    Applicability .................................................... ~~85~~90

B.    Cash Distributions ............................................ ~~85~~90

C.    Initial Issuance of Units and Distributions in Respect of Units by the Liquidating Trust ~~85~~91

D.    Fractional Units ............................................... ~~86~~92

E.    Timing and Calculation of Amounts to be Distributed ...... ~~87~~92

F.    Disbursing Agent ............................................. ~~87~~92

G.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ... ~~88~~93

H.    Compliance with Tax Requirements ......................... ~~91~~97

I.    Allocations ................................................... ~~92~~98

J.    Setoffs and Recoupment ...................................... ~~92~~98

K.    Claims Paid or Payable by Third Parties ................... ~~93~~99

L.    Allowed Unsecured Claims for Which More than One Debtor in a Debtor Group Is Jointly and/or Severally Liable ................. ~~93~~99

M.    Distributions Free and Clear ................................ ~~94~~100

ARTICLE VIII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS .......... ~~94~~100

A.    Resolution of Disputed Claims ............................... ~~94~~100

B.    Disallowance of Claims ...................................... ~~96~~102

C.    Amendments to Claims ........................................ ~~96~~102

D.    Disputed Claims Reserve ..................................... ~~96~~102

ARTICLE IX. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS .................................................. ~~97~~103

A.    Compromise and Settlement of Claims, Equity Interests, and Controversies ~~97~~103

B.    Release of Liens ............................................. ~~98~~104

C.    Releases by the Debtors ..................................... ~~98~~104

D.    Third Party Release ......................................... ~~99~~105

E.    Third Party Release Carve-Out .............................. 105

F.    Ally Release ................................................. ~~99~~106

~~F~~G.    Exculpation ................................................. ~~100~~106

~~G~~H.    Injunction .................................................. ~~100~~107

~~H~~I.    Waiver of Subrogation ....................................... ~~101~~107

~~I~~J.    Satisfaction and Release of Claims and Equity Interests .... ~~101~~108

~~J~~K.    Judgment Reduction for Co-Defendants in Securities Litigation ~~102~~108

K̶L.       Limitations ............................................................................................. 1̶0̶2̶108

ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION AND
            CONSUMMATION OF THE PLAN ............................................... 1̶0̶2̶109

A.       Conditions Precedent to Confirmation .................................................. 1̶0̶2̶109

B.       Conditions Precedent to the Effective Date .......................................... 1̶0̶3̶109

C.       Waiver of Conditions ............................................................................ 1̶0̶4̶111

D.       Effect of Nonoccurrence of Conditions ................................................ 1̶0̶4̶111

ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .... 1̶0̶5̶111

A.       Modification and Amendments .............................................................. 1̶0̶5̶111

B.       Effect of Confirmation on Modifications .............................................. 1̶0̶5̶112

C.       Revocation or Withdrawal of the Plan .................................................. 1̶0̶5̶112

ARTICLE XII. RETENTION OF JURISDICTION ............................................................ 1̶0̶6̶112

ARTICLE XIII. MISCELLANEOUS PROVISIONS ......................................................... 1̶0̶8̶115

A.       Immediate Binding Effect ..................................................................... 1̶0̶8̶115

B.       Additional Documents ........................................................................... 1̶0̶9̶115

C.       Payment of Statutory Fees .................................................................... 1̶0̶9̶115

D.       Dissolution of the Creditors' Committee ............................................... 1̶0̶9̶115

E.       Access to Debtors' Records after Effective Date. ................................. 1̶0̶9̶116

F.       Substantial Consummation ..................................................................... 1̶1̶0̶116

G.       Reservation of Rights ............................................................................ 1̶1̶0̶117

H.       Successors and Assigns .......................................................................... 1̶1̶0̶117

I.       Service of Documents ............................................................................ 1̶1̶0̶117

J.       Further Assurances ................................................................................. 1̶1̶3̶119

K.       Term of Injunctions or Stays ................................................................. 1̶1̶3̶120

L.       Entire Agreement ................................................................................... 1̶1̶3̶120

M.       Exhibits and Related Documents ........................................................... 1̶1̶3̶120

N.       Severability of Plan Provisions .............................................................. 1̶1̶3̶120

O.       Waiver or Estoppel Conflicts ................................................................ 1̶1̶4̶121

P.       Conflicts ................................................................................................. 1̶1̶4̶121

## INTRODUCTION

The Debtors and the Creditors' Committee together propose this Joint Chapter 11 Plan[1] for resolution and satisfaction of all Claims against and Equity Interests in the Debtors. Each Debtor and the Creditors' Committee is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement accompanying the Plan, including the exhibits thereto, for a discussion of the Debtors' history, business, properties, and operations and risk factors, together with a summary and analysis of the Plan and a description of the settlements agreed to by the Debtors, the Creditors' Committee and certain other parties pursuant to the Global Settlement. All holders of Claims entitled to vote on the Plan are encouraged to consult the Disclosure Statement and to read the Plan carefully before voting to accept or reject the Plan.

NO SOLICITATION MATERIALS, OTHER THAN THE DISCLOSURE STATEMENT AND RELATED MATERIALS TRANSMITTED THEREWITH AS APPROVED BY THE BANKRUPTCY COURT HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THIS PLAN.

## ARTICLE I.

## DEFINED TERMS, RULES OF CONSTRUCTION, COMPUTATION OF TIME, AND GOVERNING LAW

### A.    Defined Terms

1.    "Accrued Professional Compensation" means, at any date, and regardless of whether such amounts are billed or unbilled, all of a Professional's accrued and unpaid fees (including success fees) and reimbursable expenses for services rendered in the Chapter 11 Cases through and including such date, whether or not such Professional has filed a fee application for payment of such fees and expenses, (i) all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been filed for any such amount) and (ii) after applying any retainer that has been provided by the Debtors to such Professional and not previously applied. No amount of a Professional's fees and expenses denied under a Final Order shall constitute Accrued Professional Compensation.

2.    "Additional Settling RMBS Trusts" means all RMBS Trusts other than the Original RMBS Settling Trusts.

3.    "Administrative Claim" means any Claim for costs and expenses of administration under sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Professional Claims; (c) all fees and charges assessed against the Estates pursuant to section

---

[1] All capitalized terms not defined in this introduction have the meanings ascribed to them in Article I of this Plan.

1930 of chapter 123 of title 28 of the United States Code, (d) any indebtedness or obligations assumed by the Debtors in connection with the conduct of their businesses; and (e) any Claim for goods delivered to the Debtors within twenty (20) days of the Petition Date and entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code.

4.      "Administrative Claim Bar Date" means the deadline for filing requests for payment of Administrative Claims, which shall be the first Business Day that is [•]thirty (30) days following the Effective Date, unless otherwise ordered by the Bankruptcy Court, except with respect to Professional Claims which shall be subject to the provisions of Article II.

5.      "Administrative, Priority, Secured and Convenience Distribution Reserve" means the reserve of the Liquidating Trust established for maintaining Cash to be used for payments after the Effective Date to holders of certain Allowed Claims as provided in Article VI.D.

6.      5. "Affiliate" means an "affiliate" as such term is defined in section 101(2) of the Bankruptcy Code.

7.      6. "AFI" means Ally Financial Inc.

8.      "AFI/JSN Cash Collateral Order" means the *Final Order Under Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured Superpriority Basis, (II) Authorizing the Debtors to Use Cash Collateral, and (III) Granting Adequate Protection to Adequate Protection Parties*, entered June 25, 2012 [Docket No. 491].

9.      7. "AIG" means AIG Asset Management (U.S.), LLC, on behalf of itself and its affiliates, as investment advisor for certain affiliated entities that have filed proofs of claim in the Chapter 11 Cases.

10.     8. "Allowed" means, with respect to a Claim against any Debtor, except as otherwise provided herein, (a) a Claim that is (i) listed in the Schedules as of the Effective Date as neither disputed, contingent nor unliquidated, and for which no Proof of Claim has been timely filed, or (ii) evidenced by a valid Proof of Claim or request for payment of Administrative Claim, as applicable, Filed by the applicable Bar Date, and as to which the Debtors or other parties in interest have not Filed an objection to the allowance thereof by the Claims Objection Deadline, or (b) a Claim that is Allowed under the Plan or any stipulation or settlement approved by, or Final Order of, the Bankruptcy Court; provided, however, that any Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court will not be considered "Allowed Claims" under the Plan, provided further, however, any Claims expunged or disallowed under the Plan or otherwise shall not be Allowed Claims. If a Claim is Allowed only in part, references to Allowed Claims include and are limited to the Allowed portion of such Claim. Notwithstanding anything to the contrary herein, no Claim that is disallowed in accordance with Bankruptcy Rule 3003 or section 502(d) of the Bankruptcy Code is Allowed and each such Claim shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

11.     9. "Allowed Fee Claim" means 5.7% of the Allowed RMBS Trust Claims, which shall be distributed to counsel to the Institutional Investors as fees via direct allocation to counsel

6

for the Institutional Investors and without conveyance to the RMBS Claims Trust, the RMBS
Trustees, or the RMBS Trusts.

12. ~~10.~~ "Allowed Kessler Claim" means a non-subordinated Allowed Borrower Claim
for voting and distribution purposes in an amount to be determined under the Kessler Settlement
Agreement.

13. ~~11.~~ "Allstate" means Allstate Insurance Company and its subsidiaries and
affiliates.

14. ~~12.~~ "Ally" means, collectively, AFI and its direct and indirect subsidiaries and
affiliates, excluding the Debtors and their direct and indirect subsidiaries.

15. "Ally Bank" means AFI's indirect banking subsidiary (f/k/a GMAC Bank), a
commercial state chartered bank regulated by the FDIC and the State of Utah.

16. ~~13.~~ "Ally Contract Claim" means any and all amounts owed to Ally as of the
Effective Date by any of the Debtors pursuant to (i) orders of the Bankruptcy Court and (ii) the
Debtors performance of the Ally Contracts following the Petition Date, provided, no Revolving
Credit Facility Claim is an Ally Contract Claim.

17. ~~14.~~ "Ally Contracts" means the contracts listed in Annex IV to Exhibit B of the
Plan Support Agreement.

18. ~~15.~~ "Ally Contribution" means Ally's contribution to the Estates of (a)
$1,950,000,000 in Cash on the Effective Date,  and (b) promptly after receipt on or after the
Effective Date, the first $150,000,000 received by Ally for any directors and officers or errors
and omissions insurance policy claims it pursues against its insurance carriers related to the
Claims released in connection with this Plan, provided that Ally guarantees that the Liquidating
Trust will receive such $150,000,000 on account of such insurance, which guarantee shall be
payable without defense, setoff or objection on September 30, 2014.

19. ~~16.~~ "Ally Indemnity Escrow Account" means the escrow account created pursuant
to the *Stipulation and Order Reserving Rights with Respect to Debtors' Motion for Interim and
Final Orders under Bankruptcy Code Section 105(a) and 363 Authorizing the Debtors to
Continue to Perform under the Ally Bank Servicing Agreement in the Ordinary Course of
Business* [Docket No. 1420].

20. ~~17.~~ "Ally Released Parties" means (a) Ally, and each of Ally's and the Debtors'
respective members, shareholders, partners, non-Debtor affiliates, and Representatives, including
Cap Re of Vermont, LLC and its current and former members, officers, and directors and (b)
each of Ally's successors and assigns, each Entity in clause (a) and (b) solely in its capacity as
such. For the avoidance of doubt, and without limiting the foregoing, the Ally Released Parties
shall not include (i) any purchaser of any assets relating to the Debtors' servicing business that is
not Ally or a Debtor, (ii) any assignee of a Servicing Agreement that is not Ally or a Debtor, (iii)
notwithstanding any status as a shareholder of any Ally Released Party, and solely in their
capacity as such, any underwriter of RMBS that is unaffiliated with Ally, and the Representatives
of such underwriter, against which an Investor has a pending or tolled Cause of Action, (iv) the

FHFA, (v) the FDIC, (vi) any assignee of executory contracts that were assumed by the Debtors that is not Ally, (vii) any insurer that is not Ally that sold any directors & officers or errors & omissions insurance policies that cover Debtors, (viii) any party that is not Ally against whom RFC may have indemnity rights arising out of the Kessler Class Action, specifically, any successors in interest to CBNV and GNBT, ~~and~~ (ix) the Plan Trustees, and (x) Fannie Mae.

21. ~~18.~~ "Ally Securities" means Ally Securities, LLC.

22. ~~19.~~ "Assumption Schedule" means the schedule in the Plan Supplement setting forth certain Executory Contracts and Unexpired Leases for assumption under section 365 of the Bankruptcy Code.

23. ~~20.~~ "Available Assets" means all the assets of the Estates, including all Equity Interests in the Non-Debtor Subsidiaries and the Ally Contribution, excluding, however, (i) any "residual" interest in any REMIC held by a Debtor and (ii) any equity interest in any PFIC held by a Debtor.

24. ~~21.~~ "Ballot" means each of the ballot forms distributed to each holder of a Claim that is entitled to vote to accept or reject this Plan and on which the holder is to indicate, among other things, acceptance or rejection of this Plan.

25. ~~22.~~ "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*, as in effect as of the date hereof.

26. ~~23.~~ "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York, or any other court having jurisdiction over the Chapter 11 Cases.

27. ~~24.~~ "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under 28 U.S.C. § 2075 and the general, local, and chambers rules of the Bankruptcy Court, as the context may require.

28. ~~25.~~ "Bar Date" means, collectively, the Administrative Claim Bar Date, the Rejection Damages Claim Bar Date, and any deadline by which a Proof of Claim must be filed under the Bar Date Order, as applicable.

29. ~~26.~~ "Bar Date Order" means the *Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof*, entered by the Bankruptcy Court on August 29, 2012 [Docket No. 1309], as amended, supplemented, or modified.

30. ~~27.~~ "BNY Mellon" means The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., each solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, master servicer, custodian and/or similar agency capacities in respect of certain of the RMBS Trusts.

31. ~~28.~~ "Borrower" means an individual whose current or former mortgage loan was originated, serviced, sold, consolidated, or owned by any of the Debtors.

32.    29. "Borrower-Related Cause of Action" means a Cause of Action of any of the Debtors that has been or could be asserted, including by way of setoff, recoupment, defense, or counterclaim, by any of the Debtors against a Borrower or a Borrower Claim as of the Effective Date.

33.    30. "Borrower Claims" means (i) Claims of a Borrower arising from or relating to any alleged act or omission or any other basis of liability of any Debtor (or any predecessor) in connection with the origination, sale, and/or servicing of a mortgage loan originated, sold, consolidated, purchased, and/or serviced by any Debtor, (ii) Claims filed for or on behalf of a Borrower by such Person's attorney or agent, including as part of a proof of claim filed on behalf of a putative class of Borrowers, and (iii) claims that have become Allowed as a result of settlement of Borrower litigation commenced against Ally and the Debtors.  For the avoidance of doubt, Borrower Claims shall include Allowed Claims held by the Kessler Class Claimants (to the extent that the Kessler Class Claimants are certified as a class action for settlement and allowance purposes), and shall not include the: (a) Senior Unsecured Notes Claims; (b) Junior Secured Notes Claims; (c) RMBS Trust Claims; (d) Private Securities Claims; (e) General Unsecured Claims; (f) General Unsecured Convenience Claims; or (g) Intercompany Balances.  For the further avoidance of doubt, no Claim described in subsection (ii) hereof shall be considered an Allowed Borrower Claim unless such Claim is either certified under Bankruptcy Rule 7023 or by Final Order for purposes of settlement or allowance.

34.    31. "Borrower Claims Trust" means the trust established for the benefit of the holders of Allowed Borrower Claims.

35.    32. "Borrower Claims Trust Agreement" means that certain trust agreement, the form of which shall be included in the Plan Supplement, that, among other things, sets forth the methodology and procedures for resolving Disputed Borrower Claims and making distributions to holders of Allowed Borrower Claims.

36.    33. "Borrower Claims Trust Assets" means (i) Cash transferred to the Borrower Claims Trust by the Liquidating Trust as of the Effective Date in the amount of $57,600,000 plus the amount of the Borrower Trust True-Up; and (ii) all Borrower-Related Causes of Action.

37.    34. "Borrower Claims Trust Committee" means (i) counsel for the Kessler Settlement Class, and (ii) those Borrowers or the representatives of Borrowers appointed by the Kessler Settlement Class, with the consent of the Plan Proponents, which consent shall not be unreasonably withheld, to oversee the administration of the Borrower Claims Trust and the disposition of the Borrower Claims Trust Assets.  The identities of the initial Persons to serve on the Borrower Claims Trust Committee as of the Effective Date will be set forth in the Plan Supplement.

38.    35. "Borrower Claims Trustee" means the Person selected to serve as the trustee of the Borrower Claims Trust.  The identity of the Person to serve as the Borrower Claims Trustee as of the Effective Date will be set forth in the Plan Supplement.

39.    36. "Borrower Trust True-Up" means the additional Cash, if any, required to be added to the Borrower Claims Trust Assets such that distributions, estimated as of the

Confirmation Date, made from the Borrower Claims Trust on account of an Allowed Borrower Claim will be comparable to the recovery that a holder of an Allowed Claim of the same amount against the same Debtor Group would realize from distributions made by the Liquidating Trust on Units issued in respect of such Allowed Claim, based on the value of the assets in the Liquidating Trust available for distribution to holders of Units as of the Effective Date (without in each case giving effect to any insurance proceeds, including proceeds from the GM Policies, that may be received in respect of the Allowed Borrower Claims in accordance with the Plan or to the time delay in receipt of distributions in respect of the Units from the Liquidating Trust). For the avoidance of doubt, to the extent necessary, there shall only be a single Borrower Trust True-Up.

40.    37. "Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are required or authorized by law or governmental action to close.

41.    38. "Cash" means legal tender of the United States of America or the equivalent thereof.

42.    39. "Cash Management Order" means the *Final Order Under Bankruptcy Code Sections 105(a), 345, 363, 364, and 503(b)(1) and Bankruptcy Rules 6003 and 6004 Authorizing (I) Continued Use of Cash Management Services and Practices, (II) Continued Use of Existing Bank Accounts, Checks, and Business Forms, (III) Implementation of Modified Cash Management Procedures and Use of Certain Bank Accounts Established in Connection with Use of Pre-And Post-Petition Lenders Financing Facilities and Cash Collateral, (IV) Waiver of the Investment and Deposit Requirements of Bankruptcy Code Section 345, (V) Debtors to Honor Specified Outstanding Prepetition Payment Obligations, and (VI) Continuation of Intercompany Transactions and Granting Administrative Expense Status to Intercompany Balances*, entered by the Bankruptcy Court on June 11, 2012 [Docket No. 309], as amended, supplemented, or modified.

43.    40. "Cause of Action" means any and all Claims, actions, causes of action, choses in action, rights, demands, suits, claims, liabilities, encumbrances, lawsuits, adverse consequences, debts, damages, dues, sums of money, accounts, reckonings, deficiencies, bonds, bills, disbursements, expenses, losses, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross-claims (including those of the Debtors, and/or the bankruptcy estate of any Debtor created pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases), whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, whether held in a personal or representative capacity, that are or may be pending as of the date hereof or instituted hereafter against any entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date hereof.

44.    41. "Centerview" means Centerview Partners LLC.

45.    42. "Chapter 11 Cases" means the chapter 11 cases commenced by the Debtors, which are jointly administered, styled *In re Residential Capital, LLC, et al.*, Case No. 12-12020 (MG), and currently pending before the Bankruptcy Court, or any of such cases as applicable.

46.    43. "Claim" means a "claim" as such term is defined in section 101(5) of the Bankruptcy Code.

47.    44. "Claims Objection Deadline" means (i) two hundred seventy (270) days following the Effective Date or (ii) such other later date the Bankruptcy Court may establish upon a motion by the Liquidating Trust, which motion may be approved without a hearing and without notice to any party.

48.    45. "Claims Record Date" means the Voting Deadline, which is the date for determining which holders of Allowed Claims are entitled to receive distributions under the Plan, and on which the transfer register for each Class of Claims or Equity Interests, as maintained by the Debtors or their agents, shall be deemed closed.

49.    46. "Claims Register" means the official register of Claims in these Chapter 11 Cases maintained by Kurtzman Carson Consultants LLC, in its capacity as the Debtors' notice and claims agent.

50.    47. "Class" means a group of holders of Claims or Equity Interests classified together under this Plan.

51.    48. "CBNV" means Community Bank of Northern Virginia.

52.    49. "Compensation Order" means the *Amended Order Under Bankruptcy Code Sections 105(a), 363, 503(b)(1), 507(a)(2), 1107(a) and 1108 and Bankruptcy Rule 9019 to the Final Wages Order (I) Authorizing and Directing the Debtors to Reimburse Ally Financial Inc. for Payments Made to the Debtors Employees on Account of Compensation Issued on or After the Petition Date; (II) Granting Ally Financial Inc. an Administrative Expense Claim on Account of Such Payments; (III) Granting Ally Financial Inc. a Limited Release; and (IV) Authorizing the Debtors to Establish and Fund an Escrow Account for the Benefit of Ally Financial Inc. on Account of Such Administrative Expense Claims, including Additional Amounts to the Escrow Account as Necessary* [Docket No. 2548].

53.    50. "Confirmation" means the entry on the docket of the Chapter 11 Cases of the Confirmation Order.

54.    51. "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

55.    52. "Confirmation Hearing" means the hearing before the Bankruptcy Court under section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as the same may be continued from time to time.

56. ~~53.~~ "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan, as amended, supplemented, or modified, under, among others, section 1129 of the Bankruptcy Code.

57. ~~54.~~ "Consent Order" means the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among AFI, Ally Bank, ResCap, GMACM, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, as amended.

58. ~~55.~~ "Consent Order Borrower Claims" means claims held by Borrowers arising from residential mortgage foreclosure actions (including judicial and non-judicial foreclosures and related bankruptcy proceedings, and other related litigation) or proceedings (including foreclosures that were in process or completed) for loans serviced by the Mortgage Servicing Companies (as defined in the Consent Order), whether brought in the name of Ally Bank, the Mortgage Servicing Companies, the investor, or any agent for the mortgage note holder (including Mortgage Electronic Registration Systems, Inc.), that have been pending at any time from January 1, 2009 to December 31, 2010, as well as claims arising from residential foreclosure sales that occurred during this time period.

59. ~~56.~~ "Consenting Claimants" means, collectively, AIG, Allstate, FGIC, the Kessler Class Claimants, MassMutual, MBIA, Prudential, the RMBS Trustees, the Steering Committee Consenting Claimants, the Talcott Franklin Consenting Claimants, the Supporting Senior Unsecured Noteholders, Wilmington Trust, Paulson, and any other parties (other than Ally) that agree to be bound by the terms of the Plan Support Agreement. Each of the foregoing parties is a Consenting Claimant.

60. ~~57.~~ "Consummation" means the occurrence of the Effective Date.

61. ~~58.~~ "Creditor" means a "creditor" as defined in section 101(10) of the Bankruptcy Code.

62. ~~59.~~ "Creditors' Committee" means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases.

63. ~~60.~~ "Cure Claim" means a Claim based upon a monetary default, if any, by a Debtor under an Executory Contract or Unexpired Lease as of the time such contract or lease is assumed by such Debtor under sections 365 or 1123 of the Bankruptcy Code, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

64. ~~61.~~ "DB" means Deutsche Bank Trust Company Americas and Deutsche Bank National Trust Company each solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, custodian, and/or similar agency capacities in respect of certain of the RMBS Trusts.

65. ~~62.~~ "Debtor Group" means, individually or collectively, the ResCap Debtors, the GMACM Debtors or the RFC Debtors.

12

66. 63. "Debtor Group Unit Distribution" means each of the GMACM Debtors Unit Distribution, the ResCap Debtors Unit Distribution and the RFC Debtors Unit Distribution.

67. 64. "Debtor Released Parties" means the Ally Released Parties, the Creditors' Committee, the Consenting Claimants, and their respective successors and assigns, members, partners, non-Debtor affiliates, and Representatives, each in its capacity as such. For the avoidance of doubt, and without limiting the foregoing, the Debtor Released Parties shall not include (i) any purchaser of any assets relating to the Debtors' servicing business that is not Ally or a Debtor, (ii) any assignee of a Servicing Agreement that is not Ally or a Debtor (iii) any underwriter of RMBS that is unaffiliated with the Debtors or Ally, and the Representatives of such underwriter, against which an Investor has a pending or tolled Cause of Action, (iv) any assignee of executory contracts that were assumed by the Debtors that is not Ally, (v) any insurer that is not Ally that sold any directors & officers or errors & omissions insurance policies that cover the Debtors in their capacity as insurers, or (vi) any party that is not Ally against whom RFC may have indemnity rights arising out of the Kessler Class Action, specifically, any successors in interest to CBNV and GNBT.

68. 65. "Debtors" means ditech, LLC; DOA Holding Properties, LLC; DOA Properties IX (Lots-Other), LLC; EPRE LLC; Equity Investment I, LLC; ETS of Virginia, Inc.; ETS of Washington, Inc.; Executive Trustee Services, LLCETS; GMAC Model Home Finance I, LLC; GMAC Mortgage USA Corporation; GMAC RH Settlement Services, LLC; GMACM; GMACM Borrower LLC; GMACM Holding; GMACM REO LLC; GMACR Mortgage Products, LLC; HFN REO SUB II, LLC; Home Connects Lending Services, LLC; Homecomings Financial Real Estate Holdings, LLC; Homecomings Financial, LLC; Ladue Associates, Inc.; Passive Asset Transactions, LLC; PATI A, LLC; PATI B, LLC; PATI Real Estate Holdings, LLC; RAHI A, LLC; RAHI B, LLC; RAHI Real Estate Holdings, LLC; RCSFJV2004, LLC; Residential Accredit Loans, Inc.; Residential Asset Mortgage Products, Inc.; Residential Asset Securities Corporation; ResCap; Residential Consumer Services of Alabama, LLC; Residential Consumer Services of Ohio, LLC; Residential Consumer Services of Texas, LLC; Residential Consumer Services, LLC; Residential Funding Mortgage Exchange, LLC; Residential Funding Mortgage Securities I, Inc.; Residential Funding Mortgage Securities II, Inc.; Residential Funding Real Estate Holdings, LLC; Residential Mortgage Real Estate Holdings, LLC; RFC; RFC Asset Holdings II, LLC; RFC Asset Management, LLC; RFC Borrower LLC; RFC Construction Funding, LLC; RFC Holding; RFC REO LLC; RFC SFJV-2002, LLC; and RFC–GSAP Servicer Advance, LLC.

69. 66. "Debtor Release" means the release set forth in Article IX.C.

70. 67. "Delaware Trustee" means the trustee, or its successor, appointed in accordance with the Liquidating Trust Agreement to comply with the requirement of Section 3807 of the Delaware Statutory Trust Act.

71. 68. "Disbursing Agent" means the Liquidating Trust, or any Person engaged by the Liquidating Trust, to perform the function of a disbursing agent.

72.    69. "Disclosure Statement" means the disclosure statement for this Plan, as amended, supplemented, or modified in accordance with the provisions of the Bankruptcy Code and the Bankruptcy Rules.

73.    70. "Disputed Borrower Claim" means any Borrower Claim that is not Allowed, until it is disallowed or expunged by Final Order, written agreement, or under the Plan.

74.    71. "Disputed Claim" means any Claim that is not Allowed until it is disallowed or expunged by Final Order, written agreement, or under the Plan, other than Disputed Borrower Claims and Disputed Private Securities Claims.

75.    72. "Disputed Claims Reserve" means the reserve of Units maintained by the Liquidating Trust for distribution to the Liquidating Trust Unit Beneficiaries that are holders of Disputed Claims, if and when such Disputed Claims become Allowed.

76.    73. "Disputed Private Securities Claims" means any Private Securities Claim that is not Allowed until it is disallowed or expunged by Final Order or under the Plan.

77.    74. "Distributable Cash" means the Cash to be distributed to holders of Units, including the Disputed Claims Reserve, on any Distribution Date.

78.    75. "Distribution Date" means, a date or dates, as determined by the Liquidating Trust Board in accordance with the Liquidating Trust Agreement, on which the Liquidating Trust makes a distribution, or causes a distribution to be made, of Distributable Cash to the Unitholders.

79.    76. "District Court" means the United States District Court for the Southern District of New York.

80.    77. "DOJ/AG Settlement" means the Consent Judgment entered by the United States District Court for the District of Columbia, dated February 9, 2012.

81.    78. "DTC" means the Depository Trust Company.

82.    79. "Duff" means Duff & Phelps, LLC, financial advisor to certain of the RMBS Trustees.

83.    80. "Effective Date" means the first Business Day after the Confirmation Date on which no stay of the Confirmation Order is in effect and all of the conditions precedent to the Effective Date specified in Article X.B have been satisfied or waived pursuant to Article X.C.

84.    81. "Entity" means an "entity" as such term is defined in section 101(15) of the Bankruptcy Code.

85.    82. "Equity Interest" means any "equity security" as defined in section 101(16) of the Bankruptcy Code, of a Debtor existing immediately prior to the Effective Date, or any other instrument evidencing an ownership interest in any of the Debtors, whether or not transferable,

14

and any option, warrant, or right, contractual or otherwise, to acquire, sell, or subscribe for any such interest.

86.    "ERISA" means the Employee Retirement Income Security Act.

87.    83. "Estates" means the estates of the Debtors created under section 541 of the Bankruptcy Code.

88.    "ETS" means the Debtor entity, Executive Trustee Services, LLC.

89.    "ETS Unsecured Claims" means all General Unsecured Claims against ETS.

90.    84. "Exculpated Party" means each of the following in its capacity as such: (a) the Debtors; (b) the Consenting Claimants; (c) Ally, (d) the Creditors' Committee and the members thereof;, and (e) with respect to each of the foregoing Entities in clauses (a) through (d), such Entity's successors and assigns, members, affiliates, subsidiaries, officers, directors, partners, principals, employees, and Representatives; provided, however, without limiting the foregoing, the following shall not be an Exculpated Party: (i) any purchaser of any assets relating to the Debtors' servicing business that is not Ally or a Debtor, (ii) any assignee of a Servicing Agreement that is not Ally or a Debtor (iii) any underwriter of RMBS that is unaffiliated with the Debtors or Ally, and the Representatives of such underwriter, against which an Investor has a pending or tolled Cause of Action, (iv) any assignee of executory contracts that were assumed by the Debtors that is not Ally, (v) any insurer that is not Ally that sold any directors & officers or errors & omissions insurance policies that cover the Debtors, in their capacity as insurers, or (vi) any party that is not Ally against whom RFC may have indemnity rights arising out of the Kessler Class Action, specifically, any successors in interest to CBNV and GNBT.

91.    85. "Executory Contract" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

92.    "Fannie Mae" means Fannie Mae (f/k/a The Federal National Mortgage Association).

93.    "Fannie Mae Contract" means that certain Mortgage Selling and Servicing Contract dated March 29, 2007, including the incorporated Fannie Mae Selling and Servicing Guides and various Master Agreements, including but not limited to the Master Agreement, dated August 3, 2012, between Fannie Mae and Ally Bank, each as may have been amended from time to time.

94.    86. "FDIC" means the Federal Deposit Insurance Corporation.

95.    87. "FGIC" means Financial Guaranty Insurance Company and its subsidiaries and affiliates.

96.    88. "FGIC Policies" means insurance policies issued by FGIC in connection with the RMBS Trusts insured by FGIC.

15

97.    89. "FGIC Rehabilitation Court" means the New York State Supreme Court with jurisdiction over FGIC's rehabilitation proceeding.

98.    90. "FGIC Settlement Agreement" means that certain settlement agreement dated, as of May 23, 2013, among the Debtors, FGIC, BNY Mellon, U.S. Bank and WFB, each in its capacity as RMBS Trustee, and the Institutional Investors.

99.    91. "FHFA" means Federal Housing Finance Agency.

100.    92. "FHFA Claims" means Claims held by FHFA in its capacity as Conservator for the Federal Home Loan Mortgage Corporation.

101.    93. "File," "Filed," or "FiledFiling" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, or, in the case of a Proof of Claim, with the Debtors' notice and claims agent.

102.    94. "Final Order" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, which has not been modified, amended, reversed, vacated, or stayed, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed relating to such order, shall not cause an order not to be a Final Order.

103.    "First Priority Collateral Agent" means Wells Fargo Bank, N.A., as collateral agent and collateral control agent under the First Priority Security Agreement, together with its respective successors and assigns in such capacity.

104.    "First Priority Collateral Agent Fees and Expenses" means the reasonable fees, costs, and expenses and indemnity claims of the First Priority Collateral Agent, including but not limited to, the fees, costs, and expenses of the First Priority Collateral Agent's counsel.

105.    "First Priority Collateral Agent Lien" means the Liens and other priority in payment and rights of the First Priority Collateral Agent under the First Priority Security Agreement, the Intercreditor Agreement, and related documents, or otherwise available to the First Priority Collateral Agent under applicable law, for the payment of First Priority Collateral Agent Fees and Expenses.

106.    "First Priority Security Agreement" means that certain security agreement, dated as of December 30, 2009, among RFC and GMACM and certain of their affiliates, GMAC Inc., and the First Priority Collateral Agent.

107.    95. "General Unsecured Claim" means any Claim against a Debtor that is not a/an: (a) Administrative Claim; (b) Priority Tax Claim; (c) Other Priority Claim; (d) Borrower Claim; (e) Revolving Credit Facility Claims, (f) Junior Secured Notes Claim; (g) Other Secured Claim; (h) Senior Unsecured Notes Claim; (i) RMBS Trust Claim; (j) Intercompany Balance; (k) Professional Claim; (l) General Unsecured Convenience Claim; (m) Private Securities Claim, (n) Postpetition Intercompany Balance, or (o(o) NJ Carpenters Claim, except as otherwise provided herein, or (p) FHFA Claim.

108.    96. "General Unsecured Convenience Claim" means Claims that would otherwise be classified as General Unsecured Claims but, with respect to each Claim either (i) the aggregate amount of such Claim is less than $30,000, or (ii) the aggregate amount of such Claim is reduced to $30,000 by agreement of the holder of such Claim.  For the avoidance of doubt, General Unsecured Convenience Claims do not include Borrower Claims.

109.    97. "Global Settlement" means the settlement among the Debtors, the Creditors' Committee, Ally and the Consenting Claimants set forth in Article IV of the Plan.

110.    98. "GM Insurance Rights" means any and all of the Debtors' rights, titles, privileges, interests, claims, demands, or entitlements to any proceeds, payments, causes of action, and choses in action under, for, or related to the GM Policies with respect to a particular item of loss under the GM Policies, including the rights (1) to recover insurance proceeds for an item of loss covered under the GM Policies and (2) to recover from the insurers that issued the GM Policies for breach of contract or breach of other duty or obligation owed by such insurer under the GM Policies, as applicable, including the duty to settle, together with any extra contractual or tort claim arising therefrom, including bad faith, breach of implied covenant of good faith and fair dealing, fraud, or violation of any statutory or common law duty owed by the insurer under the GM Policies, as applicable, and all with respect to a particular item of loss under the GM Policies.

111.    99. "GM Policies" means the General Motors Combined Specialty Insurance Program 12/15/00 – 12/15/03, with the policy numbers as set forth in the Plan Supplement.

112.    100. "GMACM" means GMAC Mortgage, LLC.

113.    101. "GMACM Debtors" means each of following Debtor subsidiaries of GMACM Holding:  GMACM,; ditech, LLC; ETS; ETS of Virginia, Inc.; ETS of Washington, Inc.; Executive Trustee Services, LLC; GMAC Mortgage USA Corporation; GMAC RH Settlement Services, LLC; GMACM Borrower LLC; GMACM REO LLC; GMACR Mortgage Products, LLC; Home Connects Lending Services, LLC; Ladue Associates, Inc.; Passive Asset Transactions, LLC; PATI A, LLC; PATI B, LLC; PATI Real Estate Holdings, LLC; Residential Consumer Services of Alabama, LLC; Residential Consumer Services of Ohio, LLC; Residential Consumer Services of Texas, LLC; Residential Consumer Services, LLC; and Residential Mortgage Real Estate Holdings, LLC.

114.   102. "GMACM Debtors Unit Distribution" means 25,425,65627,045,339 Units,
representing 25.4327.05% of the Total Initial Units Outstanding, subject to the adjustment as
provided in Article IV.J.

115.   103. "GMACM Holding" means GMAC Residential Holding Company, LLC.

116.   104. "GMACM Plan Allowed Unsecured Claims" means the following GMACM
Unsecured Claims Allowed under the Plan: (i) the RMBS Trusts' Allowed Claim in the amount
of $209.8 million, (ii) MBIA's Allowed Claim in the amount of $1,450 million, and (iii) FGIC's
Allowed Claim in the amount of $181.5 million.

117.   105. "GMACM Unsecured Claims" means the RMBS Trust Claims and General
Unsecured Claims, in each case, against the GMACM Debtors.

118.   106. "GNBT" means Guaranty National Bank of Tallahassee.

119.   107. "Governmental Unit" means "governmental unit" as such term is defined in
section 101(27) of the Bankruptcy Code.

120.   108. "HSBC" means HSBC Bank USA, N.A. solely in its capacity as trustee in
respect of certain of the RMBS Trusts.

121.   109. "Impaired" means, with respect to any Class, a Class that is impaired as set
forth in section 1124 of the Bankruptcy Code.

122.   110. "Indenture Trustees" means the Junior Secured Notes Indenture Trustee and
the Senior Unsecured Notes Indenture Trustee.

123.   111. "Indentures" means the Junior Secured Notes Indenture and the Senior
Unsecured Notes Indenture.

124.   112. "Initial Unit Distribution Date" means the date on which the Liquidating
Trust makes, or causes to be made, the initial distribution of Distributable Units and
Distributable Cash.

125.   113. "Initial Unit Distribution Record Date" means [●]the Voting Deadline,
which is the record date for determining the Liquidating Trust Unit Beneficiaries holding
Allowed Claims that are entitled to receive a distribution of Units on the Initial Unit Distribution
Date.

126.   114. "Institutional Investors" means the Steering Committee Consenting
Claimants and the Talcott Franklin Consenting Claimants.

127.   115. "Insurance Defenses" means any legal, equitable or contractual defense that
any insurer may have under applicable non-bankruptcy law to an assertion that such insurer is
obligated to defend, pay, indemnify or reimburse, or provide insurance coverage for, any item of
loss or liability under any insurance policy, except for any defense (a) that is based on the
assertion that the transfer of the insurance rights is invalid, unenforceable or otherwise breaches

the terms of any applicable policy or any other agreement with that insurer, (b) that has been
released, waived, altered or otherwise resolved, in full or in part, in any other agreement with that
insurer, (c) to the extent affected by applications of principles of res judicata, collateral estopped,
claim preclusion or issue preclusion, (d) adjudicated by the Bankruptcy Court, (e) premised upon
the commencement of the Chapter 11 Cases under section 301 of the Bankruptcy Code, or  (f)
that is based on reasonableness

128.    "Insured Exception" has the meaning set forth in Article IV.C.

129.    116. "Insured RMBS Trust" means any RMBS Trust that has an insurance policy
with a Monoline.

130.    117. "Intercompany Balance" means any prepetition Claim of a Debtor against
another Debtor, or any prepetition Claim held by a Non-Debtor Subsidiary against a Debtor,
including any subrogation claims and fraudulent conveyance claims related to the forgiveness of
intercompany debt, and any other subrogation claims owed by any Debtor to any other Debtor.
For the avoidance of doubt, Intercompany Balances do not include any Claim that Ally may
assert against a Debtor.

131.    118. "Intercreditor Agreement" means the intercreditor agreement, dated as of
June 6, 2008, by and among WFB, GMAC LLC, USB, RFC, GMACM, ResCap, Homecomings
Financial, LLC, GMAC-RFC Holding Company, LLC, GMAC Residential Holding Company,
LLC, GMAC Model Home Finance, LLC, Developers of Hidden Springs, LLC, DOA Holding
Properties, LLC, RFC Asset Holdings II, LLC, Passive Asset Transactions, LLC, Residential
Mortgage Real Estate Holdings, LLC, Residential Funding, Real Estate Holdings, LLC,
Homecomings Financial Real Estate Holdings, LLC and Equity Investment I, LLC [Docket No.
1866, Ex. A].

132.    119. "Investor" means a current or former holder of RMBS, in such capacity.

133.    120. "JSN Adversary Proceeding" means the adversary proceeding which
consolidates the adversary proceeding commenced against the Junior Secured Noteholders by the
Creditors' Committee in the proceeding *Official Committee of Unsecured Creditors v. UMB Bank,
N.A. et al.* Case No. 13-01277(MG) and the adversary proceeding commenced by the Debtors in the
proceeding *Residential Capital, et al. v. UMB Bank, N.A.*, Case No. 13-01343(MG) seeking a
determination of the Allowed amount and collateral of the Junior Secured Notes Claims.

134.    121. "Junior Secured Noteholders" means the holders of Junior Secured Notes.

135.    122. "Junior Secured Notes" means the 9.625% junior secured notes due 2015
issued by ResCap pursuant to the Junior Secured Notes Indenture.

136.    123. "Junior Secured Notes Claim" means the Junior Secured Notes Secured
Claim and the Junior Secured Notes Deficiency Claim, if any.

137.    124. "Junior Secured Notes Deficiency Claim" means the unsecured portion of the
Junior Secured Notes Claims as determined by the JSN Adversary Proceeding.

138.   "Junior Secured Notes Collateral Agent" means Wells Fargo Bank, N.A., as collateral agent and collateral control agent under the Junior Secured Notes Security Agreement, together with its respective successors and assigns in such capacity.

139.   "Junior Secured Notes Collateral Agent Fees and Expenses" means the reasonable compensation, fees, expense, liabilities, disbursements and indemnity claims, including, without limitation, attorneys' and agents' fees, expenses and disbursements, incurred by the Junior Secured Notes Collateral Agent under the Junior Secured Notes Security Agreement.

140.   "Junior Secured Notes Distribution Record Date" means the date on which the distributions under this Plan on account of the Junior Secured Notes Claim are made to the Junior Secured Notes Indenture Trustee.

141.   125. "Junior Secured Notes Indenture" means that certain Indenture, dated as of June 6, 2008, among ResCap, as issuer, GMAC Holding, GMAC-RFC Holding Company, LLC, GMACM, RFC, and Homecoming Financial, LLC as guarantors, and the Junior Secured Notes Indenture Trustee.

142.   126. "Junior Secured Notes Indenture Trustee" means UMB Bank, N.A., as indenture trustee or successor indenture trustee under the Junior Secured Notes Indenture, together with its respective successors and assigns in such capacity.

143.   "Junior Secures Notes Indenture Trustee Charging Lien" means any Lien or other priority in payment to which the Junior Secured Notes Indenture Trustee is entitled, pursuant to the Junior Secured Notes Indenture, against distributions to be made to holders of Junior Secured Notes Claims for payment of any Junior Secures Notes Indenture Trustee Fees and Junior Secured Notes Collateral Agent Fees and Expenses.

144.   "Junior Secured Notes Indenture Trustee Fees" means the reasonable compensation, fees, expense, liabilities, disbursements and indemnity claims, including, without limitation, attorneys' and agents' fees, expenses and disbursements, incurred by the Junior Secured Notes Indenture Trustee, whether prior to or after the Petition Date and whether prior to or after the consummation of the Plan.

145.   127. "Junior Secured Notes Secured Claim" means the portion of the Junior Secured Notes Claim that is a Secured Claim as determined by the JSN Adversary Proceeding.

146.   "Junior Secured Notes Security Agreement" means that certain Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of December 30, 2009, among ResCap and certain of its affiliates, the Junior Secured Noted Indenture Trustee and the Junior Secured Notes Collateral Agent.

147.   128. "Kessler Class Action" means the consolidated class action entitled *In re Community Bank of Northern Virginia Second Mortgage Lending Practice Litigation*, consolidated in the United States District Court for the Western District of Pennsylvania, MDL No. 1674, Case Nos. 03-0425, 02-01201, 05-0688, 05-1386.

148.   129. "Kessler Class Claimants" means the putative class of Persons represented in the Kessler Class Action, asserting claims against the Debtors.

149.   130. "Kessler Settlement Agreement" means that certain Settlement Agreement between the Debtors and the representatives of the Kessler Class Claimants a copy of which will be filed with the Bankruptcy Court in connection with a motion seeking approval of the Kessler Settlement Agreement.

150.   131. "Kessler Settlement Approval Orders" means the preliminary and final orders approving the certification of the Kessler Class Claimants as a settlement class under Bankruptcy Rule 7023 and approving the Kessler Settlement Agreement under section 105(a) of the Bankruptcy Code and Bankruptcy Rules 9019 and 7023.

151.   132. "Kessler Settlement Class" means the settlement class comprised of the Kessler Class Claimants certified pursuant to the Kessler Settlement Approval Orders.

152.   133. "LDTC" means Law Debenture Trust Company of New York solely in its capacity as separate trustee in respect of certain of the RMBS Trusts.

153.   134. "Lien" means a "lien" as such term is defined in section 101(37) of the Bankruptcy Code.

154.   135. "Liquidating Trust" means that certain Delaware statutory trust to be created continued on or about the Effective Date as successor by conversion of a common law trust in accordance with the provisions of Article VI of the Plan and the Liquidating Trust Agreement.

155.   136. "Liquidating Trust Administrative Reserve" means the reserve established for paying costs, fees, and expenses, and reserving for liabilities, of the Liquidating Trust, including costs, fees, and expenses of the Estates payable after the Effective Date.

156.   137. "Liquidating Trust Agreement" means that certain trust agreement, the form of which shall be included in the Plan Supplement, that, among other things: (a) establishes and governs the Liquidating Trust; (b) describes the powers, duties and responsibilities of the Liquidating Trustees, and (c) provides for the liquidation and distribution of proceeds of the Liquidating Trust Assets.

157.   138. "Liquidating Trust Assets" means all property held from time to time by the Liquidating Trust, including the Available Assets transferred to the Liquidating Trust on the Effective Date.

158.   139. "Liquidating Trust Board" means the board of trustees appointed to oversee the administration of the Liquidating Trust and the disposition of the Liquidating Trust Assets. The identities of the Persons to serve on the Liquidating Trust Board as of the Effective Date will be set forth in the Plan Supplement.

159.   140. "Liquidating Trust Budget" means the annual budget of expenses for administering the Liquidating Trust.

160.    "Liquidating Trust Causes of Action" means the Claims and Causes of Action transferred to the Liquidating Trust on the Effective Date, including those Claims and Causes of Action set forth in the Plan Supplement.

161.    141. "Liquidating Trust Management" means those Persons designated by the Liquidating Trust Board to manage the Liquidating Trust.  The identities of the Persons to serve as Liquidating Trust Management as of the Effective Date will be set forth in the Plan Supplement.

162.    142. "Liquidating Trust Unit Beneficiaries" means (i) other than holders of RMBS Trust Claims, the holders of ResCap Unsecured Claims, GMACM Unsecured Claims, and RFC Unsecured Claims (in each case, whether Allowed or Disputed), other than holders of RMBS Trust Claims and ETS Unsecured Claims, (ii) the RMBS Claims Trust, and (iii) the Private Securities Claims Trust (and those Private Securities Claimants holding Units).  For the avoidance of doubt, Liquidating Trust Unit Beneficiaries includes Wilmington Trust, on behalf of the Senior Unsecured Noteholders, until such time as Wilmington Trust causes the distribution of Units received by it to the Senior Unsecured Noteholders.

163.    143. "Liquidating Trustee" means a member of the Liquidating Trust Board.

164.    144. "MassMutual" means Massachusetts Mutual Life Insurance Company and its subsidiaries and affiliates.

165.    145. "MBIA" means MBIA Insurance Corporation and its subsidiaries and affiliates but excluding Cutwater Holdings, LLC and its subsidiaries Cutwater Investor Services Corp., Cutwater Asset Management Corp. and Trifinium Advisors (UK) Limited.

166.    146. "Misdirected Funds" means the approximately $2.6 million of funds that were misdirected to the Debtors' tri-party account with Bank of New York Mellon prior to the Petition Date.

167.    147. "Moelis" means Moelis & Company LLC.

168.    148. "Monolines" means FGIC, MBIA, and the other insurers who provided financial guaranty insurance policies insuring amounts payable to RMBS in connection with certain of the RMBS Trusts, but does not include insurers of particular mortgage loans or groups of mortgage loans held by an RMBS Trust, for the purposes of the RMBS Trust Allocation Protocol.

169.    149. "Monoline Claims Settlement" means the settlement of the Allowed amount and allocation among Debtor Groups of the Claims held by MBIA, and FGIC.

170.    150. "Monoline Reservation" means the reservation of rights of each Insured RMBS Trustee (excluding the RMBS Trusts insured by FGIC) as set forth in Article IV herein.

171.    151. "NJ Carpenters Approval" means the approvals of the NJ Carpenters Settlement from the Bankruptcy Court (which may be the Confirmation Order or a separate order of the Bankruptcy Court), and the District Court.

172.    152.  "NJ Carpenters Claims" means any and all claims, demands, rights, liabilities, and causes of action of every nature and description, known or Unknown, suspected or unsuspected, contingent or non-contingent, matured or unmatured, whether or not concealed or hidden, which now exist, or heretofore have existed, whether arising under federal, state, common, or foreign law, that any NJ Carpenters Class Member (a) asserted in the NJ Carpenters Class Action, or (b) could have asserted in any forum arising from or related in any way to the acts, failures to act, transactions, facts, events, matters, disclosures, statements, occurrences, representations, or omissions asserted or that could have been asserted in the NJ Carpenters Class Action against the NJ Carpenters Released Parties.  Notwithstanding the foregoing, "NJ Carpenters Claims" shall not include (a) any rights or claims against the Debtors that any NJ Carpenters Class Member may possess or be entitled to as a holder of RMBS pursuant to the RMBS Trust Settlement or any other distribution in the Plan in connection with the claims asserted in connection with the RMBS Trust Settlement, or (b) claims against any NJ Carpenters Non-Settling Defendant.

173.    153.  "NJ Carpenters Claims Distribution" means a distribution in the amount of $100 million in Cash in full and final satisfaction of the NJ Carpenters Claims, on terms as set forth in the NJ Carpenters Settlement.

174.    154.  "NJ Carpenters Class Action" means the class action entitled *New Jersey Carpenters Health Fund, et al. v. Residential Capital, LLC, et al.,* Civ. No. 08-8781(HB) pending in the District Court.

175.    155.  "NJ Carpenters Class Members" means the named plaintiffs in the NJ Carpenters Class Action and all other persons or entities who purchased or otherwise acquired beneficial interests in any of the following pass-through certificates and who were allegedly damaged thereby: RALI Series 2007-QS1, RALI Series 2007-QO4, RALI Series 2007-QH4, RALI Series 2006-QO7, RALI Series 2007-QS5, RALI Series 2006-QS7, RALI Series 2007-QO2, RALI Series 2006-QS11, RALI Series 2007-QS4, RALI Series 2006-QA4, RALI Series 2006-QA6, RALI Series 2006-QA7, RALI Series 2006-QA8, RALI Series 2006-QA10, RALI Series 2006-QA11, RALI Series 2007-QA1, RALI Series 2007-QA2, RALI Series 2007-QO3, RALI Series 2007-QA3, RALI Series 2007-QA5, RALI Series 2007-QH8, RALI Series 2007-QH9, RALI Series 2007-QO5, RALI Series 2007-QS11, RALI Series 2007-QS6, RALI Series 2006-QS8, RALI Series 2006-QS9, RALI Series 2007-QS7, RALI Series 2007-QH2, RALI Series 2007-QH5, RALI Series 2007-QH6, RALI Series 2006-QS18, RALI Series 2006-QO10, RALI Series 2006-QO3, RALI Series 2006-QO6, RALI Series 2007-QH3, RALI Series 2007-QS2, RALI Series 2006-QO9, RALI Series 2006-QO8, RALI Series 2006-QO5, RALI Series 2006-QA5, RALI Series 2006-QA9, RALI Series 2006-QH1, RALI Series 2006-QO4, RALI Series 2006-QS5, RALI Series 2006-QS16, RALI Series 2007-QS17, RALI Series 2007-QH1,    RALI Series 2007-QO1, RALI Series 2007-QS3, RALI Series 2007-QA4, RALI Series 2007-QH7, RALI Series 2007-QS8, RALI Series 2007-QS10, RALI Series 2006-QS12, RALI Series 2006-QS13, RALI Series 2006-QS6, RALI Series 2007-QS9 and RALI Series 2006-QS15.  Notwithstanding the foregoing, "NJ Carpenters Class Members" shall not include (a) the NJ Carpenters Class Opt-Outs, (b) the Private Securities Claimants, or (c) the NJ Carpenters Defendants, and their respective officers, affiliates and directors at all relevant times, members of their immediate families and their legal representatives, executors, estates, administrators, successors and assigns, insurers, or any entity in which any defendants

have or had a controlling interest, provided that any investment company or pooled investment fund (including, but not limited to, mutual fund families, exchange-traded funds, fund of funds, and hedge funds) in which any of the NJ Carpenters Defendants have or may have a direct or indirect interest, or as to which its affiliates may act as investment advisors, but in which any of the NJ Carpenters Defendants or any of their respective affiliates is not a majority owner or does not hold a majority beneficial interest, shall not be deemed an excluded person or entity by definition.

176.    156. "NJ Carpenters Class Opt-Outs" means any persons or entities who exclude themselves from the NJ Carpenters Class Action and the NJ Carpenters Settlement in the manner contemplated by the NJ Carpenters Notice.

177.    157. "NJ Carpenters Defendants" means the NJ Carpenters Non-Settling Defendants and the NJ Carpenters Settling Defendants.

178.    158. "NJ Carpenters Non-Settling Defendants" means Goldman, Sachs & Co., Deutsche Bank Securities Inc., Citigroup Global Markets Inc., and UBS Securities LLC, as well as any other defendant(s) later brought into the NJ Carpenters Class Action (not including the NJ Carpenters Released Parties).

179.    159. "NJ Carpenters Notice" means the Notice of Pendency of Class Action and Proposed Settlement, Settlement Fairness Hearing and Motion for Reimbursement of Litigation Expenses, attached as Exhibit A-1 to the NJ Carpenters Settlement.

180.    160. "NJ Carpenters Plan of Allocation" means the plan of allocation for the NJ Carpenters Claims Distribution to be approved by and under the jurisdiction of the District Court.

181.    161. "NJ Carpenters Released Parties" means (a) the NJ Carpenters Settling Defendants, and (b) with respect to each of the foregoing, as applicable, their parents, subsidiaries, and affiliates and all of their respective past, current, and future respective directors, officers, employees, partners, insurers, co-insurers, reinsurers, agents, controlling shareholders, shareholders, attorneys, accountants, auditors, advisors, investment advisors, personal or legal representatives, predecessors, successors, divisions, joint ventures, assigns, spouses, heirs, related or affiliated entities, and any entity in which any NJ Carpenters Released Party has a controlling interest, and all of their respective property. For the avoidance of doubt, the insurers, co-insurees, and reinsurers listed above do not include the insurers that issued the GM Policies in their capacity as insurers under the GM Policies.

182.    162. "NJ Carpenters Settlement" means the Stipulation and Agreement of Settlement with Certain Defendants, dated as of June 14, 2013, by and among the lead plaintiffs in the NJ Carpenters Class Action and the NJ Carpenters Released Parties, which is subject to the NJ Carpenters Approval.

183.    163. "NJ Carpenters Settling Defendants" means Residential Capital, LLC, Residential Funding Company, LLC, Residential Accredit Loans, Inc., Bruce J. Paradis, Kenneth M. Duncan, Davee L. Olson, Ralph T. Flees, Lisa R. Lundsten, James G. Jones, David M. Bricker, James N. Young and Ally Securities.

184.    164. "Non-Debtor Subsidiaries" means Canada Mortgage Acceptance
Corporation; Cap Re of Vermont, LLC; Foreign Obligation Exchange, Inc. 2003-H11; Foreign
Obligation Exchange, Inc. 2003-H12; Foreign Obligation Exchange, Inc. 2003-H14; Foreign
Obligation Exchange, Inc. 2004-H11; Foreign Obligation Export, Inc.; Flume (No. 8) Limited;
GMAC Residential Funding of Canada Limited; GMAC-RFC Auritec, S.A.; GMAC-RFC
Espana Hipoteacas SL; GMAC-RFC Europe Limited; GMAC-RFC Holdings Limited;
GMAC-RFC Property Finance Limited; Investments B.V. GXI; Investments B.V. GXII; Phoenix
Residential Securities, LLC; PreEmac 2 NL B.V.; and Viaduct (No. 7) Limited.

185.    165. "Ocwen" means Ocwen Loan Servicing, LLC.

186.    166. "Ocwen APA" means that certain Asset Purchase Agreement, dated as of
November 2, 2012, as amended and supplemented, entered into by and among Ocwen, ResCap,
RFC, GMACM, Executive Trustee Services, LLCETS, ETS of Washington, Inc., EPRE LLC,
GMACM Borrower LLC and RFC Borrower LLC [Docket No. 2246, Ex. 1].

187.    167. "Order of Assessment" means the Order of Assessment of a Civil Money
Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated
February 10, 2012.

188.    168. "Original RMBS Settlement Agreements" means, collectively, the Third
Amended and Restated RMBS Trust Settlement Agreement between the Debtors and the
Steering Committee Consenting Claimants, and the Third Amended and Restated RMBS Trust
Settlement Agreement between the Debtors and the Talcott Franklin Consenting Claimants, filed
with the Bankruptcy Court on March 15, 2013, as Exhibits 1 and 2, respectively to the
*Declaration of LaShann M. DeArcy in further support of Debtors Motion Pursuant to Fed. R.
Bankr. P. 9019 for Approval of the RMBS Settlement Agreements* [Docket No. 3220].

189.    169. "Original Settling RMBS Trusts" means those 392 RMBS Trusts covered in
the Original RMBS Settlement Agreements.

190.    170. "Other Priority Claim" means any Claim other than an Administrative Claim
or Priority Tax Claim that is entitled to priority in payment pursuant to section 507(a) of the
Bankruptcy Code.

191.    171. "Other Secured Claim" means any Secured Claim other than a Junior
Secured Notes Secured Claim.

192.    172. "Paulson" means funds and accounts managed by Paulson & Co. Inc.

193.    173. "Paydown Order" means the *Order Granting Debtors' Amended Motion for
Entry Under 11 U.S.C. §§ 105 and 363 Authorizing the Debtors to Satisfy Certain Secured
Claims* [Docket No. 3967].

194.    "Pension Plan" has the meaning set forth in Article IX.E.

195.    174. "Person" means a "person" as such term is defined in section 101(41) of the
Bankruptcy Code.

196.    175. "Petition Date" means May 14, 2012.

197.    176. "PFIC" means a passive foreign investment company as defined in section 1297(a) of the Tax Code or "grantor trust" under section 671-679 of the Tax Code.

198.    "Phase I" means the first phase of the JSN Adversary Proceeding.

199.    177. "Plan" means this Joint Chapter 11 Plan proposed by Residential Capital, LLC, *et al.* and the Official Committee of Unsecured Creditors, including all exhibits, addenda, schedules or other attachments hereto, and the Plan Supplement, each of which is incorporated herein by reference, as may be amended, modified, or supplemented from time to time in accordance with the Plan Support Agreement.

200.    178. "Plan Allowed Claims" means, collectively, the ResCap Plan Allowed Unsecured Claims, GMACM Plan Allowed Unsecured Claims, and the RFC Plan Allowed Unsecured Claims.

201.    179. "Plan Documents" means, collectively, the Plan, including all exhibits thereto and the Plan Supplement, the Disclosure Statement and the Confirmation Order.

202.    180. "Plan Proponents" means the Debtors and the Creditors' Committee.

203.    181. "Plan Supplement" means a compilation of documents and forms of documents, schedules, and exhibits to the Plan to be Filed on notice to parties-in-interest, and additional documents filed as supplements or amendments to the Plan Supplement including the following: (i) the Assumption Schedule, (ii) the Liquidating Trust Agreement, (iii) the RMBS Claims Trust Agreement, (iv) the Borrower Claims Trust Agreement, (v) the Private Securities Claims Trust Agreement, (vi) the identities of the initial Liquidating Trust Board, (vii) the identities of the initial Liquidating Trust Management, (viii) the identity of the Borrower Claims Trustee and the initial members of the Borrower Claims Trust Committee, (ix) the identity of the Private Securities Claims Trustee, (x) the amount of the Borrower Trust True-Up, (xi) a cooperation agreement by and between the Liquidating Trustee and the Kessler Settlement Class (xii) the policy numbers for the GM Policies, (xiii) the Liquidating Trust Causes of Action, (xiv) the stipulated amounts of the Allowed Fee Claim, (xv) the Borrower Trust Related Causes of Action, (xvi) updated RMBS Trust Claims Schedules, (xvii) estimated Ally Contract Claims, and (xviii) the identity of the RMBS Claims Trust Trustees; and (xix) the material terms on which the Plan Proponents may pay over time any post-petition interest owed to the Junior Secured Noteholders to the extent ordered by the Bankruptcy Court, including the interest rate. The Plan Proponents shall File the Assumption Schedule no later than [●]twenty-one (21) days before the commencement of the Confirmation Hearing, and the remainder of the substantially complete versions of the materials comprising the Plan Supplement no later than ten (10) days prior to the Voting Deadlinedeadline to object to the Plan or such later date as may be approved under the Bankruptcy Court, except as otherwise provided under the Plan.

204.    182. "Plan Support Agreement" means the agreement to support the Plan together with all exhibits attached thereto, including the term sheets, dated as of May 13, 2013, by and among the Debtors, Ally, the Creditors' Committee, and the Consenting Claimants, as the same may be amended or modified in accordance with its terms. [Docket No. 3814, Ex. 3].

205.    183. "Plan Trustees" means, collectively, the Liquidating Trustees, the RMBS Claims Trust Trustees, the Borrower Claims Trustee, and the Private Securities Claims Trustee.

206.    184. "Plan Trusts" means, collectively, the Liquidating Trust, the RMBS Claims Trust, the Borrower Claims Trust, and the Private Securities Claims Trust.

207.    185. "Postpetition Intercompany Balances" means any Claim against a Debtor held by another Debtor based on "Intercompany Transactions" arising pursuant to the Cash Management Order, which Claim is, pursuant to the Cash Management Order, accorded administrative expense status and priority of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.

208.    186. "Priority Tax Claim" means a Claim of a Governmental Unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

209.    187. "Private Securities Claimants" means (i) AIG, (ii) Allstate, (iii) Asset Management Funds d/b/a AMF Funds, AMF Intermediate Mortgage Fund, AMF Ultra Short Mortgage Fund, (iv) Bank Hapoalim B.M., (v) Cambridge I, (vi) Cambridge II, (viiPlace Investment Management, Inc., in two capacities based on separate actions, (vi) Deutsche Zentra-Genossenschaftsbank, New York Branch, d/b/a DZ Bank AG, New York, DH Holding Trust, (vii) Federal Home Loan Bank of Boston, (viii) Federal Home Loan Bank of BostonChicago, (ix) Federal Home Loan Bank of Chicago, (x) Federal Home Loan Bank of Indianapolis, (xix) HSH Nordbank AG, HSH Nordbank AG Luxembourg Branch, HSH Nordbank AG New York Branch, HSH Nordbank Securities S.A., (xiixi) Huntington Bancshares Inc., (xiiixii) IKB Deutsche Industriebank AG, IKB International S.A. in liquidation, (xiv) John Hancock Life Insurance Company (U.S.A.), (xvxiv) MassMutual, (xvixv) Principal Life Insurance Company, Principal Funds, Inc., Principal Variable Contracts Funds, Inc., (xviixvi) Prudential, (xviiixvii) Sealink Funding Limited, (xixxviii) Stiching Pensioenfonds ABP, (xxxix) The Union Central Life Insurance Company/Ameritas Life Insurance Corp./Acacia Life Insurance Company, and (xxixx) the Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, Columbus Life Insurance Company, Integrity Life Insurance Company, National Integrity Life Insurance Company, and Fort Washington Investment Advisors, Inc., all in their capacity as holders of Private Securities Claims.

210.    188. "Private Securities Claims" means those securities litigation claims against the Debtors, including claims against the Debtors and Ally, arising from the purchase or sale of RMBS, held by the Private Securities Claimants.

211.    189. "Private Securities Claims Trust" means the trust established for the benefit of the holders of the Private Securities Claims.

212.    190. "Private Securities Claims Trust Agreement" means that certain trust agreement, the form of which shall be included in the Plan Supplement, that, among other things, sets forth the criteria, methodology and procedures for making distributions to holders of Private Securities Claims.

213.    191. "Private Securities Claims Trust Unit Distribution" means the number of Units to be issued by the Liquidating Trust to the Private Securities Claims Trust on the Initial

Unit Distribution Date, which shall equal 9,545,578 Units, representing 9.55% of the Total Initial
Units Outstanding, subject to the adjustment as provided in Article IV.J..

214.   192. "Private Securities Claims Trustee" means the Person selected to serve as trustee of
the Private Securities Claims Trust. The identity of the Person to serve as the Private Securities
Claims Trustee as of the Effective Date will be set forth in the Plan Supplement.

215.   193. "Pro Rata Share" means, with respect to any Claim, at any time, the
proportion that the amount of such Claim in a particular Class or group of Classes bears to the
aggregate amount of all Claims (including Disputed Claims) in such Class or group of Classes,
unless in each case the Plan provides otherwise. The amount of a Disputed Claim shall be the
amount of such Claim as estimated in accordance with the provisions of Article VIII.D, and as
such definition is used in Article III.D.1(d), Article III.D.2(d) and Article III.D.3(d), the Claim
amounts shall be determined as of the Initial Unit Distribution Record Date.

216.   194. "Pro Rata Unit Share" means, with respect to a Unitholder at any time, the
fraction (which may be expressed as a percentage) equal to the number of Units held by such
Unitholder divided by the Total Units Outstanding at that time.

217.   195. "Professional" means any Person or Entity: (a) employed in the Chapter 11
Cases under a Final Order in accordance with sections 327, 328 or 1103 of the Bankruptcy Code
and compensated for services rendered prior to or on the Effective Date under sections 327, 328,
329, 330, or 331 of the Bankruptcy Code or (b) for which the Bankruptcy Court has allowed
compensation and reimbursement under section 503(b)(4) of the Bankruptcy Code.

218.   196. "Professional Claim" means a Claim by a Professional seeking an award by
the Bankruptcy Court of compensation for services rendered or reimbursement of expenses
incurred from and after the Petition Date through and including the Effective Date under sections
330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

219.   197. "Professional Fee Escrow Account" means an interest-bearing escrow
account to be funded with the Professional Fee Reserve Amount by the Liquidating Trust on the
Effective Date solely for the purpose of paying all Allowed Professional Claims.

220.   198. "Professional Fee Reserve Amount" means the aggregate Accrued
Professional Compensation through the Effective Date as estimated by the Professionals in
accordance with Article II.B.3.

221.   199. "Proof of Claim" means a written proof of Claim Filed against any Debtor in
the Chapter 11 Cases.

222.   200. "Prudential" means Prudential Insurance Company of America and its
subsidiaries and affiliates.

223.   201. "Recognized Additional R+W Claims" has the meaning set forth in Article
IV.C.3.a.ii.2.

224.   202. "Recognized Cure Claims" has the meaning set forth in Article IV.C.3.a.i.

225.    203.  "Recognized Original R+W Claims" has the meaning set forth in Article IV.C.3.a.ii.1.

226.    204.  "Recognized RMBS Claims" means (i) Recognized Cure Claims, (ii) Recognized Original R+W Claims, (iii) Recognized Additional R+W Claims, and (iv) Recognized Unsecured Servicing Claims.

227.    205.  "Recognized Unsecured Servicing Claims" has the meaning set forth in Article IV.C.3.a.iii.

228.    206.  "Registered Holder" means the registered holders of the Junior Secured Notes and the Senior Unsecured Notes issued pursuant to the Indentures.

229.    207.  "Rejection Damages Claim Bar Date" means the date that is (a) with respect to an Executory Contract or Unexpired Lease that is rejected pursuant to the Plan, forty-five (45) days after the Effective Date, or (b) with respect to an Executory Contract or Unexpired Lease that is otherwise rejected, the applicable bar date established by the Bar Date Order or other order of the Bankruptcy Court.

230.    208.  "Released Claims" means Claims, Equity Interests, Causes of Action or liabilities that: (i) have been discharged or terminated pursuant to the terms of the Plan; (ii) have been released pursuant to the Plan; or (iii) are subject to exculpation pursuant to the Plan.

231.    209.  "Released Party" means the Liquidating Trust, and each Ally Released Party, Debtor Released Party, and Exculpated Party, or the property or Estate of any Entity so released, discharged or exculpated.

232.    210.  "REMIC" means a real estate mortgage investment conduit as defined in section 860D(a) of the Tax Code.

233.    211.  "Representatives" means a person's or entity's former and current officers, former and current directors, former and current principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals, each solely in its capacity as such; provided, that in the case of Ally and the Debtors, "Representatives" shall not include an underwriter that is unaffiliated with Ally or the Debtors against which an Investor has a pending or tolled Cause of Action.  For the avoidance of doubt, Lewis Kruger shall be deemed to be a Representative of the Debtors.

234.    212.  "ResCap" means Residential Capital LLC.

235.    213.  "ResCap Debtors" means ResCap, GMACM Holding, and RFC Holding.

236.    214.  "ResCap Debtors Unit Distribution" means 31,689,942 30,413,337 Units, representing 31.69 30.41% of the Total Initial Units Outstanding, subject to the adjustment as provided in Article IV.J.

237.    215.  "ResCap Plan Allowed Unsecured Claims" means the following ResCap Unsecured Claims Allowed under the Plan (i) MBIA's Allowed Claim in the amount of $719.0

million, (ii) FGIC's Allowed Claim in the amount of $337.5 million, and (iii) the Senior Unsecured Notes Claim in the amount of $1,003,327,213.90.

238. 216. "ResCap Unsecured Claims" means the Senior Unsecured Notes Claims and General Unsecured Claims, in each case against the ResCap Debtors.

239. 217. "Revolving Credit Facility" means that certain Amended and Restated Credit Agreement, dated as of December 30, 2009 (as amended, supplemented or otherwise modified), by and among AFI as initial lender and agent, Wells Fargo, N.A. as first priority collateral agent, RFC and GMACM as borrowers, and ResCap and certain other affiliates of the borrowers as guarantors.

240. 218. "Revolving Credit Facility Claims" means any Claim held by Ally for default interest or fees under the Revolving Credit Facility.

241. 219. "RFC" means Residential Funding Company, LLC.

242. 220. "RFC Debtors" means each of the following Debtor subsidiaries of RFC Holding:  RFC; DOA Holding Properties, LLC; DOA Properties IX (Lots-Other), LLC; EPRE LLC; Equity Investment I, LLC; GMAC Model Home Finance I, LLC; HFN REO SUB II, LLC; Homecomings Financial Real Estate Holdings, LLC; Homecomings Financial, LLC; RAHI A, LLC; RAHI B, LLC; RAHI Real Estate Holdings, LLC; RCSFJV2004, LLC; Residential Accredit Loans, Inc.; Residential Asset Mortgage Products, Inc.; Residential Asset Securities Corporation; Residential Funding Mortgage Exchange, LLC; Residential Funding Mortgage Securities I, Inc.; Residential Funding Mortgage Securities II, Inc.; Residential Funding Real Estate Holdings, LLC; RFC–GSAP Servicer Advance, LLC; RFC Asset Holdings II, LLC; RFC Asset Management, LLC; RFC Borrower LLC; RFC Construction Funding, LLC; RFC REO LLC; and RFC SFJV-2002, LLC.

243. 221. "RFC Debtors Unit Distribution" means 33,338,825 32,995,746 Units, representing 33.34 33.00% of the Total Initial Units Outstanding, subject to the adjustment as provided in Article IV.J.

244. 222. "RFC Holding" means GMAC-RFC Holding Company, LLC.

245. 223. "RFC Plan Allowed Unsecured Claims" means the following RFC Unsecured Claims Allowed under the Plan (i) the RMBS Trusts' Allowed Claim in the amount of $7,091.2 million, (ii) MBIA's Allowed Claim in the amount of $1,450.0 million, and (iii) FGIC's Allowed Claim in the amount of $415 million.

246. 224. "RFC Unsecured Claims" means the RMBS Trust Claims and General Unsecured Claims, in each case against the RFC Debtors.

247. 225. "RMBS" means residential mortgage-backed securities, notes and certificates issued by the RMBS Trusts.

248. 226. "RMBS Claims Trust" means the trust established for the benefit of the RMBS Trusts that have Recognized RMBS Claims, which shall be treated by all parties,

including, without limitation, the Debtors, the RMBS Claims Trust Trustees, and the RMBS Trustees as a "qualified settlement fund" within the meaning of 468B of the Tax Code and the Treasury Regulations thereunder.

249. 227. "RMBS Claims Trust Agreement" means that certain trust agreement, the form of which shall be included in the Plan Supplement, that, among other things, sets forth the criteria, methodology and procedures for making distributions to RMBS Trusts having Recognized RMBS Claims.

250. 228. "RMBS Claims Trust Trustees" means the Persons selected to serve as trustees of the RMBS Claims Trust, which may be one or more of the RMBS Trustees. The identity of the Persons to serve as the RMBS Claims Trustees as of the Effective Date will be set forth in the Plan Supplement.

251. 229. "RMBS Cure Claims" means all claims of RMBS Trusts against the Debtors other than RMBS R+W Claims, including, without limitation, all claims of RMBS Trusts against the Debtors based on servicing obligations and other obligations of the Debtors as servicers and otherwise that were outstanding as of the date of the closing of the sale of the Debtors' servicing platform to Ocwen, that became due and owing after such closing date, or that become due and owning, as a result of pre-closing actions of the Debtors as servicers and were required to be cured prior to the assumption and assignment to Ocwen pursuant to section 365(b)(1)(A) of the Bankruptcy Code.

252. 230. "RMBS R+W Claims" means claims of the RMBS Trusts against the Debtors arising from any obligations or liability in respect of the origination and sale of mortgage loans to the RMBS Trusts.

253. 231. "RMBS Settlement" means, as part of the Global Settlement, the settlement that provides for the allowance, priority, and allocation of the RMBS Trust Claims, through approval of the Original RMBS Settlement Agreements as expanded, modified and superseded as set forth in Article IV.C of the Plan.

254. 232. "RMBS Trust Claims Schedules" means Schedules 1-G, 1-R, 2-G, 2-R, 3-G, 3-R, 4-G and 4-R attached to the Plan, as amended and restated when filed as part of the Plan Supplement.

255. 233. "RMBS Trusts" means all residential mortgage backed securitization trusts, net interest margin trusts and similar residential mortgage backed trusts for which the Debtors act as sponsor, depositor, servicer, master servicer or in similar capacities.

256. 234. "RMBS Trustees" means BNY Mellon, DB, USB, HSBC, LDTC, and WFB.

257. 235. "RMBS Trust Allocation Protocol" means the provisions set forth in Article IV.C.3 of the Plan.

258. 236. "RMBS Trust Claims" means all the claims, including RMBS Cure Claims and RMBS R+W Claims, of the RMBS Trusts against the Debtors which shall be Allowed under Article VI.C.2(a) of the Plan as non-subordinated unsecured Claims.

259.    237. "Schedules" means the Debtors' schedules of assets and liabilities and statements of financial affairs, Filed under section 521 of the Bankruptcy Code and the Bankruptcy Rules, as amended, supplemented, or modified.

260.    238. "Secured Claim" means any Claim that is (a) secured by a Lien on collateral, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Court order, to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or (b) subject to a valid right of setoff under section 553 of the Bankruptcy Code.

261.    239. "Senior Unsecured Noteholders" means the beneficial holders of Senior Unsecured Notes.

262.    240. "Senior Unsecured Notes" means the United States dollar denominated notes maturing between June 2012 and June 2015, euro denominated notes matured in May 2012, and U.K. sterling denominated notes maturing between May 2013 and July 2014, each issued by ResCap pursuant to the Senior Unsecured Notes Indenture.

263.    241. "Senior Unsecured Notes Claim" means any Claim under or evidenced by the Senior Unsecured Notes, which shall be deemed Allowed against the ResCap Debtors in an amount of $1,003,327,213.90.

264.    242. "Senior Unsecured Notes Indenture" means that certain Indenture, dated as of June 24, 2005, between ResCap, any guarantors party thereto, and the Senior Unsecured Notes Indenture Trustee, as supplemented from time to time.

265.    243. "Senior Unsecured Notes Indenture Trustee" means Wilmington Trust, as successor indenture trustee with respect to the Senior Unsecured Notes, and as paying agent, calculation agent and registrar with respect to the United States Dollar Senior Unsecured Notes, under the Senior Unsecured Notes Indenture, together with its respective successors and assigns in such capacity.

266.    244. "Senior Unsecured Notes Indenture Trustee Charging Lien" means the Liens and other priority in payment and rights available to the Senior Unsecured Notes Indenture Trustee under the Senior Unsecured Notes Indenture or otherwise available to the Senior Unsecured Notes Indenture Trustee under applicable law, for the payment of Senior Unsecured Notes Indenture Trustee Fees and Expenses.

267.    245. "Senior Unsecured Notes Indenture Trustee Fees and Expenses" means the reasonable fees, costs, expenses and indemnity claims of the Senior Unsecured Notes Indenture Trustee, including, but not limited to, the fees, costs and expenses of the Senior Unsecured Notes Indenture Trustees' counsel and financial advisors.

268.    246. "Senior Unsecured Notes Indenture Trustee Reserve" means the reserve of Cash to be funded from the Initialinitial Cash Distributiondistribution issued on account of the Senior Unsecured Notes Claims, and held by the Senior Unsecured Notes Indenture Trustee for the payment of future projected accrued and unpaid, Senior Unsecured Notes Indenture Trustee Fees and Expenses.

269. 247. "Servicing Agreement" means either a "Pooling and Servicing Agreement" or an integrated set of "Servicing Agreements," "Mortgage Loan Purchase Agreements," "Indentures," and/or "Trust Agreements," which, when combined, provide for, among other things, the servicing of the mortgage loans held by an RMBS Trust.

270. 248. "Settlement Insurance Policies" means all directors & officers and errors & omissions insurance policies with policy periods between November 2006 and the Effective Date which provide coverage to Ally or its Representatives as well as to the Debtors and/or their Representatives.

271. 249. "Settling Parties" means each of the following in its capacity as such: the Debtors, the Creditors' Committee, Ally, and the Consenting Claimants.

272. 250. "Settling Private Securities Claimants" means each of AIG, Allstate, MassMutual and Prudential.

273. 251. "Steering Committee Consenting Claimants" means certain Investors in RMBS backed by mortgage loans held by RMBS Trusts associated with securitizations sponsored by the Debtors between 2004 and 2007 and represented by Kathy D. Patrick of Gibbs & Bruns LLP and Keith H. Wofford of Ropes & Gray LLP.

274. 252. "Supporting Senior Unsecured Noteholders" means the holders of the Senior Unsecured Notes that have executed or joined the Plan Support Agreement.

275. 253. "Talcott Franklin Consenting Claimants" means certain Investors in RMBS backed by mortgage loans held by RMBS Trusts associated with securitizations sponsored by the Debtors between 2004 and 2007 represented by Talcott Franklin of Talcott Franklin, P.C., Carter Ledyard & Milburn LLP and Miller Johnson.

276. 254. "Tax Code" means the Internal Revenue Code of 1986, as amended.

277. 255. "Third Party Release" means the release set forth in Article IX.D.

278. 256. "Total Units Outstanding" means 100 million Units, which is the total number of Units to be issued by the Liquidating Trust pursuant to the Plan.

279. 257. "Treasury Regulations" means the Treasury regulations promulgated under the Tax Code.

280. 258. "Unexpired Lease" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

281. 259. "Unimpaired" means, with respect to any Class, a Class that is not Impaired.

282. 260. "Unit Distribution Date" means a date or dates established pursuant to the Liquidating Trust Agreement or otherwise determined by the Liquidating Trust Board, as of which a distribution of Units shall be made to Liquidating Trust Unit Beneficiaries that are holders of Disputed Claims that became Allowed, in whole or in part.

283.  261. "Unit Issuance Percentage" means, in the case of the GMACM  Debtors, 25.4327.05%; in the case of the ResCap Debtors, 31.6930.41%; in the case of the RFC Debtors, 33.3433.00%; and in the case of the Private Securities Claims Trust, 9.55%.

284.  262. "United States" means the United States of America, its agencies, departments, and agents.

285.  263. "Unitholders" means holders of Units.

286.  264. "Units" means units of beneficial interest issued by the Liquidating Trust, which entitle the holders thereof to receive from the Liquidating Trust a Pro Rata Unit Share of Distributable Cash.

287.  265. "Unknown" as used in the definition of NJ Carpenters Claims, means any and all NJ Carpenter Claims that any NJ Carpenters Class Member does not know or suspect to exist in his, her or its favor at the time of the release, which if known by him, her or it might have affected his, her or its settlement with and release of the NJ Carpenters Released Parties, or might have affected his, her or its decision not to object to the NJ Carpenters Settlement or not exclude himself, herself or itself from the settlement class.  With respect to any and all NJ Carpenters Claims, the parties stipulated and agreed under the NJ Carpenters Settlement that, upon the Effective Date, the NJ Carpenters Class Members shall expressly waive, and shall be deemed to have waived, and by operation of the order approving the NJ Carpenters Settlement, shall have expressly waived, to the fullest extent permitted by law, any and all provisions, rights and benefits conferred by Cal. Civ. Code § 1542 (to the extent it applies to the Action), and any law of any state or territory of the United States, or principle of common law, or the law of any foreign jurisdiction, that is similar, comparable or equivalent to Cal. Civ. Code § 1542, which provides:

**A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

288.  266. "Unsecured Claims" ~~which will mean~~means collectively, the GMACM Unsecured Claims, the ResCap Unsecured Claims and the RFC Unsecured Claims.

289.  267. "USB" means U.S. Bank National Association solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, master servicer, custodian and/or similar agency capacities in respect of certain of the RMBS Trusts.

290.  268. "U.S. Trustee" means the United States Trustee for the Southern District of New York.

291.  269. "U.S. Trustee Fees" means fees arising under 28 U.S.C. § 1930, and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

292. ~~270.~~ "Voting Deadline" means the date set forth in the order of the Bankruptcy Court approving the Disclosure Statement as the deadline for, among other things, voting to accept or reject the Plan.

293. ~~271.~~ "WFB" means Wells Fargo Bank, N.A. solely in its capacity as trustee, indenture trustee, securities administrator, co-administrator, paying agent, grantor trustee, master servicer, custodian, and/or similar agency capacities in respect of certain of the RMBS Trusts.

294. ~~272.~~ "Wilmington Trust" means Wilmington Trust, National Association, not individually, but solely in its capacity as Senior Unsecured Notes Indenture Trustee.

## B.    Rules of Construction

For the purposes of the Plan: (1) any term used in capitalized form that is not defined in the Plan, but that is defined in the Bankruptcy Code or the Bankruptcy Rules, has the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (2) in the appropriate context, each term, whether stated in the singular or the plural, includes both the singular and the plural, and pronouns stated in the masculine, feminine, or neutral gender include the masculine, feminine, and the neutral gender; (3) unless otherwise stated herein, any reference in the Plan to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (4) except as otherwise provided in the Plan, all references in the Plan to "Articles" are references to Articles of the Plan; (5) except as otherwise provided in the Plan, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (6) the words "includes" and "including" are not limiting and mean that the things specifically identified are set forth for purposes of illustration, clarity, or specificity and do not in any respect qualify, characterize, or limit the generality of the class within which such things are included; (7) any reference to an Entity or a Person as a holder of a Claim or Equity Interest includes that Entity's or Person's successors, assigns, and affiliates; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (10) any immaterial effectuating provisions may be interpreted by the Plan Proponents or the Liquidating Trust, as applicable, in a manner that is consistent with the overall purpose and intent of the Plan, all without further order of the Bankruptcy Court.

## C.    Computation of Time

Except as otherwise provided in the Plan, Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed in the Plan.

## D.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws that would require application of the law of another jurisdiction, shall govern the rights, obligations, construction, and implementation of the Plan, and any agreements, securities, instruments, or other documents executed or delivered in connection with the Plan (except as otherwise set forth in those

documents, in which case the governing law of such documents shall control); provided, however, that governance matters relating to the Debtors, the Liquidating Trust, the Borrower Claims Trust, the RMBS Claims Trust, or the Private Securities Claims Trust, as applicable, shall be governed by the laws of the State of incorporation or formation thereof.

## ARTICLE II.

## ADMINISTRATIVE CLAIMS, PROFESSIONAL CLAIMS, PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, Priority Tax Claims and U.S. Trustee Fees have not been classified and, therefore, are excluded from the Classes of Claims and Equity Interests set forth in Article III and shall have the following treatment:

**A.    Administrative Claims**

1.    **Treatment of Administrative Claims Other than Professional Claims**.

Unless otherwise agreed to by the holder of an Allowed Administrative Claim, or set forth in an order of the Bankruptcy Court, the Liquidating Trust will pay each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) the full unpaid amount of such Claim in Cash: (1) if the Administrative Claim is Allowed before the Effective Date, on the Effective Date, or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due, or as soon as practicable thereafter); or (2) if the Administrative Claim is Allowed on or after the Effective Date, on the date such Administrative Claim is Allowed, or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due, or as soon as practicable thereafter); provided, however, that Allowed Administrative Claims other than Professional Fee Claims that arise in the ordinary course of the Debtors' business shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions; provided, further, however, that accrued and unpaid Postpetition Intercompany Balances shall be satisfied pursuant to the Cash Management Order without further application or order of the Bankruptcy Court.  On or after the Effective Date, the Liquidating Trust may settle and pay any Administrative Claim in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

2.    **Administrative Claims Bar Date**.

Except as provided for herein or in any order of the Bankruptcy Court, and subject to section 503(b)(1)(D) of the Bankruptcy Code, holders of Administrative Claims (other than holders of Administrative Claims paid in the ordinary course of business, holders of Professional Claims, holders of Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code, and holders of Postpetition Intercompany Balances) must File and serve on the Plan Proponents or the Liquidating Trust, as applicable, requests for the payment of

such Administrative Claims not already Allowed by Final Order in accordance with the procedures specified in the Confirmation Order, on or before the Administrative Claim Bar Date or be forever barred, estopped, and enjoined from asserting such Claims against the Debtors, the ~~Liquidating Trust~~Plan Trusts, or their assets or properties, and such Claims shall be deemed discharged as of the Effective Date. ~~Objections to such requests, if any, must be filed and served on the Plan Proponents or the Liquidating Trust, as applicable, and the requesting party no later than [●].~~

## B.    Professional Claims

### 1.    Final Fee Applications

All final requests for Professional Claims must be Filed no later than seventy-five (75) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Claims will be determined by the Bankruptcy Court.

### 2.    Professional Fee Escrow Account

On the Effective Date, the Liquidating Trust will establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account will be maintained in trust for the Professionals.  The funds in such account will not be property of the Liquidating Trust.  The amount of Professional Claims owing to the Professionals will be paid in Cash to such Professionals by the Liquidating Trust, or at the Liquidating Trust's direction, from the Professional Fee Escrow Account, without interest or other earnings therefrom, when such Claims are Allowed by Final Order; provided, that notwithstanding the foregoing, on the Effective Date, the Debtors shall pay (1) Centerview's full In-Court Transaction Fee (as defined in paragraph 3(b) of the engagement letter by and between Centerview and the Debtors) and (2) Moelis full Restructuring Fee (as defined in paragraph 2 of the engagement letter between Moelis & Company LLC and the Committee); provided, further, that Centerview and Moelis shall File final requests for Professional Claims in accordance with Section II.B.1 above; and provided, further, that the Liquidating Trust's liability for Professional Claims shall not be limited nor be deemed to be limited to the funds available from the Professional Fee Escrow Account. After all Professional Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, will be transferred to the Liquidating Trust.

### 3.    Professional Fee Reserve Amount

To receive payment for Accrued Professional Compensation incurred through the Effective Date, Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and deliver such estimate to the Plan Proponents at least five (5) Business Days prior to the anticipated Effective Date.  If a Professional does not provide such estimate, the Plan Proponents may estimate the unbilled fees and expenses of such Professional. The total amount so estimated will constitute the Professional Fee Reserve Amount; provided that such estimate will not be considered an admission or limitation with respect to the fees and expenses of such Professional.  The Professional Fee Reserve Amount and the estimated Accrued

Professional Compensation amounts submitted by the Professionals will be subject to review by the Debtors, the Consenting Claimants, and the Creditors' Committee, and any objections to the Professional Fee Reserve Amount must be served on the Plan Proponents prior to the Effective Date.

4.    **Post-Effective Date Fees and Expenses**

Except as otherwise specifically provided in the Plan, the Liquidating Trust shall pay in Cash the reasonable legal, professional, or other fees and expenses incurred by the Professionals from and after the Effective Date, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Professionals may be employed and paid in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**C.    Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, the Liquidating Trust ~~will~~shall pay ~~such~~each holder of an Allowed Priority Tax Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority Tax Claim, in accordance with Bankruptcy Code section 1129(a)(9)(C), the full unpaid amount of such Allowed Priority Tax Claim in Cash on, or as soon as practicable after, the latest of: (1) the Effective Date; (2) the date such Allowed Priority Tax Claim becomes Allowed; or (3) in ~~quarterly~~regular payments over a period of time not to exceed five (5) years after the Petition Date~~, in accordance with Bankruptcy Code section 1129(a)(9)(C);~~ with interest at a rate determined in accordance with section 511 of the Bankruptcy Code, provided, that such Allowed Priority Tax Claims shall not be treated in a manner less favorable than the most favored nonpriority unsecured claim provided for by the Plan (other than Cash payments made to a class of creditors under section 1122(b)), and provided, further, that such election ~~will~~shall be without prejudice to the Liquidating Trust's right to prepay such Allowed Priority Tax Claim in full or in part without penalty. To the extent a holder of an Allowed Priority Tax Claim holds a valid lien (a "Tax Lien") for outstanding and unpaid real property taxes against property of the Debtors or the Liquidating Trust, as applicable, any liens imposed on account of such Claim shall remain unimpaired until such Allowed Priority Tax Claim is paid in full.

**D.    U.S. Trustee Fees**

On the Effective Date or as soon as practicable thereafter, the Liquidating Trust shall pay all U.S. Trustee Fees that are due and owing on the Effective Date. For the avoidance of doubt, nothing in the Plan shall release the Liquidating Trust from its obligation to pay all U.S. Trustee Fees due and owing after the Effective Date before a Final Order is entered by the Bankruptcy Court concluding or closing the Chapter 11 Cases.

# ARTICLE III.

## CLASSIFICATION, TREATMENT, AND VOTING
## OF CLAIMS AND EQUITY INTERESTS

**A.    Classification of Claims and Equity Interests**

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Equity Interests.  A Claim or Equity Interest is placed in a particular Class for the purposes of voting on the Plan and receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest has not been paid, withdrawn or otherwise settled before (i) the Claims Record Date for voting purposes, or (ii) the time at which distributions are made with respect to such Claims or Equity Interests pursuant to the Plan for distribution purposes.

**B.    Record Date for Claims**

As of the Claims Record Date, the transfer registers for each Class of Claims or Equity Interests (other than for publicly traded securities), as maintained by the Debtors or their agents, shall be deemed closed and there shall be no further changes made to reflect any new record holders of any such Claims or Equity Interests.  The Debtors and the Liquidating Trust shall have no obligation to recognize any transfer of such Claims or Equity Interests occurring on or after the Claims Record Date.

**C.    Summary of Classification and Class Identification**

i.    Except for Claims addressed in Article II, all Claims and Equity Interests are classified in the Classes set forth in this Article III in accordance with section 1122 of the Bankruptcy Code. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes.  A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. In no event shall any holder of an Allowed Claim be entitled to receive payments under this Plan that, in the aggregate, exceed the Allowed amount of such holder's Claim.

ii.    Although the Plan applies to all of the Debtors, (a) the Plan constitutes fifty-one (51) distinct chapter 11 plans, one for each Debtor; and (b) for voting purposes, each class of the Debtor Groups will contain sub-classes for each of the Debtors within a particular Debtor Group. The Plan groups the Debtors into three Debtor Groups (the ResCap Debtors, the GMACM Debtors and the RFC Debtors) solely for purposes of describing treatment under the Plan and making distributions under the Plan.  Such grouping shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any assets; and, except as otherwise provided by or

permitted in the Plan, all Debtors shall continue to exist as separate legal entities. For voting purposes, each Class of the Debtor Groups will contain sub-classes for each of the Debtors within a particular Debtor Group (*e.g.,* there will be three (3) sub-Classes for each Class of the ResCap Debtors, twenty-one (21) sub-Classes for each Class of the GMACM Debtors (provided, that, in lieu of Class GS-4A, the Plan for ETS contains a sub-Class, Class GS-4B, for ETS Unsecured Claims), and twenty-seven (27) sub-Classes for each Class of the RFC Debtors, and many of the sub-Classes may be vacant). Notwithstanding the foregoing, the Plan Proponents reserve the right to seek approval of the Bankruptcy Court to consolidate any two or more Debtors for purposes of administrative convenience, provided that such consolidation does not materially and adversely impact the amount of distributions to any Person under the Plan and is in accordance with the terms of the Plan Support Agreement.

       iii.        Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; provided, however, that in the event no holder of a Claim with respect to a specific Class for a particular Debtor timely submits a Ballot indicating acceptance or rejection of the Plan, such Class will be deemed to have accepted the Plan. The Plan Proponents shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Equity Interests. The Plan Proponents reserve the right to modify the Plan in accordance with Article XI.A hereof, including the right to withdraw the Plan as to an individual Debtor at any time before the Effective Date.

       iv.        The following are tables assigning each Class a letter and number designation for purposes of identifying each separate Class, a description of whether that Class is Impaired, and the Class' voting rights:

       1.      **ResCap Debtors**

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| R-1 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| R-2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| R-3 | Junior Secured Notes Claims | Impaired/ Unimpaired | Yes/No (presumed to accept) |
| R-4 | ResCap Unsecured Claims | Impaired | Yes |
| R-5 | Borrower Claims | Impaired | Yes |
| R-6 | Private Securities Claims | Impaired | Yes |
| R-7 | NJ Carpenters Claims | Impaired | Yes |
| R-8 | General Unsecured Convenience Claims | Impaired | Yes |
| R-9 | Intercompany Balances | Impaired | No (deemed to reject) |
| R-10 | Equity Interests | Impaired | No (deemed to reject) |
| R-11 | FHFA Claims | Impaired | Yes/No (deemed to reject) |
| R-12 | Revolving Credit Facility Claims | Impaired | Yes |

       2.      **GMACM Debtors**

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| GS-1 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| GS-2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| GS-3 | Junior Secured Notes Claims | Impaired/ Unimpaired | Yes/No (presumed to accept) |
| GS-4A | GMACM Unsecured Claims | Impaired | Yes |
| GS-4B | ETS Unsecured Claims | Impaired | Yes |
| GS-5 | Borrower Claims | Impaired | Yes |
| GS-6 | Private Securities Claims | Impaired | Yes |
| GS-7 | General Unsecured Convenience Claims | Impaired | Yes |
| GS-8 | Intercompany Balances | Impaired | No (deemed to reject) |
| GS-9 | Equity Interests | Impaired | No (deemed to reject) |
| GS-10 | Revolving Credit Facility Claims | Impaired | Yes |

3.    **RFC Debtors**

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| RS-1 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| RS-2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| RS-3 | Junior Secured Notes Claims | Impaired/ Unimpaired | Yes/No (presumed to accept) |
| RS-4 | RFC Unsecured Claims | Impaired | Yes |
| RS-5 | Borrower Claims | Impaired | Yes |
| RS-6 | Private Securities Claims | Impaired | Yes |
| RS-7 | NJ Carpenters Claims | Impaired | Yes |
| RS-8 | General Unsecured Convenience Claims | Impaired | Yes |
| RS-9 | Intercompany Balances | Impaired | No (deemed to reject) |
| RS-10 | Equity Interests | Impaired | No (deemed to reject) |
| RS-11 | FHFA Claims | Impaired | Yes/No (deemed to reject) |
| RS-12 | Revolving Credit Facility Claims | Impaired | Yes |

**D.    Treatment of Claims and Equity Interests**

Except to the extent that a holder of an Allowed Claim or Equity Interest, as applicable, agrees to a less favorable treatment, such holder shall, in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Equity Interest, receive the treatment described below under the Plan.

1.    **Claims Against and Equity Interests in the ResCap Debtors**

(a)    Class R-1 – Other Priority Claims

(i)      Classification: Class R-1 consists of all Allowed Other Priority Claims against the ResCap Debtors.

(ii)     Treatment: In full and final satisfaction of the Other Priority Claims in Class R-1, on or as soon as practicable after the Effective Date, each holder of an Allowed Other Priority Claim in Class R-1 shall receive one of the following treatments on account of such Claim, as determined by the Plan Proponents prior to the Effective Date or the Liquidating Trust, following the Effective Date: (a) payment in full in Cash, or (b) treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; provided, that Other Priority Claims that arise in the ordinary course of the Debtors' business and that are not due and payable on or before the Effective Date will be paid in the ordinary course of business in accordance with the terms thereof.

(iii)    Voting: Class R-1 is Unimpaired. Pursuant to Bankruptcy Code section 1126(f), holders of Allowed Class R-1 Claims are conclusively presumed to accept the Plan.

(b)    Class R-2 – Other Secured Claims

(i)      Classification: Class R-2 consists of all Allowed Other Secured Claims against the ResCap Debtors.

(ii)     Treatment: In full and final satisfaction of the Other Secured Claims in Class R-2, on or as soon as practicable after the Effective Date, each holder of an Allowed Other Secured Claim in Class R-2 shall receive one of the following treatments on account of such Claim as determined by the Plan Proponents prior to the Effective Date, or the Liquidating Trust, following the Effective Date: (a) payment in full in Cash, including any interest, at the non-default rate (or such other rate as may be ordered by the Court), required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (b) the collateral securing its Allowed Other Secured Claim.

(iii)    Voting: Class R-2 is Unimpaired. Pursuant to Bankruptcy Code section 1126(f), holders of Allowed Class R-2 Claims are conclusively presumed to accept the Plan.

(c)    Class R-3 – Junior Secured Notes Claims

(i)      Classification: Class R-3 consists of all Allowed Junior Secured Notes Claims against the ResCap Debtors.

(ii)    Treatment: In full and final satisfaction of the Junior Secured
Notes Claims in Class R-3, on or as soon as practicable after the
Effective Date, each holder of an Allowed Junior Secured Notes
Claim in Class R-3 shall receive payment in full for the Allowed
amount of such Junior Secured Notes Claim as determined by the
Bankruptcy Court in Phase I of the JSN Adversary Proceeding or
at the Confirmation Hearing; provided, however, that if the
Bankruptcy Court determines that the Junior Secured
Noteholders are entitled to post-petition interest, the Allowed
amount of such post-petition interest shall be paid in accordance
with the requirements under the Bankruptcy Code, which may
include, at the Plan Proponents' election the payment of such
post-petition interest over time at the appropriate market
rate with interest at a rate consistent with section 1129(b) of the
Bankruptcy Code.[2]

(iii)    Voting: Class R-3 is Impaired. Holders of Allowed Class R-3
Claims are entitled to vote to accept or reject the Plan; provided
that if the Bankruptcy Court makes a finding in the JSN
Adversary Proceeding that the Junior Secured Notes Claims are
oversecured such that they are entitled to payment in full in an
amount that will render them unimpaired, and the Plan
Proponents pay them in full in Cash on or as soon as practicable
after the Effective Date, then holders of Allowed Class R-3
Claims will be conclusively presumed to accept the Plan and
such votes will not be counted.

(d)    Class R-4 – ResCap Unsecured Claims

(i)    Classification: Class R-4 consists of all Allowed ResCap
Unsecured Claims.

(ii)    Treatment: In full and final satisfaction of the ResCap Unsecured
Claims in Class R-4, as soon as practicable after the Effective
Date, each holder of an Allowed ResCap Unsecured Claim in
Class R-4 shall receive its Pro Rata Share of the ResCap Debtors
Unit Distribution.

(iii)    Voting: Class R-4 is Impaired. Holders of Allowed Class R-4
Claims are entitled to vote to accept or reject the Plan.

(e)    Class R-5 – Borrower Claims

---

[2] The terms on which the Plan Proponents may pay over time any post-petition interest owed to
the Junior Secured Noteholders to the extent ordered by the Bankruptcy Court, including the
interest rate, will be set forth in the Plan Supplement.

(i)      Classification: Class R-5 consists of all Allowed Borrower Claims against the ResCap Debtors.

(ii)     Treatment: In full and final satisfaction of the Borrower Claims in Class R-5, as soon as practicable after the Effective Date, holders of Allowed Borrower Claims in Class R-5 shall receive their allocated share of Cash available for distribution from the Borrower Claims Trust, in accordance with the methodology and procedures set forth in the Borrower Claims Trust Agreement.

(iii)    Voting: Class R-5 is Impaired.  Holders of Allowed Class R-5 Claims are entitled to vote to accept or reject the Plan.

(f)     Class R-6 – Private Securities Claims

(i)      Classification: Class R-6 consists of all Allowed Private Securities Claims against the ResCap Debtors.

(ii)     Treatment: In full and final satisfaction of the Private Securities Claims in Class R-6, as soon as practicable after the Effective Date, holders of Allowed Private Securities Claims in Class R-6 shall receive their allocated share of either (A) Cash distributions from the Private Securities Claims Trust, or (B) the Units transferred to the Private Securities Claims Trust that constitute the Private Securities Claims Trust Unit Distribution, in each case in accordance with the methodology and procedures set forth in the Private Securities Claims Trust Agreement.

(iii)    Voting: Class R-6 is Impaired.  Holders of Allowed Class R-6 Claims are entitled to vote to accept or reject the Plan.

(g)     Class R-7 – NJ Carpenters Claims

(i)      Classification: Class R-7 consists of all Allowed NJ Carpenters Claims against the ResCap Debtors.

(ii)     Treatment: Subject to the NJ Carpenters Approval, in full and final satisfaction of the NJ Carpenters Claims in Class R-7, within ten (10) business days of the Effective Date, the lead plaintiff, on behalf of holders of Allowed NJ Carpenters Claims in Class R-7 shall receive the NJ Carpenters Claims Distribution which will thereafter be distributed pursuant to the NJ Carpenters Plan of Allocation.  Absent the NJ Carpenters Approval, Claims held by NJ Carpenters Class Members, to the extent Allowed, shall be classified as General Unsecured Claims, which claims may be subject to subordination.

44

       (iii)    <u>Voting</u>: Class R-7 is Impaired.  Holders of Allowed Class R-7 Claims are entitled to vote to accept or reject the Plan.

(h)    Class R-8 – General Unsecured Convenience Claims

       (i)    <u>Classification</u>: Class R-8 consists of all Allowed ~~ResCap~~ General Unsecured Convenience Claims against the ResCap Debtors.

       (ii)    <u>Treatment</u>: In full and final satisfaction of the General Unsecured Convenience Claims in Class R-8, as soon as practicable after the Effective Date, each holder of an Allowed General Unsecured Convenience Claim in Class R-8 shall receive a distribution in Cash equal to 36.3% of such holder's Allowed Class R-8 Claim.

       (iii)    <u>Voting</u>: Class R-8 is Impaired.  Holders of Allowed Class R-8 Claims are entitled to vote to accept or reject the Plan.

(i)    Class R-9 – Intercompany Balances

       (i)    <u>Classification</u>: Class R-9 consists of all Intercompany Balances against the ResCap Debtors.

       (ii)    <u>Treatment</u>: On the Effective Date, Intercompany Balances against the ResCap Debtors in Class R-9 shall be waived, cancelled, and discharged.  Holders of Intercompany Balances in Class R-9 shall receive no recovery on account of their Claims.

       (iii)    <u>Voting</u>: Class R-9 is Impaired.  Pursuant to Bankruptcy Code section 1126(g), holders of Allowed Class R-9 Claims are deemed to reject the Plan.

(j)    Class R-10 – Equity Interests

       (i)    <u>Classification</u>: Class R-10 consists of all Equity Interests in the ResCap Debtors.

       (ii)    <u>Treatment</u>: Holders of Equity Interests in Class R-10 shall receive no recovery on account of such Equity Interests and such Equity Interests shall be canceled on the Effective Date.

       (iii)    <u>Voting</u>: Class R-10 is Impaired.  Pursuant to Bankruptcy Code section 1126(g), holders of Allowed Class R-10 Equity Interests are deemed to reject the Plan.

(k)    Class R-11 – FHFA Claims

       (i)    <u>Classification</u>: Class R-11 Consists of all FHFA Claims against the ResCap Debtors.

  (ii) <u>Treatment:</u>  Holders of FHFA Claims in Class R-11 shall receive no recovery on account of such Claims; provided, that if the Bankruptcy Court determines that the FHFA Claims are not subject to subordination under section 510(b) of the Bankruptcy Code, each holder of an Allowed ResCap FHFA Claim shall receive a distribution in Cash equal to 0.001% of such holder's Allowed ResCap FHFA Claim, which accounts for the fact that no holder of an FHFA Claim is subject to the Third Party Releases, as soon as practicable after the later of the Effective Date or the allowance of such Claim.

  (iii) <u>Voting:</u> Class R-11 is Impaired. ~~Pursuant to Bankruptcy Code section 1126(g),~~<u>Holders of Allowed Class R-11 Claims are entitled to vote to accept or reject the Plan; provided, that if the Bankruptcy Court determines that the FHFA Claims are subject to subordination under section 510(b) of the Bankruptcy Code such that holders of Allowed FHFA Claims against the ResCap Debtors are not entitled to receive a distribution under the Plan, then</u> holders of Allowed Class R-11 Claims ~~are~~<u>will be</u> deemed to reject the Plan<u> and such votes will not be counted</u>.

 (l) Class R-12 – Revolving Credit Facility Claims

  (i) <u>Classification:</u> Class R-12 consists of all Allowed Revolving Credit Facility Claims against the ResCap Debtors.

  (ii) <u>Treatment:</u> In full and final satisfaction of the Revolving Credit Facility Claims in Class R-12, <u>on the Effective Date,</u> any amounts paid under the Paydown Order shall be indefeasibly and finally approved and allowed; provided, that on the Effective Date holders of Allowed Revolving Credit Facility Claims in Class R-12 shall waive<u> as against any Debtor or Plan Trust</u> any right to payment on account of the Revolving Credit Facility Claims.

  (iii) <u>Voting:</u> Class R-12 is Impaired.  Holders of Allowed Class R-12 Claims are entitled to vote to accept or reject the Plan.

## 2. **Claims Against and Equity Interests in the GMACM Debtors**

 (a) Class GS-1 – Other Priority Claims

  (i) <u>Classification:</u> Class GS-1 consists of all Allowed Other Priority Claims against the GMACM Debtors.

  (ii) <u>Treatment:</u> In full and final satisfaction of the Other Priority Claims in Class GS-1, on or as soon as practicable after the Effective Date, each holder of an Allowed Other Priority Claim

in Class GS-1 shall receive one of the following treatments on account of such Claim, as determined by the Plan Proponents prior to the Effective Date, or the Liquidating Trust, following the Effective Date: (a) payment in full in Cash, or (b) treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; provided, that Other Priority Claims that arise in the ordinary course of the Debtors' business and that are not due and payable on or before the Effective Date will be paid in the ordinary course of business in accordance with the terms thereof.

(iii)  Voting: Class GS-1 is Unimpaired.  Pursuant to Bankruptcy Code section 1126(f), holders of Allowed Class GS-1 Claims are conclusively presumed to accept the Plan.

(b)  Class GS-2 – Other Secured Claims

(i)  Classification: Class GS-2 consists of all Allowed Other Secured Claims against the GMACM Debtors.

(ii)  Treatment: In full and final satisfaction of the Other Secured Claims in Class GS-2, on or as soon as practicable after the Effective Date, each holder of an Allowed Other Secured Claim in Class GS-2 shall receive one of the following treatments on account of such Claim as determined by the Plan Proponents prior to the Effective Date, or the Liquidating Trust, following the Effective Date: (a) payment in full in Cash, including any interest, at the non-default rate (or such other rate as may be ordered by the Court), required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (b) the collateral securing its Allowed Other Secured Claim.

(iii)  Voting: Class GS-2 is Unimpaired. Pursuant to Bankruptcy Code section 1126(f), holders of Allowed Class GS-2 Claims are conclusively presumed to accept the Plan.

(c)  Class GS-3 – Junior Secured Notes Claims

(i)  Classification: Class GS-3 consists of all Allowed Junior Secured Notes Claims against the GMACM Debtors.

(ii)  Treatment: In full and final satisfaction of the Junior Secured Notes Claims in Class GS-3, on or as soon as practicable after the Effective Date, each holder of an Allowed Junior Secured Notes Claim in Class GS-3 shall receive payment in full for the Allowed amount of such Junior Secured Notes Claim as determined by the Bankruptcy Court in Phase I of the JSN Adversary Proceeding or at the Confirmation Hearing; provided,

47

however, that if the Bankruptcy Court determines that the Junior Secured Noteholders are entitled to post-petition interest, the Allowed amount of such post-petition interest shall be paid in accordance with the requirements under the Bankruptcy Code, which may include, at the Plan Proponents' election, the payment of such post-petition interest over time ~~at the appropriate market rate.~~ with interest at a rate consistent with section 1129(b) of the Bankruptcy Code. [3]

(iii)    Voting: Holders of Allowed Class GS-3 Claims are unimpaired and deemed to accept the Plan at the following GMACM Debtors:  Passive Asset Transactions, LLC; Residential Mortgage Real Estate Holdings, LLC; Home Connects Lending Services, LLC; GMACR Mortgage Products, LLC; ditech, LLC; Residential Consumer Services, LLC; and GMAC Mortgage USA Corporation.  Holders of Allowed Class GS-3 Claims are impaired and entitled to vote on the Plan at GMACM; provided that if the Bankruptcy Court makes a finding in the JSN Adversary Proceeding that the Junior Secured Notes Claims are oversecured such that they are entitled to payment in full in Cash in an amount that will render them unimpaired pursuant to the treatment provided under this Plan, then holders of Allowed Class GS-3 Claims will be conclusively presumed to accept the Plan and such votes will not be counted.

(d)    Class GS-4A – GMACM Unsecured Claims

(i)    Classification: Class GS-4A consists of all Allowed GMACM Unsecured Claims (other than Allowed ETS Unsecured Claims).

(ii)    Treatment: In full and final satisfaction of the GMACM Unsecured Claims in Class GS-~~4~~4A, as soon as practicable after the Effective Date, each holder of an Allowed GMACM Unsecured Claim in Class GS-4A shall receive its Pro Rata Share of the GMACM Debtors Unsecured Unit Distribution, provided, however, that, with respect to the distributions on account of the Allowed RMBS Trust Claims ~~of the RMBS Trusts~~, the holder shall be the RMBS Claims Trust, and subsequent distributions of, or on account of, such Units, shall be governed by Article IV.C of the Plan.

(iii)    Voting: Class GS-4A is Impaired. Holders of Allowed Class GS-4A Claims are entitled to vote to accept or reject the Plan.

---

[3] The terms on which the Plan Proponents may pay over time any post-petition interest owed to the Junior Secured Noteholders to the extent ordered by the Bankruptcy Court, including the interest rate, will be set forth in the Plan Supplement.

(e)    Class GS-4B – ETS Unsecured Claims

    (i)    Classification: Class GS-4B consists of all Allowed ETS Unsecured Claims.

    (ii)    Treatment: In full and final satisfaction of the ETS Unsecured Claims in Class GS-4B, as soon as practicable after the Effective Date, each holder of an Allowed ETS Unsecured Claim in Class GS-4B shall receive its Pro Rata Share of Cash in an amount that is equal to the value, if any, of assets available at ETS that exceed the amount of Allowed Claims senior in right of payment to such Allowed ETS Unsecured Claim against ETS.

    (iii)    Voting: Class GS-4B is Impaired. Holders of Allowed Class GS-4B Claims are entitled to vote to accept or reject the Plan.

(f)    (e) Class GS-5 – Borrower Claims

    (i)    Classification: Class GS-5 consists of all Allowed Borrower Claims against the GMACM Debtors.

    (ii)    Treatment: In full and final satisfaction of the Borrower Claims in Class GS-5, as soon as practicable after the Effective Date, holders of Allowed Borrower Claims in Class GS-5 shall receive their allocated share of Cash available for distributions from the Borrower Claims Trust, in accordance with the methodology and procedures set forth in the Borrower Claims Trust Agreement.

    (iii)    Voting: Class GS-5 is Impaired. Holders of Allowed Class GS-5 Claims are entitled to vote to accept or reject the Plan.

(g)    (f) Class GS-6 – Private Securities Claims

    (i)    Classification: Class GS-6 consists of all Allowed Private Securities Claims against the GMACM Debtors.

    (ii)    Treatment: In full and final satisfaction of the Private Securities Claims in Class GS-6, as soon as practicable after the Effective Date, holders of Allowed Private Securities Claims in Class GS-6 shall receive their allocated share of either (A) Cash distributions from the Private Securities Claims Trust, or (B) the Units transferred to the Private Securities Claims Trust that constitute the Private Securities Claims Trust Unit Distribution, in each case in accordance with the methodology and procedures set forth in the Private Securities Claims Trust Agreement.

    (iii)    Voting: Class GS-6 is Impaired. Holders of Allowed Class GS-6 Claims are entitled to vote to accept or reject the Plan.

(h)    (g) Class GS-7 – General Unsecured Convenience Claims

    (i)    Classification: Class GS-7 consists of all Allowed General
Unsecured Convenience Claims against the GMACM Debtors.

    (ii)    Treatment: In full and final satisfaction of the General Unsecured
Convenience Claims in Class GS-7, as soon as practicable after
the Effective Date, each holder of an Allowed General Unsecured
Convenience Claim in Class GS-7 shall receive a distribution in
Cash equal to 30.1% of such holder's Allowed Class GS-7
Claim.

    (iii)    Voting: Class GS-7 is Impaired. Holders of Allowed Class GS-7
Claims are entitled to vote to accept or reject the Plan.

(i)    (h) Class GS-8 – Intercompany Balances

    (i)    Classification: Class GS-8 consists of all Intercompany Balances
against the GMACM Debtors.

    (ii)    Treatment: On the Effective Date, Intercompany Balances against
the GMACM  Debtors in Class GS -8 shall be waived, cancelled,
and discharged.  Holders of Intercompany Balances in Class GS
-8 shall receive no recovery on account of their Claims.

    (iii)    Voting: Class GS-8 is Impaired. Pursuant to Bankruptcy Code
section 1126(g), holders of Allowed Class GS-8 Claims are
deemed to reject the Plan.

(j)    (i) Class GS-9 – Equity Interests

    (i)    Classification: Class GS-9 consists of all Equity Interests in the
GMACM Debtors.

    (ii)    Treatment: Holders of Equity Interests in Class GS-9 shall
receive no recovery on account of such Equity Interests and such
Equity Interests shall be canceled on the Effective Date.

    (iii)    Voting: Class GS-9 is Impaired. Pursuant to Bankruptcy Code
section 1126(g), holders of Allowed Class GS-9 Equity Interests
are deemed to reject the Plan.

(k)    (j) Class GS-10 – Revolving Credit Facility Claims

    (i)    Classification: Class GS-10 consists of all Allowed Revolving
Credit Facility Claims against the GMACM Debtors.

(ii)    Treatment: In full and final satisfaction of the Revolving Credit
Facility Claims in Class GS-10, on the Effective Date, any
amounts paid under the Paydown Order shall be indefeasibly and
finally approved and allowed; provided, that on the Effective
Date holders of Allowed Revolving Credit Facility Claims in
Class GS-10 shall waive as against any Debtor or Plan Trust any
right to payment on account of the Revolving Credit Facility
Claims.

(iii)    Voting: Class GS-10 is Impaired.  Holders of Allowed Class
GS-10 Claims are entitled to vote to accept or reject the Plan.

3.    **Claims Against and Equity Interests in the RFC Debtors**

(a)    Class RS-1 – Other Priority Claims

(i)    Classification: Class RS-1 consists of all Allowed Other Priority
Claims against the RFC Debtors.

(ii)    Treatment: In full and final satisfaction of the Other Priority
Claims in Class RS-1, on or as soon as practicable after the
Effective Date, each holder of an Allowed Other Priority Claim
in Class RS-1 shall receive one of the following treatments on
account of such Claim, as determined by the Plan Proponents
prior to the Effective Date, or the Liquidating Trust, following
the Effective Date: (a) payment in full in Cash, or (b) treatment
consistent with the provisions of section 1129(a)(9) of the
Bankruptcy Code; provided, that Other Priority Claims that arise
in the ordinary course of the Debtors' business and that are not
due and payable on or before the Effective Date will be paid in
the ordinary course of business in accordance with the terms
thereof.

(iii)    Voting: Class RS-1 is Unimpaired. Pursuant to Bankruptcy Code
section 1126(f), holders of Allowed Class RS-1 Claims are
conclusively presumed to accept the Plan.

(b)    Class RS-2 – Other Secured Claims

(i)    Classification: Class RS-2 consists of all Allowed Other Secured
Claims against the RFC Debtors.

(ii)    Treatment: In full and final satisfaction of the Other Secured
Claims in Class RS-2, on or as soon as practicable after the
Effective Date, each holder of an Allowed Other Secured Claim
in Class RS-2 shall receive one of the following treatments on
account of such Claim as determined by the Plan Proponents
prior to the Effective Date, or the Liquidating Trust, following

the Effective Date: (a) payment in full in Cash, including any interest, at the non-default rate (or such other rate as may be ordered by the Court), required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (b) the collateral securing its Allowed Other Secured Claim.

(iii)    Voting: Class RS-2 is Unimpaired. Pursuant to Bankruptcy Code section 1126(f), holders of Allowed Class RS-2 Claims are conclusively presumed to accept the Plan.

(c)    Class RS-3 – Junior Secured Notes Claims

(i)    Classification: Class RS-3 consists of all Allowed Junior Secured Notes Claims against the RFC Debtors.

(ii)    Treatment: In full and final satisfaction of the Junior Secured Notes Claims in Class RS-3, on or as soon as practicable after the Effective Date, each holder of an Allowed Junior Secured Notes Claim in Class RS-3 shall receive payment in full for the Allowed amount of such Junior Secured Notes Claim as determined by the Bankruptcy Court in Phase I of the JSN Adversary Proceeding or at the Confirmation Hearing; provided, however, that if the Bankruptcy Court determines that the Junior Secured Noteholders are entitled to post-petition interest, the Allowed amount of such post-petition interest shall be paid in accordance with the requirements under the Bankruptcy Code, which may include, at the Plan Proponents' election, the payment of such post-petition interest over time at the appropriate market rate.with interest at a rate consistent with section 1129(b) of the Bankruptcy Code. [4]

(iii)    Voting: Holders of Allowed RS-3 Claims are unimpaired and deemed to accept the Plan at the following RFC Debtors: GMAC Model Home Finance I, LLC; DOA Holding Properties, LLC; RFC Asset Holdings II, LLC; RFC Construction Funding, LLC; Residential Funding Real Estate Holdings, LLC; Homecomings Financial Real Estate Holdings, LLC; Residential Funding Mortgage Securities I, Inc.; RFC Asset Management, LLC; RFC SFJV-2002, LLC; and RCSFJV2004, LLC.  Holders of Allowed RS-3 Claims are impaired and entitled to vote on the Plan at RFC and Homecomings Financial, LLC; provided that if the Bankruptcy Court makes a finding in the JSN Adversary Proceeding that the Junior Secured Notes Claims are oversecured such that they are entitled to payment in full in Cash in an

---

[4] The terms on which the Plan Proponents may pay over time any post-petition interest owed to the Junior Secured Noteholders to the extent ordered by the Bankruptcy Court, including the interest rate, will be set forth in the Plan Supplement.

amount that will render them unimpaired pursuant to the
treatment provided under this Plan, then holders of Allowed
Class RS-3 Claims will be conclusively presumed to accept the
Plan and such votes will not be counted.

(d)     Class RS-4 – RFC Unsecured Claims

(i)      Classification: Class RS-4 consists of all Allowed RFC
Unsecured Claims.

(ii)     Treatment: In full and final satisfaction of the RFC Unsecured
Claims in Class RS-4, as soon as practicable after the Effective
Date, each holder of an Allowed RFC Unsecured Claim in Class
RS-4 shall receive its Pro Rata Share of the RFC Debtors Unit
Distribution; provided, however, that, with respect to the
distributions on account of the Allowed RMBS Trust Claims of
the RMBS Trusts, the holder shall be the RMBS Claims Trust,
and subsequent distributions of, or on account of, such Units,
shall be governed by Article IV.C of the Plan.

(iii)    Voting: Class RS-4 is Impaired. Holders of Allowed Class RS-4
Claims are entitled to vote to accept or reject the Plan.

(e)     Class RS-5 – Borrower Claims

(i)      Classification: Class RS-5 consists of all Allowed Borrower
Claims against the RFC Debtors.

(ii)     Treatment: In full and final satisfaction of the Borrower Claims
in Class RS-5, as soon as reasonably practicable after the
Effective Date, holders of Allowed Borrower Claims in Class
RS-5 shall receive their allocated share of Cash available for
distributions from the Borrower Claims Trust, in accordance with
the methodology and procedures set forth in the Borrower Claims
Trust Agreement.

(iii)    Voting: Class RS-5 is Impaired. Holders of Allowed Class RS-5
Claims are entitled to vote to accept or reject the Plan.

(f)     Class RS-6 – Private Securities Claims

(i)      Classification: Class RS-6 consists of all Allowed Private
Securities Claims against the RFC Debtors

(ii)     Treatment: In full and final satisfaction of the Private Securities
Claims in Class RS-6, as soon as practicable after the Effective
Date, holders of Allowed Private Securities Claims in Class RS-6
shall receive their allocated share of either (A) Cash distributions

53

from the Private Securities Claims Trust, or (B) the Units transferred to the Private Securities Claims Trust that constitute the Private Securities Claims Trust Unit Distribution, in each case in accordance with the methodology and procedures set forth in the Private Securities Claims Trust Agreement.

(iii)    Voting: Class RS-6 is Impaired. Holders of Allowed Class RS-6 Claims are entitled to vote to accept or reject the Plan.

(g)    Class RS-7 – NJ Carpenters Claims

(i)    Classification: Class RS-7 consists of all Allowed NJ Carpenters Claims against the RFC Debtors.

(ii)    Treatment: Subject to the NJ Carpenters Approval, in full and final satisfaction of the NJ Carpenters Claims in Class RS-7, within ten (10) business days of the Effective Date, the lead plaintiff, on behalf of holders of Allowed NJ Carpenters Claims in Class RS-7 shall receive the NJ Carpenters Claims Distribution which will thereafter be distributed pursuant to the NJ Carpenters Plan of Allocation.  Absent the NJ Carpenters Approval, Claims held by NJ Carpenters Class Members, to the extent Allowed, shall be classified as General Unsecured Claims, which claims may be subject to subordination.

(iii)    Voting: Class RS-7 is Impaired. Holders of Allowed Class RS-7 Claims are entitled to vote to accept or reject the Plan.

(h)    Class RS-8 – General Unsecured Convenience Claims

(i)    Classification: Class RS-8 consists of all Allowed General Unsecured Convenience Claims against the RFC Debtors.

(ii)    Treatment: In full and final satisfaction of the General Unsecured Convenience Claims in Class RS-8, as soon as practicable after the Effective Date, each holder of an Allowed General Unsecured Convenience Claim in Class RS-8 shall receive a distribution in Cash equal to 9.0% of such holder's Allowed Class RS-8 Claim.

(iii)    Voting: Class RS-8 is Impaired. Holders of Allowed Class RS-8 Claims are entitled to vote to accept or reject the Plan.

(i)    Class RS-9 – Intercompany Balances

(i)    Classification: Class RS-9 consists of all Intercompany Balances against the RFC Debtors.

54

(ii)    Treatment: On the Effective Date, Intercompany Balances against the RFC  Debtors in Class RS -9 shall be waived, cancelled, and discharged.  Holders of Intercompany Balances against the RFC Debtors in Class RS -9 shall receive no recovery on account of their Claims.

(iii)    Voting: Class RS-9 is Impaired. Pursuant to Bankruptcy Code section 1126(g), holders of Allowed Class RS-9 Claims are conclusively deemed to reject the Plan.

(j)    Class RS-10 – Equity Interests

(i)    Classification: Class RS-10 consists of all Equity Interests in the RFC Debtors.

(ii)    Treatment: Holders of Equity Interests in Class RS-10 shall receive no recovery on account of such Equity Interests and such Equity Interests shall be canceled on the Effective Date.

(iii)    Voting: Class RS-10 is Impaired. Pursuant to Bankruptcy Code section 1126(g), holders of Allowed Class RS-10 Equity Interests are conclusively deemed to reject the Plan.

(k)    Class RS-11 – FHFA Claims

(i)    Classification: Class RS-11 consists of all FHFA Claims against the RFC Debtors.

(ii)    Treatment: Holders of FHFA Claims in Class RS-11 shall receive no recovery on account of such Claims; provided, that if the Bankruptcy Court determines that the FHFA Claims are not subject to subordination under section 510(b) of the Bankruptcy Code, each holder of an Allowed FHFA Claim in Class RS-11 shall receive a distribution in Cash equal to 3% of such holder's Allowed FHFA Claim, which accounts for the fact that no holder of an FHFA Claim is subject to the Third Party Releases, in Class RS-11 as soon as practicable after the later of the Effective Date or the allowance of such Claim.

(iii)    Voting: Class RS-11 is Impaired. ~~Pursuant to Bankruptcy Code section 1126(g),~~Holders of Allowed Class RS-11 Claims are entitled to vote to accept or reject the Plan; provided, that if the Bankruptcy Court determines that the FHFA Claims are subject to subordination under section 510(b) of the Bankruptcy Code such that holders of Allowed FHFA Claims against the RFC Debtors are not entitled to receive a distribution under the Plan, then holders of Allowed Class RS-11 Claims ~~are~~will be deemed to reject the Plan and such votes will not be counted.

55

(l)     Class RS-12 – Revolving Credit Facility Claims

(i)     Classification: Class RS-12 consists of all Allowed Revolving
Credit Facility Claims against the RFC Debtors.

(ii)    Treatment: In full and final satisfaction of the Revolving Credit
Facility Claims in Class RS-12, on the Effective Date, any
amounts paid under the Paydown Order shall be indefeasibly and
finally approved and allowed; provided, that on the Effective
Date holders of Allowed Revolving Credit Facility Claims in
Class RS-12 shall waive as against any Debtor or Plan Trust any
right to payment on account of the Revolving Credit Facility
Claims.

(iii)   Voting: Class RS-12 is Impaired.  Holders of Allowed Class
RS-12 Claims are entitled to vote to accept or reject the Plan.

**E.    Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Equity Interests
and the respective distributions and treatments under the Plan take into account the relative
priority and rights of the Claims and Equity Interests in each Class in connection with any
contractual, legal, and equitable subordination rights relating thereto, whether arising under
general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or
otherwise. For purposes of Bankruptcy Rule 7001(8), the Plan provides for subordination.   The
Plan Proponents, prior to the Effective Date, or the Liquidating Trust (and the Borrower Trust
with respect to Borrower Claims), following the Effective Date, reserve the right to subordinate
any Claim or Equity Interest, other than the Consenting Claimants' Allowed Claims, the NJ
Carpenters Claims (assuming the NJ Carpenters Approval) and the Ally Contract Claims, in
accordance with any contractual, legal, or equitable subordination relating thereto under the
Bankruptcy Code as long as such treatment is consistent with the Plan Support Agreement.  An
initial list of Claims proposed to be subordinated under the Plan shall be set forth in the Plan
Supplement, without prejudice to the right of the Plan Proponents or Liquidating Trust (and the
Borrower Trust with respect to Borrower Claims), as the case may be, to seek to subordinate
additional Claims.  Subordinated Claims shall not receive a distribution under the Plan until all
senior Allowed Claims are paid in full.  In connection with the subordination of the FHFA's
Claims, the Plan Proponents shall either include FHFA on the list of Claims to be submitted with
the Plan Supplement, or seek to subordinate the FHFA's Claim by separate adversary proceeding.

**F.    Distributions on Account of Allowed Claims and Interests**

Except as otherwise provided in this Plan, on the Effective Date or as soon as practicable
thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a
Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each holder
of an Allowed Claim against the Debtors shall receive the distributions that this Plan provides for
Allowed Claims in the applicable Class from either the Liquidating Trust, RMBS Claims Trust,
Borrower Claims Trust, or Private Securities Claims Trust, as applicable and as set forth below.

Distributions on account of Disputed Claims of Liquidating Trust Unit Beneficiaries that become Allowed shall be made from the Disputed Claims Reserve pursuant to the Plan.  Except as otherwise provided herein, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions regardless of whether such distributions are delivered on or at any time after the Effective Date.

## G.    Elimination of Vacant Classes

Any Class of Claims or Equity Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

## H.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

`    Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Plan Proponents shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Equity Interests.

## ARTICLE IV.

## IMPLEMENTATION OF THE PLAN

## A.    Global Settlement

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates a compromise and settlement of numerous inter-Debtor, Debtor-Creditor and inter-Creditor issues designed to achieve an economic settlement of Claims against the Debtors and Ally and an efficient resolution of these Chapter 11 Cases.   This Global Settlement constitutes a settlement of the potential litigation of issues including substantive consolidation, the validity and enforceability of Intercompany Balances, the allocation of the Available Assets, the amount and allocation of certain disputed Unsecured Claims, in addition to the resolution of extensive litigation, Claims, and potential Claims against Ally.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the following compromises or settlements and all other compromises and settlements provided for herein, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their Estates, Creditors, the RMBS Trusts, Investors, and other parties-in-interest, and are fair, equitable, and within the range of reasonableness. Each provision of the Global Settlement shall be deemed non-severable from each other and from the remaining terms of the Plan.  As set forth in detail herein, the Global Settlement will be implemented as follows:

a)    The Ally Contribution will be paid to the Estates in accordance with the Plan and will be allocated by the Plan Proponents, consistent with the terms of Articles II and III herein, as follows:

| Entity | Allocation |
|---|---|
| ResCap Debtors | $~~782.7~~782.74 million |
| GMACM Debtors | $~~462.3~~462.32 million |
| RFC Debtors | $~~462.3~~462.32 million |
| Private Securities Claims Trust | $~~235.0~~235.00 million |
| Borrower Claims Trust | $~~57.6~~57.62 million |
| NJ Carpenters Claims Distribution | $~~100.0~~100.00 million |
| **TOTAL** | **$2.10 billion** |

b)      Administrative Claims shall be allocated among the ResCap Debtors, the GMACM Debtors and the RFC Debtors in accordance with the Plan Support Agreement.  Of the projected Administrative Claims of $1,086.2 million, $836.3 million shall be allocated to the GMACM Debtors, and $249.8 million shall be allocated to the RFC Debtors.  Any variation in the amount of the Administrative Claims above or below $1,086.2 million shall be borne or realized by the Liquidating Trust.

c)      On the Effective Date, the Borrower Claims Trust will be funded with the Borrower Claims Trust Assets for the benefit of holders of Borrower Claims.  Holders of Borrower Claims shall receive their allocated share of the Borrower Claims Trust Assets in accordance with the methodology and procedures set forth in the Borrower Claims Trust Agreement.

d)      On or as soon as practicable after the Effective Date, the Private Securities Claims Trust shall be funded with the Private Securities Claims Trust Unit Distribution, for the benefit of Private Securities Claimants.  Private Securities Claimants shall receive their allocable share of Cash distributions received by the Private Securities Claims Trust from the Liquidating Trust in respect of the Private Securities Claims Trust Unit Distribution, and shall not be required to tender or surrender the RMBS underlying their Private Securities Claims.

e)      The RMBS Settlement is incorporated in the Plan and shall become effective on the Effective Date.

f)      The Monoline Claims Settlement is incorporated in the Plan and shall become effective on the Effective Date.

g)      A settlement of the Allowed amounts and treatment of the Claims held by the Settling Private Securities Claimants for voting purposes is incorporated in the Plan and shall become effective on the Effective Date.

h)      Subject to the NJ Carpenters Approval, the amount of the NJ Carpenters Claims Distribution is incorporated in the Plan and shall become effective on the Effective Date.

i)      Subject to approval of the Kessler Settlement Agreement by the Bankruptcy Court, a settlement of the Allowed amount and treatment of the Claims of the Kessler Class Claimants pursuant to the Kessler Settlement Agreement is incorporated in the Plan and shall become effective on the Effective Date.

j)      A settlement of potential Claims, whether liquidated or unliquidated, of the Senior Unsecured Noteholders and of the Senior Unsecured Notes Indenture Trustee shall become effective on the Effective Date.

k)      As agreed upon among the Consenting Claimants, the Junior Secured Notes Claims shall be allocated among the Debtors and holders of Allowed Junior Secured Notes Claims shall receive payment in full on the Effective Date on account of such Allowed Claims, as determined by the JSN Adversary Proceeding.

l)      The GMACM Debtors and the RFC Debtors shall waive and release all subrogation claims against the ResCap Debtors.

m)      Each Debtor agrees to compromise Intercompany Balances and such Claims shall not be entitled to receive any recovery under the Plan.

**B.    Ally Settlement**

Ally shall pay the Estates the Ally Contribution in accordance with the Plan. In exchange for Ally's contributions to the Chapter 11 Cases, including the Ally Contribution, Ally shall be entitled to the following consideration:

a)      Debtor Releases;

b)      Third Party Releases;

c)      *Settlement of Debtors' Rights to and Under Settlement Insurance Policies*:  The Debtors (i) agree to permit Ally exclusively to recover under the Settlement Insurance Policies, (ii) relinquish in favor of Ally and its Representatives all coverage that might otherwise belong to, or inure to the benefit of, the Debtors under such Settlement Insurance Policies, (iii) shall, at Ally's discretion, assign, and seek an Order of the Bankruptcy Court permitting the assignment, to Ally of any and all of the Debtors' rights under the Settlement Insurance Policies with respect to any claims made against the Debtors or their Representatives prior to or during the bankruptcy, including each of the claims set forth on a schedule to Exhibit B to the Plan Support Agreement, and (iv) shall cooperate fully with Ally, in order to help maximize Ally's recovery under the Settlement Insurance Policies with respect to claims against the Debtors or their Representatives.

The Debtors shall retain their rights as insureds under the existing Ally general liability and workers' compensation insurance policies for bodily injury and property damage claims to the extent covered by those insurance policies. By the Effective Date, the Debtors shall be required to have purchased their own insurance policies (including general liability and workers' compensation insurance) to cover all risks of loss, damage or injury (including bodily injury and property damage) occurring on or after the Effective Date.  For the avoidance of doubt, there is no obligation for Ally to provide insurance under the Plan, or otherwise.

Notwithstanding anything to the contrary herein, nothing in the Plan or Confirmation Order shall release, enjoin, or preclude any Representative of the Debtors from pursuing any rights a Representative of the Debtors may have (i) to indemnification or advancement from Ally solely for any claims that are not released by the Plan and the Confirmation Order; or (ii) as an "insured" under any insurance coverage purchased by Ally or covering Representatives of the Debtors, or against any party (other than the Debtors) arising out of such policies of insurance, solely for any claims that are not released herein and in the Confirmation Order.  For the avoidance of doubt, nothing in this Plan expands or reduces any existing indemnification rights or rights as an "insured" for any Representative of the Debtors for claims that are not released by the Plan.

For the avoidance of doubt, the releases in the Plan shall not extend to any rights, defenses, or counterclaims, under any directors & officers or errors & omissions insurance policies sold by any of the Consenting Claimants or their affiliates and covering either Debtors or any of the Ally Released Parties. Nor do the releases herein extend to any indemnity rights against non-Ally Released Parties arising out of the Kessler Class Action or to any other indemnity right against non-Ally Released Parties arising out of any other claims of Borrowers; specifically, the releases do not extend to any indemnity rights RFC may have against any non-Ally Released Party that is a successor in interest to CBNV and GNBT, including, but not limited to, those indemnity rights extending out of the Client Contracts between RFC, on the one hand, and either CBNV or GNBT, on the other hand, which incorporate by reference the indemnity provisions of RFC's AlterNet Seller Guide.

No rights of the Consenting Claimants are released under the Plan in their capacity as liability insurance or reinsurance carriers for Ally or the Debtors, to the extent applicable.  In addition, nothing herein or in the Confirmation Order shall impair any of the Debtors' or any Borrower or former Borrower's rights or remedies (including the GM Insurance Rights) under or with respect to insurance policies other than the Settlement Insurance Policies (as assigned in the Plan), including but not limited to the GM Policies.

With respect to the Settlement Insurance Policies, the Confirmation Order shall contain language regarding the settlement of insurance that is reasonably acceptable to Ally, the Plan Proponents, and the Consenting Claimants.

d)    _Release of Funds_:  On the Effective Date, the Debtors will (i) transfer the funds held in the Ally Indemnity Escrow Account to Ally, and (ii) remit the Misdirected Funds to Ally, and Ally shall release the approximately $1.787 million in Cash that was overfunded by the Debtors prior to the petition Date and which is currently held by Ally.

e)    *Regulatory Obligations*: Through the Effective Date, the Debtors shall perform all respective obligations under the DOJ/AG Settlement, the Consent Order, and the Order of Assessment, including, for the avoidance of doubt, satisfying the settlement of the foreclosure review obligations under the Consent Order, fulfilling all specific performance obligations, and satisfying all monetary obligations in full in Cash; provided, however, that the Debtors shall not be obligated to perform those obligations under the DOJ/AG Settlement, the Consent Order, and the Order of Assessment that Ocwen performs under the Ocwen APA.  On or after the Effective Date, the Liquidating Trust shall assume all rights and obligations of the Debtors under the DOJ/AG Settlement, the Consent Order, and the Order of Assessment other than Ocwen's rights and obligations under the Ocwen APA.  For the avoidance of doubt, as of the Effective Date, Ally shall have no monetary obligations under the Consent Order, DOJ/AG Settlement and the Order of Assessment.

f)    *Treatment of Ally Contract Claims*.  On the Effective Date, the Ally Contract Claims shall be presumptively Allowed in full and the Debtors shall pay such Claims in full in Cash.  The parties to the Ally Contracts shall perform under such contracts in accordance with the terms of such contracts and orders of the Bankruptcy Court.  For the avoidance of doubt, the parties performance under each Ally Contract shall terminate in accordance with the terms of such contract and orders of the Bankruptcy Court, subject to an agreement among the Debtors, the Creditors' Committee, and Ally to otherwise terminate such contract. Ally shall provide to the Plan Proponents a good-faith estimate of the Ally Contract Claims on or about August 15, 2013; and every month thereafter until the Effective Date, provided, for the avoidance of doubt, such estimate shall be non-binding on Ally and subject to change.  Except with respect to the Debtors' obligations in this Article IV.B' and the Liquidating Trust's obligations to Ally as specifically set forth in the Plan (including their obligations to perform under the Ally Contracts in accordance with their terms), on and after the Effective Date the Debtors and the Plan Trusts shall have no other obligations to the Ally Released Parties.  In the event that before Confirmation of the Plan, Ally identifies claims that arose prior to the Petition Date under the Ally Contracts, the Plan Proponents and Ally agree to negotiate in good faith with respect to the treatment of such claims under the Plan.  Nothing herein will be deemed an assumption of the Ally Contracts.

The consideration set forth above and the rights and obligations accorded elsewhere in this Plan to Ally shall constitute the compromise and settlement under Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code in exchange for the consideration provided by Ally, and shall further constitute the Bankruptcy Court's finding that such consideration to Ally is: (1) in exchange for the good, valuable and substantial consideration from the Ally Released Parties; (2) in the best interests of the Debtors, the Estates, the Liquidating Trust and all holders of Claims and Equity Interests; (3) a good faith settlement and compromise of the claims released under the Plan; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for a hearing; (6) justified by truly unusual circumstances; (7) an essential component and critical to the success of the Plan; (8) resulting in distributions to the creditors that would otherwise have been unavailable; (9) the result of an identity of interest between the Debtors and the Ally Released Parties regarding the Plan; and (10) a bar to the Debtors, the Liquidating Trust, in the case of the Debtor Releases, and any party asserting a claim or cause of action released against any of the Ally Released Parties in connection with the Third Party Release.

C.    **RMBS Settlement**

Entry of the Confirmation Order, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, shall constitute approval of the RMBS Settlement, on terms set forth herein. The Global Settlement constitutes a good faith compromise and settlement of all objections to the Original RMBS Settlement Agreements by the Creditors' Committee and Consenting Claimants, as applicable, and all such objections shall be deemed withdrawn with prejudice upon entry of the Confirmation Order.

1.    *Modification of Original RMBS Settlement Agreements*.  The Original RMBS Settlement Agreements are hereby expanded to include all RMBS Trusts holding RMBS Trust Claims and are otherwise modified as set forth herein.

2.    *Allowance of RMBS Trust Claims and Distribution of Units to the RMBS Claims Trust for the benefit of the RMBS Trusts*.

(a)    Entry of the Confirmation Order shall constitute approval of the Allowed amount of the RMBS Trust Claims as non-subordinated Unsecured Claims, subject only to the Allowed Fee Claim, in the aggregate amounts of (i) $209.8 million against the GMACM Debtors; (ii) $7,091.2 million against the RFC Debtors; and (iii) $0 against the ResCap Debtors. On account of the Allowed RMBS Trust Claims, the RMBS Claims Trust shall receive (i) its Pro Rata Share of the GMACM Debtors Unit Distribution (the "GMACM Pool") and (ii) its Pro Rata Share of the RFC Debtors Unit Distribution (the "RFC Pool"), provided, however, 5.7% of the Allowed RMBS Trust Claims, including the Units to be distributed on account thereof (and any Distributable Cash thereon), shall be directly allocated to counsel for the Institutional Investors, without conveyance to the RMBS Claims Trust, the RMBS Trustees, or the RMBS Trusts, as the Allowed Fee Claim, in accordance with Article IV.C.6 of this Plan.

(b)    Notwithstanding anything to the contrary contained in the Plan, including but not limited to the approval of the Allowed amounts of the Claims held by RMBS Trust against the GMACM Debtors, the RFC Debtors and the ResCap Debtors described in the preceding paragraph,  the Units distributed to the RMBS Claims Trust shall be reallocated in accordance with Section 3 below.

3.    *RMBS Trust Allocation Protocol.* The Units distributed to the RMBS Claims Trust, pursuant to Article IV.C.2(a) shall be re-allocated between the GMACM Pool and the RFC Pool as provided in subparagraph (b) below, and subsequent distributions from the RMBS Claims Trust of such Units or Distributable Cash received from the Liquidating Trust as distributions on such Units, as so reallocated, shall be made to the RMBS Trusts pursuant to subparagraphs (c) and (d) below. In no event shall the provisions of this paragraph 3 entitle the RMBS Claims Trust to a distribution any more or any less than the Units described in Article IV.C.2(a), Article III or other applicable provisions of the Plan.

(a)    *Recognized RMBS Trust Claims.*

(i)    **Recognized Cure Claims**. For each RMBS Trust whose Servicing Agreement was assumed by the applicable Debtor, the Recognized

cure claims for servicing damages against any of the GMACM Debtors
are listed on Schedule 1-G (the "GMACM Recognized Cure Claims")
and the Recognized Cure Claims for Servicing Damages against any of
the RFC Debtors are listed on Schedule 1-R (the "RFC Recognized
Cure Claims", together with the GMACM Recognized Cure Claims,
the "Recognized Cure Claims").  The Recognized Cure Claims do not
include servicing damage claims arising under any Servicing
Agreement that was not assumed by the applicable Debtor, for any
reason, including the following: (a) prior to the Petition Date, the
applicable Debtors transferred all of  its servicing obligations for the
RMBS Trust to a non-Debtor servicer; (b) prior to the Petition Date,
the applicable Debtor ceased servicing all mortgage loans in the
RMBS Trust, either because the RMBS Trust was wound up or
otherwise; or (c) after the Petition Date, the applicable Debtor chose
not to assume the Servicing Agreement.

(ii)     **Recognized R+W Claims**

(1)    *Recognized Original R+W Claims.*  For each of the Original
Settling RMBS Trusts, the Recognized R+W Claims against
GMACM are listed on Schedule 2-G (the "GMACM
Recognized Original R+W Claims") and the Recognized R+W
claims against RFC are listed on Schedule 2-R (the "RFC
Recognized Original R+W Claims," together with the GMACM
Recognized Original R+W Claims, the "Recognized Original
R+W Claims").

(2)    *Recognized Additional R+W Claims.*  For each of the Additional
Settling Trusts, the Recognized R+W Claims against GMACM
are listed on Schedule 3-G (the "GMACM Recognized
Additional R+W Claims") and the Recognized R+W Claims
against RFC are listed on Schedule 3-R (the "RFC Recognized
Additional R+W Claims," together with the GMACM
Recognized Additional R+W Claims, the "Recognized
Additional R+W Claims").

(iii)    **Recognized Unsecured Servicing Claims**. For each RMBS Trust
whose Servicing Agreement was not assumed by the applicable
Debtor, the Recognized Unsecured Claims for servicing damages
against GMACM are listed on Schedule 4-G (the "GMACM
Recognized Unsecured Servicing Claims"), and the Recognized
Unsecured Claims for servicing damages against RFC are listed on
Schedule 4-R (the "RFC Recognized Unsecured Servicing Claim,"
together with the GMACM Recognized Unsecured Servicing Claim,
the "Recognized Unsecured Servicing Claims").  RMBS Trusts that
are Insured RMBS Trusts do not have any Recognized Unsecured
Servicing Claims.

(iv) **Effect of Monoline Insurance on Recognized Claims.** If an RMBS Trust (i) is an Insured RMBS Trust and (ii) has made policy claims against its Monoline and, as of the Effective Date has received full payment of such claims, the Recognized Claim of such RMBS Trust will not have any Recognized  Claim, unless the Insured Exception applies.  The Insured Exception is defined as an be set to zero, unless (a) such Insured RMBS Trust is one for which the sum of the net unreimbursed insurance payments, the accrued and unpaid losses, and projected future policy payments is zero or close to zero, (b) such Insured RMBS Trust contains one or more unwrapped tranches of securities that rank senior or equal in priority to tranches insured by a Monoline, in which case the portion of such Insured RMBS Trust's Claims allocable to such unwrapped tranches shall not be set to zero and any distribution on such unwrapped tranches shall be allocable only to such unwrapped tranches, or (c) the RMBS Trustees, with the advice of Duff, reasonably determine that, based on a particular RMBS Trust's structure it would be unfair or inequitable to set the Recognized Claim to zero (each of (a), (b) or (c), an "Insured Exception"), in each case as determined by Duff.  If an RMBS Trust (i) is an Insured RMBS Trust and (ii) has made policy claims against its Monoline and, as of the Effective Date has not received full payment of such claims, the Recognized  Claims of such RMBS Trusts are reduced to take into account the partial payments made by such Monoline, if any, on such claims, as determined by Duff.

(v) **Necessity of a Timely Filed Proof of Claim**. An RMBS Trust will not have any Recognized Claim unless a Proof of Claims asserting an RMBS R+W Claim or an RMBS Cure Claim, as applicable, was timely filed for that RMBS Trust.

(b) *Reallocation of Units from the RFC Pool to the GMACM Pool*. The number of Units distributed to the GMACM Pool and the RFC Pool is a function of the approval of the Allowed Amounts of the Unsecured Claims held by the RMBS Trusts against the Debtor Groups as provided in Article IV.C.3(a), but, as an integral part of the RMBS Settlement, the Units to be held in the GMACM Pool and the RFC Pool shall be determined based on the amount of the GMACM Recognized Cure Claims, the RFC Recognized Cure Claims, the GMACM Recognized Original R+W Claims, the RFC Recognized Original R+W Claims, the GMACM Recognized Additional R+W Claims, the RFC Recognized Additional R+W Claims, the GMACM Recognized Servicing Claims and the RFC Recognized Servicing Claims.  Based on calculations prepared by Duff (taking into account the allocation of the Allowed Fee Claim), 2,940,581 Units[25] (together with any cash distributions, if any, on such Units made prior to the reallocation of Units contemplated by this paragraph) shall be moved from the RFC Pool to the GMACM Pool.

---

[25] Subject to adjustment based on further due diligence; any changes will be included in the Plan Supplement.

(c)      *Allocations of Units in the GMACM Pool to RMBS Trusts with Recognized Claims against GMACM.*  For purposes of allocations of Units held in the GMACM Pool to RMBS Trusts having Recognized Claims against GMACM, Duff shall calculate the aggregate value of each such RMBS Trust's Recognized Claims as of the Effective Date as follows:  (i) GMACM Recognized Cure Claims shall be valued at 100% of the GMACM Recognized Cure Claims, if any, for such RMBS Trust shown on the applicable RMBS Trust Claims Schedules, (ii) GMACM Recognized Original R+W Claims, GMACM Recognized Additional R+W Claims and GMACM Recognized Unsecured Servicing Claims of such RMBS Trust, if any, will be valued at 18.2%[36] of the GMACM Recognized Original R+W Claims, GMACM Recognized Additional R+W Claims, and GMACM Recognized Unsecured Servicing Claims shown on the applicable RMBS Trust Claims Schedules, and (iii) the values so calculated will be summed for each such RMBS Trust (the "GMACM Weighted Claim").  All distributions from the RMBS Claims Trust from the GMACM Pool to RMBS Trusts with Recognized Claims against GMACM will be based on the percentage that such RMBS Trust's GMACM Weighted Claim has to the total of all of the GMACM Weighted Claims.

(d)      *Allocations of Units in the RFC Pool to RMBS Trusts with Recognized Claims against RFC.*  For purposes of allocations of Units held in the RFC Pool to RMBS Trusts having Recognized Claims against RFC, Duff shall calculate the aggregate value of each such RMBS Trust's Recognized Claims as of the Effective Date as follows:  (i) RFC Recognized Cure Claims shall be valued at 100% of the RFC Recognized Cure Claims, if any, for such RMBS Trust shown on the applicable RMBS Trust Claims Schedules, (ii) RFC Recognized Original R+W Claims, RFC Recognized Additional R+W Claims and RFC Recognized Unsecured Servicing Claims of such RMBS Trust, if any, will be valued at 6.1%[47] of the RFC Recognized Original R+W Claims, RFC Recognized Additional R+W Claims, and RFC Recognized Unsecured Servicing Claims shown on the applicable RMBS Trust Claims Schedules, and (iii) the values so calculated will be summed for each such RMBS Trust (the "RFC Weighted Claim").  All distributions from the RMBS Claims Trust from the RFC Pool to RMBS Trusts with Recognized Claims against RFC will be based on the percentage that such RMBS Trust's RFC Weighted Claim has to the total of all of the RFC Weighted Claims.

(e)      *Distributions as Subsequent Recoveries.* All distributions from the GMACM Pool or the RFC Pool on account of any Recognized RMBS Claim shall be treated as "Subsequent Recoveries," as that term is defined in the applicable governing agreement for that RMBS Trust; provided that if the governing agreement for a particular RMBS Trust does not include the term "Subsequent Recovery," the distribution resulting from any Recognized Claim shall be distributed as though it was unscheduled principal available for distribution on that distribution date; provided, however, that should the Bankruptcy Court determine that a different treatment is required to conform the distributions to the requirements of the governing agreements, that determination shall govern and shall not constitute a material change to this Plan.  Notwithstanding the forgoing or anything to the contrary in any governing agreement, no distributions from the GMACM Pool or the RFC Pool will be paid over to any Monoline.

---

[36] Subject to adjustment based on further due diligence; any changes will be included in the Plan Supplement.

[47] Subject to adjustment based on further due diligence; any changes will be included in the Plan Supplement.

4.    *Monoline Reservation*. Each Insured RMBS Trust shall retain the ability to enforce its rights, in the Bankruptcy Court or otherwise, against any Monoline (other than FGIC) that does not, in the future, perform in accordance with an insurance policy for the benefit of that RMBS Trust.

5.    *RMBS Trustee Fees and Expenses*. In addition to distributions made on account of RMBS Trust Claims, the RMBS Trustees will be paid in full in Cash on the Effective Date for their reasonable pre- and post-petition fees and expenses, pursuant to the provisions of and subject to the procedures set forth in the *Final Supplemental Order (I) Authorizing the Debtors to Continue Implementing Loss Mitigation Programs; (II) Approving Procedures for Compromise and Settlement of Certain Claims, Litigations and Causes of Action; (III) Granting Limited Stay Relief to Permit Foreclosure and Eviction Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and (IV) Authorizing and Directing the Debtors to Pay Securitization Trustee Fees and Expenses* [Docket No. 774], and the *Order under 11 U.S.C. §§ 105, 363, and 365, and Fed Bankr. P. 2002, 6004, 6006, and 9014 (I) Approving (A) Sale of Debtors' Assets Pursuant to Asset Purchase Agreement with Ocwen Loan Servicing, LLC; (B) Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Thereto; (D) Related Agreements; and (II) Granting Related Relief* [Docket No. 2246], which provisions and procedures will also apply to HSBC.  The RMBS Trustees may be reimbursed for their reasonable fees and expenses associated with making distributions and taking other actions required under the Plan following the Effective Date in accordance with the provisions of the applicable pooling and servicing agreements, including but not limited to pooling and servicing agreements assumed by the Debtors and assigned to the purchaser/assignee of same.

6.    *Allowed Fee Claim*. The Plan Supplement sets forth the stipulated amounts of the Allowed Fee Claim. On the Effective Date or as soon as practicable thereafter, the Liquidating Trust shall distribute Units on account of the Allowed Fee Claim to counsel for the Institutional Investors.  For the avoidance of doubt, the amount of the Allowed Fee Claim shall reduce the total Units (and Cash distributed thereon) by the Liquidating Trust on account of RMBS Trust Claims to the RMBS Claims Trust, and shall have no impact on any other party entitled to a distribution under this Plan. The Allowed Fee Claim payable to counsel for the Institutional Investors may be reduced to separate claim stipulations for the convenience of the parties subject to the terms of the Plan.

7.    *Affirmative Findings*. The Confirmation Order shall include affirmative findings that the Plan, including the RMBS Settlement and the FGIC Settlement Agreement, is in the best interests of Investors, that the RMBS Trustees acted in good faith and in the best interests of the Investors in entering into the Plan Support Agreement and performing their obligations thereunder, including voting for the Plan, provided, however, the Confirmation Order shall provide that such findings shall be binding solely in connection with the RMBS Trustees, the RMBS Trusts and the Investors in the RMBS of such RMBS Trusts and the actions of the RMBS Trusts and the RMBS Trustees with respect to the Plan Support Agreement and the Plan, including the RMBS Settlement, and the FGIC Settlement Agreement.

8.    *Continuation of Governing Agreements*.  Except with respect to the Debtors and the Liquidating Trust, all agreements, indentures, pooling and servicing agreements and other

66

documents governing the RMBS Trusts shall remain in full force and effect in accordance with their terms and conditions, except (i) to the extent modified by consent in connection with any assumption and assignment thereof or (ii) as specifically provided in Article IV.C.3.e above.

### D.    Settlement of Monoline Claims.

1.    *MBIA Settlement*. Entry of the Confirmation Order, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, shall constitute approval of the Allowed non-subordinated General Unsecured Claims held by MBIA in the amount of $719 million against the ResCap Debtors, $1,450 million against the GMACM Debtors, and $1,450 million against the RFC Debtors. OnIn full and final satisfaction of MBIA's General Unsecured Claims against the Debtors, MBIA shall receive on account of suchits Allowed General Unsecured Claims, MBIA shall receive (i) its Pro Rata Share of the GMACM Debtors Unit Distribution, (ii) its Pro Rata Share of the RFC Debtors Unit Distribution, and (iii) its Pro Rata Share of the ResCap Debtors Unit Distribution, as applicable.

2.    *FGIC Settlement*. As a condition precedent to Plan Consummation, the Bankruptcy Court and the FGIC Rehabilitation Court each shall have approved, by no later than August 19, 2013, the FGIC Settlement Agreement, which governs the amount and priority of the General Unsecured Claims held by FGIC.  Entry of an order substantially in the form attached to the FGIC Settlement Agreement as Exhibit D (or such other form as agreed to by FGIC, the Debtors, the RMBS Trustees, and counsel for the Institutional Investors), pursuant to Bankruptcy Rule 9019, shall constitute approval, among other things, of the minimum Allowed non-subordinated General Unsecured Claim amounts as set forth therein.  Entry of the Confirmation Order pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, shall constitute approval of Allowed non-subordinated General Unsecured Claims held by FGIC in the amount of $337.5 million against the ResCap Debtors, $181.5 million against the GMACM Debtors, and $415.0 million against the RFC Debtors, as implemented by the Plan. OnIn full and final satisfaction of FGIC's General Unsecured Claims against the Debtors, FGIC shall receive on account of suchits Allowed General Unsecured Claims, FGIC shall receive: (i) its Pro Rata Share of the GMACM Debtors Unit Distribution, (ii) its Pro Rata Share of the RFC Debtors Unit Distribution, and (iii) its Pro Rata Share of the ResCap Debtors Unit Distribution, as applicable.

### E.    Private Securities Claims Trust

The Private Securities Claims Trust shall be established for the sole benefit of the holders of Allowed Private Securities Claims, and shall be funded on the Effective Date with the Private Securities Claims Trust Unit Distribution. The Private Securities Claims Trust shall be administered by the Private Securities Claims Trustee, who shall distribute Cash received in respect of the Allowed Private Securities Claims Trust Unit Distribution to holders of Allowed Private Securities Claims in accordance with the methodology and procedures set forth in the Private Securities Claims Trust Agreement, provided, however, that nothing herein shall foreclose the Private Securities Claims Trustee from electing to distribute some or all of the Allowed Private Securities Claims Trust Unit Distribution directly to holders of Allowed Private Securities Claims in accordance with the methodology and procedures set forth in the Private Securities Claims Trust Agreement.

1.      *Private Securities Claims Trust Agreement*. On or before the Effective Date, the Private Securities Claims Trust Agreement, in a form reasonably acceptable to the Plan Proponents, Ally and the Settling Private Securities Claimants, each in their individual capacity, shall be executed, and all other necessary steps shall be taken to establish the Private Securities Claims Trust and the interests therein, which shall be for the benefit of the holders of Allowed Private Securities Claims. The Private Securities Claims Trust Agreement shall provide for the distribution of the Private Securities Trust Assets in accordance with the allocation agreement, executed by each of the Private Securities Claimants.

2.      *Purpose of the Private Securities Claims Trust*. The Private Securities Claims Trust shall be established to among other things, (i) direct perform the following duties, to the extent necessary: (i) directing the processing, liquidation and payment of the Allowed Private Securities Claims in accordance with the Plan; and (ii) preserve, holdpreserving, holding, and managemanaging the assets of the Private Securities Claims Trust for use in paying and satisfying Allowed Private Securities Claims. The Private Securities Claims Trust Agreement shall include, among other things: (i) the terms, methodology, criteria, and procedures for distributing either (a) the Cash distributed by the Liquidating Trust in respect of the Units held byallocated to the Private Securities Claims Trust to holders of Allowed Private Securities Claims, and (ii)or (b) the Units transferred to the Private Securities Claims Trust that constitute the Private Securities Claims Trust Unit Distribution; and (ii) to the extent necessary, the establishment of appropriate disputed claims reserves.

3.      *Private Securities Claimants to Receive Distributions from Private Securities Claims TrustForego Other Recoveries*.  In consideration of the Private Securities Claims Trust Unit Distribution transferred to the Private Securities Claims Trust and in furtherance of the purposes of the Private Securities Claims Trust and the Plan, the Private Securities Claimants shall agree to forego any other recovery from the Debtors or Liquidating Trust in respect of the Private Securities Claims, and neither the Debtors, Ally, nor the Liquidating Trust shall have any further financial or other responsibility or liability therefor.  Private Securities Claimants instead shall be entitled to receive their allocated share of either (a) the Cash available for distribution from the Private Securities Claims Trust in respect of the Private Securities Claims Trust AssetsUnit Distribution, or (b) the Units transferred to the Private Securities Claims Trust that constitute the Private Securities Claims Trust Unit Distribution, in each case in accordance with the Private Securities Claims Trust Agreement, as their sole source of recovery in respect of the Private Securities Claims.

4.      *Administration of the Private Securities Claims Trust*.  The Private Securities Claims Trust shall be administered by the Private Securities Claims Trustee.  For the avoidance of doubt, upon the Effective Date, the Private Securities Claims Trust shall be completely independent of the Liquidating Trust and the Liquidating Trust shall have no authority over the Private Securities Claims Trust.  One or more candidates for the Private Securities Claims Trustee shall be recommended on or before the Effective Date by the Settling Private Securities Claimants, in each of their individual capacities, and the Private Securities Claims Trustee will be designated with the consent of the Plan Proponents, which consent shall not be unreasonably withheld.

5.      *Distributions ~~from~~to the Private Securities Claimants*.  To the extent the Private Securities Claims Trust  ~~The~~ holds the Units distributed by the Liquidating Trust, the Cash distributions received by the Private Securities Claims Trust in respect of the Units that it holds shall be distributed to holders of Allowed Private Securities Claims in accordance with the methodology, criteria and procedures established in the Private Securities Claims Trust Agreement.  To the extent the Private Securities Claims Trust has distributed the Units that constitute the Private Securities Claims Trust Unit Distribution to Private Securities Claimants, the Liquidating Trust shall make Cash distributions directly to the Private Securities Claimants.

6.      *Settlement of Allowed Claims of Settling Private Securities Claimants*. Entry of the Confirmation Order, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, shall constitute approval of the settlement of the Allowed Claim amounts for voting purposes of each of the Settling Private Securities Claimants as follows: AIG shall have an allowed claim of $1.168 billion for voting purposes, Allstate shall have an allowed claim of $140 million for voting purposes, MassMutual shall have an allowed claim of $218 million for voting purposes, and Prudential shall have an allowed claim of $227 million for voting purposes.  The Settling Private Securities Claimants shall also have settled claim amounts against the Private Securities Claims Trust for distribution purposes, which amounts shall be set forth in the Private Securities Claims Trust Agreement.

7.      *Costs and Expenses of Private Securities Claims Trust*.  The reasonable costs and expenses of administering the Private Securities Claims Trust, including the reasonable fees and expenses of the Private Securities Claims Trustee and its retained professionals, shall be funded on the Effective Date as agreed to by the Plan Proponents and Consenting Claimants.

8.      *Retention of Professionals by Private Securities Claims Trustee*. The Private Securities Claims Trustee may retain and reasonably compensate counsel and other professionals to assist in its duties as Private Securities Claims Trustee on such terms as the Private Securities Claims Trustee deems appropriate without Bankruptcy Court approval, but subject to the terms and conditions provided for in the Private Securities Claims Trust Agreement.   The Private Securities Claims Trustee may retain professionals who represented parties in the Chapter 11 Cases, provided such retention is otherwise permissible under applicable law.

9.      *Indemnification of the Private Securities Claims Trustee*.  The Private Securities Claims Trustee and its agents or professionals shall not be liable for any actions taken or omitted in its capacity as, or on behalf of, the Private Securities Claims Trustee or the Private Securities Claims Trust, except those acts arising out of its own willful misconduct, gross negligence, or bad faith, and each shall be entitled to indemnification or reimbursement for fees and expenses in defending any and all of its actions or inactions in its or their capacity as, or on behalf of, the Private Securities Claims Trustee except for any and all actions or inactions involving willful misconduct, gross negligence, or bad faith.  Any indemnification claim of the Private Securities Claims Trustee (and the other parties entitled to indemnification under this subsection) shall be satisfied solely from the assets of the Private Securities Claims Trust and no recourse may be had to the Liquidating Trust, Ally, or the Debtors' Estates.  The Private Securities Claims Trustee shall be entitled to rely, in good faith, on the advice of its retained professionals.

F.      **Borrower Claims Trust**

The Borrower Claims Trust shall be established for the sole benefit of the holders of Allowed Borrower Claims, and shall consist of the Borrower Claims Trust Assets. The Borrower Claims Trust shall be administered by the Borrower Claims Trustee, subject to oversight and supervision by the Borrower Claims Trust Committee, who shall administer and distribute the Borrower Claims Trust Assets to holders of Allowed Borrower Claims in accordance with the methodology and procedures set forth in the Borrower Claims Trust Agreement. The Borrower Claims Trust shall be completely independent of the Liquidating Trust and the Liquidating Trustee shall have no authority over the Borrower Claim Trust or the Borrower Claims Trustee.

1.      *Borrower Claims Trust Agreement*. On or before the Effective Date, the Borrower Claims Trust Agreement, in a form reasonably acceptable to the Plan Proponents, Ally and the Kessler Class Claimants, shall be executed, and all other necessary steps shall be taken to establish the Borrower Claims Trust and the interests therein, which shall be for the benefit of the holders of Allowed Borrower Claims. In the event of any conflict between the terms of the Plan with respect to the Borrower Claims Trust and the terms of the Borrower Claims Trust Agreement, the Borrower Claims Trust Agreement shall govern. The Borrower Claims Trust Agreement includes: (i) participation and qualification criteria for holders of Borrower Claims to receive a distribution from the Borrower Claims Trust Assets, (ii) procedures for the prosecution and settlement of objections to Borrower Claims, including those previously filed by the Debtors or any other party, (iii) the establishment of reserves for Disputed Borrower Claims; and (iv) the establishment of procedures to resolve Disputed Borrower Claims, inclusive of any counterclaims or offsets in favor of the Debtors.

2.      *Purpose of the Borrower Claims Trust*. The Borrower Claims Trust shall be established to, among other things, (i) direct the processing, liquidation and payment of the Allowed Borrower Claims in accordance with the Plan, and the distribution procedures established under the Borrower Claims Trust Agreement, and (ii) preserve, hold, and manage the assets of the Borrower Claims Trust for use in satisfying Allowed Borrower Claims.

3.      *Assumption of Certain Liabilities by the Borrower Claims Trust*. In consideration of the Borrower Claims Trust Assets transferred to the Borrower Claims Trust and in furtherance of the purposes of the Borrower Claims Trust and the Plan, the Borrower Claims Trust shall assume all liability for all Borrower Claims, and neither the Debtors, the Released Parties, nor the Liquidating Trust shall have any further financial or other responsibility or liability therefor.

4.      *Borrower Claims Trust Assets*. The Borrower Claims Trust shall consist of the Borrower Claims Trust Assets and any other assets held from time to time incidental to the administration of the Borrower Claims Trust. On the Effective Date, the Liquidating Trust, in its capacity as Disbursing Agent, shall fund the Borrower Claims Trust with the Cash portion of the Borrower Claims Trust Assets free and clear of all Liens, Claims, and encumbrances, except to the extent otherwise provided herein.

5.      *Administration of the Borrower Claims Trust*. The Borrower Claims Trust shall be administered by the Borrower Claims Trustee subject to the supervision and oversight of the Borrower Claims Trust Committee. The Borrower Claims Trustee will be designated by counsel

for the Kessler Class Claimants with the consent of the Plan Proponents, which consent shall not be unreasonably withheld.

6. *Distributions from the Borrower Claims Trust*. It is the intention that distributions made from the Borrower Claims Trust on account of an Allowed Borrower Claim will be comparable to the recovery that the holder of an Allowed Claim in the same amount against the same Debtor Group would realize from distributions made by the Liquidating Trust on Units issued in respect of such Allowed Claim, based on the value of the assets in the Liquidating Trust available for distribution to holders of Units as of the Effective Date (without in each case giving effect to any insurance proceeds, including proceeds from the GM Policies, that may be received in respect of certain of the Allowed Borrower Claims or to the time delay in receipt of distributions in respect of the Units issued by the Liquidating Trust). For the avoidance of doubt, the comparable recovery percentages that the holder of an Allowed Claim in the same amount against the same Debtor Group would realize from distributions made by the Liquidating Trust on Units issued in respect of such Allowed Claim shall be established once and finally and for all purposes, including for all future distributions by the Borrower Claims Trust, at the time of and in connection with the Borrower Trust True-Up and confirmation of the Plan, and neither the amount to be transferred to the Borrower Claims Trust nor the percentage distributions from the Borrower Claims Trust shall be adjusted following the Effective Date based on actual experience with respect to recoveries from the Liquidating Trust following the Effective Date of the Plan.

Except as otherwise provided herein or in the Kessler Settlement Agreement, to the extent a Borrower recovers insurance proceeds on account of all or some of an Allowed Borrower Claim, (i) if distributions on account of such Allowed Borrower Claim have not been made, the amount of such Allowed Borrower Claim shall be reduced to the extent paid by insurance proceeds, or (ii) if distributions on account of such Allowed Borrower Claim have been made, the Borrower shall be required to return an amount equal to all distributions received by the Borrower from the Borrower Claims Trust on account of such Allowed Borrower Claim multiplied by a fraction, the numerator of which is the amount of the insurance proceeds received and the denominator of which is the amount of its Allowed Borrower Claim. Such Borrower shall thereafter continue to be entitled to its proportionate share of any future distribution from the Borrower Claims Trust. For the avoidance of doubt, the Kessler Settlement Class shall continue to be entitled to its proportionate share of any such future distribution. Any Borrower who recovers insurance proceeds on account of all or some of an Allowed Borrower Claim shall be required to notify the Borrower Claims Trustee of such recovery within ten (10) Business Days of receipt.

If any Borrower Claim constitutes, in whole or in part, a Consent Order Borrower Claim, the Allowed amount of such Borrower Claim shall be reduced to the extent paid pursuant to the Consent Order or any settlement of the Debtors' obligations thereunder, without further order of the Bankruptcy Court.

7. *U.S. Federal Income Tax Treatment of Borrower Claims Trust*. All parties (including, without limitation, the Debtors, the Borrower Claims Trustee, and the holders of Borrower Claims) shall treat the Borrower Claims Trust as a "qualified settlement fund" within the meaning of 468B of the Tax Code and the Treasury Regulations thereunder.

71

8.    *Dissolution of the Borrower Claims Trust*.  The Borrower Claims Trustee and the Borrower Claims Trust shall be discharged or dissolved, as applicable, at such time as (i) all Borrower Claims have been resolved by Final Order, written agreement, or pursuant to the Plan, and (ii) all distributions to be made by the Borrower Claims Trustee under the Plan and the Borrower Claims Trust Agreement have been made.  Any Cash or other remaining assets in the Borrower Claims Trust shall be transferred to the Liquidating Trust upon dissolution of the Borrower Claims Trust.

9.    *Costs and Expenses of Borrower Claims Trust*.  The reasonable costs and expenses of administering the Borrower Claims Trust, including the reasonable fees and expenses of the Borrower Claims Trustee and its retained professionals, shall be funded on the Effective Date as agreed to by the Plan Proponents and Consenting Claimants. Such costs shall not include fees and expenses incurred by the Kessler Class Claimants pursuit of GM Insurance Rights.

10.    *Retention of Professionals by Borrower Claims Trustee*. The Borrower Claims Trustee may retain and reasonably compensate counsel and other professionals to assist in its duties as Borrower Claims Trustee on such terms as the Borrower Claims Trustee deem appropriate without Bankruptcy Court approval, but subject to the terms and conditions provided for in the Borrower Claims Trust Agreement.  The Borrower Claims Trustee may retain professionals who represented parties in the Chapter 11 Cases, provided such retention is otherwise permissible under applicable law.

11.    *Indemnification of the Borrower Claims Trustee and the Borrower Claims Trust Committee*.  The Borrower Claims Trustee and members of the Borrower Claims Trust Committee and their agents or professionals shall not be liable for any actions taken or omitted in its capacity as, or on behalf of, the Borrower Claims Trustee or the Borrower Claims Trust, except those acts arising out of its or their own willful misconduct, gross negligence, or bad faith, and each shall be entitled to indemnification or reimbursement for fees and expenses in defending any and all of its actions or inactions in its or their capacity as, or on behalf of, the Borrower Claims Trust except for an action or inactions involving willful misconduct, gross negligence, or bad faith.  Any indemnification claim of the Borrower Claims Trustee and the Borrower Claims Trust Committee (and the other parties entitled to indemnification under this subsection) shall be satisfied solely from the Borrower Claims Trust Assets and no recourse may be had to the Liquidating Trust, the Released Parties or any creditor in these Chapter 11 Cases. The Borrower Claims Trustee and the members of the Borrower Claims Trust Committee shall be entitled to rely, in good faith, on the advice of its retained professionals.

12.    *Borrower Claims Trustee as Estate Representative under 1123(b)(3)(B)*.  The Borrower Claims Trustee is hereby appointed as the representative of the ~~estate~~Estates with respect to Borrower-Related Causes of Action pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

**G.    Settlement of Claims of Kessler Class Claimants**

1.    *Settlement of Allowed Amount of Kessler Class Claims*.  As provided in the Kessler Settlement Agreement, as one element of, and in consideration for, an overall negotiated

settlement of numerous disputed claims and issues embodied in the Plan and subject to the entry of the Kessler Settlement Approval Orders, the Kessler Settlement Class shall receive the Allowed Kessler Claim against the RFC Debtors.  The sole source of recovery of the Allowed Kessler Claim shall be distributions from the Borrower Claims Trust and the GM Insurance Rights, and not from any other assets or property of the Released Parties, the Liquidating Trust, or the Private Securities Claims Trust.

2.     *Transfer of GM Insurance Rights*. Subject to entry of the Kessler Settlement Approval Orders, on the Effective Date, the Debtors shall convey, transfer, and assign the GM Insurance Rights under the GM Policies in accordance with the Kessler Settlement Agreement and the Kessler Settlement Approval Orders, to (i) the Kessler Settlement Class with respect to indemnity for the Allowed Kessler Claim, and (ii) except to the extent that any such GM Insurance Rights have been transferred by the Debtors to other creditors on or before the Effective Date, the Liquidating Trust with respect to any other GM Insurance Rights.  For the avoidance of doubt, the (i) rights of the Kessler Settlement Class in and to the GM Insurance Rights and proceeds thereof, and (ii) the rights of any other creditor who has received from the Debtors an assignment of GM Insurance Rights prior to the Effective Date, shall not be transferred to the Liquidating Trust and shall not constitute Available Assets.

3.     *Discovery of Additional Insurance Policies*. Subject to the entry of the Kessler Settlement Approval Orders, if, after the Effective Date, the Liquidating Trust discovers any additional insurance policies under which any of the Debtors are insured and that provide coverage for the Debtors' liability to the Kessler Settlement Class, then the Liquidating Trust will assign to the Kessler Settlement Class the insurance rights under such policies with respect to the liability of the Debtors to the Kessler Settlement Class.

**H.     NJ Carpenters Claims Settlement**

The NJ Carpenters Settlement, which is subject to the NJ Carpenters Approval, contemplates the payment of the NJ Carpenters Claims Distribution in settlement of the NJ Carpenters Claims, which amount shall be the sole source of recovery available in respect of the NJ Carpenters Claims.  If the NJ Carpenters Approval occurs, the NJ Carpenters Class Members shall be entitled to the NJ Carpenters Claims Distribution.  The NJ Carpenters Class Opt-Outs shall not receive any portion of the NJ Carpenters Claims Distributions and shall receive no consideration under the Plan other than in respect of their Allowed Claims against the Estates, which Claims shall be classified as General Unsecured Claims and may be subject to subordination.  The reasonable costs of class notice and administration shall be advanced by the Debtors prior to the Effective Date in accordance with applicable orders of the Bankruptcy Court and District Court, which costs will be deducted from the NJ Carpenters Claims Distribution. Absent the NJ Carpenters Approval, the NJ Carpenters Class Members will not receive any portion of the NJ Carpenters Claims Distribution, and, to the extent any NJ Carpenters Class Members hold Allowed Claims, such Claims shall be classified as General Unsecured Claims, which claims may be subject to subordination.

## I.    Senior Unsecured Notes Settlement

The Plan shall constitute a good faith compromise and settlement of claims that the Senior Unsecured Notes Indenture Trustee, on behalf of the Senior Unsecured Noteholders, has against the Ally Released Parties and any Debtor, both as described in the Disclosure Statement. Distributions to the Senior Unsecured Noteholders shall be carried out consistent with Article VIII.F.G.1 of the Plan.

## J.    Adjustment Mechanism

The allocation of Units issuable pursuant to the Plan shall be determined in accordance with the following adjustment mechanism.  APrior to the Initial Unit Distribution Date, a determination shall be made as of the Initial Unit Issuance Record Date of the estimated amount of the DisputedGeneral Unsecured Claims against each of the Debtor Groups that are Disputed Claims, in accordance with the provisions of Article VIII.D.  Thereupon, the Unit Issuance Percentages shall be adjusted such that all holders of Allowed Unsecured Claims and the Private Securities Claims Trust shall share proportionately in the accretion or dilution of recoveries as a result of variances in the Allowed amounts of Unsecured Claims from the amounts set forth in the Disclosure Statement; and shall be further adjusted through an iterative mathematical process such that all holders of Allowed Unsecured Claims against a Debtor Group receive Units in the same ratio of number of Units to Allowed amount of Claim.  For the purposes of this paragraph, "proportionately" means in proportion to the recovery of the holders of Unsecured Claims in the amounts set forth in the Disclosure Statement.

The Debtor Group Unit Distributions shall be determined based on the respective Unit Issuance Percentages, after adjustment, and shall include, with respect to each Debtor Group, the Units to be issued to holders of Allowed Unsecured Claims against that Debtor Group as of the Initial Unit Distribution Record Date and the Units to be issued to the Disputed Claims Reserve with respect to that Debtor Group.

## K.    Cancellation of Securities, Indentures, and Other Documents Evidencing Claims and Equity Interests

Subject to the assumption of Executory Contracts and Unexpired Leases as set forth in the Plan, and except for purposes of evidencing a right to distributions under the Plan, on the Effective Date, all notes, stock, instruments, certificates, indentures, guarantees, and other documents or agreements evidencing a Claim against or Equity Interest in the Debtors will be deemed automatically cancelled with respect to the Debtors and shall be of no further force or effect as against the Debtors, whether such document is surrendered for cancellation or not, and the obligations of Ally, the Debtors, or the Liquidating Trust, thereunder or in any way related thereto will be discharged.

Notwithstanding anything to the contrary herein, the Senior Unsecured Notes Indenture will continue in effect for the limited purposes set forth in the Senior Unsecured Notes Indenture includingof: (i) allowing the Senior Unsecured Noteholders to receive distributions on account of their Senior Unsecured Notes Claims, and (ii) allowing the Senior Unsecured Notes Indenture Trustee to make distributions in accordance with the terms of the Plan, to fund the Senior

Unsecured Notes Indenture Trustee Reserve, and to exercise its Senior Unsecured Notes Indenture Trustee Charging Lien against distributions under the Plan and against the Senior Unsecured Notes Indenture Trustee Reserve for payment of Senior Unsecured Notes Indenture Trustee Fees and Expenses.

Notwithstanding anything to the contrary herein, the First Priority Security Agreement will continue in effect for the limited purposes of allowing the First Priority Collateral Agent to exercise its First Priority Collateral Agent Lien for the payment of First Priority Collateral Agent Fees and Expenses.

Notwithstanding anything to the contrary herein, all Junior Secured Notes, the Junior Secured Notes Indenture and the Junior Secured Notes Security Agreement shall be deemed automatically canceled and discharged on the Effective Date, provided, however, that the Junior Secured Notes, the Junior Secured Notes Indenture and the Junior Secured Notes Security Agreement shall continue in effect solely for the purposes of (i) allowing the Junior Secured Noteholders to receive distributions on account of their Junior Secured Notes Claims as provided in the Plan, (ii) allowing the Junior Secured Notes Indenture Trustee to make the distributions to be made on account of the Junior Secured Notes; and (iii) permitting the Junior Secured Notes Indenture Trustee to assert its Junior Secured Notes Indenture Trustee Charging Lien against such distributions for payment of the Junior Secured Notes Indenture Trustee Fees and the Junior Secured Notes Collateral Agent Fees and Expenses.

**L.    Treatment of Intercreditor Agreement**

Nothing contained herein shall affect the enforceability of the Intercreditor Agreement in accordance with, and subject to, the terms thereof and any applicable law, and all rights and obligations, if any, of the parties to the Intercreditor Agreement thereunder, or in connection therewith, are preserved until such time that the Confirmation Order becomes a Final Order; provided, on and after the Effective Date, the obligation of the Liquidating Trust, as successor to the Debtors under the Intercreditor Agreement shall be limited to facilitating enforcement of the Intercreditor Agreement as between the other parties thereto; provided further, however, that notwithstanding anything to the contrary contained  herein, the Estates and the Liquidating Trust shall not in any way incur any monetary obligations to any party as a result of or in any way related to the enforcement of the terms of the Intercreditor Agreement.

**M.    Compensation Order**

Notwithstanding anything herein to the contrary, following the Effective Date, Ally and the Liquidating Trust shall continue to comply with their respective obligations under the Compensation Order.

**N.    Corporate Action**

Except as otherwise provided in the Plan, the corporate or related actions to be taken by or required of the Debtors in connection with each matter provided for by the Plan shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan, and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by holders of Claims or Equity Interests, directors of the Debtors, or any other Entity. On or prior to the Effective Date, the appropriate officers of the

Debtors shall be authorized and directed to issue, execute, and deliver the agreements, securities, instruments, or other documents contemplated by the Plan, or necessary or desirable to effect the transactions contemplated by the Plan, in the name of and on behalf of the Debtors, prior to the Effective Date, or the Liquidating Trust, following the Effective Date. Notwithstanding any requirements under nonbankruptcy law, the authorizations and approvals contemplated by this provision shall be effective.

On the Effective Date, upon the appointment of the Liquidating Trust Board, the persons acting as directors, managers, and officers of the Debtors prior to the Effective Date as the case may be, will be released from all further authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors or the Chapter 11 Cases, including, for the avoidance of doubt, the obligations related to the DOJ/AG Settlement. Upon such release and discharge, the Liquidating Trust Board will be charged with the authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors and these Chapter 11 Cases, except to the extent such authority, duties, responsibilities, and obligations are to be undertaken by the Private Securities Claims Trustee, the RMBS Claims Trust Trustees, the Borrower Claims Trustee, or, with respect to the NJ Carpenters Claims Distribution, in each case as provided in the Plan.

## O.    Dissolution of the Debtors

On and after the Effective Date, the Liquidating Trust Board shall be authorized, in its sole and absolute discretion, to take all actions reasonably necessary to manage or dissolve the Debtors and their subsidiaries, including the Non-Debtor Subsidiaries, under applicable laws, including the laws of the jurisdictions in which they may be organized or registered, notwithstanding any applicable consent requirements or other restrictions contained in any financing agreements or other debt documents to which any Debtor is a party, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or filing any necessary paperwork or documentation. The Liquidating Trust Board shall have no liability for using its discretion to dissolve or not dissolve any of the Debtors or their subsidiaries. Whether or not dissolved, the Debtors shall have no authorization to implement the provisions of this Plan from and after the Effective Date except as specifically provided otherwise in the Plan. Notwithstanding the foregoing, the Liquidating Trust Board shall not dissolve any Debtor to the extent such Debtor is required to hold Available Assets after the Effective Date pursuant to Article VI.C of the Plan, and any such Debtors shall be authorized to take such actions at the direction of the Liquidating Trust Board as may be necessary to implement the provisions of the Plan with respect to such Available Assets.

Upon the appointment of the Liquidating Trust Board, the persons acting as directors, managers, and officers of the Debtors prior to the Effective Date will be released from all further authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors or the Chapter 11 Cases and, upon such release and discharge, the Liquidating Trust Board will be charged with the authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors and these Chapter 11 Cases.

**P.      Effectuating Documents; Further Transactions**

On the Effective Date, the Liquidating Trust Board will be authorized to take any actions or effect transactions, including conversions, dissolutions, transfers, liquidations, or other corporate transactions, as may be determined by the Liquidating Trust Board to be necessary or appropriate to implement to terms of the Plan. After the Effective Date, the Liquidating Trust Board may utilize the aforementioned authority without any further notice to or action, order or approval of the Bankruptcy Court.

On and after the Effective Date, the Liquidating Trust Board, directly or acting through the Liquidating Trust Management, is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of the Plan Proponents, without the need for any approvals, authorization, or consents, except for those expressly required by the Plan.

**Q.      Exemption from Certain Taxes and Fees**

Pursuant to Bankruptcy Code section 1146(a), any transfers of property pursuant to the Plan shall not be subject to any stamp, real estate transfer, mortgage reporting, sales, use tax, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

**R.      Preservation of Causes of Action**

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan (including pursuant to the Plan Support Agreement), or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Borrower Claims Trust with respect to Borrower-Related Causes of Action, and the Liquidating Trust with respect to all other Causes of Action, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors or the Debtors' Estates, whether arising before or after the Petition Date, including any Causes of Action specifically enumerated in the Plan Supplement, and the Liquidating Trust's and Borrower Claims Trust's respective rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Liquidating Trust and the Borrower Claims Trust may pursue their respective Causes of Action, as appropriate, in accordance with the best interests of the respective Trust. **No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against such Entity as any indication that the Liquidating Trust or Borrower Claims Trust, as the case may be, will not pursue any and all available Causes of Action against such Entity. The Liquidating Trust and the Borrower Claims Trust expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are

77

expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Liquidating Trust expressly reserves all Causes of Action other than Borrower-Related Causes of Action, and the Borrower Claims Trust expressly reserves all Borrower-Related Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, the Plan does not release any Causes of Action that the Plan Proponents or the Liquidating Trust or Borrower Claims Trust have or may have now or in the future against any Entity other than the Released Parties.

Except as otherwise provided in the Plan or in a Final Order, the Liquidating Trust reserves and shall retain Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtors may hold against any Entity that is not released under the Plan or a separate settlement approved by Final Order shall vest in the Borrower Claims Trust with respect to Borrower-Related Causes of Action and in the Liquidating Trust with respect to all other Causes of Action. The Liquidating Trust and Borrower Claims Trust, as the case may be, through their respective authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Liquidating Trust has the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Causes of Action other than Borrower-Related Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.  The Borrower Claims Trust has the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Borrower-Related Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE V.

## TREATMENT OF EXECUTORY
## CONTRACTS AND UNEXPIRED LEASES

### A.    Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously assumed shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (i) is expressly identified on the Assumption Schedule; (ii) has been previously assumed by the Debtors by Final Order or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to assume pending as of the Effective Date; or (iv) is otherwise assumed pursuant to the terms herein.  The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date or as otherwise set forth in the Plan Supplement.

All Proofs of Claim with respect to Claims arising from the rejection of Executory
Contracts or Unexpired Leases, including any Executory Contracts or Unexpired Leases rejected
or deemed rejected under the Plan, must be Filed in accordance with the procedures set forth in
the Bar Date Order by the Rejection Damages Claim Bar Date or such Claims will be
automatically disallowed, forever barred from assertion, and shall be unenforceable against the
Debtors, the Liquidating Trust, or their assets or properties without the need for any objection by
the Liquidating Trust or further notice to, or action, order, or approval of the Bankruptcy Court.
All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired
Leases will be classified as General Unsecured Claims against the applicable Debtor Groups and
treated in accordance with the terms of Article III. The deadline to object to Claims arising from
the rejection of Executory Contracts or Unexpired Leases, if any, shall be the Claims Objection
Deadline.

## B.    Assumption of Executory Contracts and Unexpired Leases

The Debtors will file the Assumption Schedule with the Bankruptcy Court at least
twenty-one (21) days before the commencement of the Confirmation Hearing.  The Assumption
Schedule will include (a) the name of the non-Debtor counterparty, (b) the legal description of
the Executory Contract or Unexpired Lease to be assumed, and (c) the proposed amount to be
paid on account of an associated Cure Claim, if any.  On or as soon as practicable thereafter, the
Debtors will serve a notice of filing of the Assumption Schedule upon each non-Debtor
counterparty listed thereon that will describe the procedures by which such parties may object to
the proposed assumption of their respective Executory Contract or Unexpired Lease or the
proposed Cure Claim amount, and explain how such disputes will be resolved by the Bankruptcy
Court if the parties are not able to resolve a dispute consensually.  Objections, if any, to the
proposed assumption and/or Cure Claim must be filed with the Bankruptcy Court and served so
as to be actually received by the Debtors no later than [●]fourteen (14) days from the date of
filing the Assumption Schedule.  Any non-Debtor counterparty to an Executory Contract or
Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim amount
will be deemed to have assented to such assumption or Cure Claim amount.

If an objection to the proposed Cure Claim is sustained by the Bankruptcy Court, the Plan
Proponents, prior to the Effective Date, or the Liquidating Trust, following the Effective Date,
may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it on proper
notice to the non-Debtor counterparty thereto, which non-Debtor counterparties shall then be
entitled to file Proofs of Claim asserting Claims arising from the rejection thereof, if applicable,
in accordance with the terms of the Plan and the Bar Date Order.

The Plan Proponents, prior to the Effective Date, or the Liquidating Trust, following the
Effective Date, may settle any dispute on the amount of a Cure Claim without further notice to
any party or action, approval, or order of the Bankruptcy Court.  If the Plan Proponents, prior to
the Effective Date, or the Liquidating Trust, following the Effective Date, object to any request
for payment of a Cure Claim, the Bankruptcy Court shall determine the Allowed amount of such
Cure Claim and any related issues.  Unless the parties to the Executory Contract or Unexpired
Lease agree otherwise, all disputed defaults that are required to be cured shall be cured by the
later of (i) ten (10) days after entry of a Final Order determining the amount, if any, of the
Debtors' liability with respect thereto and (ii) the Effective Date.  The Plan Proponents, prior to

the Effective Date, or the Liquidating Trust, following the Effective Date, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease no later than thirty (30) days after a Final Order determining a Cure Claim greater than that proposed by the Debtors.

**ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE OF THE DEBTORS OR THE LIQUIDATING TRUST ASSUME SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT**.

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumption Schedule, nor anything contained in the Plan or each Debtor's Schedules, shall constitute an admission by the Debtors that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease capable of assumption, that any Debtor has any liability thereunder or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement. Further, the Plan Proponents expressly may (a) remove any Executory Contract or Unexpired Lease from the Assumption Schedule and reject an Executory Contract or Unexpired Lease pursuant to the terms of the Plan, up until the Effective Date and (b) contest any Claim (or cure amount) asserted in connection with assumption of any Executory Contract or Unexpired Lease.

The assumption of Executory Contracts and Unexpired Leases under the Plan shall include the vesting of such contracts in the Liquidating Trust. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, assignments, and vesting.

In the event a written objection is filed with the Bankruptcy Court as to whether a contract or lease is executory or unexpired, the right of the Plan Proponents to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the entry of a Final Order by the Bankruptcy Court determining that the contract or lease is executory or unexpired, in which case the deemed assumptions and rejections provided for in the Plan shall not apply to such contract or lease.

## C.    Contracts and Leases Entered Into After the Petition Date

Counterparties to contracts and leases entered into after the Petition Date by a Debtor, including any Executory Contract or Unexpired Lease assumed by a Debtor, must File a proof of claim for an Administrative Claim against the appropriate Debtor by the Administrative Claims

Bar Date or have their rights with respect to such Administrative Claims forever waived and
released; provided that this provision shall not apply to any Ally Contract Claims.

**D.      Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired
Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or
otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under
such Executory Contract or Unexpired Lease. Notwithstanding any applicable non-bankruptcy
law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any
continuing obligation of a non-Debtor party to provide, warranties, indemnifications or continued
maintenance obligations on goods previously purchased, or services previously received, by the
contracting Debtors from non-Debtor parties to rejected Executory Contracts or Unexpired
Leases, and any such rights shall vest in the Liquidating Trust as of the Effective Date.

**E.      Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain
jurisdiction with respect to any consensual request, pursuant to Bankruptcy Code section
365(d)(4), to extend the deadline for assuming or rejecting Executory Contracts and Unexpired
Leases.

**F.      No Change in Control**

The consummation of the Plan or the assumption of any Executory Contract or Unexpired
Lease is not intended to, and shall not, constitute a change in ownership or change in control
under any employee benefit plan or program, financial instrument, loan or financing agreement,
Executory Contract or Unexpired Lease or contract, lease or agreement in existence on the
Effective Date to which a Debtor is a party.

**ARTICLE VI.**

**THE LIQUIDATING TRUST**

**A.      Generally; Creation and Conversion**

The powers, authority, responsibilities, and duties of the Liquidating Trust, are set forth in
and will be governed by the Liquidating Trust Agreement, the form of which shall be included in
the Plan Supplement.  The Liquidating Trust shall be a representative of the Estates pursuant to
section 1123(b)(3)(B).

A predecessor to the Liquidating Trust was initially formed pursuant to a Declaration of
Trust as a common law trust under the laws of the State of Delaware.  On or prior the Effective
Date, the Delaware Trustee will file a Certificate of Conversion and a Certificate of Trust in
accordance with the Delaware Statutory Trust Act to convert the initial trust to a Delaware
statutory trust that will constitute the Liquidating Trust under the Plan.

**B.      Purpose of the Liquidating Trust**

The Liquidating Trust shall be established for the purpose of liquidating and distributing the Liquidating Trust Assets in accordance with Treasury Regulations Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, its liquidating purpose described in this Plan and set forth in the Liquidating Trust Agreement. The Liquidating Trust, acting through the Liquidating Trust Board, Liquidating Trust Management, and their agents, shall wind down the affairs of the Debtors and perform the assumed obligations under the DOJ/AG Settlement, Consent Order, and Order of Assessment in accordance with the terms of the Plan.

**C.      Transfer of Assets to the Liquidating Trust**

On the Effective Date, the Debtors are authorized and directed to transfer, grant, assign, convey, set over, and deliver to the Liquidating Trustee, for the benefit of the Liquidating Trust, in the form thereof existing on such date, all of the Debtors' and Estates' right, title and interest in and to the Available Assets free and clear of any and all liens, claims, encumbrances and interests (legal, beneficial or otherwise) of all other Persons and Entities to the maximum extent contemplated by and permissible under section 1141 of the Bankruptcy Code.

Notwithstanding the foregoing, (i) if on the Effective Date, any of the Available Assets cannot be transferred to the Liquidating Trust for any reason, the Debtors shall continue to hold such Available Assets, as bailee for the account of the Liquidating Trust, until such time as the Liquidating Trust may receive such Available Assets (and any proceeds of such assets retained by the Debtors shall constitute Available Assets) and (ii) subject to the entry of the Kessler Settlement Approval Order, the GM Insurance Rights to be assigned to the Kessler Settlement Class or any other GM Insurance Rights that are assigned to any other Creditor pursuant to order of the Bankruptcy Court prior to or at Confirmation, shall be excluded from the Available Assets assigned to the Liquidating Trust.

The Debtors and the Liquidating Trust, as successor in interest to the Estates, may (i) execute and deliver any instruments, documents, books, and records (including those maintained in electronic format and original documents as may be needed), and (ii) take, or cause to be taken, all such further action in order to evidence, vest, perfect or effectuate the transfer of the Available Assets to the Liquidating Trust and consummate transactions contemplated by and to otherwise carry out the intent of the Plan.  Upon the transfer of the Available Assets, the Liquidating Trust shall succeed to all of the Debtors' right, title and interest in the Available Assets, and the Debtors will have no further rights or interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.

**D.      Liquidating Trust Administrative Reserve and Administrative, Priority, Secured and Convenience Distribution Reserve**

The Liquidating Trust Administrative Reserve shall be established on the Effective Date for the purpose of maintaining Cash from time to time necessary, subject to the Liquidating Trust Budget, to satisfy reasonable costs and expenses of the Liquidating Trust and other obligations incurred or reasonably anticipated by the Liquidating Trust in accordance with the

Plan Documents, including without limitation, fees and costs incurred in connection with (i) the implementation of the Plan, including to the extent not paid on the Effective Date, funds for making the payments provided in Article VII.B.2 (ii) the liquidation of the Liquidating Trust Assets, (iii) the resolution of Disputed Claims, and other Causes of Action, (iv) the winding down of the Estate and affairs of the Debtors, (v) the costs of performing under the DOJ/AG Settlement, (vi) the reserves for potential liabilities and (vii) compensation for the Liquidating Trust Board, Liquidating Trust Management, and the employees, professionals, advisors and other agents of the Liquidating Trust.  Any Cash released from the Liquidating Trust Administrative Reserve shall be available for distribution to the Unitholders.

The Administrative, Priority, Secured and Convenience Distribution Reserve shall be established on the Effective Date for the purpose of maintaining Cash from time to time necessary to satisfy (i) Administrative Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims and Junior Secured Notes Claims that are (a) Allowed as of the Effective Date but that cannot be paid on or promptly following the Effective Date, or (b) Disputed Claims as of the Effective Date but that may become Allowed after the Effective Date, and (ii) General Unsecured Convenience Claims that are Allowed or that may become Allowed on or after the Effective Date.  Any Cash released from the Administrative, Priority, Secured and Convenience Distribution Reserve shall be available for distribution to the Unitholders.

**E.    Liquidating Trust Governance**

The affairs of the Liquidating Trust shall be managed by, or under the direction of, the Liquidating Trust Board, which shall consist of five (5) Liquidating Trustees, one of whom shall be selected by each of (i) MBIA, (ii) FGIC, (iii) the RMBS Trustees that are members of the Creditors' Committee, the Steering Committee Consenting Claimants and the Talcott Franklin Consenting Claimants, jointly, (iv) Paulson, and (v) the holders of Private Securities Claims, and such other Liquidating Trustees as agreed to by the Plan Proponents and the Consenting Claimants.  The Liquidating Trust Board shall be authorized and empowered to undertake, acting through the management and agents of the Liquidating Trust, actions on behalf of the Liquidating Trust, including without limitation (i) to hold, manage, dispose and convert to Cash, the Liquidating Trust Assets, (ii) to maintain the Liquidating Trust Administrative Reserve and the Disputed Claims Reserve, (iii) to appoint and supervise management and agents of the Trust and (iv) to prepare and review periodic financial reports of the Liquidating Trust.

The Liquidating Trust Board shall elect a Liquidating Trustee to act as the Chairman of the Liquidating Trust Board and may designate one or more committees of the Liquidating Trust Board.  The Liquidating Trust Board shall appoint officers or other representative agents of the Liquidating Trust, including a Liquidating Trust manager and a secretary, to serve as the Liquidating Trust Management and carry out the purpose of the Liquidating Trust.  The Liquidating Trust Management shall be authorized to hire employees and engage advisors and other professionals, subject to any limitations imposed by the Liquidating Trust Board.

**F.    Financial Statements/Reporting**

The Liquidating Trust will provide sufficient reporting andor make available certain financial and other information, including annual and quarterly financial statements, and will also

provide other information to the extent required to make the Units freely tradable in accordance with applicable securities laws.

## G.    Tax Treatment

### 1.    *In General*

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trust Board and the Unitholders) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as:

a) a transfer of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to Unitholders, other than Liquidating Trust Assets that will be distributed pursuant to Article VII.B of the Plan or that are allocable to Disputed Claims (based on such Claims' Pro Rata Share of such Liquidating Trust Assets), followed by

b) the transfer by such Unitholders to the Liquidating Trust of such Liquidating Trust Assets in exchange for the Units.

Accordingly, those holders of Allowed Unsecured Claims receiving Units shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Liquidating Trust Assets (other than such Liquidating Trust Assets that will be distributed pursuant to Article VII.B of the Plan or that are allocable to ~~the~~ Disputed Claims). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

### 2.    *Tax Reporting.*

(a)    The Liquidating Trust shall file returns treating the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Article VI.~~F~~G.  The Liquidating Trust also shall annually send or otherwise make available to each holder of Units a separate statement setting forth the holder's share of items of income, gain, loss, deduction, or credit and will instruct all such holders to report such items on their U.S. federal income tax returns or to forward the appropriate information to their respective beneficial holders with instructions to report such items on their U.S. federal income tax returns.  The Liquidating Trust Board also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any Governmental Unit.

(b)    As soon as possible after the Effective Date, the Liquidating Trust shall make a good-faith valuation of the Liquidating Trust Assets, and such valuation shall be made available from time to time, to the extent relevant, and shall be used consistently by all parties (including, without limitation, the Debtors, the Liquidating Trust, the holders of Allowed Unsecured Claims, and the Unitholders) for all U.S. federal income tax purposes.

(c)    Allocation of Liquidating Trust taxable income and loss among the ~~beneficiaries of the Liquidating Trust~~Unitholders (other than taxable income and loss allocable to

the Disputed Claims Reserve) shall be made ~~Pro Rata to the holders of beneficial interests in the Liquidating Trust~~pro rata to the Unitholders.

(d)    The Liquidating Trust shall (A) treat the Disputed Claims Reserve and Liquidating Trust Assets allocable thereto as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 by timely making an election and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

(e)    The Liquidating Trust shall be responsible for payment, out of the Liquidating Trust Assets, of any taxes imposed on the Liquidating Trust or the Liquidating Trust Assets, including the Disputed Claims Reserve.  In the event, and to the extent, that any Cash retained on account of Disputed Claims of Liquidating Trust Unit Beneficiaries in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, such Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of such Disputed Claims or (ii) to the extent such Disputed Claims subsequently have been resolved, deducted from any amounts otherwise distributable as a result of the resolution of such Disputed Claims.

(f)    The Liquidating Trust may request an expedited determination of taxes of the Liquidating Trust, including the Disputed Claims Reserve, under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

**H.    Duration**The Liquidating Trust shall be dissolved as soon as practicable after the date that is the earliest to occur of: (i) the distribution of all Liquidating Trust Assets available for distribution pursuant to the Plan, (ii) the determination of the Liquidating Trust Board that the administration of the Liquidating Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit, or (iii) all the distributions required to be made by the Liquidating Trust have been completed; provided, however, that in no event shall the Liquidating Trust be dissolved later than three (3) years from the Effective Date, unless the Bankruptcy Court, upon motion within the six (6) months prior to the third (3rd) anniversary of the Effective Date (or within six (6) months prior to the end of an extension period), determines that a fixed-period extension is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets (without the need for a favorable private letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the trust as a Liquidating Trust for United States federal income tax purposes).

**I.    Conflicting Terms** To the extent that the terms of the Plan with respect to the Liquidating Trust are inconsistent with the terms set forth in the Liquidating Trust Agreement, then the terms of the Liquidating Trust Agreement shall govern.

**J.    Exculpation; Indemnification; Insurance**

The Liquidating Trust Agreement shall provide for the following with respect to exculpation, indemnification, and insurance:

1.      None of the Delaware Trustee, the Liquidating Trustees, the Liquidating Trust Management or Liquidating Trust Agents, or their respective advisors or professionals, shall be liable to the Liquidating Trust or any Unitholder for any damages arising out of the creation, operation or termination of the Liquidating Trust, including actions taken or omitted in fulfillment of his or her duties with respect to the Liquidating Trust, except in the case of such party's gross negligence, bad faith or willful misconduct; provided, that in no event will any such party be liable for punitive, exemplary, consequential or special damages under any circumstances. Furthermore, no Liquidating Trustee shall be liable to the Liquidating Trust or any Unitholder for any action taken in good faith reliance upon the advice of Liquidating Trust Management.

2.      None of the Delaware Trustee, the Liquidating Trustees, the Liquidating Trust Management or the Liquidating Trust Agents, when acting in such capacities, shall be subject to any personal liability whatsoever, whether in tort, contract or otherwise, to any person, other than the Liquidating Trust or the Liquidating Trust Unit Beneficiaries, in connection with the affairs of the Liquidating Trust to the fullest extent provided under section 3803 of the Delaware Statutory Trust Act, and all persons claiming against any of the Delaware Trustee, the Liquidating Trustees, the Liquidating Trust Management or Liquidating Trust Agent, or otherwise asserting claims of any nature in connection with affairs of the Liquidating Trust, shall look solely to the Liquidating Trust Assets for satisfaction of any such claims.

3.      The Liquidating Trust Board, the Delaware Trustee, the Liquidating Trust Management and their respective affiliates, and their respective officers, directors, partners, members, managers and employees shall be indemnified to the fullest extent permitted by law by the Liquidating Trust against all liabilities arising out of the creation, operation or termination of the Liquidating Trust, including actions taken or omitted in fulfillment of their duties with respect to the Liquidating Trust, except for those acts that are determined by Final Order to have arisen out of their own willful misconduct, gross negligence, or bad faith.

4.      The Liquidating Trust will maintain customary insurance coverage for the protection of the Liquidating Trustees, the Delaware Trustee and the Liquidating Trust Management from and after the Effective Date.

## ARTICLE VII.

## PROVISIONS GOVERNING ISSUANCE OF UNITS AND OTHER DISTRIBUTIONS

A.      **Applicability**

The provisions of this Article VII shall govern distributions to the extent not otherwise provided for in the Plan or in any indenture, trust agreement or plan of allocation recognized under the Plan. To the extent the provisions of any such indenture, trust agreement or plan of allocation address specifically matters set forth in this Article VII, the provision of such indenture, trust agreement or plan of allocation shall govern.

B.      **Cash Distributions**

1.      *Administrative, Priority, Secured and General Unsecured Convenience Claims*. On the Effective Date, the Liquidating Trust shall fund the Professional Fee Escrow Account. On or as

soon as practicable after the Effective Date, the Liquidating Trust, in its capacity as Disbursing Agent, shall make Cash distributions to holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, Junior Secured Notes Claims, ~~and~~Allowed ETS Unsecured Claims and Allowed General Unsecured Convenience Claims.

2.    *Borrower Claims Trust*.    On the Effective Date, the Debtors shall transfer the Borrower-Related Causes of Action to the Borrower Claims Trust. On or as soon as practicable after the Effective Date, the Liquidating Trust, in its capacity as Disbursing Agent, shall fund the Borrower Claims Trust with $57.6 million in Cash, subject to the Borrower Trust True-Up.  Distributions to holders of Borrower Claims will be made in accordance with methodology, criteria and procedures established in the Borrower Claims Trust Agreement.

3.    *NJ Carpenters Claims Settlement*.  Assuming the NJ Carpenters Approval, the Liquidating Trust, in its capacity as Disbursing Agent, shall fund the NJ Carpenters Claims Distribution with Cash within ten (10) business days of the Effective Date. Distributions to holders of NJ Carpenters Claims will be made in accordance with the methodology, criteria and procedures established in the NJ Carpenters Plan of Allocation.

**C.    Initial Issuance of Units and Distributions in Respect of Units by the Liquidating Trust**

On the Initial Unit Distribution Date, the Liquidating Trust shall issue Units to the RMBS Claims Trust, the Private Securities Claims Trust, the Disputed Claims Reserve, and the holders of ~~GMACM~~Allowed Unsecured Claims~~, ResCap Unsecured~~ (other than RMBS Trust Claims~~,~~ and ~~RFC~~ETS Unsecured Claims~~)~~, in each case, ~~that are Allowed (except for the Disputed Claims Reserve)~~ as of the Initial Unit Distribution Record Date, in accordance with the terms of the Plan, including the RMBS Trust Allocation Protocol.

Units shall entitle the holder thereof to receive a Pro Rata Unit Share of the distributions of Distributable Cash paid by the Liquidating Trust, when and as such distributions are made. Prior to making any distributions on the Units, the Liquidating Trust will (i) fund the Professional Fee Escrow Account with the Professional Fee Reserve Amount, the Borrower Claims Trust with the Borrower Claims Trust Assets, and the NJ Carpenters Claims Distribution, and (ii) pay, or adequately reserve for the payment in full of, all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, and Allowed Junior Secured Notes Claims, and General Unsecured Convenience Claims, including funding the Administrative, Priority, Secured and Convenience Distribution Reserve. Distributions on account of Disputed Claims shall be made in accordance with Article VIII.D. of the Plan.

Units will be issued in global certificate form only and registered to DTC, with interests in the certificate being held through DTC participants, for so long as the Units are eligible to be held through DTC.  ~~Holders of Allowed Claims~~Liquidating Trust Unit Beneficiaries must follow specified procedures to designate a direct or indirect DTC participant to receive ~~its~~their Units. The Units shall be freely negotiable and transferrable, subject to restrictions under applicable securities laws.  The Units shall not be listed on any national security exchange or interdealer quotation system, and the Liquidating Trust shall not take any action to promote or facilitate a trading market in the Units.

On each Distribution Date, pursuant to the Liquidating Trust Agreement, the Liquidating Trust (i) shall distribute to each Unitholder, on account of its Units, an amount equal to its respective Pro Rata Unit Share of the Distributable Cash, and (ii) shall deposit into the Disputed Claims Reserve the Pro Rata Unit Share of the Distributable Cash allocable to the Units held in the Disputed Claims Reserve. The initial distribution of Distributable Cash to the Unitholders shall be made by the Liquidating Trust on an initial Distribution Date as soon as practicable after the Effective Date. Subsequent Distribution Dates shall be determined by the Liquidating Trust Board from time to time, but shall occur no less frequently than at intervals provided in the Liquidating Trust Agreement, provided that the Liquidating Trust shall not be required to make a distribution if the aggregate Distributable Cash at the time would make the distribution impracticable, as determined by the Liquidating Trust Board.

Holders of Units shall not be entitled to interest on Cash distributions made in respect of such Units, regardless of when such distributions are made.

## D.    Fractional Units

No fractional Units shall be issued or distributed under the Plan. The actual distribution of Units shall be rounded to the next higher or lower whole number as follows: (i) fractions less than one-half (½) shall be rounded to the next lower whole number and (ii) fractions equal to or greater than one-half (½) shall be rounded to the next higher whole number. The total amount of Units to be distributed hereunder shall be adjusted as necessary to account for such rounding. No consideration shall be provided in lieu of fractional Units that are rounded down.

## E.    Timing and Calculation of Amounts to be Distributed

### 1.    Distributions on Account of Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter, each holder of an Allowed Claim against the Debtors as of the Effective Date shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 2.    Distributions on Account of Claims Allowed After the Effective Date

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be ~~resolved~~made to the extent such Claims are Allowed in accordance with the provisions set forth in Article VIII with respect to dispute resolution. Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made as soon as practicable after the Disputed Claim becomes an Allowed Claim.

Except as otherwise provided in the Plan, holders of Claims shall not be entitled to interest on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

## F.    Disbursing Agent

### 1.    Generally

All distributions under the Plan shall be made by the Liquidating Trust, as Disbursing Agent, or by such other Person designated by the Liquidating Trust to act as a Disbursing Agent. Except as otherwise ordered by the Bankruptcy Court, a Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

### 2.    Rights and Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, securities, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated by the Plan; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

### 3.    Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by a Person designated by the Liquidating Trust as Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Liquidating Trust from the Liquidating Trust Administrative Reserve.

## G.    Delivery of Distributions and Undeliverable or Unclaimed Distributions

### 1.    Delivery of Distributions

If a Creditor holds more than one Allowed Claim in any one Class, all Allowed Claims of the Creditor in a single Class will be aggregated into one Allowed Claim and one distribution will be made with respect to the aggregated Allowed Claim.

Distributions under ~~the Plan to holders of Allowed Junior Secured Notes Claims shall be made to the Junior Secured Notes Indenture Trustee, in accordance with the practice and procedures of DTC to the extent applicable, for the benefit of the holders of Allowed Junior Secured Notes Claims, and shall be deemed completed when made to the Junior Secured Notes Indenture Trustee in accordance with such practice and procedures, as applicable.~~ this Plan to holders of Junior Secured Notes Claims shall be made to the Junior Secured Notes Indenture Trustee, which, subject to the right of the Junior Secured Notes Indenture Trustee to assert its Junior Secured Notes Indenture Trustee Charging Lien against such distributions, shall transmit

such distributions to the holders of such Junior Secured Notes Claims as provided in the Junior Secured Notes Indenture. Notwithstanding any provision contained in this Plan to the contrary, the distribution provisions contained in the Junior Secured Notes Indenture shall continue in effect to the extent necessary to authorize the Junior Secured Notes Indenture Trustee to receive and make distributions to the Junior Secured Noteholders on account of the Junior Secured Notes Claims and shall terminate completely upon completion of all such distributions. Notwithstanding anything to the contrary in this Plan, the Junior Secured Notes may continue to trade until the Junior Secured Notes Distribution Record Date. As of the close of business on the Junior Secured Notes Distribution Record Date, (i) the transfer books and records of the Junior Secured Notes as maintained by the Junior Secured Notes Indenture Trustee or its agent shall be closed, and (ii) any transfer of any Junior Secured Notes, Junior Secured Notes Claims or any interest therein shall be prohibited. The Debtors, the Liquidating Trust and the Junior Secured Notes Indenture Trustee shall have no obligation to recognize any transfer of any Junior Secured Notes, Junior Secured Notes Claims or any interest therein occurring after the close of business on the Junior Secured Notes Distribution Records Date, and shall instead be entitled to recognize and deal for all purposes under this Plan with only those holders of records as of the close of business on the Junior Secured Notes Distribution Record Date. The Junior Secured Notes Indenture Trustee may assert its rights under the Junior Secured Notes Indenture Trustee Charging Lien, including for the payment of any and all accrued Junior Secured Notes Indenture Trustee Fees and Junior Secured Notes Collateral Agent Fees and Expenses. The Junior Secured Notes Indenture Trustee may withhold distribution of any Cash it receives on account of the Junior Secured Notes Claim until such time as it determines that it has received sufficient payments to satisfy all accrued and reasonably expected Junior Secured Notes Indenture Trustee Fees and Junior Secured Notes Collateral Agent Fees and Expense, and such payments shall be made in accordance with the requirements of the Junior Secured Notes Indenture and the Junior Secured Notes Security Agreement, as applicable.

Distributions under the Plan to Senior Unsecured Noteholders shall be made to the Senior Unsecured Notes Indenture Trustee for the benefit of the Senior Unsecured Noteholders and shall be deemed completed when made to the Senior Unsecured Notes Indenture Trustee. On the Effective Date, and subject to the provisions in paragraph IV.JK, the Senior Unsecured Notes, the Senior Unsecured Notes Indenture and all other related documents will be deemed cancelled except as set forth herein. Notwithstanding the foregoing, the Senior Unsecured Notes may continue to trade until the Senior Unsecured Notes Indenture Trustee makes distributions of Units it has received to the Senior Unsecured Noteholders. The Senior Unsecured Notes Indenture Trustee may (a) assert its rights under the Senior Unsecured Notes Indenture Trustee Charging Lien, including for the payment of any and all accrued Senior Unsecured Note Indenture Trustee Fees and Expenses and (b) establish the Senior Unsecured Notes Indenture Trustee Reserve on any distribution of Units or Cash. The Senior Unsecured Notes Indenture Trustee may withhold distribution of the Units and any Cash it receives on account of such Units, until such time as it determines that it has received sufficient payment to satisfy the accrued Senior Unsecured Note Indenture Trustee Fees and Expenses and to fund the Senior Unsecured Notes Indenture Trustee Reserve. At such time, the Senior Unsecured Notes Indenture Trustee shall distribute such Units and any remaining Cash it has received on account of such Units to the Registered Holders of the Senior Unsecured Notes, which distributions shall satisfy the Senior Unsecured Notes Indenture Trustee's obligations hereunder. The Senior Notes Indenture Trustee shall be reimbursed by the Liquidating Trustee as a Disbursing Agent in accordance with thisthe

Plan. Notwithstanding the foregoing, in the event that the Units are not registered with DTC, the Senior Unsecured Notes Indenture Trustee shall not bear any responsibility for the distribution of the Units to the Senior Unsecured Noteholders and such distributions will be effected by the Disbursing Agent. Upon release by the Senior Unsecured Notes Indenture Trustee of any funds remaining in the Senior Unsecured Notes Indenture Trustee Reserve, such funds shall be delivered to the Senior Unsecured Noteholders.

Subject to the NJ Carpenters Approval, the distributions under the Plan to holders of NJ Carpenters Claims shall be made and deemed completed when made to the lead plaintiff in the NJ Carpenters Class Action or as the District Court may otherwise order. The RMBS Claims Trust Trustee shall be empowered to make distributions to holders of Recognized RMBS Claims, and any distributions to holders of Recognized RMBS Claims, and any distributions to the RMBS Claims Trust for the benefit of holders of Recognized RMBS Claims by the Liquidating Trust, shall be deemed completed upon the funding of the RMBS Claims Trust. The Borrower Claims Trustee shall be empowered to make distributions to holders of Allowed Borrower Claims, and any distributions to or for the benefit of holders of Allowed Borrower Claims by the Debtors or Liquidating Trust shall be deemed completed upon the funding of the Borrower Claims Trust. The Private Securities Claims Trustee shall be empowered to make distributions to holders of Allowed Private Securities Claims, and distributions to holders of Allowed Private Securities Claims shall be deemed completed upon the issuance of the Private Securities Claims Trust Unit Distribution to the Private Securities Claims Trust.

## 2.    Distributions to Holders of Disputed Claims

Except as otherwise provided in the Plan or agreed to by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claims have been Allowed or expunged. Any distributions arising from property distributed to holders of Allowed Claims in a Class and made to such holders under the Plan shall be made also, in the applicable amounts, to any holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such distributions were earlier made to holders of Allowed Claims in such Class.

## 3.    Surrender of Junior Secured Notes and Senior Unsecured Notes

a. Junior Secured Notes. On the Effective Date, or as soon as reasonably practicable thereafter, the Junior Secured Notes Indenture Trustee, with the cooperation of the Debtors or the Liquidating Trust, as applicable, shall direct DTC and any other applicable securities depository to surrender the Junior Secured Notes to the Junior Secured Notes Indenture Trustee. No distributions under the Plan shall be made for or on behalf of a Registered Holder of the Junior Secured Notes unless and until (i) such debt securities have been receivedAll distributions by the Junior Secured Notes Indenture Trustee to Registered Holders of Junior Secured Notes Claims shall only be made to such holder after (i) the surrender by each such holder of the debt securities representing such Junior Secured Notes Claim or appropriate instructions from the applicable securities depository have been received by the Junior Secured Notes Indenture Trustee; or (ii)

the loss, theft, mutilation, or destruction of such debt securities has been established to the reasonable satisfaction of ~~such~~the Junior Secured Notes Indenture Trustee, which satisfaction may require such Registered Holder to submit a lost instrument affidavit and an indemnity bond holding the Debtors, the Liquidating Trust, and the ~~applicable~~Junior Secured Notes Indenture Trustee harmless in respect of such debt securities and distributions made in respect thereof. Each Registered Holder shall be deemed to have surrendered such debt securities as of the date it has complied with the foregoing conditions. ~~On~~Upon surrender of such debt securities, the Junior Secured Notes Indenture Trustee shall cancel and destroy such debt securities. As soon as practicable after the surrender date, ~~holders of Allowed Junior Secured Notes Claims shall be entitled to receive distributions pursuant to the Plan.~~the Junior Secured Notes Indenture Trustee shall distribute to the holder thereof such holder's pro rata share of the distribution, but subject to the rights of the Junior Secured Notes Indenture Trustee to assert its Junior Secured Notes Indenture Trustee Charging Lien against such distribution. Any Registered Holder that fails to surrender such debt securities or, if applicable, satisfactorily explain the loss, theft, or destruction of such debt securities to the Junior Secured Notes Indenture Trustee within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors, the Liquidating Trust, or the Junior Secured Notes Indenture Trustee in respect of such Claim and shall not be entitled to receive any distribution under the Plan. All property in respect of such forfeited distributions, including interest thereon, shall, subject to the Junior Secured Notes Indenture Trustee Charging Lien, be promptly returned to the Liquidating Trust by ~~such~~the Junior Secured Notes Indenture Trustee and any such debt securities shall be cancelled.

    b. <u>Senior Unsecured Notes</u>. On the Effective Date, or as soon as reasonably practicable thereafter, the Senior Unsecured Notes Indenture Trustee, with the cooperation of the Debtors or the Liquidating Trust, as applicable, shall advise DTC and any other applicable securities depository of the occurrence of such Effective Date and the cancellation of the Debtors obligations with respect to the Senior Unsecured Notes, but not to terminate the CUSIP or ISIN numbers of the Senior Unsecured Notes. At such time as the Senior Unsecured Notes Indenture Trustee is prepared to release the Units it received on account of the Senior Unsecured Notes Claims, it may request that such depositories surrender the Senior Unsecured Notes, if deemed appropriate, or with the cooperation of the Debtors or the Liquidating Trust, issue such other instructions to DTC and any other securities depository, as appropriate to effectuate the distributions contemplated under the Plan; provided, however, that nothing herein shall contravene the effectiveness of the Senior Unsecured Notes as set out in Article IV.~~J~~K. No distributions under the Plan shall be made for or on behalf of a Registered Holder unless and until (i) such debt securities have been received by the applicable Indenture Trustee or other appropriate instructions have been issued or received by the applicable Indenture Trustee; or (ii) the loss, theft, or destruction of such debt securities has been established to the reasonable satisfaction of the Senior Unsecured Notes Indenture Trustee, which satisfaction may require such Registered Holder to submit a lost instrument affidavit and an indemnity bond holding the Debtors, the Liquidating Trust, and the Senior Unsecured Notes Indenture Trustee harmless in respect of such debt securities and any distributions to be made in respect thereof. Each Registered Holder shall be deemed to have surrendered such debt securities as of the date it has complied with the foregoing conditions. On such surrender or deemed surrender date, the Senior Unsecured Noteholders shall be entitled to receive distributions pursuant to the Plan. If required by the Senior Unsecured Notes Indenture Trustee, any Registered Holder that fails to surrender such debt securities or, if applicable, satisfactorily explain the loss, theft, or destruction of such

debt securities to the Senior Unsecured Notes Indenture Trustee within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors, the Liquidating Trust, or the Senior Unsecured Notes Indenture Trustee in respect of such Claim and shall not be entitled to receive any distribution under the Plan. All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Liquidating Trust by ~~the respective~~such Indenture Trustee and any such debt securities shall be cancelled.

4.      **Minimum Distributions; Foreign Exchange Rate; and Other Distribution Limitations**

Other than with respect to Allowed General Unsecured Convenience Claims and Allowed ETS Unsecured Claims, no Cash payment of less than $50 shall be made to a holder of an Allowed Claim on account of such Allowed Claim. If a holder of an Allowed Claim would be entitled to receive less than $50 as of the time of a particular distribution, but would be entitled to receive more than $50 in combination with later distributions, the Disbursing Agent will combine such distributions with later distributions to such holder of an Allowed Claim so that such holder may eventually be entitled to a distribution of at least $50 in value.

Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

Except as otherwise provided in the Plan or a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than United States dollars shall be automatically deemed converted to the equivalent United States dollar value using the exchange rate as of the Petition Date as quoted at 4:00 p.m. (EDT), mid-range spot rate of exchange for the applicable currency as published in The Wall Street Journal, National Edition, on the Petition Date.

5.      **Undeliverable Distributions and Unclaimed Property**

In the event that any distribution to a holder of an Allowed Claim is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made to such holder without interest; provided, however, that such distributions shall be deemed unclaimed property under Bankruptcy Code section 347(b) at the expiration of six (6) months from the applicable date of distribution. After such date, all unclaimed property or interests in property shall revert to the Liquidating Trust (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder to such property or interest in property shall be released, settled, compromised, and forever barred.

**H.      Compliance with Tax Requirements**

In connection with the Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed upon it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any Governmental Unit, including income,

withholding and other tax obligations, on account of such distribution. The Disbursing Agent has the right, but not the obligation, not to make a distribution until such holder has made arrangements satisfactory to the Disbursing Agent for payment of any such withholding tax obligations and, if the Disbursing Agent fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse the Disbursing Agent. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes are reasonable and appropriate. The Disbursing Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within six months, such distribution shall be deemed an unclaimed distribution. Finally, the Disbursing Agent reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

## I.    Allocations

Distributions in respect of Allowed Claims shall be allocated first to the principal amount (as determined for federal income tax purposes) of such Claims, and then, to the extent the consideration exceeds the principal amount of such Claims, to any portion of such Claims for accrued but unpaid interest, provided, however, that distributions on the RMBS Trust Claims shall be allocated pursuant to the RMBS Trust Allocation Protocol described in Article IV herein.

## J.    Setoffs and Recoupment

The Liquidating Trust may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that it may have against the claimant, including any Causes of Action transferred to the Liquidating Trust by the Debtors, but neither the failure to do so nor the Allowance of any Claim shall constitute a waiver or release by the Debtors or the Liquidating Trust of any such Claim it may have against the holder of such Claim.

Before the Liquidating Trust can set-off or recoup against the distribution to be made on account of an Allowed Claim, the holder of the Claim shall be served with written notice of the proposed setoff or recoupment at least thirty (30) days prior to the Liquidating Trust exercising any asserted setoff or recoupment right, and, if such claimant serves a written objection to such asserted setoff or recoupment on or before thirty (30) days of receipt of such written notice, (i) the objection shall be deemed to initiate a contested matter governed by, inter alia, Bankruptcy Rule 9014 and Local Bankruptcy Rules 9014-1 and 9014-2, (ii) nothing herein shall affect the respective burden of each party in connection with such contested matter, and (iii) the Liquidating Trust shall not proceed with the asserted setoff or recoupment absent the withdrawal of such objection or the entry of a Final Order overruling such objection.

K.    **Claims Paid or Payable by Third Parties**

1.    **Claims Paid by Third Parties**

Except as otherwise provided herein, including with respect to the Ally Contract Claims, the Debtors, on or prior to the Effective Date, or the Liquidating Trust, after the Effective Date, shall reduce a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice, action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment on account of such Claim from a party that is not a Debtor, the Liquidating Trust, or other party making distributions on account of the Claim pursuant to the Plan.

2.    **Claims Payable by Insurers**

Except as otherwise provided herein, including with respect to the rights of (i) the Kessler Settlement Class and (ii) other creditors who have entered into a settlement agreement with the Debtors prior to the Effective Date, in and to the GM Insurance Rights as provided herein and in the Kessler Settlement Agreement, and the Ally Contract Claims (a) no distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies, excluding the GM Policies, until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy and (b) to the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' payment, such Claim may be expunged without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, provided, that if a Debtor or the Liquidating Trust believes a holder of an Allowed Claim has recourse to an insurance policy and intends to withhold a distribution pursuant to this Article VII.K, the Debtor, prior to the Effective Date, or Liquidating Trust, following the Effective Date, shall provide written notice to such holder as to what the Debtor or Liquidating Trust believes to be the nature and scope of applicable insurance coverage. Except as otherwise provided in the Plan, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or the Liquidating Trust or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any Insurance Defenses.

L.    **Allowed Unsecured Claims for Which More than One Debtor in a Debtor Group Is Jointly and/or Severally Liable**

Where a Creditor holds Allowed Unsecured Claims for which more than one Debtor in a Debtor Group is jointly and/or severally liable, such creditor shall only receive one recovery from the Debtor Group on account of such Claim.  This provision shall not affect distributions on account of such Creditor's Allowed Claims, if any, against the Debtors in another Debtor Group.

M.    **Distributions Free and Clear**

Except as otherwise provided herein, any distributions under this Plan shall be free and clear of any Liens, Claims, and encumbrances, and no other Entity, including the Debtors, the Liquidating Trust, or the Disbursing Agent shall have any interest (legal, beneficial or otherwise)

95

in property of the Estate distributed pursuant to this Plan, except that (i) distributions on account of Senior Unsecured Note Claims shall remain subject to the Senior Unsecured Notes Indenture Trustee Charging Lien, and (ii) distributions on account of Junior Secured Notes Claims shall remain subject to the Junior Secured Notes Indenture Trustee Charging Lien.

# ARTICLE VIII.

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

**A.    Resolution of Disputed Claims**

**1.    Applicability**

The provisions of this Article VIII shall govern the resolution of Disputed Claims to the extent not otherwise provided for in this Plan or in any other trust agreement (such as the RMBS Claims Trust Agreement, the Private Securities Claims Trust Agreement or the Borrower Claims Trust Agreement) or plan of allocation (such as the RMBS Trust Allocation Protocol) approved under this Plan.  To the extent the provisions of any such trust agreement or plan of allocation address specifically matters set forth in this Article VIII, the provision of such trust agreement or plan of allocation shall govern.

**2.    Allowance of Claims**

On or after the Effective Date, the Liquidating Trust shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim (i) deemed Allowed as of the Effective Date or (ii) waived, relinquished, exculpated, released, compromised, settled, or Allowed in the Plan or in a Final Order. Except as otherwise provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed (a) under the Plan or the Bankruptcy Code or (b) by Final Order of the Bankruptcy Court, including the Confirmation Order.

**3.    Prosecution of Objections to Claims**

On the Effective Date, the Liquidating Trust will have the exclusive authority to: (a) File, withdraw, or litigate to judgment, objections to Claims or Equity Interests (other than Borrower Claims, Private Securities Claims, and the NJ Carpenters Claims); (b) settle or compromise (or decline to do any of the foregoing) any Disputed Claim (other than Borrower Claims, Private Securities Claims, and NJ Carpenters Claims) or Cause of Action (other than the Borrower-Related Causes of Action) without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

**4.    Claims Estimation**

The Plan Proponents, prior to the Effective Date, or the Liquidating Trust or Borrower Claims Trust (to the extent provided for in the Borrower Claims Trust Agreement), as applicable,

following the Effective Date, may request that the Bankruptcy Court estimate any disputed, contingent, or unliquidated Claim to the extent permitted by Bankruptcy Code section 502(c) regardless of whether the Plan Proponents (prior to the Effective Date) or the Liquidating Trust or Borrower Claims Trust (following the Effective Date) has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  Among other things, the Plan Proponents may request that the Bankruptcy Court estimate the Recognized RMBS Claims in the amounts set out in the RMBS Trust Claims Schedules for the purpose of implementing the RMBS Trust Allocation Protocol.  The Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. Except as set forth below with respect to reconsideration under section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under this Plan, including for purposes of distributions. If the estimated amount constitutes a maximum limitation on such Claim, the Liquidating Trust or Borrower Claims Trust (to the extent provided for in the Borrower Claims Trust Agreement) may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before twenty one (21) days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

## 5.    Expungement or Adjustment of Claims Without Objection

Any Claim that has been paid, satisfied, or superseded may be expunged on the Claims Register by the Debtors' notice and claims agent, and any Claim that has been amended may be adjusted thereon by the Debtors' notice and claims agent, in both cases without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

## 6.    Deadline to File Claims Objections

Any objections to Claims shall be Filed by no later than the applicable Claims Objection Deadline.

## B.    Disallowance of Claims

Any Claims held by an Entity from which property is recoverable under Bankruptcy Code sections 542, 543, or 550, or that is a transferee of a transfer avoidable under Bankruptcy Code section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a), shall be deemed disallowed pursuant to Bankruptcy Code section 502(d), and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been

settled or a Final Order with respect thereto has been entered and all sums due, if any, by that Entity have been turned over or paid by such Entity to the Debtors or the Liquidating Trust.

EXCEPT AS OTHERWISE AGREED BY THE DEBTORS, THE LIQUIDATING TRUST, OR THE BORROWER CLAIMS TRUST, AS APPLICABLE, OR ORDERED BY THE BANKRUPTCY COURT, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.

C.    **Amendments to Claims**

On or after the Effective Date, a Claim may not be Filed or amended without prior authorization of the Bankruptcy Court, the Liquidating Trustee, or the Borrower Claims Trustee, as applicable, and any such new or amended Claim Filed without such prior authorization shall be deemed disallowed in full and expunged without any further action.

D.    **Disputed Claims Reserve**

The provisions of this Article VIII.D shall apply to Disputed Claims held by Liquidating Trust Unit Beneficiaries.

To effect distributions to holders of Allowed Unsecured Claims in a timely manner, prior to the Effective Date, the Plan Proponents shall file a motion for an order establishing the Disputed Claims Reserve with respect to unliquidated and/or Disputed Claims. The Disputed Claims Reserve shall be issued a number of Units equal to the amount sufficient to provide the distributions to which holders of Disputed Claims would be entitled under the Plan as of such date as if the Disputed Claims were Allowed Claims either in the amounts of the Claims as filed or in such amounts as estimated by the Bankruptcy Court.in accordance with Article VIII.A.4. The Disputed Claims Reserve shall also hold the Cash distributed with respect to such Units.

Disputed Claims that become Allowed, in whole or in part, shall be satisfied exclusively out of the Disputed Claims Reserve. The holder of a Disputed Claim that becomes Allowed, in whole or in part, shall receive a number of Units and amount of Cash equal to the number of Units and amount of Cash such holder would have received in accordance with the provisions of the Plan had such Claim been Allowed as of the Initial Unit Distribution Record Date. In the event the Units, and the Cash distributed with respect thereto, remaining in the Disputed Claims Reserve shall be insufficient to satisfy all the Disputed Claims that have become Allowed and are due to be satisfied with distributions from the Disputed Claims Reserve on any Unit Distribution Date, such Disputed Claims shall be satisfied Pro Rata from the Disputed Claims Reserve. After all Units, and the Cash distributed with respect thereto, have been distributed from the Disputed Claims Reserve, no further distributions shall be made in respect of Disputed Claims.

If a Disputed Claim is disallowed, in whole or in part, then on the Unit Distribution Date next following the date of determination of such disallowance, unless the Liquidating Trust

Board determines otherwise, there shall be released from the Disputed Claims Reserve, (i) a number of Units equal to the Units that would have been released from the Disputed Claims Reserve to the holder thereof had such Claim been Allowed in the as-filed or estimated amount, as applicable, of such Claim, or disallowed portion thereof if such Claim is disallowed in part, which Units shall be cancelled and retired and (ii) Cash, in the amount of such distribution made to the Disputed Claims Reserve in respect of such Units since the Effective Date, which shall then be unreserved and unrestricted, and which shall be added to the Liquidating Trust Administrative Reserve or available for distribution to the Unitholders, as determined by the Liquidating Trust Board.

If the Liquidating Trust Board at any time determines that it is not necessary to hold in the Disputed Claims Reserve all of the Units and Cash contained therein in order to satisfy all Disputed Claims of Liquidating Trust Unit Beneficiaries, the Liquidating Trust Board may, but shall not be required to, cancel such number of Units in the Disputed Claims Reserve as it determines is not required for the satisfaction of Disputed Claims and release from the Disputed Claims Reserve for distribution to Unitholders, or for deposit to the Liquidating Trust's Administrative Reserve, some or all of the Cash previously deposited to the Disputed Claims Reserve in respect of such Units.  At such time as all Disputed Claims of the Liquidating Trust Unit Beneficiaries have been resolved, any remaining Units in the Disputed Claims Reserve shall be cancelled and any remaining Cash in the Disputed Claims Reserve shall be released from the Disputed Claims Reserve for application as aforesaid.

## ARTICLE IX.

## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

### A.    Compromise and Settlement of Claims, Equity Interests, and Controversies

In accordance with section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Equity Interest, or any distribution to be made on account of such Allowed Claim or Equity Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and holders of Claims and Equity Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Liquidating Trust may compromise and settle Claims against the Debtors and Causes of Action against other Entities.

B.    **Release of Liens**

**Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of any Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall vest in the Liquidating Trust.**

C.    **Releases by the Debtors**

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including with respect to the Ally Released Parties, the Ally Contribution provided to the Estates under the Plan and otherwise, on and as of the Effective Date of the Plan, the Debtor Released Parties are deemed released and discharged by the Debtors, the Estates and the Liquidating Trust from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, including those Causes of Action based on avoidance liability under federal or state laws, veil piercing or alter-ego theories of liability, a theory of debt recharacterization, or equitable subordination liability, arising from or related in any way to the Debtors, including those that any of the Debtors would have been legally entitled to assert against a Debtor Released Party in its own right (whether individually or collectively) or that any holder of a Claim or Equity Interest, the Liquidating Trust, or other Entity would have been legally entitled to assert on behalf of any of those Debtors or any of their Estates, including those in any way related to the Chapter 11 Cases or the Plan to the fullest extent of the law.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Debtor Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtors' release; (3) in the best interests of the Debtors, the Estates, the Liquidating Trust and all holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to the Debtors, the Liquidating Trust and any holder of a Claim or Equity Interest or other Entity who would have been legally entitled to assert such Claim or Equity Interest on behalf of any of the Debtors or any of their Estates from asserting any Claim or Cause of Action released pursuant to the Debtors' release.**

**D.    Third Party Release**

On and as of the Effective Date of the Plan, the holders of Claims and Equity Interests, shall be deemed to provide a full and complete discharge and release to the Ally Released Parties and their respective property from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to the Debtors, including those in any way related to RMBS issued and/or sold by the Debtors or their affiliates and/or the Chapter 11 Cases or the Plan, and any obligations under the DOJ/AG Settlement, the Consent Order, and the Order of Assessment.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, of the Third Party Release, and further, shall constitute the Bankruptcy Court's finding that this Third Party Release is:  (1) in exchange for the good, valuable and substantial consideration provided by the Ally Released Parties; (2) in the best interests of the Debtors, the Estates, the Liquidating Trust and all holders of Claims and Equity Interests; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for a hearing; (5) justified by truly unusual circumstances; (6) an essential component and critical to the success of the Plan; (7) resulted in distributions to the Creditors that would otherwise have been unavailable; (8) the result of an identity of interest between the Debtors and the Ally Released Parties regarding the Plan; and (9) a bar to any party asserting a claim or cause of action released pursuant to this Third Party Release against any of the Ally Released Parties.

**E.    Third Party Release Carve-Out**

Notwithstanding anything to the contrary herein, the Third Party Release shall not apply to any claims held by: (i) the FDIC, in its capacity as a receiver, against Ally ~~and~~, (ii) the FHFA against Ally; and (iii) Fannie Mae against Ally Bank, including, without limitation, any claims of Fannie Mae against Ally Bank for continuing liabilities, obligations, and duties owed by Ally Bank to Fannie Mae under the Fannie Mae Contract, including the obligations and duties to honor all selling and servicing representations and warranties related to the portfolio of loans sold and/or serviced, or that were previously serviced, by Ally Bank.

For the avoidance of doubt, Released Claims in connection with this Article IX.E shall constitute any Claims, Equity Interests, Causes of Action or liabilities against the Debtors held by Ally or Fannie Mae.

Nothing in the Plan releases AFI or any other party from the obligations under the Employees Retirement Plan for GMAC Mortgage Group, LLC (the "Pension Plan") and ERISA. Notwithstanding the foregoing, upon the Effective Date, the Debtors and the Plan Trusts shall be released from all obligations under the Pension Plan and ERISA related thereto, except for any

Claims for fiduciary breaches or prohibited transactions (as defined in ERISA) relating to the Pension Plan under applicable law.

**F.** ~~E.~~ **Ally Release**

Except with respect to the Ally Contract Claims, on and as of the Effective Date of the Plan, the Ally Released Parties shall release the Creditors' Committee, the Debtors, and the Consenting Claimants and their respective successors and assigns, members, partners, advisors, and Representatives, in their capacities as such, from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise arising from or related to the Debtors' liquidation, including the negotiation, formulation, or preparation of the Plan Support Agreement, the Plan, the Disclosure Statement, and any other Plan Documents and related disclosures, as well as any counterclaims in commenced or tolled litigation with the Debtors or the Consenting Claimants.

**G.** ~~F.~~ **Exculpation**

The Exculpated Parties shall neither have, nor incur, any liability to any entity for any pre-petition or post-petition act or omission taken in connection with, or related to, formulating, negotiating, preparing, disseminating, soliciting, implementing, administering, confirming, or effecting the consummation of any prepetition plan support agreements, the Plan Support Agreement, the Plan, the Disclosure Statement, the FGIC Settlement Agreement, the Kessler Settlement Agreement, the RMBS Settlement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan provided, that the foregoing provisions of this exculpation shall have no effect on the liability of any entity that results from any such act that is determined in a final, non-appealable order to have constituted gross negligence or willful misconduct; provided, further, that the Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors concerning his, her, or its duties pursuant to, or in connection with, any prepetition plan support agreement, the Plan Support Agreement, the Plan, the Disclosure Statement, the FGIC Settlement Agreement, and the RMBS Settlement.

**H.** ~~G.~~ **Injunction**

Except as otherwise provided in the Confirmation Order or herein and in accordance with Article IX.E hereof, all Entities, including Investors, who have held, hold or may hold Claims, Equity Interests, Causes of Action or liabilities that constitute Released Claims, are permanently enjoined and precluded, from and after the effective date of the Plan, from: (a) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party whether directly, derivatively or otherwise, on account of or in connection with or with respect to any Released Claims; (b) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Released Party on account of or in connection with or with respect to any Released Claims; (c) creating, perfecting or enforcing any lien (other than any charging lien of a trustee under its respective indenture), claim or encumbrance

of any kind against any Released Party on account of or in connection with or with respect to any Released Claims; (d) asserting any right to setoff, subrogation or recoupment of any kind against any obligation due from any Released Party on account of or in connection with or with respect to any Released Claims unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in a Proof of Claim or Equity Interest or otherwise that such holder asserts, has or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; (e) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party on account of or in connection with or with respect to any Released Claims; and (f) seeking relief or collecting judgments on a ~~a~~an Investor-related securities ~~related~~ claim in a manner that fails to conform with the terms of the ~~proportionate~~ judgment reduction provision set forth in the Plan and the Confirmation Order; provided, that nothing contained herein shall be construed to prevent any entity from objecting to claims or defending against claims objections or collection actions whether by asserting a right of setoff or otherwise to the extent permitted by law. Such injunction shall extend to the successors of the Liquidating Trust, if any, and to their respective properties and interests in property.  Any person injured by any willful violation of this injunction shall be entitled to recover actual damages, including costs and attorneys' fees and, in appropriate circumstances, may recover punitive damages from the willful violator.

I.    ~~H.~~ Waiver of Subrogation

The GMACM Debtors and the RFC Debtors hereby release the ResCap Debtors from any and all liability or responsibility to the GMACM Debtors and the RFC Debtors or any entity claiming through or under the GMACM Debtors and the RFC Debtors by way of subrogation or otherwise, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, including those subrogated Causes of Action based on avoidance liability under federal or state laws, veil piercing or alter-ego theories of liability, a theory of debt recharacterization, or equitable subordination liability, arising from or related in any way to the Debtors, including those that any of the Debtors would have been legally entitled to assert against a Released Party in its own right (whether individually or collectively) or that any holder of a Claim or Equity Interest, the Liquidating Trust, or other entity would have been legally entitled to assert on behalf of any of those Debtors or any of their Estates, including those in any way related to the Chapter 11 Cases or the Plan to the fullest extent of the law.

J.    ~~I.~~ Satisfaction and Release of Claims and Equity Interests

The rights afforded herein and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction and release of all Claims of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, the Liquidating Trust, or any of their respective assets or properties arising prior to the Effective Date.  Except as otherwise expressly specified in the Plan, after the Effective Date, any holder of such Claim or Equity Interest shall be precluded from asserting against the Debtors, the Liquidating Trust, or any of their respective assets or properties, any

other or further Claim based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the entry of the Confirmation Order.

## K. ~~J.~~ Judgment Reduction for Co-Defendants in Securities Litigation

A defendant against ~~which~~whom a judgment of a court of competent jurisdiction is obtained ~~on a~~(whether in a proceeding now pending or hereafter commenced) on an Investor-related securities ~~related~~ claim where such defendant has a claim for indemnity or contribution that is subject to the Third Party Releases shall be entitled to a judgment credit~~, for each such claim, state or federal, for which contribution or indemnity from an Ally Released Party would be available if not for the Third Party Releases, in an amount that is the greater of (a) the amount of the applicable Ally Released Party's indemnification or contribution obligations under the relevant contract(s)~~ in the underlying litigation in accordance with, and to the extent permitted under, applicable statutory or common law, as determined by a court of competent jurisdiction ~~or (b) the proportionate share of the applicable Ally Released Party's fault as to such claim; provided that~~. Notwithstanding the foregoing and without limitation (i) no Ally Released Party shall be deemed to have admitted to such fault by virtue of this provision; (ii) nothing herein shall create ~~a~~any right for a defendant that it does not have under applicable statutory or common law, if any, to obtain discovery from any Ally Released Party, or create an obligation for any Ally Released Party to participate in any proceeding to determine fault that does not exist under applicable statutory or common law, if any, in connection with such claim; and (iii) no finding in any proceeding to determine fault shall create any claim against any Ally Released Party or obligation of any Ally Released Party to satisfy any claim. For the avoidance of doubt, all parties' rights under applicable law with respect to discovery and any Ally Released Party's participation in any proceeding to determine fault are preserved.

## L. ~~K.~~ Limitations

For the avoidance of doubt, the releases set forth in this Article IX shall not extend to: (i) any rights, defenses, or counterclaims under any directors & officers or errors & omissions insurance policies sold by any of the Consenting Claimants or their affiliates and covering either the Debtors or any of the Ally Released Parties; (ii) any indemnity rights against non-Ally Released Parties arising out of the Kessler Class Action or to any other indemnity right against non-Ally Released Parties arising out of any other claims of Borrowers; specifically, these releases do not extend to any indemnity rights RFC may have against any non-Ally Released Party that is a successor in interest to CBNV and GNBT, including, but not limited to, those indemnity rights extending out of the client contracts between RFC, on the one hand, and either CBNV or GNBT, on the other hand, which incorporate by reference the indemnity provisions of RFC's AlterNet Seller Guide, and (iii) any indemnity rights held by the Debtors' Representatives against Ally ~~and~~ arising from Claims not released by this Article IX.

## ARTICLE X.

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

**A.      Conditions Precedent to Confirmation**

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived in accordance with the terms of the Plan:

(a)      Court approval of the Disclosure Statement in a form and substance reasonably acceptable to the Plan Proponents, Ally, and each of the Consenting Claimants, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code;

(b)      The Plan shall be reasonably acceptable to the Plan Proponents, Ally and each of the Consenting Claimants, in accordance with the terms of the Plan Support Agreement;

(c)      The Confirmation Order shall be reasonably acceptable to the Plan Proponents, Ally, and each of the Consenting Claimants;

(d)      The Plan Supplement and any related documentation shall be reasonably satisfactory to the Plan Proponents, Ally, and each of the Consenting Claimants;

(e)      Court approval of the RMBS Settlement as part of the Plan pursuant to Bankruptcy Rule 9019;

(f)      No Plan modifications that have altered distributions to be made under the Plan shall have occurred without the consent of the Plan Proponents, Ally, and each of the Consenting Claimants; and

(g)      Court approval of the Third Party Releases, Debtor Releases and Exculpation provisions in the Plan, without any modification thereto.

**B.      Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article X.C:

(a)      the Bankruptcy Court shall have entered the Confirmation Order, which shall grant final approval of the Plan, including all settlements therein, the Debtor Releases, the Third Party Releases, the injunctions, and exculpation of the Exculpated Parties;

(b)      the Confirmation Order shall not have been stayed, modified, or vacated on appeal;

(c)      on or before ~~August 19~~September 16, 2013, the FGIC Rehabilitation Court shall have entered an order substantially in the form attached to the FGIC Settlement Agreement as Exhibit E (or

such other form as agreed to by FGIC, the Debtors, and the RMBS Trustees) approving the Plan Support Agreement (as it related to FGIC) and the FGIC Settlement Agreement, including the settlement and release of all present and future claims against FGIC under or relating to the FGIC Policies;

(d)    the Bankruptcy Court shall have entered an order substantially in the form attached to the FGIC Settlement Agreement as Exhibit D (or such other form as agreed to by FGIC, the Debtors, and the RMBS Trustees and counsel for the Institutional Investors) approving the FGIC Settlement Agreement, including the settlement and release of all present and future claims against FGIC under or relating to the FGIC Policies and the allowance of FGIC's General Unsecured Claims against the Debtors, pursuant to a Bankruptcy Rule 9019 motion, which order shall include a finding that the transactions contemplated by the FGIC Settlement Agreement are in the best interests of the RMBS Trusts;

(e)    Ally will have funded at least $1,950,000,000 of the Ally Contribution;

(f)    the Liquidating Trust Agreement, the RMBS Claims Trust Agreement, the Private Securities Claims Trust Agreement and the Borrower Claims Trust Agreement shall have been executed;

(g)    ~~any and all~~the Ally Contract Claims and any other claims held by Ally Allowed under the Plan, will have been Allowed ~~indefeasibly~~, deemed indefeasible, and approved by the Bankruptcy Court without subordination of any kind, and satisfied as set forth herein;

(h)    subject to Article VI.C, the Available Assets shall have been transferred to the Liquidating Trust;

(i)    the Professional Fee Escrow Account shall have been funded;

(j)    all material governmental and third party approvals and consents, including Bankruptcy Court approval, and approvals Ally may be required to obtain, necessary in connection with the transactions contemplated by this Plan, shall have been obtained and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions; and

(k)    all other actions, documents, and agreements necessary to implement the Plan as of the Effective Date will have been delivered and all conditions precedent thereto will have been satisfied or waived.

## C.    Waiver of Conditions

The Plan Proponents shall have the right to waive one or more of the conditions to Confirmation and Consummation of the Plan set forth in Articles X.A and X.B(b), and (e) through (k), with the consent of Ally and the Consenting Claimants, and, solely with respect to such waivers of the conditions set forth in Article X.B(c) and (d) with the consent of FGIC and the RMBS Trustees, at any time without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

### D.    Effect of Nonoccurrence of Conditions

Each of the conditions to the Effective Date must be satisfied or duly waived, and the Effective Date must occur on or before the earlier of thirty (30) days after the Confirmation Date or December 15, 2013.  If the Effective Date has not occurred on or before the earlier of thirty (30) days after the Confirmation Date or December 15, 2013, then upon motion by the Plan Proponents or Ally made before the Effective Date and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the Filing of such motion to vacate, the Confirmation Order may not be vacated if the Effective Date occurs before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, including the discharge of Claims and termination of Interests pursuant to the Plan and section 1141 of the Bankruptcy Code and the assumptions, assignments or rejections of Executory Contracts, and nothing contained in the Plan or Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Equity Interests or Causes of Action; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### A.    Modification and Amendments

Subject to the terms of the Plan Support Agreement, the Plan Proponents may amend, modify, or supplement the Plan pursuant to Bankruptcy Code section 1127(a) at any time prior to the Confirmation Date; provided, that the Plan Proponents obtain the consent, which shall not be unreasonably withheld, of the Settling Parties in accordance with the terms of the Plan Support Agreement.  After the Confirmation Date, but prior to Consummation of the Plan, the Plan Proponents may with the consent of the other Settling Parties, which shall not be unreasonably withheld, in accordance with the terms of the Plan Support Agreement, amend, modify, or supplement the Plan without further order of the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order.  At all times, the Plan Proponents may amend, modify, or supplement the Plan without the consent of any other Entity to the extent that such amendments, modifications, or supplements are non-material.  At any time, at the request of the RMBS Trustees, Art. IV.C.3 of the Plan may be amended as will be required to preserve the REMIC tax status of the RMBS Trusts notwithstanding the distribution of Units to the RMBS Claims Trust under the Plan to the RMBS Claims Trust on behalf of the RMBS Trusts, and such amendment will be deemed non-material.

### B.    Effect of Confirmation on Modifications

Pursuant to Bankruptcy Code section 1127(a), entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      **Revocation or Withdrawal of the Plan**

Subject to the terms of the Plan Support Agreement and conditions to the Effective Date, the Plan Proponents reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent chapter 11 plans. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in the Plan shall constitute a waiver or release of any Claims or Equity Interests prejudice in any manner the rights of the Plan Proponents, the Settling Parties, or any other Entity, or constitute an admission, acknowledgement, offer, or undertaking of any sort by the Plan Proponents or any other Entity.

## ARTICLE XII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction:[58]

(a)      to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured, or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

(b)      to determine, adjudicate, or decide any other applications, adversary proceedings, contested matters, and any other matters pending on the Effective Date;

(c)      to hear and determine any matter, case, controversy, suit, dispute, or Causes of Action: (i) regarding the existence, nature, and scope of the releases, injunctions, and exculpation provided under the Plan, and (ii) enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

(d)      to ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(e)      to hear and determine rights to proceeds under the GM Policies, including consideration of any Insurance Defenses;

---

[58] For the avoidance of doubt, the effectiveness of the NJ Carpenters Settlement and the related NJ Carpenters Class Distribution is subject to District Court approval.

(f)      to hear and determine the rights and obligations relating to insurance claims against the Debtors, including coverage disputes, and insurance settlements regarding insurance;

(g)      to resolve disputes as to the ownership of any Claim or Equity Interest;

(h)      to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, reversed, modified, or vacated;

(i)      to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(j)      to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(k)      to hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan including, without limitation, the allocation of RMBS Trust Claims, the RMBS Trust Allocation Protocol, the Monoline Reservation, and the Kessler Settlement Agreement;

(l)      to hear and determine any matters relating to the Liquidating Trust, the RMBS Claims Trust, the Borrower Claims Trust, and/or the Private Securities Claims Trust, including to hear and determine any actions brought against the Liquidating Trust Board, Borrower Claims Trustee and/or the Private Securities Claims Trustee, as applicable, in connection with the Plan, including any action or other dispute relating to distributions under the Plan, provided, that if the Plan does not become effective, nothing herein shall be deemed to transfer the venue or jurisdiction over any underlying litigation against Ally to the Bankruptcy Court;

(m)      to hear and determine any issue for which the Plan requires a Final Order of the Bankruptcy Court;

(n)      to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)      hear and determine all matters related to: (i) applications for allowance of compensation or   reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan or (ii) the reasonableness of the fees of the Junior Secured Notes Indenture Trustee and the fees of the ad hoc group of Junior Secured Noteholders that are referred to in the Junior Secured Noteholders Plan Support Agreement as the "Ad Hoc Group." AFI/JSN Cash Collateral Order as the "Ad Hoc Committee of Holders of Junior Secured Notes" solely to the extent required to be paid by the Debtors or the Liquidating Trust (but excluding any fees previously paid by the Debtors in accordance with the AFI/JSN Cash Collateral Order, which fees shall remain subject to the recharacterization claims pursuant to the JSN Adversary Proceeding).

(p)      to resolve any matters related to (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any

Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) potential contractual obligation under any executory contract or unexpired lease that is assumed  the Debtors or the Liquidating Trust amending, modifying, or supplementing, after the Effective Date, any Executory Contracts or Unexpired Leases to the Assumption Schedule or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

(q)      to hear and determine any Causes of Action preserved under the Plan;

(r)      to enter a final decree closing any of the Chapter 11 Cases;

(s)      to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(t)      to enforce the affirmative findings governing the RMBS Trustees that are contemplated in Article IV herein;

(u)      to enforce all orders previously entered by the Bankruptcy Court; and

(v)      to hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XIII.

## MISCELLANEOUS PROVISIONS

### A.      Immediate Binding Effect

Subject to Article X.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Liquidating Trust, and any and all holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with any Debtor.

Notwithstanding anything in Bankruptcy Rule 3020(e) to the contrary, (i) the entry of the Confirmation Order shall constitute a Final Order and the period in which an appeal must be filed shall commence upon the entry thereof, and (ii) the Confirmation Order shall take effect immediately upon its entry and the Plan Proponents are authorized to consummate the Plan immediately after entry of the Confirmation Order and the satisfaction or waiver of all other conditions to the Effective Date of the Plan, in accordance with the terms of the Plan.

## B.    Additional Documents

On or before the Effective Date, the Plan Proponents may File with the Bankruptcy Court any and all agreements and other documents that may be necessary or appropriate in order to effectuate and further evidence the terms and conditions of the Plan.

## C.    Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. § 1930 and, if applicable, 28 U.S.C. § 3717, as determined by the Bankruptcy Court at a hearing pursuant to Bankruptcy Code section 1128, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs firstOn the Effective Date, and thereafter as may be required, each of the Debtors shall (i) pay all the respective fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to section 3717 of title 31 of the United States Code, until the earliest to occur of the entry of (a) a final decree closing such Debtor's Chapter 11 Case, (b) a Final Order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (c) a Final Order dismissing such Debtor's Chapter 11 Case, and (ii) be responsible for the filing of consolidated post-confirmation quarterly status reports with the Bankruptcy Court in accordance with Rule 3021-1 of the Southern District of New York Local Bankruptcy Rules, which status reports shall include reports on the disbursements made by each of the Debtors.

## D.    Dissolution of the Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve; provided, however, that, following the Effective Date, the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (i) Claims and/or applications for compensation by Professionals and requests for allowance of Administrative Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code, (ii) any appeals of the Confirmation Order that remain pending as of the Effective Date to which the Creditors' Committee is a party, (iii) any adversary proceedings or contested matters as of the Effective Date to which the Creditors' Committee is a party, and (iv) responding to creditor inquiries for one-hundred twenty (120) days following the Effective Date.  Upon the dissolution of the Creditors' Committee, the current and former members of the Creditors' Committee and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibility and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's respective attorneys, accountants and other agents shall terminate, except that the Creditors' Committee and their respective Professionals shall have the right to pursue, review and object to any applications for compensation or reimbursement of expenses filed in accordance with Article II hereof.

## E.    Access to Debtors' Records after Effective Date.

On the Effective Date, Debtors shall be deemed to have transferred, assigned and conveyed to the Liquidating Trust, the RMBS Claims Trust, the Borrower Claims Trust, and the Private Securities Claims Trust, as their interests may appear with respect to the Claims of their

111

respective beneficiaries, and the Liquidating Trust shall be authorized to take possession of, all of the books and records of the Debtors,  including, except as set forth in any Ally Contract, all information and data on computers owned or leased by the Debtors or otherwise on premises occupied by the Debtors, and all rights of access to data of the Debtors and their affiliates, that were not otherwise transferred to a third party on or prior to the Effective Date.  The Liquidating Trust shall have the responsibility of storing and maintaining such books and records to and for the benefit of each of the Liquidating Trust, the RMBS Claims Trust, the Borrower Claims Trust, and Private Securities Claims Trust as their interests may appear, and the respective Plan Trusts shall enter into an agreement or protocol with respect to access to such books and records.  The Debtors shall cooperate with the Plan Trustees of the Plan Trusts to facilitate the delivery and storage of such books and records in accordance herewith.  For the purpose of this Section, books and records include computer generated or computer maintained books and records and computerized data, as well as electronically generated or maintained books and records or data, along with books and records of the Debtors maintained by or in possession of third parties, except as set forth in any Ally Contract, and all of the claims and rights of the Debtors in and to books and records, wherever located.  The Debtors or the Liquidating Trust, as applicable, shall make available current and historic tax returns with supporting files to Ally as necessary for Ally to address Ally's audit requirements and to facilitate Ally filing 2013 tax returns.

## F.    Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

## G.    Reservation of Rights

Except as otherwise provided in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Plan Proponents or Ally with respect to the Plan or the Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of the Plan Proponents or Ally with respect to the holders of Claims or Equity Interests prior to the Effective Date.

## H.    Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

## I.    Service of Documents

All notices, requests and demands hereunder to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)     if to the Debtors, (i) if by mail or courier to: Residential Capital LLC, Lewis
        Kruger, CRO, c/o Morrison & Foerster LLP, 1290 Avenue of the Americas, New
        York, New York 10104; with copies to: (a) Morrison & Foerster LLP, 1290
        Avenue of the Americas, New York, New York, 10104, Attn:  Gary Lee, Lorenzo
        Marinuzzi, and Todd Goren; and (b) Curtis, Mallet-Prevost, Colt & Mosle LLP,
        101 Park Avenue, New York, New York 10178, Attn: Steven J. Reisman, Theresa
        A.    Foudy,    and    Maryann    Gallagher    (ii)    if    by   e-mail,    to:
        Lewis.Kruger@gmacrescap.com,       glee@mofo.com,       lmarinuzzi@mofo.com,
        tgoren@mofo.com,   ~~sresiman~~reisman@curtis.com,   tfoudy@curtis.com,   and
        mgallagher@curtis.com.

(b)     if to the Liquidating Trust ~~to: [ ]~~: as provided in the Liquidating Trust Agreement
        for notices to the Liquidating Trust.

(c)     if to the Borrower Claims Trust ~~to: [ ]~~: as provided in the Borrower Claims Trust
        Agreement for notices to the Borrower Claims Trust.

(d)     if to the Private Securities Claims Trust ~~to: [ ]~~: as provided in the Private
        Securities Claims Trust Agreement for notices to the Private Securities Claims
        Trust.

(e)     if to the RMBS Claims Trust ~~to: [ ]~~: as provided in the RMBS Claims Trust
        Agreement for notices to the RMBS Claims Trust.

(f)     if to Ally to: Ally Financial, Inc., 1177 Avenue of the Americas, New York, NY
        10036; Attn:  William B. Solomon and Timothy Devine; with copies to: Kirkland
        & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.:
        Richard M. Cieri, and Ray C. Schrock.

(g)     if to the Creditors' Committee, (i) if by mail or courier to: Kramer Levin Naftalis
        & Frankel LLP, 1177 Avenue of the Americas, New York, New York, 10036;
        Attn: Kenneth H. Eckstein, Douglas H. Mannal and Stephen D. Zide, (ii) if by
        email   to   keckstein@kramerlevin.com,   dmannal@kramerlevin.com   and
        szide@kramerlevin.com.

(h)     if to AIG, Allstate, MassMutual and/or Prudential, (i) if by mail or courier to:
        Quinn Emanuel Urquhart & Sullivan LLP, 51 Madison Avenue, 22nd Floor, New
        York, New York 10010; Attn: Susheel Kirpalani and Scott Shelley; (ii) if by email
        to susheelkirpalani@quinnemanuel.com and scottshelley@quinnemanuel.com.

(i)     if to FGIC, (i) if by mail or courier to: Jones Day, 222 East 41st Street, New
        York, New York 10017; Attn: Richard L. Wynne and Howard F. Sidman; and the
        Superintendent of Financial Services of the State of New York, as Rehabilitator of
        FGIC, c/o Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York
        10153; Attn: Gary T. Holtzer (ii) if by e-mail to: rlwynne@jonesday.com,
        hfsidman@jonesday.com, and gary.holtzer@weil.com.

(j)     if to the Steering Committee Consenting Claimants, (i) if by mail or courier to: Gibbs & Bruns LLP, 1100 Louisiana, Suite 5300, Houston, Texas 77002; Attn: Kathy D. Patrick and Robert J. Madden; and Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036; Attn: Keith H. Wofford and Ross Martin, (ii) if by e-mail to: kpatrick@gibbsbruns.com, rmadden@gibbsbruns.com, keith.wofford@ropesgray.com, and ross.martin@ropesgray.com.

(k)     if to the Talcott Franklin Consenting Claimants, (i) if by mail or courier to: (a) Talcott Franklin, P.C., 208 N. Market Street, Suite 200, Dallas, Texas 75202; Attn: Talcott J. Franklin, (b) Carter Ledyard & Milburn LLP, 2 Wall Street, New York 10005, Attn: James Gadsden, and (c) Miller Johnson, 250 Monroe Avenue, NW, Suite 800, P.O. Box 306, Grand Rapids, Michigan; Attn: Thomas Sarb; (ii) if by e-mail to: tal@talcottfranklin.com, gadsden@clm.com and sarbt@millerjohnson.com.

(l)     if to Wilmington Trust, (i) if by mail or courier to: Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Attn: Thomas J. Moloney and Sean A. O'Neal and Loeb & Loeb, 345 Park Avenue, New York, New York 10154, Attn: Walter H. Curchack; (ii) if by e-mail to: tmoloney@cgsh.com, soneal@cgsh.com, and wcurchack@loeb.com.

(m)     if to MBIA, (i) if by mail or courier to: Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New York 10281; Attn: Gregory M. Petrick and Mark Ellenberg; (ii) if by e-mail to: Gregory.Petrick@cwt.com and Mark.Ellenberg@cwt.com.

(n)     if to the Kessler Class Claimants, (i) if by mail or courier to: Polsinelli, 900 Third Avenue, 21st Floor, New York, New York 10022; Attn: Daniel J. Flanigan; Carlson Lynch, Ltd., PNC Park, 115 Federal Street Suite 210, Pittsburgh, PA 15212, Attn: R. Bruce Carlson, Walters Bender Strohbehn & Vaughan, P.C., 2500 City Center Square, 12th & Baltimore, P.O. Box 26188, Kansas City, MO 64196, Attn: R. Frederick Walters (ii) if by e-mail to: dflanigan@polsinelli.com, bcarlson@carlsonlynch.com, and fwalters@wbsvlaw.com.

(o)     if to the RMBS Trustees (i) if by mail or courier to: BNY Mellon, c/o Dechert LLP, 1095 Avenue of the Americas, New York, New York 10036, Attn: Glenn E. Siegel; DB, c/o Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, NY 10178, Attn: James L. Garrity, Jr.; USB, c/o Seward & Kissel LLP, One Battery Park Plaza, New York, New York 10004, Attn: Arlene R. Alves; WFB, c/o Alston & Bird LLP, 1 Atlantic Center, 1201 W. Peachtree Street, NW, Atlanta, Georgia 30309-3424, Attn: John C. Weitnauer; LDTC, Seward & Kissel LLP, One Battery Park Plaza, New York, New York 10004, Attn: Dale C. Christensen, Jr., HSBC, c/o John Kibler, Allen & Overy, 1221 Avenue of the Americas, New York, NY 10020, (ii) if by e-mail to: glenn.siegel@dechert.com, jgarrity@morganlewis.com, alves@sewkis.com, kit.weitnauer@alston.com, christensen@sewkis.com, and John.Kibler@AllenOvery.com.

(p)    if to Paulson, (i) if by mail or courier to: Paulson & Co., Inc., 1251 Avenue of the Americas, New York, New York 10020, Attn: Daniel J. Kamensky, (ii) if by e-mail to: Daniel.Kamensky@paulsonco.com.

After the Effective Date, the Liquidating Trust has authority to send a notice to any Entity that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, it must File a renewed request to receive documents with the Bankruptcy Court. After the Effective Date, the Liquidating Trust is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

## J.    Further Assurances

The Debtors or the Liquidating Trust, all holders of Claims receiving distributions pursuant to the Plan, and all other Entities, as applicable, shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

## K.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan and the Confirmation Order shall remain in full force and effect in accordance with their terms.

## L.    Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## M.    Exhibits and Related Documents

All exhibits and documents Filed in relation to the Plan are incorporated into and are a part of the Plan as if set forth in full in the Plan. After any exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Liquidating Trust's counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website, http://www.kccllc.net/rescap, or the Bankruptcy Court's website, http://www.nys.uscourts.gov (a PACER login and password are required to access documents on the Bankruptcy Court's website).

## N.    Severability of Plan Provisions

Except as otherwise provided herein, if, before Confirmation of the Plan, subject to the terms of the Plan Support Agreement, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the

power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan, including the Third Party Releases, Debtor Releases, Exculpation, including Article X.A, B and C, shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Plan Proponents' consent; and (c) nonseverable and mutually dependent.

## O.    Waiver or Estoppel Conflicts

Each holder of a Claim or Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated, by virtue of an agreement made with the Plan Proponents, or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

## P.    Conflicts

Except as set forth in the Plan or unless otherwise ordered by the Bankruptcy Court, to the extent that the Disclosure Statement, any order of the Bankruptcy Court (other than the Confirmation Order), or any exhibit to the Plan or document executed or delivered in connection with the Plan is inconsistent with the terms of the Plan, the terms of the Plan shall control.

Dated: ~~July 3,~~August 16, 2013                    Respectfully Submitted,
New York, New York


                                                      RESIDENTIAL CAPITAL, LLC for itself
                                                      and its Debtor subsidiaries


                                                      By: /s/ Lewis Kruger
                                                      Name: Lewis Kruger
                                                      Title: Chief Restructuring Officer


                                                      THE OFFICIAL COMMITTEE OF
                                                      UNSECURED CREDITORS

By: /s/ John S. Dubel
Name: John S. Dubel
Title: Co-Chair

By: /s/ Peter F. Finkel
Name: Peter F. Finkel
Title: Co-Chair