1

1

2 UNITED STATES BANKRUPTCY COURT

3 SOUTHERN DISTRICT OF NEW YORK

4 Case No. 12-12020-mg

5 - - - - - - - - - - - - - - - - - - - - -x

6 In the Matter of:

7

8 RESIDENTIAL CAPITAL, LLC, et al.,

9

10          Debtors.

11

12 - - - - - - - - - - - - - - - - - - - - -x

13

14          United States Bankruptcy Court

15          One Bowling Green

16          New York, New York

17

18          August 16, 2013

19          8:59 AM

20

21 B E F O R E:

22 HON. MARTIN GLENN

23 U.S. BANKRUPTCY JUDGE

24

25

**eScribers, LLC | (973) 406-2250**
**operations@escribers.net | www.escribers.net**

2

1

2    (Doc no. 4539) Hearing RE: Monarch Alternative Capital LP,

3    Stonehill Capital Management LLC, CQS ABS Alpha Master Fund

4    Limited, CQS ABS Master Fund Limited, and Bayview Fund

5    Management LLC's Motion In Limine to Preclude the Testimony of

6    Jeffrey A. Lipps Regarding the Debtors' 9019 Motion (In Limine

7    Motion One) [Docket No. 4539]

8

9    (Doc no. 4545) Hearing RE: Monarch Alternative Capital LP,

10   Stonehill Capital Management LLC, CQS ABS Alpha Master Fund

11   Limited, CQS ABS Master Fund Limited, and Bayview Fund

12   Management LLC's Motion In Limine to Preclude Evidence on the

13   Debtors' 9019 Motion Concerning the Negotiations Leading Up to

14   the FGIC Settlement Agreement and the Conclusory Statements

15   Offered by the FGIC Trustees and Others About the Nature of

16   Those Negotiations (In Limine Motion Five) [Docket No. 4545].

17

18   (Doc no. 4541) Hearing RE: Monarch Alternative Capital LP,

19   Stonehill Capital Management LLC, CQS ABS Alpha Master Fund

20   Limited, CQS ABS Master Fund Limited, and Bayview Fund

21   Management LLC's Motion In Limine to Preclude the Testimony of

22   S.P. Kothari Regarding the Debtors' 9019 Motion (In Limine

23   Motion Two) [Docket No. 4541]

24

25

1    (Doc no. 4549) Hearing RE: Omnibus Motion In Limine of the Ad

2    Hoc Group of Junior Secured Noteholders to Preclude Certain

3    Aspects of the Testimony of Lewis Kruger and John Dubel and the

4    Expert Testimony of Ron D'Vari and Jeffrey Lipps Proffered In

5    Connection with the FGIC Settlement [Docket No. 4549]

6

7    (Doc no. 4554) Hearing RE: Motion In Limine of Federal Home

8    Loan Mortgage Corporation to Preclude certain Expert Testimony

9    of Dr. Ron D'Vari in Connection with the Debtors' Motion

10   Pursuant to Fed R. Bankr. P. 9019 for Approval of the

11   Settlement Agreement Among the Debtors, FGIC, The FGIC Trustees

12   and Certain Institutional Investors [Docket No. 4554]

13

14   (Doc no. 4548) Hearing RE: Monarch Alternative Capital LP,

15   Stonehill Capital Management LLC, CQS ABS Alpha Master Fund

16   Limited, CQS ABS Master Fund Limited, and Bayview Fund

17   Management LLC's Motion In Limine to Preclude the Trustees from

18   Offering Any Evidence of Their Reliance on Counsel in Support

19   of Debtors' 9019 Motion (In Limine Motion Four) [Docket No.

20   4548]

21

22

23

24

25

4

1

2    (Doc no. 4546) Hearing RE: Monarch Alternative Capital LP,

3    Stonehill Capital Management LLC, CQS ABS Alpha Master Fund

4    Limited, CQS ABS Master Fund Limited, and Bayview Fund

5    Management LLC's Motion In Limine to Preclude the Testimony of

6    Allen M. Pfeiffer Regarding the Debtors' 9019 Motion (Motion In

7    Limine Three) [Docket No. 4546]

8

9    Trial RE: FGIC Settlement

10

11    (Doc no. 4550) Hearing RE: Financial Guaranty Insurance

12    Company's Motion In Limine [Docket No. 4550]

13

14

15

16

17

18

19

20    Transcribed by:  David Rutt

21    eScribers, LLC

22    700 West 192nd Street, Suite #607

23    New York, NY 10040

24    (973)406-2250

25    operations@escribers.net

5

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4         Attorneys for Debtors

5         1290 Avenue of the Americas

6         New York, NY 10104

7

8  BY:   CHARLES L. KERR, ESQ.

9         JOSEPH ALEXANDER LAWRENCE, ESQ.

10        GARY S. LEE, ESQ.

11

12

13  WHITE & CASE LLP

14        Attorneys for Ad Hoc Group of Junior Secured Noteholders

15        1155 Avenue of the Americas

16        New York, NY 10036

17

18  BY:   J. CHRISTOPHER SHORE, ESQ.

19        VANESSA D. SODERBERG, ESQ.

20        HARRISON DENMAN, ESQ.

21

22

23

24

25

6

1

2    KIRKLAND & ELLIS LLP

3         Attorneys for Ally Bank and Ally Financial, Inc.

4         153 East 53rd Street

5         New York, NY 10022

6

7    BY:    PETER TSAO, ESQ.

8

9

10   CLEARY GOTTLIEB STEEN & HAMILTON LLP

11        Attorneys for Wilmington Trust

12        One Liberty Plaza

13        New York, NY 10006

14

15   BY:    MARK A. LIGHTNER, ESQ.

16

17

18   JONES DAY

19        Attorneys for FGIC

20        222 East 41st Street

21        New York, NY 10017

22

23   BY:    HOWARD F. SIDMAN, ESQ.

24        RICHARD L. WYNNE, ESQ.

25        STEVEN C. BENNETT, ESQ.

7

1

2   SEWARD & KISSEL LLP

3          Attorneys for US Bank as RMBS Trustee

4          One Battery Park Plaza

5          New York, NY 10004

6

7   BY:   MARK D. KOTWICK, ESQ.

8          THOMAS ROSS HOOPER, ESQ.

9          ARLENE R. ALVES, ESQ.

10         BRIAN MALONEY, ESQ.

11

12

13  DECHERT LLP

14         Attorneys for Bank of New York Mellon

15         1095 Avenue of the Americas

16         New York, NY 10036

17

18  BY:   GLENN E. SIEGEL, ESQ.

19         REBECCA S. KAHAN, ESQ.

20         MAURICIO A. ESPANA, ESQ.

21         HECTOR GONZALEZ, ESQ.

22

23

24

25

8

1   ALSTON & BIRD LLP

2          Attorneys for Wells Fargo Bank

3          1201 West Peachtree Street

4          Atlanta, GA 30309

5

6   BY:   JOHN C. WEITNAUER, ESQ.

7

8

9   MCKOOL SMITH, P.C.

10         Attorneys for Freddie Mac

11         One Bryant Park

12         47th Floor

13         New York, NY 10036

14

15  BY:   ANN SCHOFIELD BAKER, ESQ.

16         MICHAEL R. CARNEY, ESQ.

17         PETER S. GOODMAN, ESQ.

18

19

20  MOSS & KALISH, PLLC

21         Attorneys for Freddie Mac

22         125 East 42nd Street

23         New York, NY 10168

24

25  BY:   DAVID B. GELFARB, ESQ.

**9**

1

2   WILLKIE FARR & GALLAGHER LLP

3        Attorneys for Monarch, Stonehill, CQS, Bayview

4        787 Seventh Avenue

5        New York, NY 10019

6

7   BY:   JOSEPH T. BAIO, ESQ.

8        MARY EATON, ESQ.

9        EMMA J. JAMES, ESQ.

10

11

12   ROPES & GRAY

13        Attorneys for Steering Committee of RMBS Investors

14        800 Boylston Street

15        Boston, MA 02199

16

17   BY:   D. ROSS MARTIN, ESQ.

18        ANDREW G. DEVORE, ESQ.

19

20

21   KELLEY DRYE & WARREN, LLP

22        Attorneys for UMB Bank

23        101 Park Avenue

24        New York, NY 10178

25

```
 1   BY:   CATHERINE L. THOMPSON, ESQ.

 2

 3   GIBBS & BRUNS, LP

 4        Attorneys for Steering Committee of RMBS Investors

 5        1100 Louisiana

 6        Suite 5300

 7        Houston, TX 77002

 8

 9   BY:   KATHY PATRICK, ESQ.

10

11

12   MUNGER, TOLLES & OLSON LLP

13        Attorneys for Berkshire Hathaway, Inc.

14        355 South Grand Avenue

15        35th Floor

16        Los Angeles, CA 90071

17

18   BY:   THOMAS B. WALPER, ESQ. (TELEPHONICALLY)

19

20

21   BAYVIEW ASSET MANAGEMENT

22        4425 Ponce de Leon Boulevard

23        5th Floor

24        Coral Gables, FL 33146

25
```

1   BY:   MICHAEL B. GUSS, ESQ.

2

3   ALSO PRESENT: (TELEPHONICALLY)

4        KENT COLLIER, Reo Research

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                     P R O C E E D I N G S

3          THE COURT:  Please be seated.

4          Mr. Kerr.

5          MR. KERR:  Good morning, Your Honor --

6          MR. KERR:  -- Charles Kerr of Morrison & Foerster on

7    behalf of the debtors.  We are here on the debtors' motion to

8    seek approval under Bankruptcy Rule 9019 of a settlement

9    agreement dated as of May 23rd, 2013, among the debtors, FGIC,

10   the FGIC trustees and certain institutional investors.  The

11   motion seeking approval was made on June 7th, 2013 as docket

12   number 3929.

13          After spending the last two months engaging in

14   extensive discovery and pre-trial proceedings, we're here today

15   to present evidence that we believe will demonstrate to the

16   Court that this settlement agreement should be approved.  I

17   understand that the Court has had an opportunity to read many

18   of the filings.

19          THE COURT:  Hang on just a second.

20          THE CLERK:  That's construction.

21          THE COURT:  Nothing I can do about it.  Go ahead, Mr.

22   Kerr.

23          MR. KERR:  All right.  If someone's whining about what

24   I'm saying already, Your Honor --

25          THE COURT:  It's always something.  But go ahead.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

13

1        MR. KERR:  I understand the Court has had an

2    opportunity to read many --

3        THE COURT:  Hang -- just -- Deanna, if you're

4    listening, there's construction noise coming in.  See if you

5    can get Vito to stop it.  Go ahead, Mr. Kerr.

6        MR. KERR:  -- read many of the filings in connection

7    with this motion, and that Your Honor is familiar with many, if

8    not most, of the issues we'll be discussing today.  Therefore,

9    I will keep my opening very short.

10        But I do want to highlight from the debtors'

11    perspective what we believe the settlement agreement

12    accomplishes and why we believe it is fair, equitable, and in

13    the best interests of the debtors and the debtors' creditors

14    and their estates.  And we are confident that the evidence that

15    will be introduced at this hearing fully supports that

16    conclusion.

17        Moreover, while the debtors are seeking approval of

18    this settlement agreement based on its merits as a standalone

19    agreement, it's important to place the agreement and its

20    significant benefits in its proper context.  The settlement

21    agreement represents a significant component of the global

22    settlement described in the plan support agreement which Your

23    Honor has already previously approved.  We strongly believe

24    that if the global settlement is approved as part of the plan

25    confirmation process that will truly be a remarkable

**RESIDENTIAL CAPITAL, LLC, ET AL.**

14

1    achievement and provide broad benefits to the debtors, to the

2    debtors' estates and to all of the creditors.

3            Just so there's no confusion, I want to briefly

4    describe what the debtor is seeking to do under the settlement

5    agreement and what the evidence about the settlement agreement

6    will show.  The agreement itself is relatively simple and yet

7    accomplishes several key things.  First, the evidence will show

8    that the settlement agreement resolves and substantially

9    reduces three proofs of claim filed by FGIC which in the

10   aggregate total 5.55 billion dollars of claims asserted against

11   the debtor.  Under the agreement, the parties have agreed to a

12   floor and to a ceiling of possible claims that FGIC can assert

13   which are substantially reduced from the amount that's in the

14   proof of claims that FGIC has filed.

15           As provided in section 3.01 of the settlement

16   agreement, FGIC will have an allowed general unsecured claim of

17   596.5 million dollars that will be allocated among RFC, GMAC

18   Mortgage and ResCap LLC pro rata based on which of the debtors

19   would be obligated to reimburse FGIC for such payments under

20   the governing agreements.  This is what I will call the floor

21   or the minimum allowed claim under the settlement agreement.

22   This 596.5 million dollars is equal to the 343.2 million in

23   claims that FGIC has already paid under its policies that

24   remain unreimbursed and the further settlement amount of 253.3

25   million it has agreed to pay the FGIC trusts under the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

15

1    settlement agreement.

2          Section 3.01 of the settlement agreement also provides

3    that if the plan support agreement is terminated or the Chapter

4    11 plan contemplated by the plan support agreement does not

5    become effective, FGIC reserves its rights to assert claims of

6    up to 596.5 million dollars against each of RFC, GMAC Mortgage

7    and ResCap, but the debtors can challenge these claims in

8    excess of the minimum amount -- minimum allowed claim amount.

9    And this is what I'll call the ceiling amount of the FGIC

10   allowed claims under the settlement agreement.

11         Whether one looks at this floor amount or the ceiling

12   amount, or the range between the floor and the ceiling, all of

13   this reflects a substantial reduction in the amount of claims

14   that FGIC can pursue against the debtors.  Moreover, under

15   section 2.01 of the settlement agreement FGIC releases all of

16   its claims against the debtors, subject to the agreed amount of

17   the allowed claims that I just described.

18         Now, one thing I want to clarify is that while we are

19   asking for approval of the settlement agreement and all of its

20   terms, in seeking the order approving the agreement here today,

21   we are not here today seeking approval of an allowed claim at

22   ResCap LLC.  While under the terms of the global settlement the

23   debtors will be seeking approval of claims as described in the

24   plan support agreement and the global settlement, including

25   allowed claim by FGIC as against ResCap LLC, that is an issue

1     for plan confirmation, not for today.

2          Second, the evidence will show that under section 2.01

3     of the settlement agreement, the FGIC trustees release a

4     substantial portion of their claims against the debtors.  These

5     claims that are being released, which are in the billions of

6     dollars, are referred to in the settlement agreement as any

7     claims arising out of or relating to any of the origination-

8     related provisions as that term is defined in the revised joint

9     omnibus scheduling order and provisions for other relief which

10    was filed as docket number 945.  These release claims including

11    any claim for breach of reps and warranties and other claims

12    relating to the origination of the FGIC wrapped trusts.  Thus

13    collectively, the settlement agreement releases billions in

14    potential claims against the debtors.

15         Obviously if the settlement agreement is not approved,

16    the debtors would be faced with having to litigate these very

17    difficult and complex claims that have been asserted by FGIC

18    and the FGIC trustees against the debtors.  By resolving these

19    claims under the terms of the settlement agreement, the debtors

20    will be able to avoid lengthy and expensive litigation which we

21    believe is very much in the interests of these estates.

22         Third, under the settlement agreement, FGIC and the

23    FGIC trusts agree that FGIC will make a settlement payment of

24    253.3 million to the FGIC trusts and will waive any claim for

25    future premiums in exchange for release of its obligations

**RESIDENTIAL CAPITAL, LLC, ET AL.**

17

1    under the policies that wrapped the FGIC trusts.

2          Fourth, by its terms, the settlement agreement becomes

3    effective if and when the FGIC rehabilitation court and this

4    court approve the settlement agreement.  By requiring this

5    approval by both courts for the agreement to become effective,

6    this ensures that any parties can object to -- that have an

7    objection to or want to raise an issue to the settlement

8    agreement, can have those concerns heard.

9          Finally, as I've noted previously, while the debtors

10   seek approval of the settlement agreement based on its merits

11   as a standalone and separate agreement, one has to consider

12   this agreement in the broader global settlement.  The

13   settlement agreement represents a significant step forward

14   toward accomplishing that global settlement contemplated by the

15   plan support agreement.  That global settlement, if ultimately

16   approved as part of the plan confirmation process, will provide

17   substantial benefits to the debtors, the debtors' estates and

18   the creditors.  While the merits of the global settlement plan

19   are not before the Court today and plan confirmation must wait

20   for the plan confirmation process, approving the settlement is

21   an important step in working toward that goal.

22         Now, in support of this motion the moving parties will

23   be submitting testimony along with supporting exhibits from the

24   following.  John Dubel, who is the chief executive officer of

25   FGIC; Lewis Kruger, the chief restructuring officer of the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

18

1    debtors; Mary Sohlberg, a vice president of Wells Fargo Bank,

2    one of the FGIC trustees; Robert Major, a vice president of the

3    Bank of Mellon Trust Company which is also one of the FGIC

4    trustees; Mamta Scott, a vice president of US Bank which is

5    also one of the FGIC trustees; Jeffrey Lipps of Carpenter &

6    Lipps, who has acted as special counsel to the debtors and who

7    has firsthand experience in litigating the types of claims that

8    are being resolved under the settlement agreement; and three

9    expert witnesses:  Allen Pfeiffer of Duff & Phelps which acted

10    as financial advisors to the FGIC trustees; S.P. Kothari, who

11    is a professor in management at the Sloan School of Management

12    at MIT; and Ron D'Vari, who is the chief executive officer of

13    NewOak Capital, an advisory firm that specializes in the area

14    of residential mortgage-backed securities such as those issued

15    by the FGIC insured trusts.

16           We believe this testimony and supporting documentation

17    more than demonstrates that the settlement agreement is fully

18    supported by the Iridium factors and reflects a reasonable and

19    fair compromise and settlement.  We also believe that this

20    evidence will fully support the proposed order approving the

21    settlement including the findings in that proposed order.

22           For all of these reasons, and as shown in our moving

23    papers, and will be shown by the evidence we'll be introducing

24    over the next two days, the settlement agreement is fair,

25    equitable, and in the best interests of the debtors, the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**19**

1  debtors' estates and the creditors.

2       THE COURT:  Thank you, Mr. Kerr.

3       MR. KERR:  Thank you.

4       THE COURT:  Is anybody else going to open?  Go ahead,

5  Mr. Siegel.

6       MR. SIEGEL:  Your Honor, we'll be brief.  I'm Glenn

7  Siegel, here on behalf of Bank of New York Mellon.  I'm

8  speaking on behalf of the RMBS trustees which includes Bank of

9  New York Mellon, US Bank, Wells Fargo and Law Debenture.

10      Your Honor is being asked to enter an order that will

11  find that the settlement agreement is in the best interests of

12  investors in each FGIC-insured trust, the FGIC insured-trusts,

13  and the FGIC trustees.  Your Honor is not being asked to find

14  that every investor in every FGIC trust is satisfied with the

15  settlement.  And you're also being asked to find that the FGIC

16  trustees acted reasonably and in good faith in the best

17  interests of the investors in each FGIC-insured trust and each

18  FGIC-insured trust in entering into the settlement agreement.

19      In doing so, Your Honor will hear evidence about the

20  benefit that will be received by the FGIC trusts in connection

21  with the settlement.  It does not mean that Your Honor is

22  simply evaluating the payment that will be received -- the

23  direct payment that will be received by FGIC and that that is

24  the sole benefit that Your Honor is evaluating.  In fact, the

25  FGIC trusts get many other benefits from this settlement in

**RESIDENTIAL CAPITAL, LLC, ET AL.**

20

1  addition to the 253-million-dollar cash payment which include

2  deferral of 18 million dollars of premiums, which include the

3  waiver by FGIC of unreimbursed expenses, which include the

4  allocation of the settlement amounts coming from the ResCap

5  estate in the amount of 92 million dollars, and also include

6  the resolution of the issues between FGIC and the FGIC trusts

7  over their entitlement to distribution from this estate.

8         Your Honor, the objecting parties really haven't

9  identified why they're dissatisfied with the settlement, simply

10  because when you start with their premise ,which is that the

11  settlement is short somewhere depending upon what you read

12  seventy to ninety million dollars, I would suggest to you that

13  when you add up all the benefits that the FGIC trusts are

14  receiving, those benefits exceed the amount that they have

15  initially at least said represents the deficiency in the amount

16  that was received.

17         Now, Your Honor, that's not really what you need to

18  find.  What you need to find is that it's in the best interests

19  of the trusts; but I am pointing out that the quantification of

20  their dissatisfaction has been exceeded by the amount the

21  trustees obtained.

22         Your Honor, the other thing that we did do is

23  notwithstanding the fact that under the documents no individual

24  investor in the trust was entitled to negotiate the settlement,

25  nor was it entitled to approve the settlement, the trustees

**RESIDENTIAL CAPITAL, LLC, ET AL.**

21

1   insisted that they have notice and an opportunity to be heard

2   both in this court and in New York State court.  So we did go

3   that step further to give people an opportunity to come forward

4   and do this.  And with that, Your Honor that's really all we

5   have at this time.  We'll add at closing.

6          THE COURT:  Thank you, Mr. Siegel.

7          MR. WYNNE:  Good morning, Your Honor, Richard Wynne of

8   Jones Day appearing on behalf of FGIC.  Your Honor, my target

9   time for opening is under a minute so all that I really wanted

10  to say, Your Honor, is that we have substantial matters that

11  we'll discuss at closing.  And I did not want to have it lost

12  among all of the criticism of the settlement that the objectors

13  have raised that the reduction in claims by FGIC was not only a

14  critical component of the global settlement, but actually a

15  very substantial concession by FGIC; and that has somewhat

16  gotten lost.  And with that, Your Honor, thank you.

17         THE COURT:  Thank you, Mr. Wynne.

18         MR. BAIO:  Your Honor, Joseph Baio from Willkie Farr &

19  Gallagher.  With me today and involved in the questioning will

20  be Mary Eaton and Emma James, my colleagues.  We represent five

21  objecting parties who collectively own approximately 700

22  million dollars of current face value of the FGIC wrapped

23  securities.  They are neither debtors nor creditors of the

24  ResCap estate.  They and we are here today because of the

25  extraordinary findings that the moving parties seek from the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

22

1   Court, findings that the trustees have demanded.

2           The challenged findings are designed simply and solely

3   to accomplish one thing, the termination of the investors'

4   rights against the trustees who have agreed to settle a

5   settlement that is woefully inadequate from the investors'

6   point of view.  In the objection we filed on our clients'

7   behalf we identified the jurisdictional, contractual and due

8   process barriers that we submit preclude the entry of the

9   challenged findings.  I won't go into that at this stage.  But

10  even if those barriers do not end the matter, as we believe

11  they should, the debtors and trustees cannot, have not, will

12  not, meet their evidentiary burden to establish that the

13  proposed settlement agreement and commutation payment are in

14  the best interests of the investors, and that by entering into

15  the settlement agreement and the negotiations leading up to it,

16  the investors' fiduciaries acted in good faith.

17          The words of the findings of course are critical.  The

18  debtors and trustees are not asking you to find that the

19  trustees had some basis for entering into the agreement or that

20  it fell above some minimal level within a range of potential

21  recoveries.  No, they say that it is in the best interests of,

22  among others, a specific group of business entities, our

23  clients, who are completely capable of acting in their own

24  interest and certainly in their best interests.  And we will

25  provide evidence from those witnesses as to what they believe

1  is in their best interests and why this settlement is woefully
2  inadequate.

3       While there are many reasons why the moving parties
4  cannot and will not meet their burden to prove entitlement to
5  the findings, I mention the following points concerning the
6  evidence to focus the Court.  First, the settlement agreement
7  itself includes terms that on their face are adverse to the
8  investors, whose best interests are purportedly served by the
9  settlement agreement.  Under section 1.05 of the settlement
10 agreement, the bankruptcy court order must include the
11 challenged findings that purport to exculpate the trustees vis-
12 a-vis the investors.  That provision certainly does not benefit
13 the investors and can only benefit the trustees themselves in
14 any dispute with their own beneficiaries.  The trustees were
15 looking out for their own skin by making the entry of the
16 adverse findings a condition precedent to the settlement, and
17 in turn, a condition precedent to the proposed plan.

18      Indeed, they have characterized the findings as
19 protective, in essence, a demand for a declaratory judgment
20 from this Court designed to cut off our clients' rights even
21 though our clients did not select this forum or these truncated
22 proceedings.

23      Second, in support of the rehabilitation plan and
24 before the notion of commuting the trust policies came up, FGIC
25 and the FGIC rehabilitator, identified what the likely

**RESIDENTIAL CAPITAL, LLC, ET AL.**

24

1  recoveries for the trusts would be.  Indeed, they were duty

2  bound to propose a fair and equitable rehabilitation plan that

3  would treat all trusts fairly, equally and without

4  discrimination.  And they were required to be prudent in

5  establishing the terms of the rehabilitation plan and the

6  payment of claims in order to assure fairness, equity and

7  nondiscrimination.

8          Under their own base case, Your Honor, FGIC and the

9  rehabilitators identified reasonable and expected recoveries

10  that significantly exceeded the amount the trusts would receive

11  under the settlement agreement, even with the mathematics that

12  were presented just before I took the podium.  The base case

13  excludes recoveries -- in addition to the fact that just

14  looking at the base case we don't get enough, it excludes

15  recoveries that FGIC will undoubtedly secure and that will

16  increase significantly its ability to pay claims from a series

17  of suits and claims that aggregate in the billions of dollars.

18          Try as they might to ignore or obfuscate FGIC's public

19  statements revealing the basis for their conservative analysis

20  underlying the rehabilitation plan, the plan itself and FGIC'S

21  own statements about expected recoveries undermines the notion

22  that the settlement agreement, which effectively decapitates

23  the policies for grossly inadequate consideration, is fair and

24  equitable and nondiscriminatory to the investors, let alone

25  that it's in the best interests of the investors and the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    trusts.

2            Third, we have been precluded from learning a single

3    fact that purportedly supports the notion that the trustees

4    engaged in hard-fought negotiations on our clients' behalf to

5    get the best deal they could for our clients.  While we're left

6    with the trustees' own conclusions on all these subjects, we

7    don't know a number of facts and I'll only identify one for

8    now.  They hired a financial advisor, Duff & Phelps, not to

9    negotiate on the trusts' behalf by challenging the settlement

10   offers and fighting for our clients' interests, but they were

11   hired specifically to justify the trustees' entering into the

12   challenged agreement.  That is not good faith.

13           Fourth, much of what you will hear and see from the

14   moving parties is what I'll characterize as an after-the-fact

15   identification of supposed benefits that our clients

16   purportedly get out of the settlement.  The supposed benefits

17   were never presented to, quantified by, quantified for or

18   evaluated by the trustees before or during their one hour tele

19   and web conference with Duff & Phelps.  These afterthoughts

20   could not have been considered by the trustees when they

21   decided to enter into the settlement agreement.  Adding them

22   now only underscores the lack of care and absence of good faith

23   in the trustees' supposed deliberations.

24           Finally, many of the so-called additional benefits

25   that Your Honor will hear about, 92 million dollars here,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

26

1    another 141 million dollars that suddenly appeared here, fall

2    into two categories.  Either they have nothing to do with the

3    consideration to be received by the trusts and the investors as

4    a result of the settlement agreement, but instead relate to

5    claims that those trusts have even in the absence of the

6    commutation agreement.  They are available to the trusts and

7    the investors in the absence of the settlement agreement.  So

8    they are adding rights that we have independent from the

9    settlement agreement, totaling those numbers up in some way --

10   and I'll get to that in a minute -- and then say you have to

11   add that to what we're getting under the settlement agreement.

12   It makes no sense.  The rights remain after the -- if there is

13   a denial of the settlement agreement or an exclusion of the

14   findings.

15        Second, or alternatively, those additional benefits

16   are built on a series of unsupported suppositions and

17   incoherent calculations that have been presented at the very

18   last minute by declarants after they testified and who are

19   actually trying to slip in expert testimony in the guise of

20   facts without any foundation whatsoever.  And we will highlight

21   that in our examination, Your Honor.

22        In conclusion, while we understand that for some

23   parties, like FGIC and the trustees personally, the settlement

24   agreement may be a good thing, it may even be a sweet deal, we

25   also understand the weariness that can set in during a large

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  bankruptcy proceeding and the search for an end.  But the hope

2  for a path out does not justify the trampling of our clients'

3  rights, particularly where those rights arise out of agreements

4  that are not the property of the estate and they belong to

5  entities that are not creditors of the estate.  Despite this,

6  Your Honor, and despite the fact that the claims that this

7  Court has noted during the last hearing, that the dispute

8  involves serious issues, these claims have not been the subject

9  of any mediation whatsoever.  Unlike what we understand

10  everything else --

11          THE COURT:  Well, you could have been in the

12  mediation.  I mean, there were investors who hold FGIC wrapped

13  trust certificates who were in the mediation.

14          MR. BAIO:  And we were not, Your Honor --

15          THE COURT:  Well --

16          MR. BAIO: -- and not permitted to be in a subsequent

17  mediation --

18          THE COURT:  Mr. Abrams was involved in the mediation,

19  but your clients wouldn't become restricted so they weren't in

20  the mediation.

21          MR. BAIO:  Your Honor, I'm referring to now that these

22  claims exist.  There has been no mediation at this point.

23  We're here --

24          THE COURT:  You had a chance.  You're here now.  Go

25  ahead.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

28

 1          MR. BAIO:  We don't believe so, Your Honor, but --

 2          THE COURT:  Go ahead.

 3          MR. BAIO:  Okay.  So in any event, Your Honor, we

 4    submit that the challenged findings independent from any other

 5    matter, should not be entered as a matter of law and under the

 6    facts.  Thank you.

 7          THE COURT:  Thank you, Mr. Baio.

 8          MR. GOODMAN:  Good morning, Your Honor, Peter Goodman

 9    from McKool Smith on behalf of Freddie Mac.  With me here today

10    are my colleagues Ann Baker and Mike Carney and my co-counsel

11    David Gelfarb.  Freddie Mac is FGIC'S single largest wrapped

12    RMBS creditor. Freddie Mac's claim in the FGIC case is

13    approximately 1.6 billion.  The current face value of Freddie

14    Mac's wrapped securities claim in the ResCap trust exceeds 500

15    million dollars, Your Honor.  I know these are peculiar

16    bragging rights.

17          Freddie Mac has been intimately involved in the

18    negotiations and the creation of the plan of rehabilitation

19    that was approved by Judge Ling-Cohan back on June 11th of this

20    year.  Freddie Mac entered into a nondisclosure agreement with

21    FGIC and later entered into a similar nondisclosure agreement

22    with the rehabilitator.  Through Freddie Mac's efforts working

23    with FGIC back in -- you will hear testimony that back in

24    December 2010 through 2011, we worked feverishly to submit a

25    term sheet that was demanded by the New York State Department

**RESIDENTIAL CAPITAL, LLC, ET AL.**

29

1   of Financial Services.  And working through the holiday season,

2   we did get that term sheet to the Department of Financial

3   Services.

4        That term sheet formed the basis of the plan that was

5   approved by Judge Ling-Cohan.  The plan term sheet provided for

6   prorated cash payments to all policyholders -- the term they

7   used is a "CPP payment" I believe -- and the term sheet called

8   for commutations of policies, but only commutations of CDS

9   policies.  Notably, there was no mention of RMBS policies being

10  terminated or commuted.

11       In June 2012 the rehabilitation proceeding was

12  commenced.  Freddie Mac continued to be involved, and

13  feverishly over last summer, negotiated with FGIC and the

14  rehabilitator on the final terms of a plan of rehabilitation.

15  The main issue that was subject of negotiation was over control

16  rights, the so-called put-back claims that both the trusts and

17  FGIC held.

18       When those negotiations were finalized, a plan and

19  disclosure statement was filed, a plan and disclosure statement

20  was filed in the rehabilitation proceeding.  You will hear

21  testimony, Your Honor, that the disclosure statement only

22  references commutations of CDS instruments and reinsurance

23  policies.

24       Now, let me just speak briefly about the trustees'

25  involvement and what we believe the evidence will show.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

30

1  Following the filing of that rehabilitation plan and the

2  disclosure statement, which was part of the public record in

3  the state court rehabilitation proceeding, the indenture

4  trustees began to get involved for the first time.  BONY was

5  the trustee that took the lead.  To facilitate our discussions

6  with BONY, we entered into a confidentiality arrangement which

7  disclosed our holdings, and BONY worked with Freddie Mac, an ad

8  hoc steering committee of other RMBS security holders, and FGIC

9  to negotiate their differences on the plan.  And specifically,

10  their differences, the issue that they raised, were issues that

11  only benefited the RMBS policyholders, including Freddie Mac.

12  The main issue that was part of that discussion was the ability

13  of the trustee to exercise its setoff rights against FGIC'S

14  claims for reimbursements due the trust.

15        Eventually, that issue was resolved.  What we did not

16  know was at the same time that BONY was negotiating for the

17  benefit of the RMBS policyholders it was colluding with FGIC

18  and the rehabilitator to deny Freddie Mac its benefits under

19  the insurance -- under the plan of rehabilitation.  I believe

20  even our last calls to BONY were to the effect please hurry up,

21  finalize your negotiations so the rehabilitation plan could get

22  firm so we could get paid and money could go back to Freddie

23  Mac so that taxpayers eventually could be reimbursed.

24        Notably that the plan that was approved by the state

25  court in June 11th did not include as a condition to effective

**RESIDENTIAL CAPITAL, LLC, ET AL.**

31

1   date a ResCap settlement; and Your Honor will hear testimony to

2   that effect.  Excuse me, Your Honor.

3          So the plan could become effective without any ResCap

4   settlement.  There's really, there's no reference in the plan

5   to a ResCap settlement, there's no reference in the disclosure

6   statement to a ResCap settlement.

7          THE COURT:  Is there a reference in the plan to the

8   rehabilitator or FGIC entering into additional settlements

9   subsequent to approval of the rehabilitation plan?

10          MR. GOODMAN:  With the consent of the parties.  It's

11   section 408 of the rehabilitation plan and requires the consent

12   of the parties.  Now this is an interesting point, Your Honor.

13   There have been several commutations dealing with millions of

14   dollars of claims, billions of dollars of claims in the FGIC

15   case. They were all done, and the evidence will show, with the

16   CDS holders and reinsurers, no RMBS holders, but in each

17   instance it was done with the consent of the parties.

18          THE COURT:  Who are the parties, though?  Is it the

19   trustees or is it the investors?

20          MR. GOODMAN:  Your Honor, as I understand it --

21          THE COURT:  Because it was my understanding that the

22   investors were not parties to the rehabilitation proceeding,

23   that it's the RMBS trustees who are the parties to it.

24          MR. GOODMAN:  I know, Your Honor.

25          THE COURT:  Am I correct in that?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

32

1          MR. GOODMAN:  That is correct, Your Honor, that is

2    correct.

3          THE COURT:  Go ahead.

4          MR. GOODMAN:  That is correct.

5          THE COURT:  Go ahead, Mr. Goodman.

6          MR. GOODMAN:  Now, while we were in discussions with

7    BONY, BONY never discussed with us at any time their intent to

8    modify the plan of rehabilitation, but this is what they agreed

9    to:  the termination of the non-ResCap litigation upside, the

10   so-called Countrywide litigation, which is a significant

11   recovery and that was something that we had bargained for

12   intensely with FGIC to preserve those claims rights and

13   recoveries that may be attributable from that litigation.

14          In addition, Your Honor, the evidence is going to show

15   that the ResCap policyholders' recovery was cut by at least six

16   to nine cents or what their expert -- BONY's expert refers to

17   in his report as the forty percent haircut.  In fact, you will

18   hear testimony from in Mr. Pfeiffer's report where they concede

19   in their draft report that the recovery, the nominal recovery

20   is going to be less than twenty-one cents to the ResCap

21   securities holders.

22          BONY's justification, from what we've heard in

23   discovery, is just that there is risk.  Well there's extreme

24   risk.  And we have our expert here, Mr. Scott Gibson from

25   Mountainview, who can explain it and will explain it when he

**RESIDENTIAL CAPITAL, LLC, ET AL.**

33

1     testifies.  There's extreme risk to this ResCap settlement.  On

2     its face looks simple, you no longer have to worry about the

3     credit risk of FGIC as a whole; but what they've done is

4     they've cut us off from the rest of FGIC'S assets, which

5     were -- which would have been available to pay claims of

6     individual trusts.  Instead, they've done a finite allocation

7     to the trusts, and if the trust claims are greater and the

8     future claims -- anticipated claims are exceeded versus their

9     calculations, all it does is going to drive the value down of

10    the recoveries to the securities holders.  Whereas, under the

11    rehabilitation plan, Your Honor, they would have, again,

12    individuals, securities holders of individual trusts would have

13    had the ability to look at all of FGIC for recovery.  And that

14    recovery, as Your Honor knows, is the twenty-seven to thirty

15    cents on the dollar present value.  Now these actions are not

16    actions of a trustee that acts in good faith and in the best

17    interests of securities holders.  That's what we're here today

18    for.

19          Further, BONY argues that they have the full authority

20    to do what they are doing under the terms of the indenture.  If

21    that is the case, then why do they need the findings, not just

22    from this Court, but findings from the state court?  These are

23    effectively comfort orders.

24          Now it's very important to note that the trustee is

25    trying -- excuse me, that BONY is trying to have it both ways.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

34

1   All we're talking about in the state Supreme Court are the best

2   interests of policyholders which coincidentally happens to be

3   them, even though they have no economic interest in the trust.

4   And then they want this Court to make findings what's in the

5   best interest of investors.  And the investors are defined as

6   the wrapped security holders in the ResCap trust according to

7   their settlement.  And they're almost arguing that insurance,

8   the insurance policies have nothing to do with what's going on

9   in this court.  But it has everything to do with what's going

10  on in the court, because but for the commutations that are

11  taking place as part of the ResCap settlement, the trustees

12  would not be requesting these special findings from the Court.

13          Your Honor, Freddie Mac has waited three and a half

14  years to be paid.  You will hear testimony to the fact, they've

15  worked in good faith.  There was never -- you'll hear no issues

16  of bad conduct by Freddie Mac throughout the four-year period.

17          But Your Honor will hear testimony -- and I'll finish

18  my comments now -- that what happened here was nothing less

19  than double dealing and is not -- and double dealing is not the

20  basis for findings of good faith.

21          THE COURT:  Thank you, Mr. Goodman.

22          Mr. Shore.

23          MR. SHORE:  Good morning, Your Honor, Chris Shore from

24  White & Case, on behalf of the ad hoc group of junior secured

25  notes.  I'll be very brief.  I want to focus on one aspect of

**RESIDENTIAL CAPITAL, LLC, ET AL.**

35

1    what Mr. Kerr said in opening and discussions he and I have had

2    on behalf of our respective clients over the past few days and

3    we've reached a deal to defer most of our fight as of last

4    night.

5            And the deal we have is irrespective of what the

6    motion says, the debtors are not seeking the allowance of any

7    claim at ResCap LLC right now.  We can then withdraw our

8    objection to that portion of the motion, and we'll reserve all

9    of our rights --

10           THE COURT:  Confirmation

11           MR. SHORE:  -- to raise those issues at confirmation

12   if we're still in the game at confirmation.  One thing we'll

13   have to do to fix the record at this point is I'll get back and

14   give you new designations removing the designations and

15   counter-designations relating to the ResCap LLC claims.

16           So my case has been significantly pared down and I'll

17   quite literally be taking a back seat in the trial.  All I want

18   to focus on is around the allowance of what -- or what happens

19   in the absence of a plan being confirmed that is being ruled

20   upon now and that's the allowance of a 596-million-dollar

21   claim, the potential for the assertion of claims that are

22   capped at a 596-million-dollar claim, and indemnity risk.

23           I had a little opportunity to address those issues

24   with Mr. Kruger in his deposition and we've designated some of

25   that, but there's some gaps in the record that I'll just try to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

36

1  fill through the cross-examination and just really focus on the

2  issue of whether if a plan isn't confirmed does the deal in

3  which they get 596 guaranteed, an opportunity for another 596,

4  and then the possibility of Ally getting involved in it, does

5  that make sense under the evidence that's presented to the

6  Court.

7          THE COURT:  Thank you, Mr. Shore.

8          All right.  Are we ready to begin the evidence?  No?

9  I'm sorry.

10          MR. KERR:  I think we are, Your Honor.

11          THE COURT:  We are.  Okay.  Who is the first witness?

12          MR. SIDMAN:  Good morning, Your Honor, Howard Sidman

13  from Jones Day for FGIC.  We're calling as our first witness

14  John Dubel, chief executive officer of FGIC.

15          THE COURT:  If you would come up to the witness stand

16  and raise your right hand, Mr. Dubel.

17      (Witness sworn)

18          THE COURT:  Please have a seat.  There's water in the

19  pitcher if you wish to have some.

20          THE WITNESS:  Thank you, Your Honor.

21          THE COURT:  Mr. Sidman, go ahead.

22          MR. SIDMAN:  Because this is the first witness and I'm

23  not sure how Your Honor wants to proceed with the

24  declarations --

25          THE COURT:  Well, I think you should offer the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

37

1    declaration into evidence.

2            MR. SIDMAN:  Okay.  That's what I'm going to do, Your

3    Honor.

4            THE COURT:  Okay.  And so if you would identify it for

5    the record.

6            MR. SIDMAN:  Right.  I'm going to -- what I have in my

7    hand is a witness statement of John Dubel dated July 31st of

8    2013 along with the exhibits thereto.

9            THE COURT:  Okay.

10           MR. SIDMAN:  And at this time I'd like to offer it

11   into the record and into evidence.

12           THE COURT:  All right.  Any objections?

13           MR. BAIO:  Yes, Your Honor.  Joseph Baio for the

14   individual investors.  A couple of things.  Your Honor, we

15   obviously have an ongoing objection to references to the

16   mediation and attorneys --

17           THE COURT:  Look, I've already ruled, Mr. Baio.  don't

18   revisit what's been ruled on.  You tried that in the motion in

19   limine.  I've ruled.

20           MR. BAIO:  I understand, Your Honor.  I'm not going to

21   repeat any such objections.  I do object though to paragraphs

22   23 to the end of this declaration.

23           THE COURT:  Mr. Sidman, do you have another copy of

24   it?

25           MR. SIDMAN:  Yes.  Let me do that.  Let me --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

38

1              May I approach?

2              THE COURT:  Please.  If you want, why don't you hand

3      up the rest of it.

4              All right, what's your objection, Mr. Baio?

5              MR. BAIO:  23 to the end constitutes expert testimony,

6      Your Honor.  This witness was not identified as an expert.

7      There are assumptions that are not included, information wasn't

8      provided underlying these statements, including particularly,

9      paragraphs 27 to 29, so that it should not be accepted because

10     we did not have an opportunity to examine this witness as an

11     expert or on these subjects.  In addition --

12             THE COURT:  Did you have the declaration --

13             MR. BAIO:  No, Your Honor.

14             THE COURT:  -- when you deposed him?

15             MR. BAIO:  No, the declaration occurred afterwards,

16     Your Honor.  The deposition was I believe July 25th. The

17     declaration is --

18             THE COURT:  All right.  Go ahead with your objection.

19     Anything else?

20             MR. BAIO:  Yes, and there's no foundation independent

21     from anything else as to 27 to the end, the discussion

22     including series of calculations about which we have nothing.

23             THE COURT:  Mr. Goodman, you have an objection too?

24             MR. GOODMAN:  Your Honor, all I want to say is I

25     support Mr. Baio's objection particularly with respect to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

                                                                                    **39**

1   paragraphs 28 through the end of the affidavit for the reasons

2   he so stated.

3           THE COURT:  Mr. Sidman, do you want to respond?

4           MR. SIDMAN:  Your Honor, may I respond?

5           THE COURT:  Please.

6           MR. SIDMAN:  Look, this objection is surprising, but I

7   will tell you the information here is based on Mr. Dubel's

8   personal knowledge.  We're not offering him as an expert

9   witness.  Indeed, he's here as a fact witness.

10          THE COURT:  The objection is overruled.

11  (Declaration of Mr. Dubel was hereby received into evidence as

12  FGIC's Exhibit, as of this date.)

13          MR. SIDMAN:  Thank you, Your Honor.  With that --

14          THE COURT:  Cross-examination.

15          MR. SIDMAN:  Your Honor, we have some witness binders.

16          THE COURT:  Why don't you get them circulated and let

17  me have a copy.

18      (Pause)

19          MR. GOODMAN:  Your Honor, may I proceed?

20          THE COURT:  Please, yes, go ahead.

21          MR. GOODMAN:  Thank you.

22  CROSS-EXAMINATION

23  BY MR. GOODMAN:

24  Q.   Mr. Dubel, I'm Peter Goodman again, from McKool Smith.

25  We've met before, correct?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

40

1   A.   Yes, we have.

2   Q.   Okay.  And, Mr. Dubel, you're experienced in representing

3   troubled companies in reorganization; is that correct?

4   A.   I am.

5   Q.   And you are currently the chief executive officer of FGIC;

6   is that right?

7   A.   That is correct.

8   Q.   Okay.  Now, you have, as I understand, significant

9   experience working on plans and disclosure statements; is that

10   right?

11   A.   I do.

12   Q.   And you agree that a disclosure statement needs to provide

13   accurate information concerning the plan of reorganization; is

14   that true?

15   A.   I believe that's the -- that's what it's supposed to do,

16   yes.

17   Q.   Okay.  Now, I'm correct that the rehabilitator filed a

18   disclosure statement in the state court rehabilitation

19   proceeding; is that right?

20   A.   That is correct.

21   Q.   And you worked extensively with the agent to the

22   rehabilitator, Mr. Giacone in developing the disclosure

23   statement; is that right?

24   A.   Mr. Giacone, yes.

25   Q.   Um-hum.  And who is Mr. Giacone again?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

41

1  A.   Mr. Giacone is the chief financial officer of the New York

2  Liquidation Bureau and was appointed by the rehabilitator,

3  superintendent of the Department of Financial Services, Mr.

4  Lawsky, as his agent to act on his behalf in the FGIC

5  rehabilitation proceedings.

6  Q.   And in the disclosure statement, the rehabilitator

7  provided detailed information concerning the policies which he

8  intended to commute; am I right?

9  A.   I don't believe it was detailed information on  -- there

10  was general information about the policies, but also the fact

11  that we would have the ability to commute any and all policies.

12  Q.   Okay.  Now --

13       Mr. Dubel, in tab -- it's at tab 2 of your deposition, if

14  you could pull that out for a moment in your witness binder.

15  A.   Sorry.

16  Q.   The tab is called transcript, I apologize, and it's tab 2.

17          THE COURT:  You're looking at what's been marked for

18  identification as Objectors' Trial Exhibit AS; is that correct?

19          MR. GOODMAN:  Yes, Your Honor.

20          THE COURT:  Okay.  We have to --

21          MR. GOODMAN:  I apologize.

22          THE COURT:  -- be sure, so that we have a clear trial

23  record.

24          MR. GOODMAN:  Yes.

25          THE COURT:  You've got the binders; that's helpful,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

42

1    but you need to identify exhibits by their trial designation.

2    All right.  So we're looking at for identification Objectors'

3    Trial Exhibit AS.

4    Q.    And I'd draw your attention to page 3.  Are you there?

5    A.    Yes.  I'm sorry; yes.

6    Q.    And do you recall during your deposition we reviewed the

7    paragraph beginning "Third, in an effort to mitigate FGIC'S

8    liabilities and increase recoveries for policyholders as part

9    of the plan the rehabilitator is seeking approval of certain

10   settlements with counterparties to FGIC contracts"?  Do you see

11   that paragraph?

12           THE COURT:  I don't.

13   A.    I'm sorry, I don't either.  I apologize.  On page 3 you're

14   referring to.

15           THE COURT:  There are page numbers at the bottom of

16   the page.  Are you referring to one of those page numbers?

17   Q.    Page 23, I apologize.

18   A.    Is it the page 23 of 73, is that what you're referring to?

19           MR. GOODMAN:  One moment.  And I apologize, Your

20   Honor.  I think we gave out all the witness binders, so we're

21   just looking.  Well, I can circle back to that, Your Honor.

22   All right.

23   Q.    Now, isn't it true that the disclosure statement does not

24   include any discussion of the commutation of the RMBS policies?

25   A.    I don't believe that's true.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

43

1  Q.   Okay.  It doesn't include specific -- does it include

2  specific reference to commutations of RMBS policies?

3  A.   There are no specific references, as I recall to any

4  particular deals other than the fact that there were deals that

5  were actually in front of the court or were going to be put in

6  front of the court at that time.  But it does reference back to

7  the plan which incorporates language that says FGIC has the

8  ability to commute and/or settle any and all policies it has,

9  which would obviously include RMBS policies.

10  Q.   Okay.  Now, you recall having your deposition taken in

11  this case?

12  A.   I do.  That's correct.

13  Q.   And do you recall when I asked you on page 76, line 17

14  through 25 of your deposition, do you know whether the

15  disclosure statement contains disclosure concerning commuting

16  specific RMBS policies issued to the trusts?

17          THE COURT:  Are you referring to a specific document,

18  Mr. Goodman?

19          MR. GOODMAN:  This is his transcript, Your Honor.

20          THE COURT:  What page?  When you're going to refer to

21  deposition transcript you need to give me page and line

22  numbers.

23          MR. GOODMAN:  Yeah.  It's that same exhibit.

24          THE COURT:  I have the same exhibit, tell me the page

25  and line numbers.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

44

1            THE WITNESS:  It's Exhibit F --

2            MR. GOODMAN:  Yeah, page 76, lines 17 --

3            THE COURT:  I'm sorry, say it again?

4            MR. GOODMAN:  76 line 17 through 25

5            THE WITNESS:  Is this Exhibit FG, you're referring to?

6            THE COURT:  Okay.  The transcript is marked as Exhibit

7    FG for identification?

8            MR. GOODMAN:  FG.

9            THE COURT:  And page 76, lines 17 to 25.

10           MR. GOODMAN:  Um-hum.

11   Q.   Now, do you recall I asked you, "Do you know whether this

12   disclosure statement contains disclosure concerning commuting

13   specific RMBS policies issued to the trusts?"  Your counsel

14   objected to the form, "Are you asking him to review the entire

15   disclosure statement?"

16           THE COURT:  Let's not read the objections.  If you've

17   got an answer let's get to the --

18   Q.   "Do you know?"  And your answer is on page 77, lines 2

19   through 5, "To my knowledge, there were no specific references

20   to commutations of policies that were issued to the trustees of

21   the RMBS securitization."  Is that correct?

22   A.   That's what I stated at the time, yes.

23   Q.   Now, going back to the disclosure statement, do you have

24   the disclosure statement that's annexed to the transcript in

25   front of you --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

45

1   A.   Which tab?

2   Q.   -- as part of your witness package?  Exhibit AS tab 2.

3   A.   I'm sorry, is it in this book?

4   Q.   Yes, the witness binder.

5   A.   I'm sorry.  I see it, yes.

6          THE COURT:  There are multiple page numberings on

7   exhibits.  On Exhibit AS on the lower left there's a Supreme

8   Court records online library page something of 73.  Use those

9   and tell me where you are.  Maybe you can share, Mr. Sidman,

10  so --

11         MR. KERR:  Your Honor, I'm going to move so he can --

12         THE COURT:  Okay.  All right.

13         THE WITENSS:  I'm Sorry, Mr. Goodman, am I supposed to

14  be looking --

15         THE COURT:  Hold on, Mr. Dubel.  It's in the binder.

16  He's going to tell us where.  Okay?

17         THE WITNESS:  Thank you.

18         MR. GOODMAN:  It's Exhibit AR.

19         THE COURT:  That's behind tab 1?

20         MR. GOODMAN:  And it's FGIC 0000050.  There's page

21  numbers in the middle of the disclosure statement I believe on

22  Exhibit AR.

23         THE COURT:  Page 3 of the document?

24         MR. GOODMAN:  Yes, Your Honor.

25         THE COURT:  Go ahead.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

46

1          MR. GOODMAN:  And again, I apologize for the

2    confusion.  We just handed out more binders than we

3    anticipated.

4    BY MR. GOODMAN:

5    Q.   Now, do you see the paragraph that states "Third, in an

6    effort to mitigate FGIC'S liabilities and increase recovery for

7    policyholders," on that page?

8    A.   I do.

9    Q.   Okay.  Is there any reference in there to RMBS policies?

10   A.   Not on this line, no.

11   Q.   Um-hum.  And then turn to page 23 of that same document

12   for a moment.

13   A.   Is that 23 --

14   Q.   It's Bates number 000070 --

15   A.   70.

16   Q.   -- page 23, the bottom paragraph.  Do you see the bottom

17   paragraph there starting with "The rehabilitator will set the

18   initial CPP"?

19   A.   I do.

20   Q.   Okay.  And the gist of that paragraph is that the

21   contemplated commutations would affect the CPP payments; isn't

22   that correct?

23   A.   Yes, it is.

24   Q.   And do you see --

25   A.   Among other things, yes.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    Q.    Among other things, fair enough.   And do you see any

2    reference in that paragraph to RMBS policy commutations?

3    A.    There's no reference in this paragraph.

4    Q.    Now, am I correct that you participated in negotiations

5    with an ad hoc steering committee concerning a rehabilitation

6    plan for FGIC?

7    A.    Yes.

8    Q.    And my client, Freddie Mac, and the ad hoc steering

9    committee worked with FGIC to negotiate a plan?

10   A.    Of rehabilitation?   Yes.

11   Q.    Yes.   And in the time period towards the end of 2010 and

12   the beginning of 2011, the steering committee, the ad hoc

13   steering committee and FGIC negotiated a term sheet that was

14   submitted to the New York State Department -- excuse me, to the

15   New York Insurance Department, which is now I believe the New

16   York State Department of Financial Services; is that right?

17   A.    Yes, there was a negotiated term sheet and yes the name

18   did change.   I'm not sure what you were asking, but yes.

19   Q.    And that term sheet was submitted to the New York State

20   Insurance Department?

21   A.    Yes, it was a very high level term sheet that was

22   submitted.

23   Q.    Um-hum.   And during these negotiations that went into the

24   term sheet that was submitted to the New York State Insurance

25   Department, you never had any discussions with Freddie Mac or

**RESIDENTIAL CAPITAL, LLC, ET AL.**

48

1   the steering committee regarding the possibility that their

2   RMBS policies would be commuted, correct?

3   A.   No, we did not have specific discussions of that point.

4   Q.   Now let's move forward a little bit in terms of timing.

5   In September of 2012, FGIC filed its plan of rehabilitation and

6   disclosure statement with the New York State Supreme Court,

7   correct?

8   A.   That is correct.

9   Q.   And you understand that the entry into a settlement with

10  ResCap was not a condition to the effective date of the plan of

11  reorganization; is that right?

12  A.   I don't believe it is.

13        THE COURT:  You don't believe it's right or you don't

14  believe it's a condition?

15        THE WITNESS:  Sorry, Your Honor.

16  A.   I don't believe it's a condition.

17  Q.   But I am correct that FGIC did delay the effective date of

18  the plan of rehabilitation in order to complete the

19  implementation of the ResCap/FGIC settlement; is that right?

20  A.   Among other matters, yes.  That was one of the things.

21  But there were many other things that needed to be accomplished

22  before we could go effective.

23  Q.   Were you in court on June 11th when the rehabilitation

24  court approved the plan of rehabilitation?

25  A.   I was.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

49

1   Q.   Um-hum.  Do you recall your counsel, Mr. Holtzer stating

2   "Right now, Your Honor, we don't anticipate going effective

3   before the 6th.  Currently, Your Honor is aware that there are

4   hearings before Your Honor that may occur on August 6th

5   depending on whether there's an objection to two stipulations

6   and settlements that we've submitted to Your Honor"?  Do you

7   recall that?

8        MR. SIDMAN:  Objection; hearsay.

9        THE COURT:  Overruled.

10  A.   I don't recall exactly what he said, but something along

11  that lines.  I just don't recall exact words.

12  Q.   And the two stipulations, one stipulation had to deal with

13  settlement with JeffCo; is that correct?

14  A.   I don't believe it was with JeffCo.  It was with certain

15  holders of certificates in JeffCo.

16  Q.   In JeffCo?

17  A.   In relation to JeffCo.

18  Q.   And the other stipulation was the FGIC/ResCap settlement;

19  is that correct?

20  A.   I believe that's the case, yes.

21  Q.   Now, Mr. Dubel, you were involved in the negotiations of

22  the FGIC/ResCap settlement that is before the court today,

23  correct?

24  A.   That is correct.

25  Q.   And you never discussed the commutation of the ResCap RMBS

**RESIDENTIAL CAPITAL, LLC, ET AL.**

50

1   policies with anyone from Freddie Mac; is that right?

2   A.    I was precluded from doing that.

3   Q.    And you were precluded because there was an order entered

4   in the mediation precluding you from discussing the

5   negotiations at that mediation?

6   A.    That's correct.

7   Q.    And in fact, are you aware that your counsel -- well,

8   counsel to the rehabilitator stated "The substance of the

9   negotiations among the settlement parties was not disclosed to

10  the objectors for a very simple reason.  The negotiations were

11  covered by a court order mediation privilege to prevent such

12  disclosure."  Do you agree with that?

13  A.    I would have to look at the wording, but I think that's

14  generally what he said.  I don't remember the exact words that

15  he said.

16  Q.    And you know who FHFA is?

17  A.    I do, yes.

18  Q.    Um-hum.  And you know that the FHFA is the conservator of

19  Freddie Mac, correct?

20  A.    That's what I understand, yes.

21  Q.    And I believe in your declaration to this Court you noted

22  that the FHFA through its counsel was present at the mediation;

23  is that right?

24  A.    That's correct.

25  Q.    And you're aware that Chris Johnson from the Kasowitz firm

**RESIDENTIAL CAPITAL, LLC, ET AL.**

51

1   was asked to participate in the ResCap mediation for issues

2   involving Ally Bank; is that right?

3   A.   I don't know what he was asked to do.

4   Q.   Do you know that Mr. Johnson was there?

5   A.   I don't recall meeting Mr. Johnson --

6   Q.   Um-hum.

7   A.   -- at the mediation.

8   Q.   So you never met him?

9   A.   I have never met him.

10  Q.   Okay.  And did you seek to determine why the FHFA attended

11  the mediation sessions?

12  A.   We understood they were there to work on behalf of the

13  claims that they had in the ResCap proceeding.

14  Q.   And those claims are separate from Freddie Mac's claims in

15  the ResCap -- with respect to ResCap; is that correct?

16  A.   I don't know that.

17  Q.   Okay.

18  A.   I thought that they were part of Freddie Mac.  I thought

19  they were doing it on behalf --

20  Q.   Okay.

21  A.   -- of Freddie Mac.

22  Q.   And did you seek to determine why he attended the meeting?

23  A.   I didn't know that he was attending the meeting, so I

24  wouldn't have sought to determine.

25  Q.   Oh, you didn't know he was attended.  You learned

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**52**

1    afterwards that he attended the meeting?

2    A.    Mr. Johnson?

3    Q.    Yes.

4    A.    Yes, that's true.

5    Q.    Um-hum.  So you weren't able to tell Mr. Johnson at the

6    time that there was a proposal on the table to commute the FGIC

7    wrap --

8              THE COURT:  Sustained.

9              MR. GOODMAN:  Fair enough.

10             THE COURT:  Let's move along, Mr. Goodman.

11             MR. GOODMAN:  Yes, I'm moving, Your Honor, I

12   appreciate that.

13   Q.    Now, am I correct that according to your witness statement

14   that's attached -- excuse me, am I correct that the timeline

15   which is attached to your witness statement states that the

16   commutation issue arose as early as January 14th, 2013?

17   A.    Yes.

18   Q.    Um-hum.  Now, am I correct that Freddie Mac had entered

19   into a nondisclosure agreement with FGIC?

20   A.    Not related to ResCap, but yes.

21   Q.    But related to the negotiations that were going on with

22   respect to the ResCap plan of rehabilitation; isn't that right?

23   A.    I'm sorry, the FGIC plan of rehabilitation?  Yes.

24   Q.    I'm sorry, I did that during your deposition.

25             THE COURT:  He clarified.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

53

1           MR. GOODMAN:  Thank you.

2           THE COURT:  Just so that the record is clear, why

3   don't you ask your question again --

4           MR. GOODMAN:  Fair enough, Your Honor.

5           THE COURT:  -- and let's get it clear.

6   Q.   The note -- so --

7           THE COURT:  FGIC entered into an NDA --

8   Q.   FGIC --

9           THE COURT:  -- with --

10  Q.   -- Freddie Mac in connection with the rehabilitation plan;

11  isn't that right?

12  A.   With the FGIC rehabilitation plan.  Yes, Your Honor.  Yes.

13          THE COURT:  Go ahead, next question.

14  Q.   Mr. Dubel, am I correct that recovery for the commuted

15  ResCap trusts' interest holders is all premised on both the

16  finalization of claims that are received and the future claims

17  that come in with respect -- come into the trusts, and the

18  value to the trustees as policyholders of receiving back the

19  rights that FGIC has?

20          MR. SIDMAN:  Objection to the question, vague.  If he

21  can break it down?

22  A.   I'm sorry, I'm not sure I understand it.

23          THE COURT:  I'm going to sustain the objection.

24          MR. GOODMAN:  That's fine, Your Honor.

25          THE COURT:  You're clearly entitled to go into this,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

54

1   but --

2          MR. GOODMAN:  I understand.  Your Hon --

3          THE COURT:  Go ahead.

4   Q.   Can you turn to your deposition page 134 at lines 18

5   through 25.

6   A.   I'm sorry, you said page 134 lines?

7   Q.   Lines 18 through 25.  And in that I asked you whether you

8   had the occasion to estimate the average recovery for these

9   RMBS trusts as a result of the settlements; do you see that?

10  A.   I do.

11  Q.   And a few lines down in response to my question, "And do

12  you agree that the recovery is about twenty-one cents on the

13  dollar" and you responded "I have no reason to believe" --

14          THE COURT:  Where are you reading?

15          MR. GOODMAN:  I'm sorry, page --

16          THE COURT: 135--

17          MR. GOODMAN:  134 lines 18 through 25 over to 135

18  lines 2 through 19.

19          THE COURT:  All right.  What's your question?

20  Q.   Okay.  And Mr. Dubel, on page 135, lines 2 through 19 I

21  state "And do you agree that the recovery is about twenty-one

22  cents on the dollar?"  Do you see that?

23  A.   I see that, yes.

24  Q.   And you responded "I have no reason to believe that the

25  number -- that that's the number because it is all premised on

**RESIDENTIAL CAPITAL, LLC, ET AL.**

55

1  the finalization -- on both the finalization of the claims that

2  are received and the future claims that come in and the value

3  to the trustees as policyholders of receiving back the rights

4  that FGIC has."  Do you recall that statement?

5  A.    I do.

6  Q.    Okay.  So am I correct that with respect to the recovery

7  that ResCap investors will receive under the FGIC settlement,

8  am I correct that if future claims are higher for a particular

9  trust the recovery to the certificate holders would be lower

10  all else being equal?

11          MR. SIDMAN:  Objection to form.

12          THE COURT:  Sustained.  I don't understand your

13  question, Mr. Goodman.

14          MR. GOODMAN:  I will rephrase it.

15          THE COURT:  You know --

16  Q.    So am I correct that future claims affect the recovery to

17  certificate holders of the ResCap trust?

18  A.    Among other things, yes.  There's many other contributing

19  factors, though.

20  Q.    Um-hum.  But that's one of them, right?

21  A.    That is one.

22  Q.    And am I right that as a result of the ResCap

23  certificate --

24          MR. GOODMAN:  Strike that.

25  Q.    And am I correct that as a result of the ResCap/FGIC

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    settlement, certificate holders for the trusts would no longer

2    be able to recover from FGIC'S assets that are made available

3    under the plan of rehabilitation?

4    A.    It is a settlement that would basically not pay anything

5    further to those trusts.  From FGIC that is.

6    Q.    And am I correct that you had occasion to value how much

7    more the non-ResCap trusts will receive as a result of the

8    ResCap settlement?

9    A.    I'm sorry, could you repeat that, please?

10    Q.    Sure.  Am I correct that you have had occasion to value

11    how much more the non-ResCap trust certificate holders will

12    receive as a result the ResCap settlement?

13          MR. SIDMAN:  Objection to the form.  More than what?

14          THE COURT:  Overruled.  Do you under -- if you

15    understand the --

16    A.    I'm not sure I understand the question.  I apologize.

17          THE COURT:  If you don't understand, ask another

18    question. I'm more concerned that the witness understands.

19    Let's try and get this moving along.

20    Q.    Turn to page, please, Mr. Dubel, 138, lines 3 through 25

21    of your deposition.  And do you see where I ask you the

22    question, "Have you had occasion to value how much more the

23    non-ResCap trusts will receive as a result of the ResCap

24    settlement"?

25    A.    Yes, I do.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  Q.    Um-hum.  And your answer is "I've looked at that, yes"?

2  A.    That's correct.

3  Q.    Um-hum.  But am I correct that you could not give us that

4  information at your deposition?

5  A.    Yes, that's correct.

6  Q.    Um-hum.  In fact, your counsel interposed an objection due

7  to the mediation --

8         THE COURT:  Okay.  That's improper examination.

9         MR. GOODMAN:  Fair enough, Your Honor.

10        THE COURT:  If you want to ask the witnesses -- look,

11 if you're going to use a deposition, use it correctly.  If you

12 want to ask the witness a question, ask him a question.  If

13 you're going to use the deposition to refresh his recollection

14 use it to refresh his recollection.  If you're using it for

15 impeachment, use it for impeachment.  You haven't done any of

16 that.

17        MR. GOODMAN:  I'm trying, Your Honor, and I apologize.

18        THE COURT:  Ask direct questions.

19        MR. GOODMAN:  I will.

20        THE COURT:  When I say direct, you're entitled to ask

21 him leading questions, okay, but make it, it's got to have some

22 content to it.

23        MR. GOODMAN:  Understood, Your Honor.

24 Q.    Can you turn to tab 1, Mr. Dubel.

25 A.    Yes, sir.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

58

1   Q.    Is that your witness statement?

2   A.    Tab 1 is the disclosure statement, I'm sorry.

3   Q.    It's a tab that says Dubel at the very front of the

4   binder.

5   A.    I'm sorry, the other book, is it?  You're talking about

6   this one?  It's the tab behind, or it's the section behind the

7   tab that says Dubel, is that what you're referring to?

8   Q.    Exactly.  And is that your witness declaration, Mr. Dubel?

9   A.    Without the exhibits, yes, it is.

10  Q.    Okay.  And I'd turn your attention to paragraphs 28 and 29

11  of your declaration.  Do you see that?

12  A.    I do.

13  Q.    Um-hum.  Now, in it you analyze, as I understand it,

14  certain reimbursement rights that are due FGIC from the ResCap

15  trusts?

16  A.    Sorry.

17  Q.    In paragraphs 28 through 29 you discuss reimbursement

18  claims that FGIC has against the ResCap trusts; is that

19  correct?

20  A.    I'm discussing a line item in our financial statements

21  that was pointed out in Mr. Goldstein's, I think it was his

22  expert report, and I'm just discussing those particular -- that

23  particular line.

24  Q.    Okay.  And if you look at the bottom of the page, you

25  appear to conclude that as part of the consideration for the

1    settlement, FGIC is giving up a claim of --a reimbursement

2    claim of approximately 140 million dollars due from the trusts;

3    is that right?

4    A.    Again, I'm parsing out the line that's in the financial

5    statements --

6    Q.    Um-hum.

7    A.    -- which is based upon some statutory accounting and I'm

8    breaking it down to better explain how much of it would be

9    related to the ResCap-related trusts.

10   Q.    And your analysis is that 140 million dollars would be due

11   from the trusts; is that right?

12   A.    Of the billion, roughly billion dollars, approximately 140

13   of that is related to the ResCap-related trusts, yes.

14   Q.    Um-hum.  Do you know whether any documents or analysis

15   underlying that calculation, whether that's been provided to

16   the objectors?

17   A.    I do not know.

18          MR. GOODMAN:  Thank you, Your Honor, no further

19   questions.

20          THE COURT:  Redirect?  Oh, we have more cross.  Sorry,

21   Mr. Baio.

22          MR. BAIO:  Thank you, Your Honor.

23          THE COURT:  Go ahead.

24   CROSS-EXAMINATION

25   BY MR. BAIO:

**RESIDENTIAL CAPITAL, LLC, ET AL.**

60

1    Q.    Good morning, Mr. Dubel.  I'm Joe Baio.  I think we met at

2    your deposition.  Good morning.  And let me ask you to draw

3    your attention to your witness statement again.  And I'd like

4    you to look at paragraph 27.

5    A.    Yes, sir.

6    Q.    And the third sentence which appears in the third line

7    states, "FGIC did not include in its March 31, 2013 quarterly

8    statements any estimate of recoveries from loss mitigation

9    activities, including litigation claims as FGIC has not

10   determined them to be probable and estimable."  Do you see

11   that?

12   A.    I do.

13   Q.    And that's an accurate statement, correct?

14   A.    That is.

15   Q.    And when you referred to litigation claims in that

16   sentence, what litigation claims are you referring to?

17   A.    We have a variety of active litigations some of which are

18   on hold in the ResCap bankruptcy, obviously, also against

19   Countrywide and against Credit Suisse.

20   Q.    And are -- there may be as many as fourteen cases against

21   those parties that are outstanding?

22   A.    Roughly that's the number, yes.

23   Q.    Okay.  And the amount at least being claimed by FGIC is in

24   the billions of dollars, correct?

25   A.    That is correct.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    Q.    And to the extent that FGIC collects or settles any of

2    those claims, it will have additional funds beyond what's

3    identified in the rehabilitation plan, correct?

4    A.    That's correct.

5    Q.    Fresh money that can then be used to pay policyholders; is

6    that correct?

7    A.    That's correct.

8    Q.    Okay.  And but that's not included -- none of that, those

9    recoveries are included in the evaluation of how much

10   policyholders or trusts can receive from FGIC under the FGIC

11   rehabilitation plan, correct?

12   A.    That's correct.

13   Q.    Okay.  You say that it excludes any estimate of recoveries

14   from loss mitigation activities.  What do you mean by loss

15   mitigation activities?  Is it more than just litigation claims?

16   A.    Yes.  It would include working with servicers to improve

17   the performance of the -- of the underlying trust deals.

18   Q.    And no benefit that will redound as a result of those

19   efforts are included in the estimates of how much money FGIC

20   will have under the rehabilitation plan to pay policyholders,

21   correct?  Those are excluded?

22   A.    No, that's not correct.

23   Q.    Okay.  So I thought it says that you did not include any

24   estimate of recoveries from loss mitigation activities.  So I'm

25   trying to find out what other factors besides the billions of

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   dollars of claims are included in loss mitigation factors that

2   do not appear in the quarterly statements?  Is that clear?

3   A.   I'm sorry, could you repeat the question again?

4   Q.   Sure.  This sentence refers to items that are not included

5   in the quarterly statements that you refer to, the quarterly

6   statements of FGIC, correct?

7   A.   This sentence is referring to one line item in the

8   quarterly statement, yes.

9   Q.   Okay.  And it's saying that certain things are excluded

10   from that line item, correct?

11   A.   Yes.

12   Q.   And you've already established that the billions of

13   dollars of claims that you've identified that are outstanding

14   and are being litigated and potentially settled are excluded

15   from the financial statements, correct?

16        MR. SIDMAN:  Objection to form; assumes facts not in

17   evidence.

18        THE COURT:  Overruled.

19   Q.   Is that correct?

20   A.   We do not include them in the financial statements --

21   Q.   Okay.

22   A.   -- or in that particular line item.

23   Q.   And my only question then is, you're referring not just to

24   litigation claims, but loss mitigation activities that are not

25   included in that line.  What are those things?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

63

1  A.    As I stated, the vast majority of our loss mitigation

2  efforts right now are seeking put-back recoveries from parties

3  through, most situations through -- unfortunately through

4  expensive litigation.

5  Q.    Do you know what percentage of the billion dollars is

6  included in that?

7  A.    I'm sorry, what percent --

8       MR. BAIO:  Strike that, strike that.

9  Q.    And the reason they're not included is because FGIC has

10  determined that the claims are not probable or estimable; is

11  that correct?

12  A.    That's correct.

13  Q.    Okay.  You then refer to what is included in the 1.06-

14  billion-dollar projected recoveries in the next sentence.  Do

15  you see that?  You'll have to read it.  You can read it to

16  yourself, but I'm going to ask you about certain provisions

17  that are included in there.

18       So it starts "The approximately 1.06 billion of projected

19  recovery amount in FGIC'S March 31, 2013 quarterly statements

20  comprises" -- and then I believe there are two components, at

21  least as you've described it there.  The first, I'm picking up

22  from where I left off, is "recoveries that FGIC estimated it

23  would receive through the waterfall provisions under the

24  governing documents of the various trusts insured by FGIC from

25  funds available from projected collateral cash flows."  That's

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   one group; is that fair?

2   A.    That is fair.

3   Q.    Okay.  And then the other element of the 1.06 billion

4   dollars is projected payments from other providers of credit

5   enhancement in the subject transactions.  Do you see that?

6   A.    I do.

7   Q.    Okay.  Let's take that second component.  What does that

8   include, that is projected payments from other providers of

9   credit enhancement in the subject transactions?  What did you

10  mean by subject transactions first?

11  A.    Specific policies that we have where there are separate

12  abilities to get recoveries on.

13  Q.    Does that include reinsurance or there are other things?

14  A.    That would not include reinsurance.  That would include

15  other things such as credit enhancements, such as mortgage

16  insurance, or other first-to-pay type policies that would stand

17  in front.

18  Q.    Okay.  And what percentage of the 1.06 billion dollars is

19  the projected payments from other providers of credit

20  enhancement in the subject transactions?

21  A.    I don't recall it off the top of my head right now.

22  Q.    Well, is there a document that reflects how much of it is

23  in one category and how much is in another category?  We don't

24  have it.  But do you know if there is one?

25  A.    It would be reflected in our accounting records.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  Q.   And did you refer to your accounting records when you

2  prepared this statement?

3  A.   Yes.

4  Q.   Okay.  But we don't -- did you produce them to us?

5  A.   I did not.

6  Q.   Okay.  The first part of that -- the first component of

7  the 1.06 billion dollars is recoveries that FGIC estimated it

8  would receive through the waterfall provisions under the

9  governing documents; and then it goes on.  Do you see that?

10 A.   I do.

11 Q.   Now, and I want to be sure I have this right, when you

12 read the end of that paragraph, as I understand it, you are

13 saying it is uncertain whether and to what extent any projected

14 recoveries will be realized.  That means on both components it

15 is uncertain whether and to what extent any projected

16 recoveries will be realized; is that correct?

17 A.   That is correct.

18 Q.   Now that means certainly that the recoveries are not

19 probable, right?  I mean, they're uncertain, so they're not

20 probable?

21 A.   This is an accounting estimate based upon our financial

22 records, but it's not certain that they would be -- that we

23 would receive them, no.

24 Q.   And it's certainly not probable in your view, experience?

25 A.   Some of them are probable.  We do have some that flow

**RESIDENTIAL CAPITAL, LLC, ET AL.**

66

1    through, but I haven't looked at every single one of them at

2    this point.

3    Q.    Certainly not the reimbursements; is that correct?    The

4    reimbursements are not certain?

5    A.    That's correct.

6    Q.    They're not probable?

7    A.    You're asking what I think is an accounting question and

8    I'm not -- as I sit here today, I can't answer that

9    specifically on each one of those.

10    Q.    Sorry, I'm not asking an accounting issue.

11            THE COURT:    You are.    Probable and estimable are

12    specific accounting terms.    Ask your next question, Mr. Baio.

13            MR. BAIO:    Okay.

14    Q.    Well, you state that the amount -- the first component

15    includes amounts FGIC estimated it would receive through the

16    waterfall provisions under the governing documents.    Do you see

17    that?

18    A.    I do.

19    Q.    Now, do you understand that under the typical trust

20    indenture that FGIC generally is not entitled to reimbursement

21    until the policyholders are paid principal and interest in

22    full?

23    A.    It depends upon the specific deals.

24    Q.    Right.

25    A.    It may or may not be the case.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

67

1  Q.   Well, do you have an understanding, given your position,

2  that at least a majority of them include those provisions, that

3  is, under the waterfall FGIC doesn't get its reimbursement

4  until the trusts are paid their principal and interest in full?

5  A.   I don't have that understanding.

6  Q.   And the chances that that's going to happen, given the

7  rehabilitation plan evaluation are very slim; isn't that

8  correct, that is, that the trusts are going to be paid

9  principal and interest in full?

10 A.   That's correct.

11 Q.   So really on the reimbursement side, you don't really have

12 an idea of whether FGIC is going to get a dime from anyone

13 under the waterfall provision, correct?  Certainly not certain?

14 A.   That's correct.

15 Q.   And not probable?  I mean probable in the probability

16 sense, sorry, not in an accounting sense?

17 A.   I guess the best way to say it is what it says right here.

18 It's uncertain whether we will.  I think you're asking me what

19 I view as an accounting question so I don't want to answer

20 that --

21 Q.   Okay.

22 A.   -- in that sense, but it's uncertain, yes.

23 Q.   And the extent is uncertain, meaning it could be not a

24 dime?

25 A.   That's correct.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

68

1    Q.   Okay.  So then in paragraph 28 you refer to some potential

2    benefits under the FGIC rehabilitation plan that the people who

3    may not pay a dime get as a result of the terms of the plan.

4    This paragraph 28 does not, does not refer to anything under

5    the settlement; is that correct?  This is what happens under

6    the rehabilitation plan?

7              MR. SIDMAN:  I'll object to the question.

8              THE COURT:  What's the question?

9    Q.   The question is paragraph 28 includes an evaluation of

10   potential recoveries and benefits independent from the

11   settlement agreement.

12             THE COURT:  Do you agree?

13   Q.   This is under the rehabilitation plan?

14             THE COURT:  Do you agree with that?

15   A.   Independent of this agreement, yes.

16             THE COURT:  Okay.  Next question.

17   Q.   You project that of the one -- and let's read that second

18   sentence, "If the 1.06 billion projected recovery is realized,

19   FGIC would be entitled to receive only approximately 300

20   million dollars." And that 300 million is also the potential

21   zero, not a dime, correct?

22   A.   That's correct.

23   Q.   Okay.  "And the remainder would be retained by the trusts

24   for application in accordance with such waterfall provisions

25   likely for payment to the trusts' investors," correct?

1     A.    That's correct.

2     Q.    And that's a benefit, to the extent it is at all, that an

3     investor gets not as a result of the settlement plan, of the

4     settlement agreement, but as a result of the FGIC

5     rehabilitation plan, correct?

6     A.    That's correct.

7     Q.    Paragraph 29, the first sentence says, "However, since

8     approximately half of that 1.06 billion projected gross

9     recovery amount represents FGIC'S estimate of the

10     reimbursements that will be due to FGIC in connection with

11     ResCap-related transactions pursuant to the various waterfall

12     provisions," do you see that?

13     A.    I do.

14     Q.    Is that suggesting that the reimbursements that may never

15     come through nevertheless lead to an estimate of 500 million

16     dollars of payments that are due?

17         MR. SIDMAN:  Objection.

18         THE COURT:  Sustained.

19     Q.    Half of the billion is 500 million, correct?

20     A.    Half of a billion is 500, yes.

21     Q.    Okay.  And what you're saying here is 500 million dollars

22     of that 1 billion dollars is based on an estimate of recovery

23     of reimbursements on the ResCap-related trusts, right?

24         THE COURT:  No, it says --  it doesn't say that.  So

25     read it correctly.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

70

1          MR. BAIO:  Okay.  I'm sorry, Your Honor.

2    Q.   "Since approximately half of that 1.06-billion-dollar

3    projected gross recovery amount represents FGIC's estimate of

4    the reimbursements that will be due to FGIC in connection with

5    the ResCap-related transactions pursuant to the various trust

6    waterfall provisions," do you see that?

7    A.   I do.

8    Q.   And is that saying that FGIC has estimated that the

9    reimbursements that will be due to FGIC in connection with

10   ResCap-related transactions pursuant to the various trust

11   waterfall provisions, will be approximately half of the 1.06

12   billion dollars?

13   A.   For that one particular line item in the financial

14   statements and the footnotes, yes, that's what I'm referring

15   to.

16   Q.   And those are the reimbursements that may actually be

17   zero, correct?

18   A.   That's correct.

19   Q.   And then as you go through and you say half of the

20   projected 300 million will be forgiven and you get to the 140

21   million at the bottom, those numbers in fact all could be zero?

22   A.   That is correct.

23   Q.   In paragraph 24 you have a calculation of some ninety

24   million dollars.  Do you see that?

25   A.   I do.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    Q.    And that ninety million dollars represents a payment for

2    what claims, if you know?

3    A.    The claims that have been put forward by the various FGIC

4    insured trusts.

5    Q.    Against?

6    A.    Against, I don't recall exactly the specifics of the

7    proofs of claims that were filed, but the trusts filed claims

8    against the various ResCap debtors.

9    Q.    And so far as you understand, in the absence of the

10   settlement, those claims survive fully, correct, at least in

11   your understanding?

12   A.    I don't --

13   Q.    They don't go away?

14   A.    I don't believe that the proof of claim has been approved

15   or denied at this point in time.

16         MR. BAIO:  Your Honor, I pass the witness.

17         THE COURT:  All right.  Anybody else wish wishes to

18   cross-examine?

19         Redirect.

20         MR. SIDMAN:  Your Honor, can I have one minute to

21   confer with my colleague?

22         THE COURT:  Sure, go ahead.

23      (Pause)

24         THE COURT:  Mr. Sidman?

25   REDIRECT EXAMINATION

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    BY MR. SIDMAN:

2    Q.   Mr. Dubel, just a couple of questions on redirect.

3    Earlier counsel for Freddie Mac was discussing with you or

4    asking you about additional possible recoveries that were --

5    would be included in the rehabilitation plan that would

6    increase recoveries under the rehabilitation plan.  Do you

7    recall those questions?

8    A.   I do.

9    Q.   Okay.  Are there other items that -- not included in the

10   rehabilitation plan that would -- may lead to increases in

11   claims that would decrease the rehab -- the payments due to --

12   the payments received under the rehabilitation plan for those

13   people who receive will rehabilitation plan payments?

14            MR. BAIO:  Object to the form.

15            THE COURT:  Sustained.  Just ask it again.  Okay, Mr.

16   Sidman.

17            MR. SIDMAN:  Sure.

18   Q.   Are there --

19            THE COURT:  Are there other claims that may be

20   received that will reduce payments under the rehabilitation

21   plan?

22            THE WITNESS:  Yes, Your Honor.

23            THE COURT:  Could you explain that?

24            THE WITNESS:  We have a book of about thirty-one

25   billion dollars of exposure.  About a third of that is related

**RESIDENTIAL CAPITAL, LLC, ET AL.**

73

1    to the public finance space, and we've seen a tremendous

2    deterioration in the public finance space over the last several

3    years, something that's unprecedented.

4            THE COURT:  How much exposure do you have in Detroit?

5            THE WITNESS:  We have -- well, it's a billion-seven of

6    par but we insure the interest, too, so it could be well over

7    two billion dollars depending on what happens.  And we have

8    tremendous exposure in other areas, Puerto Rico which has more

9    recently experienced some severe downturns.  So there are other

10   areas that could happen or other structured finance problems

11   that could occur.

12           THE COURT:  Go ahead, Mr. Sidman.

13           MR. SIDMAN:  I have no further questions.

14           THE COURT:  Any further cross?

15           MR. BAIO:  Just to follow up on that, Your Honor.

16           THE COURT:  Go ahead, Mr. Baio.

17   RECROSS-EXAMINATION

18   BY MR. BAIO:

19   Q.   Mr. Dubel, FGIC has set up very significant reserves for

20   those exposures, correct?

21   A.   I'm sorry, for which exposures are you talking --

22   Q.   The ones you were just referring to?

23           THE COURT:  Public finance?

24   Q.   Public finance?

25   A.   We have put in reserves, most recently, yes, we have.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

74

1  Q.   And they're in your financial statements?

2  A.   They are.

3       MR. BAIO:  Correct.  No further questions.

4       THE COURT:  Thank you, Mr. Baio.

5       Mr. Sidman?

6       MR. SIDMAN:  Yes.

7       THE COURT:  Quickly.

8       MR. SIDMAN:  Yes, sure.

9  FURTHER REDIRECT EXAMINATION

10 BY MR. SIDMAN:

11 Q.   Speaking of reserves in your financial statements, has

12 FGIC recently issued new financial statements for the second

13 quarter ending June 30th, 2013?

14 A.   We did, in accordance with the deadlines that we have with

15 the Insurance Department, we filed our second quarter

16 yesterday.

17 Q.   Have there been any changes with respect to those

18 reserves?

19 A.   Yes, there has.

20 Q.   What were those changes?

21 A.   We've increased our reserves for the quarter by

22 approximately a little over 800 million dollars.

23       THE COURT:  Anything else?

24       MR. SIDMAN:  No, Your Honor.  At this time I just want

25 to make sure for the record we would like to introduce the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

75

1    Dubel statement into the record --

2            THE COURT:  That's in evidence already.

3            MR. SIDMAN:  And the exhibits as well.

4            THE COURT:  Well, then offer the exhibits.  What are

5    the exhibits?  Offer them by exhibit number, please?

6            MR. SIDMAN:  Well, Your Honor, what we did we just put

7    the Dubel exhibit itself, there's --

8            THE COURT:  Okay, look, if we're going to have a clear

9    record --

10           MR. SIDMAN:  Okay.

11           THE COURT:  -- you need to identify it specifically by

12   exhibit number what you're offering, I'll see if there are any

13   objections, I'll rule on the objections and I'll determine what

14   comes into evidence.

15           MR. SIDMAN:  One minute, Your Honor.

16           THE COURT:  Okay.

17           MR. SIDMAN:  So for the record, the Dubel witness

18   statement includes the following exhibits.

19           THE COURT:  Okay.Just let me get my exhibit list --

20           MR. SIDMAN:  Sure.

21           THE COURT:  -- and so I'm on the same page with you

22   all.  Go ahead, Mr. Sidman.

23           MR. SIDMAN:  Sure.

24           MR. BAIO:  I'm sorry, your  Honor, I don't have such

25   a book, I would like to just --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

76

1           MR. SIDMAN:  You didn't get one?

2           MR. BAIO:  No.  Thank you, now I'm with you.

3           THE COURT:  Okay.

4           MR. SIDMAN:  Exhibit A to the --

5           THE COURT:  You've got a problem right off the bat.  I

6   made it clear that the proponents of the settlement will use

7   numbers for their exhibits and the objectors will use letters

8   for their exhibits.  I've got an exhibit list with numbers.

9   Are what you're offering now on the exhibit list that's been

10  provided to me or not?  If you want to clarify this later,

11  let's not take the time.  But I tried to be as clear as

12  possible in the scheduling orders I entered.

13          MR. SIDMAN:  Your Honor --

14          THE COURT:  Proponents of the settlement use numbers,

15  objectors use letters.  So that everything has unique

16  identification.

17          MR. SIDMAN:  Right.

18          THE COURT:  I can't have A, B and C from you and A, B

19  and C from the other side.

20          MR. SIDMAN:  Understood, Your Honor.  What we intended

21  to do was just submit the witness statement as a whole, but I

22  understand that's --

23          THE COURT:  Is that marked as an exhibit?

24          MR. SIDMAN:  It is not, Your Honor.  I'd like to mark

25  the witness statement as an exhibit.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

77

1          THE COURT:  Well, look, let's come back to it.

2          MR. SIDMAN:  Exhibit A is a composite of Exhibit 226

3    which is the disclosure statement.  So we can just refer to --

4    for now as Exhibit 226.

5          MR. GOODMAN:  Are you submitting the disclosure

6    statement in the plan --

7          THE COURT:  Look, the disclosure statement is 175

8    pages long.

9          MR. SIDMAN:  Right, this is an excerpt.

10          THE COURT:  Okay.  You're going to deal with this

11    later.  You better work out during the recess, okay?

12          MR. SIDMAN:  Yes, Your Honor.

13          THE COURT:   If the disclosure statement is going to

14    come in, it's going to come in in its entirety.  It's going to

15    be pre-marked.  I wanted everything pre-marked.  I couldn't

16    have been any clearer, Mr. Sidman.

17          MR. SIDMAN:  Yes, Your Honor.

18          THE COURT:  Okay.  Let's not take the time now.  All

19    right?

20          MR. SIDMAN:  Yep.

21          THE COURT:  But don't forget to come back to it

22    because nothing is in evidence at this point, other than I've

23    admitted the witness statement.

24          MR. SIDMAN:  Thank you, Your Honor.

25          THE COURT:  All right.  For the proponents, who's the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    next witness?

2              You're excused, I'm sorry, Mr. Dubel.  Thank you very

3    much for your testimony.  Why don't you just leave them there.

4    Okay?  Thank you very much.

5              MR. KERR:  Your Honor, I'm Charles Kerr of the

6    debtors.  The next witness is Lewis Kruger.

7              THE COURT:  Okay.

8              MR. KERR:  If you give me a minute I have binders that

9    I want to distribute.

10             THE COURT:  All right.  So let's -- it's 10:41 or

11   10:42.  We're going to take a ten-minute recess now while you

12   switch.  Mr. Sidman, maybe you can confer --

13             MR. SIDMAN:  Yeah.

14             THE COURT:  -- and see if you can sort out the

15   exhibits now.

16        (Recess from 10:42 a.m. until 11:01 a.m.)

17             THE COURT:  All right, everybody please be seated.

18   The recess was a little longer than I anticipated.  My chambers

19   was just advised by Justice Ling-Cohan that she's rendered her

20   decision.  They're faxing it here, I haven't seen it yet.

21             MR. KERR:  Your Honor, Charles Kerr of Morrison &

22   Foerster for the debtors.  I just heard about that as well.

23   And I also realized another housekeeping matter --

24             THE COURT:  Sure.

25             MR. KERR: -- that Your Honor wanted us to -- and that

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    was about extending the date of approval of the FGIC settlement

2    from August 19th to September 16th.

3            THE COURT:  Yes.

4            MR. KERR:  I wanted to inform the Court that all the

5    parties to the PSA have agreed to that.  They're in the process

6    of documenting -- it has been documented.

7            THE COURT:  I appreciate that. Thank you, Mr. Kerr.

8            MR. KERR:  Your Honor, in support of the debtors'

9    motion for an order under Bankruptcy Rule 9019 for approval of

10   the settlement, we offer the direct testimony of Mr. Kruger

11   dated July 31st, 2013 which was filed as docket entry number

12   4431.

13           I put in front of the witness, and I put in front of

14   Your Honor two binders, and let me just explain what they have.

15           THE COURT:  Okay.

16           MR. KERR:  And I've given them to other counsel as

17   well.  In volume 1 of the binder is a copy of Mr. Kruger's

18   statement as filed.  It's document 4431.  And then behind it

19   are the exhibits that I'm going to now seek to introduce into

20   evidence that relate to Mr. Kruger's testimony.  In volume 2

21   there's a single exhibit which is the Bank of New York proof of

22   claim.  We've separated that out because it was so voluminous.

23   That's -- I believe it's Exhibit 7.  But I was going to --

24   well, first let me offer the direct testimony of Mr. Kruger

25   first into evidence.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    THE COURT:  All right, are there any objections?

2    MS. EATON:  Yes, Your Honor, Mary Eaton on behalf of

3  the Monarch objectors.  We object to the following exhibits.

4    THE COURT:  Let's deal with testimony first.  Do you

5  have any objections to the direct testimony, Ms. Eaton?

6    MS. EATON:  No, Your Honor.

7    THE COURT:  Okay.  Mr. Shore.

8    MR. SHORE:  Yes, Your Honor.  Only just want to

9  reserve any motions to strike to the conclusion of the cross-

10  examination and then renew it then, otherwise I have no

11  objection to it coming in.

12    THE COURT:  You know, that's not the way we usually do

13  it, Mr. Shore.

14    MR. SHORE:  I can voir dire the witness now on the

15  basis of his understanding or I could wait until cross.

16    THE COURT:  All right.  Let's wait until cross.

17    MR. KERR:  Your Honor, I --   THE COURT:  So subject

18  to Mr. Shore's examination, the direct testimony of Mr. Kruger,

19  which is ECF 4431 is admitted into evidence.

20  (Direct testimony declaration of Mr. Kruger was hereby received

21  into evidence as Debtors; Exhibit, as of this date.)

22    THE COURT:  Okay.  Now you want to deal with the

23  exhibits?

24    MR. KERR:  Yeah.  Your Honor, I have --

25    THE COURT:  Okay, you've got to be careful of the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

81

```
 1   light switches.

 2           Go ahead.

 3           MR. KERR:  Your Honor, I have fourteen exhibits that

 4   I'd like to offer in.

 5           THE COURT:  Okay.

 6           MR. KERR:  I can list them one by one or alL together.

 7   What would be the best way to do it for Your Honor?

 8           THE COURT:  Let's list them all and then we'll give

 9   Ms. Eaton and anybody a chance.

10           MR. KERR:  The exhibits that we're moving in, and

11   these are all on the exhibit list supplied to Your Honor --

12           THE COURT:  Right.

13           MR. KERR:  -- it's Defendant's Exhibit number 1

14   Defendants' Exhibit number 2, Defendants' Exhibit number 3,

15   Defendants' Exhibit number 4, Defendants' Exhibit number 5,

16   Defendants' Exhibit number 6, defendant's -- excuse me,

17   Debtors' Exhibit, I apologize, Your Honor.

18           THE COURT:  You've got to get used to that, Mr. Kerr.

19           MR. KERR:  I apologize, Your Honor.

20           THE COURT:  You're suggesting that you usually are

21   representing defendants.  But --

22           MR. KERR:  Not at all, Your Honor, I don't mean to be

23   defensive.  Debtors' Exhibit 7, Debtors' Exhibit 30.

24           THE COURT:  You know what, I don't have a 7 in the

25   binder.
```

**RESIDENTIAL CAPITAL, LLC, ET AL.**

82

1            MR. KERR:  It's in the separate binder volume.

2            THE COURT:  Oh, okay that's the 7.  Okay.  Go ahead,

3  30.

4            MR. KERR:  Defendants' Exhibit 30, Defendants' Exhibit

5  31, Defendants' Exhibit 32, Defendants' Exhibit 43, Defendants'

6  Exhibit 54 --

7            THE COURT:  Yeah, you're doing it again.

8            MR. KERR:  I apologize, Your Honor, I've got to just

9  get my place.

10           THE COURT:  It would be terrible if you were

11 representing a plaintiff and you do that, at least D debtor, D

12 defendant, but go ahead.

13           MR. KERR:  Debtors' Exhibit 55 and Debtors' Exhibit

14 56.  And those are each in the binders in front of you.

15           THE COURT:  They are.  There's also a 57 and 58.  Are

16 you not introducing those.

17           MR. KERR:  I am, Your Honor, 57 and 58, too.  I

18 apologize.  Yes.

19           THE COURT:  All right.  So, Ms. Eaton, you had

20 objections to exhibits.

21           MS. EATON:  We have objections to the following four

22 exhibits, Your Honor.  First with respect to Exhibit 32 we

23 object on the basis that the document is incomplete; second, or

24 I can take the next three.

25           THE COURT:  Why don't you give me the numbers first

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   and then come back, just so I write the exhibits down.

2           MS. EATON:  Exhibits 54, 55 and 56 on the basis that

3   it constitutes hearsay.  54, 55 and 56.

4           THE COURT:  Okay.

5           MR. KERR:  Your Honor --

6           THE COURT:  So what's -- let's deal with the -- the

7   completeness, what am I looking at here?

8           MR. KERR:  What Exhibit --

9           THE COURT:  32 is what we're talking about.

10          MR. KERR:  What 32 is, Your Honor -- let me just pull

11  it out -- this was the document as it was produced during

12  discovery.  It is an e-mail from Jennifer -- I think the top

13  e-mail is from Jennifer Shank, who was an employee of ResCap --

14  to members of the board; and it's attaching several documents

15  that are being supplied to the board.  It's dated May 23rd,

16  2013.

17          We produced it; and attached to it are copies of the

18  PSA, the supplemental term sheet and the term sheet.  What was

19  also forwarded to the board was a copy of the then draft FGIC

20  settlement agreement.  We did not -- you'll see at the end

21  starting at the end, Your Honor, we did not produce a copy of

22  the FGIC settlement agreement at that point because we were

23  subject to the mediation confidentiality.  We're only offering

24  this, Your Honor, for the fact of showing that a draft of the

25  FGIC settlement was sent to the board on May 23rd, no other

**RESIDENTIAL CAPITAL, LLC, ET AL.**

84

1    purpose for it whatsoever.

2           THE COURT:  For no other purpose for the entire

3    document or --

4           MR. KERR:  Well, this was the document, this was the

5    e-mail, so --

6           THE COURT:  Okay.

7           MR. KERR:  -- that's why we -- what we wanted to

8    establish, Your Honor, was simply that on May 23rd -- Mr.

9    Kruger can testify to this -- a copy of the then draft FGIC

10   settlement was sent to the board of ResCap; and this was the

11   e-mail and attachments that we had and as produced.

12          THE COURT:  Ms. Eaton?

13          MS. EATON:  Well, we still -- we stand by our

14   objection that it's incomplete.  I don't know that there is a

15   different draft of the FGIC settlement agreement, and it seems

16   to us pertinent that if this is the draft that the board

17   approved that the document in its entirety should be entered

18   into evidence.

19          MR. KERR:  Your Honor, may I address that?

20          THE COURT:  Yes, please.  Go ahead.

21          MR. KERR:  Okay, again, Your Honor -- and Mr. Kruger

22   will testify to this -- Mr. Kruger was authorized by the board

23   to approve the FGIC settlement agreement.  He approved the

24   settlement agreement.

25          THE COURT:  Okay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1      MR. KERR:  And so this was simply -- in his testimony

2  he simply testi -- in his written testimony he simply states he

3  kept the board informed about what he was doing.  This is

4  simply evidence that he had kept the board informed.  Mr.

5  Kruger is the one who approved the FGIC settlement agreement.

6  And the other documents that were just part of it, they were

7  transferred the whole time, so we had to conclude that this is

8  what was sent

9      THE COURT:  All right, for the limited purpose for

10  which it's being offered, the objection to Exhibit   32 is

11  overruled.  If the purpose changes, I'm going to listen to Ms.

12  Eaton again.

13      MR. KERR:  And, Your Honor, with respect to 54 --

14      THE COURT:  Hang on everybody. I was just handed a

15  copy of Justice Ling-Cohan's decision.  But I'll deal with it a

16  little bit after.  Go ahead.

17      MR. KERR:  With respect to Exhibits 54, 55 and 56 --

18      THE COURT:  Yes.

19      MR. KERR:  -- these are three declarations that were

20  filed in connection with the RMBS trust 9019 settlement.  We're

21  not offering these for the truth of what's asserted, simply to

22  show that Mr. Kruger was on notice of what was stated in the

23  declaration.  That's the only purpose.  And he refers to these

24  in his direct testimony.  We're not putting them in for the

25  truth.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  Ms. Eaton?

2          MS. EATON:  Well, the objection is on the basis of

3    hearsay.  And in addition, these are -- notwithstanding the

4    fact that they were filed, Your Honor, they're not self-

5    authenticating documents.  If Mr. Lipps wants to authenticate

6    them that's fine.

7          THE COURT:  Well, he doesn't --

8          MS. EATON:  But in addition, it sounds to me like this

9    is not -- that the witness intends to -- or the debtors intend

10   to elicit evidence from the witness that does go into the

11   substance of the contents of these declarations.

12         THE COURT:  Let me -- go ahead, Mr. Shore.

13         MR. SHORE:  I just have a different objection.  I'm

14   not sure of the relevance of being on notice of a pleading.  I

15   don't think the fiduciary can say he acted upon reviewing

16   documents because he was on notice of the documents.  If the

17   purpose for which it's offered is that Mr. Kruger reviewed

18   these documents and read these documents prior to doing it,

19   fine --

20         THE COURT:  Okay, let me --

21         MR. SHORE:  -- but I don't think that's what --

22         THE COURT:  First off, let's get Mr. Kruger sworn.

23   Could you just stand and raise your right hand, Mr. Kruger.

24      (Witness sworn)

25         THE COURT:  All right.  Now you can have a seat.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

87

1    Thank you, Mr. Kruger.

2         MR. KERR:  In response to Mr. Shore, if I used notice,

3    I meant what Mr. Shore indicated.  As he said in his direct

4    testimony, he reviewed these and this was part of his

5    consideration -- what he considered at the time he entered into

6    the FGIC settlement agreement.

7         THE COURT:  You're not offering 54, 55 and 56 for the

8    truth of the matters asserted.

9         MR. KERR:  Correct.

10        THE COURT:  But that these are matters that were

11   received and reviewed by Mr. Kruger and part of his

12   consideration in doing what?

13        MR. KERR:  Into entering into the FGIC settlement

14   agreement.

15        THE COURT:  Is that an accurate statement, Mr. Kruger?

16        THE WITNESS:  Yes, it is.

17        THE COURT:  The objection is overruled.  So with

18   respect to 54. So all right.  It still leaves -- so the

19   objections to Exhibit 32, 54, 55 and 56 are overruled.  Each of

20   them is coming in not for the truth of the matters asserted.

21   And there were no objections asserted as to the remaining

22   exhibits that Mr. Kerr identified.  They'll come in evidence.

23   I'll just read the list.

24        Mr. Shore, go ahead.

25        MR. SHORE:  I just want to confirm an agreement we had

**RESIDENTIAL CAPITAL, LLC, ET AL.**

88

1  with Mr. Kerr --

2            THE COURT:  Go ahead.

3            MR. SHORE:  -- with respect to the other -- all of the

4  other exhibits, 1, 6, 7, 30, 31 and 57, 58 are coming in for

5  judicial notice.  They're all pleadings that were filed.

6  They're not being offered for the truth of the matter asserted

7  either.

8            THE COURT:  Mr. Kerr?

9            MR. KERR:  Well, I will tell you this, Your Honor, let

10 me go through them.  1 is the settlement agreement.  It's a

11 verbal act, it's not being offered for its truth.  I agree that

12 documents 2, 3, 4, 5 -- excuse me, Exhibits 2, 3, 4, 5, 6 and 7

13 are not being offered for the truth.  Those are proofs of

14 claims.  But again, we're offering them to establish the fact

15 that Bank of New York -- or they were filed what they state in

16 them and whatever.  That's all.  With respect to 43, which is a

17 copy of the revised joint omnibus scheduling order and

18 provisions for other relief, this is the document that's

19 referred to in the settlement agreement, it's a cross-reference

20 to the settlement agreement for the definition of origination

21 related provisions. I'm just putting it in for that purpose

22 because its definition referred to that.

23            THE COURT:  Okay.  All right.

24            MR. KERR:  And with respect to 57 and 58, I'll have to

25 go back and look at those, Your Honor.  Maybe I can confer with

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  Mr. Shore.  Those are -- I think those documents should come

2  in.  I know what they are, Your Honor.  They are the -- they

3  are the RMBS settlement document, one between the Kathy Patrick

4  group which is 57, and one which is the Talcott group, 58.

5          THE COURT:  They're being offered for what purpose?

6          MR. KERR:  Because they -- well, frankly, Your Honor,

7  they list -- in the document they list the holdings by each of

8  those groups and -- that show that they in fact were holders of

9  trusts in the FGIC trusts.

10          THE COURT:  Mr. Shore.

11          MR. SHORE:  Your Honor, Your Honor directed us to meet

12  and confer with respect to exhibits.  We met and conferred with

13  respect to exhibits.  We came up with an agreed set of things

14  that could go in.  We told them everything could go in but

15  there were specific documents for which they were only offering

16  them on judicial notice.  Both of these were being on the list

17  as being offered for judicial notice only.  To say that a

18  sentence in there --

19          THE COURT:  Okay, wait.

20          MR. SHORE:  -- is being offered to establish what

21  people held, that's hearsay.

22          THE COURT:  Stop, stop, stop.  What I'm going to do

23  for now, I'm going to admit in evidence for the limited

24  purposes that have been described with respect to 57 and 58,

25  Mr. Shore and Mr. Kerr, during your lunch break you can confer

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**90**

1    and see if you can resolve.  I'm not -- so to the extent there

2    may need to be a further description on the record for the

3    purpose for which the documents are admitted I don't want to

4    take more time now.

5              So, the Court is admitting in evidence the following

6    exhibits and those that have been identified for a limited

7    purpose are admitted for the limited purpose, 1, 2, 3, 4, 5, 6,

8    7, 30, 31, 32, 43, 54, 55, 56, 57, 58.  With respect to 57 and

9    58, Mr. Shore and Mr. Kerr can continue to confer during a

10   recess to see if they can resolve any limitations for which

11   those documents are being admitted in evidence.  Ms. Eaton's

12   objections to 32, 54, 55 and 56 were overruled, they're coming

13   in for a nonhearsay purpose.  All right, let's move on.

14   (Settlement agreement was hereby received into evidence as

15   Debtors' Exhibit 1, as of this date.)

16   (Proofs of Claim were hereby received into evidence as Debtors'

17   Exhibits 2, 3, 4, 5, 6, 7, as of this date.)

18   (Pleadings were hereby received into evidence as Debtors'

19   Exhibits 30, 31, 32, as of this date.)

20   (Revised scheduling order was hereby received into evidence as

21   Debtors' Exhibit 43, as of this date.)

22   (Declarations were hereby received into evidence as Debtors'

23   Exhibits 54, 55, 56, as of this date.)

24   (RMBS settlement documents were hereby received into evidence

25   as Debtors' Exhibits 57, 58, as of this date.)

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1        MR. KERR:  Your Honor, just two other points.  One, as

2   the Court is aware, the settlement agreement is the process of

3   the mediation.  I just want to be clear on the record that in

4   offering Mr. Kruger's testimony he is not intending to waive

5   any privileges or any attorney-client privileges and he intends

6   to comply with confidentiality requirements in the mediation

7   order. I just want to make that clear on the record.

8        THE COURT:  And I assume he'll comply with whatever

9   directions I give him with respect to his testimony.

10       MR. KERR:  Of course he will, Your Honor.

11       THE COURT:  Okay.

12       MR. KERR:  Of course he will.  Thank you, Your Honor.

13  He is ready for cross-examination.

14       THE COURT:  Cross-examination.  Who's going to cross-

15  examine him?

16       So you have any water, Mr. Kruger?

17       THE WITNESS:  Yes, I do.

18       THE COURT:  You're all set?

19       THE WITNESS:  Thank you, Your Honor.

20       THE COURT:  Okay.

21  CROSS-EXAMINATION

22  BY MS. EATON:

23  Q.   Good morning, Mr. Kruger.

24  A.   Good morning Ms. Eaton.

25  Q.   You testified in your direct testimony that the FGIC

1    settlement agreement is in the best interests of the investors

2    in the FGIC wrapped trust.  Do you recall that?

3    A.    Yes, I do.

4    Q.    Now, you have not analyzed the FGIC settlement agreement

5    from the point of view of the investors in those trusts, have

6    you?

7    A.    What I did do is I thought about the commutation payments

8    to the trusts and thought that if there was -- if the FGIC

9    settlement was not to prevail and we would then be on behalf of

10   the debtors contesting the various claims submitted by the

11   trusts and FGIC, it's not clear that there would indeed be a

12   recovery by the FGIC trusts and that therefore a recovery by

13   the FGIC trusts it seemed to me, to be in the best interest of

14   their investors.

15   Q.    You're aware that Duff & Phelps performed a financial

16   analysis of the terms of the proposed FGIC settlement agreement

17   for the trustees, right?

18   A.    I know that they were engaged by the trustees and I

19   believe they did perform a financial analysis.

20   Q.    You did not see that analysis, did you?

21   A.    That's correct.

22   Q.    And you don't have a view, therefore, one way or the other

23   with respect to the analysis that Duff & Phelps performed?

24   A.    No, I do not.

25   Q.    Did you review any analysis pertaining to the FGIC

**RESIDENTIAL CAPITAL, LLC, ET AL.**

93

1    settlement agreement that was prepared by Lazard?

2    A.    Not that I recall.

3    Q.    In fact, did you speak -- in the months leading up to the

4    consummation of the FGIC settlement agreement, you didn't speak

5    with anyone representing the RMBS trusts about the impact of

6    the FGIC settlement on the investors in those trusts, correct?

7    A.    That's actually not correct.  I believe I did speak

8    certainly with Glenn Siegel and with my counsel, and as I

9    recall in the mediation process, with others.

10   Q.    Mr. Kruger, you remember giving a deposition earlier on in

11   these proceedings?

12   A.    Yes, I do.

13   Q.    And you were under oath at the time that you gave that

14   testimony?

15   A.    Yes, I was.

16   Q.    And I asked you some questions, and you answered those

17   questions, do you remember that?

18   A.    Yes, I did.

19   Q.    And you answered all of those questions truthfully?

20   A.    Yes, I did.

21   Q.    If you would turn to tab -- Exhibit FL in the binder

22   that's about to be handed to you.

23   A.    Thank you.  Did you say Exhibit FL?  I don't have that.

24        THE COURT:  That's your deposition transcript.

25   Q.    Yes, FL.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

94

```
 1            THE COURT:    I don't need it.  I'm overwhelmed with
 2   binders already.  Thank you, though.
 3   A.   Yes, I have that.
 4   Q.   If you would, please, turn to page 73 of the transcript.
 5   I guess I should say Exhibit FL is a copy of the deposition
 6   transcript of Lewis Kruger taken July 11, 2013.  And you
 7   recognize this transcript of your testimony, do you, Mr.
 8   Kruger?
 9   A.   Yes, I do.
10   Q.   If you'd turn to page 73, and directing your attention to
11   lines 7 through 10, you'll see that I asked you during your
12   deposition:
13   "Q.   Did you actually speak with anyone representing the trusts
14   about the impact of the agreement on the investors in the RMBS
15   trusts?"
16   "A.   No."
17   Q.   Do you see that?
18   A.   Yes, I do.
19   Q.   And that answer was truthful when you gave it?
20   A.   Yes, it was.
21   Q.   Now you participated in the mediation in connection with
22   these proceedings before Judge Peck, correct?
23   A.   Yes, I did.
24   Q.   And you attended many sessions in connection with that
25   mediation, both before Judge Peck and in sessions where Judge
```

**RESIDENTIAL CAPITAL, LLC, ET AL.**

95

1    Peck was not present, correct?

2    A.    Correct.

3    Q.    Was Mr. Marc Abrams present during any of those

4    discussions that you can recall?

5    A.    Not that I recall.

6    Q.    And it was Judge Peck who decided who could participate in

7    the mediation and who could not; is that correct?

8    A.    Yes, it is.

9    Q.    And you're aware that Mr. Abrams asked Judge Peck to

10    participate in the mediation, correct?

11            MR. KERR:   Objection.

12            THE COURT:   Sustained.

13    Q.    Do you know whether Mr. Abrams asked Judge Peck to

14    participate in the mediation?

15    A.    I've been told that.

16    Q.    And were you also told that Judge Peck denied Mr. Abrams'

17    request to participate in the mediation?

18            THE COURT:   Sustained.

19            MR. KERR:   Objection.

20    Q.    Do you know whether Judge Peck denied Mr. Abrams' request

21    to participate in the mediation?

22            THE COURT:   Sustained.   If there's no objection when I

23    sustain it it's my own objection.   I'm not permitting

24    questioning about the mediation.   That should have been clear

25    to you many times already, Ms. Eaton.   Next question.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    MS. EATON:  I'm not inquiring into the substance of

2  it.

3    THE COURT:  Ask your next question.

4  Q.   Mr. Kruger, did you ask Judge Peck to allow Mr. Abrams to

5  participate in the mediation?

6    THE COURT:  Sustained.  Ms. Eaton, if you persist with

7  questions about the mediation your questioning is concluded.

8  Move to another subject.

9  Q.   I'm going to be handing you now a document that is not in

10 your binder that is marked for identification as Objectors'

11 Exhibit -- it must be a debtors' -- Objectors' Exhibit GD.

12    MR. KERR:  One moment, Your Honor.

13    (Pause)

14 Q.   Do you recognize Exhibit GD, Mr. Kruger?

15 A.   I believe I did see it, yes.

16 Q.   And you recognize this to be a confidentiality agreement

17 between Monarch Alternative Capital LP on the one hand, and the

18 debtors and their affiliates on the other hand, correct?

19 A.   Yes, I think it actually is between counsel, but it refers

20 to, as see in the first paragraph, Monarch Alternative Capital.

21 Q.   Willkie, Farr & Gallagher?

22 A.   Yes.

23 Q.   And the agreement is dated May 2, 2013, do you see that?

24 A.   Yes, I do.

25 Q.   And this agreement was printed on the letterhead of

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  Morrison & Foerster, right?

2  A.   It appears so, yes.

3  Q.   And Morrison & Foerster acts as counsel for the debtors in

4  connection with these proceedings, correct?

5  A.   Yes, they do.

6  Q.   And if you turn to the last page of the exhibit, which is

7  Bates stamped Monarch 11, you'll see two signatures there.  Do

8  you see that?

9  A.   Yes, I do.

10  Q.   And the first one on the upper left portion of the page is

11  the signature of Mr. Lorenzo Marinuzzi.  Do you see that?

12  A.   Actually on my copy it's sort of in the center of the

13  page, but yes.

14  Q.   And Mr. Marinuzzi is an attorney at Morrison & Foerster,

15  the attorneys for the debtors, correct?

16  A.   Yes.

17  Q.   And then beneath that on the left-hand side of the page,

18  do you see the words "Accepted and agreed to Willkie Farr &

19  Gallagher", and it's signed by Mr. Abrams, do you see that?

20  A.   Yes.

21  Q.   And beneath his signature it's dated May 2nd, the date is

22  wrong, May 2nd, 2012, do you see that?

23  A.   I do.

24  Q.   I think that's an error though.  If you look at the first

25  page the letter is dated May 2nd, 2013.  Do you see that?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   A.   Yes, I do.

2   Q.   Okay.  Now, did you see this agreement, Exhibit GD before

3   it was executed by Mr. Marinuzzi or Mr. Abrams?

4   A.   I do not recall.

5   Q.   Did you see it after it was signed?

6   A.   I believe I have seen it since, yes.

7   Q.   Did you know of its existence before it was signed?

8   A.   No.  I'm sorry, before it was signed?

9   Q.   Before it was signed, were you aware that attorneys at

10  Morrison & Foerster and Willkie Farr & Gallagher were in

11  discussions --

12  A.   Yes.

13  Q.   -- about entering into a confidentiality agreement?

14  A.   Yes, I was.

15  Q.   And at some point you became aware that the attorneys at

16  those two firms did enter into a confidentiality agreement,

17  correct?

18  A.   Yes.

19  Q.   Okay.  And you were aware that Willkie Farr & Gallagher

20  sought to enter into a confidentiality agreement on behalf of

21  its client Monarch in order to obtain information about the

22  mediation, are you aware of that?

23       MR. KERR:  Objection.

24  A.   I assume that that was the motivation.

25       THE COURT:  Hold on, hold on.  Overruled.  Go ahead.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

99

1   A.   I assume -- I assume that was their motivation, but I'm not

2   aware of what their motivation was.

3   Q.   If you look at the first sentence of the second paragraph

4   of page 1 of the exhibit, the sentence beginning with the words

5   "In connection with your clients' involvement in the Chapter 11

6   cases," and then it continues.  Do you see that?

7   A.   Yes.

8   Q.   And you'll see that it says there that "In connection with

9   your clients' involvement in the Chapter 11 cases and with your

10   request for information, the debtors and their representatives

11   (as defined below) advisors (as defined below) or agents (each

12   a disclosing party and collectively the disclosing parties) may

13   directly or indirectly provide you and others at your firm, as

14   well as your representatives, advisors or agents (each being a

15   receiving party and collectively the receiving parties) with

16   certain confidential information as defined below relating to

17   the debtors, the Chapter 11 cases and the mediation being

18   conducted before Judge Peck in relation thereto."

19   A.   Yes, I do.

20   Q.   Do you see that?  Does that refresh your recollection that

21   the purpose of this agreement was to allow Willkie Farr &

22   Gallagher on behalf of Monarch to obtain information concerning

23   the mediation?

24          MR. KERR:  Objection.

25          THE COURT:  Sustained.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

100

1   Q.   You were aware, were you not, Mr. Kruger, that Willkie

2   Farr & Gallagher was attempting to get information about the

3   mediation?

4   A.   Yes.

5   Q.   Now the FGIC settlement agreement, you approved the FGIC

6   settlement agreement on or about May 23rd, 2013, correct?

7   A.   Yes, I did.  Yes, I did.

8   Q.   So after this agreement was signed by both sides there was

9   nothing --

10          THE COURT:  Which agreement?

11  Q.   The agreement marked as Exhibit GD, the confidentiality

12  agreement we've been discussing, after that confidentiality

13  agreement was signed, there was nothing precluding the debtors

14  from sharing information with Mr. Abrams about the mediation;

15  isn't that correct?

16          MR. KERR:  Objection.

17          THE COURT:  Sustained.

18  Q.   Didn't this agreement permit the debtors to share

19  information with Mr. Abrams about the mediation?

20          MR. KERR:  Objection.

21          THE COURT:  Sustained.

22  Q.   Did the debtors share with Mr. Abrams any information

23  about the mediation pursuant to this agreement?

24  A.   Not that I -- if you're asking about the debtors and

25  myself, I don't know, I think the answer is no.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1 Q.    But there was nothing precluding the debtors from --

2         MS. EATON:  Strike that.

3 Q.    In the three-week period between the time that Exhibit 148

4 was signed and May 23rd when the FGIC settlement agreement was

5 signed --

6         THE COURT:  What's 148?

7         MS. EATON:  I'm sorry.  It has two numbers on it, Your

8 Honor.  I'm sorry, I beg your pardon; and I'll start again.

9 Q.    Exhibit GD.  Between May 2nd, 2013 when Exhibit GD was

10 signed, and May 23rd, 2013 when the FGIC settlement agreement

11 was approved there wasn't anything precluding the debtors from

12 sharing information with Mr. Abrams about the mediation, was

13 there?

14        MR. KERR:  Objection, Your Honor.

15        THE COURT:  Sustained.

16 Q.    At any time during that three-week period when the

17 confidentiality agreement marked as Exhibit GD was in effect,

18 did the debtors tell Mr. Abrams anything about the negotiations

19 that were going on concerning the FGIC settlement agreement?

20 A.    Not that I'm aware of.

21 Q.    Did the debtors tell Mr. Abrams that FGIC had made a

22 proposal to commute the FGIC wrapped policies in exchange for a

23 payment of a sum of money?

24 A.    I don't know.

25 Q.    Did anyone at the debtors tell Mr. Abrams that FGIC had

1    proposed to commute those policies for 253.3 million dollars?

2    A.    I don't know.

3    Q.    Did anyone at the debtors tell Mr. Abrams that the

4    trustees had agreed to that proposal?

5    A.    I don't know.

6    Q.    Did anyone at the debtors tell Mr. Abrams that an

7    agreement with respect to that proposal was being negotiated?

8    A.    Again, I don't know.

9    Q.    Did anyone at the debtors tell Mr. Abrams anything about

10    the economics of the proposal to commute the FGIC wrapped

11    policies?

12    A.    I don't know.

13         MS. EATON:  Pass the witness.

14    CROSS-EXAMINATION

15    BY MR. CARNEY:

16    Q.    Good morning, Mr. Kruger.

17    A.    Good morning.

18    Q.    I'm Mike Carney.  You are the debtors' chief restructuring

19    officer; is that correct?

20    A.    Yes, I am.

21    Q.    And you were appointed on February 11th, 2013; is that

22    also correct?

23    A.    That's correct.

24    Q.    And you were aware that discussions were underway at the

25    mediation of the commutation; is that correct?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

103

1          MR. KERR:  Objection.

2          THE COURT:  Sustained.

3    Q.    And you became aware of this --

4          THE COURT:  Let me put you on notice right now I am

5    not going to permit any examination about what transpired

6    during the mediation.   If you persist -- I've ruled on that

7    already -- if you persist in asking questions about it your

8    examination is concluded.

9    Q.    And the board of directors of ResCap deferred to you to

10   determine whether to approve the ResCap settlement; is that

11   correct?

12   A.    The FGIC settlement I assume?

13   Q.    Yes, yes.

14   A.    I assume -- I believe they did that when they engaged me

15   in February of 2013.

16   Q.    And they gave you the authority to approve the FGIC

17   settlement?

18   A.    And they gave me the authority to approve and negotiate

19   and settle claims as well as broad authority generally to deal

20   with the Chapter 11 proceeding.

21         THE COURT:  Hold on just a second.  Deanna?

22         Go ahead, Mr. Carney.

23   A.    I was going to conclude by saying and that engagement was

24   approved by the Court on March 5th of 2013.

25   Q.    And do you understand that you, among the different, the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

104

1    authority that you were given, among those is the authority to

2    approve the FGIC settlement; is that correct?

3    A.    Yes, it is.

4    Q.    And you did understand that the commutation we've been

5    discussing was a part of that settlement; is that correct?

6    A.    Yes.

7    Q.    So all else being equal and everything under the global

8    settlement was the same, but the FGIC settlement did not

9    contain the commutation, you would have still entered the FGIC

10   settlement agreement; is that correct?

11         THE COURT:  Sustained.

12         MR. KERR:  Objection.

13   Q.    And the commutation wasn't important to the debtors if you

14   would have gotten everything else in the settlement; isn't that

15   true?

16   A.    If you're suggesting that I could have gotten the FGIC

17   reduction in the amount of their claims, the trust to release

18   their claims and have done that for the benefit of the estate

19   without having FGIC pay any money, I would, you know, I'm

20   indifferent to that.  I thought the settlement from the point

21   of view of the estate was a good one.

22   Q.    So again, perhaps let me repeat my question.  So if you

23   had received everything that you had just discussed except the

24   commutation were not in place, you still would have entered the

25   FGIC settlement; is that correct?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

105

1          MR. KERR:  Objection.

2          THE COURT:  Sustained.  It calls for speculation.

3          MR. CARNEY:  I'm just asking what he would have done.

4          THE COURT:  Well that calls for speculation, doesn't

5     it?  Yes.

6          MR. CARNEY:  That's all I have.  Thank you.

7          THE COURT:  All right.  Any further cross-examination?

8     Mr. Shore.

9          MR. SHORE:  Yes, Your Honor.

10    CROSS-EXAMINATION

11    BY MR. SHORE:

12    Q.   Good morning, Mr. Kruger.

13    A.   Still good morning.

14    Q.   Chris Shore from White & Case on behalf of the ad hoc

15    group.

16         THE COURT:  It's still morning.

17         MR. SHORE:  It's been a long morning.

18    Q.   As I said in my opening, I just want to focus no longer on

19    the ResCap LLC claims which are being deferred for the time

20    ,and really focus on something we didn't talk about in your

21    deposition to a great extent, which was what happens with

22    respect to GMACM claims and RFC claims, particularly if a plan

23    doesn't occur?  So let me just first start with your

24    understanding.

25         Your understanding is if the settlement agreement is

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   approved, the FGIC trustee claims are being released no matter

2   what, right?

3   A.   Correct.

4   Q.   Okay.  And FGIC will get no matter what a 596 million

5   dollar general unsecured claim to be apportioned between the

6   estates, right?

7   A.   Correct.  Based on the governing agreements and --

8   Q.   And then did you get --

9        THE COURT:  Hold on a second.  Go ahead and finish

10  your answer.

11       Stop a second, Mr. Kruger.  I want to make sure I've

12  got it.  Had you finished your answer?

13  A.   And you got the governing agreements.  I just wanted to

14  make sure -- okay.

15       THE WITNESS:  Yes, I had.

16       THE COURT:  Okay.  Go ahead, Mr. Shore.

17  Q.   All right.  And FGIC gets to then assert whatever claims

18  it has against the debtors, but gets capped at an additional

19  596-million-dollar claim, right?

20  A.   It gets three -- it gets three possible 596.5-million-

21  dollar claims against GMAC, ResCap and RFC.

22  Q.   And also FGIC is free to continue its pre-petition

23  lawsuits against Ally, right?

24  A.   We're assuming now that the plan support agreement and the

25  plan goes away?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  Q.   That's right.

2  A.      Yes, that's correct.

3  Q.   I'm only going to talk in my cross-examination about the

4  scenario in which the plan isn't approved, okay, and if I want

5  to change that scenario I'll let you know, all right?

6  A.   Okay.  Fair enough.

7  Q.   All right.  Now you were the sole decision-maker for GMACM

8  who executed the FGIC settlement agreement, right?

9  A.   Yes, I am.

10  Q.   Okay.  You didn't talk to any board of directors of GMACM,

11  right?

12  A.   I had --

13  Q.   With respect to the settlement agreement?

14  A.   I had decision-making authority.  I may have spoken to

15  people who were directors of GMACM, but I certainly always

16  assumed and exercised my own business judgment and my own

17  authority.

18  Q.   Right.  And in connection with your decision to enter into

19  that agreement with GMACM, you didn't talk to any GMACM

20  employees, did you?

21  A.   That's probably correct although I'm not sure when I

22  talked to ResCap employees whether they are GMAC employees,

23  ResCap employees or RFC employees.  I don't usually begin the

24  conversation in that fashion.

25  Q.   You were the decision-maker for RFC?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    A.    Yes, I was.

2    Q.    And you did not consult any people you knew to be board

3    members of RFC in seeking to enter into that agreement, right?

4    A.    That's correct.

5    Q.    And you didn't speak to any employees you knew to be

6    employees of RFC in trying to determine whether or not to enter

7    into that agreement?

8    A.    Yes.

9    Q.    Okay.  In your depo I asked you some questions with

10   respect to written documents you relied upon.  Do you recall

11   that?

12   A.    Yes, I do.

13   Q.    Okay.  And you told me that you had relied upon a review

14   of a FGIC proof of claim, right?

15   A.    Yes.

16   Q.    And you told me you had relied upon a review of a

17   complaint, right?

18   A.    Yes.

19   Q.    Okay.  And then I asked you whether you relied on any

20   other written documents and you said not that you recall,

21   right?

22   A.    You're looking at testimony on 127?

23   Q.    Sure.  If you take out the exhibit, the cross-examination

24   binder and Exhibit 10.  Is it 10?  No, it says deposition

25   testimony on it.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

109

1    A.    Yes.

2    Q.    And you go to page 114.

3           THE COURT:  You're looking at his deposition

4    transcript?

5           MR. SHORE:  Yes.

6           THE COURT:  It doesn't matter what the exhibit,

7    because you both have it but --

8           MR. SHORE:  Right.

9           THE COURT:  -- okay.  All right.

10   Q.    And I asked you the following question beginning at line

11   21: "Other than your review of the FGIC proof of claim and the

12   FGIC complaint, what other materials did you review in reaching

13   your determination that the settlement agreement was a proper

14   exercise of your business judgment?

15   "A.   I had read presentations by Morrison & Foerster on

16   monoline claims.

17   "Q.   Okay.  How many?

18   "A.   Some.

19   "Q.   Anything else, any other written materials you relied

20   upon?

21   "A.   I don't think so."

22          And that answer was true at the time, right.

23   A.    Yes.

24   Q.    Okay.  And then if you go to the very back of the

25   document, the deposition, you'll see your errata sheet?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   A.   Mr. Shore, I'm looking at something different than I think

2   you're looking at.

3   Q.   Okay.  Do you have the cross-examination binder that says

4   exhibits for cross-examination of Lewis Kruger?

5   A.   Yes, and I'm look -- at least the one handed to me by Ms.

6   Eaton.

7   Q.   Yes.  And if you turn to the very last page of that

8   binder, it is your errata sheet.

9   A.   Oh.  Yes, I see that.

10  Q.   Do you see that?  You see that was signed by you?  Was

11  that signed by you on August 8th?

12  A.   Yes.

13  Q.   Okay.  And that is your signature there?

14  A.   Yes, it is.

15  Q.   Okay.  If you turn back to the first page of that you see

16  there's a reference there to 115, 9?

17  A.   Yes.

18  Q.   Okay.  I was going to ask you to remember this.  You put

19  in that you said "I don't think I relied on other written

20  materials."  Okay, and if we go back to page 115 of your

21  deposition, the lines are changing, you were changing your

22  testimony in line 9 from "I don't think so" to "I don't think I

23  relied on other written materials", right?

24  A.   I'm sorry, on page 115, where am I?

25  Q.   Line 9.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   A.   Line 9.

2   Q.   Just from your errata sheet, you were changing the answer

3   "I don't think so" to "I don't think I relied on other written

4   materials"?

5   A.   Yes.

6   Q.   So a month later, after your deposition, even after you

7   had the opportunity to think about what you said, you

8   reconfirmed to some extent that you hadn't relied on any

9   written materials other than what you had testified to on page

10  114 and 115?

11        MR. KERR:  Objection.

12        THE COURT:  Sustained.

13  Q.   Was it true as of August 8th your recollection was you had

14  not relied on any other written materials other than what you

15  had testified to?

16  A.   What I signed on August 8th was correct on August 8th.

17  Q.   And have you subsequently had a recollection of other

18  written materials you reviewed that you relied upon in forming

19  your determination to enter into the FGIC settlement agreement?

20  A.   I think in my deposition I did refer to the Lipps

21  declarations.

22  Q.   You referred to a Carpenter Lipps memorandum?

23  A.   Right.

24  Q.   Okay.  And now it's your recollection that a Carpenter

25  Lipps memorandum were the three declarations that Mr. Lipps

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  signed in connection with the RMBS litigation?

2  A.   I saw a lot of documents during the course of the

3  mediation during the course of the process of this.   I

4  certainly did read a memorandum from Carpenter Lipps.

5  Q.   So I'm just being clear.   The declarations which are with

6  a caption on top of them -- I can show you the exhibits if you

7  want -- did you read those documents or did you read what you

8  referred to as a Carpenter Lipps memorandum?

9  A.   I had indeed read the Lipps declarations in the RMBS 9019

10  litigation.

11  Q.   When did you recall that relative to August 8th when you

12  signed your errata sheet?

13  A.   I think I must have been in error when I did not describe

14  that correctly in the original deposition that I gave you.

15  Q.   And was it an error when you didn't describe it in your

16  errata sheet?

17           MR. KERR:   Objection.

18           THE COURT:   Overruled.

19  A.   I had certainly read all of this -- a lot of the materials

20  related to the RMBS 9019 proceedings, so I was wrong when I

21  said that.

22  Q.   And let's be clear.   I wasn't asking you what you read.   I

23  asked you what you relied on.   Is it your testimony now that

24  you relied on the three Jeffrey Lipps declarations which are

25  entered in connection with the RMBS trial in making your

**RESIDENTIAL CAPITAL, LLC, ET AL.**

113

1   business determination on behalf of GMACM and RFC to execute

2   the agreement?

3   A.   I relied on a lot of different information, a lot of

4   different documents and a lot of discussion with counsel, my

5   counsel, UCC, its counsel, advisors and many, many other

6   people.

7   Q.   I was just focusing on written material.  I'm going to

8   come oral in a bit.  Do you need to supplement your answer

9   anymore as to other written materials that you didn't tell me

10  about in your deposition or in your errata sheet that you

11  relied upon in forming your decision to enter into the

12  agreement?

13  A.   I think not, but the answer in part is the fact that over

14  the course of the months that I've been involved in this I have

15  read thousands of pages of documents.  Which ones I relied upon

16  specifically to make my decision is hard to evaluate because

17  they're all part of the general process of coming to a

18  conclusion about the settlement agreement.

19  Q.   So can you answer my question.  Are there any other

20  specific documents that you relied -- written documents that

21  you relied upon that you can testify to today other than what

22  you testified to in your deposition and the Carpenter Lipps

23  declaration?

24  A.   Not specifically.

25  Q.   Okay.  Now let's talk about oral communications for a bit.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

114

1    With whom did you have oral communications that you relied upon

2    in entering into the settlement agreement?

3    A.    I had many conversations with participants in the

4    mediation process.

5    Q.    I don't want to know about that.

6    A.    Well, I had conversations with my counsel.

7    Q.    Okay.

8    A.    With other counsel.

9    Q.    Which other counsel?

10   A.    With the parties.  With the parties.

11   Q.    Which other counsel?

12   A.    Conversations with counsel for the UCC.

13   Q.    Mr. Eckstein?

14   A.    Mr. Eckstein and others.

15   Q.    Anybody else?

16   A.    I'm not sure how to answer the question, because in the

17   context of the mediation I met with all of these parties and

18   with all of these people and all of those meetings took place

19   mostly in the context of the mediation process.

20   Q.    Okay.  So what oral conversations can you testify today

21   that you relied upon in making your determination to enter into

22   the agreement?

23        MR. KERR:  Objection.

24        THE COURT:  Overruled.

25   A.    There were literally scores of conversations that dealt

**RESIDENTIAL CAPITAL, LLC, ET AL.**

115

1   with the overall context of the FGIC settlement in the context

2   of the global settlement.  And it was those conversations with

3   many, many people that I relied upon in coming to the

4   conclusion I did.  And the conclusion I came to was that absent

5   the FGIC settlement, and absent the global settlement agreement

6   and what I now believe and hope is really the prospect of a

7   confirmation of a Chapter 11 plan in these cases in the not-

8   too-distant future there would have been chaos in this case;

9   and therefore, I came to the conclusion that the settlement

10  agreement that was reached in FGIC and with the trusts was,

11  from the estates' perspective, and I believe for the benefit of

12  all creditors, a settlement worth pursuing.

13         MR. SHORE:  Motion to strike as nonresponsive, Your

14  Honor.

15         THE COURT:  Overruled.

16  Q.   With whom did you have communications that you can testify

17  to today in court that you relied upon in entering into the

18  agreement?

19  A.   Are you asking me about conversations I had outside of the

20  context of mediation?

21  Q.   Yes.

22  A.   The only ones that occur to me really are with my counsel

23  and with my advisors.

24  Q.   And which advisors are those?

25  A.   FTI, Centerview.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

116

1   Q.   Okay.  And is there any reason you can't testify about

2   what FTI or Centerview told you about --

3   A.   What they told me was usually in the context of the

4   mediation.  In fact, I think exclusively so.

5   Q.   So you can't tell me, in your view, anything -- any

6   discussions you had with FTI or Centerview about the reasons

7   for entering into this agreement, because in your view those

8   are all mediation -- covered by the mediation order?

9   A.   Yes.

10  Q.   Did you talk to anybody about how GMACM or RFC actually

11  repurchased loans from the FGIC insured trusts pre-petition?

12         THE COURT:  I don't think I understand your question,

13  Mr. Shore.

14  Q.   Sure.  Do you have any understanding as to how, in the

15  pre-petition period --

16         MR. SHORE:  Well, let me rephrase the question and

17  open it even broader.

18  Q.   Do you understand whether in the pre-petition period,

19  GMACM or RFC repurchased a single loan from the RFC trust -- or

20  from the FGIC wrapped trust?

21  A.   I don't know.

22  Q.   Okay.  So do you have any understanding as to the dollar

23  volume of loans that either GMACM or RFC repurchased from the

24  FGIC insured trusts?

25         MR. KERR:  Objection.

1                THE COURT:  Sustained.

2    A.    No.

3    Q.    Did you talk to any person employed by ResCap about what

4    the pre-petition activity was between ResCap or GMAC or GMACM

5    on the one hand and the FGIC wrapped trusts on the other about

6    loan repurchases?

7    A.    Yes, I did.

8    Q.    Who did you talk to?

9    A.    I spoke to various officers of ResCap from time to time.

10   Q.    Who?

11   A.    Tammy Hamzephour, Whittinger, Lynch and probably others.

12   Q.    But as you sit here today, you can't testify that you have

13   any understanding as to how the loan repurchase actually worked

14   pre-petition?

15   A.    I don't want to pretend that I understand that, or pretend

16   to understand that.

17   Q.    All right.  Let me focus -- I'm going to break this

18   briefly then, the rest of the examination into three parts.

19   Let me focus on the 596 million dollars that's getting allowed

20   right now if this settlement agreement is approved.  You did

21   discuss -- I think in your deposition you told me -- the

22   prospect that claims of FGIC could be subordinated under

23   Section 510(b) of the Code, right?

24   A.    It was certainly considered by me, yes.

25   Q.    All right.  And you recognized that if a FGIC claim, even

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   if allowed in a large amount, were subordinated, it would under

2   current constructs, be getting a zero recovery at GMACM and

3   RFC, right?

4           MR. KERR:  Objection.

5           THE COURT:  Overruled.

6   A.    That's probably true.  Depending whether or not there was

7   a state cause of action that was sustained that brought in

8   revenue that was greater than the amount of liabilities of

9   those companies; but I thought that was remote.

10  Q.    Right.  It would only happen in all unsecured creditors at

11  GMACM or RFC were paid in full?

12  A.    That's correct.

13  Q.    All right.  And then this is the question I didn't get to

14  in the deposition.  What likelihood of success did you put on

15  the possibility of subordination when reaching your business

16  determination to enter into the settlement agreement?

17  A.    I evaluated the kind of -- the kind of litigation that

18  would ensue from trying to pursue subordination of those

19  claims, the risks associated with that litigation, the fact

20  that I recognized that these are unusual claims.  I know that

21  you think about 510(b) as security claims.  It's not clear to

22  me that these are indeed security claims.  All I can tell you

23  is that I thought that they would be -- there would be complex

24  and lengthy and expensive litigation seeking to subordinate

25  claims of FGIC.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

119

1  Q.   Okay.  And can you tell me what the likelihood of success

2  was of winning that litigation that you had in mind in seeking

3  to allow or in agreeing to allow a 596-million-dollar general

4  unsecured claim?

5        MR. KERR:  Objection.

6  A.   All I can say is --

7        THE COURT:  Just a second, Mr. Kruger.  I'm going to

8  sustain the objection to the form of the question.

9  Q.   Did you have when you entered -- when you were assessing

10  the risks associated with the litigation that you just

11  testified to, a range of likelihood that a subordination claim

12  could prevail?

13  A.   It's hard for me to speculate on what the outcome of

14  litigation would be since I'm not a courtroom and I'm not a

15  judge, but it seemed to me there was great risk that I would

16  not prevail.

17  Q.   Okay.  And did you do any independent research into the

18  issue of subordination, that is outside what counsel may have

19  told you?

20        MR. KERR:  Objection.

21        THE COURT:  Overruled.

22        MR. KERR:  Your Honor, just --

23        THE COURT:  He just asked him if outside of counsel

24  did he do any research.

25        MR. KERR:  Okay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

120

1              THE COURT:  He can answer that question.

2   A.   If you're asking whether I did legal research separately?

3   Q.   Yes.

4   A.   I did not.

5   Q.   So I take it that the testimony you gave with respect to

6   your views of subordination risk was based on the advice your

7   counsel had given you?

8              MR. KERR:  Objection, Your Honor.

9   A.   No.

10             THE COURT:  Overruled.

11  A.   No, I have had a lot of experience as a bankruptcy lawyer.

12  And I've had my own view and I made my own decision as to what

13  I thought the risk was of prevailing in that litigation.  I was

14  certainly informed by my counsel, but the decision was my own.

15  Q.   Now let's turn to the second piece, the possibility of

16  additional claims that FGIC can assert that are capped at the

17  596 at the three estates that you testified to, okay?

18  A.   Um-hum.

19  Q.   Now, in the event that the plan is not confirmed, you're

20  right back in the FGIC litigation, right?

21  A.   If they assert claims at the other estates, yes.

22  Q.   Well they have assert the claims, right?

23  A.   Yes.  Right.  But now they would be capped.

24  Q.   Right.  But the proofs of claim, FGIC's proofs of claim,

25  in the event the plan is not confirmed will be on file and they

1    will be free to prosecute those against the estates for the

2    full amount of the claim only capped by the 596, right?

3    A.    That's correct.

4    Q.    Okay.  So all that litigation you were trying to avoid,

5    all the depositions and distraction to management and costs

6    that you have in your direct testimony is in the event that the

7    plan is not confirmed, right back on your plate, right?

8    A.    No, it's not, because the claims of the trusts will have

9    gone away and those are certainly in the billions of dollars.

10   So I think that's an enormous step forward and I've recapped,

11   instead of facing 1.850-million-dollars' worth of claims --

12          THE COURT:  1 billion 850 million.

13   A.    1 billion 850 million dollars' worth of claims in each of

14   three estates I'm now facing a total of roughly 1.8 billion

15   dollars of claims in three estates so I think I've improved the

16   estates' position there and I've retained the ability to object

17   to anything over the 596.5.

18   Q.    Of course you reserve your right to object.  I'm just

19   saying is it your testimony that if FGIC is permitted to

20   prosecute its proofs of claim for 1.8 billion dollars in the

21   aggregate it will do it less vigorously than it would if it was

22   able to pursue it as 1.8 against each estate?

23   A.    I assume FGIC will pursue their claims vigorously --

24   Q.    Okay.

25   A.    -- whatever they may be.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   Q.   All right.  And finally with respect to the non-release of

2   claims against Ally, in the event that the settlement agreement

3   is approved and the plan is not confirmed, FGIC is free to

4   pursue its pre-petition claims against Ally, right?

5   A.   Yes.

6   Q.   And you understood that in negotiating the FGIC settlement

7   agreement FGIC wanted to preserve its ability to pursue Ally if

8   the plan was not confirmed?

9          MR. KERR:  Objection.

10          THE COURT:  Overruled.

11   A.   I assumed that that was FGIC's view, but I did not know

12   that to be their view.

13   Q.   I have one just demonstrative really.  It's a piece of

14   Exhibit O which is the disclosure statement.

15          MR. SHORE:  If I may approach, Your Honor?  It's just

16   easier to --

17          MR. KERR:  Exhibit O?

18          THE COURT:  It's a part of Exhibit O is what you're

19   telling me?

20          MR. SHORE:  Yes.

21          MR. KERR:  It says two pages.

22          MR. SHORE:  I know what it says on the bottom.  I'm

23   representing that it is --

24          THE COURT:  I can only imagine how many times exhibits

25   have been marked by both sides.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

123

1            MR. SHORE:  Right.

2            THE COURT:  So what you're saying is Exhibit 226 and

3    Exhibit O are both the disclosure statement, is that what

4    you're telling me, Mr. Shore?

5            MR. SHORE:  Yes, Your Honor.

6            THE COURT:  And this is a piece of it?

7            MR. SHORE:  This is a piece of it.  And I just want

8    to --

9            MR. KERR:  Just give me one second, Your Honor.  I

10   just want to check something.

11           THE COURT:  Yes, sure.  So we're looking at an excerpt

12   of the disclosure statement?

13           MR. SHORE:  Yeah.  To be clear, it's also docket

14   number 4157.

15           THE COURT:  Okay.

16           MR. SHORE:  All right.

17   BY MR. SHORE:

18   Q.    And I want draw your attention to page 25.

19   A.    25?

20   Q.    25.  And the paragraph, it's the first full paragraph

21   beginning "The Court has subject matter jurisdiction." Do you

22   see that?

23   A.    Yes.

24   Q.    Did you review this document before it was filed with the

25   court?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

124

1  A.    Yes, I had read it.

2  Q.    Okay.  And do you recall reviewing this particular

3  paragraph?

4  A.    I assume I did.

5  Q.    All right.  And it says, first, okay, "First, ResCap's

6  operating agreement sets out certain indemnification

7  obligations owed to Ally.  Second, the debtors' current and

8  former directors and officers are entitled to indemnification

9  for a broad variety of claims pursuant to ResCap's limited

10  liability company agreement.  Third, the debtors owe

11  indemnification obligations to Ally Securities pursuant to

12  various underwriting agreements.  Fourth, Ally Bank has

13  indemnity rights against GMACM Mortgage LLC under certain

14  custodial agreements entered into between, among others, Ally

15  Bank and GMACM in connection with a series of home equity loan

16  transactions.  Therefore, to the extent that Ally would incur

17  defense costs and losses in connection with claims that would

18  otherwise be released under the plan, Ally could have direct

19  claims against the debtors' estates."  Do you see that?

20  A.    Yes.

21  Q.    All right.  Is that consistent with your understanding of

22  the debtors' indemnity exposure to Ally?

23  A.    Yes.

24  Q.    All right.  And in connection with your approval of an

25  agreement which would allow FGIC to sue Ally, you understood

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  that Ally would then be able to at least theoretically to claim

2  indemnification against the debtor estates for that?

3  A.   Yes.

4  Q.   Okay.  But you did not form a business level view as to

5  the risk you were, you were leaving in place by allowing FGIC

6  to assert its claims against Ally?

7  A.   I did not -- I don't think I said that.

8        THE COURT:  Why don't you answer, why don't you tell

9  me what you think.

10 A.   I did take into consideration the possibility that there

11 might be a claim asserted by FGIC against Ally and that Ally

12 might have some indemnification claim against ResCap, but I

13 thought that in my mind with the global settlement in place and

14 with the likelihood in my mind and the hope that the global

15 settlement would be approved because it has wide creditor

16 support, that this issue was really a nonstarter in a way and

17 that it was a real stretch of the imagination to think that

18 that was going to occur.  And that if indeed it did occur, I

19 still thought the settlement made sense because it got me the

20 releases from the trusts, got me a reduction in their claims,

21 and also got me a reduction in the FGIC claims as well for the

22 benefit of the estate.  So I thought it was worthwhile to do.

23 Q.   Well you got the release of the trusts whether or not the

24 plan gets confirmed, right?

25 A.   Yes, I did.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    Q.    They just channeled themselves to the commutation payment?

2    A.    Yes.

3    Q.    But you left open the possibility -- I agree with you, if

4    the plan is confirmed, the issue goes away. If the plan is not

5    confirmed, FGIC is free to sue --

6            THE COURT:  I really have this point, Mr. Shore.

7            MR. SHORE:  All right.

8            THE COURT:  I understood it before the examination.  I

9    understand it now.

10            MR. SHORE:  Okay.

11    Q.    But I just want to clarify one point.  At the time you

12    signed the settlement agreement you had not formed a business

13    view as to the level of risk you were leaving in place by that

14    structure?

15    A.    That's not correct.  I had formed a view and I thought the

16    risk was very modest, that there was not going to be the

17    prospect of a FGIC claim against Ally as a result of the fact

18    that the global settlement did not occur.  I thought it was a

19    high level of certainty that the global settlement would occur

20    and therefore the risk was very minor.

21    Q.    Okay.  Can you turn to page 144 of your deposition.  And

22    if you need to, you can start on 143, so you can see in

23    context, we're talking about the possibility of FGIC recovering

24    against Ally and Ally making a claim back against the debtors'

25    estates.  And I asked you at 144, line 6, "And did you" -- I

**RESIDENTIAL CAPITAL, LLC, ET AL.**

127

1  think it's -- "form a business view as to the level of that

2  risk of that happening?"  And your answer then was no?

3  A.    That's correct.

4  Q.    Okay.  All right.  Last series of questions with respect

5  to damages.  You state at paragraph 23 of your declaration --

6           MR. SHORE:  His direct, sorry.

7  A.    Yes.

8  Q.    All right.

9           MR. SHORE:  I may have the wrong cite.  Excuse me.

10 Q.    All right.  Paragraph 23 you say "Based upon my

11 involvement in the RMBS trust settlement dispute, I was aware

12 that FGIC insured trusts represented roughly ten percent of the

13 392 trusts."  And then you say further on, it's on page 12,

14 "With this in mind, I understood that the total potential

15 lifetime losses of collateral for the FGIC insured trusts could

16 likely be three to four billion dollars," right?

17 A.    Yes.

18 Q.    And that was without reference to Dr. D'Vari who was hired

19 after you entered into the settlement agreement, right?

20 A.    That's correct.

21 Q.    All right.  When did you come to the understanding that it

22 could -- that the lifetime collateral loss could be three to

23 four billion?

24 A.    Before I entered into the settlement agreement with FGIC.

25 Q.    And was that -- what was that based upon?  Was that based

**RESIDENTIAL CAPITAL, LLC, ET AL.**

128

1  upon your review of anything?

2  A.   It was based on my understanding of the claims asserted by

3  institutional investors, some forty-five billion dollars, as I

4  recall, and recognition that FGIC had wrapped roughly ten

5  percent of those trusts, and that therefore the trusts probably

6  had some claim in the four, four-and-a-half-billion-dollar

7  range, sort of in a rough justice way.

8  Q.   Was that based upon the review of any written material?

9       THE COURT:  Mr. Kruger, just pull the microphone

10  further.

11       THE WITNESS:  Oh, I'm sorry.

12       THE COURT:  Or speak further in.  Okay?  Go ahead,

13  sorry.

14       THE WITNESS:  I'm sorry, Your Honor.

15  Q.   Was that based upon the review of any written material?

16  A.   Well I had seen the claims and the -- I had read the RMBS

17  9019 litigation and recognized the amount of the claim that was

18  being asserted by the institutional investors as we call them,

19  and also the level of the FGIC wrapped trusts as a percentage

20  of total trusts.

21  Q.   So was that another written document you relied upon in

22  entering into your determination to execute the settlement

23  agreement that wasn't included in your deposition?

24  A.   I also had had conversation both with my advisors and my

25  counsel about this as well.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

129

1   Q.   But you can't tell me about any of those communications,

2   right?

3   A.   I believe that those communications, unless I'm directed

4   otherwise, are all part of the mediation process.

5   Q.   So the answer is no, you can't tell me anything about

6   those?

7   A.   Yes.

8   Q.   All right.  But let's answer my question again.  Was

9   this -- is it your recollection now, after having given the

10  deposition testimony and signed the errata sheet, that the FGIC

11  9019 settlement was a written document you relied upon in

12  deciding to enter into the agreement?

13          MR. KERR:  Objection.

14          THE COURT:  Overruled.

15  A.   I relied on a number of different sources.  I relied upon

16  my counsel, my advisors, not just on any specific document.

17  Where did I get the information that there were -- FGIC had

18  wrapped ten percent of the trusts and where I got the

19  information that Kathy Patrick had asserted forty-five billion

20  dollars of claims on behalf of the institutional investors, I

21  heard that from many, many sources.

22  Q.   The three to four billion dollars of collateral loss, is

23  it your understanding that either the trusts or FGIC can

24  recover all of the collateral losses against RFC or GMACM?

25  A.   I believe that that's what they would assert.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

130

1   Q.    Well that's what they assert.  That wasn't my question.

2   Is it your understanding that the debtors, for example, are

3   strictly liable for the collateral losses within a trust?

4   A.    I think that that's another subject that will be the

5   subject of a significant and hard fought litigation.

6   Q.    Is it the debtors' position that the debtors are liable

7   for every dollar of collateral loss in the trust?

8   A.    On behalf of the debtors I would rather say that we would

9   litigate all of those issues to see if we can minimize

10  everybody's claims against the estate.

11  Q.    And you don't testify anywhere to the proportion of the

12  three to four billion dollars in collateral loss that you

13  believe the debtors would be liable for in an RMBS litigation?

14  A.    That's correct.

15  Q.    Do you know what a loss share rate is in the context of

16  looking at RMBS exposure?

17  A.    No, I don't think I do.

18  Q.    Do you know what an agree rate is?

19  A.    No.

20  Q.    Do you know what a breach rate is?

21  A.    No.

22  Q.    Do you know what an audit rate is?

23  A.    No.

24  Q.    Do you know what a demand rate is?

25  A.    No.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    Q.    Can you point to any single document that you relied upon

2    that told you the level of expected damages for which the

3    debtors believe they would be liable if they got a claim for

4    three to four billion dollars of collateral loss?

5    A.    I had looked at, you know -- let me start that sentence

6    over again.    You want to ask me the question again, I'm sorry.

7    Q.    Sure.    Can you point to a single document you relied upon

8    which told you what the debtors' view was of the amount of that

9    three to four billion dollars of collateral loss the debtors

10    would actually be liable for under some theory under the

11    constituent documents or fraud?

12            MR. KERR:    Objection, Your Honor.

13            THE COURT:    Overruled.

14    A.    Not sitting here today.

15            MR. SHORE:    Okay.    I have no further questions.

16            THE COURT:    Thank you, Mr. Shore.    Any other cross-

17    examination?

18            Redirect?

19            MR. KERR:    May I have one minute, Your Honor?

20            THE COURT:    Yes.

21        (Pause)

22            MR. KERR:    We have no redirect, Your Honor.

23            THE COURT:    Thank you.    Mr. Kruger, you're excused.

24            THE WITNESS:    Thank you.

25            THE COURT:    All right.    It's 12:10.    We're going to

1    take our lunch recess now.  Who is going to be your next

2    witness, Mr. Kerr?

3              MR. KERR:  I believe Ms. Sohlberg.

4              THE COURT:  Okay.  All right.  We're going to resume

5    at 1:40.  All right.  My courtroom deputy has made a limited

6    number of copies of Justice Ling-Cohan's decision, so you can

7    all fight about the copies.  I think we have ten copies.

8    But --

9              MR. KERR:  I'm willing to share, Your Honor.

10             THE COURT:  Okay.  All right.  And I think I said

11   you're excused.  Thank you very much for your testimony, Mr.

12   Kruger.

13             All right.  1:50

14        (Recess from 12:11 p.m. until 1:49 p.m.)

15             THE COURT:  All right.  Please be seated. We'll resume

16   with respect to the FGIC settlement hearing.  I'm advised that

17   the proponents have used 40 minutes and the objectors 126

18   minutes.

19             Mr. Kerr.

20             MR. KERR:  Your Honor, Charles Kerr, Morrison &

21   Foerster on behalf of the debtors..  Just one quick

22   housekeeping matter. This morning in offering some -- two

23   exhibits, 57 and 58, I believe --

24             THE COURT:  Right.

25             MR. KERR:  -- with Mr. Kruger, Mr. Shore had objected

**RESIDENTIAL CAPITAL, LLC, ET AL.**

133

1    to those.  I've spoken to Mr. Shore.  We've agreed that they're

2    not being introduced as against the JSNs, and with that he

3    withdraws his objection.

4            THE COURT:  Okay.

5            MR. KERR:  Thank you.  So I offer them to be entered

6    other than --

7            THE COURT:  I think I admitted them subject to your

8    working out an agreement.  You've worked out an agreement, so

9    they are in evidence.  Thank you.

10           MR. WEITNAUER:  Your Honor, I'm Kit Weitnauer from

11   Alston & Bird.  I represent Wells Fargo.  The settling parties

12   call Mary Sohlberg to the stand.  We would like to tender

13   Exhibit 103, which is the declaration of Mary L. Sohlberg, an

14   officer of Wells Fargo Bank, N.A., an RMBS trustee.  We put on

15   your desk, Your Honor, right there, a booklet, and because

16   we've had some exhibit confusion let me walk you through that.

17   I put some hand notes on that I can share with everybody else.

18           THE COURT:  Let's get Ms. Sohlberg sworn in.

19           MR. WEITNAUER:  That's fine.

20           THE COURT:  Okay.  If you would just stand and raise

21   your right hand.

22       (Witness sworn)

23           THE COURT:  Please have a seat.  Do you have water

24   with you?

25           THE WITNESS:  Yes, I do.  Thank you.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

134

1          THE COURT:  Okay.  Go ahead, Mr. Weitnauer.

2          MR. WEITNAUER:  Okay.  So Exhibit 103 is her

3    declaration.  She refers to five documents in that declaration.

4    Excerpts or the entire document are attached to the booklet at

5    tabs -- Exhibit A is Exhibit 115.  At tab B is Exhibit 122.  At

6    tab C is Exhibit 121.  At Exhibit D of her declaration is

7    Exhibit 123.  Let's see.  Let's see.  Wait a minute.  Did I get

8    it right?  No.  E is --

9          THE COURT:  E is 128.

10         MR. WEITNAUER:  E is 128.  I apologize, Your Honor.

11         THE COURT:  No, I think you got it right.  You said D

12   is 123 and E is 128.

13         MR. WEITNAUER:  And then finally F is 129.  So we'd

14   move for the admission of all those exhibits as well.

15         THE COURT:  Any objections?

16         All right.  Exhibits 115, 122, 121, 123, 128 and 129

17   are all in evidence  And you're offering the witness statement

18   as well?

19   (Sohlberg Exhibits were hereby received into evidence as

20   Debtors' Exhibits 115, 122, 121, 123, 128, 129, as of this

21   date.)

22         MR. WEITNAUER:  Yes, I am.  Which is --

23         THE COURT:  Any objections to Exhibit 103, the witness

24   statement?

25         MS. EATON:  No, Your Honor.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

135

1          THE COURT:  It's admitted in evidence.

2     (Declaration of Ms. Sohlberg was hereby received into evidence

3     as Debtors' Exhibit 103, as of this date.)

4          MR. WEITNAUER:  All right.  And she's available for

5     cross-examination.

6          THE COURT:  Okay.  Who's going to take the lead on

7     cross?  Ms. Eaton?

8          MS. EATON:  Mary Eaton, Willkie Farr & Gallagher on

9     behalf of the Monarch objectors.

10    CROSS-EXAMINATION

11    BY MS. EATON:

12    Q.   Good afternoon, Ms. Sohlberg.  You signed the FGIC

13    settlement agreement on behalf of Wells Fargo; is that correct?

14    A.   On behalf of Wells Fargo Bank as trustee.

15    Q.   Understood.  But it's your --

16    A.   Yes.

17    Q.    -- signature that appears on the document, correct?

18    A.   Yes.

19    Q.   And you were the person at Wells Fargo who made the

20    determination to approve the FGIC settlement agreement on

21    behalf of Wells Fargo, correct?

22    A.   Ultimately, yes.

23    Q.   And that was a decision that you made individually,

24    correct?

25    A.   Yes.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  Just pull the microphone a little bit

2     closer to the front of you.  Thank you.

3     Q.   Now you said in your direct testimony that the FGIC

4     trustees insisted that the FGIC settlement require approval of

5     the bankruptcy court.  Do you recall that?

6     A.   Well, I don't recall using the word "insisted", but yes,

7     we required the approval of the bankruptcy court.

8     Q.   It was a condition to the trustees' agreement to the FGIC

9     settlement that it be approved by the bankruptcy court?

10    A.   Yes.

11    Q.   Among other things, correct?

12    A.   Yes.

13    Q.   And the trustees also insisted that the court order

14    approving the FGIC settlement contain certain terms, correct?

15    A.   Correct.

16    Q.   And those terms were spelled out in the FGIC settlement

17    agreement itself; is that correct?

18    A.   Yes.

19    Q.   And that is -- if you turn to Exhibit C in your binder

20    from our side?  And --

21         THE COURT:  You lost me now.  Do you have a separate

22    binder you put in front of her?  I'm just confused, Ms. Eaton.

23    When you said in the binder you've put before her.

24         MS. EATON:  Yes.

25         THE COURT:  Is there a separate binder you've given

**RESIDENTIAL CAPITAL, LLC, ET AL.**

137

1   her?

2           MS. EATON:  Yes, Your Honor.

3           THE WITNESS:  Is it this one?

4           THE COURT:  Okay.  It's not clear what you're doing?

5           MS. EATON:  It's the one on the right with the white

6   page.

7           THE COURT:  Thank you.  All right.  So this is which

8   volume of the two volumes?  One of your colleagues has just

9   handed me two volumes of exhibits for the cross-examination of

10  Mary Sohlberg.  I just want to be sure I'm looking at the

11  correct exhibit.

12          MS. EATON:  One moment, Your Honor, sorry.

13          THE COURT:  Thank you.

14          MS. EATON:  It's in volume 2, Exhibit C.

15          THE COURT:  Okay.

16  Q.   Do you have that, Ms. Sohlberg?

17  A.   Yes, I do.

18  Q.   Okay.  And the document that I'm going to be asking you

19  questions about is behind tab C, following the tab labeled

20  Exhibit 2.

21          THE COURT:  But it's part of Exhibit C?

22          MS. EATON:  Yes, it is, Your Honor.

23  Q.   Do you have that, Ms. Sohlberg?

24  A.   Yes, I do.

25  Q.   Okay.  If you would please turn to page 3 of the document.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  A.   Um-hum.

2  Q.   Now this is the FGIC settlement agreement, do you

3  recognize that?

4  A.   Yes.

5  Q.   Okay.  And if you look at section 103 at page 3 it's

6  entitled "Bankruptcy Court Order."  Do you see that?

7  A.   Yes.

8  Q.   And in section 103 it provides that -- well, it defines,

9  rather, the Bankruptcy Court Order to mean "an order of the

10  bankruptcy court approving this agreement, including an

11  approval of the allowance of the FGIC claims in accordance with

12  section 301 hereof, substantially in the form attached hereto

13  as Exhibit D, or such other form as agreed to by FGIC, the

14  debtors, the trustees and counsel for the institutional

15  investors," and there's a close paren, "which order shall

16  include a finding that the transactions contemplated by this

17  agreement are in the best interests of the investors and the

18  trusts and that the trustees acted in good faith and in the

19  best interests of the investors and the trusts in agreeing to

20  this agreement."  Do you see that?

21  A.   Yes.

22  Q.   And that was a condition that the trustees insisted upon

23  before approving -- giving their approval or their agreement,

24  rather, to enter into the FGIC settlement agreement, correct?

25  A.   Yes.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  Q.    Now, those findings are meant to provide protection to the

2  trustees; is that correct?

3  A.    Yes.

4  Q.    And they're not meant to protect FGIC, are they?

5  A.    No.

6  Q.    And they're not meant to protect the rehabilitator?

7  A.    No.

8  Q.    And they're not meant to protect the debtors?

9  A.    No.

10 Q.    And they're not meant to protect the investors in the FGIC

11 wrapped trusts either, are they?

12 A.    I don't believe so, no.

13 Q.    In fact, the conditions that are set forth in section --

14 the section of the FGIC settlement agreement that we just read

15 were -- the purpose of them was to protect the trustees from,

16 from liability for breaching their duties to the investors in

17 the FGIC wrapped trusts; isn't that true?

18 A.    As I understand it, yes.

19 Q.    And that language was in the trustees' best interests,

20 wasn't it?

21 A.    I believe so, yes.

22 Q.    Well it certainly wasn't in the best interests of the

23 investors in the FGIC wrapped trusts, was it?

24 A.    Well the insertion of that language wasn't in the best

25 interests of the holders, but certainly the finding that we

1   acted in the best interests of the holders was beneficial to

2   them.

3   Q.   It was beneficial to the holders, is that your testimony?

4   A.   Yes.

5   Q.   But isn't it true that the purpose of the findings is to

6   insulate the trustees from liability in a suit commenced by the

7   holders against the trustees?

8   A.   Yes.

9   Q.   Now, the holders, or pardon me, the trustees were not

10  acting in the best interests of the holders, that is the

11  investors in the FGIC wrapped trusts, at the time that they

12  insisted that that language be included in the FGIC settlement

13  agreement, correct?  The trustees, in other words, were acting

14  in their own interests at the time they insisted upon that

15  condition?

16  A.   Yes.

17  Q.   And the language was prepared by counsel for the trustees,

18  correct?

19  A.   I believe so, yes.

20  Q.   To the extent that that language was negotiated at all, it

21  was negotiated by counsel for the trustees, correct?

22  A.   I don't know.

23  Q.   Counsel -- who was counsel for the trustees?

24  A.   Well, Wells Fargo counsel is Alston & Bird.

25  Q.   So Alston & Bird was counsel to Wells Fargo in its

**RESIDENTIAL CAPITAL, LLC, ET AL.**

141

1  capacity as trustee, correct?

2  A.   Yes.

3  Q.   And Wells Fargo did not represent my clients while this

4  agreement was being negotiated, did they?

5  A.   No.

6  Q.   In fact, there was no counsel representing the interests

7  of the investors in the FGIC wrapped trusts in connection with

8  the negotiation of that language we've been discussing in the

9  FGIC settlement agreement; isn't that true?

10  A.   Correct.

11  Q.   Now, Wells Fargo was advised, as you've already indicated,

12  by Alston & Bird, that was their legal counsel, correct?

13  A.   Yes.

14  Q.   And Wells Fargo was also advised by Duff & Phelps; is that

15  right?

16  A.   Yes.

17  Q.   And Wells Fargo received advice from both Alston & Bird

18  and Duff & Phelps in connection with the negotiation of the

19  FGIC settlement agreement, right?

20  A.   Yes.

21  Q.   And it's also true that Wells Fargo relied on Duff &

22  Phelps in reaching the determination to enter into the FGIC

23  settlement agreement, correct?

24  A.   We did rely on Duff & Phelps, yes.

25  Q.   And you also relied on Alston & Bird, correct?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    A.    Correct.

2    Q.    And that was because, as you point out in your direct

3    testimony, Wells Fargo was entitled to rely on its advisors and

4    agents in fulfilling its fiduciary duties under the terms of

5    the trust indenture, right?

6    A.    Yes.

7    Q.    Now, Wells Fargo didn't perform any analysis, financial

8    analysis of the FGIC settlement agreement itself, correct?

9    A.    No, we relied on our expert.

10    Q.    Duff & Phelps?

11    A.    Correct.

12    Q.    And Wells Fargo did not participate in negotiating the

13    terms of the FGIC settlement either, correct?

14          MR. WEITNAUER:  Objection; mediation, Your Honor.

15          THE COURT:  Overruled.

16    A.    Could you repeat the question?

17    Q.    Wells Fargo did not participate in negotiating the terms

18    of the FGIC settlement agreement either, did they?

19    A.    Well they participated in negotiating the agreement.

20    Q.    Did Wells Fargo comment on any drafts of the FGIC

21    settlement agreement?

22          MR. WEITNAUER:  Objection; mediation, Your Honor.

23          THE COURT:  Overruled.  It just calls for a yes or no.

24    A.    I don't believe I made any comments to the drafts, no.

25    Q.    The drafting of the agreement was handled by Wells Fargo's

**RESIDENTIAL CAPITAL, LLC, ET AL.**

143

1  legal counsel, correct?

2  A.   They participated in the drafting of the agreement.

3  Q.   There was nobody at Wells Fargo who participated in the

4  drafting of the FGIC settlement agreement, correct?

5  A.   I don't believe so.

6  Q.   Now you personally did not perform any analysis, financial

7  analysis of the FGIC settlement agreement; isn't that right?

8  A.   I didn't perform any analysis on the Duff & Phelps

9  analysis, although I did review the report.  I did listen to

10 the overview that Duff & Phelps gave us on the analysis and

11 relied on Duff as our expert in making a decision on the

12 recommendation made by Duff.

13 Q.   You did not read the rehabilitation plan either, correct?

14 A.   No, I did not.

15 Q.   And you certainly didn't perform any analysis of the

16 rehabilitation plan?

17 A.   No.

18 Q.   Nor did you analyze the proposal to commute the policies,

19 correct?  You relied on Duff & Phelps to do that?

20 A.   I believe so, yes.

21 Q.   And you did not yourself compare the expected recoveries

22 or projected recoveries to the holders of the FGIC wrapped

23 trusts under the rehabilitation plan as compared to the FGIC

24 settlement agreement, correct?

25 A.   Could you restate that?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

144

1   Q.   You did not compare the expected recoveries to the holders

2   of the FGIC wrapped trusts under the terms of the

3   rehabilitation plan as compared to the FGIC settlement

4   agreement?

5   A.   I relied on our expert.

6   Q.   Now, when you first -- there came a point in time when you

7   learned that a proposal to commute the policies had been made,

8   right?

9   A.   Yes.

10   Q.   And you were asked to -- you were asked to consider that,

11   correct?

12   A.   Yes.

13   Q.   And at the time that proposal was first made, the

14   commutation -- amount related to the commutation was 253.3

15   million dollars, correct?

16   A.   Correct.

17   Q.   In other words, the proposal was to commute the policies

18   for a payment of 253.3 million dollars; is that correct?

19   A.   Correct.

20   Q.   And that was the original proposal, right?

21   A.   That I saw, yes.

22   Q.   Now, under the terms of the FGIC settlement agreement, the

23   agreement you approved, it provides for the commutation of the

24   policies in exchange for a payment of 253.3 million dollars,

25   right?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   A.    Right.

2   Q.    In other words, the commutation amount did not change from

3   the time you were first presented with the proposal until the

4   time you approved the FGIC settlement agreement, correct?

5   A.    Correct.

6   Q.    At your deposition I asked you some questions about when

7   you approved the agreement.  Do you remember that?

8   A.    Yes.

9   Q.    And you remember testifying that you approved the

10  agreement at the May 13 meeting when Duff & Phelps made its

11  presentation; do you recall that?

12          THE COURT:  Does she recall that that was her

13  deposition?  Why don't you just ask a question.

14  Q.    Isn't it true that you approved the proposal that was

15  presented to you at the meeting on May 13 with Duff & Phelps?

16  A.    I'm struggling with the word "approved", because to me

17  approving the agreement is when I executed it.  I participated

18  in the presentation by Duff.  Based on that presentation, I was

19  comfortable with the recommendation, but I did, after the

20  presentation, review -- re-review the analysis based on what I

21  had heard in the -- in the call.  So I guess you could look at

22  that as an approval.

23  Q.    Following the presentation by Duff & Phelps on May 13, you

24  concluded that entry into the FGIC settlement agreement was in

25  the best interests of the investors in the FGIC wrapped trusts,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    correct?

2    A.    Yes.

3    Q.    And it was following that meeting that you saw a draft of

4    the actual FGIC settlement agreement, correct?

5    A.    Yes.

6    Q.    And you only saw one such draft of that agreement, right?

7    A.    Well there was the draft and then there was the final and

8    then there was a revision in June or a supplement.

9    Q.    Between the draft -- were there any differences that you

10   discerned between the draft of the FGIC settlement that you saw

11   and the final version that you signed?

12   A.    The final version of the settlement agreement?

13   Q.    The FGIC settlement agreement, yes.

14   A.    Yes, there were revisions.

15   Q.    Now, we've already talked about this a bit.  You remember

16   giving deposition testimony in this case, right?

17   A.    Yes.

18   Q.    And I was the person asking you questions during that

19   session, do you recall that?

20   A.    Correct.

21   Q.    And if you turn to tab -- apparently we tried to make it

22   easy for you.  It's called deposition testimony, which is

23   Exhibit FH.  Do you have that?  I understand it's in volume 2,

24   Ms. Sohlberg.

25   A.    What's the tab number?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

147

1   Q.   It says deposition testimony.  It should be the last tab,

2   Ms. Sohlberg.

3   A.   Okay.

4   Q.   If you would turn to page 116, please.  Do you have that?

5   A.   Yes.

6   Q.   I asked you at your deposition, "Question:  Ms. Sohlberg,"

7   this is starting on line 3 at page 116, "Ms. Sohlberg, you

8   signed the FGIC settlement agreement on Wells Fargo's behalf,

9   correct?

10  "A.   Yes.

11  "Q.   Did you -- before signing the agreement, did you see more

12  than one version?

13  "A.   I believe I saw a draft or drafts.

14  "Q.   More than one draft?

15  "A.   I can only recollect seeing one draft.

16  "Q.   Were there any differences between the draft that you saw

17  and the version that you signed?"

18       And you answered you didn't recall.  Do you see that.

19  A.   Yes.

20  Q.   And was your testimony --

21       THE COURT:  Is that supposed to be impeaching?  It

22  seems to me consistent with her testimony.

23       Go ahead, Ms. Eaton.

24  Q.   Were your answers to those questions truthful at the time?

25  A.   At the time they were, yes.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    Q.    And did something happen in the interim that made your --

2    that altered your recollection in some fashion?

3    A.    Yes.  When I was pulling documents to prep for today, I

4    sorted my outlook e-mails by settlement agreement, and when I

5    did that I did realized that there was more than one draft.  So

6    I did see more than one draft.  And then I just -- I just

7    looked at them and there were changes.  Now I can't say whether

8    the changes were --

9         MR. WEITNAUER:  Your Honor, I'd like to object to

10    anything that goes into the mediation as part of those drafts.

11         THE COURT:  So far she hasn't.  All she's talking

12    about is she saw more than one draft and there were changes.

13         MR. WEITNAUER:  I didn't know, but I didn't know what

14    she was going to remember about it.

15         THE COURT:  Wait until you get to something that

16    you've got to object to.

17         MR. WEITNAUER:  Okay.

18         THE COURT:  You can go on with your answer.

19    A.    So that's why the answer is different.  It's because when

20    I did sort through my e-mails by settlement, I did see that

21    there was more than one draft and that there were changes.

22    Q.    And do you recall what those changes concerned?

23    A.    No.

24    Q.    In your direct testimony you indicated that there are

25    additional benefits to the FGIC trusts associated with the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

149

1  proposed bankruptcy plan, do you recall that?

2  A.    In my declaration?

3  Q.    Yes.

4  A.    Yes.

5  Q.    And you identified one of those so-called additional

6  benefits as the right to receive certain reimbursements from

7  the FGIC trusts pursuant to the waterfall provisions under the

8  relevant governing documents.  Do you recall that?

9  A.    Yes.

10  Q.    Okay.  Now, is this something that was discussed at the

11  time that you met with Duff & Phelps on May the 13th?

12  A.    Well, I did not meet with Duff & Phelps.  But I don't

13  recall that being discussed, no.

14  Q.    Do you recall that benefit being reflected in the

15  discussion materials that Duff & Phelps provided, that you were

16  provided with in advance of the meeting?

17  A.    I don't recall.

18  Q.    If you could turn to Exhibit R in your binder, please, Ms.

19  Sohlberg.  Do you have that document?

20  A.    Yes.

21  Q.    Now, is this a copy of the discussion materials that you

22  were provided with in advance of the discussion with Duff &

23  Phelps on May the 13th?

24  A.    Yes, it is.

25  Q.    And there are a series of handwritten notes on this

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  document.  Do you see that?

2  A.   Yes.

3  Q.   And those are notes that you took during the discussion

4  with Duff & Phelps on the 13th of May, correct?

5  A.   Yes.

6  Q.   Do you see anything in this document that refers to

7  reimbursements?

8      (Pause)

9          THE COURT:  Do you represent there is no such thing

10 THERE?

11         MS. EATON:  I haven't found a --

12         THE COURT:  Rather than -- I'm trying to move this

13 along.  At least help her out.  Is there anything that you know

14 of in there on it?

15         MS. EATON:  I have not been able --

16 Q.   Ms. Sohlberg, I have not been able to find any reference

17 to the reimbursements referred to in your direct testimony in

18 the document we've just handed you.

19         THE COURT:  If you want to take your time to go

20 through it further, if you think there is, go ahead.

21 A.   No, I don't see it either.

22 Q.   Then you were provided with a copy of the -- a further

23 copy of discussion materials prepared by Duff & Phelps after

24 the May 13 meeting, correct?

25 A.   Yes.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    Q.    And if you would turn to Exhibit S in your binder.

2    A.    Okay.

3    Q.    And this is a -- this is a copy of those materials,

4    discussion materials, correct?

5    A.    Yes.

6    Q.    And did you read these materials at the time you received

7    them?

8    A.    Yes.

9    Q.    And there isn't a reference to reimbursements in this

10   document either, is there?

11        Again, Ms. Sohlberg, I looked at this document, I see no

12   reference to reimbursements, but if you do please let us know.

13   A.    Um-hum.  No, I don't believe they're in there.  But

14   reimbursements are -- reimbursements on a wrapped trusts are

15   typical.  I mean it's -- it would be something that if you have

16   a wrapped trust that at some point, depending on how it's dealt

17   with in the waterfall, the bond insurer can get reimbursements

18   back.

19   Q.    Isn't it true that the benefit supposedly afforded by

20   FGIC'S foregoing its right to receive reimbursements under the

21   FGIC settlement agreement was not a topic that you discussed

22   with Duff & Phelps before you signed the agreement?

23   A.    Correct.

24   Q.    That was an alleged benefit that was identified after the

25   objections, my clients' objections in this case were filed;

**RESIDENTIAL CAPITAL, LLC, ET AL.**

152

1   isn't that true?

2   A.   I don't know.

3   Q.   Now you also identify an additional benefit in your direct

4   testimony that relates to distributions from the debtors'

5   bankruptcy estate pursuant to the ResCap bankruptcy plan --

6   A.   Correct.

7   Q.   Correct?   Now -- and you say in your direct testimony that

8   that amount could be in excess of ninety million dollars,

9   right?

10  A.   Correct.

11  Q.   And that supposed benefit was not something that Duff &

12  Phelps addressed in its analysis that it provided to you,

13  correct?

14  A.   Those certainly are all benefits.   But in terms of

15  evaluating the commutation of the payment, we looked at the

16  core issue at hand:   is it better based on the obligations of

17  the bond insurer to make payments, is it better to get those

18  payments as a lump sum payment or over a period of time.   That

19  was the analysis.   Certainly there are other benefits, and one

20  of them was the distribution under the plan support agreement,

21  which while not addressed in the -- in the analysis by Duff was

22  at one point covered.   I think it was covered in the initial

23  call that we had, because it was identified as a next step.

24  Q.   My question to you was whether that was a benefit that was

25  identified by Duff & Phelps in the discussion materials that

**RESIDENTIAL CAPITAL, LLC, ET AL.**

153

1    were supplied to you before you approved the agreement?

2    A.   The amount of the benefit -- I did not know the amount of

3    the benefit.  I knew that there was allocations that would be

4    made to the FGIC trusts.

5          THE COURT:  We need to stop for a minute.  CourtCall

6    was disconnected.  My courtroom deputy is just going to

7    reconnect them.

8         (Pause)

9          THE COURT:  Go ahead, Ms. Eaton.  I'm sorry for the

10    interruption.

11    Q.   There was no discussion of potential distributions under

12    the plan of bankruptcy during the discussion with Duff & Phelps

13    on the 13th of May, correct?

14    A.   There wasn't a -- there wasn't a discussion on it, but as

15    I recall, the list of outstanding items included that.

16    Q.   It's not reflected anywhere in either Exhibit R or S;

17    isn't that true?

18         (Pause)

19    A.   I thought it was on the last page, but I don't see it.

20    Q.   And isn't it true that the subject of the potential

21    distributions under the bankruptcy plan, any discussion of that

22    did not occur until after the FGIC settlement agreement was

23    signed?

24    A.   I don't know.

25         MS. EATON:  Pass the witness.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

154

1          THE COURT:  All right.  Further cross-examination?

2     Redirect?

3     REDIRECT EXAMINATION

4     BY MR. WEITNAUER:

5     Q.   Ms. Sohlberg --

6          THE COURT:  Just identify yourself again, Mr.

7     Weitnauer.

8          MR. WEITNAUER:  I'm sorry, Kit Weitnauer again, Your

9     Honor, from Alston & Bird.

10    Q.   Ms. Sohlberg, you work with Wells Fargo, right, you're

11    employed by Wells Fargo?

12    A.   Yes.

13    Q.   And in these cases Wells Fargo acts as trustee; is that

14    correct?

15    A.   Correct.

16    Q.   And as trustee is there any financial benefit to Wells

17    Fargo if this Court approves or disapproves this proposed

18    agreement?

19    A.   There's no financial benefit.

20    Q.   Okay.  And as a trustee, is Wells Fargo required to take

21    financial risk when it makes decisions on behalf of the trust

22    and its certificate holders?

23    A.   We are not.

24    Q.   Okay.  Now, are you a lawyer?

25    A.   No.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    Q.    Are you a financial advisor?

2    A.    No.

3    Q.    In your role as trustee, do you typically retain counsel

4    to assist in matters affecting the trust?

5    A.    Yes.

6    Q.    And in this case you hired counsel, right?

7    A.    Um-hum.

8    Q.    And as -- in your role as trustee, is it common to hire

9    financial advisors to advise Wells Fargo in the decisions it

10   has to make as trustee?

11   A.    If the situation warrants it, yes.

12   Q.    Okay.  And in this case, did Wells Fargo hire a financial

13   advisor?

14   A.    Yes.

15   Q.    And who was that?

16   A.    Duff & Phelps.

17   Q.    Would you have been able to perform your duties as trustee

18   without the assistance of counsel and a financial advisor in

19   this matter?

20   A.    We would not be able to perform them, no.

21   Q.    Okay.  Now, in your direct testimony you referred to the

22   process leading up to the decision to accept the settlement

23   agreement.  Did you, on behalf of Wells Fargo as trustee make

24   the decision to sign on behalf of Wells Fargo as trustee, or

25   did Duff tell you what to do?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

156

1   A.   Wells Fargo made the decision.

2   Q.   Okay.  Now, before you made that decision, did you

3   conclude that this settlement agreement was in the best

4   interests of the certificate holders?

5   A.   Yes.

6   Q.   Okay.  And counsel directed you to the proposed order that

7   contains findings that this settlement agreement is in the best

8   interests of certificate holders.  Do you remember that?

9   A.   Um-hum.  Yes.

10   Q.   If this court decides that it's not in the best interests

11   of the certificate holders, could he enter that order and say

12   that?

13   A.   I don't believe so.

14   Q.   Okay.  And you mentioned in your direct testimony the

15   desire of Wells Fargo to allow holders a chance to object to

16   the settlement; is that correct?

17   A.   Yes.

18   Q.   So if they didn't think it was in their best interests

19   they could make their feelings known; is that right?

20   A.   Correct.

21   Q.   And are you aware of any certificate holders trying to

22   convince this Court that this deal is not in their best

23   interests?  I mean that's why we're here, isn't it?

24   A.   Yes.

25   Q.   And the Court will decide whether it's in the best

**RESIDENTIAL CAPITAL, LLC, ET AL.**

157

1    interests or not?

2    A.    Correct.

3    Q.    Okay.  But at the time you made the decision after the

4    process you went through and described in your affidavit, in

5    your direct testimony, you believed it was in the best

6    interests, did you not?

7    A.    Yes.

8            MS. EATON:  Objection; leading.

9    Q.    At the time you made the decision --

10           THE COURT:  She answered already.  You have to be a

11   little quicker on your feet, Ms. Eaton.  Let's not lead the

12   witness.

13           MR. WEITNAUER:  I'm sorry, Your Honor, I'm just trying

14   to move things along.

15           THE COURT:  I know.

16           MR. WEITNAUER:  Okay.

17           THE COURT:  But since she has to testify not you, ask

18   her questions.

19           MR. WEITNAUER:  I'll do my best.  There's just so

20   much --

21           THE COURT:  I know it's --

22   Q.    Ms. Sohlberg, if I heard counsel correctly, she was asking

23   about whether or not anyone was present representing the

24   certificate holders in connection with these negotiations.  Do

25   you recall that?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

158

1          MS. EATON:  Objection.

2    A.    Yes.

3    Q.    I want to ask you if you can turn to the settlement

4    agreement itself.  And I believe the easiest place to find

5    it -- whoops -- is in volume 2 of the materials that Ms. Eaton

6    handed up, Exhibit C, tab 2.

7    A.    Yes.

8    Q.    And I want you to look towards the back of that exhibit.

9          THE COURT:  Let me find it.

10          MR. WEITNAUER:  Thank you, Your Honor.

11          THE COURT:  Okay.

12    Q.    And this is on -- if you look at the top of the page it's

13    got numbers, including doc 3929-2 and then it has page numbers.

14    If you look at page 25 of 50.  Do you see that?

15    A.    Um-hum.

16    Q.    Have you got to page 25?

17    A.    Yes.

18    Q.    I'm sorry, I didn't hear you.  That's what you signed, the

19    settlement agreement, was that correct?

20    A.    Yes.

21    Q.    And turn to the next page, page 26, do you see a signature

22    under the signature block for Gibbs & Bruns.  Can you tell who

23    signed that?

24    A.    Kathy Patrick.

25    Q.    And do you know who Kathy Patrick represents?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

159

1    A.    Yes.  She represents the steering committee.

2    Q.    And what is the steering committee?

3    A.    The steering committee is a group of institutional

4    holders, certificate holders.

5    Q.    And do they have holdings in the trust that are the

6    subject of this settlement agreement?

7    A.    Yes.

8    Q.    All right.  And if you look at the next page, page 27 of

9    50, there's a signature by, under the name Talcott Franklin.

10   Do you know who Talcott Franklin is?

11   A.    He's counsel to another group of holders called the

12   Talcott investors.

13   Q.    All right.  Did you consider the input of the

14   institutional investors represented by Kathy Patrick as you

15   considered whether or not this agreement was or was not in the

16   best interests of certificate holders?

17   A.    No, no.  I was aware that they were in agreement with the

18   settlement, but when I made the decision to sign on that

19   settlement agreement, it was a decision I made on behalf of

20   Wells Fargo as trustee based on the analysis done by Duff and

21   the fact that there would be an ability of holders to object.

22   Q.    Okay.  And that's why we're here today; is that right, to

23   your knowledge?

24   A.    Yes.

25   Q.    Okay.  Have you ever heard of a phrase called a global

**RESIDENTIAL CAPITAL, LLC, ET AL.**

160

1  settlement or the global resolution?

2  A.    I believe --

3  Q.    In the context of this case?

4  A.    As I understand it, I think the reference to global is the

5  plan support agreement.

6  Q.    The plan support agreement.

7  A.    Yeah.

8  Q.    And do you recall if that was signed as or part of this

9  same process that led to the signing of the FGIC settlement

10 agreement?

11        MS. EATON:  Objection.

12        THE COURT:  Sustained.

13 Q.    Do you recall when it was signed?

14 A.    Yes.

15 Q.    Okay.  About when was it signed?

16 A.    It was signed either on May 22nd or May 23rd.  Excuse me,

17 the supplemental term sheet was signed I believe on May 22nd or

18 23rd.

19 Q.    Okay.  And do you know whether or not a plan has been

20 filed in the Chapter 11 case that is based on or comes out of

21 that plan support agreement?

22 A.    Yes.

23 Q.    Okay.  And do you know whether or not the trusts that are

24 involved in this FGIC settlement agreement would receive any

25 distributions under that plan if it's confirmed?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  A.   Yes.

2  Q.   And would the litigation and the issues and the disputes

3  and the, all the time that's gone on in this case be behind us,

4  if the plan is confirmed in accordance with the PSA?

5         MS. EATON:  Objection.

6  A.   As I understand it.

7         THE COURT:  Sustained.  Let's avoid the leading

8  questions, Mr. Weitnauer.

9         MR. WEITNAUER:  Okay.  All right.  Sorry, Your Honor.

10  Q.   Are you aware of any benefits to the certificate holders

11  in these trusts if the plan of reorganization is confirmed?

12         MS. EATON:  Objection.

13         THE COURT:  Overruled.

14  A.   Well the holders will receive distributions from the --

15  from the plan.

16         MR. WEITNAUER:  Just one minute, Your Honor, let me

17  try to find a clean copy of something.

18      (Pause)

19  Q.   Let me ask you if you could look at the volume that Ms.

20  Eaton gave you, it's volume 2 of 2, and I'm going to turn to a

21  tab down towards the bottom that says Exhibit S.  It's

22  marked -- it's the May 15 Duff materials.  It's a nice color

23  copy.  Do you see that?  It's Trial Exhibit S.  Let me know

24  when you've found that.

25  A.   Yes.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  Q.   All right.  And if you'll look at the first, second, third

2  page, it's marked page 0003.  Do you see that?

3  A.   Yes.

4  Q.   At the top of the page, to be sure we're on the same page

5  it says "Executive Summary (continued)"?

6  A.   Correct.

7  Q.   And in the middle column there, the first sort of thick

8  column do you see a "benefit" with a blue heading?

9  A.   Yes.

10  Q.   Could you read what it says after the word "benefit"?

11  A.   "Provided global resolution on outstanding ResCap RMBS

12  litigation issues."

13  Q.   Okay.  Do you have any idea one way or the other whether

14  that refers to the resolution under the plan support agreement?

15        MS. EATON:  Objection.

16        THE COURT:  Overruled.

17  A.   Yes, I would interpret it as being the resolution of

18  the -- under the plan support agreement.

19        MR. WEITNAUER:  Okay.  One moment.

20        Your Honor, that's all I have on redirect.

21        THE COURT:  All right.  Any other proponent want to

22  examine?

23        MS. PATRICK:  Yes, Your Honor, Kathy Patrick with

24  Gibbs & Bruns, my appearance is in the record for the steering

25  committee group of RMBS investors.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

163

1        THE COURT:  Okay.  Go ahead, Ms. Patrick.

2   REDIRECT EXAMINATION

3   BY MS. PATRICK:

4   Q.   Ms. Sohlberg, just a few more questions to follow up on

5   what Mr. Weitnauer asked you.  He asked you what would happen

6   to the FGIC trusts if the plan was approved, and you said they

7   would get distributions from the plan; is that right?

8        MS. EATON:  Objection.

9        THE COURT:  Overruled.

10  Q.   Do you recall that testimony?

11       THE COURT:  Go ahead.

12  A.   Yes.

13  Q.   And Ms. Sohlberg, what will happen if -- what is your

14  understanding about whether the approval of this settlement is

15  a condition to the completion of the plan support agreement and

16  the plan?

17       MS. EATON:  Objection.

18       THE COURT:  Overruled.

19  A.   Yes.

20  Q.   It is a condition?

21  A.   Yes.

22  Q.   And therefore, if this settlement is not approved, is it

23  your understanding that the --

24       THE COURT:  No, ask her what her understanding is if

25  it's not approved.  Don't ask a leading question, okay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

164

1          MS. PATRICK:  Fair enough.

2     Q.    And if the plan is not -- if this settlement is not

3     approved and if the plan is not approved, what is your

4     understanding about what will happen to the anticipated size of

5     the distributions that will come from the debtors to the

6     holders in the FGIC trusts?

7          MS. EATON:  Objection.

8          THE COURT:  Overruled.

9     A.    It's my understanding that -- that the Ally contribution,

10    which is significant to the global settlement, is off the

11    table.  Which means that it's really questionable whether or

12    not the holders would receive any distributions.

13    Q.    And how did that understanding influence your conclusion

14    about what was in the best interests of the certificate holders

15    here, Ms. Sohlberg?

16         MS. EATON:  Objection.

17         THE COURT:  Overruled.

18    A.    It certainly entered into it, but at the same time my core

19    focus was whether or not our financial expert could recommend

20    the lump sum payment.  And certainly, a lot of effort went into

21    trying to achieve a settlement under the FGIC rehabilitation.

22    So it is a part of it, certainly.  You can't ignore the fact

23    that we could find ourselves in a position of not having any

24    money to distribute to the holders.  But there still had to be

25    integrity in the decision on the FGIC settlement, and I believe

**RESIDENTIAL CAPITAL, LLC, ET AL.**

165

1  there was.

2  Q.   And why did you believe there was, Ms. Sohlberg?

3  A.   Based on the recommendations of our financial expert, who

4  really looked at the core of the issue, which is a lump sum

5  payment or a series of payments over time.

6  Q.   And what did you understand the prospect of those payments

7  depended on over time if this settlement didn't happen, that is

8  when the payment streams came in, what could affect those?

9  A.   The payment streams?

10  Q.   Yes.

11  A.   Based on the global settlement or the --

12  Q.   The FGIC settlement?

13  A.   The FGIC settlements.

14  Q.   You said --

15  A.   Well, what happens to the payments is that they're -- that

16  you've got a payout period here that could go up to forty

17  years, and with that type of time frame it's subject to

18  uncertainty and risk.  So --

19        MS. PATRICK:  Thank you.  Thank you, Your Honor.

20        THE COURT:  Thank you, Your Honor.  Any further

21  examination?  Ms. Eaton.

22  RECROSS-EXAMINATION

23  BY MS. EATON:

24  Q.   If you could go back to Exhibit S, please, Ms. Sohlberg.

25  Do you have that in front of you?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

166

1    A.   Yes.

2    Q.   Now, at the time that you concluded that the commutation

3    was in the best interests of the holders -- of the investors in

4    the FGIC wrapped trusts, you did not have a copy of this

5    document, did you?

6    A.   I don't -- well, I don't know.

7    Q.   Well, you testified that you determined that the FGIC

8    settlement agreement, the commutation was in the best interests

9    of the investors in the FGIC wrapped trusts at the meeting with

10   Duff & Phelps, do you recall that?

11   A.   Yes, but we're --

12   Q.   And that meeting happened --

13        THE COURT:  Could you -- she hadn't finished her

14   answer.

15   A.   Where I get confused is your use of the word approved.  I

16   did not approve the settlement when we went through the draft.

17   I looked at the settlement.  At that point I was comfortable

18   with the settlement and I was comfortable with that we had --

19   that we had -- that we would accept a lump sum payment, but I

20   did not approve the settlement there.  As I think I mentioned

21   to you earlier, that subsequent to that meeting I did go back

22   over the report based on the presentation that Duff gave me

23   just to kind of -- what I did is kind of looked at the numbers,

24   where did they come from, how did they all fit in.  But I

25   didn't approve it.  But I was in agreement with it, maybe

**RESIDENTIAL CAPITAL, LLC, ET AL.**

167

1   that's a better word.

2   Q.   You determined at that meeting that it was in the best

3   interests --

4   A.   Yes.

5   Q.   -- of the investors in the FGIC wrapped trusts, right?

6   A.   Yes.

7   Q.   And at that time the document that is Exhibit R didn't

8   even exist, did it?

9        THE COURT:  Are you looking at R or S?  You were

10   asking about --

11        MS. EATON:  I beg your pardon, S.

12   A.   Yes.

13   Q.   That's dated two days after that meeting, correct?

14   A.   Um-hum.

15   Q.   And at the time that you determined that the proposal was

16   in the best interests of investors in the FGIC wrapped trust

17   the plan support agreement had not been signed either, correct?

18   A.   Correct.

19        MS. EATON:  Nothing further.

20        THE COURT:  All right.

21        MR. WEITNAUER:  Just one question, Your Honor.

22        THE COURT:  Mr. Weitnauer.

23   FURTHER REDIRECT EXAMINATION

24   BY MR. WEITNAUER:

25   Q.   Ms. Sohlberg, could you turn to Exhibit R in that same

**RESIDENTIAL CAPITAL, LLC, ET AL.**

168

1  binder?

2  A.    Yes.

3  Q.    Do you have it in front of you?

4  A.    Yes.

5  Q.    Is that the earlier version of Exhibit S?

6  A.    I believe so, yes.

7  Q.    And this has your handwritten notes on it?  I mean there

8  are handwritten notes on it.  These are your notes, are they

9  not?

10 A.    Yes.

11 Q.    And when did you take those notes?

12 A.    I took them during Duff's presentation.

13 Q.    Okay.  Look at page MS 000 -- many zeroes 7 that's

14 entitled "Comparison between commutation proposal and plan"?

15 A.    Yes.

16 Q.    And do you see under that second black bar the word

17 "proposal"?

18 A.    Yes.

19 Q.    And do you see a first bullet point underneath that?

20 A.    Yes.

21 Q.    And can you read that to us?  It starts with "Provides"?

22 A.    "Provides a global resolution on outstanding ResCap RMBS

23 litigation issues."

24         MR. WEITNAUER:  Thank you.

25         THE COURT:  All right.  Thank you, Mr. Weitnauer.  Any

**RESIDENTIAL CAPITAL, LLC, ET AL.**

169

1     other questions?

2           You're excused, thank you very much.

3           Mr. Kerr?

4           MR. KERR:  Your Honor, Charles Kerr, Morrison &

5     Foerster on behalf of the debtors.  I believe our next witness

6     is Ms. Scott.

7           THE COURT:  Okay.

8           MR. KERR:  So we'll shift around again if we can, Your

9     Honor.

10          THE COURT:  Yeah.  Keep moving along.

11          Ms. Scott, if you would stand and you'll be sworn.

12    Okay?  Raise your right hand.

13        (Witness sworn)

14          MR. KOTWICK:  Good afternoon, Your Honor.  My name is

15    Mark Kotwick of Seward & Kissel.  I represent U.S. Bank as RMBS

16    trustee.  And the next witness, as Mr. Kerr referenced, is

17    Mamta Scott from U.S. Bank.

18          My colleague is distributing copies of her direct

19    testimony as well as the exhibits she's sponsoring.  Her direct

20    testimony is identified as Debtors' Exhibit number 102; and

21    with the exhibits she's sponsoring are Debtors' Exhibits 114,

22    117, 120, 123, 128, 129.  I understand this entire package has

23    been filed with the Court and is identified at ECF 4697.  And

24    I'd like to move for the admission of her declaration and the

25    attendant exhibits at this point.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

170

1        THE COURT:  Any objections?

2        Hearing none, Exhibit 102, 114, 117, 120, 123, 128 and

3    129 are admitted in evidence.

4    (Declaration of Mamta Scott was hereby received into evidence

5    as Debtors' Exhibit 102, as of this date.)

6    (Mamta Scott exhibits was hereby received into evidence as

7    Debtors' Exhibits 114, 117, 120, 123, 128, 129, as of this

8    date.)

9        MR. KOTWICK:  Thank you, Your Honor.

10        THE COURT:  Thank you.  Cross-examination.

11        MS. JAMES:  Emma James for Monarch, Stonehill, CQS and

12    Bayview.

13    CROSS-EXAMINATION

14    BY MS. JAMES:

15    Q.   Good afternoon, Ms. Scott.

16    A.   Good afternoon.

17    Q.   U.S. Bank did not seek the consent of the investors or

18    holders before entering into the FGIC settlement agreement,

19    correct?

20    A.   That's correct.

21    Q.   Okay.  In fact, U.S. Bank never spoke or sought to notify

22    the holders about its intention to enter into the FGIC

23    settlement agreement, correct?

24    A.   We were not able to.  As soon as we were able to we did.

25    Q.   As soon as you were able to, okay.  Did U.S. Bank make any

**RESIDENTIAL CAPITAL, LLC, ET AL.**

171

1    attempt to inform the holders that it was considering commuting

2    the FGIC Insurance policies wrapping the trusts?

3    A.    We were not able to.

4    Q.    U.S. Bank is party to the plan support agreement, correct?

5    A.    Yes.

6    Q.    Okay. And in fact you signed that agreement on behalf of

7    U.S. Bank?

8    A.    Yes.

9    Q.    Did you read the plan support agreement before signing it?

10    A.    I did.

11    Q.    Okay.  And you understood its terms?

12    A.    Yes.

13    Q.    The plan support agreement requires U.S. Bank to use its

14    best efforts to secure the approval of the FGIC settlement

15    agreement, correct?

16    A.    Yes.

17    Q.    Okay.  And the FGIC settlement agreement, if approved, is

18    binding on all investors in the affected FGIC wrapped trusts;

19    is that right?

20    A.    That's my understanding.

21    Q.    So if the investors in the FGIC wrapped trusts were to

22    come to U.S. Bank and say don't do this, don't commute our

23    policies, U.S. Bank would nonetheless continue to ask this

24    Court to approve the FGIC settlement agreement; is that fair?

25    A.    The investors have the opportunity to object to the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

172

1   settlement.

2   Q.   Ms. Scott, that's not my question.  My question is

3   regardless of whether or not the investors have the right to

4   object, if they were to object and say to you please do not

5   enter into the FGIC settlement agreement, you'd nonetheless

6   seek this Court's approval of the FGIC settlement agreement?

7   A.   Yes, we've signed the agreement.

8   Q.   Okay.  And that's because you have also signed the plan

9   support agreement where you've agreed not to -- you've agreed

10  to oppose any attempt to derail the FGIC settlement agreement,

11  correct?

12  A.   Can you repeat the question?

13  Q.   The plan support agreement requires that you oppose any

14  effort by investors to stop the FGIC settlement agreement from

15  being approved by this Court, correct?

16  A.   I would have to refer to the plan support agreement to see

17  exactly what you are -- what you're referring to.

18  Q.   Okay.  But you agree that the plan support agreement

19  requires that you not object to the plan and that you support

20  the approval of all other documents relating to the plan,

21  including the FGIC support agreement -- the FGIC settlement

22  agreement, right?

23  A.   I mean again, I'd like to confirm what you're referring

24  to.

25  Q.   Okay.  Just a moment and we'll get you that agreement.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

173

1         THE COURT:  Thank you.

2    Q.   Ms. Scott, if you could look at Exhibit J in the binder

3    that you were just handed?

4         MS. JAMES:  Your Honor, Exhibit J is a copy of the

5    plan support agreement.

6    Q.   Ms. Scott, if you could take a look at section 4.1 of that

7    agreement, specifically section 4.1(c).

8         THE COURT:  Is that page 10?

9         MS. JAMES:  Yes, Your Honor.

10   Q.   And you see there in section 4.1(c)(ii) the parties to

11   the -- the supporting parties to the PSA agree not to object to

12   or otherwise commence any proceedings to oppose, alter, delay

13   or impede the plan or the other approved plan documents?

14   A.   Yes, I do.

15   Q.   Okay.  Does that refresh your recollection as to what the

16   plan support agreement means for U.S. Bank in connection with

17   the FGIC settlement agreement?

18   A.   I mean it's stated right here.

19   Q.   Okay.  Can the holders in the trust opt out of the FGIC

20   settlement agreement if they don't wish to have their policies

21   commuted, Ms. Scott?

22   A.   No.

23   Q.   Okay.  And U.S. Bank opposes the objections to the FGIC

24   settlement agreement that are being heard by this Court at the

25   moment; is that correct?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

174

1    A.    Can you restate the question?

2    Q.    U.S. Bank is opposing the objections that have been

3    submitted by my clients to this Court in connection with the

4    approval of the FGIC settlement agreement; is that correct?

5    A.    I would say that we still believe that the FGIC settlement

6    is in the best interests of holders.

7              MS. JAMES:  Thank you.  No further questions.

8              THE COURT:  Any other question?  I'm sorry?  Ms.

9    James, you've completed your questioning?

10             MS. JAMES:  Yes, Your Honor.

11             THE COURT:  Okay.

12        (Pause)

13             THE COURT:  Could you identify yourself for the

14   record, please?

15             MR. GELFARB:  Yes, David Gelfarb, law firm of Moss &

16   Kalish on behalf of objector Freddie Mac.

17   CROSS-EXAMINATION

18   BY MR. GELFARB:

19   Q.    Good afternoon, Ms. Scott.  Ms. Scott, you participated in

20   the conference call with Duff & Phelps on March 13th, correct?

21   A.    I can't --

22             THE COURT:  May 13th.

23   Q.    Excuse me, on May 13th?

24   A.    I believe that's the correct date.

25   Q.    And did you ask any questions during the presentation by

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   Duff & Phelps?

2   A.   I don't recall asking questions, but I know my counsel

3   asked several.

4   Q.   Did you at any time tell Freddie Mac about the possibility

5   that its policies might be commuted prior to the entry into the

6   plan support agreement?

7   A.   No.  As I stated, we were not able to.

8   Q.   Did you ever think that Freddie Mac might have wanted to

9   know that there was a possibility of the policies being

10  commuted prior to the entry into the plan support agreement?

11  A.   I believe that they would have wanted to know, but we were

12  not able to provide that information.

13  Q.   Can you tell me, please, who was involved in the

14  negotiations that led to the settlement agreement?

15  A.   I couldn't speak to who was involved.

16  Q.   Was U.S. Bank involved in the negotiations?

17  A.   Before it was presented to us?

18  Q.   Was it involved in the negotiations at any time?

19  A.   I mean we reviewed the agreement.  I guess if you're

20  referring to negotiating the material terms of the agreement,

21  like the 253 million?

22  Q.   Correct.

23  A.   No.

24  Q.   So in other words, your bank had no -- had no involvement

25  in the negotiation -- specifically had no involvement in the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

176

1  negotiation of the 253-million-dollar commutation amount,

2  correct?

3  A.   No.

4  Q.   And can you -- do you know --

5        THE COURT:  You got an ambiguous answer because of the

6  way you asked your question so you might want to clarify it.

7  Q.   Did U.S. Bank have any involvement in the negotiation of

8  the 253-million-dollar commutation amount?

9  A.   No.

10 Q.   Thank you.  Did U.S. Bank negotiate any of the terms of

11 the settlement agreement as it was presented to you?

12        MR. KOTWICK:  Objection; vague.

13        THE COURT:  Sustained.

14 Q.   You understand that there are terms and conditions in the

15 settlement agreement beyond the 253-million-dollar commutation

16 amount, correct?

17 A.   Yes.

18 Q.   Was U.S. Bank involved in the negotiation of any of the

19 terms other than the amount of the commutation?

20 A.   I mean, I would say that we reviewed the agreement, vetted

21 the agreement, may have provided certain changes to make sure

22 that the agreement was in line with big-picture issues for the

23 trustees.

24        THE COURT:  Can you just pull the microphone a little

25 closer.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE WITNESS:  Sure.

2          THE COURT:  Thank you.

3   Q.   Did you ever make an effort to get more than 253.3 million

4   dollars for the certificate holders?

5          MR. KOTWICK:  I'm going to object on the basis of the

6   mediation order and ask the witness to answer yes or no in the

7   first instance.

8          THE COURT:  Sustained.  The objection is sustained.

9   Q.   Have you read the disclosure statement with respect to the

10  plan of rehabilitation, Ms. Scott?

11         THE COURT:  You're talking about the FGIC

12  rehabilitation plan.

13  Q.   The FGIC rehabilitation, not the plan of rehabilitation?

14  A.   No.

15  Q.   Was that no?

16  A.   That was a no.

17  Q.   Thank you.  And by way of follow-up, did you happen to do

18  any analysis of the terms and conditions of the FGIC

19  rehabilitation plan?

20  A.   No.

21  Q.   Can you please take a look in -- I believe it's in your

22  book, it should be at Exhibit BD.  Do you have that in front of

23  you.

24  A.   I do.

25  Q.   Can you please take a look at page --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

178

1        MR. GELFARB:  All right.  Withdrawn.

2  Q.   Can you please move ahead to Exhibit, I believe it's

3  number 6 in the package.  For the record it's the

4  presentation -- it's Exhibit -- Objectors' Trial Exhibit S.  Do

5  you see that?

6        THE COURT:  So we're looking at what's been marked as

7  Exhibit S.

8        MR. GELFARB:  It should be Objectors' Trial Exhibit S.

9        THE COURT:  Right.

10  Q.   Do you see that?

11  A.   I see Exhibit S, yes.

12  Q.   Okay.  Now, when Duff & Phelps made its presentation they

13  went through their report, correct?

14  A.   They did.

15  Q.   And you were listening to that, correct?

16  A.   Yes.

17  Q.   Now, do you see on page 7 -- there's a 7 at the bottom --

18  the top of the page has "FGIC plan of rehabilitation summary",

19  do you see that?

20  A.   I do.

21  Q.   And do you see it refers to the word "discount rate"?

22        THE COURT:  I'm sorry.  What page are you on, Mr.

23  Gelfarb?

24        MR. GELFARB:  Page number 7.  It says FGIC plan --

25        THE COURT:  That's fine, I -- go ahead.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   Q.   Sorry, FGIC plan of rehabilitation summary at the top.  Do

2   you see that?

3   A.   I do.

4   Q.   Okay.  Do you understand what the term discount rate means

5   in connection with that page?

6   A.   Do you want me to review the full page?

7   Q.   Excuse me?

8   A.   Do you want me to review the full page?

9   Q.   Sure, go right ahead.

10   A.   Okay.

11   Q.   Do you understand what the term discount rate means in

12   connection with that page, Ms. Scott?

13   A.   So I can see that they were assuming a discount rate of

14   ten to twenty percent.

15   Q.   And what does that mean?

16   A.   I mean, I would have fully understood it at the time.  As

17   I sit here today I would be maybe not describing it as well as

18   Duff would; but I understand that to mean that they applied a

19   certain rate on the present value of what was being offered in

20   the -- in the settlement.

21   Q.   Do you understand how discount rates are usually

22   determined, Ms. Scott, or determined at all?

23   A.   No, I wouldn't say I have a thorough understanding of

24   that.

25   Q.   Okay.  Can you please go to the bracket J, that's the page

**RESIDENTIAL CAPITAL, LLC, ET AL.**

180

1   before, that's page number 5.  Do you see that page and that

2   bracket, Ms. Scott?

3   A.   I do.

4   Q.   Do you see the term "haircut of forty percent on unpaid

5   payout claim estimates"?

6   A.   I see that.

7   Q.   Do you have an understanding of what that means?

8   A.   As I sit here today, I couldn't describe it, but during

9   the presentation I would have had a -- had an understanding of

10  that.

11  Q.   Now, do you notice there's a line on page 7 -- excuse me.

12  I'd like you to go back, please to Exhibit number 4, that's the

13  older draft of the Duff & Phelps report. Do you have that

14  handy, Ms. Scott?

15  A.   Exhibit number 4?

16          THE COURT:  You lost me, Mr. Gelfarb.

17          MR. GELFARB:  I'm sorry, Your Honor.  That's the Duff

18  & Phelps earlier report.  In my book it's Exhibit number --

19  it's Exhibit number 4 to the transcript, it's really Exhibit 4

20  to the transcript of her deposition.

21          THE COURT:  Where is that?

22          MR. GELFARB:  It's trial Exhibit B as in boy, D as in

23  delta.

24          THE COURT:  BD?

25          MR. GELFARB:  Yes, Your Honor.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

181

1          THE COURT:  I have it in front of me.  Do you have it

2     in front of you, Ms. Scott?

3          THE WITNESS:  I do.

4          THE COURT:  Okay.

5     Q.   Okay.  Ms. Scott, have you had the opportunity to turn to

6     page 7 in that document, to the top of the page; it says

7     "comparison between commutation proposal and plan".  Do you see

8     that page?

9     A.   I'm there, yes.

10    Q.   Thank you.  And do you see there's a line toward the

11    bottom that says "Nominal recovery" and there's an

12    approximation sign, a little wiggle, 19-20 percent, do you see

13    that?

14    A.   I do.

15    Q.   Do you know what that means?

16    A.   I can't recall right now what that's referring to.

17    Q.   During the discussion with Duff & Phelps was there any

18    discussion about what percentage of the claims that the trusts

19    had put in or were expected to put in would be reimbursed?

20    A.   Can you restate the question?

21    Q.   Sure.  In other words, you understand that there's a

22    proposed commutation payment, correct, of 253.3 million

23    dollars?

24    A.   Yes.

25    Q.   Okay.  During the discussion with Duff & Phelps, did

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   anyone ever say that that 253.3 million dollars represented

2   some percentage of claims of the trusts?

3   A.   I don't recall a percentage.

4   Q.   So in other words, did Duff or anyone ever indicate or

5   state what percentage of losses that 253 million dollars would

6   make up?

7   A.   I don't recall.

8   Q.   Do you understand that the FGIC rehabilitation plan

9   obviously has the word rehabilitation in it, correct?

10  A.   Yes.

11  Q.   Do you know what the word rehabilitation is referring to?

12  A.   The rehabilitation proceedings currently ongoing for FGIC?

13  Q.   Now, if you look please at page -- you were deposed in

14  this action by myself and Ms. James, correct?

15  A.   Yes.

16  Q.   In Chicago?

17  A.   Yes.

18  Q.   And do you recall that there was a question asked of you,

19  "Do you know what the term rehabilitator means with respect to

20  the FGIC" --

21          THE COURT:  Where are you, Mr. Gelfarb?

22          MR. GELFARB:  Sorry, Your Honor, page 97, line number

23  18.

24          THE COURT:  Where do I find the deposition?

25          MR. GELFARB:  It should be part of your package, Your

**RESIDENTIAL CAPITAL, LLC, ET AL.**

183

1  Honor.

2          THE COURT:  Well, if you'll tell me where I'll find

3  it.

4          MR. GELFARB:  Yes, Your Honor.  I believe that was the

5  transcript.

6          THE COURT:  Is there an exhibit number, somebody?

7          MR. GELFARB:  The exhibit --

8          THE COURT:  I'm sorry?  FI?  All right.

9          MR. GELFARB:  Yes, FI, Your Honor.  There are so many

10  different versions.

11          THE COURT:  Yes, I know there are.  Okay, I have it.

12          THE WITNESS:  I don't.

13  Q.   It's FI.

14  A.   Found it.

15  Q.   Do you recall being asked --

16          MR. GELFARB:  Your Honor, I would like to withdraw the

17  previous question.

18  Q.   Ms. Scott, my question is this, do you know what the term

19  rehabilitator means with respect to the rehabilitation plan.

20  A.   No, not enough to speak to it here.

21  Q.   Have you ever heard the term runoff projections with

22  respect to the FGIC rehabilitation plan, Ms. Scott?

23  A.   No.

24  Q.   Ms. Scott, do you know how much my client Freddie Mac is

25  to receive under the commutation proposal?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

184

1    A.    Specifically, I do not.

2    Q.    Have you ever heard, Ms. Scott, that the commutation

3    proposed payment of 253 million dollars represents

4    approximately twenty percent, twenty-one percent of the accrued

5    and unpaid and expected claims by the wrapped trusts?

6    A.    I don't recall.

7    Q.    Ms. Scott, have you ever spoken to anyone at Freddie Mac

8    about the ResCap settlement plan?

9    A.    No.

10   Q.    Now, did Duff & Phelps ever say in sum and substance that

11   one plan is offering twenty-seven to thirty cents on the dollar

12   and one is offering approximately twenty-one cents, and yet

13   this is why we think one plan or the other is better for the

14   certificate holders?

15   A.    I don't recall if they said those things.

16   Q.    Now I'm going to ask you to take a look, please, at your

17   direct testimony and that's your declaration.  Do you have that

18   in front of you?

19   A.    I do.

20        MR. GELFARB:  Your Honor, I apologize, I don't have

21   the exhibit reference handy.

22        THE COURT:  I have it.  It's Exhibit 102.

23        MR. GELFARB:  Thank you, Your Honor, sorry about that.

24        THE COURT:  That's okay.

25        THE WITNESS:  I'm sorry, were we looking at -- not the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

185

1  deposition.

2            THE COURT:  No, this is your testimony.

3  Q.   No, Ms. Scott, your declaration.

4  A.   Okay.  Okay, I do have that in front of me.

5  Q.   Now please direct your attention to paragraph number 9 in

6  your declaration, Ms. Scott.

7  A.   Okay.

8  Q.   And you've had an opportunity to look at paragraph 9?

9  Have you had an opportunity to look at paragraph 9?

10 A.   Yes.

11 Q.   And please take a look at paragraph 37 as well, Ms. Scott.

12 Have you had an opportunity to look at paragraph number 37?

13 A.   I'm reviewing it now.

14 Q.   Sure.

15 A.   Okay.

16 Q.   Now, do you see that you talk about an approximately

17 ninety-two-million-dollar payments at both paragraph 9 and

18 paragraph 37?

19 A.   Yes.

20 Q.   Now, were you aware of that payment at the time of the

21 Duff & Phelps presentation?

22 A.   The exact number, no.

23 Q.   Did Duff & Phelps discuss an approximately ninety-two-

24 million-dollar payment during that presentation?

25 A.   I don't think we knew the number at that time.  I mean, we

**RESIDENTIAL CAPITAL, LLC, ET AL.**

186

1    knew there was going to be value through the trust being able

2    to have an allowed claim, but I don't think we knew the number

3    at the time.

4    Q.    Now, is it correct that you have no independent knowledge

5    of the terms of the commutation proposal unless it was -- what

6    was conveyed to you by Duff & Phelps?

7    A.    That's correct.  We engaged Duff to do the analysis for

8    us.

9    Q.    Now, if you could please take a look at paragraph 22 of

10   your declaration, Ms. Scott.  Given that you've testified that

11   you had no independent knowledge of the terms of any deal,

12   unless it was what was conveyed to you by Duff & Phelps, how

13   did being on the UCC allow you to better evaluate the

14   settlement agreement?

15   A.    Well, the UCC provided insight on other issues affecting

16   the global ResCap bankruptcy.

17   Q.    But being on the UCC had no benefit in terms of giving you

18   better insight into the commutation settlement plan, correct?

19   A.    I mean, it may have.

20   Q.    Have you or anyone else at your company besides your

21   attorneys conducted any analysis of the terms and conditions of

22   the FGIC rehabilitation plan?

23           THE COURT:  So let's focus it on if she can -- do you

24   know whether -- did you look at the FGIC rehabilitation plan?

25           THE WITNESS:  No.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

187

1          THE COURT:  Do you know whether anybody at the bank

2     reviewed it?

3          THE WITNESS:  I don't know, but I know there is --

4     there are people working on that issue.

5          THE COURT:  Ask your next question.

6          MR. GELFARB:  Thank you.

7     Q.   Were there people working on that issue as of the date of

8     the presentation by Duff & Phelps?

9     A.   There have been people working on the issue.  The exact

10    date range, I don't know.

11    Q.   Ms. Scott, I'd ask you, please, to refer to page 97 of

12    your deposition transcript, if you would.

13    A.   Deposition transcript?

14    Q.   Yes, that's the deposition transcript from Chicago.

15    A.   Okay.

16    Q.   And do you recall -- I'm reading from line 11 on page 97,

17    "Do you know whether anyone else at U.S. Bank has performed any

18    analysis of the terms and conditions of the FGIC rehabilitation

19    plan other than counsel?"  Mr. Kotwick, "Objection; outside the

20    scope."  Answer, "I don't know."  Did you give that answer?

21    A.   Yes.

22    Q.   So as of when did you come to the understanding that

23    personnel at U.S. Bank were in fact analyzing the

24    rehabilitation plan?

25    A.   I think what I just said is I know people are working on

**RESIDENTIAL CAPITAL, LLC, ET AL.**

188

1    the issue at the bank.  I still don't know whether or not they

2    reviewed or have done any analysis on the plan.

3              MR. GELFARB:  Nothing further. Thank you, Ms. Scott.

4              THE COURT:  All right.  Any other cross-examination?

5              We're going to take a ten-minute recess.  So you can

6    step down.  You'll have to go back up.

7         (Recess from 3:21 p.m. until 3:37 p.m.)

8              THE COURT:  Please be seated.

9              Redirect examination?

10             MR. KOTWICK:  Good afternoon, Your Honor, Mark Kotwick

11   of Seward & Kissel again on behalf of U.S. Bank.

12   REDIRECT EXAMINATION

13   BY MR. KOTWICK:

14   Q.   Ms. Scott, I just have a couple of brief redirect

15   questions for you.  You testified at several points that you

16   were unable to advise the holders of discussions concerning the

17   settlement agreement commutation amount.  Why were you unable

18   to advise them of the discussions you were having concerning

19   the settlement agreement?

20   A.   We were under a strict court order of confidentiality --

21   Q.   Following the --

22   A.   -- through the mediation.

23   Q.   I'm sorry.  Go ahead.

24   A.   Sorry.  Through the mediation.  Sorry.

25   Q.   Following the execution of the settlement agreement, at

**RESIDENTIAL CAPITAL, LLC, ET AL.**

189

1    some point were you able to advise the holders in the affected

2    trusts of the settlement agreement?

3    A.    Yes.

4    Q.    And did you send notice to those holders?

5    A.    Yes, we did.

6    Q.    And are those notices attached to your declaration today?

7    A.    Yes, I believe they are.

8    Q.    Could you take a look at your declaration and identify

9    them for the Court.

10            THE COURT:  Speed it up, why don't you tell me the

11   exhibit numbers.

12   Q.    Could you look at Exhibit numbers 128 and 129 which are

13   attached to your declaration, Ms. Scott?

14   A.    Sorry, I was in the other book.

15   Q.    Sorry.

16   A.    Yes, I'm here.

17   Q.    Are those the notices that were sent to the holders

18   following the execution of the FGIC settlement agreement?

19   A.    Yes, these appear to be the notices that we sent out.

20   Q.    And how many notices did you send out?

21   A.    Two immediately following the execution of the settlement

22   agreement.

23   Q.    Okay.  Ms. Scott, you had referenced that U.S. Bank was

24   not directly involved in negotiation of the FGIC settlement

25   agreement.  Are you aware whether your counsel was involved?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    A.    Yes.

2    Q.    And were they involved?  Was your counsel involved in

3    negotiation of the FGIC settlement agreement?

4    A.    Yes.

5    Q.    There was a question raised by Mr. Gelfarb about how

6    Freddie Mac, or whether Freddie Mac could learn of their

7    allocation of the commutation amount.  Is there a way that a

8    holder can learn their share of the 253-million-dollar

9    commutation amount?

10    A.    Yes.

11    Q.    And how would they go about doing that?

12    A.    They can contact their trustee representative, provide

13    proof of ownership, and each trustee can provide the breakdown

14    for those particular trusts.

15    Q.    And in the past, have holders contacted you as

16    representative of U.S. Bank to learn their share of the

17    commutation amount?

18    A.    Yes.

19    Q.    And have you provided that information to the holders that

20    were able to certify their holdings?

21    A.    Yes.

22            MR. KOTWICK:  I've got no further questions, Your

23    Honor.

24            THE COURT:  Thank you very much.

25            MR. KOTWICK:  I'd just like to confirm that the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

191

1  exhibits that were offered have been admitted into evidence.  I

2  believe they were.

3          THE COURT:  I think they were.

4          MR. KOTWICK:  Okay.

5          THE COURT:  What I'd like all of you to do is confer

6  with my law clerks after we break and go through the exhibits,

7  make sure that everybody's in agreement.  Okay.

8          MR. KOTWICK:  Thank you, Your Honor, no further

9  questions.

10          THE COURT:  Further cross-examination?

11          MS. JAMES:  No, Your Honor.

12          THE COURT:  All right.  You're excused.  Thank you

13  very much, Ms. Scott.

14          Next witness.

15          MR. KERR:  Your Honor, just give us a second to shift

16  around.

17      (Pause)

18          THE COURT:  You can talk while I'm trying to remove

19  some binders.

20          MR. KERR:  Thank you, Your Honor.  Your Honor, Charles

21  Kerr of Morrison & Foerster on behalf of the of debtors.  Your

22  Honor, in support of the debtors' motion for an order for

23  approval of the settlement agreement, we offer the direct

24  testimony of Jeffrey A. Lipps as amended, which I don't have

25  actually --  I apologize, Your Honor, I don't have the amended

**RESIDENTIAL CAPITAL, LLC, ET AL.**

192

1    docket number.  It was originally filed as 4689 but it was

2    amended yesterday consistent with the order.  And Your Honor,

3    I've given you a binder and other counsel and I put one in

4    front of Mr. Lipps, and in that binder at the front is the

5    amended direct testimony.  The number is -- it's 4689-1.

6          THE COURT:  That's ECF 4689-1 and it's the amount

7    amended direct testimony?

8          MR. KERR:  I apologize, Your Honor.  And we offer his

9    written direct, Your Honor.

10         THE COURT:  Mr. Lipps, would you stand and be sworn.

11      (Witness sworn)

12         THE COURT:  Would you have a seat.  Do you need water?

13         THE WITNESS:  I'm fine, Your Honor.

14         MR. KERR:  Your Honor, we also offered some exhibits

15   which are in the binders.  These are exhibits and I'll list

16   them by exhibit number, they're all on our trial exhibit list.

17         THE COURT:  Sure.

18         MR. KERR:  And what they are are the underlying FGIC

19   complaints that were filed pre-petition against, by FGIC

20   against ResCap.  It's Defendants' -- it's Debtors' Exhibit 8,

21   Debtor's Exhibit --

22         THE COURT:  You can't get that right, can you?

23         MR. KERR:  Your Honor, I'm doing my best.

24         THE COURT:  Go ahead.

25         MR. KERR:  Debtors' Exhibit 8, Debtors' Exhibit 9,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

193

1    Debtors' Exhibit 10, Debtors' Exhibit 11, Debtors' Exhibit 12,

2    Debtors' Exhibit 13, Debtors' Exhibit 14, and Debtors' Exhibit

3    15, Debtors' Exhibit 16, Debtors' Exhibit 17, and Debtors'

4    Exhibit 18.  And your Honor, we offer it actually not for the

5    truth.

6          THE COURT:  There's a 19 in my binder as well.

7          MR. KERR:  Excuse me, yes, I didn't turn my page.

8    Debtors' Exhibit 19, yes, Your Honor.

9          THE COURT:  And the offer is for what purpose?

10         MR. KERR:  Only really to show that these were the --

11   just that these are the FGIC complaints that were filed and

12   reflecting the claims that are asserted in the complaints,

13   that's all, Your Honor.

14         THE COURT:  All right.  Any objections?

15         MS. JAMES:  No, Your Honor.

16         THE COURT:  All right.  Exhibits 8, 9, 10, 11, 12, 13,

17   14, 15, 16, 17, 18, 19, along -- are admitted in evidence as

18   well as the amended direct testimony of Jeffrey A. Lipps.

19   (Amended testimony of Mr. Lipps was hereby received into

20   evidence as Debtors' Exhibit, as of this date.)

21   (Mr. Lipps' exhibits were hereby received into evidence as

22   Debtors' Exhibits 8-19, as of this date.)

23         MR. KERR:  Thank you, Your Honor.  Mr. Lipps is

24   available for cross-examination.

25         THE COURT:  All right, cross-examination?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

194

1          MS. JAMES:  We have no questions, Your Honor.

2          MR. CARNEY:  Neither does Freddie Mac.

3          THE COURT:  Mr. Shore.

4          MR. SHORE:  Just to be clear, we had made an

5   arrangement that our deposition designations of Mr. Lipps'

6   deposition would be going in as the cross in lieu of a live

7   cross.

8          THE COURT:  Is that correct, Mr. Kerr?

9          MR. KERR:  That is correct, Your Honor.

10          THE COURT:  Okay.  Somebody's going to give me that

11   when?  You don't have to do it now, but --

12          MR. KERR:  We will make sure -- well, Mr. Shore, I'm

13   sure will make sure you get that.

14          MR. SHORE:  The deposition designations are in

15   already, they were filed yesterday afternoon, Your Honor.

16          THE COURT:  Yes, but they have to be moved into

17   evidence, and I need -- so I don't need to do it right at this

18   minute.  You know, on Monday morning you can give me just a

19   sheet that shows page and line numbers that can be marked as

20   the exhibit and will show for the record what's in evidence.

21   Okay?

22          MR. SHORE:  Very good, Your Honor.

23          MR. KERR:  Mr. Shore and I will take care of it of the

24   weekend.

25          THE COURT:  Okay.  You're excused.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

195

1           THE WITNESS:  Brief stay.

2           MR. KERR:  Your Honor, Chet Kerr of Morrison &

3   Foerster on behalf of the debtors.  Our next witness is Dr. Ron

4   D'Vari.  Again, so let us -- if we -- allow us just to move --

5           THE COURT:  Yes, absolutely.

6           MR. KERR:  -- our papers around.

7           THE COURT:  Sure.

8           While they're moving their papers around, if you

9   wouldn't mind standing and raising your right hand, you'll be

10  sworn.  Okay.

11          THE CLERK:  Do you solemnly swear and affirm that all

12  the testimony you're about to give --

13          THE COURT:  Swear or affirm.

14      (Witness sworn)

15          THE COURT:  Thank you.  Please have a seat.

16          MR. LAWRENCE:  Good afternoon, Your Honor, my name is

17  Alex Lawrence; I'm from Morrison & Foerster.  In support of the

18  debtors' motion to approve the settlement agreement, the

19  debtors offer the direct testimony of Dr. Ron D'Vari.  It was

20  filed as docket entry number 4432.  If Dr. D'Vari was called to

21  testify he would testify as to what is in his written direct

22  testimony.  We therefore offer his written direct testimony as

23  expert testimony in support of this motion.

24          THE COURT:  Any objections?

25          All right, the D'Vari direct testimony is in evidence.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

196

1   (Direct testimony of Dr. D'Vari was hereby received into

2   evidence as Debtors' Exhibit , as of this date.)

3          MR. LAWRENCE:  Your Honor, also in connection with Dr.

4   D'Vari's direct testimony we offer a number of exhibits which

5   were previously identified on the settlement parties' trial

6   exhibit list.  Those are Exhibit numbers 34, 35, 36, 37, 38,

7   39, 40, 41, 42, and 59.

8          THE COURT:  All right.  Any objections?

9          All right.  Exhibits 34, 35, 36, 37, 38, 39, 40, 41,

10  42 and 59 are in evidence.

11  (D'Vari exhibits was hereby received into evidence as Debtors'

12  Exhibits 34-42, 59, as of this date.)

13         MR. LAWRENCE:  And with that, Your Honor, we tender

14  Dr. D'Vari for cross-examination.

15         THE COURT:  All right.  Cross-examination?

16         MR. CARNEY:  Freddie Mac doesn't have any cross-

17  examination of this witness.

18         MR. BAIO:  Nor do we.

19         MR. SHORE:  And we just add the same arrangement that

20  we'll put in the deposition designations.  We'll have those by

21  Monday morning.

22         THE COURT:  I like it.  You're excused.

23         THE WITNESS:  Thank you.

24         THE COURT:  Have a nice day.

25         MR. KERR:  Your Honor, just give us one second, we're

**RESIDENTIAL CAPITAL, LLC, ET AL.**

197

1  a little surprised.  We just need to figure out who the next

2  witness is.

3          THE COURT:  Okay.

4          MR. KERR:  Your Honor, Charles L. Kerr from Morrison &

5  Foerster on behalf of the debtors.  The next witness is -- I'm

6  not sure if it's Doctor, but it's S.P. Kothari, as expert

7  witness.  So again, Your Honor, let us shift around if we can

8  just for a second.

9          THE COURT:  That's fine.

10          Is it mister or doctor?  Mister or doctor?

11          DR. KOTHARI:  I will answer to either one.

12          THE COURT:  If you would raise your right hand and be

13  sworn.

14      (Witness sworn)

15          THE COURT:  Please have a seat.

16          THE WITNESS:  Thank you.

17          MR. WEITNAUER:  Your Honor, Kit Weitnauer again for

18  Wells Fargo.  The settling parties present Dr. Kothari for

19  cross-examination; and we ask that Exhibit 104, his direct

20  testimony, together with the three exhibits to it -- it's a

21  composite exhibit, Your Honor -- there are no different

22  numbers, be admitted into evidence.

23          THE COURT:  Do you have another copy?

24          MR. WEITNAUER:  We do.  We've covered up in copies.

25          THE COURT:  I'm running -- you're not going to see me

**RESIDENTIAL CAPITAL, LLC, ET AL.**

198

1  soon, but --

2       Mr. Weitnauer, you referred to a composite exhibit.  I

3  need an exhibit --

4       MR. WEITNAUER:  And by that I mean his testimony

5  includes three exhibits but it's numbered all the way through,

6  like it's his curriculum vitae and the like.

7       THE COURT:  Exhibit 104, pages 1 through 37 includes

8  exhibits?

9       MR. WEITNAUER:  Yes, sir.  That's correct.

10       THE COURT:  Any objections.

11       MS. EATON:  None, Your Honor.

12       THE COURT:  All right.  Exhibit 104, which includes

13  exhibits to the direct testimony are in evidence.

14  (Dr. Kothari direct testimony was hereby received into evidence

15  as Debtors' Exhibit 104, as of this date.)

16       THE COURT:  Cross-examination?  Ms. Eaton?

17       MS. EATON:  Mary Eaton from Willkie Farr, on behalf of

18  Monarch, Bayview and CQS.

19  CROSS-EXAMINATION

20  BY MS. EATON:

21  Q.   Good afternoon, Doctor.

22  A.   Good afternoon.

23  Q.   Dr. Kothari, you were asked to render a series of opinions

24  with respect to the work that Duff & Phelps performed for the

25  trustees; is that right?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  A.    I was asked to opine on the reasonableness of some of the

2  conclusions that Duff & Phelps had performed and the assignment

3  is listed in my direct testimony.

4  Q.    That's paragraph 5 of your direct testimony; is that

5  right?

6  A.    Paragraph 5 is correct.

7  Q.    So you were asked to opine on the reasonableness of the

8  discount rate that Duff & Phelps used, the reasonableness of

9  the conclusion that Duff & Phelps reached with respect to the

10  lump sum cash payment, and whether it was reasonable for Duff &

11  Phelps not to include potential recoveries associated with

12  pending litigation in its model estimating the expected payouts

13  to the ResCap policyholders under the FGIC -- under the -- yes,

14  under the FGIC rehabilitation plan, right?

15  A.    Those are three of the four questions I was asked to

16  answer.

17  Q.    With respect to the work performed by Duff & Phelps you

18  were asked to opine on those things, correct?

19  A.    That is correct.

20  Q.    And you did not yourself render -- you were not asked to

21  render an opinion, nor have you rendered an opinion as to

22  whether the commutation amount provided under the FGIC

23  settlement agreement is reasonable, correct?

24  A.    I came to the conclusion that the commutation amount is

25  within the range of, it falls within the range of present

**RESIDENTIAL CAPITAL, LLC, ET AL.**

200

1    values that Duff & Phelps' analysis had calculated and

2    therefore it struck me as reasonable.

3    Q.    Reasonable in the sense that it fell within the range that

4    Duff & Phelps developed during the course of its work, correct?

5    A.    Reasonable I think is a broader meaning in the sense that

6    if the range itself was unreasonable I would not have said that

7    their conclusion is reasonable.  For example, if the range is

8    zero to infinity, almost any number would fall within that.

9    But that wouldn't a reasonable conclusion.  I know I'm using an

10   extreme example, but nonetheless I wanted to make the point

11   that the judgment about reasonableness implicit in that is

12   whether the range itself that they arrive at struck me as

13   reasonable.

14   Q.    You were not asked to, nor did you render an opinion as to

15   whether it was reasonable to commute the policies, correct?

16   A.    That I was not asked to comment on, whether it itself

17   should be commuted, yes.

18   Q.    Nor were you asked to render an opinion on as to whether

19   the trustees acted reasonably in approving the FGIC settlement

20   agreement?

21   A.    I wasn't -- I was not asked to render an opinion on

22   whether the trustees acted reasonably.

23   Q.    And you weren't asked to render an opinion as to whether

24   the trustees acted reasonably in relying on the analysis

25   provided by Duff & Phelps, correct?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

201

1  A.   I was not asked to answer that question.

2  Q.   You weren't asked to render an opinion either as to

3  whether the settlement was in the best interests of the

4  investors in the FGIC wrapped trust from an economic point of

5  view, correct?

6  A.   That is also correct.

7  Q.   And you weren't asked to render an opinion as to whether

8  the trustees acted in the best interests of the investors in

9  the FGIC wrapped securities in approving the FGIC settlement

10  agreement, right?

11  A.   I did not study that question.  I wasn't asked to answer

12  that question.

13  Q.   And you weren't asked to study whether the trustees acted

14  reasonably or in good faith, right?

15  A.   I did not study that question.

16  Q.   Now, as part of your work in studying the first three

17  questions in paragraph 5 of your direct testimony, you looked

18  at the May 15 report that was prepared by Duff & Phelps,

19  correct?

20  A.   So letuse refresh my memory.  If that is the PowerPoint

21  presentation you are talking about, I would say yes.  That's my

22  recollection, but we should -- it would be better to verify.

23  Q.   The binder is on its way with the document in it for you.

24  A.   That certainly would help.  Thank you.

25  Q.   Look at Exhibit S in that binder, sir.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

202

1   A.   Yes, I do have it in front of me.

2   Q.   And that is the -- that exhibit reflects the analysis that

3   Duff &   Phelps performed for the trustees that you were asked

4   to opine on, correct?

5   A.   Yes, this is the summary of the analysis that Duff &

6   Phelps conducted and I was asked to opine on based on the three

7   questions, four questions that we just reviewed.

8   Q.   And it took you some time to review and digest the

9   information reflected in Exhibit S, correct?

10  A.   It took some time for me and there were two associates who

11  assisted me, so collectively it took us some time, yes.

12  Q.   It took you more than an hour to read that report,

13  correct?

14  A.   It certain -- to digest it, it certainly took more than

15  one hour.

16  Q.   And I asked you about -- at your deposition about how long

17  it took you to gain a full and complete understanding of the

18  analysis reflected in that document.  Do you remember being

19  asked that question?

20  A.   I do remember, ma'am.

21  Q.   And it's true, isn't it, that it took yourself and your

22  team somewhere in the order of five to ten hours to gain a full

23  and complete understanding of the analysis reflected in that

24  document, right?

25  A.   I would say it took five to ten hours for me, and on top

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  of that, my two associates spent some time as well.

2  Q.   Now, you're an expert in valuation matters; is that right?

3  You consider yourself to be an expert in valuation of cash

4  flows?

5  A.   I do.

6  Q.   And it is the case, is it not, that even though you are an

7  expert in that area, you could not have reviewed and understood

8  and reached an opinion on the conclusions and analyses

9  reflected in the May 15 report in less than two hours, correct?

10 A.   My assignment was to take the cash flow projections as

11 given.  That is a huge amount of information that underlies the

12 cash flows that go into the present value calculations.  And

13 those were prepared by -- if I recall correctly, by FGIC and

14 Lazard.  And that was the input that Duff & Phelps used, and I

15 was instructed to treat those cash flow projections as an

16 assumption.  So my task was to try to ascertain, given those

17 assumptions, did Duff & Phelps follow a reasonable approach to

18 translate those into generating some scenarios of high and low

19 cash flow, or a range of cash flows and whether the cash

20 settlement amount, does that therefore strike as a reasonable

21 settlement.  I was also asked to consider whether Duff & Phelps

22 used a reasonable discount rate.  And finally, as we discussed

23 before, about the cash flow litigation -- litigation-related

24 cash flows which are excluded, is that -- by way of an

25 assumption, is that reasonable or not.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    Q.   With respect to the question of the discount rate that

2    Duff & Phelps used in performing the analysis reflected in its

3    report that you reviewed, you were not asked to render an

4    opinion on the appropriate discount rate to use in analyzing

5    potential recoveries under the FGIC rehabilitation plan, right?

6    A.   I wasn't asked to calculate a single discount rate that

7    would be most appropriate in this context.  I was asked whether

8    the ten to twenty percent range of discount rates that Duff &

9    Phelps used, whether that range is reasonable.

10          THE COURT:  May I ask you this.  Did you get the data

11   that underlies their summary spreadsheet here?  Did you have a

12   disc or were you provided electronically with the data that

13   underlies the cash flows?

14          THE WITNESS:  The Excel spreadsheet that went into it,

15   and there were, I don't know, eight or ten or twelve folios and

16   how the calculations transcended from one to other, that I was

17   given and I went through that.  Now, of course, with, you

18   know --

19          THE COURT:  So you were given the Excel spreadsheet

20   with all the folios, the data?

21          THE WITNESS:  Yes, but that -- still that would be

22   only scratching the surface in terms of the mountain of data

23   that underlies those folios.  So I'm sure you are basically

24   unaware but --

25          THE COURT:  I'm just trying to understand what you

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    were given.

2              THE WITNESS:  Yes.  I was given those -- that Excel

3    spreadsheet, the folios that underlie the analysis that went

4    into the preparation of this document.

5              THE COURT:  Go ahead, Ms. Eaton.

6    BY MS. EATON:

7    Q.   You were not given the data or assumptions that underlay

8    the spreadsheets that you were supplied with, right, Doctor?

9    A.   The raw data and all the assumptions that must have gone

10   into it, those were not -- that entire -- as I use

11   figuratively, mountain of data, that certainly was not -- I did

12   not -- I didn't look at it.  I don't even know whether I had

13   access to or not, but I certainly did not look into that.

14   Q.   And you did not know what assumptions, all of the

15   assumptions that Duff & Phelps used in performing the analysis

16   reflected in the report you reviewed, correct?

17   A.   I will tell you what, I looked into it and that perhaps is

18   helpful in the sense that, to directly answer your question,

19   all of the assumptions, no, but I had discussions with two of

20   the executives who were in charge of performing the analysis.

21   I and my associates, we --

22             THE COURT:  To the Duff & Phelps people?

23             THE WITNESS:  At Duff & Phelps.

24   A.   They were Alice Chong and John Schrader.  John Schrader is

25   the more technical gentleman.  And so I spoke to them, and I

1   tried to understand the process that they followed in arriving

2   at the cash flow projections and then doing the valuation.

3   Q.   But it is correct, is it not, Doctor, that you did not

4   have all of the assumptions that Duff & Phelps used in

5   performing the analysis reflected in that report; isn't that

6   right?

7   A.   I mean, that goes -- I would be repeating myself, and the

8   answer is yes.  I mean, of course, this is --

9   Q.   Yes, you did not have all of the assumptions?

10  A.   This is a huge task.

11          THE COURT:  Don't interrupt.

12          Go ahead.

13  A.   This is a huge task, and my assignment in last one month

14  that I did was certainly not to go through from scratch and

15  conduct the same analysis that led to Duff & Phelps' report.

16  As I stated earlier, I took the assumptions that were provided

17  to me, cash flow assumptions.  Those were taken as given and I

18  ascertained whether Duff & Phelps followed a reasonable process

19  and whether the conclusions that they reached, do they strike

20  me as reasonable.

21  Q.   You did not know either how the 253 commutation payment

22  amount was derived, correct?

23  A.   My understanding is that FGIC offered that 253.3 million

24  dollar as a commutation amount, but I do not know what was the

25  basis or rationale or process FGIC followed through in coming

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    up with that, that amount.

2    Q.    And in speaking with the people at Duff & Phelps, they

3    did -- you learned, did you not, that they did not know how

4    FGIC came up with that 253.3 million dollar figure either,

5    correct?

6    A.    Sitting here, I do not recall whether I had that

7    conversation with Duff & Phelps, but in general, I have

8    developed that understanding through my discussions with --

9    through my work on this case.

10   Q.    You didn't generate any financial models in performing

11   your review of Duff & Phelps' work, correct?

12   A.    Valuation exercise entails projection of cash flows,

13   discounting of those cash flows using a reasonable discount

14   rate.    So since cash flows were already given to me, there

15   wasn't a financial model that needed to be developed besides

16   coming up with a discount rate, a range and ascertaining

17   whether the discount rate range that Duff & Phelps had used was

18   reasonable or not.

19   Q.    So you didn't develop any of your own financial models and

20   you didn't develop any of your own projections either, correct?

21   A.    I was not asked to do either of those two things.

22   Q.    Nor were you asked to develop any assumptions, right, sir?

23   A.    Not with respect to the projections of cash flows, no.

24   Q.    And you did not develop your own discount rate, correct?

25   A.    In terms of discount rate, of course I conducted a fair

1    bit of analysis to come to the conclusion that the range of

2    discount rate that Duff & Phelps had used is reasonable.

3    Q.    But you did not develop your own discount rate?  In other

4    words, you did not undertake an independent study to determine

5    what an appropriate discount rate would be, correct?

6    A.    In terms of judging whether ten to twenty percent is

7    reasonable or not, I had to go through an analysis, independent

8    analysis of what discount rate range would be reasonable, and

9    in that I conducted an analysis, as I described in my report,

10   that I relied on Ibbotson and thereafter made some adjustments

11   for the fact that FGIC is in rehabilitation and therefore it is

12   financially distressed and there are few other reasons I lay

13   out.  And that was the basis of my conclusion that ten to

14   twenty percent is a reasonable range.  So that is independent

15   work going into the determination of reasonableness of discount

16   rates.

17   Q.    And the work that you did in concluding that the discount

18   rate that Duff & Phelps used was reasonable consisted of, first

19   of all, looking at one page from Ibbotson's cost of capital,

20   right?

21   A.    That characterization is inaccurate.  So that

22   characterization would be too simplistic.  That is the one that

23   ended up in the report.  But we looked at more than that and my

24   team looked at more than that.  And this is an exercise that,

25   you know, calculation of discount rates is something that I

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    have taught and I have -- I am an expert in and therefore that

2    going to the Ibbotson book and trying to ascertain what

3    industry would be most appropriate and taking that and then

4    that turned out to be 635 Financial Guaranty Insurance

5    Companies, but also asking question about, well, would some

6    other might have been reasonable, and that's what my two

7    associates -- and they themselves are faculty at MIT and they

8    are also experienced in these matters.  So I would say that it

9    was, I would characterize, ma'am, as more than just taking one

10   page.

11   Q.    Now, I asked you some questions at your deposition about

12   what you would normally do if you had been asked to develop

13   your own discount rate.  Do you remember that?

14   A.    I do remember, and as I said, I wasn't asked here to --

15            THE COURT:  Let her ask her next question.

16            THE WITNESS:  Okay, sure.

17            MS. EATON:  Thank you.

18   Q.    And if you had been asked to develop your own discount

19   rate, in truth, you would have done much more work than you did

20   in performing this analysis that's reflected in your report,

21   correct?

22   A.    I might have done some more different analysis, but I'm

23   not so sure that the number of hours I would have spent would

24   have been that much more.  It might have been few hours plus or

25   minus more because my team and I, we spent fair bit of time,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

210

1  because this is the question in some ways -- there were three

2  questions, but this was one of the important questions that I

3  was asked to do, so we spent fair bit of time.  So if I were to

4  have been asked to calculate discount rate for this particular

5  form, I'm not sure that the amount of time I would have spent

6  would have been that much more.

7  Q.   So if you had performed your own analysis of an

8  appropriate discount rate, is it your testimony that you would

9  have, first of all, located the relevant industry from Ibbotson

10  and, second of all, taken the range from Ibbotson for that

11  industry, right?

12  A.   That would have been an input, but as I said just now,

13  that the amount of time devoted might not have been that

14  different.

15       THE COURT:  Let's listen carefully to Ms. Eaton's

16  questions and just try and answer her questions.

17       THE WITNESS:  Okay.

18  Q.   In the normal course of your business, do you rely on

19  Ibbotson for the purposes of deriving an appropriate discount

20  rate range?

21  A.   That is certainly an important input.  In terms of

22  teaching my class, students also have used Ibbotson as -- and

23  that provides you with a guide.  It provides you with a range

24  and then firm-specific characteristics is something that you

25  employ to make an adjustment to that range to arrive at a

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  particular discount rate.  That is certainly a useful, a

2  practical, and commonly used approach including an approach

3  that I would have taken.  That's not the only approach, but

4  that certainly would be a reasonable approach.

5  Q.   It isn't the only approach, correct?

6  A.   That is certainly not the only approach.

7  Q.   And you wouldn't rely on the figures reflected in Ibbotson

8  for any given industry alone, would you?

9  A.   I'm sorry.  You will have to repeat that.

10  Q.   You wouldn't -- if you had been performing your own

11  analysis of what an appropriate discount rate would be, even if

12  you had consulted Ibbotson, you would have done additional

13  analysis, correct?

14  A.   Sitting here, you know, it is possible.  I would have done

15  some more analysis, but I would still maintain that Ibbotson is

16  very reasonable and it's very well accepted.  I will tell

17  you -- if I may, I will tell you why I think it is reasonable,

18  if that is helpful.

19       THE COURT:  Why don't you just listen to Ms. Eaton's

20  questions.

21  Q.   If you don't mind, I'll ask you why --

22  A.   Okay.  All right.

23  Q.   -- if I want to know why.

24       THE COURT:  If your counsel wants an explanation,

25  he'll ask you.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

212

1              But go ahead, Ms. Eaton.

2    Q.    When you were considering whether the discount rate range

3    that Duff & Phelps had come up with, you did not consider

4    trading data for the subject securities, correct?

5    A.    I don't believe that FGIC is publicly traded.  Their, you

6    know, that -- equity is not publicly traded and so -- so, you

7    know, I mean, that -- I didn't think that was a possibility.  I

8    believe some of the debt is publicly traded and one could look

9    at that, but that is only part of the picture.  That's not the

10   whole picture by any means in calculating discount rate.

11   Q.    I understand, sir.  Just if you wouldn't mind answering

12   the question that I'm asking you.  In doing your analysis, you

13   did not consider trading data with respect to the certificates

14   that were wrapped by FGIC, correct?

15   A.    I did not.

16   Q.    So that information was not relevant to you in determining

17   whether the discount rate that Duff & Phelps derived was

18   appropriate, right?

19   A.    I would not say it is not relevant as much as the fact

20   that from Ibbotson and industry specific that information was

21   available, I thought that was a reasonable stopping point

22   because I thought I had gathered information that I felt

23   comfortable with to render an opinion on the question asked and

24   that was the process I went through.

25   Q.    And you did not consider the implied yields on those

**RESIDENTIAL CAPITAL, LLC, ET AL.**

213

1    certificates either, correct?

2    A.    In answering question 4, we tried to look at the -- we did

3    not have access to price data, and therefore, I did not look at

4    the implied yield on the debt securities.

5    Q.    We'll get to opinion 4 in due course.  I'm talking about

6    the opinion number -- the first sentence of your opinion

7    reflected in paragraph 6 of your direct testimony.  That is,

8    "My opinion is that the discount rate used by Duff & Phelps in

9    its analysis of the expected payouts to ResCap policyholders

10   under FGIC'S rehabilitation plan is reasonable."  Okay?

11   A.    I agree with that, yes.

12   Q.    So the question was you did not consider the implied yield

13   on the certificates wrapped by FGIC in formulating that

14   opinion, correct?

15   A.    That is correct.

16   Q.    Now, did you consider any company-specific discounts in

17   formulating your opinion with respect to the discount rate?

18   A.    The range from Ibbotson was nine to nineteen percent, and

19   I have a discussion of how in the context of FGIC.  The firm is

20   very small and that tends to increase the discount rate, and

21   that's why I used the median, that range.  Second, because it

22   is in rehabilitation, I thought that the discount rate would be

23   higher and that's why I went -- the range was moved to the

24   right from the Ibbotson book.  The range is between nine and

25   nineteen percent and I thought that therefore ten to twenty

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   percent certainly strikes as reasonable range.  So firm-

2   specific factors I did consider.

3   Q.   Did you take into account that the collateral underlying

4   the securities was backed by a known pool, a seasoned pool of

5   mortgages?

6   A.   I was aware of that and I had a discussion of that issue

7   with my team as well, and I decided to disregard that and I can

8   explain if you would like.

9   Q.   And did you take into consideration that the cash flows

10  associated with those securities had been conservatively

11  projected?

12  A.   I'm not aware of that, that aspect of it.  I did not --

13  here is what I knew, that claims are several billion dollars,

14  six billion dollars plus, and the assets are only two billion

15  dollars.  So even if cash flow projections are conservative,

16  still the claims are far in excess of the assets that underlie

17  to support those claims.  So that information I knew and that

18  was -- that was important piece of information as far as I was

19  concerned.

20  Q.   Did you know that the cash flows associated with those

21  securities had been conservatively projected?

22  A.   So I think I -- in the financial statements, the return on

23  approximately two billion dollars of assets that FGIC has, the

24  return on those is conservatively projected at whatever

25  percent.  That part, I had read that, but that wasn't

 1    particularly important in any of the analysis that I did.

 2    Q.   In using Ibbotson's cost of capital, did you undertake a

 3    careful analysis of all of the facts surrounding FGIC?

 4    A.   I --

 5          THE COURT:  I don't understand your question.

 6          Just don't answer it.

 7          Ask another question.

 8    Q.   Isn't it true, sir, that according to Ibbotson itself,

 9    that any individual cost of capital analysis should involve a

10    careful analysis of all facts surrounding the company?

11    A.   It certainly is true, and I certainly took into account

12    the most important fact in this case.  As an expert, as someone

13    who has done this kind of cost of capital analysis for years

14    and years and taught, so one exercises some judgment.  The most

15    important part here, as far as I was concerned, were two facts

16    with respect to the industry.  The two fact were that, besides

17    being from that industry, this firm is extraordinarily small

18    and it is in financial trouble.  So those two facts help a

19    whole lot.  Those are the most important facts, as far as I

20    could imagine, and that's where I stopped and did not go into

21    any additional factors that might be considered.

22    Q.   You understood at the time that you did your analysis,

23    relying on Ibbotson, that Ibbotson itself cautioned that on an

24    individual company basis the models utilized in this book may

25    provide information that is inaccurate or misleading?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  A.   That is something that did come up in the -- in the

2  deposition also you asked that question, and frankly, use of

3  Ibbotson as a guide is a reasonable thing to do.  That's what

4  Ibbotson itself would also say, that this -- that their book

5  and the numbers that are provided there, those are used as an

6  input in calculating discount rates by companies, by

7  individuals, by investment managers and everyone.  I have used

8  it in the classroom, and in practice I have used it.  So it's

9  not used literally one to one, but it is used as a guide.  And

10  if in the deposition, if I misspoke I would like to correct

11  that, but that was just a simple statement that you cannot take

12  the number from Ibbotson literally and use it.  And I totally

13  agree.  In my report also, I have not used it directly, taken

14  the number and used it, but made an adjustment for the firm-

15  specific factors like this being an unusually small and in

16  financially distressed condition.

17  Q.   Do you recall my reading to you that sentence from the

18  introduction to Ibbotson at your deposition?

19  A.   I do recall that, ma'am.

20  Q.   And I asked you at that time -- this is at Exhibit FM,

21  it's in your book at page 140, starting at line 10.

22  A.   Exhibit M.  Okay, line -- I'm sorry.  Page what?

23  Q.   Page 140, line 10.

24  A.   Yes, okay.

25  Q.   And I asked you the following question and you gave the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  following answer:  "Do you agree or disagree with the following

2  statement?  On an individual company basis, the models utilized

3  in Ibbotson may provide information that is inaccurate or

4  misleading?

5  "A.  I do not agree with that."

6      Do you recall being asked that question and giving that

7  answer?

8  A.  I do recall that.

9  Q.  And that was incorrect, right?  That is, in fact, how

10 Ibbotson is intended to be used?

11 A.  I was interpreting your question since it wasn't said --

12 I was interpreting that question as can this Ibbotson

13 information, can that provide a guide to someone.  And that's

14 how I interpreted your question and answered it as such.  Since

15 then, I have gone back and looked at the Ibbotson particular

16 page in which that quote is, and I would be very careful if it

17 is -- put it as, can you literally take the number and use it,

18 answer is no.  Can that provide a guidance, the numbers from

19 Ibbotson can they provide a guidance, answer is yes.

20 Q.  Why don't you take a look at Exhibit CS in your binder,

21 please.

22 A.  Okay.

23 Q.  And I'd like to direct your attention to page number 5.

24 You'll find the page numbers in the lower right-hand portion of

25 the page.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   A.   I do see that.

2   Q.   Do you see that?

3           MR. WEITNAUER:  Can you help us with that?  Say where?

4   I see C, but I don't see CS.

5           THE COURT:  It's all the way toward the back --

6           MR. WEITNAUER:  Okay.  Thank you so much.

7           THE COURT:  -- just before the deposition.

8           MR. WEITNAUER:  Got it.  I see it now.

9   Q.   Under the heading "Organization of data", there's a

10  paragraph that follows, and about halfway down, it provides

11  "any individual" -- sorry, beg your pardon -- above that "On an

12  individual company basis, the models utilized in this book may

13  provide information that is inaccurate or misleading."  Do you

14  see that?

15  A.   I think it's the same quote that you had read earlier

16  and --

17          THE COURT:  He sees it.

18          THE WITNESS:  Yes.

19          THE COURT:  Go ahead, ask your next question.

20  A.   Yes, I do.

21  Q.   You don't disagree with that statement now, do you?

22  A.   I do not.

23  Q.   Now, you also gave an opinion that it was reasonable for

24  Duff & Phelps not to include potential recoveries associated

25  with pending litigation in its model estimating the expected

1  payouts to ResCap policyholders under FGIC'S rehabilitation

2  plan, correct?

3  A.   That's correct.

4  Q.   And in rendering that opinion, you did not study all of

5  the claims that FGIC had been asserting against the debtors and

6  others that could potentially generate litigation recoveries,

7  correct?

8  A.   I developed a general understanding, but I did not study

9  each case.

10  Q.   And you did not know, Dr. Kothari, all of the causes of

11  action that FGIC was asserting in those cases, correct?

12  A.   I had a general understanding of some of the causes, but I

13  did not have an understanding of all of the causes underlying

14  all of those litigation matters.

15  Q.   And you did not know what the damages sought in those

16  cases were either, did you?

17  A.   I knew that the damages sought were in billions of

18  dollars, but I did not know each case what the damages were

19  being sought by FGIC.

20  Q.   You did not know what the aggregate damages sought in

21  those cases were, correct?

22  A.   I did not study with any degree of accuracy what the

23  aggregate amount was, no, I did not.

24  Q.   And you did not know what stage each case -- what stage

25  each case was at as a procedural matter, right?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  A.    I did not undertake an analysis of what stage each case

2  was.

3  Q.    And nor did you analyze the strengths and weaknesses of

4  the claims from a factual point of view?

5  A.    I did not.

6  Q.    And you did not compare the claims that FGIC was asserting

7  in those cases to claims asserted by other monoline insurers in

8  other cases, including cases that had been settled, correct?

9  A.    I'm generally aware that some cases are being settled, but

10  I did not consider this in any level of detail.

11  Q.    Right.  You were aware that some of those cases asserting

12  claims like the claims FGIC was asserting had settled for

13  hundreds of millions of dollars, right?

14  A.    I had a general understanding of that some claims are

15  being settled, but not any specific claims.

16  Q.    And you did not perform any analysis as to the likelihood

17  that FGIC would prevail on its claims or reach of settlement

18  similar to the settlements other monolines had reached, right?

19  A.    Not by an individual case basis, but collectively I

20  developed an assessment that the settlement that would be

21  raised in cases in which FGIC was a plaintiff and in cases in

22  which it was a defendant, that in totality, based on the

23  analysis that I did, I thought that it was at best speculative

24  and not estimable and not probable, and these terms I am using

25  currently in an accounting sense.

1  Q.   And you reached that conclusion without undertaking a

2  review or analysis of any of the factors that I just laid out

3  for you, correct?

4  A.   I relied on the disclosures and assessments that others

5  had provided in reaching that conclusion.  I did not on my own

6  reach that conclusion on the basis of analysis.

7  Q.   But you concluded that it was reasonable for Duff & Phelps

8  to reach that conclusion, right?

9  A.   If I had -- because I was relying on some of the

10  information that was provided by FGIC itself, which in turn is

11  generated by auditors, by lawyers, by managers within that

12  firm, and number of other individuals, the input that goes into

13  the preparation of that information and disclosure.  So I was

14  relying indirectly on the information that was produced by

15  others.  I was also relying on the information that Mr. Lipps

16  has provided in his assessment, in his report.  So there were a

17  number of different sources we tried to look at and asked the

18  question, does it seem that there is a lot of upside here, net

19  upside, or is it speculative, is it highly uncertain, and I

20  came to the conclusion that it looks highly speculative and

21  that was the basis of my conclusion.

22  Q.   And you didn't even know what Duff & Phelps was relying on

23  when it reached the conclusion not to give any value to those

24  potential recoveries in performing its financial analysis;

25  isn't that the truth?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  A.    So, by and large, I was not keen on asking Duff & Phelps

2  because I wanted to perform an independent analysis.  The

3  information that I relied on from Duff & Phelps I discussed

4  earlier which was some of their executives who had done the

5  cash flow projection and modeling analysis.  But I did not want

6  to ask Duff & Phelps as to, well, how did you come up with an

7  assessment because I thought that my independence would be

8  compromised.

9  Q.    Did you verify any of the information that Duff & Phelps

10  used in performing its analysis?

11  A.    In terms of the valuation those were cash flows

12  projections, and those were given to me as an assumption, so I

13  did not verify those, no, I did not.   And the discount rate, I

14  did an independent analysis.  So that -- if that independent

15  assessment is equivalent to verification, as you are calling,

16  then I did that, but not with cash flows.

17  Q.    Apart from the work that you did in connection with your

18  opinion with respect to the discount rate where you looked at

19  Ibbotson's cost of capital, did you verify any of the

20  information that Duff & Phelps relied on and the financial

21  analysis reflected in the report that you reviewed?

22  A.    Not the raw numbers, no, I did not.  That's what it would

23  amount to is where the --

24        THE COURT:  The question is did you or not.

25  A.    No, I did not.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  Q.   So you reached the opinion that Duff & Phelps' financial

2  analysis was reasonable without knowing whether any of the data

3  or any of the assumptions they used was accurate or not,

4  correct?

5  A.   Yes.

6        MS. EATON:  No further questions.

7        THE COURT:  Thank you.

8        Further cross-examination?

9  CROSS-EXAMINATION

10  BY MR. GELFARB:

11  Q.   Good afternoon, Dr. Kothari.

12  A.   Good afternoon.

13        THE COURT:  You have to identify yourself for the

14  record.

15        MR. GELFARB:  David Gelfarb again on behalf of Freddie

16  Mac.

17  Q.   Dr. Kothari, in your report, you did not formulate or

18  develop your own assumptions with respect to cash flow,

19  correct?

20  A.   That is correct.

21        THE COURT:  Mr. Gelfarb, I'm not going to permit

22  cumulative cross-examination.  I believe Ms. Eaton covered

23  that.  Go ahead.

24        MR. GELFARB:  Yes, Your Honor.

25  Q.   Now, on page 13 of your testimony, Dr. Kothari, do you see

**RESIDENTIAL CAPITAL, LLC, ET AL.**

224

1    that you state that 253.3 million dollars is within the range

2    of the present values of the expected payouts?  Do you see

3    that?

4    A.    Did you say page 13 or 33?

5    Q.    Paragraph 20, page 13, paragraph 20.  That's in your

6    direct testimony.

7    A.    So paragraph 13?

8    Q.    Yes.

9          THE COURT:  Paragraph 20.

10   Q.    Paragraph 20, page 13.

11   A.    Okay.

12   Q.    Dr. Kothari, do you see that you state that 253.3 million

13   dollars is within the range of present values of the expected

14   payouts --

15   A.    I do see --

16   Q.    -- to ResCap policyholders under the FGIC rehabilitation

17   plan?  Do you see that?

18   A.    I do.

19   Q.    Now, does that fact signify anything other than that 253

20   million dollars is in between 220 million and 340 million

21   dollars?

22   A.    I think it is.  It certainly does in the sense that the

23   220 and 340, those numbers reflect that there is some

24   uncertainty associated with projecting or coming up with the

25   present values.  And 253 -- and in fact, 253 plus 18 million we

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    will have to add, 270, it's almost in the middle of that range,

2    the range itself struck me as not an unreasonable range, and

3    within that, when this falls more or less in the middle of that

4    range, I thought that this is, my conclusion is this is a

5    reasonable -- it's reasonable, the conclusion that Duff &

6    Phelps had reached is reasonable.

7    Q.    Now, you understand, of course, that the 253 million is

8    the lump sum contemplated by the FGIC settlement plan, correct?

9    A.    That is correct.  I'm sorry.  Maybe I -- it is the

10   commutation, right?

11   Q.    Yes.

12   A.    So, yes, I don't want to get technical here.

13   Q.    And can you please take a look at page 5 of the Duff &

14   Phelps report?

15          THE COURT:  You're looking at Exhibit CS, is that what

16   you're --

17          THE WITNESS:  Is it exhibit --

18          THE COURT:  I'm sorry.  Wrong exhibit.  What exhibit

19   are you looking at?  Are you looking at Exhibit S which was the

20   PowerPoint?

21          MR. GELFARB:  I believe it's Exhibit S, yes, the main

22   report, the May 15th report.

23   A.    Yes.

24          THE COURT:  Exhibit S.

25          MR. GELFARB:  Yes.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

226

1   Q.   Now, do you know where the 253 million dollars was

2   derived?

3   A.   253 is the number that was proposed by FGIC.  I do not

4   know what was the basis or calculation that led to the number

5   253 million dollars.

6   Q.   Now, you see that page 5 has computations?  That's page 5

7   of the --

8   A.   Yes, I do see that.

9   Q.   -- Duff & Phelps report.

10  A.   Um-hum.

11  Q.   Now, is it correct that page 5 has no direct connection to

12  your opinion?

13  A.   I went through page 5 and I understood how those numbers

14  have arrived, you know, have come up there on that, but that by

15  itself, other than taking some of the assumptions from that,

16  that did not have any direct connection to my conclusion.

17  Q.   Now, did you review this page of the Duff & Phelps report

18  in connection with the rendering of your opinions?

19  A.   I did.

20  Q.   And did this page have any direct connection to your

21  opinion?

22  A.   As I said, you know, so when Duff & Phelps is projecting

23  those cash flows and they are using initial cash payment

24  percentage of 17.25 percent, for example, in their analysis

25  also, so even though I was not questioning where the cash flow

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   projections came or exact, but I was trying to make sure that

2   they are at least consistent with some of the assumptions that

3   appeared over here.  So that's the sense in which my goal was

4   to try and ascertain whether the process Duff & Phelps followed

5   through and were they reasonably faithful in implementing the

6   key assumptions or not, that's the sense in which I made use of

7   this exhibit on page 5 of this particular exhibit.

8   Q.    Do you recall that you were deposed in this matter on July

9   the 26th?

10  A.    I was, yes.  I do recall.

11  Q.    I direct your attention to page 132 of your deposition and

12  directing your attention in particular to page -- excuse me --

13  line 17 of your opinion.  Do you see that?

14  A.    Yes.

15          THE COURT:  Of the depo?

16          MR. GELFARB:  Of the deposition transcript, yes, Your

17  Honor.

18  Q.    And do you recall being asked this question:  "Did you

19  review this page of the Duff & Phelps report in connection with

20  rendering your opinions?

21  "A.    I developed a general understanding of what this is, but I

22  don't believe this has a direct connection to my opinion."

23  A.    Yeah, no, I still would say that it doesn't have a direct

24  connection in the sense that it's not anything hard wired type

25  of -- but what I did was to look at that and is it reasonably

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   they are being faithful or not in applying those assumptions in

2   doing their analysis.  But other than that --

3   Q.   Let's move along, please.  You see that there's a box J,

4   correct, on the Duff & Phelps report on page 5?

5   A.   Yes.

6   Q.   Bracket J, do you see that?

7   A.   Yes, I do.

8   Q.   And you understand that that's the 40 percent haircut?

9   A.   I do.

10  Q.   Now, in preparing your reports, isn't it a fact that you

11  did not discuss the 40 percent haircut with anyone?

12  A.   That is accurate.

13  Q.   And isn't it a fact that you do not know why the haircut

14  exists?

15  A.   This was not part of the -- this I took as part of the

16  assumptions affecting cash flow projections.  So I did not go

17  into any discussion.  I understood that there is a 40 percent

18  haircut.  That's the extent of my analysis.

19  Q.   Now, under the commutation plan, you understand that the

20  amount that each trust is to receive depends in part on

21  estimated future claims, correct?

22  A.   Yes, and it's more complicated than that, but, you know,

23  answer yes might suffice here.

24  Q.   Yes.  In fact, you had reason to look at the settlement

25  agreement in connection with the preparation of your report,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    correct?

2    A.    I did, and -- yes, I did.

3    Q.    And do you have the settlement agreement?  I believe it's

4    Exhibit 104 C-2.  Do you see that?

5    A.    104?

6    Q.    I believe so.  Is that the exhibit, the settlement

7    agreement.

8            THE COURT:  I'm not sure he has it in front of him.

9    A.    Yeah, I don't think I had it.

10            MR. GELFARB:  I certainly apologize.  I thought that

11    you had that.

12    Q.    Sorry.  It's Exhibit C, tab C-2.

13            THE COURT:  It's in the binder; it's Exhibit C.

14            MR. WEITNAUER:  Yeah, it's the first one in your book,

15    that big foot book, and you'll see Exhibit C and then you'll

16    see tab 2.

17    Q.    Now, can you please flip to Exhibit F within the

18    settlement agreement.  It's entitled "Allocation methodology."

19            THE COURT:  Page 45 of 50.  Look at the page numbers

20    at the top.

21    Q.    Do you have that in front of you, sir?

22            THE COURT:  It's actually on the next page.  It says

23    "allocation methodology" and then you flip over to 46 of 50 and

24    it describes allocation methodology.

25            THE WITNESS:  You're really quick, I am not.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

230

1              THE COURT:  I'm trying to move it along because at 5

2    o'clock, because of sequestration we stop.  And I'm trying to

3    see if we can finish with Dr. Kothari today.

4              MR. GELFARB:  We're trying.

5    A.    Allocation methodology, Exhibit F, yes, I do see that.

6    Q.    And you stated in your direct testimony that you reviewed

7    the settlement agreement in preparation of your testimony,

8    correct?

9    A.    I would be -- you know, I reviewed, yes.  I didn't go line

10   by line, but I generally reviewed.  And as I said, I also had

11   the assistance of two other professors.

12   Q.    Well, do you see on the Duff & Phelps report there's a box

13   E?  Do you understand what that box represents?

14             THE COURT:  You're back to Exhibit S?

15   Q.    Back to Exhibit S, yes?

16   A.    Page 5?

17   Q.    Yes.

18   A.    Box E, yes, future estimated claims of 481 million

19   dollars.

20   Q.    So you understand what "future estimated claims" means,

21   correct?

22   A.    I do.

23   Q.    Now, you're an expert in valuations, correct?

24   A.    I am.

25   Q.    Now, hypothetically, Dr. Kothari, if the amount of the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

231

1    future estimated claims were to go up and the commutation

2    payment stays constant, the recovery to certificate holders as

3    a percentage of their claims is going to go down, correct?

4    A.    I think that is mathematically -- that sounds as right.

5    Q.    Now, currently, as far as -- or do you know, does the

6    share of the 253.3 million that each trust is going to receive,

7    is that amount fixed as of some specific time?

8    A.    253 is a lump sum amount.  So therefore, that -- I would

9    think that there is a formula there and various trusts will

10   receive in some proportion, but I haven't studied that aspect,

11   no.

12   Q.    So you wouldn't know if that's discussed in Exhibit F to

13   the settlement agreement which is allocation methodology, would

14   you?

15   A.    Unfortunately, no.

16   Q.    Now, you understand there's a rehabilitation plan as well,

17   correct?

18   A.    That is correct.

19   Q.    Now, do you understand that the amount that each trust is

20   to receive under the rehabilitation plan is not fixed as of a

21   given time?

22   A.    I do understand that.

23   Q.    And in fact, the amount will not be known realistically

24   for almost, say, forty years?

25   A.    That is correct.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

232

1  Q.   And the amount that any individual ResCap trust is going

2  to receive depends in part at least on future claims, correct?

3  A.   Well, it -- "in part" is the key word here because it also

4  depends upon the claims that others make.

5  Q.   So it at least in part depends upon future claims?

6  A.   Yes.

7  Q.   So, for example, Dr. Kothari, that box E which says future

8  estimated claims of 481, that number presumably is -- well,

9  it's likely to change over the course of the 40 years, correct?

10 A.   Yeah.

11 Q.   Now, hypothetically, under the rehabilitation plan, if the

12 future estimated claims for a given trust turn out to be higher

13 than that trust's share of the 789 million dollars set forth at

14 item D, this trust will receive more under the rehabilitation

15 plan than if its estimated claims did not increase, correct?

16 A.   Well, as I said, it depends upon, if others increase even

17 more, then exact opposite would be true in the sense that it

18 depends upon the relative share.  So suppose you have a trust

19 and you make certain claims, your claims go up but other's

20 claims go up even more --

21 Q.   Then you would lose out?

22 A.   -- then you might lose out also.  So it doesn't -- so I

23 thought your question was if it goes up will they get more, and

24 the answer is not clear.

25 Q.   It's not -- it depends?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

233

1   A.    It depends.

2   Q.    But it is possible that a trust that over the next forty

3   years suffers relatively greater losses than its fellow trusts,

4   then that trust would receive more under the rehabilitation

5   plan than is currently contemplated, correct?

6   A.    Yes.  If that is -- given those assumptions, I would say

7   yes.

8   Q.    Now, if there's a commutation payment, then what -- how a

9   given trust does over the next forty years is irrelevant,

10  correct?

11  A.    That is correct.

12  Q.    So is it fair to say then that a trust which does

13  relatively poorly over forty years has at least some likelihood

14  of doing relatively better than the other trusts --

15          THE COURT:  I don't understand your question.

16          MR. GELFARB:  I will withdraw the question.  I'm

17  sorry, Your Honor.

18  Q.    Now, try again.  A trust that does poorly over the next

19  forty years has a better chance of seeing a greater recovery

20  relative to its peers, in other words, the other trusts, than

21  it would if the trust was commuted currently; is that correct?

22  A.    I mean, there are a number of factors.  First, we have to

23  understand that this is like cutting your nose to spite your

24  face.  First, you have to do poorly to generate more claims.

25  So that means you are at best getting yourself whole, right?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

234

1    So that's -- economically speaking, that's what it is.  That's

2    number 1.  Number 2, we also have to remember that the pot of

3    money that FGIC has is more or less fixed, so that's what is

4    going to be used to pay to different trustholder.  So --

5    policyholders.  So to ask in a very limited fashion, would the

6    cash flow from FGIC to a policyholder be greater under your

7    scenario, and the answer is that is possible.

8              MR. GELFARB:  No further questions.  Thank you,

9    Doctor.

10             THE COURT:  Thank you.

11             Any other cross-examination?

12             Redirect?  Try and get done in six minutes, Mr.

13   Weitnauer, so this witness can go back to Boston.

14             MR. WEITNAUER:  Your Honor, I would love to but --

15             THE COURT:  Otherwise, he's going to be back.  We're

16   stopping at 5 o'clock sharp.

17             MR. WEITNAUER:  I understand, I understand.

18   REDIRECT EXAMINATION

19   BY MR. WEITNAUER:

20   Q.   Kit Weitnauer again for Wells Fargo.  Dr. Kothari, was

21   your assignment to replicate or duplicate all of the things

22   that Duff analyzed in connection with the FGIC settlement?

23   A.   It was not.

24   Q.   Your assignment was as described in your direct testimony,

25   was it not, the four specific questions?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

235

1          THE COURT:  Believe it or not I know what his

2   assignment was.

3          MR. WEITNAUER:  Sorry, Your Honor.

4   Q.   Counsel asked you about the time it took you to gain an

5   understanding of the report.  As I recall, you testified about

6   five or ten hours was one aspect of that or the aspect?

7   A.   Yes, and I also said that my two colleagues also assisted

8   me and they spent time that was in addition to five to ten

9   hours that I spent.

10  Q.   And was the time that you spent in that endeavor in

11  connection with your assignment as an expert or simply to

12  understand as a business matter the conclusions and the

13  reasoning behind the conclusions in the Duff materials?

14         MS. EATON:  Objection.

15         THE COURT:  Sustained.

16  Q.   Why were you spending that much time?

17  A.   I was trying to understand as to how that -- the analysis

18  that Duff & Phelps had done, what's the basis for that, to gain

19  a general understanding.  It was also trying to develop an

20  understanding as, as you said, a businessman or more than a

21  layman, but little more financially knowledgeable kind of

22  individual would look at.  And also as an expert.

23  Q.   Let me ask you to look in that large binder that counsel

24  gave you.  Towards the back, it's Exhibit CS, the Ibbotson

25  materials.

1   A.   Yes.

2   Q.   And you'll see on the page under description of methods

3   used, you remember the sentence that was read to you --

4   A.   Yes.

5   Q.   -- where it says on an individual company basis?

6        THE COURT:  Page 5.

7   A.   Yes, page 5.

8   Q.   Could you read us the sentence after that?

9   A.   "An excellent resource for practitioners who wish to

10  create their own customized peer group" --

11  Q.   Nope, nope.  Sorry, you jumped ahead.  The sentence they

12  read to you, as I recall, was "On an individual company basis,

13  the models utilized in this book may provide information that

14  is inaccurate or misleading?"  I'd like you to read the

15  sentence after that.

16  A.   "Any individual company cost of analysis should involve a

17  careful analysis of all facts surrounding that company,

18  depending on individual company circumstances, all of the

19  assumptions underlying our models might not apply."

20  Q.   And do you believe that you undertook a careful analysis

21  of the facts surrounding FGIC for purposes of your opinion?

22        MS. EATON:  Objection.

23        THE COURT:  Overruled.

24  A.   I certainly undertook an analysis of factors that would

25  influence -- that were specific to FGIC.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   Q.   Was one of your assignments to decode or figure out how

2   FGIC came up with their proposal of a commutation amount of

3   253.3 million?

4          MS. EATON:  Objection.

5          THE COURT:  Overruled.

6   A.   That was not part of my assignment.

7   Q.   Are you aware of the expert testimony of Mr. Goldstein in

8   this case?

9          MS. EATON:  Objection.

10         THE COURT:  Sustained; beyond the scope.

11         MR. WEITNAUER:  Sir?

12         THE COURT:  It's beyond the scope.

13   Q.   You filed your direct testimony on July 31, did you not?

14   A.   Yes.

15   Q.   And has anything come to your attention that's caused you

16   to change the expert opinions you expressed in your direct

17   testimony?

18   A.   No, I don't believe so.

19   Q.   Since the date of your expert report and your direct

20   testimony given on July 31, has anything come to your attention

21   that has any bearing on the conclusions you've given?

22   A.   No, I think --

23         MS. EATON:  Objection.

24         THE COURT:  Overruled.

25   A.   I stand by my conclusions.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

238

1          MR. WEITNAUER:  In light of the scope, I don't have

2     any further questions.  We'll have to bring him back after Mr.

3     Goldstein testifies.

4          THE COURT:  Further direct -- further cross?  I'm

5     sorry.

6          MR. WEITNAUER:  As rebuttal, yeah.

7          THE COURT:  Further cross?

8          MS. EATON:  No, Your Honor.

9          THE COURT:  Anybody else?

10          Dr. Kothari, you're excused.

11          THE WITNESS:  Thank you.

12          THE COURT:  We are adjourned until Monday morning.

13        (Whereupon these proceedings were concluded at 4:58 PM)

14

15

16

17

18

19

20

21

22

23

24

25

239

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---------|----------------|------|
| Mr. Dubel | Mr. Goodman | 39 |
| Mr. Dubel | Mr. Baio | 59, 73 |
| Mr. Dubel | Mr. Sidman | 71, 74 |
| Mr. Kruger | Ms. Eaton | 91 |
| Mr. Kruger | Mr. Carney | 102 |
| Mr. Kruger | Mr. Shore | 105 |
| Ms. Sohlberg | Ms. Eaton | 135, 165 |
| Ms. Sohlberg | Mr. Weitnauer | 154, 167 |
| Ms. Sohlberg | Ms. Patrick | 163 |
| Ms. Scott | Ms. James | 170 |
| Ms. Scott | Mr. Gelfarb | 174 |
| Ms. Scott | Mr. Kotwick | 188 |
| Dr. Kothari | Ms. Eaton | 198 |
| Dr. Kothari | Mr. Gelfarb | 223 |
| Dr. Kothari | Mr. Weitnauer | 234 |

240

EXHIBITS

| DEBTORS' | DESCRIPTION | PAGE |
|---|---|---|
| | Declaration of Mr. Dubel | 39 |
| | Direct testimony declaration of Mr. Kruger | 80 |
| 1 | Settlement agreement | 90 |
| 2, 3, 4, 5, 6, 7 | Proofs of Claim | 90 |
| 30, 31, 32 | Pleadings | 90 |
| 43 | Revised scheduling order | 90 |
| 54, 55, 56 | Declarations | 90 |
| 57, 58 | RMBS settlement documents | 90 |
| 115, 122, 121, 123, 128, 129 | Sohlberg exhibits | 134 |
| 103 | Declaration of Ms. Sohlberg | 135 |
| 102 | Declaration of Mamta Scott | 170 |
| 114, 117, 120, 123, 128, 129 | Mamta Scott exhibits | 170 |

| DEBTORS' | DESCRIPTION | PAGE |
|---|---|---|
| | Amended testimony | 193 |
| | of Mr. Lipps | |
| 8-19 | Mr. Lipps' | 193 |
| | exhibits | |
| | Direct testimony | 196 |
| | of Dr. D'Vari | |
| 34-42, 59 | D'Vari exhibits | 196 |
| 104 | Dr. Kothari direct | 198 |
| | Testimony | |

242

C E R T I F I C A T I O N

I, David Rutt, certify that the foregoing transcript is a true

and accurate record of the proceedings.

DAVID RUTT

AAERT Certified Electronic Transcriber CET**D 635

eScribers

700 West 192nd Street, Suite #607

New York, NY 10040

Date:  August 19, 2013

12-12020-mg    Doc 4759    Filed 08/19/13    Entered 08/20/13 15:07:54    Main Document
RESIDENTIAL CAPITAL, LLC, et al.
Pg 243 of 273
Case No. 12-12020-mg

August 16, 2013

# A

**abilities (1)**
64:12
**ability (8)**
24:16;30:12;33:13;
41:11;43:8;121:16;
122:7;159:21
**able (18)**
16:20;52:5;56:2;
121:22;125:1;
150:15,16;155:17,20;
170:24,24,25;171:3;
175:7,12;186:1;
189:1;190:20
**above (2)**
22:20;218:11
**Abrams (17)**
27:18;95:3,9,13;
96:4;97:19;98:3;
100:14,19,22;101:12,
18,21,25;102:3,6,9
**Abrams' (2)**
95:16,20
**absence (5)**
25:22;26:5,7;
35:19;71:9
**absent (2)**
115:4,5
**absolutely (1)**
195:5
**accept (2)**
155:22;166:19
**accepted (3)**
38:9;97:18;211:16
**access (2)**
205:13;213:3
**accomplish (1)**
22:3
**accomplished (1)**
48:21
**accomplishes (2)**
13:12;14:7
**accomplishing (1)**
17:14
**accordance (4)**
68:24;74:14;
138:11;161:4
**according (3)**
34:6;52:13;215:8
**account (2)**
214:3;215:11
**accounting (10)**
59:7;64:25;65:1,
21;66:7,10,12;67:16,
19;220:25
**accrued (1)**
184:4
**accuracy (1)**
219:22
**accurate (5)**
40:13;60:13;87:15;

223:3;228:12
**achieve (1)**
164:21
**achievement (1)**
14:1
**act (2)**
41:4;88:11
**acted (12)**
18:6,9;19:16;
22:16;86:15;138:18;
140:1;200:19,22,24;
201:8,13
**acting (3)**
22:23;140:10,13
**action (3)**
118:7;182:14;
219:11
**actions (2)**
33:15,16
**active (1)**
60:17
**activities (5)**
60:9;61:14,15,24;
62:24
**activity (1)**
117:4
**acts (3)**
33:16;97:3;154:13
**actual (1)**
146:4
**actually (14)**
21:14;26:19;43:5;
70:16;93:7;94:13;
96:19;97:12;116:10;
117:13;131:10;
165:19;193:4;229:22
**ad (6)**
30:7;34:24;47:5,8,
12;105:14
**add (5)**
20:13;21:5;26:11;
196:19;225:1
**Adding (2)**
25:21;26:8
**addition (7)**
20:1;24:13;32:14;
38:11;86:3,8;235:8
**additional (12)**
25:24;26:15;31:8;
61:2;72:4;106:18;
120:16;148:25;
149:5;152:3;211:12;
215:21
**address (2)**
35:23;84:19
**addressed (2)**
152:12,21
**adjourned (1)**
238:12
**adjustment (2)**
210:25;216:14
**adjustments (1)**
208:10

**admission (2)**
134:14;169:24
**admit (1)**
89:23
**admitted (11)**
77:23;80:19;90:3,
7,11;133:7;135:1;
170:3;191:1;193:17;
197:22
**admitting (1)**
90:5
**advance (2)**
149:16,22
**adverse (2)**
23:7,16
**advice (2)**
120:6;141:17
**advise (4)**
155:9;188:16,18;
189:1
**advised (4)**
78:19;132:16;
141:11,14
**advisor (2)**
25:8;155:1,13,18
**advisors (10)**
18:10;99:11,14;
113:5;115:23,24;
128:24;129:16;
142:3;155:9
**advisory (1)**
18:13
**affect (3)**
46:21;55:16;165:8
**affected (2)**
171:18;189:1
**affecting (3)**
155:4;186:15;
228:16
**affidavit (2)**
39:1;157:4
**affiliates (1)**
96:18
**affirm (2)**
195:11,13
**afforded (1)**
151:19
**afternoon (12)**
135:12;169:14;
170:15,16;174:19;
188:10;194:15;
195:16;198:21,22;
223:11,12
**after-the-fact (1)**
25:14
**afterthoughts (1)**
25:19
**afterwards (2)**
38:15;52:1
**again (32)**
33:11;39:24;40:25;
44:3;46:1;53:3;59:4;
60:3;62:3;72:15;

82:7;84:21;85:12;
88:14;101:8;102:8;
104:22;129:8;131:6,
6;151:11;154:6,8;
169:8;172:23;
188:11;195:4;197:7,
17;223:15;233:18;
234:20
**against (40)**
14:10;15:6,14,16,
25;16:4,14,18;22:4;
30:13;58:18;60:18,
19,20;71:5,6,8;
106:18,21,23;121:1,
22;122:2,4;124:13,
19;125:2,6,11,12;
126:17,24,24;129:24;
130:10;133:2;140:7;
192:19,20;219:5
**agent (2)**
40:21;41:4
**agents (3)**
99:11,14;142:4
**aggregate (5)**
14:10;24:17;
121:21;219:20,23
**agree (16)**
16:23;40:12;50:12;
54:12,21;68:12,14;
88:11;126:3;130:18;
172:18;173:11;
213:11;216:13;
217:1,5
**agreed (13)**
14:11,25;15:16;
22:4;32:8;79:5;
89:13;97:18;102:4;
133:1;138:13;172:9,
9
**agreeing (2)**
119:3;138:19
**agreement (267)**
12:9,16;13:11,18,
19,19,21,22;14:5,5,6,
8,11,16,21;15:1,2,3,4,
10,15,19,20,24;16:3,
6,13,15,19,22;17:2,4,
5,8,10,11,12,13,15;
18:8,17,24;19:11,18;
22:13,15,19;23:6,9,
10;24:11,22;25:12,
21;26:4,6,7,9,11,13,
24;28:20,21;52:19;
68:11,15;69:4;83:20,
22;84:15,23,24;85:5;
87:6,14,25;88:10,19,
20;90:14;91:2;92:1,
4,16;93:1,4;94:14;
96:16,23,25;98:2,13,
16,20;99:21;100:5,6,
8,10,11,12,13,18,23;
101:4,10,17,19;
102:7;104:10;

105:25;106:24;
107:8,13,19;108:3,7;
109:13;111:19;
113:2,12,18;114:2,
22;115:5,10,18;
116:7;117:20;
118:16;122:2,7;
124:6,10,25;126:12;
127:19,24;128:23;
129:12;133:8,8;
135:13,20;136:8,17;
138:2,10,17,20,23,
24;139:14;140:13;
141:4,9,19,23;142:8,
18,19,21,25;143:2,4,
7,24;144:4,22,23;
145:4,7,10,17,24;
146:4,6,12,13;147:8,
11;148:4;151:21,22;
152:20;153:1,22;
154:18;155:23;
156:3,7;158:4,19;
159:6,15,17,19;
160:5,6,10,21,24;
162:14,18;163:15;
166:8,25;167:17;
170:18,23;171:4,6,9,
13,15,17,24;172:5,6,
7,9,10,13,14,16,18,
21,22,25;173:5,7,16,
17,20,24;174:4;
175:6,10,14,19,20;
176:11,15,20,21,22;
186:14;188:17,19,25;
189:2,18,22,25;
190:3;191:7,23;
195:18;199:23;
200:20;201:10;
228:25;229:3,7,18;
230:7;231:13
**agreements (6)**
14:20;27:3;106:7,
13;124:12,14
**ahead (49)**
12:21,25;13:5;
19:4;27:25;28:2;
32:3,5;36:21;38:18;
39:20;45:25;53:13;
54:3;59:23;71:22;
73:12,16;75:22;81:2;
82:2,12;84:20;85:16;
86:12;87:24;88:2;
98:25;103:22;106:9,
16;128:12;134:1;
147:23;150:20;
153:9;163:1,11;
178:2,25;179:9;
188:23;192:24;
205:5;206:12;212:1;
218:19;223:23;
236:11
**Alex (1)**
195:17

12-12020-mg   Doc 4759   Filed 08/19/13   Entered 08/20/13 15:07:54   Main Document

RESIDENTIAL CAPITAL, LLC, et al.           Pg 244 of 273

Case No. 12-12020-mg                                                August 16, 2013

**Alice (1)**
205:24
**alleged (1)**
151:24
**Allen (1)**
18:9
**allocated (1)**
14:17
**allocation (8)**
20:4;33:6;190:7;
229:18,23,24;230:5;
231:13
**allocations (1)**
153:3
**allow (8)**
96:4;99:21;119:3,
3;124:25;156:15;
186:13;195:4
**allowance (4)**
35:6,18,20;138:11
**allowed (10)**
14:16,21;15:8,10,
17,21,25;117:19;
118:1;186:2
**allowing (1)**
125:5
**Ally (24)**
6:3,3;36:4;51:2;
106:23;122:2,4,7;
124:7,11,12,14,16,18,
22,25;125:1,6,11,11;
126:17,24,24;164:9
**almost (4)**
34:7;200:8;225:1;
231:24
**alone (2)**
24:24;211:8
**along (11)**
17:23;37:8;49:10;
52:10;56:19;150:13;
157:14;169:10;
193:17;228:3;230:1
**ALSTON (8)**
8:1;133:11;140:24,
25;141:12,17,25;
154:9
**alter (1)**
173:12
**altered (1)**
148:2
**Alternative (2)**
96:17,20
**alternatively (1)**
26:15
**although (2)**
107:21;143:9
**ALVES (1)**
7:9
**always (2)**
12:25;107:15
**ambiguous (1)**
176:5
**amended (7)**

191:24,25;192:2,5,
7;193:18,19
**Americas (1)**
7:15
**among (13)**
12:9;14:17;21:12;
22:22;46:25;47:1;
48:20;50:9;55:18;
103:25;104:1;
124:14;136:11
**amount (58)**
14:13,24;15:8,8,9,
11,12,13,16;20:5,14,
15,20;24:10;60:23;
63:19;66:14;69:9;
70:3;104:17;118:1,8;
121:2;128:17;131:8;
144:14;145:2;152:8;
153:2,2;176:1,8,16,
19;188:17;190:7,9,
17;192:6;199:22,24;
203:11,20;206:22,24;
207:1;210:5,13;
219:23;222:23;
228:20;230:25;
231:7,8,19,23;232:1;
237:2
**amounts (2)**
20:4;66:15
**analyses (1)**
203:8
**analysis (76)**
24:19;59:10,14;
92:16,19,20,23,25;
142:7,8;143:6,7,8,9,
10,15;145:20;152:12,
19,21;159:20;
177:18;186:7,21;
187:18;188:2;200:1,
24;202:2,5,18,23;
204:2;205:3,15,20;
206:5,15;208:1,7,8,9;
209:20,22;210:7;
211:11,13,15;212:12;
213:9;215:1,3,9,10,
13,22;220:1,16,23;
221:2,6,24;222:2,5,
10,14,21;223:2;
226:24;228:2,18;
235:17;236:16,17,20,
24
**analyze (3)**
58:13;143:18;
220:3
**analyzed (2)**
92:4;234:22
**analyzing (2)**
187:23;204:4
**and/or (1)**
43:8
**ANDREW (1)**
9:18
**Angeles (1)**

10:16
**ANN (2)**
8:15;28:10
**annexed (1)**
44:24
**answered (5)**
93:16,19;147:18;
157:10;217:14
**anticipate (1)**
49:2
**anticipated (4)**
33:8;46:3;78:18;
164:4
**anymore (1)**
113:9
**Apart (1)**
222:17
**apologize (17)**
41:16,21;42:13,17,
19;46:1;56:16;57:17;
81:17,19;82:8,18;
134:10;184:20;
191:25;192:8;229:10
**apparently (1)**
146:21
**appear (3)**
58:25;62:2;189:19
**appearance (1)**
162:24
**appeared (2)**
26:1;227:3
**appearing (1)**
21:8
**appears (3)**
60:6;97:2;135:17
**application (1)**
68:24
**applied (1)**
179:18
**apply (1)**
236:19
**applying (1)**
228:1
**appointed (2)**
41:2;102:21
**apportioned (1)**
106:5
**appreciate (2)**
52:12;79:7
**approach (9)**
38:1;122:15;
203:17;211:2,2,3,4,5,
6
**appropriate (8)**
204:4,7;208:5;
209:3;210:8,19;
211:11;212:18
**approval (24)**
12:8,11;13:17;
15:19,21,23;17:5,10;
31:9;42:9;79:1,9;
124:24;136:4,7;
138:11,23;145:22;

163:14;171:14;
172:6,20;174:4;
191:23
**approve (13)**
17:4;20:25;84:23;
103:10,16,18;104:2;
135:20;166:16,20,25;
171:24;195:18
**approved (38)**
12:16;13:23,24;
16:15;17:16;28:19;
29:5;30:24;48:24;
71:14;84:17,23;85:5;
100:5;101:11;
103:24;106:1;107:4;
117:20;122:3;
125:15;136:9;
144:23;145:4,7,9,14,
16;153:1;163:6,22,
25;164:3,3;166:15;
171:17;172:15;
173:13
**approves (1)**
154:17
**approving (9)**
15:20;17:20;18:20;
136:14;138:10,23;
145:17;200:19;201:9
**approximately (15)**
21:21;28:13;59:2,
12;63:18;68:19;69:8;
70:2,11;74:22;184:4,
12;185:16,23;214:23
**approximation (1)**
181:12
**AR (2)**
45:18,22
**area (2)**
18:13;203:7
**areas (2)**
73:8,10
**argues (1)**
33:19
**arguing (1)**
34:7
**arise (1)**
27:3
**arising (1)**
16:7
**ARLENE (1)**
7:9
**arose (1)**
52:16
**around (6)**
35:18;169:8;
191:16;195:6,8;
197:7
**arrangement (3)**
30:6;194:5;196:19
**arrive (2)**
200:12;210:25
**arrived (1)**
226:14

**arriving (1)**
206:1
**ascertain (3)**
203:16;209:2;
227:4
**ascertained (1)**
206:18
**ascertaining (1)**
207:16
**aspect (5)**
34:25;214:12;
231:10;235:6,6
**assert (9)**
14:12;15:5;106:17;
120:16,21,22;125:6;
129:25;130:1
**asserted (8)**
14:10;16:17;85:21;
87:8,20,21;88:6;
125:11;128:2,18;
129:19;193:12;220:7
**asserting (5)**
219:5,11;220:6,11,
12
**assertion (1)**
35:21
**assessing (1)**
119:9
**assessment (4)**
220:20;221:16;
222:7,15
**assessments (1)**
221:4
**ASSET (1)**
10:21
**assets (5)**
33:4;56:2;214:14,
16,23
**assignment (8)**
199:2;203:10;
206:13;234:21,24;
235:2,11;237:6
**assignments (1)**
237:1
**assist (1)**
155:4
**assistance (2)**
155:18;230:11
**assisted (2)**
202:11;235:7
**associated (8)**
118:19;119:10;
148:25;199:11;
214:10,20;218:24;
224:24
**associates (4)**
202:10;203:1;
205:21;209:7
**assume (8)**
91:8;98:24;99:1,1;
103:12,14;121:23;
124:4
**assumed (2)**

107:16;122:11

**assumes (1)**
62:16

**assuming (2)**
106:24;179:13

**assumption (3)**
203:16,25;222:12

**assumptions (21)**
38:7;203:17;205:7,
9,14,15,19;206:4,9,
16,17;207:22;223:3,
18;226:15;227:2,6;
228:1,16;233:6;
236:19

**assure (1)**
24:6

**Atlanta (1)**
8:4

**attached (7)**
52:14,15;83:17;
134:4;138:12;189:6,
13

**attaching (1)**
83:14

**attachments (1)**
84:11

**attempt (2)**
171:1;172:10

**attempting (1)**
100:2

**attendant (1)**
169:25

**attended (5)**
51:10,22,25;52:1;
94:24

**attending (1)**
51:23

**attention (11)**
42:4;58:10;60:3;
94:10;123:18;185:5;
217:23;227:11,12;
237:15,20

**attorney (1)**
97:14

**attorney-client (1)**
91:5

**Attorneys (18)**
6:3,11,19;7:3,14;
8:2,10,21;9:3,13,22;
10:4,13;37:16;97:15;
98:9,15;186:21

**attributable (1)**
32:13

**audit (1)**
130:22

**auditors (1)**
221:11

**August (7)**
49:4;79:2;110:11;
111:13,16,16;112:11

**authenticate (1)**
86:5

**authenticating (1)**
86:5

**authority (8)**
33:19;103:16,18,
19;104:1,1;107:14,17

**authorized (1)**
84:22

**available (7)**
26:6;33:5;56:2;
63:25;135:4;193:24;
212:21

**Avenue (4)**
7:15;9:4,23;10:14

**average (1)**
54:8

**a-vis (1)**
23:12

**avoid (3)**
16:20;121:4;161:7

**aware (26)**
49:3;50:7,25;91:2;
92:15;95:9;98:9,15,
19,22;99:2;100:1;
101:20;102:24;
103:3;127:11;
156:21;159:17;
161:10;185:20;
189:25;214:6,12;
220:9,11;237:7

**away (4)**
71:13;106:25;
121:9;126:4

---

**B**

**back (35)**
28:19,23,23;30:22;
35:13,17;42:21;43:6;
44:23;53:18;55:3;
77:1,21;83:1;88:25;
109:24;110:15,20;
120:20;121:7;
126:24;151:18;
158:8;165:24;
166:21;180:12;
188:6;217:15;218:5;
230:14,15;234:13,15;
235:24;238:2

**backed (1)**
214:4

**bad (1)**
34:16

**BAIO (36)**
9:7;21:18,18;
27:14,16,21;28:1,3,7;
37:13,13,17,20;38:4,
5,13,15,20;59:21,22,
25;60:1;63:8;66:12,
13;70:1;71:16;72:14;
73:15,16,18;74:3,4;
75:24;76:2;196:18

**Baio's (1)**
38:25

**BAKER (2)**

86:5

**Bank (43)**
6:3;7:3,14;8:2;
9:22;18:1,3,4;19:7,8,
9;51:2;79:21;88:15;
124:12,15;133:14;
135:14;169:15,17;
170:17,21,25;171:4,
7,13,22,23;173:16,
23;174:2;175:16,24;
176:7,10,18;187:1,
17,23;188:1,11;
189:23;190:16

**Bankruptcy (18)**
12:8;23:10;27:1;
60:18;79:9;120:11;
136:5,7,9;138:6,9,10;
149:1;152:5,5;
153:12,21;186:16

**bar (1)**
168:16

**bargained (1)**
32:11

**barriers (1)**
22:8,10

**base (3)**
24:8,12,14

**based (25)**
13:18;14:18;17:10;
39:7;59:7;65:21;
69:22;106:7;120:6;
127:10,25,25;128:2,
8,15;145:18,20;
152:16;159:20;
160:20;165:3,11;
166:22;202:6;220:22

**basically (2)**
56:4;204:23

**basis (21)**
22:19;24:19;29:4;
34:20;80:15;82:23;
83:2;86:2;177:5;
206:25;208:13;
215:24;217:2;
218:12;220:19;
221:6,21;226:4;
235:18;236:5,12

**bat (1)**
76:5

**Bates (2)**
46:14;97:7

**Battery (1)**
7:4

**Bayview (4)**
9:3;10:21;170:12;
198:18

**BD (2)**
177:22;180:24

**bearing (1)**
237:21

**became (2)**
98:15;103:3

**become (4)**

8:15;28:10

**becomes (1)**
17:2

**beg (3)**
101:8;167:11;
218:11

**began (1)**
30:4

**begin (2)**
36:8;107:23

**beginning (5)**
42:7;47:12;99:4;
109:10;123:21

**behalf (40)**
12:7;19:7,8;21:8;
22:7;25:4,9;28:9;
34:24;35:2;41:4;
51:12,19;80:2;92:9;
98:20;99:22;105:14;
113:1;129:20;130:8;
132:21;135:9,13,14,
21;147:8;154:21;
155:23,24;159:19;
169:5;171:6;174:16;
188:11;191:21;
195:3;197:5;198:17;
223:15

**behind (7)**
45:19;58:6,6;
79:18;137:19;161:3;
235:13

**belong (1)**
27:4

**below (3)**
99:11,11,16

**beneath (2)**
97:17,21

**beneficial (2)**
140:1,3

**beneficiaries (1)**
23:14

**benefit (23)**
19:20,24;23:12,13;
30:17;61:18;69:2;
104:18;115:11;
125:22;149:14;
151:19,24;152:3,11,
24;153:2,3;154:16,
19;162:8,10;186:17

**benefited (1)**
30:11

**benefits (18)**
13:20;14:1;17:17;
19:25;20:13,14;
25:15,16,24;26:15;
30:18;68:2,10;
148:25;149:6;
152:14,19;161:10

**BENNETT (1)**
6:25

**Berkshire (1)**
10:13

**besides (4)**
61:25;186:20;
207:15;215:16

**best (48)**
13:13;18:25;19:11,
16;20:18;22:14,21,
24;23:1,8;24:25;
25:5;33:16;34:1,5;
67:17;81:7;92:1,13;
138:17,19;139:19,22,
24;140:1,10;145:25;
156:3,7,10,18,22,25;
157:5,19;159:16;
164:14;166:3,8;
167:2,16;171:14;
174:6;192:23;201:3,
8;220:23;233:25

**better (5)**
59:8;77:11;152:16,
17;167:1;184:13;
186:13,18;201:22;
233:14,19

**beyond (4)**
61:2;176:15;
237:10,12

**big (1)**
229:15

**big-picture (1)**
176:22

**billion (33)**
14:10;28:13;59:12,
12;63:5,18;64:3,18;
65:7;68:18;69:8,19,
20,22;70:12;72:25;
73:7;121:12,13,14,
20;127:16,23;128:3;
129:19,22;130:12;
131:4,9;214:13,14,
14,23

**billion-dollar (1)**
63:14

**billions (9)**
16:5,13;24:17;
31:14;60:24;61:25;
62:12;121:9;219:17

**billion-seven (1)**
73:5

**binder (28)**
41:14;45:4,15;
58:4;79:17;81:25;
82:1;93:21;96:10;
108:24;110:3,8;
136:19,22,23,25;
149:18;151:1;168:1;
173:2;192:3,4;193:6;
201:23,25;217:20;
229:13;235:23

**binders (10)**
39:15;41:25;42:20;
46:2;78:8;79:14;
82:14;94:2;191:19;
192:15

**binding (1)**

12-12020-mg    Doc 4759    Filed 08/19/13    Entered 08/20/13 15:07:54    Main Document

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg
Pg 246 of 273

August 16, 2013

171:18
**BIRD (8)**
    8:1;133:11;140:24,
    25;141:12,17,25;
    154:9
**bit (9)**
    48:4;85:16;113:8,
    25;136:1;146:15;
    208:1;209:25;210:3
**black (1)**
    168:16
**block (1)**
    158:22
**blue (1)**
    162:8
**board (12)**
    83:14,15,19,25;
    84:10,16,22;85:3,4;
    103:9;107:10;108:2
**bond (2)**
    151:17;152:17
**BONY (9)**
    30:4,6,7,16,20;
    32:7,7;33:19,25
**BONY's (2)**
    32:16,22
**book (16)**
    45:3;58:5;72:24;
    75:25;177:22;
    180:18;189:14;
    209:2;213:24;
    215:24;216:4,21;
    218:12;229:14,15;
    236:13
**booklet (2)**
    133:15;134:4
**Boston (2)**
    9:15;234:13
**both (16)**
    17:5;21:2;29:16;
    33:25;53:15;55:1;
    65:14;89:16;94:25;
    100:8;109:7;122:25;
    123:3;128:24;
    141:17;185:17
**bottom (9)**
    42:15;46:16,16;
    58:24;70:21;122:22;
    161:21;178:17;
    181:11
**Boulevard (1)**
    10:22
**bound (1)**
    24:2
**box (5)**
    228:3;230:12,13,
    18;232:7
**boy (1)**
    180:22
**Boylston (1)**
    9:14
**bracket (3)**
    179:25;180:2;

228:6
**bragging (1)**
    28:16
**breach (2)**
    16:11;130:20
**breaching (1)**
    139:16
**break (4)**
    53:21;89:25;
    117:17;191:6
**breakdown (1)**
    190:13
**breaking (1)**
    59:8
**BRIAN (1)**
    7:10
**brief (4)**
    19:6;34:25;188:14;
    195:1
**briefly (3)**
    14:3;29:24;117:18
**bring (1)**
    238:2
**broad (3)**
    14:1;103:19;124:9
**broader (3)**
    17:12;116:17;
    200:5
**brought (1)**
    118:7
**BRUNS (3)**
    10:3;158:22;
    162:24
**Bryant (1)**
    8:11
**built (1)**
    26:16
**bullet (1)**
    168:19
**burden (2)**
    22:12;23:4
**Bureau (1)**
    41:2
**business (10)**
    22:22;107:16;
    109:14;113:1;
    118:15;125:4;
    126:12;127:1;
    210:18;235:12
**businessman (1)**
    235:20

**C**

**C-2 (2)**
    229:4,12
**CA (1)**
    10:16
**calculate (2)**
    204:6;210:4
**calculated (1)**
    200:1
**calculating (2)**

212:10;216:6
**calculation (4)**
    59:15;70:23;
    208:25;226:4
**calculations (5)**
    26:17;33:9;38:22;
    203:12;204:16
**call (7)**
    14:20;15:9;128:18;
    133:12;145:21;
    152:23;174:20
**called (6)**
    29:7;41:16;146:22;
    159:11,25;195:20
**calling (2)**
    36:13;222:15
**calls (4)**
    30:20;105:2,4;
    142:23
**came (11)**
    23:24;89:13;115:4,
    9;144:6;165:8;
    199:24;207:4;
    221:20;227:1;237:2
**can (96)**
    12:21;13:5;14:12;
    15:7,14;17:6,8;
    23:13;26:25;32:25;
    35:7;42:21;45:9,11;
    53:21;54:4;57:24;
    61:5,10;63:15;71:20;
    77:3;78:12,14;80:14;
    81:6;82:24;84:9;
    86:15,25;88:25;
    89:25;90:1,9,10;
    95:4;112:6;113:19,
    21;114:20;115:16;
    118:22;119:1,6;
    120:1,16;122:24;
    126:21,22,22;129:23;
    130:9;131:1,7;132:6;
    133:17;147:15;
    148:18;151:17;
    158:3,22;168:21;
    169:8;172:12;
    173:19;174:1;
    175:13;176:4,24;
    177:21,25;178:2;
    179:13,25;181:20;
    186:23;188:5;190:8,
    12,13;191:18;
    192:22;194:18,19;
    197:7;214:7;217:12,
    13,17,18,19;218:3;
    225:13;229:17;
    230:3;234:13
**capable (1)**
    22:23
**capacity (1)**
    141:1
**Capital (8)**
    18:13;96:17,20;
    208:19;215:2,9,13;

222:19
**capped (5)**
    35:22;106:18;
    120:16,23;121:2
**caption (1)**
    112:6
**care (2)**
    25:22;194:23
**careful (6)**
    80:25;215:3,10;
    217:16;236:17,20
**carefully (1)**
    210:15
**CARNEY (9)**
    8:16;28:10;102:15,
    18;103:22;105:3,6;
    194:2;196:16
**Carpenter (6)**
    18:5;111:22,24;
    112:4,8;113:22
**case (30)**
    24:8,12,14;28:12;
    31:15;33:21;34:24;
    35:16;43:11;49:20;
    66:25;105:14;115:8;
    146:16;151:25;
    155:6,12;160:3,20;
    161:3;203:6;207:9;
    215:12;219:9,18,24,
    25;220:1,19;237:8
**cases (16)**
    60:20;99:6,9,17;
    115:7;154:13;
    219:11,16,21;220:7,
    8,8,9,11,21,21
**cash (32)**
    20:1;29:6;63:25;
    199:10;203:3,10,12,
    15,19,19,23,24;
    204:13;206:2,17;
    207:12,13,14,23;
    214:9,15,20;222:5,
    11,16;223:18;226:23,
    23,25;228:16;234:6
**categories (1)**
    26:2
**category (2)**
    64:23,23
**CATHERINE (1)**
    10:1
**cause (1)**
    118:7
**caused (1)**
    237:15
**causes (3)**
    219:10,12,13
**cautioned (1)**
    215:23
**CDS (3)**
    29:8,22;31:16
**ceiling (4)**
    14:12;15:9,11,12
**center (1)**

97:12
**Centerview (3)**
    115:25;116:2,6
**cents (7)**
    32:16,20;33:15;
    54:12,22;184:11,12
**certain (18)**
    12:10;42:9;49:14;
    58:14;62:9;63:16;
    65:22;66:4;67:13;
    99:16;124:6,13;
    136:14;149:6;
    176:21;179:19;
    202:14;232:19
**certainly (36)**
    22:24;23:12;65:18,
    24;66:3;67:13;93:8;
    107:15;112:4,19;
    117:24;120:14;
    121:9;139:22,25;
    143:15;152:14,19;
    164:18,20,22;201:24;
    202:14;205:11,13;
    206:14;210:21;
    211:1,4,6;214:1;
    215:11,11;224:22;
    229:10;236:24
**certainty (1)**
    126:19
**certificate (18)**
    55:9,17,23;56:1,
    11;154:22;156:4,8,
    11,21;157:24;159:4,
    16;161:10;164:14;
    177:4;184:14;231:2
**certificates (5)**
    27:13;49:15;
    212:13;213:1,13
**certify (1)**
    190:20
**challenge (1)**
    15:7
**challenged (5)**
    22:2,9;23:11;
    25:12;28:4
**challenging (1)**
    25:9
**chambers (1)**
    78:18
**chance (4)**
    27:24;81:9;156:15;
    233:19
**chances (1)**
    67:6
**change (5)**
    47:18;107:5;145:2;
    232:9;237:16
**changes (9)**
    74:17;20;85:11;
    148:7,8,12,21,22;
    176:21
**changing (3)**
    110:21,21;111:2

**channeled (1)**
126:1
**chaos (1)**
115:8
**Chapter (7)**
15:3;99:5,9,17;
103:20;115:7;160:20
**characteristics (1)**
210:24
**characterization (2)**
208:21,22
**characterize (2)**
25:14;209:9
**characterized (1)**
23:18
**charge (1)**
205:20
**Charles (7)**
12:6;78:5,21;
132:20;169:4;
191:20;197:4
**check (1)**
123:10
**Chet (1)**
195:2
**Chicago (2)**
182:16;187:14
**chief (7)**
17:24,25;18:12;
36:14;40:5;41:1;
102:18
**Chong (1)**
205:24
**Chris (3)**
34:23;50:25;
105:14
**circle (1)**
42:21
**circulated (1)**
39:16
**circumstances (1)**
236:18
**cite (1)**
127:9
**claim (39)**
14:9,16,21;15:8,21,
25;16:11,24;28:12,
14;35:7,21,22;59:1,2;
71:14;79:22;90:16;
106:5,19;108:14;
109:11;117:25;
119:4,11;120:24,24;
121:2,20;125:1,11,
12;126:17,24;128:6,
17;131:3;180:5;
186:2
**claimed (1)**
60:23
**claims (135)**
14:10,12,14,23;
15:5,7,10,13,16,17,
23;16:4,5,7,10,11,14,
17,19;18:7;21:13;

24:6,16,17;26:5;27:6,
8,22;29:16;30:14;
31:14,14;32:12;33:5,
7,8,8;35:15,21;51:13,
14,14;53:16,16;55:1,
2,8,16;58:18;60:9,15,
16;61:2,15;62:1,13,
24;63:10;71:2,3,7,7,
10;72:11,19;88:14;
92:10;103:19;
104:17,18;105:19,22,
22;106:1,17,21;
109:16;117:22;
118:19,20,21,22,25;
120:16,21,22;121:8,
11,13,15,23;122:2,4;
124:9,17,19;125:6,
20,21;128:2,16;
129:20;130:10;
138:11;181:18;
182:2;184:5;193:12;
214:13,16,17;219:5;
220:4,6,7,12,12,14,
15,17;228:21;230:18,
20;231:1,3;232:2,4,5,
8,12,15,19,19,20;
233:24
**clarified (1)**
52:25
**clarify (4)**
15:18;76:10;
126:11;176:6
**class (1)**
210:22
**classroom (1)**
216:8
**clean (1)**
161:17
**clear (18)**
41:22;53:2,5;62:2;
75:8;76:6,11;91:3,7;
92:11;95:24;112:5,
22;118:21;123:13;
137:4;194:4;232:24
**clearer (1)**
77:16
**clearly (1)**
53:25
**CLEARY (1)**
6:10
**CLERK (2)**
12:20;195:11
**clerks (1)**
191:6
**client (3)**
47:8;98:21;183:24
**clients (8)**
22:23;23:21;25:5,
15;27:19;35:2;141:3;
174:3
**clients' (8)**
22:6;23:20;25:4,
10;27:2;99:5,9;

151:25
**close (1)**
138:15
**closer (2)**
136:2;176:25
**closing (2)**
21:5,11
**co-counsel (1)**
28:10
**Code (1)**
117:23
**coincidentally (1)**
34:2
**collateral (11)**
63:25;127:15,22;
129:22,24;130:3,7,
12;131:4,9;214:3
**colleague (2)**
71:21;169:18
**colleagues (4)**
21:20;28:10;137:8;
235:7
**collectively (6)**
16:13;21:21;99:12,
15;202:11;220:19
**collects (1)**
61:1
**COLLIER (1)**
11:4
**colluding (1)**
30:17
**color (1)**
161:22
**column (2)**
162:7,8
**comfort (1)**
33:23
**comfortable (4)**
145:19;166:17,18;
212:23
**coming (11)**
13:4;20:4;80:11;
87:20;88:4;90:12;
113:17;115:3;
206:25;207:16;
224:24
**commence (1)**
173:12
**commenced (2)**
29:12;140:6
**comment (2)**
142:20;200:16
**comments (2)**
34:18;142:24
**Committee (12)**
9:13;10:4;30:8;
47:5,9,12,13;48:1;
159:1,2,3;162:25
**common (1)**
155:8
**commonly (1)**
211:2
**communications (5)**

113:25;114:1;
115:16;129:1,3
**commutation (43)**
22:13;26:6;42:24;
49:25;52:16;92:7;
102:25;104:4,9,13,
24;126:1;144:14,14,
23;145:2;152:15;
166:2,8;168:14;
176:1,8,15,19;181:7,
22;183:25;184:2;
186:5,18;188:17;
190:7,9,17;199:22,
24;206:21,24;
225:10;228:19;
231:1;233:8;237:2
**commutations (9)**
29:8,8,22;31:13;
34:10;43:2;44:20;
46:21;47:2
**commute (12)**
41:8,11;43:8;52:6;
101:22;102:1,10;
143:18;144:7,17;
171:22;200:15
**commuted (8)**
29:10;48:2;53:14;
173:21;175:5,10;
200:17;233:21
**commuting (4)**
23:24;43:15;44:12;
171:1
**companies (4)**
40:3;118:9;209:5;
216:6
**Company (12)**
18:3;124:10;
186:20;215:10,24;
217:2;218:12;236:5,
12,16,17,18
**company-specific (1)**
213:16
**compare (3)**
143:21;144:1;
220:6
**compared (2)**
143:23;144:3
**Comparison (2)**
168:14;181:7
**complaint (2)**
108:17;109:12
**complaints (3)**
192:19;193:11,12
**complete (3)**
48:18;202:17,23
**completed (1)**
174:9
**completely (1)**
22:23
**completeness (1)**
83:7
**completion (1)**
163:15

**complex (2)**
16:17;118:23
**complicated (1)**
228:22
**comply (2)**
91:6,8
**component (5)**
13:21;21:14;64:7;
65:6;66:14
**components (2)**
63:20;65:14
**composite (3)**
77:2;197:21;198:2
**comprises (1)**
63:20
**compromise (1)**
18:19
**compromised (1)**
222:8
**computations (1)**
226:6
**concede (1)**
32:18
**concerned (4)**
56:18;148:22;
214:19;215:15
**concerning (10)**
23:5;40:13;41:7;
43:15;44:12;47:5;
99:22;101:19;
188:16,18
**concerns (1)**
17:8
**concession (1)**
21:15
**conclude (4)**
58:25;85:7;103:23;
156:3
**concluded (6)**
96:7;103:8;145:24;
166:2;221:7;238:13
**concluding (1)**
208:17
**conclusion (24)**
13:16;26:22;80:9;
113:18;115:4,4,9;
164:13;199:9,24;
200:7,9;208:1,13;
221:1,5,6,8,20,21,23;
225:4,5;226:16
**conclusions (8)**
25:6;199:2;203:8;
206:19;235:12,13;
237:21,25
**condition (12)**
23:16,17;30:25;
48:10,14,16;136:8;
138:22;140:15;
163:15,20;216:16
**conditions (5)**
139:13;176:14;
177:18;186:21;
187:18

**conduct (2)**
34:16;206:15
**conducted (5)**
99:18;186:21;
202:6;207:25;208:9
**confer (7)**
71:21;78:12;88:25;
89:12,25;90:9;191:5
**conference (2)**
25:19;174:20
**conferred (1)**
89:12
**confident (1)**
13:14
**confidential (1)**
99:16
**confidentiality (11)**
30:6;83:23;91:6;
96:16;98:13,16,20;
100:11,12;101:17;
188:20
**confirm (3)**
87:25;172:23;
190:25
**confirmation (9)**
13:25;16:1;17:16,
19,20;35:10,11,12;
115:7
**confirmed (13)**
35:19;36:2;120:19,
25;121:7;122:3,8;
125:24;126:4,5;
160:25;161:4,11
**confused (2)**
136:22;166:15
**confusion (3)**
14:3;46:2;133:16
**connection (37)**
13:6;19:20;53:10;
69:10;70:4,9;85:20;
94:21,24;97:4;99:5,
8;107:18;112:1,25;
124:15,17,24;141:7,
18;157:24;173:16;
174:3;179:5,12;
196:3;222:17;
226:11,16,18,20;
227:19,22,24;228:25;
234:22;235:11
**consent (4)**
31:10,11,17;
170:17
**conservative (2)**
24:19;214:15
**conservatively (3)**
214:10,21,24
**conservator (1)**
50:18
**consider (12)**
17:11;144:10;
159:13;203:3,21;
212:3,13,25;213:12,
16;214:2;220:10

**consideration (7)**
24:23;26:3;58:25;
87:5,12;125:10;
214:9
**considered (5)**
25:20;87:5;117:24;
159:15;215:21
**considering (2)**
171:1;212:2
**consisted (1)**
208:18
**consistent (4)**
124:21;147:22;
192:2;227:2
**constant (1)**
231:2
**constituent (1)**
131:11
**constitutes (2)**
38:5;83:3
**construction (2)**
12:20;13:4
**constructs (1)**
118:2
**consult (1)**
108:2
**consulted (1)**
211:12
**consummation (1)**
93:4
**contact (1)**
190:12
**contacted (1)**
190:15
**contain (2)**
104:9;136:14
**contains (3)**
43:15;44:12;156:7
**contemplated (6)**
15:4;17:14;46:21;
138:16;225:8;233:5
**content (1)**
57:22
**contents (1)**
86:11
**contesting (1)**
92:10
**context (12)**
13:20;114:17,19;
115:1,1,20;116:3;
126:23;130:15;
160:3;204:7;213:19
**continue (3)**
90:9;106:22;
171:23
**continued (2)**
29:12;162:5
**continues (1)**
99:6
**contracts (1)**
42:10
**contractual (1)**
22:7

**contributing (1)**
55:18
**contribution (1)**
164:9
**control (1)**
29:15
**conversation (3)**
107:24;128:24;
207:7
**conversations (7)**
114:3,6,12,20,25;
115:2,19
**conveyed (2)**
186:6,12
**convince (1)**
156:22
**copies (6)**
83:17;132:6,7,7;
169:18;197:24
**copy (19)**
37:23;39:17;79:17;
83:19,21;84:9;85:15;
88:17;94:5;97:12;
149:21;150:22,23;
151:3;161:17,23;
166:4;173:4;197:23
**Coral (1)**
10:24
**core (3)**
152:16;164:18;
165:4
**correctly (5)**
57:11;69:25;
112:14;157:22;
203:13
**cost (6)**
208:19;215:2,9,13;
222:19;236:16
**costs (2)**
121:5;124:17
**counsel (51)**
18:6;44:13;49:1;
50:7,8,22;57:6;72:3;
79:16;93:8;96:19;
97:3;113:4,5,5;114:6,
8,9,11,12;115:22;
119:18,23;120:7,14;
128:25;129:16;
138:14;140:17,21,23,
23,24,25;141:6,12;
143:1;155:3,6,18;
156:6;157:22;
159:11;175:2;
187:19;189:25;
190:2;192:3;211:24;
235:4,23
**counter-designations (1)**
35:15
**counterparties (1)**
42:10
**Countrywide (2)**
32:10;60:19
**couple (3)**

37:14;72:2;188:14
**course (15)**
22:17;91:10,12;
112:2,3;113:14;
121:18;200:4;
204:17;206:8;
207:25;210:18;
213:5;225:7;232:9
**COURT (496)**
12:3,16,17,19,21,
25;13:1,3;17:3,4,19;
19:2,4;21:2,2,6,17;
22:1;23:6,10,20;27:7,
11,15,18,24;28:2,7;
30:3,25;31:7,18,21,
25;32:3,5;33:22,22;
34:1,4,9,10,12,21;
35:10;36:6,7,11,15,
18,21,25;37:4,9,12,
17,23;38:2,12,14,18,
23;39:3,5,10,14,16,
20;40:18;41:17,20,
22,25;42:12,15,15;43:5,
6,17,20,24;44:3,6,9,
16;45:6,8,12,15,19,
23,25;48:6,13,23,24;
49:9,22;50:11,21;
52:8,10,25;53:2,5,7,
9,13,23,25;54:3,14,
16,19;55:12,15;
56:14,17;57:8,10,18,
20;59:20,23;62:18;
66:11;68:8,12,14,16;
69:18,24;71:17,22,
24;72:15,19,23;73:4,
12,14,16,23;74:4,7,
23;75:2,4,8,11,16,19,
21;76:3,5,14,18,23;
77:1,7,10,13,18,21,
25;78:7,10,14,17,24;
79:3,4,7,15;80:1,4,7,
12,16,17,22,25;81:5,
8,12,18,20,24;82:2,7,
10,15,19,25;83:4,6,9;
84:2,6,12,20,25;85:9,
14,18;86:1,7,12,20,
22,25;87:7,10,15,17;
88:2,8,23;89:5,10,19,
22;90:5;91:2,8,11,14,
18,20;93:24;94:1;
95:12,18,22;96:3,6;
98:25;99:25;100:10,
17,21;101:6,15;
103:2,4,21,24;
104:11;105:2,4,7,16;
106:9,16;109:3,6,9;
111:12;112:18;
114:24;115:15,17;
116:12;117:1;118:5;
119:7,21,23;120:1,
10;121:12;122:10,18,
24;123:2,6,11,15,21,
25;125:8;126:6,8;

128:9,12;129:14;
131:13,16,20,23,25;
132:4,10,15,24;
133:4,7,18,20,23;
134:1,9,11,15,23;
135:1,6;136:1,5,7,9,
13,21,25;137:4,7,13,
15,21;138:6,9,10;
142:15,23;145:12;
147:21;148:11,15,18;
150:9,12,19;153:5,9;
154:1,6,17;156:10,
22,25;157:10,15,17,
21;158:9,11;160:12;
161:7,13;162:16,21;
163:1,9,11,18,24;
164:8,17;165:20;
166:13;167:9,20,22;
168:25;169:7,10,23;
170:1,10;171:24;
172:15;173:1,8,24;
174:3,8,11,13,22;
176:5,13,24;177:2,8,
11;178:6,9,22,25;
180:16,21,24;181:1,
4;182:21,24;183:2,6,
8,11;184:22,24;
185:2;186:23;187:1,
5;188:4,8,20;189:9,
10;190:24;191:3,5,
10,12,18;192:6,10,
12,17,22,24;193:6,9,
14,16,25;194:3,8,10,
16,25;195:5,7,13,15,
24;196:8,15,22,24;
197:3,9,12,15,23,25;
198:7,10,12,16;
204:10,19,25;205:5,
22;206:11;209:15;
210:15;211:19,24;
215:5;218:5,7,17,19;
222:24;223:7,13,21;
224:9;225:15,18,24;
227:15;229:8,13,19,
22;230:1,14;233:15;
234:10,15;235:1,15;
236:6,23;237:5,10,
12,24;238:4,7,9,12
**CourtCall (1)**
153:5
**courtroom (2)**
119:14;132:5;
153:6
**courts (1)**
17:5
**Court's (1)**
172:6
**covered (6)**
50:11;116:8;
152:22,22;197:24;
223:22
**CPP (3)**
29:7;46:18,21

**CQS (3)**
9:3;170:11;198:18
**create (1)**
236:10
**creation (1)**
28:18
**credit (6)**
33:3;60:19;64:4,9,
15,19
**creditor (2)**
28:12;125:15
**creditors (8)**
13:13;14:2;17:18;
19:1;21:23;27:5;
115:12;118:10
**critical (2)**
21:14;22:17
**criticism (1)**
21:12
**cross (9)**
59:20;73:14;80:15,
16;135:7;194:6,7;
238:4,7
**cross- (4)**
80:9;91:14;131:16;
196:16
**cross-examination (34)**
36:1;39:14,22;
59:24;91:13,14,21;
102:14;105:7,10;
107:3;108:23;110:3,
4;135:5,10;137:9;
154:1;170:10,13;
174:17;188:4;
191:10;193:24,25;
196:14,15;197:19;
198:16,19;223:8,9,
22;234:11
**cross-examine (1)**
71:18
**cross-reference (1)**
88:19
**CS (4)**
217:20;218:4;
225:15;235:24
**cumulative (1)**
223:22
**current (4)**
21:22;28:13;118:2;
124:7
**currently (7)**
40:5;49:3;182:12;
220:25;231:5;233:5,
21
**curriculum (1)**
198:6
**custodial (1)**
124:14
**customized (1)**
236:10
**cut (3)**
23:20;32:15;33:4
**cutting (1)**

233:23

## D

**damages (6)**
127:5;131:2;
219:15,17,18,20
**data (12)**
204:10,12,20,22;
205:7,9,11;212:4,13;
213:3;218:9;223:2
**date (26)**
31:1;39:12;48:10,
17;79:1;80:21;90:15,
17,19,21,23,25;
97:21;134:21;135:3;
170:5,8;174:24;
187:7,10;193:20,22;
196:2,12;198:15;
237:19
**dated (8)**
12:9;37:7;79:11;
83:15;96:23;97:21,
25;167:13
**DAVID (4)**
8:25;28:11;174:15;
223:15
**DAY (4)**
6:18;21:8;36:13;
196:24
**days (3)**
18:24;35:2;167:13
**de (1)**
10:22
**deadlines (1)**
74:14
**deal (14)**
25:5;26:24;35:3,5;
36:2;49:12;77:10;
80:4,22;83:6;85:15;
103:19;156:22;
186:11
**dealing (3)**
31:13;34:19,19
**deals (4)**
43:4,4;61:17;66:23
**dealt (2)**
114:25;151:16
**Deanna (2)**
13:3;103:21
**Debenture (1)**
19:9
**debt (2)**
212:8;213:4
**debtor (4)**
14:4,11;82:11;
125:2
**debtors (66)**
12:7,9;13:13,17;
14:1,18;15:7,14,16,
23;16:4,14,16,18,19;
17:9,17;18:1,6,25;
21:23;22:11,18;35:6;

71:8;78:6,22;80:21;
86:9;92:10;96:18;
97:3,15;99:10,17;
100:13,18,22,24;
101:1,11,18,21,25;
102:3,6,9;104:13;
106:18;124:10;
130:2,6,8,13;131:3,9;
132:21;138:14;
139:8;164:5;169:5;
191:21;195:3,19;
197:5;219:5
**debtors' (53)**
12:7;13:10,13;
14:2;17:17;19:1;
79:8;81:17,23,23;
82:13,13;90:15,16,
18,21,22,25;96:11;
102:18;124:7,19,22;
126:24;130:6;131:8;
134:20;135:3;152:4;
169:20,21;170:5,7;
191:22;192:20,25,25;
193:1,1,1,2,2,2,3,3,3,
8,20,22;195:18;
196:2,11;198:15
**Debtor's (1)**
192:21
**decapitates (1)**
24:22
**December (1)**
28:24
**DECHERT (1)**
7:13
**decide (1)**
156:25
**decided (3)**
25:21;95:6;214:7
**decides (1)**
156:10
**deciding (1)**
129:12
**decision (19)**
78:20;85:15;
107:18;113:11,16;
120:12,14;132:6;
135:23;143:11;
155:22,24;156:1,2;
157:3,9;159:18,19;
164:25
**decision-maker (2)**
107:7,25
**decision-making (1)**
107:14
**decisions (2)**
154:21;155:9
**declarants (1)**
26:18
**declaration (28)**
37:1,22;38:12,15,
17;39:11;50:21;58:8,
11;80:20;85:23;
113:23;127:5;

133:13;134:3,3,6;
135:2;149:2;169:24;
170:4;184:17;185:3,
6;186:10;189:6,8,13
**declarations (9)**
36:24;85:19;86:11;
90:22;111:21,25;
112:5,9,24
**declaratory (1)**
23:19
**decode (1)**
237:1
**decrease (1)**
72:11
**defendant (2)**
82:12;220:22
**defendants (1)**
81:21
**Defendants' (11)**
81:14,14,15,15,16;
82:4,4,5,5,5;192:20
**Defendant's (2)**
81:13,16
**defense (1)**
124:17
**defensive (1)**
81:23
**defer (1)**
35:3
**deferral (1)**
20:2
**deferred (2)**
103:9;105:19
**deficiency (1)**
20:15
**defined (5)**
16:8;34:5;99:11,
11,16
**defines (1)**
138:8
**definition (2)**
88:20,22
**degree (1)**
219:22
**delay (2)**
48:17;173:12
**deliberations (1)**
25:23
**delta (1)**
180:23
**demand (2)**
23:19;130:24
**demanded (2)**
22:1;28:25
**demonstrate (1)**
12:15
**demonstrates (1)**
18:17
**demonstrative (1)**
122:13
**denial (1)**
26:13
**denied (3)**

71:15;95:16,20
**deny (1)**
30:18
**Department (9)**
28:25;29:2;41:3;
47:14,15,16,20,25;
74:15
**depended (1)**
165:7
**depending (6)**
20:11;49:5;73:7;
118:6;151:16;236:18
**depends (9)**
66:23;228:20;
232:2,4,5,16,18,25;
233:1
**depo (2)**
108:9;227:15
**deposed (3)**
38:14;182:13;
227:8
**deposition (57)**
35:24;38:16;41:13;
42:6;43:10,14,21;
52:24;54:4;56:21;
57:4,11,13;60:2;
93:10,24;94:5,12;
105:21;108:24;
109:3,25;110:21;
111:6,20;112:14;
113:10,22;117:21;
118:14;126:21;
128:23;129:10;
145:6,13;146:16,22;
147:1,6;180:20;
182:24;185:1;
187:12,13,14;194:5,
6,14;196:20;202:16;
209:11;216:2,10,18;
218:7;227:11,16
**depositions (1)**
121:5
**deputy (2)**
132:5;153:6
**derail (1)**
172:10
**derived (3)**
206:22;212:17;
226:2
**deriving (1)**
210:19
**describe (4)**
14:4;112:13,15;
180:8
**described (8)**
13:22;15:17,23;
63:21;89:24;157:4;
208:9;234:24
**describes (1)**
229:24
**describing (1)**
179:17
**description (2)**

90:2;236:2
**designated (1)**
    35:24
**designation (1)**
    42:1
**designations (5)**
    35:14,14;194:5,14;
    196:20
**designed (2)**
    22:2;23:20
**desire (1)**
    156:15
**desk (1)**
    133:15
**Despite (2)**
    27:5,6
**detail (1)**
    220:10
**detailed (2)**
    41:7,9
**deterioration (1)**
    73:2
**determination (9)**
    109:13;111:19;
    113:1;114:21;
    118:16;128:22;
    135:20;141:22;
    208:15
**determine (7)**
    51:10,22,24;75:13;
    103:10;108:6;208:4
**determined (7)**
    60:10;63:10;166:7;
    167:2,15;179:22,22
**determining (1)**
    212:16
**Detroit (1)**
    73:4
**develop (9)**
    207:19,20,22,24;
    208:3;209:12,18;
    223:18;235:19
**developed (6)**
    200:4;207:8,15;
    219:8;220:20;227:21
**developing (1)**
    40:22
**DEVORE (1)**
    9:18
**devoted (1)**
    210:13
**differences (4)**
    30:9,10;146:9;
    147:16
**different (14)**
    84:15;86:13;
    103:25;110:1;113:3,
    4;129:15;148:19;
    183:10;197:21;
    209:22;210:14;
    221:17;234:4
**difficult (1)**
    16:17

**digest (2)**
    202:8,14
**dime (1)**
    67:12,24;68:3,21
**dire (1)**
    80:14
**direct (59)**
    19:23;57:18,20;
    79:10,24;80:5,18,20;
    85:24;87:3;91:25;
    121:6;124:18;127:6;
    136:3;142:2;148:24;
    150:17;152:3,7;
    155:21;156:14;
    157:5;169:18,19;
    184:17;185:5;
    191:23;192:5,7,9;
    193:18;195:19,21,22,
    25;196:1,4;197:19;
    198:13,14;199:3,4;
    201:17;213:7;
    217:23;224:6;
    226:11,16,20;227:11,
    22,23;230:6;234:24;
    237:13,16,19;238:4
**directed (3)**
    89:11;129:3;156:6
**directing (2)**
    94:10;227:12
**directions (1)**
    91:9
**directly (4)**
    99:13;189:24;
    205:18;216:13
**directors (4)**
    103:9;107:10,15;
    124:8
**disagree (2)**
    217:1;218:21
**disapproves (1)**
    154:17
**disc (1)**
    204:12
**discerned (1)**
    146:10
**disclosed (2)**
    30:7;50:9
**disclosing (2)**
    99:12,12
**disclosure (31)**
    29:19,19,21;30:2;
    31:5;40:9,12,18,22;
    41:6;42:23;43:15,15;
    44:12,12,15,23,24;
    45:21;48:6;50:12;
    58:2;77:3,5,7,13;
    122:14;123:3,12;
    177:9;221:13
**disclosures (1)**
    221:4
**disconnected (1)**
    153:6
**discount (40)**

178:21;179:4,11,
    13,21;199:8;203:22;
    204:1,4,6,8;207:13,
    16,17,24,25;208:2,3,
    5,8,15,17,25;209:13,
    18;210:4,8,19;211:1,
    11;212:2,10,17;
    213:8,17,20,22;
    216:6;222:13,18
**discounting (1)**
    207:13
**discounts (1)**
    213:16
**discovery (3)**
    12:14;32:23;83:12
**discrimination (1)**
    24:4
**discuss (5)**
    21:11;58:17;
    117:21;185:23;
    228:11
**discussed (9)**
    32:7;49:25;104:23;
    149:10,13;151:21;
    203:22;222:3;231:12
**discussing (8)**
    13:8;50:4;58:20,
    22;72:3;100:12;
    104:5;141:8
**discussion (21)**
    30:12;38:21;42:24;
    113:4;149:15,21,22;
    150:3,23;151:4;
    152:25;153:11,12,14,
    21;181:17,18,25;
    213:19;214:6;228:17
**discussions (13)**
    30:5;32:6;35:1;
    47:25;48:3;95:4;
    98:11;102:24;116:6;
    188:16,18;205:19;
    207:8
**dispute (3)**
    23:14;27:7;127:11
**disputes (1)**
    161:2
**disregard (1)**
    214:7
**dissatisfaction (1)**
    20:20
**dissatisfied (1)**
    20:9
**distraction (1)**
    121:5
**distressed (2)**
    208:12;216:16
**distribute (2)**
    78:9;164:24
**distributing (1)**
    169:18
**distribution (2)**
    20:7;152:20
**distributions (8)**

152:4;153:11,21;
    160:25;161:14;
    163:7;164:5,12
**doc (1)**
    158:13
**docket (6)**
    12:11;16:10;79:11;
    123:13;192:1;195:20
**Doctor (7)**
    197:6,10,10;
    198:21;205:8;206:3;
    234:9
**document (38)**
    43:17;45:23;46:11;
    64:22;79:18;82:23;
    83:11;84:3,4,17;
    88:18;89:3,7;96:9;
    109:25;123:24;
    128:21;129:11,16;
    131:1,7;134:4;
    135:17;137:18,25;
    149:19;150:1,6,18;
    151:10,11;166:5;
    167:7;181:6;201:23;
    202:18,24;205:4
**documentation (1)**
    18:16
**documented (1)**
    79:6
**documenting (1)**
    79:6
**documents (32)**
    20:23;59:14;63:24;
    65:9;66:16;83:14;
    85:6;86:5,16,16,18,
    18;88:12;89:1,15;
    90:3,11,24;108:10,
    20;112:2,7;113:4,15,
    20,20;131:11;134:3;
    148:3;149:8;172:20;
    173:13
**dollar (10)**
    33:15;54:13,22;
    106:5,21;116:22;
    130:7;184:11;
    206:24;207:4
**dollars (70)**
    14:10,17,22;15:6;
    16:6;20:2,5,12;
    21:22;24:17;25:25;
    26:1;28:15;31:14,14;
    59:2,10,12;60:24;
    62:1,13;63:5;64:4,
    18;65:7;68:20;69:16,
    21,22;70:12,24;71:1;
    72:25;73:7;74:22;
    102:1;117:19;121:9,
    15,20;127:16;128:3;
    129:20,22;130:12;
    131:4,9;144:15,18,
    24;152:8;177:4;
    181:23;182:1,5;
    184:3;214:13,14,15,

23;219:18;220:13;
    224:1,13,20,21;
    226:1,5;230:19;
    232:13
**dollars' (1)**
    121:13
**done (17)**
    31:15,17;33:3,6;
    57:15;104:18;105:3;
    159:20;188:2;
    209:19,22;211:12,14;
    215:13;222:4;
    234:12;235:18
**double (2)**
    34:19,19
**down (10)**
    33:9;35:16;53:21;
    54:11;59:8;83:1;
    161:21;188:6;
    218:10;231:3
**downturns (1)**
    73:9
**Dr (21)**
    127:18;195:3,19,
    20;196:1,3,14;
    197:11,18;198:14,23;
    219:10;223:11,17,25;
    224:12;230:3,25;
    232:7;234:20;238:10
**draft (21)**
    32:19;83:19,24;
    84:9,15,16;146:3,6,7,
    9,10;147:13,14,15,
    16;148:5,6,12,21;
    166:16;180:13
**drafting (3)**
    142:25;143:2,4
**drafts (4)**
    142:20,24;147:13;
    148:10
**draw (3)**
    42:4;60:2;123:18
**drive (1)**
    33:9
**DRYE (1)**
    9:21
**Dubel (24)**
    17:24;36:14,16;
    37:7;39:11,24;40:2;
    41:13;45:15;49:21;
    53:14;54:20;56:20;
    57:24;58:3,7,8;60:1;
    72:2;73:19;75:1,7,
    17;78:2
**Dubel's (1)**
    39:7
**due (12)**
    22:7;30:14;57:6;
    58:14;59:2,10;69:10,
    16;70:4,9;72:11;
    213:5
**Duff (105)**
    18:9;25:8,19;

92:15,23;141:14,18,
21,24;142:10;143:8,
10,11,12,19;145:10,
15,18,23;149:11,12,
15,22;150:4,23;
151:22;152:11,21,25;
153:12;155:16,25;
159:20;161:22;
166:10,22;174:20;
175:1;178:12;
179:18;180:13,17;
181:17,25;182:4;
184:10;185:21,23;
186:6,7,12;187:8;
198:24;199:2,8,9,10,
17;200:1,4,25;
201:18;202:3,5;
203:14,17,21;204:2,
8;205:15,22,23;
206:4,15,18;207:2,7,
11,17;208:2,18;
212:3,17;213:8;
218:24;221:7,22;
222:1,3,6,9,20;223:1;
225:5,13;226:9,17,
22;227:4,19;228:4;
230:12;234:22;
235:13,18
**Duff's (1)**
168:12
**duplicate (1)**
234:21
**during (26)**
25:18;26:25;27:7;
42:6;47:23;52:24;
77:11;83:11;89:25;
90:9;94:11;95:3;
101:16;103:6;112:2,
3;146:18;150:3;
153:12;168:12;
174:25;180:8;
181:17,25;185:24;
200:4
**duties (3)**
139:16;142:4;
155:17
**duty (1)**
24:1
**D'Vari (9)**
18:12;127:18;
195:4,19,20,25;
196:1,11,14
**D'Vari's (1)**
196:4

**E**

**Earlier (8)**
72:3;93:10;166:21;
168:5;180:18;
206:16;218:15;222:4
**early (1)**
52:16

**easier (1)**
122:16
**easiest (1)**
158:4
**East (3)**
6:4,20;8:22
**easy (1)**
146:22
**EATON (76)**
9:8;21:20;80:2,2,5,
6;81:9;82:19,21;
83:2;84:12,13;85:12;
86:1,2,8;91:22,24;
95:25;96:1,6;101:2,
7;102:13;110:6;
134:25;135:7,8,8,11;
136:22,24;137:2,5,
12,14,22;147:23;
150:11,15;153:9,25;
157:8,11;158:1,5;
160:11;161:5,20,20;
162:15;163:8,17;
164:7,16;165:21,23;
167:11,19;198:11,16,
17,17,20;205:5,6;
209:17;212:1;223:6,
22;235:14;236:22;
237:4,9,23;238:8
**Eaton's (3)**
90:11;210:15;
211:19
**ECF (3)**
80:19;169:23;
192:6
**Eckstein (2)**
114:13,14
**economic (2)**
34:3;201:4
**economically (1)**
234:1
**economics (1)**
102:10
**effect (3)**
30:20;31:2;101:17
**effective (9)**
15:5;17:3,5;30:25;
31:3;48:10,17,22;
49:2
**effectively (2)**
24:22;33:23
**effort (5)**
42:7;46:6;164:20;
172:14;177:3
**efforts (4)**
28:22;61:19;63:2;
171:14
**eight (1)**
204:15
**Either (22)**
26:2;42:13;88:7;
116:23;129:23;
139:11;142:13,18;
143:13;150:21;

151:10;153:16;
160:16;167:17;
197:11;201:2;
206:21;207:4,20,21;
213:1;219:16
**electronically (1)**
204:12
**element (1)**
64:3
**elicit (1)**
86:10
**ELLIS (1)**
6:2
**else (15)**
19:4;27:10;38:19,
21;55:10;71:17;
74:23;104:7,14;
109:19;114:15;
133:17;186:20;
187:17;238:9
**e-mail (4)**
83:12,13;84:5,11
**e-mails (2)**
148:4,20
**EMMA (3)**
9:9;21:20;170:11
**employ (1)**
210:25
**employed (2)**
117:3;154:11
**employee (1)**
83:13
**employees (7)**
107:20,22,22,23,
23;108:5,6
**end (10)**
22:10;27:1;37:22;
38:5,21;39:1;47:11;
65:12;83:20,21
**endeavor (1)**
235:10
**ended (1)**
208:23
**ending (1)**
74:13
**engaged (4)**
25:4;92:18;103:14;
186:7
**engagement (1)**
103:23
**engaging (1)**
12:13
**enhancement (3)**
64:5,9,20
**enhancements (1)**
64:15
**enormous (1)**
121:10
**enough (8)**
24:14;47:1;52:9;
53:4;57:9;107:6;
164:1;183:20
**ensue (1)**

118:18
**ensures (1)**
17:6
**entails (1)**
207:12
**enter (17)**
19:10;25:21;98:16,
20;107:18;108:3,6;
111:19;113:11;
114:21;118:16;
129:12;138:24;
141:22;156:11;
170:22;172:5
**entered (19)**
28:5,20,21;30:6;
50:3;52:18;53:7;
76:12;84:17;87:5;
104:9,24;112:25;
119:9;124:14;
127:19,24;133:5;
164:18
**entering (12)**
19:18;22:14,19;
25:11;31:8;87:13;
98:13;114:2;115:17;
116:7;128:22;170:18
**entire (5)**
44:14;84:2;134:4;
169:22;205:10
**entirety (2)**
77:14;84:17
**entities (2)**
22:22;27:5
**entitled (11)**
20:24,25;53:25;
57:20;66:20;68:19;
124:8;138:6;142:3;
168:14;229:18
**entitlement (2)**
20:7;23:4
**entry (8)**
22:8;23:15;48:9;
79:11;145:24;175:5,
10;195:20
**equal (3)**
14:22;55:10;104:7
**equally (1)**
24:3
**equitable (4)**
13:12;18:25;24:2,
24
**equity (3)**
24:6;124:15;212:6
**equivalent (1)**
222:15
**errata (7)**
109:25;110:8;
111:2;112:12,16;
113:10;129:10
**error (3)**
97:24;112:13,15
**ESPANA (1)**
7:20

**ESQ (27)**
6:7,15,23,24,25;
7:7,8,9,10,18,19,20,
21;8:6,15,16,17,25;
9:7,8,9,17,18;10:1,9,
18;11:1
**essence (1)**
23:19
**establish (4)**
22:12;84:8;88:14;
89:20
**established (1)**
62:12
**establishing (1)**
24:5
**estate (11)**
20:5,7;21:24;27:4,
5;104:18,21;121:22;
125:22;130:10;152:5
**estates (14)**
13:14;14:2;16:21;
17:17;19:1;106:6;
120:17,21;121:1,14,
15;124:19;125:2;
126:25
**estates' (2)**
115:11;121:16
**estimable (4)**
60:10;63:10;66:11;
220:24
**estimate (9)**
54:8;60:8;61:13,
24;65:21;69:9,15,22;
70:3
**estimated (11)**
63:22;65:7;66:15;
70:8;228:21;230:18,
20;231:1;232:8,12,15
**estimates (2)**
61:19;180:5
**estimating (2)**
199:12;218:25
**evaluate (2)**
113:16;186:13
**evaluated (2)**
25:18;118:17
**evaluating (3)**
19:22,24;152:15
**evaluation (3)**
61:9;67:7;68:9
**even (9)**
22:10;23:20;24:11;
26:5,24;30:20;34:3;
111:6;116:17;
117:25;167:8;203:6;
205:12;211:11;
214:15;221:22;
226:25;232:16,20
**event (5)**
28:3;120:19,25;
121:6;122:2
**Eventually (2)**
30:15,23

12-12020-mg    Doc 4759    Filed 08/19/13    Entered 08/20/13 15:07:54    Main Document
RESIDENTIAL CAPITAL, LLC, et al.
Pg 252 of 273
Case No. 12-12020-mg

August 16, 2013

**everybody (3)**
78:17;85:14;
133:17
**everybody's (2)**
130:10;191:7
**everyone (1)**
216:7
**evidence (60)**
12:15;13:14;14:5,
7;16:2;18:20,23;
19:19;22:25;23:6;
29:25;31:15;32:14;
36:5,8;37:1,11;
39:11;62:17;75:2,14;
77:22;79:20,25;
80:19,21;84:18;85:4;
86:10;87:22;89:23;
90:5,11,14,16,18,20,
22,24;133:9;134:17,
19;135:1,2;170:3,4,6;
191:1;193:17,20,21;
194:17,20;195:25;
196:2,10,11;197:22;
198:13,14
**evidentiary (1)**
22:12
**exact (6)**
49:11;50:14;
185:22;187:9;227:1;
232:17
**exactly (4)**
49:10;58:8;71:6;
172:17
**examination (19)**
26:21;57:8;71:25;
74:9;80:10,18;103:5,
8;117:18;126:8;
131:17;154:3;163:2;
165:21;167:23;
188:9,12;196:17;
234:18
**examine (3)**
38:10;91:15;
162:22
**example (5)**
130:2;200:7,10;
226:24;232:7
**exceed (1)**
20:14
**exceeded (3)**
20:20;24:10;33:8
**exceeds (1)**
28:14
**Excel (3)**
204:14,19;205:2
**excellent (1)**
236:9
**except (1)**
104:23
**excerpt (2)**
77:9;123:11
**Excerpts (1)**
134:4

**excess (3)**
15:8;152:8;214:16
**exchange (3)**
16:25;101:22;
144:24
**excluded (4)**
61:21;62:9,14;
203:24
**excludes (3)**
24:13,14;61:13
**exclusion (1)**
26:13
**exclusively (1)**
116:4
**exculpate (1)**
23:11
**Excuse (13)**
31:2;33:25;47:14;
52:14;81:16;88:12;
127:9;160:16;
174:23;179:7;
180:11;193:7;227:12
**excused (8)**
78:2;131:23;
132:11;169:2;
191:12;194:25;
196:22;238:10
**execute (2)**
113:1;128:22
**executed (3)**
98:3;107:8;145:17
**execution (3)**
188:25;189:18,21
**executive (5)**
17:24;18:12;36:14;
40:5;162:5
**executives (2)**
205:20;222:4
**exercise (4)**
30:13;109:14;
207:12;208:24
**exercised (1)**
107:16
**exercises (1)**
215:14
**Exhibit (179)**
39:12;41:18;42:3;
43:23,24;44:1,5,6;
45:2,7,18,22;75:5,7,
12,19;76:4,8,9,23,25;
77:2,2,4;79:21,23;
80:21;81:11,13,14,
14,15,15,16,17,23,23;
82:4,4,5,5,6,13,13,22;
83:8;85:10;87:19;
90:15,21;93:21,23;
94:5;96:11,11,14;
97:6;98:2;99:4;
100:11;101:3,9,9,17;
108:23,24;109:6;
122:14,17,18;123:2,
3;133:13,16;134:2,5,
5,5,6,6,7,23;135:3;

136:19;137:11,14,20,
21;138:13;146:23;
149:18;151:1;
153:16;158:6,8;
161:21,23;165:24;
167:7,25;168:5;
169:20;170:2,5;
173:2,4;177:22;
178:2,4,4,7,8,11;
180:12,15,18,19,19,
22;183:6,7;184:21,
22;189:11,12;192:16,
16,20,21,25,25;
193:1,1,1,2,2,2,3,3,4,
8,20;194:20;196:2,6,
6;197:19,21;198:2,3,
7,12,15;201:25;
202:2,9;216:20,22;
217:20;225:15,17,18,
18,19,21,24;227:7,7;
229:4,6,12,13,15,17;
230:5,14,15;231:12;
235:24
**exhibits (62)**
17:23;37:8;42:1;
45:7;58:9;75:3,4,5,
18;76:7,8;78:15;
79:19;80:3,23;81:3,
10;82:20,22;83:1,2;
85:17;87:22;88:4,12;
89:12,13;90:6,17,19,
23,25;110:4;112:6;
122:24;132:23;
134:14,16,19,20;
137:9;169:19,21,21,
25;170:6,7;191:1,6;
192:14,15;193:16,21,
22;196:4,9,11,12;
197:20;198:5,8,13
**exist (2)**
27:22;167:8
**existence (1)**
98:7
**exists (1)**
228:14
**expected (12)**
24:9,21;131:2;
143:21;144:1;
181:19;184:5;
199:12;213:9;
218:25;224:2,13
**expenses (1)**
20:3
**expensive (3)**
16:20;63:4;118:24
**experience (4)**
18:7;40:9;65:24;
120:11
**experienced (3)**
40:2;73:9;209:8
**expert (28)**
18:9;26:19;32:16,
16,24;38:5,6,11;39:8;

58:22;142:9;143:11;
144:5;164:19;165:3;
195:23;197:6;203:2,
3,7;209:1;215:12;
230:23;235:11,22;
237:7,16,19
**explain (2)**
32:25,25;59:8;
72:23;79:14;214:8
**explanation (1)**
211:24
**exposure (5)**
72:25;73:4,8;
124:22;130:16
**exposures (2)**
73:20,21
**expressed (1)**
237:16
**extending (1)**
79:1
**extensive (1)**
12:14
**extensively (1)**
40:21
**extent (11)**
61:1;65:13,15;
67:23;69:2;90:1;
105:21;111:8;
124:16;140:20;
228:18
**extraordinarily (1)**
215:17
**extraordinary (1)**
21:25
**extreme (3)**
32:23;33:1;200:10

## F

**face (5)**
21:22;23:7;28:13;
33:2;233:24
**faced (1)**
16:16
**facilitate (1)**
30:5
**facing (2)**
121:11,14
**fact (40)**
19:24;20:23;24:13;
25:3;27:6;32:17;
34:14;39:9;41:10;
43:4;50:7;57:6;
70:21;83:24;86:4;
88:14;89:8;93:3;
113:13;116:4;
118:19;126:17;
139:13;141:6;
159:21;164:22;
170:21;171:6;
187:23;208:11;
212:19;215:12,16;
217:9;224:19,25;

228:10,13,24;231:23
**factors (10)**
18:18;55:19;61:25;
62:1;214:2;215:21;
216:15;221:2;
233:22;236:24
**facts (11)**
25:7;26:20;28:6;
62:16;215:3,10,15,
18,19;236:17,21
**factual (1)**
220:4
**faculty (1)**
209:7
**fair (18)**
13:12;18:19,24;
24:2,23;47:1;52:9;
53:4;57:9;64:1,2;
107:6;164:1;171:24;
207:25;209:25;
210:3;233:12
**fairly (1)**
24:3
**fairness (1)**
24:6
**faith (9)**
19:16;22:16;25:12,
22;33:16;34:15,20;
138:18;201:14
**faithful (2)**
227:5;228:1
**fall (2)**
26:1;200:8
**falls (2)**
199:25;225:3
**familiar (1)**
13:7
**far (7)**
71:9;148:11;
214:16,18;215:15,19;
231:5
**Fargo (36)**
8:2;18:1;19:9;
133:11,14;135:13,14,
19,21;140:24,25;
141:3,11,14,17,21;
142:3,7,12,17,20;
143:3;154:10,11,13,
17,20;155:9,12,23,
24;156:1,15;159:20;
197:18;234:20
**Fargo's (2)**
142:25;147:8
**FARR (10)**
9:2;21:18;96:21;
97:18;98:10,19;
99:21;100:2;135:8;
198:17
**fashion (3)**
107:24;148:2;
234:5
**faxing (1)**
78:20

**February (2)**
102:21;103:15
**feelings (1)**
156:19
**feet (1)**
157:11
**fell (2)**
22:20;200:3
**fellow (1)**
233:3
**felt (1)**
212:22
**feverishly (2)**
28:24;29:13
**few (5)**
35:2;54:11;163:4;
208:12;209:24
**FG (3)**
44:5,7,8
**FGIC (328)**
6:19;12:9,10;14:9,
12,14,16,19,23,25;
15:5,9,14,15,25;16:3,
12,17,18,22,23,23,24;
17:1,3,25;18:2,3,5,
10,15;19:12,13,14,
15,20,23,25;20:3,6,6,
13;21:8,13,15,22;
23:24,25;24:8,15;
26:23;27:12;28:12,
21,23;29:13,17;30:8,
17;31:8,14;32:12;
33:3,13;36:13,14;
40:5;41:4;42:10;
43:7;45:20;47:6,9,
13;48:5,17;52:6,19,
23;53:7,8,12,19;55:4,
7;56:5;58:14,18;
59:1;60:7,9,23;61:1,
10,10,19;62:6;63:9,
22,24;65:7;66:15,20;
67:3,12;68:2,19;69:4,
10;70:4,8,9;71:3;
73:19;74:12;79:1;
83:19,22,25;84:9,15,
23;85:5;87:6,13;
89:9;91:25;92:2,4,8,
11,12,13,16,25;93:4,
6;100:5,5;101:4,10,
19,21,22,25;102:10;
103:12,16;104:2,8,9,
16,19,25;106:1,4,17,
22;107:8;108:14;
109:11,12;111:19;
115:1,5,10;116:11,
20,24;117:5,22,25;
118:25;120:16,20;
121:19,23;122:3,6,7;
124:25;125:5,11,21;
126:5,17,23;127:12,
15,24;128:4,19;
129:10,17,23;132:16;
135:12,20;136:3,4,8,

14,16;138:2,11,13,
24;139:4,10,14,17,
23;140:11,12;141:7,
9,19,22;142:8,13,18,
20;143:4,7,22,23;
144:2,3,22;145:4,24,
25;146:4,10,13;
147:8;148:25;149:7;
151:21;153:4,22;
160:9,24;163:6;
164:6,21,25;165:12,
13;166:4,7,9;167:5,
16;170:18,22;171:2,
14,17,18,21,24;
172:5,6,10,14,21,21;
173:17,19,23;174:4,
5;177:11,13,18;
178:18,24;179:1;
182:8,12,20;183:22;
186:22,24;187:18;
189:18,24;190:3;
192:18,19;193:11;
199:13,14,22;200:19;
201:4,9,9;203:13;
204:5;206:23,25;
207:4;208:11;212:5,
14;213:13,19;
214:23;215:3;219:5,
11,19;220:6,12,17,
21;221:10;224:16;
225:8;226:3;234:3,6,
22;236:21,25;237:2
**FGIC/ResCap (2)**
49:18,22
**FGIC-insured (3)**
19:12,17,18
**FGIC's (17)**
24:18,20;28:11;
30:13;33:4;39:12;
42:7;46:6;56:2;
63:19;69:9;70:3;
120:24;122:11;
151:20;213:10;219:1
**FH (1)**
146:23
**FHFA (4)**
50:16,18,22;51:10
**FI (3)**
183:8,9,13
**fiduciaries (1)**
22:16
**fiduciary (2)**
86:15;142:4
**fight (2)**
35:3;132:7
**fighting (1)**
25:10
**figuratively (1)**
205:11
**figure (3)**
197:1;207:4;237:1
**figures (1)**
211:7

**file (1)**
120:25
**filed (27)**
14:9,14;16:10;
22:6;29:19,20;40:17;
48:5;71:7,7;74:15;
79:11,18;85:20;86:4;
88:5,15;123:24;
151:25;160:20;
169:23;192:1,19;
193:11;194:15;
195:20;237:13
**filing (1)**
30:1
**filings (2)**
12:18;13:6
**fill (1)**
36:1
**final (4)**
29:14;146:7,11,12
**finalization (3)**
53:16;55:1,1
**finalize (1)**
30:21
**finalized (1)**
29:18
**Finally (5)**
17:9;25:24;122:1;
134:13;203:22
**finance (5)**
73:1,2,10,23,24
**Financial (39)**
6:3;18:10;25:8;
29:1,2;41:1,3;47:16;
58:20;59:4;62:15,20;
65:21;70:13;74:1,11,
12;92:15,19;142:7;
143:6;154:16,19,21;
155:1,9,12,18;
164:19;165:3;
207:10,15,19;209:4;
214:22;215:18;
221:24;222:20;223:1
**financially (3)**
208:12;216:16;
235:21
**find (15)**
19:11,13,15;20:18,
18;22:18;61:25;
150:16;158:4,9;
161:17;164:23;
182:24;183:2;217:24
**finding (2)**
138:16;139:25
**findings (20)**
18:21;21:25;22:1,
2,9,17;23:5,11,16,18;
26:14;28:4;33:21,22;
34:4,12,20;139:1;
140:5;156:7
**fine (7)**
53:24;86:6,19;
133:19;178:25;

192:13;197:9
**finish (3)**
34:17;106:9;230:3
**finished (2)**
106:12;166:13
**finite (1)**
33:6
**firm (8)**
18:13;30:22;50:25;
99:13;174:15;
213:19;215:17;
221:12
**firm- (2)**
214:1;216:14
**firms (1)**
98:16
**firm-specific (1)**
210:24
**First (41)**
14:7;23:6;30:4;
36:11,13,22;63:21;
64:10;65:6,6;66:14;
69:7;79:24,25;80:4;
82:22,25;86:22;
96:20;97:10,24;99:3;
105:23;110:15;
123:20;124:5,5;
144:6,13;145:3;
162:1,7;168:19;
177:7;201:16;
208:18;210:9;213:6;
229:14;233:22,24
**firsthand (1)**
18:7
**first-to-pay (1)**
64:16
**fit (1)**
166:24
**five (6)**
21:20;134:3;
202:22,25;235:6,8
**fix (1)**
35:13
**fixed (3)**
231:7,20;234:3
**FL (5)**
10:24;93:21,23,25;
94:5
**flip (2)**
229:17,23
**Floor (7)**
8:12;10:15,23;
14:12,20;15:11,12
**flow (13)**
65:25;203:10,15,
19,23;206:2,17;
214:15;222:5;
223:18;226:25;
228:16;234:6
**flows (15)**
63:25;203:4,12,19,
24;204:13;207:12,13,
14,23;214:9,20;

222:11,16;226:23
**FM (1)**
216:20
**focus (10)**
23:6;34:25;35:18;
36:1;105:18,20;
117:17,19;164:19;
186:23
**focusing (1)**
113:7
**Foerster (13)**
12:6;78:22;97:1,3,
14;98:10;109:15;
132:21;169:5;
191:21;195:3,17;
197:5
**folios (4)**
204:15,20,23;
205:3
**follow (3)**
73:15;163:4;
203:17
**followed (4)**
206:1,18,25;227:4
**following (18)**
17:24;23:5;30:1;
75:18;80:3;82:21;
90:5;109:10;137:19;
145:23;146:3;
188:21,25;189:18,21;
216:25;217:1,1
**follows (1)**
218:10
**follow-up (1)**
177:17
**foot (1)**
229:15
**footnotes (1)**
70:14
**foregoing (1)**
151:20
**forget (1)**
77:21
**forgiven (1)**
70:20
**form (11)**
44:14;55:11;56:13;
62:16;72:14;119:8;
125:4;127:1;138:12,
13;210:5
**formed (3)**
29:4;126:12,15
**former (1)**
124:8
**forming (2)**
111:18;113:11
**formula (1)**
231:9
**formulate (1)**
223:17
**formulating (2)**
213:13,17
**forth (2)**

139:13;232:13

**forty (8)**
32:17;165:16;
180:4;231:24;233:2,
9,13,19

**forty-five (2)**
128:3;129:19

**forum (1)**
23:21

**forward (5)**
17:13;21:3;48:4;
71:3;121:10

**forwarded (1)**
83:19

**fought (1)**
130:5

**found (3)**
150:11;161:24;
183:14

**foundation (2)**
26:20;38:20

**four (11)**
82:21;127:16,23;
128:6;129:22;
130:12;131:4,9;
199:15;202:7;234:25

**four-and-a-half-billion-dollar (1)**
128:6

**fourteen (2)**
60:20;81:3

**Fourth (3)**
17:2;25:13;124:12

**four-year (1)**
34:16

**frame (1)**
165:17

**Franklin (2)**
159:9,10

**frankly (2)**
89:6;216:2

**fraud (1)**
131:11

**Freddie (36)**
8:10,21;28:9,11,12,
13,17,20,22;29:12;
30:7,11,18,22;34:13,
16;47:8,25;50:1,19;
51:14,18,21;52:18;
53:10;72:3;174:16;
175:4,8;183:24;
184:7;190:6,6;194:2;
196:16;223:15

**free (4)**
106:22;121:1;
122:3;126:5

**Fresh (1)**
61:5

**front (22)**
43:5,6;44:25;58:3;
64:17;79:13,13;
82:14;136:2,22;
165:25;168:3;
177:22;181:1,2;

184:18;185:4;192:4,
4;202:1;229:8,21

**FTI (3)**
115:25;116:2,6

**fulfilling (1)**
142:4

**full (11)**
33:19;66:22;67:4,
9;118:11;121:2;
123:20;179:6,8;
202:17,22

**fully (5)**
13:15;18:17,20;
71:10;179:16

**funds (2)**
61:2;63:25

**further (33)**
14:24;21:3;33:19;
56:5;59:18;73:13,14;
74:3,9;90:2;105:7;
127:13;128:10,12;
131:15;150:20,22;
154:1;165:20;
167:19,23;174:7;
188:3;190:22;191:8,
10;223:6,8;234:8;
238:2,4,4,7

**future (15)**
16:25;33:8;53:16;
55:2,8,16;115:8;
228:21;230:18,20;
231:1;232:2,5,7,12

**G**

**GA (1)**
8:4

**Gables (1)**
10:24

**gain (4)**
202:17,22;235:4,
18

**GALLAGHER (9)**
9:2;21:19;96:21;
97:19;98:10,19;
99:22;100:2;135:8

**game (1)**
35:12

**gaps (1)**
35:25

**gathered (1)**
212:22

**gave (13)**
42:20;93:13;94:19;
103:16,18;112:14;
120:5;143:10;
161:20;166:22;
216:25;218:23;
235:24

**GD (7)**
96:11,14;98:2;
100:11;101:9,9,17

**GELFARB (37)**

8:25;28:11;174:15,
15,18;178:1,8,23,24;
180:16,17,22,25;
182:21,22,25;183:4,
7,9,16;184:20,23;
187:6;188:3;190:5;
223:10,15,15,21,24;
225:21,25;227:16;
229:10;230:4;
233:16;234:8

**general (11)**
14:16;41:10;106:5;
113:17;119:3;207:7;
219:8,12;220:14;
227:21;235:19

**generally (5)**
50:14;66:20;
103:19;220:9;230:10

**generate (3)**
207:10;219:6;
233:24

**generated (1)**
221:11

**generating (1)**
203:18

**gentleman (1)**
205:25

**gets (6)**
69:3;106:17,18,20,
20;125:24

**Giacone (4)**
40:22,24,25;41:1

**GIBBS (3)**
10:3;158:22;
162:24

**Gibson (1)**
32:24

**gist (1)**
46:20

**given (26)**
67:1,6;79:16;
104:1;120:7;129:9;
136:25;186:10;
192:3;203:11,16;
204:17,19;205:1,2,7;
206:17;207:14;
211:8;222:12;
231:21;232:12;
233:6,9;237:20,21

**giving (6)**
59:1;93:10;138:23;
146:16;186:17;217:6

**GLENN (3)**
7:18;19:6;93:8

**global (24)**
13:21,24;15:22,24;
17:12,14,15,18;
21:14;104:7;115:2,5;
125:13,14;126:18,19;
159:25;160:1,4;
162:11;164:10;
165:11;168:22;
186:16

**GMAC (5)**
14:17;15:6;106:21;
107:22;117:4

**GMACM (16)**
105:22;107:7,10,
15,19,19;113:1;
116:10,19,23;117:4;
118:2,11;124:13,15;
129:24

**goal (2)**
17:21;227:3

**goes (7)**
65:9;106:25;126:4;
148:10;206:7;
221:12;232:23

**Goldstein (2)**
237:7;238:3

**Goldstein's (1)**
58:21

**GONZALEZ (1)**
7:21

**Good (36)**
12:5;19:16;21:7;
22:16;25:12,22;
26:24;28:8;33:16;
34:15,20,23;36:12;
60:1,2;91:23,24;
102:16,17;104:21;
105:12,13;135:12;
138:18;169:14;
170:15,16;174:19;
188:10;194:22;
195:16;198:21,22;
201:14;223:11,12

**GOODMAN (52)**
8:17;28:8,8;31:10,
20,24;32:1,4,5,6;
34:21;38:23,24;
39:19,21,23,24;
41:19,21,24;42:19;
43:18,19,23;44:2,4,8,
10;45:13,18,20,24;
46:1,4;52:9,10,11;
53:1,4,24;54:2,15,17;
55:13,14,24;57:9,17,
19,23;59:18;77:5

**GOTTLIEB (1)**
6:10

**governing (7)**
14:20;63:24;65:9;
66:16;106:7,13;
149:8

**Grand (1)**
10:14

**GRAY (1)**
9:12

**great (2)**
105:21;119:15

**greater (5)**
33:7;118:8;233:3,
19;234:6

**gross (2)**
69:8;70:3

**grossly (1)**
24:23

**group (10)**
22:22;34:24;64:1;
89:4,4;105:15;159:3,
11;162:25;236:10

**groups (1)**
89:8

**guaranteed (1)**
36:3

**Guaranty (1)**
209:4

**guess (4)**
67:17;94:5;145:21;
175:19

**guidance (2)**
217:18,19

**guide (4)**
210:23;216:3,9;
217:13

**guise (1)**
26:19

**GUSS (1)**
11:1

**H**

**haircut (6)**
32:17;180:4;228:8,
11,13,18

**half (7)**
34:13;69:8,19,20;
70:2,11,19

**halfway (1)**
218:10

**HAMILTON (1)**
6:10

**Hamzephour (1)**
117:11

**hand (13)**
36:16;37:7;38:2;
86:23;96:17,18;
117:5;133:17,21;
152:16;169:12;
195:9;197:12

**handed (6)**
46:2;85:14;93:22;
110:5;137:9;150:18;
158:6;173:3

**handing (1)**
96:9

**handled (1)**
142:25

**handwritten (3)**
149:25;168:7,8

**handy (2)**
180:14;184:21

**Hang (3)**
12:19;13:3;85:14

**happen (9)**
67:6;73:10;118:10;
148:1;163:5,13;
164:4;165:7;177:17

12-12020-mg    Doc 4759    Filed 08/19/13    Entered 08/20/13 15:07:54    Main Document
RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

Pg 255 of 273

August 16, 2013

**happened (2)**
34:18;166:12
**happening (1)**
127:2
**happens (6)**
34:2;35:18;68:5;
73:7;105:21;165:15
**hard (4)**
113:16;119:13;
130:5;227:24
**hard-fought (1)**
25:4
**Hathaway (1)**
10:13
**head (1)**
64:21
**heading (2)**
162:8;218:9
**hear (11)**
19:19;25:13,25;
28:23;29:20;31:1;
32:18;34:14,15,17;
158:18
**heard (11)**
17:8;21:1;32:22;
78:22;129:21;
145:21;157:22;
159:25;173:24;
183:21;184:2
**hearing (4)**
13:15;27:7;132:16;
170:2
**hearings (1)**
49:4
**hearsay (4)**
49:8;83:3;86:3;
89:21
**HECTOR (1)**
7:21
**held (2)**
29:17;89:21
**help (4)**
150:13;201:24;
215:18;218:3
**helpful (3)**
41:25;205:18;
211:18
**hereby (17)**
39:11;80:20;90:14,
16,18,20,22,24;
134:19;135:2;170:4,
6;193:19,21;196:1,
11;198:14
**hereof (1)**
138:12
**hereto (1)**
138:12
**high (3)**
47:21;126:19;
203:18
**higher (3)**
55:8;213:23;
232:12

**highlight (2)**
13:10;26:20
**highly (2)**
221:19,20
**hire (2)**
155:8,12
**hired (4)**
25:8,11;127:18;
155:6
**hoc (6)**
30:8;34:24;47:5,8,
12;105:14
**hold (7)**
27:12;45:15;60:18;
98:25,25;103:21;
106:9
**holder (1)**
190:8
**holders (56)**
30:8;31:16,16;
32:21;33:10,12,17;
34:6;49:15;53:15;
55:9;17;56:1,11;
89:8;139:25;140:1,3,
7,9,10;143:22;144:1;
154:22;156:4,8,11,
15,21;157:24;159:4,
4,11,16,21;161:10,
14;164:6,12,14,24;
166:3;170:18,22;
171:1;173:19;174:6;
177:4;184:14;
188:16;189:1,4,17;
190:15,19;231:2
**holdings (4)**
30:7;89:7;159:5;
190:20
**holiday (1)**
29:1
**Holtzer (1)**
49:1
**home (1)**
124:15
**Hon (1)**
54:2
**Honor (223)**
12:5,24;13:7,23;
19:6,10,13,19,21,24;
20:8,17,22;21:4,7,8,
10,16,18;24:8;25:25;
26:21;27:6,14,21;
28:1,3,8,15;29:21;
31:1,2,12,20,24;32:1,
14;33:11,14;34:13,
17,23;36:10,12,20,
23;37:3,13,14,20;
38:6,13,16,24;39:4,
13,15,19;41:19;
42:20,21;43:19;
45:11,24;48:15;49:2,
3,4,6;52:11;53:4,12,
24;57:9,17,23;59:18,
22;70:1;71:16,20;

72:22;73:15;74:24;
75:6,15,24;76:13,20,
24;77:12,17,24;78:5,
21,25;79:8,14;80:2,6,
8,17,24;81:3,7,11,17,
19,22;82:8,17,22;
83:5,10,21,24;84:8,
19,21;85:13;86:4;
88:9,25;89:2,6,11,11;
91:1,10,12,19;96:12;
101:8,14;105:9;
115:14;119:22;
120:8;122:15;123:5,
9;128:14;131:12,19,
22;132:9,20;133:10,
15;134:10,25;137:2,
12,22;142:14,22;
148:9;154:9;157:13;
158:10;161:9,16;
162:20,23;165:19,20;
167:21;169:4,9,14;
170:9;173:4,9;
174:10;180:17,25;
182:22;183:1,4,9,16;
184:20,23;188:10;
190:23;191:8,11,15,
20,20,22,25;192:2,8,
9,13,14,23;193:4,8,
13,15,23;194:1,9,15,
22;195:2,16;196:3,
13,25;197:4,7,17,21;
198:11;223:24;
227:17;233:17;
234:14;235:3;238:8
**HOOPER (1)**
7:8
**hope (3)**
27:1;115:6;125:14
**hour (3)**
25:18;202:12,15
**hours (7)**
202:22,25;203:9;
209:23,24;235:6,9
**housekeeping (2)**
78:23;132:22
**Houston (1)**
10:7
**HOWARD (2)**
6:23;36:12
**huge (3)**
203:11;206:10,13
**hundreds (1)**
220:13
**hurry (1)**
30:20
**hypothetically (2)**
230:25;232:11

**I**

**Ibbotson (25)**
208:10;209:2;
210:9,10,19,22;

211:7,12,15;212:20;
213:18,24;215:8,23,
23;216:3,4,12,18;
217:3,10,12,15,19;
235:24
**Ibbotson's (3)**
208:19;215:2;
222:19
**idea (2)**
67:12;162:13
**identification (6)**
25:15;41:18;42:2;
44:7;76:16;96:10
**identified (16)**
20:9;22:7;23:25;
24:9;38:6;61:3;
62:13;87:22;90:6;
149:5;151:24;
152:23,25;169:20,23;
196:5
**identify (9)**
25:7;37:4;42:1;
75:11;152:3;154:6;
174:13;189:8;223:13
**ignore (2)**
24:18;164:22
**imagination (1)**
125:17
**imagine (2)**
122:24;215:20
**immediately (1)**
189:21
**impact (2)**
93:5;94:14
**impeaching (1)**
147:21
**impeachment (2)**
57:15,15
**impede (1)**
173:13
**implementation (1)**
48:19
**implementing (1)**
227:5
**implicit (1)**
200:11
**implied (3)**
212:25;213:4,12
**important (11)**
13:19;17:21;33:24;
104:13;210:2,21;
214:18;215:1,12,15,
19
**improper (1)**
57:8
**improve (1)**
61:16
**improved (1)**
121:15
**inaccurate (5)**
208:21;215:25;
217:3;218:13;236:14
**inadequate (3)**

22:5;23:2;24:23
**Inc (2)**
6:3;10:13
**include (22)**
20:1,2,3,5;23:10;
30:25;42:24;43:1,1,
9;60:7;61:16,23;
62:20;64:8,13,14,14;
67:2;138:16;199:11;
218:24
**included (16)**
38:7;61:8,9,19;
62:1,4,25;63:6,9,13,
17;72:5,9;128:23;
140:12;153:15
**includes (8)**
19:8;23:7;66:15;
68:9;75:18;198:5,7,
12
**including (12)**
15:24;16:10;18:21;
30:11;38:8,22;60:9;
138:10;158:13;
172:21;211:2;220:8
**incoherent (1)**
26:17
**incomplete (2)**
82:23;84:14
**incorporates (1)**
43:7
**incorrect (1)**
217:9
**increase (7)**
24:16;42:8;46:6;
72:6;213:20;232:15,
16
**increased (1)**
74:21
**increases (1)**
72:10
**incur (1)**
124:16
**Indeed (7)**
23:18;24:1;39:9;
92:11;112:9;118:22;
125:18
**indemnification (5)**
124:6,8,11;125:2,
12
**indemnity (3)**
35:22;124:13,22
**indenture (4)**
30:3;33:20;66:20;
142:5
**independence (1)**
222:7
**independent (14)**
26:8;28:4;38:20;
68:10,15;119:17;
186:4,11;208:4,7,14;
222:2,14,14
**indicate (1)**
182:4

**indicated (3)**
87:3;141:11;
148:24
**indifferent (1)**
104:20
**indirectly (2)**
99:13;221:14
**individual (16)**
20:23;33:6,12;
37:14;215:9,24;
217:2;218:11,12;
220:19;232:1;
235:22;236:5,12,16,
18
**individually (1)**
135:23
**individuals (3)**
33:12;216:7;
221:12
**industry (7)**
209:3;210:9,11;
211:8;212:20;
215:16,17
**infinity (1)**
200:8
**influence (2)**
164:13;236:25
**inform (2)**
79:4;171:1
**information (40)**
38:7;39:7;40:13;
41:7,9,10;57:4;
98:21;99:10,16,22;
100:2,14,19,22;
101:12;113:3;
129:17,19;175:12;
190:19;202:9;
203:11;212:16,20,22;
214:17,18;215:25;
217:3,13;218:13;
221:10,13,14,15;
222:3,9,20;236:13
**informed (3)**
85:3,4;120:14
**initial (3)**
46:18;152:22;
226:23
**initially (1)**
20:15
**input (6)**
159:13;203:14;
210:12,21;216:6;
221:12
**inquiring (1)**
96:1
**insertion (1)**
139:24
**insight (2)**
186:15,18
**insisted (7)**
21:1;136:4,6,13;
138:22;140:12,14
**instance (2)**

31:17;177:7
**instead (3)**
26:4;33:6;121:11
**institutional (7)**
12:10;128:3,18;
129:20;138:14;
159:3,14
**instructed (1)**
203:15
**instruments (1)**
29:22
**insulate (1)**
140:6
**insurance (10)**
30:19;34:7,8;
47:15,20,24;64:16;
74:15;171:2;209:4
**insure (1)**
73:6
**insured (7)**
18:15;63:24;71:4;
116:11,24;127:12,15
**insured-trusts (1)**
19:12
**insurer (2)**
151:17;152:17
**insurers (1)**
220:7
**integrity (1)**
164:25
**intend (1)**
86:9
**intended (3)**
41:8;76:20;217:10
**intending (1)**
91:4
**intends (2)**
86:9;91:5
**intensely (1)**
32:12
**intent (1)**
32:7
**intention (1)**
170:22
**interest (9)**
22:24;34:3,5;
53:15;66:21;67:4,9;
73:6;92:13
**interesting (1)**
31:12
**interests (42)**
13:13;16:21;18:25;
19:11,17;20:18;
22:14,21,24;23:1,8;
24:25;25:10;33:17;
34:2;92:1;138:17,19;
139:19,22,25;140:1,
10,14;141:6;145:25;
156:4,8,10,18,23;
157:1,6;159:16;
164:14;166:3,8;
167:3,16;174:6;
201:3,8

**interim (1)**
148:1
**interposed (1)**
57:6
**interpret (1)**
162:17
**interpreted (1)**
217:14
**interpreting (2)**
217:11,12
**interrupt (1)**
206:11
**interruption (1)**
153:10
**intimately (1)**
28:17
**into (98)**
19:18;22:9,14,19;
25:11,21;26:2;28:20,
21;30:6;31:8;37:1,
11,11;39:11;47:23;
48:9;52:19;53:7,17,
25;75:1,14;79:19,25;
80:19,21;84:18;
86:10;87:5,13,13;
90:14,16,18,20,22,
24;96:1;98:13,16,20;
107:18;108:3,7;
111:19;113:11;
114:2,21;115:17;
116:7;117:18;
118:16;119:17;
124:14;125:10;
127:19,24;128:22;
129:12;134:19;
135:2;138:24;
141:22;145:24;
148:10;164:18,20;
170:4,6,18,22;172:5;
175:5,10;186:18;
191:1;193:19,21;
194:16;196:1,11;
197:22;198:14;
203:12,18;204:14;
205:4,10,13,17;
208:15;214:3,9;
215:11,20;221:12;
228:17
**introduce (2)**
74:25;79:19
**introduced (2)**
13:15;133:2
**introducing (2)**
18:23;82:16
**introduction (1)**
216:18
**investment (1)**
216:7
**investor (3)**
19:14;20:24;69:3
**Investors (53)**
9:13;10:4;12:10;
19:12,17;22:14;23:8,

12,13;24:24,25;26:3,
7;27:12;31:19,22;
34:5,5;37:14;55:7;
68:25;92:1,5,14;
93:6;94:14;128:3,18;
129:20;138:15,17,19;
139:10,16,23;140:11;
141:7;145:25;
159:12,14;162:25;
166:3,9;167:5,16;
170:17;171:18,21,25;
172:3,14;201:4,8
**investors' (3)**
22:3,5,16
**involve (2)**
215:9;236:16
**involved (18)**
21:19;27:18;28:17;
29:12;30:4;36:4;
49:21;113:14;
160:24;175:13,15,16,
18;176:18;189:24,
25;190:2,2
**involvement (7)**
29:25;99:5,9;
127:11;175:24,25;
176:7
**involves (1)**
27:8
**involving (1)**
51:2
**Iridium (1)**
18:18
**irrelevant (1)**
233:9
**irrespective (1)**
35:5
**issue (19)**
15:25;17:7;29:15;
30:10,12,15;36:2;
52:16;66:10;119:18;
125:16;126:4;
152:16;165:4;187:4,
7,9;188:1;214:6
**issued (5)**
18:14;43:16;44:13,
20;74:12
**issues (14)**
13:8;20:6;27:8;
30:10;34:15;35:11,
23;51:1;130:9;161:2;
162:12;168:23;
176:22;186:15
**item (6)**
58:20;62:7,10,22;
70:13;232:14
**items (3)**
62:4;72:9;153:15

**J**

**JAMES (14)**
9:9;21:20;170:11,

11,14;173:4,9;174:7,
9,10;182:14;191:11;
193:15;194:1
**January (1)**
52:16
**JeffCo (5)**
49:13,14,15,16,17
**Jeffrey (4)**
18:5;112:24;
191:24;193:18
**Jennifer (2)**
83:12,13
**Joe (1)**
60:1
**JOHN (6)**
8:6;17:24;36:14;
37:7;205:24,24
**Johnson (5)**
50:25;51:4,5;52:2,
5
**joint (2)**
16:8;88:17
**JONES (3)**
6:18;21:8;36:13
**JOSEPH (3)**
9:7;21:18;37:13
**JSNs (1)**
133:2
**Judge (13)**
28:19;29:5;94:22,
25,25;95:6,9,13,16,
20;96:4;99:18;
119:15
**judging (1)**
208:6
**judgment (5)**
23:19;107:16;
109:14;200:11;
215:14
**judicial (3)**
88:5;89:16,17
**July (7)**
37:7;38:16;79:11;
94:6;227:8;237:13,
20
**jumped (1)**
236:11
**June (7)**
12:11;28:19;29:11;
30:25;48:23;74:13;
146:8
**junior (1)**
34:24
**jurisdiction (1)**
123:21
**jurisdictional (1)**
22:7
**Justice (4)**
78:19;85:15;128:7;
132:6
**justification (1)**
32:22
**justify (2)**

12-12020-mg    Doc 4759    Filed 08/19/13    Entered 08/20/13 15:07:54    Main Document
RESIDENTIAL CAPITAL, LLC, et al.
Pg 257 of 273
Case No. 12-12020-mg

August 16, 2013

25:11;27:2

## K

**KAHAN (1)**
7:19
**KALISH (2)**
8:20;174:16
**Kasowitz (1)**
50:25
**KATHY (7)**
10:9;89:3;129:19;
158:24,25;159:14;
162:23
**keen (1)**
222:1
**keep (2)**
13:9;169:10
**KELLEY (1)**
9:21
**KENT (1)**
11:4
**kept (2)**
85:3,4
**Kerr (126)**
12:4,5,6,6,22,23;
13:1,5,6;19:2,3;35:1;
36:10;45:11;78:5,5,8,
21,21,25;79:4,7,8,16;
80:17,24;81:3,6,10,
13,18,19,22;82:1,4,8,
13,17;83:5,8,10;84:4,
7,19,21;85:1,13,17,
19;87:2,9,13,22;88:1,
8,9,24;89:6,25;90:9;
91:1,10,12;95:11,19;
96:12;98:23;99:24;
100:16,20;101:14;
103:1;104:12;105:1;
111:11;112:17;
114:23;116:25;
118:4;119:5,20,22,
25;120:8;122:9,17,
21;123:9;129:13;
131:12,19,22;132:2,
3,9,19,20,20,25;
133:5;169:3,4,4,8,16;
191:15,20,21;192:8,
14,18,23,25;193:7,
10,23;194:8,9,12,23;
195:2,2,6;196:25;
197:4,4
**key (1)**
14:7;227:6;232:3
**kind (6)**
118:17,17;166:23,
23;215:13;235:21
**KIRKLAND (1)**
6:2
**KISSEL (3)**
7:2;169:15;188:11
**Kit (4)**
133:10;154:8;

197:17;234:20
**knew (9)**
108:2,5;153:3;
185:25;186:1,2;
214:13,17;219:17
**knowing (1)**
223:2
**knowledge (5)**
39:8;44:19;159:23;
186:4,11
**knowledgeable (1)**
235:21
**known (3)**
156:19;214:4;
231:23
**knows (1)**
33:14
**Kothari (16)**
18:10;197:6,11,18;
198:14,23;219:10;
223:11,17,25;224:12;
230:3,25;232:7;
234:20;238:10
**KOTWICK (14)**
7:7;169:14,15;
170:9;176:12;177:5;
187:19;188:10,10,13;
190:22,25;191:4,8
**Kruger (35)**
17:25;35:24;78:6;
79:10,24;80:18,20;
84:9,21,22;85:5,22;
86:17,22,23;87:1,11,
15;91:16,23;93:10;
94:6,8;96:4,14;
100:1;102:16;
105:12;106:11;
110:4;119:7;128:9;
131:23;132:12,25
**Kruger's (3)**
79:17,20;91:4

## L

**labeled (1)**
137:19
**lack (1)**
25:22
**laid (1)**
221:2
**language (7)**
43:7;139:19,24;
140:12,17,20;141:8
**large (4)**
26:25;118:1;222:1;
235:23
**largest (1)**
28:11
**last (13)**
12:13;26:18;27:7;
29:13;30:20;35:3;
73:2;97:6;110:7;
127:4;147:1;153:19;

206:13
**later (4)**
28:21;76:10;77:11;
111:6
**Law (4)**
19:9;28:5;174:15;
191:6
**LAWRENCE (4)**
195:16,17;196:3,
13
**Lawsky (1)**
41:4
**lawsuits (1)**
106:23
**lawyer (2)**
120:11;154:24
**lawyers (1)**
221:11
**lay (1)**
208:12
**layman (1)**
235:21
**Lazard (2)**
93:1;203:14
**lead (5)**
30:5;69:15;72:10;
135:6;157:11
**leading (7)**
22:15;57:21;93:3;
155:22;157:8;161:7;
163:25
**learn (3)**
190:6,8,16
**learned (3)**
51:25;144:7;207:3
**learning (1)**
25:2
**least (14)**
20:15;32:15;60:23;
63:21;67:2;71:10;
82:11;110:5;125:1;
150:13;227:2;232:2,
5;233:13
**leave (1)**
78:3
**leaves (1)**
87:18
**leaving (2)**
125:5;126:13
**led (4)**
160:9;175:14;
206:15;226:4
**left (5)**
25:5;45:7;63:22;
97:10;126:3
**left-hand (1)**
97:17
**legal (3)**
120:2;141:12;
143:1
**lengthy (2)**
16:20;118:24
**Leon (1)**

10:22
**less (6)**
32:20;34:18;
121:21;203:9;225:3;
234:3
**letter (1)**
97:25
**letterhead (1)**
96:25
**letters (2)**
76:7,15
**letuse (1)**
201:20
**level (9)**
22:20;47:21;125:4;
126:13,19;127:1;
128:19;131:2;220:10
**Lewis (4)**
17:25;78:6;94:6;
110:4
**liabilities (3)**
42:8;46:6;118:8
**liability (3)**
124:10;139:16;
140:6
**liable (5)**
130:3,6,13;131:3,
10
**Liberty (1)**
6:12
**library (1)**
45:8
**lieu (1)**
194:6
**lifetime (2)**
127:15,22
**light (2)**
81:1;238:1
**LIGHTNER (1)**
6:15
**likelihood (6)**
118:14;119:1,11;
125:14;220:16;
233:13
**likely (4)**
23:25;68:25;
127:16;232:9
**limine (1)**
37:19
**limitations (1)**
90:10
**limited (7)**
85:9;89:23;90:6,7;
124:9;132:5;234:5
**line (32)**
43:13,21,25;44:4;
46:10;58:20,23;59:4;
60:6;62:7,10,22,25;
70:13;109:10;
110:22,25;111:1;
126:25;147:7;
176:22;180:11;
181:10;182:22;

187:16;194:19;
216:21,22,23;227:13;
230:9,10
**lines (14)**
44:2,9,18;49:11;
54:4,6,7,11,17,18,20;
56:20;94:11;110:21
**Ling-Cohan (3)**
28:19;29:5;78:19
**Ling-Cohan's (2)**
85:15;132:6
**Lipps (19)**
18:5,6;86:5;
111:20,22,25,25;
112:4,8,9,24;113:22;
191:24;192:4,10;
193:18,19,23;221:15
**Lipps' (2)**
193:21;194:5
**Liquidation (1)**
41:2
**list (14)**
75:19;76:8,9;81:6,
8,11;87:23;89:7,7,16;
153:15;192:15,16;
196:6
**listed (1)**
199:3
**listen (4)**
85:11;143:9;
210:15;211:19
**listening (2)**
13:4;178:15
**literally (3)**
35:17;114:25;
216:9,12;217:17
**litigate (2)**
16:16;130:9
**litigated (1)**
62:14
**litigating (1)**
18:7
**litigation (32)**
16:20;32:9,10,13;
60:9,15,16;61:15;
62:24;63:4;112:1,10;
118:17,19,24;119:2,
10,14;120:13,20;
121:4;128:17;130:5,
13;161:2;162:12;
168:23;199:12;
203:23;218:25;
219:6,14
**litigation-related (1)**
203:23
**litigations (1)**
60:17
**little (11)**
35:23;48:4;74:22;
78:18;85:16;136:1;
157:11;176:24;
181:12;197:1;235:21
**live (1)**

194:6
**LLC (7)**
14:18;15:22,25;
35:7,15;105:19;
124:13
**LLP (8)**
6:2,10;7:2,13;8:1;
9:2,21;10:12
**loan (4)**
116:19;117:6,13;
124:15
**loans (2)**
116:11,23
**located (1)**
210:9
**long (3)**
77:8;105:17;
202:16
**longer (4)**
33:2;56:1;78:18;
105:18
**look (51)**
33:13;37:17;39:6;
50:13;57:10;58:24;
60:4;75:8;77:1,7;
88:25;97:24;99:3;
110:5;138:5;145:21;
158:8,12,14;159:8;
161:19;162:1;
168:13;173:2,6;
177:21,25;182:13;
184:16;185:8,9,11,
12;186:9,24;189:8,
12;201:25;205:12,
13;212:8;213:2,3;
217:20;221:17;
225:13;227:25;
228:24;229:19;
235:22,23
**looked (15)**
57:1;66:1;131:5;
148:7;151:11;
152:15;165:4;
166:17,23;201:17;
205:17;208:23,24;
217:15;222:18
**looking (21)**
23:15;24:14;41:17;
42:2,21;45:14;83:7;
108:22;109:3;110:1,
2;123:11;130:16;
137:10;167:9;178:6;
184:25;208:19;
225:15,19,19
**looks (3)**
15:11;33:2;221:20
**Lorenzo (1)**
97:11
**Los (1)**
10:16
**lose (2)**
232:21,22
**loss (14)**

60:8;61:14,14,24;
62:1,24;63:1;127:22;
129:22;130:7,12,15;
131:4,9
**losses (6)**
124:17;127:15;
129:24;130:3;182:5;
233:3
**lost (4)**
21:11,16;136:21;
180:16
**lot (9)**
112:2,19;113:3,3,
4;120:11;164:20;
215:19;221:18
**Louisiana (1)**
10:5
**love (1)**
234:14
**low (1)**
203:18
**lower (3)**
45:7;55:9;217:24
**LP (2)**
10:3;96:17
**lump (7)**
152:18;164:20;
165:4;166:19;
199:10;225:8;231:8
**lunch (2)**
89:25;132:1
**Lynch (1)**
117:11

**M**

**MA (1)**
9:15
**ma'am (3)**
202:20;209:9;
216:19
**Mac (32)**
8:10,21;28:9,11,17,
20;29:12;30:7,11,18,
23;34:13,16;47:8,25;
50:1,19;51:18,21;
52:18;53:10;72:3;
174:16;175:4,8;
183:24;184:7;190:6,
6;194:2;196:16;
223:16
**Mac's (4)**
28:12,14,22;51:14
**main (3)**
29:15;30:12;
225:21
**maintain (1)**
211:15
**Major (1)**
18:2
**majority (2)**
63:1;67:2
**makes (2)**

26:12;154:21
**making (5)**
23:15;112:25;
114:21;126:24;
143:11
**MALONEY (1)**
7:10
**Mamta (4)**
18:4;169:17;170:4,
6
**MANAGEMENT (4)**
10:21;18:11,11;
121:5
**managers (2)**
216:7;221:11
**many (24)**
12:17;13:2,6,7;
19:25;23:3;25:24;
48:21;55:18;60:20;
94:24;95:25;109:17;
113:5,5;114:3;115:3,
3;122:24;129:21,21;
168:13;183:9;189:20
**Marc (1)**
95:3
**March (4)**
60:7;63:19;103:24;
174:20
**Marinuzzi (3)**
97:11,14;98:3
**MARK (5)**
6:15;7:7;76:24;
169:15;188:10
**marked (11)**
41:17;44:6;76:23;
96:10;100:11;
101:17;122:25;
161:22;162:2;178:6;
194:19
**MARTIN (1)**
9:17
**MARY (9)**
9:8;18:1;21:20;
80:2;133:12,13;
135:8;137:10;198:17
**material (4)**
113:7;128:8,15;
175:20
**materials (21)**
109:12,19;110:20,
23;111:4,9,14,18;
112:19;113:9;
149:15,21;150:23;
151:3,4,6;152:25;
158:5;161:22;
235:13,25
**mathematically (1)**
231:4
**mathematics (1)**
24:11
**matter (14)**
22:10;28:5,5;
78:23;88:6;106:1,4;

109:6;123:21;
132:22;155:19;
219:25;227:8;235:12
**matters (4)**
21:10;48:20;87:8,
10,20;155:4;203:2;
209:8;219:14
**MAURICIO (1)**
7:20
**May (61)**
12:9;26:24,24;
32:13;38:1;39:4,19;
49:4;60:20;66:25,25;
68:3;69:14;70:16;
72:10,19;83:15,25;
84:8,19;90:2;96:23;
97:21,22,25;99:12;
100:6;101:4,9,10;
107:14;119:18;
121:25;122:15;
127:9;131:19;
145:10,15,23;149:11,
23;150:4,24;153:13;
160:16,16,17;161:22;
174:22,23;176:21;
186:19;201:18;
203:9;204:10;
211:17;215:24;
217:3;218:12;
225:22;236:13
**Maybe (6)**
45:9;78:12;88:25;
166:25;179:17;225:9
**MCKOOL (3)**
8:9;38:9;39:24
**mean (25)**
19:21;27:12;61:14;
64:10;65:19;67:15;
81:22;138:9;151:15;
156:23;168:7;
172:23;173:18;
175:19;176:20;
179:15,16,18;185:25;
186:19;198:4;206:7,
8;212:7;233:22
**meaning (2)**
67:23;200:5
**means (13)**
65:14,18;164:11;
173:16;179:4,11;
180:7;181:15;
182:19;183:19;
212:10;230:20;
233:25
**meant (6)**
87:3;139:1,4,6,8,10
**median (1)**
213:21
**mediation (55)**
27:9,12,13,17,18,
20,22;37:16;50:4,5,
11,22;51:1,7,11;57:7;
83:23;91:3,6;93:9;

94:21,25;95:7,10,14,
17,21,24;96:5,5,7;
98:22;99:17,23;
100:3,14,19,23;
101:12;102:25;
103:6;112:3;114:4,
17,19;115:20;116:4,
8,8;129:4;142:14,22;
148:10;177:6;
188:22,24
**meet (4)**
22:12;23:4;89:11;
149:12
**meeting (14)**
51:5,22,23;52:1;
145:10,15;146:3;
149:16;150:24;
166:9,12,21;167:2,13
**meetings (1)**
114:18
**Mellon (5)**
7:14;18:3;19:7,9
**members (2)**
83:14;108:3
**memorandum (4)**
111:22,25;112:4,8
**memory (1)**
201:20
**mention (2)**
23:5;29:9
**mentioned (2)**
156:14;166:20
**merits (3)**
13:18;17:10,18
**met (7)**
39:25;51:8,9;60:1;
89:12;114:17;149:11
**methodology (5)**
229:18,23,24;
230:5;231:13
**methods (1)**
236:2
**MICHAEL (2)**
8:16;11:1
**microphone (3)**
128:9;136:1;
176:24
**middle (4)**
45:21;162:7;225:1,
3
**might (14)**
24:18;125:11,12;
175:5,8;176:6;209:6,
22,24;210:13;
215:21;228:23;
232:22;236:19
**Mike (2)**
28:10;102:18
**million (55)**
14:17,22,22,25;
15:6;16:24;20:2,5,
12;21:22;25:25;26:1;
28:15;59:2,10;68:20,

20;69:15,19,21;
70:20,21,24;71:1;
74:22;102:1;106:4;
117:19;121:12,13;
144:15,18,24;152:8;
175:21;177:3;
181:22;182:1,5;
184:3;206:23;207:4;
224:1,12,20,20,20,
25;225:7;226:1,5;
230:18;231:6;
232:13;237:3

**million-dollar (1)**
185:24

**millions (2)**
31:13;220:13

**mind (7)**
119:2;125:13,14;
127:14;195:9;
211:21;212:11

**minimal (1)**
22:20

**minimize (1)**
130:9

**minimum (3)**
14:21;15:8,8

**minor (1)**
126:20

**minus (1)**
209:25

**minute (11)**
21:9;26:10,18;
71:20;75:15;78:8;
131:19;134:7;153:5;
161:16;194:18

**minutes (3)**
132:17,18;234:12

**misleading (4)**
215:25;217:4;
218:13;236:14

**misspoke (1)**
216:10

**mister (2)**
197:10,10

**MIT (2)**
18:12;209:7

**mitigate (2)**
42:7;46:6

**mitigation (7)**
60:8;61:14,15,24;
62:1,24;63:1

**model (3)**
199:12;207:15;
218:25

**modeling (1)**
222:5

**models (7)**
207:10,19;215:24;
217:2;218:12;
236:13,19

**modest (1)**
126:16

**modify (1)**

**32:8**

**moment (8)**
41:14;42:19;46:12;
96:12;137:12;
162:19;172:25;
173:25

**Monarch (10)**
9:3;80:3;96:17,20;
97:7;98:21;99:22;
135:9;170:11;198:18

**Monday (3)**
194:18;196:21;
238:12

**money (7)**
30:22;61:5,19;
101:23;104:19;
164:24;234:3

**monoline (2)**
109:16;220:7

**monolines (1)**
220:18

**month (2)**
111:6;206:13

**months (3)**
12:13;93:3;113:14

**more (42)**
18:17;46:2;56:7,
11,13,18,22;59:20;
61:15;73:8;90:4;
147:11,14;148:5,6,
12,21;163:4;177:3;
202:12,14;205:25;
208:23,24;209:9,19,
22,24,25;210:6;
211:15;225:3;
228:22;232:14,17,20,
23;233:4,24;234:3;
235:20,21

**Moreover (2)**
13:17;15:14

**morning (19)**
12:5;21:7;28:8;
34:23;36:12;60:1,2;
91:23,24;102:16,17;
105:12,13,16,17;
132:22;194:18;
196:21;238:12

**Morrison (13)**
12:6;78:21;97:1,3,
14;98:10;109:15;
132:20;169:4;
191:21;195:2,17;
197:4

**Mortgage (4)**
14:18;15:6;64:15;
124:13

**mortgage-backed (1)**
18:14

**mortgages (1)**
214:5

**MOSS (2)**
8:20;174:15

**most (9)**

**13:8;35:3;63:3;**
73:25;204:7;209:3;
215:12,14,19

**mostly (1)**
114:19

**motion (12)**
12:7,11;13:7;
17:22;35:6,8;37:18;
79:9;115:13;191:22;
195:18,23

**motions (1)**
80:9

**motivation (3)**
98:24;99:1,2

**mountain (2)**
204:22;205:11

**Mountainview (1)**
32:25

**move (13)**
45:11;48:4;52:10;
90:13;96:8;134:14;
150:12;157:14;
169:24;178:2;195:4;
228:3;230:1

**moved (2)**
194:16;213:23

**moving (10)**
17:22;18:22;21:25;
23:3;25:14;52:11;
56:19;81:10;169:10;
195:8

**much (25)**
16:21;25:13;56:6,
11,22;59:8;61:9,19;
64:22,23;73:4;78:3,
4;132:11;157:20;
169:2;183:24;
190:24;191:13;
209:19,24;210:6;
212:19;218:6;235:16

**multiple (1)**
45:6

**MUNGER (1)**
10:12

**must (5)**
17:19;23:10;96:11;
112:13;205:9

**myself (3)**
100:25;182:14;
206:7

## N

**NA (1)**
133:14

**name (3)**
47:17;159:9;
169:14;195:16

**NDA (1)**
53:7

**need (16)**
20:17,18;33:21;
42:1;43:21;75:11;

**90:2;94:1;113:8;**
126:22;153:5;
192:12;194:17,17;
197:1;198:3

**needed (2)**
48:21;207:15

**needs (1)**
40:12

**negotiate (6)**
20:24;25:9;30:9;
47:9;103:18;176:10

**negotiated (7)**
29:13;47:13,17;
102:7;140:20,21;
141:4

**negotiating (6)**
30:16;122:6;
142:12,17,19;175:20

**negotiation (9)**
29:15;141:8,18;
175:25;176:1,7,18;
189:24;190:3

**negotiations (17)**
22:15;25:4;28:18;
29:18;30:21;47:4,23;
49:21;50:5,9,10;
52:21;101:18;
157:24;175:14,16,18

**neither (2)**
21:23;194:2

**net (1)**
221:18

**nevertheless (1)**
69:15

**New (25)**
6:5,13,21;7:5,14,
16;8:13,23;9:5,24;
19:7,9;21:2;28:25;
35:14;41:1;47:14,15,
15,19,24;48:6;74:12;
79:21;88:15

**NewOak (1)**
18:13

**next (27)**
18:24;53:13;63:14;
66:12;68:16;78:1,6;
82:24;95:25;96:3;
132:1;152:23;
158:21;159:8;169:5,
16;187:5;191:14;
195:3;197:1,5;
209:15;218:19;
229:22;233:2,9,18

**nice (2)**
161:22;196:24

**night (1)**
35:4

**nine (3)**
32:16;213:18,24

**nineteen (2)**
213:18,25

**ninety (4)**
20:12;70:23;71:1;

**152:8**

**ninety-two- (1)**
185:23

**ninety-two-million-dollar (1)**
185:17

**nobody (1)**
143:3

**noise (1)**
13:4

**nominal (2)**
32:19;181:11

**nondisclosure (3)**
28:20,21;52:19

**nondiscrimination (1)**
24:7

**nondiscriminatory (1)**
24:24

**none (3)**
61:8;170:2;198:11

**nonetheless (3)**
171:23;172:5;
200:10

**nonhearsay (1)**
90:13

**non-release (1)**
122:1

**non-ResCap (4)**
32:9;56:7,11,23

**nonresponsive (1)**
115:13

**nonstarter (1)**
125:16

**nope (2)**
236:11,11

**nor (9)**
20:25;21:23;
143:18;196:18;
199:21;200:14,18;
207:22;220:3

**normal (1)**
210:18

**normally (1)**
209:12

**nose (1)**
233:23

**not- (1)**
115:7

**Notably (2)**
29:9;30:24

**note (2)**
33:24;53:6

**noted (3)**
17:9;27:7;50:21

**notes (8)**
34:25;133:17;
149:25;150:3;168:7,
8,8,11

**notice (11)**
21:1;85:22;86:14,
16;87:2;88:5;89:16,
17;103:4;180:11;
189:4

**notices (4)**

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(17) million-dollar - notices

189:6,17,19,20
**notify (1)**
170:21
**notion (3)**
23:24;24:21;25:3
**notwithstanding (2)**
20:23;86:3
**number (55)**
12:12;16:10;25:7;
46:14;54:25,25;
60:22;75:5,12;79:11;
81:13,14,14,15,15,
16;123:14;129:15;
132:6;146:25;
169:20;178:3,24;
180:1,12,15,18,19;
182:22;183:6;185:5,
12,22,25;186:2;
192:1,5,16;195:20;
196:4;200:8;209:23;
213:6;216:12,14;
217:17,23;221:12,17;
226:3,4;232:8;
233:22;234:2,2
**numbered (1)**
198:5
**numberings (1)**
45:6
**numbers (27)**
26:9;42:15,16;
43:22,25;45:21;
70:21;76:7,8,14;
82:25;101:7;158:13,
13;166:23;189:11,
12;194:19;196:6;
197:22;216:5;
217:18,24;222:22;
224:23;226:13;
229:19
**NY (9)**
6:5,13,21;7:5,16;
8:13,23;9:5,24

---

## O

**oath (1)**
93:13
**obfuscate (1)**
24:18
**object (18)**
17:6;37:21;68:7;
72:14;80:3;82:23;
121:16,18;148:9,16;
156:15;159:21;
171:25;172:4,4,19;
173:11;177:5
**objected (2)**
44:14;132:25
**objecting (2)**
20:8;21:21
**objection (70)**
17:7;22:6;35:8;
37:15;38:4,18,23,25;

39:6,10;49:5,8;53:20,
23;55:11;56:13;57:6;
62:16;69:17;80:11;
84:14;85:10;86:2,13;
87:17;95:11,19,22,
23;98:23;99:24;
100:16,20;101:14;
103:1;104:12;105:1;
111:11;112:17;
114:23;116:25;
118:4;119:5,8,20;
120:8;122:9;129:13;
131:12;133:3;
142:14,22;157:8;
158:1;160:11;161:5,
12;162:15;163:8,17;
164:7,16;176:12;
177:8;187:19;
235:14;236:22;
237:4,9,23
**objections (23)**
37:12,21;44:16;
75:13,13;80:1,5;
82:20,21;87:19,21;
90:12;134:15,23;
151:25,25;170:1;
173:23;174:2;
193:14;195:24;
196:8;198:10
**objector (1)**
174:16
**objectors (8)**
21:12;50:10;59:16;
76:7,15;80:3;132:17;
135:9
**Objectors' (6)**
41:18;42:2;96:10,
11;178:4,8
**obligated (1)**
14:19
**obligations (4)**
16:25;124:7,11;
152:16
**obtain (2)**
98:21;99:22
**obtained (1)**
20:21
**Obviously (5)**
16:15;37:15;43:9;
60:18;182:9
**occasion (2)**
54:8;56:6,10,22
**occur (9)**
49:4;73:11;105:23;
115:22;125:18,18;
126:18,19;153:22
**occurred (1)**
38:15
**o'clock (2)**
230:2;234:16
**off (7)**
23:20;33:4;63:22;
64:21;76:5;86:22;

164:10
**offer (15)**
36:25;37:10;75:4,
5;79:10,24;81:4;
133:5;191:23;192:8;
193:4,9;195:19,22;
196:4
**offered (12)**
85:10;86:17;88:6,
11,13;89:5,17,20;
179:19;191:1;
192:14;206:23
**offering (13)**
39:8;75:12;76:9;
83:23;85:21;87:7;
88:14;89:15;91:4;
132:22;134:17;
184:11,12
**offers (1)**
25:10
**officer (8)**
17:24,25;18:12;
36:14;40:5;41:1;
102:19;133:14
**officers (2)**
117:9;124:8
**OkayJust (1)**
75:19
**older (1)**
180:13
**OLSON (1)**
10:12
**omnibus (2)**
16:9;88:17
**One (89)**
6:12;7:4;8:11;
15:11,18;17:11;18:2,
3,5;22:3;25:7,18;
34:25;35:12;42:16,
19;48:20;49:12;
55:20,21;58:6;62:7;
64:1,23,24;66:1,9;
68:17;70:13;71:20;
75:15;76:1;81:6,6;
85:5;89:3,4;91:1;
92:22;96:12,17;
97:10;104:21;110:5;
117:5;122:13;123:9;
126:11;131:19;
132:21;137:3,5,8,12;
146:6;147:12,14,15;
148:5,6,12,21;149:5;
152:19,22;161:16;
162:13,19;167:21;
184:11,12,13;192:3;
196:25;197:11;
202:15;204:16;
206:13;208:19,22;
209:9;210:2;212:8;
215:14;216:9,9;
229:14;235:6;237:1
**ones (3)**
73:22;113:15;

115:22
**ongoing (2)**
37:15;182:12
**online (1)**
45:8
**only (28)**
21:13;23:13;25:7,
22;29:8,21;30:11;
62:23;68:19;80:8;
83:23;85:23;89:15,
17;107:3;115:22;
118:10;121:2;
122:24;146:6;
147:15;193:10;
204:22;211:3,5,6;
212:9;214:14
**open (3)**
19:4;116:17;126:3
**opening (1)**
13:9;21:9;35:1;
105:18
**operating (1)**
124:6
**opine (5)**
199:1,7,18;202:4,6
**opinion (26)**
199:21,21;200:14,
18,21,23;201:2,7;
203:8;204:4;212:23;
213:5,6,6,8,14,17;
218:23;219:4;
222:18;223:1;
226:12,21;227:13,22;
236:21
**opinions (4)**
198:23;226:18;
227:20;237:16
**opportunity (13)**
12:17;13:2;21:1,3;
35:23;36:3;38:10;
111:7;171:25;181:5;
185:8,9,12
**oppose (3)**
172:10,13;173:12
**opposes (1)**
173:23
**opposing (1)**
174:2
**opposite (1)**
232:17
**opt (1)**
173:19
**oral (4)**
113:8,25;114:1,20
**order (28)**
15:20;16:9;18:20,
21;19:10;23:10;24:6;
48:18;50:3,11;79:9;
88:17;90:20;91:7;
98:21;116:8;136:13;
138:6,9,9,15;156:6,
11;177:6;188:20;
191:22;192:2;202:22

**orders (2)**
33:23;76:12
**Organization (1)**
218:9
**original (2)**
112:14;144:20
**originally (1)**
192:1
**origination (2)**
16:12;88:20
**origination- (1)**
16:7
**others (17)**
22:22;93:9;99:13;
114:14;117:11;
124:14;219:6;221:4,
15;232:4,16
**other's (1)**
232:19
**otherwise (5)**
80:10;124:18;
129:4;173:12;234:15
**ourselves (1)**
164:23
**out (35)**
16:7;20:19;23:15;
25:16;27:2,3;41:14;
42:20;46:2;58:21;
59:4;61:25;77:11;
78:14;79:22;83:11;
108:23;124:6;133:8,
8;136:16;142:2;
150:13;160:20;
173:19;189:19,20;
197:1;208:13;209:4;
221:2;232:12,21,22;
237:1
**outcome (1)**
119:13
**outlook (1)**
148:4
**outside (4)**
115:19;119:18,23;
187:19
**outstanding (5)**
60:21;62:13;
153:15;162:11;
168:22
**over (23)**
18:24;20:7;29:13,
15;35:2;54:17;73:2,
6;74:22;113:13;
121:17;131:6;
152:18;165:5,7;
166:22;227:3;
229:23;232:9;233:2,
9,13,18
**overall (1)**
115:1
**overruled (29)**
39:10;49:9;56:14;
62:18;85:11;87:17,
19;90:12;98:25;

112:18;114:24;
115:15;118:5;
119:21;120:10;
122:10;129:14;
131:13;142:15,23;
161:13;162:16;
163:9,18;164:8,17;
236:23;237:5,24
**overview (1)**
143:10
**overwhelmed (1)**
94:1
**owe (1)**
124:10
**owed (1)**
124:7
**own (25)**
21:21;22:23;23:14,
15;24:8,21;25:6;
95:23;107:16,16;
120:12,12,14;140:14;
207:19,20,24;208:3;
209:13,18;210:7;
211:10;221:5;
223:18;236:10
**ownership (1)**
190:13

## P

**package (4)**
45:2;169:22;178:3;
182:25
**page (119)**
42:4,13,15,16,16,
17,18;43:13,20,21,
24;44:2,9,18;45:6,8,
20,23;46:7,11,16;
54:4,6,15,20;56:20;
58:24;75:21;94:4,10;
97:6,10,13,17,25;
99:4;109:2;110:7,15,
20,24;111:9;123:18;
126:21;127:13;
137:6,25;138:5;
147:4,7;153:19;
158:12,13,14,16,21,
21;159:8,8;162:2,2,4,
4;168:13;173:8;
177:25;178:17,18,22,
24;179:5,6,8,12,25;
180:1,1,11;181:6,6,8;
182:13,22;187:11,16;
193:7;194:19;
208:19;209:10;
216:21,22,23;217:16,
23,24,25;223:25;
224:4,5,10;225:13;
226:6,6,11,13,17,20;
227:7,11,12,19;
228:4;229:19,19,22;
230:16;236:2,6,7
**pages (4)**

77:8;113:15;
122:21;198:7
**paid (7)**
14:23;30:22;34:14;
66:21;67:4,8;118:11
**papers (3)**
18:23;195:6,8
**par (1)**
73:6
**paragraph (40)**
42:7,11;46:5,16,17,
20;47:2,3;60:4;
65:12;68:1,4,9;69:7;
70:23;96:20;99:3;
123:20,20;124:3;
127:5,10;185:5,8,9,
11,12,17,18;186:9;
199:4,6;201:17;
213:7;218:10;224:5,
5,7,9,10
**paragraphs (5)**
37:21;38:9;39:1;
58:10,17
**pardon (4)**
101:8;140:9;
167:11;218:11
**pared (1)**
35:16
**paren (1)**
138:15
**Park (3)**
7:4;8:11;9:23
**parsing (1)**
59:4
**part (34)**
13:24;17:16;30:2,
12;34:11;42:8;45:2;
51:18;58:25;65:6;
85:6;87:4,11;104:5;
113:13,17;122:18;
129:4;137:21;
148:10;160:8;
164:22;182:25;
201:16;212:9;
214:25;215:15;
228:15,15,20;232:2,
3,5;237:6
**participants (1)**
114:3
**participate (9)**
51:1;95:6,10,14,17,
21;96:5;142:12,17
**participated (7)**
47:4;94:21;142:19;
143:2,3;145:17;
174:19
**particular (13)**
43:4;55:8;58:22,
23;62:22;70:13;
124:2;190:14;210:4;
211:1;217:15;227:7,
12
**particularly (5)**

27:3;38:8,25;
105:22;215:1
**parties (28)**
14:11;17:6,22;
20:8;21:21,25;23:3;
25:14;26:23;31:10,
12,17,18,22,23;50:9;
60:21;63:2;79:5;
99:12,15;114:10,10,
17;133:11;173:10,
11;197:18
**parties' (1)**
196:5
**parts (1)**
117:18
**party (3)**
99:12,15;171:4
**pass (3)**
71:16;102:13;
153:25
**past (2)**
35:2;190:15
**path (1)**
27:2
**PATRICK (12)**
10:9;89:3;129:19;
158:24,25;159:14;
162:23,23;163:1,3;
164:1;165:19
**Pause (10)**
39:18;71:23;96:13;
131:21;150:8;153:8,
18;161:18;174:12;
191:17
**pay (9)**
14:25;24:16;33:5;
56:4;61:5,20;68:3;
104:19;234:4
**payment (29)**
16:23;19:22,23;
20:1;22:13;24:6;
29:7;68:25;71:1;
101:23;126:1;
144:18,24;152:15,18;
164:20;165:5,8,9;
166:19;181:22;
184:3;185:20,24;
199:10;206:21;
226:23;231:2;233:8
**payments (18)**
14:19;29:6;46:21;
64:4,8,19;69:16;
72:11,12,13,20;92:7;
152:17,18;165:5,6,
15;185:17
**payout (2)**
165:16;180:5
**payouts (5)**
199:12;213:9;
219:1;224:2,14
**PC (1)**
8:9
**Peachtree (1)**

8:3
**Peck (10)**
94:22,25;95:1,6,9,
13,16,20;96:4;99:18
**peculiar (1)**
28:15
**peer (1)**
236:10
**peers (1)**
233:20
**pending (2)**
199:12;218:25
**people (15)**
21:3;68:2;72:13;
89:21;107:15;108:2;
113:6;114:18;115:3;
187:4,7,9,25;205:22;
207:2
**percent (21)**
32:17;63:7;127:12;
128:5;129:18;
179:14;180:4;
181:12;184:4,4;
204:8;208:6,14;
213:18,25;214:1,25;
226:24;228:8,11,17
**percentage (9)**
63:5;64:18;128:19;
181:18;182:2,3,5;
226:24;231:3
**perform (9)**
92:19;142:7;143:6,
8,15;155:17,20;
220:16;222:2
**performance (1)**
61:17
**performed (8)**
92:15,23;187:17;
198:24;199:2,17;
202:3;210:7
**performing (9)**
204:2;205:15,20;
206:5;207:10;
209:20;211:10;
221:24;222:10
**perhaps (2)**
104:22;205:17
**period (8)**
34:16;47:11;101:3,
16;116:15,18;
152:18;165:16
**permit (3)**
100:18;103:5;
223:21
**permitted (2)**
27:16;121:19
**permitting (1)**
95:23
**persist (3)**
96:6;103:6,7
**person (3)**
117:3;135:19;
146:18

**personal (1)**
39:8
**personally (2)**
26:23;143:6
**personnel (1)**
187:23
**perspective (2)**
13:11;115:11
**pertaining (1)**
92:25
**pertinent (1)**
84:16
**PETER (4)**
6:7;8:17;28:8;
39:24
**Pfeiffer (1)**
18:9
**Pfeiffer's (1)**
32:18
**Phelps (88)**
18:9;25:8,19;
92:15,23;141:14,18,
22,24;142:10;143:8,
10,19;145:10,15,23;
149:11,12,15,23;
150:4,23;151:22;
152:12,25;153:12;
155:16;166:10;
174:20;175:1;
178:12;180:13,18;
181:17,25;184:10;
185:21,23;186:6,12;
187:8;198:24;199:2,
8,9,11,17;200:4,25;
201:18;202:3,6;
203:14,17,21;204:2,
9;205:15,22,23;
206:4,18;207:2,7,17;
208:2,18;212:3,17;
213:8;218:24;221:7,
22;222:1,3,6,9,20;
225:6,14;226:9,17,
22;227:4,19;228:4;
230:12;235:18
**Phelps' (4)**
200:1;206:15;
207:11;223:1
**phrase (1)**
159:25
**picking (1)**
63:21
**picture (2)**
212:9,10
**piece (5)**
120:15;122:13;
123:6,7;214:18
**pitcher (1)**
36:19
**place (9)**
13:19;34:11;82:9;
104:24;114:18;
125:5,13;126:13;
158:4

**plaintiff (2)**
82:11;220:21
**plan (157)**
13:22,24;15:3,4,4,
24;16:1;17:15,16,18,
19,20;23:17,23;24:2,
5,20,20;28:18;29:4,5,
14,18,19;30:1,9,19,
21,24;31:3,4,7,9,11;
32:8;33:11;35:19;
36:2;40:13;42:9;
43:7;47:6,9;48:5,10,
18,24;52:22,23;
53:10,12;56:3;61:3,
11,20;67:7;68:2,3,6,
13;69:3,5;72:5,6,10,
12,13,21;77:6;
105:22;106:24,25;
107:4;115:7;120:19,
25;121:7;122:3,8;
124:18;125:24;
126:4,4;143:13,16,
23;144:3;149:1;
152:5,20;153:12,21;
160:5,6,19,21,25;
161:4,11,15;162:14,
18;163:6,7,15,16;
164:2,3;167:17;
168:14;171:4,9,13;
172:8,13,16,18,19,
20;173:5,13,13,16;
175:6,10;177:10,12,
13,19;178:18,24;
179:1;181:7;182:8;
183:19,22;184:8,11,
13;186:18,22,24;
187:19,24;188:2;
199:14;204:5;
213:10;219:2;
224:17;225:8;
228:19;231:16,20;
232:11,15;233:5
**plans (1)**
40:9
**plate (1)**
121:7
**Plaza (2)**
6:12;7:4
**pleading (1)**
86:14
**pleadings (2)**
88:5;90:18
**Please (40)**
12:3;30:20;36:18;
38:2;39:5,20;56:9,
20;75:5;78:17;84:20;
94:4;132:15;133:23;
137:25;147:4;
149:18;151:12;
165:24;172:4;
174:14;175:13;
177:21,25;178:2;
179:25;180:12;

182:13;184:16;
185:5,11;186:9;
187:11;188:8;
195:15;197:15;
217:21;225:13;
228:3;229:17
**PLLC (1)**
8:20
**plus (3)**
209:24;214:14;
224:25
**pm (5)**
132:14,14;188:7,7;
238:13
**podium (1)**
24:12
**point (28)**
22:6;27:22;31:12;
35:13;48:3;66:2;
71:15;77:22;83:22;
92:5;98:15;104:20;
126:6,11;131:1,7;
142:2;144:6;151:16;
152:22;166:17;
168:19;169:25;
189:1;200:10;201:4;
212:21;220:4
**pointed (1)**
58:21
**pointing (1)**
20:19
**points (3)**
23:5;91:1;188:15
**policies (37)**
14:23;17:1;23:24;
24:23;29:8,9,9,23;
34:8;41:7,10,11;
42:24;43:2,8,9,16;
44:13,20;46:9;48:2;
50:1;64:11,16;
101:22;102:1,11;
143:18;144:7,17,24;
171:2,23;173:20;
175:5,9;200:15
**policy (1)**
47:2
**policyholder (1)**
234:6
**policyholders (17)**
29:6;30:11,17;
34:2;42:8;46:7;
53:18;55:3;61:5,10,
20;66:21;199:13;
213:9;219:1;224:16;
234:5
**policyholders' (1)**
32:15
**Ponce (1)**
10:22
**pool (2)**
214:4,4
**poorly (3)**
233:13,18,24

**portion (4)**
16:4;35:8;97:10;
217:24
**position (4)**
67:1;121:16;130:6;
164:23
**possibility (10)**
36:4;48:1;118:15;
120:15;125:10;
126:3,23;175:4,9;
212:7
**possible (7)**
14:12;72:4;76:12;
106:20;211:14;
233:2;234:7
**pot (1)**
234:2
**potential (13)**
16:14;22:20;35:21;
68:1,10,20;127:14;
153:11,20;199:11;
204:5;218:24;221:24
**potentially (2)**
62:14;219:6
**PowerPoint (2)**
201:20;225:20
**practical (1)**
211:2
**practice (1)**
216:8
**practitioners (1)**
236:9
**precedent (2)**
23:16,17
**preclude (1)**
22:8
**precluded (3)**
25:2;50:2,3
**precluding (4)**
50:4;100:13;101:1,
11
**pre-marked (2)**
77:15,15
**premise (1)**
20:10
**premised (2)**
53:15;54:25
**premiums (2)**
16:25;20:2
**prep (1)**
148:3
**preparation (4)**
205:4;221:13;
228:25;230:7
**prepared (6)**
65:2;93:1;140:17;
150:23;201:18;
203:13
**preparing (1)**
228:10
**pre-petition (8)**
106:22;116:11,15,
18;117:4,14;122:4;

192:19
**PRESENT (14)**
11:3;12:15;33:15;
50:22;95:1,3;157:23;
179:19;197:18;
199:25;203:12;
224:2,13,25
**presentation (15)**
145:11,18,20,
23;166:22;168:12;
174:25;178:4,12;
180:9;185:21,24;
187:8;201:21
**presentations (1)**
109:15
**presented (8)**
24:12;25:17;26:17;
36:5;145:3,15;
175:17;176:11
**preserve (2)**
32:12;122:7
**president (3)**
18:1,2,4
**presumably (1)**
232:8
**pretend (2)**
117:15,15
**pre-trial (1)**
12:14
**prevail (4)**
92:9;119:12,16;
220:17
**prevailing (1)**
120:13
**prevent (1)**
50:11
**previous (1)**
183:17
**previously (3)**
13:23;17:9;196:5
**price (1)**
213:3
**principal (3)**
66:21;67:4,9
**printed (1)**
96:25
**prior (3)**
86:18;175:5,10
**privilege (1)**
50:11
**privileges (2)**
91:5,5
**pro (1)**
14:18
**probability (1)**
67:15
**probable (11)**
60:10;63:10;65:19,
20,24,25;66:6,11;
67:15,15;220:24
**probably (4)**
107:21;117:11;
118:6;128:5

**problem (1)**
76:5
**problems (1)**
73:10
**procedural (1)**
219:25
**proceed (2)**
36:23;39:19
**proceeding (8)**
27:1;29:11,20;
30:3;31:22;40:19;
51:13;103:20
**proceedings (10)**
12:14;23:22;41:5;
93:11;94:22;97:4;
112:20;173:12;
182:12;238:13
**process (20)**
13:25;17:16,20;
22:8;79:5;91:2;93:9;
112:3;113:17;114:4,
19;129:4;155:22;
157:4;160:9;206:1,
18,25;212:24;227:4
**produce (2)**
65:4;83:21
**produced (4)**
83:11,17;84:11;
221:14
**professor (1)**
18:11
**professors (1)**
230:11
**project (1)**
68:17
**projected (16)**
63:14,18,25;64:4,8,
19;65:13,15;68:18;
69:8;70:3,20;143:22;
214:11,21,24
**projecting (2)**
224:24;226:22
**projection (2)**
207:12;222:5
**projections (10)**
183:21;203:10,15;
206:2;207:20,23;
214:15;222:12;
227:1;228:16
**proof (6)**
14:14;71:14;79:21;
108:14;109:11;
190:13
**proofs (7)**
14:9;71:7;88:13;
90:16;120:24,24;
121:20
**proper (2)**
13:20;109:13
**property (1)**
27:4
**proponent (1)**
162:21

**proponents (4)**
76:6,14;77:25;
132:17
**proportion (2)**
130:11;231:10
**proposal (19)**
52:6;101:22;102:4,
7,10;143:18;144:7,
13,17,20;145:3,14;
167:15;168:14,17;
181:7;183:25;186:5;
237:2
**propose (1)**
24:2
**proposed (12)**
18:20,21;22:13;
23:17;92:16;102:1;
149:1;154:17;156:6;
181:22;184:3;226:3
**prorated (1)**
29:6
**prosecute (2)**
121:1,20
**prospect (4)**
115:6;117:22;
126:17;165:6
**protect (5)**
139:4,6,8,10,15
**protection (1)**
139:1
**protective (1)**
23:19
**prove (1)**
23:4
**provide (16)**
14:1;17:16;22:25;
40:12;99:13;139:1;
175:12;190:12,13;
215:25;217:3,13,18,
19;218:13;236:13
**provided (23)**
14:15;29:5;38:8;
41:7;59:15;76:10;
149:15,16,22;150:22;
152:12;162:11;
176:21;186:15;
190:19;199:22;
200:25;204:12;
206:16;216:5;221:5,
10,16
**providers (3)**
64:4,8,19
**provides (8)**
15:2;138:8;144:23;
168:21,22;210:23,23;
218:10
**provision (2)**
23:12;67:13
**provisions (14)**
16:8,9;63:16,23;
65:8;66:16;67:2;
68:24;69:12;70:6,11;
88:18,21;149:7

**prudent (1)**
24:4
**PSA (4)**
79:5;83:18;161:4;
173:11
**public (6)**
24:18;30:2;73:1,2,
23,24
**publicly (3)**
212:5,6,8
**Puerto (1)**
73:8
**pull (5)**
41:14;83:10;128:9;
136:1;176:24
**pulling (1)**
148:3
**purport (1)**
23:11
**purportedly (3)**
23:8;25:3,16
**purpose (16)**
84:1,2;85:9,11,23;
86:17;88:21;89:5;
90:3,7,7,13;99:21;
139:15;140:5;193:9
**purposes (3)**
89:24;210:19;
236:21
**pursuant (8)**
69:11;70:5,10;
100:23;124:9,11;
149:7;152:5
**pursue (6)**
15:14;118:18;
121:22,23;122:4,7
**pursuing (1)**
115:12
**put (18)**
43:5;71:3;73:25;
75:6;79:13,13;103:4;
110:18;118:14;
133:14,17;136:22,23;
181:19,19;192:3;
196:20;217:17
**put-back (2)**
29:16;63:2
**putting (2)**
85:24;88:21

## Q

**quantification (1)**
20:19
**quantified (2)**
25:17,17
**quarter (3)**
74:13,15,21
**quarterly (6)**
60:7;62:2,5,5,8;
63:19
**questionable (1)**
164:11

**quick (2)**
132:21;229:25
**quicker (1)**
157:11
**Quickly (1)**
74:7
**quite (1)**
35:17
**quote (2)**
217:16;218:15

## R

**raise (7)**
17:7;35:11;36:16;
86:23;133:20;
169:12;197:12
**raised (4)**
21:13;30:10;190:5;
220:21
**raising (1)**
195:9
**range (35)**
15:12;22:20;
119:11;128:7;
187:10;199:25,25;
200:3,6,7,12;203:19;
204:8,9;207:16,17;
208:1,8,14;210:10,
20,23,25;212:2;
213:18,21,23,24;
214:1;224:1,13;
225:1,2,2,4
**rata (1)**
14:18
**rate (41)**
130:15,18,20,22,
24;178:21;179:4,11,
13,19;199:8;203:22;
204:1,4,6;207:14,16,
17,24,25;208:2,3,5,8,
18;209:13,19;210:4,
8,20;211:1,11;212:2,
10,17;213:8,17,20,
22;222:13,18
**rates (5)**
179:21;204:8;
208:16,25;216:6
**rather (4)**
130:8;138:9,24;
150:12
**rationale (1)**
206:25
**raw (5)**
205:9;222:22
**reach (5)**
220:17;221:6,8
**reached (10)**
35:3;115:10;199:9;
203:8;206:19;
220:18;221:1,23;
223:1;225:6
**reaching (4)**

109:12;118:15;
141:22;221:5
**read (36)**
12:17;13:2,6;
20:11;44:16;63:15,
15;65:12;68:17;
69:25;86:18;87:23;
109:15;112:4,7,7,9,
19,22;113:15;124:1;
128:16;139:14;
143:13;151:6;
162:10;168:21;
171:9;177:9;202:12;
214:25;218:15;
236:3,8,12,14
**reading (3)**
54:14;187:16;
216:17
**ready (2)**
36:8;91:13
**real (1)**
125:17
**realistically (1)**
231:23
**realized (5)**
65:14,16;68:18;
78:23;148:5
**really (19)**
20:8,17;21:4,9;
31:4;34:1;67:11,11;
105:20;115:6,22;
122:13;125:16;
126:6;164:11;165:4;
180:19;193:10;
229:25
**reason (6)**
50:10;54:13,24;
63:9;116:1;228:24
**reasonable (39)**
18:18;24:9;199:10,
23;200:2,3,5,7,9,13,
15;203:17,20,22,25;
204:9;206:18,20;
207:13,18;208:2,7,8,
14,18;209:6;211:4,
16,17;212:21;
213:10;214:1;216:3;
218:23;221:7;223:2;
225:5,5,6
**reasonableness (5)**
199:1,7,8;200:11;
208:15
**reasonably (7)**
19:16;200:19,22,
24;201:14;227:5,25
**reasoning (1)**
235:13
**reasons (5)**
18:22;23:3;39:1;
116:6;208:12
**REBECCA (1)**
7:19
**rebuttal (1)**

238:6
**recall (63)**
42:6;43:3,10,13;
44:11;49:1,7,10,11;
51:5;55:4;64:21;
71:6;72:7;92:2;93:2,
9;95:4,5;98:4;
108:10,20;112:11;
124:2;128:4;136:5,6;
145:11,12;146:19;
147:18;148:22;
149:1,8,13,14,17;
153:15;157:25;
160:8,13;163:10;
166:10;175:2;
181:16;182:3,7,18;
183:15;184:6,15;
187:16;203:13;
207:6;216:17,19;
217:6,8;227:8,10,18;
235:5;236:12
**recapped (1)**
121:10
**receive (25)**
24:10;55:7;56:7,
12,23;61:10;63:23;
65:8,23;66:15;68:19;
72:13;149:6;151:20;
160:24;161:14;
164:12;183:25;
228:20;231:6,10,20;
232:2,14;233:4
**received (30)**
19:20,22,23;20:16;
26:3;39:11;53:16;
55:2;72:12,20;80:20;
87:11;90:14,16,18,
20,22,24;104:23;
134:19;135:2;
141:17;151:6;170:4,
6;193:19,21;196:1,
11;198:14
**receiving (5)**
20:14;53:18;55:3;
99:15,15
**recently (5)**
73:9,25;74:12
**recess (9)**
77:11;78:11,16,18;
90:10;132:1,14;
188:5,7
**recognition (1)**
128:4
**recognize (4)**
94:7;96:14,16;
138:3
**recognized (3)**
117:25;118:20;
128:17
**recollect (1)**
147:15
**recollection (10)**
57:13,14;99:20;

12-12020-mg    Doc 4759    Filed 08/19/13    Entered 08/20/13 15:07:54    Main Document
RESIDENTIAL CAPITAL, LLC, et al.
Pg 264 of 273
Case No. 12-12020-mg

August 16, 2013

111:13,17,24;129:9;
148:2;173:15;201:22
**recommend (1)**
164:19
**recommendation (2)**
143:12;145:19
**recommendations (1)**
165:3
**reconfirmed (1)**
111:8
**reconnect (1)**
153:7
**record (19)**
30:2;35:13,25;
37:5,11;41:23;53:2;
74:25;75:1,9,17;
90:2;91:3,7;162:24;
174:14;178:3;
194:20;223:14
**records (4)**
45:8;64:25;65:1,22
**recover (2)**
56:2;129:24
**recoveries (32)**
22:21;24:1,9,13,15,
21;32:13;33:10;42:8;
60:8;61:9,13,24;63:2,
14,22;64:12;65:7,14,
16,18;68:10;72:4,6;
143:21,22;144:1;
199:11;204:5;
218:24;219:6;221:24
**recovering (1)**
126:23
**recovery (25)**
32:11,15,19,19;
33:13,14;46:6;53:14;
54:8,12,21;55:6,9,16;
63:19;68:18;69:9,22;
70:3;92:12,12;118:2;
181:11;231:2;233:19
**RECROSS-EXAMINATION (2)**
73:17;165:22
**Redirect (17)**
59:20;71:19,25;
72:2;74:9;131:18,22;
154:2,3;162:20;
163:2;167:23;188:9,
12,14;234:12,18
**redound (1)**
61:18
**reduce (1)**
72:20
**reduced (1)**
14:13
**reduces (1)**
14:9
**reduction (5)**
15:13;21:13;
104:17;125:20,21
**refer (10)**
43:20;62:5;63:13;
65:1;68:1,4;77:3;

111:20;172:16;
187:11
**reference (15)**
31:4,5,7;43:2,6;
46:9;47:2,3;110:16;
127:18;150:16;
151:9,12;160:4;
184:21
**referenced (2)**
169:16;189:23
**references (4)**
29:22;37:15;43:3;
44:19
**referred (9)**
16:6;60:15;88:19,
22;111:22;112:8;
150:17;155:21;198:2
**referring (17)**
27:21;42:14,16,18;
43:17;44:5;58:7;
60:16;62:7,23;70:14;
73:22;172:17,23;
175:20;181:16;
182:11
**refers (8)**
32:16;62:4;85:23;
96:19;134:3;150:6;
162:14;178:21
**reflect (1)**
224:23
**reflected (14)**
64:25;149:14;
153:16;202:9,18,23;
203:9;204:2;205:16;
206:5;209:20;211:7;
213:7;222:21
**reflecting (1)**
193:12
**reflects (4)**
15:13;18:18;64:22;
202:2
**refresh (5)**
57:13,14;99:20;
173:15;201:20
**regarding (1)**
48:1
**regardless (1)**
172:3
**rehab (1)**
72:11
**rehabilitation (79)**
17:3;23:23;24:2,5,
20;28:18;29:11,14,
20;30:1,3,19,21;31:9,
11,22;32:8;33:11;
40:18;41:5;47:5,10;
48:5,18,23,24;52:22,
23;53:10,12;56:3;
61:3,11,20;67:7;68:2,
6,13;69:5;72:5,6,10,
12,13,20;143:13,16,
23;144:3;164:21;
177:10,12,13,13,19;

178:18;179:1;182:8,
9,11,12;183:19,22;
186:22,24;187:18,24;
199:14;204:5;
208:11;213:10,22;
219:1;224:16;
231:16,20;232:11,14;
233:4
**rehabilitator (15)**
23:25;28:22;29:14;
30:18;31:8;40:17,22;
41:2,6;42:9;46:17;
50:8;139:6;182:19;
183:19
**rehabilitators (1)**
24:9
**reimburse (1)**
14:19
**reimbursed (2)**
30:23;181:19
**reimbursement (6)**
58:14,17;59:1;
66:20;67:3,11
**reimbursements (18)**
30:14;66:3,4;
69:10,14,23;70:4,9,
16;149:6;150:7,17;
151:9,12,14,14,17,20
**reinsurance (3)**
29:22;64:13,14
**reinsurers (1)**
31:16
**relate (2)**
26:4;79:20
**related (9)**
16:8;52:20,21;
59:9,13;72:25;88:21;
112:20;144:14
**relates (1)**
152:4
**relating (5)**
16:7,12;35:15;
99:16;172:20
**relation (2)**
49:17;99:18
**relative (3)**
112:11;232:18;
233:20
**relatively (4)**
14:6;233:3,13,14
**release (5)**
16:3,10,25;104:17;
125:23
**released (3)**
16:5;106:1;124:18
**releases (3)**
15:15;16:13;
125:20
**relevance (1)**
86:14
**relevant (4)**
149:8;210:9;
212:16,19

**relied (38)**
108:10,13,16,19;
109:19;110:19,23;
111:3,8,14,18;
112:23,24;113:3,11,
15,20,21;114:1,21;
115:3,17;128:21;
129:11,15,15;131:1,
7;141:21,25;142:9;
143:11,19;144:5;
208:10;221:4;222:3,
20
**relief (2)**
16:9;88:18
**rely (4)**
141:24;142:3;
210:18;211:7
**relying (5)**
200:24;215:23;
221:9,14,15,22
**remain (2)**
14:24;26:12
**remainder (1)**
68:23
**remaining (1)**
87:21
**remarkable (1)**
13:25
**remember (15)**
50:14;93:10,17;
110:18;145:7,9;
146:15;148:14;
156:8;202:18,20;
209:13,14;234:2;
236:3
**remote (1)**
118:9
**remove (1)**
191:18
**removing (1)**
35:14
**render (11)**
198:23;199:20,21;
200:14,18,21,23;
201:2,7;204:3;
212:23
**rendered (2)**
78:19;199:21
**rendering (3)**
219:4;226:18;
227:20
**renew (1)**
80:10
**Reo (1)**
11:4
**reorganization (4)**
40:3,13;48:11;
161:11
**repeat (7)**
37:21;56:9;62:3;
104:22;142:16;
172:12;211:9
**repeating (1)**

206:7
**rephrase (2)**
55:14;116:16
**replicate (1)**
234:21
**report (34)**
32:17,18,19;58:22;
143:9;166:22;
178:13;180:13,18;
201:18;202:12;
203:9;204:3;205:16;
206:5,15;208:9,23;
209:20;216:13;
221:16;222:21;
223:17;225:14,22,22;
226:9,17;227:19;
228:4,25;230:12;
235:5;237:19
**reports (2)**
228:10
**represent (5)**
21:20;133:11;
141:3;150:9;169:15
**representative (2)**
190:12,16
**representatives (2)**
99:10,14
**represented (3)**
127:12;159:14;
182:1
**representing (8)**
40:2;81:21;82:11;
93:5;94:13;122:23;
141:6;157:23
**represents (10)**
13:21;17:13;20:15;
69:9;70:3;71:1;
158:25;159:1;184:3;
230:13
**reps (1)**
16:11
**repurchase (1)**
117:13
**repurchased (3)**
116:11,19,23
**repurchases (1)**
117:6
**request (3)**
95:17,20;99:10
**requesting (1)**
34:12
**require (1)**
136:4
**required (3)**
24:4;136:7;154:20
**requirements (1)**
91:6
**requires (4)**
31:11;171:13;
172:13,19
**requiring (1)**
17:4
**re-review (1)**

145:20

**ResCap (60)**
14:18;15:7,22,25;
20:4;21:24;28:14;
31:1,3,5,6;32:15,20;
33:1;34:6,11;35:7,
15;48:10;49:25;51:1,
13,15,15;52:20,22;
53:15;55:7,17,22;
56:8,12,23;58:14,18;
60:18;71:8;83:13;
84:10;103:9,10;
105:19;106:21;
107:22,23;117:3,4,9;
125:12;152:5;
162:11;168:22;
184:8;186:16;
192:20;199:13;
213:9;219:1;224:16;
232:1

**ResCap/FGIC (2)**
48:19;55:25

**ResCap-related (6)**
59:9,13;69:11,23;
70:5,10

**ResCap's (2)**
124:5,9

**Research (4)**
11:4;119:17,24;
120:2

**reserve (3)**
35:8;80:9;121:18

**reserves (6)**
15:5;73:19,25;
74:11,18,21

**residential (1)**
18:14

**resolution (6)**
20:6;160:1;162:11,
14,17;168:22

**resolve (2)**
90:1,10

**resolved (2)**
18:8;30:15

**resolves (1)**
14:8

**resolving (1)**
16:18

**resource (1)**
236:9

**respect (41)**
38:25;51:15;52:22;
53:17;55:6;74:17;
82:22;85:13,17;
87:18;88:3,16,24;
89:12,13,24;90:8;
91:9;92:23;102:7;
105:22;107:13;
108:10;120:5;122:1;
127:4;132:16;177:9;
182:19;183:19,22;
198:24;199:9,17;
204:1;207:23;

212:13;213:17;
215:16;222:18;
223:18

**respective (1)**
35:2

**respond (2)**
39:3,4

**responded (2)**
54:13,24

**response (2)**
54:11;87:2

**rest (3)**
33:4;38:3;117:18

**restate (3)**
143:25;174:1;
181:20

**restricted (1)**
27:19

**restructuring (2)**
17:25;102:18

**result (12)**
26:4;54:9;55:22,
25;56:7,12,23;61:18;
68:3;69:3,4;126:17

**resume (2)**
132:4,15

**retain (1)**
155:3

**retained (2)**
68:23;121:16

**return (2)**
214:22,24

**revealing (1)**
24:19

**revenue (1)**
118:8

**review (19)**
44:14;92:25;
108:13,16;109:11,12;
123:24;128:1,8,15;
143:9;145:20;179:6,
8;202:8;207:11;
221:2;226:17;227:19

**reviewed (17)**
42:6;86:17;87:4,
11;111:18;175:19;
176:20;187:2;188:2;
202:7;203:7;204:3;
205:16;222:21;
230:6,9,10

**reviewing (3)**
86:15;124:2;
185:13

**revised (3)**
16:8;88:17;90:20

**revision (1)**
146:8

**revisions (1)**
146:14

**revisit (1)**
37:18

**RFC (16)**
14:17;15:6;105:22;

106:21;107:23,25;
108:3,6;113:1;
116:10,19,19,23;
118:3,11;129:24

**RICHARD (2)**
6:24;21:7

**Rico (1)**
73:8

**right (204)**
12:23;35:7;36:8,
16;37:6,12;38:4,18;
40:6,10,19,23;41:8;
42:2,22;45:12;47:16;
48:11,13,19;49:2;
50:1,23;51:2;52:22;
53:11;54:19;55:20,
22;59:3,11;63:2;
64:21;65:11,19;
66:24;67:17;69:23;
71:17;76:5,17;77:9,
19,25;78:10,17;80:1,
16;81:12;82:19;85:9;
86:23,25;87:18;
88:23;90:13;92:17;
97:1;103:4;105:7;
106:2,6,17,19,23;
107:1,5,7,8,11,18;
108:3,14,17,21;
109:8,9,22;110:23;
111:23;117:17,20,23,
25;118:3,10,13;
120:20,20,22,23,24;
121:2,7,7,18;122:1,4;
123:1,16;124:5,21,
24;125:24;126:7;
127:4,8,10,16,19,21;
129:2,8;131:25;
132:4,5,10,13,15,24;
133:15,21;134:8,11,
16;135:4;137:5,7;
141:15,19;142:5;
143:7;144:8,20,25;
145:1;146:6,16;
149:6;151:20;152:9;
154:1,10;155:6;
156:19;159:8,13,22;
161:9;162:1,21;
163:7;167:5,20;
168:25;169:12;
171:19;172:3,22;
173:18;178:1,9;
179:9;181:16;183:8;
188:4;191:12;
192:22;193:14,16,25;
194:17;195:9,25;
196:8,9,15;197:12;
198:12,25;199:5,14;
201:10,14;202:24;
203:2;204:5;205:8;
206:6;207:22;
208:20;210:11;
211:22;212:18;
213:24;217:9;

219:25;220:11,13,18;
221:8;225:10;231:4;
233:25

**right-hand (1)**
217:24

**rights (16)**
15:5;22:4;23:20;
26:8,12;27:3,3;
28:16;29:16;30:13;
32:12;35:9;53:19;
55:3;58:14;124:13

**risk (15)**
32:23,24;33:1,3;
35:22;119:15;120:6,
13;125:5;126:13,16,
20;127:2;154:21;
165:18

**risks (2)**
118:19;119:10

**RMBS (40)**
7:3;9:13;10:4;
19:8;28:12;29:9;
30:8,11,17;31:16,23;
42:24;43:2,9,16;
44:13,21;46:9;47:2;
48:2;49:25;54:9;
85:20;89:3;90:24;
93:5;94:14;112:1,9,
20,25;127:11;
128:16;130:13,16;
133:14;162:11,25;
168:22;169:15

**Robert (1)**
18:2

**role (2)**
155:3,8

**Ron (3)**
18:12;195:3,19

**ROPES (1)**
9:12

**ROSS (2)**
7:8;9:17

**rough (1)**
128:7

**roughly (5)**
59:12;60:22;
121:14;127:12;128:4

**Rule (3)**
12:8;75:13;79:9

**ruled (5)**
35:19;37:17,18,19;
103:6

**running (1)**
197:25

**runoff (1)**
183:21

---

**S**

**same (13)**
30:16;43:23,24;
46:11;75:21;104:8;
160:9;162:4;164:18;

167:25;196:19;
206:15;218:15

**satisfied (1)**
19:14

**saw (8)**
112:2;144:21;
146:3,6,10;147:13,
16;148:12

**saying (8)**
12:24;62:9;65:13;
69:21;70:8;103:23;
121:19;123:2

**scenario (3)**
107:4,5;234:7

**scenarios (1)**
203:18

**scheduling (4)**
16:9;76:12;88:17;
90:20

**SCHOFIELD (1)**
8:15

**School (1)**
18:11

**Schrader (2)**
205:24,24

**scope (4)**
187:20;237:10,12;
238:1

**scores (1)**
114:25

**Scott (36)**
18:4;32:24;169:6,
11,17;170:4,6,15;
172:2;173:2,6,21;
174:19,19;177:10;
179:12,22;180:2,14;
181:2,5;183:18,22,
24;184:2,7;185:3,6,
11;186:10;187:11;
188:3,14;189:13,23;
191:13

**scratch (1)**
206:14

**scratching (1)**
204:22

**search (1)**
27:1

**season (1)**
29:1

**seasoned (1)**
214:4

**seat (7)**
35:17;36:18;86:25;
133:23;192:12;
195:15;197:15

**seated (4)**
12:3;78:17;132:15;
188:8

**second (24)**
12:19;16:2;23:23;
26:15;64:7;68:17;
74:12,15;82:23;99:3;
103:21;106:9,11;

119:7;120:15;123:9;
124:7;162:1;168:16;
191:15;196:25;
197:8;210:10;213:21
**section (16)**
14:15;15:2,15;
16:2;23:9;31:11;
58:6;117:23;138:5,8,
12;139:13,14;173:6,
7,10
**secure (2)**
24:15;171:14
**secured (1)**
34:24
**securities (14)**
18:14;21:23;28:14;
32:21;33:10,12,17;
124:11;201:9;212:4;
213:4;214:4,10,21
**securitization (1)**
44:21
**security (4)**
30:8;34:6;118:21,
22
**seeing (2)**
147:15;233:19
**seek (8)**
12:8;17:10;21:25;
51:10,22;79:19;
170:17;172:6
**seeking (12)**
12:11;13:17;14:4;
15:20,21,23;35:6;
42:9;63:2;108:3;
118:24;119:2
**seem (1)**
221:18
**seemed (2)**
92:13;119:15
**seems (2)**
84:15;147:22
**sees (1)**
218:17
**select (1)**
23:21
**self- (1)**
86:4
**send (2)**
189:4,20
**sense (15)**
26:12;36:5;67:16,
16,22;125:19;200:3,
5;205:18;220:25;
224:22;227:3,6,24;
232:17
**sent (5)**
83:25;84:10;85:8;
189:17,19
**sentence (17)**
60:6,16;62:4,7;
63:14;68:18;69:7;
89:18;99:3,4;131:5;
213:6;216:17;236:3,

8,11,15
**separate (6)**
17:11;51:14;64:11;
82:1;136:21,25
**separated (1)**
79:22
**separately (1)**
120:2
**September (2)**
48:5;79:2
**sequestration (1)**
230:2
**series (8)**
24:16;26:16;38:22;
124:15;127:4;
149:25;165:5;198:23
**serious (1)**
27:8
**served (1)**
23:8
**servicers (1)**
61:16
**Services (4)**
29:1,3;41:3;47:16
**session (1)**
146:19
**sessions (3)**
51:11;94:24,25
**set (7)**
26:25;46:17;73:19;
89:13;91:18;139:13;
232:13
**setoff (1)**
30:13
**sets (1)**
124:6
**settle (3)**
22:4;43:8;103:19
**settled (5)**
62:14;220:8,9,12,
15
**settlement (281)**
12:8,16;13:11,18,
20,22,24;14:4,5,8,15,
21,24;15:1,2,10,15,
19,22,24;16:3,6,13,
15,19,22,23;17:2,4,7,
10,12,13,14,15,18,20;
18:8,17,19,21,24;
19:11,15,18,21,25;
20:4,9,11,24,25;
21:12,14;22:5,13,15;
23:1,6,9,9,16;24:11,
22;25:9,16,21;26:4,7,
9,11,13,23;31:1,4,5,
6;33:1;34:7,11;48:9,
19;49:13,18,22;50:9;
55:7;56:1,4,8,12,24;
59:1;68:5,11;69:3,4;
71:10;76:6,14;79:1,
10;83:20,22,25;
84:10,15,23,24;85:5,
20;87:6,13;88:10,19,

20;89:3;90:14,24;
91:2;92:1,4,9,16;
93:1,4,6;100:5,6;
101:4,10,19;103:10,
12,17;104:2,5,8,8,10,
14,20,25;105:25;
107:8,13;109:13;
111:19;113:18;
114:2;115:1,2,5,5,9,
12;117:20;118:16;
122:2,6;125:13,15,
19;126:12,18,19;
127:11,19,24;128:22;
129:11;132:16;
135:13,20;136:4,9,
14,16;138:2,24;
139:14;140:12;
141:9,19,23;142:8,
13,18,21;143:4,7,24;
144:3,22;145:4,24;
146:4,10,12,13;
147:8;148:4,20;
151:21;153:22;
155:22;156:3,7,16;
158:3,19;159:6,18,
19;160:1,9,24;
163:14,22;164:2,10,
21,25;165:7,11,12;
166:8,16,17,18,20;
170:18,23;171:14,17,
24;172:1,5,6,10,14,
21;173:17,20,24;
174:4,5;175:14;
176:11,15;179:20;
184:8;186:14,18;
188:17,19,25;189:2,
18,21,24;190:3;
191:23;195:18;
196:5;199:23;
200:19;201:3,9;
203:20,21;220:17,20;
225:8;228:24;229:3,
6,18;230:7;231:13;
234:22
**settlements (6)**
31:8;42:10;49:6;
54:9;165:13;220:18
**settles (1)**
61:1
**settling (2)**
133:11;197:18
**Seventh (1)**
9:4
**seventy (1)**
20:12
**several (7)**
14:7;31:13;73:2;
83:14;175:3;188:15;
214:13
**severe (1)**
73:9
**SEWARD (3)**
7:2;169:15;188:11

**shall (1)**
138:15
**Shank (1)**
83:13
**share (11)**
45:9;100:18,22;
130:15;132:9;
133:17;190:8,16;
231:6;232:13,18
**sharing (2)**
100:14;101:12
**sharp (1)**
234:16
**sheet (21)**
28:25;29:2,4,5,7;
47:13,17,19,21,24;
83:18,18;109:25;
110:8;111:2;112:12,
16;113:10;129:10;
160:17;194:19
**shift (3)**
169:8;191:15;
197:7
**Shore (61)**
34:22,23,23;35:11;
36:7;80:7,8,13,14;
86:12,13,21;87:2,3,
24,25;88:3;89:1,10,
11,20,25;90:9;105:8,
9,11,14,17;106:16;
109:5,8;110:1;
115:13;116:13,16;
122:15,20,22;123:1,
4,5,7,13,16,17;126:6,
7,10;127:6,9;131:15,
16;132:25;133:1;
194:3,4,12,14,22,23;
196:19
**Shore's (1)**
80:18
**short (2)**
13:9;20:11
**show (11)**
14:6,7;16:2;29:25;
31:15;32:14;85:22;
89:8;112:6;193:10;
194:20
**showing (1)**
83:24
**shown (2)**
18:22,23
**shows (1)**
194:19
**side (4)**
67:11;76:19;97:17;
136:20
**sides (2)**
100:8;122:25
**SIDMAN (58)**
6:23;36:12,12,21,
22;37:2,4,6,10,23,25;
39:3,4,6,13,15;45:9;
49:8;53:20;55:11;

56:13;62:16;68:7;
69:17;71:20,24;72:1,
16,17;73:12,13;74:5,
6,8,10,24;75:3,6,10,
15,17,20,22,23;76:1,
4,13,17,20,24;77:2,9,
12,16,17,20,24;
78:12,13
**SIEGEL (6)**
7:18;19:5,6,7;21:6;
93:8
**sign (3)**
155:24;159:18;
181:12
**signature (7)**
97:11,21;110:13;
135:17;158:21,22;
159:9
**signatures (1)**
97:7
**signed (34)**
97:19;98:5,7,8,9;
100:8,13;101:4,5,10;
110:10,11;111:16;
112:1,12;126:12;
129:10;135:12;
146:11;147:8,17;
151:22;153:23;
158:18,23;160:8,13,
15,16,17;167:17;
171:6;172:7,8
**significant (8)**
13:20,21;17:13;
32:10;40:8;73:19;
130:5;164:10
**significantly (3)**
24:10,16;35:16
**signify (1)**
224:19
**signing (3)**
147:11;160:9;
171:9
**similar (2)**
28:21;220:18
**simple (4)**
14:6;33:2;50:10;
216:11
**simplistic (1)**
208:22
**simply (10)**
19:22;20:9;22:2;
84:8;85:1,2,2,4,21;
235:11
**single (8)**
25:2;28:11;66:1;
79:21;116:19;131:1,
7;204:6
**sit (4)**
66:8;117:12;
179:17;180:8
**sitting (3)**
131:14;207:6;
211:14

**situation (1)**
155:11

**situations (1)**
63:3

**six (3)**
32:15;214:14;
234:12

**size (1)**
164:4

**skin (1)**
23:15

**slim (1)**
67:7

**slip (1)**
26:19

**Sloan (1)**
18:11

**small (3)**
213:20;215:17;
216:15

**SMITH (3)**
8:9;28:9;39:24

**so-called (4)**
25:24;29:16;32:10;
149:5

**Sohlberg (27)**
18:1;132:3;133:12,
13,18;134:19;135:2,
12;137:10,16,23;
146:24;147:2,6,7;
149:19;150:16;
151:11;154:5,10;
164:15;165:2,24;
167:25

**sole (2)**
19:24;107:7

**solely (1)**
22:2

**solemnly (1)**
195:11

**somebody (1)**
183:6

**Somebody's (1)**
194:10

**someone (2)**
215:12;217:13

**someone's (1)**
12:23

**somewhat (1)**
21:15

**somewhere (2)**
20:11;202:22

**soon (3)**
170:24,25;198:1

**sorry (65)**
36:9;41:15;42:5,
13;44:3;45:3,5,13;
48:15;52:23,24;
53:22;54:6,15;56:9;
58:2,5,16;59:20;
62:3;63:7;66:10;
67:16;70:1;73:21;

75:24;78:2;98:8;
101:7,8;110:24;
127:6;128:11,13,14;
131:6;137:12;153:9;
154:8;157:13;
158:18;161:9;174:8;
178:22;179:1;
180:17;182:22;
183:8;184:23,25;
188:23,24,24;189:14,
15;211:9;216:22;
218:11;225:9,18;
229:12;233:17;
235:3;236:11;238:5

**sort (5)**
78:14;97:12;128:7;
148:20;162:7

**sorted (1)**
148:4

**sought (7)**
51:24;98:20;
170:21;219:15,17,19,
20

**sounds (2)**
86:8;231:4

**sources (3)**
129:15,21;221:17

**South (1)**
10:14

**SP (2)**
18:10;197:6

**space (2)**
73:1,2

**speak (9)**
29:24;93:3,4,7;
94:13;108:5;128:12;
175:15;183:20

**speaking (4)**
19:8;74:11;207:2;
234:1

**special (2)**
18:6;34:12

**specializes (1)**
18:13

**specific (22)**
22:22;43:1,2,3,16,
17;44:13,19;48:3;
64:11;66:12,23;
89:15;113:20;
129:16;212:20;
214:2;216:15;
220:15;231:7;
234:25;236:25

**specifically (9)**
25:11;30:9;66:9;
75:11;113:16,24;
173:7;175:25;184:1

**specifics (1)**
71:6

**speculate (1)**
119:13

**speculation (2)**
105:2,4

**speculative (3)**
220:23;221:19,20

**Speed (1)**
189:10

**spelled (1)**
136:16

**spending (2)**
12:13;235:16

**spent (8)**
203:1;209:23,25;
210:3,5;235:8,9,10

**spite (1)**
233:23

**spoke (3)**
117:9;170:21;
205:25

**spoken (3)**
107:14;133:1;
184:7

**sponsoring (2)**
169:19,21

**spreadsheet (4)**
204:11,14,19;
205:3

**spreadsheets (1)**
205:8

**stage (4)**
22:9;219:24,24;
220:1

**stamped (1)**
97:7

**stand (9)**
36:15;64:16;84:13;
86:23;133:12,20;
169:11;192:10;
237:25

**standalone (2)**
13:18;17:11

**standing (1)**
195:9

**start (5)**
20:10;101:8;
105:23;126:22;131:5

**starting (4)**
46:17;83:21;147:7;
216:21

**starts (2)**
63:18;168:21

**State (20)**
21:2;28:25;30:3,
24;33:22;34:1;40:18;
47:14,16,19,24;48:6;
54:21;66:14;88:15;
118:7;127:5;182:5;
224:1,12

**stated (9)**
39:2;44:22;50:8;
63:1;85:22;173:18;
175:7;206:16;230:6

**statement (47)**
29:19,19,21;30:2;
31:6;37:7;40:12,18,
23;41:6;42:23;43:15;

44:12,15,23,24;
45:21;48:6;52:13,15;
55:4;58:1,2;60:3,13;
62:8;65:2;75:1,18;
76:21,25;77:3,6,7,13,
23;79:18;87:15;
122:14;123:3,12;
134:17,24;177:9;
216:11;217:2;218:21

**statements (18)**
24:19,21;38:8;
40:9;58:20;59:5;
60:8;62:2,5,6,15,20;
63:19;70:14;74:1,11,
12;214:22

**states (4)**
46:5;52:15;60:7;
85:2

**stating (1)**
49:1

**statutory (1)**
59:7

**stay (1)**
195:1

**stays (1)**
231:2

**STEEN (1)**
6:10

**Steering (12)**
9:13;10:4;30:8;
47:5,8,12,13;48:1;
159:1,2,3;162:24

**step (6)**
17:13,21;21:3;
121:10;152:23;188:6

**STEVEN (1)**
6:25

**still (15)**
35:12;84:13;87:18;
104:9,24;105:13,16;
125:19;164:24;
174:5;188:1;204:21;
211:15;214:16;
227:23

**stipulation (2)**
49:12,18

**stipulations (2)**
49:5,12

**Stonehill (2)**
9:3;170:11

**stop (8)**
13:5;89:22,22,22;
106:11;153:5;
172:14;230:2

**stopped (1)**
215:20

**stopping (2)**
212:21;234:16

**streams (2)**
165:8,9

**Street (5)**
6:4,20;8:3,22;9:14

**strengths (1)**

220:3

**stretch (1)**
125:17

**strict (1)**
188:20

**strictly (1)**
130:3

**Strike (8)**
55:24;63:8,8;80:9;
101:2;115:13;
203:20;206:19

**strikes (1)**
214:1

**strongly (1)**
13:23

**struck (3)**
200:2,12;225:2

**structure (1)**
126:14

**structured (1)**
73:10

**struggling (1)**
145:16

**students (1)**
210:22

**studied (1)**
231:10

**study (7)**
201:11,13,15;
208:4;219:4,8,22

**studying (1)**
201:16

**subject (18)**
15:16;27:8;29:15;
64:5,9,10,20;80:17;
83:23;96:8;123:21;
130:4,5;133:7;
153:20;159:6;
165:17;212:4

**subjects (2)**
25:6;38:11

**submit (4)**
22:8;28:4,24;76:21

**submitted (7)**
47:14,19,22,24;
49:6;92:10;174:3

**submitting (2)**
17:23;77:5

**subordinate (1)**
118:24

**subordinated (2)**
117:22;118:1

**subordination (5)**
118:15,18;119:11,
18;120:6

**subsequent (3)**
27:16;31:9;166:21

**subsequently (1)**
111:17

**substance (4)**
50:8;86:11;96:1;
184:10

**substantial (5)**

15:13;16:4;17:17;
21:10,15
**substantially (3)**
14:8,13;138:12
**success (2)**
118:14;119:1
**suddenly (1)**
26:1
**sue (2)**
124:25;126:5
**suffers (1)**
233:3
**suffice (1)**
228:23
**suggest (1)**
20:12
**suggesting (3)**
69:14;81:20;
104:16
**Suisse (1)**
60:19
**suit (1)**
140:6
**Suite (1)**
10:6
**suits (1)**
24:17
**sum (9)**
101:23;152:18;
164:20;165:4;
166:19;184:10;
199:10;225:8;231:8
**Summary (5)**
162:5;178:18;
179:1;202:5;204:11
**summer (1)**
29:13
**superintendent (1)**
41:3
**supplement (2)**
113:8;146:8
**supplemental (2)**
83:18;160:17
**supplied (4)**
81:11;83:15;153:1;
205:8
**support (37)**
13:22;15:3,4,24;
17:15,22;18:20;
23:23;38:25;79:8;
106:24;125:16;
152:20;160:5,6,21;
162:14,18;163:15;
167:17;171:4,9,13;
172:9,13,16,18,19,
21;173:5,16;175:6,
10;191:22;195:17,
23;214:17
**supported (1)**
18:18
**supporting (3)**
17:23;18:16;
173:11

**supports (2)**
13:15;25:3
**suppose (1)**
232:18
**supposed (7)**
25:15,16,23;40:15;
45:13;147:21;152:11
**supposedly (1)**
151:19
**suppositions (1)**
26:16
**Supreme (3)**
34:1;45:7;48:6
**sure (44)**
36:23;41:22;47:18;
53:22;56:10,16;62:4;
65:11;71:22;72:17;
74:8,25;75:20,23;
78:24;86:14;106:11,
14;107:21;108:23;
114:16;116:14;
123:11;131:7;
137:10;162:4;
176:21;177:1;179:9;
181:21;185:14;
191:7;192:17;
194:12,13,13;195:7;
197:6;204:23;
209:16,23;210:5;
227:1;229:8
**surface (1)**
204:22
**surprised (1)**
197:1
**surprising (1)**
39:6
**surrounding (4)**
215:3,10;236:17,
21
**survive (1)**
71:10
**sustain (3)**
53:23;95:23;119:8
**Sustained (25)**
52:8;55:12;69:18;
72:15;95:12,18,22;
96:6;99:25;100:17,
21;101:15;103:2;
104:11;105:2;
111:12;117:1;118:7;
160:12;161:7;
176:13;177:8,8;
235:15;237:10
**swear (2)**
195:11,13
**sweet (1)**
26:24
**switch (1)**
78:12
**switches (1)**
81:1
**sworn (13)**
36:17;86:22,24;

133:18,22;169:11,13;
192:10,11;195:10,14;
197:13,14

# T

**tab (24)**
41:13,13,16,16;
45:1,2,19;57:24;58:2,
3,6,7;93:21;134:5,6;
137:19,19;146:21,25;
147:1;158:6;161:21;
229:12,16
**table (2)**
52:6;164:11
**tabs (1)**
134:5
**Talcott (4)**
89:4;159:9,10,12
**talk (10)**
105:20;107:3,10,
19;113:25;116:10;
117:3,8;185:16;
191:18
**talked (2)**
107:22;146:15
**talking (9)**
34:1;58:5;73:21;
83:9;126:23;148:11;
177:11;201:21;213:5
**Tammy (1)**
117:11
**target (1)**
21:8
**task (3)**
203:16;206:10,13
**taught (2)**
209:1;215:14
**taxpayers (1)**
30:23
**teaching (1)**
210:22
**team (4)**
202:22;208:24;
209:25;214:7
**technical (2)**
205:25;225:12
**tele (1)**
25:18
**TELEPHONICALLY (2)**
10:18;11:3
**telling (2)**
122:19;123:4
**ten (14)**
127:12;128:4;
129:18;132:7;
179:14;202:22,25;
204:8,15;208:6,13;
213:25;235:6,8
**tender (2)**
133:12;196:13
**tends (1)**
213:20

**ten-minute (2)**
78:11;188:5
**term (21)**
16:8;28:25;29:2,4,
5,6,7;47:13,17,19,21,
24;83:18,18;160:17;
179:4,11;180:4;
182:19;183:18,21
**terminated (2)**
15:3;29:10
**termination (2)**
22:3;32:9
**terms (37)**
15:20,22;16:19;
17:2;23:7;24:5;
29:14;33:20;48:4;
66:12;68:3;92:16;
136:14,16;142:4,13,
17;144:2,22;152:14;
171:11;175:20;
176:10,14,19;177:18;
186:5,11,17,21;
187:18;204:22;
207:25;208:6;
210:21;220:24;
222:11
**terrible (1)**
82:10
**testi (1)**
85:2
**testified (11)**
26:18;91:25;111:9,
15;113:22;119:11;
120:17;166:7;
186:10;188:15;235:5
**testifies (2)**
33:1;238:3
**testify (11)**
84:9,22;113:21;
114:20;115:16;
116:1;117:12;
130:11;157:17;
195:21,21
**testifying (1)**
145:9
**testimony (87)**
17:23;18:16;26:19;
28:23;29:21;31:1;
32:18;34:14,17;38:5;
78:3;79:10,20,24;
80:4,5,18,20;85:1,2,
24;87:4;91:4,9,25;
93:14;94:7;108:22,
25;110:22;112:23;
120:5;121:6,19;
129:10;132:11;
136:3;140:3;142:3;
146:16,22;147:1,20,
22;148:24;150:17;
152:4,7;155:21;
156:14;157:5;
163:10;169:19,20;
184:17;185:2;

**ten-minute (2)**
78:11;188:5

191:24;192:5,7;
193:18,19;195:12,19,
22,22,23,25;196:1,4;
197:20;198:4,13,14;
199:3,4;201:17;
210:8;213:7;223:25;
224:6;230:6,7;
234:24;237:7,13,17,
20
**theoretically (1)**
125:1
**theory (1)**
131:10
**thereafter (1)**
208:10
**Therefore (16)**
13:8;92:12,22;
115:9;124:16;
126:20;128:5;
163:22;195:22;
200:2;203:20;
208:11;209:1;213:3,
25;231:8
**thereto (2)**
37:8;99:18
**thick (1)**
162:7
**Third (9)**
16:22;25:2;42:7;
46:5;60:6,6,6;72:25;
124:10;162:1
**thirty (2)**
33:14;184:11
**thirty-one (1)**
72:24
**THOMAS (2)**
7:8;10:18
**THOMPSON (1)**
10:1
**thorough (1)**
179:23
**though (9)**
23:21;31:18;34:3;
37:21;55:19;94:2;
97:24;203:6;226:25
**thought (24)**
51:18,18;61:23;
92:7,8;104:20;118:9,
23;120:13;125:13,19,
22;126:15,18;
153:19;212:21,22;
213:22,25;220:23;
222:7;225:4;229:10;
232:23
**thousands (1)**
113:15
**three (25)**
14:9;18:8;34:13;
82:24;85:19;106:20,
20;111:25;112:24;
117:18;120:17;
121:14,15;127:16,22;
129:22;130:12;

131:4,9;197:20;
198:5;199:15;
201:16;202:6;210:1
**three-week (2)**
101:3,16
**throughout (1)**
34:16
**Thus (1)**
16:12
**timeline (1)**
52:14
**times (2)**
95:25;122:24
**timing (1)**
48:4
**today (23)**
12:14;13:8;15:20,
21;16:1;17:19;21:19,
24;28:9;33:17;49:22;
66:8;113:21;114:20;
115:17;117:12;
131:14;148:3;
159:22;179:17;
180:8;189:6;230:3
**together (2)**
81:6;197:20
**told (11)**
89:14;95:15,16;
108:13,16;116:2,3;
117:21;119:19;
131:2,8
**TOLLES (1)**
10:12
**too-distant (1)**
115:8
**took (17)**
24:12;30:5;114:18;
150:3;168:12;202:8,
10,11,12,14,17,21,25;
206:16;215:11;
228:15;235:4
**top (10)**
64:21;83:12;112:6;
158:12;162:4;
178:18;179:1;181:6;
202:25;229:20
**topic (1)**
151:21
**total (4)**
14:10;121:14;
127:14;128:20
**totaling (1)**
26:9
**totality (1)**
220:22
**totally (1)**
216:12
**toward (4)**
17:14,21;181:10;
218:5
**towards (4)**
47:11;158:8;
161:21;235:24

**traded (3)**
212:5,6,8
**trading (2)**
212:4,13
**trampling (1)**
27:2
**transactions (9)**
64:5,9,10,20;
69:11;70:5,10;
124:16;138:16
**transcended (1)**
204:16
**transcript (17)**
41:16;43:19,21;
44:6,24;93:24;94:4,6,
7;109:4;180:19,20;
183:5;187:12,13,14;
227:16
**transferred (1)**
85:7
**translate (1)**
203:18
**transpired (1)**
103:5
**treat (2)**
24:3;203:15
**tremendous (2)**
73:1,8
**trial (12)**
35:17;41:18,22;
42:1,3;112:25;
161:23;178:4,8;
180:22;192:16;196:5
**tried (6)**
37:18;76:11;
146:21;206:1;213:2;
221:17
**trouble (1)**
215:18
**troubled (1)**
40:3
**true (21)**
40:14;42:23,25;
52:4;104:15;109:22;
111:13;118:6;
139:17;140:5;141:9,
21;145:14;151:19;
152:1;153:17,20;
202:21;215:8,11;
232:17
**truly (1)**
13:25
**truncated (1)**
23:21
**Trust (51)**
6:11;18:3;19:12,
14,17,18;20:24;
23:24;27:13;28:14;
30:14;33:7;34:3,6;
55:9,17;56:11;61:17;
66:19;70:5,10;85:20;
92:2;104:17;116:19,
20;127:11;130:3,7;

142:5;151:16;
154:21;155:4;159:5;
167:16;173:19;
186:1;201:4;228:20;
231:6,19;232:1,12,
14,18;233:2,4,9,12,
18,21
**Trustee (22)**
7:3;30:5,13;33:16,
24;106:1;133:14;
135:14;141:1;
154:13,16,20;155:3,
8,10,17,23,24;
159:20;169:16;
190:12,13
**trustees (56)**
12:10;16:3,18;
18:2,4,5,10;19:8,13,
16;20:21,25;22:1,4,
11,18,19;23:11,13,
14;25:3,18,20;26:23;
30:4;31:19,23;34:11;
44:20;53:18;55:3;
92:17,18;102:4;
136:4,13;138:14,18,
22;139:2,15;140:6,7,
9,13,17,21,23;
176:23;198:25;
200:19,22,24;201:8,
13;202:3
**trustees' (6)**
25:6,11,23;29:24;
136:8;139:19
**trustholder (1)**
234:4
**trusts (104)**
14:25;16:12,23,24;
17:1;18:15;19:20,25;
20:6,13,19;24:1,3,10;
25:1;26:3,5,6;29:16;
33:6,7,12;43:16;
44:13;53:17;54:9;
56:1,5,7,23;58:15,18;
59:2,9,11,13;61:10;
63:24;67:4,8;68:23;
69:23;71:4,7;89:9,9;
92:5,8,11,12,13;93:5,
6;94:13,15;115:10;
116:11,24;117:5;
121:8;125:20,23;
127:12,13,15;128:5,
5,19,20;129:18,23;
138:18,19;139:11,17,
23;140:11;141:7;
143:23;144:2;
145:25;148:25;
149:7;151:14;153:4;
160:23;161:11;
163:6;164:6;166:4,9;
167:5;171:2,18,21;
181:18;182:2;184:5;
189:2;190:14;231:9;
233:3,14,20

**trusts' (3)**
25:9;53:15;68:25
**trust's (1)**
232:13
**truth (10)**
85:21,25;87:8,20;
88:6,11,13;193:5;
209:19;221:25
**truthful (2)**
94:19;147:24
**truthfully (1)**
93:19
**Try (9)**
24:18;35:25;56:19;
161:17;203:16;
210:16;227:4;
233:18;234:12
**trying (21)**
26:19;33:25,25;
57:17;61:25;108:6;
118:18;121:4;
150:12;156:21;
157:13;164:21;
191:18;204:25;
209:2;227:1;230:1,2,
4;235:17,19
**TSAO (1)**
6:7
**turn (28)**
23:17;46:11;54:4;
56:20;57:24;58:10;
93:21;94:4,10;97:6;
110:7,15;120:15;
126:21;136:19;
137:25;146:21;
147:4;149:18;151:1;
158:3,21;161:20;
167:25;181:5;193:7;
221:10;232:12
**turned (1)**
209:4
**twelve (1)**
204:15
**twenty (6)**
179:14;184:4;
204:8;208:6,14;
213:25
**twenty-one (5)**
32:20;54:12,21;
184:4,12
**twenty-seven (2)**
33:14;184:11
**two (31)**
12:13;18:24;26:2;
49:5,12;63:20;73:7;
79:14;91:1;97:7;
98:16;101:7;122:21;
132:22;137:8,9;
167:13;189:21;
202:10;203:1,9;
205:19;207:21;
209:6;214:14,23;
215:15,16,18;230:11;

235:7
**TX (1)**
10:7
**type (3)**
64:16;165:17;
227:24
**types (1)**
18:7
**typical (2)**
66:19;151:15
**typically (1)**
155:3

---

**U**

**UCC (5)**
113:5;114:12;
186:13,15,17
**ultimately (2)**
17:15;135:22
**UMB (1)**
9:22
**Um-hum (24)**
40:25;44:10;46:11;
47:23;49:1;50:18;
51:6;52:5,18;55:20;
57:1,3,6;58:13;59:6,
14;120:18;138:1;
151:13;155:7;156:9;
158:15;167:14;
226:10
**unable (2)**
188:16,17
**unaware (1)**
204:24
**uncertain (7)**
65:13,15,19;67:18,
22,23;221:19
**uncertainty (2)**
165:18;224:24
**under (88)**
12:8;14:4,11,19,21,
23,25;15:10,14,22;
16:2,19,22;17:1;
18:8;20:23;21:9;
23:9;24:8,11;26:11;
28:5;30:18,19;33:10,
20;36:5;55:7;56:3,
14;61:10,20;63:23;
65:8;66:16,19;67:3,
13;68:2,4,5,13;72:6,
12,20;79:9;93:13;
104:7;117:22;118:1;
124:13,18;131:10,10;
142:4;143:23;144:2,
22;149:7;151:20;
152:20;153:11,21;
158:22;159:9;
160:25;162:14,18;
164:21;168:16;
183:25;188:20;
199:13,13,14,22;
204:5;213:10;218:9;

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(27) three-week - under

219:1;224:16;
228:19;231:20;
232:11,14;233:4;
234:6;236:2
**underlay (1)**
205:7
**underlie (2)**
205:3;214:16
**underlies (4)**
203:11;204:11,13,
23
**underlying (8)**
24:20;38:8;59:15;
61:17;192:18;214:3;
219:13;236:19
**undermines (1)**
24:21
**underneath (1)**
168:19
**underscores (1)**
25:22
**understands (1)**
56:18
**understood (14)**
51:12;57:23;76:20;
122:6;124:25;126:8;
127:14;135:15;
171:11;179:16;
203:7;215:22;
226:13;228:17
**undertake (3)**
208:4;215:2;220:1
**undertaking (1)**
221:1
**undertook (2)**
236:20,24
**underway (1)**
102:24
**underwriting (1)**
124:12
**undoubtedly (1)**
24:15
**unfortunately (2)**
63:3;231:15
**unique (1)**
76:15
**unless (3)**
129:3;186:5,12
**Unlike (1)**
27:9
**unpaid (2)**
180:4;184:5
**unprecedented (1)**
73:3
**unreasonable (2)**
200:6;225:2
**unreimbursed (2)**
14:24;20:3
**unsecured (4)**
14:16;106:5;
118:10;119:4
**unsupported (1)**
26:16

**unusual (1)**
118:20
**unusually (1)**
216:15
**up (36)**
15:6;20:13;22:15;
23:24;26:9;30:20;
36:15;38:3;59:1;
63:21;73:15,19;
89:13;93:3;155:22;
158:6;163:4;165:16;
182:6;188:6;189:10;
197:24;207:1,4,16;
208:23;212:3;216:1;
222:6;224:24;
226:14;231:1;
232:19,20,23;237:2
**upon (34)**
20:11;35:20;59:7;
65:21;66:23;86:15;
108:10,13,16;109:20;
111:18;113:11,15,21;
114:1,21;115:3,17;
127:10,25;128:1,8,
15,21;129:11,15;
131:1,7;138:22;
140:14;232:4,5,16,18
**upper (1)**
97:10
**upside (3)**
32:9;221:18,19
**Use (18)**
45:8;57:11,11,13,
14,15;76:6,7,14,15;
166:15;171:13;
204:4;205:10;216:2,
12;217:17;227:6
**used (31)**
29:7;61:5;81:18;
87:2;132:17;199:8;
203:14,22;204:2,9;
205:15;206:4;
207:17;208:2,18;
210:22;211:2;213:8,
21;216:5,7,8,9,9,13,
14;217:10;222:10;
223:3;234:4;236:3
**useful (1)**
211:1
**using (7)**
57:14;136:6;200:9;
207:13;215:2;
220:24;226:23
**usually (5)**
80:12;81:20;
107:23;116:3;179:21
**utilized (4)**
215:24;217:2;
218:12;236:13

**V**

**vague (2)**

53:20;176:12
**valuation (5)**
203:2,3;206:2;
207:12;222:11
**valuations (1)**
230:23
**value (13)**
21:22;28:13;33:9,
15;53:18;55:2;56:6,
10,22;179:19;186:1;
203:12;221:23
**values (4)**
200:1;224:2,13,25
**variety (2)**
60:17;124:9
**various (10)**
63:24;69:11;70:5,
10;71:3,8;92:10;
117:9;124:12;231:9
**vast (1)**
63:1
**verbal (1)**
88:11
**verification (1)**
222:15
**verify (4)**
201:22;222:9,13,
19
**version (5)**
146:11,12;147:12,
17;168:5
**versions (1)**
183:10
**versus (1)**
33:8
**vetted (1)**
176:20
**vice (2)**
18:1,2,4
**view (18)**
22:6;65:24;67:19;
92:5,22;104:21;
116:5,7;120:12;
122:11,12;125:4;
126:13,15;127:1;
131:8;201:5;220:4
**views (1)**
120:6
**vigorously (2)**
121:21,23
**vis- (1)**
23:11
**vitae (1)**
198:6
**Vito (1)**
13:5
**voir (1)**
80:14
**volume (10)**
79:17,20;82:1;
116:23;137:8,14;
146:23;158:5;
161:19,20

**volumes (2)**
137:8,9
**voluminous (1)**
79:22

**W**

**wait (6)**
17:19;80:15,16;
89:19;134:7;148:15
**waited (1)**
34:13
**waive (2)**
16:24;91:4
**waiver (1)**
20:3
**walk (1)**
133:16
**WALPER (1)**
10:18
**wants (3)**
36:23;86:5;211:24
**warranties (1)**
16:11
**warrants (1)**
155:11
**WARREN (1)**
9:21
**water (4)**
36:18;91:16;
133:23;192:12
**waterfall (11)**
63:23;65:8;66:16;
67:3,13;68:24;69:11;
70:6,11;149:7;
151:17
**way (15)**
26:9;67:17;80:12;
81:7;92:22;125:16;
128:7;162:13;176:6;
177:17;190:7;198:5;
201:23;203:24;218:5
**ways (2)**
33:25;210:1
**weaknesses (1)**
220:3
**weariness (1)**
26:25
**web (1)**
25:19
**weekend (1)**
194:24
**WEITNAUER (52)**
8:6;133:10,10,19;
134:1,2,10,13,22;
135:4;142:14,22;
148:9,13,17;154:4,7,
8,8;157:13,16,19;
158:10;161:8,9,16;
162:19;163:5;
167:21,22,24;168:24,
25;197:17,17,24;
198:2,4,9;218:3,6,8;

229:14;234:13,14,17,
19,20;235:3;237:11;
238:1,6
**Wells (38)**
8:2;18:1;19:9;
133:11,14;135:13,14,
19,21;140:24,25;
141:3,11,14,17,21;
142:3,7,12,17,20,25;
143:3;147:8;154:10,
11,13,16,20;155:9,
12,23,24;156:1,15;
159:20;197:18;
234:20
**weren't (6)**
27:19;52:5;200:23;
201:2,7,13
**West (1)**
8:3
**what's (16)**
34:4,8,9;37:18;
38:4;41:17;54:19;
61:2;68:8;83:6;
85:21;101:6;146:25;
178:6;194:20;235:18
**whatsoever (3)**
26:20;27:9;84:1
**Whereas (1)**
33:10
**Whereupon (1)**
238:13
**whining (1)**
12:23
**White (3)**
34:24;105:14;
137:5
**Whittinger (1)**
117:11
**whole (6)**
33:3;76:21;85:7;
212:10;215:19;
233:25
**whoops (1)**
158:5
**who's (3)**
77:25;91:14;135:6
**whose (1)**
23:8
**wide (1)**
125:15
**wiggle (1)**
181:12
**willing (1)**
132:9
**WILLKIE (10)**
9:2;21:18;96:21;
97:18;98:10,19;
99:21;100:1;135:8;
198:17
**Wilmington (1)**
6:11
**winning (1)**
119:2

**wired (1)**
227:24
**wish (4)**
36:19;71:17;
173:20;236:9
**wishes (1)**
71:17
**WITENSS (1)**
45:13
**withdraw (3)**
35:7;183:16;
233:16
**Withdrawn (1)**
178:1
**withdraws (1)**
133:3
**within (11)**
22:20;130:3;
199:25,25;200:3,8;
221:11;224:1,13;
225:3;229:17
**without (9)**
24:3;26:20;31:3;
58:9;104:19;127:18;
155:18;221:1;223:2
**witness (92)**
36:11,13,15,17,20,
22;37:7;38:6,10;
39:9,9,15;41:14;
42:20;44:1,5;45:2,4,
17;48:15;52:13,15;
56:18;57:12;58:1,8;
60:3;71:16;72:22,24;
73:5;75:17;76:21,25;
77:23;78:1,6;79:13;
80:14;86:9,10,24;
87:16;91:17,19;
102:13;106:15;
128:11,14;131:24;
132:2;133:22,25;
134:17,23;137:3;
153:25;157:12;
169:5,13,16;177:1,6;
181:3;183:12;
184:25;186:25;
187:3;191:14;
192:11,13;195:1,3,
14;196:17,23;197:2,
5,7,14,16;204:14,21;
205:2,23;209:16;
210:17;218:18;
225:17;229:25;
234:13;238:11
**witnesses (3)**
18:9;22:25;57:10
**woefully (2)**
22:5;23:1
**word (10)**
136:6;145:16;
162:10;166:15;
167:1;168:16;
178:21;182:9,11;
232:3

**wording (1)**
50:13
**words (13)**
22:17;49:11;50:14;
97:18;99:4;140:13;
144:17;145:2;
175:24;181:21;
182:4;208:4;233:20
**work (13)**
51:12;77:11;
154:10;198:24;
199:17;200:4;
201:16;207:9,11;
208:15,17;209:19;
222:17
**worked (7)**
28:24;30:7;34:15;
40:21;47:9;117:13;
133:8
**working (10)**
17:21;28:22;29:1;
40:9;61:16;133:8;
187:4,7,9,25
**worry (1)**
33:2
**worth (3)**
115:12;121:11,13
**worthwhile (1)**
125:22
**wrap (1)**
52:7
**wrapped (36)**
16:12;17:1;21:22;
27:12;28:11,14;34:6;
92:2;101:22;102:10;
116:20;117:5;128:4,
19;129:18;139:11,17,
23;140:11;141:7;
143:22;144:2;
145:25;151:14,16;
166:4,9;167:5,16;
171:18,21;184:5;
201:4,9;212:14;
213:13
**wrapping (1)**
171:2
**write (1)**
83:1
**written (20)**
85:2;108:10,20;
109:19;110:19,23;
111:3,9,14,18;113:7,
9,20;128:8,15,21;
129:11;192:9;
195:21,22
**wrong (4)**
97:22;112:20;
127:9;225:18
**WYNNE (4)**
6:24;21:7,7,17

---
**Y**
---

**year (1)**
28:20
**years (11)**
34:14;73:3;165:17;
215:13,14;231:24;
232:9;233:3,9,13,19
**Yep (1)**
77:20
**yesterday (3)**
74:16;192:2;
194:15
**yield (2)**
213:4,12
**yields (1)**
212:25
**York (23)**
6:5,13,21;7:5,14,
16;8:13,23;9:5,24;
19:7,9;21:2;28:25;
41:1;47:14,15,16,19,
24;48:6;79:21;88:15

---
**Z**
---

**zero (5)**
68:21;70:17,21;
118:2;200:8
**zeroes (1)**
168:13

---
**0**
---

**000 (1)**
168:13
**0000050 (1)**
45:20
**000070 (1)**
46:14
**0003 (1)**
162:2
**02199 (1)**
9:15

---
**1**
---

**1 (15)**
45:19;57:24;58:2;
69:22;79:17;81:13;
88:4,10;90:7,15;
99:4;121:12,13;
198:7;234:2
**1.05 (1)**
23:9
**1.06 (7)**
63:18;64:3,18;
65:7;68:18;69:8;
70:11
**1.06- (1)**
63:13
**1.06-billion-dollar (1)**
70:2
**1.6 (1)**
28:13

**1.8 (3)**
121:14,20,22
**1.850-million-dollars' (1)**
121:11
**1:40 (1)**
132:5
**1:49 (1)**
132:14
**1:50 (1)**
132:13
**10 (8)**
94:11;108:24,24;
173:8;193:1,16;
216:21,23
**10:41 (1)**
78:10
**10:42 (2)**
78:11,16
**10004 (1)**
7:5
**10006 (1)**
6:13
**10017 (1)**
6:21
**10019 (1)**
9:5
**10022 (1)**
6:5
**10036 (1)**
7:16;8:13
**101 (1)**
9:23
**10168 (1)**
8:23
**10178 (1)**
9:24
**102 (4)**
169:20;170:2,5;
184:22
**103 (6)**
133:13;134:2,23;
135:3;138:5,8
**104 (6)**
197:19;198:7,12,
15;229:4,5
**1095 (1)**
7:15
**11 (12)**
15:4;94:6;97:7;
99:5,9,17;103:20;
115:7;160:20;
187:16;193:1,16
**11:01 (1)**
78:16
**1100 (1)**
10:5
**114 (5)**
109:2;111:10;
169:21;170:2,7
**115 (7)**
110:16,20,24;
111:10;134:5,16,20
**116 (2)**

**147:4,7**
**117 (3)**
169:22;170:2,7
**11th (4)**
28:19;30:25;48:23;
102:21
**12 (3)**
127:13;193:1,16
**12:10 (1)**
131:25
**12:11 (1)**
132:14
**120 (3)**
169:22;170:2,7
**1201 (1)**
8:3
**121 (3)**
134:6,16,20
**122 (3)**
134:5,16,20
**123 (7)**
134:7,12,16,20;
169:22;170:2,7
**125 (1)**
8:22
**126 (1)**
132:17
**127 (1)**
108:22
**128 (9)**
134:9,10,12,16,20;
169:22;170:2,7;
189:12
**129 (7)**
134:13,16,20;
169:22;170:3,7;
189:12
**13 (11)**
145:10,15,23;
150:24;193:2,16;
223:25;224:4,5,7,10
**132 (1)**
227:11
**134 (3)**
54:4,6,17
**135 (2)**
54:17,20
**135- (1)**
54:16
**138 (1)**
56:20
**13th (7)**
149:11,23;150:4;
153:13;174:20,22,23
**14 (2)**
193:2,17
**140 (6)**
59:2,10,12;70:20;
216:21,23
**141 (1)**
26:1
**143 (1)**
126:22

12-12020-mg    Doc 4759    Filed 08/19/13    Entered 08/20/13 15:07:54    Main Document
RESIDENTIAL CAPITAL, LLC, et al.        Pg 272 of 273
Case No. 12-12020-mg

August 16, 2013

**144 (2)**
126:21,25
**148 (2)**
101:3,6
**14th (1)**
52:16
**15 (5)**
161:22;193:3,17;
201:18;203:9
**153 (1)**
6:4
**15th (1)**
225:22
**16 (2)**
193:3,17
**16th (1)**
79:2
**17 (7)**
43:13;44:2,4,9;
193:3,17;227:13
**17.25 (1)**
226:24
**175 (1)**
77:7
**18 (8)**
20:2;54:4,7,17;
182:23;193:4,17;
224:25
**19 (5)**
54:18,20;193:6,8,
17
**19-20 (1)**
181:12
**19th (1)**
79:2

---

**2**

**2 (22)**
41:13,16;44:18;
45:2;54:18,20;79:20;
81:14;88:12,12;90:7,
17;96:23;137:14,20;
146:23;158:5,6;
161:20,20;229:16;
234:2
**2.01 (2)**
15:15;16:2
**20 (4)**
224:5,5,9,10
**2010 (2)**
28:24;47:11
**2011 (2)**
28:24;47:12
**2012 (3)**
29:11;48:5;97:22
**2013 (18)**
12:9,11;37:8;
52:16;60:7;63:19;
74:13;79:11;83:16;
94:6;96:23;97:25;
100:6;101:9,10;
102:21;103:15,24

**21 (1)**
109:11
**22 (1)**
186:9
**220 (2)**
224:20,23
**222 (1)**
6:20
**226 (3)**
77:2,4;123:2
**22nd (2)**
160:16,17
**23 (9)**
37:22;38:5;42:17,
18;46:11,13,16;
127:5,10
**23rd (9)**
12:9;83:15,25;
84:8;100:6;101:4,10;
160:16,18
**24 (1)**
70:23
**25 (12)**
43:14;44:4,9;54:5,
7,17;56:20;123:18,
19,20;158:14,16
**253 (12)**
175:21;182:5;
184:3;206:21;
224:19,25,25;225:7;
226:1,3,5;231:8
**253.3 (15)**
14:24;16:24;102:1;
144:14,18,24;177:3;
181:22;182:1;
206:23;207:4;224:1,
12;231:6;237:3
**253-million-dollar (5)**
20:1;176:1,8,15;
190:8
**25th (1)**
38:16
**26 (1)**
158:21
**26th (1)**
227:9
**27 (4)**
38:9,21;60:4;159:8
**270 (1)**
225:1
**28 (6)**
39:1;58:10,17;
68:1,4,9
**29 (4)**
38:9;58:10,17;69:7
**2nd (1)**
97:21,22,25;101:9

---

**3**

**3 (12)**
42:4,13;45:23;
56:20;81:14;88:12,

**12;90:7,17;137:25;**
138:5;147:7
**3.01 (2)**
14:15;15:2
**3:21 (1)**
188:7
**3:37 (1)**
188:7
**30 (6)**
81:23;82:3,4;88:4;
90:8,19
**300 (3)**
68:19,20;70:20
**301 (1)**
138:12
**30309 (1)**
8:4
**30th (1)**
74:13
**31 (8)**
60:7;63:19;82:5;
88:4;90:8,19;237:13,
20
**31st (2)**
37:7;79:11
**32 (9)**
82:5,22;83:9,10;
85:10;87:19;90:8,12,
19
**33 (1)**
224:4
**33146 (1)**
10:24
**34 (2)**
196:6,9
**340 (2)**
224:20,23
**343.2 (1)**
14:22
**34-42 (1)**
196:12
**35 (2)**
196:6,9
**355 (1)**
10:14
**35th (1)**
10:15
**36 (2)**
196:6,9
**37 (6)**
185:11,12,18;
196:6,9;198:7
**38 (2)**
196:6,9
**39 (2)**
196:7,9
**392 (1)**
127:13
**3929 (1)**
12:12
**3929-2 (1)**
158:13

---

**4**

**4 (11)**
81:15;88:12,12;
90:7,17;180:12,15,
19,19;213:2,5
**4.1 (1)**
173:6
**4.1c (1)**
173:7
**4.1cii (1)**
173:10
**4:58 (1)**
238:13
**40 (7)**
132:17;196:7,9;
228:8,11,17;232:9
**408 (1)**
31:11
**41 (2)**
196:7,9
**4157 (1)**
123:14
**41st (1)**
6:20
**42 (2)**
196:7,10
**42nd (1)**
8:22
**43 (4)**
82:5;88:16;90:8,21
**4425 (1)**
10:22
**4431 (3)**
79:12,18;80:19
**4432 (1)**
195:20
**45 (1)**
229:19
**46 (1)**
229:23
**4689 (1)**
192:1
**4689-1 (2)**
192:5,6
**4697 (1)**
169:23
**47th (1)**
8:12
**481 (2)**
230:18;232:8

---

**5**

**5 (23)**
44:19;81:15;88:12,
12;90:7,17;180:1;
199:4,6;201:17;
217:23;225:13;
226:6,6,11,13;227:7;
228:4;230:1,16;
234:16;236:6,7

**5.55 (1)**
14:10
**50 (4)**
158:14;159:9;
229:19,23
**500 (5)**
28:14;69:15,19,20,
21
**510b (2)**
117:23;118:21
**5300 (1)**
10:6
**53rd (1)**
6:4
**54 (11)**
82:6;83:2,3;85:13,
17;87:7,18,19;90:8,
12,23
**55 (9)**
82:13;83:2,3;
85:17;87:7,19;90:8,
12,23
**56 (9)**
82:14;83:2,3;
85:17;87:7,19;90:8,
12,23
**57 (10)**
82:15,17;88:4,24;
89:4,24;90:8,8,25;
132:23
**58 (10)**
82:15,17;88:4,24;
89:4,24;90:8,9,25;
132:23
**59 (3)**
196:7,10,12
**596 (6)**
36:3,3;106:4;
117:19;120:17;121:2
**596.5 (4)**
14:17,22;15:6;
121:17
**596.5-million- (1)**
106:20
**596-million-dollar (4)**
35:20,22;106:19;
119:3
**5th (2)**
10:23;103:24

---

**6**

**6 (8)**
81:16;88:4,12;
90:7,17;126:25;
178:3;213:7
**635 (1)**
209:4
**6th (2)**
49:3,4

---

**7**

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

August 16, 2013

**7 (15)**
  79:23;81:23,24;
  82:2;88:4,12;90:8,
  17;94:11;168:13;
  178:17,17,24;180:11;
  181:6
**70 (1)**
  46:15
**700 (1)**
  21:21
**73 (4)**
  42:18;45:8;94:4,10
**76 (4)**
  43:13;44:2,4,9
**77 (1)**
  44:18
**77002 (1)**
  10:7
**787 (1)**
  9:4
**789 (1)**
  232:13
**7th (1)**
  12:11

## 8

**8 (3)**
  192:20,25;193:16
**800 (2)**
  9:14;74:22
**8-19 (1)**
  193:22
**850 (2)**
  121:12,13
**8th (5)**
  110:11;111:13,16,
  16;112:11

## 9

**9 (10)**
  110:16,22,25;
  111:1;185:5,8,9,17;
  192:25;193:16
**90071 (1)**
  10:16
**9019 (7)**
  12:8;79:9;85:20;
  112:9,20;128:17;
  129:11
**92 (2)**
  20:5;25:25
**945 (1)**
  16:10
**97 (3)**
  182:22;187:11,16