**Hearing Date: September 24, 2013 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Deadline: September 11, 2013 at 4:00 p.m. (Prevailing Eastern Time)**

| | |
|---|---|
| MORRISON & FOERSTER LLP | BRADLEY ARANT BOULT |
| 1290 Avenue of the Americas | CUMMINGS LLP |
| New York, New York 10104 | Bank of America Corporate Center |
| Telephone:    (212) 468-8000 | 100 N. Tryon Street, Suite 2690 |
| Facsimile:    (212) 468-7900 | Charlotte, NC 28202 |
| Gary S. Lee | Telephone:    704-338-6005 |
| Norman S. Rosenbaum | Facsimile:    704-338-6089 |
| Jordan A. Wishnew | Christian W. Hancock |

*Counsel for the Debtors and*          *Special Litigation and Compliance Counsel*
*Debtors in Possession*                    *for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------ | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ------------------------------------ | ) | |

## DEBTORS' OBJECTION TO PROOFS OF CLAIM
## FILED BY REX AND DANIELA GILBERT AND KATHERINE PARKER-LOWE

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

JURISDICTION, VENUE AND STATUTORY PREDICATE ................................... 1

PRELIMINARY STATEMENT .............................................................................. 2

BACKGROUND ..................................................................................................... 3

    A.    The Chapter 11 Cases ............................................................................ 3

    B.    Loan History & Prepetition Litigation ................................................... 4

    C.    Proof of Claim No. 1984......................................................................... 6

    D.    Proof of Claim No. 1991......................................................................... 6

RELIEF REQUESTED.............................................................................................. 6

OBJECTION............................................................................................................. 6

CLAIM NO. 1991 – THE "LITIGATION CLAIM"................................................... 8

I.     THE CLAIMANTS OVERSTATE AND FAIL TO SUBSTANTIATE THE
      PURPORTED DAMAGES AGAINST GMACM ............................................ 8

    A.    The Litigation Claim Fails To Account For The Lack Of Merit In The
          Claims Asserted In The Gilberts' Lawsuit............................................... 9

         1.    The TILA Claim ......................................................................... 9

         2.    The Usury Claim....................................................................... 11

         3.    The UDTPA Claim ................................................................... 13

         4.    The Collection Practices Act Claim.......................................... 15

         5.    The Remaining Claims ............................................................. 17

CLAIM NO. 1984 – THE "FEES CLAIM" ............................................................. 17

II.    THE CLAIMANT IMPERMISSIBLY SEEKS FEES FOR CLAIMS THAT
       HAVE NOT YET BEEN ADJUDICATED AND FOR UNRELATED
       MATTERS................................................................................................... 17

NOTICE................................................................................................................. 19

CONCLUSION....................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps">CASES</span>

Ace Chemical Corp. v. DSI Transports, Inc.,
   446 S.E.2d 100 (N.C. Ct. App. 1994 .......................................................................14

Dolan v. Dickson Properties, Inc.,
   735 S.E.2d 632 (Table), 2012 WL 6018701 (N.C. Ct. App. 2012) ...................................13, 15

Ellis v. Smith-Broadhurst, Inc.,
   268 S.E.2d 271 (N.C. Ct. App. 1980) ......................................................................15

Gale v. First Franklin Loan Services,
   701 F.3d 1240 (9th Cir. 2012) ..............................................................................10

Gilbert v. Deutsche Bank Trust Co. America,
   No. 09-CV-181-D, 2010 WL 2696763 (E.D.N.C. July 7, 2010) .............................................5

Gilbert v. Residential Funding LLC,
   678 F.3d 271 (4th Cir. 2012) .......................................................................10, 11, 13

Harvick v. American Home Mortgage Servicing, Inc.,
   No. 2:12-cv-03077-MCE-CKD, 2013 WL 3283523 (E.D.Cal., Jun. 27, 2013) .....................10

In re DePugh,
   409 B.R. 125 (Bankr. S.D. Tex. 2009) .......................................................................9

In re Hess,
   404 B.R. 747 (Bankr. S.D.N.Y. 2009) .......................................................................7

In re Hight,
   393 B.R. 484 (Bankr. S.D. Tex.2008) .......................................................................8

In re Lundberg,
   No. 02–34542(LMW), 2008 WL 4829846 (Bankr. D. Conn. 2008) .......................................8

In re MF Global Holdings, Ltd.,
   Nos. 11-15059 (MG), 11-02790 (MG) (SIPA), 2012 WL 5499847 (Bankr. S.D.N.Y.
   Nov. 13, 2012) ...................................................................................................6, 7

In re Minbatiwalla,
   424 B.R. 104 (Bankr. S.D.N.Y. 2010) .......................................................................8

In re Oneida Ltd.,
   400 B.R. 384 (Bankr. S.D.N.Y. 2009) .......................................................................7

## TABLE OF AUTHORITIES

(continued)

**Page**

In re Porter,
  374 B.R. 471 (Bankr. D. Conn. 2007) ...................................................................8

In re Simpson,
  711 S.E.2d 165 (N.C. Ct. App. 2011) ..................................................................15

In re Smith,
  No. 12-10142, 2013 WL 665991 (Bankr. D. Vt. Feb. 22, 2013).............................6

In re W.R. Grace & Co.,
  346 B.R. 672 (Bankr. D. Del. 2006) .....................................................................7

Keiran v. Home Capital, Inc.,
  Nos. 11-3878, 12-1053, 2013 WL 3481366 (8th Cir. July 12, 2013)...............10, 18

Key v. Dirty South Custom Sound & Wheels,
  2009 U.S. Dist. LEXIS 46907 (E.D.N.C. June 3, 2009).......................................16

Marks v. Ocwen Loan Servicing,
  No. C 07-02133 SI, 2008 WL 344210 (N.D.Cal. Feb. 6, 2008)............................10

SunTrust Bank v. Bryant/Sutphin Properties, LLC,
  732 S.E.2d 594 (N.C. Ct. App. 2012)..................................................................14

Swindell v. Federal National Mortgage Association,
  409 S.E.2d 892 (N.C. Sup. Ct. 1991) ..................................................................13

Vanston Bondholders Protective Committee v. Green,
  329 U.S. 156 (1946)............................................................................................7

**STATUTES**

11 U.S.C.
  § 101(5)..............................................................................................................17
  § 502(a)................................................................................................................6
  § 502(b)(1) ..........................................................................................7, 9, 17, 18

15 U.S.C.
  § 1635(b)..............................................................................................................9
  § 1641(c) and (f) .................................................................................................10

N.C. Gen. Stat. § 24-1.1(a)(2)..................................................................................12

N.C. Gen. Stat. § 24-9(b) ...................................................................................11, 12

## TABLE OF AUTHORITIES
(continued)

**Page**

N.C. Gen. Stat. § 24-9(a)(3)...........................................................................................................11

N.C. Gen. Stat. § 74-54...........................................................................................................16, 17

N.C. Gen. Stat. § 74-55...............................................................................................................17

N.C. Gen. Stat. § 75-16.1............................................................................................................18

**OTHER AUTHORITIES**

4 COLLIER ON BANKRUPTCY ¶ 502.02[2] (16th ed. rev. 2012) ........................................................6

FED. R. BANKR. P. 3001(f) .........................................................................................................6, 8

iv

**TO THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE:**

Residential Capital, LLC and its affiliated debtors in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), as debtors and debtors in possession (collectively, the "Debtors"), hereby file this objection (the "Objection") seeking to expunge and disallow (i) proof of claim No. 1984 (the "Fees Claim")[1] filed against Debtor GMAC Mortgage, LLC ("GMACM") by Katherine Parker-Lowe ("Parker-Lowe") as well as (ii) proof of claim No. 1991 (the "Litigation Claim," together with the Fees Claim, the "Gilbert Claims") filed by Rex and Daniela Gilbert against GMACM, pursuant to section 502(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") on the grounds that the Gilbert Claims are without merit and do not include colorable claims against GMACM.[2]  Accordingly, the Debtors seek entry of an order substantially in the form annexed hereto as Exhibit 1 (the "Proposed Order") granting the requested relief.  In support of the Objection, the Debtors submit the Declaration of Lauren Graham Delehey (annexed hereto as Exhibit 2, the "Delehey Declaration") and respectfully represent as follows:

## JURISDICTION, VENUE AND STATUTORY PREDICATE

1. This Court has jurisdiction over this Objection under 28 U.S.C. § 1334.  This matter is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

---

[1] The Fees Claim is asserted against "GMAC Mortgage LLC / Residential Accredit Loans." (See claim No. 1984). However, the inclusion of debtor Residential Accredit Loans appears to be erroneous, as neither Parker-Lowe nor the Gilberts have ever engaged in litigation with this entity.  The Debtors assume confusion stems from the fact that Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 is the owner of the Gilberts' loan and is a party to the Gilberts' Federal Suit. Therefore, only GMACM responds to claim No. 1984.
[2] The Debtors reserve all their rights to amend this Objection should any further bases come to light.

ny-1098829

2.       The statutory predicate for the relief requested herein is section 502(b) of the

Bankruptcy Code and Bankruptcy Rule 3007(a).

**PRELIMINARY STATEMENT**

3.       Mr. and Mrs. Gilbert filed a general unsecured claim for nearly $6 million

predicated on multiple state and federal causes of action pending in the federal courts of North

Carolina for which no final judgment has been entered against GMACM; and their counsel,

Katherine Parker-Lowe, filed a general unsecured claim for more than $83,000 for attorneys'

fees related to causes of action that are a part of the pending federal litigation, which have not yet

been resolved.

4.       The North Carolina litigation in the federal district court seeks monetary damages

against GMACM for violation of the Truth in Lending Act, 15 U.S.C. §§ 1601-1667(f)

("TILA"), and Regulation Z, 12 C.F.R. § 1026; the North Carolina Unfair and Deceptive Trade

Practices Act, N.C. Gen. Stat. § 71.1 ("UDTPA"); North Carolina usury and collections laws,

N.C. Gen. Stat. §§ 24 and 75-50; and breach of contract.  It further seeks to enjoin a foreclosure

sale of the Gilberts' real property, which is a moot issue at this time as the foreclosure order was

reversed on appeal and no foreclosure is currently pending.

5.       For the reasons discussed in greater detail below, the Gilberts' causes of action

are without merit and their claim as well as their counsel's claim should be disallowed and

expunged.  The TILA Claim is not a valid claim against GMACM because, in its capacity as a

loan servicer, GMACM is not liable for monetary damages to the claimants.  In addition, the

Gilberts are unlikely to succeed on the UDPTA claim because they fail to plead or proffer

sufficient facts that demonstrate any deceptive or misleading statements by GMACM that caused

actual injury to them.  The North Carolina usury and collection law claims are also not likely to

2

succeed against GMACM because the Gilberts fail to plead the requisite statutory elements and

thus fail to state a valid claim against GMACM.  Moreover, without having achieved a judgment

on the TILA or UDPTA claim, Ms. Parker-Lowe cannot recover attorneys' fees from GMACM.

Therefore, both Claim Nos. 1984 and 1991 should be expunged by the Court from the GMACM

Claims Register.

## **BACKGROUND**

### A.    **The Chapter 11 Cases**

6.    On May 14, 2012, each of the Debtors filed a voluntary petition in this Court for

relief under Chapter 11 of the Bankruptcy Code.  The Debtors are managing and operating their

businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

These Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

7.    On May 16, 2012, the United States Trustee for the Southern District of New

York appointed a nine member official committee of unsecured creditors [Docket No. 102].

8.    On July 17, 2012, the Court entered an order [Docket No. 798] appointing

Kurtzman Carson Consultants LLC ("KCC") as the notice and claims agent in these Chapter 11

Cases.  Among other things, KCC is authorized to (a) receive, maintain, and record and

otherwise administer the proofs of claim filed in these Chapter 11 cases and (b) maintain an

official claims registers for the Debtors.

9.    On August 29, 2012, this Court entered an order approving the Debtors' motion to

establish procedures for filing proofs of claim in the Chapter 11 Cases [Docket No. 1309] (the

"Bar Date Order").[3]

---

[3] The Bar Date Order established, among other things, (i) November 9, 2012 at 5:00 p.m. (Prevailing Eastern Time) as the deadline to file proofs of claim by virtually all creditors against the Debtors (the "General Bar Date") and prescribing the form and manner for filing proofs of claim; and (ii) November 30, 2012 at 5:00 p.m. (Prevailing (Cont.'d)

3

10.     On October 30, 2012, Claimants filed the Gilbert Claims against GMACM,

asserting (i) a general unsecured claim in the amount of **$5,948,900** and (ii) a general unsecured

claim in the amount of **$83,181.11**.  The Gilbert Claims are attached hereto as Exhibits 3 & 4.

**B.     Loan History & Prepetition Litigation[4]**

11.     On May 5, 2009, the Gilberts refinanced their home loan secured by their real

property in Ocracoke, North Carolina.  Specifically, they entered into a $525,000.00 Deed of

Trust with First National Bank of Arizona.  Both spouses signed the Deed of Trust, the

Adjustable Rate Rider, and the Interest Only Addendum to the Adjustable Rate Rider.  Only Rex

Gilbert signed the associated Adjustable Rate Note.  The loan documents are annexed to the

Delehey Decl. as Exhibit A ("the Loan Documents").  See Delehey Decl. at ¶ 3.

12.     The Gilberts defaulted on their loan and foreclosure proceedings were initiated

against them ("Foreclosure Suit").  The foreclosure was brought by David A. Simpson, P.C.,

Substitute Trustee, and the Substitution of Trustee identified Deutsche Bank Trust Company

Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 ("Deutsche") as the

holder of the Note and the lien created by the Deed of Trust.  GMACM was not a party to the

foreclosure suit.  In June 2009, the Clerk of the Hyde County (NC) Superior Court entered an

order authorizing the foreclosure on the Gilberts' house.  After an unsuccessful appeal of the

clerk's order to the Hyde County Superior Court, the Gilberts further appealed the order to the

N.C. Court of Appeals.  See Delehey Decl. at ¶ 5.

---

Eastern Time) as the deadline for governmental units to file proofs of claim (the "Governmental Bar Date").  (Bar Date Order ¶¶ 2, 3).  On November 7, 2012, the Court entered an order extending the General Bar Date to November 16, 2012 at 5:00 p.m. (Prevailing Eastern Time) [Docket No. 2093].  The Governmental Bar Date was **not** extended.  To date, approximately 6,860 proofs of claim have been filed in these Chapter 11 Cases as reflected on the Debtors' claims registers.

[4] The Court previously addressed the details of the Gilberts' prepetition litigation with the Debtors.  See Memorandum Opinion Denying the Gilbert Motion to Dismiss or to Vacate the Automatic Stay [Docket No. 1054].

ny-1098829

13.    During the pendency of their appeal, the Gilberts brought suit in North Carolina

state court against Deutsche, David Simpson as Substitute Trustee, Residential Funding, LLC,

and GMACM, the servicer of their loan.  The defendants removed the suit to the U.S. District

Court for the Eastern District of North Carolina on October 13, 2009 (the "Federal Suit").  See

Delehey Decl. at ¶ 6.

14.    The Federal Suit sought an injunction against the foreclosure sale and the Gilberts

also asserted claims for violation of the Truth in Lending Act, 15 U.S.C. §§ 1601-1667(f)

("TILA"), and Regulation Z, 12 C.F.R. § 1026; the North Carolina Unfair and Deceptive Trade

Practices Act, N.C. Gen. Stat. § 71.1 ("UDTPA"); North Carolina usury and collections laws,

N.C. Gen. Stat. §§ 24 and 75-50; and breach of contract.  See Delehey Decl. at ¶ 7 & Exh. B

thereto.

15.    In October 2009, the defendants in the Federal Suit filed a motion to dismiss,

pursuant to Fed. R. Civ. P. 12, which was granted by the District Court on July 7, 2010.  See

Gilbert v. Deutsche Bank Trust Co. Ams., No. 09-CV-181-D, 2010 WL 2696763 (E.D.N.C.

July 7, 2010).  The Gilberts appealed the dismissal to the U.S. Court of Appeals for the Fourth

Circuit (the "Fourth Circuit").  See Delehey Decl. at ¶ 8.

16.    In May 2011, while the Fourth Circuit appeal was pending, the N.C. Court of

Appeals reversed the sale order in the Foreclosure Suit, and the foreclosure suit has not

recommenced.  See Delehey Decl. at ¶ 9 & Exh. C thereto.

17.    In May 2012, the Fourth Circuit reversed the District Court's dismissal of the

Gilberts' lawsuit and reinstated the majority of their claims.  Prior to issuance of the Fourth

Circuit's mandate, Debtors filed their Chapter 11 petition.  As a result, the Fourth Circuit stayed

the mandate as to GMACM and Residential Funding, LLC while issuing it as to the non-debtor

5

parties.  At present, the Gilberts' lawsuit in the Fourth Circuit remains stayed as to GMACM and

Residential Funding, LLC.  See Delehey Decl. at ¶ 10 & Exh. D thereto.

### C.    Proof of Claim No. 1984

18.    The Fees Claim, filed by Katherine Parker-Lowe, counsel for Mr. and

Mrs. Gilbert, seeks the payment of attorneys' fees by GMACM, on a general unsecured basis,

purportedly incurred by Mr. and Mrs. Gilbert in connection with their litigations against

GMACM and other defendants.

### D.    Proof of Claim No. 1991

19.    The Litigation Claim seeks nearly $6 million of damages, on a general unsecured

basis, purportedly owing to the claimants under both state and federal causes of action.

## RELIEF REQUESTED

20.    The Debtors file this Objection pursuant to section 502(b) of the Bankruptcy Code

to expunge and disallow each of the Gilbert Claims.

## OBJECTION

21.    A filed proof of claim is "deemed allowed, unless a party in interest . . . objects."

11 U.S.C. § 502(a).  A properly completed proof of claim is *prima facie* evidence of the validity

and amount of a claim.  See FED. R. BANKR. P. 3001(f).  A party in interest may object to a proof

of claim, and once an objection is made, the court must determine whether the objection is well

founded.  See 4 COLLIER ON BANKRUPTCY ¶ 502.02[2] (16th ed. rev. 2012).

22.    Although Bankruptcy Rule 3001(f) establishes the initial evidentiary effect of a

filed claim, the burden of proof "[r]ests on different parties at different times."  In re Smith,

No. 12-10142, 2013 WL 665991, at *6 (Bankr. D. Vt. Feb. 22, 2013) (citation omitted).  The

party objecting to the proof of claim "bears the initial burden of providing evidence to show that

the proof of claim should not be allowed."  In re MF Global Holdings, Ltd., Nos. 11-15059

6

(MG), 11-02790 (MG) (SIPA), 2012 WL 5499847, at * 3 (Bankr. S.D.N.Y. Nov. 13, 2012).  If

the objecting party satisfies its initial burden and "the presumption of *prima facie* validity is

overcome—*e.g.*, the objecting party establishes that the proof of claim lacks a sound legal

basis—the burden shifts to the claimant to support its proof of claim unless the claimant would

not bear that burden outside of bankruptcy."  Id. (citing In re Oneida Ltd., 400 B.R. 384, 389

(Bankr. S.D.N.Y. 2009) ("A proof of claim is prima facie evidence of the validity and amount of

a claim, and the objector bears the initial burden of persuasion.  The burden then shifts to the

claimant if the objector produces evidence equal in force to the prima facie case . . . which, if

believed, would refute at least one of the allegations that is essential to the claim's legal

sufficiency.")).  Once the burden is shifted back to the claimant, "it must prove its claim by a

preponderance of the evidence."  Id. (citations omitted).

23.    Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim

may not be allowed to the extent that "such claim is unenforceable against the debtor and

property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b)(1).  Whether

a claim is allowable is "generally determined by applicable nonbankruptcy law."  In re W.R.

Grace & Co., 346 B.R. 672, 674 (Bankr. D. Del. 2006).  "What claims of creditors are valid and

subsisting obligations against the bankrupt at the time a petition is filed, is a question which, in

the absence of overruling federal law, is to be determined by reference to state law."  In re Hess,

404 B.R. 747, 749 (Bankr. S.D.N.Y. 2009) (quoting Vanston Bondholders Protective Comm. v.

Green, 329 B.R. 156, 161 (1946)).

24.    Here, the Debtors object to the Gilbert Claims on the basis that, after reviewing

the Debtors' books and records and the supporting documentation attached to the Gilbert Claims,

7

the Gilbert Claims are not supported by the Debtors' books and records.  Therefore, the Gilbert

Claims should be expunged and disallowed.

## CLAIM NO. 1991 – THE "LITIGATION CLAIM"

**I.    THE CLAIMANTS OVERSTATE AND FAIL TO SUBSTANTIATE THE PURPORTED DAMAGES AGAINST GMACM**

25.    The Gilberts submitted a $5,948,900.00 unsecured claim, attaching a copy of the

North Carolina Court of Appeals order reversing the foreclosure order, the Fourth Circuit's

opinion in the Federal Suit, and a copy of their Complaint in the Federal Suit, but fail to provide

any supporting damages calculation corresponding to the face amount of the Litigation Claim.

26.    The Debtors have determined that the Litigation Claim should be expunged and

disallowed because it lacks sufficient documentation as to its validity and amount and has no

basis in the Debtors' books and records.

27.    Although a properly filed proof of claim constitutes *prima facie* evidence of the

validity of the claim, Fed. R. Bankr. P. 3001(f), "failure to attach the documentation required by

Rule 3001 will result in the loss of the *prima facie* validity of the claim", In re Minbatiwalla, 424

B.R. 104, 112 (Bankr. S.D.N.Y. 2010), citing In re Lundberg, No. 02–34542(LMW), 2008 WL

4829846, at *2 (Bankr. D. Conn. 2008); In re Hight, 393 B.R. 484, 493 (Bankr. S.D. Tex. 2008).

28.    Failure to attach sufficient documentation to a proof of claim can result in

disallowance of the claim under appropriate circumstances because absent adequate

documentation, the proof of claim is not sufficient for the objector to concede the validity of the

claim. Minbatiwalla, 424 B.R. at 119, citing In re Porter, 374 B.R. 471, 480 (Bankr. D. Conn.

2007) ("under some circumstances lack of [documentation required by Rule 3001(c)] followed

by a creditor's failure to appear or otherwise respond to an objection ... made on the grounds of

insufficient annexed documentation may result in a disallowance of the claim on procedural (i.e.,

8

default) grounds"); <u>see also</u> <u>In re DePugh</u>, 409 B.R. 125, 137-8 (Bankr. S.D. Tex. 2009) (holding

that insufficient documentation is a valid basis for disallowing a claim as "unenforceable against

the debtor…under any agreement or applicable law" under 11 U.S.C. § 502(b)(1) because of a

lack of compliance with Bankruptcy Rule 3001).

### A.    The Litigation Claim Fails To Account For The Lack Of Merit In The Claims Asserted In The Gilberts' Lawsuit

29.     The Litigation Claim is based on contingent liabilities arising from claims

asserted by the Gilberts against GMACM in the Federal Suit.  None of those claims has been

reduced to judgment, and the motion practice addressing the sufficiency of the pleadings and

evidence supporting the claims are only in their initial stages.  As detailed below, the Litigation

Claim is without merit.

### 1.    The TILA Claim

30.     In Count I of their Complaint, the Gilberts allege that GMACM and others

violated TILA by: (i) failing to "deliver all 'material' disclosures required by [TILA] and

Regulation Z" (Complaint, ¶ 69); and (ii) failing to take the steps required by 15 U.S.C.

§ 1635(b)[5] to effectuate the rescission of the Gilberts' secured loan after receiving timely notice

of rescission (<u>Id</u>., ¶¶ 75-76).

---

[5] Title 15 U.S.C. § 1635(b) provides as follows:

> When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission.  Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it.  Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor.  If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it.  The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.

9

31.    The trial court dismissed Count I based on the statute of limitations.  That

dismissal was reversed in part by the Fourth Circuit, which ruled that the claim regarding an

alleged failure to deliver disclosures—an omission by the originating lender—was time barred

but that the "claim regarding Appellees' refusal to honor [Plaintiffs'] right to rescind was timely

filed."  Gilbert v. Residential Funding LLC, 678 F.3d 271, 278 (4th Cir. 2012).  Accordingly, the

Gilberts' only surviving TILA claim is based on GMACM's alleged failure to comply with

15 U.S.C. § 1635(b).

32.    As a consequence of the February 2013 sale of the servicing rights of the Gilberts'

loan to Ocwen Loan Servicing, LLC ("Ocwen"), GMACM no longer has any relationship with

the Gilberts' loan.  Therefore, even if the Federal Court should determine that rescission is

warranted, such relief must come from Ocwen and/or Deutsche.  See Delehey Decl. at ¶ 11.

33.    Apart from the rescission itself, the Gilberts also seek damages against GMACM

under TILA.  However, GMACM was only the servicer of the Gilberts' loan, see Delehey Decl.

at ¶ [ ], and "**loan servicers are not liable for money damages under TILA**."  Keiran v. Home

Capital, Inc., Nos. 11-3878, 12-1053, 2013 WL 3481366, at *6 n.5 (8th Cir. July 12, 2013);

15 U.S.C. § 1641(c)[6] & (f); Gale v. First Franklin Loan Servs., 701 F.3d 1240, 1245 (9th Cir.

2012); Harvick v. Am. Home Mortg. Servicing, Inc., No. 2:12-cv-03077-MCE-CKD, 2013 WL

3283523, at *4 (E.D. Cal., Jun. 27, 2013); Marks v. Ocwen Loan Servicing, No. C 07-02133 SI,

2008 WL 344210, at *2 (N.D. Cal., Feb. 6, 2008) ("[L]oan servicers are not liable under TILA as

assignees unless the loan servicer owned the loan obligation at some point.").  At no point did

GMACM own the Gilberts' loan obligation.  See Delehey Decl. at ¶ 2, 11.  Therefore, any

portion of the Gilberts' claim related to TILA damages must be disallowed.

---

[6] Section 1641(c) of TILA expressly says that "[a]ny consumer who has the right to rescind a transaction ... may rescind the transaction as against any **assignee of the obligation**." (emphasis added).

## 2.    The Usury Claim

34.    In Count II of the Federal Suit Complaint, the Gilberts allege that GMACM engaged in usurious conduct in violation of an unspecified section of Chapter 24 of the North Carolina General Statutes by "charging and collecting a greater rate of interest than allowed by law, . . . including without limitation the charge, collection and imposition of hidden finance charges contained in the erroneous payment schedule set forth in the Truth in lending [sic] disclosure statement."  (Complaint, ¶ 79).

35.    The trial court dismissed the Gilberts' usury claim because their Complaint failed to allege the payment of usurious interest within the two-year limitation period applicable to such claims.  The Complaint did not specifically identify any payment, the charging or collection of that amounted to usurious conduct.  The Fourth Circuit reversed, finding that the usury claim was adequately pled.[7]

36.    The Gilberts' allegations of usurious conduct by GMACM are so cursory that the trial court initially dismissed them as not amounting to a claim.  While the Fourth Circuit disagreed with dismissal on the trial court's stated grounds, it issued an explicit invitation for the trial court to examine additional potential grounds for dismissal.  The Fourth Circuit directed the district court to "consider whether North Carolina General Statute Section . . . Section 24-9(a)(3) ("'Exempt loan' means a loan in which . . . [t]he loan amount is three hundred thousand ($300,000) or more . . . ."), and Section 24-9(b) ("A claim or defense of usury is prohibited in an exempt loan transaction.") are applicable."  Gilbert, 678 F.3d at 280.

---

[7]  The Fourth Circuit recited that that a usury claim is adequately pled if the following are alleged: (i) "a loan or forbearance of the collection of money"; (ii) "an understanding that the money owed will be paid"; (iii) "payment or an agreement to pay interest at a rate greater than allowed by law"; and (iv) "the lender's corrupt intent to receive more in interest than the legal rate permits for use of the money loaned." Gilbert, 678 F.3d 271 at 279.

37.     Here, the Gilberts' loan is indisputably an "exempt loan" under N.C. Gen. Stat. § 24-9, as the principal balance exceeds $300,000.  Accordingly, under the plain language of N.C. Gen. Stat. § 24-9(b), no usury claim can be made in relation to the loan: "[a] claim or defense of usury is prohibited in an exempt loan transaction."  Therefore, while the Gilberts may have sufficiently stated a usury claim under state law, they cannot maintain the claim in relation to their half-million dollar home loan, just as the Fourth Circuit suspected.

38.     Even if the Gilberts' loan was not an exempt loan under North Carolina law, the usury claim would still fail on its face.  In North Carolina, for purposes of a loan with a principal amount in excess of a $25,000, the interest rate allowed by law is "[a]ny rate agreed upon by the parties."  N.C. Gen. Stat. § 24-1.1(a)(2).  Therefore, payment of interest at a rate "greater than allowed by law" means payment of interest in excess of the parties' agreed-upon rate.  The Gilberts, however, did not pay any interest greater than the rate to which they agreed.

39.     Rex Gilbert signed the Adjustable Rate Note and both spouses signed the Interest-Only Addendum associated with the couples' Deed of Trust.  The Interest-Only Addendum provided that the Gilberts would make payments of $3,226.57 each month "for the next 240 payments."  See Exhibit D to the Delehey Decl.  While servicing the Gilberts' loan, GMACM collected only 22 payments from the Gilberts, which included interest and additional amounts for their escrow account.[8] From each of those payments, $3,226.56 was allocated to the payment of interest, as shown in the payment history annexed to the Delehey Decl. as Exhibit E.  That amount is one penny less than the monthly payment amount disclosed in the Interest-Only Addendum.  Consequently, the Gilberts did not pay any interest amounts higher than the amount agreed upon by the parties in the loan documents.  See Delehey Decl. at ¶ 12.

---

[8] Funds from the escrow account were used to pay the taxes and insurance associated with the Gilberts' property.

ny-1098829

40.     Because the Gilberts paid, and GMACM collected, only the amount of interest
that the Gilberts agreed to in the Interest-Only Addendum, the Gilberts cannot prove payment of
interest at a rate greater than allowed by law, i.e., payment of interest in excess of an agreed-
upon rate.  Therefore, their usury claim fails as a matter of law.  See Swindell v. Fed. Nat'l
Mortg. Assoc., 409 S.E.2d 892, 895 (N.C. Sup. Ct. 1991) (payment or an agreement to pay
interest at a rate greater than allowed by law is a required element of usury claim).

### 3.     The UDTPA Claim

41.     In Count III of their Complaint, the Gilberts allege violations of UDTPA by
unspecified defendants based on the defendants' (i) failure to make material disclosures pursuant
to TILA; (ii) disclosure, charging and collecting of allegedly usurious interest; (iii) failure to act
on the rescission notice (as required by TILA); and (iv) making of false representations relative
to note ownership.  As a threshold matter, the Fourth Circuit ruled that the Gilberts' UDTPA
claim was properly dismissed to the extent it is based on the alleged failure to make TILA
disclosures, an omission by the loan originator, not any named party.  Gilbert, 678 F.3d at 280.

42.     "The elements of a claim for unfair and deceptive trade practices in violation of
N.C. Gen. Stat. § 75–1.1 are: (1) an unfair or deceptive act or practice, or an unfair method of
competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the
plaintiff or to his business.  Thus, recovery according to N.C. Gen. Stat. § 75–1.1 and 75–16 is
limited to those situations when a plaintiff can show that it detrimentally relied upon a statement
or misrepresentation and he or she suffered actual injury as a proximate result of defendant's
deceptive statement or misrepresentation."  Dolan v. Dickson Props., Inc., No. COA12-681, 735
S.E. 2d 632 (Table), 2012 WL 6018701, at *3 (N.C. Ct. App. Dec. 4, 2012) (quotations and
citations omitted).  "Under G.S. 75–1.1, an act or practice is unfair if it is immoral, unethical,
oppressive, unscrupulous, or substantially injurious to consumers.  An act or practice is deceptive

13

if it has the capacity or tendency to deceive."  SunTrust Bank v. Bryant/Sutphin Props., LLC,

732 S.E.2d 594, 598 (N.C. Ct. App. 2012) (quoting Ace Chem. Corp. v. DSI Transps., Inc.,

446 S.E.2d 100, 106 (N.C. Ct. App. 1994)).  "Although it is a question of fact whether the

defendant performed the alleged acts, it is a question of law whether those facts constitute an

unfair or deceptive trade practice."  SunTrust Bank, 732 S.E.2d at 598.

43.     As noted above, the Gilberts cannot show GMACM engaged in usurious conduct.

Usurious conduct can form the basis for a UDTPA claim only if it is shown that the collection of

excessive interest was somehow deceptive or misleading.  Id.  Here, on those occasions when the

Gilberts succeeded in making their loan payment, GMACM allocated $3,226.56 to interest.

Again, that amount is a penny less than the payment amount disclosed in the Interest-Only

Addendum.

44.     Were the monthly collection of interest in the amount of $3,226.56 usurious

conduct, which it was not, such collection could not be said to be deceptive or misleading.  The

Gilberts agreed to the monthly interest payment amount on May 5, 2006, before they ever made

a single payment.  They cannot now claim to be surprised that they were charged the monthly

interest amount they acknowledged in writing they would pay each month.  Accordingly,

GMACM's conduct in charging and collecting interest payments, even if taken as usurious, does

not amount to a violation of UDTPA.

45.     Similarly, the Gilberts cannot succeed on a UDTPA claim based on any statement

by GMACM identifying Deutsche as the owner of their note.  Deutsche owns the note and did at

all times it might have been identified by GMACM as owner of the note.  Contrary to what the

Gilberts would have this Court believe, the N.C. Court of Appeals did not find that Deutsche did

not own the note.  That court ruled only that the trial court erred in finding Deutsche to be the

ny-1098829

holder of the note based on the evidence presented during foreclosure proceedings.  In re

Simpson, 711 S.E.2d 165, 174-75 (N.C. Ct. App. 2011).  Moreover, the Gilberts cannot show

that they relied on any statement by GMACM relative to note ownership to their detriment.

Because the Gilberts cannot show that any statement by GMACM to them regarding ownership

of the note was false or the proximate result of any injury, no such statement can support a claim

for violation for UDTPA.  See Dolan, 2012 WL 6018701 at *3.

      46.     GMACM's failure to effectuate rescission of the Gilberts' loan consistent with

TILA also does not give rise to a UDTPA claim.  GMACM reviewed the rescission notice and,

after concluding that the Gilberts lacked grounds for rescission, informed the Gilberts of the

rejection of their rescission request.  GMACM was not deceptive or unfair in its handling of the

request.  It did not engage in any "immoral, unethical, oppressive, unscrupulous, or substantially

injurious" conduct, which the UDTPA was intended to deter and punish.  Moreover, as discussed

above, the Gilberts do not proffer any evidence that they suffered an actual injury as a result of

their inability to secure rescission of their loan.  Proof of an injury proximately resulting from the

conduct alleged to violate UDTPA is an essential element of a UDTPA claim.  Ellis v. Smith-

Broadhurst, Inc., 268 S.E.2d 271, 273-74 (N.C. Ct. App. 1980).

### 4.    The Collection Practices Act Claim

      47.     In Count IV of their Complaint, the Gilberts allege violation by unspecified

defendants of N.C. Gen. Stat. §§ 75-50–56 (the "Collection Practices Act" or "CPA"), detailing

prohibited acts by debt collectors.  The Gilberts claim "defendants" violated the CPA by:

(i) communicating with a debtor represented by counsel; (ii) falsely representing the character

and extent of a debt after its purported rescission; (iii) falsely representing that Deutsche owned

the note; and (iv) attempting to foreclose without authority.

15

48.     GMACM made no attempt to foreclose and could not have falsely represented that Deutsche owned the note because Deutsche did, in fact, own the note.  Accordingly, the only CPA violations of which GMACM might be guilty relate to communications with the Gilberts instead of their attorney and representations by GMACM relative to the "character and extent" of the debt.

49.     However, in their Complaint, the Gilberts do not specifically identify any communication or representation by GMACM that they consider to have violated the CPA. They generally allege that GMACM "[f]alsely represent[ed] the character, extent, or amount of a debt against a consumer pursuant to N.C. Gen. Stat. 74-54(4)" by seeking collection of amounts owed on the mortgage loan after receiving the Gilberts' rescission notice.  A violation of N.C. Gen. Stat. § 74-54(4) section, however, requires that a debt collector be shown to have "[f]alsely represent[ed] the character, extent, or amount of a debt against a consumer or of its status *in [a] legal proceeding* . . . ." (emphasis added).  "Because plaintiff's [CPA] allegation . . . says nothing about a legal proceeding, plaintiff has failed to state a claim under section 74-54(4)." Key v. Dirty S. Custom Sound & Wheels, 2009 U.S. Dist. LEXIS 46907 (E.D.N.C. June 3, 2009).  The Gilberts have not stated and cannot sustain a claim for violation of N.C. Gen. Stat. § 74-54(4) against GMACM because it made no representation, let alone a false representation, regarding the Gilberts' debt in a legal proceeding in which it was attempting to collect a debt. *See* ¶48 *supra*; See N.C. Gen. Stat. § 74-54 (prohibiting certain representations in the course of collecting and attempting to collect debt).

50.     The Gilberts further allege that GMACM violated the CPA by "communicating with plaintiffs after the defendants had been notified by the plaintiffs' attorney that she represents said plaintiffs."  Although no statutory citation is given, the Debtors presume this

16

allegation is intended as a claim pursuant to N.C. Gen. Stat. § 74-55, which provides that "[n]o

debt collector shall collect or attempt to collect any debt by use of any unconscionable means"

including "Communicating with a consumer (other than a statement of account used in the

normal course of business) whenever the debt collector has been notified by the consumer's

attorney that he represents said consumer."

51.     However, no communication violating N.C. Gen. Stat. § 74-55(3) is specifically

identified in the Complaint or documentation supporting the Litigation Claim.  Therefore, the

Debtor cannot give any credence to such vague and unsubstantiated allegations.

### 5.      The Remaining Claims

52.     In Count V of their Complaint, the Gilberts allege an unspecified breach of an

unspecified contract by unspecified defendants.  As documented by the loan documents entered

into by the Gilberts in 2006, which were all with First National Bank of Arizona and its

successors, GMACM had no contractual relationship with the Gilberts and therefore cannot be

liable for any alleged breach of contract.

53.     Through the sixth and final claim in their Complaint, the Gilberts seek equitable

relief in the form of an order striking the foreclosure sale order.  However, this non-monetary

claim was rendered moot by the N.C. Court of Appeals' reversal of the sale order and has no

bearing on the Litigation Claim.

### CLAIM NO. 1984 – THE "FEES CLAIM"

## II.     THE CLAIMANT IMPERMISSIBLY SEEKS FEES FOR CLAIMS THAT HAVE NOT YET BEEN ADJUDICATED AND FOR UNRELATED MATTERS

54.     Pursuant to section 101 of the Bankruptcy Code, a creditor holds a claim against a

bankruptcy estate only to the extent that it has a "right to payment" for the asserted liability.  See

11 U.S.C. § 101(5).  Likewise, section 502(b)(1) of the Bankruptcy Code provides, in relevant

17

part, that the Court shall allow a claim except to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1).

55.    Parker-Lowe's Fees Claim states a claim in the amount of $83,181.11 and is premised on the Gilberts' not-yet-adjudicated TILA and UDTPA claims. GMACM does not, in any way, concede that the Gilberts' attorneys' fees are a valid claim. Although TILA and the state UDTPA claims allow for the award of attorneys' fees in the event of a successful claim, no court has adjudicated the Gilberts' claims in their favor. Rather, the Fourth Circuit upheld the dismissal of the disclosure-related portion of the TILA claim and merely found that the rescission-based claim was *timely filed*. The Fourth Circuit further ruled that the Gilberts' UDTPA claim was properly dismissed to the extent it is based on the alleged failure to make TILA disclosures and made no finding of liability as to that claim.

56.    The TILA claim, and the associated Fees Claim, it is without merit because GMACM was only the servicer of the Gilberts' loan and it was not the assignee of the loan itself. As detailed above, "loan servicers are not liable for money damages under TILA" and, therefore, cannot be liable for any associated attorneys' fees. See Keiran, 2013 WL 3481366 at *6 n.5.

57.    The Gilberts' claim for UDTPA, if GMACM were found liable for misconduct, would also allow for recovery of attorneys' fees.[9] However, as explained above, such claim is without merit, as the Gilberts cannot establish that GMACM engaged in any "immoral, unethical, oppressive, unscrupulous, or substantially injurious" conduct, which the UDTPA was intended to deter and punish.

---

[9] N.C.G.S.A. § 75-16.1 provides that attorneys' fees can be awarded if the presiding judge finds that the defendant willfully engaged in the unfair or deceptive practice, that there was an unwarranted refusal to settle, and that the amount of the attorney's fees was reasonable.

18

58.     Further, the Fees Claim is supported by a copy of a "Charge Code & Services Statement" (the "Statement") cataloguing the total fees and costs billed by Katherine Parker-Lowe, Esq. to Rex Gilbert between January 1, 2008 and May 13, 2012.  The Statement reflects total charges of $83,181.11, total payments of $23,534.49 and a balance due of $49,646.62.

59.     The Fees Claim is otherwise impermissibly vague and overstated because the Statement fails to allocate time between the two (2) cases handled by Parker-Lowe on behalf of the Gilberts.  Parker-Lowe represents the Gilberts in the Foreclosure Suit brought against them by Deutsche and in the Federal Suit filed by the Gilberts.  GMACM is a party to only the Federal Suit, so litigation expenses related to the Foreclosure Suit cannot be claimed as recoverable from GMACM.

60.     A conservative parsing of the Statement based on the dates of hearings and filings in the Foreclosure Suit shows approximately $15,000 of the amount claimed in the Fees Claim to be attributable to work done my Parker-Lowe on the Foreclosure Suit.  See Delehey Decl. at ¶ 13.  A spreadsheet illustrating the allocation of fees to the foreclosure case is annexed to the Delehey Decl. as Exh. F.

61.     For each of the forgoing reasons, the Fees Claim should be disallowed in its entirety.

## NOTICE

62.     The Debtors have provided notice of this Motion in accordance with the Case Management Procedures Order, approved by this Court on May 23, 2012 [Docket No. 141] and the Procedures Order.

ny-1098829

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the Proposed Order granting the

relief requested herein and such other and further relief as the Court may deem proper.

Dated:  August 20, 2013

/s/ Norman S. Rosenbaum
Gary S. Lee
Norman S. Rosenbaum
Jordan A. Wishnew
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel for the Debtors and
Debtors in Possession*

-and-

Christian W. Hancock
BRADLEY ARANT BOULT
CUMMINGS LLP
Bank of America Corporate Center
100 N. Tryon Street, Suite 2690
Charlotte, NC 28202
Telephone:    704-338-6005
Facsimile:    704-338-6089

*Special Litigation and Compliance Counsel for
the Debtors and Debtors in Possession*

## EXHIBIT 1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------
                                              )
In re:                                        )     Case No. 12-12020 (MG)
                                              )
RESIDENTIAL CAPITAL, LLC, et al.,             )     Chapter 11
                                              )
                              Debtors.        )     Jointly Administered
                                              )
---------------------------------------------------------------

## ORDER GRANTING DEBTORS' OBJECTION TO PROOFS OF CLAIM FILED BY REX AND DANIELA GILBERT AND KATHERINE PARKER-LOWE

Upon the objection (the "**Objection**")[1] of Residential Capital, LLC, and certain of

its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**") to the Proofs of

Claim and request for entry of an order (the "**Order**") pursuant to section 502(b) of the

Bankruptcy Code and Bankruptcy Rule 3007 seeking to disallow and expunge the Proofs of

Claim, all as more fully set forth in the Objection, and the Declaration of Lauren Delehey

annexed to the Objection as Exhibit 2; and the Court having jurisdiction to consider the

Objection and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and

consideration of the Objection and the relief requested therein being a core proceeding pursuant

to 28 U.S.C. § 157(b); and venue being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and due

and sufficient notice of the Objection having been provided; and the Court having determined

that the legal and factual bases set forth in the Objection establish just cause for the relief granted

herein; and it appearing that the relief requested in the Objection is in the best interests of the

Debtors' estates, their creditors and other parties in interest; and responses to the Objection, if

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Objection.

any, having been resolved, withdrawn or otherwise overruled by this Order; and after due deliberation and sufficient cause appearing therefore, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT**:

1.      The relief requested in the Objection is GRANTED as set forth herein.

2.      The Proofs of Claim are hereby disallowed and expunged in their entirety and shall no longer be maintained on the Debtors' claim register, and Kurtzman Carson Consultants LLC, the Claims and Noticing Agent, is directed to disallow and expunge the Proofs of Claim.

3.      Entry of this Order is without prejudice to the Debtors' right to object to any other claims in the Debtors' Chapter 11 Cases.

4.      The Debtors are authorized and empowered to take all actions as may be necessary and appropriate to implement the terms of this Order.

5.      Notice of the Objection as provided therein shall be deemed good and sufficient notice of such objection, and the requirements of the Procedures Order, Bankruptcy Rule 3007(a) and the Local Bankruptcy Rules of this Court are satisfied by such notice.

6.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

7.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to the interpretation or implementation of this Order.

Dated:      _____ __, 2013
            New York, New York


_____
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

ny-1104571 v1

**EXHIBIT 2**

ny-1098829

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------
)
In re:                                                       )        Case No. 12-12020 (MG)
                                                             )
RESIDENTIAL CAPITAL, LLC, et al.,        )        Chapter 11
                                                             )
                                            Debtors.    )        Jointly Administered
--------------------------------------------------------------------
)

**DECLARATION OF LAUREN GRAHAM DELEHEY, IN-HOUSE LITIGATION
COUNSEL AT RESIDENTIAL CAPITAL, LLC, IN SUPPORT OF DEBTORS'
OBJECTION TO PROOFS OF CLAIM FILED BY REX AND DANIELA GILBERT
AND KATHERINE PARKER-LOWE AGAINST GMAC MORTGAGE, LLC
PURSUANT TO BANKRUPTCY CODE
SECTION 502(b) AND BANKRUPTCY RULE 3007**

I, Lauren Graham Delehey, hereby declare as follows:

1.        I serve as In-House Litigation Counsel in the Legal Department at Residential Capital, LLC ("**ResCap**"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "**Debtors**").[1]  I have held this position since I joined ResCap on August 1, 2011.  In my role as In-House Litigation Counsel at ResCap, I am responsible for the management of residential mortgage-related litigation, including class actions, mass actions and multi-district litigation.  I am authorized to submit this declaration (the "**Declaration**") in support of the *Debtors' Objection to Proofs Of Claim Filed By Rex And Daniela Gilbert And Katherine Parker-Lowe Against GMAC Mortgage, LLC Pursuant to Section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007* (the "**Objection**").

---

[1]        The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the *Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 6], dated May 14, 2012.

2.      In my capacity as In-House Litigation Counsel, I am generally familiar with the Debtors' litigation matters, including the Gilbert Claims (defined below) and putative class actions to which the Debtors are parties.  Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge; information supplied or verified by personnel in departments within the Debtors' various business units; my review of the Debtors' litigation case files, books and records as well as other relevant documents; my discussions with other members of the Legal Department; information supplied by the Debtors' consultants; or my opinion based upon experience, expertise, and knowledge of the Debtors' litigation matters, financial condition and history.  In making my statements based on my review of the Debtors' litigation case files, books and records, relevant documents, and other information prepared or collected by the Debtors' employees or consultants, I have relied upon these employees and consultants accurately recording, preparing, collecting, or verifying any such documentation and other information.  If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

I.      **BACKGROUND**

A.      **Loan History and Prepetition Litigation**

3.      On May 5, 2009, Rex and Daniela Gilbert (the "**Gilberts**") refinanced their home loan secured by their real property in Ocracoke, North Carolina.  Specifically, they entered into a $525,000.00 Deed of Trust with First National Bank of Arizona.  Both spouses signed the Deed of Trust, the Adjustable Rate Rider, and the Interest Only Addendum to the Adjustable Rate Rider.  Only Rex Gilbert signed the associated Adjustable Rate Note.  The assorted loan documents are annexed hereto as Exhibit A (the "**Loan Documents**").

4.      GMACM was only the servicer of the Gilberts' loan.

5.      The Gilberts defaulted on their loan and foreclosure proceedings were initiated against them ("**Foreclosure Suit**").  The foreclosure was brought by David A. Simpson, Substitute Trustee, and the Substitution of Trustee identified Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 ("**Deutsche**") as the holder of the Note and the lien created by the Deed of Trust.  In June 2009, the Clerk of the Hyde County (NC) Superior Court entered an order authorizing Deutsche to foreclose on the Gilberts' house.  After an unsuccessful appeal of the clerk's order to the Hyde County Superior Court, the Gilberts further appealed the order to the N.C. Court of Appeals.

6.      During the pendency of their appeal, the Gilberts brought suit in North Carolina state court against Deutsche, David Simpson as Substitute Trustee, Residential Funding, LLC, and GMACM, the servicer of their loan.  The defendants removed the suit to the U.S. District Court for the Eastern District of North Carolina on October 13, 2009 (the "**Federal Suit**").  A copy of the Federal Suit is attached as Exhibit B hereto.

7.      The Federal Suit sought an injunction against the foreclosure sale and the Gilberts also asserted claims for violation of the Truth in Lending Act, 15 U.S.C. §§ 1601-1667(f) ("**TILA**"), and Regulation Z, 12 C.F.R. § 1026; the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 71.1 ("**UDTPA**"); North Carolina usury and collections laws, N.C. Gen. Stat. §§ 24 and 75-50; and breach of contract.

8.      In October 2009, the defendants in the Federal Suit filed a motion to dismiss, pursuant to Fed. R. Civ. P. 12, which was granted by the District Court on July 7, 2010. See Gilbert v. Deutsche Bank Trust Co. Ams., No. 09-CV-181-D, 2010 WL 2696763 (E.D.N.C. July 7, 2010).  The Gilberts appealed the dismissal to the U.S. Court of Appeals for the Fourth Circuit (the "**Fourth Circuit**").

9.      In May 2011, while the Fourth Circuit appeal was pending, the N.C. Court of Appeals reversed the sale order in the Foreclosure Suit, and the foreclosure suit hasn't recommenced.  A copy of the North Carolina court's reversal is attached as <u>Exhibit C</u> hereto.

10.     In May 2012, the Fourth Circuit reversed the District Court's dismissal of the Gilberts' lawsuit and reinstated the majority of their claims.  Prior to issuance of the Fourth Circuit's mandate, Debtors filed their Chapter 11 petition.  As a result, the Fourth Circuit stayed the mandate as to GMACM and Residential Funding, LLC while issuing it as to the non-debtor parties.  <u>See Exhibit D</u> attached hereto.  At present, the Gilberts' lawsuit in the Fourth Circuit remains stayed as to GMACM and Residential Funding, LLC.

11.     As a consequence of the February 2013 sale of the servicing rights of the Gilberts' loan to Ocwen Loan Servicing, LLC ("**Ocwen**"), GMACM no longer has any relationship with the Gilberts' loan.  Before the sale of the servicing rights, GMACM never owned the note underlying the Gilberts' loan obligation.

12.     Rex Gilbert signed the Adjustable Rate Note and both spouses signed the Interest-Only Addendum associated with the couples' Deed of Trust.  The Interest-Only Addendum provided that the Gilberts would make payments of $3,226.57 each month "for the next 240 payments." (See <u>Exhibit A</u> hereto).  While servicing the Gilberts' loan, GMACM collected only 22 payments from the Gilberts, which included interest and additional amounts for their escrow account.[2] From each of those payments, $3,226.56 was allocated to the payment of interest.  (See <u>Exhibit E</u> hereto.)  That amount is one penny less than the monthly payment amount disclosed in the Interest-Only Addendum.  Consequently, the Gilberts did not pay any interest amounts higher than the amount agreed upon by the parties in the loan documents.

---

[2] Funds from the escrow account were used to pay the taxes and insurance associated with the Gilberts' property.

-4-

13.    A conservative parsing of the Statement based on the dates of hearings and filings in the Foreclosure Suit shows approximately $15,000 of the amount claimed in the Fees Claim to be attributable to work done my Parker-Lowe on the Foreclosure Suit. A spreadsheet illustrating the allocation of fees to the foreclosure case is annexed hereto as <u>Exhibit F</u>.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  August 20, 2013

<u>/s/  Lauren Graham Delehey</u>
Lauren Graham Delehey
In-House Litigation Counsel for Residential
Capital, LLC

**Exhibit A**

FILED in Hyde County, NC
on May 10 2006 at 02:38:57 PM
by Lora Mooney Byrd
Register of Deeds
BOOK 219 PAGE    53

# DEED OF TRUST

MAY 1 1 2006
Return To: First National Bank of Arizona
P.O. Box 66604, Phoenix, AZ 85082
Prepared By: Ngoc Chu
and Casey, Grimsley & Ragaller, PLLC

MIN  100135553000008437

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.
(A) "Security Instrument" means this document, which is dated May 5, 2006
together with all Riders to this document.
(B) "Borrower" is Rex T. Gilbert, JR and Daniela L. Gilbert, Husband and Wife

Borrower is the trustor under this Security Instrument.
(C) "Lender" is First National Bank of Arizona

Lender is a NATIONAL BANKING ASSOCIATION
organized and existing under the laws of The United States of America
0843

NORTH CAROLINA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS    Form 3034  1/01

-6A(NC) (0207).01
Page 1 of 16                    Initials: RTG
        VMP MORTGAGE FORMS - (800)521-7291

**BOOK 219 PAGE   54**

Lender's address is 1760 Old Meadow Road, 3rd Floor, Mc Lean, VA 22102

(D) "Trustee" is  **MATTHEW J. RAGALLER**

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated May 5, 2006
The Note states that Borrower owes Lender **five hundred twenty-five thousand and 00/100**                                          Dollars
(U.S. $525,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than June 1, 2036

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:



| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
|---|---|---|
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [x] Other(s) [specify] |
| | | Interest Only Rider |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

■■■ 0843

-6A(NC) (0207).01                                  Page 2 of 15              Initials: RTC   NGq                Form 3034   1/01

BOOK 219 PAGE  55

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee and Trustee's successors and assigns, in trust, with power of sale, the following described property located in the
**COUNTY** of **Hyde** :
[Type of Recording Jurisdiction]       [Name of Recording Jurisdiction]
SEE ATTACHED LEGAL DESCRIPTION

Parcel ID Number: 207592                        which currently has the address of
134 West End Road                                              [Street]
Ocracoke                        [City], North Carolina27960      [Zip Code]
("Property Address"):

TO HAVE AND TO HOLD this property unto Trustee and Trustee's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.
BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

▮▮▮0843

-6A(NC) (0207).01                Page 3 of 15        Initials: ___        Form 3034  1/01

BOOK 219 PAGE 56

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. If Borrower has breached any covenant or agreement in this Security Instrument and Lender has accelerated the obligations of Borrower hereunder pursuant to Section 22 the Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and



**BOOK 219 PAGE 57**

assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to


0843

6A(NC) (0207).01                    Page 6 of 15          Initials: RTG          Form 3034   1/01

**BOOK 219 PAGE 58**

prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any



0843

-6A(NC) (0207).01                     Page 6 of 15              Initials: RTG

                                                               OG

                                                    Form 3034    1/01

interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is

0843

-6A(NC) (0207).01                    Page 7 of 15                    Initials: [initials]                    Form 3034   1/01

BOOK 219 PAGE 60

reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve, if permitted under Applicable Law, in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve, if permitted under Applicable Law. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, if permitted under Applicable Law, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement

 0843

-6A(NC) (0207).01                    Page 8 of 15                    Initials: _____                    Form 3034   1/01

provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material

0843

-6A(NC) (0207).01          Page 9 of 15          Form 3034  1/01

impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time.



0843

6A(NC) (0207).01    Page 10 of 16    Initials:    Form 3034   1/01

BOOK 219 PAGE   63

Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects

0843

-6A(NC) (0207).01                    Page 11 of 15              Initials:                Form 3034  1/01

Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

0843

-6A(NC) (0207).01                    Page 12 of 15                    Initials:            Form 3034    1/01

BOOK 219 PAGE  65

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, and if it is determined in a hearing held in accordance with Applicable Law that Trustee can proceed to sale, Trustee shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of 5.000 % of the gross sale price; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The interest rate set forth in the Note shall apply whether before or after any judgment on the indebtedness evidenced by the Note.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender or Trustee shall cancel this Security Instrument. If Trustee is requested to release this Security Instrument, all notes evidencing debt secured by this Security Instrument shall be surrendered to Trustee. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Attorneys' Fees. Attorneys' fees must be reasonable.

**BOOK 219 PAGE   66**

BY SIGNING UNDER SEAL BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____        _____ (Seal)
                                        Rex T. Gilbert, JR            -Borrower

_____

                                        _____ (Seal)
                                                                     -Borrower

_____ (Seal)  _____ (Seal)
                         -Borrower                                    -Borrower

_____ (Seal)  _____ (Seal)
                         -Borrower                                    -Borrower

 (Seal)             _____ (Seal)
Daniela L. Gilbert      -Borrower                                    -Borrower

██ 0843

GMD-6A(NC) (07071.01)        Page 14 of 15        Form 3034  1/01

BOOK 219 PAGE 67

STATE OF NORTH CAROLINA,
I, LINDA RUSH
a Notary Public of the County of  Dare , State of North Carolina, do hereby
certify that Rex T. Gilbert, JR & Daniela L. Gilbert

Dare                County ss:

personally appeared before me this day and acknowledged the due execution of the foregoing instrument.
Witness my hand and official seal this    5th    day of  May, 2006

My Commission Expires:



_Linda Rush_
Notary Public

STATE OF NORTH CAROLINA,
    The foregoing certificate of
a Notary Public of the County of
is certified to be correct.
    This            day of

County ss:

, State of

Registrar of Deeds

By _____
    Deputy Assistant

0843

-6A(NC) (0207).01                Page 15 of 15        Initials: _____        Form 3034  1/01

BOOK 219 PAGE 6B

# ADJUSTABLE RATE RIDER
(LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 5th    day of May, 2006
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
First National Bank of Arizona

("Lender") of the same date and covering the property described in the Security Instrument
and located at: 134 West End Road, Ocracoke, NC  27960

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME
AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of    7.375 %. The Note provides
for changes in the interest rate and the monthly payments, as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates

The interest rate I will pay may change on the first day of June, 2013
and on that day every 6th    month thereafter. Each date on which my interest rate
could change is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The
"Index" is the average of interbank offered rates for six month U.S. dollar-denominated
deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most
recent Index figure available as of the first business day of the month immediately preceding
the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based
upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding
two and three-quarters    percentage points
(    2.750 %) to the Current Index. The Note Holder will then round the result of
5300000843

MULTISTATE ADJUSTABLE RATE RIDER - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN
THE WALL STREET JOURNAL) - Single Family - Fannie Mae Uniform Instrument
⊕-838R (0402)  Form 3138 1/01
Page 1 of 3    Initials: _____
VMP Mortgage Solutions, Inc.
(800)521-7291

this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 13.375 % or less than 2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one

(                                     1.000 %) from the rate of interest I have been paying for the preceding
6          months. My interest rate will never be greater than 13.375 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

■ 0843

BOOK 219 PAGE 70

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
Rex T. Gilbert, JR          -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

0843

-838R (0402)            Page 3 of 3            Form 3138 1/01

BOOK 219 PAGE 71

## INTEREST-ONLY ADDENDUM
## TO ADJUSTABLE RATE RIDER

LOAN NUMBER: ███0843

PROPERTY ADDRESS:

134 West End Road, Ocracoke, NC 27960

THIS ADDENDUM is made this 5th day of May, 2006, and is incorporated into and intended to form a part of the Adjustable Rate Rider (the"Rider") dated the same date as this Addendum executed by the undersigned and payable to First National Bank of Arizona (the Lender).

THIS ADDENDUM supersedes Section 4 (C) of the Rider. None of the other provisions of the Note are changed by this Addendum.

4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and three-quarters percentage point(s) (2.750%) to the Current Index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

During first ten (10) years after the loan closing ("interest-only period"), the Note Holder will determine the amount of the monthly payment that would be sufficient to pay accrued interest on the unpaid principal balance. This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the interest only period unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the interest-only period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower unpaid principal balance.

At the end of the Interest-Only Period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal balance that I am expected to owe in substantially equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the interest-only period, my payment amount will not be adjusted due to voluntary principal payments.

Dated: 5/5/06

_Rex T. Gilbert, JR_

_Daniela L. Gilbert_

Form 404
6/4/2003

Alt A Interest Only Rider/ ARM (404)
10/30/2005

Exhibit "A"

**BOOK 219 PAGE   72**

All that certain lot or parcel of land lying and being in the Village of Ocracoke, in
Ocracoke Township, Hyde County, North Carolina, and known and designated as and
being Lot No. 85-A, in the subdivision known as Beachside Extension, as shown and
delineated on a map or plat entitled "Recombination Plat of Lot 84-A & 85-A -
Beachside Extension - Ocracoke, formerly lot 84 & 85 - Beachside Extension -
Ocracoke" made by Seaboard Surveying & Planning, Inc., and recorded in Plat Cabinet
C, Slide 89B, Hyde County Registry.

# ADJUSTABLE RATE NOTE

(LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

May 5, 2006                    MCLEAN                    VA
[Date]                         [City]                    [State]

134 West End Road, Ocracoke, NC  27960
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 525,000.00          (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **First National Bank of Arizona**

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of          7.375 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on July 1, 2006 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on June 1, 2036          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. BOX 62768, PHOENIX, AZ 85082-2768

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**  See Attached Interest-Only Addendum here to and made a part here of.

Each of my initial monthly payments will be in the amount of U.S. $ 4,391.32          . This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

5300000943

MULTISTATE ADJUSTABLE RATE NOTE - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*) -
Single Family - Fannie Mae UNIFORM INSTRUMENT

-838N (0210)          Form 3520 1/01

VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 4          Initials: R. W.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

(A) Change Dates

The interest rate I will pay may change on the first day of June, 2013                                              , and on that day every 6th       month thereafter. Each date on which my interest rate could change is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and three-quarters                                percentage points (                              2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than                              13.375 % or less than                     2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one                           percentage point(s) (                         1.000 %) from the rate of interest I have been paying for the preceding 6          months. My interest rate will never be greater than                13.375 %, OR LESS THAN 2.750 .

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

0843



## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **4.000** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

■ 0843




**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

CAUTION-IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
Rex T. Gilbert, JR        -Borrower                                -Borrower


_____ (Seal)          _____ (Seal)
                          -Borrower                                -Borrower


_____ (Seal)          _____ (Seal)
                          -Borrower                                -Borrower


_____ (Seal)          _____ (Seal)
                          -Borrower                                -Borrower


*[Sign Original Only]*


█████0843

-83BN (0210)                     Page 4 of 4                     Form 3520 1/01

## INTEREST-ONLY ADDENDUM
### TO ADJUSTABLE RATE PROMISSORY NOTE

Loan Number: ████0843

Property Address: 134 West End Road, Ocracoke, NC 27960

**THIS ADDENDUM** is made this 5th day of May, 2006, and is incorporated into and intended to form a part of the Adjustable Rate Note (the "Note") dated the same date as this Addendum executed by the undersigned and payable to First National Bank of Arizona (the "Lender").

**THIS ADDENDUM** supersedes Sections 3(A), 3(B), 4(C) and 7(A) of the Note. None of the other provisions of the Note are changed by this addendum.

3.    **PAYMENTS**

    (A)    **Time and Place of Payments**
        I will pay interest by making payments every month for the first 120 payments (the "Interest-Only Period") in the amount sufficient to pay interest as it accrues. I will pay principal and interest by making payments every month thereafter for the next 240 payments in an amount sufficient to fully amortize the outstanding principal balance of the Note at the end of the Interest-Only Period over the remaining term of the Note in equal monthly payments.

        I will make my monthly payments on the first day of each month beginning on July 1, 2006. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal. If, on June 1, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

        I will make my payments at 1165 West Alameda Drive, Tempe, AZ 85282 or at a different place if required by the Note Holder.

    (B)    **Amount of My Initial Monthly Payments**
        Each of my initial monthly payments will be in the amount of U.S. $3,226.57. This payment amount is based on the original principal balance of the Note. This payment amount may change.

4.    **INTEREST RATE AND MONTHLY PAYMENT CHANGES**
    (C)    **Calculation of Changes**

        Before each Change Date, the Note Holder will calculate my new interest rate by adding two and three-quarters percentage point(s) (2.750%) to the Current Index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

        During the Interest-Only Period, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay accrued interest. This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the Interest-Only Period unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the Interest-Only Period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower principal balance. At the end of the Interest-Only Period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I am expected to owe at the end of the Interest-Only Period or Change Date, as applicable, in equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the Interest-Only Period, my payment amount will not be reduced due to voluntary prepayments.

7.    **BORROWER'S FAILURE TO PAY AS REQUIRED**

    (A)    **A Late Charge for Overdue Payments**

        If the Note Holder has not received the full amount of any monthly payment by the end of fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 4.000% of my overdue payment of interest during the interest-only period, 4.000% of my overdue payment of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

Dated: 5/5/06

Rex T. Gilbert, JR



## BANK OF ARIZONA

1665 W. Alameda Drive
Tempe, AZ 85282
Office (480) 224-8321 Fax 480-224-8522

### ALLONGE TO NOTE

LOAN NUMBER: ████0843
BORROWER: Gilbert JR
IN THE AMOUNT OF: $525,000.00

PAY TO THE ORDER OF:

First National Bank of
Nevada

WITHOUT RECOURSE BY:

AMY HAWKINS, ASSISTANT VICE PRESIDENT
FIRST NATIONAL BANK OF ARIZONA

Pay to The order Of
RESIDENTIAL FUNDING CORPORATION

Without Recourse
First National Bank of Nevada

By:
Deutsche Bank National Trust
Company, F/K/A Bankers Trust
Company of California, N. A.
as Custodian as Attorney In
Fact

Christopher Corcoran
Vice President

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Corporation

BY
Judy Faber, Vice President

# Exhibit B

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
NO.   __-_____-CV-_____ (___)

| | |
|---|---|
| REX T. GILBERT, JR. AND<br>DANIELA L. GILBERT,<br><br>    PLAINTIFFS,<br><br>v.<br><br>DEUTSCHE BANK TRUST COMPANY<br>AMERICAS, AS TRUSTEE FOR<br>RESIDENTIAL ACCREDIT LOANS,<br>INC. DAVID A SIMPSON, P.C.,<br>SUBSTITUTE TRUSTEE,<br>RESIDENTIAL FUNDING, LLC<br>AND GMAC MORTGAGE, LLC<br>    DEFENDANTS. | **NOTICE OF REMOVAL**<br>28 U.S.C. §§1331, 1441, and 1446 |

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

PLEASE TAKE NOTICE that Defendants, Deutsche Bank Trust Company Americas, As Trustee for Residential Accredit Loans, Inc., Residential Funding, LLC, and GMAC Mortgage, LLC (Herein collectively "Defendants"), pursuant to 28 U.S.C. §§1331, 1441, and 1446, file this Notice of Removal of this action from the Superior Court Division of the General Court of Justice, Hyde County, North Carolina, being the district embracing the place where the case is pending. Furthermore, David A. Simpson, P.C., being a nominal Defendant does hereby affirmatively and expressly consent to and join in this Notice of Removal of this

matter from the Superior Court Division of the General Court of Justice, Hyde County. Defendants state the grounds for removal as follows:

## TIMELINESS OF REMOVAL

1. Plaintiffs, Rex T. Gilbert, Jr. and Daniela L. Gilbert, commenced this action, designated Civil Action No. 09 CVS 70, on or about September 14, 2009 by filing a Complaint in the General Court of Justice, Superior Court Division, Hyde County, North Carolina. Defendants' counsel is in receipt of a file-stamped copy of the Complaint, but at this time has no information regarding service of the Summons and Complaint by the Plaintiff. This removal was effected within 30 days of receipt of the Complaint by Defendants' counsel, 28 U.S.C. §1446(b), and the time within which Defendants are required by the laws of the North Carolina to answer or otherwise plead has not yet expired.

## FEDERAL QUESTION JURISDICTION

2. This action is alleged to arise under the Federal Truth in Lending Act, 15 U.S.C. §1601 *et. seq.*, and the implementing regulations codified at 12 C.F.R. Part 226, of which the district courts have original jurisdiction pursuant to 28 U.S.C. §1331.

3. This Court has supplemental jurisdiction over the state law claims asserted in this action pursuant to 28 U.S.C. § 1367(a).

4.   Accordingly, this case is removable under 28 U.S.C. §1441.

## COMPLIANCE WITH 28 U.S.C. §1446

5.   Defendants have attached to this Notice as **Exhibit 1** and filed herewith the Complaint, Civil Summons, Affidavit of Keith Parker-Lowe, Restraining Order, Notices of Hearing, and Affidavit of Scott Zeitz, which  to date constitute all process, pleadings and orders received by them in this action, all in compliance with the provisions of 28 U.S.C. §1446(a).

6.   Contemporaneously with the filing of this Notice of Removal, written notice has been served upon the Plaintiffs and a true and accurate copy of this Notice of Removal has been or will be filed with the Clerk of Superior Court for Hyde County, North Carolina, as required by 28 U.S.C. §1446(d).

7.   The Superior Court for Hyde County, North Carolina is located within the jurisdiction of the United States District Court for the Eastern District of North Carolina, Eastern Division; therefore this Court is the proper one for removal of this action.

8.   The Defendants have submitted the required filing fee of Three Hundred Fifty Dollars ($350.00) to the Clerk of Court.

9.   By filing this Notice, Defendants do not waive any defense that may be available to it.

WHEREFORE, Defendants, Deutsche Bank Trust Company Americas, As Trustee for Residential Accredit Loans, Inc., Residential Funding, LLC, GMAC Mortgage, LLC, and David A. Simpson, P.C., Substitute Trustee, respectfully request that this action now pending in the State of North Carolina, Hyde County, Superior Court Division, as Civil Action No. 09 CVS 70, proceed before this Court as an action properly removed.

This the 13th day of October, 2009.

THE LAW OFFICE OF JOHN T. BENJAMIN, JR., P.A.

John T. Benjamin, Jr.
N.C. State Bar No.: 18673
benjamin@lawjtb.com

James R. White
N.C. State Bar No.: 29508
white@lawjtb.com
*Attorneys for Defendants,* Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc, Residential Funding, LLC and GMAC Mortgage, LLC.
712 West North Street
Raleigh, N.C. 27603
(919) 755-0060
Fax (919) 755-0069

David A. Simpson, P.C.
By: David A. Simpson, President
dvdsimpson@msn.com
7804 Fairview Road, No. 225
Charlotte, N.C. 28226
(704) 619-6551
Fax (704) 442-8595

4

## CERTIFICATE OF SERVICE

I, John T. Benjamin, Jr., of The Law Office of John T. Benjamin, Jr., P.A., attorney for Deutsche Bank Trust Company Americas, as Trustee for Residential Credit Loans, Inc., Residential Funding, LLC, and GMAC Mortgage, LLC do hereby certify that I served a copy of the foregoing document upon the other parties in this action by depositing the same in the United States Mail, postage prepaid, addressed as follows:

Katherine S. Parker-Lowe
Attorney at Law
35 Miss Elecia Lane, Ste. 101
Post Office Box 730
Ocracoke, North Carolina 27960

David A. Simpson, P.C.
Substitute Trustee
7804 Fairview Road, No. 225
Charlotte, N.C. 28226

This the _____ day of October, 2009.

_____
John T. Benjamin, Jr.
Attorney for Deutsche Bank Trust Company,
Residential Funding, LLC and
GMAC Mortgage, LLC

3

STATE OF NORTH CAROLINA                    IN THE GENERAL COURT OF JUSTICE
COUNTY OF HYDE                             SUPERIOR COURT DIVISION
                                           09 CVS ⁊ꝋ
                                           CODE: COMP: OTHR

REX T. GILBERT, JR. and              )
DANIELA L. GILBERT,                  )
                    Plaintiffs,      )                    **FILED**
                                     )            JUNE __10:15 Am__
                                     )
v.                                   )                SEP 1 4 2009
                                     )
DEUTSCHE BANK TRUST COMPANY          )         CLERK SUPERIOR COURT
AMERICAS, *As Trustee for,*          )            HYDE COUNTY
RESIDENTIAL ACCREDIT LOANS, INC,     )         _____ CLERK
DAVID A. SIMPSON, P.C., Substitute Trustee, )
RESIDENTIAL FUNDING, LLC, and        )
GMAC MORTGAGE, LLC,                  )
                    Defendants.      )
_____)

## COMPLAINT

NOW COME the plaintiffs by and through their counsel of record and allege and

say as follows:

### JURISDICTION

This action is instituted pursuant to N.C. Gen. Stat. § 45-21.34 for the purpose of

enjoining the foreclosure sale authorized by Order of the Honorable Marvin Blount in

Hyde County File 09-SP-09 and raising legal and equitable defenses, including but not

limited to, rescission pursuant to rights granted under the federal Truth in Lending Act,

material disclosures violations of the federal Truth in Lending Act, unfair and deceptive

acts or practices in violation of N.C. Gen. Stat. § 75-1.1, et. seq, and the charging and

collecting of usurious interest in violation of N.C. Gen. Stat. § 24-2, et. seq.

### PARTIES

1.    The plaintiffs are citizens and residents of Hyde County North Carolina.



2.      Defendant, Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 (hereinafter Deutsche) is, upon information and belief, an entity that serves as Trustee for securitized pools of mortgage loans that are secured by North Carolina real property and regularly uses the North Carolina Courts for purposes of foreclosing mortgage loans that it holds as Trustee. Defendant Deutsche purports to be the owner and holder of the Adjustable Rate Note (hereinafter Promissory Note) and Deed of Trust that are the subject of this complaint and has, upon information and belief, instructed the Substitute Trustee of a Deed of Trust signed by plaintiffs, to file the foreclosure action known as 09 SP 09 in the Superior Court of Hyde County, North Carolina.

3.      Defendant, David A. Simpson, P.C. (hereinafter Simpson) is a professional corporation organized under the laws of the State of North Carolina which, upon information and belief, contracts with financial services companies to provide Substitute Trustee services for prosecution of foreclosures in North Carolina and, upon information and belief, purports to have been appointed as a Substitute Trustee under the Deed of Trust that secures the mortgage loan that is the subject of this complaint.

4.      Defendant Residential Funding, LLC (hereinafter Residential Funding) is, upon information and belief, a limited liability company which purports to be the master servicer for the Note and Deed of Trust which is the subject of this complaint.

5.      Defendant, GMAC Mortgage, LLC (hereinafter GMAC) is, upon information and belief, a limited liability company which regularly services loans secured by real property located in North Carolina. GMAC purports to be the current subservicer of the Note and Deed of Trust which is the subject of this complaint.

2

## FACTUAL ALLEGATIONS

6.    All paragraphs of this complaint are incorporated herein as if fully set forth.

7.    Plaintiffs, Rex T. Gilbert, Jr. and Daniela L. Gilbert, are husband and wife and reside upon a tract of land that is titled in their name as tenants by the entirety on Ocracoke Island, Hyde County, North Carolina.

8.    During the late winter or early spring of 2006, plaintiff, Daniela Gilbert, telephoned First Flight Mortgage, LLC office located at 2503 North Croatan Highway in Kill Devil Hills, North Carolina.

9.    During the months of March and April of 2006, plaintiff, Daniela L. Gilbert spoke on many occasions with Emily Berry-Belvin, who represented herself to be the loan officer for First Flight Mortgage, LLC who would handle the mortgage loan transaction for plaintiffs.

10.    Upon information and belief, Emily Berry-Belvin, was, at all times pertinent to the transactions described in this complaint, the employee or agent of First Flight Mortgage, LLC, with full actual and apparent authority to act for First Flight Mortgage, LLC.

11.    During the spring of 2006, plaintiffs were struggling to make the payments on an adjustable rate mortgage loan and wanted to refinance to cash out money until they were able to sell their home and borrow money to build another home on an adjacent parcel of land.

12.   Plaintiff, Daniela L. Gilbert, talked with Emily Berry-Belvin and explained that plaintiffs wanted to refinance their mortgage loan with a loan that would allow them to cash out money until they sold their home and built a new lower cost home.

13.   Plaintiff, Daniela L. Gilbert, provided Emily Berry-Belvin with copies of plaintiffs' bank statements to show their income.

14.   The income documentation provided by plaintiffs does not show monthly income of $10,950.00 each month.

15.   At some point, Emily Berry-Belvin called plaintiffs to advise of the need for an appraisal. After some discussion, Emily Berry Belvin represented to plaintiffs that their home needed to appraise at $700,000.00 in order for them to get the loan.

16.   When plaintiff, Daniela L. Gilbert, offered to contact John W. Hunter, a licensed appraiser who has considerable experience appraising residential properties on Ocracoke, Emily Berry-Belvin advised plaintiff that they needed someone "more aggressive with the numbers."

17.   On information and belief, Ms. Berry-Belvin contacted Marco P. Garcia with Appraisal Group Outer Banks, Inc. who conducted, prepared and signed a Uniform Residential Appraisal Report which valued the plaintiff's property at $700,000.00.

18.   Plaintiffs did not receive a copy of aforementioned appraisal under sometime after the loan transaction which is the subject matter of this complaint was completed. The copy received by plaintiffs is inserted into a plastic binder with a green spine which matches the color of the First Flight Mortgage logo and includes a cover sheet with First Flight Mortgage letterhead.

19.    When the appraisal came in, Emily Berry-Belvin represented to plaintiffs that they would close before the end of April, 2006.

20.    Emily Berry-Belvin told plaintiff, Daniela L. Gilbert, not to make further payments to the lender that currently held plaintiffs' mortgage loan because the refinance loan would be closing during the month of April.

21.    In reasonable reliance upon the statements and assurances of Emily Berry-Belvin, that the refinance loan would close during the month of April, plaintiffs followed her instruction and withheld the May 2003 mortgage payment and plaintiffs proceeded to use the money that would otherwise have been used for the May mortgage payment for other necessary household expenses.

22.    The mortgage loan finally closed late on the afternoon of May 5, 2006.

23.    During the month of May, 2006 and shortly before the May 5, 2006, loan closing, plaintiff, Daniela L. Gilbert, received a telephone call from Emily Berry-Belvin who stated that because the plaintiffs were planning to sell their home, the refinance they would be getting would be an interest only loan. No other option was presented to plaintiffs.

24.    Plaintiffs voiced objections to the interest-only loan; however, plaintiffs were reassured by Emily Berry-Belvin that this was the best option for them given their financial situation and she led plaintiffs to believe that they would be able to refinance the terms of the loan in a year or so.

25.    On May 5, 2006, plaintiffs traveled to Nags Head to the office of a lawyer for the loan closing.

26.   Upon arrival at the lawyer's office, plaintiffs were advised that they would have to wait because the paper work had not arrived.

27.   After waiting several hours and having to make calls to Ocracoke to arrange for unplanned after school child care, the plaintiffs were finally ushered into a back office to sign the paper work beginning at approximately 5:50 p.m.

28.   Plaintiffs did not meet the lawyer who was supposed to be handling the closing. Instead, plaintiffs met with an assistant who sat across the table from the plaintiffs with a stack of papers marked with stickies indicating where their signatures were needed.

29.   The assistant did not review the documents with the plaintiffs nor did she explain the contents or purpose of any of the documents. The assistant hurried plaintiffs through the signing process by showing plaintiffs where to sign and instructing them to sign. Plaintiffs did look at several of the documents but did not have an opportunity to review the full extent of the contents of all of the documents.

30.   Once the plaintiffs had signed each of the documents in the place indicated by the assistant, the meeting was over. Plaintiffs did not receive any of the documents or copies of any of the documents after they had completed the signing process.

31.   Among other documents, plaintiffs executed a Promissory Note in the amount of $525,000.00 and a Deed of Trust securing the Promissory Note for the benefit of the original lender, First National Bank of Arizona.

32.   The copy of the Promissory Note presented at the foreclosure hearing in the matter 09 SP 09 in Hyde County Superior Court bore an additional page entitled

"Allonge to Note" (hereinafter Allonge) The Allonge purports to meet the requirements of N.C. Gen. Stat. § 25-1-201(21) by showing indorsements, authorized signatures, by the various and multiple entities purporting to assign and transfer the Promissory Note and Deed of Trust from the original lender, First National Bank of Arizona through to present purported holder and owner, defendant Deutsche. (Exhibit 1)

33.    The Allonge shows an indorsement by First National Bank of Arizona to First National Bank of Nevada.

34.    The Allonge shows an indorsement by Deutsche Bank National Trust Company, FKA Bankers Trust Company of California, N.A. as Custodian as Attorney in Fact wherein it purports to have authority to indorse on behalf of First National Bank of Nevada to Residential Funding Corporation.

35.    Plaintiffs have requested documentation to substantiate the authority of Deutsche Bank National Trust Company, FKA Bankers Trust Company of California, N.A. as Custodian as Attorney in Fact to act on behalf of First National Bank of Nevada; no such information has been provided; therefore, on information and belief, there is no underlying documentation to substantiate the indorsement by Deutsche Bank National Trust Company, FKA Bankers Trust Company of California, N.A. as Custodian as Attorney in Fact for First National Bank of Nevada to Residential Funding Corporation.

36.    The Allonge shows an indorsement from Residential Funding Corporation to Deutsche Bank Trust Company Americas as Trustee.

37.    With respect to Residential Accedit Loans, Inc., the Allonge bears no indorsement to Residential Accredit Loans, Inc. which is the entity which purports to be the owner and holder of the note.

38.    The Allonge bears the indorsement "Deutsche Bank Trust Company of Americas Trustee". The indorsement does not state for whom Deutsche Bank is acting as Trustee.

39.    The Promissory Note executed by plaintiff provides for interest to be charged at a yearly rate of 7.375% and for the first *84 monthly payments in the amount of $4,391.32*. (Exhibit 2) This same Promissory Note indicates on its face that there was an interest-only addendum to the note.

40.    The interest-only addendum states that it superseded certain sections of the Promissory Note; to wit: *the first 120 payments in the amount of $3226.57 and the next 240 payments in an amount sufficient to fully amortize the outstanding principal balance of the note over the remaining term of the Note in equal monthly payments.* (Exhibit 3)

41.    The federal Truth in Lending disclosure statement provided to plaintiffs at closing disclosed the following:

| APR: | Finance charge | Amount Financed | Total of Payments |
|---|---|---|---|
| 7.953% | $943469.57 | $507,473.43 | $1,450,943.00 |

Payment Schedule:

84 payments @ $3226.57
36 payments @ $3500.00
239 payments @ $4391.32
1 payment @ $4385.64

(Exhibit 4)

42.     The payment schedule disclosed on the Truth in Lending Disclosure Statement does not match the payment schedule set forth in the Promissory Note or the interest only addendum to the Promissory Note.

43.     To date, plaintiffs have failed to receive a Truth in Lending Disclosure Statement which accurately discloses the payment schedule for the transaction which is the subject of this Complaint.

44.     The three day right to cancel the transaction is extended until plaintiffs receive the Truth in Lending disclosures or the expiration of three years whichever is later.

45.     On April 5, 2009, plaintiffs by and through their counsel exercised their extended right to rescind the loan transaction by giving written notice. (Exhibit 5)

46.     By letter dated April 24, 2009, Kathy Priore, Associate Counsel for GMACM, advised that it "would not rescind the Loan transaction at this time." (Exhibit 6)

47.     The payment schedule set forth on the Truth in Lending Disclosure Statement charges plaintiffs more than $100,000.00 in hidden finance charges.

48.     Beginning in the summer of 2008, plaintiffs attempted to negotiate with defendant GMAC for a loan modification by submitting detailed financial documentation.

49.     Plaintiffs were told that they needed to make two consecutive regular mortgage payments before they would be considered for a loan modification.

50.     Plaintiffs spent untold hours on hold on the telephone attempting to contact representatives of defendant GMAC sometimes with success but many times without success. Plaintiffs never spoke to the same representative twice.

50.    On or about August 27, 2008, plaintiffs received a letter from defendant GMAC returning their last mortgage payment and informing plaintiffs that they had failed to honor the trial period.

51.    In a state of near panic, plaintiff telephoned defendant GMAC and after a long wait on hold plaintiff was told that the representative responsible for processing their request for loan modification had been fired for failing to process loan modifications.

52.    Plaintiff was assured by a representative of defendant GMAC that he would place a hold on the foreclosure status and work with them to process the loan modification. Plaintiff was subsequently unable to reach this representative again.

53.    On or after September 5, 2008, plaintiffs received an overnight envelope from defendant GMAC regarding a loan modification.

54.    Plaintiff learned that they had been approved for a loan modification which modified the interest rate to 5.7500% on a new principal balance of $541,036.08, on a term of 332 months with a maturity date of June 1, 2026.

55.    The loan modification also required them to make a lump sum payment of $8051.40 by October 1, 2008 and begin making the modified payments on November 1, 2008.

56.    The loan modification reduced plaintiffs' monthly mortgage payment by 4429.99. Plaintiffs were unable to make the lump sum payment required to qualify for the loan modification.

57.    Beginning in October, 2008, plaintiffs attempted by and through counsel to negotiate with defendant GMAC.

58.    On October 14, 2008, plaintiffs faxed releases of information authorizing defendant GMAC to discuss their account with counsel.

59.    Defendant GMAC advised plaintiffs that it would take up to five days for verification of the release of information to post to plaintiffs account and until such time defendant GMAC was not authorized to speak with counsel.

60.    On October 20, 2008, plaintiffs through counsel again attempted without success to speak with representatives of defendant GMAC regarding plaintiffs' account.

61.    On November 2, 1008, plaintiffs through counsel wrote to defendant GMAC regarding options for a real loan modification. Plaintiffs did not receive a response to this letter.

62.    On November 14, 2008, plaintiffs through counsel spoke with defendant GMAC's representative Jay Graves regarding their account. Plaintiffs were advised that the modification had been denied because of the failure to make the lump sum payment.

63.    On January 9, 2009, plaintiffs again through counsel wrote to defendant GMAC regarding a loan modification. Plaintiffs did not receive a response to this letter.

63.    On February 10, 2009, plaintiffs again through counsel wrote to defendant GMAC regarding their account.

64.    On February 20, 2009, defendant GMAC by letter advised plaintiffs' counsel that until she submitted written permission from the plaintiffs, defendant GMAC could not speak with counsel.

## CLAIMS FOR RELIEF

## STATEMENT OF NATURE OF CLAIMS ASSERTED

65.    This action is filed, in part, to enjoin the mortgage foreclosure sale ordered in 09 SP 09, Hyde County, on equitable and legal grounds pursuant to N.C. Gen. Stat. §45-21.34. All claims asserted affirmatively by plaintiffs in this action are also asserted, in the alternative, in defense and recoupment against any claim of indebtedness arising from the mortgage loan obligations and transactions that are the subject of this complaint.

### FIRST CLAIM FOR RELIEF
### VIOLATIONS OF TRUTH IN LENDING
### AGAINST DEFENDANTS DEUTSCHE, RESIDENTIAL FUNDING AND GMAC

66.    All paragraphs of this complaint are incorporated herein as if fully restated.

67.    This consumer credit transaction was subject to the Plaintiffs' right of rescission as described by 15 U.S.C. § 1635 and Regulation Z § 226.23 (12 C.F.R. § 226.23).

68.    Defendants Deutsche, Residential Funding and GMAC as purported assignees of First National Bank of Arizona and servicers and subservicers of the purported holder of the Promissory Note are liable to plaintiffs for violations 15 U.S.C. § 1635(a) and Regulation Z § 226.23(b) for failure to timely deliver to the Plaintiffs two copies of the notice of the right to rescind which clearly and conspicuously disclosed the date the rescission period expired.

69.    Defendants Deutsche, Residential Funding and GMAC as purported assignees of First National Bank of Arizona and servicers and subservicers of the purported holder of the Promissory Note are liable to plaintiffs for failing to deliver all "material" disclosures required by the Act and Regulation Z, including the following:

   a. By failing to properly and accurately disclose the "amount financed," using that term in violation of Regulation Z § 226.18(b) and 15 U.S.C. §1638(a)(2)(A).
   b. By failing to clearly and accurately disclose the "finance charge," using that term, in violation of Regulation Z §§ 226.4 and 226.18(d) and 15 U.S.C. §1638(a)(3).

c. By failing to clearly and accurately disclose the "annual percentage rate," using that term, in violation of Regulation Z § 226.18(e) and 15 U.S.C. § 1638(a)(4).

d. By failing to properly disclose the number, amounts, and timing of payments scheduled to repay the obligation, in violation of Regulation Z § 226.18(g) and 15 U.S.C. § 1638(a)(6).

e. By failing to clearly and accurately disclose the "total of payments," using that term, in violation of Regulation Z § 226.18(h) and 15 U.S.C. § 1638(a)(5).33.

70.    These material disclosure violations are apparent from the face of the disclosure statement and other documents assigned pursuant to the requirements of 15 U.S.C. § 1641(a).

71.    Plaintiffs have a continuing right to rescind the transaction until the third business day after receiving both the notice described in paragraph 50 and all "material" disclosures described in paragraph 69, pursuant to 15 U.S.C. § 1635(a) and Regulation Z § 226.23(a)(3), up to three years after consummation of the transaction.

72.    On April 5, 2009, Plaintiffs by and through counsel rescinded the transaction by sending to a notice of rescission addressed to "Holder of Loan # , c/o Ms. Lauren S. Thurmond, Kellam & Pettit, P.A. , 2701 Coltsgate Road, Suite 300, Charlotte, North Carolina 28211.

73.    Counsel for defendants forwarded the plaintiffs' letter of rescission to GMAC.

74.    More than 20 calendar days have passed since the Defendants received copies of the Plaintiff's notice of rescission.

75.    Defendants have failed to take any action necessary or appropriate to reflect the termination of the security interest created under this transaction as required by 15 U.S.C. § 1635(b) and Regulation Z § 226.23(d)(2).

76.    Defendants have failed to return to plaintiffs any money or property given by the plaintiffs to anyone, including the defendants, as required by 15 U.S.C. §1635(b) and Regulation Z § 226.23(d)(2).

77.    As a result of the aforesaid violations of the Act and Regulation Z, pursuant to 15 U.S.C. §§ 1635(a), 1640(a), and 1641(c), defendants are liable to plaintiffs for:

    a. Rescission of this transaction.
    b. Termination of any security interest in Plaintiff's property created under the transaction.
    c. Return of any money or property given by the Plaintiff to anyone, including the Defendant, in connection with this transaction.
    d. Statutory damages of $2000 for the disclosure violations.
    e. Statutory damages of $2000 for Defendants' failure to respond properly to Plaintiff's rescission notice.
    f. Forfeiture of return of loan proceeds.
    g. Actual damages in an amount to be determined at trial.
    h. A reasonable attorney fee.

SECOND CLAIM FOR RELIEF
USURY

78.    All paragraphs of this complaint are incorporated herein as if fully restated.

79.    With willful and corrupt intent to charge and collect a greater rate of interest than allowed by law, defendants charged and collected interest in excess of the agreed rate or limits set forth in Chapter 24 of the North Carolina General Statutes, including without limitation, the charge, collection and imposition of hidden finance charges contained in the erroneous payment schedule set forth in the Truth in lending disclosure statement.

80.    These acts and practices entitle plaintiffs to the remedies set out in N.C.G.S. § 24-2 *et seq.*, and defendant, Deutsche, as purported holder of the loan and by reason of its joint venture relationship with defendants, Residential Funding and

GMAC is jointly and severally liable with defendants, Residential Funding and GMAC, for all damages pursuant to this Claim.

## THIRD CLAIM FOR RELIEF
## UNFAIR TRADE PRACTICES PURSUANT TO N.C. GEN. STAT. 75-1.1

81.    All paragraphs of this complaint are incorporated herein as if fully restated.

82.    Defendants have engaged in unfair methods of competition in or affecting commerce or unfair or deceptive acts or practices in or affecting commerce in at least but not limited to the following:

    a.    disclosing, charging and collecting usurious rates of interest;

    b.    failing to make material disclosures pursuant to the requirements of the federal Truth in Lending Act;

    c.    failing to take affirmative steps to cancel the plaintiffs' Deed of Trust upon their notice of rescission;

    d.    falsely representing to be the owner and holder of plaintiffs' note and deed of trust;

83.    These acts and omissions proximately damaged plaintiffs, are in and affecting commerce, violate public policy, have the capacity to deceive an ordinary consumer, are unscrupulous, immoral, and oppressive, and constitute unfair and/or deceptive trade practices under N.C.G.S. § 75-1.1, thereby entitling plaintiffs to three times their actual damages plus a reasonable attorney's fee pursuant to N.C.G.S.§§ 75-16 and 75-16.1.

## FOURTH CLAIM FOR RELIEF
## VIOLATIONS OF NORTH CAROLINA'S PROHIBITED ACTS BY DEBT COLLECTORS
## PURSUANT TO N.C. GEN. STAT. § 75-50 ET. SEQ.

84.    All paragraphs of this complaint are incorporated herein as if fully restated.

85.    Plaintiffs are consumers within the meaning of N.C. Gen. Stat. § 75-50 et seq.

86.    Defendants are debt collectors within the meaning of N.C. Gen. Stat. § 75-50 et. seq.

87.    Defendants have attempted to collect a debt within the meaning of N.C. Gen. Stat. § 75-50(2).

88.    Defendants have engaged in acts of debt collection in violation of N.C. Gen. Stat. § 75-50 et. seq. in at least but not limited to the following:

a.    communicating with plaintiffs after the defendants had been notified by the plaintiff's attorney that she represents said plaintiffs;

b.    falsely representing the character, extent, or amount of debt against a consumer pursuant to N.C. Gen. Stat. § 75-54(4) to wit: all attempts to collect money from plaintiffs after plaintiffs forwarded their notice of rescission to the noteholder;

c.    falsely representing to be owner and holder of the plaintiffs' Promissory Note;

d.    attempting to foreclose on plaintiffs' property without legal authority.

89.    Defendants are liable to plaintiffs for actual damages and a statutory penalty of $2000.00 for each violation proved at trial and reasonable attorney's fees.

## FIFTH CLAIM FOR RELIEF
## BREACH OF CONTRACT

90.    All paragraphs of this complaint are incorporated herein as if fully restated.

91.    On or about May 5, 2006, plaintiff executed a Promissory Note in favor of First National Bank of Arizona.

92.     The federal Truth in Lending disclosure statement provided to plaintiffs at closing disclosed the following payment schedule:

84 payments @ $3226.57
36 payments @ $3500.00
239 payments @ $4391.32
1 payment @ $4385.64

93.     The payment schedule set forth in paragraph 74 is a breach of the contract between plaintiff and the original lender.

94.     Plaintiffs are entitled to actual damages and reasonable attorney's fees.

SIXTH CLAIM FOR RELIEF

95.     All paragraphs of this complaint are incorporated herein as if fully restated.

96.     On or about May 5, 2006, plaintiff executed a Promissory Note in favor of First National Bank of Arizona.

97.     Defendant, Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc. purports to be the owner and holder of the Promissory Note executed by plaintiff to First National Bank of Arizona by and through various indorsements.

98.     Under N.C. Gen. Stat. § 25-3-301, the holder of a negotiable instrument may enforce payment in his own name.

99.     N. C. Gen. Stat. § 25-1-201(21) defines a holder of an instrument as one who is in possession of an instrument "drawn, issued, or indorsed to him or to his order or to bearer or in blank.

100.    Where a negotiable instrument is made payable to order, one becomes a holder of the instrument when it is properly indorsed and delivered.

101.   Mere possession of a note payable to order does not suffice to prove ownership or holder status. . Econo-Travel Motor Hotel Corp. v. Taylor, 301 N.C. 200, 271 S.E.2d 54 (1980).

102.   The Allonge under and by which Defendant Deutsche claims to hold is defective in at least the following:

a.   on information and belief, the indorsement by Deutsche Bank National Trust Company, FKA Bankers Trust Company of California, N.A. as Custodian as Attorney in Fact on behalf of First National Bank of Nevada is not duly authorized;

b.   the indorsement to Defendant Deutsche is in its representative capacity as trustee not to Defendant Deutsche in its own name. No principal's name appears in the indorsement.

103.   Defendant Deutsche is without authority and capacity to enforce the Promissory Note executed by plaintiff to First National Bank of Arizona.

104.   The Court should strike the Order allowing foreclosure by sale entered by Judge Blount as void.

105.   Defendants are liable to plaintiffs for an amount to be proven at trial.

**PLAINTIFFS' FIRST MOTION FOR INJUNCTIVE RELIEF AGAINST DEFENDANTS**
TO PRESERVE THE STATUS QUO AND TO PREVENT DELAYING TACTICS BY
PROHIBITING THE ASSIGNMENT OF THE MORTGAGE OR SERVICING
RIGHTS DURING THE COURSE OF THE LITIGATION

106.   All paragraphs of this complaint are incorporated herein as if fully restated.

107.   Plaintiffs, pursuant to Rule 65(b) of the North Carolina Rules of Civil Procedure, move this Court for an Order granting a Preliminary Injunction, enjoining these defendants   from conveying or assigning any interest in the mortgage loan that is the subject of this litigation until and unless otherwise allowed by Court Order.

108.   As grounds for said Motion, plaintiffs reallege and incorporate herein by reference the facts of this verified complaint and state  additionally that they will suffer immediate  and  irreparable  harm  if said  defendants  undertake  to  delay  these proceedings by forcing addition or joinder of parties who may subsequently obtain an interest in plaintiffs' loan.   The prospect of prolonged delay by virtue of sale or assignment of interests in this loan is not without precedent by similarly situated lender-defendants and would cause great harm to the plaintiffs.

109.   Plaintiffs show the court that the relief requested is for the purpose of preserving the status quo and that the burden imposed upon the defendants is reasonable and necessary for purposes of preserving the status quo and that the burden is far less than would be suffered by the plaintiffs if the status quo is not maintained during the course of the litigation.

110.   Plaintiffs respectfully request that the Court accept this verified complaint as their affidavit for purposes of this Motion for Preliminary Injunction.

## PLAINTIFFS' SECOND MOTION FOR INJUNCTIVE RELIEF AGAINST DEFENDANTS
## TO PRESERVE THE STATUS QUO AND TO RESTRAIN A FORECLOSURE SALE DURING THE COURSE OF THIS LITIGATION, WHICH WOULD OTHERWISE CAUSE IRREPARABLE HARM TO PLAINTIFFS.

111.   All paragraphs of this complaint are incorporated herein as if fully restated.

112.   Plaintiffs, through counsel and pursuant to Rule 65 of the North Carolina Rules of Civil Procedure, respectfully move this Court for a Temporary Restraining Order prohibiting defendants  from proceeding toward the foreclosure sale of plaintiffs' home and, in support of this motion, show the following: (i) plaintiffs have shown

through their Complaint and Affidavit, and will show at the hearing of this Motion, claims which have a substantial likelihood of success on the merits; (ii) that plaintiffs will suffer immediate and irreparable harm by virtue of losing title to their home through foreclosure sale before the adverse parties or their counsel can be heard in opposition to this Motion; (iii) that the potential injury to the plaintiffs is of such a nature that compensation alone will not make plaintiffs whole; (iii) that the restraint ordered imposes no undue burden or risk of harm to defendants; (iv) that balancing the risk of harm between the parties favors injunctive relief in favor of plaintiffs; (v) that time is of the essence, and that the bond, if applicable, will adequately protect defendants from any reasonable risk of harm by the restraint ordered while the underlying claims determining the rights of the parties are decided.

113.  Plaintiffs' counsel undersigned certifies to the Court the efforts that have been made to give notice of this Motion to the adverse parties and the reasons supporting the claim that notice should not be required as follows:

114.  Wherefore plaintiffs respectfully request that a Temporary Restraining Order be entered by the Court prohibiting the defendants from pursuing further proceedings toward the foreclosure sale of plaintiffs' home or otherwise ordering relief as the Court determines appropriate.

## REQUEST FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court:

1.    Assume jurisdiction of this case;

2.    Declare the security interest in Plaintiff's home void;

3.    Rescind the transaction of May 5, 2006;

4.    Order defendants to take all action necessary to terminate any security interest in plaintiffs' property created under the transaction and that the Court declare all such security interests void, including but not limited to the mortgage related to the transaction of May 5, 2006;

5.    Order the return to the plaintiffs of any money or property given by the plaintiffs to anyone, including the defendants, in connection with the transaction;

6.    Enjoin defendants during the pendency of this action, and permanently thereafter, from instituting, prosecuting, or maintaining foreclosure proceedings on the plaintiffs' property, from recording any deeds or mortgages regarding the property or from otherwise taking any steps to deprive plaintiffs of ownership of that property;

7.    Award the plaintiffs statutory damages for the disclosure violations, in the amount of twice the finance charge in connection with this transaction, but not less than $200 or more than $2000 as provided under 15 U.S.C. § 1640(a);

8.    Award the plaintiffs statutory damages for defendants' failure to respond properly to the plaintiffs' rescission notice, in the amount of twice the finance charge in connection with this transaction, but not less than $200 or more than $2000 as provided under 15 U.S.C. § 1640(a);

9.    Order that, because the defendants failed to respond to the plaintiffs' notice of rescission, plaintiffs have no duty to tender, but in the alternative, if tender is required, determine the amount of the tender obligation in light of all of the plaintiffs' claims, and order the defendants to accept tender on reasonable terms and over a reasonable period of time;

10.    Award actual damages in an amount to be established at trial;

11.    Award the plaintiff costs and a reasonable attorney fee as provided under 15 U.S.C. § 1640(a);

12.    Award treble damages pursuant to N.C. Gen. Stat. §75-16;

13.    Order a forfeiture of all interest under the loan transaction;

14.    Award twice the amount of usurious interest pursuant to N.C. Gen. Stat. § 24-2, et. seq.;

15.    Grant plaintiffs injunctive relief as requested above;

16.    Strike the Order of allowing the foreclosure sate;

17.    Award such other and further relief as the Court deems just and proper.

This the 14th day of September 2009.

Katherine S. Parker-Lowe
Attorney for Plaintiffs
NC Bar # 13318
35 Miss Elecia Lane, Suite 101
Post Office Box 730
Ocracoke, North Carolina 27960
252-928-1000
252-928-3037

## VERIFICATION

I, Rex T. Gilbert, Jr.,  being  duly sworn, depose and say the following:

That the contents of the foregoing instrument are true to my own knowledge except matters stated on information and belief and as to those matters I believe them to be true.

This the 12th day of _____Sept_____, 20 09

_____
Rex T. Gilbert, Jr.

Sworn and subscribed to before me
this 12th day of _____Sept_____, 20 09

_____
Notary Public

My Commission Expires:
_____3-20 14_____



## BANK OF ARIZONA

1565 W. Alameda Drive
Tempe, AZ 85282
Office (480) 224-8321 Fax 480-224-8522

### ALLONGE TO NOTE

LOAN NUMBER: ████0843
BORROWER: Gilbert JR
IN THE AMOUNT OF: $525,000.00

PAY TO THE ORDER OF:
First National Bank of
Nevada

WITHOUT RECOURSE BY:

_____
AMY HAWKINS, ASSISTANT VICE PRESIDENT
FIRST NATIONAL BANK OF ARIZONA

Pay to the order of
RESIDENTIAL FUNDING CORPORATION

Without Recourse
First National Bank of Nevada

By:
Deutsche Bank National Trust
Company, F/K/A Bankers Trust
Company of California, N. A.,
as Custodian as Attorney In
Fact

Christopher Corcoran
Vice President

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Corporation

BY _____
Judy Faber, Vice President

# ADJUSTABLE RATE NOTE

### (LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| | | |
|---|---|---|
| May 5, 2006 | MCLEAN | VA |
| [Date] | [City] | [State] |

134 West End Road, Ocracoke, NC  27960
[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 525,000.00        (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **First National Bank of Arizona**

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of        7.375 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.  PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on **July 1, 2006** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **June 1, 2036**                , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. BOX 62768, PHOENIX, AZ 85085-2768**

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments   See Attached Interest-Only Addendum here to and made a part here of.

Each of my initial monthly payments will be in the amount of U.S. $ 4,391.32                . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

▆▆▆▆0843

MULTISTATE ADJUSTABLE RATE NOTE - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*) - Single Family - Fannie Mae UNIFORM INSTRUMENT

*VMP*®-838N (0210)             Form 3520 1/01

VMP MORTGAGE FORMS · (800)521-7291

Page 1 of 4                    Initials: ▆▆

P Ex. 2

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES Pg 94 of 317

### (A) Change Dates

The interest rate I will pay may change on the first day of **June, 2013**, and on that day every **6th** month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **two and three-quarters** percentage points ( **2.750** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **13.375** % or less than **2.750** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **one** percentage point(s) ( **1.000** %) from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than **13.375** %, OR LESS THAN **2.750** .

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

0843



**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **4.000** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

0843

Form 3520 1/01

VMP-838N (0210)                                Page 3 of 4                          Initials: _KTG_

Transfer of the Property   a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

CAUTION–IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)        _____ (Seal)
Rex T. Gilbert, JR          -Borrower                        -Borrower

_____ (Seal)        _____ (Seal)
                            -Borrower                        -Borrower

_____ (Seal)        _____ (Seal)
                            -Borrower                        -Borrower

_____ (Seal)        _____ (Seal)
                            -Borrower                        -Borrower

*[Sign Original Only]*


0843

-838N (0210)

Page 4 of 4

Form 3520 1/01

Loan Number: ██████0843

Property Address: 134 West End Road, Ocracoke, NC 27960

THIS ADDENDUM is made this 5th day of May, 2006, and is incorporated into and intended to form a part of the Adjustable Rate Note (the "Note") dated the same date as this Addendum executed by the undersigned and payable to First National Bank of Arizona (the "Lender").

THIS ADDENDUM supersedes Sections 3(A), 3(B), 4(C) and 7(A) of the Note. None of the other provisions of the Note are changed by this addendum.

3.    PAYMENTS

    (A)    Time and Place of Payments
        I will pay interest by making payments every month for the first 120 payments (the "Interest-Only Period") in the amount sufficient to pay interest as it accrues. I will pay principal and interest by making payments every month thereafter for the next 240 payments in an amount sufficient to fully amortize the outstanding principal balance of the Note at the end of the Interest-Only Period over the remaining term of the Note in equal monthly payments.

        I will make my monthly payments on the first day of each month beginning on July 1, 2006. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal. If, on June 1, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

        I will make my payments at 1165 West Alameda Drive, Tempe, AZ 85282 or at a different place if required by the Note Holder.

    (B)    Amount of My Initial Monthly Payments
        Each of my initial monthly payments will be in the amount of U.S. $3,226.57. This payment amount is based on the original principal balance of the Note. This payment amount may change.

4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES
    (C)    Calculation of Changes
        Before each Change Date, the Note Holder will calculate my new interest rate by adding two and three-quarters percentage point(s) (2.750%) to the Current Index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

        During the Interest-Only Period, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay accrued interest. This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the Interest-Only Period unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the Interest-Only Period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower principal balance. At the end of the Interest-Only Period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I am expected to owe at the end of the Interest-Only Period or Change Date, as applicable, in equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the Interest-Only Period, my payment amount will not be reduced due to voluntary prepayments.

7.    BORROWER'S FAILURE TO PAY AS REQUIRED

    (A)    A Late Charge for Overdue Payments

        If the Note Holder has not received the full amount of any monthly payment by the end of fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 4.000% of my overdue payment of interest during the interest-only period, 4.000% of my overdue payment of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

Dated: 5/5/06

_Rex T. Gilbert, JR_

TRUTH-IN-LENDING DISCLOSURE STATEMENT
(THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER OR LENDER'S AGENT:

    First National Bank of Arizona
    1760 Old Meadow Road
    Mc Lean, VA 22102

☐ Preliminary   ☒ Final

DATE: 05/05/2006
LOAN NO.: ████0843
Type of Loan: ARM

BORROWERS:

ADDRESS:
CITY/STATE/ZIP:
PROPERTY: 134 West End Road Ocracoke NC 27960

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.953 % | $ 943,469.57 | $ 507,473.43 | $ 1,450,943.00 |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE<br>MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE<br>MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 84 | $3,226.57 | 07/01/2006 | | | |
| 36 | $3,500.00 | 07/01/2013 | | | |
| 239 | $4,391.32 | 07/01/2016 | | | |
| 1 | $4,385.64 | 06/01/2036 | | | |

**DEMAND FEATURE:**   ☒ This loan does not have a Demand Feature.   ☐ This loan has a Demand Feature as follows:

**VARIABLE RATE FEATURE:**
☒ This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

KATHERINE S. PARKER-LOWE
ATTORNEY AT LAW
2 BEACH LANE
OCRACOKE, NORTH CAROLINA 27960

MAILING ADDRESS
POST OFFICE BOX 730
OCRACOKE, NC 27960
E-MAIL: katherine@parker-lowe.net

TELEPHONE
(252) 928-1000
FACSIMILE
(252) 928-3037

April 5, 2009


Holder of Loan # ████2713
c/o Ms. Lauren S. Thurmond
Kellam & Pettit, P.A.
2701 Coltsgate Road
Suite 300
Charlotte, North Carolina 28211

Re:    In the Matter of the Foreclosure....Gilbert
       Hyde County File 09-SP-9
       Rex T. Gilbert, Jr.
       134 West End Road
       Post Office Box 754
       Ocracoke, North Carolina 27960

Dear Ms. Thurmond:

As you are aware, I represent Mr. Gilbert concerning the loan transaction which he
entered into with First National Bank of Arizona on May 5, 2006. I have been authorized
by my clients to rescind this transaction and hereby exercise that right pursuant to the
Federal Truth in Lending Act, 15 U.S.C. § 1635, Regulation Z § 226.23.

The disclosure statement failed to provide all the required material disclosures correctly,
including, but not limited to:

    (a)    The disclosed payment schedule does not match the note;
    (b)    The stated APR is more than one-eighth of one-percent off;
    (c)    The total of payments is not correct;
    (d)    The total of payments results in a higher APR than the disclosed APR
    (e)    The disclosures do not match the note or the addendum to the note.

The security interest is void upon our rescission. See 15 U.S.C. § 1635; Regulation Z §
226.23. Pursuant to the Regulation, you have twenty days after receipt of this notice of
rescission to return to my client all monies paid and to take action necessary or
appropriate to reflect termination of the security interest.

We are prepared to discuss a tender obligation, should it arise, and satisfactory ways in
which my client may meet this obligation. Please be advised that if you do not cancel

Ms. Lauren S. Thurmon
April 6, 2009
Page 2 of 2

the security interest and return all consideration paid by my client within 20 days of receipt of this letter, you will be responsible for actual and statutory damages pursuant to 15 U.S.C. § 1640(a).

Please send me a copy of my client's payment history and other documents showing the loan disbursements, loan charges, payments made, and current principal balance due.

Sincerely,

Katherine S. Parker-Lowe

KPL/mpc

cc: Mr. and Mrs. Rex T. Gilbert, Jr.

**GMAC ResCap**

April 24, 2009

Katherine Parker-Lowe
Attorney at Law
2 Beach Lane
Ocracoke, NC 27960

Re:    Rex Gilbert, Jr.
       Loan number # ███ 2713 ("Loan")

Dear Ms. Parker-Lowe:

We are writing in response to your correspondence to GMAC Mortgage, LLC requesting rescission of the loan transaction your client entered into with First National Bank of Arizona on May 5, 2006.

We have reviewed your client's loan file and find no basis to conclude that there were any material disclosure errors that would give rise to an extended right of rescission.

Consequently, we will not rescind the Loan transaction at this time.

If you have any documents or further information that sets forth the basis of the demand, please contact me at the address below.

Sincerely,

Kathy Priore
Associate Counsel

cc: Lauren Thurmond, Kellam & Pettit, PA

GMAC ResCap
One Meridian Crossings   Suite 100   Richfield, MN 55423
952.857.7000   gmacrescap.com

LENDER: First National Bank of Ariz.                                                    LOAN NO. ████████843
                                                                                        TYPE Conventional

BORROWERS/OWNERS Rex T. Gilbert, JR

ADDRESS            134 West End Road
CITY/STATE/ZIP     Ocracoke, NC 27960
PROPERTY           134 West End Road, Ocracoke, NC  27960

## YOUR RIGHT TO CANCEL

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

(1) The date of the transaction, which is
                or
(2) The date you received your Truth In Lending disclosures;
                or
(3) The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

---

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

**First National Bank of Arizona**
**MS AZ-4003-078**
**1665 W. Alameda Drive**          **Or Fax to:  (602) 636-7096**
**Tempe, AZ 85282-3200**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of
                    (or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

_____          _____
CONSUMER'S SIGNATURE                                         DATE

---

Each of the borrowers/owners in this transaction has the right to cancel. The exercise of this right by one borrower/owner shall be effective as to all borrowers/owners.

The undersigned each acknowledge receipt of two copies of NOTICE of RIGHT TO CANCEL.

X _____   5/5/06    X _____
BORROWER/OWNER Rex T. Gilbert, JR      DATE        BORROWER/OWNER                      DATE

X _____   5/5/06    X _____
BORROWER/OWNER  Daniela L. Gilbert     DATE        BORROWER/OWNER                      DATE

---

**————— CONFIRMATION CERTIFICATE —————**
**DO NOT SIGN UNTIL THREE BUSINESS DAYS HAVE ELAPSED**

**Three business days have elapsed** since the undersigned have received two copies of this document. Each of the undersigned hereby certify and warrant that they have not exercised any right which they may have to rescind the transaction, that they do not desire to do so, and that they ratify and confirm the transaction in all respects.

_____   _____          _____   _____
BORROWER/OWNER Rex T. Gilbert, JR  DATE             BORROWER/OWNER                      DATE

_____   _____          _____   _____
BORROWER/OWNER Daniela L. Gilbert  DATE             BORROWER/OWNER                      DATE

---

0843

VMP -66 (0305).01
®
VMP Mortgage Solutions (800)521-7291          10/00

PEx 7

## STATE OF NORTH CAROLINA

File No. 09 CVS 70

HYDE County

In The General Court Of Justice
☐ District  ☒ Superior Court Division

| | |
|---|---|
| Name Of Plaintiff<br>REX T. GILBERT, JR. AND DANIELA L. GILBERT | |
| Address<br>C/O POST OFFICE BOX 730 | **CIVIL SUMMONS** |
| City, State, Zip<br>OCRACOKE, NC 27960 | ☐ **ALIAS AND PLURIES SUMMONS** |

**VERSUS**

G.S. 1A-1, Rules 3, 4

| | |
|---|---|
| Name Of Defendant(s)<br>DEUTSCHE BANK TRUST COMPANY AMERICAS, As Trustee for,  RESIDENTIAL ACCREDIT LOANS, INC., DAVID A.SIMPSON, P.C., Substitute Trustee, RESIDENTIAL FUNDING, LLC, and  GMAC MORTGAGE, LLC, ⊞ | Date Original Summons Issued<br><br>Date(s) Subsequent Summons(es) Issued |

### To Each Of The Defendant(s) Named Below:

| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
|---|---|
| RESIDENTIAL FUNDING, LLC<br>C/O KELLAM & PETTIT, P.A. AND JOHN T. BENJAMIN<br>AND DAVID A. SIMPSON, P.A. | GMAC MORTGAGE, LLC<br>C/O KELLAM & PETTIT, P.A. AND JOHN T. BENJAMIN<br>AND DAVID A. SIMPSON, P.A. |

### A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served.  You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff)<br>Katherine S. Parker-Lowe<br>35 Miss Elecia Lane, Suite 101<br>Post Office Box 730<br>Ocracoke, NC 27960 | Date Issued<br>9-14-09 | Time<br>10:15 | ☒ AM  ☐ PM |
|---|---|---|---|
| | Signature<br>*Maria A. Slade* | | |
| | ☒ Deputy CSC | ☐ Assistant CSC | ☐ Clerk Of Superior Court |

| ☐ ENDORSEMENT<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | Date Of Endorsement | Time | ☐ AM  ☐ PM |
|---|---|---|---|
| | Signature | | |
| | ☐ Deputy CSC | ☐ Assistant CSC | ☐ Clerk Of Superior Court |

**NOTE TO PARTIES:** *Many counties have* **MANDATORY ARBITRATION** *programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial.  The parties will be notified if this case is assigned for mandatory arbitration and, if so, what procedure is to be followed.*

AOC-CV-100, Rev. 10/01
© 2001 Administrative Office of the Courts

(Over)

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason.

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (Type Or Print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 10/01
© 2001 Administrative Case 4:09-cv-00181-D    Document 1-2    Filed 10/13/09    Page 36 of 100

# STATE OF NORTH CAROLINA

File No. **09CVS 70**

HYDE _____ County

In The General Court Of Justice
☐ District  ☒ Superior Court Division

Name Of Plaintiff
REX T. GILBERT, JR. AND DANIELA L. GILBERT

Address
C/O POST OFFICE BOX 730

City, State, Zip
OCRACOKE, NC 27960

**CIVIL SUMMONS**
☐ ALIAS AND PLURIES SUMMONS

G.S. 1A-1, Rules 3, 4

**VERSUS**

Name Of Defendant(s)
DEUTSCHE BANK TRUST COMPANY AMERICAS, As Trustee
for, RESIDENTIAL ACCREDIT LOANS, INC., DAVID
A. SIMPSON, P.C., Substitute Trustee, RESIDENTIAL FUNDING,
LLC, and GMAC MORTGAGE, LLC,

Date Original Summons Issued

Date(s) Subsequent Summons(es) Issued

## To Each Of The Defendant(s) Named Below:

| Name And Address Of Defendant 1 | Name And Address Of Defendant 2 |
|---|---|
| DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE FOR RESIDENTIAL ACCREDIT LOANS, INC. C/O KELLAM & PETTIT, P.A. AND JOHN T. BENJAMIN | DAVID A. SIMPSON, P.A. 7804 Fairview Road, #225 Charlotte, NC 28226 |

## A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff)
Katherine S. Parker-Lowe
35 Miss Elecia Lane, Suite 101
Post Office Box 730
Ocracoke, NC 27960

Date Issued
9-14-09

Time
10:15  ☒ AM  ☐ PM

Signature
Maria H Slade

☒ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court

☐ **ENDORSEMENT**
This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days.

Date Of Endorsement

Time  ☐ AM  ☐ PM

Signature

☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk Of Superior Court

**NOTE TO PARTIES:** *Many counties have* **MANDATORY ARBITRATION** *programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

AOC-CV-100, Rev 10/01
© 2001 Administrative Office of the Courts

(Over)

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM  ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM  ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason.

| Service Fee Paid | Signature Of Deputy Sheriff Making Return |
|---|---|
| $ | |
| Date Received | Name Of Sheriff (Type Or Print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 10/01
© 2001 Administrative Office of the Courts

STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF JUSTICE
COUNTY OF HYDE                              SUPERIOR COURT DIVISION
                                                          09 CVS 70

REX T. GILBERT, JR. and                    )
DANIELA L. GILBERT,                        )
                          Plaintiffs,         )
                                                    )
v.                                                  )
                                                    )
DEUTSCHE BANK TRUST COMPANY     )
AMERICAS, *As Trustee for,*             )
RESIDENTIAL ACCREDIT LOANS, INC.,   )
DAVID A. SIMPSON, P.C., Substitute Trustee, )
RESIDENTIAL FUNDING, LLC, and       )
GMAC MORTGAGE, LLC,                    )
                          Defendants.      )
                                                    )

## AFFIDAVIT OF KEITH PARKER-LOWE

I, Keith Parker-Lowe, being first duly sworn, aver and say as follows:

1.    I am President and CEO of KPL, Inc. a software development company and system integrator for county governments in the mid-Atlantic located and doing business in Ocracoke, North Carolina.

2.    I completed training for the business planning department of AETNA Life and Casualty.  This course of study included calculations, financial yields, actuarial tables, compound interest tables, statistics, and financial plotting and modeling.

3.    I completed training for and obtained a Securities and Exchange Commission Brokers License

4.    I am a licensed Realtor in North Carolina.  The course study included not only the study of financial calculations for mortgage loans and installment loans but the

actual preparation of the financial calculations required for making these loans and making accurate disclosures to consumers on these loans.

5.    I completed Canon's computer programming school in 1973.

6.    I wrote the financial programs and several operating manuals for Sharp Electronics on installment loan calculations and amortization schedules.

7.    I created computer programs for installment loan calculations to meet the compliance requirements of Truth in Lending for various banks and lending institutions including The Federal Land Bank, PCA and Southern National Bank and Bank of Montgomery, Bank of Raeford and NCNB.

8.    I created computer programs to calculate installment loans, amortization schedules, mortgage loans, APR's, and special compound interest calculations for Canon, Sharp and the Federal Reserve.

9.    I have created and used various programs to review and check the finance charges against the stated APR, terms, interest, payments and repayment schedule.

10.    I worked closely with the Federal Reserve to implement the Federal Truth in Lending Act and Regulation Z to assist many banks in meeting compliance requirements.

11.    Over the last several years I have gained experience in drafting and understanding compliance issues for profit sharing and various investment vehicles. This experience has proven invaluable in checking and verifying financial accounts of all types.

2

12.    I previously testified on behalf of Ms. Parker-Lowe in <u>Irene Britt v. Thomas Jones,</u> 123 N.CApp. 108, 472 S.E.2d 199 (1996). This case was originally filed in Hertford County, North Carolina.

13.    Based upon my testimony, the Court of Appeals upheld the application of monthly payments to interest first and principal second.

14.    Since February 1990, I have reviewed numerous loan agreements, promissory notes, schedules of payments on notes, mortgages, Truth in Lending Disclosure Statements (TIL), and related documents related to actions pending in the North Carolina trial courts and before the U.S. Bankruptcy Court for the Eastern District of North Carolina.

15.    I have reviewed ledgers, amortization schedules, repayment schedules, deeds, deeds of trust, land surveys, paper documents, and electronic records for compliance with Truth in Lending and the state usury laws.

16.    At Ms. Parker-Lowe's request, I have familiarized myself with the Gilberts' promissory note, interest only addendum to the promissory note and the federal Truth in Lending disclosure statement.

17.    At Ms. Parker-Lowe's request, I compared the payment schedules set forth in the promissory note, the addendum to the promissory note and the one set forth in the federal Truth in Lending disclosure statement.

18.    The payment schedule set forth in the Truth in Lending disclosure statement does not match either the promissory note or the interest only addendum to the promissory note.

3

19.    After reviewing the documents and determining that the TIL payment schedule did not match either the promissory note or the interest only addendum to the promissory note, I examined the other Truth in Lending mandated disclosures and calculated the APR.

20.    The APR using the information disclosed in the TIL results in an APR of 9% not the 7.953% as disclosed to the Gilberts.

21.    The Gilberts could have had a repayment schedule with 240 equal successive installments after the interest only period of approximately $4189.33. The APR would have been incorrect in this case also.

22.    The Truth in Lending disclosure statement payment schedule results in an additional $100,000.00+ interest.

23.    In the Interest-Only Addendum to the Gilbert promissory note, Loan 5300000843, in paragraph 4.(C), the Addendum states: After the end of the Interest-only Period, my payment amount will not be reduced due to voluntary prepayments. This statement results in a contradiction: voluntary prepayments after the interest only period will either not be allowed or will not reduce the amount of principal. In my opinion, this is contrary to existing law.

24.    Whereas in the Fannie Mae Uniform Instrument note allows for voluntary prepayment by stating that the maturity date will be accelerated as follows: "However, if the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest as well as during the time that my payments consist of principal and interest. If the partial Prepayment is made during the

4

period when my payments consist of principal and interest, the amount of my monthly

payment will not decrease; however, the principal and interest required under this Note

will be paid prior to the Maturity Date.

This the _15_ day of September 2009.

_____
Keith Parker-Lowe

Hyde County, North Carolina
Sworn to and subscribed before me this day by _Keith Parker-Lowe_

Date: _September 15, 2009_

_Laura Dunlow Belch_
Notary Public Signature
Notary's printed or typed name: _Laura Dunlow Belch_
(SEAL)
My Commission Expires: _10·13·2013_

STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF JUSTICE
COUNTY OF HYDE                       SUPERIOR COURT DIVISION
                                          09 CVS *10*

REX T. GILBERT, JR. and               )
DANIELA L. GILBERT,                   )
                    Plaintiffs,       )
                                      )
v.                                    )
                                      )
DEUTSCHE BANK TRUST COMPANY           )
AMERICAS, *As Trustee for*,           )
RESIDENTIAL ACCREDIT LOANS, INC,      )
DAVID A. SIMPSON, P.C., Substitute Trustee, )
RESIDENTIAL FUNDING, LLC, and         )
GMAC MORTGAGE, LLC,                   )
                    Defendants.       )
_____ )

## RESTRAINING ORDER

This cause was heard by the undersigned judge upon the application of

plaintiffs for a restraining order. It appears that this Court should grant a Temporary

Restraining Order prohibiting defendants from proceeding toward the foreclosure sale of

plaintiffs' home; plaintiff have shown the following: (i) plaintiffs have shown through their

Complaint and Affidavit, and will show at the hearing of this Motion, claims which have a

substantial likelihood of success on the merits; (ii) that plaintiffs will suffer immediate

and irreparable harm by virtue of losing title to their home through foreclosure sale

before the adverse parties or their counsel can be heard in opposition to this Motion; (iii)

that the potential injury to the plaintiffs is of such a nature that compensation alone will

not make plaintiffs whole; (iii) that the restraint ordered imposes no undue burden or risk

of harm to defendants; (iv) that balancing the risk of harm between the parties favors

injunctive relief in favor of plaintiffs; (v) that time is of the essence, and that the bond, if

applicable, will adequately protect defendants from any reasonable risk of harm by the

restraint ordered while the underlying claims determining the rights of the parties are decided.

Further, the court should enjoin these defendants from conveying or assigning any interest in the mortgage loan that is the subject of this litigation until and unless otherwise allowed by Court Order.

It further appears that plaintiff has made bond, with sufficient surety, in the amount of $~~250.00~~ 3000.00 Dollars to secure the defendant from damages for the restraining order prayed.

IT IS THEREFORE ORDERED that the defendant be and hereby are restrained from proceeding toward the foreclosure sale of plaintiffs' home and from conveying or assigning any interest in the mortgage loan.

IT IS FURTHER ORDERED that a copy of this Restraining Order be served upon the defendants in the manner now provided for service of process.

This restraining order shall expire ~~within~~ on _Sept. 25, 2009_ unless extended by further order of court or by consent.

This the _14_ day of September 2009. _at 2:29pm_

_Wayland J Sermons Jr._

The Honorable Wayland J. Sermons, Jr.
Resident Superior Court Judge Presiding

STATE OF NORTH CAROLINA       IN THE GENERAL COURT OF JUSTICE
COUNTY OF HYDE               SUPERIOR COURT DIVISION
                             09 CVS 70____

| | |
|---|---|
| REX T. GILBERT, JR. and<br>DANIELA L. GILBERT,<br>            Plaintiffs,<br><br>v.<br><br>DEUTSCHE BANK TRUST COMPANY<br>AMERICAS, *As Trustee for,*<br>RESIDENTIAL ACCREDIT LOANS, INC,<br>DAVID A. SIMPSON, P.C., Substitute Trustee,<br>RESIDENTIAL FUNDING, LLC, and<br>GMAC MORTGAGE, LLC,<br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### NOTICE OF HEARING

Please be notified that a hearing will be held at the Pitt County Courthouse, Greenville, North Carolina on Thursday, September 24, 2009 at 2:00 p.m., or as soon thereafter as the matter may be reached by the Court, upon the Plaintiff's Motion for Preliminary Injunction and return on Temporary Restraining Order entered on September 14, 2009. You are notified to attend and present evidence to the Court. Your failure to attend this hearing may result in an adverse ruling by the Court in your absence.

This the 10th day of September, 2009.

                                 *Katherine S. Parker-Lowe* (signature)
                                 Katherine S. Parker-Lowe
                                 Attorney for Plaintiffs
                                 NC State Bar #13318
                                 35 Miss Elecia Lane, Suite 101
                                 Post Office Box 730
                                 Ocracoke, North Carolina 27960
                                 252-928-1000
                                 252-928-3037 fax

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon all parties to the above cause by:

____ Hand delivering a copy hereof to each said party or his/her attorney.

 X   Depositing a copy hereof, postage prepaid in the United States Mail, properly addressed as disclosed by the pleadings on record herein to each said party or his/her attorney.

 X   Telefacsimile transmittal, which was received by 5:00 p.m. Eastern time, as evidenced by the attached telefacsimile receipt confirmation to each said party or his/her attorney.

Ms. Lauren S. Thurmond
Kellam & Pettit, P.A.
2701 Coltsgate Road
Suite 300
Charlotte, North Carolina 28211

David A. Simpson
Kellam Simpson Loflin & Poe
2901 Coltsgate Road, Suite 102
Charlotte, North Carolina 28211

John T. Benjamin, Jr.
712 West North Street
Raleigh, North Carolina 27602

This the 10th day of September, 2009.

_____
Katherine S. Parker-Lowe

STATE OF NORTH CAROLINA     IN THE GENERAL COURT OF JUSTICE
COUNTY OF HYDE           SUPERIOR COURT DIVISION
                                  BEFORE THE CLERK
                                   09 SP 9

|  |  |
|---|---|
| IN THE MATTER OF THE FORECLOSURE by | ) |
| David A. Simpson, P.C., Substitute Trustee, of | ) |
| Deed of Trust Executed by Rex T. Gilbert, Jr. | ) |
| and Daniela L. Gilbert, Husband and Wife and | ) |
| recorded on May 10, 2006, in Book 219 at Page | ) |
| 53 of the Hyde County Public Registry | ) |
|  | ) |

## REVISED CERTIFICATE OF SERVICE

I, Katherine S. Parker-Lowe, Attorney at Law, attorney for Plaintiffs, do hereby certify that I have served a copy of this Notice of Appeal to the North Carolina Court of Appeals by U.S. Mail in the manner prescribed by Rule 5 of the North Carolina Rules of Civil Procedure upon opposing counsel as follows:

Ms. Lauren S. Thurmond
Kellam & Pettit, P.A.
2701 Coltsgate Road
Suite 300
Charlotte, North Carolina 28211

David A. Simpson
Kellam Simpson Loflin & Poe
2901 Coltsgate Road, Suite 102
Charlotte, North Carolina 28211

John T. Benjamin, Jr.
712 West North Street
Raleigh, North Carolina 27602

This the 23th day of _Sept_, 2009.

_Katherine S. Parker-Lowe_
Katherine S. Parker-Lowe

STATE OF NORTH CAROLINA      IN THE GENERAL COURT OF JUSTICE
COUNTY OF HYDE                            SUPERIOR COURT DIVISION
                                                      BEFORE THE CLERK
                                                          09 SP 9

IN THE MATTER OF THE FORECLOSURE by )
David A. Simpson, P.C., Substitute Trustee, of )
Deed of Trust Executed by Rex T. Gilbert, Jr. )
and Daniela L. Gilbert, Husband and Wife and )
recorded on May 10, 2006, in Book 219 at Page )
53 of the Hyde County Public Registry )
                                                                                )

## NOTICE OF APPEAL
## TO THE HONORABLE COURT OF APPEALS OF NORTH CAROLINA
**************************************

NOW COME Respondents, Rex T. Gilbert, Jr. and Daniela L. Gilbert, pursuant to

N.C. Gen. Stat. § 1-279.1 and Rule 3 of the North Carolina Rules of Appellate

Procedure and give notice of appeal to the Court of Appeals of North Carolina of

the order in this action which was entered on August 18, 2009, allowing

Foreclosure Sale.

Respectfully submitted this the 16th day of September 2009.

_Katherine S. Parker-Lowe_
Katherine S. Parker-Lowe
Attorney for Respondents
NC State Bar #13318
Post Office Box 730
Ocracoke, North Carolina 27960
252-928-1000
katherine@parker-lowe.net

STATE OF NORTH CAROLINA
COUNTY OF HYDE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
09 CVS 70

REX T. GILBERT, JR. and )
DANIELA L. GILBERT, )
                    Plaintiffs, )
                               )
v.                             )
                               )
DEUTSCHE BANK TRUST COMPANY )
AMERICAS, *As Trustee for,* )
RESIDENTIAL ACCREDIT LOANS, INC, )
DAVID A. SIMPSON, P.C., Substitute Trustee, )
RESIDENTIAL FUNDING, LLC, and )
GMAC MORTGAGE, LLC, )
                    Defendants. )
_____)

## NOTICE OF HEARING

Please be notified that a hearing will be held at the Pitt County Courthouse, in Superior Court Room #1, Greenville, North Carolina, on Thursday, October 1, 2009 at 11:00 a.m., or as soon thereafter as the matter may be reached by the Court, upon the Plaintiffs' Motion for Preliminary Injunction and return on Temporary Restraining Order entered on September 14, 2009. You are notified to attend and present evidence to the Court. Your failure to attend this hearing may result in an adverse ruling by the Court in your absence.

This the 15th day of September, 2009.

*Katherine S. Parker-Lowe*
Katherine S. Parker-Lowe
Attorney for Plaintiffs
NC State Bar #13318
35 Miss Elecia Lane, Suite 101
Post Office Box 730
Ocracoke, North Carolina 27960
252-928-1000
252-928-3037 fax

STATE OF NORTH CAROLINA                    IN THE GENERAL COURT OF JUSTICE
COUNTY OF HYDE                                         SUPERIOR COURT DIVISION
                                                                      09 CVS 70

REX T. GILBERT, JR. and                    )
DANIELA L. GILBERT,                        )
                          Plaintiffs,      )
                                           )
                                           )
v.                                         )
                                           )
DEUTSCHE BANK TRUST COMPANY                )
AMERICAS, *As Trustee for,*                )
RESIDENTIAL ACCREDIT LOANS, INC,           )
DAVID A. SIMPSON, P.C., Substitute Trustee, )
RESIDENTIAL FUNDING, LLC, and              )
GMAC MORTGAGE, LLC,                        )
                          Defendants.      )
_____   )

## CERTIFICATE OF SERVICE

I, Katherine S. Parker-Lowe, Attorney at Law, attorney for Plaintiffs, do hereby certify that I have served a copy of this Notice of Hearing by facsimile, electronic transmission and U.S. Mail in the manner prescribed by Rule 5 of the North Carolina Rules of Civil Procedure upon opposing counsel as follows:

John T. Benjamin, Jr.
712 West North Street
Raleigh, North Carolina 27602

This the 25th day of ___September___, 2009

                                       ___Katherine S. Parker-Lowe___
                                       Katherine S. Parker-Lowe

NORTH CAROLINA

HYDE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
09 CVS 70

| | |
|---|---|
| REX T. GILBERT, JR. AND<br>DANIELA L. GILBERT,<br><br>    PLAINTIFFS,<br><br>v.<br><br>DEUTSCHE BANK TRUST COMPANY<br>AMERICAS, AS TRUSTEE FOR<br>RESIDENTIAL ACCREDIT LOANS,<br>INC. DAVID A SIMPSON, P.C.,<br>SUBSTITUTE TRUSTEE,<br>RESIDENTIAL FUNDING, LLC<br>AND GMAC MORTGAGE, LLC<br>     DEFENDANTS. | AFFIDAVIT |

Scott Zeitz, first being duly sworn, deposes and says as follows:

1.  I am over the age of 21 and competent to testify as to all matters contained in this affidavit.

2.  I have personal knowledge of all matters contained in this affidavit.

3.  I work for GMAC Mortgage, LLC (herein "GMAC") in the capacity as Litigation Analyst.  GMAC is the current sub-servicer of the note and deed of trust at issue in this matter. Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 (herein "Deutsche") is the

current owner and holder of the note and deed of trust at issue in this matter.

4.   In the course of my day-to-day duties, I work with documents that relate to account histories and account balances of particular loans.   I am familiar with the account of Rex T. Gilbert, Jr. (herein collectively the "Borrower" or "Gilbert") which has a loan number of ████2713 (herein "Mortgage Loan Account").

5.   On May 5, 2006 Gilbert borrowed $525,000.00 to re-finance the lien on certain property located in Hyde County, North Carolina at 134 West End Road, Ocracoke, NC 27960.

6.   As part of this transaction the Borrower signed a note Herein "Note").   A true and accurate copy of the note is attached hereto as **EXHIBIT 1**.

7.   On May 5, 2006 the Borrower signed an addendum to the Note.   The addendum supersedes sections 3(A), 3(B), 4(c), and 7(A) of the Note.   A true and accurate copy of the addendum to the Note is attached and incorporated hereto as **EXHIBIT 2**.

8.   The addendum to the Note contains a provision in Paragraph 3(A) entitled "Time and Place of Payments" which reads in pertinent part:

> I will pay interest by making payments every month for the first 120 months in the amount sufficient to pay interest as it accrues.   I will pay principal and interest by making payments every month thereafter for the next 240 months in an amount sufficient to fully amortize the outstanding

principal balance of the Note at the end of the Interest-
Only Period over the remaining term of the Note in equal
monthly payments.

I will make my monthly payments on the 1st day of each month
beginning on July 1, 2006.   I will make these payments
every month until I have paid all of the principal and
interest and any other charges described below that I may
owe under this Note.  Each monthly payment will be applied
as of its scheduled due date and will be applied to
interest before principal.  If, on June 1, 2036, I still
owe amounts under this Note, I will pay those amounts in
full on that date, which is called the "Maturity Date"…

9.   The addendum to the Note also contains a provision in

Paragraph 3(B) entitled "Amount of My Initial Monthly Payments"

which reads:

Each of my initial monthly payments will be in the amount
of U.S. $3226.57.   This payment amount is based on the
original principal balance of the Note.   This payment
amount may change.

10.   The Note contains a provision in Paragraph 3(c)

entitled "Monthly Payment Changes" which reads:

Changes in my monthly payment will reflect changes in the
unpaid principal of my loan and in the interest rate that I
must pay.   The Note Holder will determine my new interest
rate and the changed amount of my monthly payment in
accordance with Section 4 of this Note.

11.   The Note is an adjustable rate note.   Paragraph 4(A)

of the Note provides that the interest rate may change on June

1, 2013 (herein "first change date"), which would be the first

possible change date.  If the interest rate does change then the

amount for each monthly payment will change accordingly.

12.    There is a provision in Paragraph 7(B) entitled "Default" which reads:

> If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

13.    The Borrower and his wife, Daniela L. Gilbert, also signed a deed of trust on May 5, 2006, that secured the loan amount of $525,000.00 on the subject property and lists First National Bank of Arizona as the Lender (herein "Deed of Trust"). This Deed of Trust was recorded on May 10, 2006 in Book 219, Page 53 in the Hyde County Register of Deeds.   A true and accurate copy of the Deed of Trust is attached and incorporated hereto as **EXHIBIT 3.**

14.    First National Bank of Arizona sold, assigned and transferred all of its right, title and interest in and to the Note and Deed of Trust to First National Bank of Nevada.   This is reflected on the Allonge to the Note, a true and accurate copy of which is attached and incorporated hereto as **EXHIBIT 4.**

15.    First National Bank of Nevada sold, assigned and transferred all of its right, title and interest in and to the Note and Deed of Trust to Residential Funding Corporation.   This is reflected on the Allonge to the Note, a true and accurate copy of which is attached and incorporated hereto as **EXHIBIT 4.**

16.    Residential Funding Corporation sold, assigned and transferred all of its right, title and interest in and to the

Note and Deed of Trust to Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6. This is reflected on the Allonge to the Note, a true and accurate copy of which is attached and incorporated hereto as **EXHIBIT 4**.

17.    Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 is the current owner and holder of the Note and Deed of Trust.    It currently has possession of the original Note and has provided such to its counsel.    The original Note will be available at the Preliminary Injunction Hearing in this matter for the Court's inspection and the Borrower's inspection.

18.    Deutsche purchased this loan from the previous owner and holder of the Note and Deed of Trust, Residential Funding Corporation.

19.    The origination file for the Mortgage Loan Account contained a "Truth in Lending Disclosure Statement."    A true and accurate copy of the "Truth in Lending Disclosure Statement" is attached and incorporated hereto as **EXHIBIT 5**.

20.    The origination file for the Mortgage Loan Account contained a "Notice of Right to Cancel."    A true and accurate copy of the "Notice of Right to Cancel" is attached and incorporated hereto as **EXHIBIT 6**.

21. The "Notice of Right to Cancel" attached as **EXHIBIT 6** has a provision within it that states:

> The undersigned each acknowledge receipt of two copies of <u>NOTICE OF RIGHT TO CANCEL</u>

22. The origination file for the Mortgage Loan Account contained a "Variable Rate Mortgage Program Disclosure." A true and accurate copy of the "Variable Rate Mortgage Program Disclosure" is attached and incorporated hereto as **EXHIBIT 7**.

23. The origination file for the Mortgage Loan Account contained a "HUD-1 Settlement Statement." A true and accurate copy of the "HUD-1 Settlement Statement" is attached hereto as **EXHIBIT 8**.

24. The origination file for the Mortgage Loan Account contained a "First Payment Letter." A true and accurate copy of the "First Payment Letter" is attached and incorporated hereto as **EXHIBIT 9**

25. The Borrowers are currently in the "interest only" period of their note.

26. The amount of their interest only payments had not yet changed.

27. They are currently required to make monthly interest only payments of $3226.57.

28.    They are required to make one hundred and twenty (120) interest only payments.    Payment eight-five (85) will be due on or after the First Change Date.

29.    Payment eight-five (85) will be either higher or lower depending on the interest rate change on the First Change Date.

30.    I have reviewed the business records of the Mortgage Loan Account and determined that there has been a default in the payments required under the Note and Deed of Trust.    The last payment prior to acceleration of the amount due under the Mortgage Loan Account was received and accepted on or about July 9, 2008.    This payment was applied to the monthly interest payment amount of Three Thousand Two Hundred Twenty-Six Dollars and Fifty-Seven cents ($3,226.57) that was due on April 1, 2008. I have attached the Mortgage Loan Account History showing how payments were made and applied as **EXHIBIT 10**.

31.    Further affiant sayeth not.

This the 22 day of September, 2009

_____
Scott Zeitz

Sworn to and subscribed before
me this the 22 day of September, 2009.

_____
Notary Public
My commission expires:

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Aixo M. Torres, Notary Public
Upper Dublin Twp., Montgomery County
My Commission Expires Aug. 3, 2010
Member, Pennsylvania Association of Notaries

CERTIFICATE OF SERVICE

I, John T. Benjamin, Jr., of The Law Office of John T. Benjamin, Jr., P.A., attorney for Deutsche Bank Trust Company Americas as Trustee for Residential Credit Loans, Inc, Residential Funding, LLC and GMAC Mortgage, LLC do hereby certify that I served a copy of the foregoing document upon the other parties in this action by hand delivery on Thursday, September 24, 2009 as follows:

> Katherine S. Parker-Lowe
> Attorney at Law
> 35 Miss Elecia Lane, Ste. 101
> Post Office Box 730
> Ocracoke, North Carolina 27960

This the 25th day of September, 2009.

_____
John T. Benjamin, Jr.
*Attorney for Deutsche Bank Trust Company, Residential Funding, LLC and GMAC Mortgage, LLC*

## ADJUSTABLE RATE NOTE
(LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

May 5, 2006                          MCLEAN                          VA
[Date]                              [City]                         [State]

134 West End Road, Ocracoke, NC   27960
[Property Address]

### 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 525,000.00            (this amount is called "Principal"), plus interest, to the order of Lender. Lender is First National Bank of Arizona

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of            7.375 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3.  PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on July 1, 2006                      . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on June 1, 2036                    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. BOX 62768, PHOENIX, AZ 85085-2768

or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments   See Attached Interest-Only Addendum here to and made a part here of.

Each of my initial monthly payments will be in the amount of U.S. $ 4,391.32                  . This amount may change.

(C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

5300000843

MULTISTATE ADJUSTABLE RATE NOTE - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*) -
Single Family - Fannie Mae UNIFORM INSTRUMENT

838N (0210)        Form 3520 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 4        Initials: ___

EXHIBIT
1

4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates

The interest rate I will pay may change on the first day of June, 2013 , and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding two and three-quarters percentage points ( 2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 13.375 % or less than 2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point(s) ( 1.000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 13.375 %, OR LESS THAN 2.750 .

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

0843

-838N (0210)                                    Page 2 of 4

Form 3520 1/01
Initials: R.T.L.

7. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be a .000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

0843

VMP®-838N (0210)

Page 3 of 4

Form 3520 1/01
Initials: KT

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**CAUTION-IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
Rex T. Gilbert, JR              -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                -Borrower                                        -Borrower

[Sign Original Only]

0843

-83BN (0210)                    Page 4 of 4                    Form 3520 1/01



BANK OF ARIZONA

1555 W. Alameda Drive
Tempe, AZ 85232
Office (480) 224-8521 Fax 480-224-8522

### ALLONGE TO NOTE

LOAN NUMBER: ███00343
BORROWER: Gilbert JR
IN THE AMOUNT OF: $525,000.00

PAY TO THE ORDER OF:
First National Bank of
Nevada

WITHOUT RECOURSE BY:

AMY HAWKINS, ASSISTANT VICE PRESIDENT
FIRST NATIONAL BANK OF ARIZONA

Pay to The order Of
RESIDENTIAL FUNDING CORPORATION

Without Recourse
First National Bank of Nevada

By:
Deutsche Bank National Trust
Company, f/k/a Bankers Trust
Company of California, N. A.
as Custodian as Attorney in
Fact

Christopher Corcoran
Vice President

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Corporation

BY
Judy Faber, Vice President

INTEREST ONLY ADDENDUM
TO ADJUSTABLE RATE PROMISSORY NOTE

Loan Number: ████ ████

Property Address: 114 West End Road, Conecka, NC 27602

THIS ADDENDUM is made this 5th day of May, 2006, and is incorporated into and intended to form a part of the Adjustable Rate Note (the "Note") dated the same date as this Addendum executed by the undersigned and payable to First National Bank of Arizona (the "Lender").

THIS ADDENDUM supersedes Sections 3(A), 3(B), 4(C) and 7(A) of the Note. None of the other provisions of the Note are changed by this addendum.

3.      PAYMENTS

   (A)    Time and Place of Payments
        I will pay interest by making payments every month for the first 120 payments (the "Interest-Only Period") in the amount sufficient to pay interest as it accrues. I will pay principal and interest by making payments every month thereafter for the next 240 payments in an amount sufficient to fully amortize the outstanding principal balance of the Note at the end of the Interest-Only Period over the remaining term of the Note in equal monthly payments.

        I will make my monthly payments on the first day of each month beginning on July 1, 2006. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal. If, on June 1, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

        I will make my payments at 1165 West Alameda Drive, Tempe, AZ 85282 or at a different place if required by the Note Holder.
   (B)    Amount of My Initial Monthly Payments
        Each of my initial monthly payments will be in the amount of U.S. $3,226.57. This payment amount is based on the original principal balance of the Note. This payment amount may change.

4.      INTEREST RATE AND MONTHLY PAYMENT CHANGES
   (C)    Calculation of Changes
        Before each Change Date, the Note Holder will calculate my new interest rate by adding two and three-quarters percentage point(s) (2.750%) to the Current Index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

        During the Interest-Only Period, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay accrued interest. This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the Interest-Only Period unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the Interest-Only Period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower principal balance. At the end of the Interest-Only Period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I am expected to owe at the end of the Interest-Only Period or Change Date, as applicable, in equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the Interest-Only Period, my payment amount will not be reduced due to voluntary prepayments.

7.      BORROWER'S FAILURE TO PAY AS REQUIRED

   (A)    A Late Charge for Overdue Payments
        If the Note Holder has not received the full amount of any monthly payment by the end of fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 4.000% of my overdue payment of interest during the interest-only period, 4.000% of my overdue payment of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

Dated: 5/5/06

_Rex T. Gilbert, JR_

_____

EXHIBIT
2

INT Only Addendums / ARMS   (603E)
01/27/2004

FILED in Haze County, NC
on May 10 2006 at 03:39:27 PM
BY Lena (Sele) Quick
Register of Deeds
BOOK 219 PAGE   53

# DEED OF TRUST

MAY 1 1 2006

Return To: First National Bank of Arizona
P.O. Box 66604, Phoenix, AZ 85082
Prepared By: Ngoc Chu

and Casey, Grimsley & Ragaller, PLLC

MIN  100135553000008437

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated May 5, 2006
together with all Riders to this document.

(B) "Borrower" is Rex T. Gilbert, JR and Daniela L. Gilbert, Husband and Wife

Borrower is the trustor under this Security Instrument.

(C) "Lender" is First National Bank of Arizona

Lender is a NATIONAL BANKING ASSOCIATION
organized and existing under the laws of The United States of America
████0843

NORTH CAROLINA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS     Form 3034   1/01

Ⓜ -6A(NC) (0307).01
Page 1 of 16                      Initials: RTG
                                           DLC
   VMP MORTGAGE FORMS - (800)521-7291

EXHIBIT

3

BOOK 219 PAGE 54

Lender's address is 1760 Old Meadow Road, 3rd Floor, Mc Lean, VA 22102.

(D) "Trustee" is MATTHEW J. RACKLER.

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated May 5, 2006.
The Note states that Borrower owes Lender five hundred twenty-five thousand and 00/100                                                                              Dollars
(U.S. $ 525,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than June 1, 2036.

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[x] Adjustable Rate Rider   [ ] Condominium Rider          [ ] Second Home Rider
[ ] Balloon Rider           [ ] Planned Unit Development Rider  [ ] 1-4 Family Rider
[ ] VA Rider                [ ] Biweekly Payment Rider      [x] Other(s) [specify]
                                                            Interest Only Rider

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

0843

-6A(NC) (0207).01                      Page 2 of 15          Initials: RTL  DKg          Form 3034  1/01

BOOK 215 PAGE 55

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(2) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee and Trustee's successors and assigns, in trust, with power of sale, the following described property located in the
COUNTY          of          Hyde          :
[Type of Recording Jurisdiction]      [Name of Recording Jurisdiction]
SEE ATTACHED LEGAL DESCRIPTION

Parcel ID Number: 207592                          which currently has the address of
134 West End Road                                                      [Street]
Ocracoke                          [City], North Carolina 27960      [Zip Code]
("Property Address"):

TO HAVE AND TO HOLD this property unto Trustee and Trustee's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

0843
-6A(NC) (0207).01                          Page 3 of 15                          Initials: RTL      Form 3034   1/01
                                                                          DG

BOOK 219 PAGE 56

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. If Borrower has breached any covenant or agreement in this Security Instrument and Lender has accelerated the obligations of Borrower hereunder pursuant to Section 22 the Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and

0843

6A(NC) (0107).01                    Page 4 of 15                    Initials: RTG  DVg                    Form 3034   1/01

BOOK 219 PAGE 57

assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to

0843

VMP®-6A(NC) (0203).01                    Page 6 of 15                    Initials: RTG                    Form 3034    1/01

BOOK 213 PAGE 58

prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any

0843

VMP-6A(NC) (0207).01                     Page 6 of 15          Initials: RTC   Form 3034  1/01

BOOK 219 PAGE 59

interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is

0843

VMP-6A(NC) (0207).01                    Page 7 of 15            Initials: ___      Form 3034  1/01

BOOK 219 PAGE 60

reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve, if permitted under Applicable Law, in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve, if permitted under Applicable Law. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement

0843

6A(NC) (0107).01                    Page 8 of 15            Initials:            Form 3034   1/01

BOOK 219 PAGE  81

provided that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreement will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material

0843

VMP-6A(NC) (0207).01          Page 8 of 15          Form 3034  1/01

BOOK 219 PAGE 62

impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time.

0843

6A(NC) (0207).01                    Page 10 of 15                    Form 3034    1/01

BOCK 219 PAGE 83

Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects

0843

-6A(NC) (0207).01          Page 11 of 15          Initials: RTC / DVG          Form 3034   1/01

BOOK 219 PAGE 84

Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

00143

-6A(NC) (0207).01                Page 17 of 15        Initials:                Form 3034   1/01

BOOK 219 PAGE 85

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, and if it is determined in a hearing held in accordance with Applicable Law that Trustee can proceed to sale, Trustee shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of 5.000 % of the gross sale price; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The interest rate set forth in the Note shall apply whether before or after any judgment on the indebtedness evidenced by the Note.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender or Trustee shall cancel this Security Instrument. If Trustee is requested to release this Security Instrument, all notes evidencing debt secured by this Security Instrument shall be surrendered to Trustee. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Attorneys' Fees. Attorneys' fees must be reasonable.

0843

-6A(NC) (0201).01                    Page 13 of 14              Initials: RTc                    Form 3034   1/01
                                                                        DWg

BOOK 219 PAGE    66

BY SIGNING UNDER SEAL BELOW, Borrower accepts and agrees to the terms and covenants
contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____                    _____ (Seal)
                                                    Rex T. Gilbert, JR        -Borrower


_____                    _____ (Seal)
                                                                              -Borrower


_____ (Seal)                        _____ (Seal)
                     -Borrower                                                -Borrower


_____ (Seal)                        _____ (Seal)
                     -Borrower                                                -Borrower


__Daniela Gilbert__ (Seal)                          _____ (Seal)
Daniela L. Gilbert   -Borrower                                                -Borrower


▬0843

-6A(NC) (0705).01                    Page 14 of 15                    Form 3034   1/01

BOOK 239 PAGE 67

STATE OF NORTH CAROLINA,                    Dare                County ss:
I, LINDA RUSH
a Notary Public of the County of        Dare        , State of North Carolina, do hereby
certify that Rex H. Gilbert, JR & Daniele G. Gilbert

personally appeared before me this day and acknowledged the due execution of the foregoing instrument.
Witness my hand and official seal this    5th    day of    May, 2006    .

My Commission Expires:

OFFICIAL SEAL
Notary Public, North Carolina
County of Dare
LINDA RUSH
My Commission Expires November 18, 2006

_____
Notary Public

STATE OF NORTH CAROLINA,                    County ss:
    The foregoing certificate of
a Notary Public of the County of             , State of
is certified to be correct.
    This            day of

                        Registrar of Deeds

        By _____
        Deputy Assistant

0843

-6A(NC) (0202).01            Page 15 of 15        Initials: DKgRTZ        Form 3034    1/01

BOCK 219 PAGE    68

# ADJUSTABLE RATE RIDER
### (LIBOR Six-Month Index (As Published In The Wall Street Journal) - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 5th    day of May, 2008
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
First National Bank of Arizona

("Lender") of the same date and covering the property described in the Security Instrument
and located at: 134 West End Road, Ocracoke, NC  27960

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME
AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:
## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of          7.375 %. The Note provides
for changes in the interest rate and the monthly payments, as follows:
## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The interest rate I will pay may change on the first day of June, 2013
and on that day every 6th          month thereafter. Each date on which my interest rate
could change is called a "Change Date."
(B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The
"Index" is the average of interbank offered rates for six month U.S. dollar-denominated
deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most
recent Index figure available as of the first business day of the month immediately preceding
the month in which the Change Date occurs is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index that is based
upon comparable information. The Note Holder will give me notice of this choice.
(C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding
two and three-quarters                              percentage points
(          2.750 %) to the Current Index. The Note Holder will then round the result of
5300000843

MULTISTATE ADJUSTABLE RATE RIDER - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN
THE WALL STREET JOURNAL) - Single Family - Fannie Mae Uniform Instrument
-838R (0402)   Form 3138 1/01
Page 1 of 3    Initials: _____
VMP Mortgage Solutions, Inc.
(800)521-7291

BOOK 219 PAGE 69

this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 13.375 % or less than 2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one

6 percentage points ( 1.000 %) from the rate of interest I have been paying for the preceding months. My interest rate will never be greater than 13.375 %.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

0843

-838R (0402)                    Page 2 of 3          Initials: _____    Form 3138 1/01

BOOK 219 PAGE   72

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
Rex T. Gilbert, JR        -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                  -Borrower

0843

CMB-838R (0402)              Page 3 of 3                 Form 3138 1/01

BOOK 219 PAGE 71

INTEREST-ONLY ADDENDUM
TO ADJUSTABLE RATE RIDER

LOAN NUMBER: ███████

PROPERTY ADDRESS:

114 West End Road, Cornelia, GA 30040

THIS ADDENDUM is made this 5th day of May, 2006, and is incorporated into and intended to form a part of the Adjustable Rate Rider (the "Rider") dated the same date as this Addendum executed by the undersigned and payable to First National Bank of Arizona (the Lender)

THIS ADDENDUM supersedes Section 4 (C) of the Rider. None of the other provisions of the Note are changed by this Addendum.

4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES

     (C)  Calculation of Changes

          Before each Change Date, the Note Holder will calculate my new interest rate by adding two and three-quarters percentage point(s) (2.750%) to the Current Index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

During first ten (10) years after the loan closing ("interest-only period"), the Note Holder will determine the amount of the monthly payment that would be sufficient to pay accrued interest on the unpaid principal balance. This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the interest only period unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the interest-only period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower unpaid principal balance.

At the end of the Interest-Only Period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal balance that I am expected to owe in substantially equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the interest-only period, my payment amount will not be adjusted due to voluntary principal payments.

Dated: 5/5/06

Rex T. Gilbert, JR

Daniela L. Gilbert

Form 404
6/4/2003

Alt A Interest Only Rider/ ARM (404)
10/10/2005

BOOK 209 PAGE 72

Exhibit "A"

All that certain lot or parcel of land lying and being in the Village of Ocracoke, in Ocracoke Township, Hyde County, North Carolina, and known and designated as and being Lot No. 31-A, in the subdivision known as Scout's Extension, as shown and delineated on a map or plat entitled "Recombination Plat of Lot 34-A & 31-A - Beachside Extension - Ocracoke, formerly lot 34 & 21 - Beachside Extension - Ocracoke" made by Seaboard Surveying & Planning, Inc., and recorded in Plat Cabinet C, Slide 398, Hyde County Registry.



BANK OF ARIZONA

1551 W. Alameda Drive
Tempe, AZ 85282
Office (480) 224-3521 Fax 480-224-3522

### ALLONGE TO NOTE

LOAN NUMBER: ███ 0843
BORROWER: Gilbert JR
IN THE AMOUNT OF: $525,000.00

PAY TO THE ORDER OF:
First National Bank of
Nevada

WITHOUT RECOURSE BY:

AMY HAWKINS, ASSISTANT VICE PRESIDENT
FIRST NATIONAL BANK OF ARIZONA   .

Pay to the order Of
RESIDENTIAL FUNDING CORPORATION

Without Recourse
First National Bank of Nevada

By:
Deutsche Bank National Trust
Company, f/k/a Bankers Trust
Company of California, N.A.
as Custodian as Attorney In
Fact

Christopher Corcoran
Vice President

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Corporation

BY
Judy Faber, Vice President

**EXHIBIT**
4

TRUTH-IN-LENDING DISCLOSURE STATEMENT

LENDER OR LENDER'S AGENT:
First National Bank of Arizona
1760 Old Meadow Road
Mc Lean, VA 22102

DATE: 05/05/2006
LOAN NO.: ▮▮▮0843
Type of Loan: ARM

☐ Preliminary   ☒ Final

BORROWERS:

ADDRESS:
CITY/STATE/ZIP:
PROPERTY: 134 West End Road Ocracoke NC 27960

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.953 % | $ 943,469.57 | $ 507,473.43 | $ 1,450,943.00 |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 84 | $3,226.57 | 07/01/2006 | | | |
| 36 | $3,500.00 | 07/01/2013 | | | |
| 239 | $4,391.32 | 07/01/2016 | | | |
| 1 | $4,385.64 | 06/01/2036 | | | |

DEMAND FEATURE:   ☒ This loan does not have a Demand Feature.   ☐ This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
☒ This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY:   You are giving a security interest in the property located at:
134 West End Road Ocracoke NC 27960
ASSUMPTION:   Someone buying this property ☐ cannot assume the remaining balance due under original mortgage terms
☒ may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

FILING / RECORDING FEES:   $ 250.00

PROPERTY INSURANCE:   You may obtain property insurance from anyone that is acceptable to Lender.

LATE CHARGES:   If your payment is more than 15 days late, a late charge of 4.000 % of the payment will be assessed.

PREPAYMENT:   If you pay off your loan early, you
☐ may ☒ will not   have to pay a penalty.
☐ may ☒ will not   be entitled to a refund of part of the finance charge.
See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.
e means estimate

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_Rex T. Gilbert, JR_   5/5/06   BORROWER/DATE        BORROWER/DATE

_Daniela L. Gilbert_   5/5/06   BORROWER/DATE        BORROWER/DATE

EXHIBIT 5

5300000843

VMP -788 (0412).01        VMP Mortgage Solutions, Inc. (800)521-7291        Page 1 of 2        12/04
© 2005 CBF Systems, Inc. The contents of this form in whole or in part are protected under the copyright laws of the United States.

DEFINITION OF FAIR LENDING TERMS

## ANNUAL PERCENTAGE RATE

This is not the Note rate for which the borrower applied. The Annual Percentage Rate (APR) is the cost of the loan in percentage terms taking into account various loan charges of which interest is only one such charge. Other charges which are used in calculation of the Annual Percentage Rate are Private Mortgage Insurance or FHA Mortgage Insurance Premium (when applicable) and Prepaid Finance Charges (loan discount, origination fees, prepaid interest and other credit costs). The APR is calculated by spreading these charges over the life of the loan which results in a rate generally higher than the interest rate shown on your Mortgage/Deed of Trust Note. If interest was the only Finance Charge, then the interest rate and the Annual Percentage Rate would be the same.

## PREPAID FINANCE CHARGES

Prepaid Finance Charges are certain charges made in connection with the loan and which must be paid upon the close of the loan. These charges are defined by the Federal Reserve Board in Regulation Z and the charges must be paid by the borrower. Non-Inclusive examples of such charges are: Loan origination fee, "Points" or Discount, Private Mortgage Insurance or FHA Mortgage Insurance, Tax Service Fee. Some loan charges are specifically excluded from the Prepaid Finance Charge such as appraisal fees and credit report fees.

Prepaid Finance Charges are totaled and then subtracted from the Loan Amount (the face amount of the Deed of Trust/Mortgage Note). The net figure is the Amount Financed as explained below.

## FINANCE CHARGE

The amount of interest, prepaid finance charge and certain insurance premiums (if any) which the borrower will be expected to pay over the life of the loan.

## AMOUNT FINANCED

The Amount Financed is the loan amount applied for less the prepaid finance charges. Prepaid finance charges can be found on the Good Faith Estimate/Settlement Statement (HUD-1 or 1A). For example if the borrower's note is for $100,000 and the Prepaid Finance Charges total $5,000, the Amount Financed would be $95,000. The Amount Financed is the figure on which the Annual Percentage Rate is based.

## TOTAL OF PAYMENTS

This figure represents the total of all payments made toward principal, interest and mortgage insurance (if applicable).

## PAYMENT SCHEDULE

The dollar figures in the Payment Schedule represent principal, interest, plus Private Mortgage Insurance (if applicable). These figures will not reflect taxes and insurance escrows or any temporary buydown payments contributed by the seller.



Initials:

-788 (0412101)    Page 2 of 2

DATE 5/5/06

LENDER: First National Bank of Arizona

LOAN NO. ██████0843
TYPE Conventional

BORROWERS/OWNERS Rex T. Gilbert, JR

ADDRESS        134 West End Road
CITY/STATE/ZIP Ocracoke, NC 27960
PROPERTY       134 West End Road, Ocracoke, NC  27960

## YOUR RIGHT TO CANCEL

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

(1) The date of the transaction, which is
                                        or
(2) The date you received your Truth In Lending disclosures;
                                        or
(3) The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

---

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

**First National Bank of Arizona**
**MS AZ-4003-078**
**1665 W. Alameda Drive**                    Or Fax to: (602) 636-7096
**Tempe, AZ 85282-3200**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of
_____ (or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

_____                    _____
CONSUMER'S SIGNATURE                                         DATE

---

Each of the borrowers/owners in this transaction has the right to cancel. The exercise of this right by one borrower/owner shall be effective as to all borrowers/owners.

The undersigned each acknowledge receipt of two copies of NOTICE of RIGHT TO CANCEL

X _____     5/5/06     X _____
BORROWER/OWNER Rex T. Gilbert, JR    DATE    BORROWER/OWNER                    DATE

X _____     5/5/06     X _____
BORROWER/OWNER Daniela L. Gilbert    DATE    BORROWER/OWNER                    DATE

---

## CONFIRMATION CERTIFICATE

### DO NOT SIGN UNTIL THREE BUSINESS DAYS HAVE ELAPSED

**Three business days have elapsed** since the undersigned have received two copies of this document. Each of the undersigned hereby certify and warrant that they have not exercised any right which they may have to rescind the transaction, that they do not desire to do so, and that they ratify and confirm the transaction in all respects.

_____ _____     _____ _____
BORROWER/OWNER Rex T. Gilbert, JR   DATE    BORROWER/OWNER                    DATE

_____ _____     _____ _____
BORROWER/OWNER Daniela L. Gilbert   DATE    BORROWER/OWNER                    DATE

0843

-66 (0305).01
VMP Mortgage Solutions (800)521-7291          10/00

**EXHIBIT**
6

LENDER:    First National Bank of Arizona

VARIABLE RATE LOAN PROGRAM:

*Six (6) Month LIBOR ARM Fixed for the First Seven (7) Years - First (10) Years Interest - Only Payments*

This variable rate loan program disclosure describes the features of the adjustable rate mortgage ("ARM") program you are considering. Information on other ARM programs is available upon request. This is neither a contract nor a commitment to lend. If you do obtain a loan from the Lender, the Note, Security Instrument and related documents will establish your legal rights and obligations.

Because the Lender may sell any loan it makes, the purchaser of the loan ("Noteholder") may enforce the terms of any loan obtained from the Lender. You will be required to make payments to the Noteholder or a servicer the Noteholder designates. For purpose of easy reference the term Lender is used below and refers to the initial Lender or purchaser of the note.

## HOW YOUR INTEREST RATE AND PAYMENT ARE DETERMINED
- Your interest rate will be based on an index rate plus a margin.
- During the period that you make your payments of interest only, your payments will be based on the interest rate and loan balance. After that period, your payment will be based on the interest rate, loan balance and remaining loan term.
- The index upon which the Interest Rate will be based is the yearly average of interbank offered rate for six-month U.S. Dollar denominated deposits in the London Market ("LIBOR").
- Information about the current index is published in the Wall Street Journal
- This ARM loan may have a discount feature, and your initial interest rate may not be based on the index used to make later adjustments. Ask about our current discount rate.
- Your interest rate will equal the index rate plus your margin unless your interest rate "caps" limit the amount of change in the interest rate.
- During the first ten (10) years, interest only payments will be required to be made. This means that the regular monthly payments will not reduce the principal balance during the first ten (10) years of your loan.
- Beginning in year eleven (11), the payment will be amortized over the remaining term and applied towards principal and interest.

## HOW YOUR INTEREST RATE CAN CHANGE
- Your interest rate can change every six (6) months beginning approximately 7 years after your loan closes. These are known as the "Change Dates".
- Your new interest rate will be equal to the sum of the margin and index value published on the first business day of the month in the month prior to the Change Date subject to the restrictions described below.
- Your interest rate cannot increase or decrease more than six percentage points (6.000%) at the first adjustment (a "cap").
- Your interest rate cannot increase or decrease more than one percentage point (1.000%) at each adjustment thereafter (a "cap").
- Your interest rate can never be less than your margin (a "cap").
- Your interest rate can never increase by more than six percentage points (6.000%) above the start rate (a "cap").
- Your interest rate will be rounded to the nearest .0125% at each adjustment.

## HOW YOUR MONTHLY PAYMENT CAN CHANGE
- Your monthly payment can increase or decrease substantially every 6 months beginning approximately 7 years after your loan closes based on changes to the interest rate. You will begin making your new monthly payments on the first payment due date after each Change Date.
- At each Change Date during the interest-only period the lender will recalculate your monthly payment to be an amount necessary to fully repay the accrued interest at the then current interest rate.
- If you make a voluntary pre-payment of principal during the interest-only period, your payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current rate on the lower unpaid principal balance.
- At each Change Date after the interest-only period, the lender will recalculate your monthly payment based on an amount necessary to fully repay the unpaid principal balance at the then current interest rate on the maturity date in substantially equal monthly payments.
- You will be notified in writing at least 25 calendar days before the monthly adjustment is made. This notice will contain information about your index, interest rate, payment amount and loan balance.
- For example, on a new $10,000, 30 year loan with an initial interest rate of 7.250% in effect in December 2005, the maximum amount that the interest rate could rise under this example is 6.000% over the start rate to 13.250%, and the payment amount could rise from a beginning payment of $60.42 to a maximum of $110.42* in 7 years. (For example, the monthly payment for a mortgage amount of $60,000/$10,000 = 6; 6 x $60.42 = $362.52.)* *The maximum payment amount reflects principal and interest. You will begin making monthly payments of principal and interest in the 11th year.* To compute the above example we used a margin value and interest rate we have used recently. Your margin value and interest rate may be different and you should ask about what is the current margin value and interest rate.

I/We hereby acknowledge receipt of this variable rate program disclosure and a copy of the Consumer Handbook on Adjustable Rate Mortgages on the date indicated below.

Date: 5/5/06

Rex T. Gilbert, JR

---

**EXHIBIT 7**

7/6 IO ARM Bulk Disclosure (4014-2005)

OMB No. 2502-0265

| B. Type of Loan | | | | |
|---|---|---|---|---|
| 1. ☐ FHA  2. ☐ FmHA  3. ☒ Conv. Unins.  4. ☐ VA  5. ☐ Conv. Ins. | 6. File Number | 7. Loan Number ____0843 | 8. Mortgage Insurance Case Number | |

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

D. NAME AND ADDRESS OF BORROWER: Rex T. Gilbert, JR

134 West End Road
Ocracoke, NC 27960

E. NAME AND ADDRESS OF SELLER:

F. NAME AND ADDRESS OF LENDER: First National Bank of Arizona
1760 Old Meadow Road
Mc Lean, VA 22102

G. PROPERTY 134 West End Road
LOCATION: Ocracoke NC 27960

H. SETTLEMENT AGENT:

PLACE OF SETTLEMENT: 7531 SOUTH VIRGINIA DARE TRAIL
NAGS HEAD, NC 27959

I. SETTLEMENT DATE: 05/05/2006

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| 100. GROSS AMOUNT DUE FROM BORROWER: | | 400. GROSS AMOUNT DUE TO SELLER: | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower: | | 403. | |
| (from line 1400) | 22,581.02 | | |
| 104. | | 404. | |
| 105. | | 405. | |
| ADJUSTMENTS FOR ITEMS PAID BY SELLER IN ADVANCE: | | ADJUSTMENTS FOR ITEMS PAID BY SELLER IN ADVANCE: | |
| 106. City/town taxes        to | | 406. City/town taxes        to | |
| 107. County taxes           to | | 407. County taxes           to | |
| 108. Assessments            to | | 408. Assessments            to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. GROSS AMOUNT DUE FROM BORROWER: ▶ | 22,581.02 | 420. GROSS AMOUNT DUE TO SELLER: ▶ | |
| 200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER: | | 500. REDUCTIONS IN AMOUNT DUE TO SELLER: | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 525000.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| ADJUSTMENTS FOR ITEMS UNPAID BY SELLER: | | ADJUSTMENTS FOR ITEMS UNPAID BY SELLER: | |
| 210. City/town taxes        to | | 510. City/town taxes        to | |
| 211. County taxes           to | | 511. County taxes           to | |
| 212. Assessments            to | | 512. Assessments            to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. TOTAL PAID BY/FOR BORROWER: ▶ | 525,000.00 | 520. TOTAL REDUCTIONS IN AMOUNT DUE SELLER: ▶ | |
| 300. CASH AT SETTLEMENT FROM/TO BORROWER: | | 600. CASH AT SETTLEMENT TO/FROM SELLER: | |
| 301. Gross amount due from borrower (line 120) | 22,581.02 | 601. Gross amount due to seller (line 420) | |
| 302. Less amount paid by/for borrower (line 220) | 525,000.00 | 602. Less total reductions in amount due seller (line 520) | ( ) |
| 303. CASH ( ☐ FROM) ( ☒ TO) BORROWER: ▶ | 502,418.98 | 603. CASH ( ☐ TO) ( ☐ FROM) SELLER: ▶ | |

HUD-1 (3-86)
RESPA, HB 4305.2

VMP-S01 (0004).01

VMP Mortgage Solutions (800)521-7291

PAGE 1

EXHIBIT
8

| | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| DIVISION OF COMMISSION (LINE 700) AS FOLLOWS: | | | |
| 701. $0.00 | to | | |
| 702. $0.00 | to | | |
| 703. Commission paid at settlement | | | |
| 704. | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN:** | | | |
| 801. Loan origination fee 1.000      % FIRST FLIGHT MTG. | | 5290.00 | |
| 802. Loan discount 0.000      % | | | |
| 803. Appraisal fee to: FIRST FLIGHT MTG. | | 400.00 (poc) | |
| 804. Credit report to: FIRST FLIGHT MTG. | | 35.00 (poc) | |
| 805. Lender's Inspection fee 2NBA | | 33.00 | |
| 806. Mortgage Insurance application fee to | | | |
| 807. Assumption | | | |
| 808. Broker's Discount Fee | | | |
| 809. Application Fee | COMMITMENT FEE TO FIRST | 300.00 | |
| 810. Buydown Subsidy | | | |
| 811. Yield Spread Premium | $3,281.25 (poc) | | |
| 812. Underwriting/Commitment Fee | FNBA | 699.00 | |
| 813. Document Preparation Fee | | | |
| 814. Administration Fee | | | |
| 815. Flood Certification Fee | FNBA | 13.25 | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE:** | | | |
| 901. Interest from 05/10/2006 to 06/01/2006 @ $106.08 /day | | 2333.76 | |
| 902. Mortgage Insurance premium for 0 mos. to | | | |
| 903. Hazard Insurance premium for 0 yrs. to | | 2031.00 | |
| 904. Flood Insurance Premium for 0 yrs. to | | 406.00 | |
| 905. Insurance Premium (Other) | | | |
| **1000. RESERVES DEPOSITED WITH LENDER:** | | | |
| 1001. Hazard Insurance | 7 months @ $169.25 | per month | 1184.75 | |
| 1002. Mortgage Insurance | 0 months @ $ | per month | |
| 1003. City property taxes | 0 months @ $ | per month | |
| 1004. County property taxes | 11 months @ $232.99 | per month | 2562.89 | |
| 1005. Annual assessments | 0 months @ $ | per month | |
| 1006. Flood Insurance | 0 months @ $ | per month | |
| 1007. Insurance Reserves Other | 0 months @ $ | per month | |
| 1008. Tax Reserves (Other) | | | |
| **1100. TITLE CHARGES:** | | | |
| 1101. Settlement or closing fee to TITLE | | 695.00 | |
| 1102. Abstract or title search to | | | |
| 1103. Title examination to | | | |
| 1104. Title Insurance binder to | | | |
| 1105. Document preparation to | | | |
| 1106. Notary fees to | | | |
| 1107. Attorneys' fees to TITLE | | 695.00 | |
| 1108. Title Insurance to TITLE | | 577.81 | |
| 1109. Lender's coverage $     0.00 | | | |
| 1110. Owner's coverage $     0.00 | | | |
| 1111. Environmental Endorsement | TITLE | 300.00 | |
| 1112. Reconveyance Fees | | | |
| 1113. | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES:** | | | |
| 1201. Recording fees: Deed $ 0.00 ; Mortgage $0.00 ; Releases $ 0.00 | | 250.00 | |
| 1202. City/county tax / stamps: Deed $ 0.00 ; Mortgage $ 0.00 | | 750.00 | |
| 1203. State tax / stamps      Deed $ 0.00 ; Mortgage $ 0.00 | | 1500.00 | |
| 1204. Open R.E. 2005 TAX DUES | | 3414.75 | |
| 1205. Open | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES:** | | | |
| 1301. Survey to | | | |
| 1302. Pest Inspection to | | | |
| 1303. Courier/Wire Transfer Fee | TITLE | 200.00 | |
| 1304. Escrow Holdback Fee | | | |
| 1305. Trustee Review Fee | | | |
| 1306. County Property Tax | | | |
| 1307. City Property Tax | | | |
| 1308. Tax (Other) | | 22,561.02 | |
| **1400. TOTAL SETTLEMENT CHARGES** (Enter on line 103, Section J and line 502, Section K) ▶ | | | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Borrower: _____ Date: 5/5/06      Seller: _____ Date: _____

Rex T. Gilbert, JR

Borrower: _____ Date: _____      Seller: _____ Date: _____

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

_____ Date: _____
Settlement Agent

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.
VMP Mortgage Solutions, Inc. (800)521-7291        VMP-6D2R (0509)        PAGE 2        5300000843

Name & Address of Borrower:
Rex T. Gilbert, JR

193 West End Road
Ocracoke, NC 27960

Name & Address of Lender:
First National Bank of Arizona

1760 Old Meadow Road
Mc Lean, VA 22102

Property Location: (if different from above)
234 West End Road
Ocracoke NC 27960

Settlement Agent:

Place of Settlement:
7531 SOUTH VIRGINIA DARE TRAIL
NAGS HEAD, NC 27959

Loan Number:
5300000843

Application Number:

Settlement Date:
05/05/2006

| L. | Settlement Charges | P.O.C. | Borrower | Seller |
|---|---|---|---|---|
| | | FNBA | 79.00 | 0.00 |
| 816 | Tax Service | | 0.00 | 0.00 |
| 817 | Processing Fee | | 0.00 | 0.00 |
| 818 | Open | | 0.00 | 0.00 |
| 819 | Open | | -695.19 | 0.00 |
| 1009 | Aggregate Adjustment | | | |

Borrower(s) Signature(s):

x _Rex T. Gilbert_          x _____
Rex T. Gilbert, JR

x _____          x _____

x _____          x _____

x _____          x _____

VMP-502A (0603)

VMP Mortgage Solutions, Inc. (800)521-7291

7/05

## ADDENDUM TO HUD-1 SETTLEMENT STATEMENT

Lender:        First National Bank of Arizona

Loan Number:    ██0843

Title Company:

Escrow Number:

Borrower(s):    Rex T. Gilbert, JR

Property Address:  134 West End Road, Ocracoke, NC 27960

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

**BUYER(S)**

_____  5/5/06        _____
Rex T. Gilbert, JR        Date                                Date

_____              _____
Date                                Date

**SELLER(S)**

_____              _____
Date                                Date

_____              _____
Date                                Date

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

_____  5/5/06
Settlement Agent        Date

[The certifications contained herein may be obtained from the respective parties at different times or may be obtained on separate addenda].

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For Details, see: Title 18 U.S.C. Sections 1001 and 1010.

Form 205

Addendum to HUD - 1 (Conv.) - ALL (205)
6/18/2003

## FIRST PAYMENT LETTER

Mortgagor(s):    Rex T. Gilbert, JR

Property Address:    134 West End Road, Ocracoke, NC  27960

Loan Number:    ███0843

Loan Amount:    $ 525,000.00
Rate:                   7.375 %
Term:                  360    Month

Your payments are scheduled to begin on July 1, 2006  and are to be as follows:

| | | |
|---|---|---:|
| First Payment | $ | 3,226.57 |
| City Taxes | $ | 0.00 |
| County Taxes | $ | 232.99 |
| Hazard Insurance | $ | 169.25 |
| Flood Insurance | $ | 0.00 |
| FHA/PMI Insurance | $ | 0.00 |
| Other Taxes | $ | 0.00 |
| Other Insurance | $ | 0.00 |
| **TOTAL PAYMENT** | $ | 3,628.81 |

In the event you do not receive information from your Servicing Department prior to your first payment, please forward your payments to the address below, including your loan number on your check. Your check should be made payable to: First National Bank of Arizona

First National Bank of Arizona
P.O. Box 62768
Phoenix, AZ    85082-2768

In the event that your mortgage is sold to another mortgage company, please disregard this information and follow any new payment procedures or instructions.

Please sign and date the bottom of this form indicating your receipt of same. Thank you.

_Rex T. Gilbert, JR_    5/5/06
Rex T. Gilbert, JR                         Date

_____    _____
                                 Date                                                          .Date

_____    _____
                                 Date                                                          Date

**EXHIBIT**

9

First Payment Letter - ALL (1018)
11/11/2004

LOAN#  3713
Borrower:Gilbert

**PAYMENT HISTORY**

ORIGINAL UPB $55000.00
ORIGINAL INT R. 7.375%
ORIGINAL P&I 3126.56

14-May-09
KS

INTEREST ONLY ARM

| Closing Source | Comments | DATE BOND | DATE PMT RECEIVED | AMOUNT RECEIVED | TRAN CODE | NEW/PMT PER | INT RATE | Total | INT | PRINC | OPTL CUSH | BUY DWN | UPB | ESCROW BAL | ESCROW HISTORY | SUSPENSE | SUSPENSE BALANCE | LATE CHARGES | PROPERTY ADV % BAL | CORPORATE ADVANCE | DEFT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Transferred: OA/OM | | 7/1/2006 | | | | 360 | | | | | | | | 225000.00 | | 872.16 | | | 0 | | 0 |
| | | 8/1/2006 | 8/22/2006 | 3,662.64 | | 359 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | 0.00 | 225000.00 | 436.08 | 1308.24 | | | 0 | | 0 |
| First Escrow Bal Disbursement | | 9/1/2006 | 9/14/2006 | 3,662.64 | | 358 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | | 225000.00 | 436.08 | 1308.24 | | | 0 | | 0 |
| | | 10/1/2006 | | | | 357 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | 0.01 | 225000.00 | 436.08 | 1744.32 | | | 0 | | 0 |
| | | 10/1/2006 | 10/14/2006 | 13,662.64 | | 356 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | | 324999.99 | 2240.24 | 2180.4 | | | 0 | | 0 |
| Hazard Ins Disbursement | | 11/1/2006 | 11/10/2006 | 13,662.64 | | 355 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | | 324999.99 | 436.08 | -1068.88 | | | 0 | | 0 |
| | | 12/1/2006 | 12/14/2006 | 13,662.64 | 6 | 354 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | | 324999.99 | 436.08 | -632.8 | | | 0 | | 0 |
| Hazard Ins Disbursement | | 1/1/2007 | 1/16/2007 | 13,662.64 | 7 | 353 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | | 324999.99 | 436.08 | -196.72 | | | 0 | | 0 |
| Hazard Ins Disbursement | | | | | | | | | | | | | | 324999.99 | 436.08 | 239.36 | | | 0 | | 0 |
| Escrow Disbursement | | 2/1/2007 | 2/6/2007 | 13,091.00 | | 352 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | | 324999.99 | -406 | -166.64 | | | 0 | | 0 |
| | | 2/1/2007 | 2/15/2007 | 13,662.64 | 8 | 351 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | | 324999.99 | -2215 | 269.44 | | | 0 | | 0 |
| | | 3/1/2007 | 3/12/2007 | 13,662.64 | 9 | 350 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | | 324999.99 | -2215 | -2045.16 | | | 0 | | 0 |
| Funds sent back to apply towards payment | | 4/1/2007 | 4/12/2007 | 13,662.64 | 10 | | 7.375% | 3226.56 | 3226.56 | 0.00 | | | | 324999.99 | 1091 | -3178.16 | | | 0 | | 0 |
| Funds placed in suspense | | | | | | | | | | | | | 324999.99 | 436.08 | -2142.48 | | -129 | | | |
| Late Charge assessed on the 05/01/07 payment | | 5/1/2007 | 5/14/2007 | 13,662.64 | | | | | | | | | | 324999.99 | 436.08 | -2306.4 | | | -129 | | |
| Funds taken out of suspense and applied towards 05/01/07 payment | | | | | | | | | | | | | 324999.99 | | -1870.32 | 3662.64 | | -129 06 | 0 | | |
| | | | | | | | | | | | | | | | -1870.32 | 3662.64 | | -129 06 | -129 | | |
| Late Charge assessed on the 06/01/07 payment | | 5/1/2007 | 6/22/2007 | 13,662.56 | 11 | 349 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | | 324999.99 | | -1870.32 | | -487.5 | | -129 | | |
| Funds taken out of suspense and applied towards 06/01/07 payment | | | | | | | | | | | | | 324999.99 | 994.44 | -1475.88 | | | | | | |
| | | | | | | | | | | | | | | | -475.88 | 2975.14 | | -129 06 | -129 | | |
| Property Inspection Fee Assessed | | 6/1/2007 | 7/10/2007 | 13,662.56 | 12 | 348 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | | 324999.99 | | -475.88 | 2975.14 | | -129 06 | -129 | | |
| Late Charge assessed on the 07/01/07 payment | | | | | | | | | | | | | 324999.99 | 994.44 | -475.88 | | -558.44 | | -129 | | |
| Funds taken out of suspense and applied towards 07/01/07 payment | | | | | | | | | | | | | 324999.99 | | 118.56 | 2416.7 | | | -129 | | |
| | | | | | | | | | | | | | | | 118.56 | 2416.7 | | | -129 | | |
| Late Charge assessed on the 08/01/07 payment | | 7/1/2007 | 6/27/2007 | 13,662.56 | 13 | 347 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | | 324999.99 | | 118.56 | 2416.7 | | -129 06 | -129 | 11.75 | | -1.75 |
| Funds taken out of suspense and applied towards 08/01/07 payment | | | | | | | | | | | | | 324999.99 | 994.44 | 118.56 | | -558.44 | | -254 | | | -1.13 |
| | | | | | | | | | | | | | | | 118.56 | 1858.26 | | | -254 | | | -1.13 |
| Late Charge assessed on the 09/01/07 payment | | 8/1/2007 | 9/11/2007 | 13,662.56 | 14 | 346 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | | 324999.99 | | 1113 | 1858.26 | | -129 06 | -387 | | | -1.13 |
| Funds taken out of suspense and applied towards 09/01/07 payment | | | | | | | | | | | | | 324999.99 | 994.44 | 2107.44 | | -558.44 | | -387 | | | -1.13 |
| | | | | | | | | | | | | | | | 2107.44 | 1299.82 | | | -387 | | | -1.13 |
| Funds Cross Balance Disbursement | | 9/1/2007 | 10/26/2007 | 13,662.56 | 15 | 345 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | | 324999.99 | | 2107.44 | 1299.82 | | -129 06 | -516 | | | -1.13 |
| Late Charge assessed on the 10/01/07 payment | | | | | | | | | | | | | 324999.99 | 994.44 | 3101.88 | | -558.44 | | -516 | | | -1.13 |
| Funds taken out of suspense and applied towards 10/01/07 payment | | | | | | | | | | | | | 324999.99 | -3599.38 | -297.4 | 741.38 | | | -516 | | | -1.13 |
| | | | | | | | | | | | | | | | -297.4 | 741.38 | | | -516 | | | -1.13 |
| Partial payment coming as post payment to suspense | | 10/1/2007 | 11/21/2007 | 13,662.56 | 16 | 344 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | | 324999.99 | | -297.4 | 741.38 | | | -516 | | | -1.13 |
| Hazard Ins Disbursement | | | | | | | | | | | | | 324999.99 | 994.44 | 697.04 | 182.94 | | -558.44 | -645 | | | -1.13 |
| Hazard Ins Disbursement | | 12/24/2007 | | 3,500.00 | | | | | | | | | | 324999.99 | | 697.04 | 182.94 | | | -645 | | | -1.13 |
| Funds cross balance to 11/01/07 and 12/01/07 payments | | | | | | | | | | | | | 324999.99 | -466 | 697.04 | 3682.94 | 3500 | | -645 | | | -1.13 |
| Funds taken out of suspense and applied towards 11/01/07 payment | | | | | | | | | | | | | 324999.99 | -2846 | 231.04 | 3682.94 | | | -645 | | | -1.13 |
| | | | | | | | | | | | | | | | -2354.96 | 3682.94 | | | -645 | | | -1.13 |
| Partial payment coming as post payment to suspense | | 11/1/2007 | 1/17/2008 | 1531.06 | | 343 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | | 326999.99 | | -2354.96 | 3482.94 | -258.12 | .993 | | | | -1.11 |
| | | | | | | | | | | | | | | | -2354.96 | 0 | | | .903 | | | |
| | | | | | | | | | | | | | | 994.44 | -1560.52 | | | -3682.94 | .903 | | | |

EXHIBIT
10



STATE OF NORTH CAROLINA              IN THE GENERAL COURT OF JUSTICE
                                        SUPERIOR COURT DIVISION
COUNTY OF HYDE                              09 CVS 70


REX T. GILBERT, JR. AND           )
DANIELA L. GILBERT,               )
                   Plaintiffs,    )
v.                                )
                                  )
DEUTSCHE BANK TRUST COMPANY       )
AMERICAS, As Trustee for          )
RESIDENTIAL ACCREDIT LOANS, INC.  )
DAVID A. SIMPSON, PC., Substitute )
Trustee, RESIDENTIAL FUNDING, LLC, )
And GMAC MORTGAGE, LLC,           )
                   Defendants,    )

---

### PRELIMINARY INJUNCTION

This case was heard before the Court on the 1st day of October, 2009, upon the application of the plaintiffs for a preliminary injunction, and after notice and hearing and considering the verified complaint, the affidavits filed, and the evidence presented, the court finds the following facts:

1. Plaintiffs have set forth through their Complaint, Affidavit and the evidence presented claims for violations of the Federal Truth in Lending Act, usury and unfair acts and/or practices under G.S. 75-1.1, et seq.

2. The Court finds that the Plaintiffs did not carry their burden with respect to any of the claims that the Holder of the Note

was not the foreclosing party. This issue has been determined in the Special Proceeding.

3. The Court finds that the Plaintiffs have met their burden for purposes of the preliminary injunction hearing on the TILA claims. The Court finds that the Plaintiffs have tendered sufficient evidence to establish that they are likely to succeed on the merits of these claims.

4. Plaintiffs will suffer immediate and irreparable loss, injury and damage by virtue of losing title to their home unless an injunction is issued against the pending foreclosure sale noticed for October 27, 2009.

5. The injunction ordered imposes no undue burden or risk of harm to defendants.

6. Balancing the risk of harm between the parties favors injunctive relief in favor of Plaintiffs.

The Court concludes as a matter of law:

    1. That the foreclosure sale of Plaintiffs' real property should be enjoined pending the resolution of this matter.

IT IS THEREFORE ORDERED that plaintiffs' motion for preliminary injunction be and hereby is GRANTED; and

It is further ordered that the foreclosure sale of Plaintiffs' real property located at 134 West End Road, Ocracoke, North Carolina 27960, scheduled for Tuesday, October 27, 2009 at 10:00 AM be and hereby is STAYED; and defendants are hereby ENJOINED

from re-advertising and re-noticing said sale, foreclosing upon or otherwise transferring title to the property located at 134 West End Road, Ocracoke, North Carolina 27960, pending resolution of this matter,

IT IS FURTHER ORDERED that plaintiffs shall post bond in the amount of TEN THOUSAND ($10,000.00) DOLLARS by 5 PM Friday, October 2, 2009, to indemnify and save harmless the Defendants pursuant to G.S. § 45-21.34. This bond shall be separate and apart from the three thousand dollars ($3,000.00) that was previously posted. If this bond is not posted in accordance with this Order the Injunction shall dissolve and be of no further force and effect.

This the 9th day of October, 2009.

_____
The Honorable Wayland J. Sermons, Jr.
Resident Superior Court Judge Presiding

**Exhibit C**

NO. COA10-361

NORTH CAROLINA COURT OF APPEALS

Filed:  3 May 2011

IN THE MATTER OF THE FORECLOSURE BY
DAVID A. SIMPSON, P.C., SUBSTITUTE
TRUSTEE, OF A DEED OF TRUST EXECUTED
BY REX T. GILBERT, JR. AND DANIELA L.
GILBERT, HUSBAND AND WIFE, DATED MAY
5, 2006 AND RECORDED ON MAY 10, 2006,
IN BOOK 219 AT PAGE 53 OF THE HYDE
COUNTY PUBLIC REGISTRY

                                    Hyde County
                                    No. 09 SP 09


     Appeal by Respondents from order entered 18 August 2009 by Judge

Marvin K. Blount, III in Hyde County Superior Court.  Heard in the

Court of Appeals 12 October 2010.


     *Katherine S. Parker-Lowe, for respondent-appellants.*

     *The Law Office of John T. Benjamin, Jr., P.A., by John T.
     Benjamin, Jr. and James R. White for petitioner-appellee.*


     HUNTER, JR., Robert N., Judge.


     Respondents Rex T. Gilbert, Jr. and his wife Daniela L. Gilbert,

appeal from the trial court's Order authorizing David A. Simpson,

P.C., as Substitute Trustee, to proceed with foreclosure under a

power of sale in the Deed of Trust recorded in Book 219 at Page 53

in the Hyde County Register of Deeds.  We reverse.

-2-

## I. Factual and Procedural History

On 5 May 2006, Respondent Rex T. Gilbert, Jr. executed an adjustable rate note ("the Note") to refinance an existing mortgage on his home.   According to the terms of the Note, Mr. Gilbert promised to pay a principal amount of $525,000.00 plus interest to First National Bank of Arizona.   The Note was secured by a Deed of Trust, executed by Mr. Gilbert and his wife, Daniela L. Gilbert, on real property located at 134 West End Road, Ocracoke, North Carolina.   The Deed of Trust identified First National Bank of Arizona as the lender and Matthew J. Ragaller of Casey, Grimsley & Ragaller, PLLC as the trustee.

The record reveals that, during 2008, Respondents ceased making payments on the Note and made an unsuccessful attempt to negotiate a modification of the loan.   On 9 March 2009, a Substitution of Trustee was recorded in the Hyde County Register of Deeds, which purports to remove Matthew Ragaller as the trustee of the Deed of Trust and appoint his successor, David A. Simpson, P.C. ("Substitute Trustee").   The Substitution of Trustee identified Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 ("Petitioner") as the holder of the Note and the lien created by the Deed of Trust.

On 12 March 2009, the Substitute Trustee commenced this action by filing a Notice of Hearing on Foreclosure of Deed of Trust with

-3-

the Hyde County Clerk of Superior Court pursuant to section 45-21.16
of our General Statutes.   N.C. Gen. Stat. § 45-21.16 (2009).   The
Notice of Hearing stated, "the current holder of the foregoing Deed
of Trust, and of the debt secured thereby, is: Deutsche Bank Trust
Company Americas as Trustee for Residential Accredit Loans, Inc.
Series 2006-QA6."

In a letter dated 5 April 2009, Mr. Gilbert purported to exercise
his right to rescind the loan transaction he entered into with the
original lender, First National Bank of Arizona, pursuant to the
federal Truth in Lending Act, 15 U.S.C. § 1635.   As justification
for his purported rescission, Gilbert alleged that the Truth in
Lending Disclosure Statement provided by First National Bank of
Arizona failed to accurately provide all required material
disclosures including, *inter alia*, the correct annual percentage
rate and payment schedule.   The Substitute Trustee responded with
a letter from GMAC ResCap, in which it denied any material disclosure
errors were made and refused to rescind the loan transaction.

The foreclosure hearing was held on 2 June 2009 before the Clerk
of Superior Court of Hyde County.   The Honorable Sharon G. Sadler
entered an Order on 17 June 2009, permitting the Substitute Trustee
to proceed with the foreclosure.   In the Order, the Clerk
specifically found, *inter alia*, that Petitioner was the holder of
the Note and Deed of Trust that it sought to foreclose and the Note

-4-

evidenced a valid debt owed by Mr. Gilbert.  Respondents appealed
the Order to superior court.

    The matter came on for a *de novo* hearing on 18 August 2009 before
the Honorable Marvin K. Blount, III, in Hyde County Superior Court.
During the hearing, the trial court admitted into evidence a
certified copy of the Note and the Deed of Trust and two affidavits
attesting to the validity of Gilbert's indebtedness pursuant to the
Note, and that Deutsche Bank Trust Company Americas as Trustee for
Residential Accredit Loans, Inc. Series 2006-QA6 is the current owner
and holder of the Note.  Additionally, Petitioner introduced the
original Note and Allonge for the trial court's inspection.

    Reviewing the record before this Court, the Allonge contains
a series of indorsements evidencing the alleged assignments of the
Note, as follows:

                    PAY TO THE ORDER OF:
                    First National Bank of Nevada
                    WITHOUT RECOURSE BY:
                    ____[Signature]_____
                    AMY HAWKINS, ASSISTANT VICE PRESIDENT
                    FIRST NATIONAL BANK OF ARIZONA


                    Pay to the order of:
                    RESIDENTIAL FUNDING CORPORATION
                    Without Recourse
                    FIRST NATIONAL BANK OF NEVADA
                    By: [Signature]_____
                    Deutsche Bank National Trust
                    Company, F/K/A Bankers Trust
                    Company of California, N.A.
                    as Custodian as Attorney in Fact

-5-

[Illegible Name and Title]

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Corporation
BY    [Signature]
Judy Faber, Vice President

Respondents made two arguments at the hearing. First, Respondents argued that the debt evidenced by the Note no longer existed, as Mr. Gilbert had rescinded the transaction for the loan with First National Bank of Arizona. Petitioner objected to Respondents' rescission argument as being a defense in equity and, as such, inadmissible in a proceeding held pursuant to N.C. Gen. Stat. § 45-21.16. The trial court agreed and refused to let Respondents' expert witness testify as to alleged material errors in the Truth in Lending Disclosure Statement, which Mr. Gilbert alleged permitted him the right to rescind the loan. Second, Respondents argued that Petitioner had not produced sufficient evidence to establish that Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 was the holder of the Note.

Based on the preceding evidence, the trial court entered an order on 18 August 2009 in which it found, *inter alia*: Mr. Gilbert executed the Note and, with his wife, executed a Deed of Trust in favor of First National Bank of Arizona, secured by the real property described in the Deed of Trust; a valid debt exists and is owed by

-6-

Gilbert to Petitioner; Gilbert is in default under the Note and Deed of Trust; proper notice of the foreclosure hearing was given to all parties as required by N.C. Gen. Stat. § 45-21.16; Petitioner was the current holder of the Note and the Deed of Trust.   The trial court concluded as a matter of law that the requirements of N.C. Gen. Stat. § 45-21.16 had been satisfied.   Based on these findings and conclusion of law, the trial court authorized the Substitute Trustee to proceed with the foreclosure.   Respondents timely entered notice of appeal.

## II. Analysis

A party seeking permission from the clerk of court to proceed with a foreclosure pursuant to a power of sale contained in a deed of trust must prove the following statutory requirements: (1) the party seeking foreclosure is the holder of a valid debt, (2) default on the debt by the debtor, (3) the deed of trust provides the right to foreclose, (4) proper notice was given to those parties entitled to notice pursuant to section 45-21.16(b).   N.C. Gen. Stat. § 45-21.16(d) (2009).   The General Assembly added a fifth requirement, which expired 31 October 2010: "that the underlying mortgage debt is not a subprime loan," or, if it is a subprime loan, "that the pre-foreclosure notice under G.S. 45-102 was provided in all material respects, and that the periods of time established by Article 11 of this Chapter have elapsed[.]"   *Id.*   The role of the clerk of court

-7-

is limited to making a determination on the matters specified by section 45-21.16(d). *See Mosler ex rel. Simon v. Druid Hills Land Co., Inc.*, 199 N.C. App. 293, 295-96, 681 S.E.2d 456, 458 (2009). If the clerk's order is appealed to superior court, that court's *de novo* hearing is limited to making a determination on the same issues as the clerk of court. *See id.*

The trial court's order authorizing the foreclosure to proceed was a final judgment of the superior court, therefore, this Court has jurisdiction to hear the instant appeal. N.C. Gen. Stat. § 7A-27(b) (2009). Our standard of review for this appeal, where the trial court sat without a jury, is "'whether competent evidence exists to support the trial court's findings of fact and whether the conclusions reached were proper in light of the findings.'" *In re Adams*, __ N.C. App. __, __, 693 S.E.2d 705, 708 (2010) (quoting *In re Foreclosure of Azalea Garden Bd. & Care, Inc.*, 140 N.C. App. 45, 50, 535 S.E.2d 388, 392 (2000)).

We note the trial court classified multiple conclusions of law as "findings of fact." We have previously recognized "[t]he classification of a determination as either a finding of fact or a conclusion of law is admittedly difficult." *In re Helms*, 127 N.C. App. 505, 510, 491 S.E.2d 672, 675 (1997). Generally, "any determination requiring the exercise of judgment or the application of legal principles is more properly classified a conclusion of law."

-8-

*Id.* (citations omitted).   Any determination made by "'logical reasoning from the evidentiary facts,'" however, "is more properly classified a finding of fact." *Id.* (quoting *Quick v. Quick*, 305 N.C. 446, 452, 290 S.E.2d 653, 657-58 (1982)).   When this Court determines that findings of fact and conclusions of law have been mislabeled by the trial court, we may reclassify them, where necessary, before applying our standard of review. *N.C. State Bar v. Key*, 189 N.C. App. 80, 88, 658 S.E.2d 493, 499 (2008) (citing *In re Helms*, 127 N.C. App. at 510, 491 S.E.2d at 675).

Looking to the trial court's Order, we conclude that the following "findings of fact" are determinations that required the application of legal principles and are more appropriately classified as conclusions of law: a valid debt exists and is owed to Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6; proper notice was given to and received by all parties as required by N.C. Gen. Stat. § 45-21.16 and the Rules of Civil Procedure; Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 is the current owner and holder of the Note and Deed of Trust. *See In re Watts*, 38 N.C. App. 90, 92, 247 S.E.2d 427, 428 (1978) (noting upon the appeal of a N.C. Gen. Stat. § 45-21.16 special proceeding the trial court's *conclusions of law* included the existence of a valid debt, the right to foreclose under the deed of

-9-

trust, and proper notice to the mortgagors); *see also Connolly v.
Potts*, 63 N.C. App. 547, 549, 306 S.E.2d 123, 124 (1983) (same).  In
light of this reclassification of the trial court's findings of fact
and conclusions of law, we turn to the issues raised on appeal.

## 1. Rescission of the Loan Transaction

Respondents raise several arguments alleging the trial court
erred by refusing to consider their defense to the foreclosure
action, that the debt Petitioner sought to foreclose was not a valid
debt——a required element under the statute for foreclosure by power
of sale.  *See* N.C. Gen. Stat. § 45-21.16(d)(i) (requiring, *inter
alia*, that the clerk of court must determine that a valid debt
exists).  Respondents contend the debt is not valid because Mr.
Gilbert rescinded the transaction by which he obtained the loan from
First National Bank of Arizona pursuant to the federal Truth in
Lending Act ("TILA"), 15 U.S.C. §§ 1601-1667f, and the Federal
Reserve Board's Regulation Z, 12 C.F.R. § 226.1-.58.  We conclude
the trial court did not err.

The admissibility of evidence in the trial court is based upon
that court's sound discretion and may be disturbed on appeal only
upon a finding that the decision was based on an abuse of discretion.
*Gibbs v. Mayo*, 162 N.C. App. 549, 561, 591 S.E.2d 905, 913 (2004).
Here, we conclude the trial court properly refused to consider
Respondents' evidence of rescission.  Rescission under the TILA is

                                      -10-

an equitable remedy.  *See Am. Mortg. Network, Inc. v. Shelton*, 486
F.3d 815, 819 (4th Cir. 2007) ("'[A]lthough the right to rescind
[under the TILA] is [statutory], it remains an equitable doctrine
subject to equitable considerations.'"  (quoting *Brown v. Nat'l
Permanent Fed. Sav. & Loan Ass'n*, 683 F.2d 444, 447 (D.C. Cir. 1982)).
While legal defenses to a foreclosure under a power of sale are
properly raised in a hearing held pursuant to section 45-21.16,
equitable defenses are not.  *Watts*, 38 N.C. App. at 94, 247 S.E.2d
at 429.  As we have previously stated, a hearing under section
45-21.16 is "not intended to settle all matters in controversy
between mortgagor and mortgagee, nor was it designed to provide a
second procedure for invoking equitable relief."  *Id.*  A party
seeking to raise an equitable defense may do so in a separate civil
action brought in superior court under section 45-21.34.  *Id.*; N.C.
Gen. Stat. § 45-21.34 (2009) (stating that a party with a legal or
equitable interest in the subject property may apply to a superior
court judge to enjoin a sale of the property upon legal or equitable
grounds).  Accordingly, the trial court properly concluded
Respondents' argument that Mr. Gilbert had rescinded the loan
transaction, invaliding the debt Petitioner sought to foreclose, was
an equitable defense and not properly before the trial court.
Respondents' argument is without merit.[1]

        _____

        1 During the pendency of this action, the Gilberts filed a

-11-

## 2. Evidence that Petitioner was the Owner and Holder of Mr. Gilbert's Promissory Note

Respondents also argue the trial court erred in ordering the foreclosure to proceed, as Petitioner did not prove that it was the holder of the Note with the right to foreclose under the instrument as required by section 45-21.16(d)(i) and (iii).  We agree.

A "foreclosure under a power of sale is not favored in the law and its exercise will be watched with jealousy."  *In re Foreclosure of Goforth Props., Inc.*, 334 N.C. 369, 375, 432 S.E.2d 855, 859 (1993) (citations and internal quotation marks omitted).  That the party seeking to foreclose on a promissory note is the holder of said note is an essential element of the action and the debtor is "entitled to demand strict proof of this element."  *Liles v. Myers*, 38 N.C. App. 525, 528, 248 S.E.2d 385, 388 (1978).

For the trial court to find sufficient evidence that Petitioner is the holder of a valid debt in accordance with section 45-21.16(d), "this Court has determined that the following two questions must be

---

separate action against Deutsche Bank Trust Company Americas, Residential Funding, LLC, GMAC Mortgage, LLC, and David A. Simpson, P.C. to litigate, *inter alia*, their TILA claim in Hyde County Superior Court.  The defendants removed the action to federal court.  *See Gilbert v. Deutsche Bank Trust Co. Americas*, slip op. at 1, 4:09-CV-181-D, 2010 WL 2696763 (E.D.N.C. July 7, 2010), *reconsideration denied*, 2010 WL 4320460 (E.D.N.C. Oct. 19, 2010). Because the Gilberts' claim was filed more than three years after the loan transaction was completed, the federal trial court dismissed the action for failure to state a claim upon which relief could be granted.  *Id.* at __, slip op. at 5.

-12-

answered in the affirmative: (1) 'is there sufficient competent evidence of a valid debt?'; and (2) 'is there sufficient competent evidence that [the party seeking to foreclose is] the holder[ ] of the notes [that evidence that debt]?'" *Adams*, __ N.C. App. at __, 693 S.E.2d at 709 (quoting *In re Cooke*, 37 N.C. App. 575, 579, 246 S.E.2d 801, 804–05 (1978)); *see* N.C. Gen. Stat. § 45-21.16(d) (2009) (in order for the foreclosure to proceed, the clerk of court must find, *inter alia*, the existence of a "valid debt of which *the party seeking to foreclose is the holder*," and a "right to foreclose under the instrument" securing the debt) (emphasis added).

Establishing that a party is the holder of the note is essential to protect the debtor from the threat of multiple judgments on the same note.

> If such proof were not required, the plaintiff
> could negotiate the instrument to a third party
> who would become a holder in due course, bring
> a suit upon the note in her own name and obtain
> a judgment in her favor. . . . Requiring proof
> that the plaintiff is the holder of the note at
> the time of her suit reduces the possibility of
> such an inequitable occurrence.

*Liles*, 38 N.C. App. at 527, 248 S.E.2d at 387.

We have previously determined that the definition of "holder" under the Uniform Commercial Code ("UCC"), as adopted by North Carolina, controls the meaning of the term as it used in section 45-21.16 of our General Statutes for foreclosure actions under a

-13-

power of sale.  *See Connolly*, 63 N.C. App. at 550, 306 S.E.2d at 125;

*Adams*, ___ N.C. App. at ___, 693 S.E.2d at 709.  Our General Statutes

define the "holder" of an instrument as "[t]he person in possession

of a negotiable instrument that is payable either to bearer or to

an identified person that is the person in possession."  N.C. Gen.

Stat. § 25-1-201(b)(21) (2009); *Econo-Travel Motor Hotel Corp. v.*

*Taylor*, 301 N.C. 200, 203, 271 S.E.2d 54, 57 (1980).  Furthermore,

a "'[p]erson' means an individual, corporation, business trust,

estate, trust . . . or any other legal or commercial entity."  N.C.

Gen. Stat. § 25-1-201(b)(27) (2009).

As addressed above, we conclude the trial court properly found

that a valid debt existed.  The remaining issue before this Court

is whether there was competent evidence that Petitioner was the

holder of the Note that evidences Mr. Gilbert's debt.

In support of its argument that it provided competent evidence

to support the trial court's findings, Petitioner first points to

its production of the original Note with the Allonge at the *de novo*

hearing, as well as its introduction into evidence true and accurate

copies of the Note and Allonge.  Petitioner asserts this evidence

"plainly evidences the transfers" of the Note to Petitioner.  We

cannot agree.

Under the UCC, as adopted by North Carolina, "[a]n instrument

is transferred when it is delivered by a person other than its issuer

-14-

for the purpose of giving to the person receiving delivery the right to enforce the instrument."  N.C. Gen. Stat. § 25-3-203(a) (2009). Production of an original note at trial does not, in itself, establish that the note was transferred to the party presenting the note with the purpose of giving that party the right to enforce the instrument, as demonstrated in *Connolly*, 63 N.C. App. at 551, 306 S.E.2d at 125, and *Smathers v. Smathers*, 34 N.C. App. 724, 726, 239 S.E.2d 637, 638 (1977) (holding that despite evidence of voluntary transfer of promissory notes and the plaintiff's possession thereof, the plaintiff was not the holder of the note under the UCC as the notes were not drawn, issued, or indorsed to her, to bearer, or in blank. "[T]he plaintiff testified to some of the circumstances under which she obtained possession of the notes, but the trial court made no findings of fact with respect thereto.")

In *Connolly*, determining who had possession of the note became the critical question for the foreclosure proceeding.  63 N.C. App. at 551, 306 S.E.2d at 125.  Several years prior to the foreclosure proceedings at issue in *Connolly*, the petitioners obtained a loan from a bank and pledged as collateral a promissory note that was payable to the petitioners by assigning and delivering the note to the bank.  *Id*. at 549, 306 S.E.2d at 124.  After obtaining their loan, the petitioners sought to foreclose on the promissory note and deed of trust, which was in the bank's possession, but were denied

-15-

at the special proceeding before the clerk of court. *Id.* at 548, 306 S.E.2d at 124. The petitioners appealed the decision to superior court. *Id.* During the *de novo* hearing, the petitioners testified their loan to the bank had been paid, but "they had left the [] note at the bank, for security purposes." *Id.* at 551, 306 S.E.2d at 125. The petitioners, however, "introduced the originals of the note and deed of trust" during the hearing. *Id.* The trial court found the bank was in possession of the note and concluded, as a matter of law, the petitioners were not the holders of the note at the institution of the foreclosure proceedings; the foreclosure was again denied. *Connolly*, 63 N.C. App. at 550, 306 S.E.2d at 124-25. On appeal, this Court concluded that despite the fact that the party seeking foreclosure introduced the original note at the time of the *de novo* hearing, the trial court's findings of fact did not address whether the petitioners were in possession of the note at the time of the trial; the trial court's judgment was vacated and remanded. *Id.* at 551, 306 S.E.2d at 125-26.

Similarly, here, the trial court's findings of fact do not address who had possession of Mr. Gilbert's note at the time of the *de novo* hearing. Without a determination of who has physical possession of the Note, the trial court cannot determine, under the UCC, the entity that is the holder of the Note. *See* N.C. Gen. Stat. § 25-1-201(b)(21) (defining "holder" as "the person *in possession*

-16-

of a negotiable instrument that is payable either to bearer or to
an identified person that is the person *in possession*") (emphasis
added); *Connolly*, 63 N.C. App. at 550, 306 S.E.2d at 125 ("It is the
fact of possession which is significant in determining whether a
person is a holder, and the *absence of possession defeats that
status*.") (emphasis added).    Accordingly, the trial court's
findings of fact do not support the conclusion of law that Petitioner
is the holder of Mr. Gilbert's note.

     Assuming *arguendo* that production of the Note was evidence of
a transfer of the Note pursuant to the UCC and that Petitioner was
in possession of the Note, this is not sufficient evidence that
Petitioner is the "holder" of the Note.   As discussed in detail
below, the Note was not indorsed to Petitioner or to bearer, a
prerequisite to confer upon Petitioner the status of holder under
the UCC.   *See* N.C. Gen. Stat. § 25-1-201(b)(21) (requiring that, to
be a holder, a person must be in possession of the note payable to
bearer or to the person in possession of the note).   "'[M]ere
possession' of a note by a party to whom the note has neither been
indorsed nor made payable 'does not suffice to prove ownership or
holder status.'"   *Adams*, __ N.C. App. at __, 693 S.E.2d at 710
(quoting *Econo-Travel Motor Hotel Corp.*, 301 N.C. at 203, 271 S.E.2d
at 57).

-17-

    Petitioner acknowledges that following the signing of the Note by Mr. Gilbert, the Note was sequentially assigned to several entities, as indicated by the series of indorsements on the Allonge, reprinted above.  Respondents argue these indorsements present two problems.  First, Respondents state that Petitioner did not provide any evidence to establish that Deutsche Bank National Trust Company had the authority, as the attorney-in-fact for First National Bank of Nevada, to assign the Note to Residential Funding Corporation in the second assignment.  Respondents make no argument——and cite no authority to establish——that such evidence is needed.  Therefore, we do not address the merits of this alleged error and deem it abandoned.  *See* N.C. R. App. P. 28(6) (2011) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned.")

    Second, Respondents argue Petitioner has not offered sufficient evidence that Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 was the holder of the Note and, thus, the party entitled to proceed with the foreclosure action.  We agree.

    Respondents note the third and final assignment on the Allonge was made to "Deutsche Bank Trust Company Americas as Trustee," which is not the party asserting a security interest in Respondents' property; this action was brought by Deutsche Bank Trust Company

-18-

Americas as Trustee for Residential Accredit Loans, Inc. Series
2006-QA6, the entity the trial court found to be the owner and holder
of the Note.  Section 3-110 of the UCC, as codified in our General
Statutes, states in pertinent part:

> For the purpose of determining the *holder* of an
> instrument, the following rules apply:
>
> . . . .
>
> (2) If an instrument is payable to (i) a trust,
> an estate, *or a person described as trustee* or
> representative of a trust or estate, the
> instrument is *payable to the trustee*, the
> representative, or a successor of either,
> whether or not the beneficiary or estate is also
> named . . . .

N.C. Gen. Stat. § 25-3-110(c) (2009) (emphasis added).
Additionally, the official comments to this section of the UCC state,
in part, "This provision merely determines who can deal with an
instrument as a holder.  It does not determine ownership of the
instrument or its proceeds."  *Id.* § 25-3-110, Official Comment 3.

In the present case, the Note is clearly indorsed "PAY TO THE
ORDER OF Deutsche Bank Trust Company Americas as Trustee."  Thus,
pursuant to section 25-3-110(c)(2), the Note is payable to Deutsche
Bank Trust Company Americas as Trustee.  *See Id.*  Because the
indorsement does not identify Petitioner and is not indorsed in blank
or to bearer, it cannot be competent evidence that Petitioner is the
holder of the Note.  *See* N.C. Gen. Stat. § 25-1-201(b)(21) (defining

-19-

"holder" as "[t]he person in possession of a negotiable instrument that is *payable either to bearer or to an identified person that is the person in possession*"); *Econo-Travel Motor Hotel Corp.*, 301 N.C. at 204, 271 S.E.2d at 57 (concluding that where the defendants produced a copy of the note indorsed to an entity other than the plaintiff, the "defendants established that plaintiff was not the owner or holder of the note").

In addition to the Note and Allonge, Petitioner points to two affidavits provided by two GMAC Mortgage employees as further evidence that the trial court's findings are based on sufficient competent evidence. Again, we disagree.

The first affidavit is an Affidavit of Indebtedness by Jeffrey Stephan ("Stephan").[2]  In his affidavit, Stephan averred, *inter*

---

2 This Court finds troubling that GMAC Mortgage, LLC was recently found to have submitted a false affidavit by Signing Officer Jeffrey Stephan in a motion for summary judgment against a mortgagor in the United States District Court of Maine.  Judge John H. Rich, III concluded that GMAC Mortgage submitted Stephan's false affidavit in bad faith and levied sanctions against GMAC Mortgage, stating:

> [T]he attestation to the Stephan affidavit was not, in fact, true; that is, Stephan did not know personally that all of the facts stated in the affidavit were true. . . . GMAC [Mortgage] was on notice that the conduct at issue here was unacceptable to the courts, which rely on sworn affidavits as admissible evidence in connection with motions for summary judgment.  In 2006, an identical jurat signed under identical circumstances resulted in the imposition of sanctions against GMAC [Mortgage] in Florida.

-20-

*alia*, he was a limited signing officer for GMAC Mortgage, the sub-servicer of Mr. Gilbert's loan, and as such, was "familiar with the books and records of [GMAC Mortgage], specifically payments made pursuant to the Note and Deed of Trust."   Accordingly, Stephan testified as to the principal amount of Mr. Gilbert's loan and to his history of loan payments.   Stephan further testified that after the Note and Deed of Trust were executed they were "delivered" to the original lender, First National Bank of Arizona;   the original lender then "assigned and transferred all of its right, title and interest" to First National Bank of Nevada, which, in turn, assigned all its rights, title, and interest in the instruments to Residential Funding Corporation.   The final assignment to which Stephan averred is an assignment and securitization of the Note and Deed of Trust from Residential Funding Corporation to "Deutsche Bank Trust Company Americas as Trustee."   Stephan then makes the conclusory statement, "Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 is the current owner and holder of the Note and Deed of Trust described herein."

Whether Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 is the owner and holder of the Note and Deed of Trust is a legal conclusion that is

---

*James v. U.S. Bank Nat. Ass'n*, 272 F.R.D. 47, 48 (D. Me. 2011).

-21-

to be determined by a court of law on the basis of factual allegations.
As such, we disregard Stephan's conclusion as to the identity of the
"owner and holder" of the instruments.  *See Lemon v. Combs*, 164 N.C.
App. 615, 622, 596 S.E.2d 344, 349 (2004) ("'Statements in affidavits
as to opinion, belief, or conclusions of law are of no effect.'"
(quoting 3 Am. Jur. 2d, *Affidavits* § 13 (2002))); *see also Speedway
Motorsports Int'l Ltd. v. Bronwen Energy Trading, Ltd.*, __ N.C. App.
__, __ n.2, __ S.E.2d __, __ n.2, slip op. at 12 n.2, No. 09-1451
(Feb. 15, 2011) (rejecting a party's contention that this Court must
accept as true all statements found in the affidavits in the record,
stating, "our standard of review does not require that we accept a
witness' characterization of what 'the facts' mean").  While Stephan
referred to a Pooling and Servicing Agreement ("PSA") that allegedly
governs the securitization of the Note to Deutsche Bank Trust Company
Americas as Trustee, the PSA was not included in the record and will
not be considered by this Court.  *See* N.C. R. App. P. 9(a) (2011)
("In appeals from the trial division of the General Court of Justice,
review is solely upon the record on appeal, the verbatim transcript
of proceedings, if one is designated, and any other items filed
pursuant to this Rule 9.")  The record is void of any evidence the
Note was assigned and securitized to a trust.

    We also note that Stephan alleged no facts as to who possesses
Mr. Gilbert's note, other than his averment that the Note was

-22-

"delivered" to the original lender, First National Bank of Arizona.
Stephan referred to a statement made by counsel for GMAC Mortgage
that the original Note "would be brought to the foreclosure hearing,"
but he did not provide any facts from which the trial court could
determine who has possession of the Note.   As demonstrated by
*Connolly*, discussed above, production of a note at trial is not
conclusive evidence of possession.   63 N.C. App. at 551, 306 S.E.2d
at 125.   Thus, we conclude Stephan's affidavit is not competent
evidence to support the trial court's conclusion that Deutsche Bank
Trust Company Americas as Trustee for Residential Accredit Loans,
Inc. Series 2006-QA6 is the owner and holder of Mr. Gilbert's note.

Petitioner also provided the affidavit of Scott Zeitz
("Zeitz"), who alleged in his affidavit to be a litigation analyst
for GMAC Mortgage.   Zeitz's basis for his affidavit testimony is that
he works with "the documents that relate to account histories and
account balances of particular loans" and that he is familiar with
Mr. Gilbert's account.   Accordingly, Zeitz testified to the details
of Mr. Gilbert's loan and the terms of the Note.   Zeitz's affidavit,
substantially similar to the affidavit of Jeffrey Stephan, also
averred to the transfer of the Note and Deed of Trust through the
series of entities indicated on the Allonge, stating in part:

> Residential Funding Corporation sold, assigned
> and transferred all of its right, title and
> interest in and to the Note and Deed of Trust

-23-

> to Deutsche Bank Trust Company Americas as
> Trustee for Residential Accredit Loans, Inc.
> Series 2006-QA6. *This is reflected on the*
> *Allonge to the Note, a true and accurate copy*
> *of which is attached* and incorporated hereto as
> EXHIBIT 5. (Emphasis added.)

This statement is factually incorrect; the Allonge in the record
contains no indorsement to Deutsche Bank Trust Company Americas as
Trustee for Residential Accredit Loans, Inc. Series 2006-QA6. Zeitz
further stated that "Deutsche Bank Trust Company Americas as Trustee
for Residential Accredit Loans, Inc. Series 2006-QA6 is the current
owner and holder of the Note and Deed of Trust." This statement is
a legal conclusion postured as an allegation of fact and as such will
not be considered by this Court. *See Lemon*, 164 N.C. App. at 622,
596 S.E.2d at 349.

Unlike Jeffrey Stephan, Zeitz stated that Deutsche Bank Trust
Company Americas as Trustee for Residential Accredit Loans, Inc.
Series 2006-QA6 "has possession of the original Note and Deed of
Trust." We note, however, that "[w]hen an affiant makes a conclusion
of fact, it must appear that the affiant had an opportunity to observe
and did observe matters about which he or she testifies." *Lemon*,
164 N.C. App. at 622, 596 S.E.2d at 348-49 (quoting 3 Am. Jur. 2d
*Affidavits* § 13) (internal quotation marks omitted). Moreover,

> [t]he personal knowledge of facts asserted in
> an affidavit is not presumed from a mere
> positive averment of facts but rather the court
> should be shown how the affiant knew or could

-24-

> have known such facts and if there is no evidence
> from which an inference of personal knowledge
> can be drawn, then it is presumed that such does
> not exist.

*Id.* at 622-23, 596 S.E.2d at 349 (quoting 3 Am. Jur. 2d *Affidavits*
§ 14, *cited with approval in Currituck Associates Residential P'ship
v. Hollowell*, 170 N.C. App. 399, 403-04, 612 S.E.2d 386, 389 (2005)).
Thus, while Zeitz concluded as fact that Deutsche Bank Trust Company
Americas as Trustee for Residential Accredit Loans, Inc. Series
2006-QA6 has possession of the Note, his affidavit provides no basis
upon which we can conclude he had personal knowledge of this alleged
fact. Because of these deficiencies, we conclude that neither the
affidavit of Jeffrey Stephan nor the affidavit of Scott Zeitz is
competent evidence to support the trial court's finding that Deutsche
Bank Trust Company Americas as Trustee for Residential Accredit
Loans, Inc. Series 2006-QA6 is the owner and holder of Mr. Gilbert's
note.

### III. Conclusion

We conclude the record is lacking of competent evidence
sufficient to support that Petitioner is the owner and holder of Mr.
Gilbert's note and deed of trust. The trial court erred in
permitting the Substitute Trustee to proceed with foreclosure
proceedings and its order is

-25-

Reversed.

Judges MCGEE and BEASLEY concur.

# Exhibit D

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

| | |
|---|---|
| REX T. GILBERT, JR.; DANIELA L. GILBERT, *Plaintiffs-Appellants,* v. RESIDENTIAL FUNDING LLC; GMAC MORTGAGE LLC; DEUTSCHE BANK TRUST COMPANY AMERICAS, as Trustee for Residential Accredit Loans, Incorporated, *Defendants-Appellees,* and DAVID A. SIMPSON, Substitute Trustee, *Trustee.* | No. 10-2295 |

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Dever III, District Judge.
(4:09-cv-00181-D)

Argued: January 24, 2012

Decided: May 3, 2012

Before TRAXLER, Chief Judge, FLOYD, Circuit Judge,
and J. Michelle CHILDS, United States District Judge for
the District of South Carolina, sitting by designation.

2          GILBERT v. RESIDENTIAL FUNDING LLC

Affirmed in part, reversed in part, and remanded by published opinion. Judge Floyd wrote the opinion, in which Chief Judge Traxler and Judge Childs joined.

---

**COUNSEL**

**ARGUED:** Katherine Suzanne Parker-Lowe, Ocracoke, North Carolina, for Appellants. Marc James Ayers, BRADLEY ARANT BOULT CUMMINGS, LLP, Birmingham, Alabama, for Appellees. **ON BRIEF:** Nicholas J. Voelker, BRADLEY ARANT BOULT CUMMINGS, LLP, Charlotte, North Carolina, Jonathan M. Hooks, BRADLEY ARANT BOULT CUMMINGS, LLP, Birmingham, Alabama, for Appellees.

---

**OPINION**

FLOYD, Circuit Judge:

Rex and Daniela Gilbert appeal the district court's dismissal of their claim that Deutsche Bank Trust Company Americas (Deutsche), as trustee for Residential Accredit Loans, Inc. (RAL); David A. Simpson (Simpson), substitute trustee; Residential Funding LLC (RFL); and GMAC Mortgage LLC (GMAC) violated various consumer protection laws in connection with a mortgage the Gilberts secured on their home, located at 134 West End Road, Ocracoke, North Carolina (the subject property). Specifically, the Gilberts allege that they are entitled to relief on account of violations of the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601-1667(f), and its implementing regulation, Regulation Z, 12 C.F.R. § 1026 (previously codified at 12 C.F.R. § 226); North Carolina usury law, N.C. Gen. Stat. § 24; the North Carolina Unfair and Deceptive Trade Practices Act (NCUDTPA), *id.* § 75-1.1; and North Carolina's Prohibited Acts by Debt Col-

lectors statute, *id.* § 75-50. The Gilberts also claim a breach of contract and that Deutsche lacks the authority to enforce the loan.

Appellees filed a motion to dismiss, which the district court granted. The Gilberts timely appealed. For the reasons that follow, we affirm in part, reverse in part and remand for further proceedings.

I.

We review the district court's decision granting a motion to dismiss de novo, and we view the facts in the light most favorable to the non-prevailing party. *See Chaudhry v. Mobil Oil Corp.*, 186 F.3d 502, 504 (4th Cir. 1999).

On May 5, 2006, Rex Gilbert executed an adjustable rate note with First National Arizona to refinance the existing lien on the subject property. Pursuant to the terms of the note, Mr. Gilbert agreed to pay a principal amount of $525,000, plus interest to the bank. The Gilberts executed a deed of trust on the subject property to secure the note. As a part of the transaction, First National Arizona provided several disclosures, including a "Truth in Lending Disclosure Statement," a "Notice of Right to Cancel," a "Variable Rate Mortgage Program Disclosure," a "HUD-1 Settlement Statement," and a "First Payment Letter."

Thereafter, according to the district court, First National Arizona transferred its interest in the Gilberts' mortgage to First National Bank of Nevada, First National Bank of Nevada transferred its interest in the mortgage to RFL, and RFL sold its interest to Deutsche, as the trustee for RAL. *Gilbert v. Deutsche Bank Trust Co. Ams.*, No. 09-CV-181-D, 2010 WL 2696763, at *1 (E.D.N.C. July 7, 2010). Thus, the district court stated, Deutsche, as the trustee for RAL, currently owns and holds the note and deed of trust on the subject

4          G<small>ILBERT</small> v. R<small>ESIDENTIAL</small> F<small>UNDING</small> LLC

property. *Id.* RFC is the master servicer and GMAC is the subservicer. *Id.* at *2.

The Gilberts defaulted on the loan in 2008. Subsequently, Deutsche chose Simpson as the substitute trustee of the deed of trust. *Id.* On March 12, 2009, Simpson filed a foreclosure action against the Gilberts in the Hyde County Superior Court.

The Gilberts' counsel wrote a letter to GMAC dated April 5, 2009, in which she alleged several violations of TILA, provided notice that the Gilberts were rescinding their mortgage transaction, and requested that GMAC cancel its security interest in the subject property and return all consideration paid by the Gilberts. In a letter dated April 14, 2009, counsel for GMAC responded that GMAC had reviewed the Gilberts' file and found "no basis to conclude that there were any material disclosure errors that would give rise to an extended right of rescission." As such, counsel for GMAC stated that they would not rescind the transaction.

On June 2, 2009, the Clerk of the Hyde County Superior Court conducted a foreclosure hearing, after which she entered a June 17, 2009, order allowing Simpson to proceed with the foreclosure. According to the order, the Clerk found that Deutsche was the holder of the subject note and deed of trust and that the note evidenced a valid debt. The Gilberts appealed to the Hyde County Superior Court.

Following a de novo hearing on the matter on August 18, 2009, the superior court allowed the foreclosure proceeding to go forward. In doing so, the court relied in part on an affidavit signed by Jeffrey Stephan, a signing officer for GMAC, certifying the validity of the indebtedness pursuant to the note as well as Deutsche's status as the current owner and holder of the note. The Gilberts appealed that decision to the North Carolina Court of Appeals.

On September 14, 2009, while their appeal was pending, the Gilberts filed suit in the Hyde County Superior Court against Appellees seeking, among other things, to enjoin the mortgage foreclosure sale and to rescind their May 5, 2006, loan. They alleged violations of TILA by Appellees. The Gilberts also claimed that Appellees violated North Carolina usury law, engaged in unfair and deceptive trade practices, engaged in prohibited debt collection acts, and breached the mortgage contract. The Gilberts further maintained that Deutsche was without authority to enforce the note because of a defect in the allonge, which granted Deutsche an interest in the note.

Appellees removed the Gilberts' suit to the district court and subsequently filed a motion to dismiss the complaint, which the district court granted. This appeal, in which the Gilberts contest the district court's dismissal of their TILA, usury, and NCUDTPA claims, followed. They also assign error to the district court's determination that res judicata barred them from raising claims related to the endorsement on the allonge to the note, as well as the district court's denial of their motion to alter or amend the judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure.

After becoming aware that Stephan had engaged in improper affidavit practices in unrelated cases, the Gilberts filed with the district court a motion for relief pursuant to Rule 60(b) of the Federal Rules of Civil Procedure and Rule 12.1 of the Federal Rules of Appellate Procedure. In light of this new evidence, they requested that the district court file an order indicating whether it would be inclined to relieve them of its prior order dismissing their claims and its denial of their Rule 59(e) motion.

On May 3, 2011, the North Carolina Court of Appeals reversed the superior court's decision to allow Simpson to proceed with a foreclosure sale, finding that "the record is lacking of competent evidence sufficient to support that

[Deutsche] is the owner and holder of Mr. Gilbert's note and deed of trust." *In re Simpson*, 711 S.E.2d 165, 175 (N.C. Ct. App. 2011). The court was also troubled by the fact "that [GMAC] was recently found to have submitted a false affidavit by Signing Officer Jeffrey Stephan in a motion for summary judgment against a mortgagor in the United States District Court of Maine." *Id.* at 173 n.2. The Gilberts subsequently supplemented their Rule 60(b) motion with a copy of the *Simpson* opinion.

On June 15, 2011, the district court filed an order stating that "should the Fourth Circuit return jurisdiction to this court, the court would grant the [Rule 60(b)] motion, dismiss the federal claims for the reasons stated in the July 7, 2010[,] order [dismissing all of the Gilberts' claims], and remand all state-law claims to Hyde County Superior Court." *Gilbert v. Deutsche Bank Trust Co. Ams.*, No. 4:09-CV-181-D (E.D.N.C. June 15, 2011). In light of this order, the Gilberts filed a motion with us to reverse and remand the case to the district court. We denied the motion. Accordingly, we now undertake a de novo review of each of the Gilberts' assignments of error. *See Chaudhry*, 186 F.3d at 504.

## II.

### A.

The Gilberts first argue that the district court erred in dismissing their TILA claim on the basis that they had failed to exercise their extended right to rescind in a timely manner.

In adopting TILA, Congress declared that "[i]t is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a). As such, TILA requires that a creditor make certain material disclosures at the time the loan is made. *Id.* § 1638(a). If the

GILBERT v. RESIDENTIAL FUNDING LLC        7

creditor fails to comply with this mandate, the borrower has the right to rescind up to three years after the transaction. *Id.* § 1635(f).

The Gilberts closed the loan with First National Arizona on May 5, 2006, but they did not file the instant lawsuit until September 14, 2009. They notified GMAC by letter, however, that they were exercising their right to rescind in April 2009. So, although the Gilberts did not file this lawsuit within three years of closing the loan, they did notify GMAC that they were exercising their right to rescind during that three-year time period.

There is a split of authority as to whether the borrower must file a lawsuit within three years after the consummation of a loan transaction to exercise her right to rescind, or whether the borrower need only assert the right to rescind through a written notice within the three-year period. For example, in *McOmie-Gray v. Bank of America Home Loans*, 667 F.3d 1325 (9th Cir. 2012)**,** the Ninth Circuit held that "rescission suits must be brought within three years from the consummation of the loan, regardless [of] whether notice of rescission is delivered within that three-year period." *Id.* at 1328. But, in *In re Hunter*, 400 B.R. 651 (Bankr. N.D. Ill. 2009), the bankruptcy court held that "TILA gives a consumer the right to rescind a credit transaction simply by notifying the creditor, within a specific period of time, that she intends to do so." *Id.* at 659.

The district court cited *American Mortgage Network, Inc. v. Shelton*, 486 F.3d 815 (4th Cir. 2007), for the proposition that the Gilberts were required to file suit to exercise their right of rescission. Thus, in that the Gilberts failed to file suit until after the three years passed, the district court dismissed their rescission claim. As explained below, however, we are convinced that the Gilberts exercised their right to rescind when they sent their April 5, 2009, letter to GMAC, alleging several violations of TILA and Regulation Z, and providing

8          GILBERT v. RESIDENTIAL FUNDING LLC

notice of their rescission of the mortgage transaction. More-
over, we do not think that our prior decision in *Shelton* com-
pels a contrary conclusion. Further, we disagree with the
Ninth Circuit that a borrower must file a lawsuit within the
three-year time period to exercise her right to rescind, as
opposed simply to notifying the creditor.

We begin, as we must, with the plain meaning of the stat-
ute. "The starting point for any issue of statutory interpreta-
tion . . . is the language of the statute itself." *United States v.
Bly*, 510 F.3d 453, 460 (4th Cir. 2007). "We have stated time
and again that courts must presume that a legislature says in
a statute what it means and means in a statute what it says
there. When the words of a statute are unambiguous, then, this
first canon is also the last: 'judicial inquiry is complete.'"
*Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)
(citations omitted) (quoting *Rubin v. United States*, 449 U.S.
424, 430 (1981)).

In the same way, our interpretation of regulations begins
with their text. *Textron, Inc. v. Comm'r*, 336 F.3d 26, 31 (1st
Cir. 2003). "The Supreme Court has repeatedly emphasized
the importance of the plain meaning rule, stating that if the
language of a statute or regulation has a plain and ordinary
meaning, courts need look no further and should apply the
regulation as it is written." *Id.* In most cases, a textual reading
will be dispositive. *United States v. Ron Pair Enters., Inc.*,
489 U.S. 235, 242 (1989). Furthermore, "absent some obvious
repugnance to the statute, the . . . regulation implementing
[TILA] should be accepted by the courts." *Anderson Bros.
Ford v. Valencia*, 452 U.S. 205, 219 (1981).

Here, we are primarily concerned with just one statute and
one regulation. Section 1635(f) provides, in relevant part, the
following:

> An obligor's right of rescission shall expire three
> years after the date of consummation of the transac-

tion or upon the sale of the property, whichever occurs first, notwithstanding the fact that the information and forms required under this section or any other disclosures required under this part have not been delivered to the obligor . . . .

15 U.S.C. § 1635(f). Its implementing regulation, Regulation Z, states as follows:

To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.

12 C.F.R. § 1026.23(a)(2). Taking the plain meaning of these texts, and assuming that the words say what they mean and mean what they say, we come to the conclusion that the Gilberts exercised their right to rescind with the April 5, 2009, letter. Simply stated, neither 15 U.S.C. § 1635(f) nor Regulation Z says anything about the filing of a lawsuit, and we refuse to graft such a requirement upon them.

But what about the *Shelton* case that the district court relied upon in reaching a different conclusion? There, the creditor filed an action seeking a declaratory judgment that the processing of the borrowers' home refinancing loan complied with TILA. 486 F.3d at 817. The borrowers counterclaimed, requesting damages for violations of TILA. *Id.* They also sought rescission and a declaration by the district court that the defendant had forfeited the loan principal pursuant to TILA. *Id.*

We stated that the "unilateral notification of cancellation does not automatically void the loan contract." *Id.* at 821. "[O]therwise, a borrower could get out from under a secured

10          GILBERT v. RESIDENTIAL FUNDING LLC

loan simply by claiming TILA violations, whether or not the
lender had actually committed any." *Id.* (quoting *Yamamoto
v. Bank of N.Y.*, 329 F.3d 1167, 1172 (9th Cir. 2003)) (internal
quotation marks omitted).

    We must not conflate the issue of whether a borrower has
exercised her right to rescind with the issue of whether the
rescission has, in fact, been completed and the contract
voided. The former is the concern of § 1635(f) and Regulation
Z, and a borrower exercises her right of rescission by merely
communicating in writing to her creditor her intention to
rescind. To complete the rescission and void the contract,
however, more is required. Either the creditor must "acknowl-
edge[ ] that the right of rescission is available" and the parties
must unwind the transaction amongst themselves, or the bor-
rower must file a lawsuit so that the court may enforce the
right to rescind. *Shelton*, 486 F.3d at 821 (quoting *Large v.
Conseco Fin. Servicing Corp.*, 292 F.3d 49, 54-55 (1st Cir.
2002)) (internal quotation marks omitted).

    At this stage of the litigation, we are not concerned with
whether the contract has been effectively voided. A court
must make a determination on the merits as to whether that
should occur. Instead, the question presented here is whether
the Gilberts exercised their right to rescind with the April 5,
2009, letter. Based on the plain meaning of the applicable
statute and regulation, we answer that question in the affirma-
tive.

    Appellees' reliance on *Beach v. Ocwen Federal Bank*, 523
U.S. 410 (1998), is misplaced. The *Beach* Court did not
address the proper method of exercising a right to rescind or
the timely exercise of that right. Instead, in *Beach*, the Court
looked at "whether § 1635(f) is a statute of limitation, that is,
'whether [it] operates, with the lapse of time, to extinguish the
right which is the foundation for the claim' or 'merely to bar
the remedy for its enforcement.'" *Id.* at 416 (alteration in orig-

inal) (quoting *Midstate Horticultural Co. v. Pa. R.R. Co.*, 320 U.S. 356, 358-59 (1943)). The Court stated the following:

> Section 1635(f), however, takes us beyond any question whether it limits more than the time for bringing a suit, by governing the life of the underlying right as well. . . . It talks not of a suit's commencement but of a right's duration, which it addresses in terms so straightforward as to render any limitation on the time for seeking a remedy superfluous.

*Id.* at 417. In other words, the three-year limitation in 15 U.S.C. § 1635 concerns the extinguishment of the right of rescission and does not require borrowers to file a claim for the invocation of that right. Thus, that the Gilberts failed to seek enforcement of their right to rescind within the three years does nothing to take away from the fact that they exercised their right of rescission within that time period.

## B.

Next, the Gilberts argue that the district court's decision to dismiss their claim for rescission on the basis that Appellees are assignees and not creditors was improper. Appellees do not appear to disagree.

Section 1641(c) states, "Any consumer who has the right to rescind a transaction under section 1635 of this title may rescind the transaction as against any assignee of the obligation." 15 U.S.C. § 1641(c). The district court's holding to the contrary is reversible error.

## C.

According to the Gilberts, the district court also erred in deciding that all of their money damages under TILA are barred by the one-year statute of limitations. We agree.

Section 1640(e) provides a one-year statute of limitations for the filing of a suit once a violation of TILA has occurred. *Id.* ("Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation."). The alleged TILA disclosure violations occurred on May 5, 2006, but the Gilberts did not file suit until September 14, 2009. Thus, the statute of limitations for those violations has long past and the district court was correct in dismissing those claims.

But, it appears that the Gilberts' TILA claim regarding Appellees' refusal to honor their right to rescind was timely filed. The Gilberts sent a letter to GMAC pursuant to 15 U.S.C. § 1635(f) and Regulation Z on April 5, 2009, indicating that they were exercising their right to rescind the mortgage loan. The creditor then had twenty days to respond. *Id.* § 1635(b). The alleged violation of TILA occurred when GMAC sent the April 14, 2009, letter indicating that it would not rescind the loan transaction. To maintain an action for damages pursuant to TILA**,** the action had to be filed "within one year from the date of the occurrence of the violation." *Id.* § 1640(e). Inasmuch as the Gilberts filed this lawsuit on September 14, 2009, their TILA claim for damages for GMAC's refusal to honor their right to rescind is not time barred.

III.

Next, the Gilberts challenge the district court's dismissal of their usury claim. Appellees make two arguments as to why the district court did not err. We are convinced by neither.

First, Appellees urge that the Gilberts' usury claim is not ripe for adjudication. According to Appellees, to the extent that the Gilberts might be subject to pay usurious interest, given the manner in which the payment schedule is configured, they have not yet been required to pay the alleged usurious interest rate. The Gilberts counter that because the

payments that they made were interest only, they were paying usurious interest with each payment. As such, according to the Gilberts, their claim is ripe. Construing the Gilberts' allegations as true, as we must at this stage, we accept that this claim is ripe for adjudication.

Second, Appellees maintain that the Gilberts failed to plead a usury claim. According to Appellees, parties have the right to pay any interest rate to which they agree. Therefore, claim Appellees, "to survive a motion to dismiss, the Gilberts would have to allege that they never agreed to the interest rates imposed by the loan documents. On this they are silent." We disagree.

In their complaint, the Gilberts allege that Appellees "charged and collected interest in excess of the agreed rate or limits set forth in Chapter 24 of the North Carolina General Statutes, including without limitation, the charge, collection and imposition of hidden finance charges contained in the erroneous payment schedule set forth in the Truth in [L]ending disclosure statement."

The elements of a usury claim are as follows:

> a loan or forbearance of the collection of money, an understanding that the money owed will be paid, payment or an agreement to pay interest at a rate greater than allowed by law, and the lender's corrupt intent to receive more in interest than the legal rate permits for use of the money loaned.

*Swindell v. Fed. Nat'l Mortg. Ass'n*, 409 S.E.2d 892, 895 (N.C. 1991). "Where the lender intentionally charges the borrower a greater rate of interest than the law allows and his purpose is clearly revealed on the face of the instrument, a corrupt intent to violate the usury law on the part of the lender is shown." *Id.* at 895–96 (quoting *Kessing v. Nat'l Mortg.*

14      GILBERT v. RESIDENTIAL FUNDING LLC

*Corp.*, 180 S.E.2d 823, 827 (1971)) (internal quotation marks omitted).

No one disputes that the Gilberts have established the first two elements. We hold that the Gilberts have adequately pled elements three and four as well. Specifically, the Gilberts contend that there was a loan that was to be repaid; pursuant to the terms of the loan, they were charged an agreed upon or stated interest rate; under the repayment schedule for the loan, they were charged a higher interest rate than agreed upon or allowed by Chapter 24 of the North Carolina General Statutes; when they paid a higher interest rate, Appellees collected more than the agreed upon or allowed interest rate; and Appellees charged the higher rate with a corrupt intent. Consequently, they have properly pled a usury claim pursuant to *Swindell*.

Although not argued by the parties or referenced below, on remand, the district court should consider whether North Carolina General Statute Section 24-1.1A(a)(1) ("Where the principal amount is ten thousand dollars ($10,000) or more the parties may contract for the payment of interest as agreed upon by the parties . . . ."), Section 24-9(a)(3) ("'Exempt loan' means a loan in which . . . [t]he loan amount is three hundred thousand ($300,000) or more . . . ."), and Section 24-9(b) ("A claim or defense of usury is prohibited in an exempt loan transaction.") are applicable.

IV.

The Gilberts also urge that the district court erred in granting Appellees' Rule 12(b)(6) motion as to their NCUDTPA cause of action. To establish a prima facie case of unfair and deceptive trade practices, a plaintiff must demonstrate the following: (1) the defendant committed an unfair or deceptive trade practice; (2) the action in question was in or affecting commerce; and (3) the act proximately caused injury to the plaintiff. *Spartan Leasing v. Pollard*, 400 S.E.2d 476, 482

(N.C. Ct. App. 1991). An act is unfair when it is unethical or unscrupulous, and it is deceptive if it tends to deceive. *Marshall v. Miller*, 276 S.E.2d 397, 403 (N.C. 1981).

In their allegations concerning their NCUDTPA claims, the Gilberts make the following complaints: usury law violations, TILA violations, and "falsely representing to be the owner and holder of [the Gilberts'] note and deed of trust." Thus, they argue the following:

> These acts and omissions proximately damaged plaintiffs, are in and affecting commerce, violate public policy, have the capacity to deceive an ordinary consumer, are unscrupulous, immoral, and oppressive, and constitute unfair and/or deceptive trade practices under [North Carolina General Statute] § 75-1.1, thereby entitling plaintiffs to three times their actual damages plus a reasonable attorney's fee pursuant to [North Carolina General Statute] §§ 75-16 and 75-16.1.

Some of the Gilberts' allegations concern the actions of the Appellees, and some concern the actions of the original creditor, who is not party to this lawsuit. And, although some claims in this lawsuit can be assigned, "unfair practice claims pursuant to . . . § 75-1.1 cannot be assigned," *Investors Title Ins. Co. v. Herzig*, 413 S.E.2d 268, 271 (N.C. 1992). Thus, the district court properly dismissed those portions of the claims. "[A] violation of a consumer protection statute may, in some instances, constitute a *per se* violation of the UDTPA[,]" however. *In re Fifth Third Bank, Nat'l Ass'n-Vill. of Penland Litig.*, 719 S.E.2d 171, 176 (N.C. Ct. App. 2011). Inasmuch as we have held that certain of the Gilberts' TILA and usury claims should go forward, and because we are of the opinion that the Gilberts have set forth a sufficient factual basis for these claims, we hold that their unassigned NCUDTPA claims should be allowed to proceed as well.

16          GILBERT v. RESIDENTIAL FUNDING LLC

V.

The Gilberts also contest the district court's determination
that res judicata barred them from raising issues related to the
endorsements on the allonge to the note.

As the district court recognized, "[i]ssues that 'the clerk of
court decides at a foreclosure hearing as to the validity of the
debt and the trustee's right to foreclose are subject to res judi-
cata and cannot be relitigated.'" *Gilbert*, 2010 WL 2696763,
at *4 (quoting *Merrill Lynch Bus. Fin. Servs. Inc. v. Cobb*,
No. 5:07-CV-129-D, 2008 WL 6155804, at *3 (E.D.N.C.
Mar. 18, 2008)). Because the superior court affirmed the
Clerk's decision that Deutsche could enforce the note, the dis-
trict court concluded that res judicata barred the Gilberts from
relitigating Deutsche's enforcement authority. *Id.*

But, as noted above, on May 3, 2011, the North Carolina
Court of Appeals reversed the state trial court's decision that
allowed Simpson to proceed with a foreclosure sale, finding
that "the record is lacking of competent evidence sufficient to
support that [Deutsche] is the owner and holder of Mr. Gil-
bert's note and deed of trust." *In re Simpson*, 711 S.E.2d at
175. As such, res judicata no longer bars the Gilberts from lit-
igating whether Deutsche has authority to enforce the note.

VI.

Finally, the Gilberts complain that the district court erred
in denying their motion to alter or amend pursuant to Rule
59(e). Because we are reversing and remanding this case to
the district court, the argument is moot.

VII.

In light of the foregoing, we affirm in part, reverse in part
and remand for further proceedings.

GILBERT v. RESIDENTIAL FUNDING LLC          17

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*

**Exhibit E**

LOAN# ...713
Borrower: Gilbert

ORIGINAL UPB 529000.00
ORIGINAL INTR R: 7.375%
ORIGINAL P&I 3226.56

14-16y-49
RS

## PAYMENT HISTORY

### INTEREST ONLY ARM

| COMMENTS | PMT RCVD | DATE PMT RCVD'D | AMOUNT REMITTED | PMT# FROM | PMT# TO | INT RATE | P&I | INT | PRIN | CUR PRIN | RAI ADJ | UPB | ESCROW | ESCROW | SERV/SECE | SUSPENSE BAL | LATE CHARGE | PROPERTY INSP | PROPERTY INSPECT BAL | CORPORATE ADVANCE | EXPENSE ADVANCE BAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Closing Escrow | 7/7/2006 | | | 1 | 360 | | | | | | | 529000.00 | 436.08 | 872.16 | | | 0 | | 0 | 0 | 0 |
| Transferred to GMACM | | | | | 359 | 7.375% | 3226.56 | 3226.56 | 0.00 | 0.00 | | 529000.00 | 436.08 | 1308.24 | | | 0 | | 0 | 0 | 0 |
| | 8/2/2006 | 8/22/2006 | $3,662.64 | 2 | 358 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | 529000.00 | 436.08 | 1744.32 | | | 0 | | 0 | 0 | 0 |
| | 9/7/2006 | 9/14/2006 | $3,662.65 | 3 | 357 | 7.375% | 3226.56 | 3226.56 | 0.00 | 0.01 | | 529000.00 | 436.08 | 2180.4 | | | 0 | | 0 | 0 | 0 |
| Hyde County Tax Disbursement | | | | | | | | | | | | 529000.00 | -3240.28 | -1061.88 | | | 0 | | 0 | 0 | 0 |
| | 10/1/2006 | 10/14/2006 | $3,662.64 | 4 | 356 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | 529000.00 | 436.08 | -632.8 | | | 0 | | 0 | 0 | 0 |
| | 11/1/2006 | 11/13/2006 | $3,662.64 | 5 | 355 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | 529000.00 | 436.08 | -196.72 | | | 0 | | 0 | 0 | 0 |
| | 12/1/2006 | 12/14/2006 | $3,662.64 | 6 | 354 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | 529000.00 | 436.08 | 239.36 | | | 0 | | 0 | 0 | 0 |
| Hazard Insurance Disbursement | | | | | | | | | | | | 529000.00 | -406 | -166.64 | | | 0 | | 0 | 0 | 0 |
| | 1/1/2007 | 1/16/2007 | $3,662.64 | 7 | 353 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | 529000.00 | 436.08 | 269.44 | | | 0 | | 0 | 0 | 0 |
| Hazard Insurance Disbursement | | 2/9/2007 | $1,991.00 | | | | | | | | | 529000.00 | -2215 | -2043.56 | | | 0 | | 0 | 0 | 0 |
| Hazard Insurance Disbursement | | 2/13/2007 | | | | | | | | | | 529000.00 | -2224 | -4269.56 | | | 0 | | 0 | 0 | 0 |
| Escrow Deposit | | | | | | | | | | | | 529000.00 | 1691 | -3178.56 | | | 0 | | 0 | 0 | 0 |
| | 2/1/2007 | 3/12/2007 | $3,662.64 | 8 | 352 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | 524999.99 | 436.08 | -2742.48 | | | 0 | | 0 | 0 | 0 |
| | 3/12/2007 | 3/12/2007 | $3,662.64 | 9 | 351 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | 524999.99 | 436.08 | -2306.4 | | | 0 | | 0 | 0 | 0 |
| | 4/1/2007 | 4/12/2007 | $3,662.64 | 10 | 350 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | 524999.99 | 436.08 | -1870.32 | | | 0 | | 0 | 0 | 0 |
| Funds not enough to apply towards payment, funds placed in suspense | | 5/14/2007 | $3,662.64 | | | | | | | | | 524999.99 | | -1870.32 | 3662.64 | 3662.64 | 0 | | 0 | 0 | 0 |
| Late Charge Assessed on the 05/01/07 payment | | | | | | | | | | | | 524999.99 | | -1870.32 | 3662.64 | | -129.06 | -129 | | 0 | 0 | 0 |
| Funds taken out of suspense and applied towards the 05/01/07 payment | 5/1/2007 | 6/22/2007 | $3,662.55 | 11 | 349 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | 524999.99 | 994.44 | -1870.32 | -687.5 | 2975.14 | 129.06 | -129 | | 0 | 0 |
| Late Charge Assessed on the 06/01/07 payment | | | | | | | | | | | | 524999.99 | | -875.88 | | 2975.14 | 129.06 | -129 | | 0 | 0 |
| Funds taken out of suspense and applied towards the 06/01/07 payment | 6/1/2007 | 7/20/2007 | $3,662.56 | 12 | 348 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | 524999.99 | 994.44 | -875.88 | -558.44 | 2416.7 | -129 | | 0 | 0 | 0 |
| Property Inspection Fee Assessed | | | | | | | | | | | | 524999.99 | | 118.56 | | 2416.7 | -129 | | 0 | 0 | 0 |
| Late Charge Assessed on the 07/01/07 payment | | | | | | | | | | | | 524999.99 | | 118.56 | | 2416.7 | -129 | -11.25 | -11.3 | 0 | 0 |
| Funds taken out of suspense and applied towards the 07/01/07 payment | 7/1/2007 | 8/27/2007 | $3,662.56 | 13 | 347 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | 524999.99 | 994.44 | 118.56 | -558.44 | 1858.26 | -258 | | -11.3 | 0 | 0 |
| Late Charge Assessed on the 08/01/07 payment | | | | | | | | | | | | 524999.99 | | 118.56 | | 1858.26 | -258 | | -11.3 | 0 | 0 |
| Funds taken out of suspense and applied towards the 08/01/07 payment | 8/1/2007 | 9/21/2007 | $3,662.56 | 14 | 346 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | 524999.99 | 994.44 | 1113 | -558.44 | 1853.26 | -129.06 | -387 | | -11.3 | 0 | 0 |
| Late Charge Assessed on the 09/01/07 payment | | | | | | | | | | | | 524999.99 | | 2107.44 | | 1299.82 | -387 | | -11.3 | 0 | 0 |
| Funds taken out of suspense and applied towards the 09/01/07 payment | 9/1/2007 | 10/26/2007 | $3,662.56 | 15 | 345 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | 524999.99 | 994.44 | 2107.44 | -558.44 | 741.38 | -516 | | -11.3 | 0 | 0 |
| Hyde County Tax Disbursement | | | | | | | | | | | | 524999.99 | -3399.28 | 3101.88 | | 741.38 | -516 | | -11.3 | 0 | 0 |
| Late Charge Assessed on the 10/01/07 payment | | | | | | | | | | | | 524999.99 | | -297.4 | | 741.38 | -516 | | -11.3 | 0 | 0 |
| Funds taken out of suspense and applied towards the 10/01/07 payment | 10/1/2007 | 11/28/2007 | $3,662.56 | 16 | 344 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | 524999.99 | 994.44 | -297.4 | -558.44 | 182.94 | -645 | | -11.3 | 0 | 0 |
| Funds remitted not enough to post payment applied towards suspense | | 12/24/2007 | $3,500.00 | | | | | | | | | 524999.99 | | 697.04 | 3500 | 3682.94 | -645 | | -11.3 | 0 | 0 |
| Hazard Insurance Disbursement | | | | | | | | | | | | 524999.99 | -466 | 291.04 | | 3682.94 | -645 | | -11.3 | | 0 |
| Hazard Insurance Disbursement | | | | | | | | | | | | 524999.99 | -2846 | -2554.96 | | 3682.94 | -645 | | -11.3 | | 0 |
| Late Charge Assessed on the 11/01/07 and 12/01/07 payments | | | | | | | | | | | | 524999.99 | | -2554.96 | | 3682.94 | -903 | | -11.3 | | 0 |
| Funds taken out of suspense and applied towards the 11/01/07 payment | 11/1/2007 | 1/17/2008 | $518.06 | 17 | 343 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | 524999.99 | 994.44 | -1560.52 | -3662.94 | 0 | -903 | | -11.3 | | 0 |

| Insurance Disbursement | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Property Advance | | | | | | | 524999.99 | -2591.52 | | | 0 | | -903 | | -11.3 | | 0 |
| Late Charges Assessed on the 01/01/08, 02/01/08, 03/01/08 payments | | | | | | | 524999.99 | -2591.52 | | -1051 | -2591.52 | 0 | | -903 | | -11.3 | -.45 |
| Payments made under repayment plan | 12/1/2007 | 4/21/2008 | 18 | 342 | 7.375% | 3226.56 | 3226.56 | 0.00 | | | -2591.52 | -387.18 | -1291 | -11.3 | -45 | | -.45 |
|  | 1/1/2008 | 4/21/2008 | 19 | 341 | 7.375% | 3226.56 | 3226.56 | 0.00 | | 994.44 | -1597.08 | 0 | -1291 | -11.3 | -45 | | -.45 |
|  | 2/1/2008 | 4/21/2008 | 20 | 340 | 7.375% | 3226.56 | 3226.56 | 0.00 | | 994.44 | -602.64 | 0 | -1291 | -11.3 | -45 | | -.45 |
| Funds applied towards suspense under repayment plan | | | | | | | 524999.99 | 391.8 | 994.44 | 391.8 | 0 | -1291 | -11.3 | -45 | | -.45 |
| Expense Advances | | | | | $1,337.00 | | 524999.99 | 391.8 | 1337 | 391.8 | 1337 | -1291 | -11.3 | -45 | | -.45 | -25 |
| Expense Advances | | | | | | | 524999.99 | 391.8 | | 391.8 | 1337 | -1291 | -11.3 | -45 | | -.45 | -550 |
| Expense Advances | | | | | | | 524999.99 | 391.8 | | 391.8 | 1337 | -1291 | -11.3 | -45 | | -.45 | -46.42 |
| Expense Advances | | | | | | | 524999.99 | 391.8 | | 391.8 | 1337 | -1291 | -11.3 | -45 | | -.45 | -17 |
| Expense Advances | | | | | | | 524999.99 | 391.8 | | 391.8 | 1337 | -1291 | -11.3 | -45 | | -.45 | -200 |
| Property Inspection Fee Assessed | | | | | | | 524999.99 | 391.8 | | 391.8 | 1337 | -1291 | -11.3 | -45 | | -.45 |
| Finds under repayment plan applied towards suspense | 3/1/2008 | 5/21/2008 | 21 | 339 | 7.375% | 3226.56 | 3226.56 | 0.00 | 524999.99 | 1061.88 | 670.08 | 1061.88 | 1337 | -1291 | -22.5 | -11.25 | -.45 |
| Property Inspection Fee Assessed | | | | $3120.06 | | | 524999.99 | 1061.88 | | 1061.88 | 1466.06 | 129.06 | -1291 | -33.8 | -11.25 | -.45 |
| Late Charges Assessed on the 04/01/08 and 04/01/08 payments | | | | | | | | | | | | | | | | | |
| Late Charge Assessed on the 04/01/08 payment | 4/1/2008 | 7/9/2008 | 22 | 338 | 7.375% | 3226.56 | 3226.56 | 0.00 | 524999.99 | 1061.88 | 670.08 | 1061.88 | 1466.06 | -258.12 | -1549 | -33.8 | -.45 |
| Extra funds remitted on 07/29/08 are applied towards suspense | | | | $1,594.42 | | | 524999.99 | 1731.96 | | 1731.96 | 1466.06 | -129.06 | -1678 | -33.8 | -.45 |
| Property Inspection Fee Assessed | | | | | | | 524999.99 | 1731.96 | 128.36 | 1731.96 | 1594.42 | | -1678 | -33.8 | -11.25 | -.45 |
| Corporate Advance | | | | | | | 524999.99 | 1731.96 | | 1731.96 | 1594.42 | | -1678 | -45 | | -.45 |
| Expense Advances | | | | | | | 524999.99 | 1731.96 | | 1731.96 | 1594.42 | | -1678 | -45 | -300 | -385 |
| Expense Advances | | | | | | | 524999.99 | 1751.96 | | 1751.96 | 1594.42 | | -1678 | -45 | | -385 | -300 |
| Hyde County Tax Disbursement | | | | | | | 524999.99 | -1367.32 | -3099.28 | -1367.32 | 1594.42 | | -1678 | -45 | | -385 | -200 |
| Hazard Insurance Disbursement | | | | | | | 524999.99 | -1778.32 | -411 | -1778.32 | 1594.42 | | -1678 | -45 | | -385 |
| Hazard Insurance Disbursement | | | | | | | 524999.99 | -1778.32 | | -1778.32 | 1594.42 | | -1678 | -56.3 | -11.25 | -563 |
| Hyde County Tax Disbursement | | | | | | | 524999.99 | -4720.32 | -2942 | -4720.32 | 1594.42 | | -1678 | -56.3 | | -563 |
| Expense Advances | | | | | | | 524999.99 | -4720.32 | | -4720.32 | 1594.42 | | -1678 | -56.3 | | -385 | -100 |
| Hazard Insurance Disbursement | | | | | | | 524999.99 | -5820.32 | -1100 | -5820.32 | 1594.42 | | -1678 | -56.3 | | -385 |
| Corporate Advance | | | | | | | 524999.99 | -5820.32 | | -5820.32 | 1594.42 | | -1678 | -56.3 | | -385 |
| Property Inspection Fee Assessed | | | | | | | 524999.99 | -5820.32 | | -5820.32 | 1594.42 | | -1678 | -56.3 | -43 | -468 |
| Expense Advances | | | | | | | 524999.99 | -5820.32 | | -5820.32 | 1594.42 | | -1678 | -67.5 | -11.25 | -468 |
| Expense Advances | | | | | | | 524999.99 | -5820.32 | | -5820.32 | 1594.42 | | -1678 | -67.5 | | -468 | .75 |
| Expense Advances | | | | | | | 524999.99 | -5820.32 | | -5820.32 | 1594.42 | | -1678 | -67.5 | | -468 | -182 |
| Expense Advances | | | | | | | 524999.99 | -5820.32 | | -5820.32 | 1594.42 | | -1678 | -67.5 | | -468 | -50.59 |
| Property Inspection Fee Assessed | | | | | | | 524999.99 | -5820.32 | | -5820.32 | 1594.42 | | -1678 | -67.5 | | -468 | -17 |
| Property Inspection Fee Assessed | | | | | | | 524999.99 | -5820.32 | | -5820.32 | 1594.42 | | -1678 | -78.8 | -11.25 | -468 |
| Property Inspection Fee Assessed | | | | | | | 524999.99 | -5820.32 | | -5820.32 | 1594.42 | | -1678 | -90 | -11.25 | -468 |
| Property Inspection Fee Assessed | | | | | | | 524999.99 | -5820.32 | | -5820.32 | 1594.42 | | -1678 | -100 | -11.25 | -468 |
|  | | | | | | | 524999.99 | -5820.32 | | -5820.32 | 1594.42 | | -1678 | -101 | | -468 |

| | SUBTOTALS | 70,984.32 | | | 0.00 | 0.01 | 0.00 |
|---|---|---|---|---|---|---|---|
| | TOTALS | 70,984.32 | | | 0.00 | | |
| | TOTAL PRI | 70,984.35 | | | 0.01 | | |

**Exhibit F**

**KATHERINE S. PARKER-LOWE**
**ATTORNEY AT LAW**
**P.O. BOX 730**
**OCRACOKE, NC 27960-0730**

| CLIENT: | | Rex Tyler Gilbert, Jr.<br>Post Office Box 504<br>Ocracoke, NC  27960- | | Client No. 100725<br>Matter No. 2800056 | | | |
|---|---|---|---|---|---|---|---|

| DATE | **CHARGE CODE** | **& SERVICES STATEMENT**<br>from 01/01/2008 to 05/13/2012 | **MINS** | **AMOUNT CHARGED** | | | |
|---|---|---|---|---|---|---|---|
| 8/26/2008 | CWC | Conference with Client | 45 | 112.50 | | | |
| 8/27/2008 | TCC | Telephone Call T/F Client | 10 | 25.00 | | | |
| 9/12/2008 | CWC | Conference with Client | 15 | 37.50 | | | |
| 9/24/2008 | CWC | Conference with Client | 60 | 150.00 | | | |
| 10/2/2008 | RAR | Received and Reviewed | 6 | 15.00 | | | |
| 10/3/2008 | EMA | Email | 10 | 25.00 | | | |
| 10/7/2008 | RES | Legal Research | 120 | 300.00 | | | |
| 10/14/2008 | FAX | EXPENSE-FAX | 2 | 4.50 | | | |
| 10/14/2008 | LTC | Local Telephone Call | 25 | 62.50 | | | |
| 10/14/2008 | LTC | Local Telephone Call | 10 | 25.00 | | | |
| 10/14/2008 | TCC | Telephone Call T/F Client | 6 | 15.00 | | | |
| 10/20/2008 | LTC | Local Telephone Call | 120 | 300.00 | | | |
| 11/2/2008 | LTT | Draft/Revise Letter | 30 | 75.00 | | | |
| 12/1/2008 | PAY | Payment | 1 | 1,072.00 | | | |
| 1/9/2009 | LTT | Draft/Revise Letter | 45 | 112.50 | | | |
| 1/9/2009 | LTC | Local Telephone Call | 6 | 15.00 | | | |
| 1/9/2009 | EMA | Email | 20 | 50.00 | | | |
| 1/10/2009 | EMA | Email | 15 | 37.50 | | | |
| 1/12/2009 | FAX | EXPENSE-FAX | 2 | 5.20 | | | |
| 2/2/2009 | LTT | Draft/Revise Letter | 6 | 15.00 | | | |
| 2/2/2009 | POS | EXPENSE-Postage | 1 | 0.42 | | | |
| 2/10/2009 | LTT | Draft/Revise Letter | 30 | 75.00 | | | |
| 2/10/2009 | WKO | Work On | 20 | 50.00 | | | |
| 3/5/2009 | EMA | Email | 6 | 15.00 | | | |
| 3/11/2009 | EMA | Email | 15 | 37.50 | | | |
| 3/24/2009 | REF | Reviewed File | 50 | 125.00 | | | |
| 3/24/2009 | LTT | Draft/Revise Letter | 45 | 112.50 | | | |
| 4/3/2009 | CWC | Conference with Client | 120 | 300.00 | | | |
| 4/3/2009 | PAY | Payment | 1 | 400.00 | | | |
| 4/5/2009 | LTT | Draft/Revise Letter | 240 | 600.00 | | | |
| 4/5/2009 | FAX | EXPENSE-FAX | 12 | 31.20 | | | |
| 4/7/2009 | PPL | CIVIL-Prepared Pleading | 240 | 600.00 | | | |
| 4/8/2009 | CWC | Conference with Client | 15 | 37.50 | | | |
| 4/9/2009 | EMA | Email | 10 | 25.00 | | | |
| 4/9/2009 | RES | Legal Research | 15 | 37.50 | | | |
| 4/9/2009 | LDC | Long Distance Call | 10 | 27.50 | | | |
| 4/9/2009 | REF | Reviewed File | 120 | 300.00 | | | |
| 4/9/2009 | LTC | Local Telephone Call | 10 | 25.00 | | | |
| 4/9/2009 | REF | Reviewed File | 45 | 112.50 | | | |
| 4/30/2009 | LTT | Draft/Revise Letter | 210 | 525.00 | | | |
| 5/1/2009 | CWE | Conference With Expert | 45 | 135.00 | | | |
| 5/1/2009 | LTT | Draft/Revise Letter | 65 | 162.50 | | | |
| 5/2/2009 | POS | EXPENSE-Postage | 4 | 1.68 | | | |
| 5/2/2009 | CCS | EXPENSE-Copies/Printing | 16 | 8.00 | | | |
| 5/2/2009 | FAX | EXPENSE-FAX | 8 | 20.80 | | | |
| 5/2/2009 | LTT | Draft/Revise Letter | 30 | 75.00 | | | |
| 5/2/2009 | PAY | Payment | 1 | 350.00 | | | |
| 5/11/2009 | RAR | Received and Reviewed | 10 | 25.00 | | | |
| 5/11/2009 | FAX | EXPENSE-FAX | 12 | 31.20 | | | |
| 5/11/2009 | TCA | Telephone Call T/F Attorney | 6 | 15.00 | | | |

| Date | Code | Description | Qty | Amount | Amount2 | Notes |
|---|---|---|---|---|---|---|
| 5/11/2009 | TCA | Telephone Call T/F Attorney | 15 | 37.50 | | |
| 5/12/2009 | RES | Legal Research | 75 | 187.50 | 187.50 | Prepare for and attend foreclosure hearing before clerk; attention to post-hearing matters |
| 5/19/2009 | PAY | Payment | 1 | 600.00 | | |
| 5/25/2009 | RES | Legal Research | 210 | 525.00 | 525.00 | |
| 6/1/2009 | TRP | Trial Preparation | 30 | 75.00 | 75.00 | |
| 6/2/2009 | CWC | Conference with Client | 25 | 62.50 | 62.50 | |
| 6/2/2009 | HCL | Hearing-Before Clerk | 45 | 112.50 | 112.50 | |
| 6/2/2009 | TRP | Trial Preparation | 20 | 50.00 | 50.00 | |
| 6/12/2009 | FAX | EXPENSE-FAX | 2 | 5.20 | | |
| 6/15/2009 | FAX | EXPENSE-FAX | 4 | 10.40 | | |
| 6/16/2009 | RAR | Received and Reviewed | 10 | 25.00 | | |
| 6/16/2009 | RES | Legal Research | 10 | 25.00 | | |
| 6/16/2009 | EMA | Email | 6 | 15.00 | | |
| 6/16/2009 | TCL | Telephone Call T/F Clerk | 10 | 25.00 | 25.00 | |
| 6/16/2009 | EMA | Email | 15 | 37.50 | | |
| 6/18/2009 | CCK | Conference with Clerk | 20 | 50.00 | 50.00 | |
| 6/18/2009 | FAX | EXPENSE-FAX | 1 | 2.60 | | |
| 6/22/2009 | PAY | Payment | 1 | 600.00 | | |
| 6/23/2009 | FAX | EXPENSE-FAX | 1 | 2.60 | | |
| 6/23/2009 | RAR | Received and Reviewed | 6 | 15.00 | | |
| 6/24/2009 | TCL | Telephone Call T/F Clerk | 10 | 25.00 | 25.00 | |
| 6/24/2009 | LTT | Draft/Revise Letter | 30 | 75.00 | | |
| 6/30/2009 | EMA | Email | 15 | 37.50 | | |
| 6/30/2009 | TCT | Telephone Call T/F TAdminstrat | 6 | 15.00 | | |
| 7/7/2009 | EMA | Email | 30 | 75.00 | | |
| 7/16/2009 | FAX | EXPENSE-FAX | 2 | 5.20 | | |
| 7/16/2009 | RAR | Received and Reviewed | 6 | 15.00 | | |
| 7/17/2009 | RAR | Received and Reviewed | 10 | 25.00 | | |
| 7/20/2009 | CCS | EXPENSE-Copies/Printing | 14 | 7.00 | | |
| 7/20/2009 | POS | EXPENSE-Postage | 3 | 1.32 | | |
| 7/27/2009 | PAY | Payment | 1 | 500.00 | | |
| 7/29/2009 | TCA | Telephone Call T/F Attorney | 6 | 15.00 | | |
| 7/29/2009 | RAR | Received and Reviewed | 15 | 37.50 | | |
| 7/29/2009 | FAX | EXPENSE-FAX | 2 | 5.20 | | |
| 7/29/2009 | LTT | Draft/Revise Letter | 60 | 150.00 | | |
| 7/30/2009 | LTT | Draft/Revise Letter | 30 | 75.00 | | |
| 7/30/2009 | EMA | Email | 6 | 15.00 | | |
| 7/30/2009 | CWE | Conference With Expert | 20 | 60.00 | 60.00 | Prepare for and attend foreclosure hearing before superior court judge; attention to post-hearing matters |
| 7/30/2009 | FAX | EXPENSE-FAX | 3 | 7.80 | | |
| 7/30/2009 | LTC | Local Telephone Call | 75 | 187.50 | | |
| 8/12/2009 | CWE | Conference With Expert | 30 | 90.00 | 90.00 | |
| 8/12/2009 | PBR | Prepared Brief | 75 | 187.50 | 187.50 | |
| 8/13/2009 | CWE | Conference With Expert | 20 | 60.00 | 60.00 | |

| Date | Code | Description | Qty | Amount | Total | | |
|------|------|-------------|-----|--------|-------|---|---|
| 8/15/2009 | PBR | Prepared Brief | 45 | 112.50 | 112.50 | | |
| 8/18/2009 | TRA | Travel | 180 | 225.00 | 225.00 | | |
| 8/18/2009 | CCS | EXPENSE-Copies/Printing | 69 | 34.50 | 34.50 | | |
| 8/18/2009 | HSC | Hearing-Superior Court | 90 | 270.00 | 270.00 | | |
| 8/18/2009 | CWC | Conference with Client | 15 | 37.50 | 37.50 | | |
| 8/18/2009 | TRA | Travel | 180 | 225.00 | 225.00 | | |
| 8/20/2009 | PAY | Payment | 1 | 500.00 | | | |
| 9/9/2009 | CWC | Conference with Client | 100 | 250.00 | | | |
| 9/10/2009 | PPL | CIVIL-Prepared Pleading | 45 | 112.50 | | | |
| 9/10/2009 | PPL | CIVIL-Prepared Pleading | 120 | 300.00 | | | |
| 9/10/2009 | PPL | CIVIL-Prepared Pleading | 120 | 300.00 | | | |
| 9/12/2009 | PPL | CIVIL-Prepared Pleading | 150 | 375.00 | | | |
| 9/12/2009 | PPL | CIVIL-Prepared Pleading | 120 | 300.00 | | | |
| 9/13/2009 | TRP | Trial Preparation | 300 | 750.00 | | | |
| 9/13/2009 | PPL | CIVIL-Prepared Pleading | 90 | 225.00 | | | |
| 9/14/2009 | HSC | Hearing-Superior Court | 30 | 90.00 | | | |
| 9/14/2009 | FPL | CIVIL- Filed Pleadings | 30 | 75.00 | | | |
| 9/14/2009 | FPL | CIVIL- Filed Pleadings | 15 | 37.50 | | | |
| 9/14/2009 | TRA | Travel | 90 | 112.50 | | | |
| 9/14/2009 | TRA | Travel | 90 | 112.50 | | | |
| 9/15/2009 | SDC | Serve Pleading,Motion,etc | 150 | 375.00 | | | |
| 9/18/2009 | TCL | Telephone Call T/F Clerk | 10 | 25.00 | | | |
| 9/18/2009 | TCA | Telephone Call T/F Attorney | 10 | 25.00 | | | |
| 9/18/2009 | POS | EXPENSE-Postage | 6 | 2.64 | | | |
| 9/18/2009 | TCL | Telephone Call T/F Clerk | 10 | 25.00 | | | |
| 9/18/2009 | PDC | Prepared Document(s) | 15 | 37.50 | | | |
| 9/18/2009 | FAX | EXPENSE-FAX | 20 | 52.00 | | | |
| 9/18/2009 | TCA | Telephone Call T/F Attorney | 6 | 15.00 | | | |
| 9/18/2009 | TCA | Telephone Call T/F Attorney | 6 | 15.00 | | | |
| 9/19/2009 | CWC | Conference with Client | 10 | 25.00 | | | |
| 9/19/2009 | CWE | Conference With Expert | 15 | 45.00 | | | |
| 9/24/2009 | HSC | Hearing-Superior Court | 15 | 45.00 | | | |
| 9/24/2009 | TRA | Travel | 90 | 112.50 | | | |
| 9/24/2009 | TRA | Travel | 300 | 375.00 | | | |
| 9/25/2009 | FAX | EXPENSE-FAX | 6 | 15.60 | | | |
| 9/25/2009 | PDC | Prepared Document(s) | 120 | 300.00 | | | |
| 9/25/2009 | ADV | Advance-Expense | 1 | 180.00 | | | |
| 9/30/2009 | TRA | Travel | 240 | 300.00 | | | |
| 10/1/2009 | CWC | Conference with Client | 30 | 75.00 | | | |
| 10/1/2009 | HSC | Hearing-Superior Court | 165 | 495.00 | | | |
| 10/1/2009 | TRA | Travel | 240 | 300.00 | | | |
| 10/2/2009 | ADV | Advance-Expense | 2 | 20.00 | | | |
| 10/2/2009 | CCS | EXPENSE-Copies/Printing | 190 | 95.00 | | | |
| 10/2/2009 | POS | EXPENSE-Postage | 3 | 27.56 | | | |
| 10/2/2009 | PIB | Post Injunction Bond | 15 | 37.50 | | | |
| 10/2/2009 | WKO | Work On | 135 | 337.50 | | | |
| 10/2/2009 | PPO | Prepared Order(s) | 60 | 150.00 | | | |
| 10/7/2009 | FAX | EXPENSE-FAX | 4 | 10.40 | | | |
| 10/7/2009 | RAR | Received and Reviewed | 15 | 37.50 | | | |
| 10/7/2009 | PPO | Prepared Order(s) | 30 | 75.00 | | | |
| 10/17/2009 | RES | Legal Research | 30 | 75.00 | | | |
| 10/19/2009 | PAY | Payment | 1 | 500.00 | | | |
| 10/19/2009 | PDC | Prepared Document(s) | 75 | 187.50 | | | |
| 10/19/2009 | POS | EXPENSE-Postage | 1 | 4.95 | | | |
| 10/26/2009 | EFI | Efile documents with court | 20 | 50.00 | | | |
| 10/26/2009 | PDC | Prepared Document(s) | 15 | 37.50 | | | |
| 10/27/2009 | TCL | Telephone Call T/F Clerk | 6 | 15.00 | | | |
| 10/27/2009 | EFI | Efile documents with court | 10 | 25.00 | | | |
| 10/29/2009 | CCS | EXPENSE-Copies/Printing | 54 | 27.00 | | | |
| 10/29/2009 | POS | EXPENSE-Postage | 2 | 19.86 | | | |
| 10/29/2009 | CCS | EXPENSE-Copies/Printing | 8 | 4.00 | | | |
| 10/30/2009 | RES | Legal Research | 60 | 150.00 | | | |

| Date | Code | Description | Qty | Amount | Amount2 | Notes |
|---|---|---|---|---|---|---|
| 10/30/2009 | PPM | Prepared Motion | 130 | 325.00 | | |
| 10/31/2009 | PBR | Prepared Brief | 180 | 450.00 | | |
| 11/1/2009 | PBR | Prepared Brief | 120 | 300.00 | | |
| 11/2/2009 | TCA | Telephone Call T/F Attorney | 10 | 25.00 | | |
| 11/2/2009 | PPM | Prepared Motion | 75 | 187.50 | | |
| 11/2/2009 | EFI | Efile documents with court | 20 | 50.00 | | |
| 11/3/2009 | LTT | Draft/Revise Letter | 15 | 37.50 | | |
| 11/3/2009 | LDC | Long Distance Call | 10 | 27.50 | | |
| 11/3/2009 | EFI | Efile documents with court | 10 | 25.00 | | |
| 11/3/2009 | PPO | Prepared Order(s) | 15 | 37.50 | | |
| 11/4/2009 | TCA | Telephone Call T/F Attorney | 10 | 25.00 | | |
| 11/16/2009 | PBR | Prepared Brief | 240 | 600.00 | | |
| 11/17/2009 | PBR | Prepared Brief | 55 | 137.50 | | |
| 12/15/2009 | EMA | Email | 10 | 25.00 | | |
| 12/16/2009 | TCJ | Telephone Call T/F Judge | 6 | 18.00 | | |
| 12/16/2009 | LTC | Local Telephone Call | 6 | 15.00 | | |
| 12/16/2009 | PPO | Prepared Order(s) | 15 | 37.50 | | |
| 12/16/2009 | EMA | Email | 6 | 15.00 | | |
| 12/23/2009 | FAX | EXPENSE-FAX | 1 | 2.60 | | |
| 12/23/2009 | TCL | Telephone Call T/F Clerk | 6 | 15.00 | | |
| 12/23/2009 | LTT | Draft/Revise Letter | 20 | 50.00 | | |
| 1/12/2010 | PBR | Prepared Brief | 240 | 600.00 | | |
| 1/13/2010 | PPB | Prepared Brief/Memorandum | 90 | 225.00 | | |
| 1/15/2010 | ROA | APPEAL- Prepare Record | 180 | 540.00 | 540.00 | |
| 1/16/2010 | ROA | APPEAL- Prepare Record | 210 | 630.00 | 630.00 | |
| 1/18/2010 | ROA | APPEAL- Prepare Record | 270 | 810.00 | 810.00 | |
| 1/18/2010 | RAR | Received and Reviewed | 10 | 25.00 | | |
| 1/18/2010 | FAX | EXPENSE-FAX | 2 | 5.20 | | |
| 1/22/2010 | PAY | Payment | 1 | 500.00 | | |
| 2/24/2010 | ROA | APPEAL- Prepare Record | 60 | 180.00 | 180.00 | |
| 2/26/2010 | PPM | Prepared Motion | 45 | 112.50 | | |
| 2/26/2010 | LTT | Draft/Revise Letter | 150 | 375.00 | | |
| 2/27/2010 | PPM | Prepared Motion | 90 | 225.00 | | |
| 2/27/2010 | POS | EXPENSE-Postage | 2 | 2.78 | | |
| 3/1/2010 | PBR | Prepared Brief | 180 | 450.00 | | |
| 3/9/2010 | RAR | Received and Reviewed | 10 | 25.00 | | |
| 3/9/2010 | RAR | Received and Reviewed | 10 | 25.00 | | |
| 3/9/2010 | RES | Legal Research | 20 | 50.00 | | Attention to |
| 3/9/2010 | RES | Legal Research | 20 | 50.00 | | preparation of |
| 3/10/2010 | ROA | APPEAL- Prepare Record | 135 | 405.00 | 405.00 | record on appeal |
| 3/10/2010 | ROA | APPEAL- Prepare Record | 75 | 225.00 | 225.00 | and draft brief of |
| 3/25/2010 | CCS | EXPENSE-Copies/Printing | 502 | 251.00 | 251.00 | appellant filed in |
| 4/16/2010 | PPB | Prepared Brief/Memorandum | 40 | 100.00 | 100.00 | foreclosure case |
| 4/20/2010 | PPB | Prepared Brief/Memorandum | 150 | 450.00 | 450.00 | on 5/11/10 |
| 4/21/2010 | PBR | Prepared Brief | 45 | 112.50 | 112.50 | |
| 4/21/2010 | ADV | Advance-Expense | 1 | 332.50 | | |
| 4/22/2010 | PBR | Prepared Brief | 180 | 450.00 | 450.00 | |
| 4/29/2010 | PBR | Prepared Brief | 135 | 337.50 | 337.50 | |
| 4/30/2010 | PBR | Prepared Brief | 135 | 337.50 | 337.50 | |
| 4/30/2010 | PBR | Prepared Brief | 180 | 450.00 | 450.00 | |
| 5/1/2010 | PBR | Prepared Brief | 135 | 337.50 | 337.50 | |
| 5/1/2010 | PBR | Prepared Brief | 210 | 525.00 | 525.00 | |
| 5/2/2010 | PBR | Prepared Brief | 90 | 225.00 | 225.00 | |
| 5/3/2010 | PBR | Prepared Brief | 135 | 337.50 | 337.50 | |
| 5/3/2010 | PBR | Prepared Brief | 300 | 750.00 | 750.00 | |
| 5/3/2010 | PAY | Payment | 1 | 332.50 | | |
| 5/6/2010 | PBR | Prepared Brief | 180 | 450.00 | 450.00 | |
| 5/6/2010 | PBR | Prepared Brief | 210 | 525.00 | 525.00 | |
| 5/11/2010 | PAY | Payment | 1 | 500.00 | | |
| 5/18/2010 | ADV | Advance-Expense | 1 | 218.50 | | |
| 6/10/2010 | DDP | CIVIL-Draft Discovery Plan | 75 | 150.00 | | |
| 6/10/2010 | DDP | CIVIL-Draft Discovery Plan | 120 | 360.00 | | |

| Date | Code | Description | Qty | Amount | Amount | Note |
|---|---|---|---|---|---|---|
| 6/11/2010 | DDP | CIVIL-Draft Discovery Plan | 120 | 360.00 | | |
| 6/11/2010 | PAY | Payment | 1 | 500.00 | | |
| 6/11/2010 | CWE | Conference With Expert | 65 | 195.00 | | |
| 6/12/2010 | DDP | CIVIL-Draft Discovery Plan | 40 | 120.00 | | |
| 6/14/2010 | TCA | Telephone Call T/F Attorney | 10 | 25.00 | | |
| 6/14/2010 | RES | Legal Research | 30 | 75.00 | | |
| 06/14/2010 | DDP | CIVIL-Draft Discovery Plan | 75 | 225.00 | | |
| 6/16/2010 | PPB | Prepared Brief/Memorandum | 120 | 300.00 | 300.00 | Draft reply brief of appellant filed in foreclosure case on 6/23/10 |
| 6/16/2010 | PPB | Prepared Brief/Memorandum | 90 | 225.00 | 225.00 | |
| 6/17/2010 | PPB | Prepared Brief/Memorandum | 120 | 300.00 | 300.00 | |
| 6/19/2010 | PPB | Prepared Brief/Memorandum | 240 | 600.00 | 600.00 | |
| 6/21/2010 | PPB | Prepared Brief/Memorandum | 180 | 450.00 | 450.00 | |
| 6/21/2010 | POS | EXPENSE-Postage | 2 | 3.46 | | |
| 6/21/2010 | PPB | Prepared Brief/Memorandum | 45 | 112.50 | 112.50 | |
| 6/24/2010 | TCA | Telephone Call T/F Attorney | 6 | 15.00 | | |
| 6/28/2010 | EMA | Email | 10 | 25.00 | | |
| 6/28/2010 | EMA | Email | 6 | 15.00 | | |
| 6/28/2010 | PDC | Prepared Document(s) | 30 | 75.00 | | |
| 6/29/2010 | TCA | Telephone Call T/F Attorney | 10 | 25.00 | | |
| 6/29/2010 | EMA | Email | 10 | 25.00 | | |
| 6/29/2010 | LTT | Draft/Revise Letter | 45 | 112.50 | | |
| 6/29/2010 | EMA | Email | 6 | 15.00 | | |
| 7/1/2010 | TCA | Telephone Call T/F Attorney | 30 | 75.00 | | |
| 7/7/2010 | ADV | Advance-Expense | 1 | 50.75 | | |
| 7/9/2010 | RES | Legal Research | 120 | 300.00 | | |
| 7/13/2010 | PPM | Prepared Motion | 210 | 525.00 | | |
| 7/13/2010 | CWC | Conference with Client | 90 | 225.00 | | |
| 7/14/2010 | PPM | Prepared Motion | 75 | 187.50 | | |
| 7/14/2010 | CCK | Conference with Clerk | 10 | 25.00 | | |
| 7/19/2010 | PAY | Payment | 1 | 500.00 | | |
| 7/20/2010 | PPB | Prepared Brief/Memorandum | 120 | 300.00 | | |
| 7/20/2010 | PPB | Prepared Brief/Memorandum | 120 | 300.00 | | |
| 7/27/2010 | PPB | Prepared Brief/Memorandum | 240 | 600.00 | | |
| 7/28/2010 | PPB | Prepared Brief/Memorandum | 210 | 525.00 | | |
| 7/29/2010 | PPB | Prepared Brief/Memorandum | 240 | 600.00 | | |
| 7/30/2010 | PPB | Prepared Brief/Memorandum | 120 | 300.00 | | |
| 7/31/2010 | PPB | Prepared Brief/Memorandum | 210 | 525.00 | | |
| 8/2/2010 | PPB | Prepared Brief/Memorandum | 240 | 600.00 | | |
| 8/2/2010 | TRP | Trial Preparation | 20 | 50.00 | | |
| 8/2/2010 | FAX | EXPENSE-FAX | 21 | 54.60 | | |
| 10/6/2010 | PPM | Prepared Motion | 180 | 540.00 | 540.00 | Draft motions to strike and requesting judicial notice filed in foreclosure appeal on 10/7/10 and motion to remand filed on 10/11/10 |
| 10/7/2010 | ADV | Advance-Expense | 1 | 21.85 | | |
| 10/7/2010 | TCA | Telephone Call T/F Attorney | 15 | 37.50 | | |
| 10/7/2010 | EMA | Email | 15 | 37.50 | | |
| 10/7/2010 | EMA | Email | 45 | 112.50 | | |
| 10/7/2010 | LTC | Local Telephone Call | 30 | 75.00 | | |
| 10/7/2010 | CCS | EXPENSE-Copies/Printing | 70 | 35.00 | | |
| 10/7/2010 | RES | Legal Research | 10 | 25.00 | 25.00 | |
| 10/8/2010 | RES | Legal Research | 20 | 50.00 | 50.00 | |
| 10/8/2010 | LDC | Long Distance Call | 30 | 82.50 | | |
| 10/9/2010 | PPM | Prepared Motion | 240 | 600.00 | | |
| 10/10/2010 | EMA | Email | 6 | 15.00 | | |
| 10/10/2010 | PPM | Prepared Motion | 210 | 525.00 | 525.00 | |
| 10/11/2010 | PPM | Prepared Motion | 300 | 750.00 | 750.00 | |
| 10/12/2010 | PPM | Prepared Motion | 210 | 525.00 | | |

| Date | Code | Description | Qty | Amount | | |
|---|---|---|---|---|---|---|
| 10/12/2010 | RAR | Received and Reviewed | 20 | 50.00 | | Total fees incurred in relation to foreclosure case |
| | | | | | 14,720.50 | |
| 10/18/2010 | PAY | Payment | 1 | 500.00 | | |
| 10/20/2010 | RES | Legal Research | 240 | 600.00 | | |
| 10/29/2010 | LTT | Draft/Revise Letter | 20 | 50.00 | | |
| 10/29/2010 | CCS | EXPENSE-Copies/Printing | 22 | 11.00 | | |
| 11/1/2010 | RAR | Received and Reviewed | 6 | 15.00 | | |
| 11/5/2010 | WKO | Work On | 75 | 187.50 | | |
| 11/5/2010 | PPN | Prepared Notice of Appeal | 30 | 75.00 | | |
| 11/8/2010 | RES | Legal Research | 75 | 187.50 | | |
| 11/15/2010 | PAI | APPEAL-Prepare Appeal Issues | 105 | 262.50 | | |
| 11/16/2010 | PAI | APPEAL-Prepare Appeal Issues | 180 | 540.00 | | |
| 11/19/2010 | RES | Legal Research | 20 | 50.00 | | |
| 11/19/2010 | PPM | Prepared Motion | 75 | 187.50 | | |
| 11/19/2010 | PDC | Prepared Document(s) | 15 | 37.50 | | |
| 11/19/2010 | EFI | Efile documents with court | 10 | 25.00 | | |
| 11/20/2010 | PPM | Prepared Motion | 150 | 375.00 | | |
| 11/21/2010 | PPM | Prepared Motion | 150 | 375.00 | | |
| 11/21/2010 | CFW | Conference | 45 | 112.50 | | |
| 11/29/2010 | PPB | Prepared Brief/Memorandum | 240 | 600.00 | | |
| 11/30/2010 | PPB | Prepared Brief/Memorandum | 240 | 600.00 | | |
| 12/2/2010 | PDC | Prepared Document(s) | 75 | 187.50 | | |
| 12/2/2010 | TCA | Telephone Call T/F Attorney | 10 | 25.00 | | |
| 12/2/2010 | EFI | Efile documents with court | 20 | 50.00 | | |
| 12/3/2010 | EFI | Efile documents with court | 10 | 25.00 | | |
| 12/3/2010 | PPM | Prepared Motion | 195 | 487.50 | | |
| 12/3/2010 | POS | EXPENSE-Postage | 2 | 1.22 | | |
| 12/4/2010 | PPM | Prepared Motion | 75 | 187.50 | | |
| 12/15/2010 | RAR | Received and Reviewed | 6 | 15.00 | | |
| 12/15/2010 | RAR | Received and Reviewed | 6 | 15.00 | | |
| 12/16/2010 | TCC | Telephone Call T/F Client | 15 | 37.50 | | |
| 1/4/2011 | MDT | CIVIL-Mediation | 150 | 450.00 | | |
| 1/7/2011 | DOA | APPEAL-Draft Oral Argument | 225 | 938.25 | | |
| 1/21/2011 | RES | Legal Research | 90 | 225.00 | | |
| 1/21/2011 | TCC | Telephone Call T/F Client | 15 | 37.50 | | |
| 1/21/2011 | LDC | Long Distance Call | 10 | 27.50 | | |
| 1/22/2011 | RES | Legal Research | 120 | 300.00 | | |
| 1/24/2011 | TCC | Telephone Call T/F Client | 10 | 25.00 | | |
| 1/24/2011 | PBR | Prepared Brief | 300 | 750.00 | | |
| 1/24/2011 | TCC | Telephone Call T/F Client | 6 | 15.00 | | |
| 1/26/2011 | RES | Legal Research | 45 | 112.50 | | |
| 1/29/2011 | PBR | Prepared Brief | 90 | 225.00 | | |
| 1/31/2011 | PBR | Prepared Brief | 75 | 187.50 | | |
| 2/1/2011 | EFI | Efile documents with court | 10 | 25.00 | | |
| 2/1/2011 | POS | EXPENSE-Postage | 3 | 1.32 | | |
| 2/1/2011 | EMA | Email | 6 | 15.00 | | |
| 2/1/2011 | WKO | Work On | 45 | 112.50 | | |
| 2/1/2011 | CCS | EXPENSE-Copies/Printing | 10 | 5.00 | | |
| 2/1/2011 | CCS | EXPENSE-Copies/Printing | 102 | 51.00 | | |
| 2/2/2011 | POS | EXPENSE-Postage | 1 | 4.95 | | |
| 2/8/2011 | PBR | Prepared Brief | 75 | 187.50 | | |
| 2/9/2011 | PBR | Prepared Brief | 75 | 187.50 | | |
| 2/10/2011 | PBR | Prepared Brief | 420 | 1,050.00 | | |
| 2/14/2011 | PDC | Prepared Document(s) | 75 | 187.50 | | |

| Date | Code | Description | Qty | Amount | | |
|---|---|---|---|---|---|---|
| 2/19/2011 | PBR | Prepared Brief | 75 | 187.50 | | |
| 2/19/2011 | PBR | Prepared Brief | 90 | 225.00 | | |
| 2/22/2011 | PBR | Prepared Brief | 90 | 225.00 | | |
| 2/22/2011 | PBR | Prepared Brief | 120 | 300.00 | | |
| 2/22/2011 | PBR | Prepared Brief | 300 | 750.00 | | |
| 2/25/2011 | PBR | Prepared Brief | 420 | 1,050.00 | | |
| 2/26/2011 | PBR | Prepared Brief | 90 | 225.00 | | |
| 2/28/2011 | PBR | Prepared Brief | 270 | 675.00 | | |
| 3/29/2011 | PAY | Payment | 1 | 500.00 | | |
| 4/20/2011 | PAY | Payment | 1 | 500.00 | | |
| 4/21/2011 | TCL | Telephone Call T/F Clerk | 10 | 25.00 | | |
| 4/23/2011 | PPM | Prepared Motion | 75 | 187.50 | | |
| 4/23/2011 | PPB | Prepared Brief/Memorandum | 90 | 225.00 | | |
| 4/25/2011 | PPB | Prepared Brief/Memorandum | 240 | 600.00 | | |
| 4/26/2011 | PPB | Prepared Brief/Memorandum | 240 | 600.00 | | |
| 5/3/2011 | RAR | Received and Reviewed | 45 | 112.50 | | |
| 5/3/2011 | PPB | Prepared Brief/Memorandum | 90 | 225.00 | | |
| 5/3/2011 | EMA | Email | 20 | 50.00 | | |
| 5/3/2011 | CWC | Conference with Client | 20 | 50.00 | | |
| 5/6/2011 | PPB | Prepared Brief/Memorandum | 75 | 187.50 | | |
| 5/9/2011 | PPB | Prepared Brief/Memorandum | 270 | 675.00 | | |
| 5/9/2011 | RES | Legal Research | 60 | 150.00 | | |
| 5/12/2011 | PPB | Prepared Brief/Memorandum | 240 | 600.00 | | |
| 5/13/2011 | PPB | Prepared Brief/Memorandum | 120 | 300.00 | | |
| 5/13/2011 | RES | Legal Research | 75 | 187.50 | | |
| 5/13/2011 | CFW | Conference | 40 | 100.00 | | |
| 5/14/2011 | PPB | Prepared Brief/Memorandum | 120 | 300.00 | | |
| 5/14/2011 | CWE | Conference With Expert | 75 | 225.00 | | |
| 5/15/2011 | CWE | Conference With Expert | 135 | 405.00 | | |
| 5/15/2011 | PPB | Prepared Brief/Memorandum | 120 | 300.00 | | |
| 5/15/2011 | PPB | Prepared Brief/Memorandum | 210 | 525.00 | | |
| 5/16/2011 | CWE | Conference With Expert | 60 | 180.00 | | |
| 5/16/2011 | PPB | Prepared Brief/Memorandum | 75 | 187.50 | | |
| 5/26/2011 | PAY | Payment | 1 | 400.00 | | |
| 6/7/2011 | PAY | Payment | 1 | 100.00 | | |
| 6/15/2011 | RAR | Received and Reviewed | 30 | 75.00 | | |
| 6/16/2011 | PDC | Prepared Document(s) | 45 | 112.50 | | |
| 6/16/2011 | EFI | Efile documents with court | 20 | 50.00 | | |
| 6/17/2011 | TCT | Telephone Call T/F Adminstrat | 10 | 25.00 | | |
| 6/20/2011 | TCC | Telephone Call T/F Client | 15 | 37.50 | | |
| 6/21/2011 | TCA | Telephone Call T/F Attorney | 30 | 75.00 | | |
| 6/21/2011 | TCL | Telephone Call T/F Clerk | 6 | 15.00 | | |
| 6/22/2011 | TCL | Telephone Call T/F Clerk | 10 | 25.00 | | |
| 7/3/2011 | PPM | Prepared Motion | 45 | 112.50 | | |
| 7/4/2011 | RES | Legal Research | 90 | 225.00 | | |
| 7/4/2011 | PPM | Prepared Motion | 60 | 150.00 | | |
| 7/5/2011 | PAY | Payment | 1 | 500.00 | | |
| 7/14/2011 | RES | Legal Research | 40 | 100.00 | | |
| 7/15/2011 | CWC | Conference with Client | 45 | 112.50 | | |
| 7/15/2011 | LTT | Draft/Revise Letter | 180 | 450.00 | | |
| 7/27/2011 | TCL | Telephone Call T/F Clerk | 15 | 37.50 | | |
| 8/9/2011 | PAY | Payment | 1 | 500.00 | | |
| 8/12/2011 | CWC | Conference with Client | 45 | 112.50 | | |
| 8/16/2011 | PAY | Payment | 1 | 10,000.00 | | |
| 8/23/2011 | LTT | Draft/Revise Letter | 75 | 187.50 | | |
| 9/3/2011 | RES | Legal Research | 240 | 600.00 | | |
| 9/13/2011 | TCC | Telephone Call T/F Client | 10 | 25.00 | | |
| 9/13/2011 | LTC | Local Telephone Call | 10 | 25.00 | | |
| 9/13/2011 | CWC | Conference with Client | 15 | 37.50 | | |
| 9/13/2011 | CFW | Conference | 15 | 37.50 | | |
| 9/29/2011 | RAR | Received and Reviewed | 30 | 75.00 | | |
| 9/29/2011 | RES | Legal Research | 30 | 75.00 | | |

| 10/17/2011 | PAY | Payment | 1 | 500.00 | | | |
|---|---|---|---|---|---|---|---|
| 10/17/2011 | EMA | Email | 30 | 75.00 | | | |
| 10/17/2011 | EMA | Email | 6 | 15.00 | | | |
| 10/18/2011 | RES | Legal Research | 45 | 112.50 | | | |
| 12/6/2011 | MIL | EXPENSE-Mileage | 267 | 146.85 | | | |
| 12/6/2011 | TRA | Travel | 360 | 450.00 | | | |
| 12/7/2011 | AAP | Appearance in Court | 270 | 810.00 | | | |
| 12/8/2011 | AAP | Appearance in Court | 180 | 540.00 | | | |
| 12/8/2011 | TRA | Travel | 360 | 450.00 | | | |
| 12/8/2011 | MIL | EXPENSE-Mileage | 260 | 143.00 | | | |
| 12/12/2011 | RAR | Received and Reviewed | 6 | 15.00 | | | |
| 12/13/2011 | CCK | Conference with Clerk | 10 | 25.00 | | | |
| 12/26/2011 | DOA | APPEAL-Draft Oral Argument | 420 | 1,751.40 | | | |
| 12/27/2011 | DOA | APPEAL-Draft Oral Argument | 180 | 750.60 | | | |
| 1/1/2012 | DOA | APPEAL-Draft Oral Argument | 90 | 375.30 | | | |
| 1/2/2012 | DOA | APPEAL-Draft Oral Argument | 210 | 875.70 | | | |
| 1/3/2012 | DOA | APPEAL-Draft Oral Argument | 75 | 312.75 | | | |
| 1/4/2012 | DOA | APPEAL-Draft Oral Argument | 120 | 500.40 | | | |
| 1/5/2012 | DOA | APPEAL-Draft Oral Argument | 120 | 500.40 | | | |
| 1/6/2012 | DOA | APPEAL-Draft Oral Argument | 285 | 1,188.45 | | | |
| 1/9/2012 | DOA | APPEAL-Draft Oral Argument | 240 | 1,000.80 | | | |
| 1/12/2012 | DOA | APPEAL-Draft Oral Argument | 90 | 375.30 | | | |
| 1/12/2012 | DOA | APPEAL-Draft Oral Argument | 75 | 312.75 | | | |
| 1/13/2012 | DOA | APPEAL-Draft Oral Argument | 120 | 500.40 | | | |
| 1/13/2012 | DOA | APPEAL-Draft Oral Argument | 30 | 125.10 | | | |
| 1/13/2012 | DOA | APPEAL-Draft Oral Argument | 210 | 875.70 | | | |
| 1/20/2012 | DOA | APPEAL-Draft Oral Argument | 180 | 750.60 | | | |
| 1/23/2012 | MIL | EXPENSE-Mileage | 267 | 146.85 | | | |
| 1/23/2012 | TRA | Travel | 480 | 600.00 | | | |
| 1/24/2012 | ARG | APPEAL-ORAL ARGUMENT | 135 | 788.40 | | | |
| 1/24/2012 | TRA | Travel | 390 | 487.50 | | | |
| 1/24/2012 | MIL | EXPENSE-Mileage | 260 | 143.00 | | | |
| 1/30/2012 | APA | APPEAL-Supp Authorities | 180 | 540.00 | | | |
| 2/6/2012 | APA | APPEAL-Supp Authorities | 150 | 450.00 | | | |
| 2/6/2012 | APA | APPEAL-Supp Authorities | 120 | 360.00 | | | |
| 2/23/2012 | CWC | Conference with Client | 60 | 150.00 | | | |
| 3/9/2012 | PAY | Payment | 1 | 1,000.00 | | | |
| 3/19/2012 | PAY | Payment | 1 | 500.00 | | | |
| 3/27/2012 | RAR | Received and Reviewed | 20 | 50.00 | | | |
| 3/28/2012 | RES | Legal Research | 6 | 15.00 | | | |
| 3/28/2012 | TCL | Telephone Call T/F Clerk | 15 | 37.50 | | | |
| 3/28/2012 | RES | Legal Research | 30 | 75.00 | | | |
| 3/28/2012 | TAP | Telephone T/F Adverse Party | 15 | 41.25 | | | |
| 3/29/2012 | TAP | Telephone T/F Adverse Party | 10 | 25.00 | | | |
| 3/30/2012 | EMA | Email | 30 | 75.00 | | | |
| 3/30/2012 | EFI | Efile documents with court | 20 | 50.00 | | | |
| 4/1/2012 | PAY | Payment | 1 | 179.99 | | | |
| 4/3/2012 | CFW | Conference | 30 | 75.00 | | | |
| 4/3/2012 | LDC | Long Distance Call | 30 | 82.50 | | | |
| 4/3/2012 | TCL | Telephone Call T/F Clerk | 6 | 15.00 | | | |
| 4/11/2012 | TCC | Telephone Call T/F Client | 6 | 15.00 | | | |
| 4/11/2012 | TCC | Telephone Call T/F Client | 6 | 15.00 | | | |
| 4/11/2012 | LTC | Local Telephone Call | 6 | 15.00 | | | |
| 4/11/2012 | TAP | Telephone T/F Adverse Party | 10 | 32.00 | | | |
| 4/11/2012 | PAY | Payment | 1 | 1,000.00 | | | |
| 4/11/2012 | RAR | Received and Reviewed | 6 | 15.00 | | | |
| 4/13/2012 | FAX | EXPENSE-FAX | 4 | 10.40 | | | |
| 4/13/2012 | RAR | Received and Reviewed | 20 | 50.00 | | | |
| 4/14/2012 | PPM | Prepared Motion | 120 | 300.00 | | | |
| 4/16/2012 | CFW | Conference | 15 | 37.50 | | | |
| 4/16/2012 | PPM | Prepared Motion | 65 | 162.50 | | | |
| 4/16/2012 | RES | Legal Research | 20 | 50.00 | | | |

| 4/16/2012 | POS | EXPENSE-Postage | 3 | 3.15 | | | |
|-----------|-----|-----------------|---|------|---|---|---|
| 4/16/2012 | CCS | EXPENSE-Copies/Printing | 54 | 27.00 | | | |
| 4/17/2012 | NOH | CIVIL-NOTICE OF HEARING | 15 | 37.50 | | | |
| 4/17/2012 | POS | EXPENSE-Postage | 5 | 2.25 | | | |
| 4/17/2012 | CCS | EXPENSE-Copies/Printing | 17 | 8.50 | | | |
| 4/17/2012 | CCK | Conference with Clerk | 10 | 25.00 | | | |
| 4/19/2012 | TCA | Telephone Call T/F Attorney | 6 | 15.00 | | | |
| 4/23/2012 | PAY | Payment | 1 | 500.00 | | | |
| 4/24/2012 | TCA | Telephone Call T/F Attorney | 6 | 15.00 | | | |
| 4/24/2012 | TCA | Telephone Call T/F Attorney | 15 | 37.50 | | | |
| 4/24/2012 | TCA | Telephone Call T/F Attorney | 6 | 15.00 | | | |
| 4/25/2012 | RAR | Received and Reviewed | 6 | 15.00 | | | |
| 4/28/2012 | RAR | Received and Reviewed | 10 | 25.00 | | | |
| 4/30/2012 | RAR | Received and Reviewed | 20 | 50.00 | | | |
| 5/3/2012 | RAR | Received and Reviewed | 30 | 75.00 | | | |
| 5/3/2012 | EMA | Email | 30 | 75.00 | | | |
| 5/9/2012 | TCT | Telephone Call T/F TAdminstrat | 10 | 25.00 | | | |
| | | Total Charges | | $83,181.11 | | | |
| | | Total Payments | | $23,534.49 | | | |
| | | Balance Due | | $59,646.62 | | | |
| | | | | | | | |
| | | | | | | | |
| | | TIME BREAKDOWN 33519 Minutes | | | | | |
| | | Or more than 559 Hours | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**EXHIBIT 3**

The Debtor has listed your claim as Contingent, Unliquidated on Schedule F as a General Unsecured claim in the amount of $0.00. You MUST timely file a Proof of Claim or you will be forever barred from recovery.

Claim #1991  Date Filed: 10/30/2012

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor:  GMAC Mortgage, LLC          Case Number: 12-12032

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
GILBERT IN THE MATTER OF THE FORECLOSURE BY DAVID A SIMPSON PC SUBSTITUTE TRUSTEE OF DEED OF TRUST EXECUTED BY et al

☐ Check this box if this claim amends a previously filed claim.

Name and address where notices should be sent:     NameID: 10987289
GILBERT IN THE MATTER OF THE FORECLOSURE BY DAVID A SIMPSON PC SUBSTITUTE
TRUSTEE OF DEED OF TRUST EXECUTED BY et al
KATHERINE S PARKER LOWE ATTORNEY AT LAW
35 MISS ELECIA LN STE 101
OCRACOKE, NC 27960
Telephone number: 252-988-1000       email: katherine@ocracokelaw.com

Court Claim Number: _____ (*If known*)
Filed on: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Name and address where payment should be sent (if different from above):
Telephone number:       email:

**1. Amount of Claim as of Date Case Filed:** $ 5,948,900.00
If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of both. Attach a statement that itemizes interest or charges.

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).
☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).
☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).
☐ Taxes or penalties owed to governmental units – 11U.S.C. §507 (a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

Amount entitled to priority:
$ _____

**2. Basis for Claim:** Rescission under TILA, money damages, usury, wrongful foreclosure, debt collection violations, UDAP
(See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:** 5107

**3a. Debtor may have scheduled account as:** General Litigation - Mtg Contingent, Unliquidated (See instruction #3a)

**3b. Uniform Claim Identifier (optional):** (See instruction #3b)

**4. Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
Describe:
Value of Property: $_____  Annual Interest Rate _____% ☐Fixed ☐Variable (when case was filed)
Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any: $_____  Basis for perfection: _____
Amount of Secured Claim: $_____   Amount Unsecured: $ 5,948,900.00

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$ N/A  (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. (See instruction #8, and the definition of "redacted".)     See Attached NC CCA Decision, Complaint, 4th CA Decision
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

* Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**9. Signature:** (See instruction #9) Check the appropriate box.
☐ I am the creditor.  ☑ I am the creditor's authorized agent. (Attach copy of power of attorney, if any.)  ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)  ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)
I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: Katherine S. Parker-Lowe
Title: Attorney for Gilbert
Company:
Address and telephone number (if different from notice address above):
(Signature) Katherine S. Parker-Lowe   (Date) 10-26-2012

**RECEIVED**
OCT 30 2012
KURTZMAN CARSON CONSULTANTS

Telephone number:       Email:

COURT USE ONLY

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

001KC0002_51765_5_domestic_21/027590/165536     1212032120824150609001312

NO. COA10-361

NORTH CAROLINA COURT OF APPEALS

Filed:  3 May 2011

IN THE MATTER OF THE FORECLOSURE BY
DAVID A. SIMPSON, P.C., SUBSTITUTE
TRUSTEE, OF A DEED OF TRUST EXECUTED
BY REX T. GILBERT, JR. AND DANIELA L.
GILBERT, HUSBAND AND WIFE, DATED MAY
5, 2006 AND RECORDED ON MAY 10, 2006,
IN BOOK 219 AT PAGE 53 OF THE HYDE
COUNTY PUBLIC REGISTRY

                                        Hyde County
                                        No. 09 SP 09

        Appeal by Respondents from order entered 18 August 2009 by Judge

Marvin K. Blount, III in Hyde County Superior Court.  Heard in the

Court of Appeals 12 October 2010.

        *Katherine S. Parker-Lowe, for respondent-appellants.*

        *The Law Office of John T. Benjamin, Jr., P.A., by John T.
        Benjamin, Jr. and James R. White for petitioner-appellee.*

        HUNTER, JR., Robert N., Judge.

        Respondents Rex T. Gilbert, Jr. and his wife Daniela L. Gilbert,

appeal from the trial court's Order authorizing David A. Simpson,

P.C., as Substitute Trustee, to proceed with foreclosure under a

power of sale in the Deed of Trust recorded in Book 219 at Page 53

in the Hyde County Register of Deeds.  We reverse.

-2-

## I. Factual and Procedural History

On 5 May 2006, Respondent Rex T. Gilbert, Jr. executed an adjustable rate note ("the Note") to refinance an existing mortgage on his home.  According to the terms of the Note, Mr. Gilbert promised to pay a principal amount of $525,000.00 plus interest to First National Bank of Arizona.  The Note was secured by a Deed of Trust, executed by Mr. Gilbert and his wife, Daniela L. Gilbert, on real property located at 134 West End Road, Ocracoke, North Carolina.  The Deed of Trust identified First National Bank of Arizona as the lender and Matthew J. Ragaller of Casey, Grimsley & Ragaller, PLLC as the trustee.

The record reveals that, during 2008, Respondents ceased making payments on the Note and made an unsuccessful attempt to negotiate a modification of the loan.  On 9 March 2009, a Substitution of Trustee was recorded in the Hyde County Register of Deeds, which purports to remove Matthew Ragaller as the trustee of the Deed of Trust and appoint his successor, David A. Simpson, P.C. ("Substitute Trustee").  The Substitution of Trustee identified Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 ("Petitioner") as the holder of the Note and the lien created by the Deed of Trust.

On 12 March 2009, the Substitute Trustee commenced this action by filing a Notice of Hearing on Foreclosure of Deed of Trust with

-3-

the Hyde County Clerk of Superior Court pursuant to section 45-21.16 of our General Statutes. N.C. Gen. Stat. § 45-21.16 (2009). The Notice of Hearing stated, "the current holder of the foregoing Deed of Trust, and of the debt secured thereby, is: Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6."

In a letter dated 5 April 2009, Mr. Gilbert purported to exercise his right to rescind the loan transaction he entered into with the original lender, First National Bank of Arizona, pursuant to the federal Truth in Lending Act, 15 U.S.C. § 1635. As justification for his purported rescission, Gilbert alleged that the Truth in Lending Disclosure Statement provided by First National Bank of Arizona failed to accurately provide all required material disclosures including, *inter alia*, the correct annual percentage rate and payment schedule. The Substitute Trustee responded with a letter from GMAC ResCap, in which it denied any material disclosure errors were made and refused to rescind the loan transaction.

The foreclosure hearing was held on 2 June 2009 before the Clerk of Superior Court of Hyde County. The Honorable Sharon G. Sadler entered an Order on 17 June 2009, permitting the Substitute Trustee to proceed with the foreclosure. In the Order, the Clerk specifically found, *inter alia*, that Petitioner was the holder of the Note and Deed of Trust that it sought to foreclose and the Note

-4-

evidenced a valid debt owed by Mr. Gilbert. Respondents appealed the Order to superior court.

The matter came on for a *de novo* hearing on 18 August 2009 before the Honorable Marvin K. Blount, III, in Hyde County Superior Court. During the hearing, the trial court admitted into evidence a certified copy of the Note and the Deed of Trust and two affidavits attesting to the validity of Gilbert's indebtedness pursuant to the Note, and that Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 is the current owner and holder of the Note. Additionally, Petitioner introduced the original Note and Allonge for the trial court's inspection.

Reviewing the record before this Court, the Allonge contains a series of indorsements evidencing the alleged assignments of the Note, as follows:

        PAY TO THE ORDER OF:
        First National Bank of Nevada
        WITHOUT RECOURSE BY:
        _____[Signature]_____
        AMY HAWKINS, ASSISTANT VICE PRESIDENT
        FIRST NATIONAL BANK OF ARIZONA


        Pay to the order of:
        RESIDENTIAL FUNDING CORPORATION
        Without Recourse
        FIRST NATIONAL BANK OF NEVADA
        By: [Signature]_____
        Deutsche Bank National Trust
        Company, F/K/A Bankers Trust
        Company of California, N.A.
        as Custodian as Attorney in Fact

-5-

[Illegible Name and Title]

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Corporation
BY    [Signature]
Judy Faber, Vice President

Respondents made two arguments at the hearing. First, Respondents argued that the debt evidenced by the Note no longer existed, as Mr. Gilbert had rescinded the transaction for the loan with First National Bank of Arizona. Petitioner objected to Respondents' rescission argument as being a defense in equity and, as such, inadmissible in a proceeding held pursuant to N.C. Gen. Stat. § 45-21.16. The trial court agreed and refused to let Respondents' expert witness testify as to alleged material errors in the Truth in Lending Disclosure Statement, which Mr. Gilbert alleged permitted him the right to rescind the loan. Second, Respondents argued that Petitioner had not produced sufficient evidence to establish that Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 was the holder of the Note.

Based on the preceding evidence, the trial court entered an order on 18 August 2009 in which it found, *inter alia*: Mr. Gilbert executed the Note and, with his wife, executed a Deed of Trust in favor of First National Bank of Arizona, secured by the real property described in the Deed of Trust; a valid debt exists and is owed by

-6-

Gilbert to Petitioner; Gilbert is in default under the Note and Deed
of Trust; proper notice of the foreclosure hearing was given to all
parties as required by N.C. Gen. Stat. § 45-21.16; Petitioner was
the current holder of the Note and the Deed of Trust.    The trial court
concluded as a matter of law that the requirements of N.C. Gen. Stat.
§ 45-21.16 had been satisfied.    Based on these findings and
conclusion of law, the trial court authorized the Substitute Trustee
to proceed with the foreclosure.    Respondents timely entered notice
of appeal.

## II. Analysis

A party seeking permission from the clerk of court to proceed
with a foreclosure pursuant to a power of sale contained in a deed
of trust must prove the following statutory requirements: (1) the
party seeking foreclosure is the holder of a valid debt, (2) default
on the debt by the debtor, (3) the deed of trust provides the right
to foreclose, (4) proper notice was given to those parties entitled
to notice pursuant to section 45-21.16(b).    N.C. Gen. Stat. §
45-21.16(d) (2009).    The General Assembly added a fifth requirement,
which expired 31 October 2010: "that the underlying mortgage debt
is not a subprime loan," or, if it is a subprime loan, "that the
pre-foreclosure notice under G.S. 45-102 was provided in all material
respects, and that the periods of time established by Article 11 of
this Chapter have elapsed[.]" *Id.* The role of the clerk of court

-7-

is limited to making a determination on the matters specified by section 45-21.16(d). *See Mosler ex rel. Simon v. Druid Hills Land Co., Inc.*, 199 N.C. App. 293, 295-96, 681 S.E.2d 456, 458 (2009). If the clerk's order is appealed to superior court, that court's *de novo* hearing is limited to making a determination on the same issues as the clerk of court. *See id.*

The trial court's order authorizing the foreclosure to proceed was a final judgment of the superior court, therefore, this Court has jurisdiction to hear the instant appeal. N.C. Gen. Stat. § 7A-27(b) (2009). Our standard of review for this appeal, where the trial court sat without a jury, is "'whether competent evidence exists to support the trial court's findings of fact and whether the conclusions reached were proper in light of the findings.'" *In re Adams*, __ N.C. App. __, __, 693 S.E.2d 705, 708 (2010) (quoting *In re Foreclosure of Azalea Garden Bd. & Care, Inc.*, 140 N.C. App. 45, 50, 535 S.E.2d 388, 392 (2000)).

We note the trial court classified multiple conclusions of law as "findings of fact." We have previously recognized "[t]he classification of a determination as either a finding of fact or a conclusion of law is admittedly difficult." *In re Helms*, 127 N.C. App. 505, 510, 491 S.E.2d 672, 675 (1997). Generally, "any determination requiring the exercise of judgment or the application of legal principles is more properly classified a conclusion of law."

-8-

*Id.* (citations omitted).  Any determination made by "'logical reasoning from the evidentiary facts,'" however, "is more properly classified a finding of fact." *Id.* (quoting *Quick v. Quick*, 305 N.C. 446, 452, 290 S.E.2d 653, 657-58 (1982)).  When this Court determines that findings of fact and conclusions of law have been mislabeled by the trial court, we may reclassify them, where necessary, before applying our standard of review.  *N.C. State Bar v. Key*, 189 N.C. App. 80, 88, 658 S.E.2d 493, 499 (2008) (citing *In re Helms*, 127 N.C. App. at 510, 491 S.E.2d at 675).

Looking to the trial court's Order, we conclude that the following "findings of fact" are determinations that required the application of legal principles and are more appropriately classified as conclusions of law: a valid debt exists and is owed to Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6; proper notice was given to and received by all parties as required by N.C. Gen. Stat. § 45-21.16 and the Rules of Civil Procedure; Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 is the current owner and holder of the Note and Deed of Trust. *See In re Watts*, 38 N.C. App. 90, 92, 247 S.E.2d 427, 428 (1978) (noting upon the appeal of a N.C. Gen. Stat. § 45-21.16 special proceeding the trial court's *conclusions of law* included the existence of a valid debt, the right to foreclose under the deed of

-9-

trust, and proper notice to the mortgagors); *see also Connolly v.*

*Potts*, 63 N.C. App. 547, 549, 306 S.E.2d 123, 124 (1983) (same).  In

light of this reclassification of the trial court's findings of fact

and conclusions of law, we turn to the issues raised on appeal.

## 1. Rescission of the Loan Transaction

Respondents raise several arguments alleging the trial court

erred by refusing to consider their defense to the foreclosure

action, that the debt Petitioner sought to foreclose was not a valid

debt—a required element under the statute for foreclosure by power

of sale.  *See* N.C. Gen. Stat. § 45-21.16(d)(i) (requiring, *inter*

*alia*, that the clerk of court must determine that a valid debt

exists).  Respondents contend the debt is not valid because Mr.

Gilbert rescinded the transaction by which he obtained the loan from

First National Bank of Arizona pursuant to the federal Truth in

Lending Act ("TILA"), 15 U.S.C. §§ 1601-1667f, and the Federal

Reserve Board's Regulation Z, 12 C.F.R. § 226.1-.58.  We conclude

the trial court did not err.

The admissibility of evidence in the trial court is based upon

that court's sound discretion and may be disturbed on appeal only

upon a finding that the decision was based on an abuse of discretion.

*Gibbs v. Mayo*, 162 N.C. App. 549, 561, 591 S.E.2d 905, 913 (2004).

Here, we conclude the trial court properly refused to consider

Respondents' evidence of rescission.  Rescission under the TILA is

-10-

an equitable remedy. *See Am. Mortg. Network, Inc. v. Shelton*, 486 F.3d 815, 819 (4th Cir. 2007) ("'[A]lthough the right to rescind [under the TILA] is [statutory], it remains an equitable doctrine subject to equitable considerations.'" (quoting *Brown v. Nat'l Permanent Fed. Sav. & Loan Ass'n*, 683 F.2d 444, 447 (D.C. Cir. 1982)). While legal defenses to a foreclosure under a power of sale are properly raised in a hearing held pursuant to section 45-21.16, equitable defenses are not. *Watts*, 38 N.C. App. at 94, 247 S.E.2d at 429. As we have previously stated, a hearing under section 45-21.16 is "not intended to settle all matters in controversy between mortgagor and mortgagee, nor was it designed to provide a second procedure for invoking equitable relief." *Id.* A party seeking to raise an equitable defense may do so in a separate civil action brought in superior court under section 45-21.34. *Id.*; N.C. Gen. Stat. § 45-21.34 (2009) (stating that a party with a legal or equitable interest in the subject property may apply to a superior court judge to enjoin a sale of the property upon legal or equitable grounds). Accordingly, the trial court properly concluded Respondents' argument that Mr. Gilbert had rescinded the loan transaction, invaliding the debt Petitioner sought to foreclose, was an equitable defense and not properly before the trial court. Respondents' argument is without merit.[1]

_____

1 During the pendency of this action, the Gilberts filed a

-11-

## 2. Evidence that Petitioner was the Owner and Holder of Mr. Gilbert's Promissory Note

Respondents also argue the trial court erred in ordering the foreclosure to proceed, as Petitioner did not prove that it was the holder of the Note with the right to foreclose under the instrument as required by section 45-21.16(d)(i) and (iii). We agree.

A "foreclosure under a power of sale is not favored in the law and its exercise will be watched with jealousy." *In re Foreclosure of Goforth Props., Inc.*, 334 N.C. 369, 375, 432 S.E.2d 855, 859 (1993) (citations and internal quotation marks omitted). That the party seeking to foreclose on a promissory note is the holder of said note is an essential element of the action and the debtor is "entitled to demand strict proof of this element." *Liles v. Myers*, 38 N.C. App. 525, 528, 248 S.E.2d 385, 388 (1978).

For the trial court to find sufficient evidence that Petitioner is the holder of a valid debt in accordance with section 45-21.16(d), "this Court has determined that the following two questions must be

---

separate action against Deutsche Bank Trust Company Americas, Residential Funding, LLC, GMAC Mortgage, LLC, and David A. Simpson, P.C. to litigate, *inter alia*, their TILA claim in Hyde County Superior Court. The defendants removed the action to federal court. *See Gilbert v. Deutsche Bank Trust Co. Americas*, slip op. at 1, 4:09-CV-181-D, 2010 WL 2696763 (E.D.N.C. July 7, 2010), *reconsideration denied*, 2010 WL 4320460 (E.D.N.C. Oct. 19, 2010). Because the Gilberts' claim was filed more than three years after the loan transaction was completed, the federal trial court dismissed the action for failure to state a claim upon which relief could be granted. *Id.* at __, slip op. at 5.

-12-

answered in the affirmative: (1) 'is there sufficient competent
evidence of a valid debt?'; and (2) 'is there sufficient competent
evidence that [the party seeking to foreclose is] the holder[ ] of
the notes [that evidence that debt]?'" *Adams*, __ N.C. App. at __,
693 S.E.2d at 709 (quoting *In re Cooke*, 37 N.C. App. 575, 579, 246
S.E.2d 801, 804-05 (1978)); *see* N.C. Gen. Stat. § 45-21.16(d) (2009)
(in order for the foreclosure to proceed, the clerk of court must
find, *inter alia*, the existence of a "valid debt of which *the party
seeking to foreclose is the holder*," and a "right to foreclose under
the instrument" securing the debt) (emphasis added).

Establishing that a party is the holder of the note is essential
to protect the debtor from the threat of multiple judgments on the
same note.

> If such proof were not required, the plaintiff
> could negotiate the instrument to a third party
> who would become a holder in due course, bring
> a suit upon the note in her own name and obtain
> a judgment in her favor. . . .  Requiring proof
> that the plaintiff is the holder of the note at
> the time of her suit reduces the possibility of
> such an inequitable occurrence.

*Liles*, 38 N.C. App. at 527, 248 S.E.2d at 387.

We have previously determined that the definition of "holder"
under the Uniform Commercial Code ("UCC"), as adopted by North
Carolina, controls the meaning of the term as it used in section
45-21.16 of our General Statutes for foreclosure actions under a

-13-

power of sale. *See Connolly*, 63 N.C. App. at 550, 306 S.E.2d at 125;

*Adams*, __ N.C. App. at __, 693 S.E.2d at 709.  Our General Statutes

define the "holder" of an instrument as "[t]he person in possession

of a negotiable instrument that is payable either to bearer or to

an identified person that is the person in possession."  N.C. Gen.

Stat. § 25-1-201(b)(21) (2009); *Econo-Travel Motor Hotel Corp. v.*

*Taylor*, 301 N.C. 200, 203, 271 S.E.2d 54, 57 (1980).  Furthermore,

a "'[p]erson' means an individual, corporation, business trust,

estate, trust . . . or any other legal or commercial entity."  N.C.

Gen. Stat. § 25-1-201(b)(27) (2009).

As addressed above, we conclude the trial court properly found

that a valid debt existed.  The remaining issue before this Court

is whether there was competent evidence that Petitioner was the

holder of the Note that evidences Mr. Gilbert's debt.

In support of its argument that it provided competent evidence

to support the trial court's findings, Petitioner first points to

its production of the original Note with the Allonge at the *de novo*

hearing, as well as its introduction into evidence true and accurate

copies of the Note and Allonge.  Petitioner asserts this evidence

"plainly evidences the transfers" of the Note to Petitioner.  We

cannot agree.

Under the UCC, as adopted by North Carolina, "[a]n instrument

is transferred when it is delivered by a person other than its issuer

-14-

for the purpose of giving to the person receiving delivery the right

to enforce the instrument." N.C. Gen. Stat. § 25-3-203(a) (2009).

Production of an original note at trial does not, in itself, establish

that the note was transferred to the party presenting the note with

the purpose of giving that party the right to enforce the instrument,

as demonstrated in *Connolly*, 63 N.C. App. at 551, 306 S.E.2d at 125,

and *Smathers v. Smathers*, 34 N.C. App. 724, 726, 239 S.E.2d 637, 638

(1977) (holding that despite evidence of voluntary transfer of

promissory notes and the plaintiff's possession thereof, the

plaintiff was not the holder of the note under the UCC as the notes

were not drawn, issued, or indorsed to her, to bearer, or in blank.

"[T]he plaintiff testified to some of the circumstances under which

she obtained possession of the notes, but the trial court made no

findings of fact with respect thereto.")

In *Connolly*, determining who had possession of the note became

the critical question for the foreclosure proceeding. 63 N.C. App.

at 551, 306 S.E.2d at 125. Several years prior to the foreclosure

proceedings at issue in *Connolly*, the petitioners obtained a loan

from a bank and pledged as collateral a promissory note that was

payable to the petitioners by assigning and delivering the note to

the bank. *Id*. at 549, 306 S.E.2d at 124. After obtaining their

loan, the petitioners sought to foreclose on the promissory note and

deed of trust, which was in the bank's possession, but were denied

-15-

at the special proceeding before the clerk of court. *Id.* at 548,

306 S.E.2d at 124. The petitioners appealed the decision to superior

court. *Id.* During the *de novo* hearing, the petitioners testified

their loan to the bank had been paid, but "they had left the [] note

at the bank, for security purposes." *Id.* at 551, 306 S.E.2d at 125.

The petitioners, however, "introduced the originals of the note and

deed of trust" during the hearing. *Id.* The trial court found the

bank was in possession of the note and concluded, as a matter of law,

the petitioners were not the holders of the note at the institution

of the foreclosure proceedings; the foreclosure was again denied.

*Connolly*, 63 N.C. App. at 550, 306 S.E.2d at 124-25. On appeal, this

Court concluded that despite the fact that the party seeking

foreclosure introduced the original note at the time of the *de novo*

hearing, the trial court's findings of fact did not address whether

the petitioners were in possession of the note at the time of the

trial; the trial court's judgment was vacated and remanded. *Id.* at

551, 306 S.E.2d at 125-26.

Similarly, here, the trial court's findings of fact do not

address who had possession of Mr. Gilbert's note at the time of the

*de novo* hearing. Without a determination of who has physical

possession of the Note, the trial court cannot determine, under the

UCC, the entity that is the holder of the Note. *See* N.C. Gen. Stat.

§ 25-1-201(b)(21) (defining "holder" as "the person *in possession*

-16-

of a negotiable instrument that is payable either to bearer or to an identified person that is the person *in possession*") (emphasis added); *Connolly*, 63 N.C. App. at 550, 306 S.E.2d at 125 ("It is the fact of possession which is significant in determining whether a person is a holder, and the *absence of possession defeats that status*.") (emphasis added).    Accordingly,    the    trial    court's findings of fact do not support the conclusion of law that Petitioner is the holder of Mr. Gilbert's note.

Assuming *arguendo* that production of the Note was evidence of a transfer of the Note pursuant to the UCC and that Petitioner was in possession of the Note, this is not sufficient evidence that Petitioner is the "holder" of the Note.    As discussed in detail below, the Note was not indorsed to Petitioner or to bearer, a prerequisite to confer upon Petitioner the status of holder under the UCC.    *See* N.C. Gen. Stat. § 25-1-201(b)(21) (requiring that, to be a holder, a person must be in possession of the note payable to bearer or to the person in possession of the note).    "'[M]ere possession' of a note by a party to whom the note has neither been indorsed nor made payable 'does not suffice to prove ownership or holder status.'"    *Adams*, ___ N.C. App. at ___, 693 S.E.2d at 710 (quoting *Econo-Travel Motor Hotel Corp.*, 301 N.C. at 203, 271 S.E.2d at 57).

-17-

Petitioner acknowledges that following the signing of the Note by Mr. Gilbert, the Note was sequentially assigned to several entities, as indicated by the series of indorsements on the Allonge, reprinted above. Respondents argue these indorsements present two problems. First, Respondents state that Petitioner did not provide any evidence to establish that Deutsche Bank National Trust Company had the authority, as the attorney-in-fact for First National Bank of Nevada, to assign the Note to Residential Funding Corporation in the second assignment. Respondents make no argument—and cite no authority to establish—that such evidence is needed. Therefore, we do not address the merits of this alleged error and deem it abandoned. *See* N.C. R. App. P. 28(6) (2011) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned.")

Second, Respondents argue Petitioner has not offered sufficient evidence that Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 was the holder of the Note and, thus, the party entitled to proceed with the foreclosure action. We agree.

Respondents note the third and final assignment on the Allonge was made to "Deutsche Bank Trust Company Americas as Trustee," which is not the party asserting a security interest in Respondents' property; this action was brought by Deutsche Bank Trust Company

-18-

Americas as Trustee for Residential Accredit Loans, Inc. Series

2006-QA6, the entity the trial court found to be the owner and holder

of the Note.  Section 3-110 of the UCC, as codified in our General

Statutes, states in pertinent part:

> For the purpose of determining the *holder* of an
> instrument, the following rules apply:
>
> . . . .
>
> (2) If an instrument is payable to (i) a trust,
> an estate, *or a person described as trustee* or
> representative of a trust or estate, the
> instrument is *payable to the trustee*, the
> representative, or a successor of either,
> whether or not the beneficiary or estate is also
> named . . . .

N.C. Gen. Stat. § 25-3-110(c) (2009) (emphasis added).

Additionally, the official comments to this section of the UCC state,

in part, "This provision merely determines who can deal with an

instrument as a holder.  It does not determine ownership of the

instrument or its proceeds."  *Id.* § 25-3-110, Official Comment 3.

In the present case, the Note is clearly indorsed "PAY TO THE

ORDER OF Deutsche Bank Trust Company Americas as Trustee."  Thus,

pursuant to section 25-3-110(c)(2), the Note is payable to Deutsche

Bank Trust Company Americas as Trustee.  *See Id.*  Because the

indorsement does not identify Petitioner and is not indorsed in blank

or to bearer, it cannot be competent evidence that Petitioner is the

holder of the Note.  *See* N.C. Gen. Stat. § 25-1-201(b)(21) (defining

-19-

"holder" as "[t]he person in possession of a negotiable instrument that is *payable either to bearer or to an identified person that is the person in possession*"); *Econo-Travel Motor Hotel Corp.*, 301 N.C. at 204, 271 S.E.2d at 57 (concluding that where the defendants produced a copy of the note indorsed to an entity other than the plaintiff, the "defendants established that plaintiff was not the owner or holder of the note").

In addition to the Note and Allonge, Petitioner points to two affidavits provided by two GMAC Mortgage employees as further evidence that the trial court's findings are based on sufficient competent evidence.  Again, we disagree.

The first affidavit is an Affidavit of Indebtedness by Jeffrey Stephan ("Stephan").[2]  In his affidavit, Stephan averred, *inter*

---

2 This Court finds troubling that GMAC Mortgage, LLC was recently found to have submitted a false affidavit by Signing Officer Jeffrey Stephan in a motion for summary judgment against a mortgagor in the United States District Court of Maine.  Judge John H. Rich, III concluded that GMAC Mortgage submitted Stephan's false affidavit in bad faith and levied sanctions against GMAC Mortgage, stating:

> [T]he attestation to the Stephan affidavit was not, in fact, true; that is, Stephan did not know personally that all of the facts stated in the affidavit were true. . . . GMAC [Mortgage] was on notice that the conduct at issue here was unacceptable to the courts, which rely on sworn affidavits as admissible evidence in connection with motions for summary judgment.  In 2006, an identical jurat signed under identical circumstances resulted in the imposition of sanctions against GMAC [Mortgage] in Florida.

-20-

*alia*, he was a limited signing officer for GMAC Mortgage, the sub-servicer of Mr. Gilbert's loan, and as such, was "familiar with the books and records of [GMAC Mortgage], specifically payments made pursuant to the Note and Deed of Trust." Accordingly, Stephan testified as to the principal amount of Mr. Gilbert's loan and to his history of loan payments. Stephan further testified that after the Note and Deed of Trust were executed they were "delivered" to the original lender, First National Bank of Arizona; the original lender then "assigned and transferred all of its right, title and interest" to First National Bank of Nevada, which, in turn, assigned all its rights, title, and interest in the instruments to Residential Funding Corporation. The final assignment to which Stephan averred is an assignment and securitization of the Note and Deed of Trust from Residential Funding Corporation to "Deutsche Bank Trust Company Americas as Trustee." Stephan then makes the conclusory statement, "Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 is the current owner and holder of the Note and Deed of Trust described herein."

Whether Deutsche Bank Trust Company Americas as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 is the owner and holder of the Note and Deed of Trust is a legal conclusion that is

---

*James v. U.S. Bank Nat. Ass'n*, 272 F.R.D. 47, 48 (D. Me. 2011).

-21-

to be determined by a court of law on the basis of factual allegations.
As such, we disregard Stephan's conclusion as to the identity of the
"owner and holder" of the instruments.  *See Lemon v. Combs*, 164 N.C.
App. 615, 622, 596 S.E.2d 344, 349 (2004) ("'Statements in affidavits
as to opinion, belief, or conclusions of law are of no effect.'"
(quoting 3 Am. Jur. 2d, *Affidavits* § 13 (2002))); *see also Speedway
Motorsports Int'l Ltd. v. Bronwen Energy Trading, Ltd.*, __ N.C. App.
__, __ n.2, __ S.E.2d __, __ n.2, slip op. at 12 n.2, No. 09-1451
(Feb. 15, 2011) (rejecting a party's contention that this Court must
accept as true all statements found in the affidavits in the record,
stating, "our standard of review does not require that we accept a
witness' characterization of what 'the facts' mean").  While Stephan
referred to a Pooling and Servicing Agreement ("PSA") that allegedly
governs the securitization of the Note to Deutsche Bank Trust Company
Americas as Trustee, the PSA was not included in the record and will
not be considered by this Court.  *See* N.C. R. App. P. 9(a) (2011)
("In appeals from the trial division of the General Court of Justice,
review is solely upon the record on appeal, the verbatim transcript
of proceedings, if one is designated, and any other items filed
pursuant to this Rule 9.")  The record is void of any evidence the
Note was assigned and securitized to a trust.

We also note that Stephan alleged no facts as to who possesses
Mr. Gilbert's note, other than his averment that the Note was

-22-

"delivered" to the original lender, First National Bank of Arizona.
Stephan referred to a statement made by counsel for GMAC Mortgage
that the original Note "would be brought to the foreclosure hearing,"
but he did not provide any facts from which the trial court could
determine who has possession of the Note.   As demonstrated by
*Connolly*, discussed above, production of a note at trial is not
conclusive evidence of possession.   63 N.C. App. at 551, 306 S.E.2d
at 125.   Thus, we conclude Stephan's affidavit is not competent
evidence to support the trial court's conclusion that Deutsche Bank
Trust Company Americas as Trustee for Residential Accredit Loans,
Inc. Series 2006-QA6 is the owner and holder of Mr. Gilbert's note.

Petitioner also provided the affidavit of Scott Zeitz
("Zeitz"), who alleged in his affidavit to be a litigation analyst
for GMAC Mortgage.   Zeitz's basis for his affidavit testimony is that
he works with "the documents that relate to account histories and
account balances of particular loans" and that he is familiar with
Mr. Gilbert's account.   Accordingly, Zeitz testified to the details
of Mr. Gilbert's loan and the terms of the Note.   Zeitz's affidavit,
substantially similar to the affidavit of Jeffrey Stephan, also
averred to the transfer of the Note and Deed of Trust through the
series of entities indicated on the Allonge, stating in part:

> Residential Funding Corporation sold, assigned
> and transferred all of its right, title and
> interest in and to the Note and Deed of Trust

-23-

> to Deutsche Bank Trust Company Americas as
> Trustee for Residential Accredit Loans, Inc.
> Series 2006-QA6. *This is reflected on the
> Allonge to the Note, a true and accurate copy
> of which is attached* and incorporated hereto as
> EXHIBIT 5. (Emphasis added.)

This statement is factually incorrect; the Allonge in the record

contains no indorsement to Deutsche Bank Trust Company Americas as

Trustee for Residential Accredit Loans, Inc. Series 2006-QA6. Zeitz

further stated that "Deutsche Bank Trust Company Americas as Trustee

for Residential Accredit Loans, Inc. Series 2006-QA6 is the current

owner and holder of the Note and Deed of Trust." This statement is

a legal conclusion postured as an allegation of fact and as such will

not be considered by this Court. *See Lemon*, 164 N.C. App. at 622,

596 S.E.2d at 349.

Unlike Jeffrey Stephan, Zeitz stated that Deutsche Bank Trust

Company Americas as Trustee for Residential Accredit Loans, Inc.

Series 2006-QA6 "has possession of the original Note and Deed of

Trust." We note, however, that "[w]hen an affiant makes a conclusion

of fact, it must appear that the affiant had an opportunity to observe

and did observe matters about which he or she testifies." *Lemon*,

164 N.C. App. at 622, 596 S.E.2d at 348-49 (quoting 3 Am. Jur. 2d

*Affidavits* § 13) (internal quotation marks omitted). Moreover,

> [t]he personal knowledge of facts asserted in
> an affidavit is not presumed from a mere
> positive averment of facts but rather the court
> should be shown how the affiant knew or could

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

Rex T. Gilbert, Jr.; Daniela L.
Gilbert,

        *Plaintiffs-Appellants,*

        v.

Residential Funding LLC; GMAC
Mortgage LLC; Deutsche Bank
Trust Company Americas, as
Trustee for Residential Accredit
Loans, Incorporated,

        *Defendants-Appellees,*        No. 10-2295

        and

David A. Simpson, Substitute
Trustee,

        *Trustee.*

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Dever III, District Judge.
(4:09-cv-00181-D)

Argued: January 24, 2012

Decided: May 3, 2012

Before TRAXLER, Chief Judge, FLOYD, Circuit Judge,
and J. Michelle CHILDS, United States District Judge for
the District of South Carolina, sitting by designation.

2      GILBERT v. RESIDENTIAL FUNDING LLC

Affirmed in part, reversed in part, and remanded by published opinion. Judge Floyd wrote the opinion, in which Chief Judge Traxler and Judge Childs joined.

## COUNSEL

**ARGUED:** Katherine Suzanne Parker-Lowe, Ocracoke, North Carolina, for Appellants. Marc James Ayers, BRADLEY ARANT BOULT CUMMINGS, LLP, Birmingham, Alabama, for Appellees. **ON BRIEF:** Nicholas J. Voelker, BRADLEY ARANT BOULT CUMMINGS, LLP, Charlotte, North Carolina, Jonathan M. Hooks, BRADLEY ARANT BOULT CUMMINGS, LLP, Birmingham, Alabama, for Appellees.

## OPINION

FLOYD, Circuit Judge:

Rex and Daniela Gilbert appeal the district court's dismissal of their claim that Deutsche Bank Trust Company Americas (Deutsche), as trustee for Residential Accredit Loans, Inc. (RAL); David A. Simpson (Simpson), substitute trustee; Residential Funding LLC (RFL); and GMAC Mortgage LLC (GMAC) violated various consumer protection laws in connection with a mortgage the Gilberts secured on their home, located at 134 West End Road, Ocracoke, North Carolina (the subject property). Specifically, the Gilberts allege that they are entitled to relief on account of violations of the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601-1667(f), and its implementing regulation, Regulation Z, 12 C.F.R. § 1026 (previously codified at 12 C.F.R. § 226); North Carolina usury law, N.C. Gen. Stat. § 24; the North Carolina Unfair and Deceptive Trade Practices Act (NCUDTPA), *id.* § 75-1.1; and North Carolina's Prohibited Acts by Debt Col-

lectors statute, *id.* § 75-50. The Gilberts also claim a breach of contract and that Deutsche lacks the authority to enforce the loan.

Appellees filed a motion to dismiss, which the district court granted. The Gilberts timely appealed. For the reasons that follow, we affirm in part, reverse in part and remand for further proceedings.

## I.

We review the district court's decision granting a motion to dismiss de novo, and we view the facts in the light most favorable to the non-prevailing party. *See Chaudhry v. Mobil Oil Corp.*, 186 F.3d 502, 504 (4th Cir. 1999).

On May 5, 2006, Rex Gilbert executed an adjustable rate note with First National Arizona to refinance the existing lien on the subject property. Pursuant to the terms of the note, Mr. Gilbert agreed to pay a principal amount of $525,000, plus interest to the bank. The Gilberts executed a deed of trust on the subject property to secure the note. As a part of the transaction, First National Arizona provided several disclosures, including a "Truth in Lending Disclosure Statement," a "Notice of Right to Cancel," a "Variable Rate Mortgage Program Disclosure," a "HUD-1 Settlement Statement," and a "First Payment Letter."

Thereafter, according to the district court, First National Arizona transferred its interest in the Gilberts' mortgage to First National Bank of Nevada, First National Bank of Nevada transferred its interest in the mortgage to RFL, and RFL sold its interest to Deutsche, as the trustee for RAL. *Gilbert v. Deutsche Bank Trust Co. Ams.*, No. 09-CV-181-D, 2010 WL 2696763, at *1 (E.D.N.C. July 7, 2010). Thus, the district court stated, Deutsche, as the trustee for RAL, currently owns and holds the note and deed of trust on the subject

4      Gilbert v. Residential Funding LLC

property. *Id.* RFC is the master servicer and GMAC is the subservicer. *Id.* at *2.

The Gilberts defaulted on the loan in 2008. Subsequently, Deutsche chose Simpson as the substitute trustee of the deed of trust. *Id.* On March 12, 2009, Simpson filed a foreclosure action against the Gilberts in the Hyde County Superior Court.

The Gilberts' counsel wrote a letter to GMAC dated April 5, 2009, in which she alleged several violations of TILA, provided notice that the Gilberts were rescinding their mortgage transaction, and requested that GMAC cancel its security interest in the subject property and return all consideration paid by the Gilberts. In a letter dated April 14, 2009, counsel for GMAC responded that GMAC had reviewed the Gilberts' file and found "no basis to conclude that there were any material disclosure errors that would give rise to an extended right of rescission." As such, counsel for GMAC stated that they would not rescind the transaction.

On June 2, 2009, the Clerk of the Hyde County Superior Court conducted a foreclosure hearing, after which she entered a June 17, 2009, order allowing Simpson to proceed with the foreclosure. According to the order, the Clerk found that Deutsche was the holder of the subject note and deed of trust and that the note evidenced a valid debt. The Gilberts appealed to the Hyde County Superior Court.

Following a de novo hearing on the matter on August 18, 2009, the superior court allowed the foreclosure proceeding to go forward. In doing so, the court relied in part on an affidavit signed by Jeffrey Stephan, a signing officer for GMAC, certifying the validity of the indebtedness pursuant to the note as well as Deutsche's status as the current owner and holder of the note. The Gilberts appealed that decision to the North Carolina Court of Appeals.

GILBERT v. RESIDENTIAL FUNDING LLC                    5

On September 14, 2009, while their appeal was pending, the Gilberts filed suit in the Hyde County Superior Court against Appellees seeking, among other things, to enjoin the mortgage foreclosure sale and to rescind their May 5, 2006, loan. They alleged violations of TILA by Appellees. The Gilberts also claimed that Appellees violated North Carolina usury law, engaged in unfair and deceptive trade practices, engaged in prohibited debt collection acts, and breached the mortgage contract. The Gilberts further maintained that Deutsche was without authority to enforce the note because of a defect in the allonge, which granted Deutsche an interest in the note.

Appellees removed the Gilberts' suit to the district court and subsequently filed a motion to dismiss the complaint, which the district court granted. This appeal, in which the Gilberts contest the district court's dismissal of their TILA, usury, and NCUDTPA claims, followed. They also assign error to the district court's determination that res judicata barred them from raising claims related to the endorsement on the allonge to the note, as well as the district court's denial of their motion to alter or amend the judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure.

After becoming aware that Stephan had engaged in improper affidavit practices in unrelated cases, the Gilberts filed with the district court a motion for relief pursuant to Rule 60(b) of the Federal Rules of Civil Procedure and Rule 12.1 of the Federal Rules of Appellate Procedure. In light of this new evidence, they requested that the district court file an order indicating whether it would be inclined to relieve them of its prior order dismissing their claims and its denial of their Rule 59(e) motion.

On May 3, 2011, the North Carolina Court of Appeals reversed the superior court's decision to allow Simpson to proceed with a foreclosure sale, finding that "the record is lacking of competent evidence sufficient to support that

6          GILBERT v. RESIDENTIAL FUNDING LLC

[Deutsche] is the owner and holder of Mr. Gilbert's note and deed of trust." *In re Simpson*, 711 S.E.2d 165, 175 (N.C. Ct. App. 2011). The court was also troubled by the fact "that [GMAC] was recently found to have submitted a false affidavit by Signing Officer Jeffrey Stephan in a motion for summary judgment against a mortgagor in the United States District Court of Maine." *Id.* at 173 n.2. The Gilberts subsequently supplemented their Rule 60(b) motion with a copy of the *Simpson* opinion.

On June 15, 2011, the district court filed an order stating that "should the Fourth Circuit return jurisdiction to this court, the court would grant the [Rule 60(b)] motion, dismiss the federal claims for the reasons stated in the July 7, 2010[,] order [dismissing all of the Gilberts' claims], and remand all state-law claims to Hyde County Superior Court." *Gilbert v. Deutsche Bank Trust Co. Ams.*, No. 4:09-CV-181-D (E.D.N.C. June 15, 2011). In light of this order, the Gilberts filed a motion with us to reverse and remand the case to the district court. We denied the motion. Accordingly, we now undertake a de novo review of each of the Gilberts' assignments of error. *See Chaudhry*, 186 F.3d at 504.

II.

A.

The Gilberts first argue that the district court erred in dismissing their TILA claim on the basis that they had failed to exercise their extended right to rescind in a timely manner.

In adopting TILA, Congress declared that "[i]t is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a). As such, TILA requires that a creditor make certain material disclosures at the time the loan is made. *Id.* § 1638(a). If the

GILBERT v. RESIDENTIAL FUNDING LLC                 7

creditor fails to comply with this mandate, the borrower has the right to rescind up to three years after the transaction. *Id.* § 1635(f).

The Gilberts closed the loan with First National Arizona on May 5, 2006, but they did not file the instant lawsuit until September 14, 2009. They notified GMAC by letter, however, that they were exercising their right to rescind in April 2009. So, although the Gilberts did not file this lawsuit within three years of closing the loan, they did notify GMAC that they were exercising their right to rescind during that three-year time period.

There is a split of authority as to whether the borrower must file a lawsuit within three years after the consummation of a loan transaction to exercise her right to rescind, or whether the borrower need only assert the right to rescind through a written notice within the three-year period. For example, in *McOmie-Gray v. Bank of America Home Loans*, 667 F.3d 1325 (9th Cir. 2012), the Ninth Circuit held that "rescission suits must be brought within three years from the consummation of the loan, regardless [of] whether notice of rescission is delivered within that three-year period." *Id.* at 1328. But, in *In re Hunter*, 400 B.R. 651 (Bankr. N.D. Ill. 2009), the bankruptcy court held that "TILA gives a consumer the right to rescind a credit transaction simply by notifying the creditor, within a specific period of time, that she intends to do so." *Id.* at 659.

The district court cited *American Mortgage Network, Inc. v. Shelton*, 486 F.3d 815 (4th Cir. 2007), for the proposition that the Gilberts were required to file suit to exercise their right of rescission. Thus, in that the Gilberts failed to file suit until after the three years passed, the district court dismissed their rescission claim. As explained below, however, we are convinced that the Gilberts exercised their right to rescind when they sent their April 5, 2009, letter to GMAC, alleging several violations of TILA and Regulation Z, and providing

8      GILBERT v. RESIDENTIAL FUNDING LLC

notice of their rescission of the mortgage transaction. More-over, we do not think that our prior decision in *Shelton* com-pels a contrary conclusion. Further, we disagree with the Ninth Circuit that a borrower must file a lawsuit within the three-year time period to exercise her right to rescind, as opposed simply to notifying the creditor.

We begin, as we must, with the plain meaning of the stat-ute. "The starting point for any issue of statutory interpreta-tion . . . is the language of the statute itself." *United States v. Bly*, 510 F.3d 453, 460 (4th Cir. 2007). "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (citations omitted) (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)).

In the same way, our interpretation of regulations begins with their text. *Textron, Inc. v. Comm'r*, 336 F.3d 26, 31 (1st Cir. 2003). "The Supreme Court has repeatedly emphasized the importance of the plain meaning rule, stating that if the language of a statute or regulation has a plain and ordinary meaning, courts need look no further and should apply the regulation as it is written." *Id.* In most cases, a textual reading will be dispositive. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989). Furthermore, "absent some obvious repugnance to the statute, the . . . regulation implementing [TILA] should be accepted by the courts." *Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 219 (1981).

Here, we are primarily concerned with just one statute and one regulation. Section 1635(f) provides, in relevant part, the following:

> An obligor's right of rescission shall expire three
> years after the date of consummation of the transac-

GILBERT v. RESIDENTIAL FUNDING LLC          9

tion or upon the sale of the property, whichever occurs first, notwithstanding the fact that the information and forms required under this section or any other disclosures required under this part have not been delivered to the obligor . . . .

15 U.S.C. § 1635(f). Its implementing regulation, Regulation Z, states as follows:

> To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.

12 C.F.R. § 1026.23(a)(2). Taking the plain meaning of these texts, and assuming that the words say what they mean and mean what they say, we come to the conclusion that the Gilberts exercised their right to rescind with the April 5, 2009, letter. Simply stated, neither 15 U.S.C. § 1635(f) nor Regulation Z says anything about the filing of a lawsuit, and we refuse to graft such a requirement upon them.

But what about the *Shelton* case that the district court relied upon in reaching a different conclusion? There, the creditor filed an action seeking a declaratory judgment that the processing of the borrowers' home refinancing loan complied with TILA. 486 F.3d at 817. The borrowers counterclaimed, requesting damages for violations of TILA. *Id.* They also sought rescission and a declaration by the district court that the defendant had forfeited the loan principal pursuant to TILA. *Id.*

We stated that the "unilateral notification of cancellation does not automatically void the loan contract." *Id.* at 821. "[O]therwise, a borrower could get out from under a secured

10       GILBERT V. RESIDENTIAL FUNDING LLC

loan simply by claiming TILA violations, whether or not the
lender had actually committed any." *Id.* (quoting *Yamamoto
v. Bank of N.Y.*, 329 F.3d 1167, 1172 (9th Cir. 2003)) (internal
quotation marks omitted).

We must not conflate the issue of whether a borrower has
exercised her right to rescind with the issue of whether the
rescission has, in fact, been completed and the contract
voided. The former is the concern of § 1635(f) and Regulation
Z, and a borrower exercises her right of rescission by merely
communicating in writing to her creditor her intention to
rescind. To complete the rescission and void the contract,
however, more is required. Either the creditor must "acknowl-
edge[ ] that the right of rescission is available" and the parties
must unwind the transaction amongst themselves, or the bor-
rower must file a lawsuit so that the court may enforce the
right to rescind. *Shelton*, 486 F.3d at 821 (quoting *Large v.
Conseco Fin. Servicing Corp.*, 292 F.3d 49, 54-55 (1st Cir.
2002)) (internal quotation marks omitted).

At this stage of the litigation, we are not concerned with
whether the contract has been effectively voided. A court
must make a determination on the merits as to whether that
should occur. Instead, the question presented here is whether
the Gilberts exercised their right to rescind with the April 5,
2009, letter. Based on the plain meaning of the applicable
statute and regulation, we answer that question in the affirma-
tive.

Appellees' reliance on *Beach v. Ocwen Federal Bank*, 523
U.S. 410 (1998), is misplaced. The *Beach* Court did not
address the proper method of exercising a right to rescind or
the timely exercise of that right. Instead, in *Beach*, the Court
looked at "whether § 1635(f) is a statute of limitation, that is,
'whether [it] operates, with the lapse of time, to extinguish the
right which is the foundation for the claim' or 'merely to bar
the remedy for its enforcement.'" *Id.* at 416 (alteration in orig-

GILBERT v. RESIDENTIAL FUNDING LLC          11

inal) (quoting *Midstate Horticultural Co. v. Pa. R.R. Co.*, 320 U.S. 356, 358-59 (1943)). The Court stated the following:

> Section 1635(f), however, takes us beyond any question whether it limits more than the time for bringing a suit, by governing the life of the underlying right as well. . . . It talks not of a suit's commencement but of a right's duration, which it addresses in terms so straightforward as to render any limitation on the time for seeking a remedy superfluous.

*Id.* at 417. In other words, the three-year limitation in 15 U.S.C. § 1635 concerns the extinguishment of the right of rescission and does not require borrowers to file a claim for the invocation of that right. Thus, that the Gilberts failed to seek enforcement of their right to rescind within the three years does nothing to take away from the fact that they exercised their right of rescission within that time period.

### B.

Next, the Gilberts argue that the district court's decision to dismiss their claim for rescission on the basis that Appellees are assignees and not creditors was improper. Appellees do not appear to disagree.

Section 1641(c) states, "Any consumer who has the right to rescind a transaction under section 1635 of this title may rescind the transaction as against any assignee of the obligation." 15 U.S.C. § 1641(c). The district court's holding to the contrary is reversible error.

### C.

According to the Gilberts, the district court also erred in deciding that all of their money damages under TILA are barred by the one-year statute of limitations. We agree.

Section 1640(e) provides a one-year statute of limitations for the filing of a suit once a violation of TILA has occurred. *Id.* ("Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation."). The alleged TILA disclosure violations occurred on May 5, 2006, but the Gilberts did not file suit until September 14, 2009. Thus, the statute of limitations for those violations has long past and the district court was correct in dismissing those claims.

But, it appears that the Gilberts' TILA claim regarding Appellees' refusal to honor their right to rescind was timely filed. The Gilberts sent a letter to GMAC pursuant to 15 U.S.C. § 1635(f) and Regulation Z on April 5, 2009, indicating that they were exercising their right to rescind the mortgage loan. The creditor then had twenty days to respond. *Id.* § 1635(b). The alleged violation of TILA occurred when GMAC sent the April 14, 2009, letter indicating that it would not rescind the loan transaction. To maintain an action for damages pursuant to TILA, the action had to be filed "within one year from the date of the occurrence of the violation." *Id.* § 1640(e). Inasmuch as the Gilberts filed this lawsuit on September 14, 2009, their TILA claim for damages for GMAC's refusal to honor their right to rescind is not time barred.

### III.

Next, the Gilberts challenge the district court's dismissal of their usury claim. Appellees make two arguments as to why the district court did not err. We are convinced by neither.

First, Appellees urge that the Gilberts' usury claim is not ripe for adjudication. According to Appellees, to the extent that the Gilberts might be subject to pay usurious interest, given the manner in which the payment schedule is configured, they have not yet been required to pay the alleged usurious interest rate. The Gilberts counter that because the

GILBERT v. RESIDENTIAL FUNDING LLC          13

payments that they made were interest only, they were paying usurious interest with each payment. As such, according to the Gilberts, their claim is ripe. Construing the Gilberts' allegations as true, as we must at this stage, we accept that this claim is ripe for adjudication.

Second, Appellees maintain that the Gilberts failed to plead a usury claim. According to Appellees, parties have the right to pay any interest rate to which they agree. Therefore, claim Appellees, "to survive a motion to dismiss, the Gilberts would have to allege that they never agreed to the interest rates imposed by the loan documents. On this they are silent." We disagree.

In their complaint, the Gilberts allege that Appellees "charged and collected interest in excess of the agreed rate or limits set forth in Chapter 24 of the North Carolina General Statutes, including without limitation, the charge, collection and imposition of hidden finance charges contained in the erroneous payment schedule set forth in the Truth in [L]ending disclosure statement."

The elements of a usury claim are as follows:

> a loan or forbearance of the collection of money, an understanding that the money owed will be paid, payment or an agreement to pay interest at a rate greater than allowed by law, and the lender's corrupt intent to receive more in interest than the legal rate permits for use of the money loaned.

*Swindell v. Fed. Nat'l Mortg. Ass'n*, 409 S.E.2d 892, 895 (N.C. 1991). "Where the lender intentionally charges the borrower a greater rate of interest than the law allows and his purpose is clearly revealed on the face of the instrument, a corrupt intent to violate the usury law on the part of the lender is shown." *Id.* at 895–96 (quoting *Kessing v. Nat'l Mortg.*

14        GILBERT v. RESIDENTIAL FUNDING LLC

*Corp.*, 180 S.E.2d 823, 827 (1971)) (internal quotation marks omitted).

No one disputes that the Gilberts have established the first two elements. We hold that the Gilberts have adequately pled elements three and four as well. Specifically, the Gilberts contend that there was a loan that was to be repaid; pursuant to the terms of the loan, they were charged an agreed upon or stated interest rate; under the repayment schedule for the loan, they were charged a higher interest rate than agreed upon or allowed by Chapter 24 of the North Carolina General Statutes; when they paid a higher interest rate, Appellees collected more than the agreed upon or allowed interest rate; and Appellees charged the higher rate with a corrupt intent. Consequently, they have properly pled a usury claim pursuant to *Swindell*.

Although not argued by the parties or referenced below, on remand, the district court should consider whether North Carolina General Statute Section 24-1.1A(a)(1) ("Where the principal amount is ten thousand dollars ($10,000) or more the parties may contract for the payment of interest as agreed upon by the parties . . . ."), Section 24-9(a)(3) ("'Exempt loan' means a loan in which . . . [t]he loan amount is three hundred thousand ($300,000) or more . . . ."), and Section 24-9(b) ("A claim or defense of usury is prohibited in an exempt loan transaction.") are applicable.

IV.

The Gilberts also urge that the district court erred in granting Appellees' Rule 12(b)(6) motion as to their NCUDTPA cause of action. To establish a prima facie case of unfair and deceptive trade practices, a plaintiff must demonstrate the following: (1) the defendant committed an unfair or deceptive trade practice; (2) the action in question was in or affecting commerce; and (3) the act proximately caused injury to the plaintiff. *Spartan Leasing v. Pollard*, 400 S.E.2d 476, 482

GILBERT v. RESIDENTIAL FUNDING LLC          15

(N.C. Ct. App. 1991). An act is unfair when it is unethical or unscrupulous, and it is deceptive if it tends to deceive. *Marshall v. Miller*, 276 S.E.2d 397, 403 (N.C. 1981).

In their allegations concerning their NCUDTPA claims, the Gilberts make the following complaints: usury law violations, TILA violations, and "falsely representing to be the owner and holder of [the Gilberts'] note and deed of trust." Thus, they argue the following:

> These acts and omissions proximately damaged plaintiffs, are in and affecting commerce, violate public policy, have the capacity to deceive an ordinary consumer, are unscrupulous, immoral, and oppressive, and constitute unfair and/or deceptive trade practices under [North Carolina General Statute] § 75-1.1, thereby entitling plaintiffs to three times their actual damages plus a reasonable attorney's fee pursuant to [North Carolina General Statute] §§ 75-16 and 75-16.1.

Some of the Gilberts' allegations concern the actions of the Appellees, and some concern the actions of the original creditor, who is not party to this lawsuit. And, although some claims in this lawsuit can be assigned, "unfair practice claims pursuant to . . . § 75-1.1 cannot be assigned," *Investors Title Ins. Co. v. Herzig*, 413 S.E.2d 268, 271 (N.C. 1992). Thus, the district court properly dismissed those portions of the claims. "[A] violation of a consumer protection statute may, in some instances, constitute a *per se* violation of the UDTPA[,]" however. *In re Fifth Third Bank, Nat'l Ass'n-Vill. of Penland Litig.*, 719 S.E.2d 171, 176 (N.C. Ct. App. 2011). Inasmuch as we have held that certain of the Gilberts' TILA and usury claims should go forward, and because we are of the opinion that the Gilberts have set forth a sufficient factual basis for these claims, we hold that their unassigned NCUDTPA claims should be allowed to proceed as well.

16        GILBERT V. RESIDENTIAL FUNDING LLC

V.

The Gilberts also contest the district court's determination that res judicata barred them from raising issues related to the endorsements on the allonge to the note.

As the district court recognized, "[i]ssues that 'the clerk of court decides at a foreclosure hearing as to the validity of the debt and the trustee's right to foreclose are subject to res judicata and cannot be relitigated.'" *Gilbert*, 2010 WL 2696763, at *4 (quoting *Merrill Lynch Bus. Fin. Servs. Inc. v. Cobb*, No. 5:07-CV-129-D, 2008 WL 6155804, at *3 (E.D.N.C. Mar. 18, 2008)). Because the superior court affirmed the Clerk's decision that Deutsche could enforce the note, the district court concluded that res judicata barred the Gilberts from relitigating Deutsche's enforcement authority. *Id.*

But, as noted above, on May 3, 2011, the North Carolina Court of Appeals reversed the state trial court's decision that allowed Simpson to proceed with a foreclosure sale, finding that "the record is lacking of competent evidence sufficient to support that [Deutsche] is the owner and holder of Mr. Gilbert's note and deed of trust." *In re Simpson*, 711 S.E.2d at 175. As such, res judicata no longer bars the Gilberts from litigating whether Deutsche has authority to enforce the note.

VI.

Finally, the Gilberts complain that the district court erred in denying their motion to alter or amend pursuant to Rule 59(e). Because we are reversing and remanding this case to the district court, the argument is moot.

VII.

In light of the foregoing, we affirm in part, reverse in part and remand for further proceedings.

GILBERT V. RESIDENTIAL FUNDING LLC                    17

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*

STATE OF NORTH CAROLINA
COUNTY OF HYDE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
09 CVS 70
CODE: COMP: OTHR

REX T. GILBERT, JR. and
DANIELA L. GILBERT,

                Plaintiffs,

v.

DEUTSCHE BANK TRUST COMPANY
AMERICAS, *As Trustee for,*
RESIDENTIAL ACCREDIT LOANS, INC,
DAVID A. SIMPSON, P.C., Substitute Trustee,
RESIDENTIAL FUNDING, LLC, and
GMAC MORTGAGE, LLC,

                Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
;IME    10:15   Am

SEP 1 4 2009

**CLERK SUPERIOR COURT**
**HYDE COUNTY,**
Deputy          CLERK

## COMPLAINT

NOW COME the plaintiffs by and through their counsel of record and allege and say as follows:

### JURISDICTION

This action is instituted pursuant to N.C. Gen. Stat. § 45-21.34 for the purpose of enjoining the foreclosure sale authorized by Order of the Honorable Marvin Blount in Hyde County File 09-SP-09 and raising legal and equitable defenses, including but not limited to, rescission pursuant to rights granted under the federal Truth in Lending Act, material disclosures violations of the federal Truth in Lending Act, unfair and deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, et. seq, and the charging and collecting of usurious interest in violation of N.C. Gen. Stat. § 24-2, et. seq.

### PARTIES

1.      The plaintiffs are citizens and residents of Hyde County North Carolina.

2.      Defendant, Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc. Series 2006-QA6 (hereinafter Deutsche) is, upon information and belief, an entity that serves as Trustee for securitized pools of mortgage loans that are secured by North Carolina real property and regularly uses the North Carolina Courts for purposes of foreclosing mortgage loans that it holds as Trustee. Defendant Deutsche purports to be the owner and holder of the Adjustable Rate Note (hereinafter Promissory Note) and Deed of Trust that are the subject of this complaint and has, upon information and belief, instructed the Substitute Trustee of a Deed of Trust signed by plaintiffs, to file the foreclosure action known as 09 SP 09 in the Superior Court of Hyde County, North Carolina.

3.      Defendant, David A. Simpson, P.C. (hereinafter Simpson) is a professional corporation organized under the laws of the State of North Carolina which, upon information and belief, contracts with financial services companies to provide Substitute Trustee services for prosecution of foreclosures in North Carolina and, upon information and belief, purports to have been appointed as a Substitute Trustee under the Deed of Trust that secures the mortgage loan that is the subject of this complaint.

4.      Defendant Residential Funding, LLC (hereinafter Residential Funding) is, upon information and belief, a limited liability company which purports to be the master servicer for the Note and Deed of Trust which is the subject of this complaint.

5.      Defendant, GMAC Mortgage, LLC (hereinafter GMAC) is, upon information and belief, a limited liability company which regularly services loans secured by real property located in North Carolina. GMAC purports to be the current subservicer of the Note and Deed of Trust which is the subject of this complaint.

2

## FACTUAL ALLEGATIONS

6.      All paragraphs of this complaint are incorporated herein as if fully set forth.

7.      Plaintiffs, Rex T. Gilbert, Jr. and Daniela L. Gilbert, are husband and wife and reside upon a tract of land that is titled in their name as tenants by the entirety on Ocracoke Island, Hyde County, North Carolina.

8.      During the late winter or early spring of 2006, plaintiff, Daniela Gilbert, telephoned First Flight Mortgage, LLC office located at 2503 North Croatan Highway in Kill Devil Hills, North Carolina.

9.      During the months of March and April of 2006, plaintiff, Daniela L. Gilbert spoke on many occasions with Emily Berry-Belvin, who represented herself to be the loan officer for First Flight Mortgage, LLC who would handle the mortgage loan transaction for plaintiffs.

10.     Upon information and belief, Emily Berry-Belvin, was, at all times pertinent to the transactions described in this complaint, the employee or agent of First Flight Mortgage, LLC, with full actual and apparent authority to act for First Flight Mortgage, LLC.

11.     During the spring of 2006, plaintiffs were struggling to make the payments on an adjustable rate mortgage loan and wanted to refinance to cash out money until they were able to sell their home and borrow money to build another home on an adjacent parcel of land.

3

12. Plaintiff, Daniela L. Gilbert, talked with Emily Berry-Belvin and explained that plaintiffs wanted to refinance their mortgage loan with a loan that would allow them to cash out money until they sold their home and built a new lower cost home.

13. Plaintiff, Daniela L. Gilbert, provided Emily Berry-Belvin with copies of plaintiffs' bank statements to show their income.

14. The income documentation provided by plaintiffs does not show monthly income of $10,950.00 each month.

15. At some point, Emily Berry-Belvin called plaintiffs to advise of the need for an appraisal. After some discussion, Emily Berry Belvin represented to plaintiffs that their home needed to appraise at $700,000.00 in order for them to get the loan.

16. When plaintiff, Daniela L. Gilbert, offered to contact John W. Hunter, a licensed appraiser who has considerable experience appraising residential properties on Ocracoke, Emily Berry-Belvin advised plaintiff that they needed someone "more aggressive with the numbers."

17. On information and belief, Ms. Berry-Belvin contacted Marco P. Garcia with Appraisal Group Outer Banks, Inc. who conducted, prepared and signed a Uniform Residential Appraisal Report which valued the plaintiff's property at $700,000.00.

18. Plaintiffs did not receive a copy of aforementioned appraisal under sometime after the loan transaction which is the subject matter of this complaint was completed. The copy received by plaintiffs is inserted into a plastic binder with a green spine which matches the color of the First Flight Mortgage logo and includes a cover sheet with First Flight Mortgage letterhead.

19.    When the appraisal came in, Emily Berry-Belvin represented to plaintiffs that they would close before the end of April, 2006.

20.    Emily Berry-Belvin told plaintiff, Daniela L. Gilbert, not to make further payments to the lender that currently held plaintiffs' mortgage loan because the refinance loan would be closing during the month of April.

21.    In reasonable reliance upon the statements and assurances of Emily Berry-Belvin, that the refinance loan would close during the month of April, plaintiffs followed her instruction and withheld the May 2003 mortgage payment and plaintiffs proceeded to use the money that would otherwise have been used for the May mortgage payment for other necessary household expenses.

22.    The mortgage loan finally closed late on the afternoon of May 5, 2006.

23.    During the month of May, 2006 and shortly before the May 5, 2006, loan closing, plaintiff, Daniela L. Gilbert, received a telephone call from Emily Berry-Belvin who stated that because the plaintiffs were planning to sell their home, the refinance they would be getting would be an interest only loan. No other option was presented to plaintiffs.

24.    Plaintiffs voiced objections to the interest-only loan; however, plaintiffs were reassured by Emily Berry-Belvin that this was the best option for them given their financial situation and she led plaintiffs to believe that they would be able to refinance the terms of the loan in a year or so.

25.    On May 5, 2006, plaintiffs traveled to Nags Head to the office of a lawyer for the loan closing.

5

26.    Upon arrival at the lawyer's office, plaintiffs were advised that they would have to wait because the paper work had not arrived.

27.    After waiting several hours and having to make calls to Ocracoke to arrange for unplanned after school child care, the plaintiffs were finally ushered into a back office to sign the paper work beginning at approximately 5:50 p.m.

28.    Plaintiffs did not meet the lawyer who was supposed to be handling the closing. Instead, plaintiffs met with an assistant who sat across the table from the plaintiffs with a stack of papers marked with stickies indicating where their signatures were needed.

29.    The assistant did not review the documents with the plaintiffs nor did she explain the contents or purpose of any of the documents. The assistant hurried plaintiffs through the signing process by showing plaintiffs where to sign and instructing them to sign. Plaintiffs did look at several of the documents but did not have an opportunity to review the full extent of the contents of all of the documents.

30.    Once the plaintiffs had signed each of the documents in the place indicated by the assistant, the meeting was over. Plaintiffs did not receive any of the documents or copies of any of the documents after they had completed the signing process.

31.    Among other documents, plaintiffs executed a Promissory Note in the amount of $525,000.00 and a Deed of Trust securing the Promissory Note for the benefit of the original lender, First National Bank of Arizona.

32.    The copy of the Promissory Note presented at the foreclosure hearing in the matter 09 SP 09 in Hyde County Superior Court bore an additional page entitled

6

"Allonge to Note" (hereinafter Allonge) The Allonge purports to meet the requirements of N.C. Gen. Stat. § 25-1-201(21) by showing indorsements, authorized signatures, by the various and multiple entities purporting to assign and transfer the Promissory Note and Deed of Trust from the original lender, First National Bank of Arizona through to present purported holder and owner, defendant Deutsche. (Exhibit 1)

33.    The Allonge shows an indorsement by First National Bank of Arizona to First National Bank of Nevada.

34.    The Allonge shows an indorsement by Deutsche Bank National Trust Company, FKA Bankers Trust Company of California, N.A. as Custodian as Attorney in Fact wherein it purports to have authority to indorse on behalf of First National Bank of Nevada to Residential Funding Corporation.

35.    Plaintiffs have requested documentation to substantiate the authority of Deutsche Bank National Trust Company, FKA Bankers Trust Company of California, N.A. as Custodian as Attorney in Fact to act on behalf of First National Bank of Nevada; no such information has been provided; therefore, on information and belief, there is no underlying documentation to substantiate the indorsement by Deutsche Bank National Trust Company, FKA Bankers Trust Company of California, N.A. as Custodian as Attorney in Fact for First National Bank of Nevada to Residential Funding Corporation.

36.    The Allonge shows an indorsement from Residential Funding Corporation to Deutsche Bank Trust Company Americas as Trustee.

37.    With respect to Residential Accedit Loans, Inc., the Allonge bears no indorsement to Residential Accredit Loans, Inc. which is the entity which purports to be the owner and holder of the note.

7

38.     The Allonge bears the indorsement "Deutsche Bank Trust Company of Americas Trustee". The indorsement does not state for whom Deutsche Bank is acting as Trustee.

39.     The Promissory Note executed by plaintiff provides for interest to be charged at a yearly rate of 7.375% and for the first *84 monthly payments in the amount of $4,391.32*. (Exhibit 2) This same Promissory Note indicates on its face that there was an interest-only addendum to the note.

40.     The interest-only addendum states that it superseded certain sections of the Promissory Note; to wit: *the first 120 payments in the amount of $3226.57 and the next 240 payments in an amount sufficient to fully amortize the outstanding principal balance of the note over the remaining term of the Note in equal monthly payments*. (Exhibit 3)

41.     The federal Truth in Lending disclosure statement provided to plaintiffs at closing disclosed the following:

| APR: | Finance charge | Amount Financed | Total of Payments |
|------|----------------|-----------------|-------------------|
| 7.953% | $943469.57 | $507,473.43 | $1,450,943.00 |

Payment Schedule:

84 payments @ $3226.57
36 payments @ $3500.00
239 payments @ $4391.32
1 payment @ $4385.64

(Exhibit 4)

42.    The payment schedule disclosed on the Truth in Lending Disclosure Statement does not match the payment schedule set forth in the Promissory Note or the interest only addendum to the Promissory Note.

43.    To date, plaintiffs have failed to receive a Truth in Lending Disclosure Statement which accurately discloses the payment schedule for the transaction which is the subject of this Complaint.

44.    The three day right to cancel the transaction is extended until plaintiffs receive the Truth in Lending disclosures or the expiration of three years whichever is later.

45.    On April 5, 2009, plaintiffs by and through their counsel exercised their extended right to rescind the loan transaction by giving written notice. (Exhibit 5)

46.    By letter dated April 24, 2009, Kathy Priore, Associate Counsel for GMACM, advised that it "would not rescind the Loan transaction at this time." (Exhibit 6)

47.    The payment schedule set forth on the Truth in Lending Disclosure Statement charges plaintiffs more than $100,000.00 in hidden finance charges.

48.    Beginning in the summer of 2008, plaintiffs attempted to negotiate with defendant GMAC for a loan modification by submitting detailed financial documentation.

49.    Plaintiffs were told that they needed to make two consecutive regular mortgage payments before they would be considered for a loan modification.

50.    Plaintiffs spent untold hours on hold on the telephone attempting to contact representatives of defendant GMAC sometimes with success but many times without success. Plaintiffs never spoke to the same representative twice.

50.    On or about August 27, 2008, plaintiffs received a letter from defendant GMAC returning their last mortgage payment and informing plaintiffs that they had failed to honor the trial period.

51.    In a state of near panic, plaintiff telephoned defendant GMAC and after a long wait on hold plaintiff was told that the representative responsible for processing their request for loan modification had been fired for failing to process loan modifications.

52.    Plaintiff was assured by a representative of defendant GMAC that he would place a hold on the foreclosure status and work with them to process the loan modification. Plaintiff was subsequently unable to reach this representative again.

53.    On or after September 5, 2008, plaintiffs received an overnight envelope from defendant GMAC regarding a loan modification.

54.    Plaintiff learned that they had been approved for a loan modification which modified the interest rate to 5.7500% on a new principal balance of $541,036.08, on a term of 332 months with a maturity date of June 1, 2026.

55.    The loan modification also required them to make a lump sum payment of $8051.40 by October 1, 2008 and begin making the modified payments on November 1, 2008.

56.    The loan modification reduced plaintiffs' monthly mortgage payment by 4429.99. Plaintiffs were unable to make the lump sum payment required to qualify for the loan modification.

57.    Beginning in October, 2008, plaintiffs attempted by and through counsel to negotiate with defendant GMAC.

10

58.    On October 14, 2008, plaintiffs faxed releases of information authorizing defendant GMAC to discuss their account with counsel.

59.    Defendant GMAC advised plaintiffs that it would take up to five days for verification of the release of information to post to plaintiffs account and until such time defendant GMAC was not authorized to speak with counsel.

60.    On October 20, 2008, plaintiffs through counsel again attempted without success to speak with representatives of defendant GMAC regarding plaintiffs' account.

61.    On November 2, 1008, plaintiffs through counsel wrote to defendant GMAC regarding options for a real loan modification. Plaintiffs did not receive a response to this letter.

62.    On November 14, 2008, plaintiffs through counsel spoke with defendant GMAC's representative Jay Graves regarding their account. Plaintiffs were advised that the modification had been denied because of the failure to make the lump sum payment.

63.    On January 9, 2009, plaintiffs again through counsel wrote to defendant GMAC regarding a loan modification. Plaintiffs did not receive a response to this letter.

63.    On February 10, 2009, plaintiffs again through counsel wrote to defendant GMAC regarding their account.

64.    On February 20, 2009, defendant GMAC by letter advised plaintiffs' counsel that until she submitted written permission from the plaintiffs, defendant GMAC could not speak with counsel.

## CLAIMS FOR RELIEF

## STATEMENT OF NATURE OF CLAIMS ASSERTED

11

65.    This action is filed, in part, to enjoin the mortgage foreclosure sale ordered in 09 SP 09, Hyde County, on equitable and legal grounds pursuant to N.C. Gen. Stat. §45-21.34.  All claims asserted affirmatively by plaintiffs in this action are also asserted, in the alternative, in defense and recoupment against any claim of indebtedness arising from the mortgage loan obligations and transactions that are the subject of this complaint.

FIRST CLAIM FOR RELIEF
VIOLATIONS OF TRUTH IN LENDING
AGAINST DEFENDANTS DEUTSCHE, RESIDENTIAL FUNDING AND GMAC

66.    All paragraphs of this complaint are incorporated herein as if fully restated.

67.    This consumer credit transaction was subject to the Plaintiffs' right of rescission as described by 15 U.S.C. § 1635 and Regulation Z § 226.23 (12 C.F.R. § 226.23).

68.    Defendants Deutsche, Residential Funding and GMAC as purported assignees of First National Bank of Arizona and servicers and subservicers of the purported holder of the Promissory Note are liable to plaintiffs for violations 15 U.S.C. § 1635(a) and Regulation Z § 226.23(b) for failure to timely deliver to the Plaintiffs two copies of the notice of the right to rescind which clearly and conspicuously disclosed the date the rescission period expired.

69.  Defendants Deutsche, Residential Funding and GMAC as purported assignees of First National Bank of Arizona and servicers and subservicers of the purported holder of the Promissory Note are liable to plaintiffs for failing to deliver all "material" disclosures required by the Act and Regulation Z, including the following:

a. By failing to properly and accurately disclose the "amount financed," using that term in violation of Regulation Z § 226.18(b) and 15 U.S.C. §1638(a)(2)(A).
b. By failing to clearly and accurately disclose the "finance charge," using that term, in violation of Regulation Z §§ 226.4 and 226.18(d) and 15 U.S.C. §1638(a)(3).

12

c. By failing to clearly and accurately disclose the "annual percentage rate," using that term, in violation of Regulation Z § 226.18(e) and 15 U.S.C. § 1638(a)(4).

d. By failing to properly disclose the number, amounts, and timing of payments scheduled to repay the obligation, in violation of Regulation Z § 226.18(g) and 15 U.S.C. § 1638(a)(6).

e. By failing to clearly and accurately disclose the "total of payments," using that term, in violation of Regulation Z § 226.18(h) and 15 U.S.C. § 1638(a)(5).33.

70.    These material disclosure violations are apparent from the face of the disclosure statement and other documents assigned pursuant to the requirements of 15 U.S.C. § 1641(a).

71.    Plaintiffs have a continuing right to rescind the transaction until the third business day after receiving both the notice described in paragraph 50 and all "material" disclosures described in paragraph 69, pursuant to 15 U.S.C. § 1635(a) and Regulation Z § 226.23(a)(3), up to three years after consummation of the transaction.

72.    On April 5, 2009, Plaintiffs by and through counsel rescinded the transaction by sending to a notice of rescission addressed to "Holder of Loan # , c/o Ms. Lauren S. Thurmond, Kellam & Pettit, P.A. , 2701 Coltsgate Road, Suite 300, Charlotte, North Carolina 28211.

73.    Counsel for defendants forwarded the plaintiffs' letter of rescission to GMAC.

74.    More than 20 calendar days have passed since the Defendants received copies of the Plaintiff's notice of rescission.

75.    Defendants have failed to take any action necessary or appropriate to reflect the termination of the security interest created under this transaction as required by 15 U.S.C. § 1635(b) and Regulation Z § 226.23(d)(2).

13

76.     Defendants have failed to return to plaintiffs any money or property given by the plaintiffs to anyone, including the defendants, as required by 15 U.S.C. §1635(b) and Regulation Z § 226.23(d)(2).

77.     As a result of the aforesaid violations of the Act and Regulation Z, pursuant to 15 U.S.C. §§ 1635(a), 1640(a), and 1641(c), defendants are liable to plaintiffs for:

a. Rescission of this transaction.
b. Termination of any security interest in Plaintiff's property created under the transaction.
c. Return of any money or property given by the Plaintiff to anyone, including the Defendant, in connection with this transaction.
d. Statutory damages of $2000 for the disclosure violations.
e. Statutory damages of $2000 for Defendants' failure to respond properly to Plaintiff's rescission notice.
f. Forfeiture of return of loan proceeds.
g. Actual damages in an amount to be determined at trial.
h. A reasonable attorney fee.

SECOND CLAIM FOR RELIEF
USURY

78.     All paragraphs of this complaint are incorporated herein as if fully restated.

79.     With willful and corrupt intent to charge and collect a greater rate of interest than allowed by law, defendants charged and collected interest in excess of the agreed rate or limits set forth in Chapter 24 of the North Carolina General Statutes, including without limitation, the charge, collection and imposition of hidden finance charges contained in the erroneous payment schedule set forth in the Truth in lending disclosure statement.

80.     These acts and practices entitle plaintiffs to the remedies set out in N.C.G.S. § 24-2 et seq., and defendant, Deutsche, as purported holder of the loan and by reason of its joint venture relationship with defendants, Residential Funding and

14

GMAC is jointly and severally liable with defendants, Residential Funding and GMAC, for all damages pursuant to this Claim.

## THIRD CLAIM FOR RELIEF
## UNFAIR TRADE PRACTICES PURSUANT TO N.C. GEN. STAT. 75-1.1

81.    All paragraphs of this complaint are incorporated herein as if fully restated.

82.    Defendants have engaged in unfair methods of competition in or affecting commerce or unfair or deceptive acts or practices in or affecting commerce in at least but not limited to the following:

   a.    disclosing, charging and collecting usurious rates of interest;

   b.    failing to make material disclosures pursuant to the requirements of the federal Truth in Lending Act;

   c.    failing to take affirmative steps to cancel the plaintiffs' Deed of Trust upon their notice of rescission;

   d.    falsely representing to be the owner and holder of plaintiffs' note and deed of trust;

83.    These acts and omissions proximately damaged plaintiffs, are in and affecting commerce, violate public policy, have the capacity to deceive an ordinary consumer, are unscrupulous, immoral, and oppressive, and constitute unfair and/or deceptive trade practices under  N.C.G.S. § 75-1.1, thereby entitling plaintiffs to three times their actual damages plus a reasonable attorney's fee pursuant to N.C.G.S.§§ 75-16 and 75-16.1.

## FOURTH CLAIM FOR RELIEF
## VIOLATIONS OF NORTH CAROLINA'S PROHIBITED ACTS BY DEBT COLLECTORS
## PURSUANT TO N.C. GEN. STAT. § 75-50 ET. SEQ.

84.    All paragraphs of this complaint are incorporated herein as if fully restated.

85.    Plaintiffs are consumers within the meaning of N.C. Gen. Stat. § 75-50 et seq.

86.    Defendants are debt collectors within the meaning of N.C. Gen. Stat. § 75-50 et. seq.

87.    Defendants have attempted to collect a debt within the meaning of N.C. Gen. Stat. § 75-50(2).

88.    Defendants have engaged in acts of debt collection in violation of N.C. Gen. Stat. § 75-50 et. seq. in at least but not limited to the following:

a.    communicating with plaintiffs after the defendants had been notified by the plaintiff's attorney that she represents said plaintiffs;

b.    falsely representing the character, extent, or amount of debt against a consumer pursuant to N.C. Gen. Stat. § 75-54(4) to wit: all attempts to collect money from plaintiffs after plaintiffs forwarded their notice of rescission to the noteholder;

c.    falsely representing to be owner and holder of the plaintiffs' Promissory Note;

d.    attempting to foreclose on plaintiffs' property without legal authority.

89.    Defendants are liable to plaintiffs for actual damages and a statutory penalty of $2000.00 for each violation proved at trial and reasonable attorney's fees.

## FIFTH CLAIM FOR RELIEF
## BREACH OF CONTRACT

90.    All paragraphs of this complaint are incorporated herein as if fully restated.

91.    On or about May 5, 2006, plaintiff executed a Promissory Note in favor of First National Bank of Arizona.

16

92.    The federal Truth in Lending disclosure statement provided to plaintiffs at closing disclosed the following payment schedule:

84 payments @ $3226.57
36 payments @ $3500.00
239 payments @ $4391.32
1 payment @ $4385.64

93.    The payment schedule set forth in paragraph 74 is a breach of the contract between plaintiff and the original lender.

94.    Plaintiffs are entitled to actual damages and reasonable attorney's fees.

### SIXTH CLAIM FOR RELIEF

95.    All paragraphs of this complaint are incorporated herein as if fully restated.

96.    On or about May 5, 2006, plaintiff executed a Promissory Note in favor of First National Bank of Arizona.

97.    Defendant, Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc. purports to be the owner and holder of the Promissory Note executed by plaintiff to First National Bank of Arizona by and through various indorsements.

98.    Under N.C. Gen. Stat. § 25-3-301, the holder of a negotiable instrument may enforce payment in his own name.

99.    N. C. Gen. Stat. § 25-1-201(21) defines a holder of an instrument as one who is in possession of an instrument "drawn, issued, or indorsed to him or to his order or to bearer or in blank.

100.    Where a negotiable instrument is made payable to order, one becomes a holder of the instrument when it is properly indorsed and delivered.

17

101.    Mere possession of a note payable to order does not suffice to prove ownership or holder status. . Econo-Travel Motor Hotel Corp. v. Taylor, 301 N.C. 200, 271 S.E.2d 54 (1980).

102.    The Allonge under and by which Defendant Deutsche claims to hold is defective in at least the following:

a.    on information and belief, the indorsement by Deutsche Bank National Trust Company, FKA Bankers Trust Company of California, N.A. as Custodian as Attorney in Fact on behalf of First National Bank of Nevada is not duly authorized;

b.    the indorsement to Defendant Deutsche is in its representative capacity as trustee not to Defendant Deutsche in its own name. No principal's name appears in the indorsement.

103.    Defendant Deutsche is without authority and capacity to enforce the Promissory Note executed by plaintiff to First National Bank of Arizona.

104.    The Court should strike the Order allowing foreclosure by sale entered by Judge Blount as void.

105.    Defendants are liable to plaintiffs for an amount to be proven at trial.

**PLAINTIFFS' FIRST MOTION FOR INJUNCTIVE RELIEF AGAINST DEFENDANTS**
TO PRESERVE THE STATUS QUO AND TO PREVENT DELAYING TACTICS BY
PROHIBITING THE ASSIGNMENT OF THE MORTGAGE OR SERVICING
RIGHTS DURING THE COURSE OF THE LITIGATION

106.    All paragraphs of this complaint are incorporated herein as if fully restated.

107.    Plaintiffs, pursuant to Rule 65(b) of the North Carolina Rules of Civil Procedure, move this Court for an Order granting a Preliminary Injunction, enjoining these defendants   from conveying or assigning any interest in the mortgage loan that is the subject of this litigation until and unless otherwise allowed by Court Order.

18

108.    As grounds for said Motion, plaintiffs reallege and incorporate herein by reference the facts of this verified complaint and state  additionally that they will suffer immediate and irreparable harm if said defendants undertake to delay these proceedings by forcing addition or joinder of parties who may subsequently obtain an interest in plaintiffs' loan.   The prospect of prolonged delay by virtue of sale or assignment of interests in this loan is not without precedent by similarly situated lender-defendants and would cause great harm to the plaintiffs.

109.    Plaintiffs show the court that the relief requested is for the purpose of preserving the status quo and that the burden imposed upon the defendants is reasonable and necessary for purposes of preserving the status quo and that the burden is far less than would be suffered by the plaintiffs if the status quo is not maintained during the course of the litigation.

110.    Plaintiffs respectfully request that the Court accept this verified complaint as their affidavit for purposes of this Motion for Preliminary Injunction.

## PLAINTIFFS' SECOND MOTION FOR INJUNCTIVE RELIEF AGAINST DEFENDANTS
### TO PRESERVE THE STATUS QUO AND TO RESTRAIN A FORECLOSURE SALE DURING THE COURSE OF THIS LITIGATION, WHICH WOULD OTHERWISE CAUSE IRREPARABLE HARM TO PLAINTIFFS.

111.    All paragraphs of this complaint are incorporated herein as if fully restated.

112.    Plaintiffs, through counsel and pursuant to Rule 65 of the North Carolina Rules of Civil Procedure, respectfully move this Court for a Temporary Restraining Order prohibiting defendants  from proceeding toward the foreclosure sale of plaintiffs' home and, in support of this motion, show the following: (i) plaintiffs have shown

through their Complaint and Affidavit, and will show at the hearing of this Motion, claims which have a substantial likelihood of success on the merits; (ii) that plaintiffs will suffer immediate and irreparable harm by virtue of losing title to their home through foreclosure sale before the adverse parties or their counsel can be heard in opposition to this Motion; (iii) that the potential injury to the plaintiffs is of such a nature that compensation alone will not make plaintiffs whole; (iii) that the restraint ordered imposes no undue burden or risk of harm to defendants; (iv) that balancing the risk of harm between the parties favors injunctive relief in favor of plaintiffs; (v) that time is of the essence, and that the bond, if applicable, will adequately protect defendants from any reasonable risk of harm by the restraint ordered while the underlying claims determining the rights of the parties are decided.

113.    Plaintiffs' counsel undersigned certifies to the Court the efforts that have been made to give notice of this Motion to the adverse parties and the reasons supporting the claim that notice should not be required as follows:

114.    Wherefore plaintiffs respectfully request that a Temporary Restraining Order be entered by the Court prohibiting the defendants from pursuing further proceedings toward the foreclosure sale of plaintiffs' home or otherwise ordering relief as the Court determines appropriate.

## **REQUEST FOR RELIEF**

WHEREFORE, plaintiffs respectfully request that this Court:

1.    Assume jurisdiction of this case;

2.    Declare the security interest in Plaintiff's home void;

3.    Rescind the transaction of May 5, 2006;

4.      Order defendants to take all action necessary to terminate any security interest in plaintiffs' property created under the transaction and that the Court declare all such security interests void, including but not limited to the mortgage related to the transaction of May 5, 2006;

5.      Order the return to the plaintiffs of any money or property given by the plaintiffs to anyone, including the defendants, in connection with the transaction;

6.      Enjoin defendants during the pendency of this action, and permanently thereafter, from instituting, prosecuting, or maintaining foreclosure proceedings on the plaintiffs' property, from recording any deeds or mortgages regarding the property or from otherwise taking any steps to deprive plaintiffs of ownership of that property;

7.      Award the plaintiffs statutory damages for the disclosure violations, in the amount of twice the finance charge in connection with this transaction, but not less than $200 or more than $2000 as provided under 15 U.S.C. § 1640(a);

8.      Award the plaintiffs statutory damages for defendants' failure to respond properly to the plaintiffs' rescission notice, in the amount of twice the finance charge in connection with this transaction, but not less than $200 or more than $2000 as provided under 15 U.S.C. § 1640(a);

9.      Order that, because the defendants failed to respond to the plaintiffs' notice of rescission, plaintiffs have no duty to tender, but in the alternative, if tender is required, determine the amount of the tender obligation in light of all of the plaintiffs' claims, and order the defendants to accept tender on reasonable terms and over a reasonable period of time;

10.      Award actual damages in an amount to be established at trial;

21

11.    Award the plaintiff costs and a reasonable attorney fee as provided under 15 U.S.C. § 1640(a);

12.    Award treble damages pursuant to N.C. Gen. Stat. §75-16;

13.    Order a forfeiture of all interest under the loan transaction;

14.    Award twice the amount of usurious interest pursuant to N.C. Gen. Stat. § 24-2, et. seq.;

15.    Grant plaintiffs injunctive relief as requested above;

16.    Strike the Order of allowing the foreclosure sate;

17.    Award such other and further relief as the Court deems just and proper.

This the 14th day of September 2009.

Katherine S. Parker-Lowe
Attorney for Plaintiffs
NC Bar # 13318
35 Miss Elecia Lane, Suite 101
Post Office Box 730
Ocracoke, North Carolina 27960
252-928-1000
252-928-3037

22

## VERIFICATION

I, Rex T. Gilbert, Jr.,  being  duly sworn, depose and say the following:

That the contents of the foregoing instrument are true to my own knowledge except matters stated on information and belief and as to those matters I believe them to be true.

This the ___12th___ day of ___Sept___, 20_09_

_____
Rex T. Gilbert, Jr.


Sworn and subscribed to before me

this ___13th___ day of ___Sept___, 20_09_.

_____
Notary Public

My Commission Expires:

_____3-3-2014_____

STATE OF NORTH CAROLINA
COUNTY OF HYDE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
09 CVS 70

REX T. GILBERT, JR. and
DANIELA L. GILBERT,

                Plaintiffs,

v.

DEUTSCHE BANK TRUST COMPANY
AMERICAS, *As Trustee for*,
RESIDENTIAL ACCREDIT LOANS, INC.,
DAVID A. SIMPSON, P.C., Substitute Trustee,
RESIDENTIAL FUNDING, LLC, and
GMAC MORTGAGE, LLC,

                Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

FILED
10:15 - Am

SEP 1 2009

CLERK SUPERIOR COURT
HYDE COUNTY
Deputy      Clerk

## AFFIDAVIT OF KEITH PARKER-LOWE

I, Keith Parker-Lowe, being first duly sworn, aver and say as follows:

1.      I am President and CEO of KPL, Inc. a software development company and system integrator for county governments in the mid-Atlantic located and doing business in Ocracoke, North Carolina.

2.      I completed training for the business planning department of AETNA Life and Casualty.  This course of study included calculations, financial yields, actuarial tables, compound interest tables, statistics, and financial plotting and modeling.

3.      I completed training for and obtained a Securities and Exchange Commission Brokers License

4.      I am a licensed Realtor in North Carolina.  The course study included not only the study of financial calculations for mortgage loans and installment loans but the

actual preparation of the financial calculations required for making these loans and making accurate disclosures to consumers on these loans.

5.    I completed Canon's computer programming school in 1973.

6.    I wrote the financial programs and several operating manuals for Sharp Electronics on installment loan calculations and amortization schedules.

7.    I created computer programs for installment loan calculations to meet the compliance requirements of Truth in Lending for various banks and lending institutions including The Federal Land Bank, PCA and Southern National Bank and Bank of Montgomery, Bank of Raeford and NCNB.

8.    I created computer programs to calculate installment loans, amortization schedules, mortgage loans, APR's, and special compound interest calculations for Canon, Sharp and the Federal Reserve.

9.    I have created and used various programs to review and check the finance charges against the stated APR, terms, interest, payments and repayment schedule.

10.    I worked closely with the Federal Reserve to implement the Federal Truth in Lending Act and Regulation Z to assist many banks in meeting compliance requirements.

11.    Over the last several years I have gained experience in drafting and understanding compliance issues for profit sharing and various investment vehicles. This experience has proven invaluable in checking and verifying financial accounts of all types.

12.     I previously testified on behalf of Ms. Parker-Lowe in <u>Irene Britt v. Thomas
Jones,</u> 123 N.CApp. 108, 472 S.E.2d 199 (1996). This case was originally filed in
Hertford County, North Carolina.

13.     Based upon my testimony, the Court of Appeals upheld the application of
monthly payments to interest first and principal second.

14.     Since February 1990, I have reviewed numerous loan agreements,
promissory notes, schedules of payments on notes, mortgages, Truth in Lending
Disclosure Statements (TIL), and related documents related to actions pending in the
North Carolina trial courts and before the U.S. Bankruptcy Court for the Eastern District
of North Carolina.

15.     I have reviewed ledgers, amortization schedules, repayment schedules,
deeds, deeds of trust, land surveys, paper documents, and electronic records for
compliance with Truth in Lending and the state usury laws.

16.     At Ms. Parker-Lowe's request, I have familiarized myself with the Gilberts'
promissory note, interest only addendum to the promissory note and the federal Truth in
Lending disclosure statement.

17.     At Ms. Parker-Lowe's request, I compared the payment schedules set
forth in the promissory note, the addendum to the promissory note and the one set forth
in the federal Truth in Lending disclosure statement.

18.     The payment schedule set forth in the Truth in Lending disclosure
statement does not match either the promissory note or the interest only addendum to
the promissory note.

3

19.    After reviewing the documents and determining that the TIL payment schedule did not match either the promissory note or the interest only addendum to the promissory note, I examined the other Truth in Lending mandated disclosures and calculated the APR.

20.    The APR using the information disclosed in the TIL results in an APR of 9% not the 7.953% as disclosed to the Gilberts.

21.    The Gilberts could have had a repayment schedule with 240 equal successive installments after the interest only period of approximately $4189.33. The APR would have been incorrect in this case also.

22.    The Truth in Lending disclosure statement payment schedule results in an additional $100,000.00+ interest.

23.    In the Interest-Only Addendum to the Gilbert promissory note, Loan 5300000843, in paragraph 4.(C), the Addendum states: After the end of the Interest-only Period, my payment amount will not be reduced due to voluntary prepayments. This statement results in a contradiction: voluntary prepayments after the interest only period will either not be allowed or will not reduce the amount of principal. In my opinion, this is contrary to existing law.

24.    Whereas in the Fannie Mae Uniform Instrument note allows for voluntary prepayment by stating that the maturity date will be accelerated as follows: "However, if the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest as well as during the time that my payments consist of principal and interest. If the partial Prepayment is made during the

4

period when my payments consist of principal and interest, the amount of my monthly payment will not decrease; however, the principal and interest required under this Note will be paid prior to the Maturity Date.

This the 15th day of September 2009.

_____
Keith Parker-Lowe

Hyde County, North Carolina
Sworn to and subscribed before me this day by _Keith Parker-Lowe_.

Date: _9/13/2009_

_Katherine Parker Lowe_
Notary Public Signature
Notary's printed or typed name: _Katherine S Parker-Lowe_
(SEAL)
My Commission Expires: _7-13-2014_

KATHERINE S. PARKER-LOWE
NOTARY
PUBLIC
HYDE COUNTY, NC

5



1x
BANK OF ARIZONA
1655 W. Alameda Drive
Tempe, AZ 85282
Office (480) 224-8321 Fax 480-224-8522

<u>ALLONGE TO NOTE</u>

LOAN NUMBER: 5300000843
BORROWER: Gilbert JR
IN THE AMOUNT OF: $525,000.00

PAY TO THE ORDER OF:

First National Bank of
Nevada

WITHOUT RECOURSE BY:

AMY HAWKINS, ASSISTANT VICE PRESIDENT
FIRST NATIONAL BANK OF ARIZONA

Pay to The order Of
RESIDENTIAL FUNDING CORPORATION

Without Recourse
First National Bank of Nevada

By
Deutsche Bank National Trust
Company, F/K/A Bankers Trust
Company of California, N. A.
as Custodian as Attorney In
Fact

Christopher Corcoran
Vice President

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Corporation

BY Judy Faber
Judy Faber, Vice President

P Ex 1

# ADJUSTABLE RATE NOTE

### (LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| | | |
|---|---|---|
| May 5, 2006 | MCLEAN | VA |
| [Date] | [City] | [State] |

134 West End Road, Ocracoke, NC  27960
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 525,000.00                    (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **First National Bank of Arizona**

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of                    7.375 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on **July 1, 2006** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **June 1, 2036**                    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. BOX 62768, PHOENIX, AZ 85085-2768**

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments   See Attached Interest-Only Addendum here to and made a part here of.

Each of my initial monthly payments will be in the amount of U.S. $ 4,391.32                    . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

████0843

---

MULTISTATE ADJUSTABLE RATE NOTE - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*) - Single Family - **Fannie Mae UNIFORM INSTRUMENT**

VMP-838N (0210)                    Form 3520 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 4                    Initials:



*P Ex. 2*

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the first day of June, 2013 , and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **two and three-quarters** percentage points ( 2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 13.375 % or less than 2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **one** percentage point(s) ( 1.000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 13.375 %, OR LESS THAN 2.750 .

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

■■■■0843



Form 3520 1/01
Initials: RTL

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **4.000** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

0843



Form 3520 1/01

Initials: KTC

VMP-838N (0210)
®

Page 3 of 4

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

CAUTION-IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
Rex T. Gilbert, JR                       -Borrower                                                -Borrower


_____ (Seal)          _____ (Seal)
                                         -Borrower                                                -Borrower


_____ (Seal)          _____ (Seal)
                                         -Borrower                                                -Borrower


_____ (Seal)          _____ (Seal)
                                         -Borrower                                                -Borrower


*[Sign Original Only]*

0843

VMP-838N (0210)                          Page 4 of 4                          Form 3520 1/01

INTEREST-ONLY ADDENDUM
TO ADJUSTABLE RATE PROMISSORY NOTE

Loan Number: ████0843

Property Address: 134 West End Road, Ocracoke, NC  27960

**THIS ADDENDUM** is made this 5th day of May, 2006, and is incorporated into and intended to form a part of the Adjustable Rate Note (the "Note") dated the same date as this Addendum executed by the undersigned and payable to First National Bank of Arizona (the "Lender").

**THIS ADDENDUM** supersedes Sections 3(A), 3(B), 4(C) and 7(A) of the Note.  None of the other provisions of the Note are changed by this addendum.

3.    **PAYMENTS**

    **(A)    Time and Place of Payments**
        I will pay interest by making payments every month for the first 120 payments (the "Interest-Only Period") in the amount sufficient to pay interest as it accrues.  I will pay principal and interest by making payments every month thereafter for the next 240 payments in an amount sufficient to fully amortize the outstanding principal balance of the Note at the end of the Interest-Only Period over the remaining term of the Note in equal monthly payments.

        I will make my monthly payments on the first day of each month beginning on July 1, 2006.  I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.  Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal.  If, on June 1, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

        I will make my payments at 1165 West Alameda Drive, Tempe, AZ 85282 or at a different place if required by the Note Holder.

    **(B)    Amount of My Initial Monthly Payments**
        Each of my initial monthly payments will be in the amount of U.S. $3,226.57.  This payment amount is based on the original principal balance of the Note.  This payment amount may change.

4.    **INTEREST RATE AND MONTHLY PAYMENT CHANGES**
    **(C)    Calculation of Changes**

        Before each Change Date, the Note Holder will calculate my new interest rate by adding two and three-quarters percentage point(s) (2.750%) to the Current Index for such Change Date.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

        During the Interest-Only Period, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay accrued interest.  This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the Interest-Only Period unless I make a voluntary prepayment of principal during such period.  If I make a voluntary prepayment of principal during the Interest-Only Period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower principal balance.  At the end of the Interest-Only Period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I am expected to owe at the end of the Interest-Only Period or Change Date, as applicable, in equal monthly payments over the remaining term of the Note.  The result of this calculation will be the new amount of my monthly payment.  After the end of the Interest-Only Period, my payment amount will not be reduced due to voluntary prepayments.

7.    **BORROWER'S FAILURE TO PAY AS REQUIRED**

    **(A)    A Late Charge for Overdue Payments**

        If the Note Holder has not received the full amount of any monthly payment by the end of fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be 4.000% of my overdue payment of interest during the interest-only period, 4.000% of my overdue payment of principal and interest thereafter.  I will pay this late charge promptly but only once on each late payment.

Dated: 5/5/06

Rex T. Gilbert, JR

INT Only Addendums / ARMS  (603E)
01/27 2004



*Ex 4*

# TRUTH-IN-LENDING DISCLOSURE STATEMENT
## (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER OR LENDER'S AGENT:

    First National Bank of Arizona
    1760 Old Meadow Road
    Mc Lean, VA 22102

☐ Preliminary    [X] Final

*DATE:* 05/05/2006
*LOAN NO.:* ▮▮▮0843
*Type of Loan:* ARM

BORROWERS:

ADDRESS:
CITY/STATE/ZIP:
PROPERTY: 134 West End Road Ocracoke NC 27960

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate | The dollar amount the credit will cost you | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled |
| 7.953 % | $ 943,469.57 | $ 507,473.43 | $ 1,450,943.00 |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 84 | $3,226.57 | 07/01/2006 | | | |
| 36 | $3,500.00 | 07/01/2013 | | | |
| 239 | $4,391.32 | 07/01/2016 | | | |
| 1 | $4,385.64 | 06/01/2036 | | | |

DEMAND FEATURE:   [X] This loan does not have a Demand Feature.    ☐ This loan has a Demand Feature as follows.

VARIABLE RATE FEATURE:
| -

KATHERINE S. PARKER-LOWE
ATTORNEY AT LAW
2 BEACH LANE
OCRACOKE, NORTH CAROLINA 27960

MAILING ADDRESS
POST OFFICE BOX 730
OCRACOKE, NC 27960
E-MAIL: katherine@parker-lowe.net

TELEPHONE
(252) 928-1000
FACSIMILE
(252) 928-3037

April 5, 2009

Holder of Loan # ████2713
c/o Ms. Lauren S. Thurmond
Kellam & Pettit, P.A.
2701 Coltsgate Road
Suite 300
Charlotte, North Carolina 28211

Re:     In the Matter of the Foreclosure....Gilbert
        Hyde County File 09-SP-9
        Rex T. Gilbert, Jr.
        134 West End Road
        Post Office Box 754
        Ocracoke, North Carolina 27960

Dear Ms. Thurmond:

As you are aware, I represent Mr. Gilbert concerning the loan transaction which he entered into with First National Bank of Arizona on May 5, 2006. I have been authorized by my clients to rescind this transaction and hereby exercise that right pursuant to the Federal Truth in Lending Act, 15 U.S.C. § 1635, Regulation Z § 226.23.

The disclosure statement failed to provide all the required material disclosures correctly, including, but not limited to:

    (a)     The disclosed payment schedule does not match the note;
    (b)     The stated APR is more than one-eighth of one-percent off;
    (c)     The total of payments is not correct;
    (d)     The total of payments results in a higher APR than the disclosed APR
    (e)     The disclosures do not match the note or the addendum to the note.

The security interest is void upon our rescission. See 15 U.S.C. § 1635; Regulation Z § 226.23. Pursuant to the Regulation, you have twenty days after receipt of this notice of rescission to return to my client all monies paid and to take action necessary or appropriate to reflect termination of the security interest.

We are prepared to discuss a tender obligation, should it arise, and satisfactory ways in which my client may meet this obligation. Please be advised that if you do not cancel



Ms. Lauren S. Thurmond
April 5, 2009
Page 2 of 2

the security interest and return all consideration paid by my client within 20 days of receipt of this letter, you will be responsible for actual and statutory damages pursuant to 15 U.S.C. § 1640(a).

Please send me a copy of my client's payment history and other documents showing the loan disbursements, loan charges, payments made, and current principal balance due.

Sincerely,

Katherine S. Parker-Lowe

KPL/mpc

cc: Mr. and Mrs. Rex T. Gilbert, Jr.

**GMAC ResCap**

April 24, 2009

Katherine Parker-Lowe
Attorney at Law
2 Beach Lane
Ocracoke, NC 27960

Re:     Rex Gilbert, Jr.
        Loan number #█████2713 ("Loan")

Dear Ms. Parker-Lowe:

We are writing in response to your correspondence to GMAC Mortgage, LLC requesting rescission of the loan transaction your client entered into with First National Bank of Arizona on May 5, 2006.

We have reviewed your client's loan file and find no basis to conclude that there were any material disclosure errors that would give rise to an extended right of rescission.

Consequently, we will not rescind the Loan transaction at this time.

If you have any documents or further information that sets forth the basis of the demand, please contact me at the address below.

Sincerely,

*Kathy P.*

Kathy Priore
Associate Counsel

cc: Lauren Thurmond, Kellam & Pettit, PA

GMAC ResCap
One Meridian Crossings  Suite 100  Richfield MN 55423
952.857.7000  gmacrescap.com

P Ex 6

LENDER: First National Bank of Arizona

DATE 5/5/06
LOAN NO. ████ 0843
TYPE Conventional

BORROWERS/OWNERS Rex T. Gilbert, JR

ADDRESS          134 West End Road
CITY/STATE/ZIP   Ocracoke, NC 27960
PROPERTY         134 West End Road, Ocracoke, NC  27960

## YOUR RIGHT TO CANCEL

You are entering into a transaction that will result in a mortgage/lien/security interest on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

(1) The date of the transaction, which is
or
(2) The date you received your Truth In Lending disclosures;
or
(3) The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage/lien/security interest is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage/lien/security interest on your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

---

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing, at:

**First National Bank of Arizona**
**MS AZ-4003-078**
**1665 W. Alameda Drive**          Or Fax to: (602) 636-7096
**Tempe, AZ 85282-3200**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of
(or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

_____          _____
CONSUMER'S SIGNATURE                                        DATE

---

Each of the borrowers/owners in this transaction has the right to cancel. The exercise of this right by one borrower/owner shall be effective as to all borrowers/owners.

The undersigned each acknowledge receipt of two copies of NOTICE of RIGHT TO CANCEL

X _____    5/5/06    X _____
BORROWER/OWNER Rex T. Gilbert, JR       DATE    BORROWER/OWNER                    DATE

X _____    5/5/06    X _____
BORROWER/OWNER  Daniela L. Gilbert       DATE    BORROWER/OWNER                    DATE

---

### CONFIRMATION CERTIFICATE

**DO NOT SIGN UNTIL THREE BUSINESS DAYS HAVE ELAPSED**

**Three business days have elapsed** since the undersigned have received two copies of this document. Each of the undersigned hereby certify and warrant that they have not exercised any right which they may have to rescind the transaction, that they do not desire to do so, and that they ratify and confirm the transaction in all respects.

_____    ____    _____    ____
BORROWER/OWNER Rex T. Gilbert, JR       DATE    BORROWER/OWNER                    DATE

_____    ____    _____    ____
BORROWER/OWNER  Daniela L. Gilbert       DATE    BORROWER/OWNER                    DATE

---

████ 0843

VMP®-66 (0305).01
VMP Mortgage Solutions (800)521-7291

10/00

PEx 7

**EXHIBIT 4**

Claim #1984  Date Filed: 10/30/2012

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor: GMAC mortgage LLC / Residential Accredit Loan     Case Number: 12-12032

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
KATHERINE S. PARKER-LOWE - ATTORNEY AT LAW

☐ Check this box if this claim amends a previously filed claim.

Name and address where notices should be sent:        NameID: 10854274
KATHERINE S. PARKER-LOWE - ATTORNEY AT LAW
GILBERT - IN THE MATTER OF THE FORECLOSURE BY DAVID A SIMPSON, P C, SUBSTITUTE TRUSTEE, OF DEED OF TRUST EXECUTED BY RE ET AL
P.O. Box 730
Ocracoke, NC 27960
Telephone number: 252-928-1000        email: Katherine@ocracoke law.com

Court Claim
Number:_____
(If known)

Filed on:_____

Name and address where payment should be sent (if different from above):

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Telephone number:        email:

1. Amount of Claim as of Date Case Filed: $    83,181.11
If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

2. Basis for Claim: Attorneys fees for Name Id 10987289
(See instruction #2)

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

3. Last four digits of any number by which creditor identifies debtor: 5107

3a. Debtor may have scheduled account as:
_____
(See instruction #3a)

3b. Uniform Claim Identifier (optional):
_____
(See instruction #3b)

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

4. Secured Claim (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Other
Describe:
Value of Property: $_____    Annual Interest Rate____% ☐Fixed ☐Variable
(when case was filed)
Amount of arrearage and other charges, as of the time case was filed, included in secured claim,
if any: $_____    Basis for perfection: _____

Amount of Secured Claim: $_____    Amount Unsecured: $_____

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).
☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).
☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

6. Claim Pursuant to 11 U.S.C. § 503(b)(9):
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.        $_____    (See instruction #6)

Amount entitled to priority:
$_____

7. Credits. The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

8. Documents: Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*        see Attached

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

9. Signature: (See instruction #9) Check the appropriate box.
☒ I am the creditor.  ☐ I am the creditor's authorized agent. (Attach copy of power of attorney, if any.)  ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)  ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: Katherine Parker-Lowe
Title: Attorney for Gilbert
Company:
Signature: Kathy S. Parker Lowe    (Date) 10-26-2012
Address and telephone number (if different from notice address above):

Telephone number:        Email:

RECEIVED
OCT 3 0 2012
KURTZMAN CARSON CONSULTANTS
COURT USE ONLY

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

KATHERINE S. PARKER-LOWE
ATTORNEY AT LAW
P.O. BOX 730
OCRACOKE, NC  27960-0730


CLIENT:  Rex Tyler Gilbert, Jr.
         Post Office Box 504
         Ocracoke, NC  27960-

                                              Client No. 100725
                                              Matter No. 2800056


---------------------------------------------------------------------
DATE              CHARGE CODE & SERVICES STATEMENT from 01/01/2008 to 05/13/2012
                                      MINS              AMOUNT CHARGED
---------------------------------------------------------------------
| DATE | CHARGE CODE & SERVICES | MINS | | AMOUNT CHARGED |
|------|------------------------|------|---|---------------|
| 08/26/2008 | CWC Conference with Client | 45 | | 112.50 |
| 08/27/2008 | TCC Telephone Call T/F Client | 10 | | 25.00 |
| 09/12/2008 | CWC Conference with Client | 15 | | 37.50 |
| 09/24/2008 | CWC Conference with Client | 60 | | 150.00 |
| 10/02/2008 | RAR Received and Reviewed | 6 | | 15.00 |
| 10/03/2008 | EMA Email | 10 | | 25.00 |
| 10/07/2008 | RES Legal Research | 120 | | 300.00 |
| 10/14/2008 | FAX EXPENSE-FAX | 2 | | 4.50 |
| 10/14/2008 | LTC Local Telephone Call | 25 | | 62.50 |
| 10/14/2008 | LTC Local Telephone Call | 10 | | 25.00 |
| 10/14/2008 | TCC Telephone Call T/F Client | 6 | | 15.00 |
| 10/20/2008 | LTC Local Telephone Call | 120 | | 300.00 |
| 11/02/2008 | LTT Draft/Revise Letter | 30 | | 75.00 |
| 12/01/2008 | PAY Payment | 1 | - | 1,072.00 |
| 01/09/2009 | LTT Draft/Revise Letter | 45 | | 112.50 |
| 01/09/2009 | LTC Local Telephone Call | 6 | | 15.00 |
| 01/09/2009 | EMA Email | 20 | | 50.00 |
| 01/10/2009 | EMA Email | 15 | | 37.50 |
| 01/12/2009 | FAX EXPENSE-FAX | 2 | | 5.20 |
| 02/02/2009 | LTT Draft/Revise Letter | 6 | | 15.00 |
| 02/02/2009 | POS EXPENSE-Postage | 1 | | .42 |
| 02/10/2009 | LTT Draft/Revise Letter | 30 | | 75.00 |
| 02/10/2009 | WKO Work On | 20 | | 50.00 |
| 03/05/2009 | EMA Email | 6 | | 15.00 |
| 03/11/2009 | EMA Email | 15 | | 37.50 |
| 03/24/2009 | REF Reviewed File | 50 | | 125.00 |
| 03/24/2009 | LTT Draft/Revise Letter | 45 | | 112.50 |
| 04/03/2009 | CWC Conference with Client | 120 | | 300.00 |
| 04/03/2009 | PAY Payment | 1 | - | 400.00 |
| 04/05/2009 | LTT Draft/Revise Letter | 240 | | 600.00 |
| 04/05/2009 | FAX EXPENSE-FAX | 12 | | 31.20 |
| 04/07/2009 | PPL CIVIL-Prepared Pleading | 240 | | 600.00 |
| 04/08/2009 | CWC Conference with Client | 15 | | 37.50 |
| 04/09/2009 | EMA Email | 10 | | 25.00 |
| 04/09/2009 | RES Legal Research | 15 | | 37.50 |
| 04/09/2009 | LDC Long Distance Call | 10 | | 27.50 |
| 04/09/2009 | REF Reviewed File | 120 | | 300.00 |
| 04/09/2009 | LTC Local Telephone Call | 10 | | 25.00 |
| 04/09/2009 | REF Reviewed File | 45 | | 112.50 |
| 04/30/2009 | LTT Draft/Revise Letter | 210 | | 525.00 |
| 05/01/2009 | CWE Conference With Expert | 45 | | 135.00 |

report bill-t (C)copyright 1994 Keith Parker-Lowe

| DATE | CHARGE CODE & SERVICES<br>STATEMENT from 01/01/2008 to 05/13/2012 | MINS | AMOUNT CHARGED |
|---|---|---|---|
| 05/01/2009 | LTT Draft/Revise Letter | 65 | 162.50 |
| 05/02/2009 | POS EXPENSE-Postage | 4 | 1.68 |
| 05/02/2009 | CCS EXPENSE-Copies/Printing | 16 | 8.00 |
| 05/02/2009 | FAX EXPENSE-FAX | 8 | 20.80 |
| 05/02/2009 | LTT Draft/Revise Letter | 30 | 75.00 |
| 05/02/2009 | PAY Payment | 1 | 350.00 |
| 05/11/2009 | RAR Received and Reviewed | 10 | 25.00 |
| 05/11/2009 | FAX EXPENSE-FAX | 12 | 31.20 |
| 05/11/2009 | TCA Telephone Call T/F Attorney | 6 | 15.00 |
| 05/11/2009 | TCA Telephone Call T/F Attorney | 15 | 37.50 |
| 05/12/2009 | RES Legal Research | 75 | 187.50 |
| 05/19/2009 | PAY Payment | 1 | 600.00 |
| 05/25/2009 | RES Legal Research | 210 | 525.00 |
| 06/01/2009 | TRP Trial Preparation | 30 | 75.00 |
| 06/02/2009 | CWC Conference with Client | 25 | 62.50 |
| 06/02/2009 | HCL Hearing-Before Clerk | 45 | 112.50 |
| 06/02/2009 | TRP Trial Preparation | 20 | 50.00 |
| 06/12/2009 | FAX EXPENSE-FAX | 2 | 5.20 |
| 06/15/2009 | FAX EXPENSE-FAX | 4 | 10.40 |
| 06/16/2009 | RAR Received and Reviewed | 10 | 25.00 |
| 06/16/2009 | RES Legal Research | 10 | 25.00 |
| 06/16/2009 | EMA Email | 6 | 15.00 |
| 06/16/2009 | TCL Telephone Call T/F Clerk | 10 | 25.00 |
| 06/16/2009 | EMA Email | 15 | 37.50 |
| 06/18/2009 | CCK Conference with Clerk | 20 | 50.00 |
| 06/18/2009 | FAX EXPENSE-FAX | 1 | 2.60 |
| 06/22/2009 | PAY Payment | 1 | 600.00 |
| 06/23/2009 | FAX EXPENSE-FAX | 1 | 2.60 |
| 06/23/2009 | RAR Received and Reviewed | 6 | 15.00 |
| 06/24/2009 | TCL Telephone Call T/F Clerk | 10 | 25.00 |
| 06/24/2009 | LTT Draft/Revise Letter | 30 | 75.00 |
| 06/30/2009 | EMA Email | 15 | 37.50 |
| 06/30/2009 | TCT Telephone Call T/F TAdminstrat | 6 | 15.00 |
| 07/07/2009 | EMA Email | 30 | 75.00 |
| 07/16/2009 | FAX EXPENSE-FAX | 2 | 5.20 |
| 07/16/2009 | RAR Received and Reviewed | 6 | 15.00 |
| 07/17/2009 | RAR Received and Reviewed | 10 | 25.00 |
| 07/20/2009 | CCS EXPENSE-Copies/Printing | 14 | 7.00 |
| 07/20/2009 | POS EXPENSE-Postage | 3 | 1.32 |
| 07/27/2009 | PAY Payment | 1 | 500.00 |
| 07/29/2009 | TCA Telephone Call T/F Attorney | 6 | 15.00 |
| 07/29/2009 | RAR Received and Reviewed | 15 | 37.50 |
| 07/29/2009 | FAX EXPENSE-FAX | 2 | 5.20 |
| 07/29/2009 | LTT Draft/Revise Letter | 60 | 150.00 |
| 07/30/2009 | LTT Draft/Revise Letter | 30 | 75.00 |
| 07/30/2009 | EMA Email | 6 | 15.00 |
| 07/30/2009 | CWE Conference With Expert | 20 | 60.00 |
| 07/30/2009 | FAX EXPENSE-FAX | 3 | 7.80 |
| 07/30/2009 | LTC Local Telephone Call | 75 | 187.50 |
| 08/12/2009 | CWE Conference With Expert | 30 | 90.00 |
| 08/12/2009 | PBR Prepared Brief | 75 | 187.50 |
| 08/13/2009 | CWE Conference With Expert | 20 | 60.00 |
| 08/15/2009 | PBR Prepared Brief | 45 | 112.50 |
| 08/18/2009 | TRA Travel | 180 | 225.00 |
| 08/18/2009 | CCS EXPENSE-Copies/Printing | 69 | 34.50 |
| 08/18/2009 | HSC Hearing-Superior Court | 90 | 270.00 |
| 08/18/2009 | CWC Conference with Client | 15 | 37.50 |
| 08/18/2009 | TRA Travel | 180 | 225.00 |

report bill-t (C)copyright 1994 Keith Parker-Lowe

| DATE | CHARGE CODE & SERVICES | MINS | AMOUNT CHARGED |
|------|------------------------|------|----------------|
| | STATEMENT from 01/01/2008 to 05/13/2012 | | |

| DATE | CHARGE CODE & SERVICES | MINS | AMOUNT CHARGED |
|------|------------------------|------|----------------|
| 08/20/2009 | PAY Payment | 1 | 500.00 |
| 09/09/2009 | CWC Conference with Client | 100 | 250.00 |
| 09/10/2009 | PPL CIVIL-Prepared Pleading | 45 | 112.50 |
| 09/10/2009 | PPL CIVIL-Prepared Pleading | 120 | 300.00 |
| 09/10/2009 | PPL CIVIL-Prepared Pleading | 120 | 300.00 |
| 09/12/2009 | PPL CIVIL-Prepared Pleading | 150 | 375.00 |
| 09/12/2009 | PPL CIVIL-Prepared Pleading | 120 | 300.00 |
| 09/13/2009 | TRP Trial Preparation | 300 | 750.00 |
| 09/13/2009 | PPL CIVIL-Prepared Pleading | 90 | 225.00 |
| 09/14/2009 | HSC Hearing-Superior Court | 30 | 90.00 |
| 09/14/2009 | FPL CIVIL- Filed Pleadings | 30 | 75.00 |
| 09/14/2009 | FPL CIVIL- Filed Pleadings | 15 | 37.50 |
| 09/14/2009 | TRA Travel | 90 | 112.50 |
| 09/14/2009 | TRA Travel | 90 | 112.50 |
| 09/15/2009 | SDC Serve Pleading,Motion,etc | 150 | 375.00 |
| 09/18/2009 | TCL Telephone Call T/F Clerk | 10 | 25.00 |
| 09/18/2009 | TCA Telephone Call T/F Attorney | 10 | 25.00 |
| 09/18/2009 | POS EXPENSE-Postage | 6 | 2.64 |
| 09/18/2009 | TCL Telephone Call T/F Clerk | 10 | 25.00 |
| 09/18/2009 | PDC Prepared Document(s) | 15 | 37.50 |
| 09/18/2009 | FAX EXPENSE-FAX | 20 | 52.00 |
| 09/18/2009 | TCA Telephone Call T/F Attorney | 6 | 15.00 |
| 09/18/2009 | TCA Telephone Call T/F Attorney | 6 | 15.00 |
| 09/19/2009 | CWC Conference with Client | 10 | 25.00 |
| 09/19/2009 | CWE Conference With Expert | 15 | 45.00 |
| 09/24/2009 | HSC Hearing-Superior Court | 15 | 45.00 |
| 09/24/2009 | TRA Travel | 90 | 112.50 |
| 09/24/2009 | TRA Travel | 300 | 375.00 |
| 09/25/2009 | FAX EXPENSE-FAX | 6 | 15.60 |
| 09/25/2009 | PDC Prepared Document(s) | 120 | 300.00 |
| 09/25/2009 | ADV Advance-Expense | 1 | 180.00 |
| 09/30/2009 | TRA Travel | 240 | 300.00 |
| 10/01/2009 | CWC Conference with Client | 30 | 75.00 |
| 10/01/2009 | HSC Hearing-Superior Court | 165 | 495.00 |
| 10/01/2009 | TRA Travel | 240 | 300.00 |
| 10/02/2009 | ADV Advance-Expense | 2 | 20.00 |
| 10/02/2009 | CCS EXPENSE-Copies/Printing | 190 | 95.00 |
| 10/02/2009 | POS EXPENSE-Postage | 3 | 27.56 |
| 10/02/2009 | PIB Post Injunction Bond | 15 | 37.50 |
| 10/02/2009 | WKO Work On | 135 | 337.50 |
| 10/02/2009 | PPO Prepared Order(s) | 60 | 150.00 |
| 10/07/2009 | FAX EXPENSE-FAX | 4 | 10.40 |
| 10/07/2009 | RAR Received and Reviewed | 15 | 37.50 |
| 10/07/2009 | PPO Prepared Order(s) | 30 | 75.00 |
| 10/17/2009 | RES Legal Research | 30 | 75.00 |
| 10/19/2009 | PAY Payment | 1 | 500.00 |
| 10/19/2009 | PDC Prepared Document(s) | 75 | 187.50 |
| 10/19/2009 | POS EXPENSE-Postage | 1 | 4.95 |
| 10/26/2009 | EFI Efile documents with court | 20 | 50.00 |
| 10/26/2009 | PDC Prepared Document(s) | 15 | 37.50 |
| 10/27/2009 | TCL Telephone Call T/F Clerk | 6 | 15.00 |
| 10/27/2009 | EFI Efile documents with court | 10 | 25.00 |
| 10/29/2009 | CCS EXPENSE-Copies/Printing | 54 | 27.00 |
| 10/29/2009 | POS EXPENSE-Postage | 2 | 19.86 |
| 10/29/2009 | CCS EXPENSE-Copies/Printing | 8 | 4.00 |
| 10/30/2009 | RES Legal Research | 60 | 150.00 |
| 10/30/2009 | PPM Prepared Motion | 130 | 325.00 |
| 10/31/2009 | PBR Prepared Brief | 180 | 450.00 |

| DATE | CHARGE CODE & SERVICES | MINS | AMOUNT CHARGED |
|------|------------------------|------|----------------|
| | STATEMENT from 01/01/2008 to 05/13/2012 | | |
| 11/01/2009 | PBR Prepared Brief | 120 | 300.00 |
| 11/02/2009 | TCA Telephone Call T/F Attorney | 10 | 25.00 |
| 11/02/2009 | PPM Prepared Motion | 75 | 187.50 |
| 11/02/2009 | EFI Efile documents with court | 20 | 50.00 |
| 11/03/2009 | LTT Draft/Revise Letter | 15 | 37.50 |
| 11/03/2009 | LDC Long Distance Call | 10 | 27.50 |
| 11/03/2009 | EFI Efile documents with court | 10 | 25.00 |
| 11/03/2009 | PPO Prepared Order(s) | 15 | 37.50 |
| 11/04/2009 | TCA Telephone Call T/F Attorney | 10 | 25.00 |
| 11/16/2009 | PBR Prepared Brief | 240 | 600.00 |
| 11/17/2009 | PBR Prepared Brief | 55 | 137.50 |
| 12/15/2009 | EMA Email | 10 | 25.00 |
| 12/16/2009 | TCJ Telephone Call T/F Judge | 6 | 18.00 |
| 12/16/2009 | LTC Local Telephone Call | 6 | 15.00 |
| 12/16/2009 | PPO Prepared Order(s) | 15 | 37.50 |
| 12/16/2009 | EMA Email | 6 | 15.00 |
| 12/23/2009 | FAX EXPENSE-FAX | 1 | 2.60 |
| 12/23/2009 | TCL Telephone Call T/F Clerk | 6 | 15.00 |
| 12/23/2009 | LTT Draft/Revise Letter | 20 | 50.00 |
| 01/12/2010 | PBR Prepared Brief | 240 | 600.00 |
| 01/13/2010 | PPB Prepared Brief/Memorandum | 90 | 225.00 |
| 01/15/2010 | ROA APPEAL- Prepare Record | 180 | 540.00 |
| 01/16/2010 | ROA APPEAL- Prepare Record | 210 | 630.00 |
| 01/18/2010 | ROA APPEAL- Prepare Record | 270 | 810.00 |
| 01/18/2010 | RAR Received and Reviewed | 10 | 25.00 |
| 01/18/2010 | FAX EXPENSE-FAX | 2 | 5.20 |
| 01/22/2010 | PAY Payment | 1 | - 500.00 |
| 02/24/2010 | ROA APPEAL- Prepare Record | 60 | 180.00 |
| 02/26/2010 | PPM Prepared Motion | 45 | 112.50 |
| 02/26/2010 | LTT Draft/Revise Letter | 150 | 375.00 |
| 02/27/2010 | PPM Prepared Motion | 90 | 225.00 |
| 02/27/2010 | POS EXPENSE-Postage | 2 | 2.78 |
| 03/01/2010 | PBR Prepared Brief | 180 | 450.00 |
| 03/09/2010 | RAR Received and Reviewed | 10 | 25.00 |
| 03/09/2010 | RAR Received and Reviewed | 10 | 25.00 |
| 03/09/2010 | RES Legal Research | 20 | 50.00 |
| 03/09/2010 | RES Legal Research | 20 | 50.00 |
| 03/10/2010 | ROA APPEAL- Prepare Record | 135 | 405.00 |
| 03/10/2010 | ROA APPEAL- Prepare Record | 75 | 225.00 |
| 03/25/2010 | CCS EXPENSE-Copies/Printing | 502 | 251.00 |
| 04/16/2010 | PPB Prepared Brief/Memorandum | 40 | 100.00 |
| 04/20/2010 | PPB Prepared Brief/Memorandum | 150 | 450.00 |
| 04/21/2010 | PBR Prepared Brief | 45 | 112.50 |
| 04/21/2010 | ADV Advance-Expense | 1 | 332.50 |
| 04/22/2010 | PBR Prepared Brief | 180 | 450.00 |
| 04/29/2010 | PBR Prepared Brief | 135 | 337.50 |
| 04/30/2010 | PBR Prepared Brief | 135 | 337.50 |
| 04/30/2010 | PBR Prepared Brief | 180 | 450.00 |
| 05/01/2010 | PBR Prepared Brief | 135 | 337.50 |
| 05/01/2010 | PBR Prepared Brief | 210 | 525.00 |
| 05/02/2010 | PBR Prepared Brief | 90 | 225.00 |
| 05/03/2010 | PBR Prepared Brief | 135 | 337.50 |
| 05/03/2010 | PBR Prepared Brief | 300 | 750.00 |
| 05/03/2010 | PAY Payment | 1 | - 332.50 |
| 05/06/2010 | PBR Prepared Brief | 180 | 450.00 |
| 05/06/2010 | PBR Prepared Brief | 210 | 525.00 |
| 05/11/2010 | PAY Payment | 1 | - 500.00 |
| 05/18/2010 | ADV Advance-Expense | 1 | 218.50 |

| DATE | CHARGE CODE & SERVICES | MINS | AMOUNT CHARGED |
|------|------------------------|------|----------------|
|      | STATEMENT from 01/01/2008 to 05/13/2012 | | |
| 06/10/2010 | DDP CIVIL-Draft Discovery Plan | 75 | 150.00 |
| 06/10/2010 | DDP CIVIL-Draft Discovery Plan | 120 | 360.00 |
| 06/11/2010 | DDP CIVIL-Draft Discovery Plan | 120 | 360.00 |
| 06/11/2010 | PAY Payment | 1 | - 500.00 |
| 06/11/2010 | CWE Conference With Expert | 65 | 195.00 |
| 06/12/2010 | DDP CIVIL-Draft Discovery Plan | 40 | 120.00 |
| 06/14/2010 | TCA Telephone Call T/F Attorney | 10 | 25.00 |
| 06/14/2010 | RES Legal Research | 30 | 75.00 |
| 06/14/2010 | DDP CIVIL-Draft Discovery Plan | 75 | 225.00 |
| 06/16/2010 | PPB Prepared Brief/Memorandum | 120 | 300.00 |
| 06/16/2010 | PPB Prepared Brief/Memorandum | 90 | 225.00 |
| 06/17/2010 | PPB Prepared Brief/Memorandum | 120 | 300.00 |
| 06/19/2010 | PPB Prepared Brief/Memorandum | 240 | 600.00 |
| 06/21/2010 | PPB Prepared Brief/Memorandum | 180 | 450.00 |
| 06/21/2010 | POS EXPENSE-Postage | 2 | 3.46 |
| 06/21/2010 | PPB Prepared Brief/Memorandum | 45 | 112.50 |
| 06/24/2010 | TCA Telephone Call T/F Attorney | 6 | 15.00 |
| 06/28/2010 | EMA Email | 10 | 25.00 |
| 06/28/2010 | EMA Email | 6 | 15.00 |
| 06/28/2010 | PDC Prepared Document(s) | 30 | 75.00 |
| 06/29/2010 | TCA Telephone Call T/F Attorney | 10 | 25.00 |
| 06/29/2010 | EMA Email | 10 | 25.00 |
| 06/29/2010 | LTT Draft/Revise Letter | 45 | 112.50 |
| 06/29/2010 | EMA Email | 6 | 15.00 |
| 07/01/2010 | TCA Telephone Call T/F Attorney | 30 | 75.00 |
| 07/07/2010 | ADV Advance-Expense | 1 | 50.75 |
| 07/09/2010 | RES Legal Research | 120 | 300.00 |
| 07/13/2010 | PPM Prepared Motion | 210 | 525.00 |
| 07/13/2010 | CWC Conference with Client | 90 | 225.00 |
| 07/14/2010 | PPM Prepared Motion | 75 | 187.50 |
| 07/14/2010 | CCK Conference with Clerk | 10 | 25.00 |
| 07/19/2010 | PAY Payment | 1 | - 500.00 |
| 07/20/2010 | PPB Prepared Brief/Memorandum | 120 | 300.00 |
| 07/20/2010 | PPB Prepared Brief/Memorandum | 120 | 300.00 |
| 07/27/2010 | PPB Prepared Brief/Memorandum | 240 | 600.00 |
| 07/28/2010 | PPB Prepared Brief/Memorandum | 210 | 525.00 |
| 07/29/2010 | PPB Prepared Brief/Memorandum | 240 | 600.00 |
| 07/30/2010 | PPB Prepared Brief/Memorandum | 120 | 300.00 |
| 07/31/2010 | PPB Prepared Brief/Memorandum | 210 | 525.00 |
| 08/02/2010 | PPB Prepared Brief/Memorandum | 240 | 600.00 |
| 08/02/2010 | TRP Trial Preparation | 20 | 50.00 |
| 08/02/2010 | FAX EXPENSE-FAX | 21 | 54.60 |
| 10/06/2010 | PPM Prepared Motion | 180 | 540.00 |
| 10/07/2010 | ADV Advance-Expense | 1 | 21.85 |
| 10/07/2010 | TCA Telephone Call T/F Attorney | 15 | 37.50 |
| 10/07/2010 | EMA Email | 15 | 37.50 |
| 10/07/2010 | EMA Email | 45 | 112.50 |
| 10/07/2010 | LTC Local Telephone Call | 30 | 75.00 |
| 10/07/2010 | CCS EXPENSE-Copies/Printing | 70 | 35.00 |
| 10/07/2010 | RES Legal Research | 10 | 25.00 |
| 10/08/2010 | RES Legal Research | 20 | 50.00 |
| 10/08/2010 | LDC Long Distance Call | 30 | 82.50 |
| 10/09/2010 | PPM Prepared Motion | 240 | 600.00 |
| 10/10/2010 | EMA Email | 6 | 15.00 |
| 10/10/2010 | PPM Prepared Motion | 210 | 525.00 |
| 10/11/2010 | PPM Prepared Motion | 300 | 750.00 |
| 10/12/2010 | PPM Prepared Motion | 210 | 525.00 |
| 10/12/2010 | RAR Received and Reviewed | 20 | 50.00 |

report bill-t (C)copyright 1994 Keith Parker-Lowe

Client No. 100726 Matter No. 2800056

| DATE | CHARGE CODE & SERVICES | MINS | AMOUNT CHARGED |
|------|------------------------|------|----------------|
|      | STATEMENT from 01/01/2008 to 05/13/2012 | | |
| 10/18/2010 | PAY Payment | 1 | 500.00 |
| 10/20/2010 | RES Legal Research | 240 | 600.00 |
| 10/29/2010 | LTT Draft/Revise Letter | 20 | 50.00 |
| 10/29/2010 | CCS EXPENSE-Copies/Printing | 22 | 11.00 |
| 11/01/2010 | RAR Received and Reviewed | 6 | 15.00 |
| 11/05/2010 | WKO Work On | 75 | 187.50 |
| 11/05/2010 | PPN Prepared Notice of Appeal | 30 | 75.00 |
| 11/08/2010 | RES Legal Research | 75 | 187.50 |
| 11/15/2010 | PAI APPEAL-Prepare Appeal Issues | 105 | 262.50 |
| 11/16/2010 | PAI APPEAL-Prepare Appeal Issues | 180 | 540.00 |
| 11/19/2010 | RES Legal Research | 20 | 50.00 |
| 11/19/2010 | PPM Prepared Motion | 75 | 187.50 |
| 11/19/2010 | PDC Prepared Document(s) | 15 | 37.50 |
| 11/19/2010 | EFI Efile documents with court | 10 | 25.00 |
| 11/20/2010 | PPM Prepared Motion | 150 | 375.00 |
| 11/21/2010 | PPM Prepared Motion | 150 | 375.00 |
| 11/21/2010 | CFW Conference | 45 | 112.50 |
| 11/29/2010 | PPB Prepared Brief/Memorandum | 240 | 600.00 |
| 11/30/2010 | PPB Prepared Brief/Memorandum | 240 | 600.00 |
| 12/02/2010 | PDC Prepared Document(s) | 75 | 187.50 |
| 12/02/2010 | TCA Telephone Call T/F Attorney | 10 | 25.00 |
| 12/02/2010 | EFI Efile documents with court | 20 | 50.00 |
| 12/03/2010 | EFI Efile documents with court | 10 | 25.00 |
| 12/03/2010 | PPM Prepared Motion | 195 | 487.50 |
| 12/03/2010 | POS EXPENSE-Postage | 2 | 1.22 |
| 12/04/2010 | PPM Prepared Motion | 75 | 187.50 |
| 12/15/2010 | RAR Received and Reviewed | 6 | 15.00 |
| 12/15/2010 | RAR Received and Reviewed | 6 | 15.00 |
| 12/16/2010 | TCC Telephone Call T/F Client | 15 | 37.50 |
| 01/04/2011 | MDT CIVIL-Mediation | 150 | 450.00 |
| 01/07/2011 | DOA APPEAL-Draft Oral Argument | 225 | 938.25 |
| 01/21/2011 | RES Legal Research | 90 | 225.00 |
| 01/21/2011 | TCC Telephone Call T/F Client | 15 | 37.50 |
| 01/21/2011 | LDC Long Distance Call | 10 | 27.50 |
| 01/22/2011 | RES Legal Research | 120 | 300.00 |
| 01/24/2011 | TCC Telephone Call T/F Client | 10 | 25.00 |
| 01/24/2011 | PBR Prepared Brief | 300 | 750.00 |
| 01/24/2011 | TCC Telephone Call T/F Client | 6 | 15.00 |
| 01/26/2011 | RES Legal Research | 45 | 112.50 |
| 01/29/2011 | PBR Prepared Brief | 90 | 225.00 |
| 01/31/2011 | PBR Prepared Brief | 75 | 187.50 |
| 02/01/2011 | EFI Efile documents with court | 10 | 25.00 |
| 02/01/2011 | POS EXPENSE-Postage | 3 | 1.32 |
| 02/01/2011 | EMA Email | 6 | 15.00 |
| 02/01/2011 | WKO Work On | 45 | 112.50 |
| 02/01/2011 | CCS EXPENSE-Copies/Printing | 10 | 5.00 |
| 02/01/2011 | CCS EXPENSE-Copies/Printing | 102 | 51.00 |
| 02/02/2011 | POS EXPENSE-Postage | 1 | 4.95 |
| 02/08/2011 | PBR Prepared Brief | 75 | 187.50 |
| 02/09/2011 | PBR Prepared Brief | 75 | 187.50 |
| 02/10/2011 | PBR Prepared Brief | 420 | 1,050.00 |
| 02/14/2011 | PDC Prepared Document(s) | 75 | 187.50 |
| 02/19/2011 | PBR Prepared Brief | 75 | 187.50 |
| 02/19/2011 | PBR Prepared Brief | 90 | 225.00 |
| 02/22/2011 | PBR Prepared Brief | 90 | 225.00 |
| 02/22/2011 | PBR Prepared Brief | 120 | 300.00 |
| 02/22/2011 | PBR Prepared Brief | 300 | 750.00 |
| 02/25/2011 | PBR Prepared Brief | 420 | 1,050.00 |

```
DATE           CHARGE CODE & SERVICES     MINS           AMOUNT CHARGED
               STATEMENT from 01/01/2008 to 05/13/2012
---------------------------------------------------------------------------
02/26/2011     PBR Prepared Brief          90                   225.00
02/28/2011     PBR Prepared Brief         270                   675.00
03/29/2011     PAY Payment                  1        -          500.00
04/20/2011     PAY Payment                  1        -          500.00
04/21/2011     TCL Telephone Call T/F Clerk 10                   25.00
04/23/2011     PPM Prepared Motion         75                   187.50
04/23/2011     PPB Prepared Brief/Memorandum 90                 225.00
04/25/2011     PPB Prepared Brief/Memorandum 240                600.00
04/26/2011     PPB Prepared Brief/Memorandum 240                600.00
05/03/2011     RAR Received and Reviewed   45                   112.50
05/03/2011     PPB Prepared Brief/Memorandum 90                 225.00
05/03/2011     EMA Email                   20                    50.00
05/03/2011     CWC Conference with Client  20                    50.00
05/06/2011     PPB Prepared Brief/Memorandum 75                 187.50
05/09/2011     PPB Prepared Brief/Memorandum 270                675.00
05/09/2011     RES Legal Research          60                   150.00
05/12/2011     PPB Prepared Brief/Memorandum 240                600.00
05/13/2011     PPB Prepared Brief/Memorandum 120                300.00
05/13/2011     RES Legal Research          75                   187.50
05/13/2011     CFW Conference              40                   100.00
05/14/2011     PPB Prepared Brief/Memorandum 120                300.00
05/14/2011     CWE Conference With Expert  75                   225.00
05/15/2011     CWE Conference With Expert 135                   405.00
05/15/2011     PPB Prepared Brief/Memorandum 120                300.00
05/15/2011     PPB Prepared Brief/Memorandum 210                525.00
05/16/2011     CWE Conference With Expert  60                   180.00
05/16/2011     PPB Prepared Brief/Memorandum 75                 187.50
05/26/2011     PAY Payment                  1        -          400.00
06/07/2011     PAY Payment                  1        -          100.00
06/15/2011     RAR Received and Reviewed   30                    75.00
06/16/2011     PDC Prepared Document(s)    45                   112.50
06/16/2011     EFI Efile documents with court 20                 50.00
06/17/2011     TCT Telephone Call T/F TAdminstrat  10            25.00
06/20/2011     TCC Telephone Call T/F Client 15                  37.50
06/21/2011     TCA Telephone Call T/F Attorney  30               75.00
06/21/2011     TCL Telephone Call T/F Clerk  6                   15.00
06/22/2011     TCL Telephone Call T/F Clerk 10                   25.00
07/03/2011     PPM Prepared Motion         45                   112.50
07/04/2011     RES Legal Research          90                   225.00
07/04/2011     PPM Prepared Motion         60                   150.00
07/05/2011     PAY Payment                  1        -          500.00
07/14/2011     RES Legal Research          40                   100.00
07/15/2011     CWC Conference with Client  45                   112.50
07/15/2011     LTT Draft/Revise Letter    180                   450.00
07/27/2011     TCL Telephone Call T/F Clerk 15                   37.50
08/09/2011     PAY Payment                  1        -          500.00
08/12/2011     CWC Conference with Client  45                   112.50
08/16/2011     PAY Payment                  1        -       10,000.00
08/23/2011     LTT Draft/Revise Letter     75                   187.50
09/03/2011     RES Legal Research         240                   600.00
09/13/2011     TCC Telephone Call T/F Client 10                  25.00
09/13/2011     LTC Local Telephone Call    10                    25.00
09/13/2011     CWC Conference with Client  15                    37.50
09/13/2011     CFW Conference              15                    37.50
09/29/2011     RAR Received and Reviewed   30                    75.00
09/29/2011     RES Legal Research          30                    75.00
10/17/2011     PAY Payment                  1        -          500.00
10/17/2011     EMA Email                   30                    75.00
```

report bill-t (C)copyright 1994 Keith Parker-Lowe

| DATE | CHARGE CODE & SERVICES | MINS | AMOUNT CHARGED |
|------|------------------------|------|----------------|
| | STATEMENT from 01/01/2008 to 05/13/2012 | | |
| 10/17/2011 | EMA Email | 6 | 15.00 |
| 10/18/2011 | RES Legal Research | 45 | 112.50 |
| 12/06/2011 | MIL EXPENSE-Mileage | 267 | 146.85 |
| 12/06/2011 | TRA Travel | 360 | 450.00 |
| 12/07/2011 | AAP Appearance in Court | 270 | 810.00 |
| 12/08/2011 | AAP Appearance in Court | 180 | 540.00 |
| 12/08/2011 | TRA Travel | 360 | 450.00 |
| 12/08/2011 | MIL EXPENSE-Mileage | 260 | 143.00 |
| 12/12/2011 | RAR Received and Reviewed | 6 | 15.00 |
| 12/13/2011 | CCK Conference with Clerk | 10 | 25.00 |
| 12/26/2011 | DOA APPEAL-Draft Oral Argument | 420 | 1,751.40 |
| 12/27/2011 | DOA APPEAL-Draft Oral Argument | 180 | 750.60 |
| 01/01/2012 | DOA APPEAL-Draft Oral Argument | 90 | 375.30 |
| 01/02/2012 | DOA APPEAL-Draft Oral Argument | 210 | 875.70 |
| 01/03/2012 | DOA APPEAL-Draft Oral Argument | 75 | 312.75 |
| 01/04/2012 | DOA APPEAL-Draft Oral Argument | 120 | 500.40 |
| 01/05/2012 | DOA APPEAL-Draft Oral Argument | 120 | 500.40 |
| 01/06/2012 | DOA APPEAL-Draft Oral Argument | 285 | 1,188.45 |
| 01/09/2012 | DOA APPEAL-Draft Oral Argument | 240 | 1,000.80 |
| 01/12/2012 | DOA APPEAL-Draft Oral Argument | 90 | 375.30 |
| 01/12/2012 | DOA APPEAL-Draft Oral Argument | 75 | 312.75 |
| 01/13/2012 | DOA APPEAL-Draft Oral Argument | 120 | 500.40 |
| 01/13/2012 | DOA APPEAL-Draft Oral Argument | 30 | 125.10 |
| 01/13/2012 | DOA APPEAL-Draft Oral Argument | 210 | 875.70 |
| 01/20/2012 | DOA APPEAL-Draft Oral Argument | 180 | 750.60 |
| 01/23/2012 | MIL EXPENSE-Mileage | 267 | 146.85 |
| 01/23/2012 | TRA Travel | 480 | 600.00 |
| 01/24/2012 | ARG APPEAL-ORAL ARGUMENT | 135 | 788.40 |
| 01/24/2012 | TRA Travel | 390 | 487.50 |
| 01/24/2012 | MIL EXPENSE-Mileage | 260 | 143.00 |
| 01/30/2012 | APA APPEAL-Supp Authorities | 180 | 540.00 |
| 02/06/2012 | APA APPEAL-Supp Authorities | 150 | 450.00 |
| 02/06/2012 | APA APPEAL-Supp Authorities | 120 | 360.00 |
| 02/23/2012 | CWC Conference with Client | 60 | 150.00 |
| 03/09/2012 | PAY Payment | 1 | - 1,000.00 |
| 03/19/2012 | PAY Payment | 1 | - 500.00 |
| 03/27/2012 | RAR Received and Reviewed | 20 | 50.00 |
| 03/28/2012 | RES Legal Research | 6 | 15.00 |
| 03/28/2012 | TCL Telephone Call T/F Clerk | 15 | 37.50 |
| 03/28/2012 | RES Legal Research | 30 | 75.00 |
| 03/28/2012 | TAP Telephone T/F Adverse Party | 15 | 41.25 |
| 03/29/2012 | TAP Telephone T/F Adverse Party | 10 | 25.00 |
| 03/30/2012 | EMA Email | 30 | 75.00 |
| 03/30/2012 | EFI Efile documents with court | 20 | 50.00 |
| 04/01/2012 | PAY Payment | 1 | - 179.99 |
| 04/03/2012 | CFW Conference | 30 | 75.00 |
| 04/03/2012 | LDC Long Distance Call | 30 | 82.50 |
| 04/03/2012 | TCL Telephone Call T/F Clerk | 6 | 15.00 |
| 04/11/2012 | TCC Telephone Call T/F Client | 6 | 15.00 |
| 04/11/2012 | TCC Telephone Call T/F Client | 6 | 15.00 |
| 04/11/2012 | LTC Local Telephone Call | 6 | 15.00 |
| 04/11/2012 | TAP Telephone T/F Adverse Party | 10 | 32.00 |
| 04/11/2012 | PAY Payment | 1 | - 1,000.00 |
| 04/11/2012 | RAR Received and Reviewed | 6 | 15.00 |
| 04/13/2012 | FAX EXPENSE-FAX | 4 | 10.40 |
| 04/13/2012 | RAR Received and Reviewed | 20 | 50.00 |
| 04/14/2012 | PPM Prepared Motion | 120 | 300.00 |
| 04/16/2012 | CFW Conference | 15 | 37.50 |

| DATE | CHARGE CODE & SERVICES<br>STATEMENT from 01/01/2008 to 05/13/2012 | MINS | AMOUNT CHARGED |
|------|------|------|------|
| 04/16/2012 | PPM Prepared Motion | 65 | 162.50 |
| 04/16/2012 | RES Legal Research | 20 | 50.00 |
| 04/16/2012 | POS EXPENSE-Postage | 3 | 3.15 |
| 04/16/2012 | CCS EXPENSE-Copies/Printing | 54 | 27.00 |
| 04/17/2012 | NOH CIVIL-NOTICE OF HEARING | 15 | 37.50 |
| 04/17/2012 | POS EXPENSE-Postage | 5 | 2.25 |
| 04/17/2012 | CCS EXPENSE-Copies/Printing | 17 | 8.50 |
| 04/17/2012 | CCK Conference with Clerk | 10 | 25.00 |
| 04/19/2012 | TCA Telephone Call T/F Attorney | 6 | 15.00 |
| 04/23/2012 | PAY Payment | 1 | - 500.00 |
| 04/24/2012 | TCA Telephone Call T/F Attorney | 6 | 15.00 |
| 04/24/2012 | TCA Telephone Call T/F Attorney | 15 | 37.50 |
| 04/24/2012 | TCA Telephone Call T/F Attorney | 6 | 15.00 |
| 04/25/2012 | RAR Received and Reviewed | 6 | 15.00 |
| 04/28/2012 | RAR Received and Reviewed | 10 | 25.00 |
| 04/30/2012 | RAR Received and Reviewed | 20 | 50.00 |
| 05/03/2012 | RAR Received and Reviewed | 30 | 75.00 |
| 05/03/2012 | EMA Email | 30 | 75.00 |
| 05/09/2012 | TCT Telephone Call T/F TAdminstrat | 10 | 25.00 |

|  |  |  |
|------|------|------|
| Total Charges | | $83,181.11 |
| Total Payments | - | $23,534.49 |
| Balance Due | | $59,646.62 |

TIME BREAKDOWN 33519 Minutes
Or more than 559 Hours

====================================================
## BALANCE TO BE REMITTED IMMEDIATELY
====================================================