***THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION UNDER BANKRUPTCY CODE SECTION 1125(b) FOR USE IN THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE CHAPTER 11 PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT ARE NOT INTENDED TO BE, AND SHOULD NOT IN ANY WAY BE CONSTRUED AS, A SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT BE RELIED ON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION. THE PLAN PROPONENTS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT AT OR BEFORE THE HEARING TO CONSIDER THIS DISCLOSURE STATEMENT.***

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN PROPOSED BY RESIDENTIAL CAPITAL, LLC, et al. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

MORRISON & FOERSTER LLP
Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren
Jennifer L. Marines
Samantha Martin
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000

Alexandra Steinberg Barrage
2000 Pennsylvania Avenue, NW
Washington, DC 20006-1888
Telephone: (202) 887-1500

*Counsel for the Debtors and
Debtors in Possession*
 Dated:   August 20, 2013
        New York, New York

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
Stephen D. Zide
Rachael L. Ringer
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100

*Counsel for the Official Committee of
Unsecured Creditors*

---

| IMPORTANT INFORMATION FOR YOU TO READ |
| --- |

---

**THE DEADLINE TO VOTE ON THE PLAN IS OCTOBER 21, 2013, AT 7:00 P.M. EASTERN TIME.**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

**PLEASE BE ADVISED THAT ARTICLE V OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS. YOU SHOULD REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED THEREUNDER.**

**The Plan Proponents are providing the information in this Disclosure Statement to holders of Claims and Equity Interests entitled to vote on the Plan for the purpose of soliciting votes to accept the Plan. Nothing in this Disclosure Statement may be relied upon or used by any entity for any other purpose.**

**This Disclosure Statement may not be deemed as providing any legal, financial, securities, tax, or business advice. The Plan Proponents urge any holder of a Claim or Equity Interest to consult with its own advisors with respect to any such legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each of the proposed transactions contemplated thereby. The Bankruptcy Court's approval of the adequacy of disclosures contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the merits of the Plan or a guarantee of the accuracy or completeness of the information contained herein. The Plan Proponents have not authorized any entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the value of their property other than as set forth in this Disclosure Statement. Any information, representations, or inducements made to obtain acceptance of the Plan, which are other than or inconsistent with the information contained in this Disclosure Statement, in the Plan, or in the Plan Supplement should not be relied upon by any holder of a Claim or Equity Interest entitled to vote to accept or reject the Plan.**

**The Plan Proponents urge every holder of a Claim or Equity Interest entitled to vote on the Plan to (1) read the entire Disclosure Statement and the Plan carefully, (2) consider all of the information in this Disclosure Statement, including, importantly, the risk factors described in Article IX of this Disclosure Statement, and (3) consult with its own advisors with respect to reviewing this Disclosure Statement, the Plan, all documents annexed hereto or filed in connection herewith, and the proposed transactions contemplated under the Plan before deciding whether to vote to accept or reject the Plan.**

**This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events in the Debtors' Chapter 11 Cases, and certain documents related to the Plan. In the event of any inconsistency or discrepancy between a description in this**

Disclosure Statement and the terms and provisions of the Plan or other documents referenced herein, the Plan or such other documents will govern for all purposes. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtors' management. The Plan Proponents do not represent or warrant that the information contained herein or annexed hereto is without any material inaccuracy or omission.

Although the Plan Proponents have used their reasonable business judgment to ensure the accuracy of the financial information contained in, or incorporated by reference into, this Disclosure Statement, such financial information has not been and will not be audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise. The Plan Proponents are generally making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof where feasible, unless otherwise specifically noted. Although the Plan Proponents may subsequently update the information in this Disclosure Statement, the Plan Proponents have no affirmative duty to do so, and parties reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was filed.

Neither this Disclosure Statement nor the Plan is or should be construed as an admission of fact, liability, stipulation, or waiver. No reliance should be placed on the fact that a particular Claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Plan Proponents may seek to investigate, file, and prosecute Claims and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.

## QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan, or any of the documents annexed hereto or referenced herein, or have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact the Debtors' notice and claims agent by: (i) visiting http://www.kccllc.net/rescap; (ii) writing to Residential Capital, LLC c/o Kurtzman Carson Consultants LLC, 2335 Alaska Ave, El Segundo, CA, 90245; or (iii) calling (888) 251-2914. You may also contact the Creditors' Committee by (i) visiting http://rescapcommittee.com; or (ii) calling (212) 715-3280.

## ATTENTION BORROWERS

SilvermanAcampora LLP has been approved as special borrower counsel to the Creditors' Committee and is available at 866-259-5217 to answer any questions you may have as a Borrower whose loan was originated, sold, consolidated, purchased, and/or serviced by Residential Capital LLC or any of its subsidiaries.

# TABLE OF CONTENTS

**Page**

ARTICLE I. INTRODUCTION AND PLAN SUMMARY ...........................................................1

    A.    Introduction and Overview .................................................................................1

    B.    General Information ............................................................................................4

    C.    Overview of Chapter 11 .....................................................................................5

    D.    Summary of Classification and Voting Rights of Allowed Claims and
Equity Interests ..................................................................................................6

    E.    Summary of Solicitation Package and Voting Instructions................................15

    F.    Summary of Treatment of Allowed Claims and Equity Interests ......................16

    G.    Confirming and Consummating the Plan ..........................................................21

ARTICLE II. THE GLOBAL SETTLEMENT & IMPLEMENTATION OF THE PLAN.........21

    A.    The Global Settlement........................................................................................22

    B.    Settlement of Claims Against Ally and Plan Releases.........................................22

    C.    The Plan Includes a Settlement of RMBS Trust Claims ...................................28

    D.    The Plan Settles the Claims of Certain Monoline Insurers ...............................30

    E.    The Plan Resolves Certain Securities Claims Against the Debtors and Ally.......34

    F.    The Plan Resolves the Claims of NJ Carpenters .................................................35

    G.    The Plan Resolves the Claims in the Kessler Class Action .............................36

    H.    The Plan Establishes a Trust to Allow for Payment in Cash to Holders of
Borrower Claims ...............................................................................................36

    I.    The Plan Provides Junior Secured Noteholders with Payment in Full.................38

    J.    The Plan Resolves Claims of the Senior Unsecured Noteholders and the
Senior Unsecured Notes Indenture Trustee .......................................................39

    K.    The Plan Resolves Issues Relating to Substantive Consolidation of the
Debtors' Estates.................................................................................................39

    L.    The Plan Contains a Compromise of Intercompany Balances and Resolves
Subrogation and Other Disputed Intercompany Issues ......................................40

    M.    The Plan Allocates the Estate Assets and Administrative Expenses among
Debtor Groups and Creditor Constituencies......................................................42

    N.    Implementation of the Plan.................................................................................44

ARTICLE III. BACKGROUND .............................................................................................48

# TABLE OF CONTENTS
(continued)

**Page**

A.    The Debtors' Businesses and Operations ................................................48

B.    The Debtors' Organizational Structure....................................................51

C.    The Debtors' Assets and Capital Structure..............................................51

D.    Events Leading to the Filing of the Chapter 11 Cases .........................57

ARTICLE IV. THE CHAPTER 11 CASES......................................................66

A.    Commencement of the Chapter 11 Cases ..............................................67

ARTICLE V. OTHER PLAN PROVISIONS ...................................................113

A.    Unclassified Claims...............................................................................114

B.    Classification, Treatment, and Voting of Claims and Equity Interests .............116

C.    Establishment of Trusts and Provisions Governing Issuance of Units and
       Distributions ..........................................................................................117

D.    Cancellation of Securities, Indentures, and Other Documents
       Evidencing Claims and Equity Interests ...............................................127

E.    Junior Secured Notes; Fees and Expenses ............................................128

F.    Senior Unsecured Notes; Fees and Expenses ........................................128

G.    Corporate Action ...................................................................................130

H.    Dissolution of the Debtors.....................................................................130

I.    Exemption from Certain Taxes and Fees ...............................................131

J.    Preservation of Causes of Action ..........................................................131

K.    Nonconsensual Confirmation ................................................................132

L.    Treatment of Executory Contracts and Unexpired Leases ...................133

M.    Surrender of Existing Publicly Traded Securities ...............................136

N.    Minimum Distributions; Foreign Exchange Rate; and Other Distribution
       Limitations.............................................................................................137

O.    Undeliverable Distributions and Unclaimed Property.........................138

P.    Compliance with Tax Requirements .....................................................138

Q.    Setoffs and Recoupment........................................................................139

R.    Interest on Claims ..................................................................................139

S.    Claims Paid or Payable by Third Parties ..............................................139

# TABLE OF CONTENTS
(continued)

**Page**

T.    Allowed Unsecured Claims for Which More than One Debtor in a Debtor Group Is Jointly and/or Severally Liable ........................................... 140

U.    Distributions Free and Clear ........................................... 140

V.    Procedures for Resolving Disputed Claims ........................................... 140

W.    Claims Estimation; Allowance ........................................... 141

X.    Settlement, Release, Injunction, and Related Provisions ........................................... 143

Y.    Conditions Precedent to Confirmation and Consummation of the Plan ........................................... 148

Z.    Modification, Revocation, or Withdrawal of the Plan ........................................... 150

AA.    Retention of Jurisdiction ........................................... 151

BB.    Miscellaneous Plan Provisions ........................................... 152

CC.    Plan Supplement ........................................... 156

ARTICLE VI. VOTING PROCEDURES ........................................... 156

A.    Voting Deadline ........................................... 156

B.    Holders of Claims or Interests Entitled to Vote ........................................... 157

D.    Vote Required for Acceptance by a Class ........................................... 159

E.    Returning Your Ballot ........................................... 159

ARTICLE VII. RECOVERY ANALYSIS ........................................... 160

ARTICLE VIII. CONFIRMATION OF THE PLAN ........................................... 161

A.    Confirmation Hearing ........................................... 161

B.    Deadline to Object to Confirmation ........................................... 162

C.    Confirmation Standards ........................................... 162

D.    Persons to Contact for More Information ........................................... 167

E.    Disclaimer ........................................... 167

ARTICLE IX. PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMING THE PLAN ........................................... 168

A.    General ........................................... 168

B.    Certain Bankruptcy Law Considerations ........................................... 168

C.    Considerations Relating to the Units and Recoveries ........................................... 171

-iii-

# TABLE OF CONTENTS
## (continued)

**Page**

D.    Disclosure Statement Disclaimer ......................................................174

E.    Additional Factors to Be Considered ...............................................176

ARTICLE X. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN ..............................................................................................177

A.    Certain U.S. Federal Income Tax Consequences to the Debtors .......179

B.    Certain U.S. Federal Income Tax Consequences to Holders of Allowed
Claims ..............................................................................................180

C.    Tax Treatment of the Liquidating Trust and Holders of Beneficial Interests ....183

D.    Treatment of the Disputed Claims Reserve ......................................185

E.    Tax Treatment of the RMBS Claims Trust, the Private Securities Claims
Trust and the Borrower Claims Trust ...............................................186

ARTICLE XI. SECURITIES LAW MATTERS ......................................................187

ARTICLE XII. RULES OF INTERPRETATION ....................................................189

A.    Rules of Construction ......................................................................189

B.    Computation of Time .......................................................................189

C.    Governing Law .................................................................................189

ARTICLE XIII. CONCLUSION AND RECOMMENDATION ............................................189

## **EXHIBITS**

1. Joint Chapter 11 Plan
2. List of Debtors
3. Organizational Chart
4. Illustrative Unit Issuance Structure
5. Consenting Claimants
6. List of Seven Largest Intercompany Balances
7. Recovery Analysis
8. Liquidation Analysis
9. RMBS Trust Allocation Protocol Methodology
10. JSN's Position on Examiner's Report and Ally's Response
11. List of Payments to be Made Pursuant to the Plan
12. Schedule of Recoveries to the RMBS Trusts
13. Calculation of Recoveries to the RMBS Trusts

ny-1105358

## ARTICLE I.
## INTRODUCTION AND PLAN SUMMARY[1]

### A.    Introduction and Overview

The Debtors and the Creditors' Committee[2] (together, the "Plan Proponents") submit this disclosure statement (the "Disclosure Statement") pursuant to Section 1125 of the Bankruptcy Code to holders of Claims against and Equity Interests in the Debtors in connection with the solicitation of acceptances with respect to the *Joint Chapter 11 Plan of Residential Capital, LLC, et al.*, dated July 3, 2013.  A copy of the Plan is annexed hereto as Exhibit 1 and incorporated herein by reference.

The purpose of this Disclosure Statement, including the Exhibits annexed hereto, is to provide information of a kind, and in sufficient detail, to enable creditors of the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan.  This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events in the Chapter 11 Cases and certain documents related to the Plan.[3]

Prior to the Petition Date, the Debtors were a leading originator of residential mortgage loans and, together with their non-Debtor affiliates, the fifth largest servicer of residential mortgage loans in the United States, servicing approximately $374 billion of domestic[4] residential mortgage loans and working with more than 2.4 million mortgage loans across the United States.  On May 14, 2012, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York.  **Neither Ally Financial Inc. (f/k/a GMAC Inc.) ("AFI", and together with its direct and indirect subsidiaries excluding the Debtors, "Ally"),[5] ResCap's indirect parent, nor Ally Bank (f/k/a GMAC Bank),[6] ResCap's affiliate, are Debtors in the Chapter 11 Cases.**

---

[1]    This introduction is qualified in its entirety by the more detailed information contained in the Plan and elsewhere in this Disclosure Statement.  Capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[2]    On May 16, 2012, the United States Trustee for the Southern District of New York appointed nine (9) creditors to represent all unsecured creditors in these Chapter 11 Cases on the Creditors' Committee [Docket No. 102]. The Creditors' Committee is comprised of the following creditors:  (1) Wilmington Trust, N.A.; (2) Deutsche Bank Trust Company Americas; (3) The Bank of New York Mellon Trust Company, N.A.; (4) MBIA Insurance Corporation; (5) Rowena L. Drennen; (6) AIG Asset Management (U.S.), LLC; (7) U.S. Bank National Association; (8) Allstate Life Insurance Company; and (9) Financial Guaranty Insurance Company.

[3]    Reference is made to the Plan and Plan Supplement for the complete terms of the Plan.

[4]    Unless otherwise specified, all information regarding the Debtors' mortgage loan operations refers only to domestic operations.

[5]    AFI, a bank-holding company regulated by the Board of Governors of the Federal Reserve System, is the parent company of GMAC Mortgage Group, LLC, the intermediate non-Debtor company that owns 100% of ResCap's equity.

[6]    Ally Bank is a commercial state chartered bank regulated by the Federal Deposit Insurance Corporation.

The Debtors and the Creditors' Committee, which represents the interests of all unsecured creditors, are co-proponents of the Plan and believe that the Plan is the best means to fairly and efficiently resolve the Debtors' Chapter 11 Cases.  Additional parties who support the Plan include parties who hold billions of dollars in claims against the Debtors (the "Consenting Claimants") and Ally, each of which are signatories to that certain plan support agreement dated May 13, 2013 (the "Plan Support Agreement").[7]  The Consenting Claimants and Ally represent the majority of the Debtors' largest creditor constituencies.  The Debtors' entry into the Plan Support Agreement was approved by the Bankruptcy Court on June 26, 2013 [Docket No. 4098].

The Plan is the culmination of extensive, good faith negotiations guided by the Honorable James M. Peck, a United States Bankruptcy Judge for the Southern District of New York, as mediator (the "Mediator"), among the Debtors, the Creditors' Committee, Ally, and the Consenting Claimants.  The terms of the Plan are premised upon Ally's agreement to provide, in addition to the substantial financial and operational support already provided to the Estates throughout the Chapter 11 Cases, an additional contribution of $2.1 billion in plan funding, comprised of (1) $1.95 billion in Cash to be paid on the Effective Date of the Plan and (2) the first $150 million received by Ally for any Directors and Officers or Errors and Omissions claims it pursues against its insurance carriers related to the claims released in connection with the Plan; provided, that Ally guarantees that the Debtors (or the Liquidating Trust) will receive $150 million on account of such insurance claims, which guarantee shall be payable without defense, objection, or setoff on September 30, 2014 (collectively (1) and (2), the "Ally Contribution") in exchange for the Debtor Release and Third Party Releases.  The Ally Contribution represents a near three-fold increase in Plan funding from the prior agreement among the Debtors, Ally, and certain other constituencies that was presented on the Petition Date.  In addition, the Plan settles a variety of highly complex disputes that have been a source of contention throughout the Chapter 11 Cases and which, if left unresolved, would have led to years of costly litigation and resulted in significant uncertainty and delays in distributions to creditors.  Each of the settlements embodied in the Plan are dependent upon all others and, thus, constitute a global settlement (the "Global Settlement") of the numerous issues resolved under the Plan.  Absent the Ally Contribution, the Global Settlement would not be possible.  As set forth in further detail in Article II, the Global Settlement embodied in the Plan provides for, among other things:

> 1   A settlement of the size, allocation, and priority of all of the claims asserted by the RMBS Trustees arising from over 1,000 RMBS Trusts, including mortgage loan repurchase claims relating to breach of origination or sale representations and warranties (often referred to as "put-back claims"), cure claims, and servicing-related claims, which comprise the largest disputed claims against the Debtors' Estates, as well as approval of the RMBS Settlement, which was the subject of substantial litigation in the Chapter 11 Cases.

---

[7]   Although the Consenting Claimants support the terms of the Plan and the Global Settlement, nothing herein shall constitute a waiver or admission with respect to any of the Claims of the Consenting Claimants.  In addition, the Consenting Claimants do not make any representations or warranties as to the accuracy of any of the information contained herein.  The Consenting Claimants have not adopted, and may not agree with, the contents of this Disclosure Statement.

2    A settlement of the allowance, allocation, and priority of the claims of certain monoline insurers, including MBIA and FGIC, eliminating the need for complex and uncertain litigation concerning the scope and nature of the claims held by these entities and the potential subordination of such claims, separate and apart from the litigation concerning the claims of the RMBS Trusts.

3    A settlement of billions of dollars of Private Securities Claims against the Debtors, including claims involving Ally, arising from their structuring, sponsoring, underwriting, and sale of RMBS, eliminating litigation concerning such issues as the validity and value of these claims and their potential subordination pursuant to Section 510 of the Bankruptcy Code.  The settlement of the Private Securities Claims is implemented through the establishment of a Private Securities Claims Trust, which will settle and administer distributions to holders of Allowed Private Securities Claims in accordance with the procedures and methodology set forth in the Private Securities Claims Trust Agreement.

4    The establishment of a Borrower Claims Trust, which sets a floor of available assets for distributions to Borrowers and provides streamlined procedures for holders of Allowed Borrower Claims to receive distributions in accordance with the procedures and methodology set forth in the Borrower Claims Trust Agreement.  The amounts distributed to the holders of Borrower Claims through the Borrower Claims Trust are in addition to approximately $230 million to be paid by the Debtors outside of the Plan for the benefit of Borrowers through a settlement of the Debtors' foreclosure file review obligations under the Consent Order.

5    A resolution of approximately $1.003 billion in claims held by Wilmington Trust, National Association, in its capacity as indenture trustee for the Senior Unsecured Notes.

6    An agreed-upon allocation of Estate assets, including the Ally Contribution, to be distributed via three groups of Debtors (the ResCap Debtors, the GMACM Debtors and the RFC Debtors), the Borrower Claims Trust, the Private Securities Claims Trust, and the NJ Carpenters Claims Distribution.

7    An agreed-upon allocation of projected Administrative Claims pursuant to which Administrative Claims will be allocated among the GMACM Debtors and RFC Debtors, but not to the ResCap Debtors.

8    Payment in full of all administrative, secured, and priority claims, including the Junior Secured Notes Claim (as determined either by agreement or pursuant to the JSN Adversary Proceeding, discussed in further detail in Article I, Section F below).  The payment in full of the Allowed Junior Secured Notes Claims represents an improvement upon the treatment proposed in the pre-petition agreement between the holders of the Junior Secured Notes Claims and the Debtors.

-3-

9    Subject to the approval of the United States District Court for the Southern District of New York (the "District Court") and confirmation of the Plan, a settlement of the Allowed Claim amount and distribution to the NJ Carpenters Class Members, whose class was certified for settlement purposes in the NJ Carpenters Class Action.

10   A waiver of any Subrogation Claims held by the GMACM Debtors and the RFC Debtors against the ResCap Debtors.

11   A compromise of all Intercompany Balances, potential subrogation claims, potential avoidance of historical debt forgiveness, claims relating to failure to charge Debtor entities with allocable expenses, and substantive consolidation.

Notably, as explained in more detail in Article IV.A.10 herein, the conclusions contained in the Report of the Examiner (as each defined below) supports the terms of the Global Settlement.

**THE DEBTORS, THE CREDITORS' COMMITTEE, ALLY, AND THE CONSENTING CLAIMANTS BELIEVE THAT IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS. FOR ALL OF THESE REASONS AND THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT, THE PLAN PROPONENTS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE, (THE DATE BY WHICH YOUR BALLOT MUST BE ACTUALLY RECEIVED), WHICH IS OCTOBER 21, 2013 AT 7:00 P.M. (EASTERN TIME) (the "Voting Deadline").**

---

**ARTICLE V OF THE DISCLOSURE STATEMENT AND ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

---

**B.    General Information**

**1.    Important Information about this Disclosure Statement**

On **[●]**, 2013, the Bankruptcy Court entered an order (the "Disclosure Statement Approval Order") approving this Disclosure Statement as containing "adequate information," *i.e.*, information of a kind and in sufficient detail to enable a hypothetical reasonable investor typical of the holders of Claims or Equity Interests to make an informed judgment about the Plan [Docket No. **[●]**]. This Disclosure Statement is submitted pursuant to Section 1125 of the Bankruptcy Code to holders of Claims against the Debtors in connection with (i) the solicitation of votes on the Plan, and (ii) the hearing scheduled for **November 19, 2013**, **at 10:00 a.m. (Eastern Time)** (the "Confirmation Hearing") to consider an order confirming the Plan (the "Confirmation Order").

-4-

The Disclosure Statement Approval Order sets forth, among other things, (i) the deadlines, procedures, and instructions for voting to accept or reject the Plan, and for filing objections to confirmation of the Plan, (ii) the record date for voting purposes, and (iii) the applicable standards for tabulating Ballots. A Ballot for acceptance or rejection of the Plan is enclosed with the copies of this Disclosure Statement submitted to the holders of Claims that are entitled to vote on the Plan. Detailed voting instructions accompany each Ballot. **The last day for a Ballot to be actually received with respect to voting to accept or reject the Plan is the Voting Deadline, October 21, 2013 at 7:00 p.m. (Eastern Time).**

THE DEBTORS, THE CREDITORS' COMMITTEE, ALLY, AND THE CONSENTING CLAIMANTS BELIEVE THAT IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS. FOR ALL OF THESE REASONS AND THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT, THE PLAN PROPONENTS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE.

## C.    Overview of Chapter 11

Under Chapter 11 of the Bankruptcy Code, a debtor may propose to reorganize or liquidate its business and assets subject to the provisions of the Bankruptcy Code. In general, a Chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the consideration that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the plan. The Bankruptcy Code defines "claims" and "equity security holders" rather than "creditors" and "shareholders;" as a result, this Disclosure Statement speaks in terms of "claims" and "equity interests." Under Section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (i) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in that class, or (ii) to the extent defaults exist, provides for the cure of existing defaults, reinstatement of the maturity of claims in that class, compensates each holder of a claim for any pecuniary damages incurred as a result of reasonable reliance upon the default, and does not otherwise alter the legal, equitable or contractual rights of each holder of a claim in that class.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal, contractual, and equitable interests of the debtor as of the commencement date. The Bankruptcy Code provides that a debtor may continue to manage and operate its business and remain in possession of its property as a "debtor-in-possession." The consummation of a plan is a principal objective of a Chapter 11 case. A Chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor and, if appropriate, the future conduct of the debtor's business or the liquidation of the debtor's remaining assets. Confirmation of a plan by the bankruptcy court binds the debtor, any person acquiring property under the plan, and any creditor or equity security holder of a debtor to the terms and provisions of the plan as of the effective date of the plan. Certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment to accept or reject the plan. The Plan Proponents are distributing

-5-

this Disclosure Statement to holders of Claims against and Equity Interests in the Debtors that are expected to receive a distribution under the Plan in satisfaction of the requirements of Section 1125 of the Bankruptcy Code.

**D.    Summary of Classification and Voting Rights of Allowed Claims and Equity Interests**

The primary purpose of the Plan is to set forth the manner in which the Debtors' assets will be liquidated and allocated and describe how Claims against and Equity Interests in the Debtors will be treated if the Plan is confirmed by the Bankruptcy Court and thereafter consummated on the Effective Date.  The Plan creates the following three Debtor groups (each, a "Debtor Group" and collectively, the "Debtor Groups") for ease of describing distributions:[8]

(i)    The "**ResCap Debtors**," comprised of three (3) sub-Classes, including ResCap, GMAC Residential Holding Company, LLC, and GMAC-RFC Holding Company, LLC;

(ii)    The "**GMACM Debtors**," comprised of twenty-one (21) sub-Classes, including each of the direct and indirect Debtor subsidiaries of GMAC Residential Holding Company, LLC (including ETS, provided that, in lieu of Class GS-4A, the Plan for ETS contains a sub-Class, Class GS-4B, for ETS Unsecured Claims);[9] and

(iii)    The "**RFC Debtors**," comprised of twenty-seven (27) sub-Classes, including each of the direct and indirect Debtor subsidiaries of GMAC-RFC Holding Company, LLC.[10]

Only claims (including claims for administrative expenses) and equity interests that are "allowed" may receive distributions under a Chapter 11 plan.  An "allowed" claim or equity interest means that the debtors agree, or, in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, including the amount thereof, is in fact a valid obligation of or equity interest in, the debtors.  Section 502(a) of the Bankruptcy Code provides that a timely filed, claim or equity interest is "allowed" unless the debtor or another party in interest objects.  However, Section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in a bankruptcy case even if a proof of claim is filed.  These include claims that are unenforceable under the governing agreement or applicable non-bankruptcy law, claims for unmatured interest in unsecured and/or undersecured obligations, property tax claims in excess of the debtor's equity in the property, claims for certain services that exceed their reasonable value, nonresidential real property lease and employment contract rejection damage claims in excess of specified amounts, and late-filed claims.  In addition, Rule 3003(c)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") prohibits the allowance of any

---

[8]    Exhibit 3 annexed hereto contains organizational charts detailing the Debtor entities.

[9]    Prior to the Asset Sales (defined herein), the GMACM Debtors were primarily responsible for conducting the Debtors' business operations, including originating, brokering, and servicing loans.

[10]    Prior to the Asset Sales, the RFC Debtors were primarily the private issuers of mortgage-backed and home equity loan asset-backed securities and master servicer for many of the securitizations.

claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent, or unliquidated if the holder has not filed a proof of claim or equity interest before the deadline to file proofs of claim and equity interests.

The Bankruptcy Code also requires that, for purposes of treatment and voting, a Chapter 11 plan categorize the different claims against, and equity interests in, the debtors into separate classes based upon their legal nature. Claims of a substantially similar legal nature are typically classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests that give rise to different legal rights, the holders of such claims and/or equity interests may find themselves as members of multiple classes of claims and/or equity interests.

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a Chapter 11 plan. For example, pursuant to Section 1126(f) of the Bankruptcy Code, holders of claims and interests that are unimpaired by a plan are presumed to accept such plan and, therefore, are not entitled to vote. Additionally, pursuant to Bankruptcy Code Section 1126(g), holders of claims or interests receiving no distributions under a plan are presumed to have rejected such plan and are not entitled to vote.

As set forth in Article III of the Plan and in accordance with Sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Equity Interests, other than Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth in Article III of the Plan for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in connection with Sections 1122 and 1123(a)(1) of the Bankruptcy Code.[11] A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes. A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. Section 1129(a)(10) of the

---

[11] The allowance, classification, and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan take into account the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, Section 510(b) of the Bankruptcy Code, or otherwise. The Plan Proponents or the Liquidating Trust (and the Borrower Trust with respect to Borrower Claims), as applicable, reserve the right to re-classify any Allowed Claim or Equity Interest other than the Consenting Claimants' Allowed Claims, the NJ Carpenters Claims (assuming the NJ Carpenters Approval), the Allowed Private Securities Claims, and the Ally Claims, in accordance with any contractual, legal, or equitable subordination relating thereto under the Bankruptcy Code, subject to further order of the Bankruptcy Court. An initial list of Claims proposed to be subordinated under the Plan shall be set forth in the Plan Supplement, without prejudice to the right of the Plan Proponents or Liquidating Trust (and the Borrower Trust with respect to Borrower Claims), as the case may be, to seek to subordinate additional Claims. Subordinated Claims shall not receive a distribution under the Plan until all senior Allowed Claims are paid in full. In connection with the subordination of the FHFA's Claims, the Plan Proponents shall either include FHFA on the list of Claims to be submitted with the Plan Supplement, or may seek to subordinate the FHFA's Claim by separate adversary proceeding.

Bankruptcy Code shall be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; provided, however, that in the event no holder of a Claim with respect to a specific Class for a particular Debtor timely submits a Ballot indicating acceptance or rejection of the Plan, such Class will be presumed to have accepted the Plan.[12]  Within each Debtor Group, holders of Allowed Claims entitled to vote on the Plan will vote within the applicable Debtor sub-Class.[13]

Your ability to vote and your distribution under the Plan, if any, depends on the type of Claim or Interest you hold.  As set forth in Article III of the Plan, Claims in Classes R-3, R-4, R-5, R-6, R-7, R-8, R-11, GS-3, GS-4, GS-5, GS-6, GS-7, RS-3, RS-4, RS-5, RS-6, RS-7, RS-8, and RS-11 are impaired and entitled to vote on the Plan.  All other Classes of Claims (Classes R-1, R-2, R-9, R-10, R-12, GS-1, GS-2, GS-8, GS-9, GS-10, RS-1, RS-2, RS-9, and RS-10), are not entitled to vote on the Plan because the Claims or Equity Interests in those classes are either unimpaired and presumed to accept the Plan, or are receiving no distributions under the Plan and are presumed to reject the plan.

The following charts summarize the classification, treatment, and voting rights of Claims against and Equity Interests in the Debtors and the potential distributions to holders of Allowed Claims and Equity Interests under the Plan, in accordance with the creation of the three Debtor Groups discussed above:[14]

---

[12]   Certain parties have argued that this presumption is impermissible. The Plan Proponents disagree, as this approach has been approved by the Bankruptcy Court in prior cases, as well as other cases in the Southern District of New York and elsewhere.  Courts have concluded that such a provision is consistent with the Bankruptcy Code and thus valid and enforceable.  If necessary, the Plan Proponents will demonstrate in connection with confirmation of the Plan that this provision is appropriate.

[13]   Any Class of Claims or Equity Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies Section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

[14]   These charts contain a summary of the classification and treatment of Allowed Claims and Equity Interests. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims and Equity Interests. The Estimated Aggregate Allowed Claim Amounts at each of the Debtor Groups reflects the Debtors' current estimations based on the analysis of the validity and priority of Claims against each Debtor Group, after taking into account pending and/or anticipated Claims objections. As discussed herein in Article IV.A.19, numerous objections to Claims are currently pending, and the Debtors expect that a number of Claims will remain disputed, contingent or unliquidated as of the Effective Date.  As discussed in Article II.N.5, the Debtors will establish a Disputed Claims Reserve for such Claims and, to the extent Disputed Claims become Allowed in excess of the Debtors' estimates, the aggregate Allowed Claims against each Debtor Group will be greater than what the Debtors estimate in Article I.D of the Disclosure Statement, certain holders of Claims may not receive a recovery, and the estimated recovery percentages for Claims against the Debtor Groups will on average decrease. All Estimated Aggregate Allowed Claim Amounts are reflected in millions of dollars.

-8-

**ALL DEBTORS**
**($ in Millions)**

| CLASS | TYPE OF CLAIM OR EQUITY INTEREST | TREATMENT | VOTING RIGHTS | ESTIMATED AGGREGATE ALLOWED AMOUNT | ESTIMATED PERCENTAGE RECOVERY UNDER CH. 7 LIQUIDATION | ESTIMATED RECOVERY UNDER PLAN |
|---|---|---|---|---|---|---|
| | Administrative Expense Claims | Unclassified | Non-Voting | 300.00 – 400.00 | 100.0% | 100.0% |
| | Priority Tax Claims | Unclassified | Non-Voting | 5.31 | 100.0% | 100.0% |

**RESCAP DEBTORS**
**($ in Millions)**

| CLASS | TYPE OF CLAIM OR EQUITY INTEREST | TREATMENT | VOTING RIGHTS | ESTIMATED AGGREGATE ALLOWED AMOUNT | ESTIMATED PERCENTAGE RECOVERY UNDER CH. 7 LIQUIDATION | ESTIMATED RECOVERY UNDER PLAN[15] |
|---|---|---|---|---|---|---|
| R-1 | Other Priority Claims | Unimpaired | Presumed to Accept | N/A | N/A | N/A |
| R-2 | Other Secured Claims | Unimpaired | Presumed to Accept | 0.01 | 100.0% | 100.0% |

---

[15] The Debtors and the Creditors' Committee believe that the Junior Secured Noteholders are undersecured and therefore not entitled to any post-petition interest on account of their Claims. In contrast, the holders of the Junior Secured Notes Claims assert that they are oversecured and have been accruing post-petition interest since the Petition Date. The Junior Secured Noteholders assert that they will have accrued post-petition interest in the amount of approximately $330 million by November 30, 2013 on account of their secured claims. This estimate of accrued post-petition interest includes default interest at a rate of 10.625% (a rate disputed by the Debtors and the Creditors' Committee). As described in greater detail in Article IV.A Section 20 below, the issues of whether the Junior Secured Notes are over or undersecured will be addressed in the JSN Adversary Proceeding or at the Confirmation Hearing. In these charts, the low end of the "Estimated Recovery Under Plan" for the Junior Secured Noteholders, and the high end of such column for all other creditors, assumes the Debtors and the Creditors' Committee are completely successful in the JSN Adversary Proceeding, resulting in Junior Secured Notes Claims in the aggregate amount of $1.846 billion (representing principal and prepetition accrued and unpaid interest, reduced to reflect the disallowance of unamortized original issue discount ("OID"), as of the Petition Date) and no post-petition interest. The high end of the "Estimated Recovery Under Plan" for the Junior Secured Noteholders, and the low end of such column for all other creditors, assumes the Junior Secured Parties are completely successful in the JSN Adversary Proceeding and reflects the Junior Secured Notes Claims in the aggregate amount of $2.553 billion (representing principal and prepetition accrued and unpaid interest, as of the Petition Date without the disallowance of OID, plus post-petition interest and fees of an additional $330 million).

| CLASS | TYPE OF CLAIM OR EQUITY INTEREST | TREATMENT | VOTING RIGHTS | ESTIMATED AGGREGATE ALLOWED AMOUNT | ESTIMATED PERCENTAGE RECOVERY UNDER CH. 7 LIQUIDATION | ESTIMATED RECOVERY UNDER PLAN[15] |
|---|---|---|---|---|---|---|
| R-3[16] | Junior Secured Notes Claims | Impaired/ Unimpaired | Presumed to Accept/ Entitled to Vote | 1,846.00-2,553.00[17] | 70.3% - 77.0% | 100.0% - 100.0% |
| R-4 | ResCap Unsecured Claims[18] | Impaired | Entitled to Vote | 2,060.44 | 0.1% - 0.2% | 31.5% - 41.9% |
| R-5 | Borrower Claims | Impaired | Entitled to Vote | N/A | N/A | N/A |
| R-6 | Private Securities Claims | Impaired | Entitled to Vote | N/A | 0.0% - 0.1% | N/A |
| R-7 | NJ Carpenters Claims | Impaired | Entitled to Vote | N/A | 0.0% - 0.1% | N/A |
| R-8 | General Unsecured Convenience Claims | Impaired | Entitled to Vote | 0.30 | 0.1% - 0.2% | 36.3% |

[16] Recovery rates for the Junior Secured Notes are shown on a consolidated basis. The Junior Secured Noteholders are impaired at certain Debtor entities where the Debtors have issued or guaranteed the Junior Secured Notes and may be liable for post-petition interest, subject to the outcome of the JSN Adversary Proceeding. The Junior Secured Noteholders are unimpaired at certain Debtor entities where the Debtors are not issuers or guarantors of such debt; rather, these Debtor entities have pledged specific assets as collateral, and the Junior Secured Noteholders will receive such collateral (*i.e.*, Cash) under the Plan. Specifically, the Junior Secured Noteholders are impaired and entitled to vote on the Plan at all of the ResCap Debtors.

[17] The claims and liens of the Junior Secured Noteholders against each of the Debtor Groups currently are the subject of litigation before the Bankruptcy Court in the JSN Adversary Proceeding. As part of the JSN Adversary Proceeding, the Creditors' Committee is seeking the disallowance under section 502(b)(2) of the Bankruptcy Code of approximately $377 million of the Junior Secured Notes Claims as unamortized OID as of the Petition Date. In these charts, the low end of the "Estimated Aggregate Allowed Amount" assumes the Creditors' Committee is successful in seeking the disallowance of the OID and the Junior Secured Noteholders are found to be undersecured by the Bankruptcy Court, resulting in Junior Secured Notes Claims in the aggregate amount of $1.846 billion (representing principal and prepetition accrued and unpaid interest, reduced to reflect the disallowance of OID, as of the Petition Date). The high end of the "Estimated Aggregate Allowed Amount" assumes the Creditors' Committee is unsuccessful in seeking such disallowance and the Junior Secured Noteholders are found to be fully oversecured by the Bankruptcy Court, resulting in Junior Secured Notes Claims in the aggregate amount of $2.553 billion (representing principal and prepetition accrued and unpaid interest, as of the Petition Date without the disallowance of OID, plus post-petition interest and fees of an additional $330 million).

[18] ResCap Unsecured Claims consist of: (i) the Senior Unsecured Notes Claims in the Allowed Amount of $1.003 billion; (ii) MBIA's Claim in the Allowed Amount of $719 million; (iii) FGIC's Claim in the Allowed Amount of $337.5 million; and (iv) other General Unsecured Claims, which are assumed to be in the amount of $916,000.

-10-

| CLASS | TYPE OF CLAIM OR EQUITY INTEREST | TREATMENT | VOTING RIGHTS | ESTIMATED AGGREGATE ALLOWED AMOUNT | ESTIMATED PERCENTAGE RECOVERY UNDER CH. 7 LIQUIDATION | ESTIMATED RECOVERY UNDER PLAN[15] |
|---|---|---|---|---|---|---|
| R-9 | Intercompany Balances | Impaired | Presumed to Reject | N/A | N/A | N/A |
| R-10 | Equity Interests | Impaired | Presumed to Reject | N/A | N/A | N/A |
| R-11 | FHFA Claims | Impaired | Entitled to Vote[19] | N/A | 0.0% - 0.1% | N/A |
| R-12 | Revolving Credit Facility Claims | Impaired | Entitled to Vote | N/A | 100.0% | N/A |

## GMACM DEBTORS
### ($ in Millions)

| CLASS | TYPE OF CLAIM OR EQUITY INTEREST | TREATMENT | VOTING RIGHTS | ESTIMATED AGGREGATE ALLOWED AMOUNT | ESTIMATED PERCENTAGE RECOVERY UNDER CH. 7 LIQUIDATION | ESTIMATED RECOVERY UNDER PLAN[20] |
|---|---|---|---|---|---|---|
| GS-1 | Other Priority Claims | Unimpaired | Presumed to Accept | 0.13 | 100.0% | 100.0% |
| GS-2 | Other Secured Claims | Unimpaired | Presumed to Accept | 0.04 | 100.0% | 100.0% |
| GS-3[21] | Junior Secured Notes Claims | Impaired/ Unimpaired | Presumed to Accept/ Entitled to Vote | 1,846.00 - 2,553.00 | 70.3% - 77.0% | 100.0% - 100.0% |

---

[19]    Holders of FHFA Claims are entitled to vote to accept or reject the Plan; provided, that if the Bankruptcy Court determines that the FHFA Claims are subject to subordination under section 510(b) of the Bankruptcy Code such that holders of Allowed FHFA Claims against the GMACM Debtors are not entitled to receive a distribution under the Plan, then holders of Allowed FHFA Claims will be deemed to reject the Plan and such votes will not be counted.

[20]    See supra note 15 for a discussion of the estimated recoveries of the Junior Secured Noteholders and the impact thereof on all recoveries under the Plan.

[21]    Recovery rates for the Junior Secured Notes are shown on a consolidated basis. The Junior Secured Noteholders are impaired at certain Debtor entities where the Debtors have issued or guaranteed the Junior Secured Notes and may be liable for post-petition interest, subject to the outcome of the JSN Adversary Proceeding. The Junior Secured Noteholders are unimpaired at certain Debtor entities where the Debtors are not issuers or guarantors of such debt; rather, these Debtor entities have pledged specific assets as collateral, and the Junior Secured Noteholders will receive such collateral (i.e., Cash) under the Plan. The Junior Secured Noteholders are impaired and entitled to vote on the Plan at the following GMACM Debtors: GMACM; they

-11-

| GS-4A | GMACM Unsecured Claims[22] | Impaired | Entitled to Vote | 2,205.07 | 6.3% - 8.1% | 26.0% - 34.7% |
| GS-4B | ETS Unsecured Claims[23] | Impaired | Entitled to Vote | 4.9 | 100% | 100% |
| GS-5[24] | Borrower Claims | Impaired | Entitled to Vote | 88.57 | 6.3% - 8.1% | 30.1% |
| GS -6[25] | Private Securities Claims | Impaired | Entitled to Vote | N/A | 0.0% - 6.3% | N/A |
| GS -7 | General Unsecured Convenience Claims | Impaired | Entitled to Vote | 2.50 | 6.3% - 8.1% | 30.1% |
| GS -8 | Intercompany Balances | Impaired | Presumed to Reject | N/A | N/A | N/A |
| GS -9 | Equity Interests | Impaired | Presumed to Reject | N/A | N/A | N/A |

---

are unimpaired and presumed to accept the Plan at the following GMACM Debtors:  Passive Asset Transactions, LLC; Residential Mortgage Real Estate Holdings, LLC; Home Connects Lending Services, LLC; GMACR Mortgage Products, LLC; ditech, LLC; Residential Consumer Services, LLC; and GMAC Mortgage USA Corporation.  The Junior Secured Noteholders dispute that they are unimpaired at any entity and believe that they are impaired at each entity.  The Debtors believe this issue is more appropriately addressed at the Plan Confirmation Hearing.  Accordingly, the Debtors will send ballots for each Class to the holders of Junior Secured Notes Claims, regardless of whether it is classified as Impaired or Unimpaired, to preserve the Junior Secured Noteholders' rights with respect to this issue, and the appropriate ballots will be counted once the Bankruptcy Court rules on this issue at the Confirmation Hearing.

[22]    GMACM Unsecured Claims consist of: (i) MBIA's Claim in the Allowed Amount of $1.450 billion; (ii) FGIC's Claim in the Allowed Amount of $181.5 million; (iii) other Monolines' Claims, which are assumed to be in the amount of $307.5 million; (iv) RMBS Trust Allowed Claims in the amount of $209.8 million; and (v) other General Unsecured Claims, which are assumed to be in the amount of $63.7 million (including $4.9 million of ETS Unsecured Claims).

[23]    The Debtors believe that there will be approximately $12 million of distributable value at Debtor ETS following the payment of projected Administrative and Priority Claims and wind down costs.   The Debtors currently estimate that the General Unsecured Claims at Debtor ETS will be approximately $5 million, resulting in full recoveries for claimholders.  **However, to the extent the Claims exceed the Debtors' projections, recoveries may be materially lower than expected**.

[24]    Allocation of recovery amounts for Allowed Borrower Claims, in the Plan, is subject to determination by the Borrower Trust; however, the recovery rate will be comparable, subject to the Borrower Claims Trust True-Up, to that of GMACM Unsecured Claims.

[25]    No estimate was made for Private Securities Claims under the Recovery Scenario.  Under the higher case of the Chapter 7 Liquidation Scenario, it is assumed that the Private Securities Claims are subordinated resulting in no recovery for these claims.

-12-

| Class | Type of Claim or Equity Interest | Treatment | Voting Rights | Estimated Aggregate Allowed Amount | Estimated Percentage Recovery Under Ch. 7 Liquidation | Estimated Recovery Under Plan |
|-------|----------------------------------|-----------|---------------|-------------------------------------|-------------------------------------------------------|-------------------------------|
| GS-10 | Revolving Credit Facility Claims | Impaired | Entitled to Vote | N/A | N/A | N/A |

**RFC DEBTORS**
**($ in Millions)**

| Class | Type of Claim or Equity Interest | Treatment | Voting Rights | Estimated Aggregate Allowed Amount | Estimated Percentage Recovery Under Ch. 7 Liquidation | Estimated Recovery Under Plan[26] |
|-------|----------------------------------|-----------|---------------|-------------------------------------|-------------------------------------------------------|-------------------------------|
| RS-1 | Other Priority Claims | Unimpaired | Presumed to Accept | 0.01 | 100.0% | 100.0% |
| RS-2 | Other Secured Claims | Unimpaired | Presumed to Accept | 0.01 | 100.0% | 100.0% |
| RS-3[27] | Junior Secured Notes Claims | Impaired/ Unimpaired | Presumed to Accept/ Entitled to Vote | 1,846.00 - 2,553.00 | 70.3% - 77.0% | 100.0% - 100.0% |
| RS-4 | RFC Unsecured Claims[28] | Impaired | Entitled to Vote | 9,063.78 | 1.9% - 3.6% | 7.8% - 10.3% |

---

[26]  *See supra* note 15 for a discussion of the estimated recoveries of the Junior Secured Noteholders and the impact thereof on all recoveries under the Plan.

[27]  Recovery rates for the Junior Secured Notes are shown on a consolidated basis. The Junior Secured Noteholders are impaired at certain Debtor entities where the Debtors have issued or guaranteed the Junior Secured Notes and may be liable for post-petition interest, subject to the outcome of the JSN Adversary Proceeding. The Junior Secured Noteholders are unimpaired at certain Debtor entities where the Debtors are not issuers or guarantors of such debt; rather, these Debtor entities have pledged specific assets as collateral, and the Junior Secured Noteholders will receive such collateral (*i.e.*, Cash) under the Plan. The Junior Secured Noteholders are impaired and entitled to vote on the Plan at the following RFC Debtors: RFC and Homecomings Financial, LLC; they are unimpaired and presumed to accept the Plan at the following RFC Debtors: GMAC Model Home Finance I, LLC; DOA Holding Properties, LLC; RFC Asset Holdings II, LLC; RFC Construction Funding, LLC; Residential Funding Real Estate Holdings, LLC; Homecomings Financial Real Estate Holdings, LLC; Residential Funding Mortgage Securities I, Inc.; RFC Asset Management, LLC; RFC SFJV-2002, LLC; and RCSFJV2004, LLC. The Junior Secured Noteholders dispute that they are unimpaired at any entity and believe that they are impaired at each entity. The Debtors believe this issue is more appropriately addressed at the Plan Confirmation Hearing. Accordingly, the Debtors will send ballots for each Class to the holders of Junior Secured Notes Claims, regardless of whether it is classified as Impaired or Unimpaired, to preserve the Junior Secured Noteholders' rights with respect to this issue, and the appropriate ballots will be counted once the Bankruptcy Court rules on this issue at the Confirmation Hearing.

[28]  RFC Unsecured Claims consist of: (i) MBIA's Claim in the Allowed Amount of $1.450 billion; (ii) FGIC's Claim in the Allowed Amount of $415.0 million; (iii) other Monolines' Claims, which are assumed to be in the amount of $80.8 million, (iv) RMBS Trust Allowed Claims in the amount of $7.091 billion; and (v) other General Unsecured Claims, which are assumed to be in the amount of $27.5 million.

-13-

| | | | | | | |
|---|---|---|---|---|---|---|
| RS-5[29] | Borrower Claims | Impaired | Entitled to Vote | 333.09 | 1.9% - 3.6% | 9.0% |
| RS-6[30] | Private Securities Claims | Impaired | Entitled to Vote | N/A | 0.0% - 1.9% | N/A |
| RS -7[31] | NJ Carpenters Claims | Impaired | Entitled to Vote | N/A | 0.0% - 1.9% | N/A |
| RS -8 | General Unsecured Convenience Claims | Impaired | Entitled to Vote | 0.70 | 1.9% - 3.6% | 9.0% |
| RS -9 | Intercompany Balances | Impaired | Presumed to Reject | N/A | N/A | N/A |
| RS -10 | Equity Interests | Impaired | Presumed to Reject | N/A | N/A | N/A |
| RS -11 | FHFA Claims | Impaired | Entitled to Vote[32] | N/A | 0.0% - 1.9% | N/A |
| RS-12 | Revolving Credit Facility Claims | Impaired | Entitled to Vote | N/A | 100.0% | N/A |

The potential distributions to holders of Allowed Claims and Equity Interests identified in the charts above reflect the Plan Proponents' estimate of the full range of potential recoveries for all parties, taking into account the potential outcomes of the JSN Adversary Proceeding involving the Plan Proponents and the Junior Secured Noteholders.

---

[29]    Allocation of recovery amounts for Allowed Borrower Claims is subject to determination by the Borrower Trust; however, the recovery rate will be comparable, subject to the Borrower Claims Trust True-Up, to that of RFC Unsecured Claims.

[30]    No estimate was made for Private Securities Claims under the Recovery Scenario. Under the higher case of the Chapter 7 Liquidation Scenario, it is assumed that the Private Securities Claims are subordinated resulting in no recovery for these claims.

[31]    No estimate was made for NJ Carpenters Claims under the Recovery Scenario. Under the higher case of the Chapter 7 Liquidation Scenario, it is assumed that the NJ Carpenters Claims are subordinated resulting in no recovery for these Claims.

[32]    Holders of FHFA Claims are entitled to vote to accept or reject the Plan; provided, that if the Bankruptcy Court determines that the FHFA Claims are subject to subordination under section 510(b) of the Bankruptcy Code such that holders of Allowed FHFA Claims against the RFC Debtors are not entitled to receive a distribution under the Plan, then holders of Allowed FHFA Claims will be deemed to reject the Plan and such votes will not be counted.

ny-1105358

E.    **Summary of Solicitation Package and Voting Instructions**

Together with this Disclosure Statement, the Plan Proponents are distributing or causing to be distributed solicitation packages (the "Solicitation Packages") containing the documents described below to all parties entitled to receive notice of the hearing before the Bankruptcy Court pursuant to Bankruptcy Code Section 1128 to consider confirmation of the Plan.

1.    **Solicitation Packages**

The Solicitation Packages for holders of Claims in Classes R-3, R-4, R-5, R-6, R-7, R-8, R-11, GS-3, GS-4A, GS-4B, GS-5, GS-6, GS-7, RS-3, RS-4, RS-5, RS-6, RS-7, RS-8, and RS-11 (collectively, the "Voting Classes") will contain:

1.    A copy of the Disclosure Statement Approval Order (without exhibits);

2.    A paper copy of the notice of the Confirmation Hearing (the "Confirmation Hearing Notice");

3.    The Disclosure Statement, which shall include the Plan as an exhibit thereto and the proposed order to approve the Disclosure Statement (without exhibits);

4.    An appropriate form of Ballot in paper form, instructions on how to complete the Ballot, and a Ballot return envelope;

5.    A paper copy of the applicable letters from the Plan Proponents recommending acceptance of the Plan;[33]

6.    As appropriate, a postage pre-paid envelope; and

7.    Such other materials as the Bankruptcy Court may direct.

The holders of Claims or Interests in Classes R-1, R-2, R-9, R-10, GS-1, GS-2, GS-8, GS-9, GS-10, RS-1, RS-2, RS-9, and RS-10 will receive a Confirmation Hearing Notice and a notice of non-voting status.

To reduce the administrative costs associated with printing and mailing such a voluminous document, the Plan Proponents may, but are not required to, elect to serve the Disclosure Statement and the Plan (including exhibits) via CD-ROM instead of in printed format. In addition to the service procedures outlined above: (a) the Plan, the Disclosure Statement and, once they are filed, all exhibits to both documents will be made available at no charge via the internet at http://www.kccllc.net/rescap; and (b) the Plan Proponents will provide parties in

---

[33] On August 16, 2013, the Creditors' Committee filed copies of (i) a letter from the Creditors' Committee to holders of General Unsecured Claims recommending that they vote in favor of the Plan, and (ii) a letter from the Creditors' Committee to holders of Borrower Claims recommending that they vote in favor of the Plan [Docket No. 4337], to be attached to the Disclosure Statement Order as Exhibit D, and included in the applicable Solicitation Packages.

interest (at no charge) with hard copies of the Plan and/or Disclosure Statement upon (i) written request to Kurtzman Carson Consultants LLC ("KCC"), at ResCap Balloting Center, c/o KCC, 2335 Alaska Avenue, El Segundo, CA 90245, or (ii) calling (888) 251-2914.

### 2.     Voting Procedures, Ballots and Voting Deadline

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.

Please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan after carefully reviewing (1) the Plan, (2) the Disclosure Statement, (3) the Disclosure Statement Approval Order, and (4) the detailed instructions accompanying the Ballot.

**In order for your vote to be counted, you must complete and sign your original Ballot (copies will not be accepted) and return it so that it is actually received by KCC prior to the Voting Deadline of 7:00 p.m. (Eastern Time) on October 21, 2013.**

For further information, refer to Article VI below, entitled "Voting Procedures". For answers to any questions regarding solicitation procedures, parties may contact KCC directly, by (i) writing to Kurtzman Carson Consultants LLC, at ResCap Balloting Center, c/o KCC, 2335 Alaska Avenue, El Segundo, CA 90245, or (ii) calling (888) 251-2914.

---

**THE PLAN PROPONENTS RECOMMEND THAT ALL HOLDERS OF CLAIMS, IN CLASSES ENTITLED TO VOTE, VOTE TO ACCEPT THE PLAN.**

---

### F.     Summary of Treatment of Allowed Claims and Equity Interests

The Plan provides for payment in full of Allowed Administrative Expense Claims and Allowed Priority Tax Claims. Holders of Equity Interests in, and Intercompany Balances against, the ResCap Debtors, the GMACM Debtors, and the RFC Debtors will receive no distributions under the Plan and, therefore, are presumed to reject the Plan. All other classes in each Debtor Group either are (i) unimpaired, and therefore presumed to accept the Plan, or (ii) impaired and expected to receive a distribution, and therefore permitted to vote on the Plan. The Plan is presented as a joint plan for administrative convenience, but applies to each Debtor individually.

The following table summarizes the treatment of Claims and Equity Interests under the Plan:

| CLASS OF CLAIMS | APPLICABLE DEBTORS | TREATMENT OF CLAIM |
|---|---|---|
| Other Priority Claims | ResCap Debtors GMACM Debtors RFC Debtors | In full and final satisfaction of the Other Priority Claims in the Debtor Groups, on or as soon as practicable after the Effective Date, each holder of an Allowed Other Priority Claim shall receive one of the following treatments on account of such Claim, as determined by |

-16-

| CLASS OF CLAIMS | APPLICABLE DEBTORS | TREATMENT OF CLAIM |
|---|---|---|
| | | the Plan Proponents or the Liquidating Trust, as applicable: (i) payment in full in Cash, or (ii) treatment consistent with the provisions of Section 1129(a)(9) of the Bankruptcy Code; provided, that Other Priority Claims that arise in the ordinary course of the Debtors' business and that are not due and payable on or before the Effective Date will be paid in the ordinary course of business in accordance with the terms thereof. |
| Other Secured Claims | ResCap Debtors GMACM Debtors RFC Debtors | In full and final satisfaction of the Allowed Other Secured Claims against the Debtor Groups, on or as soon as practicable after the Effective Date, each holder of such a Claim shall receive one of the following treatments on account of such Claim as determined by the Plan Proponents or the Liquidating Trust, as applicable: (i) payment in full in Cash, including any interest, at the non-default rate (or such other rate as may be ordered by the Bankruptcy Court), required to be paid pursuant to Section 506(b) of the Bankruptcy Code, or (ii) the collateral securing its Allowed Other Secured Claim. |
| Junior Secured Notes Claims | ResCap Debtors GMACM Debtors RFC Debtors | In full and final satisfaction of the Junior Secured Notes Claims, on or as soon as practicable after the Effective Date, each holder of an Allowed Junior Secured Notes Claim shall receive payment in full for the Allowed amount of such Junior Secured Notes Claim as determined by the Bankruptcy Court in Phase I of the JSN Adversary Proceeding or at the Confirmation Hearing; provided, however, that if the Bankruptcy Court determines that the Junior Secured Noteholders are entitled to post-petition interest, the Allowed amount of such post-petition interest shall be paid in accordance with the requirements under the Bankruptcy Code, which may include at the Plan Proponents' election the payment of such post-petition interest over time with interest at a rate consistent with section 1129(b) of the Bankruptcy Code.[34] |

---

[34] The terms on which the Plan Proponents may pay over time any post-petition interest owed to the Junior Secured Noteholders to the extent ordered by the Bankruptcy Court, including the interest rate, will be set forth in the Plan Supplement.

| CLASS OF CLAIMS | APPLICABLE DEBTORS | TREATMENT OF CLAIM |
|---|---|---|
| Unsecured Claims | ResCap Debtors GMACM Debtors RFC Debtors | In full and final satisfaction of the Unsecured Claims against the Debtor Groups, as soon as practicable after the Effective Date, each holder of an allowed General Unsecured Claim will receive its Pro Rata Unit Share of the Unit Distribution of the applicable Debtor Group; provided, however, that with respect to the distributions on account of the Allowed RMBS Trust Claims, the Units shall be held by the RMBS Claims Trust. |
| ETS Unsecured Claims | GMACM Debtors | In full and final satisfaction of the ETS Unsecured Claims, as soon as practicable after the Effective Date, each holder of an Allowed ETS Unsecured Claim shall receive its Pro Rata Share of Cash in an amount that is equal to the value, if any, of assets available at ETS that exceed the amount of Allowed Claims senior in right of payment to such Allowed ETS Unsecured Claim against ETS. |
| Borrower Claims | ResCap Debtors GMACM Debtors RFC Debtors | In full and final satisfaction of the Borrower Claims, as soon as practicable after the Effective Date, holders of Allowed Borrower Claims shall receive their allocated share of Cash available for distribution from the Borrower Claims Trust, in accordance with the methodology and procedures set forth in the Borrower Claims Trust Agreement. |
| Private Securities Claims | ResCap Debtors GMACM Debtors RFC Debtors | In full and final satisfaction of the Private Securities Claims against the Debtor Groups, as soon as practicable after the Effective Date, holders of Allowed Private Securities Claims shall receive their allocated share of either (A) Cash distributions from the Private Securities Claims Trust, or (B) the Units transferred to the Private Securities Claims Trust that constitute the Private Securities Claims Trust Unit Distribution, in each case in accordance with the methodology and procedures set forth in the Private Securities Claims Trust Agreement. |

-18-

| CLASS OF CLAIMS | APPLICABLE DEBTORS | TREATMENT OF CLAIM |
|---|---|---|
| NJ Carpenters Claims | ResCap Debtors RFC Debtors | Subject to the approvals of the NJ Carpenters Settlement by the Bankruptcy Court (through confirmation or otherwise) and the District Court in full and final satisfaction of the NJ Carpenters Claims, within ten (10) business days of the Effective Date, the lead plaintiffs, on behalf of holders of Allowed NJ Carpenters Claims, shall receive the NJ Carpenters Claims Distribution, which will thereafter be distributed pursuant to the NJ Carpenters Plan of Allocation.  Absent the NJ Carpenters Approval, Claims held by NJ Carpenters Class Members, to the extent Allowed, shall be classified as General Unsecured Claims, which claims may be subject to subordination. |

-19-

| CLASS OF CLAIMS | APPLICABLE DEBTORS | TREATMENT OF CLAIM |
|---|---|---|
| General Unsecured Convenience Claims | ResCap Debtors GMACM Debtors RFC Debtors | In full and final satisfaction of the General Unsecured Convenience Claim against the Debtor Groups, as soon as practicable after the Effective Date, each holder of an Allowed General Unsecured Convenience Claims shall receive a distribution in Cash equal to 36.3% at the ResCap Debtors, 30.1% at the GMACM Debtors, and 9.0% at the RFC Debtors of such holder's Allowed General Unsecured Convenience Claim against each applicable Debtor Group. |
| Intercompany Balances | ResCap Debtors GMACM Debtors RFC Debtors | On the Effective Date, as part of the overall compromise embodied in the Plan, Intercompany Balances shall be waived, cancelled, and discharged.  Holders of Intercompany Balances shall receive no recovery on account of their Claims. |
| Equity Interests | ResCap Debtors GMACM Debtors RFC Debtors | Holders of Equity Interests in the Debtor Groups shall receive no recovery on account of such Equity Interests and such Equity Interests shall be canceled on the Effective Date. |
| FHFA Claims | ResCap Debtors RFC Debtors | Holders of FHFA Claims shall receive no recovery on account of such Claims; provided, that if the Bankruptcy Court determines that the FHFA Claims are not subject to subordination under section 510(b) of the Bankruptcy Code, each holder of an Allowed ResCap FHFA Claim shall receive a distribution in Cash equal to 0.001% of such holder's Allowed ResCap FHFA Claim, and each holder of an Allowed RFC FHFA Claim shall receive a distribution in Cash equal to 2.0% of such holder's Allowed RFC FHFA Claim, which accounts for the fact that no holder of an FHFA Claim is subject to the Third Party Releases, as soon as practicable after the later of the Effective Date or the allowance of such Claim. |
| Revolving Credit Facility Claims | ResCap Debtors GMACM Debtors RFC Debtors | In full and final satisfaction of the Revolving Credit Facility Claims, on the Effective Date, any payment under the Paydown Order with respect to an Allowed Ally Secured Claim shall be indefeasibly and finally approved and allowed; provided, that holders of Allowed Revolving Credit Facility Claims shall waive as against any Debtor or Plan Trust any right to receive additional interest or fees on account of such Claims. |

-20-

## G.    Confirming and Consummating the Plan

Bankruptcy Code Section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan.  Bankruptcy Code Section 1128(b) provides that any party in interest may object to confirmation of the Plan.

The Bankruptcy Court has fixed November 19, 2013, or as soon as practicable thereafter, as the date and time of the Confirmation Hearing, and the Debtors will provide notice of the Confirmation Hearing to all necessary parties.  The Confirmation Hearing may be adjourned from time to time by filing a notice or without further notice except for an announcement of the adjourned date made at the Confirmation Hearing, whether or not such hearing has already been adjourned.

It is a condition to confirmation of the Plan that the Bankruptcy Court shall have approved this Disclosure Statement as containing "adequate information" and entered the Confirmation Order in form and substance acceptable to the Plan Proponents and the Consenting Claimants.  Additionally, pursuant to the provisions of Article X of the Plan, certain other conditions contained in the Plan must be satisfied or waived.  There is no assurance that the Plan will be confirmed or, if confirmed, that such material conditions precedent will be satisfied or waived.

Following Confirmation, the Plan will be consummated and the Effective Date will occur on the date that is the first Business Day following the Confirmation Date on which the Confirmation Order is a Final Order and all conditions specified in Article X of the Plan have been satisfied or waived pursuant to Article X of the Plan.  If the Plan is confirmed by the Bankruptcy Court and consummation occurs, all holders of Claims and Equity Interests (including those holders of Claims or Equity Interests that do not submit ballots to accept or reject the Plan, or that are not entitled to vote on the Plan) will be bound by the terms of the Plan and the proposed transactions contemplated thereby.

## ARTICLE II.
## THE GLOBAL SETTLEMENT & IMPLEMENTATION OF THE PLAN

The Plan reflects a global compromise among the Debtors, the Creditors' Committee, Ally, and the Debtors' major creditor constituencies, pursuant to which, among other things, Ally has agreed to contribute $2.1 billion to the Estates, pursuant to the terms and conditions of the Plan Support Agreement, an increase of $1.35 billion over the amount Ally had agreed to contribute in its pre-petition plan support agreement with the Debtors.

The settlement is the product of a year of intense, arm's length negotiations among the Debtors, the Creditors' Committee, Ally, and each of the major creditor constituencies in these Chapter 11 Cases.  As discussed in Article IV herein, prior to the Petition Date, the Debtors entered into plan support agreements with Ally and certain other parties in interest whereby Ally agreed to contribute $750 million to the Debtors' Estates, and these Chapter 11 Cases were filed contemplating a pre-packaged plan process and swift emergence from bankruptcy.  Following the Petition Date, the Creditors' Committee and certain of the Debtors' creditor constituencies challenged the sufficiency of the proposed contribution, among other things, and ultimately the

Debtors and Ally allowed the prepetition plan support agreements to expire and continued to negotiate the terms of a potential settlement that would appeal to a larger group of creditor constituents.   The Debtors have engaged in numerous discussions and meetings with the Creditors' Committee, Ally, and various interested parties.   The process culminated in the appointment of the Mediator in late 2012.   Generally, the Mediator's role was to facilitate a global resolution of pivotal issues and the treatment of certain Claims and Classes of Claims. Following his appointment, the Mediator, the Debtors, the Creditors' Committee, Ally, and numerous other parties in interest convened several all-day meetings and participated in intensive negotiation sessions in order to pursue a Global Settlement of the existing issues.   With the assistance of the Mediator, on May 13, 2013, the Debtors and the substantial majority of parties in interest entered into a comprehensive settlement, which is embodied in the Plan.   The Plan Proponents now hope to achieve confirmation of the Plan on a consensual basis as efficiently as possible.

## A.    The Global Settlement

As detailed below, the Plan includes a proposed settlement of numerous inter-Debtor, Debtor-Creditor and inter-Creditor disputes designed to provide the maximum recovery to all Creditors of the Debtors' Estates.   Among other things, the Plan includes:   (i) the RMBS Settlement and the resolution of the amount and allocation of the RMBS Trust Claims, (ii) a settlement of the amount, allocation, and priority of the General Unsecured Claims held by certain of the Monoline insurers, including MBIA and FGIC, (iii) the settlement of the Private Securities Claims, the RMBS subordination litigation, and the establishment of the Private Securities Claims Trust, (iv)   subject to Bankruptcy Court and District Court approval, the settlement of the NJ Carpenters Class Action, (v) the settlement with the Senior Unsecured Notes and the Senior Unsecured Notes Trustee, (vi) treatment of the Claims of the Junior Secured Noteholders, and an allocation of the Junior Secured Notes Deficiency Claim, if any, or post-petition interest, if any, (vii) the establishment of the Borrower Claims Trust and procedures for resolving Disputed Borrower Claims, (viii) the settlement of Estate and third party claims against Ally embodied in the Debtor Release and the Third Party Releases, and (ix) the compromise of all Intercompany Balances and subrogation claims.[35]

## B.    Settlement of Claims Against Ally and Plan Releases

The Plan provides for the Releases of claims that the Debtors and third parties have brought or may bring against Ally in connection with the Debtors' businesses.   In exchange for those Releases, Ally has agreed to fund $2.1 billion to the Estates for distribution to Creditors, comprised of (1) $1.95 billion in Cash to be paid on the Effective Date of the Plan and (2) the first $150 million received by Ally for any Directors and Officers or Errors and Omissions claims it pursues against its insurance carriers related to the claims released in connection with the Plan; provided, that Ally guarantees that the Debtors will receive $150 million on account of such insurance claims, which guarantee shall be payable without defense, objection, or setoff on

---

[35]   The Junior Secured Noteholders contend that elements of the Global Settlement are inconsistent with certain positions previously taken in these cases by the Plan Proponents, as well as with conclusions that can be drawn from the Examiner's Report.

September 30, 2014. In addition, the Debtors assert that Ally has provided substantial financial and operational support to the Estates during the Chapter 11 Cases, including, among other things: (i) providing up to $220 million in debtor in possession financing; (ii) enabling the Debtors to continue originating mortgages during the restructuring by entering into a broker agreement with the Debtors that calls for Ally to fund the mortgages on market terms and face the market on account of certain mortgage loan sales pools; (iii) permitting the Debtors to continue subservicing Ally Bank's MSRs, which assisted the Debtors in the successful completion of their Platform Sale (defined below); (iv) continuing to provide the Debtors with use of Ally's back-office shared services, such as centralized payroll and risk management services, among others; (v) cooperating with the Debtors to separate the shared services resources and permit the smooth transition of the Debtors' businesses to the purchasers; and (vi) agreeing to serve as a stalking horse bidder for the Debtors' Whole Loan Sale (defined below). Absent Ally's contributions to these Chapter 11 Cases, the Debtors may have been unable to continue their operations and conduct going concern Asset Sales and it is possible that the Debtors would have shared the fate of every other mortgage servicer that has filed for bankruptcy in recent years—a "firesale" liquidation.

> YOUR RIGHTS MAY BE IMPACTED BY THE DEBTOR RELEASE AND THE THIRD PARTY RELEASES IN FAVOR OF THE ALLY RELEASED PARTIES CONTAINED IN THE PLAN. YOU MAY WISH TO SEEK LEGAL ADVICE CONCERNING THE PLAN AND THE RELEASES CONTAINED THEREIN.

If the Plan is confirmed, Ally, and each of Ally's and the Debtors' respective successors and assigns, members, shareholders, partners, non-Debtor affiliates, and Representatives— including Ally's and the Debtors' Current and Former Officers and Directors, as discussed in greater detail below— each in its capacity as such (collectively, the "Ally Released Parties") will be fully released and discharged from claims that either have been asserted or could be asserted against the Ally Released Parties by (i) the Debtors, the Estates, and the Liquidating Trust (the "Debtor Release") and (ii) third parties whose claims relate to the Debtors' businesses, e.g., claims arising from or related in any way to the Debtors, including claims related to (x) RMBS issued and/or sold by the Debtors or their affiliates and (y) the Debtors' mortgage origination, servicing and securitization activities, and other business activities (the "Third Party Releases" and together with the Debtor Release, the "Releases"). The Releases include any and all Causes of Action, including tort, fraud, contract, violations of federal or state securities laws, and veil piercing or alter-ego theories of liability, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise. The Releases will apply to all holders of claims (as such terms are defined in Section 101(5) of the Bankruptcy Code) and Equity Interests (as defined in the Plan), whether or not such entities have filed Proofs of Claim as noted above in these Chapter 11 Cases.

The Releases in favor of the Ally Released Parties—made in exchange for the $2.1 billion Ally Contribution as well as other monetary and non-monetary contributions made by Ally throughout these Cases, and other settlements embodied in the Plan Support Agreement— were an essential component of the Global Settlement and the Consenting Claimants' execution and approval of the Plan Support Agreement. Indeed, Ally has insisted that the Releases are a

-23-

condition to its agreement to make the Ally Contribution. The Releases are the product of extensive arms'-length negotiations between the Debtors, the Creditors' Committee, Ally, and the Consenting Claimants, with the guidance of the Mediator, in connection with the Plan Support Agreement. The Debtors, the Creditors' Committee, and the Consenting Claimants have agreed to support the Releases. The Debtors, the Creditors' Committee, and the Consenting Claimants determined that the exchange of the Releases for all of Ally's substantial contributions throughout the Chapter 11 Cases is fair, and based on a well-reasoned, and calculated assessment of their respective claims against Ally and the attendant litigation risks related thereto.

Generally speaking, the Plan resolves any and all claims against the Ally Released Parties as specified above and spares all parties, including the Debtors, costly and uncertain litigation that would inevitably delay consummation of a plan and recoveries to holders of Claims and Equity Interests, and would result in the substantial reduction of such recoveries. Accordingly, the Plan Proponents believe that the Releases are an essential component and critical to the success of the Plan, in addition to being in the best interests of all creditors. Importantly, of the total estimated cash projected to be distributed on account of Unsecured Claims, approximately 80% will be funded with Estate assets available because of the Ally Contribution. Thus, without the Releases embodied in the Plan, creditors would receive only a small fraction of the anticipated distributions described herein.

### 1.    The Plan Resolves Estate Claims Against the Ally-Released Parties

The Plan includes the Debtor Release, pursuant to which all Estate claims against the Ally Released Parties are released. The Plan Proponents believe that the Debtor Release is fair, equitable and in the best interests of the Estates, as required by applicable law.

First, the settlement of the Estate claims against the Ally Released Parties is the product of extensive arms' length bargaining among the Creditors' Committee, the Consenting Claimants, the Debtors and Ally, overseen by the Mediator. As discussed in more detail in Article III, below, following the Petition Date, each of the Examiner and the Creditors' Committee investigated the Potential Claims against Ally arising out of pre-petition transactions among the Debtors and Ally.[36] During the course of these Chapter 11 Cases, the Creditors' Committee and the Examiner considered the merits and defenses to Potential Claims and causes of action against Ally. As a result of these thorough investigations of the claims and the vigorous and arms' length negotiations overseen by the Mediator, the Plan Proponents, with the support of the Consenting Claimants, reasonably, in good faith, and in the best interests of their respective constituencies, concluded that the Ally Contribution of $2.1 billion, in addition to Ally's contributions to the Estates throughout these Chapter 11 Cases, represents a substantial contribution without which these Chapter 11 Cases likely would not come to a successful conclusion.

Second, the Debtor Release is broadly supported by nearly all of the Debtors' key constituencies, including, in addition to the Creditors' Committee: all six RMBS Trustees; the

---

[36]    No party, apart from the Bankruptcy Court, was aware of the conclusions of the Examiner's Report until the Examiner's Report was unsealed by the Bankruptcy Court on June 26, 2013.

Institutional Investors; the largest securities fraud claimants; MBIA and FGIC, as the two largest monoline claimants; Wilmington Trust; the Supporting Senior Unsecured Noteholders (as defined in the Plan Support Agreement), including Paulson & Co., Inc.; and the representatives of the Borrowers on the Creditors' Committee.   Each of these parties was represented by competent and experienced counsel in the negotiations leading to agreement on the terms of the Debtor Release.

Third, the settlement reflects a reasonable balance between the litigation's possibility of success and the settlement's future benefits.   Each party to the negotiations that led to the settlement was armed with a wealth of information, gleaned from the months' long investigations conducted by the Creditors' Committee and the materials made available from the Examiner's investigation.   To facilitate settlement negotiations, the parties reviewed extensive document discovery, briefed the merits of the claims, and exchanged written and oral presentations regarding their legal positions.   With the knowledge accumulated in this process, each party independently determined that the settlement of the Estate claims against the Ally Released Parties reflected a reasonable resolution of the claims.

Fourth, the Debtor Release resolves myriad complex disputes among the parties regarding the nature, scope and validity of the Estate claims against Ally, obviating the need for protracted litigation with its attendant expense, inconvenience and delay.   The settlement spares all parties, including the Debtors, costly and uncertain litigation that would inevitably delay consummation of a plan and recoveries to holders of Claims.[37]

For the foregoing reasons, the settlement of the Estate claims against the Ally Released Parties falls well within the range of reasonableness and satisfies the applicable standards for approval of settlements in bankruptcy cases.

## 2.    The Plan Resolves Third Party Claims Against the Ally Released Parties

The Plan includes the Third Party Releases, pursuant to which claims relating to the Debtors' business that claimants have asserted or could assert against the Ally Released Parties are released.   The Plan Proponents believe that the Third Party Releases are within the Bankruptcy Court's subject matter jurisdiction, and that the unique circumstances of these Chapter 11 Cases render the Third Party Releases crucial to the success of the Plan.   Indeed, without the Third Party Releases, the Ally Contribution could not have been obtained and no Global Settlement achieved.

The Bankruptcy Court has subject matter jurisdiction over the released claims because the claims, if not released, would have a direct impact on the Estates.   Absent the Third Party Release, claims against the Ally Released Parties would indirectly be asserted against the Estates due to various alleged indemnification and contribution obligations between the Debtors and the Ally Released Parties.   First, ResCap's operating agreement sets out certain indemnification obligations owed to Ally.   Second, the Debtors' current and former directors and officers are

---

[37]    Although the Examiner's Report was not available to any party or their advisors prior to the signing of the Plan Support Agreement, the Plan Proponents believe that the Examiner's Report supports the Global Settlement.

entitled to indemnification for a broad variety of claims pursuant to ResCap's limited liability company agreement. Third, the Debtors owe indemnification obligations to Ally Securities pursuant to various underwriting agreements. Fourth, Ally Bank has indemnity rights against GMAC Mortgage, LLC under certain custodial agreements entered into between, among others, Ally Bank and GMACM in connection with a series of home equity loan transactions. Therefore, to the extent that Ally would incur defense costs and losses in connection with claims that would otherwise be released under the Plan, Ally could have direct claims against the Debtors' Estates.

In addition, certain claims covered by the Third Party Release could otherwise have an impact on the Debtors' Estates as a result of Errors & Omissions insurance policies that provide shared coverage to the Debtors and Ally Bank. The proceeds of those policies are an asset of the Estates. Because they are "wasting" policies, the provision of policy benefits to the non-debtor insureds would deplete an Estate asset—most likely irreversibly. The Bankruptcy Court has clear subject matter jurisdiction to prevent that outcome, including through approval of the Third Party Release.

The Third Party Releases are justified by the truly unusual circumstances of this case where the success of the Plan, and indeed the prospects for any meaningful distribution to many of the Debtors' creditors, hinges on the very substantial financial contribution provided by Ally, and where the settlement was negotiated by and is supported by representatives of every creditor constituency that is receiving less than a full recovery under the Plan. The execution and approval by the Consenting Claimants of the Plan Support Agreement would not have been possible without the Ally Contribution. Ally's substantial contributions have enabled and will continue to allow the Debtors to maximize stakeholder recovery. For these reasons the Third Party Releases meet the requisite standard adopted by the United States Court of Appeals for the Second Circuit (the "Second Circuit"). A more detailed discussion of the pre- and post-petition negotiations between Ally, the Creditors' Committee, the Consenting Claimants and the Debtors, and the substantial consideration provided by Ally during these Chapter 11 Cases, is contained below in Article III.

3.    **The Plan Releases Claims Against the Debtors' Current and Former Officers and Directors**

Certain parties have alleged that claims may lie against the Debtors' current and former officers and directors regarding their pre- and post-petition actions. While the Debtors and their officers and directors vigorously dispute the validity of any such claims, the Plan provides that, in exchange for valuable consideration in the form of the forbearances described below, the Debtor Release and Third Party Release shall release all Claims that have been or could have been brought against the Representatives of the Debtors, as that term is defined in the Plan. Representatives of the Debtors include, but are not limited to, the Debtors' former and current officers and directors, including the Debtors' Chief Restructuring Officer, Lewis Kruger. The Claims to be released under the Plan against such individuals include, but are not limited to, claims relating to the Pre-petition AFI-ResCap Settlement Agreement (as defined below), RMBS Settlement, DOJ/AG Settlement, Consent Order, and the pre-petition sales of certain of the Debtors' assets to Ally and affiliates of Cerberus Capital Management. In exchange for these

-26-

Releases, the Representatives of the Debtors have agreed to forego any claims for coverage they may have under any directors & officers or errors & omissions insurance policies covering the Debtors or their Representatives for the period between November 2006 and the Effective Date, with respect to those Claims that are released under the Plan. This forbearance increased the amount that Ally was willing to contribute to the Plan through the Ally Contribution because it will facilitate Ally in reaching a settlement with certain of Ally's insurers regarding coverage issues. Additionally, the Representatives of the Debtors have agreed to a forbearance of contractual claims for indemnification that the representatives of the Debtors many have against the Debtors and Ally with respect to those Claims released under the Plan. As a result, Ally was willing to make a greater contribution to the Plan and the Debtors and Ally were relieved of these contractual indemnification claims. The full scope of the release provisions in favor of the Representatives of the Debtors is described in further detail in Article V.

**4.    The Plan Releases Ally and the Debtors' Current and Former Officers and Directors from Continuing Obligations, Including Under the DOJ/AG Settlement**

Under the Plan, through the Effective Date, the Debtors shall perform any of their remaining obligations under (i) the DOJ/AG Settlement (other than those obligations under the DOJ/AG Settlement that were assumed by Ocwen Loan Servicing, LLC ("Ocwen") and Walter Investment Management Corporation ("Walter") under the Ocwen APA (as defined below) and related Walter Assignment (as defined below)), (ii) the Consent Order, and (iii) the Order of Assessment, including, for the avoidance of doubt, satisfying the settlement of the foreclosure file review obligations under the Consent Order in full in Cash. On or after the Effective Date, the Liquidating Trust shall assume any and all rights and remaining obligations of only the Debtors under the DOJ/AG Settlement, the Consent Order, and the Order of Assessment (collectively, the "Continuing Obligations").

On the Effective Date, upon the appointment of the Liquidating Trust Board, the persons acting as directors, managers, and officers of the Debtors prior to the Effective Date as the case may be, will be released from all further authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors or the Chapter 11 Cases. Upon such release and discharge, the Liquidating Trust Board will be charged with the authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors and these Chapter 11 Cases, except to the extent such authority, duties, responsibilities, and obligations are to be undertaken by the Private Securities Claims Trustee, the RMBS Claims Trust Trustees, the Borrower Claims Trustee, or, with respect to the NJ Carpenters Claims Distribution, in each case as provided in the Plan. In addition, Ally and the Debtors are in discussions with the DOJ regarding potentially excluding the DOJ/AG Settlement from the Third Party Release.

As described above, the consideration provided by the Debtors' current and former officers and directors in exchange for the release discussed in this section includes their forbearance regarding any claims for coverage they may have under any directors & officers or errors & omissions insurance policies covering the Debtors or their Representatives between November 2006 and the Effective Date, and their forbearance regarding any contractual claims for indemnification that they may have against Ally or the Debtors. In addition, the Plan's

-27-

release provisions seek to release the Debtors' current and former officers and directors from any post-Effective Date liability, thereby preventing certain of these individuals, as a practical matter, from performing the Continuing Obligations described in this section post-Effective Date.

Notwithstanding anything to the contrary herein, nothing in the Plan shall release, enjoin, or preclude any Representative of the Debtors from pursuing any rights a Representative of the Debtors may have (i) to indemnification or advancement from Ally solely for any claims that are not released by the Plan and the Confirmation Order; or (ii) as an "insured" under any insurance coverage purchased by Ally or covering Representatives of the Debtors, or against any party (other than the Debtors) arising out of such policies of insurance, solely for any claims that are not released by the Plan and the Confirmation Order.  For the avoidance of doubt, nothing in the Plan expands or reduces any existing indemnification rights or rights as an "insured" for any Representative of the Debtors for claims that are not released by the Plan.  No rights of the Consenting Claimants are released under the Plan in their capacity as liability insurance or reinsurance carriers for Ally or the Debtors.

### 5.    The Plan Exculpates the Released Parties

The Plan also provides that the Debtors, the Consenting Claimants, Ally, the Creditors' Committee and its members, and each of the foregoing entities' successors, assigns, members, subsidiaries, officers, directors, partners, principals, employees and Representatives (collectively, the "Exculpated Parties") will be exculpated from liability in connection with the negotiation and documentation of any prepetition plan support agreements, the Plan Support Agreement, the Plan, Disclosure Statement, FGIC Settlement Agreement, RMBS Settlement, and any other documents entered into in connection with the Plan, other than for gross negligence or willful misconduct.  Each of the Exculpated Parties played a key role in the mediation process and in the negotiation and implementation of the Global Settlement and Plan.  Thus, each of the Exculpated Parties—including certain non-estate fiduciaries—made a substantial contribution to the Debtors' liquidation efforts and played an integral role in working towards an expeditious resolution of these Chapter 11 Cases.  The proposed Exculpation Provision, which carves out gross negligence and willful misconduct, is entirely consistent with established practice in this jurisdiction and Second Circuit case law.

### C.    The Plan Includes a Settlement of RMBS Trust Claims

As one element of the overall negotiated settlement of numerous disputed claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and Section 1123 of the Bankruptcy Code, the Plan contemplates approval of a settlement that provides for the allowance, priority, and allocation of claims of residential mortgage backed securities trusts (the "RMBS Settlement").  The Plan's treatment of those claims is a modification of the Debtors' prior settlement agreement with certain Investors in certain RMBS Trusts (the "Original RMBS Settlement Agreement"), expanded to include the Additional Settling RMBS Trusts and modified in a number of additional respects.  The RMBS Settlement embodied in the Plan resolves: (i) alleged and potential claims for breaches of representations and warranties held by all RMBS Trusts and (ii) all alleged and potential claims for damages arising from servicing, in exchange

for Allowed Claims in the aggregate amount of $7.301 billion for the RMBS Trusts, to be allocated as between the GMACM Debtors and the RFC Debtors. The allocation of distributions received on account of the RMBS Trust Claims is subject to the RMBS Trust Allocation Protocol, as set forth in more detail in Article IV.C. of the Plan.

Upon confirmation of the Plan, no RMBS Trust can opt out of the RMBS Settlement embodied in the Plan.[38] Consistent with the Notice provided on May 24, 2013 by the RMBS Trustees and the order approving the Plan Support Agreement, certificate holders who provided valid direction to their respective RMBS Trustees to withdraw their execution of the Plan Support Agreement in respect of the applicable Trust (the "Opt Outs") will maintain their ability to object to the treatment of the applicable Trust's Claims under the Plan, although the Bankruptcy Court may find that such certificate holders lack standing to object to the Plan. Upon confirmation of the Plan, distributions to the RMBS Trusts on account of the RMBS Trust Claims will be made in accordance with the RMBS Trust Allocation Protocol.

Importantly, the Plan resolves outstanding disputes regarding the claims of the RMBS Trusts that are insured by monoline insurers (the "Insured RMBS Trusts"). The Plan provides that monoline insurers will have claims against the Debtors' Estates independent of the claims of the RMBS Trusts, and the Insured RMBS Trusts will have no allowed RMBS Trust Claims but will reserve the ability to enforce their rights against any monoline insurer (other than FGIC) that does not, in the future, perform in accordance with an insurance policy for the benefit of the applicable RMBS Trust. In addition, those Insured RMBS Trusts that have made policy claims against an applicable monoline insurer but have not received full payment on account of such claims as of the Effective Date shall receive an allocated distribution that takes into account such partial payment on account of the RMBS Trust Claims in accordance with the RMBS Trust Allocation Protocol.

The Plan treatment covers all of the RMBS Trusts that have Claims against the Debtors, whether the RMBS Trust was sponsored by the Debtors and their affiliates or was sponsored by a third party. These claims comprise the single largest set of disputed claims against the Debtors' Estates. The Plan resolves such claims without the need for protracted and costly litigation that would otherwise result. By way of example, litigation over the claims asserted by the RMBS Trustees could require a trust-by-trust analysis of the claims and could last several years, presenting a significant burden on the Debtors' Estates. As discussed below, the Plan also avoids the cost of going forward with the trial on the Debtors' motion seeking approval of the Original RMBS Settlement Agreement pursuant to Bankruptcy Rule 9019, as well as likely follow-up litigation regarding the subordination of the RMBS Trust Claims pursuant to Section 510 of the Bankruptcy Code, each of which would have posed a significant burden on the Estates and required a massive amount of time, effort, and expense.

---

[38]    Amherst Advisory & Management, LLC, acting in its capacity as investment manager for holders of certain trust certificates issued by the RALI Series 2006-QO7 Trust, has previously argued and continues to assert that the RALI Series 2006-QO7 Trust should not be bound by the terms of the RMBS Settlement and should be permitted to litigate the amount of the RALI Series 2006-QO7 Trust claim outside and apart from Plan confirmation.

The Creditors' Committee had previously objected to the grant of an Allowed Claim of $8.7 billion to the RMBS Trusts pursuant to the Original RMBS Settlement Agreements, arguing, among other things, that the Claims of the RMBS Trusts should be resolved in the context of a global settlement rather than in a pre-plan settlement motion. The Plan, with its Global Settlement, constitutes a realization of the Creditors' Committee's goal in that regard. Moreover, while the Creditors' Committee contended that a variety of defenses to the RMBS Trusts' claims could reduce them to less than $8.7 billion, the RMBS Trusts and Institutional Investors strongly disagreed with the Creditors' Committee's assertions, and the possibility always existed that the Claims could be allowed in an aggregate amount far greater than $8.7 billion. In the months preceding the Global Settlement, the case law pertaining to certain of the Creditors' Committee's legal positions continued to evolve; several courts rejected arguments advanced by the Creditors' Committee in opposition to the Original RMBS Settlement Agreements, thus confirming the highly uncertain nature of the law governing RMBS put-back litigation. For these and other reasons, the Creditors' Committee agreed to the Global Settlement, including its treatment of the RMBS Trusts, and believes that it is very much in the interest of the Debtors' Estates and Creditors.

## D.      The Plan Settles the Claims of Certain Monoline Insurers

The Plan also resolves the allowance, priority and allocation of the Claims of Monoline insurers, arising generally from alleged breaches by the Debtors and their affiliates of representations, warranties, and/or covenants in various governing documents and offering documents related to RMBS and insurance agreements associated with the relevant RMBS transactions. Specifically, certain monoline insurers, including MBIA Insurance Corporation ("MBIA"), Financial Guaranty Insurance Company ("FGIC"), and Assured Guaranty Municipal Corp. ("Assured"), filed lawsuits against the Debtors and Ally asserting billions of dollars of Claims, and the continued litigation of such Claims would have been costly and could have taken years to resolve. In addition, Ambac Assurance Corporation ("Ambac") has likewise asserted claims against the Debtors for fraud, breach of contract, indemnity, reimbursement and damages relating to certain RMBS transactions. The settlement of these claims eliminates the need for complex and uncertain litigation concerning the scope and nature of the claims and their potential subordination. These issues would have engendered an additional round of lengthy and costly litigation even after the claims of the RMBS Trusts had been resolved.

***MBIA Settlement.*** The Plan resolves the allowed amount and allocation of MBIA's claims and avoids the need for further litigation between the Debtors and MBIA. MBIA has asserted claims against: the ResCap Debtors in the amount of not less than approximately $2.2 billion, the GMACM Debtors in the amount of not less than approximately $2.2 billion, and the RFC Debtors in the amount of not less than approximately $8.8 billion. Those claims generally relate to alleged breaches of representations and warranties and fraud in connection with RMBS Trusts associated with securities insured by MBIA (the "MBIA Insured Trusts").[39] MBIA has asserted that its claims could be equal to the amount of claims it must pay under its relevant

---

[39]   The MBIA Insured Trusts include both Debtor-sponsored RMBS Trusts and one third-party securitization that included RFC loans for which RFC had provided representations as to which MBIA had not sued the Debtors on prepetition.

financial guaranty insurance policies in connection with such future collateral losses. The Debtors performed an analysis with respect to the MBIA claims regarding estimated lifetime losses and determined, in an exercise of their business judgment, that a settlement of the MBIA claims, as outlined in the Plan, represents a reasonable resolution of the novel and fact-intensive issues that have already been the subject of several years of litigation, and is in the best interest of the Estates.

As one element of, and in consideration for, an overall negotiated settlement of numerous disputed claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and Section 1123 of the Bankruptcy Code, the Plan approves the settled Allowed amount of General Unsecured Claims held by MBIA in the amount of $719 million against the ResCap Debtors, $1.45 billion against the GMACM Debtors, and $1.45 billion against the RFC Debtors.[40] Under the RMBS Trust Allocation Protocol, MBIA Insured Trusts will not share in the distribution to the RMBS Trusts, except where the Insured Exceptions apply. In full and final satisfaction of MBIA's General Unsecured Claims against the Debtors, MBIA shall receive on account of its Allowed General Unsecured Claims (i) its Pro Rata Share of the GMACM Debtors Unit Distribution, (ii) its Pro Rata Share of the RFC Debtors Unit Distribution, and (iii) its Pro Rata Share of the ResCap Debtors Unit Distribution, as applicable.

***Assured***. The Plan resolves the allowed amount and allocation of Assured's claims and avoids the need for further litigation between the Debtors and Assured. Assured has asserted claims against the Debtors in the aggregate amount of approximately $200 million. In addition, certain portions of this claim may be asserted against multiple Debtors. Those claims generally relate to (i) alleged breaches of its contractual obligations in connection with RMBS Trusts associated with securities insured by Assured (the "Assured Insured Trusts"), and (ii) the Debtors' servicing of Assured-insured securitizations. The Debtors performed an analysis with respect to the Assured claims including estimated lifetime losses and determined, in an exercise of their business judgment, that a settlement of the Assured claims, as outlined in the Plan, represents a reasonable resolution of the novel and fact-intensive issues that have already been the subject of several years of litigation, and is in the best interest of the Estates.

Pursuant to Bankruptcy Rule 9019 and Section 1123 of the Bankruptcy Code, the Plan approves the settled Allowed amount of General Unsecured Claims held by Assured in the amount of $88,868,346 against the GMACM Debtors, and $57,950,560 against the RFC Debtors. Under the RMBS Trust Allocation Protocol, Assured Insured Trusts will not share in the distribution to the RMBS Trusts, except where the Insured Exceptions apply. On account of such Allowed General Unsecured Claims, Assured shall receive its Pro Rata Share of the GMACM Debtors Unit Distribution, and the RFC Debtors Unit Distribution, as applicable.

---

[40] The Plan calls for MBIA and FGIC to receive recoveries against ResCap in recognition of MBIA and FGIC's alter ego and aiding and abetting theories of liability alleged against ResCap based on alleged fraud by RFC and GMACM and alleged breaches of contract by RFC and GMACM. Although the Debtors dispute such allegations, the provisions in the Plan relating to the ResCap Debtors' allocation of distributions to FGIC and MBIA are part of a larger settlement designed to resolve potentially burdensome and costly litigation in connection with the largest Claims filed in these Chapter 11 Cases.

*Ambac*.  The Debtors, the Creditors' Committee, and Ambac are currently negotiating the terms of the Ambac Cure Stipulation, which will resolve Ambac's objections to the sale of Ambac-insured securitizations by the Debtors (the "Ambac Insured Trusts") to Ocwen pursuant to the Ocwen APA and settle the cure amounts owed in connection therewith.   The Ambac Cure Stipulation will also provide for the transfer of the servicing of the Ambac-insured securitizations to either Ocwen under the terms of the Ocwen APA, and a subset of such securitizations to Ocwen or to Specialized Loan Servicing, LLC, as applicable under the terms of the stipulation.

Ambac has asserted claims against the Debtors in the aggregate amount of approximately $435 million.   In addition, certain portions of this claim may be asserted against multiple Debtors.   The parties anticipate that the Ambac Cure Stipulation will settle the amount of General Unsecured Claims held by Ambac to be allowed pursuant to the Plan.   Accordingly, the Plan provides that, subject to approval of the Ambac Cure Stipulation, the Allowed amount of Ambac's General Unsecured Claims shall be $207,315,815 against the GMACM Debtors, and $22,800,000 against the RFC Debtors.   Under the RMBS Trust Allocation Protocol, Ambac Insured Trusts will not share in the distribution to the RMBS Trusts, except where the Insured Exceptions apply.   Subject to approval of the Ambac Cure Stipulation, on account of such Allowed General Unsecured Claims, Ambac shall receive its Pro Rata Share of the GMACM Debtors Unit Distribution, and the RFC Debtors Unit Distribution, as applicable.

*FGIC Settlement*.   The Plan contemplates a resolution of FGIC's Claims through a separate FGIC settlement agreement entered into as of May 23, 2013 (the "FGIC Settlement Agreement"), among the Debtors, The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A., Law Debenture Trust Company of New York, U.S. Bank National Association, and Wells Fargo Bank, N.A., each in their respective capacities as Trustees, indenture trustees, or separate trustees (the "FGIC Trustees"), FGIC and certain Institutional Investors, holders of securities issued by the RMBS  Trusts with securities insured by FGIC (the "FGIC Insured Trusts").  Subject to approval by the Bankruptcy Court and the New York State Supreme Court with jurisdiction over FGIC's rehabilitation proceeding (the "FGIC Rehabilitation Court"), the FGIC Settlement Agreement creates a floor and a cap on the allowed amount of FGIC's claims against the Debtors, as well as the Claims asserted against the Debtors by the RMBS Trustees arising out of the origination based provisions in the governing agreements for the FGIC Insured Trusts on behalf of the FGIC Insured Trusts.  In addition, the FGIC Settlement Agreement settles, releases, and discharges FGIC of its obligation under the policies it issued in connection with the FGIC Insured Trusts, in exchange for a $253.3 million cash payment from FGIC to the applicable FGIC Trustees.  Absent agreement on these issues, the parties would be faced with significant and uncertain litigation regarding the validity, amount and priority of the claims of FGIC and the FGIC Trustees in connection with the FGIC Insured Trusts, particularly in light of the novel and fact-intensive issues raised in connection with the pre-petition FGIC litigation, described in further detail below.   The parties would also face difficult and novel issues regarding the effect of the proceedings in the FGIC Rehabilitation Court on the treatment of FGIC's Claims in the Chapter 11 Cases.

On June 7, 2013, the Debtors filed a motion pursuant to Bankruptcy Rule 9019 seeking the Bankruptcy Court's approval of the FGIC Settlement Agreement [Docket No. 3929], and

-32-

the Bankruptcy Court scheduled a hearing to consider the motion on August 16 and 19, 2013.[41]
In addition, the FGIC Rehabilitation Court held a hearing on August 6, 2013 to consider
approval of the FGIC Settlement Agreement. It is a termination event under the Plan Support
Agreement if the FGIC Rehabilitation Court shall not have approved the FGIC Settlement
Agreement by August 19, 2013. At the request of the Bankruptcy Court, the Debtors, the
Creditors' Committee, Ally, FGIC and certain of the Consenting Claimants, in each case as
required pursuant to the applicable documents, consented to extending the deadlines under the
Plan Support Agreement and FGIC Settlement Agreement for approval of the FGIC Settlement
to September 16, 2013 to provide sufficient time for the FGIC Rehabilitation Court to rule on the
matter,[42] and permit the Bankruptcy Court to consider the evidence and any necessary post-trial
briefing.

FGIC has asserted Claims against each of the ResCap Debtors, the GMACM Debtors
and the RFC Debtors in the amount of $1.85 billion. Pursuant to the FGIC Settlement
Agreement, if approved, the FGIC Claims shall be deemed allowed as General Unsecured
Claims against each of the ResCap Debtors, the GMACM Debtors, and the RFC Debtors in the
aggregate amount of $596.5 million if the Plan does not become effective and $934 million if
the Plan becomes effective, and will be allocated among each of those Debtors as described
below. If the Plan does not become effective, FGIC will also be allowed to assert three General
Unsecured Claims, one each against each of the ResCap Debtors, the GMACM Debtors, and
the RFC Debtors as reflected in the proofs of claim filed by FGIC in the Chapter 11 Cases, with
all claims by FGIC (including the deemed allowed portion referenced above or otherwise)
against each such entity capped in each case at the amount of $596.5 million, and the Debtors
reserve all rights to object to such claims, including any objection to the amount or priority of
such claims above the deemed allowed portion.

If the Plan becomes effective, the Allowed amounts of the General Unsecured Claims
held by FGIC shall be: $337.5 million against the ResCap Debtors, $181.5 million against the
GMACM Debtors, and $415.0 million against the RFC Debtors. In full and final satisfaction of

---

[41]    Certain parties, including Freddie Mac, an ad hoc group of holders of residential mortgage backed securities
issued by the FGIC Insured Trusts (the "Investor Objectors"), and the Junior Secured Noteholders, filed
objections to the FGIC Settlement. Freddie Mac and the Investor Objectors opposed the proposed findings that
(i) the FGIC Settlement is in the best interests of investors in the FGIC-wrapped trusts and (ii) the FGIC
Trustees have acted reasonably and in good faith in entering into the settlement, and the Junior Secured
Noteholders objected to the Settlement on the grounds that the allowance of the FGIC Claims is not an
appropriate exercise of the Debtors' business judgment. The Plan Proponents and the parties to the FGIC
Settlement believe that these objections should be overruled, and believe that the FGIC Settlement, including
the proposed findings regarding the FGIC Settlement, is reasonable and appropriate and should be approved by
the Court.

[42]    On August 16, 2013, the FGIC Rehabilitation Court issued a decision approving the FGIC Settlement, finding
that "[i]n the limited context of [the FGIC] Rehabilitation proceeding, as the Rehabilitator has indicated that in
his business judgment that such finding is necessary, and as it is in the interest of all FGIC policyholders as a
whole that the Settlement Agreement be approved, the Court grants the Rehabilitator's application for a finding
that the Trustees acted in good faith and without negligence in entering into the Settlement Agreement; such
finding is for the sole purpose of approval of the Settlement Agreement, and limited to this proceeding." In re
Fin. Guar. Ins. Co., Index No. 401265/12 (Sup. Ct. N.Y. Cnty. August 16, 2013)

-33-

FGIC's General Unsecured Claims against the Debtors, FGIC shall receive on account of its Allowed General Unsecured Claims: (i) its Pro Rata Share of the GMACM Debtors Unit Distribution, (ii) its Pro Rata Share of the RFC Debtors Unit Distribution, and (iii) its Pro Rata Share of the ResCap Debtors Unit Distribution, as applicable.

In addition, pursuant to the FGIC Settlement Agreement, the RMBS Trustees have agreed to release all Claims asserted by the RMBS Trustees arising out of the origination-related provisions in the governing agreements for the FGIC Insured Trusts on behalf of the FGIC Insured Trusts, except claims for past or future losses to holders of securities related to such RMBS Trusts and not insured by FGIC, provided, however, that the FGIC Insured Trusts shall share in distributions to the RMBS Trusts in accordance with the RMBS Trust Allocation Protocol. The Debtors performed an analysis of (i) the estimated lifetime collateral losses of the FGIC Insured Trusts, and (ii) the estimated lifetime losses to holders of securities related to the FGIC Insured Trusts and not insured by FGIC, and determined, in an exercise of their business judgment, that settlement of FGIC's Claims and the Claims asserted by the RMBS Trustees on behalf of the FGIC Insured Trusts, pursuant to the terms of the FGIC Settlement Agreement, is in the best interests of the Estates.

E.      **The Plan Resolves Certain Securities Claims Against the Debtors and Ally**

Private Securities Claims comprise securities litigation claims against the Debtors and Ally, arising from the purchase or sale of RMBS, asserted by parties who have filed a lawsuit against the Debtors and Ally (including Ally Securities, LLC) within the relevant limitations period or who are Tolled Claimants (defined below). No Private Securities Claims rely on statutory or equitable tolling or have an untested or uncertain right to pursue securities litigation claims against the Debtors and Ally. To the contrary, the Private Securities Claimants asserted or conspicuously preserved securities claims against Ally. As a result, they were identifiable as parties with concrete relevance to a global settlement based on their third party claims. The Plan Proponents have established that Private Securities Claimants include only twenty-one (21) entities, or groups of affiliated entities.[43]

The creation of the Private Securities Claims Trust resolves approximately $2.429 billion dollars of securities law claims against the Debtors and AFI, including approximately $1.409

---

[43]    The Private Securities Claimants are (i) AIG, (ii) Allstate, (iii) Asset Management Funds d/b/a AMF Funds, AMF Intermediate Mortgage Fund, AMF Ultra Short Mortgage Fund, (iv) Bank Hapoalim B.M., (v) Cambridge Place Investment Management, Inc., in two capacities based on separate actions, (vi) Deutsche Zentra-Genossenschaftsbank, New York Branch, d/b/a DZ Bank AG, New York, DH Holding Trust, (vii) Federal Home Loan Bank of Boston, (viii) Federal Home Loan Bank of Chicago, (ix) Federal Home Loan Bank of Indianapolis, (x) HSH Nordbank AG, HSH Nordbank AG Luxembourg Branch, HSH Nordbank AG New York Branch, HSH Nordbank Securities S.A., (xi) Huntington Bancshares Inc., (xii) IKB Deutsche Industriebank AG, IKB International S.A. in liquidation, (xiii) John Hancock Life Insurance Company (U.S.A.), (xiv) MassMutual, (xv) Principal Life Insurance Company, Principal Funds, Inc., Principal Variable Contracts Funds, Inc., (xvi) Prudential, (xvii) Sealink Funding Limited, (xviii) Stiching Pensioenfonds ABP, (xix) The Union Central Life Insurance Company/Ameritas Life Insurance Corp./Acacia Life Insurance Company, and (xx) the Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, Columbus Life Insurance Company, Integrity Life Insurance Company, National Integrity Life Insurance Company, and Fort Washington Investment Advisors, Inc.

-34-

billion in aggregate asserted securities law claims against Ally Securities, in each case arising from, among other things, the Debtors' loan origination activities and the structuring, sponsoring, underwriting, and sale of RMBS. The Private Securities Claims Trust creates a streamlined process for the distribution of recoveries to the Private Securities Claimants with alleged Claims against the Debtors and avoids significant litigation regarding some of the largest claims asserted against the Debtors, including litigation over the validity and value of the Private Securities Claims and whether such claims should be subordinated pursuant to Section 510 of the Bankruptcy Code.

The Private Securities Claims will be settled and resolved through the Private Securities Claims Trust. On the Effective Date, the Private Securities Claims Trust will receive Units constituting the Private Securities Claims Trust Unit Distribution and, subsequently on a periodic basis, will receive distributions equal to $235.0 million in aggregate, subject to the Adjustments (collectively, the "Private Securities Trust Assets"). As more fully described in Article V.C.2 below, the Private Securities Trust Assets will be distributed to the Private Securities Claims Trust for the benefit of the holders of Allowed Private Securities Claims (the "Private Securities Claims Trust Beneficiaries"), and the Private Securities Claimants shall forego any other recovery from the Debtors or the Liquidating Trust in respect of their Private Securities Claims including any recoveries in the NJ Carpenters Securities Class Action (defined below) and the NJ Carpenters Claims Distribution.

## F.    The Plan Resolves the Claims of NJ Carpenters

Subject to District Court approval, the Plan resolves an ongoing securities class action filed against certain Debtors and their former officers and directors, *N.J. Carpenters Health Fund v. Residential Capital LLC*, No. 08 Civ. 8781 (HB) (S.D.N.Y.) (the "NJ Carpenters Securities Class Action"). The proposed settlement would resolve federal securities law claims based on alleged misstatements and omissions in the offering materials for 59 different RMBS offerings with original face amount of approximately $38 billion. Although the Debtors dispute these claims, they are a source of significant potential liability. Subject to District Court approval, the Plan resolves these claims for a distribution of $100 million. On June 28, 2013, the District Court preliminarily approved the proposed settlement. Reasonable costs of class notice and administration (estimated to be $450,000) will be advanced by the Debtors pursuant to authorization by the Bankruptcy Court, which amounts will be deducted from the NJ Carpenters Claims Distribution. If members of the class opt out of the settlement class, they will be ineligible to share in the settlement distribution. To the extent such opt-outs have Allowed Claims against the Estates, or if the settlement is not approved and any class members have Allowed Claims against the Estates, such claims will be treated as General Unsecured Claims, provided, that they may be subject to contractual, legal, or equitable subordination.[44] The Private

---

[44]    The Plan Proponents acknowledge that, in the event the NJ Carpenters Settlement has been terminated or the District Court declines to approve the NJ Carpenters Settlement, all rights of the NJ Carpenters Class Members with respect to the Plan and the NJ Carpenters Claims, including but not limited to their rights to dispute the proposed classification of the NJ Carpenters Claims as General Unsecured Claims, dispute the treatment of such claims, oppose any attempt to subordinate the NJ Carpenters Claims, dispute the Third Party Releases, and/or oppose confirmation of the Plan on any other basis, are reserved.

Securities Claimants will not recover through the NJ Carpenters Settlement, irrespective of whether they would otherwise be members of the class that the District Court ultimately certifies for settlement purposes.

## G.    The Plan Resolves the Claims in the Kessler Class Action

The Plan contemplates a resolution of claims asserted against the Debtors in *In re: Community Bank of Northern Virginia Second Mortgage Lending Practice Litigation*, filed in the United States District Court for the Western District of Pennsylvania, MDL No. 1674, Case Nos. 03-0425, 02-01201, 05-0688, 051386 (the "Kessler Class Action"), alleging violations of various consumer protection statutes as discussed in detail in Article III. The Kessler Class Action has been pending against the Debtors for over ten (10) years, and is one of the largest putative Borrower class actions pending against the Debtors.  As discussed below, on or about June 27, 2013, certain of the Debtors and representatives of the named plaintiffs in the Kessler Class Action entered into a settlement agreement (the "Kessler Settlement Agreement") resolving the Claims asserted against the Debtors in connection with the Kessler Class Action.  On July 31, 2013, the Debtors and representatives of the named plaintiffs filed a joint motion for preliminary and final approval of the Kessler Settlement Agreement.  [See Docket No. 4451].

## H.    The Plan Establishes a Trust to Allow for Payment in Cash to Holders of Borrower Claims

The Plan provides for the treatment of claims asserted by Borrowers through the establishment of the Borrower Claims Trust.  On the Effective Date, the Borrower Claims Trust will be funded in cash with $57.6 million less any amounts paid by the Debtors to or on behalf of holders of Borrower Claims prior to the Effective Date pursuant to (i) the Supplementary Case Management Procedures[45] or (ii) any other order of the Bankruptcy Court, plus the amount of the Borrower Trust True-Up, if any.  The Borrower Claims Trust will be sufficiently funded such that the estimated Allowed Borrower Claims will receive a recovery from the Borrower Claims Trust comparable to recoveries of unsecured Creditors against the applicable Debtor Group against which the Borrower Claims would otherwise have been asserted.  The Plan Proponents currently estimate that, based on estimated Allowed Borrower Claims at each of the Debtor Groups, an amount of $57.6 million, as adjusted, will be sufficient to provide holders of Allowed Borrower Claims with a comparable recovery from the Borrower Claims Trust to that of general unsecured creditors at the respective Debtor Groups against which the Borrower Claims are asserted.  Pursuant to the Borrower Trust True-Up, however, to the extent further analysis of the estimated Allowed Borrower Claims reveals that the projected amount to be funded to the

---

[45]    The "Supplementary Case Management Procedures" means the *Order Approving Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and (d), Bankruptcy Rules 1015(c), 2002(m), 7016, and 9007 and Local Bankruptcy Rule 2002-2 for Entry of an Order Approving (A) Supplement to Case Management Order Establishing Mandatory Procedures for Management of Adversary Proceedings Commenced by Borrowers and Former Borrowers and (B) Related Relief [Docket No. 3304], as amended by the Amended Order Approving Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and (d), Bankruptcy Rules 1015(c), 2002(m), 7016, and 9007 and Local Bankruptcy Rule 2002-2 for Entry of an Order Approving (A) Supplemental to Case Management Order Establishing Mandatory Procedures for Management of Adversary Proceedings Commenced by Borrowers and Former Borrowers and (B) Related Relief* [Docket No. 3490].

-36-

Borrower Claims Trust will be insufficient to provide holders of Borrower Claims with a comparable recovery to general unsecured creditors of the applicable Debtor Groups, on the Effective Date, the Liquidating Trust will fund the Borrower Claims Trust with an additional amount necessary to provide comparable recoveries to holders of Allowed Borrower Claims. The amount of the Borrower Trust True-Up, if any, will be set forth in the Plan Supplement and filed with the Bankruptcy Court no later than ten (10) days prior to the deadline to object to the Plan.

The establishment of the Borrower Claims Trust—which will be funded with Cash, in contrast to the Units that will be funding the Liquidating Trust—allows for Borrower Claims to be addressed in a streamlined manner, with the oversight of a Borrower Claims Trustee. The Borrower Claims Trust Agreement will establish procedures for the resolution of disputed Borrower Claims, whether pending at the time of confirmation and thereafter. In addition, by funding the Borrower Claims Trust with Cash (rather than Units such as those funding the Liquidating Trust), holders of Allowed Borrower Claims will be able to receive immediate Cash payments on account of such Claims, and the recoveries will be unaffected by any variation in the projected distributable value for unsecured creditors as a result of the wind down of the Debtors' Estates.

In addition to the amounts that will be funded to the Borrower Claims Trust, the Board of Governors of the Federal Reserve System (the "FRB") and the Debtors have agreed to an amendment to the Consent Order,[46] pursuant to which the Debtors have funded approximately $230 million in Cash that will then be paid directly to Borrowers, in full satisfaction of the foreclosure review requirements under the Consent Order.[47] By entering into the amendment to the Consent Order, the Debtors eliminated costly professionals' fees associated with the foreclosure review, and, by entering into the Global Settlement, the Debtors resolved outstanding litigation with AFI regarding the allocation of liabilities for the foreclosure review obligations and ensured expedited payment of remediation payments to Borrowers. To the extent a holder of a Borrower Claim receives payment pursuant to the settlement of the Debtors' obligations under the Consent Order, the amount of such Borrower Claim shall be reduced in an amount equal to the amount received.

Certain Borrower Claims may also be covered by insurance policies. The Plan provides that, except as set forth in the Kessler Settlement Agreement, to the extent a Borrower recovers insurance proceeds on account of all or a portion of a Borrower Claim, (i) if distributions on account of such Allowed Borrower Claim have not been made, the Allowed Borrower Claim amount shall be reduced to the extent paid by insurance proceeds, or (ii) if distributions on account of such Allowed Borrower Claim have been made, the direct recipient of such proceeds

---

[46] The Bankruptcy Court approved the Debtors' entry into the amendment to the Consent Order on July 26, 2013 [Docket No. 4365].

[47] The Borrowers who will be entitled to some payment under the FRB settlement include any Borrower who was in some stage of active foreclosure proceedings during 2009 and 2010. In addition, certain Borrowers will receive remediation payments as a consequence of a separate review related to Borrowers who were eligible to receive benefits under the Service Members' Civil Relief Act from January 1, 2006 – March 12, 2012 undertaken as part of the DOJ/AG Settlement.

will be required to return a proportionate amount (such proportionate amount determined by dividing the recovered insurance proceeds by the Allowed amount of the Borrower Claim) of any prior distributions from the Borrower Claims Trust Assets made on account of such Borrower Claim to the Borrower Claims Trust.  Such Borrower shall hereafter be entitled to its proportionate share of any future distribution from the Borrower Claims Trust.

## I.    The Plan Provides Junior Secured Noteholders with Payment in Full

While the Junior Secured Noteholders (as defined herein) are not a party to the Plan Support Agreement and have not consented thereto, the Plan provides that the Junior Secured Noteholders will receive payment in full on account of their Allowed Claims (*e.g.*, the secured claims for outstanding principal, accrued pre-petition interest, and any applicable post-petition interest), with such amount to be determined pursuant to pending adversary proceedings challenging the extent and validity of the Junior Secured Noteholders' claims and security interests.  Specifically, the Debtors and the Creditors' Committee believe that the Junior Secured Noteholders are significantly undersecured and therefore not entitled to post-petition interest. Accordingly, as described in greater detail below, the Debtors and the Creditors' Committee each filed a complaint seeking to determine the extent and validity of the liens and claims of the Junior Secured Noteholders.  Such litigation has been consolidated (the "JSN Adversary Proceeding") and the causes of action bifurcated for trial in two phases.  The first phase ("Phase I"), which relates to the Junior Secured Noteholders' recoveries, is scheduled for trial in October 2013.  The second phase ("Phase II"), which relates to issues that implicate creditors more broadly, including issues proposed to be resolved through the Plan and the Global Settlement reached therein, is to be adjudicated at the Confirmation Hearing and, if necessary, in subsequent proceedings scheduled by the Court.[48]

If the Bankruptcy Court ultimately determines in Phase I of the JSN Adversary Proceeding or at the Confirmation Hearing that the Junior Secured Noteholders are oversecured, then, to the extent they are oversecured, the Junior Secured Noteholders will receive payment on or around the Effective Date or over time by the Liquidating Trust of post-petition interest under the Plan on account of their Secured Claims, which will reduce the value of Units distributable under the Plan and thereby reduce distributions to the unsecured Creditors holding such Units on a pro rata basis.  In addition to the issues to be addressed in Phase I, the Court could determine that the Junior Secured Noteholders are oversecured and thus entitled to post-petition interest if it concludes, among other things, that:

> 1.    as a result of the compromise of the Intercompany Balances, the Junior Secured Noteholders' aggregate collateral has suffered a diminution in value, such that the

---

[48]    The Debtors and the Creditors' Committee believe that if the Plan (which incorporates the Global Settlement) is confirmed, all Phase II issues will have been adjudicated or become moot.  The Junior Secured Noteholders disagree and believe that certain causes of action will need to be tried in Phase II if the Court has not already found in Phase I that the Junior Secured Noteholders are entitled to full post-petition interest.

Junior Secured Noteholders are entitled to an adequate protection claim in the amount of the decline;[49]

2. the Junior Secured Noteholders' liens attach to some or all of the Ally Contribution; and/or

3. as a result of the Plan's non-allocation of the Ally Contribution, the Junior Secured Noteholders' aggregate collateral has suffered a diminution in value, such that the Junior Secured Noteholders are entitled to an adequate protection claim in the amount of the decline.

**J.    The Plan Resolves Claims of the Senior Unsecured Noteholders and the Senior Unsecured Notes Indenture Trustee**

The Plan provides for a good faith compromise and settlement of claims that the Senior Unsecured Notes Indenture Trustee, on behalf of the Senior Unsecured Noteholders, has against the Ally Released Parties and certain other Debtors.  The claims related to, among other things, a breach of the Senior Unsecured Notes Indenture as well as claims held by the ResCap Estate against Ally relating to, among other things, the transfer of Ally Bank from ResCap to or for the benefit of Ally.

**K.    The Plan Resolves Issues Relating to Substantive Consolidation of the Debtors' Estates**

The Plan provides for a settlement and compromise of the issues relating to whether the liabilities and the assets of the Debtors should be substantively consolidated for purposes of distributions under the Plan.  Specifically, the Plan provides for partial consolidation of the Debtors into three (3) Debtor Groups, as described above, solely for purposes of describing their treatment under the Plan, confirmation of the Plan, and making distributions under the Plan.[50]

---

[49]    To be clear, the Debtors and the Creditors' Committee do not believe that the Court should entertain the Junior Secured Noteholders' efforts to obtain an adequate protection claim arising from the compromise of the Intercompany Balances, because, among other things: (a) the Junior Secured Noteholders have never had any protectable property interest in the Intercompany Balances, as under the controlling documents the Debtors have at all times had the right to compromise, forgive, or otherwise dispose of Intercompany Balances, and did so consistently during the years leading up to the Petition Date; (b) as the Junior Secured Noteholders' counsel has noted, in the absence of the Global Settlement, the Intercompany Balances have little or no value, and certainly not enough to have rendered the Junior Secured Noteholders oversecured; (c) the value of the Junior Secured Noteholders' collateral (including Intercompany Balances) at the Petition Date was substantially less than what they are receiving under the Plan, such that there is no basis for a finding of diminution in value; and (d) litigation over such a putative adequate protection claim would improperly subvert much of the benefit of the compromise, by requiring precisely the same time-consuming and costly litigation the settlement was intended to avoid.  The Plan Proponents expressly preserve and intend to advance these arguments, but in the event the Court disagrees and finds that the Junior Secured Noteholders are entitled to an adequate protection claim on this issue, such a finding would not be inconsistent with the Plan and Global Settlement.

[50]    Exhibit 3 annexed hereto contains organizational charts detailing the Debtor entities.  As set forth in the Plan Support Agreement, the grouping of Debtors set forth in the Plan remains subject to change with the reasonable consent of the Plan Proponents, Ally, and the Consenting Claimants.

-39-

The decision to partially consolidate the Debtors solely for the foregoing purposes was made after considering the various factors weighing both in favor of and against substantive consolidation. The Debtors concluded that complex, time-consuming, and uncertain litigation was likely if the issue of substantive consolidation was not earlier resolved, and that the cost of such litigation could pose a material risk to the Debtors' plan efforts and all Creditor recoveries. Moreover, the Debtors determined that the partial consolidation proposed in the Plan is consistent with applicable law because it does not harm any creditors.

The majority of the assets of the Debtors' Estates reside at ResCap, GMACM, and RFC, with the Debtor subsidiaries within each Debtor Group having little to no assets available for distribution to Creditors. In addition, the majority of Claims asserted against the Debtors are asserted against ResCap, GMACM, and RFC, with, in limited circumstances, *de minimis* Claims asserted against the other Debtor subsidiaries within a Debtor Group. In light of the location of Claims and assets, the partial consolidation proposed in the Plan confers the benefits of convenience and expediency without compromising Creditor recoveries at any Debtor. Under the Plan, each holder of an Allowed Claim will receive, on account of its Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that it would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. Accordingly, based upon the Plan Proponents' analysis, no creditors are harmed by the proposed grouping of the Debtors into the Debtor Groups for distribution purposes under the Plan.

The single exception to the partial consolidation described above applies to holders of General Unsecured Claims against Debtor ETS. To ensure that the Plan meets the "best interest of creditors" test, following a review and analysis by the Debtors of each Debtor's assets and the estimated Allowed Claims against each individual Debtor's Estate, the Plan provides, with respect to Debtor ETS, that holders of ETS Unsecured Claims will receive Cash, to be distributed pro rata, in an amount equal to the value of assets remaining in the ETS estate after the payment of Allowed Claims with a senior priority.

L.    **The Plan Contains a Compromise of Intercompany Balances and Resolves Subrogation and Other Disputed Intercompany Issues**

The Debtors' books and records reflect various intercompany payables and receivables among various Debtor entities as of the Petition Date. These balances were accumulated through tens of thousands of separate transactions over a period of years from a course of dealing whereby certain Debtors made payments under pre-petition loan agreements for the benefit of other Debtors, or by operation of the Debtors' centralized cash management system. The seven largest Intercompany Balances, which comprise approximately 96% of all Intercompany Balances, are described on Exhibit 6 annexed hereto.

The Debtors filed their Schedules of assets and liabilities on June 30, 2012 [Docket Nos. 548 - 649], as amended, which reflected the Intercompany Balances that existed on the Debtors' books and records as of the Petition Date. Since the filing of these Schedules, the Debtors conducted an extensive analysis of the Intercompany Balances to determine whether they should be treated as Allowed Claims, subordinated to other Claims, subject to set-off, or recharacterized as equity contributions or dividends. The analyses focused on the intent associated with each

-40-

balance, including but not limited to consideration of the following factors: (i) the names given to the instruments, if any, evidencing the indebtedness; (ii) the presence or absence of a fixed maturity date and schedule of payments; (iii) the presence or absence of a rate of interest and interest payments; (iv) the source of repayments of the purported indebtedness; (v) the adequacy or inadequacy of the capitalization of the net receiver; (vi) the identity of interest between net receiver and the "lender"; (vii) the security, if any, for the putative debt; (viii) the ability of the net receiver to obtain financing from outside lenders; (ix) the extent to which the payments were subordinated to the claims of outside creditors; (x) the extent to which the advances were used to acquire capital assets; and (xi) the presence or absence of a sinking fund to provide repayments. The Debtors also reviewed historical practices and other evidence as to whether there was any intent that Intercompany Balances would be enforced or repaid.

The Debtors shared their analyses and supporting materials with advisors for the Creditors' Committee. The Creditors' Committee's advisors independently reviewed the supporting materials and analyses and performed follow-up due diligence on the Intercompany Balances. The Creditors' Committee's advisors provided reports to the full Creditors' Committee on the Intercompany Balances.

After conducting this analysis, the Debtors and the Creditors' Committee, based upon their independent review and analysis, believe that the Intercompany Balances reflected in the Schedules lack many of the indicia of true debt and likely would not be enforceable Intercompany Balances. While the Intercompany Balances generally were a result of the Debtors' shared cash management system, evidence reflects no consistent practice of repayment or other formal settlement of such balances. Most Intercompany Balances are not supported by documents other than entries in the accounting records. For the few instances in which agreements exist, the documents often contemplated a "lending" relationship (A owes B) that is the reverse of the existing balance (B owes A). In nearly all instances, interest on Intercompany Balances did not accrue, accrued but was not paid, or, in one instance, was paid even though the agreement did not provide an interest rate. Further, in each instance, the same individuals, entities, or affiliates controlled both the "lender" and the net receiver upon the commencement of the "lending" relationship.

On numerous occasions, where the existence of an intercompany payable on a Debtor's balance sheet threatened the solvency and net worth thresholds required under external funding agreements, or by federal and state regulators, the putative debt obligations were forgiven. Additionally, putative debt obligations were forgiven among the Debtors and certain non-Debtor subsidiaries in connection with the Debtors' international transactions and the dissolution of entities. Approximately $16.6 billion of debt was forgiven without consideration from 2007 through the Petition Date.

As a result of these facts, even if the Intercompany Balances reflected on the Debtors' books and records were accurate and enforceable debts, any attempt to enforce such claims would inevitably result in litigation relating to, among other things, (i) potential avoidance of historical debt forgiveness; (ii) failure to charge Debtor entities with allocable expenses; and (iii) substantive consolidation. Indeed, as discussed herein, Wilmington Trust, on behalf of the Senior Unsecured Noteholders, has already requested in the Wilmington Trust Standing Motion

-41-

standing to pursue certain Estate Causes of Action that forgiveness of intercompany debt constituted constructive and actual fraudulent transfers. Pursuant to the Global Settlement, all Intercompany Balances will be compromised under the Plan. In light of the analysis of the Intercompany Balances, in addition to the cost and delay that could result from litigating these issues, the Plan Proponents believe that the compromise of Intercompany Balances embodied in the Plan is in the best interest of the Estates and creditors.

Setting aside the cost of reviewing, analyzing, and taking discovery with respect to tens of thousands of transactions, litigation of these and similar claims would be extremely time-consuming and expensive. Fraudulent conveyance, substantive consolidation, recharacterization, and similar issues are highly complex and factually intensive, requiring extensive discovery and expert testimony addressing solvency, valuation, contemporaneous exchange of value, arms'-length terms, accounting practices, allocation issues, and so forth. Experience in similar cases demonstrates that, absent consensual resolution, fully litigating these issues would cost the Estates tens of millions of dollars, and substantially delay the ability to confirm any Chapter 11 plan.

Given the numerous inter-related litigations that would arise from any attempt to enforce the Intercompany Balances and any objections thereto, it was clear that the uncertainty and costs associated with litigating the intercompany issues would impact all Creditor recoveries. As part of the Global Settlement, each Debtor, with the support of the Creditors' Committee and the Consenting Claimants, has agreed to compromise the Intercompany Balances. For purposes of the Plan, Intercompany Balances, as well as any subrogation claims and fraudulent conveyance claims related to the forgiveness of intercompany debt, will be compromised as part of the Global Settlement, and waived, cancelled, and discharged on the Effective Date, and holders of Intercompany Balances will receive no recovery on account of such claims.

The Debtors and the Creditors' Committee have concluded that the compromise of Intercompany Balances is reasonable in consideration of all of the factors discussed above, including (i) the Debtors' and Creditors' Committee's analysis and conclusion that the Intercompany Balances reflected on the Schedules lack indicia of true debt and are not enforceable claims; (ii) the costly and time-consuming litigation that would result from any effort to enforce the putative Intercompany Balances; (iii) the inability to reach consensual agreement with numerous Creditor constituencies absent consensual resolution of the Intercompany Balances and inextricably related issues; and (iv) the substantial benefits to all creditor constituencies from the Global Settlement. For these reasons, the Plan Proponents and the Consenting Claimants agree that it is in the best interest of the Debtors' Estates and their Creditors to compromise the Intercompany Balances.

M.    **The Plan Allocates the Estate Assets and Administrative Expenses among Debtor Groups and Creditor Constituencies**

The cornerstone of the Global Settlement is the $2.1 billion Ally Contribution, together with Ally's other substantial contributions through the Chapter 11 Cases, in exchange for the Debtor Release and Third Party Releases. Through the negotiation process, the parties

-42-

determined to allocate the Ally Contribution as follows (which remains subject to adjustment based on amounts reserved for Disputed Claims):

| Entity | Allocation |
| --- | --- |
| ResCap Debtors | $782.74 million |
| GMACM Debtors | $462.32 million |
| RFC Debtors | $462.32 million |
| Private Securities Claims Trust | $235.00 million |
| Borrower Claims Trust | $57.62 million |
| NJ Carpenters Claims Distribution | $100.00 million |
| TOTAL | $2.10 billion |

The agreed upon allocation of the Ally Contribution was a central focus of the mediation sessions, and reflects a thorough analysis of a number of variables.[51]  First, the parties analyzed the assets available for unsecured Creditors at each of the Debtor Groups, and determined that the GMACM and RFC Debtors held significant unencumbered assets, whereas the ResCap Debtors had little to no unencumbered assets available for distribution to unsecured Creditors at those entities.  Second, the parties then analyzed the Secured Claims and Unsecured Claims asserted against each of the Debtors, the allocation of Allowed Claims against each Debtor Group.  Third, the parties considered the rights and Causes of Action that each of the Debtor Groups could pursue against Ally, as identified by the Debtors and the Creditors' Committee through their investigations.  After conducting each of these analyses, the parties determined that the proposed allocation of the Estate assets is reasonable and appropriate, and is in the best interest of the Estates and the creditors of each of the Debtor Groups.

The Global Settlement also embodies an allocation of accrued and projected administrative expenses among the Debtor Groups.  The Debtors project that, after April 30, 2013, there will be approximately $1.086 billion in administrative costs to wind-down the Estates.  In light of the fact that the GMACM Debtors and the RFC Debtors were the operating companies and have the greatest amount of unencumbered assets available for unsecured Creditors, in contrast to the ResCap Debtors with limited operations and assets, and as part of the global compromise and settlement, the settling parties agreed to allocate the accrued and projected administrative costs to the GMACM Debtors and the RFC Debtors, with no administrative expenses allocated to the ResCap Debtors, as appropriate under the circumstances.  Specifically, the parties determined that of the projected $1.086 billion in administrative costs, $836.3 million shall be allocated to the GMACM Debtors, and $249.8 million shall be allocated to the RFC Debtors.

After payment of all projected Allowed secured, administrative, and priority Claims, which includes all wind-down costs, the Debtors estimate that, based upon the projected Estate

---

[51]    Thus, the Global Settlement does not include an allocation of any portion of the Ally Contribution on account of specific Claims or Causes of Action that could be pursued by the Debtors or third parties.

assets (including the Ally Contribution, Cash and non-Cash assets) available for distribution to unsecured creditors at each of the Debtors' Estates, the following amounts will be available for distribution to unsecured creditors:

| Entity | Allocation |
|---|---|
| ResCap Debtors | $748.8 million |
| GMACM Debtors | $665.9 million |
| RFC Debtors | $812.4 million |
| Private Securities Claims Trust | $235.0 million |
| Borrower Claims Trust | $57.6 million |
| NJ Carpenters Claims Distribution | $100.0 million |
| **TOTAL** | **$2,619 million** |

In light of the fact that the cost to wind down the Estates remains uncertain and the value of certain non-Cash assets held by the Estates will vary as they are liquidated over time, the Plan provides that any increase or decrease in administrative expenses and/or the value of all of the Debtor Estates from current projections, would be shared among the ResCap Debtors, the GMACM Debtors, the RFC Debtors, and the Private Securities Claims Trust, pro rata.

## N.    Implementation of the Plan

### 1.    Plan Funding

Funding for the Plan is derived from two primary sources, (1) proceeds from the Asset Sales (defined herein) and the liquidation of the remaining assets of the Estates, and (2) the Ally Contribution. The creation and implementation of the Liquidating Trust, the Borrower Claims Trust and the Private Securities Claims Trust, each as described below will facilitate the making of distributions to holders of Allowed Claims.

### 2.    Establishment of the Liquidating Trust

The Plan establishes a Liquidating Trust and vests substantially all of the Debtors' assets, including the Ally Contribution (with the exception of certain assets designated to remain with the Debtors) in the Liquidating Trust.[52] From and after the Effective Date, the Liquidating Trust will (i) make Cash distributions to holders of certain Claims, as described below; (ii) issue Units (defined below) to holders of Allowed Unsecured Claims and to a Disputed Claims Reserve (defined below); (iii) monetize the non-Cash assets; (iv) make Cash distributions to holders of Units, including on Units held in the Disputed Claims Reserve; (v) administer and make distributions from the Disputed Claims Reserve and the Liquidating Trust Administrative Reserve; (vi) effect the general wind-down of the Debtors' Estates following the Effective Date; (vii) facilitate and complete the potential resolution of any remaining regulatory obligations

---

[52]    A predecessor to the Liquidating Trust was initially formed pursuant to a Declaration of Trust as a common law trust under the laws of the State of Delaware. On or prior to the Effective Date, the Delaware Trustee will file a Certificate of Conversion and a Certificate of Trust in accordance with the Delaware Statutory Trust Act to convert the initial trust to a Delaware statutory trust that will constitute the Liquidating Trust under the Plan.

owed by the Debtors under the DOJ/AG Settlement; and (viii) engage in general administrative functions in connection with the foregoing.

### 3.    Distributions of Cash by the Liquidating Trust

On or as soon as practicable after the Effective Date, the Liquidating Trust will:  (i) fund the Borrower Claims Trust with Cash in the amount of $57.6 million, as may be reduced by amounts paid by the Debtors to or on behalf of holders of Borrower Claims prior to the Effective Date pursuant to the Supplementary Case Management Procedures or any other order of the Bankruptcy Court plus the amount of the Borrower Trust True-Up, if any; (ii) if the related settlement is approved, pay the NJ Carpenters Claim Distribution in Cash in the amount of $100 million, less any funds previously expended by the Estates to administer the NJ Carpenters Settlement; (iii) make Cash distributions to the holders of Allowed Administrative Claims, Allowed Priority Claims, Allowed Other Secured Claims; (iv) pay the Allowed Junior Secured Notes Claim in full in Cash; (v) make Cash distributions to the holders of Allowed ETS Unsecured Claims; (vi) establish the Liquidating Trust Administrative Reserve, the Professional Fee Escrow Account, and the Administrative, Priority, Secured, and Convenience Distribution Reserve; and (vii) make Cash distributions on account of Units, as set forth below.

### 4.    Issuance of Units by the Liquidating Trust

Beneficial interests in the Liquidating Trust, in the form of liquidating trust units (the "Units") will be issued by the Liquidating Trust to holders of Allowed Unsecured Claims (other than RMBS Trust Claims, Borrower Claims, NJ Carpenters Claims, and ETS Unsecured Claims) against the ResCap Debtors, the GMACM Debtors, and the RFC Debtors, and to the RMBS Claims Trust and the Private Securities Claims Trust.

The total number of Units to be initially issued and outstanding, including the Units to be held in the Disputed Claims Reserve, will be 100 million Units.  Annexed as Exhibit 7 to the Disclosure Statement is the Debtors' Recovery Analysis.  Based on the Debtors' Recovery Analysis, the estimated distributable value to holders of the beneficial interests in the Liquidating Trust is approximately $2.462 billion.  Therefore, based on the Debtors' estimates, each Unit is worth $24.62.[53]  As set forth in the chart below, the Units issuable pursuant to the Plan will be allocated among the Private Securities Claims Trust and the holders of Allowed Claims against the respective Debtor Groups in accordance with their percentage of distributable value from the Liquidating Trust (each, a "Unit Issuance Percentage"):

---

[53]    The estimated value of each Unit does not take into account the anticipated delay in making distributions on account of non-Cash assets to be held in the Liquidating Trust.

|  | Allocated Amount[54] | Unit Issuance Percentage | Allocated Units |
|---|---|---|---|
| ResCap Debtors | $748.8 million | 30.41% | 30.41 million |
| GMACM Debtors | $665.9 million | 27.05% | 27.05 million |
| RFC Debtors | $812.4 million | 33.00% | 33.00 million |
| Private Securities Claims Trust | $235.0 million | 9.55% | 9.55 million |
| **Total** | **$2.462 billion** | **100.00%** | **100 million** |

The holders of Allowed Unsecured Claims against a Debtor Group (or the RMBS Claims Trust, as applicable) will receive their proportionate share of the total Units issued at that Debtor Group (each a "Debtor Group Unit Distribution").  The Plan also provides a mechanism for adjusting the Unit Issuance Percentages such that any dilution from additional Allowed Unsecured Claims beyond current projections will be borne by all Unitholders on a pro rata basis.  Prior to the Initial Unit Distribution Date, a determination shall be made of the estimated amount of Unsecured Claims against each of the Debtor Groups that are Disputed Claims, in accordance with the provisions of Article VIII.D.[55]  Thereupon, the Unit Issuance Percentages shall be adjusted such that all Unitholders shall share proportionately in the accretion or dilution of recoveries as a result of variances in the Allowed amounts of Unsecured Claims from the amounts set forth in the Disclosure Statement; and shall be further adjusted through an iterative mathematical process such that all holders of Allowed Unsecured Claims against a Debtor Group receive Units in the same ratio of number of Units to Allowed amount of Claim.  Thus, the Debtor Group Unit Distributions shall be determined based on the respective Unit Issuance Percentages (after adjustment), and shall include, with respect to each Debtor Group, the Units to the issued to holders of Allowed Unsecured Claims against that Debtor Group as of the Initial Unit Distribution Record Date and the Units to be issued to the Disputed Claims Reserve with respect to that Debtor Group.  For the purposes of this paragraph, proportionately means in proportion to the recovery of the holders of Unsecured Claims in the amounts set forth in Article I.D of the Disclosure Statement.  **The Illustrative Unit Issuance Structure, which explains how the Units will be distributed in accordance with the Plan, is annexed hereto as Exhibit 4.**

Each Unit will entitle its holder to the pro rata share of the Cash of the Liquidating Trust available for distribution following the funding of the Borrower Claims Trust, the making of payments to or reserving for Allowed Administrative Claims, Allowed Priority Claims, and Allowed Other Secured Claims, the distribution on account of NJ Carpenters Claims, distribution on account of the Allowed ETS Claims, and payment of the Junior Secured Notes Claims, and the funding of reserves to pay the administrative expenses of the Liquidating Trust. The Cash of the Liquidating Trust will include Cash transferred to the Liquidating Trust as of the Effective

---

[54]    All amounts, other than the NJ Carpenters Claims Distribution and Borrower Claims Trust (which will be funded with Cash on the Effective Date as described herein), have been updated from the amounts contemplated in the Plan Support Agreement to reflect an increase in the projected distributable value available for unsecured creditors since the time the Plan Support Agreement was executed.

[55]    The Plan Proponents will file a motion seeking to establish a Disputed Claims Reserve, pursuant to which the Plan Proponents will estimate, as of the Initial Unit Issuance Date, the amount needed to fund the reserve for Disputed Claims against each of the Debtor Groups.

-46-

Date, including the Ally Contribution, and Cash that subsequently becomes available to the Liquidating Trust as a result of the sale or other monetization of the non-Cash assets of the Liquidating Trust.

Units will be issued in global certificate form only and registered to DTC, with interests in the certificate being held in book-entry form through DTC participants, for so long as the Units are eligible to be held through DTC.  Holders of Allowed Unsecured Claims (other than holders of RMBS Trust Claims, whose Units will be delivered to the RMBS Claims Trust and holders of Senior Unsecured Notes, whose Units will be delivered to the Senior Unsecured Notes Trustee) must follow specified procedures to designate a broker, bank or other financial institution that is a direct or indirect DTC participant with whom they have a securities account in order to receive their Units.  As part of these procedures, a notice will be sent on behalf of the Liquidating Trust to the holders of Allowed Unsecured Claims (other than holders of RMBS Trust Claims and holders of Senior Unsecured Notes) shortly after the Plan is confirmed asking each such holder to identify the broker, bank or other financial institution with whom such holder has a security account into which his, her or its Units may be deposited.

The Liquidating Trust will make an initial distribution of Cash to the holders of Units, including the Units held in the Disputed Claims Reserve, as soon as practicable after the Effective Date.  The Liquidating Trust will make subsequent, additional distributions of Cash to holders of Units as its non-Cash assets are monetized.

## 5.    Establishment of the Disputed Claims Reserve

From the 100 million Units, the Liquidating Trust will reserve Units for those Disputed Claims that remain disputed but may become Allowed through the claims resolution process after the Effective Date (the "Disputed Claims Reserve").  The number of Units issued to the Disputed Claims Reserve in respect of each Debtor Group will equal the Debtor Group Unit Distribution of that Debtor Group, less the Units issuable to holders of Allowed Unsecured Claims against that Debtor Group as of the Initial Unit Distribution Record Date, which will be in an amount sufficient to satisfy all Disputed Claims against the particular Debtor Group as if they were Allowed in their estimated amounts as of the Initial Unit Distribution Record Date.

Upon each Cash distribution to holders of Units, Cash distributed in respect of the Units in the Disputed Claims Reserve will remain in the Disputed Claims Reserve.  As Disputed Claims become Allowed, Units and Cash will be distributed from the Disputed Claims Reserve in an amount equal to what the holders of the Claims would have received had they been Allowed as of the Initial Unit Distribution Record Date.  To the extent Disputed Claims are disallowed, the Units reserved on account of those claims will be cancelled, and the Cash on reserve for such Units will be available for distribution to holders of Units or to pay expenses of the Liquidating Trust.  After all Units, and the Cash distributed with respect thereto, have been distributed from the Disputed Claims Reserve, no further distributions will be made in respect of Disputed Claims.

6.        **Establishment of the Private Securities Claims Trust**

As described in greater detail in Article V**,** the Plan contemplates establishing a Private Securities Claims Trust which shall administer and distribute the Private Securities Claims Trust assets to holders of Private Securities Claims in accordance with the Private Securities Claims Trust Agreement.  The Private Securities Claims Trust shall, to the extent necessary, perform the following duties: (i) directing the processing, liquidation and payment of the Allowed Private Securities Claims in accordance with the Private Securities Claims Trust Agreement; and (ii) preserving, holding, and managing the assets of the Private Securities Claims Trust for use in making distributions to holders of Allowed Private Securities Claims.   The Private Securities Claims Trust Agreement shall include, among other things: (i) the terms, methodology, criteria, and procedures for distributing either (a) the Cash distributed by the Liquidating Trust in respect of the Units allocated to the Private Securities Claims Trust to holders of Allowed Private Securities Claims, or (b) the Units transferred to the Private Securities Claims Trust that constitute the Private Securities Claims Trust Unit Distribution; and (ii) to the extent necessary, the establishment of appropriate Disputed Claims Reserves.

7.        **Establishment of the Borrower Claims Trust**

As described in greater detail in Article V**,** the Plan contemplates establishing a Borrower Claims Trust that will, among other things, (i) direct the processing, liquidation and payment of Allowed Borrower Claims, (ii) provide for the treatment of insurance, if any, that may be available for the satisfaction of Allowed Borrower Claims, (iii) provide for the prosecution and settlement of objections to Borrower Claims including those that may have been filed previously by the Debtors or any other party (iv) establish affirmative claims reserves for disputed Borrower Claims, and (v) establish streamlined procedures for the resolution of objections to any disputed Borrower Claims, inclusive of any counterclaims or offsets in favor of the Debtors.

8.        **Establishment of the RMBS Claims Trust**

The Plan contemplates establishing an RMBS Claims Trust which shall administer and distribute the RMBS Claims Trust assets to holders of RMBS Trust Claims in accordance with the RMBS Claims Trust Agreement. The RMBS Claims Trust shall, among other things, (i) direct the processing, liquidation and payment of the Recognized RMBS Trust Claims in accordance with the Plan, and (ii) preserve, hold, and manage the assets of the RMBS Claims Trust for use in making distributions to holders of Recognized RMBS Trust Claims.

## ARTICLE III.
## BACKGROUND

A.        **The Debtors' Businesses and Operations**

1.        **Overview**

As a result of the commencement of the Chapter 11 Cases and the sale of the Debtors' mortgage loan servicing and origination platform (the "Origination and Servicing Business") to Ocwen and Walter and the Debtors' "legacy whole loan" portfolio (the "Whole Loan Portfolio")

-48-

to Berkshire Hathaway, Inc. ("Berkshire") for a combined total of approximately $4.1 billion in gross sale proceeds (prior to reduction for payment of assumed liabilities, cure costs, and other associated liabilities) (together, the "Asset Sales"), the Debtors' operations have significantly changed. A general description of the Debtors' organization and business prior to the Petition Date is set forth below.

Prior to the Petition Date, the Debtors were a leading residential real estate finance company indirectly owned by non-Debtor AFI. The Debtors, together with their non-debtor subsidiaries, managed their mortgage-related businesses in two business lines: (i) the Origination and Servicing Business, and (ii) the Whole Loan Portfolio and other business, which the Debtors started to wind down prior to the Petition Date. As discussed herein, following the Petition Date, the Debtors sold substantially all of the assets associated with the Origination and Servicing Business to Ocwen and Walter and sold the Whole Loan Portfolio to Berkshire.

## 2.    Origination and Servicing

Prior to the closing of the Asset Sales, the principal activities of the Debtors' Origination and Servicing Business included: (a) brokering, originating, purchasing, selling and securitizing residential mortgage loans throughout the United States for the Debtors and their non-Debtor affiliate, Ally Bank; and (b) servicing residential mortgage loans throughout the United States for the Debtors, Ally Bank, and other investors in residential mortgage loans and in RMBS. The Debtors obtained Bankruptcy Court approval to continue these operations in the ordinary course during the pendency of these Chapter 11 Cases.

GMACM, under the GMAC Mortgage brand, brokered and originated mortgage loans through a consumer lending business that consisted of internet and telephone-based call center operations and, to a lesser extent, a retail network of loan officers who had direct contact with consumers. GMACM brokered its loan production in 47 states to Ally Bank. Ally Bank underwrote and originated loans based on loan application packages submitted by GMACM in accordance with applicable regulatory and industry standards. In recent years, substantially all of the Debtors' loan production consisted of conforming loans (that is, loans that met the required guidelines of Fannie Mae,[56] Freddie Mac,[57] or Ginnie Mae,[58] as applicable) and a limited number of prime nonconforming jumbo mortgage loans.

A fundamental part of the Debtors' business strategy consisted of securitizing or selling substantially all of the mortgage loans they purchased or originated. The Debtors participated in the securitization programs of Fannie Mae, Freddie Mac, and Ginnie Mae. Securitization trusts are the issuing entities associated with the RMBS held by a broad range of investors, including

---

[56]    Fannie Mae was formerly known as the Federal National Mortgage Association.

[57]    Freddie Mac was formerly known as the Federal Home Loan Mortgage Company.

[58]    Ginnie Mae is the Government National Mortgage Association.

pension funds, money market funds, mutual funds, banks, insurance companies, governmental bodies, and other public and private entities.[59]

Since 2008, mortgage loan servicing had been the Debtors' primary source of ongoing revenue. The Debtors held "mortgage servicing rights" (referred to as "MSRs") that consisted of primary or master servicing rights. In addition, the Debtors sub-serviced loans for a fee. As a primary servicer, the Debtors, among other things, collected and remitted mortgage loan payments, responded to Borrower inquiries, accounted for and applied principal and interest, held custodial and escrow funds for payment of property taxes and insurance premiums, provided ancillary products, counseled or otherwise worked with delinquent Borrowers, supervised foreclosures and property dispositions, made Advances of required principal, interest, and certain "property protection" costs with respect to delinquent and defaulted mortgage loans and the real estate that the trust or owner acquired as the result of a foreclosure of the loan (the "Advances"), and generally administered the loans consistent with their contractual undertakings and business practices. When the Debtors acted as master servicer, they collected mortgage loan payments from primary servicers or sub-servicers and distributed those funds to investors and to other transaction parties in RMBS and whole-loan packages. Finally, as a sub-servicer (where another party owns the MSR), the Debtors performed functions similar to the primary servicing functions described above pursuant to contractual arrangements, and the Debtors received a fee based on the unpaid principal balance ("UPB") of the mortgage pool, or in some cases, for each loan serviced. In addition, the Debtors received other remuneration for loan servicing, including interest earned on custodial accounts where mortgage payments are held pending remittance to investors, as well as Borrower-contracted fees, such as late charge fees, assignment transfer fees, and other incidental fees and charges. On January 31, 2013 and February 15, 2013, respectively, the Debtors sold their servicing and origination platforms to Walter and Ocwen.

During the course of these Chapter 11 Cases, the Debtors, with Ally's operational and financial support, have been able to achieve what no other mortgage originator and servicer had ever been able to achieve: the Debtors remained a going concern after filing their Chapter 11 petitions and operated their mortgage servicing and origination businesses in bankruptcy. The Debtors have maintained their qualified servicer status, which enabled them to continue to issue loans and offer loan modifications to thousands of Borrowers, originate new mortgage loans to allow individuals to purchase homes or refinance their existing mortgage loans, and service millions of mortgage loans during the pendency of the Chapter 11 Cases. In addition, the Debtors were able to continue employing thousands of employees, most of whom were transferred to Ocwen and Walter following the Asset Sales. Since the Petition Date, the Debtors originated or brokered billions of dollars in UPB of mortgage loans and continued certain Borrower programs. Because the Debtors (together with their non-Debtor affiliates) were a significant originator and servicer of residential mortgage loans nationally, their continued

---

[59]  Since the collapse of the mortgage loan industry in 2007, the Debtors have not been active sponsors of private label securitizations ("PLS"). In a PLS, the Debtors pooled together nonconforming mortgage loans in their own names ("private label") and conveyed the pool of loans to a newly formed securitization trust (a "PLS Trust"). The PLS Trust raised cash to purchase the mortgage loans from the Debtors by issuing RMBS to investors. The RMBS entitle their holders to receive the principal (including prepayments) and interest collected on the mortgage loans in the PLS Trust.

operation of mortgage servicing activities during the Chapter 11 Cases has minimized any adverse effects on homeowners, the housing market, and existing securitizations for which the Debtors function as servicers.

### 3.    Whole Loan Portfolio and Other Operations

The Debtors' Whole Loan Portfolio principally consisted of the mortgage loan assets from their historical nonconforming domestic residential mortgage loan origination and securitization activities, and its other operations principally consisting of the Debtors' remaining international operations and the Debtors' captive mortgage reinsurance operation.  Following the Petition Date, the Debtors sold a significant portion of their Whole Loan Portfolio to Berkshire. The remaining assets in the Whole Loan Portfolio and the Debtors' other operations will be wound down by the Liquidating Trust through opportunistic asset sales, workouts, or other strategic disposition transactions.

### B.    The Debtors' Organizational Structure

The Debtors are wholly owned, indirect domestic subsidiaries of AFI.  As of the Petition Date, the Debtors consist of 51 separate entities organized and located in the United States. ResCap also has 13 wholly owned indirect subsidiaries organized under the laws of various international jurisdictions.  All of the direct and indirect domestic subsidiaries of ResCap except for Cap Re of Vermont LLC ("Cap Re")[60] and Phoenix Residential Securities, LLC ("Phoenix RS") are Debtors in this case.  Exhibit 2 annexed hereto is a list of the Debtors that filed for Chapter 11 relief on the Petition Date, and Exhibit 3 annexed hereto is a summary organizational chart.  In all cases, this information excludes the securitization trusts, which are not Debtors.

### C.    The Debtors' Assets and Capital Structure

### 1.    The Debtors' Assets

Prior to the Asset Sales, the principal property owned by the Debtors were its servicing advance receivables, held-for-sale ("HFS") mortgage loans, held-for-investment ("HFI") mortgage loans, MSRs, claims with respect to government-insured loans (included within Debtors' accounts receivable), and derivative assets.

As of April 30, 2013, the Debtors continue to hold approximately $1.4 billion of non-cash assets, after certain proforma adjustments.   At that time, the Debtors retained 257 employees to assist in both their short-term and long-term management and wind down activities.  With respect to certain of these assets (for example, FHA/VA Loans), the Debtors have entered into servicing agreements with Ocwen, pursuant to which Ocwen subservices the assets for a fee pending liquidation or other disposition.  The Debtors' remaining employees also manage and conduct activities related to the monetization of the remaining assets, the claims reconciliation and distribution process, resolution of outstanding cure objections, the pursuit of recoveries on the Debtors' claims against correspondent lenders, the effective communication

---

[60]    While not a Debtor in the Chapter 11 Cases, each of Cap Re and Phoenix RS are an "Ally Released Party" under the Plan.

and reporting to constituents, and the administration of the Estates in a cost-effective manner, among other wind down activities, in some cases with support from the Debtors' professionals.

      **(a)     Platforms**

Prior to the Petition Date, the Debtors maintained the following business platforms:

- Origination Platform: consisted of a direct call center, a retail network, and an operations fulfillment center.

- Capital Markets Platform: used to price, hedge, and distribute mortgage loans as well as to transact interest rate and foreign currency swaps, futures, forwards, options, swaptions, and agency to-be-announced securities in connection with the Debtors' risk management activities.

- Servicing Platform: addressed the servicing, foreclosure trustee, recovery, and special servicing needs of the Debtors' customers.

- Master Servicing Operations: included oversight of approximately 38 servicers and the provision of bond administration services.

- Special Servicing Operations: addressed those loans that required additional "high touch" capability for managing loss mitigation, collections, and real estate owned ("REO") liquidation.

- Recovery Operations: certain of the Debtors served as foreclosure trustees in five states and managed recoveries on charged-off assets.

      **(b)     Servicing Advance Receivables**

The Debtors, much like other mortgage loan servicers, were required to make Advances on behalf of Borrowers that were delinquent or in default on their loan obligations. The Debtors made the Advances monthly, and such Advances constituted the single largest use of the Debtors' Cash. These Advances were repaid from the Debtors' collections on principal, interest, tax, and insurance payments made by the mortgage Borrowers (assuming the Borrowers cured their defaults). Alternatively, the Debtors recovered such Advances following the foreclosure sales of the properties securing the defaulted mortgage loans. The right to collect repayment of Advances (the "Servicing Advance Receivables") was a significant asset of the Debtors.

      **(c)     Mortgage Loans**

The Debtors held domestic HFS mortgage loans (i.e. those not sold or securitized), consisting of first and second lien mortgage loans (including mortgage loans that were subject to the Debtors' conditional repurchase options).

The Debtors also held the held for investment consumer finance receivables and loan portfolio (the "HFI Portfolio"), which primarily consisted of non-economic PLS assets required

-52-

to be recognized by the Debtors under generally accepted accounting principles in the United States of America. The corresponding liabilities were recognized on the Debtors' financial statements as collateralized borrowings in securitization trusts as a component of total borrowings. The Debtors' economic exposure to the net assets of these PLS was limited to their retained interests in such PLS Trusts and the related MSRs. The balance of the Debtors' HFI Portfolio represented home equity mortgage loans financed through the use of a special purpose entity. These PLS assets were transferred to special purpose entities as part of the Debtors' Whole Loan Portfolio's nonconforming securitization activities.

### (d)    Mortgage Servicing Rights

The Debtors' MSRs are rights the Debtors either retained upon a sale of loans or purchased from other industry participants.

### (e)    Other Assets

As of the Petition Date, the Debtors held $475.5 million of unrestricted Cash and $136.0 million of restricted Cash. The Debtors also owned other assets, consisting of: (i) accounts receivable, including a net loan insurance guarantee receivable that represented mortgage loans in foreclosure, which loans were guaranteed by the Federal Housing Administration or the U.S. Department of Veterans Affairs, and other various accounts receivable; (ii) net property and equipment and foreclosed assets, including REO assets; (iii) trading securities, consisting of RMBS or mortgage-related asset-backed securities (including senior and subordinated interests), and interest-only, principal-only or residual interests, which may be investment grade, non-investment grade, or unrated securities.

### 2.    The Debtors' Liabilities

Prior to the Petition Date, certain of the Debtors were borrowers, guarantors, issuers and/or obligors under credit facilities and publicly traded notes, as well as collateralized nonrecourse borrowing facilities for securitization trusts.

### (a)    AFI Senior Secured Credit Facility

On December 30, 2009, Debtors Residential Funding Company, LLC and GMACM, as borrowers, and Debtors ResCap, Passive Asset Transactions, LLC ("PATI"), and RFC Asset Holdings II, LLC ("RAHI"), as guarantors, entered into a loan agreement with AFI, as agent and lender (as amended from time to time, the "AFI Senior Secured Credit Facility"), which amended and restated the original loan agreement entered into on June 4, 2008. While no longer a revolving facility as of the Petition Date, the borrowers were permitted to use certain accounts as revolving accounts to make Advances under certain securitizations that were not funded under the GSAP Facility (described below). The outstanding principal amount under the AFI Senior Secured Credit Facility as of the Petition Date was approximately $747 million. The AFI Senior Secured Credit Facility is secured by a first priority lien for the benefit of AFI on certain assets of the Debtors with certain exclusions, such as the Ginnie Mae MSRs and related assets, as well as certain of the assets that secure the other secured debt facilities. The assets that secure the AFI Senior Secured Credit Facility also secure the Junior Secured Notes (as discussed below).

-53-

On June 13, 2013, the Debtors repaid the AFI Senior Secured Credit Facility in full, plus all accrued and unpaid interest, pursuant to the Paydown Order [Docket No. 3967] (the "Paydown Order"). As a result, subject to the conditions of the Paydown Order, the AFI Senior Secured Credit Facility is no longer outstanding.

### (b)   AFI LOC

On December 30, 2009, Debtors RFC and GMACM, as borrowers, Debtors ResCap, PATI and RAHI, and certain other Debtors, as guarantors, and AFI, as agent and lender, entered into a $1.1 billion amended and restated secured loan agreement (as amended from time to time, the "AFI LOC"). The outstanding principal amount under the AFI LOC as of Petition Date was approximately $380 million.[61] The AFI LOC provided funds to the Debtors, generally limited to unused capacity, when the Debtors' unrestricted liquidity was less than $300 million. The AFI LOC is secured by assets of the Debtors, including, without limitation: certain mortgage loans secured by properties located in the United States; certain notes and related agreements issued by third parties that are held by PATI and RFC; certain equity interests of special purpose vehicles (including a pledge by RFC of 100% of the equity of Equity Investment I, LLC, a pledge by PATI of 100% of the equity of PATI Real Estate Holdings, LLC, and a pledge by RAHI of 100% of the equity of RAHI Real Estate Holdings, LLC); certain MSRs; certain Freddie Mac servicing Advances; and, from time to time, certain domestic loans and Advances. The obligations under the AFI LOC and certain derivative agreements with AFI (or its subsidiaries) are cross-collateralized for the benefit of AFI.

On June 13, 2013, the Debtors repaid the AFI LOC in full, plus all accrued and unpaid interest, pursuant to the Paydown Order. As a result, subject to the conditions of the Paydown Order, the AFI LOC is no longer outstanding.

### (c)   Secured Notes

In June 2008, ResCap issued approximately $5.7 billion of new senior and junior secured notes consisting of 8.5% Senior Secured Notes due 2010 (the "Senior Secured Notes") and 9.625% Junior Secured Notes due 2015 (the "Junior Secured Notes," and together with the Senior Secured Notes, the "Secured Notes"), in exchange for approximately $8.6 billion of its then outstanding unsecured notes. The Senior Secured Notes and the Junior Secured Notes held second and third priority liens, respectively, on the same assets that secure the AFI Senior Secured Credit Facility (the first lienholder). On May 15, 2010, the then outstanding Senior Secured Notes were repaid at maturity, and the Junior Secured Notes effectively stepped into the second lien position.

As of the Petition Date, the outstanding principal amount of Junior Secured Notes was approximately $2.1 billion. The Junior Secured Notes are guaranteed by GMACM, RFC, Homecomings, GMAC-RFC Holding Company, LLC, and GMAC Residential Holding Company, LLC. The Junior Secured Notes accrued interest at a non-default rate of 9.625% per

---

[61]   Following the Petition Date, the Debtors were granted authority to make post-petition draws under the AFI LOC in an amount not to exceed $220 million.

annum, payable semi-annually in arrears and were repayable in three equal tranches of $707 million in May of 2013, 2014 and 2015.

On June 13, 2013 and July 29, 2013, the Bankruptcy Court entered orders authorizing the Debtors to partially satisfy the principal balance of the Junior Secured Notes in the amounts of $800 million and $300 million, respectively.  [Docket Nos. 3967, 4404].

### (d)    Loans Against Mortgage Servicing Rights

GMACM was a borrower, and ResCap was a guarantor, under a revolving facility with Citibank N.A. ("Citibank," and such facility, the "Citibank MSR Facility") consisting, until March 30, 2012, of a $300 million committed line of credit with an additional $250 million of uncommitted capacity, secured by MSRs for mortgage loans in Freddie Mac and Fannie Mae securitization pools.  Prior to the Petition Date, the Debtors repaid $124 million of the outstanding principal balance in connection with an extension of the termination date.  The outstanding amount under the Citibank MSR Facility as of the Petition Date was approximately $152 million.

Pursuant to the Sale Orders entered on November 21, 2012, the Debtors used the proceeds of the Asset Sales to pay off the Citibank MSR Facility.  The Debtors believe that, as a result, such facility is no longer outstanding.  However, Citibank contends that the interest rate used by the Debtors to calculate the payoff amount was insufficient because it did not include the default interest rate under the Citibank MSR Facility.  The Debtors and Citibank remain in the process of negotiating a resolution of this issue.  In the event Citibank is entitled to receive interest at the default rate, it would be entitled to an Allowed Other Secured Claim of approximately $4.5 million in addition to the amounts already paid.  Pending resolution by the parties or determination by the Bankruptcy Court, such Claim shall be treated as a Disputed Claim.

### (e)    Funding of Non-Agency Servicing Advances

As noted above, Advances constituted the single largest use of the Debtors' cash.  In order to meet their liquidity needs to fund Advances, in addition to the Debtors' credit facilities, the Debtors maintained a nonrecourse servicing advance facility to fund Advances for specified PLS Trusts secured by the receivables relating to those Advances.  Under the servicing advance facility (the "GSAP Facility"), the Debtors sold the Servicing Advance Receivables through a two-step transaction to a Cayman Islands special purpose entity, GMAC Mortgage Servicer Advance Funding Company Ltd. (the "GSAP Issuer"), which is not a Debtor in these Chapter 11 Cases.  The GSAP Issuer, in turn, issued to investors term notes and/or variable funding notes secured by the Servicing Advance Receivables.  The amount of Servicing Advance Receivables that secured notes issued under the GSAP Facility fluctuated depending on the volume of Advances required to be made by the Debtors under the servicing agreements and the sale of the related Servicing Advance Receivables to the GSAP Issuer.

Pursuant to an order entered on May 15, 2012, the Debtors used the proceeds of the Barclays DIP Facility (as defined below) to refinance the GSAP Facility.  As a result, the GSAP Facility is no longer outstanding.

**(f)      BMMZ Repurchase Facility**

From time to time, the Debtors have entered into secured financing facilities pursuant to which they sell assets under repurchase agreements and agree to repurchase the assets at a later date.  The Debtors entered into a repurchase agreement, dated December 21, 2011, with BMMZ Holdings LLC, an indirect, wholly owned subsidiary of AFI ("BMMZ"), with a facility amount of $250 million (the "BMMZ Repo Facility").  The BMMZ Repo Facility was secured by the assets being sold pursuant to the repurchase agreements.  The total amount outstanding under the BMMZ Repo Facility as of the Petition Date was approximately $250 million.

Pursuant to an order entered on May 15, 2012, the Debtors used the proceeds of the Barclays DIP Facility to refinance the BMMZ Repo Facility.  As a result, such facility is no longer outstanding.

**(g)      Funding of Certain Fannie Mae Servicing Advances**

Pursuant to a Term Sheet, dated August 1, 2010, as amended and restated, Fannie Mae provided GMACM with early partial reimbursement of certain required Fannie Mae servicing Advances (the "FNMA EAF Facility"), which amounts were secured by certain collection accounts.  In turn, Fannie Mae recouped such early reimbursement amounts from future final servicing advance reimbursements to, and other recoveries by, GMACM.  The total commitment under this facility was $125 million, of which $40.3 million was outstanding as of the Petition Date.

Pursuant to the Sale Orders entered on November 21, 2012, the Debtors used the proceeds of the Asset Sales to pay off the FNMA EAF Facility, and as a result, such facility is no longer outstanding.

**(h)      HELOC Facility**

The Debtors established a nonrecourse funding facility to assist in the financing of certain home equity mortgage loans. The Debtors formed a special purpose entity, GMACM Home Equity Notes 2004 Variable Funding Trust (the "GMEN Issuer"), which is not a Debtor in these Chapter 11 Cases.  The GMEN Issuer issued variable funding notes (the "GMEN Notes") collateralized by home equity loans and revolving lines of credit.  Under this facility, the Debtors sold certain home equity mortgage loans in a two-step transaction to the GMEN Issuer, which, in turn, issued the GMEN Notes.  Under the mortgage sale agreement, the GMEN Issuer purchased the initial loan balances on the home equity mortgage loans and any additional balances up to the commencement of the amortization period for such loans.  The maturity date of the GMEN Notes is February 25, 2031.  As of March 31, 2012, the principal amount due to holders of the GMEN Notes was $127.3 million.  No further draws on this facility are permitted.

**(i)      Unsecured Notes**

As of May 14, 2012, ResCap had outstanding senior unsecured notes consisting of $665.5 million of U.S. dollar denominated notes maturing between June 2012 and June 2015, $127.4 million in euro denominated notes maturing in May 2012 and $162.4 million in U.K. sterling

-56-

denominated notes maturing between May 2013 and July 2014, based on exchange rates as of May 11, 2012.

## D.    Events Leading to the Filing of the Chapter 11 Cases

### 1.    Restructuring Initiatives

Starting in 2007, the mortgage and capital markets experienced severe stress due to credit concerns and housing market contractions, which led to record declines in home values and continuing gluts of homes available for sale and in foreclosure.  Homeowners have had difficulty paying their mortgages, refinancing their mortgages (despite record low interest rates), selling their homes or buying new homes.  As both loan delinquencies and regulation increased, the costs of servicing mortgage loans also increased.  Since 2007, the Debtors' management explored various strategic alternatives and took aggressive actions in an attempt to reduce risk, reduce leverage, streamline the Debtors' cost structure and maximize the value of the Debtors' assets.

As part of a global out-of-court restructuring effort, a series of inter-related transactions were consummated by the Debtors in June 2008, including, among other things: (i) exchange offers for the Debtors' publicly traded unsecured notes; (ii) modifications of certain debt facilities, including modified consolidated tangible net worth covenants; and (iii) sales of certain non-core assets to AFI and affiliates of Cerberus Capital Management (the largest equity owner of Ally at that time) on terms favorable to the Debtors to increase the Debtors' liquidity position. Notwithstanding these efforts, the Debtors continued to struggle through the economic downturn.

In total, from January 1, 2008 through March 31, 2012, the Debtors sold approximately $790.5 million of domestic non-core mortgage loan assets to affiliates and third parties, including $3.9 billion of UPB of mortgage loans, and substantially eliminated their international operations.   Over  the  same  period,  the  Debtors'  workforce  decreased  by 63%  from approximately 10,900 to 4,031 employees, and the use of independent contractors substantially declined.  In addition, since January 1, 2007, Ally has made capital contributions of over $8 billion to ResCap in the form of debt forgiveness and infusions of cash and securities.

### 2.    Representation and Warranty Claims

Since 2007, the Debtors have faced substantial and continuing increases in repurchase requests due to their alleged breaches of representations and warranties as to loans sold into securitization or whole loan pools or early payment defaults of such loans.  From January 1, 2008 through March 31, 2012, the Debtors repurchased mortgage loans or otherwise made payments with respect to representation and warranty claims of approximately $2.8 billion.  On March 31, 2012, the Debtors' aggregate reserve in respect of representation and warranty liabilities was $810.8 million.[62]

---

[62]    This estimated loss reserve is primarily based on an internal model that considers current and historic repurchase request volume, rescission rates on claims and severity of loss on repurchase or indemnification,

Certain Debtors are (or were) party to a number of lawsuits commenced prior to the Petition Date. These lawsuits are summarized in Article IV and are stayed against the Debtors as a result of the Chapter 11 Cases.[63]

### 3.    Consent Order and DOJ/AG Settlement

Commencing in the third quarter of 2010, various federal and state governmental entities and regulatory authorities began investigations into the Debtors' mortgage loan servicing and origination operations, including the Debtors' servicing practices for mortgage loans of Borrowers in foreclosure and bankruptcy. Throughout the third and fourth quarters of 2010 and into 2011, the Debtors were served with many formal document requests and subpoenas in connection with these investigations. The Debtors promptly cooperated with the investigating authorities and commenced discussions with them about their concerns.

### (a)    The Federal Reserve Board Consent Order

As a result of an examination conducted by the FRB and the FDIC, on April 13, 2011, Debtors ResCap and GMACM, and non-debtor affiliates AFI and Ally Bank, entered into a Consent Order with the FRB and the FDIC (the "Consent Order"). Pursuant to the Consent Order, certain of the Debtors were responsible for making improvements to various aspects of their Origination and Servicing Business, including, among other things, compliance programs, internal audit, communications with Borrowers, vendor management, employee training, and oversight by the board of directors of ResCap. Additionally, the Consent Order required GMACM to retain and compensate an independent consultant to conduct an extensive review of past foreclosure proceedings and sales pending or completed during 2009 and 2010 with respect to loans serviced by GMACM and its subsidiaries, and to prepare and submit a report regarding the results of that review. As of the Petition Date, the Debtors estimated that the performance of this review could cost as much as $180 million. By September 2012, the estimated cost of the foreclosure review had increased to approximately $250 million and by February of 2013, the estimated cost had skyrocketed to approximately $450 million—in large part due to changing regulatory guidance from the FRB.

As described further in Article III.D.3.(b), *infra*, the Debtors continued to comply with the requirements of the Consent Order through the closing of the Platform Sale. On February 27, 2013, the Debtors filed a motion seeking a determination that GMACM's obligation to conduct the foreclosure review required by the Consent Order is a General Unsecured Claim, and that the automatic stay prevents enforcement of the foreclosure review obligation. [Docket No. 3055]. The Debtors were continuing to comply with their foreclosure review obligations pending resolution of this motion. As a result of the Plan Support Agreement, however, the motion seeking to classify the claims arising from the foreclosure review obligations under the Consent Order as General Unsecured Claims, in addition to objections to the compensation of PricewaterhouseCoopers LLP, or other professionals, for services performed in connection with

---

among other factors. Adjustments to the reserve were also made based on consideration of other qualitative factors including ongoing dialogue and experience with counterparties.

[63]    Other pre-petition lawsuits not discussed herein have been withdrawn.

the foreclosure review under the Consent Order, were stayed during the term of the Plan Support Agreement. Subsequently, the Debtors consensually resolved their foreclosure review obligations with the FRB, as described below.

In June 2013, ResCap, GMAC Mortgage and the FRB agreed in principle to the terms of an amendment to the Consent Order (the "FRB Amendment"). Under the FRB Amendment, GMAC Mortgage paid approximately $230 million, which will then be paid directly to Borrowers (the "FRB Settlement Amount") in satisfaction of certain obligations contained in the Consent Order, including the foreclosure review obligations set forth in paragraphs 3 and 4 of the Consent Order. In order to suspend payments to consultants in connection with the Foreclosure Review while seeking Court approval of the FRB Amendment, ResCap, GMAC Mortgage, and the FRB negotiated a Term Sheet related to the FRB Amendment, which provided for a suspension of the foreclosure review once GMAC Mortgage transferred the Settlement Amount into an escrow account. On June 26, 2013, the Bankruptcy Court entered an order authorizing ResCap and GMAC Mortgage to enter into the Term Sheet and authorizing GMAC Mortgage to transfer the Settlement Amount into an escrow account. As of June 28, 2013, the Foreclosure Review was suspended. On July 12, 2013, the Debtors filed a motion seeking approval from the Bankruptcy Court to enter into and perform under the FRB Amendment. On July 26, 2013, the Bankruptcy Court granted the Debtors' motion [Docket No. 4365] and the FRB Settlement Amount was released into a qualified settlement fund in accordance with the terms of the FRB Amendment. The Bankruptcy Court also denied the Debtors' motion to classify the foreclosure review obligation, reasoning that the relief requested in the motion was rendered moot by the amendment to the Consent Order. [Docket No. 4727]. The Plan contemplates that any continuing regulatory obligations under the Consent Order, including continuing Ally regulatory obligations, will be transferred to the Liquidating Trust on the Effective Date.

**(b)    The DOJ/AG Settlement**

In addition, in March 2011, representatives of the Debtors met in Washington, D.C. with various members of the Department of Treasury, the Department of Housing and Urban Development ("HUD"), the Department of Justice ("DOJ") and the offices of numerous State attorneys general to discuss the investigations and the potential resolution of various claims being made against the Debtors by such entities. Extensive arms' length negotiations among the parties—including four other large servicers—continued throughout 2011 and into 2012.

On February 9, 2012, the DOJ, HUD, and several State attorneys' general announced that the federal government, 49 State attorneys' general, and 48 state banking departments had successfully negotiated a settlement with the five largest servicers, including ResCap and GMACM, and other parties, including Ally, regarding their mortgage loan servicing and origination operations (the "DOJ/AG Settlement"). On March 12, 2012, definitive DOJ/AG Settlement documents were filed by the parties with the United States District Court for the District of Columbia in the case styled *U.S., et al., v. Bank of America Corp., et al.,* Case No. 1:12-cv-00361-RMC. On April 4, 2012, after a duly noticed hearing, the District Court for the District of Columbia approved the settlement and signed the Consent Judgment negotiated among the parties approving the DOJ/AG Settlement.

-59-

The material terms of the DOJ/AG Settlement included the following:

- The implementation of comprehensive new standards regarding the servicing of residential mortgage loans, the handling of foreclosures and the verification of information provided about mortgage loans in federal bankruptcy court proceedings.

- The payment by the Debtors of $109,628,425 into escrow in settlement of civil claims of various federal and state governmental entities against the Debtors with respect to their mortgage origination and servicing operations, the proceeds of which were to be used, in part, for disbursement to eligible Borrowers who allege harm from the Debtors' alleged deficiencies in its mortgage servicing operations. The funds required by this portion of the settlement were deposited into an escrow account prior to the Petition Date.

- The commitment by the Debtors to provide a minimum of $185 million of financial relief within three years—including, among other things, loan modifications, such as principal reductions, rate modifications and refinancing for Borrowers that meet certain requirements—to eligible Borrowers who were either delinquent or at imminent risk of default and owed more on their mortgages than their homes were worth, or were otherwise qualified to obtain relief under the terms of the DOJ/AG Settlement.

- The Debtors' commitment to provide an additional minimum of $15 million of additional refinancing relief within three years to eligible Borrowers who were current on their mortgages but who owed more on their mortgage than their homes were worth. Once the Debtors reached the threshold of their $200 million in financial relief—comprised of the minimum of $185 million of financial relief stated above and the minimum of $15 million of additional relief stated herein—the Debtors were required to continue to solicit and give any responsive, eligible Borrower a loan or rate modification, which may include a principal reduction or other refinancing obligation.

- The commitment by the Debtors to undertake a review of their compliance with the Servicemembers Civil Relief Act ("SCRA"), which provides certain protections for active duty service members with respect to foreclosure actions and modifications to mortgage loan interest rates. This review is currently ongoing and, to the extent it is not completed by the Effective Date, the Liquidating Trust shall be responsible for assuring compliance with any then-existing obligations arising from that review.

- Joseph A. Smith Jr. (the "Monitor"), was designated to oversee compliance with the DOJ/AG Settlement as an independent monitor, including: (i) the implementation of the servicing standards required by the agreement; (ii) the imposition of penalties of up to $1 million per violation (or up to $5 million for certain repeat violations); (iii) the imposition of penalties of $15 million, and

-60-

possibly up to $25 million in certain instances, in the event the Debtors do not substantially comply with their Consumer Relief solicitation obligations and fail to cure any failure to comply; and (iv) publication of regular public reports that identify any quarter in which a servicer fell short of the standards imposed in the DOJ/AG Settlement.

- The release of certain claims against the Debtors held by the settling governmental authorities and regulatory agencies, which released claims do not include, inter alia, securities claims, certain claims raised in specifically referenced lawsuits, criminal enforcements, and claims by county recorders.

Under the DOJ/AG Settlement, all consumer relief obligations must be met by October 4, 2015 and are enforceable through April 4, 2016. The Monitor will review any required final reports by April 4, 2016, the date on which the Debtors are officially released from their obligations under the Consent Judgment; to the extent there remain outstanding violations of the Consent Judgment on this date (or any such violations are discovered during the Monitor's review of the final reports), the District Court for the District of Columbia retains jurisdiction to remedy those outstanding violations.

On February 14, 2013, the Monitor filed an Interim Consumer Relief Report and Certification with the U.S. District Court for the District of Columbia in respect of the DOJ/AG Settlement, certifying that ResCap has provided more than $257 million in consumer relief. Based on that certification, the Debtors have exceeded the minimum amount of consumer relief required by the DOJ/AG Settlement and are not required to provide more consumer relief except (i) in respect of any relief that may be provided in any remaining outstanding Borrower solicitations, or (ii) in respect of any remaining SCRA file review and remediation costs. ResCap believes it has completed the solicitation process during the second quarter of 2013, and expects that the Monitor will be in position to certify that compliance on or around October 31, 2013.

Ocwen and Walter agreed to comply with the DOJ/AG Settlement with respect to the purchased assets and to cooperate with and assist the Debtors with respect to these matters. The Plan contemplates that any continuing regulatory obligations of the Debtors under the DOJ/AG Settlement will be transferred to the Liquidating Trust after confirmation of the Plan. The Liquidating Trust will facilitate the potential resolution of any remaining regulatory obligations owed by the Debtors under the DOJ/AG Settlement—namely, the payment of Monitor-related expenses (estimated by the Debtors at approximately $30 million), the obligation to reimburse Ocwen and Walter for the costs of monitoring the Debtors' compliance and testing obligations under the DOJ/AG Settlement, and any then-existing SCRA file review and remediation costs (which the Debtors believe will have been satisfied by October 31, 2013).

### (c)    Order of Assessment of Civil Money Penalty

On February 9, 2012, AFI, ResCap, and GMACM also agreed with the FRB to pay a civil money penalty of $207 million related to the same activities that were the subject of the DOJ/AG Settlement, which amount will be reduced dollar-for-dollar in connection with satisfaction of the required monetary payment and Borrower relief obligations included within the DOJ/AG

Settlement, as well as through participation in other similar programs approved by the FRB.  To date, the Debtors believe there have been sufficient payments made and Borrower relief requirements completed to satisfy the civil money penalty, but a final determination must be made by the Monitor that ResCap has fully complied with its consumer solicitation obligations, as referenced above.  The Debtors expect to be in position to complete solicitation compliance testing and receive the Monitor's certification on or around October 31, 2013.

### 4.    Pre-petition Negotiations with Ally

Prior to the Petition Date, on or about September 2011, the Debtors and their advisors began a comprehensive review of the Potential Claims that could be made by the Debtors against Ally in the context of a bankruptcy proceeding, as well as the potential third party claims that could be brought against Ally, including claims that are derivative of the Debtors' conduct (collectively, the "Potential Claims").  As part of this review, the Debtors' legal counsel, Morrison & Foerster LLP ("Morrison & Foerster"), conducted an in-depth review of every material related-party transaction between any of the Debtors on one hand and Ally on the other, as well as an investigation of the financial and operational course of dealing between the Debtors and Ally dating back to 2005.  The Morrison & Foerster investigation focused on evaluating the nature of the relationship between ResCap and Ally and any and all claims that could be raised against Ally by ResCap and its creditors/third parties.  Morrison & Foerster also retained FTI Consulting, Inc. ("FTI") to conduct an evaluation of the Debtors' capitalization, solvency, enterprise value, and damages scenarios.  As part of this process, the Independent Directors directed their counsel, Morrison Cohen LLP ("Morrison Cohen"), to interface on a regular basis with Morrison & Foerster and FTI in order to be in a position to report to the Independent Directors on the progress of the investigation and to independently review both the process and the results of the investigation. Morrison Cohen was provided with investigatory material and research by both Morrison & Foerster and FTI and actively participated in the analytical process including conducting its own research and analysis. Morrison Cohen provided frequent updates to the Independent Directors. The investigation was not conducted as part of a formal legal process, and as a result, the Debtors did not obtain discovery from Ally.

During this process, Morrison & Foerster focused on issues relating to the following groups of claims, as outlined below:

- Single entity claims, including claims related to whether the Debtors and Ally functioned (or were perceived to function) as a single entity, either through a substantive consolidation analysis or veil-piercing/alter-ego theory;

- Bankruptcy claims, including Potential Claims related to equitable subordination, recharacterization of debt as equity, and actual or constructive fraudulent conveyance; and

- Contribution/indemnity/subrogation claims, including claims arising as a result of the Debtors' alleged liability to third parties.

The Debtors expended significant resources in connection with analyzing the Potential Claims. The Debtors and the Independent Directors retained competent and experienced outside counsel and outside consultants to conduct a thorough examination of the legal and factual bases for these claims. Notwithstanding, the investigation was not conducted as part of a formal legal process, and as a result, the Debtors did not obtain discovery from Ally.[64] The investigation of Potential Claims formed the basis of the pre-petition AFI-ResCap settlement agreement between the Debtors and Ally (the "Pre-Petition AFI-ResCap Settlement Agreement"), which enabled the successful Asset Sales and the Debtors' soft landing in Chapter 11.

### 5.    Entry into the Original RMBS Settlement Agreements

After engaging in extensive pre-petition negotiations with two sets of Consenting Institutional Investors (as defined below)—one led by Kathy Patrick of Gibbs & Bruns LLP and the other led by Talcott Franklin of Talcott Franklin, P.C. (collectively, the "Institutional Investors")—the Debtors entered into the Original RMBS Settlement Agreements, two substantially similar agreements with the Institutional Investors.[65] Generally, the Original RMBS Settlement Agreements sought to resolve potential liability arising from contractual claims relating to 392 trusts (each an "Originally Settling Trust" and collectively the "Originally Settling Trusts") associated with Debtor-sponsored mortgage-backed securitization transactions occurring from 2004 to 2007. Mortgage-backed securities with a total original issue balance ("OIB") of approximately $221 billion were issued in connection with these transactions.

### (d)    The Reasons for the Original RMBS Settlement Agreements

Prior to the Petition Date, amidst significant regulatory and financial pressures, the Debtors were faced with possible liquidation due to, among other things, uncertainty regarding their ability to assume and assign the valuable portions of numerous pooling and servicing agreements, mortgage loan purchase agreements, indentures, servicing agreements and/or Trust agreements (collectively, the "PSAs") governing the securitizations at issue, while rejecting other provisions in their PSAs related to origination and sale of the mortgage loans into the Originally Settling Trusts—e.g., provisions associated with the bulk of the Debtors' legacy liability regarding representations and warranties made in connection with such sales.

In the absence of this bifurcation, it was conceivable that the Debtors would have been required to pay billions of dollars of additional defaults under origination-related provisions in the PSAs prior to assuming and assigning these agreements to a purchaser. Accordingly, the Debtors intended that the Original RMBS Settlement would facilitate the continued operation of their businesses during the Chapter 11 Cases.

---

[64]    Ally asserted, and continues to assert, that the Potential Claims are meritless, but Ally sought an expedited resolution of such claims to support Ally refocusing on non-Debtor related businesses.

[65]    Copies of the Original RMBS Settlement Agreements are annexed as Exhibits A and B to *Declaration of LaShann M. DeArcy in Further Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Settlement Agreements* (Docket No. 3222).

-63-

In addition to deferring the issue of the permissibility of bifurcating the PSAs, the Original RMBS Settlement Agreements facilitated the Debtors' ability to limit the amount of cure claims that could be asserted by the RMBS Trustees on behalf of the Trusts.  This limitation included a cap on (i) cure claims on a trust-by-trust basis, and (ii) the overall cure claims that could be asserted in connection with the origination-related provisions in the PSAs. Accordingly, the Debtors entered into the Original RMBS Settlement Agreements to avoid potential long-term litigation, which could have resulted in massive expense to the Estates and delay in the filing and confirmation of a Chapter 11 plan.  The Original RMBS Settlement Agreements endeavored to resolve claims and benefit creditors by allowing an ailing enterprise to seamlessly continue operating its massive Origination and Servicing Business in Chapter 11, thus permitting the sale of a going concern not encumbered by billions of dollars of claims.  Moreover, these agreements indirectly helped save approximately 3,000 jobs by avoiding a sale of financial assets alone — the fate suffered by virtually every prior mortgage servicer debtor in the U.S.

### (e)    The Terms of the Original RMBS Settlement Agreements

In exchange for an Allowed Unsecured Claim, as described below, the Original RMBS Settlement Agreements were intended to resolve potential claims against RFC and GMACM for breaches of representations and warranties (the "R&W Claims").  The Original RMBS Settlement Agreements included a release by the Originally Settling Trusts, the Institutional Investors, and persons claiming derivatively through the Originally Settling Trusts of all other non-securities claims, including claims arising under the PSAs, as described therein, in exchange for an Allowed Unsecured Claim.

As proposed, the RMBS Trustees, on behalf of the Originally Settling Trusts would have had 30 days after entry of an order approving the Original RMBS Settlement Agreements by the Bankruptcy Court in which to elect to participate in the settlement.  Those Originally Settling Trusts that opted into the settlement would have received an allocable share of an Allowed Unsecured Claim in the maximum amount of $8.7 billion against debtors RFC and GMACM (the "Original RMBS Allowed Claim"), subject to adjustment based on the number of trusts that opted in to the Original RMBS Settlement Agreements.  In exchange for their allocable portion of the Original RMBS Allowed Claim, the Originally Settling Trusts would have released all R&W Claims against RFC and GMACM.  The Institutional Investors also agreed to direct the respective RMBS Trustees for the Originally Settling Trusts in which they hold sufficient securities to accept the terms set forth in the Original RMBS Settlement Agreements.  The final amount of the Original RMBS Allowed Claim as against the Debtors (excluding ResCap) was to be reduced from $8.7 billion proportionally by the percentage, based on OIB, of the non-accepting trusts.

Under the Original RMBS Settlement Agreements, the Institutional Investors also agreed to provide various types of support to the Debtors.  In particular, the Institutional Investors agreed to support the Debtors' first and second day relief, use commercially reasonable efforts to persuade other investors to join in the Original RMBS Settlement Agreements, and support the Debtors' efforts to propose and confirm a Chapter 11 plan consistent with a pre-petition plan term sheet and the terms of the Pre-Petition AFI-ResCap Settlement Agreement.  Moreover, each group of Institutional Investors agreed to maintain their 25% holdings in at least one class of

securities related to approximately 80% of the Trusts in which the respective group originally held at least 25% of the securities in a class, subject to minor exceptions. This provided assurance that the Institutional Investors would continue to have the authority to influence a large portion of the Trustees and comply with their other support obligations under the Original RMBS Settlement Agreements. Finally, Ally agreed, under the terms of the Original RMBS Settlement Agreements, not to object to Original RMBS Allowed Claim or to the allocation of such proceeds among the Trusts.

The motion to approve the Original RMBS Settlement Agreements was originally scheduled for hearing in November 2012, but was delayed on several occasions, and was most recently scheduled to begin on May 28, 2013. As described in further detail in Article IV, the parties determined that it was in their collective best interests to avoid protracted and costly litigation with respect to the Original RMBS Settlement Agreements, and instead to resolve the RMBS Trusts' claims in the context of the Plan Support Agreement. Following extensive discussion in connection with the overall Global Settlement, the parties determined that the Plan would incorporate a modification of the Original RMBS Settlement Agreements with, among other things, certain important modifications to cover all RMBS Trusts holding RMBS Trust Claims.

### 6.    Formation of Ad Hoc Group of Junior Secured Noteholders and the Pre-Petition JSN Plan Support Agreement

In November 2011, approximately 37% of the Junior Secured Noteholders formed a group (the "Ad Hoc Group")[66] and acted collectively by and through their representatives, White & Case LLP and Milbank, Tweed, Hadley & McCloy LLP as co-counsel and Houlihan Lokey Capital Inc. as financial advisors. In April 2012, the Debtors and their advisors entered into extensive discussions with the Ad Hoc Group and its advisors regarding the potential Chapter 11 filing, the potential debtor-in-possession financing facilities, and the potential Asset Sales. The Ad Hoc Group participated in each of these processes, as well as in the negotiations leading up to the development of the Pre-Petition AFI-ResCap Settlement Agreement. Ultimately, the Debtors obtained the Ad Hoc Group's support pre-petition for a restructuring plan premised upon the Asset Sales, which was reflected in a separate plan support agreement (the "JSN Plan Support Agreement").

Pursuant to the plan contemplated by the JSN Plan Support Agreement, the Junior Secured Noteholders and AFI would share in the proceeds of the collateral securing the Revolving Credit Facility and the Junior Secured Notes as follows:  First, AFI would receive the first $400 million of collateral proceeds, plus any accrued post-petition interest on the $400 million. Second, the Junior Secured Noteholders would receive the next $1 billion of collateral proceeds. Third, with respect to the remaining collateral proceeds, AFI would receive 19% of such proceeds and the Junior Secured Noteholders would receive 81% of such proceeds until the

---

[66]    Based on the Ad Hoc Group's recent Rule 2019 Statement, the Ad Hoc Group currently holds approximately 50% of the Junior Secured Notes. See Supplement to Amended Verified Statement of White & Case LLP and Milbank, Tweed, Hadley & McCloy LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019 [Docket No. 3770].

Junior Secured Notes were paid in full. AFI would receive any excess proceeds in satisfaction of any remaining post-petition interest under the Revolving Credit Facility. In the event the collateral proceeds were insufficient to repay the Revolving Credit Facility and the Junior Secured Notes in full, until the Junior Secured Noteholders were paid in full AFI would receive 19% of any distributions on account of the deficiency claims under the Revolving Credit Facility and the Junior Secured Notes, and the Junior Secured Noteholders would receive 81% of such distributions. Any remaining distributions would go to AFI in satisfaction of any remaining post-petition interest under the Revolving Credit Facility.

Significantly, the Ad Hoc Group agreed to waive any and all rights to any post-petition interest under the Junior Secured Noteholders through December 31, 2012, so long as (i) no unsecured creditor received post-petition interest, (ii) the JSN Plan Support Agreement did not terminate, and (iii) (x) the effective date of the contemplated by the JSN Plan Support Agreement occurred by December 31, 2012 or (y) the closing of the Asset Sales occurred by December 31, 2013 and the effective date of the contemplated plan occurred by March 31, 2013.

Following the Petition Date, the JSN Plan Support Agreement was terminated on September 26, 2012.

### 7.    Other Factors

Other factors leading up to the filing of these Chapter 11 Cases include the magnitude of the Debtors' potential liability for representation and warranty claims in connection with mortgage loans sold by the Debtors (as detailed in Article III), and the significant time and defense costs in respect of defending such claims; the Debtors' overwhelming debt burden, including the principal and final maturity payments on the Junior Secured Notes, the near-term principal payments on the Senior Unsecured Notes, and the near-term maturities of the Debtors' credit facilities; and the continuing volatility in the interest rate markets, which affected the Debtors' ability to hedge the value of their MSRs and to comply with financial covenants imposed in their credit facilities and other agreements.

In addition, while the Debtors were heavily dependent on AFI for funding and capital support, AFI indicated that there could be no assurance that AFI or its affiliates would continue any such support or that AFI would choose to execute any further strategic transactions with respect to the Debtors or that any transactions undertaken would be successful. In particular, AFI was not willing to extend the termination dates for the various credit facilities with the Debtors beyond May 14, 2012. For all of the foregoing reasons, the Debtors did not expect to be able to satisfy their obligations as they became due.

### ARTICLE IV.
### THE CHAPTER 11 CASES

On May 14, 2012, the Debtors commenced their Chapter 11 Cases to preserve their assets and maximize value for the benefit of all of their economic stakeholders. Exhibit 2 annexed hereto contains a list of the Debtor entities. The Debtors' Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b). The Debtors are authorized to operate their businesses and manage

-66-

their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

## A.    Commencement of the Chapter 11 Cases

### 1.    First and Second Day Motions

On or shortly after the Petition Date, the Debtors filed certain "first day" and "second day" pleadings with the Bankruptcy Court to facilitate the Debtors' seamless transition into Chapter 11, minimize disruption to the Debtors' operations, and aid in the preservation of the Debtors' going-concern value.  On the Petition Date, the Bankruptcy Court considered and approved the Debtors' motions to: (i) continue using their cash management system; (ii) gain interim access to senior secured superpriority debtor-in-possession financing (discussed below); and (iii) use certain of their pre-petition lenders' cash collateral (discussed below).

The remaining first day "operational" motions were heard shortly after the Petition Date, and the Bankruptcy Court entered orders that, collectively, authorized the Debtors to: (i)(a) continue their operations with respect to the servicing and origination business in the ordinary course; (b) pay pre-petition amounts due to third party vendors and foreclosure professionals, and (c) grant limited stay relief to enable Borrowers to assert related counterclaims in foreclosure proceedings (discussed in greater detail below, the "Servicing Relief"); (ii) notify Borrowers that the Debtors would no longer fund draws under home equity lines of credit; (iii) honor pre-petition obligations to customers; (iv) continue the Debtors' shared services arrangements with non-debtor affiliates, including AFI and Ally Bank; (v) maintain their cash management practices and use pre-petition bank accounts, checks, and other business forms; (vi) make tax payments to federal, local and state taxing authorities; (vii) prohibit utility companies from discontinuing services; and (viii) pay certain pre-petition employee wages and benefits and continue related programs.

In addition to these "operational" orders, the Bankruptcy Court entered several procedural and administrative orders to facilitate the efficient administration of these Chapter 11 Cases.  These orders: (i) authorized the joint administration of the Chapter 11 Cases; (ii) extended the time during which the Debtors could file certain schedules of assets and liabilities and statements of financial affairs; (iii) authorized the Debtors to file a consolidated list of the Debtors' 50 largest creditors; and (iv) established certain notice, case management, and administrative procedures that govern the Chapter 11 Cases.

### 2.    Servicing Relief

The orders granting Servicing Relief enabled the Debtors to continue operating their mortgage loan servicing and origination business in the ordinary course, which was essential to the Debtors' efforts to consummate the Asset Sales and necessary for the Debtors to continue their pre-petition operations unabated.

Ordinary Course Servicing Activities.  On June 15, 2012, the Bankruptcy Court entered orders authorizing the Debtors to continue in the ordinary course of business (i) servicing governmental association loans (the "GA Loans"), (ii) participating in foreclosure activities

-67-

involving GA Loans and maintaining property that is "real estate owned" by Fannie Mae, Freddie Mac, and Ginnie Mae (together, the "Governmental Associations"), (iii) servicing non-governmental association loans (the "Non-GA Loans"), (iv) participating in foreclosure activities involving Non-GA Loans and maintaining property that is "real estate owned" by the Debtors, and (v) with respect to each of these activities, making certain payments related to pre-petition obligations [Docket Nos. 401, 402].  The GA Loans consist of domestic mortgage loans that are pooled together into securitization trusts guaranteed or insured by the Governmental Associations.  The Non-GA Loans are comprised of domestic mortgage loans originated or acquired by the Debtors and sold to private investors and securitization trusts for so-called "private label" securitization pools.

Ordinary Course Origination Activities.  On July 25, 2012, the Bankruptcy Court entered a final order authorizing the Debtors to continue their mortgage loan retail, brokerage and origination activities, and their purchase and resale of Ginnie Mae loans pursuant to various agreements [Docket No. 898].  Pursuant to this order, the Debtors were authorized to (i) process and where applicable fund pre-petition mortgage loan commitments; (ii) continue origination activities (including direct origination and brokering of completed loan applications) and sale activities related to the ultimate securitization of mortgage loans; (iii) continue to (a) perform under the Purchase and Sale Agreement with Ally Bank and the related Master Forward Agreement with Ally Investment Management LLC ("AIM"), and incur secured indebtedness under those agreements, and (b) perform under the Pledge and Security Agreement with Ally Bank, AFI, GMAC Mortgage Group, LLC and AIM, and grant such parties superpriority administrative claims in relation to the foregoing; (iv) pay certain amounts due to critical vendors providing origination services that accrued prior to the Petition Date; and (v) continue honoring certain mortgage loan repurchase and other related obligations arising in connection with the sale and servicing of loans, each in the ordinary course of business.

Supplemental Servicing Relief.   On July 13, 2013 the Bankruptcy Court entered a supplemental order (i) authorizing the Debtors to continue implementing loss mitigation programs, (ii) approving procedures for the compromise and settlement of certain claims, litigations and causes of action in the ordinary course of the Debtors' business, (iii) granting limited stay relief to permit (a) Borrowers or their tenants, as applicable, to prosecute direct claims and counter-claims in foreclosure and eviction proceedings (including in states in which non-judicial foreclosure is followed), (b) Borrowers to prosecute certain actions in Borrower bankruptcy cases, and (c) the Debtors to prosecute foreclosure actions in those circumstances where they service senior mortgage loans and own the junior loans on the underlying property, and (iv) authorizing and directing the Debtors to pay certain securitization trustee fees and expenses.  [Docket No. 774] (the "Supplemental Servicing Order").

Shared Services.  In light of the integrated nature of the Debtors' and AFI's businesses, on May 15, 2012, the Bankruptcy Court entered a final order authorizing the Debtors to enter into a shared services agreement with AFI to prevent any disruption in the Debtors' day-to-day operations [Docket No. 387].  The agreement permitted the Debtors and AFI to provide and receive from one another during the Debtors' Chapter 11 Cases certain services including, among other things: (i) information technology services; (ii) employee benefits administration and other human resources functions; (iii) accounting, tax and internal audit services;

-68-

(iv) treasury and collateral management; (v) risk management functions; (vi) supply chain management, including procurement of goods and services from third parties; (vii) government and regulatory relations and compliance services; (viii) facilities management services; (ix) marketing services; and (x) capital markets services relating to managing the value of certain of the Debtors' loan servicing rights.

### 3.      Retention of Restructuring and Other Professionals

#### (f)      The Debtors' Professionals

To assist the Debtors in carrying out their duties as debtors-in-possession and to represent their interests in the Chapter 11 Cases, the Debtors obtained Bankruptcy Court approval to retain (i) Morrison & Foerster as their lead restructuring attorneys, (ii) FTI, as financial advisors, (iii) Centerview Partners LLC ("Centerview") as investment bankers, (iv) Bradley Arant Boult Cummings LLP as special litigation and compliance counsel, and (v) Kurtzman Carson Consultants, LLC as the Debtors' claims and noticing agent and the Debtors' balloting and solicitation agent.  In addition to these key professionals, the Debtors have retained Curtis, Mallet-Prevost, Colt & Mosle LLP as conflicts counsel, as well as special counsel, communication consultants, auditors, tax service providers, compensation consultants, and other professionals to assist them in managing the Chapter 11 Cases.  The Debtors are required to pay the fees of their own advisors, as well as fees incurred by the respective advisors for certain of the Debtors' other constituencies related to the Chapter 11 Cases.  In addition, the Bankruptcy Court granted the Debtors the authority to utilize the services of various additional attorneys as "ordinary course professionals" to assist the Debtors in managing the Debtors' pre-existing litigation filed nation-wide (as described herein at Article IV.).

#### (g)      The Creditors' Committee's Professionals

To assist the Creditors' Committee in carrying out its duties and to represent the interests of unsecured creditors in the Chapter 11 Cases, the Creditors' Committee obtained Bankruptcy Court approval to retain Kramer Levin Naftalis & Frankel LLP as counsel ("Committee Counsel"), Pachulski Stang Ziehl & Jones LLP as co-counsel ("Committee Co-Counsel"), SilvermanAcampora LLP as special counsel for Borrower-related matters ("Committee Borrower Counsel"), and Wilmer Cutler Pickering Hale and Dorr LLP as special counsel for regulatory matters ("Committee Regulatory Counsel").  In addition, the Creditors' Committee received Bankruptcy Court approval to retain AlixPartners, LLP as financial advisor and Moelis & Company LLC ("Moelis") as investment banker.

### 4.      Post-petition Financing and Use of Cash Collateral

In January 2012, the Debtors, with the assistance of Centerview and FTI, their financial advisors, commenced a marketing process to obtain debtor-in-possession financing for these Chapter 11 Cases.  As part of that process, the Debtors approached several potential lenders, including AFI, Barclays Bank PLC ("Barclays"), other pre-petition providers of debt capital to the Debtors and certain third party lenders with experience in financing mortgage loan servicing and origination businesses and providing debtor-in-possession financings of the magnitude required in these Chapter 11 Cases.

-69-

After engaging in extensive discussions and negotiations with the potential lenders, the Debtors ultimately determined to enter into a post-petition debtor-in-possession financing arrangement (the "Barclays DIP Facility") with Barclays, as administrative agent for a syndicate of financial institutions (together with Barclays, the "DIP Lenders"). As the Petition Date approached, the Debtors determined that the Barclays DIP Facility would be insufficient to cover the Debtors' second largest expense—repurchases (the "Ginnie Buybacks") of certain whole loans that were sold into securitization trusts guaranteed by Ginnie Mae (the "Ginnie Mae Trusts"). These repurchases were funded prior to the Petition Date by draws under the AFI LOC. Beginning in April 2012, the Debtors engaged in discussions with AFI regarding funding the Ginnie Buybacks prior to and during these Chapter 11 Cases. Such discussions eventually morphed into negotiations regarding the terms and structure of an additional post-petition financing facility from AFI in the form of post-petition draws under the AFI LOC (the "AFI DIP Facility"). Ultimately, AFI agreed to allow the Debtors to draw on the AFI LOC post-petition in an amount up to $220 million to fund the Ginnie Buybacks.

Accordingly, on the Petition Date, the Debtors filed three motions (the "DIP and Cash Collateral Motions") seeking authority to (i) enter into the Barclays DIP Facility with Barclays as administrative agent for the DIP Lenders, (ii) use the cash collateral of Citibank under the Citibank MSR Facility, and (iii) continue making post-petition draws under the AFI LOC in an amount up to $220 million (the "AFI DIP Loans") and to use the cash collateral under the AFI LOC, the Revolving Credit Facility, and the Junior Secured Notes (the "AFI DIP and Cash Collateral Motion"). The relief sought in the DIP and Cash Collateral Motions advanced the Debtors' efforts in obtaining post-petition liquidity, which was essential for the Debtors in order for them to continue operating their business in the ordinary course during the Chapter 11 Cases. The Bankruptcy Court approved the DIP and Cash Collateral Motions on an interim basis on May 15, 2012, and on a final basis on June 25, 2012.

Barclays DIP Facility. The Barclays DIP Facility, approved by the Bankruptcy Court on June 25, 2012 [Docket No. 491], consisted of revolving and term loans with a total commitment of $1.45 billion. Of this amount, the DIP Lenders provided (i) revolving loans in an aggregate principal amount up to $190 million, and (ii) two term loans in (a) an aggregate principal amount up to $1.06 billion, and (b) an aggregate principal amount up to $200 million (collectively, the "Barclays Loans"). The Debtors used the proceeds of the Barclays Loans to (i) refinance the GSAP Facility and the BMMZ Repo Facility through the purchase of certain mortgage loans and Servicing Advance Receivables, which brought substantial assets into the Debtors' Estates that otherwise may not have been available to the Debtors, (ii) fund general corporate and working capital requirements, including the acquisition of additional Servicing Advance Receivables, (iii) pay interest, fees and expenses payable under the Barclays DIP Facility, and (iv) pay certain costs of administration of the Chapter 11 Cases in accordance with the DIP budget. The Debtors granted the DIP Lenders senior security interests on the collateral that previously secured the GSAP Facility and the BMMZ Repo Facility, and junior security interests on the collateral that secured the AFI LOC and the Citibank MSR Facility. The Debtors also granted the DIP Lenders superpriority administrative expense claims, subject to a carveout. The DIP Lenders did not take any liens on the primary unencumbered assets of the Debtors or liens on causes of action under Chapter 5 of the Bankruptcy Code (or the proceeds of such causes of action). The Barclays DIP Facility was paid off in full upon the closing of the Asset Sales.

-70-

AFI DIP Facility. Pursuant to the order granting the AFI DIP and Cash Collateral Motion [Docket No. 491] (the "AFI/JSN Cash Collateral Order"), the Debtors were authorized to enter into a post-petition financing facility pursuant to which the Debtors were permitted to make post-petition draws under the AFI LOC in an amount up to $220 million, provided that the aggregate amount of AFI LOC pre-petition and post-petition draws (plus any unpaid interest, expenses, or other costs thereunder) did not exceed $600 million. The post-petition extensions of credit under the AFI LOC were to be used solely to fund repurchases of Ginnie Buybacks to the extent necessary to (i) continue making repurchases of whole loans from Ginnie Mae Trusts in order to prevent the Debtors from being in violation of delinquency triggers applicable under the Ginnie Mae Guide, (ii) effect foreclosures, conveyances, or other normal course loss mitigation activities of the related properties in connection with the submission of HUD claims, and (iii) allow for trial modifications under programs implemented by the Debtors for which the related loans and Borrowers were qualified. In exchange for the post-petition draws under the AFI LOC, the Debtors granted AFI, in its capacity as lender under the AFI DIP Facility, (i) a senior security interest on the repurchased whole loans and HUD claims funded with the AFI DIP Loans, (ii) a priming lien on all other assets securing the AFI LOC, and (iii) superpriority administrative expense claims in an amount equal to the principal and interest on the post-petition draws. The AFI DIP Facility was paid off in full upon the closing of the Asset Sales.

Use of Cash Collateral. Pursuant to orders entered by the Bankruptcy Court [Docket Nos. 471, 491] (as it relates to Citibank, the "Citibank Cash Collateral Order"), the Debtors used the cash collateral under the Citibank MSR Facility, the AFI LOC, the Revolving Credit Facility, and the Junior Secured Notes to fund only the cash needs related to the operations (including an allocated portion of the costs to administer the Chapter 11 Cases based on the asset values within each collateral pool) and assets of each of the respective collateral pools based on an agreed-upon budget. Each of AFI, the Junior Secured Noteholders, and Citibank consented to the Debtors' use of Cash Collateral and were provided with adequate protection for the use thereof.

Following the closing of the Asset Sales, the Debtors believe that the Citibank MSR Facility was paid off in full. However, Citibank contends that the interest rate used by the Debtors to calculate the payoff amount was insufficient because it did not include the default interest rate under the Citibank MSR Facility. The Debtors and Citibank remain in the process of negotiating a resolution of this issue. In the event Citibank is entitled to receive interest at the default rate, it would be entitled to an Allowed Other Secured Claim of approximately $4.5 million in addition to the amounts already paid. Pending resolution by the parties or determination by the Bankruptcy Court, such Claim shall be treated as a Disputed Claim.

Each of the AFI/JSN Cash Collateral Order and the Citibank Cash Collateral Order authorized the Debtors to use Cash Collateral through the effective date of a Chapter 11 plan for any Debtor.[67] Pursuant to the AFI/JSN Cash Collateral Order, the Debtors' ability to use Cash

---

[67]    The AFI/JSN Cash Collateral Order contained a covenant requiring that the effective date of the Debtors' Chapter 11 plan occur by December 15, 2012. Accordingly, on December 20, 2012, the Bankruptcy Court entered the Stipulation and Order Amending the AFI DIP and Cash Collateral Order [Docket No. 2495] (the "First AFI/JSB Cash Collateral Stipulation"), which removed the covenant and also revised the termination date to be the earlier of, among other things, the effective date of the closing of the Platform Sale or March 31, 2013.

Collateral was limited to the terms of a 20-week forecast for anticipated cash receipts and disbursements that was to be updated on a monthly basis (collectively, the "Forecasts"). The Forecasts also provided for the pro rata allocation of the cash disbursements during the relevant period to the assets securing the Debtors' various secured credit facilities as well as unencumbered assets. Pursuant to the AFI/JSN Cash Collateral Order, the Debtors, AFI, and the Ad Hoc Group agreed that the Forecasts would be approved by AFI.

The Debtors subsequently negotiated several extensions regarding the use of the Cash Collateral of AFI and the Junior Secured Noteholders, including the *Eighth Stipulation and Order Amending the AFI DIP and Cash Collateral Order* [Docket No. 4115]. On April 8, 2013, the Debtors filed a motion to continue using the Cash Collateral of AFI and the Junior Secured Noteholders on a non-consensual basis (the "Cash Collateral Motion"). AFI, the Ad Hoc Group of Junior Secured Noteholders, and UMB Bank filed objections to the Cash Collateral Motion. In addition, the Creditors' Committee filed a limited objection to the Cash Collateral Motion. The parties engaged in discovery and ultimately resolved the Cash Collateral Motion by entering into the *Stipulation and Order in Respect of the Debtors' Motion for Entry of an Order to Permit the Debtors to Continue Using Cash Collateral [Docket No. 3374]* [Docket No. 4193], pursuant to which (i) the Debtors' ability to continue using Cash Collateral under the AFI/JSN Cash Collateral Order terminated, effective July 11, 2013; (ii) the Junior Secured Noteholders are no longer entitled to certain forms of adequate protection, including adequate protection payments; (iii) the Debtors expressly reserved the right to seek authorization to replenish from Cash Collateral any unencumbered funds used for the purposes referenced in paragraph 30 of the Cash Collateral Motion for the period following May 14, 2013, as though such expenses had been paid in the first instance from Cash Collateral; and (iv) during the period beginning on July 11, 2013 and ending on December 15, 2013, the Debtors are authorized to use Cash Collateral for the limited purpose of funding servicer advance obligations, subject to certain limitations.

## 5.    Sale Process

On the Petition Date, the Debtors filed a motion with the Bankruptcy Court seeking: (i) approval of Nationstar Mortgage LLC ("Nationstar") and Ally as proposed stalking horse purchasers, including related bid protections for Nationstar; (ii) approval of sale procedures; (iii) to schedule a bid deadline and sale hearing; and (iv) approval of and authorization to enter into the respective Nationstar and AFI asset purchase agreements (the "Sale Motion").

The Debtors' dual sale structure allowed for certain combinations of sale transactions, ensuring that the Debtors received the highest or best value for the assets. The robust marketing process for the Debtors' servicing and mortgage loan origination assets (effectively comprising the entirety of the Debtors' Origination and Servicing Business, the "Servicing Platform") and a significant portion of the Debtors' and Whole Loan Portfolio, which began pre-petition and extended post-petition, was designed to maximize the value of these assets for the benefit of the Debtors' Estates and their creditors.

Prior to the Petition Date, the Debtors commenced and pursued a targeted marketing process, launched and managed by Centerview, their investment banker, for their most valuable assets. On May 13, 2012, after several months of extensive negotiations, the Debtors executed

two separate stalking-horse asset purchase agreements to effectuate the sales of the Debtors' Servicing Platform and Whole Loan Portfolio, respectively: one with Nationstar, for the Debtors' Servicing Platform; the second with AFI and BMMZ Holdings LLC, for the Debtors' Whole Loan Portfolio. The original Nationstar stalking horse bid was approximately $2.3 billion for the purchase of the Debtors' Servicing Platform. The original AFI stalking horse bid for the Whole Loan Portfolio, contained a "toggle" whereby Ally would agree to purchase the Whole Loan Portfolio at a higher purchase price of $1.6 billion provided that the Chapter 11 plan provide for the Releases contained in the Pre-Petition AFI-ResCap Settlement Agreement, and, if the sale was not consummated through the Chapter 11 plan, would pay a lower purchase price of $1.4 billion.

Prior to the June 18, 2012 hearing date on the Sale Motion, the Creditors' Committee filed an objection to the Sale Motion, raising a number of issues with the proposed stalking horse bids, the sale procedures, and the timeline. The Creditors' Committee also objected to the "toggle" feature in the AFI stalking horse agreement. Berkshire also filed an objection to the Sale Motion, seeking to replace the stalking-horse offers of Nationstar and AFI, respectively. In connection with its objection, Berkshire submitted two separate executed asset purchase agreements to purchase the Servicing Platform and the Whole Loan Portfolio.

In response to the objections to the Sale Motion, Nationstar agreed to reduce its proposed break-up fee, expense, reimbursement, and initial bid increment, and AFI agreed to remove the "toggle" in its stalking horse price for the Whole Loan Assets. Following a mini-auction to serve as stalking horse bidder among Nationstar and Berkshire for the Servicing Platform, and AFI, Berkshire and Lone Star U.S. Acquisitions, LLC for the Whole Loan Portfolio, the Bankruptcy Court approved Nationstar as the stalking-horse bidder for the Servicing Platform with a stalking horse bid of an increase of $125 million over the original stalking horse bid, and Berkshire as the stalking-horse bidder for the Whole Loan Portfolio with a stalking horse bid of an increase of $42 million over the original stalking horse bid (each calculated using of February 29, 2012 asset balances). On June 28, 2012, the Bankruptcy Court entered the Sales Procedures Order approving, among other things, the asset purchase agreement by and among the Debtors and Nationstar for the Platform Sale and the asset purchase agreement by and among the Debtors and Berkshire for the Whole Loan Portfolio.

The Debtors conducted the Auctions from October 23, 2012 through October 25, 2012. The auction for the Servicing Platform was held from October 23 through October 24, 2012. Nationstar and Ocwen were the two bidders that presented offers for the Servicing Platform. Although Ocwen was the bidder of record, the Ocwen APA provided for the assignment of the Debtors' Fannie Mae servicing assets to Walter or one of its affiliates as part of the transaction.

After 28 rounds of bidding, however, Ocwen made the highest and best offer to purchase the Servicing Platform, which included the Debtors' mortgage loan servicing, consumer lending, and capital markets platforms, as well as mortgage loan servicing rights and servicer Advances belonging to Ginnie Mae (the "Ginnie Mae MSRs"). The purchase price for these assets was comprised of a joint bid by Ocwen and Walter for approximately $3 billion, subject to adjustment, of which approximately $160 million related to the Ginnie Mae MSRs. Walter coordinated with the Debtors and Ocwen to enter into an ancillary agreement whereby Ocwen

-73-

assigned to Walter the Debtors' consumer lending and capital markets platforms, as well as the Fannie Mae mortgage servicing rights (the "Fannie Mae MSRs") contained in the Debtors' servicing portfolio. Ocwen's winning bid included approximately $782.4 million of incremental value over Nationstar's stalking horse bid, for the benefit of the Debtors' Estates and stakeholders.

On October 25, 2012, ResCap held an auction for its Whole Loan Portfolio, which consisted of loans with an aggregate unpaid principal balance as of August 31, 2012 of $3.05 billion and book value of $1.37 billion. The two bidders who participated in the Auction were Berkshire and a consortium of bidders referred to as the DLJ Consortium.

The Whole Loan Auction commenced with Berkshire's stalking horse bid of $1.32 billion for the Whole Loan Portfolio, which was comprised of approximately 28,000 whole loans. After 11 rounds of bidding, Berkshire won the auction with the highest and best offer of $1.5 billion, subject to adjustment. As compared to Berkshire's stalking horse bid of $1.32 billion, Berkshire's winning bid included approximately $176 million of incremental value over the stalking horse bid for the benefit of the Debtors' Estates and stakeholders, and removed certain meaningful conditions previously in the agreement.

Subsequent to the Auctions but prior to the Sale Hearing (defined below), the Debtors received approximately 60 objections to the Platform Sale; however, not one of them took issue with the sale process, the conduct at the Auctions, the purchase price for the respective assets, and/or whether the sales remained in the best interest of the Debtors and their creditors. Rather, the objections to the Platform Sale were, for the most part, limited to issues with the assumption by the Debtors and assignment to Ocwen of various agreements, Ocwen's ability to perform under those agreements, and other sale objections, e.g., requests for clarification language in the Sale Motion (collectively, the "Cure/Sale Objections"). There were no objections to the Whole Loan Portfolio.

The terms of the Asset Sales were reflected in two separate asset purchase agreements, which were the product of significant governmental cooperation and extensive negotiations among the Debtors, AFI, Ocwen, Walter, Berkshire, and numerous stakeholders, including the Creditors' Committee: (i) the asset purchase agreement with Ocwen, dated as of November 2, 2012 as amended from time to time (the "Ocwen APA"); and (ii) the asset purchase agreement with Berkshire, dated November 2, 2012 as amended from time to time (the "Berkshire APA"). In connection with these transactions, Ocwen assigned certain of the purchased assets to Walter for approximately $509 million under the "Walter Assignment."[68] At a hearing held on November 19, 2012, the Bankruptcy Court approved the Debtors' Asset Sales (the "Sale Hearing"), and on November 21, 2012, the Bankruptcy Court entered the Sale Orders approving the Asset Sales (the "Sale Orders"). Following the Sale Hearing and prior to the closings of the Asset Sales, the Debtors resolved a majority of the Cure/Sale Objections. For the remainder of the Cure/Sale Objections and other objections, the Debtors agreed with each of the remaining

---

[68]    As of the date hereof, this figure is still the subject of a "true-up" accounting of amounts paid for assets transferred to Walter.

objectors on a process and schedule by which any alleged cure claims would be resolved post-closing.

The transactions comprising the Debtors' Platform Sale closed in two parts: the sale to Walter closed on January 31, 2013, and the sale to Ocwen closed on February 15, 2013. The Debtors' Whole Loan Portfolio sale to Berkshire closed on February 5, 2013. In the aggregate, the Asset Sales yielded approximately $4.1 billion in gross sale proceeds (prior to reduction for payment of assumed liabilities, cure costs and other associated liabilities) to the Debtors' Estates, providing over $1 billion of incremental value for the Debtors' Estates over what the Debtors' Estates would have received through the original stalking horse bids.

The Plan sets forth the mechanism by which the Debtors will distribute the remaining proceeds of the Asset Sales, the Ally Contribution, and any other Estate assets so as to achieve their goals of maximizing value to their various creditor constituencies and bringing a successful conclusion to these Chapter 11 Cases.

**6.      Key Employee Retention Plan (KERP) and Key Employee Incentive Plan (KEIP)**

On July 17, 2012, the Debtors filed a motion seeking entry of an order approving a key employee incentive plan ("Sale KEIP") and a key employee retention plan ("Sale KERP") in connection with the Debtors' efforts to effectuate an unprecedented going-concern sale of substantially all of their assets to the third party providing the highest and best offer. [Docket No. 812]. The Sale KERP was intended to retain certain key personnel, who were identified by the Debtors' senior management as necessary to execute the Debtors' business plan, maintain operational stability throughout the sale processes and transition the Debtors' businesses as a going concern, with a financial incentive to remain with the Debtors during the sale process. The Bankruptcy Court entered an order approving the Sale KERP on August 15, 2012 [Docket No. 1169]. The Sale KEIP was intended to provide certain senior executives with financial incentives to maximize value for the Debtors' creditors through the Asset Sales while also achieving certain financial and operational goals. On October 18, 2012, following the revision of the initial proposal and with the consent of both the U.S. Trustee and the Creditors' Committee, the Debtors obtained the Bankruptcy Court's approval of the Sale KEIP [Docket No. 1854].

Upon the conclusion of the Asset Sales, the Chapter 11 Cases focused on managing the Estates' remaining assets and maximizing value for the creditors. Accordingly, on March 20, 2013, the Debtors filed a motion seeking entry of an order approving both a short-term ("Executive Estate KEIP") and long-term key employee incentive program ("Estate KEIP") as well as a key employee retention program ("Estate KERP," together with the Executive Estate KEIP and the Estate KEIP, the "Estate Plans") [Docket No. 3280]. The Estate Plans were intended to both incentivize the senior executives that remained with the Estate to preserve and maximize the Estate's value in order to enhance the return for creditors, as well as provide non-insider employees with a fixed award to ensure that they work with the Estate through the end of their retention period. The Bankruptcy Court entered an order approving the Estate Plans on April 16, 2013 [Docket No. 3443].

7.    **Plan Exclusivity**

Upon commencement of these Chapter 11 Cases, Section 1121(d) of the Bankruptcy Code provided the Debtors with the exclusive right to file and solicit a Chapter 11 plan through and including September 11, 2012 and November 10, 2012, respectively.  The Bankruptcy Court granted several extensions of the Debtors' exclusive periods, and most recently, the Debtors were granted the exclusive right (i) to file a plan through and including August 21, 2013, and (ii) solicit votes through and including October 21, 2013 [Docket No. 3919].  The Debtors requested each of these extensions to give them sufficient time to, among other things, reach accord with Ally, the Creditors' Committee, and other major parties in interest on a consensual plan.

8.    **Committee Investigation of Claims against AFI**

Prior to the appointment of the Examiner, the Creditors' Committee sought authority under Bankruptcy Rule 2004 to subpoena information from the Debtors, AFI, and AFI's parent Cerberus Capital Management L.P.  On June 5, 2012, the Bankruptcy Court granted the Creditors' Committee's request and authorized the issuance of subpoenas [Docket No. 217].  After the Examiner's appointment, the Bankruptcy Court entered an order providing that the scope of the Examiner's investigation would be co-extensive with the scope of the Creditors' Committee investigation.  [Docket No. 925].

Over the course of several months, the Creditors' Committee conducted an extensive investigation, beginning with the time period associated with ResCap's formation in 2004, of the pre-petition and post-petition transactions and agreements between the Debtors, AFI, and non-Debtor AFI affiliates.  During the course of its investigation, the Creditors' Committee reviewed and analyzed millions of pages of documents from a shared document depository made available by the Examiner.  For purposes of furthering its understanding of the Debtors' historical solvency and capitalization, together with the complex historical, business, and legal relationships among the Debtors, AFI, and AFI's affiliates, the Creditors' Committee retained specialists from AlixPartners and Moelis to assist its counsel.

The primary focus of the Creditors' Committee investigation was on the following:

- Whether the transfer to AFI over several years of one of the Debtors' assets, Ally Bank, was for adequate consideration; and whether the promise at the inception of the transfer that AFI would pursue an industrial bank charter for ResCap and return its assets thereto was false.

- Whether a Master Mortgage Loan Purchase and Sale Agreement and several swap agreements relating to mortgage servicing rights ("MSRs") between GMAC Mortgage Inc. ("GMACM") and Ally Bank contained non-market terms; whether these agreements were intended to insulate Ally Bank from representation and warranty related risk and liability in connection with loans it had originated or acquired, as well as the volatility risks relating to the ownership of MSRs, and shift all of that risk and liability onto GMACM; and whether the Debtors' boards of directors adequately vetted these transactions at the time they were executed.

-76-

- Whether profitable and valuable businesses were transferred away from the Debtors at less than fair market value over the course of several years; and whether these transfers occurred in compressed timeframes, without adequate valuations or fairness opinions, without comprehensive (or any) third-party marketing.

- Whether the Debtors assumed AFI's financial liabilities and obligations in connection with the April 13, 2011 Consent Order with the Federal Reserve Board, and the February 9, 2012 settlement agreement with the U.S. Department of Justice and the Attorneys General of several states; and whether the Debtors made fraudulent and preferential transfers to or for the benefit of AFI in the days leading up to the Petition Date.

Based on the foregoing, the Creditors' Committee determined that the Debtors could pursue claims against AFI and its directors sounding in alter ego/veil piercing, substantive consolidation, fraudulent conveyance, preferential transfer, recharacterization, equitable subordination, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty.

On January 9, 2013 and January 17, 2013, respectively, the Creditors' Committee presented its perspective on the evidence and Potential Claims to AFI and the Debtors. The Creditors' Committee also presented its perspective on the evidence and Potential Claims to the Examiner on January 23, 2013, and in written submissions dated March 7, 2013, May 2, 2013 and May 6, 2013.

Ally has denied and continues to deny any breach, fault, liability, or wrongdoing regarding claims alleged against Ally.

9.    **Appointment of an Examiner**

On June 28, 2012, the Bankruptcy Court entered an order granting Berkshire's motion to appoint an examiner in the Chapter 11 Cases to investigate the pre-petition activities of the parties and the Pre-Petition AFI-ResCap Settlement Agreement. [Docket No. 536]. The scope, timing, and budget for this investigation was set by the Bankruptcy Court after the U.S. Trustee's appointment of former Judge Arthur J. Gonzalez[69] (the "Examiner"), which the Bankruptcy Court approved on July 3, 2012 [Docket No. 674].

On August 6, 2012, the Examiner filed a Work Plan with the Bankruptcy Court. The Work Plan detailed the scope of the Examiner's investigation, specifically identifying the following areas of investigation: (i) pre-petition transactions between Debtors and one or more of AFI, Cerberus Capital Partners, LLC, and/or Ally Bank; (ii) negotiations and approval of the AFI-ResCap Settlement Agreement or any other pre-petition settlement agreements entered by the Debtors; (iii) activities of Debtors' officers and directors concerning (a) the pre-petition transactions, (b) post-petition transactions, and (c) the investigation of claims against AFI; (iv) the Debtors' corporate relationship with AFI, Cerberus, and Ally Bank; and (v) the nature

---

[69]    Judge Gonzalez retired as Chief Judge of the Bankruptcy Court for the Southern District of New York in March 2012 and currently is a professor of bankruptcy law at the New York University School of Law.

-77-

and value of all third party claims against Ally the Debtors then proposed to release under the Pre-Petition AFI-ResCap Settlement Agreement against AFI. On August 20, 2012, the Bankruptcy Court issued an order granting the Examiner broad powers to subpoena witnesses and documents, and to investigate each item set out above. [Docket No. 1223].

The Examiner and his financial and legal advisors conducted 42 interviews of the Debtors' current and former employees and directors, and more than 55 interviews of non-Debtor witnesses. Additionally, the Debtors produced over six million pages of material in response to the Examiner's requests for information, and the Examiner's advisors collected more than 3 million pages of documents from over 20 other parties. The Examiner also received multiple written submissions from the Debtors, AFI, the Creditors' Committee, and other major creditors regarding each subject of the Examiner's inquiry. Additionally, the Examiner met with interested parties on more than sixty occasions. The Examiner projected that preparation of the Examiner's report (the "Report")[70] would cost the Debtors' Estates more than $80 million.

Upon agreeing to the terms of the Plan Support Agreement, the Debtors applied for an order temporarily sealing the Report, which they were advised was ready for filing on or about the date of the execution of the Plan Support Agreement. The Bankruptcy Court entered a supplemental sealing order [Docket No. 3739] further sealing the Report through and including the earlier of (x) July 3, 2013 or (y) the date that the Bankruptcy Court determined the Debtors' motion seeking authorization to enter into and perform under the Plan Support Agreement.

### 10.    Issuance of Examiner's Report

On June 26, 2013, the Bankruptcy Court approved the Plan Support Agreement and unsealed the Report [Docket No. 3698], which spans nine volumes and over 2,200 pages.[71] The Report's scope is exceptionally broad and contains a number or findings and conclusions covering the course of conduct and material intercompany dealings involving ResCap, AFI, Ally Bank, and Cerberus within an approximate ten year period. As a general matter, the factual findings in the Report are inadmissible into evidence as hearsay—but the Examiner's findings and conclusions in the Report support the Plan.

The majority of the Examiner's findings and conclusions cover: (i) potential Causes of Action of the Estates; (ii) the negotiation and entry into the now-terminated Pre-Petition AFI-ResCap Settlement Agreement and Original RMBS Settlement Agreements, including the role of the ResCap Board in such negotiations; (iii) the proposed Third Party Release of AFI and its affiliates from all Causes of Action arising from or related in any way to the Debtors (as articulated in the Pre-Petition AFI-ResCap Settlement Agreement), including asserted (or assertable) third-party claims against AFI, Ally Securities, and Ally Bank; (iv) whether the

---

[70]   The Report is publicly available and can be accessed at:
http://www.KCCllc.net/rescap/document/1212020130513000000000009.

[71]   The Report is publicly available and can be accessed at:
http://www.KCCllc.net/rescap/document/1212020130513000000000009.

proposed debtor release and Third Party Release contemplated by the Pre-Petition AFI-ResCap Settlement Agreement were warranted; and (v) the financial condition of ResCap, RFC, and GMACM at various points in time.  The following provides a very high level synopsis of some of these findings and conclusions; the summary below is in no respect intended to supplant or conflict with any portions of the Report.

### (a)    Potential Causes of Action of the Estates

After analyzing in great detail a host of potential claims for alter ego, veil piercing, fraudulent conveyance, preference, fraud, breach of contract, contribution, constructive trust, breach of fiduciary duty, substantive consolidation, equitable subordination, and debt recharacterization, the Report concludes that the Debtors' Estates could assert claims with varying likelihoods of success.

In particular, the Estates could assert claims seeking:

- Up to approximately $1.31 billion in damages with respect to claims the Examiner believes are likely to prevail;

- Up to approximately $1.78 billion in damages with respect to claims the Examiner believes, while a close question, are more likely than not to prevail;

- Up to approximately $2.36 billion in damages with respect to claims the Examiner believes, while a close question, are more likely than not to fail; and

- Equitable subordination of AFI's claims (totaling approximately $1.13 billion), with respect to which the Examiner concludes, while a close question, is more likely than not to fail. (Examiner's Report, I-29)

The Examiner found that the Debtors' Estates were unlikely to prevail on:

- Claims against AFI or its subsidiaries for veil piercing, alter ego, substantive consolidation, aiding and abetting breaches of fiduciary duty, fraudulent transfer in connection with Ally Bank transactions; fraudulent transfer regarding asset sales between the Debtors and AFI or its subsidiaries, and various other claims. (Examiner's Report, I-33).

### (b)    Negotiation and Entry into Pre-Petition AFI-ResCap Settlement Agreement and Original RMBS Settlement Agreements

Regarding the processes leading to the Original RMBS Settlement Agreements and related Plan Support Agreements, the Examiner concluded that, while a "close question," (i) the process underlying negotiation of the settlements was conducted at arm's length and (ii) that the

ResCap Board voted on an informed basis when approving the agreements.[72]  The Examiner concluded that the "ResCap Board acted on a sufficiently informed basis, in good faith, and with an honest and reasonable belief that the settlement of major claims—perceived by the Board as facilitating the efficacy of ResCap's imminent bankruptcy filing through eliminating an obstacle to sale of ResCap's assets—was in the best interests of ResCap and its creditors." (Examiner's Report, VII.E-43).  The Report also concludes that no viable claims for breach of fiduciary duty exist in connection with the ResCap Board's approval of the Pre-Petition AFI-ResCap Settlement Agreement and Original RMBS Settlement Agreements.  (Examiner's Report, VII.E-42).[73]

### (c)    Third-Party Claims against AFI Defendants

Section VIII of the Report (i) summarizes the Debtors' mortgage securitization business; (ii) analyzes the merits of identified Debtor-related third-party claims against AFI, Ally Bank, Ally Securities, and their respective directors and officers (the "AFI Defendants"); and (iii) analyzes the potential damages arising from those claims.

While most of the claims discussed in Section VIII depend on a threshold finding of primary liability against the Debtors, the Report does not analyze the merits of any underlying claims against the Debtors.  Moreover, the Report does not, for the most part, describe or summarize the purported basis for relevant underlying claims against the Debtors.  The Examiner did not present any findings regarding the anticipated range of actual damages of the Third-Party claimants.  Rather, the Examiner accepted at face-value the damages numbers asserted by the Third-Party claimants (which the Debtors have consistently challenged).

The Report identifies and analyzes four categories of Potential Claims against the AFI Defendants: (i) RMBS-related claims against Debtors, AFI, Ally Bank, and Ally Securities; (ii) RMBS-related claims against Debtor, AFI, Ally Bank, and Ally Securities' directors and officers; (iii) claims against the Debtors and the AFI Defendants that are not RMBS-related; and (iv) potential causes of action belonging to unsecured noteholders.  Given the exhaustive analysis included in the Report on these potential claims, parties should refer directly to the Report for additional information on the Examiner's findings.

### (d)    Propriety of the Consideration for Releases Contained in Pre-Petition AFI-ResCap Settlement Agreement

The Pre-Petition AFI-ResCap Settlement Agreement proposed to settle all of the Estate's causes of action against and third-party claims against certain AFI released parties.  AFI proposed a cash contribution of $750 million (in addition to other non-cash contributions including the ability to continue to originate in bankruptcy and sell a going concern) in exchange for these releases.  The Examiner concluded that in the context of the Pre-Petition AFI-ResCap Settlement Agreement, it is unlikely a court would have approved such a settlement.

---

[72]   The Examiner explicitly did *not* opine on whether the $8.7 billion unsecured claim proposed in the Original RMBS Settlement Agreements was within the range of reasonableness.

[73]   Examiner's Report, VII.E-43.

Nevertheless, the Examiner urged: "the best course for AFI to seek to achieve a Third Party Release is to negotiate a Plan that enjoys very broad creditor support," (Examiner's Report, I-44), which the Consenting Claimants have done through the Global Settlement

### (e)    Conclusions Regarding the Debtors' Financial Condition

Using the balance sheet test for solvency, the Examiner concluded that ResCap was balance sheet solvent on May 4, 2005, the date that AFI announced the capitalization of ResCap, and was balance sheet insolvent from December 31, 2007 through the Petition Date. (Examiner's Report, I-45).  Using the "inadequate capital" test, the Examiner concluded that ResCap was adequately capitalized on May 4, 2005, and was left with unreasonably small capital from August 15, 2007 through the Petition Date.

*        *        *

**The Debtors, Ally, and the Creditors' Committee dispute a number of the findings and conclusions contained in the Report.  Nevertheless, the Plan Proponents, Ally, and all Consenting Claimants believe the Report, as a whole, supports the Plan Support Agreement and confirmation of the Plan.**

### 11.    Appointment of a Chief Restructuring Officer

Following the Asset Sales, in addition to administering and monetizing the remaining assets and winding down the Estates, the Debtors' primary focus shifted to reaching and obtaining confirmation of a consensual plan.  In furtherance of this goal, on February 11, 2013, the Debtors sought the appointment of Lewis Kruger to act as the Debtors' chief restructuring officer ("CRO").  After consultation with the Creditors' Committee regarding the appropriate scope of the CRO's appointment, on March 5, 2013, the Bankruptcy Court appointed Mr. Kruger as CRO [Docket No. 3103].

Mr. Kruger, an independent business leader with significant restructuring experience, has been integral in addressing and seeking resolution of key disputes among the Debtors' major stakeholders, in brokering a consensual settlement of the Estates' and others' claims against Ally, and in determining the appropriate allocation of Estate assets among the Debtors' creditors throughout the negotiation and mediation process.

### 12.    Motions Seeking Standing to Pursue Claims Against Ally

*Committee Standing Motion*.  Following its investigation (as described above), the Creditors' Committee believed it identified viable and valuable Claims and Causes of Action against Ally, and that it was best suited to prosecute and settle claims against AFI and certain of AFI's non-debtor affiliates (the "AFI Defendants") arising from those transactions.  On April 11, 2013, the Creditors' Committee filed a motion seeking entry of an order authorizing it to prosecute and settle veil-piercing, fraudulent transfer, indemnification, pre-petition preference, and equitable subordination claims on behalf of the Debtors' Estates against the AFI Defendants [Docket No. 3412].  Prior to the filing of this motion, the Debtors consented to the Creditors' Committee's standing to investigate these claims after determining that the Creditors' Committee

-81-

was best positioned to pursue the claims and causes of action against the AFI Defendants in light of the Pre-Petition AFI-ResCap Settlement Agreement. The motion was heard by the Bankruptcy Court on May 7, 2013, but the Bankruptcy Court reserved decision. The Creditors' Committee's motion is stayed during the term of the Plan Support Agreement.

_Wilmington Trust Standing Motion_. On April 19, 2013, Wilmington Trust, National Association, solely in its capacity as Indenture Trustee for the Senior Unsecured Notes ("Wilmington Trust") filed a motion (the "Wilmington Trust Standing Motion") seeking authority to prosecute claims and other causes of action on behalf of the ResCap Estate [Docket No. 3475]. In particular, Wilmington Trust sought permission to file a complaint to pursue certain Estate claims and claims that Wilmington Trust alleged were third party claims, including constructive and actual fraudulent transfers, in coordination with the Creditors' Committee's efforts to prosecute Estate claims. On May 6, 2013, the Debtors filed a limited objection to the Wilmington Trust Standing Motion [Docket No. 3598]. The Wilmington Trust Standing Motion has not yet been heard by the Bankruptcy Court.

As a result of the Plan Support Agreement, the Wilmington Trust Standing Motion and other motions seeking standing to pursue claims or Causes of Action against AFI or its affiliates on behalf of the Debtors' Estates are stayed during the term of the Plan Support Agreement, and will be rendered moot once the Plan is confirmed.

## 13.    Appointment of a Mediator

Recognizing the numerous, divergent interests held by the Debtors' key stakeholders, on December 6, 2012, the Debtors requested the appointment of a mediator to assist with the plan negotiations process [Docket No. 2357]. Such request was supported by the Creditors' Committee. On December 26, 2012, the Bankruptcy Court entered an order appointing the Honorable James M. Peck as Mediator in these Chapter 11 Cases to assist in plan negotiations, foster a dialogue with key stakeholders, and reach resolution on significant plan issues [Docket No. 2519]. Initially, the Mediator was appointed for a limited period ending February 28, 2013, but as a result of subsequent negotiations amongst parties involved in the mediation, the Bankruptcy Court further extended the term of the Mediator's appointment through October 31, 2013, or such earlier date as the Mediator declares that the mediation is at an impasse and should be terminated [Docket Nos. 2519, 3101, 3877] (collectively, the "Mediation Order").

The Mediator has offered constructive and independent guidance to the Mediation parties (as defined below) on the complex interdebtor and intercreditor issues that necessarily impact plan distributions. In particular, the focus of the mediation to date has been twofold: (1) to settle certain potential Estate and third party claims and causes of action identified against Ally in exchange for a contribution from Ally to the Debtors' Estates, in the form of the Debtor Release and the Third Party Releases, and (2) to address intercreditor issues related to the allocation of the Debtors' assets. Tremendous progress was made under the Mediator's guidance, ultimately culminating in the Plan Support Agreement.

14.     **Mediation Process**

As discussed above, commencing shortly after the Mediator's appointment through the date of the filing of this Disclosure Statement, the Mediator attended numerous mediation sessions with the following parties, both on an individual basis and jointly with different combinations of representative parties: the Debtors, the Creditors' Committee (as well as its individual members), the Ad Hoc Group, Ally, FHFA, the Institutional Investors, Paulson, and certain of the Debtors' other key constituencies (collectively, the "Mediation Parties").  In an effort to facilitate these discussions and to guide the Mediation Parties in their negotiations, the Debtors and their advisors prepared and provided the Mediator and the Mediation Parties with comprehensive business and financial information, including multiple "waterfall" analyses that helped set forth hypothetical returns to creditors based on shifting recovery scenarios.  In addition, certain parties provided to each other, as well as to the Mediator, presentations and draft pleadings outlining the strengths and weaknesses of their own, and other parties' claims. Subject to the Mediation Order, materials provided by any party as part of the mediation remain confidential in order to promote progress and protect commercially sensitive information. Ultimately, a global resolution was reached on a consensual plan and embodied in the Plan Support Agreement.

15.     **The Termination of the Pre-Petition AFI-ResCap Settlement Agreement**

Following the Asset Sales, the Debtors engaged in numerous discussions with various parties in interest, including Lewis Kruger, the Debtors' CRO, the Mediator, and the Creditors' Committee, regarding the framework of the Plan and the Potential Claims.  Because the Asset Sales successfully closed thus accomplishing the primary objective of the Pre-Petition AFI-ResCap Settlement Agreement, the Debtors, with the support of the Creditors' Committee, allowed the AFI-ResCap Settlement Agreement to expire by its terms.  However, the Creditors' Committee determined that negotiations with Ally regarding the resolution of the Potential Claims should continue.  As discussed below, after substantial investigation and examination of claims and causes of action against Ally by the Creditors' Committee and the Examiner, the negotiations among the Debtors, Ally, the Creditors' Committee and the Consenting Claimants culminated in the Ally Contribution and the Global Settlement embodied in the Plan.

16.     **Adjournment of the RMBS Trial**

On June 11, 2012, the Debtors filed a motion pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "9019 Motion") for approval of the Original RMBS Settlement Agreements, [see Docket Nos. 320, 1176 and 1887].  When it became clear that the sale of the Debtors' servicing assets would occur before the 9019 Motion would be heard by the Bankruptcy Court, the RMBS Trustees agreed in July 2012 (i) not to object to the assignment of PSAs free and clear of R&W Claims and (ii) to defer and cap the amount of their cure claims.

A hearing on the 9019 Motion was originally scheduled for November 2012, but was adjourned on several occasions and was most recently scheduled to begin on May 28, 2013.  A number of parties, including the Creditors' Committee, Wilmington Trust, FGIC and MBIA, among others, filed objections to the 9019 Motion.

-83-

### 17.    The RMBS Settlement Embodied in the Plan

The parties ultimately determined that it was in their collective best interests to avoid protracted and costly litigation with respect to the Original RMBS Settlement Agreements, and instead to resolve the RMBS Trusts' claims in the context of, and as provided by, the Plan Support Agreement.  Following extensive discussions in connection with the overall Global Settlement, the parties agreed that the Plan should expand the scope of the Original RMBS Settlement Agreements to cover all RMBS Trusts holding RMBS Trust Claims.

Pursuant to the Plan, the RMBS Trust Claims shall be Allowed as non-subordinated Unsecured Claims in the amount of $209,800,000 against the GMACM Debtors and $7,091,200,000 against the RFC Debtors.[74]  In exchange for these Allowed Claims, the RMBS Trusts shall be deemed to provide a full and complete discharge of the ResCap Debtors from any and all RMBS Trust Claims.  On account of those Allowed Claims, the RMBS Claims Trust shall receive and hold, for the benefit of the RMBS Trusts, (i) the RMBS Trusts' Pro Rata Share of the GMACM Debtors Unit Distribution[75] (the "GMACM Pool") and (ii) the RMBS Trusts' Pro Rata Share of the RFC Debtors Unit Distribution[76]  (the "RFC Pool"), net of the Allowed Fee Claim of 5.7%, which will be directly allocated to counsel for the Institutional Investors.[77]

Pursuant to the RMBS Trust Allocation Protocol, the Units initially distributed to the GMACM Pool and the RFC Pool will be re-allocated, based on the amount of the GMACM

---

[74]    The RMBS Settlement also provides that 5.7% of the aggregate Allowed RMBS Trust Claims will be transferred to counsel for the Institutional Investors, by direct allocation under the Plan and without conveyance to the RMBS Trustees (the "Allowed Fee Claim"), who shall hold RMBS Trust Claims against the relevant entities for each respective Trust pursuant to the Plan and the RMBS Trust Allocation Protocol, which amounts shall reduce the total amount of Allowed RMBS Trust Claims. The Allowed Fee Claim shall be apportioned among counsel for the Steering Committee Consenting Claimants, on the one hand, and counsel for the Talcott Franklin Consenting Claimants, on the other, in conformity with the Original RMBS Settlement Agreements. The portion of the Allowed Fee Claim allocated to counsel for the Steering Committee Consenting Claimants shall be paid 4.75% to Gibbs & Bruns LLP and 0.95% to Ropes & Gray LLP. The portion of the Allowed Fee Claim allocated to counsel for the Talcott Franklin Consenting Claimants shall be paid 5.7% to be shared among Talcott Franklin P.C., Miller, Johnson, Snell & Cummiskey, P.L.C., and Carter Ledyard & Milburn LLP based on lodestar as calculated per agreement between co-counsel. Each share of the Allowed Fee Claim (and distributions thereon, including Trust Units) shall be documented in separate claims stipulations and shall be independently transferable. Amherst Advisory & Management, LLC, acting in its capacity as investment manager for holders of certain trust certificates issued by the RALI Series 2006-QO7 Trust, has previously argued and continues to assert that the Allowed Fee Claim should not be deducted from all RMBS investors' recoveries or, alternatively, advisor fees for all RMBS investors should be paid by the Estates.

[75]    Annexed hereto as Exhibit 13 is the Calculation of Recoveries to the RMBS Trusts.  All amounts set forth therein are estimated and subject to change.  Based on Exhibits 4, 7, and 13 to this Disclosure Statement (which are subject to change), the Pro Rata Share would result in 2,564,600 Units being distributed into the GMACM Pool on Initial Unit Distribution Date.

[76]    Based on Exhibits 4, 7, and 13 to this Disclosure Statement (which are subject to change), the Pro Rata Share would result in 25,812,769 Units being distributed into the RFC Pool on Initial Unit Distribution Date.

[77]    Based on Exhibits 4, 7, and 13 to this Disclosure Statement (which are subject to change), 1,617,510 Units would be directly allocated to counsel for the Allowed Fee Claim.

-84-

Recognized Cure Claims,[78] the RFC Recognized Cure Claims,[79] the GMACM Recognized Original R+W Claims,[80] the RFC Recognized Original R+W Claims,[81] the GMACM Recognized Additional R+W Claims,[82] the RFC Recognized Additional R+W Claims,[83] the GMACM Recognized Servicing Claims[84] and the RFC Recognized Servicing Claims.[85] This re-allocation of Units settles (i) any disputed claims that RFC-sponsored RMBS Trusts have asserted or could assert against GMACM, (ii) disputes as to the proper allocation of Estate assets as between the GMACM Debtors and the RFC Debtors, and (iii) other potential disputes that the RMBS Trusts could have with respect to the terms of the Plan. Based on calculations prepared by Duff & Phelps, LLC ("Duff") (taking into account the allocation of the Allowed Fee Claim), 2,949,494 Units (together with any cash distributions, if any, on such Units made prior to the reallocation of Units contemplated by this paragraph) shall be moved from the RFC Pool to the GMACM

---

[78]    The GMACM Recognized Cure Claims are listed on Schedule 1-G to the Plan. The claims represent claims of the RMBS Trust listed on that schedule for damages arising out of or related to GMACM's servicing of mortgage loans held by an RMBS Trust where the Servicing Agreement for that trust was assumed by GMACM.

[79]    The RFC Recognized Cure Claims are listed on Schedule 1-R to the Plan. The claims represent claims of the RMBS Trust listed on that schedule for damages arising out of or related to RFC's servicing of mortgage loans held by an RMBS Trust where the Servicing Agreement for that trust was assumed by RFC.

[80]    The GMACM Recognized Original R+W Claims are listed on Schedule 2-G to the Plan. These claims represent claims of the RMBS Trusts listed on that schedule for damages arising out of or related to breaches of representations and warranties made by GMACM with respect to the mortgage loans contributed or sold to such RMBS Trust. Each of the RMBS Trusts listed on this Schedule is one of the Original Settling RMBS Trusts.

[81]    The RFC Recognized Original R+W Claims are listed on Schedule 2-R to the Plan. These claims represent claims of the RMBS Trusts listed on that schedule for damages arising out of or related to breaches of representations and warranties made by RFC with respect to the mortgage loans contributed or sold to such RMBS Trust. Each of the RMBS Trusts listed on this Schedule is one of the Original Settling RMBS Trusts.

[82]    The GMACM Recognized Additional R+W Claims are listed on Schedule 3-G to the Plan. These claims represent claims of the RMBS Trusts listed on that schedule for damages arising out of or related to breaches of representations and warranties made by GMACM with respect to the mortgage loans contributed or sold to such RMBS Trust. The RMBS Trusts listed on this Schedule were not one of the Original Settling RMBS Trusts.

[83]    The RFC Recognized Additional R+W Claims are listed on Schedule 3-R to the Plan. These claims represent claims of the RMBS Trusts listed on that schedule for damages arising out of or related to breaches of representations and warranties made by RFC with respect to the mortgage loans contributed or sold to such RMBS Trust. The RMBS Trusts listed on this Schedule were not one of the Original Settling RMBS Trusts.

[84]    The GMACM Recognized Servicing Claims are listed on Schedule 4-G to the Plan. The claims represent agreed claims of the RMBS Trust listed on that schedule for damages arising out of or related to GMACM's servicing of mortgage loans held by an RMBS Trust where the Servicing Agreement for that trust was not assumed by GMACM.

[85]    The RFC Recognized Unsecured Servicing Claims are listed on Schedule 4-R to the Plan. The claims represent agreed claims of the RMBS Trust listed on that schedule for damages arising out of or related to RFC's servicing of mortgage loans held by an RMBS Trust where the Servicing Agreement for that trust was not assumed by RFC.

-85-

Pool.[86]  After this re-allocation, the GMACM Pool will hold 5,367,912 Units and the RFC Pool will hold 21,391,947 Units.[87]

All distributions from the RMBS Claims Trust from the GMACM Pool to RMBS Trusts with Recognized Claims against GMACM will be based on the percentage that such RMBS Trust's GMACM Weighted Claim has to the total of all of the GMACM Weighted Claims.  The GMACM Weighted Claim of each RMBS Trust will be determined as follows: if a trust has any of the following Recognized Claims (as shown on Schedules 1-G, 2-G, 3-G or 4-G), they will be valued as follows (i) a GMACM Recognized Cure Claim shall be valued at 100%, (ii) a GMACM Recognized Original R+W Claim, a GMACM Recognized Additional R+W Claims or a GMACM Recognized Servicing Claims, as applicable, will be valued at 16.7%,[88] and (iii) the values so calculated will be summed for each such RMBS Trust (the "GMACM Weighted Claim").[89]

All distributions from the RMBS Claims Trust from the RFC Pool to RMBS Trusts with Recognized Claims against RFC will be based on the percentage that such RMBS Trust's RFC Weighted Claim has to the total of all of the RFC Weighted Claims.  The RFC Weighted Claim of each RMBS Trust will be determined as follows: if a trust has any of the following Recognized Claims (as shown on Schedules 1-R, 2-R, 3-R or 4-R), they will be valued as follows (i) a RFC Recognized Cure Claim shall be valued at 100%, (ii) a RFC Recognized Original R+W Claim, a RFC Recognized Additional R+W Claims or a RFC Recognized Unsecured Servicing Claim, as applicable, will be valued at 5.34%, and (iii) the values so calculated will be summed for each such RMBS Trust (the "RFC Weighted Claim").

An illustration of the calculation of the weighted claims of several trusts is contained on Exhibit 12 to this Disclosure Statement.

For each RMBS Trust having Recognized Claims against GMACM, Exhibit 12 to this Disclosure Statement shows (i) that RMBS Trust's GMACM Weighted Claim, (ii) the percentage that RMBS Trust's GMACM Weighted Claim has to the total of all of the GMACM Weighted Claims, and (iii) based on the estimated value of a Unit, the estimated cash distributions to such trust from the Units held by the RMBS Claims Trust.

---

[86]  This number will be recalculated after the Unit Issuance Percentages are adjusted.  *See* Article II.N. of this Disclosure Statement.

[87]  These numbers may change after the Unit Issuance Percentages are adjusted.  *See* Article II.N. of this Disclosure Statement.

[88]  This number may change after the Unit Issuance Percentages are adjusted.  *See* Art. II.N. of this Disclosure Statement.

[89]  The "Weighted" claim accounts for the fact that some of the Servicing Agreement were assumed by the Debtors, giving rise to administrative priority status, and distributions to RMBS Trusts having such claims are weighted accordingly for purposes of distribution to each RMBS Trust.

For each RMBS Trust having Recognized Claims against RFC, <u>Exhibit 12</u> to this Disclosure Statement shows (i) that RMBS Trust's RFC Weighted Claim, (ii) the percentage that RMBS Trust's RFC Weighted Claim has to the total of all of the RFC Weighted Claims, and (iii) based on the estimated value of a Unit (which is subject to change), the estimated cash distributions to such trust from the Units held by the RMBS Claims Trust.

All of the numbers in both Table G and Table R are subject to change, and each will be updated in the Plan Supplement.

Recognized RMBS Claims are any claims of RMBS Trusts that have timely filed Proofs of Claim, taking into account the impact of payments by monoline insurers, in the amounts determined by Duff. Duff's methodology for determining the Recognized Claims is annexed hereto as <u>Exhibit 9</u>. Duff's determination of each RMBS Trust's Recognized Claims is annexed to the Plan as the RMBS Trust Claims Schedules. A final version of the RMBS Trust Claims Schedules will be filed with the Plan Supplement.

In addition, each Insured RMBS Trust shall retain the ability to enforce its rights, in the Bankruptcy Court or otherwise, against any Monoline (other than FGIC) that does not, in the future, perform in accordance with an insurance policy for the benefit of that RMBS Trust. The Debtors also agreed to pay the RMBS Trustees in full on the Effective Date for their reasonable pre- and post-petition fees and expenses, subject to the procedures set forth in the *Supplemental Order Under Bankruptcy Code Section 105(a), 362, 502, 1107 (a), and 1108 and Bankruptcy Rules 9019 (I) Authorizing the Debtors to Continue Loss Mitigation Programs; (II) Approving Procedures for Compromise and Settlement of Certain Claims, Litigations and Causes of Action; (III) Granting Limited Stay Relief to Permit Foreclosure and Eviction Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and (IV) Authorizing and Directing the Debtors to Pay Securitization Trustee Fees and Expenses* [Docket No. 774].

## 18.    Plan Support Agreement

After months of intensive negotiations and a series of all-day mediation sessions led by the Mediator, on May 13, 2013, the Debtors, the Creditors' Committee, certain of the Debtors' creditors[90] and Ally entered into the Plan Support Agreement and plan term sheet (the "<u>Original Plan Term Sheet</u>"). The Plan Support Agreement and Original Plan Term Sheet outlined the main terms of the Plan and the resolution of many complex legal issues involving the Debtors' largest claimant constituencies. These documents were endorsed by a large number of the Debtors' largest claimant constituencies, outlining the main terms of the Plan and resolving many complex legal issues involving these parties signatory thereto. Following entry into an announcement of the Plan Support Agreement on May 13, 2013, the parties to the Plan Support Agreement engaged in further negotiations over the terms of a supplemental plan term sheet (the "<u>Supplemental Plan Term Sheet</u>" and together with the Original Plan Term Sheet, the "<u>Term Sheets</u>"), which addressed the Plan Compromises in substantial detail. As discussed above, the Term Sheets address, among other things: (1) Ally's contributions to the Estates, including the Ally Contribution, in exchange for, among other things, the Debtor Release and the Third Party

---

[90]   As noted above, the Junior Secured Noteholders are not a party to the Plan Support Agreement.

Releases (each as defined in the Plan Support Agreement) in favor of Ally, (2) the allocation of proceeds available for distribution to Creditors based on a mediated compromise and settlement of disputed inter-creditor and intra-Debtor issues, and (3) the creation of various trusts designed to provide distributions to creditors and to administer the Estates following confirmation of the Plan. Absent agreement on these issues, the parties would be faced with significant and uncertain litigation prospects, particularly in light of the novel and fact-intensive issues at play. On June 26, 2013, the Bankruptcy Court entered an order authorizing the Debtors to enter into the Plan Support Agreement [Docket No. 4098].

The Plan Support Agreement also provides a number of relevant milestones (collectively, the "Milestones") that must be satisfied, including:

(a) Not later than August 19, 2013, the "FGIC Rehabilitation Court" will have approved the Plan Support Agreement (as it relates to FGIC) and the FGIC Settlement Agreement;

(b) Not later than August 30, 2013, the Bankruptcy Court will have approved the Disclosure Statement; and

(c) Not later than 30 days following entry of the Confirmation Order, but in no event later than December 15, 2013, the Plan will be effective.

Ally and the Creditors' Committee may terminate their support of the Plan and the Plan Term Sheet if any Milestone is not satisfied. A Consenting Claimant may terminate its support of the Plan Support Agreement if certain Milestones are not satisfied. FGIC may terminate its support of the Plan and the Term Sheets if Milestone (a) is not satisfied. The Plan Support Agreement and the Term Sheets are discussed in further detail in Article IV.

### 19.   Claims Process and Bar Date

#### (a)   Schedules and Statements of Financial Affairs

On June 30, 2012, the Debtors filed their schedules of assets and liabilities, statements of financial affairs, and schedules of executory contracts and unexpired leases (the "Schedules"). On July 3, 2012, the Debtors filed amendments to their Schedules. On July 19, 2012, the Debtors filed the Statement of Financial Affairs 3A and 3B ("SOFA 3A and 3B"). On December 11, 2012, the Debtors filed amendments to SOFA 3A and 3B.

#### (b)   Bar Date and Claims Reconciliation Process

On August 29, 2012, the Bankruptcy Court entered an order establishing: (i) November 9, 2012 at 5:00 p.m. (Prevailing Eastern Time) as the deadline for creditors to file Proofs of Claim against the Debtors and prescribing the form and manner thereof; and (ii) November 30, 2012 at 5:00 p.m. (Prevailing Eastern Time) as the deadline for governmental units to file Proofs of Claim [Docket No. 1309] (the "Bar Date"). Due to events precipitated by Hurricane Sandy, the Bankruptcy Court approved an extension of the Bar Date to November 16, 2012 at 5:00 p.m. (Prevailing Eastern Time) [Docket No. 2093].

-88-

As of August 2013, approximately 6,870 Proofs of Claim in the aggregate amount of approximately $99.7 billion had been filed against the Debtors in these Chapter 11 Cases. The Debtors and their advisors have been engaged in a diligent and comprehensive review and reconciliation of all claims.  On March 21, 2013, the Bankruptcy Court entered an order approving certain omnibus claim objection procedures [Docket No. 3294] (the "Claims Procedures Order").  The Claims Procedures Order permits the Debtors, in consultation with the Creditors' Committee through Committee Borrower Counsel, to: (i) object to filed claims on a collective basis on additional grounds not set forth in Bankruptcy Rule 3007(d); (ii) object to Borrower Claims subject to certain specified procedures; (iii) settle certain claims without further Bankruptcy Court approval; and (iv) amend the Debtors' Schedules to resolve any discrepancies that may be discovered as part of the claims reconciliation process.  Based on a thorough and ongoing examination of the Proofs of Claim and in accordance with the Claims Procedures Order, the Debtors and their advisors are in the process of determining which filed claims should be allowed, and which should be disallowed and expunged, reduced in amount, reclassified, or subordinated so as to avoid providing certain creditors with improper recoveries to the detriment of other creditors.

Since the entry of the Claims Procedures Order, the Debtors have filed twenty-eight (28) omnibus claims objections, including fourteen (14) omnibus objections addressing certain non-Borrower claims, asserting that such claims should be disallowed and expunged from the claims register on the basis that they were: (i) filed after the Bar Date and thus not timely filed; (ii) duplicates of other claims; (iii) amended and superseded by a claim subsequently filed by the same claimant on the same basis, or (iv) duplicative of bondholder Trustee claims.  In addition, the Debtors filed fourteen (14) omnibus objections addressing certain Borrower Claims on the aforementioned bases, among other grounds (as described further below).  On June 6, 2013, the Bankruptcy Court entered orders granting the relief requested in each of the first three omnibus claims objections, thereby expunging non-Borrower Claims in the approximate aggregate amount of $225.1 million.  On July 15, 2013, the Bankruptcy Court entered orders granting the relief requested in each of the fourth through ninth omnibus claims objections, thereby expunging non-Borrower and Borrower Claims in the approximate aggregate amount of $18.4 billion, and making the total amount of expunged Claims as of the date of this Disclosure Statement approximately $18.6 billion.  The Debtors intend to continue filing omnibus claims objections, as well as objections to specific disputed claims, to create an identifiable claims pool with a more definite size limitation, which will assist them in ensuring that each Class of creditors receives its appropriate distribution from the Debtors' Estates.

(c)    **Composition of Filed Claims**

As part of their claims reconciliation process, the Debtors have determined that claims filed in these Chapter 11 Cases primarily fall into the following subject matter categories: (i) PLS Claims; (ii) breach of representation and warranty whole loan claims (excluding RMBS Trustees); (iii) monoline insurance claims; (iv) master servicer claims; (v) governmental agency claims; (vi) servicing claims; (vii) claims filed by current or former individual Borrowers; (viii) putative class action litigation claims; (ix) bondholder claims; (x) tax claims; (xi) trade claims; and (xii) employee benefit and indemnification claims.

-89-

Many claims filed against the Debtors are based on litigations related to the Debtors' businesses, and many of those parties bring claims against Ally or other non-Debtor affiliates based on veil piercing and aiding and abetting theories of liability. After conducting an exhaustive and expensive investigation, the Examiner concluded that such claims against Ally are unlikely to prevail.

The claims comprising Unsecured Claims primarily relate to Borrower Claims, claims related to pending putative class actions commenced on behalf of current or former Borrowers, trade claims, employment-related claims, contract based claims related to mortgage loan servicing, and claims alleging of breach of contract arising from the Debtors' mortgage business operations.

To date, approximately 3,000 Proofs of Claim totaling approximately $14.2 billion in asserted aggregate liquidated amount have been filed against the Debtors by or on behalf of Borrowers or former Borrowers allegedly in connection with mortgage loans originated, acquired, securitized, or serviced by the Debtors. In general, the Borrower Claims consist of claims arising out of the Debtors' mortgage loan servicing activities and assert damages for alleged wrongful foreclosures, failure to approve or comply with loan modification obligations, improper assignment of deeds of trust, lender-placed insurance policies, violations of RESPA (defined below) and/or the Truth In Lending Act, and fraud. The Debtors currently are reviewing and analyzing the Borrower Proofs of Claim in consultation with Committee Borrower Counsel, and believe that a substantial number of the Borrower Proofs of Claim are subject to reduction or disallowance on, among others, the basis that they are overstated, invalid, or duplicative. The Debtors, the Creditors' Committee and Committee Borrower Counsel also analyzed all the Borrower class action Claims, some of which are discussed in greater detail in Article IV.A.19.(h), *supra*, contained herein. Based on that analysis, it is believed that a substantial portion of those claims will be significantly reduced.

Pursuant to the Claims Procedures Order, the Debtors are required to consult with Committee Borrower Counsel prior to filing an objection to a Borrower Claim on designated grounds, which grounds and Borrower claims procedures were mutually agreed upon by the Debtors, the Creditors' Committee, and the Committee Borrower Counsel. The Debtors also are required, under the terms of the Claims Procedures Order, in certain circumstances to contact Borrowers that filed a Proof of Claim with insufficient or no supporting documentation to request additional information prior to objecting to such claims. To determine which Borrowers were required to be contacted, the Debtors and Committee Borrower Counsel expended a substantial amount of time reviewing all the Proofs of Claim filed by Borrowers and through this process were able to develop a subset of the Borrower Claims where additional information was needed to assess the claim. To date, the Debtors have mailed approximately 1,800 letters to Borrowers requesting additional information with respect to their Proofs of Claim. The Debtors and Committee Borrower Counsel have reviewed and continue to review the Borrower responses to those letters in an effort to evaluate and reconcile all Borrower Claims.

In addition, to date the Debtors have filed fourteen (14) omnibus claim objections to Borrower Claims. The basis for these fourteen (14) omnibus Borrower Claims objections included, among others: (i) claims filed after the Bar Date and thus not timely filed; (ii) duplicate

-90-

claims filed by the same Borrower; (iii) amended and superseded claims filed by the same Borrower on the same basis; (iv) redundant and substantially identical claims to a previously filed Borrower Claim filed by the same Borrower; or (v) claims for which the Debtors have no liability. Under the Claims Procedures Order, the Debtors were not required to consult with the Creditors' Committee or Committee Borrower Counsel prior to filing certain of these omnibus claims objections, except for omnibus objections to claims for which the Debtors have no liability.  On July 15, 2013, the Bankruptcy Court entered orders granting the relief sought in nine (9) of these omnibus claims objections.  In connection with the claims reconciliation effort, the Debtors, in consultation with Committee Borrower Counsel when appropriate, will be filing additional omnibus objections to Borrower Claims, as well as individual objections to Borrower Claims.

### (d)   Creditor/Borrower Hotline

In an effort to assist Borrowers and other creditors through the bankruptcy process, Committee Borrower Counsel has operated a dedicated, toll-free hotline for Borrower inquiries (the "Borrower Hotline").  Inquiries to the Borrower Hotline have primarily focused on questions regarding procedures for filing proofs of claim, information regarding the sale of the Debtors' loan portfolios, the claims reconciliation process, omnibus objections to claims, Borrower-specific requirements of the Omnibus Claims Procedures, and the overall status of the Chapter 11 Cases.  In addition, Committee Borrower Counsel assisted Borrowers in connection with specific loan inquiries by facilitating communication between the Borrower and the Debtors regarding specific loans.  To date, Committee Borrower Counsel has responded to more than 1,000 phone inquiries from Borrowers.

### (e)   Borrower Adversary Proceedings

The Debtors, the Creditors' Committee, and Committee Borrower Counsel, have reviewed all pleadings filed by Borrowers against the Debtors.   At the direction of the Bankruptcy Court, the Debtors, Committee Counsel, and/or Committee Borrower Counsel have attempted to contact those Borrowers via telephone and/or written correspondence to, among other things, reach a resolution of the claims being asserted against the Debtors.  Additionally, in order to establish mechanisms for the efficient intake and review of the adversary proceedings commenced by current or former Borrowers under the Bankruptcy Rules  (the "Borrower Adversary Proceedings"), on March 21, 2013, the Bankruptcy Court entered an order approving and implementing a supplement to the Case Management Order[91] establishing notice, case management, and administrative procedures to assist the Debtors in the management and administration of the Borrower Adversary Proceedings (the "Supplemental Procedures Order"). The terms of the Supplemental Procedures Order were the product of several discussions by and among the Debtors and the Creditors' Committee.   Since the entry of the Supplemental Procedures Order, the Debtors and Committee Borrower Counsel have conducted several initial case conferences with Borrowers, and continue to conduct case conferences in an effort to

---

[91]   On May 23, 2012, the Bankruptcy Court entered an order establishing certain notice, case management, and administrative procedures applicable to these Chapter 11 Cases [Docket No. 141] (the "Case Management Order").

resolve the Borrower Adversary Proceedings. These communications have resulted in the successful resolution, without the need for judicial intervention, of several Borrower Adversary Proceedings.

### (f) Mortgage-backed Securities Litigation

The Debtors currently are defendants in numerous securities litigation cases relating to various PLS Trusts containing mortgage loans with an aggregate UPB of $9.3 billion. The plaintiffs in all cases have alleged that the various defendant Debtors made misstatements and omissions in registration statements, prospectuses, prospectus supplements, and/or other documents related to RMBS offerings in connection with the mortgages held by the PSA Trusts. The alleged misstatements and omissions typically concern representations regarding the underwriting standards employed in the origination of the mortgage loans held by the PLS Trusts. The plaintiffs claim that such misstatements and omissions constitute violations of state and/or federal securities law and common law including negligent misrepresentation and fraud. The plaintiffs seek monetary damages and rescission. Set forth below are summaries of certain notable pending mortgage-backed securities litigations, which are for illustrative purposes only and are not intended to be inclusive of all litigation pending against the Debtors.

### (i) Tolled Claimants

Certain Debtors and non-Debtor Affiliates, including AFI and Ally Securities have at various times entered into tolling agreements with parties who claim to have causes of action against the Debtors or non-Debtor Affiliates related to RMBS (the "Tolled Claimants"). Many of the Tolled Claimants filed proofs of claim in these Chapter 11 Cases. To the extent the statute of limitations had not run prior to the execution of any particular tolling agreement, the applicable Tolled Claimants would not be time-barred from commencing litigation against those Debtor and non-Debtor Affiliates with whom they have tolling agreements. The Ally Contribution is conditioned upon the receipt of releases from the Tolled Claimants for claims against any non-Debtor Affiliate subject to the tolling agreements. The Plan provides that any claims filed by the Tolled Claimants will be administered in the Private Securities Claims Trust.

### (ii) Notable Private-label Securities Litigation

The Debtors are currently defendants in at least 14 private-label securities litigation cases relating to the packaging, marketing, offering, and sale of private label securities. The plaintiffs in these cases have alleged that the various defendant Debtors made misrepresentations in the offering materials, that the Debtors' public filings and offering documents contained false statements and omissions of material facts, and that the Debtors' alleged actions constituted violations of state and/or federal securities law. The plaintiffs assert claims for fraud, negligent misrepresentation, fraudulent inducement, aiding and abetting, and unjust enrichment and seek rescission, monetary damages, and costs.

Allstate Ins. Co., et al. v. GMACM, et al. On February 18, 2011, the Allstate Insurance Company and various of its subsidiaries and affiliates (collectively, "Allstate") filed a complaint in Hennepin County District Court, Minnesota, against numerous defendants, including

Residential Funding Securities LLC n/k/a Ally Securities LLC ("Ally Securities")[92] and Debtors GMACM, RFC, Residential Accredit Loans, Inc. ("RALI"), Residential Asset Mortgage Products, Inc. ("RAMP"), Residential Funding Mortgage Securities I, Inc. ("RFMSI"), Residential Funding Mortgage Securities II, Inc. ("RFMSII"), and Residential Asset Securities Corp. ("RASC"). GMACM and RFC are named as seller, sponsor and servicer defendants. Ally Securities is named as an affiliated underwriter defendant, with responsibility for underwriting and managing the securitizations' sale, including screening mortgage loans for compliance with underwriting guidelines. RALI, RAMP, RASC, RFMSI, and RFMSII are named as depositor defendants. The complaint alleges that the defendants misrepresented in the offering materials the riskiness and credit quality of, and omitted material information related to, RMBS purchased by Allstate. The complaint asserts claims for fraud and negligent misrepresentation, fraudulent inducement and violations of the Minnesota Consumer Fraud Act against all defendants and seeks money damages and costs, including attorneys' fees. Discovery is proceeding against the non-Debtor defendants in this action. The Plan contemplates resolution of Allstate's Claims through the Private Securities Claims Trust established under the Plan.

Federal Home Loan Bank of Boston. On April 20, 2011, the Federal Home Loan Bank of Boston ("FHLB of Boston") filed a complaint in Superior Court of the Commonwealth of Massachusetts, Suffolk County, naming numerous defendants including non-Debtors AFI and GMAC Mortgage Group LLC and Debtors RFC and RALI. The complaint alleges that the defendants collectively packaged, marketed, offered, and sold private label MBS, and FHLB of Boston purchased such securities in reliance upon misstatements and omissions of material facts in the offering documents. The complaint seeks rescission and damages for negligent misrepresentation and violations of the Massachusetts Uniform Securities Act, among other claims. On May 23, 2011, the case was removed to federal court in the United States District Court for the District of Massachusetts. Plaintiff's motion to remand was denied on March 9, 2012. On June 29, 2012, the FHLB of Boston filed an amended complaint, which expressly acknowledged the automatic stay in the Debtors' Chapter 11 Cases. On October 11, 2012, all defendants except the Debtors moved to dismiss the Amended Complaint and those motions are pending. Motions to dismiss were argued on July 17, 2013 and are currently under submission and awaiting ruling. The Plan contemplates resolution of FHLB of Boston's Claims through the Private Securities Claims Trust established under the Plan.

Federal Home Loan Bank of Chicago. On October 15, 2010, the Federal Home Loan Bank of Chicago ("FHLB of Chicago") filed a Complaint for Rescission and Damages in the Circuit Court for Cook County, Illinois, naming as defendants, among others, Debtors RFC, RAMP, RASC, and RFMSI, as well as non-Debtor affiliates Ally Securities, GMAC Mortgage Group LLC, and AFI, and asserting claims under the Illinois Securities Law and for common law negligence (the complaint was subsequently amended to add claims against certain defendants under the North Carolina and New Jersey securities statutes). This action was removed to federal court on November 23, 2010 and, on January 18, 2011, the action was remanded to the Circuit Court for Cook County. The Debtors, their affiliates, and others moved to dismiss the Amended Complaint on May 27, 2011. On September 19, 2012, the court denied defendants'

---

[92]    Underwriter Ally Securities was formerly owned by the Debtors. In 2009, the Debtors sold Ally Securities to AFI.

motions to dismiss in their entirety.  Written discovery as to all parties except Debtors RFC, RAMP, RASC, and RFMSI is currently in its early stages and is ongoing.  The Plan contemplates resolution of FHLB of Chicago's Claims through the Private Securities Claims Trust established under the Plan.

Federal Home Loan Bank of Indianapolis.  On October 15, 2010, the Federal Home Loan Bank of Indianapolis ("FHLB of Indianapolis") filed a complaint in Indiana in the Marion County Superior Court naming as defendants, among others, Debtor RMFSI and non-debtor affiliates Ally Securities and GMAC Mortgage Group LLC, and asserting claims under the Indiana Uniform Securities Act, Sections 11, 12 and 15 of the Securities Act of 1933, and for common law negligence (only the negligence claim was asserted against Debtor RFMSI).  On November 24, 2010, the FHLB of Indianapolis action was removed to federal court and, on May 25, 2011, the action was remanded to the Marion County Superior Court.  On July 14, 2011, FHLB of Indianapolis filed an amended complaint.  Debtor RFMSI, its affiliates, and others moved to dismiss the amended complaint on September 14, 2011.  On May 24, 2012, while motions to dismiss were pending, the state court entered an order staying the entire proceeding due to RFMSI's bankruptcy filing.  On July 3, 2012, the state court granted FHLB of Indianapolis' motion to dismiss the claims against RFMSI without prejudice.  On the same date, the court issued a memorandum opinion and order denying defendants' motions to dismiss as to all but FHLB of Indianapolis' federal securities claims, which the court concluded were time-barred.  Written discovery is currently underway against the non-Debtor defendants.  The Plan contemplates resolution of FHLB of Indianapolis's Claims through the Private Securities Claims Trust established under the Plan.

Massachusetts Mutual Life Ins. Co. v. Residential Funding Co., LLC, et al.  On February 9, 2011, the Massachusetts Mutual Life Insurance Company ("MassMutual") filed a complaint in the United States District Court for the District of Massachusetts against Ally Securities and Debtors RFC, RALI, RAMP and RASC, and seven former directors and officers of Debtor entities.  The complaint alleges that the defendants' public filings and offering documents associated with RMBS MassMutual purchased contained false statements and omissions of material facts and that the directors and officers were involved in the day-to-day affairs of the primary violators and had control over the securitizations at issue, as evidenced by their signatures on the registration statements.  MassMutual asserts claims for violations of the Massachusetts Uniform Securities Act and seeks unspecified compensatory and statutory damages.  On February 14, 2012, all Debtor entities were dismissed from this action, but Ally Securities remains in the action as a defendant.  Discovery is proceeding against the non-Debtor defendants in this action.  The Plan contemplates resolution of MassMutual's Claims through the Private Securities Claims Trust established under the Plan.

National Credit Union Administration Board (the "NCUAB") Litigation.  On August 9, 2011, the NCUAB filed a complaint as liquidating agent of U.S. Central Federal Credit Union ("U.S. Central") and Western Corporate Federal Credit Union ("WesCorp"), in the United States District Court for the Central District of California, against Goldman, Sachs & Co. as underwriter and seller, and Fremont Mortgage Securities Corp., GS Mortgage Securities Corp., Long Beach Securities Corp., and RALI, as issuers, with respect to certain RMBS purchased by U.S. Central and WesCorp.  Previously, on June 20, 2011, the NCUAB filed a complaint as

-94-

liquidating agent of U.S. Central against numerous defendants, including RFMSII, in the United States District Court for the District of Kansas. The complaints assert claims under Sections 11 and 12 of the Securities Act of 1933 and state securities laws and allege that the offering documents associated with the underlying transactions contained untrue statements and omissions of material facts. These complaints seek costs and rescission, rescissory damages, or money damages. The defendants moved to dismiss both complaints. In the Kansas action, motions to dismiss were, in general, denied. The case is being coordinated with five other NCUAB actions and is currently stayed, subject to certain exceptions, pending the Tenth Circuit's resolution of an interlocutory appeal concerning issues involving the statute of limitations applicable to NCUAB's federal Securities Act claims. In the California action, motions to dismiss the original complaint were granted in part and denied in part. NCUAB filed a first amended complaint on October 29, 2012 and defendants (excluding RALI) moved to dismiss on December 13, 2012. Following several rounds of briefing and oral argument, motions to dismiss the amended complaint were for the most part denied, except as to certain securitizations not related to the Debtors. Discovery will likely commence following a Rule 26 conference on August 22, 2013.

The NCUAB has filed Proofs of Claim asserting certain of the claims asserted in the district court litigations. On June 20, 2013, the Debtors filed an objection seeking to disallow and expunge NCUAB's Proofs of Claim on the following grounds: (i) the NCUAB Claims are untimely; (ii) the NCUAB cannot allege, let alone prove, any material misstatement in the offering materials; and (iii) the underlying losses were caused by a market-wide collapse, not by any misstatement by the Debtors. The NCUAB Claims are not included in the Private Securities Claims Trust. To the extent the NCUAB's Claims are Allowed, such Claims will be treated as General Unsecured Claims.

In addition to the actions filed against the Debtors and the related Proofs of Claim, NCUAB also informed the Debtors that it believes it has claims against AFI and Ally Securities that are timely based on equitable tolling and constructive notice arguments. The Claims that NCUAB purports to have against AFI and Ally Securities include, among others, Claims based on the same allegations as in its Proofs of Claim. The Debtors believe the NCUAB's purported claims against AFI and Ally Securities are time barred and otherwise without merit.

New Jersey Carpenters Health Fund v. Residential Capital, LLC. On September 22, 2008, New Jersey Carpenters Health Fund, New Jersey Carpenters Vacation Fund, and Boilermaker Blacksmith National Pension Trust, on behalf of themselves and a putative class (collectively, "NJ Carpenters Class Members") filed a complaint in New York Supreme Court, New York County. On October 14, 2008, the case was removed to the District Court. On May 18, 2009, NJ Carpenters Class Members filed a Consolidated First Amended Securities Class Action Complaint against Ally Securities and numerous Debtor defendants including ResCap, RFC and RALI, and eight directors and officers of Debtor entities. The First Amended Complaint alleges that the plaintiffs and the class purchased RMBS issued between March 28, 2006, and October 9, 2007, and asserts that the offering documents associated with these transactions contained misrepresentations and omitted material information in violation of Sections 11, 12, and 15 of the Securities Act of 1933. The complaint seeks unspecified compensatory damages, rescission or a rescissory measure of damages, and attorneys' fees and

-95-

costs, among other relief. On July 30, 2010, several additional pension funds moved to intervene. On August 16, 2010, NJ Carpenters Class Members moved for class certification and to be named class representative. On December 22, 2010, the District Court granted the motion to intervene, and NJ Carpenters Class Members then filed a second amended complaint adding in the intervenor claims. On January 18, 2011, the court denied NJ Carpenters Class Members' motion for class certification. The Second Circuit granted leave to appeal, but ultimately affirmed the District Court's denial of class certification on April 30, 2012. On remand, NJ Carpenters Class Members renewed their motion for class certification, which was granted on October 15, 2012. The non-Debtor defendants' petition for leave to appeal this ruling was denied by the Second Circuit and factual discovery has commenced. On April 30, 2013, the District Court issued an opinion reinstating previously dismissed claims as to an additional 37 offerings. The NJ Carpenters Class Members have sought class certification with respect to 19 of these additional offerings. Discovery has been proceeding as to the non-debtor defendants and the court has entered a scheduling order placing this matter on the District Court's January 2015 trial calendar. Based on recent Second Circuit law, the non-Debtor defendants recently moved for reconsideration of the denial of their motions to dismiss the intervenors' claims.

Subject to approval of the District Court, the Plan contemplates resolution of the NJ Carpenters Claims against the NJ Carpenters Released Parties and related proofs of claim filed by the named plaintiffs in the Chapter 11 Cases. This NJ Carpenters Settlement, which is subject to District Court approval, reduces burdensome and costly discovery, including detailed loan-level discovery of up to 59 separate securitizations. In addition, the settlement avoids continued litigation and motion practice regarding class certification and the adequacy of class representation in mortgaged backed securities litigation. Based on the few publicly-available comparable settlements, the Debtors believe that the terms of the proposed settlement are reasonable and beneficial to the Debtors' Estates. On June 28, 2013, the District Court preliminarily approved the proposed settlement.

### (iii)    Notable Securities Litigations Against Non-Debtor Affiliates

Federal Housing Finance Agency Litigation.    On September 2, 2011, the FHFA, as conservator for Freddie Mac, filed a complaint naming numerous defendants, including AFI, Ally Securities, GMAC Mortgage Group, LLC and against Debtors ResCap, GMAC-RFC, RFC, RAMP, RASC, and RALI, in New York County Supreme Court. The complaint alleges that Freddie Mac purchased over $6.0 billion of RMBS issued in connection with twenty-one securitizations sponsored and/or underwritten by the defendants. It further alleges that the registration statements, prospectuses, and other offering materials associated with these transactions contained false and misleading statements and omissions of material facts. Based on these allegations, the complaint brings claims for violation of the Securities Act of 1933, the Virginia Securities Act, and control-person claims. The complaint also asserts claims for fraud and aiding and abetting fraud, and seeks rescission and recovery of the consideration Freddie Mac paid for the securities, as well as other compensatory and punitive damages. AFI and ResCap removed this case to the United States District Court for the Southern District of New York. The case was coordinated with 15 other cases brought by FHFA against other issuers, underwriters, and affiliated parties. The first of the 15 cases to proceed through summary judgment briefing was the one filed by FHFA against UBS. On May 4, 2012 the District Court

denied in large part the UBS defendants' motion to dismiss. On June 13, 2012 FHFA filed an amended complaint withdrawing the claims against the Debtors. All of the cases have survived motions to dismiss in large part, and on April 5, 2013, the Second Circuit considered an interlocutory appeal of the District Court's order on the UBS motion to dismiss and affirmed the District Court's denial thereof. Following this decision, AFI, Ally Securities, GMAC Mortgage Group, LLC and certain third parties remain pending with factual discovery in progress. Several of the cases, including the case against UBS, have settled. The trial in the first of the remaining coordinated cases is scheduled for mid-2014, and the trial in the case proceeding against AFI and its affiliates is currently scheduled to begin in early 2015. Under scheduling orders in the consolidated action, the trial against AFI may be accelerated if other consolidated cases scheduled to be heard earlier are settled.

On November 30, 2012, FHFA timely filed proofs of claim against certain of the Debtors (Claim Nos. 6296, 6297, 6298, 6299, 6300, and 6301) (the "FHFA Claims"). FHFA has asserted that the FHFA Claims are entitled to be treated as priority claims under the Housing and Economic Recovery Act of 2008 ("HERA"), as codified in 12 U.S.C. §§ 4617(b)(15).

The Plan Proponents believe that, at best, HERA may provide the FHFA with a first priority right to avoidance of certain transfers made with the intent to hinder, delay, or defraud FHFA or Freddie Mac. The Plan Proponents have conducted an intensive investigation of potential fraudulent conveyance claims and are not aware of any intentional fraudulent conveyance claims that may be covered by HERA that are being settled pursuant to the Global Settlement. Moreover, the Plan Proponents are not aware of any avoidable transfers that were intended to defraud the FHFA or Freddie Mac. Accordingly, the Plan Proponents have not modified any provisions in the Plan relating to the impact of HERA on creditor recoveries or the ability of the FHFA to bring such actions.

Notwithstanding anything herein to the contrary, nothing herein shall have any impact on the validity or classification of the FHFA Claims, and all rights of FHFA are fully preserved in that regard. Moreover, notwithstanding anything herein to the contrary, nothing herein or in the Plan shall have any impact on the right of FHFA to assert that the FHFA Claims are entitled to be treated as priority claims based on the rights, powers, and privileges of the FHFA, in its statutory capacity as the Conservator of Freddie Mac under HERA, and all rights of FHFA are fully preserved in that regard. In addition, FHFA asserts that nothing herein or in the Plan or the order confirming the Plan can affect, limit, enjoin or otherwise prejudice FHFA's rights, powers, and privileges under HERA as conservator of Freddie Mac and all rights of FHFA are fully preserved in that regard. Moreover, the Plan Proponents reserve all of their respective rights and defenses with respect to the FHFA's assertions regarding HERA.

The Plan provides that the Third Party Releases will not apply to any claims held by the FHFA against Ally Bank. The Plan further provides that the FHFA will not receive any recovery from the Private Securities Claims Trust established under the Plan, and the FHFA will retain all securities claims against AFI and its affiliates.

ny-1105358

        **(iv)**     **Resolution of Private Securities Claims in Plan Support
Agreement**

As discussed further in Article V, the Debtors and the holders of Private Securities
Claims agreed to resolve billions of dollars in claims against the Debtors and non-Debtor
affiliates arising from their structuring, sponsoring, underwriting, and sale of RMBS in the Plan
Support Agreement.  Pursuant to the Plan Support Agreement, the Private Securities Claims will
be transferred into the Private Securities Claims Trust and will recover, in the aggregate, $235.0
million, subject to the adjustments, in full and complete satisfaction of their claims against the
Debtors, and in full resolution of the Debtors' claims that the Private Securities Claims should be
subordinated to the Debtors' general unsecured creditors' claims pursuant to Section 510 of the
Bankruptcy Code.

        **(g)**     **Private-label Monoline Bond Insurer Litigation**

The Debtors are currently defendants in fourteen (14) cases in which monoline insurance
companies, which provided financial guaranty insurance for certain tranches of the RMBS issued
by the Debtors' PLS Trusts, have alleged that certain of the Debtors breached their contractual
representations and warranties relating to the characteristics of the mortgage loans contained in
certain RMBS offerings insured by the applicable insurer.  The Monoline insurers further allege
that the defendant Debtors failed to follow certain remedy procedures set forth in the contracts
and improperly serviced the mortgage loans.  The Monoline insurers allege both breach of
contract and fraud.  Set forth below are summaries of certain notable pending private-label
monoline bond insurer litigations, which are included for illustrative purposes only and are not
intended to be inclusive of all litigation pending against the Debtors.

        **(i)**     **MBIA Litigations**

MBIA brought two cases against Debtors RFC and GMACM in New York State
Supreme Court for New York County:  <u>MBIA Insurance Corporation v. RFC</u>, filed December 4,
2008,[93] and <u>MBIA Insurance Corporation v. GMACM</u>, filed April 1, 2010.  The complaints
allege that the defendants: (i) breached their contractual representations and warranties relating
to the characteristics of mortgage loans contained in certain insured RMBS offerings; (ii) failed
to follow the repurchase specific remedy procedures set forth in the contracts; (iii) improperly
serviced the mortgage loans; and (iv) committed fraud.  The RFC complaint also included
negligent misrepresentation, breach of the duty of good faith and fair dealing, equitable and
implied indemnification and unjust enrichment counts which have been dismissed.  The
GMACM complaint also included negligent misrepresentation and breach of the duty of good
faith and fair dealing counts which have been dismissed.  The RFC case involves five
securitizations MBIA insured in 2006 and 2007.  The GMACM case involves three
securitizations MBIA insured between 2004 and 2007.  MBIA seeks, among other remedies,
repurchase of certain loans, monetary damages for past and future payments MBIA has made
payments on current and future claims under the relevant insurance policies, indemnification for

---

[93]    MBIA first filed a complaint against RFC in the District Court on October 15, 2008.  On December 4, 2008,
MBIA voluntarily dismissed that case and filed the state court complaint against RFC.

attorneys' fees and costs, and punitive damages. Fact discovery was substantially complete in the RFC case on the Petition Date and expert discovery was underway. The GMACM case was in the middle of fact discovery on the Petition Date. Both cases were stayed by the filing of the Debtors' Chapter 11 Cases. MBIA also filed a complaint on September 17, 2012 in the Fourth Judicial District Court for the State of Minnesota naming as defendants AFI, IB Finance, Ally Bank, Ally Securities, and GMAC Mortgage Group. The complaint asserts claims for aiding and abetting fraud (and breach of contract as to Ally Bank) relating to seven of the eight securitizations at issue in the previously filed lawsuits against debtors RFC and GMACM. MBIA did not include in this complaint claims with respect to a 2004 securitization sponsored by GMACM at issue included in the GMACM suit. The case was removed to the United States District Court for the District of Minnesota. Briefing on the defendants' motion to dismiss has not yet been completed, but oral argument has not yet been held on this motion. The scheduled oral argument on the motion to dismiss has been cancelled based on the entry into the PSA.

MBIA is a Consenting Claimant and the Plan seeks to resolve the MBIA litigation through the allowance, priority, and allocation of the Allowed Claims held by MBIA. (See, *supra* Article II).

### (ii)    FGIC Litigations

Beginning on November 29, 2011, and prior to the Petition Date, FGIC initiated a total of twelve (12) civil suits asserting a variety of claims against ResCap, GMACM, and/or RFC in connection with twenty (20) of the FGIC Insured Trusts. Summaries of these lawsuits are below. The FGIC Settlement Agreement, if approved by the Bankruptcy Court and the FGIC Rehabilitation Court, will resolve all of the claims asserted in these lawsuits in exchange for FGIC receiving allowed claims in the Debtors' Chapter 11 Cases, as explained in greater detail above.

Financial Guaranty Insurance Company v. Ally Financial, Inc., Residential Capital, LLC, and Residential Funding Co., LLC ("FGIC v. AFI"). On December 12, 2011, FGIC filed a complaint against AFI and Debtors ResCap and RFC in the New York County Supreme Court for New York County. The complaint alleges that: (i) the defendants breached their contractual representations and warranties relating to the characteristics of the mortgage loans contained in certain insured RMBS offerings and fraudulently induced FGIC to enter into these contracts; (ii) the defendants breached their contractual obligations to permit access to loan files and certain books and records; (iii) ResCap and RFC are alter egos of AFI, and that AFI is therefore liable for the actions of its subsidiaries; and (iv) AFI aided and abetted ResCap and RFC's fraudulent inducement of the insurance contracts. FGIC filed three additional complaints with substantially similar allegations in New York County Supreme Court on December 27, 2011 with respect to different securitizations, and each of these four complaints was removed to federal court on January 13, 2012. FGIC filed two substantially similar complaints in the Southern District of New York on March 5 and 13, 2012 regarding additional securitizations. In each of the six FGIC v. AFI actions, FGIC seeks, among other relief, reimbursement of all sums it paid under the various policies and an award of legal, rescissory, equitable, and punitive damages. No answers or dispositive motions have been filed in these cases, and they were stayed as to the non-

Debtor defendants through April 30, 2013.  The district court subsequently stayed these actions indefinitely based on FGIC's entry into the PSA.

Financial Guaranty Insurance Company v. Ally Financial, Inc., Residential Capital, LLC, Ally Bank, and GMACM.  On January 31, 2012, FGIC filed a complaint against AFI, Ally Bank, and Debtors ResCap and GMACM in the District Court.  The complaint alleges that the defendants improperly transferred a large volume of mortgage loans after the closing of the relevant transaction in violation of the contractual provisions which permitted the addition of loans in these securitizations after the closing.  FGIC further alleges that the defendants breached their contractual obligations to permit access to loan files and certain books and records.  With regard to AFI, FGIC alleges that ResCap and GMACM are alter egos of AFI, and that AFI is therefore liable for the actions of its subsidiaries.  FGIC also alleges that Ally Bank breached its obligations as custodian of the underlying mortgage notes.  FGIC filed two additional lawsuits against AFI, ResCap, GMACM, and Ally Bank on March 6 and 12, 2012 regarding additional securitizations, which tracked the allegations brought on January 31, 2012, with regards to AFI's alter ego liability and Ally Bank's custodial breach, but did not include allegations of improper transfer, and also alleged that defendants (i) breached their contractual representations and warranties relating to the characteristics of the mortgage loans contained in certain insured RMBS offerings, (ii) fraudulently induced FGIC to enter into these contracts and (iii) that AFI and Ally Bank aided and abetted ResCap and GMACM's fraudulent inducement.  On March 30, 2012, FGIC amended a complaint—originally brought in the New York Supreme Court on November 29, 2011, and subsequently removed to the Southern District of New York— in a fourth action against ResCap, GMACM and Ally Bank to add AFI and to include improper subsequent transfer and alter ego allegations substantially similar to those alleged in the January 31, 2012 action, as well as allegations of breach of representations and warranties, fraudulent inducement, and aiding and abetting fraud substantially similar to those alleged in the March 6 and 12 actions.  In each of these four actions, FGIC seeks, among other relief, reimbursement of all sums it paid under the various policies and an award of legal, rescissory, equitable, and punitive damages.  No answers or dispositive motions have been made in these cases, and they were stayed as to the non-Debtor defendants through April 30, 2013.

Financial Guaranty Insurance Company v. Residential Funding Co., LLC, and Residential Capital, LLC.  On November 29, 2011, FGIC filed two complaints against Debtors ResCap and RFC in New York County Supreme Court for New York County.  These complaints allege that RFC breached its contractual representations and warranties relating to the characteristics of the mortgage loans contained in certain insured RMBS offerings.  FGIC further alleges that RFC breached its contractual obligations to permit access to loan files and certain books and records.  FGIC alleges that ResCap tortiously interfered with FGIC's contract with RFC.  Both actions against RFC were removed to the District Court on December 30, 2011.  FGIC voluntarily dismissed the claims against ResCap in both actions against RFC on March 27, 2012, and no answers or dispositive motions have been filed by RFC prior to the Petition Date.

### (iii)    Assured Guaranty Municipal Corp. Litigations

Assured Guaranty Municipal Corp., f/k/a Financial Security Assurance Inc., v. GMACM, et. al.  On May 11, 2012, Assured Guaranty Municipal Corp. filed a complaint against Ally

Bank, AFI, GMACM, RAMP, RFC, ResCap, and RFMSII in the Southern District of New York. The complaint alleges that GMACM, RAMP, RFC, ResCap, and RFMSII breached their contractual representations and warranties relating to the characteristics of the mortgage loans contained in certain insured RMBS offerings. The complaint also alleges that GMACM, RFC, and ResCap breached their contractual obligations as servicers. The complaint also alleges that Ally Bank and ResCap breached their obligations as document custodians. Finally, the complaint alleges that AFI shares all liability alleged because of its alleged direction and control of the other parties' actions. The complaint seeks compensatory, consequential, and rescissory damages, reimbursement, and indemnification. In light of the bankruptcy proceedings, the case was stayed as to all parties through September 30, 2013. Currently, no answer or dispositive motions have been filed in this matter.

### (h)   Borrower Class Actions and Other Loan Servicing Related Litigations

The Debtors are currently defendants in several cases in which Borrower Claimants or putative classes of Borrower Claimants, allege violations of, among other things, the Real Estate Settlement Procedures Act ("RESPA"), the Truth in Lending Act ("TILA"), as amended by the Home Ownership and Equity Protection Act ("HOEPA"); and/or the Racketeer Influenced and Corrupt Organizations Act ("RICO") by the Debtors. Set forth below are summaries of certain pending Borrower and other class action litigations, which are included for illustrative purposes only and are not intended to be inclusive of all mortgage loan-related litigation pending against the Debtors.

### (i)   Notable Borrower and Other Class Actions

Kessler Litigation. Several putative class actions filed between 2001-2003, all alleging that originators Community Bank of Northern Virginia and Guaranty National Bank of Tallahassee charged certain fees in violation of state and federal law, were consolidated in the U.S. District Court for the Western District of Pennsylvania. On September 22, 2010, the Third Circuit Court of Appeals vacated an order approving the then most recent settlement and remanded the case to the trial court for further proceedings. On October 10, 2011, plaintiffs filed a joint consolidated amended class action complaint against, among others, RFC alleging violations of RESPA; TILA, HOEPA, and RICO. Prior to the Petition Date, RFC filed a motion to dismiss the complaint. The action as against RFC was stayed upon the filing of the Petition. On June 27, 2013, the district court granted in part and denied in part the motions to dismiss of certain of the non-debtor defendants in the consolidated action.

Representatives of the putative class filed proofs of claim in the Chapter 11 Cases purportedly on behalf of the class, and on November 2, 2012, filed a motion with the Bankruptcy Court for authority to certify the class pursuant to Bankruptcy Rule 7023. In connection with the mediation and as provided for in the Plan Support Agreement, the Plan Proponents, over a period of several weeks, participated in extensive, good faith and arm's length negotiations with representatives of the Kessler Class Claimants in an effort to resolve the class Proofs of Claim and the underlying litigation against RFC. Those efforts proved to be successful, and the Debtors and representatives of the named plaintiffs entered into the Kessler Settlement Agreement providing for, among other things, the treatment of the Kessler Class Claimants'

Proofs of Claim as a Borrower Claim, and the certification of the putative class for settlement purposes.

The Bankruptcy Court will conduct a preliminary hearing on the motion on August 21, 2013, after which the Debtors anticipate providing a Bankruptcy Court approved notice of the Kessler Settlement Agreement to the Kessler Settlement Class and seeking final approval from the Bankruptcy Court contemporaneously with confirmation of the Plan.

<u>Moore v. GMACM, <em>et al.</em></u>    On December 20, 2006, a putative class action complaint was filed in United States District Court for the Northern District of California against defendants GMAC LLC (now AFI) and Cap Re.    After several named plaintiffs were dismissed from the action, the parties stipulated that the case would be transferred to the United States District Court for the Eastern District of Pennsylvania, where it is currently pending.    The plaintiffs have amended their claims several times, most recently in the third amended complaint, filed November 26, 2010.    That complaint, filed on behalf of plaintiffs Donna Moore, Frenchola Holden, and Keith McMillon, alleges that defendants GMACM, GMAC Bank (now known as Ally Bank) and Cap Re engaged in captive reinsurance arrangements that violated RESPA, 12 U.S.C. § 2607.    The third amended complaint seeks certification of a nationwide class, declaratory relief, statutory damages, and attorneys' fees and costs.

On July 10, 2012, GMACM filed a notice of bankruptcy, informing the court that GMACM and certain of its affiliates had filed petitions for relief under Chapter 11 of the Bankruptcy Code and the resulting imposition of the automatic stay under Section 362 of the Bankruptcy Code, enjoining the continued prosecution of the action against it.    Currently, the litigation remains stayed in its entirety, including plaintiffs' motion for class certification, although it could potentially resume against defendants Cap Re and Ally Bank at any time.    In that event, Cap Re and/or Ally Bank could seek an additional stay in light of pending bankruptcy issues.    GMACM, Cap Re, Ally and the plaintiffs have, during the course of the litigation, engaged in formal mediation.    The parties are currently engaged in negotiations, but to date, the parties have not reached a resolution of the matter.    The class plaintiffs in the Moore litigation have filed Proofs Claim in the Chapter 11 Cases purportedly on behalf of the putative class.

### (ii)    Other Borrower Class Actions

In addition to the *Moore* and *Kessler* putative class actions, the Debtors are also named defendants in approximately twelve (12) other putative class actions commenced prior to the Petition Date, which were filed on behalf of current or former Borrowers in state and federal courts throughout the country (all of which have been stayed as a result of the filing of these Chapter 11 Cases).    The Borrower-plaintiffs seek monetary damages from the Debtors, which are premised on broad-based allegations that pertain generally to: (i) improper lending and disclosure practices; (ii) force-placing of hazard or flood insurance on individual Borrowers; (iii) improperly charging closing or refinancing fees to Borrowers; and (iv) wrongfully foreclosing on Borrowers' homes and subsequently disposing of the Borrowers' real property.    With the exception of two related cases in which a class was certified for settlement purposes before the Petition Date, none of these putative classes were certified as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure before the Petition Date or have been certified by this Court

subsequent to the Petition Date. Notwithstanding, certain of the named plaintiffs in these actions have filed proofs of claims against the Debtors purporting to represent and speak for the putative class without previously obtaining authority from any court of competent jurisdiction to do so.

The Debtors contend that they have meritorious defenses on both procedural and substantive grounds to each of these putative class actions and, prior to the Petition Date, the Debtors were vigorously defending each such action other than those literally filed on the eve of the Petition Date. Nonetheless, based on: (i) the volume of the class actions; (ii) the damages asserted therein which exceed several billions of dollars in the aggregate; (iii) the anticipated costs of litigating these matters in connection with the claims resolution process; (iv) the uncertainty inherent in any litigation; and (v) the Debtors' objective of providing fair treatment to Borrowers under the Plan, the Debtors are presently engaged in settlement discussions with lead counsel for substantially all of these class actions in an effort to reach a consensual resolution of the underlying claims. To the extent the Debtors are unable to settle any putative class action on acceptable terms for which a proof of claim has been asserted, the Debtors expect they will promptly file claim objections with the Bankruptcy Court and pursue all appropriate procedural and substantive objections to these claims. To the extent the Debtors pursue such objections, the class action plaintiffs will have "Disputed" Claims and will not be entitled to receive any distributions from the Borrower Claims Trust until such time that the Claim is deemed "Allowed."

### (iii)    Notable Borrower Litigations Against Non-Debtor Affiliates

Included among the litigation commenced by the Debtors' current and former Borrowers against the Debtors are actions naming non-Debtor affiliates AFI, Ally Bank, and GMAC Mortgage Group as co-defendants. Among other bases, these actions assert claims against AFI, Ally Bank, and GMAC Mortgage Group under theories of alter ego, veil-piercing, dominion and control, and agency. As of the Petition Date, AFI and Ally Bank collectively were named as co-defendants in approximately forty-five (45) pending actions—including several putative class actions—commenced by current and former Borrowers. Several of the class actions have either been stayed as against all of the named defendants by the presiding courts pending the disposition of the Chapter 11 Cases, or are otherwise being held in abeyance. Ally has denied and continues to deny any breach, fault, liability or wrongdoing regarding claims alleged against Ally.

AFI and/or Ally Bank are named as co-defendants with a particular Debtor entity in five putative Borrower class actions pending in Ohio, Georgia, Alabama and South Carolina; however, the named plaintiffs in these actions have not filed proofs of claim in the Chapter 11 Cases on behalf of the punitive class.

Also included among the putative Borrower class actions naming AFI and/or Ally Bank are Moore *et al.* v. GMAC, LLC, Cap Re of Vermont, Inc., Case No. 06-cv-07817 (JCS) (N.D. Cal. Dec. 20, 2006); Rothstein v. Ally Financial, Inc. *et al.*, Case No. 12-cv3412 (AJN) (U.S. D. Ct. S.D.N.Y.) (the "<u>Rothstein Action</u>"). None of these class actions have been certified. The named plaintiffs in each of these class actions have filed proofs of claim on behalf of the putative

-103-

class; however, none of these parties have obtained authority to do so from any court of competent jurisdiction.

The Rothstein Action was commenced by the filing of a complaint on April 30, 2012, naming only GMACM, Balboa Insurance Company ("Balboa"), a Balboa affiliate, and several unnamed "John Does" as defendants. The original complaint was amended twice; by the first amended class action complaint filed in the Rothstein Action, the plaintiffs dropped GMACM as a defendant and named Ally Bank and AFI as co-defendants, along with additional Balboa entities. A second amended class action complaint was filed in the Rothstein Action on January 22, 2013.

In the Rothstein Action, the plaintiffs assert causes of action against AFI and Ally Bank under, among other bases, alter ego and dominion and control theories. The Rothstein Action is a nationwide class action arising out of allegations concerning hazard insurance allegedly placed by GMACM in its capacity as a servicer after March 6, 2003. Among other things, the plaintiffs allege that the mortgagors were overcharged for such services as a consequence of an undisclosed "kick- back scheme" between GMACM and Balboa. The amended complaint alleges violations of both RICO and RESPA, among other counts. As framed by the complaint filed in the Rothstein Action, the Debtors' preliminary estimates suggest that if ultimately certified, the certified class would be extremely large. Although, GMACM was dropped from the amended complaint filed in the Rothstein Action, the plaintiffs in the Rothstein Action have filed proofs of claim on behalf of the putative class in the Chapter 11 Cases.

AFI and Ally Bank have filed a motion in the Bankruptcy Court to enjoin the prosecution of the Rothstein Action on the basis that the alter ego and related claims alleged against AFI and Ally Bank constitute the property of the Debtors' Estates, and as such, only the Debtors are authorized to bring such claims. [Docket No. 2511]. The Debtors joined in this motion, and the Rothstein plaintiffs are opposing the motion. As of the date hereof, this motion has not been heard by the Bankruptcy Court. The Rothstein plaintiffs and AFI have agreed to stay further litigation against AFI and Ally Bank in the action pending the disposition of this motion. The Balboa defendants have moved in the District Court to dismiss the action as against Balboa. Balboa's motion to dismiss has been fully briefed before the District Court and remains pending as of the date hereof.

The Debtors have meritorious defenses on both standing and substantive grounds to each of the class actions and other Borrower related litigation to which their non-Debtor affiliates are named as parties. The Debtors understand that AFI, Ally Bank, and GMAC Mortgage Group likewise have meritorious defenses to these actions. Nonetheless, in combination, the class actions and other Borrower-related litigation allege damages in excess of several hundred million dollars. If any non-Debtor affiliate of AFI were to be found liable in any of these actions, such liability would give rise to claims for contribution and indemnity against the Debtors both on legal and contractual bases. Similarly, the AFI non-debtor affiliates have incurred and should these actions continue against such parties, will continue to incur professional fees and expenses associated with their defense of such actions for which they could seek indemnification from the Debtors. These expenses could easily exceed several millions of dollars, particularly in the event

-104-

one or more of such actions survive motions to dismiss and then proceed with the class certification phases.

To properly defend each of the actions, AFI, Ally Bank, and GMAC Mortgage Group will require extensive access to the Debtors' books and records, current and former personnel, and the Debtors' external counsel. Moreover, many of those records now reside with Ocwen. Supporting AFI and Ally Bank in these efforts would require considerable expense and effort on the part of the Debtors' Estates.

### 20. Litigation against the Junior Secured Noteholders

The Junior Secured Noteholders collectively assert secured Claims in the amount of $2.223 billion, including principal and accrued pre-petition interest. The Debtors and the Creditors' Committee believe that the Junior Secured Noteholders are significantly undersecured because the value of the collateral securing the Junior Secured Notes is approximately $1.69 billion (subject to adjustment based on expense allocation). The Ad Hoc Group has publicly contended that the Junior Secured Noteholders are oversecured and thus entitled to principal and pre-petition interest, as well as accrued post-petition interest at the default contractual rate of 10.625%. In response, the Debtors and the Creditors' Committee have separately commenced adversary proceedings seeking judicial determinations as to a number of issues bearing on the size of the Junior Secured Noteholders' Claims and the extent and validity of the liens securing the Junior Secured Notes. On June 21, 2013, the Bankruptcy Court entered an order consolidating the adversary proceedings. [Case No. 13-01277, Docket No. 41]. The issues in the JSN Adversary Proceeding have been bifurcated into two parts: (i) Phase I issues, which relate to the Junior Secured Noteholders' recoveries, including the value of the collateral securing the Junior Secured Notes, and are scheduled to be tried in October 2013, and (ii) Phase II issues, which relate to the Plan Support Agreement and the global settlements reached therein and will be adjudicated at the Confirmation Hearing, and, if necessary, in further subsequent proceedings scheduled by the Court. The Junior Secured Noteholders are not a party to the Plan Support Agreement and, as a result, the JSN Adversary Proceeding are not stayed.

The Plan currently provides that the Junior Secured Noteholders will receive payment for the full amount of their pre-petition claims, including both principal and pre-petition accrued interest. However, the Plan (i) does not resolve the issue of whether the Junior Secured Noteholders' pre-petition claim for the principal balance includes approximately $377 million in original issue discount that had not been amortized as of the Petition Date, and (ii) reserves on the issue of whether the Junior Secured Noteholders are entitled to post-petition interest and other charges. As noted above, it is anticipated that these issues will be litigated prior to the Confirmation Hearing. If the Bankruptcy Court determines in Phase I of the JSN Adversary Proceeding or as otherwise determined by the Bankruptcy Court at the Confirmation Hearing that the Junior Secured Noteholders are oversecured creditors, then the Junior Secured Noteholders could be entitled to up to approximately $330 million in post-petition interest (calculated as of November 2013). The Plan contains a mechanism to allow for such payments, by adjusting certain other Creditor recoveries accordingly.

In June and July 2013, with Bankruptcy Court approval, the Debtors (i) partially satisfied the outstanding secured claims of the Junior Secured Noteholders in the amounts of $800 million and $300 million, (ii) paid the outstanding secured claims of AFI under the AFI LOC in the amount of $380 million, plus accrued and unpaid interest and (iii) paid the outstanding secured claims of AFI under the AFI Senior Secured Credit Facility in the amount of $747 million, plus accrued and unpaid interest on  [Docket Nos. 3967, 4404].  The Debtors decided to fully pay down AFI, and partially pay down the Junior Secured Noteholders, in accordance with the Plan Support Agreement.  The Plan Support Agreement provides that the Creditors' Committee and the Consenting Claimants will support a partial paydown of the Junior Secured Notes as long as the Debtors first repay the AFI Senior Secured Credit Facility, subject to a reservation of rights to permit the Debtors to seek to recharacterize or subordinate the AFI claims relating to the AFI LOC or the AFI Senior Secured Credit Facility in the event that the Plan Support Agreement is terminated or the Plan is not approved.  The parties believe that the repayment of each of the AFI LOC, the AFI Senior Secured Credit Facility, and the Junior Secured Notes will benefit the Debtors' Estates by eliminating the interest expense associated with the AFI LOC and the AFI Senior Secured Credit Facility, which the Debtor had been paying on a current basis, thereby enhancing distributions to unsecured creditors, as well as reducing the potential interest expenses for the Junior Secured Notes.  In the event that the Bankruptcy Court determines the Junior Secured Noteholders are oversecured creditors, the partial repayment of the Junior Secured Noteholders alleviates the accrual of post-petition interest on such Claims.  Accordingly, the Debtors do not believe that the payments will in any way prejudice unsecured Creditor recoveries.

(a)     Creditors' Committee's Motion for Standing to Prosecute Claims Against the Junior Secured Noteholders

Pursuant to the AFI/JSN Cash Collateral Order, shortly after its appointment, the Creditors' Committee undertook an investigation of the validity and enforceability of the claims and liens of the Junior Secured Noteholders.  On September 24, 2012, after identifying potential challenges to the claims and liens of the Junior Secured Noteholders, on September 24, 2012, the Creditors' Committee filed a motion seeking authorization to prosecute and settle certain claims on behalf of the Debtors' Estates against U.S. Bank, as indenture trustee for the Junior Secured Notes (as succeeded by UMB Bank, N.A., the "Junior Secured Notes Indenture Trustee"), and Wells Fargo Bank, N.A., as collateral agent for the Junior Secured Notes (the "JSN Collateral Agent").  [Docket No. 1546].

The Creditors' Committee believed it was best positioned to prosecute and settle the claims because the Debtors had (i) entered into numerous stipulations in the AFI/JSN Cash Collateral Order regarding the validity, enforceability, and perfection of the Claims and Liens of the Junior Secured Notes Indenture Trustee, the JSN Collateral Agent, and the Junior Secured Noteholders (collectively, the "Junior Secured Parties"), and (ii) agreed to waive all such claims against the Junior Secured Parties.  These stipulations and waivers would have become binding on all parties in interest unless objected to by the Creditors' Committee by September 24, 2012.  Prior to that deadline, the Creditors' Committee conducted an extensive investigation into the Claims and Liens of the Junior Secured Parties, and the Debtors consented to the Creditors' Committee's derivative standing to investigate the Claims and initiate an adversary proceeding

against the Junior Secured Parties. The Creditors' Committee preserved its objection rights by filing a motion for standing to prosecute and settle the claims before the deadline.

On December 26, 2012, the Bankruptcy Court entered an order granting the Creditors' Committee's motion for standing to prosecute and settle certain claims on behalf of the Debtors' Estates against the Junior Secured Parties (the "Committee JSN Standing Order"). The Committee JSN Standing Order required that the Creditors' Committee to file an adversary complaint by February 28, 2013, and authorized the Creditors' Committee to enter into any settlements with the Junior Secured Parties in consultation with the Debtors. [Docket No. 2518].

(b)    **Adversary Proceeding: JSN Adversary Proceeding for**
*Official Committee of Unsecured Creditors v. UMB Bank, N.A., et al.*
*and Residential Capital, et al. v. UMB Bank, N.A., et al.*

Pursuant to the Committee JSN Standing Order, on February 28, 2013, the Creditors' Committee filed a complaint commencing an adversary proceeding against the Junior Secured Notes Indenture Trustee and the JSN Collateral Agent for declaratory judgment, avoidance of Liens, and disallowance of Claims. [Docket No. 3069]. The complaint seeks: (i) a declaratory judgment that certain property of the Debtors is not subject to Liens or security interests asserted by the JSN Collateral Agent for the benefit of the Junior Secured Notes Indenture Trustee and the Junior Secured Noteholders; (ii) a declaratory judgment that certain Liens or security interests asserted by the Junior Secured Parties on property of the Debtors are unperfected; (iii) an order avoiding the Junior Secured Parties' unperfected Liens on or security interests in certain property under Sections 544, 550, and 551 of the Bankruptcy Code; (iv) an order avoiding certain Liens or security interests asserted by the Junior Secured Parties on at least $350 million of assets as preferential transfers under Sections 547, 550, and 551 of the Bankruptcy Code; (v) an order recharacterizing post-petition payments to the Junior Secured Parties' professionals as payments of principal; (vi) an order clarifying the priority of the Junior Secured Parties' Liens; (vii) an order disallowing the Junior Secured Parties' Claims pending final resolution of the Claims in the complaint; and (viii) an order disallowing the Junior Secured Parties' Claims to the extent such Claims include unmatured interest arising as a result of an original issue discount at the time the Junior Secured Notes were issued. [Adv. Pro. 13-01277, Docket No. 1].

Subsequently, on May 3, 2013, the Debtors filed a complaint against the Junior Secured Parties to determine the extent of certain liens securing the Junior Secured Notes [Docket No. 3592]. On June 19, 2013, the Debtors amended their complaint [Adv. Pro. Docket No. 8]. The Debtors' amended complaint seeks declaratory judgments that:    (i) the Junior Secured Noteholders' Lien on general intangibles does not extend to any portion of the proceeds of, or value attributed to, the Debtors' sale of assets to Ocwen or Walter; (ii) the Junior Secured Noteholders are not entitled to an adequate protection replacement Lien in an amount equal to all or any portion of the Junior Secured Noteholders' Cash Collateral that the Debtors have used during the Chapter 11 Cases because there has been no diminution in the value of the Junior Secured Noteholders' collateral during the pendency of the Chapter 11 Cases; (iii) the Junior Secured Noteholders are not entitled to a Lien on the assets that secure the AFI LOC or any other assets that have been released from the Junior Secured Noteholders' collateral; (iv) the Junior Secured Noteholders are not entitled to a Lien on any proceeds from avoidance actions

-107-

prosecuted on behalf of the Debtors' Estates; and (v) the Junior Secured Noteholders are not oversecured at any individual Debtor entity, and as a result are not entitled to post-petition interest either at the contractual rate or the contractual default rate.  [Adv. Pro. 13-01343, Docket No. 1].

The Junior Secured Parties have filed motions to dismiss various counts in each of the Debtors' and the Creditors' Committee's complaints.    In addition, the Junior Secured Noteholders set forth thirty-five (35) counterclaims to the Debtors' complaint, which relate to all aspects of these Chapter 11 Cases.  [Adv. Pro. 13-01343, Docket No. 29].  In particular the Junior Secured Noteholders seek declarations concerning:  (i) the ownership and value of collateral, (ii) the Intercompany Balances and the value of those claims, (iii) the allocation of the Ally Contribution among the Debtors' Estates and among each potential Cause of Action underlying the Debtor Release and the Third Party Releases, (iv) the allocation of the purchase prices of the Asset Sales, (v) the collateral released prepetition in connection with one of the Debtors' secured financings, (vi) the Junior Secured Noteholders' alleged entitlement to adequate protection liens, (vii) the Junior Secured Noteholders' alleged entitlement to post-petition interest, fees, and expenses, including accrual of interest at the contractual default rate pursuant to the Junior Secured Notes Indenture, and (viii) the treatment of certain Unsecured Claims resolved by the Global Settlement that the Junior Secured Noteholders' allege should be subordinated to other Creditors under Section 510 of the Bankruptcy Code, each of which the Junior Secured Noteholders' allege impacts their entitlement to post-petition interest, fees, and expenses.

The Junior Secured Parties have filed motions to dismiss certain counts in each of the Debtors' and the Creditors' Committee's complaints [Adv. Pro. 13-01277, Docket Nos. 21, 52; Adv. Pro. 13-01343, Docket No. 21], and the Debtors and the Creditors' Committee have filed a motion to dismiss certain of the Junior Secured Parties' counterclaims.  [Adv. Pro. 13-01277, Docket No. 53; Adv. Pro. 13-01343, Docket No. 22].  The Bankruptcy Court held a hearing on the Junior Secured Parties' motion to dismiss parts of the Creditors' Committee's complaint on July 26, 2013, and issued on August 13, 2013 a memorandum opinion, granting in part and denying in part, the motion.  Responses to each of the remaining motions to dismiss were filed on July 30, 2013 [Adv. Pro. 13-01277, Docket Nos. 63, 64; Adv. Pro. 13-01343, Docket Nos. 30, 31], and replies are due on August 13, 2013.  The hearing on the remaining motions to dismiss is scheduled for August 28, 2013.

> **(c)    Junior Secured Noteholders' Motion Requesting that the Debtors and Creditors' Committee Remain Neutral With Regard To Intercompany Claims**

On July 18, 2013, the Ad Hoc Group filed a motion for entry of an order directing Morrison & Foerster, the Creditors' Committee, Kramer Levin, and the Debtors' management, including Mr. Kruger, to remain neutral in any dispute regarding putative claims by and between any Debtors and disqualifying these parties to the extent necessary to effectuate the foregoing [Docket No. 4289] (the "Disqualification Motion").  The Disqualification Motion was premised on the Ad Hoc Group's belief that one law firm cannot provide legal advice to the individuals responsible for decision making on behalf of all of the Debtors, who in reliance on that advice

-108-

will take corporate actions on behalf of each Debtor, including with respect to putative intercompany claims as to which the Debtors are allegedly in direct conflict.

The Debtors, the Creditors' Committee, and Ally each filed objections to the Disqualification Motion [Docket Nos. 4368, 4372, 4369, respectively]. The Creditors' Committee's objection was joined by certain consenting creditors [Docket No. 4371]. The objections argued that the Disqualification Motion was inappropriate and should be denied based on (i) the significant disclosures made by the Debtors regarding the Intercompany Balances and their complexity, (ii) the process under which the Debtors sought and received approval from the Bankruptcy Court to prosecute the Plan containing the settlement of the Intercompany Balances, (iii) the complete unity of interests among the Debtors' estates in settling the Intercompany Balances as opposed to litigating them, (iv) the oversight of Mr. Kruger, a fiduciary of each Debtor, and (v) the impractical consequence of granting the relief.

At the hearing on the Disqualification Motion held on July 30, 2013, the Bankruptcy Court denied the Disqualification Motion for the reasons set forth on the record. The Bankruptcy Court ruled, among other things, that it is standard practice to allow one law firm to represent multiple debtors even when intercompany claims exist.

### (d)    Mediation with the Junior Secured Noteholders

On July 26, 2013, the Bankruptcy Court entered an *Order in Aid of Mediation and Settlement* [Docket No. 4379] to facilitate the participation of the principals from the Junior Secured Noteholders in mediation. On July 30, 2013, the Debtors, the Creditors' Committee, certain of the Consenting Claimants, certain of the Junior Secured Noteholders, and the Mediator held their first mediation session in an effort to consensually resolve the issues relating to whether the Junior Secured Parties are entitled to post-petition interest. The parties intend to continue mediating these issues while contemporaneously proceeding with the litigation described above.

### (e)    Treatment of Junior Secured Noteholders' Claims under Plan

No principals for the Junior Secured Noteholders participated in Mediation, which resulted in the Plan Support Agreement, or in any Plan negotiation sessions, and ultimately did not enter into the Plan Support Agreement. Notwithstanding the Plan provides that the Junior Secured Noteholders will receive payment in full on account of their Allowed Claims, with such amount to be determined pursuant to pending adversary proceedings challenging the extent and validity of the Junior Secured Noteholders' claims and security interests. To the extent the Bankruptcy Court ultimately determines that the Junior Secured Noteholders are oversecured and entitled to post-petition interest, the Allowed amount of such post-petition interest shall be paid in accordance with the requirements under the Bankruptcy Code, which may include at the Plan Proponents' election the payment of post-petition interest over time at a rate consistent with law or as may be otherwise determined by the Bankruptcy Court to be necessary in order to satisfy section 1129(b) of the Bankruptcy Code.

### (f)    Disputes with the Junior Secured Noteholders

-109-

The Plan Proponents assert that the Junior Secured Noteholders are undersecured for a variety of reasons. The Junior Secured Noteholders assert there are compelling arguments that their Claims are substantially oversecured. The Plan Proponents and Junior Secured Noteholders are currently engaged in litigation with respect to such issues, which will be decided by the Bankruptcy Court as part of the Consolidated Proceedings and/or the Confirmation Hearing. It is the position of the Junior Secured Noteholders that the Plan Proponents will need to prevail on *all* of the issues currently being litigated for the Junior Secured Noteholders' claims to be undersecured, whereas the Junior Secured Noteholders could prevail either partially or fully on issues in dispute to be fully secured and, thus, entitled to payment in full of their post-petition interest. The Plan Proponents dispute this position and believe there is a broad range of outcomes that could result from the litigation depending on how the Bankruptcy Court rules; ranging from the Junior Secured Noteholders being significantly undersecured and the principal amount of their Claim being reduced on account of alleged OID to being fully oversecured. As set forth on the charts on pages 9-15, the outcome of these disputes could have a significant impact on the recoveries of nearly all Creditors under the Plan.

The position of the Plan Proponents is that the valuation for the Junior Secured Noteholders' collateral is estimated at $1.69 billion. Based on this valuation, the Plan Proponents assert the Junior Secured Noteholders have to succeed in litigation seeking liens on an additional $532 million in collateral for the Junior Secured Noteholders to be entitled to at least some post-petition interest; and $874 million for the Junior Secured Noteholders to be entitled to full payment of interest accrued at the default rate. In addition, in the JSN Adversary Proceeding, the Creditors' Committee has alleged that the principal amount of the Junior Secured Noteholders' Claim should be reduced by $377 million on account of OID generated upon the issuance of the Junior Secured Notes. If the Creditors' Committee is successful in this challenge and are correct that the Junior Secured Noteholders are undersecured, the amount payable to the Junior Secured Noteholders would be reduced to $1.846 billion. Moreover, even if the Junior Secured Noteholders are successful in arguing that they are fully oversecured, if the Junior Secured Notes are reduced on account of OID, the Plan Proponents believe that the maximum amount of interest that the Junior Secured Noteholders could be entitled to is approximately $137 million (at the non-default rate).

The position of the Junior Secured Noteholders is that they are substantially oversecured. First, the Junior Secured Noteholders allege that their baseline collateral is approximately $1.85 billion because the Plan Proponents' estimate includes approximately $160 million of value attributable to the future use of Cash Collateral that Junior Secured Noteholders contend has not yet been authorized. Thus, the Junior Secured Noteholders allege that the baseline collateral deficiency is only about $375 million. Second, the Junior Secured Noteholders assert that the Plan Proponents' position that the JSN collateral is worth $1.69 billion is subject to significant litigation risk because the Junior Secured Noteholders take the position that most issues in dispute are not binary. For instance, the Junior Secured Noteholders allege that the Bankruptcy Court might not agree with either side with respect to each of the issues in dispute and could conclude that the Junior Secured Noteholders are entitled to *some* adequate protection, *some* going-concern value, *some* portion of the Ally Contribution, and *some* value from the Intercompany Balances. To the extent the Bankruptcy Court were to conclude the Junior

-110-

Secured Noteholders are entitled to some value on each of these, the Junior Secured Noteholders argue they will likely be oversecured.

The Junior Secured Noteholders assert the following as key points in contention between the Plan Proponents and the Junior Secured Noteholders:

- **Allocation of Ally Contribution**:  The Junior Secured Noteholders dispute the Plan Proponents' position that no portion of the Ally Contribution is subject to the Junior Secured Noteholders' liens and believe that some or all of the causes of action settled were collateral of the Junior Secured Notes such that they are entitled to some or all of the Ally Contribution as the proceeds of their collateral.

- **Enforcement of Intercompany Balances**:  The Junior Secured Noteholders dispute the waiver of the Intercompany Balances in connection with the Global Settlement.  The Junior Secured Noteholders also dispute the Plan Proponents' position that the Junior Secured Noteholders are entitled to no adequate protection for the value of the Intercompany Balances waived under the Plan.

- **Allocation of Ocwen/Walter Asset Sale Proceeds**:  The Junior Secured Noteholders dispute the Plan Proponents' position that no portion of the Ocwen/Walter Asset Sale Proceeds are allocable to the "platform" or going-concern value, which value the Junior Secured Noteholders assert is subject to the Junior Secured Noteholders' liens.

- **Adequate Protection Liens**:  The Junior Secured Noteholders dispute the Plan Proponents' position that they do not have to provide any adequate protection to the Junior Secured Noteholders for their use of $665 million in Cash Collateral through April 30, 2013.

- **Adequate Protection Liens/506(c) Surcharge**:  The Junior Secured Noteholders dispute the Plan Proponents' position that they can use an additional $180 million in Cash Collateral subsequent to April 30, 2013 (approximately $21 million of which was spent between April 30 and the termination of the use of Cash Collateral).

The Junior Secured Noteholders also have taken certain positions with respect to the Examiner's Report.  The Junior Secured Noteholders' position and Ally's response are detailed in Exhibit 10 annexed hereto.

### 21.    Other Pending Adversary Proceedings

#### (a)    *Residential Capital, LLC et al. v. Allstate Ins. Co. et al.*

On November 27, 2012, Allstate Insurance Company (and affiliated entities), AIG Asset Management (U.S.), LLC (and affiliated entities), Massachusetts Mutual Life Insurance Company, Prudential Insurance Company of America (and affiliated entities) (collectively with the NCUAB, the "Securities Investors") filed a motion seeking a declaration that their claims arising from the purchase of the Debtors' RMBS were not subordinated under Section 510 of the

-111-

Bankruptcy Code. [Docket No. 2284] (the "Rule 3013 Motion"). On January 4, 2013, the NCUAB filed a joinder to the Rule 3013 Motion. [Docket No. 2555]. On February 19, 2013, the Debtors filed an opposition to the Rule 3013 Motion [Docket No. 2953] and commenced an adversary proceeding against the Securities Investors seeking a declaration from the Bankruptcy Court that the Securities Investors' claims should be subordinated to the Debtors' Unsecured Claims pursuant to section 510 of the Bankruptcy Code. [Docket No. 2970]. The Securities Investors had brought securities fraud claims (including federal claims, blue-sky law claims, and common law claims) against the Debtors arising out of their investments in the Debtors' RMBS. Those claims had been asserted in pre-petition litigation and/or in proofs of claim filed in the Chapter 11 Cases. The Rule 3013 Motion and the adversary proceeding were subsequently consolidated. After the Bankruptcy Court directed the parties to meet and confer to determine whether the disputed issues could be resolved by summary judgment, all of the parties moved for summary judgment with the Bankruptcy Court's permission. As a result of the Plan Support Agreement, this litigation and all other pleadings seeking to subordinate the claims of the Securities Investors pursuant to Section 510 of the Bankruptcy Code are stayed during the term of the Plan Support Agreement.

### (b)    *American Residential Equities, LLC v. GMACM*

American Residential Equities, LLC ("ARE") commenced an adversary proceeding against GMACM, Balboa Insurance Company, and AFI on November 9, 2012 [Docket No. 2118]. On March 22, 2013, ARE filed a first amended complaint in the adversary proceeding. The first amended complaint contains various counts against GMACM, including alleged breaches of a loan servicing agreement between ARE and GMACM, a declaratory judgment that certain alleged assets are not property of the Debtors' Estates, conversion, breach of fiduciary duty, turnover, a request for an accounting, and fraud and fraudulent inducement. Among other things, the first amended complaint requested damages in an amount to be determined at final judgment. GMACM, Balboa and AFI have filed motions to dismiss the first amended complaint. Pursuant to a memorandum opinion dated July 30, 2013 [Adv. Proc. Docket No. 62], the Bankruptcy Court denied GMACM's and Balboa's motions to dismiss without prejudice, abstained from hearing the case, dismissed the complaint without prejudice as to all defendants and lifted the automatic stay to allow a related action commenced by ARE against GMACM in the United States District Court for the Southern District of Florida to proceed.

### 22.    FIRREA Investigation

On March 18, 2013, the US Attorney's Office for the Central District of California served an investigative subpoena on counsel for ResCap, and related entities, under 12 U.S.C. 1833a (Financial Institutions Reform, Recovery, and Enforcement Act of 1989, or FIRREA). The subpoena seeks documents relating to ResCap's (and related entities') RMBS, as well as information relating to loans underlying the RMBS and general information about ResCap's business. The requests seek information for the time period of 2005 to the present. ResCap has produced documents and otherwise has cooperated in the investigation. This fact-finding investigation is ongoing. No claims have been asserted against ResCap or any of its current or former personnel.

23.    **SEC Investigation**

On February 23, 2012, the staff of the Los Angeles Regional Office of the US Securities and Exchange Commission served an investigative subpoena on counsel for ResCap, and related entities.  The staff issued the subpoena pursuant to the Commission's Formal Order of Investigation issued under Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934.  The subpoena sought documents relating to ResCap's (and related entities') RMBS, as well as general information about ResCap's business.  The subpoena sought information from the time period of 2006 to the present.  ResCap produced documents responsive to the subpoena and otherwise cooperated with the staff.  On June 13, 2012, the staff served a second subpoena on counsel for ResCap seeking additional information about the RMBS and investors in the RMBS, again for the time period of 2006 to the present.  ResCap produced documents responsive to the subpoena and otherwise cooperated with the staff.  No claims have been asserted against ResCap or any of its current or former personnel.

24.    **Intercompany Balances**

For a complete description of the Intercompany Balances and a discussion of the compromise thereof, see Article III and Exhibit 6.

25.    **Wind Down of Daily Operations**

Following the close of the Asset Sales, the Debtors still hold significant and material assets, including approximately $1.4 billion[94] of non-cash assets to be monetized, as discussed in detail in Article VI—"Recovery Analysis."  Accordingly, the Estates will continue to administer and manage these assets as part of their wind down process by monetizing and maximizing the assets' value.

**ARTICLE V.**
**OTHER PLAN PROVISIONS**

**IN ADDITION TO THE DISCUSSION OF THE PLAN IN ARTICLE I, THE FOLLOWING IS A SUMMARY OF SIGNIFICANT ELEMENTS OF THE PLAN.  THE SUMMARIES OF THE PLAN PROVISIONS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE DESCRIPTIONS OF ALL OF THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL. ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

---
[94] The asset balances are $1.4 billion after certain proforma adjustments, as of April 30, 2013.

**PLEASE BE ADVISED THAT THE PLAN CONTAINS RELEASE, EXCULPATION AND INJUNCTION PROVISIONS. YOU SHOULD REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED THEREUNDER.**

**A.    Unclassified Claims**

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, certain types of claims— including Administrative Claims, Professional Claims, Priority Tax Claims and U.S. Trustee Fees (collectively, the "Unclassified Claims")—are not included in the classification of Claims and Equity Interests under the Plan. Accordingly, the Unclassified Claims have not been classified and, therefore, are excluded from the Classes of Claims and Equity Interests set forth in Article III of the Plan. The Unclassified Claims shall have the following treatment:

**1.    Administrative Claims**

**(a)    Treatment of Administrative Claims Other than Professional Claims**

Unless otherwise agreed to by the holder of an Allowed Administrative Claim, or set forth in an order of the Bankruptcy Court, the Liquidating Trust will pay each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to Section 1930 of Chapter 123 of title 28 of the United States Code) the full unpaid amount of such Claim in Cash: (1) if the Administrative Claim is Allowed before the Effective Date, on the Effective Date, or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due, or as soon as practicable thereafter); or (2) if the Administrative Claim is Allowed on or after the Effective Date, on the date such Administrative Claim is Allowed, or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due, or as soon as practicable thereafter); provided, however, that Allowed Administrative Claims other than Professional Fee Claims that arise in the ordinary course of the Debtors' business shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions; provided, further, however, that accrued and unpaid Postpetition Intercompany Claims shall be paid pursuant to the Cash Management Order. On or after the Effective Date, the Liquidating Trust may settle and pay any Administrative Claim in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**(b)    Administrative Claims Bar Date**

Except as provided for in the Plan or in any order of the Bankruptcy Court, and subject to section 503(b)(1)(D) of the Bankruptcy Code, holders of Administrative Claims (other than holders of Administrative Claims paid in the ordinary course of business, holders of Professional Claims, holders of Claims for fees and expenses pursuant to Section 1930 of Chapter 123 of title 28 of the United States Code, and holders of Postpetition Intercompany Balances) must File and serve on the Plan Proponents or the Liquidating Trust, as

-114-

applicable, requests for the payment of such Administrative Claims not already Allowed by Final Order in accordance with the procedures specified in the Confirmation Order, on or before the Administrative Claims Bar Date or be forever barred, estopped, and enjoined from asserting such Claims against the Debtors, the Plan Trusts, or their assets or properties, and such Claims shall be deemed discharged as of the Effective Date.

## 2. Professional Claims

### (a) Final Fee Applications

All final requests for Professional Claims must be Filed no later than seventy-five (75) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Claims will be determined by the Bankruptcy Court.

### (b) Professional Fee Escrow Account

On the Effective Date, the Debtors will establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account will be maintained in Trust for the Professionals. The funds in such account will not be property of the Liquidating Trust.  The amount of Professional Claims owing to the Professionals will be paid in Cash to such Professionals by the Liquidating Trust, or at the Liquidating Trust's direction, from the Professional Fee Escrow Account, without interest or other earnings therefrom, when such Claims are Allowed by Final Order; provided, that the Liquidating Trust's liability for Professional Claims shall not be limited nor be deemed to be limited to the funds available from the Professional Fee Escrow Account. After all Professional Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, will be transferred to the Liquidating Trust. Specific treatment for certain amounts payable to Centerview and Moelis is set forth in the Plan.

### (c) Professional Fee Reserve Amount

To receive payment for Accrued Professional Compensation incurred through the Effective Date, Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and deliver such estimate to the Plan Proponents at least five (5) Business Days prior to the anticipated Effective Date. If a Professional does not provide such estimate, the Plan Proponents may estimate the unbilled fees and expenses of such Professional. The total amount so estimated will constitute the Professional Fee Reserve Amount; provided that such estimate will not be considered an admission or limitation with respect to the fees and expenses of such Professional. The Professional Fee Reserve Amount and the estimated Accrued Professional Compensation amounts submitted by the Professionals will be subject to review by the Debtors, the Consenting Claimants, and the Creditors' Committee, and any objections to the Professional Fee Reserve Amount must be served on the Plan Proponents prior to the Effective Date.

-115-

(d)    **Post-Effective Date Fees and Expenses**

Except as otherwise specifically provided in the Plan, the Liquidating Trust shall pay in Cash the reasonable legal, professional, or other fees and expenses incurred by the Professionals from and after the Effective Date, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Professionals may be employed and paid in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    **Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, the Liquidating Trust shall pay each holder of an Allowed Priority Tax Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority Tax Claim, in accordance with Bankruptcy Code section 1129(a)(9)(C), the full unpaid amount of such Allowed Priority Tax Claim in Cash on, or as soon as practicable after, the latest of: (1) the Effective Date; (2) the date such Allowed Priority Tax Claim becomes Allowed; or (3) in regular payments over a period of time not to exceed five (5) years after the Petition Date with interest at a rate determined in accordance with section 511 of the Bankruptcy Code, provided, that such Allowed Priority Tax Claims shall not be treated in a manner less favorable than the most favored nonpriority Unsecured Claim provided for by the Plan (other than Cash payments made to a class of creditors under section 1122(b)), and provided, further, that such election shall be without prejudice to the Liquidating Trust's right to prepay such Allowed Priority Tax Claim in full or in part without penalty.  To the extent a holder of an Allowed Priority Tax Claim holds a valid lien (a "Tax Lien") for outstanding and unpaid real property taxes against property of the Debtors or the Liquidating Trust, as applicable, any liens imposed on account of such Claim shall remain unimpaired until such Allowed Priority Tax Claim is paid in full.

4.    **U.S. Trustee Fees**

On the Effective Date or as soon as practicable thereafter, the Liquidating Trust shall pay all U.S. Trustee Fees that are due and owing on the Effective Date.  For the avoidance of doubt, nothing in the Plan shall release the Liquidating Trust from its obligation to pay all U.S. Trustee Fees due and owing after the Effective Date before a Final Order is entered by the Bankruptcy Court concluding or closing the Chapter 11 Cases.

B.    **Classification, Treatment, and Voting of Claims and Equity Interests**

All Claims and Equity Interests, except Administrative Expense Claims, Professional Claims, Priority Tax Claims, U.S. Trustee Fees, and Postpetition Intercompany Balances, are classified in the Classes set forth in Article III of the Plan.  The classification, voting rights and treatment of Allowed Claims and Equity Interests are summarized in Article I above.

-116-

C.    **Establishment of Trusts and Provisions Governing Issuance of Units and Distributions**

As discussed above in Article II, the Plan establishes three separate Trusts for administering distributions to creditors: (i) the Liquidating Trust, (ii) the Private Securities Claims Trust, and (iii) the Borrower Claims Trust.  All Available Assets will be transferred to the Liquidating Trust on the Effective Date, and the Liquidating Trust will fund the Borrower Claims Trust in Cash, and the Private Securities Claims Trust with Units.  Except as provided below, the Liquidating Trust will administer all other distributions under the Plan.

1.    **Liquidating Trust**

The Liquidating Trust shall be established for the purpose of liquidating and distributing the Liquidating Trust Assets in accordance with Treasury Regulations Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, its liquidating purpose described in the Plan and set forth in the Liquidating Trust Agreement. The Liquidating Trust, acting through the Liquidating Trust Board, Liquidating Trust Management, and their agents, shall wind down the affairs of the Debtors and perform the assumed obligations under the DOJ/AG Settlement, Consent Order, and Order of Assessment in accordance with the terms of the Plan.

a)    *Transfer of Assets to the Liquidating Trust*. On the Effective Date, the Debtors are authorized and directed to transfer, grant, assign, convey, set over, and deliver to the Liquidating Trustee, for the benefit of the Liquidating Trust, in the form thereof existing on such date, all of the Debtors' and Estates' right, title and interest in and to the Available Assets free and clear of any and all liens, claims, encumbrances and interests (legal, beneficial or otherwise) of all other Persons and Entities to the maximum extent contemplated by and permissible under section 1141 of the Bankruptcy Code.

Notwithstanding the foregoing, (i) if on the Effective Date, any of the Available Assets cannot be transferred to the Liquidating Trust for any reason, the Debtors shall continue to hold such Available Assets, as bailee for the account of the Liquidating Trust, until such time as the Liquidating Trust may receive such Available Assets (and any proceeds of such assets retained by the Debtors shall constitute Available Assets) and (ii) subject to the entry of the Kessler Settlement Approval Order, the GM Insurance Rights to be assigned to the Kessler Settlement Class or any other GM Insurance Rights that are assigned to any other Creditor pursuant to order of the Bankruptcy Court prior to or at Confirmation, shall be excluded from the Available Assets assigned to the Liquidating Trust.

The Debtors and the Liquidating Trust, as successor in interest to the Estates, may (i) execute and deliver any instruments, documents, books, and records (including those maintained in electronic format and original documents as may be needed), and (ii) take, or cause to be taken, all such further action in order to evidence, vest, perfect or effectuate the transfer of the Available Assets to the Liquidating Trust and consummate transactions contemplated by and to otherwise carry out the intent of the Plan.  Upon the transfer of the Available Assets, the Liquidating Trust shall succeed to all of the Debtors' right, title and interest in the Available

-117-

Assets, and the Debtors will have no further rights or interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.

b) *Liquidating Trust Administrative Reserve and Administrative, Priority, Secured and Convenience Distribution Reserve*. The Liquidating Trust Administrative Reserve shall be established on the Effective Date for the purpose of maintaining Cash from time to time necessary, subject to the Liquidating Trust Budget, to satisfy reasonable costs and expenses of the Liquidating Trust and other obligations incurred or reasonably anticipated by the Liquidating Trust in accordance with the Plan Documents, including without limitation, fees and costs incurred in connection with (i) the implementation of the Plan, including to the extent not paid on the Effective Date, funds for making the payments provided in Article VII.B.2 (ii) the liquidation of the Liquidating Trust Assets, (iii) the resolution of Disputed Claims, and other Causes of Action, (iv) the winding down of the Estate and affairs of the Debtors, (v) the costs of performing under the DOJ/AG Settlement, (vi) the reserves for potential liabilities and (vii) compensation for the Liquidating Trust Board, Liquidating Trust Management, and the employees, professionals, advisors and other agents of the Liquidating Trust. Any Cash released from the Liquidating Trust Administrative Reserve shall be available for distribution to the Unitholders.

The Administrative, Priority, Secured and Convenience Distribution Reserve shall be established on the Effective Date for the purpose of maintaining Cash from time to time necessary to satisfy (i) Administrative Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims and Junior Secured Notes Claims that are (a) Allowed as of the Effective Date but that cannot be paid on or promptly following the Effective Date, or (b) Disputed Claims as of the Effective Date but that may become Allowed after the Effective Date, and (ii) General Unsecured Convenience Claims that are Allowed or that may become Allowed on or after the Effective Date. Any Cash released from the Administrative, Priority, Secured and Convenience Distribution Reserve shall be available for distribution to the Unitholders.

c) *Liquidating Trust Governance*. The affairs of the Liquidating Trust shall be managed by, or under the direction of, the Liquidating Trust Board, which shall consist of five (5) Liquidating Trustees, one of whom shall be selected by each of (i) MBIA, (ii) FGIC, (iii) the RMBS Trustees that are members of the Creditors' Committee, the Steering Committee Consenting Claimants and the Talcott Franklin Consenting Claimants, jointly, (iv) Paulson, and (v) the holders of Private Securities Claims, and such other Liquidating Trustees as agreed to by the Plan Proponents and the Consenting Claimants. The Liquidating Trust Board shall be authorized and empowered to undertake, acting through the management and agents of the Liquidating Trust, actions on behalf of the Liquidating Trust, including without limitation (i) to hold, manage, dispose and convert to Cash, the Liquidating Trust Assets, (ii) to maintain the Liquidating Trust Administrative Reserve, the Disputed Claims Reserve, and the Administrative, Priority, Secured and Convenience Distribution Reserve, (iii) to appoint and supervise management and agents of the Trust and (iv) to prepare and review periodic financial reports of the Liquidating Trust.

The Liquidating Trust Board shall elect a Liquidating Trustee to act as the Chairman of the Liquidating Trust Board and may designate one or more committees of the Liquidating Trust

Board.  The Liquidating Trust Board shall appoint officers or other representative agents of the Liquidating Trust, including a Liquidating Trust manager and a secretary, to serve as the Liquidating Trust Management and carry out the purpose of the Liquidating Trust.  The Liquidating Trust Management shall be authorized to hire employees and engage advisors and other professionals, subject to any limitations imposed by the Liquidating Trust Board.

d)      *Financial Statements, Reporting*.  The Liquidating Trust will provide or make available certain financial and other information, including annual and quarterly financial statements, and will also provide other information to the extent required to make the Units freely tradable under applicable securities laws.

e)      *Tax Treatment*.

*a.  In General*

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trust Board and the Unitholders) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as:

(i)      a transfer of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to Unitholders, other than Liquidating Trust Assets that will be distributed pursuant to Article VII.B of the Plan or that are allocable to Disputed Claims (based on such Claims' Pro Rata Share of such Liquidating Trust Assets), followed by

(ii)      the transfer by such Unitholders to the Liquidating Trust of such Liquidating Trust Assets in exchange for the Units.

Accordingly, those holders of Allowed Unsecured Claims receiving Units shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Liquidating Trust Assets (other than such Liquidating Trust Assets that will be distributed pursuant to Article VII.B of the Plan or that are allocable to the Disputed Claims). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

*b.  Tax Reporting*

(i)      The Liquidating Trust shall file returns treating the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with Article VI.G. The Liquidating Trust also shall annually send or otherwise make available to each holder of Units a separate statement setting forth the holder's share of items of income, gain, loss, deduction, or credit and will instruct all such holders to report such items on their U.S. federal income tax returns or to forward the appropriate information to their respective beneficial holders with instructions to report such items on their U.S. federal income tax returns.  The Liquidating Trust Board also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any Governmental Unit.

-119-

(ii)    As soon as possible after the Effective Date, the Liquidating Trust shall make a good-faith valuation of the Liquidating Trust Assets, and such valuation shall be made available from time to time, to the extent relevant, and shall be used consistently by all parties (including, without limitation, the Debtors, the Liquidating Trust, the holders of Allowed Unsecured Claims, and the Unitholders) for all U.S. federal income tax purposes.

(iii)    Allocation of Liquidating Trust taxable income and loss among the Unitholders (other than taxable income and loss allocable to the Disputed Claims Reserve) shall be made pro rata to the Unitholders.

(iv)    The Liquidating Trust shall (A) treat the Disputed Claims Reserve and Liquidating Trust Assets allocable thereto as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 by timely making an election and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

(v)    The Liquidating Trust shall be responsible for payment, out of the Liquidating Trust Assets, of any taxes imposed on the Liquidating Trust or the Liquidating Trust Assets, including the Disputed Claims Reserve.  In the event, and to the extent, that any Cash retained on account of Disputed Claims of Liquidating Trust Unit Beneficiaries in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, such Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of such Disputed Claims or (ii) to the extent such Disputed Claims subsequently have been resolved, deducted from any amounts otherwise distributable as a result of the resolution of such Disputed Claims.

(vi)    The Liquidating Trust may request an expedited determination of taxes of the Liquidating Trust, including the Disputed Claims Reserve, under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

a)    *Duration*. The Liquidating Trust shall be dissolved as soon as practicable after the date that is the earliest to occur of: (i) the distribution of all Liquidating Trust Assets available for distribution pursuant to the Plan, (ii) the determination of the Liquidating Trust Board that the administration of the Liquidating Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit, or (iii) all the distributions required to be made by the Liquidating Trust have been completed; provided, however, that in no event shall the Liquidating Trust be dissolved later than three (3) years from the Effective Date, unless the Bankruptcy Court, upon motion within the six (6) months prior to the third (3rd) anniversary of the Effective Date (or within six (6) months prior to the end of an extension period), determines that a fixed-period extension is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets (without the need for a favorable private letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the trust as a Liquidating Trust for United States federal income tax purposes).

b)    *Exculpation; Indemnification; Insurance*.  The Liquidating Trust Agreement shall provide for the following with respect to exculpation, indemnification, and insurance:

ny-1105358

None of the Delaware Trustee, the Liquidating Trustees, the Liquidating Trust Management or Liquidating Trust Agents, or their respective advisors or professionals, shall be liable to the Liquidating Trust or any Unitholder for any damages arising out of the creation, operation or termination of the Liquidating Trust, including actions taken or omitted in fulfillment of his or her duties with respect to the Liquidating Trust, except in the case of such party's gross negligence, bad faith or willful misconduct; provided, that in no event will any such party be liable for punitive, exemplary, consequential or special damages under any circumstances. Furthermore, no Liquidating Trustee shall be liable to the Liquidating Trust or any Unitholder for any action taken in good faith reliance upon the advice of Liquidating Trust Management.

None of the Delaware Trustee, the Liquidating Trustees, the Liquidating Trust Management or the Liquidating Trust Agents, when acting in such capacities, shall be subject to any personal liability whatsoever, whether in tort, contract or otherwise, to any person, other than the Liquidating Trust or the Liquidating Trust Unit Beneficiaries, in connection with the affairs of the Liquidating Trust to the fullest extent provided under Section 3803 of the Delaware Statutory Trust Act, and all persons claiming against any of the Delaware Trustee, the Liquidating Trustees, the Liquidating Trust Management or Liquidating Trust Agent, or otherwise asserting Claims of any nature in connection with affairs of the Liquidating Trust, shall look solely to the Liquidating Trust Assets for satisfaction of any such Claims.

The Liquidating Trust Board, the Delaware Trustee, the Liquidating Trust Management and their respective affiliates, and their respective officers, directors, partners, members, managers and employees shall be indemnified to the fullest extent permitted by law by the Liquidating Trust against all liabilities arising out of the creation, operation or termination of the Liquidating Trust, including actions taken or omitted in fulfillment of their duties with respect to the Liquidating Trust, except for those acts that are determined by Final Order to have arisen out of their own willful misconduct, gross negligence, or bad faith.

The Liquidating Trust will maintain customary insurance coverage for the protection of the Liquidating Trustees, the Delaware Trustee and the Liquidating Trust Management from and after the Effective Date.

## 2.    Private Securities Claims Trust

The Private Securities Claims Trust will be established to administer and distribute the Private Securities Claims Trust assets to holders of Private Securities Claims in accordance with the Private Securities Claims Trust Agreement, which will be executed in a form reasonably acceptable to the Plan Proponents, Ally, and the Settling Private Securities Claimants on or before the Effective Date. The Private Securities Claims Trust Agreement, or a substantially complete version thereof, will be filed no later than ten (10) days prior to the deadline to object to the Plan, or such later date as may be approved by the Bankruptcy Court, as part of the Plan Supplement. The Private Securities Claims Trust Agreement shall provide for the distribution of the Private Securities Trust Assets in accordance with the allocation agreement executed by each of the Private Securities Claimants. The Settling Private Securities Claimants are conferring with the other holders of Private Securities Claims on the terms of the Private Securities Claims

-121-

Trust, and will continue to do so, with involvement from the Plan Proponents, in order to facilitate the understanding and agreement of all Private Securities Claimants.

The Private Securities Claims Trustee will be appointed in the Confirmation Order, following the recommendation of one or more candidates by the Settling Private Securities Claimants and the designation of the final choice with the reasonable consent of the Plan Proponents.  The Private Securities Claims Trustee shall distribute to holders of Allowed Private Securities Claims in accordance with the Private Securities Claims Trust Agreement (a) the Cash distributed by the Liquidating Trust in respect of the Units allocated to the Private Securities Claims Trust to holders of Allowed Private Securities Claims, or (b) the Units transferred to the Private Securities Claims Trust that constitute the Private Securities Claims Trust Unit Distribution.  To the extent the Private Securities Claims Trust has distributed the Units that constitute the Private Securities Claims Trust Unit Distribution to Private Securities Claimants, the Liquidating Trust shall make Cash distributions directly to the Private Securities Claimants.  The Private Securities Claims Trustee's authority will be effective as of the Effective Date, provided that the Private Securities Claims Trustee will be permitted to act in accordance with the Private Securities Claims Trust Agreement following the Confirmation Date.

In accordance with the Plan Support Agreement, $235 million of the Available Assets (subject to the adjustment as provided in Article IV.J (the "PSC Fund") were allocated for distribution to the twenty-one Private Securities Claimants.  During the mediation led by the Honorable James Peck and thereafter, the Settling Private Securities Claimants, who are parties to the Plan Support Agreement, engaged in a diligence process to ascertain the amount, strength, viability and litigation status of each of the Private Securities Claims.  In seeking a method for allocating the PSC Fund in a rational and evenhanded manner, the Settling Private Securities Claimants established a tiering structure that took into account the nature and strength of each claim.  By way of example, Private Securities Claims based on laws favorable to investors, such as certain state blue sky laws that do not require a showing of loss causation or scienter, were deemed likely to produce greater recoveries and placed in the highest tier.  Similarly, Private Securities Claims that had already survived a motion to dismiss were viewed as more valuable that those that had not.  Private Securities Claims that had been dismissed were placed in the lowest tier and allocated *de minimis* recoveries (rather than no recovery, to encourage settlement and avoid hold-outs).

Given the potential legal challenges in establishing valid claims against Ally Financial based on control person liability or an alter ego theory, and the lesser burden of proving claims against Ally Securities in its capacity as underwriter of many of the securities at issue, the Settling Private Securities Claimants initially determined that the PSC Fund should be allocated solely with reference to claims against Ally Securities.  Following extensive discussions with the entire group of Private Securities Claimants, the allocation method was revised to attribute some value to claims against AFI in consideration for the release of claims against AFI.  Thus, the recovery allocated to any particular Private Securities Claimant is the result of a negotiated settlement based on two primary components: (i) a recovery on account of claims against Ally Securities; and (ii) a recovery on account of claims against AFI.  Under this approach, no value is specifically attributed to claims against the Debtors, which are deemed to have been waived to

-122-

the extent not encompassed within the Ally claims.  To be clear, the proposed allocation of the PSC Fund is entirely a construct of the Settling Private Securities Claimants.  Ally denies the validity of all Private Securities Claims. The proposed allocation of the PSC Fund is subject to the Private Securities Claims Trust Agreement being finalized and executed in a form reasonably acceptable to the Plan Proponents, Ally, and each of the Settling Private Securities Claimants.

Following several weeks of intensive discussions and negotiations, the Settling Private Securities Claimants reached agreement in principle with each of the other Private Securities Claimants regarding respective recoveries based on established claim amounts and an allocation of the PSC Fund.  In the case of the Settling Private Securities Claimants, allowed claim amounts were agreed pursuant to the Plan Support Agreement based on a settlement, supported by confidential loss information, which will be subject to approval pursuant to Bankruptcy Rule 9019.  In the case of the other Private Securities Claimants, a separate verification process occurred following the Plan Support Agreement's approval whereby parties demonstrated actual purchase prices for the relevant RMBS (less principal received) and either an arms' length sale price or published market price, both as of the Petition Date.

The parties are in the process of memorializing their settlement in a written agreement to be signed by all of the Private Securities Claimants.  This settlement resolves Private Securities Claims against the Debtors and AFI estimated at $2.429 billion in aggregate, including claims against Ally Securities in the aggregate estimated amount of $1.409 billion.  The recovery on particular claims varies dramatically, depending on the facts and circumstances pertaining to each claim, though specific details have not yet been finalized in definitive documents and are therefore not available for disclosure at this time. The settlement will also obligate each Private Securities Claimant to support the Plan and the Third Party Release.

In consideration of the Private Securities Claims Trust Unit Distribution transferred to the Private Securities Claims Trust and in furtherance of the purposes of the Private Securities Claims Trust and the Plan, the Private Securities Claimants shall agree to forego any other recovery from the Debtors or the Liquidating Trust in respect of the Private Securities Claims, and neither the Debtors, Ally, nor the Liquidating Trust shall have any further financial or other responsibility or liability therefor.  Private Securities Claimants instead shall be entitled to receive their allocated share of either (a) the Cash available for distribution from the Private Securities Claims Trust in respect of the Private Securities Claims Trust Assets, or (b) the Units transferred to the Private Securities Claims Trust that constitute the Private Securities Claims Trust Unit Distribution, in each case in accordance with the Private Securities Claims Trust Agreement, as their sole source of recovery in respect of the Private Securities Claims.  To the extent the Private Securities Claims Trust holds the Units distributed by the Liquidating Trust, the Cash distributions received by the Private Securities Claims Trust in respect of such Units shall be distributed to holders of Allowed Private Securities Claims in accordance with the methodology, criteria and procedures established in the Private Securities Claims Trust Agreement.  To the extent the Private Securities Claims Trust has distributed the Units that constitute the Private Securities Claims Trust Unit Distribution to Private Securities Claimants, the Liquidating Trust shall make Cash distributions directly to the Private Securities Claimants.

-123-

The reasonable costs and expenses of administering the Private Securities Claims Trust, including the reasonable fees and expenses of the Private Securities Claims Trustee and its retained professionals, shall be funded on the Effective Date as agreed to by the Plan Proponents and Consenting Claimants. The Private Securities Claims Trustee may retain and reasonably compensate counsel and other professionals to assist in its duties as Private Securities Claims Trustee on such terms as the Private Securities Claims Trustee deems appropriate without Bankruptcy Court approval, but subject to the terms and conditions provided for in the Private Securities Claims Trust Agreement. The Private Securities Claims Trustee may retain professionals who represented parties in the Chapter 11 Cases, provided such retention is otherwise permissible under applicable law. The Private Securities Claims Trustee and its agents and professionals shall be entitled to indemnification by the Private Securities Claims Trust, in accordance with the terms of the Plan.

**3.      Borrower Claims Trust**

The Borrower Claims Trust shall be established for the sole benefit of the holders of Allowed Borrower Claims, and shall consist of the Borrower Claims Trust Assets. The Borrower Claims Trust shall be administered by the Borrower Claims Trustee, subject to oversight and supervision by the Borrower Claims Trust Committee, who shall administer and distribute the Borrower Claims Trust Assets to holders of Allowed Borrower Claims in accordance with the methodology and procedures set forth in the Borrower Claims Trust Agreement. The Borrower Claims Trust shall be completely independent of the Liquidating Trust, and the Liquidating Trustee shall have no authority over the Borrower Claim Trust or the Borrower Claims Trustee.

a)      *Borrower Claims Trust Agreement.* On or before the Effective Date, the Borrower Claims Trust Agreement, in a form reasonably acceptable to the Plan Proponents, Ally and the Kessler Class Claimants, shall be executed, and all other necessary steps shall be taken to establish the Borrower Claims Trust and the interests therein, which shall be for the benefit of the holders of Allowed Borrower Claims. In the event of any conflict between the terms of the Plan with respect to the Borrower Claims Trust and the terms of the Borrower Claims Trust Agreement, the Borrower Claims Trust Agreement shall govern. The Borrower Claims Trust Agreement includes: (i) participation and qualification criteria for holders of Borrower Claims to receive a distribution from the Borrower Claims Trust Assets, (ii) procedures for the prosecution and settlement of objections to Borrower Claims, including those previously filed by the Debtors or any other party, (iii) the establishment of reserves for Disputed Borrower Claims; and (iv) the establishment of procedures to resolve Disputed Borrower Claims, inclusive of any counterclaims or offsets in favor of the Debtors.

b)      *Purpose of the Borrower Claims Trust.* The Borrower Claims Trust shall be established to, among other things, (i) direct the processing, liquidation and payment of the Allowed Borrower Claims in accordance with the Plan, and the distribution procedures established under the Borrower Claims Trust Agreement, and (ii) preserve, hold, and manage the assets of the Borrower Claims Trust for use in satisfying Allowed Borrower Claims.

c)      *Assumption of Certain Liabilities by the Borrower Claims Trust.* In consideration of the Borrower Claims Trust Assets transferred to the Borrower Claims Trust and in furtherance

ny-1105358

of the purposes of the Borrower Claims Trust and the Plan, the Borrower Claims Trust shall assume all liability for all Borrower Claims, and neither the Debtors, the Released Parties, nor the Liquidating Trust shall have any further financial or other responsibility or liability therefor.

d)    *Borrower Claims Trust Assets*.    The Borrower Claims Trust shall consist of the Borrower Claims Trust Assets and any other assets held from time to time incidental to the administration of the Borrower Claims Trust.    On the Effective Date, the Liquidating Trust, in its capacity as Disbursing Agent, shall fund the Borrower Claims Trust with the Cash portion of the Borrower Claims Trust Assets free and clear of all liens, claims, and encumbrances, except to the extent otherwise provided herein.

e)    *Governance of the Borrower Claims Trust*.    The Borrower Claims Trust shall be administered by the Borrower Claims Trustee subject to the supervision and oversight of the Borrower Claims Trust Committee.    The Borrower Claims Trustee will be designated by counsel for the Kessler Class Claimants with the consent of the Plan Proponents, which consent shall not be unreasonably withheld.    The Borrower Claims Trust Committee will comprise Borrowers or representatives of Borrowers appointed to oversee the administration of the Borrower Claims Trust and the disposition of the Borrower Claims Trust Assets.    The identities of the initial Persons to serve on the Borrower Claims Trust Committee as of the Effective Date will be set forth in the Plan Supplement, and will include (i) counsel for the Kessler Settlement Class and (ii) those Borrowers or representatives of Borrowers appointed by the Kessler Settlement Class, with the consent of the Plan Proponents, which consent shall not be unreasonably withheld.    The Borrower Claims Trustee will be designated by counsel for the Kessler Settlement Class with the consent of the Plan Proponents, which consent shall not be unreasonably withheld.

f)    *Distribution of the Borrower Claims Trust Assets*.    It is the intention that distributions made from the Borrower Claims Trust on account of Allowed Borrower Claims will be comparable to the recovery that the holder of an Allowed Claim in the same amount against the same Debtor Group would realize from distributions made by the Liquidating Trust on Units issued in respect of such Allowed Claim, based on the value of the assets in the Liquidating Trust available for distribution to holders of Units as of the Effective Date (without in each case giving effect to any insurance proceeds, including proceeds from the GM Policies,  that may be received in respect of certain of the Allowed Borrower Claims or to the time delay in receipt of distributions in respect of the Units issued by the Liquidating Trust).    For the avoidance of doubt, the comparable recovery percentages that the holder of an Allowed Claim in the same amount against the same Debtor Group would realize from distributions made by the Liquidating Trust on Units issued in respect of such Allowed Claim shall be established once and finally and for all purposes, including for all future distributions by the Borrower Claims Trust, at the time of and in connection with the Borrower Trust True-Up and confirmation of the Plan, and neither the amount to be transferred to the Borrower Claims Trust nor the percentage distributions from the Borrower Claims Trust shall be adjusted following the Effective Date based on actual experience with respect to recoveries from the Liquidating Trust following the Effective Date of the Plan.

Except as otherwise provided herein or in the Kessler Settlement Agreement, to the extent a Borrower recovers insurance proceeds on account of all or some of an Allowed Borrower Claim, (i) if distributions on account of such Allowed Borrower Claim have not been

-125-

made, the amount of such Allowed Borrower Claim shall be reduced to the extent paid by insurance proceeds, or (ii) if distributions on account of such Allowed Borrower Claim have been made, the Borrower shall be required to return an amount equal to all distributions received by the Borrower from the Borrower Claims Trust on account of such Allowed Borrower Claim multiplied by a fraction, the numerator of which is the amount of the insurance proceeds received and the denominator of which is the amount of its Allowed Borrower Claim. Such Borrower shall thereafter continue to be entitled to its proportionate share of any future distribution from the Borrower Claims Trust. For the avoidance of doubt, the Kessler Settlement Class shall continue to be entitled to its proportionate share of any such future distribution. Any Borrower who recovers insurance proceeds on account of all or some of an Allowed Borrower Claim shall be required to notify the Borrower Claims Trustee of such recovery within ten (10) Business Days of receipt.

If any Borrower Claim constitutes, in whole or in part, a Consent Order Borrower Claim, the Allowed amount of such Borrower Claim shall be reduced to the extent paid pursuant to the Consent Order or any settlement of the Debtors' obligations thereunder, without further order of the Bankruptcy Court.

g)    *U.S. Federal Income Tax Treatment of Borrower Claims Trust*. All parties (including, without limitation, the Debtors, the Borrower Claims Trustee, and the holders of Borrower Claims) shall treat the Borrower Claims Trust as a "qualified settlement fund" within the meaning of section 468B of the Tax Code and the Treasury Regulations thereunder.

h)    *Dissolution of the Borrower Claims Trust*. The Borrower Claims Trustee and the Borrower Claims Trust shall be discharged or dissolved, as applicable, at such time as (i) all Borrower Claims have been resolved by Final Order, written agreement, or pursuant to the Plan, and (ii) all distributions to be made by the Borrower Claims Trustee under the Plan and the Borrower Claims Trust Agreement have been made. Any Cash or other remaining assets in the Borrower Claims Trust shall be transferred to the Liquidating Trust upon dissolution of the Borrower Claims Trust.

i)    *Costs and Expenses of Borrower Claims Trust*. The reasonable costs and expenses of administering the Borrower Claims Trust, including the reasonable fees and expenses of the Borrower Claims Trustee and its retained professionals, shall be funded on the Effective Date as agreed to by the Plan Proponents and Consenting Claimants. Such costs shall not include fees and expenses incurred by the Kessler Class Claimants pursuit of GM Insurance Rights.

j)    *Retention of Professionals by Borrower Claims Trustee*. The Borrower Claims Trustee may retain and reasonably compensate counsel and other professionals to assist in its duties as Borrower Claims Trustee on such terms as the Borrower Claims Trustee deems appropriate without Bankruptcy Court approval, but subject to the terms and conditions provided for in the Borrower Claims Trust Agreement. The Borrower Claims Trustee may retain professionals who represented parties in the Chapter 11 Cases, provided such retention is otherwise permissible under applicable law.

-126-

k)      *Indemnification of the Borrower Claims Trustee and Borrower Claims Trust Committee*.    The Borrower Claims Trustee and members of the Borrower Claims Trust Committee and their agents or professionals shall not be liable for any actions taken or omitted in its capacity as, or on behalf of, the Borrower Claims Trustee or the Borrower Claims Trust, except those acts arising out of its or their own willful misconduct, gross negligence, or bad faith, and each shall be entitled to indemnification or reimbursement for fees and expenses in defending any and all of its actions or inactions in its or their capacity as, or on behalf of, the Borrower Claims Trust except for an action or inaction involving willful misconduct, gross negligence, or bad faith.    Any indemnification claim of the Borrower Claims Trustee and the Borrower Claims Trust Committee (and the other parties entitled to indemnification under this subsection) shall be satisfied solely from the Borrower Claims Trust Assets and no recourse may be had to the Liquidating Trust, the Released Parties or any creditor in these Chapter 11 Cases. The Borrower Claims Trustee and the members of the Borrower Claims Trust Committee shall be entitled to rely, in good faith, on the advice of its retained professionals.

l)      *Borrower Claims Trustee as Estate Representative under 1123(b)(3)(B)*.    The Borrower Claims Trustee is hereby appointed as the representative of the estate with respect to Borrower-Related Causes of Action pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

### 4.      Provisions Governing Issuance of Units and Distributions

The provisions governing the issuance of Units and distributions are summarized in Article II of this Disclosure Statement and set forth in Article VII of the Plan.

### D.      Cancellation of Securities, Indentures, and Other Documents Evidencing Claims and Equity Interests

Subject to the assumption of Executory Contracts and Unexpired Leases as set forth in the Plan, and except for purposes of evidencing a right to distributions under the Plan, on the Effective Date, all notes, stock, instruments, certificates, indentures, guarantees, and other documents or agreements evidencing a Claim against or Equity Interest in the Debtors will be deemed automatically cancelled with respect to the Debtors and shall be of no further force or effect as against the Debtors, whether such document is surrendered for cancellation or not, and the obligations of Ally, the Debtors, or the Liquidating Trust, thereunder or in any way related thereto will be discharged.

Notwithstanding anything to the contrary herein, the First Priority Security Agreement will continue in effect for the limited purposes set forth in the First Priority Security Agreement, including allowing the First Priority Collateral Agent to exercise its First Priority Collateral Agent Lien for the payment of First Priority Collateral Agent Fees and Expenses.

Notwithstanding anything to the contrary herein, the Senior Unsecured Notes Indenture will continue in effect for the limited purposes set forth in the Senior Unsecured Notes Indenture including (i) allowing the Senior Unsecured Noteholders to receive distributions on account of their Senior Unsecured Notes Claims, and (ii) allowing the Senior Unsecured Notes Indenture Trustee to make distributions in accordance with the

-127-

terms of the Plan, to fund the Senior Unsecured Notes Indenture Trustee Reserve, and to exercise its Senior Unsecured Notes Indenture Trustee Charging Lien against distributions under the Plan and against the Senior Unsecured Notes Indenture Trustee Reserve for payment of Senior Unsecured Notes Indenture Trustee Fees and Expenses.

Notwithstanding anything to the contrary herein, all Junior Secured Notes, the Junior Secured Notes Indenture and the Junior Secured Notes Security Agreement shall be deemed automatically canceled and discharged on the Effective Date, provided, however, that the Junior Secured Notes, the Junior Secured Notes Indenture and the Junior Secured Notes Security Agreement shall continue in effect solely for the purposes of (i) allowing the Junior Secured Noteholders to receive distributions on account of their Junior Secured Notes Claims, (ii) allowing the Junior Secured Notes Indenture Trustee to make the distributions to be made on account of the Junior Secured Notes; and (iii) permitting the Junior Secured Notes Indenture Trustee to assert its Junior Secured Notes Indenture Trustee Charging Lien against such distributions for payment of the Junior Secured Notes Indenture Trustee Fees and the Junior Secured Notes Collateral Agent Fees and Expenses.

## E.   Junior Secured Notes; Fees and Expenses

The Junior Secured Notes Indenture Trustee and the Junior Secured Notes Collateral Agent have incurred and will continue to incur, through at least the Effective Date, Junior Secured Notes Indenture Trustee Fees and Junior Secured Notes Collateral Agent Fees and Expenses. In accordance with the Junior Secured Notes Indenture, including Section 6.10, all money collected by the Junior Secured Notes Indenture Trustee for distribution on account of the Junior Secured Notes Claims must first be applied to the payment of the Junior Secured Notes Indenture Trustee Fees and the Junior Secured Notes Collateral Agent Fees and Expenses and such money collected remains subject to the Junior Secured Notes Indenture Trustee Charging Lien before such funds may be distributed to the Junior Secured Noteholders. Pursuant to Section VII.G. of the Plan, the Junior Secured Notes Indenture Trustee may withhold distribution of any Cash it receives on account of the Junior Secured Notes Claim until such time as it determines that it has received sufficient payment to satisfy all accrued and reasonably expected Junior Secured Notes Indenture Trustee Fees and Junior Secured Notes Collateral Agent Fees and Expenses, and such payments shall be made in accordance with the requirements of the Junior Secured Notes Indenture and the Junior Secured Notes Security Agreement, as applicable.

## F.   Senior Unsecured Notes; Fees and Expenses

Wilmington Trust succeeded DB as the Senior Unsecured Notes Indenture Trustee shortly after the Petition Date and has continued in that capacity during the pendency of the Chapter 11 Cases. Wilmington Trust was appointed by the U.S. Trustee to be a member of the Creditors' Committee and was subsequently elected co-chair. Wilmington Trust was initially represented by Seward & Kissel LLP ("SK"), but shortly after the Petition Date, Loeb & Loeb LLP ("Loeb") replaced SK as general bankruptcy counsel.

Certain beneficial holders of the Senior Unsecured Notes, or the nominees of such beneficial holders with full power to act on behalf of and bind such beneficial holders, representing in the aggregate over 50% of principal of the outstanding Senior Unsecured Notes,

-128-

delivered a letter of direction pursuant to section 6.06 of the Senior Unsecured Notes Indenture (the "Direction") to Wilmington Trust instructing and directing it, among other things, (a) to retain Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb") as special restructuring counsel in the bankruptcy cases and (b) to authorize and instruct Cleary Gottlieb to engage Alvarez and Marsal North America, LLC ("A&M," and together with SK, Loeb and Cleary Gottlieb, the "SUN Professionals") as financial advisors in connection with restructuring issues in the Chapter 11 Cases concerning the Senior Unsecured Notes Indenture and the Senior Unsecured Notes. Accordingly, Wilmington Trust retained Cleary Gottlieb pursuant to the Direction, and Cleary Gottlieb retained A&M.

Wilmington Trust and the SUN Professionals have taken an active role in the Chapter 11 Cases. In addition to serving as co-chair of the Creditors' Committee, preparing and filing the proof of claim on behalf of the Senior Unsecured Notes and providing various notices to the Senior Unsecured Noteholders, Wilmington Trust, through the SUN Professionals, often took a lead role in, various contested matters on issues of importance to the Senior Unsecured Noteholders. For instance, after the Original RMBS Settlement Agreement was amended to allow a claim of up to $1.74 billion against ResCap (the sole obligor on the Senior Unsecured Notes), the SUN Professionals actively opposed that amendment by objecting to the proposed settlement and participating in discovery. Additionally, at the invitation of the Examiner, the SUN Professionals made multiple submissions with respect to third-party claims that Wilmington Trust and the Senior Unsecured Noteholders might assert against Ally related to, among other things, a breach of the Senior Unsecured Notes Indenture as well as claims held by the ResCap estate against Ally relating to, among other things, the transfer of Ally Bank from ResCap to or for the benefit of AFI. The SUN Professionals performed substantial due diligence and analysis concerning such claims. The SUN Professionals also prepared the Wilmington Trust Standing Motion, which seeks authority and standing to prosecute certain alleged ResCap Estate Causes of Action against Ally and its officers and directors and the officers and directors of ResCap as well as against other Debtors for constructive fraudulent transfers related to, among other things, the forgive of intercompany debt. Furthermore, Wilmington Trust and the SUN Professionals actively participated in the motion to appoint Judge Peck as the Mediator, mediation sessions and negotiations that led to the Global Settlement embodied in the Plan Support Agreement, numerous meetings and drafting sessions with the Mediator, the Plan Proponents, and the other Consenting Claimants.

Wilmington Trust has incurred, and estimates that it will incur through the Effective Date, Indenture Trustee Fees and Expenses on account of its own fees and those of all the SUN Professionals in the amount of approximately $14 million (the "Senior Notes Indenture Trustee Fee Claim"). In accordance with the Senior Unsecured Notes Indenture, including Section 6.03 and 7.06 thereof, all monies collected by Wilmington Trust on account of the Senior Unsecured Notes Claims for distribution must first be applied to the payment of the Senior Unsecured Notes Indenture Trustee Fee Claim and remain subject to the Senior Notes Indenture Trustee Charging Lien before such funds may be distributed to the Senior Unsecured Noteholders. In accordance with Section VII.G of the Plan, Wilmington Trust may withhold distributions until such time as the Liquidating Trust makes a Cash distribution sufficient to pay in full the Senior Unsecured Notes Indenture Trustee Fee Claim and the Senior Unsecured Notes Indenture Trustee Reserve (as defined below). Wilmington Trust may also establish a reserve in the amount of $1 million

-129-

("Senior Unsecured Notes Indenture Trustee Reserve") for any liability and for any future costs and expenses that may be incurred by Wilmington Trust and the SUN Professionals which exceed the Senior Notes Indenture Trustee Fee Claim.  The initial distribution of Cash to the Senior Unsecured Noteholders on account of their distributed Units shall be reduced by the Senior Unsecured Notes Indenture Trustee Fee Claim and the Senior Unsecured Notes Indenture Trustee Reserve.  To effectuate the distribution of any Cash remaining in the Senior Unsecured Notes Indenture Trustee Reserve that Wilmington Trust determines is no longer required to be reserved, Wilmington Trust anticipates that the appropriate securities depository will maintain the register of the Senior Unsecured Notes (or maintain such a register in a similar form).

## G.    Corporate Action

Except as otherwise provided in the Plan, the corporate or related actions to be taken by or required of the Debtors in connection with each matter provided for by the Plan shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan, and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by holders of Claims or Equity Interests, directors of the Debtors, or any other Entity. On or prior to the Effective Date, the appropriate officers of the Debtors shall be authorized and directed to issue, execute, and deliver the agreements, securities, instruments, or other documents contemplated by the Plan, or necessary or desirable to effect the transactions contemplated by the Plan, in the name of and on behalf of the Debtors, prior to the Effective Date, or the Liquidating Trust, following the Effective Date. Notwithstanding any requirements under non-bankruptcy law, the authorizations and approvals contemplated by this provision shall be effective.

On the Effective Date, upon the appointment of the Liquidating Trust Board, the persons acting as directors and officers of the Debtors prior to the Effective Date will be released from all further authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors or the Chapter 11 Cases—including, for the avoidance of doubt, the Continuing Obligations—and, upon such release and discharge, the Liquidating Trust Board will be charged with the authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors and these Chapter 11 Cases.  In addition, Ally and the Debtors are in discussions with the DOJ regarding potentially excluding the DOJ/AG Settlement from the Third Party Release.

## H.    Dissolution of the Debtors

**On the Effective Date, upon the appointment of the Liquidating Trust Board, the persons acting as directors, managers, and officers of the Debtors prior to the Effective Date as the case may be, will be released from all further authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors or the Chapter 11 Cases, including, for the avoidance of doubt, the obligations relating to the DOJ/AG Settlement.  Upon such release and discharge, the Liquidating Trust Board will be charged with the authority, duties, responsibilities, and obligations relating to and arising from operations of the Debtors and these Chapter 11 Cases, except to the extent such authority, duties, responsibilities, and obligations are to be undertaken by the Private Securities**

-130-

**Claims Trustee, the RMBS Claims Trust Trustees, the Borrower Claims Trustee, or, with respect to the NJ Carpenters Claims Distribution, in each case as provided in the Plan.**

On and after the Effective Date, the Liquidating Trust Board shall be authorized, in its sole and absolute discretion, to take all actions reasonably necessary to manage or dissolve the Debtors and their subsidiaries, including the Non-Debtor Subsidiaries, under applicable laws, including the laws of the jurisdictions in which they may be organized or registered, notwithstanding any applicable consent requirements or other restrictions contained in any financing agreements or other debt documents to which any Debtor is a party, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or filing any necessary paperwork or documentation. The Liquidating Trust Board shall have no liability for using its discretion to dissolve or not dissolve any of the Debtors or their subsidiaries. Whether or not dissolved, the Debtors shall have no authorization to implement the provisions of the Plan from and after the Effective Date except as specifically provided otherwise in the Plan. Notwithstanding the foregoing, the Liquidating Trust Board shall not dissolve any Debtor to the extent such Debtor is required to hold Available Assets after the Effective Date pursuant to Article VI of the Plan, and any such Debtors shall be authorized to take such actions at the direction of the Liquidating Trust Board as may be necessary to implement the provisions of the Plan with respect to such Available Assets.

I.    **Exemption from Certain Taxes and Fees**

Pursuant to Bankruptcy Code section 1146(a), any transfers of property pursuant to the Plan shall not be subject to any stamp, real estate transfer, mortgage reporting, sales, use tax, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

J.    **Preservation of Causes of Action**

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan (including pursuant to the Plan Support Agreement), or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Borrower Claims Trust with respect to Borrower-Related Causes of Action, and the Liquidating Trust with respect to all other Causes of Action, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors or the Debtors' Estates, whether arising before or after the Petition Date, including any Causes of Action specifically enumerated in the Plan Supplement, and the Liquidating Trust's and Borrower Claims Trust's respective rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Liquidating Trust and Borrower Claims Trust may pursue their respective Causes of Action, as appropriate, in accordance with the best interests of the respective Trust. **No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against such Entity as any**

-131-

**indication that the Liquidating Trust or Borrower Claims Trust, as the case may be, will not pursue any and all available Causes of Action against such Entity. The Liquidating Trust and Borrower Claims Trust expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Liquidating Trust expressly reserves all Causes of Action other than Borrower-Related Causes of Action, and the Borrower Claims Trust expressly reserves all Borrower-Related Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, the Plan does not release any Causes of Action that the Plan Proponents or the Liquidating Trust or Borrower Claims Trust have or may have now or in the future against any Entity other than the Released Parties (and only in their capacity as Released Parties).

Except as otherwise provided in the Plan or in a Final Order, the Liquidating Trust reserves and shall retain Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtors may hold against any Entity that is not released under the Plan or a separate settlement approved by Final Order shall vest in the Borrower Claims Trust with respect to Borrower-Related Causes of Action and in the Liquidating Trust with respect to all other Causes of Action. The Liquidating Trust and Borrower Claims Trust, as the case may be, through their respective authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Liquidating Trust has the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Causes of Action other than Borrower-Related Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court. The Borrower Claims Trust has the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Borrower-Related Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

**K.    Nonconsensual Confirmation**

If fewer than all Impaired Classes accept the Plan, but at least one Class of Claims that is Impaired under the Plan has accepted the Plan (and which Class' acceptance is determined without inclusion of any vote submitted by the holder of a Claim that is an "insider," as such term is defined in Section 101(31) of the Bankruptcy Code), the Plan Proponents may seek to have the Bankruptcy Court confirm the Plan under Section 1129(b) of the Bankruptcy Code. The Plan Proponents request confirmation of the Plan under Section 1129(b) of the Bankruptcy

-132-

Code with respect to any impaired Class that has not accepted or is deemed not to have accepted the Plan pursuant to Section 1126 of the Bankruptcy Code.

**L.    Treatment of Executory Contracts and Unexpired Leases**

**1.    Rejection of Executory Contracts and Unexpired Leases**

Except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously assumed shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (i) is expressly identified on the Assumption Schedule; (ii) has been previously assumed by the Debtors by Final Order or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to assume pending as of the Effective Date; or (iv) is otherwise assumed pursuant to the terms herein.  The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date or as otherwise set forth in the Plan Supplement.

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, including any Executory Contracts or Unexpired Leases rejected or deemed rejected under the Plan, must be Filed in accordance with the procedures set forth in the Bar Date Order by the Rejection Damages Claim Bar Date or such Claims will be automatically disallowed, forever barred from assertion, and shall be unenforceable against the Debtors, the Liquidating Trust, or their assets or properties without the need for any objection by the Liquidating Trust or further notice to, or action, order, or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases will be classified as General Unsecured Claims against the applicable Debtor Groups and treated in accordance with the terms of Article III. The deadline to object to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, shall be the Claims Objection Deadline.

**2.    Assumption of Executory Contracts and Unexpired Leases**

The Debtors will file the Assumption Schedule with the Bankruptcy Court at least twenty-one (21) days before the commencement of the Confirmation Hearing.  The Assumption Schedule will include (a) the name of the non-Debtor counterparty, (b) the legal description of the Executory Contract or Unexpired Lease to be assumed, and (c) the proposed amount to be paid on account of an associated Cure Claim, if any.  On or as soon as practicable thereafter, the Debtors will serve a notice of filing of the Assumption Schedule upon each non-Debtor counterparty listed thereon that will describe the procedures by which such parties may object to the proposed assumption of their respective Executory Contract or Unexpired Lease or the proposed Cure Claim amount, and explain how such disputes will be resolved by the Bankruptcy Court if the parties are not able to resolve a dispute consensually.  Objections, if any, to the proposed assumption and/or Cure Claim must be filed with the Bankruptcy Court and served so as to be actually received by the Debtors no later than fourteen (14) days from the date of the filing of the Assumption Schedule.  Any non-Debtor counterparty to an Executory Contract or

-133-

Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim amount will be deemed to have assented to such assumption or Cure Claim amount.

If an objection to the proposed Cure Claim is sustained by the Bankruptcy Court, the Plan Proponents, prior to the Effective Date, or the Liquidating Trust, following the Effective Date, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it on proper notice to the non-Debtor counterparty thereto, which non-Debtor counterparties shall then be entitled to file Proofs of Claim asserting Claims arising from the rejection thereof, if applicable, in accordance with the terms of the Plan and the Bar Date Order.

The Plan Proponents, prior to the Effective Date, or the Liquidating Trust, following the Effective Date, may settle any dispute on the amount of a Cure Claim without further notice to any party or action, approval, or order of the Bankruptcy Court.  If the Plan Proponents, prior to the Effective Date, or the Liquidating Trust, following the Effective Date, object to any request for payment of a Cure Claim, the Bankruptcy Court shall determine the Allowed amount of such Cure Claim and any related issues.  Unless the parties to the Executory Contract or Unexpired Lease agree otherwise, all disputed defaults that are required to be cured shall be cured by the later of (i) ten (10) days after entry of a Final Order determining the amount, if any, of the Debtors' liability with respect thereto and (ii) the Effective Date.  The Plan Proponents, prior to the Effective Date, or the Liquidating Trust, following the Effective Date, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease no later than thirty (30) days after a Final Order determining a Cure Claim greater than that proposed by the Debtors.

**Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date of the Debtors or the Liquidating Trust assume such executory contract or unexpired lease.  Any proofs of claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.**

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumption Schedule, nor anything contained in the Plan or each Debtor's Schedules, shall constitute an admission by the Debtors that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease capable of assumption, that any Debtor has any liability thereunder or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement.  Further, the Plan Proponents expressly may (a) remove any Executory Contract or Unexpired Lease from the Assumption Schedule and reject an Executory Contract or Unexpired Lease pursuant to the terms of the Plan, up until the Effective Date and (b) contest any Claim (or cure amount) asserted in connection with assumption of any Executory Contract or Unexpired Lease.

-134-

The assumption of Executory Contracts and Unexpired Leases under the Plan shall include the vesting of such contracts in the Liquidating Trust. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, assignments, and vesting.

In the event a written objection is filed with the Bankruptcy Court as to whether a contract or lease is executory or unexpired, the right of the Plan Proponents to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the entry of a Final Order by the Bankruptcy Court determining that the contract or lease is executory or unexpired, in which case the deemed assumptions and rejections provided for in the Plan shall not apply to such contract or lease.

### 3.    Contracts and Leases Entered Into After the Petition Date

Counterparties to contracts and leases entered into after the Petition Date by a Debtor, including any Executory Contract or Unexpired Lease assumed by a Debtor, must File a proof of claim for an Administrative Claim against the appropriate Debtor by the Administrative Claims Bar Date or have their rights with respect to such Administrative Claims forever waived and released; provided that this provision shall not apply to any Ally Contract Claims. Contracts and unexpired leases entered into after the Petition Date by any Debtor will vest in the Liquidating Trust.

### 4.    Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously assumed shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (i) is expressly identified on the Assumption Schedule; (ii) has been previously assumed by the Debtors by Final Order or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (iii) is the subject of a motion to assume pending as of the Effective Date; or (iv) is otherwise assumed pursuant to the terms herein. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date or as otherwise set forth in the Plan Supplement.

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, including any Executory Contracts or Unexpired Leases rejected or deemed rejected under the Plan, must be Filed in accordance with the procedures set forth in the Bar Date Order by the Rejection Damages Claim Bar Date or such Claims will be automatically disallowed, forever barred from assertion, and shall be unenforceable against the Debtors, the Liquidating Trust, or their assets or properties without the need for any objection by the Liquidating Trust or further notice to, or action, order, or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases will be classified as General Unsecured Claims against the applicable Debtor Groups and treated in accordance with the terms of Article III.

-135-

The deadline to object to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, shall be the Claims Objection Deadline.

### 5.   Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request, pursuant to Bankruptcy Code Section 365(d)(4), to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases.

### 6.   No Change in Control

The consummation of the Plan or the assumption of any Executory Contract or unexpired lease is not intended to, and shall not, constitute a change in ownership or change in control under any employee benefit plan or program, financial instrument, loan or financing agreement, Executory Contract or Unexpired Lease or contract, lease or agreement in existence on the Effective Date to which a Debtor is a party.

## M.   Surrender of Existing Publicly Traded Securities

On the Effective Date, or as soon as reasonably practicable thereafter, the Junior Secured Notes Indenture Trustee, with the cooperation of the Debtors or the Liquidating Trust, as applicable, shall direct DTC and any other applicable securities depository to surrender the Junior Secured Notes to the Junior Secured Notes Indenture Trustee. All payments by the Junior Secured Notes Indenture Trustee to Registered Holders of Junior Secured Notes Claims shall be made to such holder only after (i) the surrender by each such holder of the debt securities representing such Junior Secured Notes Claim or appropriate instructions from the applicable securities depository have been received by the Junior Secured Notes Indenture Trustee; or (ii) the loss, theft, mutilation, or destruction of such debt securities has been established to the reasonable satisfaction of the Junior Secured Notes Indenture Trustee, which satisfaction may require such Registered Holder to submit a lost instrument affidavit and an indemnity bond holding the Debtors, the Liquidating Trust, and the Junior Secured Notes Indenture Trustee harmless in respect of such debt securities and distributions made in respect thereof. Each Registered Holder shall be deemed to have surrendered such debt securities as of the date it has complied with the foregoing conditions. Upon surrender of such debt securities, the Junior Secured Notes Indenture Trustee shall cancel and destroy such debt securities. As soon as practicable after the surrender date, the Junior Secured Notes Indenture Trustee shall distribute to Junior Secured Noteholders such holder's pro rata share of the distribution, but subject to the rights of the Junior Secured Notes Indenture Trustee to assert its Junior Secured Notes Indenture Trustee Charging Lien against such distribution. Any Registered Holder that fails to surrender such debt securities or, if applicable, satisfactorily explain the loss, theft, mutilation or destruction of such debt securities to the Junior Secured Notes Indenture Trustee within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors, the Liquidating Trust, or the Junior Secured Notes Indenture Trustee in respect of such Claim and shall not be entitled to receive any distribution under the Plan. All property in respect of such forfeited distributions, including interest thereon, shall, subject to the Junior Secured Notes Indenture

-136-

Trustee Charging Lien, be promptly returned to the Liquidating Trust by the Junior Secured Notes Indenture Trustee and any such debt securities shall be cancelled.

On the Effective Date, or as soon as reasonably practicable thereafter, the Senior Unsecured Notes Indenture Trustee, with the cooperation of the Debtors or the Liquidating Trust, as applicable, shall advise DTC and any other applicable securities depository of the occurrence of such Effective Date and the cancellation of the Debtors obligations with respect to the Senior Unsecured Notes, but not to terminate the CUSIP or ISIN numbers of the Senior Unsecured Notes. At such time as the Senior Unsecured Notes Indenture Trustee is prepared to release the Units it received on account of the Senior Unsecured Notes Claims, it may request that such depositories surrender the Senior Unsecured Notes, if deemed appropriate, or with the cooperation of the Debtors or the Liquidating Trust, issue such other instructions to DTC and any other securities depository, as appropriate to effectuate the distributions contemplated under the Plan; provided, however, that nothing herein shall contravene the effectiveness of the Senior Unsecured Notes as set out in Article V.F. No distributions under the Plan shall be made for or on behalf of a Registered Holder unless and until (i) such debt securities have been received by the applicable Indenture Trustee or other appropriate instructions have been issued or received by the applicable Indenture Trustee; or (ii) the loss, theft, or destruction of such debt securities has been established to the reasonable satisfaction of the Senior Unsecured Notes Indenture Trustee, which satisfaction may require such Registered Holder to submit a lost instrument affidavit and an indemnity bond holding the Debtors, the Liquidating Trust, and the Senior Unsecured Notes Indenture Trustee harmless in respect of such debt securities and any distributions to be made in respect thereof. Each Registered Holder shall be deemed to have surrendered such debt securities as of the date it has complied with the foregoing conditions. On such surrender or deemed surrender date, the Senior Unsecured Noteholders shall be entitled to receive distributions pursuant to the Plan. If required by the Senior Unsecured Notes Indenture Trustee, any Registered Holder that fails to surrender such debt securities or, if applicable, satisfactorily explain the loss, theft, or destruction of such debt securities to the Senior Unsecured Notes Indenture Trustee within one (1) year of the Effective Date shall be deemed to have no further Claim against the Debtors, the Liquidating Trust, or the Senior Unsecured Notes Indenture Trustee in respect of such Claim and shall not be entitled to receive any distribution under the Plan. All property in respect of such forfeited distributions, including interest thereon, shall be promptly returned to the Liquidating Trust by such Indenture Trustee and any such debt securities shall be cancelled.

N.    **Minimum Distributions; Foreign Exchange Rate; and Other Distribution Limitations**

Other than with respect to Allowed General Unsecured Convenience Claims and Allowed ETS Unsecured Claims, no Cash payment of less than $50 shall be made to a holder of an Allowed Claim on account of such Allowed Claim. If a holder of an Allowed Claim would be entitled to receive less than $50 as of the time of a particular distribution, but would be entitled to receive more than $50 in combination with later distributions, the Disbursing Agent will combine such distributions with later distributions to such holder of an Allowed Claim so that such holder may eventually be entitled to a distribution of at least $50 in value.

-137-

Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

Except as otherwise provided in the Plan or a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than United States dollars shall be automatically deemed converted to the equivalent United States dollar value using the exchange rate as of the Petition Date as quoted at 4:00 p.m. (EDT), mid-range spot rate of exchange for the applicable currency as published in The Wall Street Journal, National Edition, on the Petition Date.

**O.    Undeliverable Distributions and Unclaimed Property**

In the event that any distribution to a holder of an Allowed Claim is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made to such holder without interest; provided, however, that such distributions shall be deemed unclaimed property under Bankruptcy Code section 347(b) at the expiration of six (6) months from the applicable date of distribution. After such date, all unclaimed property or interests in property shall revert to the Liquidating Trust (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder to such property or interest in property shall be released, settled, compromised, and forever barred.

**P.    Compliance with Tax Requirements**

In connection with the Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed upon it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution. The Disbursing Agent has the right, but not the obligation, not to make a distribution until such holder has made arrangements satisfactory to the Disbursing Agent for payment of any such withholding tax obligations and, if the Disbursing Agent fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse the Disbursing Agent. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms it believes are reasonable and appropriate. The Disbursing Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within six months, such distribution shall be deemed an

-138-

unclaimed distribution. Finally, the Disbursing Agent reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

**Q.    Setoffs and Recoupment**

The Liquidating Trust may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that it may have against the claimant, including any Causes of Action transferred to the Liquidating Trust by the Debtors, but neither the failure to do so nor the Allowance of any Claim shall constitute a waiver or release by the Debtors or the Liquidating Trust of any such Claim it may have against the holder of such Claim.

Before the Liquidating Trust can set-off or recoup against the distribution to be made on account of an Allowed Claim, the holder of the Claim shall be served with written notice of the proposed setoff or recoupment at least thirty (30) days prior to the Liquidating Trust exercising any asserted setoff or recoupment right, and, if such claimant serves a written objection to such asserted setoff or recoupment on or before thirty (30) days of receipt of such written notice, (i) the objection shall be deemed to initiate a contested matter governed by, inter alia, Bankruptcy Rule 9014 and Local Bankruptcy Rules 9014-1 and 9014-2, (ii) nothing herein shall affect the respective burden of each party in connection with such contested matter, and (iii) the Liquidating Trust shall not proceed with the asserted setoff or recoupment absent the withdrawal of such objection or the entry of a Final Order overruling such objection.

**R.    Interest on Claims**

Except as specifically provided for in the Plan, no Claims, Allowed or otherwise (including Administrative Claims), shall be entitled, under any circumstances, to receive any interest on a Claim.

**S.    Claims Paid or Payable by Third Parties**

**1.    Claims Paid by Third Parties**

Except as otherwise provided herein, including with respect to the Ally Contract Claims, the Debtors, on or prior to the Effective Date, or the Liquidating Trust, after the Effective Date, shall reduce a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice, action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment on account of such Claim from a party that is not a Debtor, the Liquidating Trust, or other party making distributions on account of the Claim pursuant to the Plan.

**2.    Claims Payable by Insurers**

Except as otherwise provided herein, including with respect to the rights of (i) the Kessler Settlement Class and (ii) other creditors who have entered into a settlement agreement with the Debtors prior to the Effective Date, in and to the GM Insurance Rights as provided herein and in the Kessler Settlement Agreement, and the Ally Contract Claims

-139-

(a) no distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies, excluding the GM Policies, until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy and (b) to the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' payment, such Claim may be expunged without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, provided, that if a Debtor or the Liquidating Trust believes a holder of an Allowed Claim has recourse to an insurance policy and intends to withhold a distribution pursuant to this Article VII.K, the Debtor, prior to the Effective Date, or Liquidating Trust, following the Effective Date, shall provide written notice to such holder as to what the Debtor or Liquidating Trust believes to be the nature and scope of applicable insurance coverage. Except as otherwise provided in the Plan, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or the Liquidating Trust or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any Insurance Defenses.

## T.    Allowed Unsecured Claims for Which More than One Debtor in a Debtor Group Is Jointly and/or Severally Liable

Where a Creditor holds Allowed Unsecured Claims for which more than one Debtor in a Debtor Group is jointly and/or severally liable, such creditor shall only receive one recovery from the Debtor Group on account of such Claim. This provision shall not affect distributions on account of such Creditor's Allowed Claims, if any, against the Debtors in another Debtor Group.

## U.    Distributions Free and Clear

Except as otherwise provided herein, any distributions under the Plan shall be free and clear of any Liens, Claims, and encumbrances, and no other Entity, including the Debtors, the Liquidating Trust, or the Disbursing Agent shall have any interest (legal, beneficial or otherwise) in property of the Estate distributed pursuant to the Plan, except that (i) distributions on account of Senior Unsecured Note Claims shall remain subject to the Senior Unsecured Notes Indenture Trustee Charging Lien; and (ii) distributions on account of Junior Secured Notes Claims shall remain subject to the Junior Secured Notes Indenture Trustee Charging Lien.

## V.    Procedures for Resolving Disputed Claims

### 1.    Resolution of Disputed Claims

The provisions of this Article VIII of the Plan shall govern the resolution of Disputed Claims to the extent not otherwise provided for in the Plan or in any other trust agreement (such as the RMBS Claims Trust Agreement, the Private Securities Claims Trust Agreement or the Borrower Claims Trust Agreement) or plan of allocation (such as the RMBS Trust Allocation Protocol) approved under the Plan. To the extent the provisions of any such trust agreement or

-140-

plan of allocation address specific matters set forth in Article VIII of the Plan, the provision of such trust agreement or plan of allocation shall govern.

## W.     Claims Estimation; Allowance

### 1.     Allowance of Claims

On or after the Effective Date, the Liquidating Trust shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim (i) deemed Allowed as of the Effective Date or (ii) waived, relinquished, exculpated, released, compromised, settled, or Allowed in the Plan or in a Final Order. Except as otherwise provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed (a) under the Plan or the Bankruptcy Code or (b) by Final Order of the Bankruptcy Court, including the Confirmation Order.

### 2.     Prosecution of Objections to Claims

On the Effective Date, the Liquidating Trust will have the exclusive authority to: (a) File, withdraw, or litigate to judgment objections to Claims or Equity Interests (other than Borrower Claims, Private Securities Claims, and the NJ Carpenters Claims); (b) settle or compromise (or decline to do any of the foregoing) any Disputed Claim (other than Borrower Claims, Private Securities Claims, and NJ Carpenters Claims) or Cause of Action (other than the Borrower-Related Causes of Action) without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

### 3.     Claims Estimation

The Plan Proponents, prior to the Effective Date, or the Liquidating Trust or Borrower Claims Trust (to the extent provided for in the Borrower Claims Trust Agreement), as applicable, following the Effective Date, may request that the Bankruptcy Court estimate any disputed, contingent, or unliquidated Claim to the extent permitted by Bankruptcy Code section 502(c) regardless of whether the Plan Proponents (prior to the Effective Date) or the Liquidating Trust or Borrower Claims Trust (following the Effective Date) has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.   Among other things, the Plan Proponents may request that the Bankruptcy Court estimate the Recognized RMBS Claims in the amounts set out in the RMBS Trust Claims Schedules for the purpose of implementing the RMBS Trust Allocation Protocol.   The Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. Except as set forth below with respect to reconsideration under section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a

-141-

maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions. If the estimated amount constitutes a maximum limitation on such Claim, the Liquidating Trust or Borrower Claims Trust (to the extent provided for in the Borrower Claims Trust Agreement) may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 4.      Expungement or Adjustment of Claims Without Objection

Any Claim that has been paid, satisfied, or superseded may be expunged on the Claims Register by the Debtors' notice and claims agent, and any Claim that has been amended may be adjusted thereon by the Debtors' notice and claims agent, in both cases without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### 5.      Deadline to File Claims Objections

Any objections to Claims shall be Filed by no later than the applicable Claims Objection Deadline.

### 6.      Disallowance of Claims

Any Claims held by an Entity from which property is recoverable under Bankruptcy Code sections 542, 543, or 550, or that is a transferee of a transfer avoidable under Bankruptcy Code sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a), shall be deemed disallowed pursuant to Bankruptcy Code section 502(d), and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums due, if any, by that Entity have been turned over or paid by such Entity to the Debtors or the Liquidating Trust.

**Except as otherwise agreed by the Liquidating Trust, any and all proofs of claim filed after the applicable Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless such late proof of claim is deemed timely filed by a Final Order of the Bankruptcy Court.**

-142-

### 7.    Amendments to Claims

On or after the Effective Date, a Claim may not be Filed or amended without prior authorization of the Bankruptcy Court or the Liquidating Trust, and any such new or amended Claim Filed without such prior authorization shall be deemed disallowed in full and expunged without any further action.

## X.    Settlement, Release, Injunction, and Related Provisions

As discussed in detail in Article II above, the Plan contains the following settlements, Releases, exculpations, and injunctions:

### 1.    Compromise and Settlement of Claims, Equity Interests, and Controversies

In accordance with section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Equity Interest, or any distribution to be made on account of such Allowed Claim or Equity Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and holders of Claims and Equity Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Liquidating Trust may compromise and settle Claims against the Debtors and Causes of Action against other Entities.

### 2.    Release of Liens

**Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of any Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall vest in the Liquidating Trust.**

### 3.    Releases by the Debtors

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including with respect to the Ally Released Parties, the Ally Contribution provided to the Estates under the Plan and otherwise, on and as of the Effective Date of the**

-143-

Plan, the Debtor Released Parties are deemed released and discharged by the Debtors, the Estates and the Liquidating Trust from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, including those Causes of Action based on avoidance liability under federal or state laws, veil piercing or alter-ego theories of liability, a theory of debt recharacterization, or equitable subordination liability, arising from or related in any way to the Debtors, including those that any of the Debtors would have been legally entitled to assert against a Debtor Released Party in its own right (whether individually or collectively) or that any holder of a Claim or Equity Interest, the Liquidating Trust, or other Entity would have been legally entitled to assert on behalf of any of those Debtors or any of their Estates, including those in any way related to the Chapter 11 Cases or the Plan to the fullest extent of the law.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Debtor Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtors' release; (3) in the best interests of the Debtors, the Estates, the Liquidating Trust and all holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to the Debtors, the Liquidating Trust and any holder of a Claim or Equity Interest or other Entity who would have been legally entitled to assert such Claim or Equity Interest on behalf of any of the Debtors or any of their Estates from asserting any Claim or Cause of Action released pursuant to the Debtors' release.

4.      Third Party Releases by Holders of Claims and Equity Interests

On and as of the Effective Date of the Plan, the holders of Claims and Equity Interests, shall be deemed to provide a full and complete discharge and release to the Ally Released Parties and their respective property from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to the Debtors, including those in any way related to RMBS issued and/or sold by the Debtors or their affiliates and/or the Chapter 11 Cases or the Plan, and any obligations under the DOJ/AG Settlement, the Consent Order, and the Order of Assessment.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, of the Third Party Release, and further, shall constitute the Bankruptcy Court's finding that this Third Party Release is:   (1) in exchange for the good, valuable and substantial

-144-

consideration provided by the Ally Released Parties; (2) in the best interests of the Debtors, the Estates, the Liquidating Trust and all holders of Claims and Equity Interests; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for a hearing; (5) justified by truly unusual circumstances; (6) an essential component and critical to the success of the Plan; (7) resulted in distributions to the Creditors that would otherwise have been unavailable; (8) the result of an identity of interest between the Debtors and the Ally Released Parties regarding the Plan; and (9) a bar to any party asserting a claim or cause of action released pursuant to this Third Party Release against any of the Ally Released Parties.

5.    **Third Party Release Carve-Out**

Notwithstanding anything to the contrary herein, the Third Party Release shall not apply to any claims held by: (i) the FDIC, in its capacity as a receiver, against Ally, (ii) the FHFA against Ally; and (iii) Fannie Mae against Ally Bank, including, without limitation, any claims of Fannie Mae against Ally Bank for continuing liabilities, obligations, and duties owed by Ally Bank to Fannie Mae under the Fannie Mae Contract, including the obligations and duties to honor all selling and servicing representations and warranties related to the portfolio of loans sold and/or serviced, or that were previously serviced, by Ally Bank.

For the avoidance of doubt, Released Claims in connection with this Article V.X.5. shall constitute any Claims, Equity Interests, Causes of Action or liabilities against the Debtors held by Ally or Fannie Mae.

Nothing in the Plan releases AFI or any other party from the obligations under the Employees Retirement Plan for GMAC Mortgage Group, LLC (the "Pension Plan") and ERISA.  Notwithstanding the foregoing, upon the Effective Date, the Debtors and the Plan Trusts shall be released from all obligations under the Pension Plan and ERISA related thereto, except for any Claims for fiduciary breaches or prohibited transactions (as defined in ERISA) relating to the Pension Plan under applicable law.

6.    **Ally Releases**

Except with respect to the Ally Contract Claims, on and as of the Effective Date of the Plan, the Ally Released Parties shall release the Creditors' Committee, the Debtors, and the Consenting Claimants and their respective successors and assigns, members, partners, advisors, and Representatives, in their capacities as such, from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise arising from or related to the Debtors' liquidation, including the negotiation, formulation, or preparation of the Plan Support Agreement, the Plan, the Disclosure Statement, and any other Plan Documents and related disclosures, as well as any counterclaims in commenced or tolled litigation with the Debtors or the Consenting Claimants.

-145-

7.    **Exculpation**

The Exculpated Parties shall neither have, nor incur, any liability to any entity for any pre-petition or post-petition act or omission taken in connection with, or related to, formulating, negotiating, preparing, disseminating, soliciting, implementing, administering, confirming, or effecting the consummation of any prepetition plan support agreements, the Plan Support Agreement, the Plan, the Disclosure Statement, the FGIC Settlement Agreement, the Kessler Settlement Agreement, the RMBS Settlement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan provided, that the foregoing provisions of this exculpation shall have no effect on the liability of any entity that results from any such act that is determined in a final, non-appealable order to have constituted gross negligence or willful misconduct; provided, further, that the Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors concerning his, her, or its duties pursuant to, or in connection with, any prepetition plan support agreement, the Plan Support Agreement, the Plan, the Disclosure Statement, the FGIC Settlement Agreement, and the RMBS Settlement.

8.    **Injunction**

Except as otherwise provided in the Confirmation Order or in the Plan, and in accordance with Article IX.E. of the Plan, all Entities, including Investors, who have held, hold or may hold Claims, Equity Interests, Causes of Action or liabilities that constitute Released Claims, are permanently enjoined and precluded, from and after the effective date of the Plan, from: (a) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party whether directly, derivatively or otherwise, on account of or in connection with or with respect to any Released Claims; (b) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Released Party on account of or in connection with or with respect to any Released Claims; (c) creating, perfecting or enforcing any lien (other than any charging lien of a trustee under its respective indenture), claim or encumbrance of any kind against any Released Party on account of or in connection with or with respect to any Released Claims; (d) asserting any right to setoff, subrogation or recoupment of any kind against any obligation due from any Released Party on account of or in connection with or with respect to any Released Claims unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in a Proof of Claim or Equity Interest or otherwise that such holder asserts, has or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; (e) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party on account of or in connection with or with respect to any Released Claims; and (f) seeking relief or collecting judgments on an Investor-related securities claim in a manner that fails to conform with the terms of the judgment reduction provision set forth in the Plan and the Confirmation Order; provided, that nothing contained herein shall be construed to prevent any entity from objecting to claims or defending against claims objections or collection actions whether by asserting a right of setoff or otherwise to the extent permitted by law.  Such injunction shall extend to the successors of the Liquidating Trust, if any, and to their respective properties

**and interests in property. Any person injured by any willful violation of this injunction shall be entitled to recover actual damages, including costs and attorneys' fees and, in appropriate circumstances, may recover punitive damages from the willful violator.**

### 9.   Waiver of Subrogation

The GMACM Debtors and the RFC Debtors hereby release the ResCap Debtors from any and all liability or responsibility to the GMACM Debtors and the RFC Debtors or any entity claiming through or under the GMACM Debtors and the RFC Debtors by way of subrogation or otherwise, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, including those subrogated Causes of Action based on avoidance liability under federal or state laws, veil piercing or alter-ego theories of liability, a theory of debt recharacterization, or equitable subordination liability, arising from or related in any way to the Debtors, including those that any of the Debtors would have been legally entitled to assert against a Released Party in its own right (whether individually or collectively) or that any holder of a Claim or Equity Interest, the Liquidating Trust, or other entity would have been legally entitled to assert on behalf of any of those Debtors or any of their Estates, including those in any way related to the Chapter 11 Cases or the Plan to the fullest extent of the law.

### 10.   Judgment Reduction for Co-Defendants in Securities Litigation

The Plan provides for a Third Party Release for the Ally Released Parties, including the release of any claims for contribution and indemnity that the defendants in Investor-related securities litigation may have against an Ally Released Party. In light of the Third Party Release, Article IX.K of the Plan (the "Judgment Reduction Provision") provides that a defendant against whom a judgment is obtained on an Investor-related securities claim, where such defendant has a claim for indemnity or contribution that is subject to the Third Party Releases, shall be entitled to a judgment credit in the underlying litigation in accordance with, and to the extent permitted under, applicable statutory or common law, as determined by a court of competent jurisdiction.

Article IX.K of the Plan provides:

A defendant against whom a judgment of a court of competent jurisdiction is obtained (whether in a proceeding now pending or hereafter commenced) on an Investor-related securities claim where such defendant has a claim for indemnity or contribution that is subject to the Third Party Releases shall be entitled to a judgment credit in the underlying litigation in accordance with, and to the extent permitted under, applicable statutory or common law, as determined by a court of competent jurisdiction. Notwithstanding the foregoing and without limitation (i) no Ally Released Party shall be deemed to have admitted to such fault by virtue of this provision; (ii) nothing herein shall create any right for a defendant that it does not have under applicable statutory or common law, if any, to obtain discovery from any Ally Released Party, or create an obligation for any Ally Released Party to participate in any proceeding to determine fault that does not exist under applicable statutory or common law, if any, in connection with such

-147-

claim; and (iii) no finding in any proceeding to determine fault shall create any claim against any Ally Released Party or obligation of any Ally Released Party to satisfy any claim.  For the avoidance of doubt, all parties' rights under applicable law with respect to discovery and any Ally Released Party's participation in any proceeding to determine fault are preserved.

The Judgment Reduction Provision does not impair or enhance the rights of either the plaintiffs or the defendants in the underlying Investor-related securities litigations.  There are currently Investor-related securities litigations that may implicate rights of contribution or indemnity and the Third Party Release in the following jurisdictions: California, Illinois, Indiana, Kansas, Massachusetts, Minnesota, New York, New Jersey, and Ohio.  In addition, Investor-related securities plaintiffs have tolled claims in actions that could be commenced in the following jurisdictions: Florida, Illinois, Iowa, New Jersey, New York, and Israel.  Judgment reduction and contribution law in jurisdictions beyond the forum of any particular litigation, including Israel, Ireland and Germany, may apply depending on questions of choice of law.

Certain parties have raised issues with the Judgment Reduction Provision that the Plan Proponents hope to resolve prior to confirmation.

## Y.   Conditions Precedent to Confirmation and Consummation of the Plan

### 1.   Conditions Precedent to Confirmation

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived in accordance with the terms of the Plan:

(a)   Court approval of the Disclosure Statement in a form and substance reasonably acceptable to the Plan Proponents, Ally, and the Consenting Claimants, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code;

(b)   The Plan shall be reasonably acceptable to the Plan Proponents, Ally and each of the Consenting Claimants, in accordance with the terms of the Plan Support Agreement;

(c)   The Confirmation Order shall be reasonably acceptable to the Plan Proponents, Ally, and each of the Consenting Claimants;

(d)   The Plan Supplement and any related documentation shall be reasonably satisfactory to the Plan Proponents, Ally, and each of the Consenting Claimants;

(e)   Court approval of the RMBS Settlement pursuant to Bankruptcy Rule 9019; and

(f)   No Plan modifications that have altered distributions to be made under the Plan shall have occurred without the consent of the Plan Proponents, Ally, and each of the Consenting Claimants;

(g)   Court approval of the Third Party Releases, Debtor Releases and Exculpation provisions in the Plan, without any modification thereto.

-148-

### 2.    Conditions Precedent to Consummation

It shall be a condition to the Plan Effective Date that the following conditions shall have been satisfied or waived pursuant to Article X.C of the Plan:

(a)    the Bankruptcy Court shall have entered the Confirmation Order, which shall grant final approval of the Plan, including all settlements therein, the Debtor Releases, the Third Party Releases, the injunctions, and exculpation of the Exculpated Parties;

(b)    the Confirmation Order shall not have been stayed, modified, or vacated on appeal, and the time to appeal shall have passed;

(c)    on or before September 16, 2013, the FGIC Rehabilitation Court shall have entered an order substantially in the form attached to the FGIC Settlement Agreement as Exhibit E (or such other form as agreed to by FGIC, the Debtors, and the RMBS Trustees) approving the Plan Support Agreement (as it relates to FGIC) and the FGIC Settlement Agreement, including the settlement and release of all present and future claims against FGIC under or relating to the FGIC Policies;

(d)    the Bankruptcy Court shall have entered an order substantially in the form attached to the FGIC Settlement Agreement as Exhibit D (or such other form as agreed to by FGIC, the Debtors, and the RMBS Trustees and counsel for the Institutional Investors) approving the FGIC Settlement Agreement, including the settlement and release of all present and future claims against FGIC under or relating to the FGIC Policies and the allowance of FGIC's General Unsecured Claims against the Debtors, pursuant to a Bankruptcy Rule 9019 motion, which order shall include a finding that the transactions contemplated by the FGIC Settlement Agreement are in the best interests of the RMBS Trusts;

(e)    Ally will have funded at least $1,950,000,000 of the Ally Contribution;

(f)    the Liquidating Trust Agreement, the RMBS Claims Trust Agreement, the Private Securities Claims Trust Agreement and the Borrower Claims Trust Agreement shall have been executed;

(g)    the Ally Contract Claims and any other Claims held by Ally Allowed under the Plan, will have been Allowed, deemed indefeasible, and approved by the Bankruptcy Court without subordination of any kind, and satisfied as set forth herein;

(h)    subject to Article IV.C. of the Plan, the Available Assets shall have been transferred to the Liquidating Trust;

(i)    the Professional Fee Escrow Account shall have been funded;

(j)    all material governmental and third party approvals and consents, including Bankruptcy Court approval, and approvals Ally may be required to obtain, necessary in connection with the transactions contemplated by the Plan, shall have been obtained and be in full force and effect, and all applicable waiting periods shall have expired without any

-149-

action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions; and

(k)      all other actions, documents, and agreements necessary to implement the Plan as of the Effective Date will have been delivered and all conditions precedent thereto will have been satisfied or waived.

### 3.      Waiver of Conditions

The Plan Proponents shall have the right to waive one or more of the conditions to Confirmation and Consummation of the Plan set forth in Articles X.A and X.B(b), and (e) through (k), with the Consent of Ally and the Consenting Claimants, and, solely with respect to such waivers of the conditions set forth in Article X.B(c) and (d) of the Plan with the consent of FGIC and the RMBS Trustees, at any time without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

### 4.      Effect of Nonoccurrence of Conditions to Consummation

Each of the conditions to the Effective Date must be satisfied or duly waived, and the Effective Date must occur on or before the earlier of thirty (30) days after the Confirmation Date or December 15, 2013.  If the Effective Date has not occurred on or before the earlier of thirty (30) days after the Confirmation Date or December 15, 2013, then upon motion by the Plan Proponents or Ally made before the Effective Date and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the Filing of such motion to vacate, the Confirmation Order may not be vacated if the Effective Date occurs before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, including the discharge of Claims and termination of Interests pursuant to the Plan and section 1141 of the Bankruptcy Code and the assumptions, assignments or rejections of Executory Contracts, and nothing contained in the Plan or Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Equity, Interests or Causes of Action; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking of any sort by such Debtor or any other Entity.

## Z.      Modification, Revocation, or Withdrawal of the Plan

### 1.      Modification and Amendments

Subject to the terms of the Plan Support Agreement, the Plan Proponents may amend, modify, or supplement the Plan pursuant to Bankruptcy Code section 1127(a) at any time prior to the Confirmation Date; provided, that the Plan Proponents obtain the consent, which shall not be unreasonably withheld, of the Settling Parties in accordance with the terms of the Plan Support Agreement. After the Confirmation Date, but prior to Consummation of the Plan, the Plan Proponents may with the consent of the other Settling

-150-

Parties, which shall not be unreasonably withheld, in accordance with the terms of the Plan Support Agreement, amend, modify, or supplement the Plan without further order of the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order.  At all times, the Plan Proponents may amend, modify, or supplement the Plan without the consent of any other Entity to the extent that such amendments, modifications, or supplements are non-material.  At any time, at the request of the RMBS Trustees, Art. IV.C.3 of the Plan may be amended as will be required to preserve the REMIC tax status of the RMBS Trusts notwithstanding the distribution of Units to the RMBS Claims Trust under the Plan on behalf of the RMBS Trusts, and such amendment will be deemed non-material.

### 2.    Effect of Confirmation on Modifications

Pursuant to Bankruptcy Code Section 1127(a), entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

### 3.    Revocation or Withdrawal of the Plan

Subject to the terms of the Plan Support Agreement and conditions to the Effective Date, the Plan Proponents reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent chapter 11 plans. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in the Plan shall constitute a waiver or release of any Claims or Equity Interests or prejudice in any manner the rights of the Plan Proponents, the Settling Parties, or any other Entity, or constitute an admission, acknowledgement, offer, or undertaking of any sort by the Plan Proponents or any other Entity.

## AA.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction, as set forth in further detail in Article XII of the Plan.

-151-

**BB.    Miscellaneous Plan Provisions**

**1.    Immediate Binding Effect**

Subject to Article X.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Liquidating Trust, and any and all holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are presumed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with any Debtor.

Notwithstanding anything in Bankruptcy Rule 3020(e) to the contrary, (i) the entry of the Confirmation Order shall constitute a Final Order and the period in which an appeal must be filed shall commence upon the entry thereof, and (ii) the Confirmation Order shall take effect immediately upon its entry and the Plan Proponents are authorized to consummate the Plan immediately after entry of the Confirmation Order and the satisfaction or waiver of all other conditions to the Effective Date of the Plan, in accordance with the terms of the Plan.

**2.    Additional Documents**

On or before the Effective Date, the Plan Proponents may File with the Bankruptcy Court any and all agreements and other documents that may be necessary or appropriate in order to effectuate and further evidence the terms and conditions of the Plan.

**3.    Payment of Statutory Fees[95]**

Notwithstanding the grouping of the Debtors described in Article II.K, on the Effective Date, and thereafter as may be required, each of the Debtors shall (i) pay all the respective fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to section 3717 of title 31 of the United States Code, until the earliest to occur of the entry of (a) a final decree closing such Debtor's Chapter 11 Case, (b) a Final Order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (c) a Final Order dismissing such Debtor's Chapter 11 Case, and (ii) be responsible for the filing of consolidated post-confirmation quarterly status reports with the Bankruptcy Court in accordance with Rule 3021-1 of the Southern District of New York Local Bankruptcy Rules, which status reports shall include reports on the disbursements made by each of the Debtors.

---

[95]    Annexed hereto as <u>Exhibit 11</u> is a chart, which identifies all parties for which the Plan provides for reimbursement of fees and expenses, and the legal and factual bases for those not seeking prior Court approval for payment.

4.    **Dissolution of the Creditors' Committee**

On the Effective Date, the Creditors' Committee shall dissolve; provided, however, that, following the Effective Date, the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (i) Claims and/or applications for compensation by Professionals and requests for allowance of Administrative Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; (ii) any appeals of the Confirmation Order that remain pending as of the Effective Date to which the Creditors' Committee is a party; (iii) any adversary proceedings or contested matters as of the Effective Date to which the Creditors' Committee is a party; and (iv) responding to creditor inquiries for one-hundred-twenty (120) days following the Effective Date.  Upon the dissolution of the Creditors' Committee, the current and former members of the Creditors' Committee and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's respective attorneys, accountants and other agents shall terminate, except that the Creditors' Committee and their respective Professionals shall have the right to pursue, review and object to any applications for compensation or reimbursement of expenses filed in accordance with Article II hereof.

5.    **Access to Debtors' Records After Effective Date**

On the Effective Date, Debtors shall be deemed to have transferred, assigned and conveyed to the Liquidating Trust, the RMBS Claims Trust, the Borrower Claims Trust, and the Private Securities Claims Trust, as their interests may appear with respect to the Claims of their respective beneficiaries, and the Liquidating Trust shall be authorized to take possession of, all of the books and records of the Debtors,  including, except as set forth in any Ally Contract, all information and data on computers owned or leased by the Debtors or otherwise on premises occupied by the Debtors, and all rights of access to data of the Debtors and their affiliates, that were not otherwise transferred to a third party on or prior to the Effective Date.  The Liquidating Trust shall have the responsibility of storing and maintaining such books and records to and for the benefit of each of the Liquidating Trust, the RMBS Claims Trust, the Borrower Claims Trust, and Private Securities Claims Trust as their interests may appear, and the respective Plan Trusts shall enter into an agreement or protocol with respect to access to such books and records.  The Debtors shall cooperate with the Plan Trustees of the Plan Trusts to facilitate the delivery and storage of such books and records in accordance herewith.  For the purpose of this Section, books and records include computer-generated or computer-maintained books and records and computerized data, as well as electronically generated or maintained books and records or data, along with books and records of the Debtors maintained by or in possession of third parties, except as set forth in any Ally Contract, and all of the claims and rights of the Debtors in and to books and records, wherever located.  The Debtors or the Liquidating Trust, as applicable, shall make available current and historic tax returns with supporting files to Ally as necessary for Ally to address Ally's audit requirements and to facilitate Ally filing 2013 tax returns.

-153-

**6.    Substantial Consummation**

On the Effective Date, the Plan shall be deemed to be substantially consummated under Sections 1101 and 1127(b) of the Bankruptcy Code.

**7.    Reservation of Rights**

Except as otherwise provided in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Plan Proponents or Ally with respect to the Plan or the Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of the Plan Proponents or Ally with respect to the holders of Claims or Equity Interests prior to the Effective Date.

**8.    Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**9.    Further Assurances**

The Debtors or the Liquidating Trust, all holders of Claims receiving distributions pursuant to the Plan, and all other Entities, as applicable, shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

**10.    Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to Bankruptcy Code Sections 105 or 362 or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan and the Confirmation Order shall remain in full force and effect in accordance with their terms.

**11.    Entire Agreement**

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

12.    **Exhibits and Related Documents**

All exhibits and documents Filed in relation to the Plan are incorporated into and are a part of the Plan as if set forth in full in the Plan. After any exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Liquidating Trust's counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website, http://www.KCCllc.net/rescap, or the Bankruptcy Court's website, http://www.nys.uscourts.gov (a PACER login and password are required to access documents on the Bankruptcy Court's website).

13.    **Severability of Plan Provisions**

Except as otherwise provided herein including Article X.A, B and C, if, before Confirmation of the Plan, subject to the terms of the Plan Support Agreement, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan, including the Third Party Releases, Debtor Releases, and Exculpation, shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Plan Proponents' consent; and (c) nonseverable and mutually dependent.

14.    **Waiver or Estoppel Conflicts**

Each holder of a Claim or Equity Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Equity Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated, by virtue of an agreement made with the Plan Proponents, or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

15.    **Conflicts**

Except as set forth in the Plan or unless otherwise ordered by the Bankruptcy Court, to the extent that the Disclosure Statement, any order of the Bankruptcy Court (other than the Confirmation Order), or any exhibit to the Plan or document executed or delivered in connection with the Plan is inconsistent with the terms of the Plan, the terms of the Plan shall control.

-155-

**CC.    Plan Supplement**

The Plan Proponents will file a Plan Supplement with the Bankruptcy Court no later than ten (10) days prior to the Objection Deadline or such later date as may be approved by the Bankruptcy Court, except as otherwise provided under the Plan with the exception of the Assumption Schedule which shall be filed no later than twenty-one (21) days before the commencement of the Confirmation Hearing.  The Plan Supplement will include documents and forms of documents, Schedules, and exhibits to the Plan (as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules), including the Liquidation Trust Agreement, the Borrower Claims Trust Agreement and the Private Securities Claims Trust Agreement.

The Plan and all documents to be executed and/or delivered in connection with the consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan).

**ARTICLE VI.**
**VOTING PROCEDURES**

The Disclosure Statement Approval Order entered by the Bankruptcy Court approved certain procedures for the Plan Proponents' solicitation of votes to approve the Plan, including setting the deadline for voting, which holders of Claims or Equity Interests are eligible to receive Ballots to vote on the Plan, and certain other voting procedures.

THE DISCLOSURE STATEMENT APPROVAL ORDER IS HEREBY INCORPORATED BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.  YOU SHOULD READ THE DISCLOSURE STATEMENT APPROVAL ORDER, THE CONFIRMATION HEARING NOTICE (AS DEFINED IN THE DISCLOSURE STATEMENT APPROVAL ORDER), AND THE INSTRUCTIONS ANNEXED TO YOUR BALLOT AS THEY SET FORTH IN DETAIL, AMONG OTHER THINGS, PROCEDURES GOVERNING VOTING DEADLINES AND OBJECTION DEADLINES.

If you have any questions about the procedures for voting your Claim or the Solicitation Package you received, or if you wish to obtain a paper copy of the Plan, the Disclosure Statement, or any exhibits to such documents, please contact KCC by telephone at (888) 251 2914 or in writing at Kurtzman Carson Consultants LLC, at ResCap Balloting Center, c/o KCC, 2335 Alaska Avenue, El Segundo, CA 90245.

**A.    Voting Deadline**

This Disclosure Statement and the appropriate Ballot(s) are being distributed to all holders of Claims that are entitled to vote on the Plan.  In order to facilitate vote tabulation, there is a separate Ballot designated for each impaired Voting Class; however, all Ballots are substantially similar in form and substance, and the term "Ballot" is used without intended reference to the Ballot of any specific Class of Claims.

-156-

IN ACCORDANCE WITH THE DISCLOSURE STATEMENT APPROVAL ORDER, IN ORDER TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS MUST BE RECEIVED BY THE SOLICITATION AND TABULATION AGENT NO LATER THAN 7:00 P.M. (EASTERN TIME) ON THE VOTING DEADLINE OF OCTOBER 21, 2013. ONLY THOSE BALLOTS ACTUALLY RECEIVED BY KCC BEFORE THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE PLAN. NO BALLOTS MAY BE SUBMITTED BY FACSIMILE OR ELECTRONIC MAIL, AND ANY BALLOTS SUBMITTED BY FACSIMILE OR ELECTRONIC MAIL WILL NEITHER BE ACCEPTED NOR COUNTED BY KCC. BALLOTS SHOULD NOT BE SENT TO THE DEBTORS OR ANY OF THEIR ADVISORS.

## B.    Holders of Claims or Interests Entitled to Vote

Under Section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a Chapter 11 plan unless: (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, under Section 1126(a) of the Bankruptcy Code, the holder of a claim or interest that is allowed under a Chapter 11 plan is entitled to vote to accept or reject the plan if such claim or interest is impaired under the plan. Under Section 1126(f) of the Bankruptcy Code, the holder of a claim that is not impaired under a Chapter 11 plan is deemed to have accepted the plan, and the Plan Proponent need not solicit such holder's vote. Under Section 1126(g) of the Bankruptcy Code, the holder of an impaired claim or impaired interest that will not receive any distribution under the plan in respect of such claim or interest is deemed to have rejected the plan and is not entitled to vote on the plan. For a detailed description of the treatment of Claims and Equity Interests under the Plan, refer to Article I.F, entitled "Summary of Treatment of Allowed Claims and Equity Interests," and Article III of the Plan.

PURSUANT TO THE PLAN, ONLY THE HOLDERS OF CLAIMS IN CLASSES R-3, R-4, R-5, R-6, R-7, R-8, R-11, GS-3, GS-4A, GS-4B, GS-5, GS-6, GS-7, RS-3, RS-4, RS-5, RS-6, RS-7, RS-8, and RS-11 ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.

The Voting Record Date is **August 16, 2013**. The Voting Record Date is the date for determining (1) which holders of Claims or Equity Interests are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the Disclosure Statement Approval Order and (2) whether Claims or Equity Interests have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the holder of the Claim. The Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' Creditors and other parties-in-interest.

As more fully set forth in the Disclosure Statement Approval Order, claimants who have timely filed Proofs of Claim or have been scheduled by the Debtors and are classified in the Plan in one of the Voting Classes may vote on the Plan <u>unless</u>: (a) as of the Voting Record Date, the

outstanding amount of such holder's Claim is not greater than zero ($0.00); (b) as of the Voting Record Date, such Claim has been disallowed or expunged; (c) the Debtors scheduled such Claim as contingent, unliquidated, or disputed and a Proof of Claim was not filed by the General Bar Date or deemed timely filed by order of the Bankruptcy Court at least five (5) business day prior to the Voting Deadline; (d) such Claim is subject to an objection by September 20, 2013; and (e) the holder of a Claim has timely filed a motion pursuant to Bankruptcy Rule 3018(a) seeking temporary allowance of such Claim for voting purposes only by September 30, 2013 and the Debtor has not opposed such motion or objected to the Claim, in which case the holder's vote will be counted only upon order of the Bankruptcy Court; or (f) by other order of the Bankruptcy Court.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to Section 1126(e) of the Bankruptcy Code, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Disclosure Statement Approval Order also sets forth assumptions and procedures for tabulating Ballots, including Ballots that are not completed fully or correctly.

## C.   Beneficial Owners of the Junior Secured Notes and Senior Unsecured Notes

If you are the beneficial owner of the Junior Secured Notes or the Senior Unsecured Notes and you received a Ballot for beneficial owners of a security (a "Beneficial Owner Ballot") from a brokerage firm, commercial bank, Trust company or other nominee (each a "Master Ballot Agent") with a return envelope addressed to the Master Ballot Agent, return the completed Ballot to the appropriate Master Ballot Agent so that the Master Ballot Agent will have sufficient time to complete a Ballot summarizing votes cast by beneficial owners holding securities (each a "Master Ballot") so that it can be forwarded to KCC by the Voting Deadline. If your Beneficial Owner Ballot is not received by your Master Ballot Agent with sufficient time for the Master Ballot Agent to submit its Master Ballot by the Voting Deadline, your vote will not count.

If you received a return envelope addressed to KCC, your Master Ballot Agent has pre-validated your Beneficial Owner Ballot. Therefore, you must return your pre-validated Beneficial Owner Ballot directly to KCC so it is actually received by KCC on or before the Voting Deadline.

If you are the Beneficial Owner of the Junior Secured Notes or the Senior Unsecured Notes and hold them in your own name, you can vote by completing either a Beneficial Owner Ballot or by completing and signing the enclosed Ballot and returning it directly to KCC using the enclosed pre-addressed, postage prepaid envelope.

Do not return your Junior Secured Notes or the Senior Unsecured Notes or any other instruments or agreements that you may have with your Ballot(s).

-158-

**D.**  **Vote Required for Acceptance by a Class**

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan in accordance with the Disclosure Statement Approval Order.

**E.**  **Returning Your Ballot**

HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN MAY DO SO BY COMPLETING THE APPROPRIATE BALLOTS AND RETURNING THEM IN THE ENVELOPE PROVIDED. VOTING INSTRUCTIONS ARE ANNEXED TO EACH BALLOT. BALLOTS CAST BY HOLDERS AND MASTER BALLOTS CAST ON BEHALF OF BENEFICIAL HOLDERS IN CLASSES ENTITLED TO VOTE MUST BE RECEIVED BY THE NOTICE AND CLAIMS AGENT BY THE VOTING DEADLINE AT THE FOLLOWING ADDRESS

| BALLOTS AND MASTER BALLOTS |
| --- |

1. Ballots and Master Ballots must be actually received by KCC by the Voting Deadline.

2. Please send your completed Ballot in the envelope provided. If you have received a return envelope addressed to your Nominee, please allow additional time for your vote to be included on a Master Ballot and sent to KCC by the Voting Deadline.

3. All Ballots must be returned directly to KCC and may be sent by First Class Mail, Overnight Courier, or Personal Delivery to:

**ResCap Balloting Center**
**c/o Kurtzman Carson Consultants LLC**
**2335 Alaska Avenue**
**El Segundo, CA 90245**

ALL BALLOTS ARE ACCOMPANIED BY RETURN ENVELOPES. IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT AND MASTER BALLOT. IF YOU ARE RETURNING YOUR BALLOT TO YOUR NOMINEE, YOU MUST RETURN YOUR BALLOT WITH SUFFICIENT TIME FOR YOUR VOTE TO BE INCLUDED BY YOUR NOMINEE ON A MASTER BALLOT AND SENT TO KCC BY THE VOTING DEADLINE. PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT.

-159-

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE PLAN PROPONENTS DETERMINE OTHERWISE IN THEIR SOLE AND ABSOLUTE DISCRETION.

EXCEPT AS OTHERWISE SET FORTH IN THE DISCLOSURE STATEMENT APPROVAL ORDER, EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EXCEPT AS OTHERWISE SET FORTH IN THE DISCLOSURE STATEMENT APPROVAL ORDER, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.

THE FOLLOWING BALLOTS WILL NOT BE COUNTED: (I) ANY BALLOT THAT IS COMPLETED, EXECUTED, AND TIMELY RETURNED TO KCC, BUT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN; (II) EXCEPT AS OTHERWISE SET FORTH IN THE DISCLOSURE STATEMENT APPROVAL ORDER, ANY BALLOT SUBMITTED FOR WHICH THE HOLDER OF A CLAIM ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN VOTES TO BOTH ACCEPT AND REJECT THE PLAN; (III) IN THE ABSENCE OF ANY EXTENSION OF THE VOTING DEADLINE GRANTED BY THE PLAN PROPONENTS, ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE; (IV) ANY BALLOT THAT IS ILLEGIBLE OR CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE CLAIMANT; (V) ANY BALLOT CAST BY A PERSON OR ENTITY THAT DOES NOT HOLD A CLAIM THAT IS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN; (VI) ANY UNSIGNED BALLOT; OR (VII) ANY BALLOT TRANSMITTED TO KCC BY FAX, E-MAIL, OR OTHER ELECTRONIC MEANS OF TRANSMISSION, UNLESS OTHERWISE AGREED TO BY THE PLAN PROPONENTS.

**If you have any questions on the procedures for voting on the Plan, please call KCC at the following telephone number:  (888) 251-2914**

## ARTICLE VII.
## RECOVERY ANALYSIS

On January 31, 2013, the Debtors closed the sale of their originations and capital markets platform to Walter.  This sale also included the Fannie Mae MSR portion of the Debtors' servicing portfolio, representing approximately $43.8 billion in UPB at December 31, 2012.  On February 5, 2013, the Debtors then sold a Whole Loan Portfolio, made up of over 49,000 whole loans with $2.9 billion in UPB at December 31, 2012, to Berkshire.  Finally, on February 15, 2013, the Debtors closed the sale of their servicing platform assets, representing approximately $175.4 billion of UPB (inclusive of master serviced loans) at December 31, 2012, to Ocwen.

-160-

Notwithstanding the significant transfer of assets included in the Platform and Legacy Sales, as of April 30, 2013, approximately $1.4 billion of non-cash assets after certain pro forma adjustments, remain in the Debtors' Estates to be monetized. Most significantly, there are approximately $945 million of loans and Advances insured by the FHA or the VA that the Debtors intend to monetize for the Estate's benefit. In addition, there are other residual financial assets to be monetized including, but not limited to, servicer Advances, non-FHA/VA Loans, trading securities, restricted cash balances, non-debtor equity interests, accounts receivable and other illiquid assets that will take some time to liquidate and ultimately yield value for the Debtors and the Estates. The Estates will also include those residual servicing rights and servicing Advances that were not assigned to Ocwen as part of the assets sale transactions closed in the first quarter of 2013.

As described in more detail in the recovery analysis annexed hereto as <u>Exhibit 7</u> (the "<u>Recovery Analysis</u>"), the Debtors have provided an analysis of the recovery from these assets, along with cash on hand as of April 30, 2013 and the proceeds from the settlement with Ally Financial, Inc., which are then distributed to (i) holders of Secured Claims, (ii) administrative and priority expenses, and (iii) Unsecured Claims. THE DEBTORS' RECOVERY ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF THE ORDERLY LIQUIDATION OF THE ASSETS OF THE DEBTORS. Underlying the Recovery Analysis are a number of estimates and assumptions that are inherently subject to significant economic, competitive, and operational uncertainties and contingencies beyond the control of the Debtors. In addition, various decisions upon which certain assumptions are based are subject to change. Therefore, there can be no assurance that the assumptions and estimates employed in determining the values of the assets will result in an accurate estimate of the proceeds that will be realized. In addition, amounts of Claims against the Estate could vary significantly from the estimate set forth herein. Therefore, the actual recovery received by creditors of the Debtors could vary materially from the estimates provided herein.

## ARTICLE VIII.
## <u>CONFIRMATION OF THE PLAN</u>

### A.    Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a Confirmation Hearing at which it will hear objections (if any) and consider evidence with respect to whether the Plan should be confirmed. Bankruptcy Code Section 1128(b) provides that any party in interest may object to confirmation of the Plan. At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all the requirements of Section 1129 of the Bankruptcy Code described below are met.

The Bankruptcy Court has fixed **November 19, 2013 at 10:00 a.m.** (Eastern Time) before the Honorable Martin Glenn, United States Bankruptcy Judge for the Southern District of New York, Room 500, New York, New York 10004, or as soon as practicable thereafter, as the date of the Confirmation Hearing. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court, without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing. Notice of the Confirmation Hearing will be

provided in the manner prescribed by the Bankruptcy Court, and will also be available at the Debtors' restructuring website, www.kccllc.net/rescap.

## B.    Deadline to Object to Confirmation

Objections, if any, to the Confirmation of the Plan must: (1) be in writing; (2) state the name and address of the objecting party and the nature of the Claim, Equity Interest or other interest of such party; (3) state with particularity the basis and nature of any objection; and (4) be filed with the Bankruptcy Court, and served on the following parties so that they are received no later than **October 21, 2013 at 4:00 p.m.**:

(a) the Debtors, (i) if by mail or courier to: Residential Capital LLC, Lewis Kruger, CRO, c/o Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104; with copies to: Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York, 10104, Attn:  Gary Lee, Lorenzo Marinuzzi, and Todd Goren; (ii) if by e-mail, to: Lewis.Kruger@gmacrescap.com, glee@mofo.com, lmarinuzzi@mofo.com and tgoren@mofo.com;

(b) the Creditors' Committee, (i) if by mail or courier to: Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York, 10036; Attn: Kenneth H. Eckstein, Douglas H. Mannal and Stephen D. Zide, (ii) if by email to keckstein@kramerlevin.com, dmannal@kramerlevin.com and szide@kramerlevin.com;

(c) Ally Financial, Inc., 1177 Avenue of the Americas, New York, New York 10036; Attn:  William B. Solomon and Timothy Devine; with copies to: Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.:  Richard M. Cieri and Ray C. Schrock; and

(d) the Office of the United States Trustee, Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004; Attn: Brian Masumoto and Michael Driscoll.

## C.    Confirmation Standards

To confirm the Plan, the Bankruptcy Court must find that the requirements of Section 1129 of the Bankruptcy Code have been satisfied.  The Plan Proponents believe that they will satisfy Section 1129 because, among other things:

(i)    the Plan complies with the applicable provisions of the Bankruptcy Code;

(ii)    the Debtors and the Creditors' Committee, have complied with the applicable provisions of the Bankruptcy Code;

(iii)    the Plan has been proposed in good faith and not by any means forbidden by law;

-162-

(iv)     any payment made or promised under the Plan for services or for costs and expenses in or in connection with these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

(v)     the Plan Proponents will disclose the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer or voting trustee of the Debtors or Liquidating Trust, an affiliate of the Debtors participating in the Plan with the Debtor or a successor to the Debtors under the Plan. The appointment to, or continuance in, such office of such individuals, will be consistent with the interests of holders of Claims and Equity Interests and with public policy, and the Debtors will have disclosed the identity of any insider that the Liquidating Trust will employ or retain and the nature of any compensation for such insider;

(vi)     with respect to each Class of Impaired Claims or Equity Interests, each holder of a Claim or Equity Interest in such Class has either accepted the Plan or will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code (see Section 1 below, the "Best Interests of Creditors Test");

(vii)     each class of Claims or Equity Interests has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such class pursuant to Section 1129(b) of the Bankruptcy Code;

(viii)     except to the extent that the holder of a particular Administrative Claim has agreed or will agree to a different treatment of such Claim, the Plan provides that Allowed Administrative Claims will be paid in full in Cash on the Effective Date;

(ix)     except to the extent that a holder of an Allowed Other Priority Claim has agreed to a different treatment of such Claim, each such holder shall receive cash in an amount equal to the Allowed amount of such Claim, or treatment in a manner so that such Claim shall otherwise be rendered Unimpaired, (i) on the Effective Date or as soon as reasonably practicable thereafter; (ii) if an Other Priority Claim is Allowed after the Effective Date, on the date such Other Priority Claim is Allowed or as soon as reasonably practicable thereafter; (iii) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Liquidating Trust, as the case may be; or (iv) at such time and upon such terms as set forth in an order of the Bankruptcy Court;

(x)     except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive, as soon as reasonably practicable after the Effective Date, on

-163-

account of such Claim: (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (ii) Cash in an amount agreed to by the Debtors or the Liquidating Trust, as applicable, and such holder; provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date; or (iii) at the option of the Debtors or the Liquidating Trust, as applicable, and in lieu of payment in full in Cash of an Allowed Priority Tax Claim, deferred Cash payments on account thereof in the manner and to the extent permitted under Section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on or before the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors or the Liquidating Trust, as applicable, and such holder, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business;

(xi)    confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan (see Section 2 below, "Financial Feasibility"); and

(xii)   all fees payable under Section 1930 of title 28 of the United States Code will be paid as of the Effective Date of the Plan.

The Plan Proponents believe that: (i) the Plan satisfies or will satisfy all of the statutory requirements of Chapter 11 of the Bankruptcy Code; (ii) they have complied, or will have complied, with all of the requirements of Chapter 11; and (iii) they have proposed the Plan in good faith.

## 1.    Best Interests of Creditors Test/Liquidation Analysis

Section 1129(a)(7) of the Bankruptcy Code requires that any holder of an impaired claim or interest voting against a proposed Chapter 11 plan must be provided in the plan with a value, as of the effective date of the plan, at least equal to the value that the holder would receive if the debtor's operations were terminated and its assets liquidated under Chapter 7 of the Bankruptcy Code. To determine what the holders of Claims and Equity Interests in each impaired Class would receive if the Debtors were liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from a liquidation of each Debtor's assets in the context of a hypothetical liquidation. Such a determination must take into account the fact that Secured Claims, and any Administrative Claims resulting from the original Chapter 11 Cases and from the hypothetical Chapter 7 cases, would have to be paid in full from the liquidation proceeds before the balance of those proceeds were made available to pay unsecured Creditors and make distributions to holders of Equity interests.

As described in more detail in the hypothetical liquidation analysis annexed hereto as Exhibit 8 (the "Liquidation Analysis"), the Plan Proponents believe that the value of the Estate under Chapter 7 would be less than the value of the Estate under the Plan. In particular, proceeds received in a Chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale, and the fees and expenses of a Chapter 7 trustee would likely further reduce

-164-

Cash available for distribution. THESE LIQUIDATION VALUATIONS HAVE BEEN PREPARED SOLELY FOR USE IN THIS DISCLOSURE STATEMENT AND DO NOT REPRESENT VALUES THAT ARE APPROPRIATE FOR ANY OTHER PURPOSE. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF THE PLAN PROPONENTS FOR ANY PURPOSE. The assumptions used in developing the Liquidation Analysis are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors or a Chapter 7 trustee. Accordingly, there can be no assurances that the values assumed in the Liquidation Analysis would be realized if the Debtors were actually liquidated. In addition, any liquidation would take place in the future at which time circumstances may exist that cannot presently be predicted. A description of the procedures followed and the assumptions and qualifications made by the Debtors in connection with the Liquidation Analysis are set forth in the notes thereto.

### 2.      Financial Feasibility

In connection with Confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible in accordance with Section 1129(a)(11) of the Bankruptcy Code (which Section requires that the Confirmation of the Plan is not likely to be followed by the further liquidation of the Debtors, other than a liquidation contemplated by the Plan). The Plan contemplates liquidation of the Debtors' assets, which process will be funded by the proceeds received through the Asset Sales, the Ally Contribution, and activities of the Liquidation Trust. The Debtors are expected to be dissolved promptly after Consummation of the Plan. Thus, the Plan Proponents believe that the Plan can be consummated without a risk of an additional liquidation or conversion, and therefore that the Plan meets the financial feasibility requirement.

### 3.      Acceptance by Impaired Classes

As a condition to confirmation, the Bankruptcy Code requires that, except as described in the following Section, each class of claims and interests that is impaired under a plan accepts the plan. A class of claims or equity interests that is unimpaired under the plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Under Section 1124 of the Bankruptcy Code, a class is impaired under a Chapter 11 plan unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Section 1126(c) of the Bankruptcy Code defines acceptance of a Chapter 11 plan by an impaired class as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class; only those holders that actually vote to accept or reject the plan are counted for purposes of determining whether these dollar and number thresholds are met. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number that actually vote cast their ballots in favor of acceptance. Under Section

-165-

1126(d) of the Bankruptcy Code, a class of equity interests has accepted a Chapter 11 plan if holders of such equity interests holding at least two-thirds in amount have actually voted to accept the plan. Holders of Claims who fail to vote are deemed neither to accept nor to reject the Plan.

### 4.    Confirmation Without Acceptance by All Impaired Classes

Bankruptcy Code Section 1129(b) allows a Bankruptcy Court to confirm a plan, even if all impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class. Bankruptcy Code Section 1129(b) states that, notwithstanding an Impaired class's failure to accept a plan, the plan shall be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims and interests that is Impaired under, and has not accepted, the plan.

### (a)    Unfair Discrimination

A Chapter 11 plan does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated. The Plan Proponents do not believe that the Plan discriminates unfairly against any impaired Class of Claims or Equity Interests.

### (b)    Fair and Equitable

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors and equity interest holders as follows:

(i)    Secured Creditors. A plan is fair and equitable to a class of secured claims that rejects the plan if the plan provides: (i) that each holder of a secured claim included in the rejecting class (A) retains the liens securing its claim to the extent of the allowed amount of such claim, whether the property subject to those liens is retained by the debtor or transferred to another entity, and (B) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan, at least equal to such holder's interest in the Estate's interest in such property; (ii) that each holder of a secured claim included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (iii) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens with such liens to attach to the proceeds of the sale, and the treatment of such liens on proceeds in accordance with clause (i) or (ii) of this paragraph.

(ii)    Unsecured Creditors. A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides that: (i) each holder of a claim included in the rejecting class under the plan receives or retains property of a value, as of the effective date of the plan, equal to the amount of its allowed

ny-1105358

claim; or (ii) the holders of claims and interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan on account of such junior claims or interests.

(iii)  <u>Holders of Equity Interests</u>.  A plan is fair and equitable as to a class of interests that rejects the plan if the plan provides that: (i) each holder of an equity interest included in the rejecting class under the plan receives or retains property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of (A) any fixed liquidation preference to which such holder is entitled, (B) any fixed redemption price to which such holder is entitled or (C) the value of the interest; or (ii) the holder of any interest that is junior to the interests of the rejecting class will not receive or retain any property under the plan on account of such junior interest.

The Plan Proponents submit that, pursuant to Bankruptcy Code Section 1129(b), the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.

## D.    Persons to Contact for More Information

Any interested party desiring further information about the Plan should contact: Counsel for the Debtors:  Gary S. Lee, Esq., Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104, via e-mail at glee@mofo.com, or by telephone at (212) 468-7900; Counsel for the Creditors' Committee: Kenneth H. Eckstein, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York, 10036, via e-mail at keckstein@kramerlevin.com, or by telephone at (212) 715-9100.

## E.    Disclaimer

In formulating the Plan, the Plan Proponents have relied upon financial data derived from the Debtors' books and records.  The Plan Proponents, therefore, represent that everything stated in this Disclosure Statement is true to the best of their knowledge.  The Plan Proponents nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Moreover, the Bankruptcy Court has not yet determined whether the Plan is confirmable and, therefore, does not recommend whether you should accept or reject the Plan.

The discussion in this Disclosure Statement regarding the Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The liquidation analyses, distribution projections, and other information are estimates only, and the timing and amount of actual distributions to Creditors may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

-167-

Nothing contained in this Disclosure Statement or the Plan is, or shall be deemed to be, an admission or statement against interest by the Plan Proponents for purposes of any pending or future litigation matter or proceeding.

Although the attorneys, accountants, advisors, and other Professionals employed by the Plan Proponents have assisted in preparing this Disclosure Statement based upon factual information and assumptions respecting financial, business, and accounting data found in the books and records of the Debtors, they have not independently verified such information and make no representations as to the accuracy thereof.  The attorneys, accountants, advisors, and other Professionals employed by the Plan Proponents shall have no liability for the information in this Disclosure Statement.

The Plan Proponents and their Professionals also have made a diligent effort to identify in this Disclosure Statement pending litigation claims and projected objections to claims.  However, no reliance should be placed upon the fact that a particular litigation claim or projected objection to claim is, or is not, identified in this Disclosure Statement.

## ARTICLE IX.
## PLAN-RELATED RISK FACTORS AND
## ALTERNATIVES TO CONFIRMING THE PLAN

Prior to voting to accept or reject the Plan, all holders of Claims in Classes R-3, R-4, R-5, R-6, R-7, R-8, R-11, GS-3, GS-4A, GS-4B, GS-5, GS-6, GS-7, RS-3, RS-4, RS-5, RS-6, RS-7, RS-8, and RS-11 should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced in this Disclosure Statement.

A.    General

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive.  In considering whether to vote for or against the Plan, holders of Claims in Classes R-3, R-4, R-5, R-6, R-7, R-8, R-11, GS-3, GS-4A, GS-4B, GS-5, GS-6, GS-7, RS-3, RS-4, RS-5, RS-6, RS-7, RS-8, and RS-11 are entitled to vote and should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

B.    Certain Bankruptcy Law Considerations

1.    Parties in Interest May Object to the Plan Proponents' Classification of Claims and Equity Interests

Bankruptcy Code Section 1122 provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Plan Proponents believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Plan Proponents created thirty-five (35) Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other

-168-

Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. The Plan Proponents May Fail to Satisfy the Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, as promptly as practicable thereafter, the Plan Proponents intend to seek Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative Chapter 11 plan. There can be no assurance that the terms of any such alternative Chapter 11 plan would be similar or as favorable to the holders of Allowed Claims and Equity Interests as those proposed in the Plan.

### 3. The Plan Proponents May Not Be Able to Secure Confirmation of the Plan

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures, and the voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including the requirements that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes, confirmation is not likely to be followed by a liquidation or a need for further financial reorganization, and the value of distributions to non-accepting holders of Claims and Equity Interests within a particular Class under the Plan will not be less than the value of distributions such holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. While the Plan Proponents believe that the Plan complies with Bankruptcy Code Section 1129, there can be no assurance that the Bankruptcy Court will find that these requirements are met.

Confirmation of the Plan is also subject to certain conditions as described in Article X of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims or Equity Interests would receive with respect to their Allowed Claims and Equity Interests.

Subject to the terms and conditions of the Plan and the Bankruptcy Code, the Plan Proponents reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior thereto, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

**4.      The Plan Proponents May Object to the Amount or Classification of a Claim or Interest**

Except as otherwise provided in the Plan, the Plan Proponents and the Liquidating Trust reserve the right to object to the amount or classification of any Claim or Equity Interest under the Plan.  Any holder of a Claim or Equity Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**5.      Risk of Non-Occurrence or Delayed Occurrence of the Effective Date**

Although the Plan Proponents believe that the Effective Date will occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

Consummation of the Plan is also subject to certain conditions as described in Article X of the Plan, which are not certain.  For example, the determination of appropriate distribution reserves and the resolution of the dispute regarding the validity of certain disputed liens may not be resolved for a significant period of time, thereby potentially delaying consummation.

**6.      Contingencies Will Not Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to holders of Allowed Claims and Equity Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims and Equity Interests under the Plan, will not affect the validity of the vote taken by the Impaired Class to accept or reject the Plan or require any sort of revote by the Impaired Class.

**7.      Liquidation Under Chapter 7**

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to a case under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code.  Even if a plan is confirmed, under certain specified scenarios, the Debtors may seek to convert the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code.  A discussion of the effects that a Chapter 7 liquidation would have upon the recoveries of holders of Claims and Equity Interests is set forth in the Debtors' Liquidation Analysis (a copy of which is annexed hereto as <u>Exhibit 8</u>).

**8.      Estimation for Allowed Claims**

There can be no assurance that the estimated amounts of Claims set forth in this Disclosure Statement are correct, and the actual Allowed amounts of Claims may differ from the Plan Proponents' estimates.  Because the estimated amounts are based solely upon (i) a review of the Debtors' books and records, (ii) a review of the Claims, (iii) the Plan Proponents' estimates

-170-

as to additional Claims that may be filed in the Chapter 11 Cases or that would arise in the event of a conversion of the cases from Chapter 11 to Chapter 7; and (iv) the Plan Proponents' estimates of Claims that will be Allowed following the objections to Claims by the Plan Proponents, such estimated amounts are subject to certain risks, uncertainties and assumptions. Should one or more of these risks or uncertainties materialize or should underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein.

9.    **The Plan Releases and Global Settlement May Not Be Approved**

There can be no assurance that the Plan Releases and Global Settlement will be approved by the Bankruptcy Court. If the Plan Releases and Global Settlement are not approved, there will be no Ally Contribution, and it would be highly unlikely that the Plan would be consummated. In the absence of any Ally Contribution, the proposed distributions in the Plan could not be effectuated, and holders of Claims and Equity Interests would receive significantly reduced recoveries in any alternative plan scenario. In addition, the litigation surrounding each of the Claims and intercreditor issues resolved pursuant to the Plan would likely recommence, as would the litigation between the Debtors and/or the Creditors' Committee and Ally, resulting in potentially significant additional costs to the Estates and substantial delays in distributions to creditors.

C.    **Considerations Relating to the Units and Recoveries**

1.    **The Junior Secured Noteholders May Be Entitled to Postpetition Interest, Which Would Decrease Recoveries to the Holders of Units**

The Debtors and Creditors' Committee currently are involved in litigation with the Junior Secured Noteholders before the Bankruptcy Court regarding the extent and validity of the Junior Secured Noteholders' security interests. The Debtors and Creditors' Committee believe that the Junior Secured Noteholders are undersecured and not entitled to post-petition interest under the Bankruptcy Code; however, the Junior Secured Noteholders believe that they are oversecured and entitled to post-petition interest. The litigation involves, among other things, determinations regarding the existence and perfection of Liens on certain of the Debtors' assets, determinations regarding the Junior Secured Noteholders' entitlement to adequate protection claims resulting from the Debtors' use of Cash Collateral, and the validity of Intercompany Balances. This litigation is not stayed, and the majority of this litigation will proceed following the Voting Deadline. To the extent the Bankruptcy Court determines in Phase I of the JSN Adversary Proceeding or at the Confirmation Hearing that the Junior Secured Noteholders are entitled to post-petition interest, the payments to holders of Units will be lower than the amounts contemplated under the Plan.

2.    **The FHFA May Receive a Greater Recovery Under the Plan, Resulting in Reduced Recoveries for Unsecured Creditors**

The Plan Proponents believe that the FHFA may object to their proposed treatment in the Plan. To the extent the FHFA is successful in prosecuting an objection to the Plan, it is possible that the Court may determine either that (i) the FHFA should be entitled to recover as a General Unsecured Claim, which would dilute recoveries to other Unsecured Claims, or (ii) the FHFA's Claim, if not subordinated, should be entitled to a greater Cash recovery than is currently contemplated in the Plan, which would result in a reduction in the value of the Liquidating Trust Units versus what is projected in the Disclosure Statement.

3.   **The Allocation of Units Among Holders of Allowed Unsecured Claims and the Private Securities Claims Trust May Not Be Known Prior to the Voting Deadline**

The Plan provides for the distribution of Units to holders of Allowed Unsecured Claims against the ResCap Debtors, the GMACM Debtors and the RFC Debtors, and to the Private Securities Claims Trust. The Units will be allocated among the Private Securities Claims Trust and the holders of Allowed Unsecured Claims against the respective Debtor Groups in accordance with the respective Unit Issuance Percentages of the Private Securities Claims Trust, the ResCap Debtors, the GMACM Debtors and the RFC Debtors. The Units allocated to a particular Debtor Group will be issued to holders of Allowed Unsecured Claims against that Debtor Group, and to the Disputed Claims Reserve on account of Unsecured Claims against the Debtor Group that are disputed, Pro Rata based on the Allowed amount of Claims and on the estimated amount of Unsecured Claims that are disputed. While unadjusted Unit Issuance Percentages are set forth in the Plan, these percentages will be adjusted to assure that (i) all holders of Allowed Unsecured Claims and the Private Securities Claims Trust share proportionately in any accretion or dilution of recoveries as a result of variances in the Allowed amounts of Unsecured Claims set forth in this Disclosure Statement and (ii) all holders of Allowed Unsecured Claims against a Debtor Group receive Units in the same ratio of Units to Allowed amount of Claims. The adjustment will require an estimate of the Unsecured Claims that are disputed pursuant to a Claims estimation procedure in the Bankruptcy Court, and will be dependent on the estimated amounts of these Claims and their allocation among the Debtor Groups. The Claims estimation has not yet been made and as a result the adjusted Unit Issuance Percentages have not yet been calculated or disclosed. If the Claims estimation and the adjusted Unit Issuance Percentages are finalized prior to the Voting Deadline, the Plan Proponents will file the adjusted Unit Issuance Percentages with the Bankruptcy Court. It is possible, however, that the adjusted Unit Issuance Percentages will not be finalized prior to the Voting Deadline. If so, holders of Claims voting on the Plan will not be able to determine at the time they cast their votes the number of Units that will be issued to the Private Securities Claims Trust or to the holders of Unsecured Claims against each Debtor Group per the amount of Allowed Claim.

4.   **The Value of a Unit May be More or Less than the $24.62 Estimated in the Disclosure Statement**

The total number of Units to be initially issued and outstanding, including the Units to be held in the Disputed Claims Reserve, will be 100 million Units. Based on the Debtors' Recovery Analysis, the estimated distributable value to holders of the beneficial interests in the Liquidating Trust is approximately $2.462 billion. Therefore, based on the Debtors' estimates, each Unit is

-172-

worth $24.62. This actual amount of distributions that will be made to the holder of Unit will depend on the actual amount of Cash that the Liquidating Trust will receive upon the sale or other monetization of the non-Cash assets that will be placed in the Liquidating Trust on the Effective Date, the amount of expenses that will be incurred in the administration of the Liquidating Trust and any variance between the amount reserved for the payment of Claims having priority over the Unsecured Claims and the Private Securities Claims and the actual amounts paid out be the Liquidating Trust on account of those Claims. Also, if Disputed Claims for which Units have been placed in the Disputed Claims Reserve are disallowed, those Units will be cancelled, with the result that the per Unit distributions in respect of the remaining Units will be increased. Accordingly, the total per Unit distribution will necessarily be different than the value of a Unit calculated based on the Debtors' Recovery Analysis, and could be less. Furthermore, while the Liquidating Trust will make a substantial initial distribution on the Units shortly after the Effective Date, it will make additional distributions as the non-Cash assets of the Liquidating Trust are monetized. The estimated worth of $24.62 per Unit in the Disclosure Statement is not discounted for the future distributions.

5.    **There Is No Assurance that Any Market Will Develop for the Units, and Holders of Units May Not Be Able to Dispose of the Units for Prices Approximating the Remaining Distributions or At All**

The Plan provides that the Units will be freely tradable to the extent permitted under applicable securities laws, and that the Liquidating Trust will issue such reports as may be required under applicable securities laws to allow for the Units to be freely tradable. However, the Liquidating Trust is expressly prohibited from facilitating a market in the Units, and will not list the Units on any securities exchange. Thus, there is no assurance that a market for the Units will develop or that holders of the Units will otherwise be able to dispose of them. Even if such a market does develop or the holder of Units is otherwise able to dispose of such Units, there is no assurance of the price that the holder may receive for the Units, which will likely be less, and could be substantially less, than the discounted estimate of the remaining distributions to be made on the Units.

6.    **The Liquidating Trust Does Not Intend to Register the Units under the Securities Exchange Act, so that the Information Available with Respect to the Units May Be Limited**

The Plan Proponents do not believe that the Liquidating Trust will be required to register the Units under the Securities Exchange Act of 1934. The Liquidating Trust Agreement will provide that the Liquidating Trust is required to issue or make available annual and quarterly financial information concerning the Liquidating Trust; however, this is not the same information concerning the Liquidating Trust that would have been required if the Units were registered under the Securities Exchange Act. Also, the Liquidating Trust will not be required to issue or make available current reports analogous to the reports on Form 8-K that it would be required to issue if the Units were so registered.

-173-

### 7.     Holders of Units Will Not Have Any Voting Rights

The Liquidating Trust will be managed by or under the direction of the Liquidating Trust Board.  Members of the Liquidating Trust Board will be appointed initially as provided under the Plan and thereafter may be removed and replaced, and any vacancies may be filled, only by the Liquidating Trust Board itself.  Holders of Units will not have any voting rights under the Liquidating Trust Agreement.  In particular, the holders of Units will not have the power to remove and replace the members of the Liquidating Trust Board, even if a majority of the holders of Units would otherwise elect to do so.

### 8.     Holders of Unsecured Claims Will Be Required to Have a Securities Account in Order to Receive Their Units

The Plan contemplates that, for ease of administration of Cash distributions, all Units will be held in book-entry form through DTC.  In order to receive their Units, holders of Allowed Unsecured Claims will be required to have a securities account with a broker, bank or other financial institution into which the Units may be deposited.  A notice will be sent on behalf of the Liquidating Trust to each holder of an Allowed Unsecured Claim (other than holders of RMBS Trust Claims, whose Units will be delivered to the RMBS Claims Trust and holders of Senior Unsecured Notes, whose Units will be delivered to the Senior Unsecured Notes Trustee) shortly after the Plan is confirmed asking such holder to identify the broker, bank or other financial institution with whom such holder has a security account into which the Units may be deposited.  If a holder of an Allowed Unsecured Claim fails to provide this information on a timely basis, the distribution of Units to such holder, and the distribution of Cash in respect of those Units, will be delayed.   If such holder fails to provide this information before the Liquidating Trust is terminated, the holder may forfeit the Units to which the holder would otherwise be entitled.

## D.     Disclosure Statement Disclaimer

### 1.     The Information Contained Herein Is for Soliciting Votes Only

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

### 2.     The Information in this Disclosure Statement May Be Inaccurate

Unless otherwise specified herein, the statements contained in this Disclosure Statement are made by the Plan Proponents as of the date hereof, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change since that date in the information set forth herein.  The Plan Proponents may subsequently update the information in this Disclosure Statement, but it has no duty to update this Disclosure Statement unless ordered to do so by the Bankruptcy Court.   Further, the performance and prospective financial information contained herein, unless otherwise expressly indicated, is unaudited.

Although the Plan Proponents used their reasonable best efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, some of the financial

-174-

information contained in this Disclosure Statement has not been audited and is based upon an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement. While the Plan Proponents believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the information contained herein and annexed hereto is without inaccuracies.

**3.      This Disclosure Statement Was Not Approved by the Securities and Exchange Commission**

This Disclosure Statement has not been filed with the Securities and Exchange Commission or any state regulatory authority.  Neither the Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

**4.      No Legal or Tax Advice Is Provided to You by this Disclosure Statement**

**The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.**  Each holder of a Claim or Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

**5.      No Reliance Should be Placed upon any Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed upon the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement.  The Plan Proponents or the Liquidating Trust may seek to investigate, file and prosecute Claims and Equity Interests and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Objections to Claims.

**6.      Nothing Herein Constitutes a Waiver of any Right to Object to Claims or Recover Transfers and Assets**

The vote by a holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims of the Debtors or the Liquidating Trust or rights of the Plan Proponents or the Liquidating Trust (or any party in interest, as the case may be) to object to that holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their Estates is specifically or generally identified herein.

**7.      No Representations Made Outside this Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in

-175-

this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Plan Proponents and the U.S. Trustee.

### E.    Additional Factors to Be Considered

#### 1.    The Plan Support Agreement May Terminate

Pursuant to the Plan Support Agreement, the Debtors, the Creditors' Committee, and Consenting Claimants have agreed to support the Plan; subject, however, to certain termination events not having occurred, including, without limitation, if:

(a) the Bankruptcy Court has entered an order in any of the Chapter 11 Cases appointing a trustee under Chapter 11 of the Bankruptcy Code;

(b) any of the Chapter 11 Cases are dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(c) any court has entered a final, non-appealable judgment or order declaring the Plan Support Agreement or any material portion thereof to be unenforceable;

(d) the Releases set forth in the Plan Term Sheet are modified, amended, changed, severed or otherwise altered in the Plan or any other definitive document in any manner;

(e) the Plan Support Agreement ceases to be binding on Ally or the Creditors' Committee;

(f) the Plan Support Agreement ceases to be binding on any Consenting Claimant;

(g) the Debtors file with the Bankruptcy Court a proposed disclosure statement, Chapter 11 plan, confirmation order or other related document that is not an Approved Plan Document (as such term is defined in the Plan Term Sheet); or

(h) the Milestones provided in the Plan Support Agreement are not satisfied.

To the extent the terms or conditions of the Plan Support Agreement are not satisfied, or to the extent events of termination arise under the Plan Support Agreement, the Plan Support Agreement may terminate prior to the confirmation or consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituents. Any such loss of support could have an adverse effect on the Debtors' ability to confirm and consummate the Plan or any alternative plan.

2.      **Plan Releases May Not Be Approved**

There can be no assurance that the Plan Releases will be approved by the Bankruptcy Court. If the Plan Releases are not approved, there will be no Ally Contribution, and it would be highly unlikely that the Plan would be consummated. In the absence of any Ally Contribution, the proposed distributions in the Plan could not be effectuated, and holders of Claims and Equity Interests would receive significantly reduced recoveries in any alternative plan scenario.

3.      **Potential Creditor Actions**

Certain holders of Claims against the Debtors may express dissatisfaction with the proposed Plan. As of the date hereof, the Plan Proponents do not express any views with respect to the outcome of potential actions of such holders. It is possible that such actions could lead to modifications to the Plan. It is also possible that such actions could impact the Debtors' existing business operations.

4.      **Certain Tax Implications**

Certain consequences of the Plan regarding U.S. federal income taxes are summarized under "Certain U.S. Federal Income Tax Consequences of the Plan." Many of these tax issues raise unsettled and complex legal issues, and are subject to substantial uncertainties. Except as described below, no ruling from the U.S. Internal Revenue Service ("IRS") has been sought by the Debtors regarding the tax consequences described in this Disclosure Statement. The IRS may challenge the various positions the Debtors have taken, or intend to take, with respect to their tax treatment, and a court may sustain such a challenge or objection by the IRS. For a more detailed discussion of risks relating to the specific positions the Debtors intend to take with respect to various tax issues, please review Article X.

**ARTICLE X.**
**CERTAIN U.S. FEDERAL INCOME**
**TAX CONSEQUENCES OF THE PLAN**

The following discussion summarizes certain U.S. federal income tax consequences of implementation of the Plan to the Debtors and certain holders of Claims.

This discussion is based on the Internal Revenue Code of 1986, as amended, (the "IRC") and the Treasury Regulations promulgated thereunder, judicial decisions and published administrative rulings, and pronouncements of the IRS, each as in effect on the date hereof. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the discussion set forth below with respect to the U.S. federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences described herein.

Except as otherwise set forth herein, this discussion does not address the U.S. federal income tax consequences to holders of Claims who (a) are unimpaired or otherwise entitled to payment in full in Cash on the Effective Date under the Plan, or (b) are otherwise not entitled to

-177-

vote under the Plan. The discussion assumes that each holder of a Claim holds only Claims in a single class, each holder of a Claim holds such Claims only as "capital assets" within the meaning of the IRC, none of the Claims have "original issue discount" ("<u>OID</u>") within the meaning of the IRC, and the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

The U.S. federal income tax consequences of the Plan are complex and are subject to substantial uncertainties. Except as described below, the Debtors have not requested a ruling from the IRS, and the discussion set forth below of certain U.S. federal income tax consequences of the Plan is not binding upon the IRS. Thus, no assurance can be given that the IRS would not assert, or that a court would not sustain, a position different from any discussed herein, resulting in U.S. federal income tax consequences to the Debtors and/or holders of Claims that are substantially different from those discussed herein. The Debtors have not requested an opinion of counsel with respect to any of the tax aspects of the Plan, and no opinion is given by this Disclosure Statement.

This discussion does not apply to a holder of a Claim that is not a "United States person," as such term is defined in the IRC. Moreover, this discussion does not address U.S. federal taxes other than income taxes nor any state, local or non-U.S. tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to United States persons in light of their individual circumstances or to United States persons that may be subject to special tax rules, such as persons who are related to the Debtors within the meaning of the IRC, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, real estate mortgage investment conduits, tax-exempt organizations, pass-through entities, beneficial owners of pass-through entities, Subchapter S corporations, employees of the Debtors, persons who received their Claims as compensation, persons who hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark to market method of accounting, and holders of Claims who are themselves in bankruptcy. If a partnership or entity treated as a partnership for U.S. federal income tax purposes holds Claims, the tax treatment of a partner generally will depend on the status of the partner and the activities of the partnership.

THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, NON-U.S. INCOME, ESTATE, GIFT, AND OTHER TAX CONSEQUENCES OF THE PLAN.

**IRS CIRCULAR 230 DISCLOSURE**:  ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE

-178-

TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## A.    Certain U.S. Federal Income Tax Consequences to the Debtors

### 1.    Tax Filing Status

For U.S. federal income tax purposes, the Debtors, excluding Debtors organized as corporations, are classified as disregarded entities (the "Disregarded Debtors"). Accordingly, all assets and liabilities of the Disregarded Debtors are treated as assets and liabilities of AFI for U.S. federal income tax purposes. As such, the Disregarded Debtors are not taxpaying entities, but rather operate as unincorporated divisions of AFI with their taxable income (or loss) accounted for in the consolidated federal U.S. Corporation Income Tax Return filed by AFI.

### 2.    Tax Impact of the Plan on the Debtors

Since the Disregarded Debtors are not taxpaying entities, but rather operate as unincorporated divisions of AFI for U.S. federal income tax purposes, the U.S. federal income tax impact of the Plan to such entities will be reported and accounted for by AFI. Consequently, the transactions contemplated by the Plan, including the transfer of assets to the Liquidating Trust should be treated as though AFI entered into them directly and should not have any U.S. federal income tax consequences to the Disregarded Debtors.

### 3.    Tax Sharing Agreements

ResCap, and certain ResCap Debtors, are party to certain tax sharing agreements (each, a "TSA"), which govern the allocation and payment of certain U.S. federal income tax liabilities of such Debtors. Such tax sharing agreements generally allocate the amount of U.S. federal income tax liability computed as if such Debtor were a corporation for U.S. federal income tax purposes and filed a separate consolidated U.S. federal income tax return including all of such Debtor's eligible subsidiaries. Specifically, ResCap is a party to a TSA with GMAC Mortgage Group LLC, its immediate parent (the "ResCap TSA"). A separate TSA between GMAC Mortgage Group LLC and AFI provides for similar obligations with respect to the payment of taxes by GMAC Mortgage Group LLC (the "GMAC MG TSA," and together with the ResCap TSA, the "TSAs").[96] The Debtors have not assumed the TSAs. To the extent the Debtors are obligated to perform under the TSAs, the Debtors may be exposed to substantial liability.

---

[96]    The ResCap TSA provides that ResCap must make quarterly estimated tax payments based on the estimated separate tax liability of the hypothetical ResCap tax group. After the filing of the AFI consolidated U.S. federal income tax return, the difference between the estimated tax payments made by ResCap and the separate tax liability of ResCap will be either paid by ResCap or by AFI depending on whether ResCap underpaid or overpaid its estimated tax liability. Additionally, a similar method to that provided for in the tax sharing agreement for allocating U.S. federal income taxes to the hypothetical ResCap tax group will be used to allocate any state, local, or foreign tax liability in which there is a combined tax liability between ResCap and GMAC Mortgage Group LLC.

**B.    Certain U.S. Federal Income Tax Consequences to Holders of Allowed Claims**

**1.    General**

The U.S. federal income tax consequences to a holder receiving, or entitled to receive, a payment in partial or total satisfaction of a Claim will depend on a number of factors, including the nature of the Claim, the holder's method of tax accounting, and its own particular tax situation.

Because the holders' Claims and tax situations differ, holders should consult their own tax advisors to determine how the Plan affects them for federal, state and local tax purposes, based on their particular tax situations. Among other things, the U.S. federal income tax consequences of a payment to a holder may depend initially on the nature of the original transaction pursuant to which the Claim arose. For example, a payment in repayment of the principal amount of a loan is generally not included in the gross income of an original lender.

The U.S. federal income tax consequences of a transfer to a holder may also depend on whether the item to which the payment relates has previously been included in the holder's gross income or has previously been subject to a loss or a worthless security or bad debt deduction. For example, if a payment is made in satisfaction of a receivable acquired in the ordinary course of a holder's trade or business, the holder had previously included the amount of such receivable payment in its gross income under its method of tax accounting, and had not previously claimed a loss or a worthless security or bad debt deduction for that amount, the receipt of the payment should not result in additional income to the holder but may result in a loss. Conversely, if the holder had previously claimed a loss or worthless security or bad debt deduction with respect to the item previously included in income, the holder generally would be required to include the amount of the payment in income.

A holder receiving a payment pursuant to the Plan in satisfaction of its Claim generally may recognize taxable income or loss measured by the difference between (i) the amount of cash and the fair market value (if any) of any property received by the holder (other than any consideration attributable to a Claim for accrued but unpaid interest), including, as discussed below, any beneficial interests in the Liquidating Trust, and (ii) its adjusted tax basis in the Claim (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item. The character of any income or loss that is recognized will depend upon a number of factors, including the status of the creditor, the nature of the Claim in its hands, whether the Claim was purchased at a discount, whether and to what extent the creditor has previously claimed a bad debt deduction with respect to the Claim, and the creditor's holding period of the Claim. Generally, the income or loss will be capital gain or loss if the Claim is a capital asset in the holder's hands.

When gain or loss is recognized, as discussed below (see Section B.2 – "Consequences to holders of Junior Secured Notes Claims, Senior Unsecured Notes Claims, Junior Secured Notes Deficiency Claims, and General Unsecured Claims"), such gain or loss may be long-term capital gain or loss if the Claim has been held for more than one year. Each holder of the Claim should

-180-

consult its own tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such holder.

As discussed below (see Section C —"Tax Treatment of the Liquidating Trust and holders of Beneficial Interests"), each holder of a Claim that receives a beneficial interest in the Liquidating Trust will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Liquidating Trust Assets, consistent with its economic rights in the Trust. Pursuant to the Plan, the Liquidating Trustee will in good faith value the assets transferred to the Liquidating Trust, and all parties to the Liquidating Trust (including holders of Claims receiving Liquidating Trust Units) must consistently use such valuation for all U.S. federal income tax purposes.

A holder's share of any proceeds received by the Liquidating Trust upon the sale or other disposition of the assets of the Liquidating Trust (other than any such amounts received as a result of the subsequent disallowance of Disputed Claims or the reallocation among holders of the Claims of undeliverable Plan distributions) should not be included, for U.S. federal income tax purposes, in the holder's amount realized in respect of its Claim but should be separately treated as amounts realized in respect of such holder's ownership interest in the underlying assets of the Liquidating Trust. See Section C —"Tax Treatment of the Liquidating Trust and Holders of Beneficial Interests," below.

A holder's tax basis in its respective share of the Liquidating Trust Assets will equal the fair market value of each such interest on the date the Liquidating Trust is created, and the holder's holding period generally will begin the day following the establishment of the Liquidating Trust.

## 2.    Consequences to Holders of Junior Secured Notes Claims, Senior Unsecured Notes Claims, Junior Secured Notes Deficiency Claims, and General Unsecured Claims.

Pursuant to the Plan, a holder of Junior Secured Notes Claims, Senior Unsecured Notes Claims, Junior Secured Notes Deficiency Claims, and General Unsecured Claims will receive their pro rata share of distributions of deferred cash payments from time to time and their pro rata share of the beneficial interests in the Liquidating Trust, respectively (not to exceed the amount of its Allowed Claim). The holder of any such Allowed Claim generally will realize gain or loss in an amount equal to the difference, if any, between (a) the amount of Cash and the fair market value (if any) of any property received by the holder (other than any consideration attributable to a Claim for accrued but unpaid interest) including the fair market value of beneficial interests in the Liquidating Trust received in exchange for such Claims, and (b) the holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).  It is possible that any loss, or a portion of any gain, realized by a holder of a Claim may have to be deferred until all of the distributions to such holder are received.

As discussed in the next Section, the amount of Cash or other property received in respect of Claims for accrued but unpaid interest will be taxed as ordinary income, except to the extent previously included in income by a holder under his method of accounting.

-181-

### 3. Allocation of Consideration to Interest

Pursuant to Article VII.I of the Plan, all distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for U.S. federal income tax purposes), with any excess allocated to accrued but unpaid interest.

However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. In general, to the extent any amount received (whether Cash, or other property) by a holder of a debt instrument is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income under the holder's normal method of accounting). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration and the taxation or deductibility of unpaid interest for tax purposes.

### 4. Market Discount

Market discount is the amount by which a holder's tax basis in a debt obligation immediately after its acquisition is exceeded by the adjusted issue price of the debt obligation at such time, subject to a *de minimis* exception. A holder generally is required to include gain on the disposition of a market discount debt instrument as ordinary income to the extent of the accrued market discount on the debt instrument.

### 5. Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan.  Furthermore, all distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the applicable withholding rate.

Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. These categories are very broad; however, there are numerous exceptions. Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

***HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, INCLUDING***

-182-

*POTENTIAL WITHHOLDING ON DISTRIBUTIONS BY THE DEBTORS OR PAYMENTS FROM THE LIQUIDATING TRUST, PRIVATE SECURITIES CLAIMS TRUST, AND THE BORROWERS CLAIM TRUST, RESPECTIVELY.*

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's tax returns.

C.    **Tax Treatment of the Liquidating Trust and Holders of Beneficial Interests**

1.    **Classification of the Liquidating Trust**

The Liquidating Trust, created pursuant to the Plan, is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (*i.e.*, all income and loss is taxed directly to the liquidating trust beneficiaries). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a Chapter 11 plan. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Liquidating Trustees, and holders) will be required to treat, for U.S. federal income tax purposes, the Liquidating Trust as a grantor trust. The holders of beneficial interests in the Liquidating Trust are the owners and grantors of the Liquidating Trust. The following discussion assumes that the Liquidating Trust will be so respected for U.S. federal income tax purposes. The Liquidating Trust intends to request a ruling from the IRS concerning the tax status of the Liquidating Trust as a grantor trust. However, prior to obtaining a favorable ruling by the IRS, there can be no assurance that the IRS would not take a contrary position. If the IRS were to successfully challenge the classification of the Liquidating Trust, the U.S. federal income tax consequences to the Liquidating Trust and the holders of beneficial interests in the Liquidating Trust, respectively, and the Debtors could vary from those discussed herein (including the potential for an entity-level tax on income of the Liquidating Trust). Moreover, if the Liquidating Trust were found to be carrying on a profit-making business, the Trust would be treated as a publicly traded partnership taxable as a corporation for U.S. federal income tax purposes. As a result, the U.S. federal income tax consequences to the Liquidating Trust, the holders of beneficial interests in the Liquidating Trust, and the Debtors could vary from those discussed herein.

2.    **General Tax Reporting by the Liquidating Trust and Holders of Beneficial Interests**

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and holders) must treat the transfer of the Liquidating Trust Assets to the Liquidating Trust in accordance with the terms of the Plan. Pursuant to the Plan, the

-183-

Liquidating Trust Assets (other than assets allocable to Disputed Claims) are treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those assets, directly to the holders of the respective Claims receiving beneficial interests in the Liquidating Trust (with each holder receiving an undivided interest in such assets in accordance with their economic interests in such assets), followed by the transfer by the holders of such assets to the Liquidating Trust in exchange for a beneficial interest in the Liquidating Trust. Accordingly, all parties must treat the Liquidating Trust as a grantor trust of which the holders of beneficial interests in the Liquidating Trust are the owners and grantors, and treat the holders of beneficial interests in the Liquidating Trust as the direct owners of an undivided interest in the Liquidating Trust Assets (other than any assets allocable to Disputed Claims), consistent with their economic interests therein, for all U.S. federal income tax purposes.

Each holder of a beneficial interest in the Liquidating Trust must report on its U.S. federal income tax return its pro rata allocable share of income, gain, loss, deduction and credit recognized or incurred by the Liquidating Trust. Moreover, upon the sale or other disposition (or deemed disposition) of any Liquidating Trust asset, each holder of a beneficial interest in the Liquidating Trust must report on its U.S. federal income tax return its share of any gain or loss measured by the difference between (1) its share of the amount of Cash and/or the fair market value of any property received by the Liquidating Trust in exchange for the Liquidating Trust asset so sold or otherwise disposed of and (2) such holder's adjusted tax basis in its pro rata share of such Liquidating Trust asset. The character of any such gain or loss to the holder will be determined as if such holder itself had directly sold or otherwise disposed of the Liquidating Trust asset. The character of items of income, gain, loss, deduction and credit to any holder of a beneficial interest in the Liquidating Trust, and the ability of the holder to benefit from any deductions or losses, depends on the particular circumstances or status of the holder.

As soon as reasonably practicable after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of the Liquidating Trust Assets. All parties to the Liquidating Trust (including, without limitation, the Debtors and holders of beneficial interests) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a holder of a beneficial interest in the Liquidating Trust will be treated as income or loss with respect to holder's undivided interest in the Liquidating Trust Assets, and not as income or loss with respect to its prior Allowed Claim. The character of any income and the character and ability to use any loss will depend on the particular situation of the holder of a beneficial interest in the Liquidating Trust.

The U.S. federal income tax obligations of a holder with respect to its beneficial interest in the Liquidating Trust are not dependent on the Liquidating Trust distributing any cash or other proceeds. Thus, a holder may incur a U.S. federal income tax liability with respect to its allocable share of Liquidating Trust income even if the Liquidating Trust does not make a concurrent distribution to the holder. In general, other than in respect of cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a holder's Allowed Claim), a distribution of cash

-184-

by the Liquidating Trust will not be separately taxable to a holder of a beneficial interest in the Liquidating Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Liquidating Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of cash originally retained by the Liquidating Trust on account of Disputed Claims.

The Liquidating Trustees will comply with all applicable governmental withholding requirements (see Section VII.H of the Plan). Thus, in the case of any holders of beneficial interests in the Liquidating Trust that are not U.S. persons, the Liquidating Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate).

The Liquidating Trustee will file with the IRS tax returns for the Liquidating Trust consistent with its classification as a grantor Trust pursuant to Treasury Regulation Section 1.671-4(a). Except as discussed below with respect to any reserve for Disputed Claims, the Liquidating Trustee also will send annually to each holder of a beneficial interest in the Liquidating Trust a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

## D.      Treatment of the Disputed Claims Reserve

The Disputed Claims Reserve is intended to be treated, for U.S. federal income tax purposes, as a disputed ownership fund within the meaning of Treasury Regulations Section 1.468B-9(b)(1). If so treated, any income of the Disputed Claims Reserve will be subject to tax as provided by the regulations governing disputed ownership funds. Any payment of Cash or distribution of Liquidating Trust Units made out of the Disputed Claims Reserve should not be deemed to have been made to any holder of a Disputed Claim until, and to the extent that, the amount (if any) to which such holder is entitled has been determined and distributed. At such time, such holder will take such amount into account for U.S. federal income tax purposes as an amount received in respect of its Claim. Upon the disallowance of a Disputed Claim, the Disputed Claims Reserve will be treated as having distributed to holders of Liquidating Trust Units the portion of the Liquidating Trust Assets allocable to such Disputed Claim. Recipients of amounts from the Disputed Claims Reserve should report these amounts consistently with the foregoing and should consult their tax advisors concerning the federal, state, local, and other tax consequences of the receipt of amounts from the Disputed Claims Reserve.

Upon the allowance or disallowance of a Disputed Claim, the Disputed Claims Reserve generally will be treated as having sold or exchanged the portion of the Liquidating Trust Assets allocable to such Claim for purposes of IRC Section 1001(a). Any income realized by the Disputed Claims Reserve will be reported as income of and taxable to the Disputed Claims Reserve.

-185-

E.    **Tax Treatment of the RMBS Claims Trust, the Private Securities Claims Trust and the Borrower Claims Trust**

All parties including, without limitation, the Debtors, the RMBS Claims Trustee and the holders of RMBS Trust Claims (with respect to the RMBS Claims Trust), the Private Securities Claims Trustee and the holders of Private Securities Claims (with respect to the Private Securities Claims Trust), and the Borrower Claims Trustee and the holders of Borrower Claims (with respect to the Borrower Claims Trust), unless otherwise required by law (or by the terms of the applicable trust agreement), shall treat each of the RMBS Claims Trust, the Private Securities Claims Trust, and the Borrower Claims Trust, respectively, as a qualified settlement fund within the meaning of IRC Section 468B and the Treasury Regulations thereunder.  Pursuant to such treatment, any payment made out of the RMBS Claims Trust, the Private Securities Claims Trust, or the Borrower Claims Trust to a holder of an RMBS Trust Claim, a Private Securities Claim or a Borrower Claim, respectively, should not be deemed to have been made to any recipient until, and to the extent that, the amount to which the recipient is entitled has been determined and distributed.  At such time, the recipient will take such amount into account for U.S. federal income tax purposes as an amount received in respect of its Claim.  Recipients of amounts from the RMBS Claims Trust, the Private Securities Claims Trust, or the Borrower Claims Trust, respectively, should report these amounts consistently with the foregoing and should consult their tax advisors concerning the federal, state, local, and other tax consequences of the receipt of amounts from the RMBS Claims Trust, the Private Securities Claims Trust or the Borrowers Claims Trust, respectively.

As qualified settlement funds:  Amounts earned by the RMBS Claims Trust, the Private Securities Claims Trust and the Borrower Claims Trust, respectively, will generally be subject to an entity level tax on amounts earned on a current basis.  In general, in determining the RMBS Claims Trust's, the Private Securities Claims Trust's, and the Borrowers Claims Trust's taxable income, (1) any amounts transferred to the Trust would be excluded from its income, (2) any sale or exchange of property by the RMBS Claims Trust, the Private Securities Claims Trust and the Borrowers Claims Trust, respectively, would result in the recognition of gain or loss equal to the difference between the amount received on such disposition and the respective Trust's adjusted basis in such property, and (3) any interest income or other earnings with respect to RMBS Claims Trust and the Private Securities Claims Trust (through their interests in the Liquidating Trust) and the Borrowers Claims Trust's assets, respectively, would be included in income.  Additionally, the RMBS Claims Trust and the Private Securities Claims Trust generally will treat a distribution of Liquidating Trust Units in respect of RMBS Trust Claims and Private Securities Claims, respectively, as a sale or exchange of such Units for purposes of IRC Section 1001(a).  Any income realized by the RMBS Claims Trust, the Private Securities Claims Trust and the Borrowers Claims Trust will be reported as income of and taxable to the RMBS Claims Trust, the Private Securities Claims Trust, and the Borrowers Claims Trust.  The RMBS Claims Trustee, the Private Securities Claims Trustee and the Borrowers Claims Trustee will file with the IRS tax returns for the RMBS Claims Trust, the Private Securities Claims Trust, and the Borrowers Claims Trust, respectively, consistent with its classification as a qualified settlement fund pursuant to Treasury Regulation Section 1.468B-2(k)(1).

-186-

*THE FOREGOING SUMMARY IS PROVIDED FOR GENERAL INFORMATIONAL PURPOSES ONLY. HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN TO THEM.*

## ARTICLE XI.
## SECURITIES LAW MATTERS

The issuance of the Units pursuant to the Plan is being made in reliance upon Section 1145(a) of the Bankruptcy Code. Section 1145(a) of the Bankruptcy Code exempts securities issued pursuant to a plan from registration under the Securities Act, or any state law requiring registration for the sale or offering of securities, provided certain conditions are met, except for securities issued to an "underwriter," as defined in Section 1145(b) of the Bankruptcy Code. Subsequent transfers of the Units by holders that are not "underwriters" will generally be exempt from federal and state securities registration requirements.

Section 1145(a) of the Bankruptcy Code generally exempts from federal and state registration requirements the issuance of securities if the following conditions are satisfied:

(i) the securities are offered or sold under a Chapter 11 plan by (x) a debtor, (y) one of its affiliates participating in a joint plan with the debtor, or (z) a successor to a debtor under the plan; and

(ii) the securities are issued in exchange for a claim against or interest in the debtor or such affiliate, or are issued principally in such exchange and partly for cash or property.

Section 1145(b)(1) of the Bankruptcy Code defines "underwriter" as one who (A) purchases a claim or interest with a view to distribution of any security to be received in exchange for the claim or interest, (B) offers to sell securities issued under a plan for the holders of such securities, (C) offers to buy securities issued under a plan from the holders receiving such securities, if the offer to buy is made with a view to distribution of such securities and under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan, or (D) is an issuer of the securities within the meaning of Section 2(a)(11) of the Securities Act.

Section 2(a)(11) of the Securities Act defines an "issuer" to include any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer. "Control," as defined in Rule 405 under the Securities Act, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Section 1145(b)(1)(D) therefore applies to persons considered "affiliates" of the issuer, as defined in Rule 144 under the Securities Act. A member of the Liquidating Trust Board or Liquidating Trust Management may be deemed to be an affiliate of the Liquidating Trust, and therefore an "underwriter" for purposes Section 1145(b) of the Bankruptcy Code.

-187-

The Plan Proponents believe that the exchange of Units for Claims against the Debtors under the circumstances provided in the Plan will generally satisfy the requirements of Section 1145(a) of the Bankruptcy Code. Any Units not issuable pursuant to Section 1145(a) of the Bankruptcy Code, because of the applicability of Section 1145(b) of the Bankruptcy Code, will be considered "restricted securities" as defined in Rule 144, or securities held by affiliates.

The Units issued pursuant to the Plan will be deemed to have been issued in a public offering, except to holders who meet the Section 1145(b) definition of an "underwriter." Accordingly, the Units may be resold by a holder, other than such an underwriter, without registration under the Securities Act pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, and without compliance with the registration requirements of state securities laws pursuant to applicable exemptions under those laws.

Units held by persons deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will generally be restricted, and may not be resold under the Securities Act or applicable state securities laws absent an effective registration statement under the Securities Act, or pursuant to an applicable exemption from registration such as Rule 144, and pursuant to applicable exemptions under state securities laws. Under certain circumstances, such persons may be able to resell their securities pursuant to Rule 144, and in compliance with applicable state securities laws. Generally, Rule 144 provides that persons who are affiliates may resell securities, without being deemed underwriters under the Securities Act, if certain conditions are met. These conditions include: the availability of current public information with respect to the issuer; a limitation as to the amount of securities that may be sold in any three-month period; the requirement that the securities be sold in a "brokers' transaction" or in a transaction directly with a "market maker"; and the filing of a notice of resale with the Securities and Exchange Commission. The Plan Proponents cannot provide assurance that the required current public information will exist with respect to the Units and, therefore, that the safe harbor provisions of Rule 144 will be available. Holders of Units who may be deemed underwriters are advised to consult with their own counsel as to the availability in their particular situation of exemptions from registration under federal and state securities laws.

To the extent that the interests in the Private Securities Claims Trust may be deemed to be securities, the Plan Proponents believe that the issuance of these interests to holders of Private Securities Claims under the terms of the Plan satisfies the requirements of Section 1145(a) of the Bankruptcy Code. The treatment of these interests for securities law purposes would therefore be the same as the treatment of the Units, as described above and subject to the caveat below, mutatis mutandis.

IN VIEW OF THE COMPLEXITY OF THE APPLICABLE SECURITIES LAWS, AND THE FACT SPECIFIC INQUIRY OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE LIQUIDATING TRUST, THE PLAN PROPONENTS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO RESELL THE UNITS. ACCORDINGLY, THE PLAN PROPONENTS ADVISE POTENTIAL RECIPIENTS OF THE UNITS TO CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE THE UNITS.

# ARTICLE XII.
# RULES OF INTERPRETATION

## A.    Rules of Construction

The following rules for interpretation and construction shall apply to this Disclosure Statement: (i) capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings ascribed to them in the Plan; (ii) terms and phrases, whether capitalized or not, that are used but not defined herein or in the Plan, but that are defined in the Bankruptcy Code, shall have the meanings ascribed to them in the Bankruptcy Code; (iii) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (iv) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (v) unless otherwise specified, all references herein to "Parts" are references to Articles hereof; (vi) unless otherwise stated, the words "herein," "hereof," and ''hereto'' refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (vii) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (viii) the rules of construction set forth in Bankruptcy Code Section 102 shall apply; and (ix) any immaterial effectuating provisions may be interpreted by the Plan Proponents in a manner that is consistent with the overall purpose and intent of the Plan and Disclosure Statement, all without further order of the Bankruptcy Court.

## B.    Computation of Time

Unless otherwise specified herein, Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## C.    Governing Law

Unless a rule of law or procedure is supplied by federal law or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, and any agreements, securities, instruments, or other documents executed or delivered in connection with the Plan (except as otherwise set forth in those documents, in which case the governing law of such documents shall control); provided, however, that corporate governance matters relating to the Debtors shall be governed by the laws of the State of Delaware.

# ARTICLE XIII.
# CONCLUSION AND RECOMMENDATION

In the opinion of the Plan Proponents, because the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under Chapter 7 of the Bankruptcy Code, the Plan is preferable to the alternatives described in this Disclosure Statement.  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions than

those which are proposed under the Plan.   Accordingly, the Plan Proponents recommend that parties entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

ny-1105358

Respectfully submitted,

/s/  Lewis Kruger
Residential Capital, LLC
By: Lewis Kruger
Title: Chief Restructuring Officer
Dated: August 20, 2013

Prepared by:

| | |
|---|---|
| Gary S. Lee | Kenneth H. Eckstein |
| Lorenzo Marinuzzi | Doughlas H. Mannal |
| Todd M. Goren | Stephen D. Zide |
| Jennifer L. Marines | Rachael L. Ringer |
| Samantha Martin | KRAMER LEVIN NAFTALIS & |
| MORRISON & FOERSTER LLP | FRANKEL LLP |
| 1290 Avenue of the Americas | 1177 Avenue of the Americas |
| New York, New York 10104 | New York, New York 10036 |
| Telephone: (212) 468-8000 | Telephone: (212) 715-9100 |
| Facsimile: (212) 468-7900 | Facsimile: (212) 715-8000 |

- and -

*Counsel for the Official Committee of
Unsecured Creditors*

Alexandra Steinberg Barrage
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006-1888
Telephone:  (202) 887-1500
Facsimile:  (202) 887-0763

*Counsel for the Debtors and
Debtors in Possession*

-191-