243

1

2 UNITED STATES BANKRUPTCY COURT

3 SOUTHERN DISTRICT OF NEW YORK

4 Case No. 12-12020-mg

5 - - - - - - - - - - - - - - - - - - - -x

6 In the Matter of:

7

8 RESIDENTIAL CAPITAL, LLC, et al.,

9

10             Debtors.

11

12 - - - - - - - - - - - - - - - - - - - -x

13

14             United States Bankruptcy Court

15             One Bowling Green

16             New York, New York

17

18             August 19, 2013

19             8:59 AM

20

21 B E F O R E:

22 HON. MARTIN GLENN

23 U.S. BANKRUPTCY JUDGE

24

25

244

1

2    Trial RE: FGIC Settlement

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20    Transcribed by:   David Rutt

21    eScribers, LLC

22    700 West 192nd Street, Suite #607

23    New York, NY 10040

24    (973)406-2250

25    operations@escribers.net

245

1

2    A P P E A R A N C E S :

3    MORRISON & FOERSTER LLP

4        Attorneys for Debtors

5        1290 Avenue of the Americas

6        New York, NY 10104

7

8    BY:   CHARLES L. KERR, ESQ.

9        JOSEPH ALEXANDER LAWRENCE, ESQ.

10

11

12   ALSTON & BIRD LLP

13       Attorneys for Wells Fargo Bank

14       1201 West Peachtree Street

15       Atlanta, GA 30309

16

17   BY:   JOHN "KIT" C. WEITNAUER, ESQ.

18

19

20   CLEARY GOTTLIEB STEEN & HAMILTON LLP

21       Attorneys for Wilmington Trust

22       One Liberty Plaza

23       New York, NY 10006

24

25   BY:   MARK A. LIGHTNER, ESQ.

246

1
2  DECHERT LLP
3        Attorneys for Bank of New York Mellon
4        1095 Avenue of the Americas
5        New York, NY 10036
6
7  BY:   GLENN E. SIEGEL, ESQ.
8        REBECCA S. KAHAN, ESQ.
9        MAURICIO A. ESPANA, ESQ.
10       HECTOR GONZALEZ, ESQ.
11
12
13  GIBBS & BRUNS, LP
14       Attorneys for Steering Committee of RMBS Investors
15       1100 Louisiana
16       Suite 5300
17       Houston, TX 77002
18
19  BY:   KATHY PATRICK, ESQ.
20
21
22
23
24
25

247

1

2   JONES DAY

3       Attorneys for FGIC

4       222 East 41st Street

5       New York, NY 10017

6

7   BY:   RICHARD L. WYNNE, ESQ.

8         HOWARD SIDMAN, ESQ.

9         STEVEN BENNETT, ESQ.

10

11  JONES DAY

12      Attorneys for FGIC

13      901 Lakeside Avenue

14      Cleveland, OH 44114

15

16  BY:   CARL E. BLACK, ESQ. (TELEPHONICALLY)

17

18  KIRKLAND & ELLIS LLP

19      Attorneys for Ally Bank and Ally Financial, Inc.

20      153 East 53rd Street

21      New York, NY 10022

22

23  BY:   PETER TSAO, ESQ.

24        VICTORIA COLE, ESQ. (TELEPHONICALLY)

25

248

1

2    KRAMER LEVIN NAFTALIS & FRANKEL LLP

3          Attorneys for Official Creditors' Committee

4          1177 Avenue of the Americas

5          New York, NY 10036

6

7    BY:    PHILIP S. KAUFMAN, ESQ.

8          RACHAEL RINGER, ESQ. (TELEPHONICALLY)

9

10   LOEB & LOEB

11         Attorneys for Wilmington Trust, N.A. at Trustee

12         345 Park Avenue

13         New York, NY 10154

14

15   BY:    WALTER H. CURCHACK, ESQ.

16

17   MCKOOL SMITH, P.C.

18         Attorneys for Freddie Mac

19         One Bryant Park

20         47th Floor

21         New York, NY 10036

22

23   BY:    ANN SCHOFIELD BAKER, ESQ.

24         MICHAEL R. CARNEY, ESQ.

25         PETER S. GOODMAN, ESQ.

249

1

2  MOSS & KALISH, PLLC

3        Attorneys for Freddie Mac

4        125 East 42nd Street

5        New York, NY 10168

6

7  BY:   DAVID B. GELFARB, ESQ.

8

9

10  ROPES & GRAY

11        Attorneys for Steering Committee of RMBS Investors

12        800 Boylston Street

13        Boston, MA 02199

14

15  BY:   D. ROSS MARTIN, ESQ.

16        ANDREW G. DEVORE, ESQ.

17

18

19

20

21

22

23

24

25

250

1

2  SEWARD & KISSEL LLP

3       Attorneys for US Bank as RMBS Trustee

4       One Battery Park Plaza

5       New York, NY 10004

6

7  BY:   MARK D. KOTWICK, ESQ.

8        THOMAS ROSS HOOPER, ESQ.

9        ARLENE R. ALVES, ESQ.

10       BRIAN P. MALONEY, ESQ.

11       DALE C. CHRISTENSEN, JR. ESQ.

12       JEFFREY M. DINE, ESQ.

13

14

15  WHITE & CASE LLP

16       Attorneys for Ad Hoc Group of Junior Secured Noteholders

17       1155 Avenue of the Americas

18       New York, NY 10036

19

20  BY:   J. CHRISTOPHER SHORE, ESQ.

21        VANESSA D. SODERBERG, ESQ.

22        HARRISON DENMAN, ESQ.

23        DWIGHT A. HEALY, ESQ.

24

25

251

1

2   WILLKIE FARR & GALLAGHER LLP

3          Attorneys for Monarch, Stonehill, CQS, Bayview

4          787 Seventh Avenue

5          New York, NY 10019

6

7   BY:   JOSEPH T. BAIO, ESQ.

8          MARY EATON, ESQ.

9          EMMA J. JAMES, ESQ.

10         MARC ABRAMS, ESQ.

11

12  BAYVIEW ASSET MANAGEMENT

13         4425 Ponce de Leon Boulevard

14         5th Floor

15         Coral Gables, FL 33146

16

17  BY:   MICHAEL B. GUSS, ESQ.

18

19  MORRISON COHEN LLP

20         909 Third Avenue

21         New York, NY 10022`

22

23  BY:   ROBERT K. DAKIS, ESQ. (TELEPHONICALLY)

24         JOSEPH T. MOLDOVAN, ESQ. (TELEPHONICALLY)

25

252

1

2   MUNGER, TOLLES & OLSON LLP

3        Attorneys for Berkshire Hathaway, Inc.

4        355 South Grand Avenue

5        35th Floor

6        Los Angeles, CA 90071

7

8   BY:   SETH GOLDMAN, ESQ. (TELEPHONICALLY)

9        THOMAS B. WALPER, ESQ. (TELEPHONICALLY)

10

11

12   PATTERSON BELKNAP WEBB & TYLER LLP

13        Attorneys for Anbac Insurance

14        1133 Avenue of the Americas

15        New York, NY 10036

16

17   BY:   BRIAN P. GUINEY, ESQ. (TELEPHONICALLY)

18

19

20   WINSTON & STRAWN LLP

21        Attorneys for Wells Fargo Bank, N.A.

22        200 Park Avenue

23        New York, NY 10166

24   BY:   JAMES DONNELL, ESQ. (TELEPHONICALLY)

25

253

1

2   MONARCH ALTERNATIVE CAPITAL LP

3   BY:   MICHAEL J. KELLY (TELEPHONICALLY)

4

5

6   REORG RESEARCH, INC.

7   BY:   KENT COLLIER (TELEPHONICALLY)

8

9

10   SOUTHPAW ASSET MANAGEMENT

11   BY:   ANDREW M. THAU (TELEPHONICALLY)

12

13

14   STONEHILL CAPITAL MANAGEMENT

15   BY:   PAUL MALEK (TELEPHONICALLY)

16

17

18   VARDE PARTNERS, INC.

19   BY:   DI WU (TELEPHONICALLY)

20

21

22   WATERSHED ASSET MANAGEMENT, LLC

23   BY:   MICHELE F. KYROUZ (TELEPHONICALLY)

24

25

**RESIDENTIAL CAPITAL, LLC, et al.**

254

1                          P R O C E E D I N G S

2              THE COURT:  Please be seated.  Good morning,

3     everybody.

4              MR. KERR:  Good morning, Your Honor.

5              THE COURT:  So the time is proponents 75 minutes,

6     objectors 254 minutes.  That's 329 minutes.  We're 31 minutes

7     short of the 6 hours for Friday.  Lunch will have to be

8     shortened accordingly.

9              Mr. Kerr?

10             MR. KERR:  Good morning, Your Honor.  Charles Kerr of

11    Morrison & Foerster on behalf of the debtors.  A couple of

12    housekeeping items first --

13             THE COURT:  Okay.

14             MR. KERR:  -- before we begin.  The parties, over the

15    weekend were working on designations and cross-designations.

16    And an issue arose that I was asked to raise with Your Honor.

17    And with respect to objections that were raised in the

18    depositions --

19             THE COURT:  Yes.

20             MR. KERR:  -- on the record, do you want the parties

21    to try and resolve all those, or do you just want to make the

22    designations come in and you can look at them at the time.

23             THE COURT:  Well, you really ought to try and resolve

24    them.  I'll deal with ones that can't be resolved.

25             MR. KERR:  Okay, that's fine, Your Honor.

**RESIDENTIAL CAPITAL, LLC, et al.**

1          THE COURT:  I won't hear argument about them, but

2    resolve what you can.

3          MR. KERR:  Okay.  And I think -- and the parties who

4    still have some issues with that --

5          THE COURT:  That's fine.

6          MR. KERR:  -- we'll try to do it over lunch.

7          THE COURT:  Okay, that's fine.

8          MR. KERR:  The second thing is, Your Honor, I think

9    yesterday there was some -- FGIC had identified some documents,

10   and they just want -- now they want to formally move them into

11   the record --

12         THE COURT:  That's fine.

13         MR. KERR:  -- and so I think Mr. Sidman's going to do

14   that.

15         THE COURT:  Okay.  Mr. Sidman?

16         MR. SIDMAN:  Good morning, Your Honor.  Howard Sidman,

17   Jones Day, for FGIC.

18         I'm just following up with the four exhibits --

19         THE COURT:  Right.

20         MR. SIDMAN:  -- to the July 31st, 2013 Dubel witness

21   statement.  As you may recall, the Dubel witness statement was

22   previously admitted into evidence on Friday.  We have conferred

23   with the objectors and I'm prepared to offer into evidence the

24   four exhibits to the Dubel witness statement.  Those exhibits

25   are as follows:  Debtors' Exhibit 53, Debtors' Exhibit 226, and

**RESIDENTIAL CAPITAL, LLC, et al.**

1　Debtors' Exhibit 227.  These three documents are public court

2　filings and are not being offered for the truth of the matter

3　asserted.

4　　　　　THE COURT:  All right.  Any objections?

5　　　　　MR. BAIO:  No, Your Honor.

6　　　　　MR. SIDMAN:  And then there's a fourth exhibit --

7　　　　　THE COURT:  Okay.

8　　　　　MR. SIDMAN:  -- Your Honor --

9　　　　　THE COURT:  Well let me just -- with respect to 53,

10　226 and 227, they're in evidence.

11　(Dubel exhibits were hereby received into evidence as Debtors'

12　Exhibits 53, 226, 227, as of this date.)

13　　　　　THE COURT:  All right.  What's the fourth exhibit?

14　　　　　Okay, and the fourth?

15　　　　　MR. SIDMAN:  And the fourth is Exhibit 311 --

16　　　　　THE COURT:  Okay.

17　　　　　MR. SIDMAN:  Which is a timeline of FGIC settlement

18　discussions during the mediation process.

19　　　　　THE COURT:  All right.  Any objections?

20　　　　　MR. BAIO:  No, Your Honor.

21　　　　　THE COURT:  All right.  Exhibit 311 is in evidence as

22　well.

23　(Settlement timeline was hereby received into evidence as

24　Debtors' Exhibit 311, as of this date.)

25　　　　　THE COURT:  Okay, thank you very much, Mr. Sidman.

**RESIDENTIAL CAPITAL, LLC, et al.**

257

1           MR. SIDMAN:  Thank you, Your Honor.

2           THE COURT:  All right, Mr. Kerr, next witness?

3           MR. KERR:  Next witness, Your Honor, is Robert Major.

4           THE COURT:  Okay.  Good morning, Mr. Major.  If you

5    would raise your right hand, you'll be sworn.

6       (Witness sworn)

7           THE COURT:  Please have a seat.  There's a pitcher of

8    water there, if you need it, and there are cups, okay?

9           MR. ESPANA:  Good morning, Your Honor.  Mauricio

10   Espana from Dechert for the Bank of New York Mellon.

11          THE COURT:  Okay.

12          MR. ESPANA:  Your Honor, at this time we'd move in Mr.

13   Major's declaration, which is Exhibit 101.  It's the binder to

14   your left.  Along with a few supporting exhibits.  A few of the

15   exhibits already have been moved in.  But the ones that remain

16   are 116, 118, 119, and 170.  And Exhibits 119 and 170 are not

17   being offered for the truth.

18          THE COURT:  Any objections?

19          MR. BAIO:  No, Your Honor.

20          THE COURT:  Thank you.  All right.  Exhibits -- and no

21   objection to the decl -- to the witness statement either?

22          MR. BAIO:  No, Your Honor.

23          THE COURT:  All right.  So Exhibits 101, 116, 118,

24   119, and 170 are all admitted in evidence.

25   (Mr. Major direct testimony was hereby received into evidence

**RESIDENTIAL CAPITAL, LLC, et al.**

1  as Debtors' Exhibit 101, as of this date.)

2  (Mr. Major exhibits were hereby received into evidence as

3  Debtors' Exhibits 116, 118, 119, 170, as of this date.)

4            MR. ESPANA:  Thank you, Your Honor.

5            THE COURT:  Thank you very much.

6            Cross-examination?

7            MR. BAIO:  No questions, Your Honor.

8            THE COURT:  Okay.

9            UNIDENTIFIED SPEAKER:  No question from Freddie Mac

10  either, Your Honor.

11            THE COURT:  You're excused.

12            Next witness, Mr. Kerr.  That would be Mr. Pfeiffer?

13            MR. KERR:  Correct, Your Honor.  The next witness is

14  Allen Pfeiffer.

15            THE COURT:  All right, Mr. Pfeiffer, if you would

16  raise your raise your right hand and be sworn?

17       (Witness sworn)

18            THE COURT:  All right, please have a seat.  You've got

19  your own water there, I see.  Okay.

20            MR. WEITNAUER:  Your Honor, Kit Weitnauer, Alston &

21  Bird.

22            THE COURT:  Good morning, Mr. Weitnauer.

23            MR. WEITNAUER:  For Wells Fargo.  The settling parties

24  would like to tender into evidence the direct testimony of

25  Allen M. Pfeiffer, which is Exhibit 109.  And that's that.

**RESIDENTIAL CAPITAL, LLC, et al.**

1          THE COURT:  Any objections?

2          MR. BAIO:  No, Your Honor.

3          THE COURT:  All right.  Exhibit 109, direct testimony

4     of Mr. Pfeiffer, is admitted into evidence.

5     (Mr. Pfeiffer direct testimony was hereby received into

6     evidence as Debtors' Exhibit 109, as of this date.)

7          THE COURT:  Cross-examination, Mr. Baio?

8          MR. BAIO:  Yes, Your Honor.  Joseph Baio on behalf of

9     the investors.

10    CROSS-EXAMINATION

11    BY MR. BAIO:

12    Q.   Good morning, Mr. Pfeiffer.

13    A.   Good morning.

14    Q.   Mr. Pfeiffer, your assignment in connection with what you

15    are here for today, was to assess the reasonableness from a

16    financial perspective and from the perspective of the FGIC

17    insured trusts of the settlement agreement.  Is that correct?

18    A.   That's correct.

19    Q.   So you and Duff & Phelps did your analysis from a

20    financial perspective, and not from any other perspective.  Is

21    that correct?

22    A.   We looked at it from a financial perspective, but we

23    included qualitative factors that impact the financial

24    perspective as well.

25    Q.   You were not asked or tasked with the responsibility to

**RESIDENTIAL CAPITAL, LLC, et al.**

1    assess whether the settlement agreement was in the best

2    interests of the FGIC insured trusts, correct?

3    A.    We were not.

4    Q.    You were not asked and you were not tasked with the job of

5    assessing whether the settlement agreement was in the best

6    interests of investors in the trusts, correct?

7    A.    Those are decisions that are made by the trustee.  We

8    provide for them all the advice they need in order to make that

9    decision with a full set of analysis that we can provide to

10    them.

11    Q.    But you were not asked whether the settlement agreement

12    was in the best interests of the investors in the trusts,

13    correct?

14    A.    We were not.

15    Q.    That wasn't your job?

16    A.    That was not our job.

17    Q.    Nobody hired you to do that?

18    A.    Again, we were hired as financial advisor.  And as is made

19    clear in my declaration, the role is -- the role is summarized

20    in my declaration, and I'm trying to find the paragraphs --

21    yeah, it's at paragraphs 12 and 13.

22    Q.    Yes.  I've just asked, no one asked you to do that.  Isn't

23    that correct?

24    A.    No one asked us to do the trustees' job for them.  We did

25    not --

**RESIDENTIAL CAPITAL, LLC, et al.**

1        THE COURT:  Mr. Pfeiffer, it'll be much faster if you

2   just answer the question.

3   A.   No, we did not --

4        THE COURT:  It's a very clear question.  Just give you

5   answer to it, and let's move on.

6        THE WITNESS:  Okay.  I thought I already answered the

7   question.  No, we were not determining the trustees' role for

8   the best interests of the trusts.

9   Q.   And you didn't advise the trustees, independent from what

10  your assignment was -- you didn't advise the trustees that the

11  settlement agreement was in the best interests of the investors

12  in the FGIC trusts, correct?

13  A.   Correct.

14  Q.   You didn't provide any opinion to your clients --

15       THE COURT:  How many times does he have to say it?

16       MR. BAIO:  This is a different question, Your Honor.

17  First I did the trusts, now the trustees --

18       THE COURT:  Go ahead.

19  Q.   It was the trustees' job to determine, in your view,

20  whether the proposal was in the best interests of the trusts,

21  correct?

22  A.   I'm not here to opine on what the trustees' job is or

23  isn't.  I know what we did.

24  Q.   You also didn't tell the trustees where in the range of

25  reasonableness you believed the settlement proposal that FGIC

**RESIDENTIAL CAPITAL, LLC, et al.**

262

1   made fell, correct?

2   A.   That's not correct.

3   Q.   I'd ask you to look at your testimony, which is Exhibit

4   FR, at page 152.

5            THE COURT:  Is this the testimony or the deposition?

6            MR. BAIO:  I'm sorry, his deposition, Your Honor.

7            Can you hand the book to our opponent.

8            MR. WEITNAUER:  Are there other things in the book

9   that are in front of him?

10            Thank you.  Thank you so much.

11            THE WITNESS:  I'm sorry, where'd you ask me to look?

12   Q.   At page 152 line 23.  I asked you the following --

13   A.   I'm sorry, what exhibit?  Oh, FR?  Okay.

14   Q.   Yes sir.  Tell me when you're there.

15   A.   Page 152 -- one two three -- I'm joking.  I got it.

16   Q.   Line 23:

17   "Q.  And you did not tell the trustees where in the range you

18   believed the settlement proposal fell, the commutation payment,

19   correct?

20   "A.  Correct."

21        You gave that testimony, didn't you?

22   A.   If you look at the quest --

23            THE COURT:  That's a yes or no.

24   A.   If you look at the question --

25            THE COURT:  That's a yes or no, Mr. --

**RESIDENTIAL CAPITAL, LLC, et al.**

1   A.   Oh, we made that statement, yes.

2   Q.   And it was true when you said it, correct?

3   A.   I answered correct -- I testified -- my deposition was

4   true and it still is true, yes.

5   Q.   You did not do any evaluation of the likelihood that the

6   investors would receive more under the rehabilitation plan than

7   they would under the settlement agreement.  Isn't that correct?

8   A.   I'm sorry, could you repeat the question?

9   Q.   You did not do any evaluation -- you or Duff & Phelps --

10  of the likelihood that investors would receive more under the

11  rehabilitation plan than they would under the settlement

12  agreement.  Isn't that correct?

13  A.   We did not do a likelihood analysis.  We just provided the

14  advice and the context around the advice.

15  Q.   And you provided a range of estimated recoveries under the

16  FGIC rehabilitation plan, correct?

17  A.   Yes.

18  Q.   Okay.  And at the time that you spoke to the trustees, in

19  May -- and was that May 13th, 2013 that you had a presentation

20  to the trustees?

21  A.   That was the presentation that is referred to in our

22  report, yes.

23  Q.   At that time, and even thereafter, is it fair and accurate

24  to say, sir, that you couldn't say whether a 240-million-dollar

25  payment, as opposed to a 253-million-dollar payment, fell

**RESIDENTIAL CAPITAL, LLC, et al.**

264

1  within the range of reasonableness?

2  A.   Our job was to assess 253 and no other number.

3  Q.   And you couldn't say, and you weren't asked, whether a

4  190-million-dollar payment would fall within the range of

5  reasonableness.  Isn't that correct?

6  A.   That was not -- our assignment was not to assess 190

7  million.

8  Q.   And you were never asked that.  And as you sit here today,

9  you cannot say whether 190-million-dollar payment would be

10  within the range of reasonableness, correct?

11  A.   As I just testified, we were not asked to assess 190, and

12  that's not my assignment here today.

13  Q.   In fact, sir, you did not establish a range to determine

14  whether the number was reasonable or unreasonable.  Is that

15  correct?

16       THE COURT:  I don't understand the question.

17       MR. BAIO:  Okay.

18       THE WITNESS:  I don't understand it either.

19  Q.   Did you establish a range such that, if anything fell

20  outside of that range, it would not be reasonable?

21  A.   That was not the goal of our assignment, to establish

22  specific ranges that -- to assess, you know, what number would

23  be within and outside the range.  That was not the assignment

24  that we had.

25  Q.   That was not what you did?

**RESIDENTIAL CAPITAL, LLC, et al.**

265

1    A.    We did establish a range, and we talked about the numbers

2    and the various factors that impact that range, but our

3    assignment was not to determine whether a particular number was

4    under the range or higher than the range.  Our assignment was

5    to assess whether the commutation proposal was within the range

6    of reasonableness.

7    Q.    Let's turn to the May 13th presentation.  The presentation

8    you made -- you and your colleagues -- was telephonic and on

9    the Web.  Is that correct?

10    A.    It was a Web conference, yes.

11    Q.    And it occurred before the May 15th report was finalized.

12    Is that correct?

13    A.    May 13th, it was the date of the Web conference, which is

14    two days before May 15th, yes.

15    Q.    So at the actual Web conference, is it fair and accurate

16    to say that you presented what appears in Exhibit 123?

17    A.    On -- no.

18    Q.    I'm sorry, it is not 123.  It is that correct?

19    A.    It is substantially the same as 123, but, you know, likely

20    had "Draft" written on it, and a few words may have been

21    different.

22    Q.    Can you look in your book for Exhibit P?

23    A.    Okay, I have it.

24    Q.    Was that the PowerPoint that you used to present at the

25    time that you spoke to the trustees on May 13th?

**RESIDENTIAL CAPITAL, LLC, et al.**

266

1   A.   No, it was not.

2   Q.   Okay.  There's yet another draft that you used?

3   A.   We shared the draft early in May, and that might be

4   Exhibit P or Q -- I'm not looking right now over what the

5   differences are between the two exhibits.  But we shared a

6   draft presentation in the first few days of May and received

7   some feedback.  On May 13th, we then had a Web conference which

8   included the presentation slides, which were substantially

9   similar to the slides that you see on Exhibit 123, but were

10  still in draft form.  And in the days -- in the two days

11  between May 13th and May 15th, we finalized our presentation.

12  We don't have a hard copy of the actual exact presentation that

13  was shared on the 13th.

14  Q.   You don't have it anywhere?  You've never produced it to

15  us and you don't have it?

16  A.   It was a Web conference.

17  Q.   Yes.

18  A.   And we were making slight changes as the conference -- as

19  we presented.  And like I said, in the day or two after, we did

20  not keep that version.  It's substantially similar to the

21  Exhibit 123 that's dated May 15th that's in front of you, like

22  I said before.

23  Q.   Well, is it also substantially similar to P?  Can you tell

24  which one was used?  Because you will see that -- and you may

25  recall this -- if you look at page 7 on Exhibit P, the base

**RESIDENTIAL CAPITAL, LLC, et al.**

267

1    scenario range that you came up with was 200 million to 320

2    million, and that's different from the number that you came up

3    with two days after you spoke to the trustees, which as you'll

4    see is 220 million to 340 million.  Which one did you -- which

5    number did you present of those two, which range, under the

6    base scenario?

7    A.    My recollection is that the numbers were, if not

8    identical, were substantially similar to the presentation that

9    is dated May 15th.

10   Q.    So you believe it was the 220 to the 320, not the 200 to

11   the 300?  Is that correct?

12   A.    I think I just said that that's -- to the best of my

13   recollection that's what I think it was.

14   Q.    Okay.

15   A.    And that's only for the base case.  There's a stress case

16   on there too which includes 190 to 250.

17   Q.    I didn't ask about it.

18          MR. BAIO:   I think we will end up going too long,

19   Your Honor.

20          THE COURT:  Ask your next question, Mr. Baio.

21   Q.    Can you kindly look at -- in Exhibit 123, page 5?

22   A.    Okay.

23   Q.    And by the way, this conference took about an hour to an

24   hour and a half.  Is that correct?  That is, the May 13th

25   presentation?

**RESIDENTIAL CAPITAL, LLC, et al.**

268

1    A.   The Web conference was -- yes, between an hour and an hour

2    and a half, I believe.

3    Q.   And you can't recall precisely what you said during that

4    presentation, correct?

5    A.   I can't recall precisely, no.

6    Q.   And you can't recall what the trustees said.  Isn't that

7    correct?

8    A.   I recall that there were questions.  I recall some of the

9    questions.  But I don't -- I can't recall precisely who asked

10   what.

11   Q.   Okay.  Now, page 5, which you are looking at, includes

12   FGIC's own calculations leading up to the proposed settlement

13   offer that was made as part of the commutation, correct?

14   A.   It was pro -- it was presented to us as FGIC's

15   calculations, or the Kathy Patrick's group and FGIC's

16   present -- calculation.  It's not our calculations.

17   Q.   And it's true that the first sentence that appears at the

18   top is accurate, that is, the proposal outlined a cash payment

19   of approximately 250 million dollars by FGIC upon emergence, in

20   exchange for --

21           THE COURT:  It says 253.  You said two --

22           MR. BAIO:  Pardon me, Your Honor.

23           THE COURT:  You said 250.  It says 253.

24           MR. BAIO:  Oh, 253.  I'm sorry, Your Honor.

25   Q.   -- by FGIC upon emergence, in exchange for the ability for

**RESIDENTIAL CAPITAL, LLC, et al.**

1    FGIC to assert approximately 597 million dollars of allowed

2    claims at ResCap.  That's accurate, correct?  That's what the

3    proposal did?

4    A.    That summarizes the proposal, yes.

5    Q.    That's the quid pro quo as presented by FGIC?

6    A.    There are obviously more elements to it.  But that's a

7    summary of the proposal.

8    Q.    And these -- the figures that appear on this page on the

9    right-hand side -- and let's leave aside the haircut figure --

10   that came from FGIC's own calculations in connection with its

11   rehabilitation plan, correct?

12   A.    I can't speak to exactly where FGIC got each number from,

13   but these numbers were provided by FGIC.

14   Q.    And you understood that it came out of the work that they

15   did in connection with their rehabilitation plan, correct?

16   A.    Some of the numbers come from the rehabilitation plan.  At

17   least that's the way I see the numbers and I connect it to the

18   rehabilitation plan.  It seems to have come from that plan.

19   Other of the numbers -- some of the other numbers, I just don't

20   know where they came from.  You'd have to ask FGIC.

21   Q.    It's true, you understood that the stated goal of the

22   rehabilitation plan is to treat FGIC's policyholders in a fair

23   and equitable manner in order to remove the causes and

24   conditions that made the rehabilitation proceeding necessary.

25   Isn't that correct?

**RESIDENTIAL CAPITAL, LLC, et al.**

270

1  A.    That sounds like language from the plan.

2  Q.    Okay.  And you also understood that the intention of the

3  rehabilitation plan was to provide for all of the value of FGIC

4  other than administrative expenses and other costs to go to

5  FGIC policyholders until the policyholders are paid in full.

6  You understood that?

7  A.    I have to go back to my report to see if that's an exact

8  quote.  But it's --

9  Q.    Well, I'm asking first independent from the language -- if

10  you want to look you can, but --

11  A.    So what are you asking, exactly?

12  Q.    Do you understand that the rehabilitation plan provides

13  for all of the value of FGIC, other than those expenses I

14  identified, to go to FGIC's policyholders until the

15  policyholders are paid in full?

16  A.    Yes.

17  Q.    And you also understand that no claimants junior to

18  policyholders receive any payment until the policyholders are

19  paid in full in accordance with the rehabilitation plan,

20  correct?

21  A.    Correct.

22  Q.    Okay.  And you understand that FGIC, in providing the

23  rehabilitation plan, had to act prudently and conservatively.

24  Isn't that correct?

25  A.    I don't know if they had to act that way.  But I believe

**RESIDENTIAL CAPITAL, LLC, et al.**

1    that the plan refers to those words.

2    Q.    And you understood that FGIC presented a base case and a

3    stress case, correct?

4    A.    Correct.

5    Q.    And you understood that in presenting its base case, FGIC

6    was giving the expected case.  Isn't that correct?  From its

7    perspective?

8    A.    Correct.

9    Q.    And as you understood it, FGIC expected the base case to

10   occur more so than the stress case, correct?

11   A.    I would say that that's correct.

12   Q.    Okay.  If we look at page 5, going back to Exhibit 123,

13   there are a series of numbers on the right-hand side, and there

14   are assumptions on the left.  Do you see that?

15   A.    I'm sorry, page 5?

16   Q.    Yes.  Exhibit 123.

17   A.    And what was the question?

18   Q.    There are numbers that appear on the right-hand side and

19   assumptions that appear on the left-hand side.  Do you see

20   that?

21   A.    There are numbers on the right-hand side, and the left

22   lists some of the assumptions that help explain the numbers on

23   the right.  To the --

24   Q.    Okay.

25   A.    -- extent that we understood what the numbers were.

**RESIDENTIAL CAPITAL, LLC, et al.**

1  Q.    And this was something that FGIC presented to you.  Is

2  that correct?  These numbers and these assumptions?

3  A.    I -- they e-mailed -- it was e-mailed to us, and then we

4  had the opportunity to ask questions to FGIC in a meeting that

5  we had with them and Lazard.

6  Q.    And you provided this page to the trustees during the May

7  13th presentation, correct?

8  A.    Correct.

9  Q.    And you explained what it was.  Is that correct?

10  A.    We explained that this is a page that came from FGIC.

11  Q.    So if we look at the right-hand side -- or actually the

12  left-hand side, on an assumption, the first assumption is

13  "Initial cash payment percentages of 17.25 percent."  Do you

14  see that?

15  A.    I do.

16  Q.    And you understand that figure came right out of the

17  rehabilitation plan and the Miller affidavit.  Is that correct?

18  A.    Yes.

19  Q.    And the next assumption, "Base case payout to

20  policyholders of 28.5 percent," that was, in fact, based on the

21  rehabilitation plan and employing a fifteen percent discount

22  rate.  Is that correct?

23  A.    That's what the words say, yes.

24  Q.    And that's what you understood FGIC had done, correct?

25  A.    I understood that as it says on the page, that's what they

**RESIDENTIAL CAPITAL, LLC, et al.**

1  were attempting to display, yes.

2  Q.   And the fifteen percent was the average or the midpoint

3  between the ten percent that they had used and the twenty

4  percent that they had used in the Miller affidavit and in their

5  rehabilitation plan.  Is that correct?

6  A.   That's correct.

7  Q.   So when you look at the right-hand side, the initial cash

8  payment percentage, that comes right out of the rehabilitation

9  plan and the Miller affidavit, correct?  17.25 percent?

10  A.   I think you just asked me that.  I think yes.

11  Q.   Okay.  And the base case, which is B -- I just want to go

12  through the math quickly -- that also comes from the same

13  place, the average -- the midpoint of the discount rate,

14  fifteen percent?

15  A.   Again, that's what -- that's what this page presents the

16  number as coming from.  We could not replicate that number, but

17  that's what it says it came from.

18  Q.   But you believed that FGIC was acting in good faith when

19  it provided those numbers.  Isn't that correct?

20  A.   I have no reason to believe otherwise.

21  Q.   The next number, then, is the ResCap sponsored RMBS claim

22  per FGIC.  That also comes right out of their analysis in

23  connection with the rehabilitation plan, which they were

24  required to do, as you described in your report, to be sure

25  that there is a fair and equitable manner of distributing the

**RESIDENTIAL CAPITAL, LLC, et al.**

274

1  funds.  Is that correct?

2  A.    If you're quoting from my report, I'd have to look at --

3  Q.    Paragraph 17.

4  A.    Okay.

5          THE COURT:  Is he looking at his testimony or his

6  report?

7          MR. BAIO:  Paragraph 17 of his report -- of his --

8          THE COURT:  Testimony.

9          MR. BAIO:  -- direct, Your Honor.

10         THE COURT:  Thank you.

11  A.    Paragraph 17 says, as we mentioned earlier, that the

12  stated goal of the rehab plan is to treat FGIC policyholders in

13  a fair and equitable manner.

14  Q.    And the number that appears on this page, page 5 of the

15  presentation, for ResCap sponsored RMBS claims, came out of the

16  rehabilitation plan, correct?

17  A.    Are you referring to the 1850?

18  Q.    Yes.

19  A.    I'd have to look at the rehabilitation plan, but I believe

20  it has.

21  Q.    Okay.  And the same thing with respect to the total

22  projected claims in the POC.  Do you see that?  That comes

23  right out of FGIC's rehabilitation plan and the calculations in

24  the Miller affidavit, correct?

25  A.    You know, I don't think that these numbers came from the

**RESIDENTIAL CAPITAL, LLC, et al.**

1  plan.  Now that I think about it, I don't think it came from

2  the plan or from the Miller affidavit.  I think that the Miller

3  affidavit and the plan were focused on all the policyholders

4  for FGIC and did not provide specific emphasis, to my

5  recollection, related to the ResCap sponsored RMBS claims.  And

6  I'm quite -- I'm relatively confident that these numbers were

7  not in the Miller affidavit.  And I don't think they're in the

8  rehab plan either.

9  Q.   But the calculations are based on FGIC's work in

10  connection with what they did in the rehabilitation plan.

11  That's what you understood, correct?

12  A.   These numbers were provided by FGIC and the page was

13  provided by FGIC.  And I'm not sure what else to tell you about

14  them except that they calculated them likely as part of their

15  calculations in assessing the rehabilitation plan or the impact

16  it would have on the ResCap sponsored RMBS claim.  But I -- but

17  I can't tell you, you know, exactly what they did in arriving

18  at these numbers.

19  Q.   Well, when you met with them and you asked them, did you

20  say, are these numbers that you just pulled out of the air?  Or

21  they numbers that you believe?  Did you ask?

22  A.   We probably didn't ask it in that tone.  But they

23  believed -- they believed that the ResCap sponsored RMBS claim

24  and the total projected claims in the proof of claim are

25  approximated by these numbers on this page.

**RESIDENTIAL CAPITAL, LLC, et al.**

276

1   Q.   And you believe they gave you those numbers in good faith

2   in connection with the offer that they were making.  Isn't that

3   correct?

4   A.   Yes.

5   Q.   And that's true of all the numbers that appear in that

6   first upper chart, including the future estimated claims.  It's

7   your understanding that they provided them to you because they

8   believed they were accurate?

9   A.   My understanding is that they provided us what they

10  believed to be accurate numbers and assumptions, and that the

11  numbers on the top part of the page, including the 481, are

12  their estimates of the nominal amount -- the notional amount of

13  the claims from the FGIC insured ResCap trusts.

14  Q.   Okay.  And did you examine them at all about whether

15  their -- what the basis was for those numbers?  Did you

16  challenge any of the numbers?  Did you accept them?  What did

17  you do?

18  A.   We looked at them.  Obviously, to the extent that we

19  didn't understand -- to the extent that the claim number was

20  very different from our numbers, we would have asked more

21  questions.  But I think with the 481 and the 1270 of estimated

22  unpaid claims, was relatively consistent with the midpoint of

23  our claim estimates.  And so to the extent that we did some

24  analysis we were focused more on what we thought the projected

25  claims would be.  And I think the fact that FGIC came up with

**RESIDENTIAL CAPITAL, LLC, et al.**

1  future estimated claims and total projected claims that are

2  consistent with our numbers, provided us with a source of

3  comfort that our numbers were accurate.

4  Q.  Well, that's not what I asked, but I just asked what you

5  had asked them at that meeting.  But let me ask you this --

6  A.  I thought you asked what I did in connection with those

7  numbers.

8  Q.  Let's go to the chart that appears under "Commutation

9  Considerations".  There are then a series of calculations, and

10  those are calculations that were done by FGIC, correct, based

11  upon the math and the assumptions that appear above?

12  A.  Those were presented to us by FGIC.

13  Q.  They then applied what they identify as a factor

14  percentage of unpaid payout, sixty percent.  Do you see that?

15  A.  I see the number, yes.

16  Q.  And you refer to that as the haircut, on the left-hand

17  side of this page -- a haircut of forty percent on unpaid

18  payout claim estimates.  Do you see that?

19  A.  I do.

20  Q.  And that was a phrase that you or people at D&P decided to

21  use with respect to the forty percent.  Isn't that correct?

22  A.  The phrase "haircut", are you referring to?

23  Q.  Yes.

24  A.  The phrase "haircut" is a way of saying discount, and it

25  is a phrase that the trustees and their counsel became

**RESIDENTIAL CAPITAL, LLC, et al.**

278

1   accustomed to us using as we referred to discounts in the

2   broader RMBS claim assessments.

3   Q.   Yeah, well, my question sir, is that you and people at D&P

4   elected to describe that as a haircut, didn't you?

5   A.   I don't recall if FGIC or Lazard referred to that word in

6   their meetings or if we used the word first.  But it

7   characterizes a haircut of forty percent on the page.

8   Q.   Look at your report -- I'm sorry, your direct testimony,

9   which is Exhibit 109, at paragraph 68.

10  A.   I'm sorry --

11          THE COURT:  Page 30.

12  Q.   Page 30 -- 30 going over to 31.

13  A.   Okay.

14  Q.   If you look at the tail end of that sentence, it says,

15  "D&P gave a shorthand description as a haircut of forty percent

16  on unpaid payout claims estimates."  Do you see that?

17  A.   What paragraph?  I'm sorry.

18  Q.   Paragraph 68.

19  A.   Okay.

20  Q.   The end of the paragraph --

21  A.   Oh, okay.

22  Q.   -- which carries over to page --

23  A.   Page --

24  Q.   -- 31.  Where you said in your direct testimony, "D&P gave

25  a shorthand description as a haircut of forty percent on unpaid

**RESIDENTIAL CAPITAL, LLC, et al.**

1    payout claim estimates."  Do you see that?

2    A.    I see that.

3    Q.    So does that -- was that accurate when you submitted this

4    in late July?

5    A.    Yes.

6    Q.    And does that refresh your recollection that in fact, D&P

7    gave that shorthand description, the haircut?

8    A.    The words on the page were written by Duff & Phelps and we

9    provided that description on the page 5 of the presentation.  I

10   just -- what I said to you before is I don't recall if the word

11   was also used in the context of the meeting we had with FGIC,

12   if they also used that same term or if we invented it.  It was

13   certainly used as a shorthand description of the discount on

14   the page in the presentation that we provided on May 13th.

15   Q.    And D&P gave it that shorthand, right?  I mean, that's

16   what you said in your direct?

17   A.    What I'm trying to make sure you understand is that the --

18   if you go back to Exhibit 123 and you look at page 5, the

19   numbers on the right-hand side or the entire presentation,

20   the -- not just the numbers, but the way the numbers are

21   characterized on page 5, all derive exactly from the page which

22   we received from FGIC.  We did not ad lib or create any context

23   or any create any description except to the extent that we

24   provided a -- those letters on the right-hand side of page 5

25   and the descriptions which are listed on the left.  So my

**RESIDENTIAL CAPITAL, LLC, et al.**

1    direct testimony is and was that we provided that shorthand

2    description on the page.  The number -- the description on the

3    left was provided by Duff & Phelps and not FGIC.

4    Q.    That was my question.  Now, you met with Duff & Phelps to

5    talk about --

6              THE COURT:  He is Duff & Phelps.

7    Q.    -- the proposal, correct?

8              THE COURT:  He met with FGIC.

9              MR. BAIO:  I'm sorry.  Yes, Your Honor.  He is Duff &

10   Phelps.

11   Q.    You met with FGIC --

12   A.    I'm not Duff -- you know --

13   Q.    You are a Duff & Phelps --

14   A.    -- I'm a partner at Duff & Phelps.

15   Q.    -- I think we can call you a Duff & Phelpian.

16        You, in fact, met with FGIC to discuss their proposal,

17   correct?

18   A.    Members of my team met with FGIC.

19              THE COURT:  Did you?  Did you?

20              THE WITNESS:  I was not present.

21              MR. BAIO:  Okay.

22   Q.    Did you direct members of your team to tell FGIC

23   representatives that the haircut is inappropriate?

24   A.    I did not, no.

25   Q.    Did you tell your team to find out what in the world is

**RESIDENTIAL CAPITAL, LLC, et al.**

281

1  this forty percent haircut?

2  A.   We had a discussion about what the forty percent haircut

3  meant on the page.  And -- and we understood it as much as we

4  needed to understand it.  Our focus was on the 253 and not how

5  they got to the 253, though.

6  Q.   But you understand they got to the 253 by applying a forty

7  percent haircut.  You understand that much, right?

8  A.   I understand that they got to the 250 -- the page gets to

9  253, including the forty percent haircut, right.

10  Q.   Yes.  And you and Duff & Phelps did not review the

11  analysis behind the forty percent reduction in payments,

12  correct?

13  A.   As I said, our focus was to --

14       THE COURT:  Can you answer his question.

15  A.   We didn't review the details behind how they got to forty

16  percent, no.

17  Q.   Not just detail.  You didn't rely -- you didn't analyze

18  anything behind the forty percent.  Isn't that correct?

19  A.   Both what you said in both your questions just now is

20  correct.  We did not analyze the forty percent; it wasn't

21  important to us; it was irrelevant to us.  And we certainly did

22  not rely on it.

23  Q.   I didn't ask whether you relied on it.  I asked whether

24  you analyzed --

25       THE COURT:  Ask your next question.

**RESIDENTIAL CAPITAL, LLC, et al.**

1  Q.   Did you --

2          THE COURT:  Ask your next question.

3          MR. BAIO:  Yes, Your Honor.

4  Q.   Did you, on behalf --

5          MR. BAIO:  Strike that.

6  Q.   You were reviewing this settlement proposal from the

7  perspective of the FGIC trusts, right?

8  A.   Yes.

9  Q.   From that perspective, did you think that you should find

10 out what the forty percent reduction was all about?

11 A.   No.  Our focus was to assess the reasonableness of the 253

12 and the entire proposal.

13 Q.   The forty percent haircut appears nowhere in any of the

14 FGIC rehabilitation plan documents.  Isn't that correct?

15 A.   I wouldn't expect it to.  It does not.  No.

16 Q.   Okay.  And did you direct your people to say when they

17 were discussing this item with Lazard and FGIC, that since the

18 forty percent factor doesn't appear in the rehabilitation plan,

19 how can it be fair and equitable here?  Did you ask them to

20 inquire about that?

21 A.   We had a discussion, as I mentioned, and we came to a full

22 understanding as to what the discount means, and we got

23 comfortable with the 253 and the fact that there should be a

24 discount.  And because your question has some assumptions that

25 are inaccurate, I want to make sure you understand that the --

**RESIDENTIAL CAPITAL, LLC, et al.**

1   there's no reason for the forty percent to be in the plan.  The

2   plan was focused on the policyholders -- all of FGIC's

3   policyholders.  As far as this number, it represents, to be

4   very clear --

5          MR. BAIO:  Your Honor, may I ask for the --

6          THE COURT:  No.

7          MR. BAIO:  -- just an answer.

8          THE COURT:  Let him finish his answer.

9   A.   What it represents is the fact that the ResCap thirty-

10  seven or forty-seven, including the nonsettlement trusts, these

11  FGIC insured ResCap sponsored trusts have cash flows.  The

12  timing of those cash flows are very different from the timing

13  of the cash flows of the other FGIC policyholders.  They are

14  front loaded.  Their claims are, for the most part -- a lot of

15  them already existed and were unpaid -- accrued and unpaid.

16  The remainder of those claims, a great majority of them were in

17  the next few years, which is unlike the other claims that are

18  going to flow to the FGIC trusts that are coming over the next

19  thirty or forty years, and therefore you'd expect a different

20  present value factor for the FGIC policyholders at large from

21  the ResCap sponsored FGIC policyholders.

22          It's apples and oranges.  There's -- and I described it in

23  my report.  But to continue to ask as if we didn't understand

24  it -- the forty percent, is wholly inaccurate.  We didn't need

25  to know the exact nature of the forty and why it's forty as

**RESIDENTIAL CAPITAL, LLC, et al.**

284

1    opposed to thirty-eight or forty-two.  But we got comfortable

2    that it made a lot of sense that there would be a discount for

3    our claims from a present value factor relative to the other --

4    the other FGIC policyholders.

5    Q.    Done?

6    A.    I'm done.  I'm happy to go back to it if you need to

7    understand it.

8    Q.    Well, did anybody say what about thirty percent, when you

9    were dealing with FGIC saying shouldn't the amount be thirty or

10   twenty or ten, so that the amount that the payment would be,

11   would be more for the trustees, not less?

12   A.    No.  Like I said, our focus was not on that number, but

13   rather on what resulted, the 253 plus the 18 million of waived

14   premiums.  It was not on the forty percent.

15   Q.    And you didn't view your job or D&P's job to negotiate

16   with FGIC over the amount of the payment.  Isn't that correct?

17   A.    Our job was to assess the reasonableness of the 253 plus

18   the other benefits of the commutation.

19   Q.    And your job didn't include to come back to them and say

20   the forty percent has problems, the forty percent, as a

21   negotiating matter, should be lower or it shouldn't be there at

22   all.  That was not your job?

23   A.    Our job was to --

24        THE COURT:  Do you want to answer his question?

25   A.    My job was not to negotiate the forty percent.  My job was

**RESIDENTIAL CAPITAL, LLC, et al.**

1  to -- if I thought the 253 was too low, or if I thought that

2  any of the inputs that related to the forty percent or the 253

3  were inaccurate or wrong, then I might have pushed and asked

4  more about it.  We felt, objectively and clearly, that the 253

5  was reasonable, and therefore whatever they -- FGIC used to get

6  to the 253 was less important to me.

7  Q.   The factors that you identified, the fact that most of the

8  claims had already occurred, that they were going to be

9  occurring in the first few years, in fact, sir, those lead to a

10  lower discount than a higher discount.  Isn't that correct?  If

11  they're already claims that have occurred and they're going to

12  occur in the near future, to add a forty percent haircut is

13  illogical.  Do you agree or disagree?

14  A.   I don't agree.  But I -- apparently you misunderstood what

15  I said before.  So I could certainly explain it for your

16  benefit or for the benefit of the judge again, if you'd like.

17  Q.   I'm not asking for another explanation.

18        THE COURT:  Your counsel can ask if he wishes.

19        Go ahead, Mr. Baio.

20  Q.   Could you look at, in your book, what's identified as

21  Exhibit BZ?

22  A.   Okay.

23  Q.   Exhibit BZ is the first settlement proposal that you and

24  people at Duff & Phelps received concerning the proposal by

25  FGIC.  Isn't that correct?

**RESIDENTIAL CAPITAL, LLC, et al.**

1  A.   Yes.

2  Q.   You received it sometime in late March.  It says at the

3  bottom March 26, 2013.  Correct?

4  A.   We received it in late March.  I don't know if we received

5  it on March 26th, but we received it in late March.

6  Q.   And in fact, except for when you get to the bottom of the

7  page where it talks about percent of allowed claim realized,

8  the numbers that appear there that you had received in March of

9  2013, are the same, at least with respect to what was included

10  in the chart, as appears in page 5 of Exhibit 123?

11  A.   That's correct.

12  Q.   Okay.  So there were no changes between March and the

13  analysis that you did?

14  A.   No, page 5 is not the analysis that we did.  Page 5 was

15  meant to replicate this exact page.  So I wouldn't expect any

16  changes.

17  Q.   And they never changed that amount?  That is, FGIC never

18  made a different proposal.  It was one proposal, and you

19  analyzed one proposal.  Correct?

20  A.   The presentation on May 13th, May 15th, was with respect

21  to this proposal.  And my testimony is with regard to this

22  proposal.  Any other proposals or discussions about other

23  numbers are mediation confidential.

24  Q.   But I'm not asking about anything having to do with the

25  mediation.  Isn't it true that you only analyzed one proposal

**RESIDENTIAL CAPITAL, LLC, et al.**

1  from FGIC?

2  A.    And I said that in the context of the presentation and in

3  the context of my expert report, we're only analyzing one

4  proposal.  There may have been discussions during mediation

5  about potential different numbers.

6  Q.    I'm not asking about mediation at all.  Let me draw your

7  attention to page -- to your own deposition transcript.  Page

8  17, I asked the following question:  "Did you do any analysis

9  on any settlement offer made by FGIC other than the one that

10  appears in the May 15th presentation?

11  "A.  I don't believe so."

12      Do you see that?

13  A.    That's correct.  We did not do any other analysis of any

14  of this.

15  Q.    So that's accurate?

16  A.    That's accurate.

17  Q.    There's no analysis on anything else no matter where it

18  came from?

19  A.    That's correct.

20  Q.    Okay.  It's also true, is it not, sir, that in your

21  analysis, you did not include any amounts that FGIC may receive

22  as a result of claims that it has brought for reps and

23  warranties against other parties?  You did not include any

24  potential recoveries in evaluating how much money FGIC will

25  have available to pay policyholders.  Correct?

**RESIDENTIAL CAPITAL, LLC, et al.**

288

1    A.    I heard two different questions there.  So you'd have to

2    separate those questions so I could answer it accurately.

3    Q.    You did not include in your analysis any recoveries that

4    FGIC may receive in connection with rep and warranty claims

5    that it has brought against others, isn't that correct?

6    A.    Others, you mean non-ResCap?

7    Q.    ResCap or non-ResCap.

8    A.    I think we considered the 215 or roughly 200 million

9    dollars that FGIC would receive as part of the ResCap

10   settlement.

11   Q.    And that money would not go to the settling policyholders,

12   correct?

13   A.    Under the terms of the commutation, the number -- the

14   money does not go to the policyholders.

15   Q.    Right.  And in fact, in that -- the first proposal that

16   you received from FGIC, if you go back and look at it, BZ, FGIC

17   itself identified a net that it was planning to pay; isn't that

18   correct?

19   A.    Can you refer to me the exact page you're looking at?

20   Q.    Yes.  Do you have BZ in front of you?  It's a single-page

21   document.

22   A.    I do.

23   Q.    Okay.  And at the bottom they identify a net that they are

24   prepared to pay; isn't that correct?

25   A.    That's correct.

**RESIDENTIAL CAPITAL, LLC, et al.**

289

1  Q.   All right.  Have you seen an affidavit or declaration that

2  was prepared by Alice Chong in this matter?

3  A.   I have.

4  Q.   Can you look at the last document in your binder?  And I

5  think --

6          MR. BAIO:  Do we have an exhibit number?

7          UNIDENTIFIED SPEAKER:  GV.

8          MR. BAIO:  GZ, Your Honor.

9          UNIDENTIFIED SPEAKER:  GV in my binder, V.

10         MR. BAIO:  GV.

11         UNIDENTIFIED SPEAKER:  GV.

12         MR. BAIO:  Is it GV?

13         THE COURT:  It's GV in my binder.

14         MR. BAIO:  Then, by God, it's GV.

15 Q.   You've seen this before, correct?

16 A.   Yes.

17 Q.   Did you play any role in the preparation of it?

18 A.   No.

19 Q.   Is it your understanding -- you've read it before, though,

20 is that correct?

21 A.   I've -- I've read it, yes.

22 Q.   And do you believe it's accurate?

23 A.   Yes.

24 Q.   And you understand that your counsel produced to us, last

25 week, a hard drive that had 113 gigabytes of information; do

**RESIDENTIAL CAPITAL, LLC, et al.**

1    you know that?

2    A.    My understanding, it was not last week; it was the week

3    before last.

4    Q.    Okay.  It was on August 8th, the week before last,

5    correct.  You understand that that was delivered at that time,

6    is that correct?

7    A.    I don't know the exact date, but my understanding is the

8    week before last.

9    Q.    And if you look at the chart that appears on the last page

10    of Ms. Chong's declaration, you'll see that the hard drive file

11    is identified at the bottom left; do you see that?

12    A.    I do.

13    Q.    And that there is a series of arrows that go up, leading

14    up to your expert report where recoveries to policy holders was

15    identified as between 217 and 340 million dollars; do you see

16    that?

17    A.    I do.

18    Q.    And that chart accurately reflects the flow of information

19    up to the recovery to policyholders, correct?

20    A.    The chart is accurate, yes.

21         MR. BAIO:  Your Honor, I offer this declaration and

22    the chart into evidence?

23         THE COURT:  Any objections?

24         MR. WEITNAUER:  No objections.

25         THE COURT:  All right.  Exhibit GV, which includes

**RESIDENTIAL CAPITAL, LLC, et al.**

1   Exhibit A to it, is admitted into evidence.

2   (Alice Chong declaration was hereby marked for identification

3   as Opposing Parties' Exhibit GV, as of this date.)

4   Q.   Okay.  Sir, have you served as an expert in other matters?

5   A.   I have.

6   Q.   Was one of those matters the Celebrity Cruise case?

7   A.   Yes, we discussed it at my deposition.

8   Q.   Yes.  And in that case the Court rejected analysis, isn't

9   that correct?

10   A.   I don't know the exact terminology, but I was not -- I did

11   not -- I did not serve as an expert in the case, due to the

12   fact that the judge precluded certain experts, including me,

13   from testifying.

14   Q.   And the judge found that, "Your analysis suffers from the

15   same fatal flaws as another expert's methodology, reliance on

16   projections that were not borne out in reality."  Correct?

17   A.   I'd have to see the language that you're looking at there.

18   Q.   Can you look behind Exhibit CA?  There is the reported

19   decision, and tell me if that refreshes your recollection.  I

20   think it's CA.

21   A.   Okay.  I'm here.

22   Q.   And I was quoting from page 14.

23   A.   Okay.

24   Q.   It's the second full paragraph on the left hand side.  And

25   you'll see that it refers, if you look at the earlier page, to

**RESIDENTIAL CAPITAL, LLC, et al.**

1    Allen Pfeiffer.  "This analysis suffers from the same fatal

2    flaw as Dr. Lasater's methodology,  reliance on projections

3    that were not borne out in reality.  This defect drives the

4    entire calculation and is not repaired by identifying a lower

5    bound, using a methodology, which standing alone, might be more

6    reliable."  Do you see that?

7    A.    I do.

8    Q.    And does that refresh your recollection as to the judge's

9    ruling with respect to analysis?

10   A.    Yes.

11   Q.    Now, in this case, sir --

12           THE COURT:  This case, meaning which, Celebrity

13   Cruises or ResCap?

14   Q.    I'm sorry; our case.  In our case, did you make

15   evaluations of anticipated losses from January of 2013 for the

16   rest of the year, in evaluating whether the settlement was

17   appropriate or reasonable?

18   A.    I'm sorry, my head was in Celebrity Cruises, and then you

19   switched to this case.

20   Q.    Okay.

21   A.    Ask the question again, please.

22   Q.    Cleanse your palate, for a minute, on Celebrity Cruises;

23   now we'll talk about this case.  Did you make estimates of what

24   the claims would be, by the various policyholders in the FGIC-

25   wrapped trusts, for the period 2013?

**RESIDENTIAL CAPITAL, LLC, et al.**

1    A.    We made estimates for every year, yes.

2    Q.    Okay.  But 2013, in particular, you had used actual

3    results that appeared as of the end of 2012, and then you

4    estimated 2013 and forward, is that correct?

5    A.    Yes.

6    Q.    And what did you estimate for 2013, at the time that you

7    prepared your report and presented it to the trustees?

8    A.    I don't recall what we estimated for that year in

9    particular.

10   Q.    And have you checked to determine whether in fact the

11   losses that you projected for the entire year have already

12   occurred in the first six or seven months of this year?

13   A.    We have.  Yes, we have actually gone back and recalculated

14   the estimated claim amounts as of the end of July, and made

15   sure to provide that updated accurate assessment, on a trust-

16   by-trust basis, as part of our allocation.  And we reconfirmed

17   that our estimated future claim amount for the FGIC-wrapped

18   trusts is consistent, as of end of July -- is consistent to

19   what we estimated at the end of December 2012.

20   Q.    Except it's coming in higher, correct?

21   A.    No, like I just said, we estimated the range, and I think

22   that the low case for the claims came in slightly higher, but

23   the high case came in slightly lower.  And so, in total, the

24   mid-point was, you know, within a few million dollars of the

25   1.25, 1.3 mid-point range.

**RESIDENTIAL CAPITAL, LLC, et al.**

1  Q.   But if you don't use the low case, and just use a base

2  case, the claims are coming in higher, isn't that correct?

3  A.   No, you're confusing the terminology.   The base case

4  represents FGIC and Lazard's estimation for the -- for the

5  rehab plan.   We did not provide a base case in our stress case;

6  we, instead, provided a low scenario and a high scenario for

7  claims on the FGIC-wrapped, ResCap-sponsored trusts.   And it is

8  that estimate that we updated, and for that we have a low, we

9  have a high, we have a mid-point.   And the analysis that we

10  have done, as of the end of July, comes up with a claim

11  estimate that's consistent with what we did as of end of

12  December and it's also consistent with FGIC's estimate for

13  claims and Holtzer's affidavit.   So when you say "base case", I

14  think you're confusing --

15  Q.   I wasn't confusing it; I meant low and high.

16        THE COURT:  Let him finish --

17  Q.   Okay.   I used the wrong phrase.

18        THE COURT:  -- the answer.

19        MR. BAIO:  Sorry, Your Honor.

20        THE COURT:  Let him finish --

21        MR. BAIO:  Yes, sir.

22        THE COURT:  -- his answer.

23        MR. BAIO:  Okay.

24        THE COURT:  Let him finish.   Mr. Pfeiffer?

25  A.   I'm finished.   I'm just saying that base case is very

**RESIDENTIAL CAPITAL, LLC, et al.**

1    different than a low and a high; it's a very different -- base

2    case was provided by FGIC; we did a low and a high --

3    Q.    I understand that.

4    A.    -- of our claims.

5    Q.    The low case, in your evaluation, is one where there are

6    low claims.  That's because the economy is better, things are

7    going better, et cetera, et cetera.  That's the assumption

8    under a low case, that there will be low claims, correct?

9    A.    The low case assumes the economy is better than in the

10    high case or in the mid case, yes.

11    Q.    And yet you still use -- and I just want a yes or no, if

12    you can -- you still use as high as a twenty percent discount

13    rate in that scenario; is that correct?

14    A.    No, you're mischaracterizing what we did.

15    Q.    All right.

16            MR. BAIO:  I have no further questions.  I pass the

17    witness.

18            THE COURT:  Further cross?  Hold on, Mr. Weitnauer.

19            UNIDENTIFIED SPEAKER:  Can you give us one minute,

20    Your Honor?

21            THE COURT:  Sure.

22        (Pause)

23            UNIDENTIFIED SPEAKER:  No further cross, Your Honor.

24            THE COURT:  All right.  Mr. Weitnauer?

25            MR. WEITNAUER:  Kit Weitnauer, Your Honor, again.

**RESIDENTIAL CAPITAL, LLC, et al.**

1   CROSS-EXAMINATION

2   BY MR. WEITNAUER:

3   Q.   I want to go back to the last couple of questions that

4   counsel was asking you.  And the discount rate you applied to

5   the low case, the high case, I was a little confused on base

6   cases versus the high and low scenario.  Do you discuss the

7   application of discount rates in your direct testimony at

8   paragraph 81 to the low and the high scenario?

9   A.   Yes, we do.

10   Q.   All right.  I won't waste the Court's time.  That's what I

11   wanted to be clear was --

12        THE COURT:  Paragraph 81?

13        MR. WEITNAUER:  Paragraph 81, Your Honor, relates to

14   the last couple of questions.

15        THE COURT:  Okay.

16        MR. WEITNAUER:  Thank you.

17        THE COURT:  All right.  You're excused -- Mr. --

18        MR. KERR:  No, no.

19        THE COURT:  Mr. Kerr, are you --

20        MR. KERR:  No, no.

21        THE COURT:  You're excused, Mr. Pfeiffer.  Thank you

22   very much.

23        THE WITNESS:  Thank you.

24        MR. WYNNE:  If I could just have one moment, Your

25   Honor?

**RESIDENTIAL CAPITAL, LLC, et al.**

1            THE COURT:  Go ahead, sure.

2            MR. WYNNE:  Good morning, Your Honor.  Richard Wynne,

3    on behalf of FGIC.  Your Honor, we just have, I think, a time

4    management or procedure question --

5            THE COURT:  Sure.

6            MR. WYNNE:  -- for Your Honor.  Your Honor, we have a

7    couple of short rebuttal questions that we would call -- we

8    normally would do that at the end of their case, because we

9    anticipate possible other rebuttal questions for some things

10   that were raised on cross and in their openings.  And we've

11   reserved time, while the settling parties have agreed to that,

12   but I just wanted to raise it, Your Honor, because this is, I

13   believe, our last witness for the case-in-chief.

14           THE COURT:  You've got -- you know, you've got six

15   hours on your side.

16           MR. WYNNE:  Okay.  Your Honor --

17           THE COURT:  You'll have time --

18           MR. WYNNE:  -- then we'll just save --

19           THE COURT:  -- for rebuttal.

20           MR. WYNNE:  I didn't want to put peo -- we didn't want

21   to put people up and down, so we'll do it at the end.

22           THE COURT:  That's fine.

23           MR. WYNNE:  Thank you, Your Honor.

24           THE COURT:  Okay.  Do the proponents rest, Mr. Kerr?

25           MR. KERR:  Your Honor, Charles Kerr of Morrison &

**RESIDENTIAL CAPITAL, LLC, et al.**

298

1    Foerster on behalf of the debtors.

2              The only one item is that there is still these

3    designations and cross-designations.  Besides that --

4              THE COURT:  Subject to the designations and cross-

5    designations --

6              MR. KERR:  And I -- we apparently have some exhibits,

7    Your Honor.

8              THE COURT:  Well, if you can offer -- anybody's who's

9    going to -- for the proponents, if you're going to offer

10   exhibits, do it now.

11             MR. KERR:  Yes.

12             THE COURT:  Because what I -- other than the

13   designations and cross-designations, which I understood are

14   going to get done --

15             MR. KERR:  I understand, Your Honor.

16             THE COURT:  -- I expect you to wrap --

17             MR. KERR:  If you just give me a moment --

18             THE COURT:  Fine.

19             MR. KERR:  -- I'll confer.

20             THE COURT:  Okay.

21         (Pause)

22             MR. KERR:  One second, Your Honor.  I think they're

23   just getting a document.

24             THE COURT:  Take all the time you want; I'm counting

25   it against your side.

**RESIDENTIAL CAPITAL, LLC, et al.**

299

1           MR. KERR:  I know that, Your Honor.  Despite that,

2    we're not going to take all the time we want.

3           THE COURT:  Yeah.

4           MR. SIDMAN:  Your Honor, Howard Sidman again, for

5    FGIC.  We have three documents we want to introduce into

6    evidence at this time.  One is Exhibit 174; it is the second

7    quarter of 2013 quarterly statement of FGIC.  It was referred

8    to on Mr. Dubel's redirect, I believe, Your Honor.  Exhibit

9    174.

10          THE COURT:  Any objections?

11          MR. BAIO:  We're checking, Your Honor.

12          UNIDENTIFIED SPEAKER:  No objection, Your Honor.

13          THE COURT:  All right.  Exhibit 174 is in evidence.

14   (FGIC statement for second quarter of 2013 was hereby received

15   into evidence as Debtors' Exhibit 174, as of this date.)

16          MR. SIDMAN:  A second exhibit I want to move in at

17   this time is Exhibit 312, which is a listing of news stories

18   regarding the mediator appointment and/or the mediation.  And

19   it's a list of about, I would say, ten news stories.  It was

20   annexed to my declaration that we submitted in connection with

21   the reply in this matter, Your Honor, and it's 312.

22          THE COURT:  For what purpose are you offering it?

23          MR. SIDMAN:  Just for notice, not for the truth of the

24   matter asserted, Your Honor.

25          THE COURT:  Any objections?

**RESIDENTIAL CAPITAL, LLC, et al.**

300

1      (Pause)

2           MR. BAIO:  Your Honor, we just don't understand what

3  the purpose is of providing this as evidence.  They are

4  articles.

5           MR. SIDMAN:  Well, we can provide --

6           MR. BAIO:  So we object.

7           THE COURT:  What's the purpose, Mr. Sidman?

8           MR. SIDMAN:  The purpose is, is to understand the fact

9  that this mediation was -- people -- that the references to the

10 mediation were publicly available, and people knew that it was

11 happening.

12          THE COURT:  Can I see a copy of Exhibit 312 --

13          MR. SIDMAN:  Of course, Your Honor.

14          THE COURT:  -- rather than searching for it up here.

15          MR. SIDMAN:  There's --

16          THE COURT:  All right.  Thank you.

17          Mr. Baio, your objection?

18          MR. SIDMAN:  We could --

19          THE COURT:  Just --

20          MR. BAIO:  My objection is that this should be offered

21 and admitted for no purpose whatsoever; it's just articles.

22          THE COURT:  No, it's a list of articles; it's not even

23 the articles.

24          MR. BAIO:  It's not even the articles.

25          MR. SIDMAN:  Well, but we can --

**RESIDENTIAL CAPITAL, LLC, et al.**

301

1        THE COURT:  He's offering it for notice that there

2    were articles published.

3        MR. BAIO:  I don't see relevance or probative value of

4    this list or anything.

5        THE COURT:  Well, I --

6        MR. BAIO:  So we object.

7        THE COURT:  I mean, what I've understood so far in the

8    case is that your clients contend that -- well, I don't know

9    what -- I mean, they obviously had -- they obviously knew there

10   was a mediation going on.  I mean, that -- you don't dispute

11   that.

12       MR. BAIO:  I don't think that's the issue, Your Honor.

13       THE COURT:  Right.

14       MR. BAIO:  You don't need this.  There are public

15   filings that accomplish that.  These articles are --

16       THE COURT:  Right.  Objection to 312 is sustained.

17       MR. SIDMAN:  Okay.  Well, Your Honor, speaking of

18   public filings, the next Exhibit 313 is a listing of public

19   filings.  It's the same point, Your Honor.

20       THE COURT:  You're offering it for notice?

21       MR. SIDMAN:  For notice; that's it, Your Honor.  We're

22   happy to move in the underling documents.

23       THE COURT:  No, I don't want to --

24       MR. SIDMAN:  I didn't think software.

25       THE COURT:  Stop.  Mr. Baio?

**RESIDENTIAL CAPITAL, LLC, et al.**

302

1          MR. BAIO:  If it's for that purpose, Your Honor, no

2    objection.

3          THE COURT:  All right.  Exhibit 313 is in evidence.

4    (Listing of public filings was hereby received into evidence as

5    Debtors' Exhibit 313, as of this date.)

6          THE COURT:  Anything else, Mr. Sidman?

7          MR. SIDMAN:  No thank you, Your Honor.

8          THE COURT:  Mr. Kerr, do the proponents rest, subject

9    to the designations and cross-designations?

10         MR. KERR:  Your Honor, Charles, Kerr, Morrison &

11   Foerster.  The proponents rest, subject to the cross-

12   designations.

13         THE COURT:  All right.  Who, on the objectors, is

14   beginning?

15         MR. BAIO:  Your Honor, Joseph Baio, on behalf of the

16   investors.  We call K. Austen McQuillen to the stand.

17         THE COURT:  Thank you.  Mr. McQuillen, if you would

18   raise your right hand and be sworn?

19      (Witness sworn)

20         THE COURT:  Please have a seat.

21         Mr. Baio?

22   DIRECT EXAMINATION

23   BY MR. BAIO:

24   Q.   Sir, you have before you a declaration, executed and filed

25   on July 31st, 2013.

**RESIDENTIAL CAPITAL, LLC, et al.**

303

1      And after you pour the water.  Do you need a little more?

2  A.   I do.

3  Q.   Okay.

4          THE COURT:  Let's find out whether he's going to be up

5  there for a while before you --

6          MR. BAIO:  True.

7  Q.   And did you execute this declaration, on or about the date

8  it bears?

9  A.   I'm trying --

10  Q.   It should be right there --

11          THE COURT:  In the folder.

12  Q.   -- Mr. McQuillen, in the folder.

13  A.   Yes.

14          MR. BAIO:  Your Honor, we offer this is Mr.

15  McQuillen's affirmative testimony, direct testimony.

16          THE COURT:  Any objections?

17          MR. KERR:  No objection, Your Honor.

18          THE COURT:  All right.  Mr. McQuillen's declaration,

19  which is ECF 4425, is admitted into evidence.

20  (Mr. McQuillen's declaration, ECF 4425, was hereby received

21  into evidence, as of this date.)

22          Cross-examination?

23          MR. KERR:  No cross-examination, Your Honor.

24          THE COURT:  Anyone else?

25          You're excused.

**RESIDENTIAL CAPITAL, LLC, et al.**

304

1           Next witness?

2           Do we have a witness?

3           MR. GELFARB:  Good morning, Your Honor.  David

4    Gelfarb, on behalf of objector Freddie Mac.

5           Freddie Mac calls Ms. Gina Healy to the stand.

6           THE COURT:  Okay.  Ms. Healy, why don't you come on

7    up?  Go ahead up to the witness stand.  Raise your right hand.

8        (Witness sworn)

9           THE COURT:  Please have a seat.

10          MR. GELFARB:  Your Honor, David Gelfarb, again, on

11   behalf of objector Freddie Mac.

12          Your Honor, Freddie Mac offers Ms. Healy's declaration

13   as her direct testimony in this matter.

14          THE COURT: All right.  Let me -- hang on.  All right.

15   What I have in front of me is the declaration of Gina Healy in

16   support of, et cetera, which is dated July 31, 2013.

17          Mr. Kerr?

18          MR. KERR:  Yeah, no objection.

19          THE COURT:  All right.  It's in evidence.

20   (Ms. Gina Healy's declaration was hereby received into

21   evidence, as of this date.)

22          MR. GELFARB:  And Your Honor, just so that we may have

23   a moment or two to clarify things with exhibits, if it's okay

24   with Your Honor to proceed with cross-examination and we'll

25   move the exhibits in when cross is finished?

**RESIDENTIAL CAPITAL, LLC, et al.**

1          UNIDENTIFIED SPEAKER:  I don't care.

2          THE COURT:  Okay.

3          MR. KERR:  Your Honor, that's fine.

4          THE COURT:  That's fine.

5          MR. GELFARB:  Thank you, Your Honor.

6          THE COURT:  Cross-examination?

7          MR. BENNETT:  Your Honor, we do have a binder -- it's

8    Steven Bennett from Jones Day for FGIC.  We have a cross-

9    binder.

10          THE COURT:  Okay.  Come on up.

11          Thank you, Mr. Sidman.

12          UNIDENTIFIED SPEAKER:  And one for Mr. Gelfarb?

13          THE COURT:  I'm going to be lost here soon.

14          UNIDENTIFIED SPEAKER:  Can we get one for Mr. Gelfarb,

15    please?  Thank you.

16          THE COURT:  Just to be clear, with the Healy

17    declaration, it should be filed on ECF.  Okay?  I don't see

18    it -- if it has, I don't see it, at least on the copy that's in

19    the binder.  I want all of the -- all of the testimony, either

20    in the transcript or in the declarations.  So it either has to

21    be marked as an exhibit or put on ECF.  It actually should be

22    put on ECF.

23          UNIDENTIFIED SPEAKER:  Your Honor, we have filed it on

24    ECF in redacted form.

25          THE COURT:  Okay.

**RESIDENTIAL CAPITAL, LLC, et al.**

306

 1            UNIDENTIFIED SPEAKER:  In the binder --

 2            THE COURT:  Okay.  Well, do you know what the number

 3   is, by any chance?

 4            UNIDENTIFIED SPEAKER:  I have all that --

 5            MR. BENNETT:  I think the ECF number is 4691.

 6            THE COURT:  4691.  Thank you.  Okay.

 7            MR. BENNETT:  That's actually the first tab in the

 8   cross-binder, Your Honor.

 9            THE COURT:  Great.  I see.  Thank you.

10            MR. BENNETT:  May I proceed?

11            THE COURT:  Please do.  Tell me your name again; I'm

12   sorry.

13            MR. BENNETT:  Steven Bennett --

14            THE COURT:  Okay.

15            MR. BENNETT:  -- with Jones Day --

16            THE COURT:  Okay.

17            MR. BENNETT:  -- for FGIC.

18            THE COURT:  Go ahead with cross.  Fine.

19            MR. BENNETT:  May I proceed?

20            THE COURT:  Yes.

21            MR. BENNETT:  Okay.

22   CROSS-EXAMINATION

23   BY MR. BENNETT:

24   Q.   Ms. Healy, you're the vice president of credit risk

25   management at Freddie Mac, correct?

**RESIDENTIAL CAPITAL, LLC, et al.**

1   A.   Correct, yes.

2   Q.   And you're responsible for negotiating credit workouts and

3   restructurings, correct?

4   A.   Correct.

5   Q.   And Freddie has had claims unpaid from FGIC since about

6   2009; is that right?

7   A.   Yes.

8   Q.   And those are significant claims, in your view, correct?

9   A.   Yes.

10  Q.   And the current face amount of those claims is about 522

11  million dollars, is that right?

12  A.   The outstanding UPB, correct?

13  Q.   And the claim that Freddie has against FGIC was important

14  enough that Freddie hired counsel, in 2010, to assist in

15  enforcing that claim, correct?

16  A.   Can you explain your question?  You're talking about their

17  steering committee that was established --

18  Q.   Right, yeah --

19  A.   -- is that what you're referring to?

20  Q.   Freddie Mac hired McKool Smith in 2010, correct?

21  A.   Yes.

22  Q.   And that was for purposes of enforcing, potentially, its

23  claim, in connection with any FGIC restructuring, correct?

24  A.   Yes.

25  Q.   And Freddie Mac also has in-house counsel, correct?

**RESIDENTIAL CAPITAL, LLC, et al.**

308

1   A.   Yes.

2   Q.   And Freddie Mac's in-house counsel have been involved in

3   claims against FGIC, correct?

4   A.   Yes.  Again, it was -- the goal was to have a global

5   restructuring for the rehabilitation plan that sort of pays out

6   the claims in a policyholder -- like a pre-packaged bankruptcy

7   solution.

8   Q.   Okay.  And that was the steering committee that negotiated

9   with FGIC, is that right?

10  A.   Yes.

11  Q.   And Freddie Mac joined that steering committee in 2010, is

12  that right?

13  A.   That is correct.

14  Q.   And Freddie Mac was a key participant in the steering

15  committee, correct?

16  A.   Yes.

17  Q.   And the steering committee was, itself, separately,

18  represented by the law firm of Bingham McCutchen, correct?

19  A.   Yes.

20          MR. GELFARB:  Objection.

21          THE COURT:  Overruled.

22  Q.   That was in addition to McKool Smith, correct?

23  A.   McKool Smith represented Freddie Mac, so in terms of our

24  direct dealings and our counsel, it was McKool Smith

25  representing our interest in the case.

**RESIDENTIAL CAPITAL, LLC, et al.**

1   Q.    Okay.   So the Bingham representation was for the whole

2   steering committee, correct?

3   A.    At --

4           MR. GELFARB:  Objection.

5           THE COURT:  Overruled.

6   Q.    And there was also a financial advisor for the whole

7   steering committee, correct?

8   A.    Yes.

9   Q.    That was Rothschild, correct?

10  A.    Yes.

11  Q.    And the steering committee, as far as you know, continued

12  to have communications as late as April of 2013, correct?

13  A.    Only with respect to questions that we raised.  As we were

14  getting near the approving the rehabilitation plan, there were

15  certain concerns and questions we had about offsets, that in

16  terms of what the policyholders would ultimately, you know,

17  receive under the proposed payouts, there was some potential

18  cash offsets.  So we needed to make sure we understood how that

19  structure worked, and we had some conversations with John

20  Dubel, as well as some of the trustees around that.

21  Q.    All right.  So that's the steering committee having

22  communications about the FGIC rehabilitation, as late as April

23  of 2013, correct?

24  A.    Again, only with respect to that aspect.

25  Q.    Okay.

**RESIDENTIAL CAPITAL, LLC, et al.**

310

1   A.   That's all that we were -- with questions we had raised

2   that were materially changing ours, we asked what other issues

3   there were.  At the time, to our knowledge, the only thing that

4   was sort of presenting an issue was the right of offsets.

5   Q.   Okay.  You were aware of the filing of the ResCap

6   bankruptcy, correct?

7   A.   Yes, I was.

8   Q.   And preservation of Freddie Mac's claims within the ResCap

9   bankruptcy was important, correct?

10  A.   Yeah, we had a number of claims in the ResCap

11  bankruptcies.  I worked on, for example, the transfer of the

12  mortgage servicing rights from ResCap to Ocwen for the thirty

13  billion dollar underlying our mortgages.  And we -- so the

14  elements that I was responsible for, yes, we worked on those.

15  Q.   Okay.  So the Ocwen transaction, in particular, was an

16  important part of the ResCap bankruptcy that you paid attention

17  to, correct?

18  A.   Yes.

19  Q.   And McKool Smith also advised Freddie Mac with respect to

20  the ResCap bankruptcy, is that right?

21          MR. GELFARB:  Objection.

22          THE COURT:  Sustained.

23  A.   Yes, that's correct.

24          THE COURT:  I sustained the objection.

25          THE WITNESS:  I'm sorry, oh, okay.  Okay.

**RESIDENTIAL CAPITAL, LLC, et al.**

311

1  Q.   Well, you did have counsel in connection with the ResCap

2  bankruptcy --

3          THE COURT:  Ask your next question.  Let's go.

4          MR. BENNETT:  That's the question.

5          THE COURT:  Come on, ask --

6          MR. BENNETT:  I'm not asking about specifics of

7  advice, Your Honor.

8          THE COURT:  She already said she had counsel.  Let's

9  go.

10          MR. BENNETT:  Okay.

11  Q.   And if you could go to, please, tab 10 in your binder,

12  please.

13  A.   Okay.

14  Q.   And that's Exhibit 204, you see that?

15  A.   Yes.

16  Q.   And that's a "Notice of appearance and demand for service

17  of papers" that was filed on behalf of Freddie Mac, correct?

18  A.   Yes.

19  Q.   And if you go to the second page there, on Exhibit 204,

20  there's a listing of the individuals who are supposed to

21  receive notice; you see that?

22  A.   Yes.

23  Q.   And that included folks at McKool Smith, and in the

24  associate general counsel's office at Freddie Mac, correct?

25  A.   Okay.

**RESIDENTIAL CAPITAL, LLC, et al.**

312

1   Q.   And what they asked for was copies of all the pleadings,

2   documents, and notices in connection with the case, correct?

3   A.   I haven't seen this before, but okay, yes, I see that.

4   That's what it says.

5           MR. BENNETT:  Your Honor, we'll offer Exhibit 204.

6           THE COURT:  Any objection?

7           MR. GELFARB:  Objection, Your Honor.  It's a court

8   filing.  It should just be admitted as a court document, court

9   exhibit.

10          THE COURT:  No, he's offered it.  Do you have an

11  objection to the exhibit?

12          MR. GELFARB:  I do, Your Honor.

13          THE COURT:  What's the objection?

14          MR. GELFARB:  It's simply a court exhibit.  I mean --

15          THE COURT:  Overruled.  In evidence.

16  (List of individuals who are supposed to receive notice was

17  hereby received into evidence as Debtors' Exhibit 204, as of

18  this date.)

19  Q.   And you did expect McKool Smith to monitor developments in

20  the ResCap bankruptcy, correct?

21          MR. GELFARB:  Objection.

22          THE COURT:  You can answer that yes or no.

23  A.   Yes, the parts that we --

24          THE COURT:  Just --

25  A.   -- were --

**RESIDENTIAL CAPITAL, LLC, et al.**

313

1          THE COURT:  Just answer it --

2    A.    Yes.

3          THE COURT:  -- yes or no, if you can.

4    A.    Okay.  Yes.

5    Q.    You've heard of a lawyer named Kathy Patrick?

6    A.    I have heard of her, yes.

7    Q.    And Kathy Patrick has represented Freddie in connection

8    with some private-label securities cases, correct?

9          MR. GELFARB:  Objection.

10         THE COURT:  Overruled.

11   A.    That -- yes, that's my understanding.  But again, that's

12   not something that I directly worked on.  There are other

13   members that may have better knowledge of that.

14   Q.    And to your knowledge, nobody at Freddie Mac reached out

15   to Kathy Patrick for representation in the ResCap case,

16   correct?

17         MR. GELFARB:  Objection.

18         THE COURT:  Sustained.

19   Q.    To your knowledge, Freddie Mac never attempted to join the

20   Kathy Patrick noteholder group, correct?

21         MR. GELFARB:  Objection.

22         THE COURT:  Overruled.

23   A.    I don't know the answer.  I don't know.

24   Q.    And you're aware of the existence of an unsecured

25   creditors' committee in the ResCap bankruptcy, correct?

**RESIDENTIAL CAPITAL, LLC, et al.**

314

1    A.    Yes.

2    Q.    And you know that there was some contact between

3    representatives of Freddie Mac and the unsecured creditors'

4    committee in connection with the ResCap bankruptcy, correct?

5    A.    Yes.  So again, the element that we were sort of working

6    through, in terms of transferring the mortgage assets, we had

7    some calls with the unsecured creditors' committee in

8    addressing the concerns around our proof of claim.

9    Q.    And --

10   A.    So that's how I know the dealings with them.

11   Q.    And you never directed anyone to reach out to the

12   unsecured creditors' committee to discuss other ongoing

13   developments in the bankruptcy, correct?

14           MR. GELFARB:  Objection, Your Honor, just to the

15   extent I -- my only objection is to the extent it implicates

16   any form of legal representation.

17           THE COURT:  It didn't call for any.

18           Did you instruct anybody to reach out to the

19   creditors' committee?

20           THE WITNESS:  I did not, no.

21   Q.    And you claim that you were personally not aware of the

22   mediation in the ResCap bankruptcy; is that right?

23   A.    I was not.

24   Q.    And you don't know whether there were other individuals at

25   Freddie Mac who were aware of the mediation, correct?

**RESIDENTIAL CAPITAL, LLC, et al.**

315

 1   A.    To my knowledge, based on the colleagues I've talked to,

 2   no -- nobody I knew was involved in any of the mediation

 3   discussions.

 4           THE COURT:  That wasn't the question.

 5           THE WITNESS:  It wasn't?

 6           THE COURT:  Can you ask your question --

 7   A.    Can you repeat your question?

 8   Q.    Sure.  You don't know whether there were other individuals

 9   at Freddie Mac who were aware of the mediation, correct?

10   A.    I don't know.

11   Q.    And you're familiar with something called a Federal

12   Housing Finance Agency; is that right?

13   A.    Yes.

14   Q.    That was the agency that placed Freddie Mac into

15   conservatorship, is that correct?

16   A.    Um-hum.

17           MR. GELFARB:  Objection, Your Honor.

18           THE COURT:  Overruled.

19           MR. GELFARB:  I believe it was an act of Congress that

20   would do that.

21           MR. BENNETT:  It's in her declaration, Your Honor.

22           THE WITNESS:  Yes.

23   Q.    Okay.  Could you go to Exhibit 310 -- it's at tab 9 --

24   please?

25   A.    Okay.

**RESIDENTIAL CAPITAL, LLC, et al.**

316

1  Q.   And you'll see there an affirmation of Christopher P.

2  Johnson in the state court proceeding.  Do you see that?

3  A.   Yes.

4  Q.   And you know that Mr. Johnson is affiliated with the

5  Federal Housing Finance Agency?

6          MR. GELFARB:  Objection, Your Honor.  That's not what

7  the affirmation of Mr. Johnson says at all.

8          THE COURT:  Sustained.

9          MR. BENNETT:  Well, he says that he's counsel of

10 record for the Federal Housing Finance Agency.

11         THE COURT:  Well, that wasn't what you asked.

12         MR. BENNETT:  Do you see that in paragraph 1?

13         THE COURT:  That wasn't what you asked.

14         MR. BENNETT:  Okay.  That's fine.

15 Q.   Do you see that in paragraph 1 of his statement?

16 A.   Yes.

17 Q.   Okay.  And you do know that, according to Mr. Johnson's

18 statement, he attended various sessions of the mediation,

19 correct?

20         MR. GELFARB:  Objection, Your Honor.

21         THE COURT:  Well, the affirmation is not in evidence.

22         MR. BENNETT:  We'll offer it, Your Honor.

23         THE COURT:  Any objection?

24         MR. GELFARB:  No objection, Your Honor.

25         THE COURT:  All right.  In evidence.

**RESIDENTIAL CAPITAL, LLC, et al.**

317

1   (Affirmation of Christopher P. Johnson was hereby received into

2   evidence as Debtors' Exhibit 310, as of this date.)

3          THE COURT:  All right.  Now ask your question again.

4          MR. BENNETT:  Right.

5   Q.   So you do know that, according to Mr. Johnson, he attended

6   several of the court-ordered mediation sessions, correct?

7   A.   I was not aware of that, but I guess I'm reading it now,

8   to kind of see what his statement says.

9   Q.   Okay.  You know that FGIC set up a Web site regarding the

10  rehabilitation proceedings, correct?

11  A.   Yes.

12  Q.   And you understood that the rehabilitation Web site

13  provided information to all policyholders, informing them of

14  key developments, correct?

15  A.   All policyholders that were not involved as part of the

16  steering committee, right?  So the parties that were not

17  participants directly to the terms and conditions of the

18  steering committee, our understanding was it was going to be

19  set up as a mechanism to communicate the plan, the

20  rehabilitation plan to all policyholders.  But it was always

21  our expectation that any significant changes to the plan would

22  be consulted with the members of the steering committee,

23  including Freddie Mac.

24  Q.   Well, take a look at tab 4, please.  It's Exhibit 206.  To

25  your knowledge, that's a printout from the FGIC Web site with

**RESIDENTIAL CAPITAL, LLC, et al.**

318

1   regard to the rehabilitation proceeding, correct?

2   A.   Okay.

3         MR. BENNETT:  And we'll offer 206, Your Honor.

4         MR. GELFARB:  It's hearsay, Your Honor.

5         THE COURT:  Sustained.

6         MR. BENNETT:  It's not for any truth; it's for --

7         THE COURT:  What are you offering it for?

8         MR. BENNETT:  Only offering it for the fact that there

9   was a Web site that listed information and it was publicly

10   available.

11         MR. GELFARB:  We have no authentication of the

12   contents of the Web site.

13         MR. BENNETT:  She just did.

14         THE COURT:  She did.  All right.  Objection's

15   overruled.  It's in evidence.

16   (Printout from the FGIC Web site with regard to the

17   rehabilitation proceeding was hereby received into evidence as

18   Debtors' Exhibit 206, as of this date.)

19   Q.   And you know that that was a public Web site, correct?

20   A.   Okay.

21         THE COURT:  Well, do you -- you have to be clear.

22   A.   I have not gone into the Web site.  If that's your

23   question, I have not gone into it.  I know, again, as I

24   mentioned, there was indication that there was a Web site that

25   was going to be set up.  I personally have not -- because

**RESIDENTIAL CAPITAL, LLC, et al.**

1  again, our expectation is, it was the conversations we've had

2  as part of the steering committee to discuss any of the

3  contents and substantive changes to the plan.  That's it.

4  Q.   Okay.  Part of the negotiation with the steering

5  committee -- between the steering committee and Freddie Mac

6  concerned discussions of commutation of policies, correct?

7  A.   Can you repeat your question again?

8  Q.   Yeah.  Part of the negotiation between the steering

9  committee and FGIC --

10  A.   Uh-huh.

11  Q.   -- concerned discussion of commutation of policies.

12  A.   Only to the extent of CDS and some of the reinsurance

13  commutations.

14  Q.   And you did know that, as part of the rehabilitation plan,

15  there would be settlements to commute certain FGIC exposures,

16  correct?

17       MR. GELFARB:  Objection.

18       THE COURT:  Overruled.

19  A.   It was never contemplated, to my knowledge, any of the

20  RMBS securities, those policies would be commuted.  So again,

21  it was just the CDS, in terms of to get some -- given the

22  pri -- we were not clear about the priority of those payments,

23  that we wanted to make sure that those commutations, which John

24  Dubel had discussed some of the key economic terms and how that

25  was going to be approached, and it was on a pari passu basis

**RESIDENTIAL CAPITAL, LLC, et al.**

1  with the payments to be made for the RMBS security holders.

2  Q.   Could you take a look at tab 11, please?  That is Exhibit

3  209.

4  A.   Okay.

5  Q.   These are copies of some orders from the rehabilitation

6  proceedings confirming commutation deals, correct?

7  A.   Yes.

8         MR. GELFARB:  Objection, Your Honor.  It's asking her

9  to -- she's not an attorney.  She's not here as an attorney.

10 She's not here to interpret, Judge --

11        THE COURT:  Sustained.

12 Q.   Well, you know that these were documents that were filed

13 in connection with the rehabilitation proceeding, correct?

14        THE COURT:  Do you -- have you seen these before?

15 Q.   You saw them at your deposition, didn't you?

16 A.   Yeah, we -- I saw them for the deposition for the first

17 time.  But I do know in general that they were, you know, some

18 commutations, again, related to CDS and some of the reinsurance

19 transactions that was being contemplated.  And as to the course

20 of since the steering committee met, as they were being

21 executed, we were getting information on that.

22        MR. BENNETT:  Okay.  We'll offer 209, Your Honor.

23        THE COURT:  All right.  In evidence.

24 (Commutations related to CDS were hereby received into evidence

25 as Debtors' Exhibit 209, as of this date.)

**RESIDENTIAL CAPITAL, LLC, et al.**

321

1    Q.    And one of the commutation orders that you're aware of

2    involved an entity called Aardvark (ph.) Funding, correct?

3    A.    Where are you?  I'm sorry.

4    Q.    If you go to Exhibit 209 at page 9 --

5    A.    Okay.

6    Q.    -- right in the middle there --

7    A.    Yeah.

8    Q.    -- it references Aardvark Funding.  You see that?

9    A.    Okay.  Yes.

10   Q.    And that was a commutation deal that took place in late

11   2012, correct?

12         MR. GELFARB:  Objection, Your Honor.

13         THE COURT:  Well, she can answer the question.  I

14   mean, do you know whether there was a commutation with

15   Aardvark?

16   A.    I was aware of just CDS commutations in general.  I can

17   not recall the specific Aardvark.  But I think I -- it might

18   ring a bell.  So, yeah.

19   Q.    Well, could you go to tab 2, please?  It's your

20   deposition, Exhibit FJ at page 127.

21   A.    Okay.

22   Q.    You were under oath at that time, correct?

23   A.    Yes, as I am right now.

24   Q.    Okay.  And were you asked these questions and did you give

25   this answer?

**RESIDENTIAL CAPITAL, LLC, et al.**

322

1  "Q.   Just with regard to Radian (ph.) and Aardvark, sometime in

2  the December 2012, January 2013 time frame, Freddie Mac was

3  aware of those commutation agreements, correct?"

4       There's an objection, and then your answer, "Yes."

5  A.   Yeah.

6  Q.   And that's true testimony, correct?

7  A.   Yeah.

8  Q.   Okay.  And --

9  A.   Again, I look at many settlements --

10       THE COURT:  You've answered the question.

11  A.   -- and settlements.  So --

12       THE COURT:  Go ahead.

13       THE WITNESS:  Sorry.

14       THE COURT:  Ask your next --

15       MR. BENNETT:  Yes.

16       THE COURT:  -- question.

17  Q.   The Aardvark deal actually did involve a conduit

18  arrangement for an RMBS transaction.  Isn't that true?

19       MR. GELFARB:  Object to the form.

20       THE COURT:  He's doing cross-examination.  The form is

21  entirely proper.

22       Do you know the answer to his question?

23  A.   I do not know.  No, I don't -- I was not aware of that.

24  My understanding was it was another CDS type of commutation.

25  Q.   Okay.  Could you look at Exhibit 318, please?

**RESIDENTIAL CAPITAL, LLC, et al.**

1      THE COURT:  Where do I find that?

2      THE WITNESS:  Where is that?

3      MR. BENNETT:  It's tab 12, Your Honor.

4      THE COURT:  Thank you.

5  Q.   This one, you'll see, is an e-mail from Dana Kaufman at

6  Weil Gotshal to John Briody at McKool Smith and Peter Goodman

7  at McKool Smith and others, November 7, 2012, concerning

8  Aardvark.  You see that?

9  A.   Yes.

10  Q.   And to the best of your knowledge, that's an e-mail that

11  actually was sent to your counsel about the termination

12  agreement, correct?

13      MR. GELFARB:  Objection.

14      THE COURT:  Sustained unless you're going to establish

15  a foundation for this.

16      Have you seen this e-mail before?

17      THE WITNESS:  I have not, no.

18      THE COURT:  Sustained.

19      MR. BENNETT:  Well, I think it's self authenticating,

20  Your Honor.  So we'll for offer Exhibit --

21      THE COURT:  It isn't to me.

22      MR. BENNETT:  Say again?

23      THE COURT:  It isn't self authenticating to me.

24      MR. BENNETT:  Okay.

25  Q.   Well, try 317 at tab 13, please.  You'll see that one's an

**RESIDENTIAL CAPITAL, LLC, et al.**

324

1  e-mail from Dana Kaufman to Peter Goodman and John Briody,

2  among others, at McKool Smith, June 18, 2013.  To the best of

3  your knowledge, that's an e-mail that was sent to your

4  counsel --

5          MR. GELFARB:  Objection --

6  Q.   -- correct?

7          MR. GELFARB:  Your Honor.

8          THE COURT:  Do you know what --

9          THE WITNESS:  I'm -- again.  I'm not a party to this

10  e-mail, so --

11          THE COURT:  Have you seen it before?

12          THE WITNESS:  I have not seen it before.

13          THE COURT:  Sustained.

14          MR. BENNETT:  Okay.  If we need to, I guess, we'll put

15  that in --

16          THE COURT:  Well, I'm --

17          MR. BENNETT:  -- on rebuttal.

18          THE COURT:  What you do is up to you, but the

19  objection is sustained.

20          MR. BENNETT:  Thank you, Your Honor.  No further

21  questions.

22          THE COURT:  All right.  Further cross?

23          MR. DINE:  Yes, Your Honor.

24          THE COURT:  You're a new player.  You are --

25          MR. DINE:  I am a new player, Your Honor.  Jeffrey

**RESIDENTIAL CAPITAL, LLC, et al.**

325

1    Dine, Seward and Kissel for U.S. Bank as indenture trustee.

2              THE COURT:  Okay.

3    CROSS-EXAMINATION

4    BY MR. DINE:

5    Q.   Ms. Healy, in your direct testimony at paragraph 15 --

6    that's tab 1 of your binder.

7    A.    What page is that?

8    Q.    Paragraph 15.

9              THE COURT:  Page 6.

10             THE WITNESS:  Oh.  Thank you.

11   Q.   You say that FGIC's most recent financial --

12             THE COURT:  Let her get there.  Let her get there --

13             THE WITNESS:  Thank you.

14             THE COURT:  -- okay?

15             MR. GELFARB:  Where are we, Mr. Dine?

16             MR. DINE:  Paragraph 15 of the direct.

17             MR. GELFARB:  And what exhibit is that?

18             THE COURT:  It's the first thing in your binder --

19             MR. GELFARB:  Sorry.

20             THE COURT:  -- Mr. Gelfarb.

21             THE WITNESS:  Oh.  I'm sorry, page 6.  Okay.  Hang on.

22             THE COURT:  We'll wait until --

23             THE WITNESS:  Okay.

24             THE COURT:  -- everybody gets -- you got it?

25             THE WITNESS:  Yes.

**RESIDENTIAL CAPITAL, LLC, et al.**

1          THE COURT:  Go ahead.  All right.

2          THE WITNESS:  Yeah.

3          THE COURT:  Go ahead, Mr. Dine.

4          MR. DINE:  Thank you.

5  Q.   So in looking at paragraph 15 of your direct testimony,

6  you say in there that -- in the second sentence, "FGIC's most

7  recent financial disclosures in the rehabilitation proceeding,

8  project that policyholders will receive present-value

9  recoveries on FGIC policy claims in the amount of twenty-seven

10  to thirty cents on the dollar."  Is that correct?

11  A.   Yes.

12  Q.   And the disclosure you were referring to, twenty-seven to

13  thirty cents on the dollar, was an estimate, not a certainty,

14  correct?

15  A.   Well, it was based on an expected loss, and --

16          THE COURT:  Could --

17  A.   -- again --

18          THE COURT:  Could you answer the --

19  A.   -- we expected a case --

20          THE COURT:  Could you just answer the question?  If

21  your counsel --

22  Q.   It was --

23          THE COURT:  -- wants.

24  Q.   -- an estimate, not a certainty, correct?

25  A.   Yes.

**RESIDENTIAL CAPITAL, LLC, et al.**

1  Q.    Thank you.  And so if we turn to paragraph 16 in your

2  direct testimony--

3  A.    Um-hum.

4  Q.    -- where you say, "It is Freddie Mac's understanding that

5  under the rehabilitation plan Freddie Mac is to receive a

6  present-value recovery of twenty-seven to thirty cents on the

7  dollar," you don't really mean that it's certain that Freddie

8  Mac will receive that amount?

9  A.    As a business person, I'm talking about high probability

10  of recovery.  And given that that was the -- when you look at

11  the economic conditions, first of all, the whole overall plan

12  was based upon what is -- you know, seeking --

13  Q.    That's not really --

14  A.    -- the advantage --

15  Q.    -- my question.

16  A.    -- of long date and short dated of --

17        THE COURT:  Let her finish her answer.

18  A.    -- policyholders.  And so really, at twenty-seven to

19  thirty cents, that was designed over -- what is it -- over

20  twelve or eighteen months ago.  If you look at since, if

21  anything, the economic recovery has --

22        THE COURT:  Okay, let's --

23  A.    -- significantly improved.  So --

24        THE COURT:  You've answered the question.

25  A.    This is my expectation of --

**RESIDENTIAL CAPITAL, LLC, et al.**

1           THE COURT:  Stop.

2           THE WITNESS:  Okay.

3           THE COURT:  Ask your next question.

4    Q.   It was an estimate, not a certainty.

5           THE COURT:  Can you answer that a yes or no?

6    A.   It was -- yes.

7    Q.   And in fact, in paragraph 18, you say that it was your

8    understanding from the Miller affidavit that FGIC policyholders

9    would very likely recover twenty-seven to thirty cents on the

10   dollar.  Is that correct?

11   A.   Yes.

12   Q.   And the Miller affidavit does not itself say "very

13   likely," does it?

14   A.   Again, that's my probability of recovery.

15   Q.   But not Mr. Miller's?

16   A.   Okay.

17   Q.   All right.  So Ms. Healy, there is no settlement number

18   below twenty-eight cents on the dollar that Freddie Mac would

19   consider to be in the best interests of the trusts and the

20   holders.

21           MR. BENNETT:  Objection.

22           THE COURT:  Overruled.

23   A.   Sorry.  Can you repeat the question again?

24   Q.   There is no settlement number below twenty-eight cents on

25   the dollar that Freddie Mac would consider to be in the best

**RESIDENTIAL CAPITAL, LLC, et al.**

1  interests of the trusts and the holders.  Is that correct?

2  A.   At this point we were not asked to even to even opine on

3  that.

4       THE COURT:  Could you answer the question that's been

5  asked?

6  A.   Yes, that's correct.

7  Q.   Is --

8  A.   Because I've got an obligation as a -- to the tax payers,

9  so -- and again, if you look at Miller's --

10       THE COURT:  Stop.

11       THE WITNESS:  Oh.  Okay.

12       THE COURT:  Okay.  Your counsel can -- if he wants to

13  draw out your --

14       THE WITNESS:  Okay.

15       THE COURT:  -- testimony --

16       THE WITNESS:  Okay.

17       THE COURT:  -- on redirect, he can do that.  So let's

18  just try and confine yourself to the questions Mr. Dine's

19  asking.

20       THE WITNESS:  Okay.

21       THE COURT:  All right.  Go ahead.  Ask the next

22  question.

23  Q.   So just to be clear, there is no number below twenty-eight

24  cents?

25  A.   Right now, we want to entitle -- no.  We want to entitle

**RESIDENTIAL CAPITAL, LLC, et al.**

330

1   to what the policy holders and going to benefiting under the

2   plan.

3          MR. DINE:  Thank you.

4          THE COURT:  All right.  Any other cross-examination?

5          Redirect?

6   REDIRECT EXAMINATION

7   BY MR. GELFARB:

8   Q.   Ms. Healy, you had discussions with John Dubel in

9   connection with the steering committee, correct?

10  A.   Yes.

11         MR. BENNETT:  Objection, Your Honor; beyond the scope.

12         THE COURT:  I don't know.  Overruled.

13  Q.   Did Mr. Dubel ever discuss the subject of commutation of

14  the RMBS policies?

15  A.   No, he did not.

16  Q.   I believe Mr. Bennett showed you Exhibit 204.  That should

17  be in your binder.  That was the notice of appearance.  Do you

18  recall that?

19  A.   What tab was that on?

20  Q.   I believe that's following tab number 10.

21  A.   Okay.

22  Q.   Do you recall Mr. Bennett showed you that a few moments

23  ago?

24  A.   Yes.

25  Q.   Do you have any understanding of whether that -- the

**RESIDENTIAL CAPITAL, LLC, et al.**

1  filing of that document entitled you to receive information as

2  to what was going on in the ResCap mediation?

3          MR. BENNETT:  Objection, Your Honor.

4          THE COURT:  Overruled.

5  A.   No.

6  Q.   Did you have reason to believe that you were already at

7  the negotiating table during the months that the mediation was

8  going on?

9          THE COURT:  I don't understand --

10         MR. BENNETT:  Objection.

11         THE COURT:  -- the question.  Ask another question.

12 Q.   Was it Freddie Mac's understanding throughout the course

13 of the discussions leading to the enactment of the FGIC

14 rehabilitation plan that Freddie Mac was occupying a seat at

15 the negotiating table?

16 A.   Yes.  Over the past three years we'd been working on

17 active negotiations with FGIC as part of the steering

18 committee.  So again, any material changes, we were expected to

19 be part of the negotiating table.

20 Q.   Approximately how much in claims has Freddie Mac asserted

21 in connection with this matter, if you know?

22 A.   Our holdings, again, are 500 million.  And we have at

23 least, I would say, over a 100 million in losses at this

24 point -- our expectation.

25 Q.   And can you briefly tell --

**RESIDENTIAL CAPITAL, LLC, et al.**

1              THE COURT:  Did you also have a cure claim?  I just --

2    I'm not sure.  Did Freddie Mac also --

3              THE WITNESS:  With the ResCap?

4              THE COURT:  Yes.

5              THE WITNESS:  Yes, we did.

6              THE COURT:  Yeah.  You're not talking about the cure

7    claims.  You're talking about something different.

8              THE WITNESS:  You're talking about with ResCap FGIC?

9              MR. GELFARB:  ResCap, Your Honor.  Yes --

10             THE WITNESS:  FGIC?

11             MR. GELFARB:  -- for ResCap.

12             THE WITNESS:  FGIC-wrapped securities?

13             MR. GELFARB:  Yes.

14             THE WITNESS:  Is that what you're --

15             MR. GELFARB:  Yes.

16             THE WITNESS:  -- talking about?  Yeah.

17   Q.   And what is the amount of the holdings of Freddie Mac in

18   FGIC-wrapped securities that are covered within the ResCap

19   bankruptcy?

20   A.   It's approximately 500 million.

21             MR. GELFARB:  Okay.  No further redirect.  We would

22   like to enter some exhibits unless there's, of course, further

23   recross, or any recross.

24             THE COURT:  Well, whether or not there's -- do wish to

25   offer -- if you're going to offer exhibits, go ahead and offer

**RESIDENTIAL CAPITAL, LLC, et al.**

333

1    your exhibits.

2              MR. GELFARB:  All right.  We would like to enter, Your

3    Honor, Exhibit W, Exhibit GX --

4              THE COURT:  GX or X?

5              MR. GELFARB:  GX, I believe, Your Honor.

6              THE COURT:  Okay.

7              MR. GELFARB:    That's the --

8              THE COURT:  Yeah, there's a -- go ahead.

9              MR. GELFARB:  Thank you, Your Honor.

10              THE COURT:  I just want to get the list right.

11              MR. GELFARB:  Yes, Your Honor.  That's why I'm trying

12    to go as slowly as I can.   Exhibit 205, Exhibit 208, Exhibit

13    209, Exhibit 212, Exhibit 216, and that's it, Your Honor.

14              THE COURT:  All right.  Just let me make sure.  What I

15    wrote down is W, GX, 205, 208, 209, 212, and 216.  Do I have

16    that list right?

17              MR. GELFARB:  That sounds right to us --

18              THE COURT:  Mr. Bennett?

19              MR. GELFARB:  Your Honor.  Just one more time to

20    reiterate --

21              THE COURT:  No, we don't have to do it one more time

22    if I read it correctly.  All right.

23              MR. GELFARB:  Yes, that's --

24              THE COURT:  Any objections?

25              MR. GELFARB:  -- correct, Your Honor.

**RESIDENTIAL CAPITAL, LLC, et al.**

334

1          MR. KERR:  One second, Your Honor.

2          THE COURT:  Yes.

3          MR. KERR:  We're just trying to --

4       (Pause)

5          MR. KERR:  Your Honor, we object to Exhibits W, GX,

6   and 216 on hearsay grounds.  W is an affidavit by Ms. Healy.

7          THE COURT:  Let me look at it.

8       (Pause)

9          THE COURT:  The objection to W is overruled.  She's

10  here.  You can cross-examine further, if you wish.  With

11  respect to GX, what's the objection?

12         MR. KERR:  Hearsay, Your Honor.  It's just -- it's

13  their legal brief on an objection.

14         THE COURT:  Well, it's kind of like what you've been

15  putting --

16         MR. KERR:  Well, I guess I'd just like to know the

17  purpose --

18         THE COURT:  -- what Mr. Bennett put --

19         MR. KERR:  -- of its going in then.

20         THE COURT:  What's the purpose of GX?

21         MR. GELFARB:  The purpose of GX, Your Honor, is that

22  in case there's any contention that she was unable to answer

23  questions, or that she didn't answer questions fully enough, we

24  want it on the record that we did object to the 30(b)(6)

25  notice.  And that's why want it in.

**RESIDENTIAL CAPITAL, LLC, et al.**

335

1          MR. KERR:  I'll object to that.

2          THE COURT:  Sustained.  What about 216?

3          MR. KERR:  Again, Your Honor, this seems to be an

4   objection filed by Freddie Mac in the rehabilitation.  I'm not

5   sure what the purpose of that is.

6          THE COURT:  What do you -- what's the purpose of the

7   argument?

8          MR. GELFARB:  The purpose, Your Honor, is that -- for

9   example, with respect to Mr. Bennett's questions implying or at

10  least we were to infer --

11         THE COURT:  Just tell me the basis for the purpose.

12         MR. GELFARB:  The basis is to show a continuous course

13  of objection to the commutation proposals; that we objected in

14  state court, we objected in this court --

15         THE COURT:  It's overruled.  The objection is

16  overruled.

17         MR. GELFARB:  Thank you, Your Honor.

18         THE COURT:  So W and 216 are admitted.

19  (Affidavit by Ms. Healy was hereby received into evidence as

20  Opposing Parties' Exhibit W, as of this date.)

21  (Objection filed by Freddie Mac in the rehabilitation was

22  hereby received into evidence as Debtors' Exhibit 216, as of

23  this date.)

24  (Various Documents were hereby received into evidence as

25  Debtors' Exhibits 205, 208, 209, 212, as of this date).

**RESIDENTIAL CAPITAL, LLC, et al.**

336

1           THE COURT:  Further cross-examination?

2           MR. KERR:  No, Your Honor.

3           THE COURT:  Anybody else?

4           MR. BENNETT:  No, Your Honor.

5           THE COURT:  All right.  You're excused.  Thank you

6    very much Ms. Healy.

7           All right.  We're going to take our recess.  It's

8    10:47.  We'll take a ten-minute recess.

9           MR. BENNETT:  Thank you, Your Honor.

10          THE COURT:  And have your next witness ready to go.

11          MR. BAIO:  Thank you, Your Honor.

12        (Recess from 10:47 a.m. until 10:59 a.m.)

13          THE COURT:  Please be seated.  Court is back in

14   session.  Mr. Baio, your next witness.  Ms. Eaton.

15          MS. EATON:  Good morning, Your Honor.  Mary Eaton,

16   Willkie Farr & Gallagher, on behalf of Monarch, Bayview, and

17   CQS.  We'd like to call Adam Sklar.

18          THE COURT:  Okay.  Mr. Sklar.  If you would raise your

19   right hand and be sworn.

20        (Witness sworn)

21          THE COURT:  All right.  Please have a seat.

22          MS. EATON:  Your Honor, Mr. Sklar submitted a

23   declaration on July 31st that is filed as docket number 4427

24   that we'd like to move into evidence.

25          THE COURT:  Any objection?

**RESIDENTIAL CAPITAL, LLC, et al.**

1        MR. ESPANA:  No objection, Your Honor.

2        THE COURT:  All right.  The Sklar declaration is in

3   evidence.

4   (Sklar declaration was hereby received into evidence as

5   Opposing Parties' Exhibit, as of this date.)

6        MR. ESPANA:  Mauricio Espana of Dechert, on behalf of

7   the Bank of New York Mellon.  May I inquire?

8        THE COURT:  Please go ahead.

9        MR. ESPANA:  Good morning, Mr. Sklar.

10        THE WITNESS:  Good morning.

11        MR. ESPANA:  There are just a few exhibits.  I'll pass

12   them around.

13        THE COURT:  Thank you.

14   CROSS-EXAMINATION

15   BY MR. ESPANA:

16   Q.   So Mr. Sklar, according to the declaration that you've

17   submitted in this case, you are a managing principal at

18   Monarch, and co-portfolio manager of its structured credit

19   funds, correct?

20   A.   Correct.

21   Q.   Okay.  And your current responsibilities in those

22   positions include researching corporate credits, structured

23   credit investments, trading certain investments, and making

24   select portfolio management decisions, correct?

25   A.   Correct.

**RESIDENTIAL CAPITAL, LLC, et al.**

1  Q.   And you're not appearing today as an expert witness,

2  correct?

3  A.   That's my understanding.

4  Q.   And you have never been qualified to testify as an expert

5  witness, correct?

6  A.   That's correct.

7  Q.   And Mr. Sklar, Monarch engaged counsel in connection with

8  the ResCap bankruptcy in proceeding around October, 2012,

9  correct?

10 A.   At some point post the filing in 2012.  That's correct.  I

11 don't recall if it was October specifically, but --

12 Q.   Do you recall whether it was latter part of 2012?

13 A.   Again, I don't recall specifically.  You know, end of the

14 summer, early fall feels about right.

15 Q.   Okay.  And Monarch's counsel corresponded with certain of

16 the trustees on behalf of Monarch, on or about the time of

17 October, 2012, or November, correct?

18 A.   That's my recollection.

19 Q.   And Monarch did not issue a direction to any of the

20 trustees in connection with the ResCap bankruptcy proceeding,

21 correct?

22 A.   That's correct.

23 Q.   And Monarch did not make a request to the trustees that it

24 be permitted to participate in the mediation, correct?

25 A.   That characterization, I believe, is not correct.

**RESIDENTIAL CAPITAL, LLC, et al.**

339

1   Q.    Did Monarch ever contact any of the trustees and seek to

2   participate in the mediation?

3   A.    The reason why I am hesitating is because through counsel,

4   it's my understanding that we did reach out to various parties

5   and request attendance in the mediation.

6   Q.    Are you aware whether your counsel ever contacted the

7   trustees to seek to participate in mediation?

8   A.    My understanding is that the trustees were not the party

9   that decided who or who not would participate in the mediation,

10  so I'm not sure that it would be completely relevant to ask the

11  trustee's --

12          THE COURT:  Do you know?

13  A.    -- permission.

14          THE COURT:  All right.  Mr. Sklar, listen to the

15  question, and just answer that question, okay?

16          Ask your question again.

17          THE WITNESS:  Can you --

18  Q.    Are you aware whether or not Monarch or -- sorry,

19  Monarch's counsel ever contacted the trustees to seek to

20  participate in the mediation?

21  A.    We contacted the trustees numerous times on various

22  points.  I'm not sure whether or not it was specifically to ask

23  to participate in the mediation.

24  Q.    So you're not aware of whether or not they ever contacted

25  the trustees to seek to participate in the mediation.

**RESIDENTIAL CAPITAL, LLC, et al.**

340

1  A.   Again --

2  Q.   Yes, or no.

3        THE COURT:  Can you answer that, yes or no?

4  A.   I'm not specifically aware of that point.

5        MR. ESPANA:  Nothing further, Your Honor.

6        THE COURT:  All right.  Any further cross-examination?

7        MR. KERR:  No, Your Honor.

8        THE COURT:  All right.  Redirect?

9  REDIRECT EXAMINATION

10  BY MS. EATON:

11  Q.   Mr. Sklar, did --

12        THE COURT:  Just identify yourself, for the record.

13        MS. EATON:  I beg your pardon, Your Honor.  Mary

14  Eaton, again, Willkie Farr on behalf of --

15        THE COURT:  Go ahead.

16        MS. EATON:  -- Monarch, CQS, and Bayview.

17  Q.   Mr. Sklar, did -- to your knowledge, did Monarch ever

18  request information from the trustees regarding the bankruptcy,

19  prior to the time the mediator in this case was appointed?

20  A.   We did.

21  Q.   If you would turn -- I handed a binder momentarily, and

22  I'm going to ask you to turn to the tab marked DR.

23  A.   I'm there.

24  Q.   Have you seen -- do you recognize Exhibit DR, Mr. Sklar?

25  A.   I do.

**RESIDENTIAL CAPITAL, LLC, et al.**

341

1  Q.   And can you tell us what it is?

2  A.   It is a letter from Willkie Farr & Gallagher to Bill Munno

3  at Seward & Kissel as counsel for U.S. Bank, who is a trustee

4  on the RAMP 2005-EFC7 trust.

5  Q.   And did you see Exhibit DR on or about the time that it

6  was sent to Mr. Munno?

7  A.   I did.

8  Q.   Do you know any of the circumstances surrounding the

9  sending of this letter that's marked as Exhibit DR to counsel

10 for U.S. Bank?

11        MR. ESPANA:  Your Honor, objection; scope.

12        THE COURT:  Sustained.

13 Q.   Mr. -- well --

14        MS. EATON:  I'd like to move Exhibit DR into evidence.

15        MR. KERR:  Objection, Your Honor.  I'm not sure the

16 purpose of its going into evidence.  I would object on just

17 hearsay grounds.

18        THE COURT:  What's the purpose, Ms. Eaton?

19        MS. EATON:  So that the fact that a request for

20 information was sent by counsel from Monarch to counsel for the

21 trustee before the mediation.

22        MR. KERR:  I'm not going to object that this letter --

23 the fact the letter was sent, Your Honor.

24        THE COURT:  It's essentially, notice is what you're

25 saying --

**RESIDENTIAL CAPITAL, LLC, et al.**

342

1           MR. KERR:  Right.

2           MS. EATON:  Yes.

3           THE COURT:  -- Ms. Eaton.  Is it?

4           MS. EATON:  Yes.

5           THE COURT:  Any other --

6           MR. KOTWICK:  Objection; foundation --

7           THE COURT:  -- objection?

8           MR. KOTWICK:  Objection --

9           THE COURT:  I'm sorry.  Go ahead.

10           MR. KOTWICK:  Mark Kotwick on behalf of U.S. Bank, of

11   Seward & Kissel.  Lack of foundation; it's hearsay.  He's

12   neither a --

13           THE COURT:  It's not being offered for --

14           MR. KOTWICK:  -- an author or a recipient.

15           THE COURT:  Wait, wait.  Stop.  It's not being offered

16   for hearsay purpose.  You say you have a foundation objection?

17           MR. KOTWICK:  He's neither the author nor the

18   recipient.

19           THE COURT:  Well, he doesn't have to be the author.

20   He said he saw at or about the time it was sent.  Do we have to

21   drag Mr. Munno in here to find out whether he received a copy

22   of this?

23           MR. KOTWICK:  No, we don't.

24           THE COURT:  Okay.  Objection is overruled.  Exhibit DR

25   is in evidence for notice.

**RESIDENTIAL CAPITAL, LLC, et al.**

343

 1    (Letter from Willkie Farr & Gallagher to Mr. Munno was hereby

 2    received into evidence as Opposing Parties' Exhibit DR, as of

 3    this date.)

 4    BY MS. EATON:

 5    Q.    If you could turn, Mr. Sklar, to the tab in your binder

 6    marked GE.  Do you have that document?

 7    A.    I do.

 8    Q.    And do you recognize Exhibit GE?

 9    A.    I do.  I was copied on the e-mail chain.

10    Q.    Can you tell us what it is?

11    A.    It is an e-mail between Willkie and Seward & Kissel

12    regarding the receipt of the letter previously referenced, I

13    believe, in tab DR.

14    Q.    And did you see this document, Exhibit GE, at or about the

15    time that it was sent?

16    A.    Again, I was copied on the e-mail, so it appears I did.

17    Q.    Did Monarch ever speak to Mr. Munno about requesting

18    information regarding the bankruptcy --

19            MR. ESPANA:  Objection --

20    Q.    -- before the --

21            MR. ESPANA:  -- Your Honor; scope.

22            THE COURT:  Sustained.  Well, let's let her finish.

23    I'm sorry, Ms. Eaton.  I'm going to withdraw that ruling.  Ask

24    your full question, and then will see if there's an objection.

25    Don't interrupt in the middle of a question.

**RESIDENTIAL CAPITAL, LLC, et al.**

344

1          MR. ESPANA:  I apologize, Your Honor.

2          THE COURT:  Go ahead, Ms. Eaton.

3   Q.   Before the mediator was appointed in this bankruptcy, Mr.

4   Sklar, you testified that Monarch either had asked -- made

5   requests of the trustees for information regarding the

6   bankruptcy, correct?

7   A.   Yes.

8   Q.   Do you remember what subjects of information Monarch was

9   requesting information about?

10          MR. ESPANA:  Objection, Your Honor --

11   A.   I do.

12          MR. ESPANA:  -- scope.

13          THE COURT:  You can answer that, yes or no.

14   A.   I do recall.

15   Q.   And what were those subjects?

16          MR. ESPANA:  Same objection.

17          THE COURT:  Sustained.  This is beyond the scope of

18   the last examination.

19          MS. EATON:  The objectors move Exhibit GE into

20   evidence.

21          THE COURT:  Mr. Kerr?

22          MR. KERR:  Again, Your Honor, I would just -- we

23   object on hearsay grounds.  I'm not sure the purpose.

24          THE COURT:  What's the purpose of the offer, Ms.

25   Eaton?

**RESIDENTIAL CAPITAL, LLC, et al.**

345

1          MS. EATON:  It's the same as the last exhibit,

2          THE COURT:  Well --

3          MS. EATON:  -- Your Honor.

4          THE COURT:  -- then let's --

5          MS. EATON:  Notice.

6          THE COURT:  -- so we have a clear record.

7          MS. EATON:  Notice --

8          THE COURT:  What's the purpose --

9          MS. EATON:  -- and a response --

10         THE COURT:  -- of the offer?

11         MS. EATON:  I beg your pardon?

12         THE COURT:  What is the purpose of the offer of this

13    exhibit?  Don't tell me the same as the last exhibit.

14         MS. EATON:  Simply, notice purposes.  It's a response

15    to the last exhibit.

16         THE COURT:  Mr. Kerr?

17         MR. KERR:  For that limited purpose, I have no

18    objection, Your Honor.

19         THE COURT:  All right.  It's in evidence for that

20    purpose.

21    (E-mail between Willkie Farr & Gallagher and Seward & Kissel

22    was hereby received into evidence as Opposing Parties' Exhibit

23    GE, as of this date.)

24    BY MS. EATON:

25    Q.   If you could turn to Exhibit DS.  Do you have that

**RESIDENTIAL CAPITAL, LLC, et al.**

346

1    document, Mr. Sklar?

2    A.    Yes.

3    Q.    And have you seen this document before?

4    A.    I have.

5    Q.    And can you tell us what it is?

6    A.    It is a letter, again, from our counsel, Willkie Farr &

7    Gallagher to Seward & Kissel in their capacity as repres -- as

8    counsel to U.S. Bank.

9    Q.    And did you receive Exhibit DS on or about the time that

10   it was sent by your counsel to Mr. Munno?

11   A.    Yes.

12          MS. EATON:  The objectors move Exhibit DS into

13   evidence.

14          THE COURT:  For what purpose?

15          MS. EATON:  Notice, sir.

16          MR. KERR:  Your Honor, we object to this.  I don't

17   think -- this is not -- I'm not sure what she means by notice.

18   This is not a request for information as far as I can read it.

19   And would object on hearsay grounds.

20          THE COURT:  Sustained.

21   Q.    Now, Mr. Sklar, during your cross-examination, you were

22   asked whether you were an expert.  Do you recall that?

23   A.    I do.

24   Q.    Even though you're not an expert, do you ever perform --

25          THE COURT:  He was asked if he's testifying as an

**RESIDENTIAL CAPITAL, LLC, et al.**

347

1  expert, and he said no.

2  Q.   Even though you've never testified as an expert, Mr.

3  Sklar, have you ever performed any financial analysis with

4  respect to the recoveries Monarch expects to receive pursuant

5  to the FGIC rehabilitation plan?

6          MR. ESPANA:  Objection.  Scope.

7          THE COURT:  You can answer that yes or no.

8  A.   Yes.

9  Q.   And when did you start performing that -- those analyses?

10          MR. ESPANA:  Same objection.

11          THE COURT:  Sustained.  It's beyond the scope.

12          MS. EATON:  No further questions.

13          THE COURT:  Thank you very much.

14          Any further examination?

15          MR. ESPANA:  Nothing, Your Honor.

16          THE COURT:  All right.  You're excused, Mr. Sklar.

17  Thank you very much for your testimony.

18          All right.  Next witness.  Ms. Eaton, somebody,

19  calling a next witness?  Mr. Baio, are you calling a witness?

20          MR. BAIO:  I'm sorry, Your Honor.  It's their turn.  I

21  apologize.

22          THE COURT:  I don't care whose turn it is I just want

23  to know --

24          MR. BAIO:  We are not --

25          THE COURT:  Okay.

**RESIDENTIAL CAPITAL, LLC, et al.**

1          MR. BAIO:  -- at this point.

2          THE COURT:  Okay.  Mr. Carney, are you calling a

3     witness?

4          MR. CARNEY:  Yes, Your Honor.  We'd like to call Scott

5     Gibson to the stand.

6          THE COURT:  Mr. Gibson, come on up and be sworn.

7     Raise your right hand.

8        (Witness sworn)

9          THE COURT:  Please have a seat.

10         THE WITNESS:  Thank you.

11         THE COURT:  Mr. Carney.

12         MR. CARNEY:  Good morning, Your Honor.  Michael Carney

13    from McKool Smith for Freddie Mac.

14         As I mentioned before, we're calling Scott Gibson, our

15    expert witness, to the stand and Mr. Gibson submitted his

16    declaration on July 31st originally and it was refiled in

17    unredacted format pursuant to Your Honor's request.

18         If I may have a moment, Your Honor?

19         THE COURT:  Yes.  Go ahead.

20       (Pause)

21         THE COURT:  If what you're looking for is the ECF

22    docket number you can tell me later.  Let's

23         UNIDENTIFIED SPEAKER:  I have it.  It's 4693.

24         MR. CARNEY:  It's 4693 but unfortunately it looks as

25    if a previous version of the declaration was included in the

**RESIDENTIAL CAPITAL, LLC, et al.**

349

1    binder.

2           THE COURT:  Okay.  Which one do you want me to take

3    out of the binder?  Is it ER?

4           MR. CARNEY:  The -- yes.  That is an exhibit to his

5    deposition but the actual docket number 4693 is what should

6    have been in the -- at first.  That's his actual direct.

7           THE COURT:  I'm confused.  What's in the beginning of

8    your binder is or is not the right testimony?

9           MR. CARNEY:  It is not.  That is a previous

10   declaration submitted on July 19th --

11          THE COURT:  Okay.

12          MR. CARNEY:  -- which is an exhibit to his deposition,

13   I believe.

14          UNIDENTIFIED SPEAKER:  Are you sure about that because

15   my ER is the 19th.  I can hand it up.  Your Honor, it's yours.

16          MR. CARNEY:  This is the July 31.

17          UNIDENTIFIED SPEAKER:  Based on yours.

18          MR. CARNEY:  Actually, I think that's my mistake, Your

19   Honor.  It is July 31 is the correct one, I'm sorry.

20          THE COURT:  And that is ECF 4693?

21          MR. CARNEY:  Yes, it is.

22          THE COURT:  Okay.

23          MR. CARNEY:  All right.  Thank you.

24          THE COURT:  You're offering it in evidence?

25          MR. CARNEY:  Yes, we're offering it in evidence.

**RESIDENTIAL CAPITAL, LLC, et al.**

350

1           THE COURT:  Okay.

2    (Scott Gibson declaration was hereby received into evidence as

3    Opposing Parties' Exhibit, as of this date.)

4           THE COURT:  Okay.  Are you offering any exhibits at

5    this time or not?

6           MR. CARNEY:  Yes, we are, Your Honor.

7           THE COURT:  Could you tell me which ones?

8           MR. CARNEY:  We are offering Exhibits 212, which is

9    the Holtzer affirmation; I believe it may have already been

10   admitted.  Exhibit 123 which I also believe has been admitted

11   so -- and Exhibit 125, the Miller affidavit.

12          THE COURT:  So are 212 and 123 in evidence?

13          MR. KERR:  212 is already in, I believe, Your Honor.

14          THE COURT:  What about 123?

15          UNIDENTIFIED SPEAKER:  123 is already in.

16          THE COURT:  Okay.  So they're offering 125.  Any

17   objection?

18          MR. KERR:  No objection.

19          THE COURT:  All right.  Exhibit 125 is in evidence.

20   (Miller affidavit was hereby received into evidence as Debtors'

21   Exhibit 125, as of this date.)

22          MR. CARNEY:  Thank you, Your Honor.

23          THE COURT:  All right.  Cross-examination.

24          MR. BENNETT:  Just hand the binders up.  Make sure

25   those guys get a copy.

**RESIDENTIAL CAPITAL, LLC, et al.**

351

1           THE COURT:  Thank you.

2           MR. BENNETT:  Steven Bennett from Jones Day for FGIC,

3    Your Honor.

4    CROSS-EXAMINATION

5    BY MR. BENNETT:

6    Q.    Mr. Gibson, you're a financial professional specializing

7    in RMBS and ABS modeling.  Correct?

8    A.    That's correct.

9    Q.    And that kind of work involves a blend of market and

10   credit research, internal and external pricing models and

11   specialist judgment to determine and verify the correct set of

12   performance assumptions that derive an assets cash flow and

13   ultimate fair value.  Correct?

14   A.    That's correct.

15   Q.    And cash flow analysis can involve literally hundreds of

16   inputs into a model.  Correct?

17   A.    Between settings and inputs for this type of analysis it

18   can.

19   Q.    And change in any one of those inputs can have an impact

20   on cash flows.  Correct?

21   A.    Of varying amounts it can.

22   Q.    And MountainView generally uses a sophisticated computer

23   model called Intex to model all the variables that can affect

24   cash flow from securities.  Correct?

25   A.    No.  Not to model the variables, per se, but to model the

**RESIDENTIAL CAPITAL, LLC, et al.**

352

1   expected cash flows for the securities.

2   Q.   Okay.  So the inputs are into the model and the output is

3   expected cash flow.

4   A.   That's corr --

5   Q.   Correct?

6   A.   That's generally correct.

7   Q.   Okay.  And in this case, you did not use that model to

8   actually compare recoveries under the rehabilitation plan

9   versus recoveries under the settlement on a trust-by-trust

10  basis.  Correct?

11  A.   Recoveries on the settlement plan?  I mean, in effect, we

12  did.  We essentially used Intex models to project amount of

13  losses for specific securities and then calculated what would

14  be expected to be recovered based upon the terms of the

15  rehabilitation plan as it was presented to us.

16  Q.   You did that for Freddie Mac but not for any of the other

17  holders.  Correct?

18  A.   We did not do a specific independent analysis on the other

19  forty-seven securities to create an IPS projection of cash

20  flows.

21  Q.   Okay.  And part of the reason that you didn't do that was

22  you only had three business days between the date that you were

23  hired and the date of your report.  Correct?

24  A.   No.  That was not a material factor.  We analyze hundreds

25  of securities in a given day so --

**RESIDENTIAL CAPITAL, LLC, et al.**

353

1   Q.   Could you take a look at tab 2 in your binder?  It's

2   Exhibit FP, page 115, line 7 -- 115, line 7.  Are you there?

3   A.   Yes.

4   Q.   Okay.  This is a deposition taken of you in this case.

5   Correct?

6   A.   Page 15, line 7?

7   Q.   115.

8   A.   Oh, 115.

9   Q.   Are you there?

10   A.   Yes.

11   Q.   And this is a deposition that was taken of you.  Correct?

12   A.   I believe that's the case, yes.

13   Q.   And you were under oath?

14   A.   Yes.

15   Q.   Same oath as today.  Correct?

16   A.   Yes.

17   Q.   And did you -- were you asked these questions and did you

18   give this answer,

19   "Q.   Is there anything that precluded you from gathering

20   information about securities not held by Freddie Mac from

21   Intex?

22   "A.   Just availability of information.  I was not presented a

23   full list of CUSIPs or security identifiers associated with the

24   ResCap FGIC population and time consideration but I did not

25   have that list of the securities at the time."

**RESIDENTIAL CAPITAL, LLC, et al.**

354

1        Was that your answer, sir?

2    A.   Yes.  I believe that's correct.

3    Q.   Now, there are a total of forty-seven FGIC-wrapped ResCap

4    trusts.  Correct?

5    A.   That's correct.

6    Q.   And Freddie holds securities in only nine of those trusts.

7    Correct?

8    A.   I believe that's correct.

9    Q.   And there are multiple tranches in each of the trusts.

10   Correct?

11   A.   That is correct.

12   Q.   And for the individual tranches where Freddie holds an

13   interest, it holds a hundred percent of the interest in that

14   particular tranche.  Correct?

15   A.   I believe it's a hundred in all but one of them and then

16   materially close to a hundred in the last.

17   Q.   And that means that nobody else but Freddie holds those

18   particular securities.  Correct?

19   A.   That's correct.  Yes.

20   Q.   And inputs for cash flow modeling are different for each

21   tranche and trust.  Correct?

22   A.   That is not correct.

23   Q.   Could you go back to your deposition please?  It's Exhibit

24   FP, page 103, line 13 -- 103 -- are you with me?

25   A.   Yep, I'm there now.

**RESIDENTIAL CAPITAL, LLC, et al.**

355

1    "Q.    And so, inputs are different for each RMBS trust.

2    Correct?

3    "A.    Yes.    They do vary."

4         Was that your testimony?

5    A.    They can vary is probably more accurate.    Many of the

6    tranches are backed by the same collateral pool, and therefore,

7    those assumptions would remain the same.

8    Q.    Okay.    Try to listen to my question --

9    A.    Okay.

10   Q.    -- and answer just my question.

11   A.    Okay.

12   Q.    Thank you.    And recoveries for each of the tranches in

13   each of the trusts may be different under the rehabilitation

14   plan.    Correct?

15   A.    That is generally correct.    Yes.

16   Q.    And each tranche of each trust may suffer different

17   degrees of loss at different times.    Correct?

18   A.    That is generally correct.

19   Q.    And I think as you already said other than for Freddie

20   Mac, you have not assessed the impact of the rehabilitation

21   plan versus the settlement on a trust-by-trust basis.    Correct?

22   A.    That is generally correct.

23   Q.    And that means it's possible that recoveries to Freddie

24   under the rehabilitation plan could differ from the recoveries

25   to other holders of FGIC-wrapped securities.    Correct?

**RESIDENTIAL CAPITAL, LLC, et al.**

1   A.   To some extent that is possible, yes.

2   Q.   And the fact that Freddie has made a determination

3   regarding its own recoveries on the plan versus the settlement

4   does not specifically provide a reference either way regarding

5   results for the other holders.  Correct?

6   A.   I think that they are a general reference, and I think I

7   stated in the deposition that based upon our knowledge of the

8   other securities as well as those specific tranches that they

9   hold that they are a representation of expected cash flows and

10  losses for certain tranches.

11  Q.   Could you go to page 116 of your deposition?

12  A.   Yes.

13  Q.   Exhibit FP, line 9.  Are you there?  116?

14  A.   I am, yes.

15  Q.   You were asked this question and did you give this answer?

16  "Q.   And so the fact that Freddie Mac has determined that its

17  recoveries under the plan of rehabilitation are far better than

18  its recoveries under the ResCap settlement agreement does not

19  mean that other certificate holders would determine that their

20  recoveries under the plan of rehabilitation are far better than

21  their recoveries under the ResCap settlement agreement.

22  Correct?"

23       There was an objection and then you said,

24  "A.   It does not specifically provide a reference either way."

25       And you went on.  Was that your testimony?

**RESIDENTIAL CAPITAL, LLC, et al.**

1          THE COURT:  Please read the rest --

2          MR. CARNEY:  Objection, Your Honor.

3          THE COURT:  -- read the rest of the answer.

4          MR. BENNETT:  I'll read the rest of it.

5   "A.  It does not specifically provide a reference either way.

6   We evaluated those securities relative to the other trusts that

7   we are familiar with and deem them to be representative.  There

8   was not an in-depth analysis to do a specific comparison of the

9   timing or magnitude of losses because I didn't have access to

10  the securities separate and aside from that.  What we utilized

11  was, once again, the Lazard analysis, their base case

12  scenarios, and then the Holtzer affirmation of what the

13  expected lifetime loss scenarios would be for the ResCap

14  population and utilized that to make an independent assessment

15  for the benefit to the remaining population."

16       Was that your testimony, sir?

17  A.   Yes.

18  Q.   Now, under the rehabilitation plan if additional claims

19  beyond what was estimated by Lazard are made against FGIC that

20  could reduce recoveries for the policy holders.  Correct?

21  A.   It varies.  If you're talking in a global sense for all of

22  their claims then potentially it could.  Individual claims, it

23  may not have an impact directly.  It's hard to assess without

24  knowing the actual projections that were used within the Lazard

25  analysis.

**RESIDENTIAL CAPITAL, LLC, et al.**

358

1   Q.   And you have not made an assessment of the likelihood of

2   additional claims.   Correct?

3   A.   Across the entire exposure of FGIC or specific to these

4   securities?

5   Q.   Specific to these securities, I believe.

6   A.   Specific to these securities, we do analyze them under

7   various different scenarios as we're creating our base case.

8   We presented what we believe to be the most likely base case

9   scenario in this analysis.

10  Q.   Right.

11  A.   We do not run a specific hi-low or --

12  Q.   And with regard to FGIC's own --

13          THE COURT:  Wait.  Had you finished your answer?

14          THE WITNESS:  I believe so.  Yes.

15          THE COURT:  Okay.  Go ahead.

16          THE WITNESS:  I'm sorry.

17          THE COURT:  Ask your next question.

18  Q.   With regard to FGIC's overall exposure to claims, you

19  haven't done any assessment of the likelihood of --

20  A.   Okay.  So overall --

21  Q.   -- additional claims?

22          THE COURT:  Just --

23          THE WITNESS:  Sorry.

24          THE COURT:  -- let him finish his question.

25          THE WITNESS:  Okay.

**RESIDENTIAL CAPITAL, LLC, et al.**

359

1      THE COURT:  And then I'll make sure that you get to

2    finish your answer.  Okay?

3          THE WITNESS:  Okay.  Thank you.

4          THE COURT:  All right.  Ask your question again, Mr.

5    Bennett.

6    Q.   Overall exposure, that's not something for which you've

7    done an assessment of the likelihood of additional claims.

8    Correct?

9          MR. CARNEY:  I'll object to form, Your Honor, I'm not

10   quite sure what he's asking.

11         THE COURT:  Overruled.

12   A.   So overall, you're speaking to all claims that could be

13   coming into FGIC regardless of RMBS securities or otherwise.

14   Q.   Correct.

15   A.   We did not have access to the sufficient models or

16   information from Lazard to be able to assess that.

17   Q.   All you have is the base and stress case scenarios that

18   Lazard did.  Correct?

19   A.   That is correct.

20   Q.   And you're aware that Detroit recently filed for

21   bankruptcy.  Correct?

22   A.   I am aware, yes.

23   Q.   And you know that FGIC does have some exposure to Detroit.

24   Correct?

25   A.   Yes, I think in my deposition you presented that to me.

**RESIDENTIAL CAPITAL, LLC, et al.**

360

1   Q.   And you have done no review of FGIC's exposure to

2   municipal bonds issued by Detroit.   Correct?

3   A.   We did not do a specific analysis on that.

4   Q.   You were present in the court last Friday for the

5   testimony from Mr. John Dubel.   Correct?

6   A.   I was.   Yes.

7   Q.   And you are aware that Mr. Dubel testified that FGIC

8   recently increased its estimate of reserve losses by 800

9   million dollars in a single quarter.   Correct?

10  A.   Yes.   I believe I heard that.

11  Q.   And you're not in a position to contradict that testimony.

12  Correct?

13  A.   If that's what they did, certainly not.

14  Q.   And you have seen the most recent financial quarterly

15  report from FGIC.   Correct?

16  A.   I believe I've reviewed it.   Yes.

17  Q.   And to the best of your knowledge, it's accurate.

18  Correct?

19  A.   I can't say that I confirm that or not, but I have no

20  reason to not believe his statement.

21  Q.   Okay.   And as part of your opinion, you didn't do any

22  independent economic forecasting.   Correct?

23  A.   As part of our daily analysis for these types of

24  securities, we are constantly reviewing economic scenarios,

25  expected outcomes as it relates to this type of valuation.

**RESIDENTIAL CAPITAL, LLC, et al.**

361

1   Q.   Could you go to page 87 in your deposition, sir?

2   A.   Yes.

3   Q.   It's Exhibit FP.

4   A.   Yes.

5   Q.   Were you asked this question at line 8:

6   "Q.   What have you done to predict the status of the economy

7   through 2052?

8   "A.   Once again, I rely upon industry research and forecasts

9   from various different vendors we subscribe to.  We use that in

10  conjunction of our various different sources to come up with

11  our base analysis.  We did not do an independent economic

12  forecast for any of these scenarios."

13        Was that your testimony, sir?

14  A.   I believe so, yes.

15  Q.   You did give an Internet interview in May of 2013.

16  Correct?

17  A.   That sounds like an approximate time that I conducted one.

18  Q.   And that interview talked about RMBS, CMBS, loan pricing

19  and outlooks.  Correct?

20  A.   I think that was the topic.  Yes.

21  Q.   And you agree with the statement, "It is difficult, at

22  present, to do a fair evaluation of RMBS securities because of

23  illiquid markets."  Correct?

24        MR. CARNEY:  Objection, Your Honor.  Does he have a

25  transcript of this radio broadcast?

**RESIDENTIAL CAPITAL, LLC, et al.**

362

1  A.   I would --

2         THE COURT:  Overruled.

3  A.   -- I would need to see the context of the question to be

4  able to evaluate that.

5  Q.   Well, if you go to page 185 of your deposition, Exhibit

6  FP --

7  A.   Yes.

8  Q.   -- were you asked this question and did you give this

9  answer at page 185, line 7:

10  "Q.  And as part of that interview, do you recall saying that

11  it's difficult at present to do fair valuation of RMBS

12  securities because of illiquid markets?

13  "A.  I don't recall specifically what was presented but that,

14  that certainly is a consideration, yes."

15      Was that your testimony, sir?

16         MR. CARNEY:  Objection.

17         THE COURT:  Overruled.

18  A.   Yes, I believe that's the case.

19  Q.   And you agree with the statement that there are at present

20  uncertainties with the health of the economy.  Correct?

21  A.   I think there -- is this specific to this question you

22  just asked, or is this with regard to another topic?  Just in

23  general?

24  Q.   I'm just asking you whether you agree with the statement,

25  at present, there are uncertainties with the health of the

**RESIDENTIAL CAPITAL, LLC, et al.**

1   economy?

2   A.   I think there's general uncertainties, yes.  Economic

3   conditions are improving.  Home prices are improving.

4   Everything seems to be doing much better.  But there are

5   uncertainties with every forecast.

6   Q.   Okay.  And you don't know whether if the economy improves

7   the FGIC-insured trusts would have decreased claims against

8   FGIC reducing their payouts under the plan.  Correct?

9   A.   Whether the economic condition deteriorates, whether they

10  would --

11  Q.   No, no.  Whether if the economy improves the FGIC-insured

12  trusts would have decreased claims against FGIC reducing their

13  payouts under the plan?  You don't know whether that's the

14  case.  Correct?

15  A.   I have not done a specific analysis.  From a general

16  context of the securities that we do price, there are

17  correlations to be made.  As home prices increase,

18  delinquencies tend to decrease, losses can be reduced.

19  Conversely, I think the same thing holds true for other types

20  of claims that may be submitted to FGIC.

21  Q.   I'm asking you, sir, you don't know because you didn't do

22  an analysis to determine whether if the economy improves the

23  FGIC-insured trusts would have decreased claims against FGIC

24  reducing payouts.  Is that correct?

25          MR. CARNEY:  Objection.  I think he answered the

**RESIDENTIAL CAPITAL, LLC, et al.**

364

1    question.

2         THE COURT:  He don't think he did.  Overruled.

3    A.   I can't say to a specific amount.

4         THE COURT:  Do you have a page and line number in the

5    deposition?

6         MR. BENNETT:  Sure.

7    Q.   It's at page 96 of the deposition.  It's Exhibit FP.  It

8    starts at line 2, a series of questions.

9    "Q.   In estimating Freddie Mac's future losses, did you

10   consider how improvements in the economy would impact future

11   losses?

12   "A.   No.  I did not run alternative scenarios.  We applied a

13   base case analysis for their holdings as well to be consistent

14   with or as consistent as possible with the Lazard analysis.

15   "Q.   Isn't it true that improvements in the economy would also

16   improve the performance of the FGIC-insured trusts?

17   "A.   It varies greatly.  You have to look at the actual

18   collateral performance of that specific security.  You have to

19   look at then the deal cash flow waterfalls and how it would

20   impact the individual securities.  It's impossible for me to

21   say on a blanket statement."

22        Was that your testimony, sir?

23   A.   Yes.

24   Q.   Your trial declaration in this case mentions risks

25   associated with accepting the FGIC settlement.  Correct?

**RESIDENTIAL CAPITAL, LLC, et al.**

365

1    A.    Yes, I believe so.

2    Q.    And your testimony is that commutation payment exposes

3    holders to risk because their claims against FGIC could

4    increase in size.  Correct?

5    A.    Yes, I believe I make that statement.

6    Q.    But you haven't done any analysis of the likelihood that

7    claims against FGIC will either increase or decrease.  Isn't

8    that true?

9    A.    We submitted a base case analysis.  In the course of our

10   evaluation of these types of securities, we do look at

11   alternative outcomes and are aware of general impacts.

12   Q.    But you haven't done an analysis of the likelihood of

13   future claims either increasing or decreasing.  Isn't that

14   true?

15   A.    That's correct.  I did not submit a specific analysis for

16   that.

17   Q.    Now, MountainView, your company, specializes in fair

18   valuation of mortgage and other asset-backed securities.

19   Correct?

20   A.    That's generally correct, yes.

21   Q.    And you have no experience analyzing settlement

22   agreements.  Correct?

23   A.    Well, we do not -- we are not party of a settle --

24         THE COURT:  Can you answer the question he was asking?

25   A.    No, I do not conduct settlement agreement analysis.

**RESIDENTIAL CAPITAL, LLC, et al.**

366

1  Q.   And you have no experience analyzing litigation

2  recoveries.   Correct?

3  A.   We run scenarios for litigation recoveries.

4       THE COURT:  Can you answer the question that was

5  asked?

6  A.   So yes, we have some experience.

7       THE COURT:  Do you?  The question was --

8       THE WITNESS: Yes, I have been involved in some of that

9  analysis.

10      THE COURT:  Okay.  Next question.

11 Q.   Go to page 24 of your deposition.  It's Exhibit FP, line

12 20.  Were you asked this question?  Did you give this answer?

13 "Q.  You do not have any prior experience evaluating litigation

14 claims.  Is that correct?

15 "A.  That's correct."

16      Was that your testimony, sir?

17 A.   It was.  My understanding --

18      THE COURT:  Next question.

19 Q.   Now, in formulating your opinion, you were not asked to

20 include an analysis of risk associating -- associated with

21 litigating the FGIC rep and warranty claims against ResCap.

22 Correct?

23 A.   In a sense we were.  We were asked to evaluate the -- what

24 we believed to be the better outcome for our client.  As part

25 of that analysis, one-half of the equation has potential upside

**RESIDENTIAL CAPITAL, LLC, et al.**

367

1    to rep and warranties claims, the other half does not.  And so

2    while it's not explicitly implied, we did conduct that as part

3    of our analysis.

4    Q.   So go to page 33 of your deposition.  That's Exhibit FP.

5    Were you asked these questions, did you give these answers?

6    Question at line 6.

7    "Q.   You were not asked to consider the risks that are posed by

8    litigating claims relating to violations of representations and

9    warranties.  Correct?

10   "A.   That was not a specific request.  No.

11   "Q.   Was that embedded in any other request?

12   "A.   I think that aspects of that are included in our

13   evaluation at a high level and understanding of the two

14   different plans."

15        Was that your testimony, sir?

16   A.   It was.  Yes, sir.

17   Q.   And you've never actually reviewed the FGIC proofs of

18   claim in this case.  Correct?

19   A.   That is correct.

20   Q.   And you haven't considered the possibility that FGIC's

21   claims might be subordinated in this case.  Correct?

22   A.   We did not do a specific analysis.  We based it upon the

23   information presented to us from the Holtzer affirmation.

24   Q.   And you didn't do anything to consider the cost to FGIC of

25   litigating claims.  Correct?

**RESIDENTIAL CAPITAL, LLC, et al.**

1   A.   We did not do a specific analysis to that effect.

2   Q.   And you didn't do any analysis to consider how litigating

3   the claims might affect the timing of payouts to the trust.

4   Correct?

5   A.   We did not do a specific analysis to that effect.

6   Q.   And you didn't do any analysis to consider whether if

7   litigation produced some proceeds, parts of the proceeds might

8   be held in reserve and not paid out immediately.  Correct?

9   A.   That is generally correct.  Yes.

10   Q.   For your purposes and your opinion, you simply assume that

11   even absent the settlement agreement between FGIC and the

12   debtors, FGIC would somehow recover 206.5 million dollars on

13   its claims in litigation.  Isn't that true?

14   A.   I think it's a reasonable proxy, yes, that under this

15   circumstance of a settlement agreement, they were willing to

16   accept the 206 to offset those claims that that's a reasonable

17   proxy for what might be expected outside of the settlement.

18   Q.   Can you listen to my question?

19        That was an assumption that you made.  Correct, sir?

20   A.   Yes, it was based upon the information provided.  Yes.

21   Q.   You just assumed that was true, correct, for purposes of

22   your opinion?

23   A.   Yes.

24   Q.   Let's talk about discount rates for a second, okay?

25   A.   Okay.

**RESIDENTIAL CAPITAL, LLC, et al.**

369

1   Q.   Now, the purpose of a discount rate, in part, is to

2   account for the benefit of receiving money now as opposed to

3   having to wait for the money in the future.  Correct?

4   A.   It is.  It accounts for time-value of money, as you

5   mentioned, as well as then also uncertainty and risk of

6   expected cash flows not coming in as anticipated.

7   Q.   And your opinion in this case does not contest the

8   appropriateness of the discount rates applied to estimates of

9   payouts under the FGIC rehabilitation plan.  Correct?

10  A.   I did not contest that, no.

11  Q.   And, in fact, your opinion is that a discount rate of ten

12  to twenty percent is a reasonable discount to account for the

13  uncertainties and timing of the cash flows within the FGIC

14  rehabilitation plan.  Correct?

15  A.   I believe that's generally correct.  Yes.

16  Q.   As part of your opinion, you have not reviewed the

17  proposed plan and plan support agreement negotiated in

18  conjunction with the FGIC settlement.  Correct?

19  A.   I believe we reviewed aspects of it, but I did not do a

20  specific analysis of it.

21  Q.   And in formulating your opinion, you were not asked to

22  consider benefits that the plan support agreement would have

23  along with the FGIC settlement.  Correct?

24  A.   I did not do a specific analysis on the plan support

25  agreement in itself.

**RESIDENTIAL CAPITAL, LLC, et al.**

1  Q.   And you did not consider the fact that as part of the plan

2  support agreement, Ally will make a 2.1-billion-dollar

3  contribution to the bankruptcy estate.  Correct?

4  A.   Subsequent to my submitting our analysis, we have reviewed

5  that information.

6  Q.   So you do know now that that's part of the plan support

7  agreement.  Correct?

8  A.   I believe that that is part of it, yes.

9  Q.   And you have not considered what benefit the larger plan

10 support agreement would have on the FGIC-insured trusts.

11 Correct?

12 A.   My understanding; the bondholders have a valid claim to

13 the -- within the trust to Ally, whether it's within the

14 agreement or not.  We did not consider it on either side of the

15 equation, no.

16 Q.   Well, I'm not sure what your answer means.  Could you go

17 to your deposition page 55 --

18 A.   Yes.

19 Q.   -- please?  That's Exhibit FP at line 4.  Are you there?

20 A.   I am.

21 "Q.  You did not consider the impact that the" -- "that that

22 larger agreement might have on the FGIC insured trusts,

23 correct?"

24      There's an objection, and then you say, "Can you specify

25 what -- what type of impact?"

**RESIDENTIAL CAPITAL, LLC, et al.**

371

1    "Q.   Sure.   The plan support agreement includes an agreement

2    that Ally will make a contribution of 2.1 billion dollars to

3    the bankruptcy estate, correct?

4    "A.   I did not specifically include that as part of our

5    analysis."

6         Was that your testimony, sir?

7    A.   That was.

8    Q.   And you agree that there is at least some uncertainty as

9    to whether a plan of reorganization could ever be confirmed

10   absent the FGIC settlement, correct?

11   A.   There's uncertainty, yes.

12   Q.   And you haven't made any assessment of what the discount

13   for uncertainty should be for purposes of comparing the FGIC

14   rehabilitation plan to the FGIC settlement, correct?

15   A.   Again, I think we reviewed the discount rates that were

16   presented to us by Lazard.  And based upon our knowledge of

17   analyzing these types of securities, and -- we believe that ten

18   to twenty percent discount rate was reasonable.  I did not do a

19   specific independent analysis to that, though.

20         MR. BENNETT:  No further questions, Your Honor.

21         THE COURT:  Thank you.  Redirect?  Well, any further

22   cross?

23         MR. DEVORE:  Yes, Your Honor.

24         THE COURT:  All right.  Come on up.

25   CROSS-EXAMINATION

**RESIDENTIAL CAPITAL, LLC, et al.**

1  BY MR. DEVORE:

2  Q.   Good morning, Mr. Gibson.  My name is Andrew Devore.  I'm

3  from Ropes & Gray, and we represent the steering committee

4  of RM--

5        THE COURT:  Just tell me your last name again.  I'm

6  sorry.

7        MR. DEVORE:  Devore, D-E-V-O-R-E.  We represent the

8  steering committee of RMBS investors, also known as the Kathy

9  Patrick Group.

10        THE COURT:  Go ahead.

11  Q.   Mr. Gibson, I'd like to focus your attention on the table

12  on top of page 16 -- excuse me -- of your direct testimony.  Do

13  you have that in front of you?

14  A.   What's -- what section is that?  I don't --

15  Q.   It's tab 1 of your binder.

16  A.   Tab 1, table 16 --

17  Q.   Of page 16.

18        THE COURT:  The top of page 16.

19  A.   Page 16.  All right.

20  Q.   If you could just let me know when you're there.

21  A.   I'm there.

22  Q.   This table summarizes your conclusions regarding a

23  comparison of recoveries under the FGIC rehabilitation plan

24  versus the proposed FGIC settlement with respect to all FGIC

25  insured trust.  Is that fair to say?

**RESIDENTIAL CAPITAL, LLC, et al.**

1   A.   Yes, that's correct.

2   Q.   And this table shows that in your opinion the

3   rehabilitation plan is in the best interests of all FGIC

4   wrapped holders, generally.  Is that your opinion?

5   A.   Yes.

6   Q.   Okay.  In the chart, you include 41.3 million dollars in

7   litigation upside in each of the FGIC rehabilitation plan

8   scenarios that you presented.  Is that right?

9   A.   That is correct.

10  Q.   And this 41.3 million dollars in litigation upside

11  represents the FGIC insured trusts' pro rata share of 206.5

12  million dollars in recoveries that FGIC is projected to receive

13  under the proposed joint Chapter 11 plan.  Is that right?

14  A.   I believe that's correct, yes.

15  Q.   And are you aware that the FGIC settlement is a condition

16  precedent to confirmation of the proposed joint Chapter 11

17  plan?

18  A.   I'm aware of that.  Again, we view it as a proxy for what

19  might be expected on other terms absent a settlement.  There's

20  no reason why they don't have a valid claim for those damages.

21  Q.   So you are aware that the FGIC settlement is a condition

22  precedent to the Chapter 11 plan?

23  A.   I'm aware of that.

24  Q.   Have you done --

25  A.   I'm also aware that Mr. --

**RESIDENTIAL CAPITAL, LLC, et al.**

374

1          THE COURT:  You answered the question.

2          THE WITNESS:  Okay, sorry.

3          THE COURT:  Go ahead.

4    Q.   Have you done any analysis of the likelihood of FGIC

5    receiving these recovery amounts in the bankruptcy case if the

6    FGIC settlement is not approved?

7    A.   It's a high level analysis in the sense that we reviewed

8    deposition from Mr. Kruger, CRO for ResCap, who indicated that

9    absent the settle agreement -- settlement agreement, he would

10   be fine with settling at those levels.  So in his opinion, he

11   was okay with that number.

12   Q.   Have you done any analysis as to the likelihood of FGIC

13   receiving these amounts in the absence of the Chapter 11 plan?

14   A.   That's high level analysis.

15   Q.   As to likelihood?

16   A.   Yeah.  If he's agreeing to it -- it says absent this

17   settlement, I would be okay with that level.  That's a high

18   level analysis in my opinion.

19   Q.   Do you have an understanding of all the intercompany

20   settlements that are embodied in the joint Chapter 11 plan?

21   A.   I am not intimately familiar with it, no.

22   Q.   So you have no basis to state whether those settlements

23   would still exist in the absence of the FGIC settlement.  Isn't

24   that right?

25   A.   I gave you my basis.

**RESIDENTIAL CAPITAL, LLC, et al.**

375

1   Q.   So that's --

2         THE COURT:  Can you --

3   Q.   -- correct?

4         THE COURT:  -- answer the question?

5   A.   No -- well, yes, I believe I have basis.

6   Q.   Turning back to the 41.3 million dollars in litigation

7   upside in that chart, do you have that in front of you?

8   A.   I do, yes.

9   Q.   You would agree that this 41.3 million dollar in

10  litigation upside figure would -- I'll --

11        MR. DEVORE:  For the record, I'll start over.

12  Q.   You would agree that this 41.3 million dollar litigation

13  upside figure would, at a minimum, need to be discounted to

14  reflect the risk that recoveries provided in the joint Chapter

15  11 plan would not be realized in the absence of the FGIC

16  settlement.  Isn't that right?

17  A.   Again, I believe that it --

18        THE COURT:  Can you answer that question, Mr. Gibson?

19  A.   It's possible that some discount might be warranted.  I

20  don't have any way of measuring that specifically.

21  Q.   Can you turn to your deposition transcript, which is tab

22  2?

23  A.   Yes.

24  Q.   Page 154, lines 20 -- lines 17 through 25.  And if you

25  could let me know when you're there.

**RESIDENTIAL CAPITAL, LLC, et al.**

1   A.   Yes.

2   Q.   Line 17.

3   "Q.   Would you agree that the 41.3-million-dollar number would

4   have to be discounted, at least, in order to represent the

5   uncertainty of the confirmation of that joint Chapter 11 plan

6   in the absence of the FGIC settlement?

7   "A.   Yes.  I would say that it probably could or should be

8   discounted to some effect."

9        That was your testimony?

10  A.   It was, yes.

11  Q.   You are aware that Duff & Phelps has projected that the

12  FGIC insured trusts are to receive ninety-two million dollars

13  under the proposed Chapter 11 plan.  Isn't that right?

14  A.   Yes, I believe I've seen that.

15  Q.   Okay.  Assuming that the FGIC insured trusts are to

16  receive ninety-two million dollars in recoveries under the

17  proposed Chapter 11 plan, on account of representation and

18  warranty claims, that would represent litigation upside as you

19  define it, correct?

20  A.   That's correct.  It's a form of litigation upside.

21  Q.   So to make your chart an apples-to-apples comparison, the

22  litigation upside under the proposed Chapter 11 plan would need

23  to be added to the settlement scenario.  Isn't that right?

24  A.   Not only to the settlement scenario, but also to the other

25  scenarios.  I don't -- I'm not aware that they would forgo any

**RESIDENTIAL CAPITAL, LLC, et al.**

377

1    of those rights to those claims by adhering to the

2    rehabilitation plan.

3    Q.    That's because you don't unders -- you don't know the

4    conditions to the joint Chapter 11 plan?

5    A.    I've subsequently reviewed specifically this contribution,

6    and I don't -- I have not been presented any information that

7    would indicate that they would waive those rights under the

8    rehabilitation.

9    Q.    Have you been presented with any information that they

10   would retain those rights in the absence of the joint Chapter

11   11 plan?

12   A.    My general understanding is yes.

13   Q.    And what is the basis of that understanding?

14   A.    Once again, just a knowledge of the claims as they were

15   put forth towards Ally; that it is not con -- not necessarily

16   their claims are not contingent upon one rehabilitation or the

17   settlement plan, specifically.

18   Q.    Is that the extent of your understanding?

19   A.    It's a general knowledge, yes.

20         MR. DEVORE:  That's all I have, Your Honor.

21         THE COURT:  All right.  Any further cross-examination?

22   Redirect?  Mr. Carney?

23         MR. CARNEY:  Michael Carney from McKool Smith for

24   Freddie Mac.

25   REDIRECT EXAMINATION

**RESIDENTIAL CAPITAL, LLC, et al.**

378

```
 1   BY MR. CARNEY:
 2   Q.   It was mentioned earlier on -- in your deposition on page
 3   154, I believe, line 17, that you had said that the 41.3-
 4   million-dollar litigation upside would have to be, and I'll
 5   quote, "probably could or should be discounted to some effect."
 6   Do you have any idea of what that effect would be, how much?
 7   A.   I haven't done a specific analysis.  I think that in
 8   its -- as it stands, it's a reasonable expectation based upon
 9   the figures that I've seen in the settlement.
10   Q.   And you understand that the --
11           MR. CARNEY:  Strike that.
12   Q.   Do you have an understanding of the -- what the payout on
13   those litigation claims would be?
14   A.   To individual trusts?
15   Q.   No, just the timing aspect?
16   A.   I would imagine it's -- under the settlement agreement?
17   I'm sorry.
18           MR. CARNEY:  Strike that.
19   Q.   Now, do you have an understanding of whether FGIC has any
20   exposure to the City of Detroit?
21   A.   I do have a general understanding that they do.
22   Q.   And can you tell me what the general understanding is?
23   A.   I believe they have insurance policies on various
24   municipal debt obligations.
25   Q.   And you -- you testified that you understand that FGIC
```

**RESIDENTIAL CAPITAL, LLC, et al.**

379

1   increased its reserves because of that?

2   A.   Yes, I did.

3   Q.   Okay.  And do you believe that that increase in reserves

4   would have any effect on the base case recovery?

5   A.   I'm not aware of any update to the base case scenario as

6   presented by Lazard.  I believe that at the time they ran the

7   analysis they were aware that Detroit was a distressed city,

8   and there probably was risk within those obligations.  I have

9   no basis to make an adjustment to the base case scenario.

10  Q.   And you were asked earlier about your knowledge of certain

11  litigation claims that FGIC has?

12  A.   Yes.

13  Q.   In connection with that, did you review any -- the --

14  either declarations submitted by Mr. Lipps or Mr. Kruger?

15  A.   I did.

16  Q.   And after reviewing those declarations, did you -- what

17  was your understanding of those claims?

18        MR. BENNETT:  Objection, Your Honor.  It's beyond his

19  expert --

20        THE COURT:  He's ent --

21        MR. CARNEY:  He's entitled to look at whatever he

22  wants to form his expert opinion.  He testified he reviewed

23  those declarations.  I think he can say what his thoughts were.

24        THE COURT:  Overruled.  Go ahead and answer.

25  A.   With regard to Mr. Kruger, again, he stated in the

**RESIDENTIAL CAPITAL, LLC, et al.**

380

1  deposition that I reviewed that all else being equal, if the

2  settlement agreement was not accepted, he would be perfectly

3  fine with the 206.5 million dollar amount to settle those

4  claims.

5       With regard to Robert Major's report, you know, it was a

6  general understanding that from his deposition that he believed

7  there is material risk and merit to the claims of -- within

8  the -- within those --

9  Q.   Do you mean Mr. Major or Mr. Lipps?

10  A.   Sorry, Lipps.  Sorry.  Yeah, I'm sorry.

11  Q.   Go on.

12  A.   That there was merit and therefore risk to those claims.

13  Q.   Okay.  Now, I think you were asked a question earlier

14  about the -- your opinion of the riskiness of the

15  settlement/commutation vis-a-vis the rehabilitation plan.

16  Could you just possibly expand on what your view is of that;

17  why one is riskier than the other, or not?

18  A.   Well, effectively, monoline insurance wrapped provisions

19  are a form of credit enhancement.  They are designed,

20  essentially, to protect against losses coming in greater than

21  original anticipation.  So within that context, even under

22  current circumstances, even at a reduced amount of payout, that

23  provision still holds true.  If losses were to come in on

24  individual trusts higher than expected, you would receive some

25  incremental benefit from the monoline wrap provision.

**RESIDENTIAL CAPITAL, LLC, et al.**

381

1    A commutation of that locks you into a base case scenario,

2    such that if losses were to increase, you would receive no

3    further benefit.

4    Q.    Okay.

5             MR. CARNEY:  That's all I have, Your Honor.

6             THE COURT:  Thank you --

7             MR. CARNEY:  Thank you.

8             THE COURT:  -- very much.  Any other redirect form

9    anybody?  Further cross-examination?

10            MR. BENNETT:  Steven Bennett from Jones Day for FGIC,

11   Your Honor.  May I proceed?

12            THE COURT:  Yeah, go ahead.

13   RECROSS-EXAMINATION

14   BY MR. BENNETT:

15   Q.    With regard to Mr. Kruger's testimony that he himself

16   would have been happy to settle the thing without making a

17   payment out to FGIC, that's not a surprise to you, is it?

18            MR. CARNEY:  Objection.  I don't know if he testified

19   to that.

20            THE COURT:  Sustained.

21   Q.    Whatever Mr. Kruger said about his side of the settlement

22   deal, he'd be willing to do that deal if FGIC didn't insist on

23   the consideration that it was asking for.  That was your

24   understanding of his testimony, correct?

25            MR. CARNEY:  Objection.  Vague.

**RESIDENTIAL CAPITAL, LLC, et al.**

382

1          THE COURT:  Overruled.

2    A.   I would have to review his specific comments.  My general

3    understanding is yes, he would accept it, all else being equal.

4    Q.   And that's not a surprise to you that on behalf of the

5    debtors he'd be happy with a settlement that didn't give any

6    consideration to FGIC.  Isn't that true?

7    A.   It's true to the sense that yes, I think it seems like a

8    favorable deal for him.  If outside of this settlement, FGIC

9    would not get a commutation its potential they would have or

10   demand higher amounts under these claims.

11   Q.   And from that, the fact that Mr. Kruger thought it would

12   be okay for him to accept a settlement where there wasn't any

13   commutation, you can't extrapolate some possibility that that

14   deal -- the overall plan settlement deal can be made without

15   the arrangement that FGIC gets under the settlement.  Isn't

16   that true?

17          MR. CARNEY:  Objection.  That's beyond the scope of

18   redirect.

19          THE COURT:  Overruled.

20   A.   I believe it provides good context because it, if

21   anything, provides more of a downside or a conservative

22   estimate of that claim.  Within the confines of this

23   settlement, the two parties were willing to offset their

24   opposing claims for 206 on the part of the debtors; commutation

25   plus other things on the part of FGIC.

**RESIDENTIAL CAPITAL, LLC, et al.**

383

1        Outside of that, FGIC potentially would have higher claims

2   or want a higher compensation.   Therefore, to be conservative

3   and assume 206, I think was reasonable.

4   Q.   Okay.

5            MR. BENNETT:  Nothing further, Your Honor.

6            THE COURT:  All right.  Any other cross?

7            All right.  You're excused.  Thank you very much.

8            Next witness.

9            MR. BAIO:  Your Honor, we will be calling Mr.

10  Goldstein.  May we have a minute?  We will be calling Mr.

11  Goldstein.  I just need a minute to move things around.

12           THE COURT:  So my law clerk handed me a note -- and

13  you can check your own time -- but according to their

14  calculations, they believe the objectors have twenty --

15  approximately twenty-one minutes left.

16           MR. BENNETT:  How much, Your Honor?

17           MR. BAIO:  Twenty-one minutes.  We'll talk quickly,

18  Your Honor.

19           THE COURT:  I'm sorry.  Please raise your right hand.

20      (Witness sworn)

21           THE COURT:  Please have a seat.

22           MR. BAIO:  Your Honor, we offer Mr. Goldstein's

23  declaration, which was filed on August 14th, and it is document

24  number 4675.

25           THE COURT:  Okay.

**RESIDENTIAL CAPITAL, LLC, et al.**

384

1          MR. KERR:  No objection, Your Honor.

2          THE COURT:  All right.  It's in evidence.

3    (Goldstein's Declaration was hereby received into evidence as

4    Opposing Parties' Exhibit, as of this date.)

5          THE COURT:  Cross-examination, Mr. Kerr?

6          MR. KERR:  Yes, Your Honor.

7          THE COURT:  Mr. Bennett, you're going to do it again?

8          MR. BENNETT:  Can we have the binders?  Thank you.

9          Have we sworn the witness?

10         THE COURT:  No, we haven't.  Good.  You don't have to

11   stand.

12         THE WITNESS:  I'm sorry.

13         THE COURT:  You have to be sworn.  Stand and raise

14   your hand.

15         THE CLERK:  He's sworn.

16         THE WITNESS:  I did.

17         THE COURT:  You did?  I missed it.  Thank you.  Way

18   ahead of me.  Go ahead.

19         MR. BENNETT:  Once did about ten minutes of a

20   deposition like that, and then we went back.

21         THE COURT:  You know, I just read a report of a

22   decision where a jury hadn't been sworn, and the verdict had to

23   be reversed just last week.

24         MR. BENNETT:  You can never have too many --

25         THE COURT:  No.

**RESIDENTIAL CAPITAL, LLC, et al.**

385

1        MR. BENNETT:  -- swearing sessions, Your Honor.

2        THE COURT:  No.  That's true.  Go ahead.  Go ahead,

3    Mr. Bennett.

4        MR. BENNETT:  May I proceed, Your Honor?

5        THE COURT:  Yes, please.  Go ahead.

6        MR. BENNETT:  So Steven Bennett from Jones Day for

7    FGIC.

8    CROSS-EXAMINATION

9    BY MR. BENNETT:

10   Q.   Mr. Goldstein, your opinion in this case, in part, is that

11   Duff & Phelps were charged with assessing a settlement offer

12   from FGIC and comparing it to the FGIC rehabilitation plan,

13   correct?

14   A.   Yes.

15   Q.   And in your opinion, simply by tweaking the FGIC offer,

16   Duff & Phelps could have justified a higher offer than the 253-

17   million-dollar commutation payment, correct?

18   A.   I'm not sure I agree with the classification or the

19   termina -- term "tweaking".  We certainly assessed the offer

20   that was provided by FGIC and felt that that was -- there were

21   items within that offer that could have been tweaked and

22   discussed more fully and investigated more fully.

23   Q.   Well, I'm actually using the tweaking word that you --

24   A.   Yeah.

25   Q.   -- used in your --

**RESIDENTIAL CAPITAL, LLC, et al.**

386

1   A.   Yeah, I know.

2   Q.   -- deposition.

3   A.   Okay.

4   Q.   If you want to use something else, tell me what it is?

5   A.   That's fine.

6   Q.   "Tweaking."  Okay, fine.

7   A.   Adjusting.

8   Q.   And you have not expressed an opinion as to whether a

9   higher cash payment amount actually could have been negotiated

10  from FGIC, correct?  That's not in your opinions anywhere?

11  A.   My opinion is not that -- with -- I think there should

12  have been a higher cash settlement offer negotiated.

13  Q.   Okay.  My question is you haven't expressed opinions as to

14  whether it was actually possible to negotiate a higher amount,

15  correct?

16  A.   I'm not sure anybody would be able to know --

17        THE COURT:  Can you answer the question?

18        THE WITNESS:  I don't understand the question.

19        THE COURT:  Did --

20        THE WITNESS:  I mean, just --

21        THE COURT:  Listen carefully.  Go ahead.  Ask your

22  question again, Mr. Bennett.

23        MR. BENNETT:  Yes.

24  Q.   You haven't expressed an opinion as to whether a higher

25  cash payment amount actually could have been negotiated from

**RESIDENTIAL CAPITAL, LLC, et al.**

387

1  FGIC, correct?

2  A.   True.

3  Q.   Now, you make some comments in your opinions about the

4  Duff report, correct?

5  A.   Yes.

6  Q.   And you are not suggesting that in order for the trustees

7  to have reasonably rep -- relied on Duff's advice, Duff &

8  Phelps had to provide to the trustees all the information that

9  it had reviewed in connection with formulating its assessment.

10  Isn't that true?

11  A.   I -- when you use the term "all", then certainly not all

12  of the information; relevant sufficient information to make

13  their decision.

14  Q.   And it's your view that the trustees did not have to

15  independently validate and assess the conclusions in the Duff &

16  Phelps opinion independent of the advice that Duff provided,

17  correct?

18          MR. BAIO:  Object to the form.

19          THE COURT:  Overruled.

20  A.   If you could read that question again.  I'm --

21  Q.   Yeah.  It's not your view that the trustees had to

22  independently validate and assess the conclusions that Duff &

23  Phelps came to independent of what -- the presentations that

24  they received from Duff & Phelps?

25          MR. BAIO:  Object to the form.

**RESIDENTIAL CAPITAL, LLC, et al.**

388

1          THE COURT:  Overruled.

2     A.   If what you're saying is that they couldn't rely on Duff &

3     Phelps, I believe that they had an obligation to consider the

4     Duff & Phelps report.  And if there were issues where items

5     that they identified or were known from the Duff & Phelps

6     report, they had an obligation to inquire as to that.

7     Q.   Could you take a look at your deposition, please?  It's

8     tab 2, Exhibit FN.

9     A.   I'm there.

10    Q.   Page 42, line 3.

11    A.   Yes.

12    Q.   Were you asked this question, and did you give this

13    answer?

14    "Q.   In paragraph 11 of your report, on page 5, you say 'and my

15    analysis of the D&P report, identified inconsistencies,

16    omissions and the absence of relevant information that is

17    necessary to validate, recompute and assess the conclusions

18    arrived by D&P.'  Is it your opinion that in order for the FGIC

19    trustees to have relied on the Duff report that the report must

20    have contained information necessary to validate, recompute and

21    assess the conclusions independent from what the expert

22    provided?"

23          There's an objection, and then you say:

24    "A.   Nothing I am saying here indicates that the trustees had

25    to do that, but what they needed to be assured was that their

**RESIDENTIAL CAPITAL, LLC, et al.**

389

1   expert did."

2       Was that your testimony, sir?

3   A.   That was.

4   Q.   You're not aware the details of the negotiations that led

5   to the 253-million-dollar cash term in the settlement

6   agreement, correct?

7   A.   I am not.

8           MR. BAIO:  Object.  Mediation.

9           MR. BENNETT:  Exactly.

10          THE COURT:  Yes, exactly the point.

11          MR. BENNETT:  Exactly.

12          THE COURT:  Overruled.

13  A.   I am not.

14          THE COURT:  He said "I am not."

15  Q.   And you don't have an opinion as to the likelihood that

16  the plan of reorganization could be negotiated absent the FGIC

17  settlement, correct?

18  A.   I have no reason to know that.

19  Q.   And you didn't have an opinion as to the effect on

20  stakeholders if the plan of reorganization proposed in

21  connection with the FGIC settlement is not approved?

22  A.   I have no knowledge of that.

23  Q.   And you don't have an opinion on the likelihood that Ally

24  Financial would agree to contribute 2.1 billion dollars to the

25  ResCap bankruptcy estate absent the FGIC settlement agreement,

**RESIDENTIAL CAPITAL, LLC, et al.**

390

1  correct?

2  A.   I don't know the -- all the parameters, but all I have is

3  that there was a willingness at this point with the set of

4  circumstances to make that contribution to the plan.

5  Q.   Well, let me ask you a hypothetical, sir.  Independent of

6  the mediation privilege, if you knew that the 253-million-

7  dollar number had been heavily negotiated and if you knew that

8  there was no possibility of obtaining a higher cash offer, in

9  the context of the overall settlement, would your opinion be

10  that the trustees should have accepted the deal?

11  A.   First, the hypothetical -- the -- if I were not provided

12  the analysis that I was provided, that is the calculation as to

13  how they got to the 253, that might have some credence to it.

14  But I have from the opposing side the full detail of how their

15  claim -- how their offer was arrived at.  And those particular

16  issues, the parameters and the calculations contained within

17  that offer, are the things that lead me to believe that there

18  was a -- there was more money available and that there should

19  have been further negotiation.

20      I didn't understand that there was an offer of 253, take

21  it or leave it; that these numbers had within them, as we

22  talked -- or there was testimony earlier rem -- regarding the

23  haircut percentage, as well as I have a disagreement regarding

24  the premium waiver that apparently is part of the calculation

25  of the benefit.

**RESIDENTIAL CAPITAL, LLC, et al.**

391

```
 1          All those things were apparent in the offer.  And so I do
 2     believe there was more money available.  The hypothetical
 3     doesn't make any sense, because they gave the calculation and
 4     saw the calculation in front of them.
 5     Q.   So you can't answer the hypothetical?  Is that your
 6     testimony?
 7               MR. BAIO:  Object to the form.
 8               THE COURT:  Sustained.  Ask another question.
 9     Q.   Let me ask it again.  If you knew -- this is a
10     hypothetical, okay, whatever your explanation of what you think
11     was -- else was going on.  If this was the situation -- there's
12     a 253-million-dollar number.  It's been heavily negotiated.
13     And at this point, there is no possibility of obtaining a
14     higher cash offer, and the rest of the settlement deal,
15     including the plan support agreement, is on the table; is it
16     your testimony the trustees should have said forget it, we're
17     not doing the deal?  Is that your testimony?
18     A.   Well, in fact, within that hypothetical, I would have
19     argued for more money.  If we were really the condition
20     precedent to all of this, there might have been some
21     additional --
22               THE COURT:  Mr. Goldstein --
23     A.   -- leverage.
24               THE COURT:  -- you were asked to make certain
25     assumptions.
```

**RESIDENTIAL CAPITAL, LLC, et al.**

392

1              THE WITNESS:  I was.

2              THE COURT:  Answer the question.

3              THE WITNESS:  I understand that, Your Honor.  If --

4              THE COURT:  Can you answer the question as asked?

5     A.   It's a take it or leave it offer?

6     Q.   Correct.

7     A.   And I would -- so that would mean then you were stuck with

8     the take it or leave it.  And you decide to take it or not, but

9     if the -- I mean, the parties still have the right not to agree

10    to an offer.

11    Q.   In good faith, in your view, the trustees, under those

12    circumstances, could have accepted the deal, correct?

13             MR. BAIO:  Object to the form.

14             THE COURT:  Overruled.

15    A.   Not if they had information that was contrary to that.

16             THE COURT:  Mr. Goldstein, you were asked a

17    hypothetical question.  Can you answer that question?

18             MR. BAIO:  Can we hear it again, Your Honor?

19             THE COURT:  Sure.

20             MR. BAIO:  I'm sorry.  Just so it's clear.

21             THE COURT:  Listen it carefully.

22             THE WITNESS:  Sure.

23             THE COURT:  And just answer the question that's asked.

24    Don't throw in other facts.  It's a hypothetical question.

25             MR. BENNETT:  Correct.

**RESIDENTIAL CAPITAL, LLC, et al.**

1   Q.   The 253-million-dollar cash commutation payment has been

2   heavily negotiated.  The parties are at an end to that

3   negotiation.  There's no possibility of obtaining a higher cash

4   offer, and the deal is on the table in the context of the

5   overall plan support agreement.  So it's the FGIC settlement

6   plus the plan support agreement being presented as a take it or

7   leave it deal.  In your view, could the trustees, in good

8   faith, accept that deal?

9   A.   I'm still -- no, I think if they -- again, they could

10  always -- and they always have the right, if -- to not accept

11  that.  Just because it's the last --

12          THE COURT:  Mr. Goldstein?

13  A.   -- dollar --

14          THE WITNESS:  Yes?

15          THE COURT:  I thought the question was pretty clear.

16  Can you answer the question?  It's a hypothetical question.

17  Take it or leave it deal.

18          THE WITNESS:  And I -- what I'm saying is they could

19  not take it.

20  Q.   Well, is it your testimony it's either way?  They could

21  either take it or leave it, and there'd be good faith in either

22  direction?

23          THE COURT:  The question is --

24          MR. BAIO:  Objection to form.

25          THE COURT:  -- whether, if they accept it -- a take it

**RESIDENTIAL CAPITAL, LLC, et al.**

394

1    or leave it deal, do you believe that's in good faith?

2            THE WITNESS:  Again, the -- a take it or leave it is

3    not always in the --

4            THE COURT:  At the end of the negotiation, you get to

5    a point where somebody --

6            THE WITNESS:  Right.

7            THE COURT:  -- isn't going to raise the price anymore.

8            THE WITNESS:  Right.

9            THE COURT:  And the trustees -- I take it this is your

10   question, Mr. Bennett.

11           MR. BENNETT:  Correct.

12           THE COURT:  The trustees are faced with a decision.

13   Take it or not.  If they decide to take it, do you believe it's

14   in good faith?

15           THE WITNESS:  Okay.  I -- it could possibly be, or not

16   because --

17           THE COURT:  Okay.

18           THE WITNESS:  -- there might be other -- Your Honor, I

19   participate in negotiations all the time.  And just because

20   somebody says I'm not going to pay you a dollar more doesn't

21   make it --

22           THE COURT:  You were asked a hypothetical --

23           THE WITNESS:  -- the right offer.

24           THE COURT:  -- question, Mr. Goldstein.  Ask your next

25   question.

**RESIDENTIAL CAPITAL, LLC, et al.**

395

1          THE WITNESS:  But it doesn't mean it's a reasonable --

2          THE COURT:  Mr. Bennett --

3          THE WITNESS:  -- answer.

4          THE COURT:  -- the witness doesn't want to answer the

5     question, okay?

6          MR. BENNETT:  I'm fine with that --

7          THE COURT:  And the Court will take --

8          MR. BENNETT:  -- Your Honor.

9          THE COURT:  -- that into account in evaluating --

10         MR. BENNETT:  Certainly.

11         THE COURT:  -- his credibility.

12    BY MR. BENNETT:

13    Q.   Let's talk about the forty --

14         THE COURT:  Ask your next question.

15         MR. BENNETT:  Sorry.  Sorry, Your Honor.

16         THE COURT:  Thank you.

17    Q.   Let's talk about the forty-percent haircut.

18    A.   Yes.

19    Q.   There's -- in your report, there's a criticism of that,

20    correct?

21    A.   Yes.

22    Q.   And you -- in your understanding of the forty-percent

23    haircut, that was based on a FGIC estimate of unpaid future

24    claims, correct?

25    A.   The forty-percent haircut was -- what I saw, as an

**RESIDENTIAL CAPITAL, LLC, et al.**

396

1   additional discount to the discounts already in place in

2   calculating what the payout would have been to security holders

3   at that point.  So there was already -- it was a double

4   discount.

5   Q.   Not my question.  The basis, as you understood it, of the

6   FGIC forty-percent haircut was on an estimate of unpaid future

7   claims, correct?

8   A.   I don't have that explanation -- well -- as to what was

9   the forty-percent discount.  It's called a haircut.  It was

10  called settlement terms.  It was called negotiation.  I'm not

11  really sure what the overall basis of it was.

12  Q.   Sir, take a look at your own expert report.  It's tab 3,

13  Exhibit CL.

14  A.   Yes.

15  Q.   And if you go to page 7 -- a little hard to tell the

16  numbering here, but it's paragraph 18(ii) on the forty percent

17  reduction of future payment, and then you go from page 6 over

18  to page 7, are you there?

19  A.   Yes.

20  Q.   And it says "The reduction is described in the Duff &

21  Phelps report as a haircut of forty percent on unpaid payout

22  claim estimates," correct, that's what it says?

23  A.   Yes.

24  Q.   And that was your understanding of what the haircut was

25  for, correct?

**RESIDENTIAL CAPITAL, LLC, et al.**

1   A.   Those are -- yes, I mean, the unpaid claims they took a

2   reduction off of those claims that have been -- the future

3   claims, yes.

4   Q.   And you believe that the potential for additional

5   liabilities to the extent that they would impact cash flows

6   should be factored into an assessment of the rehabilitation

7   plan, correct?

8         MR. BAIO:  Object to the form, I don't understand it.

9         THE COURT:  Sustained.  Ask your question again, Mr.

10   Bennett.  I didn't understand it either.

11   Q.   To the extent that additional liabilities, future

12   liabilities, may have an impact on cash flows in your opinion

13   in assessing the rehabilitation plan, the likely results of the

14   rehabilitation plan, that has to be taken into account,

15   correct?

16         MR. BAIO:  Same objection.

17         THE COURT:  Overruled.

18   A.   The claim levels certainly impact the payout under the

19   plan and it would be effective in the relative sense.  That is,

20   depending on which type of claim would be made; whether it's

21   under the municipality claims, or whether it's under the other

22   claims, whatever would be in the mix, it would be a relative

23   impact.

24   Q.   Okay.  And you are aware that that FGIC insures public

25   finance obligations, correct?

**RESIDENTIAL CAPITAL, LLC, et al.**

398

1   A.   I am.

2   Q.   And you have an understanding that about thirty percent or

3   more of FGIC's business involves the insurance of public

4   finance, correct?

5   A.   I'm aware of that.

6   Q.   And you have not studied FGIC's exposures to public

7   financing insurance obligations, correct?

8   A.   Only to the extent they're included in their quarterly

9   reports.

10  Q.   Well, you have not made an assessment of the likelihood

11  that the Detroit filing will have an impact on FGIC's financial

12  circumstances, correct?

13  A.   I have not done an individual study of that.

14  Q.   And you have not made any assessment of the likelihood

15  that any other state, county or municipal entities defaulting

16  or filing for bankruptcy might have an effect on FGIC's

17  finances, correct?

18  A.   That's true.

19  Q.   And you were present in court last week when John Dubel

20  testified, correct?

21  A.   I was.

22  Q.   And you heard Mr. Dubel testify that FGIC added something

23  in excess of 800 million dollars in loss reserves in a single

24  quarter just this year, correct?

25  A.   I heard that, yes.

**RESIDENTIAL CAPITAL, LLC, et al.**

399

1  Q.    And you're not in a position to contradict that testimony,

2  are you?

3  A.    No, I've heard his testimony.

4  Q.    And you have seen the most recent FGIC financial

5  statements, correct?

6  A.    I have.

7  Q.    And if you go to tab 9, Exhibit 174, I think that's

8  already in evidence.

9  A.    I see that.

10  Q.   That's a set of financial statements that you have

11  reviewed, correct?

12  A.    Well, review is a technical term, I've read them.

13  Q.    You've seen them?

14  A.    I have seen them.

15  Q.    Okay.  And you're not in a position to contradict any of

16  the numbers that are included in that set of financial

17  statements, correct?

18  A.    I've only read those, sir.

19  Q.    You have reviewed the terms of the FGIC rehabilitation

20  plan, correct?

21  A.    I have.

22  Q.    And you agree that the amount of the upfront payment

23  according to the plan could go up or down from what is

24  estimated in the plan disclosure, correct?

25  A.    Yes.

**RESIDENTIAL CAPITAL, LLC, et al.**

400

1   Q.   And you recognize that the rehabilitator has discretion to

2   determine the amount of the upfront payment, correct?

3   A.   I'm aware of that.

4   Q.   And you're aware there's no minimum initial CPP or cash

5   payment under the rehabilitation plan, correct?

6   A.   That's true.

7   Q.   And you recognize that future cash flows under the

8   rehabilitation plan may extend as long as forty years, correct?

9   A.   My understanding is yes, that would be the time frame.

10   Q.   And you agree there's no guarantee of the amount of any

11   such future cash flows, correct?

12   A.   That is also true.

13   Q.   And you have not done any analysis of likely recoveries

14   under the FGIC rehabilitation plan, correct?

15   A.   I have not.

16   Q.   The only analysis that you have seen unlikely recoveries

17   comes from the Duff & Phelps report, correct?

18   A.   Yes, and also the Lazard reports.

19   Q.   Okay.  Now let's talk about the premium payment.

20   A.   Yes.

21   Q.   You recognize that as part of the FGIC deal the trusts

22   will not have to pay any future insurance premiums to FGIC,

23   correct?

24   A.   That is a term, yes.

25   Q.   And you recognize that the nonpayment of the insurance

**RESIDENTIAL CAPITAL, LLC, et al.**

401

1   premiums constitutes value to the trusts and their

2   beneficiaries, correct?

3   A.    If you don't have to pay a bill, yes, that would be a

4   benefit.

5   Q.    And the present cash value as you understand it, is about

6   18.1 million dollars, correct?

7   A.    Yes, that is the number.

8   Q.    But you say in your declaration that the trust might

9   already have a right to set off premium payments against a

10  deficiency related to policy claims, is that right?

11  A.    Yes.

12  Q.    And is that based on your legal analysis of the

13  rehabilitation plan?

14  A.    No, it was my assessment or my understanding from speaking

15  with counsel.

16  Q.    Okay.  And you're not offering the Court a legal opinion

17  on the meaning of the provisions of the rehabilitation plan

18  with regard to setoff, are you?

19  A.    I'm not.

20  Q.    Isn't it true that the right of setoff under the

21  rehabilitation plan only arises if FGIC does not pay the cash

22  payments, the CPP?

23          MR. BAIO:  Object to the form.

24          THE COURT:  Overruled.

25  A.    My understanding is that if there were unpaid claims that

**RESIDENTIAL CAPITAL, LLC, et al.**

1    there was an ability to offset those unpaid amounts versus the

2    premium payment.

3    Q.    Right.  So you have a plan of rehabilitation, FGIC is

4    supposed to make cash payments pursuant to the plan.  If they

5    don't then there's a right of setoff --

6    A.    Right.

7    Q.    -- correct?

8    A.    Yes.

9    Q.    That's the only situation where there's a right of setoff,

10   correct?

11   A.    To my understanding, yes.

12   Q.    Now, your original expert report included reference to

13   potential benefits from FGIC litigation against RMBS organizers

14   like Countrywide, AFI and Credit Suisse, correct?

15   A.    Yes.

16   Q.    And your opinion originally was that proceeds from such

17   litigation should have been included in determining the

18   potential value of the FGIC rehabilitation plan, correct?

19   A.    What my opinion was that there should have been an

20   assessment of those litigation items, that the offer did not

21   include any of those items.  That there was a walk away, it was

22   the 253 million dollars and then a no ability to collect on any

23   of the upside based on those litigation items.

24   Q.    And your original opinion actually assumed that there was

25   more than one billion dollars of gross recoveries available

**RESIDENTIAL CAPITAL, LLC, et al.**

1  from loss mitigation activities that could include litigation

2  claims, correct?

3  A.    From loss mitigation which includes litigation.  If you

4  look at the report that we were just talking about, the

5  quarterly report, the language in that section describes what

6  potential recoveries are.  It could be reinsurance, there could

7  be subrogation claims, and as well, there could be litigation

8  as mentioned here.  So it's not just the litigation, it would

9  be any mitigation.

10  Q.    I'm talking about your original expert report?

11  A.    Yes.

12  Q.    You assume there was more than a billion dollars' worth of

13  loss mitigation recoveries that could be in the form of

14  litigation claims, correct?

15  A.    Not only in the form of litigation, it's among other

16  things.  So litigation, was certainly one of the items that was

17  included, but other recovery actions were also included.

18  Q.    And that was based on your reading of the March 2013 FGIC

19  quarterly statement, correct?

20  A.    Yes, there was an estimate at that point in that report;

21  the quarterly report.

22  Q.    And you recognized now that that assumption actually was

23  an error, correct?

24  A.    Well, I certainly have heard some testimony.  The one

25  thing I haven't seen is the actual details of -- what's

**RESIDENTIAL CAPITAL, LLC, et al.**

404

1   included in that amount.  There was -- Mr. Dubel testified as

2   to, you know, a certain portion of that being reimbursable

3   claims, or reimbursement claims.  And, but other than that, I

4   haven't seen any of the detail to know specifically --

5   Q.    Okay.

6   A.    -- what's in there.

7   Q.    Your new declaration, your trial testimony, actually takes

8   that out, correct?  You no longer refer to the billion dollars

9   in gross recoveries, correct?

10  A.    That is accurate.

11  Q.    And that's based on the new information that you got that

12  explained what the quarterly March 2013 statement actually was

13  about, correct?

14  A.    No, it was more of a simplification of my presentation.

15  Q.    Okay.  You do know that John Dubel testified in his direct

16  that that one-billion-dollar recovery actually didn't refer to

17  litigation claims, correct?

18  A.    I did hear his testimony.  He described approximately 500

19  million of it related to reimbursement claims, of which his

20  further testimony was that they could have no value.  So I'm

21  not -- I haven't seen the exact details that make up that

22  amount.  So I don't know what's included or not included,

23  whether it has litigation, doesn't have it, whether it's --

24          THE COURT:  Why don't you take well enough alone, Mr.

25  Bennett.

**RESIDENTIAL CAPITAL, LLC, et al.**

405

1          MR. BENNETT:  Yeah, that's fine.

2          THE COURT:  He took it out of his final report, you

3   know.

4   Q.   Why don't we get to the assumption about the payout to

5   FGIC absent the settlement deal.  You recognize that as part of

6   the FGIC settlement deal FGIC will get an allowed claim in the

7   ResCap bankruptcy which you say will generate about a 206-

8   million-dollar payment, correct?

9   A.   Yes.

10  Q.   And you state in your declaration that absent the

11  commutation FGIC ResCap policyholders are entitled to receive

12  proceeds from contingent assets, such as litigation recoveries,

13  correct?

14  A.   Yes.

15  Q.   And you assume that if the ResCap Chapter 11 plan did not

16  become effective the value of the FGIC recovery is uncertain,

17  correct?

18  A.   I think it is -- yes, there was no precise number,

19  although I used the number that was in the settlement agreement

20  because it was a negotiated -- heavily negotiated amount, as

21  you've discussed.

22  Q.   So you did the same thing that Mr. Gibson did, just assume

23  that the claim could be settled or litigated for that amount,

24  correct?

25  A.   Yes, that's right.

**RESIDENTIAL CAPITAL, LLC, et al.**

406

1   Q.   And you have not independently made an assessment of

2   FGIC's likelihood of success on any of its claims, correct?

3   A.   That's the exact kind of information that I would like to

4   have had.  Yes, I haven't done an independent view of it, and

5   that was not available to the trustees either from what I could

6   tell.

7   Q.   Well, in fact, as of your deposition you hadn't even

8   reviewed FGIC's proofs of claims in the case, isn't that true?

9   A.   I don't recall what that particular question was.  I don't

10  recall saying that, but you'll I'm sure point it out to me.

11  Q.   Well, why don't we go to your deposition again?

12  A.   Yep.

13  Q.   Tab 2, page 163, line 14.

14  "Q.  So your understanding, though, is that if the FGIC

15  settlement agreement is not approved the FGIC trusts would not

16  have allowed claims at the levels, whatever levels they are at

17  this point, under the proposed ResCap bankruptcy agreement?

18  "A.  I have not looked at the proofs of claim that have been

19  filed for that purpose and assess whether there is enough, you

20  know, a positive or a negative to that.  So I don't have an

21  opinion."

22       Was that your testimony, sir?

23  A.   It was.

24  Q.   Now, you agree with regard to discount rates that the

25  purpose of a discount rate is to adjust the value of projected

**RESIDENTIAL CAPITAL, LLC, et al.**

407

1  cash flows to account for risk and uncertainty in financial

2  projections, correct?

3  A.   Yes.

4  Q.   And you criticized the Duff & Phelps report for failing to

5  provide a build up explanation of the discount rates that they

6  used in calculating future cash payments under the

7  rehabilitation plan, correct?

8  A.   Well, the criticism was that I didn't see a basis of it,

9  and I think they assumed the Lazard range that was provided to

10  them.

11  Q.   Right.  And you have not for your own purposes derived a

12  specific alternative discount rate number of your own, correct?

13  A.   I have not.

14  Q.   And you were present in court just less than an hour ago

15  when Mr. Gibson testified that a discount rate of ten to twenty

16  percent is a reasonable discount to account for the

17  uncertainties and timing of the cash flows within the FGIC

18  rehabilitation plan.  Did you hear him testify to that effect?

19  A.   I did hear him say that, yes.

20  Q.   And you're not in a position to contradict Mr. Gibson's

21  testimony, are you?

22  A.   My criticism is contained in my report as to the discount

23  rates, and the lack of calculations or underlying data

24  supporting that.

25           MR. BENNETT:  Nothing further, Your Honor.

**RESIDENTIAL CAPITAL, LLC, et al.**

408

```
 1            THE COURT:  Any further cross-examination?
 2            Redirect.
 3   REDIRECT EXAMINATION
 4   BY MR. BAIO:
 5   Q.   Mr. Goldstein, let's go back to the hypothetical.
 6   A.   Yes.
 7   Q.   And as I understood it on the one hand there's a 253-
 8   million-dollar commutation policy by FGIC and that's it,
 9   they're not going to do anything more, that's their final
10   offer.  On the other side there is a rehabilitation plan with
11   all that has been described.
12   A.   Right.
13   Q.   In your view, if the trustees accept the 253 and reject
14   the rehabilitation plan could that be in good faith on behalf
15   of the trusts?
16   A.   No.
17   Q.   And why not?
18   A.   And if we turn to page 3 of my report it outlines the FGIC
19   proposal versus -- well, just outlines the FGIC proposal and
20   tries to further explain or to identify my disagreements with
21   those amounts, or those amounts that are present.  So I think
22   it's probably important to start with the initial cash payment
23   is 253 million dollars in the offer; in the plan it would be
24   136 million dollars as suggested in the FGIC offer, and it's
25   also approximately 150 to 163 million dollars in the Duff &
```

**RESIDENTIAL CAPITAL, LLC, et al.**

409

1    Phelps analysis; so the initial cash payment is increased.

2         If you roll down the calculation it comes to what amount

3    is being paid to the -- underneath the plan, and it would be

4    the 136 million dollars up front, and then there would be 225

5    million dollars of payments over time that would be already

6    present value.  That is, those cash flows are taken back to

7    present value.  You'd add those up and it would come out to a

8    total of 362 million.  That obviously takes into account, or

9    does not take into account this forty percent haircut that was

10   described, which I still don't believe has any -- has no

11   support from what I can find.

12        In addition, the total value to the trust calculation as

13   everything rolls through is a number that is assumed throughout

14   the -- from the -- or the rehabilitation plan.  That number

15   assumes that the -- that the premiums are paid.  So, for

16   example, the 271 million dollars even under the proposal is

17   then reduced by the premium payment.  If, in fact, that is a

18   benefit that's being described, then the payment wouldn't have

19   to be made.  So the 253's already net of a payment of eighteen

20   million dollars.  The 271 -- if somebody were to offer the 271

21   and say okay, you get 271 million dollars and you don't have to

22   pay the premium, then you would have that money.  But, in fact,

23   you can't call it a benefit if they reduce your present value

24   or the value of the trusts by the payment.  It doesn't make any

25   sense; they're reducing it so, in fact, they're having you pay

**RESIDENTIAL CAPITAL, LLC, et al.**

410

1    that amount.

2        I've removed that from the adjusted FGIC proposal to have

3    the 362 million, that is removing the forty percent discount

4    rate, or discounted amount, for future claims, as well as the

5    eighteen million dollars, to arrive at the adjusted proposal.

6    And based on that, based on that number alone, without

7    considering any of the other upsides, upside on the modeling,

8    upside on any of the litigation, or any of the recovery areas,

9    that number is, as we can see, a 109 --

10            THE COURT:  What paragraph are you looking at?

11            THE WITNESS:  This is in paragraph 5 -- I'm sorry,

12    paragraph 11, but it carries over to page 3.

13            THE COURT:  I got it.

14    A.    So that these numbers and this difference doesn't include

15    any of those potential upsides.  And I think as we've

16    identified, there are a number of items that are there.  There

17    are litigation items, material litigation that where the --

18    where FGIC is represented by material firms, like Jones Day,

19    who obviously is not going into litigation frivolously.  So all

20    of these actions of Credit Suisse, the Countrywide, and the

21    other litigation with the debtor, are all items that are

22    potential upsides that are completely discounted and not

23    provided.  There's no analysis of it, there's no -- and there's

24    even no attempt to come up with a number.

25        But despite all that, and not considering any of that, the

**RESIDENTIAL CAPITAL, LLC, et al.**

411

1   mere adjustments that I place onto the proposal provide a 362-
2   million-dollar payment to the investors.
3   Q.    And what about if you also include the settlement that
4   generates 206 million dollars, what does that do in your
5   analysis as to whether the trustees could be acting in good
6   faith by accepting the last offer of 253 million dollars?
7   A.    Again, as I stated earlier or was trying to, within that
8   the 206 million dollars is a negotiated amount, and I use that
9   as, again, a proxy, or a number that was arrived at by these
10  competing parties.  To say that that number is outlandishly one
11  way or the other I've decided -- or not decided, I've
12  concluded, that seeing that, that the 206 million dollars is an
13  amount to at least consider and present here.  And then what
14  I've provided also is what the share of those -- the particular
15  proceeds would be for the investor group.
16  Q.    And what is that share?
17  A.    43.4 million dollars.
18  Q.    And when you add that to the 361 it's -- what do you get?
19  A.    It's a total of 405.3 million dollars.
20  Q.    And it is your opinion that that amount is the minimum
21  that could be paid?
22  A.    It is a floor, yes.
23  Q.    Now, we were asking about good faith.  In that
24  hypothetical is there any way that you could see that the
25  trustees could be acting in good faith on behalf of the trusts

**RESIDENTIAL CAPITAL, LLC, et al.**

412

1   by accepting the 253 million dollar take it or leave it number?

2   A.   No, I don't believe they could have been acting in good

3   faith at that point.

4        THE COURT:  So why didn't you answer the question when

5   you were asked by Mr. Bennett?

6        THE WITNESS:  I -- I --

7        THE COURT:  All you did was fence and you didn't

8   answer the question.

9        THE WITNESS:  That it wasn't in good faith, I'm sorry,

10  Your Honor, I thought he was trying --

11       THE COURT:  Go on, Mr. Baio.

12       THE WITNESS:  Yep.

13       THE COURT:  I don't particularly appreciate it,

14  though, when in cross-examination the witness refuses to answer

15  questions.  And then now you stand up there and go through it

16  as if oh, all is sweetness and light.  Go on and finish your

17  examination.

18  Q.   Let's talk about in a hypothetical without -- with another

19  conclusion, and that is whether the settlement would be in the

20  best interests of the trusts.  If it were a take it or leave it

21  offer of 253 million dollars, the alternative being the

22  rehabilitation plan, in your view is it in the best

23  interests -- could it be in the best interests of the trusts to

24  accept the 253 million dollars?

25  A.   No.

**RESIDENTIAL CAPITAL, LLC, et al.**

413

1  Q.   Let's talk about -- you also were asked about discount

2  rates by the cross-examining attorney, and the forty percent

3  haircut.  You heard an explanation of the forty percent haircut

4  that there are claims that would be front-loaded, and

5  therefore, that would justify an additional discount, does that

6  make any sense to you?

7  A.   Well, in fact, I believe it's the opposite.  Those claims

8  that are incurred in the current time have a higher present

9  value to them, in that the discount rate is applying over a

10  shorter period of time.  So if there's a claim made, 17.25 or

11  whatever the number ends up being in the initial payment, will

12  be there, as well as a carry of three percent on the balance

13  that's unpaid.  So that those claims would have a higher

14  percentage, higher present value, than the claims that would

15  occur five, ten, fifteen years down the line.

16  Q.   And what was your understanding as to the excuse or the

17  basis for the forty percent haircut?

18  A.   Well, that somehow -- I think it's a combination of items.

19  That is, there's great risk that there will be further claims

20  and that these particular claims would be further diluted, or

21  diluted in a relative ratio, and therefore, the payments that

22  would go out to these -- the folks that are settling here would

23  be less.

24  Q.   And what about the front-ended aspect of it, how does that

25  work as you understand it from the explanation that you

**RESIDENTIAL CAPITAL, LLC, et al.**

414

1 received?

2 A. Again, well, the front -- I don't want to have to repeat

3 myself, but basically those dollars that are received in the

4 current framework or within the current time have a higher

5 present value than dollars that are received at a later period

6 of time.

7 Q. And does that make any sense as a justification for the

8 forty percent haircut?

9 A. I have not heard any explanation for the forty percent

10 haircut.

11         MR. BAIO: That's all I have, Your Honor, I pass the

12 witness.

13         THE COURT: Any other redirect?

14         Further cross?

15         MR. BENNETT: Nothing further, Your Honor.

16         THE COURT: All right. You're excused, Mr. Goldstein.

17         All right. Before I decide on whether we're going to

18 take the lunch break what other witnesses do the objectors

19 have?

20         MR. BAIO: Your Honor, we have the exhibits that we

21 want to go through that also we will submit, and the deposition

22 testimony designations.

23         THE COURT: Are there any other live witnesses I'm

24 going to hear?

25         MR. BAIO: Other than our rebuttal case, Your Honor,

**RESIDENTIAL CAPITAL, LLC, et al.**

415

1    we have no other live witnesses.

2         THE COURT:  Rebuttal case?

3         MR. BAIO:  To whatever they're putting on, to what

4    they have put on.  We are limited, right, Your Honor, we were

5    not able to ask witnesses --

6         THE COURT:  Well, do you have a witness you're calling

7    as part of your case?

8         MR. BAIO:  The affirmative case, or the rebuttal case?

9         THE COURT:  The objectors are putting their case on,

10   are there any other witnesses that you're calling as part of

11   your case?

12        MR. BAIO:  Yes, Your Honor, we will call Mr. Sklar,

13   but that will be in the form of rebuttal.

14        THE COURT:  No, it won't.  You --

15        MR. BAIO:  Okay, then we'll call him.

16        THE COURT:  -- can call Mr. Sklar.

17        MR. BAIO:  Okay.

18        THE COURT:  They rested, you're putting your case on.

19   I asked whether you have any other witnesses, you want to

20   call -- recall Mr. Sklar.  Anybody else?

21        MR. BAIO:  I don't believe so, Your Honor.

22        THE COURT:  All right.  How long do you anticipate

23   being with Mr. Sklar?

24        MR. BAIO:  No more than fifteen minutes.

25        THE COURT:  All right.  We're going to take -- all

**RESIDENTIAL CAPITAL, LLC, et al.**

416

1   right, and then what is the status of the designations and

2   counter-designations, Mr. Kerr?

3           MR. KERR:  Your Honor, it's my understanding -- I

4   believe, and I believe that these are some open issues between

5   the investor objectors and the trustees.

6           THE COURT:  Okay.

7           MR. KERR:  I was hoping -- I have to figure out over

8   lunch how to get those resolved, and I think -- I've not been

9   directly involved in it, but I'll find out, Your Honor, and

10  I'll report back to Your Honor.

11          THE COURT:  All right.  When the objectors rest are

12  there witnesses that the proponents intend to call as part of a

13  rebuttal case?

14          MR. KERR:  And, again, Your Honor, I believe Mr. --

15          MR. WYNNE:  Wynne, yes.

16          MR. KERR:  Mr. Wynne said that there may be a rebuttal

17  witness, and I -- and I just have to check with Mr. -- now that

18  he's heard this, I have to check with him to make sure.

19          THE COURT:  Well, check with him now.

20          MR. KERR:  I will.

21          MR. WYNNE:  Yes, Your Honor.  Yes, we'll be calling

22  Mr. Dubel, Your Honor.  I would estimate probably fifteen

23  minutes -- ten to fifteen minutes.

24          MR. WEITNAUER:  And we'd be calling maybe Dr. Kothari,

25  but certainly Mr. Pfeiffer for rebuttal.

**RESIDENTIAL CAPITAL, LLC, et al.**

417

1          THE COURT:  Okay.  We can take one hour for lunch.

2          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

3          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

4          THE COURT:  It's 12:37, so 1:37 we'll resume.

5       (Recess from 12:37 p.m. until 1:37 p.m.)

6          THE COURT:  Please be seated.  Court's back in

7    session.

8          Mr. Kerr?

9          MR. KERR:  Your Honor, Charles Kerr of Morrison &

10   Foerster, on behalf of the debtor.

11         Just some housekeeping matters if I could, Your Honor?

12         THE COURT:  Yes.

13         MR. KERR:  During the lunch, we -- several parties

14   worked on getting the designations correct, and I'd like to

15   offer into evidence as Exhibits (sic) 175 the deposition

16   designations and counter-designations for Michael Thayer (ph.).

17   Exhibit 176 are the deposition designations and cross-

18   designations for Adam Sklar.  Exhibit 177:  the deposition

19   designations and cross-designations for David Williams.  And

20   178 are the deposition designations and cross-designations for

21   Gina Healy.  And I have copies of those here, Your Honor, if

22   you want me to hand them up to you?

23         THE COURT:  Okay, please.

24         Okay, thank you.

25         All right, is everybody in agreement on that?

**RESIDENTIAL CAPITAL, LLC, et al.**

418

1          MR. KERR:  I believe so.

2          MS. JAMES:  Your Honor, any objections we have, I

3    believe, are listed on those documents we just handed up.

4          MR. GOODMAN:  And, Your Honor, Peter Goodman for

5    Freddie Mac.  We echo counsel's comments.

6          THE COURT:  Well, I want to make sure I understand.

7    So the objections that are shown are being reserved, is that

8    correct?

9          MS. JAMES:  That's correct, Your Honor.

10          THE COURT:  Okay.  All right --

11          MR. KERR:  Your Honor, one moment?

12          THE COURT:  Sure.

13          MR. KERR:  Yes, that's fine, Your Honor.  And I --

14          THE COURT:  I'm going to read the designations and

15    counter-designations and where there's -- I'm not sure whether

16    I'm going to enter a separate order on the objections or not;

17    I'll see when I read this.

18          MR. KERR:  Okay.  That's my only housekeeping, Your

19    Honor.

20          THE COURT:  All right, so Exhibits 175, -76, -77 and

21    -78 don't come into evidence per se; they're the listing of the

22    designations -- deposition designations and counter-

23    designations and some objections.  And the Court will review

24    the testimony and including the objections.

25          All right.  Do the objectors -- are they calling

**RESIDENTIAL CAPITAL, LLC, et al.**

419

1    another witness?

2         MR. KERR:  Oh.  I believe we are, Your Honor.

3         MS. JAMES:  Your Honor, we will have designations to

4    offer --

5         THE COURT:  I'm sorry, I didn't hear you, Ms. James.

6         MS. JAMES:  I'm sorry.  We will have designations to

7    offer, Your Honor.  We don't have them right now; they'll be

8    available shortly.

9         THE COURT:  Okay.

10         MR. CARNEY:  Your Honor, we do have designations to

11    offer --

12         THE COURT:  Come on up, Mr. Carney.

13         Go ahead, Mr. Carney.

14         MR. CARNEY:  Good afternoon, Your Honor.  Michael

15    Carney for Freddie Mac.

16         We do have the designations to offer:  the

17    designations of Federal Home Loan Mortgage Corporation, the

18    deposition testimony of John Dubel, Robert Major and Lewis

19    Kruger; and the designations of the Federal Home Mortgage --

20    oh, that's the same one -- and the counter-designations of

21    Federal Home Loan Mortgage Corporation, to the testimony of

22    Gina Healy; and --

23         THE COURT:  I'm confused.  Mr. Kerr has indicated that

24    he was -- that what he gave me included the designations and

25    counter-designations.

**RESIDENTIAL CAPITAL, LLC, et al.**

420

1          MR. KERR:  One second, Your Honor.  Let me --

2          THE COURT:  Yeah, confer.

3          MR. KERR:  Let me clarify.

4      (Pause; counsel confer)

5          MR. CARNEY:  Your Honor, generally what we've agreed

6   to is we've agreed with the parties that we would -- each party

7   would submit its own designations and counter-designations, and

8   we --

9          THE COURT:  No.  I want one for each witness.  I want

10  a document, a pleading, that indicates the designations,

11  counter-designations and any remaining objections.  I'm not

12  going to refer to one document from each of you for the same

13  witness.

14         MR. CARNEY:  All right.

15         THE COURT:  It's not complicated.

16         MR. CARNEY:  We will certainly do that, Your Honor,

17  and apologize for wasting the Court's time.

18         THE COURT:  Okay, but you -- the only overlap was

19  Healy.  You have -- are there designations and counter-

20  designations through Dubel, Major and Kruger?

21         MR. CARNEY:  Yes.

22         THE COURT:  Okay.

23         MR. CARNEY:  Yes, and we will submit those in the

24  format the Court requested.

25              We would also like to introduce a few exhibits, if

**RESIDENTIAL CAPITAL, LLC, et al.**

421

1    that's all right, or --

2              THE COURT:  Offer them now.  Go ahead.

3              MR. CARNEY:  Okay.

4              MR. KERR:  Your Honor --

5              THE COURT:  Go ahead, Mr. Kerr.

6         Let me hear --

7              MR. KERR:  I'm just trying to understand.  I was --

8    with respect to the designations -- let me step back.  We sent

9    to the objectors a full list of all the designations and

10   counter-designations for Kruger and we didn't get any response

11   from them.  So what I'm assuming is that they're now going to

12   look at that and hopefully agree to that, I guess.

13             THE COURT:  I set a -- I think, when I got the McKool

14   Smith letter complaining about disagreement about designations

15   and counter-designations, I required a meet-and-confer and a

16   deadline to get it resolved.  There should be -- I should be

17   getting a document that reflects that you've exchanged -- I

18   don't want to hear that you're telling Mr. Kerr for the first

19   time now that you've got counter-designations to depositions.

20             MR. CARNEY:  With respect to Mr. Kruger, no, we don't.

21   We agree with what was submitted this morning that he submitted

22   to the Court.

23             MR. KERR:  Your Honor, I haven't submitted anything

24   for Mr. Kruger.

25             THE COURT:  I know you haven't.  Nobody's submitted

**RESIDENTIAL CAPITAL, LLC, et al.**

422

1   anything with respect to Mr. Kruger.

2          MR. CARNEY:  Well, let me confer with the parties and

3   maybe we can iron this out.  Just give us a second, and I guess

4   we can move on at this point.

5          MS. JAMES:  Your Honor, we had submitted counter-

6   designations to Mr. Kruger, designations we received from the

7   debtors.

8          MR. KERR:  Your Honor, if I can cut through this.  We

9   have a single piece of paper that has Mr. Kruger's -- all

10  Mr. Kruger's designations we got from all the other parties,

11  and the counter-designations that we provided.  And I've sent

12  that to everybody and I'm willing to mark that and put that in

13  if that's what makes it easier, but --

14         THE COURT:  Well, it's not a question of putting it

15  in.  It's --

16         MR. KERR:  All right.  I just marked it, Your Honor.

17         THE COURT:  Okay.

18         MR. KERR:  I recognize that.

19         THE COURT:  Mr. Shore?

20         MR. SHORE:  The only question -- I fully understand

21  what Your Honor wants.  The only question is, when we provide

22  the designations, you also want us to highlight the transcripts

23  for each of those witnesses?

24         THE COURT:  It would be helpful.

25         MR. SHORE:  Okay.

**RESIDENTIAL CAPITAL, LLC, et al.**

423

1              THE COURT:  What I had asked for is that the

2    transcripts be marked, color-coded, so I can see -- you know, I

3    pick up a transcript, I start treading it.

4              MR. SHORE:  Here's --

5              THE COURT:  I read the designations; I read the

6    counter-designations.  If there're objections, I'll resolve

7    them.

8              MR. SHORE:  Right.  Here was the problem:  We

9    exchanged designations and counter-designations on the date and

10   filed them on the docket; that's what you have.  Then other

11   people started adding other stuff in -- nobody has a master

12   list right now -- of some of the debtors' witnesses.  So we'll

13   get that done --

14             THE COURT:  Okay.

15             MR. SHORE:  -- provide it to Your Honor and get you

16   copies --

17             THE COURT:  Thank you.

18             MR. SHORE:  -- that are marked.

19             THE COURT:  Thank you.

20             MR. CARNEY:  And, Your Honor, Michael Carney again.

21   We did submit our designations and counter-designations and,

22   like Mr. Shore said, we will make sure the Court gets --

23             THE COURT:  Okay.

24             MR. CARNEY:  -- a master list.

25             THE COURT:  But you just need to work together, okay?

**RESIDENTIAL CAPITAL, LLC, et al.**

**424**

1    So I'll get a list and hopefully I will have these transcripts

2    that will be marked to show the designations and counter-

3    designations.  I don't want to have to -- all right, that's

4    what I want.  It's not complicated.

5           MR. KERR:  Your Honor, the debtors will make sure it

6    happens.

7           THE COURT:  Thank you, Mr. Kerr.

8           Ms. Eaton, are you calling another witness?

9           MS. EATON:  Yes, Your Honor.  The objecting parties

10   call Mr. Sklar.

11          THE COURT:  Yeah, make a -- can you -- you've already

12   called Mr. Sklar; you put in his direct testimony; he's been

13   cross-examined.  For what purposes are you calling Mr. Sklar?

14          MS. EATON:  We're calling him as a rebuttal witness,

15   Your Honor.

16          THE COURT:  He's not a rebuttal witness.  They put

17   their case on; they rested.  What are you responding to that is

18   part of the proponents' case that you're calling Mr. Sklar for?

19   You put his testimony in, in direct narrative form; it was

20   admitted without objection.  There was limited cross-

21   examination.  You did limited redirect.  For what purpose are

22   you calling Mr. Sklar now?

23          MS. EATON:  To rebut certain aspects of the testimony

24   put in by the proponents, by other witnesses.

25          THE COURT:  Okay, I think you have twelve minutes

**RESIDENTIAL CAPITAL, LLC, et al.**

425

1  left.

2         MR. KERR:  Your Honor --

3         THE COURT:  Mr. Kerr.

4         MR. KERR:  -- let me just state my objection to this,

5  for the fact that they have called him, put on his direct.

6  This is not a rebuttal witness; this is just more direct, and I

7  object to it, Your Honor.

8         THE COURT:  Okay.

9         You're still under oath, Mr. Sklar.

10 DIRECT EXAMINATION

11 BY MS. EATON:

12 Q.   Good afternoon, Mr. Sklar.  You heard testimony about

13 approximately ninety-two million dollars in potential

14 recoveries for claims that -- under the ResCap bankruptcy plan,

15 for claims that FGIC has asserted against ResCap; do you

16 remember that?

17 A.   Yes.

18 Q.   In analyzing whether the FGIC settlement agreement was in

19 your best interest, did you consider those potential

20 recoveries?

21        MR. KERR:  Objection, Your Honor.  This is -- I don't

22 know what this is being used to rebut.  And I --

23        THE COURT:  It's sustained.  This -- you know, this is

24 a clear subject of what the direct testimony, in writing, was

25 supposed to cover.  It's part of your case.  The objection is

**RESIDENTIAL CAPITAL, LLC, et al.**

426

1    sustained.

2            If you want to make an offer of proof, go ahead and

3    make an offer of proof.

4            MS. EATON:  The offer is that if the witness were to

5    testify, he would testify that they did in fact consider --

6    take into consideration the potential ninety-two million

7    dollars in recoveries under the bankruptcy plan, in respect of

8    claims that FGIC has against ResCap; that those potential

9    recoveries bear no relationship to the proposed commutation of

10   the policies pursuant to the FGIC settlement agreement; that

11   the policies are an asset of -- ultimately an asset of

12   investors in the FGIC-wrapped securities; that --

13           THE COURT:  Where's the proof of that?  The policies

14   belong to the trust; they're not asset -- do you have any

15   evidence that these policies are assets of the investors?

16           MS. EATON:  The policies -- on the face of the

17   policies, it states, Your Honor, that the policies are being

18   held for the benefit of the holders of the securities.

19           THE COURT:  Why didn't you include any of this in the

20   direct testimony of Mr. Sklar by declaration?

21           MS. EATON:  It wasn't our understanding, Your Honor,

22   that we needed to put in every point in direct.

23           THE COURT:  What did you think?  You think you were

24   going to sit back and just wait?  When I ordered that direct

25   testimony be put in in written declaration form, written

**RESIDENTIAL CAPITAL, LLC, et al.**

427

1    narrative form, do you think you could withhold that which you

2    wished to withhold and just put in that which you thought you

3    might like to put in?

4              MS. EATON:  No.

5              THE COURT:  This was to avoid any surprise.  Why

6    didn't you include what you'd now offer as proof -- as an offer

7    of proof, in the written direct testimony of Mr. Sklar?

8              MS. EATON:  Well, no.  To answer both of Your Honor's

9    questions, no, we weren't holding back in an effort to surprise

10   anyone, and indeed it shouldn't be a surprise since some of

11   these issues came up during depositions.  And secondly, the

12   purpose of putting Mr. Sklar on -- or attempting to put

13   Mr. Sklar on as a rebuttal witness, was to speak to testimony

14   that came up through other witnesses.

15             THE COURT:  Mr. Kerr, do you want to be heard?

16             MR. KERR:  Your Honor, this is not included in the

17   direct.  Ms. Eaton is correct:  These issues were all out

18   there.  If this was something they wanted to put in through

19   this witness, they should have done it in his direct, which was

20   filed, I believe, on July 31st, 2013, which is after the

21   completion of all the depositions.

22             So if this is something they learned about in the

23   depositions, that should have been in his direct; it was not.

24   We object.

25             THE COURT:  Did you learn about it in the depositions,

**RESIDENTIAL CAPITAL, LLC, et al.**

428

1  Ms. Eaton?

2           MS. EATON:  Well, in some --

3           THE COURT:  Did you learn about it in the depositions?

4           MS. EATON:  In some of the depositions, yes --

5           THE COURT:  Okay --

6           MS. EATON:  -- Your Honor.

7           THE COURT:  -- objection's sustained.

8  BY MS. EATON:

9  Q.   Mr. Sklar, in their direct testimony, certain of the

10  trustees -- after discovery was completed, certain of the

11  trustees indicated that they considered that the institutional

12  investors had actively participated in the mediation and

13  supported the settlement proposal and that was one of the

14  reasons why they decided to enter into the FGIC settlement

15  agreement --

16           MR. ESPANA:  Objection, Your Honor.  That is --

17           THE COURT:  Let her finish her question.

18           MR. ESPANA:  Sorry.

19  Q.   Are you aware of that?

20           THE COURT:  Are you objecting?

21           MR. ESPANA:  Yes.

22           THE COURT:  Okay.

23           MR. ESPANA:  That was all within information --

24           THE COURT:  Overruled.

25  A.   Yes, I'm aware of that.

**RESIDENTIAL CAPITAL, LLC, et al.**

429

1  Q.   And do you know who the institutional investors are that

2  the trustees were referring to?

3  A.   I do.

4  Q.   Who are they?

5  A.   They're, I believe, twenty-two -- a group of twenty-two

6  institutions that include you; very large money managers.

7  Q.   And is this the group that people have been referring to

8  over the past two days of this trial as the Kathy Patrick

9  group, do you know?

10  A.   It is.

11  Q.   Did you do an analysis of the holdings of the members of

12  the Kathy Patrick group in the FGIC-wrapped trusts?

13  A.   I did.

14       MR. KERR:  Objection, Your Honor.

15       THE COURT:  Overruled.

16  Q.   What did your analysis show, Mr. Sklar?

17  A.   Based on the publicly available information, looking at

18  the holdings of the Kathy Patrick group, approximately 2.8

19  percent -- only 2.8 percent of their holdings include FGIC-

20  wrapped securities.  And when you look -- when you compare what

21  they hold versus the entire FGIC-wrapped universe, it

22  represents only 7.6 percent of the universe versus our holdings

23  represented by the objectors as approximately 23 to 24 percent

24  of that universe.

25  Q.   And what conclusion, if any, did you draw from the fact

**RESIDENTIAL CAPITAL, LLC, et al.**

430

1  that the percentage holdings of the Kathy Patrick group and

2  others were different?

3          MR. KERR:  Your Honor, I object.  This is --

4          THE COURT:  Sustained.  He's not testifying as an

5  expert.

6  Q.   Did you take those facts into consideration in

7  determining -- in reaching your determination that the FGIC

8  settlement agreement was not in your best interests?

9          MR. KERR:  Objection, Your Honor.

10          THE COURT:  Sustained.

11  Q.   Why did you perform that analysis, Mr. Sklar?

12  A.   Because I was concerned about the incentives of certain

13  parties in the mediation that were supposedly representing our

14  interests, those incentives being that if the commutation was

15  part of FGIC's compensation, definitionally -- because it's a

16  zero-sum game, you know, effectively are a loss.  I was

17  concerned that if a group of RMBS holders didn't have ownership

18  in the FGIC-wrapped securities, that they would be very willing

19  to -- you know, to accept a deal that was inadequate vis-a-vis

20  our -- the FGIC-wrapped securities.

21  Q.   And that is because they stood to benefit more from the --

22  A.   Exactly.  The point --

23          MR. KERR:  Objection.

24          THE COURT:  Sustained.  Leading question.

25  Q.   What did that indicate to you, if anything, about the --

**RESIDENTIAL CAPITAL, LLC, et al.**

431

1  their interest in the ResCap bankruptcy plan --

2          MR. KERR:  Ob --

3  Q.   -- as opposed to the FGIC rehabilitation plan?

4          THE COURT:  Sustained.

5          MR. KERR:  Objection.

6  Q.   What did that indicate to you, Mr. Sklar?

7          THE COURT:  Sustained.

8          MR. KERR:  Objection.

9  Q.   Did you discuss that analysis with anyone?

10 A.   I did.

11 Q.   And what did you discuss about --

12         THE COURT:  Who did you discuss --

13 Q.   -- your analysis?

14         THE COURT:  -- it with?

15 A.   I discussed the analysis with other members of our --

16 of -- others of the objectors.

17 Q.   And what did you and the other members of the objectors

18 discuss in that regard?

19         MR. KERR:  Objection.

20         THE COURT:  Sustained.  That's called hearsay.

21         MS. EATON:  Pass the witness.

22         THE COURT:  Cross-examination?  Any cross-examination?

23         MR. KERR:  Nothing.  Nothing further, Your Honor.

24         THE COURT:  All right.  You're excused.

25         Do you have any other witnesses, Ms. Eaton?

**RESIDENTIAL CAPITAL, LLC, et al.**

432

1          MS. EATON:  No, Your Honor.

2          THE COURT:  Do any of the other objectors have

3   witnesses they wish to call?

4          MR. SHORE:  No, Your Honor.  Chris Shore from White &

5   Case, for the ad hoc group.

6          MR. GOODMAN:  No, Your Honor.  Peter Goodman on behalf

7   of Freddie Mac.

8          THE COURT:  Subject to the Court's consideration of

9   the deposition designations and counter-designation, do the

10  objectors rest?

11         MS. EATON:  Well, we have some exhibits that we'd like

12  to move into evidence.

13         THE COURT:  Let's get them in now.

14         MR. KERR:  Your Honor --

15         THE COURT:  Mr. Kerr.

16         MR. KERR:  -- just so I can put this on the record, we

17  would move to strike Mr. Sklar's testimony just provided, as

18  impermissible expert testimony.

19         THE COURT:  Overruled.

20         MS. EATON:  The exhibits we'd like to move into

21  evidence, Your Honor, are the following:  Exhibit A, Exhibit C,

22  Exhibit D, Exhibit J, Exhibit U, Exhibit Z, Exhibit AB, Exhibit

23  AC, Exhibit AD, Exhibit AJ, Exhibit AS, Exhibit BB, Exhibit BK,

24  Exhibit BO, Exhibit BP, Exhibit BQ, Exhibit BR, Exhibit BS,

25  Exhibit BT -- I'll pause there.  Apparently the incorrect

**RESIDENTIAL CAPITAL, LLC, et al.**

433

1   document behind that exhibit tab was provided to the Court and

2   to the other side that has since been -- as far as I understand

3   it, has since been corrected.

4           MR. KERR:  We have the correct version.

5           THE COURT:  I don't know if I do, but --

6           MS. EATON:  We'll make -- if you don't, Your Honor,

7   we'll make sure that you do.

8           THE COURT:  Okay.  Go ahead.

9           MS. EATON:  -- Exhibit BU, Exhibit BV, Exhibit BW,

10  Exhibit BX, Exhibit BZ, Exhibit CA, Exhibit CH, Exhibit CJ,

11  Exhibit CK, Exhibit CS, Exhibit CV, Exhibit CW, Exhibit CZ,

12  Exhibit DA, Exhibit DB, Exhibit DE, Exhibit DR, Exhibit DS,

13  Exhibit DT, Exhibit DU, Exhibit DV, Exhibit EI, EJ, EL, E --

14          THE COURT:  Slow down.  Go ahead.

15          MS. EATON:  -- EL, EO, Exhibit FM, Exhibit FS, Exhibit

16  FT, Exhibit F --

17          MR. KERR:  Is that Exhibit FT as in Tom?

18          MS. EATON:  T as in Tom, yes.

19          -- Exhibit FU, Exhibit FV, Exhibit FW, Exhibit FX,

20  Exhibit FY, Exhibit FZ, Exhibit GB, Exhibit GC, Exhibit GD,

21  Exhibit GE, Exhibit GF, Exhibit GI, Exhibit GO, Exhibit GP,

22  Exhibit GQ, Exhibit GR, Exhibit GS, and last but not least,

23  Exhibit GT.

24          THE COURT:  Mr. Kerr?

25          MR. KERR:  Your Honor, give me one second that I

**RESIDENTIAL CAPITAL, LLC, et al.**

434

1    can --

2              THE COURT:  Sure.

3              MR. KERR:  -- respond to this.

4         (Pause)

5              MR. KERR:  I have objections to a small number of

6    these exhibits.

7              THE COURT:  Okay.

8              MR. KERR:  Exhibit AC, the form that we received --

9              THE COURT:  Why don't you give me the list of them,

10   and then you --

11             MR. KERR:  Okay.

12             THE COURT:  -- we'll come back --

13             MR. KERR:  I think it's AC, DE, DS -- and I suspect

14   DS, Your Honor, was one they tried to move in before; Your

15   Honor excluded it.  That's a letter -- that's a November 16,

16   2012 letter.

17             -- and then FM.  Those are the exhibits that we're

18   objecting to, Your Honor.

19        (Pause)

20             THE COURT:  All right, so tell me what your

21   objections -- start with AC.

22             MR. KERR:  Well, AC is a question -- the form of the

23   exhibit, as we received it, is a five-page affirmation of

24   Mr. Shalhoub -- I don't know how to quite pronounce his name

25   correctly -- and it just lists a bunch of exhibits that aren't

**RESIDENTIAL CAPITAL, LLC, et al.**

435

1  part of the exhibit, and I'm not sure why this is going on or

2  what it is meant to be.

3         THE COURT:  This is the list of exhibits.

4         MS. EATON:  As I understand it, the failure to attach

5  the exhibits was in error.  It's --

6         THE COURT:  Objection sustained.

7         MR. KERR:  And then with respect to DE, Your Honor --

8         THE COURT:  Okay, let me find it.

9      (Pause)

10        THE COURT:  Go ahead.

11        MR. KERR:  DE is a document produced by Monarch; it

12 appear -- it's -- well, it's hearsay to what appears to be some

13 kind of expert report by Monarch.  There's no foundation to it,

14 Your Honor.  We would object to it.

15        THE COURT:  What's the purpose of the offering,

16 Ms. Eaton?

17        MS. EATON:  We're submitting it as part of our direct

18 case, Your Honor.  It's not an expert report; it was an

19 analysis that people at Monarch did contemporaneously with

20 respect to the terms of the FGIC rehabilitation plan and

21 potential recoveries thereunder.

22        THE COURT:  Objection's sustained.  No foundation.

23        MR. KERR:  Next is -- Your Honor, is Exhibit DS.  And

24 I apologize, Your Honor; this was an exhibit that in fact, I

25 believe, Ms. Eaton attempted to put in through a witness, and

**RESIDENTIAL CAPITAL, LLC, et al.**

436

1  I -- my memory's short; I can't remember which witness it was.

2              MS. EATON:  I think that it already is in for a

3  limited purpose and that we're not trying to move it for any

4  other purpose.

5              MR. KERR:  Your Honor, actually, I believe that DR

6  went in for a limited purpose but DS was kept out.

7              THE COURT:  The DS objection is sustained.

8              MR. KERR:  Okay.  The final one, Your Honor, is

9  Exhibit FM.

10              THE COURT:  Hold on.

11         (Pause)

12              THE COURT:  Go ahead.

13              MR. KERR:  This is the entire deposition transcript

14  of --

15              THE COURT:  I don't take deposition transcripts.

16              MR. KERR:  Thank you, Your Honor.

17              THE COURT:  Mr. Carney, you have --

18              MR. CARNEY:  Just six more, Your Honor.

19              It's Michael Carney for Freddie Mac.

20              The additional exhibits we would like to have admitted

21  are E, P, Q, R, AO and AR.

22              UNIDENTIFIED SPEAKER:  Can you repeat that?

23              MR. KERR:  Yeah, can you just -- I'm sorry, can you

24  say --

25              UNIDENTIFIED SPEAKER:  And slow down.

**RESIDENTIAL CAPITAL, LLC, et al.**

437

1          MR. CARNEY:  E, P, Q, R, AO and AR.

2          MR. KERR:  One second, Your Honor.

3       (Pause)

4          MR. KERR:  Your Honor, I can make this easy:  We have

5    no objection to those exhibits.

6          THE COURT:  All right.  Exhibits E, P, Q, R, AO and AR

7    are all admitted in evidence.

8    (Exhibits E, P, Q, R, AO and AR were hereby received into

9    evidence as Opposing Parties' exhibits, as of this date.)

10          THE COURT:  Exhibits A, C, D, J, U, Z, AB, AD, AJ, AS,

11   BB, BK, BO, BP, BQ, BR, BS, BT, BU, BV, BW, BX, BZ, CA, CH, CJ,

12   CK, CS, CV, CW, CZ, DA, DB, DR, DT, DU, DV, EI, EJ, EL, EO, FS,

13   FT, FU, FV, FW, FX, FY, FZ, GB, GC, GD, GE, GF, GI, GO, GP, GQ,

14   GR, GS and GT are all admitted in evidence as well.

15   (Exhibits A, C, D, J, U, Z, AB, AD, AJ, AS, BB, BK, BO, BP, BQ,

16   BR, BS, BT, BU, BV, BW, BX, BZ, CA, CH, CJ, CK, CS, CV, CW, CZ,

17   DA, DB, DR, DT, DU, DV, EI, EJ, EL, EO, FS, FT, FU, FV, FW, FX,

18   FY, FZ, GB, GC, GD, GE, GF, GI, GO, GP, GQ, GR, GS and GT were

19   hereby received into evidence as Opposing Parties' exhibits, as

20   of this date.)

21          THE COURT:  Mr. Shore?

22          MR. SHORE:  I have one document, Your Honor, that's

23   not on the --

24          THE COURT:  Okay.

25          MR. SHORE:  -- the list.  If I may approach?

**RESIDENTIAL CAPITAL, LLC, et al.**

438

1          Your Honor may recall an issue arose, during

2     Mr. Kruger's deposition, in the entry of three exhibits -- 54,

3     55 and 56 -- where which the Lipps declarations that were filed

4     in the RMBS litigation.  We had originally -- or I thought we

5     had agreed that they were just coming in for judicial notice,

6     and then Mr. Kruger had testimony elicited that he relied upon

7     these in agreeing to enter into the settlement agreement.

8          What's been pre-marked as Exhibit HZ are the debtors'

9     responses and objections to the ad hoc group's document

10    requests served in this contested matter.  And Exhibit -- or

11    request number one of two asked for all documents reviewed by

12    the CEO in connection with any debtors' consideration,

13    essentially to enter into the settlement agreement is how the

14    debtors interpreted that.

15          I'm offering this document into evidence.  I believe

16    Mr. Kerr has agreed to it going into evidence.  I'll also,

17    rather than burden the Court with the record of all the

18    documents that were produced, represent to the Court, on the

19    record, that the Lipps declarations -- Exhibits 54, 55 and

20    56 -- were not in the production by the debtors.  And I believe

21    Mr. Kerr is willing to accept that representation to the Court

22    as well.

23          THE COURT:  Mr. Kerr?

24          MR. KERR:  I will accept that representation.

25          THE COURT:  All right, so Exhibit HZ is in evidence.

**RESIDENTIAL CAPITAL, LLC, et al.**

439

1    (Debtors' responses and objections to the ad hoc group's

2    document requests served in this contested matter were hereby

3    received into evidence as Objecting Parties' Exhibit HZ, as of

4    this date.)

5             THE COURT:  Any other object -- do the objectors rest?

6             MR. SHORE:  Yes, Your Honor.

7             MR. GOODMAN:  Yes, Your Honor.

8             UNIDENTIFIED SPEAKER:  Yes, Your Honor.

9             THE COURT:  All right, objectors rest.

10            Mr. Kerr, any rebuttal?

11            MR. KERR:  One second, Your Honor.

12            Your Honor, we call Mr. Pfeiffer back up for rebuttal.

13            THE COURT:  Okay.  Mr. Pfeiffer, why don't you come on

14   back up.

15            Mr. Pfeiffer, you're still under oath.

16            Mr. Weitnauer?

17            MR. WEITNAUER:  Thank you, Your Honor.  For the

18   record, Kit Weitnauer.

19   DIRECT EXAMINATION

20   BY MR. WEITNAUER:

21   Q.   Mr. Pfeiffer, were you present in the courtroom when

22   Mr. Goldstein gave his testimony?

23            MR. BAIO:  Objection, Your Honor.  This is the same --

24   this is going to be --

25            THE COURT:  Overruled.

**RESIDENTIAL CAPITAL, LLC, et al.**

440

1          MR. BAIO:  Okay.

2     A.    I was.

3     Q.    Okay.  And do you recall some testimony by him about

4     whether or not the 18.1 million dollars in premiums should be

5     added to the value of the commutation payment or not?

6          MR. BAIO:  Same objection, Your Honor.

7          THE COURT:  Overruled.

8     A.    I do.

9     Q.    Can you explain how Duff analyzed it as compared to what

10    Mr. Goldstein was explaining on the stand?

11    A.    Sure.  I think it's relatively simple.  The commutation

12    agreement provides for a payment upfront of 253.3 million and,

13    in addition, there's the waiving of premiums that have a

14    present value of 18 million, and a nominal value of the

15    premiums are significantly higher than 18 million.  Those

16    premiums, absent the commutation agreement, would have to be

17    paid by the trusts; and now due to the commutation agreement,

18    they do not have to be paid.  And therefore the value resulting

19    from the commutation agreement equals the 253.3 plus the

20    present value of the waived premiums, and any other benefits

21    that the trusts are going to realize as a result of the

22    commutation agreement.

23    Q.    All right, I want to direct your attention to

24    Mr. Goldstein's testimony towards the end of his time on the

25    stand, about frontloaded claims and how frontloading impacts

**RESIDENTIAL CAPITAL, LLC, et al.**

441

 1  the value of payments to those claims.  Do you recall that

 2  testimony?

 3  A.   I do.

 4  Q.   Can you explain, in the context of the FGIC plan of

 5  rehabilitation, what it means if a policyholder has a

 6  frontloaded claim versus one that is not frontloaded?

 7  A.   What it means, to be very clear, is that certain

 8  policyholders accrue their claims early on:  Either they've

 9  already been accrued and unpaid or they will accrue in the

10  beginning of the forty-year period, they will accrue over the

11  next fears.  And then there are other claimants who will not

12  make their claims until several years or many years out.  So

13  the frontloading refers to the fact that the claims are many

14  years -- in some instances, many years prior to the actual

15  payments.

16  Q.   Okay.  And how far into the future can claims arise for

17  the first time and be asserted against FGIC in its plan of

18  rehabilitation?

19  A.   Can you repeat the question, please?

20  Q.   Yes.  Well, let me start another way.  How long does the

21  FGIC plan of rehabilitation extend for?

22  A.   For forty years.

23  Q.   And can claims come into existence and be asserted during

24  that whole period, by policyholders?

25  A.   Claims can be made throughout the forty-year period, and

**RESIDENTIAL CAPITAL, LLC, et al.**

442

1    many of the payments are not made till the very end of that

2    forty-year period.  As a matter of fact, if you look at the

3    CPP, in the base case the CPP goes up marketably (sic) in the

4    last few years.  One who claims -- who makes a claim in the

5    early years has to wait a very long time -- in this case, in

6    this example, forty years -- to receive those payments.

7    Q.    And what about someone who has a claim that doesn't arise

8    until, say, thirty-five years from today?

9    A.    So that's what I wanted to certainly make sure is clear is

10   that there is a significant difference between a claim that is

11   made today and paid over forty years, versus a claim that's not

12   made for a long period of time and then paid in the few year --

13   in the years after that.

14        It's -- to be very clear, it's a time-value-of-money

15   issue, irrespective of what discount rate you use.  You

16   simply -- the longer you have to wait to receive payment on

17   your claim, the less value there is to the payment when it's

18   made relative to the claim.  So if you have a dollar claim

19   today and you have to wait twenty years for it to be paid, then

20   on a present-value basis you've received much less than if you

21   have to wait only one year or two years.

22        If ResCap -- ResCap -- FGIC -- ResCap-sponsored FGIC-

23   insured trusts have most of their claims already made, and they

24   have to wait a long period of time.  The present value of those

25   payments is much less than the present value of those payments

**RESIDENTIAL CAPITAL, LLC, et al.**

443

1   if they would have made the claim in year forty, for example;

2   they would get the payment right away.  There'd be very little

3   difference, if no difference, between the nominal amount and

4   the present-value amount.

5   Q.   And so did Duff analyze the nature of the claims of the

6   forty-seven FGIC-wrapped trusts, whether they were frontloaded

7   or backloaded?

8   A.   We did, and it's referenced in my direct testimony.  The

9   claims in these forty-seven trusts are significantly

10  frontloaded to the extent that approximately eighty percent of

11  the claims will have been made, you know, at the end of the

12  first period.  And the average claims are well, well beyond

13  that.

14       So therefore, you would expect that on a present-value

15  basis -- again, irrespective of what discount rate you use, on

16  a present-value basis, whereas the average claimant, based on

17  the base case, might receive twenty-seven cents, twenty-eight

18  cents, twenty-nine, thirty cents on the dollar, because our

19  claims are all -- are frontloaded, we would expect that our --

20  on a present-value basis, the forty-seven trusts would receive

21  markedly less than that.

22  Q.   All right.  And when you say "the first period", what did

23  you mean when you said the claims of these trusts arise in the

24  first period?

25  A.   I mean that -- I don't have the numbers in front of me,

**RESIDENTIAL CAPITAL, LLC, et al.**

444

1    but somewhere between sixty-five and seventy percent of the

2    claims have already accrued and been unpaid.  And if you look

3    at the first five-year period, the great majority of the

4    additional claims will accrue in that period of time.

5    Q.    And that's how FGIC demarcated their periods:  five years

6    over the -- five-year periods over the forty years?

7    A.    In five-year buckets over forty years --

8    Q.    Okay.

9    A.    -- correct.

10   Q.    All right.  And --

11   A.    So the --

12   Q.    -- when you're referring -- finish.

13   A.    No, I'm just saying, so on average, the nominal payout is

14   forty-five cents in the base case.  There's a CPP of, what,

15   38.6 at the end, but on average, on a present-value basis, the

16   average policyholder -- or the average claimant will receive,

17   according to the base case -- it's not a certainty, but is

18   expected to receive twenty-seven to thirty cents in FGIC's

19   plan.

20        But it is not contemplated in the plan, based on the

21   timing of our claims of the forty-seven ResCap-sponsored

22   trusts -- it has never been -- never been contemplated, and

23   it's not contemplated based on our analysis, that they would

24   receive twenty-seven to thirty cents.  They would receive

25   significantly less because their claims are frontloaded.

**RESIDENTIAL CAPITAL, LLC, et al.**

445

1    Q.    Thank you.

2           THE COURT:  Over what period of time would the ResCap

3    trusts receive the twenty-seven to thirty cents?

4           THE WITNESS:  That's a good question.  They're not --

5    they're never going to receive twenty-seven to thirty cents.

6    Twenty-seven to thirty cents is an estimate on a present-value

7    basis as to what the claimants on average will receive.  But

8    depending on the timing of the claimants, some claimants will

9    receive fifteen cents, some will receive twenty, some twenty-

10   five, some thirty, some forty.  It really depends on the timing

11   of your claims relative to your payments.

12          Everybody's receiving the same on a nominal basis;

13   that's where the "fair and equitable" comes in.  Everybody's

14   receiving the same nominal dollars out of the plan, but they're

15   not receiving the same amount of present-value basis.  That was

16   the important part of our analysis:  to model out the claims on

17   an annual basis over a forty-year period relative to the

18   payments that may come out of the plan.

19          THE COURT:  Thank you.

20          MR. WEITNAUER:  No, nothing further.  Thank you.

21          THE COURT:  Cross-examination?

22   CROSS-EXAMINATION

23   BY MR. BAIO:

24   Q.   Mr. Pfeiffer, Joe Baio again.

25          If I understand your testimony, the trusts -- the forty-

**RESIDENTIAL CAPITAL, LLC, et al.**

446

1  seven trusts have frontloaded claims, and that is that, I think

2  you said, sixty-five to seventy percent have been accrued and

3  unpaid already or within the first period; is that accurate?

4  A.    I said that sixty-five to seventy percent are accrued and

5  unpaid as of now.

6  Q.    Yes?

7  A.    And if you take the first five-year period, it's eighty

8  percent approximately, or more.

9  Q.    Now, once the claim is accrued and unpaid, there is no

10  vagary about whether it will be a claim in ten years or fifteen

11  years or twenty years; it is a claim today, it's in an amount

12  certain, it's accrued and it's unpaid; correct?

13  A.    Okay.

14  Q.    And is it your understanding, under the rehabilitation

15  plan, that that amount, whatever it is -- and for these trusts

16  it's largely already established -- that there will be a three-

17  percent rate of return on that?  Do you understand that?

18  A.    The DPO allows for a three-percent rate of return on the

19  investment -- on the invested -- on the invested amount.

20  Q.    So that the forty-seven trusts have -- at least a vast

21  majority of their claims will be effectively fixed, without the

22  vagaries of what will happen in the future.  I realize they

23  will collect over time, but certainly that is an advantage

24  compared to those who do not have an accrued and established

25  unpaid claim.  The other claims that you are referring to arise

**RESIDENTIAL CAPITAL, LLC, et al.**

447

1  ten years out, fifteen years out, twenty years out, and you

2  would agree with me that the further out you go, the more

3  uncertain it is that they will recover; is that fair?

4  A.   What you said is totally confused, because there is -- if

5  you have a certain claim but you're not going to get paid for a

6  while, therefore -- that is what we're looking at here:  how

7  quickly will I get paid relative to the claim amount.  I've got

8  a -- I have a claim already, accrued and unpaid, of 800 million

9  dollars or so.  If I'm not getting paid out for a while, I'll

10 take my dollars today.  But if I'm not going to claim -- if --

11 the loss on a claim, therefore, will not be made even for forty

12 years, for example.  It may or may not be made, but I don't

13 need to get dollars today.

14      You can almost see what happens.  In forty years I'll make

15 a claim and then I'll get paid out within one day?  That's a

16 great -- then I'll wait for that deal; that's a good deal,

17 meaning you're not -- you're -- we're not talking about the

18 certainty related to the claim; we're talking about the

19 certainty related to the cash flows --

20      THE COURT:  Yes.

21 A.   -- the discount related to the timing of the cash flows,

22 the projected payments from the FGIC rehabilitation plan.

23 Q.   But if you were using a ten- or twenty-percent discount

24 rate for claims that are going to be made in forty years, the

25 present value of that is close to zero, correct?

**RESIDENTIAL CAPITAL, LLC, et al.**

448

1   A.   That's where you're misunderstanding.

2   Q.   But is that right --

3   A.   No.  No.

4   Q.   -- that sentence?

5   A.   It's not a ten- to twenty-percent on the claim.  The

6   twenty-percent or ten-percent discount rate is on the projected

7   payments.

8   Q.   But what about the forty percent haircut?

9        THE COURT:  Could you let him finish his answer?

10       MR. BAIO:  Sorry, Your Honor.

11  A.   It's on the projected payments.  The claims don't get

12  discounted; only the payments do.

13  Q.   And what about the forty-percent discount?  It's supposed

14  to be accounting for this phenomenon --

15       MR. KERR:  Objection.

16  Q.   -- that there are front --

17       THE COURT:  Let him finish his question.

18  Q.   -- that there are frontend-loaded payments, due to the

19  forty-seven trusts, isn't that correct?

20       MR. KERR:  Objection.

21       THE COURT:  Sustained.  Ask -- you can -- I'm not

22  precluding you from going to the substance of your question;

23  it's the form of your question.

24       MR. BAIO:  All right, Your Honor.

25  Q.   This frontend-loading aspect that you were testifying

**RESIDENTIAL CAPITAL, LLC, et al.**

449

1   about, that's one of the -- that is the justification that was

2   presented to you by FGIC to provide a forty-percent haircut,

3   correct?

4   A.   It's one of the justifications, yes.

5   Q.   Okay.  And these claims actually that have been accrued

6   and unpaid are going to be paid before claims that arise later,

7   correct?

8   A.   No.

9   Q.   So you believe that the claims that are accrued and unpaid

10   will be -- will not be paid before claims that arise maybe

11   forty years later?  That is, the trusts will not get a dime or

12   any increased value before the claim that's made in forty

13   years?

14   A.   Obviously, if the claim doesn't exist, there'll be no

15   payment.  But there's no -- you don't get payments today or in

16   ten years based on when the claimant -- claim arised (sic).

17   The only factor is, you know, what claims exist, and everybody

18   gets their pro rata portion.

19   Q.   But the claims that don't exist aren't included in the pro

20   rata portion at the time of the distribution.  A claim that

21   will arise in ten or twenty or thirty years will only be paid

22   later, while the claims that have already accrued and been

23   unpaid will be paid sooner, yes?

24   A.   I think I made very clear that the --

25           MR. BAIO:  Your Honor, can I get an answer to that

**RESIDENTIAL CAPITAL, LLC, et al.**

450

1    one?

2              THE COURT:  I think you're getting an answer,

3    Mr. Baio.  You asked a question and let's hear the answer.

4    A.   The claims that are made that are as of today will be paid

5    as an initial CPP, which is seventeen and a quarter percent;

6    that's subject to change.  It may actually very well change as

7    a result of the additional reserves that we read about last

8    week, but that amount is the only initial CPP that's paid based

9    on today's claims.  All subsequent claims are paid pro rata

10   irrespective of when the claim came in.

11             THE COURT:  Well, when --

12   Q.   But the --

13             THE COURT:  Let me stop -- so after the initial

14   payment, when are the next payments made?

15             THE WITNESS:  The next payments are made on an annual

16   basis, at a clip of seventeen and a quarter percent.  And the

17   CPP can be reevaluated, but they're paid annually based on the

18   amount of claims in the pool at that period of time.

19             THE COURT:  As the claims that exist annually?

20             THE WITNESS:  Right.

21             THE COURT:  Okay.  Go ahead, Mr. Baio.

22             MR. BAIO:  Thank you, Your Honor.  I have no further

23   questions.

24             THE COURT:  All right.  Mr. Weitnauer?

25             MR. WEITNAUER:  Nothing further, Your Honor.

**RESIDENTIAL CAPITAL, LLC, et al.**

451

1          THE COURT:  You're excused, Mr. Pfeiffer.

2          THE WITNESS:  Thank you.

3          MR. WYNNE:  Your Honor, we're -- Richard Wynne for

4     FGIC.  Your Honor, we're going to call Mr. Dubel back to the

5     stand.

6          THE COURT:  All right, Mr. Dubel?

7          You're still under oath, Mr. Dubel, okay?

8          THE WITNESS:  Yes.

9          THE COURT:  Thank you very much.

10         MR. KERR:  Your Honor, just so that we can gauge our

11    time, it's my understanding that the objectors are out of time.

12         THE COURT:  Yeah, I'll see when -- the proponents

13    called nine witnesses; the proponents called nine witnesses;

14    the objectors called five.  You had three experts; they had two

15    experts.  I will -- as far as I'm concerned, their time is up.

16    I may permit them further examination.  So let's -- Mr. Wynne,

17    go ahead.

18         MR. WYNNE:  Thank you, Your Honor.

19         Mr. Dubel, we have some binders that we'll be passing

20    out.

21         THE WITNESS:  Thank you.

22         THE COURT:  This is a different binder than the one I

23    got earlier.

24         MR. WYNNE:  It's a rebuttal binder --

25         THE COURT:  Okay.

**RESIDENTIAL CAPITAL, LLC, et al.**

452

1        MR. WYNNE:  -- Your Honor, but we're --

2        THE COURT:  All right.

3        MR. WYNNE:  -- we're actually not intending on using

4    all the documents --

5        THE COURT:  Go ahead.

6        MR. WYNNE:  -- in it.

7        THE COURT:  Go ahead, Mr. Wynne.

8    DIRECT EXAMINATION

9    BY MR. WYNNE:

10    Q.    Mr. Dubel, you were present in court, I believe, when

11    Ms. Healy, the Freddie Mac representative, testified?

12    A.    I was.

13    Q.    And you heard her testimony that, to her knowledge,

14    neither FGIC or the rehabilitator had commuted or terminated

15    any RMBS policies during FGIC's rehabilitation?

16    A.    I did.

17    Q.    Could you describe how many asset categories FGIC has

18    issued insurance for?

19    A.    Yes.  We've insured basic -- four basic categories:

20    credit default swaps; public finance; other structured finance;

21    and RMBS.

22    Q.    Could you briefly describe each category, very briefly?

23    A.    Yes.  Credit default swaps are just that.  Public finance

24    are bonds or securities issued by municipalities, states'

25    governments, local governments, et cetera.  Other structured

**RESIDENTIAL CAPITAL, LLC, et al.**

453

1    may be other commercial transactions that were put in a

2    structured finance format.  And then RMBS would be anything

3    related to RMBS securitizations.

4    Q.    How familiar are you with FGIC's rehabilitation

5    proceeding?

6            MR. BAIO:  Objection.

7            THE COURT:  Overruled.

8            MR. BAIO:  This could all be in direct.

9            THE COURT:  Overruled.

10   A.    I am very familiar, as the CEO of FGIC.

11   Q.    During the rehabilitation proceeding, what types of

12   policies were commuted or terminated?

13   A.    We commuted CDS -- the credit default swaps -- policies,

14   we commuted RMBS policies, and also a public-finance policy.

15   Q.    Can you describe the public-finance policy that you

16   commuted?

17   A.    Yes.  There was a policy that had exposure of about 1.4

18   billion dollars; it was a hospital in Australia that we

19   commuted and terminated.

20   Q.    So FGIC -- does FGIC have any remaining exposure on that

21   policy?

22   A.    No, it does not.

23   Q.    Were any RMBS-related policies commuted during the

24   rehabilitation?

25   A.    Yes.  We did two of them.

**RESIDENTIAL CAPITAL, LLC, et al.**

454

1   Q.   Could you describe them?

2   A.   Yes.  One was called Aardvark; I think it's been

3   referenced earlier in the testimony.  And the other one was

4   related to a confidential policyholder; I'll refer to it as

5   Contract M right now.

6   Q.   Could you describe when these policies were commuted?

7   A.   Yes.  The Aardvark RMBS transaction was commuted in

8   November of 2012, and the Contract M RMBS transaction was

9   commuted in June of this year.

10  Q.   Did FGIC or the rehabilitator provide any public

11  information or notice with respect to these two specific RMBS

12  commutations?

13  A.   Yes.  When the order was signed by Justice Ling-Cohan on

14  those two particular transactions -- in fact, on all of the

15  commutations that FGIC did during the rehabilitation period,

16  the order was posted up on FGIC -- www.fgicrehabilitation.com,

17  which is a Web site hosted by Garden City Group, which is a

18  well-known docketing clerical service.

19  Q.   Was there any other notice provided?

20  A.   Yes.  As it related to all of these transactions, notice

21  was given to the steering committee and its counsel Bingham

22  McCutchen, and also to McKool Smith --

23  Q.   I'd like to --

24  A.   -- on behalf of Freddie Mac.

25  Q.   Mr. Dubel, I'd like to direct your attention to tab 5 in

12-12020-mg   Doc 4776   Filed 08/21/13   Entered 08/21/13 08:35:02   Main Document
Pg 213 of 352
RESIDENTIAL CAPITAL, LLC, et al.

455

1  the binder that's in front of you; it's Exhibit number 318;

2  previously been marked.  Do you recognize this exhibit?

3  A.   I do.

4  Q.   Could you describe it for the Court, please?

5  A.   It is an e-mail which is a notice provided by Dana

6  Kaufman -- who is an attorney at the Weil Gotshal firm, counsel

7  for the rehabilitator and FGIC -- provided to John Briody at

8  McKool Smith; it was sent on Wednesday, November 7th of 2012,

9  and there were multiple parties copied on it, including

10 Mr. Goodman and Mr. Holtzer and others.  And it's noted

11 "NYLB" --

12         MR. GOODMAN:  Your Honor?

13 A.   -- "FGIC termination agreement filing".

14         MR. GOODMAN:  I mean, I'm going to object to this line

15 of questioning.  Ms. Healy did not deny that she received the

16 proposal that's reflected in Exhibit number 5.  That was -- he

17 had the chance to explain these transactions on direct --

18         THE COURT:  Overruled.

19 A.   And there's an attachment, which is the Aardvark -- a PDF

20 of the Aardvark agreement.

21 Q.   At the time that this was sent, did you know that this was

22 being sent?

23 A.   Yes, I did.

24 Q.   Was this the regular practice, as you understood it, that

25 notices of this type were sent to counsel for both Freddie Mac

**RESIDENTIAL CAPITAL, LLC, et al.**

456

1  and counsel for the --

2          MR. GOODMAN:  Objection.

3  Q.   -- steering-committee group?

4          THE COURT:  Overruled.

5          Go ahead.

6  A.   Yes, it is.

7  Q.   And the Aardvark transaction that is the subject of this

8  notice, that is related to RMBS products?

9  A.   Yes, it is.

10 Q.   Mr. Dubel, I'd like to --

11         MR. WYNNE:  I'd like to move, Your Honor, Exhibit 318

12 into evidence.

13         THE COURT:  Hearing no objections, it's --

14         MR. GOODMAN:  No, Your Honor.

15         THE COURT:  It's in evidence.

16 (11/7/12 e-mail notice by Dana Kaufman, entitled "NYLB FGIC

17 termination agreement filing", was hereby received into

18 evidence as Exhibit 318, as of this date.)

19 Q.   Mr. Dubel, I'd like to show you -- if you'd turn to tab 6,

20 Exhibit 317.  Do you recognize this exhibit --

21 A.   I --

22 Q.   -- this document?

23 A.   I do.

24 Q.   Could you briefly describe this document?

25 A.   Yes.  This is an e-mail notice; in this case it was sent

**RESIDENTIAL CAPITAL, LLC, et al.**

457

1    both to the Bingham McCutchen firm, Mr. Horwich, along with the

2    McKool Smith firm, and multiple other parties were attached to

3    it.  It's referenced "FGIC filing".  It was sent from the same

4    person, Ms. Kaufman, and it's dated June 18th of 2013.  The

5    attachment, which the Court will see is redacted here, relates

6    to Contract M; the actual name was included on the e-mail.  And

7    it sends over a copy of the affirmation, all the supporting

8    termination agreements related to the Contract M RMBS

9    commutation.

10   Q.   The -- is this the Contract -- this is the Contract M that

11   you referred to before?

12   A.   Yes, it is.

13   Q.   And Contract M, did that also relate to an RMBS policy?

14   A.   Yes, it did.  Had RMBS assets in it, yes.

15         MR. WYNNE:  Your Honor, I'd like to move Exhibit 317

16   into evidence as well.

17         THE COURT:  It's in evidence.

18   (6/18/13 e-mail notice by Dana Kaufman, entitled "FGIC filing",

19   was hereby received into evidence as Exhibit 317, as of this

20   date.)

21         MR. WYNNE:  Thank you.

22   Q.   Mr. Dubel, were there any other public disclosures

23   concerning that there were commutations of RMBS-related

24   policies, to your knowledge?

25   A.   Yes.  There were multiple --

**RESIDENTIAL CAPITAL, LLC, et al.**

458

1          MR. GOODMAN:  Objection, Your Honor.

2          THE COURT:  Overruled.

3    A.    Yes.  There were multiple disclosures in our financial

4    statements, both in our statutory -- what's referred to as the

5    yellow book, but also in our statutory quarterly and year-end

6    financial statements for 2012.

7    Q.    Mr. Dubel, could you turn to Exhibit -- tab 3, which is

8    Exhibit 316, and describe for me what that exhibit is?

9    A.    Yes.  This is our quarterly statement that's required to

10   be filed with the NAIC; it's commonly referred to as the yellow

11   book because it has a yellow cover on it.  And it's the -- it

12   represents the quarterly statement for September 30th of 2012.

13   Q.    Do you know when that document was filed publicly?

14   A.    It was filed on or about December 17th of 2012, within a

15   day of that date.

16   Q.    And, Mr. Dubel, are these -- when you say they're filed,

17   how are these statements publicly available, if you know?

18   A.    Yes, this statement is filed with the NAIC -- National

19   Association of Insurance Commissioners -- which is a public

20   database that anyone around the country can get access to.  But

21   within a day of filing this, FGIC also posted it up on its Web

22   page, under the Investor Relations Financial Reports section,

23   and so it's available even now.

24   Q.    Is there a disclosure, in this Exhibit 316, with respect

25   to the commutation of RMBS policies, Mr. Dubel?

**RESIDENTIAL CAPITAL, LLC, et al.**

459

1  A.    Yes, there is.

2  Q.    Could you point it out to the Court?

3  A.    Yes, it's on -- I'll have to be careful here.  It's on

4  page 6.19, but at the very bottom I believe it says "Exhibit

5  316, page 25 of 55".

6  Q.    And where on that page?

7  A.    It's in note 25, "change in incurred losses and loss

8  adjustment expenses", the first paragraph.  The -- about

9  halfway down in the paragraph, there's a sentence that starts,

10  "The decrease in projected claims for RMBS backed by first-

11  lien" -- "backed by first-lien mortgage loans reflects the

12  completion of policy terminations in November 2012, with no

13  payment by FGIC."

14  Q.    Do you know what that sentence is referring to, which

15  transaction, Mr. Dubel?

16  A.    Yes.  The only RMBS transaction that we did during that

17  period, which is the Aardvark transaction that I referred to

18  earlier.

19        MR. WYNNE:  Your Honor, I'd like to move Exhibit 316

20  into evidence at this time.

21        THE COURT:  Any objections?

22        MR. GOODMAN:  No objection, Your Honor.

23        MR. KERR:  No, Your Honor.

24        THE COURT:  Exhibit 316 is in evidence.

25  (FGIC quarterly statement for 9/30/12 was hereby received into

**RESIDENTIAL CAPITAL, LLC, et al.**

460

1   evidence as Exhibit 316, as of this date.)

2   Q.    Mr. Dubel, are you familiar with the FGIC plan of

3   rehabilitation?

4   A.    I am.

5   Q.    I believe that you have also in front of you Exhibit 238,

6   which is --

7            MR. WYNNE:  It's not in the binder, but we have it

8   loose, Your Honor.

9            UNIDENTIFIED SPEAKER:  It's already in.

10           MR. WYNNE:  Exhibit 238 is already in.

11  Q.    Mr. Dubel, are there any provisions of the FGIC

12  rehabilitation plan that discuss settlement or commutation of

13  RMBS policies?

14           MR. GOODMAN:  Your Honor, I object.  This was clearly

15  covered on day one.

16           THE COURT:  This is rebuttal.  Overruled.

17           MR. GOODMAN:  Okay.

18  A.    I'm sorry, could you repeat the question, please?

19  Q.    Are there any provisions of the FGIC rehabilitation plan

20  that discuss settlements or commutations -- I'll start -- well,

21  first, generally?

22  A.    Yes.

23  Q.    Can you describe those?

24  A.    In section 4.8, which I believe is --

25           THE COURT:  25 of 73?

**RESIDENTIAL CAPITAL, LLC, et al.**

461

1          THE WITNESS:  Yes, Your Honor.

2     A.    It's "Alternative resolution of claims".

3     Q.    Are there any limitations that -- to your knowledge, in

4     the plan, that limit FGIC's ability with respect to commuting

5     any type of policies?

6          MR. GOODMAN:  Object to the form.  Legal conclusion.

7          THE COURT:  Sustained.

8          MR. WYNNE:  Mr. Dubel testified that he's very

9     familiar with it.  He's the CEO of FGIC.

10          THE COURT:  All right, ask your question.

11    Q.    Are there any provisions that you're aware of in the plan,

12    that restrict or limit FGIC's ability to commute any specific

13    type of policies?

14    A.    No specific types of policies.  We have the ability to

15    commute, settle, terminate any of our policies, just subject to

16    the two provisions -- A and B -- in 4.8.

17    Q.    When was this plan filed?

18    A.    This plan was filed on June 4th of 2013.

19    Q.    Are you aware if there were any prior versions of this

20    plan filed?

21    A.    Yes.  There were several other versions filed.

22    Q.    Do you know -- if you know, did --

23          THE COURT:  Tell me how come it's got a file stamp of

24    June 13th rather than June 4th.

25          THE WITNESS:  Your Honor, I believe this is the order

**RESIDENTIAL CAPITAL, LLC, et al.**

462

1  being entered, as opposed to the plan being filed.

2          THE COURT:  Okay.

3          THE WITNESS:  The order was entered on --

4          THE COURT:  All right.

5          THE WITNESS:  -- or about the 13th.

6          THE COURT:  Thank you.

7  Q.   Do you know if Section 4.8 changed from the other plans

8  that were filed to this final version?

9  A.   The first plan that was filed by the rehabilitator was

10 filed in September of 2012.  There were two or three other

11 version of this plan that were filed.  This is the first

12 amended plan.  And this section, 4.8, has not changed at all

13 since the original plan was filed on September -- in September

14 of 2012.

15 Q.   When the FGIC settlement agreement was signed that is the

16 subject of today's hearing was the rehabilitation plan

17 effective?

18 A.   It was not.

19 Q.   Do you have any understanding of what authority the

20 rehabilitator had to commute policies prior to the plan

21 becoming effective?

22         MR. BAIO:  Objection.

23         MR. GOODMAN:  Same objection, Your Honor.

24         THE COURT:  Overruled.

25 A.   I do.

**RESIDENTIAL CAPITAL, LLC, et al.**

463

1   Q.   Can you tell us what your understanding is?

2   A.   Yes.  On June 28th of 2012 Judge Ling-Cohan issued the

3   order of rehabilitation that put FGIC in rehabilitation and

4   appointed the Superintendent, New York State Department of

5   Financial Services, as the rehabilitator, and his authority was

6   vested in that specifically in two areas, one that said they --

7   he was required to remove the causes of the rehabilitation, and

8   the other area that authorized him to run FGIC in the ordinary

9   course as he saw it was appropriate, subject to certain things

10  that would go in front of the Court.

11  Q.   Is it your understanding that the rehabilitator acted

12  under the authority granted in that order with respect to all

13  of the commutations that FGIC did during the rehabilitation?

14       MR. GOODMAN:  Objection.

15  Q.   Do you have an understanding?

16  A.   I do.

17  Q.   What is your understanding?

18       MR. GOODMAN:  Objection.

19       THE COURT:  Overruled.

20  A.   That he did act in accordance with the rehabilitation

21  order and that as it related to commutations that were done by

22  FGIC during the rehabilitation proceeding, that they were all

23  brought in front of the Court for review and approval, and they

24  were all approved by the Court.

25  Q.   Did you ever discuss the concept of commutation of

**RESIDENTIAL CAPITAL, LLC, et al.**

464

1   policies with the ad hoc steering committee or steering group?

2        MR. BAIO:  Objection.

3        MR. GOODMAN:  Same objection.

4        MR. WYNNE:  Ms. Healy clearly testified about --

5        THE COURT:  Your question about the ad hoc, you're

6   talking about the steering committee in --

7        MR. WYNNE:  She testified she was --

8        MR. WYNNE:  Oh.

9        THE WITNESS:  Which steering committee?

10        THE COURT:  Steering committee in the rehabilitation

11  proceeding.

12        MR. WYNNE:  In the rehabilitation, Your Honor.

13        THE COURT:  Overruled.

14  A.  I'm sorry.  Could you just --

15  Q.  Did you have discussions about the concept of commutation

16  of policies with the ad hoc steering committee in the

17  rehabilitation proceeding?

18  A.  Yes, I did.

19  Q.  Could you describe those conversations?

20  A.  We talked about early on the commutation of CDS

21  transactions but also talked in general terms about the ability

22  to commute any and all types of policies.  In fact, certain

23  members of the steering committee encouraged FGIC to commute

24  other policies that would be accretive.

25  Q.  Were there negotiations with the steering committee with

**RESIDENTIAL CAPITAL, LLC, et al.**

465

1  respect to limiting FGIC's rights to commute or terminate

2  policies?

3  A.   No.

4  Q.   Do you recall whether Freddie Mac or any member of the ad

5  hoc steering committee group attempted to negotiate any such

6  limitations with respect to the type of policies that could be

7  commuted with respect to the rehabilitation plan?

8  A.   There were none to my knowledge.

9  Q.   Okay.  Mr. Dubel, you also have, I believe, been here and

10  heard the testimony of the trustees and the opening statements

11  that were made on last Friday.  Is that correct?

12  A.   Yes, that's correct.

13  Q.   Okay.  And you have been -- how were you involved in the

14  negotiations with respect to the FGIC settlement agreement?

15         MR. BAIO:  Objection.

16         THE COURT:  I'm going to sustain the objection to the

17  form of that question, because the mediation is off limits.

18         MR. WYNNE:  Okay.  I understand, Your Honor, and --

19         THE COURT:  So ask another question.

20  Q.   Mr. Dubel, can you explain your role with respect to the

21  FGIC settlement agreement?  Just your role, not the content of

22  any negotiations.

23  A.   Yes.  I was the lead negotiator for FGIC.

24  Q.   Okay.

25         THE COURT:  I think that's in your direct testimony.

**RESIDENTIAL CAPITAL, LLC, et al.**

1          MR. WYNNE:  I was just doing it for context, Your

2    Honor.

3          THE COURT:  Okay.

4          MR. WYNNE:  The question I was just doing for --

5    I'm --

6          THE COURT:  Go ahead.

7          MR. WYNNE:  -- switching subjects to our final

8    subject --

9          THE COURT:  All right.  Go ahead.

10          MR. WYNNE:  -- so I was just doing that.

11   Q.   Without revealing the substance of the negotiations that

12   occurred during the mediation were there negotiations with

13   respect to the commutation amount of 253 million dollars?

14          MR. BAIO:  Objection.

15          THE COURT:  Sustained.

16          MR. WYNNE:  Your Honor, I'd like to be able to

17   inquire.  There was clear testimony that there were no

18   negotiations.  In the opening statements they have made a

19   point, and we think it's very misleading the way that they have

20   done it, that there were no negotiations with respect to the

21   253.

22          THE COURT:  I'll permit the question.

23          MR. WYNNE:  What?

24          THE COURT:  I'll permit that question.

25          MR. WYNNE:  Thank you, Your Honor.

**RESIDENTIAL CAPITAL, LLC, et al.**

467

1          THE COURT:  But not the details of the negotiations.

2          MR. WYNNE:  Not the details.  Just whether or not

3    there were.

4          THE COURT:  Go ahead.

5    Q.   Mr. Dubel, do you want me to repeat it or do you --

6          THE COURT:  Yes, please.  Go ahead.  So we have a

7    clear --

8    Q.   Without revealing the substance of the negotiations, were

9    there negotiations with respect to the commutation amount of

10   253 million dollars?

11   A.   There were extensive negotiations.

12   Q.   With the same preface, without revealing the substance of

13   the negotiations, were there negotiations over other terms that

14   are in the FGIC-ResCap settlement agreement?  I don't want to

15   hear any specific substance, just were there those

16   negotiations?

17         MR. BAIO:  Same objection.

18         THE COURT:  Overruled.  You opened the door to this.

19   A.   There were extensive negotiations.

20   Q.   Mr. Dubel, when did those negotiations occur?

21         MR. BAIO:  Same objection.

22         THE COURT:  Sustained.  That I'm not letting.  He said

23   there were negotiations.

24         MR. WYNNE:  Okay.  Thank you, Your Honor.

25         THE COURT:  You got what you wanted.

**RESIDENTIAL CAPITAL, LLC, et al.**

468

1  Q.   Mr. Dubel, who participated in those negotiations,

2  without, again, telling me the substance of any negotiations?

3        THE COURT:  His direct testimony is he was the lead

4  negotiator.

5        MR. WYNNE:  No.  Who participated on the other side?

6        MR. BAIO:  Same objection.

7        THE COURT:  Sustained.

8        MR. WYNNE:  Your Honor, I'd like one moment.

9  Q.   Mr. Dubel, have there been any material changes with

10  respect to FGIC since you testified on Friday?

11        MR. BAIO:  Objection.

12        THE COURT:  Overruled.

13  A.   Yes, there has.

14  Q.   Could you describe that?

15  A.   Yes.  The rehabilitator determined that it was appropriate

16  for us to go effective, and we went effective on the plan of

17  rehabilitation this morning.  We are no longer in

18  rehabilitation.

19        MR. WYNNE:  Thank you, Your Honor.  Your Honor, I

20  recognize that was, sort of, beyond the scope, but we thought

21  it was important to at least inform the parties and the

22  Court --

23        THE COURT:  Okay.

24        MR. WYNNE:  -- about that, which is why I asked that

25  question.

**RESIDENTIAL CAPITAL, LLC, et al.**

469

1            THE COURT:  Okay.

2            MR. WYNNE:  Thank you.

3            THE COURT:  Cross-examination?

4  CROSS-EXAMINATION

5  BY MR. GOODMAN:

6  Q.    Good afternoon, Mr. Dubel.  In your witness binder that

7  your counsel handed out, can you turn to that for a moment,

8  please?

9  A.    Yes, sir.

10  Q.   And I believe it's Exhibit 6.

11           THE COURT:  Tab 6?

12           MR. GOODMAN:  Excuse me.  Tab 6.

13  Q.   It says it's --

14           THE COURT:  It's Exhibit 3?

15  Q.   I believe it's dated June 18, 2013 from --

16           THE COURT:  Exhibit 317?

17           MR. GOODMAN:  Exhibit 317.  Thank you, Your Honor.

18  Q.   Now, the date of this exhibit, this e-mail from Dana

19  Kaufman is June 18, 2013.  Is that correct?

20  A.    That is correct.

21  Q.   And that was after the time when FGIC filed its order to

22  show cause in order to enter into the settlement, the ResCap

23  settlement.  Isn't that correct?

24  A.    Yes, that is correct.

25  Q.   So I would believe by about that time our client would

**RESIDENTIAL CAPITAL, LLC, et al.**

470

1  have realized that all bets are off with respect to commutation

2  of the RMBS policies.  Is that correct?

3  A.    I don't know what your client would believe.

4  Q.    Okay.

5  A.    I'm sorry.

6  Q.    Well, thank you.  But the settlement, the order to show

7  cause to approve the settlement had already been filed,

8  correct?

9  A.    That's correct.

10  Q.    Okay.  Thank you.  Now, I believe you were in court when

11  the trustees testified that as of May 24, 2013 they started to

12  notify the certificate holders of the fact that there was a

13  settlement.  Is that correct?  Were you there?

14  A.    I believe that I stepped out at that point in time when

15  that discussion came up.

16  Q.    Is that your understanding?

17  A.    As I understand it they started the process right

18  thereafter.  I'm not sure whether it was 24th, 25th, but

19  shortly thereafter.

20  Q.    Okay.  But it became public knowledge about that time, the

21  24th, 25th, correct?

22  A.    It would have become public knowledge when it was filed

23  with the bankruptcy court and the rehabilitation court.

24  Q.    Okay.  So it wouldn't have become --

25  A.    And I'm not sure when it was, but --

**RESIDENTIAL CAPITAL, LLC, et al.**

471

1   Q.   It wouldn't have become -- and that was when?

2   A.   In that general time frame, yes.

3   Q.   Around that general time frame.  Did you bother at that

4   point in time to notify my client the fact that you were going

5   to commute their FGIC-wrapped ResCap securities policies?

6   A.   I believe that there was a -- that you had actually --

7   Mr. Goodman, that you had actually reached out to me and to

8   Mr. Holtzer to discuss the affirmation of Mr. Holtzer.

9   Q.   Okay.  That wasn't my question.  My question was, at the

10  time that the trustees were filing the notice, public notice

11  that the settlement -- that they were entering into the

12  settlement with FGIC and ResCap, did you notify my client, at

13  that time, that you intended to commute their ResCap policies?

14  A.   At that specific time, no.

15  Q.   Okay.  Thank you.  Please turn to tab 3; it's Exhibit 316,

16  I believe.

17  A.   Yes, sir.

18  Q.   And this -- you just testified a few minutes early to,

19  this was the Aardvark transaction; is that what you referred to

20  it as?

21          THE COURT:  No, he testified this is the quarterly

22  financial statement, and there's --

23          MR. GOODMAN:  Okay, I apologize.

24          THE COURT:  -- a footnote that has the --

25          MR. GOODMAN:  I apologize; I got a little ahead of

**RESIDENTIAL CAPITAL, LLC, et al.**

472

1  myself.

2  Q.   Please turn to page 25.

3  A.   25 of 55?

4  Q.   25 of 55.

5  A.   Yes, sir.

6  Q.   6.19.

7  A.   Yes, sir.

8  Q.   Your counsel directed you to that page a few minutes ago.

9  And you were looking at the first full paragraph, regarding an

10  RMBS commutation, is that correct?

11  A.   Yes, this is what I referred to, not what my counsel

12  directed me to.  Yes.

13  Q.   Okay.  Well, thank you for sharing that.  Was this the

14  Aardvark transaction that's referred to in here?

15  A.   As I said earlier, yes, this -- what is referred in that

16  sentence is referring to the Aardvark transaction, yes.

17  Q.   Thank you.  And was that commutation done with the consent

18  of the RMBS policyholder?

19  A.   Yes, it was.  Yes.

20  Q.   And if you look at one, two, three -- I believe it's the

21  third sentence, or at the very least, the sentence in that

22  paragraph starting with "the decrease in projected claim

23  amounts"?  Do you see that sentence?

24  A.   Yes, "The decrease in projected claims" --

25  Q.   Okay.  And --

**RESIDENTIAL CAPITAL, LLC, et al.**

473

1   A.   -- "projected claims"; that's the -- yes.

2   Q.   Um-hum.  And at the end of that sentence, does it say,

3   "with no payment by FGIC"?

4   A.   That's correct.

5   Q.   Um-hum.  And this was a consensual deal, right?

6   A.   Yes, it was.

7   Q.   Okay.  Thank you.

8          THE COURT:  Who is the policyholder?

9          THE WITNESS:  Bank of New York -- Bank of New York

10  Mellon or one of its entities as the trustee.

11         THE COURT:  So when you say it was done with the

12  consent of the policyholders, whose consent are you referring

13  to?

14         THE WITNESS:  The Bank of New York, as the

15  policyholder.

16  Q.   And was Bank of New York a trustee -- in a position of a

17  trustee in that transaction?

18  A.   Yes.

19  Q.   Okay.  And were there any objections by the investors in

20  the underlying --

21         MR. GOODMAN:  Well, strike that.

22  Q.   Were there investors holding on to securities that were

23  part of that trust that Bank of New York acted as trustee on

24  behalf of?

25  A.   Yes, there were.

**RESIDENTIAL CAPITAL, LLC, et al.**

474

1    Q.    Um-hum.  And do you know if any of them objected?

2    A.    They did not.

3    Q.    Thank you.  Now, am I correct that with respect to the

4    members of the steering committee, the steering committee that

5    my client, Freddie Mac, was participating in -- you know which

6    steering committee I'm referring to?

7    A.    I assume you're referring to the one that was involved in

8    the FGIC rehabilitation, since the term steering committee is

9    probably used five or six times in different areas here.

10    Q.    Exactly; I'm just trying to clarify.  Thank you.

11    A.    Yes.

12    Q.    That's the one I'm referring --

13    A.    Yes.

14    Q.    So when I say steering committee, that's the one I'm

15    referring to.

16    A.    I'll assume that, unless you say differently, yes.

17    Q.    Now, the committee was composed, largely, of RMBS security

18    holders, correct?

19    A.    It had a mix of everybody that held various different

20    securities.

21    Q.    Um-hum.  But there were significant amounts of RMBS

22    security holders on that committee, correct?

23    A.    That is correct, yes.

24    Q.    And my client was one of the largest, if not the largest,

25    right?

**RESIDENTIAL CAPITAL, LLC, et al.**

475

1    A.    They were one of the largest, if not the largest --

2    Q.    Okay.

3    A.    I don't recall --

4    Q.    Thank you.

5    A.    -- where their size ratio was, yes.

6    Q.    During the rehabilitation proceeding, did you ever commute

7    any of those policies prior to entry into the settlement

8    agreement with FGIC and ResCap?

9    A.    Any of which policies?  Any of --

10   Q.    Any of the RMBS policies held by the steering committee --

11   members of the steering committee?

12   A.    Yes.

13   Q.    And which one was that?

14   A.    I believe the Aardvark transaction.

15   Q.    The one we just talked about earlier, that was the only

16   one, and they were on the steering committee?

17         THE COURT:  The they -- was Bank of New York on the

18   steering committee or were they investors?

19         THE WITNESS:  No, Your Honor, it was not -- the

20   trustees were not -- they separately were involved in the

21   process.

22         I'm sorry, Mr. Goodman, your question again?  I

23   apologize.

24   Q.    I'm trying to focus you in on the members of the

25   steering --

**RESIDENTIAL CAPITAL, LLC, et al.**

1          THE COURT:  Just ask your question.

2          MR. GOODMAN:  Thank you, Your Honor.

3   Q.   Prior to entering into the settlement agreement with FGIC

4   and ResCap, did you commute any of the RMBS policies that

5   members of -- excuse me, that members of the steering committee

6   held certificates for?

7   A.   I believe we did.

8   Q.   And the ones -- which one was that?

9   A.   I believe it was the Aardvark transaction.

10  Q.   That was Aardvark; that was it.

11  A.   I may have mixed up, but I believe it was the Aardvark

12  transaction.

13  Q.   Okay.  And we just discussed the Aardvark was a consensual

14  transaction, correct?

15  A.   Yes, it was.

16  Q.   And no one objected to that, correct?

17  A.   That's correct.

18  Q.   And you provided the steering committee with information

19  about that transaction, am I right?

20  A.   We did.

21  Q.   Prior to entering into it, or after you entered into it?

22  A.   Prior -- prior to court approval, after it was entered

23  into.

24  Q.   Okay.  Thanks.  Okay.  Now, just so I'm clear --

25          THE COURT:  Whether you're clear or not --

**RESIDENTIAL CAPITAL, LLC, et al.**

477

1          MR. GOODMAN:  Fair --

2          THE COURT:  -- you're on borrowed time.

3          MR. GOODMAN:  I'm just about out of time, I

4    understand.  This is an important question.

5          THE COURT:  You're out of time, but I'm allowing you

6    to ask these questions.

7          MR. GOODMAN:  I appreciate that, Your Honor.

8    Q.   Am I correct that you never -- you never communicated to

9    the steering committee members that you would commute the RMBS

10   policies, is that correct?

11   A.   No.

12   Q.   Okay.

13       (Pause)

14          MR. GOODMAN:  Okay.  Your Honor, the issue here is

15   that I want to examine the witness on statements he made at his

16   deposition, and we don't have that binder here with his

17   deposition, that I'm aware of.

18          THE COURT:  It's got to be here.  I mean, I've got --

19   this courtroom is filled with documents, and I'm sure it

20   includes the Dubel transcript.  Can somebody help Mr. Goodman

21   out?

22          UNIDENTIFIED SPEAKER:  Yeah, it's Exhibit FG, Your

23   Honor.

24          MR. GOODMAN:  FG, thank you.

25          UNIDENTIFIED SPEAKER:  FG.

**RESIDENTIAL CAPITAL, LLC, et al.**

478

1        (Pause)

2            THE COURT:  Alex, go ahead.  We're going to give the

3    witness a copy.

4            MR. GOODMAN:  Yeah --

5            THE COURT:  Let's --

6            MR. GOODMAN:  -- thank you.

7            THE COURT:  Let's move on here.

8            MR. GOODMAN:  Thank you, Your Honor.  I appreciate

9    that.

10           THE WITNESS:  Thank you.

11   Q.   Mr. Dubel, you have Exhibit FG in front of you?

12   A.   I do.

13   Q.   Okay, I ask you to turn to page 58, line 16.  Just let me

14   know when you're there.

15           UNIDENTIFIED SPEAKER:  Can I see what you're --

16           MR. GOODMAN:  Yeah, sure.  You can look on, sorry.

17           UNIDENTIFIED SPEAKER:  It's okay.  What line?

18           MR. GOODMAN:  Line 16, starting here.

19   Q.   You with me, Mr. Dubel?

20   A.   Line 16?

21   Q.   Yeah, and it -- it states:

22       "And did the committee, the steering committee agree with

23   you that you had the right to commute the policies insuring the

24   trust that had issued their securities?

25   "A.  They agreed that they were in full agreement that we

**RESIDENTIAL CAPITAL, LLC, et al.**

479

1  should have the right to commute any policies that -- that we

2  could work our arrangements with.

3  "Q.  Including the policies insuring the underlying securities

4  in the trust?

5  "A.  I don't believe that we talked about specific policies.

6  We talked about any policies that FGIC had issue, and they were

7  fully supportive of us commuting any policies that FGIC had

8  issue."

9      So you had no specific discussions with them regarding

10  commuting RMBS policies, am I correct?

11  A.  Well, I believe, as I stated here, that it's any policies

12  and RMBS policies are part of the policies that FGIC issued, so

13  I'm referring to that.

14  Q.  Did you have specific discussion with them regarding

15  commuting the RMBS policies that were insuring their

16  securities?

17  A.  I did not have specific discussions about that.

18  Q.  Thank you.

19  A.  It --

20      MR. GOODMAN:  No further questions, Your Honor.

21      THE COURT:  Mr. Wynne?

22      MR. BAIO:  May I ask a few, Your Honor, just a few?

23      THE COURT:  Go ahead, Mr. Baio.

24      MR. BAIO:  Thank you.

25  CROSS-EXAMINATION

**RESIDENTIAL CAPITAL, LLC, et al.**

480

1    BY MR. BAIO:

2    Q.    Sir, you testified just a while ago, that the steering

3    committee encouraged commutations because they were accretive.

4    Do you remember saying that?

5    A.    I do.

6    Q.    And the steering committee encouraged those commutations

7    because they believed, in your view, that the accretive quality

8    would redound to their benefit, correct?

9    A.    I don't know what they believed.  I know that from my

10   point of view if it would be accretive it would redound to all

11   of the policy holders that remained at FGIC.

12   Q.    So it would eliminate those policyholders' claims in the

13   future who were being commuted, but it would improve or be

14   accretive for everybody else, correct?

15   A.    That would be the intention, yes.

16   Q.    And the steering committee encouraged that.  Isn't that

17   correct?

18   A.    That is correct.

19   Q.    Okay, now in connection with the commutations that you

20   identified, they were all consensual, correct?

21   A.    Yes, they were.

22   Q.    And in connection with those commutations, the trustees

23   did not seek any orders from either the state court or any

24   bankruptcy court that the commutations were in the best

25   interests of the policyholders, correct?

**RESIDENTIAL CAPITAL, LLC, et al.**

481

1          MR. WYNNE:  Objection, beyond the scope, Your Honor.

2          THE COURT:  Sustained.

3          MR. BAIO:  Your Honor, he -- he asked specifically

4    about --

5          THE COURT:  Ask your next question.

6    Q.   Did the trustees seek any exculpation in connection with

7    the commutations, from any courts?

8          MR. WYNNE:  Objection, it's beyond the scope, Your

9    Honor.

10          THE COURT:  Sustained.

11   Q.   Were the commutations court approved?

12   A.   They were approved by the Rehabilitation Court.

13   Q.   Not by any bankruptcy court?

14   A.   There were no bankruptcy courts involved in those

15   transactions.

16   Q.   No other court was involved.

17   A.   No other court.

18   Q.   And to the extent there were findings, they are in those

19   publicly filed documents, correct?

20          MR. WYNNE:  Objection.

21          THE COURT:  Sustained.

22   Q.   Now, do you -- do you know who Dave Williams is?

23   A.   I do.

24   Q.   And --

25   A.   I assume you're talking Dave Williams of CQS?

**RESIDENTIAL CAPITAL, LLC, et al.**

482

```
 1   Q.   Yes, of CQS.

 2   A.   I do.

 3        MR. WYNNE:  Objection, beyond the scope.

 4        THE COURT:  Sustained.

 5   Q.   Well, you were negotiating with a number of people as to

 6   withdrawing objections to the FGIC rehabilitation plan, which

 7   you've testified about here.

 8        MR. WYNNE:  Objection.

 9        THE COURT:  Sustained.

10   Q.   Do you recall notifying Mr. Williams that in fact policies

11   would be commuted, policies in which he had an interest?

12        MR. WYNNE:  Objection.

13        THE COURT:  Overruled as per yes or no.

14   A.   No, sorry.

15   Q.   And you -- you never told him, isn't that correct?

16   A.   No, he never asked me.

17   Q.   But he was in discussions with you, correct?

18   A.   I had to be careful what I said to him because he told me

19   repeatedly that he did not want to have what he would view as

20   material amount of public information.  So I was very careful

21   in -- in what I provided to him because he wanted to you know,

22   stay on what's referred to as the public side.

23   Q.   But you continued to keep from him the commutation, even

24   when you were no longer bound by the mediation agreement.

25   Isn't that correct, by the mediation order, isn't that correct?
```

**RESIDENTIAL CAPITAL, LLC, et al.**

483

1          MR. WYNNE:  Objection.

2          THE COURT:  Sustained.

3   Q.   Well, there came a time when you were no longer bound by

4   the mediation order to talk about commutation, correct?

5          MR. WYNNE:  Objection.

6          THE COURT:  Sustained.

7          MR. BAIO:  One second, Your Honor.

8   Q.   There were no objections files to any of the commutations?

9   Is that correct?

10  A.   You're referring to the other commutations in the FGIC --

11  Q.   Yes.

12  A.   -- there were none, to my knowledge, no.

13  Q.   Unlike in this case, correct?

14  A.   That is correct.

15         THE COURT:  Your time is up, Mr. Baio.

16         Mr. Shore?

17         MR. SHORE:  It felt so lonely there in the back, so I

18  mean --

19         THE COURT:  Yeah, I'm sure.

20  CROSS-EXAMINATION

21  BY MR. SHORE:

22  Q.   Mr. Dubel, I think we've only met outside the context of

23  the case, outside in the hallway.  I'm Chris Shore, from White

24  & Case on behalf of the ad hoc group of junior secured note

25  holders. I don't know whether you read it or not, but it's in

**RESIDENTIAL CAPITAL, LLC, et al.**

484

1    evidence as Exhibit C.  It's the debtors' motion and in

2    particular, their omnibus reply in further support of the

3    motion.

4         At heading B which is the ad hoc group's objections to the

5    minimum allowed claim amount provided in the settlement

6    agreement has no merit is a heading 1: "Providing FGIC the

7    minimum allowed claim amount in advance of a plan is entirely

8    appropriate."  And at paragraph 34, the debtors say, "In light

9    of the pending proceedings in the Rehabilitation Court, the

10   parties sought approval of the settlement agreement in

11   connection with and prior to FGIC's imminent emergence from

12   rehabilitation, and separate from and prior to the plan-

13   confirmation process in this Court."

14        So I have two questions.  Is it fair that you did not need

15   a ruling from this Court prior to your emergence from the

16   rehabilitation?

17             MR. WYNNE:  Objection, beyond the scope, Your Honor.

18             THE COURT:  Sustained.

19   Q.   And one other question, you didn't need a ruling from the

20   state court in the approval of the settlement agreement before

21   you exited?

22             MR. WYNNE:  Objection.

23             THE COURT:  Sustained.

24             Mr. Wynne, any further questions?

25             MR. WYNNE:  No, Your Honor.

**RESIDENTIAL CAPITAL, LLC, et al.**

485

1          THE COURT:  You're excused, Mr. Dubel.

2          THE WITNESS:  Your Honor, will somebody get this?

3          THE COURT:  Yeah, one of my -- one of my law clerks,

4   as if we don't have enough copies of it already.

5          All right, do the proponents rest?

6          MR. KERR:  Your Honor, I just need to do one quick

7   circle around just to make sure.

8          THE COURT:  Go ahead.

9          MR. KERR:  We rest.

10          THE COURT:  All right, all parties have rested.

11   It's -- depending on which clock one looks at, it's -- on my

12   watch it's 3:11.  We're going to take a fifteen minute recess

13   and then despite the fact that the objector's time has expired,

14   I'm going to hear closing statements.

15          How long do you estimate you would be, your side would

16   be?

17          MR. KERR:  Your Honor, I think we could be an hour and

18   I say that with this caveat:  I'm going to speak.  Mr. Siegel's

19   going to speak on behalf of the trustee.  And Mr. Wynne is

20   going to speak on behalf of FGIC, and then Mr. Kaufman will

21   speak on behalf of the committee.  And we're going to try to

22   keep it -- and we worked to not duplicate each other.

23          THE COURT:  Well, let's -- and let me hear from the

24   other side.

25          How long do you estimate you would be?

**RESIDENTIAL CAPITAL, LLC, et al.**

486

1          MR. BAIO:  Ten minutes, Your Honor.

2          THE COURT:  Mr. Goodman?

3          MR. GOODMAN:  Same amount, Your Honor.

4          THE COURT:  Mr. Shore?

5          MR. SHORE:  Yeah, ten to fifteen, Your Honor.

6          THE COURT:  Okay -- let me ask this before -- it

7    doesn't seem to me that anyone has contested -- or maybe Mr.

8    Shore has, but I don't think so -- that the proposed settlement

9    is in the best interests of the debtors, that it's fair,

10   equitable, and in the best interests of the debtors.  Does

11   anybody disagree with that?

12         MR. SHORE:  We have objected, Your Honor.

13         THE COURT:  You have?

14         MR. SHORE:  Yes.

15         THE COURT:  Okay, and you're going to argue that

16   point?

17         Is anybody else going to argue that?  All right --

18         MR. KAUFMAN:  I'm going to argue against it.

19         THE COURT:  Yeah, I know you will, Mr. Kaufman.

20   Surprise, surprise.

21         MR. KERR:  And Your Honor, I'm still writing mine,

22   so --

23         THE COURT:  You're still writing yours.  Okay, all

24   right.

25         MR. KERR:  Your Honor, one -- I understand Ms. Patrick

**RESIDENTIAL CAPITAL, LLC, et al.**

1  is going to do a short closing, as well.

2          THE COURT:  I'm sorry?  Ms. Patrick is --

3          MR. KERR:  Ms. Patrick, as well.

4          THE COURT:  Okay, all right, we're going to resume at

5  3:30.  I'm going to give the proponents forty-five minutes,

6  which is shorter than you've -- you may still have time on the

7  clock but forty-five minutes will be plenty of time for your

8  side, okay?

9          MR. KERR:  That's fine, Your Honor.  We'll work to be

10  within that time.

11          THE COURT:  Okay, and I will listen to the objectors

12  to the amounts of time that they said they would need.  All

13  right, see you at 3:30.

14      (Recess from 3:14 p.m. until 3:34 p.m.)

15          THE COURT:  All right, please be seated.

16          Mr. Kerr.

17          MR. KERR:  Your Honor, Charles Kerr of Morrison &

18  Foerster.  Your Honor, I've taken your admonitions to heart and

19  have spent the last ten minutes cutting out much of what my

20  glamorous closing --

21          THE COURT:  I'm sure it would've been great.

22          MR. KERR:  And that I did for my wife last night, so

23  I'm -- she's going to be disappointed.  But so it'll be a

24  little choppy but I still want to highlight a couple of key

25  facts that I think -- and key evidence that I think is

**RESIDENTIAL CAPITAL, LLC, et al.**

488

1    important to be in the record and be in the closing for Your

2    Honor to refer to.

3        THE COURT:  Okay, look -- I'm going to get -- this

4    isn't getting you to cut back.

5        MR. KERR:  I know.

6        THE COURT:  I am going to get proposed findings of

7    fact and conclusions of law, and I had questions yesterday did

8    I want to hear this argument today.  Yes, I do.  But you know,

9    I'll get the proposed --

10       MR. KERR:  And I realize that, Your Honor.

11       THE COURT:  Go ahead, Mr. Kerr.

12       MR. KERR:  Okay, so in my opening on Friday morning, I

13   told the Court that the settlement provides substantial

14   benefits to the debtors and the estates.  And I don't think --

15   and I think the evidence that we put in has established that,

16   at whatever standard needs to be done.

17       In our post-trial proposed findings of fact includes

18   law and we'll detail the specific testimony and facts.  And

19   given my limited time, I'm only going to try to highlight some

20   of that here. I will describe, however, each of the Iridium

21   factors this Court needs to consider when deciding whether to

22   approve the agreement, and the fundamental benefits provided by

23   the agreement are fully supported by the evidence.

24       In fact, with respect to most of the Iridium factors,

25   the objectors have not even challenged them at all.

**RESIDENTIAL CAPITAL, LLC, et al.**

489

1          Your Honor, we put into evidence the settlement

2     agreement as Exhibit 1 and testimony by Mr. Kruger about how

3     the settlement agreement operates and the specific benefits it

4     provides to the debtors.  And I refer to Mr. Kruger's direct

5     testimony, paragraphs 27 through 34 and 37 through 40.  And

6     that evidence is, I think, undisputed.

7          First, the evidence shows that the settlement

8     agreement resolves and substantially reduces the 5.55 billion

9     dollars in FGIC claims.  And what it's done is it's reduced

10    those claims down to a figure of a minimum claim of 596.5 and

11    then a potential ceiling of a claim of three claims at 596.5,

12    of which the debtor can challenge above that minimum amount.

13    And Your Honor, whether you look a the floor, whether you look

14    at the ceiling, or you look at the range, there is no dispute

15    that these amounts reflect a substantial reduction in the

16    amount of claims that FGIC could pursue.

17          In addition, under section 2.01(a) of the settlement

18    agreement, FGIC released all of its claims against the debtors

19    subject to the range of allowed claims I just described.

20    Again, not disputed.

21          Now, let me stop here and briefly discuss and address

22    two issues raised by the JSNs, about how these parts of the

23    settlement agreement operate.  First, in their questioning of

24    Mr. Kruger, the JSNs tried to suggest that because if the

25    global settlement does not become effective, FGIC will be able

**RESIDENTIAL CAPITAL, LLC, et al.**

490

1    to assert claims against each of RFC, GMAC Mortgage and ResCap

2    of 596.5, and the debtors can object to those claims to the

3    extent they exceed the minimum-allowed amount.  And this could

4    lead to additional litigation over the FGIC claims.

5             THE COURT:  It could.

6             MR. KERR:  And I say, Your Honor, while that is true,

7    Mr. Kruger explained why, in his judgment, this was still a

8    good compromise for the debtors.  And I cite here, Your Honor,

9    Mr. Kruger's testimony at 173 -- page 173, lines 7 to 174 line,

10   5 of Friday's transcript.

11            Second, the JSNs have tried to suggest that because

12   under the settlement agreement FGIC has reserved its ability to

13   pursue claims against Ally, which it could do if the global

14   settlement is not approved.  And the release of FGIC's claims

15   against the debtors is therefore illusory because FGIC could

16   sue Ally, and Ally could turn around and sue the debtors back,

17   and seek indemnification.

18            And I would suggest in making this argument that JSNs

19   are talking out of both sides of their mouth, Your Honor.  In

20   their supplemental objection, the JSNs themselves cite to the

21   examiners' report, and acknowledge that these types of claims

22   that FGIC could potentially assert against Ally for alter ego

23   and aiding and abetting have no validity or chance of success.

24   And that's supplemental opposition at 23, note 8.  Moreover,

25   this argument is difficult to reconcile with the JSN's argument

**RESIDENTIAL CAPITAL, LLC, et al.**

491

1  that ResCap has no such alter ego or aiding and abetting

2  liability for RFC and GMAC Mortgage, but that Ally would.

3         Moreover, even if FGIC asserted such claims, the

4  chance that Ally could successfully asset claims against the

5  debtors for indemnification is highly unlikely.  First, any

6  such claims would be subject to challenge on a number of

7  grounds, including such as 502(e).  Second, if FGIC claims

8  against Ally were based on aiding and abetting, any claim over

9  by Ally against the debtors could very well be subject to

10 equitable subordination.

11        And I must say, and I suspect if Ally in fact asserted

12 those indemnification claims against the debtors, Mr. Shore

13 would be standing right here, shoulder to shoulder with me,

14 pounding the lectern and saying that those claims are spurious

15 and have no value.

16        In any event, Mr. Kruger testified at page 179, lines

17 4 to 25, that even if one can use their imagination to spin out

18 unsubstantiated theories of what types of claims might be

19 asserted if the global settlement does not become effective,

20 and chaos results, this settlement and all the benefits it

21 brings still made sense in his business judgment.  And we think

22 that's the right answer, Your Honor.

23        Let's turn back to the other benefits of the

24 settlement agreement.  The evidence shows, and it's undisputed,

25 that under section 2.01(a)(4) of the settlement agreement, the

**RESIDENTIAL CAPITAL, LLC, et al.**

1    FGIC trustees released a substantial portion of their claims

2    against the debtors.  Mr. Kruger testified it was his

3    understanding that those potential collateral losses for the

4    FGIC-wrapped trust were potentially three to four billion

5    dollars in total potential collateral losses.  And that's Mr.

6    Kruger's direct testimony at paragraphs 22 and 23, and the

7    trial transcript at 181, line 20 to 183, line 10.  And those

8    estimates were consistent with Mr. D'Vari's expert testimony,

9    which was not challenged by cross.

10          Thus, the evidence shows and the objectors have often

11   no evidence to the contrary, that the settlement releases

12   billions in potential claims against the debtors.  And as I

13   will explain again, when I just refer to the Iridium factors in

14   second, Your Honor, if this settlement agreement is not

15   approved, the debtors will be faced with having to litigate

16   these complex and difficult claims asserted by FGIC and the

17   FGIC trustees.

18          Mr. Kruger testified, based on his involvement in

19   these bankruptcy cases, his experience in the RMBS settlement

20   litigation, and his experience of fifty years as a

21   restructuring lawyer; these types of claims are complex, and

22   difficult, and there's great uncertainty how they would be

23   resolved.

24          Moreover, the testimony by both Mr. Kruger and by Mr.

25   Lipps shows that litigating these types of claims is very fact

**RESIDENTIAL CAPITAL, LLC, et al.**

493

1    intensive, and the discovery will be lengthy and costly.  And I

2    refer to Kruger's direct testimony, paragraphs 47 through 49;

3    and Lipps' amended direct testimony, paragraphs 148 -- I mean

4    141 to 148, and 150 to 153.

5         THE COURT:  You know, my takeaway from Mr. Kruger's

6    testimony is standing alone it's a good deal.  If the plan gets

7    confirmed it's even a better deal.  I mean that's the long and

8    short of it.

9         MR. KERR:  I --

10        THE COURT:  From the debtors' standpoint.

11        MR. KERR:  Yeah, from the debtors' standpoint and I

12   think that is right, Your Honor.  And again, two other quick

13   benefits and we'll turn to the Iridium factors particularly.

14        Another benefit of this settlement agreement is that

15   the FGIC trusts are going to receive a settlement payment of

16   253.3 million and the added benefit of having 18 million of

17   their future premiums waived on the FGIC policies.

18        Mr. Dubel also testified about other benefits they

19   would get.  While I will let the trustees and the FGIC

20   trustee -- the FGIC trustees and FGIC address the comparison

21   between that and the rehabilitation; there is no doubt that

22   receiving those funds alone is substantial benefit to the FGIC

23   trustees, and thus the creditors of the estate.  And that

24   amount is better than perhaps getting a little more or a little

25   less over the time from the rehabilitation process while

**RESIDENTIAL CAPITAL, LLC, et al.**

494

1    remaining at risk to FGIC's credit worthiness for the next

2    forty years.

3         I would suggest that not approving this settlement

4    because a small percentage of investors in the FGIC-wrapped

5    trust want to make a bet that in the marketplace using house

6    money to direct -- directly contrary -- is directly contrary to

7    the notions that settlements and compromises are favored in

8    bankruptcy, Your Honor.

9         Finally, Section 601 shows that a settlement agreement

10   cannot become effective until the Rehabilitation Court and this

11   Court approves the settlement.  That's given the -- anybody who

12   has concerns the opportunity to come in and raise objections.

13        THE COURT:  Does it have to be final orders from both

14   courts?

15        MR. KERR:  I believe it does.  I believe it does,

16   under 601, and I don't have the -- I can find it but I believe

17   it to be final orders, Your Honor.

18        THE COURT:  You'll be waiting for a very long time for

19   a final order from a state court.

20        MR. KERR:  I understand that, Your Honor.  After

21   holding a hearing to consider the objections as you are aware,

22   the Rehabilitation Court has now approved the settlement

23   agreement, including a commutation of the policies issued by

24   FGIC.  In this Court, only one group of actual creditors, the

25   JSNs, has raised any objection, and only a small percentage of

**RESIDENTIAL CAPITAL, LLC, et al.**

495

1    the investors in the FGIC-wrapped trust have raised a concern.

2    Even those investors, however, as Your Honor noted, do not

3    challenge that this settlement's in the best interest of the

4    debtors or the debtors' estate.

5            So let me turn to the Iridium factors.  And I'm not

6    going to recite the legal justification.  I'll just refer to

7    Your Honor's decision in Dewey, which I think runs that

8    through.

9            THE COURT:  No, I have these Iridium factors; they're

10    firmly impressed in my mind.

11            MR. KERR:  Okay, and I understand that, Your Honor.

12            THE COURT:  They only come up about twice a week.

13            MR. KERR:  Okay, and I don't want to replow ground,

14    Your Honor.  So let me just go through one, the balance between

15    the litigation's possibility of success and the settlement's

16    future benefits.

17            I've talked about the benefits of the settlement, and

18    I don't think those are in question and none of that's in

19    dispute.  You have to balance that against the likelihood of

20    litigation's possibility of success.

21            What is important to recognize, that if this

22    settlement's not approved, it's not just one claim that will

23    need to be litigated.  But multiple, competing claims between

24    the debtors, FGIC, the FGIC trustees, and a whole bunch of

25    other creditors.

**RESIDENTIAL CAPITAL, LLC, et al.**

496

1          Mr. Kruger testified based on his involvement in this

2    bankruptcy and his experience as a restructuring lawyer that

3    "The issues that have to be litigated: the underlying contract

4    and tort claims, and the bankruptcy claims are very

5    complicated, and there's great uncertainty as to how they would

6    be resolved."  And again I cite to his testimony from Friday.

7    I won't read it but it's pages 164, line 19 to 165, line 8 Your

8    Honor.

9          Second factor is likelihood of complex and protracted

10   litigation with the attended expense and inconvenience and

11   delay, including the difficulty in collecting the judgment.

12   None of the objectors have really disputed that if this unfolds

13   without a settlement, litigation's going to be long, complex,

14   and lengthy.  And that's supported by both Mr. Kruger's and Mr.

15   Lipps' direct testimony.  And I won't cite it to you.  It'll be

16   in our findings of fact.  I think I'm not going to say any more

17   about that, Your Honor.  I don't think that's really in

18   dispute.

19          The paramount interest of the creditors include each

20   effected class' relative benefits, and the degree to which the

21   creditors either do or do not object or firmly support the

22   proposed settlement. I've already described the evidence

23   showing the benefits the settlement agreement brings to the

24   estates.  Of the over forty --

25          THE COURT:  Well the -- the objecting -- the Monarch

**RESIDENTIAL CAPITAL, LLC, et al.**

1    and the other objecting investors, they say we have twenty-five

2    percent of the FGIC-wrapped bonds versus what was the figure

3    that was given this morning -- eight percent or less or

4    something, for the steering committee and the Talcott Franklin

5    group, their holdings.  So you know, I'm not sure.  I mean a

6    substantial group of investors have objected to the settlement.

7              MR. KERR:  And I don't mean to mischaracterize it,

8    Your Honor, but I think what's important here, and I think

9    you'll hear this from Mr. Siegel; the issue is not to -- and I

10   think even related to the findings, is not that every single

11   investor is happy.  It's whether or not as a whole the

12   investors are better off because of this, and that's I think

13   the standard to be done.

14             But I would like to point out though, of the over

15   4,400 parties that have filed claims against the debtors in

16   this proceeding, only one group of creditors, the JSNs, have

17   objected to this settlement agreement, and that silence is

18   telling.  And I would suggest that the creditors recognize that

19   both this settlement agreement standing alone and as part -- as

20   a step toward the global settlement, is much to everyone's

21   benefit: the debtors, the debtors' estates, and the debtors'

22   creditors.

23             As to what other parties and interests support this

24   settlement, in paragraph 54 of Mr. Kruger's direct testimony,

25   he lists a large number of major constituencies in this Court

**RESIDENTIAL CAPITAL, LLC, et al.**

498

1    that support this settlement.

2          THE COURT:  The consenting claimants to the PSA

3    support the FGIC settlement.

4          MR. KERR:  Correct.  And I don't think I'll say

5    anything more about that, Your Honor.  Although again -- I

6    will.  Ms. Patrick -- I apologize, Your Honor.  I can't resist.

7    One thing I do want to -- and I just want to -- obviously your

8    Court's -- Your Honor's aware of this.

9          THE COURT:  Clocks' running, go ahead.

10         MR. KERR:  Is that -- is that Ms. Patrick's clients

11   are also investors in the FGIC trust, as well as other trusts.

12         THE COURT:  I have that in mind.

13         MR. KERR:  Okay, the competency and experience of

14   counsel and the competency and experience of the bankruptcy

15   court reviewing, no one's touched that.  And I don't -- I don't

16   think we do.  I think there's no doubt that all these parties

17   were represented by competent counsel and thoughtful counsel in

18   how they've approached this.

19         The nature and breadth of the releases to be obtained

20   by the officers and directors, no one's challenged that.  Mr.

21   Kruger dealt with that in his direct testimony.

22         The extent to which the settlement is the product of

23   arm's-length bargaining, I think this is the one place where

24   the creditors and perhaps the investors have sought to

25   challenge, based on the fact that the negotiation process

**RESIDENTIAL CAPITAL, LLC, et al.**

1   leading up to the settlement agreement was confidential.

2         The objectors, I would suggest, offered no affirmative

3   evidence, however, that the settlement agreement was not the

4   product of arm's-length negotiations.  And even in light of the

5   confidentiality limitations, the evidence that's in the record

6   support a finding that the settlement agreement was the product

7   of arm's-length bargaining.

8         And I would refer first to Exhibit 311, which is the

9   chronology that was submitted by FGIC, about the chronology of

10   the period over which this was negotiated.  And Mr. Dubel's

11   rebuttal testimony recently about the fact it was different

12   back and forth in the commutation amount.  And then I'd also

13   refer to Mr. Kruger's direct testimony from his perspective,

14   what he saw.  And that's Kruger direct testimony paragraphs 5,

15   14, 57, and 58.  And those conclusions were supported by Mr.

16   Dubel's direct testimony at paragraphs 6 through 7 and 10 and

17   18.

18         Let me just touch on business judgment for one second,

19   while not formally part of the Iridium factors, it's been an

20   issue that I think Your Honor's noted in the Dewey decision and

21   whatever.  And I don't think there's any question here that Mr.

22   Kruger, in taking on the responsibility to be CRO of the

23   debtors, properly exercised his business judgment in making a

24   determination to enter into this settlement agreement.

25         That's reflected in both his engagement letter, which

**RESIDENTIAL CAPITAL, LLC, et al.**

500

1   is Exhibit 30, which gave him that authority, and he testified

2   as well, that based on his overall review of the facts, his

3   involvement, his fifty years of experience, and his knowledge

4   about it that he got out of the RMBS settlement about the

5   contentions of the policies -- of the parties, that he believed

6   that in his business judgment this was the right thing to do.

7   And again I just cite to his direct testimony, paragraphs 10

8   through 15, 22 through 23, and 36 through 43.

9        Now, in their cross-examination of Mr. Kruger, the

10  JSNs tried to suggest that somehow his decision-making was not

11  thorough by trying to draw distinction between what he reviewed

12  and read over his months as CRO and what he specifically relied

13  on with respect to this.

14       And I think Mr. Kruger's testified and properly so at

15  Friday, at page 161, line 23 to 162, line 22 and 164, line 13

16  through 165, line 8, that he reviewed and relied on many things

17  over the months leading up -- his involvement as CRO, and all

18  of that came into his underlying thinking about why this was a

19  good deal.  And as he also testified in direct and in his

20  cross, he brought his many years of experience as a bankruptcy

21  lawyer in reaching that decision.

22       So let me just turn to the proposed order and the

23  findings.  Again, I'm going to leave the specifics of the

24  findings related to the trust and the investor trust to Mr.

25  Siegel and to FGIC.  But there's no dispute here, I think, Your

**RESIDENTIAL CAPITAL, LLC, et al.**

1    Honor, that those part of the findings that entering this

2    settlement agreement is in the best interest of the debtors and

3    the debtors' estate.

4          And the investors raised a bunch of -- a series of

5    objections about jurisdiction, and authority of the Court.  We

6    dealt with them in our omnibus reply in support of this motion,

7    which is docket 4474, at pages 4 through 12.  And I will leave

8    that to that, unless Your Honor has questions.

9          With respect to the factual support for the findings,

10   Your Honor, there's no real dispute, as I said, it's in the

11   best interest of the debtors.  And with respect to the FGIC

12   trust, and the investors, again while leaving that to Mr.

13   Siegel, and Mr. Wynne; Mr. Kruger did testify that from his

14   perspective the basis of why he believed those findings were

15   correct.  And again I refer to his testimony in paragraphs 41

16   and 42, of his direct, and at page 132 and 133 of the trial

17   transcript, why from his perspective he thought that was good.

18         In summary, Your Honor, the testimony and supporting

19   documentation that is now in evidence more than demonstrates

20   that the settlement agreement is fully supported by the Iridium

21   factors and reflects reasonable and fair compromise in

22   settlement.  The evidence also fully supports the proposed

23   order approving the settlement agreement, including the

24   findings of the proposed order.  And we ask the Court grant the

25   motion and approve the settlement.

**RESIDENTIAL CAPITAL, LLC, et al.**

502

1          THE COURT:  Thank you, Mr. Kerr.

2          MR. KERR:  Thank you.

3          THE COURT:  All right, who's next?  Mr. Siegel?

4          MR. SIEGEL:  Good afternoon, Your Honor.  I have a few

5    basic points that I'd like to make.

6          The first thing is that although we are here to look

7    at the FGIC settlement in the context of the ResCap case this

8    cannot be separated out from the overall bankruptcy case, and I

9    am concerned, as I listen to the testimony that's been adduced

10   by the objecting parties and their argument, that they think

11   that somehow this is an a la carte menu that they can pick from

12   the things they like and they can exclude the things they don't

13   like.

14         That's not what's happened here.  The negotiation here

15   was very complex.  The idea that somehow, if we didn't do the

16   commutation, that somehow there would have still been a

17   settlement that was as beneficial as we believe it was to the

18   FGIC trusts, where they were able to achieve ninety-two million

19   dollars, is not only completely speculative, I don't believe it

20   would have been possible.

21         I also think, Your Honor, that when you look at what

22   was really going on here and you think about what the trusts

23   were doing, the trusts have two sources of payment.  Their

24   sources of payment are their originators of the loans, against

25   whom they have the rep and warranty claims, and their monoline,

**RESIDENTIAL CAPITAL, LLC, et al.**

503

1    FGIC.  Now, it just so happens that both of them became

2    insolvent, and that wasn't a great thing for the investors, but

3    that's what happened.  And a big part of the case had to do

4    with the competition between FGIC and the FGIC-based trusts

5    over the assets that were the subject of the ResCap bankruptcy.

6         What do I mean by that?  What I mean by that is we

7    asserted rep and warranty claims on behalf of the trusts

8    against ResCap and also against Ally, I mean, essentially.

9    FGIC took the position that they were defrauded when they

10   entered into the insurance that paid our claims or that was

11   supposed to pay our claims.  And how were they damaged?  Well,

12   rep and warranty claims.  I mean, there's some other assertions

13   they made, but a big part of what was going on here was the

14   allocation of the recoveries that we would receive from Ally

15   and ResCap between the trusts and between FGIC.

16        So what result did we achieve?  The result we achieved

17   was that FGIC only got a claim equal to the amounts they

18   actually paid the trusts, and the balance was something that

19   was folded into the overall rep and warranty settlement.  And

20   when we did the calculation, and it's true we didn't know the

21   exact number when we entered into it, but we knew it was a

22   significant number, there was ninety-two million dollars there.

23   So the suggestion when they testify that somehow they could

24   have gotten a piece of the 206 plus the 92 is just wrong.  It's

25   wrong because the total damage amount is really 298.  And why

**RESIDENTIAL CAPITAL, LLC, et al.**

504

1    is it 298?  Because that's the total amount that's being paid,

2    effectively, by ResCap and Ally with respect to the rep and

3    warranty losses.

4         And what did we do?  We took a disproportionate chunk

5    of that for the benefit of the FGIC-wrapped trusts.  That's

6    what happened.  And that number, when you add it to the 253

7    commutation amount, results in a very significant recovery.

8    And, by the way, Your Honor, I'm not even talking about the

9    eighteen million yet.  I'm not talking about the future expense

10   recoveries that have a nominal value of 140 million.  Who knows

11   what they're going to be worth?  We got a package of things

12   that are part of the settlement overall, and if you just

13   pretend that the value that was received was simply the

14   commutation payment you're not looking at the overall picture,

15   and I would submit that's not the way to do this.

16        So when you do that you say well, is this in the best

17   interests of the investors and did we act reasonably and in

18   good faith.  And one thing the last two days have demonstrated,

19   to me at least, is just how complicated all of this is, how

20   people can disagree over the way they can run the numbers, how

21   this is not a science, how none of us know what's going to

22   happen over the next forty years.  None of us know what would

23   happen if the settlement were not achieved and we had to go

24   through a litigation with Ally and the amounts that would have

25   been realized.  That's what a settlement is about.  It's

**RESIDENTIAL CAPITAL, LLC, et al.**

505

1    exchanging uncertainty for certainty.  And that's what we did.

2    We got a certain number.

3          It seems to me that the objections that we're getting

4    from the objecting parties really boil down to two things.  One

5    is, frankly, they think they could have done a better job than

6    us.  That's what they think.  They think if they had been in

7    the room negotiating the number would have been higher.  That

8    may be true.  That may not be true.  They weren't in the room.

9    And it wasn't their job to negotiate, frankly.  It was ours.

10         The other thing they say is they think they had the

11   right to consent to the settlement in advance of us entering

12   into the settlement.  That right is not present in the

13   documents.  They don't have the right to approve a settlement

14   as an individual certificate holder.  The right we did preserve

15   for them that we included in the settlement agreement we

16   insisted upon was that they would have the right to direct us

17   to opt out of the settlement.  Whether they were able to do it

18   or they were not able to do it that was their right.  They did

19   not try to do so.  Therefore they defaulted to our judgment on

20   this.  That's where we wound up.

21         So at the end of the day, when you talk about this

22   complex process, I think what you need to evaluate in

23   determining our good faith about whether or not this is the

24   right number is you need to look at the process we went

25   through.

**RESIDENTIAL CAPITAL, LLC, et al.**

506

1        THE COURT:  Let me stop you for a second.

2        MR. SIEGEL:  Sure.

3        THE COURT:  Did the investor objectors here hold

4   sufficient percentage of securities in FGIC-wrapped trusts to

5   be able to direct the trustees to opt out of the settlement?

6        MR. SIEGEL:  Your Honor, I do not know.  They did

7   provide us with holdings in individual trusts, but each of the

8   trusts have their own mechanisms for directions.

9        THE COURT:  Let me ask it.  Did the investor objectors

10  purport to direct the trustees to opt out of the FGIC

11  settlement?

12       MR. SIEGEL:  Not prior to the PSA.  There was a letter

13  sent to us, full disclosure, Your Honor, by Freddie Mac,

14  subsequent to the PSA, asking us to opt out.  We explained to

15  them that that would constitute a breach of the plan support

16  agreement order and --

17       THE COURT:  That letter's not in evidence, is it?

18       MR. SIEGEL:  I don't think so.  You're right, Your

19  Honor.

20       THE COURT:  Okay.

21       MR. SIEGEL:  You asked the question.  I'm answering

22  it.

23       THE COURT:  I did.

24       MR. SIEGEL:  But you're right.  It's not in evidence.

25       THE COURT:  But in terms of what's in the record here,

**RESIDENTIAL CAPITAL, LLC, et al.**

507

1　there is no evidence that the investor objectors instructed the

2　trustees to opt out of FGIC settlement.  Is that correct?

3　　　　　MR. SIEGEL:  Not that I can recall.

4　　　　　THE COURT:  Okay.  Go ahead, Mr. Siegel.

5　　　　　MR. SIEGEL:  All right.  Now, one of things I think we

6　should talk about -- I do want to talk about what they say the

7　numerical deficiencies in the settlement are, but before I do

8　that I want to spend a moment talking about the very

9　complicated cash flows that relate to the FGIC settlement, what

10　they talk about the CPPs.  I just want to talk about why it is

11　that our advisors told us that despite the fact the global

12　number that's being described is twenty-seven to thirty cents

13　that, in fact, in their view the value that would be received

14　by the FGIC trusts would be closer to twenty-two cents for

15　those particular trusts.

16　　　　　The way that this is set up is that assuming the

17　number doesn't change you get an initial distribution of

18　seventeen and a quarter percent, and then as your claims accrue

19　over the next five years you would continue to get seventeen

20　and a quarter cents for all the new claims you would accrue,

21　and then, by the time the fifth year comes around, you would

22　get another three cents on the dollar.  And I can't tell you

23　precisely how it ratchets up, but assume -- and, by the way,

24　this is completely within the discretion of FGIC, but that's

25　what the projections show.

**RESIDENTIAL CAPITAL, LLC, et al.**

508

1          I am told that eighty percent of our claims will have

2     accrued within the next five years.  Okay?

3          THE COURT:  I heard that.

4          MR. SIEGEL:  Roughly.  So then what happens?  Well,

5     with respect to us getting future distributions thereafter,

6     with respect to getting the difference between the twenty and

7     what they say is twenty-eight, which is, I believe, in nominal

8     dollars something around twenty-eight cents, we will have to

9     wait, or these trusts would have to wait over forty years to

10    get that remaining twenty-eight cents in nominal value.

11         Why are they different than the other trusts?  They're

12    different than the other trusts because they've already accrued

13    the losses for which they're going to be compensated with that

14    twenty-eight nominal cents in dollars.  The other trusts, or

15    the other insured parties, have not yet accrued the losses.

16         THE COURT:  I have that point.

17         MR. SIEGEL:  Okay.

18         THE COURT:  I understand.

19         MR. SIEGEL:  That's fine.

20         THE COURT:  I understand that point.

21         MR. SIEGEL:  I just wanted to spend a moment on it.

22         THE COURT:  That's fine.

23         MR. SIEGEL:  But I'll move on if Your Honor

24    understands that.

25         THE COURT:  I understand that point.

**RESIDENTIAL CAPITAL, LLC, et al.**

509

1          MR. SIEGEL:  Okay.  So then the only other point that
2     I want to make --

3          THE COURT:  That was Mr. Pfeiffer who testified about
4     that on redirect.

5          MR. SIEGEL:  Yes.  Yes, it was, Your Honor.

6          THE COURT:  On rebuttal.

7          MR. SIEGEL:  We were concerned that --

8          THE COURT:  Okay.  I got it.

9          MR. SIEGEL:  -- it was not clear enough.

10          THE COURT:  Okay.

11          MR. SIEGEL:  But thank you.  In the Gibson declaration
12     at paragraph 45 what it says is "FGIC further applies a haircut
13     in the amount of forty percent resulting in a reduction to the
14     proposed expected recovery under the rehabilitation plan in the
15     amount of $90.32 million".  So they say that our settlement
16     shorts them ninety million dollars.

17          In the Goldstein declaration he gets at it a little
18     bit differently.  He says "excluding the unexplained forty
19     percent reduction and the mischaracterized benefit of waived
20     premium payments", which we continue to believe is a benefit,
21     "the cash commutation payment, as calculated by FGIC, should be
22     362 million dollars."  So I want to do some simple math, which
23     I think is based on the evidence.

24          We all agree that we start with 253 million dollars.
25     I think we also agree that under the allocation formula in this

**RESIDENTIAL CAPITAL, LLC, et al.**

510

1   settlement there's another ninety-two million dollars coming.

2   So that gets us up to about 340 million dollars, more or less.

3   Then we have the eighteen million dollars, which we think is

4   clearly a benefit.  Once you get to the eighteen million

5   dollars you exceed the Freddie Mac shortfall.  You exceed the

6   Freddie Mac shortfall simply by getting the ninety-two million.

7   And in order to get to the Monarch number, you're about ten

8   million dollars away from that number, and, of course, I think

9   that's probably close enough, in any event, but we haven't even

10  considered the reimbursements that we don't how to calculate

11  that will go off into the future that have been foregone by --

12          THE COURT:  And will come to you rather than to FGIC.

13          MR. SIEGEL:  Exactly.  So I would submit, based on the

14  evidence in front of you, to the extent to which they've said

15  that these settlements are deficient, which we don't believe

16  them to be, and to the extent to which they even have a

17  legitimate objection as to it as all, we've already

18  demonstrated they're getting as much as they think they should

19  have gotten.

20          THE COURT:  Let me cut through this.  Tell me why is

21  it that you believe the trustees acted reasonably and in the

22  best interests of the investors in approving the FGIC

23  settlement versus the FGIC rehabilitation plan.

24          MR. SIEGEL:  I think, Your Honor, we were confronted

25  with two very uncertain outcomes for the trusts.  One uncertain

**RESIDENTIAL CAPITAL, LLC, et al.**

511

1    outcome would have been the continued protracted unknown

2    litigation with ResCap and Ally with respect to our claims and,

3    by the way, as related to that, the competition between us and

4    FGIC over who was going to get the money on the rep and

5    warranty claims.  We had that on one side.

6         On the other side we had the uncertain distributions

7    coming out of the FGIC rehabilitation, where we did not know

8    what that number was going to be.  We hired a financial

9    advisor.  We participated very heavily in the mediation.  We

10   ran calculations.  We paid Duff & Phelps a lot of money to

11   understand the complexity of this thing, which they explained

12   to the trustees.  The trustees looked at all of this.  They

13   said that the numbers that we see coming to these trusts are

14   more than sufficient to take away the uncertainties to our

15   holders and give them a fair and, we think, a more than fair

16   recovery based upon the circumstances.

17        THE COURT:  Right.  And you believe what you've just

18   told is supported by the evidence in the record.

19        MR. SIEGEL:  Yes, Your Honor.  I do.

20        THE COURT:  Okay.  Go ahead.

21        MR. SIEGEL:  And I think what you did was you simply

22   pushed me to my close, so I'm done.

23        THE COURT:  Thank you very much, Mr. Siegel.

24        MR. SIEGEL:  Thank you, Your Honor.

25        THE COURT:  Ms. Patrick, are you next?

**RESIDENTIAL CAPITAL, LLC, et al.**

512

1          MS. PATRICK:  I think I am, Your Honor.

2          May it please the Court, Kathy Patrick for the RMBS

3    steering committee investors.  A few additional points.  There

4    have been repeated suggestions by the objectors to this

5    settlement that these policies are their claims or that they

6    are the investors' policies, but, as the Court rightly noted,

7    they are not.  These policies belong to the trust.

8          THE COURT:  This is undisputed.  Go on.  What's your

9    next point?

10          MS. PATRICK:  And under the trusts it is not relevant

11    whether their clients have 23 percent or my clients have 7.6

12    percent.  What is relevant is that one hundred percent of the

13    interest of all certificate holders, each and every one of

14    them, is represented by one set of parties in this proceeding,

15    and that is the trustees.  And it is the benefit of all

16    certificate holders whose interests have to be vindicated here,

17    not the idiosyncratic risk tolerance of three certificate

18    holders out of thousands who received notice.

19          THE COURT:  Well, four.

20          MS. PATRICK:  Four.

21          THE COURT:  Freddie Mac.

22          MS. PATRICK:  Freddie Mac.  Four.  Who have received

23    notice and chosen not to object to this commutation; have, by

24    their silence, having been given notice, said the bird in the

25    hand is fine with us.  And it's a very sizeable bird in the

**RESIDENTIAL CAPITAL, LLC, et al.**

513

1   hand.

2          Going to the reasonableness of the trustee's decision

3   you have not only their own careful deliberations, Ms.

4   Sohlberg's testimony, the testimony of the trustee witnesses,

5   they did what they are entitled to do under the pooling &

6   servicing agreements.  They retained an expert, Duff & Phelps.

7   Duff & Phelps did an enormous analysis and advised them that

8   this was NPV positive.  And so they made their decision that

9   the bird in the hand certainty, rather than subjecting the

10  trusts to the risk of forty years of exposure to FGIC, an

11  entity that is in rehabilitation, why?  Because it's --

12          THE COURT:  Let me ask you this.

13          MS. PATRICK:  Yes.

14          THE COURT:  The ninety million that is pre --

15  estimated is ninety-two million distribution from the estate

16  estimated at this time, why wouldn't that be additive to either

17  the FGIC rehabilitation plan outcome as well as this outcome?

18          MS. PATRICK:  Because I don't believe --

19          THE COURT:  You added what I -- you, the trustees, add

20  the ninety million --

21          MS. PATRICK:  Yes.

22          THE COURT:  -- to --

23          MS. PATRICK:  To the 253.

24          THE COURT:  -- the commutation.

25          MS. PATRICK:  Yes.

**RESIDENTIAL CAPITAL, LLC, et al.**

514

1          THE COURT:  Okay.  Why wouldn't it likewise be

2     additive of the rehabilitation plan outcome?

3          MS. PATRICK:  It's not additive, Your Honor, because

4     it exists only because of the global compromise.  And that's a

5     point that I think I hold very dearly, since we spent months

6     achieving it, and I understand fully --

7          THE COURT:  Global compromise that hasn't been

8     approved yet.

9          MS. PATRICK:  Exactly.

10         THE COURT:  Where you say global compromise is the

11    plan.

12         MS. PATRICK:  Right.  That's correct.

13         THE COURT:  All right.

14         MS. PATRICK:  And critical to that, Your Honor, is

15    that to assume that -- to use the Chinese metaphor menu, or I

16    like what I like and I don't like what I don't like -- to

17    assume that that ninety-two million dollars will be available

18    in a universe where the FGIC policies are not commuted and in a

19    universe where this compromise is not achieved so that in the

20    overall context the FGIC holders, the holders in the FGIC

21    trusts, are fighting with FGIC over who gets what dollars in --

22         THE COURT:  But we won't know -- even if I approve the

23    FGIC settlement we won't know until plan confirmation whether

24    the ninety-two million really is additive of the result for the

25    certificate holders in this trust, FGIC-wrapped trust.

**RESIDENTIAL CAPITAL, LLC, et al.**

515

1            MS. PATRICK:  I fully understand that, Your Honor, and

2    that's why even without it our clients believe that this

3    compromise makes abundant sense.  The compromise on its own,

4    the bird in the hand, the cash upfront, the real weirdness of

5    continuing to pay policy premiums for coverage that you're not

6    getting, I mean, you can go down the list of benefits the

7    trustees have achieved here.  The release of the trusts from

8    the obligation to reimburse or reinsure a certificate insurer

9    that isn't covering them anymore.  I mean, there is

10   something --

11           THE COURT:  Okay.  I've got that.

12           MS. PATRICK:  -- very sad here about this in that

13   sense, but the key point is this.  If this compromise means

14   anything it means that the trustees, under the PSAs, were

15   entitled to retain experts to advise them as to how all

16   certificate holders were better off, and they did that.  And if

17   those PSAs mean anything they mean that the trustees are not

18   required to take financial risk when they act in the best

19   interests of certificate holders as they have done here, and

20   because of that they have come to get a very commonplace, very

21   simple order confirming that they've done their job, that

22   they've complied with the PSAs.

23           THE COURT:  Okay.  I've got that point.

24           MS. PATRICK:  That's our point, Your Honor.

25           THE COURT:  Thank you very much, Ms. Patrick.

**RESIDENTIAL CAPITAL, LLC, et al.**

516

1           MS. PATRICK:  Thank you.

2           THE COURT:  Who's next?  Mr. Wynne?

3           MR. WYNNE:  Thank you, Your Honor.  Richard Wynne on

4    behalf of FGIC, and I will be very brief, Your Honor.  I only

5    have a few, very few things to say.  But I want to pick up on

6    the question that Your Honor asked with respect to the ninety-

7    two million.  And it points out, we have a lot of very strange

8    theories and theses that the objecting parties, and because

9    they're in different situations that they've propounded, that

10   that actually highlights.

11          On the one hand, FGIC has been criticized, that the

12   rehabilitator has been criticized that litigation recoveries

13   were excluded from the FGIC plan.  And that was a big point

14   that they made, and that's simply statutory accounting.  I

15   don't control the rehabilitator.  The rehabilitator does what

16   they do under what -- we had some testimony about whether they

17   were probable and estimable.  There's accounting terminology.

18   And that was not done.

19          So, on the one hand FGIC is, sort of, being accused of

20   saying well, under your rehab plan you're not considering these

21   wonderful claims that you have.  And they are wonderful claims.

22   Every claim that FGIC has is a wonderful claim.  We should

23   completely prevail.

24          But that is not the world of litigation.  The world of

25   litigation, people lose.  You can win.  You can lose on appeal.

**RESIDENTIAL CAPITAL, LLC, et al.**

517

1  We've all seen that, and these are big high-ticket cases, and

2  Mr. Lipps testified, and what was allowed, very well about that

3  there's a very limited experience past the trial court, and you

4  only have a few trial court decisions.  And this whole area is

5  brand new.  It's, sort of, an explosion in the last five years.

6  So for anyone to say with certainty what FGIC's claims against

7  Countrywide are going to be worth or not, there's no certainty.

8  So we have that on the one hand.  We're not counting these

9  great litigation claims.

10       On the other hand, we pointed out there's the

11  municipal market, which is over a third of FGIC's exposure, has

12  dramatically declined since the FGIC rehabilitation plan and

13  its disclosure was put out.  So we have those sort of

14  counterbalancing, and now we have this ninety-two million

15  dollar issue.  And when I think about it, the ninety-two

16  million dollars is sort of being attacked by the objectors

17  because it's not certain because the plan hasn't been

18  confirmed.  Well, when we started out this case, most of the

19  parties on, sort of, this side of the room, were fighting.  And

20  we went through eight months of as intense fighting as anyone

21  has seen over the deal that Ms. Patrick and AFI and the

22  debtors --

23       THE COURT:  Trust me, Mr. Wynne, I'm very aware --

24       MR. WYNNE:  I know you are -- I know you are, Your

25  Honor.  But now twenty-three parties spent five months in a

**RESIDENTIAL CAPITAL, LLC, et al.**

518

1  mediation.  And I want to direct you, Your Honor -- we didn't

2  really, you know, give it a time trial.  We didn't really have

3  time to do what I wanted, and I've got a beautiful litigation

4  board, that I'm not going to show you, of the time line that's

5  attached to Mr. Dubel's declaration.  It's now in as Exhibit

6  311.

7          And I would ask Your Honor, when you're reviewing

8  this, and we'll certainly do it in the findings, that you take

9  a look at that, because we were very careful to only discuss

10  the process of the negotiations that happened in the mediation.

11  And when you look at just the before and after picture, Your

12  Honor, and if you see the fighting that went on beforehand, and

13  you were -- you had a front-row seat to that fighting that went

14  on, and the five-month mediation, and what came out the other

15  side, I think there is no way to make any conclusion that this

16  was extensive, hard-fought negotiation in good faith and that

17  everybody involved acted in their own client's best interests.

18  And it's just looking at the documents; look at the before and

19  after.  And I love to rely upon Mr. Shore, and --

20          THE COURT:  He's smiling.

21          MR. WYNNE:  What?

22          THE COURT:  He's smiling.

23          MR. WYNNE:  I know.  I knew he would.  But if you

24  look, Your Honor, Exhibit 313, which is in evidence, is a

25  compilation of Exhibits that talk about the mediation.  And Mr.

**RESIDENTIAL CAPITAL, LLC, et al.**

519

1    Shore filed a pleading, docket number 2997, that's there, where

2    he was complaining about the mediation, that they had patiently

3    participated, they were hoping for a global compromise, and he

4    said, "Perversely, these well-intentioned efforts to achieve

5    consensus through mediation have seemingly emboldened certain

6    parties to harden their negotiating positions, secure in the

7    knowledge that the debtors' present plan construct with its

8    nonconsensual third-party release provisions with Ally remains

9    the only show in town."

10            THE COURT:  I remember that pleading very well.

11            MR. WYNNE:  Okay.  Then I will stop reading, Your

12    Honor.

13            So what we have is, twenty-three parties signed the

14    plan support agreement, and a key predicate to that was FGIC

15    reducing its claims, and a very substantial reduction in its

16    claims.  That's what we're here for.  This settlement, while it

17    stands alone, it is the predicate to that.  And so the same

18    parties that tell you you should count these billions of

19    dollars we're going to get from Country Wide, are basically

20    saying, but you should discount the ninety-two million dollars

21    that if this plan, that the twenty-three largest creditor

22    groups in this case came together and supported, after five

23    months of fighting, after eight months of fighting, that you

24    should totally just take that ninety-two million dollars and

25    ignore it.

**RESIDENTIAL CAPITAL, LLC, et al.**

520

1          THE COURT:  So I don't know -- and there is no direct

2    evidence on this, but I just was speculating in my own mind, if

3    the FGIC claim against the debtors was not reduced, and if it

4    wound up allowed in full, what dilutive effect it would have on

5    recovery of unsecured creditors in the case, what the ninety-

6    two million would become.  It's just my speculation.  There's

7    no direct evidence --

8          MR. WYNNE:  Okay.  That --

9          THE COURT:  -- it is what it is.

10          MR. WYNNE:  It is what it is, Your Honor.  But that

11    really does point out -- and my last point, Your Honor.  You've

12    really got that, sort of, dichotomy between the objectors.  So

13    essentially, on the one hand, the investor objectors are saying

14    that FGIC could have gotten the --

15          THE COURT:  Well, they thought they got not often, and

16    Mr. Shore thought they were getting too much.

17          MR. WYNNE:  Exactly.  Your Honor, with that, I'm done.

18          THE COURT:  Thank you.

19          MR. WYNNE:  Thank you, Your Honor.

20          THE COURT:  Let me just -- hold on, Mr. Baio.

21          Mr. Kaufman, on behalf of the committee, wants to be

22    heard, briefly --

23          MR. KAUFMAN:  Good afternoon, Your Honor.

24          THE COURT:  -- briefly.

25          MR. KAUFMAN:  Yes, briefly.  Actually, Your Honor, as

**RESIDENTIAL CAPITAL, LLC, et al.**

521

1   you know, I have remained silent during the course of these

2   proceedings, and was looking forward to the opportunity to

3   speak.  Many of my colleagues have chided me that it must have

4   been very difficult for me to not speak.  And now that I'm

5   here, purportedly batting cleanup, I find myself in the

6   position of having nothing to clean up.

7           THE COURT:  Okay.  So is that it?

8           MR. KAUFMAN:  My colleagues did a wonderful job, and

9   for the reasons they have expressed, the committee fully

10  supports the approval of this settlement and entry of the

11  proposed findings in full.

12          THE COURT:  Thank you.

13          Mr. Baio?

14          MR. BAIO:  Your Honor, may it please the Court;

15  Joseph Baio.

16          We will be submitting findings of facts and

17  conclusions of law which will detail the evidence that has been

18  provided and the absence of evidence that we think is fatal to

19  the movants and the findings that they are seeking.

20          Mr. Kerr said, I think, a remarkable thing in his

21  opening, and that was that, Your Honor, what we're asking for

22  here, from his perspective and from the perspective of the

23  movants, is a finding that the investors and the trust, as a

24  whole, are going to be benefitting to their best interests.

25  That is not what the finding says.  And I will come back, again

**RESIDENTIAL CAPITAL, LLC, et al.**

1    and again, in the findings -- I'm sorry; in the findings of

2    fact -- to what they are asking you to find, and that is that

3    the investors in each trust, that their -- the investors in the

4    trust, not just the trusts -- that their interests are being

5    served and that they acted in the best interest of the

6    investors in each trust.  You do not have an evidentiary basis

7    for that, Your Honor, that they have provided, seeking that

8    finding as to those investors, and we will highlight that.

9            But let's talk about, also, the other finding, the

10   good faith and the best interests combined.  What do we know,

11   now that we've actually had a trial?  We do know that FGIC

12   lobbed in its commutation demand and 253 million dollar

13   proposed payment at the end of March of this year.  It is

14   already an exhibit.  We will identify it.  And that was

15   unchanged from March 26th, when it was received, to the

16   analysis, to the present, unaltered.  That's a fact.  We don't

17   know what happened in the mediation, but we do know that.

18           What did the trustees do when that was lobbed in?  And

19   they trumpet the fact that they have hired financial experts

20   and Duff & Phelps.  Well, we have seen in many cases, Your

21   Honor, and I think Your Honor has as well, when you hire a

22   financial advisor and somebody has proposed a settlement to you

23   where they want to give you X, the financial analyst actually

24   analyzes whether, from a financial point of view, that

25   proposal, the dollar amount, is in the best interests.  That

**RESIDENTIAL CAPITAL, LLC, et al.**

523

1   was not done here.  They did not hire Duff & Phelps to do an

2   evaluation as to whether this settlement is in the best

3   interests of the clients that hired them.

4          And what we're going to emphasize is the things that

5   they didn't ask Duff & Phelps to do, and what Duff & Phelps

6   didn't do.  They did not evaluate the proposal, or Duff &

7   Phelps -- at least, we heard that from Mr. Pfeiffer --

8   negotiate its terms.  They did not evaluate whether the

9   proposal is in the best interests of the trust.  They didn't do

10  it.  And by not asking them, the trustee shouldn't be able to

11  duck and cover.  They could have asked that question, there

12  could have been an evaluation, and they decided not to.  And I

13  think, Your Honor --

14         THE COURT:  Well, the contents of the mediation are

15  protected by the mediation privilege or by the order entered.

16  So who said what to whom in the mediation is not part of this

17  record.

18         MR. BAIO:  I understand.  Your Honor, if there's one

19  thing I understand from what has happened, I completely

20  understand that, and I am not talking about that.  I'm talking

21  about what the witness said he did, not in connection with the

22  mediation.  He wasn't involved in negotiations; that's the

23  testimony.

24         And what he did do was, he didn't look behind the

25  forty percent haircut.  Now, if you're normally the financial

**RESIDENTIAL CAPITAL, LLC, et al.**

524

1  advisor for someone who gets a proposal lobbed in, which talks

2  about a forty percent haircut, you fight that.  You don't

3  embrace it.  You don't take it as a given.  You don't do

4  another analysis that will justify that.  You come up with

5  reasons why it is insufficient.  This entire process has been

6  reversed, when you look at what Duff & Phelps does.  And we

7  will emphasize that, Your Honor, in our papers.

8           What did the trustees do?  The trustees actually bound

9  themselves to support the settlement agreement.  They say --

10  and they trumpet the fact that we purportedly have the right to

11  make these objections and we are making these objections.  At

12  the same time, they are duty-bound by contract to fight us, to

13  fight the beneficiaries of the trust.  And within the agreement

14  that they signed -- and you heard Ms. Sohlberg testify about

15  this --

16           THE COURT:  Well, you are a subset --

17           MR. BAIO:  Yes.

18           THE COURT:  -- of the investors.  And the fact --

19  substantial --

20           MR. BAIO:  Yes.

21           THE COURT:  -- no doubt, substantial.  But the fact

22  that your group of clients thinks it could have done better, or

23  perhaps, take another view, wants to hold 'em up to try and get

24  more, doesn't mean that the trustees didn't act in good faith

25  in what they believed was the best interests of the investors

**RESIDENTIAL CAPITAL, LLC, et al.**

525

1   in agreeing to a settlement that was the bird in hand, versus

2   the uncertainty of the FGIC rehabilitation.

3         MR. BAIO:  And I understand that, Your Honor, and we

4   will talk about the bird in hand.  We are not talking about we

5   could have done better in the settlement negotiation.  What we

6   have demonstrated is that we, with a very high degree of

7   likelihood, will do better if we are allowed to participate in

8   the rehabilitation plan that we now know has been approved just

9   north of here.

10         Now, that was trumpeted, I think, by the other side,

11   as somehow favorable to them.  Let me give you our perspective

12   on it, because, from our perspective, we've spent two weeks

13   hearing about Detroit, municipal horrors, the world will end,

14   the sky is falling.  And yet, with all of that, no amendment to

15   the rehabilitation plan, no change whatsoever.  And added 800

16   million dollars, supposedly, of lost reserves, no effect.

17         THE COURT:  I don't know whether it's going to have

18   a --

19         MR. BAIO:  The amount --

20         THE COURT:  That just happened, but --

21         MR. BAIO:  Right, well, so -- but the plan was

22   approved without any modification, Your Honor.  The checks are

23   going to be written.  They are going to start in 150 days.  And

24   you heard that we're talking about seventeen percent.  The

25   total that we're going to get, this magical -- eliminate all of

**RESIDENTIAL CAPITAL, LLC, et al.**

526

1    the uncertainty, is a very small additional amount beyond that,

2    Your Honor.

3           And you did hear, also, that our claims are -- that

4    is, the trust's claims -- are largely ripened.  That is,

5    they're entitled to get paid for those.  Certainly there are

6    limitations as to how much FGIC has, but we're not saying that

7    we could have done better in negotiating with FGIC.  We're

8    saying that the alternative to this settlement, which generates

9    253 million dollars, and actually decapitates the trust, not

10   from any claims that are in this bankruptcy, but in another

11   court, and you're being asked to find that they're in the best

12   interests of us for what happens in another court.

13          THE COURT:  I guess Justice Ling-Cohan didn't think

14   much of your argument because she approved it.

15          MR. BAIO:  Well, Your Honor, she substantially limited

16   her findings.  She said they are only --

17          THE COURT:  She approved --

18          MR. BAIO:  -- limited here --

19          THE COURT:  She approved the commutation.  Her

20   findings are limited to her court, but she went ahead and

21   proved what was presented to her.  She rejected your arguments.

22          MR. BAIO:  Without finding that it was in our best

23   interests, Your Honor.  And that's what these findings are that

24   are presented to you.  They're asking you -- the whole

25   purpose -- Ms. Sohlberg made it absolutely clear.

**RESIDENTIAL CAPITAL, LLC, et al.**

527

1          THE COURT:  What did Justice Ling-Cohan do?

2          MR. BAIO:  She --

3          THE COURT:  What do you think she did?

4          MR. BAIO:  She now has appro -- she said that she's

5    limiting the findings, which is what we asked.

6          THE COURT:  What did she do?  What is the result of

7    her approval?

8          MR. BAIO:  She has now approved the rehabilitation

9    plan, and at least with respect to the proceedings, the

10   commutation, but not binding us to say that the trustees did

11   not serve our interests.  That's what we're talking about, Your

12   Honor.  That's what we're talking about here.  Our clients have

13   consideration in another court.  We believe that we have

14   demonstrated that they will be the sacrificial lamb for

15   everyone else.

16          You've heard about the chaos that will descend on this

17   case if the settlement is not approved.  There will be no chaos

18   in the FGIC rehabilitation as a result of that.  We will start

19   getting checks.  This matter, although we understand

20   that --

21          THE COURT:  Are you appealing --

22          MR. BAIO:  -- it may --

23          THE COURT:  Are you appealing Judge Ling-Cohan's

24   ruling?

25          MR. BAIO:  Probably.  Yes.  And we're going to pursue

**RESIDENTIAL CAPITAL, LLC, et al.**

528

1    our client's rights, Your Honor.

2              THE COURT:  Okay.

3              MR. BAIO:  And you know, we do believe that Ms.

4    Sohlberg, when she testified about why she included the

5    requirement that there be findings, she made it crystal clear

6    why that's in there, Your Honor.

7              THE COURT:  It's crystal clear to me why they included

8    the findings, because otherwise you're going to turn around

9    tomorrow and sue all the trustees.

10             MR. BAIO:  And that's not for --

11             THE COURT:  That's not a mystery to anybody.

12             MR. BAIO:  That's not for our benefit, though, Your

13   Honor.  They didn't say that we should be thankful that they

14   have done this when they are specifically precluding us --

15             THE COURT:  How many investors --

16             MR. BAIO:  -- from making the objection.

17             THE COURT:  How many investors are there in the

18   FGIC-wrapped trust?

19             MR. BAIO:  I don't know, Your Honor, and there is no

20   evidence before you --

21             THE COURT:  So there are four of you here.

22             MR. BAIO:  There are six.  Your Honor, I'm sorry,

23   there are six.  We have two CQS's --

24             THE COURT:  Okay.  All right.

25             MR. BAIO:  -- and we --

**RESIDENTIAL CAPITAL, LLC, et al.**

1          THE COURT:  Six.

2          MR. BAIO:  -- combine over twenty percent, and I don't

3   know, with FGIC we have a very large number.

4          THE COURT:  All right.  So there's six of you who are

5   objecting and complaining.  There are others who didn't.  Okay?

6          MR. BAIO:  Yes.

7          THE COURT:  You've asserted your objections.  I'm

8   listening to all the objections.  I've taken the evidence.

9   I've got the arguments.  I'm going to get proposed findings and

10  conclusions, and I'll reach a decision.  You've had your

11  opportunity.  But you know, it's no surprise to anybody why the

12  FGIC trustees insisted upon a finding that they acted in good

13  faith and in the best interests of the investors in approving

14  the settlement.

15         MR. BAIO:  Your Honor, we --

16         THE COURT:  And I'll evaluate whether they did or they

17  didn't, and I'll make findings based on it.

18         MR. BAIO:  I understand that.

19         THE COURT:  But, you know --

20         MR. BAIO:  Well, I'm arguing now --

21         THE COURT:  I understand.

22         MR. BAIO:  -- that they have not met that test, Your

23  Honor.  And in fact, we think it's unprecedented.

24         THE COURT:  You make it sound astounding that they've

25  come and asked for this finding from the Court.

**RESIDENTIAL CAPITAL, LLC, et al.**

530

1          MR. BAIO:  I've never seen it before, Your Honor.

2          THE COURT:  Well --

3          MR. BAIO:  We've never seen it in any other case;

4    there is no precedent for this, to seek exculpation in a

5    bankruptcy court where we're not a creditor or we're not a

6    debtor --

7          THE COURT:  I'm not exculpating anybody from anything.

8    I've been asked to make a determination.  And somebody,

9    someday, can figure out what the implications of that are.

10   That won't be before me, okay?  I've been asked to make a

11   finding.  The requirement of it is included as a privilege in

12   the settlement.  You've argued that I don't have the

13   jurisdiction to do it.  They've all argued that I do.  I'll

14   make that determination as well.  Assuming I make the findings

15   that are requested of me, it'll be another court, some other

16   day, I supposed, that will determine what the impact of that

17   is.

18         MR. BAIO:  But Your Honor, just working off what you

19   had said, nobody's confused about why they asked for them,

20   because they don't want us to be able to sue.  It's not for

21   some intellectual, theoretical approach that maybe some other

22   court will accept or not.

23         THE COURT:  I don't think they have any doubt but that

24   you --

25         MR. BAIO:  That --

**RESIDENTIAL CAPITAL, LLC, et al.**

531

1          THE COURT:  -- would sue.

2          MR. BAIO:  Well, but that's my point, and that's the

3    question of whether they're acting in good faith in entering

4    into the settlement.  And whether you can evaluate all of these

5    facts, including binding themselves to pursue this, and

6    unprecedented findings to hold our clients hostage.

7          THE COURT:  Well, let me ask you.  Let me assume that,

8    not you, not your clients, but some other investors, might be

9    characterized as strike suitors, and are threatening the

10   trustees, if you go ahead and approve this, we're going to go

11   ahead and sue you.  And they say, you don't have the author --

12   you've argued this -- they don't have -- you said -- you argued

13   they don't have the authority to enter into this agreement.

14   They believe they do.  Okay?  I guess I'll make the decision

15   whether they did or not.  Okay?

16         MR. BAIO:  Well, that's the point, Your Honor.

17   They're trying to make you make the decision, and we think it

18   should be another court, and we don't think they've --

19         THE COURT:  And four years --

20         MR. BAIO:  -- proved their case.

21         THE COURT:  -- from now you expect some state court

22   judge to make a decision whether they have the ability to enter

23   into an agreement, in a very fast-moving bankruptcy case that

24   I'm administering, where this affects the administration of the

25   bankruptcy case.

**RESIDENTIAL CAPITAL, LLC, et al.**

532

1          MR. BAIO:  Where we are not a party; I understand

2      that, Your Honor.

3          THE COURT:  Okay.  All right.  Go on with your

4      argument.

5          MR. BAIO:  I have nothing further, Your Honor.

6          THE COURT:  Okay.  Thank you, Mr. Baio.

7          Mr. Goodman.

8          MR. GOODMAN:  Your Honor, Peter Goodman, on behalf of

9      Freddie Mac.  I'm with McKool Smith.

10         I agree with Mr. Baio's comments.  I'm not going to

11     retread already piled fields, but I do want to make some

12     points, and they do relate to the findings, Your Honor.

13         Freddie Mac believed it was at the negotiating table.

14     It had been at the negotiating table for three and a half

15     years.  That was the testimony of Ms. Gina Healy.  She's a vice

16     president of Freddie Mac, and she's a senior credit risk

17     manager.

18         We were in discussions with FGIC, we were in

19     discussions with the trustees.  Now, the testimony of some of

20     the trustees clearly indicates that they knew Freddie Mac would

21     be interested in the topic that they were discussing, but

22     everyone throws up the mediation and the fact of the mediation

23     and the order of the mediation as something that blocked them

24     from communicating anything to Freddie Mac.

25         Now, one of the exhibits that was entered into

**RESIDENTIAL CAPITAL, LLC, et al.**

533

1   evidence today is from Chris Johnson of the Kasowitz firm.  He

2   was representing the FHFA with respect to claims against Ally

3   Bank, and I believe Your Honor's familiar with that.

4   Somehow -- somehow, the parties participating in the mediation

5   found a way to communicate with Mr. Johnson and tell him, as

6   you will read in the affidavit, you really should be in the

7   mediation that Judge Peck is conducting.  And Mr. Johnson went

8   there.  So there was a way -- it wasn't just a cone of

9   silence -- there was a way to communicate.  And I think that's

10  a very important fact.

11          Now, with respect to the plan and disclosure

12  statement, we worked with Mr. Dubel.  We worked with Mr. Gene

13  Kohn (ph.), who is the agent of the rehabilitator.  We worked

14  with Weil Gotshal.  The plan was clear what it would provide.

15  It provides that we had a pro rata share of available assets,

16  based upon our actual claims.  We would get paid over time.

17  The plan was heavily vetted.  I think Lazard Freres spent eight

18  months digging down into the financials to make sure --

19          THE COURT:  Let's --

20          MR. GOODMAN:  -- the numbers were accurate.

21          THE COURT:  Let's stay in the record.

22          MR. GOODMAN:  That is the record; that's from the

23  Miller affidavit, Your Honor.

24          THE COURT:  All right.

25          MR. GOODMAN:  And at the very last possible moment,

**RESIDENTIAL CAPITAL, LLC, et al.**

534

1    the very last possible moment, less than a week, or maybe a

2    week prior to confirmation of the rehabilitation plan, the trap

3    door was pulled out from under us.  The proposal came to us to

4    commute our policies.

5            THE COURT:  The proposal came to who?

6            MR. GOODMAN:  The proposal came to us, to Freddie Mac,

7    and to McKool Smith to commute the policies.  We reviewed it.

8    The analysis isn't so straightforward.  We had to understand

9    how many policies were effected, how many policies Freddie Mac

10   had concerning GMAC and ResCap.  And the determination was made

11   to object to the plan.

12           We even tried to discuss with Mr. Dubel and with Mr.

13   Holtzer -- and this is in Ms. Healy's affidavit -- why it was

14   in Freddie Mac's best interests to enter into the settlement,

15   and we got back the wall of silence; this thing is going to go

16   to litigation and they can no longer talk to us, even though we

17   had not filed any objection or served any pleading, and we had

18   been working with them for three and a half years.

19           Now, the plan, in effect, as modified, is a zero sum

20   game.  What they're taking from the ResCap side, they're giving

21   to the non-ResCap side.  So all the upside from the Country

22   Wide litigation now goes to holders, non-ResCap securities

23   holders.  So there's no real question here of why many parties

24   aren't objecting, because they benefit from this; it's a

25   zero-sum game.

**RESIDENTIAL CAPITAL, LLC, et al.**

535

1          THE COURT:  Is there any way of knowing, with

2    certainty, that you would be better off with the rehabilitation

3    plan payable -- paid out over forty years, versus the

4    commutation payment and the expected recovery from the ResCap

5    estate?

6          MR. GOODMAN:  Well, that's what we believe our

7    analysis shows, and the analysis that is done by Mr. Gibson.

8    We believe that the assets of this -- not this estate, but the

9    rehabilitation estate was heavily vetted, the claims analyzed.

10   There was three and a half years of discussions regarding the

11   recoveries, information about their claims regarding Country

12   Wide/ResCap, and the expectation that we would start getting

13   immediate cash of seventeen and a quarter cents today, on

14   hundreds of millions of dollars of claims, billions.  I mean,

15   the claim against FGIC, I believe, is about 1.6.  The exposure

16   just on ResCap is 500 million.

17         So I don't believe that the trustees deserve the

18   findings that are proposed.  I think the record is clear.  I

19   don't want to retread what Mr. Baio said, but we will submit

20   findings of fact to Your Honor that the testimony, the

21   objective evidence clearly indicates that the trustees here

22   were just window dressing, and that's what they saw their role.

23   And if you are going to be window dressing, then you're not

24   entitled to these specific facts, whether unusual or not

25   unusual, whether given in any case, it's really irrelevant to

**RESIDENTIAL CAPITAL, LLC, et al.**

536

1   the issue here, Your Honor.  You have to earn something, and

2   you have to provide evidence that you've earned it.  And I

3   believe that the evidence in this case cannot support a finding

4   that the trustees earned these findings of fact.

5          Thank you, Your Honor.

6          THE COURT:  Thank you, Mr. Goodman.

7          Mr. Shore, are you next?

8          MR. SHORE:  I promise not to bang the lectern.  Bang

9   the lectern.

10         All right.  Your Honor, we had three objections

11   originally, and obviously the objection to the ResCap, LLC

12   claim has been withdrawn.  We just need to make sure any order

13   granting it makes clear that the motion with respect to that --

14   there's no claim allowance there and we've reserved our rights.

15         But let me focus, because we do have two remaining

16   objections.  One is a process objection, and one is more of a

17   deal-oriented objection.  Let me focus first on the minimum

18   claim amount and on the record that the debtors chose to create

19   on seeking the allowance of that.  Different than you would get

20   in a normal 9019 setting, the record here is virtually opaque

21   as to what the debtors actually did because of the mediation

22   order.  We didn't -- we haven't fought that.  We understand the

23   ground rules.  We'll raise the consequences of that in the

24   proposed finding of facts and conclusions of law, but that does

25   not mean the debtors were powerless to come to the Court and

**RESIDENTIAL CAPITAL, LLC, et al.**

1  say this what we relied on, whether or not they had a financial

2  advisor prepare for them or Mr. Kruger a deck that says here

3  are the benefits of the settlement, here are the risks, here

4  are the damage calculations, or not, and whether that was used

5  in the mediation, that doesn't prevent the debtor s--

6          THE COURT: Let me ask you this.  Is there any evidence

7  that contradicts Mr. Kruger's testimony that capping the FGIC

8  claim, two different outcomes, depending on whether the plan is

9  approved -- let's assume no plan is approved.  He clearly

10  testified that he believed, in his business judgment, that

11  there was a benefit to the estate in capping that claim and at

12  the same time getting the release from the FGIC trustees.

13          MR. SHORE:  And here's the problem; there's no

14  evidence in the record that he actually considered the issue.

15  Here's the problem.  The debtors went out -- when they decided

16  that they weren't going to be putting on the evidence of what

17  actually got deliberated over, they went out and they hired Mr.

18  Lipps to do his report and Mr. D'Vari to do his report, and

19  they put together, essentially, what we call the virtual 9019.

20  This is what Mr. Kruger could have relied on, but for the

21  mediation order.  The problem is, is there's some holes in that

22  virtual 9019.  Let me focus on that.  First of all, none of the

23  agreements have come in on the record.  I don't know why they

24  haven't moved them into evidence.  Your Honor has said, in MF

25  Global, you need all facts necessary for an intelligent and

**RESIDENTIAL CAPITAL, LLC, et al.**

538

1  objective opinion as to the probability of ultimate success,

2  should the claim be litigated, I think, to conclusion.  You had

3  no evidence of what the contracts are that are being resolved.

4  You have no evidence of the debtors' pre-petition activity

5  under those contracts.  You didn't get a business person, who

6  actually was involved in any of this, pre-petition, or can

7  testify from personal knowledge as to what the contracts meant

8  and what the parties did under the contracts.  And there are no

9  evidence of damages.  Mr. D'Vari put forward something that

10  said there's a potential five billion dollar claim.

11          THE COURT:  He talked about the collateral losses.

12          MR. SHORE:  Right, collateral losses.  And he says

13  specifically, and we didn't cross, and we didn't draw it to

14  your attention, in paragraph 2, "I do not express an opinion as

15  to the validity of a claim for collateral losses."

16          THE COURT:  I'm aware of what --

17          MR. SHORE:  Right.

18          THE COURT:  -- I understand the issue.

19          MR. SHORE:  We don't have Stillman or anybody else who

20  came in and said they could file a five-billion-dollar claim.

21  But we've looked at the contracts.  We've looked at the

22  performance under the contracts.  We've gone through the

23  contracts, even in a cursory fashion, to find out which loans

24  are nonconforming and which loans that need to put back, or the

25  debtors have a repurchase obligation on.

**RESIDENTIAL CAPITAL, LLC, et al.**

539

1          So Your Honor is going to be left to speculate

2    entirely that even though there are 5 billion dollars of

3    collateral losses, 596 million dollars is within the range of

4    reasonable damage outcomes if they were permitted to sue for

5    these things.  So that's the problem I see with the creation of

6    a virtual record for the minimum claim amount.

7          In addition, they don't deal with -- and I'll deal

8    with fraud and misrepresentation claims and servicing claims,

9    because I think they have the same defect on the proof -- they

10   don't focus on 510(b).  It's a real issue.  Mr. Lipps doesn't

11   deal with it.  The debtors gave it the back of their hand.

12   They said they considered it, but did not come forward with any

13   kind of view as to the likelihood of success.

14         Let me talk about why that matters and kind of bleed

15   into the real objection right now.  The 596, the minimum claim

16   amount is allowed as a general unsecured claim.  The 596 times

17   3, that could occur if the plan isn't done, is also a general

18   unsecured claim.  If Your Honor grants the settlement agreement

19   now, FGIC will be the only monoline within the case who will

20   have an allowed general unsecured claim if the plan does not go

21   forward.  You're locking in, essentially, a plan treatment now

22   for a situation in which the plan isn't confirmed.

23         The 510(b) issue is going to have to be dealt with at

24   some point.  Quite frankly, as you know, leading into the

25   mediation was the subject of the cross motions for summary

**RESIDENTIAL CAPITAL, LLC, et al.**

540

1    judgment on the AIG parties.  That's a real issue that has to

2    be resolved.  And that's what our big --

3              THE COURT:  And I know which side of that issue you're

4    going to be on if this settlement isn't approved.

5              MR. SHORE:  You know what side?

6              THE COURT:  Yeah.

7              MR. SHORE:  Yeah.  I think all general unsecured

8    creditors or allowed claim creditors within the case have views

9    as to whether or not those claims are entitled to a general

10   unsecured claim priority.

11             But so I get it about the global plan and everything

12   else.  And again, by moving the ResCap LLC issues to

13   confirmation, we can deal with a lot of that then.  But one

14   large aspect of this settlement agreement is dealing with what

15   if the global settlement doesn't close.

16             You have the 596-million-dollar allowance plus the

17   possibility of suit.  So all -- I think Your Honor recognized

18   it -- all that comes back.  Everything that Mr. Lipps said was

19   a benefit from getting rid of these claims comes back.  And Mr.

20   Kruger testified on cross, he believes they will vigorously

21   prosecute their claims, whether they're 1.8 billion or limited

22   to 596 at the three estates, adding up to 1.8 billion.

23             And unlike any other RMBS holder --

24             THE COURT:  Versus three claims of 1.8 billion.

25             MR. SHORE:  Versus three claims of 1.8 billion.

**RESIDENTIAL CAPITAL, LLC, et al.**

541

1    Although I would point out that the three claims of 1.8

2    billion, it's a bit of a misnomer.  It is the same claim filed

3    against three estates, which would be capped at a 1.8-billion-

4    dollar recovery.  But also, it assumes that claims that were

5    brought against GMACM under the GMACM agreements, can be

6    asserted against RFC and back and forth.  It's essentially an

7    aggregation of the 596, which is something --

8             THE COURT:  I understand that.

9             MR. SHORE:  -- okay.  The Ally indemnity claim, which

10   is another big issue.  And I got accused of talking out of both

11   sides of my mouth, I'm just trying to respond to what the

12   debtors are saying.

13            It sounds like today they want a finding that the

14   indemnity issue is not an issue because Ally has no right of

15   indemnity --

16            THE COURT:  They haven't asked for that, Mr. Shore.

17            MR. SHORE:  Okay.

18            THE COURT:  Mr. Kruger said yes, he considered it.

19   And he concluded what he concluded.

20            MR. SHORE:  Right.

21            THE COURT:  So yes, they considered that.

22            MR. SHORE:  Right.  And so until we get a

23   determination as to Ally's indemnity rights --

24            THE COURT:  But if I followed your argument to your

25   conclusion, you could never settle anything, because you're

**RESIDENTIAL CAPITAL, LLC, et al.**

542

1   saying until this is resolved you shouldn't settle it, until

2   that's resolved you shouldn't settle it.  Parties settle

3   because they reach a judgment as to what they think is in their

4   best interests.

5           MR. SHORE:  Right.  And when they -- when the debtor

6   brings it to you they put a record on and they justify it to

7   Your Honor and give Your Honor the facts that are necessary for

8   you to make the determination --

9           THE COURT:  That's what Mr. Kruger did.

10          MR. SHORE:  And with respect to finality, they come in

11  and they seek finality.  The notion of coming in and allowing

12  claims but then allowing the litigation to go on and not, at

13  the very least, protect yourself from the downside of the full

14  claim being asserted again.  What they gave in the context of

15  the non-plan scenario is a floor of 596 with a general

16  unsecured claim that no other RMBS holder has, and they haven't

17  capped a ceiling unless -- unless it is found that the

18  indemnity risk isn't there.  Because if the indemnity risk is

19  there, they are -- and let's be clear, it's not -- they're not

20  just -- not just the plan -- they're free at any time to assert

21  claims against Ally.  And if Ally comes back, Ally's going to

22  start spending money; they're going to make claims under the

23  policies and deplete the policies, and then they're going to

24  make --

25          THE COURT:  Okay, Mr. Shore, I had that ar -- I

**RESIDENTIAL CAPITAL, LLC, et al.**

1  understand your argument.

2          MR. SHORE:  All right, thank you, Your Honor.

3          THE COURT:  Thank you very much.

4          All right.  Mr. Siegel, Mr. Baio argued that I

5  don't -- there's no evidentiary basis that the settlement is in

6  the best interests of the investors in each trust.  He said

7  that's the finding that you've asked for.  Do I have any

8  evidence that the -- evidentiary basis to conclude that the

9  settlement is in the best interests of the investors in each

10 trust?

11         MR. SIEGEL:  Your Honor, I would submit that you do.

12 And the reason I would submit that is while --

13         THE COURT:  All right.  So you'll give me in your

14 proposed findings --

15         MR. SIEGEL:  That's fine, Your Honor.

16         THE COURT:  -- the specific --

17         MR. SIEGEL:  We're happy to do that.

18         THE COURT:  -- Mr. Baio is going to submit his.  I

19 just -- I don't want to hear -- I don't want to get into a

20 whole battle --

21         MR. SIEGEL:  You don't want argument, you want it in

22 the findings.

23         THE COURT:  -- argument.  But I just -- that was

24 something very specifically that Mr. Baio raised, and I want to

25 be sure that when I read your proposed findings, that I see

**RESIDENTIAL CAPITAL, LLC, et al.**

544

 1  what it is you're relying on.

 2          MR. GOODMAN:  And we agree with Mr. Baio.

 3          THE COURT:  And I understand, Mr. Goodman --

 4          MR. SIEGEL:  I expected Mr. Goodman would agree with

 5  Mr. Baio.

 6          THE COURT:  Okay, all right.  Okay, thank you, Mr.

 7  Siegel.

 8          MR. SIEGEL:  Thank you, Your Honor.

 9          THE COURT:  All right.  It's 4:50.  I have evidence --

10  all parties introduced their evidence.  The evidence is closed.

11  I've heard argument from counsel.  I've given a schedule for

12  proposed findings of fact and conclusions of law.  I know there

13  was a daily transcript from yesterday.  I see you don't have

14  your reporter here from today.  I don't know how quickly you're

15  going to get the transcript from today.

16          I assume when I get the proposed findings, there will

17  be a transcript, there'll be page and line references to

18  testimony from today's testimony as there was from Friday's

19  testimony.

20          I'm overwhelmed with paper.  I've got a lot of

21  reading.  Tell me, when am I going to get the sheets of paper

22  that show the designations and counter-designations?  I've got

23  some reading to do.

24          I think you know what I want --

25          MR. KERR:  I know exactly what you want, Your Honor.

**RESIDENTIAL CAPITAL, LLC, et al.**

545

1          THE COURT:  -- I don't want nine pieces of paper.

2          MR. KERR:  I need to corral --

3          THE COURT:  Yes, you do.

4          MR. KERR:  -- and I will -- can I make -- can I say

5  that we'll get it to you by 5 p.m. tomorrow.

6          THE COURT:  I'll give you till noon on Thursday, how's

7  that?

8          MR. KERR:  That's even better.  It makes it a lot

9  easier, Your Honor.  Thank you very much.

10          THE COURT:  Okay.

11          MR. KERR:  I was hoping to drive people to get it to

12  me by 5 o'clock tomorrow.  But I'll give them till Thursday.

13  That's fine.

14          THE COURT:  Well, you can drive, but I'm giving you

15  until Thursday at noon.

16          MR. KERR:  Well, I want it by tomorrow.

17          THE COURT:  Okay.

18          MR. KERR:  Okay, thank you, Your Honor.

19          THE COURT:  Are there any other housekeeping matters

20  that need to be raised at this point?

21          MR. KERR:  I don't think so, Your Honor, except, I

22  have -- I just have one request.  There's a lot of stuff in the

23  courtroom --

24          THE COURT:  Oh, yeah.

25          MR. KERR:  -- tonight.  And do we need to get it out

**RESIDENTIAL CAPITAL, LLC, et al.**

546

1    tonight or can we get it out --

2            THE COURT:  No.

3            MR. KERR:  -- tomorrow?

4            THE COURT:  You don't.  You can get it out tomorrow.

5    I do have a calendar tomorrow.  But talk to my law clerks.  My

6    courtroom deputy has left ill, and -- but talk to my law

7    clerks.  You don't have to get them out today.

8            MR. KERR:  And, Your Honor, we'll also -- we can -- do

9    you need us to provide you with a final list of exhibits that

10   are in evidence, or not?

11           THE COURT:  I was just going to ask that.  We've tried

12   to keep an accurate list, but I would like all of you to confer

13   and make sure you agree on all of the exhibits that are in

14   evidence.  It would be helpful to me if you could provide me --

15   because I had your list -- I had a list from the proponents and

16   I had a list from the objectors.  And we've been trying to keep

17   track from each of the lists which are in evidence.  Confer.  I

18   don't care whether I'm getting two -- essentially -- when I say

19   two pieces of paper, it was more than one page with each of

20   them -- but I do want to make sure there's agreement by all of

21   the parties as to which -- what is in evidence:  testimony,

22   both deposition, written statements, et cetera.  Okay?

23           MR. KERR:  We will do that, Your Honor.

24           THE COURT:  All right.  Thank you very much everybody.

25           MR. KERR:  Thank you.

**RESIDENTIAL CAPITAL, LLC, et al.**

547

1            THE COURT:  We're adjourned.

2        (Whereupon these proceedings were concluded at 4:53 PM)

548

1

2                                I N D E X

3    WITNESS                 EXAMINATION BY        PAGE

4    Mr. Pfeiffer            Mr. Baio              17

5    Mr. Pfeiffer            Mr. Weitnauer         54

6    Mr. McQuillen           Mr. Baio              60

7    Ms. Healy               Mr. Bennett           64

8    Ms. Healy               Mr. Dine              83

9    Ms. Healy               Mr. Gelfarb           88

10   Mr. Sklar               Mr. Espana            95

11   Mr. Sklar               Ms. Eaton             98

12   Mr. Gibson              Mr. Bennett           109, 139

13   Mr. Gibson              Mr. Devore            129

14   Mr. Gibson              Mr. Carney            135

15   Mr. Goldstein           Mr. Bennett           143

16   Mr. Goldstein           Mr. Baio              166

17

18   REBUTTAL WITNESS        EXAMINATION BY        PAGE

19   Mr. Sklar               Ms. Eaton             183

20   Mr. Pfeiffer            Mr. Weitnauer         197

21   Mr. Pfeiffer            Mr. Baio              203

22   Mr. Dubel               Mr. Wynne             210

23   Mr. Dubel               Mr. Goodman           227

24   Mr. Dubel               Mr. Baio              238

25   Mr. Dubel               Mr. Shore             241

549

1

2                              E X H I B I T S

3    DEBTORS'              DESCRIPTION          PAGE

4    53                    Dubel exhibits       14

5    101                   Mr. Major direct     15

6                          testimony

7    109                   Mr. Pfeiffer         17

8                          direct testimony

9    116                   Mr. Major exhibits   16

10   118                   Mr. Major exhibits   16

11   119                   Mr. Major exhibits   16

12   125                   Miller affidavit     108

13   170                   Mr. Major exhibits   16

14   174                   FGIC statement for   57

15                         second quarter of

16                         2013

17   204                   List of              70

18                         individuals who

19                         are to receive

20                         notice

21   205                   Various Documents    93

22   206                   FGIC Web printout    76

23                         regarding

24                         rehabilitation

25                         proceeding

550

| | EXHIBITS (cont'd.) | |
|---|---|---|
| DEBTORS' | DESCRIPTION | PAGE |
| 208 | Various Documents | 93 |
| 209 | Commutations | 78 |
| | related to CDS | |
| 212 | Various Documents | 93 |
| 216 | Objection filed by | 93 |
| | Freddie Mac in the | |
| | rehabilitation | |
| 226 | Dubel exhibits | 14 |
| 227 | Dubel exhibits | 14 |
| 310 | Affirmation of | 75 |
| | Christopher P. | |
| | Johnson | |
| 311 | Settlement | 14 |
| | timeline | |
| 313 | Listing of public | 60 |
| | filings | |
| 316 | FGIC quarterly | 217 |
| | statement for | |
| | 9/30/12 | |
| 317 | 6/18/13 e-mail | 215 |
| | notice by Dana | |
| | Kaufman, entitled | |
| | "FGIC filing" | |

551

| | | | |
|---|---|---|---|
1 | | E X H I B I T S (cont'd.) | |
2 | DEBTORS' | DESCRIPTION | PAGE |
3 | 318 | 11/7/12 e-mail | 214 |
4 | | notice by Dana | |
5 | | Kaufman, entitled | |
6 | | "NYLB FGIC | |
7 | | termination | |
8 | | agreement filing" | |
9 | | | |
10 | OBJECTING PARTIES' | DESCRIPTION | PAGE |
11 | A, C, D, E, J, P, | | 195 |
12 | Q, R, U, Z, AB, | | |
13 | AD, AJ, AO, AR, | | |
14 | AS, BB, BK, BO, | | |
15 | BP, BQ, BR, BS, | | |
16 | BT, BU, BV, BW, | | |
17 | BX, BZ, CA, CH, | | |
18 | CJ, CK, CS, CV, | | |
19 | CW, CZ, DA, DB, | | |
20 | DT, DU, DV, EI, | | |
21 | EJ, EL, EO, FS, | | |
22 | FT, FU, FV, FW, | | |
23 | FX, FY, FZ, GB, | | |
24 | GC, GD, GF, GI, | | |
25 | GO, GP, GQ, GR, GS, GT | | |

552

```
 1                    E X H I B I T S (cont'd.)

 2    OBJECTING PARTIES'   DESCRIPTION          PAGE

 3    W                    Affidavit by Ms.     93

 4                         Healy

 5    DR                   Letter from          101

 6                         Willkie Farr &

 7                         Gallagher to Mr.

 8                         Munno

 9    GE                   E-mail between       103

10                         Willkie Farr &

11                         Gallagher and

12                         Seward & Kissel

13    GV                   Alice Chong's        49

14                         declaration

15    HZ                   Debtors' responses   196

16                         and objections to

17                         the ad hoc group's

18                         document requests

19    --                   Mr. McQuillen's      61

20                         declaration

21    --                   Ms. Healy's          62

22                         declaration

23    --                   Sklar declaration    95

24    --                   Scott Gibson         108

25                         Declaration
```

553

1

2                         E X H I B I T S (cont'd.)

3    OBJECTING PARTIES'   DESCRIPTION          PAGE

4    --                   Goldstein's          142

5                         Declaration

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

554

C E R T I F I C A T I O N

I, David Rutt, certify that the foregoing transcript is a true

and accurate record of the proceedings.


_____

DAVID RUTT

AAERT Certified Electronic Transcriber CET**D 635



eScribers

700 West 192nd Street, Suite #607

New York, NY 10040


Date:  August 20, 2013

12-12020-mg    Doc 4776    Filed 08/21/13    Entered 08/21/13 08:35:02    Main Document
RESIDENTIAL CAPITAL, LLC, et al.
Pg 313 of 352
Case No. 12-12020-mg

August 19, 2013

**$**

**$90.32 (1)**
509:15

**A**

**Aardvark (21)**
321:2,8,15,17;
322:1,17;323:8;
454:2,7;455:19,20;
456:7;459:17;
471:19;472:14,16;
475:14;476:9,10,11,
13

**AB (3)**
432:22;437:10,15

**abetting (3)**
490:23;491:1,8

**ability (9)**
268:25;402:1,22;
461:4,12,14;464:21;
490:12;531:22

**able (12)**
359:16;362:4;
386:16;415:5;
466:16;489:25;
502:18;505:17,18;
506:5;523:10;530:20

**above (2)**
277:11;489:12

**ABRAMS (1)**
251:10

**ABS (1)**
351:7

**absence (7)**
374:13,23;375:15;
376:6;377:10;
388:16;521:18

**absent (10)**
368:11;371:10;
373:19;374:9,16;
389:16,25;405:5,10;
440:16

**absolutely (1)**
526:25

**abundant (1)**
515:3

**AC (5)**
432:23;434:8,13,
21,22

**accept (13)**
276:16;368:16;
382:3,12;393:8,10,
25;408:13;412:24;
430:19;438:21,24;
530:22

**accepted (3)**
380:2;390:10;
392:12

**accepting (3)**
364:25;411:6;

**412:1**
**access (3)**
357:9;359:15;
458:20

**accomplish (1)**
301:15

**accordance (2)**
270:19;463:20

**according (3)**
316:17;317:5;
337:16;383:13;
399:23;444:17

**accordingly (1)**
254:8

**account (9)**
369:2,12;376:17;
395:9;397:14;407:1,
16;409:8,9

**accounting (3)**
448:14;516:14,17

**accounts (1)**
369:4

**accretive (5)**
464:24;480:3,7,10,
14

**accrue (6)**
441:8,9,10;444:4;
507:18,20

**accrued (15)**
283:15;441:9;
444:2;446:2,4,9,12,
24;447:8;449:5,9,22;
508:2,12,15

**accurate (19)**
263:23;265:15;
268:18;269:2;276:8,
10;277:3;279:3;
287:15,16;289:22;
290:20;293:15;
355:5;360:17;
404:10;446:3;
533:20;546:12

**accurately (2)**
288:2;290:18

**accused (2)**
516:19;541:10

**accustomed (1)**
278:1

**achieve (3)**
502:18;503:16;
519:4

**achieved (4)**
503:16;504:23;
514:19;515:7

**achieving (1)**
514:6

**acknowledge (1)**
490:21

**Across (1)**
358:3

**act (7)**
270:23,25;315:19;
463:20;504:17;

**515:18;524:24**
**acted (6)**
463:11;473:23;
510:21;518:17;
522:5;529:12

**acting (5)**
273:18;411:5,25;
412:2;531:3

**actions (2)**
403:17;410:20

**active (1)**
331:17

**actively (1)**
428:12

**activities (1)**
403:1

**activity (1)**
538:4

**actual (12)**
265:15;266:12;
293:2;349:5,6;
357:24;364:17;
403:25;441:14;
457:6;494:24;533:16

**actually (35)**
272:11;293:13;
305:21;306:7;
322:17;323:11;
349:18;352:8;
367:17;385:23;
386:9,14,25;402:24;
403:22;404:7,12,16;
436:5;449:5;450:6;
452:3;471:6,7;
503:18;516:10;
520:25;522:11,23;
524:8;526:9;536:21;
537:14,17;538:6

**Ad (14)**
250:16;279:22;
432:5,23;437:10,15;
438:9;439:1;464:1,5,
16;465:4;483:24;
484:4

**Adam (2)**
336:17;417:18

**add (5)**
285:12;409:7;
411:18;504:6;513:19

**added (6)**
376:23;398:22;
440:5;493:16;
513:19;525:15

**adding (2)**
423:11;540:22

**addition (5)**
308:22;409:12;
440:13;489:17;539:7

**additional (15)**
357:18;358:2,21;
359:7;391:21;396:1;
397:4,11;413:5;
436:20;444:4;450:7;

**490:4;512:3;526:1**
**additive (4)**
513:16;514:2,3,24

**address (2)**
489:21;493:20

**addressing (1)**
314:8

**adduced (1)**
502:9

**adhering (1)**
377:1

**adjourned (1)**
547:1

**adjust (1)**
406:25

**adjusted (2)**
410:2,5

**Adjusting (1)**
386:7

**adjustment (2)**
379:9;459:8

**adjustments (1)**
411:1

**administering (1)**
531:24

**administration (1)**
531:24

**administrative (1)**
270:4

**admitted (14)**
255:22;257:24;
259:4;291:1;300:21;
303:19;312:8;
335:18;350:10,10;
424:20;436:20;
437:7,14

**admonitions (1)**
487:18

**advance (2)**
484:7;505:11

**advantage (2)**
327:14;446:23

**advice (6)**
260:8;263:14,14;
311:7;387:7,16

**advise (3)**
261:9,10;515:15

**advised (2)**
310:19;513:7

**advisor (6)**
260:18;309:6;
511:9;522:22;524:1;
537:2

**advisors (1)**
507:11

**affect (2)**
351:23;368:3

**affects (1)**
531:24

**affidavit (18)**
272:17;273:4,9;
274:24;275:2,3,7;
289:1;294:13;328:8,

**12;334:6;335:19;**
**350:11,20;533:6,23;**
**534:13**
**affiliated (1)**
316:4

**affirmation (10)**
316:1,7,21;317:1;
350:9;357:12;
367:23;434:23;
457:7;471:8

**affirmative (3)**
303:15;415:8;
499:2

**AFI (2)**
402:14;517:21

**afternoon (3)**
419:14;425:12;
469:6;502:4;520:23

**Again (75)**
260:18;273:15;
285:16;292:21;
295:25;299:4;
304:10;306:11;
308:4;309:24;
313:11;314:5;317:3;
318:23;319:1,7,20;
320:18;322:9;
323:22;324:9;
326:17;328:14,23;
329:9;331:18,22;
335:3;338:13;
339:16;340:1,14;
343:16;344:22;
346:6;357:11;359:4;
361:8;371:15;372:5;
373:18;375:17;
377:14;379:25;
384:7;386:22;
387:20;391:9;
392:18;393:9;394:2;
397:9;406:11;411:7,
9;414:2;416:14;
423:20;443:15;
445:24;468:2;
475:22;489:20;
492:13;493:12;
496:6;498:5;500:7,
23;501:12,15;
521:25;522:1;
540:12;542:14

**against (43)**
287:23;288:5;
298:25;307:13;
308:3;357:19;363:7,
12,23;365:3,7;
366:21;380:20;
401:9;402:13;
425:15;426:8;
441:17;486:18;
489:18;490:1,13,15,
22;491:4,8,9,12;
492:2,12;495:19;
497:15;502:24;

503:8,8;517:6;520:3;
533:2;535:15;541:3,
5,6;542:21
**Agency (4)**
315:12,14;316:5,
10
**agent (1)**
533:13
**aggregation (1)**
541:7
**ago (5)**
327:20;330:23;
407:14;472:8;480:2
**agree (25)**
285:13,14;361:21;
362:19,24;371:8;
375:9,12;376:3;
385:18;389:24;
392:9;399:22;
400:10;406:24;
421:12,21;447:2;
478:22;509:24,25;
532:10;544:2,4;
546:13
**agreed (6)**
297:11;420:5,6;
438:5,16;478:25
**agreeing (3)**
374:16;438:7;
525:1
**agreement (95)**
259:17;260:1,5,11;
261:11;263:7,12;
323:12;356:18,21;
365:25;368:11,15;
369:17,22,25;370:2,
7,10,14,22;371:1,1;
374:9,9;378:16;
380:2;389:6,25;
391:15;393:5,6;
405:19;406:15,17;
417:25;425:18;
426:10;428:15;
430:8;438:7,13;
440:12,16,17,19,22;
455:13,20;456:17;
462:15;465:14,21;
467:14;475:8;476:3;
478:25;482:24;
484:6,10,20;488:22,
23;489:2,3,8,18,23;
490:12;491:24,25;
492:14;493:14;
494:9,23;496:23;
497:17,19;499:1,3,6,
24;501:2,20,23;
505:15;506:16;
519:14;524:9,13;
531:13,23;539:18;
540:14;546:20
**agreements (6)**
322:3;365:22;
457:8;513:6;537:23;

541:5
**ahead (55)**
261:18;285:19;
297:1;304:7;306:18;
322:12;326:1,3;
329:21;332:25;
333:8;337:8;340:15;
342:9;344:2;348:19;
358:15;372:10;
374:3;379:24;
381:12;384:18,18;
385:2,2,5;386:21;
419:13;421:2,5;
426:2;433:8,14;
435:10;436:12;
450:21;451:17;
452:5,7;456:5;466:6,
9;467:4,6;471:25;
478:2;479:23;485:8;
488:11;498:9;507:4;
511:20;526:20;
531:10,11
**aiding (1)**
490:23;491:1,8
**AIG (1)**
540:1
**air (1)**
275:20
**AJ (3)**
432:23;437:10,15
**Alex (1)**
478:2
**Alice (2)**
289:2;291:2
**Allen (3)**
258:14,25;292:1
**allocation (3)**
293:16;503:14;
509:25
**allowance (3)**
536:14,19;540:16
**allowed (13)**
269:1;286:7;405:6;
406:16;484:5,7;
489:19;517:2;520:4;
525:7;539:16,20;
540:8
**allowing (3)**
477:5;542:11,12
**allows (1)**
446:18
**Ally (27)**
247:19,19;370:2,
13;371:2;377:15;
389:23;490:13,16,16,
22;491:2,4,8,9,11;
503:8,14;504:2,24;
511:2;519:8;533:2;
541:9,14;542:21,21
**Ally's (2)**
541:23;542:21
**almost (1)**
447:14

**alone (7)**
292:5;404:24;
410:6;493:6,22;
497:19;519:17
**Along (3)**
257:14;369:23;
457:1
**Alston (1)**
258:20
**alter (2)**
490:22;491:1
**ALTERNATIVE (7)**
253:2;364:12;
365:11;407:12;
412:21;461:2;526:8
**although (5)**
405:19;498:5;
502:6;527:19;541:1
**ALVES (1)**
250:9
**always (4)**
317:20;393:10,10;
394:3
**amended (2)**
462:12;493:3
**amendment (1)**
525:14
**Americas (4)**
246:4;248:4;
250:17;252:14
**among (1)**
324:2;403:15
**amount (62)**
276:12,12;284:9,
10,16;286:17;
293:17;307:10;
326:9;327:8;332:17;
352:12;364:3;380:3,
22;386:9,14,25;
399:22;400:2,10;
404:1,22;405:20,23;
409:2;410:1,4;411:8,
13,20;443:3,4;
445:15;446:11,15,19;
447:7;450:8,18;
466:13;467:9;
482:20;484:5,7;
486:3;489:12,16;
490:3;493:24;
499:12;503:25;
504:1,7;509:13,15;
522:25;525:19;
526:1;536:18;539:6,
16
**amounts (15)**
287:21;293:14;
351:21;374:5,13;
382:10;402:1;
408:21,21;472:23;
474:21;487:12;
489:15;503:17;
504:24
**analyses (1)**

347:9
**analysis (82)**
259:19;260:9;
263:13;273:22;
276:24;281:11;
286:13,14;287:8,13,
17,21;288:3;291:8,
14;292:1,9;294:9;
347:3;351:15,17;
352:18;357:8,11,25;
358:9;360:3,23;
361:11;363:15,22;
364:13,14;365:6,9,
12,15,25;366:9,20,
25;367:3,22;368:1,2,
5,6;369:20,24;370:4;
371:5,19;374:4,7,12,
14,18;378:7;379:7;
388:15;390:12;
400:13,16;401:12;
409:1;410:23;411:5;
429:11,16;430:11;
431:9,13,15;435:19;
444:23;445:16;
513:7;522:16;524:4;
534:8;535:7,7
**analyst (1)**
522:23
**analyze (5)**
281:17,20;352:24;
358:6;443:5
**analyzed (5)**
281:24;286:19,25;
440:9;535:9
**analyzes (1)**
522:24
**analyzing (5)**
287:3;365:21;
366:1;371:17;425:18
**Anbac (1)**
252:13
**and/or (1)**
299:18
**ANDREW (3)**
249:16;253:11;
372:2
**Angeles (1)**
252:6
**ANN (1)**
248:23
**annexed (1)**
299:20
**annual (2)**
445:17;450:15
**annually (2)**
450:17,19
**answered (6)**
261:6;263:3;
322:10;327:24;
363:25;374:1
**anticipate (2)**
297:9;415:22
**anticipated (2)**

292:15;369:6
**anticipation (1)**
380:21
**anymore (2)**
394:7;515:9
**AO (4)**
436:21;437:1,6,8
**apologize (8)**
344:1;347:21;
420:17;435:24;
471:23,25;475:23;
498:6
**apparent (1)**
391:1
**apparently (4)**
285:14;298:6;
390:24;432:25
**appeal (1)**
516:25
**appealing (2)**
527:21,23
**appear (8)**
269:8;271:18,19;
276:5;277:11;
282:18;286:8;435:12
**appearance (2)**
311:16;330:17
**appeared (1)**
293:3
**appearing (1)**
338:1
**appears (10)**
265:16;268:17;
274:14;277:8;
282:13;286:10;
287:10;290:9;
343:16;435:12
**apples (1)**
283:22
**apples-to-apples (1)**
376:21
**application (1)**
296:7
**applied (4)**
277:13;296:4;
364:12;369:8
**applies (1)**
509:12
**applying (2)**
281:6;413:9
**appointed (3)**
340:19;344:3;
463:4
**appointment (1)**
299:18
**appreciate (3)**
412:13;477:7;
478:8
**appro (1)**
527:4
**approach (2)**
437:25;530:21
**approached (2)**

319:25;498:18

**appropriate (4)**
292:17;463:9;
468:15;484:8
**appropriateness (1)**
369:8
**approval (6)**
463:23;476:22;
484:10,20;521:10;
527:7
**approve (6)**
470:7;488:22;
501:25;505:13;
514:22;531:10
**approved (21)**
374:6;389:21;
406:15;463:24;
481:11,12;490:14;
492:15;494:22;
495:22;514:8;525:8,
22;526:14,17,19;
527:8,17;537:9,9;
540:4
**approves (1)**
494:11
**approving (5)**
309:14;494:3;
501:23;510:22;
529:13
**approximate (1)**
361:17
**approximated (1)**
275:25
**approximately (12)**
268:19;269:1;
331:20;332:20;
383:15;404:18;
408:25;425:13;
429:18,23;443:10;
446:8
**April (2)**
309:12,22
**AR (5)**
436:21;437:1,6,8;
542:25
**area (2)**
463:8;517:4
**areas (3)**
410:8;463:6;474:9
**argue (3)**
486:15,17,18
**argued (6)**
391:19;530:12,13;
531:12,12;543:4
**arguing (1)**
529:20
**argument (14)**
255:1;335:7;488:8;
490:18,25,25;502:10;
526:14;532:4;
541:24;543:1,21,23;
544:11
**arguments (2)**

526:21;529:9
**arise (7)**
441:16;442:7;
443:23;446:25;
449:6,10,21
**arised (1)**
449:16
**arises (1)**
401:21
**ARLENE (1)**
250:9
**arm's-length (3)**
498:23;499:4,7
**arose (2)**
254:16;438:1
**around (13)**
263:14;309:20;
314:8;337:12;338:8;
383:11;458:20;
471:3;485:7;490:16;
507:21;508:8;528:8
**arrangement (2)**
322:18;382:15
**arrangements (1)**
479:2
**arrive (1)**
410:5
**arrived (3)**
388:18;390:15;
411:9
**arriving (1)**
275:17
**arrows (1)**
290:13
**articles (7)**
300:4,21,22,23,24;
301:2,15
**aside (2)**
269:9;357:10
**aspect (5)**
309:24;378:15;
413:24;448:25;
540:14
**aspects (3)**
367:12;369:19;
424:23
**assert (4)**
269:1;490:1,22;
542:20
**asserted (14)**
256:3;299:24;
331:20;425:15;
441:17,23;491:3,11,
19;492:16;503:7;
529:7;541:6;542:14
**assertions (1)**
503:12
**assess (16)**
259:15;260:1;
264:2,6,11,22;265:5;
282:11;284:17;
357:23;359:16;
387:15,22;388:17,21;

406:19
**assessed (2)**
355:20;385:19
**assessing (4)**
260:5;275:15;
385:11;397:13
**assessment (13)**
293:15;357:14;
358:1,19;359:7;
371:12;387:9;397:6;
398:10,14;401:14;
402:20;406:1
**assessments (1)**
278:2
**ASSET (8)**
251:12;253:10,22;
426:11,11,14;452:17;
491:4
**asset-backed (1)**
365:18
**assets (8)**
314:6;351:12;
405:12;426:15;
457:14;503:5;
533:15;535:8
**assignment (8)**
259:14;261:10;
264:6,12,21,23;
265:3,4
**assist (1)**
307:14
**associate (1)**
311:24
**associated (3)**
353:23;364:25;
366:20
**associating (1)**
366:20
**Association (1)**
458:19
**assume (14)**
368:10;383:3;
403:12;405:15,22;
474:7,16;481:25;
507:23;514:15,17;
531:7;537:9;544:16
**assumed (4)**
368:21;402:24;
407:9;409:13
**assumes (3)**
295:9;409:15;
541:4
**Assuming (4)**
376:15;421:11;
507:16;530:14
**assumption (7)**
272:12,12,19;
295:7;368:19;
403:22;405:4
**assumptions (10)**
271:14,19,22;
272:2;276:10;
277:11;282:24;

351:12;355:7;391:25
**assured (1)**
388:25
**astounding (1)**
529:24
**attach (1)**
435:4
**attached (2)**
457:2;518:5
**attachment (2)**
455:19;457:5
**attacked (1)**
517:16
**attempt (1)**
410:24
**attempted (3)**
313:19;435:25;
465:5
**attempting (2)**
273:1;427:12
**attendance (1)**
339:5
**attended (3)**
316:18;317:5;
496:10
**attention (6)**
287:7;310:16;
372:11;440:23;
454:25;538:14
**attorney (4)**
320:9,9;413:2;
455:6
**Attorneys (16)**
246:3,14;247:3,12,
19;248:3,11,18;
249:3,11;250:3,16;
251:3;252:3,13,21
**August (2)**
290:4;383:23
**Austen (1)**
302:16
**Australia (1)**
453:18
**authenticating (2)**
323:19,23
**authentication (1)**
318:11
**author (4)**
342:14,17,19;
531:11
**authority (6)**
462:19;463:5,12;
500:1;501:5;531:13
**authorized (1)**
463:8
**availability (1)**
353:22
**available (13)**
287:25;300:10;
318:10;390:18;
391:2;402:25;406:5;
419:8;429:17;
458:17,23;514:17;

533:15
**Avenue (10)**
246:4;247:13;
248:4,12;250:17;
251:4,20;252:4,14,22
**average (9)**
273:2,13;443:12,
16;444:13,15,16,16;
445:7
**avoid (1)**
427:5
**aware (41)**
310:5;313:24;
314:21,25;315:9;
317:7;321:1,16;
322:3,23;339:6,18,
24;340:4;359:20,22;
360:7;365:11;
373:15,18,21,23,25;
376:11,25;379:5,7;
389:4;397:24;398:5;
400:3,4;428:19,25;
461:11,19;477:17;
494:21;498:8;
517:23;538:16
**away (2)**
402:21;443:2;
510:8;511:14

**B**

**back (36)**
270:7;271:12;
279:18;284:6,19;
288:16;293:13;
296:3;336:13;
354:23;375:6;
384:20;408:5;409:6;
416:10;417:6;421:8;
426:24;427:9;
434:12;439:12,14;
451:4;483:17;488:4;
490:16;491:23;
499:12;521:25;
534:15;538:24;
539:11;540:18,19;
541:6;542:21
**backed (3)**
355:6;459:10,11
**backloaded (1)**
443:7
**BAIO (163)**
251:7;256:5,20;
257:19,22;258:7;
259:2,7,8,8,11;
261:16;262:6;
264:17;267:18,20;
268:22,24;274:7,9;
280:9,21;282:3,5;
283:5,7;285:19;
289:6,8,10,12,14;
290:21;294:19,21,23;
295:16;299:11;

12-12020-mg    Doc 4776    Filed 08/21/13    Entered 08/21/13 08:35:02    Main Document
Pg 316 of 352

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

August 19, 2013

300:2,6,17,20,24;
301:3,6,12,14,25;
302:1,15,15,21,23;
303:6,14;336:11,14;
347:19,20,24;348:1;
383:9,17,22;387:18,
25;389:8;391:7;
392:13,18,20;393:24;
397:8,16;401:23;
408:4;412:11;
414:11,20,25;415:3,
8,12,15,17,21,24;
439:23;440:1,6;
445:23,24;448:10,24;
449:25;450:3,21,22;
453:6,8;462:22;
464:2;465:15;
466:14;467:17,21;
468:6,11;479:22,23,
24;480:1;481:3;
483:7,15;486:1;
520:20;521:13,14,15;
523:18;524:17,20;
525:3,19,21;526:15,
18,22;527:2,4,8,22,
25;528:3,10,12,16,
19,22,25;529:2,6,15,
18,20,22;530:1,3,18,
25;531:2,16,20;
532:1,5,6;535:19;
543:4,18,24;544:2,5

**Baio's (1)**
532:10

**BAKER (1)**
248:23

**balance (4)**
413:12;495:14,19;
503:18

**Bang (2)**
536:8,8

**Bank (18)**
246:3;247:19;
250:3;252:21;
257:10;325:1;337:7;
341:3,10;342:10;
346:8;473:9,9,14,16,
23;475:17;533:3

**bankruptcies (1)**
310:11

**bankruptcy (45)**
308:6;310:6,9,16,
20;311:2;312:20;
313:25;314:4,13,22;
332:19;338:8,20;
340:18;343:18;
344:3,6;359:21;
370:3;371:3;374:5;
389:25;398:16;
405:7;406:17;
425:14;426:7;431:1;
470:23;480:24;
481:13,14;492:19;
494:8;496:2,4;

498:14;500:20;
502:8;503:5;526:10;
530:5;531:23,25

**bargaining (1)**
498:23;499:7

**base (30)**
266:25;267:6,15;
271:2,5,9;272:19;
273:11;294:1,3,5,13,
25;295:1;296:5;
357:11;358:7,8;
359:17;361:11;
364:13;365:9;379:4,
5,9;381:1;442:3;
443:17;444:14,17

**based (37)**
272:20;275:9;
277:10;315:1;
326:15;327:12;
349:17;352:14;
356:7;367:22;
368:20;371:16;
378:8;395:23;
401:12;402:23;
403:18;404:11;
410:6,6;429:17;
443:16;444:20,23;
449:16;450:8,17;
491:8;492:18;496:1;
498:25;500:2;
509:23;510:13;
511:16;529:17;
533:16

**basic (3)**
452:19,19;502:5

**basically (2)**
414:3;519:19

**basis (30)**
276:15;293:16;
319:25;335:11,12;
352:10;355:21;
374:22,25;375:5;
377:13;379:9;396:5,
11;407:8;413:17;
442:20;443:15,16,20;
444:15;445:7,12,15,
17;450:16;501:14;
522:6;543:5,8

**Battery (1)**
250:4

**batting (1)**
521:5

**battle (1)**
543:20

**Bayview (4)**
251:3,12;336:16;
340:16

**BB (3)**
432:23;437:11,15

**bear (1)**
426:9

**bears (1)**
303:8

**beautiful (1)**
518:3

**became (3)**
277:25;470:20;
503:1

**become (8)**
405:16;470:22,24;
471:1;489:25;
491:19;494:10;520:6

**becoming (1)**
462:21

**beforehand (1)**
518:12

**beg (2)**
340:13;345:11

**begin (1)**
254:14

**beginning (3)**
302:14;349:7;
441:10

**behalf (29)**
254:11;259:8;
282:4;297:3;298:1;
302:15;304:4,11;
311:17;336:16;
337:6;338:16;
340:14;342:10;
382:4;408:14;
411:25;417:10;
432:6;454:24;
473:24;483:24;
485:19,20,21;503:7;
516:4;520:21;532:8

**behind (6)**
281:11,15,18;
291:18;433:1;523:24

**believes (1)**
540:20

**BELKNAP (1)**
252:12

**bell (1)**
321:18

**belong (2)**
426:14;512:7

**below (3)**
328:18,24;329:23

**beneficial (1)**
502:17

**beneficiaries (2)**
401:2;524:13

**benefit (27)**
285:16,16;357:15;
369:2;370:9;380:25;
381:3;390:25;401:4;
409:18,23;426:18;
430:21;480:8;
493:14,16,22;497:21;
504:5;509:19,20;
510:4;512:15;
528:12;534:24;
537:11;540:19

**benefiting (1)**
330:1

**benefits (17)**
284:18;369:22;
402:13;440:20;
488:14,22;489:3;
491:20,23;493:13,18;
495:16,17;496:20,23;
515:6;537:3

**benefitting (1)**
521:24

**BENNETT (89)**
247:9;305:7,8;
306:5,7,10,13,13,15,
17,19,21,23;311:4,6,
10;312:5;315:21;
316:9,12,14,22;
317:4;318:3,6,8,13;
320:22;322:15;
323:3,19,22,24;
324:14,17,20;328:21;
330:11,16,22;331:3,
10;333:18;334:18;
336:4,9;350:24;
351:2,2,5;357:4;
359:5;364:6;371:20;
379:18;381:10,10,14;
383:5,16;384:7,8,19,
24;385:1,3,4,6,6,9;
386:22,23;389:9,11;
392:25;394:10,11;
395:2,6,8,10,12,15;
397:10;404:25;
405:1;407:25;412:5;
414:15

**Bennett's (1)**
335:9

**Berkshire (1)**
252:3

**Besides (1)**
298:3

**best (42)**
260:1,5,12;261:8,
11,20;267:12;
323:10;324:2;
328:19,25;360:17;
373:3;412:20,22,23;
425:19;430:8;
480:24;486:9,10;
495:3;501:2,11;
504:16;510:22;
515:18;518:17;
521:24;522:5,10,25;
523:2,9;524:25;
526:11,22;529:13;
534:14;542:4;543:6,
9

**bet (1)**
494:5

**bets (1)**
470:1

**better (19)**
295:6,7,9;313:13;
356:17,20;363:4;
366:24;493:7,24;

497:12;505:5;
515:16;524:22;
525:5,7;526:7;535:2;
545:8

**beyond (13)**
330:11;344:17;
347:11;357:19;
379:18;382:17;
443:12;468:20;
481:1,8;482:3;
484:17;526:1

**big (6)**
503:3,13;516:13;
517:1;540:2;541:10

**Bill (2)**
341:2;401:3

**billion (16)**
310:13;371:2;
389:24;402:25;
403:12;404:8;
453:18;489:8;492:4;
538:10;539:2;
540:21,22,24,25;
541:2

**billions (3)**
492:12;519:18;
535:14

**binder (25)**
257:13;289:4,9,13;
305:7,9,19;306:1;
311:11;325:6,18;
330:17;340:21;
343:5;349:1,3,8;
353:1;372:15;
451:22,24;455:1;
460:7;469:6;477:16

**binders (3)**
350:24;384:8;
451:19

**binding (2)**
527:10;531:5

**Bingham (4)**
308:18;309:1;
454:21;457:1

**Bird (7)**
258:21;512:24,25;
513:9;515:4;525:1,4

**bit (2)**
509:18;541:2

**BK (3)**
432:23;437:11,15

**BLACK (1)**
247:16

**blanket (1)**
364:21

**bleed (1)**
539:14

**blend (1)**
351:9

**blocked (1)**
532:23

**BO (3)**
432:24;437:11,15

12-12020-mg    Doc 4776    Filed 08/21/13    Entered 08/21/13 08:35:02    Main Document

RESIDENTIAL CAPITAL, LLC, et al.
Pg 317 of 352

Case No. 12-12020-mg

August 19, 2013

**board (1)**
518:4
**boil (1)**
505:4
**bondholders (1)**
370:12
**bonds (3)**
360:2;452:24;
497:2
**book (6)**
262:7,8;265:22;
285:20;458:5,11
**borne (2)**
291:16;292:3
**borrowed (1)**
477:2
**Boston (1)**
249:13
**Both (15)**
281:19,19;427:8;
455:25;457:1;458:4;
490:19;492:24;
494:13;496:14;
497:19;499:25;
503:1;541:10;546:22
**bother (1)**
471:3
**bottom (5)**
286:3,6;288:23;
290:11;459:4
**Boulevard (1)**
251:13
**bound (4)**
292:5;482:24;
483:3;524:8
**Boylston (1)**
249:12
**BP (3)**
432:24;437:11,15
**BQ (3)**
432:24;437:11,15
**BR (3)**
432:24;437:11,16
**brand (1)**
517:5
**breach (1)**
506:15
**breadth (1)**
498:19
**break (1)**
414:18
**BRIAN (2)**
250:10;252:17
**brief (2)**
334:13;516:4
**briefly (8)**
331:25;452:22,22;
456:24;489:21;
520:22,24,25
**brings (3)**
491:21;496:23;
542:6
**Briody (3)**

323:6;324:1;455:7
**broadcast (1)**
361:25
**broader (1)**
278:2
**brought (5)**
287:22;288:5;
463:23;500:20;541:5
**BRUNS (1)**
246:13
**Bryant (1)**
248:19
**BS (3)**
432:24;437:11,16
**BT (3)**
432:25;437:11,16
**BU (3)**
433:9;437:11,16
**buckets (1)**
444:7
**build (1)**
407:5
**bunch (3)**
434:25;495:24;
501:4
**burden (1)**
438:17
**business (9)**
327:9;352:22;
398:3;491:21;
499:18,23;500:6;
537:10;538:5
**BV (3)**
433:9;437:11,16
**BW (3)**
433:9;437:11,16
**BX (3)**
433:10;437:11,16
**by-trust (1)**
293:16
**BZ (7)**
285:21,23;288:16,
20;433:10;437:11,16

**C**

**CA (6)**
252:6;291:18,20;
433:10;437:11,16
**calculate (1)**
510:10
**calculated (3)**
275:14;352:13;
509:21
**calculating (2)**
396:2;407:6
**calculation (9)**
268:16;292:4;
390:12,24;391:3,4;
409:2,12;503:20
**calculations (14)**
268:12,15,16;
269:10;274:23;

275:9,15;277:9,10;
383:14;390:16;
407:23;511:10;537:4
**calendar (1)**
546:5
**call (17)**
280:15;297:7;
302:16;314:17;
336:17;348:4;
409:23;415:12,15,16,
20;416:12;424:10;
432:3;439:12;451:4;
537:19
**called (13)**
315:11;321:2;
351:23;396:9,10,10;
424:12;425:5;
431:20;451:13,13,14;
454:2
**calling (16)**
347:19,19;348:2,
14;383:9,10;415:6,
10;416:21,24;
418:25;424:8,13,14,
18,22
**calls (2)**
304:5;314:7
**came (29)**
267:1,2;269:10,14,
20;272:10,16;
273:17;274:15,25;
275:1;276:25;
282:21;287:18;
293:22,23;387:23;
427:11,14;450:10;
470:15;483:3;
500:18;518:14;
519:22;534:3,5,6;
538:20
**can (131)**
254:22;255:2;
260:9;262:7;265:22;
266:23;267:21;
270:10;280:15;
281:14;282:19;
285:18;288:19;
289:4;291:18;
295:12,19;298:8;
300:5,12,25;305:14;
307:16;312:22;
313:3;315:6,7;319:7;
321:13,16;328:5,23;
329:12,17;331:25;
333:12;334:10;
339:17;340:3;341:1;
343:10;344:13;
346:5,18;347:7;
348:22;349:15;
351:15,18,19,21,23;
355:5;363:18;
365:24;366:4;
368:18;370:24;
375:2,18,21;378:22;

379:23;382:14;
383:13;384:8,24;
386:17;392:4,17,18;
393:16;409:11;
410:9;415:16;417:1;
422:3,4,8;423:2;
424:11;432:16;
434:1;436:22,23,23;
437:4;440:9;441:4,
16,19,23,25;447:14;
448:21;449:25;
450:17;451:10;
453:15;458:20;
460:23;463:1;
465:20;469:7;
477:20;478:15,16;
489:12;490:2;
491:17;494:16;
502:11,12;504:20,20;
507:3;515:6;516:25,
25;530:9;531:4;
534:16;538:6;
540:13;541:5;545:4,
4,14;546:1,4,8
**capacity (1)**
346:7
**CAPITAL (2)**
253:2,14
**capped (2)**
541:3;542:17
**capping (2)**
537:7,11
**care (3)**
305:1;347:22;
546:18
**careful (5)**
459:3;482:18,20;
513:3;518:9
**carefully (2)**
386:21;392:21
**CARL (1)**
247:16
**CARNEY (55)**
248:24;348:2,4,11,
12,12,24;349:4,9,12,
16,18,21,23,25;
350:6,8,22;357:2;
359:9;361:24;
362:16;363:25;
377:22,23,23;378:1,
11,18;379:21;381:5,
7,18,25;382:17;
419:10,12,13,14,15;
420:5,14,16,21,23;
421:3,20;422:2;
423:20,20,24;436:17,
18,19;437:1
**carries (2)**
278:22;410:12
**carry (1)**
413:12
**carte (1)**
502:11

379:23;382:14;

**CASE (106)**
250:15;267:15,15;
271:2,3,5,6,9,10;
272:19;273:11;
291:6,8,11;292:11,
12,14,14,19,23;
293:22,23;294:1,2,3,
5,5,13,25;295:2,5,8,9,
10,10;296:5,5;297:8;
301:8;308:25;312:2;
313:15;326:19;
334:22;337:17;
340:19;352:7;353:4,
12;357:11;358:7,8;
359:17;362:18;
363:14;364:13,24;
365:9;367:18,21;
369:7;374:5;379:4,5,
9;381:1;385:10;
406:8;414:25;415:2,
7,8,8,9,11,18;416:13;
424:17,18;425:25;
432:5;435:18;442:3,
5;443:17;444:14,17;
456:25;483:13,23,24;
502:7,8;503:3;
517:18;519:22;
520:5;527:17;530:3;
531:20,23,25;535:25;
536:3;539:19;540:8
**case-in-chief (1)**
297:13
**cases (5)**
296:6;313:8;
492:19;517:1;522:20
**cash (47)**
268:18;272:13;
273:7;283:11,12,13;
309:18;351:12,15,20,
24;352:1,3,19;
354:20;356:9;
364:19;369:6,13;
386:9,12,25;389:5;
390:8;391:14;393:1,
3;397:5,12;400:4,7,
11;401:5,21;402:4;
407:1,6,17;408:22;
409:1,6;447:19,21;
507:9;509:21;515:4;
535:13
**categories (2)**
452:17,19
**category (1)**
452:22
**cause (2)**
469:22;470:7
**causes (2)**
269:23;463:7
**caveat (1)**
485:18
**CDS (8)**
319:12,21;320:18,
24;321:16;322:24;

453:13;464:20

**ceiling (3)**
489:11,14;542:17

**Celebrity (4)**
291:6;292:12,18,
22

**cents (26)**
326:10,13;327:6,
19;328:9,18,24;
329:24;443:17,18,18;
444:14,18,24;445:3,
5,6,9;507:12,14,20,
22;508:8,10,14;
535:13

**CEO (3)**
438:12;453:10;
461:9

**certain (22)**
291:12;309:15;
319:15;327:7;
337:23;338:15;
356:10;379:10;
391:24;404:2;
424:23;428:9,10;
430:12;441:7;
446:12;447:5;463:9;
464:22;505:2;
517:17;519:5

**certainly (17)**
279:13;281:21;
285:15;360:13;
362:14;385:19;
387:11;395:10;
397:18;403:16,24;
416:25;420:16;
442:9;446:23;518:8;
526:5

**certainty (11)**
326:13,24;328:4;
444:17;447:18,19;
505:1;513:9;517:6,7;
535:2

**certificate (10)**
356:19;470:12;
505:14;512:13,16,17;
514:25;515:8,16,19

**certificates (1)**
476:6

**cetera (5)**
295:7,7;304:16;
452:25;546:22

**CH (3)**
433:10;437:11,16

**chain (1)**
343:9

**challenge (5)**
276:16;489:12;
491:6;495:3;498:25

**challenged (5)**
488:25;492:9;
498:20

**chance (4)**
306:3;455:17;

490:23;491:4

**change (6)**
351:19;450:6,6;
459:7;507:17;525:15

**changed (3)**
286:17;462:7,12

**changes (7)**
266:18;286:12,16;
317:21;319:3;
331:18;468:9

**changing (1)**
310:2

**chaos (3)**
491:20;527:16,17

**Chapter (13)**
373:13,16,22;
374:13,20;375:14;
376:5,13,17,22;
377:4,10;405:15

**characterization (1)**
338:25

**characterized (2)**
279:21;531:9

**characterizes (1)**
278:7

**charged (1)**
385:11

**Charles (5)**
254:10;297:25;
302:10;417:9;487:17

**chart (10)**
276:6;277:8;
286:10;290:9,18,20,
22;373:6;375:7;
376:21

**check (4)**
383:13;416:17,18,
19

**checked (1)**
293:10

**checking (1)**
299:11

**checks (2)**
525:22;527:19

**chided (1)**
521:3

**Chinese (1)**
514:15

**Chong (2)**
289:2;291:2

**Chong's (1)**
290:10

**choppy (1)**
487:24

**chose (1)**
536:18

**chosen (1)**
512:23

**Chris (3)**
432:4;483:23;
533:1

**CHRISTENSEN (1)**
250:11

**CHRISTOPHER (3)**
250:20;316:1;
317:1

**chronology (2)**
499:9,9

**chunk (1)**
504:4

**circle (1)**
485:7

**circumstance (1)**
368:15

**circumstances (6)**
341:8;380:22;
390:4;392:12;
398:12;511:16

**cite (5)**
490:8,20;496:6,15;
500:7

**City (3)**
378:20;379:7;
454:17

**CJ (3)**
433:10;437:11,16

**CK (3)**
433:11;437:12,16

**CL (1)**
396:13

**claim (89)**
273:21;275:16,23,
24;276:19,23;
277:18;278:2;279:1;
286:7;293:14,17;
294:10;307:13,15,23;
314:8,21;332:1;
367:18;370:12;
373:20;382:22;
390:15;396:22;
397:18,20;405:6,23;
406:18;413:10;
441:6;442:4,7,10,11,
17,18,18;443:1;
446:9,10,11,25;
447:5,7,8,10,11,15,
18;448:5;449:12,14,
16,20;450:10;
472:22;484:5,7;
489:10,11;491:8;
495:22;503:17;
516:22,22;520:3;
535:15;536:12,14,18;
537:8,11;538:2,10,
15,20;539:6,15,16,
18,20;540:8,10;
541:2,9;542:14,16

**claimant (3)**
443:16;444:16;
449:16

**claimants (6)**
270:17;441:11;
445:7,8,8;498:2

**claims (213)**
269:2;274:15,22;
275:5,24;276:6,13,

22,25;277:1,1;
278:16;283:14,16,17;
284:3;285:8,11;
287:22;288:4;
292:24;293:22;
294:2,7,13;295:4,6,8;
307:5,8,10;308:3,6;
310:8,10;326:9;
331:20;332:7;
357:18,22,22;358:2,
18,21;359:7,12;
363:7,12,20,23;
365:3,7,13;366:14,
21;367:1,8,21,25;
368:3,13,16;376:18;
377:1,14,16;378:13;
379:11,17;380:4,7,
12;382:10,24;383:1;
395:24;396:7;397:1,
2,3,21,22;401:10,25;
403:2,7,14;404:3,3,
17,19;406:2,8,16;
410:4;413:4,7,13,14,
19,20;425:14,15;
426:8;440:25;441:1,
8,12,13,16,23,25;
442:4,23;443:5,9,11,
12,19,23;444:2,4,21,
25;445:11,16;446:1,
21,25;447:24;
448:11;449:5,6,9,10,
17,19,22;450:4,9,9,
18,19;459:10;461:2;
472:24;473:1;
480:12;489:9,10,11,
16,18,19;490:1,2,4,
13,14,21;491:3,4,6,7,
12,14,18;492:1,12,
16,21,25;495:23;
496:4,4;497:15;
502:25;503:7,10,11,
12;507:18,20;508:1;
511:2,5;512:5;
516:21,21;517:6,9;
519:15,16;526:3,4,
10;533:2,16;535:9,
11,14;539:8,8;540:9,
19,21,24,25;541:1,4;
542:12,21,22

**clarify (3)**
304:23;420:3;
474:10

**class' (1)**
496:20

**classification (1)**
385:18

**clean (1)**
521:6

**Cleanse (1)**
292:22

**cleanup (1)**
521:5

**clear (28)**

260:19;261:4;
283:4;296:11;
305:16;318:21;
319:22;329:23;
345:6;392:20;
393:15;425:24;
441:7;442:9,14;
449:24;466:17;
467:7;476:24,25;
509:9;526:25;528:5,
7;533:14;535:18;
536:13;542:19

**clearly (7)**
285:4;460:14;
464:4;510:4;532:20;
535:21;537:9

**clerical (1)**
454:18

**clerk (2)**
383:12;384:15

**clerks (3)**
485:3;546:5,7

**Cleveland (1)**
247:14

**client (7)**
366:24;469:25;
470:3;471:4,12;
474:5,24

**clients (11)**
261:14;301:8;
498:10;512:11,11;
515:2;523:3;524:22;
527:12;531:6,8

**client's (2)**
518:17;528:1

**clip (1)**
450:16

**clock (2)**
485:11;487:7

**Clocks' (1)**
498:9

**close (5)**
354:16;447:25;
510:9;511:22;540:15

**closed (1)**
544:10

**closer (1)**
507:14

**closing (4)**
485:14;487:1,20;
488:1

**CMBS (1)**
361:18

**COHEN (1)**
251:19

**COLE (1)**
247:24

**collateral (8)**
355:6;364:18;
492:3,5;538:11,12,
15;539:3

**colleagues (4)**
265:8;315:1;521:3,

12-12020-mg    Doc 4776    Filed 08/21/13    Entered 08/21/13 08:35:02    Main Document
RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg
Pg 319 of 352

August 19, 2013

8
**collect (2)**
402:22;446:23
**collecting (1)**
496:11
**COLLIER (1)**
253:7
**color-coded (1)**
423:2
**combination (1)**
413:18
**combine (1)**
529:2
**combined (1)**
522:10
**comfort (1)**
277:3
**comfortable (2)**
282:23;284:1
**coming (12)**
273:16;283:18;
293:20;294:2;
359:13;369:6;
380:20;438:5;510:1;
511:7,13;542:11
**comments (4)**
382:2;387:3;418:5;
532:10
**commercial (1)**
453:1
**Commissioners (1)**
458:19
**Committee (62)**
246:14;248:3;
249:11;307:17;
308:8,11,15,17;
309:2,7,11,21;
313:25;314:4,7,12,
19;317:16,18,22;
319:2,5,5,9;320:20;
330:9;331:18;372:3,
8;454:21;464:1,6,9,
10,16,23,25;465:5;
474:4,4,6,8,14,17,22;
475:10,11,16,18;
476:5,18;477:9;
478:22,22;480:3,6,
16;485:21;497:4;
512:3;520:21;521:9
**commonly (1)**
458:10
**commonplace (1)**
515:20
**communicate (3)**
317:19;533:5,9
**communicated (1)**
477:8
**communicating (1)**
532:24
**communications (2)**
309:12,22
**commutation (58)**
262:18;265:5;

268:13;277:8;
284:18;288:13;
319:6,11;320:6;
321:1,10,14;322:3,
24;330:13;335:13;
365:2;381:1;382:9,
13,24;385:17;393:1;
405:11;408:8;429:7;
430:14;440:5,11,16,
17,19,22;457:9;
458:25;460:12;
463:25;464:15,20;
466:13;467:9;470:1;
472:10,17;482:23;
483:4;494:23;
499:12;502:16;
504:7,14;509:21;
512:23;513:24;
522:12;526:19;
527:10;535:4
**commutations (20)**
319:13,23;320:18,
24;321:16;454:12,
15;457:23;460:20;
463:13,21;480:3,6,
19,22,24;481:7,11;
483:8,10
**commute (16)**
319:15;461:12,15;
462:20;464:22,23;
465:1;471:5,13;
475:6;476:4;477:9;
478:23;479:1;534:4,
7
**commuted (15)**
319:20;452:14;
453:12,13,14,16,19,
23;454:6,7,9;465:7;
480:13;482:11;
514:18
**commuting (4)**
461:4;479:7,10,15
**company (1)**
365:17
**compare (2)**
352:8;429:20
**compared (2)**
440:9;446:24
**comparing (2)**
371:13;385:12
**comparison (4)**
357:8;372:23;
376:21;493:20
**compensated (1)**
508:13
**compensation (2)**
383:2;430:15
**competency (2)**
498:13,14
**competent (1)**
498:17
**competing (2)**
411:10;495:23

**competition (2)**
503:4;511:3
**compilation (1)**
518:25
**complaining (3)**
421:14;519:2;
529:5
**completed (1)**
428:10
**completely (6)**
339:10;410:22;
502:19;507:24;
516:23;523:19
**completion (2)**
427:21;459:12
**complex (6)**
492:16,21;496:9,
13;502:15;505:22
**complexity (1)**
511:11
**complicated (5)**
420:15;424:4;
496:5;504:19;507:9
**complied (1)**
515:22
**composed (1)**
474:17
**compromise (10)**
490:8;501:21;
514:4,7,10,19;515:3,
3,13;519:3
**compromises (1)**
494:7
**computer (1)**
351:22
**con (1)**
377:15
**concept (2)**
463:25;464:15
**concern (1)**
495:1
**concerned (7)**
319:6,11;430:12,
17;451:15;502:9;
509:7
**concerning (4)**
285:24;323:7;
457:23;534:10
**concerns (3)**
309:15;314:8;
494:12
**conclude (1)**
543:8
**concluded (4)**
411:12;541:19,19;
547:2
**conclusion (6)**
412:19;429:25;
461:6;518:15;538:2;
541:25
**conclusions (11)**
372:22;387:15,22;
388:17,21;488:7;

499:15;521:17;
529:10;536:24;
544:12
**condition (4)**
363:9;373:15,21;
391:19
**conditions (5)**
269:24;317:17;
327:11;363:3;377:4
**conduct (2)**
365:25;367:2
**conducted (1)**
361:17
**conducting (1)**
533:7
**conduit (1)**
322:17
**cone (1)**
533:8
**confer (6)**
298:19;420:2,4;
422:2;546:12,17
**conference (3)**
265:10,13,15;
266:7,16,18;267:23;
268:1
**conferred (1)**
255:22
**confident (1)**
275:6
**confidential (3)**
286:23;454:4;
499:1
**confidentiality (1)**
499:5
**confine (1)**
329:18
**confines (1)**
382:22
**confirm (1)**
360:19
**confirmation (6)**
373:16;376:5;
484:13;514:23;
534:2;540:13
**confirmed (4)**
371:9;493:7;
517:18;539:22
**confirming (2)**
320:6;515:21
**confronted (1)**
510:24
**confused (5)**
296:5;349:7;
419:23;447:4;530:19
**confusing (3)**
294:3,14,15
**Congress (1)**
315:19
**conjunction (2)**
361:10;369:18
**connect (1)**
269:17

**connection (28)**
259:14;269:10,15;
273:23;275:10;
276:2;277:6;288:4;
299:20;307:23;
311:1;312:2;313:7;
314:4;320:13;330:9;
331:21;338:7,20;
379:13;387:9;
389:21;438:12;
480:19,22;481:6;
484:11;523:21
**consensual (3)**
473:5;476:13;
480:20
**consensus (1)**
519:5
**consent (3)**
472:17;473:12,12;
505:11
**consenting (1)**
498:2
**consequences (1)**
536:23
**conservative (2)**
382:21;383:2
**conservatively (1)**
270:23
**conservatorship (1)**
315:15
**consider (17)**
328:19,25;364:10;
367:7,24;368:2,6;
369:22;370:1,14,21;
388:3;411:13;
425:19;426:5;
488:21;494:21
**consideration (9)**
353:24;362:14;
381:23;382:6;426:6;
430:6;432:8;438:12;
527:13
**Considerations (1)**
277:9
**considered (9)**
288:8;367:20;
370:9;428:11;
510:10;537:14;
539:12;541:18,21
**considering (3)**
410:7,25;516:20
**consistent (9)**
276:22;277:2;
293:18,18;294:11,12;
364:13,14;492:8
**constantly (1)**
360:24
**constituencies (1)**
497:25
**constitute (1)**
506:15
**constitutes (1)**
401:1

**construct (1)**
519:7

**consulted (1)**
317:22

**contact (2)**
314:2;339:1

**contacted (4)**
339:6,19,21,24

**contained (3)**
388:20;390:16;
407:22

**contemplated (5)**
319:19;320:19;
444:20,22,23

**contemporaneously (1)**
435:19

**contend (1)**
301:8

**content (1)**
465:21

**contention (1)**
334:22

**contentions (1)**
500:5

**contents (3)**
318:12;319:3;
523:14

**contest (2)**
369:7,10

**contested (3)**
438:10;439:2;
486:7

**context (17)**
263:14;279:11,22;
287:2,3;362:3;
363:16;380:21;
382:20;390:9;393:4;
441:4;466:1;483:22;
502:7;514:20;542:14

**contingent (2)**
377:16;405:12

**continue (3)**
283:23;507:19;
509:20

**continued (3)**
309:11;482:23;
511:1

**continuing (1)**
515:5

**continuous (1)**
335:12

**Contract (9)**
454:5,8;457:6,8,10,
10,13;496:3;524:12

**contracts (7)**
538:3,5,7,8,21,22,
23

**contradict (4)**
360:11;399:1,15;
407:20

**contradicts (1)**
537:7

**contrary (4)**

392:15;492:11;
494:6,6

**contribute (1)**
389:24

**contribution (4)**
370:3;371:2;377:5;
390:4

**control (1)**
516:15

**conversations (3)**
309:19;319:1;
464:19

**Conversely (1)**
363:19

**copied (3)**
343:9,16;455:9

**copies (5)**
312:1;320:5;
417:21;423:16;485:4

**co-portfolio (1)**
337:18

**copy (7)**
266:12;300:12;
305:18;342:21;
350:25;457:7;478:3

**Coral (1)**
251:15

**corporate (1)**
337:22

**Corporation (2)**
419:17,21

**corr (1)**
352:4

**corral (1)**
545:2

**corrected (1)**
433:3

**correctly (2)**
333:22;434:25

**correlations (1)**
363:17

**corresponded (1)**
338:15

**cost (1)**
367:24

**costly (1)**
493:1

**costs (1)**
270:4

**counsel (40)**
277:25;285:18;
289:24;296:4;
307:14,25;308:2,24;
311:1,8;316:9;
323:11;324:4;
326:21;329:12;
338:7,15;339:3,6,19;
341:3,9,20,20;346:6,
8,10;401:15;420:4;
454:21;455:6,25;
456:1;469:7;472:8,
11;498:14,17,17;
544:11

**counsel's (2)**
311:24;418:5

**count (1)**
519:18

**counter- (4)**
418:22;420:19;
422:5;424:2

**counterbalancing (1)**
517:14

**counter-designation (1)**
432:9

**counter-designations (15)**
416:2;417:16;
418:15;419:20,25;
420:7,11;421:10,15,
19;422:11;423:6,9,
21;544:22

**counting (2)**
298:24;517:8

**country (4)**
458:20;519:19;
534:21;535:11

**Countrywide (3)**
402:14;410:20;
517:7

**county (1)**
398:15

**couple (5)**
254:11;296:3,14;
297:7;487:24

**course (9)**
300:13;320:19;
331:12;332:22;
335:12;365:9;463:9;
510:8;521:1

**COURT (874)**
254:2,5,13,19,23;
255:1,5,7,12,15,19;
256:1,4,7,9,13,16,19,
21,25;257:2,4,7,11,
18,20,23;258:5,8,11,
15,18,22;259:1,3,7;
261:1,4,15,18;262:5,
23,25;264:16;
267:20;268:21,23;
274:5,8,10;278:11;
280:6,8,19;281:14,
25;282:2;283:6,8;
284:24;285:18;
289:13;290:23,25;
291:8;292:12;
294:16,18,20,22,24;
295:18,21,24;296:12,
15,17,19,21;297:1,5,
14,17,19,22,24;
298:4,8,12,16,18,20,
24;299:3,10,13,22,
25;300:7,12,14,16,
19,22;301:1,5,7,13,
16,20,23,25;302:3,6,
8,13,17,20;303:4,11,
16,18,24;304:6,9,14,
19;305:2,4,6,10,13,

16,25;306:2,6,9,11,
14,16,18,20;308:21;
309:5;310:22,24;
311:3,5,8;312:6,7,8,
8,10,13,14,15,22,24;
313:1,3,10,18,22;
314:17;315:4,6,18;
316:2,8,11,13,21,23,
25;317:3;318:5,7,14,
21;319:18;320:11,14,
23;321:13;322:10,12,
14,16,20;323:1,4,14,
18,21,23;324:8,11,
13,16,18,22,24;
325:2,9,12,14,18,20,
22,24;326:1,3,16,18,
20,23;327:17,22,24;
328:1,3,5,22;329:4,
10,12,15,17,21;
330:4,12;331:4,9,11;
332:1,4,6,24;333:4,6,
8,10,14,18,21,24;
334:2,7,9,14,18,20;
335:2,6,11,14,14,15,
18;336:1,3,5,10,13,
13,18,21,25;337:2,8,
13;339:12,14;340:3,
6,8,12,15;341:12,18,
24;342:3,5,7,9,13,15,
19,24;343:22;344:2,
13,17,21,24;345:2,4,
6,8,10,12,16,19;
346:14,20,25;347:7,
11,13,16,22,25;
348:2,6,9,11,19,21;
349:2,7,11,20,22,24;
350:1,4,7,12,14,16,
19,23;351:1;357:1,3;
358:13,15,17,22,24;
359:1,4,11;360:4;
362:2,17;364:2,4;
365:24;366:4,7,10,
18;371:21,24;372:5,
10,18;374:1;375:2,
4,18;377:21;379:20,
24;381:6,8,12,20;
382:1,19;383:6,12,
19,21,25;384:2,5,7,
10,13,17,21,25;
385:2,5;386:17,19,
21;387:19;388:1;
389:10,12,14;391:8,
22,24;392:2,4,14,16,
19,21,23;393:12,15,
23,25;394:4,7,9,12,
17,22,24;395:2,4,7,7,
9,11,14,16;397:9,17;
398:19;401:16,24;
404:24;405:2;
407:14;408:1;
410:10,13;412:4,7,
11,13;414:13,16,23;
415:2,6,9,14,16,18,

22,25;416:6,11,19;
417:1,4,6,12,23;
418:6,10,12,14,20,
23;419:5,9,12,23;
420:2,9,15,18,22,24;
421:2,5,13,22,25;
422:14,17,19,24;
423:1,5,14,17,19,22,
23,25;424:7,11,16,
25;425:3,8,23;
426:13,19,23;427:5,
15,25;428:3,5,7,17,
20,22,24;429:15;
430:4,10,24;431:4,7,
12,14,20,22,24;
432:2,8,13,15,19;
433:1,5,8,14,24;
434:2,7,9,12,20;
435:3,6,8,10,15,22;
436:7,10,12,15,17;
437:6,10,21,24;
438:17,18,21,23,25;
439:5,9,13,25;440:7;
445:2,19,21;447:20;
448:9,17,21;450:2,
11,13,19,21,24;
451:1,6,9,12,22,25;
452:2,5,7,10;453:7,9;
455:4,18;456:4,13,
15;457:5,17;458:2;
459:2,21,24;460:16,
25;461:7,10,23;
462:2,4,6,24;463:10,
19,23,24;464:5,10,
13;465:16,19,25;
466:3,6,9,15,22,24;
467:1,4,6,18,22,25;
468:3,7,12,22,23;
469:1,3,11,14,16;
470:10,23,23;471:21,
24;473:8,11;475:17;
476:1,22,25;477:2,5,
18;478:2,5,7;479:21,
23;480:23,24;481:2,
5,10,11,12,13,16,17,
21;482:4,9,13;483:2,
6,15,19;484:9,13,15,
18,20,23;485:1,3,8,
10,23;486:2,4,6,13,
15,19,21;487:2,4,11,
15,21;488:3,6,11,13,
21;490:5;493:5,10;
494:10,11,13,18,19,
22,24;495:9,12;
496:25;497:25;
498:2,9,12,15;501:5,
24;502:1,3;506:1,3,9,
17,20,23,25;507:4;
508:3,16,18,20,22,
25;509:3,6,8,10;
510:12,20;511:17,20,
23,25;512:2,6,8,19,
21;513:12,14,19,22,

24;514:1,7,10,13,22;
515:11,23,25;516:2;
517:3,4,23;518:20,
22;519:10;520:1,9,
15,18,20,24;521:7,
12,14;523:14;524:16,
18,21;525:17,20;
526:11,12,13,17,19,
20;527:1,3,6,13,21,
23;528:2,7,11,15,17,
21,24;529:1,4,7,16,
19,21,24,25;530:2,5,
7,15,22,23;531:1,7,
18,19,21,21;532:3,6;
533:19,21,24;534:5;
535:1;536:6,25;
537:6;538:11,16,18;
540:3,6,24;541:8,16,
18,21,24;542:9,25;
543:3,13,16,18,23;
544:3,6,9;545:1,3,6,
10,14,17,19,24;
546:2,4,11,24;547:1
**court-ordered (1)**
317:6
**courtroom (4)**
439:21;477:19;
545:23;546:6
**courts (3)**
481:7,14;494:14
**Court's (5)**
296:10;417:6;
420:17;432:8;498:8
**cover (3)**
425:25;458:11;
523:11
**coverage (1)**
515:5
**covered (2)**
332:18;460:15
**covering (1)**
515:9
**CPP (8)**
400:4;401:22;
442:3,3;444:14;
450:5,8,17
**CPPs (1)**
507:10
**CQS (5)**
251:3;336:17;
340:16;481:25;482:1
**CQS's (1)**
528:23
**create (4)**
279:22,23;352:19;
536:18
**creating (1)**
358:7
**creation (1)**
539:5
**credence (1)**
390:13
**credibility (1)**

395:11
**credit (13)**
306:24;307:2;
337:18,23;351:10;
380:19;402:14;
410:20;452:20,23;
453:13;494:1;532:16
**creditor (2)**
519:21;530:5
**creditors (12)**
493:23;494:24;
495:25;496:19,21;
497:16,18,22;498:24;
520:5;540:8,8
**Creditors' (6)**
248:3;313:25;
314:3,7,12,19
**credits (1)**
337:22
**critical (1)**
514:14
**criticism (3)**
395:19;407:8,22
**criticized (3)**
407:4;516:11,12
**CRO (4)**
374:8;499:22;
500:12,17
**cross (14)**
295:18,23;297:10;
304:25;306:18;
324:22;371:22;
383:6;414:14;492:9;
500:20;538:13;
539:25;540:20
**cross- (5)**
298:4;302:11;
305:8;417:17;424:20
**cross-binder (1)**
306:8
**cross-designations (6)**
254:15;298:3,13;
302:9;417:19,20
**Cross-examination (34)**
258:6;259:7,10;
296:1;303:22,23;
304:24;305:6;
306:22;322:20;
325:3;330:4;336:1;
337:14;340:6;
346:21;350:23;
351:4;371:25;
377:21;381:9;384:5;
385:8;408:1;412:14;
431:22,22;445:21,22;
469:3,4;479:25;
483:20;500:9
**cross-examine (1)**
334:10
**cross-examined (1)**
424:13
**cross-examining (1)**
413:2

**Cruise (1)**
291:6
**Cruises (3)**
292:13,18,22
**crystal (2)**
528:5,7
**CS (3)**
433:11;437:12,16
**cups (1)**
257:8
**CURCHACK (1)**
248:15
**cure (2)**
332:1,6
**current (6)**
307:10;337:21;
380:22;413:8;414:4,
4
**cursory (1)**
538:23
**CUSIPs (1)**
353:23
**cut (3)**
422:8;488:4;
510:20
**cutting (1)**
487:19
**CV (3)**
433:11;437:12,16
**CW (3)**
433:11;437:12,16
**CZ (3)**
433:11;437:12,16

## D

**D&P (7)**
277:20;278:3,15,
24;279:6,15;388:15
**D&P' (1)**
388:18
**D&P's (1)**
284:15
**DA (3)**
433:12;437:12,17
**daily (2)**
360:23;544:13
**DAKIS (1)**
251:23
**DALE (1)**
250:11
**damage (3)**
503:25;537:4;
539:4
**damaged (1)**
503:11
**damages (2)**
373:20;538:9
**Dana (6)**
323:5;324:1;455:5;
456:16;457:18;
469:18
**data (1)**

407:23
**database (1)**
458:20
**date (38)**
256:12,24;258:1,3;
259:6;265:13;290:7;
291:3;299:15;302:5;
303:7,21;304:21;
312:18;317:2;
318:18;320:25;
327:16;335:20,23,25;
337:5;343:3;345:23;
350:3,21;352:22,23;
384:4;423:9;437:9,
20;439:4;456:18;
457:20;458:15;
460:1;469:18
**dated (6)**
266:21;267:9;
304:16;327:16;
457:4;469:15
**Dave (2)**
481:22,25
**DAVID (4)**
249:7;304:3,10;
417:19
**DAY (17)**
247:2,11;255:17;
266:19;305:8;
306:15;351:2;
352:25;381:10;
385:6;410:18;
447:15;458:15,21;
460:15;505:21;
530:16
**days (9)**
265:14;266:6,10,
10;267:3;352:22;
429:8;504:18;525:23
**DB (3)**
433:12;437:12,17
**de (5)**
251:13;433:12;
434:13;435:7,11
**deadline (1)**
421:16
**deal (33)**
254:24;321:10;
322:17;364:19;
381:22,22;382:8,14,
14;390:10;391:14,
17;392:12;393:4,7,8,
17;394:1;400:21;
405:5,6;430:19;
447:16,16;473:5;
493:6,7;500:19;
517:21;539:7,7,11;
540:13
**dealing (2)**
284:9;540:14
**dealings (2)**
308:24;314:10
**deal-oriented (1)**

536:17
**deals (1)**
320:6
**dealt (3)**
498:21;501:6;
539:23
**dearly (1)**
514:5
**debt (1)**
378:24
**debtor (6)**
410:21;417:10;
489:12;530:6;537:5;
542:5
**debtors (41)**
254:11;298:1;
368:12;382:5,24;
422:7;424:5;438:14,
20;484:8;486:9,10;
488:14;489:4,18;
490:2,8,15,16;491:5,
9,12;492:2,12,15;
495:4,24;497:15,21;
499:23;501:2,11;
517:22;520:3;
536:18,21,25;537:15;
538:25;539:11;
541:9
**Debtors' (30)**
255:25,25;256:1,
11,24;258:1,3;259:6;
299:15;302:5;
312:17;317:2;
318:18;320:25;
335:22,25;350:20;
423:12;438:8,12;
439:1;484:1;493:10,
11;495:4;497:21,21;
501:3;519:7;538:4
**decapitates (1)**
526:9
**December (4)**
293:19;294:12;
322:2;458:14
**DECHERT (3)**
246:2;257:10;
337:6
**decide (3)**
392:8;394:13;
414:17
**decided (7)**
277:20;339:9;
411:11,11;428:14;
523:12;537:15
**deciding (1)**
488:21
**decision (14)**
260:9;291:19;
384:22;387:13;
394:12;495:7;
499:20;500:21;
513:2,8;529:10;
531:14,17,22

**decision-making (1)**
500:10
**decisions (3)**
260:7;337:24;
517:4
**deck (1)**
537:2
**decl (1)**
257:21
**declaration (36)**
257:13;260:19,20;
289:1;290:10,21;
291:2;299:20;
302:24;303:7,18,20;
304:12,15,20;305:17;
315:21;336:23;
337:2,4,16;348:16,
25;349:10;350:2;
364:24;383:23;
384:3;401:8;404:7;
405:10;426:20,25;
509:11,17;518:5
**declarations (6)**
305:20;379:14,16,
23;438:3,19
**declined (1)**
517:12
**decrease (5)**
363:18;365:7;
459:10;472:22,24
**decreased (3)**
363:7,12,23
**decreasing (1)**
365:13
**deem (1)**
357:7
**default (3)**
452:20,23;453:13
**defaulted (1)**
505:19
**defaulting (1)**
398:15
**defect (2)**
292:3;539:9
**deficiencies (1)**
507:7
**deficiency (1)**
401:10
**deficient (1)**
510:15
**define (1)**
376:19
**definitionally (1)**
430:15
**defrauded (1)**
503:9
**degree (2)**
496:20;525:6
**degrees (1)**
355:17
**delay (1)**
496:11
**deliberated (1)**

537:17
**deliberations (1)**
513:3
**delinquencies (1)**
363:18
**delivered (1)**
290:5
**demand (3)**
311:16;382:10;
522:12
**demarcated (1)**
444:5
**demonstrated (4)**
504:18;510:18;
525:6;527:14
**demonstrates (1)**
501:19
**DENMAN (1)**
250:22
**deny (1)**
455:15
**Department (1)**
463:4
**depending (4)**
397:20;445:8;
485:11;537:8
**depends (1)**
445:10
**deplete (1)**
542:23
**deposition (47)**
262:5,6;263:3;
287:7;291:7;320:15,
16;321:20;349:5,12;
353:4,11;354:23;
356:7,11;359:25;
361:1;362:5;364:5,7;
366:11;367:4;
370:17;374:8;
375:21;378:2;380:1,
6;384:20;386:2;
388:7;406:7,11;
414:21;417:15,17,18,
20;418:22;419:18;
432:9;436:13,15;
438:2;477:16,17;
546:22
**depositions (8)**
254:18;421:19;
427:11,21,23,25;
428:3,4
**deputy (1)**
546:6
**derive (2)**
279:21;351:12
**derived (1)**
407:11
**descend (1)**
527:16
**describe (13)**
278:4;452:17,22;
453:15;454:1,6;
455:4;456:24;458:8;

460:23;464:19;
468:14;488:20
**described (10)**
273:24;283:22;
396:20;404:18;
408:11;409:10,18;
489:19;496:22;
507:12
**describes (1)**
403:5
**description (8)**
278:15,25;279:7,9,
13,23;280:2,2
**descriptions (1)**
279:25
**deserve (1)**
535:17
**designations (45)**
254:15,22;298:3,4,
5,13;302:9,12;
414:22;416:1;
417:14,16,17,18,19,
20;418:14,22,22,23;
419:3,6,10,16,17,19,
24;420:7,10,19,20;
421:8,9,14;422:6,6,
10,22;423:5,9,21;
424:2,3;432:9;
544:22
**designed (2)**
327:19;380:19
**Despite (4)**
299:1;410:25;
485:13;507:11
**detail (5)**
281:17;390:14;
404:4;488:18;521:17
**details (6)**
281:15;389:4;
403:25;404:21;
467:1,2
**deteriorates (1)**
363:9
**determination (8)**
356:2;430:7;
499:24;530:8,14;
534:10;541:23;542:8
**determine (9)**
261:19;264:13;
265:3;293:10;
351:11;356:19;
363:22;400:2;530:16
**determined (2)**
356:16;468:15
**determining (4)**
261:7;402:17;
430:7;505:23
**Detroit (7)**
359:20,23;360:2;
378:20;379:7;
398:11;525:13
**developments (3)**
312:19;314:13;

317:14
**DEVORE (8)**
249:16;371:23;
372:1,2,7,7;375:11;
377:20
**D-E-V-O-R-E (1)**
372:7
**Dewey (2)**
495:7;499:20
**DI (1)**
253:19
**dichotomy (1)**
520:12
**differ (1)**
355:24
**difference (5)**
410:14;442:10;
443:3,3;508:6
**differences (1)**
266:5
**different (31)**
261:16;265:21;
267:2;276:20;
283:12,19;286:18;
287:5;288:1;295:1,1;
332:7;354:20;355:1,
13,16,17;358:7;
361:9,10;367:14;
430:2;451:22;474:9,
19;499:11;508:11,
12;516:9;536:19;
537:8
**differently (2)**
474:16;509:18
**difficult (6)**
361:21;362:11;
490:25;492:16,22;
521:4
**difficulty (1)**
496:11
**digging (1)**
533:18
**diluted (2)**
413:20,21
**dilutive (1)**
520:4
**dime (1)**
449:11
**DINE (10)**
250:12;324:23,25;
325:1,4,15,16;326:3,
4;330:3
**Dine's (1)**
329:18
**direct (67)**
257:25;258:24;
259:3,5;274:9;278:8,
24;279:16;280:1,22;
282:16;296:7;
302:22;303:15;
304:13;308:24;
325:5,16;326:5;
327:2;349:6;372:12;

404:15;424:12,19;
425:5,6,10,24;
426:20,22,24;427:7,
17,19,23;428:9;
435:17;439:19;
440:23;443:8;452:8;
453:8;454:25;
455:17;465:25;
468:3;489:4;492:6;
493:2,3;494:6;
496:15;497:24;
498:21;499:13,14,16;
500:7,19;501:16;
505:16;506:5,10;
518:1;520:1,7
**directed (3)**
314:11;472:8,12
**direction (2)**
338:19;393:22
**directions (1)**
506:8
**directly (6)**
313:12;317:17;
357:23;416:9;494:6,
6
**directors (1)**
498:20
**disagree (3)**
285:13;486:11;
504:20
**disagreement (2)**
390:23;421:14
**disagreements (1)**
408:20
**disappointed (1)**
487:23
**disclosure (6)**
326:12;399:24;
458:24;506:13;
517:13;533:11
**disclosures (3)**
326:7;457:22;
458:3
**discount (42)**
272:21;273:13;
277:24;279:13;
282:22,24;284:2;
285:10,10;295:12;
296:4,7;368:24;
369:1,8,11,12;
371:12,15,18;375:19;
396:1,4,9;406:24,25;
407:5,12,15,16,22;
410:3;413:1,5,9;
442:15;443:15;
447:21,23;448:6,13;
519:20
**discounted (7)**
375:13;376:4,8;
378:5;410:4,22;
448:12
**discounts (2)**
278:1;396:1

**discovery (2)**
428:10;493:1
**discretion (2)**
400:1;507:24
**discuss (16)**
280:16;296:6;
314:12;319:2;
330:13;431:9,11,12,
18;460:12,20;
463:25;471:8;
489:21;518:9;534:12
**discussed (6)**
291:7;319:24;
385:22;405:21;
431:15;476:13
**discussing (2)**
282:17;532:21
**discussion (5)**
281:2;282:21;
319:11;470:15;
479:14
**discussions (14)**
256:18;286:22;
287:4;315:3;319:6;
330:8;331:13;
464:15;479:9,17;
482:17;532:18,19;
535:10
**display (1)**
273:1
**disproportionate (1)**
504:4
**dispute (6)**
301:10;489:14;
495:19;496:18;
500:25;501:10
**disputed (2)**
489:20;496:12
**distinction (1)**
500:11
**distressed (1)**
379:7
**distributing (1)**
273:25
**distribution (3)**
449:20;507:17;
513:15
**distributions (2)**
508:5;511:6
**docket (6)**
336:23;348:22;
349:5;423:10;501:7;
519:1
**docketing (1)**
454:18
**document (22)**
288:21;289:4;
298:23;312:8;331:1;
343:6,14;346:1,3;
383:23;420:10,12;
421:17;433:1;
435:11;437:22;
438:9,15;439:2;

456:22,24;458:13
**documentation (1)**
501:19
**documents (16)**
255:9;256:1;
282:14;299:5;
301:22;312:2;
320:12;335:24;
418:3;438:11,18;
452:4;477:19;
481:19;505:13;
518:18
**dollar (22)**
310:13;326:10,13;
327:7;328:10,18,25;
375:9,12;380:3;
390:7;393:13;
394:20;412:1;
442:18;443:18;
507:22;517:15;
522:12,25;538:10;
541:4
**dollars (75)**
268:19;269:1;
288:9;290:15;
293:24;307:11;
360:9;368:12;371:2;
373:6,10,12;375:6;
376:12,16;389:24;
398:23;401:6;
402:22,25;404:8;
408:23,24,25;409:4,
5,16,20,21;410:5;
411:4,6,8,12,17,19;
412:21,24;414:3,5;
425:13;426:7;440:4;
445:14;447:9,10,13;
453:18;466:13;
467:10;489:9;492:5;
502:19;503:22;
508:8,14;509:16,22,
24;510:1,2,3,5,8;
514:17,21;517:16;
519:19,20,24;525:16;
526:9;535:14;539:2,
3
**dollars' (1)**
403:12
**done (42)**
272:24;277:10;
284:5,6;294:10;
298:14;358:19;
359:7;360:1;361:6;
363:15;365:6,12;
373:24;374:4,12;
378:7;398:13;
400:13;406:4;
423:13;427:19;
463:21;466:20;
472:17;473:11;
488:16;489:9;
497:13;505:5;
511:22;515:19,21;

516:18;520:17;
523:1;524:22;525:5;
526:7;528:14;535:7;
539:17
**DONNELL (1)**
252:24
**door (2)**
467:18;534:3
**double (1)**
396:3
**doubt (4)**
493:21;498:16;
524:21;530:23
**down (12)**
297:21;333:15;
399:23;409:2;
413:15;433:14;
436:25;459:9;
489:10;505:4;515:6;
533:18
**downside (2)**
382:21;542:13
**DPO (1)**
446:18
**Dr (14)**
292:2;340:22,24;
341:5,9,14;342:24;
343:2,13;416:24;
433:12;436:5;
437:12,17
**Draft (5)**
265:20;266:2,3,6,
10
**drag (1)**
342:21
**dramatically (1)**
517:12
**draw (5)**
287:6;329:13;
429:25;500:11;
538:13
**dressing (2)**
535:22,23
**drive (4)**
289:25;290:10;
545:11,14
**drives (1)**
292:3
**DS (9)**
345:25;346:9,12;
433:12;434:13,14;
435:23;436:6,7
**DT (3)**
433:13;437:12,17
**DU (3)**
433:13;437:12,17
**Dubel (48)**
255:20,21,24;
256:11;309:20;
319:24;330:8,13;
360:5,7;398:19,22;
404:1,15;416:22;
419:18;420:20;

451:4,6,7,19;452:10;
454:25;456:10,19;
457:22;458:7,16,25;
459:15;460:2,11;
461:8;465:9,20;
467:5,20;468:1,9;
469:6;477:20;
478:11,19;483:22;
485:1;493:18;
533:12;534:12
**Dubel's (4)**
299:8;499:10,16;
518:5
**duck (1)**
523:11
**due (3)**
291:11;440:17;
448:18
**Duff (41)**
259:19;263:9;
279:8;280:3,4,6,9,12,
13,14,15;281:10;
285:24;376:11;
385:11,16;387:4,7,
15,16,22,24;388:2,4,
5,19;396:20;400:17;
407:4;408:25;440:9;
443:5;511:10;513:6,
7;522:20;523:1,5,5,6;
524:6
**Duff's (1)**
387:7
**duplicate (1)**
485:22
**during (20)**
256:18;268:3;
272:6;287:4;331:7;
346:21;417:13;
427:11;438:1;
441:23;452:15;
453:11,23;454:15;
459:16;463:13,22;
466:12;475:6;521:1
**duty-bound (1)**
524:12
**DV (3)**
433:13;437:12,17
**D'Vari (2)**
537:18;538:9
**D'Vari's (1)**
492:8
**DWIGHT (1)**
250:23

---

**E**

---

**earlier (12)**
274:11;291:25;
378:2;379:10;
380:13;390:22;
411:7;451:23;454:3;
459:18;472:15;
475:15

**early (6)**
266:3;338:14;
441:8;442:5;464:20;
471:18
**earn (1)**
536:1
**earned (2)**
536:2,4
**easier (2)**
422:13;545:9
**East (3)**
247:4,20;249:4
**easy (1)**
437:4
**EATON (62)**
251:8;336:14,15,
15,22;340:10,13,14,
16;341:14,18,19;
342:2,3,4;343:4,23;
344:2,19,25;345:1,3,
5,7,9,11,14,24;
346:12,15;347:12,18;
424:8,9,14,23;
425:11;426:4,16,21;
427:4,8,17;428:1,2,4,
6,8;431:21,25;432:1,
11,20;433:6,9,15,18;
435:4,16,17,25;436:2
**ECF (9)**
303:19,20;305:17,
21,22,24;306:5;
348:21;349:20
**echo (1)**
418:5
**economic (8)**
319:24;327:11,21;
360:22,24;361:11;
363:2,9
**economy (10)**
295:6,9;361:6;
362:20;363:1,6,11,
22;364:10,15
**effect (13)**
352:11;368:1,5;
376:8;378:5,6;379:4;
389:19;398:16;
407:18;520:4;
525:16;534:19
**effected (2)**
496:20;534:9
**effective (9)**
397:19;405:16;
462:17,21;468:16,16;
489:25;491:19;
494:10
**effectively (4)**
380:18;430:16;
446:21;504:2
**effort (1)**
427:9
**efforts (1)**
519:4
**ego (2)**

490:22;491:1

**EI (3)**
433:13;437:12,17

**eight (4)**
497:3;517:20;
519:23;533:17

**eighteen (6)**
327:20;409:19;
410:5;504:9;510:3,4

**eighty (3)**
443:10;446:7;
508:1

**either (23)**
257:21;258:10;
264:18;275:8;
305:19,20;344:4;
356:4,24;357:5;
365:7;13;370:14;
379:14;393:20,21,21;
397:10;406:5;441:8;
480:23;496:21;
513:16

**EJ (3)**
433:13;437:12,17

**EL (4)**
433:13,15;437:12,
17

**elected (1)**
278:4

**element (1)**
314:5

**elements (2)**
269:6;310:14

**elicited (1)**
438:6

**eliminate (2)**
480:12;525:25

**ELLIS (1)**
247:18

**else (16)**
275:13;287:17;
302:6;303:24;336:3;
354:17;380:1;382:3;
386:4;391:11;
415:20;480:14;
486:17;527:15;
538:19;540:12

**em (1)**
524:23

**e-mail (16)**
323:5,10,16;324:1,
3,10;343:9,11,16;
345:21;455:5;
456:16,25;457:6,18;
469:18

**e-mailed (2)**
272:3,3

**embedded (1)**
367:11

**embodied (1)**
374:20

**emboldened (1)**
519:5

embrace (1)
524:3

**emergence (4)**
268:19,25;484:11,
15

**EMMA (1)**
251:9

**emphasis (1)**
275:4

**emphasize (2)**
523:4;524:7

**employing (1)**
272:21

**enactment (1)**
331:13

**encouraged (4)**
464:23;480:3,6,16

**end (22)**
267:18;278:14,20;
293:3,14,18,19;
294:10,11;297:8,21;
338:13;393:2;394:4;
440:24;442:1;
443:11;444:15;
473:2;505:21;
522:13;525:13

**ends (1)**
413:11

**enforcing (2)**
307:15,22

**engaged (1)**
338:7

**engagement (1)**
499:25

**enhancement (1)**
380:19

**enormous (1)**
513:7

**enough (7)**
307:14;334:23;
404:24;406:19;
485:4;509:9;510:9

**ent (1)**
379:20

**enter (11)**
332:22;333:2;
418:16;428:14;
438:7,13;469:22;
499:24;531:13,22;
534:14

**entered (8)**
462:1,3;476:21,22;
503:10,21;523:15;
532:25

**entering (6)**
471:11;476:3,21;
501:1;505:11;531:3

**entire (8)**
279:19;282:12;
292:4;293:11;358:3;
429:21;436:13;524:5

**entirely (3)**
322:21;484:7;

539:2

**entities (2)**
398:15;473:10

**entitle (2)**
329:25,25

**entitled (10)**
331:1;379:21;
405:11;456:16;
457:18;513:5;
515:15;526:5;
535:24;540:9

**entity (2)**
321:2;513:11

**entry (3)**
438:2;475:7;
521:10

**EO (3)**
433:15;437:12,17

**equal (3)**
380:1;382:3;
503:17

**equals (1)**
440:19

**equation (2)**
366:25;370:15

**equitable (7)**
269:23;273:25;
274:13;282:19;
445:13;486:10;
491:10

**ER (2)**
349:3,15

**error (2)**
403:23;435:5

**ESPANA (26)**
246:9;257:9,10,12;
258:4;337:1,6,6,9,11,
15;340:5;341:11;
343:19,21;344:1,10,
12,16;347:6,10,15;
428:16,18,21,23

**ESQ (41)**
246:7,8,9,10,19;
247:7,8,9,16,23,24;
248:7,8,15,23,24,25;
249:7,15,16;250:7,8,
9,10,11,12,20,21,22,
23;251:7,8,9,10,17,
23,24;252:8,9,17,24

**essentially (10)**
341:24;352:12;
380:20;438:13;
503:8;520:13;
537:19;539:21;
541:6;546:18

**establish (5)**
264:13,19,21;
265:1;323:14

**established (4)**
307:17;446:16,24;
488:15

**estate (11)**
370:3;371:3;

389:25;493:23;
495:4;501:3;513:15;
535:5,8,9;537:11

**estates (5)**
488:14;496:24;
497:21;540:22;541:3

**estimable (1)**
516:17

**estimate (16)**
293:6;294:8,11,12;
326:13,24;328:4;
360:8;382:22;
395:23;396:6;
403:20;416:22;
445:6;485:15,25

**estimated (14)**
263:15;276:6,21;
277:1;293:4,8,14,17,
19,21;357:19;
399:24;513:15,16

**estimates (10)**
276:12,23;277:18;
278:16;279:1;
292:23;293:1;369:8;
396:22;492:8

**estimating (1)**
364:9

**estimation (1)**
294:4

**et (5)**
295:7,7;304:16;
452:25;546:22

**evaluate (7)**
362:4;366:23;
505:22;523:6,8;
529:16;531:4

**evaluated (1)**
357:6

**evaluating (4)**
287:24;292:16;
366:13;395:9

**evaluation (8)**
263:5,9;295:5;
361:22;365:10;
367:13;523:2,12

**evaluations (1)**
292:15

**even (33)**
263:23;300:22,24;
329:2,2;346:24;
347:2;368:11;
380:21,22;406:7;
409:16;410:24;
447:11;458:23;
482:23;488:25;
491:3,17;493:7;
495:2;497:10;499:4;
504:8;510:9,16;
514:22;515:2;
534:12,16;538:23;
539:2;545:8

**event (2)**
491:16;510:9

**everybody (9)**
254:3;325:24;
417:25;422:12;
449:17;474:19;
480:14;518:17;
546:24

**Everybody's (2)**
445:12,13

**everyone (2)**
527:15;532:22

**everyone's (1)**
497:20

**evidence (125)**
255:22,23;256:10,
11,21,23;257:24,25;
258:2,24;259:4,6;
290:22;291:1;299:6,
13,15;300:3;302:3,4;
303:19,21;304:19,21;
312:15,17;316:21,25;
317:2;318:15,17;
320:23,24;335:19,22,
24;336:24;337:3,4;
341:14,16;342:25;
343:2;344:20;
345:19,22;346:13;
349:24,25;350:2,12,
19,20;384:2,3;399:8;
417:15;418:21;
426:15;432:12,21;
437:7,9,14,19;
438:15,16,25;439:3;
456:12,15,18;457:16,
17,19;459:20,24;
460:1;484:1;487:25;
488:15,23;489:1,6,7;
491:24;492:10,11;
496:22;499:3,5;
501:19,22;506:17,24;
507:1;509:23;
510:14;511:18;
518:24;520:2,7;
521:17,18;528:20;
529:8;533:1;535:21;
536:2,3;537:6,14,16,
24;538:3,4,9;543:8;
544:9,10,10;546:10,
14,17,21

**evidentiary (3)**
522:6;543:5,8

**exact (10)**
266:12;270:7;
283:25;286:15;
288:19;290:7;
291:10;404:21;
406:3;503:21

**exactly (13)**
269:12;270:11;
275:17;279:21;
389:9,10,11;430:22;
474:10;510:13;
514:9;520:17;544:25

**EXAMINATION (13)**

302:22;330:6;
340:9;344:18;
347:14;377:25;
408:3;412:17;
424:21;425:10;
439:19;451:16;452:8
**examine (2)**
276:14;477:15
**examiners' (1)**
490:21
**example (6)**
310:11;335:9;
409:16;442:6;443:1;
447:12
**exceed (3)**
490:3;510:5,5
**except (5)**
275:14;279:23;
286:6;293:20;545:21
**excess (1)**
398:23
**exchange (2)**
268:20,25
**exchanged (2)**
421:17;423:9
**exchanging (1)**
505:1
**exclude (1)**
502:12
**excluded (2)**
434:15;516:13
**excluding (1)**
509:18
**exculpating (1)**
530:7
**exculpation (2)**
481:6;530:4
**excuse (4)**
372:12;413:16;
469:12;476:5
**excused (11)**
258:11;296:17,21;
303:25;336:5;
347:16;383:7;
414:16;431:24;
451:1;485:1
**execute (1)**
303:7
**executed (2)**
302:24;320:21
**exercised (1)**
499:23
**Exhibit (222)**
255:25,25;256:1,6,
13,15,21,24;257:13;
258:1,25;259:3,6;
262:3,13;265:16,22;
266:4,9,21,25;
267:21;271:12,16;
278:9;279:18;
285:21,23;286:10;
289:6;290:25;291:1,
3,18;299:6,8,13,15,

16,17;300:12;
301:18;302:3,5;
305:21;311:14,19;
312:5,9,11,14,17;
315:23;317:2,24;
318:18;320:2,25;
321:4,20;322:25;
323:20;325:17;
330:16;333:3,3,12,
12,12,13,13;335:20,
22;337:5;340:24;
341:5,9,14;342:24;
343:2,8,14;344:19;
345:1,13,13,15,22,
25;346:9,12;349:4,
12;350:3,10,11,19,
21;353:2;354:23;
356:13;361:3;362:5;
364:7;366:11;367:4;
370:19;384:4;388:8;
396:13;399:7;
417:17,18;432:21,21,
22,22,22,22,22,22,23,
23,23,23,23,24,24,24,
24,24,25;433:1,9,9,9,
10,10,10,10,10,11,11,
11,11,11,12,12,12,12,
12,13,13,13,13,15,15,
15,16,17,19,19,19,19,
20,20,20,20,20,21,21,
21,21,21,22,22,22,23;
434:8,23;435:1,23,
24;436:9;438:8,10,
25;439:3;455:1,2,16;
456:11,18,20,20;
457:15,19;458:7,8,8,
24;459:4,19,24;
460:1,5,10;469:10,
14,16,17,18;471:15;
477:22;478:11;
484:1;489:2;499:8;
500:1;518:5,24;
522:14
**exhibits (50)**
255:18,24,24;
256:11,12;257:14,15,
16,20,23;258:2,3;
266:5;298:6,10;
304:23,25;332:22,25;
333:1;334:5;335:25;
337:11;350:4,8;
414:20;417:15;
418:20;420:25;
432:11,20;434:6,17,
25;435:3,5;436:20;
437:5,6,8,9,10,15,19;
438:2,19;518:25;
532:25;546:9,13
**exist (5)**
374:23;449:14,17,
19;450:19
**existed (1)**
283:15

**existence (2)**
313:24;441:23
**exists (1)**
514:4
**exited (1)**
484:21
**expand (1)**
380:16
**expect (8)**
282:15;283:19;
286:15;298:16;
312:19;443:14,19;
531:21
**expectation (6)**
317:21;319:1;
327:25;331:24;
378:8;535:12
**expected (19)**
271:6,9;326:15,19;
331:18;352:1,3,14;
356:9;357:13;
360:25;368:17;
369:6;373:19;
380:24;444:18;
509:14;535:4;544:4
**expects (1)**
347:4
**expense (2)**
496:10;504:9
**expenses (3)**
270:4,13;459:8
**experience (12)**
365:21;366:1,6,13;
492:19,20;496:2;
498:13,14;500:3,20;
517:3
**expert (24)**
287:3;290:14;
291:4,11;338:1,4;
346:22,24;347:1,2;
348:15;379:19,22;
388:21;389:1;
396:12;402:12;
403:10;430:5;
432:18;435:13,18;
492:8;513:6
**experts (5)**
291:12;451:14,15;
515:15;522:19
**expert's (1)**
291:15
**expired (1)**
485:13
**explain (9)**
271:22;285:15;
307:16;408:20;
440:9;441:4;455:17;
465:20;492:13
**explained (6)**
272:9,10;404:12;
490:7;506:14;511:11
**explaining (1)**
440:10

**explanation (7)**
285:17;391:10;
396:8;407:5;413:3,
25;414:9
**explicitly (1)**
367:2
**explosion (1)**
517:5
**exposes (1)**
365:2
**exposure (11)**
358:3,18;359:6,23;
360:1;378:20;
453:17,20;513:10;
517:11;535:15
**exposures (2)**
319:15;398:6
**express (1)**
538:14
**expressed (4)**
386:8,13,24;521:9
**extend (2)**
400:8;441:21
**extensive (1)**
467:11,19;518:16
**extent (19)**
271:25;276:18,19,
23;279:23;314:15,
15;319:12;356:1;
377:18;397:5,11;
398:8;443:10;
481:18;490:3;
498:22;510:14,16
**external (1)**
351:10
**extrapolate (1)**
382:13

### F

**face (2)**
307:10;426:16
**faced (2)**
394:12;492:15
**fact (63)**
264:13;272:20;
276:25;279:6;
280:16;282:23;
283:9;285:7,9;286:6;
288:15;291:12;
293:10;300:8;318:8;
328:7;341:19,23;
356:2,16;369:11;
370:1;382:11;
391:18;406:7;
409:17,22,25;413:7;
425:5;426:5;429:25;
435:24;441:13;
442:2;454:14;
464:22;470:12;
471:4;482:10;
485:13;488:7,17,24;
491:11;492:25;

**explanation**
496:16;498:25;
499:11;507:11,13;
522:2,16,19;524:10,
18,21;529:23;
532:22;533:10;
535:20;536:4;544:12
**factor (7)**
277:13;282:18;
283:20;284:3;
352:24;449:17;496:9
**factored (1)**
397:6
**factors (11)**
259:23;265:2;
285:7;488:21,24;
492:13;493:13;
495:5,9;499:19;
501:21
**facts (11)**
392:24;430:6;
487:25;488:18;
500:2;521:16;531:5;
535:24;536:24;
537:25;542:7
**factual (1)**
501:9
**failing (1)**
407:4
**failure (1)**
435:4
**fair (19)**
263:23;265:15;
269:22;273:25;
274:13;282:19;
351:13;361:22;
362:11;365:17;
372:25;445:13;
447:3;477:1;484:14;
486:9;501:21;
511:15,15
**faith (20)**
273:18;276:1;
392:11;393:8,21;
394:1,14;408:14;
411:6,23,25;412:3,9;
504:18;505:23;
518:16;522:10;
524:24;529:13;531:3
**fall (2)**
264:4;338:14
**falling (1)**
525:14
**familiar (8)**
315:11;357:7;
374:21;453:4,10;
460:2;461:9;533:3
**far (9)**
283:3;301:7;
309:11;346:18;
356:17,20;433:2;
441:16;451:15
**Fargo (2)**
252:21;258:23

**FARR (7)**
  251:2;336:16;
  340:14;341:2;343:1;
  345:21;346:6
**fashion (1)**
  538:23
**faster (1)**
  261:1
**fast-moving (1)**
  531:23
**fatal (3)**
  291:15;292:1;
  521:18
**favorable (2)**
  382:8;525:11
**favored (1)**
  494:7
**fears (1)**
  441:11
**Federal (6)**
  315:11;316:5,10;
  419:17,19,21
**feedback (1)**
  266:7
**feels (1)**
  338:14
**fell (4)**
  262:1,18;263:25;
  264:19
**felt (3)**
  285:4;385:20;
  483:17
**fence (1)**
  412:7
**few (21)**
  257:14,14;265:20;
  266:6;283:17;285:9;
  293:24;330:22;
  337:11;420:25;
  442:4,12;471:18;
  472:8;479:22,22;
  502:4;512:3;516:5,5;
  517:4
**FG (4)**
  477:22,24,25;
  478:11
**FGIC (325)**
  247:3,12;255:9,17;
  256:17;259:16;
  260:2;261:12,25;
  263:16;268:19,25;
  269:1,5,12,13,20;
  270:3,5,13,22;271:2,
  5,9;272:1,4,10,24;
  273:18,22;274:12;
  275:4,12,13;276:13,
  25;277:10,12;278:5;
  279:11,22;280:3,8,
  11,16,18,22;282:7,
  14,17;283:11,13,18,
  20,21;284:4,9,16;
  285:5,25;286:17;
  287:1,9,21,24;288:4,

9,16,16;294:4;295:2;
  297:3;299:5,7,14;
  305:8;306:17;307:5,
  13,23;308:3,9;
  309:22;317:9,25;
  318:16;319:9,15;
  326:9;328:8;331:13,
  17;332:8,10;347:5;
  351:2;353:24;
  357:19;358:3;
  359:13,23;360:7,15;
  363:8,12,20,23;
  364:25;365:3,7;
  366:21;367:17,24;
  368:11,12;369:9,13,
  18,23;370:22;371:10,
  13,14;372:23,24,24;
  373:3,7,11,12,15,21;
  374:4,6,12,23;
  375:15;376:6,12,15;
  378:19,25;379:11;
  381:10,17,22;382:6,
  8,15,25;383:1;385:7,
  12,12,15,20;386:10;
  387:1;388:18;
  389:16,21,25;393:5;
  395:23;396:6;
  397:24;398:22;
  399:4,19;400:14,21,
  22;401:21;402:3,13,
  18;403:18;405:5,6,6,
  11,16;406:14,15;
  407:17;408:8,18,19,
  24;410:2,18;425:15,
  18;426:8,10;428:14;
  430:7;431:3;435:20;
  441:4,17,21;442:22;
  444:5;447:22;449:2;
  451:4;452:14,17;
  453:10,20,20;454:10,
  15,16;455:7,13;
  456:16;457:3,18;
  458:21;459:13,25;
  460:2,11,19;461:9;
  462:15;463:3,8,13,
  22;464:23;465:14,21,
  23;468:10;469:21;
  471:12;473:3;474:8;
  475:8;476:3;479:6,7,
  12;480:11;482:6;
  483:10;484:6;
  485:20;489:9,16,18,
  25;490:4,12,15,22;
  491:3,7;492:1,16,17;
  493:15,17,19,20,20,
  22;494:24;495:24,
  24;498:3,11;499:9;
  500:25;501:11;
  502:7,18;503:1,4,9,
  15,17;506:10;507:2,
  9,14,24;509:12,21;
  510:12,22,23;511:4,
  7;513:10,17;514:18,

20,20,21,23;516:4,
  11,13,19,22;517:12;
  519:14;520:3,14;
  522:11;525:2;526:6,
  7;527:18;529:3,12;
  532:18;535:15;
  537:7,12;539:19
**FGIC- (3)**
  292:24;429:19;
  442:22
**FGIC-based (1)**
  503:4
**FGIC-insured (5)**
  363:7,11,23;
  364:16;370:10
**FGIC-ResCap (1)**
  467:14
**FGIC's (34)**
  268:12,14,15;
  269:10,22;270:14;
  274:23;275:9;283:2;
  294:12;325:11;
  326:6;358:12,18;
  360:1;367:20;398:3,
  6,11,16;406:2,8;
  430:15;444:18;
  452:15;453:4;461:4,
  12;465:1;484:11;
  490:14;494:1;517:6,
  11
**FGIC-wrapped (21)**
  293:17;294:7;
  332:12,18;354:3;
  355:25;426:12;
  429:12,21;430:18,20;
  443:6;471:5;492:4;
  494:4;495:1;497:2;
  504:5;506:4;514:25;
  528:18
**FHFA (1)**
  533:2
**fields (1)**
  532:11
**fifteen (12)**
  272:21;273:2,14;
  413:15;415:24;
  416:22,23;445:9;
  446:10;447:1;
  485:12;486:5
**fifth (1)**
  507:21
**fifty (2)**
  492:20;500:3
**fight (3)**
  524:2,12,13
**fighting (7)**
  514:21;517:19,20;
  518:12,13;519:23,23
**figure (8)**
  269:9;272:16;
  375:10,13;416:7;
  489:10;497:2;530:9
**figures (2)**

269:8;378:9
**file (3)**
  290:10;461:23;
  538:20
**filed (37)**
  302:24;305:17,23;
  311:17;320:12;
  335:4,21;336:23;
  359:20;383:23;
  406:19;423:10;
  427:20;438:3;
  458:10,13,14,16,18;
  461:17,18,20,21;
  462:1,8,9,10,11,13;
  469:21;470:7,22;
  481:19;497:15;
  519:1;534:17;541:2
**files (1)**
  483:8
**filing (12)**
  310:5;312:8;331:1;
  338:10;398:11,16;
  455:13;456:17;
  457:3,18;458:21;
  471:10
**filings (5)**
  256:2;301:15,18,
  19;302:4
**filled (1)**
  477:19
**final (9)**
  405:2;408:9;436:8;
  462:8;466:7;494:13,
  17,19;546:9
**finality (2)**
  542:10,11
**finalized (2)**
  265:11;266:11
**Finally (1)**
  494:9
**Finance (9)**
  315:12;316:5,10;
  397:25;398:4;
  452:20,20,23;453:2
**finances (1)**
  398:17
**Financial (31)**
  247:19;259:16,20,
  22,23;260:18;309:6;
  325:11;326:7;347:3;
  351:6;360:14;
  389:24;398:11;
  399:4,10,16;407:1;
  458:3,6,22;463:5;
  471:22;511:8;
  515:18;522:19,22,23,
  24;523:25;537:1
**financials (1)**
  533:18
**financing (1)**
  398:7
**find (14)**
  260:20;280:25;

282:9;303:4;323:1;
  342:21;409:11;
  416:9;435:8;494:16;
  521:5;522:2;526:11;
  538:23
**finding (13)**
  499:6;521:23,25;
  522:8,9;526:22;
  529:12,25;530:11;
  536:3,24;541:13;
  543:7
**findings (36)**
  481:18;488:6,17;
  496:16;497:10;
  500:23,24;501:1,9,
  14,24;518:8;521:11,
  16,19;522:1,1;
  526:16,20,23;527:5;
  528:5,8;529:9,17;
  530:14;531:6;
  532:12;535:18,20;
  536:4;543:14,22,25;
  544:12,16
**fine (23)**
  254:25;255:5,7,12;
  297:22;298:18;
  305:3,4;306:18;
  316:14;374:10;
  380:3;386:5,6;395:6;
  405:1;418:13;487:9;
  508:19,22;512:25;
  543:15;545:13
**finish (13)**
  283:8;294:16,20,
  24;327:17;343:22;
  358:24;359:2;
  412:16;428:17;
  444:12;448:9,17
**finished (3)**
  294:25;304:25;
  358:13
**firm (5)**
  308:18;455:6;
  457:1,2;533:1
**firmly (2)**
  495:10;496:21
**firms (1)**
  410:18
**first (38)**
  254:12;261:17;
  266:6;268:17;270:9;
  272:12;276:6;278:6;
  285:9,23;288:15;
  293:12;306:7;
  320:16;325:18;
  327:11;349:6;
  390:11;421:18;
  441:17;443:12,22,24;
  444:3;446:3,7;459:8;
  460:21;462:9,11;
  472:9;489:7,23;
  491:5;499:8;502:6;
  536:17;537:22

**first- (1)**
459:10
**first-lien (1)**
459:11
**five (11)**
413:15;444:5;
445:10;451:14;
474:9;507:19;508:2;
517:5,25;519:22;
538:10
**five-billion-dollar (1)**
538:20
**five-month (1)**
518:14
**five-page (1)**
434:23
**five-year (4)**
444:3,6,7;446:7
**fixed (1)**
446:21
**FJ (1)**
321:20
**FL (1)**
251:15
**flaw (1)**
292:2
**flaws (1)**
291:15
**Floor (6)**
248:20;251:14;
252:5;411:22;
489:13;542:15
**flow (8)**
283:18;290:18;
351:12,15,24;352:3;
354:20;364:19
**flows (19)**
283:11,12,13;
351:20;352:1,20;
356:9;369:6,13;
397:5,12;400:7,11;
407:1,17;409:6;
447:19,21;507:9
**FM (3)**
433:15;434:17;
436:9
**FN (1)**
388:8
**focus (10)**
281:4,13;282:11;
284:12;372:11;
475:24;536:15,17;
537:22;539:10
**focused (3)**
275:3;276:24;
282:2
**Foerster (5)**
254:11;298:1;
302:11;417:10;
487:18
**folded (1)**
503:19
**folder (2)**

303:11,12
**folks (2)**
311:23;413:22
**followed (1)**
541:24
**following (5)**
255:18;262:12;
287:8;330:20;432:21
**follows (1)**
255:25
**footnote (1)**
471:24
**forecast (2)**
361:12;363:5
**forecasting (1)**
360:22
**forecasts (1)**
361:8
**foregone (1)**
510:11
**forget (1)**
391:16
**forgo (1)**
376:25
**form (28)**
266:10;305:24;
314:16;322:19,20;
359:9;376:20;
379:22;380:19;
381:8;387:18,25;
391:7;392:13;
393:24;397:8;
401:23;403:13,15;
415:13;424:19;
426:25;427:1;434:8,
22;448:23;461:6;
465:17
**formally (2)**
255:10;499:19
**format (3)**
348:17;420:24;
453:2
**formula (1)**
509:25
**formulating (3)**
366:19;369:21;
387:9
**forth (3)**
377:15;499:12;
541:6
**forty (61)**
277:17,21;278:7,
15,25;281:1,2,6,9,11,
15,18,20;282:10,13,
18;283:1,19,24,25,
25;284:14,20,20,25;
285:2,12;395:13;
396:16,21;400:8;
409:9;410:3;413:2,3,
17;414:8,9;441:22;
442:6,11;443:1;
444:6,7;445:10;
447:11,14,24;448:8;

449:11,12;494:2;
496:24;504:22;
508:9;509:13,18;
513:10;523:25;
524:2;535:3
**forty- (1)**
445:25
**forty-five (3)**
444:14;487:5,7
**forty-percent (7)**
395:17,22,25;
396:6,9;448:13;
449:2
**forty-seven (9)**
283:10;352:19;
354:3;443:6,9,20;
444:21;446:20;
448:19
**forty-two (1)**
284:1
**forty-year (4)**
441:10,25;442:2;
445:17
**forward (5)**
293:4;521:2;538:9;
539:12,21
**fought (1)**
536:22
**found (3)**
291:14;533:5;
542:17
**foundation (6)**
323:15;342:6,11,
16;435:13,22
**four (9)**
255:18,24;452:19;
492:4;512:19,20,22;
528:21;531:19
**fourth (4)**
256:6,13,14,15
**FP (9)**
353:2;354:24;
356:13;361:3;362:6;
364:7;366:11;367:4;
370:19
**FR (2)**
262:4,13
**frame (4)**
322:2;400:9;471:2,
3
**framework (1)**
414:4
**FRANKEL (1)**
248:2
**Franklin (1)**
497:4
**frankly (3)**
505:5,9;539:24
**fraud (1)**
539:8
**Freddie (77)**
248:18;249:3;
258:9;304:4,5,11,12;

306:25;307:5,13,14,
20,25;308:2,11,14,
23;310:8,19;311:17,
24;313:7,14,19;
314:3,25;315:9,14;
317:23;319:5;322:2;
327:4,5,7;328:18,25;
331:12,14,20;332:2,
17;335:4,21;348:13;
352:16;353:20;
354:6,12,17;355:19,
23;356:2,16;364:9;
377:24;418:5;
419:15;432:7;
436:19;452:11;
454:24;455:25;
465:4;474:5;506:13;
510:5,6;512:21,22;
532:9,13,16,20,24;
534:6,9,14
**free (1)**
542:20
**Freres (1)**
533:17
**Friday (8)**
254:7;255:22;
360:4;465:11;
468:10;488:12;
496:6;500:15
**Friday's (2)**
490:10;544:18
**frivolously (1)**
410:19
**front (18)**
262:9;266:21;
283:14;288:20;
304:15;372:13;
375:7;391:4;409:4;
414:2;443:25;
448:16;455:1;460:5;
463:10,23;478:11;
510:14
**front-ended (1)**
413:24
**frontend-loaded (1)**
448:18
**frontend-loading (1)**
448:25
**frontloaded (8)**
440:25;441:6,6;
443:6,10,19;444:25;
446:1
**front-loaded (1)**
413:4
**frontloading (2)**
440:25;441:13
**front-row (1)**
518:13
**FS (3)**
433:15;437:12,17
**FT (4)**
433:16,17;437:13,
17

**FU (3)**
433:19;437:13,17
**full (16)**
260:9;270:5,15,19;
282:21;291:24;
343:24;353:23;
390:14;421:9;472:9;
478:25;506:13;
520:4;521:11;542:13
**fully (11)**
334:23;385:22,22;
422:20;479:7;
488:23;501:20,22;
514:6;515:1;521:9
**fundamental (1)**
488:22
**Funding (2)**
321:2,8
**funds (3)**
274:1;337:19;
493:22
**further (39)**
295:16,18,23;
324:20,22;332:21,22;
334:10;336:1;340:5,
6;347:12,14;371:20,
21;377:21;381:3,9;
383:5;390:19;
404:20;407:25;
408:1,20;413:19,20;
414:14,15;431:23;
445:20;447:2;
450:22,25;451:16;
479:20;484:2,24;
509:12;532:5
**future (26)**
276:6;277:1;
285:12;293:17;
364:9,10;365:13;
369:3;395:23;396:6,
17;397:2,11;400:7,
11,22;407:6;410:4;
441:16;446:22;
480:13;493:17;
495:16;504:9;508:5;
510:11
**FV (3)**
433:19;437:13,17
**FW (3)**
433:19;437:13,17
**FX (3)**
433:19;437:13,17
**FY (3)**
433:20;437:13,18
**FZ (3)**
433:20;437:13,18

## G

**Gables (1)**
251:15
**GALLAGHER (6)**
251:2;336:16;

12-12020-mg    Doc 4776    Filed 08/21/13    Entered 08/21/13 08:35:02    Main Document

RESIDENTIAL CAPITAL, LLC, et al.    Pg 328 of 352

Case No. 12-12020-mg    August 19, 2013

341:2;343:1;345:21;
346:7
**game (3)**
430:16;534:20,25
**Garden (1)**
454:17
**gathering (1)**
353:19
**gauge (1)**
451:10
**gave (13)**
262:21;276:1;
278:15,24;279:7,15;
374:25;391:3;
419:24;439:22;
500:1;539:11;542:14
**GB (3)**
433:20;437:13,18
**GC (3)**
433:20;437:13,18
**GD (3)**
433:20;437:13,18
**GE (8)**
343:6,8,14;344:19;
345:23;433:21;
437:13,18
**GELFARB (57)**
249:7;304:3,4,10,
10,22;305:5,12,14;
308:20;309:4;
310:21;312:7,12,14,
21;313:9,17,21;
314:14;315:17,19;
316:6,20,24;318:4,
11;319:17;320:8;
321:12;322:19;
323:13;324:5,7;
325:15,17,19,20;
330:7;332:9,11,13,
15,21;333:2,5,7,9,11,
17,19,23,25;334:21;
335:8,12,17
**Gene (1)**
533:12
**general (23)**
311:24;320:17;
321:16;356:6;
362:23;363:2,15;
365:11;377:12,19;
378:21,22;380:6;
382:2;464:21;471:2,
3;539:16,17,20;
540:7,9;542:15
**generally (11)**
351:22;352:6;
355:15,18,22;365:20;
368:9;369:15;373:4;
420:5;460:21
**generate (1)**
405:7
**generates (2)**
411:4;526:8
**gets (10)**

281:8;325:24;
382:15;423:22;
449:18;493:6;
509:17;510:2;
514:21;524:1
**GF (3)**
433:21;437:13,18
**GI (3)**
433:21;437:13,18
**GIBBS (1)**
246:13
**Gibson (13)**
348:5,6,14,15;
350:2;351:6;372:2,
11;375:18;405:22;
407:15;509:11;535:7
**Gibson's (1)**
407:20
**gigabytes (1)**
289:25
**Gina (6)**
304:5,15,20;
417:21;419:22;
532:15
**given (11)**
319:21;327:10;
352:25;454:21;
488:19;494:11;
497:3;512:24;524:3;
535:25;544:11
**giving (3)**
271:6;534:20;
545:14
**glamorous (1)**
487:20
**GLENN (1)**
246:7
**global (14)**
308:4;357:21;
489:25;490:13;
491:19;497:20;
507:11;514:4,7,10;
519:3;537:25;
540:11,15
**GMAC (3)**
490:1;491:2;
534:10
**GMACM (2)**
541:5,5
**goal (4)**
264:21;269:21;
274:12;308:4
**God (1)**
289:14
**goes (2)**
442:3;534:22
**GOLDMAN (1)**
252:8
**Goldstein (12)**
383:10,11;385:10;
391:22;392:16;
393:12;394:24;
408:5;414:16;

439:22;440:10;
509:17
**Goldstein's (3)**
383:22;384:3;
440:24
**GONZALEZ (1)**
246:10
**Good (49)**
254:2,4,10;255:16;
257:4,9;258:22;
259:12,13;273:18;
276:1;297:2;304:3;
336:15;337:9,10;
348:12;372:2;
382:20;384:10;
392:11;393:7,21;
394:1,14;408:14;
411:5,23,25;412:2,9;
419:14;425:12;
445:4;447:16;469:6;
490:8;493:6;500:19;
501:17;502:4;
504:18;505:23;
518:16;520:23;
522:10;524:24;
529:12;531:3
**GOODMAN (57)**
248:25;323:6;
324:1;418:4,4;432:6,
6;439:7;455:10,12,
14;456:2,14;458:1;
459:22;460:14,17;
461:6;462:23;
463:14,18;464:3;
469:5,12,17;471:7,
23,25;473:21;
475:22;476:2;477:1,
3,7,14,20,24;478:4,6,
8,16,18;479:20;
486:2,3;532:7,8,8;
533:20,22,25;534:6;
535:6;536:6;544:2,3,
4
**Gotshal (3)**
323:6;455:6;
533:14
**governments (2)**
452:25,25
**GP (3)**
433:21;437:13,18
**GQ (3)**
433:22;437:13,18
**GR (3)**
433:22;437:14,18
**Grand (1)**
252:4
**grant (1)**
501:24
**granted (1)**
463:12
**granting (1)**
536:13
**grants (1)**

539:18
**GRAY (2)**
249:10;372:3
**great (10)**
283:16;306:9;
413:19;444:3;
447:16;487:21;
492:22;496:5;503:2;
517:9
**greater (1)**
380:20
**greatly (1)**
364:17
**gross (2)**
402:25;404:9
**ground (2)**
495:13;536:23
**grounds (5)**
334:6;341:17;
344:23;346:19;491:7
**Group (23)**
250:16;268:15;
313:20;372:9;
411:15;429:5,7,9,12,
18;430:1,17;432:5;
454:17;456:3;464:1;
465:5;483:24;
494:24;497:5,6,16;
524:22
**groups (1)**
519:22
**group's (3)**
438:9;439:1;484:4
**GS (3)**
433:22;437:14,18
**GT (3)**
433:23;437:14,18
**guarantee (1)**
400:10
**guess (7)**
317:7;324:14;
334:16;421:12;
422:3;526:13;531:14
**GUINEY (1)**
252:17
**GUSS (1)**
251:17
**guys (1)**
350:25
**GV (9)**
289:7,9,10,11,12,
13,14;290:25;291:3
**GX (8)**
333:3,4,5,15;334:5,
11,20,21
**GZ (2)**
289:8

---

**H**

**haircut (36)**
269:9;277:16,17,
22,24;278:4,7,15,25;

279:7;280:23;281:1,
2,7,9;282:13;285:12;
390:23;395:17,23,25;
396:6,9,21,24;409:9;
413:3,3,17;414:8,10;
448:8;449:2;509:12;
523:25;524:2
**half (6)**
267:24;268:2;
367:1;532:14;
534:18;535:10
**halfway (1)**
459:9
**hallway (1)**
483:23
**hand (26)**
257:5;258:16;
262:7;291:24;
302:18;304:7;
336:19;348:7;
349:15;350:24;
383:19;384:14;
408:7;417:22;
512:25;513:1,9;
515:4;516:11,19;
517:8,10;520:13;
525:1,4;539:11
**handed (4)**
340:21;383:12;
418:3;469:7
**hang (2)**
304:14;325:21
**happen (3)**
446:22;504:22,23
**happened (7)**
502:14;503:3;
504:6;518:10;
522:17;523:19;
525:20
**happening (1)**
300:11
**happens (5)**
424:6;447:14;
503:1;508:4;526:12
**happy (6)**
284:6;301:22;
381:16;382:5;
497:11;543:17
**hard (5)**
266:12;289:25;
290:10;357:23;
396:15
**harden (1)**
519:6
**hard-fought (1)**
518:16
**HARRISON (1)**
250:22
**Hathaway (1)**
252:3
**head (1)**
292:18
**heading (2)**

12-12020-mg    Doc 4776    Filed 08/21/13    Entered 08/21/13 08:35:02    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 329 of 352
Case No. 12-12020-mg

August 19, 2013

484:4,6
**health (2)**
362:20,25
**HEALY (19)**
250:23;304:5,6,15;
305:16;306:24;
325:5;328:17;330:8;
334:6;335:19;336:6;
417:21;419:22;
420:19;452:11;
455:15;464:4;532:15
**Healy's (3)**
304:12,20;534:13
**hear (17)**
255:1;392:18;
404:18;407:18,19;
414:24;419:5;421:6,
18;450:3;467:15;
485:14,23;488:8;
497:9;526:3;543:19
**heard (22)**
288:1;313:5,6;
360:10;398:22,25;
399:3;403:24;413:3;
414:9;416:18;
425:12;427:15;
452:13;465:10;
508:3;520:22;523:7;
524:14;525:24;
527:16;544:11
**Hearing (4)**
456:13;462:16;
494:21;525:13
**hearsay (10)**
318:4;334:6,12;
341:17;342:11,16;
344:23;346:19;
431:20;435:12
**heart (1)**
487:18
**heavily (7)**
390:7;391:12;
393:2;405:20;511:9;
533:17;535:9
**HECTOR (1)**
246:10
**held (6)**
353:20;368:8;
426:18;474:19;
475:10;476:6
**help (2)**
271:22;477:20
**helpful (2)**
422:24;546:14
**hereby (29)**
256:11,23;257:25;
258:2;259:5;291:2;
299:14;302:4;
303:20;304:20;
312:17;317:1;
318:17;320:24;
335:19,22,24;337:4;
343:1;345:22;350:2,

20;384:3;437:8,19;
439:2;456:17;
457:19;459:25
**Here's (3)**
423:4;537:13,15
**hesitating (1)**
339:3
**high (17)**
293:23;294:6,9,15;
295:1,2,10,12;296:5,
6,8;327:9;367:13;
374:7,14,17;525:6
**higher (23)**
265:4;285:10;
293:20,22;294:2;
380:24;382:10;
383:1,2;385:16;
386:9,12,14,24;
390:8;391:14;393:3;
413:8,13,14;414:4;
440:15;505:7
**highlight (4)**
422:22;487:24;
488:19;522:8
**highlights (1)**
516:10
**highly (1)**
491:5
**high-ticket (1)**
517:1
**hi-low (1)**
358:11
**himself (1)**
381:15
**hire (2)**
522:21;523:1
**hired (9)**
260:17,18;307:14,
20;352:23;511:8;
522:19;523:3;537:17
**Hoc (10)**
250:16;432:5;
438:9;439:1;464:1,5,
16;465:5;483:24;
484:4
**Hold (9)**
295:18;356:9;
429:21;436:10;
506:3;514:5;520:20;
524:23;531:6
**holder (3)**
505:14;540:23;
542:16
**holders (31)**
290:14;320:1;
328:20;329:1;330:1;
352:17;355:25;
356:5,19;357:20;
365:3;373:4;396:2;
426:18;430:17;
470:12;474:18,22;
480:11;483:25;
511:15;512:13,16,18;

514:20,20,25;515:16,
19;534:22,23
**holding (3)**
427:9;473:22;
494:21
**holdings (10)**
331:22;332:17;
364:13;429:11,18,19,
22;430:1;497:5;
506:7
**holds (6)**
354:6,12,13,17;
363:19;380:23
**holes (1)**
537:21
**Holtzer (7)**
350:9;357:12;
367:23;455:10;
471:8,8;534:13
**Holtzer's (1)**
294:13
**Home (5)**
363:3,17;419:17,
19,21
**Honor (425)**
254:4,10,16,25;
255:8,16;256:5,8,20;
257:1,3,9,12,19,22;
258:4,7,10,13,20;
259:2,8;261:16;
262:6;267:19;
268:22,24;274:9;
280:9;282:3;283:5;
289:8;290:21;
294:19;295:20,23,25;
296:13,25;297:2,3,6,
6,12,16,23,25;298:7,
15,22;299:1,4,8,11,
12,21,24;300:2,13;
301:12,17,19,21;
302:1,7,10,15;
303:14,17,23;304:3,
10,12,22,24;305:3,5,
7,23;306:8;311:7;
312:5,7,12;314:14;
315:17,21;316:6,20,
22,24;318:3,4;320:8,
22;321:12;323:3,20;
324:7,20,23,25;
330:11;331:3;332:9;
333:3,5,9,11,13,19,
25;334:1,5,12,21;
335:3,8,17;336:2,4,9,
11,15,22;337:1;
340:5,7,13;341:11,
15,23;343:21;344:1,
10,22;345:3,18;
346:16;347:15,20;
348:4,12,18;349:15,
19;350:6,13,22;
351:3;357:2;359:9;
361:24;371:20,23;
377:20;379:18;

381:5,11;383:5,9,16,
18,22;384:1,6;385:1,
4;392:3,18;394:18;
395:8,15;407:25;
412:10;414:11,15,20,
25;415:4,12,21;
416:3,9,10,14,21,22;
417:2,3,9,11,21;
418:2,4,9,11,13,19;
419:2,3,7,10,14;
420:1,5,16;421:4,23;
422:5,8,16,21;
423:15,20;424:5,9,
15;425:2,7,21;
426:17,21;427:16;
428:6,16;429:14;
430:3,9;431:23;
432:1,4,6,14,21;
433:6,25;434:14,15,
18;435:7,14,18,23,
24;436:5,8,16,18;
437:2,4,22;438:1;
439:6,7,8,11,12,17,
23;440:6;448:10,24;
449:25;450:22,25;
451:3,4,10,18;452:1;
455:12;456:11,14;
457:15;458:1;
459:19,22,23;460:8,
14;461:1,25;462:23;
464:12;465:18;
466:2,16,25;467:24;
468:8,19,19;469:17;
475:19;476:2;477:7,
14,23;478:8;479:20,
22;481:1,3,9;483:7;
484:17,25;485:2,6,
17;486:1,3,5,12,21,
25;487:9,17,18;
488:2,10;489:1,13;
490:6,8,19;491:22;
492:14;493:12;
494:8,17,20;495:2,
11,14;496:8,17;
497:8;498:5,6;501:1,
8,10,18;502:4,21;
504:8;506:6,13,19;
508:23;509:5;
510:24;511:19,24;
512:1;514:3,14;
515:1,24;516:3,4,6;
517:25;518:1,7,12,
24;519:12;520:10,11,
17,19,23,25;521:14,
21;522:7,21,21;
523:13,18;524:7;
525:3,22;526:2,15,
23;527:12;528:1,6,
13,19,22;529:15,23;
530:1,18;531:16;
532:2,5,8,12;533:23;
535:20;536:1,5,10;
537:24;539:1,18;

540:17;542:7,7;
543:2,11,15;544:8,
25;545:9,18,21;
546:8,23
**Honor's (6)**
348:17;427:8;
495:7;498:8;499:20;
533:3
**HOOPER (1)**
250:8
**hopefully (2)**
421:12;424:1
**hoping (3)**
416:7;519:3;
545:11
**horrors (1)**
525:13
**Horwich (1)**
457:1
**hospital (1)**
453:18
**hostage (1)**
531:6
**hosted (1)**
454:17
**hour (7)**
267:23,24;268:1,1;
407:14;417:1;485:17
**hours (2)**
254:7;297:15
**house (1)**
494:5
**housekeeping (4)**
254:12;417:11;
418:18;545:19
**Housing (3)**
315:12;316:5,10
**Houston (1)**
246:17
**HOWARD (3)**
247:8;255:16;
299:4
**how's (1)**
545:6
**hundred (4)**
354:13,15,16;
512:12
**hundreds (3)**
351:15;352:24;
535:14
**hypothetical (13)**
390:5,11;391:2,5,
10,18;392:17,24;
393:16;394:22;
408:5;411:24;412:18
**HZ (3)**
438:8,25;439:3

**I**

**idea (2)**
378:6;502:15
**identical (1)**

267:8
identification (1)
  291:2
identified (11)
  255:9;270:14;
  285:7,20;288:17;
  290:11,15;388:5,15;
  410:16;480:20
identifiers (1)
  353:23
identify (5)
  277:13;288:23;
  340:12;408:20;
  522:14
identifying (1)
  292:4
idiosyncratic (1)
  512:17
ignore (1)
  519:25
ill (1)
  546:6
illiquid (2)
  361:23;362:12
illogical (1)
  285:13
illusory (1)
  490:15
imagination (1)
  491:17
imagine (1)
  378:16
immediate (1)
  535:13
immediately (1)
  368:8
imminent (1)
  484:11
impact (16)
  259:23;265:2;
  275:15;351:19;
  355:20;357:23;
  364:10,20;370:21,25;
  397:5,12,18,23;
  398:11;530:16
impacts (2)
  365:11;440:25
impermissible (1)
  432:18
implicates (1)
  314:15
implications (1)
  530:9
implied (1)
  367:2
implying (1)
  335:9
important (13)
  281:21;285:6;
  307:13;310:9,16;
  408:22;445:16;
  468:21;477:4;488:1;
  495:21;497:8;533:10

impossible (1)
  364:20
impressed (1)
  495:10
improve (2)
  364:16;480:13
improved (1)
  327:23
improvements (2)
  364:10,15
improves (3)
  363:6,11,22
improving (2)
  363:3,3
inaccurate (3)
  282:25;283:24;
  285:3
inadequate (1)
  430:19
inappropriate (1)
  280:23
Inc (4)
  247:19;252:3;
  253:6,18
incentives (2)
  430:12,14
include (17)
  284:19;287:21,23;
  288:3;337:22;
  366:20;371:4;373:6;
  402:21;403:1;
  410:14;411:3;
  426:19;427:6;429:6,
  19;496:19
included (23)
  259:23;266:8;
  286:9;311:23;
  348:25;367:12;
  398:8;399:16;
  402:12,17;403:17,17;
  404:1,22,22;419:24;
  427:16;449:19;
  457:6;505:15;528:4,
  7;530:11
includes (7)
  267:16;268:11;
  290:25;371:1;403:3;
  477:20;488:17
including (15)
  276:6,11;281:9;
  283:10;291:12;
  317:23;391:15;
  418:24;455:9;479:3;
  491:7;494:23;
  496:11;501:23;531:5
inconsistencies (1)
  388:15
inconvenience (1)
  496:10
incorrect (1)
  432:25
increase (5)
  363:17;365:4,7;

379:3;381:2
increased (4)
  360:8;379:1;409:1;
  449:12
increasing (1)
  365:13
incremental (1)
  380:25
incurred (1)
  413:8;459:7
indeed (1)
  427:10
indemnification (3)
  490:17;491:5,12
indemnity (6)
  541:9,14,15,23;
  542:18,18
indenture (1)
  325:1
independent (12)
  261:9;270:9;
  352:18;357:14;
  360:22;361:11;
  371:19;387:16,23;
  388:21;390:5;406:4
independently (3)
  387:15,22;406:1
in-depth (1)
  357:8
indicate (3)
  377:7;430:25;
  431:6
indicated (3)
  374:8;419:23;
  428:11
indicates (4)
  388:24;420:10;
  532:20;535:21
indication (1)
  318:24
individual (8)
  354:12;357:22;
  364:20;378:14;
  380:24;398:13;
  505:14;506:7
individuals (4)
  311:20;312:16;
  314:24;315:8
industry (1)
  361:8
infer (1)
  335:10
inform (1)
  468:21
information (35)
  289:25;290:18;
  317:13;318:9;
  320:21;331:1;
  340:18;341:20;
  343:18;344:5,8,9;
  346:18;353:20,22;
  359:16;367:23;
  368:20;370:5;377:6,

9;387:8,12,12;
  388:16,20;392:15;
  404:11;406:3;
  428:23;429:17;
  454:11;476:18;
  482:20;535:11
informing (1)
  317:13
in-house (2)
  307:25;308:2
Initial (10)
  272:13;273:7;
  400:4;408:22;409:1;
  413:11;450:5,8,13;
  507:17
inputs (7)
  285:2;351:16,17,
  19;352:2;354:20;
  355:1
inquire (4)
  282:20;337:7;
  388:6;466:17
insist (1)
  381:22
insisted (2)
  505:16;529:12
insolvent (1)
  503:2
instances (1)
  441:14
instead (1)
  294:6
institutional (2)
  428:11;429:1
institutions (1)
  429:6
instruct (1)
  314:18
instructed (1)
  507:1
insufficient (1)
  524:5
Insurance (10)
  252:13;378:23;
  380:18;398:3,7;
  400:22,25;452:18;
  458:19;503:10
insured (12)
  259:17;260:2;
  276:13;283:11;
  370:22;372:25;
  373:11;376:12,15;
  442:23;452:19;
  508:15
insurer (1)
  515:8
insures (1)
  397:24
insuring (3)
  478:23;479:3,15
intellectual (1)
  530:21
intelligent (1)

537:25
intend (1)
  416:12
intended (1)
  471:13
intending (1)
  452:3
intense (1)
  517:20
intensive (1)
  493:1
intention (2)
  270:2;480:15
intercompany (1)
  374:19
interest (10)
  308:25;354:13,13;
  425:19;431:1;
  482:11;495:3;
  496:19;501:2,11;
  512:13;522:5
interested (1)
  532:21
interests (38)
  260:2,6,12;261:8,
  11,20;328:19;329:1;
  373:3;412:20,23,23;
  430:8,14;480:25;
  486:9,10;497:23;
  504:17;510:22;
  512:16;515:19;
  518:17;521:24;
  522:4,10,25;523:3,9;
  524:25;526:12,23;
  527:11;529:13;
  534:14;542:4;543:6,
  9
internal (1)
  351:10
Internet (1)
  361:15
interpret (1)
  320:10
interpreted (1)
  438:14
interrupt (1)
  343:25
interview (3)
  361:15,18;362:10
Intex (3)
  351:23;352:12;
  353:21
intimately (1)
  374:21
into (96)
  255:10,22,23;
  256:11,23;257:25;
  258:2,24;259:4,5;
  290:22;291:1;299:5,
  15;302:4;303:19,21;
  304:20;312:17;
  315:14;317:1;
  318:17,22,23;320:24;

335:19,22,24;336:24;
337:4;341:14,16;
343:2;344:19;
345:22;346:12;
350:2,20;351:16;
352:2;359:13;381:1;
384:3;395:9;397:6,
14;409:8,9;410:19;
417:15;418:21;
426:6;428:14;430:6;
432:12,20;437:8,19;
438:7,13,15,16;
439:3;441:16,23;
456:12,17;457:16,19;
459:20,25;469:22;
471:11;475:7;476:3,
21,21,23;489:1;
499:24;500:18;
503:10,19,21;505:12;
510:11;531:4,13,23;
532:25;533:18;
534:14;537:24;
539:15,24;543:19

**introduce (2)**
299:5;420:25
**introduced (1)**
544:10
**invented (1)**
279:12
**invested (2)**
446:19,19
**investigated (1)**
385:22
**investment (1)**
446:19
**investments (2)**
337:23,23
**investor (9)**
411:15;416:5;
458:22;497:11;
500:24;506:3,9;
507:1;520:13
**Investors (45)**
246:14;249:11;
259:9;260:6,12;
261:11;263:6,10;
302:16;372:8;411:2;
426:12,15;428:12;
429:1;473:19,22;
475:18;494:4;495:1,
2;497:1,6,12;498:11,
24;501:4,12;503:2;
504:17;510:22;
512:3;521:23;522:3,
3,6,8;524:18,25;
528:15,17;529:13;
531:8;543:6,9
**investors' (1)**
512:6
**involve (2)**
322:17;351:15
**involved (14)**
308:2;315:2;

317:15;321:2;366:8;
416:9;465:13;474:7;
475:20;481:14,16;
518:17;523:22;538:6
**involvement (4)**
492:18;496:1;
500:3,17
**involves (2)**
351:9;398:3
**IPS (1)**
352:19
**Iridium (8)**
488:20,24;492:13;
493:13;495:5,9;
499:19;501:20
**iron (1)**
422:3
**irrelevant (2)**
281:21;535:25
**irrespective (3)**
442:15;443:15;
450:10
**issue (22)**
254:16;301:12;
310:4;338:19;438:1;
442:15;477:14;
479:6,8;497:9;
499:20;517:15;
536:1;537:14;
538:18;539:10,23;
540:1,3;541:10,14,14
**issued (7)**
360:2;452:18,24;
463:2;478:24;
479:12;494:23
**issues (10)**
255:4;310:2;388:4;
390:16;416:4;
427:11,17;489:22;
496:3;540:12
**item (2)**
282:17;298:2
**items (11)**
254:12;385:21;
388:4;402:20,21,23;
403:16;410:16,17,21;
413:18

## J

**JAMES (8)**
251:9;252:24;
418:2,9;419:3,5,6;
422:5
**January (2)**
292:15;322:2
**JEFFREY (2)**
250:12;324:25
**job (19)**
260:4,15,16,24;
261:19,22;264:2;
284:15,15,17,19,22,
23,25,25;505:5,9;

515:21;521:8
**Joe (1)**
445:24
**John (10)**
309:19;319:23;
323:6;324:1;330:8;
360:5;398:19;
404:15;419:18;455:7
**Johnson (8)**
316:2,4,7;317:1,5;
533:1,5,7
**Johnson's (1)**
316:17
**join (1)**
313:19
**joined (1)**
308:11
**joint (7)**
373:13,16;374:20;
375:14;376:5;377:4,
10
**joking (1)**
262:15
**JONES (9)**
247:2,11;255:17;
305:8;306:15;351:2;
381:10;385:6;410:18
**JOSEPH (5)**
251:7;254:2;259:8;
302:15;521:15
**JR (1)**
250:11
**JSNs (8)**
489:22,24;490:11,
18,20;494:25;
497:16;500:10
**JSN's (1)**
490:25
**judge (8)**
285:16;291:12,14;
320:10;463:2;
527:23;531:22;533:7
**judge's (1)**
292:8
**judgment (11)**
351:11;490:7;
491:21;496:11;
499:18,23;500:6;
505:19;537:10;
540:1;542:3
**judicial (1)**
438:5
**July (13)**
255:20;279:4;
293:14,18;294:10;
302:25;304:16;
336:23;348:16;
349:10,16,19;427:20
**June (9)**
324:2;454:9;457:4;
461:18,24,24;463:2;
469:15,19
**Junior (3)**

250:16;270:17;
483:24
**jurisdiction (2)**
501:5;530:13
**jury (1)**
384:22
**Justice (3)**
454:13;526:13;
527:1
**justification (3)**
414:7;449:1;495:6
**justifications (1)**
449:4
**justified (1)**
385:16
**justify (2)**
413:5;524:4;542:6

## K

**KAHAN (1)**
246:8
**KALISH (1)**
249:2
**Kasowitz (1)**
533:1
**KATHY (12)**
246:19;268:15;
313:5,7,15,20;372:8;
429:8,12,18;430:1;
512:2
**KAUFMAN (15)**
248:7;323:5;324:1;
455:6;456:16;457:4,
18;469:19;485:20;
486:18,19;520:21,23,
25;521:8
**keep (5)**
266:20;482:23;
485:22;546:12,16
**KELLY (1)**
253:3
**KENT (1)**
253:7
**kept (1)**
436:6
**KERR (177)**
254:4,9,10,10,14,
20,25;255:3,6,8,13;
257:2,3;258:12,13;
296:18,19,20;297:24,
25,25;298:6,11,15,
17,19,22;299:1;
302:8,10,10;303:17,
23;304:17,18;305:3;
334:1,3,5,12,16,19;
335:1,3;336:2;340:7;
341:15,22;342:1;
344:21,22;345:16,17;
346:16;350:13,18;
384:1,5,6;416:2,3,7,
14,16,20;417:8,9,9,
13;418:1,11,13,18;

419:2,23;420:1,3;
421:4,5,7,18,23;
422:8,16,18;424:5,7;
425:2,3,4,21;427:15,
16;429:14;430:3,9,
23;431:2,5,8,19,23;
432:14,15,16;433:4,
17,24,25;434:3,5,8,
11,13,22;435:7,11,
23;436:5,8,13,16,23;
437:2,4;438:16,21,
23,24;439:10,11;
448:15,20;451:10;
459:23;485:6,9,17;
486:21,25;487:3,9,
16,17,17,22;488:5,
10,11,12;490:6;
493:9,11;494:15,20;
495:11,13;497:7;
498:4,10,13;502:1,2;
521:20;544:25;
545:2,4,8,11,16,18,
21,25;546:3,8,23,25
**key (7)**
308:14;317:14;
319:24;487:24,25;
515:13;519:14
**kind (7)**
317:8;334:14;
351:9;406:3;435:13;
539:13,14
**kindly (1)**
267:21
**KIRKLAND (1)**
247:18
**KISSEL (7)**
250:2;325:1;341:3;
342:11;343:11;
345:21;346:7
**Kit (3)**
258:20;295:25;
439:18
**knew (9)**
300:10;301:9;
315:2;390:6,7;391:9;
503:21;518:23;
532:20
**knowing (2)**
357:24;535:1
**knowledge (27)**
310:3;313:13,14,
19;315:1;317:25;
319:19;323:10;
324:3;340:17;356:7;
360:17;371:16;
377:14,19;379:10;
389:22;452:13;
457:24;461:3;465:8;
470:20,22;483:12;
500:3;519:7;538:7
**known (2)**
372:8;388:5
**knows (1)**

504:10

**Kohn (1)**
533:13

**Kothari (1)**
416:24

**KOTWICK (8)**
250:7;342:6,8,10,
10,14,17,23

**KRAMER (1)**
248:2

**Kruger (31)**
374:8;379:14,25;
381:21;382:11;
419:19;420:20;
421:10,20,24;422:1,
6;438:6;489:2,24;
490:7;491:16;492:2,
18,24;496:1;498:21;
499:14,22;500:9;
501:13;537:2,20;
540:20;541:18;542:9

**Kruger's (14)**
381:15;422:9,10;
438:2;489:4;490:9;
492:6;493:2,5;
496:14;497:24;
499:13;500:14;537:7

**KYROUZ (1)**
253:23

**L**

**la (1)**
502:11

**Lack (2)**
342:11;407:23

**Lakeside (1)**
247:13

**lamb (1)**
527:14

**language (4)**
270:1,9;291:17;
403:5

**large (4)**
283:20;429:6;
497:25;529:3;540:14

**largely (3)**
446:16;474:17;
526:4

**larger (2)**
370:9,22

**largest (5)**
474:24,24;475:1,1;
519:21

**Lasater's (1)**
292:2

**last (32)**
289:4,24;290:2,3,4,
8,9;296:3,14;297:13;
344:18;345:1,13,15;
354:16;360:4;372:5;
384:23;393:11;
398:19;411:6;

433:22;442:4;450:7;
465:11;487:19,22;
504:18;517:5;
520:11;533:25;534:1

**late (7)**
279:4;286:2,4,5;
309:12,22;321:10

**later (5)**
348:22;414:5;
449:6,11,22

**latter (1)**
338:12

**law (10)**
308:18;383:12;
485:3;488:7,18;
521:17;536:24;
544:12;546:5,6

**lawyer (4)**
313:5;492:21;
496:2;500:21

**Lazard (14)**
272:5;278:5;
282:17;357:11,19,24;
359:16,18;364:14;
371:16;379:6;
400:18;407:9;533:17

**Lazard's (1)**
294:4

**lead (5)**
285:9;390:17;
465:23;468:3;490:4

**leading (7)**
268:12;290:13;
331:13;430:24;
499:1;500:17;539:24

**learn (2)**
427:25;428:3

**learned (1)**
427:22

**least (16)**
269:17;286:9;
305:18;331:23;
335:10;371:8;376:4;
411:13;433:22;
446:20;468:21;
472:21;504:19;
523:7;527:9;542:13

**leave (13)**
269:9;390:21;
392:5,8;393:7,17,21;
394:1,2;412:1,20;
500:23;501:7

**leaving (1)**
501:12

**lectern (3)**
491:14;536:8,9

**led (1)**
389:4

**left (11)**
257:14;271:14,21;
279:25;280:3;
290:11;291:24;
383:15;425:1;539:1;

546:6

**left-hand (3)**
271:19;272:12;
277:16

**legal (6)**
314:16;334:13;
401:12,16;461:6;
495:6

**legitimate (1)**
510:17

**lengthy (2)**
493:1;496:14

**Leon (1)**
251:13

**less (13)**
284:11;285:6;
407:14;413:23;
442:17,20,25;443:21;
444:25;493:25;
497:3;510:2;534:1

**letter (12)**
341:2,9,22,23;
343:1,12;346:6;
421:14;434:15,16;
499:25;506:12

**letters (1)**
279:24

**letter's (1)**
506:17

**letting (1)**
467:22

**level (5)**
367:13;374:7,14,
17,18

**levels (4)**
374:10;397:18;
406:16,16

**leverage (1)**
391:23

**LEVIN (1)**
248:2

**Lewis (1)**
419:18

**liabilities (3)**
397:5,11,12

**liability (1)**
491:2

**lib (1)**
279:22

**lien (1)**
459:11

**lifetime (1)**
357:13

**light (3)**
412:16;484:8;
499:4

**likelihood (20)**
263:5,10,13;358:1,
19;359:7;365:6,12;
374:4,12,15;389:15,
23;398:10,14;406:2;
495:19;496:9;525:7;
539:13

**likely (7)**
265:19;275:14;
328:9,13;358:8;
397:13;400:13

**likewise (1)**
514:1

**limit (2)**
461:4,12

**limitations (4)**
461:3;465:6;499:5;
526:6

**limited (12)**
345:17;415:4;
424:20,21;436:3,6;
488:19;517:3;
526:15,18,20;540:21

**limiting (2)**
465:1;527:5

**limits (1)**
465:17

**line (35)**
262:12,16;353:2,2,
6;354:24;356:13;
361:5;362:9;364:4,8;
366:11;367:6;
370:19;376:2;378:3;
388:10;406:13;
413:15;455:14;
478:13,17,18,20;
490:9;492:7,7;496:7,
7;500:15,15,15,16;
518:4;544:17

**lines (4)**
375:24,24;490:9;
491:16

**Ling-Cohan (4)**
454:13;463:2;
526:13;527:1

**Ling-Cohan's (1)**
527:23

**Lipps (10)**
379:14;380:9,10;
438:3,19;492:25;
517:2;537:18;
539:10;540:18

**Lipps' (2)**
493:3;496:15

**list (21)**
299:19;300:22;
301:4;312:16;
333:10,16;353:23,25;
421:9;423:12,24;
424:1;434:9;435:3;
437:25;515:6;546:9,
12,15,15,16

**listed (3)**
279:25;318:9;
418:3

**listen (7)**
339:14;355:8;
368:18;386:21;
392:21;487:11;502:9

**listening (1)**

529:8

**listing (5)**
299:17;301:18;
302:4;311:20;418:21

**lists (4)**
271:22;434:25;
497:25;546:17

**literally (1)**
351:15

**litigate (1)**
492:15

**litigated (4)**
405:23;495:23;
496:3;538:2

**litigating (5)**
366:21;367:8,25;
368:2;492:25

**litigation (49)**
366:1,3,13;368:7,
13;373:7,10;375:6,
10,12;376:18,20,22;
378:4,13;379:11;
402:13,17,20,23;
403:1,3,7,8,14,15,16;
404:17,23;405:12;
410:8,17,17,19,21;
438:4;490:4;492:20;
496:10;504:24;
511:2;516:12,24,25;
517:9;518:3;534:16,
22;542:12

**litigation's (3)**
495:15,20;496:13

**little (9)**
296:5;303:1;
396:15;443:2;
471:25;487:24;
493:24,24;509:17

**live (2)**
414:23;415:1

**LLC (3)**
253:22;536:11;
540:12

**LLP (10)**
246:2;247:18;
248:2;250:2,15;
251:2,19;252:2,12,20

**loaded (1)**
283:14

**loan (3)**
361:18;419:17,21

**loans (4)**
459:11;502:24;
538:23,24

**lobbed (3)**
522:12,18;524:1

**local (1)**
452:25

**locking (1)**
539:21

**locks (1)**
381:1

**LOEB (2)**

248:10,10
**lonely (1)**
    483:17
**long (13)**
    267:18;327:16;
    400:8;415:22;
    441:20;442:5,12,24;
    485:15,25;493:7;
    494:18;496:13
**longer (6)**
    404:8;442:16;
    468:17;482:24;
    483:3;534:16
**look (58)**
    254:22;262:3,11,
    22,24;265:22;
    266:25;267:21;
    270:10;271:12;
    272:11;273:7;274:2,
    19;278:8,14;279:18;
    285:20;288:16;
    289:4;290:9;291:18,
    25;317:24;320:2;
    322:9,25;327:10,20;
    329:9;334:7;353:1;
    364:17,19;365:10;
    379:21;388:7;
    396:12;403:4;
    421:12;429:20;
    442:2;444:2;472:20;
    478:16;488:3;
    489:13,13,14;502:6,
    21;505:24;518:9,11,
    18,24;523:24;524:6
**looked (6)**
    259:22;276:18;
    406:18;511:12;
    538:21,21
**looking (14)**
    266:4;268:11;
    274:5;288:19;
    291:17;326:5;
    348:21;410:10;
    429:17;447:6;472:9;
    504:14;518:18;521:2
**looks (2)**
    348:24;485:11
**loose (1)**
    460:8
**Los (1)**
    252:6
**lose (2)**
    516:25,25
**loss (10)**
    326:15;355:17;
    357:13;398:23;
    403:1,3,13;430:16;
    447:11;459:7
**losses (23)**
    292:15;293:11;
    331:23;352:13;
    356:10;357:9;360:8;
    363:18;364:9,11;

380:20,23;381:2;
    459:7;492:3,5;504:3;
    508:13,15;538:11,12,
    15;539:3
**lost (2)**
    305:13;525:16
**lot (8)**
    283:14;284:2;
    511:10;516:7;
    540:13;544:20;
    545:8,22
**Louisiana (1)**
    246:15
**love (1)**
    518:19
**low (16)**
    285:1;293:22;
    294:1,6,8,15;295:1,2,
    5,6,8,8,9;296:5,6,8
**lower (4)**
    284:21;285:10;
    292:4;293:23
**LP (2)**
    246:13;253:2
**Lunch (6)**
    254:7;255:6;
    414:18;416:8;417:1,
    13

## M

**MA (1)**
    249:13
**Mac (62)**
    248:18;249:3;
    258:9;304:4,5,11,12;
    306:25;307:20,25;
    308:11,14,23;310:19;
    311:17,24;313:14,19;
    314:3,25;315:9,14;
    317:23;319:5;322:2;
    327:5,8;328:18,25;
    331:14,20;332:2,17;
    335:4,21;348:13;
    352:16;353:20;
    355:20;356:16;
    377:24;418:5;
    419:15;432:7;
    436:19;452:11;
    454:24;455:25;
    465:4;474:5;506:13;
    510:5,6;512:21,22;
    532:9,13,16,20,24;
    534:6,9
**Mac's (6)**
    308:2;310:8;327:4;
    331:12;364:9;534:14
**magical (1)**
    525:25
**magnitude (1)**
    357:9
**Major (8)**
    257:3,4,25;258:2;

380:9;419:18;
    420:20;497:25
**majority (3)**
    283:16;444:3;
    446:21
**Major's (2)**
    257:13;380:5
**makes (5)**
    422:13;442:4;
    515:3;536:13;545:8
**making (8)**
    266:18;276:2;
    337:23;381:16;
    490:18;499:23;
    524:11;528:16
**MALEK (1)**
    253:15
**MALONEY (1)**
    250:10
**MANAGEMENT (7)**
    251:12;253:10,14,
    22;297:4;306:25;
    337:24
**manager (2)**
    337:18;532:17
**managers (1)**
    429:6
**managing (1)**
    337:17
**manner (3)**
    269:23;273:25;
    274:13
**many (18)**
    261:15;322:9;
    355:5;384:24;
    441:12,13,14;442:1;
    452:17;500:16,20;
    521:3;522:20;
    528:15,17;534:9,9,23
**MARC (1)**
    251:10
**March (11)**
    286:2,3,4,5,5,8,12;
    403:18;404:12;
    522:13,15
**MARK (3)**
    250:7;342:10;
    422:12
**marked (10)**
    291:2;305:21;
    340:22;341:9;343:6;
    422:16;423:2,18;
    424:2;455:2
**markedly (1)**
    443:21
**market (2)**
    351:9;517:11
**marketably (1)**
    442:3
**marketplace (1)**
    494:5
**markets (2)**
    361:23;362:12

**MARTIN (1)**
    249:15
**MARY (3)**
    251:8;336:15;
    340:13
**master (2)**
    423:11,24
**material (7)**
    331:18;352:24;
    380:7;410:17,18;
    468:9;482:20
**materially (2)**
    310:2;354:16
**math (3)**
    273:12;277:11;
    509:22
**matter (12)**
    256:2;284:21;
    287:17;289:2;
    299:21,24;304:13;
    331:21;438:10;
    439:2;442:2;527:19
**matters (5)**
    291:4,6;417:11;
    539:14;545:19
**MAURICIO (3)**
    246:9;257:9;337:6
**may (8)**
    255:21;263:19,19;
    265:7,11,13,14,20,
    25;266:3,6,7,11,11,
    21,24;267:9,24;
    272:6;279:14;283:5;
    286:20,20;287:4,10,
    21;288:4;304:22;
    306:10,19;313:13;
    337:7;348:18;350:9;
    355:13,16;357:23;
    361:15;363:20;
    381:11;383:10;
    385:4;397:12;400:8;
    416:16;437:25;
    438:1;445:18;
    447:12,12;450:6;
    451:16;453:1;
    470:11;476:11;
    479:22;487:6;505:8,
    8;512:2;521:14;
    527:22
**maybe (6)**
    416:24;422:3;
    449:10;486:7;
    530:21;534:1
**McCutchen (3)**
    308:18;454:22;
    457:1
**MCKOOL (19)**
    248:17;307:20;
    308:22,23,24;310:19;
    311:23;312:19;
    323:6,7;324:2;
    348:13;377:23;
    421:13;454:22;

455:8;457:2;532:9;
    534:7
**McQuillen (3)**
    302:16,17;303:12
**McQuillen's (3)**
    303:15,18,20
**mean (36)**
    279:15;288:6;
    301:7,9,10;312:14;
    321:14;327:7;
    352:11;356:19;
    380:9;386:20;392:7,
    9;395:1;397:1;
    443:23,25;455:14;
    477:18;483:18;
    493:3,7;497:5,7;
    503:6,6,8,12;515:6,9,
    17,17;524:24;
    535:14;536:25
**meaning (3)**
    292:12;401:17;
    447:17
**means (9)**
    282:22;346:17;
    354:17;355:23;
    370:16;441:5,7;
    515:13,14
**meant (5)**
    281:3;286:15;
    294:15;435:2;538:7
**measuring (1)**
    375:20
**mechanism (1)**
    317:19
**mechanisms (1)**
    506:8
**mediation (56)**
    256:18;286:23,25;
    287:4,6;299:18;
    300:9,10;301:10;
    314:22,25;315:2,9;
    316:18;317:6;331:2,
    7;338:24;339:2,5,7,9,
    20,23,25;341:21;
    389:8;390:6;428:12;
    430:13;465:17;
    466:12;482:24,25;
    483:4;511:9;518:1,
    10,14,25;519:2,5;
    522:17;523:14,15,16,
    22;532:22,22,23;
    533:4,7;536:21;
    537:5,21;539:25
**mediator (3)**
    299:18;340:19;
    344:3
**meet-and-confer (1)**
    421:15
**meeting (3)**
    272:4;277:5;
    279:11
**meetings (1)**
    278:6

**Mellon (4)**
246:3;257:10;
337:7;473:10

**member (1)**
465:4

**Members (14)**
280:18,22;313:13;
317:22;429:11;
431:15,17;464:23;
474:4;475:11,24;
476:5,5;477:9

**memory's (1)**
436:1

**mentioned (7)**
274:11;282:21;
318:24;348:14;
369:5;378:2;403:8

**mentions (1)**
364:24

**menu (2)**
502:11;514:15

**mere (1)**
411:1

**merit (3)**
380:7,12;484:6

**met (9)**
275:19;280:4,8,11,
16,18;320:20;
483:22;529:22

**metaphor (1)**
514:15

**methodology (3)**
291:15;292:2,5

**MF (1)**
537:24

**MICHAEL (9)**
248:24;251:17;
253:3;348:12;
377:23;417:16;
419:14;423:20;
436:19

**MICHELE (1)**
253:23

**mid (1)**
295:10

**middle (2)**
321:6;343:25

**midpoint (3)**
273:2,13;276:22

**mid-point (3)**
293:24,25;294:9

**might (20)**
266:3;285:3;292:5;
321:17;367:21;
368:3,7,17;370:22;
373:19;375:19;
390:13;391:20;
394:18;398:16;
401:8;427:3;443:17;
491:18;531:8

**Miller (12)**
272:17;273:4,9;
274:24;275:2,2,7;

328:8,12;350:11,20;
533:23

**Miller's (2)**
328:15;329:9

**million (91)**
264:7;267:1,2,4,4;
268:19;269:1;
284:13;288:8;
290:15;293:24;
307:11;331:22,23;
332:20;360:9;
368:12;373:6,10,12;
375:6,9,12;376:12,
16;380:3;398:23;
401:6;402:22;
404:19;408:23,24,25;
409:4,5,8,16,20,21;
410:3,5;411:4,6,8,12,
17,19;412:1,21,24;
425:13;426:6;440:4,
12,14,15;447:8;
466:13;467:10;
493:16,16;502:18;
503:22;504:9,10;
509:15,16,22,24;
510:1,2,3,4,6,8;
513:14,15,20;514:17,
24;516:7;517:14,16;
519:20,24;520:6;
522:12;525:16;
526:9;535:16;539:2

**million-dollar (5)**
378:4;385:17;
405:8;408:8;411:2

**millions (1)**
535:14

**mind (3)**
495:10;498:12;
520:2

**mine (1)**
486:21

**minimum (10)**
375:13;400:4;
411:20;484:5,7;
489:10,12;536:17;
539:6,15

**minimum-allowed (1)**
490:3

**minute (5)**
292:22;295:19;
383:10,11;485:12

**minutes (17)**
254:5,6,6,6;383:15,
17;384:19;415:24;
416:23,23;424:25;
471:18;472:8;486:1;
487:5,7,19

**mischaracterize (1)**
497:7

**mischaracterized (1)**
509:19

**mischaracterizing (1)**
295:14

**misleading (1)**
466:19

**misnomer (1)**
541:2

**misrepresentation (1)**
539:8

**missed (1)**
384:17

**mistake (1)**
349:18

**misunderstanding (1)**
448:1

**misunderstood (1)**
285:14

**mitigation (4)**
403:1,3,9,13

**mix (2)**
397:22;474:19

**mixed (1)**
476:11

**model (8)**
351:16,23,23,25,
25;352:2,7;445:16

**modeling (3)**
351:7;354:20;
410:7

**models (3)**
351:10;352:12;
359:15

**modification (1)**
525:22

**modified (1)**
534:19

**MOLDOVAN (1)**
251:24

**moment (11)**
296:24;298:17;
304:23;348:18;
418:11;468:8;469:7;
507:8;508:21;
533:25;534:1

**momentarily (1)**
340:21

**moments (1)**
330:22

**Monarch (22)**
251:3;253:2;
336:16;337:18;
338:7,16,19,23;
339:1,18;340:16,17;
341:20;343:17;
344:4,8;347:4;
435:11,13,19;496:25;
510:7

**Monarch's (2)**
338:15;339:19

**money (15)**
287:24;288:11,14;
369:2,3,4;390:18;
391:2,19;409:22;
429:6;494:6;511:4,
10;542:22

**monitor (1)**

312:19

**monoline (4)**
380:18,25;502:25;
539:19

**months (11)**
293:12;327:20;
331:7;500:12,17;
514:5;517:20,25;
519:23,23;533:18

**more (41)**
263:6,10;269:6;
271:10;276:20,24;
284:11;285:4;292:5;
303:1;333:19,21;
355:5;382:21;
385:22,22;390:18;
391:2,19;394:20;
398:3;402:25;
403:12;404:14;
408:9;415:24;425:6;
430:21;436:18;
446:8;447:2;493:24;
496:16;498:5;
501:19;510:2;
511:14,15;524:24;
536:16;546:19

**Moreover (3)**
490:24;491:3;
492:24

**morning (20)**
254:2,4,10;255:16;
257:4,9;258:22;
259:12,13;297:2;
304:3;336:15;337:9,
10;348:12;372:2;
421:21;468:17;
488:12;497:3

**MORRISON (6)**
251:19;254:11;
297:25;302:10;
417:9;487:17

**mortgage (9)**
310:12;314:6;
365:18;419:17,19,21;
459:11;490:1;491:2

**mortgages (1)**
310:13

**MOSS (1)**
249:2

**most (10)**
283:14;285:7;
325:11;326:6;358:8;
360:14;399:4;
442:23;488:24;
517:18

**motion (5)**
484:1,3;501:6,25;
536:13

**motions (1)**
539:25

**MountainView (2)**
351:22;365:17

**mouth (2)**

490:19;541:11

**movants (2)**
521:19,23

**move (22)**
255:10;257:12;
261:5;299:16;
301:22;304:25;
336:24;341:14;
344:19;346:12;
383:11;422:4;
432:12,17,20;434:14;
436:3;456:11;
457:15;459:19;
478:7;508:23

**moved (2)**
257:15;537:24

**moving (1)**
540:12

**much (31)**
256:25;258:5;
261:1;262:10;281:3,
7;287:24;296:22;
331:20;336:6;
347:13,17;363:4;
378:6;381:8;383:7,
16;442:20,25;451:9;
487:19;497:20;
510:18;511:23;
515:25;520:16;
526:6,14;543:3;
545:9;546:24

**multiple (6)**
354:9;455:9;457:2,
25;458:3;495:23

**MUNGER (1)**
252:2

**municipal (5)**
360:2;378:24;
398:15;517:11;
525:13

**municipalities (1)**
452:24

**municipality (1)**
397:21

**Munno (6)**
341:2,6;342:21;
343:1,17;346:10

**must (3)**
388:19;491:11;
521:3

**myself (3)**
414:3;472:1;521:5

**mystery (1)**
528:11

---

**N**

**NA (2)**
248:11;252:21

**NAFTALIS (1)**
248:2

**NAIC (2)**
458:10,18

**name (5)**
306:11;372:2,5;
434:24;457:6
**named (1)**
313:5
**narrative (2)**
424:19;427:1
**National (1)**
458:18
**nature (3)**
283:25;443:5;
498:19
**near (2)**
285:12;309:14
**necessarily (1)**
377:15
**necessary (5)**
269:24;388:17,20;
537:25;542:7
**need (27)**
257:8;260:8;
283:24;284:6;
301:14;303:1;
324:14;362:3;
375:13;376:22;
383:11;423:25;
447:13;484:14,19;
485:6;487:12;
495:23;505:22,24;
536:12;537:25;
538:24;545:2,20,25;
546:9
**needed (4)**
281:4;309:18;
388:25;426:22
**needs (2)**
488:16,21
**negative (1)**
406:20
**negotiate (6)**
284:15,25;386:14;
465:5;505:9;523:8
**negotiated (13)**
308:8;369:17;
386:9,12,25;389:16;
390:7;391:12;393:2;
405:20,20;411:8;
499:10
**negotiating (11)**
284:21;307:2;
331:7,15,19;482:5;
505:7;519:6;526:7;
532:13,14
**negotiation (10)**
319:4,8;390:19;
393:3;394:4;396:10;
498:25;502:14;
518:16;525:5
**negotiations (25)**
331:17;389:4;
394:19;464:25;
465:14,22;466:11,12,
18,20;467:1,8,9,11,

13,13,16,19,20,23;
468:1,2;499:4;
518:10;523:22
**negotiator (1)**
465:23;468:4
**neither (1)**
342:12,17;452:14
**net (3)**
288:17,23;409:19
**New (29)**
246:3,5;247:5,21;
248:5,13,21;249:5;
250:5,18;251:5,21;
252:15,23;257:10;
324:24,25;337:7;
404:7,11;463:4;
473:9,9,14,16,23;
475:17;507:20;517:5
**news (2)**
299:17,19
**next (41)**
257:2,3;258:12,13;
267:20;272:19;
273:21;281:25;
282:2;283:17,18;
301:18;304:1;311:3;
322:14;328:3;
329:21;336:10,14;
347:18,19;358:17;
366:10,18;383:8;
394:24;395:14;
435:23;441:11;
450:14,15;481:5;
494:1;502:3;504:22;
507:19;508:2;
511:25;512:9;516:2;
536:7
**night (1)**
487:22
**nine (4)**
354:6;451:13,13;
545:1
**ninety (3)**
509:16;513:14,20
**ninety- (2)**
516:6;520:5
**ninety-two (15)**
376:12,16;425:13;
426:6;502:18;
503:22;510:1,6;
513:15;514:17,24;
517:14,15;519:20,24
**Nobody (5)**
260:17;313:14;
315:2;354:17;423:11
**Nobody's (2)**
421:25;530:19
**nominal (10)**
276:12;440:14;
443:3;444:13;
445:12,14;504:10;
508:7,10,14
**nonconforming (1)**

538:24
**nonconsensual (1)**
519:8
**none (7)**
465:8;483:12;
495:18;496:12;
504:21,22;537:22
**nonpayment (1)**
400:25
**non-plan (1)**
542:15
**non-ResCap (4)**
288:6,7;534:21,22
**nonsettlement (1)**
283:10
**noon (2)**
545:6,15
**nor (1)**
342:17
**normal (1)**
536:20
**normally (2)**
297:8;523:25
**north (1)**
525:9
**note (4)**
383:12;459:7;
483:24;490:24
**noted (4)**
455:10;495:2;
499:20;512:6
**noteholder (1)**
313:20
**Noteholders (1)**
250:16
**notice (30)**
299:23;301:1,20,
21;311:16,21;
312:16;330:17;
334:25;341:24;
342:25;345:5,7,14;
346:15,17;438:5;
454:11,19,20;455:5;
456:8,16,25;457:18;
471:10,10;512:18,23,
24
**notices (2)**
312:2;455:25
**notify (3)**
470:12;471:4,12
**notifying (1)**
482:10
**notion (1)**
542:11
**notional (1)**
276:12
**notions (1)**
494:7
**November (6)**
323:7;338:17;
434:15;454:8;455:8;
459:12
**nowhere (1)**

282:13
**NPV (1)**
513:8
**number (68)**
264:2,14,22;265:3;
267:2,5;269:12;
273:16,16,21;274:14;
276:19;277:15;
280:2;283:3;284:12;
288:13;289:6;306:2,
5;310:10;328:17,24;
329:23;330:20;
336:23;348:22;
349:5;364:4;374:11;
376:3;383:24;390:7;
391:12;401:7;
405:18,19;407:12;
409:13,14;410:6,9,
16,24;411:9,10;
412:1;413:11;434:5;
438:11;455:1,16;
482:5;491:6;497:25;
503:21,22;504:6;
505:2,7,24;507:12,
17;510:7,8;511:8;
519:1;529:3
**numbering (1)**
396:16
**numbers (44)**
265:1;267:7;
269:13,16,17,19,19;
271:13,18,21,22,25;
272:2;273:19;
274:25;275:6,12,18,
20,21,25;276:1,5,10,
11,15,16,20;277:2,3,
7;279:19,20,20;
286:8,23;287:5;
390:21;399:16;
410:14;443:25;
504:20;511:13;
533:20
**numerical (1)**
507:7
**numerous (1)**
339:21
**NY (13)**
246:5;247:5,21;
248:5,13,21;249:5;
250:5,18;251:5,21;
252:15,23
**NYLB (2)**
455:11;456:16

**O**

**oath (6)**
321:22;353:13,15;
425:9;439:15;451:7
**Ob (1)**
431:2
**object (31)**
300:6;301:6;

322:19;334:5,24;
335:1;341:16,22;
344:23;346:16,19;
359:9;387:18,25;
389:8;391:7;392:13;
397:8;401:23;425:7;
427:24;430:3;
435:14;439:5;
455:14;460:14;
461:6;490:2;496:21;
512:23;534:11
**objected (7)**
335:13,14;474:1;
476:16;486:12;
497:6,17
**objecting (11)**
424:9;428:20;
434:18;439:3;
496:25;497:1;
502:10;505:4;516:8;
529:5;534:24
**objection (131)**
257:21;299:12;
300:17,20;301:16;
302:2;303:17;
304:18;308:20;
309:4;310:21,24;
312:6,7,11,13,21;
313:9,17,21;314:14,
15;315:17;316:6,20,
23,24;319:17;320:8;
321:12;322:4;
323:13;324:5,19;
328:21;330:11;
331:3,10;334:9,11,
13;335:4,13,15,21;
336:25;337:1;
341:11,15;342:6,7,8,
16,24;343:19,24;
344:10,16;345:18;
347:6,10;350:17,18;
356:23;357:2;
361:24;362:16;
363:25;370:24;
379:18;381:18,25;
382:17;384:1;
388:23;393:24;
397:16;424:20;
425:4,21,25;428:16;
429:14;430:9,23;
431:5,8,19;435:6;
436:7;437:5;439:23;
440:6;448:15,20;
453:6;456:2;458:1;
459:22;462:22,23;
463:14,18;464:2,3;
465:15,16;466:14;
467:17,21;468:6,11;
481:1,8,20;482:3,8,
12;483:1,5;484:17,
22;490:20;494:25;
510:17;528:16;
534:17;536:11,16,17;

12-12020-mg   Doc 4776   Filed 08/21/13   Entered 08/21/13 08:35:02   Main Document

RESIDENTIAL CAPITAL, LLC, et al.
Pg 336 of 352

Case No. 12-12020-mg

August 19, 2013

539:15

**objections (38)**
254:17;256:4,19;
257:18;259:1;
290:23,24;299:10,25;
303:16;333:24;
418:2,7,16,23,24;
420:11;423:6;434:5,
21;438:9;439:1;
456:13;459:21;
473:19;482:6;483:8;
484:4;494:12,21;
501:5;505:3;524:11,
11;529:7,8;536:10,16

**Objection's (3)**
318:14;428:7;
435:22

**objective (2)**
535:21;538:1

**objectively (1)**
285:4

**objector (2)**
304:4,11

**objectors (34)**
254:6;255:23;
302:13;344:19;
346:12;383:14;
414:18;415:9;416:5,
11;418:25;421:9;
429:23;431:16,17;
432:2,10;439:5,9;
451:11,14;487:11;
488:25;492:10;
496:12;499:2;506:3,
9;507:1;512:4;
517:16;520:12,13;
546:16

**objector's (1)**
485:13

**obligation (5)**
329:8;388:3,6;
515:8;538:25

**obligations (4)**
378:24;379:8;
397:25;398:7

**obtained (1)**
498:19

**obtaining (3)**
390:8;391:13;
393:3

**obviously (9)**
269:6;276:18;
301:9,9;409:8;
410:19;449:14;
498:7;536:11

**occupying (1)**
331:14

**occur (5)**
271:10;285:12;
413:15;467:20;
539:17

**occurred (5)**
265:11;285:8,11;

293:12;466:12

**occurring (1)**
285:9

**o'clock (1)**
545:12

**October (3)**
338:8,11,17

**Ocwen (2)**
310:12,15

**off (9)**
397:2;401:9;
465:17;470:1;
497:12;510:11;
515:16;530:18;535:2

**offer (54)**
255:23;268:13;
276:2;287:9;290:21;
298:8,9;303:14;
312:5;316:22;318:3;
320:22;323:20;
332:25,25,25;344:24;
345:10,12;383:22;
385:11,15,16,19,21;
386:12;390:8,15,17,
20;391:1,14;392:5,
10;393:4;394:23;
402:20;408:10,23,24;
409:20;411:6;
412:21;417:15;
419:4,7,11,16;421:2;
426:2,3,4;427:6,6

**offered (7)**
256:2;257:17;
300:20;312:10;
342:13,15;499:2

**offering (13)**
299:2;301:1,20;
318:7,8;349:24,25;
350:4,8,16;401:16;
435:15;438:15

**offers (1)**
304:12

**office (1)**
311:24

**officers (1)**
498:20

**Official (1)**
248:3

**offset (3)**
368:16;382:23;
402:1

**offsets (3)**
309:15,18;310:4

**often (1)**
492:10;520:15

**OLSON (1)**
252:2

**omissions (1)**
388:16

**omnibus (2)**
484:2;501:6

**once (6)**
357:11;361:8;

377:14;384:19;
446:9;510:4

**One (111)**
248:19;250:4;
260:22,24;262:15;
266:24;267:4;
286:18,19,25;287:3,
9;291:6;295:5,19;
296:24;298:2,22;
299:6;305:12,14;
321:1;323:5;333:19,
21;334:1;349:2,19;
351:19;354:15;
361:17;377:16;
380:17;402:25;
403:16,24;408:7;
411:10;417:1;
418:11;419:20;
420:1,9,12;428:13;
433:25;434:14;
436:8;437:2,22;
438:11;439:11;
441:6;442:4,21;
447:15;449:1,4;
450:1;451:22;454:2,
3;460:15;463:6;
468:8;472:20;
473:10;474:7,12,14,
24;475:1,13,15,16;
476:8,16;483:7;
484:19;485:3,3,6,11;
486:25;491:17;
494:24;495:14,22;
497:16;498:7,23;
499:18;504:18;
505:4;507:5;510:25;
511:5;512:12,13,14;
516:11,19;517:8;
520:13;523:18;
532:25;536:16,16;
540:13;545:22;
546:19

**one-billion-dollar (1)**
404:16

**one-half (1)**
366:25

**ones (4)**
254:24;257:15;
350:7;476:8

**one's (3)**
323:25;498:15,20

**ongoing (1)**
314:12

**only (49)**
267:15;286:25;
287:3;298:2;309:13,
24;310:3;314:15;
318:8;319:12;
352:22;354:6;
376:24;398:8;
399:18;400:16;
401:21;402:9;
403:15;418:18;

420:18;422:20,21;
429:19,22;442:21;
448:12;449:17,21;
450:8;459:16;
475:15;483:22;
488:19;494:24,25;
495:12;497:16;
502:19;503:17;
509:1;513:3;514:4;
516:4;517:4;518:9;
519:9;526:16;539:19

**onto (1)**
411:1

**opaque (1)**
536:20

**open (1)**
416:4

**opened (1)**
467:18

**opening (4)**
465:10;466:18;
488:12;521:21

**openings (1)**
297:10

**operate (1)**
489:23

**operates (1)**
489:3

**opine (2)**
261:22;329:2

**opinion (35)**
261:14;360:21;
366:19;368:10,22;
369:7,11,16,21;
373:2,4;374:10,18;
379:22;380:14;
385:10,15;386:8,11,
24;387:16;388:18;
389:15,19,23;390:9;
397:12;401:16;
402:16,19,24;406:21;
411:20;538:1,14

**opinions (3)**
386:10,13;387:3

**opponent (1)**
262:7

**opportunity (4)**
272:4;494:12;
521:2;529:11

**opposed (5)**
263:25;284:1;
369:2;431:3;462:1

**Opposing (11)**
291:3;335:20;
337:5;343:2;345:22;
350:3;382:24;384:4;
390:14;437:9,19

**opposite (1)**
413:7

**opposition (1)**
490:24

**opt (5)**
505:17;506:5,10,

14;507:2

**oranges (1)**
283:22

**order (30)**
260:8;269:23;
376:4;387:6;388:18;
418:16;454:13,16;
461:25;462:3;463:3,
12,21;469:21,22;
470:6;482:25;483:4;
494:19;500:22;
501:23,24;506:16;
510:7;515:21;
523:15;532:23;
536:12,22;537:21

**ordered (1)**
426:24

**orders (5)**
320:5;321:1;
480:23;494:13,17

**ordinary (1)**
463:8

**organizers (1)**
402:13

**original (5)**
380:21;402:12,24;
403:10;462:13

**originally (4)**
348:16;402:16;
438:4;536:11

**originators (1)**
502:24

**others (8)**
288:5,6;323:7;
324:2;430:2;431:16;
455:10;529:5

**otherwise (2)**
273:20;359:13;
528:8

**ought (1)**
254:23

**ours (2)**
310:2;505:9

**out (82)**
269:14;272:16;
273:8,22;274:15,23;
275:20;280:25;
282:10;291:16;
292:3;303:4;308:5;
313:14;314:11,18;
329:13;339:4;
342:21;349:3;368:8;
381:17;404:8;405:2;
406:10;409:7;
413:22;416:7,9;
422:3;427:17;436:6;
441:12;445:14,16,18;
447:1,1,1,2,9,15;
451:11,20;459:2;
469:7;470:14;471:7;
477:3,5,21;487:19;
490:19;491:17;
497:14;500:4;502:8;

12-12020-mg    Doc 4776    Filed 08/21/13    Entered 08/21/13 08:35:02    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 337 of 352
Case No. 12-12020-mg

August 19, 2013

505:17;506:5,10,14;
507:2;511:7;512:18;
516:7;517:10,13,18;
518:14;520:11;
530:9;534:3;535:3;
537:15,17;538:23;
541:1,10;545:25;
546:1,4,7

**outcome (5)**
366:24;511:1;
513:17,17;514:2

**outcomes (5)**
360:25;365:11;
510:25;537:8;539:4

**outlandishly (1)**
411:10

**outlined (1)**
268:18

**outlines (2)**
408:18,19

**outlooks (1)**
361:19

**output (1)**
352:2

**outside (7)**
264:20,23;368:17;
382:8;383:1;483:22,
23

**outstanding (1)**
307:12

**over (49)**
254:14;255:6;
266:4;278:12,22;
283:18;284:16;
327:19,19;331:16,23;
375:11;396:17;
409:5;410:12;413:9;
416:7;429:8;441:10;
442:11;444:6,6,7;
445:2,17;446:23;
457:7;467:13;490:4;
491:8;493:25;
496:24;497:14;
499:10;500:12,17;
503:5;504:20,22;
507:19;508:9;511:4;
514:21;517:11,21;
529:2;533:16;535:3;
537:17

**overall (15)**
327:11;358:18,20;
359:6,12;382:14;
390:9;393:5;396:11;
500:2;502:8;503:19;
504:12,14;514:20

**overlap (1)**
420:18

**Overruled (45)**
308:21;309:5;
312:15;313:10,22;
315:18;318:15;
319:18;328:22;
330:12;331:4;334:9;

335:15,16;342:24;
359:11;362:2,17;
364:2;379:24;382:1,
19;387:19;388:1;
389:12;392:14;
397:17;401:24;
428:24;429:15;
432:19;439:25;
440:7;453:7,9;
455:18;456:4;458:2;
460:16;462:24;
463:19;464:13;
467:18;468:12;
482:13

**overwhelmed (1)**
544:20

**own (16)**
258:19;268:12;
269:10;287:7;356:3;
358:12;383:13;
396:12;407:11,12;
420:7;506:8;513:3;
515:3;518:17;520:2

**ownership (1)**
430:17

## P

**package (1)**
504:11

**page (90)**
262:4,12,15;
266:25;267:21;
268:11;269:8;
271:12,15;272:6,10,
25;273:15;274:14,
14;275:12,25;
276:11;277:17;
278:7,11,12,22,23;
279:8,9,14,18,21,21,
24;280:2;281:3,8;
286:7,10,14,14,15;
287:7,7;288:19;
290:9;291:22,25;
311:19;321:4,20;
325:7,9,21;353:2,6;
354:24;356:11;
361:1;362:5,9;364:4,
7;366:11;367:4;
370:17;372:12,17,18,
19;375:24;378:2;
388:10,14;396:15,17,
18;406:13;408:18;
410:12;458:22;
459:4,5,6;472:2,8;
478:13;490:9;
491:16;500:15;
501:16;544:17;
546:19

**pages (2)**
496:7;501:7

**paid (32)**
270:5,15,19;

310:16;368:8;409:3,
15;411:21;440:17,
18;442:11,12,19;
447:5,7,9,15;449:6,
10,21,23;450:4,8,9,
17;503:10,18;504:1;
511:10;526:5;
533:16;535:3

**palate (1)**
292:22

**paper (5)**
422:9;544:20,21;
545:1;546:19

**papers (2)**
311:17;524:7

**Paragraph (32)**
274:3,7,11;278:9,
17,18,20;291:24;
296:8,12,13;316:12,
15;325:5,8,16;326:5;
327:1;328:7;388:14;
396:16;410:10,11,12;
459:8,9;472:9,22;
484:8;497:24;
509:12;538:14

**paragraphs (10)**
260:20,21;489:5;
492:6;493:2,3;
499:14,16;500:7;
501:15

**parameters (2)**
390:2,16

**paramount (1)**
496:19

**Pardon (3)**
268:22;340:13;
345:11

**pari (1)**
319:25

**Park (4)**
248:12,19;250:4;
252:22

**part (51)**
268:13;275:14;
276:11;283:14;
289:8;293:16;
310:16;317:15;
319:2,4,8,14;331:17,
19;338:12;352:21;
360:21,23;362:10;
366:24;367:2;369:1,
16;370:1,6,8;371:4;
382:24,25;385:10;
390:24;400:21;
405:5;415:7,10;
416:12;424:18;
425:25;430:15;
435:1,17;445:16;
473:23;479:12;
497:19;499:19;
501:1;503:3,13;
504:12;523:16

**participant (1)**

308:14

**participants (1)**
317:17

**participate (9)**
338:24;339:2,7,9,
20,23,25;394:19;
525:7

**participated (5)**
428:12;468:1,5;
511:9;519:3

**participating (2)**
474:5;533:4

**particular (13)**
265:3;293:2,9;
310:15;354:14,18;
390:15;406:9;
411:14;413:20;
454:14;484:2;507:15

**particularly (2)**
412:13;493:13

**parties (44)**
254:14,20;255:3;
258:23;287:23;
297:11;317:16;
339:4;382:23;392:9;
393:2;411:10;
417:13;420:6;422:2,
10;424:9;430:13;
455:9;457:2;468:21;
484:10;485:10;
497:15,23;498:16;
500:5;502:10;505:4;
508:15;512:14;
516:8;517:19,25;
519:6,13,18;533:4;
534:23;538:8;540:1;
542:2;544:10;546:21

**Parties' (10)**
291:3;335:20;
337:5;343:2;345:22;
350:3;384:4;437:9,
19;439:3

**partner (1)**
280:14

**PARTNERS (1)**
253:18

**parts (3)**
312:23;368:7;
489:22

**party (5)**
324:9;339:8;
365:23;420:6;532:1

**pass (4)**
295:16;337:11;
414:11;431:21

**passing (1)**
451:19

**passu (1)**
319:25

**past (3)**
331:16;429:8;
517:3

**patiently (1)**

519:2

**PATRICK (35)**
246:19;313:5,7,15,
20;372:9;429:8,12,
18;430:1;486:25;
487:2,3;498:6;
511:25;512:1,2,10,
20,22;513:13,18,21,
23,25;514:3,9,12,14;
515:1,12,24,25;
516:1;517:21

**Patrick's (2)**
268:15;498:10

**PATTERSON (1)**
252:12

**PAUL (1)**
253:15

**Pause (11)**
295:22;298:21;
300:1;334:4,8;
348:20;420:4;
432:25;434:4,19;
435:9;436:11;437:3;
477:13;478:1

**pay (11)**
287:25;288:17,24;
394:20;400:22;
401:3,21;409:22,25;
503:11;515:5

**payable (1)**
535:3

**payers (1)**
329:8

**payment (48)**
262:18;263:25,25;
264:4,9;268:18;
270:18;272:13;
273:8;284:10,16;
365:2;381:17;
385:17;386:9,25;
393:1;396:17;
399:22;400:2,5,19;
402:2;405:8;408:22;
409:1,17,18,19,24;
411:2;413:11;440:5,
12;442:16,17;443:2;
449:15;450:14;
459:13;473:3;
493:15;502:23,24;
504:14;509:21;
522:13;535:4

**payments (26)**
281:11;319:22;
320:1;401:9,22;
402:4;407:6;409:5;
413:21;441:1,15;
442:1,6,25,25;
445:11,18;447:22;
448:7,11,12,18;
449:15;450:14,15;
509:20

**payout (12)**
272:19;277:14,18;

278:16;279:1;
378:12;380:22;
396:2,21;397:18;
405:4;444:13
**payouts (6)**
309:17;363:8,13,
24;368:3;369:9
**pays (1)**
308:5
**PC (1)**
248:17
**PDF (1)**
455:19
**Peck (1)**
533:7
**pending (1)**
484:9
**peo (1)**
297:20
**people (14)**
277:20;278:3;
282:16;285:24;
297:21;300:9,10;
423:11;429:7;
435:19;482:5;
504:20;516:25;
545:11
**per (4)**
273:22;351:25;
418:21;482:13
**percent (77)**
272:13,20,21;
273:2,3,4,9,14;
277:14,17,21;278:7,
15,25;281:1,2,7,9,11,
16,18,20;282:10,13,
18;283:1,24;284:8,
14,20,20,25;285:2,
12;286:7;295:12;
354:13;369:12;
371:18;396:16,21;
398:2;407:16;409:9;
410:3;413:2,3,12,17;
414:8,9;429:19,19,
22,23;443:10;444:1;
446:2,4,8,17;448:8;
450:5,16;497:2,3;
507:18;508:1;
509:13,19;512:11,12,
12;523:25;524:2;
525:24;529:2
**percentage (8)**
273:8;277:14;
390:23;413:14;
430:1;494:4,25;
506:4
**percentages (1)**
272:13
**perfectly (1)**
380:2
**perform (2)**
346:24;430:11
**performance (4)**

351:12;364:16,18;
538:22
**performed (1)**
347:3
**performing (1)**
347:9
**perhaps (3)**
493:24;498:24;
524:23
**period (22)**
292:25;413:10;
414:5;441:10,24,25;
442:2,12,24;443:12,
22,24;444:3,4;445:2,
17;446:3,7;450:18;
454:15;459:17;
499:10
**periods (2)**
444:5,6
**permission (1)**
339:13
**permit (3)**
451:16;466:22,24
**permitted (2)**
338:24;539:4
**person (3)**
327:9;457:4;538:5
**personal (1)**
538:7
**personally (2)**
314:21;318:25
**perspective (16)**
259:16,16,20,20,
22,24;271:7;282:7,9;
499:13;501:14,17;
521:22,22;525:11,12
**Perversely (1)**
519:4
**PETER (7)**
247:23;248:25;
323:6;324:1;418:4;
432:6;532:8
**Pfeiffer (21)**
258:12,14,15,25;
259:4,5,12,14;261:1;
292:1;294:24;
296:21;416:25;
439:12,13,15,21;
445:24;451:1;509:3;
523:7
**ph (4)**
321:2;322:1;
417:16;533:13
**Phelpian (1)**
280:15
**Phelps (34)**
259:19;263:9;
279:8;280:3,4,6,10,
13,14;281:10;
285:24;376:11;
385:11,16;387:8,16,
23,24;388:3,4,5;
396:21;400:17;

407:4;409:1;511:10;
513:6,7;522:20;
523:1,5,5,7;524:6
**phenomenon (1)**
448:14
**PHILIP (1)**
248:7
**phrase (5)**
277:20,22,24,25;
294:17
**pick (3)**
423:3;502:11;
516:5
**picture (2)**
504:14;518:11
**piece (2)**
422:9;503:24
**pieces (2)**
545:1;546:19
**piled (1)**
532:11
**pitcher (1)**
257:7
**place (5)**
273:13;321:10;
396:1;411:1;498:23
**placed (1)**
315:14
**plan (189)**
263:6,11,16;
269:11,15,16,18,18,
22;270:1,3,12,19,23;
271:1;272:17,21;
273:5,9,23;274:12,
16,19,23;275:1,2,3,8,
18;283:1,2;294:5;308:5;
309:14;317:19,20,21;
319:3,14;327:5,11;
330:2;331:14;347:5;
352:8,11,15;355:14,
21,24;356:3,17,20;
357:18;363:8,13;
369:9,14,17,17,22,
24;370:1,6,9;371:1,9,
14;372:23;373:3,7,
13,17,22;374:13,20;
375:15;376:5,13,17,
22;377:2,4,11,17;
380:15;382:14;
385:12;389:16,20;
390:4;391:15;393:5,
6;397:7,13,14,19;
399:20,23,24;400:5,
8,14;401:13,17,21;
402:3,4,18;405:15;
407:7,18;408:10,14,
23;409:3,14;412:22;
425:14;426:7;431:1,
3;435:20;441:4,17,
21;444:19,20;445:14,
18;446:15;447:22;
460:2,12,19;461:4,

11,17,18,20;462:1,9,
11,12,13,16,20;
465:7;468:16;482:6;
484:7;493:6;506:15;
509:14;510:23;
513:17;514:2,11,23;
516:13,20;517:12,17;
519:7,14,21;525:8,
15,21;527:9;533:11,
14,17;534:2,11,19;
535:3;537:8,9;
539:17,20,21,22;
540:11;542:20
**plan- (1)**
484:12
**planning (1)**
288:17
**plans (2)**
367:14;462:7
**play (1)**
289:17
**player (2)**
324:24,25
**Plaza (1)**
250:4
**pleading (4)**
420:10;519:1,10;
534:17
**pleadings (1)**
312:1
**Please (39)**
254:2;257:7;
258:18;292:21;
302:20;304:9;
305:15;306:11;
311:11,12;315:24;
317:24;320:2;
321:19;322:25;
323:25;336:13,21;
337:8;348:9;354:23;
357:1;370:19;
383:19,21;385:5;
388:7;417:6,23;
441:19;455:4;
460:18;467:6;469:8;
471:15;472:2;
487:15;512:2;521:14
**plenty (1)**
487:7
**PLLC (1)**
249:2
**plus (7)**
284:13,17;382:25;
393:6;440:19;
503:24;540:16
**pm (6)**
417:5,5;487:14,14;
545:5;547:2
**POC (1)**
274:22
**point (43)**
301:19;329:2;
331:24;338:10;

340:4;348:1;389:10;
390:3;391:13;394:5;
396:3;403:20;
406:10,17;412:3;
422:4;426:22;
430:22;459:2;
466:19;470:14;
471:4;480:10;
486:16;497:14;
508:16,20,25;509:1;
512:9;514:5;515:13,
23,24;516:13;520:11,
11;522:24;531:2,16;
539:24;541:1;545:20
**pointed (1)**
517:10
**points (5)**
339:22;502:5;
512:3;516:7;532:12
**policies (66)**
319:6,11,20;
330:14;378:23;
426:10,11,13,15,16,
17,17;452:15;453:12,
13,14,23;454:6;
457:24;458:25;
460:13;461:5,13,14,
15;462:20;464:1,16,
22,24;465:2,6;470:2;
471:5,13;475:7,9,10;
476:4;477:10;
478:23;479:1,3,5,6,7,
10,11,12,12,15;
482:10,11;493:17;
494:23;500:5;512:5,
6,7;514:18;534:4,7,9,
9;542:23,23
**policy (14)**
290:14;326:9;
330:1;357:20;
401:10;408:8;
453:14,15,17,21;
457:13;459:12;
480:11;515:5
**policyholder (7)**
308:6;441:5;
444:16;454:4;
472:18;473:8,15
**policyholders (33)**
269:22;270:5,5,14,
15,18,18;272:20;
274:12;275:3;283:2,
3,13,20,21;284:4;
287:25;288:11,14;
290:19;292:24;
309:16;317:13,15,20;
326:8;327:18;328:8;
405:11;441:8,24;
473:12;480:25
**policyholders' (1)**
480:12
**Ponce (1)**
251:13

**pool (2)**
355:6;450:18
**pooling (1)**
513:5
**population (3)**
353:24;357:14,15
**portfolio (1)**
337:24
**portion (4)**
404:2;449:18,20;
492:1
**posed (1)**
367:7
**position (7)**
360:11;399:1,15;
407:20;473:16;
503:9;521:6
**positions (2)**
337:22;519:6
**positive (2)**
406:20;513:8
**possibility (8)**
367:20;382:13;
390:8;391:13;393:3;
495:15,20;540:17
**possible (9)**
297:9;355:23;
356:1;364:14;
375:19;386:14;
502:20;533:25;534:1
**possibly (2)**
380:16;394:15
**post (1)**
338:10
**posted (2)**
454:16;458:21
**post-trial (1)**
488:17
**potential (21)**
287:5,24;309:17;
366:25;382:9;397:4;
402:13,18;403:6;
410:15,22;425:13,19;
426:6,8,435:21;
489:11;492:3,5,12;
538:10
**potentially (5)**
307:22;357:22;
383:1;490:22;492:4
**pounding (1)**
491:14
**pour (1)**
303:1
**powerless (1)**
536:25
**PowerPoint (1)**
265:24
**practice (1)**
455:24
**pre (1)**
513:14
**precedent (4)**
373:16,22;391:20;

530:4
**precise (1)**
405:18
**precisely (4)**
268:3,5,9;507:23
**precluded (2)**
291:12;353:19
**precluding (2)**
448:22;528:14
**predicate (2)**
519:14,17
**predict (1)**
361:6
**preface (1)**
467:12
**pre-marked (1)**
438:8
**premium (7)**
390:24;400:19;
401:9;402:2;409:17,
22;509:20
**premiums (11)**
284:14;400:22;
401:1;409:15;440:4,
13,15,16,20;493:17;
515:5
**pre-packaged (1)**
308:6
**preparation (1)**
289:17
**prepare (1)**
537:2
**prepared (4)**
255:23;288:24;
289:2;293:7
**pre-petition (2)**
538:4,6
**present (32)**
265:24;267:5;
268:16;280:20;
283:20;284:3;360:4;
361:22;362:11,19,25;
398:19;401:5;
407:14;408:21;
409:6,7,23;411:13;
413:8,14;414:5;
439:21;440:14,20;
442:24,25;447:25;
452:10;505:12;
519:7;522:16
**presentation (2)**
263:19,21;265:7,7;
266:6,8,11,12;267:8,
25;268:4;272:7;
274:15;279:9,14,19;
286:20;287:2,10;
404:14
**presentations (1)**
387:23
**presented (23)**
265:16;266:19;
268:14;269:5;271:2;
272:1;277:12;293:7;

352:15;353:22;
358:8;359:25;
362:13;367:23;
371:16;373:8;377:6,
9;379:6;393:6;449:2;
526:21,24
**presenting (2)**
271:5;310:4
**presents (1)**
273:15
**present-value (10)**
326:8;327:6;
442:20;443:4,14,16,
20;444:15;445:6,15
**preservation (1)**
310:8
**preserve (1)**
505:14
**president (2)**
306:24;532:16
**pretend (1)**
504:13
**pretty (1)**
393:15
**prevail (1)**
516:23
**prevent (1)**
537:5
**previous (2)**
348:25;349:9
**previously (3)**
255:22;343:12;
455:2
**pri (1)**
319:22
**price (2)**
363:16;394:7
**prices (2)**
363:3,17
**pricing (2)**
351:10;361:18
**principal (1)**
337:17
**printout (2)**
317:25;318:16
**prior (15)**
340:19;366:13;
441:14;461:19;
462:20;475:7;476:3,
21,22,22;484:11,12,
15;506:12;534:2
**priority (2)**
319:22;540:10
**private-label (1)**
313:8
**privilege (3)**
390:6;523:15;
530:11
**pro (7)**
268:14;269:5;
373:11;449:18,19;
450:9;533:15
**probability (3)**

327:9;328:14;
538:1
**probable (1)**
516:17
**probably (10)**
275:22;355:5;
376:7;378:5;379:8;
408:22;416:22;
474:9;510:9;527:25
**probative (1)**
301:3
**problem (5)**
423:8;537:13,15,
21;539:5
**problems (1)**
284:20
**procedure (1)**
297:4
**proceed (5)**
304:24;306:10,19;
381:11;385:4
**proceeding (16)**
269:24;316:2;
318:1,17;320:13;
326:7;338:8,20;
453:5,11;463:22;
464:11,17;475:6;
497:16;512:14
**proceedings (6)**
317:10;320:6;
484:9;521:2;527:9;
547:2
**proceeds (5)**
368:7,7;402:16;
405:12;411:15
**process (11)**
256:18;470:17;
475:21;484:13;
493:25;498:25;
505:22,24;518:10;
524:5;536:16
**produced (5)**
266:14;289:24;
368:7;435:11;438:18
**product (3)**
498:22;499:4,6
**production (1)**
438:20
**products (1)**
456:8
**professional (1)**
351:6
**project (2)**
326:8;352:12
**projected (15)**
274:22;275:24;
276:24;277:1;
293:11;373:12;
376:11;406:25;
447:22;448:6,11;
459:10;472:22,24;
473:1
**projection (1)**

352:19
**projections (5)**
291:16;292:2;
357:24;407:2;507:25
**promise (1)**
536:8
**pronounce (1)**
434:24
**proof (8)**
275:24;314:8;
426:2,3,13;427:6,7;
539:9
**proofs (1)**
367:17;406:8,18
**proper (1)**
322:21
**properly (2)**
499:23;500:14
**proponents (12)**
254:5;297:24;
298:9;302:8,11;
416:12;424:24;
451:12,13;485:5;
487:5;546:15
**proponents' (1)**
424:18
**proposal (37)**
261:20,25;262:18;
265:5;268:18;269:3,
4,7;280:7,16;282:6,
12;285:23,24;286:18,
18,19,21,22,25;
287:4;288:15;
408:19,19;409:16;
410:2,5;411:1;
428:13;455:16;
522:25;523:6,9;
524:1;534:3,5,6
**proposals (2)**
286:22;335:13
**proposed (31)**
268:12;309:17;
369:17;372:24;
373:13,16;376:13,17,
22;389:20;406:17;
426:9;486:8;488:6,9,
17;496:22;500:22;
501:22,24;509:14;
521:11;522:13,22;
529:9;535:18;
536:24;543:14,25;
544:12,16
**propounded (1)**
516:9
**prosecute (1)**
540:21
**protect (2)**
380:20;542:13
**protected (1)**
523:15
**protracted (2)**
496:9;511:1
**proved (2)**

526:21;531:20

**provide (23)**
260:8,9;261:14;
270:3;275:4;293:15;
294:5;300:5;356:4,
24;357:5;387:8;
407:5;411:1;422:21;
423:15;449:2;
454:10;506:7;
533:14;536:2;546:9,
14

**provided (40)**
263:13,15;269:13;
272:6;273:19;
275:12,13;276:7,9;
277:2;279:9,14,24;
280:1,3;294:6;295:2;
317:13;368:20;
375:14;385:20;
387:16;388:22;
390:11,12;407:9;
410:23;411:14;
422:11;432:17;
433:1;454:19;455:5,
7;476:18;482:21;
484:5;488:22;
521:18;522:7

**provides (7)**
270:12;382:20,21;
440:12;488:13;
489:4;533:15

**providing (3)**
270:22;300:3;
484:6

**provision (2)**
380:23,25

**provisions (7)**
380:18;401:17;
460:11,19;461:11,16;
519:8

**proxy (4)**
368:14,17;373:18;
411:9

**prudently (1)**
270:23

**PSA (3)**
498:2;506:12,14

**PSAs (3)**
515:14,17,22

**public (19)**
256:1;301:14,18,
18;302:4;318:19;
397:24;398:3,6;
452:20,23;454:10;
457:22;458:19;
470:20,22;471:10;
482:20,22

**public-finance (2)**
453:14,15

**publicly (6)**
300:10;318:9;
429:17;458:13,17;
481:19

**published (1)**
301:2

**pulled (2)**
275:20;534:3

**purport (1)**
506:10

**purportedly (2)**
521:5;524:10

**purpose (33)**
299:22;300:3,7,8,
21;302:1;334:17,20,
21;335:5,6,8,11;
341:16,18;342:16;
344:23,24;345:8,12,
17,20;346:14;369:1;
406:19,25;424:21;
427:12;435:15;
436:3,4,6;526:25

**purposes (7)**
307:22;345:14;
368:10,21;371:13;
407:11;424:13

**pursuant (4)**
347:4;348:17;
402:4;426:10

**pursue (4)**
489:16;490:13;
527:25;531:5

**pushed (2)**
285:3;511:22

**put (31)**
297:20,21;305:21,
22;324:14;334:18;
377:15;415:4;
422:12;424:12,16,19,
24;425:5;426:22,25;
427:2,3,12,18;
432:16;435:25;
453:1;463:3;488:15;
489:1;517:13;
537:19;538:9,24;
542:6

**putting (7)**
334:15;415:3,9,18;
422:14;427:12;
537:16

## Q

**qualified (1)**
338:4

**qualitative (1)**
259:23

**quality (1)**
480:7

**quarter (9)**
299:7,14;360:9;
398:24;450:5,16;
507:18,20;535:13

**quarterly (12)**
299:7;360:14;
398:8;403:5,19,21;
404:12;458:5,9,12;

459:25;471:21

**quest (1)**
262:22

**quick (2)**
485:6;493:12

**quickly (4)**
273:12;383:17;
447:7;544:14

**quid (1)**
269:5

**quite (4)**
275:6;359:10;
434:24;539:24

**quo (1)**
269:5

**quote (2)**
270:8;378:5

**quoting (2)**
274:2;291:22

## R

**RACHAEL (1)**
248:8

**Radian (1)**
322:1

**radio (1)**
361:25

**raise (14)**
254:16;257:5;
258:16,16;297:12;
302:18;304:7;
336:18;348:7;
383:19;384:13;
394:7;494:12;536:23

**raised (10)**
254:17;297:10;
309:13;310:1;
489:22;494:25;
495:1;501:4;543:24;
545:20

**RAMP (1)**
341:4

**ran (2)**
379:6;511:10

**range (23)**
261:24;262:17;
263:15;264:1,4,10,
13,19,20,23;265:1,2,
4,4,5;267:1,5;293:21,
25;407:9;489:14,19;
539:3

**ranges (1)**
264:22

**rata (5)**
373:11;449:18,20;
450:9;533:15

**ratchets (1)**
507:23

**rate (18)**
272:22;273:13;
295:13;296:4;369:1,
11;371:18;406:25;

407:12,15;410:4;
413:9;442:15;
443:15;446:17,18;
447:24;448:6

**rates (8)**
296:7;368:24;
369:8;371:15;
406:24;407:5,23;
413:2

**rather (6)**
284:1;300:14;
438:17;461:24;
510:12;513:9

**ratio (2)**
413:21;475:5

**reach (3)**
314:11,18;339:4;
529:10;542:3

**reached (2)**
313:14;471:7

**reaching (1)**
430:7;500:21

**read (21)**
289:19,21;333:22;
346:18;357:1,3,4;
384:21;387:20;
399:12,18;418:14,17;
423:5,5;450:7;
483:25;496:7;
500:12;533:6;543:25

**reading (5)**
317:7;403:18;
519:11;544:21,23

**ready (1)**
336:10

**real (6)**
501:10;515:4;
534:23;539:10,15;
540:1

**reality (2)**
291:16;292:3

**realize (2)**
440:21;446:22;
488:10

**realized (4)**
286:7;375:15;
470:1;504:25

**really (19)**
254:23;327:7,13,
18;391:19;396:11;
445:10;496:12,17;
502:22;503:25;
505:4;514:24;518:2,
2;520:11,12;533:6;
535:25

**reason (9)**
273:20;283:1;
331:6;339:3;352:21;
360:20;373:20;
389:18;543:12

**reasonable (14)**
264:14,20;285:5;
292:17;368:14,16;

369:12;371:18;
378:8;383:3;395:1;
407:16;501:21;539:4

**reasonableness (9)**
259:15;261:25;
264:1,5,10;265:6;
282:11;284:17;513:2

**reasonably (3)**
387:7;504:17;
510:21

**reasons (3)**
428:14;521:9;
524:5

**REBECCA (1)**
246:8

**rebut (2)**
424:23;425:22

**rebuttal (21)**
297:7,9,19;324:17;
414:25;415:2,8,13;
416:13,16,25;424:14,
16;425:6;427:13;
439:10,12;451:24;
460:16;499:11;509:6

**recalculated (1)**
293:13

**recall (31)**
255:21;266:25;
268:3,5,6,8,8,9;
278:5;279:10;293:8;
321:17;330:18,22;
338:11,12,13;344:14;
346:22;362:10,13;
406:9,10;415:20;
438:1;440:3;441:1;
465:4;475:3;482:10;
507:3

**receipt (1)**
343:12

**receive (36)**
263:6,10;270:18;
287:21;288:4,9;
309:17;311:21;
312:16;326:8;327:5,
8;331:1;346:9;347:4;
373:12;376:12,16;
380:24;381:2;
405:11;442:6,16;
24,24;445:3,5,7,9,9;
493:15;503:14

**received (52)**
256:11,23;257:25;
258:2;259:5;266:6;
279:22;285:24;
286:2,4,4,5,8;288:16;
299:14;302:4;
303:20;304:20;
312:17;317:1;
318:17;320:24;
335:19,22,24;337:4;
342:21;343:2;
345:22;350:2,20;

384:3;387:24;414:1,
3,5;422:6;434:8,23;
437:8,19;439:3;
442:20;455:15;
456:17;457:19;
459:25;504:13;
507:13;512:18,22;
522:15
**receiving (7)**
369:2;374:5,13;
445:12,14,15;493:22
**recent (4)**
325:11;326:7;
360:14;399:4
**recently (3)**
359:20;360:8;
499:11
**recess (6)**
336:7,8,12;417:5;
485:12;487:14
**recipient (2)**
342:14,18
**recite (1)**
495:6
**recognize (13)**
340:24;343:8;
400:1,7,21,25;405:5;
422:18;455:2;
456:20;468:20;
495:21;497:18
**recognized (2)**
403:22;540:17
**recollection (7)**
267:7,13;275:5;
279:6;291:19;292:8;
338:18
**recompute (2)**
388:17,20
**reconcile (1)**
490:25
**reconfirmed (1)**
293:16
**record (25)**
254:20;255:11;
316:10;334:24;
340:12;345:6;
375:11;432:16;
438:17,19;439:18;
488:1;499:5;506:25;
511:18;523:17;
533:21,22;535:18;
536:18,20;537:14,23;
539:6;542:6
**recover (3)**
328:9;368:12;
447:3
**recovered (1)**
352:14
**recoveries (40)**
263:15;287:24;
288:3;290:14;326:9;
347:4;352:8,9,11;
355:12,23,24;356:3,

17,18,20,21;357:20;
366:2,3;372:23;
373:12;375:14;
376:16;400:13,16;
402:25;403:6,13;
404:9;405:12;
425:14,20;426:7,9;
435:21;503:14;
504:10;516:12;
535:11
**recovery (17)**
290:19;327:6,10,
21;328:14;374:5;
379:4;403:17;
404:16;405:16;
410:8;504:7;509:14;
511:16;520:5;535:4;
541:4
**recross (2)**
332:23,23
RECROSS-EXAMINATION (1)
381:13
**redacted (2)**
305:24;457:5
**redirect (17)**
299:8;329:17;
330:5,6;332:21;
340:8,9;371:21;
377:22,25;381:8;
382:18;408:2,3;
414:13;424:21;509:4
**redound (2)**
480:8,10
**reduce (2)**
357:20;409:23
**reduced (5)**
363:18;380:22;
409:17;489:9;520:3
**reduces (1)**
489:8
**reducing (5)**
363:8,12,24;
409:25;519:15
**reduction (9)**
281:11;282:10;
396:17,20;397:2;
489:15;509:13,19;
519:15
**reevaluated (1)**
450:17
**refer (14)**
277:16;288:19;
404:8,16;420:12;
454:4;488:2;489:4;
492:13;493:2;495:6;
499:8,13;501:15
**reference (8)**
356:4,6,24;357:5;
402:12
**referenced (4)**
343:12;443:8;
454:3;457:3
**references (3)**

300:9;321:8;
544:17
**referred (13)**
263:21;278:1,5;
299:7;457:11;458:4,
10;459:17;471:19;
472:11,14,15;482:22
**referring (17)**
274:17;277:22;
307:19;326:12;
429:2,7;444:12;
446:25;459:14;
472:16;473:12;
474:6,7,12,15;
479:13;483:10
**refers (3)**
271:1;291:25;
441:13
**refiled (1)**
348:16
**reflect (2)**
375:14;489:15
**reflected (2)**
455:16;499:25
**reflects (4)**
290:18;421:17;
459:11;501:21
**refresh (2)**
279:6;292:8
**refreshes (1)**
291:19
**refuses (1)**
412:14
**regard (13)**
286:21;318:1,16;
322:1;358:12,18;
362:22;379:25;
380:5;381:15;
401:18;406:24;
431:18
**regarding (16)**
299:18;317:9;
340:18;343:12,18;
344:5;356:3,4;
372:22;390:22,23;
472:9;479:9,14;
535:10,11
**regardless (1)**
359:13
**regular (1)**
455:24
**rehab (4)**
274:12;275:8;
294:5;516:20
**rehabilitation (134)**
263:6,11,16;
269:11,15,16,18,22,
24;270:3,12,19,23;
272:17,21;273:5,8,
23;274:16,19,23;
275:10,15;282:14,18;
308:5;309:14,22;
317:10,12,20;318:1,

17;319:14;320:5,13;
326:7;327:5;331:14;
335:4,21;347:5;
352:8,15;355:13,20,
24;356:17,20;
357:18;369:9,14;
371:14;372:23;
373:3,7;377:2,8,16;
380:15;385:12;
397:6,13,14;399:19;
400:5,8,14;401:13,
17,21;402:3,18;
407:7,18;408:10,14;
409:14;412:22;
431:3;435:20;441:5,
18,21;446:14;
447:22;452:15;
453:4,11,24;454:15;
460:3,12,19;462:16;
463:3,3,7,13,20,22;
464:10,12,17;465:7;
468:17,18;470:23;
474:8;475:6;481:12;
482:6;484:9,12,16;
493:21,25;494:10,22;
509:14;510:23;
511:7;513:11,17;
514:2;517:12;525:2,
8,15;527:8,18;534:2;
535:2,9
**rehabilitator (13)**
400:1;452:14;
454:10;455:7;462:9,
20;463:5,11;468:15;
516:12,15,15;533:13
**reimbursable (1)**
404:2
**reimburse (1)**
515:8
**reimbursement (2)**
404:3,19
**reimbursements (1)**
510:10
**reinsurance (3)**
319:12;320:18;
403:6
**reinsure (1)**
515:8
**reiterate (1)**
333:20
**reject (1)**
408:13
**rejected (2)**
291:8;526:21
**relate (3)**
457:13;507:9;
532:12
**related (18)**
275:5;285:2;
320:18,24;401:10;
404:19;447:18,19,21;
453:3;454:4,20;
456:8;457:8;463:21;

17;319:14;320:5,13;
497:10;500:24;511:3
**relates (3)**
296:13;360:25;
457:5
**relating (1)**
367:8
**Relations (1)**
458:22
**relationship (1)**
426:9
**relative (10)**
284:3;357:6;
397:19,22;413:21;
442:18;445:11,17;
447:7;496:20
**relatively (3)**
275:6;276:22;
440:11
**release (4)**
490:14;515:7;
519:8;537:12
**released (2)**
489:18;492:1
**releases (2)**
492:11;498:19
**relevance (1)**
301:3
**relevant (5)**
339:10;387:12;
388:16;512:10,12
**reliable (1)**
292:6
**reliance (2)**
291:15;292:2
**relied (8)**
281:23;387:7;
388:19;438:6;
500:12,16;537:1,20
**rely (5)**
281:17,22;361:8;
388:2;518:19
**relying (1)**
544:1
**rem (1)**
390:22
**remain (2)**
257:15;355:7
**remainder (1)**
283:16
**remained (2)**
480:1;521:11
**remaining (6)**
357:15;420:11;
453:20;494:1;
508:10;536:15
**remains (1)**
519:8
**remarkable (1)**
521:20
**remember (5)**
344:8;425:16;
436:1;480:4;519:10
**remove (2)**

269:23;463:7
**removed (1)**
   410:2
**removing (1)**
   410:3
**REORG (1)**
   253:6
**reorganization (3)**
   371:9;389:16,20
**rep (10)**
   288:4;366:21;
   367:1;387:7;502:25;
   503:7,12,19;504:2;
   511:4
**repaired (1)**
   292:4
**repeat (9)**
   263:8;315:7;319:7;
   328:23;414:2;
   436:22;441:19;
   460:18;467:5
**repeated (1)**
   512:4
**repeatedly (1)**
   482:19
**replicate (2)**
   273:16;286:15
**replow (1)**
   495:13
**reply (3)**
   299:21;484:2;
   501:6
**report (43)**
   263:22;265:11;
   270:7;273:24;274:2,
   6,7;278:8;283:23;
   287:3;290:14;293:7;
   352:23;360:15;
   380:5;384:21;387:4;
   388:4,6,14,15,19,19;
   395:19;396:12,21;
   400:17;402:12;
   403:4,5,10,20,21;
   405:2;407:4,22;
   408:18;416:10;
   435:13,18;490:21;
   537:18,18
**reported (1)**
   291:18
**reporter (1)**
   544:14
**reports (3)**
   398:9;400:18;
   458:22
**repres (1)**
   346:7
**represent (5)**
   372:3,7;376:4,18;
   438:18
**representation (7)**
   309:1;313:15;
   314:16;356:9;
   376:17;438:21,24

**representations (1)**
   367:8
**representative (2)**
   357:7;452:11
**representatives (2)**
   280:23;314:3
**represented (7)**
   308:18,23;313:7;
   410:18;429:23;
   498:17;512:14
**representing (3)**
   308:25;430:13;
   533:2
**represents (6)**
   283:3,9;294:4;
   373:11;429:22;
   458:12
**reps (1)**
   287:22
**repurchase (1)**
   538:25
**request (10)**
   338:23;339:5;
   340:18;341:19;
   346:18;348:17;
   367:10,11;438:11;
   545:22
**requested (2)**
   420:24;530:15
**requesting (2)**
   343:17;344:9
**requests (3)**
   344:5;438:10;
   439:2
**required (5)**
   273:24;421:15;
   458:9;463:7;515:18
**requirement (2)**
   528:5;530:11
**ResCap (72)**
   269:2;273:21;
   274:15;275:5,16,23;
   276:13;283:9,11,21;
   288:7,9;292:13;
   310:5,8,10,12,16,20;
   311:1;312:20;
   313:15,25;314:4,22;
   331:2;332:3,8,9,11,
   18;338:8,20;353:24;
   354:3;356:18,21;
   357:13;366:21;
   374:8;389:25;405:7,
   11,15;406:17;425:14,
   15;426:8;431:1;
   442:22,22;445:2;
   469:22;471:5,12,13;
   475:8;476:4;490:1;
   491:1;502:7;503:5,8,
   15;504:2;511:2;
   534:10,20;535:4,16;
   536:11;540:12
**ResCap-sponsored (3)**
   294:7;442:22;

444:21
**RESEARCH (3)**
   253:6;351:10;
   361:8
**researching (1)**
   337:22
**reserve (2)**
   360:8;368:8
**reserved (4)**
   297:11;418:7;
   490:12;536:14
**reserves (5)**
   379:1,3;398:23;
   450:7;525:16
**resist (1)**
   498:6
**resolution (1)**
   461:2
**resolve (4)**
   254:21,23;255:2;
   423:6
**resolved (9)**
   254:24;416:8;
   421:16;492:23;
   496:6;538:3;540:2;
   542:1,2
**resolves (1)**
   489:8
**respect (49)**
   254:17;256:9;
   274:21;277:21;
   286:9,20;292:9;
   309:13,24;310:19;
   334:11;335:9;347:4;
   372:24;421:8,20;
   422:1;426:7;435:7,
   20;454:11;458:24;
   461:4;463:12;465:1,
   6,7,14,20;466:13,20;
   467:9;468:10;470:1;
   474:3;488:24;
   500:13;501:9,11;
   504:2;508:5,6;511:2;
   516:6;527:9;533:2,
   11;536:13;542:10
**respond (2)**
   434:3;541:11
**responding (1)**
   424:17
**response (3)**
   345:9,14;421:10
**responses (2)**
   438:9;439:1
**responsibilities (1)**
   337:21
**responsibility (2)**
   259:25;499:22
**responsible (2)**
   307:2;310:14
**rest (14)**
   292:16;297:24;
   302:8,11;357:1,3,4;
   391:14;416:11;

432:10;439:5,9;
   485:5,9
**rested (3)**
   415:18;424:17;
   485:10
**restrict (1)**
   461:12
**restructuring (4)**
   307:23;308:5;
   492:21;496:2
**restructurings (1)**
   307:3
**result (8)**
   287:22;440:21;
   450:7;503:16,16;
   514:24;527:6,18
**resulted (1)**
   284:13
**resulting (2)**
   440:18;509:13
**results (5)**
   293:3;356:5;
   397:13;491:20;504:7
**resume (2)**
   417:4;487:4
**retain (2)**
   377:10;515:15
**retained (1)**
   513:6
**retread (2)**
   532:11;535:19
**return (2)**
   446:17,18
**revealing (3)**
   466:11;467:8,12
**reversed (2)**
   384:23;524:6
**review (9)**
   281:10,15;360:1;
   379:13;382:2;
   399:12;418:23;
   463:23;500:2
**reviewed (18)**
   360:16;367:17;
   369:16,19;370:4;
   371:15;374:7;377:5;
   379:22;380:1;387:9;
   399:11,19;406:8;
   438:11;500:11,16;
   534:7
**reviewing (5)**
   282:6;360:24;
   379:16;498:15;518:7
**RFC (3)**
   490:1;491:2;541:6
**RICHARD (4)**
   247:7;297:2;451:3;
   516:3
**rid (1)**
   540:19
**Right (209)**
   255:19;256:4,13,
   19,21;257:2,5,20,23;

258:15,16,18;259:3;
   266:4;271:23;
   272:16;273:8,22;
   274:23;279:15;
   281:7,9;282:7;
   288:15;289:1;
   290:25;295:15,24;
   296:10,17;299:13;
   300:16;301:13,16;
   302:3,13,18;303:10,
   18;304:7,14,14,19;
   307:6,11,18;308:9,
   12;309:21;310:4,20;
   314:22;315:12;
   316:25;317:3,4,16;
   318:14;320:23;
   321:6,23;324:22;
   326:1;328:17;
   329:21,25;330:4;
   333:2,10,14,16,17,
   22;336:5,7,19,21;
   337:2;338:14;
   339:14;340:6,8;
   342:1;345:19;
   347:16,18;348:7;
   349:8,23;350:19,23;
   358:10;359:4;
   371:24;372:19;
   373:8,13;374:24;
   375:16;376:13,23;
   377:21;383:6,7,19;
   384:2;392:9;393:10;
   394:6,8,23;401:9,10,
   20;402:3,5,6,9;
   405:25;407:11;
   408:12;414:16,17;
   415:4,22,25;416:1,
   11;417:25;418:10,20,
   25;419:7;420:14;
   421:1;422:16;423:8,
   12;424:3;431:24;
   434:20;437:6;
   438:25;439:9;
   440:23;443:2,22;
   444:10;448:2,24;
   450:20,24;451:6;
   452:2;454:5;461:10;
   462:4;466:9;470:17;
   473:5;474:25;
   476:19;478:23;
   479:1;485:5,10;
   486:17,24;487:4,13,
   15;491:13,22;
   493:12;500:6;502:3;
   505:11,12,13,14,16,
   18,24;506:18,24;
   507:5;511:17;
   514:12,13;524:10;
   525:21;528:24;
   529:4;532:3;533:24;
   536:10;538:12,17;
   539:15;541:14,20,22;
   542:5;543:2,4,13;

544:6,9;546:24
**right-hand (8)**
269:9;271:13,18,
21;272:11;273:7;
279:19,24
**rightly (1)**
512:6
**rights (8)**
310:12;377:1,7,10;
465:1;528:1;536:14;
541:23
**ring (1)**
321:18
**RINGER (1)**
248:8
**ripened (1)**
526:4
**risk (17)**
306:24;365:3;
366:20;369:5;
375:14;379:8;380:7,
12;407:1;413:19;
494:1;512:17;
513:10;515:18;
532:16;542:18,18
**riskier (1)**
380:17
**riskiness (1)**
380:14
**risks (3)**
364:24;367:7;
537:3
**RM- (1)**
372:4
**RMBS (55)**
246:14;249:11;
250:3;273:21;
274:15;275:5,16,23;
278:2;319:20;320:1;
322:18;330:14;
351:7;355:1;359:13;
361:18,22;362:11;
372:8;402:13;
430:17;438:4;
452:15,21;453:2,3,
14;454:7,8,11;456:8;
457:8,13,14;458:25;
459:10,16;460:13;
470:2;472:10,18;
474:17,21;475:10;
476:4;477:9;479:10,
12,15;492:19;500:4;
512:2;540:23;542:16
**RMBS-related (2)**
453:23;457:23
**ROBERT (4)**
251:23;257:3;
380:5;419:18
**role (3)**
260:19,19;261:7;
289:17;465:20,21;
535:22
**roll (1)**

409:2
**rolls (1)**
409:13
**room (3)**
505:7,8;517:19
**ROPES (2)**
249:10;372:3
**ROSS (2)**
249:15;250:8
**Rothschild (1)**
309:9
**roughly (2)**
288:8;508:4
**rules (1)**
536:23
**ruling (5)**
292:9;343:23;
484:15,19;527:24
**run (5)**
358:11;364:12;
363:4;463:8;504:20
**running (1)**
498:9
**runs (1)**
495:7

---

## S

**s- (1)**
537:5
**sacrificial (1)**
527:14
**sad (1)**
515:12
**same (38)**
265:19;273:12;
274:21;279:12;
286:9;291:15;292:1;
301:19;344:16;
345:1,13;347:10;
353:15;355:6,7;
363:19;397:16;
405:22;419:20;
420:12;439:23;
440:6;445:12,14,15;
457:3;462:23;464:3;
467:12,17,21;468:6;
486:3;519:17;
524:12;537:12;
539:9;541:2
**save (1)**
297:18
**saw (8)**
320:15,16;342:20;
391:4;395:25;463:9;
499:14;535:22
**saying (19)**
277:24;284:9;
294:25;341:25;
362:10;388:2,24;
393:18;406:10;
444:13;480:4;
491:14;516:20;

519:20;520:13;
526:6,8;541:12;
542:1
**scenario (14)**
267:1,6;294:6,6;
295:13;296:6,8;
358:9;376:23,24;
379:5,9;381:1;
542:15
**scenarios (10)**
357:12,13;358:7;
359:17;360:24;
361:12;364:12;
366:3;373:8;376:25
**schedule (1)**
544:11
**SCHOFIELD (1)**
248:23
**science (1)**
504:21
**scope (13)**
330:11;341:11;
343:21;344:12,17;
347:6,11;382:17;
468:20;481:1,8;
482:3;484:17
**Scott (3)**
348:4,14;350:2
**se (2)**
351:25;418:21
**searching (1)**
300:14
**seat (9)**
257:7;258:18;
302:20;304:9;
331:14;336:21;
348:9;383:21;518:13
**seated (4)**
254:2;336:13;
417:6;487:15
**second (22)**
255:8;291:24;
298:22;299:6,14,16;
311:19;326:6;334:1;
368:24;420:1;422:3;
433:25;437:2;
439:11;483:7;
490:11;491:7;
492:14;496:9;
499:18;506:1
**secondly (1)**
427:11
**section (9)**
372:14;403:5;
458:22;460:24;
462:7,12;489:17;
491:25;494:9
**secure (1)**
519:6
**Secured (2)**
250:16;483:24
**securities (43)**
313:8;319:20;

332:12,18;351:24;
352:1,13,19,25;
353:20,25;354:6,18;
355:25;356:8;357:6,
10;358:4,5,6;359:13;
360:24;361:22;
362:12;363:16;
364:20;365:10,18;
371:17;426:12,18;
429:20;430:18,20;
452:24;471:5;
473:22;474:20;
478:24;479:3,16;
506:4;534:22
**securitizations (1)**
453:3
**security (6)**
320:1;353:23;
364:18;396:2;
474:17,22
**seeing (1)**
411:12
**seek (9)**
339:1,7,19,25;
480:23;481:6;
490:17;530:4;542:11
**seeking (4)**
327:12;521:19;
522:7;536:19
**seem (1)**
486:7
**seemingly (1)**
519:5
**seems (5)**
269:18;335:3;
363:4;382:7;505:3
**select (1)**
337:24
**self (2)**
323:19,23
**sending (1)**
341:9
**sends (1)**
457:7
**senior (1)**
532:16
**sense (13)**
284:2;357:21;
366:23;374:7;382:7;
391:3;397:19;
409:25;413:6;414:7;
491:21;515:3,13
**sent (17)**
323:11;324:3;
341:6,20,23;342:20;
343:15;346:10;
421:8;422:11;455:8,
21,22,25;456:25;
457:3;506:13
**sentence (11)**
268:17;278:14;
326:6;448:4;459:9,
14;472:16,21,21,23;

473:2
**separate (4)**
288:2;357:10;
418:16;484:12
**separated (1)**
502:8
**separately (2)**
308:17;475:20
**September (4)**
458:12;462:10,13,
13
**series (5)**
271:13;277:9;
290:13;364:8;501:4
**serve (2)**
291:11;527:11
**served (5)**
291:4;438:10;
439:2;522:5;534:17
**service (2)**
311:16;454:18
**Services (1)**
463:5
**servicing (3)**
310:12;513:6;
539:8
**session (2)**
336:14;417:7
**sessions (3)**
316:18;317:6;
385:1
**set (12)**
260:9;317:9,19;
318:25;351:11;
390:3;399:10,16;
401:9;421:13;
507:16;512:14
**SETH (1)**
252:8
**setoff (4)**
401:18,20;402:5,9
**setting (1)**
536:20
**settings (1)**
351:17
**settle (5)**
365:23;374:9;
380:3;381:16;
461:15;541:25;
542:1,2,2
**settled (1)**
405:23
**settlement (184)**
256:17,23;259:17;
260:1,5,11;261:11,
25;262:18;263:7,11;
268:12;282:6;
285:23;287:9;
288:10;292:16;
328:17,24;352:9,11;
355:21;356:3,18,21;
364:25;365:21,25;
368:11,15,17;369:18,

23;371:10,14;
372:24;373:15,19,21;
374:6,9,17,23;
375:16;376:6,23,24;
377:17;378:9,16;
380:2;381:21;382:5,
8,12,14,15,23;
385:11;386:12;
389:5,17,21,25;
390:9;391:14;393:5;
396:10;405:5,6,19;
406:15;411:3;
412:19;425:18;
426:10;428:13,14;
430:8;438:7,13;
460:12;462:15;
465:14,21;467:14;
469:22,23;470:6,7,
13;471:11,12;475:7;
476:3;484:5,10,20;
486:8;488:13;489:1,
3,7,17,23,25;490:12,
14;491:19,20,24,25;
492:11,14,19;493:14,
15;494:3,9,11,22;
495:17;496:13,22,23;
497:6,17,19,20,24;
498:1,3,22;499:1,3,6,
24;500:4;501:2,20,
22,23,25;502:7,17;
503:19;504:12,23,25;
505:11,12,13,15,17;
506:5,11;507:2,7,9;
509:15;510:1,23;
512:5;514:23;
519:16;521:10;
522:22;523:2;524:9;
525:1,5;526:8;
527:17;529:14;
530:12;531:4;
534:14;537:3;
539:18;540:4,14,15;
543:5,9

**settlement/commutation (1)**
380:15
**settlements (8)**
319:15;322:9,11;
374:20,22;460:20;
494:7;510:15
**settlement's (3)**
495:3,15,22
**settling (5)**
258:23;288:11;
297:11;374:10;
413:22
**seven (3)**
283:10;293:12;
446:1
**seventeen (6)**
450:5,16;507:18,
19;525:24;535:13
**Seventh (1)**
251:4

**seventy (3)**
444:1;446:2,4
**several (4)**
317:6;417:13;
441:12;461:21
**SEWARD (7)**
250:2;325:1;341:3;
342:11;343:11;
345:21;346:7
**Shalhoub (1)**
434:24
**share (4)**
373:11;411:14,16;
533:15
**shared (3)**
266:3,5,13
**sharing (1)**
472:13
**sheets (1)**
544:21
**SHORE (46)**
250:20;422:19,20,
25;423:4,8,15,18,22;
432:4,4;437:21,22,
25;439:6;483:16,17,
21,23;486:4,5,8,12,
14;491:12;518:19;
519:1;520:16;536:7,
8;537:13;538:12,17,
19;540:5,7,25;541:9,
16,17,20,22;542:5,
10,25;543:2
**short (6)**
254:7;297:7;
327:16;436:1;487:1;
493:8
**shortened (1)**
254:8
**shorter (2)**
413:10;487:6
**shortfall (2)**
510:5,6
**shorthand (3)**
278:15,25;279:7,
13,15;280:1
**shortly (2)**
419:8;470:19
**shorts (1)**
509:16
**shoulder (2)**
491:13,13
**show (10)**
335:12;424:2;
429:16;456:19;
469:22;470:6;
507:25;518:4;519:9;
544:22
**showed (2)**
330:16,22
**showing (1)**
496:23
**shown (1)**
418:7

**shows (7)**
373:2;489:7;
491:24;492:10,25;
494:9;535:7
**sic (3)**
417:15;442:3;
449:16
**side (33)**
269:9;271:13,18,
19,21;272:11,12;
273:7;277:17;
279:19,24;291:24;
297:15;298:25;
370:14;381:21;
390:14;408:10;
433:2;468:5;482:22;
485:15,24;487:8;
511:5,6;517:19;
518:15;525:10;
534:20,21;540:3,5
**sides (2)**
490:19;541:11
**SIDMAN (28)**
247:8;255:15,16,
16,20;256:6,8,15,17,
25;257:1;299:4,4,16,
23;300:5,7,8,13,15,
18,25;301:17,21,24;
302:6,7;305:11
**Sidman's (1)**
255:13
**SIEGEL (39)**
246:7;497:9;
500:25;501:13;
502:3,4;506:2,6,12,
18,21,24;507:3,4,5;
508:4,17,19,21,23;
509:1,5,7,9,11;
510:13,24;511:19,21,
23,24;543:4,11,15,
17,21;544:4,7,8
**Siegel's (1)**
485:18
**signed (4)**
454:13;462:15;
519:13;524:14
**significant (6)**
307:8;317:21;
442:10;474:21;
503:22;504:7
**significantly (4)**
327:23;440:15;
443:9;444:25
**silence (4)**
497:17;512:24;
533:9;534:15
**silent (1)**
521:1
**similar (4)**
266:9,20,23;267:8
**simple (3)**
440:11;509:22;
515:21

**simplification (1)**
404:14
**simply (9)**
312:14;345:14;
368:10;385:15;
442:16;504:13;
510:6;511:21;516:14
**single (4)**
360:9;398:23;
422:9;497:10
**single-page (1)**
288:20
**sit (2)**
264:8;426:24
**site (10)**
317:9,12,25;318:9,
12,16,19,22,24;
454:17
**situation (3)**
391:11;402:9;
539:22
**situations (1)**
516:9
**six (8)**
293:12;297:14;
436:18;474:9;
528:22,23;529:1,4
**sixty (1)**
277:14
**sixty-five (3)**
444:1;446:2,4
**size (2)**
365:4;475:5
**sizeable (1)**
512:25
**Sklar (38)**
336:17,18,22;
337:2,4,9,16;338:7;
339:14;340:11,17,24;
343:5;344:4;346:1,
21;347:3,16;415:12,
16,20,23;417:18;
424:10,12,13,18,22;
425:9,12;426:20;
427:7,12,13;428:9;
429:16;430:11;431:6
**Sklar's (1)**
432:17
**sky (1)**
525:14
**slides (2)**
266:8,9
**slight (1)**
266:18
**slightly (2)**
293:22,23
**Slow (1)**
433:14;436:25
**slowly (1)**
333:12
**small (4)**
434:5;494:4,25;
526:1

**smiling (2)**
518:20,22
**SMITH (19)**
248:17;307:20;
308:22,23,24;310:19;
311:23;312:19;
323:6,7;324:2;
348:13;377:23;
421:14;454:22;
455:8;457:2;532:9;
534:7
**SODERBERG (1)**
250:21
**software (1)**
301:24
**Sohlberg (3)**
524:14;526:25;
528:4
**Sohlberg's (1)**
513:4
**solution (1)**
308:7
**somebody (8)**
347:18;394:5,20;
409:20;477:20;
485:2;522:22;530:8
**someday (1)**
530:9
**somehow (10)**
368:12;413:18;
500:10;502:11,15,16;
503:23;525:11;
533:4,4
**someone (2)**
442:7;524:1
**sometime (2)**
286:2;322:1
**somewhere (1)**
444:1
**soon (1)**
305:13
**sooner (1)**
449:23
**sophisticated (1)**
351:22
**sorry (55)**
262:6,11,13;263:8;
265:18;268:24;
271:15;278:8,10,17;
280:9;292:14,18;
294:19;306:12;
310:25;321:3;
322:13;325:19,21;
328:23;339:18;
342:9;343:23;
347:20;349:19;
358:16,23;372:6;
374:2;378:17;
380:10,10,10;383:19;
384:12;392:20;
395:15,15;410:11;
412:9;419:5,6;
428:18;436:23;

448:10;460:18;
464:14;470:5;
475:22;478:16;
482:14;487:2;522:1;
528:22
**sort (10)**
308:5;310:4;314:5;
468:20;516:19;
517:5,13,16,19;
520:12
**sought (2)**
484:10;498:24
**sound (1)**
529:24
**sounds (4)**
270:1;333:17;
361:17;541:13
**source (1)**
277:2
**sources (3)**
361:10;502:23,24
**South (1)**
252:4
**SOUTHPAW (1)**
253:10
**speak (9)**
269:12;343:17;
427:13;485:18,19,20,
21;521:3,4
**SPEAKER (27)**
258:9;289:7,9,11;
295:19,23;299:12;
305:1,12,14,23;
306:1,4;348:23;
349:14,17;350:15;
417:2,3;436:22,25;
439:8;460:9;477:22,
25;478:15,17
**speaking (3)**
301:17;359:12;
401:14
**specialist (1)**
351:11
**specializes (1)**
365:17
**specializing (1)**
351:6
**specific (40)**
264:22;275:4;
321:17;352:13,18;
356:8;357:8;358:3,5,
6,11;360:3;362:21;
363:15;364:3,18;
365:15;367:10,22;
368:1,5;369:20,24;
371:19;378:7;382:2;
407:12;454:11;
461:12,14;467:15;
471:14;479:5,9,14,
17;488:18;489:3;
535:24;543:16
**specifically (19)**
338:11,13;339:22;

340:4;356:4,24;
357:5;362:13;371:4;
375:20;377:5,17;
404:4;463:6;481:3;
500:12;528:14;
538:13;543:24
**specifics (2)**
311:6;500:23
**specify (1)**
370:24
**speculate (1)**
539:1
**speculating (1)**
520:2
**speculation (1)**
520:6
**speculative (1)**
502:19
**spend (2)**
507:8;508:21
**spending (1)**
542:22
**spent (5)**
487:19;514:5;
517:25;525:12;
533:17
**spin (1)**
491:19
**spoke (3)**
263:18;265:25;
267:3
**sponsored (7)**
273:21;274:15;
275:5,16,23;283:11,
21
**spurious (1)**
491:14
**stakeholders (1)**
389:20
**stamp (1)**
461:23
**stand (11)**
302:16;304:5,7;
348:5,15;384:11,13;
412:15;440:10,25;
451:5
**standard (2)**
488:16;497:13
**standing (4)**
292:5;491:13;
493:6;497:19
**standpoint (2)**
493:10,11
**stands (2)**
378:8;519:17
**start (12)**
347:9;375:11;
408:22;423:3;
434:21;441:20;
460:20;509:24;
525:23;527:18;
535:12;542:22
**started (4)**

423:11;470:11,17;
517:18
**starting (2)**
472:22;478:18
**starts (2)**
364:8;459:9
**state (11)**
316:2;335:14;
374:22;398:15;
405:10;425:4;463:4;
480:23;484:20;
494:19;531:21
**stated (6)**
269:21;274:12;
356:7;379:25;411:7;
479:11
**statement (24)**
255:21,21,24;
257:21;263:1;299:7,
14;316:15,18;317:8;
360:20;361:21;
362:19,24;364:21;
365:5;403:19;
404:12;458:9,12,18;
459:25;471:22;
533:12
**statements (11)**
399:5,10,17;458:4,
6,17;465:10;466:18;
477:15;485:14;
546:22
**states (2)**
426:17;478:21
**states' (1)**
452:24
**status (2)**
361:6;416:1
**statutory (3)**
458:4,5;516:14
**stay (2)**
482:22;533:21
**Steering (52)**
246:14;249:11;
307:17;308:8,11,14,
17;309:2,7,11,21;
317:16,18,22;319:2,
4,5,8;320:20;330:9;
331:17;372:3,8;
454:21;464:1,1,6,9,
10,16,23,25;465:5;
474:4,4,6,8,14;
475:10,11,16,18,25;
476:5,18;477:9;
478:22;480:2,6,16;
497:4;512:3
**steering-committee (1)**
456:3
**step (2)**
421:8;497:20
**stepped (1)**
470:14
**STEVEN (6)**
247:9;305:8;

306:13;351:2;
381:10;385:6
**still (21)**
255:4;263:4;
266:10;295:11,12;
298:2;374:23;
380:23;392:9;393:9;
409:10;425:9;
439:15;451:7;
486:21,23;487:6,24;
490:7;491:21;502:16
**Stillman (1)**
538:19
**Stonehill (2)**
251:3;253:14
**stood (1)**
430:21
**Stop (8)**
301:25;328:1;
329:10;342:15;
450:13;489:21;
506:1;519:11
**stories (2)**
299:17,19
**straightforward (1)**
534:8
**strange (1)**
516:7
**STRAWN (1)**
252:20
**Street (3)**
247:4,20;249:4,12
**stress (5)**
267:15;271:3,10;
294:5;359:17
**Strike (6)**
282:5;378:11,18;
432:17;473:21;531:9
**structure (1)**
309:19
**structured (5)**
337:18,22;452:20,
25;453:2
**stuck (1)**
392:7
**studied (1)**
398:6
**study (1)**
398:13
**stuff (2)**
423:11;545:22
**Subject (17)**
298:4;302:8,11;
330:13;425:24;
432:8;450:6;456:7;
461:15;462:16;
463:9;466:8;489:19;
491:6,9;503:5;
539:25
**subjecting (1)**
513:9
**subjects (3)**
344:8,15;466:7

**submit (11)**
365:15;414:21;
420:7,23;423:21;
504:15;510:13;
535:19;543:11,12,18
**submitted (15)**
279:3;299:20;
336:22;337:17;
348:15;349:10;
363:20;365:9;
379:14;421:21,21,23,
25;422:5;499:9
**submitting (3)**
370:4;435:17;
521:16
**subordinated (1)**
367:21
**subordination (1)**
491:10
**subrogation (1)**
403:7
**subscribe (1)**
361:9
**Subsequent (3)**
370:4;450:9;
506:14
**subsequently (1)**
377:5
**subset (1)**
524:16
**substance (6)**
448:22;466:11;
467:8,12,15;468:2
**substantial (8)**
488:13;489:15;
492:1;493:22;497:6;
519:15;524:19,21
**substantially (7)**
265:19;266:8,20,
23;267:8;489:8;
526:15
**substantive (1)**
319:3
**success (6)**
406:2;490:23;
495:15,20;538:1;
539:13
**successfully (1)**
491:4
**sue (7)**
490:16,16;528:9;
530:20;531:1,11;
539:4
**suffer (1)**
355:16
**suffers (2)**
291:14;292:1
**sufficient (4)**
359:15;387:12;
506:4;511:14
**suggest (7)**
489:24;490:11,18;
494:3;497:18;499:2;

500:10
**suggested (1)**
408:24
**suggesting (1)**
387:6
**suggestion (1)**
503:23
**suggestions (1)**
512:4
**Suisse (2)**
402:14;410:20
**suit (1)**
540:17
**Suite (1)**
246:16
**suitors (1)**
531:9
**sum (1)**
534:19
**summarized (1)**
260:19
**summarizes (2)**
269:4;372:22
**summary (3)**
269:7;501:18;
539:25
**summer (1)**
338:14
**Superintendent (1)**
463:4
**supplemental (2)**
490:20,24
**support (24)**
304:16;369:17,22,
24;370:2,6,10;371:1;
391:15;393:5,6;
409:11;484:2;
496:21;497:23;
498:1,3;499:6;501:6,
9;506:15;519:14;
524:9;536:3
**supported (7)**
428:13;488:23;
496:14;499:15;
501:20;511:18;
519:22
**supporting (4)**
257:14;407:24;
457:7;501:18
**supportive (1)**
479:7
**supports (2)**
501:22;521:10
**supposed (7)**
311:20;312:16;
402:4;425:25;
448:13;503:11;
530:16
**supposedly (2)**
430:13;525:16
**sure (57)**
273:24;275:13;
279:17;282:25;

293:15;295:21;
297:1,5;309:18;
315:8;319:23;332:2;
333:14;335:5;
339:10,22;341:15;
344:23;346:17;
349:14;350:24;
359:1,10;364:6;
370:16;371:1;
385:18;386:16;
392:19,22;396:11;
406:10;416:18;
418:6,12,15;423:22;
424:5;433:7;434:2;
435:1;440:11;442:9;
470:18,25;477:19;
478:16;483:19;
485:7;487:21;497:5;
506:2;533:18;
536:12;543:25;
546:13,20
**surprise (8)**
381:17;382:4;
427:5,9,10;486:20,
20;529:11
**surrounding (1)**
341:8
**suspect (2)**
434:13;491:11
**sustain (1)**
465:16
**sustained (46)**
301:16;310:22,24;
313:18;316:8;318:5;
320:11;323:14,18;
324:13,19;335:2;
341:12;343:22;
344:17;346:20;
347:11;381:20;
391:8;397:9;425:23;
426:1;428:7;430:4,
10,24;431:4,7,20;
435:6,22;436:7;
448:21;461:7;
466:15;467:22;
468:7;481:2,10,21;
482:4,9;483:2,6;
484:18,23
**swaps (1)**
452:20,23;453:13
**swearing (1)**
385:1
**sweetness (1)**
412:16
**switched (1)**
292:19
**switching (1)**
466:7
**sworn (16)**
257:5,6;258:16,17;
302:18,19;304:8;
336:19,20;348:6,8;
383:20;384:9,13,15,

22

**T**

**tab (29)**
306:7;311:11;
315:23;317:24;
320:2;321:19;323:3,
25;325:6;330:19,20;
340:22;343:5,13;
353:1;372:15,16;
375:21;388:8;
396:12;399:7;
406:13;433:1;
454:25;456:19;
458:7;469:11,12;
471:15
**table (11)**
331:7,15,19;
372:11,16,22;373:2;
391:15;393:4;
532:13,14
**tail (1)**
278:14
**takeaway (1)**
493:5
**Talcott (1)**
497:4
**talk (22)**
280:5;292:23;
368:24;383:17;
395:13,17;400:19;
412:18;413:1;483:4;
505:21;507:6,6,10,
10;518:25;522:9;
525:4;534:16;
539:14;546:5,6
**talked (11)**
265:1;315:1;
361:18;390:22;
464:20,21;475:15;
479:5,6;495:17;
538:11
**talking (24)**
307:16;327:9;
332:6,7,8,16;357:21;
403:4,10;447:17,18;
464:6;481:25;
490:19;504:8,9;
507:8;523:20,20;
525:4,24;527:11,12;
541:10
**talks (2)**
286:7;524:1
**tasked (2)**
259:25;260:4
**tax (1)**
329:8
**team (3)**
280:18,22,25
**technical (1)**
399:12
**telephonic (1)**

265:8
**TELEPHONICALLY (15)**
247:16,24;248:8;
251:23,24;252:8,9,
17,24;253:3,7,11,15,
19,23
**telling (3)**
421:18;468:2;
497:18
**ten (17)**
273:3;284:10;
299:19;369:11;
371:17;384:19;
407:15;413:15;
416:23;446:10;
447:1;449:16,21;
486:1,5;487:19;
510:7
**ten- (2)**
447:23;448:5
**tend (1)**
363:18
**tender (1)**
258:24
**ten-minute (1)**
336:8
**ten-percent (1)**
448:6
**term (7)**
279:12;385:19;
387:11;389:5;
399:12;400:24;474:8
**termina (1)**
385:19
**terminate (2)**
461:15;465:1
**terminated (3)**
452:14;453:12,19
**termination (4)**
323:11;455:13;
456:17;457:8
**terminations (1)**
459:12
**terminology (3)**
291:10;294:3;
516:17
**terms (16)**
288:13;308:23;
309:16;314:6;
317:17;319:21,24;
352:14;373:19;
396:10;399:19;
435:20;464:21;
467:13;506:25;523:8
**test (1)**
529:22
**testified (35)**
263:3;264:11;
344:4;347:2;360:7;
378:25;379:22;
381:18;398:20;
404:1,15;407:15;
452:11;461:8;464:4,

7;468:10;470:11;
471:18,21;480:2;
482:7;491:16;492:2,
18;493:18;496:1;
500:1,14,19;509:3;
517:2;528:4;537:10;
540:20
**testify (9)**
338:4;398:22;
407:18;426:5,5;
501:13;503:23;
524:14;538:7
**testifying (4)**
291:13;346:25;
430:4;448:25
**testimony (117)**
257:25;258:24;
259:3,5;262:3,5,21;
274:5,8;278:8,24;
280:1;286:21;296:7;
303:15,15;304:13;
305:19;322:6;325:5;
326:5;329:15;
347:17;349:8;355:4;
356:25;357:16;
360:5,11;361:13;
362:15;364:22;
365:2;366:16;
367:15;371:6;
372:12;376:9;
381:15,24;389:2;
390:22;391:6,16,17;
393:20;399:1,3;
403:24;404:7,18,20;
406:22;407:21;
414:22;418:24;
419:18,21;424:12,19,
23;425:12,24;426:20,
25;427:7,13;428:9;
432:17,18;438:6;
439:22;440:3,24;
441:2;443:8;445:25;
452:13;454:3;
465:10,25;466:17;
468:3;488:18;489:2,
5;490:9;492:6,8,24;
493:2,3,6;496:6,15;
497:24;498:21;
499:11,13,14,16;
500:7;501:15,18;
502:9;513:4,4;
516:16;523:23;
532:15,19;535:20;
537:7;544:18,18,19;
546:21
**testimony- (1)**
327:2
**thankful (1)**
528:13
**Thanks (1)**
476:24
**THAU (1)**
253:11

**Thayer (1)**
417:16
**theoretical (1)**
530:21
**theories (2)**
491:18;516:8
**thereafter (4)**
263:23;470:18,19;
508:5
**there'd (2)**
393:21;443:2
**therefore (13)**
283:19;285:5;
355:6;380:12;383:2;
413:5,21;440:18;
443:14;447:6,11;
490:15;505:19
**there'll (2)**
449:14;544:17
**there're (1)**
423:6
**thereunder (1)**
435:21
**theses (1)**
516:8
**thinking (1)**
500:18
**Third (3)**
251:20;472:21;
517:11
**third-party (1)**
519:8
**thirty (19)**
283:19;284:8,9;
310:12;326:10,13;
327:6,19;328:9;
398:2;443:18;
444:18,24;445:3,5,6,
10;449:21;507:12
**thirty- (1)**
283:9
**thirty-eight (1)**
284:1
**thirty-five (1)**
442:8
**THOMAS (2)**
250:8;252:9
**thorough (1)**
500:11
**though (11)**
281:5;289:19;
346:24;347:2;
371:19;406:14;
412:14;497:14;
528:12;534:16;539:2
**thought (14)**
261:6;276:24;
277:6;285:1,1;
382:11;393:15;
412:10;427:2;438:4;
468:20;501:17;
520:15,16
**thoughtful (1)**

498:17
**thoughts (1)**
379:23
**thousands (1)**
512:18
**threatening (1)**
531:9
**three (3)**
256:1;262:15;
299:5;331:16;
352:22;413:12;
438:2;451:14;
462:10;472:20;
489:11;492:4;
507:22;512:17;
532:14;534:18;
535:10;536:10;
540:22,24,25;541:1,3
**three- (1)**
446:16
**three-percent (1)**
446:18
**throughout (3)**
331:12;409:13;
441:25
**throw (1)**
392:24
**throws (1)**
532:22
**Thursday (3)**
545:6,12,15
**Thus (2)**
492:10;493:23
**till (3)**
442:1;545:6,12
**timeline (2)**
256:17,23
**times (5)**
261:15;339:21;
355:17;474:9;539:16
**time-value (1)**
369:4
**time-value-of-money (1)**
442:14
**timing (11)**
283:12,12;357:9;
368:3;369:13;
378:15;407:17;
444:21;445:8,10;
447:21
**today (20)**
259:15;264:8,12;
338:1;353:15;442:8,
11,19;446:11;447:10,
13;449:15;450:4;
488:8;533:1;535:13;
541:13;544:14,15;
546:7
**today's (3)**
450:9;462:16;
544:18
**together (3)**
423:25;519:22;

537:19
**told (6)**
482:15,18;488:13;
507:11;508:1;511:18
**tolerance (1)**
512:17
**TOLLES (1)**
252:2
**Tom (2)**
433:17,18
**tomorrow (7)**
528:9;545:5,12,16;
546:3,4,5
**tone (1)**
275:22
**tonight (2)**
545:25;546:1
**took (6)**
267:23;321:10;
397:1;405:2;503:9;
504:4
**top (4)**
268:18;276:11;
372:12,18
**topic (3)**
361:20;362:22;
532:21
**tort (1)**
496:4
**total (12)**
274:21;275:24;
277:1;293:23;354:3;
409:8,12;411:19;
492:5;503:25;504:1;
525:25
**totally (2)**
447:4;519:24
**touch (1)**
499:18
**touched (1)**
498:15
**toward (1)**
497:20
**towards (2)**
377:15;440:24
**town (1)**
519:9
**track (1)**
546:17
**trading (1)**
337:23
**tranche (3)**
354:14,21;355:16
**tranches (6)**
354:9,12;355:6,12;
356:8,10
**transaction (17)**
310:15;322:18;
454:7,8;456:7;
459:15,16,17;471:19;
472:14,16;473:17;
475:14;476:9,12,14,
19

**transactions (7)**
320:19;453:1;
454:14,20;455:17;
464:21;481:15
**transcript (13)**
287:7;305:20;
361:25;375:21;
423:3;436:13;
477:20;490:10;
492:7;501:17;
544:13,15,17
**transcripts (2)**
422:22;423:2;
424:1;436:15
**transfer (1)**
310:11
**transferring (1)**
314:6
**trap (1)**
534:2
**treading (1)**
423:3
**treat (2)**
269:22;274:12
**treatment (1)**
539:21
**trial (9)**
364:24;404:7;
429:8;492:7;501:16;
517:3,4;518:2;
522:11
**tried (6)**
434:14;489:24;
490:11;500:10;
534:12;546:11
**tries (1)**
408:20
**true (33)**
263:2,4,4;268:17;
269:21;276:5;
286:25;287:20;
303:6;322:6,18;
363:19;364:15;
365:8,14;368:13,21;
380:23;382:6,7,16;
385:2;387:2,10;
398:18;400:6,12;
401:20;406:8;490:6;
503:20;505:8,8
**trumpet (1)**
522:19;524:10
**trumpeted (1)**
525:10
**Trust (35)**
248:11;341:4;
354:21;355:1,16;
368:3;370:13;
372:25;401:8;
409:12;426:14;
473:23;478:24;
479:4;492:4;494:5;
495:1;498:11;
500:24,24;501:12;

512:7;514:25,25;
517:23;521:23;
522:3,4,6;523:9;
524:13;526:9;
528:18;543:6,10
**trust- (1)**
293:15
**trust-by-trust (2)**
352:9;355:21
**Trustee (14)**
248:11;250:3;
260:7;325:1;341:3,
21;473:10,16,17,23;
485:19;493:20;
513:4;523:10
**trustees (83)**
261:9,10,17,24;
262:17;263:18,20;
265:25;267:3;268:6;
272:6;277:25;
284:11;293:7;
309:20;338:16,20,23;
339:1,7,8,19,21,25;
340:18;344:5;387:6,
8,14,21;388:19,24;
390:10;391:16;
392:11;393:7;394:9,
12;406:5;408:13;
411:5,25;416:5;
428:10,11;429:2;
465:10;470:11;
471:10;475:20;
480:22;481:6;492:1,
17;493:19,20,23;
495:24;506:5,10;
507:2;510:21;
511:12,12;512:15;
513:19;515:7,14,17;
522:18;524:8,8,24;
527:10;528:9;
529:12;531:10;
532:19,20;535:17,21;
536:4;537:12
**trustees' (4)**
260:24;261:7,19,
22
**trustee's (2)**
339:11;513:2
**trusts (83)**
259:17;260:2,6,12;
261:8,12,17,20;
276:13;282:7;
283:10,11,18;292:25;
293:18;294:7;
328:19;329:1;354:4,
6,9;355:13;357:6;
363:7,12,23;364:16;
370:10,22;376:12,15;
378:14;380:24;
400:21;401:1;
406:15;408:15;
409:24;411:25;
412:20,23;429:12;

440:17,21;442:23;
443:6,9,20,23;
444:22;445:3,25;
446:1,15,20;448:19;
449:11;493:15;
498:11;502:18,22,23;
503:4,7,15,18;504:5;
506:4,7,8;507:14,15;
508:9,11,12,14;
510:25;511:13;
512:10;513:10;
514:21;515:7;522:4
**trusts' (1)**
373:11
**trust's (1)**
526:4
**truth (4)**
256:2;257:17;
299:23;318:6
**try (10)**
254:21,23;255:6;
323:25;329:18;
355:8;485:21;
488:19;505:19;
524:23
**trying (15)**
260:20;279:17;
303:9;333:11;334:3;
411:7;412:10;421:7;
436:3;474:10;
475:24;500:11;
531:17;541:11;
546:16
**TSAO (1)**
247:23
**turn (22)**
265:7;327:1;
340:21,22;343:5;
345:25;347:20,22;
375:21;408:18;
456:19;458:7;469:7;
471:15;472:2;
478:13;490:16;
491:23;493:13;
495:5;500:22;528:8
**Turning (1)**
375:6
**tweaked (1)**
385:21
**tweaking (4)**
385:15,19,23;
386:6
**twelve (2)**
327:20;424:25
**twenty (14)**
273:3;284:10;
295:12;369:12;
371:18;383:14;
407:15;442:19;
445:9;446:11;447:1;
449:21;508:6;529:2
**twenty- (1)**
445:9

**twenty-eight (8)**
328:18,24;329:23;
443:17;508:7,8,10,14
**twenty-five (1)**
497:1
**twenty-nine (1)**
443:18
**twenty-one (2)**
383:15,17
**twenty-percent (3)**
447:23;448:5,6
**twenty-seven (12)**
326:9,12;327:6,18;
328:9;443:17;
444:18,24;445:3,5,6;
507:12
**twenty-three (3)**
517:25;519:13,21
**twenty-two (3)**
429:5,5;507:14
**twice (1)**
495:12
**two (38)**
262:15;265:14;
266:5,10,19;267:3,5;
268:21;288:1;
304:23;367:13;
382:23;429:8;
438:11;442:21;
451:14;453:25;
454:11,14;461:16;
462:10;463:6;
472:20;484:14;
489:22;493:12;
502:23;504:18;
505:4;510:25;516:7;
520:6;525:12;
528:23;536:15;
537:8;546:18,19
**TX (1)**
246:17
**TYLER (1)**
252:12
**type (9)**
322:24;351:17;
360:25;370:25;
397:20;455:25;
461:5,13;465:6
**types (11)**
360:23;363:19;
365:10;371:17;
453:11;461:14;
464:22;490:21;
491:18;492:21,25

**U**

**ultimate (2)**
351:13;538:1
**ultimately (2)**
309:16;426:11
**Um-hum (6)**
315:16;327:3;

473:2,5;474:1,21
**unable (1)**
334:22
**unaltered (1)**
522:16
**uncertain (5)**
405:16;447:3;
510:25,25;511:6
**uncertainties (7)**
362:20,25;363:2,5;
369:13;407:17;
511:14
**uncertainty (11)**
369:5;371:8,11,13;
376:5;407:1;492:22;
496:5;505:1;525:2;
526:1
**unchanged (1)**
522:15
**under (75)**
263:6,7,10,11,15;
265:4;267:5;277:8;
288:13;295:8;
309:17;321:22;
327:5;330:1;352:8,9;
353:13;355:13,24;
356:17,18,20,21;
357:18;358:6;363:8,
13;368:14;369:9;
372:23;373:13;
376:13,16,22;377:7;
378:16;380:21;
382:10,15;392:11;
397:18,21,21;400:5,
7,14;401:20;406:17;
407:6;409:16;425:9,
14;426:7;439:15;
446:14;451:7;
458:22;463:12;
489:17;490:12;
491:25;494:16;
509:14,25;512:10;
513:5;515:14;
516:16,20;534:3;
538:5,8,22;541:5;
542:22
**underling (1)**
301:22
**underlying (6)**
310:13;407:23;
473:20;479:3;496:3;
500:18
**underneath (1)**
409:3
**unders (1)**
377:3
**understands (1)**
508:24
**understood (19)**
269:14,21;270:2,6;
271:2,5,9,25;272:24,
25;275:11;281:3;
298:13;301:7;

309:18;317:12;
396:5;408:7;455:24
**undisputed (3)**
489:6;491:24;
512:8
**unexplained (1)**
509:18
**unfolds (1)**
496:12
**unfortunately (1)**
348:24
**UNIDENTIFIED (27)**
258:9;289:7,9,11;
295:19,23;299:12;
305:1,12,14,23;
306:1,4;348:23;
349:14,17;350:15;
417:2,3;436:22,25;
439:8;460:9;477:22,
25;478:15,17
**universe (5)**
429:21,22,24;
514:18,19
**unknown (1)**
511:1
**unless (6)**
323:14;332:22;
474:16;501:8;
542:17,17
**unlike (3)**
283:17;483:13;
540:23
**unlikely (2)**
400:16;491:5
**unpaid (26)**
276:22;277:14,17;
278:16,25;283:15,15;
307:5;395:23;396:6,
21;397:1;401:25;
402:1;413:13;441:9;
444:2;446:3,5,9,12,
25;447:8;449:6,9,23
**unprecedented (2)**
529:23;531:6
**unreasonable (1)**
264:14
**unredacted (1)**
348:17
**unsecured (11)**
313:24;314:3,7,12;
520:5;539:16,18,20;
540:7,10;542:16
**unsubstantiated (1)**
491:18
**unusual (2)**
535:24,25
**up (62)**
255:18;267:1,2,18;
268:12;276:25;
290:13,14,19;294:10;
297:21;300:14;
303:4;304:7,7;
305:10;317:9,19;

318:25;324:18;
348:6;349:15;
350:24;361:10;
371:24;399:23;
404:21;407:5;409:4,
7;410:24;412:15;
413:11;417:22;
418:3;419:12;423:3;
427:11,14;439:12,14;
442:3;451:15;
454:16;458:21;
470:15;476:11;
483:15;495:12;
499:1;500:17;
505:20;507:16,23;
510:2;516:5;520:4;
521:6;524:4,23;
532:22;540:22
**UPB (1)**
307:12
**update (1)**
379:5
**updated (2)**
293:15;294:8
**upfront (4)**
399:22;400:2;
440:12;515:4
**upon (18)**
268:19,25;277:11;
327:12;352:14;
356:7;361:8;367:22;
368:20;371:16;
377:16;378:8;438:6;
505:16;511:16;
518:19;529:12;
533:16
**upper (1)**
276:6
**upside (14)**
366:25;373:7,10;
375:7,10,13;376:18,
20,22;378:4;402:23;
410:7,8;534:21
**upsides (3)**
410:7,15,22
**use (14)**
277:21;294:1,1;
295:11,12;352:7;
361:9;386:4;387:11;
411:8;442:15;
443:15;491:17;
514:15
**used (20)**
265:24;266:2,24;
273:3,4;278:6;
279:11,12,13;285:5;
293:2;294:17;
352:12;357:24;
385:25;405:19;
407:6;425:22;474:9;
537:4
**uses (1)**
351:22

**using (6)**
278:1;292:5;
385:23;447:23;
452:3;494:5
**utilized (2)**
357:10,14

### V

**vagaries (1)**
446:22
**vagary (1)**
446:10
**Vague (1)**
381:25
**valid (2)**
370:12;373:20
**validate (4)**
387:15,22;388:17,
20
**validity (2)**
490:23;538:15
**valuation (3)**
360:25;362:11;
365:18
**value (36)**
270:3,13;283:20;
284:3;301:3;351:13;
401:1,5;402:18;
404:20;405:16;
406:25;409:6,7,12,
23,24;413:9,14;
414:5;440:5,14,14,
18,20;441:1;442:17,
24,25;447:25;
449:12;491:15;
504:10,13;507:13;
508:10
**VANESSA (1)**
250:21
**VARDE (1)**
253:18
**variables (2)**
351:23,25
**varies (2)**
357:21;364:17
**various (11)**
265:2;292:24;
316:18;335:24;
339:4,21;358:7;
361:9,10;378:23;
474:19
**vary (2)**
355:3,5
**varying (1)**
351:21
**vast (1)**
446:20
**vendors (1)**
361:9
**verdict (1)**
384:22
**verify (1)**

**351:11**
**version (5)**
266:20;348:25;
433:4;462:8,11
**versions (2)**
461:19,21
**versus (17)**
296:6;352:9;
355:21;356:3;
372:24;402:1;
408:19;429:21,22;
441:6;442:11;497:2;
510:23;525:1;535:3;
540:24,25
**vested (1)**
463:6
**vetted (2)**
533:17;535:9
**vice (2)**
306:24;532:15
**VICTORIA (1)**
247:24
**view (19)**
261:19;284:15;
307:8;373:18;
380:16;387:14,21;
392:11;393:7;406:4;
408:13;412:22;
480:7,10;482:19;
507:13;522:24;
524:23;539:13
**views (1)**
540:8
**vigorously (1)**
540:20
**vindicated (1)**
512:16
**violations (1)**
367:8
**virtual (3)**
537:19,22;539:6
**virtually (1)**
536:20
**vis-a-vis (2)**
380:15;430:19

### W

**wait (14)**
325:22;342:15,15;
358:13;369:3;
426:24;442:5,16,19,
21,24;447:16;508:9,9
**waiting (1)**
494:18
**waive (1)**
377:7
**waived (4)**
284:13;440:20;
493:17;509:19
**waiver (1)**
390:24
**waiving (1)**

**440:13**
**walk (1)**
402:21
**wall (1)**
534:15
**WALPER (1)**
252:9
**WALTER (1)**
248:15
**wants (6)**
326:23;329:12;
379:22;422:21;
520:21;524:23
**warranted (1)**
375:19
**warranties (3)**
287:23;367:1,9
**warranty (9)**
288:4;366:21;
376:18;502:25;
503:7,12,19;504:3;
511:5
**waste (1)**
296:10
**wasting (1)**
420:17
**watch (1)**
485:12
**water (3)**
257:8;258:19;
303:1
**waterfalls (1)**
364:19
**WATERSHED (1)**
253:22
**way (26)**
267:23;269:17;
270:25;277:24;
279:20;356:4,24;
357:5;375:20;
384:17;393:20;
411:11,24;441:20;
466:19;504:8,15,20;
507:16,23;511:3;
518:15;533:5,8,9;
535:1
**Web (18)**
265:9,10,13,15;
266:7,16;268:1;
317:9,12,25;318:9,
12,16,19,22,24;
454:17;458:21
**WEBB (1)**
252:12
**Wednesday (1)**
455:8
**week (11)**
289:25;290:2,2,4,
8;384:23;398:19;
450:8;495:12;534:1,
2
**weekend (1)**
254:15

**weeks (1)**
525:12
**Weil (3)**
323:6;455:6;
533:14
**weirdness (1)**
515:4
**WEITNAUER (21)**
258:20,20,22,23;
262:8;290:24;
295:18,24,25,25;
296:2,13,16;416:24;
439:16,17,18,20;
445:20;450:24,25
**well-intentioned (1)**
519:4
**well-known (1)**
454:18
**Wells (2)**
252:21;258:23
**weren't (4)**
264:3;427:9;505:8;
537:16
**What's (24)**
256:13;285:20;
300:7;312:13;
334:11,20;335:6;
341:18;344:24;
345:8;349:7;372:14;
403:25;404:6,22;
435:15;438:8;458:4;
482:22;497:8;
502:14;504:21;
506:25;512:8
**whatsoever (2)**
300:21;525:15
**whereas (1)**
443:16
**where'd (1)**
262:11
**Where's (1)**
426:13
**Whereupon (1)**
547:2
**WHITE (3)**
250:15;432:4;
483:23
**whole (10)**
309:1,6;327:11;
441:24;495:24;
497:11;517:4;
521:24;526:24;
543:20
**wholly (1)**
283:24
**who's (3)**
298:8;502:3;516:2
**whose (3)**
347:22;473:12;
512:16
**Wide (2)**
519:19;534:22
**Wide/ResCap (1)**

**535:12**
**wife (1)**
487:22
**Williams (4)**
417:19;481:22,25;
482:10
**willing (6)**
368:15;381:22;
382:23;422:12;
430:18;438:21
**willingness (1)**
390:3
**WILLKIE (8)**
251:2;336:16;
340:14;341:2;343:1,
11;345:21;346:6
**Wilmington (1)**
248:11
**win (1)**
516:25
**window (2)**
535:22,23
**WINSTON (1)**
252:20
**wish (3)**
332:24;334:10;
432:3
**wished (1)**
427:2
**wishes (1)**
285:18
**withdraw (1)**
343:23
**withdrawing (1)**
482:6
**withdrawn (1)**
536:12
**withhold (2)**
427:1,2
**within (36)**
264:1,4,10,23;
265:5;293:24;310:8;
332:18;357:24;
369:13;370:13,13;
379:8;380:7,8,21;
382:22;385:21;
390:16,21;391:18;
407:17;411:7;414:4;
428:23;446:3;
447:15;458:14,21;
487:10;507:24;
508:2;524:13;539:3,
19;540:8
**without (15)**
357:23;381:16;
382:14;410:6;
412:18;424:20;
446:21;466:11;
467:8,12;468:2;
496:13;515:2;
525:22;526:22
**witness (132)**
255:20,21,24;

257:2,3,6,21;258:12,
13,17;261:6;262:11;
264:18;280:20;
295:17;296:23;
297:13;302:19;
304:1,2,7,8;310:25;
314:20;315:5,22;
322:13;323:2,17;
324:9,12;325:10,13,
21,23,25;326:2;
328:2;329:11,14,16,
20;332:3,5,8,10,12,
14,16;336:10,14,20;
337:10;338:1,5;
339:17;347:18,19,19;
348:3,8,10,15;
358:14,16,23,25;
359:3;366:8;374:2;
383:8,20;384:9,12,
16;386:18,20;392:1,
3,22;393:14,18;
394:2,6,8,15,18,23;
395:1,3,4;410:11;
412:6,9,12,14;
414:12;415:6;
416:17;419:1;420:9,
13;424:8,14,16;
425:6;426:4;427:13,
19;431:21;435:25;
436:1;445:4;450:15,
20;451:2,8,21;461:1,
25;462:3,5;464:9;
469:6;473:9,14;
475:19;477:15;
478:3,10;485:2;
523:21

**witnesses (16)**
414:18,23;415:1,5,
10,19;416:12;
422:23;423:12;
424:24;427:14;
431:25;432:3;
451:13,13;513:4

**wonderful (4)**
516:21,21,22;
521:8

**word (4)**
278:5,6;279:10;
385:23

**words (4)**
265:20;271:1;
272:23;279:8

**work (7)**
269:14;275:9;
351:9;413:25;
423:25;479:2;487:9

**worked (9)**
309:19;310:11,14;
313:12;417:14;
485:22;533:12,12,13

**working (5)**
254:15;314:5;
331:16;530:18;

534:18

**workouts (1)**
307:2

**world (4)**
280:25;516:24,24;
525:13

**worth (3)**
403:12;504:11;
517:7

**worthiness (1)**
494:1

**wound (2)**
505:20;520:4

**wrap (2)**
298:16;380:25

**wrapped (4)**
292:25;373:4;
380:18;429:20

**writing (3)**
425:24;486:21,23

**written (7)**
265:20;279:8;
426:25,25;427:7;
525:23;546:22

**wrong (4)**
285:3;294:17;
503:24,25

**wrote (1)**
333:15

**WU (1)**
253:19

**wwwfgicrehabilitationcom (1)**
454:16

**WYNNE (76)**
247:7;296:24;
297:2,2,6,16,18,20,
23;416:15,15,16,21;
451:3,3,16,18,24;
452:1,3,6,7,9;456:11;
457:15,21;459:19;
460:7,10;461:8;
464:4,7,8,12;465:18;
466:1,4,7,10,16,23,
25;467:2,24;468:5,8,
19,24;469:2;479:21;
481:1,8,20;482:3,8,
12;483:1,5;484:17,
22,24,25;485:19;
501:13;516:2,3,3;
517:23,24;518:21,23;
519:11;520:8,10,17,
19

**Y**

**year (12)**
292:16;293:1,8,11,
12;398:24;442:12,
21;443:1;454:9;
507:21;522:13

**year-end (1)**
458:5

**years (50)**

283:17,19;285:9;
331:16;400:8;
413:15;441:12,12,14,
14,22;442:4,5,6,8,11,
13,19,21;444:5,6,7;
446:10,11,11;447:1,
1,1,12,14,24;449:11,
13,16,21;492:20;
494:2;500:3,20;
504:22;507:19;
508:2,9;513:10;
517:5;531:19;
532:15;534:18;
535:3,10

**yellow (3)**
458:5,10,11

**Yep (3)**
354:25;406:12;
412:12

**yesterday (3)**
255:9;488:7;
544:13

**York (23)**
246:3,5;247:5,21;
248:5,13,21;249:5;
250:5,18;251:5,21;
252:15,23;257:10;
337:7;463:4;473:9,9,
14,16,23;475:17

**Z**

**zero (2)**
447:25;534:19

**zero-sum (2)**
430:16;534:25

**0**

**02199 (1)**
249:13

**1**

**1 (7)**
316:12,15;325:6;
372:15,16;484:6;
489:2

**1.25 (1)**
293:25

**1.3 (1)**
293:25

**1.4 (1)**
453:17

**1.6 (1)**
535:15

**1.8 (5)**
540:21,22,24,25;
541:1

**1.8-billion- (1)**
541:3

**1:37 (2)**
417:4,5

**10 (5)**
311:11;330:20;
492:7;499:16;500:7

**10:47 (2)**
336:8,12

**10:59 (1)**
336:12

**100 (1)**
331:23

**10004 (1)**
250:5

**10017 (1)**
247:5

**10019 (1)**
251:5

**10022 (1)**
247:21

**10022` (1)**
251:21

**10036 (5)**
246:5;248:5,21;
250:18;252:15

**101 (3)**
257:13,23;258:1

**10154 (1)**
248:13

**10166 (1)**
252:23

**10168 (1)**
249:5

**103 (2)**
354:24,24

**109 (5)**
258:25;259:3,6;
278:9;410:9

**1095 (1)**
246:4

**11 (16)**
320:2;373:13,16,
22;374:13,20;
375:15;376:5,13,17,
22;377:4,11;388:14;
405:15;410:12

**11/7/12 (1)**
456:16

**1100 (1)**
246:15

**113 (1)**
289:25

**1133 (1)**
252:14

**115 (4)**
353:2,2,7,8

**1155 (1)**
250:17

**116 (5)**
257:16,23;258:3;
356:11,13

**1177 (1)**
248:4

**118 (3)**
257:16,23;258:3

**119 (4)**

257:16,16,24;
258:3

**12 (3)**
260:21;323:3;
501:7

**12:37 (2)**
417:4,5

**123 (14)**
265:16,18,19;
266:9,21;267:21;
271:12,16;279:18;
286:10;350:10,12,14,
15

**125 (5)**
249:4;350:11,16,
19,21

**127 (1)**
321:20

**1270 (1)**
276:21

**13 (4)**
260:21;323:25;
354:24;500:15

**132 (1)**
501:16

**133 (1)**
501:16

**136 (2)**
408:24;409:4

**13th (13)**
263:19;265:7,13,
25;266:7,11,13;
267:24;272:7;
279:14;286:20;
461:24;462:5

**14 (3)**
291:22;406:13;
499:15

**140 (1)**
504:10

**141 (1)**
493:4

**148 (2)**
493:3,4

**14th (1)**
383:23

**15 (6)**
325:5,8,16;326:5;
353:6;500:8

**150 (3)**
408:25;493:4;
525:23

**152 (3)**
262:4,12,15

**153 (2)**
247:20;493:4

**154 (2)**
375:24;378:3

**15th (7)**
265:11,14;266:11,
21;267:9;286:20;
287:10

**16 (10)**

327:1;372:12,16,
    17,18,19;434:15;
    478:13,18,20
**161 (1)**
    500:15
**162 (1)**
    500:15
**163 (2)**
    406:13;408:25
**164 (2)**
    496:7;500:15
**165 (2)**
    496:7;500:16
**17 (7)**
    274:3,7,11;287:8;
    375:24;376:2;378:3
**17.25 (3)**
    272:13;273:9;
    413:10
**170 (4)**
    257:16,16,24;
    258:3
**173 (2)**
    490:9,9
**174 (6)**
    299:6,9,13,15;
    399:7;490:9
**175 (2)**
    417:15;418:20
**176 (1)**
    417:17
**177 (1)**
    417:18
**178 (1)**
    417:20
**179 (1)**
    491:16
**17th (1)**
    458:14
**18 (9)**
    284:13;324:2;
    328:7;440:14,15;
    469:15,19;493:16;
    499:17
**18.1 (2)**
    401:6;440:4
**181 (1)**
    492:7
**183 (1)**
    492:7
**185 (2)**
    362:5,9
**1850 (1)**
    274:17
**18ii (1)**
    396:16
**18th (1)**
    457:4
**19 (1)**
    496:7
**190 (3)**
    264:6,11;267:16
**190-million-dollar (2)**

264:4,9
**19th (2)**
    349:10,15

**2**

**2 (7)**
    321:19;353:1;
    364:8;375:22;388:8;
    406:13;538:14
**2.01a (1)**
    489:17
**2.01a4 (1)**
    491:25
**2.1 (2)**
    371:2;389:24
**2.1-billion-dollar (1)**
    370:2
**2.8 (2)**
    429:18,19
**20 (3)**
    366:12;375:24;
    492:7
**200 (4)**
    252:22;267:1,10;
    288:8
**2005-EFC7 (1)**
    341:4
**2009 (1)**
    307:6
**2010 (3)**
    307:14,20;308:11
**2012 (19)**
    293:3,19;321:11;
    322:2;323:7;338:8,
    10,12,17;434:16;
    454:8;455:8;458:6,
    12,14;459:12;462:10,
    14;463:2
**2013 (26)**
    255:20;263:19;
    286:3,9;292:15,25;
    293:2,4,6;299:7,14;
    302:25;304:16;
    309:12,23;322:2;
    324:2;361:15;
    403:18;404:12;
    427:20;457:4;
    461:18;469:15,19;
    470:11
**204 (5)**
    311:14,19;312:5,
    17;330:16
**205 (3)**
    333:12,15;335:25
**2052 (1)**
    361:7
**206 (10)**
    317:24;318:3,18;
    368:16;382:24;
    383:3;411:4,8,12;
    503:24
**206- (1)**

405:7
**206.5 (3)**
    368:12;373:11;
    380:3
**208 (3)**
    333:12,15;335:25
**209 (7)**
    320:3,22,25;321:4;
    333:13,15;335:25
**212 (6)**
    333:13,15;335:25;
    350:8,12,13
**215 (1)**
    288:8
**216 (6)**
    333:13,15;334:6;
    335:2,18,22
**217 (1)**
    290:15
**22 (3)**
    492:6;500:8,15
**220 (2)**
    267:4,10
**222 (1)**
    247:4
**225 (1)**
    409:4
**226 (3)**
    255:25;256:10,12
**227 (3)**
    256:1,10,12
**23 (8)**
    262:12,16;429:23;
    490:24;492:6;500:8,
    15;512:11
**238 (2)**
    460:5,10
**24 (3)**
    366:11;429:23;
    470:11
**240-million-dollar (1)**
    263:24
**24th (2)**
    470:18,21
**25 (8)**
    375:24;459:5,7;
    460:25;472:2,3,4;
    491:17
**250 (4)**
    267:16;268:19,23;
    281:8
**253 (33)**
    264:2;268:21,23,
    24;281:4,5,6,9;
    282:11,23;284:13,17;
    285:1,2,4,6;390:13,
    20;402:22;408:13,
    23;411:6;412:1,21,
    24;466:13,21;
    467:10;504:6;
    509:24;513:23;
    522:12;526:9
**253- (2)**

385:16;408:7
**253.3 (3)**
    440:12,19;493:16
**253-million- (1)**
    390:6
**253-million-dollar (4)**
    263:25;389:5;
    391:12;393:1
**253's (1)**
    409:19
**254 (1)**
    254:6
**25th (2)**
    470:18,21
**26 (1)**
    286:3
**26th (2)**
    286:5;522:15
**27 (1)**
    489:5
**271 (4)**
    409:16,20,20,21
**28.5 (1)**
    272:20
**28th (1)**
    463:2
**298 (2)**
    503:25;504:1
**2997 (1)**
    519:1

**3**

**3 (8)**
    388:10;396:12;
    408:18;410:12;
    458:7;469:14;
    471:15;539:17
**3:11 (1)**
    485:12
**3:14 (1)**
    487:14
**3:30 (2)**
    487:5,13
**3:34 (1)**
    487:14
**30 (2)**
    278:11,12,12;
    500:1
**300 (1)**
    267:11
**30b6 (1)**
    334:24
**30th (1)**
    458:12
**31 (6)**
    254:6;278:12,24;
    304:16;349:16,19
**310 (2)**
    315:23;317:2
**311 (5)**
    256:15,21,24;
    499:8;518:6

**312 (4)**
    299:17,21;300:12;
    301:16
**313 (4)**
    301:18;302:3,5;
    518:24
**316 (7)**
    458:8,24;459:5,19,
    24;460:1;471:15
**317 (6)**
    323:25;456:20;
    457:15,19;469:16,17
**318 (4)**
    322:25;455:1;
    456:11,18
**31st (5)**
    255:20;302:25;
    336:23;348:16;
    427:20
**320 (2)**
    267:1,10
**329 (1)**
    254:6
**33 (1)**
    367:4
**33146 (1)**
    251:15
**34 (2)**
    484:8;489:5
**340 (3)**
    267:4;290:15;
    510:2
**345 (1)**
    248:12
**355 (1)**
    252:4
**35th (1)**
    252:5
**36 (1)**
    500:8
**361 (1)**
    411:18
**362 (3)**
    409:8;410:3;
    509:22
**362- (1)**
    411:1
**37 (1)**
    489:5
**38.6 (1)**
    444:15

**4**

**4 (4)**
    317:24;370:19;
    491:17;501:7
**4,400 (1)**
    497:15
**4.8 (4)**
    460:24;461:16;
    462:7,12
**4:50 (1)**

544:9
**4:53 (1)**
   547:2
**40 (1)**
   489:5
**405.3 (1)**
   411:19
**41 (1)**
   501:15
**41.3 (5)**
   373:6,10;375:6,9,
   12
**41.3- (1)**
   378:3
**41.3-million-dollar (1)**
   376:3
**41st (1)**
   247:4
**42 (2)**
   388:10;501:16
**42nd (1)**
   249:4
**43 (1)**
   500:8
**43.4 (1)**
   411:17
**44114 (1)**
   247:14
**4425 (3)**
   251:13;303:19,20
**4427 (1)**
   336:23
**4474 (1)**
   501:7
**45 (1)**
   509:12
**4675 (1)**
   383:24
**4691 (2)**
   306:5,6
**4693 (4)**
   348:23,24;349:5,
   20
**47 (1)**
   493:2
**47th (1)**
   248:20
**481 (2)**
   276:11,21
**49 (1)**
   493:2
**4th (2)**
   461:18,24

**5**

**5 (21)**
   267:21;268:11;
   271:12,15;274:14;
   279:9,18,21,24;
   286:10,14,14;388:14;
   410:11;454:25;
   455:16;490:10;

499:14;539:2;545:5,
   12
**5.55 (1)**
   489:8
**500 (4)**
   331:22;332:20;
   404:18;535:16
**502e (1)**
   491:7
**510b (2)**
   539:10,23
**522 (1)**
   307:10
**53 (3)**
   255:25;256:9,12
**5300 (1)**
   246:16
**53rd (1)**
   247:20
**54 (3)**
   438:2,19;497:24
**55 (6)**
   370:17;438:3,19;
   459:5;472:3,4
**56 (2)**
   438:3,20
**57 (1)**
   499:15
**58 (2)**
   478:13;499:15
**596 (6)**
   539:3,15,16;
   540:22;541:7;542:15
**596.5 (3)**
   489:10,11;490:2
**596-million-dollar (1)**
   540:16
**597 (1)**
   269:1
**5th (1)**
   251:14

**6**

**6 (10)**
   254:7;325:9,21;
   367:6;396:17;
   456:19;469:10,11,12;
   499:16
**6.19 (2)**
   459:4;472:6
**6/18/13 (1)**
   457:18
**601 (2)**
   494:9,16
**68 (2)**
   278:9,18

**7**

**7 (10)**
   266:25;323:7;
   353:2,2,6;362:9;

396:15,18;490:9;
   499:16
**7.6 (2)**
   429:22;512:11
**73 (1)**
   460:25
**75 (1)**
   254:5
**76 (1)**
   418:20
**77 (1)**
   418:20
**77002 (1)**
   246:17
**78 (1)**
   418:21
**787 (1)**
   251:4
**7th (1)**
   455:8

**8**

**8 (4)**
   361:5;490:24;
   496:7;500:16
**800 (5)**
   249:12;360:8;
   398:23;447:8;525:15
**81 (3)**
   296:8,12,13
**87 (1)**
   361:1
**8th (1)**
   290:4

**9**

**9 (4)**
   315:23;321:4;
   356:13;399:7
**9/30/12 (1)**
   459:25
**90071 (1)**
   252:6
**901 (1)**
   247:13
**9019 (3)**
   536:20;537:19,22
**909 (1)**
   251:20
**92 (1)**
   503:24
**96 (1)**
   364:7