**MORRISON & FOERSTER LLP**
Gary S. Lee
Anthony Princi
Charles L. Kerr
1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
*Counsel for the Debtors and Debtors in Possession*

**JONES DAY**
Richard L. Wynne
Howard F. Sidman
Erin Brady (*pro hac vice*)
222 East 41st Street
New York, New York 10017.6702
Telephone:    (212) 326-3939
Facsimile:    (212) 755-7306
*Attorneys for Creditor Financial Guaranty Insurance Company*

**DECHERT LLP**
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
*Counsel to The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., as Trustee of Certain Mortgage-Backed Securities Trusts*

**ALSTON & BIRD LLP**
John C. Weitnauer (*pro hac vice*)
Michael E. Johnson
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
*Counsel to Wells Fargo Bank, N.A., as Trustee of Certain Mortgage Backed Securities Trusts*

**SEWARD & KISSEL LLP**
Mark D. Kotwick
Brian P. Maloney
Ryan Suser
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421
*Counsel to U.S. Bank National Association, as Trustee of Certain Mortgage-Backed Securities Trusts*

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
Kenneth H. Eckstein
Philip S. Kaufman
Daniel M. Eggermann
1177 Avenue of Americas
New York, New York 10036
Telephone:  (212) 715-9100
Facsimile:  (212) 715-8000
*Counsel to the Official Committee of Unsecured Creditors*

1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- )
  In re:                       )     Case No. 12-12020 (MG)
                               )
  RESIDENTIAL CAPITAL, LLC, et al.,     )     Chapter 11
                               )
                   Debtors.     )     Jointly Administered
                               )
---------------------------------------------------------------------- )

**SETTLEMENT PARTIES' PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

2

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

FINDINGS OF FACT ................................................................................................3

I.     BACKGROUND ...............................................................................................3

     A.     The Structure of the FGIC Insured Trusts and the Policies issued by FGIC to the Trusts ..........................................................................................................3

     B.     The Rights and Obligations of the FGIC Trustees .................................5

     C.     Proofs of Claim filed by FGIC and the FGIC Trustees in the Bankruptcy ...........7

           (a)     FGIC's Proofs of Claim............................................................7

           (b)     The FGIC Trustees' Claims in Connection with the FGIC Insured Trusts ........................................................................................9

     D.     The Mediation Process ..........................................................................11

           (a)     Pre-Mediation .........................................................................11

           (b)     The Mediation .........................................................................12

           (c)     The Settlement Payment Proposal...........................................14

     E.     The Terms of the Settlement Agreement................................................15

           (a)     The FGIC Allowed Claims.......................................................16

           (b)     The Settlement, Discharge and Release of FGIC's Obligations Under the Policies..........................................................................17

           (c)     Releases of Claims Against the Debtors ..................................18

II.     FACTS SUPPORTING THE DEBTORS' ENTRY INTO THE SETTLEMENT AGREEMENT ...............................................................................................19

     A.     Mr. Kruger's Authority to Enter Into the Settlement Agreement.........19

     B.     Basis for Mr. Kruger's Business Judgment ...........................................21

     C.     The Possibility of Success of Litigating the FGIC Claims and the Settlement Agreement's Future Benefits to the Debtors .........................................22

           (a)     Litigation Uncertainty.............................................................22

           (b)     The Settlement Agreement's Future Benefits ..........................23

     D.     The Likelihood of Complex and Protracted Litigation .........................23

     E.     The Paramount Interests of the Estates' Creditors ...............................26

     F.     The Settlement Agreement's Support From Other Parties-in-Interest .................27

     G.     The Settlement Agreement's Releases of the Debtors' Officers and Directors ...28

i

     H.      The Settlement Parties' Counsel ............................................................29

     I.       Arm's-Length Negotiations...................................................................30

III.    FACTS SUPPORTING THE FINDINGS RELATING TO THE FGIC
       TRUSTEES AND FGIC INSURED TRUSTS .............................................30

     A.      The FGIC Trustees Were Advised by Qualified Professionals and Experts........30

     B.      The FGIC Trustees and Duff & Phelps Considered and Analyzed the
          Settlement Agreement and Negotiated Its Terms Through Court Ordered
          Mediation................................................................................32

          (a)     Duff & Phelps' Analysis .......................................................34

          (a)     The Investors in the FGIC Insured Trusts Participating in the
                  Mediation................................................................39

     C.      The Investors in the FGIC Insured Trusts Received Notice of the Settlement
          Agreement and Had an Opportunity to Object....................................................40

     D.      The FGIC Trustees Believe the Settlement Agreement, on a Stand-Alone
          Basis, Is in the Best Interest of Each of the FGIC Insured Trusts and the
          Investors. ................................................................................42

          (a)     The Investor Objecting Parties' Analyses of the Settlement Payment
                  and Rehabilitation Plan...........................................................47

     E.      The FGIC Trustees Believe that, Because the Settlement Agreement Is an
          Integral Part of the Plan, It Is in the Best Interest of Each of the FGIC Insured
          Trusts and the Investors. .....................................................................50

     F.      The Objectors Were Aware of the Ongoing Mediation, in Some Instances
          Participated in the Negotiations Concerning the Settlement Agreement, and
          Were Aware that the Policies Could Be Commuted or Settled............................54

     G.      The FGIC Trustees Continued to Assess the Reasonableness of the
          Settlement Agreement and Continued To Believe that It Is in the Best Interest
          of Each of the Forty-Seven FGIC Insured Trusts.................................................57

IV.    THE APPROVAL OF THE SETTLEMENT AGREEMENT BY THE
       REHABILITATION COURT ........................................................................58

CONCLUSIONS OF LAW .........................................................................................61

I.      JURISDICTION .................................................................................61

     A.      The Court Has Subject Matter Jurisdiction to Approve the Settlement
          Agreement and Enter the Proposed Findings. ....................................................61

     B.      The McCarran-Ferguson Act Does Not Preempt the Court's Jurisdiction..........64

     C.      This is a Core Proceeding. .................................................................65

II.    APPROVAL OF THE SETTLEMENT AGREEMENT UNDER RULE 9019 .............66

     A.      Mr. Kruger Was Authorized to Approve the Settlement Agreement on Behalf
          of the Debtors. .....................................................................................66

B. The Debtors Properly Exercised Reasonable Business Judgment in Signing the Settlement Agreement. ...................................................................66

C. The Iridium Factors Have Been Satisfied ...........................................66

(a) The Settlement Agreement Properly Balances the Possibility of Success of Litigating the FGIC Claims and the FGIC Trustee Claims and the Settlement Agreement's Future Benefits to the Debtors. ............68

(b) The Settlement Agreement Avoids the Strong Likelihood of Complex and Protracted Litigation. ........................................................70

(c) The Settlement Agreement is in the Paramount Interests of the Estates' Creditors ...................................................................71

(d) The Settlement Agreement has Support From the Overwhelming Majority of Other Parties-in-Interest. ......................................72

(e) The Settlement Agreement's Releases of the Debtors' Officers and Directors are Reasonable. ........................................................72

(f) The Parties to the Settlement Agreement Were Ably Represented By Competent and Experienced Counsel ........................................73

(g) The Settlement Agreement was the Product of Arm's-Length Negotiations. ...........................................................................73

III. APPROVAL OF THE FINDINGS RELATING TO THE FGIC TRUSTEES AND THE FGIC INSURED TRUSTS ..........................................................74

A. The Settlement Agreement Involves Resolution of a Claim Against an Insurer in an Insolvency Proceeding; It Is Not an Amendment to the Governing Agreements ................................................................................74

B. The Governing Agreements Authorized the FGIC Trustees to Enter into the Settlement Agreement. ...........................................................74

C. The Court Should Defer to the FGIC Trustees' Discretion Because They Acted in Good Faith and Reasonably in Determining Whether to Enter into the Settlement Agreement. ...........................................................77

D. The FGIC Trustees Acted Reasonably and in Good Faith in Entering into the Settlement Agreement. ...........................................................79

E. The Settlement Agreement Is in the Best Interests of the Investors in Each Trust ......................................................................................84

F. Notice of the Settlement Agreement Was Sufficient and Effective. ...................87

CONCLUSION ................................................................................89

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Asset Securitization Corp. v. Orix Capital Mkts.*,
    LLC, 784 N.Y.S.2d 513 (1st Dep't. 2004) ........................................................................76

*Bayerische Landesbank v. Deutsche Bank AG (In re Residential Capital, LLC)*,
    488 B.R. 565 (Bankr. S.D.N.Y. 2013) ...........................................................................62

*Blackacre Bridge Capital, L.L.C. v. Korff (In re River Center Holdings, L.L.C.)*,
    288 B.R. 59 (Bankr. S.D.N.Y. 2003) .............................................................................63

*Congregation Yetev Lev D'Satmar, Inc. v. Cnty. of Sullivan*,
    59 N.Y.2d 418 (1983)........................................................................................................89

*Haynes v. Haynes*,
    72 A.D.3d 535 (1st Dep't. 2010)......................................................................................78

*HSBC Bank USA, N.A. v. Fane (In re MF Global Inc.)*,
    466 B.R. 244 (Bankr. S.D.N.Y 2012) .....................................................................66, 67

*In re Adelphia Communications Corp.*,
    327 B.R. 143 (Bankr. S.D.N.Y. 2005), *aff'd sub. nom. Ad Hoc Adelphia Trade*
    *Claims Comm. v. Adelphia Commc'ns Corp.*, 337 B.R. 475 (S.D.N.Y. 2006) .....................68

*In re Cuyahoga Equip. Corp.*,
    980 F.2d 110 (2d Cir. 1992) ...........................................................................................62

*In re Delta Air Lines, Inc.*,
    370 B.R. 537 (Bankr. S.D.N.Y. 2007), *aff'd sub nom. Kenton Cnty. Bondholders*
    *Comm. v. Delta Air Lines, Inc.*, 374 B.R. 516 (S.D.N.Y. 2007), *aff'd,* 309 Fed. Appx.
    455 (2d Cir. 2009) ..................................................................................................64, 74

*In re Dewey & LeBoeuf LLP*,
    478 B.R. 627 (Bankr. S.D.N.Y. 2012) .....................................................................62, 67

*In re Drexel Lambert Grp. Inc.*,
    138 B.R. 717 (Bankr. S.D.N.Y. 1992), *aff'd sub. nom. Lambert Brussels Assocs. L.P.*
    *v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*,
    140 B.R. 347 (S.D.N.Y. 1992) ......................................................................................69

*In re Drexel Burnham Lambert Grp., Inc.*
    134 B.R. 493 (Bankr. S.D.N.Y. 1991) ..........................................................................64

iv

*In re FGIC*,
No. 401265/2012, 2013 N.Y. Misc. LEXIS 3607 (Sup. Ct. N.Y. County Aug. 16, 2013) .................................................................................3, 14, 58, 59, 61, 65, 75

*In re First Trust & Deposit Co.*,
280 N.Y. 155 (1939) .............................................................................................78

*In re IBJ Schroder Bank & Trust Co.*,
Index No. 101530/98, 2000 N.Y. Misc. LEXIS 692 (Sup. Ct. N.Y. Cnty. Aug. 16, 2000) ...................................................................................................................78

*In re Matter of De Sanchez*,
2008 NY slip op. 50342U (Sup. Ct. N.Y County 2008) .......................................87

*In re MF Global Holdings Ltd.*,
469 B.R. 177 (Bankr. S.D.N.Y. 2012) .................................................................65

*In re MF Global, Inc.*,
No. 11-2790 (MG), 2012 Bankr. LEXIS 3701 (Bankr. S.D.N.Y. Aug. 10, 2012)
(Glenn, J.) .............................................................................................................66

*In re Residential Capital, LLC*,
No. 12-12020 (MG), 2013 Bankr. LEXIS 2601 (Bankr. S.D.N.Y. June 27, 2013) ...............64

*Magten Asset Mgmt. Corp. v. Bank of New York*,
2007 WL 1326795 (Sup. Ct. N.Y. Cnty. 2007)....................................................77

*Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*,
930 F.2d 1132 (6th Cir. 1991) .............................................................................63

*Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus.)*,
467 B.R. 694 (S.D.N.Y. 2012) .............................................................................87

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
478 F.3d 452 (2d Cir. 2007) ..............................................................67, 72, 73

*Mullane v. Cent. Hanover Bank & Trust Co.*,
339 U.S. 306 (1950) ........................................................................................87, 89

*Munford v. Munford (In re Munford, Inc.)*,
97 F.3d 449 (11th Cir. 1996) ..........................................................................63, 64

*N.Y.C. Emps. Ret. Sys. v. Ebbers (In re Worldcom, Inc. Secs. Litig.)*,
293 B.R. 308 (S.D.N.Y. 2003) ........................................................................62, 63

*O'Toole v. McTaggart (In re Trinsum Grp., Inc)*,
No. 11-01284 (MG), 2013 Bankr. LEXIS 1753 (Bankr. S.D.N.Y. Apr. 30, 2013) ...............64

v

*Orentreich v. Prudential Ins. Co. of Am.*,
275 A.D.2d 685 (1st Dep't 2000) .........................................................................75

*Pike v. New York Life Ins. Co.*,
72 A.D.3d 1043 (2d Dep't 2010).........................................................................75

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968) .............................................................................................67

*Wells Fargo Bank, N.A. v. Konover*,
No. 3:05 CV 1924(CFD), U.S. Dist. LEXIS 74873 (D. Conn. Aug. 21, 2009).....................76

*Winstar Holdings, LLC v. Blackstone Grp. L.P.*,
No. 07 Civ. 4634 (GEL), 2007 U.S. Dist. LEXIS 90482 (S.D.N.Y. Dec. 10, 2007)..............62

*Wood v. Wood (In re Wood)*,
825 F.2d 90 (5th Cir. 1987) ..................................................................................62

## STATUTES

15 U.S.C. § 1012(b).................................................................................................64

28 U.S.C. § 157(b)(2) *et seq.*...................................................................................65

28 U.S.C. § 1334(b).........................................................................................61, 62

## OTHER AUTHORITIES

Bankruptcy Rule 9019(a)..........................................................................................66

N.Y. C.P.L.R. § 7701 ...............................................................................................78

10 COLLIER ON BANKRUPTCY ¶ 9019.01 (16th ed. rev. 2013).......................................67

*Restatement (Second) of Trusts* (1959)...............................................................75, 78

Residential Capital, LLC, and each of its debtor affiliates (collectively, the "**Debtors**"),

Financial Guaranty Insurance Company ("**FGIC**"), the FGIC Trustees,[1] and certain Institutional

Investors[2] (collectively, the "**Settlement Parties**"), along with the Official Committee of

Unsecured Creditors (the "**Creditors' Committee"**) hereby submit the following proposed

findings of fact and conclusions of law:

## <u>INTRODUCTION</u>

1.        This proceeding arises from a settlement agreement in bankruptcy (the

"**Settlement Agreement**"), adjudicated pursuant to Rule 9019 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**").  The Debtors filed the *Debtors' Motion*

*Pursuant to Fed. R. Bankr. P. 9019 for Approval of the Settlement Agreement Among the*

*Debtors, FGIC, the FGIC Trustees and Certain Institutional Investors* [Dkt. No. 3929] (the

"**FGIC 9019 Motion**"), seeking approval of the Settlement Agreement on June 7, 2013.

2.        The FGIC 9019 Motion was opposed by Monarch Alternative Capital LP

("**Monarch**"), Stonehill Capital Management LLC ("**Stonehill**"), Bayview Fund Management

LLC ("**Bayview**"), CQS ABS Master Fund Limited and CQS ABS Alpha Master Fund Limited

(collectively, "**CQS**"), hedge funds represented by Willkie Farr & Gallagher, LLP (the "**Willkie**

**Objecting Parties**") and the Federal Home Loan Mortgage Corporation ("**Freddie Mac**" and,

together with the Willkie Objecting Parties, the "**Investor Objecting Parties**"), and the Ad Hoc

Group of Junior Secured Noteholders (the "**Ad Hoc Group**" and, collectively with the Investor

Objecting Parties, the "**Objecting Parties**").

---

[1] The "**FGIC Trustees**" include The Bank of New York Mellon, The Bank of New York Mellon Trust Company, N.A. (together, "**BNY Mellon**"), Law Debenture Trust Company of New York, U.S. Bank National Association ("**U.S. Bank**") and Wells Fargo Bank, N.A. ("**Wells Fargo**"), each solely in their respective capacities as trustees, indenture trustees or separate trustees for certain FGIC Insured Trusts.

[2] The "**Institutional Investors**" include the Steering Committee Consenting Claimants (the "**Steering Committee Group**") and certain members of the Talcott Franklin Consenting Claimants (the "**Talcott Franklin Committee Group**") (each as defined in the Plan Support Agreement, approved by the Court on June 26, 2013 [Dkt. No. 4098]).

3.       The proponents of the FGIC 9019 Motion request that the Court approve the

Settlement Agreement pursuant to Bankruptcy Rule 9019. They contend that the Settlement

Agreement is the product of months of good faith negotiations between numerous parties,

resolves proofs of claim by FGIC totaling $5.55 billion in the aggregate, resolves the majority of

the general unsecured claims asserted by the FGIC Trustees relating to the FGIC Insured Trusts,

provides for a $253.3 million payment from FGIC to the FGIC Trustees (for the benefit of

certain investors), along with other significant value, and is an essential, critical and inextricable

cornerstone of the global settlement set forth in the Plan Support Agreement [Dkt. No. 3814] (the

"**PSA**") previously approved by the Court.  They ask the Court to find (the "**Proposed**

**Findings**"), among other things, that:

- the Settlement Agreement and the transactions contemplated therein, including the releases given therein, meet the Second Circuit's standards for approval of a compromise and settlement in bankruptcy, and are reasonable, fair and equitable, and supported by adequate consideration;

- the Settlement Agreement and the transactions contemplated therein, including the releases given therein, are in the best interest of the Debtors, their estates, their creditors, the investors in each Trust, each such Trust, the Trustees and all other parties in interest;

- the Trustees acted "reasonably, in good faith and in the best interests of the Investors in each Trust and each such Trust in agreeing to the Settlement,"; and

- notice of the Settlement Agreement, including the Trustee's notice of the Settlement Agreement, was adequate and satisfies due process.

4.       The Investor Objecting Parties do not dispute that the Settlement Agreement is in

the best interests of the Debtors and their estates, but rather contend that the FGIC Trustees did

not act reasonably, in good faith, and in their individual best interests in entering into the

Settlement Agreement.  They further contend that the FGIC Trustees did not have authority to

enter into the Settlement Agreement, that the Court does not have jurisdiction to enter certain of

the proposed findings, and that they did not have adequate notice of the proposed settlement.

2

During the evidentiary hearings on this matter, held on August 16 and 19, 2013, the Investor

Objecting Parties asserted, among other things, that potential recoveries under the Rehabilitation

Plan[3] "significantly exceeded the amount the trusts would receive" under the Settlement

Agreement, that there is no evidecm that the FGIC Trustees engaged in hard-fought negotiations

in connection with the Settlement Agreement, and that many of the benefits afforded by the

settlement would also be available to the FGIC Insured Trusts in the absence of the settlement.

Freddie Mac has also asserted that FGIC did not commute any RMBS policies (like the ones at

issue here) during its rehabilitation, and characterized the FGIC Trustees' negotiations for the

Settlement Agreement as "double-dealing."

5.      The Ad Hoc Group contends that the proposed allowance and treatment of

FGIC's claim is not in the best interests of the Debtors and their estates.

6.      Following a thorough review of the record and in connection with this Court's

*Order Granting Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the*

*Settlement Agreement Among FGIC, The Debtors, The Trustees and the Institutional Investors*

(the "**Proposed Order**"), the Court enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

I.    **BACKGROUND**

   A.    **The Structure of the FGIC Insured Trusts and the Policies issued by FGIC to
         the Trusts**

7.      As part of the Debtors' mortgage servicing and origination business, Debtors

GMAC Mortgage, LLC ("**GMACM**") and Residential Funding Company, LLC ("**RFC**") acted

---

[3] The "**Rehabilitation Plan**" refers to the First Amended Plan of Rehabilitation, *In re FGIC*, No. 401265/2012,
pending before Justice Ling-Cohan in the Supreme Court of the State of New York, New York County (the
"**Rehabilitation Court**"). Justice Ling-Cohan approved the Rehabilitation Plan, without objection, by order dated
June 11, 2013. *See In re FGIC*, No. 401265/2012, 2013 N.Y. Misc. LEXIS 3607, at *2 (Sup. Ct. N.Y. County Aug.
16, 2013) (the "**August 16th Mem. of Decision**").

3

in a variety of roles in connection with transactions involving the securitization of residential

mortgages through securitization trusts (the "**RMBS Transactions**").  (Direct Testimony of

Lewis Kruger ¶ 16, July 31, 2013 [Dkt. No. 4431] ("**Kruger Direct**").)  In conjunction with their

various roles in the RMBS Transactions, certain of the Debtors were parties to Pooling and

Servicing Agreements, Assignment and Assumption Agreements, Indentures, Mortgage Loan

Purchase Agreements and other agreements governing the creation and operation of the FGIC

Insured Trusts (as defined below) (the "**Governing Agreements**").  (Kruger Direct ¶ 16; *see e.g.*,

Exs. 114 through 118.)

8.      FGIC, a monoline financial guaranty insurance company, issued irrevocable

insurance policies (the "**Policies**") for securities issued in connection with certain of the

securitization trusts associated with the RMBS Transactions (the "**FGIC Insured Trusts**").

(Kruger Direct ¶ 17.)  There are forty-seven FGIC Insured Trusts.  (*Id.*; Ex. 212 at 2.)  By issuing

the Policies, FGIC guaranteed the payment of principal and interest due on the insured securities

("**Securities**").  (Kruger Direct ¶ 17; Direct Testimony of Robert H. Major ¶ 4, July 31, 2013

[Dkt. No. 4692] ("**Major Direct**"); Direct Testimony of Mary L. Sohlberg ¶ 2, July 31, 2013

[Dkt. No. 4695] ("**Sohlberg Direct**"); Direct Testimony of Mamta K. Scott ¶ 3, July 31, 2013

[Dkt. No. 4697] ("**Scott Direct**").)  Additionally, FGIC entered into an Insurance and Indemnity

Agreement with one or more of the Debtors in connection with each of the FGIC Insured Trusts

(the "**Insurance Agreements**"), which contained certain representations and warranties.

(Kruger Direct ¶ 17; Major Direct ¶ 4; Sohlberg Direct ¶ 2; Scott Direct ¶ 3.)  Pursuant to the

Insurance Agreements, the Debtor parties agreed, among other things, to reimburse FGIC for

certain payments FGIC made under the Policies resulting from the applicable Debtor's failure to

repurchase or substitute mortgage loans in breach of one or more representations or warranties

4

contained in the applicable Governing Agreements.  (Kruger Direct ¶ 17; Major Direct ¶ 4;

Sohlberg Direct ¶ 2; Scott Direct ¶ 3.)

### B.    The Rights and Obligations of the FGIC Trustees

9.      The applicable Debtors, as Sellers under the Governing Agreements, made

representations and warranties to the FGIC Trustees regarding the mortgage loans underlying the

FGIC Insured Trusts.  (*See e.g.*, Ex. 114 § 2.04; Ex. 118 § 2.04; Ex. 116 § 3.12; Ex. 117 § 3.12.)

The Governing Agreements convey to the applicable FGIC Trustee all "right, title, and interest in

. . . the [loans] . . . [and] all present and future claims, demands, causes and choses in action in

respect of any or all of the foregoing and all payments on or under, and all proceeds of every

kind and nature whatsoever."  (*See, e.g.*, Exs. 116 & 117 at Granting Clause; *see also* Ex. 118 §§

2.01, 2.04.)

10.     As noted, the Governing Agreements include Indentures, Pooling and Servicing

Agreements and other documents that govern the creation and operation of the FGIC Insured

Trusts.  (Kruger Direct ¶ 16.)  Pursuant to the Indentures, "[a]ll rights of action and of asserting

claims under this Indenture, or under any of the Notes, may be enforced by the Indenture Trustee

without the possession of any of the Notes or production thereof in any trial or other Proceeding

relative thereto, and any such action or proceeding instituted by the Indenture Trustee shall be

brought in its own name."  (*E.g.*, Ex. 116 § 5.03(f); Ex. 117 § 5.03(f).)  The respective indentures

provide that if there is a default in the payment of principal or interest due under the notes, the

FGIC Trustee may, "in its own name and as trustee of an express trust," institute proceedings for

the collection of such amounts from the trust or other obligor on the notes. (Ex. 116 § 5.03(b);

117 § 5.03(b).)  Similarly, the Pooling and Servicing Agreements provide that, in the event of

certain shortfalls in cash flow to the FGIC Insured Trust, the FGIC Trustees are required to

submit a claim to FGIC under the applicable Policy.  (*E.g.*, Ex. 114 § 4.10(a); Ex. 118 § 4.12(a).)

11.     In performing their duties as trustee or exercising their rights and powers under the Governing Agreements, the FGIC Trustees are under no obligation to expend or risk their own funds, or incur any personal liability.  (*See, e.g.*, Ex. 114 §§ 8.01(c)(v), 8.02(a)(iv); Ex. 116 §§ 6.01(f), 6.02(d), 6.02(f); Ex. 117 §§ 6.01(f), 6.02(d), 6.02(f); Ex. 118 §§ 8.01(c)(v), 8.02(a)(iv).)

12.     The FGIC Trustees are also "under no obligation to exercise any of the powers vested in [them] by [the Governing Agreements] or to institute, conduct or defend any litigation . . . at the request, order or direction [of] . . . the [investors]" if FGIC or the investors do not provide the respective FGIC Trustee with proper indemnity "against the costs, expenses and liabilities" of such action.  (*E.g.*, Ex. 114 § 8.02(a)(iii); Ex. 116 § 6.02(h); Ex. 118 § 8.02(a)(iii).)

13.     Prior to the occurrence of an Event of Default (as defined in the relevant Governing Agreement), the FGIC Trustees' duties are strictly limited to those set forth in the Governing Agreements.  (*See, e.g.*, Ex. 114 § 8.01(a); Ex. 116 § 6.01(b)(i); 117 § 6.01(b)(i); Ex. 118 § 8.01(a).)  Upon the occurrence of an Event of Default that has not been cured or waived, the Governing Agreements provide that the FGIC Trustees must exercise such of the "rights and powers vested in [them] by [the Governing Agreements], and use the same degree of care and skill in their exercise as a prudent investor would exercise or use under the circumstances in the conduct of such investor's own affairs."  (*E.g.*, Ex. 114 § 8.01(a); Ex. 118 § 8.01(a); *see also, e.g.*, Ex. 116 § 6.01(a); Ex. 117 § 6.01(a).)

14.     The Governing Agreements provide that the FGIC Trustees are entitled to rely on the advisors to assist in the performance of the FGIC Trustees' duties.  (*E.g.*, Major Direct ¶ 17; Sohlberg Direct ¶ 13; Scott Direct ¶ 14; Trial Tr. 142:2-6; Ex. 116, 117 § 6.02; Ex. 114, 118 § 8.02; Deposition Designations for Mary Solhberg at 143:15-19 ("**Sohlberg Dep.**"), *The*

6

*Objectors' Designations of Trustees' Deposition Testimony*, dated August 22, 2013 [Dkt. No. 4799].)

### C.    Proofs of Claim filed by FGIC and the FGIC Trustees in the Bankruptcy

#### (a)    FGIC's Proofs of Claim

15.    Before the petition date in these cases, FGIC filed twelve civil suits asserting a variety of claims against Residential Capital, LLC ("**ResCap**"), GMACM, and RFC in connection with twenty of the FGIC Insured Trusts.  (Kruger Direct ¶ 18; Ex. 212 at 11; Exs. 8-19.)  The actions are currently pending in the United States District Court for the Southern District of New York, and each action has been automatically stayed as against the Debtors. (Kruger Direct ¶ 18; Ex. 212 at 3.)  In the complaints, FGIC asserts claims for fraudulent inducement and breach of the Insurance Agreements, alleging, among other things, that ResCap, GMACM, and RFC made false representations and warranties with respect to the credit quality and characteristics of the loans backing the securities wrapped by FGIC.  (*See generally* Exs. 8-19.)  As of the petition date, the Debtors had not yet filed responsive pleadings or commenced discovery in any of the FGIC actions.  (Kruger Direct ¶ 18.)

16.    On November 16, 2012, FGIC filed three proofs of claim numbered 4868, 4870 and 4871 against Debtors RFC, ResCap and GMACM, respectively (collectively, the "**FGIC Claims**"), asserting general unsecured claims against each of those Debtors relating to, among other things, the claims set forth in FGIC's prepetition suits.  (Kruger Direct ¶ 19; Ex. 212 at 3-4; Exs. 2-4.)

17.    The FGIC Claims allege that, among other things: (i) RFC and GMACM breached various representations, warranties and covenants in the Insurance Agreements, Governing Agreements or the offering documents, (ii) FGIC was fraudulently induced to issue the Policies in connection with most of the FGIC Insured Trusts, and (iii) ResCap is liable for the

7

alleged breaches and fraud of GMACM and RFC under alter ego liability theory. (Kruger Direct ¶ 19; Ex. 2 at 9, 13-15; Ex. 3 at 9, 13-15; Ex. 4 at 9, 13-15.) Each of the FGIC Claims also asserts that "because GMACM and RFC were acting at the direction of ResCap, ResCap may be jointly and severally liable to FGIC for the harms FGIC has suffered from the fraudulent inducement committed by GMACM and RFC." (*E.g.*, Ex. 2 at 13.) FGIC also asserts claims related to the Debtors' allegedly deficient servicing of the mortgage loans in the FGIC Insured Trusts and based on the Debtors' alleged failure to provide FGIC access to certain information in accordance with the Governing Agreements. (*Id.* at 10-11.) FGIC further seeks indemnification for "any and all claims, losses, liabilities, demands, damages, costs, or expenses of any nature arising out of or relating to the breach" of the Governing Agreements. (*Id.* at 16.)

18.    The FGIC Claims assert claims of "not less than $1.85 Billion" against each of RFC, ResCap, and GMACM. (*E.g.*, Ex. 2 at 17.) Thus, in total, FGIC asserts claims of $5.55 billion. (Kruger Direct ¶ 34.) FGIC determined this amount by calculating the total expected lifetime claims against FGIC under the Policies and adding, among other things, estimated interest and costs that FGIC has incurred or expects to incur in connection with pursuing the claims. (Kruger Direct ¶ 20; *e.g.,* Ex. 2 at 16-17.) The value of total expected lifetime claims includes historical claims FGIC has already received, plus the present value of the difference between the projected expected future claims and expected future premiums. (*Id.*)

19.    FGIC ceased making payments on all claims—including claims made by the FGIC Trustees under the Policies—as of November 2009, pursuant to an order issued on November 24, 2009 by the Superintendent of Financial Services of New York, FGIC's court-appointed rehabilitator (the "**FGIC Rehabilitator**"), under section 1310 of the New York Insurance Law. (Kruger Direct ¶ 21.) FGIC subsequently commenced a formal rehabilitation

proceeding in June 2012.  (Ex. 212 at 4.)  According to counsel for the FGIC Rehabilitator,

FGIC has paid to date approximately $343.2 million in claims to the insured Debtor-sponsored

FGIC Insured Trusts for which FGIC has not yet been reimbursed.  (Ex. 212 at 3; Kruger Direct

¶ 28; Ex. 1 § 3.01.)  Approximately $789 million of additional claims have been asserted against

FGIC arising out of those trusts, and the present value of losses FGIC has projected to arise

under the Policies exceeds $400 million.  (*Id.*)

> **(b)**    **The FGIC Trustees' Claims in Connection with the FGIC Insured
>            Trusts**

20.    In addition to and separate from the claims asserted by FGIC in these chapter 11

cases, each of the FGIC Trustees has asserted claims and has filed proofs of claim with respect to

the forty-seven FGIC Insured Trusts (the "**FGIC Trustees' Claims**").  (Kruger Direct ¶ 22;

Major Direct ¶¶ 11-12; Exs. 5-7.)

21.    In their proofs of claim, the FGIC Trustees assert servicing claims, representation

and warranty claims, indemnification claims, fraud and negligent misrepresentation claims, alter

ego and veil piercing claims, and setoff and recoupment rights, among others, with respect to the

forty-seven FGIC Insured Trusts.  (Ex. 5 at 16-21; Ex. 6 at 18-24; Ex. 7 at 15-22.)  While the

proofs of claim do not indicate an aggregate amount of damages being sought, with respect to the

representation and warranty claims above, each of the FGIC Trustees assert a "Buyback Claim

for an amount not less than its allocable portion of the Allowed Repurchase Claim of $8.7

billion", which was at issue in the RMBS 9019 Motion.[4]  (*E.g.*, Ex. 5 at 18 ¶ 36.)  In the absence

of the proposed RMBS Trust Settlement, the FGIC Trustees' claims against the Debtors in

connection with the FGIC Insured Trusts could be equal to the aggregate estimated lifetime

---

[4] *See Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust
Settlement Agreements* [Dkt. No. 1887] ("**RMBS 9019 Motion**").  Pursuant to this Motion, the Debtors sought
approval of the compromise and settlement of an allowed claim against the Debtors to be offered to and allocated
amongst certain securitization trusts ("**RMBS Trust Settlement**").  (*Id.* at 1.)

9

reductions in the value of the collateral pools underlying those trusts.  (Kruger Direct ¶ 22.)

These collateral losses would be substantial.  (Kruger Direct ¶ 24.)

22.     Based on his involvement in the RMBS Trust Settlement dispute, Mr. Kruger was

aware that the FGIC Insured Trusts represented roughly ten percent of the 392 trusts in the

RMBS Trust Settlement at issue in the RMBS 9019 Motion.  (*See* Kruger Direct ¶ 23.)  Mr.

Kruger was also aware that those 392 trusts had by April 2013 suffered over $30 billion in

collateral losses and that those trusts were projected to lose another $13.5 to $19.8 billion in the

future.  (*Id.*) (internal quotation marks omitted).)  Mr. Kruger therefore believed that, absent a

settlement, the FGIC Trustees' claims could total roughly ten percent of those aggregate

collateral losses, or, in his mind, roughly $3 billion to $4 billion.  (*Id.*)

23.     In support of the FGIC 9019 Motion, the Debtors retained a financial expert, Dr.

Ron D'Vari, to provide an estimate of the total potential lifetime collateral losses for the forty-

seven FGIC Insured Trusts.  (Direct Testimony of Ron D'Vari ¶¶ 1-3, July 31, 2013 [Dkt. No.

4432] ("**D'Vari Direct**").)  Dr. D'Vari determined from publicly available data that the FGIC

Trustees have already incurred over $3.6 billion of collateral losses with respect the FGIC

Insured Trusts, and he forecasted future collateral losses of approximately $1.7 billion.  (*Id.* ¶ 4.)

Dr. D'Vari also estimated the upper-bound of lifetime losses to those interests in the Trusts that

are not insured by FGIC, because, as explained further below, under the Settlement Agreement

the FGIC Trustees' are not releasing any claims arising from past or future losses to

certificateholders whose interests in the FGIC Insured Trusts are not insured by FGIC.  (*Id.* ¶ 3;

Ex. 1 § 2.01(a)(iv).)  Dr. D'Vari calculated that lifetime collateral losses to these non-wrapped

interests are roughly $413 million.  (D'Vari Direct ¶ 4.)  Subtracting this upper limit of losses to

non-wrapped interests, Dr. D'Vari concluded that the lifetime expected collateral losses of the

FGIC Insured Trusts—and thus the outer-limit of claims released by the FGIC Trustees—is $5,001,609,304.  (*Id.*)[5]

### D.    The Mediation Process

#### (a)    Pre-Mediation

24.    The path to execution of the Settlement Agreement began prior to the commencement of the Debtors' bankruptcy filing, when the Steering Committee Group, the Talcott Franklin Group, and the Ad Hoc Group negotiated and signed a pre-bankruptcy agreement with the Debtors  and Ally Financial, Inc. ("**AFI**"), whereby AFI would contribute $750 million to the Debtors in exchange for general releases of all claims, including third party claims, and certain claims held by the Trustees against the Debtors would be compromised for $8.7 billion.  (Witness Statement of John S. Dubel ¶ 8, July 31, 2013 [Dkt. No. 4436] ("**Dubel Direct**"); Major Direct ¶ 14; Scott Direct ¶ 11.)

25.    This proposed pre-bankruptcy settlement agreement was opposed by many parties in the chapter 11 cases, including FGIC and the Creditors' Committee.  (Dubel Direct ¶¶ 8.)  In addition to litigation regarding the pre-bankruptcy settlement, it appeared that additional litigation between and among the Debtors, AFI, and their creditor constituencies was

---

[5] Dr. D'Vari's estimate does not represent an analysis of the potential losses to certificateholders, nor does it reflect any analysis of the validity of any claims for collateral losses.  (D'Vari Direct ¶¶ 2-4.)  Of the view that Dr. D'Vari's testimony that he did not analyze the validity of such claims is inconsistent with his testimony that the potential universe of claims released is roughly $5 billion, Freddie Mac moved *in limine* to preclude Dr. D'Vari's testimony, asserting that Dr. D'Vari shifted his testimony, or that his testimony was inconsistent.  The Debtors contended that Freddie Mac misunderstood or misinterpreted Dr. D'Vari's testimony.  The Court denied the motion for the reasons stated on the record on August 14, 2013.  (August 14, 2013 Hearing Tr. at 17:5-18:16 [Dkt. No. 4686].)   The Court reserved for cross-examination Freddie Mac's criticism that Dr. D'Vari shifted his testimony, or that his testimony was inconsistent.  (*Id.* at 18:12-15.)  At trial, however, the Investor Objecting Parties declined to cross-examine Dr. D'Vari.  (Trial Tr. 196:13-22.)

ny-1105566

unavoidable absent a larger resolution.[6]  (Ex. 226 (Disclosure Statement, July 4, 2013, at 10-12 [Dkt. No. 4157]).)

26.     In order to forestall potentially years of burdensome and expensive litigation, this Court appointed the Honorable James M. Peck, a sitting bankruptcy judge with significant experience in complex, multi-party cases, to act as global plan mediator.  (Dubel Direct ¶ 9; *see* Ex. 311.)

27.     The mediation process (the "**Mediation**") was designed by the Debtors and approved by this Court to encompass two major areas: (i) the claims asserted by the Debtors' estates and the third party claims held by individual creditors against AFI, and (ii) allocation of the value of any recovery on those claims and the other assets of the Debtors' estates among the many competing creditor groups.  (Dubel Direct ¶ 12; Ex. 226 at 79-80.)  As part of the Mediation, the Court put strict confidentiality protections in place, which precluded the parties from describing the substance of any of the negotiations.  (*Id.* at 9; Ex. 53 (the "**Mediation Order**").)  Nonetheless, the fact of the Mediation was highly publicized in dozens of publicly available court filings in these proceedings.  (*See generally* Ex. 313.)

>     (b)     **The Mediation**

28.     The Mediation, which ultimately produced the Settlement Agreement, involved intense, good faith, arm's-length negotiations conducted among sophisticated parties with differing and conflicting interests, under the close supervision and guidance of Judge Peck. (Major Direct ¶ 21; Scott Direct ¶ 18; Sohlberg Direct ¶ 15; Dubel Direct ¶¶ 6, 7, 10-18; Kruger Direct ¶¶ 5, 14, 57-59; Deposition Designations for Lewis Kruger at 192:6-18 ("**Kruger Dep.**"), *Consolidated Designations of Lewis Kruger's Deposition Testimony*, dated August 22, 2013

---

[6] As reflected in the Debtors' Disclosure Statement, some 6,850 proofs of claim were filed, totaling $99.7 billion, although the Debtors estimate that they will end up with approximately $13.4 billion in allowed unsecured claims. (Dubel Direct ¶ 12; Ex. 226 at 352.)

[Dkt. No. 4803]; Deposition Designations for Robert H. Major at 195:6-13 ("**Major Dep**."), *The Objectors' Designations of Trustees' Deposition Testimony*, dated August 22, 2013 [Dkt. No. 4799]; Trial Tr. 467:8-19.)

29.    All of the parties who participated in the negotiations understood and appreciated the complexities involved in RMBS transactions and financial guaranty insurance.  (Dubel Direct ¶ 6-7, 15-16; Kruger Direct ¶¶ 38, 57, 58; Kruger Dep.  192:6-12; Major Direct ¶¶ 8-9, 16, 18.) These parties include, but are not limited to, the Debtors, AFI, the Creditors' Committee, FGIC, the Trustees of the various ResCap related trusts that issued RMBS securities, the Trustees' financial advisor, Duff & Phelps, LLC ("**Duff & Phelps**"), the Ad Hoc Group,[7] the Federal Housing Finance Agency, and various significant creditor groups, such as the Steering Committee Group and the Talcott Franklin Group.  (*Id*.)

30.    The Mediation proceeded over approximately five months, consisting of intense negotiations among the Settlement Parties and involving dozens of small group mediation meetings and conference calls, which culminated in a series of five all-hands mediation sessions. (Dubel Direct ¶¶ 10, 14-18; Ex. 311; *see* Trial Tr. 93:3-9.)

31.    Judge Peck began the mediation process by holding individual meetings with each of the main participants.  (Dubel Direct ¶ 10.)  Throughout the next several months, the parties held dozens of meetings and conference calls.  (*Id.* at ¶¶ 14-15; Ex. 311.)

---

[7] The Ad Hoc Group, in their February 21, 2013 objection to the Debtors' motion to extend their exclusive time period to file a bankruptcy plan (where the Debtors in part relied upon the mediation process as cause for the extension), described the hard-fought nature of the mediation negotiations:

> For the past two months, the Ad Hoc Group has patiently participated in a plan mediation process that has, to date, not resulted in the global compromise envisioned by the Court at its inception.  Perversely, these well-intentioned efforts to achieve consensus through mediation have seemingly emboldened certain parties to harden their negotiating positions, secure in the knowledge that the Debtors' present plan construct— with its non-consensual third party release provisions with Ally—remains the only show in town.  Even the best efforts of a sitting bankruptcy judge and experienced and respected mediator have been unable to break this impasse.

(Ex. 313 at 5.)

32.     On April 22, 2013, Judge Peck held the first global mediation session.  (Dubel Direct ¶ 16; Ex. 311 at 4.)  Approximately 140 parties attended, including representatives from approximately twenty-three different creditors or creditor groups, seventy-five attorneys and thirty-six financial advisors to the various parties.  (Dubel Direct ¶ 16.)

33.     Throughout the rest of April and May 2013, Judge Peck held additional large group mediation sessions, conference calls and smaller group meetings.  (Dubel Direct ¶ 18; Ex. 311.)  The mediation process concluded after the last large group negotiation, which began the morning of May 22, 2013, went through the following night, and ended with the signing and filing of settlement documents at approximately 9 a.m. on May 23, 2013, in compliance with a deadline set by the Court.  (Dubel Direct ¶ 18; Ex. 311.)

34.     The Settlement Agreement represents an integral part of the Settlement Parties' broader efforts to reach a resolution of the various, often competing, claims of creditor constituencies, and it was instrumental in facilitating the success of the global mediation effort directed by Judge Peck.  (Kruger Direct ¶ 4-5; Scott Direct ¶18; Major Direct ¶ 21; Sohlberg Direct ¶ 15; Ex. 313; August 16th Mem. of Decision at *2.)

(c)     **The Settlement Payment Proposal**

35.     The concept of a commutation between FGIC and the FGIC Insured Trusts, discussed in greater detail below, was first discussed early in the Mediation, in January 2013. (Deposition Designations for John S. Dubel at 154:20-22, 154:25-155:2, 156:2-6 ("**Dubel Dep.**"), *The Objectors' Designations of Deposition Testimony of John S. Dubel*, dated August 22, 2013 [Dkt. No. 4800]; Trial Tr. 52:13-17; Ex. 311.)

36.     The FGIC Trustees joined the negotiations of the Settlement Agreement, including the commutation, two months later, in March 2013.  (Dubel Dep. 145:25-146:22, 146:24-147:10, 154:20-22, 154:25-155:15.)  John Dubel, Chief Executive Officer of FGIC, met

14

with Glenn Siegel, representing The Bank of New York Mellon Trust Company, N.A., who was

"acting as a spokesman" for the FGIC Trustees, to discuss settlement. (Dubel Dep. 149:20-25,

150:2, 150:4-24.) The amount of the commutation was extensively negotiated. (Trial Tr. 467:8-

11; *see also* Major Dep. 154:22-155:9, *FGIC's Rebuttal Designations of Deposition Testimony*,

dated August 22, 2013 [Dkt. No. 4801].)

37.     The Debtors, meanwhile, joined the negotiations of the prospective settlement

between FGIC and the FGIC Trustees in early April 2013. (*See* Kruger Direct ¶ 58.)

### E.     The Terms of the Settlement Agreement

38.     The Settlement Agreement consists of three principal parts, described in further

detail below: (i) allowance of the FGIC Claims against certain of the Debtors' estates in the

minimum aggregate amount of $596.5 million (the "**Minimum Allowed Claim Amount**"),

subject to FGIC's reservation of its rights to assert certain additional claims in a larger amount

capped at $596.5 million at each of ResCap, GMACM and RFC in the event that the Plan

Support Agreement is terminated or the plan contemplated thereunder is not approved (Ex. 1

§ 3.01); (ii) the settlement, discharge and release of FGIC's obligations under the Policies in

exchange for, among other things, a cash payment of $253.3 million from FGIC to the FGIC

Trustees and the waiver of future premiums, reimbursements and other payments under the

waterfall provisions of the Governing Agreements (Ex. 1 §§ 2.01-2.02); and (iii) the release

against the Debtors' estates of the remainder of the FGIC Claims and the vast majority of the

FGIC Trustees' Claims related to the FGIC Insured Trusts (Ex. 1 § 2.01).

39.     The Settlement Parties calculated the base $596.5 million Minimum Allowed

Claim Amount by taking the sum of $343.2 million (the amount of claims FGIC has already paid

under the Policies that remains unreimbursed by the Debtors) and $253.3 million (the amount of

the Settlement Payment provided for under the Settlement Agreement). (Kruger Direct ¶ 28; Ex. 1 § 3.01.)

40.     The Settlement Agreement's "Effective Date" is the first Business Day on which all of the conditions in Section 6.01 have been satisfied or waived.  (Ex. 1 § 1.05.)  Those conditions are that (i) the Rehabilitation Court has entered an order approving the Settlement Agreement; (ii) that order has become a final order; (iii) the Bankruptcy Court has entered an order approving the Settlement Agreement; and (iv) that order has become a final order.  (Ex. 1 § 6.01.)  The Effective Date of the Settlement Agreement is not conditioned on the completion of the plan confirmation process or on the global settlement plan contemplated in the PSA being approved or becoming effective.  (Kruger Direct ¶ 29.)

### (a)     The FGIC Allowed Claims

41.     The first component of the Settlement Agreement is the allowance of the FGIC Claims (the "**FGIC Allowed Claims**").  The amount of the FGIC Allowed Claims will depend on whether or not the plan contemplated in the PSA is or is not ultimately approved as part of a plan confirmation process and becomes effective.  (Kruger Direct ¶ 30.)

42.     The Settlement Agreement provides that, as of the Effective Date, the FGIC Claims shall be deemed allowed as general unsecured claims against each of ResCap, GMACM, and RFC in the aggregate for the Minimum Allowed Claim Amount of $596.5 million.  (Kruger Direct ¶ 31; Ex. 1 at § 3.01.)  This Minimum Allowed Claim Amount will be allocated among ResCap, GMACM, and RFC pro rata based on which of the Debtors would be obligated to reimburse FGIC for such payments under the Governing Agreements.  (Ex. 1 at § 3.01.)  The Minimum Allowed Claim Amount is, therefore, a floor for the amount of the claims that FGIC will receive if the Settlement Agreement is approved.  (Kruger Direct ¶ 31.)  This amount is significantly less than the $1.85 billion in claims that FGIC has asserted against each of ResCap,

16

GMACM, and RFC under its proofs of claim.  (Kruger Direct ¶ 31; *cf.* Ex. 2 at 17; Ex. 3 at 17;

Ex. 4 at 17.)

43.    The Settlement Agreement further provides that, if the PSA is terminated or the

plan contemplated under the PSA does not "go effective," then, in addition to the single allowed

and allocated claim of $596.5 million, FGIC reserves the right to assert general unsecured claims

against each of ResCap, GMACM, and RFC "with all claims by FGIC (including any FGIC

Allowed Claims or otherwise) against each such entity capped in each case at the amount of"

$596.5 million.  (Kruger Direct ¶ 32; Ex. 1 § 3.01.)  Nothing in the Settlement Agreement

prevents the Debtors from objecting to or otherwise seeking subordination of any unsecured

claims asserted by FGIC in excess of the Minimum Allowed Claim Amount.  (Kruger Direct ¶

32.)  Thus, the terms of the Settlement Agreement also set a ceiling for claims that FGIC can

ever assert against the Debtors if the Settlement Agreement is approved.  (*Id.*)  This ceiling is

also significantly less than the $1.85 billion in claims that FGIC has asserted against each of

ResCap, GMACM and RFC under its proofs of claim. (*Id*; *cf.* Ex. 2 at 17; Ex. 3 at 17; Ex. 4 at

17.)

44.    Under either scenario, the FGIC Allowed Claims will be treated *pari passu* with

other unsecured claims allowed against ResCap, GMACM and RFC.  (Ex. 1 § 3.02.)

> **(b)    The Settlement, Discharge and Release of FGIC's Obligations Under
> the Policies**

45.    The second element of the Settlement Agreement is a settlement, discharge and

release of FGIC's obligations under the Policies.  (Kruger Direct ¶ 33; Ex. 1 § 2.01(a).)  FGIC

will obtain releases of its obligations under the Policies, in exchange for a cash payment from

FGIC to the FGIC Trustees in the amount of $253.3 million (the "**Settlement Payment**") a

waiver of future premiums under the Policies, and a waiver of rights to receive certain other

17

payments pursuant to the waterfall provisions of the Governing Agreements.  (Ex. 1 §§ 2.01, 2.02.)  The Settlement Payment will be allocated among each FGIC Insured Trust based on each FGIC Insured Trust's accrued and unpaid claims under the Policies and each FGIC Insured Trust's estimated future claims under the Policies.  (Ex. 1 at Ex. F (Allocation Methodology).)  Upon the effective date of the Settlement Agreement, this settlement, discharge and release will prevent any further claims against FGIC under the Policies, ending any further accrual of claims FGIC alleges it holds against the Debtors.  (Ex. 1 § 2.01.)

### (c)    Releases of Claims Against the Debtors

46.    The third element of the Settlement Agreement is releases to the Debtors.  (Kruger Direct ¶ 34; Ex. 1 § 2.01.)  These releases become effective and binding as of the Effective Date of the Settlement Agreement.  (*Id.*)

47.    In accordance with the releases, FGIC agrees to a reduction of its total, asserted claims in the aggregate amount of $5.55 billion—*i.e.*, its proofs of claim totaling $1.85 billion against each of ResCap, GMACM, and RFC—to a specified range as described in Section 3.01 of the Settlement Agreement.  (Kruger Direct ¶ 34; Ex. 1 §§ 2.01, 3.01.)  FGIC has also agreed to release any and all other claims against the Debtors and their estates under the Governing Agreements and the Policies.  (Ex. 1 §§ 2.01(a)(i)-(iii), 2.01(b).)

48.    In addition, the FGIC Trustees agreed to release all of the "origination-based" claims that the FGIC Trustees asserted in connection with the FGIC Insured Trusts, less the amount of any claims under the Governing Agreements for any past or future losses to holders of Securities not insured by the Policies.  (Ex. 1 §§ 2.01(a)(iv), 2.01(b); *see* Ex. 43.)  This release, however, expressly did not affect distribution under the RMBS Trust Allocation Protocol appearing at Annex III to the Supplemental Term Sheet (as defined in the Plan Support Agreement, dated May 23, 2013 [Dkt. No. 3814-5]).  (Ex. 1 §§ 2.01(a)(iv).)

18

49.    Using the amounts sought by FGIC as against each Debtor in its proofs of claim and the lifetime estimated loss of collateral for the FGIC Insured Trusts calculated by Dr. D'Vari, this means that each of the Debtors will obtain a release of claims asserted by FGIC and the FGIC Trustees, in varying amounts of up to approximately $6.85 billion against any one Debtor, less the maximum claim FGIC may assert against that Debtor under Section 3.01 of the Settlement Agreement.  (Kruger Direct ¶ 34.)

## II.    FACTS SUPPORTING THE DEBTORS' ENTRY INTO THE SETTLEMENT AGREEMENT

### A.    Mr. Kruger's Authority to Enter Into the Settlement Agreement

50.    On February 11, 2013, Mr. Kruger was appointed by the Debtors to serve as their Chief Restructuring Officer ("**CRO**"). (Kruger Direct ¶ 7.)

51.    Mr. Kruger's Engagement Letter provides that "Mr. Kruger shall serve as the Chief Restructuring Officer (the 'CRO') of the Debtors [and] shall report directly to the Board Directors of Residential Capital, LLC (the 'Board')."  (Kruger Direct ¶ 8; Ex. 30 at 7.)

52.    The Engagement Letter further provides that:

- [T]he CRO shall be vested with the Debtors' powers to oversee, manage, and direct the acts, conduct, assets, liabilities and financial conditions of the Debtors, the operation of the Debtors' business [in] any matters relevant to the case, including without limitation, the authority to:

- direct Debtors' respective management teams and professionals in connection with the Debtors' efforts to negotiate and settle the Claims against the Debtors, and propose a schedule and process for the litigation of disputed claims, including, but not limited to, those held by the monolines, junior secured bonds, the RMBS Trustees, and securities claimants;

- direct the Debtors' executive management teams and professionals in developing and implementing an efficient liquidation of the Debtors' assets for the benefits of the Debtors' unsecured creditors;

- direct the litigation strategy of the Debtors including the investigation, prosecution, settlement and compromise of claims filed against the Debtors and of estate causes of action;

19

- direct the Debtors' executive management team and professionals in formulating a chapter 11 plan;

- communicate and negotiate with the Debtors' creditors and key stakeholders, including the official committee of unsecured creditors (the "Creditors' Committee"), and assist such parties in working towards a consensual chapter 11 plan;

- make decisions on behalf of each Debtor with respect to chapter 11 plan negotiations and formulation, in such a manner as is consistent with the business judgment rule, the provision of applicable law, taking into account the respective fiduciary duties of the CRO to each Debtor's respective estate;

- cooperate with the Creditors' Committee in negotiations with Ally Financial Inc. ("AFI") to attempt to pursue a global settlement of the Debtors' claims against AFI that is acceptable to all major stakeholders;

- represent the Debtors' interests through counsel before this Court; . . .

(*Id.*)

53.    Mr. Kruger's Engagement Letter also makes clear that "[e]ach of the Debtors acknowledges and agrees that the Services being provided hereunder are being provided on behalf of them, and the Company, on behalf of each Debtor, hereby waives any and all conflicts of interest that may arise on account of the Services being provided on behalf of any other entity."  (*Id.* at 4.)

54.    Mr. Kruger's appointment as CRO and the terms of his Engagement Letter were approved by the Court on March 5, 2013. (*Id.*; Ex. 31.)

55.    Under this Engagement Letter, Mr. Kruger had the requisite authority to enter into the Settlement Agreement on behalf of all debtor entities involved. (Kruger Direct ¶¶ 35-36; Kruger Dep. 38:19-39:5, 105:21-25; Trial Tr. 103:9-24, 103:25-104:3, 107:7-17, 107:25-108:1.)

20

B.    **Basis for Mr. Kruger's Business Judgment**

56.    Mr. Kruger exercised his own independent business judgment in determining that entry into the Settlement Agreement was appropriate and in the best interests of the Debtors and their creditors. (Kruger Direct ¶ 36.)

57.    Prior to exercising this judgment, and approving the Settlement Agreement, Mr. Kruger reviewed a significant amount of materials. (Kruger Direct ¶ 13; Kruger Dep. 108:20-22; Trial Tr. 112:5-113:18.)  These materials included, but were not limited to, one of the FGIC Complaints filed pre-petition (Kruger Direct ¶ 13; Kruger Dep. 108:9-16), one of FGIC's proofs of claim (Kruger Dep. 109:7-13), a memorandum prepared by Morrison & Foerster regarding the merits of the FGIC Claims asserted (Kruger Dep. 110:21-111:10), presentations by Morrison & Foerster on monoline claims (Kruger Dep. 114:21-115:6), a Carpenter Lipps & Leland presentation on monoline claims (Kruger Dep. 112:11-16), and the substantive materials prepared in connection with the RMBS 9019 Motion.  (Kruger Direct ¶¶ 10, 37; *see* Exs. 54, 55, 56.)

58.    Mr. Kruger's views of the Settlement Agreement were also informed by additional discussions with his counsel, financial advisors, and with the other parties and constituencies involved in the effort to reach a global settlement.  (Kruger Direct ¶¶ 35-36; Trial Tr. 114:1-115:12.)

59.    Mr. Kruger was aware that potential lifetime losses for the FGIC Insured Trusts could be $3 to $4 billion.  (Kruger Direct ¶ 23; Trial Tr. 127:10-24.)  He understood that if the parties were unable to reach an agreement to resolve the claims involving the FGIC Insured Trusts, the FGIC Trustees' claims against the Debtors could be substantial and in the billions of dollars. (Kruger Direct ¶ 23.)

21

60.     Mr. Kruger also considered potential drawbacks to entering into the Settlement

Agreement, such as the waiver of the possibility to subordinate the FGIC Claims under Section

510(b) of the Bankruptcy Code (Trial Tr. 117:17-118:9), and possible future AFI indemnification

claims.  (Trial Tr. 124:24-125:22.)  Mr. Kruger considered the former risk remote, and the latter

risk insufficient reason for pause.  (Trial Tr. 117:17-118:9, 124:24-125:22.)

### C.     The Possibility of Success of Litigating the FGIC Claims and the Settlement Agreement's Future Benefits to the Debtors

#### (a)     Litigation Uncertainty

61.     There is significant uncertainty regarding the outcome of any litigation addressing

the validity, priority and amount of the FGIC Claims and the FGIC Trustees' Claims through the

claims resolution process.  (Kruger Direct ¶ 44.)  As described above, FGIC's claims arise in part

from twelve prepetition complaints; however, as of the petition date, the Debtors had not yet

filed responsive pleadings or commenced discovery in any of the FGIC actions.  (*Id*. ¶ 18.)

Litigation involving these types of monoline claims would involve substantial litigation risk.  (*Id.*

¶ 45.)

62.     The reasons for this uncertainty and risk include, but are not limited to, the fact-

intensive issues and the relatively novel legal issues involved in litigating the FGIC Claims and

the FGIC Trustees' Claims.  (Kruger Direct ¶ 45.)  In addition, as explained by Jeffrey Lipps,

Special Litigation Counsel to the Debtors, the Debtors have experienced tremendous attrition

among their employees, in particular their employees who worked on the securitizations at issue.

(Amended Direct Testimony of Jeffrey Lipps, ¶¶ 129-130, Aug. 15, 2013 [Dkt. No. 4689-1]

("**Lipps Direct**").)  This attrition would hinder Debtors' efforts to offer meaningful live

testimony in support of the Debtors' defenses.  (*Id.*)

63.    Further, the results of recent litigation among other RMBS sponsors, monoline

insurers and securitization trustees have resulted in some unfavorable outcomes for RMBS

sponsors.  (Kruger Direct ¶ 45.)

(b)    <b>The Settlement Agreement's Future Benefits</b>

64.    The Settlement Agreement provides a number of very significant benefits to the

Debtors' estates and their creditors, described more fully above.  (*Supra* ¶¶ 38-49; Kruger Direct

¶ 46.)  In sum, the Settlement Agreement provides the following:

- A substantial reduction of claims asserted against each of the Debtors' estates. (Kruger Direct ¶¶ 34, 46; Kruger Dep. 37:19-24, 53:16-54:10.)

- Increased certainty regarding the validity, priority and amount of the FGIC Claims and the FGIC Trustees' Claims.  (Kruger Direct ¶ 46.)

- Substantial cost savings when compared with the probable costs of professional fees and experts that would be needed if litigation over the FGIC Claims and the FGIC Trustees' Claims proceeded.  (*Id.*)

65.    Equally important, the Settlement Agreement is also part of the global settlement

plan that, if ultimately approved, will provide a $2.1 billion contribution to the Debtors' estates

from AFI and secure global peace.  (Kruger Direct ¶ 40; Kruger Dep. 37:25-38:8, 53:16-54:10;

Trial Tr. 164:2-12.)  While the approval of that global settlement plan is not before the Court on

this Motion and will have to wait for the plan confirmation process, entry into and approval of

the Settlement Agreement is a necessary and required step.  (Kruger Direct ¶ 40.)

**D.    The Likelihood of Complex and Protracted Litigation**

66.    Absent the Settlement Agreement, the Debtors would face complex and lengthy

litigation with FGIC and the FGIC Trustees over the validity, amount and possible subordination

of their asserted claims. (Kruger Direct ¶ 48; Kruger Dep. 125:10-21.)

67.    The discovery necessary to resolve the FGIC Claims and the FGIC Trustees'

Claims could be massive. (Kruger Direct ¶ 49.)  As an initial matter, each of the securitizations

23

contains thousands of individual loans. (Lipps Direct ¶ 131.)  The anticipated scope of discovery

would likely involve tens of millions of pages of documents and hundreds of days of deposition

testimony from current and former employees of the Debtor entities.  (*Id.* ¶ 141.)

68.    The MBIA Insurance Corp. ("**MBIA**") litigation against RFC and GMACM

serves as an example of the enormous discovery burden required.  (Lipps Direct ¶ 142.)

69.    MBIA filed a case in 2008 against RFC alleging breaches of representations and

warranties, and related claims of alleged failure to repurchase loans pursuant to the terms of the

applicable contract; it was still ongoing as of the petition date, three and a half years later.

(Lipps Direct ¶¶ 8, 143; Kruger Dep. 189:19-2.)  Although the case involved only five

securitizations made up of loans issued by RFC in less than a year, RFC has produced over a

million pages of documents, over 63,000 mortgage loan files, and one terabyte of data.  (Lipps

Direct ¶ 143.)  MBIA has also taken over eighty days of depositions of current or former RFC,

GMACM, or ResCap personnel while RFC has taken fifty days of depositions of current or

former MBIA personnel.  (*Id.* ¶ 144.)  Ten expert reports have been exchanged, and rebuttal

reports were anticipated.  (*Id.*)

70.    Fact discovery in a similar lawsuit by MBIA against GMACM was also ongoing

when these chapter 11 cases were filed.  (Lipps Direct ¶ 145.)  Although that case involves only

three GMACM securitizations, GMACM has already produced over a million pages of

documents and additional electronic records.  (*Id.*)  This Court has previously cited to this

discovery as showing the likely burden of discovery of other cases in deciding to extend the

automatic stay to stop litigation pursued by Western & Southern.  (*Id.*)  This Court remarked that

"[t]he debtors have provided specific samples of cases that involved a small number of

securitizations, but still produced millions of pages in discovery and upwards of eighty days'

worth of depositions from the debtors' current and former employees." (*Id.* (quoting July 10, 2012 Tr. 137:11-15, *In re Residential Capital, LLC*, Adv. Proc. No. 12-0167).)

71.    Litigating the FGIC claims could pose a greater burden than the MBIA cases. (Lipps Direct ¶ 146.)  The FGIC Insured Trusts consist of a larger number of securitizations, and a more diverse array of securitizations and loan types, issued over many more years.  (*Id.*)  FGIC served the Debtors with no fewer than 117 document requests prior to entry into the Settlement Agreement, including a request for all loan files in connection with the twenty FGIC Insured Trusts at issue in the prepetition litigation and six additional FGIC Insured Trusts.  (*Id.*)  FGIC's initial document requests included a request for all relevant loan files—over 185,000 loans.  (*Id.* ¶ 150.)  Merely complying with such a request would cost approximately $6.5 million dollars, if estimated at $35 per loan file.  (*Id.*)

72.    In addition, the Debtors previously analyzed the likely custodians for FGIC's discovery requests and preliminarily identified over sixty potential custodians.  (Lipps Direct ¶ 146.)  Further complications could arise due to the fact that investors and the FGIC Trustees also have asserted claims against the Debtors based on FGIC's failure to make payments since November 2009 on its policies, which could impose additional demands on the Debtors.  (*Id.* ¶ 147.)  Absent the Settlement Agreement, the FGIC Trustees and/or investors could serve their own unique document requests on the Debtors.  (*Id.*)  Deposition discovery could also be more involved, with more parties actively participating.  (*Id.*)

73.    The limited file review performed in connection with the prior RMBS 9019 Motion with certain institutional investors is also instructive.  (Lipps Direct ¶ 151.)  That limited file review lasted several months and cost the Debtors millions of dollars.  (*Id.*)

### E.    The Paramount Interests of the Estates' Creditors

74.    The Settlement Agreement represents a compromise that is in the paramount

interests of creditors.  (Kruger Direct ¶ 52.)

75.    As described above, the Settlement Agreement resolves substantial claims against

the Debtors' estates—in varying amounts of up to $6.85 billion against each Debtor, less the

maximum claim FGIC is permitted to assert against that Debtors under the terms of the

Settlement Agreement.  (Kruger Direct ¶¶ 34, 51.)  Obtaining the releases in the Settlement

Agreement ensures that the Debtors will not have to litigate and face the risk of being

responsible for the full amount of claims originally asserted by FGIC or the FGIC Trustees.

(Kruger Direct ¶ 51.)

76.    As a result, the remaining claims in connection with the FGIC Insured Trusts will

be limited to an amount between (i) the Minimum Allowed Claim Amount and the claims that

FGIC is allowed to assert in the event that the plan contemplated under the PSA does not become

effective, (ii) certain servicing claims held by the FGIC Trustees, and (iii) claims attributable to

losses by holders of Securities not insured by the Policies.  (Kruger Direct ¶¶ 30-32; Ex.1 at §

2.01.)

77.    The FGIC Trustees will receive $253.3 million in cash compensation from FGIC,

and the FGIC Trustees will be responsible for distributing that payment to the individual FGIC

Insured Trusts and investors in those Trusts in accordance with their respective obligations under

the applicable Governing Agreements.  (Kruger Direct ¶ 33; Ex.1 at § 2.02.)  FGIC will make

this settlement payment in cash immediately if the Bankruptcy Court Order (as that term is

defined in the Settlement Agreement) is signed by this Court and the Rehabilitation Court signs

the Rehabilitation Court Order (as that term is defined in the Settlement Agreement) and both

become Final Orders (as that term is defined in the Settlement Agreement)  and the Agreement

26

becomes effective.[8]  (Dubel Direct ¶ 22.)  The FGIC Insured Trusts and the investors therein will

not have to wait for plan confirmation to receive payment, but can and will be paid upon this

Court's order approving this Settlement and the Rehabilitation Court's order each becoming

final.  (*Id.*)

78.    The FGIC Trustees will also be relieved of the responsibility to continue to pay

premiums on the Policies.  (Ex.1 at § 2.01(a)(i).)  These forgone premiums amount to

approximately $40 million in future installment payments that FGIC estimates the FGIC Insured

Trusts would otherwise be obligated to pay to FGIC over the life of the Policies.  (Dubel Direct

¶ 23.)  Discounted at a 15% rate, these omitted payments represent approximately $18.3 million

in present value savings to the FGIC Insured Trusts.  (*Id.*)

79.    Under the Settlement Agreement, FGIC will also forgo its right to receive any and

all reimbursements from the FGIC Insured Trusts pursuant to the waterfall provisions under the

applicable Governing Agreements.  (Dubel Direct ¶ 25; Ex. 1 at § 2.01(b).)  These amounts will

be retained by the FGIC Insured Trusts, and the FGIC Trustees will be responsible for

distributing these amounts to the FGIC Insured Trusts and investors in those trusts in accordance

with their respective obligations under the applicable Governing Agreements.  (Dubel Direct

¶ 25; Ex.1 at § 2.02.)

**F.    The Settlement Agreement's Support From Other Parties-in-Interest**

80.    The Settlement Agreement has support from entities that hold or represent the

holders of the overwhelming majority of claims asserted in the Debtors' chapter 11 cases.

(Kruger Direct ¶ 54.)  Each of the Debtors' claimant constituencies that have signed on to the

PSA also support the Settlement Agreement, including:

---

[8] Sections 6.01 and 6.02 of the Settlement Agreement provide that the Settlement may become effective absent a
final order if the Debtors, FGIC, the FGIC Trustees and counsel for the Institutional Investors each waive such
requirement.  (Ex. 1.)

- the Creditors' Committee;

- AFI, on behalf of itself and its direct and indirect non-debtor subsidiaries;

- Allstate Insurance Company and its subsidiaries and affiliates;

- American International Group, as investment advisor for certain affiliated entities that have filed proofs of claim in the Debtors' chapter 11 cases;

- the Kessler Class Claimants (as defined in the PSA);

- Massachusetts Mutual Life Insurance Company and its subsidiaries and affiliates;

- MBIA and its subsidiaries and affiliates;

- Prudential Insurance Company of America and its subsidiaries and affiliates;

- certain funds and accounts managed by Paulson & Co. Inc., holders of Senior Unsecured Notes issued by ResCap;

- the RMBS Trusts (as defined in the PSA);

- certain holders of the Senior Unsecured Notes issued by ResCap;

- the Steering Committee Consenting Claimants (as defined in the PSA);

- the Talcott Franklin Consenting Claimants (as defined in the PSA); and

- Wilmington Trust, National Association, not individually, but solely in its capacity as Indenture Trustee for the Senior Unsecured Notes issued by ResCap.

(*Id.*)

## G.   The Settlement Agreement's Releases of the Debtors' Officers and Directors

81.     The Settlement Agreement provides a mutual release to the Debtors, the FGIC

Trustees, the Institutional Investors and their respective "Representatives" from their respective

rights, interests, obligations and liabilities arising out of the "Policy Agreements" (that is, the

Policies and Insurance Agreements, collectively), and to FGIC and its Representatives from its

obligations and liabilities under or relating to the Governing Agreements.  (Ex. 1 at § 2.01(a)(i).)

It also provides that each Party releases the other Parties and their Representatives from all

claims and liabilities arising out of the Policy Agreements (*id*. § 2.01(a)(ii)); FGIC releases the

28

other Parties and their Representatives from obligations, claims, and liabilities relating to the

Governing Agreements, and the other Parties each release FGIC and its Representatives from

obligations, claims, and liabilities relating to the Governing Agreements (*id*. § 2.01(a)(iii)); and

finally the FGIC Trustees on their own behalf and on behalf of the FGIC Wrapped Trusts release

the Debtors and their Representatives from obligations, claims, and liabilities arising out of the

origination-related provisions of the Governing Agreements, provided, however, that

distributions under the RMBS Trust Allocation Protocol, appearing at Annex III to the

Supplemental Term Sheet (as defined in the Plan Support Agreement, dated May 23, 2013 [Dkt.

No. 3814-5]), are not affected thereby (*id*. § 2.01(a)(iv)).  As defined in the Settlement

Agreement, "Representatives" means "as to any person, such person's successors, assigns,

regulators, stockholders, directors, officers, employees, attorneys, advisors and agents, and as to

the Debtors, each Debtor's bankruptcy estate, any litigation or liquidation trust arising out of a

confirmed plan of reorganization or liquidation in the chapter 11 cases, any chapter 11 trustee

and any chapter 7 trustee appointed following conversion of any of the chapter 11 cases to a case

under chapter 7 of the Bankruptcy Code."  (Ex. 1 at § 1.12.)  These releases are consistent with

releases in settlement agreements approved in other cases in the district.  (Kruger Direct ¶ 55.)

> **H.    The Settlement Parties' Counsel**

82.    Mr. Kruger has over fifty years of experience as a practicing attorney in

restructuring matters.  (Kruger Direct ¶ 56.)  Based on his involvement and interactions

negotiating the Settlement Agreement, it is his belief that the Debtors; the FGIC Rehabilitator;

The Bank of New York Mellon; The Bank of New York Mellon Trust Company, N.A.; Law

Debenture Trust Company of New York; U.S. Bank National Association; Wells Fargo Bank,

N.A.; the Steering Committee Consenting Claimants and the Talcott Franklin Consenting

Claimants were all represented by competent and experienced counsel.  (Kruger Direct ¶ 56.)

29

83.    Throughout these chapter 11 cases and in connection with the Settlement Agreement, BNY Mellon has been advised by Dechert LLP (Major Direct ¶ 16); U.S. Bank has been advised by Seward & Kissel LLP (Scott Direct ¶ 13); and Wells Fargo has been advised by Alston & Bird LLP (Sohlberg Direct ¶ 10.)

**I.    Arm's-Length Negotiations**

84.    As discussed in greater detail above, numerous parties, holding many divergent and different interests and agendas, were involved throughout, and participated in, the Mediation. (*See supra* ¶¶ 28-37*; Kruger Direct ¶¶ 16-21; 38; Dubel Direct ¶¶ 7, 10-11, 13, 17.)

85.    The Mediation, overseen by Judge Peck, proceeded over approximately five months of intense negotiations among the Settlement Parties and involved dozens of small group mediation meetings and conference calls, which culminated in a series of five all-hands mediation sessions, and ultimately produced the Settlement Agreement.  (Dubel Direct ¶¶ 10, 14-18; Ex. 311; *see* Trial Tr. 93:3-9; 467:8-19.)

**III.    FACTS SUPPORTING THE FINDINGS RELATING TO THE FGIC TRUSTEES AND FGIC INSURED TRUSTS**

**A.    The FGIC Trustees Were Advised by Qualified Professionals and Experts.**

86.    The FGIC Trustees retained and have been advised throughout these chapter 11 cases, including in connection with their consideration of the Settlement Agreement, by experienced and knowledgeable counsel.  (Major Direct ¶ 16; Scott Direct ¶ 13; Sohlberg Direct ¶ 10; Dubel Direct ¶ 11; Kruger Direct ¶¶ 5, 14, 42, 56 and 57.)

87.    Counsel for the FGIC Trustees played an active role in negotiating the Settlement Agreement and informing the FGIC Trustees' evaluation and review of the Settlement Agreement.  (Major Direct ¶¶ 16, 26, 30; Scott Direct ¶¶ 13, 23; Sohlberg Direct ¶¶ 10, 17; Dubel Direct ¶¶ 6, 11; Ex. 311; Trial Tr. 128:21-25, 176:18-23, 189:6-190:4).)

88.     At the outset of these chapter 11 cases, the FGIC Trustees retained Duff & Phelps, a qualified and experienced financial advisor, as their financial advisor in the bankruptcy. (Major Direct ¶¶ 18-19; Scott Direct ¶¶ 15-16; Sohlberg Direct ¶¶ 11-12; Dubel Direct ¶ 11; Ex. U (Duff & Phelps Engagement Letter, dated July 23, 2012).)  Duff & Phelps was chosen by the FGIC Trustees over other qualified candidates after a rigorous interview process, because, among other things, it had extensive experience in mortgage loan servicing agreements and loan origination agreements, asset valuation, complex securitizations and RMBS loan repurchase actions.  (Major Direct ¶¶ 18-19; Scott Direct ¶¶ 15-16; Sohlberg Direct ¶¶ 11-12.)

89.     Duff & Phelps was well-positioned to advise the FGIC Trustees in connection with the negotiations leading up to the Settlement Agreement.  Not only did it have expertise in financial modeling and cash flow projections, but it was very familiar with these chapter 11 cases, having worked closely with the FGIC Trustees throughout the bankruptcy proceedings. (Major Direct ¶ 19; Scott Direct ¶ 16; Sohlberg Direct ¶ 12.)  Among other things, Duff & Phelps previously reviewed more than 6,500 mortgage loan files, using historical information and financial analysis to calculate the present and projected future losses experienced by the trusts identified in the proofs of claim filed by the FGIC Trustees, including for the FGIC Insured Trusts.  (Major Direct ¶ 19; Scott Direct ¶ 16; Sohlberg Direct ¶ 12.)

90.     Each of the FGIC Trustees, while evaluating the Settlement Proposal (as defined below) on their own, had the benefit of the views of the other two FGIC Trustees and their counsel.  This informed their respective views of the Settlement Agreement.  (Major Direct ¶ 26; Scott Direct ¶ 23; Sohlberg ¶ 17.)

91.     The evaluation of the Settlement Proposal (as defined below) by BNY Mellon and U.S. Bank was also informed by their role as members of the Creditors' Committee in these

31

chapter 11 cases. (Major Direct ¶ 25; Scott Direct ¶ 22; Trial Tr. 186:9-19.) This position gave

BNY Mellon and U.S. Bank access to the resources of the Creditors' Committee and a

perspective on the overall chapter 11 cases, and allowed them to better evaluate the Settlement

Proposal in the larger context of the chapter 11 cases and understand the relative risks and

benefits of proceeding under the Rehabilitation Plan. (Major Direct ¶ 25; Scott Direct ¶ 22; Trial

Tr. 186:9-19.)

> ### B.    The FGIC Trustees and Duff & Phelps Considered and Analyzed the Settlement Agreement and Negotiated Its Terms Through Court Ordered Mediation.

92.     The FGIC Trustees and their counsel actively participated in the Mediation and

the negotiation of the Settlement Agreement. (Major Direct ¶ 8; Scott Direct ¶ 7; Sohlberg

Direct ¶ 6; Dubel Direct ¶ 11; Trial Tr. 176:18-23, 189:23-190:4.) Duff & Phelps also

participated in the Mediation, including the sessions in which the Settlement Agreement was

negotiated. (Major Direct ¶ 8; *see* Dubel Direct ¶ 16.)

93.     During the Mediation, the FGIC Trustees were asked to consider a settlement

proposal between FGIC, MBIA and the Steering Committee Consenting Claimants (the

"**Settlement Proposal**"). (Major Direct ¶ 8; Scott Direct ¶ 7; Sohlberg Direct ¶ 6; Trial Tr.

144:6-12.) Certain terms of that Settlement Proposal ultimately became the basis of the

Settlement Agreement. (Major Direct ¶ 8; Scott Direct ¶ 7; Sohlberg Direct ¶ 6; *see* Dubel

Direct ¶¶ 22-25.)

94.     The Settlement Proposal included, among other things, the payment of the lump

sum Settlement Payment by FGIC to the FGIC Insured Trusts in satisfaction of any obligations

of FGIC to make projected payments in the future (the "**Projected Payments**") to the FGIC

Insured Trusts under the Rehabilitation Plan. (Major Direct ¶ 8; Scott Direct ¶ 7; Sohlberg

Direct ¶ 6; Trial Tr. 144:13-145:5.) Extensive negotiations regarding the amount of the

32

Settlement Payment, and other terms of the Settlement Agreement, began on or about January 14, 2013, and continued through late March or early April 2013.  (*See* Trial Tr. 52:13-17; 467:8-19; Ex. 311 (Dubel timeline).)  The Settlement Payment amount was reached through negotiations among FGIC, the Steering Committee Consenting Claimants, MBIA, the Debtors, and a representative of the FGIC Trustees.  (Ex. 311; Dubel Direct ¶¶ 6-7, 10-11, and 16; Dubel Dep. 145:25-146:21, 146:24-147:10; *see also* Major Dep. 154:22-155:9; Major Direct ¶¶ 8-9, 16.)[9]

95.     The FGIC Trustees requested that Duff & Phelps analyze the economic terms of the Settlement Proposal and in particular, compare the value of the Projected Payments under the Rehabilitation Plan with the Settlement Payment and other value to the FGIC Insured Trusts under the Settlement Proposal, and provide a recommendation to the FGIC Trustees.  (Major Direct ¶ 9; Scott Direct ¶ 8; Sohlberg Direct ¶ 7; Trial Tr. 259:14-24; Sohlberg Dep. 56:3-5, 56:8-18, 138:15-19, 138:20-139:6.)

96.     After receiving the initial Settlement Proposal in April 2013, the FGIC Trustees did not ask Duff & Phelps to analyze how the Settlement Payment was determined, but rather how the financial terms of the Settlement Proposal, and in particular the Settlement Payment, compared to the Projected Payments.  (Major Direct ¶ 28; Scott Direct ¶ 25; Sohlberg Direct ¶ 21.)

---

[9] The timeline included with Mr. Dubel's direct testimony indicates that there were at least ten meetings and calls between FGIC, the Steering Committee Consenting Claimants, and others between the beginning of Mediation and the time that the parties arrived at the $253 million Settlement Payment.  (Ex. 311.)  BNY Mellon participated in at least one of these meetings in mid-March.  (Ex. 311 at 3; Dubel Dep. 145:25-146:21, 146:24-147:10.)  Ms. Scott testified that U.S. Bank's counsel did most of the negotiating.  (Trial Tr. 189:23 – 190:4.)  Ms. Sohlberg similarly testified at trial that although she did not make any comments to drafts of the Settlement Agreement, Wells Fargo's legal counsel "participated in the drafting of the agreement."  (Trial Tr. 142:20-143:2; *see also* Major Dep. 154:22-155:9.)

(a)    **Duff & Phelps' Analysis**

97.    In conducting its analysis, Duff & Phelps reviewed and analyzed publicly available information and also signed a confidentiality agreement with FGIC, pursuant to which Duff & Phelps had access to FGIC's Chief Restructuring Officer and Lazard Freres & Co. LLC ("**Lazard**"), the financial advisors to the FGIC Rehabilitator, and received additional information concerning the Rehabilitation Plan.  (Major Direct ¶ 29; Scott Direct ¶ 26; Sohlberg Direct ¶ 22; Direct Testimony of Allen M. Pfeiffer ¶ 14, July 31, 2013 [Dkt. No. 4694] ("**Pfeiffer Direct**").)  Duff & Phelps also considered additional information provided to it by parties to the Mediation.  (Major Direct ¶ 29.)

98.    Duff & Phelps analyzed the recoveries to *each* of the forty-seven FGIC Insured Trusts under the Settlement Proposal and Rehabilitation Plan.  (Pfeiffer Direct ¶ 9.)  Duff & Phelps analyzed and calculated the actual and projected losses of the FGIC Insured Trusts *on a trust-by-trust* basis in order to estimate Projected Payments to the trusts under the Rehabilitation Plan.  (*Id.* ¶¶ 35-39, 42.)

99.    In order to determine the present value of the Projected Payments, Duff & Phelps used what it believed was a reasonable discount rate to determine the present value of those projected future cash flows.  (Pfeiffer Direct ¶¶ 53, 81; Direct Testimony Declaration of S.P. Kothari, Ph.D ¶¶ 8-15, July 31, 2013 [Dkt. No. 4696] ("**Kothari Direct**").)  Duff & Phelps concluded that a range of discount rates of ten to twenty percent was reasonable to discount future cash flows under the Rehabilitation Plan.  (Pfeiffer Direct ¶ 54.)  Freddie Mac's expert, Mr. Scott Gibson, confirmed at trial that "the discount rate of ten to twenty percent is a reasonable discount to account for the uncertainties and timing of the cash flows within the FGIC rehabilitation plan."  (Trial Tr. 369:7-15.)

34

100.    The FGIC Trustees' expert, Dr. S.P. Kothari, the Gordon Y. Billard, Professor in Management at the Sloan School of Management at the Massachusetts Institute of Technology (Kothari Direct ¶ 1), independently determined that using a discount range of ten to twenty percent was appropriate to discount projected cash flows under the Rehabilitation Plan.  (Kothari Direct ¶¶ 8-15; Trial Tr. 208:6-16.)

101.    Charles R. Goldstein, the expert for the Willkie Objecting Parties, did not opine on an alternative discount rate appropriate to discount projected cash flows under the Rehabilitation Plan.  (Trial Tr. 407:11-13.)

102.    All FGIC policyholder claims, including those of the FGIC Insured Trusts, are intended to receive the same *nominal* payout under the Rehabilitation Plan, regardless of when the claims are incurred.  (Trial Tr. 445:2-18.)

103.    Approximately 80 percent of the FGIC Insured Trusts' claims under the Policies, however, have either already been incurred or are estimated to be incurred in the next five years. (Trial Tr. 445:25-446:8; Pfeiffer Direct ¶ 75.)   Under the Rehabilitation Plan, those claims will be paid out over the next forty years.  (Trial Tr. 441:4-18, 441:20-443:4; Pfeiffer Direct ¶¶ 18, 71-72.)  As a result, the Projected Payments to the FGIC Insured Trusts have a lower present value relative to the claims of policyholders that are projected to arise later in time.  (Trial Tr. 283:16 – 284:4; 442:9 – 443:4; 443:14-21; 447:4-22; ; Pfeiffer Direct ¶¶ 70-76.)  Because the claims of the FGIC Insured Trusts are front-loaded, Duff & Phelps estimated that the FGIC Insured Trusts would *not* receive the 27–30 cent on the dollar net present value recovery estimated for all FGIC policyholders under the Rehabilitation Plan; but rather they would receive significantly less on a net present value basis.  (Trial Tr. 444:13-445:18; Pfeiffer Direct ¶¶ 52-

35

54.)  Duff & Phelps estimated that the actual recoveries would be closer to 24 to 28 percent on a discounted basis.  (Pfeiffer Direct ¶ 60.)

104.    In early May 2013, Duff & Phelps provided to the FGIC Trustees draft discussion materials setting forth its analysis of the Settlement Proposal.  (Major Direct ¶ 30; Scott Direct ¶ 27; Sohlberg Direct ¶ 23; Major Dep. 30:19-31:19; Deposition Designations of Mamta Scott at 45:5-10 ("**Scott Dep.**"), *The Objectors' Designations Of Trustees' Deposition Testimony*, dated August 22, 2013 [Dkt. No. 4799]; Exs. 119-122; Trial Tr. 266:3-7.)

105.    Subsequently, on May 13, 2013, Duff & Phelps made a presentation to the FGIC Trustees and their counsel concerning the Settlement Proposal (the "**May 13 Presentation**").  (Major Direct ¶ 31; Scott Direct ¶ 28; Sohlberg Direct ¶ 24; Trial Tr. 265:7-14.)  The presentation was made in New York, but it was also available via a "webex" that allowed people to participate remotely.  (Scott Direct ¶ 28; Scott Dep. 44:19-22; Sohlberg ¶ 24; Trial Tr. 265:7-10.)  The meeting lasted for over an hour.  (Major Direct ¶ 31; Scott Direct ¶ 28; Sohlberg Direct ¶ 24; Trial Tr. 265:23-268:2.)

106.    The analysis of the discounted projected cash flows under the Rehabilitation Plan involved sophisticated financial modeling (Major Direct ¶ 17; Scott Direct ¶ 14) and as provided for under the Governing Agreements, the FGIC Trustees relied on the advice of Duff & Phelps in evaluating the terms of the Settlement Proposal.  (*See supra* ¶ 88.)  The Investor Objecting Parties concede that the FGIC Trustees could rely on Duff & Phelps' advice without independently having to "validate, recompute and assess the conclusions" provided to them by Duff & Phelps.  (Trial Tr. 388:14-389:3.)

107.    During the May 13 Presentation, the FGIC Trustees focused on how the Settlement Payment, together with the other benefits to each of the forty-seven FGIC Insured

Trusts under the Settlement Proposal, compared to the Projected Payments under the

Rehabilitation Plan.  (Major Direct ¶ 33; Scott Direct ¶ 30; Sohlberg ¶ 28.)  The FGIC Trustees

understood Duff & Phelps' analysis and its advice that the financial benefits of the Settlement

Proposal, including in particular the amount of the Settlement Payment, was within the

reasonable range of Projected Payments under the Rehabilitation Plan.  (Major Direct ¶¶ 33, 35

Scott Direct ¶¶ 30, 33; Sohlberg Direct ¶¶ 25, 27; Major Dep. 125:10-127:25.)  The FGIC

Trustees and/or their respective counsel asked Duff & Phelps questions regarding their analysis

and ensured that any concerns or questions were addressed by Duff & Phelps.  (Trial Tr. 174:19-

175:3, 267:23-268:10; Major Direct ¶¶ 31-32; Scott Direct ¶ 29.)  While Duff & Phelps

presented findings to the FGIC Trustees for the overall benefits of all forty-seven FGIC Insured

Trusts, their analysis also considered the reasonableness of the Settlement Agreement for each of

the forty-seven FGIC Insured Trusts individually, and they found that, on a trust-by-trust basis,

the Settlement Agreement is reasonable for each FGIC Insured Trust.  (Pfeiffer Direct ¶¶ 34-40.)

108.    On or about May 15, 2013, Duff & Phelps provided a final written version of its

analysis to the FGIC Trustees (the "**Duff Report**").  (Major Direct ¶ 34; Scott Direct ¶ 31;

Sohlberg Direct ¶ 26; Major Dep. 15:5-22; Ex. 123.)  The Duff Report was substantially

identical to the version that was presented to the FGIC Trustees during the May 13 Presentation.

(Trial Tr. 266:2-267:9; Major Direct ¶ 34; Scott Direct ¶ 31; Sohlberg Direct ¶ 26.)

109.    In the Duff Report, Duff & Phelps reduced to writing its conclusion that the

$253.3 million Settlement Payment is within the reasonable range of the present value of the

Projected Payments to each of the forty-seven FGIC Insured Trusts.  (Major Direct ¶ 35; Scott

Direct ¶ 32; Sohlberg Direct ¶ 27; Major Dep. 20:9-17, 90:22-91:18; Ex. 123 at 3.)

110.    The Duff Report also identified the value associated with not having to pay premiums on the Policies going forward, as well as the fact that the Settlement Agreement, as part of the global settlement embodied in the PSA, resolves various outstanding disputes in the chapter 11 cases, including various potential litigations and inter-creditor disputes in the chapter 11 cases.  (Major Direct ¶ 35; Scott Direct ¶ 32; Sohlberg Direct ¶ 27; Major Dep 24:5-12; Ex. 123 at 3.)

111.    Duff & Phelps recommended that the FGIC Trustees accept the Settlement Proposal and forego the Projected Payments.  (Ex. 123 at 3.)  The $271.6 million of benefit to the FGIC Insured Trusts (from the $253.3 million commutation amount and present value of $18.3 million of waived premiums) is twenty-one percent of the midpoint of total projected nominal clams of the FGIC Insured Trusts, which are estimated to be approximately $1.3 billion. (Pfeiffer Direct ¶ 60 and table 1.)  This twenty-one percent falls within the range of nineteen to twenty-two percent of nominal claims that FGIC Insured Trusts are projected to receive under the Base Case of the Rehabilitation Plan.  (*Id.*)  Additionally, the $271.6 million of benefit to the FGIC Insured Trusts is more than twenty-five percent of the midpoint of the total projected discounted claims, which are estimated to be $1.07 billion.  (*Id.*)  This twenty-five percent is within the range of twenty-four to twenty-eight percent of discounted claims that the trusts were projected to receive under the base case of the Rehabilitation Plan.  (*Id.*)

112.    While the FGIC Trustees relied on Duff & Phelps' analysis and advice in agreeing to the Settlement Agreement, the Duff Report was only a summary of its conclusions that were discussed during the May 13 Presentation and in discussions between Duff & Phelps, the FGIC Trustees and counsel for the FGIC Trustees. (Major Direct ¶¶ 8, 30, 32, 39; Scott Direct ¶ 27, 29, 36.)

113.    Based on the FGIC Trustees' prior work with Duff & Phelps in the chapter 11 cases, Duff & Phelps's access to FGIC and Lazard in connection with analyzing the Settlement Proposal, the Duff Report and the May 13 Presentation, the FGIC Trustees had reason to place confidence in the accuracy of Duff & Phelps's analysis and the soundness of its recommendation.  (Major Direct ¶ 39; Scott Direct ¶ 36; Sohlberg Direct ¶ 30.)[10]

(a)    **The Investors in the FGIC Insured Trusts Participating in the Mediation**

114.    The Institutional Investors, who were active in the case and held minority interests in the FGIC Insured Trusts (*see* Ex. 57 & 58), were participants in the Mediation and supported the Settlement Proposal, ultimately becoming signatories to the Settlement Agreement. (Major Direct ¶ 22; Scott Direct ¶ 19; Sohlberg Direct ¶ 16; Major Dep. at 145:16-146:8; Sohlberg Dep. at 110:11-15, 110:17-111:6.)

115.    The terms of the Mediation Order prevented the FGIC Trustees from discussing the Settlement Proposal with investors in the FGIC Insured Trusts who were not participants in the Mediation.  (Ex. 208.)  The FGIC Trustees, however, took into consideration in evaluating the Settlement Proposal that the only investors in the FGIC Insured Trusts that were actively participating in the Mediation, the Institutional Investors, supported the Settlement Proposal. (Dubel Direct ¶ 6; Major Direct ¶ 22; Scott Direct ¶ 19; Sohlberg Direct ¶ 16; Major Dep. 145:16-146:8; Sohlberg Dep. 110:11-15, 110:17-111:6.)

---

[10] Ms. Sohlberg also testified that she understood the Settlement Agreement as "an integral part of a Plan Support Agreement" that provided additional value for Investors in the FGIC Insured Trusts, and the FGIC Trustees considered that value in deciding to enter into the Settlement Agreement.  (Sohlberg Direct ¶ 8.)  Ms. Sohlberg was aware that the supplemental term sheet for the Plan was not executed until May 22nd or 23rd.  (Trial Tr. 160:13-18.)

C.     **The Investors in the FGIC Insured Trusts Received Notice of the Settlement Agreement and Had an Opportunity to Object.**

116.     The FGIC Trustees insisted that prompt notice of the Settlement Agreement be given to investors in the FGIC Insured Trusts and required that the Bankruptcy Court and the Rehabilitation Court approve the Settlement Agreement.  (Ex. 1 §§ 4.02, 6.01; Major Direct ¶ 23; Scott Direct ¶ 20; Sohlberg Direct ¶ 18; Trial Tr. 136:3-10.)

117.     The FGIC Trustees provided investors in the FGIC Insured Trusts a full and fair opportunity to voice any objections to the Settlement Agreement and to be heard with respect to any such objections.  (Major Direct ¶ 23; Scott Direct ¶ 20; Sohlberg Direct ¶ 18; Trial Tr. 156:14-24; Sohlberg Dep. 60:12-14, 60:16-19, 60:21-23, 60:25.)

118.     A notice dated May 24, 2013, entitled "Time Sensitive Notice Regarding (a) Plan Support Agreement Among ResCap Debtors and the RMBS Trustees, Among Others, and (b) Settlement Agreement Among the Debtors, Financial Guaranty Insurance Company and Certain of the RMBS Trustees" (the "May 24 Notice") was distributed to various investors and published on a website maintained by the FGIC Trustees in connection with the Chapter 11 Cases (the "Trustee Website").  (Major Direct ¶ 47; Scott Direct ¶ 44; Sohlberg Direct ¶ 40; *see* Ex. 128.)

119.     The May 24 Notice, among other things, described the key financial terms of the Settlement Agreement, including that:

> (b) FGIC will pay to the FGIC Trusts certain amounts in settlement of the FGIC Trusts' claims against FGIC as set forth in the FGIC Settlement Agreement . . . (d) the Policies and other Policy Agreements will be commuted, (e) FGIC will not be liable for any further payments under the Policies and other Policy Agreements, and (f) the FGIC Trusts will no longer make premium, reimbursement, or other payments to FGIC.

(Ex. 128 at 6.)

40

120.    Further, the May 24 Notice (Ex. 128) described the process by which the

investors in the FGIC Insured Trusts could direct the FGIC Trustees and stated that investors

should contact the relevant FGIC Trustee if they had any questions in that regard.  The May 24

Notice stated, in the relevant part, that:

> Pursuant to the Plan Support Agreement, if Certificateholders do not
> desire the Trusts in which they hold Certificates to be bound by the Plan
> Support Agreement and the Term Sheets, they have the option, if they
> meet the requirements set forth in the applicable Governing Agreements,
> to issue a direction. . . directing the RMBS Trustee to withdraw its
> execution of the Plan Support Agreement in respect of the applicable
> Trust.  Any direction and indemnity . . . must be received by such RMBS
> Trustee on or before June 19, 2013.  Any Certificateholder that intends to
> issue such a direction is strongly urged to contact the relevant RMBS
> Trustee as soon as possible.

(Ex. 128 at 5.)

121.    The May 24 Notice expressly advised that "[i]f the Plan Support Agreement is

approved by the Bankruptcy Court, the RMBS Trustees will vote in favor of the Plan on behalf

of each Trust, and the Certificateholders will be precluded from providing contrary direction to

the RMBS Trustees with respect to the Plan." (Ex. 128 at 5.)

122.    Importantly, any FGIC Insured Trust could have withdrawn its execution of the

PSA if it was provided a valid, binding direction and indemnity by the investors in the Trust.

(*Id.*)

123.    None of the Investor Objecting Parties allege that they timely directed the FGIC

Trustees to withdraw their execution of the PSA on behalf of any FGIC Insured Trusts in which

the Objecting Parties held securities, or otherwise timely directed the FGIC Trustees with respect

to any part of the Settlement Agreement. (Trial Tr. 338:19-22; Ex. 175 at 25:11-14, 30:17-31:9;

*see also, generally,* Declaration of K. Austin McQuillen, July 31, 2013 [Dkt. No. 4425]

("**McQuillan Direct**"); Declaration of Adam Sklar, July 31, 2013 [Dkt. No. 4427] ("**Sklar**

**Direct**"); Declaration of David Williams, July 31, 2013 [Dkt. No. 4431] ("**Williams Direct**");

Declaration of Gina Healy In Support, July 31, 2013 [Dkt. No. 4691] ("**Healy Direct**").)

124.     A further notice, dated June 4, 2013, entitled "Time Sensitive Notice Regarding

Settlement Agreement Among the ResCap Debtors, Financial Guaranty Insurance Company and

the FGIC Trustees" (the "June 4 Notice") was distributed by the FGIC Trustees to holders in the

FGIC Insured Trusts and published on the Trustee Website.  (Major Direct ¶ 48; Scott Direct ¶

45; Sohlberg Direct ¶ 41; Ex. 129; Major Dep. 181:5-18.)

125.     The June 4 Notice described in greater detail the terms of the Settlement

Agreement, including the amount of the Settlement Payment and the fact that the FGIC Insured

Trusts would no longer be required to make premium, reimbursement or other payments to

FGIC.  (Ex. 129 at 3.)  It also described the process by which holders could object to the

Settlement Agreement in the FGIC Rehabilitation Proceeding.  (Major Direct ¶ 48; Scott Direct ¶

45; Sohlberg ¶ 41; Ex. 129 at 4-5.)

126.     As part of the notice process, and as described in the June 4 Notice, the FGIC

Trustees agreed to make available to investors in the FGIC Insured Trusts information

concerning the allocable share of the Settlement Payment that each FGIC Insured Trust would

receive under the Settlement Agreement.  (Major Direct ¶ 49; Scott Direct ¶ 46; Sohlberg Direct

¶ 42; Ex. 129 at 3.)

> **D.**     **The FGIC Trustees Believe the Settlement Agreement, on a Stand-Alone**
> **Basis, Is in the Best Interest of Each of the FGIC Insured Trusts and the**
> **Investors.**

127.     The Settlement Payment, by itself, was within the reasonable range of the

estimated total Projected Payments to the forty-seven FGIC Insured Trusts, which range was

estimated by Duff & Phelps to be $190 million to $340 million (on a present value basis).  (Ex.

123 at 3; Major Direct ¶ 38; Scott Direct ¶ 35; Sohlberg Direct ¶ 29.)

42

128.    The Settlement Payment will be allocated among each such Trust based on each

such Trust's accrued and unpaid claims under the Policies and estimated future claims under the

Policies.  (Ex. 1 at Ex. F (Allocation Methodology).)

129.    The $253.3 million Settlement Payment, moreover, is a fixed amount, while the

estimated $150 million initial Projected Payments to the FGIC Insured Trusts under the

Rehabilitation Plan is uncertain and subject to change at the discretion of the FGIC Rehabilitator

following the effective date of the Rehabilitation Plan.  (Ex. 123 at 3; Major Direct ¶ 37; Scott

Direct ¶ 34; Sohlberg Direct ¶ 28; Trial Tr. 399:22-400:6; Ex. AS (Plan Approval Order, *In the

Matter of the Rehabilitation of FGIC*, June 13, 2013).)  In addition, there is no certainty of the

amount or timing of any future Projected Payments, and there is a risk that future Projected

Payments will fall short of the amount of the Settlement Payment.  (Ex. 123 at 3; Major Direct ¶

37; Scott Direct ¶ 34; Sohlberg Direct ¶ 28.)  Any Projected Payments, as well, would be paid

over forty years.  (Pfeiffer Direct ¶ 76; Trial Tr. 400:7-9, 441:20-442:6.)

130.    The uncertainty and risks associated with the Projected Payments includes the

uncertainty and risks associated with the financial condition of FGIC and its exposures, including

those associated with bonds issued by municipalities in financial distress.  (Major Direct ¶¶ 37,

54; Dubel Direct ¶ 26; Trial Tr. 72:19-73:11, 74:11-22; 165:2-18.)  Other factors further

contributing to the uncertainty surrounding the Projected Payments under the Rehabilitation Plan

include outdated projections, uncertainty of FGIC's actual investment income, uncertainty

regarding tax-related payments, uncertainty of the expected timing and magnitude of claims, and

the unpredictable litigation recoveries that contribute to the uncertainty surrounding the

Projected Payments.  (Pfeiffer Direct ¶¶ 44-56.)  The Settlement Agreement "mitigates downside

risk to [holders of the FGIC Insured Trusts] by securing a known payment to [holders of the

FGIC Insured Trusts] following approval of the Settlement Agreement by the Bankruptcy Court and the Rehabilitation Court." (Pfeiffer Direct ¶ 12.)

131.    The extended time frame for payment of claims under the Rehabilitation Plan also subjects the investors in the FGIC Insured Trusts to myriad risks relating to the economy. For example, FGIC has potentially over two billion dollars in exposure to Detroit. (Trial Tr. 73:4-11.) As a result of the recent Detroit bankruptcy and other declines in the public finance sector, FGIC had increased its reserves for the second quarter of 2013 "by approximately a little over 800 million dollars." (Trial Tr. 74:11-22; Ex. 316.)

132.    The FGIC Trustees' views concerning the uncertainty of payments from FGIC were informed by the fact that, although the FGIC Insured Trusts continued to pay premiums under the FGIC Policies, they had not received payments on any claims made under the Policies since late 2009. (Major Direct ¶ 37; Scott Direct ¶ 34; Sohlberg Direct ¶ 28.)

133.    The Settlement Proposal and the fixed amount of the Settlement Payment eliminates the risk and uncertainty associated with the Projected Payments. (Major Direct ¶ 37; Scott Direct ¶ 34; Sohlberg Direct ¶ 28; Trial Tr. 152:14-19, 165:2-18.)

134.    The FGIC Trustees' judgment, therefore, was that securing a certain and immediate payment and eliminating future payment risk represents a significant benefit of the Settlement Agreement and is in the best interests of each of the forty-seven FGIC Insured Trusts and their respective holders. (Major Direct ¶ 37; Scott Direct ¶ 34; Sohlberg Direct ¶ 28.)

135.    In addition to the Settlement Payment, the Settlement Agreement provides, among other things, that FGIC will no longer have any rights "to receive any premiums, reimbursements or any other amounts otherwise payable to FGIC" from each of the FGIC Insured Trusts

44

pursuant to the waterfall provisions of the Governing Documents. (Ex 1 at § 2.01(b); Major Direct ¶ 38; Scott Direct ¶ 35; Sohlberg Direct ¶ 29.)

136.    Specifically, under the Settlement Agreement, each of the FGIC Insured Trusts will avoid paying their respective portion of some $40 million in aggregate future insurance premiums under the Policies, resulting in an aggregate net present value of approximately $18.3 million. (Major Direct ¶ 38; Scott Direct ¶ 35; Sohlberg Direct ¶ 29; Dubel Direct ¶ 23, 25; Pfeiffer Direct ¶ 57.) Freddie Mac's expert witness, Mr. Gibson, conceded at the Hearing that FGIC's forgoing of policy premiums "constitutes value to the trusts and their beneficiaries." (Trial Tr. 400:25-401:4.) These savings are in the best interests of each of the forty-seven FGIC Insured Trusts and their respective holders. (Major Direct ¶ 38; Scott Direct ¶ 35; Sohlberg Direct ¶ 29.)

137.    Additionally, pursuant to the Governing Agreements, FGIC had the right to receive all amounts owing to it under the Policies for each of the FGIC Insured Trusts. (*See, e.g.*, Ex. 116 § 5.04(b); Ex. 118 §§ 4.02(c), (d) & 4.12.) Under the Settlement Agreement, FGIC agrees to forego its right to receive reimbursement amounts from each of the forty-seven FGIC Insured Trusts pursuant to the waterfall provisions under the relevant Governing Documents. (Ex. 1 §2.01(b); Major Direct ¶ 38; Scott Direct ¶ 35; Sohlberg Direct ¶ 29; Dubel Direct ¶ 23, 25; Pfeiffer Direct ¶ 57.) "Reimbursements" refer to recoveries on individual mortgage loans (such as foreclosure or REO sale proceeds) that are received by a FGIC Insured Trust after FGIC has paid a loss in respect of such loan. Under the Policies and Governing Agreements, as well as FGIC's Plan of Rehabilitation, the FGIC Insured Trusts are obligated to pay to FGIC certain of such reimbursements. (*See, e.g.*, Ex. 116 § 5.04(b); Ex. 118 §§ 4.02(c), (d) & § 4.12; Ex. AS.)

45

138.    Although the FGIC Trustees recognized this as additional value to the FGIC

Insured Trusts at the time they were considering the Settlement Proposal (Major Direct ¶ 38;

Scott Direct ¶ 35; Sohlberg Direct ¶ 29), it was, and continues to be a largely unquantified value.

FGIC itself, however, has estimated that the value of the reimbursements it is foregoing from the

FGIC Insured Trusts, based on projections in its publicly filed financial statements could be in

excess of $140 million dollars over the lifetime of the FGIC Insured Trusts.  (Dubel Direct ¶ 29;

Trial Tr. 58:17-59:13.)  While Mr. Dubel testified that there is no certain value to the

reimbursements (Trial Tr. 66:3-5), any value will be received by the FGIC Insured Trusts and

not FGIC under the terms of the Settlement Agreement (Dubel Direct ¶ 25; Trial Tr. 66:3-5).

139.    Each of the forty-seven FGIC Insured Trusts will retain the amounts owing under

the Policies that are applicable to each specific trust, and each of the forty-seven FGIC Insured

Trusts will retain the reimbursements and other payments made to each specific trust.  (Ex. 1

§2.01(b); *see also, e.g.*, Ex. 116 § 5.04(b); Ex. 118 § 4.02(c), (d) and § 4.12.)

140.    The combined notional value of the Settlement Agreement is significantly higher

than the $253.3 million Settlement Payment.  (Pfeiffer Direct ¶ 57.)  The total value also includes

the forgone premiums of approximately $18.3 million in aggregate present value.  (Pfeiffer

Direct ¶ 57.)  It also includes the potential additional distributions of approximately $92 million

in recoveries under the proposed Chapter 11 Plan (the "**Plan**")[11] in these cases, if that Plan is

confirmed, for alleged breaches of representations and warranties.[12]  (Pfeiffer Direct ¶ 59.)  Even

before adding the value of the waived reimbursements, the total value of the Settlement

---

[11] The Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al and the Official Committee of Unsecured
Creditors [Dkt. No. 4819-2].

[12] The Investor Objecting Parties have argued that the $92 million should not be factored in because the FGIC
Insured Trusts would receive at least that amount under any alternative plan.  (Trial Tr. 25:24-26:14; Goldstein
Direct ¶ 13; Gibson Direct ¶ 17.)  The Investor Objecting Parties have presented no evidence that an alternative plan
is possible, whether those recoveries would be available in such alternative plan and whether those recoveries would
go to the FGIC Trustees (as opposed to FGIC).

46

Agreement exceeds $363.6 million, assuming the Plan is confirmed.  (Pfeiffer Direct ¶ 59.)

This will be recognized by each of the forty-seven FGIC Insured Trusts.  (Major Direct ¶ 40;

Scott Direct ¶ 37; Sohlberg Direct ¶ 31.)  Even if the Plan is not confirmed, the present value of

the Settlement Agreement is $271.6 (present value) plus the present value (currently

undetermined) of the estimated notational value of the reimbursements of approximately $140

million.

**(a)    The Investor Objecting Parties' Analyses of the Settlement Payment
and Rehabilitation Plan**

141.    The Investor Objecting Parties' proffered the expert testimony of Messrs. Gibson

and Goldstein, both of whom attempted to analyze the recoveries the Investor Objecting Parties

could expect to receive under the Settlement Agreement versus the Rehabilitation Plan.  (*See*

Direct Testimony of Charles R. Goldstein, July 31, 2013 [Dkt. No. 4675] ("**Goldstein Direct**");

Direct Testimony of Scott R. Gibson, July 31, 2013 [Dkt. No. 4693].)

142.    In his initial written direct testimony, Mr. Goldstein incorrectly referred to

FGIC's March 31, 2013 quarterly statements, which employ statutory accounting, as projecting

over $1 billion in gross recoveries from loss mitigation activities, which he assumed to include

litigation recoveries.  ( Goldstein Direct ¶ 12.)  However, FGIC's CEO, John Dubel stated that

FGIC did not include in its March 31, 2013 quarterly statements any estimate of recoveries from

loss mitigation activities, including litigation claims, as FGIC has not determined them to be

probable and estimable.  (Dubel Direct ¶ 27; Trial Tr. 63:9-12.)  Instead, the $1.06 billion

projected recovery amount to which Mr. Goldstein refers comprises recoveries that FGIC

estimated it would receive through the waterfall provisions under the governing documents of

the various trusts insured by FGIC from funds available from projected collateral cash flows and

projected payments from other providers of credit enhancement in the subject transactions.  (*Id.*)

47

143.    Mr. Goldstein subsequently amended his testimony and removed references to the
$1.06 billion in gross recoveries.  (Trial Tr. 403:10-404:10.)  At trial he characterized the
removal of the reference as "a simplification of [his] presentation," instead of a change based on
new information from Mr. Dubel explaining the information contained in the March 2013 FGIC
quarterly statements and the basis for Mr. Goldstein's criticism in his expert report that FGIC's
contingent litigation recoveries had been significantly undercounted by Duff & Phelps in its
analysis of the Settlement Agreement.  (Trial Tr. 404:7-14; *see* Goldstein Direct, Ex. A at ¶¶ 12,
29.)

144.    Mr. Goldstein asserted in his direct testimony that forgone premium payments
from the FGIC Trustees to FGIC should not be counted as additional value to the FGIC Insured
Trusts.  (Goldstein Direct ¶ 15.)    Mr. Goldstein also stated in his direct testimony that "the 18.3
million in premium payments could potentially be set off by the trusts against the deficiency
related to $1.2 billion in policy claims."  (Goldstein Direct ¶ 15.)  At trial, however, Mr.
Goldstein acknowledged that the right to set off only arises if FGIC fails to make the
significantly reduced cash payments pursuant to the Rehabilitation Plan (Trial Tr. 402:3-11), and
he acknowledged that not paying premiums to FGIC is value to the FGIC Insured Trusts (Trial
Tr. Trial Tr. 400:25-401:4).

145.    During cross-examination, when presented five times with a hypothetical as to
whether the FGIC Trustees would be acting in good faith if the proposed settlement, and its
$253.3 million Settlement Payment, were presented to them as a "take it or leave it" offer, Mr.
Goldstein did not answer.  (Trial Tr. 390:5-395:11.)  Mr. Goldstein continued in his refusal to
answer in response to the Court's attempts to elicit a response.  (*Id.* (noting "the witness doesn't
want to answer the question . . . And the Court will take . . . that into account in evaluating . . .

48

his credibility.").)  When counsel for the Investor Objecting Parties presented a similar

hypothetical, however, Mr. Goldstein cooperated and responded at length.  (Trial Tr. 412:13-17.)

146.     Freddie Mac's expert, Mr. Gibson, testified that "it is reasonable to conclude the

FGIC-Wrapped Holders would receive materially superior recoveries under the Rehabilitation

Plan than under the ResCap Settlement."  (Declaration of Scott R. Gibson ¶ 47, July 31, 2013

[Dkt No. 4693] ("**Gibson Direct**").)  Mr. Gibson acknowledged, however, that recoveries for

each tranche in each FGIC Insured Trust may be different, and that he only analyzed Freddie

Mac's holdings.  (Trial Tr. 355:12-22.)  Freddie Mac owned securities in only seven out of the

forty-seven FGIC Insured Trusts.  (Trial Tr. 354:3-8.)  Mr. Gibson did not compare recoveries

for all FGIC Insured Trusts under the Settlement Agreement versus recoveries under the

Rehabilitation Plan.  (Trial Tr. 353:17-354:2.)

147.     Mr. Gibson also did not analyze additional FGIC exposures, including Detroit's

recent bankruptcy.  (Trial Tr. 359:6-360:3.)  Mr. Gibson conceded that he did not perform

independent analysis of the economy through 2052, but instead relied upon current industry

research and other sources regarding near-term conditions.  (Trial Tr. 360:21-361:14.)

148.     Moreover, Mr. Gibson failed to consider how future improvements in the

economy would reduce future losses for, and therefore reduce claims of, the FGIC Insured

Trusts.  (Trial Tr. 363:11-364:23.)

149.     Mr. Gibson was not asked to consider the risk of litigating representation and

warranty claims relating to the FGIC Insured Trusts.  (Trial Tr. 367:4-16.)  He did not review

FGIC's proofs of claim or consider the possibility that FGIC's claims could be subordinated in

bankruptcy.  (Trial Tr. 367:17-23.)  Moreover, Mr. Gibson failed to account for the cost of

litigation, the effects that litigation would have on the timing of payout, or the amount of

49

potential litigation proceeds that would be held in reserve instead of being paid out immediately. (Trial Tr. 367:24-368:9.)  Mr. Gibson, despite his failures to perform these analyses, assumed that FGIC would recover $206.5 million in litigation from these Debtors and the related $2.1 billion contribution from Ally—even without the Settlement Agreement.  (Trial Tr. 368:10-23.)

> **E.    The FGIC Trustees Believe that, Because the Settlement Agreement Is an Integral Part of the Plan, It Is in the Best Interest of Each of the FGIC Insured Trusts and the Investors.**

150.    In addition to the stand-alone benefits of the Settlement Agreement to each of the FGIC Insured Trusts,  the Settlement Agreement is an essential, inextricable, and critical component of the PSA and the global settlement embodied therein (and the now proposed Plan), which resolves the claims of substantially all of the major constituents in these chapter 11 cases and confers significant benefits on the Debtors' creditors, including each of the forty-seven FGIC Insured Trusts and their respective creditors.  (Major Direct ¶ 40; Scott Direct ¶ 37; Sohlberg Direct ¶ 31; Dubel Direct ¶ 20; Kruger Direct ¶ 40.)  The global plan construct cannot move forward—and the benefits thereunder cannot be realized—absent approval of the FGIC Settlement Agreement.  (Dubel Direct ¶ 20.)

151.    Specifically, the approval of the Settlement Agreement by the Bankruptcy Court is a condition precedent of the effectiveness of the PSA. (Ex. 1, § 6.01; Major Direct ¶ 41; Scott Direct ¶ 38; Sohlberg Direct ¶ 32; Pfeiffer Direct ¶ 58; Dubel Direct ¶¶ 4, 20; Kruger Direct ¶ 29; Trial Tr. 163:13-21.)

152.    Under the PSA and the Plan, the FGIC Insured Trusts are estimated to receive a recovery based on their allowed claims in excess of $90 million.  (Major Direct ¶ 40; Scott Direct ¶ 37; Sohlberg Direct ¶ 31; Dubel Direct ¶ 24; Pfeiffer Direct ¶ 59.)  This distribution in excess of $90 million formed a part of the FGIC Trustees' understanding in accepting the Settlement Agreement, as the FGIC Trustees contemplated that "under the Plan Support

50

Agreement and the global settlement it embodies, the FGIC Insured Trusts will receive a

significant distribution, estimated now to be approximately $92 million, from the Debtors'

bankruptcy estate on account of representation and warranty claims against the Debtors."[13]

(Major Direct ¶ 10; *see also* Sohlberg Direct ¶ 31; Scott Direct ¶ 9.)

153.    An analysis of the distributions to each trust, including each FGIC Insured Trust,

was included in ResCap's disclosure statement.  (Major Direct ¶ 50; Scott Direct ¶ 47; Sohlberg

Direct ¶ 43; Ex. 226.)  Although the aggregate amount of the recoveries, and the particular

amount each particular FGIC Insured Trust would recover, was not quantified at the time the

Settlement Agreement was negotiated and later signed, the FGIC Trustees knew that the FGIC

Insured Trusts would receive substantial recoveries from the Debtors' estates.  (Trial Tr. 152:11-

153:4; 185:5-186:3.)

154.    In the absence of the Settlement Agreement and the global settlement embodied in

the PSA, the amount of any future recovery, if any, by each of the forty-seven FGIC Insured

Trusts and their holders in the chapter 11 cases is highly uncertain.  (Major Direct ¶ 42; Scott

Direct ¶ 39; Sohlberg Direct ¶ 33; Kruger Direct ¶¶ 44-45.)

155.    First, under the terms of the PSA and Plan, AFI will make a $2.1 billion

contribution to the Debtors' estates, which is a substantial portion of the assets that will be

distributed to the creditors of the Debtors' estates (including the FGIC Insured Trusts).  (Ex. J;

Major Direct ¶ 42; Scott Direct ¶ 39; Sohlberg Direct ¶ 33.)  Each of the forty-seven FGIC

Insured Trusts will share in the proceeds of that contribution.  (Major Direct ¶ 42; Scott Direct ¶

39; Sohlberg Direct ¶ 33.)  In the absence of the PSA and Plan, the amount of any AFI

---

[13] Indeed, Ms. Scott testified at the trial that "[w]e knew there was going to be value through trust being able to have
an allowed claim . . ." (Trial Tr. 185:23-186:3.)  Freddie Mac's own expert acknowledged that the $92 contribution
represented "a form of litigation upside" during cross examination at the Hearing.  (Trial Tr. 376:15-20.)

contribution is highly uncertain.  (Dubel Direct ¶ 20; Kruger Direct ¶¶ 4, 40; Scott Direct ¶ 39;

Major Direct ¶ 42; Sohlberg Direct ¶ 33.)

156.    Second, the PSA and Plan allow the repurchase claims and servicing claims of the

FGIC Insured Trusts that otherwise would be the subject of time-consuming and uncertain

proceedings.  (Major Direct ¶ 42; Scott Direct ¶ 39; Sohlberg Direct ¶ 33.)  In the absence of the

global settlement embodied in the PSA, the allowance of repurchase claims of each of the forty-

seven FGIC Insured Trusts would be left to the expensive and uncertain process of claims

litigation.[14]  (Id.)  Likewise, the servicing claims of the FGIC Insured Trusts would have required

further extensive discovery and analysis, probably leading to litigation over both the

quantification of the claims and their relative priority.  (Major Direct ¶ 42; Scott Direct ¶ 39;

Sohlberg Direct ¶ 33; Kruger Direct ¶¶ 51-53; Major Dep. 27:14-28:2.)

157.    Third, many of the contentious and complicated inter-creditor issues in the

chapter 11 cases are resolved by the PSA and Plan, including disputes over the priority of claims

asserted by FGIC and the other monoline insurers and by certain other securities claimants.

(Major Direct ¶ 42; Scott Direct ¶ 39; Sohlberg Direct ¶ 33; Kruger Direct ¶¶ 44, 46.)  In

particular, both the amount of FGIC's claims and the relationship between those claims and the

claims of the FGIC Insured Trusts are the subject of disputes, and the resolution of all those

disputes through litigation presents both a general risk of delay and expense to all stakeholders as

well as a specific risk to the FGIC Insured Trusts of dilution.  (Id.)  Mr. Kruger testified that "the

Settlement Agreement is a part of a broader global settlement agreement" and that "[a]bsent the

Settlement Agreement and the overall global settlement, the Debtors' estates would be

diminished significantly and there is very little likelihood that the creditors will see a

---

[14] Mr. Kruger testified that the "alternative of endless litigation among the creditors and Debtors, and no resulting contribution from AFI in the Debtors' estates, is, in my judgment, a much worse alternative in this process." (Kruger Direct ¶ 40.)

distribution, if any, for years to come."  (Kruger Direct ¶ 4; *see also* Ex. 313 ("The Court also expressed hope that the prospect of 'nuclear war' absent a global deal could spur progress by encouraging parties to compromise on their negotiating positions.") (citing Dkt. No. 2997 at 4).)

158.    Finally, the Plan effectively abates the continued accrual of the administrative costs of the chapter 11 cases, thus increasing the amount of ultimate recoveries to all creditors, including the FGIC Insured Trusts.  (Major Direct ¶ 42; Scott Direct ¶ 39; Sohlberg Direct ¶ 33; Kruger Direct ¶ 46.)  In the absence of a global settlement, the significant costs of administrating the chapter 11 cases would erode any eventual distribution to unsecured creditors (including the FGIC Insured Trusts). (*Id.*)

159.    The resolution of the matters described above are in the best interests of each of the FGIC Insured Trusts and their respective holders and are accomplished as part of the global settlement embodied in the PSA, which is conditioned on the approval of the Settlement Agreement.  (Dubel Direct ¶ 20; Kruger Direct ¶ 46; Major Direct ¶ 41; Sohlberg Direct ¶ 32; Scott Direct ¶ 38.)

160.    In analyzing the Settlement Agreement, the Investor Objecting Parties have not considered these additional benefits that would inure to the FGIC Insured Trusts.  (Dubel Direct ¶ 26; Deposition Designations for Michael Thoyer at 70:20-71:5 ("**Thoyer Dep.**"), *Designations from Deposition of Michael Thoyer as the Rule 30(b)(6) Designee of Stonehill Capital Management LLP*, dated August 22, 2013 [Dkt. No. 4795]; McQuillan Direct ¶¶ 5-6 (analyzed only the Settlement Payment and the Rehabilitation Plan); Sklar Direct ¶¶ 6-7 (same); Williams Direct ¶¶ 7-8 (same); Healy Direct ¶ 15 (same).)

161.    Based on the benefits that would inure to each of the forty-seven FGIC Insured Trusts, and based on the analysis provided by Duff & Phelps, the FGIC Trustees concluded that

the Settlement Agreement was reasonable and in the best interests of each of the FGIC Insured

Trusts and their investors and agreed to accept it on behalf of the FGIC Insured Trusts. (Major

Direct ¶¶ 42-43; Scott Direct ¶¶ 39-40; Sohlberg Direct ¶ 33; Major Dep. 14:13-25, 93:18-94:6,

94:20-23; Trial Tr. 164:2-165:5; Sohlberg Dep. 51:8-10, 51:13, 51:15-18, 51:20-52:4, 154:23-

155:6; *see also* Dubel Direct ¶¶ 21-25.)

     **F.**    **The Objectors Were Aware of the Ongoing Mediation, in Some Instances
Participated in the Negotiations Concerning the Settlement Agreement, and
Were Aware that the Policies Could Be Commuted or Settled.**

162.    Because of the confidentiality provisions of the Mediation Order (Ex. 53), the

FGIC Trustees were unable to disclose the Settlement Proposal to investors in the FGIC Insured

Trusts who were not participants in the Mediation. (Major Direct ¶ 22; Scott Direct ¶ 19;

Sohlberg Direct ¶ 16; Dubel Direct ¶ 9; Trial Tr. 188:14-24.) The fact that the Mediation was

occurring, however, was not confidential. (Major Direct ¶ 22; Scott Direct ¶ 19; Sohlberg Direct

¶ 16; Dubel Direct at ¶ 17; Exs. 53, 313.)

163.    Monarch, Freddie Mac and CQS were represented by sophisticated counsel

throughout the chapter 11 cases. (Trial Tr. 312:19-313:4, 338:7-14; Ex. 177 at 21:17-22:16, Ex.

204; Deposition Designations for David Williams at 21:17-22:16 ("**Williams Dep.**"),

*Designations from Deposition of David Williams as the Rule 30(b)(6) Designee of CQS ABS*

*Alpha Master Fund Limited and CQS ABAS Mater Fund Limited*, dated August 22, 2013 [Dkt.

No. 4797].) CQS was represented by Talcott Franklin, P.C. in the Mediation. (Williams Dep. at

24:18-25:7, 39:16-21; Dubel Direct ¶ 17.) Talcott Franklin signed the Settlement Agreement.

(Williams Dep. at 58:22-59:5.)

164.    Despite the fact that counsel for CQS participated in the Mediation, CQS elected

not to receive confidential information regarding the Mediation because it did not want to

become restricted. (Williams Dep. at 153:18-154:2.)

165.    Monarch's counsel entered into a confidentiality agreement with the Debtors.

(Ex. GD.)  Monarch's counsel did not share information that it received pursuant to that

confidentiality agreement with Monarch.  (Deposition Designations for Adam Sklar at 59:20-

60:10, 61:8-21 ("**Sklar Dep**."), *Designations from Deposition of David Williams as the Rule*

*30(b)(6) Designee of Monarch Alternative Capital LP*, dated August 22, 2013 [Dkt. No. 4796].)

There is no evidence that Monarch ever itself agreed to become restricted and sign a

confidentiality agreement.

166.    Although Monarch had been in contact with the FGIC Trustees, and alleges that it

sought to participate in the Mediation, Monarch never contacted the FGIC Trustees regarding its

desire to participate in the Mediation.  (Trial Tr. 339:18-340:4.)

167.    Freddie Mac had notice of the Mediation.  (*See* Ex. 204, 310, 313; Trial Tr. 50:21-

23.)  Gina Healy of Freddie Mac testified that Freddie Mac expected its counsel, McKool Smith,

to monitor developments in the Debtors' bankruptcy proceedings.  (Trial Tr. 312:19-313:4.)

Indeed, on May 14, 2012, the very first day of the Debtors' bankruptcy, counsel for Freddie Mac

filed a Notice of Appearance and Demand for Service of Papers, which notice included a request

that all pleadings be served on both outside counsel and in-house counsel.  (Ex. 204; Trial Tr.

311:14-312:4.)  As such, Freddie Mac has been on the service list for the entirety of the Debtors'

bankruptcy cases and received copies of the more than twenty pleadings that specifically made

reference to the Mediation.  (Ex. 313.)  Moreover, counsel to Freddie Mac's conservator, the

Federal Housing Finance Authority, even attended the Mediation, but did not participate in the

Settlement Agreement negotiations.  (Trial Tr. 50:21-23, 317:5-8; Ex. 310.)

168.    Further, Freddie Mac was aware that the Policies could be commuted or settled.

As an initial matter, Freddie Mac was a member of an ad hoc committee that provided input to

the Rehabilitation Plan.  (Trial Tr. 308:11-16.)  As a member of this committee, throughout the

process of structuring the Rehabilitation Plan, Freddie Mac communicated with Mr. Dubel

regarding FGIC's ability to commute or settle all types of policies. (Trial Tr. 464:15-24; Dubel

Dep. 54:22-55:16; 57:23-60:20.)  Mr. Dubel and this ad hoc committee, including Freddie Mac,

never discussed limiting FGIC's rights to commute or terminate policies.  (Trial Tr. 464:25-

465:8.)

169.    Moreover, the Rehabilitation Plan that the ad hoc committee agreed to provides,

in section 4.8, that FGIC may commute any of its policies with the consent of the policyholder.

(Ex. AS at Ex. 1, § 4.8; Trial Tr. 462:19 - 463:24.)

170.    Not only was Freddie Mac generally aware that FGIC could commute policies,

but, contrary to counsel for Freddie Mac's opening statements (Trial Tr. 29:9-10), and the

testimony of Gina Healy (Trial Tr. 319:14-320:1), the record shows that Freddie Mac was on

notice that not only CDS policies, but also municipal finance and RMBS policies, could be and

were properly commuted pursuant to Court Order prior to the execution of the Settlement

Agreement (Trial Tr. 317:9-11, 317:24-318:2, 453:11-459:18; Exs. 206, 316, 317, 318).[15]

Orders approving commutation of prior RMBS policies and a public finance policy were posted

to FGIC's public website.  (Ex. 206; Trial Tr. 317:9-11, 454:10-18.)  Counsel for FGIC even

directly mailed these orders and the underlying documentation to Freddie Mac's counsel on

multiple occasions.  (Trial Tr. 454:19-457:14; Exs. 317, 318.)  In addition, FGIC disclosed one

of these RMBS commutations in its publicly available third quarter 2013 financial statement,

filed December 17, 2012, prior to signing of the Settlement Agreement.  (Trial Tr. 457:22-

459:18; Ex. 316 at 25, Note 25 ("The decrease in projected claims for RMBS backed by first lien

---

[15] After approval of the Rehabilitation Plan, the commutation, settlement or termination of policies is governed by
Section 4.8 of the Rehabilitation Plan.  (*See* Ex. AS.)

mortgage loans reflects the completion of policy terminations in November 2012 with no

payment by FGIC").)  Gina Healy testified that Freddie Mac was aware that one of these two

commutations—the same commutation disclosed in FGIC's financial report, the so-called

"Aardvark" commutation—had occurred, but was not aware that it involved RMBS exposure.

(Trial Tr. 321:1-322:24; Deposition Designations for Gina Healy at 124:25-126:19, 126:21-

127:10, 127:12 ("**Healy Dep.**"), *Designations from Deposition of Gina Healy as the Rule

30(b)(6) Designee of Federal Home Loan Mortgage Corp.*, dated August 22, 2013 [Dkt. No.

4798].)

> ### G.    The FGIC Trustees Continued to Assess the Reasonableness of the Settlement Agreement and Continued To Believe that It Is in the Best Interest of Each of the Forty-Seven FGIC Insured Trusts.

171.    After the Settlement Agreement was signed, the FGIC Trustees continued to

assess the reasonableness of the FGIC Settlement Agreement.  (Major Direct ¶ 51; Scott Direct ¶

48; Sohlberg Direct ¶ 34.)

172.    Duff & Phelps evaluated and considered the assertions of the Investor Objecting

Parties and its conclusions are presented in the Expert Report of Allen M. Pfeiffer dated July 19,

2013 (the "**Pfeiffer Expert Report**").  (Major Direct ¶ 52; Scott Direct ¶ 49; Sohlberg Direct ¶

35; Ex. BX.)

173.    In addition, Dr. S.P. Kothari assessed, among other things, the reasonableness of

the conclusion by Duff & Phelps that the Settlement Payment under the Settlement Agreement is

within the range of present values of the expected payouts to the FGIC Insured Trusts under

FGIC's Rehabilitation Plan.  (Kothari Direct ¶ 5.)

174.    Dr. Kothari considered the assumptions utilized by Duff & Phelps and the process

employed by Duff & Phelps to analyze the Settlement Agreement and determined that it was

reasonable for Duff & Phelps to conclude that the lump sum payment under the Settlement

Agreement is within the range of present values of the expected payouts to each of the forty-seven FGIC Insured Trusts under FGIC's Rehabilitation Plan.  (Kothari Direct ¶¶ 6, 16-20.)

175.    In addition to consulting with experts, in continuing to assess whether the Settlement Agreement is in the best interests of the investors in each of the forty-seven FGIC Insured Trusts, the FGIC Trustees have also considered how recent events, such as the bankruptcy of the City of Detroit, might impact payments under the Rehabilitation Plan.  (Major Direct ¶ 54.)

## IV.    THE APPROVAL OF THE SETTLEMENT AGREEMENT BY THE REHABILITATION COURT

176.    On June 11, 2013, the Rehabilitation Court approved the Rehabilitation Plan without objection.  (*See* August 16th Mem. of Decision at *1.)  The Rehabilitation Plan became effective on August 19, 2013.  (Trial Tr. 468:15-18.)

177.    Before the Rehabilitation Plan was approved, on or about May 29, 2013, the FGIC Rehabilitator filed a motion with the Rehabilitation Court, seeking approval of the PSA and the Settlement Agreement (the "**Rehabilitation Approval Motion**").  (*See* August 16th Mem. of Decision at *1.)

178.    On May 30, 2013, the Rehabilitation Court issued an order to show cause regarding the Rehabilitation Approval Motion and held a hearing thereon on August 6, 2013. (*See Id.*)

179.    On August 16, 2013, the Rehabilitation Court issued the Memorandum of Decision and a related order, approving both the PSA and the Settlement Agreement, overruling the objections to the Rehabilitation Approval Motion, and authorizing the FGIC Rehabilitator to carry out the terms of each agreement.  (*See* August 16th Mem. of Decision.)  Among other things, the Rehabilitation Court made the following findings in its Memorandum of Decision:

ny-1105566

- "Both agreements were negotiated and entered into as part of a global settlement in the Residential Capital, LLC (ResCap) bankruptcy case (Bankruptcy case) presided over by Honorable Martin Glenn." (August 16th Mem. of Decision at *1.)

- "The Settlement Agreement, a product of an intense five month mediation, mediated by another Bankruptcy Judge, Honorable James M. Peck, inter alia, releases FGIC from actual and potential claims in exchange for a one-time payment (Commutation Payment) by FGIC." (*Id.*)

- "[T]he Rehabilitator seeks a finding that the Trustees have acted reasonably and in good faith in entering into the Settlement Agreement, and that the Trustees have not acted negligently in performing their duties with respect to the Settlement Agreement." (*Id*. at *1-2.)

- "On July 16, 213, two interested groups, Federal Home Loan Mortgage Corporation (Freddie Mac), and Monarch Alternative Capital LP, Stonehill Capital Management LLC, Bayview ABS Fund Management LLC, CQS ABS Master Fund Limited, and CQS ABS Alpha Master Fund Limited (the "Monarch Group") (collectively, the "Objecting Investors" or "Objectors"), representing certain investors in Trusts, with investments in such Trusts totaling approximately $1.2 billion, filed objections to the instant OSC; such Trusts are FGIC policyholders." (*Id.* at *2.)

- "The Objecting Investors argue that due to the commutation in the Settlement Agreement, the Objectors would receive a less favorable recovery than other beneficiaries of FGIC policies with the same priority and, thus, it is not fair and equitable to the Objectors. According to the Objectors, the Settlement Agreement impermissibly amends the Amended Plan, as the Objectors would receive a higher recovery under the Amended Plan than under the Settlement Agreement. The Objectors further argue that the Trustees did not have the authority to enter into the commutation in the Settlement Agreement, and that the Trust Indenture Act governs." (*Id.* at *2-3.)

- "At oral argument, with regard to the request for a finding of good faith as to the Trustees, Objector Freddie Mac argued that the Trustees failed to provide any evidence to support a finding that they acted in good faith, and Objector Monarch Group argued that this Court lacked the jurisdiction to make such a determination, but if such a determination were to be considered, that the Court lacks an evidentiary basis to determine whether the Trustees acted reasonably, in good faith, and not negligently." (*Id.* at *3.)

- "Significantly, the Court notes that the Objectors are not policyholders, and, indeed, no FGIC policyholder has objected to the Settlement Agreement. Nor are the Objectors FGIC's credit holders or stockholders. Notwithstanding this, the Objectors complain that they were not consulted about the settlement and were not aware of the settlement negotiations. However, the Objectors are no more

59

than mere creditors of certain [of] FGIC's creditors and their consent is simply not required to consummate a settlement of policy claims." (*Id.* at *4.)

- "Similarly, whether under the Trust Indenture Act, the policies were materially changed, and, thus, necessitated the Objectors' consent (as argued by the Objectors), are issues which should more properly be raised in the Bankruptcy Court, which is addressing, inter alia, whether the Trustees acted in the best interests of the trusts' beneficiaries, including such Objecting Investors." (*Id.* at *4.)

- "The Objectors concede that the Bankruptcy Court has already approved the Plan Support Agreement, and in doing so, has determined that [] 'the [Bankruptcy] Court has no difficulty in concluding that the . . . Trustees reached their decisions to sign and support the [Plan Support Agreement] in good faith'. The Bankruptcy Court made this finding after discovery and a full evidentiary hearing. While the Bankruptcy Court's finding that the Trustees acted in good faith relate to the Plan Support Agreement, such agreement was negotiated in conjunction with the Settlement Agreement, in contemplation of a global settlement, during the mediation in the Bankruptcy Case." (*Id.* at *5 (citation omitted).)

- "[T]he Objectors have failed to provide any proof in their submissions that the Trustees acted unreasonably, negligently, or in bad faith in entering into the Settlement Agreement." (*Id.*)

- "[N]one of the Objectors' three affirmations raise any issue of fact as to the Trustees' actions, nor do they even allege that the Trustees did not act in good faith." (*Id.*)

- "Dubel participated in the lengthy and complicated mediation process, which was negotiated at arms'-length and in good faith amongst the parties involved, including the Trustees. Further, according to the Dubel Affidavit, the Trustees were represented by counsel and received advice from Duff & Phelps, a financial advisory firm who served as the Trustees' expert during the mediation." (*Id.* (citation omitted).)

- [T]he Objectors have failed to show that the Rehabilitator acted arbitrarily and capriciously, or abused its discretion, in entering into the Settlement Agreement." (*Id.* at *6.)

- "Although the Commutation Payment limits distribution to certain FGIC policyholders, significantly, the FGIC policyholders affected by the Commutation Payment are the same policyholders that voluntarily negotiated and entered into the Settlement Agreement (through the Trustees) and have not filed objections. In fact, as noted, the Trustees have filed a reply in support of the relief sought in the Rehabilitator's OSC." (*Id.*)

60

- "[O]ver the objections asserted, the Court determines that the Rehabilitator did not act arbitrarily or capriciously in entering into the Settlement Agreement." (*Id*.)

- "In the limited context of this Rehabilitation proceeding, as the Rehabilitator has indicated that in his business judgment that such finding is necessary, and as it is in the interest of all FGIC policyholders as a whole that the Settlement Agreement be approved, the Court grants the Rehabilitator's application for a finding that the Trustees acted in good faith and without negligence in entering into the Settlement Agreement; such finding is for the sole purpose of the Settlement Agreement, and limited to this proceeding."  (*Id*.)

180.    Through the Memorandum of Decision, the Rehabilitation Court ordered, among

other things, that "[t]he Settlement Agreement, and the settlements, releases and discharges

contemplated thereby, shall be binding on all Investors holding Securities insured by FGIC's

Policies, and any other persons or entities who were served with notice of the Affirmation

pursuant to the Order to Show Cause."  (Order ¶ 4, Annexed to August 16th Mem. of Decision.)

## CONCLUSIONS OF LAW

## I.    JURISDICTION

### A.    The Court Has Subject Matter Jurisdiction to Approve the Settlement Agreement and Enter the Proposed Findings.

181.    The Court has subject matter jurisdiction over the issues presented in the FGIC

9019 Motion pursuant to 28 U.S.C. § 1334(b), which provides that "the district courts shall have

original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in

or related to cases under title 11."

182.    The United States District Court for the Southern District of New York has

referred all cases under title 11 and any or all proceedings arising under title 11 or arising in or

related to a case under title 11 to the bankruptcy courts in this district pursuant to 28 U.S.C.

§ 157(a) and the Amended Standing Order of Reference, M-431 (dated January 31, 2012.)

183.    The FGIC 9019 Motion is a proceeding under Bankruptcy Rule 9019 and

therefore constitutes a "proceeding arising under title 11" for purposes of 28 U.S.C. § 1334(b).

*See In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640 (Bankr. S.D.N.Y. 2012) (exercising

jurisdiction over approval of settlement agreement pursuant to Fed. R. Bankr. P. 9019).

184.    The Court also has jurisdiction over this proceeding pursuant to its "related to"

jurisdiction under 28 U.S.C. § 1334(b).

185.    A bankruptcy court's "related to" jurisdiction is broad.  *See Bayerische

Landesbank v. Deutsche Bank AG (In re Residential Capital, LLC)*, 488 B.R. 565, 572 (Bankr.

S.D.N.Y. 2013) (citing 28 U.S.C. § 1334(b)).  In the Second Circuit, before confirmation of a

chapter 11 plan, "related to" bankruptcy jurisdiction exists in any civil action where the outcome

"might have any 'conceivable' effect on [a bankruptcy] estate."  *In re Cuyahoga Equip. Corp.*,

980 F.2d 110, 114 (2d Cir. 1992).

186.    To have a "conceivable" effect on a bankruptcy estate, "certainty, or even

likelihood, is not required."  *Winstar Holdings, LLC v. Blackstone Grp. L.P.*, No. 07 Civ. 4634

(GEL), 2007 U.S. Dist. LEXIS 90482, at *1 n.1 (S.D.N.Y. Dec. 10, 2007); *see also N.Y.C. Emps.

Ret. Sys. v. Ebbers (In re Worldcom, Inc. Secs. Litig.)*, 293 B.R. 308, 322 (S.D.N.Y. 2003).

Rather, an action has a "conceivable effect" if "the outcome could alter the debtor's rights,

liabilities, options or freedom of action (either positively or negatively) and which in any way

impacts upon the handling and administration of the bankrupt estate."  *WorldCom*, 293 B.R. at

317 (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995)); *see also Wood v. Wood

(In re Wood)*, 825 F.2d 90, 94 (5th Cir. 1987) (stating that even where suit "may ultimately have

no effect on the bankruptcy," jurisdiction is established where a court "cannot conclude, on the

facts before [it], that it will have no *conceivable* effect").

62

187.    Jurisdiction exists where it is premised on a contractual indemnification

obligation by a debtor entity.  *See, e.g., Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re*

*Wolverine Radio Co.)*, 930 F.2d 1132, 1143 (6th Cir. 1991) (holding that an indemnification

provision supported jurisdiction even though the debtor "would not be affected until and unless

[the third party] invoked the indemnification" provision); *WorldCom*, 293 B.R. at 318-19

(collecting cases); *Blackacre Bridge Capital, L.L.C. v. Korff (In re River Center Holdings,*

*L.L.C.)*, 288 B.R. 59, 63-65 (Bankr. S.D.N.Y. 2003) (finding jurisdiction where the debtor was

contractually obligated to indemnify guarantor who was third party defendant).

188.    The Court has "related to" jurisdiction to enter the Proposed Findings because the

Governing Agreements provide the FGIC Trustees with broad indemnification rights against the

Debtors for any action the FGIC Trustees take that affects the administration of the property in

the FGIC Insured Trusts.  (*See, e.g.*, Ex. 114 § 8.05(b)) (requiring Debtor to "indemnify the

Trustee for, and to hold the Trustee harmless against, any loss, liability or expense incurred

without negligence or willful misconduct on its part, arising out of, or in connection with, the

acceptance and administration of the Trust Fund, . . . .)

189.    Because the FGIC Trustees have asserted claims against the Debtors' estates for

any and all claims against the Debtors' arising under the Governing Agreements, including

indemnification claims, (*see, e.g.*, Ex. 6 (US Bank Proof of Claim) at Addendum ¶¶ 45-49), entry

of the Proposed Findings would diminish the likelihood that the Debtors' estates would be

required to indemnify the FGIC Trustees for loss arising out of the entry into the Settlement

Agreement.

190.    "Related to" jurisdiction also exists because, without the Proposed Findings, the

FGIC Trustees would not have entered into the Settlement Agreement.  *See Munford v. Munford*

63

*(In re Munford, Inc.)*, 97 F.3d 449, 453-54 (11th Cir. 1996) (affirming approval of injunction

preventing non-settling defendants from pursuing claims against non-debtor where non-debtor

settlor would not have entered into settlement absent the injunction); *see also In re Delta Air

Lines, Inc.*, 370 B.R. 537, 549-51 (Bankr. S.D.N.Y. 2007) (approving Bankruptcy Rule 9019

settlement and (a) finding that settlement was in best interests of trust investors and (b) releasing

trust investor claims against trustees), *aff'd*, 374 B.R. 516 (S.D.N.Y. 2007), *aff'd*, 309 Fed.

Appx. 455 (2d Cir. 2009); *In re Residential Capital, LLC*, No. 12-12020 (MG), 2013 Bankr.

LEXIS 2601, at *70-71 (Bankr. S.D.N.Y. June 27, 2013) (approving plan support agreement and

finding that trustees acted in good faith and in best interests of their constituencies); *O'Toole v.

McTaggart (In re Trinsum Grp., Inc)*, No. 11-01284 (MG), 2013 Bankr. LEXIS 1753, at *18-19

(Bankr. S.D.N.Y. Apr. 30, 2013) (approving settlement with insurer including third-party

releases where such releases were "integral to the global settlement"); *In re Drexel Burnham

Lambert Grp., Inc.)*, 134 B.R. 493 (Bankr. S.D.N.Y. 1991) (approving settlement agreement with

insurer which released claims of non-debtor insured for bad faith or improper conduct).

### B.    The McCarran-Ferguson Act Does Not Preempt the Court's Jurisdiction.

191.    The Court's jurisdiction is not preempted by the McCarran-Ferguson Act.

192.    The McCarran-Ferguson Act provides that "[n]o Act of Congress shall be

construed to invalidate, impair, or supersede any law enacted by any State for the purpose of

regulating the business of insurance . . . unless such Act specifically relates to the business of

insurance." 15 U.S.C. § 1012(b).

193.    A federal statute, including the Bankruptcy Code and related jurisdictional

statutes, would be preempted by New York insurance law only if "(i) the federal statute does not

specifically relate to insurance; (ii) the state law at issue was enacted to regulate the business of

insurance; and (iii) the federal statute at issue would invalidate, impair, or supersede the state

law." *In re MF Global Holdings Ltd.*, 469 B.R. 177, 195, n.17 (Bankr. S.D.N.Y. 2012).

194.    Approval of the Settlement Agreement and entry of the [Proposed Findings] will

not "invalidate, impair, or supersede" New York insurance law since the [Proposed Findings]

involve only the relationship between the FGIC Trustees (the policyholders) and individual

investors in the FGIC Insured Trusts (who are not policyholders) – not the relationship between

FGIC and its policyholders.

195.    Approval of the Settlement Agreement and entry of the Proposed Findings will

not "invalidate, impair, or supersede" New York insurance law because the Rehabilitation Court

has already entered an order approving the Settlement Agreement which specifically noted that

"the finding of whether the Settlement Agreement is in the best interests of the Objectors is an

issue reserved for the Bankruptcy Court." *In re FGIC*, No. 401265/2012, 2013 Misc. LEXIS

3607, at *1 (N.Y. Sup. Ct. Aug. 16, 2013) (the August 16th Mem. of Decision).

### C.    This is a Core Proceeding.

196.    The FGIC 9019 Motion for approval of the Settlement Agreement is a core

proceeding under 28 U.S.C. § 157(b)(2).

197.    Section 157 sets out a non-exhaustive list of core bankruptcy proceedings,

including (i) matters concerning the administration of the estate; (ii) allowance or disallowance

of claims against the estate and (iii) other proceedings affecting the liquidation of assets of the

estate.  28 U.S.C. § 157(b)(2)(A), (B), and O.

198.    The Settlement Agreement (i) allows the FGIC Claims against the Debtors'

estates and disallows certain of the FGIC Trustee Claims against the Debtors' estates, 28 U.S.C.

§ 157(b)(2)(B), and (ii) will affect the administration and liquidation of the assets of the Debtors'

estates, 28 U.S.C. § 157(b)(2)(A) and (O).

65

## II.    APPROVAL OF THE SETTLEMENT AGREEMENT UNDER RULE 9019

### A.    Mr. Kruger Was Authorized to Approve the Settlement Agreement on Behalf of the Debtors.

199.    Mr. Kruger's appointment as CRO and the terms of his Engagement Letter were approved by this Court on March 5, 2013.  (Ex. 31.)  As per the terms of this Engagement Letter, Mr. Kruger had the requisite authority to enter into the FGIC Settlement Agreement on behalf of all debtor entities involved.  (Ex. 30 at 7, § 1(b); Kruger Direct ¶¶ 8, 35-36.)

### B.    The Debtors Properly Exercised Reasonable Business Judgment in Signing the Settlement Agreement.

200.    "Although courts have discretion to approve settlements, the business judgment of the debtor in recommending the settlement should be factored into the court's analysis."  *In re MF Global, Inc.*, No. 11-2790 (MG), 2012 Bankr. LEXIS 3701, at *16-17 (Bankr. S.D.N.Y. Aug. 10, 2012) (Glenn, J.) (citing *JP Morgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC (In re Charter Commc'ns)*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009)).  The Court finds that it was Mr. Kruger's reasonable business judgment, based on his years of experience as a restructuring lawyer, his personal involvement in months of negotiations overseen by Judge Peck, input from the Debtors' professionals, his review of relevant materials, and his knowledge of these cases as CRO, that the Settlement Agreement was in the best interests of the Debtors and their estates.  Mr. Kruger had the requisite authority to exercise business judgment on behalf of the Debtors in authorizing entry into the Settlement Agreement.

### C.    The Iridium Factors Have Been Satisfied.

201.    Bankruptcy Rule 9019(a) provides this Court with the authority to "approve a compromise or settlement."  Indeed, "[s]ettlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate."  *HSBC Bank USA, N.A. v. Fane (In re MF Global Inc.)*, 466 B.R. 244,

66

247 (Bankr. S.D.N.Y 2012); *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 455 (2d Cir. 2007) (stating that settlements are important in bankruptcy because they "help clear a path for the efficient administration of the bankrupt estate . . . ."); 10 COLLIER ON BANKRUPTCY ¶ 9019.01 at 9019-2 (16th ed. rev. 2013) (highlighting that "[c]ompromises are favored in bankruptcy").

202.   Prior to approval, the Court must determine that the settlement is fair, equitable and in the best interest of the estate. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968).  In so doing, the Court need not decide the numerous issues of law and fact raised by the compromise or settlement, "but must only 'canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.'" *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640-41 (Bankr. S.D.N.Y. 2012) (citing *In re Adelphia Communications Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005)).  The decision to approve or deny a particular settlement involving a bankruptcy estate lies within the discretion of the bankruptcy court.  *Id.*

203.   In the Second Circuit, the opinion in *In re Iridium Operating LLC* provides seven interrelated factors for a court to consider in its determination.  These factors are:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting, and [t]he experience and knowledge of the bankruptcy court judge reviewing, the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining.

*Iridium*, 478 F.3d at 462 (internal quotations omitted).

204.    The Settlement Agreement satisfies all seven Iridium factors.

**(a)    The Settlement Agreement Properly Balances the Possibility of Success of Litigating the FGIC Claims and the FGIC Trustee Claims and the Settlement Agreement's Future Benefits to the Debtors.**

205.    The compromises in the Settlement Agreement properly balance the possibility of success of litigating the FGIC Claims and the FGIC Trustee Claims and the Settlement Agreement's future benefits to the Debtors.

**(i)    Success Litigating the FGIC Claims and FGIC Trustees' Claims Is Uncertain.**

206.    The liabilities to be released under the Settlement Agreement relate to claims that pose unique legal and evidentiary challenges, many of which have not fully developed in a definitive way in the case law to date, and none of which has been litigated to resolution with respect to the Debtors specifically, such that there is considerable uncertainty and risk in the outcome.

207.    Only the Ad Hoc Group challenges the uncertainty of success in litigating these claims, arguing that the FGIC Claims "plainly fall within the ambit of Section 510(b)" of the Bankruptcy Code and that the Debtors thus could subordinate the claims with ease.  (Ad Hoc Obj. ¶ 33.)  The Ad Hoc Group, however, cites no case law supporting subordination under Section 510(b) of a securitization trustee's contract- and fraud-based claims, let alone subordination of a monoline insurer's contract- and fraud-based claims.  (*See* Trial Tr. 117:17-118:9.)

208.    Courts in this district have approved settlements of claims even when there exists some dispute regarding the applicability of Section 510(b).  *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 327 B.R. at 168-70 ("[T]he very difficulty of the underlying issue makes the [] issue before me—whether a settlement of such a controversy is inappropriate or unlawful—a rather

68

easy one."), *aff'd sub. nom. Ad Hoc Adelphia Trade Claims Comm. v. Adelphia Commc'ns Corp.*, 337 B.R. 475, 478 (S.D.N.Y. 2006); Order Granting Debtors' Motion for Allowance of Compromise and Settlement at 3-4, *In re WorldCom, Inc.*, No. 02-13533 (Bankr. S.D.N.Y. Aug. 6, 2003), Dkt No. 8125 ("[T]here are sufficient legal issues [regarding 510(b)] that must be addressed . . . which issues, when combined with the unsettled nature of the law in this area, furnish sufficient doubt as to the outcome of any such litigation."); *In re Drexel Lambert Grp. Inc.*, 138 B.R. 717, 719 (Bankr. S.D.N.Y. 1992) (approving settlement resolving employee ERISA and compensation claims over objections that those claims should be subordinated where it was unclear whether ERISA overrode the mandates of Section 510(b)), *aff'd sub. nom. Lambert Brussels Assocs. L.P. v. Drexel Burnham Lambert Grp., Inc.* (*In re Drexel Burnham Lambert Grp., Inc.*), 140 B.R. 347 (S.D.N.Y. 1992).

> (ii)    **The Settlement Agreement Provides Substantial Future Benefits to the Debtors.**

209.    The Settlement Agreement provides substantial future benefits to the Debtors' estate and creditors in the form of (i) a substantial reduction of claims asserted against each of the Debtors' estates; (ii) increased certainty regarding the validity, priority and amount of the FGIC Claims and the FGIC Trustees' Claims; and (iii) substantial cost savings when compared with the likely costs of professional fees and experts that would be needed if litigation over the FGIC Claims the FGIC Trustees' Claims proceeded.

210.    Again, only the Ad Hoc Group challenges the Settlement Agreement's benefits to the Debtors, arguing that, in the event the Plan contemplated in the Settlement Agreement is not approved, the ceiling placed on the FGIC Claims has no value.  (Ad Hoc Group Objection ¶¶ 18-21, June 19, 2013 [Dkt. No. 4027] ("Ad Hoc Obj.").)  The Ad Hoc Group asserts that, because FGIC can only ever recover $1.85 billion, the Debtors are settling the FGIC Claims for

"approximately 32% of the total claims filed against th[e Settling] Debtors" and providing FGIC

with "a 'free option' to recover nearly the full amount of its claims." (*Id.* ¶¶ 18, 21.)  This

argument confuses the economics of the settlement.

211.    The Ad Hoc Group inflates the amount of the FGIC Claims allowed under the

Settlement Agreement, and it ignores the fact that FGIC has asserted three separate proofs of

claim in the amount of $1.85 billion against each of the Settling Debtors.  (*See* Ex. 2; Ex. 3; Ex.

4.)  At the same time, the Ad Hoc Group inflates FGIC's expected recovery under the Settlement

Agreement by arguing, incorrectly, that FGIC will retain the right to recover $1.79 billion.

Implicit in this reasoning is the assumption that the Debtors' creditors will receive a 100%

dividend, allowing FGIC to recover $1.79 billion on the artificially deflated $1.85 billion in total

claims.  This argument also assumes, incorrectly, that if the Plan is not approved, the Debtors

will not contest any claims asserted by FGIC in excess of the $596.5 million Minimum Allowed

Claim Amount.  Combined, these inaccuracies significantly undervalue the benefits to the

Debtors under the Settlement Agreement.  (*See* Trial Tr. 120:15-121:17.)

>    **(b)    The Settlement Agreement Avoids the Strong Likelihood of Complex
>    and Protracted Litigation.**

212.    Absent a settlement, litigation of the FGIC Claims and FGIC Trustees' Claims,

and the inter-creditor disputes between the monoline insurer and the trustees, will likely continue

for many years, at a substantial cost to the parties.  This likelihood weighs strongly in favor of

the Settlement Agreement's approval.

213.    Only the Ad Hoc Group challenges this point, arguing that the releases the

Debtors obtain from FGIC are in effect illusory, because, in a failed-plan scenario, FGIC may

assert alter-ego and veil-piercing claims against AFI, and if FGIC is successful, AFI might then

assert claims for indemnity or contribution against the Debtors.  (Ad Hoc Group Supplemental

Objection ¶ 38, July 29, 2013 [Dkt. No. 4401] ("**Ad Hoc Group Sup. Obj.**".)  Following this

argument to its conclusion, however, parties would never be able to settle absent finality on all

auxiliary issues.  (*See* Trial Tr. 124:24-125:22.)

214.    In addition, even the Ad Hoc Group seems to doubt the likelihood of its

hypothetical coming to pass, as it has acknowledged that the Examiner concluded that such third

party claims against AFI are unlikely to prevail.  (Ad Hoc Group Sup. Obj. ¶ 40 n. 8.)  It is also

difficult to reconcile the Ad Hoc Group's argument with its claim that there is no basis for

ResCap, which is the intermediate parent of RFC and GMAC Mortgage, to have any liability to

FGIC.  (*See* Ad Hoc Obj. ¶ 25.)  Finally, the Ad Hoc Group ignores the fact that the Debtors may

have defenses to any indemnification claims asserted by AFI that might not otherwise be

available were such claims asserted directly by FGIC, including, but not limited to, disallowance

as contingent claims for indemnification under Section 502(e) of the Bankruptcy Code and

equitable subordination under Section 510(c) of the Bankruptcy Code.

### (c)    The Settlement Agreement is in the Paramount Interests of the Estates' Creditors.

215.    The Settlement Agreement resolves substantial claims against the Debtors to the

benefit of all creditors.  Although the Ad Hoc Group initially raised concerns about the

paramount interests of creditors (Ad Hoc Group Sup. Obj. ¶ 16), they later determined that their

concerns principally pertained to the economics of a settlement not contained in the Settlement

Agreement and, instead, in the proposed Plan and for which the Debtors do not seek approval at

this time.  (Trial Tr. 34:23-35:22.)

216.    Here, it is clear that the Settlement Agreement resolves substantial claims against

the Debtors' estates, and ensures that the Debtors will not have to litigate and face the risk of

being responsible for the full amount of claims originally asserted by FGIC and the FGIC

Trustees.   As a result, relatively few claims against the Debtors will remain in connection with

the FGIC Insured Trusts, limited to an amount between (i) the Minimum Allowed Claim Amount

(subject to the reservations of rights described above) or the limited claims that FGIC is allowed

to assert in the event that the plan contemplated under the PSA does not become effective, (ii)

certain servicing claims held by the FGIC Trustees, and (iii) claims attributable to losses by

holders of securities not insured by the Policies.

217.    Even if the proposed Plan is not approved, the Settlement Agreement substantially

narrows the universe of open disputes to be settled in connection with approval of the Plan or

litigation regarding the allowance of the FGIC Claims at some later date, to the benefit of all

creditors.  (*See* Trial Tr. 120:15-121:17.)

> **(d)    The Settlement Agreement has Support From the Overwhelming
> Majority of Other Parties-in-Interest.**

218.    No objector has challenged the fact that the Settlement Agreement has support

from entities that hold or represent the holders of the overwhelming majority of claims asserted

in the Debtors' chapter 11 cases.  Each of the Debtors' claimant constituencies that have signed

on to the PSA also support the Settlement Agreement.  (Kruger Direct ¶ 54.)  Indeed, except for

the Ad Hoc Group, none of the objectors are creditors.  *See In re Iridium*, 478 F.3d at 465 ("[I]t

is telling that no other creditor objects to the Settlement.").

> **(e)    The Settlement Agreement's Releases of the Debtors' Officers and
> Directors are Reasonable.**

219.    No objector has challenged the fact that the releases of the Debtors' officers and

directors in the Settlement Agreement are reasonable.  *In re Iridium*, 478 F.3d at 462.  These

releases are also consistent with those approved in other cases in the Southern District, providing

only for voluntary releases by the non-debtor Settlement Parties.  (Kruger Direct ¶ 55.)

(f)    **The Parties to the Settlement Agreement Were Ably Represented By Competent and Experienced Counsel.**

220.    No objector has challenged the fact that the Settlement Parties were represented by competent and experienced counsel throughout the negotiation of the Settlement Agreement. *In re Iridium*, 478 F.3d at 465.  (*See* Kruger Direct ¶ 56.)

221.    As a result, and as made clear by the Settlement Parties' testimony, the Court finds that the parties to the Settlement Agreement were ably represented by competent and experienced counsel.

(g)    **The Settlement Agreement was the Product of Arm's-Length Negotiations.**

222.    Finally, no objector seriously challenges whether the negotiations that produced the Settlement Agreement were at arm's-length.  The Ad Hoc Group asserts that it has not seen the "substantive communication between parties concerning the Settlement" as evidence of the arm's-length nature (Ad Hoc Group Sup. Obj. ¶ 34), but the Settlement Parties were precluded from divulging such communications under General Order M-390 and this Court's Mediation Order.  (Ex. 53.)

223.    Working within the confines of the Mediation Order, the Settlement Parties have presented sufficient testimony that the Settlement Agreement was the product of arms'-length negotiations.  (*See supra* ¶¶ 24-37.)  The Settlement Agreement arose out of broader discussions in the Mediation directed by Judge Peck, resulted from months of hard fought negotiations, and involved many different parties, most of whom had divergent and different interests and agendas, and, as noted above, were represented by experienced counsel and financial advisors.

III.    APPROVAL OF THE FINDINGS RELATING TO THE FGIC TRUSTEES AND
        THE FGIC INSURED TRUSTS

    A.    **The Settlement Agreement Involves Resolution of a Claim Against an
        Insurer in an Insolvency Proceeding; It Is Not an Amendment to the
        Governing Agreements.**

    224.    The Settlement Agreement is not an amendment to the Governing Agreements.

The ability of the FGIC Insured Trusts to recover from FGIC and from the Debtors has been

irreversibly altered because of their respective insolvency proceedings, not because of any

allegedly improper action by the FGIC Trustees.  In an analogous context, courts have held that

contractual provisions requiring consent of the holders for an amendment are not implicated in

insolvency scenarios:

> We are not concerned here with a "supplemental indenture" (Section
> 12.03) or amendments of the agreement or guaranty with or without
> consent of the owners (Sections 12.06, 12.07), and those provisions are
> simply irrelevant here.  The impairment which the Objectors complain of
> results not from any agreement of the Bond Trustee, but from operation of
> the Bankruptcy Code and the simple economic fact that this insolvent
> debtor cannot pay its creditors unimpaired.

*In re Delta Air Lines, Inc.*, 370 B.R. 537, 546-47 (Bankr. S.D.N.Y. 2007), *aff'd sub nom. Kenton

Cnty. Bondholders Comm. v. Delta Air Lines, Inc.*, 374 B.R. 516 (S.D.N.Y. 2007), *aff'd,* 309

Fed. Appx. 455 (2d Cir. 2009).

    225.    The Settlement Agreement does not impair the certificateholders' rights to receive

payment from the FGIC Insured Trusts.  By entering into the Settlement Agreement, the FGIC

Trustees have simply agreed to the form of impaired payment which the FGIC Insured Trusts

will receive from the Debtors and FGIC.

    B.    **The Governing Agreements Authorized the FGIC Trustees to Enter into the
        Settlement Agreement.**

    226.    The FGIC Trustees have the exclusive power and authority to commute the

Policies, and nothing in the Governing Agreements provides otherwise.  The FGIC Trustees are

74

the only parties who have the right and authority to enforce the Policies because they, on behalf

of the FGIC Insured Trusts, are the policyholders. (*See, e.g.*, Trial Tr. 473:8-15; Ex. 124-40[16] at

1; August 16th Mem. of Decision at *8-9) ("The Rehabilitator negotiated the Settlement

Agreement with its policyholders, the Trustees, who represent the trusts.").) As the

policyholders of the Policies, the FGIC Trustees have exclusive authority to assert claims against

FGIC on behalf of the respective FGIC Insured Trusts.

227.    Under New York law,[17] "[o]nly the policy owner has standing to sue based on an

insurance policy." *Pike v. New York Life Ins. Co.*, 72 A.D.3d 1043, 1049 (2d Dep't 2010); *see

also Orentreich v. Prudential Ins. Co. of Am.*, 275 A.D.2d 685, 685 (1st Dep't 2000) ("The

action was properly dismissed on the ground that since the policies in question are owned by a

trust, only the trustee, who was not named as a plaintiff in that capacity, may seek their

rescission or damages attributable to their issuance.") (citing *Restatement (Second) of Trusts*

§§ 280-82 (1959)). The FGIC Policies explicitly state that the FGIC Insured Trusts are the

policyholders, and acknowledge that the FGIC Trustees act on behalf of the FGIC Insured

Trusts. (*See, e.g.*, Ex.124-40 at 1.) Specifically, the FGIC Policies state that FGIC

"unconditionally and irrevocably agrees to pay [amounts equal to the shortfall in payments to the

Holders] to the Trustee…, as trustee for the Holders of the…Certificates." (*Id.*; *see also* Ex. 2 at

¶ 5 ("FGIC's financial guaranty insurance policies for the Transaction at issue guaranteed the

payment of principal and interest due on the insured securities."); Trial Tr. 473:8-15.)

228.    Furthermore, pursuant to the Governing Agreements, the FGIC Trustees are the

only parties authorized to enforce the claims of the FGIC Insured Trusts, including those against

---

[16] Ex. 124-40 refers to Surety Bond Insurance Policy No. 05030159, Issuer: RAMP Series 2005-EFC7 Trust, effective as of December 28, 2005. The admission of this exhibit is pending.

[17] The Insurance Policies are "subject to and shall be governed by the laws of the State of New York." (Ex. 124-40 at 4.)

FGIC, and accordingly to settle any of their respective FGIC Insured Trusts' claims.  For

instance, the relevant indentures[18] provide that, subject to certain restrictions, if there is a default

in the payment of principal or interest due under a note, the FGIC Trustee may, "in its own name

and as trustee of an express trust," institute proceedings for the collection of such amounts from

the trust or other obligor on a note.  (*See, e.g.*, Ex. 116 § 5.03(a)-(b).)  Moreover, if an Event of

Default exists under a FGIC Insured Trust, the FGIC Trustee, subject to certain restrictions,

"may . . . in its discretion proceed to protect and enforce its rights and the rights of the

Noteholders by such appropriate Proceedings as the Indenture Trustee shall deem most effective

to protect and enforce any such rights . . . ."  (*Id.* § 5.03(c).)  Similarly, the relevant pooling and

servicing agreements[19] provide that, in the event of certain shortfalls in cash flow to a FGIC

Insured Trust, the FGIC Trustees alone are required to submit a claim to FGIC under the

applicable FGIC Policy.

229.    Under the terms of the Governing Agreements, because the FGIC Policies

"unconditionally and irrevocably" guarantee payment to the FGIC Trustees of principal and

interest owed to the FGIC Insured Trusts (Ex. 124-40 at 1), the FGIC Trustees alone have the

power to institute collection actions against FGIC, regardless of whether an event of default has

---

[18] *See, e.g.*, Ex. 116 § 5.03(b) ("In case the Issuer shall fail forthwith to pay such amounts upon such demand, the Indenture Trustee, in its own name and as trustee of an express trust, subject to the provisions of Section 10.17 hereof, may institute a Proceeding for the collection of the sums so due and unpaid, and may prosecute such Proceeding to judgment or final decree, and may enforce the same against the Issuer or other obligor on the Notes....").

[19] *See* Ex. 118 § 4.12(a) ("If pursuant to Section 4.04(a)(vii), the Master Servicer determines and notifies a Responsible Officer of the Trustee in writing that an Insured Payment exists and the amount of such Insured Payment for any Distribution Date, the Trustee shall complete the Notice and submit such Notice in accordance with the related Certificate Guaranty Insurance Policy to the Certificate Insurer..."); *see also* Ex. 118 § 4.12(b) ("The Trustee shall establish and maintain the Insurance Account on behalf of the Holders of the Class A Certificates. Upon receipt of an Insured Payment from the Certificate Insurer on behalf of the Class A Certificates, the Trustee shall deposit such Insured Payment in the Insurance Account."); *see also Asset Securitization Corp. v. Orix Capital Mkts.*, LLC, 784 N.Y.S.2d 513, 514 (1st Dep't. 2004) ("authority [to commence litigation under PSAs] is committed solely to the trustee of the pooled loans"); *Wells Fargo Bank, N.A. v. Konover*, No. 3:05 CV 1924(CFD), 2009 U.S. Dist. LEXIS 74873, at *12 (D. Conn. Aug. 21, 2009) ("The PSA establishes that Wells Fargo as Trustee does have these customary powers [to sue], as other courts have held in cases involving similar PSAs").

76

occurred.  (*See, e.g.*, Ex. 116 § 5.03(b).)  Accordingly, because the FGIC Trustees are the only

parties with the express authority to submit claims to FGIC pursuant to the FGIC Policies, it

necessarily follows that, if FGIC fails to make payments under the FGIC Policies, the FGIC

Trustees also have the power to institute collection actions or assert claims against FGIC.

### C.    The Court Should Defer to the FGIC Trustees' Discretion Because They Acted in Good Faith and Reasonably in Determining Whether to Enter into the Settlement Agreement.

230.    An indenture trustee's duties are defined by the trust instrument – here, the

Governing Agreements.  *See Magten Asset Mgmt. Corp. v. Bank of New York*, 2007 WL

1326795, at *6 (Sup. Ct. N.Y. Cnty. 2007) ("The role of an indenture trustee differs from that of

an ordinary trustee. . . . [I]ts obligations are defined primarily by the indenture rather than by the

common law of trusts") (citations omitted).

231.    The Governing Agreements generally provide that, prior to the occurrence of an

Event of Default (as defined in the relevant agreement), the FGIC Trustees' duties are strictly

limited to those set forth explicitly in the contracts.  (*See, e.g.*, Ex. 118 § 8.01(a); Ex. 116

§ 6.01(b)(i).)  Subsequent to an event of default that has not been cured or waived, the FGIC

Trustees must exercise such of the "rights and powers vested in [them] by [the Governing

Agreements], and use the same degree of care and skill in their exercise as a prudent investor

would exercise or use under the circumstances in the conduct of such investor's own affairs."

(Ex. 118 § 8.01(a); *see also* Ex. 116 § 6.01.)  Regardless of whether an event of default has

occurred here, in determining whether to enter into the Settlement Agreement, the FGIC Trustees

have acted reasonably, in good faith, and in accordance with the "prudent person" standard set

forth in the Governing Agreements.

232.    Courts review trustees' discretionary decisions for two elements: good faith and

reasonableness.  "Where a trustee has discretionary power, its exercise should not be the subject

of judicial interference, as long as it is exercised reasonably and in good faith." *Haynes v. Haynes*, 72 A.D.3d 535, 536 (1st Dep't. 2010) (citing *Cmty. Serv. Soc'y v. N.Y. Cmty. Trust (In re Preiskel)*, 713 N.Y.S.2d 712, 719 (1st Dep't. 2000)); *see also In re First Trust & Deposit Co.*, 280 N.Y. 155, 163 (1939) ("We find no abuse of discretion and no evidence of bad faith or that the trustee administered the trust in a careless or negligent manner").  Similarly, Section 187 of the *Restatement (Second) of Trusts* (1959) provides that "[w]here discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except *to prevent an abuse by the trustee of his discretion*" (emphasis added.).  *See also id.* § 259 cmt. d ("Where a matter rests within the discretion of the trustee, the court ordinarily will not instruct him how to exercise his discretion").

233.    In fact, numerous authorities have applied a deferential standard of review to trustee decisions to settle.  For instance, Section 192 of the *Restatement (Second) of Trusts* provides that "[t]he trustee can properly compromise, submit to arbitration or abandon claims affecting the trust property provided that in doing so he exercises reasonable prudence."  The holding in *In re IBJ Schroder Bank & Trust Co.*, Index No. 101530/98, 2000 N.Y. Misc. LEXIS 692 (Sup. Ct. N.Y. Cnty. Aug. 16, 2000) further supports the FGIC Trustees' authority to enter into the Settlement Agreement and the Proposed Findings that the FGIC Trustees seek.  That case involved an Article 77 proceeding[20] where a securitization trustee sought approval of a settlement.  Nearly 200 beneficiaries objected, arguing that the trustee had settled too cheaply and "failed to take any discovery."  *Id.* at *7.  The court, however, refused to "invalidate the proposed settlement merely because certain beneficiaries believe a greater recovery might be obtained if the . . . action is submitted to an expensive and unpredictable litigation."  *Id.* at *8.

---

[20] An Article 77 proceeding is an action provided for under the New York Civil Practice Law and Rules that may be brought to determine a matter relating to an express trust.  *See* N.Y. C.P.L.R. § 7701.

Indeed, the court held that the trustee's decision to compromise "was entitled to judicial

deference," and "the trustee's view must prevail" because of "the trustee's showing of [its]

reasonableness." *Id.* ("the trustee's decision to compromise the... action is within the scope of

the trustee's powers, is reasonable and prudent, and is entitled to judicial deference").

> ### D.   The FGIC Trustees Acted Reasonably and in Good Faith in Entering into the Settlement Agreement.

234.   The process by which the FGIC Trustees determined to enter into the Settlement

Agreement evidences that they acted reasonably and in good faith.   Notably, this Court

previously held that the FGIC Trustees acted in good faith and in the best interest of their

respective constituencies with respect to the PSA, of which the Settlement Agreement is a part.

*Memorandum Opinion Approving the Plan Support Agreement*, No. 12-12020 (MG) (Bankr.

S.D.N.Y. June 27, 2013) [Dkt. No. 4102] (the "**PSA Opinion**") at 44-45.   The Court has already

determined, in concluding that the fiduciary exception does not apply, that the Objectors do not

have a colorable claim that the FGIC Trustees have a conflict of interest or that they engaged in

self-dealing.   *See* July 17, 2013 Tr. 69:12–71:13 ("And so, the Court concludes that the three

issues raised by Ms. Eaton do not raise a colorable claim of self dealing or conflict-of-interest

sufficient to trigger the fiduciary exception to the attorney-client privilege.").

235.   The Settlement Agreement was agreed to as part of the extensive Mediation with

numerous interested parties in the chapter 11 cases in an effort to reach a consensual chapter 11

plan.   (Major Direct ¶ 21; Scott Direct ¶ 18; Sohlberg ¶ 15; Dubel Direct ¶ 10; Kruger Direct ¶¶

5, 57, 58 and 59; Major Dep. at 195:6-13.)   The Mediation occurred over the course of some five

months beginning in December 2012 and was overseen by a sitting bankruptcy judge.   (Major

Direct ¶ 20; Scott Direct ¶ 17; Sohlberg Direct ¶ 14.)   The Settlement Agreement is an essential,

inextricable and critical cornerstone of the global settlement embodied in the PSA, now part of

the Plan, and must be understood as the product of heavily negotiated, arm's-length, good faith

discussions conducted among sophisticated parties with differing and conflicting interests, under

the close supervision and guidance of the Mediator.  (Major Direct ¶ 21; Scott Direct ¶ 18;

Sohlberg Direct ¶ 15.)  *See also* PSA Opinion at 12, 43-44 (stating that "[a]ll of the parties that

signed the [the Settlement Agreement and the Plan Support Agreement] are sophisticated" and

that the Settlement Agreement and the Plan Support Agreement were "the result of many months

of the mediation led by Judge Peck" and reflect "a heavily negotiated resolution supported by a

substantial majority of the Debtors' major claimant constituencies").

236.    Although the Mediation Order prohibits the FGIC Trustees from disclosing the

substance of mediation discussions, representatives from each of the FGIC Trustees have

testified generally regarding the process surrounding the negotiations (including that the amount

of the Settlement Payment was extensively negotiated) and have testified at length regarding the

analysis provided to them by Duff & Phelps and the benefits that the Settlement Agreement

provides to each of the FGIC Insured Trusts and the investors therein.  (*See, e.g.,* Major Direct

¶¶ 8, 9, 20, 21, 27-43, 51-54; Scott Direct ¶¶ 7, 8, 17, 18, 24-40, 48, 49; Sohlberg Direct ¶¶ 6, 7,

14, 15, 20-36.)  The FGIC Trustees gave careful and informed consideration to the Settlement

Agreement, considering its merits on both a stand-alone basis and in the context of the global

settlement embodied in the PSA and the proposed Plan.  (Major Direct ¶¶ 42-43; Scott Direct ¶¶

39-40; Sohlberg Direct ¶ 33; Major Dep. 14:13-25, 93:18-94:6, 94:20-23; Trial Tr. 164:1-165:1;

Sohlberg Dep. 51:8-10, 51:13, 51:15-18, 51:20-52:4, 154:23-155:6.)

237.    The success of the Mediation itself provides significant evidence of the parties'

good faith and the arm's length nature of the Settlement Agreement. The months leading up to

the Mediation were a quagmire of litigation, and it appeared that the cases could devolve not

only into years of difficult, protracted and expensive litigation between the Debtors' estates and

Ally, but also between competing groups of creditors.  (*See* Kruger Direct ¶ 40 (noting that

alternative to the global settlement involves "endless litigation among the creditors and

Debtors.))  When the Mediation began, the RMBS Trust Settlement litigation was in its eighth

month.  There existed outstanding securities class actions, borrower class actions, inter-debtor

disputes, allocation disputes, and inter-creditor disputes, among others.  There also existed

significant disputes regarding AFI, and its proposed $750 million contribution in exchange for

full non-consensual third party releases.  During this time, even though FGIC did not sign the

RMBS Trust Settlement, the Debtors and FGIC publicly disputed whether FGIC's claims against

the estates were entirely released under the RMBS Trust Settlement and as late as May 20, 2013,

the Debtors contested the Creditors' Committee's and FGIC's objections to the RMBS 9019

Motion.  (See Ex. 313; *see generally* March 1, 2013 Tr. [Dkt. No. 3119].)

238.    After five months of Mediation, more than twenty creditor groups collectively

resolved numerous complex, interrelated disputes, and agreed upon the terms of a plan

(conditioned upon approval of the Settlement Agreement) under which AFI will contribute $2.1

billion toward the Debtors' estate.  The "before and after" comparison demonstrates arms'-

length, good faith efforts to resolve a very complicated case.

239.    In evaluating and ultimately accepting the Settlement Agreement, the FGIC

Trustees sought and received the advice of competent counsel they had retained to advise them

in the Chapter 11 Cases.  (Major Direct ¶ 16; Scott Direct ¶ 13; Sohlberg Direct ¶ 10; Dubel

Direct ¶ 11; *see* Kruger Direct ¶¶ 5, 14, 42, 56 and 57.)

240.    As they were entitled to do under the Governing Agreements, the FGIC Trustees

relied on Duff & Phelps, their financial advisor in the Chapter 11 Cases, to review and analyze

the Settlement Agreement.  (Major Direct ¶¶ 17-18; Sohlberg Direct ¶ 11; Scott Direct ¶¶ 14-15;

Sohlberg Dep. 143:15-19; Trial Tr. 142:2-6.)

241.    In considering the Settlement Agreement, the FGIC Trustees requested that Duff

& Phelps analyze and compare the economic terms of the Settlement Proposal, including the

Settlement Payment, against the Projected Payments under the Rehabilitation Plan and provide a

recommendation to the FGIC Trustees.  (*See* Major Direct ¶¶ 9, 28; Sohlberg Direct ¶¶ 7, 21;

Scott Direct ¶¶ 8, 25; Scott Dep. 43:11-15.)  In conducting its analysis, Duff & Phelps reviewed

publicly available information; obtained additional information concerning the Rehabilitation

Plan directly from FGIC and Lazard Freres & Co. LLC, the FGIC Rehabilitator's financial

advisor; and also considered certain information provided by parties to the Mediation.  (*See*

Major Direct ¶ 29; Sohlberg Direct Direct ¶ 22; Scott Direct ¶ 26.)

242.    In addition to providing the FGIC Trustees with discussion materials and informal

discussions with counsel for the FGIC Trustees, Duff & Phelps made a formal presentation to the

FGIC Trustees on May 13, 2013 concerning its analysis of the Settlement Proposal and its

recommendation on whether to accept the Settlement Agreement.  (Major Direct ¶¶ 30-33;

Sohlberg Direct ¶¶ 23-25; Scott Direct ¶¶ 27-30; Scott Dep. 44:19-22, 47:12-15; Exs. 119-123.)

The FGIC Trustees reviewed the Duff Report, which summarized and memorialized Duff &

Phelps' analysis and recommendation to the FGIC Trustees concerning the Settlement Proposal.

(Major Direct ¶¶ 34-36; Sohlberg Direct ¶¶ 26-27; Scott Direct ¶¶ 31-33.)

243.    The Institutional Investors, who were active in the case and held minority

interests in the FGIC Insured Trusts (Trial Tr. 429:16-24), were significant participants in the

case, participated in the Mediation and supported the Settlement Proposal, ultimately becoming

signatories to the Settlement Agreement.  (Major Direct ¶ 22; Scott Direct ¶ 19; Sohlberg Direct

82

¶ 16; Major Dep. at 145:16-146:8; Sohlberg Dep. at 110:11-15, 110:17-111:6.)  Most, if not all,

of the Institutional Investors are money managers who equally owe fiduciary duties to their

clients in both FGIC Insured Trusts and non-FGIC Insured Trusts. (*See* Dubel Direct ¶ 7

(cataloging the banks, funds and financial institutions that make up the Institutional Investors).)

The Institutional Investors, who were the only investors in the FGIC Insured Trusts who actively

participated in the mediation, supported the Settlement Agreement, ultimately becoming

signatories to the FGIC Settlement Agreement.  (Major Direct ¶ 22; Scott Direct ¶ 19; Sohlberg

Direct ¶ 16.)

244.    Each of the FGIC Trustees, while evaluating the Settlement Proposal on their

own, had the benefit of the views of the other two FGIC Trustees and their counsel.  This

informed their respective views of the Settlement Agreement.  (Major Direct ¶ 26; Scott Direct ¶

23; Sohlberg ¶ 17.)

245.    The evaluation of the Settlement Proposal by BNY Mellon and U.S. Bank were

also informed by their roles as members of the Creditors' Committee.  That position gave BNY

Mellon and U.S. Bank access to all the resources of the Creditors' Committee and a perspective

on the overall bankruptcy cases, thus allowing them to evaluate the Settlement Proposal in the

larger context of the Chapter 11 Cases and understand the relative risks and benefits of

proceeding under the Settlement Agreement or the Rehabilitation Plan.  (Major Direct ¶ 25; Scott

Direct ¶ 22; Trial Tr. 186:9-19.)

246.    Finally, the FGIC Trustees ensured that Investors in the FGIC Insured Trusts had

notice and a full and fair opportunity to be heard concerning the Settlement Agreement,

including any objection that the Settlement Agreement was not in the best interests of the

Investors.  Investors were provided two separate notices advising them of, among other things,

83

the terms of the Settlement Agreement, the process by which the Investors could direct the FGIC

Trustees to withdraw from the PSA, and how they could otherwise object to the terms of the

Settlement Agreement either in the Bankruptcy Court or the New York State Court overseeing

FGIC's Rehabilitation Proceeding, or both.  (Ex. 1 §§ 4.02, 6.01; Ex. 128; Ex 129; Major Direct

¶ 23; Scott Direct ¶ 20; Sohlberg Direct ¶ 18; Trial Tr. 136:3-10, 156:14-24; Sohlberg Dep. at

60:12-14, 60:16-19, 60:21-23, 60:25.)

247.    Accordingly, the FGIC Trustees acted reasonably and in good faith in entering

into the Settlement Agreement.

### E.    The Settlement Agreement Is in the Best Interests of the Investors in Each Trust.

248.    Based on the advice of Duff & Phelps, the FGIC Trustees properly determined

that the Settlement Agreement is in the best interests of each of the FGIC Insured Trusts and the

respective investors therein because (i) the Settlement Payment is within the range of

reasonableness when compared to the Projected Payments under the Rehabilitation Plan; (ii)

FGIC is agreeing to forgo insurance premiums and the right to receive reimbursements from the

FGIC Insured Trusts;[21] and (iii) the Settlement Agreement confers significant benefits upon the

FGIC Insured Trusts as part of a global settlement embodied in the PSA.

249.    The Settlement Agreement, first and foremost, is in the best interests of the FGIC

Insured Trusts and their investors on a stand-alone basis.  The $253.3 million Settlement

Payment, by itself, is within the reasonable range of the estimated total Projected Payments to

the forty-seven FGIC Insured Trusts (estimated by Duff & Phelps to $190 million to $340

---

[21] "Reimbursements" refer to recoveries on individual mortgage loans (such as foreclosure or REO sale proceeds) that are received by a FGIC Trustee after FGIC has paid a loss in respect of such loan.  Under the Policies and Governing Agreements, as well as FGIC's Plan of Rehabilitation, the FGIC Trustees are obligated to pay to FGIC certain of such reimbursements.  (*See, e.g.*, Ex. 116 at § 5.04(b); Ex. 118 at §§ 4.02(c), (d) and 4.12.)  Another benefit of the Settlement Agreement is that FGIC agrees therein to relinquish all its rights to reimbursements from the FGIC Trustees.  (*See* Ex. 1 at § 2.01(b).)

million on a net present value basis).  (Ex. 123 at 3, 9; Major Direct ¶ 38; Scott Direct ¶ 35;

Sohlberg Direct ¶ 29.)

250.    In addition to the Settlement Payment, the Settlement Agreement provides that

FGIC would forgo its right to receive from the forty-seven FGIC Insured Trusts an estimated

total of $18.3 million in present value of future insurance premiums under the Policies.  (Ex. 1 §

2.01(b)(i); Major Direct ¶ 38; Scott Direct ¶ 35; Sohlberg Direct ¶ 29; Dubel Direct ¶ 23; Pfeiffer

Direct ¶ 57.)  When added to the amount of the Settlement Payment, this increases the present

value of the Settlement Agreement on a stand-alone basis to $271.6 million.  (Pfeiffer Direct ¶

57.)

251.    Moreover, under the Settlement Agreement, FGIC also forgoes its right to receive

reimbursements from the FGIC Insured Trusts pursuant to the waterfall provisions under the

relevant Governing Documents.  (Ex. 1 § 2.01(b)(i); Major Direct ¶ 38; Scott Direct ¶ 35;

Sohlberg Direct ¶ 29; Dubel Direct ¶ 25; Pfeiffer Direct ¶ 57.)  While the FGIC Trustees

recognized this benefit of the Settlement Agreement at the time it was signed (Major Direct ¶ 38;

Scott Direct ¶ 35; Sohlberg Direct ¶ 29), and identified it as a benefit of the Settlement

Agreement in the May 24 and June 4 Notices to holders in the FGIC Insured Trusts (Exs. 128,

129), the value of avoided reimbursement payments remains unquantified.  The amount of the

potential reimbursements retained by the FGIC Insured Trusts, however, is substantial, FGIC

having estimated it to be some $140 million in its publicly reported financial statements.  (Trial

Tr. 58:17-59:13; Dubel Direct ¶ 29.)

252.    The Settlement Payment is a fixed amount paid upfront, whereas the Projected

Payments under the FGIC Plan of Rehabilitation are uncertain and paid over forty years.  (Ex.

123 at 3; Major Direct ¶ 37; Scott Direct ¶ 34; Sohlberg Direct ¶ 28; Trial Tr. 152:14-19, 165:2-

18.)  The Settlement Agreement eliminates the risk and uncertainty associated with the Projected

Payments under the Rehabilitation Plan.  (Major Direct ¶ 37; Scott Direct ¶ 34; Sohlberg Direct ¶

28; Trial Tr. 152:14-19, 165:2-18.)

253.    Demonstrating the uncertainty underlying FGIC's ability to pay future claims is

the fact that the FGIC Policies, despite the FGIC Insured Trusts' continued payment of

premiums thereunder, have not received payments on any claims since late 2009.  (Major Direct

¶ 37; Scott Direct ¶ 34; Sohlberg Direct ¶ 28.)  FGIC is also exposed to potentially large future

claims relating to, among other things, municipal bonds (including those issued by the City of

Detroit and other municipalities) that could have the effect of diluting the Projected Payments.

(Major Direct ¶ 54; Dubel Direct ¶ 26; Trial Tr. 72:19-73:11, 74:11-22.)  The Settlement

Payment eliminates the risk of dilution resulting from an increase in policy claims against FGIC.

254.    While in the best interests of the FGIC Insured Trusts and their holders on a

stand-alone basis, the Settlement Agreement also provides significant benefits to the FGIC

Insured Trusts and their holders under the PSA and the Plan; specifically, an estimated recovery

of $92 million on their allowed claims in the bankruptcy proceedings.  (Major Direct ¶¶ 40, 42;

Scott Direct ¶¶ 37, 39; Sohlberg Direct ¶¶ 31, 33.)

255.    Specifically, the benefits that would be conferred upon the FGIC Insured Trusts

by the proposed Plan, if and when the proposed Plan goes effective, include:

- fixing the $2.1 billion contribution (the "**Ally Contribution**") from AFI to the Debtors' bankruptcy estates, which contribution is made possible by the Settlement Agreement and other elements of the global settlement embodied in the PSA and is the substantial portion of the distributable assets in the estates (Major Direct ¶ 42; Scott Direct ¶ 39; Sohlberg Direct ¶ 33; Pfeiffer Direct ¶ 59);

- fixing the allowed repurchase and servicing claims of the FGIC Insured Trusts in the bankruptcy and providing for a projected recovery of approximately $92 million on account of such claims (Major Direct ¶¶ 40-41; Scott Direct ¶¶ 37-38; Sohlberg Direct ¶¶ 31-32);

86

- resolving the many inter-creditor issues in the bankruptcy, including disputes over the allowance, priority and subordination of the claims of FGIC and the FGIC Insured Trusts against the Debtors (Major Direct ¶ 42; Scott Direct ¶ 39; Sohlberg Direct ¶ 33); and

- curtailing the administrative expenses of the estates (Major Direct ¶ 42; Scott Direct ¶ 39; Sohlberg Direct ¶ 33).

If the Court does not approve the Settlement Agreement, then the PSA will terminate and the FGIC Insured Trusts will not receive the above substantial benefits.

256.    Based on the benefits that would inure to each of the forty-seven FGIC Insured Trusts, and based on the analysis provided by Duff & Phelps, the FGIC Trustees concluded that the Settlement Agreement was reasonable and in the best interests of each of the FGIC Insured Trusts and their investors and agreed to accept it on behalf of each of the FGIC Insured Trusts. (Major Direct ¶ 42-43; Scott Direct ¶ 39-40; Sohlberg Direct ¶ 33; Major Dep. 14:13-25, 93:18-94:6, 94:20-23; Trial Tr. 164:1-165:5; Sohlberg Dep. 51:8-10, 51:13, 51:15-18, 51:20-52:4, 154:23-155:6.)

### F.    Notice of the Settlement Agreement Was Sufficient and Effective.

257.    Notice of the Settlement Agreement by the FGIC Trustees, was sufficient and effective to put the parties in interest in these Chapter 11 Cases, including all the investors in the FGIC Insured Trusts on notice of the Settlement Agreement.  Due process does not require that each investor actually receive notice; rather, it mandates only "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *see also In re Matter of De Sanchez*, 2008 NY slip op. 50342U, at 5 (Sup. Ct. N.Y County 2008) (same); *Morgan Olson L.L.C. v. Frederico (In re Grumman Olson Indus.)*, 467 B.R. 694, 706–07 (S.D.N.Y. 2012) (same).  The FGIC Trustees' notice to Investors was more than adequate.

258.    As described more fully in the FGIC Trustees' testimony, the FGIC Trustees have utilized a robust notice program during these Chapter 11 Cases that combines delivery of notices and notice through a website created and maintained by the RMBS Trustees (the "**RMBS Trustee Website**").  (Major Direct ¶¶ 45-46; Scott Direct ¶¶ 42-43; Sohlberg Direct ¶¶ 38-39.) The RMBS Trustee Website posts notices, and provides contact information for the FGIC Trustees, information on significant relevant developments in the Chapter 11 Cases, links to relevant documents filed in the Chapter 11 cases, and upcoming Court deadlines and Court hearings.  (Major Direct ¶¶ 45-46; Scott Direct ¶¶ 42-43; Sohlberg Direct ¶¶ 38-39.)

259.    The FGIC Trustees retained an agent, The Garden City Group ("**GCG**"), to provide certain administrative services and build and maintain the RMBS Trustee Website in connection with facilitating and coordinating notice to all investors regarding important events in the Chapter 11 Cases.  (Major Direct ¶¶ 45-46; Scott Direct ¶¶ 42-43; Sohlberg Direct ¶¶ 38-39.) The GCG-designed notice program ensured that all investors were provided with notices by distributing notices to all registered holders of RMBS by mail and posting the notices and other information on the RMBS Trustee Website.  (*See, e.g.*, Major Direct ¶¶ 45-49; Scott Direct ¶¶ 42-46; Sohlberg Direct ¶¶ 38-42.)

260.    The Settlement Agreement requires both that prompt notice be given to investors with respect to the Settlement Agreement and that the Bankruptcy Court and the Rehabilitation Court approve the Settlement Agreement.  (Ex. 1 §§ 4.02, 6.01; Major Direct ¶ 23; Scott Direct ¶ 20; Sohlberg Direct ¶ 18; Trial Tr. 136:3-10.)  As set forth in more detail in the Findings of Fact above, the FGIC Trustees provided investors in the FGIC Insured Trusts a full and fair opportunity to voice any objections to the Settlement Agreement and to be heard with respect to

any such objections.  (Major Direct ¶ 23; Scott Direct ¶ 20; Sohlberg Direct ¶ 18; Trial Tr.

156:14-24; Sohlberg Dep. 60:12-14, 60:16-19, 60:21-23, 60:25.)

261.    Because the form and method of notice that the FGIC Trustees provided was

reasonably calculated to provide notice to all investors, the notice program fully satisfies New

York and federal due process requirements.  *See Mullane*, 339 U.S. at 314 (finding that notice by

publication satisfied due process requirements); *Congregation Yetev Lev D'Satmar, Inc. v. Cnty.*

*of Sullivan*, 59 N.Y.2d 418, 423 (1983) ("Those whose names or whereabouts are unknown and

cannot be learned with due diligence or those whose interests are uncertain may be notified by

publication even though it is reasonably certain that such notice will prove futile,") (citing

*Mullane*, 339 U.S. at 316).

## **CONCLUSION**

262.    In accordance with the findings of fact and conclusions of law found above, the

Court hereby overrules the Objections and will enter an order, in the form of the Proposed Order

attached to the Settlement Agreement as Exhibit D, granting the relief requested and granting

such other relief as is just and proper.

New York, New York
Dated: August 26, 2013

/s/  Gary S. Lee                                           /s/  John C. Weitnauer
Gary S. Lee                                                  John C. Weitnauer (*pro hac vice*)
Anthony Princi                                            Michael E. Johnson
Charles L. Kerr                                            ALSTON & BIRD LLP
MORRISON & FOERSTER LLP               90 Park Avenue
1290 Avenue of the Americas                 New York, NY 10016
New York, New York 10104                     Telephone: (212) 210-9400
Telephone:    (212) 468-8000                   Facsimile: (212) 210-9444
Facsimile:    (212) 468-7900

*Counsel for the Debtors and Debtors in*        *Counsel to Wells Fargo Bank, N.A., as Trustee*
*Possession*                                                       *of Certain Mortgage Backed Securities Trusts*

89

/s/ Richard L. Wynne
Richard L. Wynne
Howard F. Sidman
Erin Brady (*pro hac vice*)
JONES DAY
222 East 41st Street
New York, New York 10017.6702
Telephone:    (212) 326-3939
Facsimile:    (212) 755-7306

*Attorneys for Creditor Financial Guaranty Insurance Company*

/s/ Glenn E. Siegel
Glenn E. Siegel
Mauricio A. España
Rebecca S. Kahan
DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Counsel to The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., as Trustee of Certain Mortgage-Backed Securities Trusts*

/s/ Mark D. Kotwick
Mark D. Kotwick
Brian P. Maloney
Ryan Suser
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

*Counsel to U.S. Bank National Association, as Trustee of Certain Mortgage-Backed Securities Trusts*

/s/ Kenneth H. Eckstein
Kenneth H. Eckstein
Philip S. Kaufman
Daniel M. Eggermann
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of Americas
New York, New York 10036
Telephone:  (212) 715-9100
Facsimile:  (212) 715-8000

*Counsel to the Official Committee of Unsecured Creditors*

90