1    Plaintiffs;

2    e.  engaging in conduct that undermines or violates the spirit or intent of the consumer

3    protection laws alleged in this Complaint; and

4    f.  omitting to inform Plaintiffs that they could be rejected from the trial modification

5    period at any point, and that this would result in the immediate demand for a balloon

6    payment consisting of purported delinquency payments and substantial late fees,

7    default fees, foreclosure fees, inspection fees, property preservation fees, trustee fees,

8    trustee sale guarantee fees, mail fees, recording fees, and default servicing fees

9    311.    Counts 14 through 22 arise under this (Fourth) Cause of Action for Deception in Loan

10    Modifications, and are brought by all Plaintiffs named in this Cause of Action, against all Defendants

11    named in this Cause of Action.

12

13    **COUNT 14 : VIOLATION OF CAL. CODE CIV. PROC. § 580B AND §726 PROHIBITING**

14    **COLLECTION OF DEBT AFTER ELECTING TO FORECLOSE**

15    312.    The preceding paragraphs and the paragraphs following this cause of action are

16    incorporated by reference as though fully set forth herein.

17    313.    As described above, California law forbids deficiency judgments in non-judicial

18    foreclosure of residential mortgages. *See* Cal. Code Civ. Proc. § 580b. Once a lender invokes its power

19    to sell the underlying security for a mortgage (through providing its "Notice of Default and Election to

20    Sell"), it cannot also seek to collect on the underlying note any amount owed in excess of the amount it

21    recovers through the trustee's sale.

22    314.    As alleged throughout this Cause of Action, Bank Defendants have entered into Workout

23    Agreements with Plaintiffs after initiating foreclosures on their properties, under which it has

24    intentionally extracted thousands of dollars of payments from each of the Plaintiffs named herein in

25    explicit and *knowing* violation of  Cal. Code Civ. Proc §580(b) and §726 prohibiting the collection of

26    payments on the note after the election to foreclose.

27    315.    Bank Defendants' acts comprise a scheme to circumvent the statutory bar against seeking

28    a deficiency judgment. These acts were taken in furtherance of the conspiracy among all Defendants

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   alleged throughout this Complaint.

2       316.    Such unlawfully extracted payments constitute damage to Plaintiffs herein. These

3   payments must be returned to Plaintiffs, plus pre-judgment interest.  Further, Bank Defendants should be

4   enjoined from continuing to violate this rule in the future.

5                          **COUNT 15 : FRAUDULENT CONCEALMENT**

6       317.    The preceding paragraphs and the paragraphs following this cause of action are

7   incorporated by reference as though fully set forth herein

8       318.    Plaintiffs and Bank Defendants were parties to the Loan Workout Agreements described

9   above in this Cause of Action

10      319.    By intentionally failing to disclose the material information described above in this Cause

11  of Action, Aurora fraudulently induced Plaintiffs to enter into such Workout Agreements. To reiterate,

12  *in part* here, Bank Defendants intentionally concealed the materials facts:

13          a.  that the true purpose of such Loan Workout Agreements were to extract additional

14              payments from Plaintiffs, and

15          b.  that Plaintiffs would not be modified despite their exact compliance with the terms of the

16              agreement

17          c.  that such payments would not be applied to their loan balance,

18      320.    Bank Defendants were under a duty to disclose this information to Plaintiffs

19      321.    By intentionally failing to disclose such information Bank Defendants intended to induce

20  Plaintiffs reliance to enter in the illusory Workout Agreements, and to induce their payments made

21  thereunder

22      322.    Plaintiffs under this Cause of Action did rely on Bank Defendants' failure to disclose

23  such information in deciding to enter into the Workout Agreements and Extended Workout Agreements

24      323.    If Plaintiffs had known the truth, they would not have entered into the Workout

25  Agreements and Extended Workout Agreements

26      324.    As a result, Plaintiffs were damaged in amount to be determined at trial. At minimum

27  Plaintiffs must be returned all amounts paid by Plaintiffs under the Workout Agreements, as well as pre-

28  judgment interest. Plaintiffs have also been damaged in the form of reduced credit scores, and the

- 79 -

1 | unavailability of financing.

2 |     325.    Plaintiffs are further entitled to an award of punitive damages for Defendants intentional

3 | fraudulent conduct.

4 | **<u>COUNT 16</u> : INTENTIONAL MISREPRESENTATION**

5 |     326.    The preceding paragraphs and the paragraphs following this cause of action are

6 | incorporated by reference as though fully set forth herein

7 |     327.    Plaintiffs and Bank Defendants were parties to the Loan Workout Agreements discussed

8 | in this Cause of Action.

9 |     328.    By intentionally misrepresenting the material information described above in this Cause

10 | of Action, Bank Defendants fraudulently induced Plaintiffs to enter into such Workout Agreements. To

11 | reiterate, *in part* here, Bank Defendants intentionally misrepresented the materials facts:

12 |     a.  it wanted to help Plaintiffs maintain ownership of their homes. In particular, Bank

13 |         Defendants sent the letters and made the statements described herein.

14 |     b.  that by complying with the Workout Agreements, Plaintiffs loans would be permanently

15 |         modified

16 |     c.  that their homes would not be foreclosed as long as Plaintiffs continued to make

17 |         payments under the Workout Agreements and Extended Workout Agreements. In

18 |         particular, Plaintiffs were repeatedly told to continue to make payments and that their

19 |         homes would not be foreclosed, as described herein.

20 |     d.  whether they were approved for a loan modification and would have a genuine

21 |         opportunity to cure their loan defaults prior to the execution of a Trustee's sale on their

22 |         homes. Plaintiffs were never given such an opportunity

23 |     e.  that upon the expiration of the Work out Agreements, Plaintiffs would have an

24 |         opportunity to cure their defaults through: (1) reinstatement; (2) payoff; (3) HAMP

25 |         sponsored Loan Modification; or (4) Investor Sponsored internal modification

26 |     f.  that their foreclosures would continue to be on hold after the expiration of the Workout

27 |         Agreements if Plaintiffs continued to make payments to Aurora.

28 |     329.    At the time Bank Defendants made these representations to the Plaintiffs, Bank

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

Defendants knew they were not true. Bank Defendants intended to and did foreclose during the time period for which the Plaintiffs had already made payments under their Extended Workout Agreements.

330. Bank Defendants made these representations with the purpose of inducing Plaintiffs reliance to enter into the Workout Agreements, and Extended workout Agreements, and to continue to make payments of thousands of dollars per month.

331. Plaintiffs relied on these representations in entering the Workout Agreements, and extended Workout agreements, and in continuing to make payments thereunder.

332. Plaintiffs would not have entered into the Workout Agreements and Extended Workout Agreements had they known that these representations were not true. That is, had they known that they would not have a genuine opportunity to save their homes and to cure, and that Bank Defendants could and would foreclose on their properties without any notice that modifications were denied and after they had paid thousands of dollars to Bank Defendants, Plaintiffs would not have entered into the Workout Agreements to begin with and would not have made the payments during the terms of the Workout Agreements and the Extended Workout Agreements.

333. As a result, Plaintiffs were damaged in amount to be determined at trial. At minimum Plaintiffs must be returned all amounts paid by Plaintiffs under the Workout Agreements, as well as pre-judgment interest. Plaintiffs have also been damaged in the form of reduced credit scores, and the unavailability of financing.

334. Plaintiffs are further entitled to an award of punitive damages for Defendants intentional fraudulent conduct.

## COUNT 17: NEGLIGENT MISREPRESENTATION

335. The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein

336. The allegations of this Count are identical to those above in the previous Count except that the degree of intent herein is that of negligence. Put another way, at the time Bank Defendants made the misrepresentations described in this Cause of Action (and listed in part above), Bank Defendants did not have reasonable grounds to believe them to be true.

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

## COUNT 18: RESCISSION OF CONTRACT AND/OR RESTITUTION ON THE GROUNDS OF FRAUD, AND/OR UNCONSCIONABILITY

337.    All preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein

338.    As described throughout this Cause of Action, consent to the Workout Agreements and Extended Workout Agreements was not real or free in that it was obtained solely through fraud and misrepresentations as herein alleged.

339.    As described throughout this Cause of Action, the Workout Agreements were both procedurally and substantively unconscionable. Rescission is appropriate for this separate and independent reason.

340.    Plaintiffs thus seek to rescind the agreements under California Civil Code § 1689 (b)(1). Plaintiffs have retained no consideration provided by Bank Defendants that can be tendered back to Bank Defendants prior to rescission.

## COUNT 19: BREACH OF CONTRACT

341.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

342.    Plaintiffs and Bank Defendants were parties to the Loan Workout Agreements discussed in this Cause of Action.

343.    Plaintiffs furnished consideration under the Loan Workout Agreement in the form of thousands of dollars of payments

344.    Bank Defendants breached their obligations to Plaintiffs under Contract as set forth above in this Cause of action, including but not limited to:

    a.  Breaching its obligations to modify plaintiffs upon their compliance with the terms of the Workout agreement

    b.  Breaching its obligation to not foreclose while Plaintiffs made payments under the Workout Agreement

    c.  Breaching its obligation to allow Plaintiffs an opportunity to cure under the Workout Agreement

- 82 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

345.    Separately Bank Defendants has breached the duty of good faith and fair dealing implicit in all contracts, as alleged above.

346.    As a result, Plaintiffs have been damaged in an amount to be proven at trial. At minimum Plaintiffs must be returned all amounts paid by Plaintiffs under the Workout Agreements, as well as pre-judgment interest.

347.    Alternatively Plaintiffs request enforcement of the Workout Agreement. Specifically Plaintiffs request enforcement of the promise of Loan Modification pursuant to the terms and payments made thereunder, and any other legal or equitable remedies which this Court may deem just and proper.

## COUNT 20: VIOLATION OF THE CRIER RULE (CAL. CIV. CODE §2994G)

348.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

349.    California law provides that a Trustee's sale can be postponed by mutual agreement. *See* Cal. Civ. Code § 2994g. However, the new date and time of the postponed sale must be provided by the trustee (and can be "cried") at the time of the prior scheduled sale. *See* Cal. Civ. Code § 2994g (d).

350.    Bank Defendants have violated this law by failing to provide the time of the new postponed sale at the time of the prior scheduled sale.

351.    In doing so, Defendants have failed to comply with the fundamental notice requirements of California's non-judicial foreclosure statutes, with which "strict compliance" is required. *Ung v. Koehler* (2005) 37 Cal.App.4[th] 186, 202.  Without proper notice, there is no power of sale, and accordingly the foreclosure sales at issue are void.    .

## COUNT 21: UNFAIR DEBT COLLECTION PRACTICES (VIOLATION OF CAL. CIV. CODE §1788 ET SEQ)

352.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

353.    Bank Defendants, in their capacity as servicers, are "debt collector" engaging in "debt collection" practices under the Rosenthal Fair Debt Collection Practices Act (the "Rosenthal Act"). See

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1 Cal. Civ. Code § 1788.2 (c).

2  354. Bank Defendants violated the Rosenthal Act by using false, deceptive, and misleading

3 statements and deceptive omissions in connection with its collection of Plaintiffs' mortgage debt, as

4 alleged herein. See Cal. Civ. Code § 1788.17, incorporating 15 U.S.C. § 1692(e). For example(and

5 without limitation), Plaintiffs were consistently led to believe that modification review was pending

6 under the Workout Agreements and that the requests for additional documents and receipt thereof would

7 continue the review process and Workout Agreements. But Bank Defendants unilaterally ceased the

8 review process and foreclosed on dates previously represented as being postponed.

9  355. The Rosenthal Act was also violated because the Workout Agreements were themselves

10 deceptive in that they ambiguously appeared to offer an opportunity for borrowers to cure their arrearage

11 and save their homes from foreclosure *and* stated that the arrearage would not be cured at the end of the

12 Workout Agreement. The Rosenthal Act allows for a private right of action to the same extent permitted

13 under the federal Fair Debt Collection Practices Act ("FDCPA"). *See* Cal. Civ. Code § 1788.17;

14 *Gonzales v. Arrow Financial Services, LLC*, 233 F.R.D. 577, 581 (S.D. Cal. 2006).

15  356. Plaintiffs have suffered damages and harm as a result of Bank Defendants' unfair debt

16 collection practices, including irreparable harm to their credit and the amounts paid under the Workout

17 Agreements and Extended Workout Agreements.

18

19  **COUNT 22:  UNLAWFUL, UNFAIR & FRAUDULENT BUSINESS PRACTICES**
20  **(VIOLATION OF CAL. BUS. & PROF. CODE §17200)**

21  357. The preceding paragraphs and the paragraphs following this cause of action are

22 incorporated by reference as though fully set forth herein.

23  358. Bank Defendants' acts described in this action are **Unlawful** in that they violate:

24   a. The prohibition against collection of deficiency judgments after electing to foreclose

25     (Cal. Code Civ. Proc. § 580b)

26   b. The Security First Rule (Cal. Code Civ. Proc. § 726)

27   c. The Crier rule (Cal. Civ. Code §2994(g)

28   d. The Rosenthal Fair Debt Collection Practices Act (Cal. Civ. Code §1788 et seq)

- 84 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

359.    Separately, Bank Defendants' acts as described in this Cause of Action are **Fraudulent** as set forth above.

360.    Bank Defendants' acts are also patently **Unfair** as more fully set forth above. Without limiting the allegations above which are fully incorporated herein, Defendants acts are unfair insofar as:

    a.    they unfairly bait Plaintiffs to make thousands of dollars of monthly payments under the false promise of having their loan modified, when in reality Defendants have no intent of modifying. These illusory work-out agreements were nothing more than unfair, and fraudulent cash-grabs

    b.    they used the promise of Loan Modification as bait to damage plaintiffs' credit preventing them from obtaining financing anywhere else.

    a.    they are designed a subterfuge to the crier rule, and are designed to allow Defendants to foreclose on Plaintiffs without their knowledge and without giving them notice.

361.    The Bank Defendants' acts and practices violate established public policy and the harm they cause to consumers in California greatly outweighs any benefits associated with those practices.

362.    Bank Defendants' conduct offends public policy and/or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Bank Defendants' conduct in this regard includes, but is not necessarily limited to, the following:

    a.    Bank Defendants have commonly failed to withdraw foreclosure proceedings against borrowers who made all Plan Payments under Workout Agreement;

    b.    Bank Defendants have initiated foreclosure proceedings without providing borrowers notice or opportunity to cure their remaining arrearage or default;

    c.    Bank Defendants have engaged in conduct that constitutes systematic breach of contract and breach of the implied covenant of good faith and fair dealing.

363.    Bank Defendants' conduct as set forth herein resulted in loss of money or property to Plaintiffs, including (1) principal and interest that they were not obligated to pay after Bank Defendants elected to exercise non-judicial foreclosure and to which Bank Defendants had no ability to collect after foreclosure; and (2) legal and other fees that Plaintiffs paid to Bank Defendants under the Workout Agreements and Extended Workout Agreements.

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

364.    Defendant's acts caused substantial consumer injury with no benefits to consumer competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation, and omission. Further, Defendants acts significantly threatened harm to competition

365.    Plaintiffs' payments made under the Workout Agreements constitute cognizable restitution which must be returned to Plaintiffs as well as pre-judgment interest thereon.

366.    The unfair, unlawful and fraudulent acts and practices of Defendants named herein present a continuing threat to Plaintiff and to members of the public in that these acts and practices are ongoing and are harmful and disruptive to business and financial markets. Accordingly, Plaintiffs request injunctive relief to preclude the actions/wrongs described above by Bank Defendants.

## FIFTH CAUSE OF ACTION :
## INTENTIONAL UNAUTHORIZED FORECLOSURES PURSUED IN THE NAME OF PROFIT

*(By Plaintiffs Norberto Zenteno Flores, Margarita Flores, Sushila Patel, Maria del Carmen Torres, Ana Rosa, Gumersindo Castaneda, Adell Aldrich, Benjamin Avalos, Jr., Eugene Marzette, Ervetta Marzette, Elmer Clarke, Pearlie Clarke, Ferdinand Paragas-Whittier, Josephine Paragas-Whittier, Mihai Schera, Gilberto Pelayo, Helidoro Hernandez, Cristina Hernandez, Antonio Hernandez Jamie, Gloria Vargas Jamie, Ivan Iles, and Shewkali Rajkumar, John Ahlstead, Gina Ahlstead, Ivan Iles — Against All Defendants)*

367.    Continuing their chronology of profit-driven deception and intentional wrongdoing, Defendants not only (1) intentionally placed Plaintiffs into known dangerous and impossible loans in the name of profit on the secondary market, and, (2) offered Plaintiffs trial loan modifications in an attempt to grab as much cash as they could before foreclosing – none of which would be applied to the principal or interest of Plaintiff's loans -  with no intent of ever actually modifying Plaintiffs' loans, but in a final coup-de-grace (3) intentionally foreclosed on plaintiffs despite having no ownership interest in the notes or deeds of trust, in the name of collecting preposterous and unmerited "foreclosure fees" including:

- 86 -

1    inspection fees, default fees, late fees, advance fees, attorney fees, and trustee fees – hand in hand with

2    the Trustee Defendants, who while purporting to act merely in their capacity as trustee, act intentionally

3    and maliciously to foreclose knowing they have no authority to do so, and in knowing violation of

4    California foreclosure statutes.  As discussed above, Trustee Defendants are the vital foreclosure arm of

5    Defendants' fraudulent scheme alleged throughout this Complaint.

6       368.    Bank Defendants along with Trustee Defendants unilaterally charged these ill-defined

7    and ambiguous fees whose amounts were *never* disclosed, nor consented to Plaintiffs in any writing or

8    contract whatsoever. They decided how much they wanted to charge for whatever reason they wanted to

9    charge it. The amounts they charged were tantamount to price gauging, often charging double, triple or

10   even quadruple the fair market value for these "services."  The outrageous price markups all inured to

11   the benefit of the conspiracy of Defendants. As Defendants did not have an ownership interest in the

12   property upon which to foreclose, these charges and fees were entirely unjustified, and constitute

13   numerous cognizable sources of restitution.

14      369.    In short, Bank Defendants together with Trustee Defendants made money by initiating

15   foreclosures, and for this very reason intentionally steamrolled wrongful foreclosures over plaintiffs

16   without having any true possessory or ownership interest in the deed of trust – the document which

17   confers the power of foreclosure -  threatening to wrongfully dispossess Plaintiffs of their homes and

18   placing them on the streets.

19      370.    In the greed-driven world of Defendants, neither law nor ethics would be allowed to

20   stand as an obstacle in their insatiable hunt for profit.

21      371.    Counts 23 through 24 arise under this (Fifth) Cause of Action for "Intentional

22   Unauthorized Foreclosure in the Pursuit of Profit" and are brought by all Plaintiffs named in this Cause

23   of Action, against all Defendants named in this Cause of Action.

24

25                    **COUNT 23: WRONGFUL FORECLOSURE**

26      372.    Bank Defendants' continue to demand payment and to foreclose and threaten to foreclose

27   on Plaintiffs (through co-conspirator Trustee Defendants), despite the facts that:

28       a.   The Foreclosing Defendants have no proof that they own the notes and deeds of trust they

- 87 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

seek to enforce;

b.   The Foreclosing Defendants have never received a proper assignment of the Deed of Trust (**"DOT"**) - the document which confers the power of foreclosure. Accordingly, they have no authority to foreclose.

c.   There is considerable evidence that the Foreclosing Defendants do not own the notes and deeds of trust they enforce and seek to enforce and based thereon, Plaintiffs allege that they do not; and

373.   As alleged with further detail in Appendix A, in many instances, the foreclosing Bank Defendants never properly received an assignment of the DOT (and therefore had no authority to foreclose) because the trusts they were being assigned into had been closed long prior, and therefore could not legally accept assignment of the Loans and DOTs.

a.   The reason loans are pooled and placed into these loan trusts named REMIC's is due to income tax purposes. A REMIC is an "SPV" or Special Purpose Vehicle that is treated by the IRS as a "QSPE" or Qualifying Special Purpose Entity. It specifically was designed by Congress to allow the vehicle to not be taxed as the cash flows through the vehicle and distributed to the investor and certificate holders. It is like an S Corp where there is no double taxation.

b.   Pooling and Servicing Agreements only allow loans to be placed into a REMIC for **two years** after the set-up of the Trust due to tax implications.  A loan substituted in or out of such trust after the two year period, results in a massive tax penalty of 100% of the face value of *all the assets in the trust*.

374.   The trusts which foreclosed on many of the Plaintiffs never received assignment of the DOT – the document which confers the power of foreclosure. Specifically, Bank Defendants foreclosed on numerous Plaintiffs herein on behalf of trusts which had no ownership interest whatsoever in the DOT, **because the trusts had been-long closed under the terms of their very own PSA.**  In other words Defendants had no authority whatsoever to foreclose on Plaintiffs herein. The foreclosing trust had no ownership interest in the DOT which would give it the power to foreclose.

375.   Established authority makes clear that a Plaintiff states a claim for wrongful foreclosure

- 88 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

when it is alleged that the assignment to the trust was executed after the closing date of the trust. *Vogan v. Wells Fargo Bank, N.A.* (E.D. Cal., Nov. 17, 2011,) 2011 WL 5826016 at *7; *Johnson v. HSBC Bank USA, Nat. Ass'n* (S.D. Cal., Mar. 19, 2012) 2012 WL 928433at *3.

376.    As to other Plaintiffs, Bank Defendants and Trustee Defendants foreclosed on them despite having no ownership interest in the DOT, because the DOT was **never endorsed to them**. In other words, they never had the authority to foreclose. A Plaintiff states a viable claim for wrongful foreclosure when it is alleged that the Defendants are "not the proper parties to foreclose." *Ohlendorf v. Am. Home Mortg.,* (E.D.Cal. 2010) 2010 U.S. Dist. LEXIS 31098, at *21–24; *Tamburri v. Suntrust Mortgage (N.D. Cal, 2011) 2011 WL 6294472 *11'* [same] *Sacchi v. Mortgage Electronic Registration Systems, Inc. (C.D.Cal. June 24, 2011) 2011 WL 253302* at *8; *Castillo v. Skoba* (S.D.Cal. 2010) 2010 WL 3986953, at*2 [same].

377.    As to other Plaintiffs herein, Bank Defendants and Trustee Defendants had no authority to foreclose because *at the time* they initiated foreclosure (by filing a Notice of Default), they had not yet received an assignment of the DOT. In other words, at the time they initiated foreclosure, they had no authority to foreclose. ""[S]ince the plaintiffs had alleged facts **suggesting the foreclosing party had no legal interest in the deed <u>at the appropriate time</u>**, there [is] a valid cause of action." *Tamburri v. Suntrust Mortgage (N.D. Cal, 2011) 2011 WL 6294472 *11*, citing *Sacchi v. Mortgage Electronic Registration Systems, Inc. (C.D.Cal. June 24, 2011) 2011 WL 253302* at *8 [[holding plaintiff had stated a valid cause of action for wrongful foreclosure where the foreclosing entity had no authority to foreclose because it had "**no beneficial interest in the Deed of Trust <u>when</u> it acted to foreclose** on Plaintiffs' home."]; *Castillo v. Skoba* (S.D.Cal. 2010) 2010 WL 3986953, at*2 [same]. Foreclosures initiated by or on behalf of a party, who at the time had no authority to foreclose are *void ab initio*. *Tamburri; Castillo*.

378.    As to other Plaintiffs still, Bank Defendants and Trustee Defendants had no authority to foreclose because they had failed to comply with Cal. Civ. Code §2923.5 – a necessary prerequisite to foreclosure – which requires a lender to contact its borrower to disclose alternatives to foreclosure. Foreclosing Bank Defendants have failed to, and continue to fail to comply with this legal requirement.

379.    Still, as to other Plaintiffs, Bank Defendants' and Trustee Defendants' foreclosures were

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

void because the trustee who conducted the foreclosure sale was an unauthorized trustee who had never been properly substituted as trustee. Under California Law, a foreclosure sale conducted by an unauthorized trustee is void as a matter of law. *Dimock v. Emerald Properties* (2000) 198 Cal.App.4th 868.

380.    Finally, such foreclosures were additionally wrongful insofar as they were intentionally occasioned by the Frauds of Defendants who (1) concealed the true terms, payments, and nature of the loans in order to induce borrowers into entering them, knowing that such loans would be impossible for them to afford, and would result in their default to a *mathematical certainty*, and (2) falsely tampered with the appraised values of their homes – so that Bank Defendants, Trustee Defendants, and their conspirators could collect lucrative fees, including **foreclosure fees**. Causing the foreclosure of their borrowers was an intentional part of their fraudulent scheme. It meant more money.

381.    Whether or not they can demonstrate ownership of the requisite notes and deeds of trust, Defendants lack the legal right to enforce the foregoing because they have not complied with disclosure requirements intended to assure mortgages are funded with monies obtained lawfully.

382.    Plaintiffs allege that Bank Defendants have made demand for payment on the Plaintiffs with respect to Plaintiffs' properties at a time when Defendants are incapable of establishing (and do not have any credible knowledge regarding) who owns the promissory notes Defendants are purportedly servicing.   Plaintiffs believe and thereon allege that because Defendants are not the holders of Plaintiffs' notes and deeds of trust and are not operating under a valid power from the various current holders of the notes and deeds of trust, Defendants may not enforce the notes or deeds of trust.

383.    Bank Defendants have already foreclosed upon the following property owned by the following Plaintiffs – allegations establishing the specific factual basis of the wrongful nature of the foreclosure as against each of the Plaintiffs below are set forth in **APPENDIX A**.

        a)  Norberto Zenteno-Flores and Margarita Flores  (Appendix A, ¶ 1)
           3321 Taurus Lane, Unit #3
           Santa Ana, CA 92704

        b)  Sushila Patel (Appendix A, ¶ 5)
           5841 Ranch View Road
           Oceanside, CA 92057

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

c) Maria del Carmen Torres (Appendix A, ¶ 8)
   8332 Brimfield Avenue
   Panorama City, CA 91402

d) Ana Rosa and Gumersindo Castaneda (Appendix A, ¶ 9)
   22616 S. Menlo Avenue
   Torrance, CA 90502

e) Adell Aldrich (Appendix A, ¶ 10)
   222238 Flanco Road
   Woodland Hills, CA 91762

f) Benjamin Avalos, Jr. (Appendix A, ¶ 12)
   108 Cormorant Drive
   Ontario, CA 91762

g) Eugene and Ervetta Marzette (Appendix A, ¶ 15)
   5707 Sycamore Avenue
   Rialto, CA 92377

h) Elmer and Pearlie Clarke (Appendix A, ¶ 16)
   3569 Mulford Avenue
   Lynwood, CA 90262

i) Ferdinand and Josephine Paragas-Whittier (Appendix A, ¶ 17)
   10621 Victoria Avenue
   Whittier, CA 90604

j) Mihai Schera (Appendix A, ¶ 22)
   35565 Grandview Drive
   Yucaipa, CA 92399

k) Gilberto Pelayo (Appendix A, ¶ 30)
   31501 Stoney Creek Drive
   Lake Elsinore, CA 92532

l) Helidoro and Cristina Hernandez (Appendix A, ¶ 34)
   8296 Velvet Lane
   Fontana, CA 92335

m) Antonio Hernandez Jamie and Gloria Vargas Jamie (Appendix A, ¶ 35)
   630 West 149 Street
   Gardena, CA 90247

n) Ivan Iles (Appendix A, ¶ 42)

- 91 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1758 Duncan Way
Corona, CA 92881

o) Shewkali Rajkumar (Appendix A, ¶ 43)
1420 Stoddard Street
Sacramento, CA 95828

p) John Ahlstead and Gina Ahlstead (Appendix A, ¶44)
9529 Brook Drive
Rancho Cucamonga CA 91730

q) Ivan Iles (Appendix A, ¶42)
17548 Duncan Way
Corona CA 92881

384.    Because the foreclosing Bank Defendants are not the holders of the notes and deeds of trust and are not operating under a valid power from the current holders of the notes and deeds of trust, Defendants did not have the right to proceed with the foregoing foreclosures.

385.    Bank Defendants, and Trustee Defendants, acted outrageously, persistently, intentionally and with actual malice in performing the acts alleged in this cause of action.  Accordingly, Plaintiff is entitled to exemplary and punitive damages in a sum according to proof and to such other relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

386.    As a result of the foregoing unlawful acts Plaintiffs have been damaged in being wrongfully deprived of their homes, losing equity, being forced to incur relocation expenses,  suffering emotional distress, being forced to pay foreclosure fees, attorney's fees, trustee fees, suffering damage to their credit scores, experiencing reduced availability of financing, among the other damages described throughout this Complaint.

## COUNT 24: UNFAIR, UNLAWFUL, AND FRAUDULENT BUSINESS PRACTICES
## (VIOLATION OF CAL. BUS. & PROF. CODE §17200)

387.    The preceding paragraphs and the paragraphs following this cause of action are incorporated by reference as though fully set forth herein.

388.    Bank Defendants' and Trustee Defendants' acts described in this action are **Unlawful** in that they violate:

- 92 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

a. The requirement to make contact with a defaulting borrower prior to foreclosure in order to explore alternatives to foreclosure (Cal. Civ. Code §2923.5)

b. The requirement that the party on behalf of whom foreclosure is being instituted must first have an ownership interest in the Deed of Trust before acting to foreclose. (Cal. Civ. Code §2924 et seq.)

c. The Requirement that a trustee must first be authorized as a trustee before it can conduct a trustee/foreclosure sale (Cal. Civ. Code §2924 et seq.)

d. The Requirement that a party must first record an NOD before they have the power to foreclose (Cal. Civ. Code §2924 et seq).

e. The Crier Rule (Cal. Civ. Code §2994(g)

f. The Rosenthal Fair Debt Collection Practices Act (Cal. Civ. Code §1788 et seq)

389.   Separately, Bank Defendants' acts as described in this Cause of Action are **Fraudulent** as set forth above.

390.   Such foreclosures were **additionally** wrongful insofar as they were intentionally occasioned by the Frauds of Defendants who concealed the true terms, payments, and nature of the loans in order to induce borrowers into entering them, knowing that such loans would be impossible for them to afford, and would result in their default to a *mathematical certainty* – so that Plaintiffs and their conspirators and could collect lucrative fees, including **foreclosure fees**. Causing the foreclosure of their borrowers was an intentional part of their fraudulent scheme. It meant more money.

391.   Bank Defendants' and Trustee Defendants' acts in intentionally foreclosing upon their borrowers in the name of profit, and/or without authority, as described above are also unfair.

392.   Such acts and practices violate established public policy and the harm they cause to consumers in California greatly outweighs any benefits associated with those practices.

393.   These actions were immoral, unethical, oppressive, unscrupulous and substantially injurious to similarly situated borrowers, and Plaintiffs herein. Bank Defendants' and Trustee Defendants' conduct had no utility other than for their own ill-gotten gain, and the harm was great not only to Plaintiffs herein, but also to residents of California, broadly, who have seen a decrease in their home and property values as a result of the bursting of the super-heated pricing bubble created by

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

Defendants' intentional wrongful foreclosure which now devastate real estate values.

394.    At the time of their fraud, Defendants *knew* that their conduct would cause the precipitous decline in property values throughout the State of California.

395.    Defendant's acts caused substantial consumer injury with no benefits to consumer competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation, and omission. Further, Defendants acts significantly threatened harm to competition.

396.    Defendant's acts caused substantial consumer injury with no benefits to consumer competition. Plaintiffs could not have reasonably avoided these injuries occasioned by Defendants' intentional deceit, misrepresentation, and omission. Further, Defendants acts significantly threatened harm to competition.

397.    Ally and Bank Defendants acted with malice and with the intent of artificially inflating California Real estate properties generally, as well as the values of Plaintiffs' individual properties and homes.

398.    As a result of Defendants' unfair competition, Plaintiffs are entitled to restitution for all sums received by Defendants with respect to Defendants' unlawful and/or unfair and/or fraudulent conduct, including, without limitation, interest payments made by Plaintiffs, fees paid to Defendants, including, without limitation, trustee fees, and the excessive fees paid at Defendants' direction, and premiums received upon selling the mortgages at an inflated value.

399.    As a result of the foregoing unfair, unlawful, and fraudulent acts Plaintiffs have been damaged in being wrongfully deprived of their homes, losing equity, being forced to incur relocation expenses, suffering emotional distress, being forced to pay foreclosure fees, attorney's fees, trustee fees, suffering damage to their credit scores, experiencing reduced availability of financing, among the other damages described throughout this Complaint.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants and each of them as follows:

1.    General, Actual, Compensatory, Special and Exemplary damages according to proof

- 94 -

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

under the First, Second, Third, Fourth, Sixth, Seventh, Eighth, Tenth, Eleventh, Twelfth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth, Twenty-First, and Twenty-Third Counts, and any other Counts for which such relief may be available;

2.      Punitive Damages under the First, Second, Sixth, Tenth, Fifteenth, and Sixteenth Counts and any other Counts for which such relief may be available;

3.      Statutory relief according to proof under the Twelfth, Fourteenth, Twentieth, and Twenty-First Counts and any other Counts for which such relief may be available;

4.      Restitution and Injunctive Relief under the Ninth, Thirteenth, Eighteenth, Twenty-Second and Twenty Fourth Counts and any other Counts for which such relief may be available;

5.      Rescission under the Eighteenth Count;

6.      On all Counts, for costs of suit herein;

7.      On all Counts, for pre- and post-judgment interest;

8.      On all Counts for which attorney's fees may be awarded pursuant to the governing contract, by statute or otherwise, reasonable attorneys' fees; and

9.      On all Counts, for such other and further relief as this Court may deem just and proper.

Dated: August 9, 2013                    Respectfully submitted,

                                         **BROOKSTONE LAW, PC**


                                         By: _____
                                             Vito Torchia, Jr.
                                             Attorneys for Plaintiffs

**AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

| PLAINTIFF: EO MACARTHUR, LLC | CASE NUMBER: |
|---|---|
| DEFENDANT: BROOKSTONE LAW, P.C. | 30-2013-00660219-CL-UD-HNB |

7.  ☑  Plaintiff and defendant further stipulate as follows *(specify):*

Plaintiff agrees to hold this Stipulation and not file it with the Court, so long as Defendant surrenders possession of the premises referred to in paragraph 2, on or before the close of business, September 8, 2013. If Defendant surrenders possession of the premises referred to in paragraph 2 on or before September 8, 2013, Plaintiff agrees to dismiss this matter without prejudice.

8.  a.  **The parties named in item 1 understand that they have the right to (1) have an attorney present and (2) receive notice of and have a court hearing about any default in the terms of this stipulation.**

   b.  Date:

   Daniel P. Stimpert, Esq., Attorney for Plaintiff
   _____
   (TYPE OR PRINT NAME)

   _____
   (TYPE OR PRINT NAME)

   ▶ _____
   (SIGNATURE OF PLAINTIFF OR ATTORNEY)

   ▶ _____
   (SIGNATURE OF PLAINTIFF OR ATTORNEY)

   ☐  Continued on *Attachment* 8b (form MC-025).

   c.  Date:  8/6/2013

   Vito Torchia, Jr., Attorney for Defendant
   _____
   (TYPE OR PRINT NAME)

   _____
   (TYPE OR PRINT NAME)

   _____
   (TYPE OR PRINT NAME)

   ▶ _____
   (SIGNATURE OF DEFENDANT OR ATTORNEY)

   ▶ _____
   (SIGNATURE OF DEFENDANT OR ATTORNEY)

   ▶ _____
   (SIGNATURE OF DEFENDANT OR ATTORNEY)

   ☐  Continued on *Attachment* 8c (form MC-025).

9.  IT IS SO ORDERED.

Date:

   _____
   JUDICIAL OFFICER

**STIPULATION FOR ENTRY OF JUDGMENT**
**(Unlawful Detainer)**

UD–115

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and state bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Daniel P. Stimpert, Esq.    SBN: 147420<br>STIMPERT & FORD, LLP<br>6300 Wilshire Blvd., Suite 1890, Los Angeles, CA 90048-5220<br>TELEPHONE NO.: (323) 782-6782    FAX NO. (Optional): (323) 782-6788<br>E-MAIL ADDRESS (Optional): info@stimpertford.com<br>ATTORNEY FOR (Name): EO MacArthur, LLC | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** ORANGE
STREET ADDRESS: 4601 Jamboree Road
MAILING ADDRESS: 4601 Jamboree Road
CITY AND ZIP CODE: Newport Beach, 92660-2595
BRANCH NAME: Harbor Justice Center - Newport Beach Facility

PLAINTIFF: EO MACARTHUR, LLC

DEFENDANT: BROOKSTONE LAW, P.C.

| STIPULATION FOR ENTRY OF JUDGMENT<br>(Unlawful Detainer) | CASE NUMBER:<br>30-2013-00660219-CL-UD-HNB |
|---|---|

1. IT IS STIPULATED by plaintiff (name each): EO MACARTHUR, LLC    and
defendant (name each): BROOKSTONE LAW, P.C.

2. [X] Plaintiff [ ] Defendant (specify name):    is awarded
   a. [X] possession of the premises located at (street address, apartment number, city, and county):
   4000 MacArthur Blvd, Suite 1110, Newport Beach, CA   92660 Orange County

   b. [ ] cancellation of the rental agreement.    [ ] forfeiture of the lease.
   c. [ ] past due rent $
   d. [ ] total holdover damages $
   e. [ ] attorney fees $
   f. [ ] costs $
   g. [ ] deposit of $    [ ] See item 3.
   h. [X] other (specify): $10,000.00 as and for general damages.
   i. [ ] Total $    to be paid by [ ] (date):    [ ] installment payments (see item 5)

3. [ ] Deposit. If not awarded under item 2g, then plaintiff must
   a. [ ] return deposit of $    to defendant by (date):
   b. [ ] give an itemized deposit statement to defendant within three weeks after defendant vacates the premises (Civ. Code, § 1950.5).
   c. [ ] mail the [ ] deposit [ ] itemized statement    to the defendant at (mailing address):

4. [X] A writ of possession will issue immediately, but there will be no lockout before (date): September 9, 2013

5. [ ] AGREEMENT FOR INSTALLMENT PAYMENTS
   a. Defendant agrees to pay $    on the (specify day)    day of each month beginning
   on (specify date)    until paid in full.
   b. If any payment is more than (specify)    days late, the entire amount in item 2i will become immediately due and payable plus interest at the legal rate.

6. a. [X] Judgment will be entered now.
   b. [ ] Judgment will be entered only upon default of payment of the amount in item 2i or the payment arrangement in item 5a. The case is calendared for dismissal on (date and time) (specify)    in department    unless plaintiff or defendant otherwise notifies the court.
   c. [ ] Judgment will be entered as stated in Judgment —Unlawful Detainer Attachment (form UD-110S), which is attached.
   d. [ ] Judgment will be entered as stated in item 7.

Form Approved for Optional Use
Judicial Council of California
UD-115 [New January 1, 2003]

**STIPULATION FOR ENTRY OF JUDGMENT**
**(Unlawful Detainer)**

Code of Civil Procedure, § 664.6
Westlaw Doc & Form Builder™

| PLAINTIFF: EO MACARTHUR, LLC | CASE NUMBER: |
|---|---|
| DEFENDANT: BROOKSTONE LAW, P.C. | 30-2013-00660219-CL-UD-HNB |

7. ☒ Plaintiff and defendant further stipulate as follows *(specify):* Plaintiff agrees to hold this Stipulation and not file it with the Court, so long as Defendant surrenders possession of the premises referred to in paragraph 2, on or before the close of business, September 8, 2013. If Defendant surrenders possession of the premises referred to in paragraph 2 on or before September 8, 2013, Plaintiff agrees to dismiss this matter without prejudice.

8. a. **The parties named in item 1 understand that they have the right to (1) have an attorney present and (2) receive notice of and have a court hearing about any default in the terms of this stipulation.**

   b. Date:

   Daniel P. Stimpert, Esq.
   _____
   (TYPE OR PRINT NAME)

   ▶ _____
   (SIGNATURE OF PLAINTIFF OR ATTORNEY)

   _____
   (TYPE OR PRINT NAME)

   ▶ _____
   (SIGNATURE OF PLAINTIFF OR ATTORNEY)

   ☐ Continued on *Attachment* 8b (form MC-025).

   c. Date:

   Attorney for BROOKSTONE LAW, PC
   Vito Torchia, Jr.
   _____
   (TYPE OR PRINT NAME)

   ▶ _____
   (SIGNATURE OF DEFENDANT OR ATTORNEY)

   _____
   (TYPE OR PRINT NAME)

   ▶ _____
   (SIGNATURE OF DEFENDANT OR ATTORNEY)

   _____
   (TYPE OR PRINT NAME)

   ▶ _____
   (SIGNATURE OF DEFENDANT OR ATTORNEY)

   ☐ Continued on *Attachment* 8c (form MC-025).

9. IT IS SO ORDERED.

   Date:

   _____
   JUDICIAL OFFICER

**STIPULATION FOR ENTRY OF JUDGMENT**
**(Unlawful Detainer)**

UD–115

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and state bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Daniel P. Stimpert, Esq.    SBN: 147420<br>STIMPERT & FORD, LLP<br>6300 Wilshire Blvd., Suite 1890, Los Angeles, CA 90048-5220<br>TELEPHONE NO.: (323) 782-6782    FAX NO. (Optional): (323) 782-6788<br>E-MAIL ADDRESS (Optional): info@stimpertford.com<br>ATTORNEY FOR (Name): EO MacArthur, LLC | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
STREET ADDRESS: 4601 Jamboree Road
MAILING ADDRESS: 4601 Jamboree Road
CITY AND ZIP CODE: Newport Beach, 92660-2595
BRANCH NAME: Harbor Justice Center- Newport Beach Facility

PLAINTIFF: EO MACARTHUR, LLC

DEFENDANT: BROOKSTONE LAW, P.C.

| STIPULATION FOR ENTRY OF JUDGMENT<br>(Unlawful Detainer) | CASE NUMBER:<br>30-2013-00660219-CL-UD-HNB |
|---|---|

1. IT IS STIPULATED by plaintiff (name each): EO MACARTHUR, LLC                                    and
   defendant (name each): BROOKSTONE LAW, P.C.

2. ☑ Plaintiff    ☐ Defendant (specify name):                                    is awarded
   a. ☑ possession of the premises located at (street address, apartment number, city, and county):
      4000 MacArthur Blvd., Suite 1110, Newport Beach, CA 92660 Orange County

   b. ☐ cancellation of the rental agreement.    ☐ forfeiture of the lease.
   c. ☐ past due rent $
   d. ☐ total holdover damages $
   e. ☐ attorney fees $
   f. ☐ costs $
   g. ☐ deposit of $                                    ☐ See item 3.
   h. ☑ other (specify): $10,000.00 as and for general damages.
   i. ☐ Total $        to be paid by ☐ (date):                    ☐ installment payments (see item 5)

3. ☐ Deposit. If not awarded under item 2g, then plaintiff must
   a. ☐ return deposit of $                        to defendant by (date):
   b. ☐ give an itemized deposit statement to defendant within three weeks after defendant vacates the premises
        (Civ. Code, § 1950.5).
   c. ☐ mail the ☐ deposit ☐ itemized statement to the defendant at (mailing address):

4. ☑ A writ of possession will issue immediately, but there will be no lockout before (date): September 9, 2013

5. ☐ AGREEMENT FOR INSTALLMENT PAYMENTS
   a. ☐ Defendant agrees to pay $                on the (specify day)        day of each month beginning
      on (specify date)                    until paid in full.

   b. ☐ If any payment is more than (specify)        days late, the entire amount in item 2i will become immediately due and
      payable plus interest at the legal rate.

6. a. ☐ Judgment will be entered now.
   b. ☐ Judgment will be entered only upon default of payment of the amount in item 2i or the payment arrangement in item 5a.
      The case is calendared for dismissal on (date and time)                                    in
      department (specify)                    unless plaintiff or defendant otherwise notifies the court.
   c. ☐ Judgment will be entered as stated in Judgment —Unlawful Detainer Attachment (form UD-110S), which is attached.
   d. ☑ Judgment will be entered as stated in item 7.

| Form Approved for Optional Use<br>Judicial Council of California<br>UD-115 [New January 1, 2003] | STIPULATION FOR ENTRY OF JUDGMENT<br>(Unlawful Detainer) | Code of Civil Procedure, § 664.6 |
|---|---|---|

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1.      Plaintiff Carolyn Hairston ("Hairston") discussed refinancing an existing mortgage on her property located at 1544-46 Hauser Boulevard, Los Angeles, CA 90019 and A.P.N. 5069-031-030 with a loan consultant (the "Loan Consultant"), a representative and authorized agent of Paul Financial, LLC, a correspondent of GMAC Mortgage Group, Inc. and authorized by GMAC Mortgage Group, Inc. and Defendants herein (the "Defendants") to lend on its behalf, in or around January, 2007. In the course of their discussions ranging from January 2007 until March 2007, Defendants and Loan Consultant steered her into a negatively amortized PayOption ARM in the amount of $550,000.00 with an interest rate at 7.875% for a term of 30 years. Little did Hairston know, however, the disclosed interest rate was never "fixed" but applied to only her first monthly payment and could adjust every six months thereafter. The maximum interest rate is 12.875%. The amount of Hairston's minimum monthly payment was "fixed" for 12 months and could adjust every 12 months thereafter. When the amount of the minimum monthly payment is insufficient to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid principal balance of her loan. The recast point of this loan is 115% of the original loan amount. This loan was originated by GMAC and Defendants, on the note and deed of trust Paul Financial, LLC is identified as the lender, and GMAC is currently servicing the loan.

Defendants and Loan Consultant represented to Hairston that her monthly payment would always be $114.58. Although the amount of Hairston's initial, disclosed minimum monthly payment was $114.58, Defendants and Loan Consultant failed to clarify their partially true representations and advise Hairston: (1) how the interest rate on her loan was calculated; (2) that the initial, disclosed minimum monthly payment of $114.58 would not always be available; (3) that the initial, disclosed minimum monthly payment would not be the permanent payment under the loan despite Defendants' and Loan Consultant's affirmative representations to the contrary; (4) that by paying the initial, disclosed minimum monthly payment she would be definitively deferring interest on her loan, increasing the principal balance of her loan every time she made the minimum monthly payment; (5) that by paying the minimum monthly payment the principal balance of her loan was certain to increase; or (6) her loan would be recast within a few

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    years and she would be forced to pay considerably higher payments.

2    The disclosures in Hairston's loan documents discussing negative amortization only

3    frame negative amortization as a mere **possibility** rather than a **certainty** when making the

4    minimum payment. However, the reality was that by making the minimum payment, negative

5    amortization was a *certainty*. Indeed, the payment schedule set forth in the Truth in Lending

6    Disclosure Statement ("TILDS"), which set forth what appeared to be the *required* payment

7    schedule, fails to disclose that making payments pursuant to the TILDS payment schedule *will*

8    result in negative amortization. Hairston was not provided, before entering into the loans, with

9    any other payment schedule or with any informed option to make payments different than those

10    listed in the TILDS payment schedule. Had Defendants disclosed that by making the payment

11    pursuant to the TILDS Hairston would be deferring interest, or had Defendants disclosed the

12    payment amounts sufficient to avoid negative amortization from occurring, Hairston would not

13    have entered into the loan. **Defendants intentionally omitted a clear disclosure of the nature**

14    **of Hairston's loan because giving a clear explanation of how the loan worked would have**

15    **punctured the illusion of a low-payment, low interest rate loan.**

16    Further, Defendants and Loan Consultant advised her that she was eligible for a Low Doc

17    Loan. Unbeknownst to her at the time, Defendants and Loan Consultant used this low

18    documentation requirement to fraudulently inflate her income by $7,000, a factor of 250%; and

19    in doing so, Defendants and Loan Consultant caused her to be placed into a loan whose

20    payments she could not afford given her true, un-inflated monthly income. Defendants and Loan

21    Consultant altered Hairston's loan application without her knowing consent and authorization as

22    Loan Consultant completed Hairston's application without giving Hairston an opportunity to

23    review the loan application.

24    Defendants and Loan Consultant also explicitly represented to Hairston that she could

25    afford her loan and further represented that she could shoulder the additional financial burden of

26    repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully

27    amortized monthly payment on the loan was $6,804.14. Given Hairston's true monthly income

28    of $4,500.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio,

2

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  before any other debts are even considered, of over 151%- grossly in excess of industry standard

2  underwriting guidelines, and in excess of Defendants' own underwriting guidelines. Defendants

3  and Loan Consultant further represented to Hairston that she could rely on the assessment that

4  she was "qualified" to mean that she could afford the loan. Because of Hairston's lack of

5  familiarity with how much debt a person can and should reasonably take on compared to her

6  monthly income, and because Hairston reasonably relied on Defendants' and Loan Consultant's

7  expertise that any payment she was "qualified" for would take into account what the maximum

8  debt a person such as Hairston should be shouldering was, Hairston reasonably believed

9  Defendants' and Loan Consultant's representations that she could afford her loan and its

10  payments. Although Defendants and the Loan Consultant represented to Hairston that she was

11  "qualified" for her loan and could afford her loan and its monthly payments, Defendants and the

12  Loan Consultant misled Hairston into believing that her monthly payments would always only be

13  $114.58. Furthermore, at no point did Defendants or Loan Consultant clarify Hairston's false

14  belief and advise her that $114.58 would not be her permanent payment under the loan, or that

15  every time she made a monthly payment in the amount of $114.58, which is less than interest

16  only, she would be deferring interest on her loan, increasing the principal balance of her loan.

17      In addition, Defendants and Loan Consultant represented that appraisals conducted by or

18  on behalf of Defendants were accurate and made in good faith. On or around February 2007, an

19  appraisal company under the direct control and supervision of Defendants conducted an appraisal

20  on Hairston's home, which was fraudulently inflated to a grossly and intentionally overstated

21  value.  Defendants and Loan Consultant represented that, per appraisal, Hairston's home was

22  worth $1,200,000.00 at the time she entered into her loan, and that such a valuation was a true

23  and correct measure of her home's worth. The current fair market value of Hairston's home is

24  approximately $511,922.00. Hairston alleges that the appraisal was artificially inflated, and that

25  she has suffered damages in the amount of $688,078.00 ($1,200,000.00-$511,922.00) due to a

26  substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other

27  acts described herein.

28      Defendants and Loan Consultant also represented to Hairston that she would be able to

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    refinance her loan at a later time. Hairston relied on this assurance in deciding to enter into the

2    mortgage contract. However, Hairston has not been able to refinance her loan.  Defendants and

3    Loan Consultant also represented that it would modify Hairston's loan, and Hairston relied on

4    this representation in deciding to enter into the loan. However, Hairston was unable to modify

5    her loan.

6        Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

7    reputable and complied with industry standard underwriting guidelines and were engaged in

8    lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

9    made in good faith;  (3) Hairston could afford the loan ; (4) She was "qualified" for her loan;  (5)

10   "qualified" meant that she could afford her loan; (6) she would be able to modify her loan and

11   (7) She would be able to refinance her loan.

12       Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

13   otherwise improperly disclosed to Hairston that: (1) Defendants and Loan Consultant knew that

14   she could not and would not be able to afford her loan and that there was a very high probability

15   that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her

16   loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

17   "qualification" process was for Defendants' own protection and not hers; (4) that Defendants'

18   and Loan Consultant's representations that she was "qualified" to pay her loan was not intended

19   to communicate that she could actually "afford" the loan which she was being given; (5)

20   Defendants had abandoned its conventional lending business, prudent lending standards, and

21   industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

22   Hairston's home to require her to borrow more money with the knowledge that the true value of

23   Hairston's home was insufficient to justify the amount of Hairston's loan; or (7) Defendants

24   knew that due to its scheme of fraudulently manipulating and inflating property values

25   throughout the State of California that the real estate market would crash and Hairston would

26   lose substantial equity in her home.

27       Based on these misrepresentations and omissions, the material facts concerning

28   Hairston's loan were concealed from her, and she decided to move forward with her loan. On

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    March 30, 2007, Hairston signed the loan and Deed of Trust, before a notary. Had she known the

2    truth however, Hairston would not have accepted the loan. As a result of Defendants' fraudulent

3    acts described throughout this complaint, Hairston has lost substantial equity in her home, has

4    damaged or destroyed credit, and at the time Hairston entered into the loan her home was worth

5    $1,200,000.00, now her home is worth approximately $511.922.00. Hairston did not discover

6    any of these misrepresentations or omissions until after a consultation with legal counsel at

7    Brookstone Law, and through a complete and thorough investigation of the loan documentation,

8    and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described

9    throughout this complaint, were brought to light on or around July 19, 2011. (True and correct

10    copy of the aforementioned documents are attached hereto as *Exhibit I*).

11        2.      Plaintiff Carolyn Hairston ("Hairston") discussed refinancing an existing

12    mortgage on her property located at 1534-36 Hauser Blvd, Los Angeles, CA 90019 and A.P.N.

13    5069-031-032 with a Loan Consultant ("Loan Consultant") with Paul Financial, LLC, a

14    correspondence of GMAC Financial and Defendants herein ("the Defendants"), and authorized

15    by Defendants to lend on its behalf, in or around January 2007. In the course of their discussions

16    ranging from January 2007 until March 2007, Defendants and Loan Consultant steered her into a

17    negatively amortized PayOption ARM in the amount of $500,000.00 with an interest rate at

18    0.250% for a term of 30 years. Little did Hairston know that the interest rate of 0.250% is the

19    amount used to calculate the amount of her minimum monthly payment. Hairston also did not

20    know that she was accruing interest on her loan at the interest rate of 8.375%. Hairston's true

21    interest rate of 8.375% is "fixed" for ten years and can adjust every six months thereafter. The

22    maximum interest rate is 13.375%. The amount of Hairston's minimum monthly payment is also

23    "fixed" for ten years. When the amount of the minimum monthly payment is insufficient to cover

24    the amount of interest due, then the amount of that deficiency is added onto the unpaid principal

25    balance of her loan. Her loan has a recast point of 155% of the original amount. Once her loan

26    hits the recast point, Hairston will be obligated to make interest only payment for the remainder

27    of the ten year "fixed" period. This loan was originated by GMAC and Defendants, on the note

28    and deed of trust Paul Financial, LLC is identified as the lender, and GMAC is currently

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  servicing the loan.

2  Defendants and Loan Consultant recommended the loan, representing that this was a

3  worthy loan. Defendants and Loan Consultant represented to Hairston that her monthly payment

4  would always be $104.00 Although the amount of Hairston's initial, minimum monthly payment

5  was $104.00, Defendants and Loan Consultant failed to clarify their partially true representations

6  and advise Hairston: (1) how the interest rate on her loan was calculated; (2) that the initial

7  minimum monthly payment of $104.00 would not always be available; (3) that the initial

8  minimum monthly payment would not be the permanent payment under the loan despite

9  Defendants' and Loan Consultant's affirmative representations to the contrary; (4) that by

10  paying the initial minimum monthly payment she would be definitively deferring interest on her

11  loan, increasing the principal balance of her loan every time she made the minimum monthly

12  payment; (5) that by paying the minimum monthly payment the principal balance of her loan was

13  certain to increase; or (6) her loan would be recast within a few years and she would be forced to

14  pay considerably higher payments.

15  The disclosures in Hairston's loan documents discussing negative amortization only

16  frame negative amortization as a mere **possibility** rather than a **certainty** when making the

17  minimum payment. However, the reality was that by making the minimum payment, negative

18  amortization was a *certainty*. Indeed, the payment schedule set forth in the Truth in Lending

19  Disclosure Statement ("TILDS"), which set forth what appeared to be the *required* payment

20  schedule, fails to disclose that making payments pursuant to the TILDS payment schedule *will*

21  result in negative amortization. Hairston was not provided, before entering into the loans, with

22  any other payment schedule or with any informed option to make payments different than those

23  listed in the TILDS payment schedule. Had Defendants disclosed that by making the payment

24  pursuant to the TILDS Hairston would be deferring interest, or had Defendants disclosed the

25  payment amounts sufficient to avoid negative amortization from occurring, Hairston would not

26  have entered into the loan. **Defendants intentionally omitted a clear disclosure of the nature**

27  **of Hairston's loan because giving a clear explanation of how the loan worked would have**

28  **punctured the illusion of a low-payment, low interest rate loan.**

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1        Defendants and Loan Consultant altered Hairston's loan application without her knowing

2    consent or authorization as Loan Consultant completed Hairston's application without giving

3    Hairston an opportunity to review the loan application. Further, Defendants and Loan Consultant

4    advised her that she was eligible for a Low Doc Loan. Unbeknownst to her at the time,

5    Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate

6    her income and in doing so, Defendants and Loan Consultant caused her to be placed into a loan

7    whose payments she could not afford given her true, un-inflated monthly income.

8        Defendants and Loan Consultant also explicitly represented to Hairston that she could

9    afford her loan and further represented that she could shoulder the additional financial burden of

10   repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully

11   amortized monthly payment on the loan was $6,517.23. Given Hairston's true monthly income

12   of $4,500.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio,

13   before any other debts are even considered, of over 144%- in excess of industry standard

14   underwriting guidelines, and in excess of Defendants' own underwriting guidelines. Defendants

15   and Loan Consultant further represented to Hairston that she could rely on the assessment that

16   she was "qualified" to mean that she could afford the loan. Because of Hairston's lack of

17   familiarity with how much debt a person can and should reasonably take on compared to her

18   monthly income, and because Hairston reasonably relied on Defendants' and Loan Consultant's

19   expertise that any payment she was "qualified" for would take into account what the maximum

20   debt a person such as Hairston should be shouldering was, Hairston reasonably believed

21   Defendants' and Loan Consultant's representations that she could afford her loan and its

22   payments. Although Defendants and the Loan Consultant represented to Hairston that she was

23   "qualified" for her loan and could afford her loan and its monthly payments, Defendants and the

24   Loan Consultant misled Hairston into believing that her monthly payments would always only be

25   $104.00. Furthermore, at no point did Defendants or Loan Consultant clarify Hairston's false

26   belief and advise her that $104.00 would not be her permanent payment under the loan, or that

27   every time she made a monthly payment in the amount of $104.00, which is less than interest

28   only, she would be deferring interest on her loan, increasing the principal balance of her loan.

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    In addition, Defendants and Loan Consultant represented that appraisals conducted by or

2    on behalf of Defendants were accurate and made in good faith. On or around March 2005, an

3    appraisal company under the direct control and supervision of Defendants conducted an appraisal

4    on Hairston's home, which was fraudulently inflated to a grossly and intentionally overstated

5    value. Defendants and Loan Consultant represented that, per appraisal, Hairston's home was

6    worth $1,000,000.00 at the time she entered into her loan, and that such a valuation was a true

7    and correct measure of her home's worth. The current fair market value of Hairston's home is

8    approximately $281,312.00. Hairston alleges that the appraisal was artificially inflated, and that

9    she has suffered damages in the amount of $718,688.00 ($1,000,000.00-$281,312.00) due to a

10   substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other

11   acts described herein.

12       Due to the economic crash, caused by the Defendants fraudulent acts described through

13   this complain, Hairston suffered from extreme financial hardship, and sought the assistance of

14   the Defendants in repaying her loan. Hairston applied for loan modification with the Defendants.

15   The Defendants delayed processing, repeatedly demanding that Hairston furnish duplicate

16   documentation and information over the course of four months.  Hairston was ultimately denied

17   a loan modification because she did not have sufficient income. At the time Hairston applied for

18   a loan modification her "fixed" income was the same as it was when she entered into the loan.

19       Hairston inquired about getting a loan modification HAMP. A representative an

20   authorized agent of Defendants informed Hairston that she did not qualify for HAMP but refused

21   to provide a reason why. Moreover, the Defendants failed to provide adequate information or

22   communication regarding the loan modification programs to Hairston.

23       Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

24   reputable and complied with industry standard underwriting guidelines and were engaged in

25   lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

26   made in good faith; (3) Hairston could afford the loan ; (4) she was "qualified" for her loan; (5)

27   "qualified" meant that she could afford her loan; (6) she would be able to modify her loan in the

28   future; and (7) Defendants would refinance her loan in the future.

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

2    otherwise improperly disclosed to Hairston that: (1) Defendants and Loan Consultant knew that

3    she could not and would not be able to afford her loan and that there was a very high probability

4    that she would default and/or be foreclosed upon;  (2) Defendants had an incentive to sell her

5    loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

6    "qualification" process was for Defendants' own protection and not her; (4) that Defendants' and

7    Loan Consultant's representations that she was "qualified" to pay her loan was not intended to

8    communicate that she could actually "afford" the loan which she was being given; (5)

9    Defendants had abandoned its conventional lending business, prudent lending standards, and

10    industry standard underwriting guidelines;(6) Defendants influenced the appraiser to over-value

11    Hairston's home to require her to borrow more money with the knowledge that the true value of

12    Hairston's home was insufficient to justify the amount of Hairston's loan; or (7) Defendants

13    knew that due to its scheme of fraudulently manipulating and inflating property values

14    throughout the State of California that the real estate market would crash and Hairston would

15    lose substantial equity in her home.

16    Based on these misrepresentations and omissions, the material facts concerning

17    Hairston's loan were concealed from her, and she decided to move forward with her loan. On

18    March 22, 2007, Hairston signed the loan and Deed of Trust, before a notary. Had she known the

19    truth however, Hairston would not have accepted the loan. As a result of Defendants' fraudulent

20    acts described throughout this complaint Hairston has lost substantial equity in her home, has

21    damaged or destroyed credit, and at the time Hairston entered into the loan her home was worth

22    $1,000,000.00, now her home is worth approximately $281,312.00. Hairston did not discover

23    any of these misrepresentations or omissions until after a consultation with legal counsel at

24    Brookstone Law, and through a complete and thorough investigation of the loan documentation,

25    and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described

26    throughout this complaint, were brought to light on or around July 5, 2011. (True and correct

27    copy of the aforementioned documents are attached hereto as *Exhibit 2*).

28    3.    Plaintiffs William Mimiaga ("Mimiaga") and Christine Petersen ("Petersen")

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    discussed refinancing an existing mortgage on their property located at 936 Coronado Drive,

2    Costa Mesa, CA 92626 and APN 141-323-21 with a Loan Consultant ("Loan Consultant") with

3    Homecomings Financial, LLC, a correspondent of GMAC and the Defendants (the

4    "Defendants"), and authorized by Defendants to lend on its behalf, in or around November 2006.

5    In the course of their discussions ranging from November 2006 until January 2007, Defendants

6    and Loan Consultant steered them into a fixed rate Interest-Only mortgage in the amount of

7    $534,000.00 with an interest rate at 6.500% for a term of 30 years. Little did Mimiaga and

8    Petersen know, however, payments made during the first ten years of their loan were Interest-

9    Only. This loan was originated by GMAC and Defendants, on the note and deed of trust

10    Homecomings Financial, LLC is identified as the lender, and GMAC is currently servicing the

11    loan.

12        Defendants and Loan Consultant represented to Mimiaga and Petersen that their monthly

13    payment would always be $2,892.50 Although the amount of Mimiaga and Petersen's initial

14    monthly payment was $2,892.50, Defendants and Loan Consultant failed to clarify their partially

15    true representations and advise Mimiaga and Petersen that: (1) their monthly payment would not

16    pay down any of their principal balance during the Interest-Only period, or (2) their monthly

17    payment would drastically increase at the end of the Interest-Only period, or (3) the amount of

18    their initial, disclosed monthly payment would not remain "fixed" for the entire term of his loan.

19        Defendants and Loan Consultant altered Mimiaga and Petersen's loan application without

20    their knowing consent or authorization as Loan Consultant completed Mimiaga and Petersen's

21    application without giving Mimiaga and Petersen an opportunity to review the loan application.

22    Further, Defendants and Loan Consultant advised them that they were eligible for a Low Doc

23    Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low

24    documentation requirement to fraudulently inflate their income; and in doing so, Defendants and

25    Loan Consultant caused them to be placed into a loan whose payments they could not afford

26    given their true, un-inflated monthly income.

27        Defendants and Loan Consultant also explicitly represented to Mimiaga and Petersen that

28    they could afford their loan and further represented that they could shoulder the additional

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   financial burden of repaying their loan in consideration of their other existing debts; yet failed to

2   disclose that the fully amortized monthly payment on the loan was $3,981.36. Defendants and

3   Loan Consultant further represented to Mimiaga and Petersen that they could rely on the

4   assessment that they were "qualified" to mean that they could afford the loan. Because of

5   Mimiaga and Petersen's lack of familiarity with how much debt a person can and should

6   reasonably take on compared to their monthly income, and because Mimiaga and Petersen

7   reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were

8   "qualified" for would take into account what the maximum debt a person such as Mimiaga and

9   Petersen should be shouldering was, Mimiaga and Petersen reasonably believed Defendants' and

10  Loan Consultant's representations that they could afford their loan and its payments. Although

11  Defendants and Loan Consultant represented to Mimiaga and Petersen that they were "qualified"

12  for their loan and could afford their loan and its monthly payments, Defendants and Loan

13  Consultant misled Mimiaga and Petersen into believing that their monthly payments would

14  always only be $2,892.50. Furthermore, at no point did Defendants or Loan Consultant clarify

15  Mimiaga and Petersen's false belief and advise them that $2,892.50 would not be their

16  permanent payment under the loan, or that every time they made a monthly payment in the

17  amount of $2,892.50, they were not paying down any of their principal balance.

18      In addition, Defendants and Loan Consultant represented that appraisals conducted by or

19  on behalf of Defendants were accurate and made in good faith. On or around January 2007,

20  Bradbury Appraisal Service, Inc., an appraisal company under the direct control and supervision

21  of Defendants, conducted an appraisal on Mimiaga and Petersen's home, which was fraudulently

22  inflated to $715,000.00 - a grossly an intentionally overstated value. The current fair market

23  value of Petersen's home is approximately $494,202.00. Mimiaga and Petersen allege that the

24  appraisal was artificially inflated, and that they have suffered damages in the amount of

25  $220,798.00 ($715,000.00-$494,202.00) due to a substantial loss of equity in their home as a

26  result of Defendants' fraudulent inflation and other acts described herein.

27      Defendants and Loan Consultant also represented to Mimiaga and Petersen that they

28  would be able to refinance their loan at a later time. Mimiaga and Petersen relied on this

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  assurance in deciding to enter into the mortgage contract. However, Mimiaga and Petersen have

2  not been able to refinance their loan because they did not generate enough income, had a low

3  credit score and the value of their home was of under value.

4      Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

5  reputable and complied with industry standard underwriting guidelines and were engaged in

6  lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

7  made in good faith; (3) Mimiaga and Petersen could afford the loan; (4) they were "qualified" for

8  their loan; (5) "qualified" meant that they could afford their loan; (6) Defendants would modify

9  their loan; and (7) they would be able to refinance their loan.

10      Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

11  otherwise improperly disclosed to Mimiaga and Petersen that: (1) Defendants and Loan

12  Consultant knew that they could not and would not be able to afford their loan and that there was

13  a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an

14  incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants'

15  and Loan Consultant's "qualification" process was for Defendants' own protection and not

16  theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to

17  pay their loan was not intended to communicate that they could actually "afford" the loan which

18  they were being given; (5) Defendants had abandoned its conventional lending business, prudent

19  lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the

20  appraiser to over-value Mimiaga and Petersen's home to require them to borrow more money

21  with the knowledge that the true value of Mimiaga and Petersen's home was insufficient to

22  justify the amount of Mimiaga and Petersen's loan; or (7) Defendants knew that due to its

23  scheme of fraudulently manipulating and inflating property values throughout the State of

24  California that the real estate market would crash and Petersen would lose substantial equity in

25  their home.

26      Based on these misrepresentations and omissions, the material facts concerning Mimiaga

27  and Petersen's loan were concealed from them, and they decided to move forward with their

28  loan. On January 24, 2007, Mimiaga and Petersen signed the loan and Deed of Trust, before a

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    notary. Had they known the truth however, Mimiaga and Petersen would not have accepted the

2    loan. As a result of Defendants' fraudulent acts described throughout this complaint Mimiaga

3    and Petersen have lost substantial equity in their home, have damaged or destroyed credit, and at

4    the time Mimiaga and Petersen entered into the loan their home was worth $715,000.00, now

5    their home is worth approximately $494,202.00. Mimiaga and Petersen did not discover any of

6    these misrepresentations or omissions until after a consultation with legal counsel at Brookstone

7    Law, and through a complete and thorough investigation of the loan documentation, and a

8    discussion of the surrounding facts, the fraudulent acts of the Defendants, as described

9    throughout this complaint, were brought to light on or around January 12, 2011. (True and

10   correct copy of the aforementioned documents are attached hereto as *Exhibit 3*).

11        4.    Plaintiffs Robin Gaston and Patrick Gaston (collectively referred to as "Mr. and

12   Mrs. Gaston") discussed refinancing an existing mortgage on their property located at 10726

13   Lynn Circle, Cypress, CA 90630, A.P.N.:134-553-39 with a Loan Consultant ("Loan

14   Consultant"), a representative and authorized agent of Homecoming Financial Corporation and

15   Defendants herein (the "Defendants") in or around August 2006. In the course of their

16   discussions ranging from August 2006 until October 2006, Defendants and Loan Consultant

17   steered them into a fixed rate mortgage in the amount of $552,000.00 with an interest rate at

18   4.125% for a term of 30 years. This loan was originated by GMAC, on the note and deed of trust

19   Homecoming Financial Corporation is identified as the lender, and GMAC is servicing the loan.

20        Further, Defendants and Loan Consultant advised them that they were eligible for a Low

21   Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low

22   documentation requirement to fraudulently inflate their income; and in doing so, Defendants and

23   Loan Consultant caused them to be placed into a loan whose payments they could not afford

24   given their true, *un-inflated* monthly income. Defendants and Loan Consultant altered Mr. and

25   Mrs. Gaston's loan application without their knowing consent or authorization as Loan

26   Consultant completed Mr. and Mrs. Gaston's application without giving Mr. and Mrs. Gaston an

27   opportunity to review the loan application.

28        Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Gaston that

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  they could afford their loan and further represented that they could shoulder the additional

2  financial burden of repaying their loan in consideration of their other existing debts. Defendants

3  and Loan Consultant also represented to them that they could afford a $2,675.27 monthly

4  payment, despite their $7,494.00 true monthly income (a "front-end" debt-to-income ratio,

5  meaning a debt-to-income ratio, before any other debts are even considered, of over 36%).

6  Defendants and Loan Consultant further represented to Mr. and Mrs. Gaston that they could rely

7  on the assessment that they were "qualified" to mean that they could afford the loan. Because of

8  Mr. and Mrs. Gaston's lack of familiarity with how much debt a person can and should

9  reasonably take on compared to their monthly income, and because Mr. and Mrs. Gaston

10  reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were

11  "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs.

12  Gaston should be shouldering was, Mr. and Mrs. Gaston reasonably believed Defendants' and

13  Loan Consultant's representations that they could afford their loan and its payments.

14     In addition, Defendants and Loan Consultant represented that appraisals conducted by or

15  on behalf of Defendants were accurate and made in good faith. On or around October 3, 2006, an

16  appraisal company under the direct control and supervision of Defendants conducted an appraisal

17  on Mr. and Mrs. Gaston's home, which was fraudulently inflated to an intentionally overstated

18  value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Gaston's

19  home was worth $690,000.00 at the time they entered into their loan, and that such a valuation

20  was a true and correct measure of their home's worth. The current fair market value of Mr. and

21  Mrs. Gaston's home is approximately $321,300.00. Mr. and Mrs. Gaston allege that the appraisal

22  was artificially inflated, and that they have suffered damages in the amount of $368,700.00

23  ($690,000.00-$321,300.00) due to a substantial loss of equity in their home as a result of

24  Defendants' fraudulent inflation and other acts described herein.

25     Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

26  reputable and complied with industry standard underwriting guidelines and were engaged in

27  lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

28  made in good faith; (3) Mr. and Mrs. Gaston could afford the loan; (4) they were "qualified" for

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    their loan; and (5) "qualified" meant that they could afford their loan.

2        Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

3    otherwise improperly disclosed to Mr. and Mrs. Gaston that: (1) Defendants and Loan

4    Consultant knew that they could not and would not be able to afford their loan and that there was

5    a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an

6    incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants'

7    and Loan Consultant's "qualification" process was for Defendants' own protection and not

8    theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to

9    pay their loan was not intended to communicate that they could actually "afford" the loan which

10   they were being given; (5) Defendants had abandoned its conventional lending business, prudent

11   lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the

12   appraiser to over-value Mr. and Mrs. Gaston's home to require them to borrow more money with

13   the knowledge that the true value of Mr. and Mrs. Gaston's home was insufficient to justify the

14   amount of Mr. and Mrs. Gaston's loan; or (7) Defendants knew that due to its scheme of

15   fraudulently manipulating and inflating property values throughout the State of California that

16   the real estate market would crash and Mr. and Mrs. Gaston would lose substantial equity in their

17   home.

18        Based on these misrepresentations and omissions, the material facts concerning Mr. and

19   Mrs. Gaston's loan were concealed from them, and they decided to move forward with their

20   loan. On October 31, 2006, Mr. and Mrs. Gaston signed the loan and Deed of Trust, before a

21   notary. Had they known the truth however, Mr. and Mrs. Gaston would not have accepted the

22   loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and

23   Mrs. Gaston have lost substantial equity in their home, have damaged or destroyed credit, and at

24   the time Mr. and Mrs. Gaston entered into the loan their home was worth $690,000.00, now their

25   home is worth approximately $321,300.00. Mr. and Mrs. Gaston did not discover any of these

26   misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law,

27   and through a complete and thorough investigation of the loan documentation, and a discussion

28   of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    complaint, were brought to light on or around March 26, 2011.

2    5.    Plaintiff Mary Serrano ("Serrano") discussed obtaining a mortgage to purchase

3    her home located at 3423 East White Chapel Court Unit B, Orange, CA 92869 and A.P.N. 939-

4    21-315 with a Loan Consultant ("Loan Consultant") with Nationwide Lending Corporation, a

5    correspondent of GMAC and Defendants herein (the "Defendants"), and authorized by

6    Defendants to lend on its behalf, in or around January 2006. In the course of their discussions

7    ranging from January 2006 until March 2006, Defendants steered her into a negatively amortized

8    PayOption ARM in the amount of $412,000.00 with an interest rate at 1.750% for a term of 40

9    years. Little did Serrano know, however, the interest rate was never "fixed" but applied to only

10   her first monthly payment and could adjust every 12 months thereafter. The amount of Serrano's

11   minimum monthly payment was "fixed" for 12 months and could adjust every 12 months

12   thereafter. When the amount of the minimum monthly payment is insufficient to cover the

13   amount of interest due, then the amount of that deficiency is added onto the unpaid principal

14   balance of her loan. The recast point of this loan is 115% of the original loan amount.  Loan

15   Consultant and Defendants also steered Serrano into a piggy-back loan in the amount of

16   $51,500.00 with the interest rate 11.57% for a term of 15 years. This loan was originated by

17   GMAC and Defendants, the note and deed of trust identifies Nationwide Lending Corporation as

18   the lender, and Aurora is currently servicing the loan.

19   Defendants represented to Serrano  that her monthly payment would always be $1,194.00

20   Although the amount of Serrano's initial, minimum monthly payment was $1,194.00,

21   Defendants failed to clarify their partially true representations and advise Serrano : (1) how the

22   interest rate on her loan was calculated; (2) that the initial minimum monthly payment of

23   $1,194.00 would not always be available; (3) that the initial minimum monthly payment would

24   not be the permanent payment under the loan despite Defendants' affirmative representations to

25   the contrary; (4) that by paying the initial minimum monthly payment she would be definitively

26   deferring interest on her loan, increasing the principal balance of her loan every time she made

27   the minimum monthly payment; (5) that by paying the minimum monthly payment the principal

28   balance of her loan was certain to increase; or (6) her loan would be recast within a few years

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    and she would be forced to pay considerably higher payments.

2    The disclosures in Serrano's loan documents discussing negative amortization only frame

3    negative amortization as a mere **possibility** rather than a **certainty** when making the minimum

4    payment. However, the reality was that by making the minimum payment, negative amortization

5    was a *certainty*. Indeed, the payment schedule set forth in the Truth in Lending Disclosure

6    Statement ("TILDS"), which set forth what appeared to be the *required* payment schedule, fails

7    to disclose that making payments pursuant to the TILDS payment schedule *will* result in negative

8    amortization. Serrano was not provided, before entering into the loans, with any other payment

9    schedule or with any informed option to make payments different than those listed in the TILDS

10    payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS

11    Serrano would be deferring interest, or had Defendants disclosed the payment amounts sufficient

12    to avoid negative amortization from occurring, Serrano would not have entered into the loan.

13    **Defendants intentionally omitted a clear disclosure of the nature of Serrano's loan because**

14    **giving a clear explanation of how the loan worked would have punctured the illusion of a**

15    **low-payment, low interest rate loan.**

16    Defendants altered Serrano's loan application without her knowing consent or

17    authorization as Defendants completed Serrano's application without giving Serrano an

18    opportunity to review the loan application. Further, Defendants advised her that she was eligible

19    for a Low Doc Loan. Unbeknownst to her at the time, Defendants used this low documentation

20    requirement to fraudulently inflate her income and in doing so, Defendants caused her to be

21    placed into a loan whose payments she could not afford given her true, *un-inflated* monthly

22    income.

23    Defendants also explicitly represented to Serrano that she could afford her loan and

24    further represented that she could shoulder the additional financial burden of repaying her loan in

25    consideration of her other existing debts; yet failed to disclose that the fully amortized monthly

26    payment on the loan was $3,013.00. Given Serrano's true monthly income of $3,112.00, this

27    represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other

28    debts are even considered, of over 96%- in excess of industry standard underwriting guidelines,

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    and in excess of Defendants' own underwriting guidelines. Defendants further represented to

2    Serrano that she could rely on the assessment that she was "qualified" to mean that she could

3    afford the loan. Because of Serrano's lack of familiarity with how much debt a person can and

4    should reasonably take on compared to her monthly income, and because Serrano reasonably

5    relied on Defendants' expertise that any payment she was "qualified" for would take into account

6    what the maximum debt a person such as Serrano should be shouldering was, Serrano reasonably

7    believed Defendants' representations that she could afford her loan and its payments. Although

8    Defendants represented to Serrano that she was "qualified" for her loan and could afford her loan

9    and its monthly payments, Defendants misled Serrano into believing that her monthly payments

10   would always only be $1,194.00. Furthermore, at no point did Defendants clarify Serrano's false

11   belief and advise her that $1,194.00 would not be her permanent payment under the loan, or that

12   every time she made a monthly payment in the amount of $1,194.00, which is less than interest

13   only, she would be deferring interest on her loan, increasing the principal balance of her loan.

14          In addition, Defendants represented that appraisals conducted by or on behalf of

15   Defendants were accurate and made in good faith. On or around March 2006, an appraisal

16   company under the direct control and supervision of Defendants conducted an appraisal on

17   Serrano's home, which was fraudulently inflated to an intentionally overstated value. Defendants

18   represented that, per appraisal, Serrano's home was worth $430,000.00 at the time she entered

19   into her loan, and that such a valuation was a true and correct measure of her home's worth. The

20   current fair market value of Serrano's home is approximately $301,100.00. Serrano alleges that

21   the appraisal was artificially inflated, and that she has suffered damages in the amount of

22   $128,900.00 ($430,000.00-$301,100.00) due to a substantial loss of equity in her home as a

23   result of Defendants' fraudulent inflation and other acts described herein.

24          Defendants also represented to Serrano that she would be able to refinance her loan at a

25   later time. Serrano relied on this assurance in deciding to enter into the mortgage contract.

26   However, Serrano has not been able to refinance her loan.  Defendants also represented that it

27   would modify Serrano's loan, and Serrano relied on this representation in deciding to enter into

28   the loan. However, Serrano was unable to modify her loan.

18

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1   Furthermore, Defendants represented that: (1) Defendants were reputable and complied

2 with industry standard underwriting guidelines and were engaged in lending of the highest

3 caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3)

4 Serrano could afford the loan; (4) she was "qualified" for her loan; (5) "qualified" meant that she

5 could afford her loan; (6) Defendants would modify her loan in the future; and (7) Defendants

6 would refinance her loan in the future.

7   Moreover, Defendants withheld or incompletely, inaccurately or otherwise improperly

8 disclosed to Serrano that: (1) Defendants knew that she could not and would not be able to afford

9 her loan and that there was a very high probability that she would default and/or be foreclosed

10 upon; (2) Defendants had an incentive to sell her loan, and did sell her loan at fraudulently

11 inflated prices; (3) Defendants' "qualification" process was for Defendants' own protection and

12 not hers; (4) that Defendants' representations that she was "qualified" to pay her loan was not

13 intended to communicate that she could actually "afford" the loan which she was being given;

14 (5) Defendants had abandoned its conventional lending business, prudent lending standards, and

15 industry standard underwriting guidelines;(6) Defendants influenced the appraiser to over-value

16 Serrano's home to require her to borrow more money with the knowledge that the true value of

17 Serrano's home was insufficient to justify the amount of Serrano's loan; or (7) Defendants knew

18 that due to its scheme of fraudulently manipulating and inflating property values throughout the

19 State of California that the real estate market would crash and Serrano would lose substantial

20 equity in her home.

21   Based on these misrepresentations and omissions, the material facts concerning Serrano's

22 loan were concealed from her, and she decided to move forward with her loan. On March 22,

23 2006, Serrano signed the loan and Deed of Trust, before a notary. Had she known the truth

24 however, Serrano would not have accepted the loan. As a result of Defendants' fraudulent acts

25 described throughout this complaint Serrano has lost substantial equity in her home, has

26 damaged or destroyed credit, and at the time Serrano entered into the loan her home was worth

27 $430,000.00, now her home is worth approximately $301,100.00. Serrano did not discover any

28 of these misrepresentations or omissions until after a consultation with legal counsel at

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   Brookstone Law, and through a complete and thorough investigation of the loan documentation,

2   and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described

3   throughout this complaint, were brought to light on or around February 1, 2011. (True and

4   correct copy of the aforementioned documents are attached hereto as *Exhibit 4*).

5       6.    Plaintiff Sarah Sebagh ("Sebagh") discussed refinancing an existing mortgage on

6   their property located at 1233 N Flores Street #302, West Hollywood CA 90069 and APN 5554-

7   025-162 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of

8   SBMC, a correspondent of GMAC and Defendants herein (the "Defendants"), and authorized by

9   Defendants to lend on its behalf, in or around March 2006. In the course of their discussions

10   ranging from March 2006 until May 2006, Defendants and Loan Consultant steered her into a

11   negatively amortized PayOption ARM in the amount of $430,000.00 with an interest rate at

12   1.000% for a term of 30 years. Little did Sebagh know, however, the interest rate was never

13   "fixed" but applied to only their first monthly payment and could adjust every month thereafter.

14   The maximum interest rate is 9.950%. The amount of Sebagh's minimum monthly payment was

15   "fixed" for 12 months and could adjust every 12 months thereafter. When the amount of the

16   minimum monthly payment is insufficient to cover the amount of interest due, then the amount

17   of that deficiency is added onto the unpaid principal balance of their loan. The recast point of this

18   loan is 110% of the original loan amount. In addition, Defendants and Loan Consultant

19   recommended the loan, representing that the loan was a good loan. The loan was originated by

20   GMAC, on the note and deed of trust SBMC was identified as the lender, and GMAC was the

21   servicer of the loan.

22       Defendants and Loan Consultant represented to Sebagh that her monthly payment would

23   always be $1,383.05. Although the amount of Sebagh's initial minimum monthly payment was

24   $1,383.05, Defendants and Loan Consultant failed to clarify their partially true representations

25   and advise Sebagh: (1) how the interest rate on her loan was calculated; (2) that the initial

26   minimum monthly payment of $1,383.05 would not always be available; (3) that the initial

27   minimum monthly payment would not be the permanent payment under the loan despite

28   Defendants' and  Loan Consultant's affirmative representations to the contrary; (4) that by

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  paying the initial minimum monthly payment she would be definitively deferring interest on her

2  loan, increasing the principal balance of her loan every time she made the minimum monthly

3  payment; (5) that by paying the minimum monthly payment the principal balance of her loan was

4  certain to increase; or (6) her loan would be recast within a few years and she would be forced to

5  pay considerably higher payments.

6        The disclosures in Sebagh's loan documents discussing negative amortization only frame

7  negative amortization as a mere **possibility** rather than a **certainty** when making the minimum

8  payment. However, the reality was that by making the minimum payment, negative amortization

9  was a *certainty*. Indeed, the payment schedule set forth in the Truth in Lending Disclosure

10  Statement ("TILDS"), which set forth what appeared to be the *required* payment schedule, fails

11  to disclose that making payments pursuant to the TILDS payment schedule *will* result in negative

12  amortization. Sebagh was not provided, before entering into the loans, with any other payment

13  schedule or with any informed option to make payments different than those listed in the TILDS

14  payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS

15  Sebagh would be deferring interest, or had Defendants disclosed the payment amounts sufficient

16  to avoid negative amortization from occurring, Sebagh would not have entered into the loan.

17  **Defendants intentionally omitted a clear disclosure of the nature of Sebagh's loan because**

18  **giving a clear explanation of how the loan worked would have punctured the illusion of a**

19  **low-payment, low interest rate loan.**

20        Defendants and Loan Consultant also explicitly represented to Sebagh that she could

21  afford her loan and further represented that she could shoulder the additional financial burden of

22  repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully

23  amortized monthly payment on the loan was $3,161.018. Given Sebagh's true monthly income

24  of $2,610.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio,

25  before any other debts are even considered, of over 121%- grossly in excess of industry standard

26  underwriting guidelines, and in excess of Defendants' own underwriting guidelines. Defendants

27  and Loan Consultant further represented to Sebagh that she could rely on the assessment that she

28  was "qualified" to mean that she could afford the loan. Because of Sebagh's lack of familiarity

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    with how much debt a person can and should reasonably take on compared to her monthly

2    income, and because Sebagh reasonably relied on Defendants' and Loan Consultant's expertise

3    that any payment she was "qualified" for would take into account what the maximum debt a

4    person such as Sebagh should be shouldering was, Sebagh reasonably believed Defendants' and

5    Loan Consultant's representations that she could afford her loan and its payments.

6          Although Defendants and the Loan Consultant represented to Sebagh that she was

7    "qualified" for her loan and could afford her loan and its monthly payments, Defendants and the

8    Loan Consultant misled Sebagh into believing that her monthly payments would always only be

9    $1,383.05. Furthermore, at no point did Defendants or Loan Consultant clarify Sebagh's false

10    belief and advise her that $1,383.05 would not be her permanent payment under the loan, or that

11    every time she made a monthly payment in the amount of $1,383.05, which is less than interest

12    only, she would be deferring interest on her loan, increasing the principal balance of her loan.

13          In addition, Defendants and Loan Consultant represented that appraisals conducted by or

14    on behalf of Defendants were accurate and made in good faith. On or around April 26, 2006, an

15    appraisal company under the direct control and supervision of Defendants conducted an appraisal

16    on Sebagh's home, which was fraudulently inflated to an intentionally overstated value. The

17    current fair market value of Sebagh's home is approximately $330,650.00. Sebagh alleges that

18    the appraisal was artificially inflated, and that she has suffered damages due to a substantial loss

19    of equity in her home as a result of Defendants' fraudulent inflation and other acts described

20    herein.

21          Defendants and Loan Consultant also represented to Sebagh that she would be able to

22    refinance her loan at a later time. Sebagh relied on this assurance in deciding to enter into the

23    mortgage contract. However, Sebagh has not been able to refinance her loan because her income

24    was insufficient to justify the size of the loan. Defendants and Loan Consultant also represented

25    that it would modify Sebagh's loan, and Sebagh relied on this representation in deciding to enter

26    into the loan. However, Sebagh were unable to modify her loan. After many unsuccessful

27    applications for a loan modification, Sebagh received a three-month trial-payment plan in

28    September 2011, hoping that Defendants would offer her a permanent loan modification at the

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1     end of the trial period. Per Defendants' request Sebagh made three timely trial payments or even

2     made them in advance of the due date. However, Defendants rejected Sebagh's loan

3     modification despite Sebagh's compliance with every term of the modification offer. First,

4     Defendants sent Sebagh an approval letter for a loan modification, then only two days of the

5     receipt of the approval letter Defendants mailed her a conflicting denial letter stating that

6     Sebagh's loan was not approved for a permanent loan modification. Defendants refused to

7     permanently modify Sebagh's loan.

8         In addition, the foreclosure against Sebagh was wrongful. The assignment deed of trust

9     (February 22, 2011) noted MERS as the party assigning the beneficiary interest in the property in

10    its individual capacity. However, under California law MERS is only a nominee acting on behalf

11    of the true beneficiary, and cannot initiate foreclosure in its own name. MERS can only act when

12    acting in its nominal capacity. Here, MERS assigned the interest in the Deed of Trust from to

13    Deutsch Bank Nation Trust Company in its own name, rendering the ADOT void. Accordingly,

14    Deutsch Bank National Trust Company was never properly assigned the beneficial interest as a

15    foreclosing beneficiary of the Deed. Therefore, any subsequent recorded documents based on

16    that assignment in order to move forward with the foreclosure sale would be void as well.

17    Moreover, the foreclosure against Sebagh was wrongful because at the time the NOD was

18    recorded (April 22, 2011), the foreclosing trustee (Executive Trustee Services) did not have the

19    legal authority to initiate the foreclosure because the foreclosing trustee was never properly

20    substituted as trustee. The original trustee under the Deed of Trust (recorded May 31, 2006) was

21    T.D Services.

22        Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

23    reputable and complied with industry standard underwriting guidelines and were engaged in

24    lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

25    made in good faith; (3) Sebagh could afford the loan; (4) she was "qualified" for her loan; (5)

26    "qualified" meant that she could afford their loan; (6) Defendants would modify her loan in the

27    future; and (7) she would be able to refinance her loan in the future.

28        Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1   otherwise improperly disclosed to Sebagh that: (1) Defendants and Loan Consultant knew that

2   she could not and would not be able to afford her loan and that there was a very high probability

3   that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her

4   loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

5   "qualification" process was for Defendants' own protection and not hers; (4) that Defendants'

6   and Loan Consultant's representations that she was "qualified" to pay her loan was not intended

7   to communicate that she could actually "afford" the loan which she were being given; (5)

8   Defendants had abandoned its conventional lending business, prudent lending standards, and

9   industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

10  Sebagh's home to require her to borrow more money with the knowledge that the true value of

11  Sebagh's home was insufficient to justify the amount of Sebagh's loan; or (7) Defendants knew

12  that due to its scheme of fraudulently manipulating and inflating property values throughout the

13  State of California that the real estate market would crash and Sebagh would lose substantial

14  equity in her home.

15         Based on these misrepresentations and omissions, the material facts concerning Sebagh's

16  loan were concealed from her, and she decided to move forward with her loan. On May 10,

17  2006, Sebagh signed the loan and Deed of Trust, before a notary. Had she known the truth

18  however, Sebagh would not have accepted the loan. As a result of Defendants' fraudulent acts

19  described throughout this complaint Sebagh has lost substantial equity in her home, has damaged

20  or destroyed credit, and at the time Sebagh entered into the loan her home was worth

21  substantially more than the approximately $330,650.00 it is worth today. Mr. and Mrs. Sebagh

22  did not discover any of these misrepresentations or omissions until after a consultation with legal

23  counsel at Brookstone Law, and through a complete and thorough investigation of the loan

24  documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants,

25  as described throughout this complaint, were brought to light on or around April 10, 2012. (True

26  and correct copy of the aforementioned documents are attached hereto as *Exhibit 5*).

27         7.      Plaintiffs Rick Albritton and Deborah Albritton ("Mr. and Mrs. Albritton")

28  discussed refinancing an existing mortgage on their property located at 2030 West Windhaven

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    Drive, Rialto, CA 92377 and A.P.N: 0239-711-22 with a Loan Consultant ("Loan Consultant") a

2    representative and authorized agent of GMAC and Defendants herein (the "Defendants") in or

3    around August 2006. In the course of their discussions ranging from August 2006 until October

4    2006, Defendants and Loan Consultant steered them into an Adjustable Rate Mortgage in the

5    amount of $310,000.00 with the initial interest rate of 6.250% for a term of 30 years. Loan

6    Consultant recommended the loan, representing that this is the best loan for Mr. and Mrs.

7    Albritton. This loan was originated by GMAC, on the note and deed of trust GMAC was

8    identified as the lender, and GMAC was the servicer of the loan.

9         Defendants and Loan Consultant altered Mr. and Mrs. Albritton's loan application

10    without their knowing consent or authorization as Loan Consultant completed Mr. and Mrs.

11    Albritton's application without giving Mr. and Mrs. Albritton an opportunity to review the loan

12    application. Further, Defendants and Loan Consultant advised them that they were eligible for a

13    Low Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this

14    low documentation requirement to fraudulently inflate their income ; and in doing so, Defendants

15    and Loan Consultant caused them to be placed into a loan whose payments they could not afford

16    given their true, *un-inflated* monthly income.

17         Defendants and Loan Consultant explicitly represented to Mr. and Mrs. Albritton that

18    they could afford their loan; and further represented that they could shoulder the additional

19    financial burden of repaying their loan in consideration of their other existing debts. Defendants

20    and Loan Consultant also represented to them that they could afford a $1,908.00 monthly

21    payment, despite their $3,643.00 true monthly income (a "front-end" debt-to-income ratio,

22    meaning a debt-to-income ratio, before any other debts are even considered, of over 52%- in

23    excess of industry standard underwriting guidelines, and in excess of Defendants' own

24    underwriting guidelines). Defendants and Loan Consultant further represented to Mr. and Mrs.

25    Albritton that they could rely on the assessment that they were "qualified" to mean that they

26    could afford the loan. Because of Mr. and Mrs. Albritton's lack of familiarity with how much

27    debt a person can and should reasonably take on compared to their monthly income, and because

28    Mr. and Mrs. Albritton reasonably relied on Defendants' and Loan Consultant's expertise that

1   any payment they were "qualified" for would take into account what the maximum debt a person

2   such as Mr. and Mrs. Albritton should be shouldering was, Mr. and Mrs. Albritton reasonably

3   believed Defendants' and Loan Consultant's representations that they could afford their loan and

4   its payments.

5       In addition, Defendants and Loan Consultant represented that appraisals conducted by or

6   on behalf of Defendants were accurate and made in good faith. On or around September 12,

7   2006, an appraisal company under the direct control and supervision of Defendants conducted an

8   appraisal on Mr. and Mrs. Albritton's home, which was fraudulently inflated to $420,000.00 - an

9   intentionally overstated value.  The current fair market value of Mr. and Mrs. Albritton's home is

10   approximately $146,566.00. Mr. and Mrs. Albritton allege that the appraisal was artificially

11   inflated, and that they have suffered damages in the amount of $273,434.00 ($420,000.00-

12   $146,566.00) due to a substantial loss of equity in their home as a result of Defendants'

13   fraudulent inflation and other acts described herein.

14       Defendants and Loan Consultant also represented to Mr. and Mrs. Albritton that they

15   would be able to refinance their loan at a later time. Mr. and Mrs. Albritton relied on this

16   assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Albritton have

17   not been able to refinance their loan.  Defendants and Loan Consultant also represented that it

18   would modify Mr. and Mrs. Albritton's loan, and Mr. and Mrs. Albritton relied on this

19   representation in deciding to enter into the loan. In addition, Mr. and Mrs. Albritton were advised

20   by a representative of Defendants, to stop making payments in order to be eligible for a

21   modification. Mr. and Mrs. Albritton relied on Defendants' and representative's advice and

22   stopped making their monthly payments causing them to fall even further behind. However, Mr.

23   and Mrs. Albritton were unable to modify their loan.

24       The foreclosure against Rick Albritton and Deborah Albritton (collectively referred to as

25   "Mr. and Mrs. Albritton") was wrongful because the Substitution of Trustee (SOT) is ineffective.

26   Under California law, MERS is only a nominee acting on behalf of the true beneficiary and

27   cannot initiate foreclosure in its own name. MERS only has the power to act when acting in its

28   nominal capacity. Here, MERS in its individual capacity purports to substitute Executive Trustee

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1   Services, LLC. The original trustee on the deed of trust was Executive Trustee Services,

2   Incorporation. However, MERS cannot do so in its individual capacity, rendering the SOT

3   without effect. Accordingly ETS, LLC was never properly substituted as the foreclosing trustee

4   and thus unauthorized to conduct the trustee's sale. Under California law, a trustee's sale

5   conducted by an unauthorized trustee as here, is void as a matter of law. Therefore, any

6   subsequent foreclosure sale based on that SOT is also void ad initio.

7        Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

8   reputable and complied with industry standard underwriting guidelines and were engaged in

9   lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

10   made in good faith; (3) Mr. and Mrs. Albritton could afford the loan ; (4) they were "qualified"

11   for their loan;  (5) "qualified" meant that they could afford their loan; (6) they would be able to

12   modify their loan in the future; and (7) they would be able to refinance their loan in the future.

13        Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

14   otherwise improperly disclosed to Mr. and Mrs. Albritton that: (1) Defendants and Loan

15   Consultant knew that they could not and would not be able to afford their loan and that there was

16   a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an

17   incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants'

18   and Loan Consultant's "qualification" process was for Defendants' own protection and not

19   theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to

20   pay their loan was not intended to communicate that they could actually "afford" the loan which

21   they were being given; (5) Defendants had abandoned its conventional lending business, prudent

22   lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the

23   appraiser to over-value Mr. and Mrs. Albritton's home to require them to borrow more money

24   with the knowledge that the true value of Mr. and Mrs. Albritton's home was insufficient to

25   justify the amount of Mr. and Mrs. Albritton's loan; or (7) Defendants knew that due to its

26   scheme of fraudulently manipulating and inflating property values throughout the State of

27   California that the real estate market would crash and Mr. and Mrs. Albritton would lose

28   substantial equity in their home.

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    Based on these misrepresentations, the material facts concerning Mr. and Mrs. Albritton's

2  loan were concealed from them, and they decided to move forward with their loan. On October

3  2, 2006, Mr. and Mrs. Albritton signed the loan and Deed of Trust, before a notary. Had they

4  known the truth however, Mr. and Mrs. Albritton would not have accepted the loan. As a result

5  of Defendants' fraudulent acts described throughout this complaint  Mr. and Mrs. Albritton have

6  lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and

7  Mrs. Albritton entered into the loan their home was worth $420,000.00, now their home is worth

8  approximately $146,566.00.  Mr. and Mrs. Albritton did not discover any of these

9  misrepresentations until after a consultation with legal counsel at Brookstone Law, and through a

10  complete and thorough investigation of the loan documentation, and a discussion of the

11  surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint,

12  were brought to light on or around March 16, 2011. (True and correct copy of the

13  aforementioned documents are attached hereto as *Exhibit 6*).

14    8.    Plaintiff Veronica Grey ("Grey") discussed obtaining a mortgage to purchase her

15  home located at 217 4th Avenue #2, Venice, CA 90291 and A.P.N.: 4286-001-048 with a Loan

16  Consultant ("Loan Consultant") with Green Point Mortgage Funding, Inc., a correspondent of

17  GMAC and Defendants herein ("the Defendants"), and authorized by Defendants to lend on its

18  behalf, in or around April 2006. In the course of their discussions ranging from April 2006 until

19  June 2006, Defendants and Loan Consultant steered her into a negatively amortized PayOption

20  ARM in the amount of $736,000.00 with an interest rate at 2.000% for a term of 40 years. Little

21  did Grey know, however, the interest rate was never "fixed" but applied to only her first monthly

22  payment and could adjust every 12 months thereafter. The maximum interest rate is 12.000%.

23  The amount of Grey's minimum monthly payment was "fixed" for 12 months and could adjust

24  every 12 months thereafter. When the amount of the minimum monthly payment is insufficient

25  to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid

26  principal balance of her loan. The recast point of this loan is 125% of the original loan amount.

27  The loan was originated by GMAC. On the note and Deed of Trust Green Point Mortgage

28  Funding, Inc. is identified as the lender, and the loan is being serviced by GMAC.

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    Defendants and Loan Consultant represented to Grey that her monthly payment would

2    always be $2,228.00 Although the amount of Grey's initial, minimum monthly payment was

3    $2,228.00, Defendants and Loan Consultant failed to clarify their partially true representations

4    and advise Grey: (1) how the interest rate on her loan was calculated; (2) that the initial

5    minimum monthly payment of $2,228.00 would not always be available; (3) that the initial

6    minimum monthly payment would not be the permanent payment under the loan despite

7    Defendants' and Loan Consultant's affirmative representations to the contrary; (4) that by

8    paying the initial minimum monthly payment she would be definitively deferring interest on her

9    loan, increasing the principal balance of her loan every time she made the minimum monthly

10   payment; (5) that by paying the minimum monthly payment the principal balance of her loan was

11   certain to increase; or (6) her loan would be recast within a few years and she would be forced to

12   pay considerably higher payments.

13       The disclosures in Grey's loan documents discussing negative amortization only frame

14   negative amortization as a mere **possibility** rather than a **certainty** when making the minimum

15   payment. However, the reality was that by making the minimum payment, negative amortization

16   was a *certainty*. Indeed, the payment schedule set forth in the Truth in Lending Disclosure

17   Statement ("TILDS"), which set forth what appeared to be the *required* payment schedule, fails

18   to disclose that making payments pursuant to the TILDS payment schedule *will* result in negative

19   amortization. Grey was not provided, before entering into the loans, with any other payment

20   schedule or with any informed option to make payments different than those listed in the TILDS

21   payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS

22   Grey would be deferring interest, or had Defendants disclosed the payment amounts sufficient to

23   avoid negative amortization from occurring, Grey would not have entered into the loan.

24   **Defendants intentionally omitted a clear disclosure of the nature of Grey's loan because**

25   **giving a clear explanation of how the loan worked would have punctured the illusion of a**

26   **low-payment, low interest rate loan**.

27       Defendants and Loan Consultant altered Grey's loan application without her knowing

28   consent or authorization as Loan Consultant completed Grey's application without giving Grey

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   an opportunity to review the loan application. Further, Defendants and Loan Consultant advised

2   her that she was eligible for a Low Doc Loan. Unbeknownst to her at the time, Defendants and

3   Loan Consultant used this low documentation requirement to fraudulently inflate her income,

4   and in doing so, Defendants and Loan Consultant caused her to be placed into a loan whose

5   payments she could not afford given her true, *un-inflated* monthly income.

6          Defendants and Loan Consultant also explicitly represented to Grey that she could afford

7   her loan and further represented that she could shoulder the additional financial burden of

8   repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully

9   amortized monthly payment on the loan was $5,460.54. Given Grey's true monthly income of

10  $10,000.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio,

11  before any other debts are even considered, of over 54%- in excess of industry standard

12  underwriting guidelines, and in excess of Defendants' own underwriting guidelines. Defendants

13  and Loan Consultant further represented to Grey that she could rely on the assessment that she

14  was "qualified" to mean that she could afford the loan. Because of Grey's lack of familiarity

15  with how much debt a person can and should reasonably take on compared to her monthly

16  income, and because Grey reasonably relied on Defendants' and Loan Consultant's expertise that

17  any payment she was "qualified" for would take into account what the maximum debt a person

18  such as Grey should be shouldering was, Grey reasonably believed Defendants' and Loan

19  Consultant's representations that she could afford her loan and its payments. Although

20  Defendants and the Loan Consultant represented to Grey that she was "qualified" for her loan

21  and could afford her loan and its monthly payments, Defendants and the Loan Consultant misled

22  Grey into believing that her monthly payments would always only be $2,228.00. Furthermore, at

23  no point did Defendants or Loan Consultant clarify Grey's false belief and advise her that

24  $2,228.00 would not be her permanent payment under the loan, or that every time she made a

25  monthly payment in the amount of $2,228.00, which is less than interest only, she would be

26  deferring interest on her loan, increasing the principal balance of her loan.

27          In addition, Defendants and Loan Consultant represented that appraisals conducted by or

28  on behalf of Defendants were accurate and made in good faith. On or around May 2006, an

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  appraisal company under the direct control and supervision of Defendants conducted an appraisal

2  on Grey's home, which was fraudulently inflated to an intentionally overstated value.

3  Defendants and Loan Consultant represented that, per appraisal, Grey's home was worth

4  $800,000.00 at the time she entered into her loan, and that such a valuation was a true and

5  correct measure of her home's worth. The current fair market value of Grey's home is

6  approximately $467,074.00. Grey alleges that the appraisal was artificially inflated, and that she

7  has suffered damages in the amount of $332,926.00 ($800,000.00-$467,074.00) due to a

8  substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other

9  acts described herein.

10      Defendants and Loan Consultant also represented to Grey that she would be able to

11  refinance her loan at a later time. Grey relied on this assurance in deciding to enter into the

12  mortgage contract. However, Grey has not been able to refinance her loan.  Defendants and Loan

13  Consultant also represented that it would modify Grey's loan, and Grey relied on this

14  representation in deciding to enter into the loan.

15      Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

16  reputable and complied with industry standard underwriting guidelines and were engaged in

17  lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

18  made in good faith; (3) Grey could afford the loan ; (4) she was "qualified" for her loan; (5)

19  "qualified" meant that she could afford her loan; (6) she would be able to modify her loan; and

20  (7) she would be able to refinance her loan.

21      Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

22  otherwise improperly disclosed to Grey that: (1) Defendants and Loan Consultant knew that she

23  could not and would not be able to afford her loan and that there was a very high probability that

24  she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her loan,

25  and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

26  "qualification" process was for Defendants' own protection and not hers; (4) that Defendants'

27  and Loan Consultant's representations that she was "qualified" to pay her loan was not intended

28  to communicate that she could actually "afford" the loan which she was being given; (5)

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   Defendants had abandoned its conventional lending business, prudent lending standards, and

2   industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

3   Grey's home to require her to borrow more money with the knowledge that the true value of

4   Grey's home was insufficient to justify the amount of Grey's loan; or (7) Defendants knew that

5   due to its scheme of fraudulently manipulating and inflating property values throughout the State

6   of California that the real estate market would crash and Grey would lose substantial equity in

7   her home.

8        Based on these misrepresentations and omissions, the material facts concerning Grey's

9   loan were concealed from her, and she decided to move forward with her loan. On June 16,

10  2006, Grey signed the loan and Deed of Trust, before a notary. Had she known the truth

11  however, Grey would not have accepted the loan. As a result of Defendants' fraudulent acts

12  described throughout this complaint Grey has lost substantial equity in her home, has damaged

13  or destroyed credit, and at the time Grey entered into the loan her home was worth $800,000.00,

14  now her home is worth approximately $467,074.00. Grey did not discover any of these

15  misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law,

16  and through a complete and thorough investigation of the loan documentation, and a discussion

17  of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this

18  complaint, were brought to light on or around February 12, 2011. (True and correct copy of the

19  aforementioned documents are attached hereto as *Exhibit 7*).

20       9.    Plaintiffs Joselito Mella and Brenda Mella ("Mr. and Mrs. Mella") discussed

21  refinancing an existing mortgage on their home located at 6 Caltrop Way, Ladera Ranch, CA

22  92694 and A.P.N.:741-362-22 with a loan consultant (the "Loan Consultant"), and representative

23  and authorized agent of Defendants herein (the "Defendants") in or around November 2005. In

24  the course of their discussions ranging from November 2005 until January 2005, Defendants and

25  Loan Consultant steered them into a loan of which the Defendants and Loan Consultant

26  concealed and inaccurately, incompletely or otherwise improperly disclosed the material terms

27  and information concerning the loan. This loan was originated by GMAC, on the note and deed

28  of trust Wescom Credit Union is identified as the lender.

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1      Defendants and Loan Consultant explicitly represented to Mr. and Mrs. Mella that they

2   could afford their loan; and further represented that they could shoulder the additional financial

3   burden of repaying their loan in consideration of their other existing debts.  Loan Consultant and

4   Defendants further represented to Mr. and Mrs. Mella that they could rely on the assessment that

5   they were "qualified" to mean that they could afford the loan.  Because of Mr. and Mrs. Mella's

6   lack of familiarity with how much debt a person can and should reasonably take on compared to

7   his/her monthly income, and because Mr. and Mrs. Mella reasonably relied on Defendants' and

8   Loan Consultant's expertise that any payment they were "qualified" for would take into account

9   what the maximum debt a person such as Mr. and Mrs. Mella should be shouldering was, Mr.

10  and Mrs. Mella reasonably believed Defendants' and Loan Consultant's representations that they

11  could afford their loan and its payments.

12      In addition, Defendants and Loan Consultant represented that appraisals conducted by or

13  on behalf of Defendants were accurate and made in good faith.  An appraisal company under the

14  direct control and supervision of Defendants conducted an appraisal on Mr. and Mrs. Mella's

15  home, which was fraudulently inflated to an intentionally overstated value. Mr. and Mrs. Mella

16  allege that the appraisal was artificially inflated, and that they have suffered damages due to a

17  substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other

18  acts described herein.

19      Loan Consultant and Defendants also represented to Mr. and Mrs. Mella that they would

20  be able to refinance their loan at a later time. Mr. and Mrs. Mella relied on this assurance in

21  deciding to enter into the mortgage contract.  However, Mr. and Mrs. Mella have not been able

22  to refinance their loan.  Loan Consultant and Defendants also represented that it would modify

23  Mr. and Mrs. Mella's loan, and Mr. and Mrs. Mella relied on this representation in deciding to

24  enter into the loan.  In addition, Mr. and Mrs. Mella were advised by a representative and

25  authorized agent of Defendants to stop making payments in order to be eligible for a

26  modification.  Mr. and Mrs. Mella relied on the Defendants' and the Defendants representative

27  and authorized agents' advice and stopped making their monthly payments causing them to fall

28  even further behind.  However, Mr. and Mrs. Mella were unable to modify their loan.

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were reputable and complied with industry standard underwriting guidelines and were engaged in lending of the highest caliber; (2) property appraisals done by Defendants were accurate and made in good faith; (3) Mr. and Mrs. Mella could afford the loan; (4) They were "qualified" for their loan; (5) "qualified" meant that they could afford their loan; (6) They would be able to modify their loan in the future; and (7) They would be able to refinance their loan in the future.

Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or otherwise improperly disclosed to Mr. and Mrs. Mella that: (1) Loan Consultant and Defendants knew that they could not and would not be able to afford their loan and that there was a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Loan Consultant's and Defendants' "qualification" process was for Defendants' own protection and not theirs; (4) That Loan Consultant's and Defendants' representations that they were "qualified" to pay their loan was not intended to communicate that they could actually "afford" the loan which they was being given; (5) Defendants had abandoned its conventional lending business, prudent lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Mr. and Mrs. Mella's home to require them to borrow more money with the knowledge that the true value of Mr. and Mrs. Mella's home was insufficient to justify the amount of Mr. and Mrs. Mella's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating and inflating property values throughout the State of California that the real estate market would crash and Mr. and Mrs. Mella would lose substantial equity in their home.

Based on these misrepresentations and omissions, the material facts concerning Mr. and Mrs. Mella's loan were concealed from them, and they decided to move forward with their loan. On January 26, 2006, Mr. and Mrs. Mella signed the loan and Deed of Trust, before a notary. Had they known the truth however, Mr. and Mrs. Mella would not have accepted the loan. As a result of the Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Mella have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr.

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1   and Mrs. Mella entered into the loan their home was worth substantially more than its current

2   fair market value. Mr. and Mrs. Mella did not discover any of these misrepresentations or

3   omissions until after a consultation with legal counsel at Brookstone Law, and through a

4   complete and thorough investigation of the loan documentation, and a discussion of the

5   surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint,

6   were brought to light on or around April 6, 2011.

7          10.     Plaintiffs Michael Man and July Lim ("Man and Lim") discussed refinancing an

8   existing mortgage on their property located at 15417 Roper Avenue, Norwalk, CA 90650 and

9   A.P.N.:8082-028-020 with a Loan Consultant ("Loan Consultant"), a representative and

10  authorized agent of SCME Mortgage Bankers, a correspondent of GMAC and Defendants herein

11  (the "Defendants"), and authorized by Defendants to lend on its behalf, in or around November

12  2006. In the course of their discussions ranging from November 2006 until January 2007,

13  Defendants and Loan Consultant steered them into a fixed rate mortgage in the amount of

14  $500,000.00 with an interest rate at 6.75% for a term of 30 years. This loan was originated by

15  GMAC, on the note and deed of trust SCME is identified as the lender, and GMAC is currently

16  servicing the loan.

17         Defendants and Loan Consultant advised them that they were eligible for a Low Doc

18  Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low

19  documentation requirement to fraudulently inflate their income by $6,990.00, a factor of 117%;

20  and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose

21  payments they could not afford given their true, *un-inflated* monthly income. Defendants and

22  Loan Consultant also fraudulently overstated Man and Lim's assets. Defendants and Loan

23  Consultant altered Man and Lim's loan application without their knowing consent or

24  authorization as Loan Consultant completed Man and Lim's application without giving Man and

25  Lim an opportunity to review the loan application.

26         Defendants and Loan Consultant also explicitly represented to Man and Lim that they

27  could afford their loan and further represented that they could shoulder the additional financial

28  burden of repaying their loan in consideration of their other existing debts. Defendants and Loan

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    Consultant also represented to them that they could afford a $3,242.99 monthly payment, despite

2    their $6,000.00 true monthly income (a "front-end" debt-to-income ratio, meaning a debt-to-

3    income ratio, before any other debts are even considered, of over 54% - in excess of industry

4    standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines).

5    Defendants and Loan Consultant further represented to Man and Lim that they could rely on the

6    assessment that they were "qualified" to mean that they could afford the loan. Because of Man

7    and Lim's lack of familiarity with how much debt a person can and should reasonably take on

8    compared to their monthly income, and because Man and Lim reasonably relied on Defendants'

9    and Loan Consultant's expertise that any payment they were "qualified" for would take into

10   account what the maximum debt a person such as Man and Lim should be shouldering was, Man

11   and Lim reasonably believed Defendants' and Loan Consultant's representations that they could

12   afford their loan and its payments.

13       In addition, Defendants and Loan Consultant represented that appraisals conducted by or

14   on behalf of Defendants were accurate and made in good faith. On or around December 12,

15   2007, an appraisal company under the direct control and supervision of Defendants conducted an

16   appraisal on Man and Lim's home, which was fraudulently inflated to an intentionally

17   overstated. Man and Lim's loan documentation indicates that their home was worth $650,000.00

18   at the time they entered into their loan. The current fair market value of Man and Lim's home is

19   approximately $272,646.00. Man and Lim allege that the appraisal was artificially inflated, and

20   that they have suffered damages in the amount of $377,354.00 ($650,000.00-$272,646.00) due to

21   a substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other

22   acts described herein.

23       Due to the economic crash caused by Defendants' fraudulent acts described throughout

24   the complaint, Man and Lim suffered from financial hardship because their income substantially

25   decreased. Defendants and Loan Consultant also represented to Man and Lim that they would be

26   able to refinance their loan at a later time. Man and Lim relied on this assurance in deciding to

27   enter into the mortgage contract. However, Man and Lim have not been able to refinance their

28   loan because their home value has dropped by 50% since they entered into the loan.

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1        Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

2   reputable and complied with industry standard underwriting guidelines and were engaged in

3   lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

4   made in good faith; (3) Man and Lim could afford the loan; (4) they were "qualified" for their

5   loan; (5) "qualified" meant that they could afford their loan; and (6) Defendants would refinance

6   their loan in the future.

7        Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

8   otherwise improperly disclosed to Man and Lim that: (1) Defendants and Loan Consultant knew

9   that they could not and would not be able to afford their loan and that there was a very high

10   probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to

11   sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan

12   Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that

13   Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan

14   was not intended to communicate that they could actually "afford" the loan which they were

15   being given; (5) Defendants had abandoned its conventional lending business, prudent lending

16   standards, and industry standard underwriting guidelines; (6) Defendants influenced the

17   appraiser to over-value Man and Lim's home to require them to borrow more money with the

18   knowledge that the true value of Man and Lim's home was insufficient to justify the amount of

19   Man and Lim's loan; or (7) Defendants knew that due to its scheme of fraudulently manipulating

20   and inflating property values throughout the State of California that the real estate market would

21   crash and Man and Lim would lose substantial equity in their home.

22        Based on these misrepresentations and omissions, the material facts concerning Man and

23   Lim's loan were concealed from them, and they decided to move forward with their loan. On

24   January 2, 2007, Man and Lim signed the loan and Deed of Trust, before a notary. Had they

25   known the truth however, Man and Lim would not have accepted the loan. As a result of

26   Defendants' fraudulent acts described throughout this complaint Man and Lim have lost

27   substantial equity in their home, have damaged or destroyed credit, and at the time Man and Lim

28   entered into the loan their home was worth $650,000.00, now their home is worth approximately

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    $272,646.00. Man and Lim did not discover any of these misrepresentations or omissions until

2    after a consultation with legal counsel at Brookstone Law, and through a complete and thorough

3    investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent

4    acts of the Defendants, as described throughout this complaint, were brought to light on or

5    around April 8, 2011. (True and correct copy of the aforementioned documents are attached

6    hereto as *Exhibit 8*).

7         11.    Plaintiffs David Cruz and Yesenia Cruz ("Mr. and Mrs. Cruz") discussed

8    obtaining a mortgage to purchase their home located at 48159 Sol De Lind, Coachella, CA

9    92236 and A.P.N.: 612-433-009 with a Loan Consultant ("Loan Consultant"), Equi-First

10   Corporation, a correspondent of GMAC Mortgage, LLC, Defendants herein ("the Defendants),

11   and authorized by Defendants to lend on its behalf, in or around April 2005. In the course of their

12   discussions ranging from April 2005 until June 2005, Defendants and Loan Consultant advised

13   them to enter into a fixed rate loan in the amount of $232,500.00 with the interest rate of 6.500%

14   for a term of 30 years. This loan was originated by GMAC, on the note and deed of trust Equi-

15   First Corporation is identified as the lender, and the loan is currently being serviced by GMAC.

16        Further, Defendants and Loan Consultant advised them that they were eligible for a Low

17   Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low

18   documentation requirement to fraudulently inflate their income by $1,000.00, a factor of 27%;

19   and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose

20   payments they could not afford given their true, *un-inflated* monthly income. Defendants and

21   Loan Consultant altered Mr. and Mrs. Cruz's loan application without their knowing consent or

22   authorization as Loan Consultant completed Mr. and Mrs. Cruz's application without giving Mr.

23   and Mrs. Cruz an opportunity to review the loan application.

24        Defendants and Loan Consultant explicitly represented to Mr. and Mrs. Cruz that they

25   could afford their loan; and further represented that they could shoulder the additional financial

26   burden of repaying their loan in consideration of their other existing debts. Defendants and Loan

27   Consultant also represented to them that they could afford a $1,469.00 monthly payment, despite

28   their $3,700.00 true monthly income (a "front-end" debt-to-income ratio, meaning a debt-to-

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    income ratio, before any other debts are even considered, of over 39%- in excess of industry

2    standard underwriting guidelines, and in excess of Defendants' own underwriting guidelines).

3    Defendants and Loan Consultant further represented to Mr. and Mrs. Cruz that they could rely on

4    the assessment that they were "qualified" to mean that they could afford the loan. Because of Mr.

5    and Mrs. Cruz's lack of familiarity with how much debt a person can and should reasonably take

6    on compared to their monthly income, and because Mr. and Mrs. Cruz reasonably relied on

7    Defendants' and Loan Consultant's expertise that any payment they were "qualified" for would

8    take into account what the maximum debt a person such as Mr. and Mrs. Cruz should be

9    shouldering was, Mr. and Mrs. Cruz reasonably believed Defendants' and Loan Consultant's

10   representations that they could afford their loan and its payments.

11        In addition, Defendants and Loan Consultant represented that appraisals conducted by or

12   on behalf of Defendants were accurate and made in good faith. On or around May 27, 2005, an

13   appraisal company under the direct control and supervision of Defendants conducted an appraisal

14   on Mr. and Mrs. Cruz's home, which was fraudulently inflated to an intentionally overstated

15   value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Cruz's

16   home was worth $310,000.00 at the time they entered into their loan, and that such a valuation

17   was a true and correct measure of their home's worth. The current fair market value of Mr. and

18   Mrs. Cruz's home is approximately $118,579.00. Mr. and Mrs. Cruz allege that the appraisal was

19   artificially inflated, and that they have suffered damages in the amount of $191,421.00

20   ($310,000.00-$118,579.00) due to a substantial loss of equity in their home as a result of

21   Defendants' fraudulent inflation and other acts described herein.

22        Defendants and Loan Consultant also represented to Mr. and Mrs. Cruz that they would

23   be able to refinance their loan at a later time. Mr. and Mrs. Cruz relied on this assurance in

24   deciding to enter into the mortgage contract. However, Mr. and Mrs. Cruz have not been able to

25   refinance their loan.  Defendants and Loan Consultant also represented that it would modify Mr.

26   and Mrs. Cruz's loan, and Mr. and Mrs. Cruz relied on this representation in deciding to enter

27   into the loan. In addition, Mr. and Mrs. Cruz were advised by a representative of Defendants, to

28   stop making payments in order to be eligible for a modification. Mr. and Mrs. Cruz relied on

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    Defendants' and representative's advice and stopped making their monthly payments causing

2    them to fall even further behind. However, Mr. and Mrs. Cruz were unable to modify their loan.

3            The foreclosure against Cruz is wrongful. Under California law MERS is only a nominee

4    acting on behalf of the true beneficiary, and cannot initiate foreclosure in its own name. MERS

5    only has the power to act when acting in its nominal capacity. Here, MERS in its individual

6    capacity purports to substitute Executive Trustee Services, LLC dba ETS Services, LLC –

7    however MERS cannot do so in its individual capacity, rendering their substitution of trustee

8    without effect.  Accordingly, ETS was never properly substituted as trustee and thus

9    unauthorized to conduct the trustee's sale. Under California law, a trustee's sale conducted by an

10   unauthorized trustee as here, is void as a matter of law.

11           Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

12   reputable and complied with industry standard underwriting guidelines and were engaged in

13   lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

14   made in good faith; (3) Mr. and Mrs. Cruz could afford the loan; (4) they were "qualified" for

15   their loan; (5) "qualified" meant that they could afford their loan; (6) they would be able to

16   modify their loan; and (7) they would be able to refinance their loan.

17           Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

18   otherwise improperly disclosed to Mr. and Mrs. Cruz that: (1) Defendants and Loan Consultant

19   knew that they could not and would not be able to afford their loan and that there was a very high

20   probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to

21   sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan

22   Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that

23   Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan

24   was not intended to communicate that they could actually "afford" the loan which they were

25   being given; (5) Defendants had abandoned its conventional lending business, prudent lending

26   standards, and industry standard underwriting guidelines; (6) Defendants influenced the

27   appraiser to over-value Mr. and Mrs. Cruz's home to require them to borrow more money with

28   the knowledge that the true value of Mr. and Mrs. Cruz's home was insufficient to justify the

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    amount of Mr. and Mrs. Cruz's loan; or (7) Defendants knew that due to its scheme of

2    fraudulently manipulating and inflating property values throughout the State of California that

3    the real estate market would crash and Mr. and Mrs. Cruz would lose substantial equity in their

4    home.

5        Based on these misrepresentations, the material facts concerning Mr. and Mrs. Cruz's

6    loan were concealed from them, and they decided to move forward with their loan. On June 17,

7    2005, Mr. and Mrs. Cruz signed the loan and Deed of Trust, before a notary. Had they known the

8    truth however, Mr. and Mrs. Cruz would not have accepted the loan. As a result of Defendants'

9    fraudulent acts described throughout this complaint Mr. and Mrs. Cruz have lost substantial

10    equity in their home, has damaged or destroyed credit, and at the time Mr. and Mrs. Cruz entered

11    into the loan their home was worth $310,000.00, now their home is worth approximately

12    $118,579.00.  Mr. and Mrs. Cruz did not discover any of these misrepresentations until after a

13    consultation with legal counsel at Brookstone Law, and through a complete and thorough

14    investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent

15    acts of the Defendants, as described throughout this complaint, were brought to light on or

16    around May 11, 2011. (True and correct copy of the aforementioned documents are attached

17    hereto as *Exhibit 9*).

18        12.    Plaintiff Gregory Buck ("Buck") discussed obtaining a mortgage on his home

19    located at 68 Toulon Avenue, Foothill Ranch, CA 92610 and A.P.N.: 601-215-04 with a loan

20    consultant (the "Loan Consultant"), and representative and authorized agent of Defendants

21    herein (the "Defendants") in or around June 2006. In the course of their discussions ranging from

22    June 2006 until August 2006, Defendants and Loan Consultant steered him into a loan, of which

23    the Defendants and Loan Consultant concealed and inaccurately, incompletely or otherwise

24    improperly disclosed the material terms and information concerning the loan to him. This loan

25    was originated by GMAC, on the note and deed of trust Provident Funding Associates is

26    identified as the lender, and GMAC is currently servicing the loan.

27        Defendants and Loan Consultant explicitly represented to Buck that he could afford his

28    loan; and further represented that he could shoulder the additional financial burden of repaying

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    his loan in consideration of his other existing debts.  Loan Consultant and Defendants further

2    represented to Buck that he could rely on the assessment that he was "qualified" to mean that he

3    could afford the loan.  Because of Buck's lack of familiarity with how much debt a person can

4    and should reasonably take on compared to his/her monthly income, and because Buck

5    reasonably relied on Defendants' and Loan Consultant's expertise that any payment he was

6    "qualified" for would take into account what the maximum debt a person such as Buck should be

7    shouldering was, Buck reasonably believed Defendants' and Loan Consultant's representations

8    that he could afford his loan and its payments.

9         In addition, Defendants and Loan Consultant represented that appraisals conducted by or

10    on behalf of Defendants were accurate and made in good faith.  An appraisal company under the

11    direct control and supervision of Defendants conducted an appraisal on Buck's home, which was

12    fraudulently inflated to an intentionally overstated value.  Buck alleges that the appraisal was

13    artificially inflated, and that he has suffered damages due to a substantial loss of equity in his

14    home as a result of Defendants' fraudulent inflation and other acts described herein.

15         Loan Consultant and Defendants also represented to Buck that he would be able to

16    refinance his loan at a later time.  Buck relied on this assurance in deciding to enter into the

17    mortgage contract.  However, Buck has not been able to refinance his loan.  Loan Consultant and

18    Defendants also represented that it would modify Buck's loan, and Buck relied on this

19    representation in deciding to enter into the loan.  In addition, Buck was advised by a

20    representative and authorized agent of Defendants to stop making payments in order to be

21    eligible for a modification.  Buck relied on Defendants' and the Defendants representative and

22    authorized agent's advice and stopped making his monthly payments causing him to fall even

23    further behind.  However, Buck was unable to modify his loan.

24         Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were

25    reputable and complied with industry standard underwriting guidelines and were engaged in

26    lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

27    made in good faith; (3) Buck could afford the loan; (4) He was "qualified" for his loan; (5)

28    "qualified" meant that he could afford his loan; (6)  He would be able to modify his loan in the

1    future; and (7)  He would be able to refinance his loan in the future.

2         Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or

3    otherwise improperly disclosed to Buck that: (1) Loan Consultant and Defendants knew that he

4    could not and would not be able to afford his loan and that there was a very high probability that

5    he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan, and

6    did sell his loan at fraudulently inflated prices; (3) Loan Consultant's and Defendants'

7    "qualification" process was for Defendants' own protection and not his; (4) That Loan

8    Consultant's and Defendants' representations that he was "qualified" to pay his loan was not

9    intended to communicate that he could actually "afford" the loan which he was being given; (5)

10   Defendants had abandoned its conventional lending business, prudent lending standards, and

11   industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

12   Buck 's home to require him to borrow more money with the knowledge that the true value of

13   Buck 's home was insufficient to justify the amount of Buck's loan; or (7) Defendants knew that

14   due to its scheme of fraudulently manipulating and inflating property values throughout the State

15   of California that the real estate market would crash and Buck would lose substantial equity in

16   his home.

17        Based on these misrepresentations and omissions, the material facts concerning Buck's

18   loan were concealed from him, and he decided to move forward with his loan. On August 23,

19   2006, Buck signed the loan and Deed of Trust, before a notary. Had he known the truth however,

20   Buck would not have accepted the loan.  As a result of the Defendants' fraudulent acts described

21   throughout this complaint Buck has lost substantial equity in his home, has damaged or

22   destroyed credit, and at the time Buck entered into the loan his home was worth substantially

23   more than its current fair market value.  Buck did not discover any of these misrepresentations or

24   omissions until after a consultation with legal counsel at Brookstone Law, and through a

25   complete and thorough investigation of the loan documentation, and a discussion of the

26   surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint,

27   were brought to light on or around May 19, 2011.

28        13.    Plaintiff Cristina Palbicke ("Palbicke") discussed refinancing an existing

43

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   mortgage on her property located at 27949 Harwood Drive, Santa Clarita, CA, 91350 and APN

2   3244-065-009 with a loan consultant (the "Loan Consultant"), a representative and authorized

3   agent of GMAC and Defendants herein (the "Defendants"), in or around February 2007. In the

4   course of their discussions ranging from February 2007 until April 2007, Defendants and Loan

5   Consultant advised her to enter into fixed rate loan in the amount of $346,000.00, with an

6   interest rate of 5.125%, for a term of 15 years. This loan was originated by GMAC, on the note

7   and deed of trust GMAC is identified as the lender, and GMAC was the servicer of the loan.

8        Defendants and Loan Consultant explicitly represented to Palbicke that she could afford

9   her loan and further represented that she could shoulder the additional financial burden of

10   repaying her loan in consideration of her other existing debts. Defendants and Loan Consultant

11   also represented to her that she could afford a $3,097.31 monthly payment. Defendants and Loan

12   Consultant further represented to Palbicke that she could rely on the assessment that she was

13   "qualified" to mean that she could afford the loan. Because of Palbicke's lack of familiarity with

14   how much debt a person can and should reasonably take on compared to her monthly income,

15   and because Palbicke reasonably relied on Defendants' and Loan Consultant's expertise that any

16   payment they were "qualified" for would take into account what the maximum debt a person

17   such as Palbicke should be shouldering was, Palbicke reasonably believed Defendants' and Loan

18   Consultant's representations that she could afford her loan and its payments.

19        In addition, Defendants and Loan Consultant represented that appraisals conducted by or

20   on behalf of Defendants were accurate and made in good faith. On or around March 2007, an

21   appraisal company under the direct control and supervision of Defendants conducted an appraisal

22   on Palbicke's home, which was fraudulently inflated to an intentionally overstated value.

23   Defendants and Loan Consultant represented that, per appraisal, Palbicke's home was worth

24   $485,000.00 at the time she entered into their loan, and that such a valuation was a true and

25   correct measure of their home's worth. The current fair market value of Palbicke's home is

26   approximately $314,036.00. Palbicke allege that the appraisal was artificially inflated, and that

27   she has suffered damages in the amount of $170,964.00 ($485,000.00-$314,036.00) due to a

28   substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  acts described herein.

2      Defendants and Loan Consultant also represented to Palbicke that she would be able to

3  refinance her loan at a later time.  Palbicke relied on this assurance in deciding to enter into the

4  mortgage contract. However, Palbicke has  not been able to refinance her loan because she has

5  been told that her home does not contain enough equity. Defendants and Loan Consultant also

6  represented that it would modify Palbicke's loan, and Palbicke relied on this representation in

7  deciding to enter into the loan. However, Palbicke were unable to modify her loan.

8      The foreclosure against Palbicke was wrongful because the ADOT (recorded February

9  28, 2011) notes MERS as the party assigning the beneficial interest in the property in its

10  individual capacity to the foreclosing party (GMAC). However, under California law MERS is

11  only a nominee acting on behalf of the true beneficiary, and cannot initiate foreclosure in its own

12  name. MERS can only act when acting in its nominal capacity. Here, MERS assigned the interest

13  in the Deed of Trust to GMAC in its own name, rendering its ADOT void. Accordingly, GMAC

14  was never properly assigned the beneficiary interest as a foreclosing beneficiary of the Deed.

15  Therefore, any subsequent recorded documents based on that assignment in order to move

16  forward with the foreclosure sale would be ineffective as well. Therefore, since the assignment

17  of deed of trust from MERS to the foreclosing party (GMAC) was void, it will render any

18  subsequent transactions based on that assignment void ab initio.

19      In addition, the foreclosure against Palbicke was wrongful because at the time the

20  Trustee's deed was recorded (August 11, 2011), the foreclosing trustee (Executive Trustee

21  Services, LLC) did not have the legal authority to initiate the foreclosure because the foreclosing

22  trustee was never properly substituted as trustee. The original trustee under the Deed of Trust

23  (recorded April 4, 2007) was Executive Trustee Services, Incorporation.

24      Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

25  reputable and complied with industry standard underwriting guidelines and were engaged in

26  lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

27  made in good faith; (3)  Palbicke could afford the loan; (4) they were "qualified" for their loan;

28  (5) "qualified" meant that they could afford their loan; (6) they would be able to modify her

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    loan; and  (7) they would be able to refinance her loan.

2          Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

3    otherwise improperly disclosed to Palbicke that: (1) Defendants and Loan Consultant knew that

4    she could not and would not be able to afford her loan and that there was a very high probability

5    that she would default and/or be foreclosed upon;  (2) Defendants had an incentive to sell her

6    loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

7    "qualification" process was for Defendants' own protection and not theirs; (4) that Defendants'

8    and Loan Consultant's representations that she was "qualified" to pay her  loan was not intended

9    to communicate that she could actually "afford" the loan which they were being given; (5)

10   Defendants had abandoned its conventional lending business, prudent lending standards, and

11   industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

12   Palbicke home to require them to borrow more money with the knowledge that the true value of

13   Palbicke's home was insufficient to justify the amount of Palbicke's loan; or (7) Defendants

14   knew that due to its scheme of fraudulently manipulating and inflating property values

15   throughout the State of California that the real estate market would crash and Palbicke would

16   lose substantial equity in their home.

17         Based on these misrepresentations, the material facts concerning Palbicke's loan was

18   concealed from her, and she decided to move forward with her loan. On April 4, 2007, Palbicke

19   signed the loan and Deed of Trust, before a notary. Had she known the truth however, Palbicke

20   would not have accepted the loan. As a result of Defendants' fraudulent acts described

21   throughout this complaint, Palbicke has lost substantial equity in her home, has damaged or

22   destroyed credit, and at the time Palbicke entered into the loan her home was worth $485,000.00,

23   now her home is worth approximately $314,036.00.  Palbicke did not discover any of these

24   misrepresentations until after a consultation with legal counsel at Brookstone Law, and through a

25   complete and thorough investigation of the loan documentation, and a discussion of the

26   surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint,

27   were brought to light on or around April 7, 2011. (True and correct copy of the aforementioned

28   documents are attached hereto as *Exhibit 10*).

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1      14.    Plaintiffs Khalil Subat and Manija Subat ("collectively referred to as "Mr. and

2    Mrs. Subat") discussed refinancing an existing mortgage on their property located at 7330

3    Cerritos Avenue, Stanton, CA 90680 and A.P.N.:079-541-55 with a Loan Consultant ("Loan

4    Consultant"), a representative and authorized agent of Greenpoint Mortgage Funding, a

5    correspondent of GMAC and Defendants herein (the "Defendants") and authorized by

6    Defendants to lend on its behalf, in or around April 2006. In the course of their discussions

7    ranging from April 2006 until June 2006, Defendants and Loan Consultant steered them into an

8    adjustable rate mortgage in the amount of $650,000.00 with an interest rate at 3.000% for a term

9    of 30 years. Little did Mr. and Mrs. Subat know, however, their loan was a negatively amortized

10    PayOption ARM. Mr. and Mrs. Subat was not advised that the interest rate was never "fixed" but

11    applied to only their first monthly payment and could adjust every month thereafter. The

12    maximum interest rate is 12%. The amount of Mr. and Mrs. Subat's minimum monthly payment

13    was "fixed" for 12 months and could adjust every 12 months thereafter. When the amount of the

14    minimum monthly payment is insufficient to cover the amount of interest due, then the amount

15    of that deficiency is added onto the unpaid principal balance of their loan. The recast point of this

16    loan is 110% of the original loan amount. In addition, Loan Consultant steered them into an

17    ARM "piggy-back" loan in the amount of $100,000.00 for a term of 15 years. These loans were

18    originated by GMAC, on the note and deed of trust Greenpoint Mortgage Funding is identified as

19    the lender, and GMAC is currently servicing the loan.

20        Defendants and Loan Consultant represented to Mr. and Mrs. Subat that their monthly

21    payment would always be $2,740.43. Although the amount of Mr. and Mrs. Subat's initial

22    minimum monthly payment was $2,740.43. Defendants and Loan Consultant failed to clarify

23    their partially true representations and advise Mr. and Mrs. Subat: (1) how the interest rate on

24    their loan was calculated; (2) that the initial minimum monthly payment of $2,740.43 would not

25    always be available; (3) that the initial minimum monthly payment would not be the permanent

26    payment under the loan despite Defendants' and Loan Consultant's affirmative representations

27    to the contrary; (4) that by paying the initial minimum monthly payment they would be

28    definitively deferring interest on their loan, increasing the principal balance of their loan every

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  time they made the minimum monthly payment; (5) that by paying the minimum monthly

2  payment the principal balance of their loan was certain to increase; or (6) their loan would be

3  recast within a few years and they would be forced to pay considerably higher payments.

4      The disclosures in Mr. and Mrs. Subat's loan documents discussing negative amortization

5  only frame negative amortization as a mere **possibility** rather than a **certainty** when making the

6  minimum payment. However, the reality was that by making the minimum payment, negative

7  amortization was a *certainty*. Indeed, the payment schedule set forth in the Truth in Lending

8  Disclosure Statement ("TILDS"), which set forth what appeared to be the *required* payment

9  schedule, fails to disclose that making payments pursuant to the TILDS payment schedule *will*

10  result in negative amortization. Mr. and Mrs. Subat were not provided, before entering into the

11  loans, with any other payment schedule or with any informed option to make payments different

12  than those listed in the TILDS payment schedule. Had Defendants disclosed that by making the

13  payment pursuant to the TILDS Mr. and Mrs. Subat would be deferring interest, or had

14  Defendants disclosed the payment amounts sufficient to avoid negative amortization from

15  occurring, Mr. and Mrs. Subat would not have entered into the loan. **Defendants intentionally**

16  **omitted a clear disclosure of the nature of Mr. and Mrs. Subat's loan because giving a clear**

17  **explanation of how the loan worked would have punctured the illusion of a low-payment,**

18  **low interest rate loan.**

19      Further, Defendants and Loan Consultant advised them that they were eligible for a Low

20  Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low

21  documentation requirement to fraudulently inflate their income by $6,620.00, a factor of 69%;

22  and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose

23  payments they could not afford given their true, *un-inflated* monthly income. Defendants and

24  Loan Consultant altered Mr. and Mrs. Subat's loan application without their knowing consent or

25  authorization as Loan Consultant completed Mr. and Mrs. Subat's application without giving Mr.

26  and Mrs. Subat an opportunity to review the loan application.

27      Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Subat that

28  they could afford their loan and further represented that they could shoulder the additional

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1  financial burden of repaying their loan in consideration of their other existing debts; yet failed to

2  disclose that the fully amortized monthly payment on the loan was $5,627.94 for both the first

3  loan and the piggy-back loan. Given Mr. and Mrs. Subat's true monthly income of $9,630.00 this

4  represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any other

5  debts are even considered, of over 58% - in excess of industry standard underwriting guidelines,

6  and in excess of Defendants' own underwriting guidelines. Defendants and Loan Consultant

7  further represented to Mr. and Mrs. Subat that they could rely on the assessment that they were

8  "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Subat's lack of

9  familiarity with how much debt a person can and should reasonably take on compared to their

10  monthly income, and because Mr. and Mrs. Subat reasonably relied on Defendants' and Loan

11  Consultant's expertise that any payment they were "qualified" for would take into account what

12  the maximum debt a person such as Mr. and Mrs. Subat should be shouldering was, Mr. and Mrs.

13  Subat reasonably believed Defendants' and Loan Consultant's representations that they could

14  afford their loan and its payments.

15      Although Defendants and the Loan Consultant represented to Mr. and Mrs. Subat that

16  they were "qualified" for their loan and could afford their loan and its monthly payments,

17  Defendants and the Loan Consultant misled Mr. and Mrs. Subat into believing that their monthly

18  payments would always only be $2,740.43. Furthermore, at no point did Defendants or Loan

19  Consultant clarify Mr. and Mrs. Subat's false belief and advise them that $2,740.43 would not be

20  their permanent payment under the loan, or that every time they made a monthly payment in the

21  amount of $2,740.43, which is less than interest only, they would be deferring interest on their

22  loan, increasing the principal balance of their loan.

23      In addition, Defendants and Loan Consultant represented that appraisals conducted by or

24  on behalf of Defendants were accurate and made in good faith. On June 7, 2006, an appraisal

25  company under the direct control and supervision of Defendants conducted an appraisal on Mr.

26  and Mrs. Subat's home, which was fraudulently inflated to $1,000,000.00 - an intentionally

27  overstated value. The current fair market value of Mr. and Mrs. Subat's home is approximately

28  $620,000.00. Mr. and Mrs. Subat allege that the appraisal was artificially inflated, and that they

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  have suffered damages in the amount of $380,000.00 ($1,000,000.00-$620,000.00) due to a

2  substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other

3  acts described herein.

4  Due to the economic crash caused by Defendants' fraudulent acts described throughout

5  the complaint, Mr. and Mrs. Subat suffered from financial hardship that they were struggling to

6  make the mortgage payments. At the time of entering into the loan, Defendants and Loan

7  Consultant represented to Mr. and Mrs. Subat that they would be able to refinance their loan at a

8  later time. Mr. and Mrs. Subat relied on this assurance in deciding to enter into the mortgage

9  contract. However, Mr. and Mrs. Subat have not been able to refinance their loan. Mr. and Mrs.

10  Subat also sought to modify their loan with Defendants to lower the mortgage payments.

11  Although Mr. and Mrs. Subat's loan was modified, the modification is active only for a limited

12  time. When the modification expires, Mr. and Mrs. Subat's monthly payment will climb to the

13  point that the loan is unaffordable to Mr. and Mrs. Subat.

14  Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

15  reputable and complied with industry standard underwriting guidelines and were engaged in

16  lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

17  made in good faith; (3) Mr. and Mrs. Subat could afford the loan; (4) they were "qualified" for

18  their loan; (5) "qualified" meant that they could afford their loan; and (6) they would be able to

19  refinance their loan in the future.

20  Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

21  otherwise improperly disclosed to Mr. and Mrs. Subat that: (1) Defendants and Loan Consultant

22  knew that they could not and would not be able to afford their loan and that there was a very high

23  probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to

24  sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan

25  Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that

26  Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan

27  was not intended to communicate that they could actually "afford" the loan which they were

28  being given; (5) Defendants had abandoned its conventional lending business, prudent lending

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   standards, and industry standard underwriting guidelines; (6) Defendants influenced the

2   appraiser to over-value Mr. and Mrs. Subat's home to require them to borrow more money with

3   the knowledge that the true value of Mr. and Mrs. Subat's home was insufficient to justify the

4   amount of Mr. and Mrs. Subat's loan; or (7) Defendants knew that due to its scheme of

5   fraudulently manipulating and inflating property values throughout the State of California that

6   the real estate market would crash and Mr. and Mrs. Subat would lose substantial equity in their

7   home.

8        Based on these misrepresentations and omissions, the material facts concerning Mr. and

9   Mrs. Subat's loan were concealed from them, and they decided to move forward with their loan.

10   On June 26, 2006, Mr. and Mrs. Subat signed the loan and Deed of Trust, before a notary. Had

11   they known the truth however, Mr. and Mrs. Subat would not have accepted the loan. As a result

12   of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Subat have lost

13   substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs.

14   Subat entered into the loan their home was worth $1,000,000.00, now their home is worth

15   approximately $620,000.00. Mr. and Mrs. Subat did not discover any of these misrepresentations

16   or omissions until after a consultation with legal counsel at Brookstone Law, and through a

17   complete and thorough investigation of the loan documentation, and a discussion of the

18   surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint,

19   were brought to light on or around August 1, 2011. (True and correct copy of the

20   aforementioned documents are attached hereto as ***Exhibit 11***).

21        15.    Plaintiff Genevie Cabang ("Cabang") discussed refinancing an existing mortgage

22   on her property located at 37915 52nd Street East, Palmdale, CA 92252 and A.P.N.: with a loan

23   consultant (the "Loan Consultant"), a representative and authorized agent of Homecomings

24   Financial Services, LLC, a correspondent of GMAC Mortgage (herein "Defendants"), and

25   authorized by Defendants to lend on its behalf, in or around August 2007. In the course of their

26   discussions ranging from August 2007 until October 2007, Defendants and Loan Consultant

27   advised her to enter into a fixed rate loan in the amount of $416,500.00, with an interest rate of

28   7.875%, for a term of 30 years. This loan was originated by GMAC, on the note and deed of trust

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  Homecomings Financial Services, LLC is identified as the lender, and this loan is currently being

2  serviced by GMAC.

3     Further, Defendants and Loan Consultant advised her she was eligible for a Low Doc

4  Loan. Unbeknownst to her at the time, Defendants and Loan Consultant used this low

5  documentation requirement to fraudulently inflate her income  by $2,024.00, a factor of 35% ;

6  and in doing so, Defendants and Loan Consultant caused her to be placed into a loan whose

7  payments she could not afford given her true, *un-inflated* monthly income. Defendants and Loan

8  Consultant altered Cabang's loan application without her knowing consent or authorization as

9  Loan Consultant completed Cabang's application without giving Cabang an opportunity to

10  review the loan application.

11     Defendants and Loan Consultant explicitly represented to Cabang that she could afford

12  her loan; and further represented that she could shoulder the additional financial burden of

13  repaying her loan in consideration of her other existing debts. Defendants and Loan Consultant

14  also represented to her that she could afford a $3,443.35 monthly payment, despite her $5,876.00

15  true monthly income (a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before

16  any other debts are even considered, of over 59%- in excess of industry standard underwriting

17  guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan

18  Consultant further represented to Cabang that she could rely on the assessment that she was

19  "qualified" to mean that he could afford the loan. Because of Cabang's lack of familiarity with

20  how much debt a person can and should reasonably take on compared to her monthly income,

21  and because Cabang reasonably relied on Defendants' and Loan Consultant's expertise that any

22  payment she was "qualified" for would take into account what the maximum debt a person such

23  as Cabang should be shouldering was, Cabang reasonably believed Defendants' and Loan

24  Consultant's representations that she could afford her loan and its payments.

25     In addition, Defendants and Loan Consultant represented that appraisals conducted by or

26  on behalf of Defendants were accurate and made in good faith. On or around September 2007, an

27  appraisal company under the direct control and supervision of Defendants conducted an appraisal

28  on Cabang's home, which was fraudulently inflated to a grossly and intentionally overstated

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   value. Defendants and Loan Consultant represented that, per appraisal, Cabang's home was

2   worth $416,000.00 at the time she entered into their loan, and that such a valuation was a true

3   and correct measure of her home's worth. The current fair market value of Cabang's home is

4   approximately $147,000.00. Cabang alleges that the appraisal was artificially inflated and that

5   she has suffered damages in the amount of $269,900.00 ($416,000.00-$147,000.00) due to a

6   substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other

7   acts described herein.

8        Defendants and Loan Consultant also represented to Cabang that she would be able to

9   refinance her loan at a later time. Cabang relied on this assurance in deciding to enter into the

10  mortgage contract. However, Cabang has not been able to refinance her loan because she has

11  been told that her home does not contain enough equity. Defendants and Loan Consultant also

12  represented that it would modify Cabang's loan, and Cabang relied on this representation in

13  deciding to enter into the loan. However, Cabang was unable to modify her loan.

14       Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

15  reputable and complied with industry standard underwriting guidelines and were engaged in

16  lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

17  made in good faith; (3) Cabang could afford the loan ; (4) she was "qualified" for her loan;  (5)

18  "qualified" meant that she could afford her loan; (6) Defendants would modify her loan in the

19  future; and (7) she would be able to refinance her loan in the future.

20       At no point was it revealed to Cabang that her mortgage payment included a Private

21  Mortgage Insurance ("PMI"). After being told her new payment of $3,019.91 would be her

22  payment after combining both of her previous loans through refinancing, Defendants and Loan

23  Consultant failed to represent that in order to combine both loans, a PMI rate of $423.33 was

24  added each month to her payment without her knowing. Cabang alleges that this increase caused

25  her new, refinanced mortgage payment to be unaffordable.

26       Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

27  otherwise improperly disclosed to Cabang that: (1) Defendants and Loan Consultant knew that

28  they could not and would not be able to afford her loan and that there was a very high probability

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  that she would default and/or be foreclosed upon;  (2) Defendants had an incentive to sell her

2  loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

3  "qualification" process was for Defendants' own protection and not hers; (4) that Defendants'

4  and Loan Consultant's representations that she was "qualified" to pay her loan was not intended

5  to communicate that she could actually "afford" the loan which she was being given; (5)

6  Defendants had abandoned its conventional lending business, prudent lending standards, and

7  industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

8  Cabang's home to require her to borrow more money with the knowledge that the true value of

9  Cabang's home was insufficient to justify the amount of Cabang's loan; or (7) Defendants knew

10  that due to its scheme of fraudulently manipulating and inflating property values throughout the

11  State of California that the real estate market would crash and Cabang would lose substantial

12  equity in her home.

13        Based on these misrepresentations, the material facts concerning Cabang's loan were

14  concealed from her, and she decided to move forward with her loan. On October 11, 2007,

15  Cabang signed the loan and Deed of Trust, before a notary. Had she known the truth however,

16  Cabang would not have accepted the loan. As a result of Defendants' fraudulent acts described

17  throughout this complaint Cabang has lost substantial equity in her home, has damaged or

18  destroyed credit, and at the time Cabang entered into the loan her home was worth $416,000.00,

19  now her home is worth approximately $147,000.00. Cabang did not discover any of these

20  misrepresentations until after a consultation with legal counsel at Brookstone Law, and through a

21  complete and thorough investigation of the loan documentation, and a discussion of the

22  surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint,

23  were brought to light on or around September 6, 2011.  (True and correct copy of the

24  aforementioned documents are attached hereto as ***Exhibit 12***).

25        16.     Plaintiff Julio Gonzalez ("Gonzalez") discussed obtaining a mortgage on his

26  home located at 13552 Abana Street, Cerritos, CA 90703 and A.P.N.: 7006-027-004 with a loan

27  consultant (the "Loan Consultant"), and representative and authorized agent of GMAC herein

28  (the "Defendants") in or around April 2005. In the course of their discussions ranging from April

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   2005 until June 2005, Defendants and Loan Consultant steered him into a loan, of which the

2   Defendants and Loan Consultant concealed and inaccurately, incompletely or otherwise

3   improperly disclosed the material terms and information concerning the loan to him. This loan

4   was originated by E-loan, Inc., on the note and deed of trust GMAC is identified as the lender,

5   and GMAC is currently servicing the loan.

6        Defendants and Loan Consultant explicitly represented to Gonzalez that he could afford

7   his loan; and further represented that he could shoulder the additional financial burden of

8   repaying his loan in consideration of his other existing debts. Loan Consultant and Defendants

9   further represented to Gonzalez that he could rely on the assessment that he was "qualified" to

10  mean that he could afford the loan. Because of Gonzalez's lack of familiarity with how much

11  debt a person can and should reasonably take on compared to his/her monthly income, and

12  because Gonzalez reasonably relied on Defendants' and Loan Consultant's expertise that any

13  payment he was "qualified" for would take into account what the maximum debt a person such

14  as Gonzalez should be shouldering was, Gonzalez reasonably believed Defendants' and Loan

15  Consultant's representations that he could afford his loan and its payments.

16       In addition, Defendants and Loan Consultant represented that appraisals conducted by or

17  on behalf of Defendants were accurate and made in good faith. An appraisal company under the

18  direct control and supervision of Defendants conducted an appraisal on Gonzalez's home, which

19  was fraudulently inflated to an intentionally overstated value. Gonzalez alleges that the appraisal

20  was artificially inflated, and that he has suffered damages due to a substantial loss of equity in

21  his home as a result of Defendants' fraudulent inflation and other acts described herein.

22       Loan Consultant and Defendants also represented to Gonzalez that he would be able to

23  refinance his loan at a later time. Gonzalez relied on this assurance in deciding to enter into the

24  mortgage contract. However, Gonzalez has not been able to refinance his loan. Loan Consultant

25  and Defendants also represented that it would modify Gonzalez's loan, and Gonzalez relied on

26  this representation in deciding to enter into the loan. In addition, Gonzalez was advised by a

27  representative and authorized agent of Defendants to stop making payments in order to be

28  eligible for a modification. Gonzalez relied on Defendants' and the Defendants representative

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    and authorized agent's advice and stopped making his monthly payments causing him to fall

2    even further behind. However, Gonzalez was unable to modify his loan.

3    　　　Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were

4    reputable and complied with industry standard underwriting guidelines and were engaged in

5    lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

6    made in good faith; (3) Gonzalez could afford the loan; (4) He was "qualified" for his loan; (5)

7    "qualified" meant that he could afford his loan; (6) He would be able to modify his loan in the

8    future; and (7) He would be able to refinance his loan in the future.

9    　　　Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or

10    otherwise improperly disclosed to Gonzalez that: (1) Loan Consultant and Defendants knew that

11    he could not and would not be able to afford his loan and that there was a very high probability

12    that he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan,

13    and did sell his loan at fraudulently inflated prices; (3) Loan Consultant's and Defendants'

14    "qualification" process was for Defendants' own protection and not his; (4) That Loan

15    Consultant's and Defendants' representations that he was "qualified" to pay his loan was not

16    intended to communicate that he could actually "afford" the loan which he was being given; (5)

17    Defendants had abandoned its conventional lending business, prudent lending standards, and

18    industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

19    Gonzalez 's home to require him to borrow more money with the knowledge that the true value

20    of Gonzalez 's home was insufficient to justify the amount of Gonzalez 's loan; or (7)

21    Defendants knew that due to its scheme of fraudulently manipulating and inflating property

22    values throughout the State of California that the real estate market would crash and Gonzalez

23    would lose substantial equity in his home.

24    　　　Based on these misrepresentations and omissions, the material facts concerning

25    Gonzalez's loan were concealed from him, and he decided to move forward with his loan. On

26    June 22, 2005, Gonzalez signed the loan and Deed of Trust, before a notary. Had he known the

27    truth however, Gonzalez would not have accepted the loan. As a result of the Defendants'

28    fraudulent acts described throughout this complaint Gonzalez has lost substantial equity in his

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  home, has damaged or destroyed credit, and at the time Gonzalez entered into the loan his home

2  was worth substantially more than its current fair market value. Gonzalez did not discover any

3  of these misrepresentations or omissions until after a consultation with legal counsel at

4  Brookstone Law, and through a complete and thorough investigation of the loan documentation,

5  and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described

6  throughout this complaint, were brought to light on or around October 10, 2011.

7        17.    Plaintiff Lisa Simonyi ("Simonyi") discussed refinancing an existing mortgage on

8  her property located at 14442 Rancho Del Prado Trail, San Diego, CA 92127 and APN 303-230-

9  25-00 with a loan consultant (the "Loan Consultant") with Plaza Home Mortgage, Inc., a

10  correspondent of GMAC and the Defendants (the "Defendants"), and authorized by Defendants

11  to lend on its behalf, in or around November 2006. In the course of their discussions ranging

12  from November 2006 until January 2007, Defendants and Loan Consultant steered her into a

13  negatively amortized PayOption ARM in the amount of $1,500,000.00 with an interest rate at

14  3.750% for a term of 30 years. Little did Simonyi know, however, the disclosed interest rate was

15  never "fixed" but applied to only the first five years of her loan and could adjust every six

16  months thereafter. The maximum interest rate is 11.750%. The amount of Simonyi's minimum

17  monthly payment was "fixed" for 12 months and could adjust every 12 months thereafter. When

18  the amount of the minimum monthly payment is insufficient to cover the amount of interest due,

19  then the amount of that deficiency is added onto the unpaid principal balance of her loan. The

20  recast point of this loan is 115% of the original loan amount. This loan was originated by GMAC

21  and Defendants, on the note and deed of trust Plaza Home Mortgage is identified as the lender,

22  and GMAC is currently servicing this loan.

23        Defendants and Loan Consultant represented to Simonyi that her monthly payment would

24  always be $4,687.50. Although the amount of Simonyi's initial, disclosed minimum monthly

25  payment was $4,687.50, Defendants and Loan Consultant failed to clarify their partially true

26  representations and advise Simonyi: (1) how the interest rate on her loan was calculated; (2) that

27  the initial, disclosed minimum monthly payment of $4,687.50 would not always be available; (3)

28  that the initial, disclosed minimum monthly payment would not be the permanent payment under

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    the loan despite Defendants' and Loan Consultant's affirmative representations to the contrary;

2    (4) that by paying the initial, disclosed minimum monthly payment she would be definitively

3    deferring interest on her loan, increasing the principal balance of her loan every time she made

4    the minimum monthly payment; (5) that by paying the minimum monthly payment the principal

5    balance of her loan was certain to increase; or (6) her loan would be recast within a few years

6    and she would be forced to pay considerably higher payments.

7       The disclosures in Simonyi's loan documents discussing negative amortization only

8    frame negative amortization as a mere **possibility** rather than a **certainty** when making the

9    minimum payment. However, the reality was that by making the minimum payment, negative

10    amortization was a *certainty*. Indeed, the payment schedule set forth in the Truth in Lending

11    Disclosure Statement ("TILDS"), which set forth what appeared to be the *required* payment

12    schedule, fails to disclose that making payments pursuant to the TILDS payment schedule *will*

13    result in negative amortization. Simonyi was not provided, before entering into the loans, with

14    any other payment schedule or with any informed option to make payments different than those

15    listed in the TILDS payment schedule. Had Defendants disclosed that by making the payment

16    pursuant to the TILDS Simonyi would be deferring interest, or had Defendants disclosed the

17    payment amounts sufficient to avoid negative amortization from occurring, Simonyi would not

18    have entered into the loan. **Defendants intentionally omitted a clear disclosure of the nature**

19    **of Simonyi's loan because giving a clear explanation of how the loan worked would have**

20    **punctured the illusion of a low-payment, low interest rate loan.**

21       Defendants and Loan Consultant also explicitly represented to Simonyi that she could

22    afford her loan and further represented that she could shoulder the additional financial burden of

23    repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully

24    amortized monthly payment on the loan was $12,500.00. Given Simonyi's true monthly income

25    of $16,000.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income

26    ratio, before any other debts are even considered, of over 78%- in excess of industry standard

27    underwriting guidelines, and in excess of Defendants' own underwriting guidelines. Defendants

28    and Loan Consultant further represented to Simonyi that she could rely on the assessment that

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    she was "qualified" to mean that she could afford the loan. Because of Simonyi's lack of

2    familiarity with how much debt a person can and should reasonably take on compared to her

3    monthly income, and because Simonyi reasonably relied on Defendants' and Loan Consultant's

4    expertise that any payment she was "qualified" for would take into account what the maximum

5    debt a person such as Simonyi should be shouldering was, Simonyi reasonably believed

6    Defendants' and Loan Consultant's representations that she could afford her loan and its

7    payments.

8       Although Defendants and the Loan Consultant represented to Simonyi that she was

9    "qualified" for her loan and could afford her loan and its monthly payments, Defendants and the

10    Loan Consultant misled Simonyi into believing that her monthly payments would always only be

11    $4,687.50. Furthermore, at no point did Defendants or Loan Consultant clarify Simonyi's false

12    belief and advise her that $4,687.50 would not be her permanent payment under the loan, or that

13    every time she made a monthly payment in the amount of $4,687.50, which is less than interest

14    only, she would be deferring interest on her loan, increasing the principal balance of her loan.

15       In addition, Defendants and Loan Consultant represented that appraisals conducted by or

16    on behalf of Defendants were accurate and made in good faith. On or around December 2006, an

17    appraisal company under the direct control and supervision of Defendants conducted an appraisal

18    on Simonyi's home, which was fraudulently inflated to an intentionally overstated value.

19    Defendants and Loan Consultant represented that, per appraisal, Simonyi's home was worth

20    $2,000,000.00 at the time she entered into her loan, and that such a valuation was a true and

21    correct measure of her home's worth. The current fair market value of Simonyi's home is

22    approximately $1,242,642.00. Simonyi alleges that the appraisal was artificially inflated and that

23    she has suffered damages in the amount of $757,358.00 ($2,000,000.00-$1,242,642.00) due to a

24    substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other

25    acts described herein.

26       Defendants and Loan Consultant also represented to Simonyi that she would be able to

27    refinance her loan at a later time. Simonyi relied on this assurance in deciding to enter into the

28    mortgage contract Defendants and Loan Consultant also represented that it would modify

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1  Simonyi's loan, and Simonyi relied on this representation in deciding to enter into the loan.

2  However, Simonyi was unable to modify her loan.

3       Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

4  reputable and complied with industry standard underwriting guidelines and were engaged in

5  lending of the highest caliber;(2) property appraisals done by Defendants were accurate and

6  made in good faith;  (3) Simonyi could afford the loan ; (4) she was "qualified" for her loan;  (5)

7  "qualified" meant that she could afford her loan; (6) she would be able to modify her loan and

8  (7) she would be able to refinance her loan.

9       Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

10  otherwise improperly disclosed to Simonyi that: (1) Defendants and Loan Consultant knew that

11  she could not and would not be able to afford her loan and that there was a very high probability

12  that she would default and/or be foreclosed upon;  (2) Defendants had an incentive to sell her

13  loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

14  "qualification" process was for Defendants' own protection and not hers; (4) that Defendants'

15  and Loan Consultant's representations that she was "qualified" to pay her loan was not intended

16  to communicate that she could actually "afford" the loan which she was being given; (5)

17  Defendants had abandoned its conventional lending business, prudent lending standards, and

18  industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

19  Simonyi's home to require her to borrow more money with the knowledge that the true value of

20  Simonyi's home was insufficient to justify the amount of Simonyi's loan; or (7) Defendants

21  knew that due to its scheme of fraudulently manipulating and inflating property values

22  throughout the State of California that the real estate market would crash and Simonyi would

23  lose substantial equity in her home.

24       Based on these misrepresentations and omissions, the material facts concerning

25  Simonyi's loan were concealed from her, and she decided to move forward with her loan. On

26  January 5, 2007, Simonyi signed the loan and Deed of Trust, before a notary. Had she known the

27  truth however, Simonyi would not have accepted the loan. As a result of Defendants' fraudulent

28  acts described throughout this complaint, Simonyi has lost substantial equity in her home, has

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    damaged or destroyed credit, and at the time Simonyi entered into the loan her home was worth

2    $2,000,000.00, now her home is worth approximately $1,242,624.00. Simonyi did not discover

3    any of these misrepresentations or omissions until after a consultation with legal counsel at

4    Brookstone Law, and through a complete and thorough investigation of the loan documentation,

5    and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described

6    throughout this complaint, were brought to light on or around November 11, 2011.

7        18.    Plaintiff Rick Ewald ("Ewald") discussed refinancing an existing mortgage on his

8    property located at 108 Grove Street, Nevada City, CA 95959 and A.P.N.: 05-395-02-000 with a

9    loan consultant (the "Loan Consultant"), a representative and authorized agent of Green Point

10   Mortgage, a correspondent of GMAC and Defendants herein (the "Defendants"), and authorized

11   by Defendants to lend on its behalf, in or around February 2006. In the course of their

12   discussions ranging from January 2006 until March 2006, Defendants and Loan Consultant

13   steered him into a negatively amortized PayOption ARM in the amount of $626,400.00 with an

14   interest rate at 7.875% for a term of 30 years. Little did Ewald know, however, the disclosed

15   interest rate was never "fixed" but applied to only his first monthly payment and could adjust

16   every month thereafter. The maximum interest rate is 12.000%. The amount of Ewald's

17   minimum monthly payment was "fixed" for 60 months and could adjust every 12 months

18   thereafter. When the amount of the minimum monthly payment is insufficient to cover the

19   amount of interest due, then the amount of that deficiency is added onto the unpaid principal

20   balance of his loan. The recast point of this loan is 115% of the original loan amount. This loan

21   was originated by GMAC, on the note and deed of trust Green Point Mortgage is identified as the

22   lender, and the loan is being serviced by GMAC.

23       The disclosures in Ewald's loan documents discussing negative amortization only frame

24   negative amortization as a mere **possibility** rather than a **certainty** when making the minimum

25   payment. However, the reality was that by making the minimum payment, negative amortization

26   was a *certainty*. Indeed, the payment schedule set forth in the Truth in Lending Disclosure

27   Statement ("TILDS"), which set forth what appeared to be the *required* payment schedule, fails

28   to disclose that making payments pursuant to the TILDS payment schedule *will* result in negative

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    amortization. Ewald was not provided, before entering into the loans, with any other payment

2    schedule or with any informed option to make payments different than those listed in the TILDS

3    payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS

4    Ewald would be deferring interest, or had Defendants disclosed the payment amounts sufficient

5    to avoid negative amortization from occurring, Ewald would not have entered into the loan.

6    **Defendants intentionally omitted a clear disclosure of the nature of Ewald's loan because**

7    **giving a clear explanation of how the loan worked would have punctured the illusion of a**

8    **low-payment, low interest rate loan**.

9          Further, Defendants and Loan Consultant advised him that he was eligible for a Low Doc

10    Loan. Unbeknownst to him at the time, Defendants and Loan Consultant used this low

11    documentation requirement to fraudulently inflate his income by $9,854.00, a factor of 54%; and

12    in doing so, Defendants and Loan Consultant caused him to be placed into a loan whose

13    payments he could not afford given his true, *un-inflated* monthly income. Defendants and Loan

14    Consultant altered Ewald's loan application without his knowing consent or authorization as

15    Loan Consultant completed Ewald's application without giving Ewald an opportunity to review

16    the loan application.

17          Defendants and Loan Consultant represented to Ewald that his monthly payment would

18    always be $2,014.75. Although the amount of Ewald's initial, disclosed minimum monthly

19    payment was $2,014.75, Defendants and Loan Consultant failed to clarify their partially true

20    representations and advise Ewald: (1) how the interest rate on his loan was calculated; (2) that

21    the initial, disclosed minimum monthly payment of $2,014.75 would not always be available; (3)

22    that the initial, disclosed minimum monthly payment would not be the permanent payment under

23    the loan despite Defendants' and  Loan Consultant's affirmative representations to the contrary;

24    (4) that by paying the initial, disclosed minimum monthly payment he would be definitively

25    deferring interest on his loan, increasing the principal balance of his loan every time he made the

26    minimum monthly payment; (5) that by paying the minimum monthly payment the principal

27    balance of his loan was certain to increase; or (6) his loan would be recast within a few years and

28    he would be forced to pay considerably higher payments.

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    Defendants and Loan Consultant also explicitly represented to Ewald that he could afford

2  his loan and further represented that he could shoulder the additional financial burden of

3  repaying his loan in consideration of his other existing debts; yet failed to disclose that the fully

4  amortized monthly payment on the loan was $4,541.83. Given Ewald's true monthly income of

5  $5,416.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio,

6  before any other debts are even considered, of over 84%- in excess of industry standard

7  underwriting guidelines, and in excess of Defendants' own underwriting guidelines. Defendants

8  and Loan Consultant further represented to Ewald that he could rely on the assessment that he

9  was "qualified" to mean that he could afford the loan. Because of Ewald's lack of familiarity

10  with how much debt a person can and should reasonably take on compared to his monthly

11  income, and because Ewald reasonably relied on Defendants' and Loan Consultant's expertise

12  that any payment he was "qualified" for would take into account what the maximum debt a

13  person such as Ewald should be shouldering was, Ewald reasonably believed Defendants' and

14  Loan Consultant's representations that he could afford his loan and its payments. Although

15  Defendants and the Loan Consultant represented to Ewald that he was "qualified" for his loan

16  and could afford his loan and its monthly payments, Defendants and the Loan Consultant misled

17  Ewald into believing that his monthly payments would always only be $2,014.75. Furthermore,

18  at no point did Defendants or Loan Consultant clarify Ewald's false belief and advise him that

19  $2,014.75 would not be his permanent payment under the loan, or that every time he made a

20  monthly payment in the amount of $2,014.75, which is less than interest only, he would be

21  deferring interest on his loan, increasing the principal balance of his loan.

22    In addition, Defendants and Loan Consultant represented that appraisals conducted by or

23  on behalf of Defendants were accurate and made in good faith. On or around February 2006, an

24  appraisal company under the direct control and supervision of Defendants conducted an appraisal

25  on Ewald's home, which was fraudulently inflated to a grossly and intentionally overstated

26  value. Defendants and Loan Consultant represented that, per appraisal, Ewald's home was worth

27  $755,000.00 at the time he entered into his loan, and that such a valuation was a true and correct

28  measure of his home's worth. The current fair market value of Ewald's home is approximately

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    $303,798.00. Ewald alleges that the appraisal was artificially inflated, and that he has suffered

2    damages in the amount of $451,202.00 ($755,000.00-$303,798.00) due to a substantial loss of

3    equity in his home as a result of Defendants' fraudulent inflation and other acts described herein.

4         Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

5    reputable and complied with industry standard underwriting guidelines and were engaged in

6    lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

7    made in good faith;  (3) Ewald could afford the loan ; (4) he was  "qualified" for his loan;  (5)

8    "qualified" meant that he could afford his loan; (6) Defendants would modify his loan in the

9    future; and (7) Defendants would refinance his loan in the future.

10        Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

11    otherwise improperly disclosed to Ewald that: (1) Defendants and Loan Consultant knew that he

12    could not and would not be able to afford his loan and that there was a very high probability that

13    he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan, and

14    did sell his loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

15    "qualification" process was for Defendants' own protection and not his; (4) that Defendants' and

16    Loan Consultant's representations that he was "qualified" to pay his loan was not intended to

17    communicate that he could actually "afford" the loan which he was being given; (5) Defendants

18    had abandoned its conventional lending business, prudent lending standards, and industry

19    standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Ewald's

20    home to require him to borrow more money with the knowledge that the true value of Ewald's

21    home was insufficient to justify the amount of Ewald's loan; or (7) Defendants knew that due to

22    its scheme of fraudulently manipulating and inflating property values throughout the State of

23    California that the real estate market would crash and Ewald would lose substantial equity in his

24    home.

25         Based on these misrepresentations and omissions, the material facts concerning Ewald's

26    loan were concealed from him, and he decided to move forward with his loan. On March 31,

27    2006, Ewald signed the loan and Deed of Trust, before a notary. Had he known the truth

28    however, Ewald would not have accepted the loan. As a result of Defendants' fraudulent acts

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    described throughout this complaint Ewald has lost substantial equity in his home, has damaged

2    or destroyed credit, and at the time Ewald entered into the loan his home was worth $755,000.00,

3    now his home is worth approximately $303,798.00. Ewald did not discover any of these

4    misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law,

5    and through a complete and thorough investigation of the loan documentation, and a discussion

6    of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this

7    complaint, were brought to light on or around September 22, 2011. (True and correct copy of the

8    aforementioned documents are attached hereto as *Exhibit 13*).

9        19.    Plaintiff Regina Faison ("Faison") discussed refinancing an existing mortgage on

10    her property located at 22791 Rumble Drive, Lake Forest, CA 92630 and A.P.N.:  614-082-40

11    with a loan consultant (the "Loan Consultant"), a representative and authorized agent of

12    Homecomings Financial, LLC, a correspondent of GMAC Mortgage and authorized by GMAC

13    Mortgage and Defendants herein (the "Defendants") to lend on its behalf, in or around October

14    2005. In the course of their discussions ranging from October 2005 until December 2005,

15    Defendants and Loan Consultant steered her into an Interest-Only ARM in the amount of

16    $576,000 with an interest rate at 6.500% for a term of 30 years. Little did Faison know, however,

17    payments made during the first ten years of her loan were Interest-Only. Faison was also not

18    advised that her interest rate was "fixed" for ten years and could adjust every month. This loan

19    was originated by GMAC and Defendants, on the note and deed of trust Homecomings

20    Financial, LLC is identified as the lender, and GMAC is currently servicing the loan.

21        Defendants and Loan Consultant represented to Faison that her monthly payment would

22    always be $3,120.00. Although the amount of Faison's initial, disclosed monthly payment was

23    $3,120.00, Defendants and Loan Consultant failed to clarify their partially true representations

24    and advise Faison that: (1) her monthly payment would not pay down any of their principal

25    balance during the Interest-Only period, or (2) her monthly payment would drastically increase at

26    the end of the Interest-Only period, or (3) the amount of her initial, disclosed monthly payment

27    would not remain "fixed" for the entire term of his loan.

28        Defendants and Loan Consultant also explicitly represented to Faison that she could

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1   afford her loan and further represented that she could shoulder the additional financial burden of

2   repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully

3   amortized monthly payment on the loan was $4,294.51. Given Faison's true monthly income of

4   $4,500, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio,

5   before any other debts are even considered, of over 95%- in excess of industry standard

6   underwriting guidelines, and in excess of Defendants' own underwriting guidelines. Defendants

7   and Loan Consultant further represented to Faison that she could rely on the assessment that she

8   was "qualified" to mean that she could afford the loan. Because of Faison's lack of familiarity

9   with how much debt a person can and should reasonably take on compared to her monthly

10  income, and because Faison reasonably relied on Defendants' and Loan Consultant's expertise

11  that any payment she was "qualified" for would take into account what the maximum debt a

12  person such as Faison should be shouldering was, Faison reasonably believed Defendants' and

13  Loan Consultant's representations that she could afford her loan and its payments. Although

14  Defendants and Loan Consultant represented to Faison that she was "qualified" for her loan and

15  could afford her loan and its monthly payments, Defendants and Loan Consultant misled Faison

16  into believing that her monthly payments would always only be $3,120.00. Furthermore, at no

17  point did Defendants or Loan Consultant clarify Faison's false belief and advise her that

18  $3,120.00 would not be her permanent payment under the loan, or that every time she made a

19  monthly payment in the amount of $3,120.00, she was not paying down any of her principal

20  balance.

21      In addition, Defendants and Loan Consultant represented that appraisals conducted by or

22  on behalf of Defendants were accurate and made in good faith. On or around November 2005, an

23  appraisal company under the direct control and supervision of Defendants conducted an appraisal

24  on Faison's home, which was fraudulently inflated to a grossly and intentionally overstated

25  value. Defendants and Loan Consultant represented that, per appraisal, Faison's home was worth

26  $800,000.00 at the time she entered into her loan, and that such a valuation was a true and

27  correct measure of her home's worth. The current fair market value of Faison's home is

28  approximately $510,000.00. Faison alleges that the appraisal was artificially inflated, and that

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    she has suffered damages in the amount of $290,000.00 ($800,000.00-$510,000.00) due to a

2    substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other

3    acts described herein.

4    Defendants and Loan Consultant also represented to Faison that she would be able to

5    refinance her loan at a later time. Faison relied on this assurance in deciding to enter into the

6    mortgage contract. However, Faison has not been able to refinance her loan. Defendants and

7    Loan Consultant also represented that it would modify Faison's loan, and did so, yet with

8    egregious terms. The terms of Faison's permanent modification require her to pay interest only

9    payments for the next ten years, maturing on February 10, 2016, then principal and interest

10   payments until the end of her loan term, being January 1, 2036. Defendant's loan modification

11   only allows 20 years, (February 10, 2016 until January 1, 2036) for Faison to pay off the full

12   principal balance of her loan. Should she fail to do so, a balloon payment of the remaining

13   amount will be due. Faison alleges that these loan terms are not beneficial, effectively worsening

14   her loan conditions, yet to no success has been able to obtain a more reasonable offer from

15   Defendants, despite numerous attempts.

16   Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

17   reputable and complied with industry standard underwriting guidelines and were engaged in

18   lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

19   made in good faith;  (3) Faison could afford the loan ; (4) she was "qualified" for her loan; (5)

20   "qualified" meant that she could afford her loan; (6) she would be able to modify her loan and

21   (7) she would be able to refinance her loan.

22   Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

23   otherwise improperly disclosed to Faison that: (1) Defendants and Loan Consultant knew that

24   she could not and would not be able to afford her loan and that there was a very high probability

25   that she would default and/or be foreclosed upon;  (2) Defendants had an incentive to sell her

26   loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

27   "qualification" process was for Defendants' own protection and not hers; (4) that Defendants'

28   and Loan Consultant's representations that she was "qualified" to pay her loan was not intended

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  to communicate that she could actually "afford" the loan which she was being given; (5)

2  Defendants had abandoned its conventional lending business, prudent lending standards, and

3  industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

4  Faison's home to require her to borrow more money with the knowledge that the true value of

5  Faison's home was insufficient to justify the amount of Faison's loan; or (7) Defendants knew

6  that due to its scheme of fraudulently manipulating and inflating property values throughout the

7  State of California that the real estate market would crash and Faison would lose substantial

8  equity in her home.

9       Based on these misrepresentations and omissions, the material facts concerning Faison's

10  loan were concealed from her, and she decided to move forward with her loan. On December 23,

11  2005, Faison signed the loan and Deed of Trust, before a notary. Had she known the truth

12  however, Faison would not have accepted the loan. As a result of Defendants' fraudulent acts

13  described throughout this complaint Faison has lost substantial equity in her home, has damaged

14  or destroyed credit, and at the time Faison entered into the loan her home was worth $800,000.00

15  now her home is worth approximately $510,000.00. Faison did not discover any of these

16  misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law,

17  and through a complete and thorough investigation of the loan documentation, and a discussion

18  of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this

19  complaint, were brought to light on or around February 3, 2012. (True and correct copy of the

20  aforementioned documents are attached hereto as *Exhibit 14*).

21       20.    Plaintiff Alejandra Ibarra ("Ibarra") discussed obtaining a mortgage to purchase

22  her home located at 2740 Lincoln Drive, San Bernardino, CA 92405 and A.P.N.: 0148-112-21-

23  0000 with a loan consultant (the "Loan Consultant"), a representative and authorized agent of

24  GMAC Mortgage and Defendants herein (the "Defendants"), in or around March 2008. In the

25  course of their discussions ranging from March 2008 until May 2008, Defendants and Loan

26  Consultant advised her to enter into a fixed rate loan in the amount of $156,750 with an interest

27  rate of 6.25%, for a term of 30 years. The loan was originated by GMAC, on the note and deed

28  of trust GMAC was identified as the lender, and the loan is being serviced by GMAC.

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    Defendants and Loan Consultant explicitly represented to Ibarra that she could afford her

2    loan; and further represented that she could shoulder the additional financial burden of repaying

3    her loan in consideration of her other existing debts. Defendants and Loan Consultant also

4    represented to her that she could afford a $1,446.10 monthly payment, despite her $2,480.00 true

5    monthly income (a "front-end" debt-to-income ratio, meaning a debt-to-income ratio, before any

6    other debts are even considered, of over 58%- in excess of industry standard underwriting

7    guidelines, and in excess of Defendants' own underwriting guidelines). Defendants and Loan

8    Consultant further represented to Ibarra that she could rely on the assessment that she was

9    "qualified" to mean that she could afford the loan. Because of Ibarra's lack of familiarity with

10    how much debt a person can and should reasonably take on compared to her monthly income,

11    and because Ibarra reasonably relied on Defendants' and Loan Consultant's expertise that any

12    payment she was "qualified" for would take into account what the maximum debt a person such

13    as Ibarra should be shouldering was, Ibarra reasonably believed Defendants' and Loan

14    Consultant's representations that she could afford her loan and its payments.

15    Defendants and Loan Consultant also represented to Ibarra that she would be able to

16    refinance her loan at a later time. Ibarra relied on this assurance in deciding to enter into the

17    mortgage contract. However, Ibarra was not been able to refinance her loan because her home

18    did not contain enough equity. Defendants and Loan Consultant also represented that it would

19    modify Ibarra's loan, and Ibarra relied on this representation in deciding to enter into the loan.

20    However, Ibarra was unable to modify her loan.

21    Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

22    reputable and complied with industry standard underwriting guidelines and were engaged in

23    lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

24    made in good faith; (3) Ibarra could afford the loan; (4) she was "qualified" for her loan; (5)

25    "qualified" meant that she could afford her loan; (6) she would be able to modify her loan and

26    (7) she would be able to refinance her loan.

27    Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

28    otherwise improperly disclosed to Ibarra that: (1) Defendants and Loan Consultant knew that she

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   could not and would not be able to afford her loan and that there was a very high probability that

2   she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her loan,

3   and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

4   "qualification" process was for Defendants' own protection and not hers; (4) that Defendants'

5   and Loan Consultant's representations that she was "qualified" to pay her loan was not intended

6   to communicate that she could actually "afford" the loan which she was being given; (5)

7   Defendants had abandoned its conventional lending business, prudent lending standards, and

8   industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

9   Ibarra's home to require her to borrow more money with the knowledge that the true value of

10   Ibarra's home was insufficient to justify the amount of Ibarra's loan; or (7) Defendants knew that

11   due to its scheme of fraudulently manipulating and inflating property values throughout the State

12   of California that the real estate market would crash and Ibarra would lose substantial equity in

13   her home.

14       Based on these misrepresentations, the material facts concerning Ibarra's loan were

15   concealed from her, and she decided to move forward with her loan. On May 13, 2008, Ibarra

16   signed the loan and Deed of Trust, before a notary. Had she known the truth however, Ibarra

17   would not have accepted the loan. As a result of Defendants' fraudulent acts described

18   throughout this complaint Ibarra has lost substantial equity in her home and has damaged or

19   destroyed credit. Ibarra did not discover any of these misrepresentations until after a consultation

20   with legal counsel at Brookstone Law, and through a complete and thorough investigation of the

21   loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the

22   Defendants, as described throughout this complaint, were brought to light on or around

23   December 10, 2011.

24       21.   Plaintiffs Julio and Maria Elena Del Cid ("Mr. and Mrs. Del Cid") discussed

25   refinancing an existing mortgage on their property located at 5424 Cimarron Street, Sherman

26   Oaks, CA 91423 with a loan consultant (the "Loan Consultant"), a representative and authorized

27   agent of GMAC Mortgage and Defendants herein (the "Defendants"), in or around April 2007.

28   In the course of their discussions ranging from April 2007 until June 2007, Defendants and Loan