### APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    Consultant steered them into an Interest-Only ARM in the amount of $400,000 with an interest

2    rate at 6.000% for a term of 30 years. Little did Mr. and Mrs. Del Cid know, however, payments

3    made during the first five years of their loan were Interest-Only. Mr. and Mrs. Del Cid were also

4    not advised that their interest rate was "fixed" for two months and could adjust every month

5    thereafter. The maximum interest rate is 9.950%. The loan was originated by GMAC, on the note

6    and deed of trust the GMAC was identified as the lender, and GMAC is currently servicing the

7    loan.

8         Defendants and Loan Consultant represented to Mr. and Mrs. Del Cid that their monthly

9    payment would always be $824.00. Although the amount of Mr. and Mrs. Del Cid's initial,

10   disclosed monthly payment was $824.00, Defendants and Loan Consultant failed to clarify their

11   partially true representations and advise Mr. and Mrs. Del Cid that: (1) their monthly payment

12   would not pay down any of their principal balance during the Interest-Only period, or (2) their

13   monthly payment would drastically increase at the end of the Interest-Only period, or (3) the

14   amount of their initial, disclosed monthly payment would not remain "fixed" for the entire term

15   of his loan.

16        Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Del Cid that

17   they could afford their loan and further represented that they could shoulder the additional

18   financial burden of repaying their loan in consideration of their other existing debts; yet failed to

19   disclose that the fully amortized monthly payment on the loan was $1,718.44. Given Mr. and

20   Mrs. Del Cid's true monthly income of $1,916.66, this represents a "front-end" debt-to-income

21   ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 89%-

22   in excess of industry standard underwriting guidelines, and in excess of Defendants' own

23   underwriting guidelines. Defendants and Loan Consultant further represented to Mr. and Mrs.

24   Del Cid that they could rely on the assessment that they were "qualified" to mean that they could

25   afford the loan. Because of Mr. and Mrs. Del Cid's lack of familiarity with how much debt a

26   person can and should reasonably take on compared to their monthly income, and because Mr.

27   and Mrs. Del Cid reasonably relied on Defendants' and Loan Consultant's expertise that any

28   payment they were "qualified" for would take into account what the maximum debt a person

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  such as Mr. and Mrs. Del Cid should be shouldering was, Mr. and Mrs. Del Cid reasonably

2  believed Defendants' and Loan Consultant's representations that they could afford their loan and

3  its payments.

4       Although Defendants and Loan Consultant represented to Mr. and Mrs. Del Cid that they

5  were "qualified" for their loan and could afford their loan and its monthly payments, Defendants

6  and Loan Consultant misled Mr. and Mrs. Del Cid into believing that their monthly payments

7  would always only be $824.00. Furthermore, at no point did Defendants or Loan Consultant

8  clarify Mr. and Mrs. Del Cid's false belief and advise them that $824.00 would not be their

9  permanent payment under the loan, or that every time they made a monthly payment in the

10  amount of $824.00, they were not paying down any of their principal balance.

11       In addition, Defendants and Loan Consultant represented that appraisals conducted by or

12  on behalf of Defendants were accurate and made in good faith. On or around May 2007, an

13  appraisal company under the direct control and supervision of Defendants conducted an appraisal

14  on Mr. and Mrs. Del Cid's home, which was fraudulently inflated to a grossly and intentionally

15  overstated value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs.

16  Del Cid's home was worth $500,000.00 at the time they entered into their loan, and that such a

17  valuation was a true and correct measure of their home's worth. The current fair market value of

18  Mr. and Mrs. Del Cid's home is approximately $247,367.00. Mr. and Mrs. Del Cid allege that

19  the appraisal was artificially inflated, and that they have suffered damages in the amount of

20  $252,633.00 ($500,000.00-$247,367.00) due to a substantial loss of equity in their home as a

21  result of Defendants' fraudulent inflation and other acts described herein.

22       Defendants and Loan Consultant also represented to Mr. and Mrs. Del Cid that they

23  would be able to refinance their loan at a later time. Mr. and Mrs. Del Cid relied on this

24  assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Del Cid have

25  not been able to refinance their loan.  Defendants and Loan Consultant also represented that it

26  would modify Mr. and Mrs. Del Cid's loan, and Mr. and Mrs. Del Cid relied on this

27  representation in deciding to enter into the loan. However, Mr. and Mrs. Del Cid were unable to

28  modify their loan.

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

2    reputable and complied with industry standard underwriting guidelines and were engaged in

3    lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

4    made in good faith; (3) Mr. and Mrs. Del Cid could afford the loan ; (4) they were "qualified" for

5    their loan; (5) "qualified" meant that they could afford their loan; (6) they would be able to

6    modify their loan; and (7) they would be able to refinance their loan.

7    Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

8    otherwise improperly disclosed to Mr. and Mrs. Del Cid that: (1) Defendants and Loan

9    Consultant knew that they could not and would not be able to afford their loan and that there was

10    a very high probability that they would default and/or be foreclosed upon;  (2) Defendants had an

11    incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants'

12    and Loan Consultant's "qualification" process was for Defendants' own protection and not

13    theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to

14    pay their loan was not intended to communicate that they could actually "afford" the loan which

15    they were being given; (5) Defendants had abandoned its conventional lending business, prudent

16    lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the

17    appraiser to over-value Mr. and Mrs. Del Cid's home to require them to borrow more money

18    with the knowledge that the true value of Mr. and Mrs. Del Cid's home was insufficient to justify

19    the amount of Mr. and Mrs. Del Cid's loan; or (7) Defendants knew that due to its scheme of

20    fraudulently manipulating and inflating property values throughout the State of California that

21    the real estate market would crash and Mr. and Mrs. Del Cid would lose substantial equity in

22    their home.

23    Based on these misrepresentations and omissions, the material facts concerning Mr. and

24    Mrs. Del Cid's loan were concealed from them, and they decided to move forward with their

25    loan. On June 26, 2007, Mr. and Mrs. Del Cid signed the loan and Deed of Trust, before a

26    notary. Had they known the truth however, Mr. and Mrs. Del Cid would not have accepted the

27    loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and

28    Mrs. Del Cid have lost substantial equity in their home, have damaged or destroyed credit, and at

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  the time Mr. and Mrs. Del Cid entered into the loan their home was worth $500,000.00, now

2  their home is worth approximately $247,367.00. Mr. and Mrs. Del Cid did not discover any of

3  these misrepresentations or omissions until after a consultation with legal counsel at Brookstone

4  Law, and through a complete and thorough investigation of the loan documentation, and a

5  discussion of the surrounding facts, the fraudulent acts of the Defendants, as described

6  throughout this complaint, were brought to light on or around January 23, 2012.

7       22.    Plaintiffs Mesbel Mohamoud and Michael Moultrie ("Mohamoud and Moultrie")

8  discussed obtaining a mortgage to purchase their home located at 425 East Ellis Avenue,

9  Inglewood, CA 90302 and A.P.N.: 4014-005-031with a Loan Consultant, a representative and

10  authorized agent of Metrocities Mortgage LLC, a correspondent lender of GMAC and

11  Defendants herein (the "Defendants") and authorized by Defendants to lend on its behalf, in or

12  around July 2006. In the course of their discussions ranging from July 2006 until September

13  2006, Defendants and Loan Consultant steered them into an Interest-Only ARM in the amount of

14  $417,000.00 with an interest rate at 7.000% for a term of 30 years. Little did Mohamoud and

15  Moultrie know, however, payments made during the first five years of their loan were Interest-

16  Only. Mohamoud and Moultrie were also not advised that their interest rate was "fixed" for five

17  years and could adjust every six months. The maximum interest rate is 13.000%. In addition,

18  Defendants and Loan Consultant also steered Mohamoud and Moultrie into a 30-year fixed rate

19  loan in the amount of $112, 000.00. These loans were originated by GMAC, on the note and

20  deed of trust Metrocities Mortgage LLC is identified as the lender, and GMAC is currently

21  servicing the loan.

22       Defendants and Loan Consultant represented to Mohamoud and Moultrie that their

23  monthly payment would always be $2,437.50. Although the amount of Mohamoud and

24  Moultrie's initial, disclosed monthly payment was $2,437.50, Defendants and Loan Consultant

25  failed to clarify their partially true representations and advise Mohamoud and Moultrie that: (1)

26  their monthly payment would not pay down any of their principal balance during the Interest-

27  Only period, or (2) their monthly payment would drastically increase at the end of the Interest-

28  Only period, or (3) the amount of their initial, disclosed monthly payment would not remain

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    "fixed" for the entire term of his loan.

2         Further, Defendants and Loan Consultant advised them that they were eligible for a Low

3    Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low

4    documentation requirement to fraudulently inflate their income; and in doing so, Defendants and

5    Loan Consultant caused them to be placed into a loan whose payments they could not afford

6    given their true, *un-inflated* monthly income. Defendants and Loan Consultant altered

7    Mohamoud and Moultrie's loan application without their knowing consent or authorization as

8    Loan Consultant completed Mahomoud and Moultrie's application without giving Mohamoud

9    and Moultrie an opportunity to review the loan application.

10         Defendants and Loan Consultant also explicitly represented to Mohamoud and

11    Moultriethat they could afford their loan and further represented that they could shoulder the

12    additional financial burden of repaying their loan in consideration of their other existing debts;

13    yet failed to disclose that the fully amortized monthly payment on the loan was $2,774.31. Given

14    Mohamoud and Moultrie's true monthly income of $4,500.00, this represents a "front-end" debt-

15    to-income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of

16    over 62%- in excess of industry standard underwriting guidelines, and in excess of Defendants'

17    own underwriting guidelines. Defendants and Loan Consultant further represented to Mohamoud

18    and Moultrie that they could rely on the assessment that they were "qualified" to mean that they

19    could afford the loan. Because of Mohamoud and Moultrie's lack of familiarity with how much

20    debt a person can and should reasonably take on compared to their monthly income, and because

21    Mohamoud and Moultrie reasonably relied on Defendants' and Loan Consultant's expertise that

22    any payment they were "qualified" for would take into account what the maximum debt a person

23    such as Mohamoud and Moultrie should be shouldering was, Mohamoud and Moultrie

24    reasonably believed Defendants' and Loan Consultant's representations that they could afford

25    their loan and its payments.

26         Although Defendants and Loan Consultant represented to Mohamoud and Moultrie that

27    they were "qualified" for their loan and could afford their loan and its monthly payments,

28    Defendants and Loan Consultant misled Mohamoud and Moultrie into believing that their

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   monthly payments would always only be $2,432.50. Furthermore, at no point did Defendants or

2   Loan Consultant clarify Mohamoud and Moultrie's false belief and advise them that $2,432.50

3   would not be their permanent payment under the loan, or that every time they made a monthly

4   payment in the amount of $2,432.50, they were not paying down any of their principal balance.

5          In addition, Defendants and Loan Consultant represented that appraisals conducted by or

6   on behalf of Defendants were accurate and made in good faith. On or around August 27, 2006,

7   an appraisal company under the direct control and supervision of Defendants conducted an

8   appraisal on Mohamoud and Moultrie's home, which was fraudulently inflated to an

9   intentionally overstated value. Defendants and Loan Consultant represented that, per appraisal,

10  Mohamoud and Moultrie's home was worth $529,000.00 at the time they entered into their loan,

11  and that such a valuation was a true and correct measure of their home's worth. The current fair

12  market value of Mohamoud's and Moultrie's home is approximately $164,383.00. Mohamoud

13  and Moultrie allege that the appraisal was artificially inflated, and that they have suffered

14  damages in the amount of $364,617.00 ($529,000.00-$164,383.00) due to a substantial loss of

15  equity in their home as a result of Defendants' fraudulent inflation and other acts described

16  herein.

17         Defendants and Loan Consultant also represented to Mohamoud and Moultrie that they

18  would be able to refinance their loan at a later time. Mohamoud and Moultrie relied on this

19  assurance in deciding to enter into the mortgage contract. However, Mohamoud and Moultrie

20  have not been able to refinance their loan because their modest income was insufficient to justify

21  the size of the loan. Defendants and Loan Consultant also represented that it would modify

22  Mohamoud and Moultrie's loan, and Mohamoud and Moultrie relied on this representation in

23  deciding to enter into the loan.

24         Mohamoud and Moultrie suffered from extreme financial hardship because their family

25  business went down due to the economic crisis that hit hard the entire country hard. Being unable

26  to afford their loan, Mohamoud and Moultrie applied for a loan modification under HAMP with

27  Defendants. Mohamoud and Moultrie were put in a three-month "Trial Payment Plan" in which

28  Defendants promised that if Mohamoud and Moultrie made timely trial payments, Defendants

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    would permanently modify their loan. During the course of the trial period, Mohamoud and

2    Moultrie complied with every term that Defendant requested such as making monthly payments

3    timely and submitting requested documents. However, near the end of the trial period Defendant

4    sent Mohamoud and Moultrie a denial letter for a modification because Defendants claimed that

5    Mohamoud and Moultrie failed to submit sufficient loan modification documents.

6        Desperate to save their home, Mohamoud and Moultrie from 2008 until 2010 never

7    stopped applying for a regular loan modification. After several attempts, in November 2010,

8    Defendants offered Mohamoud and Moultrie a permanent loan modification, but the offer

9    remained effective for only five days, which was close to the sale date on the Notice of Sale.

10   Without any choices, Mohamoud and Moutrie accepted the permanent loan modification in

11   which Defendants did not reduce the unpaid principal balance on the loan. In addition, the

12   monthly payment under the modification was only less than the original payment by less than

13   $100.00. Since modified mortgage payment did not relieve Mohamoud and Moultrie's mortgage

14   responsibility, they decided to appeal Defendants' denial of their HAMP application. However,

15   Defendants refused to consider the matter for Mohamoud and Moultrie. As of now Mohamoud

16   and Moutrie have not been able to modify their loan.

17       Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

18   reputable and complied with industry standard underwriting guidelines and were engaged in

19   lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

20   made in good faith; (3) Mohamoud and Moultrie could afford the loan; (4) they were "qualified"

21   for their loan; (5) "qualified" meant that they could afford their loan; (6) Defendants would

22   modify their loan in the future; and (7) they would be able to refinance their loan in the future.

23       Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

24   otherwise improperly disclosed to Mohamoud and Moultrie that: (1) Defendants and Loan

25   Consultant knew that they could not and would not be able to afford their loan and that there was

26   a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an

27   incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants'

28   and Loan Consultant's "qualification" process was for Defendants' own protection and not

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to

2  pay their loan was not intended to communicate that they could actually "afford" the loan which

3  they were being given; (5) Defendants had abandoned its conventional lending business, prudent

4  lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the

5  appraiser to over-value Mohamoud and Moultrie's home to require them to borrow more money

6  with the knowledge that the true value of Mohamoud and Moultrie's home was insufficient to

7  justify the amount of Mohamoud and Moultrie's loan; or (7) Defendants knew that due to its

8  scheme of fraudulently manipulating and inflating property values throughout the State of

9  California that the real estate market would crash and Mohamoud and Moultrie would lose

10  substantial equity in their home.

11        Based on these misrepresentations and omissions, the material facts concerning

12  Mohamoud and Moultrie's loan were concealed from them, and they decided to move forward

13  with their loan. On September 18, 2006, Mohamoud and Moultrie signed the loan and Deed of

14  Trust, before a notary. Had they known the truth however, Mohamoud and Moultrie would not

15  have accepted the loan. As a result of Defendants' fraudulent acts described throughout this

16  complaint Mohamoud and Moultrie have lost substantial equity in their home, have damaged or

17  destroyed credit, and at the time Mohamoud and Moultrie entered into the loan their home was

18  worth $529,000.00, now their home is worth approximately $164,383.00. Mohamoud and

19  Moultrie did not discover any of these misrepresentations or omissions until after a consultation

20  with legal counsel at Brookstone Law, and through a complete and thorough investigation of the

21  loan documentation, and a discussion of the surrounding facts, the fraudulent acts of the

22  Defendants, as described throughout this complaint, were brought to light on or around January

23  27, 2012. (True and correct copy of the aforementioned documents are attached hereto as ***Exhibit***

24  ***15***).

25        23.    Plaintiffs Willie Gilmore ("Gilmore") and Phyllis McCrea ("Mccrea") discussed

26  obtaining a mortgage to purchase their home located at 13844 Dellbrook Street, Corona, CA

27  92880 and A.P.N.: 130-443-016 with a Loan Consultant ("Loan Consultant") with Impac

28  Funding Corporation, a correspondent of GMAC and the Defendants herein (the "Defendants")

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    and authorized by Defendants to lend on its behalf, in or around June 2006. In the course of their

2    discussions ranging from June 2006 until August 2006, Loan Consultant and Defendants steered

3    them into an ARM balloon 40/30 loan in the amount of $580,000.00 with the interest rate at

4    6.900% for a term of 30 years. Little did Gilmore and Mccrea know, however, the loan was

5    amortized over 40 years, but payable in 30 years with a balloon payment. In addition, Defendants

6    and Loan Consultant steered them into a "piggy-bank" loan in the amount $145,000.00 for a

7    term of 15 years. These loans were originated by GMAC, on the note and deed of trust Impac

8    Funding Corporation is identified as the lender, and the loan is currently being serviced by

9    GMAC.

10           Further, Defendants and Loan Consultant advised them that they were eligible for a Low

11    Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low

12    documentation requirement to fraudulently inflate their income; and in doing so, Defendants and

13    Loan Consultant caused them to be placed into a loan whose payments they could not afford

14    given their true, *un-inflated* monthly income. Defendants and Loan Consultant altered Gilmore

15    and Mccrea's loan application without their knowing consent or authorization as Loan

16    Consultant completed Gilmore and Mccrea's application without giving Gilmore and Mccrea an

17    opportunity to review the loan application.

18           Defendants and Loan Consultant explicitly represented to Gilmore and Mccrea that they

19    could afford their loan; and further represented that they could shoulder the additional financial

20    burden of repaying their loan in consideration of their other existing debts. Defendants and Loan

21    Consultant also represented to them that they could afford a $3,562.25 monthly payment on the

22    first loan along with a $1,200.00 monthly payment on the "piggy-back" loan. Given Gilmore and

23    Mccrea's true monthly income of $11,000.00, this represents a "front-end" debt-to-income ratio,

24    meaning a debt-to-income ratio, before any other debts are even considered, of over 43%.

25    Defendants and Loan Consultant further represented to Gilmore and Mccrea that they could rely

26    on the assessment that they were "qualified" to mean that they could afford the loan. Because of

27    Gilmore and Mccrea's lack of familiarity with how much debt a person can and should

28    reasonably take on compared to their monthly income, and because Gilmore and Mccrea

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1   reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were

2   "qualified" for would take into account what the maximum debt a person such as Gilmore and

3   Mccrea should be shouldering was, Gilmore and Mccrea reasonably believed Defendants' and

4   Loan Consultant's representations that they could afford their loan and its payments.

5       In addition, Defendants and Loan Consultant represented that appraisals conducted by or

6   on behalf of Defendants were accurate and made in good faith. On or around July 13, 2006, an

7   appraisal company under the direct control and supervision of Defendants conducted an appraisal

8   on Gilmore and Mccrea's home, which was fraudulently inflated an intentionally overstated

9   value. The current fair market value of Gilmore and Mccrea's home is approximately

10   $291,550.00. Gilmore and Mccrea allege that the appraisal was artificially inflated, and that they

11   have suffered damages due to a substantial loss of equity in their home as a result of Defendants'

12   fraudulent inflation and other acts described herein.

13       Defendants and Loan Consultant also represented to Gilmore and Mccrea that they would

14   be able to refinance their loan at a later time. Gilmore and Mccrea relied on this assurance in

15   deciding to enter into the mortgage contract. However, Gilmore and Mccrea have not been able

16   to refinance their loan.

17       Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

18   reputable and complied with industry standard underwriting guidelines and were engaged in

19   lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

20   made in good faith; (3) Gilmore and Mccrea could afford the loan; (4) they were "qualified" for

21   their loan; (5) "qualified" meant that they could afford their loan; (6) Defendants would modify

22   their loan in the future; and (7) they would be able to refinance their loan in the future.

23       Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

24   otherwise improperly disclosed to Gilmore and Mccrea that: (1) Defendants and Loan Consultant

25   knew that they could not and would not be able to afford their loan and that there was a very high

26   probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to

27   sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan

28   Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan

2  was not intended to communicate that they could actually "afford" the loan which they were

3  being given; (5) Defendants had abandoned its conventional lending business, prudent lending

4  standards, and industry standard underwriting guidelines; (6) Defendants influenced the

5  appraiser to over-value Gilmore and Mccrea's home to require them to borrow more money with

6  the knowledge that the true value of Gilmore and Mccrea's home was insufficient to justify the

7  amount of Gilmore and Mccrea's loan; or (7) Defendants knew that due to its scheme of

8  fraudulently manipulating and inflating property values throughout the State of California that

9  the real estate market would crash and Gilmore and Mccrea would lose substantial equity in their

10  home.

11      Based on these misrepresentations, the material facts concerning Gilmore and Mccrea's

12  loan were concealed from them, and they decided to move forward with their loan. On August 3,

13  2006, Gilmore and Mccrea signed the loan and Deed of Trust, before a notary. Had they known

14  the truth however, Gilmore and Mccrea would not have accepted the loan. As a result of

15  Defendants' fraudulent acts described throughout this complaint Gilmore and Mccrea have lost

16  substantial equity in their home, have damaged or destroyed credit, and at the time Gilmore and

17  Mccrea entered into the loan their home was worth substantially higher than the current market

18  then, now their home is worth approximately $291,550.00. Gilmore and Mccrea did not discover

19  any of these misrepresentations until after a consultation with legal counsel at Brookstone Law,

20  and through a complete and thorough investigation of the loan documentation, and a discussion

21  of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this

22  complaint, were brought to light on or around February 15, 2012.

23      24.    Plaintiff Cecilia Chaube ("Chaube") discussed obtaining a mortgage to purchase

24  her home located at 2617 Ranchwood Drive, Brentwood, CA 94513 and A.P.N.: 007-350-019-

25  with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of Paul

26  Financial LLC., a correspondent lender of GMAC and Defendants herein (the "Defendants")

27  and authorized by Defendants to lend on its behalf, in or around August 2006. In the course of

28  their discussions ranging from August 2006 until October 2006, Defendants and Loan Consultant

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    steered her into a negatively amortized PayOption ARM in the amount of $516,000.00 with an

2    interest rate at 7.125% for a term of 40 years. Little did Chaube know, however, her minimum

3    payment was based on the interest rate at 1.375%, and the true interest accruing on her loan was

4    7.125%. The true interest rate of 7.125% was "fixed" for five years and could adjust every six

5    months thereafter. The maximum interest rate is 12.125%. The amount of Chaube's minimum

6    monthly payment was "fixed" for five years or until the mimimum payments reaches the recast

7    point of the loan of 115%, whichever occurs first. When the amount of the minimum monthly

8    payment is insufficient to cover the amount of interest due, then the amount of that deficiency is

9    added onto the unpaid principal balance of her loan. In addition, after the first five years or upon

10   the recast point of the loan, Chaube is obligate to make interest-only payments on the loan. This

11   loan was originated by GMAC, on the note and deed of trust Paul Financial LLC was identified

12   as the lender, and the loan is being serviced by GMAC.

13        Defendants and Loan Consultant represented to Chaube that her monthly payment would

14   always be $1,398.19. Although the amount of Chaube's initial, disclosed minimum monthly

15   payment was $1,398.19, Defendants and Loan Consultant failed to clarify their partially true

16   representations and advise Chaube: (1) how the interest rate on her loan was calculated; (2) that

17   the initial, disclosed minimum monthly payment of $1,398.19 would not always be available; (3)

18   that the initial, disclosed minimum monthly payment would not be the permanent payment under

19   the loan despite Defendants' and Loan Consultant's affirmative representations to the contrary;

20   (4) that by paying the initial, disclosed minimum monthly payment she would be definitively

21   deferring interest on her loan, increasing the principal balance of her loan every time she made

22   the minimum monthly payment; (5) that by paying the minimum monthly payment the principal

23   balance of her loan was certain to increase; or (6) her loan would be recast within a few years

24   and she would be forced to pay considerably higher payments.

25        The disclosures in Chaube's loan documents discussing negative amortization only frame

26   negative amortization as a mere **possibility** rather than a **certainty** when making the minimum

27   payment. However, the reality was that by making the minimum payment, negative amortization

28   was a *certainty*. Indeed, the payment schedule set forth in the Truth in Lending Disclosure

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1   Statement ("TILDS"), which set forth what appeared to be the *required* payment schedule, fails

2   to disclose that making payments pursuant to the TILDS payment schedule *will* result in negative

3   amortization. Chaube was not provided, before entering into the loans, with any other payment

4   schedule or with any informed option to make payments different than those listed in the TILDS

5   payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS

6   Chaube would be deferring interest, or had Defendants disclosed the payment amounts sufficient

7   to avoid negative amortization from occurring, Chaube would not have entered into the loan.

8   **Defendants intentionally omitted a clear disclosure of the nature of Chaube's loan because**

9   **giving a clear explanation of how the loan worked would have punctured the illusion of a**

10  **low-payment, low interest rate loan.**

11          Further, Defendants and Loan Consultant advised her that she was eligible for a Low Doc

12  Loan. Unbeknownst to her at the time, Defendants and Loan Consultant used this low

13  documentation requirement to fraudulently inflate her income by $12,284.00, a factor of 294%;

14  and in doing so, Defendants and Loan Consultant caused her to be placed into a loan whose

15  payments she could not afford given her true, *un-inflated* monthly income. Defendants and Loan

16  Consultant altered Chaube's loan application without her knowing consent or authorization as

17  Loan Consultant completed Chaube's application without giving Chaube an opportunity to

18  review the loan application.

19          Defendants and Loan Consultant also explicitly represented to Chaube that she could

20  afford her loan and further represented that she could shoulder the additional financial burden of

21  repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully

22  amortized monthly payment on the loan was $3,476.39. Given Chaube's true monthly income of

23  $4.166.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio,

24  before any other debts are even considered, of over 83%- in excess of industry standard

25  underwriting guidelines, and in excess of Defendants' own underwriting guidelines. Defendants

26  and Loan Consultant further represented to Chaube that she could rely on the assessment that she

27  was "qualified" to mean that she could afford the loan. Because of Chaube's lack of familiarity

28  with how much debt a person can and should reasonably take on compared to her monthly

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    income, and because Chaube reasonably relied on Defendants' and Loan Consultant's expertise

2    that any payment she was "qualified" for would take into account what the maximum debt a

3    person such as Chaube should be shouldering was, Chaube reasonably believed Defendants' and

4    Loan Consultant's representations that she could afford her loan and its payments.

5        Although Defendants and the Loan Consultant represented to Chaube that she was

6    "qualified" for her loan and could afford her loan and its monthly payments, Defendants and the

7    Loan Consultant misled Chaube into believing that her monthly payments would always only be

8    $1,398.19. Furthermore, at no point did Defendants or Loan Consultant clarify Chaube's false

9    belief and advise her that $1,398.19 would not be her permanent payment under the loan, or that

10    every time she made a monthly payment in the amount of $1,398.19, which is less than interest

11    only, she would be deferring interest on her loan, increasing the principal balance of her loan.

12        In addition, Defendants and Loan Consultant represented that appraisals conducted by or

13    on behalf of Defendants were accurate and made in good faith. On or around October 4, 2006, an

14    appraisal company under the direct control and supervision of Defendants conducted an appraisal

15    on Chaube's home, which was fraudulently inflated to an intentionally overstated value.

16    Chaube's loan documentation indicates that her home was worth $720,000.00 at the time they

17    entered into their loan. The current fair market value of Chaube's home is approximately

18    $258,917.00. Chaube alleges that the appraisal was artificially inflated, and that she has suffered

19    damages in the amount of $461,083.00 ($720,000.00-$258,917.00) due to a substantial loss of

20    equity in her home as a result of Defendants' fraudulent inflation and other acts described herein.

21        Defendants and Loan Consultant also represented that it would modify Chaube's loan,

22    and Chaube relied on this representation in deciding to enter into the loan. In addition, Chaube

23    was advised by a representative of Defendants, to stop making payments in order to be eligible

24    for a modification. Chaube relied on Defendants' and Defendants' representative's advice and

25    stopped making her monthly payments causing her to fall even further behind. However, Chaube

26    was unable to permanently modify her loan although she had complied with every term during

27    the trial modification period.

28        In addition, the foreclosure against Chaube was wrongful. The assignment deed of trust

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  (recorded June 27, 2012) noted MERS as the party assigning the beneficiary interest in the

2  property in its individual capacity to the foreclosing party (Central Mortgage Company).

3  However, under California law MERS is only a nominee acting on behalf of the true beneficiary,

4  and cannot initiate foreclosure in its own name. MERS can only act when acting in its nominal

5  capacity. Here, MERS assigned the interest in the Deed of Trust to Central Mortgage Company

6  in its own name, rendering the ADOT void. Accordingly, Central Mortgage Company was never

7  properly assigned the beneficiary interest as a foreclosing beneficiary of the Deed. Therefore,

8  any subsequent recorded documents based on that assignment in order to move forward with the

9  foreclosure sale would be void as well. Moreover, the foreclosure against Chaube was wrongful

10  because at the time the NOD was recorded (recorded June 27, 2012), the foreclosing trustee

11  (Trustee Corps) did not have the legal authority to initiate the foreclosure because the foreclosing

12  trustee was never properly substituted as trustee. The original trustee under the Deed of Trust

13  (recorded October 25, 2006) was Foundation Conveying, LLC.

14      Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

15  reputable and complied with industry standard underwriting guidelines and were engaged in

16  lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

17  made in good faith; (3) Chaube could afford the loan; (4) she was "qualified" for her loan; (5)

18  "qualified" meant that she could afford her loan; (6) Defendants would modify her loan in the

19  future; and (7) she would be able to refinance her loan in the future.

20      Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

21  otherwise improperly disclosed to Chaube that: (1) Defendants and Loan Consultant knew that

22  she could not and would not be able to afford her loan and that there was a very high probability

23  that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her

24  loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

25  "qualification" process was for Defendants' own protection and not hers; (4) that Defendants'

26  and Loan Consultant's representations that she was "qualified" to pay her loan was not intended

27  to communicate that she could actually "afford" the loan which she was being given; (5)

28  Defendants had abandoned its conventional lending business, prudent lending standards, and

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

2    Chaube's home to require them to borrow more money with the knowledge that the true value of

3    Chaube's home was insufficient to justify the amount of Chaube's loan; or (7) Defendants knew

4    that due to its scheme of fraudulently manipulating and inflating property values throughout the

5    State of California that the real estate market would crash and Chaube would lose substantial

6    equity in her home.

7          Based on these misrepresentations and omissions, the material facts concerning Chaube's

8    loan were concealed from her, and she decided to move forward with her loan. On October 25,

9    2006, Chaube signed the loan and Deed of Trust, before a notary. Had she known the truth

10   however, Chaube would not have accepted the loan. As a result of Defendants' fraudulent acts

11   described throughout this complaint Chaube has lost substantial equity in her home, has damaged

12   or destroyed credit, and at the time Chaube entered into the loan her home was worth

13   $720,000.00, now her home is worth approximately $258,917.00. Chaube did not discover any

14   of these misrepresentations or omissions until after a consultation with legal counsel at

15   Brookstone Law, and through a complete and thorough investigation of the loan documentation,

16   and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described

17   throughout this complaint, were brought to light on or around April 13, 2012. (True and correct

18   copy of the aforementioned documents are attached hereto as *Exhibit 16*).

19          25.    Plaintiff Magdalena Avila ("Avila") discussed obtaining a mortgage to purchase

20   her home located at 1015 Via Carmelita, Burbank, CA 91501 and A.P.N.: 5618-008-005 with a

21   Loan Consultant ("Loan Consultant"), a representative and authorized agent of Accredited Home

22   Lender, a correspondent lender of GMAC and Defendants herein (the "Defendants") and

23   authorized by Defendants to lend on its behalf, in or around January 2005. In the course of their

24   discussions ranging from January 2005 until March 2005, Defendants and Loan Consultant

25   advised her to enter a 30/40 balloon ARM loan in the amount of $742,500.00 with the interest

26   rate at 9.99%, and the maximum interest rate was 16.99%. Little did Avila know, however, the

27   loan was amortized over 40 years, but payable in 30 years with a balloon payment. This loan was

28   originated by GMAC, on the noted and deed of trust Accredited Home Lender is identified as the

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1   lender, and the loan is currently being serviced by GMAC.

2       Further, Defendants and Loan Consultant advised her that she was eligible for a Low Doc

3   Loan. Unbeknownst to her at the time, Defendants and Loan Consultant used this low

4   documentation requirement to fraudulently inflate her income; and in doing so, Defendants and

5   Loan Consultant caused her to be placed into a loan whose payments she could not afford given

6   her true, *un-inflated* monthly income. Defendants and Loan Consultant altered Avila's loan

7   application without her knowing consent or authorization as Loan Consultant completed Avila's

8   application without giving Avila an opportunity to review the loan application.

9       Defendants and Loan Consultant explicitly represented to Avila that she could afford her

10   loan; and further represented that she could shoulder the additional financial burden of repaying

11   her loan in consideration of her other existing debts. Defendants and Loan Consultant also

12   represented to her that she could afford a $6,299.00 monthly payment; yet failed to disclose that

13   the fully amortized monthly payment over a 30-year term on the loan was $6,510.00. Given

14   Avila's true monthly income of $7,000.00, this represents a "front-end" debt-to-income ratio,

15   meaning a debt-to-income ratio, before any other debts are even considered, of over 93%- in

16   excess of industry standard underwriting guidelines, and in excess of Defendants' own

17   underwriting guidelines. Defendants and Loan Consultant further represented to Avila that she

18   could rely on the assessment that she was "qualified" to mean that she could afford the loan.

19   Because of Avila's lack of familiarity with how much debt a person can and should reasonably

20   take on compared to her monthly income, and because Avila reasonably relied on Defendants'

21   and Loan Consultant's expertise that any payment she was "qualified" for would take into

22   account what the maximum debt a person such as Avila should be shouldering was, Avila

23   reasonably believed Defendants' and Loan Consultant's representations that she could afford her

24   loan and its payments.

25       In addition, Defendants and Loan Consultant represented that appraisals conducted by or

26   on behalf of Defendants were accurate and made in good faith. On July 9, 2005, an appraisal

27   company under the direct control and supervision of Defendants conducted an appraisal on

28   Avila's home to $825,000.00 – a grossly and intentionally overstated value. The current fair

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1   market value of Avila's home is approximately $384,200.00. Avila alleges that the appraisal was

2   artificially inflated, and that she has suffered damages in the amount of $440,800.00

3   ($825,000.00-$384,200.00) due to a substantial loss of equity in her home as a result of

4   Defendants' fraudulent inflation and other acts described herein.

5          Defendants and Loan Consultant also represented to Avila that she would be able to

6   refinance her loan at a later time. Avila relied on this assurance in deciding to enter into the

7   mortgage contract. However, Avila has not been able to refinance her loan. Defendants and Loan

8   Consultant also represented that it would modify Avila's loan, and Avila relied on this

9   representation in deciding to enter into the loan. However, Avila has not yet been able to modify

10  her loan with Defendants.

11         The foreclosure against Avila was wrongful because the ADOT (recorded June 29, 2011)

12  notes MERS as the party assigning the beneficiary interest in the property in its individual

13  capacity to the foreclosing party (the Bank of New York Mellon Trust Company). However,

14  under California law MERS is only a nominee acting on behalf of the true beneficiary, and

15  cannot initiate foreclosure in its own name. MERS can only act when acting in its nominal

16  capacity. Here, MERS assigned the interest in the Deed of Trust to Bank of New York Mellon

17  Trust Company in its own name, rendering its ADOT void. Accordingly, Bank of New York

18  Mellon Trust Company was never properly assigned the beneficiary interest as a foreclosing

19  beneficiary of the Deed. Therefore, any subsequent recorded documents based on that

20  assignment in order to move forward with the foreclosure sale would be ineffective as well.

21  Therefore, since the assignment of deed of trust from MERS to the foreclosing party (the Bank

22  of New York Mellon Trust Company) was void, it will render any subsequent transactions based

23  on that assignment such as NOD, as here, would be void ab initio.

24         Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

25  reputable and complied with industry standard underwriting guidelines and were engaged in

26  lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

27  made in good faith; (3) Avila could afford the loan; (4) she was "qualified" for her loan; (5)

28  "qualified" meant that she could afford her loan; (6) Defendants would modify her loan in the

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    future; and (7) she would be able to refinance her loan in the future.

2        Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

3    otherwise improperly disclosed to Avila that: (1) Defendants and Loan Consultant knew that she

4    could not and would not be able to afford her loan and that there was a very high probability that

5    she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her loan,

6    and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

7    "qualification" process was for Defendants' own protection and not hers; (4) that Defendants'

8    and Loan Consultant's representations that she was "qualified" to pay her loan was not intended

9    to communicate that she could actually "afford" the loan which she was being given; (5)

10    Defendants had abandoned its conventional lending business, prudent lending standards, and

11    industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

12    Avila's home to require her to borrow more money with the knowledge that the true value of

13    Avila's home was insufficient to justify the amount of Avila's loan; or (7) Defendants knew that

14    due to its scheme of fraudulently manipulating and inflating property values throughout the State

15    of California that the real estate market would crash and Avila would lose substantial equity in

16    her home.

17        Based on these misrepresentations, the material facts concerning Avila's loan were

18    concealed from her, and she decided to move forward with her loan. On October 24, 2005, Avila

19    signed the loan and Deed of Trust, before a notary. Had she known the truth however, Avila

20    would not have accepted the loan. As a result of Defendants' fraudulent acts described

21    throughout this complaint Avila has lost substantial equity in her home, has damaged or

22    destroyed credit, and at the time Avila entered into the loan her home was worth $825,000.00,

23    now her home is worth approximately $384,200.00. Avila did not discover any of these

24    misrepresentations until after a consultation with legal counsel at Brookstone Law, and through a

25    complete and thorough investigation of the loan documentation, and a discussion of the

26    surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint,

27    were brought to light on or around March 28, 2011. (True and correct copy of the

28    aforementioned documents are attached hereto as *Exhibit 17*).

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    26.    Plaintiffs Gricelda Ruano ("Ruano") and Elisa Jordan ("Jordan") discussed

2    refinancing an existing mortgage on their home located at 170 East Street Unit D9, Chula Vista,

3    CA 91910 and A.P.N.: 569-010-09-34 with a loan consultant (the "Loan Consultant"), and

4    representative and authorized agent of GMAC and the Defendants herein (the "Defendants"), in

5    or around April 2003. In the course of their discussions ranging from April 2003 until June 2003,

6    Defendants and Loan Consultant steered them into a loan of which the Defendants and Loan

7    Consultant concealed and inaccurately, incompletely or otherwise improperly disclosed the

8    material terms and information concerning the loan. This loan was originated by GMAC, on the

9    note and deed of trust GMAC is identified as the lender, and GMAC is currently servicing the

10    loan.

11    Defendants and Loan Consultant explicitly represented to Ruano and Jordan that they

12    could afford their loan; and further represented that they could shoulder the additional financial

13    burden of repaying their loan in consideration of their other existing debts.  Loan Consultant and

14    Defendants further represented to Ruano and Jordan that they could rely on the assessment that

15    they were "qualified" to mean that they could afford the loan.  Because of Ruano and Jordan's

16    lack of familiarity with how much debt a person can and should reasonably take on compared to

17    their monthly income, and because Ruano and Jordan reasonably relied on Defendants' and Loan

18    Consultant's expertise that any payment they were "qualified" for would take into account what

19    the maximum debt a person such as Ruano and Jordan should be shouldering was, Ruano and

20    Jordan reasonably believed Defendants' and Loan Consultant's representations that they could

21    afford their loan and its payments.

22    In addition, Defendants and Loan Consultant represented that appraisals conducted by or

23    on behalf of Defendants were accurate and made in good faith.  An appraisal company under the

24    direct control and supervision of Defendants conducted an appraisal on Ruano and Jordan's

25    home, which was fraudulently inflated to an intentionally overstated value. Ruano and Jordan

26    allege that the appraisal was artificially inflated, and that they have suffered damages due to a

27    substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other

28    acts described herein.

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    Loan Consultant and Defendants also represented to Ruano and Jordan that they would

2   be able to refinance their loan at a later time. Ruano and Jordan relied on this assurance in

3   deciding to enter into the mortgage contract. However, Ruano and Jordan have not been able to

4   refinance their loan. Loan Consultant and Defendants also represented that it would modify

5   Ruano and Jordan's loan, and Ruano and Jordan relied on this representation in deciding to enter

6   into the loan. In addition, Ruano and Jordan were advised by a representative and authorized

7   agent of Defendants to stop making payments in order to be eligible for a modification. Ruano

8   and Jordan relied on the Defendants' and the Defendants representative and authorized agents'

9   advice and stopped making their monthly payments causing them to fall even further behind.

10   However, Ruano and Jordan were unable to modify their loan and Defendants wrongfully

11   foreclosed on their home.

12    Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were

13   reputable and complied with industry standard underwriting guidelines and were engaged in

14   lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

15   made in good faith; (3) Ruano and Jordan could afford the loan; (4) They were "qualified" for

16   their loan; (5) "qualified" meant that they could afford their loan; (6) They would be able to

17   modify their loan in the future; and (7) They would be able to refinance their loan in the future.

18    Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or

19   otherwise improperly disclosed to Ruano and Jordan that: (1) Loan Consultant and Defendants

20   knew that they could not and would not be able to afford their loan and that there was a very high

21   probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to

22   sell their loan, and did sell their loan at fraudulently inflated prices; (3) Loan Consultant's and

23   Defendants' "qualification" process was for Defendants' own protection and not theirs; (4) That

24   Loan Consultant's and Defendants' representations that they were "qualified" to pay their loan

25   was not intended to communicate that they could actually "afford" the loan which they was

26   being given; (5) Defendants had abandoned its conventional lending business, prudent lending

27   standards, and industry standard underwriting guidelines; (6) Defendants influenced the

28   appraiser to over-value Ruano's and Jordan's home to require them to borrow more money with

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   the knowledge that the true value of Ruano and Jordan's home was insufficient to justify the

2   amount of Ruano's and Jordan's loan; or (7) Defendants knew that due to its scheme of

3   fraudulently manipulating and inflating property values throughout the State of California that

4   the real estate market would crash and Ruano and Jordan would lose substantial equity in their

5   home.

6         Based on these misrepresentations and omissions, the material facts concerning Ruano

7   and Jordan's loan were concealed from them, and they decided to move forward with their loan.

8   On June 20, 2003, Ruano and Jordan signed the loan and Deed of Trust, before a notary. Had

9   they known the truth however, Ruano and Jordan would not have accepted the loan. As a result

10   of the Defendants' fraudulent acts described throughout this complaint Ruano and Jordan have

11   lost substantial equity in their home, have damaged or destroyed credit, and at the time Ruano

12   and Jordan entered into the loan their home was worth substantially more than its current fair

13   market value. Ruano and Jordan did not discover any of these misrepresentations or omissions

14   until after a consultation with legal counsel at Brookstone Law, and through a complete and

15   thorough investigation of the loan documentation, and a discussion of the surrounding facts, the

16   fraudulent acts of the Defendants, as described throughout this complaint, were brought to light

17   on or around June 20, 2003.

18        27.     Plaintiff Lois Terrell Sullivan ("Sullivan") discussed refinancing an existing

19   mortgage on her property located at 43728 Santa Rosa Circle, Lancaster, CA 93553 and A.P.N.:

20   3150-035-056 with a Loan Consultant ("Loan Consultant"), a representative and authorized

21   agent of Secured Bankers Mortgage Company, a correspondent of GMAC and Defendants herein

22   (the "Defendants") and authorized by Defendants to lend on its behalf, in or around August

23   2005. In the course of their discussions ranging from August 2005 until October 2005,

24   Defendants and Loan Consultant steered her into an Interest-Only ARM in the amount of

25   $236,000.00 with an interest rate at 5.875% for a term of 30 years. Little did Sullivan know,

26   however, payments made during the first two years of her loan were Interest-Only. Sullivan was

27   also not advised that the interest rate was "fixed" for two years and could adjust every 12

28   months. The maximum interest rate is 11.875%. Loan Consultant recommended the loan,

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    representing that the loan was the best loan for Sullivan. The loan was originated by GMAC, on

2    the note and deed of trust Secured Bankers Mortgage Company is identified as the lender, and

3    the loan is currently being serviced by GMAC.

4        Defendants and Loan Consultant represented to Sullivan that her monthly payment would

5    always be $1,155.40. Although the amount of Sullivan's initial, disclosed monthly payment was

6    $1,155.40, Defendants and Loan Consultant failed to clarify their partially true representations

7    and advise Sullivan that: (1) her monthly payment would not pay down any of their principal

8    balance during the Interest-Only period, or (2) her monthly payment would drastically increase at

9    the end of the Interest-Only period, or (3) the amount of her initial, disclosed monthly payment

10    would not remain "fixed" for the entire term of his loan.

11        Defendants and Loan Consultant also explicitly represented to Sullivan that she could

12    afford her loan and further represented that she could shoulder the additional financial burden of

13    repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully

14    amortized monthly payment on the loan was $1,396.03. Given Sullivan's true monthly income of

15    $3,600.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio,

16    before any other debts are even considered, of over 39%. Defendants and Loan Consultant

17    further represented to Sullivan that she could rely on the assessment that she was "qualified" to

18    mean that she could afford the loan. Because of Sullivan's lack of familiarity with how much

19    debt a person can and should reasonably take on compared to her monthly income, and because

20    Sullivan reasonably relied on Defendants' and Loan Consultant's expertise that any payment she

21    was "qualified" for would take into account what the maximum debt a person such as Sullivan

22    should be shouldering was, Sullivan reasonably believed Defendants' and Loan Consultant's

23    representations that she could afford her loan and its payments.

24        Although Defendants and Loan Consultant represented to Sullivan that she was

25    "qualified" for her loan and could afford her loan and its monthly payments, Defendants and

26    Loan Consultant misled Sullivan into believing that her monthly payments would always only be

27    $1,155.40. Furthermore, at no point did Defendants or Loan Consultant clarify Sullivan's false

28    belief and advise her that $1,155.40 would not be her permanent payment under the loan, or that

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    every time she made a monthly payment in the amount of $1,155.40, she was not paying down

2    any of her principal balance.

3          In addition, Defendants and Loan Consultant represented that appraisals conducted by or

4    on behalf of Defendants were accurate and made in good faith. On or around September 15,

5    2005, an appraisal company under the direct control and supervision of Defendants conducted an

6    appraisal on Sullivan's home, which was fraudulently inflated to an intentionally overstated

7    value. Defendants and Loan Consultant represented that, per appraisal, Sullivan's home was

8    worth $295,000.00 at the time she entered into her loan, and that such a valuation was a true and

9    correct measure of her home's worth. The current fair market value of Sullivan's home is

10   approximately $88,174.00. Sullivan alleges that the appraisal was artificially inflated, and that

11   she has suffered damages in the amount of $206,826.00 ($295,000.00-$88,174.00) due to a

12   substantial loss of equity in her home as a result of Defendants' fraudulent inflation and other

13   acts described herein.

14         Defendants and Loan Consultant also represented to Sullivan that she would be able to

15   refinance her loan at a later time. Sullivan relied on this assurance in deciding to enter into the

16   mortgage contract. However, Sullivan has not been able to refinance her loan. Defendants and

17   Loan Consultant also represented that it would modify Sullivan's loan, and Sullivan relied on

18   this representation in deciding to enter into the loan. However, Sullivan was unable to modify

19   her loan. Defendants have rejected Sullivan's loan modification more than four times; Sullivan

20   as a result had to pay $8,000.00 in late fees. Currently Sullivan is doing everything she can to

21   avoid the foreclosure on her home.

22         Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

23   reputable and complied with industry standard underwriting guidelines and were engaged in

24   lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

25   made in good faith; (3) Sullivan could afford the loan; (4) she was "qualified" for her loan; (5)

26   "qualified" meant that she could afford her loan; (6) Defendants would modify her loan in the

27   future; and (7) she would be able to refinance her loan in the future.

28         Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   otherwise improperly disclosed to Sullivan that: (1) Defendants and Loan Consultant knew that

2   she could not and would not be able to afford her loan and that there was a very high probability

3   that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her

4   loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

5   "qualification" process was for Defendants' own protection and not hers; (4) that Defendants'

6   and Loan Consultant's representations that she was "qualified" to pay her loan was not intended

7   to communicate that she could actually "afford" the loan which she was being given; (5)

8   Defendants had abandoned its conventional lending business, prudent lending standards, and

9   industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

10  Sullivan's home to require her to borrow more money with the knowledge that the true value of

11  Sullivan's home was insufficient to justify the amount of Sullivan's loan; or (7) Defendants

12  knew that due to its scheme of fraudulently manipulating and inflating property values

13  throughout the State of California that the real estate market would crash and Sullivan would

14  lose substantial equity in her home.

15        Based on these misrepresentations and omissions, the material facts concerning

16  Sullivan's loan were concealed from her, and she decided to move forward with her loan. On

17  October 10, 2005, Sullivan signed the loan and Deed of Trust, before a notary. Had she known

18  the truth however, Sullivan would not have accepted the loan. As a result of Defendants'

19  fraudulent acts described throughout this complaint Sullivan has lost substantial equity in her

20  home, has damaged or destroyed credit, and at the time Sullivan entered into the loan her home

21  was worth $295,000.00, now her home is worth approximately $88,174.00. Sullivan did not

22  discover any of these misrepresentations or omissions until after a consultation with legal

23  counsel at Brookstone Law, and through a complete and thorough investigation of the loan

24  documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants,

25  as described throughout this complaint, were brought to light on or around March 22, 2012. .

26  (True and correct copy of the aforementioned documents are attached hereto as *Exhibit 18*).

27        28.    Plaintiff Gloria Portillo's ("Portillo") individualized allegations have been

28  intentionally omitted. Portillo is negotiating dismissal of all claims.

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

29.     Plaintiff Florastene Holden ("Holden") discussed refinancing an existing mortgage on her property located at 2114 Oak Crest Drive, Riverside, CA 92506 and A.P.N.: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 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of Wholesale Cap Corporation, a correspondent of GMAC and Defendants herein (the "Defendants") and authorized by Defendants to lend on its behalf, in or around August 2004. In the course of their discussions ranging from August 2004 until October 2004, Defendants and Loan Consultant steered her into an Interest-Only ARM in the amount of $338,000.00 with an interest rate at 4.500% for a term of 30 years. Little did Holden know, however, payments made during the first five years of the loan were Interest-Only. Holden also was not advised that the interest rate was "fixed" for five years and could adjust every six months. The maximum interest rate is 10.500%. This loan was originated by GMAC, on the note and deed of trust Wholesale Cap Corporation is identified as the lender, and the loan is currently being serviced by GMAC.

Defendants and Loan Consultant represented to Holden that her monthly payment would always be $1,267.50. Although the amount of Holden's initial monthly payment was $1,267.50, Defendants and Loan Consultant failed to clarify their partially true representations and advise Holden that: (1) her monthly payment would not pay down any of their principal balance during the Interest-Only period, or (2) her monthly payment would drastically increase at the end of the Interest-Only period, or (3) the amount of her initial monthly payment would not remain "fixed" for the entire term of his loan.

Further, Defendants and Loan Consultant advised her that she was eligible for a Low Doc Loan. Unbeknownst to her at the time, Defendants and Loan Consultant used this low documentation requirement to fraudulently inflate her income; and in doing so, Defendants and Loan Consultant caused her to be placed into a loan whose payments she could not afford given her true, *un-inflated* monthly income. Defendants and Loan Consultant altered Holden's loan application without her knowing consent or authorization as Loan Consultant completed Holden's application without giving Holden an opportunity to review the loan application.

Defendants and Loan Consultant also explicitly represented to Holden that she could

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1  afford her loan and further represented that she could shoulder the additional financial burden of

2  repaying her loan in consideration of her other existing debts; yet failed to disclose that the fully

3  amortized monthly payment on the loan was $1,712.60. Defendants and Loan Consultant further

4  represented to Holden that she could rely on the assessment that she was "qualified" to mean that

5  she could afford the loan. Because of Holden's lack of familiarity with how much debt a person

6  can and should reasonably take on compared to her monthly income, and because Holden

7  reasonably relied on Defendants' and Loan Consultant's expertise that any payment she was

8  "qualified" for would take into account what the maximum debt a person such as Holden should

9  be shouldering was, Holden reasonably believed Defendants' and Loan Consultant's

10  representations that she could afford her loan and its payments.

11     Although Defendants and Loan Consultant represented to Holden that she was

12  "qualified" for her loan and could afford her loan and its monthly payments, Defendants and

13  Loan Consultant misled Holden into believing that her monthly payments would always only be

14  $1,712.60.  Furthermore, at no point did Defendants or Loan Consultant clarify Holden's false

15  belief and advise her that $1,712.60 would not be her permanent payment under the loan, or that

16  every time she made a monthly payment in the amount of $1,712.60, she was not paying down

17  any of her principal balance.

18     In addition, Defendants and Loan Consultant represented that appraisals conducted by or

19  on behalf of Defendants were accurate and made in good faith. On or around September 25,

20  2004, an appraisal company under the direct control and supervision of Defendants conducted an

21  appraisal on Holden's home, which was fraudulently inflated to an intentionally overstated value.

22  The current fair market value of Holden's home is approximately $123,876.00. Holden alleges

23  that the appraisal was artificially inflated, and that she has suffered damages due to a substantial

24  loss of equity in her home as a result of Defendants' fraudulent inflation and other acts described

25  herein.

26     Defendants and Loan Consultant also represented to Holden that she would be able to

27  refinance her loan at a later time. Holden relied on this assurance in deciding to enter into the

28  mortgage contract. However, Holden has not been able to refinance her loan. Defendants and

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   Loan Consultant also represented that it would modify Holden's loan, and Holden relied on this

2   representation in deciding to enter into the loan. In addition, However, Holden was unable to

3   modify her loan. When Holden experienced financial difficulty, she contacted Defendants for

4   help in making mortgage payments. Defendants' representative promised that Defendants would

5   modify her loan in condition that she paid $6,000.00. Although Holden followed the

6   representative's advice and made a payment of $6,000.00 per Defendants' requests, Defendants

7   rejected Holden's modification.

8       The foreclosure initiated against Holden was wrongful. At the time the NOD was

9   recorded (on July 20, 2012), the foreclosing trustee (Executive Trustee Services) did not have yet

10  the legal authority to conduct a trustee's sale because it was not yet substituted as trustee of the

11  Deed of Trust. Under California law, a trustee's sale conducted by an unauthorized trustee is

12  void as a matter law. Accordingly, any subsequent foreclosure sale based on that NOD is also

13  void ab initio.

14      Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

15  reputable and complied with industry standard underwriting guidelines and were engaged in

16  lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

17  made in good faith; (3) Holden could afford the loan; (4) she was "qualified" for her loan; (5)

18  "qualified" meant that she could afford her loan; (6) Defendants would modify her loan in the

19  future; and (7) she would be able to refinance her loan in the future.

20      Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

21  otherwise improperly disclosed to Holden that: (1) Defendants and Loan Consultant knew that

22  she could not and would not be able to afford her loan and that there was a very high probability

23  that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her

24  loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

25  "qualification" process was for Defendants' own protection and not hers; (4) that Defendants'

26  and Loan Consultant's representations that she was "qualified" to pay her loan was not intended

27  to communicate that she could actually "afford" the loan which she was being given; (5)

28  Defendants had abandoned its conventional lending business, prudent lending standards, and

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

2  Holden's home to require her to borrow more money with the knowledge that the true value of

3  Holden's home was insufficient to justify the amount of Holden's loan; or (7) Defendants knew

4  that due to its scheme of fraudulently manipulating and inflating property values throughout the

5  State of California that the real estate market would crash and Holden would lose substantial

6  equity in her home.

7        Based on these misrepresentations and omissions, the material facts concerning Holden's

8  loan were concealed from her, and she decided to move forward with her loan. On October 9,

9  2004, Holden signed the loan and Deed of Trust, before a notary. Had she known the truth

10  however, Holden would not have accepted the loan. As a result of Defendants' fraudulent acts

11  described throughout this complaint Holden has lost substantial equity in her home, has damaged

12  or destroyed credit, and at the time Holden entered into the loan her home was worth

13  substantially higher than the current market value then, now her home is worth approximately

14  $123,876.00. Holden did not discover any of these misrepresentations or omissions until after a

15  consultation with legal counsel at Brookstone Law, and through a complete and thorough

16  investigation of the loan documentation, and a discussion of the surrounding facts, the fraudulent

17  acts of the Defendants, as described throughout this complaint, were brought to light on or

18  around March 30, 2012.  (True and correct copy of the aforementioned documents are attached

19  hereto as *Exhibit 19*).

20        30.   Plaintiff Marco and Manuela Badilla ("Mr. and Mrs. Badilla") discussed

21  refinancing an existing mortgage on their property located at Address 14355 Stuard Drive,

22  Moreno Valley, CA 92553 and APN 484-153-014 with a Loan Consultant ("Loan Consultant"),

23  a representative and authorized agent of GMAC and Defendants herein (the "Defendant"), in or

24  around March 2006. In the course of their discussions ranging from March 2006 until May 2006,

25  Defendants and Loan Consultant steered them into an Interest-Only ARM in the amount of

26  $274,000.00 with an interest rate at 6.375% for a term of 30 years. Little did Mr. and Mrs.

27  Badilla know, however, payements made during the first five years were Interest-Only. Mr. and

28  Mrs. Badilla also were not advised that the interest rate was "fixed" for five years and could

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  adjust every 12 months. The maximum interest rate is 11.375%. This loan was originated by

2  GMAC, on the note and deed of trust GMAC is identified as the lender, and the loan is currently

3  being serviced by GMAC.

4       Defendants and Loan Consultant represented to Mr. and Mrs. Badilla that their monthly

5  payment would always be $1,455.63. Although the amount of Mr. and Mrs. Badilla's initial,

6  disclosed monthly payment was $1,455.63, Defendants and Loan Consultant failed to clarify

7  their partially true representations and advise Mr. and Mrs. Badilla that: (1) their monthly

8  payment would not pay down any of their principal balance during the Interest-Only period, or

9  (2) their monthly payment would drastically increase at the end of the Interest-Only period, or

10  (3) the amount of their initial, disclosed monthly payment would not remain "fixed" for the

11  entire term of his loan.

12       Further, Defendants and Loan Consultant advised them that they were eligible for a Low

13  Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low

14  documentation requirement to fraudulently inflate their income; and in doing so, Defendants and

15  Loan Consultant caused them  to be placed into a loan whose payments they could not afford

16  given their true, *un-inflated* monthly income. Defendants and Loan Consultant altered Mr. and

17  Mrs. Badilla's loan application without their knowing consent or authorization as Loan

18  Consultant completed Mr. and Mrs. Badilla's application without giving Mr. and Mrs. Badilla an

19  opportunity to review the loan application.

20       Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Badilla that

21  they could afford their loan and further represented that they could shoulder the additional

22  financial burden of repaying their loan in consideration of their other existing debts; yet failed to

23  disclose that the fully amortized monthly payment on the loan was $1,709.40. Given Mr. and

24  Mrs. Badilla's true monthly income of $4,000.00, this represents a "front-end" debt-to-income

25  ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 43%.

26  Defendants and Loan Consultant further represented to Mr. and Mrs. Badilla that they could rely

27  on the assessment that they were "qualified" to mean that they could afford the loan. Because of

28  Mr. and Mrs. Badilla's lack of familiarity with how much debt a person can and should

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  reasonably take on compared to their monthly income, and because Mr. and Mrs. Badilla

2  reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were

3  "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs.

4  Badilla should be shouldering was, Mr. and Mrs. Badilla reasonably believed Defendants' and

5  Loan Consultant's representations that they could afford their loan and its payments.

6        Although Defendants and Loan Consultant represented to Mr. and Mrs. Badilla that they

7  were "qualified" for their loan and could afford their loan and its monthly payments, Defendants

8  and Loan Consultant misled Mr. and Mrs. Badilla into believing that their monthly payments

9  would always only be $1,455.63. Furthermore, at no point did Defendants or Loan Consultant

10  clarify Mr. and Mrs. Badilla's false belief and advise them that $1,455.63 would not be their

11  permanent payment under the loan, or that every time they made a monthly payment in the

12  amount of $1,455.63, they were not paying down any of their principal balance.

13        In addition, Defendants and Loan Consultant represented that appraisals conducted by or

14  on behalf of Defendants were accurate and made in good faith. On May 25, 2006, an appraisal

15  company under the direct control and supervision of Defendants conducted an appraisal on Mr.

16  and Mrs. Badilla's home to $425,000.00 - an intentionally overstated value. The current fair

17  market value of Mr. and Mrs. Badilla's home is approximately $111,939.00. Mr. and Mrs.

18  Badilla allege that the appraisal was artificially inflated, and that they have suffered damages in

19  the amount of $313,061.00 ($425,000.00-$111,939.00) due to a substantial loss of equity in their

20  home as a result of Defendants' fraudulent inflation and other acts described herein.

21        Defendants and Loan Consultant also represented to Mr. and Mrs. Badilla that they

22  would be able to refinance their loan at a later time. Mr. and Mrs. Badilla relied on this assurance

23  in deciding to enter into the mortgage contract. However, Mr. and Mrs. Badilla have not been

24  able to refinance their loan. Defendants and Loan Consultant also represented that it would

25  modify Mr. and Mrs. Badilla's loan, and Mr. and Mrs. Badilla relied on this representation in

26  deciding to enter into the loan. When Mr. and Mrs. Badilla experienced financial difficulty, they

27  sought Defendants' assistance in repaying their loan in May 2009. Mr. and Mrs. Badilla were

28  advised by a representative of Defendants, to stop making payments in order to be eligible for a

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   modification. However, Mr. and Mrs. Badilla were unable to modify their loan.

2       Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

3   reputable and complied with industry standard underwriting guidelines and were engaged in

4   lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

5   made in good faith; (3) Mr. and Mrs. Badilla could afford the loan; (4) they were "qualified" for

6   their loan; (5) "qualified" meant that they could afford their loan; (6) Defendants would modify

7   their loan in the future; and (7) they would be able to refinance their loan in the future.

8       Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

9   otherwise improperly disclosed to Mr. and Mrs. Badilla that: (1) Defendants and Loan

10  Consultant knew that they could not and would not be able to afford their loan and that there

11  was a very high probability that they would default and/or be foreclosed upon; (2) Defendants

12  had an incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3)

13  Defendants' and Loan Consultant's "qualification" process was for Defendants' own protection

14  and not theirs; (4) that Defendants' and Loan Consultant's representations that they were

15  "qualified" to pay their loan was not intended to communicate that they could actually "afford"

16  the loan which they were being given; (5) Defendants had abandoned its conventional lending

17  business, prudent lending standards, and industry standard underwriting guidelines; (6)

18  Defendants influenced the appraiser to over-value Mr. and Mrs. Badilla's home to require them

19  to borrow more money with the knowledge that the true value of Mr. and Mrs. Badilla's home

20  was insufficient to justify the amount of Mr. and Mrs. Badilla's loan; or (7) Defendants knew

21  that due to its scheme of fraudulently manipulating and inflating property values throughout the

22  State of California that the real estate market would crash and Mr. and Mrs. Badilla would lose

23  substantial equity in their home.

24      Based on these misrepresentations and omissions, the material facts concerning Mr. and

25  Mrs. Badilla's loan were concealed from them, and they decided to move forward with their

26  loan. On May 25, 2006, Mr. and Mrs. Badilla signed the loan and Deed of Trust, before a notary.

27  Had they known the truth however, Mr. and Mrs. Badilla would not have accepted the loan. As a

28  result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Badilla

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr.

2  and Mrs. Badilla entered into the loan their home was worth $425,000.00, now their home is

3  worth approximately $11,939.00. Mr. and Mrs. Badilla did not discover any of these

4  misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law,

5  and through a complete and thorough investigation of the loan documentation, and a discussion

6  of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this

7  complaint, were brought to light on or around April 12, 2012. (True and correct copy of the

8  aforementioned documents are attached hereto as ***Exhibit 20***).

9          31.    Plaintiffs Ignacio Rodriguez and Rosa Rodriguez (Mr. and Mrs. Rodriguez)

10  discussed refinancing an existing mortgage on their property located at 2714 Norton Avenue,

11  Lynwood, CA 90262 and A.P.N.: 6170-011-004 with a Loan Consultant ("Loan Consultant"), a

12  representative and authorized agent of Greenpoint Mortgage Funding, Inc., a correspondent of

13  GMAC and Defendants herein (the "Defendants") and authorized by Defendants to lend on its

14  behalf, in or around November 2006. In the course of their discussions ranging from November

15  2006 until January 2006, Defendants and Loan Consultant steered them into a negatively

16  amortized PayOption ARM in the amount of $312,000.00 with an interest rate at 2.75% for a

17  term of 30 years. Little did Mr. and Mrs. Rodriguez know, however, the interest rate was never

18  "fixed" but applied to only their first monthly payment and could adjust every month thereafter.

19  The maximum interest rate is 12.000%. The amount of Mr. and Mrs. Rodriguez's minimum

20  monthly payment was "fixed" for five months and could adjust every 12 months thereafter.

21  When the amount of the minimum monthly payment is insufficient to cover the amount of

22  interest due, then the amount of that deficiency is added onto the unpaid principal balance of

23  their loan. The recast point of this loan is 110% of the original loan amount.  Defendants and

24  Loan Consultant recommended the loan, representing that Defendants were honest and reputable

25  in their lending practice. In addition, the loan consultant also represented that the loan was the

26  best loan for Mr. and Mrs. Rodriguez, and the fixed rate loan Mr. and Mrs. Rodriguez wanted to

27  get was no longer available in the real estate market. In addition to the PayOption ARM loan,

28  Defendants and Loan Consultant also steered Mr. and Mrs. Rodriguez into a HELOC in the

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    amount of $39,000.00. These loans were originated by GMAC, on the note and deed of trust

2    Greenpoint Mortgage Funding, Inc. is identified as the lender, and the loan is currently being

3    serviced by GMAC.

4              Defendants and Loan Consultant represented to Mr. and Mrs. Rodriguez that their

5    monthly payment would always be $1,273.72. Although the amount of Mr. and Mrs. Rodriguez's

6    initial, disclosed minimum monthly payment was $1,273.72, Defendants and Loan Consultant

7    failed to clarify their partially true representations and advise Mr. and Mrs. Rodriguez: (1) how

8    the interest rate on their loan was calculated; (2) that the initial, disclosed minimum monthly

9    payment of $1,273.72 would not always be available; (3) that the initial, disclosed minimum

10    monthly payment would not be the permanent payment under the loan despite Defendants' and

11    Loan Consultant's affirmative representations to the contrary; (4) that by paying the initial,

12    disclosed minimum monthly payment they would be definitively deferring interest on their loan,

13    increasing the principal balance of their loan every time they made the minimum monthly

14    payment; (5) that by paying the minimum monthly payment the principal balance of their loan

15    was certain to increase; or (6) their loan would be recast within a few years and they would be

16    forced to pay considerably higher payments.

17              The disclosures in Mr. and Mrs. Rodriguez's loan documents discussing negative

18    amortization only frame negative amortization as a mere **possibility** rather than a **certainty** when

19    making the minimum payment. However, the reality was that by making the minimum payment,

20    negative amortization was a *certainty*. Indeed, the payment schedule set forth in the Truth in

21    Lending Disclosure Statement ("TILDS"), which set forth what appeared to be the *required*

22    payment schedule, fails to disclose that making payments pursuant to the TILDS payment

23    schedule *will* result in negative amortization. Mr. and Mrs. Rodriguez were not provided, before

24    entering into the loans, with any other payment schedule or with any informed option to make

25    payments different than those listed in the TILDS payment schedule. Had Defendants disclosed

26    that by making the payment pursuant to the TILDS Mr. and Mrs. Rodriguez would be deferring

27    interest, or had Defendants disclosed the payment amounts sufficient to avoid negative

28    amortization from occurring, Mr. and Mrs. Rodriguez would not have entered into the loan.

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    **Defendants intentionally omitted a clear disclosure of the nature of Mr. and Mrs.**

2    **Rodriguez's loan because giving a clear explanation of how the loan worked would have**

3    **punctured the illusion of a low-payment, low interest rate loan**.

4          Defendants and Loan Consultant altered Mr. and Mrs. Rodriguez's loan application

5    without their knowing consent or authorization as Loan Consultant completed Mr. and Mrs.

6    Rodriguez's application without giving Mr. and Mrs. Rodriguez an opportunity to review the

7    loan application. Unbeknownst to them at the time, Defendants and Loan Consultant used this

8    low documentation requirement to fraudulently inflate their income; and in doing so, Defendants

9    and Loan Consultant caused them to be placed into a loan whose payments they could not afford

10    given their true, *un-inflated* monthly income.

11          Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Rodriguez

12    that they could afford their loan and further represented that they could shoulder the additional

13    financial burden of repaying their loan in consideration of their other existing debts; yet failed to

14    disclose that the fully amortized monthly payment on the loan was $2,102.00. Mr. and Mrs.

15    Rodriguez were also obligated to make a $149.59 monthly payment on HELOC. Given Mr. and

16    Mrs. Rodriguez's true monthly income of $5,200.00, this represents a "front-end" debt-to-

17    income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of

18    over 43%. Defendants and Loan Consultant further represented to Mr. and Mrs. Rodriguez that

19    they could rely on the assessment that they were "qualified" to mean that they could afford the

20    loan. Because of Mr. and Mrs. Rodriguez's lack of familiarity with how much debt a person can

21    and should reasonably take on compared to their monthly income, and because Mr. and Mrs.

22    Rodriguez reasonably relied on Defendants' and Loan Consultant's expertise that any payment

23    they were "qualified" for would take into account what the maximum debt a person such as Mr.

24    and Mrs. Rodriguez should be shouldering was, Mr. and Mrs. Rodriguez reasonably believed

25    Defendants' and Loan Consultant's representations that they could afford their loan and its

26    payments.

27          Although Defendants and the Loan Consultant represented to Mr. and Mrs. Rodriguez

28    that they were "qualified" for their loan and could afford their loan and its monthly payments,

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    Defendants and the Loan Consultant misled Mr. and Mrs. Rodriguez into believing that their

2    monthly payments would always only be $1,273.72. Furthermore, at no point did Defendants or

3    Loan Consultant clarify Mr. and Mrs. Rodriguez's false belief and advise them that $1,273.72

4    would not be their permanent payment under the loan, or that every time they made a monthly

5    payment in the amount of $1,273.72, which is less than interest only, they would be deferring

6    interest on their loan, increasing the principal balance of their loan.

7        In addition, Defendants and Loan Consultant represented that appraisals conducted by or

8    on behalf of Defendants were accurate and made in good faith. On or around January 2, 2006, an

9    appraisal company under the direct control and supervision of Defendants conducted an appraisal

10   on Mr. and Mrs. Rodriguez's home, which was fraudulently inflated to an intentionally

11   overstated value.  Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs.

12   Rodriguez's home was worth $312,000.00 at the time they entered into their loan, and that such a

13   valuation was a true and correct measure of their home's worth. The current fair market value of

14   Mr. and Mrs. Rodriguez's home is approximately $150,600.00. Mr. and Mrs. Rodriguez allege

15   that the appraisal was artificially inflated, and that they have suffered damages in the amount of

16   $161,400.00 ($312,000.00-$150,600.00) due to a substantial loss of equity in their home as a

17   result of Defendants' fraudulent inflation and other acts described herein.

18       Defendants and Loan Consultant also represented to Mr. and Mrs. Rodriguez that they

19   would be able to refinance their loan within three years of the loan, should the mortgage

20   payments go up. Mr. and Mrs. Rodriguez relied on this assurance in deciding to enter into the

21   mortgage contract. However, Mr. and Mrs. Rodriguez have not been able to refinance their loan

22   although they have tried to refinance more than three times. Defendants and Loan Consultant

23   also represented that it would modify Mr. and Mrs. Rodriguez's loan, and Mr. and Mrs.

24   Rodriguez relied on this representation in deciding to enter into the loan. However, Mr. and Mrs.

25   Rodriguez were unable to modify their loan. When Mr. and Mrs. Rodriguez's mortgage

26   payments substantially increased from the original payment, causing financial difficulty for

27   them, they contacted Defendants for assistance in repaying their loan. However, Defendants

28   refused to review their loan modification application because Mr. and Mrs. Rodriguez were not

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    in default on their loan. Soon after Defendants' denial for the loan modification, Mr. and Mrs.

2    Rodriguez fell behind on their mortgage and lost their home to the foreclosure in 2010.

3            The foreclosure against Mr. and Mrs. Rodriguez was wrongful for numerous reasons.

4    First, the NOD (recorded July 19, 2010) noted MERS as the foreclosing beneficiary of the loan

5    in its individual capacity. However, under California law MERS is only a nominee acting on

6    behalf of the true beneficiary, and cannot initiate foreclosure in its own name. MERS can only

7    act when acting in its nominal capacity. Here, MERS initiates the foreclosure sale in its own

8    name, rendering their NOD ineffective. Accordingly, any subsequent foreclosure sale based on

9    that NOD would be void as well.

10           Second, the Substitution of Trustee is also ineffective because MERS substitutes ETS as

11   the foreclosing trustee in its own name. Therefore, ETS was never properly substituted as a

12   trustee of the loan and it was unauthorized to conduct the trustee's sale. Under California law, a

13   trustee's sale conducted by an unauthorized trustee was void as a matter of law.

14           Finally, the foreclosure against Mr. and Mrs. Rodriguez was wrongful because the

15   foreclosing trustee on the Trustee's Deed upon Sale was GMAC, but GMAC was never properly

16   assigned beneficiary interest in the deed of trust. Therefore, at the time of the foreclosure sale,

17   GMAC was unauthorized to conduct the trustee's sale, so the foreclosure sale was void as a

18   matter a law.

19           Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

20   reputable and complied with industry standard underwriting guidelines and were engaged in

21   lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

22   made in good faith; (3) Mr. and Mrs. Rodriguez could afford the loan ; (4) they were "qualified"

23   for their loan; (5) "qualified" meant that they could afford their loan; (6) Defendants would

24   modify their loan in the future; and (7) they would be able to refinance their loan in the future.

25           Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

26   otherwise improperly disclosed to Mr. and Mrs. Rodriguez that: (1) Defendants and Loan

27   Consultant knew that they could not and would not be able to afford their loan and that there was

28   a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants'

2    and Loan Consultant's "qualification" process was for Defendants' own protection and not

3    theirs;(4) that Defendants' and Loan Consultant's representations that they were "qualified" to

4    pay their loan was not intended to communicate that they could actually "afford" the loan which

5    they were being given; (5) Defendants had abandoned its conventional lending business, prudent

6    lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the

7    appraiser to over-value Mr. and Mrs. Rodriguez's home to require them to borrow more money

8    with the knowledge that the true value of Mr. and Mrs. Rodriguez's home was insufficient to

9    justify the amount of Mr. and Mrs. Rodriguez's loan; or (7) Defendants knew that due to its

10    scheme of fraudulently manipulating and inflating property values throughout the State of

11    California that the real estate market would crash and Mr. and Mrs. Rodriguez would lose

12    substantial equity in their home.

13         Based on these misrepresentations and omissions, the material facts concerning Mr. and

14    Mrs. Rodriguez's loan were concealed from them, and they decided to move forward with their

15    loan. On January 25, 2006, Mr. and Mrs. Rodriguez signed the loan and Deed of Trust, before a

16    notary. Had they known the truth however, Mr. and Mrs. Rodriguez would not have accepted the

17    loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and

18    Mrs. Rodriguez have lost substantial equity in their home, have damaged or destroyed credit, and

19    at the time Mr. and Mrs. Rodriguez entered into the loan their home was worth $312,000.00,

20    now their home is worth approximately $150,600.00. Mr. and Mrs. Rodriguez did not discover

21    any of these misrepresentations or omissions until after a consultation with legal counsel at

22    Brookstone Law, and through a complete and thorough investigation of the loan documentation,

23    and a discussion of the surrounding facts, the fraudulent acts of the Defendants, as described

24    throughout this complaint, were brought to light on or around March 9, 2011. (True and correct

25    copy of the aforementioned documents are attached hereto as *Exhibit 21*).

26         32.    Plaintiffs Salvador Barajas and Maria Barajas ("Mr. and Mrs. Barajas") discussed

27    refinancing an existing mortgage on their property located at 2202 West Avalon Avenue, Santa

28    Ana, CA 92706 and A.P.N.: 101-581-10 with a Loan Consultant ("Loan Consultant") with

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    Homecomings Financial Company, LLC, a correspondent of GMAC and Defendants herein

2    ("Defendants") and authorized by Defendants to lend on its behalf, in or around December 2006.

3    In the course of their discussions ranging from December 2006 until February 2006, Defendants

4    and Loan Consultant steered them into a negatively amortized PayOption ARM in the amount of

5    $521,600.00 with an interest rate at 1.510% for a term of 30 years. Little did Mr. and Mrs.

6    Barajas know, however, the interest rate was never "fixed" but applied to only their first monthly

7    payment and could adjust every 12 months thereafter. The maximum interest rate is 9.950%. The

8    amount of Mr. and Mrs. Barajas's minimum monthly payment was "fixed" for 12 months and

9    could adjust every 12 months thereafter. When the amount of the minimum monthly payment is

10   insufficient to cover the amount of interest due, then the amount of that deficiency is added onto

11   the unpaid principal balance of their loan. The recast point of this loan is 115% of the original

12   loan amount. The loan was originated by GMAC, on the note and deed of trust Homecomings

13   Financial Company, LLC was identified as the lender, and the loan is currently being serviced by

14   GMAC.

15        Defendants and Loan Consultant represented to Mr. and Mrs. Barajas that their monthly

16   payment would be $1,800.00 Although the amount of Mr. and Mrs. Barajas's initial minimum

17   monthly payment was $1,800.00, Defendants and Loan Consultant failed to clarify their partially

18   true representations and advise Mr. and Mrs. Barajas: (1) how the interest rate on their loan was

19   calculated; (2) that the initial minimum monthly payment of $1,800.00 would not always be

20   available; (3) that the initial minimum monthly payment would not be the permanent payment

21   under the loan despite Defendants' and  Loan Consultant's affirmative representations to the

22   contrary; (4) that by paying the initial minimum monthly payment they would be definitively

23   deferring interest on their loan, increasing the principal balance of their loan every time they

24   made the minimum monthly payment; (5) that by paying the minimum monthly payment the

25   principal balance of their loan was certain to increase; or (6) their loan would be recast within a

26   few years and they would be forced to pay considerably higher payments.

27        The disclosures in Mr. and Mrs. Barajas' loan documents discussing negative

28   amortization only frame negative amortization as a mere **possibility** rather than a **certainty** when

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   making the minimum payment. However, the reality was that by making the minimum payment,

2   negative amortization was a *certainty*. Indeed, the payment schedule set forth in the Truth in

3   Lending Disclosure Statement ("TILDS"), which set forth what appeared to be the *required*

4   payment schedule, fails to disclose that making payments pursuant to the TILDS payment

5   schedule *will* result in negative amortization. Mr. and Mrs. Barajas were not provided, before

6   entering into the loans, with any other payment schedule or with any informed option to make

7   payments different than those listed in the TILDS payment schedule. Had Defendants disclosed

8   that by making the payment pursuant to the TILDS Mr. and Mrs. Barajas would be deferring

9   interest, or had Defendants disclosed the payment amounts sufficient to avoid negative

10   amortization from occurring, Mr. and Mrs. Barajas would not have entered into the loan.

11   **Defendants intentionally omitted a clear disclosure of the nature of Mr. and Mrs. Barajas'**

12   **loan because giving a clear explanation of how the loan worked would have punctured the**

13   **illusion of a low-payment, low interest rate loan.**

14   Defendants and Loan Consultant altered Mr. and Mrs. Barajas's loan application without

15   their knowing consent or authorization as Loan Consultant completed Mr. and Mrs. Barajas'

16   application without giving Mr. and Mrs. Barajas an opportunity to review the loan application.

17   Further, Defendants and Loan Consultant advised them that they were eligible for a Low Doc

18   Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low

19   documentation requirement to fraudulently inflate their income and in doing so, Defendants and

20   Loan Consultant caused them to be placed into a loan whose payments they could not afford

21   given their true, *un-inflated* monthly income.

22   Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Barajas that

23   they could afford their loan and further represented that they could shoulder the additional

24   financial burden of repaying their loan in consideration of their other existing debts; yet failed to

25   disclose that the fully amortized monthly payment on the loan was $3,825.00. Given Mr. Barajas

26   and Mrs. Barajas's true monthly income of $1,800.00, this represents a "front-end" debt-to-

27   income ratio of 212% - grossly in excess of industry standard underwriting guidelines, and in

28   excess of Defendants' own underwriting guidelines. Defendants and Loan Consultant further

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    represented to Mr. and Mrs. Barajas that they could rely on the assessment that they were

2    "qualified" to mean that they could afford the loan. Because of Mr. and Mrs. Barajas' lack of

3    familiarity with how much debt a person can and should reasonably take on compared to their

4    monthly income, and because Mr. and Mrs. Barajas reasonably relied on Defendants' and Loan

5    Consultant's expertise that any payment they were "qualified" for would take into account what

6    the maximum debt a person such as Mr. and Mrs. Barajas should be shouldering was, Mr. and

7    Mrs. Barajas reasonably believed Defendants' and Loan Consultant's representations that they

8    could afford their loan and its payments.

9        Although Defendants and the Loan Consultant represented to Mr. and Mrs. Barajas that

10    they were "qualified" for their loan and could afford their loan and its monthly payments,

11    Defendants and the Loan Consultant misled Mr. and Mrs. Barajas into believing that their

12    monthly payments would always only be $1,800.00. Furthermore, at no point did Defendants or

13    Loan Consultant clarify Mr. and Mrs. Barajas' false belief and advise them that $1,800.00 would

14    not be their permanent payment under the loan, or that every time they made a monthly payment

15    in the amount of $1,800.00, which is less than interest only, they would be deferring interest on

16    their loan, increasing the principal balance of their loan.

17        In addition, Defendants and Loan Consultant represented that appraisals conducted by or

18    on behalf of Defendants were accurate and made in good faith. On or around January 2007, an

19    appraisal company under the direct control and supervision of Defendants conducted an appraisal

20    on Mr. and Mrs. Barajas' home, which was fraudulently inflated to an intentionally overstated

21    value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs. Barajas'

22    home was worth $370,000.00 at the time they entered into their loan, and that such a valuation

23    was a true and correct measure of their home's worth. The current fair market value of Mr. and

24    Mrs. Barajas' home is approximately $299,301.00. Mr. and Mrs. Barajas allege that the appraisal

25    was artificially inflated, and that they have suffered damages in the amount of $70,699.00

26    ($370,000.00-$299,301.00) due to a substantial loss of equity in their home as a result of

27    Defendants' fraudulent inflation and other acts described herein.

28        Defendants and Loan Consultant also represented that it would modify Mr. and Mrs.

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    Barajas' loan, and Mr. and Mrs. Barajas relied on this representation in deciding to enter into the

2    loan. In addition, Mr. Barajas and Mrs. Barajas were advised by a representative of Defendants,

3    to stop making payments in order to be eligible for a modification. Mr. and Mrs. Barajas relied

4    on Defendants' and Defendants' representative's advice and stopped making their monthly

5    payments causing them to fall even further behind. However, Mr. and Mrs. Barajas were unable

6    to modify their loan.

7        Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

8    reputable and complied with industry standard underwriting guidelines and were engaged in

9    lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

10    made in good faith; (3) Mr. and Mrs. Barajas could afford the loan; (4) they were "qualified" for

11    their loan; (5) "qualified" meant that they could afford their loan; (6) they would be able to

12    modify their loan; and (7) they would be able to refinance their loan.

13        Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

14    otherwise improperly disclosed to Mr. and Mrs. Barajas that: (1) Defendants and Loan

15    Consultant knew that they could not and would not be able to afford their loan and that there was

16    a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an

17    incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants'

18    and Loan Consultant's "qualification" process was for Defendants' own protection and not

19    theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to

20    pay their loan was not intended to communicate that they could actually "afford" the loan which

21    they were being given; (5) Defendants had abandoned its conventional lending business, prudent

22    lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the

23    appraiser to over-value Mr. Barajas and Mrs. Barajas's home to require them to borrow more

24    money with the knowledge that the true value of Mr. Barajas and Mrs. Barajas's home was

25    insufficient to justify the amount of Mr. Barajas and Mrs. Barajas's loan; or (7) Defendants knew

26    that due to its scheme of fraudulently manipulating and inflating property values throughout the

27    State of California that the real estate market would crash and Mr. Barajas and Mrs. Barajas

28    would lose substantial equity in their home.

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    Based on these misrepresentations and omissions, the material facts concerning Mr. and

2    Mrs. Barajas' loan were concealed from them, and they decided to move forward with their loan.

3    On February 13, 2007, Mr. and Mrs. Barajas signed the loan and Deed of Trust, before a notary.

4    Had they known the truth however, Mr. and Mrs. Barajas would not have accepted the loan. As a

5    result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Barajas

6    have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr.

7    and Mrs. Barajas entered into the loan their home was worth $370,000.00, now their home is

8    worth approximately $299,301.00. Mr. and Mrs. Barajas did not discover any of these

9    misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law,

10    and through a complete and thorough investigation of the loan documentation, and a discussion

11    of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this

12    complaint, were brought to light on or around July 29, 2011. (True and correct copy of the

13    aforementioned documents are attached hereto as *Exhibit 22*).

14    33.    Plaintiff Brian Foote ("Foote") discussed refinancing an existing mortgage on his

15    property located at 15872 Coral Street, Palm Springs, CA 92262 and A.P.N.: 522-211-004 with a

16    Loan Consultant ("Loan Consultant"), a representative and authorized agent of Homecomings

17    Financial LLC. and Defendants herein (the "Defendants") and authorized by Defendants to lend

18    on its behalf, in or around August 2006. In the course of their discussions ranging from August

19    2006 until October 2006, Defendants and Loan Consultant steered him into a negatively

20    amortized PayOption ARM in the amount of $312,000.00 with an interest rate at 2.000% for a

21    term of 40 years. Little did Foote know, however, the interest rate was never "fixed" but applied

22    to only his first monthly payment and could adjust every month thereafter. The maximum

23    interest rate is 12.000%. The amount of Foote's minimum monthly payment was "fixed" for 12

24    months and could adjust every 12 months thereafter. When the amount of the minimum monthly

25    payment is insufficient to cover the amount of interest due, then the amount of that deficiency is

26    added onto the unpaid principal balance of his loan. The recast point of this loan is 115% of the

27    original loan amount. In addition, Defendants and Loan Consultant also steered Foote in a fixed

28    rate loan in the amount of $36,500.00 with the interest rate at 9.025% for a term of 25 years. This

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1  loan was originated by GMAC, on the note and deed of trust Homecomings Financial LLC is

2  identified as the lender, and the loan is currently being serviced by Aurora.

3       Defendants and Loan Consultant represented to Foote that his monthly payment would

4  always be $884.25. Although the amount of Foote's initial, disclosed minimum monthly

5  payment was $884.25, Defendants and Loan Consultant failed to clarify their partially true

6  representations and advise Foote: (1) how the interest rate on his loan was calculated; (2) that the

7  initial, disclosed minimum monthly payment of $884.25 would not always be available; (3) that

8  the initial, disclosed minimum monthly payment would not be the permanent payment under the

9  loan despite Defendants' and Loan Consultant's affirmative representations to the contrary; (4)

10  that by paying the initial, disclosed minimum monthly payment he would be definitively

11  deferring interest on his loan, increasing the principal balance of his loan every time he made the

12  minimum monthly payment; (5) that by paying the minimum monthly payment the principal

13  balance of his loan was certain to increase; or (6) his loan would be recast within a few years and

14  he would be forced to pay considerably higher payments.

15       The disclosures in Foote's loan documents discussing negative amortization only frame

16  negative amortization as a mere **possibility** rather than a **certainty** when making the minimum

17  payment. However, the reality was that by making the minimum payment, negative amortization

18  was a *certainty*. Indeed, the payment schedule set forth in the Truth in Lending Disclosure

19  Statement ("TILDS"), which set forth what appeared to be the *required* payment schedule, fails

20  to disclose that making payments pursuant to the TILDS payment schedule *will* result in negative

21  amortization. Foote was not provided, before entering into the loans, with any other payment

22  schedule or with any informed option to make payments different than those listed in the TILDS

23  payment schedule. Had Defendants disclosed that by making the payment pursuant to the TILDS

24  Foote would be deferring interest, or had Defendants disclosed the payment amounts sufficient to

25  avoid negative amortization from occurring, Foote would not have entered into the loan.

26  **Defendants intentionally omitted a clear disclosure of the nature of Foote's loan because**

27  **giving a clear explanation of how the loan worked would have punctured the illusion of a**

28  **low-payment, low interest rate loan.**

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1     Further, Defendants and Loan Consultant advised him that he was eligible for a Low Doc

2     Loan. Unbeknownst to him at the time, Defendants and Loan Consultant used this low

3     documentation requirement to fraudulently inflate his income by $2,772.00, a factor of 55%; and

4     in doing so, Defendants and Loan Consultant caused him to be placed into a loan whose

5     payments he could not afford given his true, *un-inflated* monthly income. Defendants and Loan

6     Consultant altered Foote's loan application without his knowing consent or authorization as Loan

7     Consultant completed Foote's application without giving Foote an opportunity to review the loan

8     application.

9     Defendants and Loan Consultant also explicitly represented to Foote that he could afford

10     his loan and further represented that he could shoulder the additional financial burden of

11     repaying his loan in consideration of his other existing debts; yet failed to disclose that the fully

12     amortized monthly payment on the loan was $2,055.33. Foote was also obligated to make a

13     $306.93. Given Foote's true monthly income of $5,028.00, this represents a "front-end" debt-to-

14     income ratio, meaning a debt-to-income ratio, before any other debts are even considered, of

15     over 47%. Defendants and Loan Consultant further represented to Foote that he could rely on the

16     assessment that he was "qualified" to mean that he could afford the loan. Because of Foote's lack

17     of familiarity with how much debt a person can and should reasonably take on compared to his

18     monthly income, and because Foote reasonably relied on Defendants' and Loan Consultant's

19     expertise that any payment he was "qualified" for would take into account what the maximum

20     debt a person such as Foote should be shouldering was, Foote reasonably believed Defendants'

21     and Loan Consultant's representations that he could afford his loan and its payments.

22     Although Defendants and the Loan Consultant represented to Foote that he was

23     "qualified" for his loan and could afford his loan and its monthly payments, Defendants and the

24     Loan Consultant misled Foote into believing that his monthly payments would always only be

25     $884.25. Furthermore, at no point did Defendants or Loan Consultant clarify Foote's false belief

26     and advise him that $884.25 would not be his permanent payment under the loan, or that every

27     time he made a monthly payment in the amount of $884.25, which is less than interest only, he

28     would be deferring interest on his loan, increasing the principal balance of his loan.

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    In addition, Defendants and Loan Consultant represented that appraisals conducted by or

2  on behalf of Defendants were accurate and made in good faith. On or around October 4, 2006, an

3  appraisal company under the direct control and supervision of Defendants conducted an appraisal

4  on Foote's home, which was fraudulently inflated to an intentionally overstated value. Foote's

5  loan documentation indicates that his home was worth $350,000.00 at the time he entered into

6  their loan. The current fair market value of Foote's home is approximately $80,750.00. Foote

7  alleges that the appraisal was artificially inflated, and that he has suffered damages in the amount

8  of $269,250.00 ($350,000.00-$80,750) due to a substantial loss of equity in his home as a result

9  of Defendants' fraudulent inflation and other acts described herein.

10    Defendants and Loan Consultant also represented to Foote that he would be able to

11  refinance his loan at a later time. Foote relied on this assurance in deciding to enter into the

12  mortgage contract. However, Foote has not been able to refinance his loan. Defendants and

13  Loan Consultant also represented that it would modify Foote's loan, and Foote relied on this

14  representation in deciding to enter into the loan. However, Foote was unable to modify his loan.

15    Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

16  reputable and complied with industry standard underwriting guidelines and were engaged in

17  lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

18  made in good faith; (3) Foote could afford the loan; (4) he was "qualified" for his loan; (5)

19  "qualified" meant that he could afford his loan; (6) Defendants would modify his loan in the

20  future; and (7) he would be able to refinance his loan in the future.

21    Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

22  otherwise improperly disclosed to Foote that: (1) Defendants and Loan Consultant knew that he

23  could not and would not be able to afford his loan and that there was a very high probability that

24  he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan, and

25  did sell his loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

26  "qualification" process was for Defendants' own protection and not his; (4) that Defendants' and

27  Loan Consultant's representations that he was "qualified" to pay his loan was not intended to

28  communicate that he could actually "afford" the loan which he was being given; (5) Defendants

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    had abandoned its conventional lending business, prudent lending standards, and industry

2    standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value Foote's

3    home to require him to borrow more money with the knowledge that the true value of Foote's

4    home was insufficient to justify the amount of Foote's loan; or (7) Defendants knew that due to

5    its scheme of fraudulently manipulating and inflating property values throughout the State of

6    California that the real estate market would crash and Foote would lose substantial equity in his

7    home.

8          Based on these misrepresentations and omissions, the material facts concerning Foote's

9    loan were concealed from him, and he decided to move forward with his loan. On October 25,

10   2006, Foote signed the loan and Deed of Trust, before a notary. Had he known the truth

11   however, Foote would not have accepted the loan. As a result of Defendants' fraudulent acts

12   described throughout this complaint Foote has lost substantial equity in his home, has damaged

13   or destroyed credit, and at the time Foote entered into the loan his home was worth $350,000.00,

14   now his home is worth approximately $80,750.00. Foote did not discover any of these

15   misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law,

16   and through a complete and thorough investigation of the loan documentation, and a discussion

17   of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this

18   complaint, were brought to light on or around October 14, 2011. (True and correct copy of the

19   aforementioned documents are attached hereto as *Exhibit 23*).

20         34.    Plaintiffs Olan Ross and Evelyn Ross ("Mr. and Mrs. Ross") discussed

21   refinancing an existing mortgage on their property located at 19901 Archwood Street, Winnetka,

22   CA 91306 and A.P.N.: 2134-011-017 with a Loan Consultant ("Loan Consultant"), a

23   representative and authorized agent of National City Mortgage, a correspondent of GMAC and

24   Defendants herein (the "Defendants") and authorized by Defendants to lend on its behalf, in or

25   around November 2006. In the course of their discussions ranging from November 2006 until

26   January 2007, Defendants and Loan Consultant steered them into a fixed rate Interest-Only in the

27   amount of $408,000.00 with an interest rate at 6.875% for a term of 30 years. Little did Mr. and

28   Mrs. Ross know, however, payments made during the first five years of their loan were Interest-

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1     Only. This loan was originated by GMAC, on the note and deed of trust National City Mortgage

2     is identified as the lender, and the loan is currently being serviced by PNC Mortgage.

3          Defendants and Loan Consultant represented to Mr. and Mrs. Ross that their monthly

4     payment would always be $2,337.50. Although the amount of Mr. and Mrs. Ross' initial monthly

5     payment was $5,500.00, Defendants and Loan Consultant failed to clarify their partially true

6     representations and advise Mr. and Mrs. Ross that: (1) their monthly payment would not pay

7     down any of their principal balance during the Interest-Only period, or (2) their monthly

8     payment would drastically increase at the end of the Interest-Only period, or (3) the amount of

9     their initial monthly payment would not remain "fixed" for the entire term of his loan.

10         Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Ross that

11    they could afford their loan and further represented that they could shoulder the additional

12    financial burden of repaying their loan in consideration of their other existing debts; yet failed to

13    disclose that the fully amortized monthly payment on the loan was $2,680.27. Given Mr. and

14    Mrs. Ross's true monthly income of $5,500.00, this represents a "front-end" debt-to-income

15    ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 49%-

16    in excess of industry standard underwriting guidelines, and in excess of Defendants' own

17    underwriting guidelines. Defendants and Loan Consultant further represented to Mr. and Mrs.

18    Ross that they could rely on the assessment that they were "qualified" to mean that they could

19    afford the loan. Because of Mr. and Mrs. Ross' lack of familiarity with how much debt a person

20    can and should reasonably take on compared to their monthly income, and because Mr. and Mrs.

21    Ross reasonably relied on Defendants' and Loan Consultant's expertise that any payment they

22    were "qualified" for would take into account what the maximum debt a person such as Mr. and

23    Mrs. Ross should be shouldering was, Mr. and Mrs. Ross reasonably believed Defendants' and

24    Loan Consultant's representations that they could afford their loan and its payments.

25         Although Defendants and Loan Consultant represented to Mr. and Mrs. Ross that they

26    were "qualified" for their loan and could afford their loan and its monthly payments, Defendants

27    and Loan Consultant misled Mr. and Mrs. Ross into believing that their monthly payments would

28    always only be $2,337.00. Furthermore, at no point did Defendants or Loan Consultant clarify

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1   Mr. and Mrs. Ross' false belief and advise them that $2,337.00 would not be their permanent

2   payment under the loan, or that every time they made a monthly payment in the amount of

3   $2,337.00, they were not paying down any of their principal balance.

4           In addition, Defendants and Loan Consultant represented that appraisals conducted by or

5   on behalf of Defendants were accurate and made in good faith. On or around December 15,

6   2006, an appraisal company under the direct control and supervision of Defendants conducted an

7   appraisal on Mr. and Mrs. Ross's home, which was fraudulently inflated an intentionally

8   overstated value. Defendants and Loan Consultant represented that, per appraisal, Mr. and Mrs.

9   Ross' home was worth $500,000.00 at the time they entered into their loan, and that such a

10  valuation was a true and correct measure of their home's worth. The current fair market value of

11  Mr. and Mrs. Ross' home is approximately $190,000.00. Mr. and Mrs. Ross allege that the

12  appraisal was artificially inflated, and that they have suffered damages in the amount of

13  $310,000.00 ($500,000.00-$190,000.00 due to a substantial loss of equity in their home as a

14  result of Defendants' fraudulent inflation and other acts described herein.

15          Defendants and Loan Consultant also represented to Mr. and Mrs. Ross that they would

16  be able to refinance their loan at a later time. Mr. and Mrs. Ross relied on this assurance in

17  deciding to enter into the mortgage contract. However, Mr. and Mrs. Ross have not been able to

18  refinance their loan. Defendants and Loan Consultant also represented that it would modify Mr.

19  and Mrs. Ross' loan, and Mr. and Mrs. Ross relied on this representation in deciding to enter into

20  the loan. However, Mr. and Mrs. Ross were unable to modify their loan.

21          Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

22  reputable and complied with industry standard underwriting guidelines and were engaged in

23  lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

24  made in good faith; (3) Mr. and Mrs. Ross could afford the loan; (4) they were "qualified" for

25  their loan; (5) "qualified" meant that they could afford their loan; (6) Defendants would modify

26  their loan in the future; and (7) they would be able to refinance their loan in the future.

27          Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

28  otherwise improperly disclosed to Mr. and Mrs. Ross that: (1) Defendants and Loan Consultant

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   knew that they could not and would not be able to afford their loan and that there was a very high

2   probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to

3   sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan

4   Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that

5   Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan

6   was not intended to communicate that they could actually "afford" the loan which they were

7   being given; (5) Defendants had abandoned its conventional lending business, prudent lending

8   standards, and industry standard underwriting guidelines; (6) Defendants influenced the

9   appraiser to over-value Mr. and Mrs. Ross' home to require them to borrow more money with

10   the knowledge that the true value of Mr. and Mrs. Ross' home was insufficient to justify the

11   amount of Mr. and Mrs. Ross' loan; or (7) Defendants knew that due to its scheme of

12   fraudulently manipulating and inflating property values throughout the State of California that

13   the real estate market would crash and Mr. and Mrs. Ross would lose substantial equity in their

14   home.

15      Based on these misrepresentations and omissions, the material facts concerning Mr. and

16   Mrs. Ross' loan were concealed from them, and they decided to move forward with their loan.

17   On January 5, 2007, Mr. and Mrs. Ross signed the loan and Deed of Trust, before a notary. Had

18   they known the truth however, Mr. and Mrs. Ross would not have accepted the loan. As a result

19   of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Ross have lost

20   substantial equity in their home, have damaged or destroyed credit, and at the time Mr. and Mrs.

21   Ross entered into the loan their home was worth $500,000.00, now their home is worth

22   approximately $190,000.00. Mr. and Mrs. Ross did not discover any of these misrepresentations

23   or omissions until after a consultation with legal counsel at Brookstone Law, and through a

24   complete and thorough investigation of the loan documentation, and a discussion of the

25   surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint,

26   were brought to light on or around April 7, 2012. (True and correct copy of the aforementioned

27   documents are attached hereto as ***Exhibit 24***).

28      35.     Plaintiffs Gary Johnson and Joellyn Johnson ("Mr. and Mrs. Johnson") discussed

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  refinancing an existing mortgage on their property located at 17228 Janell Avenue, Cerritos, CA

2  90703 and A.P.N.: 7025-004-021 with a Loan Consultant ("Loan Consultant") with

3  Homecomings Financial Company, LLC, a correspondent of GMAC and Defendants herein

4  ("Defendants"), and authorized by Defendants to lend on its behalf, in or around March 2007. In

5  the course of their discussions ranging from March 2007 until May 2007, Defendants and Loan

6  Consultant steered them into a negatively amortized PayOption ARM in the amount of

7  $648,000.00 with an interest rate at 1.500% for a term of 30 years. Little did Mr. Johnson and

8  Mrs. Johnson know, however, the interest rate was never "fixed" but applied to only their first

9  monthly payment and could adjust every 12 months thereafter. The maximum interest rate is

10  9.950%. The amount of Mr. Johnson and Mrs. Johnson's minimum monthly payment was

11  "fixed" for 12 months and could adjust every 12 months thereafter. When the amount of the

12  minimum monthly payment is insufficient to cover the amount of interest due, then the amount

13  of that deficiency is added onto the unpaid principal balance of their loan. The recast point of this

14  loan is 115% of the original loan amount. The loan was originated by GMAC, on the note and

15  deed of trust Homecomings Financial Company, LLC is identified as the lender, and the loan is

16  currently being serviced by GMAC.

17        Defendants and Loan Consultant represented to Mr. and Mrs. Johnson that their monthly

18  payment would be $2,236.00 Although the amount of Mr. and Mrs. Johnson's initial, minimum

19  monthly payment was $2,236.00, Defendants and Loan Consultant failed to clarify their partially

20  true representations and advise Mr. Johnson and Mrs. Johnson: (1) how the interest rate on their

21  loan was calculated; (2) that the initial minimum monthly payment of $2,236.00 would not

22  always be available; (3) that the initial minimum monthly payment would not be the permanent

23  payment under the loan despite Defendants' and Loan Consultant's affirmative representations

24  to the contrary; (4) that by paying the initial minimum monthly payment they would be

25  definitively deferring interest on their loan, increasing the principal balance of their loan every

26  time they made the minimum monthly payment; (5) that by paying the minimum monthly

27  payment the principal balance of their loan was certain to increase; or (6) their loan would be

28  recast within a few years and they would be forced to pay considerably higher payments.

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    The disclosures in Mr. and Mrs. Johnson's loan documents discussing negative

2    amortization only frame negative amortization as a mere **possibility** rather than a **certainty** when

3    making the minimum payment. However, the reality was that by making the minimum payment,

4    negative amortization was a *certainty*. Indeed, the payment schedule set forth in the Truth in

5    Lending Disclosure Statement ("TILDS"), which set forth what appeared to be the *required*

6    payment schedule, fails to disclose that making payments pursuant to the TILDS payment

7    schedule *will* result in negative amortization. Mr. and Mrs. Johnson were not provided, before

8    entering into the loans, with any other payment schedule or with any informed option to make

9    payments different than those listed in the TILDS payment schedule. Had Defendants disclosed

10   that by making the payment pursuant to the TILDS Mr. and Mrs. Johnson would be deferring

11   interest, or had Defendants disclosed the payment amounts sufficient to avoid negative

12   amortization from occurring, Mr. and Mrs. Johnson would not have entered into the loan.

13   **Defendants intentionally omitted a clear disclosure of the nature of Mr. and Mrs.**

14   **Johnson's loan because giving a clear explanation of how the loan worked would have**

15   **punctured the illusion of a low-payment, low interest rate loan.**

16       Defendants and Loan Consultant altered Mr. and Mrs. Johnson's loan application without

17   their knowing consent or authorization as Loan Consultant completed Mr. and Mrs. Johnson's

18   application without giving Mr. and Mrs. Johnson an opportunity to review the loan application.

19       Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Johnson that

20   they could afford their loan and further represented that they could shoulder the additional

21   financial burden of repaying their loan in consideration of their other existing debts; yet failed to

22   disclose that the fully amortized monthly payment on the loan was $4,754.00. Given Mr. and

23   Mrs. Johnson's true monthly income of $13,500.00, this represents a "front-end" debt-to-income

24   ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 35%.

25   Defendants and Loan Consultant further represented to Mr. and Mrs. Johnson that they could

26   rely on the assessment that they were "qualified" to mean that they could afford the loan.

27   Because of Mr. and Mrs. Johnson's lack of familiarity with how much debt a person can and

28   should reasonably take on compared to their monthly income, and because Mr. and Mrs. Johnson

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    reasonably relied on Defendants' and Loan Consultant's expertise that any payment they were

2    "qualified" for would take into account what the maximum debt a person such as Mr. and Mrs.

3    Johnson should be shouldering was, Mr. and Mrs. Johnson reasonably believed Defendants' and

4    Loan Consultant's representations that they could afford their loan and its payments.

5        Although Defendants and the Loan Consultant represented to Mr. and Mrs. Johnson that

6    they were "qualified" for their loan and could afford their loan and its monthly payments,

7    Defendants and the Loan Consultant misled Mr. and Mrs. Johnson into believing that their

8    monthly payments would only be $2,236.00. Furthermore, at no point did Defendants or Loan

9    Consultant clarify Mr. and Mrs. Johnson's false belief and advise them that $2,236.00 would not

10   be their permanent payment under the loan, or that every time they made a monthly payment in

11   the amount of $2,236.00, which is less than interest only, they would be deferring interest on

12   their loan, increasing the principal balance of their loan.

13       In addition, Defendants and Loan Consultant represented that appraisals conducted by or

14   on behalf of Defendants were accurate and made in good faith. On or around May 2007, Allstate

15   Ban Corp, an appraisal company under the direct control and supervision of Defendants,

16   conducted an appraisal on Mr. and Mrs. Johnson's home, which was fraudulently inflated

17   $855,000.00 an intentionally overstated value. The current fair market value of Mr. and Mrs.

18   Johnson's home is approximately $354,898.00. Mr. and Mrs. Johnson allege that the appraisal

19   was artificially inflated and that they have suffered damages in the amount of $269,398.00

20   ($855,000.00-$354,898.00) due to a substantial loss of equity in their home as a result of

21   Defendants' fraudulent inflation and other acts described herein.

22       Defendants and Loan Consultant also represented to Mr. and Mrs. Johnson that they

23   would be able to refinance their loan at a later time. Mr. and Mrs. Johnson relied on this

24   assurance in deciding to enter into the mortgage contract. However, Mr. and Mrs. Johnson have

25   not been able to refinance their loan. Defendants and Loan Consultant also represented that it

26   would modify Mr. and Mrs. Johnson's loan, and Mr. and Mrs. Johnson relied on this

27   representation in deciding to enter into the loan. In addition, Mr. and Mrs. Johnson were advised

28   by a representative of Defendants, to stop making payments in order to be eligible for a

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1  modification. Mr. and Mrs. Johnson relied on Defendants' and Defendants' representative's

2  advice and stopped making their monthly payments causing them to fall even further behind.

3  However, Mr. and Mrs. Johnson were unable to modify their loan.

4      Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

5  reputable and complied with industry standard underwriting guidelines and were engaged in

6  lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

7  made in good faith; (3) Mr. and Mrs. Johnson could afford the loan ; (4) they were "qualified"

8  for their loan; (5) "qualified" meant that they could afford their loan; (6) they  would be able to

9  modify their loan; and (7) they would be able to refinance their loan.

10      Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

11  otherwise improperly disclosed to Mr. and Mrs. Johnson that: (1) Defendants and Loan

12  Consultant knew that they could not and would not be able to afford their loan and that there was

13  a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an

14  incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants'

15  and Loan Consultant's "qualification" process was for Defendants' own protection and not

16  theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to

17  pay their loan was not intended to communicate that they could actually "afford" the loan which

18  they were being given; (5) Defendants had abandoned its conventional lending business, prudent

19  lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the

20  appraiser to over-value Mr. and Mrs. Johnson's home to require them to borrow more money

21  with the knowledge that the true value of Mr. and Mrs. Johnson's home was insufficient to

22  justify the amount of Mr. and Mrs. Johnson's loan; or (7) Defendants knew that due to its

23  scheme of fraudulently manipulating and inflating property values throughout the State of

24  California that the real estate market would crash and Mr. and Mrs. Johnson would lose

25  substantial equity in their home.

26      Based on these misrepresentations and omissions, the material facts concerning Mr. and

27  Mrs. Johnson's loan were concealed from them, and they decided to move forward with their

28  loan. On May 21, 2007, Mr. and Mrs. Johnson signed the loan and Deed of Trust, before a

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   notary. Had they known the truth however, Mr. and Mrs. Johnson would not have accepted the

2   loan. As a result of Defendants' fraudulent acts described throughout this complaint Mr. and

3   Mrs. Johnson have lost substantial equity in their home, have damaged or destroyed credit, and at

4   the time Mr. and Mrs. Johnson entered into the loan their home was worth $855,000.00, now

5   their home is worth approximately $354,898.00. Mr. and Mrs. Johnson did not discover any of

6   these misrepresentations or omissions until after a consultation with legal counsel at Brookstone

7   Law, and through a complete and thorough investigation of the loan documentation, and a

8   discussion of the surrounding facts, the fraudulent acts of the Defendants, as described

9   throughout this complaint, were brought to light on or around May 24, 2012. (True and correct

10  copy of the aforementioned documents are attached hereto as **Exhibit 25**).

11      36.     Plaintiffs Jun Santos and Rodelina Santos ("Mr. and Mrs. Santos") discussed

12  refinancing an existing mortgage on their property located at 235 Sea Mist Drive, Vallejo, CA

13  94561 and A.P.N.: 0079-302-210 with a loan consultant (the "Loan Consultant"), a

14  representative and authorized agent of Sierra Pacific Mortgage, a correspondent of GMAC and

15  Defendants herein ("Defendants"), and authorized by Defendants to lend on its behalf, in or

16  around November 2006. In the course of their discussions ranging from November 2006 until

17  January 2007, Defendants and Loan Consultant steered them into an adjustable rate mortgage in

18  the amount of $448,500.00 with an interest rate at 6.750% for a term of 30 years. Little did Mr.

19  and Mrs. Santos know, however, payments made during the first ten years of their loan were

20  Interest-Only. Mr. and Mrs. Santos also were not advised that their interest rate was "fixed" for

21  only 5 years, and could adjust every 6 months thereafter. This loan was originated by GMAC, on

22  the note and deed of trust Sierra Pacific Mortgage is identified as the lender, and GMAC

23  Mortgage is currently servicing the loan.

24      Defendants and Loan Consultant represented to Mr. and Mrs. Santos that their monthly

25  payment would always be $2,520.00. Although the amount of Mr. and Mrs. Santos' initial

26  monthly payment was $2,520.00, Defendants and Loan Consultant failed to clarify their partially

27  true representations and advise Mr. and Mrs. Santos that: (1) their monthly payment would not

28  pay down any of their principal balance during the Interest-Only period, or (2) their monthly

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1   payment would drastically increase at the end of the interest-Only period, or (3) the amount of

2   their monthly payment would not remain "fixed" for the entire term of the loan.

3          Further, Defendants and Loan Consultant advised them that they were eligible for a Low

4   Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low

5   documentation requirement to fraudulently inflate their income  by $4,322.00, a factor of 56% ;

6   and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose

7   payments they could not afford given their true, un-inflated monthly income. Defendants and

8   Loan Consultant altered Mr. and Mrs. Santos' loan application without their knowing consent or

9   authorization as Loan Consultant completed Mr. and Mrs. Santos' application without giving Mr.

10  and Mrs. Santos an opportunity to review the loan application.

11         Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Santos that

12  they could afford their loan and further represented that they could shoulder the additional

13  financial burden of repaying their loan in consideration of their other existing debts; yet failed to

14  disclose that the fully amortized monthly payment on the loan was $3,643.38. Given Mr. and

15  Mrs. Santos' true monthly income of $7,631.00, this represents a "front-end" debt-to-income

16  ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 47%-

17  in excess of industry standard underwriting guidelines, and in excess of Defendants' own

18  underwriting guidelines. Defendants and Loan Consultant further represented to Mr. and Mrs.

19  Santos that they could rely on the assessment that they were "qualified" to mean that they could

20  afford the loan. Because of Mr. and Mrs. Santos' lack of familiarity with how much debt a

21  person can and should reasonably take on compared to their monthly income, and because Mr.

22  and Mrs. Santos reasonably relied on Defendants' and Loan Consultant's expertise that any

23  payment they were "qualified" for would take into account what the maximum debt a person

24  such as Mr. and Mrs. Santos should be shouldering was, Mr. and Mrs. Santos reasonably

25  believed Defendants' and Loan Consultant's representations that they could afford their loan and

26  its payments.

27         Although Defendants and Loan Consultant represented to Mr. and Mrs. Santos that they

28  were "qualified" for their loan and could afford their loan and its monthly payments, Defendants

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1   and Loan Consultant misled Mr. and Mrs. Santos into believing that their monthly payments

2   would always only be $2,520.00. Furthermore, at no point did Defendants or Loan Consultant

3   clarify Mr. and Mrs. Santos' false belief and advise them that $2,520.00 would not be their

4   permanent payment under the loan, or that every time they made a monthly payment in the

5   amount of $2,520.00, they were not paying down any of their principal balance.

6       In addition, Defendants and Loan Consultant represented that appraisals conducted by or

7   on behalf of Defendants were accurate and made in good faith. On or around December 21,

8   2006, an appraisal company under the direct control and supervision of Defendants conducted an

9   appraisal on Name's home, which was fraudulently inflated to an intentionally overstated value.

10   Mr. and Mrs. Santos' loan documentation indicates that her home was worth $560,000.00 at the

11   time they entered into their loan. The current fair market value of Name's home is approximately

12   $222,300.00. Mr. and Mrs. Santos allege that the appraisal was artificially inflated, and that they

13   have suffered damages in the amount of $337,700.00 ($560,000.00-$222,300.00) due to a

14   substantial loss of equity in their home as a result of Defendants' fraudulent inflation and other

15   acts described herein.

16       Defendants and Loan Consultant also represented to Mr. and Mrs. Santos that they would

17   be able to refinance their loan at a later time. Mr. and Mrs. Santos relied on this assurance in

18   deciding to enter into the mortgage contract. However, Mr. and Mrs. Santos have not been able

19   to refinance their loan. Defendants and Loan Consultant also represented that it would modify

20   Mr. and Mrs. Santos' loan, and Mr. and Mrs. Santos relied on this representation in deciding to

21   enter into the loan. However, Defendants refused to permanently modify their loan.

22       Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

23   reputable and complied with industry standard underwriting guidelines and were engaged in

24   lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

25   made in good faith; (3) Mr. and Mrs. Santos could afford the loan; (4) they were "qualified" for

26   their loan; (5) "qualified" meant that they could afford their loan; (6) they would be able to

27   modify their loan (7) they would be able to refinance their loan.

28       Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1   otherwise improperly disclosed to Mr. and Mrs. Santos that: (1) Defendants and Loan Consultant

2   knew that they could not and would not be able to afford their loan and that there was a very high

3   probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to

4   sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan

5   Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that

6   Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan

7   was not intended to communicate that they could actually "afford" the loan which they were

8   being given; (5) Defendants had abandoned its conventional lending business, prudent lending

9   standards, and industry standard underwriting guidelines:(6) Defendants influenced the appraiser

10   to over-value Mr. and Mrs. Santos' home to require them to borrow more money with the

11   knowledge that the true value of Mr. and Mrs. Santos' home was insufficient to justify the

12   amount of Mr. and Mrs. Santos' loan; or (7) Defendants knew that due to its scheme of

13   fraudulently manipulating and inflating property values throughout the State of California that

14   the real estate market would crash and Mr. and Mrs. Santos would lose substantial equity in their

15   home.

16        Based on these misrepresentations and omissions, the material facts concerning Mr. and

17   Mrs. Santos' loan were concealed from them, and they decided to move forward with their loan.

18   On January 10, 2007, Mr. and Mrs. Santos signed the loan and Deed of Trust, before a notary.

19   Had they known the truth however, Mr. and Mrs. Santos would not have accepted the loan. As a

20   result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Santos

21   have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr.

22   and Mrs. Santos entered into the loan their home was worth $560,000.00, now their home is

23   worth approximately $222,300.00. Mr. and Mrs. Santos did not discover any of these

24   misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law,

25   and through a complete and thorough investigation of the loan documentation, and a discussion

26   of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this

27   complaint, were brought to light on or around June 20, 2012.   (True and correct copy of the

28   aforementioned documents are attached hereto as *Exhibit 26*).

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

37.    Plaintiffs Michael Brown and Claudinette Brown ("collectively referred to as "Mr. and Mrs. Brown") discussed refinancing an existing mortgage on their property located at 1023 East Cartagena Street, Long Beach, CA 90807 and A.P.N.:7138-003-014 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of Homecoming Financial Network, Incorporation and Defendants herein (the "Defendants") in or around July 2006. In the course of their discussions ranging from July 2006 until September 2006, Defendants and Loan Consultant steered them into an adjustable rate mortgage in the amount of $795,000.00 with an interest rate at 1% for a term of 30 years. Little did Mr. and Mrs. Brown know, however, their loan was a negatively amortized PayOption ARM. Mr. and Mrs. Brown were not advised that the interest rate was never "fixed" but applied to only their first monthly payment and could adjust every month thereafter. The amount of Mr. and Mrs. Brown's minimum monthly payment was "fixed" for 12 months and could adjust every 12 months thereafter. When the amount of the minimum monthly payment is insufficient to cover the amount of interest due, then the amount of that deficiency is added onto the unpaid principal balance of their loan. The recast point of this loan is 115% of the original loan amount. This loan was originated by GMAC, on the note and deed of trust Homecoming Financial Network, Incorporation is identified as the lender, and Nationstar Mortgage LLC is currently servicing the loan.

Defendants and Loan Consultant recommended the loan, representing that: 1) Mr. and Mrs. Brown would develop great equity 2) Mr. and Mrs. Brown can refinance when their interest rate changes 3) Mr. and Mrs. Brown would be able to pay off their debt and 4) Mr. and Mrs. Brown would be paying $500 less each month on their mortgage payment each month. Defendants and Loan Consultant represented to Mr. and Mrs. Brown that their monthly payment would always be $2,557.03. Although the amount of Mr. and Mrs. Brown's initial minimum monthly payment was $2,557.03, Defendants and Loan Consultant failed to clarify their partially true representations and advise Mr. and Mrs. Brown: (1) how the interest rate on their loan was calculated; (2) that the initial minimum monthly payment of $2,557.03 would not always be available; (3) that the initial minimum monthly payment would not be the permanent payment under the loan despite Defendants' and  Loan Consultant's affirmative representations to the

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    contrary; (4) that by paying the initial minimum monthly payment they would be definitively

2    deferring interest on their loan, increasing the principal balance of their loan every time they

3    made the minimum monthly payment; (5) that by paying the minimum monthly payment the

4    principal balance of their loan was certain to increase; or (6) their loan would be recast within a

5    few years and they would be forced to pay considerably higher payments.

6        The disclosures in Mr. and Mrs. Brown' loan documents discussing negative

7    amortization, only frame negative amortization as a mere **possibility** rather than a **certainty**

8    when making the minimum payment. However the reality was that by making the minimum

9    payment, negative amortization was a certainty. Indeed, the payment schedule set forth in the

10    Truth in Lending Disclosure Statement ("TILDS") which set forth what appeared to be the

11    required payment schedule fails to disclose that making payments pursuant to the TILDS

12    payment schedule will result in negative amortization. Mr. and Mrs. Brown were not provided,

13    before entering into the loans, with any other payment schedule or with any informed option to

14    make payments different than those listed in the TILDS payment schedule. Had Defendants

15    disclosed that by making the payment pursuant to the TILDS Mr. and Mrs. Brown would be

16    deferring interest, or had they disclosed the payment amounts sufficient to avoid negative

17    amortization from occurring, Mr. and Mrs. Brown would not have entered into the loans.

18    **Defendants intentionally omitted a clear disclosure of the nature of Mr. and Mrs. Brown'**

19    **loans because giving a clear explanation of how the loan worked would have punctured the**

20    **illusion of a low-payment, low interest rate loan.**

21        Further, Defendants and Loan Consultant advised them that they were eligible for a Low

22    Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low

23    documentation requirement to fraudulently inflate their income by $12,600.00, a factor of 196%;

24    and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose

25    payments they could not afford given their true, *un-inflated* monthly income. Defendants and

26    Loan Consultant altered Mr. and Mrs. Brown's loan application without their knowing consent

27    or authorization as Loan Consultant completed Mr. and Mrs. Brown's application without giving

28    Mr. and Mrs. Brown an opportunity to review the loan application.

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1  Defendants and Loan Consultant also explicitly represented to Mr. and Mrs. Brown that

2 they could afford their loan and further represented that they could shoulder the additional

3 financial burden of repaying their loan in consideration of their other existing debts; yet failed to

4 disclose that the fully amortized monthly payment on the loan was $5,634.07. Given Mr. and

5 Mrs. Brown's true monthly income of $5,634.07, this represents a "front-end" debt-to-income

6 ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over

7 grossly in excess of industry standard underwriting guidelines, and in excess of Defendants' own

8 underwriting guidelines). Defendants and Loan Consultant further represented to Mr. and Mrs.

9 Brown that they could rely on the assessment that they were "qualified" to mean that they could

10 afford the loan. Because of Mr. and Mrs. Brown's lack of familiarity with how much debt a

11 person can and should reasonably take on compared to their monthly income, and because Mr.

12 and Mrs. Brown reasonably relied on Defendants' and Loan Consultant's expertise that any

13 payment they were "qualified" for would take into account what the maximum debt a person

14 such as Mr. and Mrs. Brown should be shouldering was, Mr. and Mrs. Brown reasonably

15 believed Defendants' and Loan Consultant's representations that they could afford their loan and

16 its payments.

17  Although Defendants and the Loan Consultant represented to Mr. and Mrs. Brown that

18 they were "qualified" for their loan and could afford their loan and its monthly payments,

19 Defendants and the Loan Consultant misled Mr. and Mrs. Brown into believing that their

20 monthly payments would always only be $2,557.03. Furthermore, at no point did Defendants or

21 Loan Consultant clarify Mr. and Mrs. Brown's false belief and advise them that $2,557.03 would

22 not be their permanent payment under the loan, or that every time they made a monthly payment

23 in the amount of $2,557.03, which is less than interest only, they would be deferring interest on

24 their loan, increasing the principal balance of their loan.

25  In addition, Defendants and Loan Consultant represented that appraisals conducted by or

26 on behalf of Defendants were accurate and made in good faith. On August 22, 2006, Fairway

27 Appraisal Service, a company under the direct control and supervision of Defendants, conducted

28 an appraisal on Mr. and Mrs. Brown's home, which was fraudulently inflated to $1,140,000.00 -

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    an intentionally overstated value. The current fair market value of Mr. and Mrs. Brown's home is

2    approximately $586,330.00. Mr. and Mrs. Brown allege that the appraisal was artificially

3    inflated, and that they have suffered damages in the amount of $553,670.00 ($1,140,000.00-

4    $586,330.00) due to a substantial loss of equity in their home as a result of Defendants'

5    fraudulent inflation and other acts described herein.

6        Due to the economic crash caused by Defendants' fraudulent acts described throughout

7    the complaint, Mr. and Mrs. Brown suffered from financial hardship because of the huge drop in

8    income in the family. Mr. and Mrs. Brown sought to refinance their loan into a better loan. Mr.

9    and Mrs. Brown believed that that they would be able to refinance their loan since at the time of

10   they entered the loan in 2006, Defendants and Loan Consultant represented to Mr. and Mrs.

11   Brown that they would be able to refinance their loan at a later time, and Mr. and Mrs. Brown

12   relied on this assurance in deciding to enter into the loan. However, Mr. and Mrs. Brown have

13   not been able to refinance because there was negative equity in their house.

14       Mr. and Mrs. Brown also applied for a loan modification to get their loan affordable. Mr.

15   and Mrs. Brown were advised by a representative and authorized agent of Defendants to stop

16   making payments in order to be eligible for a modification. Mr. and Mrs. Brown relied on

17   Defendants' and Defendants' representative's advice and stopped making their monthly

18   payments causing them to fall even further behind. However, Defendants have rejected Mr. and

19   Mrs. Brown's modification 4 times. On the first attempt, the modification was denied due to the

20   fact that Mr. and Mrs. Brown were current on their loan. Defendants denied the modification the

21   2nd time because Mr. and Mrs. Brown did not qualify for HAMP. The application was denied

22   the third time because of the negative NPV. Finally, on the fourth try, Defendants refused to

23   modify Mr. and Mrs. Brown's loan since Defendants determined that Mr. and Mrs. Brown was

24   not eligible for HAMP. As of now, Defendants have not yet modified Mr. and Mrs. Brown's

25   loan.

26       Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

27   reputable and complied with industry standard underwriting guidelines and were engaged in

28   lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   made in good faith; (3) Mr. and Mrs. Brown could afford the loan; (4) they were "qualified" for

2   their loan; (5) "qualified" meant that they could afford their loan; and (6) they would be able to

3   refinance their loan in the future.

4          Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

5   otherwise improperly disclosed to Mr. and Mrs. Brown that: (1) Defendants and Loan Consultant

6   knew that they could not and would not be able to afford their loan and that there was a very high

7   probability that they would default and/or be foreclosed upon; (2) Defendants had an incentive to

8   sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants' and Loan

9   Consultant's "qualification" process was for Defendants' own protection and not theirs; (4) that

10  Defendants' and Loan Consultant's representations that they were "qualified" to pay their loan

11  was not intended to communicate that they could actually "afford" the loan which they were

12  being given; (5) Defendants had abandoned its conventional lending business, prudent lending

13  standards, and industry standard underwriting guidelines; (6) Defendants influenced the

14  appraiser to over-value Mr. and Mrs. Brown's home to require them to borrow more money with

15  the knowledge that the true value of Mr. and Mrs. Brown's home was insufficient to justify the

16  amount of Mr. and Mrs. Brown's loan; or (7) Defendants knew that due to its scheme of

17  fraudulently manipulating and inflating property values throughout the State of California that

18  the real estate market would crash and Mr. and Mrs. Brown would lose substantial equity in their

19  home.

20          Based on these misrepresentations and omissions, the material facts concerning Mr. and

21  Mrs. Brown's loan were concealed from them, and they decided to move forward with their loan.

22  On September 6, 2006, Mr. and Mrs. Brown signed the loan and Deed of Trust, before a notary.

23  Had they known the truth however, Mr. and Mrs. Brown would not have accepted the loan. As a

24  result of Defendants' fraudulent acts described throughout this complaint Mr. and Mrs. Brown

25  have lost substantial equity in their home, have damaged or destroyed credit, and at the time Mr.

26  and Mrs. Brown entered into the loan their home was worth $1,140,000.00, now their home is

27  worth approximately $586,330.00. Mr. and Mrs. Brown did not discover any of these

28  misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law,

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   and through a complete and thorough investigation of the loan documentation, and a discussion

2   of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this

3   complaint, were brought to light on or around May 21, 2012.  (True and correct copy of the

4   aforementioned documents are attached hereto as *Exhibit 27*).

5       38.    Plaintiffs Martin Kassowitz ("Kassowitz") and Shirley Kaplan ("Kaplan")

6   discussed refinancing an existing mortgage on their property located at 17545 Baltar Street,

7   Northridge, CA 91325 and A.P.N.: 2201-004-026 with a Loan Consultant ("Loan Consultant"), a

8   representative and authorized agent of Greenpoint Mortgage Funding, a correspondent of GMAC

9   and Defendants herein (the "Defendants") in or around August 2006. In the course of their

10  discussions ranging from August 2006 until October 2006, Defendants and Loan Consultant

11  steered them into an adjustable rate mortgage in the amount of $470,000.00 with an interest rate

12  at 1% for a term of 30 years. Little did Kassowitz and Kaplan know, however, their loan was a

13  negatively amortized PayOption ARM. Kassowitz and Kaplan were not advised that the interest

14  rate was never "fixed" but applied to only their first monthly payment and could adjust every

15  month thereafter. The amount of Kassowitz's and Kaplan's minimum monthly payment was

16  "fixed" for 12 months and could adjust every 12 months thereafter. When the amount of the

17  minimum monthly payment is insufficient to cover the amount of interest due, then the amount

18  of that deficiency is added onto the unpaid principal balance of their loan. The recast point of this

19  loan is 110% of the original loan amount. This loan was originated by GMAC, on the note and

20  deed of trust Greenpoint Mortgage Funding is identified as the lender, and GMAC is currently

21  servicing the loan.

22      Defendants and Loan Consultant represented to Kassowitz and Kaplanthat their monthly

23  payment would always be $1,511.71. Although the amount of Kassowitz's and Kaplan's initial

24  minimum monthly payment was $1,511.71, Defendants and Loan Consultant failed to clarify

25  their partially true representations and advise Kassowitz and Kaplan: (1) how the interest rate on

26  their loan was calculated; (2) that the initial minimum monthly payment of $1,511.71 would not

27  always be available; (3) that the initial minimum monthly payment would not be the permanent

28  payment under the loan despite Defendants' and  Loan Consultant's affirmative representations

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  to the contrary; (4) that by paying the initial minimum monthly payment they would be

2  definitively deferring interest on their loan, increasing the principal balance of their loan every

3  time they made the minimum monthly payment; (5) that by paying the minimum monthly

4  payment the principal balance of their loan was certain to increase; or (6) their loan would be

5  recast within a few years and they would be forced to pay considerably higher payments.

6      The disclosures in Kassowitz's and Kaplan's loan documents discussing negative

7  amortization, only frame negative amortization as a mere **possibility** rather than a **certainty**

8  when making the minimum payment. However the reality was that by making the minimum

9  payment, negative amortization was a certainty. Indeed, the payment schedule set forth in the

10  Truth in Lending Disclosure Statement ("TILDS") which set forth what appeared to be the

11  required payment schedule fails to disclose that making payments pursuant to the TILDS

12  payment schedule will result in negative amortization. Kassowitz and Kaplan were not provided,

13  before entering into the loans, with any other payment schedule or with any informed option to

14  make payments different than those listed in the TILDS payment schedule. Had Defendants

15  disclosed that by making the payment pursuant to the TILDS Kassowitz and Kaplan would be

16  deferring interest, or had they disclosed the payment amounts sufficient to avoid negative

17  amortization from occurring, Kassowitz and Kaplan would not have entered into the loans.

18  **Defendants intentionally omitted a clear disclosure of the nature of Kassowitz's and**

19  **Kaplan's loans because giving a clear explanation of how the loan worked would have**

20  **punctured the illusion of a low-payment, low interest rate loan.**

21      Further, Defendants and Loan Consultant advised them that they were eligible for a Low

22  Doc Loan. Unbeknownst to them at the time, Defendants and Loan Consultant used this low

23  documentation requirement to fraudulently inflate their income by $1,020.00, a factor of 14%;

24  and in doing so, Defendants and Loan Consultant caused them to be placed into a loan whose

25  payments they could not afford given their true, *un-inflated* monthly income. Defendants and

26  Loan Consultant altered Kassowitz's and Kaplan's loan application without their knowing

27  consent or authorization as Loan Consultant completed Kassowitz's and Kaplan's application

28  without giving Kassowitz and Kaplan an opportunity to review the loan application.

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    Defendants and Loan Consultant also explicitly represented to Kassowitz and Kaplan that

2    they could afford their loan and further represented that they could shoulder the additional

3    financial burden of repaying their loan in consideration of their other existing debts; yet failed to

4    disclose that the fully amortized monthly payment on the loan was $3,502.58. Given Kassowitz's

5    and Kaplan's true monthly income of $6,988.00, this represents a "front-end" debt-to-income

6    ratio, meaning a debt-to-income ratio, before any other debts are even considered, of over 50% -

7    in excess of industry standard underwriting guidelines, and in excess of Defendants' own

8    underwriting guidelines). Defendants and Loan Consultant further represented to Kassowitz and

9    Kaplan that they could rely on the assessment that they were "qualified" to mean that they could

10   afford the loan. Because of Kassowitz and Kaplan's lack of familiarity with how much debt a

11   person can and should reasonably take on compared to their monthly income, and because

12   Kassowitz and Kaplan reasonably relied on Defendants' and Loan Consultant's expertise that

13   any payment they were "qualified" for would take into account what the maximum debt a person

14   such as Kassowitz and Kaplan should be shouldering was, Kassowitz and Kaplan reasonably

15   believed Defendants' and Loan Consultant's representations that they could afford their loan and

16   its payments.

17   Although Defendants and the Loan Consultant represented to Kassowitz and Kaplan that

18   they were "qualified" for their loan and could afford their loan and its monthly payments,

19   Defendants and the Loan Consultant misled Kassowitz and Kaplan into believing that their

20   monthly payments would always only be $1,511.71. Furthermore, at no point did Defendants or

21   Loan Consultant clarify Kassowitz's and Kaplan's false belief and advise them that $1,511.71

22   would not be their permanent payment under the loan, or that every time they made a monthly

23   payment in the amount of $1,511.71, which is less than interest only, they would be deferring

24   interest on their loan, increasing the principal balance of their loan.

25   In addition, Defendants and Loan Consultant represented that appraisals conducted by or

26   on behalf of Defendants were accurate and made in good faith. On or around September 12,

27   2006, an appraisal company under the direct control and supervision of Defendants conducted an

28   appraisal on Kassowitz's and Kaplan's home, which was fraudulently inflated an intentionally

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    overstated value. Kassowitz's and Kaplan's loan documentation indicates that their home was

2    worth $610,000.00 at the time they entered into their loan. The current fair market value of

3    Kassowitz's and Kaplan's home is approximately $296,207.00. Kassowitz and Kaplan allege that

4    the appraisal was artificially inflated, and that they have suffered damages in the amount of

5    $313,793.00 ($610,000.00-$296,207.00) due to a substantial loss of equity in their home as a

6    result of Defendants' fraudulent inflation and other acts described herein.

7        Defendants and Loan Consultant also represented to Kassowitz and Kaplan that they

8    would be able to refinance their loan at a later time. Kassowitz and Kaplan relied on this

9    assurance in deciding to enter into the mortgage contract. However, Kassowitz and Kaplan have

10   not been able to refinance their loan. Defendants and Loan Consultant also represented that it

11   would modify Kassowitz's and Kaplan's loan, and Kassowitz and Kaplan relied on this

12   representation in deciding to enter into the loan. In addition, March 19, 2012 Kassowitz and

13   Kaplan were advised by a representative and authorized agent of Defendants, to stop making

14   payments in order to be eligible for a modification. Kassowitz and Kaplan relied on Defendants'

15   and Defendants' Representative's advice and stopped making their monthly payments causing

16   them to fall even further behind. However, Defendants refused to permanently modify their loan.

17       Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

18   reputable and complied with industry standard underwriting guidelines and were engaged in

19   lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

20   made in good faith; (3) Kassowitz and Kaplan could afford the loan; (4) they were "qualified"

21   for their loan; (5) "qualified" meant that they could afford their loan; and (6) they would be able

22   to refinance their loan in the future.

23       Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

24   otherwise improperly disclosed to Kassowitz and Kaplan that: (1) Defendants and Loan

25   Consultant knew that they could not and would not be able to afford their loan and that there was

26   a very high probability that they would default and/or be foreclosed upon; (2) Defendants had an

27   incentive to sell their loan, and did sell their loan at fraudulently inflated prices; (3) Defendants'

28   and Loan Consultant's "qualification" process was for Defendants' own protection and not

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1  theirs; (4) that Defendants' and Loan Consultant's representations that they were "qualified" to

2  pay their loan was not intended to communicate that they could actually "afford" the loan which

3  they were being given; (5) Defendants had abandoned its conventional lending business, prudent

4  lending standards, and industry standard underwriting guidelines; (6) Defendants influenced the

5  appraiser to over-value Kassowitz's and Kaplan's home to require them to borrow more money

6  with the knowledge that the true value of Kassowitz's and Kaplan's home was insufficient to

7  justify the amount of Kassowitz's and Kaplan's loan; or (7) Defendants knew that due to its

8  scheme of fraudulently manipulating and inflating property values throughout the State of

9  California that the real estate market would crash and Kassowitz and Kaplan would lose

10 substantial equity in their home.

11        Based on these misrepresentations and omissions, the material facts concerning

12 Kassowitz and Kaplan's loan were concealed from them, and they decided to move forward with

13 their loan. On October 3, 2006, Kassowitz and Kaplan signed the loan and Deed of Trust, before

14 a notary. Had they known the truth however, Kassowitz and Kaplan would not have accepted the

15 loan. As a result of Defendants' fraudulent acts described throughout this complaint Kassowitz

16 and Kaplan have lost substantial equity in their home, have damaged or destroyed credit, and at

17 the time Kassowitz and Kaplan entered into the loan their home was worth $610,000.00, now

18 their home is worth approximately $296,207.00. Kassowitz and Kaplan did not discover any of

19 these misrepresentations or omissions until after a consultation with legal counsel at Brookstone

20 Law, and through a complete and thorough investigation of the loan documentation, and a

21 discussion of the surrounding facts, the fraudulent acts of the Defendants, as described

22 throughout this complaint, were brought to light on or around September 20, 2012. (True and

23 correct copy of the aforementioned documents are attached hereto as *Exhibit 28*).

24        39.    Plaintiff Henry Completo ("Completo") discussed obtaining a mortgage to

25 purchase his home located at 2802 El Dorado Street, Torrance, CA 90503, A.P.N.: 7362-016-006

26 with a Loan Consultant ("Loan Consultant"), a representative and authorized agent of Southstar

27 Funding LLC, a correspondent of GMAC and Defendants herein (the "Defendants") in or around

28 December 2006. In the course of their discussions ranging from December 2006 until February

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1    2007, Defendants and Loan Consultant steered him into an adjustable rate mortgage in the

2    amount of $585,000.00 with an interest rate at 7.05% for a term of 30 years. Little did Completo

3    know, however, payments made during the first 5year of his loan were Interest-Only. Completo

4    also was not advised that his interest rate was "fixed" for only 2 years, and could adjust every 6

5    months thereafter. This loan was originated by GMAC, on the note and deed of trust Southstar

6    Funding LLC is identified as the lender, and GMAC is currently servicing the loan.

7        Defendants and Loan Consultant represented to Completo that his monthly payment

8    would always be $3,436.88. Although the amount of Completo's initial monthly payment was

9    $3,436.88. Defendants and Loan Consultant failed to clarify their partially true representations

10    and advise Completo that: (1) his monthly payment would not pay down any of their principal

11    balance during the Interest-Only period, or (2) his monthly payment would drastically increase at

12    the end of the Interest-Only period, or (3) the amount of his initial monthly payment would not

13    remain "fixed" for the entire term of the loan.

14        Further, Defendants and Loan Consultant advised him that he was eligible for a Low Doc

15    Loan. Unbeknownst to him at the time, Defendants and Loan Consultant used this low

16    documentation requirement to fraudulently inflate his income by $2,327.49, a factor of 36%; and

17    in doing so, Defendants and Loan Consultant caused him to be placed into a loan whose

18    payments he could not afford given his true, *un-inflated* monthly income. Defendants and Loan

19    Consultant altered Completo's loan application without his knowing consent or authorization as

20    Loan Consultant completed Completo's application without giving Completo an opportunity to

21    review the loan application.

22        Defendants and Loan Consultant also explicitly represented to Completo that he could

23    afford his loan and further represented that he could shoulder the additional financial burden of

24    repaying his loan in consideration of his other existing debts; yet failed to disclose that the fully

25    amortized monthly payment on the loan was $4,629.38. Given Completo's true monthly income

26    of $6,400.00, this represents a "front-end" debt-to-income ratio, meaning a debt-to-income ratio,

27    before any other debts are even considered, of over 72% -in excess of industry standard

28    underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants

1  and Loan Consultant further represented to Completo that he could rely on the assessment that he

2  was "qualified" to mean that he could afford the loan. Because of Completo's lack of familiarity

3  with how much debt a person can and should reasonably take on compared to his monthly

4  income, and because Completo reasonably relied on Defendants' and Loan Consultant's

5  expertise that any payment he was "qualified" for would take into account what the maximum

6  debt a person such as Completo should be shouldering was, Completo reasonably believed

7  Defendants' and Loan Consultant's representations that he could afford his loan and its

8  payments.

9        Although Defendants and Loan Consultant represented to Completo that he was

10  "qualified" for his loan and could afford his loan and its monthly payments, Defendants and

11  Loan Consultant misled Completo into believing that his monthly payments would always only

12  be $3,436.88. Furthermore, at no point did Defendants or Loan Consultant clarify Completo's

13  false belief and advise him that $3,436.88 would not be his permanent payment under the loan,

14  or that every time he made a monthly payment in the amount of $3,436.88, he was not paying

15  down any of his principal balance.

16        In addition, Defendants and Loan Consultant represented that appraisals conducted by or

17  on behalf of Defendants were accurate and made in good faith. On or around February 3, 2007,

18  an appraisal company under the direct control and supervision of Defendants conducted an

19  appraisal on Completo's home, which was fraudulently inflated to an intentionally overstated

20  value. Completo's loan documentation indicates that his home was worth $800,000.00 at the

21  time he entered into their loan. The current fair market value of Completo's home is

22  approximately $535,695.00. Completo alleges that the appraisal was artificially inflated, and that

23  he has suffered damages in the amount of $264,305.00 ($800,000.00-$264,305.00) due to a

24  substantial loss of equity in his home as a result of Defendants' fraudulent inflation and other

25  acts described herein.

26        Defendants and Loan Consultant also represented to Completo that he would be able to

27  refinance his loan at a later time. Completo relied on this assurance in deciding to enter into the

28  mortgage contract. However, Completo has not been able to refinance his loan. Defendants and

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  Loan Consultant also represented that it would modify Completo's loan, and Completo relied on

2  this representation in deciding to enter into the loan.

3     Completo struggled to make the monthly mortgage payment when the interest rate

4  increased 2 years after he entered into the loan. In addition, Completo lost his job shortly after he

5  suffered from the payment shock when the interest-only period of his loan ended. In other words,

6  Completo had to make the monthly payment including both the principal and interest. Therefore,

7  Completo applied for a loan modification with Defendants to lower his payments. Completo was

8  advised by Defendants and a representative and authorized agent of Defendants, to stop making

9  payments in order to be eligible for a modification. Completo relied on Defendants' and

10  Defendants' representative and authorized agent's advice and stopped making his monthly

11  payments causing him to fall even further behind .However, Defendants refused to modify

12  Completo's loan because Completo was informed that he already had an active HAMP

13  modification. Completo has not received any assistance from Defendants in getting his loan

14  modified.

15     Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

16  reputable and complied with industry standard underwriting guidelines and were engaged in

17  lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

18  made in good faith; (3) Completo could afford the loan; (4) he was "qualified" for his loan; (5)

19  "qualified" meant that he could afford his loan; (6) Defendants would modify his loan in the

20  future; and (7) he would be able to refinance his loan in the future.

21     Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

22  otherwise improperly disclosed to Completo that: (1) Defendants and Loan Consultant knew that

23  he could not and would not be able to afford his loan and that there was a very high probability

24  that he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan,

25  and did sell his loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

26  "qualification" process was for Defendants' own protection and not his; (4) that Defendants' and

27  Loan Consultant's representations that he was "qualified" to pay his loan was not intended to

28  communicate that he could actually "afford" the loan which he was being given; (5) Defendants

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1   had abandoned its conventional lending business, prudent lending standards, and industry

2   standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

3   Completo's home to require him to borrow more money with the knowledge that the true value

4   of Completo's home was insufficient to justify the amount of Completo's loan; or (7) Defendants

5   knew that due to its scheme of fraudulently manipulating and inflating property values

6   throughout the State of California that the real estate market would crash and Completo would

7   lose substantial equity in his home.

8           Based on these misrepresentations and omissions, the material facts concerning

9   Completo's loan were concealed from him, and he decided to move forward with his loan. On

10  February 27, 2007, Completo signed the loan and Deed of Trust, before a notary. Had he known

11  the truth however, Completo would not have accepted the loan. As a result of Defendants'

12  fraudulent acts described throughout this complaint Completo has lost substantial equity in his

13  home, has damaged or destroyed credit, and at the time Completo entered into the loan his home

14  was worth $800,000.00 now his home is worth approximately $535,695.00. Completo did not

15  discover any of these misrepresentations or omissions until after a consultation with legal

16  counsel at Brookstone Law, and through a complete and thorough investigation of the loan

17  documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants,

18  as described throughout this complaint, were brought to light on or around September 24, 2012.

19  (True and correct copy of the aforementioned documents are attached hereto as *Exhibit 29*).

20          40.    Plaintiff Irma Laredo ("Laredo") discussed refinancing an existing mortgage on

21  her property located at 99567 Oak Street, Bellflower, CA 90706 and A.P.N.:7106-005-017with a

22  Loan Consultant ("Loan Consultant"), a representative and authorized agent of EZ Funding

23  Corporation, a correspondent of GMAC and Defendants herein (the "Defendants") authorized by

24  Defendants to lend on their behalf in or around May 2008. In the course of their discussions

25  ranging from May 2008 until July 2008, Defendants and Loan Consultant steered her into a fixed

26  rate mortgage in the amount of $365,400.00 with an interest rate at 6.75% for a term of 30 years.

27  This loan was originated by GMAC, on the note and deed of trust EZ Funding Corporation is

28  identified as the lender, and GMAC is currently servicing the loan.

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1   Further, Defendants and Loan Consultant advised her that she was eligible for a Low Doc

2   Loan. Unbeknownst to her at the time, Defendants and Loan Consultant used this low

3   documentation requirement to fraudulently inflate her income by $3,184.36, a factor of 103%;

4   and in doing so, Defendants and Loan Consultant caused her to be placed into a loan whose

5   payments she could not afford given her true, *un-inflated* monthly income. Defendants and Loan

6   Consultant also fraudulently overstated her assets. Defendants and Loan Consultant altered

7   Laredo's loan application without her knowing consent or authorization as Loan Consultant

8   completed Laredo's application without giving Laredo an opportunity to review the loan

9   application.

10   Defendants and Loan Consultant also explicitly represented to Laredo that she could

11   afford her loan and further represented that she could shoulder the additional financial burden of

12   repaying her loan in consideration of her other existing debts. Defendants and Loan Consultant

13   also represented to them that they could afford a $2,369.98 monthly payment, despite their

14   $3,100.00 true monthly income (a "front-end" debt-to-income ratio, meaning a debt-to-income

15   ratio, before any other debts are even considered, of over 76%) - in excess of industry standard

16   underwriting guidelines, and in excess of Defendants' own underwriting guidelines). Defendants

17   and Loan Consultant further represented to Laredo that she could rely on the assessment that she

18   was "qualified" to mean that she could afford the loan. Because of Laredo's lack of familiarity

19   with how much debt a person can and should reasonably take on compared to her monthly

20   income, and because Laredo reasonably relied on Defendants' and Loan Consultant's expertise

21   that any payment she was "qualified" for would take into account what the maximum debt a

22   person such as Laredo should be shouldering was, Laredo reasonably believed Defendants' and

23   Loan Consultant's representations that she could afford her loan and its payments.

24   In addition, Defendants and Loan Consultant represented that appraisals conducted by or

25   on behalf of Defendants were accurate and made in good faith. On or around June 25, 2008, an

26   appraisal company under the direct control and supervision of Defendants, conducted an

27   appraisal on Laredo's home, which was fraudulently inflated to an intentionally overstated value

28   Laredo's loan documentation indicates that her home was worth $620,000.00 at the time she

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1   entered into their loan. The current fair market value of Laredo's home is approximately

2   $374,000.00. Laredo alleges that the appraisal was artificially inflated, and that she has suffered

3   damages in the amount of $246,000.00 ($620,000.00-$374,000.00) due to a substantial loss of

4   equity in her home as a result of Defendants' fraudulent inflation and other acts described herein.

5       When Laredo was struggling to afford to the mortgage payments, she applied for a loan

6   modification with Defendant. However, Defendants refused to permanently modify her loan.

7   Even worse, in the midst of the modification, Defendants initiated the foreclosure proceedings

8   against Laredo.

9       Furthermore, Defendants and Loan Consultant represented that: (1) Defendants were

10  reputable and complied with industry standard underwriting guidelines and were engaged in

11  lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

12  made in good faith; (3) Laredo could afford the loan; (4) she was "qualified" for her loan; (5)

13  "qualified" meant that she could afford her loan; (6) Defendants would modify her loan in the

14  future; and (7) she would be able to refinance her loan in the future.

15      Moreover, Defendants and Loan Consultant withheld or incompletely, inaccurately or

16  otherwise improperly disclosed to Laredo that: (1) Defendants and Loan Consultant knew that

17  she could not and would not be able to afford her loan and that there was a very high probability

18  that she would default and/or be foreclosed upon; (2) Defendants had an incentive to sell her

19  loan, and did sell her loan at fraudulently inflated prices; (3) Defendants' and Loan Consultant's

20  "qualification" process was for Defendants' own protection and not hers; (4) that Defendants'

21  and Loan Consultant's representations that she was "qualified" to pay her loan was not intended

22  to communicate that she could actually "afford" the loan which she was being given; (5)

23  Defendants had abandoned its conventional lending business, prudent lending standards, and

24  industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

25  Laredo's home to require her to borrow more money with the knowledge that the true value of

26  Laredo's home was insufficient to justify the amount of Laredo's loan; or (7) Defendants knew

27  that due to its scheme of fraudulently manipulating and inflating property values throughout the

28  State of California that the real estate market would crash and Laredo would lose substantial

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1    equity in her home.

2        Based on these misrepresentations and omissions, the material facts concerning Laredo's

3    loan were concealed from her, and she decided to move forward with her loan. On July 15, 2008,

4    Laredo signed the loan and Deed of Trust, before a notary. Had she known the truth however,

5    Laredo would not have accepted the loan. As a result of Defendants' fraudulent acts described

6    throughout this complaint Laredo has lost substantial equity in her home, has damaged or

7    destroyed credit, and at the time Laredo entered into the loan her home was worth $620,000.00,

8    now her home is worth approximately $374,000.00. Laredo did not discover any of these

9    misrepresentations or omissions until after a consultation with legal counsel at Brookstone Law,

10    and through a complete and thorough investigation of the loan documentation, and a discussion

11    of the surrounding facts, the fraudulent acts of the Defendants, as described throughout this

12    complaint, were brought to light on or around February 29, 2012. (True and correct copy of the

13    aforementioned documents are attached hereto as *Exhibit 30*).

14        41.     Plaintiff Marcia Willoughby ("Willoughby") entered into a mortgage contract on

15    March 9, 2005 with Washington Mutual Bank to refinance an existing mortgage on her property

16    located at 40625 Vernay Street, Murrieta, CA 92562 and A.P.N.: 949-451-004. Willoughby was

17    given an ARM PayOption loan in the amount of $263,900.00 with the interest rate at 5.261%.

18    The interest rate of the loan was never fixed and could adjust every month thereafter. The loan

19    was originated by Washington Mutual Bank, and GMAC and Defendants herein (the

20    "Defendants") is currently servicing the loan.

21        At the time Willoughby entered into the loan, she was represented that appraisals

22    conducted on her home were accurate and made in good faith. An appraisal company conducted

23    an appraisal on Willoughby's home, which was fraudulently inflated to an intentionally

24    overstated value. Willoughby alleges that the appraisal was artificially inflated, and that she has

25    suffered damages due to a substantial loss of equity in her home.

26        Soon after Willoughby's loan hit the recast point of 115%, she suffered from the payment

27    shock because her monthly mortgage payment substantially increased. Willoughby sought to

28    refinance her loan, but she has not been able to refinance her loan. Unable to refinance her loan,

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1   Willoughby also applied for a loan modification with Defendants. In addition, Willoughby was

2   advised by a representative and authorized agent of Defendants to stop making payments in order

3   to be eligible for a modification. Willoughby relied on Defendants' and the Defendants

4   representative and authorized agent's advice and stopped making her monthly payments causing

5   her to fall even further behind. However, Willoughby was unable to modify her loan.

6           Willoughby has lost substantial equity in her home, has damaged or destroyed credit after

7   she entered into the loan on March 9, 2005. At the time Willoughby entered into the loan her

8   home was worth substantially more than its current fair market value. Willoughby did not

9   discover any of these misrepresentations or omissions until after a consultation with legal

10  counsel at Brookstone Law, and through a complete and thorough investigation of the loan

11  documentation, and a discussion of the surrounding facts, the fraudulent acts of the Defendants,

12  as described throughout this complaint, were brought to light on or around October 25, 2012.

13          42.     Plaintiff Victor Pazos ("Pazos") discussed obtaining a mortgage on his home

14  located at 1403 East 125th, Compton, CA 90222 and A.P.N.:6147-011-011 with a loan

15  consultant (the "Loan Consultant"), and representative and authorized agent of Defendants

16  herein (the "Defendants") in or around May 2006. In the course of their discussions ranging from

17  May 2006 until July 2006, Defendants and Loan Consultant steered him into a loan, of which the

18  Defendants and Loan Consultant concealed and inaccurately, incompletely or otherwise

19  improperly disclosed the material terms and information concerning the loan to him. This loan

20  was originated by GMAC, on the note and deed of trust Mortgage Store Financial Incorporation

21  is identified as the lender, and Ocwen is currently servicing the loan.

22          Defendants and Loan Consultant explicitly represented to Pazos that he could afford his

23  loan; and further represented that he could shoulder the additional financial burden of repaying

24  his loan in consideration of his other existing debts. Loan Consultant and Defendants further

25  represented to Pazos that he could rely on the assessment that he was "qualified" to mean that he

26  could afford the loan. Because of Pazos' lack of familiarity with how much debt a person can

27  and should reasonably take on compared to his/her monthly income, and because Pazos

28  reasonably relied on Defendants' and Loan Consultant's expertise that any payment he was

**APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM**

1  "qualified" for would take into account what the maximum debt a person such as Pazos should

2  be shouldering was, Pazos reasonably believed Defendants' and Loan Consultant's

3  representations that he could afford his loan and its payments.

4      In addition, Defendants and Loan Consultant represented that appraisals conducted by or

5  on behalf of Defendants were accurate and made in good faith. An appraisal company under the

6  direct control and supervision of Defendants conducted an appraisal on Pazos' home, which was

7  fraudulently inflated to an intentionally overstated value. Pazos alleges that the appraisal was

8  artificially inflated, and that he has suffered damages due to a substantial loss of equity in his

9  home as a result of Defendants' fraudulent inflation and other acts described herein.

10      Loan Consultant and Defendants also represented to Pazos that he would be able to

11  refinance his loan at a later time. Pazos relied on this assurance in deciding to enter into the

12  mortgage contract. However, Pazos has not been able to refinance his loan. Loan Consultant

13  and Defendants also represented that it would modify Pazos' loan, and Pazos relied on this

14  representation in deciding to enter into the loan. In addition, Pazos was advised by a

15  representative and authorized agent of Defendants to stop making payments in order to be

16  eligible for a modification. Pazos relied on Defendants' and the Defendants representative and

17  authorized agent's advice and stopped making his monthly payments causing him to fall even

18  further behind. However, Pazos was unable to modify his loan.

19      Furthermore, Loan Consultant and Defendants represented that: (1) Defendants were

20  reputable and complied with industry standard underwriting guidelines and were engaged in

21  lending of the highest caliber; (2) property appraisals done by Defendants were accurate and

22  made in good faith; (3) Pazos could afford the loan; (4) He was "qualified" for his loan; (5)

23  "qualified" meant that he could afford his loan; (6) He would be able to modify his loan in the

24  future; and (7) He would be able to refinance his loan in the future.

25      Moreover, Loan Consultant and Defendants withheld or incompletely, inaccurately or

26  otherwise improperly disclosed to Pazos that: (1) Loan Consultant and Defendants knew that he

27  could not and would not be able to afford his loan and that there was a very high probability that

28  he would default and/or be foreclosed upon; (2) Defendants had an incentive to sell his loan, and

147

APPENDIX A TO AMENDED COMPLAINT IN SUPPORT OF AMENDED PROOF OF CLAIM

1   did sell his loan at fraudulently inflated prices; (3) Loan Consultant's and Defendants'

2   "qualification" process was for Defendants' own protection and not his; (4) That Loan

3   Consultant's and Defendants' representations that he was "qualified" to pay his loan was not

4   intended to communicate that he could actually "afford" the loan which he was being given; (5)

5   Defendants had abandoned its conventional lending business, prudent lending standards, and

6   industry standard underwriting guidelines; (6) Defendants influenced the appraiser to over-value

7   Pazos' home to require him to borrow more money with the knowledge that the true value of

8   Pazos' home was insufficient to justify the amount of Pazos' loan; or (7) Defendants knew that

9   due to its scheme of fraudulently manipulating and inflating property values throughout the State

10  of California that the real estate market would crash and Pazos would lose substantial equity in

11  his home.

12         Based on these misrepresentations and omissions, the material facts concerning Pazos'

13  loan were concealed from him, and he decided to move forward with his loan. On July 26, 2006,

14  Pazos signed the loan and Deed of Trust, before a notary. Had he known the truth however,

15  Pazos would not have accepted the loan.  As a result of the Defendants' fraudulent acts described

16  throughout this complaint Pazos has lost substantial equity in his home, has damaged or

17  destroyed credit, and at the time Pazos entered into the loan his home was worth substantially

18  more than its current fair market value.  Pazos did not discover any of these misrepresentations

19  or omissions until after a consultation with legal counsel at Brookstone Law, and through a

20  complete and thorough investigation of the loan documentation, and a discussion of the

21  surrounding facts, the fraudulent acts of the Defendants, as described throughout this complaint,

22  were brought to light on or around October 15, 2012.

23

24

25

26

27

28