WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007
Gary T. Holtzer
Bruce S. Meyer
Ronit J. Berkovich

*Attorneys for Syncora Guarantee Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
|  | : |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| RESIDENTIAL CAPITAL, LLC, *et al.* | : | Case No. 12-12020 (MG) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

---------------------------------------------------------x

**OBJECTION OF SYNCORA GUARANTEE INC. TO**
**DEBTORS' MOTION UNDER SECTION 365 OF THE BANKRUPTCY CODE**
**TO ASSUME AND ASSIGN SERVICING-RELATED AGREEMENTS FOR TRUSTS**
**INSURED BY SYNCORA GUARANTEE INC. TO OCWEN LOAN SERVICING, LLC**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .....................................................................................................................4

OBJECTION.........................................................................................................................8

I.      The Debtors Cannot Assign The Syncora-Related Servicing
        Agreements Without Adequate Assurance of Future Performance ....................................9

II.     The Sale Order Impermissibly Modifies Syncora's Contracts .........................................12

III.    The Assignment Motion Creates
        Substantial and Undefined Administrative Expenses .......................................................20

IV.     Syncora's Cure Claim Will Be Fixed Through
        Contemporaneous Litigation of Its Proof of Claim With the Assignment Motion...........22

RESERVATION OF RIGHTS .................................................................................................24

CONCLUSION.....................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AGV Prods., Inc. v. Metro-Goldwyn-Mayer, Inc.,*
  115 F.Supp.2d 378 (S.D.N.Y. 2000)........................................................................13

*Am. Flint Glass Workers Union v. Anchor Resolution Corp., et al.,*
  197 F.3d 76 (3d Cir. 1999)........................................................................................21

*Androse Assocs. Of Allaire LLC v. Great Atl. & Pac. Tea Co. (In re Great Atl. & Pac.
  Tea Co.),*
  472 B.R. 666 (S.D.N.Y. 2012)....................................................................................9

*In re Barnhill's Buffet, Inc.,*
  No. 07-08948, 2008 WL 4489687 (Bankr. M.D. Tenn. Feb. 13, 2008) ..................10

*In re Bygaph, Inc.,*
  56 B.R. 596 (Bankr. S.D.N.Y. 1986) .................................................................... 9-10

*Byrd v. Gardinier, Inc. (In re Gardinier, Inc.),*
  831 F.2d 974 (11th Cir. 1987) ..................................................................................14

*In re the Drexel Burnham Lambert Grp. Inc., et al.,*
  151 B.R. 674 (Bankr. S.D.N.Y. 1993).......................................................................22

*Empire State Bldg. Co. v. N.Y. Skyline, Inc. (In re N.Y. Skyline, Inc.),*
  432 B.R. 66 (Bankr. S.D.N.Y. 2010)........................................................................15

*In re Fleming Cos., Inc., et al.,*
  499 F.3d 300 (3d Cir. 2007).......................................................................................9

*In re Frontier Props.,*
  979 F.2d 1358 (9th Cir. 1992) ..................................................................................21

*The Leslie Fay Cos. v. Corp. Prop. Assocs. 3 (In re The Leslie Fay Cos.),*
  166 B.R. 802 (Bankr. S.D.N.Y. 1994).......................................................................14

*LNS Inv. Co. v. Phillips 66 Co.,*
  731 F. Supp. 1484 (D. Kan. 1990)............................................................................10

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Turner,*
  892 F.2d 199 (2d Cir. 1989)......................................................................................15

*NLRB v. Bildisco & Bildisco,*
  465 U.S. 513 (1984)..................................................................................................13

*Pieco, Inc. v. Atl. Computer Sys. (In re Atl. Computer Sys.)*,
    173 B.R. 844 (S.D.N.Y. 1994) ......................................................................................... 13-14

*In re Plitt Amusement Co. of Wash., Inc.*,
    233 B.R. 837 (Bankr. C.D. Cal. 1999) ................................................................................14

*Schaffer ex rel. Schaffer v. Weast*,
    546 U.S. 49 (2005) ..............................................................................................................15

STATUTES

11 U.S.C. § 105 ...........................................................................................................................17

11 U.S.C. § 363 .............................................................................................................................3

11 U.S.C. § 365 .................................................................................................................... *passim*

11 U.S.C. § 1129(a)(11) ...............................................................................................................21

N.Y. BANK §§ 44 and 595-B ......................................................................................................12

U.C.C. § 2-609 ..........................................................................................................................9, 10

OTHER AUTHORITIES

Restatement (Second) of Contracts § 318(3) (1981) ..................................................................21

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

Syncora Guarantee Inc. ("**Syncora**") submits this objection (the "**Objection**")[1] to

the motion [D.I. 4718] (the "**Assignment Motion**"), of the debtors and debtors in possession in

the above-captioned cases (collectively, the "**Debtors**"), for entry of an order authorizing the

assumption of certain servicing-related agreements for trusts insured by Syncora and assignment

of such agreements to Ocwen Loan Servicing, LLC ("**Ocwen**"), and, in support of the Objection,

respectfully represents as follows:

### **Preliminary Statement**

1.    Last November, the Debtors strategically withdrew Syncora's contracts

from the sale of their servicing platform assets (the "**Sale**") because they knew that Syncora's

valid objections to their proposed sale order could jeopardize the Sale.  They did the same with

other objecting parties' contracts, and the Court entered the order approving the sale to Ocwen

[D.I. 2246] (the "**Sale Order**") without having to address the major objections to it.  Now having

obtained approval of the Sale Order, consummated the Sale, entered into a plan support

agreement with major parties, and filed a plan (the "**Plan**") and disclosure statement, the Debtors

are hoping to use that momentum to force the ill-fitting Sale Order on Syncora by fully

incorporating it into a proposed order granting the Assignment Motion, notwithstanding

Syncora's objection on the record to such Sale Order.

2.    The Court should deny the Assignment Motion, because Ocwen has not

met its burden of providing adequate assurance of future performance.  First and foremost,

Ocwen does not have the history, experience, and track record of performing well on the specific

---

[1] The Debtors extended the deadline for Syncora to object to the Assignment Motion from August 26, 2013 to
August 28, 2013.

distressed types of mortgage loan portfolios in the trusts that Syncora insures. Indeed, since the

Sale, additional events have transpired which confirm and amplify Syncora's deep apprehensions

about Ocwen. Specifically, as a result of New York State's "concerns regarding Ocwen's rapid

growth and capacity to properly board a significant portfolio of distressed home loans" (*See* 2012

Consent Order (as defined below) at p.1), Ocwen agreed in 2011 to certain controls and

procedures (the "*2011 Agreement*"). Yet, in a new Consent Order, dated December 5, 2012 (the

"*2012 Consent Order*"), the New York State Department of Financial Services noted that an

examination revealed numerous instances of "non-compliance" by Ocwen with the 2011

Agreement, leading to the Department requiring further review for the next two years by an

independent monitor. Secondly, as discussed below, Ocwen has not agreed to adequately

perform Syncora's contracts post-closing – instead, it has agreed only to perform at most some of

the obligations in the contracts.

       3.     In the alternative, if the Court is going to approve the assignment to

Ocwen, it should do so not under the existing Sale Order, which Syncora found to be

problematic, but under a plain vanilla order, such as the one attached hereto as **Exhibit A**, which

provides Syncora the protections that section 365 of the Bankruptcy Code guarantees to contract

counterparties. The Sale Order impermissibly and ambiguously attempts to carve out obligations

from the agreements being assigned thereunder and limit Ocwen's future performance

obligations, in contravention of the Bankruptcy Code and applicable case law. Any order

approving assignment should instead provide clearly that the Debtors (or Ocwen) will cure

defaults and Ocwen will perform all future obligations. Any other gloss or protection that

Ocwen tries to build in is simply not allowed by the Bankruptcy Code. If other parties want the

rights between the Debtors and Ocwen to be governed by the Sale Order, the assignment order

can refer to the Sale Order for that one purpose.  But Syncora is entitled to have its very clear

rights under the Bankruptcy Code not be governed by an order entered at a hearing at which it

was not permitted to participate.  Indeed, the Sale Order specifically provides that none of its

findings of fact or conclusions or law are binding on Syncora.  Sale Order at ¶ 61.

> 4.      A contract assumption and assignment under section 365 of the

Bankruptcy Code is, plain and simple, not like a sale of assets under section 363.  A 363 sale is a

negotiated deal between a debtor and a purchaser, where the parties can decide which assets the

purchaser will take and which liabilities the purchaser will assume (if any), and the Bankruptcy

Code permits the assets to be sold free and clear of most claims and interests.  A typical 363 sale

order therefore contains a great deal of language specifying which claims and interests are being

assumed versus left behind.  Section 365 of the Bankruptcy Code, on the other hand, provides a

clear delineation of how a contract counterparty must be "made whole" by the assumption and

assignment of its contract – (i) cure of pre-assumption defaults and (ii) *future performance by the

assignee of all other obligations*.  It does not allow for the "cherry picking" or disavowal of

obligations by the assignee, and there is no concept of contracts being assigned free and clear of

obligations.  Section 365 could not be any clearer on this point.  As a result, a typical 365

contract assumption and assignment order is much simpler than a 363 sale order, providing for

little more than cure and the assumption by the assignee of all obligations under the contract.

The Sale Order is patently not appropriate for the simple Assignment Motion that is before the

Court at this time.

> 5.      In addition, to the extent that the Court agrees to the relief the Debtors are

seeking and strips out obligations from the servicing agreements when transferring such

agreements to Ocwen, those future obligations will remain an obligation of the estate and expose

the liquidating Debtors to high administrative expense costs, calling into question the feasibility

of the Debtors' proposed Plan. Denial of the Assignment Motion, on the other hand, will have

no effect on the Plan process. Syncora believes that the Debtors will receive less than $7 million

from Ocwen if the assignment is approved (an amount that is not mentioned in the Assignment

Motion, and an amount that is significantly less than the hundreds of millions that Syncora is at

risk of losing on account of faulty servicing).[2] This is not the multi-billion dollar deal that was

being considered last November. While the Debtors and the Committee should rightfully seek to

maximize value for the estate, they cannot be permitted to do so by violating Syncora's rights.

6.     Furthermore, because the Debtors removed the Syncora agreements from

the Sale entirely, the Debtors procedurally opened an entirely new matter with the filing of the

Assignment Motion. As such, Syncora is not foreclosed from making any arguments in this

Objection and asserting cure claims relating to the prepetition period, as well as the period

postpetition but pre-assignment to Ocwen. In any case, the deadline relevant to cure in

connection with the Sale Motion does not, by its terms, apply to Syncora's contracts.

**Background**

7.     Contemporaneously with their May 14, 2012 bankruptcy filings, the

Debtors filed a motion for approval of sales of substantially all of their assets (the "***Sale***

***Motion***") [D.I. 61], including the servicing agreements for the three mortgage-backed trusts[3] for

which Syncora acted as bond insurer, listed on **Schedule 1** to the proposed order attached as

**Exhibit A** hereto ("***Schedule 1***") and also on the assumption notices filed on July 26, 2012 and

---

[2] As of last fall, the purchase price for all three contracts was approximately $7 million. *See Statement of the Official Committee of Unsecured Creditors Concerning Sales of the Debtors' Servicing Platform and Legacy Loan Portfolio* at 3 [D.I. 2187].

[3] The three trusts are: (i) SunTrust Acquisition Closed-End Seconds Trust, Series 2007-1 (the "***SunTrust Trust***"), (ii) Greenpoint Mortgage Funding Trust 2006-HE1 (the "***Greenpoint Trust***"), and (iii) Bear Stearns Second Lien Trust 2007-SV1 (the "***Bear Stearns Trust***" and, collectively, the "***Syncora Trusts***").

September 18, 2012 [D.I. 924 and 1484].  On June 28, 2012, the Court entered an order

approving sale procedures [D.I. 538].  Syncora filed objections to the sale of the Syncora-Related

Servicing Agreements on September 28, 2012 and October 29, 2012 [D.I. 1657 and 1996] (the

"*Syncora Objections*").

        8.      Syncora objected on several bases, including that the Debtors had not

provided evidence that the stalking horse bidder, Nationstar Mortgage LLC – and, later, the

winning bidder, Ocwen – could adequately perform as servicer, and that the proposed sale order

impermissibly modified the servicing agreements by (i) improperly cherry-picking only certain

rights and obligations for assumption and/or assignment and (ii) failing to assume and assign

together with the servicing agreements other essential agreements, also listed on **Schedule 1**

hereto (the "*Additional Agreements*" and, together with the servicing agreements listed on

**Schedule 1**, the "*Syncora-Related Servicing Agreements*"), that are an integral part of a single

transaction.  Notably, numerous other parties filed objections to the proposed sale on similar

grounds, including the indenture trustees for the hundreds of trusts serviced by the Debtors

(collectively, the "*RMBS Trustees*"),[4] Ambac Assurance Corporation ("*Ambac*"), Financial

Guaranty Insurance Company ("*FGIC*"), Federal National Mortgage Association, and Federal

Home Loan Mortgage Corporation ("*Freddie Mac*").  After an auction on October 23-24, 2012,

the Debtors selected Ocwen as the purchaser of the servicing platform assets.

        9.      Faced with a fatally flawed proposed sale order, the Debtors nonetheless

obtained approval of the Sale by strategically eliminating the objections thereto – either by

adding special protections for certain objecting parties in exchange for their consent (the RMBS

---

[4] The RMBS Trustees are The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A.,
Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas, HSBC Bank USA, N.A.,
Law Debenture Trust Company of New York, U.S. Bank National Association, and Wells Fargo Bank, N.A.

Trustees) or adjourning consideration of assumption and assignment of the contracts of other

objecting parties (*e.g.*, Ambac and FGIC).  The Debtors sidestepped Syncora's objection by

removing the Syncora-Related Servicing Agreements from the Sale and taking the position at the

Sale hearing that Syncora had no standing to object to entry of the proposed sale order.[5]  *See* H'g

Tr. at 64:20-22 Nov. 19, 2012 ("we don't think they have standing to be heard today.").

Concerned about the unfair burden of having to argue against the propriety of an already-entered

order at a later date (which is, of course, exactly where Syncora finds itself right now), Syncora

objected to the Court deciding any matters that might affect Syncora's rights without Syncora

being heard, given the real possibility that the Debtors would seek to put the Syncora-Related

Servicing Agreements back into the Sale Order at a later date.  In response to this argument, the

Court agreed that while it would not let Syncora be heard on the merits, the November sale

process would in no way affect Syncora's rights.[6]  The Sale Order itself says "No findings of fact

or conclusions of law contained in this Order or rulings at the Sale Hearing shall be binding on,

prejudice the arguments of, be considered law of the case with respect to, or otherwise estop

Syncora Guarantee Inc. . . . at any future hearing or proceedings."[7]  Sale Order at ¶ 61.

---

[5] The Debtors have flip-flopped numerous times on their position on the Syncora contracts—from initially putting them on the list of contracts to be assumed and assigned in connection with the Sale, to removing them from that list and representing that they would be rejected, to adding them back to the list to removing them from the list on the eve of the hearing, to telling Syncora they would work with Syncora to find another mutually acceptable assignee, to filing the Assignment Motion now.  Syncora has expended resources at each turn.

[6] The Court stated:  "I'm not going to hear and decide any issues today that I don't have to hear and decide. Your contracts have been removed from the schedule of contracts to be assumed…  I'm not going to reach out and treat issues that I don't have to treat."  *See* H'g Tr. at 75:23-76:4 Nov. 19, 2012.

[7] Since then the Debtors have been working with two other bond insurers, Ambac and FGIC, on resolving their similar objections to the Sale.  On March 13, 2013, Syncora wrote a letter to the Court asking for permission to appear at any Ambac or FGIC sale objection hearing, because the objections to be decided with respect to the Sale Order may be identical to those raised by Syncora, and the Debtors had indicated that they might try to sell the Syncora-Related Servicing Agreements pursuant to the Sale Order at a later date [D.I. 3164].  On March 14, 2013, the Court had entered an order on Syncora's letter request, saying that it would determine at any Ambac or FGIC hearing whether to let Syncora be heard as well [D.I. 3186].  The hearings on the Sale objections of both Ambac and FGIC have been adjourned numerous times.

10.    Since the Sale hearing, the Debtors have seemingly been unwilling to litigate the permissibility of language in the Sale Order that could modify Ocwen's obligations to perform under the servicing agreements post-closing and have instead made side deals one at a time with the objectors, sometimes without fully disclosing all of the terms.  *See*, *e.g.*, *Amended Stipulation and Order between the Debtors and MBIA Insurance Corporation*, referencing a letter agreement not attached to the stipulation [D.I. 3129].

11.    After the Sale hearing, Syncora worked with the Debtors to help them find a way to assign the Syncora-Related Servicing Agreements in a manner consistent with the Bankruptcy Code.  Syncora also sought to understand the specific obligations that Ocwen was unwilling to perform.  Each to no avail.  In December, 2012, Syncora sent the Debtors a form of assignment order that might be acceptable, which the Debtors rejected out of hand and indicated that Ocwen refused to consider.  Syncora even suggested that it might consider negotiating modifications to Ocwen's future obligations, if only Ocwen would identify with precision the provisions of the Syncora-Related Servicing Agreements that would be affected.  Ocwen refused. Finally, Syncora cooperated in locating bidders for the Syncora-Related Servicing Agreements, resulting in preliminary non-binding bids from at least two alternate servicers.

12.    On August 15, 2013, while Syncora was working with counsel to review the terms of an alternate proposed assignee that the Debtors had indicated they would support, the Debtors filed the Assignment Motion, with no advance notice to Syncora of the about-face in their sale approach.  In the Assignment Motion, the Debtors imply that they move pursuant to their previous sale pleadings and characterize the Syncora Objections as adjourned.  But this is a mischaracterization.  The assignment of the Syncora-Related Servicing Agreements has not been before the Court since fall 2012.

13.     By the Assignment Motion, the Debtors seek to assume certain servicing-related agreements for trusts insured by Syncora and assign such agreements to Ocwen under the terms of the Sale Order.  While the Debtors have included most of the Additional Agreements that they had failed to include previously, they continue to omit two custodial agreements that are integral to the transaction (collectively, the "***Custodial Agreements***"):  (i) the Custodial Agreement, dated as of August 1, 2006, among Deutsche Bank National Trust Company, as custodian, U.S. Bank National Association, as indenture trustee and Greenpoint Mortgage Funding Trust 2006-HE1, as issuer, and (ii) the Custodial Agreement, dated as of August 1, 2006, among U.S. Bank National Association, as custodian and as trustee and Greenpoint Mortgage Funding Trust 2006-HE1, as issuer.  Finally, the Debtors ask the Court to establish that no cure amount is owed to Syncora in connection with the assumption of these agreements.

## Objection

14.     The Assignment Motion is a wholly deficient pleading and should be rejected out of hand, because it fails to disclose the extraordinary relief that the Debtors are seeking in severing obligations from the Syncora-Related Servicing Agreements upon assignment, or provide any justification for such relief.  Remarkably, although the Debtors were well aware of Syncora's objections, the Debtors neither make clear the import of the relief they are seeking, nor address ***any of*** the obvious (and previously made) arguments that the proposed assignment effectuates impermissible contract modifications.  On the adequate assurance issue, the Debtors simply assert that the sub-servicing by Ocwen of the mortgages in the Syncora Trusts, over the last six months, by itself should be all the adequate assurance that Syncora needs, without providing any evidence that Ocwen has performed satisfactorily under the Syncora-Related Servicing Agreements.  They also conveniently ignore that this sub-servicing is pursuant to the terms of the Syncora-Related Servicing Agreements **without** any modification

effected by the Sale Order.  Finally, by misstating the procedural posture of the Assignment

Motion, the Debtors seek to deny Syncora its right to seek a cure claim.

**I.      The Debtors Cannot Assign The Syncora-Related Servicing
         Agreements Without Adequate Assurance of Future Performance**

15.     A debtor's right to assume and assign an executory contract is not

absolute.  Debtors are prohibited from assuming and assigning executory contracts pursuant to

section 365(f) of the Bankruptcy Code unless "adequate assurance of future performance by the

assignee . . . is provided . . . ."  It is the Debtors' burden to demonstrate adequate protection of

future performance.  *See Androse Assocs. Of Allaire LLC v. Great Atlantic & Pacific Tea Co.,

Inc. (In re Great Atlantic & Pacific Tea Co., Inc.)*, 472 B.R. 666, 674-75 (S.D.N.Y. 2012).

16.     The Bankruptcy Code's adequate assurance requirement, which is derived

from section 2-609 of the Uniform Commercial Code, is a flexible concept that must be applied

in light of the facts and circumstances.  *See In re Fleming Companies, Inc., et al.*, 499 F.3d 300,

305-07 (3d Cir. 2007) ("[T]he Bankruptcy Code adopted the phrase 'adequate assurance of

future performance' from Uniform Commercial Code § 2-609(1), which provides that "when

reasonable grounds for insecurity arise with respect to the performance of either party, the other

may in writing demand adequate assurance of future performance. . . .'Adequate assurance of

future performance' are not words of art; the legislative history of the [Bankruptcy] Code shows

that they were intended to be given a practical, pragmatic construction… What constitutes

'adequate assurance of future performance' must be determined by consideration of the facts of

the proposed assumption.").  A party's financial wherewithal is only one important factor when

considering its performance of obligations as complex as those under a servicing agreement.  An

assignee's operational capabilities – including their experience and logistics of performing – to

perform adequately all such obligations is equally critical.  *See In re Bygaph, Inc.*, 56 B.R. 596

(Bankr. S.D.N.Y. 1986) (finding adequate assurance based on, among other things, assignee's

"experience as an owner and operator of a successful" business venture); *In re Barnhill's Buffet,*

*Inc.*, No. 07-08948, 2008 WL 4489687 (Bankr. M.D. Tenn. Feb. 13, 2008) (holding that

adequate assurance was not shown for entity without operating experience). Moreover, a party's

reputation and conduct of its business is a fact that bears on the determination of what constitutes

adequate assurance. *See LNS Investment Co., Inc. v. Phillips 66 Co.*, 731 F. Supp. 1484, 1487

(D. Kan. 1990) (citing Official Comment 4 to Uniform Commercial Code § 2-609 (stating that in

some circumstances "a mere promise by a seller of good repute that he is giving the matter his

attention and that the defect will not be repeated" is sufficient assurance, but "a similar statement

by a known corner-cutter might well be considered insufficient . . . .")).

17.    The Debtors and Ocwen have not provided adequate assurance that Ocwen

can properly service the mortgages in the Syncora Trusts.  Importantly, the heavily distressed

nature of the Syncora Trusts, especially the Greenpoint Trust, distinguishes the servicing rights

in these trusts from most of the others Ocwen assumed in the Sale.  Neither the Debtors nor

Ocwen has responded to Syncora's numerous requests for information on Ocwen's experience

servicing heavily distressed mortgage portfolios and performance in generating recoveries

therefrom.  Without proof of such relevant experience and performance, the Debtors and Ocwen

fail to satisfy their burden of demonstrating adequate assurance of future performance under the

Syncora-Related Servicing Agreements.

18.    The Debtors' attempt to assuage adequate assurance concerns with the

blanket statement that Ocwen has been sub-servicing the loans in the Syncora Trusts since the

closing of the Sale is not sufficient.  The Debtors and Ocwen will need to provide data to

Syncora and to the Court with respect to the quality of and results of such sub-servicing, as well

as how Ocwen intends to continue to produce such results, especially if it does not intend to

perform all obligations under the servicing agreements.

19.    Syncora has good reason to be concerned.  On September 1, 2011, the

Department of Financial Services for the State of New York and Ocwen entered into the 2011

Agreement, attached hereto as **Exhibit B**, in which Ocwen agreed to adhere to certain servicing

practices after the State raised issues regarding Ocwen's servicing.  More recently, Ocwen

apparently breached the agreement, causing the Department to take regulatory action, appointing

an examiner to assess compliance with the 2011 Agreement.  The examination

> preliminarily identified gaps in the servicing records of certain loans that the
> Department believe[d] indicate non-compliance by Ocwen, including, in some
> instances:
>
> (1) failing to send borrowers a 90-day notice prior to commencing a foreclosure
> action as required under Real Property Actions and Proceedings Law ("RP APL")
> § 1304;
>
> (2) commencing foreclosure actions on subprime loans without affirmatively
> alleging in the complaint that Ocwen has standing to bring the foreclosure action
> as required under RP APL §13 02; and
>
> (3) commencing foreclosure actions without sufficient documentation of its
> standing to do so.

2012 Consent Order (as defined below) at p.2.  The examination also identified other instances

of non-compliance by Ocwen, including

> (1) failing to provide certain borrowers direct contact information for their
> designated loss mitigation staff or a single point of contact;
>
> (2) pursuing foreclosure actions against certain borrowers who are seeking a loan
> modification (referred to in the Agreement as "dual tracking");
>
> (3) failing to conduct an independent review of certain loan modification denials;
>
> (4) failing to demonstrate its adoption of policies and procedures to effectively
> track sanctioned third-party vendors, including local foreclosure counsel;

(5) failing to demonstrate its implementation of policies and procedures to verify borrower information on newly boarded accounts to accurately reflect the status and current balance of the borrower's account; and

(6) failing to sufficiently document actions required to ensure that prior modification efforts are not rendered futile upon transfer of a servicing file to or from Ocwen.

*Id*. at p.3.  As a result, in December 2012 the Department required Ocwen to enter the 2012

Consent Order, attached hereto as **Exhibit C**, requiring the appointment of a compliance monitor

to conduct further investigations for the next 24 months into Ocwen's corrective measures,

including the "adequacy of Ocwen's staffing levels for delinquent loans" and "the robustness of

established policies and procedures governing loss mitigation programs and foreclosure

alternatives."

        20.    If Ocwen will not (or cannot) even comply with a contract with a regulator

that has authority to impose a fine or penalty, Syncora cannot be certain that Ocwen will comply

with, and fully perform, the Syncora-Related Servicing Agreements.  *See* New York Code,

Article 2 (NY Banking Law), Sections 44 and 595-B (allowing the superintendent to impose

fines or penalties on mortgage loan servicers).  This is the sort of corner-cutting that justifies

imposition of a higher level of assurance than a mere promise to perform.

## II.    The Sale Order Impermissibly Modifies Syncora's Contracts

        21.    To the extent that the Court believes Ocwen has provided adequate

assurance, it should still deny approval of the assumption and assignment of the Syncora-Related

Servicing Agreements pursuant to the terms of the Sale Order.  Rather, assignment should only

be approved, if at all,  under a plain vanilla order that provides Syncora the protections that

section 365 of the Bankruptcy Code guarantees to contract counterparties, such as the one

attached as **Exhibit A**.

22.     Section 365 of the Bankruptcy Code governs the assumption and

assignment of executory contracts.  It is quite simple.  To assume a contract, "[i]f there has been

a default in [the contract]," the debtor must

> at the time of assumption of such contract… (A) cure[], or provide[] adequate
> assurance that the [debtor] will promptly cure, such default…; (B) compensate[],
> or provide[] adequate assurance that the [debtor] will promptly compensate, a
> party other than the debtor to such contract… for any pecuniary loss to such party
> resulting from such default; and (C) provide[] adequate assurance of future
> performance under such contract.

11 U.S.C. § 365(b)(1).  To assign a contract, "(A) the [debtor must] assume such contract . . . in

accordance with the provisions of this section; and (B) adequate assurance of future performance

by the assignee of such contract [must be] provided..."  11 U.S.C. § 365(f)(2).  Section 365 thus

divides the universe of obligations in the contract into two simple parts:  (i) pre-closing

"defaults," which must be cured, and compensation provided, and (ii) future performance, which

must be provided in full by the assignee.  An order approving the assumption and assignment of

a contract is thus generally, and fittingly, quite a short document.

23.     It is a fundamental tenet of bankruptcy law that contracts are to be

assumed and assigned *cum onere*.  Reformation or modification of contracts through the

assumption process (also known as "cherry picking") is strictly prohibited.  *See NLRB v. Bildisco*

*& Bildisco*, 465 U.S. 513, 531-32 (1984) (superseded in part on other grounds by statute)

("Should the debtor-in-possession elect to assume the executory contract, however, it assumes

the contract *cum onere*, and the expenses and liabilities incurred may be treated as administrative

expenses, which are afforded the highest priority on the debtor's estate.") (citations omitted);

*AGV Productions, Inc. v. Metro-Goldwyn-Mayer, Inc.*, 115 F.Supp.2d 378, 391 (S.D.N.Y. 2000)

("under the law of bankruptcy a contract cannot be assumed in part or rejected in part."); *Pieco,*

*Inc. v. Atlantic Computer Sys. (In re Atlantic Computer Sys.)*, 173 B.R. 844, 849 (S.D.N.Y.

1994) ("[U]nder Section 365 of the [Bankruptcy] Code, a debtor may not 'cherry pick' pieces of contracts it wishes to assume."); *The Leslie Fay Cos., Inc. v. Corp. Prop. Assocs. 3 (In re The Leslie Fay Cos., Inc.)*, 166 B.R. 802, 808 (Bankr. S.D.N.Y. 1994) ("An executory contract cannot be assumed in part and rejected in part.") (citations omitted).

24.    Courts occasionally allow certain obligations in a single written agreement to be treated as separate contracts, or single agreements in a larger transaction to be treated differently from other agreements in the same transaction, but only upon a motion to so do, which the Debtors have not made, and under a severance doctrine that applies only when the debtor establishes that the parties' intent was to allow the separation of the rights and obligations. *See Byrd v. Gardinier, Inc. (In re Gardinier, Inc.)*, 831 F.2d 974, 976-978 (11th Cir. 1987) (debtor permitted to assume a contract for the sale of property and reject a specific, identified provision in such contract that provided for the payment of a broker's fee after the court analyzed party intent by considering whether (i) the parties' obligations under each of the agreements were interrelated, (ii) the nature and purpose of the agreements were different and (iii) there was separate and distinct consideration for each agreement); *see also In re Plitt Amusement Co. of Washington, Inc.*, 233 B.R. 837, 845 (Bankr. C.D. Cal. 1999) ("Severability is determined by the intent and the actions of the contracting parties. Severability is a question whether parts of a contract or lease, or part performance thereunder, can be separated and treated as independent legal obligations.") (citations omitted). In other words, severance requires a specific showing of intent to enter into separate obligations. Moreover, when applied, it divides certain specific provisions in a contract from others, rather than loosely carving out (or in) certain amorphous obligations for the expediency of one party, as occurs under the Sale Order.

25.    Similarly, courts allow single agreements in a larger transaction to be treated differently from other agreements in the same transaction only when the debtor establishes that the parties' intent was to allow the separation of the rights and obligations.  *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Turner,* 892 F.2d 199, 204 (2d Cir. 1989) (internal citations omitted) ("Two separate written agreements executed at the same time may be considered in law as one agreement, but only if the parties so intended. Whether the parties intended that the two agreements should be interdependent is a question of fact which turns upon the circumstances of each case.").

26.    As the moving party seeking to sever the Syncora-Related Servicing Agreements, the Debtors bear the burden of proving that the intent was to allow the severability of certain obligations under, and certain Additional Agreements from, the Syncora-Related Servicing Agreements.  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005). ("We therefore begin with the ordinary default rule that plaintiffs bear the risk of failing to prove their claims. 'The burdens of pleading and proof with regard to most facts have been and should be assigned to the plaintiff who generally seeks to change the present state of affairs and who therefore naturally should be expected to bear the risk of failure of proof or persuasion.'" (citations omitted)).  State law governs whether agreements "are separate or indivisible for purposes of § 365."  *Empire State Bldg. Co. L.L.C. v. New York Skyline, Inc. (In re New York Skyline, Inc.)*, 432 B.R. 66, 77 (Bankr. S.D.N.Y. 2010) (citations omitted).  The Debtors have not met their burden on either of these points – that they can sever certain obligations out of the Syncora-Related Servicing Agreements or that they can sever out the two Additional Agreements from the other agreements to be assumed and assigned.

15

27.    Rather than simply providing that any pre-closing defaults are deemed to be cured upon payment of cure claims and that the purchaser will perform all obligations due under the contract following the assumption and assignment, the Sale Order improperly severs future obligations in three primary ways:[8]  ***First***, it purports to pick and choose what ***types*** of obligations in the agreements are assumed and assigned:

- The Sale Order expressly severs obligations by arbitrarily carving out as "Other Agreements" any obligations or liabilities in the contracts not specifically relating to servicing, subservicing, or master servicing.  Sale Order at ¶ P, ¶ 14.  Confusingly, the Debtors have not identified precisely which provisions in the Syncora-Related Servicing Agreements they intend to sever as separate and distinct contracts based on this distinction.  As such, Syncora does not know which provisions the Purchaser is obligating itself to perform.

- The language of the Sale Order expressly eliminates duties "with respect to noticing and enforcement of any remedies in respect of alleged breaches of [mortgage loan origination] representations and warranties."  Sale Order at ¶ P.  This is an important servicing function,[9] the purpose of which is to preserve the value of the trust collateral.  For example, the servicer must notify the trustee if it discovers loans in the trust that breach origination representations and warranties so that the trustee may enforce remedies for the benefit of the trust.  Yet, the Sale Order attempts to shed such functions by including them in the definition of "Other Agreements."

- Some additional specific examples of rights terminated without regard to whether they should be assumed contractual obligations are (i) rights "relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the closing," (ii) any "indemnification Claims or Liabilities relating to any act or omission of the Sellers or any other Persons prior to the Closing Date," (iii) contract termination rights, (iv) guarantees, and (v) amounts owing under any of the Debtors' agreements.  *See* Sale Order at ¶¶ O, 9.

28.    ***Second***, even for those types of obligations Ocwen has agreed to assume, the Sale Order purports to limit Ocwen's ***future obligations*** relating thereto.  It also prohibits

---

[8] As the provisions in the Sale Order that impermissibly excuse Ocwen from future performance are so numerous, these examples are not intended to be an exhaustive list.  Moreover, Ocwen's asset purchase agreement, which is attached to the Sale Order, contains additional terms, further limiting the obligations assumed under executory contracts.

[9] As the Debtors did not originate the loans in the trusts at issue here, there is no reason for any order approving the Motion to even treat the topic of severance of origination liability.

enforcement of these obligations against *the Debtors* under the assumed contracts, so that

Syncora would not be able to enforce those future obligations against anyone.  Syncora is not

aware of a single case where such a limitation was actually approved over a counterparty's

objection.

- The Sale Order provides:  "All . . . other obligations or Liabilities under any Assumed Contract occurring, arising or accruing prior to the date of the assignment or transfer to the Purchaser . . . shall be deemed cured or satisfied upon payment by the Sellers of the cure amount," without considering whether such obligations or liabilities have come due, or relate to a default and are actually subject to cure.  *See, e.g.*, Sale Order at ¶ 18.[10]  The universe of future obligations that can fit in this category is limitless.[11]

29.    ***Third***, the Sale Order purports to assign agreements to Ocwen free and

clear of ***any*** obligations, a point Syncora made to the Debtors last year but that the Debtors did

not bother to fix:

- The Sale Order provides in several places that the Purchased Assets (including the "Servicing Agreements") are being sold free and clear of "Claims" and "Interests."[12] *See, e.g.*, Sale Order at preamble, ¶¶ O, 7, 9, 10.  *See also* Sale Order at ¶ 16 ("The Debtors are . . . directed in accordance with sections 105(a) and 365 of the Bankruptcy Code to (i) assume and assign to the Purchaser . . . the Assumed Contracts free and clear of all Interests of any kind or nature whatsoever.").  Given the broad definitions of "Claims" and "Interests," Ocwen is literally disclaiming any liability for any obligations under assumed contracts.  Typically, these provisions in a sale order would provide that

---

[10] *See also*, Sale Order at ¶ T ("The Purchaser is not assuming any liability under or in connection with the Assumed Contracts (including Servicing Agreements) occurring or arising prior to the Closing Date, **whether encompassed within the Cure Amounts payable by the Debtors or otherwise** (including, without limitation, fees or indemnification Claims relating to any period prior to the Closing Date or any acts or omissions of the Sellers or any other Person occurring or arising prior to the Closing Date).") (emphasis added); ¶ 17 ("The Sellers shall be relieved from any further liability, other than the Cure Amounts, with respect to the Assumed Contracts after such assumption and assignment to the Purchaser."); ¶ 19 (barring assertion of claims against the Debtors that arise under assumed contracts post-closing).

[11] Moreover, the Sale Order enjoins parties holding interests in the assets sold, or in the Debtors, other than "Assumed Liabilities" (the definition of which is unclear), from pursuing any "Interests of any kind or nature whatsoever" against the purchaser as a successor or "on any other grounds."  *See* Sale Order at ¶ 5.  The incoherence of what liabilities are assumed by Ocwen, coupled with the use of defined terms from the asset purchase agreement, which only lead to more defined terms and ambiguous provisions in the asset purchase agreement, makes it impossible to know what obligations under assumed contracts can be enforced against Ocwen.

[12] The Sale Order defines "Claims" to include all rights to payment (which may include rights to payments under servicing agreements) and "Interests" to include "other interests." Sale Order at preamble & n. 2.

"the assets are being sold free and clear of all claims, liens and interests, *except for assumed contracts and assumed liabilities*."

30.     After the initial objections were filed, the Debtors made a half-hearted attempt to fix some of the issues by adding language to Paragraph P saying "For avoidance of doubt, notwithstanding anything to the contrary contained in this Order or in the Ocwen APA, upon the assignment of the Servicing Agreements to Purchaser, Purchaser shall perform all of the obligations under the Servicing Agreements (but not perform any obligations or have any liabilities arising under the Other Agreements) from and after the Closing Date."  Unfortunately, the Debtors followed that promising statement with a contradictory statement saying "; provided, however, that Purchaser shall not incur any liability that arises out of or relates to any act or omission of the Debtors (whether as originator, servicer, or otherwise) that occurred before the Closing Date," prompting the Court to ask at the Sale hearing "What happened to paragraph P? ... [T]he last clause took back exactly what you seemed to be covering in the opening clause." *See* H'g Tr. at 105:17-22 Nov. 19, 2012.  The Court had it right: Ocwen's and the Sale Order's statements that Ocwen will perform are not credible when in the very same paragraph Ocwen's commitment is revoked.

31.     The Syncora-Related Servicing Agreements are long, intricate, complex documents, with numerous rights and obligations on the part of multiple parties, and the Debtors must assume each of them in full or not at all.  There is no authority for a debtor being able to arbitrarily define the rights and obligations it wishes to assume without regard to the constitution of the contract.  Permitting the Debtors to do this would take away from Syncora, and the other parties to the Syncora-Related Servicing Agreements, fundamental rights the Bankruptcy Code guarantees to contract counterparties, to their great prejudice.  In this case, for example, the documents governing each Syncora Trust contain indemnification, limitation on liability,

representations, warranties and covenants in favor of or beneficial to Syncora that are

fundamental to the bargain struck by Syncora with the servicer, and are designed to protect

Syncora's interests. These protections would be excised, to a large extent, from the contracts

governing the Syncora Trusts were the Sale Order to apply.

32.     Indeed, counsel for Syncora has sought, without success, an explanation

from the Debtors or Ocwen how one could hold Ocwen to perform fully when all post-

assignment obligations may "relate" in some way to an act or omission of the Debtors. For

example, entering into the Syncora-Related Servicing Agreements was an "act" of the Debtors to

which all obligations "relate," as is all performance by the Debtors under the Syncora-Related

Servicing Agreements. Similarly, any defect in performance by the Debtors, even a slight one

that would not arise to a default and that Syncora would have no way of knowing about, is

arguably an "omission."

33.     The Debtors have not satisfied their high burden to be able to sever a

contract. Not only is it totally unclear which provisions are being severed out, but they have not

proven that the intent of the parties to the contract is to have two separate agreements. Syncora,

in fact, relied upon the contract counterparty continuing to perform *all obligations* when it

agreed to provide insurance. Indeed, the Debtors' own behavior with respect to this issue

demonstrates their precarious legal position. The Debtors have never once tried to litigate this

issue, and instead have been making deals one at a time with the larger objectors in order to

avoid such litigation, giving some parties, such as the RMBS Trustees, concessions in the Sale

Order as to which specific obligations will be assumed, and other parties, such as Freddie Mac,

new agreements, even at the expense of a $49.5 million reduction in the purchase price paid by

Ocwen for the Freddie Mac agreements. Despite having over a year to think about these issues,

the Debtors ***do not even address*** these fundamental severance issues in their Assignment Motion. The Debtors appear to be hoping that the general momentum of progress in their chapter 11 cases would lead the Court to put on a blind-fold and approve the order as is.[13]  (As noted above, however, denial of the Assignment Motion will have no effect on the Plan process.)

34.      The Debtors have similarly not shown the requisite intent to sever the Custodial Agreements from the rest of the agreements in the transaction.  These agreements relate to the custody of the mortgage loan-related documents and files and provide for servicer obligations, such as informing the applicable custodians of payments in full of mortgage loans and requesting related documentation.  The Debtors have indicated to Syncora that they are refusing to assign these agreements, because the signature block on which GMAC Mortgage, LLC ("***GMACM***") has signed indicates "Acknowledged by GMAC Mortgage, LLC." Regardless of whether such agreements were "signed" or "acknowledged" by GMACM, GMACM is a party to such agreements, has duties under such agreements, is bound by such agreements, and can assume and assign its obligations under such agreements.  These agreements were an integral part of the Greenpoint transaction, and Syncora would not have entered into the transaction without them.  Therefore, none of the agreements relating to the Greenpoint Trust can be assigned to Ocwen unless the Custodial Agreements are as well.

## III.    The Assignment Motion Creates Substantial and Undefined Administrative Expenses

35.      If the Assignment Motion is granted, the Debtors would assume **all** of the ongoing liabilities within the Syncora-Related Servicing Agreements, but would assign only certain liabilities to Ocwen, exposing the Debtors to administrative expense claims for the

---

[13] The absurdity of incorporating the Sale Order wholesale into an order approving the Assignment Motion is highlighted by the fact that the Sale Order itself provides that it is not binding on Syncora.  The resulting order is left to philosophical minds to decipher.

unassigned liabilities.  Section 365(k) of the Bankruptcy Code provides that assignment pursuant to 365(f) relieves a debtor's estate from liability for post-assignment breaches of executory contracts.  However, this section does not apply when the assignee fails to assume all liability under the contract; instead, an administrative expense claim against the estate is created.

36.    For example, in *American Flint Glass Workers Union v. Anchor Resolution Corp., et al.*, 197 F.3d 76 (3d Cir. 1999), the debtors assumed four collective bargaining agreements pursuant to section 365 and assigned them to a purchaser, except that certain obligations to make retroactive wage payments in the future were expressly carved out. The Court of Appeals for the Third Circuit held that the estate remained liable for such payments, notwithstanding that the sale order carved out such obligations, because "[the debtor] did not in fact assign the [contracts] *cum onere* (as is essential to a true assignment)," and therefore the protections of section 365(k) did not apply. *Id.* at 78; *Cf. In re Frontier Properties*, 979 F.2d 1358, 1367 (9th Cir. 1992) (damages from rejection of previously assumed contract are administrative expenses).[14]

37.    In this case, the Debtors may think that they are receiving more consideration for their estates by use of a clever Sale Order that excises some of Ocwen's obligations, but every obligation Ocwen fails to take must be paid for by the Debtors as an administrative expense claim.  The Debtors have previously acknowledged as much, by adding language to the Sale Order specifying that the indenture trustees, master servicers, and custodians have claims "against the Debtors but not the Purchaser for, any losses or liability

---

[14] Once the protections of section 365(k) of the Bankruptcy Code are held not to apply, then the principles of state contract law will govern the rights and obligations of the parties.  In the instant case, New York State contract law would apply.  The Restatement provides that "[u]nless the obligee agrees otherwise, neither delegation of performance nor a contract to assume the duty made with the obligor by the person delegated discharges any duty or liability of the delegating obligor."  Restatement (Second) of Contracts § 318(3) (1981).

suffered prior to the Closing Date, or which may be suffered after the Closing Date, by the

[claimant] as a result of any acts or omissions of the Debtors before the Closing Date." *See* Sale

Order at ¶¶ 35.C, 36, and 37. There is no principled reason to deny Syncora the same treatment.

To the extent sufficient provision is not made for Syncora's administrative expense claim, the

Plan may not be feasible pursuant to section 1129(a)(11) of the Bankruptcy Code.

## IV.   Syncora's Cure Claim Will Be Fixed Through Contemporaneous Litigation of Its Proof of Claim With the Assignment Motion

38.   The amount of Syncora's cure claim is equal to the value of Syncora's

prepetition claims against the Debtors arising under the Syncora-Related Servicing Agreements,

which will be established through contemporaneous litigation of the *Debtors' Objection to Proof*

*of Claim #2781 of Syncora Guarantee Inc.* [D.I. 4632], **plus** any amounts accruing from defaults

in performance under the Syncora-Related Servicing Agreements postpetition through

assignment, which will be established in the course of the same investigation.[15]

39.   The Debtors must satisfy **_all_** of the Bankruptcy Code's requirements for

the relief that they request in the Assignment Motion, including payment of cure claims. To bar

Syncora's cure claim as untimely, the Debtors would need to point to *some* authority. *See In re*

*the Drexel Burnham Lambert Group Inc., et al.*, 151 B.R. 674, 679 (Bankr. S.D.N.Y. 1993) ("A

claim against the estate constitutes property within the meaning of the Amendments and cannot

be forfeited through proceedings lacking in due process.").

40.   The cure deadline established in connection with the Sale Motion is both

(i) *procedurally* inapplicable to the new Assignment Motion and (ii) *by its very terms*

inapplicable to the Syncora-Related Servicing Agreements. First, procedurally, the Debtors'

---

[15] Syncora previously stated that it may have cure claims as high as $457 million after an indication of a potential breach arose in the middle of the sale process in the fall of 2012 [D.I. 1996].

argument that Syncora is barred from asserting cure claims is based on their misleading and

inaccurate statement that the previous Syncora Objections have been adjourned, implying that

the previously proposed assignment of the Syncora-Related Servicing Agreements under the Sale

Motion is still pending before the Court.  *See* Assignment Motion, n.4.  As described above, the

Debtors abandoned their request to assign the Syncora-Related Servicing Agreements under that

motion, and pending before the Court is a new motion.[16]  To wit, at the Sale hearing, the Debtors

mentioned that numerous objections were resolved or deferred to a cure hearing, as the case may

be, but that Syncora's objection was moot because, as Debtors' counsel Mr. Lee put it "Your

Honor, just to be absolutely [clear] for the record, the debtors are not assuming and assigning

Syncora's contracts."  *See* H'g Tr. at 56:11-62:14, Nov. 19, 2012.  In addition to those clear

statements at the Sale hearing, a review of the case docket reveals that, since the Sale hearing,

the Debtors themselves have not viewed the Syncora Objections as adjourned.  They have not

listed the previous Syncora Objections on any hearing agenda, as they have done for all other

matters that have been adjourned (*e.g.*, Ambac, FGIC, and others) [D.I. 2581, 2628, 2643, 2717,

2734, 2841, 2850, etc.] and have not otherwise treated the objections as adjourned.  *See, e.g.*,

*Debtors' Omnibus Reply to Objections to Debtors' Sale Motion* [D.I. 2135] (listing Syncora's

objection as "Resolved" because "Agreements to be rejected and removed from final schedule");

a version of the chart from this omnibus reply, handed out by the Debtors at the Sale hearing

(listing Syncora's contracts as "removed"); *Debtors' Omnibus Reply to Objections to the (A)*

*Assumption and Assignment of Certain Agreements and (B) Related Cure Amounts* [D.I. 2574]

(listing specific objections as going forward, adjourned, or resolved, but not listing Syncora's

---

[16] In addition to being procedurally improper, it would be odd for the current Assignment Motion to have a cure
objection deadline that occurred nearly a year ago, given that the cure period must account for the entire period
occurring before assignment of the agreements to a purchaser.

objection).  Having removed Syncora's contracts from the Sale Motion to moot out Syncora's

objection, the Debtors should not be permitted to argue now that the deadline relevant to the Sale

Motion continues to apply to Syncora.

41.    Second, the sale procedures order provides clearly that the September 28,

2012 deadline to file cure claims only applied to "Assumed Contracts" (¶¶ 20, 28) and that any

contract removed from the schedule as of two business days prior to the closing date "shall cease

to be an Assumed Contract" (¶ 22).  Because the Syncora-Related Servicing Agreements were

removed from the Sale and were not on the schedule two days prior to closing, they are not

"Assumed Contracts" and the deadline in the sale procedures order does not apply to them.

## Reservation of Rights

42.    Syncora intends to and reserves the right to serve discovery requests,

including but not limited to deposition notices, on the Debtors and Ocwen, intends to cross-

examine Mr. Ronald Faris (Chief Executive Officer of Ocwen) at the hearing on the Assignment

Motion, and may call witnesses at the hearing.

## Conclusion

43.    Until the Debtors can demonstrate that Ocwen can and will perform in full

under all of the Syncora-Related Servicing Agreements and can provide adequate assurance of

their future performance under the contracts being assumed and assigned, the Assignment

Motion should be denied.  If the Assignment Motion is granted, the Sale Order should be

modified to provide that the Debtors may only assume and assign whole contracts, including

related agreements, without modification of existing contractual rights.

WHEREFORE, Syncora respectfully requests that the Court deny the Assignment

Motion and grant Syncora such other and further relief as is just and proper.

Dated: August 28, 2013
       New York, New York

/s/ Ronit J. Berkovich
Gary T. Holtzer
Bruce S. Meyer
Ronit J. Berkovich
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Syncora Guarantee Inc.*

**<u>Exhibit A</u>**

**(Plain Vanilla Assumption and Assignment Order)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
                                                        :
In re:                                                  :        Chapter 11
                                                        :
RESIDENTIAL CAPITAL, LLC, *et al.*                      :        Case No. 12-12020 (MG)
                                                        :
                    Debtors.                            :        (Jointly Administered)
                                                        :
--------------------------------------------------------x

## ORDER GRANTING
## DEBTORS' MOTION UNDER SECTION 365 OF THE BANKRUPTCY CODE
## TO ASSUME AND ASSIGN SERVICING-RELATED AGREEMENTS FOR TRUSTS
## INSURED BY SYNCORA GUARANTEE INC. TO OCWEN LOAN SERVICING, LLC

Upon the motion (the "***Motion***")[1] of the above-captioned debtors and debtors in possession (the "***Debtors***") for entry of an order (the "***Order***"), pursuant to section 365 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rule 6006 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rule 6006-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "***Local Rules***"), authorizing the assumption of certain servicing-related agreements (the "***Syncora-Related Agreements***") for trusts insured by Syncora Guarantee Inc. ("***Syncora***") and assignment of such agreements to Ocwen Loan Servicing, LLC ("***Ocwen***"), as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and grant the requested relief in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; [and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary;] and Syncora having filed an objection (the "***Objection***") to the Motion on August 28, 2013 [D.I. ____]; and a hearing having

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

been held to consider the relief requested in the Motion (the "*Hearing*"); and due and proper

notice of the Hearing having been provided; and the appearances of all interested parties having

been noted in the record of the Hearing, and upon the record of the Hearing; and all of the

proceedings had before the Court; and the legal and factual bases set forth in the Motion and the

Objection establishing just and sufficient cause to grant the requested relief, as modified, herein;

and the Court having determined that the relief requested in the Motion, as modified herein, is in

the best interests of the Debtors, their estates, their creditors, and all parties-in-interest; and upon

the record herein; and after due deliberation thereon; and good and sufficient cause appearing

therefor,

### IT IS HEREBY FOUND, DETERMINED, AND ORDERED THAT:

1.      The Motion is granted to the extent set forth herein.

2.      Pursuant to section 365(a) of the Bankruptcy Code, the assumption of the

Syncora-Related Agreements, as listed on **Schedule 1** hereto, is hereby approved, effective as of

the date the Debtors make the Cure Payment (as defined below).

3.      Pursuant to section 365(b) of the Bankruptcy Code, within the later of three (3)

business days of entry of this Order and the date that the amount that is owed to Syncora to cure

all defaults owing pursuant to the Syncora-Related Agreements pursuant to section 365(b) of the

Bankruptcy Code (the "*Cure Payment*") is determined, the Debtors shall pay cash in the amount

of the Cure Payment to Syncora.

4.      Pursuant to section 365(f) of the Bankruptcy Code, the assignment of the

Syncora-Related Agreements, by the Debtors to Ocwen, is hereby approved, effective as of the

date the Debtors make the Cure Payment.

5.      Upon assumption and assignment of the Syncora-Related Agreements, Ocwen

shall perform and honor all obligations and be liable for all liabilities due under the Syncora-

Related Agreements and shall honor all rights and provisions contained therein, other than defaults occurring prior to the assignment, which shall be subject to cure, pursuant to paragraph 3 of this Order.

6.     Pursuant to section 365(k) of the Bankruptcy Code, upon the assumption and assignment of the Syncora-Related Agreements to Ocwen, the Debtors shall have no further liability or obligations with respect thereto.

7.     The rights and obligations between the Debtors and Ocwen shall be governed by the terms of that certain *Order Under 11 U.S.C. §§ 105, 363, and 365 and Fed. Bankr. P. 2002, 6004, 6006, and 9014 (I) Approving (A) Sale of Debtors' Assets Pursuant to Asset Purchase Agreement with Ocwen Loan Servicing, LLC;(B) Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Thereto; (D) Related Agreements; and (II) Granting Related Relief* [D.I. 2246] (the "***Sale Order***"); provided, however, the Sale Order shall not impact any of Syncora's rights or Ocwen's obligations under, or the terms of, the Syncora-Related Agreements.

8.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: _____ __, 2013
          New York, New York

                                        _____
                                        THE HONORABLE MARTIN GLENN
                                        UNITED STATES BANKRUPTCY JUDGE

## Schedule 1

### Syncora-Related Agreements

Bear Stearns Second Lien Trust 2007-SV1

- Servicing Agreement, dated as of May 1, 2001, as amended by Amendment No. 1, dated as of October 1, 2001, Amendment No. 2, dated as of July 31, 2002 and Amendment No. 3, dated as of December 20, 2005, between EMC Mortgage Corporation and GMAC Mortgage, LLC

- Insurance and Indemnity Agreement, dated as of March 30, 2007, among XL Capital Assurance Inc., EMC Mortgage Corporation, SACO I Inc., GMAC Mortgage, LLC and Citibank, N.A.

- Side Letter Agreement, dated as of March 30, 2007, between GMAC Mortgage, LLC and XL Capital Assurance Inc.

- Assignment, Assumption and Recognition Agreement, dated as of March 30, 2007, among EMC Mortgage Corporation, Citibank, N.A. and GMAC Mortgage, LLC

Greenpoint Mortgage Funding Trust 2006-HE1

- Transfer and Servicing Agreement, dated as of August 1, 2006, as amended by Amendment No. 1, dated as of September 1, 2006, among GreenPoint Mortgage Funding Trust 2006-HE1, as issuer, Structured Asset Securities Corporation, as depositor, GMAC Mortgage Corporation, as servicer and U.S. Bank National Association, as indenture trustee

- Insurance and Indemnity Agreement, dated as of August 28, 2006, among XL Capital Assurance Inc., Lehman Brothers Holdings Inc., Structured Asset Securities Corporation, Greenpoint Mortgage Funding Trust 2006- HE1, GMAC Mortgage Corporation and U.S. Bank National Association

- Side Letter Agreement, dated as of September 12, 2006, between GMAC Mortgage Corporation and XL Capital Assurance Inc.

- Flow Revolving Credit Loan Purchase and Warranties Agreement, dated as of September 26, 2005, between GMAC Mortgage Corporation, as Purchaser and Greenpoint Mortgage Funding, Inc., as Seller

- Flow Mortgage Loan Purchase and Warranties Agreement, dated as of July 26, 2006, between GMAC Mortgage Corporation, as Purchaser and Greenpoint Mortgage Funding, Inc., as Seller

- Assignment, Assumption and Recognition Agreement, dated as of July 28, 2006, among GMAC Mortgage Corporation, Lehman Brothers Bank, FSB, and Greenpoint Mortgage Funding, Inc.

- Custodial Agreement, dated as of August 1, 2006, among Deutsche Bank National Trust Company, as custodian, U.S. Bank National Association, as indenture trustee and Greenpoint Mortgage Funding Trust 2006-HE1, as issuer

- Custodial Agreement, dated as of August 1, 2006, among U.S. Bank National Association, as custodian and as trustee and Greenpoint Mortgage Funding Trust 2006-HE1, as issuer

SunTrust Acquisition Closed-End Second Trust, Series 2007-1

- Pooling and Servicing Agreement, dated as of April 1, 2007, among ACE Securities Corp., as depositor, GMAC Mortgage, LLC, as servicer, Wells Fargo Bank, National Association, as master servicer and securities administrator and HSBC Bank USA, National Association, as trustee

- Insurance and Indemnity Agreement, dated as of May 15, 2007, among XL Capital Assurance Inc., SunTrust Asset Funding, LLC, SunTrust Bank, ACE Securities Corp., GMAC Mortgage, LLC and Wells Fargo Bank, National Association

- GMACM Side Letter Agreement, dated as of May 15, 2007, between GMAC Mortgage, LLC and XL Capital Assurance Inc.

- Credit Risk Management Agreement, dated as of May 14, 2007, between GMAC Mortgage, LLC and Clayton Fixed Income Services Inc.

- Premium Letter, dated as of May 15, 2007, among XL Capital Assurance Inc., HSBC Bank USA, National Association, Wells Fargo Bank, National Association, SunTrust Asset Funding, LLC, GMAC Mortgage, LLC and ACE Securities Corp.

- Custodial Agreement, dated as of April 1, 2007, among HSBC Bank USA, National Association, as trustee, GMAC Mortgage, LLC, as servicer and Deutsche Bank National Trust Company, as custodian

- Mortgage Loan Purchase and Sale Agreement, dated as of May 15, 2007, between GMAC Mortgage, LLC as purchaser and SunTrust Asset Funding, LLC

- Assignment, Assumption and Recognition Agreement, dated May 15, 2007 among GMAC Mortgage, LLC, ACE Securities Corp., SunTrust Asset Funding, LLC, and Wells Fargo Bank, N.A.

\* As well as all other agreements memorializing these three transactions, to which the Debtors were party.

**Exhibit B**

**(2011 Agreement)**

US_ACTIVE:\44314821\15\73317.0005

**STATE OF NEW YORK
DEPARTMENT OF FINANCIAL SERVICES
BANKING DEPARTMENT**

## AGREEMENT ON  MORTGAGE SERVICING PRACTICES

WHEREAS Ocwen Financial Corporation, the parent company of Ocwen Loan Servicing, LLC (collectively "Ocwen"), a mortgage servicer regulated by the New York State Banking Department (the "Department") and headquartered at 2002 Summit Boulevard, 6th Floor, Atlanta, Georgia 30319, requested that the Department grant approval for it to acquire Litton Loan Servicing LP ("Litton"), a mortgage loan servicer engaged in the business of servicing mortgage loans in New York State and headquartered at 4828 Loop Central Drive, Houston, TX 77081 and a subsidiary of Goldman Sachs Bank USA ("GSB") headquartered at 200 West Street, New York, New York 10282 (the "Acquisition"); and

WHEREAS, the Department seeks to ensure that the post-acquisition entity, which would become the twelfth  largest mortgage loan servicer in the United States, has sufficient capacity to properly board and manage a significant portfolio of stressed loans, including the ability to effectively manage the increased volume and comply with HAMP requirements, internal loss mitigation policies and procedures and laws and regulations governing mortgage loan servicing and foreclosure activities; and

WHEREAS, the Department further has consumer protection concerns relating to practices highlighted in the media that have been prevalent in the mortgage servicing industry generally, including but not limited to, the practice of "Robo-signing," referring to affidavits in foreclosure proceedings that falsely attest that the signer has personal knowledge of the facts presented therein and/or were not notarized in accordance with state law; weak internal controls and  oversight that may have compromised the accuracy of foreclosure documents; unfair and improper practices in connection with loss mitigation, including improper denials of loan modifications; and imposition of improper fees by servicers, among others; and

WHEREAS, the Superintendent of Financial Services and of Banks has conditioned the issuance of a "No Objection" letter on the Acquisition upon Ocwen's commitment to adhere, and in the case of any portfolio serviced by a different Ocwen subsidiary or affiliate, to cause to adhere to this Agreement on Mortgage Servicing Practices (the "Servicing Practices"), together with Litton's commitment to adhere to the Servicing Practices, and GSB's commitment to adhere to the Servicing Practices in the event it reenters the mortgage servicing business following its sale of Litton; and

WHEREAS, Ocwen and Litton wish to be leaders in the mortgage servicing industry by adhering to, and causing to be adhered to, the Servicing Practices which they believe are in the best interest of homeowners and investors, and GSB also wishes to be a leader by committing to adhere to the Servicing Practices in the event it should return to the mortgage servicing business; and

WHEREAS, to provide further assurance to the Department that the interests of borrowers whose mortgage loans are currently serviced by Litton will be adequately protected if the Acquisition proceeds, Goldman Sachs Group, Inc. ("GS") has separately committed for itself and its subsidiaries to forgive 25% of the unpaid principal balance on certain delinquent first lien residential mortgage loans owned by GS or a subsidiary of GS, totaling approximately $13 million in forgiveness.

NOW THEREFORE, Ocwen and Litton agree to adhere to the following Servicing Practices and GSB agrees that, if it reenters the mortgage loan servicing business, it will adhere to the Servicing Practices (each of Ocwen, Litton and GSB, if it reenters the mortgage loan servicing business, is hereinafter referred to as "Servicer"):

## MORTGAGE SERVICING PRACTICES

### *Document Execution and Accuracy of Documentation*

1. Servicer shall ensure that affidavits and sworn statements submitted in foreclosure proceedings are executed by individuals with actual personal knowledge of the matters set forth therein based upon the individuals' personal review of borrowers' loan files and other information relating to borrowers' loans.

2. Servicer shall ensure that any information set forth in an affidavit or sworn statement detailing a borrower's default and the right to foreclose is accurate, complete and reliable.

3. Servicer shall ensure that notarized documents are signed by the affiant in the actual presence of a notary.

4. Servicer shall not provide incentives to employees or third parties based upon the number of documents executed or the speed at which documents are executed.

5. Servicer shall withdraw any pending foreclosure action in which filed affidavits are not accurate, complete, and reliable, and/or were not notarized in accordance with applicable law. In any subsequent foreclosure action concerning the same mortgage, Servicer shall ensure that all affidavits are accurate, complete, reliable, and notarized in accordance with applicable law.

6. Servicer shall implement policies and procedures to ensure that borrowers' account information is accurate and complete, and shall promptly remediate any inaccuracies in borrowers' account information. Servicer shall annually cause to be conducted an independent review of its systems, policies and procedures to ensure that they are sufficient to ensure that borrower's account information is accurate and complete.

### *Ownership of Note; Foreclosures*

7. Servicer shall implement processes to ensure that, in any foreclosure action Servicer commences, or in any foreclosure action commenced by another entity on a mortgage

2

Servicer services, the foreclosing entity has a documented enforceable interest in the promissory note and mortgage under applicable law, or otherwise possesses the legal right to foreclose.

8.  In each summons and complaint to commence a foreclosure action on a mortgage Servicer services, Servicer shall include or cause a third party to include an affirmative allegation that at the time the proceeding is commenced, the foreclosing entity is the owner and holder of the subject mortgage and note, possesses a security interest or other interest entitling it to foreclose on the subject mortgage and note, or has been delegated the authority to institute a foreclosure action by such owner and holder, or party possessing the legal right to foreclose.  In addition, Servicer shall plead or cause a third party to plead in such complaints that the originals of the subject mortgage and note are in the foreclosing entity's possession and control or that of the custodian, or in the alternative that all the requirements of Paragraph 10 below have been met, and that such foreclosing entity is otherwise entitled to enforce the subject mortgage and note pursuant to law.

9.  Upon a borrower's request, Servicer shall provide to the borrower the name of the entity that holds the borrower's note and contact information for such entity.

10.  If the original note or any interim assignment or allonge is lost or otherwise unavailable, Servicer shall comply with applicable law in any attempt to establish ownership of the note and the right to enforcement.  Servicer shall ensure good faith efforts to obtain or locate a note lost while in the possession of Servicer or Servicer's agent.

11.  Servicer shall not intentionally destroy or dispose of original notes that are still in force.

12.  In the event that any borrower is found to have been wrongfully foreclosed, Servicer shall ensure that the borrower's equity in the property is returned if the property has not been sold to a third party, or if sold to a third party, adequately compensate the borrower for the wrongful foreclosure.

*Quality Assurance/Audits*

13.  Servicer shall conduct regular audits of a statistically valid sample of documents prepared by staff and agents in furtherance of foreclosure and bankruptcy proceedings to ensure that the documents and their preparation comply with the loan instruments, prevailing law and these Servicing Practices.  The audit reviews shall also verify the accuracy of each factual allegation in each affidavit or sworn statement, account summary, ownership certification, loss mitigation affidavit, adverse action notice and other pleadings, filings or documents, by reviewing the underlying documentation/information.  Servicer shall take appropriate remedial steps if any deficiencies are identified, including remediation in individual cases, revision of procedures, retraining, and disciplinary action.

3

*Oversight of Third Party Vendors*

14.  Servicer shall adopt policies and procedures to oversee and manage foreclosure firms, law firms, foreclosure trustees, and other agents, independent contractors, entities and third parties (including subsidiaries and affiliates) that provide foreclosure or bankruptcy processing services ("Third-Party Providers"), including:

(a) Ensuring compliance with the Administrative Order of the Chief Administrative Judge of the Courts of New York dated March 2, 2011, AO/431/11, setting forth the form and requirements for an affirmation by plaintiff's counsel in residential mortgage foreclosure actions;

(b) Performing due diligence of Third-Party Providers' qualifications, expertise, capacity, complaints, information systems, quality assurance plans, financial viability, and compliance with licensing requirements and rules and regulations (including prohibitions on fee splitting);

(c) Amending agreements or engagement letters with Third-Party Providers to require them to comply with their contractual obligations to Servicer, Servicer's policies and procedures, the loan instruments, these Servicing Practices, and New York laws and rules;

(d) Conducting regular reviews of a sample of the foreclosure and bankruptcy documents prepared by each foreclosure firm, law firm, foreclosure trustee and other Third-Party Providers it uses to ensure compliance, and taking appropriate remedial steps if any problems are identified through this review or otherwise, including terminating its relationship with the firm or trustee;

(e) Tracking any instance where an adversary requests the imposition of sanctions against a law firm, foreclosure firm, trustee or other Third-Party Provider, or where a court imposes such sanctions, and taking appropriate action, including termination of its relationship with any Third-Party Provider that has been sanctioned by a court;

(f) Adopting standards for documentation of Third-Party Providers' fees and charges;

(g) Adopting policies and procedures for reviewing customer complaints about Third-Party Providers;

(h) Ensuring that all Third-Party Providers are provided reliable contact information for Servicer employees who possess information relevant to the services provided by the Third-Party Providers; and

(i) Conducting a risk assessment of Third-Party Providers to ensure that such Providers adequately protect confidential borrower information as required by Section 501(b) of the Gramm-Leach-Bliley Act.

4

*Staffing*

15. Adequate Staff. Servicer shall develop and implement a program to maintain sufficient staff in place who are adequately trained to: (1) provide information to borrowers or borrowers' representatives; (2) process requests for loss mitigation alternatives, including loan modification applications; (3) evaluate requests for non-foreclosure options; (4) manage foreclosure documentation process, including execution of relevant foreclosure documents; (5) handle escalated cases; (6) facilitate resolution of borrower complaints; and (7) manage collections. Factors that shall be considered in determining the adequacy of staffing, include without limitation:

(a) Size of loan portfolio;

(b) Percentage of delinquent loans;

(c) Percentage of loan modification or other loss mitigation requests;

(d) Number of pending foreclosure actions;

(e) Knowledge and experience level of existing staff;

(f) Loan to employee ratio; and

(g) Compliance and internal audit results, including reviews of document management system.

16. Servicer shall provide a report within 90 days of the adoption of these Servicing Practices or otherwise upon reasonable request of the Department identifying the number of full time equivalent employees assigned to loss mitigation alternatives, and escalation and the caseload of each individual.

*Training*

17. Servicer shall ensure that employees and managers engaged in mortgage loan servicing, collection, loss mitigation, foreclosure prevention and foreclosure processing and/or proceedings participate in a compliance training program. The training program shall address, at a minimum:

(a) State and federal laws and regulations governing mortgage loan servicing, including laws relating to the handling of specific classes of delinquent borrowers (Servicemembers Civil Relief Act and Bankruptcy Code), loss mitigation, collection practices, and foreclosure proceedings;

(b) Preparation and execution of legal documents, including affidavits of indebtedness or merit, declarations, assignments, note endorsements and lost note affidavits;

5

(c) Guidelines of foreclosure alternatives under the Making Home Affordable ("MHA") program such as Home Affordable Modification Program ("HAMP"), Home Affordable Refinance Program ("HARP"), Home Affordable Foreclosure Alternatives ("HAFA"), Home Affordable Unemployment Program ("UP") and other borrower assistance programs offered through state, federal or local government;

(d) Servicer's policies and procedures for servicing mortgage loans and handling delinquent accounts;

(e) Procedures and systems used to facilitate verification of information contained on foreclosure documents prepared, regardless of whether such document is internally or externally prepared, verification of information provided to borrower or third-party representative concerning loan modification or other loss mitigation documents and written correspondence; and

(f) Action that will be taken by Servicer against employees for noncompliance with servicing policies and procedures, in particular, execution of documents and verification of borrower information.

18. All employees or managers engaged in mortgage servicing, loss mitigation, foreclosure alternatives, foreclosure processing or proceedings hired after the initial compliance training required under these Servicing Practices is provided shall receive compliance training within 30 days of their employment start date. The contents and implementation of the compliance training must be fully documented, including completion of a certification form by each respective employee stating that the individual attended the required training and understands Servicer's policies and procedures relating to mortgage loan servicing, document execution and loss mitigation alternatives. Documentation relating to the contents, scheduling and attendance at each training session must be maintained for a period of three years and available for review by the Department upon reasonable request.

*Notices, Single Point of Contact and Modifications for Transferred Servicing Files*

19. Acquisition of Delinquent Loans. Within 30 days of the acquisition of delinquent loans, *i.e.*, loans that are delinquent 60 days or more, and loans where default may be imminent, a notice must be provided to borrowers appointing a single point of contact or providing for the appointment of a single point of contact based upon the borrower's convenience. The notice must also include information regarding the policies and procedures employed by the acquiring Servicer in handling any pending loss mitigation request, trial modification, permanent modification or non-foreclosure option transferred from the previous servicer. The provisions of paragraphs 26 and 27 shall apply to the designated single point of contact.

20. As of the effective date of any acquisition or transfer of loan servicing portfolios to Servicer, Servicer shall establish and have up and running a toll-free number to handle all in-bound calls from borrowers previously serviced by another servicer. The team handling such in-bound calls must have access to electronic and paper-based borrower

6

records and knowledge about Servicer's servicing policies and procedures, including loss mitigation programs, collection practices and payment dispute resolution. Additionally, the team must remain operational until any acquired or transferred servicing portfolio is fully integrated into Servicer's servicing platform but not less than 90 days.

21.  Pending Modification.  Borrowers with pending modification requests must be provided with a notice within 5 days of the initial communication identifying the single point of contact. The notice shall provide: (1) a list of all documents and information required from the borrower to evaluate the borrower for a loan modification; (2) an explanation of any change in the type of loss mitigation alternative for which the borrower is being considered; (3) the reason for the change in the type of loss mitigation offered (e.g., borrower does not qualify, program not offered); (4) the time frame in which the borrower must supply the requested information; (5) a toll-free number that provides a list of government approved not-for-profit housing counselors in the homeowner's geographic area as listed on the Department's website, the Department of Housing and Urban Development's website or the Division of Housing and Community Renewal's website; (6) a statement clearly outlining the effect of the borrower's failure to submit all required documentation, including potential denial of loan modification or other loss mitigation alternatives, continuation of pending foreclosure action or referral to foreclosure; and (7) a statement outlining the action that will be taken if documentation is not received within the time period specified in the notice.

22.  Trial Modification.  Borrowers with trial modification shall be allowed to continue making existing trial modification payments for the remainder of the trial modification period.  If the trial modification period terminates in less than 60 days, an extension shall be granted unless such extension is not compliant with Government Sponsored Enterprise ("GSE") program guidelines and the loan is a GSE loan.  Written communication must be provided to the borrower, which at a minimum addresses: (1) the new expiration date for the borrower's trial modification; and (2) a list of documents, if any, required to complete the permanent modification. Documentation concerning the extension of the trial modification period must be maintained in the borrower's servicing file.

23.  Permanent Modification.  Borrowers who have successfully completed the trial modification prior to transfer and are awaiting a permanent modification must be allowed to continue making trial modification payments until the acquiring Servicer can provide permanent modification documents, unless such payment is not compliant with GSE program guidelines and the loan is a GSE loan.  The permanent modification payment shall not change materially from the permanent modification payment previously offered or discussed with the borrower or borrower's representative.  Borrowers must be provided with clear written communication listing: (1) monthly payment, including any escrow for taxes and insurance; (2) interest rate and period of applicability if such rates adjust; (3) principal balance; (4) instructions for properly executing the modification agreement; (5) the time frame in which the borrower must return the permanent modification agreement; and (6) a statement outlining the action that will be taken if documentation is not received within the time period specified.  Borrowers who have submitted executed permanent modification documents and are satisfactorily making payments under the permanent modification shall be allowed to continue such modification arrangements.

7

24. Previously denied modification request. Borrowers who were previously denied loan modification by the transferring Servicer shall not be precluded from consideration for a modification or other loss mitigation alternative offered by the acquiring Servicer by reason of the previous denial.

25. Documentation of the actions taken to comply with Paragraphs 19-24 must be maintained in the borrower's servicing file. Additionally, management information reports (monthly, quarterly and annually) shall be maintained listing: (1) the volume of delinquent loans; (2) pending modifications or other loss mitigation alternatives; (3) active trial modifications; (4) pending foreclosures or foreclosure sales; and (5) permanent modifications, acquired and post compliance with Paragraphs 21-24. The reports must be available for review by the Department upon reasonable request.

_Borrower Communication_

26. Servicer shall assign a single point of contact or provide for the appointment of a single point of contact based upon the borrower's convenience, to each borrower who has submitted a request or an application for a loss mitigation alternative, and to borrowers in the process of foreclosure, within the following timetable:

(a) Within 30 days of the date of Servicer's agreement to adhere to these Servicing Practices as to Servicer's existing delinquent borrowers;

(b) Within 7 days of the date of Servicer's agreement to adhere to these Servicing Practices as to all of Servicer's existing borrowers in foreclosure;

(c) Thereafter, within 15 days of Servicer's identification consistent with GSE requirements of a borrower for whom default may be imminent (current or less than 60 days delinquent), and 15 days after a borrower has missed a contractual payment.

Servicer shall provide within 5 business days of the designation of a single point of contact a written communication detailing the designated representative's telephone number, email address and hours of availability, or providing for the appointment of a single point of contact based upon the borrower's convenience.

27. Servicer shall provide borrowers referenced in paragraph 26 a single point of contact using the designated contact model set forth in (a) or the appointment model set forth in (b) below.

(a) Designated single point of contacts shall:

    i. Have access to all electronic and paper-based records containing current borrower information relating to (a) loss mitigation applications, (b) pending foreclosure actions, and (c) documentation requests, including details of missing or incomplete documentation.

8

ii. No later than the 5th business day after a borrower has been provided with information regarding the single point of contact, initiate an out-bound call to the borrower to introduce himself or herself. If the borrower is unreachable via telephone, the designated individual may use alternative mechanisms as outlined in Delinquency Management and Default Prevention Guidelines issued by the GSEs.

iii. Initiate outbound contact with the borrower that, at a minimum:

a. Meets the standards of the Quality Right Party Contact as outlined in Fannie Mae Announcement SVC 2011-08, issued June 6, 2011;

b. Informs the borrower of available loss mitigation alternatives, including non-foreclosure options and provide borrower with information regarding the status of borrower's account, any request for loan modification or other loss mitigation alternative, and foreclosure action, if any;

c. Informs the borrower of the preferred method of transmitting documents to the Servicer and the address to which all future communications should be directed;

d. Provides the borrower with information on the action the borrower must take to be considered for a loss mitigation alternative or non-foreclosure option, including the time frame in which the borrower must complete a specific action; and

e. Provides the borrower with reference information on where borrower may access additional information about foreclosure alternatives, including links to KnowYourOptions.com, MakingHomesAffordable.gov, Department of Housing and Urban Development and the Department's website.

iv. Within 5 days of receipt of any application or other documentation submitted ·by borrower with respect to a request for a loan modification, other loss mitigation alternatives or non-foreclosure options (*e.g.*, short sale, deed-in-lieu), provide a letter of acknowledgement to the borrower detailing:

a. A list of missing documents or the information needed to evaluate the borrower for a loss mitigation alternative;

b. A toll-free number that provides a list of government approved not-for-profit housing counselors in the homeowner's geographic area as listed on the Department's website, the Department of Housing and Urban Development's website or the Division of Housing and Community Renewal's website;

9

c. A statement clearly outlining the effect of the borrower's failure to submit all required documentation, including potential denial of loan modification or other loss mitigation alternatives, continuation of pending foreclosure action or referral to foreclosure; and

d. A statement outlining the action that will be taken if documentation is not received within the time period specified in the letter.

v. Coordinate with the borrower and in-house and third party service providers to facilitate compliance with loss mitigation alternatives or non-foreclosure option time frames outlined in state and federal laws and guidance and MHA and GSE program requirements;

vi. Upon the request of the borrower, escalate the borrower's loan file to a designated individual responsible for managing escalated caseloads.

(b) Alternatively, Servicer shall offer a single point of contact appointment model for borrowers' convenience as follows:

i. If borrower has not contacted Servicer within 5 business days of the written communication referenced in paragraph 26, Servicer shall initiate an out-bound call to the borrower. If the borrower is unreachable via telephone, the Servicer can use alternative mechanisms as outlined in Delinquency Management and Default Prevention Guidelines issued by the GSEs. Such contact shall meet the standards of the Quality Right Party Contact as outlined in Fannie Mae Announcement SVC 2011-08, issued June 6, 2011.

ii. At the time contact is made with the borrower, Servicer shall:

a. Inform the borrower of available loss mitigation alternatives, including non-foreclosure options and provide borrower with information regarding the status of borrower's account, any request for loan modification or other loss mitigation alternative, and foreclosure action, if any;

b. Assign a single point of contact if borrower requests more information or wishes to pursue loss mitigation alternatives, schedule an appointment with the single point of contact at a date and time convenient to the borrower, and provide written confirmation within 5 business days of the contact detailing the name of the single point of contact and a phone number for establishing future appointments with the same designated single point of contact;

c. Inform the borrower of the preferred method of transmitting documents to the single point of contact and the address to which all future communications should be directed;

10

d.  Provide borrower with information on the requirements for loss mitigation alternatives or other non-foreclosure options, including the time frame in which the borrower must complete required actions; and

e.  Provide borrower with references for additional information on foreclosure alternatives, including links to KnowYourOptions.com, MakingHomesAffordable.gov, and the Department of Housing and Urban Development's and the Department's website.

iii. Within 5 days of receipt of any application or other documentation submitted by borrower with respect to a request for a loan modification, other loss mitigation alternatives or non-foreclosure options (*e.g.*, short sale, deed-in-lieu), Servicer shall assign a single point of contact to the borrower if one was not already assigned.  Thereafter, the single point of contact shall provide a letter of acknowledgment to the borrower detailing:

a.  The name of the designated representative and steps the borrower can take to set up an appointment with the designated representative to discuss their application;

b.  A list of missing documents or the information needed to evaluate the borrower for a loss mitigation alternative;

c.  A toll-free number that provides a list of government approved not-for-profit housing counselors in the homeowner's geographic area as listed on the Department's website, the Department of Housing and Urban Development website or the Division of Housing and Community Renewal's website;

d.  A statement clearly outlining the effect of the borrower's failure to submit all required documentation, including potential denial of loan modification or other loss mitigation alternatives, continuation of pending foreclosure action or referral to foreclosure;

e.  A statement outlining the action that will be taken if documentation is not received within the time period specified in the letter.

iv.  The single point of contact shall have access to all electronic and paper-based records containing current borrower information relating to (a) loss mitigation applications, (b) pending foreclosure actions, and (c) documentation requests, including details of missing or incomplete documentation;

v.  The single point of contact shall coordinate with the borrower and in-house and third party service providers to facilitate compliance with loss mitigation alternatives or non-foreclosure option time frames outlined in state and federal laws and guidance and MHA and GSE program requirements;

11

vi. Upon the request of the borrower, the single point of contact shall escalate the borrower's loan file to a designated individual responsible for managing escalated caseloads.

28. Timelines for loan modifications referenced above shall conform to the time periods required by HAMP or by the GSEs, whichever are shorter.

29. Consistent with the Department's Mortgage Servicer Business Conduct Rules, Part 419 of the Superintendent's Regulations, Servicer shall review the complete loan modification application submitted by the borrower and shall determine the disposition of borrower's trial or preliminary loan modification request no later than 30 days after receipt of the complete loan modification application, absent compelling circumstances beyond Servicer's control.

30. Consistent with GSE and HAMP requirements, for all proprietary loan modification programs, Servicer shall allow properly submitted borrower financials to be used for 90 days from the date the documents are received, unless Servicer learns that there has been a material change in circumstances or unless investor requirements mandate a shorter time frame.

31. Change in Single Point of Contact. The single point of contact shall remain assigned to the borrower until such time as the borrower's account becomes current, unless the single point of contact is reassigned or leaves the employment of Servicer, or the number of borrowers serviced by the designated representative becomes too great to ensure appropriate borrower attention, or the borrower requests assignment to another single point of contact. In the event it becomes necessary to change the designated single point of contact for any of the above-stated reasons, Servicer must provide written notification to the borrower within 5 business days of the assignment of a new single point of contact. The communication must clearly notify the borrower of the changed information, including the single point of contact's name, telephone number, email address and hours of availability.

32. Once a single point of contact has been designated, all written communications provided to the borrower or borrower's representative relating to loss mitigation and foreclosure status must include the name of the single point of contact and identify that individual as the borrower's designated representative for inquiries and submission of documents.

33. If Servicer wishes to provide borrowers with additional customer care personnel to assist the borrower with loss mitigation at times when the borrower's single point of contact is not available, it must ensure that the additional personnel have full access to the borrower's most recently updated records and that the additional personnel immediately update the borrower's records to reflect all communication with the borrower.

34. Documentation of Escalated Cases. Servicer shall ensure that any escalated case received is properly documented with: (1) the date the escalated case is received, (2) the borrower's name; (3) the referring party; (4) the name of the requestor, if any, and (5) a

12

brief reason for the referral.  At a minimum, escalated cases shall be handled within the following guidelines:

(a) Within 3 business days of receiving the case, Servicer shall send the requestor and the borrower a written acknowledgement detailing: (1) contact name and department; (2) case reference name or number (3) a proposed resolution date, which must be no more than 15 days from the date the inquiry was received; and (4) a toll-free escalation contact phone number.  Servicer shall use best efforts to resolve the case within 15 days of receiving the case.  The resolution date may be extended an additional 15 days, but under no circumstances can the total time to resolve the case exceed 30 days. Servicer shall not be deemed to violate this provision if Servicer has informed the requestor and the borrower of the information required to resolve the case and such information has not been provided.

(b) Within 5 business days of identifying the proposed resolution, Servicer must communicate to the requestor and the borrower in writing outlining the proposed resolution and action required of the borrower, if any.

35.  Complaints.  Regardless of account status, all complaints received from borrowers must be recorded with the date received, name of individual assigned to investigate the complaint, and nature of the complaint and complaint tracking number. The individual designated to investigate the complaint shall: (1) provide the complainant with written acknowledgment within 5 business days of receiving the complaint; (2) inform the borrower of any additional information required to accurately identify the borrower's account; (3) provide the borrower with a list of additional documentation required to facilitate a proper review of the borrower's complaint; and, if applicable, (4) inform the borrower that the complaint has been reassigned to (a) borrower's single point of contact, or (b) escalated to a supervisor.

36.  Complaint Resolution.  Within 30 days of the receipt of a complaint, if all information required to make a final determination with respect to the complaint is provided to the Servicer, the Servicer shall notify the borrower of the final determination with respect to the complaint.

37.  Complaint Record.  All communication and information pertaining to the current status and resolution of complaints must be maintained in servicing files as well as a separate complaint history file detailing: date complaint received, name of individual assigned, nature of complaint, status of complaint (*e.g.*, open, resolved), and action taken. *Independent Evaluation of Loan Modification Denials*

38.  Servicer shall perform or cause to be performed an independent review of each denial of a request for a loan modification.  Such evaluation shall be performed by an independent entity or group of Servicer staff that is independent from the staff that initially evaluated the borrower for a loan modification.

39.  If the independent review concludes that the loan modification denial was correct, Servicer shall promptly send a written non-approval notice to the borrower.  Such notice

13

shall state with the specificity the reason the loan modification was denied and the information considered in Servicer's decision to deny the loan modification.

40. If borrower is not satisfied with the independent review, the matter will be referred to an independent escalation unit for a second review.

41. Servicer shall not initiate or advance foreclosure until the independent review process is complete.

42. Servicer shall promptly make available account history to the borrower upon request.

_Restrictions on Dual Tracking_

43. Servicer will ensure that borrowers who are engaged in pursuing loan modifications or other loss mitigation are not referred to foreclosure, to the extent consistent with FHFA guidelines for GSE loans.

_Application of Payments_

44. Servicer shall promptly apply all payments received from borrowers, including but not limited to full monthly mortgage payments and trial modification payments, except to the extent that such application conflicts with the borrower's loan documents or applicable law.

45. For any loan on which interest is calculated based on a daily accrual or daily interest method, Servicer shall promptly accept and apply all borrower payments, including cure payments (where authorized by law or contract), trial modification payments, and payments by or on behalf of a borrower in bankruptcy to cure any pre-petition default and to maintain payments while the case is pending, as well as non-conforming payments. Payments shall be posted no more than 2 business days after receipt and credited as of the date received to borrower's account. Each monthly payment shall be applied first to interest and then to principal, provided that where mortgage insurance premiums, taxes and insurance or other payments must, as required by statute, be paid prior to interest and principal, such application shall continue.

46. For all other loans, Servicer shall promptly accept and apply all borrower payments, including cure payments (where authorized by law or contract), trial modification payments, and payments by or on behalf of a borrower in bankruptcy to cure any pre-petition default and to maintain payments while the case is pending, as well as non-conforming payments to the extent provided in the next paragraph. Payments shall be posted no more than 2 business days after receipt and credited as of the date received to borrower's account. Each monthly payment shall be applied as of the scheduled due date and will be applied first to interest and then to principal, provided that where mortgage insurance premiums, taxes and insurance or other payments must, as required by statute, be paid prior to interest and principal, such application shall continue.

14

47. Except to the extent prohibited by existing agreements, Servicer shall accept and apply non-conforming payments when the payment, whether on its own or when combined with a payment made by another source, comes within $50.00 of the scheduled principal and interest amount.

48. For payments that are not within $50.00 of the scheduled principal and interest payment amount, Servicer may post such payment to a suspense or unapplied funds account, provided that Servicer (1) discloses to the borrower the existence of and any activity in the suspense or unapplied funds account; (2) credits the borrower's account with a full payment as of the date that the funds in the suspense or unapplied funds account are sufficient to cover such full payment; and (3) applies payments from the suspense or unapplied funds account as outlined above. Servicer shall not take funds from suspense or unapplied funds accounts to pay fees until all unpaid contractual interest, principal, and escrow amounts are paid and brought current.

49. Notwithstanding the provisions above, Servicer shall not be required to accept payments which are insufficient to pay the full balance due after the borrower has been provided written notice that the contract has been declared in default and the remaining payments due under the contract have been accelerated.

*Servicing Fees.*

50. Schedules of Fees: Servicer shall maintain and keep current a schedule of fees as outlined in Part 419.10(a) of the Superintendent's Regulations. The schedule shall: (1) list standard or common fees charged to borrowers, regardless of whether such fees are charged by Servicer directly or indirectly; (2) be made available on Servicer's website and to the borrower or borrower's authorized representative upon request; (3) identify each fee; (4) provide a plain language explanation of the fee; and (5) state the maximum amount of the fee or how the fee is calculated.

51. Authorized Fees. Servicer may only collect a fee if the fee is for services actually rendered and such services were reasonable and appropriate and one of the following conditions as outlined in Part 419.10(b) of the Superintendent's Regulations is met: (a) the fee is expressly authorized and clearly and conspicuously disclosed by the loan instruments and not prohibited by law; (b) the fee is expressly permitted by law and not prohibited by the loan instruments; or (c) the fee is not prohibited by law or the loan instruments and is a reasonable fee for a specific service requested by the borrower that is assessed only after clear and conspicuous disclosure of the fee is provided to the borrower and the borrower expressly consents to pay the fee in exchange for the services.

52. Attorney's Fees. In addition to the limitations in Paragraph 50, attorney's fees charged in connection with a foreclosure action shall not exceed reasonable and customary fees for such work. The maximum foreclosure attorney's fees imposed should be consistent with guidelines published in Fannie Mae Allowable Attorney and Trust Fee Schedule, as updated from time to time. In the event the foreclosure action is terminated prior to final judgment and sale for a loss mitigation option, a reinstatement or payment in full, the borrower shall only be liable for reasonable and customary fees for work actually

15

performed as required by Part 419.10(c) of the Superintendent's Regulations.

53. Late Fees and Delinquency Charges. Servicer shall not impose any late fee or delinquency charge when the only delinquency is attributable to late fees or delinquency charges assessed on an earlier payment, and the payment is otherwise a full payment for the applicable period and is paid on its due date or within any applicable grace period. For the purposes of this provision and solely to determine whether a late payment could be assessed, payment should be applied first to the current installment and then to the delinquent installment and then to delinquency and other charges.

54. Late charges shall not be (a) in an amount greater than the past due amount; (b) collected from the escrow account or from escrow surplus without the approval of the borrower; (c) deducted from any regular payment; or (c) assessed after the borrower has submitted a complete loan modification application for evaluation; (d) assessed if the borrower is making timely trial modification payments; or (e) assessed while a short sale request is under evaluation.

55. Property Valuation. With the exception of GSE loans, property valuation (*e.g.*, "BPO") fees shall not be imposed on a borrower more than once in a 12 month period unless the property valuation is to facilitate the borrower's application for an alternative to foreclosure (*e.g.*, HAMP modification) or other non-foreclosure option (*e.g.*, short sale). The timing of property valuation for GSE loans shall conform to GSE guidelines. The amount of the fee for non-GSE loans shall be consistent with the reimbursement rates established in GSE's Preforeclosure Valuation Provider Information as updated from time to time.

56. Mark-up and Referral Fees. No mark-up shall be imposed on third-party default related foreclosure services. Referral fees shall not be paid to or accepted from third-party default or foreclosure related service providers, or in relations to third-party default or foreclosure services, regardless of whether such payment are made direct or indirectly.

57. Periodic Evaluation of Fees Charged. A periodic evaluation of fees charged shall be conducted to evaluate whether the frequency at which fees were assessed to any delinquent borrower's account was excessive under the terms of the borrower's loan documents, applicable federal and state laws and whether such fees exceed guidelines and standards established by the GSEs or applicable to federally insured transactions.

*Force-Placed Insurance*

58. Servicer shall take all commercially reasonable steps to continue or reestablish the existing homeowner's property hazard policy if there is a lapse in payment. Servicer shall ensure that force-placed insurance is not obtained for a borrower unless the borrower fails to provide evidence that property hazard insurance has been maintained as required by the mortgage loan contract following notices provided, at a minimum over two months, sent by Servicer, by first class mail, reminding the borrower that property hazard insurance must be maintained, stating that evidence that the borrower maintains such insurance is lacking, describing how the borrower may provide evidence of such

coverage, and explaining that if such coverage is not obtained, force-placed insurance may be obtained that will be significantly more costly and may provide less protection for the borrower.

59. Any force-placed insurance obtained for a borrower by Servicer shall be the lower of the last known amount of the borrower's coverage that was compliant with the requirements of the mortgage loan or the outstanding balance of the borrower's loan, provided further, that in no circumstances shall the amount of force-placed insurance exceed the replacement cost of the improvements on the mortgaged property.

60. Upon receipt of evidence of a borrower's existing property hazard insurance coverage, Servicer shall ensure that any force-placed insurance is terminated and that any unearned premiums are returned to the borrower.

61. To the extent Servicer purchases a master hazard insurance policy for force-placed insurance, it shall only purchase a policy that is reasonably priced in relation to the claims that may be incurred. In no event shall Servicer purchase a master hazard insurance policy from an affiliated entity.

_Compliance with Federal and State Law_

62. If adherence to any of these Servicing Practices would render compliance with any provision of federal law or state law relating to the same subject matter impossible, then compliance with such provision of federal or state law shall be deemed compliance with the relevant provision of these Servicing Practices. Servicer shall provide written notice to the Department within 15 days of its determination that a provision of these Servicing Practices is rendered impossible by federal or state law. If the Department disagrees with Servicer's determination, it shall notify Servicer of its disagreement within 10 days of its receipt of Servicer's notice, in which case, Servicer shall continue to adhere to the relevant Servicing Practices.

IT IS FURTHER AGREED that unless otherwise specified in the Servicing Practices, Ocwen and Litton shall have 60 days from the date of the Acquisition to implement the provisions and requirements of this Agreement; and

IT IS FURTHER AGREED that if any party to this Agreement agrees with any other regulator to adopt greater consumer protections or other more rigorous standards than are contained in this Agreement, such other provisions shall be incorporated by reference herein with respect to such party.

17

IT IS FURTHER AGREED that nothing in this Agreement shall preclude the Department from pursuing any examination, enforcement action or additional agreement with Servicer(s) regarding the subject of the above-described Servicing Practices.

IT IS FURTHER AGREED that this Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one instrument.

Dated: ~~August~~ September 1, 2011

**New York State Banking Department**

By: _____

Benjamin M. Lawsky
Acting Superintendent of Banks
Confirmed Superintendent of Financial Services

Dated: August 31, 2011

**Ocwen Financial Corporation**

By: _____

Ronald M. Faris
President and CEO

Dated: August ___, 2011

**Goldman Sachs Bank USA**

By: _____

Kevin Byrne
Chief Financial Officer

Dated: August ___, 2011

**Litton Loan Servicing, LP**
By Litton Consumer and Corporate Servicing, LLC
Its General Partner

By: _____

Thomas Halverson
Its President

18

IT IS FURTHER AGREED that nothing in this Agreement shall preclude the Department from pursuing any examination, enforcement action or additional agreement with Servicer(s) regarding the subject of the above-described Servicing Practices.

IT IS FURTHER AGREED that this Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one instrument.

Dated: ~~August~~ September 1, 2011

**New York State Banking Department**

By: _____
    Benjamin M. Lawsky
    Acting Superintendent of Banks
    Confirmed Superintendent of Financial Services

Dated: August ___, 2011

**Ocwen Financial Corporation**

By: _____
    Ronald M. Faris
    President and CEO

Dated: August 3 ̲1, 2011

**Goldman Sachs Bank USA**

By: _____
    Kevin Byrne
    Chief Financial Officer

Dated: August 3 ̲/, 2011

**Litton Loan Servicing, LP**
By Litton Consumer and Corporate Servicing, LLC
Its General Partner

By: _____
    Thomas Halverson
    Its President

18

STATE OF NEW YORK
DEPARTMENT OF FINANCIAL SERVICES

AMENDMENT #1 TO
THE AGREEMENT ON MORTGAGE SERVICING PRACTICES BETWEEN THE
NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES AND OCWEN
FINANCIAL CORPORATION DATED SEPTEMBER 1, 2011
(hereinafter, the "Agreement")

WHEREAS, the parties have agreed to amend the Agreement,

NOW THEREFORE, the parties agree that the Agreement shall be amended as follows:

1.    Paragraph 26(c) of the Agreement is hereby deleted, and the following shall be added in its place and stead:

"(c) Thereafter, as to all loans, within 15 days of Servicer's identification of a borrower in default or, consistent with GSE guidelines, of a borrower for whom default may be imminent."

2.    Paragraph 43 of the Agreement is hereby deleted, and the following shall be added in its place and stead:

"43. Servicer will ensure that borrowers who are engaged in pursuing loan modifications or other loss mitigation are not referred to foreclosure, including for GSE loans to the extent consistent with FHFA guidelines for GSE loans."

3.    The following paragraphs shall be added immediately following Paragraph 62 of the Agreement:

"IT IS FURTHER AGREED that as to those borrowers' files advanced to foreclosure, which files have been referred to the Steven J. Baum P.C. law firm (the "Baum firm"), Servicer agrees not to charge borrowers any penalties, fees, costs or interest accrued for any delays in court appearances including settlement conferences by substituted counsel, as a direct result of the closing of the Baum firm and the substitution of counsel; and,

IT IS FURTHER AGREED that Servicer will require adherence to this Agreement on Servicing Practices as a condition to any agreement with a sub-servicer or third-party to perform some or all of the servicing activities with respect to Servicer's servicing portfolio; and,

IT IS FURTHER AGREED that Servicer shall adhere to this Agreement for any loans acquired or otherwise added to Servicer's portfolio subsequent to the signing of this Agreement; and,"

4.    This amendment and its provisions shall be effective and binding only when it is signed by all parties.

1

WHEREFORE, the signatures evidencing assent to this amendment have been affixed hereto on the dates set forth below.

Dated: December 15, 2011

**New York State Department of Financial Services**

By: _____

Benjamin M. Lawsky
Superintendent of Financial Services

Dated: December 14, 2011

**Ocwen Financial Corporation**

By: _____

Ronald M. Faris
President and CEO

2

## Exhibit C

**(2012 Consent Order)**

NEW YORK STATE DEPARTMENT
OF FINANCIAL SERVICES

In the Matter of

OCWEN LOAN SERVICING, LLC

**CONSENT ORDER UNDER**
**NEW YORK BANKING LAW § 44**

WHEREAS, Ocwen Financial Corporation, the parent company of Ocwen Loan Servicing, LLC (collectively, "Ocwen"), is one of the largest mortgage loan servicers in the United States, servicing more than 40,000 residential home loan accounts in New York held largely by distressed homeowners;

WHEREAS, in the past two years, Ocwen has acquired several major servicers of home loans, including Litton Loan Servicing LP in 2011, as well as servicing rights from Saxon Mortgage Services, Inc. and JP Morgan Chase, Inc. in 2012, and has announced plans to further expand its servicing operations through the acquisition of additional mortgage servicing rights, including from Homeward Residential, Inc., formerly known as American Home Mortgage Servicing, Inc. ("AHMSI") and Residential Capital, LLC ("ResCAP");

WHEREAS, on September 1, 2011, in connection with Ocwen's acquisition of Litton and amid concerns regarding Ocwen's rapid growth and capacity to properly board a significant portfolio of distressed home loans, Ocwen and the New York State Department of Financial

Services (the "Department") (together, the "Parties") entered into an Agreement on Mortgage Servicing Practices (the "Agreement") which required Ocwen to: (1) establish and maintain sufficient capacity to properly board and manage its significant portfolio of distressed loans; (2) engage in sound document execution and retention practices to ensure that mortgage files were accurate, complete, and reliable; and (3) implement a system of robust internal controls and oversight with respect to mortgage servicing practices performed by its staff and third-party vendors;

WHEREAS, on December 15, 2011, the Agreement was amended to prevent Ocwen, among other things, from charging borrowers penalties, fees, costs and interest as a result of delays in court appearances caused by the closure of the law firm of Steven J. Baum, one of Ocwen's New York foreclosure counsel, following widespread allegations of improper foreclosure practices by the firm;

WHEREAS, on June 13, 2012, the Department conducted a targeted examination of Ocwen to assess its compliance with the Agreement and Part 419 of the Superintendent's Regulations, which govern business conduct rules for servicers;

WHEREAS, the examination preliminarily identified gaps in the servicing records of certain loans that the Department believes indicate non-compliance by Ocwen, including, in some instances: (1) failing to send borrowers a 90-day notice prior to commencing a foreclosure action as required under Real Property Actions and Proceedings Law ("RPAPL") § 1304; (2) commencing foreclosure actions on subprime loans without affirmatively alleging in the complaint that Ocwen has standing to bring the foreclosure action as required under RPAPL § 1302; and (3) commencing foreclosure actions without sufficient documentation of its standing to do so;

WHEREAS, the examination also preliminarily identified instances that the Department believes indicate non-compliance with the Agreement by Ocwen, including, in some instances: (1) failing to provide certain borrowers direct contact information for their designated loss mitigation staff or a single point of contact ("SPOC"); (2) pursuing foreclosure actions against certain borrowers who are seeking a loan modification (referred to in the Agreement as "dual tracking"); (3) failing to conduct an independent review of certain loan modification denials; (4) failing to demonstrate its adoption of policies and procedures to effectively track sanctioned third-party vendors, including local foreclosure counsel; (5) failing to demonstrate its implementation of policies and procedures to verify borrower information on newly boarded accounts to accurately reflect the status and current balance of the borrower's account; and (6) failing to sufficiently document actions required to ensure that prior modification efforts are not rendered futile upon transfer of a servicing file to or from Ocwen;

WHEREAS, the Department has preliminary concerns that Ocwen's practices have, in some instances: (1) deprived certain struggling homeowners in New York of many opportunities, including to cure the delinquencies on their loans before a foreclosure action was commenced; and (2) failing to provide certain homeowners information on where to contact a housing counselor to assist in reaching a resolution with their lender;

WHEREAS, the Department believes the preliminary evidence of non-compliance warrants the appointment of an independent monitor to conduct a comprehensive review of Ocwen's mortgage servicing files and practices, to which Ocwen has consented;

NOW, THEREFORE, the Parties are willing to resolve the matters cited herein as follows:

## SETTLEMENT PROVISIONS

**Mortgage Servicing Practices Compliance Review:**

1.     Within twenty (20) days of executing the Consent Order, Ocwen will identify an independent on-site monitor acceptable to the Department (the "Compliance Monitor") who will report directly to the Department to conduct a comprehensive review (the "Compliance Review") of Ocwen's servicing operations, including its compliance program and operational policies and procedures.

2.     The Compliance Monitor will review and assess Ocwen's operations with respect to loans on 1-4 family residential property located in the State of New York, including any loans acquired during the term of the Compliance Monitor. Such review will, at a minimum, address the following:

   a.  The adequacy of Ocwen's staffing levels for delinquent loans, loans in imminent risk of default and loans in default, including loans in foreclosure. The analysis should include the factors outlined in Paragraph 15 of the Agreement.

   b.  The robustness of established policies and procedures governing loss mitigation programs and foreclosure alternatives, independent reviews of loan modifications, execution of documents, and dual tracking of defaulted loans.

   c.  The fairness of servicing fees and foreclosure charges, including the elimination of penalties, fees, costs or interest associated with delays in court appearances as a direct result of the closing of the Steven J. Baum law firm and the substitution of counsel.

   d.  The accuracy of borrower account information for all loans serviced or sub-serviced by Ocwen.

   e.  Ocwen's compliance with state and federal law, including Part 419 of the Superintendent's Regulations and with the Agreement.

4

f.  Review by the Compliance Monitor of borrower complaints and recordings of

customer service, including those of the Collections and Loss Mitigation Units, to

assess the quality of information provided via telephone, as well as borrowers'

satisfaction with complaints and customer service assistance, and Ocwen's ability to

resolve borrower inquiries and complaints in a timely manner.

3.    Based on the Compliance Review, the Compliance Monitor will identify needed

corrective measures to address identified weaknesses and deficiencies in Ocwen's servicing

practices, make recommendations to the Superintendent, and oversee their implementation as

approved by the Superintendent.  The Compliance Monitor will also periodically review and

assess Ocwen's compliance with recommended corrective measures, as provided in paragraph 7

of this Order.

4.    Ocwen agrees to cooperate fully with the Compliance Monitor by, including but

not limited to, providing the Compliance Monitor access to all relevant personnel and records

necessary, including those at any overseas locations, to allow the Monitor to fulfill its duties.

Any confidential customer and/or proprietary Ocwen information provided to the Monitor will

remain the sole property of Ocwen and will be treated as confidential information, subject to

reporting provisions outlined in this Order.

5.    The terms of the Compliance Monitor will extend for a period of twenty-four (24)

months from the date of formal engagement.  Any dispute as to the scope of the Compliance

Monitor's authority will be resolved by the Department in the exercise of its sole discretion after

appropriate consultation with Ocwen and/or the Compliance Monitor.

6.       Within thirty (30) days of executing the Consent Order, Ocwen will submit to the Department for approval the proposed terms of the Compliance Monitor's engagement (the "Engagement Letter"). Ocwen will pay all reasonable and necessary costs of the Monitor.

7.       Within ninety (90) days of Ocwen's receipt of the Department's written approval of such terms, the Compliance Monitor will submit to the Parties a written report of findings, including, if necessary, any proposed corrective measures from the Compliance review (the "Compliance Review Report"). The Compliance Monitor will submit written monthly action progress reports ("Progress Reports") to the Parties. On a quarterly basis, beginning on June 20, 2013, the Monitor will issue a Progress Report covering the three-month period immediately preceding.

8.       Within sixty (60) days of the receipt of the Compliance Review report, Ocwen will submit to the Department for approval a written plan that is designed to improve and enhance Ocwen's servicing of mortgage loans on 1-4 family residential property located in New York State incorporating any corrective measures outlined in the Compliance Review Report (the "Action Plan"). The Action Plan will provide for any enhanced internal controls and updates and/or revisions to current policies, procedures and processes in order to ensure full compliance with all applicable provisions of the Agreement, Superintendent's Regulation Part 419, state and federal regulations governing the servicing of residential mortgage loans, and the requirements of this Consent Order. Upon receipt of written approval of the Action Plan by the Department, Ocwen will begin to implement the necessary changes.

**Breach of the Consent Order:**

9.       In the event that the Department believes Ocwen to be materially in breach of the Consent Order ("Breach"), the Department will provide written notice to Ocwen of the Breach

6

and Ocwen must, within ten (10) business days from the date of receipt of said notice, or on a later date if so determined in the sole discretion of the Department, appear before the Department to demonstrate that no Breach has occurred or, to the extent pertinent, that the Breach is not material or has been cured.

10.    The Parties understand and agree that Ocwen's failure to make the required demonstration within the specified period is presumptive evidence of Ocwen's Breach.  Upon a finding of Breach, the Department has all the remedies available to it under the New York Banking and Financial Services Laws and may use any and all evidence available to the Department for all ensuing hearings, notices, orders, and other remedies that may be available under New York Banking and Financial Services Laws.

**Waiver of Rights:**

11.    The Parties further understand and agree that no provision of the Consent Order is subject to review in any court or tribunal outside the Department.

**Parties Bound by the Consent Order:**

12.    It is further understood that the Consent Order is binding on the Department and Ocwen, as well as their successors and assigns that are within the supervision of the Department, but it specifically does not bind any federal or other state agencies or any law enforcement authorities.

13.    During the period in which the Consent Order remains in effect, the approved Plans and Engagement Letter as referenced herein will not be amended or rescinded without the prior written approval of the Department, other than amendments necessary to comply with applicable laws and regulations.

14.    Within ten (10) days after the end of each quarter following the execution of the Consent Order, Ocwen will submit to the Department written progress reports detailing the form and manner of all actions taken to secure compliance with the provisions of the Consent Order and the results thereof.  The Department may, in writing, and in its discretion, discontinue the requirement for progress reports or modify the reporting schedule.

**Notices:**

15.    All communications regarding this order will be sent to:

Gaurav Vasisht
Executive Deputy Superintendent
Banking Division
New York State Department of Financial Services
One State Street
New York, NY 10004

Ronald M. Faris
Chief Executive Officer
Ocwen Financial Corporation
1661 Worthington Road
West Palm Beach, FL 33416

**Miscellaneous:**

16.    Each provision of the Consent Order will remain effective and enforceable for a period of 24 months from the date hereof unless stayed, modified, terminated or suspended in writing by both Parties.

17.    No promise, assurance, representation, or understanding other than those contained in the Consent Order have been made to induce any Party to agree to the provisions of the Consent Order.

18.    Nothing in this Consent Order shall preclude the Department from pursuing any examination, enforcement action or additional agreement with Ocwen relating to the subject of this Consent Order.

IN WITNESS WHEREOF, the Parties have caused this Consent Order to be executed as of this 5th day of December, 2012.

OCWEN FINANCIAL CORPORATION

By: _____
Ronald M. Faris
President and CEO

NEW YORK STATE
DEPARTMENT OF FINANCIAL SERVICES

By: _____
Benjamin M. Lawsky
Superintendent