1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   - - - - - - - - - - - - - - - - - - - - -x

5   In the Matters of:

6   RESIDENTIAL CAPITAL, LLC, et al.,

7              Debtors.                Case No. 12-12020-mg

8   - - - - - - - - - - - - - - - - - - - - -x

9   RESIDENTIAL CAPITAL, LLC, et al.,

10                 Plaintiffs,

11             - against -            Case No. 13-01343-mg

12  UMB BANK, N.A. IN ITS CAPACITY AS

13  INDENTURE TRUST,

14                 Defendant.

15  - - - - - - - - - - - - - - - - - - - - -x

16  OFFICIAL COMMITTEE OF UNSECURED

17  CREDITORS, et al.,

18                 Plaintiffs,

19             - against -            Case No. 12-01277-mg

20  UMB BANK, N.A., et al.

21                 Defendants.

22  - - - - - - - - - - - - - - - - - - - - -x

23

24

25

```
 1  - - - - - - - - - - - - - - - - - - - -x
 2  JENKINS, et al.,
 3                    Plaintiffs,
 4            - against -              Case No. 12-01935-mg
 5  RESIDENTIAL FUNDING COMPANY, LLC, et al.
 6                    Defendants.
 7  - - - - - - - - - - - - - - - - - - - -x
 8  HAWTHORNE,
 9                    Plaintiff,
10            - against -              Case No. 12-02050-mg
11  GMAC MORTGAGE LLC, et al.
12                    Defendants.
13  - - - - - - - - - - - - - - - - - - - -x
14  PRUITT,
15                    Plaintiff,
16            - against -              Case No. 13-01350-mg
17  GMAC, et al.
18                    Defendants.
19  - - - - - - - - - - - - - - - - - - - -x
20
21
22
23
24
25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15                    United States Bankruptcy Court

16                    One Bowling Green

17                    New York, New York

18

19                    August 28, 2013

20                    10:03 AM

21

22   B E F O R E:

23   HON. MARTIN GLENN

24   U.S. BANKRUPTCY JUDGE

25

1

2   (CC: Document(s)3978) Motion to Lift Stay filed by Ramon Quiroz

3

4   (CC: Doc# 4200) Status Conference RE: Motion for Objection to

5   Claim(s) / Debtors' Objection to Proofs of Claim Filed by

6   Certain Plaintiffs in California Litigation.

7   Hearing Re: This Motion for Objection to Claim is Adjourned to

8   09/24/2013 at 10:00 am

9

10  (CC: Doc# 4199) Motion for Omnibus Objection to

11  Claim(s)/Debtors' Twenty-Second Omnibus Objection to Claims

12  (Borrower Claims with Insufficient Documentation).

13  Reset for 09/11/2013 at 10:00 am solely as it relates to the

14  proof of claim filed by William C. Walker (Claim No. 5529).

15

16  Adversary proceeding: 13-01277-mg Official Committee of

17  Unsecured Creditors et al v. UMB Bank, N.A., et al.

18  Doc# 41, (CC: Doc no. 53, 54) Motion to Dismiss Adversary

19  Proceeding / Memorandum of Law in Support of the Debtors' and

20  Official Committee of Unsecured Creditors' Motion to Dismiss

21  Certain of the Defendants' Counterclaims.

22

23

24

25

1

2 Adversary proceeding: 13-01343-mg Residential Capital, LLC et

3 al. v. UMB Bank, N.A., in its Capacity as Indenture Trust

4 Doc# 10, (CC: Doc no. 22, 23, 29, 30, 31) Motion to Dismiss

5 Adversary Proceeding / Memorandum of Law in Support of the

6 Debtors' and Official Committee of Unsecured Creditors' Motion

7 to Dismiss Certain of the Defendants' Counterclaims.

8

9 Adversary proceeding: 13-01277-mg Official Committee of

10 Unsecured Creditors, et al. v. UMB Bank, N.A. et al.

11 (CC: Doc# 81, 82) Motion to Amend or Confirm Time to Answer

12 (related document(s)42)

13

14 Adversary proceeding: 12-01935-mg  Jenkins et al v. Residential

15 Funding Company, LLC, et al.

16 Doc# 35 Hearing and Status Conference RE: Motion to Dismiss

17 Adversary Proceeding Pursuant to Fed. R. Civ. P. 12(b)(1), (4)-

18 (6)

19

20 Adversary proceeding: 12-02050-mg Hawthorne v. GMAC MORTGAGE,

21 LLC

22 (CC: Doc no. 1) Adj. Status Conference

23

24 Adversary proceeding: 13-01350-mg Pruitt v. GMAC et al

25 (CC: Doc no. 1, 4, 18) Adjourned Pre-trial Conference.

6

1

2   A P P E A R A N C E S :

3   MORRISON & FOERSTER LLP

4        Attorneys for Debtors

5        1290 Avenue of the Americas

6        New York, NY 10104

7

8   BY:   NORMAN A. ROSENBAUM, ESQ.

9        DANIEL J. HARRIS, ESQ.

10       JAMIE A. LEVITT, ESQ.

11       JAMES A. NEWTON, ESQ.

12       SAMANTHA MARTIN, ESQ.

13

14

15   CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

16        Conflicts Counsel to Debtors

17        101 Park Avenue

18        New York, NY 10178

19

20   BY:   THERESA A. FOUDY, ESQ.

21

22

23

24

25

```
 1
 2   LOCKE LORD LLP
 3          Special Litigation Counsel to Debtors
 4          44 Montgomery Street
 5          Suite 2400
 6          San Francisco, CA 94104
 7
 8   BY:   REGINA J. MCCLENDON, ESQ.
 9
10
11   BRADLEY ARANT BOULT CUMMINGS LLP
12          Special Litigation Counsel to Debtors
13          One Federal Place
14          1819 Fifth Avenue North
15          Birmingham, AL 35203
16
17   BY:   JAMES P. WATKINS, ESQ. (TELEPHONICALLY)
18          CHRISTOPHER A. HAWKINS, ESQ. (TELEPHONICALLY)
19
20
21
22
23
24
25
```

1

2    KRAMER LEVIN NAFTALIS & FRANKEL LLP

3           Attorneys for Official Creditors' Committee

4           1177 Avenue of the Americas

5           New York, NY 10036

6

7    BY:    GREGORY A. HOROWITZ, ESQ.

8           KENNETH ECKSTEIN, ESQ.

9

10

11   SILVERMANACAMPORA LLP

12          Special Counsel to Creditors' Committee

13          100 Jericho Quadrangle

14          Suite 300

15          Jericho, NY 11753

16

17   BY:    JUSTIN S. KRELL, ESQ.

18

19

20

21

22

23

24

25

```
 1

 2   PACHULSKI STANG ZIEHL & JONES

 3        Conflicts Counsel to Creditors' Committee

 4        780 Third Avenue

 5        36th Floor

 6        New York, NY 10017

 7

 8   BY:   ROBERT J. FEINSTEIN, ESQ.

 9        JOHN A. MORRIS, ESQ.

10

11

12   WHITE & CASE LLP

13        Attorneys for Ad Hoc Group of Junior Secured Noteholders

14        1155 Avenue of the Americas

15        New York, NY 10036

16

17   BY:   J. CHRISTOPHER SHORE, ESQ.

18        DOUGLAS P BAUMSTEIN, ESQ.

19

20

21

22

23

24

25
```

1

2  AKIN GUMP STRAUSS HAUER & FELD, LLP

3         Attorneys for UMB Bank

4         One Bryant Park

5         New York, NY 10036

6

7  BY:   DAVID M. ZENSKY, ESQ.

8         DEBORAH NEWMAN, ESQ.

9

10

11  BROOKSTONE LAW, PC

12        Attorneys for Hariston, et al.

13        4000 MacArthur Boulevard

14        Suite 1100

15        Newport Beach, CA 92660

16

17

18  BY:   VITO TORCHIA, JR., ESQ. (TELEPHONICALLY)

19

20  HOGAN LOVELLS US LLP

21        Attorneys for Wells Fargo Bank, N.A.

22        875 Third Avenue

23        New York, NY 10022

24

25  BY:   BRIAN  GRIECO, ESQ.

1

2  REED SMITH LLP

3        Attorneys for Wells Fargo Bank as collateral agent

4        599 Lexington Avenue

5        29th Floor

6        New York, NY 10022

7

8  BY:    ERIC A. SCHAFFER, ESQ.

9

10

11  MUNGER, TOLLES & OLSON LLP

12        Attorneys for Berkshire Hathaway, Inc.

13        355 South Grand Avenue

14        35th Floor

15        Los Angeles, CA 90071

16

17  BY:    THOMAS B. WALPER, ESQ. (TELEPHONICALLY)

18

19

20  LAW OFFICE OF ALABA AJETUNMOBI

21        Attorney for Charity Anyanwu

22        3350 Wilshire Boulevard

23        Los Angeles, CA 90010

24

25  BY:    ALABA AJETUNMOBI, ESQ. (TELEPHONICALLY)

1

2    ALFREDIA B. PRUITT

3            Appearing Pro Se

4

5    MARION JENKINS

6            Appearing Pro Se (TELEPHONICALLY)

7

8    JAMES HAWTHORNE

9            Appearing Pro Se (TELEPHONICALLY)

10

11

12

13

14

15

16

17

18

19

20    Transcribed by:  Penina Wolicki

21    eScribers, LLC

22    700 West 192nd Street, Suite #607

23    New York, NY 10040

24    (973)406-2250

25    operations@escribers.net

1          P R O C E E D I N G S

2          THE CLERK:  All rise.

3          THE COURT:  Please be seated.  All right, we're here

4    in Residential Capital, number 12-12020.  Mr. Rosenbaum?

5          MR. ROSENBAUM:  Good morning, Your Honor.  Norm

6    Rosenbaum, Morrison & Foerster, for the debtors.

7          Your Honor, on this morning's calendar, we have, in

8    addition to the UMB matters, three contested matters, and then

9    status conferences in three borrower adversary proceedings, and

10   one motion to dismiss.  And just to set the stage for the

11   morning, we will, with Your Honor -- if it's okay with Your

12   Honor, we will deal with the contested matters, the borrower

13   adversary proceedings, and then we can clear the deck here, and

14   we can proceed with the UMB matters.

15         THE COURT:  Okay.

16         MR. ROSENBAUM:  Your Honor, the first matter on the

17   calendar this morning is at page 9 on the agenda, (V).  This is

18   the motion of claimants Helen, Jessica Angel and Ramon Quiroz

19   to lift the automatic stay, docket number 3978.  I'm not sure

20   if the Quirozes have made an appearance, but if they're in the

21   court, I will cede the podium to them?

22         THE COURT:  Anyone here representing Quiroz?

23         Anybody on the telephone representing Quiroz?

24         Just give me a second, Mr. Rosenbaum.

25         I do have some questions about this one, Mr.

1   Rosenbaum.  There's an appeal pending in the Second Circuit

2   that's been stayed by virtue of this bankruptcy, correct?

3          MR. ROSENBAUM:  Correct, Your Honor.

4          THE COURT:  Why shouldn't the appeal go forward to

5   conclusion?  In the district court, as I understand it the

6   magist -- the district court adopted the magistrate judge's

7   report and recommendation in its entirety, and dismissed the

8   complaint on the grounds that the claims -- among other

9   reasons, that the claims were barred by the Rooker-Feldman

10  doctrine and res judicata.

11         The report and recommendation also recommended the

12  district court to decline to exercise supplemental jurisdiction

13  over negligence claims.  On September 6, 2011, the Quiroz

14  family appealed the decision to the Second Circuit.  The appeal

15  has been -- as I understand it, it's fully briefed at this

16  point, isn't it?

17         MR. ROSENBAUM:  I believe the Quirozes still have the

18  opportunity to submit a reply brief, Your Honor.

19         THE COURT:  Why shouldn't the appeal go forward to

20  decision?

21         MR. ROSENBAUM:  Your Honor, we are sensitive to that

22  issue.  And I know that there has been instances, several of

23  them, where we have consented to relief from the stay to

24  resolve those kinds of matters.

25         THE COURT:  One of those is in the First Circuit,

1    you've consented to the appeal.  I mean, there's nothing left

2    for you to do.  I mean, shouldn't the Second Circuit -- if the

3    Second Circuit affirms the district court, that's all to the

4    good.

5              MR. ROSENBAUM:  Your Honor, just two brief points

6    there.

7              THE COURT:  Go ahead.

8              MR. ROSENBAUM:  The problem is that the Quirozes have

9    filed a proof of claim.  The proof of claim is not based on the

10   lawsuit.  That might have been the intention.  So we're faced

11   with the problem that we still have to object to the proof of

12   claim.

13             THE COURT:  So what difference does -- does it make a

14   difference to the debtors which way the Second Circuit decides

15   the pending appeal?

16             MR. ROSENBAUM:  Yes, it does, Your Honor.  Because if

17   the Second Circuit reverses, then it goes back -- I assume it's

18   remanded back to the trial court.  Then we're looking at a

19   trial.

20             THE COURT:  Okay.  If the Second Circuit reverses,

21   because it finds errors of law by the district court in

22   dismissing the complaint, isn't that going to be, if not

23   binding, certainly persuasive on any determination by this

24   Court with respect to any objection to the proof of claim you

25   file?

RESIDENTIAL CAPITAL, LLC, ET AL.                    16

1          MR. ROSENBAUM:  Your Honor, I think that would be up
2   to the claimant.  We don't exactly know what the basis of the
3   claim is.  As I said, it might have been the intention of the
4   claimant, and I believe it probably was, that their underlying
5   actions in the district court -- their underlying causes of
6   action in the district court should be the basis for the
7   complaint -- for the proof of claim.
8          But there's extreme incongruity between both.  The
9   district court action alleges fifty million dollars in punitive
10  damages, and there's three nondebtor defendants.  The proof of
11  claim is for half a million dollars.
12         THE COURT:  So why should the -- there are three
13  nondebtor defendants.  Why shouldn't the appeal proceed to
14  decision, because it affect -- have the nondebtor defendants
15  filed indemnification claims in this case.
16         MR. ROSENBAUM:  I'm not aware if they have, Your
17  Honor.
18         THE COURT:  Okay.  So when I --
19         MR. ROSENBAUM:  U.S. Bank might have --
20         THE COURT:  -- look at the -- when I look at the
21  Sonnax factors, one, whether relief would result in a partial
22  or complete resolution of the issues:  it might.  I mean, I
23  don't know until the Second -- there's little or nothing that
24  the debtors need to do to enable this -- other than agreeing or
25  having the court rule to lift the stay -- to have the Second

1   Circuit decide the issues.  Their resolution may result in a

2   partial or complete resolution of the issues.  If they affirm,

3   it may well dispose of issues.

4          Second factor:  The lack of any connection with or

5   interference with the bankruptcy case.  How is it going to

6   interfere with the bankruptcy case to allow the Second Circuit

7   to reach a decision on an appeal, that if not fully briefed,

8   there's one brief left from the appellants?

9          MR. ROSENBAUM:  One brief point, Your Honor.  We --

10  it's hard to estimate when the Second Circuit will rule.  It

11  could be nine months; it could be shorter; it could be longer.

12  We're faced still with the half-a-million-dollar claim; we'd

13  either need to seek to estimate or reserve for it.

14         THE COURT:  I'll go ahead and dec -- if you want to go

15  ahead and object to the claim, I'll go ahead and deal with

16  that.  But there are nondebtor defendants.  You don't know

17  whether they filed claims for indemnification in the case.

18  When I look through the twelve Sonnax factors, frankly, I don't

19  see any -- some are not applicable at all; some point strongly

20  in favor of lifting the stay to permit the Second Circuit to

21  reach a decision.  And which of them do you think points to

22  continuing the stay?

23         MR. ROSENBAUM:  Your Honor, I think it's the ability

24  to efficiently deal with the claim is really our primary --

25         THE COURT:  Okay.

1            MR. ROSENBAUM:  -- focus here.

2            THE COURT:  I've heard enough.  The -- prepare an

3     order.  I'm lifting the stay to permit the Second Circuit to

4     proceed to decide the pending appeal.  I don't know that -- I

5     don't know that it needs to do anything -- that the order needs

6     to say anything further than that.  The Second Circuit, because

7     of this case, has held the appeal in abeyance.

8            MR. ROSENBAUM:  Understood.

9            THE COURT:  And if anything, it will just -- look, if

10    you want to go ahead and object to the claim, I'll go ahead and

11    hear it.  Although I'll see what the status of the -- I'll

12    compare what the issues in the Second Circuit are with the

13    arguments you raise here, and I'll either decide it then or

14    I'll hold it.  But I see no reason to -- there's no burden on

15    you -- on the debtors to allow this appeal to go forward.  So

16    I'm going to grant the motion to lift the stay, for the limited

17    purpose of allowing the Second Circuit appeal to proceed.

18            If the Second Circuit reverse, I'm -- somebody will

19    have to come back to me as to whether the matter proceeds in

20    the district court.  But at least for the limited purpose of

21    permitting the Second Circuit to decide the pending appeal, I'm

22    lifting the stay.

23            MR. ROSENBAUM:  Thank you, Your Honor.

24            THE COURT:  So prepare an order and submit it to

25    chambers.

1          MR. ROSENBAUM:  We'll do so.

2          Your Honor, the next matter on the calendar is --

3     sorry, Your Honor.  This is the debtors' objection to the proof

4     of claim filed by the -- in the California litigation.

5          THE COURT:  Yes.

6          MR. ROSENBAUM:  I'm going to cede the podium to my

7     colleague, Daniel Harris.

8          THE COURT:  Mr. Harris.

9          MR. HARRIS:  Good morning.

10         THE COURT:  I usually disclose at times like this,

11    that Mr. Harris is one of my former law clerks, and I'm happy

12    to have him here appearing before me.

13         Go ahead, Mr. Harris.

14         MR. HARRIS:  Good morning, Your Honor.  Daniel Harris

15    from Morrison & Foerster, on behalf of the debtors.  With me is

16    Regina McClendon from Locke Lord, as special litigation counsel

17    to the debtors in this matter.

18         MR. TORCHIA:  And Vito Torchia on behalf of the -- on

19    behalf of the Hairston debtors (sic).

20         THE COURT:  All right.  Go ahead Mr. --

21         MR. TORCHIA:  Creditors, excuse me.

22         THE COURT:  Go ahead, Mr. Harris.

23         MR. HARRIS:  Ms. McClendon is most familiar with the

24    underlying litigation, and can answer any questions Your Honor

25    has regarding the underlying allegations made and what I'll

RESIDENTIAL CAPITAL, LLC, ET AL.                    20

1  refer to as the California litigation claims.

2          Your Honor, I corresponded with chambers on Monday and

3  respectfully requested that this be converted into a status

4  conference in light of recent actions taken by opposing counsel

5  in responding to the debtors' objection.  I understand that

6  opposing counsel has objected to calling this a status

7  conference, and instead it will be going forward as a hearing.

8          THE COURT:  I'm having a hearing.  That's what I'm

9  having.  And you can call it what you want.  It's a hearing.

10         MR. HARRIS:  And in that event, we're prepared to go

11 forward to address our objection to the 549 proofs of claim

12 filed by counsel, alleging over 713 million dollars in claims

13 against the debtors.

14         THE COURT:  Well, let me ask you this, Mr. Harris.

15 You filed the claim objection and the claimants filed amended

16 claims.  That much is right?

17         MR. HARRIS:  That's correct.

18         THE COURT:  And you've not filed a new objection to

19 the claims?

20         MR. HARRIS:  We have not.  Not yet, Your Honor.  They

21 are -- there are sixty claims, and we'll need -- they attached

22 a 250-page complaint.  It'll take some time to go through that.

23         THE COURT:  Yes, I went to look at it today yesterday,

24 and I saw it was over 250 pages, and I found that daunting,

25 since I don't really have an objection to the new claim.  But

1    it raised -- it seemed to me to raise a number of issues.

2    There are -- let me find my notes on this.

3            Let me ask -- before I do that, let me ask a couple of

4    questions.  There was prior litigation in another court before

5    the bankruptcy was filed.  What court was that in?

6            MR. HARRIS:  It was in the central -- federal court in

7    the Central District of California.

8            THE COURT:  Okay.  And am I correct that on September

9    24th, 2012, the court granted the motion to dismiss the

10   complaint without prejudice as to the first six causes of

11   action, and with prejudice as to the seventh and eighth causes

12   of action?

13           MR. HARRIS:  That's correct, Your Honor.

14           THE COURT:  Okay.  And the plaintiffs then filed an

15   amended complaint?

16           MR. HARRIS:  That's right.  And it is that amended

17   complaint which serves as the basis for the initial claims that

18   were filed prior to the bar date.

19           THE COURT:  And then the nondebtor defendants filed a

20   motion to dismiss the amended complaint, and before that was

21   heard, the plaintiffs withdrew the complaint?

22           MR. HARRIS:  That's -- they voluntarily withdrew the

23   complaint in California.  That's correct, Your Honor.

24           THE COURT:  Okay.  And in the amended claims that they

25   have filed here, they've asserted new causes of action that

1  were not asserted in the original claims?

2        MR. HARRIS:  Yeah.  Your Honor, based on our review of

3  the supposed amended claims or the amended complaint attached

4  to the claims, they raise at least one new cause of action that

5  wasn't raised in the first complaint and at last on its face

6  raise several additional -- up to eighteen additional counts in

7  the complaints.

8        THE COURT:  Okay.

9        MR. TORCHIA:  Your Honor, this is actually a --

10       THE COURT:  No --

11       MR. TORCHIA:  -- here.  We raised --

12       THE COURT:  Could you wait until I call on you?  Can

13 you please be quiet until I call on you?  I permit people to

14 appear by phone, but I'll -- when it comes time for you to

15 speak, I'll give you an opportunity to do that.

16       MR. TORCHIA:  I apologize.

17       THE COURT:  All right.  So, Mr. Harris, one of the

18 things that's sort of vexing me is that -- and particularly

19 because you haven't filed a new objection to the amended

20 claims, is whether -- because of the additional claims that are

21 added, whether they're timely filed.  And as I understand the

22 rule, courts generally follow the rule that amending a timely

23 filed claim is permitted only where the original claim states

24 "as an explicit demand showing the nature and amount of the

25 claim against the estate and evidences an intent to hold the

1    debtor liable."  That's from 4 Collier paragraph 501.02(4).

2            And the First Circuit, in Hemingway Transportation,

3    954 F.2d 1 (1st Cir. 1992) sets forth the standard for when to

4    permit a creditor to amend a proof of claim.  And I don't know

5    whether you're going to contest the amended claim as asserting

6    claims that they're not -- that are not timely and they're not

7    permitted to assert.  Neither party has, at this stage, briefed

8    the issue whether the claimants' amended proofs of claim are

9    proper.  And to the extent that the Court ultimately determines

10   they are, it would be true that your objection to the original

11   claim would be mooted, if the new claims they assert are

12   properly asserted now.

13           So I'll hear from other counsel.  But my initial

14   reaction is okay, they -- you filed your objection; they filed

15   amended claims.  I'm going to give the debtors an opportunity

16   to file objections to the amended claims, including if you're

17   going to contest that they're not timely, that they can't

18   assert the additional claims that they purport to assert, you

19   can raise that.

20           I'm not sure why the claimants objected to this going

21   forward as a status conference.  They argue that your objection

22   is moot.  It may or may not be.  I don't know.  But the debtors

23   need to have an opportunity to assess the extremely lengthy

24   amended claims that have been filed.  What's your response to

25   that, Mr. Harris?

1    MR. HARRIS:  Your Honor, we're certainly prepared to

2  brief the issue of whether or not the claims are timely filed

3  post bar date amendments, or whether or not they assert new

4  claims.  Just our review -- our initial review of the claims

5  suggests that we'll be able to meet the standards announced by

6  the Second Circuit in Enron and by Your Honor in Barquet Group,

7  about amending proofs of claim.

8    We haven't briefed that issue mostly because of the

9  process here.

10    THE COURT:  Sure.

11    MR. HARRIS:  The claims were filed on the same date

12  that the objection was due.  We had a couple-of-day lag until

13  we were able to get the claims.  And then eleven days after the

14  objection deadline, a response arguing that the amendments make

15  our objection moot was filed.  I looked at -- I've studied

16  their objection; I've looked at the cases.  I think their

17  suggestion that the claims are somehow mooted -- or our

18  objection is mooted by the filing of the amended claims is

19  dubious at best.  I don't think the cases that were cited stand

20  for that proposition.  We're certainly prepared to brief the

21  issue on the amended claims.

22    THE COURT:  What I'm not -- let me just interrupt you

23  for this purpose.  What I'm not going to permit is for you to

24  file another objection, and then as soon as it's filed, they

25  file another amended claim.  We're not going to do this over

1    and over again.  So let me hear from the claimants' counsel,

2    and then I'll give you a chance to respond, Mr. Harris.  Okay?

3         MR. HARRIS:  Thank you, Your Honor.

4         THE COURT:  Thank you.  Counsel, now it's your turn to

5    go ahead.

6         MR. TORCHIA:  Thank you, Your Honor.

7         THE COURT:  Tell me your name again?

8         MR. TORCHIA:  Our amended complaint --

9         THE COURT:  Tell me your name again?

10        MR. TORCHIA:  -- the nature of the complaint is

11   exactly the same.  It was just reorganized.  Claimants -- it's

12   the same operative, we feel, facts.  And has -- it states the

13   existence, nature, and amount of claims, they're not -- it does

14   not differ.  There's nothing different.  The conditions are the

15   same, and the nature of the claims are the same.

16        They've just been reorganized for the Court and for

17   opposing counsel for clarity.  So -- which they first called

18   for in their objections.  So that's what -- that was the nature

19   of the amended complaint.  So we're allowed to amend the

20   complaint.

21        THE COURT:  Are you finished amending?

22        MR. TORCHIA:  Yes.

23        THE COURT:  All right.  Mr. Harris --

24        MR. TORCHIA:  And -- excuse me, Your Honor.  I'm

25   sorry.  But Your Honor, and our amendments were aimed to

1    address opposing counsel's objections.

2            THE COURT:  Yeah, but one thing I want to make

3    clear --

4            MR. TORCHIA:  More specificity.  We added more

5    specificity.

6            THE COURT:  What I want to make clear is, because for

7    example, you had fraud claims and you didn't allege fraud with

8    particularity -- that was among the objections, probably well

9    taken to the original claim.  But the point I want to make and

10   I'll have an order entered to this effect, we're not going to

11   do this over and over again.

12           If you're prepared to stand on the amended claims you

13   filed, that's fine.  The debtor will go forward, and if it

14   chooses, file objections to the claims.  You can respond, and

15   we'll go forward with a hearing.  But with a 250-page -- pages

16   of claims, I'm not going to have this done over and over,

17   because the expense to the estate of having to go forward each

18   time and address newly amended claims.

19           I'm not saying it was improper for you to amend the

20   claims.  I'm not saying that at all.  But I just -- what I want

21   to be clear is, I'm asking you, are you prepared to stand on

22   the claims as amended?

23           MR. TORCHIA:  Yes.

24           THE COURT:  Okay.

25           MR. TORCHIA:  To the extent that the opposing counsel

RESIDENTIAL CAPITAL, LLC, ET AL.                    27

1  doesn't object and/or we're allowed to respond to any

2  objections that they have due to lack of specificity.

3          THE COURT:  No, we'll go forward.  I mean, I'm

4  assuming the debtor's going to go forward and file an objection

5  to the amended claims.  And you'll have an opportunity to

6  respond to that, and they'll have an opportunity to reply, and

7  a hearing will be set, and the Court will render a decision.

8          MR. TORCHIA:  Well, I would respectfully --

9          THE COURT:  But you're going to have to be here for

10 the next hearing.  We're not going to do this with you on the

11 telephone.  So here's what I --

12         MR. TORCHIA:  Understandable.

13         THE COURT:  -- I'm asking you to do.  Stop.

14         MR. TORCHIA:  But --

15         THE COURT:  Stop.

16         MR. TORCHIA:  -- to --

17         THE COURT:  Stop.  Here's what I'm directing.  Mr.

18 Harris, confer with counsel -- opposing counsel, and try and

19 work out a schedule for the filing of objections to the amended

20 claim, his response, your reply.  And we'll get it set for one

21 of the omnibus -- see if you can agree on an omnibus hearing

22 date when they'll be heard.

23         As you know, I like to have the reply brief at least a

24 week before the hearing.  And put that schedule in a

25 stipulation and submit it to chambers.  If you can't agree,

RESIDENTIAL CAPITAL, LLC, ET AL.                    28

1    we'll arrange a telephone conference with opposing counsel, and

2    I'll set the schedule.  But you ought to be able to agree on

3    it, okay?

4              MR. HARRIS:  Sure. Just one point --

5              THE COURT:  Go ahead.

6              MR. HARRIS:  -- Your Honor.  We have deadlines in our

7    solicitation procedures to get objections on file for voting

8    purposes.

9              THE COURT:  Okay.

10             MR. HARRIS:  So I anticipate that we'll want to get

11   our objection to this claim on file before September 20th,

12   which is in our solicitation procedures, and we'll go from

13   there.

14             THE COURT:  Okay.  Well, that's -- the sooner you -- I

15   have no problem.  Earlier filing your objection is better from

16   my standpoint.  But you need to work out -- I want a

17   stipulation that -- because it's so voluminous, that I want a

18   stipulation that sets the schedule for your deadline for your

19   objection, their response, your reply and a hearing date.

20   Okay?

21             MR. HARRIS:  Will do, Your Honor.

22             THE COURT:  All right.  Counsel, do you understand?

23   You'll talk with Mr. Harris, work this out?

24             MR. TORCHIA:  Will do.  Will do.

25             THE COURT:  Okay.  Thank you.

1           MR. HARRIS:  Thank you, Your Honor.

2           THE COURT:  Thank you, Mr. Harris.

3           Mr. Rosenbaum?

4           MR. ROSENBAUM:  Your Honor, the next matter on the

5      agenda is (VI) on page 10.  This is the debtors' twenty-second

6      omnibus objections to claims, borrower claims with insufficient

7      documentation.

8           THE COURT:  Right.

9           MR. ROSENBAUM:  Your Honor, the only objection we

10     received was on Friday in the form of a letter.  It was two

11     weeks late.  We did respond to it.  This was filed by Alicja

12     and George Davis.  It was docketed as number 4810.  I don't

13     believe I heard an appearance.

14          THE COURT:  Is anyone from the Davises on the

15     telephone?

16          Let me ask, Mr. Rosenbaum -- and really, I ought to

17     direct this to the committee's special borrower counsel.  And

18     that is whether you've had any communication with the Davises?

19          MR. KRELL:  Your Honor, I don't believe that we had a

20     conversation with the Davises subsequent to them filing that

21     letter.  I think we did try to reach out to them, but didn't

22     have an opportunity to speak with them.

23          THE COURT:  I'm sorry, I missed the last part of

24     your --

25          MR. KRELL:  But didn't have an opportunity to speak

1  with them.

2          THE COURT:  Okay.  So -- all right, so with respect to

3  all of the other claims included in the twenty-sec -- other

4  than Davis, included in the twenty-second omnibus objection,

5  the objection is sustained.

6          With respect to Davis, I want to adjourn that for a

7  subsequent hearing.  I'm going to direct that the committee's

8  special borrower counsel, again, reach out to Mr. Davis and --

9  because he did file something.  It's not particularly

10 comprehensible, but he did file something.  And I think

11 it'll -- so you ought to do that promptly and --

12         MR. ROSENBAUM:  Your Honor, we're also happy to

13 facilitate discussions with the new servicer, Green Tree,

14 because it does seem like they were trying to get some --

15         THE COURT:  Okay.  I --

16         MR. ROSENBAUM:  -- modifications --

17         THE COURT:  -- would appreciate that.  So I'm going to

18 hold the Davis claim in abeyance.  You'll get it back on.

19 You'll let Davis know when it's going to be back on in an

20 omnibus hearing.  But you ought -- I would appreciate it if

21 both the debtors' counsel and the committees' special borrower

22 counsel, could see whether you can facilitate a resolution of

23 this.

24         MR. ROSENBAUM:  Absolutely, Your Honor.

25         MR. KRELL:  Will do, Your Honor.

1           THE COURT:  All right.  Thank you very much.  All

2    right, so the objec -- the twenty-second omnibus is sustained

3    as to all other claims.

4           MR. ROSENBAUM:  Your Honor, one housekeeping matter

5    Mr. Krell asked me to raise.  Tomorrow we have several omnibus

6    objections on.  Robert Nosek of SilvermanAcampora was a

7    declarant, and we wanted to find out if it was okay with Your

8    Honor if he appeared telephonically, if that was required?  He

9    is out of the city, but he could be here in person, if Your

10   Honor so requires?

11          THE COURT:  You know, I'll tell you, Mr. Rosenbaum,

12   I've had my hands full getting ready for today's hearing, and

13   so I know I saw the Nosek declaration, but I've got to tell

14   you, I'm not prepared for tomorrow's hearing.  I don't know

15   whether it's going to be a contested -- whether it's going to

16   be a contested matter or not.  I just -- if there'd been -- if

17   it's an omnibus objection supported by the Nosek declaration,

18   and no responses have been filed, he can be available by

19   telephone.  If any responses have been filed, I don't know.

20   And I can't ans -- I can't genuinely answer the question.  I

21   just haven't had the time to prepare for tomorrow yet.

22          MR. ROSENBAUM:  I understand, Your Honor.  There were

23   objections filed, so certain borrowers have contested the --

24          THE COURT:  Okay.

25          MR. ROSENBAUM:  Your Honor, then --

1          THE COURT:  Then he better be available.  I mean --

2          MR. KRELL:  I'll advise Mr. Nosek.

3          THE COURT:  Okay.  It's just got to be that way.

4          MR. ROSENBAUM:  Your Honor, as we discussed, we would

5     now skip ahead to page 12.  And this is the -- a motion to

6     dismiss as well as a status conference in Jenkins v.

7     Residential Funding.

8          THE COURT:  Sure.

9          MR. ROSENBAUM:  I'm going to cede the podium to my

10    colleague James Newton, and I believe also Jay Watkins from

11    Bradley Arant has appeared telephonically on the motion.

12         THE COURT:  All right.  Is anyone appearing in person

13    or by telephone for the Jenkins?

14         MR. JENKINS:  Yes, Marion Jenkins.

15         THE COURT:  Okay.  All right, Mr. Newton?

16         MR. NEWTON:  Good morning, Your Honor.  James Newton

17    of Morrison & Foerster on behalf of the debtors.  Your Honor,

18    we're here today on the Jenkins adversary proceeding -- that's

19    12-01935 -- primarily for a motion to dismiss filed by co-

20    defendants Judy Faber and Mortgage Electronic Registration

21    Systems.  And I'll let Mr. Watkins present his motion to

22    dismiss.  However, we did include this on the agenda as just a

23    brief status conference.  And if Your Honor is amenable, I

24    would give you a little bit --

25         THE COURT:  Please.

1          MR. NEWTON:  -- of the follow-up since our prior

2     appearance on this matter.  At the prior status conference on

3     the matter, you asked the debtors and the special borrower

4     counsel to attempt to get to the bottom of the Jenkins loan mod

5     situation.  And also implored the Jenkins to contact ASC and --

6     America Servicing Company, the primary servicer here and their

7     Georgia counsel.

8          I can't speak to the Jenkins' actions in terms of

9     getting in touch with America Servicing Company, but Mr. Krell

10    here has done some legwork.  And if you would, I'd like to turn

11    the mic over to him and --

12          THE COURT:  Sure.

13          MR. NEWTON:  -- let him give you an update.

14          THE COURT:  Okay, thank you.

15          MR. KRELL:  Good morning, Your Honor.  Justin Krell,

16    SilvermanAcampora, special counsel to the committee.  Yes,

17    following up from the last hearing, at Your Honor's direction,

18    I did reach out to the Jenkins.  I also reached out to counsel

19    for America Servicing Company to get a history of where we are

20    with the loan mod.

21          What I've been told is the Jenkins were granted a

22    temporary loan modification.  However, that loan modification

23    was denied permanent status because the Jenkins have tax liens

24    against their property which are still outstanding.  And it's

25    my understanding that a loan modification cannot be granted

1   permanent status if title's not clear.

2          We ran a judgment lien search, and it does appear that

3   those liens are still against the property.  Also the Jenkins'

4   most recent Chapter 13 filing, which was dismissed, the Jenkins

5   list those tax liens in their schedules.  So they're valid tax

6   liens, and title is unclear.  The most recent denial was back

7   in April of this year, and that was due to the Jenkins' failure

8   to provide the requested documentation.

9          Be that as it may, with respect to the tax liens, it's

10  unlikely that even if they provided the documentation, a loan

11  modification would have been possible.

12         THE COURT:  How much are the tax liens for?

13         MR. KRELL:  A little over 40,000 -- about 41-, 42,000

14  dollars, Your Honor.

15         I did reach out to Mr. Mark Brenner, who was providing

16  some advice on this end for the Jenkins in the New York

17  Bankruptcy Court.  I believe Mr. Brenner reached out to the

18  Jenkins after our conversation.  I had a direct conversation

19  with Ms. Jenkins, told her about the tax liens and the issues

20  with respect to the loan modification.  But just to make sure

21  that the point was clear, Mr. Brenner did the same thing.

22         But I've also been told, as -- by American Servicing

23  Companies, that as of December 2007, the mortgage is still due

24  and owing.  Therefore, that's another issue that's outstanding.

25  Based on that, I don't think that there's much more that we can

1   do for the Jenkins.  At this point, we really went above and

2   beyond and tried to get this done and resolved in an

3   amicable --

4           THE COURT:  So remind me.  I had granted a prior

5   motion for a more definite statement, I think it is, Mr.

6   Newton?

7           MR. KRELL:  Correct, Your Honor.  And the Jenkins

8   filed the same exact pleading.

9           THE COURT:  They filed the same thing again.  I know.

10          MR. KRELL:  Correct.

11          THE COURT:  But it -- all right.  And Mr. Newton, have

12  you renewed your motion, filed a new motion?

13          MR. NEWTON:  We have not filed a new motion yet.  We

14  had been working to get the follow-up and -- but we're happy to

15  file a motion to dismiss, if that's -- we think it's

16  appropriate at this point --

17          THE COURT:  Well, if you're going to -- if you're

18  going to try to dispose  -- look, I granted the first motion.

19  They filed the same thing a second time.

20          MR. NEWTON:  Correct.

21          THE COURT:  You can do as you please.  I mean, the

22  only way you're going to dispose of the case as to the debtors

23  is to file a new motion.

24          MR. NEWTON:  Absolutely.

25          THE COURT:  Or work something out with the Jenkins.

1        I don't know whether -- did the Jenkins request a

2    review in the Federal Reserve Board -- in the independent

3    foreclosure review?  Are they likely to receive any money as a

4    result of the new consent with the FRB?  Have they -- I mean,

5    because I think that does bear on how you may want to proceed.

6    Do they know what their status is?

7            MR. NEWTON:  Your Honor, I'm not --

8            THE COURT:  Mr. Krell, do you know whether the --

9            MR. NEWTON:  -- certain.  And I was trying to look

10   for -- well, I believe they would be in the population, just

11   because I believe there was foreclosure pending with respect to

12   their property --

13           THE COURT:  During the relevant time period.

14           MR. NEWTON:  -- during the period.  But we're not the

15   primary servicer on this, so it would, I think, depend on

16   America Servicing Company's --

17           THE COURT:  Okay.

18           MR. NEWTON:  -- foreclosure review process.  And our

19   intention, obviously, was to file a motion to dismiss.  As you

20   indicated, you granted our 12(b) motion, and so we'll probably

21   file a motion to dismiss on the same bases and on the failure

22   to comply with your order.

23           THE COURT:  Okay.  All right.  You know, I appreciate

24   the efforts that the borrowers' counsel made with the Jenkins

25   and the debtors, and has accommodated that to go on, and you'll

1  just have to go ahead and file your motion, I guess.

2          MR. NEWTON:  Okay.

3          THE COURT:  So let me hear the motion by Faber and

4  MERS.

5          MR. NEWTON:  I believe Jay Watkins is on the phone.

6          THE COURT:  All right.  Go ahead.

7          MR. WATKINS:  Yes, Your Honor.  This is Jay Watkins,

8  and I'm here with Chris Hawkins, as well, at Bradley Arant

9  Boult Cummings, and we represent the two nondebtor defendants,

10  Judy Faber and MERS.  And as y'all discussed, the plaintiffs

11  were told to amend their complaint, which they filed an amended

12  complaint that's substantially the same thing as their original

13  complaint.

14          We filed our second motion to dismiss on July the

15  12th.  And we believe that our complaint speaks for itself.

16  The plaintiff's amended complaint still does not describe any

17  wrongdoing by either of our clients.  And as far as we're

18  concerned, we've given them -- we've been patient while they've

19  had the opportunity to amend their complaint, and they did not

20  do so.  And so we would ask, at this point, Your Honor, that

21  you grant the motion to dismiss, at least as to Ms. Faber and

22  to MERS.

23          THE COURT:  All right.  Let me ask you this.  Has

24  either Ms. Faber or MERS filed a claim in the ResCap bankruptcy

25  for indemnification or contribution in regard of the Jenkins

1    claims?

2           MR. WATKINS:  Not that I'm aware of, Your Honor.  But

3    I do not know for sure.  I can look into that.

4           THE COURT:  Well, the reason I'm asking is this.  You

5    moved to dismiss on a number of grounds, one of which is Rule

6    12(b)(1), lack of subject matter jurisdiction.  You also

7    challenged whether the complaint was served and you also moved

8    to dismiss on 12(b)(6).  But my understanding is I've got to --

9    since you've challenged subject matter jurisdiction, I've got

10   to determine whether there's subject matter jurisdiction.  If

11   there's not, the complaint would be dismissed on that basis,

12   end of -- full stop.

13          You addressed the issue of 12(b)(1) and subject matter

14   jurisdiction.  The only arguable basis for the assertion of the

15   claims against Faber and MERS would be related to jurisdiction.

16   The conceivable effect on the debtors' estate is not apparent

17   to me unless Faber or MERS filed a claim for indemnification in

18   the case.

19          Can anybody for the debtors enlighten me as to whether

20   Faber and MERS filed a claim for indemnification?  Mr. -- I

21   don't know.  Whoever wants to speak for the debtors.  Mr.

22   Rosenbaum?

23          MR. ROSENBAUM:  Norm Rosenbaum for the debtors, Your

24   Honor.  I don't believe MERS has filed a claim.  I can't say

25   for certain.  I believe Ms. Faber likely has, but --

1         THE COURT:  Has?

2         MR. ROSENBAUM:  Has, but we would need to confirm

3    that, Your Honor.

4         THE COURT:  Okay.  You need to -- okay.  I'm going to

5    take the matter under submission.  I would like the debtors to

6    advise me by the end of the day Monday whether -- you can do it

7    sooner if you can get the answer -- whether Faber or MERS filed

8    a claim for indemnification or contribution that would cover

9    the Jenkins claim.

10         If a timely claim for indemnification or contribution

11   was filed, that might well provide a basis for subject matter

12   jurisdiction, because the outcome could have a conceivable

13   effect on the estate.  If there is -- if it appears that

14   there's subject matter jurisdiction, I'll go on and decide it

15   under the 12(b)(6) grounds, frankly, but if there's no subject

16   matter jurisdiction, I really don't have the jurisdiction to go

17   on and -- I don't think I have -- do you have a different view,

18   Mr. Rosenbaum or Mr. New -- whoever wants to speak to this

19   point?

20         MR. ROSENBAUM:  I don't, Your Honor.

21         THE COURT:  Okay.  So please -- I'm going to take the

22   matter under submission.  I'm going to decide it on some

23   ground, okay?  If there's no claim for indemnification or

24   contribution, I'm in all likelihood going to decide it on a

25   12(b)(1) lack of subject matter jurisdiction.  The Jenkins did

1   not respond to the motion to dismiss by Faber and MERS.  But I

2   need to satisfy myself as to the subject matter jurisdiction

3   issue.  Okay?

4           MR. ROSENBAUM:  Thank you, Your Honor.

5           THE COURT:  Okay.  Next.

6           MR. ROSENBAUM:  Your Honor, the next matter is the

7   status conference in Hawthorne v. GMAC.  And I'll cede the

8   podium to my colleague, Samantha Martin.

9           THE COURT:  Good morning.

10          MS. MARTIN:  Good morning, Your Honor.  Samantha

11  Martin from Morrison & Foerster, on behalf of the debtors.

12          Next on the agenda is the adversary proceeding filed

13  by Ms. Gwendolyn Hawthorne.  It's case number 12-02050.  I'm

14  not sure whether Ms. Hawthorne is appearing by phone.

15          THE COURT:  Ms. Hawthorne, are you present in the

16  courtroom or on the telephone?

17          MR. HAWTHORNE:  Yes, this is her son, James Hawthorne,

18  and my mother's on the other line.

19          THE COURT:  Okay, thank you very much.

20          All right.  Go ahead, Ms. Martin.

21          MR. HAWTHORNE:  Yes, sir.

22          THE COURT:  And I'll give you a chance to speak after

23  debtors' counsel speaks.

24          Go ahead, Ms. Martin.

25          MS. MARTIN:  Your Honor, Ms. Hawthorne filed a

RESIDENTIAL CAPITAL, LLC, ET AL.                          41

1  complaint in November 2012.  After several extensions of the

2  response deadline to enable the parties to discuss a

3  settlement, on April 3rd, Your Honor entered an order directing

4  the applicability of the adversary --

5          THE COURT:  Slow down a little bit --

6          MS. MARTIN:  -- procedures.  Oh, sure.

7          THE COURT:  Okay, so I can hear you clearly.  Go

8  ahead.

9          MS. MARTIN:  Sure.  The borrower adversary procedures

10  apply to this matter.

11          THE COURT:  Right.

12          MS. MARTIN:  The parties held the initial conference

13  required by the procedures on May 15, 2013.  During the

14  conference, Ms. Hawthorne indicated an interest in a potential

15  settlement involving either a loan modification or a purchase

16  of the note.

17          THE COURT:  Slower.  Go ahead.

18          MS. MARTIN:  Since the servicing was transferred to

19  Ocwen in the sale, we reached out to Ocwen to explain Ms.

20  Hawthorne's proposal and on May 20th we sent her a loan

21  modification package that needed to be filled out and I

22  provided her with a name, phone number and e-mail address of an

23  attorney at Troutman Sanders for turning in the package because

24  her file's under a litigation hold and it needs to go through

25  an attorney.

RESIDENTIAL CAPITAL, LLC, ET AL.                               42

1         We held a second conference on May 21st, 2013 where we

2    agreed that she would continue to seek a loan modification or a

3    note purchase.  And we followed up with her by e-mail and

4    phoned several times but have not heard back from her recently.

5         We also followed up with Troutman Sanders yesterday

6    and confirmed that she did not turn in the loan modification

7    package or reach out to them in any way.

8         At this point, she's had three months to try and get a

9    loan modification or a note purchase to settle the matter and

10   she hasn't so we were hoping to propose a schedule with you

11   today to move forward with briefing on the matter.

12        THE COURT:  Okay.  Let me hear from Mr. Hawthorne or

13   Ms. Hawthorne.

14        MR. HAWTHORNE:  Yes.  Yes, this is James Hawthorne.

15   My mother's on the other line.

16        Your Honor, I -- we spoke with the debtors' attorney.

17   We received the package.  We sent the package back over to

18   Ocwen.  But Ocwen has failed to get back in co -- although they

19   put an attorney involved and we called the attorneys, Ocwen

20   keeps telling my mother that they do not have her loan

21   documents, her paperwork.  We have an investor that's ready to

22   purchase my mother's property and we sent Ocwen a letter

23   stating this and we have not heard back from them.

24        We hired a young lady by the name of Celeste (ph.) to

25   do the loan modification package.  She is a licensed

1   modification specialist and she submitted the documents to them

2   but they keep telling my mother that they do not have her

3   files.

4           THE COURT:  May I ask you this, Mr. Hawthorne?  Was

5   the loan modification package sent to Ocwen by some form of

6   mail that provided a receipt as to mailing?

7           MR. HAWTHORNE:  Yes, sir.  We faxed it in to a fax

8   number that they provided us and I would need to call Ms.

9   Brooks (ph.) -- Celeste Brooks to ask her.  I think that

10  normally procedures for her company is to send modification

11  packages in via express mail or registered mail.

12          THE COURT:  Okay.  Approximately when was the loan

13  modification package sent to Ocwen, if you know?

14          MR. HAWTHORNE:  Yes, I do know the exact date is --

15  was July -- around July the 23rd or the 25th of July.

16          THE COURT:  All right.  Ms. Martin, let me ask you,

17  have you had any conversations with anyone from Ocwen since

18  July 25th?

19          MS. MARTIN:  I spoke with a representative of Ocwen

20  in, I believe, it was May or June and they specifically said

21  that -- the loan modification package shouldn't go straight to

22  Ocwen; it should go through this attorney because when a --

23  when a --

24          THE COURT:  Because of the litigation hold.

25          MS. MARTIN:  -- loan is on litigation hold, the Ocwen

1  representatives directly won't handle the matter.

2          THE COURT:  Maybe I could ask either the borrowers --

3  the committees' borrower special counsel to try and follow up

4  before the debtors go ahead with any motion practice.  It's

5  certainly not unheard of, let me put it this way, for loan

6  modification packages to go awry or wind up on the wrong

7  person's desk or wind up on a person's desk who says, well,

8  there's a litigation hold I'm not going to do anything with

9  this.  So I think what would be most helpful is perhaps the

10  committees' special borrower counsel could try and track this

11  down.  Maybe you could talk to Ms. Hawthorne's son and he can

12  fill you in on any details.

13          Do you have any contact information for them?

14          MR. HAWTHORNE:  Well, my -- I'm sorry, Your Honor.

15  They have been e-mailing.

16          THE COURT:  Okay.

17          MR. HAWTHORNE:  We go back-and-forth --

18          THE COURT:  Okay.  All right.  Well, good, they --

19          MR. HAWTHORNE:  -- but they have all our contact

20  information.

21          THE COURT:  All right.  They have your e-mail address

22  and they can get back in touch with you.

23          Look, we're going to adjourn the matter from today.

24  We'll get it set on another omnibus date.  Ms. Martin, you'll

25  make sure that the Hawthornes know when that is.  But I think,

1   more importantly, we ought to see whether -- I accept their

2   representation that they completed the package with the help of

3   someone and submitted it recently.  It would have been -- it

4   sounds like it was very recent.  And it would certainly be my

5   preference to have that sort of -- track it down, get it to the

6   right person.  If they need authorization, perhaps Ms.

7   Hawthorne could provide the authorization in writing for them

8   to proceed directly with them and see if you can get around the

9   litigation hold issue because if it goes to Ocwen's lawyer's

10  first because of the litigation hold, they're going to have to

11  deal with people at Ocwen who'd actually evaluate whether a

12  modification will fit.  So let's see if we can -- is that

13  acceptable, counsel?  Can we --

14          MR. KRELL:  Yes, Your Honor.

15          THE COURT:  Okay.

16          MR. KRELL:  I'll see what I can do.

17          THE COURT:  Let's see if we can do that.

18          All right.  So, Mr. Hawthorne, you ought to hear

19  from -- probably the committees' special counsel and we'll see

20  if we can move this forward.  Okay?

21          MR. HAWTHORNE:  Yes, sir.

22          THE COURT:  Thank you very much.

23          MS. MARTIN:  Thank you, Your Honor.

24          THE COURT:  Okay.  Mr. Newton?

25          MR. NEWTON:  Good morning, Your Honor.  James Newton

1   of Morrison & Foerster on behalf of the debtors again.

2           The next matter on the agenda is an adversary

3   proceeding filed by Alfredia Pruitt.  It's case number 13-

4   01350.  I believe Ms. Pruitt is in the courtroom today.

5           THE COURT:  Okay.

6           MR. NEWTON:  You'll recall that this is not the first

7   matter before Your Honor filed by Ms. Pruitt.  Ms. Pruitt filed

8   a motion for relief from stay back in March, docket number

9   3223, which was amended at docket number 3273.  And that motion

10  raised issues regarding an allegedly improper foreclosure.  Ms.

11  Pruitt claimed that the debtors did not hold a note when they

12  foreclosed on her property back in 2010, I believe.  The

13  debtors objected to that relief from stay on the bases that Ms.

14  Pruitt had filed numerous prior lawsuits based on the same

15  facts which ultimately were all resolved against Ms. Pruitt and

16  ultimately resulted in a bill of peace being entered in the

17  Georgia court preventing Ms. Pruitt from filing additional

18  actions without first obtaining approval from the Georgia court

19  and also based on the fact that Ms. Pruitt had withdrawn her

20  claim -- her proof of claim in the bankruptcy case.  Your Honor

21  granted that motion for relief from stay.  That was docket 3433

22  and noting the same basis as in our objection.

23          Your Honor, this adversary proceeding raises the same

24  issues and as far as I'm aware doesn't raise any facts that

25  weren't previously raised by Ms. Pruitt in her prior cases.

1      We had an initial conference pursuant to the adversary

2  proceeding procedures that are in place in the case on July

3  5th.  On that phone conference with Ms. Pruitt were attorneys

4  from Morrison & Foerster and SilvermanAcampora.  After those

5  discussions, as well as some follow-up e-mails, it became clear

6  that pursuit of a settlement in this case was not likely to be

7  particularly fruitful.

8          THE COURT:  How do you want to proceed?

9          MR. NEWTON:  As indicated in our joint status report,

10  with your permission, debtors would like to file a motion to

11  dismiss in short order.

12          THE COURT:  All right.  Is it going to be based on res

13  judicata?  Is that --

14          MR. NEWTON:  I think it will likely be based on res

15  judicata.

16          THE COURT:  All right.  Ms. Pruitt, are you present?

17  Do you want to come on up?

18          MS. PRUITT:  Good morning, Your Honor.  Alfredia

19  Pruitt.

20          THE COURT:  Good morning.

21          MS. PRUITT:  Your Honor, although -- I need to address

22  what the counselor just said, I did file multiple -- I didn't

23  realize they were lawsuits because of my lack of knowledge.  I

24  tried desperately to stay in my home and I filed everything,

25  trying to get their attention.  Well, the initial complaint

1  that was filed --

2          THE COURT:  This was in the Georgia State Court?

3          MS. PRUITT:  Yes.  The judge, he honored that.  He

4  sent me papers for a rule nisi -- is it [knee-sa] -- nisi

5  hearing.  I was ordered to pay 5,500 dollars into the court

6  registry which I didn't have.  And because of that, the judge

7  stated that he couldn't go forward with the hearing.  He said

8  if I could pay it right then he would.

9          Your Honor, GMAC --

10         THE COURT:  But you have to understand that I don't

11 review what a state court judge does.

12         MS. PRUITT:  Okay.  Good, okay.

13         THE COURT:  Okay.

14         MS. PRUITT:  Your Honor, GMAC state they are my

15 servicer.  They are not the holder in due course.  On September

16 7th, 2010, I filed a Chapter 13 desperately trying to stay in

17 my property because I was in a loan modification review.  I met

18 with HUD counselors.  I have been dealing with this ever since

19 June of 2010.

20         THE COURT:  Is your Chapter 13 still pending?

21         MS. PRUITT:  No, sir, it isn't.

22         THE COURT:  Okay.

23         MS. PRUITT:  I filed that at -- on September 7, 2010

24 at 8:32 a.m.  The sale was scheduled for 10 o'clock.  GMAC was

25 notified that I filed a Chapter 13 and the attorneys were

RESIDENTIAL CAPITAL, LLC, ET AL.                    49

1  notified but rather than they call it back they proceeded with

2  the foreclosure and the eviction from the September 7th filing.

3           THE COURT:  And did you raise that issue with the

4  bankruptcy judge in Georgia?

5           MS. PRUITT:  Well, I filed an adversary proceeding; by

6  the end I was just so exhausted and just -- my family was torn

7  apart and my husband was almost divorcing.  I just -- I

8  literally just forgot about it.

9           THE COURT:  Let me ask you who was the judge in

10 Georgia, the bankruptcy judge?  Do you remember?

11          MS. PRUITT:  I don't remember, Your Honor, but I

12 can --

13          THE COURT:  Was it at --

14          MS. PRUITT:  -- look through my paperwork.

15          THE COURT:  Where in Georgia was it?

16          MS. PRUITT:  It was Northern District of Georgia

17 Bankruptcy Court.

18          THE COURT:  Okay.

19          MS. PRUITT:  I filed an adversary proceeding and a

20 hearing was scheduled.  I filed a complaint for it to be

21 dismissed.  I did get on the judge nerve in South Georgia

22 because of me filing stuff I didn't know and I admit that, but

23 that does not justify them just taking my home because they are

24 not the holder in due course.

25          THE COURT:  Let me ask you this.  Has the foreclosure

RESIDENTIAL CAPITAL, LLC, ET AL.                    50

1  been completed now?

2          MS. PRUITT:  Been completed.  They kicked me out.  And

3  this is the thing that got me:  if GMAC state that they are in

4  the right, Your Honor, why -- why did they -- why did they

5  address me as their creditor that they owe me money and you

6  allowed me as I withdraw my proof of claim back in the hearing,

7  you allowed me to put it back in.  I did a phone conference.

8          Your Honor, the only thing I'm asking is they prove

9  they're the holder in due course --

10          THE COURT:  Well, let me -- let me interrupt you.

11          What I have before me now is your adversary

12  proceeding --

13          MS. PRUITT:  Yes.

14          THE COURT:  -- against GMAC.  And I gather from Mr.

15  Newton it's the debtors' intention to go ahead and file a

16  motion to dismiss.  I don't have that in front of me.  I'm not

17  making any ruling today.

18          MS. PRUITT:  Yes.  Okay.

19          THE COURT:  At least in part, the debtor, it sounds

20  like, is going to move to dismiss because the issues that

21  you're seeking to raise in the adversary proceeding were raised

22  in a prior proceeding in state court and decided against you.

23  Okay.

24          MS. PRUITT:  Yes, sir.

25          THE COURT:  I'm not going to -- I can't advise you as

1    to the law.  There are rules that really only give you sort

2    of -- it's kind of a "one bite at the apple" rule that you get

3    to raise an issue, have a court decide it.  If they decided

4    against you another court may well be bound by that earlier

5    ruling.  In most respects, I would be required to respect a

6    final decision of a judge in Georgia if he decided the same

7    issues against you and entered an order and either there was no

8    appeal or it became final.  None of that's before me today.

9            You live in Georgia, is that --

10           MS. PRUITT:  Yes, Your Honor.

11           THE COURT:  Okay.  So what will, I think, happen, Mr.

12   Newton, it's the debtors' intention to go ahead and file a

13   motion to dismiss.  Am I correct in that?

14           MR. NEWTON:  Yes, it is, Your Honor.

15           THE COURT:  I'll give you a chance, Ms. Pruitt.

16           MS. PRUITT:  Yes, Your Honor.

17           THE COURT:  Okay.  So when they file that motion,

18   you'll have a chance to file your objection to it.  It'll get

19   set for another hearing.

20           MS. PRUITT:  Okay.

21           THE COURT:  I'll make sure Mr. Newton or one of his

22   colleagues will let you know when that is.

23           MS. PRUITT:  Okay.

24           THE COURT:  I will permit you to appear by

25   telephone --

RESIDENTIAL CAPITAL, LLC, ET AL.                         52

1          MS. PRUITT:  Okay.

2          THE COURT:  -- so that you don't have to come up here

3     for it.  You're welcome to; you're always welcome to come up to

4     court, it's a public hearing, but I'll permit you to appear by

5     telephone.  The only thing I ask is if you appear by telephone

6     you can tell from some of these -- the prior hearings, when

7     people are speaking they don't hear me when I start to talk.

8          MS. PRUITT:  Right.

9          THE COURT:  So you have to pause from time-to-time and

10    give me a chance to say something if I have a question or

11    something like that but -- so I am going to -- this is the

12    status conference, the pre-trial conference today.  The debtor

13    can go ahead and file its motion.

14         MS. PRUITT:  All right.

15         THE COURT:  They've gone through the procedures that

16    were established for preliminary conferences to see whether it

17    could be avoided; it obviously couldn't.  So they'll go ahead.

18         Talk to Mr. Newton or one of his colleagues.  I want

19    to be sure that Ms. Pruitt has adequate time to file a response

20    to -- an objection to the motion and that she knows when the

21    hearing's going to be and, as I say, if you wish to appear by

22    telephone, I'll permit you to do that.

23         MS. PRUITT:  Okay.

24         THE COURT:  Okay?

25         MS. PRUITT:  Your Honor --

1          THE COURT:  Go ahead.

2          MS. PRUITT:  -- I have a -- the Chapter -- I mean the

3    Chapter 13 that I filed on September 7, 2010 --

4          THE COURT:  Yes.

5          MS. PRUITT:  -- that was never presented before the

6    state court in Georgia.  I was so upset I didn't even think to

7    present that to the state court and the judge never told me --

8    it's not in record anyplace that I need permission to file

9    anything.  Only thing I'm asking them -- Your Honor, there are

10   no assignments in the records from the original lender.  GMAC

11   just taking people houses and they're paying the attorneys all

12   this money to represent them.  GMAC took my house, bought it

13   according to the proof for 300-something-thousand dollars, sold

14   it -- quitclaimed it which is constructive fraud for 10 dollars

15   and resold it to this lady that doesn't have a clue.  There are

16   no -- no record of GMAC being hold in due course.  They sold it

17   to her for 134,000.

18         THE COURT:  May I ask you this, Ms. Pruitt?

19         MS. PRUITT:  Yes.

20         THE COURT:  You're, obviously, appearing here without

21   a lawyer and you're certainly entitled to do that.  Have you

22   tried to see whether you could get counsel to help you here?

23         MS. PRUITT:  Well, Your Honor, I tried in Georgia but

24   the problem I had, they act as if they are in some kind of

25   fraternity; once they learn the name and everything they back

1  off.

2          THE COURT:  Well, I can't --

3          MS. PRUITT:  I -- I --

4          THE COURT:  Just so you understand what's going to

5  happen now, the debtors' going to go ahead and file a motion.

6  You can go ahead and file your response.  You can give the

7  reas --

8          MS. PRUITT:  Okay.

9          THE COURT:  -- whatever reasons you think the motion

10  shouldn't be granted.

11          MS. PRUITT:  I will seek counsel.

12          THE COURT:  I'll hear argument -- I'll give you --

13  again, if you wish to come to court you're always welcome to do

14  that.

15          MS. PRUITT:  Okay.

16          THE COURT:  If you wish to -- it's expensive to come

17  up here.

18          MS. PRUITT:  Okay.

19          THE COURT:  If you wish to appear by telephone you can

20  do that as well and I'll hear you.  Okay?

21          MS. PRUITT:  Okay.  I will seek counsel, Your Honor.

22          THE COURT:  Okay.

23          MS. PRUITT:  Okay.

24          THE COURT:  Go ahead and do that.

25          MS. PRUITT:  Thank you.

1        THE COURT:  Mr. Newton?

2        MR. NEWTON:  Just two brief points, Your Honor.

3        THE COURT:  Hang on, Ms. Pruitt.  Why don't you

4  listen -- make sure you listen to this because he's still

5  talking about your case.  Go ahead, Mr. Newton.

6        MR. NEWTON:  The bankruptcy judge is Judge Diehl in

7  the Northern District of Georgia --

8        THE COURT:  Mary Grace Diehl.

9        MR. NEWTON:  -- for your reference.  And with respect

10 to the Chapter 13, we did brief this in the relief from stay

11 motion and so I won't repeat it ad nauseam but it was Ms.

12 Pruitt's third bankruptcy within a year and the debtors

13 sought --

14        THE COURT:  So there's no automatic stay?

15        MR. NEWTON:  -- they sought confirmation that the

16 automatic stay had not gone into place --

17        THE COURT:  Yes.

18        MR. NEWTON:  -- and the court entered an order.  And

19 also if Ms. Pruitt needs for her reference, we did include a

20 packet of the bill of peace that was entered by the Georgia

21 State Court in our prior objection --

22        THE COURT:  Okay.  Right.

23        MR. NEWTON:  -- and I'm happy to forward that to her.

24        THE COURT:  Well, make sure you -- if you could, if

25 you could make sure she has the papers but attach them to --

RESIDENTIAL CAPITAL, LLC, ET AL.                    56

1   when you file a motion attach the things as exhibits so I see

2   the full record.

3           MR. NEWTON:  Of course.

4           And lastly, on the scheduling point, and I understand

5   Your Honor has a standard case management and scheduling order

6   and, generally, I think that makes sense to us.  I can talk to

7   Ms. Pruitt about it.  The one thing that I would say is given

8   the circumstances, the general case management order starts

9   with discovery immediately --

10          THE COURT:  Look, Mr. Newton, what I'm going to do is,

11  because this -- the case has a history before me and before

12  other courts and I'm not going to enter a case management

13  scheduling order.  Go ahead and file your motion to dismiss.

14  Ms. Pruitt will have a chance to respond to it.  I'll hear the

15  argument on it.  Depending on the outcome of that I'll -- I

16  either will enter a case management order after that or not.

17  Okay?

18          MR. NEWTON:  Okay.  Thank you very much, Your Honor.

19          THE COURT:  Thank you very much, Ms. Pruitt.

20          MS. PRUITT:  Thank you, Your Honor.

21          THE COURT:  Okay.  And, Ms. Pruitt, you're welcome to

22  stay or leave now.  I mean it's up to you.  If you -- okay.

23          Go ahead, Mr. Rosenbaum.

24          MR. ROSENBAUM:  Well, Your Honor, thank you for

25  accommodating the change in schedule.  The next matters are on

1  page 10.  It's the UMB Bank matters.  If Your Honor gives us a

2  couple minutes we'll clear the table.

3          THE COURT:  Let's take a ten-minute recess.  In which

4  order am I going to hear these motions in -- I guess on the

5  agenda the -- what do I have?  I've got the -- which motion do

6  I have?

7          MS. LEVITT:  Your Honor, we had spoken to counsel for

8  UMB and the JSNs and we thought it made the most sense to start

9  with their motion to dismiss --

10         THE COURT:  Okay.

11         MS. LEVITT:  -- our complaint and then will argue

12  theirs.

13         THE COURT:  That's fine.  Ten minutes.

14         THE CLERK:  All rise.

15     (Recess from 11:02 a.m. until 11:19 a.m.)

16         THE COURT:  Please be seated.

17         MR. ZENSKY:  Good morning, Your Honor.  David Zensky,

18  Akin Gump Strauss Hauer & Feld for defendant, UMB.

19         As discussed before the break, we were going to

20  proceed with our motion to dismiss certain counsel for the

21  debtor complaint first and then switch over to the debtor and

22  committee motion.

23         I guess you told us last week you couldn't wait to get

24  to today, it was going to be loads of fun, and here we are.  So

25  I'm going to address Count V, our motion to dismiss Count V of

1    the debtor complaint.  That's the aggregate debtor, single

2    debtor issue and Mr. Shore will address Count III if that's

3    okay with Your Honor.

4             THE COURT:  Sure.

5             MR. ZENSKY:  So in terms of Count V, Your Honor, you

6    have to assume for purposes of this motion to dismiss at the

7    end of all of these festivities that the JSNs are, in fact,

8    oversecured in the aggregate between the various guarantors,

9    debtors, equity pledgors and the like.  Count V suggested that

10   doesn't matter at all and under those circumstances the JSNs do

11   not get post-petition interest.  So let's just take a simple

12   example so we put some specifics on it.

13            If at the end of all litigation you've resolved issues

14   about intercompanies, Ally settlement, quality -- the status of

15   certain collateral and the like, let's say we end up with one

16   billion dollars of perfected liens and collateral at each of

17   three of the debtors, say ResCap, RFC and GMACM.  That's three

18   billion dollars of perfected collateral against the claim that

19   at the petition date was 2.2 and with the post-petition

20   interest would be something more than 2.5.

21            Count V suggests that that doesn't matter that the

22   JSNs do not get post-petition interest under those facts

23   because there's not 2.5 billion at one of the three; it's

24   spread across three.  We think that that's completely wrong as

25   a matter of 506(b) and the case law and that this count should

1  be dismissed as a matter of law.

2          Post-petition interest, Your Honor, is not a dirty

3  word.  It's written right into the code in 506(b).  The U.S.

4  Supreme Court said in Ron Pair that the Code creates an

5  unqualified right to receive it when you're an oversecured

6  creditor.

7          Here, the JSN notes constitute credit that was

8  extended to multiple debtors based on the collateral that was

9  held at multiple debtors.  The equity of equity pledgors and

10  guarantors and the like allowing the company to borrow against

11  the universe of collateral on an all-asset lien at multiple

12  debtors was certainly part and parcel of the terms that the

13  debtor was able to accomplish going back to the exchange when

14  these notes were created, Your Honor, and certainly was

15  reflected in the rate, the discount and the like.

16          We also agreed in the indenture and the pledge

17  agreements that the debtors were allowed to move assets between

18  and among various debtors.  There's no rigid requirement they

19  maintain all the collateral at a single entity so that in the

20  event we wind up as we have now wound up, there's no dispute

21  about PPI.

22          It's undisputed we have a state law contractual right

23  to get post-petition inter -- excuse me -- to get interest from

24  and among any of the debtors, borrowers, guarantors and the

25  like, wherever we can find it and look to collateral that's

 1   held in any of those entities to answer for our state law

 2   contractual rights.  That's written right into the indenture in

 3   4.1 that we're entitled to get interest on late principal,

 4   interest on interest and the like.

 5          The indenture also says we're entitled to get post-

 6   petition interest.  It's written right into the indenture.  So

 7   we submit, Your Honor, provided that we are found by the Court

 8   to be oversecured in the aggregate at the end of the day

 9   between the collateral held by all the responsible entities,

10   there is no basis to find that the Code dictates a result at

11   odds with the JSN state law entitlements.  We think the Code

12   provides an unqualified right to receive that post-petition

13   interest.

14          THE COURT:  But you --

15          MR. ZENSKY:  We cited mult --

16          THE COURT:  506 doesn't specify whether the debtors'

17   various estates should be aggregated for purposes of valuing

18   the secured creditors' collateral.  Is that true?

19          MR. ZENSKY:  You're correct, Your Honor; 506(a) and

20   (b) do not say what the right text should be.  However, the

21   Code is written in the context and syntax of a single debtor

22   and as you know it's --

23          THE COURT:  I guess the point -- and I'm sure you'll

24   discuss the case law -- the language of the Code itself is not

25   determinative of the outcome of the issue before me.  Do you

RESIDENTIAL CAPITAL, LLC, ET AL.                    61

1  agree with that?

2          MR. ZENSKY:  I don't quite agree with Your Honor

3  because as we refer to in our brief, the interpretive directive

4  in Code Section 102(7) says that the singular should include

5  the plural and that was applied by the Second Circuit in -- let

6  me remember the name of the case for a moment that I was going

7  to get to -- the Geltzer case when dealing with another

8  singular word, the word "transfer" in 548(a)(2).  The Second

9  Circuit looked to 102(7) and said this Code tells us that the

10  singular includes the plural; that makes sense in interpreting

11  the statute that they were there interpreting.  I'll talk more

12  about that.

13          So there is a text-based way without even having to

14  look at the case law and that is if "estate" is supposed to

15  read it as "estates" when the context requires it, as this

16  does, then the Code answers the question that you just asked.

17          THE COURT:  Wouldn't that mean you have substantive

18  consolidation in every case?

19          MR. ZENSKY:  Not at all, Your Honor.  We are only

20  looking to the collateral of the entities that are our

21  contractual guarantors, borrowers.

22          THE COURT:  Well, okay.

23          MR. ZENSKY:  We're not asking to --

24          THE COURT:  Doesn't that essentially means substantive

25  consolidation of all of the entities who are obligors,

 1  guarantors of your obligation?

 2          MR. ZENSKY:  It doesn't, Your Honor, because at the

 3  end of the day if we are oversecured between and among two or

 4  more debtors and our post-petition interest comes out of that

 5  equity cushion, we are not invading the assets that otherwise

 6  would be available for unsecured creditors.  The debtors can

 7  easily allocate the payment of the post-petition interest in

 8  proportion to the estates where our collateral lies.  We can

 9  reduce our claim to be just under the collateral held at each

10  estate if you want to take a less than pragmatic approach to it

11  rather than just looking at it as a package.  So I don't

12  believe that our position at all contemplates that there is

13  substantive consolidation in any respect and I think the

14  debtors mischaracterize our position in the brief when they

15  suggested that is our position.

16          THE COURT:  Go ahead.

17          MR. ZENSKY:  Okay.  So turning to the case law, I

18  think we cited multiple cases that are helpful to the Court in

19  answering this.  I think, perhaps, most instructive is the In

20  re SW Hotel case out of Massachusetts.  That was a trial on

21  plan and an objection to the plan treatment of the secured

22  creditor.

23          THE COURT:  I have SW Hotel right here.

24          MR. ZENSKY:  Yes.  Where, as Your Honor knows having

25  read it that both the aggregation of collateral held by

1   multiple debtors and how to value that collateral was hotly

2   contested by the debtor and the secured lender.  And the debtor

3   did argue, as is argued here, that you do not aggregate the

4   collateral across multiple debtors and the bankruptcy judge in

5   that case said yes, you do, and that argument is wrong and

6   awarded post-petition interest to the secured lender in that

7   case.

8           THE COURT:  The one --

9           MR. ZENSKY:  It is true that --

10          THE COURT:  Let me just stop you for a second because

11  the one thing -- one thing that I think I've noted -- I may be

12  wrong about this -- that each of the courts that has aggregated

13  collateral among the debtors did so following a full

14  evidentiary hearing and not on a motion to dismiss.  Are there

15  any cases that resolve this issue on a motion to dismiss?

16          MR. ZENSKY:  No, I believe that's right.  Some of the

17  procedural context of those cases are unclear, Your Honor.  But

18  the issue --

19          THE COURT:  They either were after a full evidentiary

20  hearing or stipulated facts or things of that nature.  I think

21  they were all after an evidentiary --

22          MR. ZENSKY:  No, no, I --

23          THE COURT:   -- a full evidentiary hearing.

24          MR. ZENSKY:  -- think I would agree that there is no

25  12(b)(6) decision where in an adversary proceeding the debtor

1   or the committee took the position that the secured lenders

2   were not entitled to post-petition interest because it was

3   spread among multiple debtors.  It comes up in a variety of --

4          THE COURT:  Because SW Hotel, which is clearly a

5   leading case, and it's a full -- there was a full trial and

6   valuation.

7          MR. ZENSKY:  Right.  I agree, Your Honor, but --

8          THE COURT:  And it's the BAP decision affirming --

9          MR. ZENSKY:  And clearly, no one is suggesting that we

10  can decide the value of our collateral at any debtor on a

11  motion to dismiss but how we're going to count it at the end of

12  the day and whether it should be aggregated or whether our

13  claim amount would be reduced at each debtor to be below the

14  collateral found by this Court to exist so that no estate

15  itself is paying more -- is paying post-petition interest on an

16  amount in excess of collateral seems to us to be a question of

17  law that the Court can answer.  I'm not sure what facts could

18  be added that would aid in this.  Clearly, the indenture and

19  the note are before the Court.  They explicitly create the

20  state law entitlement to interest on past principal interest,

21  on late interest, and explicitly refer to post-petition

22  interest in the event of a bankruptcy.

23         So certainly for the meeting of the minds of the

24  parties, that fact is in the record and there's no need to have

25  a trial on that, Your Honor.

1          THE COURT:  I think in fairness -- Urban Communicators

2    is one of the cases you rely on -- the facts were undisputed so

3    no evidentiary hearing was necessary, the Court concluded

4    there.  But -- so that what sticks in my mind is they were

5    either after a full evidentiary hearing or where the parties

6    acknowledged no disputed issues of fact.

7          MR. ZENSKY:  No, I agree.  I think there were others;

8    General Growth --

9          THE COURT:  Yes.

10          MR. ZENSKY:  -- in which, I believe, Morrison &

11    Foerster was representing the creditor, it was agreed that the

12    secured lender was oversecured in the aggregate --

13          THE COURT:  Right.

14          MR. ZENSKY:  -- so there was no dispute about that.

15    And I guess this comes up more often when the dispute is about

16    valuing it which would require an evidentiary hearing.

17          So again, I don't see any procedural impediment to the

18    Court dismissing this and I don't think that the debtors have

19    offered any argument about facts on this particular issue that

20    the Court would need to address.

21          I mean the parties debate, to some degree in their

22    papers, the policy implications of this if the Court were to

23    say you must be oversecured at a single debtor about what the

24    impact that would have on lending practices.  I suppose the

25    Court could say if that's the determinant factor that there

RESIDENTIAL CAPITAL, LLC, ET AL.                              66

1  would be evidence but I don't think this issue should turn on

2  that and I don't think we need a trial for the Court to apply

3  its commonsense to determine that if you were to hold or any

4  court were to hold that secured lenders are going to have to be

5  secured at a single debtor from now on that lending instruments

6  are going to look quite different than this one does and that

7  indentures and security agreements do when lending to a

8  corporate empire like this.

9        THE COURT:  I guess one of the things that struck me

10 is depending -- you may well prevail at the trial without me

11 ever having to decide this issue.

12       MR. ZENSKY:  That is true.  It is not beyond the realm

13 of possibility that when all the different numbers are final,

14 that we are oversecured at a single debtor.  I don't think

15 anyone is saying that's a likely outcome but I think the

16 parties would certainly benefit from the Court's guidance at

17 this point on whether it is --

18       THE COURT:  I'm not sure the Court would benefit from

19 giving the guidance at this point but go ahead with your

20 argument.

21       MR. ZENSKY:  Okay.  So I started to talk SW Hotel; the

22 Court's read the decision.  You're familiar with it and the

23 explicit argument raised here was rejected by the bankruptcy

24 court there.  That case was affirmed on appeal by the district

25 court.

1          THE COURT:  By the BAP.

2          MR. ZENSKY:  Excuse me, Your Honor?

3          THE COURT:  It's actually a BAP decision.

4          MR. ZENSKY:  Yes.  I apologize.

5          I don't believe the debtors have cited any case to you

6    where a court has rejected the aggregate collateral approach in

7    any procedural context where you are looking to the assets of

8    multiple debtors.  Clearly, they stake their argument on DeNofa

9    which, as Your Honor knows, involves nondebtors, and I'll get

10   to that in a minute.  But they have not cited a case to you

11   that comes out different from SW Hotel, that comes out

12   different from the Court's discussions of this issue in the

13   Revolution Dairy case, for example, where it's an unreported

14   decision, we submitted a transcript, in the Contrarian decision

15   or General Growth where it was agreed that across multiple

16   debtors the lenders were oversecured.  There's nothing that

17   says that that approach is wrong.

18         As I said earlier, we don't believe there's any harm

19   to unsecured creditors with the approach we're taking because

20   if the collateral is there, we are not invading any value that

21   unsecured creditors would have a right to look to.  On the

22   other hand, if the Court were to reject the JSN --

23         THE COURT:  Excuse me.  Violate the rule that I always

24   set for everybody else.

25         MS. MARTIN:  I'm just glad it wasn't me.

1          THE COURT:  No idea what that phone number is.  Go

2     ahead.

3          MR. ZENSKY:  I had my phone go off one time when I was

4     arguing before Judge Carey but it was 9 at night and he said

5     that the rules against phones don't apply after hours so he let

6     me keep it.

7          THE COURT:  No one ever calls me.  I don't know.  It

8     had to be a wrong number.

9          MR. ZENSKY:  We'll call you from time-to-time if it'll

10    make you feel better.

11         THE COURT:  Right.  Go ahead.

12         MR. ZENSKY:  So as I said, I don't believe there's any

13    harm to unsecured creditors from the approach that other courts

14    have taken that we advocate here.  Alternatively, if the Court

15    says that we are not entitled to recover our state law

16    entitlement to interest until the loan is paid and interest on

17    late interest, then there is harm to us because our state law

18    entitlement, which I believe 506(b) says should be respected

19    is, in fact, not being respected.

20         THE COURT:  Let me ask you this, if -- if the Court

21    were to deny this motion without prejudice, what evidence would

22    you be introducing at trial --

23         MR. ZENSKY:  Well --

24         THE COURT:  -- to support it?

25         MR. ZENSKY:  -- it's a little hard --

1       THE COURT:  Is it going to be any different if --
2  however this issue is decided?

3       MR. ZENSKY:  Well, the only thing would be different
4  is if Your Honor says that you are interested in hearing how
5  credit agreements would be written differently if you were
6  to --

7       THE COURT:  No, I'm not interested in hearing that.

8       MR. ZENSKY:  I mean that seems to me would be the
9  province of an expert.  But I don't believe there are any facts
10  that either side would offer.  The indenture's in the record;
11  the notes --

12       THE COURT:  Yes.  Just so we're clear, when I thought
13  about this last night, late, it didn't -- I'm mindful this is
14  going to be a timed trial, limiting the amount of time, but it
15  didn't seem to me that if I wind up deferring this issue,
16  denying the motion without prejudice -- you make some very good
17  ar -- strong arguments; I'm not questioning that -- that the
18  trial is going to be lengthened in any fashion.  You're going
19  to introduce the same evidence however I decide this issue.  Is
20  that correct?

21       MR. ZENSKY:  I think that that's a fair statement,
22  Your Honor, and I would only make the observation that would
23  apply to any of the issues before you, last time --

24       THE COURT:  I don't think so.

25       MR. ZENSKY:  -- this time on a motion to dismiss that.

1    To the extent they can be determined as a matter of law and the

2    Court provides the parties with that decision, it helps narrow

3    the playing field and the party's expectations and potential --

4            THE COURT:  I'm not shy about making decisions on

5    motions to dismiss, but from the Court's standpoint, use this

6    term loosely, it's safer decided on a full evidentiary record.

7    Then, if I wind up getting reversed, the facts are all there.

8    It's not -- it's all there.  You can argue that the evidence

9    established the following and Judge Glenn was wrong as a matter

10   of law.  That goes for the committee and the debtors as well.

11           I decide it your way, all the evidence is there.

12   And -- go ahead.  I just --

13           MR. ZENSKY:  I --

14           THE COURT:  -- that's what I was kind of mulling over

15   to myself.  I don't see an issue in how you're going to present

16   your case by my waiting to hear the evidence because the issue

17   may never have to be decided and if it does, the evidence is

18   going to be there.  I'm going to decide it.

19           MR. ZENSKY:  Your Honor, I agree that for all

20   practical purposes, it would not affect the trial.  I'd be

21   interested to hear if our adversaries share the same view.

22           THE COURT:  Well, see what they say.

23           MR. ZENSKY:  The Court's resolution, though, could

24   facilitate resolution of the matter because to the extent --

25           THE COURT:  Oh, that -- if I thought that was going to

 1   happen.

 2           MR. ZENSKY:  Well, every one of these issues each side

 3   is assessing what --

 4           THE COURT:  Yes.  Sure.

 5           MR. ZENSKY:  -- the likely outcome is and --

 6           THE COURT:  Well, sometimes, the unknown sometimes is

 7   helpful but --

 8           MR. ZENSKY:  Right.  But in this case there are forty-

 9   five unknowns, Your Honor.  There are plenty of unknowns for

10   the parties to squirm over.

11           THE COURT:  One more or less isn't -- I'm afraid,

12   isn't going to make a difference, but --

13           MR. ZENSKY:  I can't speak to that but you asked my

14   view.

15           THE COURT:  Okay.  All right.

16           MR. ZENSKY:  Okay.

17           We talked about SW Hotel.  We -- Revolution Dairy, the

18   debtor tried to take the cute position that it could argue

19   adequate protection payments were not necessary because lenders

20   were vastly oversecured across the spectrum of the debtors but

21   make no mistake, they shouldn't get PPI because it doesn't

22   reside in any debtor and I don't think that bankruptcy judge

23   had much tolerance for that argument.

24           I already mentioned General Growth and Contrarian

25   which I think helped frame the analysis but are not as detailed

 1 | as the other two cases.

 2 |         Let me come back to 102(7), Your Honor.  I think

 3 | that's an important interpretative aid here.  It's in the Code.

 4 | It's not something that we've kind of pulled out of thin air.

 5 | You've heard arguments in this court many times about the

 6 | sanctity of the Code as written and we know there are plenty of

 7 | cases that says Congress means what it says and it says what it

 8 | means.  And they've said in 102(7) that singular includes the

 9 | plural.  It makes perfect sense to apply that to this

10 | particular situation where there's a multi-debtor case and all

11 | the debtors or some multiple of debtors are obligors,

12 | guarantors --

13 |         THE COURT:  See, I think it goes much too far -- that

14 | argument goes much too far because I raise the issue about

15 | substantive consolidation.  There are a whole host of issues

16 | that if you took the definitional section and had it determine

17 | the outcome of numerous issues along the way, they'd all

18 | potentially come out differently than the case law provide.  I

19 | know what the definition says.

20 |         MR. ZENSKY:  I -- I'm sorry.

21 |         THE COURT:  And I think there's a good reason because

22 | you get multi-debtor cases, fifty-one debtors, and one or more

23 | Code sections apply to all of them and -- anyway.  Go ahead.

24 |         MR. ZENSKY:  And again, a couple observations on that,

25 | Your Honor.

1        Again, we are not saying that you should interpret the

2   word "estate" to include estates that are not liable to the

3   JSNs in the first place.  We're saying that the collateral is

4   comprised of collateral held by entities that are our pledgors,

5   guarantors and borrowers.

6        THE COURT:  Um-hum.

7        MR. ZENSKY:  So I don't again see how this runs into

8   hypothetical problems of substantive consolidation.

9        I also don't think that we necessarily should look at

10  other potential applications of 102(7) which may not make sense

11  as a basis for you to reject its application here where it

12  makes perfect sense and is consistent with the approach

13  taken --

14       THE COURT:  See that point -- that point I don't agree

15  with.  I think that I need to look at the various ways and

16  provisions in which 102(7) applies and see whether it makes

17  sense to have it dictate the outcome whether it's on 506 or on

18  another issue.

19       MR. ZENSKY:  Well, the --

20       THE COURT:  So I don't agree with that -- the argument

21  you just made.  That piece of the argument I don't agree with.

22       Look, I think you got strong arguments as to why you

23  should aggregate the debtors for this purpose.  That I don't

24  find a particularly persuasive one of the arguments.  But go

25  ahead.

RESIDENTIAL CAPITAL, LLC, ET AL.                    74

1        MR. ZENSKY:  I understand.

2        In Geltzer, Your Honor, the case dealt with 548(a)(2)

3   of the Code which is the limited immunity for donations to

4   charitable organizations from avoidance by the trustee.  And

5   548(a)(2) reads, "A transfer" in the singular "A transfer of a

6   charitable contribution to a qualified religious or charitable

7   entity or organization shall not be considered to be a transfer

8   under (1)(B)" which is the constructive avoidance conveyance

9   section.  And clearly, that's plain English.  I mean the Court

10  easily could say that Congress must have known what it was

11  doing when it used the word "transfer" but it interpreted it to

12  be "transfers" and that what the proper test would be would be

13  to aggregate all of the transfers made by a debtor to its

14  charity of choice over the course of a year and it got there by

15  102(7) initially and said "and we find it makes sense and is

16  consistent with the overall purpose of this statute".

17       So the Second Circuit was -- looked at the statute

18  first and then said and this makes sense the way the Code is

19  supposed to work.  So I submit again the same is true here.

20  506(b) says that oversecured creditors are supposed to get

21  post-petition interest and our interpretation is consistent

22  with that proposition.  So let me turn briefly to DeNofa which

23  I'm sure Your Honor has read, as well.

24       We think that case has exactly zero application to the

25  issue before Your Honor.  The substantive question there in the

RESIDENTIAL CAPITAL, LLC, ET AL.                    75

1  words of the court were, "Whether nondebtor property may be

2  included in determining whether a debt is oversecured."  We're

3  not asking you to consider nondebtor property.  We're not

4  asking you to consider the property of debtors that aren't our

5  guarantors, pledgors or where we don't have a perfected lien.

6        Again, the hypothetical is that you rule at the end of

7  the day we have perfected liens under our contract at multiple

8  debtors that exceed our claim amount.

9        In DeNofa, as Your Honor knows, the creditor there,

10  there was a single debtor and the creditor had a guarantee for

11  nondebtors and tried to take advantage of the fact that the

12  words of the estate don't appear in 506(b) but do appear in

13  506(a).  And the DeNofa ruling is nothing more than a rejection

14  of that argument and the argument of that creditor that it was

15  entitled to amass collateral held by nondebtors and debtors

16  together.

17        Whether that court was right or not in that ruling, we

18  don't rely on that interpretation of 506(a) and (b) and we

19  don't think the DeNofa is helpful at all to the debtors' case

20  or the Court's resolution of this matter.

21        Finally, I think the Court is interested -- it's

22  not -- has said it's not interested in the policy arguments the

23  parties have offered.  I do believe it correct to say that

24  lenders would change their approach to lending if they were not

25  going to get PPI in this setting.

RESIDENTIAL CAPITAL, LLC, ET AL.                    76

1          There's a Second Circuit case, Ruskin v. Griffiths

2     which was cited on the default interest rule but it's a pre-

3     Code case but still cited repeatedly as good law.  The Second

4     Circuit observed I don't believe after a trial or expert

5     evidence that lenders set their interest rate, the terms of

6     their loan, based on the expectation that they will get

7     interest until paid including post-petition interest, and

8     anything the Court does to upset the state law entitlement is

9     going to change the way lenders approach their credit.

10         The debtors argue that our argument would affect the

11    behavior of unsecureds because unsecureds lend money and trade

12    debt based on the expectation that they're -- that the

13    unencumbered part of the estate will not be used to pay post-

14    petition interest, but again we're not arguing that.

15         THE COURT:  Well, let me ask you this.  The debtors

16    argue in response to your motion that in terms of the cases,

17    you're relying on that two of the cases the creditor was

18    sufficiently oversecured at any one debtor and that the court

19    didn't perform an analysis whether the secured creditor may

20    aggregate; it's Capmark, Urban Communicators.  And in three of

21    the cases, the debtors were either substantively consolidated,

22    which by definition aggregates, or the creditors were paid in

23    full.  And it's General Growth, Dana and Fiberglass.  And your

24    response?

25         MR. ZENSKY:  Yes.  First, in Capmark, they're proof

1  that the debtors were oversecured.  There's a ruling six,

2  eight, nine months later and it's entirely unclear what debtor

3  they're talking about and what had happened in the interim.  I

4  don't think there is any record before you.  There certainly

5  wasn't in the Capmark decision we cited.  There wasn't evidence

6  that the pledge pool of the assets of the aggregate debtors

7  showed the secured lenders to be oversecured in any one.

8          With respect to General Growth, it is true that that

9  decision reflects that all creditors were paid.  That might go

10  to whether default post-petition interest should be awarded.

11  That may be a factor.  But I don't believe that goes to the

12  battle between the creditor and equity as to whether the

13  creditor would get post-petition interest, unless it could

14  establish it's oversecured in the sense of 506(b).

15          So the aggregate -- the fact that all creditors

16  were --

17          THE COURT:  It goes to the issue of whether the Court

18  had to determine whether to aggregate or not.  I mean, if

19  creditors were being paid in full it doesn't do anything.

20          MR. ZENSKY:  Yes, but creditors would not necessarily

21  be paid in full or there would be less for equity, based on how

22  post-petition interest came out.  If you weren't going to

23  aggregate there'd be more value left for equity, so I think

24  that that case --

25          THE COURT:  Yes, but once you determine -- if I were

1   to determine that you're oversecured it's been clear you're

2   going to get post-petition interest.  I may still have this

3   issue, and we'll deal with it in the counterclaims, but the

4   default interest, as you -- whether it's default interest -- if

5   you're oversecured you're going to get your interest and we'll

6   deal with it.  It isn't going to matter whether I aggregate or

7   not.  It becomes totally irrelevant.  The issue is are you

8   oversecured.

9        Getting there I might have -- it's true.  I might well

10  have to decide the issue of the aggregation in order to resolve

11  the issue of whether you're oversecured, but if I conclude

12  you're oversecured it's not going to make any difference

13  whatsoever.

14        MR. ZENSKY:  All right.  Let met just come back to one

15  question the Court asked, and then I think I'm done.  In terms

16  of the trial there is one way, I think, in which it would be

17  complicated by the Court deferring this issue, and that is

18  certainly there is going to be some litigation about the assets

19  held of individual debtors, transfers between debtors.  We have

20  the intercompany issue like --

21        THE COURT:  But you already raised that in your

22  counterclaims.

23        MR. ZENSKY:  Yes.

24        THE COURT:  I mean --

25        MR. ZENSKY:  Right.  But it may --

RESIDENTIAL CAPITAL, LLC, ET AL.                          79

1          THE COURT:  That's in the case.

2          MR. ZENSKY:  But it may not be necessary to value,

3     ultimately, at the end of the day, the collateral held at each

4     and every one of the debtors, and, as I said earlier, or think

5     I said, that another approach to this is that the JSNs, after a

6     value is fixed for the collateral that we have a perfected

7     interest in, we could just reduce our claim, as we're permitted

8     to do under paragraph 31 of the cash collateral order, to fall

9     below the collateral threshold at each debtor.  That doesn't

10    implicate anything about aggregate debtors.  Then we're

11    applying our claim at each individual estate up to the amount

12    of our collateral and ask just for post-petition interest on

13    the claim amount at that estate.  So I don't know that there's

14    any argument that's not a proper approach, and by virtue of

15    mathematical properties, the name of which escapes me, it gets

16    us to the same place at the end of the day, Your Honor.  So I

17    think that that would add -- the need to go through that

18    exercise would add some complication to the litigation.

19         THE COURT:  All right.  Thank you very much.

20         MS. LEVITT:  How would you like to do this?

21         THE COURT:  Go ahead, Mr. Shore.  Let's deal with both

22    of them.

23         MR. SHORE:  No problem.  Chris Shore from White & Case

24    on behalf of the ad hoc group and UMB.  Just as a preliminary

25    on today's motions, I know there's a lot in front of you.  Some

1 of it is brought on the basis that we think that it's largely

2 the legal issue that can be done.  Some of it is just -- I will

3 say because we need guidance, and I think it will affect the

4 trial, particularly on issues that are going to be relating to

5 the experts, how we're going to be going about valuations and

6 the like, and we can cut down significantly on the number of

7 valuations that need to be done and the methods that need to be

8 done.  So I'm going to be, kind of, focusing on that, both on

9 our motion and on the debtors' motion.

10    We have two disputes today on what the debtors

11 referred as the Ally LOC silo, one of which, we discovered by

12 our motion, one of which is covered by their motion.

13    The Ally LOC silo is shorthand for a group of assets

14 which are owned by various debtors that the debtors contend are

15 not subject to our pre-petition liens but, rather, were pledged

16 to Ally.  They consist largely of mortgage servicing rights and

17 of either loans that are coming back from bilateral facilities

18 or loans which the debtors have purchased out of structures.

19    The assets themselves, mortgage servicing rights and

20 mortgage loans, meet the definition of collateral under the

21 indenture and the JSN pledge agreement, but the debtors contend

22 that the JSN collateral agent released all the liens on any of

23 that property and filed UCCs prior to the petition date, which

24 served to unperfect the liens.

25    In Count III of the complaint, then, they seek a

RESIDENTIAL CAPITAL, LLC, ET AL.                    81

1   determination from the Court that the JSNs do not have any

2   perfected lien on anything they contend is part of the Ally LOC

3   silo, which is a construct which they put together in which

4   they say these are the assets on which we believe you don't

5   have liens.

6             THE COURT:  Look.  You don't dispute that the

7   collateral agent signed releases and filed UCC-3s.

8             MR. SHORE:  Nope.

9             THE COURT:  And I don't know.  What is it, like, eight

10  of them or something?  I can't remember the precise number.

11  There was a whole bunch of them.  This is not a paralegal

12  making a mistake.

13            MR. SHORE:  There are two --

14            THE COURT:  There was a course of conduct with the

15  collateral agent executing lien releases and filing UCC-3s,

16  correct?

17            MR. SHORE:  Yes.

18            THE COURT:  Go ahead.

19            MR. SHORE:  I'll come back when I come to the issues

20  around those and whether or not the liens exist pre-petition

21  when I deal with their motion, unless you'd like me to handle

22  it now.

23            THE COURT:  No, these.

24            MR. SHORE:  But I think it's -- okay.

25            THE COURT:  However you want to.

1          MR. SHORE:  I'll lay out the groundwork for it.
2     They're really, actually, three buckets within that ALLY LOC.
3     Some are assets which they contend are unliened or liened only
4     to Ally, for which there was never a UCC filed and they never
5     appeared on any schedule.  They'd just say it's an MSR.  It
6     came out of a bilateral facility.  You have no lien on it.

7          Some of them are the subject of UCCs that were filed
8     with actual schedules attached to them which list assets.
9     That's the second bucket.

10         And the third bucket, and it's the largest bucket
11    within that group, are assets that never appeared on any filed,
12    UCC-3, but, rather were just on schedules that Ally and the
13    debtors handed back between themselves pre-petition.  Never
14    approved by the collateral agent, never given to the collateral
15    agent, never disclosed to the public, and then when they got to
16    the petition date they said we have it on a schedule here.
17    We've listed these MSRs or these loans as collateral for the
18    Ally LOC, so you have no lien on them.  And that's the third
19    bucket of assets.  And how we deal with each of those buckets
20    of assets in the context of a pre-petition lien, I'll address
21    later, because I think they get handled differently.

22         THE COURT:  I apologize.  I printed something out with
23    a whole list of questions I had.

24         MR. SHORE:  Okay.

25         THE COURT:  And I didn't bring that out.  Everybody

1   just stay in place.  Don't get up till I come back.

2       (Pause)

3           THE COURT:  Okay.  Go ahead, Mr. Shore.

4           MR. SHORE:  Okay.  So, as I said, I'll deal with the

5   existence of pre-petition liens later.  Let's deal with the

6   post-petition lien.  This is a dispute that's not going to

7   lengthen the trial, but we're bringing it to you today because

8   we think it can be resolved as a matter of law in the absence

9   of a finding of an ambiguity in the cash collateral order.

10          Paragraph 5(g) of the cash collateral order has a

11  stipulation by the debtors that the liens and security

12  interests granted to secure the interests of the junior secured

13  parties, which includes the junior secured noteholders,

14  pursuant to the junior secured note documents and in connection

15  with the junior secured notes are valid, binding, perfected,

16  and enforceable first priority liens on and security interests

17  in the personal and real property constituting, and this is in

18  the original, quote, "collateral", end quote, under and as

19  defined in the junior secured notes document.

20          THE COURT:  And you define that in the counterclaims

21  as the stipulated collateral.

22          MR. SHORE:  Yes.  They stipulated to anything that met

23  the definition of, quote, "collateral" under and as defined in

24  the junior secured notes documents.

25          THE COURT:  So does that mean that assets of a type

1    that could have been given as security but were not, for

2    whatever reason, by virtue of that stipulation automatically

3    becomes collateral?  I mean, one way to read the stipulation is

4    that anything that you had a valid and perfected security

5    interest in they're stipulating you continue to have a valid

6    and protected security interest.  That's the stipulated

7    collateral.

8         It doesn't necessarily follow that it means that if

9    things were -- if your liens were released by the collateral

10   agent that somehow, by virtue of the stipulation, it leaked

11   back into your protected pot.  I don't -- so that's the problem

12   I had.  I mean, I read that -- I tried to read that carefully,

13   and I thought, you know, it's ambiguous.  I'm not sure what --

14   I know how you rely on the language, but I'm not sure that your

15   conclusion necessarily follows from it.

16        MR. SHORE:  There are two ways to define what our

17   liens are on.  That is what we had liens on pre-petition, and

18   they could have stipulated to that.  But they did it on an

19   asset basis, and the asset basis was done by the definition of

20   collateral.

21        Just from the perspective of the negotiation history,

22   this was an Ally document presented to the debtors, presented

23   to us and signed off on.  So the language that came in was it

24   was defined as, quote, "collateral".  Collateral is defined in

25   a bunch of documents.  It's defined in the indenture as being

 1  that which as it is defined in the security documents.

 2          THE COURT:  I always love this one.  One document

 3  refers to another.

 4          MR. SHORE:  Right.

 5          THE COURT:  But go ahead.

 6          MR. SHORE:  All right.  But the security documents are

 7  defined as the pledge agreement and a list of documents which

 8  are attached to the pledge agreement, such as the pledges and

 9  the collateral assignments.

10          THE COURT:  So, look.  If the collateral agent, and I

11  know you argue that under the indenture they didn't have the

12  authority to do what they did, but if the collateral agent had

13  the authority to release collateral, and I know you dispute it,

14  but they did it.  I don't see how that jumps back to falling in

15  the definition of capital C Collateral or stipulated collateral

16  that collateral is used in the underlying documents.

17  Stipulated collateral is used in the cash collateral order.

18          MR. SHORE:  This was the method that the debtors chose

19  and Ally chose pre-petition to move assets out of our liens and

20  under the Ally LOC.  They did not amend the security agreement.

21  They did not amend the pledge agreement.

22          THE COURT:  Well, I don't know that they had to.  I

23  mean --

24          MR. SHORE:  That's how you --

25          THE COURT:  Because the collateral agent was given the

RESIDENTIAL CAPITAL, LLC, ET AL.                    86

1   authority to release collateral.  You may not like it, and you

2   may say they violated your rights, and you may sue them, but

3   that's --

4           MR. SHORE:  I'm just saying --

5           THE COURT:  That's for state court.

6           MR. SHORE:  -- that the definition of collateral never

7   changed, that the assets which were the subject of the UCC-3s

8   still met the definition of collateral under the documents.

9   The UCC-3s just move the -- remove the perfection of the

10  interest in that collateral.  They do.  When you file the

11  UCC-3s --

12          THE COURT:  How abut the releases?

13          MR. SHORE:  The releases affect the security interest

14  in, and they don't change the definition of collateral.

15          THE COURT:  But they sure do change what you have a

16  perfected security interest in.  You may not like it.

17          MR. SHORE:  That's the issue.

18          THE COURT:  You may argue that it was unauthorized.

19  It may be whatever, you know, but it wasn't the paralegal who

20  did it.

21          MR. SHORE:  That's the issue to be addressed in their

22  motion.  The issue to be addressed in our motion is under the

23  express terms of the cash collateral order we're stuck with the

24  definition of collateral.

25          THE COURT:  I saw it as inextricably linked.  You're

1   arguing, each of you are arguing the flip side of the same

2   argument.  They put it in their complaint as claim, you know,

3   Count III.  You put it in as, what is it, 25 through?

4            MR. SHORE:  24 through 26.

5            THE COURT:  Yes.  A bunch of those --

6            MR. SHORE:  22.

7            THE COURT:  -- at the end.

8            MR. SHORE:  I get it.  But one covers pre-petition

9   liens, one covers post-petition liens, liens that were granted

10  in connection with the cash collateral order.

11           To the extent that the definition that the liens they

12  stipulated to, which then become binding on all parties-in-

13  interest and shall not be modified according to the cash

14  collateral order, to the extent the Ally LOC assets meet the

15  definition of collateral the debtor stipulated to it.  That

16  didn't end the inquiry.  That gave any party-in-interest ninety

17  days, and the committee ultimately got a number of months, all

18  the way through February, before they filed their complaint, to

19  come forward and challenge it, to take up the issue that we're

20  going to discuss later, which is the pre-petition liens and

21  whether it was really effectively released or not, particularly

22  with respect to the issue that I talked about, that second

23  bucket.

24           All of the collateral which they list as Ally LOC

25  collateral that didn't appear on any file schedule, no one took

1    that up, so under the express terms of the cash collateral

2    order if it meets the definition of "collateral", in quotes,

3    there is a valid first priority perfected lien on it.  People

4    had an opportunity to challenge.  They didn't challenge.

5           The debtors then try to create ambiguity by saying we

6    have contemporaneous statements where we said we don't think

7    you have a lien on that.  I think that's a parol evidence

8    problem.  In the absence of a finding of ambiguity you can't

9    put in those contemporaneous statements.

10          But, nonetheless, that doesn't address the issue under

11   the cash collateral order, which is regardless of what their

12   subjective beliefs were as to whether the liens exist they

13   wrote down that the liens exist on all defined, in quotes,

14   "collateral" and gave other people the opportunity to come

15   forward and challenge.

16          THE COURT:  Go ahead.

17          MS. LEVITT:  Good morning, Your Honor.  Jamie Levitt

18   from Morrison & Foerster on behalf of the debtors.  Your Honor,

19   in order to try to make this more efficient today we and

20   counsel for the committee are going to try to consolidate our

21   arguments, but Mr. Horowitz or someone from the committee may

22   choose to stand up and add.

23          Which argument would Your Honor like me to address

24   first?

25          THE COURT:  Which would you like to?  Two I can keep

RESIDENTIAL CAPITAL, LLC, ET AL.                    89

1  straight in my mind, whichever you do first, okay?

2          MS. LEVITT:  Okay.  Why don't I start with Count III,

3  since Mr. Shore was just discussing this?

4          Your Honor, we believe that there's no question that

5  the JSNs cannot have a lien on assets that were released, and

6  we ask the Court --

7          THE COURT:  So what language do you point to?  I mean,

8  I will say I find the language ambiguous.  You say for parol to

9  come in it's going to, at least at this stage somebody may

10 persuade me it's time for trial, but right now, I read it over

11 about five times, and I'm not sure what it really means in the

12 context of the dispute that comes up now.

13         MS. LEVITT:  Your Honor, the language that I'm looking

14 at is the collateral that Mr. Shore was talking about clearly

15 is defined in the pledge agreement in Section 2, but the pledge

16 agreement then goes on to specifically contemplate releases of

17 collateral.  That's Section 10.  The indenture also provides

18 for releases of collateral in Section 8.4(a)(1).  So there's no

19 question that as an integrated agreement there was collateral

20 granted and collateral that was intended or that the parties --

21         THE COURT:  Hold on.

22         MS. LEVITT:  -- anticipated --

23         THE COURT:  Collateral granted.  There was excluded

24 assets and there was the right to release.

25         MS. LEVITT:  Release.  Right.  And, Your Honor, and it

RESIDENTIAL CAPITAL, LLC, ET AL.                    90

 1  was released, and there's no dispute, and I'm not going to get

 2  into the issues on the opposition to the motion to dismiss with

 3  respect to validity of release or the equitable liens.

 4          THE COURT:  So what's the effect of the stipulation

 5  that the debtor entered into with the JSNs agreeing to the

 6  validity, perfection of liens, and using the definitions that

 7  were in the underlying documents?

 8          MS. LEVITT:  Well, Your Honor, to be consistent, and I

 9  admit I didn't negotiate these documents, but to be consistent

10  we used the definitions in the documents that existed.  There

11  was a definition of their collateral.  There was the allowance

12  of releases which occurred.  And then, very importantly, (5)(g)

13  is the provision that says that we stipulate that what they --

14  the liens that they have are valid and perfected.

15          We did not and ever intend, nor did anybody believe,

16  we were reviving previously released liens.  That would have

17  had --

18          THE COURT:  Well, that's, I think, an issue, and I

19  raised it with Mr. Shore earlier and that's what strikes me.  I

20  don't think -- I have a problem with argument that would find

21  that the cash collateral stipulation revived any security

22  interests that had previously been released.

23          It certainly kept in place anything that you --

24  whatever you had, they agreed, you have, and they weren't --

25  they, the debtor, at least, agreed it wasn't going to challenge

1  the perfection, validity, enforcement of any liens that the

2  JSNs, that the collateral agent had.

3          The problem I'm having is reading it as saying that

4  somehow if the liens were released it revived it.

5          Go ahead.

6          MS. LEVITT:  And, Your Honor, the point is we don't

7  think there's an ambiguity there, because there is no way you

8  can have an affirmative action of reviving a previously

9  released lien that -- it's for -- in some cases, UCC-3s were

10 filing pulling the perfection, putting the world on notice.

11 You can't revive it by some implied understanding that didn't

12 exist.

13         But as importantly, Your Honor, (5)(g) stipulates in

14 the stipulation to the validity of the liens granted to the

15 JSNs that existed at the time.  (5)(e) and (5)(f) cover the

16 liens that were granted to Ally under the LOC and the revolver.

17 That's many of the liens that had been released.  We clearly

18 weren't double-granting through this stipulation.  We were just

19 setting what existed at the time the stipulation on the cash

20 collateral order was filed.  There was no intention of any

21 parties -- Your Honor, I believe that it's clear in the words

22 of the statute that you can't imply something as important as

23 reviving a previously released lien.  I don't believe that any

24 lawyer for the JSNs who sat in the room and negotiated this, if

25 put on the stand, could actually testify under oath that he

1    believed to be reviving release liens, but also, Your Honor,

2    there were contemporaneous documents, and if the Court thinks

3    there are -- it's ambiguous and we got there, I just want to

4    note that at the very same time the Barclay DIP motion -- in

5    the Barclay DIP motion the JSNs asserted they had equitable

6    liens.  If they believed liens were revived they either would

7    have said it and said this is an excess of caution or they

8    would not have needed that.

9             Similarly, in the plan support agreement with the

10   JSNs, also negotiated and filed at the same time, the JSNs

11   sought to preserve the right to make a claim for equitable

12   liens.  Again, they didn't need that if they truly believed and

13   the parties had agreed to revive these liens.

14            And, so, Your Honor, I don't know if there's any more

15   you need on that.  We think it's entirely unambiguous that

16   these liens -- all we did in the stipulation was agree to what

17   everybody had, what existed at the time --

18            THE COURT:  I have to say that seems like the most

19   logical thing to happen.  You have what you have, and we're not

20   going to challenge it, and if it turns out that there's a

21   dispute about something that was released, well, we can

22   challenge it.  You can make your argument.  Whatever.  I mean,

23   logically that would seem to follow.

24            I do, and I'll let you go over whatever you want.  I

25   do want you to address what Mr. Shore referred to as his second

1  silo, which were assets that were listed in schedules but as to

2  which there were no lien releases, there were no UCC-3s, there

3  was no, according to Mr. Shore, no disclosure to anybody.

4  These were AFI schedules or debtors' schedules and nothing more

5  than that.

6         MS. LEVITT:  And, Your Honor --

7         THE COURT:  But go ahead in whatever order you want.

8         MS. LEVITT:  Your Honor, if you don't mind I would ask

9  Ms. Foudy to address that.  It goes, really, to the questions

10 with respect to the counterclaims and the validity of the

11 releases.

12        THE COURT:  Okay.  That's fine.

13        MS. LEVITT:  But she can answer that question.

14        THE COURT:  Go ahead with your -- finish your argument

15 then.

16        MS. LEVITT:  Okay.  Your Honor, I'm not sure there's

17 much more to argue other than you can't ambiguously or

18 impliedly create a revival of liens, as we've said.  The only

19 way the JSNs can get to that fiction is to ignore key facts.

20 They ignore the fact that the granted liens could be released.

21 They ignore that the definition of collateral explicitly

22 provides for releases.  And they try to ignore in the stip

23 itself the definition of junior secured notes documents

24 includes and all other documents executed in connection where

25 the --

1          THE COURT:  And your position is that's releases

2    and --

3          MS. LEVITT:  The releases, and, Your Honor, in the

4    first version, in their first brief they just ignore that

5    language as though it's not there.  In their reply they play a

6    semantic, legalistic game as to what "in connection therewith"

7    means, as opposed to "relation", and we think, Your Honor, that

8    the cases are very clear and that these words are defined

9    broadly to have some causal --

10         THE COURT:  I take it that it's the debtors' position

11   that by virtue of the cash collateral order you did not agree

12   to forego the right to challenge the JSN's argument with

13   respect to the released collateral or things that may never

14   have been collateral.  Is that a fair statement?

15         MS. LEVITT:  Yes.  And I don't believe we thought

16   there was a challenge other than on an equitable lien basis.

17         THE COURT:  Okay.  Thank you.

18         MS. LEVITT:  Okay.

19         THE COURT:  Is there anything you want to say?  Go

20   ahead.  I mean, I --

21         MS. LEVITT:  No.  And I'll leave --

22         THE COURT:  Ms. Foudy?

23         MS. LEVITT:  Unless you want Ms. Foudy to address your

24   question with respect to the second bucket?  We can do that now

25   or -- if it's on your mind.

1           THE COURT:  It'll be on my mind --

2           MS. LEVITT:  Okay.

3           THE COURT:  -- at another point too, so --

4           MS. LEVITT:  So then let me turn to Count V.  And

5    here, Your Honor, we think Count V can be decided and should be

6    decided as a matter of law.  We think it's very important for

7    the parties to set the appropriate standard that the Court will

8    be applying to determine whether the JSNs are oversecured or

9    undersecured, whether on a debtor by debtor or aggregate basis.

10   We believe that Count V states exactly the correct legal

11   standard for this analysis, that in order to be oversecured

12   defendants must be oversecured at any individual debtor.

13          THE COURT:  And where do you derive that rule from?

14          MS. LEVITT:  Your Honor, we derive that from the

15   language of 506(a) and (b) as well as from the case law and as

16   well as the underlying purpose of --

17          THE COURT:  Tell me what cases you're relying on to

18   support that position.

19          MS. LEVITT:  Okay.  Your Honor, we're primarily

20   relying on the DeNofa case, which we actually think is the

21   single case that is actually directly analogous to the facts

22   here.  In that case --

23          MS. LEVITT:  I tend to agree with Mr. Shore, or Mr.

24   Zensky.  I can't remember which one of them -- Mr. Zensky

25   argued this.  I tend to agree with him that because that case

RESIDENTIAL CAPITAL, LLC, ET AL.                                    96

1    focused on the issue of debtor and nondebtor it's not

2    applicable here.

3              MS. LEVITT:  And, respectfully, Your Honor --

4              THE COURT:  Do you have any other cases?

5              MS. LEVITT:  Your Honor, there are very few cases that

6    have actually addressed this, as we put in in our papers.  Most

7    of the cases, including all of those cited by the JSNs, fall

8    into, sort of, other buckets.  Either the parties had just

9    agreed on an aggregation.  There's no discussion in the

10   decision.  And I think, as Your Honor said in another context,

11   if something happens under a statute but there's no analysis by

12   the Court it's not really binding or had a precedential value

13   for the Court.

14             In many cases there was an oversecurity, so it really

15   wasn't an issue.  In other cases there -- and, importantly,

16   there was a substantive consolidation of the debtors.  That is

17   clearly not a similar situation.  They had already chosen to

18   aggregate.  And that's important, because that's in SW --

19             THE COURT:  Well, I thought you did a reasonably good

20   job distinguishing the cases that the JSNs or UMB relied on.

21   You just didn't do a very good job in coming up with your own

22   case report for your position.

23             MS. LEVITT:  And I think -- I can't really guess, Your

24   Honor, as to why this hasn't hit the case law with more cases,

25   other than I think a lot of the times the parties do just come

1    in with a plan that's been agreed upon with respect to how the

2    calculation will be done.

3            THE COURT:  So what does Collier say on this?

4            MS. LEVITT:  Your Honor, Colliers doesn't really

5    address it.  Colliers is cited in DeNofa for the proposition

6    that you need to be oversecured in order to get the post-

7    petition interest but don't really go into the question that's

8    raised here by (a) and (b)..

9            THE COURT:  Any other articles, treatises, anything of

10   that nature?  I find it an interesting issue.  I'm being quite

11   honest.  I thought that you did a good job distinguishing the

12   cases that UMB relies on, and the case that you're relying on

13   is quite distinguishable as well, so what am I left with?

14           MS. LEVITT:  And, Your Honor, the major point of

15   distinguishment for -- DeNofa, we think, actually really is a

16   distinction without a difference, respectfully.  The issue

17   there was whether you can aggregate and look -- whether you're

18   aggregating the debtors or nondebtors, whether you can look at

19   other collateral other than in that estate.  And the Court had

20   a very good reasoned analysis as to why (a) and (b) work

21   together, why (a) -- 506(a) defines the allowed secured claim

22   by looking at only the estate at issue where the claim is

23   filed, and then it follows that when determining if the

24   creditor is oversecured you need to compare their claim to the

25   collateral in that estate.

RESIDENTIAL CAPITAL, LLC, ET AL.                          98

1        And their policy reason for that, Your Honor, is

2    clear.  The oversecured creditor gets to take out of that

3    equity cushion to pay for post-petition interest, and that's

4    fair.  But if they're not oversecured and they're undersecured

5    at a particular estate then they're taking from the unsecured

6    creditors.  And that's why it doesn't -- it isn't fair and

7    doesn't make sense unless the parties have agreed on it to

8    aggregate, because you really are taking from creditors at an

9    estate in which you would not be oversecured.  So I don't think

10   it matters.  It didn't matter in DeNofa, and I don't think it

11   matters whether the additional collateral is either nondebtor

12   or is at another nonconsolidated debtor.

13        THE COURT:  Tell me how the evidence at trial will

14   differ if this issue is reserved for a decision on a full

15   evidentiary record.

16        MS. LEVITT:  I mean, I -- well, I would say that I

17   think there is no policy issue, so I don't think we'll get into

18   that, mainly because I think the JSN and UMB pulled their

19   policy argument when they said in their reply brief that our

20   interpretation would have little effect at all, because they

21   can --

22        THE COURT:  Okay.  But just come back to my question.

23   My question is how will my reserving decision on this issue

24   affect the evidence that the parties will introduce at trial.

25   It didn't seem to me that it would have any effect whatsoever.

RESIDENTIAL CAPITAL, LLC, ET AL.                          99

1          MS. LEVITT:  I don't think it has an enormous effect.

2     As they said, I think it has the exact effect they said, which

3     is there's --

4          THE COURT:  Not an enormous effect.  Is that basically

5     conceding this is going to have --

6          MS. LEVITT:  No --

7          THE COURT:  -- an effect --

8          MS. LEVITT:  The effect I think it has is that we do

9     have to --

10         THE COURT:  You'll argue.  It'll lengthen closing

11     argument, or maybe the opening statement but --

12         MS. LEVITT:  Right.  I think --

13         THE COURT:  -- you can spare me the opening statement.

14     I understand the arguments that you're raising.  With a full

15     record it may well affect closing argument.

16         MS. LEVITT:  Your Honor, if I might, I think it's also

17     very important to negotiations, if any, between the parties to

18     understand what the playing field is.

19         THE COURT:  You know, from your lips.  I just -- if I

20     had -- well, I'm going to stay out of this.  I encourage the

21     parties to continue to negotiate and discuss, but I don't think

22     it's going to make any difference.

23         MS. LEVITT:  Well, it would make a difference, Your

24     Honor, maybe --

25         THE COURT:  Let's not talk about it.

RESIDENTIAL CAPITAL, LLC, ET AL.                    100

1          MS. LEVITT:  Okay.

2          THE COURT:  You know, the parties will either settle

3    or they won't, frankly.  Go ahead.

4          MS. LEVITT:  The other point, in terms of case law,

5    Your Honor, so we think DeNofa is directly and precisely on

6    point.  I did --

7          THE COURT:  It's not directly and precisely on point.

8    It deals with debtors and nondebtors.  It's not.  It's quite

9    distinguishable for that reason.

10         MS. LEVITT:  Okay.  I mean, Your Honor, our view is

11   that the issue is that you can only look to the estate and not

12   pull in anything from outside the estate.

13         THE COURT:  Okay.

14         MS. LEVITT:  I just wanted to --

15         THE COURT:  You can only look to the estate, but it

16   doesn't answer the question if there are fifty-one debtors

17   within the bankruptcy case do you aggregate the fifty-one or do

18   you look to one?  Do you look one by one?  I mean, that's -- so

19   I don't think that helps you.

20         MS. LEVITT:  Your Honor, I did want to correct what I

21   had said before about Colliers.  In DeNofa, in the citation

22   it's 5 Collier on Bankruptcy, paragraph 506.04.  There they did

23   say, "For purposes of Section 506(b) a secured claim is

24   oversecured to the extent that the value of the creditor's

25   interest in the estate's" -- singular -- "interest in property

1  is greater than the amount of the creditor's pre-petition

2  claim".  So --

3          THE COURT:  But that doesn't really --

4          MS. LEVITT:  I --

5          THE COURT:  -- answer the question.  Because that

6  doesn't deal with fifty-one petitions and --

7          MS. LEVITT:  But Your Honor, we're not substantively

8  consolidated, and --

9          THE COURT:  That point, I'm quite aware of, and -- all

10  right.  Go ahead.

11         MS. LEVITT:  So, let me just, if I could, just address

12  the two cases that they spent the most time on, which is SW

13  Hotel Venture.  It's importantly in that case, and I know Your

14  Honor's read our briefs, but in addition to no analysis of the

15  statutory issues that we've raised here, the debtors were

16  substantively consolidated.  Again, not at all the same

17  issue --

18         THE COURT:  I'm well aware of that.

19         MS. LEVITT:  Okay.  And the Court specifically said

20  he --

21         THE COURT:  I thought that that decision is going to

22  be more important when we talk about counterclaims than --

23         MS. LEVITT:  Okay.  And then in Revolution Dairy, it's

24  a transcript of a cash collateral or adequate protection

25  decision, it's not a question of determining post-petition

1    interests --

2            THE COURT:  That's why I think it's when I say -- I

3    think it's misused by the JSNs or UMB with respect to the

4    argument on the counterclaim.  It clearly isn't -- I read the

5    case, at least, as an issue of valuation to determine whether

6    there's entitlement to post-petition interest; whether the

7    creditor is oversecured.  I don't read it as an issue -- I

8    don't read the case as determining whether there's been a

9    diminution in the value of collateral such that to be entitled

10   to recover for that diminution.

11           MS. LEVITT:  Okay.

12           THE COURT:  I mean, I read Judge Deasy's decision as

13   focusing on the valuation -- the complicated valuation of an

14   estate for purposes of determining whether the creditor's

15   entitled to post-petition interest and determining that where

16   there's been a sale, the sale value is probably the best value

17   to look at.

18           MS. LEVITT:  And, Your Honor, for the sake of

19   completeness, in the argument I would just note as a footnote,

20   that in Revolution Dairy, the Court finds that he can neither

21   aggregate or allocate to come up with oversecurity.  He

22   actually chooses to allocate.

23           THE COURT:  Okay.

24           MS. LEVITT:  So it's not really an aggregation case.

25           I wanted to point out on 1027, Your Honor, that

RESIDENTIAL CAPITAL, LLC, ET AL.                    103

1   there's a Second Circuit case, and a case similar to the VAJI

2   case they cite called Press, both of which reject the concept

3   of consolidation of debtors.  And in fact in the In re: Press

4   case the we cited, the Court is very clear that it rejects

5   1027, that personal that --

6            THE COURT:  I was quite clear to Mr. Zensky that --

7            MS. LEVITT:  Yeah.

8            THE COURT:  -- that I'm not particularly persuaded by

9   1027 argument.

10            MS. LEVITT:  Okay.  So then the last argument --

11            THE COURT:  It would carry you way too far.

12            MS. LEVITT:  Okay.

13            THE COURT:  Go ahead.

14            MS. LEVITT:  It reads subcon into the --

15            THE COURT:  Yes.

16            MS. LEVITT:  -- the provision.  Your Honor, then I

17   guess the last point I'd like to make is really sort of a, I

18   guess, equitable one.  Which is, the junior secured notes in

19   UMB here cannot square their request that the collaterals

20   aggregated for post-petition interest purposes with their

21   consistent arguments for disaggregation with respect to

22   disqualification of a common counsel as one example, but most

23   importantly they demanded that their deficiency claims be

24   calculated on a debtor-by-debtor basis, a disaggregated basis.

25   That gave them the largest recovery, it gave them the largest

1  deficiency claim, it is the only reason they got to par.  So in

2  pre-petition negotiations, they asked the debtors to --

3            THE COURT:   I don't want to know about negotiations.

4            MS. LEVITT:  Okay.  So every claim and every -- the

5  PSA's here, have all been set up with the understanding that

6  deficiency claims would be done on a disaggregated basis, so

7  it's -- I think here they're asking to have their cake and eat

8  it, too.  And, Your Honor, that just doesn't seem like the

9  optimal way to approach this case.

10            THE COURT:  All right.

11            Ms. Foudy?

12            MS. LEVITT:  Thank you, Your Honor.

13            THE COURT:  Thank you.

14            Whoa, you okay?

15            MS. FOUDY:  Yeah.

16            THE COURT:  Sorry.

17            MS. FOUDY:  For the record, after that entrance.

18  Theresa Foudy of Curtis, Mallet-Prevost Colt & Mosle for the

19  debtors.  I actually was going to address this issue on the

20  motion to dismiss the counterclaims.  The way that this is

21  raised in the counterclaims, is in counterclaims 22 through 25.

22            The first one, counterclaim 22, raises it by seeking a

23  declaration that the lien releases executed by Wells Fargo

24  violated the JSN's lien indenture.  There's no reason -- this

25  will affect the evidence trial.  Because there's no reason --

 1          THE COURT:  I know that.

 2          MS. FOUDY:  -- to have any evidence at trial.

 3          THE COURT:  That I know.

 4          MS. FOUDY:  There's no reason to have any evidence on

 5  trial that issue --

 6          THE COURT:  That won't drive my decision, but I

 7  understand the concept.

 8          MS. FOUDY:  There's no reason to have any evidence at

 9  trial as to whether the lien release has violated the

10  indenture, because the fact is that the collateral agent, as

11  the secured party, under the JSN pledge agreement executed the

12  releases, so they're binding.

13          THE COURT:  How many releases were there?

14          MS. FOUDY:  That's the end of the story.

15          THE COURT:  How many releases were executed?

16          MS. FOUDY:  At this point, Your Honor, there was

17  certainly, as you said, there's more than eight that we

18  attached to our papers.  There actually are more than that.

19  And I do think at trial -- and this sort of goes to the other

20  issues that Mr. Shore was raising.  I do think at trial we are

21  going to have to introduce the releases, and we are going to

22  have to introduce the UCC-3 financing statements.  But that's a

23  very different scope of evidence than talking about whether

24  those things violated --

25          THE COURT:  Right.

1     MS. FOUDY:  -- the indenture, whether they were

2   authorized.  So that, we're prepared to do; we're willing to

3   do.

4     But counterclaim 22, doesn't go to that.  Counterclaim

5   22 --

6     THE COURT:  Let's talk about that, we'll come to the

7   counterclaims, okay?  But talk about your motion.

8     MS. FOUDY:  Yeah, so our motion to dismiss, again, is

9   to dismiss the counterclaims because --

10    THE COURT:  No, let's talk about their motion to

11   dismiss.  Why don't you respond with respect to your -- their

12   motion to dismiss your claim number 3; that's what we're on,

13   right?

14    MS. FOUDY:  Okay.  Well, I mean, I think as Mr. Shore

15   indicated --

16    THE COURT:  Just going to make the same --

17    MS. FOUDY:  -- that very specifically is based on

18   their post-petition lien -- what he calls their post-petition

19   lien theory, that somehow or another the cash collateral

20   stipulation --

21    THE COURT:  Could you address this issue -- Mr. Shore

22   referred to it as the second silo, which were things that were

23   listed in a schedule but not anywhere else?

24    MS. FOUDY:  Sure.  And that is that attached to the

25   UCC-3s, they have a schedule of assets that are released.  And

1    it's quite extensive.  And one of the categories says, "All" --

2    initial caps -- "Subject Mortgage Loans and All Assets, Rights

3    or Property Related Thereto".  This is -- you can see this on

4    the exhibits to the complaint, where certain samples were

5    attached of the releases and the UCC financing statements.  And

6    then if you look at the definition of "subject mortgage loan",

7    it says, "Subject Mortgage Loan means any mortgage loan, A,

8    which is identified in a mortgage schedule delivered under the

9    LLC loan agreement".  And I believe that, as presented in the

10   papers, the argument is that, that is an ineffective UCC

11   release because it doesn't --

12            THE COURT:  Because it doesn't sufficiently identify

13   the collateral in its release.

14            MS. FOUDY:  Now, first of all, even if that's the

15   case, the releases would still be effective.  I mean, really,

16   this is -- the UCC-3 is an alternative argument.  First you

17   have the fact they're released; second you by the UCC-3s you do

18   no longer have perfection.  So that's the first point.

19            The second point is the Uniform Commercial Code only

20   requires that you sufficiently give a description of the

21   collateral so that it can be objectively identified.  This

22   description is perfectly adequate to do that.

23            THE COURT:  Okay.

24            MS. FOUDY:  It states the mortgage loans, which was

25   identified in a mortgage schedule delivered under the LLC loan

RESIDENTIAL CAPITAL, LLC, ET AL.                    108

1   agreement, the AFI letter of credit, the UCC is a notice

2   enquiry statute.  There's enough notice here for anyone to

3   inquire as to what the schedule is and to identify what the

4   mortgage loans are.  That's all the UCC requires.

5              THE COURT:  Was a copy of the schedule given to the

6   collateral agent?

7              MS. FOUDY:  Yeah, I mean, the collateral agent signed

8   this and --

9              THE COURT:  Well, I know they signed it, but --

10             MS. FOUDY:  Well --

11             THE COURT:  -- Mr. Shore says they shouldn't have.

12             MS. FOUDY:  It's in Exhibit A to the UCC financing

13   statement that Wells Fargo filed.

14             THE COURT:  Okay.

15             MS. FOUDY:  They filed it; I assume they saw it, or

16   their knowledge that they saw should be -- could be imputed to

17   them certainly, since they filed it themselves.

18             THE COURT:  Okay.

19             MS. FOUDY:  So do you want me to talk about the rest

20   of the counterclaims now?

21             THE COURT:  Sure.

22             MS. FOUDY:  Okay.

23             THE COURT:  Let's shift over to the counterclaims, all

24   right.

25             Well, hold on.  Mr. Zensky, you want to --

1      MR. ZENSKY:  I had wondered if I could have thirty

2  seconds to respond to Ms. Levitt --

3      THE COURT:  Absolutely.

4      MR. ZENSKY:  -- before we --

5      THE COURT:  Yup, please.

6      MR. ZENSKY:  -- segue to the next issue?

7      THE COURT:  Please do, sure.

8      MR. ZENSKY:  Thank you, Your Honor.  So this is just

9  on the Count V issue, very briefly.  Ms. Levitt said that

10  essentially, our approach to this would be taking from the

11  unsecured creditors, and I think I tried to make clear that

12  that is not the case.  If there is three billion dollars of

13  collateral, whichever debtor pays the post-petition interest --

14  it can be equalized among them so that no asset that otherwise

15  would be available to go to an unsecured, goes to the post-

16  petition interest -- or our claim amount could be reduced as we

17  have the right to do, and Ms. Levitt did not respond to that at

18  all, or explain how that approach harms any unsecured creditor

19  where we go estate by estate.

20      THE COURT:  Well, we she doesn't have to respond to

21  your argument what you may do, what you say you can but you

22  haven't.  So I don't think she has to respond to that at all.

23      MR. ZENSKY:  Well, I appreciate that, Your Honor, but

24  if the argument she's making is that allowing the JSNs to --

25      THE COURT:  Because you may not.  You say you may; you

 1  may not.

 2          MR. ZENSKY:  That's true, but Your Honor could resolve

 3  the motion by dictating that that's the approach taken at the

 4  end of the day that the PPI be paid out of the collateral

 5  available at each debtor only to the extent of the collateral

 6  available.

 7          Secondly with respect to SW, Your Honor, while it is

 8  true that the Court did note that the plan provided for

 9  substantive consolidation, I don't think that that at all

10  directed how the Court decided the aggregate collateral versus

11  single debtor issue.  The Court said at headnote 9 --

12          THE COURT:  What page?

13          MR. ZENSKY:  -- without any discussion --

14          THE COURT:  What page in the decis -- do you have --

15          MR. ZENSKY:  I'm looking at star 26.

16          THE COURT:  I have the Westlaw --

17          MR. ZENSKY:  Then it would be --

18          THE COURT:  -- official.

19          MR. ZENSKY:  -- the page 21 of the Westlaw printout,

20  Your Honor.

21          THE COURT:  Well, I actually have the real West

22  Bankruptcy Reporter --

23          MR. ZENSKY:  Then --

24          THE COURT:  -- page citations.

25          MR. ZENSKY:  -- it might be star 26.  Its headnote 9.

1         THE COURT:  All right, let me find it.  That I have a

2    better chance of finding.  Go ahead.

3         MR. ZENSKY:  Okay, so at headnote 9, the bankruptcy

4    court rules that "For the purpose of making the comparison of

5    the debt owed to secured creditor and the value of collateral,

6    all of the collateral pledged by affiliated debtors who have

7    commenced Chapter 11 cases is considered in determining whether

8    a creditor has a fully secured claim".  And it cites Urban and

9    Fiberglass, I believe.  That says nothing about relying on

10   substantive consolidation.

11        If you then turn, Your Honor, to headnote 13 --

12        THE COURT:  I think the headnotes in the official

13   Reporter don't correspond, but go ahead.

14        MR. ZENSKY:  I'm sorry, this is a sentence that

15   begins, "The Court unequivocally rejects".

16        THE COURT:  It doesn't correspond, so -- but go ahead

17   and read it to me.

18        MR. ZENSKY:  I'm sorry, Your Honor.  Would it be

19   helpful if I handed you a --

20        THE COURT:  No, just go ahead and read it to me.

21        MR. ZENSKY:  Okay, at headnote 13, the bankruptcy

22   court rules, "The Court unequivocally rejects the argument made

23   by the debtors that each affiliated debtor's assets and

24   liabilities, including the debt owed to Prudential, must be

25   compared on a piecemeal basis for purposes of determining

1   whether Prudential has a fully secured claim, particularly in

2   view of provisions of the plan".  But it doesn't say because of

3   the provision of the plan.  It then goes on to say -- to state

4   the rule of law at headnote 14, "For purposes of determining

5   the value of a creditor security under 506(a), the Court is

6   solely concerned with property in which the debtors", plural,

7   "have an interest".

8          THE COURT:  But once these substantively consolidated

9   the cases, it doesn't --

10         MR. ZENSKY:  Well, then what would be the point of

11  having this discussion?  If all the assets were merged and the

12  claims were --

13         THE COURT:  He has the discussion after saying that

14  the cases have been substantively consolidated.

15         MR. ZENSKY:  It would be a lot of legal briefing and

16  decision for no reason at all, Your Honor.

17         It then concludes, after he states that law, he says

18  that his decision is consistent with the debtor's merger for

19  purposes of plan payments.  But I don't believe that the court

20  is saying only where there is substantive consolidation should

21  you take this approach; you can't tease that out of this

22  decision.

23         So irrespective of the distinctions that others might

24  have been agreed and query why a debtor would ever agree to

25  aggregate collateral if there was an argument not to that would

RESIDENTIAL CAPITAL, LLC, ET AL.                    113

1  result in having an ability to fight post-petition interests,

2  rather than pay it, I don't think that that's a fair and

3  complete distinction of this case.

4            THE COURT:  Okay.  Thank you.

5            Mr. Shore?

6            MR. SHORE:  Yes, also some follow up points so we can

7  close out this motion.

8            Chris Shore from White & Case on behalf of the Ad Hoc

9  Group.  Let me just be clear the bucket 2, because we can deal

10 with it on the next motion.  The schedules originally attached

11 to the UCC were seen by Wells.  Ms. Foudy read to you the

12 section that says they can deliver schedules under the Ally

13 LOC.  Those were never delivered to Wells.  We didn't get those

14 documents until post-petition.  That's why we've been pushing

15 for that CFDR database, because that's where the debtors

16 tracked what was on various schedules.  So bucket 2 is defined

17 whatever Ally and the debtors agreed on a schedule after the

18 submission of the UCC-3, after the sign of the release and

19 whether or not they were authorized in that instance to just

20 take things that were our collateral and make them not our

21 collateral by putting them on the schedule.

22           THE COURT:  Sounds like you have a gripe with Wells.

23           MR. SHORE:  We may have a gripe with Wells, but we

24 also have a right as against the debtors to pursue our liens

25 for things that were not properly --

RESIDENTIAL CAPITAL, LLC, ET AL.                    114

1          THE COURT:  We'll see.

2          MR. SHORE:  -- properly released.  Right.

3          Ms. Levitt pointed to Section 10 of the JSN pledge

4   agreement and said that releases define what is collateral.

5   That's not true, collateral is only defined in the definition

6   section by reference to Articles 2, 3, 4 and 5, not 10.

7          With respect to the revived liens, I think counsel was

8   pointing out as evidence that the Ally LOC -- or Ally was

9   granted liens in that collateral and that would be inconsistent

10  to double grant.  If you look at Section 5(g)(3) of the

11  stipulations, it expressly makes whatever liens we have

12  subordinate to Ally's liens in connection with the

13  intercreditor agreement.  So Ally would have been indifferent

14  to whether or not we were granted liens.

15         And then finally to Your Honor's questions about it

16  being logical, that it would be logical that it just held the

17  status quo.  It's only logical if the cash collateral orders

18  the status quo order and doesn't affect the party's rights.

19  The debtors have consistently taken the position that the

20  status -- that the cash collateral order was a way of

21  materially modifying the party's rights to the collateral.

22  That's why they take the position that they're entitled to

23  spend 800 million dollars of cash collateral to -- and reduce

24  our secured claim.

25         So logic begs the question, was this a status quo

1  order in which everybody was left the same way they would be

2  had they not entered into the order, or was this modifying the

3  party's rights?  Under the express terms of the order as

4  written, unless Your Honor finds it's ambiguous, they granted

5  an -- well, sorry, they stipulated to liens on collateral; they

6  filed a count in this action which is contrary to this

7  stipulation.  All we're asking is that the count be

8  dismissed --

9           THE COURT:  See I don't --

10          MR. SHORE:  -- in accordance with the order.

11          THE COURT:  I don't think it's incons -- it's only --

12  it's not inconsistent if -- I mean, I don't think it's

13  inconsistent.  Their argument is they stipulated that whatever

14  collateral you have is your collateral and they're not going to

15  challenge it.  They didn't stipulate that collateral that had

16  been released and is no longer, according to them, collateral.

17  They haven't stipulated that your rights were revived.  So I

18  don't find their position -- I don't think -- I don't see it

19  taking inconsistent positions.

20          MR. SHORE:  Just focusing --

21          THE COURT:  Okay.

22          MR. SHORE:  -- on the express language they stipulated

23  to what met capital-C "Collateral".

24          THE COURT:  I reread that a bunch of times.

25          Okay, let me ask before -- we've got to get to the

1    counterclaims.  I'm trying to judge how long people are going

2    to be with argument.

3              Mr. Horowitz?

4              Because I may take a lunch break, that's probably not

5    what anybody wants to do other than me.  It may be raining

6    outside.

7              MR. HOROWITZ:  Your Honor, we have four issues on the

8    counterclaims.  Adequate protection, the liens on avoidance

9    actions and commercial torts, default interest and the

10   equitable lien issues.  I'm going to argue three of those; Ms.

11   Foudy's going to argue the equitable lien issues.  We're

12   clearly going to take longer than before the lunch break.

13             THE COURT:  All right.

14             MR. HOROWITZ:  But I could probably get through one of

15   them.

16             THE COURT:  No, let's take -- we're going to take our

17   lunch break until 2 o'clock.  We'll resume at 2 o'clock.

18             MR. HOROWITZ:  Okay.

19             THE COURT:  Okay.  And we'll start with your

20   arguments.  Okay?

21             MR. HOROWITZ:  Thank you, Your Honor.

22             THE COURT:  All right, thank you.

23             MR. ZENSKY: We also have the UMB motion to amend or

24   confirm the answer which is on the agenda.

25             THE COURT:  Yes, I read the stack, about the inch-and-

 1    a-half of paper about the answer, so I've read it all.  I know

 2    it's on.

 3              MR. ZENSKY:  Okay, thank you.

 4         (Recess from 12:35 p.m. until 2:01 p.m.)

 5              THE COURT:  Please be seated.  All right, court's back

 6    in session.  Residential Capital, number 12-12020.  Mr.

 7    Horowitz?

 8              MR. HOROWITZ:  Good afternoon, Your Honor.  Gregory

 9    Horowitz from Kramer Levin on behalf of the creditors'

10    committee.

11              As I was saying just before the lunch break, Your

12    Honor, in this partial motion to dismiss, we are raising four

13    issues that were teed up in the JSNs' counterclaims, and as to

14    which the parties have fully joined issue.  Each of these

15    issues we believe is capable of decision as a matter of law.

16    The resolution of each of these would substantially advance the

17    case, significantly clarifying and narrowing the issues for

18    trial.  And while I think I have an idea of how Your Honor's

19    going to respond to me saying this, each would also hopefully

20    narrow the gap between the parties that's preventing a

21    consensual resolution.

22              The first issue I want to talk about, Your Honor, is

23    adequate protection.  The issue here is what is the proper

24    measure of whether and to what extent the JSNs are entitled to

25    an adequate protection claim that could increase the value of

1    their secured claim for purposes of determining their

2    entitlement to post-petition interest.

3          The JSNs teed up these issues in counterclaims 26

4    through 30.  And specifically, in counterclaim 26, the JSNs

5    assert that "the debtors' use of cash collateral for purposes

6    other than acquiring or creating replacement collateral,

7    constitutes a per se diminution in the value of the

8    collateral."

9          So they do allow -- the JSNs do allow that if the

10   debtor used cash collateral to fund advances, which are then

11   part of the JSN's collateral, they're not saying that that

12   constitutes a diminution in value.  But they are saying that

13   every other use, every other dollar of their cash collateral,

14   that's been spent in this case, for example, to fund the

15   servicing activity that's necessary to actually realize the

16   revenues from their loans, collect loan payments, collect their

17   advances, all of which creates new cash collateral for them,

18   liquidates their collateral, ran the sale process that

19   maximized the value of their collateral for the Ocwen and

20   Walters sales, and was highly successful.  They contend that

21   every dollar thus spent constitutes -- results in a dollar-for-

22   dollar adequate protection claim.

23         Now, in the alternative, the JSNs ask that if Your

24   Honor does find that some administrative expenses may not

25   result in diminution in value, they say that we have to

1  "provide an exact quantum of those expenses on a debtor-for-

2  debtor basis, and net of any new replacement collateral value,

3  that represents the direct costs of preserving, protecting, or

4  monetizing the collateral.  So they're going to -- they would

5  ask to get into a detailed forensic inquiry of how every dollar

6  was spent and for what purpose.

7         And in the thirtieth counterclaim, they ask in the

8  alternative to just revisit the method by which the debtors

9  allocated cash -- the cash collateral among buckets.

10        THE COURT:  Let me ask you this.  What is the

11  committee asking the Court to do, to determine as a matter of

12  law, with respect to the diminution in value of collateral?

13        MR. HOROWITZ:  Well, I'm going to be very explicit

14  about that --

15        THE COURT:  Let me just --

16        MR. HOROWITZ:  -- but I'll jump to it in the first

17  instance.  Your Honor, we think that the determination of

18  diminution in value is controlled by the cash collateral order.

19  And under the language of the cash collateral order, which is

20  consistent with law, the inquiry is a simple one.  It's what

21  was the value of the JSNs' collateral at the date that adequate

22  protection liens were granted, which in this case was as of the

23  petition date; and what is the current value of their cash

24  collateral -- or not their cash collateral, I'm sorry -- their

25  collateral -- their aggregate collateral.

1     THE COURT:  So I understand you're asking that.  What

2  I don't fully grasp is how that translates into the motion to

3  dismiss various counterclaims.  I mean, what it really looks to

4  me is that I mean, some of them, it's clear, if, for example,

5  with respect to your motions to dismiss the counts dealing with

6  the release of collateral.  I understand what you're asking for

7  there.

8     But with respect to diminution in value of collateral,

9  it almost seems to me you're asking for a declaratory judgment

10 and not really asking me to dismiss specific counts of the

11 counterclaims.

12    MR. HOROWITZ:  Well, to be very specific, Your Honor,

13 I think this -- we are technically accurate here.  Counterclaim

14 26, for example, asks for a declaration that the JSNs have

15 experienced a dollar-for-dollar diminution in value for every

16 dollar spent; that every dollar spent constitutes a per se

17 diminution in value.  We're asking Your Honor to dismiss that

18 claim as a matter of law, that that is an incorrect

19 statement -- an incorrect assertion as to the legal standard

20 for adequate protection.

21    Counterclaim -- you know what, I don't have it written

22 down here, but my recollection is it's 28, in paragraph 222 --

23 asks Your Honor to do -- to make a determination as to the

24 exact quantum of expenses that were incurred in connection with

25 their collateral, which we maintain, with a proper

1    understanding of the standard for adequate protection, is

2    completely irrelevant.  So we're asking Your Honor to dismiss

3    that counterclaim.

4            Counterclaim 30 asks in the alternative for them to be

5    allowed to revisit the basis on which administrative expenses

6    were allocated among different buckets of cash collateral.  We

7    think that that's wrong, and we're asking Your Honor to --

8            THE COURT:  How can I --

9            MR. HOROWITZ:  -- dismiss that.

10           THE COURT:  -- decide whether any of the

11   administrative expenses that were paid for from cash collateral

12   may properly be chargeable against the JSNs' collateral?

13           MR. HOROWITZ:  We don't think that there's any

14   reason -- need for Your Honor to decide that.

15           THE COURT:  Okay.

16           MR. HOROWITZ:  And I'll get to that in due course, but

17   in -- to cut to the chase, under the standard -- under the

18   adequate protection diminution in value protection that the

19   JSNs were given and agreed to in the cash collateral order,

20   they're only entitled to compensation for any diminution in the

21   value of their --

22           THE COURT:  Yeah, and I understand that.  And I --

23   look, and I thought -- particularly in your reply, a point that

24   jumped out at me when I read their objection, is that the

25   distinction between an adequate protection package granted at

1  the outset of the case, and what a secured creditor may

2  recover, which is for the -- and you quote the language of the

3  order where it talks about the aggregate diminution in value,

4  that leaves a lot of questions for the Court -- factual

5  questions.

6         Let me ask, just so -- and I know you didn't get very

7  far in your argument, but I -- and I'll let you go on, but let

8  me get out some questions I have that you can deal with now or

9  in the course of your argument.  It'll give you an idea of the

10 questions I have as I've thought through the issues raised by

11 your motion.

12         MR. HOROWITZ:  That's terrific

13         THE COURT:  Okay?

14         MR. HOROWITZ:  That's very helpful.

15     (Pause)

16         THE COURT:  Let me ask you -- let me ask you this

17 question first.  And I'm going to ask this question of Mr.

18 Shore or Mr. Zensky, whosever going to argue on this.  How do

19 you believe the Court must determine whether there has been a

20 compensable diminution in value of collateral for which the

21 JSNs are entitled to be compensated?

22         MR. HOROWITZ:  Well, that's going to be the thrust of

23 my argument.  Can I --

24         THE COURT:  All right.  Go ahead.

25         MR. HOROWITZ:  Okay, great.  Okay.  First of all --

1    and I think Your Honor was going there for -- a minute ago --

2    we think that the most important thing in evaluating adequate

3    protection is to understand this fundamental distinction which

4    we think the JSNs fail to understand, between adequate

5    protection and an adequate protection claim.  To be clear,

6    that's not a terminology that's found in the case law, but the

7    distinction is clear in the case law.

8           MR. HOROWITZ:  We're not asking you to find that

9    there's been no diminution in value.

10          THE COURT:  I know you're not.  I understand that.

11          MR. HOROWITZ:  We're asking you to find that they

12   don't -- they're not entitled to dollar-for-dollar and that

13   it's not necessary to determine how many -- what portion of the

14   cash collateral is spent directly on their -- with regard to

15   their collateral and there's no occasion because the cash

16   collateral ought to resolve this to revisit the allocation of

17   the administrative expenses.

18          THE COURT:  It's that last piece I'm not so sure

19   about, okay, one way or the other.

20          MR. HOROWITZ:  Okay.

21          THE COURT:  Okay?  That's the one piece of what you've

22   said that I'm not so sure about as to whether what the cash was

23   spent on.  I recognize -- I'm assuming it was paid -- it was

24   spent in accordance with the budget.  Go ahead with your

25   argument.

RESIDENTIAL CAPITAL, LLC, ET AL.                    124

1          MR. HOROWITZ:  I'm sorry; with?

2          THE COURT:  Go ahead with your argument.

3          MR. HOROWITZ:  Okay.

4          I think -- I don't want to belabor the point, Your

5    Honor, but I do think it's important to note that they did not

6    reserve their right in the cash collateral order to contest the

7    use of the cash collateral in accordance with the budget.  And

8    there's -- the language about the amount of their adequate

9    protection claim does not --

10         THE COURT:  They're not contesting the use of the cash

11   collateral; they're asserting that they have a right to an

12   adequate protection claim for the diminution in value through

13   the use of cash even -- assuming it was used as permitted in

14   the budget.  That -- I mean that's what I understand them to be

15   arguing.

16         MR. HOROWITZ:  And that's where I think the language

17   of the cash collateral order, when it refers to the aggregate

18   diminution, is saying -- taking into account the use of the

19   cash collateral but taking into the account the impact on other

20   collateral, that's how one determines --

21         THE COURT:  Okay.

22         MR. HOROWITZ:  -- whether or not there's been a

23   diminution in value.

24         And the reason I'm harping on this, Your Honor, is

25   that it does have a substantial impact on how the trial was

1  conducted.  We heard Mr. Shore last week talking about the

2  giant team at Zolfo that's engaged in a detailed analysis of

3  every dollar that the debtors have spent over the course of

4  this case and what the purpose for it was.  That's going to be

5  a substantial amount of evidence at trial that we don't think

6  has any relevance at all to the only question at issue here

7  which is are they entitled to an adequate protection claim.

8         THE COURT:  And you say that arises from the language

9  of the cash collateral order?

10        MR. HOROWITZ:  Yes.  As well as the logic of the fact

11  that an adequate protection claim can get a lender oversecured

12  if the lender wasn't oversecured on day one.  The issue should

13  simply be what was the value of their collateral on day one?

14        If they weren't oversecured on day one, then to be

15  clear they might be oversecured today and entitled to post-

16  petition interest.  And Judge Gerber made clear -- the Fifth

17  Circuit case T-H New Orleans suggests that we might -- we could

18  have said if we show that they're undersecured on day one that

19  they were only -- that they're only entitled to post-petition

20  interest from some intermediate date when the collateral went

21  up in value.  That's not what the plan provides, but I think

22  more consistently with what Judge Gerber said in In re Urban if

23  as a result of all of the events in the case, they are

24  oversecured now or I guess oversecured at any intermediate

25  point but I don't see that ever coming up, under the plan, they

1    get post-petition interest in full from day one.

2              THE COURT:  All right.

3              MR. HOROWITZ:  So that's not an issue --

4              THE COURT:  Okay.

5              MR. HOROWITZ:  -- that we have to deal with.

6              Now, I just want to deal with a couple of canards in

7    their brief.  One was that they say if the law were as

8    plaintiffs assert, "No secured creditor would consent to the

9    use of cash collateral because foreclosure would be a better

10   option."  That makes no sense at all.

11             What we say is, reading the language of the cash

12   collateral order and the law, they are assured that the use of

13   cash collateral and the use of noncash collateral -- because it

14   got substantial adequate protection -- will never result in

15   them getting less than they would have gotten through a

16   foreclosure but they have the potential upside.  Like I said,

17   liquidation's rarely an attractive option; this was a good deal

18   for them.  They're protected on the downside, they get the

19   upside, and as a result, through the course of this bankruptcy,

20   we've managed to bring in enough assets to the estate that

21   under any circumstances they're guaranteed full recovery on

22   their petition date claims.

23             So it's worked out well -- it's a good deal.  It was a

24   good deal for them here and it's a good deal for secured

25   creditors in general which is why they generally do consent to

1  the use of cash collateral.

2          You can contrast that with the deal that they say

3  they're entitled to under the dollar-for-dollar theory which is

4  that they weren't -- they said they're entitled to have their

5  assets run, serviced, the heat and light paid entirely on

6  unsecured creditors' dime.

7          THE COURT:  Maybe Mr. Shore can persuade me, but I've

8  already said pretty strongly that I don't believe the dollar-

9  for-dollar methodology is the correct one.

10         MR. HOROWITZ:  The second co --

11         THE COURT:  I'm not sure I agree with you either; it

12  may be something in-between, but I've got to go back and read

13  the language for the fourteenth time on the cash collateral

14  order.

15         MR. HOROWITZ:  I think that's a good idea.

16         The other canard I wanted to raise was their notion

17  that somehow charging their cash collateral without giving them

18  dollar-for-dollar reimbursement is inconsistent with the 506(c)

19  surcharge waiver.  We've put in our briefs and I think we made

20  it clear there's a difference between a 506(c) surcharge and

21  the requirement that a secured lender show an aggregate

22  diminution in value.

23         The thing I wanted to point out is I want to specially

24  address it's their assertion that this position would render a

25  506(c) surcharge waiver meaningless.  It's not meaningless.  It

RESIDENTIAL CAPITAL, LLC, ET AL.                    128

1    still gives some substantial protection on the downside.  It

2    happens all the time.

3              THE COURT:  Give me an example.

4              MR. HOROWITZ:  Well, if secured lender consents to

5    some limited use of the cash collateral on day one in the hopes

6    that the debtors' plan is going to end up increasing the value

7    of the collateral.  Doesn't happen.  Things go south.  It

8    happens all the time.  Secured lender terminates the use of

9    cash collateral.  The debtor continues to operate the

10   collateral.  Liquidates -- in fact, in this case, by the way,

11   the JSNs did terminate the use of cash collateral and as a

12   result of the 506(c) surcharge waiver we can't say that ongoing

13   expenses are subject to the 506(c) surcharge.  So it has an

14   effect in this case.  But going back to my hypothetical, when

15   things go south even though the senior lender has already

16   suffered a substantial diminution in value, under 506(c) the

17   trustee can take out additional amounts for -- charge the

18   lender additional amounts associated with the preservation and

19   liquidation of that collateral.  With the surcharge waiver, the

20   lender is protected from that.

21             So, A, it's theoretically got relevance --

22             THE COURT:  So they -- stop.

23             MR. HOROWITZ:  -- and, B, it actually had relevance

24   here.

25             THE COURT:  Your position is if the collateral

1    increases in value rather than decreases, then the costs of --

2    I won't use the term liquidating -- selling it as a going

3    concern is chargeable, I guess.

4            MR. HOROWITZ:  Well, my position is that by consenting

5    to the use of cash collateral, the secured lender has consented

6    to having their cash used --

7            THE COURT:  As provided --

8            MR. HOROWITZ:  -- for such expenses --

9            THE COURT:  -- as provided in the budget.

10           MR. HOROWITZ:  Right.  Subject to the possibility that

11   they may get adequate protection if, notwithstanding that use,

12   the value goes down.

13           THE COURT:  Okay.

14           MR. HOROWITZ:  So what we're seeking, I think I said

15   this at the outset is, we want Your Honor to hold the cash

16   collateral order -- dictates here, dismiss counterclaim 26

17   because it's asserting -- it's asking for a declaration that

18   they're entitled to dollar-for-dollar reimbursement --

19           THE COURT:  That's with respect to 26.  Okay.

20           MR. HOROWITZ:  Yes.

21           THE COURT:  I understand your argument on 26.  What

22   about the other counterclaims?

23           MR. HOROWITZ:  27 asks for a ruling that 506(c)

24   surcharge waiver entitles him to the reimbursement of every

25   dollar used.  We want that dismissed.

1           And importantly, counterclaims 28 and 30, which ask

2      for the specific accounting of all expenses and seek a

3      reallocation, we believe should be dismissed and that's really

4      important because that is a huge impact on the potential

5      evidence at trial because we don't think that this second-

6      guessing of the allocation of expenses is permissible under the

7      terms of the cash collateral order.

8           THE COURT:  Okay.

9           MR. HOROWITZ:  Okay.  Moving onto the liens on

10     avoidance actions and commercial torts issue unless Your Honor

11     has any more questions.

12          THE COURT:  Go ahead.

13          MR. HOROWITZ:  The issue here is whether the JSNs have

14     a lien on either any claims that could have been asserted

15     against AFI, against Ally, as of the petition date or any

16     portion of the AFI contribution.  The issue was teed up by the

17     JSNs in counterclaims 7, 9 and 35.

18          Counterclaim 7 seeks a declaration that "All of the

19     recoveries by each debtor or obligor on account of pre-petition

20     causes of action against Ally, including the Ally contribution,

21     constitute additional collateral."

22          Counterclaim 9 asks for a declaration that the JSNs

23     have liens on all avoidance actions.

24          And counterclaim 35 seeks a declaration that specif --

25     that certain -- I think unspecified but basically each

 1   potential claim against Ally identified in the examiner's

 2   report is part of their collateral.

 3          THE COURT:  Let me ask you, does the committee agree

 4   or disagree that the pledge of intangibles gives the JSNs a

 5   lien on litigation causes of action other than commercial torts

 6   and avoidance claims?

 7          MR. HOROWITZ:  Against truth --

 8          THE COURT:  You came back in the reply and you said

 9   well, they finally conceded that commercial -- they have a lien

10   on commercial torts.  You dispute with Mr. Shore whether they

11   have a lien on avoidance claims.  Let's assume I decide that

12   issue your way, do you -- does the committee concede the JSNs

13   have a perfected security interest in the debtors' breach of

14   contract claims against AFI?

15          MR. HOROWITZ:  By the way, I think that the universe

16   of litigation claims that aren't commercial torts or avoidance

17   actions probably is just contract actions.  I guess personal --

18          THE COURT:  Let me ask -- I'm asking -- I don't know

19   whether -- I mean you look to the UC -- you argued the UCC.

20   I'm not sure that's going to be controlling for these purposes

21   but -- so I have both questions written into my notes.  One --

22   when I read over the pledge, that pledged the security

23   documents, nowhere did I see language specifically saying that

24   litigation, causes of action, cause of action are part of their

25   security package.  It doesn't say that.  They seem to be

RESIDENTIAL CAPITAL, LLC, ET AL.                    132

1    relying on the term "intangibles" and, hence, I ask you -- and

2    that is in the pledge language.

3                MR. HOROWITZ:  Okay.

4                THE COURT:  So I'm asking whether the committee agrees

5    that the pledge of intangibles gives the JSNs a lien on

6    litigation, causes of action other than commercial torts and

7    avoidance actions.

8                MR. HOROWITZ:  I think the -- I don't want to hedge

9    too much, Your Honor.  First of all, it's not teed up today.

10               THE COURT:  Well --

11               MR. HOROWITZ:  But --

12               THE COURT:  -- contract actions are; they argue that

13   the tax -- and I know you argue that that's an avoidance claim

14   but the tax allocation agreements, they argue that's a contract

15   claim.  You argue otherwise.  Without --

16               MR. HOROWITZ:  But they're not seeking a declaration

17   today that they have a lien on that.

18               THE COURT:  No, but I -- so we'll focus on this

19   specific question, then.

20               MR. HOROWITZ:  Okay.  And I don't --

21               THE COURT:  Does the committee agree --

22               MR. HOROWITZ:  The answer, Your Honor, is --

23               THE COURT:  -- the JSNs have a lien on breach of

24   contract claims against AFI?

25               MR. HOROWITZ:  No, Your Honor.  We do not concede

1  that.

2            THE COURT:  Okay.  And --

3            MR. HOROWITZ:  We think that against AFI, against

4  their parent outside of bankruptcy, for a variety of reasons,

5  it's just not realistic or plausible --

6            THE COURT:  Well, realistic or plausible --

7            MR. HOROWITZ:  -- to contribute any value to the --

8            THE COURT:  -- goes to the merits of the claim.  So

9  let me ask a different question then.

10           ResCap was preparing a breach of contract lawsuit

11  against a subservicer -- third-party, unaffiliated subservicer

12  through a breach of the subservicing agreement.  Do the JSNs --

13  does the collateral agent, have a security interest in the

14  breach of contract cause of action against the subservicer?

15           MR. HOROWITZ:  Against the third party, Your Honor, I

16  believe the answer is yes.

17           THE COURT:  Okay.  And why, if that's true, why don't

18  they have a lien on breach of contract claims against AFI?

19  What makes that different?

20           MR. HOROWITZ:  I think, Your Honor, that as a

21  practical matter, any action by a debtor -- by a subsidiary

22  against its parent is really a form of avoidance action.  I

23  mean --

24           THE COURT:  Well, you say that but I'm not so sure

25  about that.  I mean avoidance actions -- avoidance actions have

RESIDENTIAL CAPITAL, LLC, ET AL.                    134

1  a relatively short limitations period, even for insider

2  transactions.  New York's got a six-year statute of limitation

3  on breach of contract claims.  So do you -- why wouldn't ResCap

4  have -- one of the ResCap debtors have a -- why couldn't they

5  assert a breach of contract claim against the nondebtor parent

6  AFI, and if they have such a claim does -- do the JSNs have a

7  lien on that claim?

8          You agree --

9          MR. HOROWITZ:  I think it's --

10         THE COURT:  -- that they would have a lien on a

11 contract claim against an unaffiliated third party and it's not

12 clear to me why a different conclusion flows from the fact that

13 it's the nondebtor parent.

14         MR. HOROWITZ:  Your Honor, I think it's arguable.  I

15 think that as a matter of --

16         THE COURT:  So arguable --

17         MR. HOROWITZ:  -- as a --

18         THE COURT:  -- arguable would mean that you wouldn't

19 be able to dismiss a claim in its entirety -- and you say, you

20 start out your reply by saying, ah-hah, they agree that there's

21 no lien on commercial torts and you -- avoidance actions I

22 disagree with you about but --

23         MR. HOROWITZ:  No, we didn't say that they agreed to

24 that one.

25         THE COURT:  On commercial torts you did.

1          MR. HOROWITZ:  No, no, no.  You said avoidance

2    actions --

3          THE COURT:  No, no.  Avoidance actions they don't

4    agree.

5          MR. HOROWITZ:  Right.

6          THE COURT:  I mean clearly -- clearly they don't

7    agree.

8          MR. HOROWITZ:  Okay.

9          THE COURT:  Okay.

10          MR. HOROWITZ:  Actually, we started off that section

11    by saying contrary to what they're saying, we're not asking for

12    a decision --

13          THE COURT:  I know.

14          MR. HOROWITZ:  -- at this point if they don't have a

15    lien on anything.

16          THE COURT:  So what --

17          MR. HOROWITZ:  We're not reaching that issue at the

18    moment.

19          THE COURT:  And when I looked at the causes of action,

20    I mean I -- do I -- the relief that you would be entitled to if

21    you're correct is dismissing count-whatever-it-is in part and

22    not -- it's not dismissed in full because I don't think they --

23    they say they've got a lien on litigation claims.  Litigation

24    claims, commercial torts, they seem to come back and

25    acknowledge you're right on that.  Mr. Shore may not agree with

1   that statement, but more or less it seemed to me they agreed

2   you were right on that.  Avoidance claims they disagree with

3   you on.

4         Breach of contract claims, they firmly believe they've

5   got a lien by virtue of intangibles, a pledge of intangibles,

6   that that's an intangible.  Well, I have to say, it's not self-

7   evident to me that -- I didn't make a life of reading

8   indentures and pledge agreements and everything, but I've read

9   a fair number of them over the years, and I usually remember

10  reading claims, causes of action, et cetera.  That language was

11  usually there.  It's not here.  Unless I missed it, it wasn't

12  here.  They didn't argue it's here.

13        MR. HOROWITZ:  And, Your Honor, I'm not going to

14  concede today because I have to do that work myself, but I'm

15  not going to concede that they have a lien on contract actions.

16        THE COURT:  Okay.

17        MR. HOROWITZ:  Period.  I think that they do have a

18  lien on third-party causes of action but please don't take that

19  as a definitive concession today.

20        THE COURT:  On what theory do you agree that they have

21  a claim on third-party causes of action?

22        MR. HOROWITZ:  Your Honor, candidly, it's in my -- I

23  just made the -- I have made the assumption that intangibles

24  encompass that without doing any study --

25        THE COURT:  Okay.  It may be --

RESIDENTIAL CAPITAL, LLC, ET AL.                    137

1          MR. HOROWITZ:  -- because it's not an issue I've
2    really had to think about.
3          THE COURT:  So that's where I have a problem.  I mean
4    you have, obviously, a giant dispute about -- not as part of
5    the motions to dismiss, about the intercompany claims.  But --
6    so when I read over the counterclaims today, they -- let me see
7    if I made a note of this or not.  I may have marked it in one.
8    Let me see if I can find one.  It was on my mind to put some
9    tabs in here.
10          Whoever's typing on the phone, put your phone on mute.
11          Oh, maybe I wasn't so careful, I didn't mark it.  Let
12    me find claim 7 and see what it says.
13          MR. HOROWITZ:  If you're looking for claim 7, Your
14    Honor --
15          THE COURT:  Yeah.  What page?
16          MR. HOROWITZ:  -- it's on page 63.
17          THE COURT:  All right.  Hold on.
18          Maybe it isn't so.
19      (Pause)
20          THE COURT:  So in paragraph 128, you say, "The
21    defendants contend the reasons set forth, in paragraphs 1
22    through 98 above, that all of the recoveries by each debtor or
23    obligor on account of pre-petition causes of action against
24    Ally, including the Ally contribution, constitute additional
25    collateral."

1      MR. HOROWITZ:  Right.

2      THE COURT:  So that would be causes of action of any

3  kind or nature that say they're getting a release for it so

4  some value's got to be attributable  How you'd ever determined

5  an allocation is beyond me, but let's put that aside for the

6  moment.

7      The first step of it is do they have causes of action

8  as collateral?  You said no as to --

9      MR. HOROWITZ:  We say no as to commercial --

10      THE COURT:  -- commercial torts.

11      MR. HOROWITZ:  -- torts and avoidance actions.  And in

12  paragraph 127, their way of teeing up that there's an actual

13  controversy is to point out that the debtors contend that --

14  or, sorry -- on the third line the committee contends that

15  commercial tort claims and avoidance actions are not subject to

16  the JSN liens.

17      I think it's fair to say, Your Honor, look we're going

18  to have to have an adjudication of whether any potential cause

19  of action --

20      THE COURT:  Yes.

21      MR. HOROWITZ:  -- against Ally is subject to a lien

22  but that's not what's teed up today.

23      THE COURT:  No, but --

24      MR. HOROWITZ:  And it's not --

25      THE COURT:  How do I dismiss the seventh cause of

RESIDENTIAL CAPITAL, LLC, ET AL.                    139

1   action --

2           MR. HOROWITZ:  Well --

3           THE COURT:  -- if -- time out.  Let me finish.

4           MR. HOROWITZ:  Sorry.

5           THE COURT:  Let's assume I agree with you that

6   commercial torts and avoidance actions are not part of their

7   collateral.  Let's assume I agree with that.  It still leaves

8   the question about breach of contract, I don't know what else.

9   Figuring out what's a commercial tort is beyond me for today.

10  All right.  But it's not -- you would have to -- I think you

11  have to agree that commercial torts and avoidance actions are

12  not the universe of potential claims against Ally.  Would you

13  agree with that?

14          MR. HOROWITZ:  I agree that it's not the universe of

15  potential claims.  I think it's the practical -- it's the

16  practically exhaustive list --

17          THE COURT:  Okay, but you agree --

18          MR. HOROWITZ:  -- of potential claims.

19          THE COURT:  That's your --

20          MR. HOROWITZ:  But --

21          THE COURT:  I understand the practical argument.  It's

22  not the universe.

23          MR. HOROWITZ:  It's not the theoretical universe.

24          THE COURT:  Okay.  How do I dismiss the claim?

25          MR. HOROWITZ:  Well, I think you just dismiss it to

RESIDENTIAL CAPITAL, LLC, ET AL.                    140

1    the extent that they seek a lien on --

2             THE COURT:  Dismiss it in part.

3             MR. HOROWITZ:  -- commercial torts or an avoidance

4    action.

5             THE COURT:  Dismiss to the extent they seek a lien on

6    commercial torts and avoidance actions?

7             MR. HOROWITZ:  Yes.

8             THE COURT:  That's what you're seeking?

9             MR. HOROWITZ:  That's what we're seeking and the

10   counterclaim 9 is easier because it's just seeking a

11   declaration that they have a lien on avoidance action.

12            THE COURT:  Yes.

13            MR. HOROWITZ:  So it's a subset of that.

14            THE COURT:  Yes.  So talk about avoidance actions.

15            MR. HOROWITZ:  That is what we're seeking, Your Honor.

16   We are not seeking today a declaration that the JSNs are not

17   entitled to any portion of the AFI contribution.  That is our

18   position and it will be our position at trial.  We take the

19   position that it's not possible to rationally allocate the AFI

20   contribution, that it's inconsis -- allocation would be

21   fundamentally inconsistent with the global settlement.

22            THE COURT:  So what's the single recovery rule?  So if

23   they're right that the tax issue is a breach of contract issue

24   and you're right that it's also an avoidance claim, if they

25   settle the avoidance claim and they get no lien on that and

RESIDENTIAL CAPITAL, LLC, ET AL.                    141

1  they're only entitled to a single recovery, it seems to me they

2  get nothing allocated to the breach of contract claim.

3          MR. HOROWITZ:  Oh, well, that's an --

4          THE COURT:  Maybe.

5          MR. HOROWITZ:  I disagree with your hypothesis that

6  the tax allocation agreement could be --

7          THE COURT:  I'm saying --

8          MR. HOROWITZ:  -- brought in alternative methods.

9          THE COURT:  -- arguably, if they say it's breach of

10  contract, you say it's avoidance, maybe it's both.  It's not

11  uncommon to have multiple theories for recovery, but you only

12  get one recovery.  And so if you settle the avoidance claims

13  and they don't have a claim in it, haven't they -- doesn't that

14  deal with the single recovery, I mean, so they don't --

15          MR. HOROWITZ:  Yeah.

16          THE COURT:  I don't know.  I just -- I'm throwing that

17  out.  I mean I just --

18          MR. HOROWITZ:  That is our -- I think that would be

19  right.  Now, we think -- getting ahead of myself but I do want

20  to talk about the tax allocation agreement -- that it could not

21  be brought as a contract claim.

22          THE COURT:  Um-hum.

23          MR. HOROWITZ:  But I think the answer is yes if it --

24          THE COURT:  I don't have to decide that today.

25          MR. HOROWITZ:  -- if it could have been brought in

1    alternatives --

2              THE COURT:  I don't have to decide that today.

3              MR. HOROWITZ:  No.  And I think it's wholly

4    theoretical because the only way that would come up is if

5    somebody actually filed a complaint seeking to pursue this as

6    an avoidance action and then settled it on that basis.

7              THE COURT:  I mean, you all try to use Judge

8    Gonzalez's examiner's report for certain limited purposes.

9    It's hearsay.

10             MR. HOROWITZ:  Well, let me be clear about that.  Your

11   Honor, we have not relied on anything in Judge Gonzalez's

12   report.  I think that --

13             THE COURT:  Well, you did argue in responding to their

14   argument that the tax allocation is a contract claim.  You

15   point to the language in the examiner's report that talks about

16   fraudulent conveyance.  You do.

17             MR. HOROWITZ:  Well, only to say that we weren't the

18   only ones to think of that.

19             THE COURT:  Oh, you weren't relying on it for that

20   purpose?

21             MR. HOROWITZ:  No.  We were not relying on it as

22   authority, absolutely not, Your Honor.

23             THE COURT:  Okay.

24             MR. HOROWITZ:  And frankly --

25             THE COURT:  I missed that point.

1          MR. HOROWITZ:  -- the way -- the only way the

2     examiner -- issues of evidence can be subtle but I do think

3     that that's accurate.

4          THE COURT:  Well, it works both ways.  It's hearsay as

5     to all of you.  I -- I don't know.  It's not evidence.  Period.

6          MR. HOROWITZ:  I agree that it's not evidence.

7          THE COURT:  It's a very well done report that

8     identifies a lot of potential claims.

9          MR. HOROWITZ:  And we have no intention of relying on

10    it.  The only way I think it comes up at all, frankly, is that

11    their counterclaim 35 refers to it in a way incorporates it by

12    reference by saying we want a declaration that each of the

13    claims identified in that report is subject to a lien.  That

14    makes us look at the characterization of the claim in the

15    report because there's no other way to understand what they're

16    asking for in counterclaim 35.  So I think --

17         THE COURT:  Okay.

18         MR. HOROWITZ:  -- it's impossible to put any meat any

19    it --

20         THE COURT:  Right.

21         MR. HOROWITZ:  -- or respond to it without looking to

22    and in some way referring to the examiner's report without

23    citing it as evidence.

24         THE COURT: All right.  Go ahead.

25         MR. HOROWITZ:  So we're not ask -- we -- we're not

1    asking for a decision that all conceivable claims are not

2    subject to lien today but we are asking for the declaration

3    with regard to commercial torts and avoidance actions because

4    that will take a substantial step towards establishing or

5    giving Your Honor comfort --

6              THE COURT:  But you're going to continue to fight out

7    what's a commercial tort.  I mean you can't agree -- you

8    haven't been able to agree on that.

9              MR. HOROWITZ:  That's true.  We can't agree on that.

10   I don't think that they've disagree that -- they didn't cite

11   any authority suggesting that to the extent veil piercing and

12   alter ego claims are independent causes of action as opposed to

13   paths for recovery supporting another cause of action that they

14   are -- that they are a form of commercial tort.

15             In the Second Circuit, Judge Pollack's opinion in

16   Central Vermont Public Service clearly treats alter ego and

17   veil piercing as independent causes of action and while the

18   JSNs may not believe that there are viable claims of those

19   sorts, certainly the committee and Wilmington Trust spent a lot

20   of time seeking authority to pursue such claims.

21             THE COURT:  What does the New York Court --- what does

22   the New Your Court of Appeals think about it?  Have they spoken

23   to it?

24             MR. HOROWITZ:  I have not seen any New York Court of

25   Appeals authority and we did look fairly exhaustively on this.

RESIDENTIAL CAPITAL, LLC, ET AL.                    145

1           THE COURT:  Okay.

2           MR. HOROWITZ:  Not a whole lot of case law on it.

3           THE COURT:  All right.  Go ahead.

4           MR. HOROWITZ:  But it was enough that the committee

5   sought -- was seeking standing at the time that the settlement

6   was.

7           THE COURT:  Yes.

8           MR. HOROWITZ:  So that's it on commercial torts and

9   it's a building block, Your Honor.  That's what it is.  It's a

10  building block towards getting to the AFI contribution is not

11  subject to JSN lien.  Avoidance actions is a very large

12  building block.

13          THE COURT:  So it seemed to me that their argument

14  about avoidance actions had a couple of separate prongs to it.

15          One, they specifically address the same release issue,

16  lien release issue.  They say, well, it wasn't -- there was

17  never -- the liens were never released.  The property was

18  transferred.  When it comes back -- if it comes back in an

19  avoidance action, it comes back with the lien still attached.

20  And so it seems to me that that then gets to the twen -- or

21  whatever those claims are, 25 -- 22 to 26 or whatever, that do

22  they -- what's the effect of the lien release in UCC-3s?

23  That's part of -- so part of their avoidance action claim is

24  that some of the assets that were transferred were assets that

25  they believe remain subject to their security interest.

1    I read that over again this morning.

2            MR. HOROWITZ:  Although they're fairly --

3            THE COURT:  Do you agree with this?

4            MR. HOROWITZ:  I hadn't drawn the same conclusion that

5    Your Honor did about this -- about their theory of relying on

6    the equitable lien theory.  I did take it as their assertion,

7    look, we have a blanket lien.  They make very conclusory

8    allegations that on information and belief the funds that were

9    used to pay for -- for example, for the -- on account of the

10   DOJ/AG settlement constituted collateral.  So it's cash.  You

11   know, it's fungible.  They say on information and belief that

12   cash was subject to our lien.

13           THE COURT:  Tell me this.  What -- in the committees'

14   view what transfers to AFI during the preference period were

15   potentially avoidable?  Not -- you don't have to give me the

16   whole list but what were the categories of transfers of

17   property to AFI during the preference period that the committee

18   believed it could assert against AFI if it litigated the

19   claims?

20           MR. HOROWITZ:  Your Honor, I can't even give a partial

21   list but if you want the list --

22           THE COURT:  I do.

23           MR. HOROWITZ:  -- Mr. Eckstein can give you the list.

24           THE COURT:  Come up to the microphone.

25           MR. ECKSTEIN:  You want me speak to it right now?

1            THE COURT:  Yes.  I do.  Yeah.

2            MR. ECKSTEIN:  Your Honor, I think first in fairness,

3    I would defer to my partner, Mr. Simon, who actually did the

4    spade work on a whole range of investigation issues and if we

5    have to get to that, I think it will be appropriate to walk

6    through it.  Adequate protection is what a debtor must provide,

7    either as a result of consensual negotiation or through a Court

8    order and a nonconsensual use of collateral.

9            At the outset, when adequate protection is requested,

10   to protect the lender from the possibility that the use of the

11   collateral, be it cash or noncash, might, in the language of

12   361, result in a decrease in the value of such entity's

13   interest in the property, the relevant date, Colliers make

14   clear a number of cases that we've cited, and, in fact, even

15   that the JSNs cite make clear that the relevant date is the

16   date that the adequate protection is granted, in this case the

17   petition date, that it's granted as of the petition date.

18           The latter, what we've referred to as the adequate

19   protection claim, is the amount the lender can realize from

20   that adequate protection package if, and only if, a diminution

21   in value actually occurs over the course of the case.  And we

22   cite Your Honor's decision in Metaldyne, which we think gets

23   this distinction perfectly.  In Metaldyne the Court approved

24   the use of cash collateral subject to adequate protection liens

25   on unencumbered foreign stock, and Your Honor observed:

1          "Of course, if it turns out that the pre-petition term

2   lenders suffer no actual diminution in value, the pre-petition

3   term lenders will never call on the additional collateral and

4   the value will be available to unsecured creditors."

5          THE COURT:  Let me give you a hypothetical, all right?

6   So let's assume that cash collateral at day one of the case

7   consists of 500 million dollars in cash and a billion dollars

8   in securities, assets, et cetera.  All right.  And let's assume

9   that the debtor uses 250 million dollars of the cash, but let's

10  assume that during the course of the case the noncash assets

11  increase from 1.5 billion to 1.75 billion.  But one other

12  assumption.  Assume that the secured creditor has a claim of

13  two billion dollars, so they're under -- well, assume it's two

14  and a half billion dollars.  Assume they're undersecured.

15  Okay.  They're undersecured by 500 million dollars, arguably,

16  at day one.  Two hundred and fifty million in cash gets used.

17  There's a 250 million increase in the value during the life of

18  the case in the noncash collateral.  In that hypothetical is

19  the secured creditor entitled to recover for diminution in the

20  value of collateral?

21          MR. HOROWITZ:  Well, I think the answer is controlled

22  by the terms of the adequate protection the creditor was given

23  on day one.  In a situation where there's a consensual cash

24  collateral order the lender may negotiate.  They usually do

25  negotiate for, first of all, potentially restrictions on the

RESIDENTIAL CAPITAL, LLC, ET AL.                    149

1   use of the cash collateral, restrictions on the purposes that

2   the cash collateral can use, and here I think I may be jumping

3   to a modification of the hypothetical that I suspect Your Honor

4   may be going to about what if some portion of that cash was

5   used for other purposes.

6        And the lender may negotiate for a specification on

7   day one of what will be the measure of whether or not a

8   diminution in value has occurred.  Just to use an example, in

9   the Dewey case, when Mr. Eckstein represented the secured

10  lenders, the cash collateral order that was entered there has a

11  very specific statement about what the diminution in value

12  claim will be deemed to be; no more, no less.  So the

13  methodology for determining the diminution in value was

14  negotiated and specified on day one.

15       Absent that, it's up to the Court to decide in a

16  nonconsensual use of cash collateral what measures are

17  necessary to meet the 361 standard.  Here we don't have that

18  situation.

19       THE COURT:  Well --

20       MR. HOROWITZ:  We have a consensual cash collateral

21  order that specifies exactly what the measure of diminution in

22  value will be.

23       THE COURT:  I'm not sure it does.  I mean, because

24  here's what -- I mean, this is what's bothering me, Mr.

25  Horowitz.  If the creditor is undersecured and the value of its

RESIDENTIAL CAPITAL, LLC, ET AL.                    150

1   collateral increases during the course of the case, but they're

2   still undersecured, who gets the benefit of the increase in

3   value of the collateral?

4        MR. HOROWITZ:  Well, I don't think there's any

5   question that the secured lender gets the benefit of that

6   increase in the collateral.

7        THE COURT:  Okay.  Because it --

8        MR. HOROWITZ:  The question is how do you measure what

9   that collateral is.

10        THE COURT:  All right.  But it seemed to me that what

11   your argument does is you seem to be saying as long as the

12   value of the collateral increases in the case you can use the

13   cash for whatever you want, for whatever purpose you want, as

14   long as the aggregate value doesn't drop below what it was on

15   day one, which, seems to me, deprives the secured lender of the

16   increase in value of collateral during the course of the case.

17        MR. HOROWITZ:  Well --

18        THE COURT:  Maybe I'm misconceiving something, but --

19        MR. HOROWITZ:  The first thing that I need to stress

20   here is that the secured lender can, in connection with

21   negotiating the consensual cash collateral order, insist on

22   restrictions on the use of cash collateral.  In fact, that did

23   happen here.  The cash collateral order has a budget, which is

24   attached.  It specifies how much of the JSN's cash collateral

25   can be spent in accordance with that budget, requires updating

1  of budgets, subject to AFI's reasonable consent in this case,

2  because there was an intercreditor agreement, and there's no

3  allegation, to my understanding, that the debtors ever violated

4  that budget, ever spent cash collateral other than within the

5  terms that it was consented to and approved.

6          There did come a time that the cash collateral order

7  expired, or was due to expire, and the parties recognized that

8  in light of the sale of a large portion of the JSN's assets the

9  original allocation methodology would have to be changed.  They

10  tried negotiating.  There were, as Your Honor recalls, a number

11  of --

12          THE COURT:  Endless hearings when this kept getting

13  put over and put over and you'd --

14          MR. HOROWITZ:  Yes.

15          THE COURT:  -- extend orders, tinker with it.

16          MR. HOROWITZ:  And sometime in the middle of that I

17  was fortunate enough to be called back into the case.

18          But at all points in time the debtors' use of cash

19  collateral was in accordance with these extended stipulations,

20  which had increasing amounts of restriction, until, ultimately,

21  the debtors brought a nonconsensual cash collateral motion, but

22  then decided to forego the use of cash collateral, subject to

23  the possibility of us essentially revisiting the nonconsensual

24  cash collateral fight, which is not an issue that's teed up for

25  today.  But the main point here is that at all times the

RESIDENTIAL CAPITAL, LLC, ET AL.                    152

1  debtors' use of the cash collateral was consistent with the

2  restrictions that were negotiated and --

3          THE COURT:  So, in your view the outcome is completely

4  determined by the terms of the cash collateral order.

5          MR. HOROWITZ:  In this case, yes.  And in a

6  nonconsensual case we could have an interesting discussion

7  about what the Court would have to do with regard to limiting

8  the use of cash collateral or providing that to the extent that

9  the cash was not used for purposes that related to the --

10          THE COURT:  So even your view is that even if the

11  debtors' use of cash collateral reduced the aggregate value of

12  the secured creditors' interest in the collateral as of day one

13  they don't get anything.

14          MR. HOROWITZ:  No.  If the aggregate value goes down

15  they're protected.

16          THE COURT:  Well, that's why I give you a hypothetical

17  where you use cash but it happens that the noncash assets,

18  because the market has changed, they increase in value.

19  They're not getting the benefit of it, because you're saying

20  too bad.  We can continue spending the cash as long as there's

21  no diminution in the aggregate value of cash and noncash.  The

22  fact that the market resulted in an increase in the value of

23  the noncash, because we found a buyer who was willing to pay

24  more or whatever, doesn't your argument deprive the secured

25  lenders of an increase in the aggregate value of cash and

1    noncash assets, because you say as long as that total -- if the

2    total was a billion and a half on day one, if it stays a

3    billion and a half, even though the debtor spent the 500

4    million in cash that they had on day one, as long as the

5    noncash assets have increased in value to a billion and a half

6    that's too bad.  They're in exactly the position they were on

7    day one, but they don't get the benefit of the market having

8    increased the value of the noncash assets.  Isn't that your

9    position?

10             MR. HOROWITZ:  It is my position under the terms of

11   this cash collateral order, but I also need to get into the

12   more interesting economic question here, which is in your

13   hypothetical it wasn't clear to me -- I mean, you made it clear

14   that the diminution in the amount of cash --

15             THE COURT:  Well, the cash just --

16             MR. HOROWITZ:  -- was offset by an increase in the

17   value.

18             THE COURT:  The debtor is spending the cash, and it

19   just happens that, because of the marketplace, the noncash

20   assets increase in value equally.

21             MR. HOROWITZ:  But that's an -- the just happened --

22             THE COURT:  I'm giving you that assumption.

23             MR. HOROWITZ:  The just happens is something that's

24   open to question.  It's entirely possible that the use --

25             THE COURT:  That's what hypotheticals are good for.

1          MR. HOROWITZ:  Of course.  But if the debtors use 250

2     million in cash and the noncash collateral increases by 250

3     million there's a real open question as to whether the use of

4     the cash was what caused the in --

5          THE COURT:  Okay.

6          MR. HOROWITZ:  -- or facilitated the increase in

7     value.

8          THE COURT:  So I would have no problem with your

9     argument if the 250 million in cash was used to purchase

10     replacement assets that became part of their security package.

11          MR. HOROWITZ:  That's the one issue they agree on, but

12     what if --

13          THE COURT:  They do.  I know.

14          MR. HOROWITZ:  -- the use of the cash, for example, is

15     used --

16          THE COURT:  I know.

17          MR. HOROWITZ:  -- to pay the heating and lighting on a

18     factory and the labor that facilitates the production of more

19     inventory that is also subject to the secured lenders lien?

20     Absent the use of the cash, that noncash collateral would never

21     exist.

22          THE COURT:  But you don't think you're subject to that

23     restriction.  You think that here the debtor could have spent

24     it on anything it wanted, and as long as the total remains a

25     billion and a half the secured creditors are out of luck.

RESIDENTIAL CAPITAL, LLC, ET AL.                    155

1           MR. HOROWITZ:  Well, but the debtors couldn't spend --

2           THE COURT:  They could spend whatever cash they wanted

3     on whatever they want.  And let's assume they didn't spend it

4     on buying replacement collateral.  Assume they spent it on a

5     totally different line of business, whatever.

6           MR. HOROWITZ:  Here they couldn't spend it on whatever

7     they wanted.  They could only spend --

8           THE COURT:  There was a budget.

9           MR. HOROWITZ:  -- it in connection with the budget

10    that was negotiated.  Here -- look, the debtor is in the

11    business --

12          THE COURT:  Do you think they negotiated a budget that

13    as long as cash was used for purposes in the budget they

14    couldn't complain, as long as the aggregate value of cash and

15    noncash didn't decline, didn't diminish?

16          MR. HOROWITZ:  Exactly.

17          THE COURT:  And even if it just happens that the

18    marketplace sale of a line of business results in a healthy

19    price that places a higher value on the noncash assets they get

20    no benefit from that.  That's your position.

21          MR. HOROWITZ:  My position is that under terms of this

22    cash collateral order there's no need to go into a very complex

23    and potentially --

24          THE COURT:  Okay.  So --

25          MR. HOROWITZ:  -- very speculative analysis of would

 1  the increase in the value of the noncash collateral have been

 2  possible, would any portion of it have been possible but for

 3  the expenditure of the cash collateral.

 4          THE COURT:  So show me the precise language in the

 5  cash collateral order that you say leads to that result.

 6          MR. HOROWITZ:  It's paragraph 16 on page 24, Your

 7  Honor, which says that "the adequate protection parties are

 8  entitled, pursuant to sections 362, 363(c)(2), and 364 of the

 9  Bankruptcy Code, to adequate protection of their interests in

10  the prepetition collateral, including cash collateral, in an

11  amount equal to the aggregate diminution of the prepetition

12  collateral to the extent of their interests therein".

13          THE COURT:  I lost the last part of your reading.

14          MR. HOROWITZ:  That which was the key part, right?

15  Too much of a windup.

16          "in an amount equal to the aggregate diminution in

17  value of the prepetition collateral".

18          Now, I think that that -- well, first of all, the word

19  aggregate clearly has to mean something, and what it clearly

20  means is that in determining whether there has been a

21  diminution in value you have to consider the cash collateral

22  together with the noncash collateral, which, first of all, we

23  believe is consistent with the case law, and we've cited a

24  number of cases along those lines.

25          THE COURT:  I don't have a problem with that part,

1  okay?  It's --

2        MR. HOROWITZ:  Well, they've contested that, among

3  other things.

4        THE COURT:  Well, where I'm stumbling is, really,

5  because in a sense it's this case.  The assets sold for more

6  than people thought they were going to sell for, okay, and,

7  basically, are the JSNs locked in to the value of their

8  collateral on day one of the case such that any increase in

9  value of cash collateral redounds exclusively to the benefit of

10 the unsecured creditors and not to the parties whose collateral

11 increased in value.

12       MR. HOROWITZ:  They're not -- the increase in

13 collateral does not redound only to the benefit of the

14 unsecured creditors.  The net increase in the value of the

15 collateral redounds to the JSNs.

16       They may be -- we may show at trial that the JSNs were

17 undersecured as of the petition date, and we'll get into

18 questions about what the basis is, but, to be clear, and

19 contrary to what they suggested, we're not asking for a ruling

20 as to what the basis for valuation as of the petition date is,

21 and I expect we'll have a healthy valuation battle in trial.

22       If they're undersecured on the petition date they may

23 still end up showing that they are oversecured today and

24 entitled to post-petition interest because -- as a result of

25 the healthy sale process and other events over the course of

RESIDENTIAL CAPITAL, LLC, ET AL.                    158

1   the bankruptcy.

2           THE COURT:  But they'll be arguing they would have

3   been even further oversecured if you hadn't spent 800 million

4   dollars in cash.

5           MR. HOROWITZ:  Well, if we hadn't spent 800 million

6   dollars in cash then their collateral -- nobody would have

7   collected on the loans and there would be no --

8           THE COURT:  I know.  Okay.

9           MR. HOROWITZ:  -- new cash collateral and --

10          THE COURT:  And that may be the complicated factual

11  issue --

12          MR. HOROWITZ:  I think the way the --

13          THE COURT:  -- what it got spent on, and I -- they

14  don't dispute if you use the cash to buy replacement

15  collateral.  I don't know, we'll hear whether they dispute if

16  it was used to collect on mortgages, whether they dispute -- I

17  guess, really, where I'm going with this is, and I don't think

18  this gets into 506(c), okay, but I do think it gets into what

19  was the cash spent on, is it fairly attributable to, chargeable

20  against their collateral, or was it used for other reasons

21  unrelated?

22          MR. HOROWITZ:  And the reason they can't dispute that

23  here, Your Honor, is because they consented to the use of their

24  cash collateral in accordance with the budget on day one.

25          THE COURT:  All right.  Now, I understand --

RESIDENTIAL CAPITAL, LLC, ET AL.                    159

1          MR. HOROWITZ:  They could have negotiated

2    restrictions.

3          THE COURT:  I understand your position.

4          MR. HOROWITZ:  Or they could have reserved their right

5    to contest the use of the cash collateral at a subsequent point

6    although --

7          THE COURT:  Or the DIPS.

8          MR. HOROWITZ:  -- I don't know why anyone would have

9    agreed to that, because that's basically just buying into the

10   huge fight that the JSNs now want to have.

11         THE COURT:  Let me just stop for a second.  I want to

12   see, because I had a whole lot of questions about this, but you

13   may have answered them already, okay?

14         Yes, I mean, I think I've asked these, but I just --

15         If the collateral was worth less than the debt on the

16   petition date but increases in value thereafter, who gains the

17   benefit, the secured party or the debtor?

18         Here it's a combination of cash and noncash.  Cash is

19   getting spent.  The noncash, there may be new stuff

20   substituted.  There may be stuff that increased in value

21   because of the marketplace.

22         Assuming the JSNs are undersecured, if the collateral

23   consists of cash and noncash assets may the debtor use the

24   cash, other than for the purpose of acquiring new collateral,

25   without compensating the JSNs if the noncash assets increase in

1    value in like amount?

2           That's, kind of, the hypothetical I gave you.  Assume

3    this meant the cash down, but it just happens the market has

4    increased the value of the noncash assets, so they're at the

5    same place where they were at day one, but they don't get any

6    of the benefit of the increase in value of the noncash.

7           MR. HOROWITZ:  Your Honor, the purpose of adequate

8    protection -- and, in fact, the JSNs themselves say this; I've

9    got a citation somewhere in here, and when I get through it

10   I'll mention it to you -- is to assure the secured lender that

11   it will do no worse off than it would have if there had been no

12   automatic stay and they had foreclosed on their assets.

13          That is the value at day one.  We can have a fight,

14   and we will have a fight, but it hasn't been teed up yet, as to

15   what is the appropriate basis for valuation at that point.

16          THE COURT:  So, look.  If it was cash and noncash, and

17   you didn't spend any of their cash, or assume there wasn't any

18   cash.  It was all securities, mortgages, assets of that type,

19   okay?  No cash.  And the value of that portfolio of noncash

20   assets increases during the case.  You agree that if they're

21   undersecured that increase in value up to the amount of their

22   claim is for the benefit of the secured creditors.  Agreed?

23          MR. HOROWITZ:  Yes.  And I think that's SW Venture.  I

24   think Your Honor made reference to that this morning.  It's

25   also in Judge Gropper's decision in In re Urban Communications,

RESIDENTIAL CAPITAL, LLC, ET AL.                    161

1   neither of which have anything to do with adequate protection.

2   They have to do with the proposition that for 506(b) purposes

3   you -- first of all, you look to actual sales as being a strong

4   indication of value.  No dispute there.  And, second, you

5   look -- you're flexible.  The Court can be flexible in terms of

6   the date of valuation for that purpose.

7            THE COURT:  Okay.  All right.  Go ahead with your

8   argument.

9            MR. HOROWITZ:  But that is not an issue for adequate

10  protection.  For adequate protection the purpose is to assure

11  the secured lenders that they get the same value they would

12  have gotten if they had foreclosed on day one.  They may say --

13           THE COURT:  Well, wait a second.  If they foreclosed

14  on day one -- I actually wrote a question specifically on this

15  as I was thinking through.  If the automatic stay is lifted,

16  and a secured creditor forecloses on the collateral and takes

17  possession of it, who's entitled to the benefit of any increase

18  in value of the collateral thereafter until the creditor is

19  paid in full?  They are, right?

20           MR. HOROWITZ:  Oh, absolutely.

21           THE COURT:  Okay?

22           MR. HOROWITZ:  But they also have to extend --

23           THE COURT:  And if it's --

24           MR. HOROWITZ:  -- all the money necessary to continue

25  to realize revenues and to sell the assets.

1          THE COURT:  Right.

2          MR. HOROWITZ:  And --

3          THE COURT:  Spent on preserving, enhancing collateral,

4    not for other --

5          MR. HOROWITZ:  Liquidating it.

6          THE COURT:  -- liquidating, but not for other things.

7          MR. HOROWITZ:  Right.  Or preserving, enhancing, and

8    also doing whatever is necessary to generate revenues

9    associated with the collateral.

10          But that's a fight we can and will have.  They may say

11    that the value of the collateral, of their whole package of

12    collateral as of day one is reflected by the ultimate sale

13    price less some reduced amount of cash, because they think they

14    could have gotten that sale price on day one, having spent less

15    cash.  They may put up someone to do that.  We think there's no

16    way in the world they could do that, and we are preparing

17    expert opinion that will show that that's the case, that, in

18    fact, if they had foreclosed there are a very large number of

19    reasons why the value, through collateral, would have been

20    significantly impaired.

21          THE COURT:  That's why one of my colleagues has

22    usually, when this fight has come up he's usually said well,

23    back your trucks up and take the inventory.  You want it?  Go

24    ahead and do it.

25          MR. HOROWITZ:  Secured lenders don't like to liquidate

RESIDENTIAL CAPITAL, LLC, ET AL.                    163

1  collateral.

2         THE COURT:  Oh, I know that.

3         MR. HOROWITZ:  There's a reason they --

4         THE COURT:  I know that.

5         MR. HOROWITZ:  -- consent to the use of their cash

6  collateral --

7         THE COURT:  I know that.

8         MR. HOROWITZ:  -- because debtors are usually much

9  better at maintaining, enhancing, and, ultimately maximizing

10 the value.

11        THE COURT:  Because, for better or worse, they were in

12 the business and the lender is not.

13        MR. HOROWITZ:  Exactly.  But we will have that fight.

14 They can say we spent more money than we had to, and they could

15 have gotten a bigger value.  We will refute that.

16        But the contours of the analysis are, to repeat, set

17 forth in the cash collateral order.  The agreed to an amount

18 that could be spent.  They negotiated whatever restrictions

19 they felt were appropriate.  The debtors spent the cash

20 collateral at all points in time consistent with that order.

21        THE COURT:  But they -- what they negotiated was an

22 adequate protection package that assured that if the cash was

23 spent in accordance with the budget they were still protected,

24 because there was a package available to make up for that

25 shortfall.

1          MR. HOROWITZ:  Oh.  What they were protected from was

2     the possibility that they would end up getting less than the

3     value of their collateral at day one.  That's the ultimate.

4          And that's an important observation, which, when you

5     think about it, we're here today on a number of issues that are

6     all supposed to relate to whether or not the JSNs are

7     oversecured and entitled to post-petition interest.

8          If adequate protection does what it's supposed to do,

9     which is just to assure that the secured lenders get no less

10    than the value of their collateral on day one.  Adequate

11    protection can't get them to an oversecured position unless

12    they were oversecured on day one.  And the --

13         THE COURT:  So -- all right.  So you're, basically, I

14    think I understand your point.  I hear your point is that all

15    it does -- if the value goes up and they wind up oversecured,

16    more power to them.  If the gap is closed so that they get paid

17    in full, more power to them.  But they only have an adequate

18    protection claim if there's a diminution in the aggregate value

19    as of the first day of the case.  That's your position.

20         MR. HOROWITZ:  That's exactly right, Your Honor.

21         THE COURT:  Okay.

22         MR. HOROWITZ:  Now, I want to go back for a moment

23    just to make an -- you said you don't know whether they're

24    claiming that the --

25         THE COURT:  Let Mr. Shore answer that.

1           MR. HOROWITZ:  Well --

2           THE COURT:  Go ahead.

3           MR. HOROWITZ:  But it's very explicit in their

4    counterclaims.  They say they are entitled to an adequate

5    protection --

6           THE COURT:  Oh, I -- yes.  I --

7           MR. HOROWITZ:  -- compensation for every dollar that

8    isn't plowed directly in.

9           THE COURT:  Mr. Shore is facing an uphill battle in

10   that.  It seemed to me that yes, at trial I'm going to have to

11   determine what the methodology and formula is, and it certainly

12   isn't necessarily the dollar for dollar.  Whether that results

13   in dismissal of that counterclaim, I'm not sure it makes a big

14   difference, but --

15          MR. HOROWITZ:  Well, I --

16          THE COURT:  -- because at the end of the day I've got

17   to decide whether they have an adequate protection claim, how

18   it's calculated, the date for calculation, the method for

19   making that calculation.  I tend to agree with you.  It

20   certainly isn't necessarily the dollar for dollar.  It may be.

21   Unlikely, but it may be that.  But, as a matter of law, is that

22   the standard?  I don't think so.

23          MR. HOROWITZ:  I -- it --

24          THE COURT:  Okay?

25          MR. HOROWITZ:  As a matter of law it is not the

1  standard.

2         THE COURT:  Okay.  All right.

3         MR. HOROWITZ:  As matter of law the standard is --

4

5         THE COURT:  Don't spend a lot of time talking about

6  that.

7         MR. HOROWITZ:  Okay.  The one thing I do want to say

8  is that when Your Honor said in Metaldyne after you granted the

9  debtors the right to use cash collateral you said if there is

10  no diminution in value then they won't take any of those

11  things.  You could not have said that if you had bought their

12  dollar for dollar theory.

13         THE COURT:  I understand that.  And when they

14  misquoted or excerpted the transcript from PRC it was to the

15  same effect, really.  I mean, it just --

16         MR. HOROWITZ:  Well, then maybe I don't have to spend

17  too much time when I get to --

18         THE COURT:  No.  Don't.  Don't.

19         MR. HOROWITZ:  Well, that's the next segment of the

20  argument, but that's good to know.

21         What I do want to say is once you understand the

22  distinction between the adequate protection given on day one

23  and the adequate protection claim for actual diminution in

24  value, the cases that they cite are irrelevant.  Buttermilk

25  Towne Center, General Auto Building, South Side House, those --

1  all three of them stand solely for the proposition that in

2  order to get the right to use cash collateral you have to

3  provide an adequate protection package that, in the event all

4  of the cash collateral ends up being --

5          THE COURT:  Things go badly are you protected.

6          MR. HOROWITZ:  -- frittered away.  Right.

7          THE COURT:  That I -- look, I've said it in Metaldyne.

8  I've said it in other cases that you don't have transcripts of.

9  It usually is not controversial at all, okay?

10         MR. HOROWITZ:  I wouldn't have thought so.  And here,

11  of course, there's no debate that the adequate protection

12  package they got was more than ample to protect them from any

13  possible diminution in value.

14         We will show, just to get -- that, in fact, the value

15  of their collateral has increased net of the use of cash

16  collateral that they agreed to.  And they are entitled to the

17  benefit of that --

18         THE COURT:  It just would have been more if they get

19  the credit for the cash that you spent or some of it.

20         MR. HOROWITZ:  I'm sorry?  What?

21         THE COURT:  Just the total would be more if they got

22  credit for at least some of the cash that you spent.

23         MR. HOROWITZ:  Right.  But the value, the collateral

24  would never have gone up in value by that much.

25         THE COURT:  I don't know whether that's true or not.

 1   I simply --

 2           MR. HOROWITZ:  And --

 3           THE COURT:  I don't know whether that's true, and I

 4   don't know that you're ever going to be able to prove that

 5   that's true, but that's --

 6           MR. HOROWITZ:  I agree with that.  I think that's why

 7   it was sensible and efficient to agree in the cash collateral

 8   order that this is how much cash collateral can be spent, and

 9   this is how we determine whether or not you're going to be

10   entitled to adequate protection.

11           THE COURT:  We insist on a thirteen-week budget for

12   either a DIP loan or cash collateral.  The Court, that's part

13   of our rules.  We require it.  We don't allow use of cash

14   collateral without a budget.

15           MR. HOROWITZ:  And the benefit of that should be, Your

16   Honor, that we don't have to go through this hindsight analysis

17   of whether the cash collateral was used inappropriately and

18   somehow represented a diminution in value.

19           THE COURT:  Well, that's not true, because if the

20   noncash assets, instead of increasing in value had decreased in

21   value, you'd have that issue, though.

22           MR. HOROWITZ:  If they decreased in value then they

23   would be entitled to an adequate protection claim, but you

24   wouldn't have to look into how the cash collateral had been

25   spent.

RESIDENTIAL CAPITAL, LLC, ET AL.                    169

1          THE COURT:  Maybe.

2          MR. HOROWITZ:  Now, Your Honor, I did mention this,

3    but I just want to emphasize it.  Contrary to what they've

4    said, we are not asking for, in their papers, we're not asking

5    for any ruling now as to what the basis of valuation is --

6          THE COURT:  Yes, I --

7          MR. HOROWITZ:  -- as of day one.  We will at trial --

8          THE COURT:  You said that in your reply brief and I

9    haven't -- with respect to this, what is the committee asking

10   the Court to determine as a matter of law with respect to the

11   diminution in value of collateral?  Can that properly be done

12   on a motion to dismiss?

13         [MR. ECKSTEIN:  ]

14         But I think Your Honor knows that there were

15   significant transfers that were made not only within ninety

16   days, but within --

17         THE COURT:  One year.

18         MR. ECKSTEIN:  -- a year --

19         THE COURT:  Right.

20         MR. ECKSTEIN:  -- prior to the petition date that were

21   made by the debtors where the debtor and AFI, the committee

22   believed, were co-obligors, and I think the documents evidence

23   that they were co-obligors, including without limitation

24   payments that were made in respect to DOJ settlements, other

25   governmental settlements where hundreds of millions of dollars

RESIDENTIAL CAPITAL, LLC, ET AL.                    170

1   of transfers were made by the debtor or AFI made none of those

2   transfers.  And we believe all of those transfers are

3   potentially avoidable transactions, either as preference or

4   fraudulent transfers or both.  I think Your Honor will recall

5   that there was the dispute with respect to the subservicing

6   transfers that were made in some respects within --

7            THE COURT:  You reserved your right, you agreed to

8   the -- right.

9            MR. ECKSTEIN:  -- a few days of the petition date

10  where those were obligations that ran both to AFI and the

11  debtor when the debtor made, I believe it was approximately

12  fifty or sixty million dollars of transfers within a few days

13  or weeks prior to the petition date.

14           Those are just two categories of transfers that come

15  to mind.  There may have been other transfers that the debtor

16  made where AFI was a co-obligor in it.  That's where I honestly

17  don't want to --

18           THE COURT:  Okay.

19           MR. ECKSTEIN:  -- try to catalogue everything, but I

20  think just off the top, there are hundreds of millions of

21  dollars of transfers that we have identified that were made

22  within ninety days and certainly within twelve months of the

23  petition date.

24           THE COURT:  Okay, so -- thanks Mr. Eckstein.

25           Of the list, and Mr. Shore will tell me this when he

1    gets up, of the list of assets that were transferred, cash or

2    assets -- other assets that were transferred to AFI within the

3    preference period, one year or ninety days, which of those

4    assets do the JSNs contend the collateral agent retained a

5    security interest?  Because it seemed to me -- okay, I

6    understood the argument as to the, they don't believe that the

7    collateral agent properly released liens, and therefore the

8    rel -- the liens remain valid.  That was part of it.  It was

9    unclear to me whether there were other categories so that

10   they -- I understand they're asserting that they have a lien on

11   litigation claims by virtue of the pledge of intangibles.  What

12   claims do they believe exist against AFI that could have been

13   asserted as avoidance claims?

14        MR. HOROWITZ:  Your Honor, our position is that even

15   if the property that was subject to an avoidance action had

16   been subject to a lien prior to the transfer, prior to the

17   preference or the fraudulent transfer.  It is not subject to

18   lien -- well the proceeds from an avoidance action which only

19   comes into existence post-petition are not subject to lien;

20   they're unencumbered under 552(a).  If Your Honor were to

21   disagree, and I would strenuously argue against it, but -- and

22   find the question of whether or not the JSNs have a lien on a

23   cause of action turns on whether they had a lien and the lien

24   was not released properly or otherwise in connection with the

25   transfer, that will be -- then that's a fact issue that that

 1    we'll have to address at trial on a cause of action-by-cause of

 2    action basis.

 3            THE COURT:  I'm struggling with this.  Not a clear

 4    holding on -- nobody cited it, but Judge Bernstein wrote a

 5    couple of opinions In re: Schick.  Schick was a corrupt lawyer.

 6    He stole money out of escrow accounts and he used some of the

 7    money to pay back Sterling Bank, which he owed money to.  And

 8    the Chapter 7 Trustee brought an action against Sterling, and

 9    Sterling moved to dismiss one of the cases arguing that it

10    wasn't property of the debtor, it was -- it belonged to

11    Schick's clients.  Judge Bernstein rejected the argument, said

12    one, they don't have standing to assert the rights of third

13    parties.  But -- clearly not a holding, but he's got some

14    language.  It may be that the client/customers whose money

15    Schick stole, if the estate recovers the transfer, they may

16    have an argument about constructive trust.  It was like one or

17    two sentences in one of Judge Bernstein's Schick opinions none

18    of you have cited.  And it's not a holding; it's in rejecting

19    the standing argument from Sterling Bank, he at least threw

20    that idea out.  And I don't think any of the causes of action

21    in the counterclaims plead that.

22            MR. HOROWITZ:  Constructive trust?

23            THE COURT:  I'm sorry?

24            MR. HOROWITZ:  Plead constructive trust or plead facts

25    on --

RESIDENTIAL CAPITAL, LLC, ET AL.                    173

1          THE COURT:  Well, they certainly don't plead
2    constructive trust.  They plead equitable lien.
3          MR. HOROWITZ:  Right.
4          THE COURT:  They plead equitable lien.  So, but -- I
5    don't know.  I mean, I think this may be something that's going
6    to need to be further addressed at trial.  I have great respect
7    for Judge Bernstein, and when he analyzes a situation like
8    that, I take note of it.  It wasn't -- it's not a decision on
9    the point.  Not a decision on the point.
10          MR. HOROWITZ:  Your Honor, if I could make some
11   observations --
12          THE COURT:  Yeah, go ahead.
13          MR. HOROWITZ:  -- just about the law.  First of all,
14   there are two distinct lines of reasoning on this question of
15   whether or not proceeds of avoidance actions are --
16          THE COURT:  Yes.
17          MR. HOROWITZ:  -- are unencumbered even if they --
18   prior to the transfer, they were subject to lien.  Collier's
19   and cases like National Gas, which we cite, and others take the
20   position under the clear language and logic of 552: they're
21   not encumbered.  The avoidance actions don't exist pre-petition
22   and, therefore, the debtor --
23          THE COURT:  And I -- look, I -- Mr. Shore will address
24   it, but I happen to be in that camp, okay?  I pretty firmly
25   believe, and I've said this, and it may not be in opinions, I

RESIDENTIAL CAPITAL, LLC, ET AL.                                    174

1   don't remember at this point.  But the -- well, this is really

2   the PRC point.  I mean, there it was the issue of whether as

3   part of an adequate protection package, you could give a lien

4   on avoidance claims, something I'm always very reluctant to do,

5   but concluded yes, I have the power to do it.  But I think I

6   said, those are estate property.  Okay.

7           MR. HOROWITZ:  I think you said they belong to the

8   creditors, actually.

9           THE COURT:  They do, they belong to the creditors.

10  All right.  But that doesn't necessarily -- at least -- so I'm

11  not keen on the -- on UMB's argument, or the JSN's argument

12  that they have a lien on avoidance actions.  It's entirely a

13  post-petition -- 552 ans -- the statutory language answers it,

14  I think the case law answers it.  But that may not be the last

15  word.  It's this point about -- okay, if the debtor, if the

16  estate recovers the avoidable transfer, what happens then?  I

17  don't know.

18          MR. HOROWITZ:  Well, 552(a) says that unless it's the

19  pro -- unless they're the proceeds of a pre-petition lien,

20  which an avoidance action can't be, they are unencumbered.  It

21  uses that phrase.

22          THE COURT:  I'm not sure that's the la -- I'm not --

23  it's -- I don't know --

24          MR. HOROWITZ:  Well --

25          THE COURT:  -- Mr. Horowitz, I --

1          MR. HOROWITZ:  -- I want to take it a little --

2          THE COURT:  Let me just say, that's not an issue I'm

3     deciding today.

4          MR. HOROWITZ:  Okay.  Let me just make another

5     observation about it though.  The line of cases that we

6     referred to in our brief as the tracing cases that say, well,

7     maybe that's not the end of the day, maybe if what's come back

8     into the estate --

9          THE COURT:  Schick actually raises the tracing issues.

10    Go read Schick.  I mean, it's --

11         MR. HOROWITZ:  Well, I wasn't aware of it, but I will

12    take a look.  Other than Schick, they were all outside of the

13    circuit.  With the exception of one case from the Eastern

14    District of Michigan which was a 2002 case, they all predate

15    the Supreme Court cases of Hartford Underwriters and Raddlock

16    (ph.), et cetera, that really require strict adherence to the

17    language of the Code, which I think is clear here.

18         But another issue which we did not --

19         THE COURT:  Mr. Horowitz, I don't -- Mr. Shore may --

20    he'll try arguing me out of this position; they don't have a

21    lien on avoidance actions in my view, but I don't know that

22    that's the last word on it.

23         MR. HOROWITZ:  Okay, well, this is an issue that was

24    not really not expressly addressed in the brief, but I do want

25    to get to this.

1          THE COURT:  I know.

2          MR. HOROWITZ:  Well, there's --

3          THE COURT:  Go ahead.

4          MR. HOROWITZ:  -- one more point --

5          THE COURT:  All right.

6          MR. HOROWITZ:  -- I want to get to.  Which is that the

7   cases that do trace, such as In re: Figiaro, they almost

8   uniformly -- and by the way, from your description, Schick,

9   involve a very different sort of situation where you've got

10  collateral that's identified with great specificity.  In

11  Figiaro, it was a jeweler who had pledged his diamonds to a

12  secured lender and then right before bankruptcy, gave them to a

13  pawnbroker.  So they're sitting in the pawnbroker's window.

14  And the Court said there's a lien pre-petition; there really is

15  a lien on those diamonds even if they're sitting in the window,

16  so there's a lien on those diamonds when they come back into

17  the estate.

18          THE COURT:  Yeah.

19          MR. HOROWITZ:  In Schick, it sounds like you're

20  talking about an escrow account that's very specifically

21  identified corpus documents.  That's extremely distinguished

22  from -- and Your Honor look at the counterclaims -- from the

23  obligations that they made here, which is on information and

24  belief this cash was subject to a lien.

25          THE COURT:  Well, cash is -- I put cash in a different

1   category, okay?  Much harder for JSN, as I don't -- the --

2   look, if they were able to establish that they had valid

3   perfected security interest in intangible assets that were

4   transferred to AFI and then recovered on an avoidance action by

5   the committee, I'm not sure why that wouldn't satisfy, it's

6   very specific.  But I don't want to deal with -- the other

7   case -- I didn't go -- I did not last night go back to look at

8   it, but the reason I'm familiar with Schick, I wrote an opinion

9   in McHale vs. Boulder Capital In re: 1031 Tax Group.  I had

10  some of the same standing issues; that's why I looked to Judge

11  Bernstein.  I talk about Schick there.  I think had a

12  discussion about whether you'd have to trace and all that, but

13  I didn't go back to look at it last night; I didn't refresh

14  myself with it.  But --

15          MR. HOROWITZ:  Okay, well, Your Honor, I don't

16  understand any of the JSN's theories on avoidance actions to

17  come close to that sort of specific tracing, but maybe -- I'll

18  tell you that what I mostly understood was the sort of generic

19  argument that, look, we have an all-assets lien, so everything

20  that -- anything that was transferred necessarily was

21  subject --

22          THE COURT:  Okay, they got an uphill battle to

23  convince me that all-asset lien covers avoidance claims, either

24  preference or fraudulent conveyance.

25          MR. HOROWITZ:  Well, the logic of the argument that if

1  the asset was subject to a lien pre-fraudulent conveyance or

2  preference, then the lien should follow, if that were taken to

3  its extreme --

4          THE COURT:  No, it shouldn't --

5          MR. HOROWITZ:  -- there are lots of cases where

6  lenders have --

7          THE COURT:  It shouldn't necessary follow.  It should

8  just, when the asset comes back to the estate, it may come back

9  subject to if there was a valid perfected lien.  But I'm not

10  making a decision on that, I just -- that's the -- I'm

11  uncertain about it, Mr. Horowitz.

12          MR. HOROWITZ:  Okay.  My point was that there were

13  lots of situations where secured lenders have real all-asset

14  liens by contrast with what the JSNs have here.  And if the

15  lender could say look, if it left the estate, it necessarily

16  was subject to our lien beforehand, so the proceeds of the

17  avoidance action must be subject to our lien now.  That would

18  eviscerate the general understanding --

19          THE COURT:  I agree.

20          MR. HOROWITZ:  -- that proceeds of avoidance actions

21  are for benefit of unsecured creditors.

22          THE COURT:  Okay.

23          MR. HOROWITZ:  Okay.  Your Honor, we've covered just

24  about everything on this issue.

25          THE COURT:  We have.

RESIDENTIAL CAPITAL, LLC, ET AL.                    179

1          MR. HOROWITZ:  I do want to talk briefly about the tax
2   allocation claim because the parties really have teed it up and
3   joined issue now.  If you start from the proposition that they
4   don't have a lien on avoidance actions, they attribute -- they
5   claim to attribute great value to this tax allocation agreement
6   claim that was identified in the examiner's report.  We're not
7   saying anything about the merits.  We have our questions about
8   this, but this isn't the time on that.  But we do think that
9   it's appropriate and helpful to just establish that as an
10  analytical matter, the only way this tax allocation agreement
11  claim, this claim that's based --
12         THE COURT:  Yes, they argue there'd be no
13  consideration for the second one; you came back and showed
14  there was a Michigan statute that changed the law, or
15  Minnesota, I don't know, was it Minnesota or --
16         MR. HOROWITZ:  You just expedited my argument.
17         THE COURT:  Yes, I read it carefully.
18         MR. HOROWITZ:  Okay, consider that argued, Your Honor.
19         THE COURT:  Okay.
20         MR. HOROWITZ:  I'll move on to default interests then.
21  Do you want to do this one, too?
22         THE COURT:  Let me just -- I'm going to shorten this
23  to this extent.  I'm denying the motion to dismiss the count
24  dealing with default interest.  If, and only if, the Court
25  determines that the JSNs are oversecured will the Court deal

RESIDENTIAL CAPITAL, LLC, ET AL.                    180

1   with the issue of what interest and fees get added on.  What --

2   it seems to me, good arguments that you made, but it seems that

3   there's an element of discretion on the part of the bankruptcy

4   court based on the facts and circumstances of the case in

5   deciding whether to apply the contract default rate here only

6   one percent above the nondefault rate.  But I'm not deciding

7   that now; it's clearly premature.  You may be right; they may

8   be right.  I will only get to that issue if and when -- really,

9   if I determine that they are oversecured, so I don't even want

10  to hear argument on that.  Sorry, but that's --

11            MR. HOROWITZ:  Okay.  I won't press it.

12            THE COURT:  Okay.

13            MR. HOROWITZ:  Well, with that, Your Honor, I'm going

14  to --

15            THE COURT:  Okay.

16            MR. HOROWITZ:  Unless you want to take the first three

17  points from the JSNs, I'm gonna --.

18            THE COURT:  No, let me hear from Ms. Foudy, and then

19  we'll take a -- after I hear from Ms. Foudy, we'll take a short

20  recess, and then you can reply.

21            MR. HOROWITZ:  Thank you, Your Honor.

22            THE COURT:  Thank you, Mr. Horowitz.

23            Is there something left to talk about?

24            MS. FOUDY:  Yeah.  Exactly.  I was --

25            THE COURT:  I'm sorry.

1      MS. FOUDY:  Again, for the record, Theresa Foudy of

2   Curtis, Mallet-Prevost, Colt & Mosle.  It's been a long day so

3   far, so I don't want to unnecessarily take Your Honor's time.

4   I just want to tick through the four counterclaims at issue to

5   see if there's anything left to address.

6          The first counterclaim issued was 22.  That's seeking

7   a declaration that the JSN indenture -- that the JSN indenture

8   was breached by the liens.  As we briefed in our papers, we

9   think that that's --

10         THE COURT:  Breached by releasing the liens.  You --

11         MS. FOUDY:  Was breached by the release of the liens.

12         THE COURT:  Yes.

13         MS. FOUDY:  Yes.  And that, as we said in our papers,

14   and I think from Your Honor's comments this morning, I don't

15   need to belabor this point, this obviously is not GM.  This was

16   not an agent that executed the release and filed the UCC-3

17   statement.

18         THE COURT:  Well it was, I mean, I don't know who did

19   it, but probably more than one person; there were a series of

20   them.  Nobody -- there was no contention made that anyone at

21   Wells -- Wells Fargo, made a horrible error in signing a bunch

22   of releases, or filing a bunch UCC-3s.  That contention is not

23   made.

24         MS. FOUDY:  Correct.

25         THE COURT:  And that's my starting point.

1        MS. FOUDY:  Correct, Your Honor.  And under the UCC,

2   we believe that's the end of the enquiry, because Wells Fargo

3   was the secured party-in-interest under the documents.  They

4   were reflected as such under the UCC-1s that initially

5   initiated the financing statements that reflected as such as

6   the UCC-3s.

7        THE COURT:  You don't think anybody who goes to look

8   at the records should have to cross a call, or try and cross-

9   examine the collateral agent to find out whether they were

10  authorized to sign a lien release and file a UCC-3 before they

11  take any action whatsoever on the basis of notice filing?

12       MS. FOUDY:  No --

13       THE COURT:  That's really your position?

14       MS. FOUDY:  No, Your Honor, I don't.  So --

15       THE COURT:  Okay.

16       MS. FOUDY:  -- just to speed this along a little --

17       THE COURT:  Now you can move on from that.

18       MS. FOUDY:  -- we'll move on to the next counterclaim.

19  Counterclaim 23 actually I think is what addressed sort of the

20  second bucket, that was discussed this morning.  Which was

21  whether saying, go look at the list that's attached to the LLC,

22  is good enough.  As we discussed this morning, we think it is

23  good enough.  So that that counter --

24       THE COURT:  You argued in the reply that you dealt

25  with a bunch of cases on it, and you said that's sufficient.

1    You described by category, it's sufficient to put people on
2    notice, and if they want to know more, they can go find out.
3              MS. FOUDY:  So that's counterclaim 23.
4              Counterclaim 24 is the argument that if the lien --
5    it's an alternative argument of theirs that if the release is
6    held to be effective because the secured party-in-interest, the
7    collateral agent didn't --
8              THE COURT:  They argue they're entitled to an
9    equitable lien.
10             MS. FOUDY:  -- they're entitled to an equitable lien.
11   Under New York law, you are only get an equitable lien if it
12   was clear that the intent of the parties was to create --
13             THE COURT:  You don't need to argue this equitable
14   lien further, okay?
15             MS. FOUDY:  Okay.  And 25 follows the rest, because 25
16   just -- if they won one -- if they won 23 (sic), 23, or 24, 25
17   was thus, we need to trace the released collateral.  If you
18   agree with us that 22, 23, 24 should be dismissed, then 25
19   falls as well.
20             THE COURT:  Okay.
21             MS. FOUDY:  Thank you, Your Honor.
22             THE COURT:  All right.  We're going to take fifteen-
23   minute recess.
24        (Recess)
25             MR. ZENSKY:  Your Honor, can I ask one question?

RESIDENTIAL CAPITAL, LLC, ET AL.                    184

1          THE COURT:  Yes.  Sure.

2          MR. ZENSKY:  Just to put the default-interest issue to

3   rest for the day, as Your Honor intended, just to be clear for

4   the parties, at the phase 1 trial, neither side should be

5   putting in any evidence on --

6          THE COURT:  Absolutely --

7          MR. ZENSKY:  -- that would --

8          THE COURT:  -- correct.

9          MR. ZENSKY:  -- inform the Court's assessment of the

10  factors about whether it can depart from the contract, right?

11  That's for another day.

12         THE COURT:  For -- that only comes up if I determine

13  that the JSNs are oversecured.

14         MR. ZENSKY:  Underst -- I just want it to be clear --

15         THE COURT:  That's --

16         MR. ZENSKY:  -- about the proofs --

17         THE COURT:  That's a fair point --

18         MR. ZENSKY:  -- for trial.

19         THE COURT:  -- you make, and I just -- that's why I

20  want it to be clear.

21         MR. ZENSKY:  Okay.

22         THE COURT:  As soon as -- I just -- it's not -- no way

23  is it today's issue.

24         MR. ZENSKY:  Good.  Thank -- it was their motion to

25  dismiss, so --

1          THE COURT:  Fair.  Yeah.

2          MR. ZENSKY:  All right.  Thank you.

3          THE COURT:  Okay.  All right, let's take a fifteen-

4     minute recess.

5          (Recess from 3:32 p.m. until 3:51 p.m.)

6          THE COURT:  All right, please be seated.

7          Mr. Shore.

8          MR. SHORE:  Good afternoon, Your Honor.  Chris Shore

9     from White & Case, on behalf of the junior secured notes and

10    UMB.  I'll deal with cash collateral usage, then the lien

11    issue, and then the release-of-lien issue.

12         Cash collateral usage:  Let me frame the dispute and

13    address one thing that I think Your Honor said that I don't

14    think is up today, which is that paragraph 16 provides adequate

15    protection in an amount equal to the aggregate diminution in

16    the value of the collateral, to the extent of their interest

17    therein.  I think Your Honor was drawing a distinction between

18    aggregate diminution in value and diminution in the aggregate

19    value.  We're just not addressing that today, and I think we're

20    going to get into that at a later date as to what that means.

21         But in counterclaim 26 --

22         THE COURT:  What page?

23         MR. SHORE:  Well, just -- let me just --

24         THE COURT:  All right, go ahead.

25         MR. SHORE:  I'll give you the quote.  The defendants

1  claim that for the reasons set -- and this is important:  "For
2  the reasons set forth in paragraphs 1 through 98, the debtors'
3  use of cash collateral, in the cases other than for requiring
4  replacement collateral, constitutes a per se diminution in the
5  value of the collateral."  They keep leaving out this "set
6  forth in paragraphs 1 through 98", and that's what qualifies
7  what I mean in the allegation as a dollar-for-dollar reduction.

8          As alleged in paragraph 1 to 98, the uncontested
9  pre-petition collateral consists of a bunch of buckets of
10  assets.  Cash was approximately 240 million dollars.  Loans,
11  servicer advances, general intangibles -- which I'll come back
12  in talking about -- in the avoidance-action issue -- including
13  goodwill, software, desks, chairs, intercompany claims,
14  pre-petition causes of action against Ally and everything
15  else -- and I'll explain why in the second part of the
16  argument -- those assets are alleged to be worth more than 2.6
17  billion dollars -- shorthand for more than our claims -- as of
18  the petition date.  That is, our allegation is, if you value
19  all of those assets on day one, it's worth more than 2.6
20  billion dollars and, therefore, we were secured creditors on
21  day one and should be getting post-petition interest.

22          The debtors contend that prior to the pay-downs, our
23  remaining collateral, as of now or as of the plan time, is
24  going to be approximately 1.8 billion dollars.  The debtors get
25  there as follows:  They sold our loans, goodwill, software,

1   desks, chairs, essentially the business, for 1.7 billion

2   dollars allocated to us.  I'm not sure that value was different

3   on the petition date, and I want to come back to your example

4   in a bit.  The other way to look at it is not that the value of

5   the assets appreciated but that stalking-horse bids were too

6   low and that ultimately what got brought out in the auction was

7   the actual realizable price for the stuff that was sold on the

8   petition date.

9          THE COURT:  Maybe the only thing I did right in this

10  case was say I wasn't going to simply accept that stalking-

11  horse bid.

12         MR. SHORE:  Since the sale, they've allocated 660

13  million dollars-plus in case administration expenses to the

14  collateral.  That is, they spent 660 million dollars under the

15  budgets, which they then deduct from the value of the

16  collateral in the silos that they've placed the assets, without

17  providing any replacement liens.  And they're seeking, pursuant

18  to one of their counterclaims, to impose another 180 million

19  dollars of stuff that was accrued but not paid before --

20         THE COURT:  You say without providing replacement

21  liens, that they say they gave you an adequate-protection

22  package on day one.  You got your replacement -- you got the

23  liens that --

24         MR. SHORE:  All right --

25         THE COURT:  -- protect you against --

1              MR. SHORE:  We got --

2              THE COURT:  -- the diminution.

3              MR. SHORE:  Without providing any value to the -- or

4     reflecting any value attributable to those adequate-protection

5     liens, essentially.  The -- that leaves about an 800 million

6     dollar delta between what we allege we were entitled to on the

7     petition date and what the debtors say that we're doing now.

8              Let me clarify a point that was made.  Of that 650-

9     spent, when we say net of replacement value, that does not

10    include the servicer advances.  The debtors have spent hundreds

11    of millions of dollars of cash collateral during the case,

12    funding servicer advances, which are collateral, and rolling it

13    back in.  That's not what we're claiming.  The 650- is for

14    things like the examiner's report, the employees and

15    professional expense --

16             THE COURT:  You mean the examiner --

17             MR. SHORE:  -- and the like.

18             THE COURT:  -- that Mr. Walper, on behalf of the

19    largest holder of the JSNs, made the motion for appointment of

20    an examiner?

21             MR. SHORE:  The examiner that apparently found that

22    there are no claims that are subject to our liens.  So it's

23    charging us eighty million dollars to do that.

24             THE COURT:  Well --

25             MR. SHORE:  Right.

1          THE COURT:  -- you know, careful what you ask for; you

2     may get it.

3          MR. SHORE:  I will remind you who stood up and said

4     maybe it was a bad idea.

5          Looking just at the aggregate value, okay, accepting

6     their interpretation -- which is you look at the aggregate

7     value of the collateral and determine whether it's higher or

8     lower now -- under the express terms of the cash-collateral

9     order, we're entitled to, under the allegations, 800 million

10    dollars of adequate-protection liens.  In other words, if our

11    collateral, under our allegations, was worth more than 2.6

12    billion dollars on the petition date and the debtors succeed in

13    proving that it's now worth 1.8, we're entitled to 800 million

14    dollars of adequate-protection liens.

15          The --

16          THE COURT:  I don't follow that.

17          MR. SHORE:  Okay.  I'm just trying to harmonize the

18    two worlds that are out there.

19          THE COURT:  So, look --

20          MR. SHORE:  In the --

21          THE COURT:  -- here's -- let me stop.  Go on.  You

22    argue, and --

23          MR. SHORE:  That's all right.

24          THE COURT:  -- then I'll come back to my question.

25          MR. SHORE:  That's why we get to a dollar-for-dollar

1    claim, based on the allegations of the complaint.  If it's true

2    that the assets were worth 2.6 billion dollars now and are not

3    worth 2. -- or worth 1.8 billion dollars as set forth in the

4    disclosure statement, we're getting adequate protection --

5              THE COURT:  Okay --

6              MR. SHORE:  -- in an amount that exceeds the 650

7    million that they've spent.

8              THE COURT:  Look, if you prove -- I don't know --

9    Mr. Horowitz will tell me if he disagrees with this:  If you

10   prove at trial that on the petition date the collateral was

11   worth 2.8 million -- billion dollars and that now it's only

12   worth 1.8 billion dollars --

13             I mean, Mr. Horowitz, are you agreeing that that would

14   be --

15             MR. HOROWITZ:  Simpler even than that, Your Honor.  If

16   they prove that they were over -- that the collateral value was

17   2.6 billion at the petition date, they are oversecured and

18   entitled to post-petition interest because anything --

19             THE COURT:  Okay --

20             MR. HOROWITZ:  -- that went down after that --

21             THE COURT:  So --

22             MR. HOROWITZ:  -- point is --

23             THE COURT:  So let's assume it was 2 --

24             MR. HOROWITZ:  -- diminution in value.

25             THE COURT:  Let's assume it was a dollar less than the

1    amount of their claim and it went down as much as is alleged.

2    Okay, that would be -- whether you call it dollar-for-dollar or

3    not, that would be -- you agree that would be a diminution?

4              MR. HOROWITZ:  Yes, that it would.

5              THE COURT:  Okay.

6              MR. SHORE:  That's why counterclaim 26, as pleaded,

7    should stand, because that's what counterclaim 26 is saying.

8    Based on paragraphs 1 through 93, which allege that we think it

9    was more than post --

10             THE COURT:  I think you said 98, but --

11             MR. SHORE:  1 through ninety- --

12             THE COURT:  Is it --

13             MR. SHORE:  -- six?

14             THE COURT:  Oh, whatever.

15             MR. SHORE:  1 through 98.

16             THE COURT:  Yeah.  I listen --

17             MR. SHORE:  As alleged in --

18             THE COURT:  I listen to you --

19             MR. SHORE:  -- 1 through 98, we --

20             THE COURT:  -- Mr. Shore.

21             MR. SHORE:  -- we allege that it was worth -- we were

22   oversecured on the petition date.  They're saying that the

23   actual collateral that they have to turn over (sic) us as of

24   today is 1.8 billion dollars.  That's -- when they say that,

25   they say, "We have cash and we have unsold loans of" -- "800

1  million dollars of unsold loans.  That's what we have to give

2  you at the end of the day."  That's why we're saying we're

3  entitled, then, to dollar-for-dollar replacement of every

4  dollar of that 650 million dollars that was spent, in the form

5  of adequate-protection liens that were granted under the cash-

6  collateral order; that's all.

7          THE COURT:  Look, if what your cause of action -- what

8  I don't buy into is what -- the way you phrased it, the dollar-

9  for-dollar.  If what you're communicating is -- and it really

10  is -- I think I said this to Mr. Horowitz earlier, and it's my

11  question about what is it they're asking me to do.  They're

12  asking me to dismiss the cause of action?  Or are they asking

13  for a declaratory judgment?  If -- maybe you both -- maybe you

14  don't disagree.  If --

15          MR. SHORE:  We may not on this --

16          THE COURT:  You --

17          MR. SHORE:  -- but --

18          THE COURT:  You argue -- you do agree that you're

19  entitled to an adequate-protection claim if you establish a

20  diminution in value first day of the case versus now?  Do you

21  agree with that?

22          MR. SHORE:  Yes.

23          THE COURT:  Mr. Horowitz, Ms. Foudy, you're not

24  arguing what the methodology for valuation should be; you're

25  not arguing that today -- that's going to be an issue at trial?

1   You agree with that?

2            MR. SHORE:  No, because I want to come back to your

3   example.  Your example was that the assets, the hard assets,

4   were worth a billion dollars on the petition date and

5   appreciated up to --

6            THE COURT:  Yes.

7            MR. SHORE:  -- 1.5 billion dollars.  I don't think --

8   look, the expert reports are going to be coming in.  I don't

9   think there's -- that what happened here was the appreciation

10  in value.  What happened here is the debtors are changing their

11  methodology.  The debtors are -- what they want to do in the

12  arguments -- and I'll get into this when we talk about why I'm

13  citing the 506 --

14           THE COURT:  Mr. Shore --

15           MR. SHORE:  -- cases.

16           THE COURT:  -- if you convince me that their experts

17  are wrong, yours are right, that there's been a diminution, I

18  think you prevail on an adequate-protection claim.  But -- so

19  that's the battle of the experts.  I don't -- the only thing

20  that's bothering me about that claim is, when you write it

21  dollar-for-dollar, I read it the same way the committee reads

22  it.  If what you're saying is the claim should be construed as

23  arguing that, to the extent there's been a diminution in value

24  of the collateral between the petition date and today, the JSNs

25  are entitled to an adequate-protection claim for the

1    difference -- is that what you're saying?

2            MR. SHORE:  Yes.  And let me --

3            THE COURT:  And, Mr. Horowitz, do you disagree with

4    that?

5            MR. HOROWITZ:  That's what I've been saying --

6            THE COURT:  Okay.

7            MR. HOROWITZ:  -- Your Honor.

8            THE COURT:  So --

9            MR. SHORE:  Okay.

10            THE COURT:  So that's why I say I'm not -- you know --

11            MR. SHORE:  Right.

12            THE COURT:  -- the problem I had was just the words --

13    if the words had been slightly different.  But I'm reluctant --

14    I'll tell you, I'm reluctant to dismiss a claim where you both

15    seem to agree on what has to happen.  And I understand, you may

16    disagree vastly about the value.  I thought -- let me just --

17    and I think I pressed Mr. Horowitz fairly firmly about this

18    point, because I am -- and you say the facts aren't going to

19    show this.  I was concerned that the issue here is that there's

20    been an appreciation in value of the hard assets.  They used

21    your cash.  The hard assets have appreciated.  And I raised the

22    question does it depend on what the cash was spent on; if you

23    spent it other than for preserving the collateral, do you get a

24    claim for diminution.

25            What I found persuasive, not yet decisive but

RESIDENTIAL CAPITAL, LLC, ET AL.                     195

1   persuasive, was Mr. Horowitz's argument that, 'Look, for

2   adequate-protection purposes, as opposed to whether you're

3   oversecured, undersecured, what the cash-collateral order does

4   is protect the JSNs' downside; it' -- well, it leaves them with

5   the upside in terms of the amount they recover.  If the value

6   increases, fine.  But it protects them at that base amount,

7   whatever -- I give the hypothetical of a billion and a half, or

8   something, whatever it was.  If it goes below that, you recover

9   so long as -- I mean, I take it you're not arguing that the

10  debtors used your cash for purposes not permitted by the

11  budget.

12          MR. SHORE:  No, don't know yet.  I've been asking for

13  the backup.

14          THE COURT:  Okay.

15          MR. SHORE:  We've now got the backup.  But we'll let

16  you know if we do.

17          THE COURT:  Okay.  If you do, I mean, that's a

18  different -- that would be a different issue.

19          I think, Mr. Horowitz, you have to agree:  If the

20  debtor used cash for -- without telling anybody, for purposes

21  not permitted by the budget, that would raise another issue?

22          MR. HOROWITZ:  I agree it would raise another issue.

23          THE COURT:  All right.  All right.  And you're looking

24  at that.

25          MR. SHORE:  Let me respond --

1           THE COURT:  Go ahead.

2           MR. SHORE:  -- to that argument and break it into

3    three pieces.  First, it confirms what I said this morning:

4    Debtors and the committee are not viewing this cash-collateral

5    order as a status quo order; they're saying that we consented

6    to a -- we put ourselves in a position far worse than we would

7    be if we had never consented at all, because had we never

8    consented at all -- and I'm going to come back to the fallacy

9    in their argument.  They say, 'Turn over the assets to you' --

10   right? -- 'or we try to' --

11          THE COURT:  Or you get a contested cash-collateral

12   order.

13          MR. SHORE:  Right, or you get contested cash

14   collateral, which would mean no 506(c) waiver.  But it would

15   require that you give us adequate protection in accordance with

16   the law, not in accordance with the, quote, "consent".  And in

17   that instance, all they would be able to do is surcharge the

18   collateral the amount of actual expenses, not 650-, but tie it

19   down to -- if they want to say -- and there're very strict

20   tests for this -- what employee costs are covered, what

21   attorneys' fee costs are covered, all that.  That would be the

22   determination of what we could be charged.

23          So that's one thing to point out.  The second thing to

24   point out in the argument:  the argument that was made is

25   directly contrary to what the Supreme Court said in Timbers.

1   What the committee and what the debtors pleaded in their

2   complaint is a valuation determined in the hands of the

3   creditor.   In Timbers the creditor came forward and said, I'm

4   undersecured.   I'm not going to get post-petition interest.   I

5   want adequate protection to protect me for what I would get

6   outside of bankruptcy, which is, I'd be able to have the

7   collateral and I'd be able to get my post-petition interest.

8   The Supreme Court said, No, we're not looking at value in the

9   hands of the creditor.   We're looking at value in the hands of

10  the estate.   And in fact they said, for the purposes of 361 and

11  506(a), the valua -- the inter -- or the interest -- value of

12  the interest in the property is the same.   So when you look at

13  506 cases and 361 cases, they have to be the same valuation,

14  and it's a valuation in the hands of the debtor.

15          So what we're coming up to, if they go forward with

16  the allegations in the complaint, is them putting on a lot of

17  evidence about what the value is in the hands of the secured

18  creditor.

19          THE COURT:  But --

20          MR. SHORE:  All right?  And that's why they say

21  there's a complete --

22          THE COURT:  The value in the hands --

23          MR. SHORE:  -- distinction --

24          THE COURT:  -- of the secured creditor --

25          MR. SHORE:  Yes.

1          THE COURT:  -- or the value in the hands of the

2     debtor?

3          MR. SHORE:  No.  The position the debtors have taken

4     in the complaint is, had we handed all you this -- all this

5     collateral on the petition date, the value of the assets would

6     be worth -- they still haven't told us a mark -- maybe 100

7     million dollars, 300 million dollars, whatever number they're

8     going to come up with.  Then they're going to argue, the reason

9     we could spend 650 million dollars in cash is because, had we

10    turned it over, you'd only get 300-.  At least you're getting

11    1.1 billion dollars out of that sale, on a net basis.

12          So the reason this is getting precipitated now is

13    because they're saying there's a distinction, and they want

14    Your Honor to rule that there's a distinction, between the

15    adequate-protection analysis, the valuation that gets done

16    under 361, and the valuation that gets done under 506, because

17    the case law that we pointed to Your Honor says under 506 --

18    and Judge Gerber really lays it out -- under 506, we're going

19    to look at it at various points in time.  It may be that at the

20    time of the petition, the assets were worth X and they

21    appreciated.

22          THE COURT:  You look at the --

23          MR. SHORE:  It may have stayed the same.

24          THE COURT:  -- purpose for which the assets are being

25    held.

RESIDENTIAL CAPITAL, LLC, ET AL.                    199

1          MR. SHORE:  Correct.

2          THE COURT:  Do you disagree with that, Mr. Horowitz?

3    I didn't think so.

4          MR. HOROWITZ:  Your Honor, I think the valuation basis

5    is not a matter that we're deciding today.  We're going to put

6    on values under multiple valuation bases, including their

7    going- --

8          THE COURT:  Okay.  Go --

9          MR. HOROWITZ:  -- in-hands-of- --

10         THE COURT:  Go ahead, Mr. Shore.

11         MR. HOROWITZ:  -- debtor basis.

12         THE COURT:  Go ahead, Mr. Shore.

13         MR. SHORE:  So that's -- so --

14         THE COURT:  But I'm not being --

15         MR. SHORE:  Part of --

16         THE COURT:  -- I'm not being --

17         MR. SHORE:  Part of the reason I'm --

18         THE COURT:  -- asked to decide the valuation basis

19   today, the methodology for that.

20         MR. SHORE:  But what that means, Your Honor, is that

21   at time (sic) trial, we're going to be having nine or ten or

22   fifteen different valuations to put on, because they want to

23   persist and they want to get a ruling from Your Honor now that

24   the 361 valuation is different than the 506 valuation.  In

25   other words, we could be undersecured; we could have 2.2

1  billion dollars of collateral for the purposes of 506(a) on the

2  petition date but only 800 million dollars of collateral for

3  the purposes of 361.

4          THE COURT:  They haven't made that argument.  I don't

5  know what the evidence is going to be, but --

6          MR. SHORE:  All right.  The argument that has been

7  made is exactly what their complaint pleads.  Their complaint

8  pleads that what the Court needs to do is value the assets in

9  the hands of the creditors, and essentially goes forward with

10 the argument, you should be happy you're getting 1.1 billion

11 dollars, because you would have gotten significantly less had

12 we turned the assets over to you.

13         THE COURT:  Unless -- you may persuade me that I'm

14 supposed to -- that even in your hands, I have to value it on a

15 going-concern basis, that -- and the best indication of that is

16 what it sold for.  All right.

17         MR. SHORE:  Right.

18         THE COURT:  It's not necessarily inconsistent, right?

19         MR. SHORE:  That's -- look, our view has always

20 been -- we've taken the position with the debtors; we've taken

21 the position in the counterclaims and everywhere else:  For the

22 purposes of determining value, whether it's for 361 or 506

23 purposes, the value of the asset sold should be the value

24 received in the auction, unless somebody comes up with some

25 evidence that there's been a market change.  I don't think we

RESIDENTIAL CAPITAL, LLC, ET AL.                           201

1    should be bothering Your Honor with a hypothetical valuation as

2    of the petition date and then an actual arm's-length auction.

3                  THE COURT:  And I think -- look, I think Judge Deasy's

4    opinion in SW Boston -- he essentially says basically what you

5    just said.  I think --

6                  MR. SHORE:  Right.

7                  THE COURT:  -- what he does is looking at the purpose

8    it's being sold; that's the best value.  Market --

9                  MR. SHORE:  Right.

10                 THE COURT:  -- is the best value.  That's reasonably

11   close --

12                 MR. SHORE:  Right.

13                 THE COURT:  -- in time.  If you have any reason to

14   think it would be higher or lower, et cetera -- and that's

15   what --

16                 MR. SHORE:  Right.

17                 THE COURT:  -- Judge Deasy did.  Or he didn't -- he

18   was -- he wrote the opinion affirming the bankruptcy court.

19                 MR. SHORE:  Correct.  The 800 million dollars of

20   unsold collateral, I think the evidence is going to show that

21   that's pretty static -- that's the FH ABA (ph.) loans -- that

22   that really doesn't change over time.

23                 THE COURT:  They tried to sell them but they haven't

24   been able to sell them.

25                 MR. SHORE:  The cash:  Cash is what changed radically

1    during the case; it went from 240 million up to a billion-six

2    or a billion-seven, and now down to -- down by 680 million.

3    And then the other assets that existed as of the petition

4    date -- the intercompany claims, cause of action against Ally,

5    and the like -- I'll come by why we have liens on those --

6    those went from whatever they were worth on the petition date

7    or during the case, to zero, because the position they're

8    taking is the collateral is no longer worth anything.

9            THE COURT:  But, see -- respond to this:  I understood

10   Mr. Horowitz to be arguing that, for purposes of an adequate-

11   protection claim, we fix the value as of the petition date, the

12   aggregate value for cash and noncash.  If it's gone down, you

13   get a claim for diminution; if it's gone up, you don't.  And

14   even if -- take my hypothetical where cash is spent even for

15   purposes unrelated; the value of the noncash assets increase

16   because of market or whatever.  Do you have an argument about

17   diminution?  His answer is, no, the issue is you fix it for

18   this purpose.  For the adequate-protection claim, you fix it at

19   the petition date and you look to see whether it's gone down.

20   If it's gone down, you get paid.

21           MR. SHORE:  I mean --

22           THE COURT:  If it hasn't, you don't.  If it's gone up,

23   you're going to -- it enhances your argument about you get

24   closer or above whether you're oversecured.

25           MR. SHORE:  Right.  I just want to make clear --

1          THE COURT:  You agree -- you disagree with --

2          MR. SHORE:  No.  I --

3          THE COURT:  -- that analysis?

4          MR. SHORE:  I agree with that.  But let me make --

5          THE COURT:  Okay.

6          MR. SHORE:  -- two qualifications to what he's saying.

7    First, the only way they're going to get us undersecured on the

8    petition date is if they change the method of valuation; one.

9          THE COURT:  And you'll put in evidence to do it --

10         MR. SHORE:  Right.

11         THE COURT:  -- differently, okay.  But let --

12         MR. SHORE:  Two --

13         THE COURT:  Let's --

14         MR. SHORE:  Two --

15         THE COURT:  I want to stop --

16         MR. SHORE:  -- I don't --

17         THE COURT:  I want to stop you for a second, okay,

18   because unless I'm missing something, your agreement with me --

19   I think you agreed with me -- is a major agreement with the

20   committee.  What it tells me is you're not disagreeing about

21   this point.  You may disagree, and you're going to put your

22   experts on about valuation, and they'll put their experts on on

23   valuation.  Okay.  And -- okay.

24         But as to the basic point, I don't hear you

25   disagreeing that we look at what the value is as of the

1  petition date:  If it's gone down, you get a diminution claim;

2  if it hasn't gone down, you don't get a diminution --

3            MR. SHORE:  Right.

4            THE COURT:  -- claim.

5            MR. SHORE:  The only --

6            THE COURT:  Do you agree with that point?

7            MR. SHORE:  No.  I agree with that -- I make one

8  modification to that:  I don't think it's limited to the

9  petition date.  I think it's -- with respect to the cash, we

10 had umpteen renewals of the cash-collateral order.  At every

11 single one of those, we had the ability to withhold consent to

12 the spending of cash.  They did not get an open-ended use of

13 cash collateral through the entire case; they got it through

14 during the periods.

15            Our view is, when you're looking at cash, you got to

16 look at it at those periods.

17            THE COURT:  Okay.  So you say that every time the

18 order was renewed, I need to look afresh at --

19            MR. SHORE:  The cash position.

20            THE COURT:  -- at the cash position?

21            MR. SHORE:  Right.

22            THE COURT:  And you're either right or you're wrong.

23            MR. SHORE:  Right.

24            THE COURT:  I don't know.

25            MR. SHORE:  That's right.  And then the other point

1   is, with respect to the unsold assets, including the

2   intercompany claims and the Ally contribution --

3              THE COURT:  You've never --

4              MR. SHORE:  -- the --

5              THE COURT:  -- convinced me you have a lien on

6   intercompany claims.

7              MR. SHORE:  I'm coming -- I'm going to come to that.

8   The next page -- I'm going to come -- actually, maybe two more

9   pages.

10             The issue is -- has always been presented in the case

11  as adequate protection is due at the time -- at the petition

12  date or at the time adequate protection is required.

13             THE COURT:  Okay, and --

14             MR. SHORE:  And the cases that have come forward and

15  have made that point have come forward after the end of the

16  case, before the assets have been disposed.  I don't -- I think

17  they're making the formalistic point right now that in -- if we

18  want to reset adequate protection from the petition date, we

19  need to move to lift the stay and get adequate protection at

20  that --

21             THE COURT:  And you say you don't.

22             MR. SHORE:  -- point.

23             THE COURT:  You simply have to enter in a new cash-

24  collateral order?

25             MR. SHORE:  No, no, the cash collateral order's with

1  respect to cash.

2           THE COURT:  All right.

3           MR. SHORE:  I'm talking about the --

4           THE COURT:  Okay

5           MR. SHORE:  -- the remaining --

6           THE COURT:  All right.

7           MR. SHORE:  -- assets.

8           THE COURT:  All right.  Okay.

9           MR. SHORE:  If their position is the formalistic one

10 that, as long as we made a motion to lift stay, Your Honor

11 denied it, said, you're entitled adequate protection, then we

12 can handle that.  But it doesn't -- that seems to be far more

13 form over substance and just asking for a multiplicity of

14 pleadings.  We really should be looking at the value of the

15 assets before -- right before they're sold, so that we don't

16 have to deal with that.

17          So that handles the adequate protection.  The expense

18 issue:  We need the itemized determination --

19          THE COURT:  Why?

20          MR. SHORE:  -- of the actual expenses, because we're

21 going to need to deal with that in the context of valuing the

22 collateral.  If the position is that the collateral -- in order

23 to realize the value of the collateral, you need to incur

24 expenses, then we're going to need to incur the expenses.  See,

25 the position the debtors have taken is you don't look at the

1    auction; right?  But if you look at the auction, you need to

2    accrue the expenses.  So we need the breakdown of that 660- to

3    determine --

4              THE COURT:  So --

5              MR. SHORE:  -- how it was actually spent.

6              THE COURT:  -- if the committee and the debtor agree

7    that you look at the auction, then you don't need it?

8              MR. SHORE:  If the debtor and the committee's agreed

9    that with respect to the -- using the auction value for the

10   value of the collat -- that collateral that was sold as of the

11   petition date, I can stand down on the expenses.

12             The -- and then the last point is the budgets and the

13   argument that the claims that seek a reallocation are gone.

14   Allocation was always an open issue.  We've had reservations of

15   rights with the debtors on that; we could show that later.

16             But again, the expenses are charges against the

17   debtors; they're not charges against the collateral; that's

18   just how it's talked -- those are administrative expenses.

19   Their argument is 660 million dollars is going to be charged to

20   particular debtors within the enterprise; that's an issue

21   that's obviously open for confirmation and, well, we can't get

22   rid of that claim at this point.

23             All right.  Liens on claims against Ally.  Let me give

24   you a little bit of history on this, because it explains kind

25   of how it came out and how we had the liens-on-avoidance-action

1   language in the documents.  In the initial complaint --

2           THE COURT:  On what documents?

3           MR. SHORE:  The liens on the claims against Ally,

4   avoidance claims.

5           THE COURT:  In --

6           MR. SHORE:  In the committee's initial --

7           THE COURT:  In --

8           MR. SHORE:  -- complaint --

9           THE COURT:  What you said, that's why you had it in

10  the documents, are you talking about the claims?

11          MR. SHORE:  I'm sorry; in the counterclaims.  The

12  original -- this is how it happened:  The committee filed

13  initial complaint and they challenged any assertion the JSN had

14  liens on commercial torts, and that was answered by UMB,

15  represented by Akin only at that point.  In the amended

16  complaint, the debtors saw the declaration that JSNs said no

17  liens on avoidance actions, broadly speaking.  So that's how

18  the issue got brought into the case.

19          In the counterclaim, we said we have liens on those

20  things, but then we all agreed in the scheduling order let's

21  wait to see what the examiner says with respect to this.  And

22  you recall there was a period of time in which we could amend

23  and do it.

24          THE COURT:  Then you added claim 35, I think is the

25  one.

1          MR. SHORE:  Right.  In fact, the -- we amended.  The

2     debtor -- neither the debtors nor the committee amended.  And

3     we put more specificity.  So on pages, I think, 31 through 39

4     of the complaint, we lay out those claims which the examiner

5     identified which we believe would be subject to our liens.

6          Now, a word on the examiner's report.  We agree it's

7     hearsay for proving that the claims are valid in those amounts,

8     but it is not hearsay for the purpose of identifying claims

9     which might exist.  That is --

10         THE COURT:  I agree with that.

11         MR. SHORE:  -- claims which --

12         THE COURT:  I agree with that.

13         MR. SHORE:  Yeah, claims which could be brought.  It

14    lists a series of claims that fall into several broad

15    categories:  breach-of-contract claims; mixed breach-of-

16    contract and tort claims, and maybe Your Honor was focusing --

17    there's an Ally Bank claim that's in there that's listed both

18    as a contract action and as a tort action; avoidance claims,

19    both preference and fraudulent conveyance; mixed avoidance and

20    breach-of-contract claims, which is the tax allocation

21    agreement; and then discusses certain remedies, veil-piercing

22    and alter ego, and comes to conclusions about that.

23         We're in the process of discovery and getting more

24    evidence on these so that when we have to put on evidence,

25    that's what will --

RESIDENTIAL CAPITAL, LLC, ET AL.                    210

1          THE COURT:  But --

2          MR. SHORE:  -- will come forward.

3          THE COURT:  -- Mr. Horowitz today, when I ask him what

4     it is that the committee is asking for, and the way I -- he

5     didn't say it in these words, but the way I interpret it is, an

6     order granting in part the motion to dismiss, the counterclaim

7     that seeks to impose a lien on litigation recoveries for

8     commercial torts and avoidance actions -- he and I got into

9     this discussion where, pulling teeth, I got him to acknowledge

10    that at least there's -- there may -- he thinks, as a practical

11    matter, it doesn't apply.  But he seemed to acknowledge that

12    there may be contract claims which you would have an argument

13    for a lien, although the pledge doesn't say it; it says

14    "intangibles"; doesn't say anything about causes of action.

15    But --

16          MR. SHORE:  Well, let's --

17          THE COURT:  Let's -- he gave you that much, at least;

18    not much, but --

19          MR. SHORE:  Well, let me deal with that, because it

20    does come into the (sic) play on why we're saying we have a

21    lien on those specific claims that are laid out.  The security

22    agreement gives us a lien on general intangibles.  General

23    intangibles is defined as -- with reference to the UCC -- in

24    that case the New York UCC -- and also specifies tax refunds

25    specifically.  Any tax refund is subject to the lien

1  specifically.  The UCC, in 9-102, section (42), defines a

2  general intangible as any personal property of the debtor,

3  except for a list, and it excludes commercial tort claims.  And

4  then in note 5(d), the official comment says general

5  intangibles, as the first thing, includes any things in action,

6  which are causes of action of the account debtor.

7           So that -- in that instance, a lien on general

8  intangibles, which is agreed to in the cash-collateral order

9  and not objected to by anybody, at least with respect to

10  anything other than commercial tort claims, which is the one

11  claim that the committee brought in their challenge, would

12  apply.

13           THE COURT:  Mr. Shore --

14           MR. SHORE:  Okay.

15           THE COURT:  -- that's fine, but you're selling, and

16  I'm not buying, liens on avoidance actions.

17           MR. SHORE:  I'm not.  So let me deal with

18  commercial -- or you want me to deal with avoidance --

19           THE COURT:  No.

20           MR. SHORE:  -- action first?

21           THE COURT:  Deal --

22           MR. SHORE:  Okay.

23           THE COURT:  Deal with -- but --

24           MR. SHORE:  All right.

25           THE COURT:  -- you're agreeing that commercial torts

1    are carved out from any lien you're asserting, correct?

2              MR. SHORE:  Yes.  The question is --

3              THE COURT:  You have a fight about what's a commercial

4    tort?

5              MR. SHORE:  Yes.  That's -- that is --

6              THE COURT:  We're not deciding that today.

7              MR. SHORE:  That's -- I don't know how this got

8    brought into our dispute.  We just say we had a lien on the

9    Ally contribution.  Again, the position the debtors are taking

10   is the Ally contribution isn't on account of anything, and

11   nobody has to allocate, but you do -- but they do want a

12   finding that it is all on account of avoidance actions.  We'll

13   get to some judicial resolution --

14             THE COURT:  Okay.

15             MR. SHORE:  -- of that --

16             THE COURT:  But, look --

17             MR. SHORE:  -- at some point.

18             THE COURT:  -- you're agreeing you don't have a lien

19   on commercial torts.  You're not agreeing --

20             MR. SHORE:  Right.

21             THE COURT:  -- what that means.

22             MR. SHORE:  The one area of disagreement's going to be

23   as follows -- well, leave aside the remedies, veil-piercing and

24   alter ego.  The one area where we're going to have a problem is

25   the UCC defines proceeds of collateral as any claim brought to

1    recover damage to property.  So if somebody took the debtors'

2    property or damaged the debtors' property which is subject to

3    our lien --

4            THE COURT:  That would be nice --

5            MR. SHORE:  -- we have a --

6            THE COURT:  -- except that you specifically answered

7    "None" with respect to --

8            MR. SHORE:  It's not a commercial --

9            THE COURT:  -- commercial torts.

10           MR. SHORE:  No, that's what I'm saying:  It's not a

11   commercial-tort claim.  In fact, there's a Judge Posner --

12           THE COURT:  Then I don't have to deal with it today.

13           MR. SHORE:  Okay.

14           THE COURT:  All he's saying is he wants a

15   determination that you have no lien on commercial torts and

16   avoidance actions.

17           MR. SHORE:  Okay.

18           THE COURT:  And you're agreeing you don't have a lien

19   on commercial torts.

20           MR. SHORE:  Subject to the --

21           THE COURT:  You're going to --

22           MR. SHORE:  -- full --

23           THE COURT:  -- fight about what that means.

24           MR. SHORE:  Exactly.

25           THE COURT:  Okay.

1          MR. SHORE:  All right, liens --

2          THE COURT:  But you are arguing you have a lien on

3    avoidance actions and --

4          MR. SHORE:  I'm having -- I'm arguing that we have a

5    lien on the recoveries on account of the claims that are

6    specifically identified in the counterclaims.

7          THE COURT:  Well, I don't think that's what you plead.

8          MR. SHORE:  What?

9          THE COURT:  You say you have a lien on avoidance

10   actions, and I don't think you have a lien on avoidance

11   actions.  They are -- they belong to the creditors.  It's a

12   post-petition claim/cause of action.  And the -- most of the

13   fight, most often, is whether a bankruptcy judge can provide

14   avoidance actions as part of an adequate-protection package.

15   We hate to do it.  I concluded we can, even though I hate to do

16   it.  And there may be one time in six and a half years when

17   I've done it, and the end result there was a good one because

18   there was never an adequate-protection claim; it -- the case

19   successfully reorganized.  And there was no diminution in value

20   of the collateral; it was available if there was, but it wasn't

21   needed at the end of the day.

22          But you haven't cited, in my view, a single case that

23   indicates that a pre-petition secured creditor has a lien on

24   avoidance actions, either preference or fraudulent conveyance.

25   Have you?

1        MR. SHORE:  No.

2        THE COURT:  Okay.

3        MR. SHORE:  The argument that is set forth in the

4   thirty-fifth counterclaim, which is the new counterclaim, is

5   that with respect to each of the causes of action that are

6   identified by the examiner in the specific paragraphs, they

7   constitute collateral and we are entitled to the benefit of the

8   recovery of them.

9        They did constitute collateral pre-petition.  The

10  issue is whether -- what happens when that comes back.  Let's

11  focus on the big one:  the tax allocation agreement.  We have a

12  specific lien in tax refunds.  What the examiner said was

13  happening in the pre-petition period is Ally was taking the

14  right to tax refunds of all of the subsidiary debtors, rolling

15  them up under the pre-petition -- the first pre-petition tax

16  agreement, and then using it.  Then they entered into a second

17  pre-petition tax agreement, which caused another fifty million

18  dollars in damage.  It sounds like we're going to later,

19  whether that's then an avoidance action or a breach-of-contract

20  action or whatnot.

21        If we get back the proceeds of the -- if the estates

22  recover and Your Honor determines that some portion of the Ally

23  contribution is on account of them having taken our collateral,

24  our view is -- our collateral; our collateral was the tax

25  refunds.  Ally -- if Ally is paying to get rid of that claim,

RESIDENTIAL CAPITAL, LLC, ET AL.                    216

1    our position is -- backed by the cases that focus on that

2    aspect of it, our position is we have a right senior to the

3    other creditors, in those recoveries.

4            THE COURT:  Let me ask you this hypothetical:  Let's

5    assume that the debtors have a pref -- a twenty million dollar

6    preference action against one of the vendors or suppliers or

7    somebody they deal with, you know, subservicer, I --

8            MR. SHORE:  Um-hum.

9            THE COURT:  They have a preference action because they

10   paid twenty million dollars ninety days before the bankruptcy.

11   It's -- unaffiliated, unrelated party.  Is it your position

12   that the JSNs -- that the collateral agent has a lien on the

13   recovery of an avoidance action against an unaffiliated party?

14           MR. SHORE:  No.  We have -- if we had brought that, we

15   would have brought that claim.

16           THE COURT:  Well --

17           MR. SHORE:  The claim we're making --

18           THE COURT:  -- why do you -- how can you draw a

19   distinction between a preference claim against an unaffil --

20   unrelated party, and against Ally?  There's a preference claim,

21   perhaps, and the issue is whether the JSNs have -- through the

22   collateral agent, have a lien on the avoidance action.  And

23   there is -- almost as sure you'll point it out to me if you

24   can, I've never seen a case that's ever said that a

25   pre-petition secured lender has a lien on recoveries of

1  avoidance actions, whether it's preference or fraudulent

2  conveyance.

3         So if you have a case like that, tell me what it is.

4  You're -- I pressed the committee and the debtors about this

5  distinction between if it involves a transaction with an

6  affiliated third party versus transaction with the debtor.  I

7  don't see why there's a difference analytically, unless you're

8  substantively consolidated; then you're out of -- then all bets

9  are off for you.

10         MR. SHORE:  The --

11         THE COURT:  But --

12         MR. SHORE:  The difference is found in the allegations

13  of the complaint.

14         THE COURT:  Well, you can't --

15         MR. SHORE:  Yes.

16         THE COURT:  No, the -- it's not -- Mr. Shore, you

17  can -- fine, and then I can rule and dismiss the cause -- you

18  can plead what you want, but the fact of the matter is there's

19  not a single case that supports giving a pre-petition secured

20  lender a lien on avoidance actions; you haven't cited one.

21         MR. SHORE:  Let me --

22         THE COURT:  I know of none.  I don't know of any of my

23  colleagues ever doing it.  I've never done it.  That doesn't

24  make it necessarily right, but I'd like to see some law that

25  supports your argument, and you don't have any.

1          MR. SHORE:  Let me respond to the first question,

2    which -- what's the distinction.  As alleged in the complaint,

3    Ally was not a bona fide purchaser for value of the property

4    which was transferred.  In your example --

5          THE COURT:  And it may make it avoidable as a result.

6    That's -- yeah.  You --

7          MR. SHORE:  And --

8          THE COURT:  You've made --

9          MR. SHORE:  And it would mean --

10         THE COURT:  -- allegations as to why it would be

11   avoidable.

12         MR. SHORE:  And it would mean our lien travelled with

13   the assets.

14         THE COURT:  No, it doesn't mean that; not at all.  Not

15   at all.  It doesn't mean that your lien travelled with the

16   asset; if you had a lien.  I mean, as to the liens that were

17   released, I'll deal with that.  So as to anything where liens

18   were released, if they were effectively released, there were no

19   liens to travel with the property.

20         MR. SHORE:  We're not making -- let me clarify that.

21   We have not made, with respect to any of the specific causes of

22   action which are identified in the complaint, any argument that

23   those were the subject of lien releases.  On the contrary,

24   the -- and nor are they; those are not assets -- those are not

25   the assets --

1          THE COURT:  You did.

2          MR. SHORE:  -- we're talking about.

3          THE COURT:  I read this -- I read it over again either

4    last night or this morning, where you included, within the

5    category of transfers for avoidance purposes, mortgage

6    servicing rights and other things which you said you had

7    pre-petition liens, and you said that there were lien releases

8    and you said they weren't authorized.  I know I read that.

9          MR. SHORE:  All right, well --

10          THE COURT:  Are you telling me I'm wrong?

11          MR. SHORE:  -- I can check.  I do not, sitting here,

12    recall that any of the claims which we specifically identified

13    involved those assets.  So I will -- we'll have it checked.

14    And before --

15          THE COURT:  I could be wrong.

16          MR. SHORE:  -- I sit down --

17          THE COURT:  I could be wrong.

18          MR. SHORE:  -- Mr. Denman will tell me that I'm wrong.

19          So our view is, looking at the cases, Figearo,

20    Hospitality, Amtron, which is the second line of cases which

21    are -- you don't have a lien on the avoidance action per se;

22    you have a right to the recoveries on the avoidance action,

23    which is senior to the rights of the general unsecured

24    creditors.  And the reason you have a distinction is because of

25    the courts trying to dealing with the unfairness of the

1  situation in which a debtor actually takes assets that are

2  subject to a lien, puts them with a party who's not arm's-

3  length, and then they try to argue that therefore the

4  recoveries on that go to the general unsecured creditors.

5         So the argument we made in the last counterclaim, and

6  the argument we set forth in the brief, is following that line

7  of cases.  If any portion of that Ally contribution is deemed

8  to be on account of an avoidance action which relates directly

9  to property which is identified, as ours, which Ally knew was

10 our collateral and for which we received no value, we are

11 entitled to a direct allocation of the Ally contribution.

12         THE COURT:  Which cause of action says it?

13         MR. SHORE:  The thirty -- the last one.

14         THE COURT:  35?

15     (Pause)

16         THE COURT:  Go ahead.  I looked at it.

17         MR. SHORE:  All right.  So to answer your question,

18 the cases we're relying on are the ones I laid out, which

19 aren't saying that the lien was there.  There was no property

20 interest in the debtors, at the time of the grant, to sue Ally

21 for avoidance, but that does not mean that there's no remedy

22 for them having transferred it to Ally and bringing it back,

23 what is essentially washing of collateral into unencumbered

24 assets, merely by them having transferred it to their parent in

25 the pre-petition period.

1          THE COURT:  Go ahead.

2          MR. SHORE:  All right.  All right, the Ally LOC

3     assets:  Look, let me clarify a couple of things.  With respect

4     to bucket 1, bucket 1 are the assets on which the -- which were

5     on the original filed UCCs and the originally signed releases.

6     Those were clearly unperfected.  We're not arguing that they

7     weren't authorized.  What we're arguing is, if it was in breach

8     of the security agreement and the indenture, for them to have

9     given the direction to release, the remedy, under New York law,

10    is an equitable lien.

11         THE COURT:  Remedy under New York law is to sue the

12    collateral agent.

13         MR. SHORE:  The remedies are not exclusive, Your

14    Honor.  The --

15         THE COURT:  In a notice filing system, I do not

16    understand how can you -- how you can require essentially the

17    cross-examination of parties when the collateral agent files a

18    whole series of UCC-3s.  Okay.  It defies the whole concept of

19    the UCC notice filing system.  Motors Liquidation raised -- I

20    think the debtors did an effective job of distinguishing

21    MarketXT and Motors Liquidation in their reply brief.  Motors

22    Liquidation involved a very different set of circumstances and

23    facts where a paralegal allegedly erroneously prepared and

24    filed a UCC-3 lien release.  There is no argument that's been

25    made here that the collateral agent erroneously, mistakenly

RESIDENTIAL CAPITAL, LLC, ET AL.                    222

1   filled out a form and filed it.  You would turn the whole UCC
2   notice filing system on its head if I accept your argument that
3   it creates -- that the allegation that the collateral agent
4   breached the indenture when it went ahead and signed the
5   release, effectively invalidates the release and lien -- the
6   UCC-3.
7           You may -- if the facts are as you allege, you may
8   well have a claim against the collateral agent.  That's very
9   different from arguing that you either have a legal or
10  equitable lien on the assets that were released.
11          MR. SHORE:  Let me just -- on the first bucket,
12  equitable liens still exist in New York, notwithstanding the
13  New York UCC -- let me cite one thing that we didn't cite to
14  you.  There's a New York Court of Appeals case from 1994,
15  Rosario-Paulo v. C & M Pizza, 84 N.Y.2d 379 (1994), which
16  granted an equitable lien to somebody to had a security
17  interest in insurance proceeds.  When the insurance proceeds
18  were sent out, the Court had an equitable lien follow with it.
19          So it is alive and well in the context.  It may raise
20  issues with respect to perfection and who has seniority between
21  the equitable lien and the hypothetical lien creditor, under
22  state law; and we've cited the cases on that.
23          Focus on bucket 2, though.
24          Bucket 2, as I've described it, are the schedules that
25  were shared purely between the debtors and Ally under the Ally

1    LLC.  There is a substantial issue here, and an allegation on

2    our part that the debtors weren't authorized to release liens

3    merely by handing a schedule back and forth without regard to

4    the -- without regard to the indenture or the pledge agreement.

5    That's not an Article 9 issue, right, because the releases

6    aren't addressing that.  The releases are addressing what was

7    there at the time.  But it is going to raise the argument on

8    our part that the lien was never released, that is, properly

9    released.  The only authorization to release the lien, in our

10   view, would be things on that schedule which comported with the

11   credit agreement and the --

12           THE COURT:  But you don't dispute that the collateral

13   agent in fact signed the release and filed the UCC-3, correct?

14           MR. SHORE:  No, we don't dispute it.

15           THE COURT:  All right.  So while I'm thinking about

16   it, the point I raised about what you're arguing about the

17   avoidance claims regarding the transfer of property that was --

18   you alleged was subject to the lien -- it's paragraph 37 of the

19   counterclaims, "In addition, even if a portion of the Ally

20   contribution pertains to post-petition claims of debtors that

21   arise under Chapter 5 of the Bankruptcy Code, the JSN liens

22   nonetheless attach to any pre-petition collateral that was

23   transferred pre-petition to Ally that are otherwise the subject

24   of potential avoidance actions as the JSN liens on such assets

25   were never properly released."

RESIDENTIAL CAPITAL, LLC, ET AL.                    224

1          MR. SHORE:  Right.

2          THE COURT:  "To the extent, then, that any such

3    transfer of the pre-petition collateral would be subject to

4    avoidance, the assets, or value of those assets, revert to any

5    individual debtor's estate, subject to the JSN liens."

6          MR. SHORE:  Yeah.

7          THE COURT:  That's the specific paragraph -- I

8    couldn't remember where it was, but that --

9          MR. SHORE:  And let me --

10         THE COURT:  There may be something else in there, but

11   that was what I had in mind.

12         MR. SHORE:  Let me explain what that means.  There's

13   no allegation, for example, that there was a lien release of

14   tax refunds.  So --

15         THE COURT:  But this has stuff that was released.

16         MR. SHORE:  No, the argument is that the lien is there

17   because they were never properly released.  We're not argu -- I

18   just don't believe we've argued --

19         THE COURT:  All right.

20         MR. SHORE:  -- that any portion of those Ally claims

21   relate to the Ally LLC transfers.  Rather, these are transfers

22   of other assets in which they don't even argue that the lien

23   was released when they were transferred to Ally.

24         Bucket 3 -- and let me clarify this in that

25   counterclaim.  There are also, in the Ally LLC, assets we

RESIDENTIAL CAPITAL, LLC, ET AL.                    225

1  believe are not traceable either to the original filed UCC-3s

2  or to any schedule that was ever exchanged pre-petition, so

3  that there would be no argument that the lien was released on

4  those.

5            THE COURT:  Is there a UCC-3 that purports to release

6  the liens?

7            MR. SHORE:  UCC -- no, there is no UCC that purports

8  to release liens on those things that are not on a schedule.

9            THE COURT:  Is there a release agreement that purports

10 to release liens?

11           MR. SHORE:  No.  Everything was tied to the mortgage

12 servicing rights that were listed on the original schedule or

13 schedules under the LLC.  To the extent that there was an asset

14 that didn't fall on one of those two things, there isn't a

15 release of that.

16           THE COURT:  Which cause of action is this, because --

17           MR. SHORE:  That's the --

18           THE COURT:  I didn't see that.

19           MR. SHORE:  The twenty-fifth counterclaim.

20           THE COURT:  What page are you on?

21           MR. SHORE:  It's page 79.

22           THE COURT:  Let me read it.

23           MR. SHORE:  All right?  And it addresses --

24           THE COURT:  No, but it's dealing specifically with the

25 purportedly released collateral.

1          MR. SHORE:  Right.  The debtors are -- when I say

2    "purported", the debtors have taken the position, as alleged in

3    the prior part of the complaint, that anything that is an MSR

4    or a bought-back loan, or proceeds of any of the foregoing, are

5    in the Ally LLC silo.  That's what they purport; they say it

6    was all released.  We're saying, no, it's only released, under

7    any arguable theory, if it is either on those original UCCs or

8    on the pre-petition schedules.  If it's not on the schedules,

9    there's no basis to say that it is released collateral.  That's

10   what purportedly released means there.  Sorry for the language

11   on that.

12          That's the contention of the debtors, that everything

13   that sits in the Ally LLC is free and clear of any lien of the

14   JSNs.  And I just -- we're just saying, well, if you're going

15   to take the position that it's been released by a UCC or a

16   schedule, trace it back to the UCC or the schedule.

17          THE COURT:  So you say that the twenty-fifth count

18   should stand because it relates to the transfer to Ally, to

19   AFI, of property to which you had a pre-petition lien which was

20   not released by the collateral agent.

21          MR. SHORE:  Right.

22          THE COURT:  Is that right?

23          MR. SHORE:  Yes.

24          THE COURT:  And that's the only thing that Count XXV

25   seeks to reach?

 1          MR. SHORE:  Yes, Your Honor.

 2          THE COURT:  And you may have a dispute, and it sounds

 3    like you do have a dispute with the debtors and committee

 4    whether there are such assets.  That's for another day.  But

 5    that's --

 6          MR. SHORE:  That's why we asked for the CFDR database,

 7    because that's what it's supposed to track.

 8          THE COURT:  All right.  Okay.  I understand your

 9    argument.

10          MR. SHORE:  Thank you, Your Honor.

11          THE COURT:  Thank you.

12          Briefly, Mr. Horowitz; I still have one more motion to

13    deal with.

14          MR. HOROWITZ:  Extremely briefly, Your Honor; maybe

15    only a minute, because most of what Mr. Shore said today I

16    think goes to the factual arguments we're going to have at

17    trial, largely about valuation.  And I just want it on record,

18    we obviously disagree with a lot of what he says.  For example,

19    we think it's -- he asserted that the value, as of the petition

20    date, of their collateral, should include the 800 million

21    dollars in cash that was used over the course of the case.  But

22    Mr. Shore also separately acknowledged that as of the petition

23    date, there was only 240 million dollars in the JSN collateral.

24          THE COURT:  Look, we're going to get into that --

25          MR. HOROWITZ:  Exactly, Your Honor.  I'll move past

1  it.

2          THE COURT:  The thing that surprised me was the two of

3  you actually seemed to be more in agreement about the issues

4  that are for the trial, for phase 1 trial.  Mr. Shore made the

5  additional argument, that I hadn't focused on -- I don't know

6  if it's in the papers -- that in terms of the measuring date

7  for diminution and using the value of the collateral each time

8  the cash collateral order was renewed, you may disagree, but

9  that'll be an issue.  At least I understand what his position

10 is.  I assume you're taking a contrary position.

11         MR. HOROWITZ:  The level of agreement shocked me too,

12 Your Honor, but let me just talk, momentarily, about this idea

13 of adequate protection reset that at each point the -- that the

14 cash collateral order was renewed, that sets a new mark for

15 adequate protection.  I don't think it's relevant.  I think we

16 agree that if at any point -- intermediate point in the case,

17 you know, in accordance with Urban Communications, they

18 actually were oversecured at that date, then they're

19 oversecured.

20         THE COURT:  But I'm telling you what I've been --

21         MR. HOROWITZ:  But that's the 506(b) point --

22         THE COURT:  Yeah.  Well --

23         MR. HOROWITZ:  -- that's not an adequate protection

24 point.

25         THE COURT:  Which is the dollar-for-dollar

 1  counterclaim?

 2          MR. HOROWITZ:  It's 26, as I recall.  And I do think,

 3  Your Honor, it's pretty explicit about what it asks for, but we

 4  don't need to get into it.  It's paragraph 213 on page 80.

 5          THE COURT:  Right, I'm there now.

 6          MR. HOROWITZ:  If Mr. Shore's position today is, in my

 7  view, different than what's in their counterclaims, I don't

 8  need to make a big deal out of it, because I think what's

 9  important is what position they're taking going into --

10          THE COURT:  Yeah --

11          MR. HOROWITZ:  -- the trial.

12          THE COURT:  -- I mean, I think you seem to be in

13  substantial agreement about what the issue is.  I read the

14  paragraph the way you've described it, the way you argued it in

15  your papers.  And I said early on today, I have a real problem

16  with this dollar-for-dollar concept.  But when Mr. Shore talked

17  his way through it, you really didn't seem to be -- it may turn

18  out to be dollar-for-dollar, and it may well not turn out to be

19  that way.  That's not the methodology, it's just -- it measures

20  a differ -- okay, go ahead.

21          MR. HOROWITZ:  Mr. Shore seems to have a valuation

22  theory, as of the petition date, that would effectively give

23  them --

24          THE COURT:  Okay.

25          MR. HOROWITZ:  -- value for every dollar --

1          THE COURT:  All right.  Go ahead with your --

2          MR. HOROWITZ:  -- that they spent.  That's something

3    we can deal with at trial, and I welcome valuation battles.

4    But he also said one --

5          THE COURT:  Oh, I'm sure you do.

6          MR. HOROWITZ:  -- one thing --

7          THE COURT:  I'm really looking forward to it too.

8          MR. HOROWITZ:  With you, my sarcasm radar isn't

9    necessarily finely tuned.  I actually am looking forward to it.

10          THE COURT:  Turn around and look at your partner, Mr.

11    Eckstein; his eyes are rolling.

12          MR. HOROWITZ:  I did -- there was one statement Mr.

13    Shore made that I just have to point out.  He said that the

14    ultimate value that was realized at auction is dispositive.

15    And to be clear, we agree it's dispositive for 506(b) purposes,

16    but not for adequate protection purposes.

17          THE COURT:  Well, you're going to disagree about that,

18    and you're going to argue --

19          MR. HOROWITZ:  Right, but we'll --

20          THE COURT:  -- you're going to argue your respective

21    positions.

22          MR. HOROWITZ:  And the last point was that while Mr.

23    Shore seems to be agreeing now that the relevant issue is what

24    was the value as of the petition date with regard to adequate

25    protection; he says that he needs --

1          THE COURT:  Except he said that every time the cash

2     collateral gets renewed that it -- it's a moving target.

3          MR. HOROWITZ:  What I was saying is that I don't

4     think, as a practical matter, that makes a difference, because

5     if there is such a date when they're oversecured, then for

6     506(b) purposes they're oversecured; they don't need to get

7     there through adequate protection.

8          But he also says that he needs expense information --

9          THE COURT:  Yes --

10         MR. HOROWITZ:  -- in order to --

11         THE COURT:  -- answer that one.

12         MR. HOROWITZ:  -- in order to present his case for

13    what the value was as of the petition date.  And I understand

14    the logic behind that.  If you're going to say, well, we should

15    use the auction value as an indication of what the value was as

16    of the petition date, fundamental element in principle of

17    finance, you have to deduct from the sale price all of the

18    expenses that they would have had to incur to get to that

19    point.  Fine, he may need some discovery on that.  That's very

20    different than what they're asking for in counterclaim 28 and

21    what Mr. Shore was suggesting they're going to be doing expert

22    reports on, which is a full throughout-the-course-of-the-case

23    dissection of what the debtors spent and whether it was spent

24    with regard to their collateral or not.  And so I'm left with a

25    little bit of -- well, more than a little bit of uncertainty

1  about what the JSNs continue to believe the relevance of this

2  expense or reallocation -- these 28 and 30, these expense and

3  reallocation counterclaims are about.

4          THE COURT:  Address, for a moment Mr. Shore's argument

5  that there is a group of assets as to which the JSNs had a lien

6  pre-petition, which lien was never released, which were

7  transferred to AFI.

8          MR. HOROWITZ:  I'm still not aware of any actual

9  particularized allegation that there is such a set of assets,

10  Your Honor.

11          THE COURT:  Well, Mr. Shore pointed to the language,

12  which I think -- remind me, Mr. Shore, which cause of action

13  did you bring that --

14          MR. SHORE:  It's the -- well, the one I pointed out to

15  Your Honor was the tax allocations -- allegations which are on

16  page --

17          MR. HOROWITZ:  Oh, it's that the reference, I'm sorry,

18  Your Honor; I did want to talk to that.  Mr. Shore did make

19  reference to there being a specific pledge of tax refunds and

20  suggested that this tax allocation claim is a claim to recover

21  tax refunds.  Factually, that's just wrong, Your Honor.  A tax

22  refund is when the IRS or a state --

23          THE COURT:  Sends a check back.

24          MR. HOROWITZ:  -- sends a check back for taxes that

25  you paid previously.  This tax allocation agreement, the first

RESIDENTIAL CAPITAL, LLC, ET AL.                    233

1    2009 tax allocation agreement, if it had been enforceable,

2    would have given ResCap a right to receive compensation from

3    Ally for Ally's ability to use NOLs to offset Ally's tax

4    liabilities --

5            THE COURT:  All right.

6            MR. HOROWITZ:  -- not only for Ally to receive a tax

7    refund.

8            THE COURT:  I'm going to stop you, because here's what

9    I'm going -- because we have to stop at 5 o'clock; we have a

10   few minutes left.  It's important that you all have guidance,

11   because you are rapidly moving toward trial.  And to the extent

12   possible, you should have that guidance sooner rather than

13   later.

14           My intention now is to tell you my disposition as to

15   certain of the claims, the motions to dismiss certain of the

16   claims.  It will be followed with a very short order, followed

17   sometime later by an opinion.  All right?  But it's contrary to

18   what my normal practice is, but because you're racing toward

19   trial and need to know where to focus your energy, I am going

20   to do that, okay?

21           So first, with respect to UMB's motion to dismiss

22   Counts III and V of the debtors' complaint, the motions are

23   denied without prejudice.  I believe that my decision will

24   be -- my ability to decide those issues will be enhanced by a

25   full factual record.  I asked questions this morning as to

1  whether it would materially alter the evidence that would be

2  offered, and I think both sides essentially agreed it would

3  not.  So I don't think it's prolonging the trial.

4          I have -- you know, so that the committee and the

5  debtors understand, I think that UMB makes some pretty

6  persuasive arguments about why you look at the debtors on an

7  aggregate basis rather than one by one, but I'm not deciding

8  the issue now, but understand that as we go to trial and act

9  accordingly.

10          All right.  Now with respect to the debtors' and the

11  committee's motion to dismiss counterclaims, slightly more

12  complicated.  With respect to Count VII -- well, here is --

13  I'll tie it to specific claims in a minute.  I do not -- I

14  conclude that UMB does not have -- or the collateral agent does

15  not have liens on avoidance actions.  That ruling should come

16  as no surprise.  So what it results in -- and I also conclude

17  they have no liens with respect to commercial torts, whatever

18  those mean, but what it means is subject to dispute.

19          So it means, as to Count VII, the motion to dismiss is

20  granted in part, solely with respect to avoidance actions.

21          As to Count IX, which specifically sought the

22  declaration that the proceeds of the pre-petition state law

23  avoidance claims held by the debtors' obligors constitute JSN

24  collateral, the motion to dismiss is granted.  Avoidance claims

25  are not their property.  They have no liens.

1       With respect to Count XXII, it's a declaration that

2   purported lien releases breach the JSN indenture and the JSN

3   pledge agreement.  Count XXII is dismissed with prejudice.

4   JSNs are not precluded from suing the collateral agent.  In my

5   view, and it will be expressed in an opinion, the lien releases

6   and UCC-3s are determinative of the issue, whether UMB or the

7   JSNs can assert either legal or equitable liens having to do

8   with recovery on any assets as to which there was a release.

9   It will be expanded on in an opinion, but as to XXII, the

10  motion is granted.

11      As to XXIII, granted; same reasoning.

12      XXIV, granted.

13      XXV, granted.  No tracing if there's no -- if the

14  releases were effective.

15      With respect to XXVI, I'm -- look for what I put and

16  try to articulate in writing.  My basic point is I don't think

17  the two of you were all that far apart on this.  I don't agree

18  with the articulation of the so-called dollar-for-dollar

19  reduction theory.  But as the colloquy extended, I don't think

20  that was really the argument that was being made.  So I'll try

21  and articulate it a little more clearly in writing.  This is

22  not going to be a really long writing, okay?

23      As to XXVII, enforcement of the debtors' 506(c)

24  waiver, dismissed without prejudice, because the 506(c) issue

25  is not ripe unless and until the Court determines the JSNs are

1  not adequately protected.

2         XXVIII, it's a declaration as to the exact quantum of

3  direct costs and liquidating collateral.  I've got to think

4  about it some more.  I'm not ruling on the bench.

5         XXIX, declaration determining the amount of the JSN's

6  adequate protection liens.  That's not going to be done now;

7  it's going to be done at trial.  I'm going to deny their motion

8  without prejudice.

9         XXX, reallocation of administrative expenses, I think

10  I'm only being asked to dismiss the counterclaim in part as it

11  relates to the surcharge.  I want to think about it some more.

12         I've already said, as to Count V and VI, which deal

13  with the default rate, they're denied without prejudice.   If

14  and when the Court determines that the JSNs are oversecured,

15  the Court will deal with the issue of interest.

16         I guess that leaves Count XXXV.  It is dismissed in

17  part with respect to commercial tort claims and avoidance

18  actions it's granted.  As to others, it's denied without

19  prejudice.

20         Okay.  So -- and that at least gives you a basis to go

21  forward as you continue to prepare for trial.  Okay.  We're

22  going to go off the record now.  And I have a motion --

23  going -- I know you have --

24      (Whereupon these proceedings were concluded at 5:03 p.m.)

25

1

2                          I N D E X

3                           RULINGS

4                                         Page      Line

5   Motion of Helen, Jessica Angel and Ramon      18        4

6   Quiroz to Lift the Stay, granted.

7   Twenty-second omnibus objection to claim is  30        3

8   sustained regarding all claims except Davis.

9   Motion to dismiss the count dealing with     179       23

10  default interest denied.

11  UMB's motion to dismiss Counts III and       233       21

12  V of the debtors' complaint is denied        233       21

13  without prejudice.

14  Motion to dismiss Count VII granted in part, 234      19

15  solely with respect to avoidance actions.

16  Motion to dismiss Count IX is granted.       234       21

17  Motion to dismiss Count XXII is              235        3

18  granted with prejudice.

19  Motion to dismiss Count XXIII granted.       235       11

20  Motion to dismiss Count XXIV granted.        235       12

21  Motion to dismiss Count XXV granted.         235       13

22  Motion to dismiss Count XXVII                235       23

23  granted without prejudice.

24  Motion to dismiss Count XXIX                 236        5

25  denied without prejudice.

```
 1
 2    Motion to dismiss Counts V and VI          236      12
 3    denied without prejudice.
 4    Motion to dismiss Count XXXV is granted    236      16
 5    with respect to commercial tort claims
 6    and avoidance actions; for all other
 7    matters, it is denied without prejudice.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2                          C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9    _____

10   PENINA WOLICKI

11   AAERT Certified Electronic Transcriber CET**D-569

12

13   eScribers

14   700 West 192nd Street, Suite #607

15   New York, NY 10040

16

17   Date:  August 29, 2013

18

19

20

21

22

23

24

25