**Hearing Date: November 7, 2013 at 2:00 p.m. (Prevailing Eastern Time)**
**Response Deadline: October 2, 2013 at 4:00 p.m. (Prevailing Eastern Time)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Norman S. Rosenbaum
Jordan A. Wishnew

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------
|  | ) |  |
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
-----------------------------------------------------------------

**NOTICE OF DEBTORS' COMBINED OBJECTION TO PROOFS OF**
**CLAIM FILED BY SIDNEY T. LEWIS AND YVONNE D. LEWIS**

**PLEASE TAKE NOTICE** that the undersigned have filed the attached *Debtors'*

*Combined Objection to Proofs of Claim Filed By Sidney T. Lewis and Yvonne D. Lewis* (the

"**Objection**").

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Objection will take place

on **November 7, 2013 at 2:00 p.m. (Prevailing Eastern Time)** before the Honorable Martin

Glenn, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern

District of New York (the "**Bankruptcy Court**"), Alexander Hamilton Custom House, One

Bowling Green, New York, NY 10004, Room 501.

**PLEASE TAKE FURTHER NOTICE** that responses, if any, to the Objection must be

made in writing, conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy

Rules for the Southern District of New York, and the Notice, Case Management, and

Administrative Procedures approved by the Bankruptcy Court [Docket No. 141], be filed

electronically by registered users of the Bankruptcy Court's electronic case filing system, and be

served, so as to be received no later than **October 2, 2013 at 4:00 p.m. (Prevailing Eastern**

**Time)**, upon (a) counsel for the Debtors, Morrison & Foerster LLP, 1290 Avenue of the

Americas, New York, NY 10104 (Attn: Gary S. Lee, Norman S. Rosenbaum and Jordan A.

Wishnew); (b) the Office of the United States Trustee for the Southern District of New York,

201 Varick Street, Suite 1006, New York, NY 10014 (Attn: Tracy Hope Davis, Linda A. Riffkin,

and Brian S. Masumoto); (c) the Office of the United States Attorney General, U.S. Department

of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001 (Attn: U.S. Attorney

General, Eric H. Holder, Jr.); (d)  Office of the New York State Attorney General, The Capitol,

Albany, NY 12224-0341 (Attn: Nancy Lord, Esq. and Enid N. Stuart, Esq.); (e) Office of the

U.S. Attorney for the Southern District of New York, One St. Andrews Plaza, New York, NY

10007 (Attn: Joseph N. Cordaro, Esq.); (f) counsel for Ally Financial Inc., Kirkland & Ellis LLP,

153 East 53rd Street, New York, NY 10022 (Attn: Ray Schrock and Craig A. Bruens); (g)

counsel to Barclays Bank PLC, as administrative agent for the DIP lenders, Skadden, Arps,

Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036 (Attn: Ken Ziman &

Jonathan H. Hofer); (h) counsel for the committee of unsecured creditors, Kramer Levin Naftalis

& Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036 (Attn: Kenneth Eckstein &

Greg Horowitz); (i) counsel for Ocwen Loan Servicing, LLC, Clifford Chance US LLP, 31 West

52nd Street, New York, NY 10019 (Attn: Jennifer C. DeMarco and Adam Lesman); (j) Internal

Revenue Service, P.O. Box 7346, Philadelphia, PA 19101-7346 (if by overnight mail, to 2970

Market Street, Mail Stop 5-Q30.133, Philadelphia, PA 19104-5016); and (k) Securities and

Exchange Commission, New York Regional Office, 3 World Financial Center, Suite 400, New

York, NY 10281-1022 (Attn: George S. Canellos, Regional Director).

**PLEASE TAKE FURTHER NOTICE** that, if no responses to the Objection are timely

filed, served and received in accordance with this Notice, the Court may enter the Objection

without further notice or hearing.

Dated: September 11, 2013         Respectfully submitted,
     New York, New York

                            /s/ Norman S. Rosenbaum
                            Gary S. Lee
                            Adam A. Lewis
                            Norman S. Rosenbaum
                            Jonathan M. Petts
                            MORRISON & FOERSTER LLP
                            1290 Avenue of the Americas
                            New York, New York 10104
                            Telephone: (212) 468-8000
                            Facsimile: (212) 468-7900

                            *Counsel for the Debtors and*
                            *Debtors in Possession*

**Hearing Date: November 7, 2013 at 2:00 p.m. (Prevailing Eastern Time)**
**Objection Deadline: October 2, 2013 at 4:00 p.m. (Prevailing Eastern Time)**

MORRISON & FOERSTER LLP

1290 Avenue of the Americas
New York, New York 10104
Telephone:     (212) 468-8000
Facsimile:     (212) 468-7900
Gary S. Lee
Adam A. Lewis
Norman S. Rosenbaum
Jonathan M. Petts

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

-------------------------------------------------------------------------

**DEBTORS' COMBINED OBJECTION TO PROOFS OF CLAIM**
**<u>FILED BY SIDNEY T. LEWIS AND YVONNE D. LEWIS</u>**

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ........................................................................................ 2

JURISDICTION, VENUE AND STATUTORY PREDICATE .................................... 3

BACKGROUND ........................................................................................................ 3

     A.    The Chapter 11 Cases ........................................................................... 3

     B.    The Lewises ........................................................................................... 5

     C.    The Lewises' Adversary Proceeding .................................................... 6

     D.    The Lewis Claims .................................................................................. 9

     E.    The Request Letters ............................................................................. 10

RELIEF REQUESTED ............................................................................................. 11

OBJECTION ............................................................................................................. 11

     A.    Failure to Provide Notice of Claims ................................................... 11

     B.    No Liability Under Applicable Law .................................................... 14

NOTICE .................................................................................................................... 17

CONCLUSION ......................................................................................................... 18

Exhibit 1 - Proposed Order

Exhibit 2 - Delehey Declaration

Exhibit 3 - Rosenbaum Declaration

Exhibit 4 - Nosek Declaration

Exhibit 5 - Request Letters

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aetna Casualty & Surety Co. v. LTV Steel Co. (In re Chateaugay Corp.),*
  94 F.3d 772 (2d Cir.1996) .................................................................................12

*Ascroft v. Iqbal,*
  556 U.S. 662 (2009) ..........................................................................................13

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) .....................................................................................12, 13

*Catudal v. Catudal,*
  2013 WL 3341220 (Ohio Ct. App. June 27, 2013) ...........................................16

*Crowley v. VisionMaker, LLC,*
  512 F. Supp. 2d 144 (S.D.N.Y. 2007) ...............................................................14

*District of Columbia Court Appeals v. Feldman,*
  460 U.S. 462 (1983) ..........................................................................................16

*Exxon Mobil Corp. v. Saudi Basic Industries Corp.,*
  544 U.S. 280 (2005) .....................................................................................16, 17

*Federal National Mortgage Association v. LeCrone,*
  868 F.2d 190 (6th Cir. 1989) ............................................................................16

*Fleet Real Estate Funding Corp. v. Smith,*
  530 A.2d 919 (Pa. Super. Ct. 1987) ..................................................................15

*General Motors Corp. v. New A.C. Chevrolet, Inc.,*
  263 F.3d 296 (3d Cir. 2001) ..............................................................................14

*Hoblock v. Albany County Board of Elections,*
  422 F.3d 77 (2d Cir. 2005) ................................................................................17

*In re 20/20 Sport, Inc.,*
  200 B.R. 972 (Bankr. S.D.N.Y. 1996) ...............................................................12

*In re Alper Holdings USA,*
  2008 WL 160203 (Bankr. S.D.N.Y. Jan. 15, 2008) *aff'd,* 398 B.R. 736 (S.D.N.Y.
  2008) ..................................................................................................................12

*In re DJK Residential, LLC,*
  416 B.R. (Bankr. S.D.N.Y. 2009) .................................................................12, 13

ii

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*In re Grocerland Coorerative, Inc.,*
    32 B.R. 427 (Bankr. N.D. Ill. 1983) ........................................................................12

*In re International Match Corp.,*
    69 F.2d 73 (2d Cir. 1934) ........................................................................................12

*In re MarchFirst, Inc.,*
    431 B.R. 436 (Bankr. N.D. Ill. 2010) ......................................................................12

*In re Rimsat, Ltd.,*
    223 B.R. 345 (Bankr. N.D. Ind. 1998) .....................................................................12

*In re Rockefeller Center Properties*,
    272 B.R. 529 (Bankr. S.D.N.Y. 2000) .....................................................................12

*In re W.R. Grace & Co.*,
    346 B.R. 672 (Bankr. D. Del. 2006) ........................................................................15

*Kelm v. Kelm,*
    749 N.E.2d 299 (Ohio S. Ct. 2001) .........................................................................16

*Lewis v. GMAC Mortgage Co., LLC (In re Residential Capital, LLC),*
    2012 WL 5386151 (Bankr. S.D.N.Y. Nov. 1, 2012) ........................................2, 8, 10

*Liona Corp. v. PCH Associates (In re PCH Associates),*
    949 F.2d 585 (2d Cir. 1991).....................................................................................13

*Regis Technologies, Inc. v. Oien (In re Oien),*
    404 B.R. 311 (Bankr. N.D. Ill. 2009) ......................................................................13

*Rooker v. Fidelity Trust Co.*,
    263 U.S. 413 (1923).................................................................................................16

*Sassower v. Alito (In re Sassower),*
    No. 05-23120, 2007 WL 1319460, (Bankr. S.D.N.Y. May 3, 2007) ........................8

*Sky Bank v. Mamone*,
    912 N.E.2d 668 (Ohio. Ct. App. 8th Dist. 2009) ....................................................16

*Smith v. Amerihome Mortgage Corp.,*
    2012 WL 5902913 (S.D. Ohio Nov. 26, 2012)........................................................15

*Wells Fargo Bank, NA v. Favino,*
    2011 WL 1256771 (N.D. Ohio 2011).......................................................................16

iii

**STATUTES**

11 U.S.C. § 502(a) ........................................................................................................................12

**OTHER AUTHORITIES**

Fed. R. Bankr. Proc. 3001(f).........................................................................................................12

Fed. R. Civ. Proc. 8(a)(2).........................................................................................................12, 13

iv

**TO THE HONORABLE MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE:**

1.     Residential Capital, LLC ("ResCap") and its affiliated debtors in the above-

captioned chapter 11 cases (collectively, the "Debtors") hereby file this combined objection

(the "Objection") seeking to disallow and expunge without leave to amend (1) proof of claim no.

932 filed by Sidney T. Lewis and Yvonne D. Lewis (the "Lewises") against Debtor GMAC

Mortgage, LLC ("GMACM") in the face amount of $25 million dollars, and (2) proof of claim

no. 933 filed by Sidney T. Lewis, as executor and heir of the estate of Bettie Hamilton, against

GMACM in the face amount of $5 million dollars (together with claim no. 932, the "Lewis

Claims"),[1] pursuant to section 502(b) of title 11 of the United States Code (the "Bankruptcy

Code"), Rule 8(a) of the Federal Rules of Civil Procedure (the "Federal Rules"), and Rule

3007(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors

seek entry of an order substantially in the form annexed hereto as Exhibit 1 (the "Proposed

Order") granting the relief they have requested.  In support of the Objection, the Debtors submit

the declaration of Lauren Graham Delehey, In-House Litigation Counsel in ResCap's Legal

Department (the "Delehey Declaration," attached hereto as Exhibit 2), the declaration of Norman

S. Rosenbaum of Morrison & Foerster LLP, counsel to the Debtors (the "Rosenbaum

Declaration," attached hereto as Exhibit 3), and the declaration of Robert D. Nosek (the "Nosek

Declaration," attached hereto as Exhibit 4) of SilvermanAcampora LLP as Special Counsel for

Borrower Issues ("Special Counsel") to the Official Committee of Unsecured Creditors (the

"Creditors' Committee").

---

[1] True and correct copies of the Lewis Claims are attached as Exhibit A (Claim No. 932) and Exhibit B (Claim No.
933) to the declaration  of Lauren Graham Delehey.

ny-1103021

## PRELIMINARY STATEMENT

2.      As this Court is well aware, the Lewises are serial litigants who have a

"documented history of vexatious litigation" in both state and federal courts.[2]  Most recently, the

Lewises filed a *Notice and Motion for Sanctions Pursuant to BR. Rule 9011* [Docket No. 4792],

by which the Lewises apparently seek the imposition of sanctions against counsel to the Debtors

and Creditors' Committee.

3.      After filing an adversary complaint against GMACM that this Court ultimately

dismissed and for which the Court denied the Lewises leave to amend, the Lewises filed the

Lewis Claims, which seek a combined total of $30 million dollars and appear to assert, at least in

---

[2] *See, e.g.*, *Lewis v. GMAC Mortgage Co., LLC (In re Residential Capital, LLC)*, No. 12-12020 (MG), 2012 WL 5386151, at *1 (Bankr. S.D.N.Y. Nov. 1, 2012); *see also* Order, *Lewis v. Holbrook*, Case No. 08-3357 (6th Cir. Aug. 14, 2008) ("Upon review, the motion is denied because any appeal by the Lewises would be frivolous."); Order Denying Debtor's Motion to Show Cause why Lindsey Sessile should not be Held in Contempt and Punished for Criminal Obstruction of Justice, *In re Sidney T. Lewis*, Case No. 07-57237 (Chapter 7) (Bankr. S.D. Ohio Apr. 27, 2009) ("In addition to being largely incomprehensible, the Motion is frivolous."); Omnibus Order Striking Notices of Removal and Denying Accompanying Motions to Proceed in Forma Pauperis, *In re Sidney T. Lewis*, Case No. 07-57237 (Chapter 7) (Bankr. S.D. Ohio Apr. 27, 2009) (characterizing the multiple removal notices filed by the Lewises as "frivolous" and determining that "[t]his Court will entertain no further notices by the Debtor or his spouse to remove actions to this Court"); Order Denying the Lewises' Motion to Proceed in Forma Pauperis on Appeal, *Lewis v. McLatchy*, Case No. 2:09-CV-936 (S.D. Ohio Jan. 5, 2010) ("For essentially the same reasons set forth in [previous Court orders] finding Mr. and Mrs. Lewis to be vexatious litigators, the Court cannot certify this appeal. Any argument raised on appeal would appear to be frivolous."); Order (1) Denying Motions to Proceed in Forma Pauperis; (2) Denying Motion to Reopen Case; and (3) Striking Notices of Removal, *In re Sidney T. Lewis*, Case No. 07-57237 (Chapter 7) (Bankr. S.D. Ohio Mar. 23, 2012) (finding that "[e]nough is enough" and noting that "[s]ince the filing of this case five years ago, the Court has expended far more of its scarce resources on Lewis's repetitious and frivolous filings than is justified"); Order Denying Motion to Reopen Closed Bankruptcy Case, *In re Yvonne Decarol Lewis*, Case No. 05-75111 (Chapter 7) (Bankr. S.D. Ohio Sept. 19, 2006) ("Debtor . . . has been cautioned against filing groundless pleadings in closed cases or adversary proceedings . . . . Further filings of baseless pleadings will result in the Court conducting a hearing to show cause why monetary sanctions should not be imposed."); Order Declaring Sidney T. Lewis and Yvonne D. Lewis to be Vexatious Litigators, *Lewis v. North Am. Specialty Ins. Co.*, Case No. 2:09-cv-179 (S.D. Ohio June 5, 2009) ("Plaintiffs are hereby warned that Rule 11 sanctions will be imposed if they continue to file frivolous lawsuits . . . . Furthermore, it is ORDERED that plaintiffs are barred from filing any action in this Court without submitting a certification from an attorney that their claims are warranted."); Order Denying the Lewises' Motion to Vacate and for Supplemental Leave to File, *Lewis v. North Am. Specialty Ins. Co.*, Case No. 2:09-cv-179 (S.D. Ohio Dec. 16, 2009) (denying the Lewises' motion to vacate after they filed the motion in violation of the anti-filing bar in place against them); Order Denying the Lewises' Motion to Proceed on Appeal in Forma Pauperis, *Lewis v. North Am. Specialty Ins. Co.*, Case No. 2:09-cv-179 (S.D. Ohio October 4, 2012) ("On June 5, 2009, before entering judgment, the Court declared Sidney T. Lewis and Yvonne D. Lewis to be vexatious litigators and ordered that they would not be permitted to proceed *in forma pauperis* in the future without first submitting a certificate from an attorney certifying that their claims were warranted.").

2

part, claims for which leave to amend was denied.  Like the Complaint, the Lewis Claims fail to

provide an intelligible statement of how the Debtors harmed the Lewises and should be

disallowed and expunged for that reason.  In addition, to the extent the Lewis Claims can be

construed as containing an intelligible claim (their so-called "equitable defenses" to foreclosure),

the Lewis Claims fail to establish entitlement to relief under applicable law because the Lewises

do not have a right to assert damages based on such equitable defenses.  Accordingly, the

Debtors request that the Lewis Claims be expunged in their entirety.

## JURISDICTION, VENUE AND STATUTORY PREDICATE

4.      This Court has jurisdiction over this Objection under 28 U.S.C. § 1334.  This

matter is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper before this Court under

28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicate for the relief requested herein is section 502(b) of the

Bankruptcy Code, and the procedural predicate is Bankruptcy Rule 3007(a) and Federal Rule

8(a).

## BACKGROUND

A.      **The Chapter 11 Cases**

6.      On May 14, 2012 (the "Petition Date"), each of the Debtors filed a voluntary

petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are

managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code

sections 1107(a) and 1108.[3]

---

[3] The Debtors were formerly a leading residential real estate finance company indirectly owned by Ally Financial Inc., which is not a Debtor.  Prior to the closing of the Debtors' Court-approved asset sales, the Debtors and their non-debtor affiliates operated the fifth largest mortgage servicing business and the tenth largest mortgage origination business in the United States. A more detailed description of the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set forth in the *Affidavit* (Cont.'d)

3

7.      On November 7, 2012, the Court entered an order extending the deadline for general creditors to file proofs of claim in the Debtors' bankruptcy cases to November 16, 2012 [Docket No. 2093].[4]

8.      To date, over 6,870 proofs of claim have been filed in these Chapter 11 Cases as reflected on the Debtors' claims register.

9.      On March 21, 2013, the Court entered an order approving procedures for the filing objections to proofs of claim filed in these Chapter 11 cases [Docket No. 3294] (the "Procedures Order").  Based on substantial input from counsel to the Creditors' Committee and Special Counsel, the Procedures Order includes specific protections for Borrowers[5] and sets forth a process for the Debtors to follow before objecting to certain categories of Borrower Claims (the "Borrower Claim Procedures").

10.     The Borrower Claim Procedures generally provide, inter alia, that prior to objecting to Borrower Claims, the Debtors must (i) consult with Special Counsel and provide Special Counsel with a list of the claims at issue, and (ii) review their books and records to determine if any amounts are owed to such Borrowers.  For Borrower Claims filed with no or insufficient documentation, prior to filing an objection, the Debtors, in cooperation with Special Counsel, must also send each Borrower claimant a letter, with notice to Special Counsel,

---

of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 6].

[4] The original order established November 9, 2012 as the deadline for general creditors to file proofs of claim in the Debtors' cases [Docket No. 1309].

[5] As used herein, the terms "Borrower" and "Borrower Claims" have the meanings ascribed to them in the Procedures Order [Docket No. 3294].

requesting additional documentation in support of the purported claim.  *See* Procedures Order at 4.

**B.    The Lewises**

11.    The Lewises formerly resided at 1875 Alvason Avenue, Columbus, Ohio 43219 (the "Alvason Property").  (*See* Delehey Decl. ¶ 3.)  The Alvason Property is apparently located near the Port Columbus International Airport, such that on April 20, 1992, Mrs. Lewis (then known as Yvonne D. Webb) executed a permanent avigation easement and right of way for noise with the Columbus Municipal Airport Authority with respect to the Alvason Property.  *See* Claim No. 932, Ex. H at Ex. 3 "Avigation Easement"; Claim No. 933, Ex. E at Ex. 3 "Avigation Easement."

12.    On March 9, 2001, Mrs. Lewis entered into a mortgage secured by the Alvason Property, which mortgage GMACM began servicing on October 1, 2001.  (Delehey Decl. ¶ 4.) Mrs. Lewis subsequently defaulted on her mortgage payments, and on April 22, 2005, GMACM filed a foreclosure action against the Lewises in the Court of Common Pleas of Franklin County, Ohio (the "Court of Common Pleas").  (*Id.*)  On September 12, 2011, the Court of Common Pleas entered a judgment decree in foreclosure.  (*Id.*)  The Lewises appealed the judgment decree in foreclosure on October 13, 2011.  (*Id.*)  After the Lewises filed a motion to voluntarily dismiss the appeal, the Court of Appeals of Ohio (the "Court of Appeals") dismissed the appeal on December 30, 2011.  (*Id.*)

13.    On June 4, 2012, the sheriff's sale of the Alvason Property was confirmed by the Court of Common Pleas.  (*Id.*)  The Lewises appealed the sale confirmation order.  (*Id.*)  On June 18, 2012, the Court of Appeals dismissed the appeal, finding that the Lewises had not demonstrated that there are reasonable grounds for the appeal and had been adjudicated

vexatious litigators by the Court of Common Pleas.  Eviction proceedings commenced and the sheriff of Franklin County returned a writ indicating that the eviction was completed on August 24, 2012.  (*Id.*)

14.     In addition, Mr. Lewis has an interest, as executor of the estate of Bettie Hamilton, in real property located at 1913 Argyle Drive, Columbus, Ohio 43219 (the "Argyle Property").  *See* Claim No. 933.  The mortgage loan secured by the Argyle Property also went into default and on June 24, 2003, GMACM, as servicer of the mortgage, filed a foreclosure action against Mr. Lewis in the Court of Common Pleas.  (Delehey Decl. ¶ 5.)  On September 19, 2003, the Court of Common Pleas entered a judgment decree in foreclosure with respect to the Argyle Property.  (*Id.*)  Mr. Lewis filed three separate appeals of the Court of Common Pleas's foreclosure decree and related post-judgment decisions.  (*Id.*)  The first two appeals were dismissed by the Court of Appeals.  (*Id.*)  The third appeal resulted in the Court of Common Pleas's decisions being affirmed by the Court of Appeals on June 19, 2007.  After a lengthy delay, the Argyle Property was sold at a sheriff's sale and the sale was confirmed by the Court of Common Pleas on December 12, 2011.  (*Id.*)  No appeal of the sale confirmation order was taken.  (*Id.*)  Following the foreclosure sale, the Federal National Mortgage Association transferred the Argyle Property by a limited warranty deed, effective February 14, 2012, to a Mr. Lawrence Boyd.  Claim No. 933, Ex. D "Limited Warranty Deed."

## C.    The Lewises' Adversary Proceeding

15.     On June 22, 2012, the Lewises filed an adversary complaint in this Court against Debtor GMACM (the "Complaint") [Case No. 12-01731, Docket No. 1].  The Complaint, though largely unintelligible, appears to have requested that this Court "[t]ransfer . . . this case to OHIO . . . due to the fact that Debtor GMAC concealed the 'set-off' of claims, 'repurchase agreement by

Huntington National Bank,' and 'unpaid transfer gain taxes' in the Ohio BR cases[6] 'so as to cure

a defect of personal jurisdiction over the defendants." Complaint at 4 (sic).

16.     After the Debtors answered the Complaint [Docket No. 7], the Lewises moved for

summary judgment on the Complaint on August 23, 2012 (the "Summary Judgment Motion")

[Docket No. 12].  Unlike the Complaint, the Summary Judgment Motion asserted causes of

action for: (i) "Federal preemption of state laws under National Housing Program 12 USC §§

1710-1723" (*see* Summary Judgment Motion at pp. 5-6); and (ii) "Federal 'stated' preemption of

state laws under Av-Ea Program 42 USC §§ 4903, 7573" (*see* Summary Judgment Motion at p.

6).

17.     On September 12, 2012, the Debtors filed a motion for judgment on the

pleadings [Docket No. 14] and shortly thereafter an opposition to the Summary Judgment Motion

[Docket No. 16].

18.     Approximately eight days after the Debtors moved for judgment on the pleadings,

the Lewises filed a motion for leave to file a first amended complaint (the "Amended Complaint

Motion") [Docket No. 18].

19.     Both the Summary Judgment Motion and the Debtors' motion for judgment on

the pleadings were heard on September 27, 2012.  The Lewises failed to appear at the hearing in

person or by telephone.[7]

20.     In a written decision dated November 1, 2012, this Court denied the Lewises'

Summary Judgment Motion, stating:

---

[6] Although the Complaint's allegations are largely incomprehensible, the Lewises are presumably referring to their
(now-closed) chapter 7 bankruptcy cases in the U. S. Bankruptcy Court for the Southern District of Ohio: *In re
Yvonne Decarol Lewis*, Case No. 05-75111 (Bankr. S.D. Ohio) and *In re Sidney T. Lewis*, Case No. 07-57237
(Bankr. S.D. Ohio).

[7] Instead of appearing at the hearing, the Lewises filed the Lewis Claims on that day.

> in their Summary Judgment Motion, Plaintiffs appear to be bringing additional
> claims that are entirely different than the claims asserted in the Complaint.  In the
> Complaint, Plaintiffs title their adversary proceeding as one "for False Claims and
> RICO."  *See* Complaint.  But in their Amended Complaint Motion, they add what
> appear to be additional legal theories under which they purport to bring claims
> (i.e., "federal FAA, FAR part 150, preemption 42 USC §§ 7573, 4621(c)(4)").
> *See* Amended Complaint Motion at 3–4.  Moreover, in their Summary Judgment
> Motion, Plaintiffs add even more legal theories (*i.e.*, "[f]ederal preemption of
> state laws under National Housing Program 12 USC §§ 1710–1723").  *See*
> Summary Judgment Motion at 5–6.  Simply put, this is improper.

*In re Residential Capital, LLC,* 2012 WL 5386151, at *3 (citation omitted).

21.    The Court also granted the Debtors' motion for judgment on the pleadings on the

ground that the Complaint failed to satisfy the pleading requirements of Federal Rule 8(a):

> The Complaint identifies various legal statutes and claims, for example, that "this
> is an adversary action to aver allegation on behalf of the United States of America
> under the False Claims act."  *See* Complaint at 3. . . .  However, the Plaintiffs do
> not explain how any of these statutes or claims relate to the Debtors, their chapter
> 11 case, or the facts of whatever dispute the Plaintiffs are attempting to resolve.
> The Court cannot discern any "viable claim alleged or even intimated."

*Id.* at *4 (quoting *Sassower v. Alito (In re Sassower),* No. 05-23120, 2007 WL 1319460, at *3

(Bankr. S.D.N.Y. May 3, 2007)).

22.    Finally, the Court denied the Lewises' request for leave to amend the Complaint

on the grounds that an amendment would be futile, noting:

> it is exceedingly unclear what relief Plaintiffs are seeking. Plaintiffs reference
> federal laws and other legal theories, but they change with each motion.
> Moreover, Plaintiffs offer no intelligible factual support to explain how they have
> been harmed by the Debtors, or articulate any legally cognizable claim.

*Id.*  The Court found its decision to deny leave to amend further supported by "the fact that

Plaintiffs have been found to be vexatious litigants in at least one court in this country, and have

filed countless motions that have been deemed 'frivolous' by state courts, federal district courts,

and the Sixth Circuit."  *Id.*; *see also* footnote 1, *supra* (listing the Lewises' history of frivolous

and/or vexatious litigation).

8

D.    **The Lewis Claims**

23.    Rather than appear at the hearing on their Summary Judgment Motion or wait for

the Court's decision on whether they could amend the Complaint, the Lewises filed the Lewis

Claims on September 27, 2012.

24.    Claim No. 932 is filed by Sidney T. Lewis & Yvonne D. Lewis against GMACM

in the face amount of $25 million dollars.  Claim No. 932's stated basis is "False Claims; Equity

Skimming; RICO; pension; Services Performed; etc." (Claim No. 932, Box. 2), apparently with

respect to the Alvason Property, though the document nowhere expressly says so.

25.    Claim No. 933 is filed by Sidney T. Lewis, as executor and heir of the estate of

Bettie Hamilton, against GMACM in the face amount of $5 million dollars.  Claim No. 933's

stated basis is "Skimming of Equity; false Claims; easement, land, interference with gov.

Program" (Claim No. 933, Box 2), apparently with respect to the Argyle Property, though again

the document nowhere says so expressly.

26.    The Lewis Claims each attach over 200 pages of purported supporting

documentation (much of which is identical), including deeds, court decisions from prior

litigation involving the Lewises, documents relating to a class action against American Equity

Life Insurance, and articles on aircraft emissions and environmental pollution.  These

bewildering collections of documents are arranged in no particular order the Debtors can

understand and certain of the documents are difficult to read, if not illegible.

27.    Buried within the exhibits to the Lewis Claims, the Lewises state that:

> on behalf of themselves and on behalf of the United States of America, **12 USC**
> **§§ 1709, 1715z-19**; 31 U.S.C.A. §§ 3729 to 3733; 18 USC §§ 2, 371, 1505, 1962;
> **42 USC §§** 1441, 2000d, 3535, **4621(c)(4)**, have filed their proof of claim for
> Debtors' false (loss mitigation) claims to collect "soft dollar credits" in
> furtherance of "Equity Skimming [Id. 1715z-19]" (Related Case Nos. <u>1:12-cv-</u>
> <u>361, 363</u>, D.C.); and Debtors' "RICO Enterprise [Id. 1962]" associated with

9

> "Equity Index Annuities [Id. 101(f)(3)(a)]" through "Trust Mills [Id. 1962]"
> (Originating Case Nos. <u>2:96-cv-494, 2:08-cv-75</u>[1], S.D., OH) pursuant to Fed. R.
> Bankr. Proc., Rules 2018(a), 3004, 7023.1 and Rule 23.1 F.R.Civ.P. for the
> [Lewises] . . .

Claim No. 932, Ex. H at p. 7-8 (footnote omitted); Claim No. 933, Ex. E at p. 5-6 (footnote

omitted) (emphasis added).  But nowhere do the Lewis Claims describe what conduct and other

facts give rise to the Lewis Claims.

28.     Noticeably, the Lewis Claims appear to assert, at least in part, theories for which

the Court denied the Lewises leave to amend their Complaint.  *Compare* bolded provisions

above with *In re Residential Capital, LLC,* 2012 WL 5386151, at \*3-4 (noting that the Lewises

improperly "appear to be bringing additional claims that are entirely different than the claims

asserted in the Complaint," including "federal FAA, FAR part 150, preemption **42 USC §§ 7573,**

**4621(c)(4)**" and "[f]ederal preemption of state laws under National Housing Program **12 USC §§**

**1710–1723**," before denying the Lewises' request for leave to amend) (emphasis added).

**E.     The Request Letters**

29.     On June 11, 2013, after consulting with Special Counsel, the Debtors sent request

letters to the Lewises, requesting additional information and documentation in support of their

claims (the "<u>Request Letters</u>").  True and correct copies of the Request Letters are attached

hereto as <u>Exhibit 5</u>.

30.     The Request Letters state that the claimants must respond within 30 days with an

explanation that states the legal and factual reasons why the claimants believe they are owed

money or are entitled to other relief from the Debtors and the claimants must provide copies of

any and all documentation that they believe supports the basis for their claims.  *See* Request

Letters at 1.  The Request Letters further state that if the claimants do not provide the requested

explanation and supporting documentation within 30 days, the Debtors may file a formal

objection to the claimants' claims, seeking to have the claims disallowed and permanently

expunged.  *Id.*

31.    In response to the Request Letters, on July 16, 2013, the Lewises filed *Facts and*

*Authorities to Supplement Claims 932 and 933* [Docket No. 4259] (the "Supplement").  The

Supplement states that the Lewises seek "to proceed under 'equitable defenses' to FHA-insured

mortgages" and assert "claims due to the FAA and City of Columbus, Ohio's 1987 'Taking' of

uncompensated private residential subdivision aviation-easements (Flight Tracks) on private

lands . . ." among other incomprehensible allegations, which may or may not be contained in the

Lewis Claims.  Supplement at 1-2.  In Exhibits A and B to the Supplement, the Lewises state the

basis of the Lewis Claims as follows:

> 1987 FAA Approval of 1990 maps with 1991 Flight Tracks as master plan update
> for FAA/AIP Grant No. 84-2-3-39-0025-03-85 as 'Planning and Technical
> Activities' pursuant to Titles 23 and 49 U.S.C., under 40 CFR 93.118(c), 121; 14
> CFR 150.21

Supplement, Ex. A at 1, Ex. B at 1.

## RELIEF REQUESTED

32.    The Debtors file this Objection, pursuant to Bankruptcy Code section 502(b),

Bankruptcy Rule 3007(a) and Federal Rule 8(a), to disallow and expunge the Lewis Claims from

the Debtors' claims register in their entirety.  The Lewis Claims should be expunged because

they are unintelligible and, to the extent they can be construed as providing notice of their

claims, they fail to state a claim upon which relief can be granted.

## OBJECTION

### A.  Failure to Provide Notice of Claims

33.    A filed proof of claim is "deemed allowed, unless a party in interest . . . objects."

11 U.S.C. § 502(a).  A properly completed proof of claim is *prima facie* evidence of the validity

11

and amount of the claim.  _See_ FRBP 3001(f).  However, a proof of claim is _prima facie_ evidence

of the validity of the claim _only_ if it is legally sufficient.  _In re Alper Holdings USA_, No. 07-

12148 (BRL), 2008 WL 160203, at *3 (Bankr. S.D.N.Y. Jan. 15, 2008), _aff'd_, 398 B.R. 736

(S.D.N.Y. 2008).  That is, among other things, it "allege[s] facts sufficient to support the claim."

_Id._

34.    At a bare minimum, a proof of claim must be "sufficiently specific" to give

"notice" of the claim.  _Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.),_ 94 F.3d

772, 777 (2d Cir.1996); _In re marchFirst, Inc.,_ 431 B.R. 436, 443 (Bankr. N.D. Ill. 2010); _see_

_also In re Rimsat, Ltd.,_ 223 B.R. 345, 348 (Bankr. N.D. Ind. 1998) (creditor must "provide some

kind of factual context" for the debtor's liability); _In re Grocerland Coop., Inc.,_ 32 B.R. 427, 437

(Bankr. N.D. Ill. 1983) ("facts of sufficient particularity must be supplied to put the trustee on

notice"); _In re DJK Residential, LLC,_ 416 B.R. at 106 (Bankr.S.D.N.Y.2009) ("While the Claim

'does not need detailed factual allegations, ... [it] requires more than labels and conclusions....'"),

quoting _Bell Atl. Corp. v. Twombly,_ 550 U.S. 544, 555 (2007); _accord In re Int'l Match Corp.,_ 69

F.2d 73, 76 (2d Cir. 1934) (a proof of claim should at least allege facts from which liability on

the part of the debtor can be seen to exist).

35.    Because a proof of claim is traditionally analogized to a complaint in a civil

action, _In re 20/20 Sport, Inc.,_ 200 B.R. 972, 978 (Bankr. S.D.N.Y. 1996), courts in this district

have found the source of this "notice" requirement for proofs of claim in Federal Rule 8(a).  _See_

_In re DJK Residential, LLC,_ 416 B.R. at 106; _In re Rockefeller Ctr. Props._, 272 B.R. 529, 542,

n.17 (Bankr. S.D.N.Y. 2000).  Under Federal Rule 8(a)(2), a "pleading that states a claim for

relief must contain . . . a short and plain statement of the claim showing that the pleader is

entitled to relief."  Federal Rule 8(a)'s pleading standard "demands more than an unadorned, the-

defendant-unlawfully-harmed-me accusation." *Ascroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(citation omitted). Rather, a party must plead sufficient facts "to provide the 'grounds' of his

'entitle[ment] to relief,' [which] requires more than labels and conclusions . . ." *Twombly*, 550

U.S. at 545 (citation omitted).

36.     The purpose of Federal Rule 8(a), like the purpose of a proof of claim, is to ensure

that the claimant "give[s] enough detail to illuminate the nature of the claims *and allow*

*defendants to respond.*" *Regis Techs., Inc. v. Oien (In re Oien)*, 404 B.R. 311, 317 (Bankr. N.D.

Ill. 2009) (emphasis added) (internal quotations omitted); *compare Liona Corp. v. PCH Assocs.*

*(In re PCH Assocs.)*, 949 F.2d 585, 605 (2d Cir. 1991) (proofs of claim are intended to "ensure

that all those involved in the proceeding will be made aware of the claims against the debtor's

estate and will *have an opportunity to contest those claims.*") (emphasis added). Where a proof

of claim fails to provide a plain and simple statement of how the claimant he has been harmed by

the debtor, the debtor is deprived of a meaningful opportunity to contest the claim. In such

circumstances, the proper result is disallowance and expungement of the claim. *See, e.g., DJK*

*Residential, LLC,* 416 B.R. at 107.

37.     The Lewis Claims suffer from the same fatal flaw as the Complaint – they are

incomprehensible and fail to provide meaningful notice of the claims asserted against GMACM.

The Lewis claims are neither simple nor plain; they do not set out the conduct with which

GMACM is charged.

38.     Although the Lewis Claims name numerous statutory provisions and federal

guidelines, they fail to specify what actions the Debtors took that caused the Lewises harm. The

Lewis Claims and their voluminous and unintelligible exhibits leave the Debtors puzzled, among

other things, as to:

13

- how the Lewises' apparent dissatisfaction with their avigation easement with the Columbus Municipal Airport Authority (*see* Claim No. 932, Ex. H at Exs. 2, 3, 13; Claim No. 933, Ex. E at Exs. 2, 3, 13) is anything for which the Debtors can be held liable;

- how the Lewises' apparent dissatisfaction with a class action settlement against American Equity Investment Life Insurance Company (*see* Claim No. 932, Ex. H at Exs. 4, 8, 9, 10, 11; Claim No. 933, Ex. E at Exs. 4, 8, 9, 10, 11) is anything for which the Debtors can be held liable; and

- why the Lewis Claims seek damages for $25 million and $5 million, respectively, despite the fact that the value of the properties on which the Lewis Claims appear to be based was less than $85,000 each, as measured by their sale price at foreclosure (*see* Claim No. 932, Ex. G at ¶ 1; Claim No. 933, Ex. B at ¶ 1).

In addition, the incomprehensible nature of the Lewis Claims prevents the Debtors from determining whether the Lewis Claims are barred by claim preclusion principles in other litigation to which the Lewises have been a party.[8]

39. The notion that pleadings should be liberally construed "has its limits." *Gen. Motors Corp. v. New A.C. Chevrolet, Inc.,* 263 F.3d 296, 333 (3d Cir. 2001) (internal quotation omitted); *see also Crowley v. VisionMaker, LLC,* 512 F. Supp. 2d 144, 151 (S.D.N.Y. 2007). The Lewis Claims, seeking a combined total of $30 million, fail to provide sufficient factual detail or a *plain* and *simple* statement of the basis of their alleged claims for relief to allow the Debtors a meaningful opportunity to respond to the claims. It was for the Lewises to cull such a statement from their mass of materials, not the Debtors. The Lewises failed to do so (or to even come close to doing so). Accordingly, the Lewis Claims should be expunged in their entirety.

## B. **No Liability Under Applicable Law**

---

[8] Because the Debtors have been unable to determine the nature of the Lewis Claims, the Debtors are unable to determine whether any of the claims asserted here are (i) claims that were resolved in the Lewises' Chapter 7 bankruptcy cases (*In re Yvonne Decarol Lewis*, Case No. 05-75111 (Bankr. S.D. Ohio); *In re Sidney T. Lewis*, Case No. 07-57237 (Bankr. S.D. Ohio)), (ii) mandatory counterclaims in the Lewises' foreclosure proceedings, or (iii) claims that could only be asserted by the Lewises' bankruptcy estates. Accordingly, the Debtors reserve their rights to raise any *res judicata* defenses to the extent more information becomes available.

14

40.     Bankruptcy Code section 502(b)(1) provides, in relevant part, that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law."  Whether a claim is allowable "generally is determined by applicable nonbankruptcy law."  *In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del. 2006).

41.     To the extent that the Lewis Claims can be construed as including sufficient detail to provide notice of their claims, the Lewis Claims fail to establish entitlement to relief under applicable non-bankruptcy law.  The only substantive "claim" in the Lewis Claims that the Debtors can arguably understand is that the Lewises have "equitable defenses" to the foreclosure sales of the Alvason Property and the Argyle Property based on GMACM's alleged failures to comply with applicable federal servicing regulations in foreclosing on both properties.  *See* Supplement at 3-4.  In support of this "claim," the Lewises quote *Fleet Real Estate Funding Corp. v. Smith,* 530 A.2d 919, 923 (Pa. Super. Ct. 1987): "a mortgagor of an FHA-insured mortgage may raise as an equitable defense to foreclosure, the mortgagee's deviation from compliance with the forbearance provisions of the HUD Handbook and regulations." Supplement at 3.

42.     However, a defense to foreclosure will not support the Lewis Claims for three reasons.  First, the Lewis Claims are not seeking equitable relief; they are seeking *monetary damages* resulting from the foreclosures.  (*See* Claim Nos. 932 and 933, Exhibit A and Exhibit B, respectively, to Delehey Decl.)  And it is well-established that violations of federal servicing guidelines do not allow borrowers to recover monetary damages.  *See Smith v. Amerihome Mortg. Corp.,* No. 2:12-cv-556, 2012 WL 5902913, at *2 (S.D. Ohio Nov. 26, 2012) ("[I]t is well-accepted law that, while a mortgagee's noncompliance with HUD servicing requirements

15

can be an affirmative defense to foreclosure, no private right of action exists under the HUD

regulations."), citing *Fed. Nat'l Mortg. Ass'n v. LeCrone,* 868 F.2d 190, 193 (6th Cir. 1989) (no

express or implied right of action in favor of the mortgagor exists for violation of HUD mortgage

servicing policies); *see also Wells Fargo Bank, NA v. Favino,* No. 1:10–cv–571, 2011 WL

1256771, at *12 (N.D. Ohio 2011) ("A failure of a mortgagee to adhere to the HUD servicing

requirements in the regulations can be an affirmative defense to foreclosure, but does not form

the basis for a claim.") (citations omitted). Thus, even construing the Lewises' cryptic allegations

as favorably as possible, the Lewises are not entitled to damages, providing an additional reason

for expungement of the Lewis Claims.

43.    Second, it is too late for the Lewises to assert any defenses to the foreclosures.

The Court of Common Pleas' orders on both the foreclosure and the sale confirmation of the

Alveson Property and the Argyle Property are final orders.  (Delehey Decl. ¶¶ 3, 4.); *see also Sky

Bank v. Mamone*, 912 N.E.2d 668, 672 (Ohio. Ct. App. 8th Dist. 2009) (explaining that, under

Ohio law, there are two final appealable orders in foreclosure actions: the judgment decree in

foreclosure and the sale confirmation order).  The doctrine of *res judicata* therefore bars an

attack on the foreclosures.  *See Catudal v. Catudal*, 2013 WL 3341220, at *4 (Ohio Ct. App.

June 27, 2013) ("Under the doctrine of *res judicata*, a valid, final judgment rendered upon the

merits bars all subsequent actions based upon any claim arising out of the transaction or

occurrence that was the subject matter of the previous action."), citing *Kelm v. Kelm,* 749 N.E.2d

299, 303 (Ohio S. Ct. 2001).  And third, the *Rooker-Feldman* doctrine prohibits collateral attack

on those state court decisions in this Court.  *See Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923);

*District of Columbia Court Appeals v. Feldman*, 460 U.S. 462 (1983).  The situations clearly

satisfy the four elements for applying *Rooker Feldman* set out in *Exxon Mobil Corp. v. Saudi*

16

*Basic Indus.Corp.,* 544 U.S. 280, 284 (2005):  "The *Rooker-Feldman* doctrine, we hold today, is

confined to cases of the kind from which the doctrine acquired its name:  [1] cases brought by

state-court losers [2] complaining of injuries caused by state-court judgments [3] rendered before

the district court proceedings commenced and [4] inviting district court review and rejection of

those judgments."  *See also Hoblock v. Albany Cnty. Bd. of Elections,* 422 F.3d 77, 85 (2d Cir.

2005) (setting forth four elements of test).

## NOTICE

44.    The Debtors have provided notice of this Motion in accordance with the Case

Management Procedures Order, approved by this Court on May 23, 2012 [Docket No. 141] and

the Procedures Order.

17

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request entry of the Proposed Order

granting the relief requested herein and such other and further relief as the Court may deem

proper.

Dated: September 11, 2013

/s/ Norman S. Rosenbaum
Gary S. Lee
Adam A. Lewis
Norman S. Rosenbaum
Jonathan M. Petts
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900

*Counsel for the Debtors and
Debtors in Possession*

18

## **Exhibit 1**

## **Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------- )
                                                    )
In re:                                              )    Case No. 12-12020 (MG)
                                                    )
RESIDENTIAL CAPITAL, LLC, <u>et al.</u>,            )    Chapter 11
                                                    )
                                    Debtors.        )    Jointly Administered
                                                    )
------------------------------------------------------------------------- )

### ORDER GRANTING DEBTORS' COMBINED OBJECTION TO PROOFS OF CLAIM FILED BY SIDNEY T. LEWIS AND YVONNE D. LEWIS

Upon the Combined Objection to Proofs of Claim Filed by Sidney T. Lewis and

Yvonne D. Lewis (the "<u>Objection</u>")[1] of Residential Capital, LLC and its affiliated debtors in the

above-referenced Chapter 11 Cases (collectively, the "<u>Debtors</u>"), seeking entry of an order,

pursuant to section 502(b) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rule

8(a) of the Federal Rules of Civil Procedure (the "<u>Federal Rules</u>"), and Rule 3007(a) of the

Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and this Court's order

approving procedures for the filing of objections to proofs of claim [Docket No. 3294] (the

"<u>Procedures Order</u>"), disallowing and expunging  (1) proof of claim no. 932 filed by Sidney T.

Lewis & Yvonne D. Lewis (the "<u>Lewises</u>"), and (2) proof of claim no. 933 filed by Sidney T.

Lewis, as executor and heir of the estate of Bettie Hamilton, (together with claim no. 932, the

"<u>Lewis Claims</u>"); and it appearing that this Court has jurisdiction to consider the Objection

pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Objection and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Objection having been provided, and it appearing that no other or further notice need be

---

[1]    Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Objection.

provided; and upon consideration of the Objection and the Declaration of Lauren Graham Delehey, the Declaration of Norman S. Rosenbaum, and the Declaration of Robert D. Nosek, annexed to the Objection as Exhibits 2-4, respectively; the Court having found and determined that the relief sought in the Objection is in the best interests of the Debtors, their estates, creditors, and all parties in interest and that the legal and factual bases set forth in the Objection establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the relief requested in the Objection is granted to the extent provided herein; and it is further

ORDERED that each of the Lewis Claims is hereby disallowed and expunged; and it is further

ORDERED that Kurtzman Carson Consultants LLC, the Debtors' claims and noticing agent, is authorized and directed to expunge from the claims register the Lewis Claims pursuant to this Order; and it is further

ORDERED that the Debtors are authorized and empowered to take all actions as may be necessary and appropriate to implement the terms of this Order; and it is further

ORDERED that notice of the Objection, as provided therein, shall be deemed good and sufficient notice of such objection, and the requirements of Bankruptcy Rule 3007(a), the Case Management Procedures entered on May 23, 2012 [Docket No. 141], the Procedures Order, and the Local Rules are satisfied by such notice; and it is further

ORDERED that this Order shall be a final order with respect to the Lewis Claims, as if each such claim had been individually objected to; and it is further

ny-1103021

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.


Dated:_____, 2013
        New York, New York


                                        _____
                                        THE HONORABLE MARTIN GLENN
                                        UNITED STATES BANKRUPTCY JUDGE

**Exhibit 2**

**Delehey Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------- )
                                                                           )
In re:                                                                     )      Case No. 12-12020 (MG)
                                                                           )
RESIDENTIAL CAPITAL, LLC, <u>et al.</u>,                                   )      Chapter 11
                                                                           )
                                              Debtors.                     )      Jointly Administered
                                                                           )
-------------------------------------------------------------------------- )

**DECLARATION OF LAUREN GRAHAM DELEHEY**
**IN SUPPORT OF DEBTORS' COMBINED OBJECTION TO PROOFS OF CLAIM**
**FILED BY SIDNEY T. LEWIS AND YVONNE D. LEWIS**

Lauren Graham Delehey, pursuant to 28 U.S.C. § 1746, declares under penalty of

perjury:

**I.      BACKGROUND AND QUALIFICATIONS**

1.      I serve as In-House Litigation Counsel in the legal department (the "<u>Legal</u>

<u>Department</u>") at Residential Capital, LLC ("<u>ResCap</u>"), a limited liability company organized

under the laws of the state of Delaware and the parent of the other debtors and debtors in

possession in the above-captioned Chapter 11 cases (collectively, the "<u>Debtors</u>").  I have held

this position since I joined ResCap on August 1, 2011.  In my role as In-House Litigation

Counsel at ResCap, I am responsible for the management of residential mortgage-related

litigation.  I am authorized to submit this declaration (the "<u>Declaration</u>") in support of the

*Debtors' Combined Objection to Proofs of Claim Filed by Sidney T. Lewis and Yvonne D. Lewis*

(the "<u>Objection</u>").[1]

2.      In my capacity as In-House Litigation Counsel, I am generally familiar with the

Lewises and their litigation history.  Except as otherwise indicated, all statements in this

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Objection.

Declaration are based upon my personal knowledge; information supplied or verified by personnel in departments within the Debtors' various business units; my review of the Debtors' litigation case files, books and records as well as other relevant documents; my discussions with other members of the Legal Department; information supplied by the Debtors' consultants; or my opinion based upon experience, expertise, and knowledge of the Debtors' litigation matters, financial condition and history. In making my statements based on my review of the Debtors' litigation case files, books and records, relevant documents, and other information prepared or collected by the Debtors' employees or consultants, I have relied upon these employees and consultants accurately recording, preparing, collecting, or verifying any such documentation and other information. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

## II.    THE LEWISES

3.    I understand that Sidney T. Lewis & Yvonne D. Lewis (the "Lewises") formerly resided at 1875 Alvason Avenue, Columbus, Ohio 43219 (the "Alvason Property"). True and correct copies of Claim Nos. 932 and 933 filed by the Lewises are attached as Exhibits A and B, respectively, to this Declaration.

4.    On March 9, 2001, Mrs. Lewis entered into a mortgage secured by the Alvason Property, which mortgage GMACM began servicing on October 1, 2001. Mrs. Lewis subsequently defaulted on her mortgage payments, and on April 22, 2005, GMACM filed a foreclosure action against the Lewises in the Court of Common Pleas of Franklin County, Ohio (the "Court of Common Pleas"). On September 12, 2011, the Court of Common Pleas entered a judgment decree in foreclosure. *See* Judgment Entry and Decree in Foreclosure, annexed hereto as Exhibit C. The Lewises appealed the judgment decree in foreclosure on October 13, 2011. After the Lewises filed a motion to voluntarily dismiss the appeal, the Court of Appeals of Ohio

(the "Court of Appeals") dismissed the appeal on December 30, 2011. *See* Journal Entry of Dismissal, annexed hereto as Exhibit D. On June 4, 2012, the sheriff's sale of the Alvason Property was confirmed by the Court of Common Pleas. *See* Sale Confirmation Entry of Sale, annexed hereto as Exhibit E. The Lewises appealed the sale confirmation order. On June 18, 2012, the Court of Appeals dismissed the appeal, finding that the Lewises had not demonstrated that there are reasonable grounds for the appeal and had been adjudicated vexatious litigators by the Court of Common Pleas. *See* Journal Entry of Dismissal, annexed hereto as Exhibit F. Eviction proceedings commenced and the sheriff of Franklin County returned a writ indicating that the eviction was completed on August 24, 2012. *See* Sheriff's Writ, annexed hereto as Exhibit G.

5.    In addition, Mr. Lewis has an interest, as executor of the estate of Bettie Hamilton, in real property located at 1913 Argyle Drive, Columbus, Ohio 43219 (the "Argyle Property"). *See* Claim No. 933. The mortgage loan secured by the Argyle Property went into default and on June 24, 2003, GMACM, as servicer of the mortgage, filed a foreclosure action against Mr. Lewis in the Court of Common Pleas. On September 19, 2003, the Court of Common Pleas entered a judgment decree in foreclosure with respect to the Argyle Property. *See* Order and Decree of Foreclosure, annexed hereto as Exhibit H. Mr. Lewis filed three separate appeals of the Court of Common Pleas's foreclosure decree and related post-judgment decisions. The first two appeals were dismissed by the Court of Appeals. *See* Journal Entry of Dismissal and Judgment Entry, both annexed hereto as Exhibit I. The third appeal resulted in the Court of Common Pleas's decisions being affirmed by the Court of Appeals on June 19, 2007. *See* Judgment Entry, annexed hereto as Exhibit J. After a lengthy delay, the Argyle Property was sold at a sheriff's sale and the sale was confirmed by the Court of Common Pleas on December

12, 2011.  *See* Confirmation Entry of Sale, annexed hereto as <u>Exhibit K</u>.  No appeal of the sale

confirmation order was taken.


Dated:  September 11, 2013


                                         /s/ Lauren Graham Delehey
                                        Lauren Graham Delehey
                                        In-House Litigation Counsel for
                                        Residential Capital, LLC

**Exhibit A**

B 10 Modified (Official Form 10) (12/11)

Claim #932  Date Filed: 9/27/2012

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor and Case Number:
**GMAC MORTGAGE LLC, Case No. 12-bk-12032/12-bk-12020**

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
**SIDNEY T. LEWIS / YVONNE D. LEWIS**

☑ Check this box if this claim amends a previously filed claim.

Name and address where notices should be sent:
**YVONNE D. LEWIS
SIDNEY T. LEWIS
1875 ALVASON AVENUE
COLUMBUS, OH 43219**

Court Claim Number: **07-bk-57237  SD. OH.**
*(If known)*

Telephone number: **(614) 940-3306**    email: **hasidngone@yahoo.com**

Filed on:

Name and address where payment should be sent (if different from above):
**YVONNE D. LEWIS, SIDNEY T. LEWIS
1875 ALVASON AVENUE
COLUMBUS, OH 43219**    **Same as Above**

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Telephone number: **(614) 940-3306**    email:

1. **Amount of Claim as of Date Case Filed: $ 25,000,000.00**

   If all or part of the claim is secured, complete item 4.

   If all or part of the claim is entitled to priority, complete item 5.

   ☑ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

   \* Also see: Notice of filing Proof of Claim, with Statement of Facts, at Exhibit A

2. **Basis for Claim:** False Claims; Equity Skimming; RICO; pension; Services Performed; Etc.
   (See instruction #2)

3. **Last four digits of any number by which creditor identifies debtor:** 1234

   3a. **Debtor may have scheduled account as:** 03-cv-7346 / 05-cv-6455
   (See instruction #3a)

   3b. **Uniform Claim Identifier (optional):**
   (See instruction #3b)

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$ _____

\* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

4. **Secured Claim (see instruction #4)**
   Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

   **Nature of property or right of setoff:** ☑ Real Estate  ☐ Motor Vehicle  ☐ Other
   **Describe:** Lot 17

   **Value of Property: $ 81,480.00**    **Annual Interest Rate 7 %** ☑ Fixed ☐ Variable (when case was filed)

   **Amount of arrearage and other charges, as of the time case was filed, included in secured claim,**
   **if any: $ 0**    **Basis for perfection:**

   **Amount of Secured Claim: $** _____    **Amount Unsecured: $** _____

   **RECEIVED**
   **OCT 0 5 2012**
   **KURTZMAN CARSON CONSULTANTS**

6. **Claim Pursuant to 11 U.S.C. § 503(b)(9):**
   Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

   $ 0    (See instruction #6)

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

8. **Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

   DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

   If the documents are not available, please explain:

9. **Signature:** (See instruction #9) Check the appropriate box.
   ☑ I am the creditor.   ☐ I am the creditor's authorized agent.   ☐ I am the trustee, or the debtor, or   ☐ I am a guarantor, surety,
   (Attach copy of power of attorney, if any.)   their authorized agent.   indorser, or other codebtor.
   (See Bankruptcy Rule 3004.)   (See Bankruptcy Rule 3005.)

   I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.   **YVONNE D. LEWIS**
   Print Name: **SIDNEY LEWIS**
   Title:
   Company:    **Sidney Lewis**    **9/25/12**
   Address and telephone number (if different from notice address above):   (Signature)   (Date)

   **RECEIVED
   SEP 27 2012
   US BANKRUPTCY COURT
   US BANKRUPTCY COURT OF NEW YORK**

   Telephone number: **(614) 940-3306**    Email: **hasidngone@yahoo.com**    **COURT USE ONLY**

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18*

121203212092700000000000004

EXHIBIT A

A

Case: 2:08-cv-00736-GLF-MRA Doc #: 9-1 Filed: 09/10/08 Page: 32 of 44  PAGEID #: 149

Full Screen Image Viewer                                    Page 1 of 8

D7865 - M99

**First American Title Insurance Company**
**Final Statement**

Page: 1

Case: 2:08-cv-00736-GLF-MRA Doc #: 9-1 Filed: 09/10/08 Page: 33 of 44  PAGEID #: 150

Full Screen Image Viewer                                        Page 2 of 8

D7865 - N1

Page: 2

Case: 2:08-cv-00736-GLF-MRA Doc #: 9-1 Filed: 09/10/08 Page: 34 of 44  PAGEID #: 151

**Full Screen Image Viewer**                                Page 3 of 8

D7865 - N2

http://fast.firstam.net/imaging/pub/pages/preview.html?Repository=fastrepos.firstam.net&...    4/22/2008

Case: 2:08-cv-00736-GLF-MRA Doc #: 9-1 Filed: 09/10/08 Page: 35 of 44  PAGEID #: 152

**Full Screen Image Viewer**                                          Page 4 of 8

D7865 - N3

ADDENDUM TO HUD-1 SETTLEMENT STATEMENT

I have carefully compared the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a
true and accurate statement of all receipts and disbursements made on my account or by me in this transaction.
I further certify that I have received a copy of the HUD-1 Settlement Statement.

Buyer/Borrower                                    Seller

_Janice E. Johnston_                              Larry A. McClintock, Trustee

                                                  Larry A. McClintock, Trustee

Selling Broker Company: Gary P. Torrens Realty    Listing Broker Company: Keller Williams Classic
                                                  Properties

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I
have caused the funds to be disbursed in accordance with this statement.

Settlement Agent:

_First American Title Insurance Company_

By: _____                       03/28/2008
    Jennifer Lovhan                                Date

Warning: It is a crime to knowingly make false statements to the United States or to any other similar form.
Penalties upon conviction can include a fine and imprisonment. For details see: TITLE 18 U.S. Code Section 1001
and Section 1010.

Page: 4

EXHIBIT

B

Full Screen Image Viewer                                    Page 5 of 8

D7865 - N4

### ADDENDUM TO HUD-1 SETTLEMENT STATEMENT

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a
true and accurate statement of all receipts and disbursements made on my account or by me at this transaction.
I further certify that I have received a copy of the HUD-1 Settlement Statement.

Buyer/Borrower:                          Seller:

James E. Johnston Jr.                    Larry J. McClatchey, Trustee

                                         Larry J. McClatchey, Trustee

Selling Broker Company: Gena F. Johnson-Beatty    Listing Broker Company: Keller Williams Classic Properties

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I
have caused the funds to be disbursed in accordance with this statement.

Settlement Agent:

**First American Title Insurance Company**

By _____              03/12/2008
         Jennifer Lawhun                     Date

Warning    It is a crime to knowingly make false statements to the United States on this or any other similar form.
Penalties upon conviction can include a fine and imprisonment   For details see TITLE 18 U.S. Code Section 1001
and Section 1010.

Page: 5

EXHIBIT

C

Page 33 of 40

Full Screen Image Viewer
D7865 - N73

**KEGLER BROWN**
**HILL & RITTER**

**FACSIMILE COVER SHEET**

To: Jim Fisher                    Fax No: 451-0280
From: Larry McCluskey            Date: December 6, 2007
Client: Trustee/Lewis            Time: 4:40 PM
Client No.: 15424-1277           Total Pages: ___
Phone No.: 614-462-5443

• Urgent          • For Review          • Please Reply

In Re Sidney Lewis - Case No. 07-57237

Attached is a Commitment for the lower price of $40,000.

Please notify Robin at extension 401 if there is a problem retrieving a complete fax.

The information contained in this facsimile message is privileged and confidential information intended for the use of the addressee listed above and for him alone. If you are not the intended recipient or the employee or agent responsible to deliver the message to the intended recipient, please do not read this. Furthermore, in any way had contact the sender by telephone.

Capitol Square • Suite 1800 • 65 East State Street • Columbus, Ohio 43215-4294
Telephone (614) 462-5400 • Facsimile (614) 464-2634 • www.keglerbrown.com

**Page: 33**

EXHIBIT

D

Case: 2:08-cv-00736-GLF-MRA Doc #: 9-3 Filed: 09/10/08 Page: 38 of 42  PAGEID #: 225

D7865 - N76



Page: 36

EXHIBIT

E

Case: 2:08-cv-00736-GLF-MRA Doc #: 9-3 Filed: 09/10/08 Page: 37 of 42  PAGEID #: 224

D7865 - N75

Mr. Johston
Johnston
Fax 332-1264

**From:Martha Hunley**
Gene P. Johnson Realty
6899 E. Main Street
Reynoldsburg, Ohio 43068
Phone 614-864-4363
Fax 614-864-5493

## To: Jim Fisher

## Date:  November 19, 2007

## No of pages: 12

Hello Jim,

Please call me if you have any questions. You can reach me on my cell at
(614)-314-5555

Thanks!

Martha Hunley

Page: 35

EXHIBIT

F



**FILED**

TIME: _____

DEC - 1 200?

**JAMES BONINI**, Clerk
**COLUMBUS, OHIO**

# United States District Court
## Southern District of Ohio

—————————

Joseph P. Kinneary United States Courthouse
85 Marconi Boulevard, Suite 260
Columbus, Ohio  43215

*James Bonini*
*Clerk of Court*

Telephone:   614.719.3000
Facsimile:   614.719.3037

### Related Case Memorandum
### Civil Cases

**TO:**        District Judge Holschuh, District Judge Marbley & District Judge Frost

**FROM:**    Eduardo Rivera, Case Administrator

**DATE:**    November 4, 2008

**SUBJECT:**    Case Caption: Lewis v. Johnston

**CASE**        Case Number: 2:08-cv-1040

            File Date: November 5, 2008

—————————————————————————————————

This memorandum is to notify you that the civil cover sheet on the above referenced case reflects
the following alleged related case(s):

**Related Case(s):**

Case Caption:   Lewis v. McClatchey

Case Number:   2:08-cv-75                District Judge:   Marbley

File Date:   1/25/08                Magistrate Judge:   N/A

**Related Case(s):**

Case Caption:   Johnston v. Lewis

Case Number:   2:08-cv-736                District Judge:   Frost

File Date:   7/29/08                Magistrate Judge:   Abel

Memo Re: Related Civil Cases
Page 2

The District Judges having conferred, we respond to Case Administrator _Ed Rivera_
_____ as follows:

**Judges' Response:**

☐    We agree that the cases are **not** related and that the subject case should
remain with the Judge to whom it is assigned.

☐    We agree that the cases **are** related and that the subject case should be
transferred to the docket of Judge _____.

☒    We agree that although the cases **are** related, the subject case nevertheless
should remain with the Judge to whom it was assigned.

☐    We are unable to agree and will accept any decision made by the Chief
Judge.

_____
United States District Judge

_____
United States District Judge

_____
United States District Judge

cc: Courtroom Deputies

Case: 2:08-cv-00736-GLF-MRA Doc #: 14 Filed: 12/01/08 Page: 3 of 3  PAGEID #: 474

Memo Re: Related Civil Cases
Page 2

       The District Judges having conferred, we respond to Case Administrator _____
_____ as follows:


**Judges' Response:**

☐    We agree that the cases are **not** related and that the subject case should
remain with the Judge to whom it is assigned.

☐    We agree that the cases **are** related and that the subject case should be
transferred to the docket of Judge _____.

☐    We agree that although the cases **are** related, the subject case nevertheless
should remain with the Judge to whom it was assigned.

☒    We are unable to agree and will accept any decision made by the Chief
Judge.

⊠ — Our case is closed.

_____
United States District Judge


_____
United States District Judge


_____
United States District Judge



cc: Courtroom Deputies

EXHIBIT

G

## IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**GMAC Mortgage Corporation**

       **Plaintiff,**

vs.

**Yvonne D. Lewis aka Yvonne D. Webb-Lewis, et al.**

       **Defendants.**

**Case No. 05CVE-04-4555**

**Judge Julie M. Lynch**

**<u>CONFIRMATION ENTRY OF
SALE AND DISTRIBUTION OF
PROCEEDS</u>**

This action was heard on the return of the Sheriff of Franklin County of the sale of property commonly known as 1875 Alvason Avenue, Columbus, OH 43219, parcel no. 010-136633-00 (the "Property"). The legal description of the Property is attached to this order as Exhibit A, which is incorporated herein by reference.

1.     The Property was sold by the Sheriff on April 20, 2012 to GMAC Mortgage Corporation for the following amount: **$81,480.00**. Plaintiff subsequently assigned its bid to Federal National Mortgage Association ("Plaintiff's Assignee").

2.     Having carefully examined the proceedings of the officer, the Court finds that the sale of the Property conformed in all respects to the law and the prior orders of this Court and hereby confirms and approves the sale of the Property and these proceedings.

3.     The Sheriff shall convey the Property to Federal National Mortgage Association by deed

Ref# 05-2846/NNW

according to law free and clear of all liens and encumbrances and shall issue the deed in

the following name: Federal National Mortgage Association.

4.    The tax mailing address of the purchaser of the Property is as follows: P.O. Box 650043,

Dallas, TX 75265-0043.

5.    The prior deed reference with respect to the Property is as follows: Deed filed May 5,

1997, recorded in Official Records Volume 35026, Page G14, Recorder's Office, Franklin

County, Ohio.filed May 23, 1990, recorded in Official Records Volume 15237, Page

D07, Recorder's Office, Franklin County, Ohio.

6.    The purchaser of the Property is hereby subrogated to the rights of the mortgagees and

lien holders in the Property to the extent necessary to protect the purchaser's title to the

Property.

7.    The Court hereby grants the purchaser of the Property a writ of possession to put the

purchaser in possession of the Property.

8.    The Court hereby orders the release of all mortgages and liens held by all parties to this

action. As a result, the Clerk of Courts shall cause certificates of satisfaction and release

to be presented for recording by the County Recorder with respect to each of the

mortgages and liens listed on Exhibit B, which is attached to this order for the

convenience of the Clerk of Courts and incorporated herein by reference. Such mortgages

and liens shall be released only to the extent that they encumber the property foreclosed

upon in this action and not to the extent that they encumber any other property.

9.    Because Federal National Mortgage Association is the assignee of the successful bid of

GMAC Mortgage Corporation, which holds a valid and subsisting mortgage on the

Property, Federal National Mortgage Association need not pay the full amount of the

Ref# 05-2846/NNW

purchase price to the Sheriff. Instead, Federal National Mortgage Association need only pay an amount necessary to pay court costs, real estate taxes and assessments, and Sheriff's costs. The deposit amount of **$350.00** tendered at the Sheriff's sale shall be distributed as follows:

a.      The Clerk of Courts shall be paid **$399.00** for court costs.

b.      The County Treasurer shall be paid **$1,046.69** for taxes and assessments currently due on the Property and payable through full year 2011 as well as an estimated portion of the 2012 taxes pro-rated through MAY 28, 2012. Grantee takes title subject to all taxes, interest, penalties, assessments, and tax lien certificates if any.

c.      The Sheriff shall be paid **$125.00** for Sheriff's costs.

d.      The Auditor shall be paid **$163.50** for conveyance fees and transfer tax.

e.      The Recorder shall be paid **$36.00** for recording the deed.

f.      Since the deposit is not sufficient to satisfy these items, the Plaintiff's Assignee shall pay the Sheriff the deficit of **$1,420.19** to cover all requisite disbursements.

10.    The following amount shall be applied as a credit toward the amount of the judgment previously entered in favor of the Plaintiff: **$79,709.81**.

**IT IS SO ORDERED.**

_____
Judge Julie M. Lynch
Common Pleas Judge

Approved:

/s/ Matthew J Richardson
Matthew J. Richardson (0077157)
Holly N. Wolf (0068847)
Manley Deas Kochalski LLC
P. O. Box 165028
Columbus, OH 43216-5028
Telephone: 614-222-4921
Fax: 614-220-5613
Email: mjr2@mdk-llc.com
Attorney for Plaintiff

Via fax 5/25/12
Mary Johnson
Assistant Prosecutor
373 South High Street
17th Floor
Columbus, OH 43215
Via Email
Attorney for Franklin County Treasurer

Ref# 05-2846/NNW

## EXHIBIT A

Legal Description of the Property

Situated in the County of Franklin, in the State of Ohio, and in the City of Columbus:

Being Lot Number Seventeen (17) of ARGYLE PARK SUBDIVISION, as the same is numbered and delineated upon the recorded plat thereof, of record in Plat Book 36, Page 6, Recorder's Office, Franklin County, Ohio.

Parcel No. 010-136633-00

Address:  1875 Alvason Avenue, Columbus, OH 43219

Property Address: 1875 Alvason Avenue, Columbus, OH 43219

Parcel No.  010-136633-00

Ref# 05-2846/NNW

## EXHIBIT B

### Mortgages and Liens to be Released

Mortgage in favor of The Huntington Mortgage Company, 7575 Huntington Park Drive, Columbus, OH 43235, from Yvonne D. Lewis aka Yvonne D. Webb-Lewis and Sidney T. Lewis, Husband and Wife, in the amount of $63,400.00, dated March 9, 2001, filed March 20, 2001, recorded as Official Instrument No. 200103200055720, Recorder's Office, Franklin County, Ohio,

as assigned by The Huntington Mortgage Company to GMAC Mortgage Corporation, 3451 Hammond Avenue, Waterloo, IA 50702, by Assignment dated October 4, 2001, filed November 14, 2001, recorded in Official Instrument No. 200111140262914, Recorder's Office, Franklin County, Ohio.

Ref# 05-2846/NNW

Franklin County Court of Common Pleas

**Date:**              06-04-2012

**Case Title:**        GMAC MORTGAGE CORPORATION -VS- YVONNE D LEWIS

**Case Number:**       05CV004555

**Type:**              CONFIRMATION OF SALE

It Is So Ordered.

/s/ Judge Julie M. Lynch

Electronically signed on 2012-Jun-04    page 6 of 6

EXHIBIT
H

E1460 - 1A89

# ORDER OF SALE

| | |
|---|---|
| GMAC Mortgage Corporation | CASE NO. 05CVE-04-4555 |
| PLAINTIFF | JUDGE Julie M. Lynch |
| -vs- | ACTION CODE NO. 6030 |
| Yvonne D. Lewis aka Yvonne D. Webb-Lewis, et al. | COMPLAINT FILED April 22, 2005 |
| DEFENDANT | |

THE STATE OF OHIO,    )  To the Sheriff of said County, Greetings:
Franklin County, ss    )

   WHEREAS, at a term of the Court of Common Pleas, held at Columbus, in and for said County on the _____ day of _____ 20_____ A.D. in this cause it was ordered, adjudged and decreed as follows, to wit:

   That an order of sale issued to the Sheriff of said County, directing him to ___ appraise, advertise ___ and sell as upon execution the following described premises to wit:

### PLEASE SEE ATTACHED SHEET

PARCEL NO.   010-136633-00   ADDRESS  1875 Alvason Avenue, Columbus, OH 43219

   WE THEREFORE COMMAND YOU, That you proceed to carry out said order, judgment and decree into execution agreeable to the tenor thereof, and that you expose to sale the above described Real Estate, under the Statute regulating sales on Execution, and that you apply the proceeds of such sale in satisfaction of said judgment and decree, with costs and interest, as specified therein, and that you make report of your proceedings herein, to our Court of Common Pleas within sixty days from date hereof, and bring this order with you  And I certify under seal of this Court that the description of the property herein is correctly copied from the records on file in this office.

   WITNESS my signature as Clerk of our said Court of Common Pleas, and the seal of said Court at Columbus, this  15  day of  September , 20 11  A.D. John O'Grady, Clerk by _____, Deputy.
COC-CV-82 (Rev 2-2001)

Ref# 05-2846/F1/PS

3

E1460 - A90

## LEGAL DESCRIPTION

Situated in the County of Franklin, in the State of Ohio, and in the City of Columbus:

Being Lot Number Seventeen (17) of ARGYLE PARK SUBDIVISION, as the same is numbered and delineated upon the recorded plat thereof, of record in Plat Book 36, Page 6, Recorder's Office, Franklin County, Ohio.

Parcel No. 010-136633-00

Address: 1875 Alvason Avenue, Columbus, OH 43219

Ref# 05-2846/F1/PS

E1460 - .A91

# SHERIFF'S RETURN OF ORDER OF SALE

GMAC Mortgage Corporation
Plaintiff

vs.

Yvonne D Lewis et al
Defendant

Case No. 05cve04 4555

Judge Lynch

**THE STATE OF OHIO, FRANKLIN COUNTY, ss}**
In obedience to the command of the Order of Sale hereto I did, on 9/22/2011 summon:
1. J Gregory Hart, 2. Vanessa B Sutton, 3. Arthur E Lee three disinterested freeholders, residents of said County, who were by me duly sworn to impartially appraise the lands and tenements therein described, upon actual view, and afterwards, on the date, said Appraisers returned to me, under their hands and seals, that they did, upon actual view of the premises, estimate and partially appraise the real value in money of the same at $57,000.00. The original of said appraisal I forthwith deposited in the Office of the Clerk of the Court of Common Pleas. And on 11/15/2011 I caused to be advertised in the Daily Reporter the said lands and tenements to be sold at public sale, in the Hall of Justice of said County, on 12/16/2011 and having advertised the said lands and tenements for more than thirty days previous to the day of sale, to wit: five consecutive weeks on the same day of the week each week; and in pursuance of said notice, I did at the time and place above mentioned, proceed to offer said lands and tenements at public sale, in the Hall of Justice, and then and there came  who bid the sum of  and said sum being  two thirds of the appraised value thereof, and being the highest and best bidder therefore, I then and there publicly sold and struck off lands and tenements to him/her for the above mentioned bid.

12/16/2011        No Bid/No Sale

PARCEL NO. 010-136633
ADDRESS        1875 Alvason Ave Columbus OH
43219
Matthew J Richardson
614-222-4921

Sheriff's Invoice for Fees

| | |
|---|---|
| Service and Return | $50.00 |
| Swearing Appraisers | $9.00 |
| Writing Advertisement | $1.00 |
| Total Sheriff's Fee | $60.00 |

Appraiser's Fees

| | |
|---|---|
| Three each at | $65.00 |
| Total | $195.00 |

ZACHARY SCOTT, SHERIFF

BY _____  DEPUTY

MIME-Version:1.0
From:nysbinfo@nysb.uscourts.gov
To:courtmail@localhost.localdomain
Bcc: JHaims@mofo.com, LIBKCourt@logs.com, Pfleming@morganlewis.com, abehlmann@lowenstein.com, adam.harris@srz.com, adoshi@magnozzikye.com,
jguso@bergersingerman.com, jpintarelli@mofo.com, jshifer@kramerlevin.com, jwishnew@mofo.com, ken.ziman@skadden.com, kristen.serrao@klgates=
Do not notice for BK case: mholton@graisellsworth.com, mmenge@graisellsworth.com;mmathis@graisellsworth.com;kmatthews@graisellsworth.com;

Message-Id:<11871373@nysb.uscourts.gov>
Subject:12-12020-mg Notice (GENERIC)

Content-Type: text/html

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se
litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to
other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy
and 30-page limit do not apply.

### U.S. Bankruptcy Court

### Southern District of New York

Notice of Electronic Filing

The following transaction was received from Bickerstaff, Chris entered on 9/28/2012 at 12:36 PM and filed on 9/27/2012
**Case Name:**      Residential Capital, LLC
**Case Number:**    12-12020-mg
**Document Number:** 1624

**Docket Text:**
Notice of Praecipe and Filing Proof of Claim With Exhibits in Support, Filed by Yvonne D. Lewis. Two Proof of Claims From Sidney T. Lewis/Yvonne D. Lewis and Sidney
T. Lewis, for Betty Hamilton (Bickerstaff, Chris).

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**12-12020 lewis praecipe.pdf
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=9/28/2012] [FileNumber=11871371-0]
[52d1e51e54c87eb90805b14aa7b4f94893b04adbd51e084b75d4dad22c59fd5cec67
39742ca575482418e80c7016e916328c8fe277eea20d61e0cd5520209fc7]]
**Document description:** Exhibit 1
**Original filename:**12-12020 exhibit 1 lewis.pdf
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=9/28/2012] [FileNumber=11871371-1]
[38f5ff80bc52e6a3e68cc07cdef2930f890f013194b7512eceb63c6bcf23d8664eb1
a0b4b4610825d540647f26cc47f412dbbebaddb62f462ee6564f29c73d9e]]
**Document description:** Exhibit 2
**Original filename:**12-12020 exhibit 2 lewis.pdf
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=9/28/2012] [FileNumber=11871371-2]
[850480ce709032a368b8b83ee1c5d61322cdd50ccff6e230027efe70951e2cbda5fa
d9a072525b92f80bacf334f3bad2cb2cce1ec02138265dbc89d627a71fc7]]
**Document description:** Exhibit 3
**Original filename:**12-12020 exhibit 3 lewis.pdf
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=9/28/2012] [FileNumber=11871371-3]
[50777f2774a5ced2ecbd001a3225f36afc3663aabc86c27baf1a717baedd6d2b5a23
6afbf0b2bc6964fcf3d91b0792b5797947b2463f26a35ad51f95d1fbd41a]]
**Document description:** Exhibit 4
**Original filename:**12-21020 exhibit 4 lewis.pdf
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=9/28/2012] [FileNumber=11871371-4]
[936944b5fa662c5925cfeba2f621d9798ddf830d5dd57815bccea569507263bbb5da
2b7bc2d6aff5b8c90474a077db6ea7fd9ba3b97a7150228cd937838ef14b]]
**Document description:** Exhibit 5
**Original filename:**12-12020 exhibit 5 lewis.pdf
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=9/28/2012] [FileNumber=11871371-5]
[00e6f3001b914193f68273e10de05b59f3afca26dd40525c0b1093cf97d11a6839b8
9a45ad3c3437363bedad602164d19ed02832964fd16bd2a6e0a89c059570]]
**Document description:** Exhibit 6
**Original filename:**12-12020 exhibit 6 lewis.pdf
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=9/28/2012] [FileNumber=11871371-6]
[5170f7a17fbb3b869385d58750cc0170e6aa26fa17abd6b390abc45ae412636df076
a035055c3f30734b890723d5b40b15e0f1c9f829fa0a7676b07130d33760]]
**Document description:** Exhibit 6.1
**Original filename:**12-12020 exhibit 6.1 lewis.pdf
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=9/28/2012] [FileNumber=11871371-7]
[3d2fc3710f39e1620175b418cafc00428d495b809ebb5f0ccf533830362d2217908
d561911acf16591079b30bd65a1a70be677482aaac161c64426e1c9ce4ba]]
**Document description:** Exhibit 7
**Original filename:**12-12020 exhibit 7 lewis.pdf
**Electronic document Stamp:**

IN Re: RESCAP, 12-bk-12020


Document #1624

# PRAECIPE

TO: Clerk of the U.S. Bankruptcy
Court For The S.D. of N.Y.

Enclosed please find the
following documents to be filed
in Bankruptcy case No. 12-bk-12020;

(1) Notice of Filing Proof of
Claim w/ Exhibits in support.

(2) Proof of Claims (2)

Yvonne D. Lewis

SEP 27 2012

**IN THE U.S. BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
(at Manhattan)

SEP 2 7 2012

| | |
|---|---|
| In Re: Residential Capital, LLC., et al., And, | ) Case No. <u>12-bk-12020</u> (MG) |
| In Re: GMAC, Mortgage Co., et al, | ) Chapter    (Ch.11, Joint Admin. ) |
| Debtors | ) (Related BR Case No.07-bk-57237, S.D., OHIO) |
| | ) (Related BR Case No. 12-bk-12032, S.D., N.Y.) |
| | ) JUDGE: GLENN, MARTIN |
| UNITED STATES of America, Ex Rel., | ) |
| Yvonne D. Lewis, et al., | ) Adversary Case No.: 1:12-av-1731 |
| Plaintiffs/ Surplus Creditors | ) (Related Case Nos. 1:12-12020, 1:12-12032; |
| Vs. | ) 05-CV-7346 (03-CV-7478); 03-CV-10836; |
| | ) 05-CV-4555; 03-CV-474; 03-CV-6954) |
| GMAC, Mortgage Co., et al, | ) (11-AP-875,COA10th Dist., OHIO), |
| Defendants/ Bankrupt Debtors, | ) (10-AP-110, COA10th Dist., OHIO) |
| | ) |
| | ) ***NOTICE OF FILING OF PROOF OF CLAIM*** |

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF OHIO;**
(at Columbus)

[18 USC §§ 2, 245(b)(2)(B), 371, 664, 666, 1001, 1505, 1962][29 USC §§ 1131, 1132(h), 1140]
[26 USC §§ 101(h), 267(b)(1)][42 USC §§ 1441, 2000d, 3535, 4621(c)(4), 4651(3),7407(d)(1)(C)(i)]

| | |
|---|---|
| In Re: SIDNEY T. LEWIS, pro se, | ) Case No. 2:07-bk-57237 |
| | ) (Ch.7 ) |
| Debtor | ) (Related BR Case No. 2:05-bk-75111, S.D., OH.) |
| | ) (Related DR Case No. 2:96-cv-494, S.D., OH.) |
| Social Security No.: xxx-xx-5959 | ) JUDGE: HOFFMAN, JOHN, Jr. |
| In Re: Yvonne D. Lewis, | ) Case No. 2:05-bk-75111 |
| | ) (Ch.7 ) |
| Debtor | ) (Related BR Case No. 2:07-bk-57237, S.D., OH.) |
| | ) (Related DR Case No. 2:96-cv-494, S.D., OH.) |
| Social Security No.: xxx-xx-2390 | ) JUDGE: HOFFMAN, JOHN, Jr. |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO;**
**(at Columbus)**

[18 USC §§ 2, 371, 245(b)(2)(B), 664, 666, 1962][29 USC §§ 1131, 1132(h), 1140]
[26 USC §§ 101(f)(3)(A), 267(b)(1) & (c)(4)][42 U.S.C. §§ 1441, 3535(d), 4651(3), 7573)]

1 of 4 pages

SEP 2 7 2012

| | |
|---|---|
| UNITED STATES of America, Ex Rel., | ) |
| Sidney T. Lewis, et al., | ) Action No. 2:08-cv-75 |
| Plaintiffs | ) (Related Dist. Ct. Cases 2:08-cv-16; 2:96-cv-494; |
| Vs. | ) 2:08-cv-1040, 2:08-cv-736, 2:09-cv-179); |
| | ) JUDGE: ALGENON L. MARBLEY |
| Larry McClatchey, Ch. 7 Trustee from | ) |
| Kegler Brown Hill & Ritter, et al., | ) Mag. Judge: MARK ABEL [RICO 2:96-cv-494] |
| And, | ) [Notice of Appeal re Bankruptcy Matter, Case |
| Larry McClatchey, Atty. for Ch. 7 Trustee, | ) No. 2:07-bk-57237, S.D., OH] |
| from Kegler Brown Hill & Ritter, et al., | ) Mag. Judge: MARK ABEL [RICO 2:96-cv-494] |
| Defendants. | |
| | |
| UNITED STATES of America, Ex Rel., | ) |
| James Johnston, et al., | ) Action No. 2:08-cv-736 |
| Plaintiffs | ) (Related Dist. Ct. Cases 2:08-cv-16; 2:96-cv-494; |
| Vs. | ) 08-cv-75, 08-cv-736, 09-cv-179; 2:08-cv-1040); |
| | ) JUDGE: GREGORY FROST |
| Sidney T. Lewis, et al., | ) Mag. Judge: MARK ABEL [RICO 2:96-cv-494] |
| Defendants. | [Remvd. From Fr. Cnty., CPC case 08CVH-10168] |
| | |
| UNITED STATES of America, Ex Rel., | ) |
| Sidney T. Lewis, et al., | ) Action No. 2:08-cv-1040 |
| Plaintiffs | ) (Related Dist. Ct. Cases 2:08-cv-16; 2:96-cv-494; |
| Vs. | ) 08-cv-75, 08-cv-736, 09-cv-179; 2:08-cv-1042); |
| | ) JUDGE: HOLSCHUH |
| James Johnston, et al., | ) Magistrate Judge: TERENCE P. KEMP |
| Defendants. | [Original Action Civil Rights  Complaint/RICO ] |

## *NOTICE OF FILING OF PROOF OF CLAIM BY CREDITORS SIDNEY LEWIS AND YVONNE LEWIS, F/K/A YVONNE MOORE; WITH STATEMENT OF FACTS AND EXHIBITS*

NOTICE IS HEREBY GIVEN that on or about September 25, 2012 the Creditors Sidney Lewis and Yvonne Lewis, f/k/a Yvonne Moore, on behalf of themselves and on behalf of the United States of America, 12 USC §§ 1709, 1715z-19; 31 U.S.C.A. §§ 3729 to 3733; 18 USC §§ 2, 371, 1505, 1962; 42 USC §§ 1441, 2000d, 3535, 4621(c)(4), have filed their proof of claim for Debtors' false (loss mitigation) claims to collect "soft dollar credits" in furtherance of "Equity Skimming [Id. 1715z-19]" (Related Case Nos. 1:12-cv-361, 363, D.C.); and Debtors' "RICO Enterprise [Id. 1962]"  associated

with "Equity Index Annuities [Id. 101(f)(3)(a)]" through "Trust Mills [Id. 1962]" (Originating Case Nos. 2:96-cv-494, 2:08-cv-75[1], S.D., OH) pursuant to Fed. R. Bankr. Proc., Rules 2018(a), 3004, 7023.1 and Rule 23.1 F.R.Civ.P. for the following creditor(s):

*1.* Creditors Yvonne Lewis, f/k/a Yvonne Moore, Lot 17 of the Argyle Park Subdivision; And, 820, 828, and 832 E. 5th Avenue, Columbus, Ohio.

2. Creditors Sidney Lewis, (e.g., Executor of Bettie Hamilton Probate Estate in BR Case No. 2:11-bk-60903, S.D., OH., Docket Sheet at 01/07/2012, "Chapter 7 Trustee's Report of No Distribution" entered 01/07/2012, Lot 11, Argyle Park Subdivision), Lots 11 and 17 of the Argyle Park Subdivision.

The deadline for filing claims is *November 9, 2012*, except that the deadline for filing claims by a governmental unit is *November 30, 2012*. (See: Doc 1309, pg. 2)  If the deadline for filing claims has not expired, a claim filed by the Lewis creditor pursuant to Fed. R. Bankr. Proc. 3002(c) or 3003(c) shall supersede the proof of claim filed by the Rescap debtors under 1:12-cv-361 Consent Decree Orders and 2:96-cv-494 Consent Decree Orders for GMAC's Liability for omissions in its 2006 defective affidavit (See: Exhibit 5 in support of POC, GMAC's affidavit) under the GMAC Original Servicing Agreement dated as executed on Aug. 21, 2001 and fourth Addendum dated and effective Sept. 1, 2007. (See: Doc. 793-1, pgs. 58 and 86 of 111, at P.7.1, in BR Case No. 12-bk-12020, USBRC, S.D. NY, GMAC Original Servicing Agreement).

---

[1] (Compare: Doc. 86, date: 06/09/09, Page: 3 of 6, in case no 2:08-cv-75, USDC, S.D., OH; **Larry McClatchey**, "**DECEMBER 1, 2008**, this Court and Judge Frost issued a Related Case Memorandum that determined that Case Numbers 2:08-cv-75 and 2:08-cv-736 would remain with the judges to whom they were assigned (doc. no. 79)"; Compare With: case no. 1:12-cv-361, USDC, .DC.; for HUD related misconduct, "…the Administrator to provide cash payments to borrowers whose homes were finally sold or taken in foreclosure between and including January 1, 2008 and **DECEMBER 31, 2011;…**"; Compare To: Doc #: 9-1, Filed: 09/10/08, Pages: 32 to 36 of 44, case no. 2:08-cv-736 USDC, S.D., OHIO, judge Gregory Frost, "HUD-1 Settlement Sheet" and "Addendum to HUD-1 Settlement Statement, **Larry McClatchey**,")

Respectfully Submitted,

Dated: Sept. 24, 2012 _____
                    Sidney T. Lewis, pro se
                    1875 Alvason Avenue
                    Columbus, OH  43219

Dated: Sept. 24, 2012 _____
                    Yvonne D. Lewis, pro se
                    1875 Alvason Avenue
                    Columbus, OH  43219

## CERTIFICATE OF SERVICE

A copy of the foregoing: **NOTICE OF FILING OF PROOF OF CLAIM BY CREDITORS SIDNEY LEWIS AND YVONNE LEWIS, F/K/A YVONNE MOORE; WITH STATEMENT OF FACTS AND EXHIBITS** was served on Debtors counsels of record, and other parties to the instant action, by hand delivery, electronic mail service, or by certified U.S. Mail Service, Postage Prepaid on Sept. 24, 2012.

Dated: Sept. 24, 2012 _____
                    Sidney T. Lewis, pro se

Dated: Sept. 24, 2012 _____
                    Yvonne D. Lewis, pro se

# IN THE U.S. BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK
### (at Manhattan)

In Re: Residential Capital, LLC., et al., And,  ) Case No. <u>12-bk-12020</u> (MG)
In Re: GMAC, Mortgage Co., et al,  ) Chapter      (Ch.11, Joint Admin. )
       Debtors  )(Related BR Case 07-bk-57237, S.D., OHIO)
         ) (Related BR Case 12-bk-12032, S.D., N.Y.)
         ) JUDGE: GLENN, MARTIN
         )
UNITED STATES of America, Ex Rel.,  )
Yvonne D. Lewis, et al.,  )      Adversary Case No.: 1:12-av-1731
    Plaintiffs/ Surplus Creditors  ) (Related Case Nos. 1:12-12020, 1:12-12032;
Vs.  )   05-CV-7346 (03-CV-7478); 03-CV-10836;
         )   05-CV-4555; 03-CV-474; 03-CV-6954)
 GMAC, Mortgage Co., et al,  ) (11-AP-875, 10-AP-110, COA10th Dist., OH.),
    Defendants/ Bankrupt Debtors,  )
         ) <u>**EXHIBITS TO SUPPORT STATEMENT**</u>
           **OF FACTS FOR PROOF OF CLAIMS**

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO;
### (at Columbus)

[18 USC §§ 2, 245(b)(2)(B), 371, 664, 666, 1001, 1505, 1962][29 USC §§ 1131, 1132(h), 1140]
[26 USC §§ 101(h), 267(b)(1)][42 USC §§ 1441, 2000d, 3535, 4621(c)(4), 4651(3), 7407(d)(1)]

In Re: SIDNEY T. LEWIS, pro se,  )      Case No. <u>2:07-bk-57237</u>
         )      (Ch.7 )
Debtor  ) (Related BR Case No. 2:05-bk-75111, S.D., OH.)
         ) (Related DR Case No. 2:96-cv-494, S.D., OH.)
Social Security No.: xxx-xx-5959  )      JUDGE: HOFFMAN, JOHN, Jr.


In Re: Yvonne D. Lewis,  )      Case No. <u>2:05-bk-75111</u>
         )      (Ch.7 )
Debtor  ) (Related BR Case No. 2:07-bk-57237, S.D., OH.)
         )  (Related DR Case No. 2:96-cv-494, S.D., OH.)
Social Security No.: xxx-xx-2390  ) JUDGE: HOFFMAN, JOHN, Jr.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO;
### (at Columbus)

[18 USC §§ 2, 371, 245(b)(2)(B), 664, 666, 1962][29 USC §§ 1131, 1132(h), 1140]
[26 USC §§ 101(f)(3)(A), 267(b)(1) & (c)(4)][42 U.S.C. §§ 1441, 3535(d), 4651(3), 7573)]

| | |
|---|---|
| UNITED STATES of America, Ex Rel.,   ) | |
| Sidney T. Lewis, et al.,   ) | Action No. 2:08-cv-75 |
|    Plaintiffs   ) | (Related Dist. Ct. Cases 2:08-cv-16; 2:96-cv-494; |
| Vs.   ) | 2:08-cv-1040, 2:08-cv-736, 2:09-cv-179); |
|    ) | JUDGE: ALGENON L. MARBLEY |
| Larry McClatchey, Ch. 7 Trustee from   ) | |
|   Kegler Brown Hill & Ritter, et al.,   ) | Mag. Judge: MARK ABEL [RICO 2:96-cv-494] |
|    And,   ) | [*Notice of Appeal re Bankruptcy Matter, Case* |
| Larry McClatchey, Atty. for Ch. 7 Trustee,   ) | *No. 2:07-bk-57237, S.D., OH*] |
|   from Kegler Brown Hill & Ritter, et al.,   ) | Mag. Judge: MARK ABEL [RICO 2:96-cv-494] |
|    Defendants.   ) | |

| | |
|---|---|
| UNITED STATES of America, Ex Rel.,   ) | |
| James Johnston, et al.,   ) | Action No. 2:08-cv-736 |
|    Plaintiffs   ) | (Related Dist. Ct. Cases 2:08-cv-16; 2:96-cv-494; |
| Vs.   ) | 08-cv-75, 08-cv-736, 09-cv-179; 2:08-cv-1040); |
|    ) | JUDGE: GREGORY FROST |
| Sidney T. Lewis, et al.,   ) | Mag. Judge: MARK ABEL [RICO 2:96-cv-494] |
|    Defendants.   ) | [Remvd. From Fr. Cnty., CPC case 08CVH-10168] |

| | |
|---|---|
| UNITED STATES of America, Ex Rel.,   ) | |
| Sidney T. Lewis, et al.,   ) | Action No. 2:08-cv-1040 |
|    Plaintiffs   ) | (Related Dist. Ct. Cases 2:08-cv-16; 2:96-cv-494; |
| Vs.   ) | 08-cv-75, 08-cv-736, 09-cv-179; 2:08-cv-1042); |
|    ) | JUDGE: HOLSCHUH |
| James Johnston, et al.,   ) | Magistrate Judge: TERENCE P. KEMP |
|    Defendants.   ) | [Original Action Civil Rights[1] Complaint/RICO[2]] |

---

[1] ("Having forfeited his right to appeal these orders on the merits, Mr. Lewis is barred from collaterally attacking the same orders in this case." (See: Doc. 3, at pg. 4 of 6, Magistrate's REPORT AND RECOMMENDATION to Dismiss Case in case no. 2:08-cv-1040);
[2] SEE AND COMPARE: Docs. 7 & 9, Related Case Memo for 2:08-cv-75, Kegler-Brown et al. Defendants & OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION to Dismiss Case in case no. 2:08-cv-1040; COMPARE WITH: RICO Related Case no. 2:96-cv-494, Kegler-Brown et al. Defendants.)

EXHIBITS TO SUPPORT STATEMENT OF FACTS FOR PROOF OF CLAIMS

Exhibits

1  Sept. 30, 1975 - FHA Mortgage Deed/Dower (executed by Y. Moore a/k/a/ Y. Lewis).

2  **Sept. 11, 1987** - FAA, Record of Approval, 14 CFR part § 150, "Land Use Controls".

3  Sept. 2, 1992   - FAA Permanent Subdivision Avigation Easement (FAR, Part 150, for

Lots 1-128, Argyle Park Subdivision "APS", Columbus, OH.) executed April 20, 1992

and recorded in County Recorders Office on Sept. 2, 1992; And, Vol. 57 FR 40242,

Passenger Facility Charges "PFC's", Col., OH., (14 CFR part §158) dated Sept. 2, 1992.

4  **Sept. 11, 1996** - Merger of American Equity Investment Life Ins. Co. ("AEL", IOWA)

with Century Insurance Co. (OH.), Foreign license from the OHIO Depart. of Ins. (ODI),

to sell "Equity Index Annuities" as "Tax Exempt Policies" under 26 USC §§ 101(f)(3)(a),

267(b) (1) and (c)(4).

5  Jan. 27, 2006  - Affidavit of GMAC (creditor) In Support of Motion For Relief From Stay

11 USC § 362(d) in In Re: Yvonne Lewis, case no. 05-bk-75111, USBRC, S.D., Ohio.

6  Mar. 8, 2006  - Trustee's Abandonment of 1875 Alvason Ave. on request of GMAC

(Creditor) in U.S. Bankruptcy Court for S.D. of Ohio in case no. 05-bk-75111.


6.1 Dec. 1, 2008 – Related Cases Memo, Doc. 14, Removal & BR appeal matters (in In Re:

Sidney T. Lewis, case no. 07-bk-57237, USBRC, S.D., Ohio) in case no 2:08-cv-736.


7  Dec. 16, 2010 - Garretson Resolution Group's (Admin. of Panter C/A, 01-CI-02109, Jeff.

Cnty., KY.) Response to Lewis' Subpoena Duces Tecum served on **Dec. 9, 2010.**

8  <u>Jan. 13, 2011</u> - Mike DeWine, Ohio's current AG, responds to the Lewis's Complaint under Ohio Consumer Protection Act, for AEL's Defective Notice of 2001-2005 Strube/Malone/Panter C/A for Unlawful Living Trust and Equity Index Annuities sales and response of Garretson to Subpoena Duces Tecum served on **Dec. 9, 2010**.

9  <u>Oct. 26, 2011</u> - First Letter to Eric LaFayette, Esq. (Lewis claimants' attorney) from CHARLES F. SMITH, Atty., of the lawfirm of **Skadden, Arps, Slate, Meagher & Flom, LLP,** on behalf of **"AEL"** (collectively, "American Equity") in Fr. Cnty. Ohio CPC case no. 11-CV-12667 filed Jan. 9, 2012.

10  <u>Dec. 23, 2011</u> - Second Letter to Eric LaFayette, Esq. from Skadden…[sic.] & Flom, LLP, by MARCELLA L. LAPE, on behalf of "AEL" in Fr. Cnty., CPC case no. 11-CV-12667.

11  <u>Jan. 9, 2012</u> - Agreed Motion and Stipulation To Extend American Equity Answer Period in CPC case 11-CV-12667, referencing a dismissal demand by "AEL" on **Dec. 30, 2011.**

12  <u>April 4, 2012</u> -  Consent Judgment executed for the *Jan. 1, 2008 to **Dec. 31, 2011,*** Class Period in related case no. 12-cv-361, USDC, Dist. of Columbia, entered April 5, 2012.

13  <u>Sept. 14, 2012</u> – Declaration of Bridget M. Lee, for impacted HUD/FHA mortgages by FAA in related case FoE vs. U.S. EPA, no. 12-cv-363, USDC, D.C. filed Sept. 14, 2012.

# EXHIBIT 1

## 1975 FHA MORTGAGE DEED WITH DOWER



VOL **3553** PAGE **21**

STATE OF OHIO

FHA Form No. 2165M
Revised November 1972

P-27987

# MORTGAGE DEED
## WITH DOWER

19296

This form is used in connection with mortgages insured under the one- to four-family provisions of the National Housing Act.

KNOW ALL MEN BY THESE PRESENTS, THAT Ronald L. Moore, by Yvonne D. Moore, his Attorney-in-Fact, and Yvonne D. Moore, husband and wife, both being over 18 years of age,

of The City of Columbus                    , County of Franklin
and State of Ohio, the Grantor, for and in consideration of the sum of Twenty-four Thousand Eight Hundred and no/100's
Dollars ($4,800.00), to him paid by CENTRAL SAVINGS AND LOAN COMPANY

, a corporation organized and existing under the laws of
The United States of America    , and having its principal place of business at 46 E. Gay Street,
Columbus, Ohio 43215    , Grantee, the receipt of which is hereby acknowledged, does give, grant,
bargain, sell, and convey unto the Grantee the following-described premises, situated in the City
of    Columbus    , County of Franklin    , State
of Ohio, and bounded and described as follows, to wit:

Being Lot Number Seventeen (17) of ARGYLE PARK SUBDIVISION, as the same is numbered and delineated upon the recorded plat thereof, of record in Plat Book 36, page 6, Recorder's Office, Franklin County, Ohio.

Received OCT 8 1975 19 At 4:05 O'Clock P. M
Recorded OCT 8 1975 19 In Franklin County
JAMES A. SCHAEFER, Recorder
Recorder's Fee $ 4.00

Columbus, Ohio                    September 30, 1975
For value received, the undersigned hereby sells, assigns and sets over unto CITIZENS MORTGAGE CORPORATION, a corporation organized and existing under the laws of the State of Delaware, whose address is, 24700 Northwestern Highway, Southfield, Michigan 48075, all its right, title and interest in and to the within Mortgage, without recourse.

CENTRAL SAVINGS AND LOAN COMPANY
X
JAMES L. BIGARD, TREAS.
X
JANE G. CLARKSON
ASST. SECY.

together with the privileges and appurtenances thereunto belonging, and all the rents, issues, and profits which may arise or be had therefrom; and all the estate, title, and interest of the said Grantor, either in law or in equity, of, in, and to the said premises; to have and to hold the above-granted and bargained premises, with all the privileges and appurtenances thereto belonging, including all heating, plumbing and lighting fixtures and equipment now or hereafter attached to or used in connection with the said premises, and all the rents, issues, and profits which may arise or be had therefrom, unto the said Grantee, its successors and assigns, forever. And the Grantor covenants that at and until the execution and delivery of these presents, he is well seized of the above-described premises in fee simple, and has good right to bargain and sell the same in manner and form above written, and that the same are free from all encumbrances whatsoever; and that he will warrant and defend said premises, with the above-mentioned appurtenances to the said Grantee, its successors and assigns, forever, against all lawful claim or claims and demands whatsoever.

And, for a valuable consideration, the said Grantors    does hereby remise, release, and forever quitclaim, unto the Grantee all right and title of dower in the above-described premises.

The conditions of this deed are such that whereas the Grantor has executed and delivered to the Grantee his certain promissory note, of even date herewith, in the principal sum of Twenty-four Thousand Eight Hundred and no/100's
Dollars ($24,800.00) with interest from date at the rate of Nine    percentum ( 9 %) per
annum on the unpaid balance until paid, said principal and interest being payable at the office of Citizens Mortgage Corporation
at 24700 Northwestern Highway
Southfield, Michigan 48075    , or at such other place as the holder may designate in writing, in monthly installments of
One Hundred Ninety-nine and 64/100's    Dollars ($ 199.64 ), commencing on
the first day of November    , 19 75, and on the first day of each month thereafter until the principal and interest are fully paid, except that the final payment of principal and interest, if not sooner paid, shall be due and payable on the first day of October, 2005.

3921

E x. 1

VOL 3553 PAGE 22

AND WHEREAS the Grantor further covenants and agrees that:

1. He will promptly pay the principal of and interest on the indebtedness evidenced by the said note, at the times and in the manner therein provided. Privilege is reserved to pay the debt in whole or in an amount equal to one or more monthly payments on the principal that are next due on the note, on the first day of any month prior to maturity; provided, however, that written notice of an intention to exercise such privilege is given at least thirty (30) days prior to prepayment.

2. In order more fully to protect the security of this deed, he will pay to the Grantee, together with, and in addition to, such payments of principal and interest, the following sums:

(a) An amount sufficient to provide the holder hereof with funds to pay the next mortgage insurance premium if this instrument and the note secured hereby are insured, or a monthly charge (in lieu of a mortgage insurance premium) if they are held by the Secretary of Housing and Urban Development, as follows:

(I) If and so long as said note of even date and this instrument are insured or are reinsured under the provisions of the National Housing Act, an amount sufficient to accumulate in the hands of the holder one (1) month prior to its due date the annual mortgage insurance premium, in order to provide such holder with funds to pay such premium to the Secretary of Housing and Urban Development pursuant to the National Housing Act, as amended, and applicable Regulations thereunder; or

(II) If and so long as said note of even date and this instrument are held by the Secretary of Housing and Urban Development, a monthly charge (in lieu of a mortgage insurance premium) which shall be in an amount equal to one-twelfth (1/12) of one-half (½) per centum of the average outstanding balance due on the note computed without taking into account delinquencies or prepayments;

(b) A sum equal to the ground rents, if any, next due, plus the premiums that will next become due and payable on policies of fire and other hazard insurance protecting the premises covered hereby, plus taxes and assessments next due on the premises covered by this deed (all as estimated by the Grantee) less all sums already paid therefor divided by the number of months to elapse before one month prior to the date when such ground rents, premiums, taxes and assessments will become delinquent, such sums to be held by the Grantee in trust to pay said ground rents, premiums, taxes and special assessments before the same become delinquent; and

(c) All payments mentioned in the two preceding subsections of this paragraph and all payments to be made under the note secured hereby shall be added together, and the aggregate amount thereof shall be paid by the Grantor each month in a single payment to be applied by the Grantee to the following items in the order set forth:

(I) premium charges under the contract of insurance with Secretary of Housing and Urban Development, or monthly charge (in lieu of mortgage insurance premium), as the case may be;

(II) ground rents, taxes, special assessments, fire and other hazard insurance premiums;

(III) interest on the note secured hereby; and

(IV) amortization of the principal of said note.

Any deficiency in the amount of such aggregate monthly payment shall, unless made good by the Grantor prior to the due date of the next such payment, constitute an event of default under this deed. The Grantee may collect a "late charge" not to exceed two cents (2¢) for each dollar ($1) of each payment more than fifteen (15) days in arrears to cover the extra expense involved in handling delinquent payments.

3. If the total of the payments made by the Grantor under subsection (b) of paragraph 2 preceding shall exceed the amount of the payments actually made by the Grantor for ground rents, taxes, or assessments or insurance premiums, as the case may be, such excess, at the option of the Grantor, shall be credited by the Grantor under said subsection on subsequent payments to be made by the Grantor, or refunded to the Grantor. If, however, the monthly payments made by the Grantor under said subsection shall not be sufficient to pay ground rents, taxes, or assessments or insurance premiums, when the same shall become due and payable, then the Grantor shall pay to the Grantee any amount necessary to make up the deficiency, on or before the date when payment of such ground rents, taxes, assessments or insurance premiums shall be due. If at any time the Grantor shall tender to the Grantee, in accordance with the provisions of said note, full payment of the entire indebtedness represented thereby, the Grantee shall, in computing the amount of such indebtedness, credit to the account of the Grantor all payments made under the provisions of subsection (a) of paragraph 2, above, which the Grantee has not become obligated to pay to the Secretary of Housing and Urban Development, and any balance remaining in the funds accumulated under the provisions of subsection (b) of paragraph 2. If there shall be a default under any of the provisions of this deed resulting in a public sale of the premises covered hereby or if the Grantee acquires the property otherwise after default, the Grantee shall apply, at the time of the commencement of such proceedings, or at the time the property is otherwise acquired, the balance then remaining in the funds accumulated under such subsection (b) of paragraph 2 as a credit against the amount of principal then remaining unpaid under said note, and shall properly adjust any payments which shall have been made under subsection (a) of paragraph 2.

4. He will pay all ground rents, taxes, assessments, water rates, and other governmental or municipal charges, fines, or impositions, levied upon said premises, or upon the interest of the Grantee in and to said premises, for which provision has not been made hereinbefore, and in default thereof the Grantee may pay the same; and he will promptly deliver the official receipts therefor to the Grantee.

5. The Grantee, its successors or assigns, shall have the right to pay any ground rents, taxes, assessments, water rents, and other governmental or municipal charges, fines or impositions, which the Grantor has agreed to pay under paragraph 4, above, and to make any payments hereinabove provided to be made by the Grantor in subsections (a) and (b) of paragraph 2 hereof, and any amount so paid by the Grantee shall then be added to the principal debt named herein and bear interest at the rate set forth in the note secured hereby, payable monthly, from the date of such payment, and be secured by this deed.

6. He will keep the improvements now existing or hereafter erected on the premises covered by this deed, insured as may be required from time to time by the Grantee against loss by fire and other hazards, casualties and contingencies including war damage insurance, in such amounts and for such periods as may be required by the Grantee and will pay promptly, when due, any premiums on such insurance provision for payment of which has not been made hereinbefore. All insurance shall be carried in companies approved by the Grantee and the policies and renewals thereof shall be held by the Grantee and have attached thereto loss payable clauses in favor of and in form acceptable to the Grantee. In event of loss Grantor will give immediate notice by mail to the Grantee, who may make proof of loss if not made promptly by Grantor, and each insurance company concerned is hereby authorized and directed to make payment for such loss directly to the Grantee instead of to the Grantor jointly, and the insurance proceeds, or any part thereof, may be applied by the Grantee at its option either to the reduction of the indebtedness hereby secured or to the restoration or repair of the property damaged. In event of foreclosure of this mortgage deed, or other transfer of title to the property covered hereby in extinguishment of the indebtedness secured hereby, all right, title and interest of the Grantor in and to any insurance policies then in force shall pass to the purchaser or Grantee.

7. He will keep the mortgaged premises in as good order and condition as they are now, and will not commit or permit waste, reasonable wear and tear excepted.

8. That if the premises, or any part thereof, be condemned under any power of eminent domain, or acquired for a public use, the damages, proceeds, and the consideration for such acquisition, to the extent of the full amount of indebtedness upon this Mortgage, and the Note secured hereby remaining unpaid, are hereby assigned by the Grantor to the Grantee and shall be paid forthwith to the Grantee to be applied by it on account of the indebtedness secured hereby, whether due or not.

9. The Grantor further agrees that should this deed and the note secured hereby not be eligible for insurance under the National Housing Act within   60 days   from date hereof (written statement of any officer of the Department of Housing and Urban Development or authorized agent of the Secretary of Housing and Urban Development dated subsequent to the   aforesaid   time from the date of this deed, declining to insure said note and this deed, being deemed conclusive proof of such ineligibility) the Grantee or the holder of the note may, at its option, declare all sums secured hereby immediately due and payable.

Ex. 1

VOL 3553 PAGE 23

10.  Upon a default in any of the terms of the note secured hereby, or upon a breach of any condition or covenant of this deed, the rents of the real estate herein described shall immediately accrue to the benefit of the Grantee, and such rents shall be immediately payable to the Grantee.

11.  Upon any default in the note secured hereby, or under this deed, foreclosure proceedings may be instituted, at the option of the Grantee. In any such action, the Grantee shall be entitled, without notice and without regard to the adequacy of the debt, to the appointment of a receiver of the rents and profits of the mortgaged premises and in case of any other sale, or legal proceeding, wherein the Grantee shall be made a party thereto by reason of this mortgage, its costs and expenses, and the reasonable fees and charges of the attorneys or solicitors of the Grantee, so made parties, for services in such suit or proceedings, shall be a further lien and charge upon the said premises under this mortgage, and all such expenses shall become so much additional indebtedness secured hereby and be allowed in any decree foreclosing this mortgage.

12.  The Grantee is authorized and empowered to do all things provided to be done by a mortgagee under Section 1311-14 of the Revised Code, and under the Act of the Legislature passed May 27, 1915, 106 Ohio Laws, Pages 522-534, and any amendments or supplements thereto.

Now, therefore, if the Grantor shall well and truly perform all the conditions of this deed, and of the note secured hereby, then this deed shall be void; otherwise, it shall remain in full force and virtue.

The covenants herein contained shall bind, and the benefits and advantages shall inure, to, the respective heirs, executors, administrators, successors and assigns of the parties hereto. Whenever used, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

IN WITNESS WHEREOF, the Grantor (s) ha ve hereunto set their . hand s , this 30th .
day of  September  , A.D. 19 75 .

X _Ronald L. Moore BY_
_Ronald D. Moore Atty. In Fact_
Ronald L. Moore
By Yvonne D. Moore, his Attorney-in-Fact

Signed, acknowledged and delivered in the presence of

X _Yvonne D. Moore_
Yvonne D. Moore

STATE OF OHIO        )
                     ) ss:
COUNTY OF Franklin   )

Before me, the undersigned, a  Notary Public  in and for said State and County, personally appeared the above-named, Ronald L. Moore, and Yvonne D.  Moore,  who, the above mortgagee deed, and severally acknowledged the signing thereof, and that such signing was their free and voluntary act and deed, for the uses and purposes therein mentioned.

IN TESTIMONY WHEREOF, I have hereunto signed my name, and affixed my official seal, this  30th  day
of  September  , A.D. 19 75 .

FRANK D. FARKAS
NOTARY PUBLIC, FRANKLIN COUNTY, OHIO
MY COMMISSION EXPIRES AUG. 27, 1930

The conditions of this mortgage have been complied with, and the sums is fully paid, satisfied, and discharged.

The form of this instrument was prepared by the Office of the General Counsel, Department of Housing and Urban Development, and the material in the blank space in this form was inserted by or under the direction of  Central Savings and Loan Company .

E x. 1

Cust Nme: S. Lewis Date/Time: 7/25/2012 11:15:55 AM TransID: Free Printing



**GENERAL WARRANTY DEED**
STATUTORY FORM   Rev. Code, Secs. 5301.41 to .65

**Know all Men by These Presents;** That¹ Willie Joe Cook and Frances G. Cook,
husband and wife,
of Franklin County, Ohio for
One Dollar ($1.00) and other good and
valuable consideration paid, grant , with general warranty covenants, to Ronald L. Moore and
Yvonne D. Moore , husband and wife,
, whose tax mailing address is
1875 Alvason Avenue, Columbus, Ohio
, the following real property: Situated in the County of
Franklin in the State of Ohio and in the City
of Columbus and bounded and described as follows:⁸

22508

Being Lot Number Seventeen (17) of ARGYLE PARK SUBDIVISION,
as the same is numbered and delineated upon the recorded plat
thereof, of record in Plat Book 36, page 6, Recorder's Office,
Franklin County, Ohio.

This conveyance is subject to the lien of any taxes and assessments
not now due and payable; zoning ordinances and regulations ; legal
highways; and restrictions, conditions reservations and easements of
record.

Prior Instrument of Reference: Volume 2570 , Page 475 .

⁸ wife-husband of the grantor, releases all rights of
dower therein.

Witness their hands this 30th day of September , 19 75 .

Signed and acknowledged in the presence of:

Willie Joe Cook
XWillie Joe Cook

Kathryn A. Rose

Frances G. Cook
XFrances G. Cook

THE STATE OF OHIO, Franklin COUNTY, ss.
Be It Remembered, That on this 30th day of September , 1975 ,
before me, the subscriber, a Notary Public in and for said County, personally came the
above named, Willie Joe Cook and Frances G. Cook, husband and wife,
the Grantor's in the foregoing Deed, and acknowledged the signing of the same to be their
voluntary act and deed, for the uses and purposes therein mentioned.
In Testimony Whereof, I have hereunto subscribed my name and affixed my official seal, on the day
and year last aforesaid.

This Instrument was prepared by

Kathryn A. Rose
KATHRYN A. ROSE
NOTARY PUBLIC, FRANKLIN COUNTY, OHIO
MY COMMISSION EXPIRES MARCH 17, 1979

J. C. Chandler, V. Attorney at Law
104 East Livingston Avenue, Cols., Ohio 43215
1. Name or names of Grantor(s) and marital status.
2. Description of land or interest therein and encumbrances, reservations, and exceptions, if any.
3. Delete whichever is not applicable.

This space for Auditor's Stamp

**TRANSFERRED**
OCT 6 1975
ARCH J. WARREN
AUDITOR
FRANKLIN COUNTY, OHIO

**TRANSFER TAX
PAID**
$ 24.90
By
ARCH J. WARREN
FRANKLIN COUNTY, AUDITOR

This space for Recorder's Stamp
4.00
Received... OCT 6 1975 , 19.....At.........O'Clock.......M
Recorded... OCT 8 .. 1975.....19.....In Franklin County
JAMES A. SCHAEFER Recorder
7.00
Recorder's Fee $...X.................

Ex. 1

EXHIBIT 2

FAA RECORD OF APPROVAL
DATED SEPT. 11, 1987

FAA, PART 150
"LAND USE CONTROLS

20824 — C23



# Memorandum

U.S. Department
of Transportation

Federal Aviation
Administration

**Subject:** ACTION: FAR Part 150 Noise Compatibility Program, **Date:** SEP 11 1987
Record of Decision; Port Columbus International
Airport, Columbus, Ohio

**From:** Director, AGL-1    **Reply to Attn. of:** Lamberts:384-7387

**To:** Administrator

The city of Columbus, Public Utilities and Aviation Department, owner and
operator of Port Columbus International Airport, has submitted noise exposure
maps (NEM's) and a proposed noise compatibility program (NCP) to this
office. The NEM's were previously accepted by FAA effective July 27, 1987.
The proposed NCP must be approved or disapproved on or before January 23,
1988. A Federal Register notice announcing the submission of the NCP for
FAA approval was published July 27, 1987. The maps and proposed program
have been coordinated with airport users, community officials, land use
planning agencies, and the public. Documentation of this coordination is
found in the appendices of the study report.

Earlier review of the proposed NCP by this office and APP-600 found the
program to be compliant with the standards set forth in FAR Part 150, para-
graph 150.23. This submittal requests formal FAA review and approval of
the NCP for Port Columbus International Airport. The airport is situated
in the eastern part of the city of Columbus, which is currently designated
as a medium hub. It has 184 based aircraft and had approximately 230,000
operations in 1986. This Part 150 study was funded under AIP Grant
84-2-3-39-0025-03-85 with a Federal project share of $267,188, which
includes a master plan update.

This office believes the NCP complies with published standards for FAR Part
150 submittals. We have coordinated this report with Regional Counsel, the
regional Planning Staff, and affected operational divisions. We are pleased
to forward this candidate NCP for your consideration. We recommend you
approve this NCP.

William H. Pollard

Attachment

EXHIBIT 2

20824 — C24

2

Date:
Subject: FAR Part 150 Noise Compatibility Program, Record of Decision;
Port Columbus International Airport, Columbus, Ohio

Associate Administrator for Airports, ARP-1

(Concur)/Non-concur: _____ Date: 9/16/87

Associate Administrator for Policy and International Aviation, API-1

(Concur)/Non-concur: _____ Date: 9/18/87

Chief Counsel, AGC-1

(Concur)/Non-concur: by: _____ Date: 9/21/87

Administrator, AOA-1

(Approved)/Disapproved: _____ Date: 9-25-87

EX. 2

EXHIBIT 3

FAA AVIGATION EASEMENT
EXECUTED APRIL 20, 1992
RECORDED SEPT. 2, 1992

20318F14

## ATTACHMENT B
## Avigation Easement

137475

TIME _10:20A_

RECORDER FRANKLIN CO., OHIO

SEP 2 1992

RICHARD B. METCALF, RECORDER

RECORDER'S FEE_____18⁰⁰

HOMEOWNER PARTICIPATION AGREEMENT
RESIDENTIAL SOUND INSULATION PROGRAM
Port Columbus International Airport

This easement is conveyed from _YVONNE DeCAROL WEBB._,
hereinafter called "Grantor", to the Columbus Municipal Airport
Authority of Columbus, Ohio, hereinafter called the "Grantee".
This easement is entered into this ___20th___ day of __APRIL___,
1992.

Grantor is the owner of land and improvements thereto located at
_1875 ALVASON AVE., COLUMBUS___, of the State of Ohio, and
described as follows:

### DESCRIPTION

Being Lot Number Seventeen (17) of Argyle Park Subdivision, as
the same is numbered and delineated upon the recorded plat
thereof, of record in Plat Book 36, page 6, Recorder's Office,
Franklin County, Ohio.

EX.3

The Grantee is the proprietor of the Port Columbus International
Airport.

MAILED
ENVELOPE FURNISHED

TRANSFER
NOT NECESSARY

SEP 2 1992

JOSEPH W. TESTA
AUDITOR
FRANKLIN COUNTY OHIO

CONVEYANCE TAX
EXEMPT

JOSEPH W. TESTA

2 0 3 1 8 F 1 5

ATTACHMENT B  (continued)
Avigation Easement

HOMEOWNER PARTICIPATION AGREEMENT
RESIDENTIAL SOUND INSULATION PROGRAM
Port Columbus International Airport

WHEREAS, The Property is subject to existing or forecast aircraft noise levels of 65 Ldn or

higher, is subject to frequent aircraft overflights, and is subject to occasionally loud aircraft

noise associated with takeoff and landing; and

WHEREAS, Grantor has been advised that the Property is located in a noise-impacted area (65

Ldn or higher); and

WHEREAS, Grantor acknowledges that the approximate aircraft flight path in relation to the

Property is as shown on the "1991 Noise Exposure Map from the Part 150 Noise Compatibility

Program" which is attached hereto and marked Exhibit A; and

WHEREAS, Grantee intends to sound insulate the Property to meet Federal Aviation

Administration (FAA) guidelines for Part 150 Noise Mitigation Programs;

NOW, THEREFORE, in consideration of the foregoing, Grantor does hereby grant a permanent

avigation easement and right of way for noise to the  Columbus Municipal Airport Authority,

owner and operator of Port Columbus International Airport in all airspace extending from the

surface of the property to an infinite height above the Property.

Grantor further agrees that no structures exceeding 50 feet in height (as measured from ground

level) shall be constructed on the Property and no other improvements, fixtures or structures in

excess of 50 feet in height (as measured from ground level) shall be permitted to be located or

remain on the Property.  Grantor further grants to the Columbus Municipal Airport Authority

the right to trim any trees or other vegetation which exceed 50 feet in height (as measured from

Ex, 3

20318F16

ATTACHMENT B   (continued)
Avigation Easement

HOMEOWNER PARTICIPATION AGREEMENT
RESIDENTIAL SOUND INSULATION PROGRAM
Port Columbus International Airport

ground level), at no cost or expense to Grantor.   By virtue of this Agreement, the Grantor, for

and on behalf of itself and its successors and assigns, waives as to the Columbus Municipal

Airport Authority, and any successor agency legally authorized to operate said airport, but only

to said Columbus Municipal Airport Authority and said successor agencies, any and all claims

for damage of any kind.

Grantor hereby grants to Grantee all that certain avigation easement over and above the Property

hereinafter described for the use and benefit of the Grantee, its successors and assigns, for the

use and benefit of the public, as an easement and right-of-way appurtenant to the Port

Columbus International Airport, for the unobstructed passage of all aircraft, ("aircraft" being

defined for the purpose of this easement as any contrivance now known or hereinafter invented,

used or designed for navigation or flight in the air by whomsoever owned and operated), which

easement is bounded and described as follows, to wit:

Grantor shall not permit or create any electrical interference with radio communication between

any installation at Port Columbus International Airport and aircraft, and shall not make it

difficult for flyers to distinguish between airport lights and others, and shall not impair visibility

in the vicinity of the airport or otherwise to endanger landing, taking off or maneuvering of

aircraft, it being understood and agreed that all of the aforementioned covenants and agreements

contained shall run with the land.

The Grantor, for and on behalf of itself and its successors and assigns, does further hereby

covenant and agree with the Columbus Municipal Airport Authority that it will not, from and

after the effective date hereof, sue, prosecute, molest or trouble the Columbus Municipal

Ex.3

- 3 -

20318F17

ATTACHMENT B   (continued)
<u>Avigation Easement</u>

### HOMEOWNER PARTICIPATION AGREEMENT
### RESIDENTIAL SOUND INSULATION PROGRAM
Port Columbus International Airport

Airport Authority in respect to or on account of the flight of any and all aircraft over or near the

Property or for any effects resulting therefrom, including, but not limited to, noise, air

pollution, or any and all other possible damages (except damage resulting from negligent

operation of the airport) to or taking of the Property resulting from such flights.

This easement and non-suit covenant is granted solely to the Columbus Municipal Airport

Authority and any successor agency (but only in their capacities as airport operators) and does

not grant any right to private persons or entities, and no such persons or entities shall be the

direct or indirect beneficiary of this easement and non-suit covenant.

Said easement and right of way, and all rights appertaining thereunto, to the Columbus

Municipal Airport Authority, its successors and assigns, shall remain in effect until said Port

Columbus International Airport shall be abandoned and shall cease to be used for public airport

purposes.

Grantor covenants that Grantor is the owner in fee simple of the Premises, and that at the time of

signing this avigation easement, Grantor has full ownership rights and powers to convey this

easement free and clear from all other grants, bargains, sales, liens, taxes, assessments and

encumbrances of whatever kind or nature, and Grantor covenants with the Grantee, its

successors, and assigns, to warrant and forever defend against all and every person or persons

claiming any right or title adverse to the easement herein granted.

E X 3

20318F1-8
### ATTACHMENT B   (continued)
### Avigation Easement

### HOMEOWNER PARTICIPATION AGREEMENT
### RESIDENTIAL SOUND INSULATION PROGRAM
Port Columbus International Airport

IN WITNESS WHEREOF, the said Grantor has caused this Avigation Easement to be executed

this _20.ᵗʰ_ day of _APRIL_, 1992.

WITNESS(ES):                                    GRANTOR(S):

_Tiffany R. Parker_                            _Yuonne D. Webb_

_Anthony C. Jacoboni_

_____

Ex. 3

2U318F19

ATTACHMENT B    (continued)
**Avigation Easement**

**HOMEOWNER PARTICIPATION AGREEMENT**
**RESIDENTIAL SOUND INSULATION PROGRAM**
Port Columbus International Airport

STATE OF OHIO          )
                       )
                       )  ss.:
                       )
COUNTY OF FRANKLIN     )

On this     20TH     day of  APRIL     , 1992, before me the undersigned Notary
Public in and for the State of   OHIO    , duly commissioned and sworn, personally
appeared   YVONNE  D.  WEBB     and _____ , to me
known to be the individual(s) described in and who executed the within instrument and
acknowledged that he/she/they signed and sealed the same as his/her/their free and voluntary act
and deed for the uses and purposes herein mentioned.

IN WITNESS WHEREOF I have hereunto set my hand and affixed my official seal.

Notary Public in and for the
State of OHIO
residing at WORTHINGTON

My Commission Expires On:  No EXPIRATI

*Rod Courtney Borden*

**ROD  COURTNEY  BORDEN**
**ATTORNEY· AT LAW**
**NOTARY PUBLIC · STATE OF OH·J**
**LIFETIME COMMISSION**

**CERTIFICATE OF RESIDENCE**

I,(we)  YVONNE  D.  Webb , do hereby certify that grantor's precise residence is,
1825 Alvason Avenue      . Dated this 20th day of April , 1992.

**GRANTOR(S):**

*Yvonne D. Webb*

_____

90018-2/w/agree-b1              E X. 3

- 6 -



EXHIBIT A

1991 NOISE EXPOSURE AND
LAND USE IMPACTS

E x . 3

EXHIBIT 4

AMERICAN EQUITY
MERGER
SEPT. 11, 1996



Debra J. Richardson
Vice President and Secretary

September 11, 1996

Harold Duryee, Director of Insurance
Ohio Department of Insurance
2100 Stella Court
Columbus, OH 43215-0167

RE:    Merger of American Equity Investment Life Insurance Company
       with Century Life Insurance Company

Dear Commissioner Duryee:

We are writing to notify you of the anticipated acquisition and merger of American Equity Investment
Life Insurance Company, an Iowa domestic insurer ("American Equity") with and into Century Life
Insurance Company, an Iowa domestic insurer ("Century"). Century, which will be survivor of the
merger, holds a certificate of authority in your state.

The acquisition was approved on July 19, 1996, by Order of the Iowa Deputy Commissioner of Insurance
pursuant to the Iowa Insurance Company Holding System Act. The closing date is in September, 1996,
subject to fulfillment of all conditions. Upon the consummation of the merger, the name of Century will
be changed to "American Equity Investment Life Insurance Company," and the Articles of Incorporation
and Bylaws of the surviving company, which was incorporated on October 19, 1980, will be amended
and restated. American Equity's parent company, American Equity Investment Life Holding Company,
a Delaware corporation, will become the 100% owner of the surviving life company.

To facilitate your review of this transaction, we enclose herewith the following documents pertaining to
American Equity:

    1. Acquisition and Merger Agreement
    2. Order of the Iowa Deputy Commissioner of Insurance

Upon completion of the merger, we will send you a letter confirming that the closing occurred and
enclosing a certified copy of the Articles of Merger. At that time, we will request the issuance of an
amended Certificate of Authority which reflects the surviving company's new name.

Should you have questions, please contact the undersigned at 515/221-0002, ext. 227. Thank you for
your assistance

                              Very truly yours,

                              *Debra J. Richardson*

                              Debra J. Richardson

Enclosures

                                                                **RECEIVED**

              EXHIBIT 4                                          SEP 16 1996

                                                    **LIFE, ACCIDENT & HEALTH**

BEFORE THE INSURANCE COMMISSIONER FOR THE STATE OF IOWA

| | | |
|---|---|---|
| In the matter of the application of | ) | |
| AMERICAN EQUITY INVESTMENT | ) | |
| LIFE HOLDING COMPANY  for approval | ) | |
| of a plan to acquire CENTURY LIFE | ) | |
| INSURANCE COMPANY and merge it with | ) | **ORDER** |
| AMERICAN EQUITY INVESTMENT | ) | (Iowa Code §521A.3(4)) |
| LIFE INSURANCE COMPANY | ) | |

Pursuant to Iowa Code § 521A.3(4)(b) (1995), a public hearing was held June 25, 1996 at which representatives of American Equity Investment Life Holding Company and American Equity Investment Life Insurance Company appeared and submitted testimonial and documentary evidence in support of the proposed plan to acquire Century Life Insurance Company.  After a careful review of the evidence submitted, the commissioner finds that none of the criteria set forth in Iowa Code § 521A.3(4)(a) (1995) are violated by the proposed acquisition.  The acquisition is, therefore, approved.

DATED this 19th day of July, 1996.

ROBERT L. HOWE
Deputy Commissioner of Insurance

Copies to:

William Demuth
Iowa Department of Economic Development
200 E.Grand Ave.
Des Moines, Iowa  50319

Mark Couch
"Des Moines Register"
P.O. Box 957
Des Moines, Iowa 50304

William L.Fairbank
Whitfield & Eddy
317 Sixth Avenue, Suite 1200
Des Moines, Iowa  50309

Or-AmEqu.doc
SMG

1

EX. 4

*69711*

### ARTICLES OF CORRECTION
### OF
### AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY
(formerly known as Century Life Insurance Company)

**TO THE SECRETARY OF STATE**
**OF THE STATE OF IOWA:**

Pursuant to Section 490.124 of the Iowa Business Corporation Act, American Equity Investment Life Insurance Company hereby adopts the following Articles of Correction:

1. On September 30, 1996, American Equity Investment Life Insurance Company (formerly known as Century Life Insurance Company) filed Restated Articles of Incorporation.

2. Article III of the Restated Articles of Incorporation contained an incorrect statement of the purposes of the corporation in that certain types of insurance which the company intends to offer were inadvertently omitted.

3. To correct this omission, subclause (2) of Article III will state as follows:

(2) To issue all forms of life insurance policies, including without limitation, ordinary life, limited payment life, variable life, endowment policies, fixed and variable annuities, accident policies, accident and health policies, hospital and medical expense policies, group accident and health policies and noncancellable accident and health policies.

AMERICAN EQUITY INVESTMENT
LIFE INSURANCE COMPANY

By: _____
D. J. Noble, President

*E x, 4*

501819 CORR10    $5.00    DONNA    2



**ODI**
Ohio Department
of Insurance

John R. Kasich, Governor
Mary Taylor, Lt. Governor/Director

50 West Town Street
Third Floor – Suite 300
Columbus, OH 43215-4186
(614) 644-2658
www.insurance.ohio.gov

# CERTIFICATION OF RECORDS

I, Tina L. Chubb, Records Administrator for the Ohio Department of Insurance, do hereby certify that the attached copy of the Certificate of Authority and Articles of Incorporation for American Equity Investment Life Insurance Company on file with the Ohio Department of Insurance is a true and accurate copy of the original records maintained in the ordinary course of business by this agency.

Signed and dated this 25th day of August, 2011.

Tina L. Chubb, Records Administrator
Ohio Department of Insurance

Jillian Froment, Deputy Director
Ohio Department of Insurance

E X, 4

**Accredited by the National Association of Insurance Commissioners (NAIC)**
Consumer Hotline: 1-800-686-1526      Fraud Hotline: 1-800-686-1527      OSHIIP Hotline: 1-800-686-1578
TDD Line: (614) 644-3745                              (Printed in house)

# EXHIBIT 5

## AFFIDAVIT OF GMAC
## (CREDITOR)

U.S. BANKRUPTCY COURT
FOR S.D. OF OHIO
CASE NO. 05-bk-75111
FILED JAN. 27, 2006

B0508359

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In Re: | ) | CASE NO. 05-75111 |
|  | ) | CHAPTER 7 |
| Yvonne Lewis | ) |  |
|  | ) |  |
| Debtor | ) | JUDGE HOFFMAN |
|  | ) |  |
|  | ) | **(1875 Alvason Ave, Columbus)** |

### AFFIDAVIT IN SUPPORT OF MOTION FOR RELIEF FROM STAY

State of _PENNSYLVANIA_

County of _PHILADELPHIA_

I, _JOHN TIMSON_ , being duly cautioned and sworn state as follows:

1. I am an employee of GMAC Mortgage Corporation, its successors and assigns, ("Creditor"), a creditor in the within bankruptcy. I am authorized to give this affidavit. The information contained in this affidavit is based upon my personal knowledge or based upon the Creditor's business records. These business records are kept in the normal course of business and the Creditor relies upon them in the conduct of its business. The information contained in these records was created at or near the events described therein. I am a custodian of those records.

2. Creditor holds the note and mortgage relating to debtor's real property referenced above. At the request of my attorney, I have reviewed those records and concluded that Debtor is currently due for the _2/1/05_ payment. The last payment received from the debtor was on _2/10/05_

$Ex, 5$

-

in the amount of $ _3/3.98_ and it was applied to the _1/1/05_ payment. . The funds being held in suspense are _#0.00_ . The total amount to reinstate the loan contractually is $_10,968.28_. The total amount to payoff this loan good through February 6, 2006, is $62,322.38.

FURTHER AFFIANT SAYETH NAUGHT.

Sworn to and subscribed in my presence this _26th_ day of _January_, 2006.

NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Zahirah Y. Sweet, Notary Public
City Of Philadelphia, Philadelphia County
My Commission Expires Mar. 7, 2009
Member, Pennsylvania Association of Notaries

$E \times 15$

## CERTIFICATE OF SERVICE

A copy of the foregoing Affidavit in Support of Motion for Relief from the Automatic Stay was served

by regular U.S. Mail and/or electronically as permitted by the rules, this 27th day of January, 2006, upon the

following parties at the addresses stated below.


Yvonne Lewis
1875 Alvason Ave
Columbus, OH 43219

Sidney Lewis
1875 Alvason Ave
Columbus, OH 43219

Clyde C. Hardesty, III, Trutee
P.O. Box 731
Newark, OH 43058-0731

Office of the U.S. Trustee
The Schaff Building
170 North High Street, Suite 200
Columbus, OH 43215


                              /S/ Andrew A. Paisley
                              Attorney for Movant


Ex. 5

EXHIBIT 6

TRUSTEE'S ABANDONMENT
FILED MARCH 8, 2006
U.S. BANKRUPTCY COURT FOR
S.D. OF OHIO
Case No. 05-bK-75111

B0508359

D2258E06

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| In Re | ) | CASE NO 05-75111 |
| | ) | CHAPTER 7 |
| Yvonne Lewis | ) | |
| | ) | |
| Debtor | ) | JUDGE HOFFMAN |
| | ) | |
| | ) | (1875 Alvason Ave, Columbus) |

---

## TRUSTEE'S ABANDONMENT OF PROPERTY AFTER CERTIFICATION AND REPRESENTATIONS BY PARTY REQUESTING ABANDONMENT

---

The Trustee having been requested by GMAC Mortgage Corporation to abandon the property set forth below and based on the representations made by such party as follows

1   The property to be abandoned is real estate ("Property"), and the property is located at 1875 Alvason Ave, Columbus, Ohio 43219

2   The fair market value of the Property is $55,200 00

3   The amount of the claim of the party requesting abandonment as of the date of the Petition Date is $60,779 47

4   The liens or encumbrances against the Property are   No others known to Movant

5   The party requesting abandonment, as set forth above, certifies, that pursuant to Local Bankruptcy Rule 6007-1, that it has checked the Docket Sheet in this proceeding as of the date set for the 341 meeting (December 9, 2005) and has determined that no parties have requested further notice of abandonment other than that given by the 341 Notice

6   The party requesting abandonment, as set forth above, has attached to this Abandonment, the applicable note, filed copies of mortgages, and assignments, if any

Ex 6

D2258E07

Based on the representations and certifications of the party requesting abandonment, as set forth above, Clyde C Hardesty, III, the duly qualified and acting Trustee for the above named bankruptcy estate, pursuant to 11 U S C Section §554, abandons the identified Property as such Property is burdensome to and/or is of inconsequential value and benefit to the bankruptcy estate

/S/ Clyde C. Hardesty, III
Clyde C Hardesty, III #
P O Box 731
Newark, OH 43058-0731
(740) 344-6567
trusteeclyde@adelpha net
Attorney for Trustee

EX. 6

## CERTIFICATE OF SERVICE

D2258E08

A copy of the foregoing Trustee's Abandonment of Real Property was served by regular U S Mail and electronically as appropriate, as permitted by the rules, this 8th day of March, 2006, upon the following parties in interest at the addresses stated below

Yvonne Lewis
1875 Alvason Ave
Columbus, OH 43219

Sidney Lewis
1875 Alvason Ave
Columbus, OH 43219

Clyde C Hardesty, III, Trustee
P O Box 731
Newark, OH 43058-0731

Office of the U S Trustee
The Scheff Building
170 North High Street, Suite 200
Columbus, OH 43215

The Law Offices of
John D Clunk Co , LPA

/S/ Andrew A. Paisley
Andrew A Paisley (#42515) Ext 248
Scott P Crupak (#0076117) Ext 237
Attorneys for Movant
5601 Hudson Drive
Hudson, Ohio 44226
(330) 342-8203 telephone
(330) 342-8205 facsimile
Email  ceubanks@johndclunk com

EX. 6

# EXHIBIT 6.1

RELATED CASE
MEMORANDUM
FILED DEC. 1, 2008
IN CASE NO. 2:08-CV-736
U.S. DIST. COURT FOR S.D. OF OHIO



**United States District Court**
**Southern District of Ohio**

TIME: **FILED**

DEC - 1 2008

**JAMES BONINI, Clerk**
**COLUMBUS, OHIO**

Joseph P. Kinneary United States Courthouse
85 Marconi Boulevard, Suite 260
Columbus, Ohio 43215

James Bonini
Clerk of Court

Telephone:   614.719.3000
Facsimile:   614.719.3037

### Related Case Memorandum
### Civil Cases

TO:         District Judge Holschuh, District Judge Marbley & District Judge Frost

FROM:       <u>Eduardo Rivera</u>, Case Administrator

DATE:       November 4, 2008

SUBJECT:    Case Caption: <u>Lewis v. Johnston</u>

CASE        Case Number: <u>2:08-cv-1040</u>

            File Date: <u>November 5, 2008</u>

---

This memorandum is to notify you that the civil cover sheet on the above referenced case reflects
the following alleged related case(s):

**Related Case(s):**

Case Caption: <u>Lewis v. McClatchey</u>

Case Number: <u>2:08-cv-75</u>                District Judge: <u>Marbley</u>

File Date: <u>1/25/08</u>                     Magistrate Judge: <u>N/A</u>

**Related Case(s):**

Case Caption: <u>Johnston v. Lewis</u>

Case Number: <u>2:08-cv-736</u>              District Judge: <u>Frost</u>

File Date: <u>7/29/08</u>                     Magistrate Judge: <u>Abel</u>

Memo Re: Related Civil Cases
Page 2

The District Judges having conferred, we respond to Case Administrator _Ed Rivera_
_____ as follows:

**Judges' Response:**

☐       We agree that the cases are **not** related and that the subject case should
remain with the Judge to whom it is assigned.

☐       We agree that the cases **are** related and that the subject case should be
transferred to the docket of Judge _____.

☒       We agree that although the cases **are** related, the subject case nevertheless
should remain with the Judge to whom it was assigned.

☐       We are unable to agree and will accept any decision made by the Chief
Judge.


United States District Judge


_____
United States District Judge


United States District Judge


cc: Courtroom Deputies

Case: 2:08-cv-00736-GLF-MRA Doc #: 14 Filed: 12/01/08 Page: 3 of 3  PAGEID #: 474

Memo Re: Related Civil Cases
Page 2

      The District Judges having conferred, we respond to Case Administrator _____
_____ as follows:

**Judges' Response:**

☐    We agree that the cases are **not** related and that the subject case should remain with the Judge to whom it is assigned.

☐    We agree that the cases **are** related and that the subject case should be transferred to the docket of Judge _____.

☐    We agree that although the cases **are** related, the subject case nevertheless should remain with the Judge to whom it was assigned.

☐    We are unable to agree and will accept any decision made by the Chief Judge.

☒ — OUR CASE IS CLOSED.

_____
United States District Judge

_____
United States District Judge

_____
United States District Judge

cc: Courtroom Deputies

EXHIBIT M

GARRETSON'S RESPONSE
TO SUBPOENA DUCES TECUM
DATED DEC. 16, 2010

·· E1366 - P7



GARRETSON
RESOLUTION GROUP

December 16, 2010

Yvonne D. Webb-Lewis
Trustee of the Vacy O. Webb Revocable Living Trust
1875 Alvason Avenue
Columbus, Ohio 43219

        RE:    Subpoena Duces Tecum

Dear Ms. Webb-Lewis:

Enclosed please find all of the documents held by the Garretson Firm Resolution Group, Inc. in response to the Subpoena Duces Tecum served on our office on December 9, 2010. Mr. Webb excluded himself from the class certified in the case of Pamela Panter and the Garretson Firm Resolution Group, Inc. does not have any further documentation in response to this subpoena.

Please do not hesitate to call members of our compliance team, Sylvius H. von Saucken, Esq. or Annie Warner, Esq., if you have any questions.

Thank you and happy holidays.


Sincerely,

Annie Win

Annie Warner, Esq.
The Garretson Firm Resolution Group, Inc.


Enclosures

c:    Ohio Department of Insurance Consumer Services Division
      Elections Commission of Ohio
      Ethics Commission of Ohio
      Ohio Department of Agriculture Enforcement Division
      Ohio Disciplinary Counsel


                          EX. 7

EXHIBIT 8

MIKE DeWINE,
Ohio Attorney General
Letter dated Jan. 13, 2011

 **Mike DeWine**
Ohio Attorney General

**Consumer Protection**
*Office*    **(614) 466-8831**
*Fax*      **(614) 466-8898**

30 East Broad Street, 14th Floor
Columbus, Ohio 43215
www.ohioattorneygeneral.gov

January 13, 2011

Sidney T. Lewis
Yvonne D. Webb-Lewis
1875 Alvason Avenue
Columbus, Ohio 43219

Dear Mr. and Mrs. Lewis:

I am in receipt of your constituent inquiry received by our office on December 9, 2010. Your request was forwarded to the Consumer Protection Section for review. I am writing to follow up on your request for our office to review the documents that you submitted with respect to your difficulties with American Investment Life Insurance Company (AILIC), regarding equity indexed annuities. I am sorry to know of the difficulties you are facing.

First, you asked us to confirm whether the notice of defective living trust was given to the State of Ohio. In reviewing your documents, I am assuming you are asking whether or not we received noticed of the class actions that are referenced in the documents. Unfortunately, I cannot answer this question for you as the Consumer Protection Section does not generally receive notices related to insurance and annuities class actions.

Second, in reviewing the documents attached, it appears that you wanted us to review and take action with respect to the court's decision on AILIC's class action settlement related to annuities and living trusts that were sold, apparently, between 1997 and 2007. First, the matter relates to a court decision and we do not have the authority to overturn the court's decision. Second, this also appears to be a matter concerning a transaction that is at least three years old and the statute that we enforce, the Ohio Consumer Sales Practices Act has a time limitation of two years.

I did confer with Greg Mobley with the Ohio Department of Insurance concerning your inquiry with us, since matters related to insurance and annuities are usually referred to them as we do not have jurisdiction over these matters. Mr. Mobley has informed me that you have filed a separate complaint with them and that they will be providing a response soon.

*EXHIBIT 8*

Ohio Attorney General Mike DeWine
January 13, 2011
Page 2

I apologize that I cannot be of further assistance to you at this time. You may want to speak with your attorney, concerning what other options may be available to you. If you are not currently represented by an attorney, you may want to call the Columbus Bar Association Lawyer Referral Service at 614/221.0754 or toll-free at 877/560.1014.

Very truly yours,

MIKE DEWINE
Ohio Attorney General

Susan Choe
Section Chief
Consumer Protection
(614) 466-1306
FAX (614) 466-8898
Susan.choe@ohioattorneygeneral.gov

EX. 8

# EXHIBIT 9

Letter To Atty.
   Eric LaFayette, Esq.
FROM Charles F. Smith
   Attorney for AEL
   Dated Oct. 26, 2011
FROM LawFIRM OF SKADDEN,
 ARPS, SLATE, MEAGHER & FLOM, LLP

   FILED IN FR. CNTY. OHIO CPC
   Case No. 11-cv-12669

0A154 – M4

## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

155 NORTH WACKER DRIVE

CHICAGO, ILLINOIS 60606-1720

———

TEL: (312) 407-0700

FAX: (312) 407-0411

www.skadden.com

FIRM/AFFILIATE OFFICES
———
BOSTON
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

DIRECT DIAL
312/407-0516
DIRECT FAX
312/407-8523
EMAIL ADDRESS
CHARLES.SMITH@SKADDEN.COM

October 26, 2011

**VIA FEDERAL EXPRESS**

Eric LaFayette, Esq.
Eric LaFayette & Co, LLP
415 E. Broad St., Suite 112
Columbus, Ohio 43215

RE:    Lewis v. Addison Insurance Marketing, Inc. et al.

Dear Mr. LaFayette:

On behalf of American Equity Investment Life Holding Company and American Equity Investment Life Insurance Company (collectively, "American Equity"), I write in response to the recently-filed action, *Lewis v. Addison Insurance Marketing Inc., et al.*, case No. 11CVB-10-12667, pending in the Common Pleas Court of Franklin County, Ohio. As I informed you last year when you filed a nearly-identical action, your client's claims against American Equity were released by a prior settlement in *Panter v. Tackett.*, Case No. 01-CI-02109 (Jefferson County, Kentucky) and must be dismissed immediately. If you do not dismiss this action on or before November 2, 2011, we will seek sanctions.

On February 21, 2008, American Equity and the *Panter* plaintiffs entered into a Stipulation of Settlement, in which they agreed that all claims asserted against American Equity and all matters relating to American Equity raised by and in connection with the action, were settled, compromised, and dismissed on the merits and with prejudice on the terms and conditions set forth in the Stipulation of Settlement and its incorporated Release (enclosed for your reference). After notice and a hearing, the court approved that settlement and entered final judgment on July

EX. 9

0A154  -  M5

Eric LaFayette
October 26, 2011
Page 2

17, 2008.[1]  As a result, your client's claims against both American Equity companies
were released on that date.

Based on the filing of the *Lewis* Complaint and the attachment
thereto, it appears that you may hold the mistaken belief that Mr. Webb excluded
himself from the settlement with American Equity.  This is not the case.  As against
American Equity, the *Panter* action was certified as an opt-out class action.  Thus,
any person who fell within the definition of the settlement class automatically
became a member <u>unless</u> he or she sent a letter by mail on or before April 18, 2008
to:

> Panter Exclusions
> American Equity Investment Life Insurance Company
> P.O. Box 71218
> West Des Moines, IA  50325-0218[2]

<u>American Equity has no record of ever receiving such a request from the *Lewis*
Plaintiffs.</u>

Subsequent to the settlement between the *Panter* plaintiffs and
American Equity, the plaintiffs entered into settlement agreements with the
remaining defendants.  It appears from the records of the Garretson Law Group that
Mr. Webb may have opted out of the settlement between the plaintiffs and the
McIntyre Defendants.  Indeed, the *Lewis* plaintiffs sent their November 29, 2009
exclusion request to "McIntyre Exclusions, as *Class Claims Administrator*."[3]  The
*Lewis* plaintiffs did not, however, send any similar paperwork to opt out of the
settlement with American Equity.

Accordingly, the *Lewis* plaintiffs—one of whom is an alleged
beneficiary of a living trust and the other of whom is an alleged trustee of the living
trust—are members of the American Equity Settlement Class in *Panter* and are

---

[1]  For your reference, a copy of the *Panter* Court's Order of Final Approval of Stipulation of
Settlement and Certification of the Settlement Class is enclosed.  The Stipulation of Settlement is
attached to the Court's Order as Exhibit A.

[2]  See Notice of Proposed Settlement, annexed hereto.

[3]  See Request for Exclusion, annexed hereto.  Also note that the *Lewis* plaintiffs sent this opt-out
letter  to the Garretson Law Group over a year and a half after the deadline to opt out of the
settlement with American Equity.

*E x. 9*

0A154 — M6

Eric LaFayette
October 26, 2011
Page 3

subject to *Panter's* Stipulation of Settlement and incorporated Release. The *Panter*
Settlement Class includes "all persons residing in the United States who, at any time
during the period from January 1, 1997 through December 31, 2007, purchased, had
an ownership interest in, or obtained a Policy (as defined herein) or a Living Trust
(as defined herein) from, through, in connection with, or involving the McIntyre
Defendants (as defined herein) and/or Tackett (as defined herein), and/or any
predecessor, successor, affiliate, agent, assign, or entity of the McIntyre Defendants
or Tackett."(Stipulation of Settlement, II.A.43)

The *Panter* Release provides that:

Plaintiff and all Class Members subject to the Settlement Agreement,
on behalf of themselves, their heirs, successors, and assigns, and any
other persons they represent, shall fully, finally, and forever release
and discharge the Releasees[4] from any and all causes of action,
claims, damages, equitable, legal, and administrative relief, interest,
demands, and rights, including, without limitation, claims for mental
anguish, whether based on federal, state, or local law, statute,
ordinance, regulation, contract, common law, or any other source, that
have been, could have been, may be or could be alleged or asserted
now or in the future by Plaintiff or any Class Member against the
Releasees or any of them in the Action or in any other court action or
before any administrative body (including any state Department of
Insurance or other regulatory entity or organization), tribunal,
arbitration panel, or other adjudicatory body, on the basis of,
connected with, arising out of, or related to, in whole or in part, the
Released Transactions.

(Stipulation of Settlement, VII.A.1.)  The Release further states that "Plaintiffs and
all Class Members (who do not timely request exclusion from the Class) further
agree that, from the date of execution of this Agreement, they will not institute any
court action or any other proceeding on the basis of, connected with, arising out of,
or related to, in whole or in part, the Released Transactions against the Releasees.
(Id. at VII.A.2.)  "Released Transactions," as defined by the Stipulation of

---

[4]   The Stipulation of Settlement defines "Releasees" as American Equity, American Equity's past,
present, and future parents, subsidiaries, affiliates, partners, predecessors, successors and assigns,
and each of their and American Equity's respective past and present officers, directors,
employees, branch managers, Agents (including those acting on an Agent's behalf or at an
Agent's direction), representatives, attorneys, heirs, administrators, executors, insurers,
predecessors, successors, and assigns, or any of them. (Stipulation of Settlement, II.A.41.)

$E \times \cdot 9$

0A154 - M7

Eric LaFayette
October 26, 2011
Page 4

Settlement, includes "the marketing, solicitation, application, underwriting, acceptance, sale, purchase, operation, performance, retention, administration and/or replacement (by means of surrender, partial surrender, withdrawal, and/or termination of any policy) of the Policies and Living Trusts." (Id. at II.A.40.)

Here, in direct violation of the *Panter* Release, plaintiffs Yvonne D. Webb-Lewis and Sidney T. Lewis have initiated a court action arising out of the Released Transactions against American Equity. Indeed, the *Lewis* plaintiffs attempt to sue American Equity based on allegations that American Equity violated the Ohio Consumer Sales Practices Act and committed fraud in connection with its alleged participation in the marketing and sale of living trusts.

In light of this violation, we expect that you will voluntarily dismiss the *Lewis* action against both American Equity defendants on or before Wednesday, November 2nd. Please send a copy of the dismissal to my attention by fax or email by the close of business on that day. If you fail to dismiss this action and American Equity is forced to appear and obtain dismissal by motion, we will seek our attorneys' fees and costs.

Please contact me if you have any questions.

Best regards,

*Charles Smith*

Charles F. Smith

Enclosures

*Ex. 9*

EXHIBIT 10

LETTER  FROM AEL,
MARCELLA L. LAPE
TO
ERIC LAFAYETTE
DATED DEC. 23, 2011

FILED IN FR. CNTY. OHIO
CPC Case No, 11-CV-12667

0A154 - M61

## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

155 NORTH WACKER DRIVE

CHICAGO, ILLINOIS 60606-1720

TEL: (312) 407-0700
FAX: (312) 407-0411
www.skadden.com

DIRECT DIAL
312/407-0954
DIRECT FAX
312/827-9387
EMAIL ADDRESS
MLAPE@SKADDEN.COM

FIRM/AFFILIATE OFFICES
BOSTON
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
—
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

December 23, 2011

### VIA FEDERAL EXPRESS AND ELECTRONIC MAIL

Eric LaFayette, Esq.
Eric LaFayette & Co, LLP
415 E. Broad St., Suite 112
Columbus, Ohio 43215

RE:    Lewis v. Addison Insurance Marketing, Inc. et al.

Dear Mr. LaFayette:

I write on behalf of American Equity Investment Life Holding
Company and American Equity Investment Life Insurance Company (collectively,
"American Equity") to once again request that you immediately dismiss *Lewis v.
Addison Insurance Marketing Inc., et al.*, case No. 11CVB-10-12667, now pending
in the Common Pleas Court of Franklin County, Ohio. As my colleague Chuck
Smith and I informed you by telephone and letter last year, by letter on October 24,
2011, and by telephone on November 11, 2011, the Lewises' claims against
American Equity were released by a prior settlement and release in *Panter v.
Tackett.*, Case No. 01-CI-02109 (Jefferson County, Kentucky). Moreover, pursuant
to the Panter Order of Final Approval of Stipulation of Settlement and Certification
of the Settlement Class, the Lewises are permanently enjoined from pursuing the
released claims against American Equity. (*See* Final Order, at 8 (attached as Ex. A).)

As you are aware, under the current schedule, American Equity is
required to answer or otherwise plead to the Lewis Complaint on or before January
10, 2011. I have left you several messages this week to determine whether you have
agreed to voluntarily dismiss this action based on the Panter Settlement and Release,
but have yet to receive a return call. If we do not hear back from you by December
30, 2011, with confirmation that you have dismissed this action, we will have no

*EX. 10*

0A154  –  M62
Eric Lafayette, Esq.
December 23, 2011
Page 2


choice but to seek appropriate relief from the Court, including asking the Court for
an order to show cause why you and your clients should not be held in contempt of
court. We will also ask the Court for all fees and costs incurred in defending this
action.

Please contact Chuck Smith at (312) 407-0516 or me at (312) 407-
0954 if you have any questions. We look forward to hearing from you promptly.

Best regards,

Marcella L. Lape


Enclosures


*Ex. 10*

EXHIBIT 11

AGREED MOTION &
STIPULATION TO EXTEND
AMERICAN EQUITY ANSWER
DATE   FILED  JAN. 9, 2012
IN FR. CNTY. OHIO CPC case 11-CV-12667

0A154 – L98

## IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

| | | |
|---|---|---|
| SIDNEY LEWIS, et al., | : | Case No. 11 CVB 10 12667 |
| | : | |
| Plaintiffs, | : | Judge: Richard S. Sheward |
| | : | |
| v. | : | **AGREED MOTION AND STIPULATION TO** |
| | : | **EXTEND AMERICAN EQUITY ANSWER** |
| | : | **DATE** |
| ADDISON INSURANCE | : | |
| MARKETING, INC., et al., | : | |
| | : | |
| Defendants. | : | |

Defendants American Equity Investment Life Insurance Company and American Equity Investment Life Holding Company (jointly, "American Equity"), with the agreement of counsel to Plaintiffs Sidney Lewis and Yvonne D. Webb-Lewis ("Plaintiffs") hereby move to extend American Equity's time to answer or otherwise respond to Plaintiffs' complaint an additional 28 days until February 7, 2012. This is the second extension sought by American Equity. The reasons for the extension are as follow:

1. Plaintiffs filed their complaint against American Equity on October 12, 2011.

2. By letter dated October 26, 2011, American Equity, through outside counsel at Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden Arps"), informed counsel for Plaintiffs that the claims asserted in the above-captioned lawsuit had been released by a class action settlement in *Panter v. Tackett*, Case No. 01-CI-02109 (Jefferson County, Kentucky) and demanded that the lawsuit be dismissed immediately. American Equity also provided Plaintiffs' counsel with copies of the relevant pleadings in the *Panter* case, including the Stipulation of Settlement and Order of Final Approval of Settlement. See October 26, 2011 Letter (Ex. "A").

3. On November 11, 2011, Plaintiffs' counsel informed counsel for American Equity that he would review the settlement information from *Panter v. Tackett* and determine whether

1

*Ex. 11*

12-12020-mg   Doc 5026   Filed 09/11/13   Entered 09/11/13 17:59:41   Main Document
Franklin County Ohio Clerk of Courts of the Common Pleas- 2012 Jan 09 5:30 PM-11CV012667
Pg 124 of 582

0A154 - L99

the case should be voluntarily dismissed. Plaintiffs' counsel also agreed to stipulate to a 60-day
extension for American Equity to answer the complaint or otherwise plead.

4. On November 16, 2011, American Equity filed a Joint Motion and Stipulation to
Extend American Equity's Answer Date 60 days until January 10, 2011. The Court granted the
Motion on November 28, 2011.

5. On December 23, 2011, American Equity, through Skadden Arps, sent Plaintiffs'
counsel a letter again requesting that Plaintiffs immediately dismiss this lawsuit. American
Equity explained that the Plaintiffs' claims were released by *Panter* and that pursuant to the
Order of Final Approval of Settlement, the Plaintiffs are permanently enjoined from pursuing
released claims against American Equity. American Equity demanded that Plaintiffs dismiss the
action on or before December 30, 2011, and advised that if it did not receive confirmation of
dismissal from Plaintiffs by December 30, 2011, it would be forced to file a motion to enforce
the *Panter* settlement agreement and a motion to show cause why Plaintiffs and their counsel
should not be held in contempt of court for violation of the agreement. See December 23, 2011
Letter (Ex. "B").

6. On December 30, 2011, Plaintiffs' counsel, via e-mail and voicemail, requested that
American Equity permit him until January 8, 2011, to meet with his clients and determine
whether to dismiss this action. American Equity agreed to refrain from filing any motions until
after January 8, 2011, on the condition that Plaintiffs' counsel agreed to provide American
Equity with an additional 28 days to answer Plaintiffs' complaint or otherwise plead. See
December 30-31, 2011 Email Exchange (Ex. "C").

7. On January 8, 2011, Plaintiffs' counsel informed counsel for American Equity that he
had determined to withdraw from the case based on a difference of opinion on how to proceed

2

$E \times \cdot 11$

## 0A154 - M1

and recommended that American Equity contact the Plaintiffs directly. See January 8, 2012

Letter (Ex. "D").   A proposed order is attached hereto.

Respectfully submitted,

*/s/ Erika J. Schoenberger*
David W. Walulik (0076079)
FROST BROWN TODD LLC
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45202
Telephone: (513) 651-6800
Facsimile: (513) 651-6981
Email: dwalulik@fbtlaw.com

Erika J. Schoenberger (0077808)
FROST BROWN TODD LLC
10 W. Broad Street, Suite 2300
Columbus, Ohio 43215
Telephone: 614-464-1211
Facsimile: 614-464-1737
Email: eschoenberger@fbtlaw.com
*Counsel for Defendants*
*American Equity Investment Life Insurance*
*Company and American Equity Investment Life*
*Holding Company*

$E \times \cdot 11$

3

0A154 - M2

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Agreed Motion and Stipulation was served via regular U.S. Mail this 9th day of January, 2012, upon:

Eric L. LaFayette
415 East Broad Street, Suite 112
Columbus, Ohio 43215


/s/ Erika J. Schoenberger
Erika J. Schoenberger

COLLibrary 0111804.0580467  330724v1

$Ex.11$

4

# EXHIBIT 12

## CONSENT JUDGMENT

FILED IN CASE NO. 1:12-cv-00361

DOC. 13, FILED 04/04/12 IN THE

U.S. DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

APR - 4 2012

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

)
UNITED STATES OF AMERICA,            )
*et al.*,                              )
)
Plaintiffs,                )
)
v.                      )
)
BANK OF AMERICA CORP. *et al.*,        )
)
Defendants.                )
)
)
)
)
)
)

**12 0361**

Civil Action No. _____

### CONSENT JUDGMENT

WHEREAS, Plaintiffs, the United States of America and the States of Alabama, Alaska,

Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii,

Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota,

Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico,

New York, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, South

Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin, Wyoming,

the Commonwealths of Kentucky, Massachusetts, Pennsylvania and Virginia, and the District of

Columbia filed their complaint on March 12, 2012, alleging that Residential Capital, LLC, Ally

Financial, Inc., and GMAC Mortgage, LLC (collectively, "Defendant") violated, among other

laws, the Unfair and Deceptive Acts and Practices laws of the Plaintiff States, the False Claims

Act, the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, the

Servicemembers Civil Relief Act, and the Bankruptcy Code and Federal Rules of Bankruptcy
Procedure;

WHEREAS, the parties have agreed to resolve their claims without the need for
litigation;

WHEREAS, Defendant, by its attorneys, has consented to entry of this Consent Judgment
without trial or adjudication of any issue of fact or law and to waive any appeal if the Consent
Judgment is entered as submitted by the parties;

WHEREAS, Defendant, by entering into this Consent Judgment, does not admit the
allegations of the Complaint other than those facts deemed necessary to the jurisdiction of this
Court;

WHEREAS, the intention of the United States and the States in effecting this settlement
is to remediate harms allegedly resulting from the alleged unlawful conduct of the Defendant;

AND WHEREAS, Defendant has agreed to waive service of the complaint and summons
and hereby acknowledges the same;

NOW THEREFORE, without trial or adjudication of issue of fact or law, without this
Consent Judgment constituting evidence against Defendant, and upon consent of Defendant, the
Court finds that there is good and sufficient cause to enter this Consent Judgment, and that it is
therefore ORDERED, ADJUDGED, AND DECREED:

### I.    JURISDICTION

1.    This Court has jurisdiction over the subject matter of this action pursuant to 28
U.S.C. §§ 1331, 1345, 1355(a), and 1367, and under 31 U.S.C. § 3732(a) and (b), and over
Defendant.  The Complaint states a claim upon which relief may be granted against Defendant.
Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) and 31 U.S.C. § 3732(a).

## II.    SERVICING STANDARDS

2.    Defendant shall comply with the Servicing Standards, attached hereto as Exhibit A, in accordance with their terms and Section A of Exhibit E, attached hereto.

## III.    FINANCIAL TERMS

3.    *Payment Settlement Amounts.*  Defendant shall pay into an interest bearing escrow account to be established for this purpose the sum of $109,628,425, which sum shall be added to funds being paid by other institutions resolving claims in this litigation (which sum shall be known as the "Direct Payment Settlement Amount") and which sum shall be distributed in the manner and for the purposes specified in Exhibit B.  Defendant's payment shall be made by electronic funds transfer no later than seven days after the Effective Date of this Consent Judgment, pursuant to written instructions to be provided by the United States Department of Justice.  After Defendant has made the required payment, Defendant shall no longer have any property right, title, interest or other legal claim in any funds held in escrow.  The interest bearing escrow account established by this Paragraph 3 is intended to be a Qualified Settlement Fund within the meaning of Treasury Regulation Section 1.468B-1 of the U.S. Internal Revenue Code of 1986, as amended.  The Monitoring Committee established in Paragraph 8 shall, in its sole discretion, appoint an escrow agent ("Escrow Agent") who shall hold and distribute funds as provided herein.  All costs and expenses of the Escrow Agent, including taxes, if any, shall be paid from the funds under its control, including any interest earned on the funds.

4.    *Payments to Foreclosed Borrowers.*  In accordance with written instructions from the State members of the Monitoring Committee, for the purposes set forth in Exhibit C, the Escrow Agent shall transfer from the escrow account to the Administrator appointed under

3

Exhibit C $1,489,813,925.00 (the "Borrower Payment Amount") to enable the Administrator to

provide cash payments to borrowers whose homes were finally sold or taken in foreclosure

between and including January 1, 2008 and December 31, 2011; who submit claims for harm

allegedly arising from the Covered Conduct (as that term is defined in Exhibit G hereto); and

who otherwise meet criteria set forth by the State members of the Monitoring Committee. The

Borrower Payment Amount and any other funds provided to the Administrator for these purposes

shall be administered in accordance with the terms set forth in Exhibit C.

 5. *Consumer Relief.* Defendant shall provide $185,000,000 of relief to consumers

who meet the eligibility criteria in the forms and amounts described in Paragraphs 1-8 of Exhibit

D, and $15,000,000 of refinancing relief to consumers who meet the eligibility criteria in the

forms and amounts described in Paragraph 9 of Exhibit D, to remediate harms allegedly caused

by the alleged unlawful conduct of Defendant. Defendant shall receive credit towards such

obligation as described in Exhibit D.

**IV. ENFORCEMENT**

 6. The Servicing Standards and Consumer Relief Requirements, attached as Exhibits

A and D, are incorporated herein as the judgment of this Court and shall be enforced in

accordance with the authorities provided in the Enforcement Terms, attached hereto as Exhibit E.

 7. The Parties agree that Joseph A. Smith, Jr. shall be the Monitor and shall have the

authorities and perform the duties described in the Enforcement Terms, attached hereto as

Exhibit E.

 8. Within fifteen (15) days of the Effective Date of this Consent Judgment, the

participating state and federal agencies shall designate an Administration and Monitoring

Committee (the "Monitoring Committee") as described in the Enforcement Terms. The

4

Monitoring Committee shall serve as the representative of the participating state and federal

agencies in the administration of all aspects of this and all similar Consent Judgments and the

monitoring of compliance with it by the Defendant.

## V.  RELEASES

9.     The United States and Defendant have agreed, in consideration for the terms

provided herein, for the release of certain claims, and remedies, as provided in the Federal

Release, attached hereto as Exhibit F. The United States and Defendant have also agreed that

certain claims, and remedies are not released, as provided in Paragraph 11 of Exhibit F. The

releases contained in Exhibit F shall become effective upon payment of the Direct Payment

Settlement Amount by Defendant.

10.    The State Parties and Defendant have agreed, in consideration for the terms

provided herein, for the release of certain claims, and remedies, as provided in the State Release,

attached hereto as Exhibit G. The State Parties and Defendant have also agreed that certain

claims, and remedies are not released, as provided in Part IV of Exhibit G. The releases

contained in Exhibit G shall become effective upon payment of the Direct Payment Settlement

Amount by Defendant.

## VI.  SERVICEMEMBERS CIVIL RELIEF ACT

11.    The United States and Defendant have agreed to resolve certain claims arising

under the Servicemembers Civil Relief Act ("SCRA") in accordance with the terms provided in

Exhibit H. Any obligations undertaken pursuant to the terms provided in Exhibit H, including

any obligation to provide monetary compensation to servicemembers, are in addition to the

obligations undertaken pursuant to the other terms of this Consent Judgment. Only a payment to

5

an individual for a wrongful foreclosure pursuant to the terms of Exhibit H shall be reduced by
the amount of any payment from the Borrower Payment Amount.

## VII.   OTHER TERMS

12.    The United States and any State Party may withdraw from the Consent Judgment
and declare it null and void with respect to that party if the Defendant does not make the
Consumer Relief Payments (as that term is defined in Exhibit F (Federal Release)) required
under this Consent Judgment and fails to cure such non-payment within thirty days of written
notice by the party.

13.    This Court retains jurisdiction for the duration of this Consent Judgment to
enforce its terms.  The parties may jointly seek to modify the terms of this Consent Judgment,
subject to the approval of this Court.  This Consent Judgment may be modified only by order of
this Court.

14.    The Effective Date of this Consent Judgment shall be the date on which the
Consent Judgment has been entered by the Court and has become final and non-appealable.  An
order entering the Consent Judgment shall be deemed final and non-appealable for this purpose if
there is no party with a right to appeal the order on the day it is entered.

15.    This Consent Judgment shall remain in full force and effect for three and one-half
years from the date it is entered ("the Term"), at which time the Defendants' obligations under
the Consent Judgment shall expire, except that, pursuant to Exhibit E, Defendants shall submit a
final Quarterly Report for the last quarter or portion thereof falling within the Term and
cooperate with the Monitor's review of said report, which shall be concluded no later than six
months after the end of the Term.  Defendant shall have no further obligations under this
Consent Judgment six months after the expiration of the Term, but the Court shall retain

6

jurisdiction for purposes of enforcing or remedying any outstanding violations that are identified

in the final Monitor Report and that have occurred but not been cured during the Term.

16.    Except as otherwise agreed in Exhibit B, each party to this litigation will bear its

own costs and attorneys' fees associated with this litigation.

17.    Nothing in this Consent Judgment shall relieve Defendant of its obligation to

comply with applicable state and federal law.

18.    The parties further agree to the additional terms contained in Exhibit I hereto.

19.    The sum and substance of the parties' agreement and of this Consent Judgment

are reflected herein and in the Exhibits attached hereto. In the event of a conflict between the

terms of the Exhibits and paragraphs 1-18 of this summary document, the terms of the Exhibits

shall govern.

SO ORDERED this ____4____ day of ___April___, 2012

_Rosmary M Collyer_

UNITED STATES DISTRICT JUDGE

7

For the United States:

_____

TONY WEST
Acting Associate Attorney General
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC  20530
Tel.:    202-514-9500
Fax:    202-514-0238

For the Department of the Treasury:

For the Department of Housing andUrban
Development:

_____

GEORGE W. MADISON
General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220
Tel.:    202-622-0283
Fax:    202-622-2882

_____

HELEN R. KANOVSKY
General Counsel
U.S. Department of Housing and Urban
Development
451 7th Street, S.W.
Washington, DC  20410
Tel.:    202-402-5023
Fax:    202-708-3389

For the Federal Trade Commission
(as to Exhibit F only):

For the Consumer Financial Protection Bureau
(as to Exhibit F only):

_____

Amanda Basta
Attorney
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC  20058
Tel:    202-326-2340
Fax:    202-326-2558

_____

Lucy Morris
Deputy Enforcement Director
Consumer Financial Protection Bureau
1500 Pennsylvania Avenue, NW
(Attn:  1801 L Street)
Washington, DC  20220
Tel:    202-435-7154

For the Department of the Treasury:

_____
GEORGE W. MADISON
General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220
Tel.:       202-622-0283
Fax:       202-622-2882


For the Federal Trade Commission
(as to Exhibit F only):


_____
Amanda Basta
Attorney
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC  20058
Tel:    202-326-2340
Fax:    202-326-2558

For the Department of Housing and Urban
Development:

_____
HELEN R. KANOVSKY
General Counsel
U.S. Department of Housing and Urban
Development
451 7th Street, S.W.
Washington, DC  20410
Tel.:    202-402-5023
Fax:    202-708-3389


For the Consumer Financial Protection Bureau
(as to Exhibit F only):


_____
Lucy Morris
Deputy Enforcement Director
Consumer Financial Protection Bureau
1500 Pennsylvania Avenue, NW
(Attn:  1801 L Street)
Washington, DC  20220
Tel:    202-435-7154

8

For the Department of the Treasury:

_____

GEORGE W. MADISON
General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220
Tel.:       202-622-0283
Fax:       202-622-2882


For the Federal Trade Commission
(as to Exhibit F only):


_____

Amanda Basta
Attorney
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20058
Tel:    202-326-2340
Fax:    202-326-2558

For the Department of Housing and Urban
Development:

HELEN R. KANOVSKY
General Counsel
U.S. Department of Housing and Urban
Development
451 7th Street, S.W.
Washington, DC 20410
Tel.:   202-402-5023
Fax:    202-708-3389


For the Consumer Financial Protection Bureau
(as to Exhibit F only):


_____

Lucy Morris
Deputy Enforcement Director
Consumer Financial Protection Bureau
1500 Pennsylvania Avenue, NW
(Attn: 1801 L Street)
Washington, DC 20220
Tel:    202-435-7154

For the Department of the Treasury:

For the Department of Housing and Urban Development:

_____
GEORGE W. MADISON
General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220
Tel.:        202-622-0283
Fax:        202-622-2882

_____
HELEN R. KANOVSKY
General Counsel
U.S. Department of Housing and Urban Development
451 7th Street, S.W.
Washington, DC 20410
Tel.:   202-402-5023
Fax:   202-708-3389

For the Federal Trade Commission
(as to Exhibit F only):

For the Consumer Financial Protection Bureau
(as to Exhibit F only):

_____
Amanda Basta
Attorney
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20058
Tel:   202-326-2340
Fax:   202-326-2558

_____
Lucy Morris
Deputy Enforcement Director
Consumer Financial Protection Bureau
1500 Pennsylvania Avenue, NW
(Attn: 1801 L Street)
Washington, DC 20220
Tel:   202-435-7154

8

For the Department of the Treasury:

For the Department of Housing and Urban Development:

GEORGE W. MADISON
General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220
Tel.:     202-622-0283
Fax:      202-622-2882

HELEN R. KANOVSKY
General Counsel
U.S. Department of Housing and Urban Development
451 7th Street, S.W.
Washington, DC  20410
Tel.:   202-402-5023
Fax:    202-708-3389

For the Federal Trade Commission
(as to Exhibit F only):

For the Consumer Financial Protection Bureau
(as to Exhibit F only):

Amanda Basta
Attorney
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC  20058
Tel:    202-326-2340
Fax:    202-326-2558

Lucy Morris
Deputy Enforcement Director
Consumer Financial Protection Bureau
1500 Pennsylvania Avenue, NW
(Attn:  1801 L Street)
Washington, DC  20220
Tel:    202-435-7154

8

For the Ohio Attorney General
MIKE DEWINE:


_____
MATTHEW J. LAMPKE
JEFFREY R. LOESER
SUSAN A. CHOE
Assistant Attorneys General
Ohio Attorney General
30 E. Broad St., 14th Floor
Columbus, OH 43215
Tel.:   614-466-1305
Fax:   614-466-8898

For the Ohio Department of
Commerce, Division of Financial
Institutions:


_____
JENNIFER S. M. CROSKEY
Assistant Attorney General
Ohio Attorney General, Executive
Agencies
30 E. Broad St., 26th Floor
Columbus, OH 43215
Tel:  614-466-2980
Fax:  614-728-9470

44

For the Ohio Attorney General
MIKE DEWINE:

For the Ohio Department of
Commerce, Division of Financial
Institutions:

_____

MATTHEW J. LAMPKE
JEFFREY R. LOESER
SUSAN A. CHOE
Assistant Attorneys General
Ohio Attorney General
30 E. Broad St., 14th Floor
Columbus, OH 43215
Tel.:   614-466-1305
Fax:   614-466-8898

JENNIFER S. M. CROSKEY
Assistant Attorney General
Ohio Attorney General, Executive
Agencies
30 E. Broad St., 26th Floor
Columbus, OH 43215
Tel:  614-466-2980
Fax:  614-728-9470

EXHIBIT 13

NOTICE OF GMAC CH. 11
BANKRUPTCY IN THE
U.S. BANKRUPTCY COURT
FOR THE S.D. OF N.Y.
FILED MAY 14, 2012
CASE NOS. 12-bk-12020, 12-bk-12032,
JOINT ADM.

# GMAC Mortgage

May 14, 2012

Dear Homeowner,

As you may have read or heard, Residential Capital, LLC (ResCap), recently announced that it and its subsidiaries, including GMAC Mortgage, are restructuring under Chapter 11. Although you may not be familiar with our name, ResCap is the parent company of GMAC Mortgage, which services your mortgage.   As servicer, GMAC Mortgage collects and keeps track of your mortgage payments and ensures that they are applied to your account and properly distributed to the lenders and investors who own your loan.

The restructuring of ResCap and GMAC Mortgage does not change your obligations as a mortgage borrower.  As such, you must continue to make your scheduled mortgage **payments on time and in full to the address listed on your monthly account statement.**

While nothing has changed in relation to the amount of your mortgage payments or where you send those payments, we understand you may have some questions. Please feel free to contact our toll-free Homeowner Hotline at (888) 926-3479 between 8 a.m. and 5 p.m. EST, or refer to http://www.kccllc.net/rescap for additional information regarding ResCap's Chapter 11 reorganization. If you have specific questions about your loan, please reach out to the customer service number listed on your monthly statement.

In the coming weeks, you will receive a Notice of Chapter 11 Bankruptcy Cases, Meeting of Creditors, and Deadlines in the mail. No action is required on your part, related to this restructuring.

For our part, everyone on the GMAC Mortgage team is committed to providing the same high level of service and responsiveness we've always shown to the homeowners whose mortgage loans are entrusted to us.  We look forward to helping you continue to build equity and value in your home.

Sincerely,

Thomas Marano
Chief Executive Officer
Residential Capital, LLC

GMAC Mortgage, LLC
1100 Virginia Drive
Fort Washington, PA 19034

$E \times H I B I T E$

# EXHIBIT 13

DECLARATION OF BRIDGET M. LEE
(FOE) IN CASE FOE vs. U.S. EPA IN
CASE No. 12-cv-363 IN THE U.S.
DISTRICT COURT, DISTRICT OF COLUMBIA
FILED SEPT. 14, 2012

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRIENDS OF THE EARTH, )<br><br>     Plaintiff, )<br><br>    v. )<br><br>UNITED STATES ENVIRONMENTAL )<br>PROTECTION AGENCY, et al., )<br><br>     Defendants. )<br>_____ ) | Civ. No. 1: 12-cv-00363-ABJ |

### CERTIFICATE OF SERVICE

I, Marianne Engelman Lado, do hereby certify that on this 14th day of September, 2012, I

filed the foregoing Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for

Summary Judgment and Declaration of Bridget M. Lee, with Exhibit A, using the Court's

CM/ECF system, which caused a copy to be served on counsel of record. I further certify that I

caused a copy of the foregoing to be served this day by First-Class U.S. Mail on:

> Yvonne D. Webb-Lewis
> Sidney T. Lewis
> 1875 Alvason Avenue
> Columbus, Ohio 43219

> /s/ Marianne L. Engelman Lado
> Marianne L. Engelman Lado
> Earthjustice
> 156 William Street, Suite 800
> New York, NY 10038-5326
> Phone: (212) 791-1881
> Fax: (212) 918-1556
> mengelmanlado@earthjustice.org
>
> *Counsel for Friends of the Earth*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FRIENDS OF THE EARTH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civ. No. 1: 12-cv-00363-ABJ |
| | ) |
| UNITED STATES ENVIRONMENTAL | ) |
| PROTECTION AGENCY and | ) |
| LISA JACKSON, Administrator, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DECLARATION OF BRIDGET M. LEE**

I, Bridget M. Lee, declare and state as follows:

1.      I submit this declaration in support of Plaintiff's Memorandum in Opposition to

Defendants' Motion for Summary, filed September 14, 2012.

2.      Attached hereto as Exhibit A is a true and correct copy of "Aircraft Emissions:

Impact on Air Quality and Feasibility of Control," a report prepared by the United Stets

Environmental Protection Agency.

I declare, under penalty of perjury, that the foregoing information is true, accurate, and correct.

Executed on September 14, 2012, in New York, New York.

Bridget M. Lee

**Exhibit A**

TD
886.7
.U52

TD
886.7
.U52



# AIRCRAFT EMISSIONS:

# IMPACT ON AIR QUALITY

# AND FEASIBILITY OF CONTROL



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

TD
886.7
.452

# PREFACE

     This report presents the available information on the present and predicted nature and extent of air pollution related to aircraft operations in the United States. In addition, it presents an investigation of the present and future technological feasibility of controlling such emissions. This report is published in accordance with Section 231 (a) of the Clean Air Act as amended, which states:

    "(1)  Within 90 days after the date of enactment of the Clean Air Amendments of 1970, the Administrator shall commence a study and investigation of emissions of air pollutants from aircraft in order to determine-

    "A.  the extent to which such emissions affect air quality in air quality control regions throughout the United States, and

    "B.  the technological feasibility of controlling such emissions

    "(2)  Within 180 days after commencing such study and investimation, the Administrator shall publish a report of such study and investigation . . ."

# TABLE OF CONTENTS

                                                                    Page

LIST OF FIGURES ................................................v

LIST OF TABLES ...............................................vii

INTRODUCTION ...................................................1

CONCLUSIONS ...................................................5

METHODOLOGY FOR ASSESSMENT OF AIR QUALITY IMPACT .....................7

    NATIONAL AMBIENT AIR QUALITY STANDARDS ...........................7

    BASIC REQUIREMENTS FOR IMPACT EVALUATION .........................10

        EMISSION FACTORS .........................................10

        SELECTION OF CRITICAL AREAS AND AIRPORTS ....................12

        EMISSION PROJECTIONS .....................................13

RESULTS OF IMPACT EVALUATION .......................................19

    REGIONAL IMPACT OF AIRCRAFT EMISSIONS ............................19

    SUBREGIONAL AND LOCALIZED IMPACT ................................29

        GENERAL INDICATIONS OF LOCALIZED AIR QUALITY IMPACT ..........29

            PASSENGER USAGE DENSITY AND AIR POLLUTION POTENTIAL .....29

            EMISSION DENSITY COMPARISON ...........................30

        DETAILED INVESTIGATION OF LOCALIZED POLLUTANT CONCENTRATION ..33

            8-HOUR CARBON MONOXIDE CONCENTRATIONS ...................33

            1-HOUR CARBON MONOXIDE CONCENTRATIONS AT LOS ANGELES AIRPORT
                                                                .....39
            CARBON MONOXIDE CONCENTRATIONS AT OTHER AIRPORTS ........39

            HYDROCARBONS AND POTENTIAL OXIDANT CONCENTRATIONS .......43

            OXIDES OF NITROGEN .....................................47

            SMOKE AND PARTICULATES .................................49

TECHNOLOGICAL FEASIBILITY OF CONTROLLING AIRCRAFT EMISSIONS ...........53

Page

EMISSION CONTROL BY ENGINE MODIFICATION ......................... 54

  ENGINE CLASSIFICATION ........................................ 54

  EMISSION CONTROL METHODS AND EFFECTIVENESS ................... 56

    TURBINE ENGINES .......................................... 56

    PISTON ENGINES ........................................... 62

  COST AND TIME REQUIREMENTS FOR CONTROL METHOD

  DEVELOPMENT AND IMPLEMENTATION .............................. 66

    EXISTING ENGINES ......................................... 66

    FUTURE ENGINES ........................................... 70

EMISSION CONTROL BY MODIFICATION OF GROUND OPERATIONS ........... 71

  DEFINITION OF GROUND OPERATIONS ............................. 71

  EMISSION CONTROL METHODS .................................... 71

  IMPLEMENTATION COST AND TIME REQUIREMENTS ................... 72

COMPARATIVE EVALUATION OF EMISSION CONTROL METHODS ............. 76

EMISSION MEASUREMENT TECHNOLOGY ................................ 79

  SAMPLING AND TEST PROCEDURES ................................ 80

  EMISSION MEASUREMENT INSTRUMENTATION ........................ 81

APPENDIX A ..................................................... 83

APPENDIX B ..................................................... 91

APPENDIX C ..................................................... 95

REFERENCES ..................................................... 97

iv

# LIST OF FIGURES

Page

1. AIR SAMPLING LOCATIONS AT LOS ANGELES INTERNATIONAL AIRPORT.......... 34

2. EXPECTED CO CONCENTRATIONS, 8-HOUR AVERAGING TIME, WINTER
   1970, STATION 209, LAX.................................................. 35

3. VICINITY OF LOS ANGELES INTERNATIONAL: PERCENT OF CONTRIBUTION
   BY AIRCRAFT TO CARBON MONOXIDE LEVELS.................................. 37

4. FREQUENCY DISTRIBUTIONS FOR CARBON MONOXIDE FOR VARIOUS
   AIRCRAFT EMISSION CONTRIBUTIONS AT STATION 209, WINTER 1980.......... 38

5. HYDROCARBON ISOPLETHS IN THE VICINITY OF LOS ANGELES INTER-
   NATIONAL:  AIRCRAFT SOURCES (3-Hr. Average for 1970)................. 44

6. HYDROCARBON ISOPLETHS IN THE VICINITY OF LOS ANGELES INTER-
   NATIONAL:  AIRCRAFT SOURCES (3-Hr. Average for 1980)................. 45

7. CALCULATED NON-METHANE HYDROCARBON CONCENTRATIONS DOWNWIND
   OF LOS ANGELES AIRPORT FOR 1980 WITH NON-AIRCRAFT SOURCES
   CONTROLLED............................................................. 46

8. $NO_x$ ISOPLETHS IN THE VICINITY OF LOS ANGELES INTERNATIONAL:
   AIRCRAFT SOURCES (Annual Average for 1970).......................... 48

9. $NO_x$ ISOPLETHS IN THE VICINITY OF LOS ANGELES INTERNATIONAL:
   AIRCRAFT SOURCES (Annual Average for 1980).......................... 50

10. $NO_x$ ISOPLETHS IN THE VICINITY OF CHICAGO-O'HARE INTER-
    NATIONAL:  AIRCRAFT SOURCES (Annual Average for 1980)............... 51

11. PISTON ENGINE EMISSION CHARACTERISTICS................................ 64

12. HYDROCARBON AND CARBON MONOXIDE EMISSIONS FROM A TYPICAL
    AIRCRAFT TURBINE ENGINE (JT3D)........................................ 73

A-1. MAXIMUM 8-HOUR AVERAGE CO CONCENTRATIONS IN LOS ANGELES AREA........85

A-2. BASELINE DATA, DAILY MAXIMUM 8-HOUR AVERAGE CO CONCENTRATIONS,
     STATION 209, LAX, 1970...............................................86

A-3. FREQUENCY DISTRIBUTION FOR 8-HOUR CO DATA, STATION 209, LAX,
     SEPTEMBER 1970.......................................................87

A-4. EXPECTED CO CONCENTRATION DISTRIBUTION, WINTER, STATION 209,
     LAX FOR 80 PERCENT AIRCRAFT CONTRIBUTION.............................88

A-5. EXPECTED CO DISTRIBUTION, WINTER, STATION 209, LAX FOR 20
     PERCENT AIRCRAFT CONTRIBUTION........................................89

v

# LIST OF TABLES

TABLE

1. NATIONAL AMBIENT AIR QUALITY STANDARDS................................... 9

2. AIRCRAFT CLASSIFICATION SYSTEM........................................ 11

3. PRESENT AND PROJECTED LTO CYCLES FOR 1970, 1975, and 1980........... 14

4. CURRENT AND PROJECTED EMISSIONS FOR AIRCRAFT AND AIRPORTS........... 16

5. ABILITY OR NON-ABILITY TO MEET THE NATIONAL AMBIENT AIR QUALITY
   STANDARDS IN 1975................................................... 20

6. METROPOLITAN LOS ANGELES INTRASTATE AQCR EMISSIONS.................. 21

7. NEW YORK PORTION OF THE N.J. - N.Y. - CONN. INTERSTATE AQCR
   EMISSIONS.......................................................... 22

8. NATIONAL CAPITAL INTERSTATE AQCR EMISSIONS......................... 23

9. ILLINOIS PORTION OF THE METROPOLITAN CHICAGO INTERSTATE AQCR
   EMISSIONS.......................................................... 24

10. METROPOLITAN DENVER INTRASTATE AQCR EMISSIONS...................... 25

11. SAN FRANCISCO BAY AREA INTRASTATE AQCR EMISSIONS................... 26

12. METROPOLITAN DALLAS - FORT WORTH INTRASTATE AQCR EMISSIONS......... 27

13. METROPOLITAN BOSTON INTRASTATE AQCR EMISSIONS...................... 28

14. INDICATIONS OF LOCALIZED AIRPORT IMPACT OF 20 LARGEST AIR
    CARRIER AIRPORTS................................................... 31

15. COMPARISON OF EMISSION DENSITIES FOR AIRPORTS VERSUS URBAN
    AREAS FOR 1970, 1975, and 1980.................................... 32

16. EXPECTED RANGE OF DAYS THAT 8-HR STANDARD WILL BE EXCEEDED
    IN VICINITY OF LAX FOR VARIOUS LEVELS OF AIRCRAFT IMPACT........... 40

17. LOS ANGELES AIRPORT - NUMBER OF TIMES THE 1-HOUR CO STANDARD
    WAS EXCEEDED - MAY 10 THROUGH NOVEMBER 9, 1970..................... 41

18. DISPERSION MODEL ESTIMATES OF 1-HOUR CO CONCENTRATIONS............. 42

19. AIRCRAFT ENGINE CLASSIFICATION.................................... 55

20. ENGINE MODIFICATIONS FOR EMISSION CONTROL FOR EXISTING AND
    FUTURE TURBINE ENGINES............................................ 57

vii

Page

21. EFFECTIVENESS OF tl - MINOR COMBUSITON CHAMBER REDESIGN -
ON REDUCTION OF EMISSIONS FROM TURBINE ENGINES...................... 59

22. EFFECTIVENESS OF ENGINE MODIFICATION IN CONTROL OF EMISSIONS
FROM TURBINE ENGINES, BY OPERATING MODE............................. 60

23. BASES FOR CONTROL METHOD EFFECTIVENESS ESTIMATES FOR TURBINE
ENGINES............................................................. 61

24. ENGINE MODIFICATIONS FOR EMISSION CONTROL FOR EXISTING AND
FUTURE PISTON ENGINES.............................................. 63

25. CURRENT UNCONTROLLED EMISSION RATES FOR PISTON ENGINES.............. 65

26. EFFECTIVENESS OF ENGINE MODIFICATIONS IN CONTROL OF
EMISSIONS FROM PISTON ENGINES BY POLLUTANT.......................... 65

27. TIME AND COSTS FOR MODIFICATION OF CURRENT CIVIL AVIATION
ENGINES............................................................. 68

28. COST RESULTS FOR TURBINE ENGINE POPULATION BY SEPARATE USE
CATEGORIES.......................................................... 69

29. COMPARATIVE REDUCTIONS RESULTING FROM CONTROL METHODS APPLIED
AT LOS ANGELES INTERNATIONAL AIRPORT................................ 74

30. COSTS AND TIME FOR OPERATIONS CHANGES AT LOS ANGELES INTER-
NATIONAL AIRPORT.................................................... 75

31. COMPARISON OF EMISSION CONTROL METHODS............................. 77

32. INSTRUMENTATION FOR MEASUREMENT OF TURBINE ENGINE EMISSIONS......... 82

B-1. SHORT-TERM METEOROLOGICAL AND ACTIVITY CONDITIONS.................. 94

viii

# INTRODUCTION

Public awareness that aircraft were a source of air pollution developed in the late 1950's with the introduction of turbine-engine aircraft. Visible exhaust plumes from the engines and increased levels of exhaust odors at airports caused complaints to be lodged. The complaints, in turn, stimulated investigations into the nature and extent of aircraft emissions. The Air Quality Act of 1967 specifically identified aircraft emissions as a subject of concern and required an investigation by the Department of Health, Education, and Welfare. The study[1], submitted to Congress on January 17, 1969, concluded that:

"1. Reduction of particulate emissions from jet aircraft is both desirable and feasible. Engine manufacturers and airlines have indicated that improvements in turbine engine combustor design can be built into new engines and retrofitted on engines already in use. Testing programs are already underway. Furthermore, they have indicated that application of this technology will be underway by the early 1970's. While there are no laws or regulations to compel the industry to follow through on this work, it appears that public pressures resulting primarily from the adverse effects of odors and visibility obscuration will lead industry to initiate the application of this technology as soon as possible and to complete it within the shortest possible time. Accordingly, it is the intention of this Department to encourage such action by engine manufacturers and airline operators and to keep close watch on their progress. If, at any time, it appears that progress is inadequate or that completion of the work will be unduly prolonged, or that the concern of the industry lags, the Department will recommend regulatory action to the Congress that statutory authority for such action be provided.

"2. Further research is needed to define more precisely the present and probable future nature and magnitude of all other air pollution problems associated with aircraft activity in the United States and to identify needs for control measures. Emphasis must be placed particularly on assessment of air pollutant levels in the

air terminal environment and their effects on health and
safety and on evaluation of possible long-term effects of
upper atmospheric pollution resulting from aircraft flight
activity.  The Department will undertake research
appropriate to the solution of this problem.

"3. As further research results in identification of
needs for additional measures to control air pollution from
any type of aircraft, and as measures to achieve such
control become available through research and development,
it is the Department's expectation that engine
manufacturers, airline operators, and other segments of the
aviation community will take the initiative in the
development and application of such control measures.  If
the private sector fails to provide adequate controls, the
Department will not hesitate to recommend to the Congress
that Federal regulatory action be authorized.

"4. In light of the relatively small contribution of
aircraft to community air pollution in all places for which
adequate data are available, and in view of the practical
problems that would result from State and local regulatory
action in this field, it is the Department's conclusion that
adoption and enforcement of State or local emission control
regulations pertaining to aircraft cannot be adequately
justified at this time.  The Department recommends that, if
and when regulations become necessary, the rationale used to
develop Federal rather than local emission standards for
motor vehicles be applied to aircraft.

"5. The Department recognizes that State and local
agencies, in cooperation with the Federal Aviation
Administration and other cognizant agencies, are the most
appropriate groups to insure that control of airport
pollution hazards will be given adequate consideration in
the selection of airport sites, planning for expansion and
reconstruction of airports, design of airports, and planning
and conduct of ground operations.

"6. The Department will include information on
progress in the control of air pollution from aircraft in
the annual report which must be submitted under section 306
of the Air Quality Act."

As a result of conclusion (1) above, in March 1970, at a
meeting held by the Secretaries of Health, Education, and
Welfare and of Transportation, representatives of 31
airlines agreed to a schedule for retrofitting JT8D engines
with reduced smoke combustors, to be substantially completed
by the end of 1972.  This agreement sought to significantly

2

abate visible (smoke) emissions from aircraft powered by
this widely used engine.   This retrofit program is 85%
complete (July 1972).  Conclusion (2) pointed to the need
for studying air terminal environments, a need which led to
an EPA-sponsored study of Los Angeles International Airport
by the Los Angeles Air Pollution Control District.   This
study was completed in April 1971.[2]

Passage of the 1970 Clean Air Act Amendments essentially
required that we reassess the aircraft emissions problem and
update our knowledge concerning the air quality impact and
feasibility of control of such emissions.

The data base for this report includes information
developed by Northern Research and Engineering[3][4], Cornell
Research Laboratories[5], the previously cited LAPCD study,
and information compiled separately by EPA personnel.

3

# CONCLUSIONS

The various approaches taken in this study to assess the impact of aircraft on air quality indicate, both individually and collectively, that aircraft operations "cause or contribute to or are likely to cause or contribute to air pollution which endangers the public health or welfare" (Sec. 231(a), Clean Air Act Amendments of 1970). Based on this general conclusion a realistic program of emissions control should be instituted. Though such a control program cannot be quantitatively related to the air quality considerations discussed herein, pollutant emissions from aircraft and aircraft engines should be reduced through the application of the present and prospective technology described in this study. A control program should have inherent flexibility so that as more extensive impact data become available the required controls can be modified accordingly.

The results of EPA's current study of aircraft emissions and their control have led to the following specific conclusions:

1. Aircraft emissions are significant contributors to the regional burden of pollution in comparison to other sources which will have to be controlled to meet National Ambient Air Quality Standards.

2. When airports are viewed as concentrated area sources of pollution emissions, either in isolation or in concert with their surrounding pollution sources, it can be demonstrated that airports will probably exert localized impact on air quality, in excess of the standards, even though relief is provided elsewhere in the region by controls relating to automobiles and stationary sources. That is, unless aircraft emissions are reduced, airports will still remain intense area emitters of pollutants when the emission densities in the surrounding region have been greatly reduced.

3. Aircraft emissions have impact on air quality in residential and business areas adjacent to major U. S. airports. The control of non-aircraft sources in and around such airports will not be adequate to insure compliance with

5

the National Ambient Air Quality Standards indicating the
need for controlling aircraft emissions.

4. There exists a variety of control techniques for
effecting aircraft emissions reductions which appear both
feasible and economically attractive during the next two
decades.  Emissions may be reduced by means of the following
general approaches:

    (a) Modification of ground operational procedures.

    (b) Improvement in maintenance and quality control
procedures to minimize emissions from existing families of
turbine engines.

    (c) Development and demonstration of new combustion
technology for major reductions in emissions from second-
generation turbine and piston aircraft engines.

    (d) Retrofit of turbine engine fleets with existing
technology for near-term reduction of emissions.

# METHODOLOGY FOR IMPACT ASSESSMENT

Assessment of air quality impact involves investigation at several different levels: (a) global, (b) regional (sub-global), (c) urban, and (d) local. In this report the urban level is defined as an air quality control region. The ability to conduct investigations or assessment at these levels depends entirely on the analytical tools and data bases available. Until quite recently most assessments were source oriented and presented data in terms of national or air quality control region inventories. With the development of models and more refined monitoring systems, we can now explore the more localized "hot spots" within an urban area. The earlier report[1] on the impact of aircraft emissions dealt only with national and regional inventories and projections of aircraft emissions and pointed to the need for a closer look at local airports and their immediate environments. Hence, this study concentrates on assessing local effects through a combination of approaches involving monitoring, statistical analysis, and modeling. Additionally, aircraft emissions are compared with those from other sources of the same pollutants in terms of relative importance and relative cost of control.

The potential impact of aircraft emissions on the global and sub-global environments is not being ignored. Studies of pollution at these levels involve an integrated assessment of all contributors to the global pollution inventory, and hence are beyond the scope of this report. The Clean Air Act mandates that EPA study the geophysical effects of air pollution. Research and monitoring components of EPA are now engaged in preliminary phases of such studies.

To provide continuity, we have updated pertinent data prepared by Northern Research and Engineering which was contained in the previous report[1]. Discrepancies between similar data presentations in the two reports result from the better data base obtained in this study.

## NATIONAL AMBIENT AIR QUALITY STANDARDS

In order to assess the significance of aircraft emissions, one must evaluate their contribution to pollutant concentrations in the atmosphere and relate the resulting concentrations to the national ambient air quality standards.

7

In accordance with the Clean Air Act Amendments of 1970, the EPA established primary and secondary ambient air quality standards[6] for six major pollutants: carbon monoxide, nitrogen dioxide, hydrocarbons, photochemical oxidants, sulfur dioxide, and particulates. The primary standards provide for protection of public health and the secondary standards for prevention of all other undesirable effects of air pollution. Table 1 shows the national standards for these six pollutants.

It should be noted that nonmethane hydrocarbons at concentrations observed in the atmosphere have not been associated with health effects. The relationship between nonmethane hydrocarbons and photochemical oxidants indicates, however, that peak photochemical oxidant concentrations are associated with hydrocarbon concentrations averaged over the time period from 6 to 9 a.m.[7] The peak oxidant levels normally appear some three hours later. The nonmethane hydrocarbon standard is based on this relationship.

As a basis for implementation of the standards, the entire United States has been divided into some 240 Air Quality Control Regions[8]. Regional boundaries are based on considerations of urban-industrial concentration, existing jurisdictional boundaries, and other factors including topography and meteorology, which would affect levels of air quality in an area.

In accordance with the provisions of Section 110 of the Clean Air Act, the States have submitted plans that provide for the implementation, maintenance, and enforcement of the national air quality standards on a regional (air quality region) basis. The State implementation plan for each region must provide for attainment of the primary standards in 3-5 years depending on whether an extension has been granted. The State plan is required to set forth the procedure for attaining the secondary standards within a reasonable amount of time.

Strategies which States are proposing to meet the standards and the possible impact aircraft emissions and their control may have on the strategies are discussed in the section on regional impact.

8

Table 1   NATIONAL AMBIENT AIR QUALITY STANDARDS

| Pollutant | Standard Description |
|---|---|
| Carbon monoxide (Primary and secondary standards are the same) | - 10 milligrams per cubic meter (9 ppm), maximum 8-hour concentration not to be exceeded more than once per year.<br><br>- 40 milligrams per cubic meter (35 ppm), maximum 1-hour concentration not to be exceeded more than once per year. |
| Nitrogen dioxide (Primary and secondary standards are the same) | - 100 micrograms per cubic meter (0.05 ppm), annual arithmetic mean. |
| Hydrocarbons (non-methane) (Primary and secondary standards are the same) | - 160 micrograms per cubic meter (0.24 ppm), maximum 3-hour concentration (6-9 a.m.) not to be exceeded more than once per year. For use as a guide in devising implementation plans to meet the oxidant standards. |
| Particulate matter<br>Primary standard | - 75 micrograms per cubic meter, annual geometric mean.<br><br>- 260 micrograms per cubic meter, maximum 24-hour concentration not to be exceeded more than once per year. |
| Secondary standard | - 60 micrograms per cubic meter, annual geometric mean, as a guide to be used in assessing implementation plans to achieve the 24-hour standard.<br><br>- 150 micrograms per cubic meter, maximum 24-hour concentration not to be exceeded more than once per year. |
| Sulfur dioxide<br>Primary standard | - 80 micrograms per cubic meter, annual arithmetic mean.<br><br>- 365 micrograms per cubic meter, maximum 24-hour concentration not to be exceeded more than once per year. |
| Secondary standard | - 60 micrograms per cubic meter, annual arithmetic mean.<br><br>- 260 micrograms per cubic meter, maximum 24-hour concentration not to be exceeded more than once per year.<br><br>- 1300 micrograms per cubic meter, maximum 3-hour concentration not to be exceeded more than once per year. |
| Oxidant (Primary and secondary standards are the same) | - 160 micrograms per cubic meter, maximum 1-hour concentration not to be exceeded more than once per year. |

9

BASIC REQUIREMENT FOR IMPACT EVALUATION

EMISSION FACTORS

Pollutants emitted by aircraft engines include gaseous
hydrocarbons, carbon monoxide, oxides of nitrogen,
particulate matter, and sulfur oxides.  In order to evaluate
the impact of aircraft emissions on the ambient air levels
of these pollutants, the logical first step is an estimate
of the total emissions due to aircraft.  Because emission
rates vary according to engine type, number of engines and
operating mode, we have classified aircraft by type, defined
the typical operating modes for each class throughout their
landing and takeoff (LTO) cycles, and determined emission
factors for each class operating in each mode.

The aircraft classification system groups aircraft into 12
separate types that include the currently used commercial
air carriers, and general aviation, and military aircraft.
(Classes 8-11 are exclusively military aircraft and are
excluded from further consideration in this report.)
Provision was also made in the classification system for the
possible introduction of supersonic commercial aircraft in
the future.  The basis for classification of civilian and
commercial aircraft is presented in Table 2.

The aircraft modes of operation for which emission rates
were categorized are:

        (1) Start-up and idle
        (2) Taxi
        (3) Idle at runway
        (4) Takeoff
        (5) Climb-out to 3,000 foot elevation
        (6) Fuel dumping
        (7) Approach from 3,000 foot elevation
        (8) Landing
        (9) Idle and shutdown
        (10) Maintenance

Emission factors were developed for the civil aviation
aircraft classes.  A representative listing of emission
factors for piston and turbine engines is presented in
subsequent discussions of control feasibility.

The aircraft emission data, obtained through various
research programs funded by EPA, are summarized in the
report prepared for EPA by Cornell University.[5]

Emissions from non-aircraft sources on and around the
airport are also accounted for in the air quality analyses.
These sources of emissions include airport heating plants,

10

TABLE 2

AIRCRAFT CLASSIFICATION SYSTEM

| Category | Class | Ref. 14 class-ification | Type | Examples | Engine Model | Type | Thrust or power[a] | Engines per aircraft |
|---|---|---|---|---|---|---|---|---|
| Air Carrier | 1 | — | Supersonic transport | Concorde Tupolev TU-144 | R-R/Snecma Olympus 593 | Turbojet | 39,000 lb. | 4 |
| | 2 | | Jumbo jet transport | Boeing 747 Douglas DC-10 | P&WA JT9D | Turbofan | 43,000 lb. | 4 |
| | 3 | 1 | Long-range jet transport | Boeing 707 Douglas DC-8 | P&WA JT3D | Turbofan | 18,000 lb. | 4 |
| | 4 | 2 | Medium range jet transport | Boeing 727 Douglas DC-9 | P&WA JT8D | Turbofan | 13,900 lb. | 2.6 |
| | 5 | 4 | Turboprop transport | Lockheed Electra Fairchild Hiller FH-227 | Allison 501-D13 | Turbo-prop | 3,750 hp. | 2.5 |
| General Aviation | 6 | 3 | Business jet | Lockheed Jetstar North American Sabreliner | P&WA JT12 | Turbojet | 2,900 lb. | 2.1 |
| | 7 | 6 | Piston-engine utility | Cessna 210 Centurion Piper 32-300 Cherokee Six | Continental 10-520-A | Opposed piston | 292 hp. | 1[b] |
| V/Stol | 12 | 7 | Helicopters and V/STOL | Silorsky S-61 Vertol 107 | General Electric CT58 | Turbo-shaft | 1,390 hp. | 2 |

[a] Equivalent shaft power.
[b] Representative of Van Nuys and Tamiami.

11

fuel storage losses, automobiles, service vehicles, and areas neighboring the airport. To estimate the impact of aircraft emissions on air quality near the ground, one must take into account emissions from the time an aircraft enters the atmospheric mixing layer during approach until it leaves this layer during climb-out. In defining an LTO cycle representative of this consideration, a height of 3,000 feet above the runway was selected as a reasonable approximation of atmospheric mixing depth over major U. S. metropolitan areas.[1] The number of LTO cycles performed, and the relative lengths of time spent in each operational mode of an LTO cycle, combined with the appropriate emission factors, determine the quantities of pollutants emitted by aircraft.

SELECTION OF CRITICAL AREAS AND AIRPORTS

Once the general emission characteristics of aircraft were determined, specific regions and airports having high aircraft activity and air pollution potential were selected for impact evaluation.

As a part of the Northern study[3], several airports were selected to represent, as nearly as possible, those at which the impact of emissions from aircraft and related activities would probably be greatest. The factors considered in evaluating the potential impact of individual airports included: (1) aircraft activity levels, (2) airport area, (3) mean wind speed, and (4) relative activity of different types of aircraft (commercial air carrier and general aviation). On the basis of these considerations and the availability of airport and aircraft activity data, these airports were selected for study:

(1) Commercial Air Carrier

   Los Angeles International

   Washington National

   J. F. Kennedy International

   O'Hare International

(2) General Aviation

   Van Nuys, California

   Tamiami, Florida

12

Less elaborate evaluations of four additional airports and their impact in their respective air quality control regions were developed as the regional impact analysis was expanded to include an examination of State implementation plans for the attainment of the air quality standards.

The four additional airports, located in San Francisco, Dallas-Ft. Worth, Denver, and Boston, were selected on the basis of high levels of aircraft activity and severity of the regional pollutant levels.

EMISSION PROJECTIONS

The basic emission factors for any particular engine type are not expected to change substantially with time unless changes are required by emission standards. In addition, the number and type of engines representative of one particular class of aircraft are not expected to change substantially in the next 10-20 years. The important and determining factors affecting the projected controlled or uncontrolled emissions are: (1) changes in the level of airport activity, and (2) changes in the mix of the various classes of aircraft.

As a part of the Northern Research Study, records of aircraft activity by class were obtained for the selected airports. Prospective growth in activity at each airport was estimated by projecting past and current activity data to 1975 and 1980. The general trend at the selected airports is towards more aircraft operations in classes 1, 2, 4, 6 and 7; and less in classes 3 and 5. The total yearly activity data and projections are summarized in Table 3.

The air carrier airports are so-called because of the preponderance of commercial air carrier activity, which, in 1970, ranged from 66 percent of total activity at Washington National to 92 percent at Chicago O'Hare. Activity at Tamiami and Van Nuys Airports is approximately 99 percent general aviation aircraft.

Additionally, data were obtained on the uses and locations of taxiways, runways, terminals, hangars, heating plants, fuel storage areas, and roadways at each airport in order to locate and quantify the various sources of emissions during the operation of aircraft.

Based on projections from Reference 3, revised to incorporate more accurate emission factors, total projected emissions of pollutants from aircraft and from all sources

13

Table 3

Present and Projected LTO Cycles for 1970, 1975, and 1980

| Airport | Type of aircraft | | | | Total LTO cycles | | |
|---|---|---|---|---|---|---|---|
| | Air carrier | General aviation | Military | Helicopters | 1970[a] | 1975 | 1980 |
| All FAA operated airports | | | | | $28 \times 10^6$ | $39 \times 10^6$ | $59 \times 10^6$ |
| Air carrier airports | | | | | | | |
| Los Angeles International | 203,900 | 59,900 | 4,200 | 4,050 | 272,000 | 305,200 | 358,100 |
| Washington National | 109,800 | 55,500 | 1,500 | - | 166,700 | 169,800 | 173,500 |
| J. F. Kennedy International | 188,800 | 27,800 | - | - | 219,200 | 208,500 | 241,300 |
| Chicago | 314,300 | 21,200 | - | - | 339,900 | 357,000 | 410,800 |
| General aviation airports | | | | | | | |
| Van Nuys, California | 20 | 279,400 | 2,700 | - | 281,600 | - | 700,000 |
| Tamiami,[b] Florida | - | 200,800 | - | - | 200,800 | - | - |

[a]Where parts do not add up to total, LTO cycles not classified by type were included in total
[b]1971 estimated activity

14

were calculated for the years 1975 and 1980 at each of the
selected airports except New Tamiami (which lacked reliable
activity projections).  These projections are presented in
Table 4 for total hydrocarbons, carbon monoxide, nitrogen
oxides, sulfur dioxide, particulate matter (including lead),
and lead.  For a more complete assessment of proposed
control strategies, emission projections for three of the
pollutants (hydrocarbons, carbon monoxide, and nitrogen
oxides) were also developed for 1990.  The projected values
for 1990 are presented in the discussion of control
feasibility and impact.  The emission projections are based
on present emission rates for each aircraft engine class and
do not incorporate potential future reductions in emissions
as a result of aircraft emission standards.  The projected
aircraft emissions reflect increased activity and changes in
the mix of existing engines.

At the four air carrier airports during the 1970's, as a
result of continued introduction of jet engines found in
present-day new jet aircraft, total emissions of carbon
monoxide from aircraft are not projected to change greatly.
Hydrocarbon emissions, however, although predicted to
increase by 18 percent at Washington National Airport, are
expected to decrease by about 60 to 70 percent at Los
Angeles, John F. Kennedy, and O'Hare Airport.  The estimated
average increase in aircraft operations is 20 percent at
these airports during the 1970's, indicating in general,
lower hydrocarbon and carbon monoxide emissions from the
newer and, in many cases, larger engines.  As shown in Table
4 there will be substantial increases in aircraft NOx
emissions of 275 percent at Los Angeles, 146 percent at John
F. Kennedy, 98 percent at O'Hare, and 33 percent at
Washington National Airport between 1970 and 1980.  These
increases reflect the greater amounts of NOx emitted during
an entire LTO cycle from the newer engines.  Some increases
in SO2 and particulate emissions from aircraft are
projected, since such increases usually follow increases in
aircraft operations.

At Van Nuys Airport, the projected increases in all
pollutants parallel the large projected increases in
activity at this airport.  During the 1970's, emissions of
hydrocarbons, carbon monoxide, NOx, and lead from aircraft
are projected to increase by about 140 percent.

As Table 4 indicates, we estimate that in 1975 CO emissions
from aircraft at Van Nuys Airport will exceed CO emissions
from aircraft at a major commercial airport, Washington
National.  This estimation indicates the increasing
importance of general aviation aircraft emissions, and

15

Table 4. CURRENT AND PROJECTED EMISSIONS[a] FROM AIRCRAFT AND AIRPORTS

(tons/year)

| Airport and year | Particulates[b] | | NOx | | SO2 | | Lead | | Carbon monoxide | | Total hydrocarbons | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Aircraft | Airport total | Aircraft | Airport total | Aircraft | Airport total | Aircraft | Airport total | Aircraft | Airport total | Aircraft | Airport total |
| **Los Angeles** | | | | | | | | | | | | |
| 1970 | 570 | 616 | 3,050 | 4,369 | 431 | 434 | 0.3 | 35.2 | 16,030 | 29,230 | 12,570 | 14,660 |
| 1975 | 610 | 627 | 6,790 | 8,110 | 490 | 561 | 0.9 | 22.0 | 16,630 | 28,730 | 8,660 | 10,530 |
| 1980 | 680 | 693 | 11,490 | 12,480 | 623 | 726 | 1.0 | 7.8 | 18,480 | 27,280 | 4,770 | 5,760 |
| **Washington National** | | | | | | | | | | | | |
| 1970 | 231 | 253 | 820 | 1,074 | 105 | 319 | 0.5 | 4.8 | 2,410 | 3,731 | 610 | 864 |
| 1975 | 242 | 253 | 980 | 1,211 | 121 | 330 | 0.5 | 2.1 | 2,700 | 3,691 | 680 | 823 |
| 1980 | 286 | 297 | 1,090 | 1,277 | 143 | 352 | 0.5 | 0.9 | 3,030 | 3,470 | 720 | 775 |
| **John F. Kennedy** | | | | | | | | | | | | |
| 1970 | 570 | 660 | 2,580 | 4,846 | 418 | 902 | 0.3 | 53.9 | 12,590 | 32,390 | 9,490 | 12,680 |
| 1975 | 550 | 605 | 4,660 | 6,640 | 415 | 913 | 0.4 | 27.5 | 11,280 | 26,680 | 5,700 | 8,010 |
| 1980 | 550 | 583 | 6,370 | 7,580 | 442 | 957 | 0.9 | 7.8 | 10,680 | 18,380 | 2,830 | 3,930 |
| **O'Hare** | | | | | | | | | | | | |
| 1970 | 900 | 1,001 | 3,760 | 6,290 | 562 | 605 | 0.2 | 63.8 | 14,740 | 34,540 | 9,580 | 13,210 |
| 1975 | 970 | 1,023 | 5,760 | 7,520 | 600 | 660 | 0.4 | 28.6 | 13,840 | 31,440 | 6,300 | 8,830 |
| 1980 | 1,100 | 1,100 | 7,440 | 8,540 | 718 | 803 | 0.6 | 7.7 | 13,530 | 22,330 | 3,710 | 4,920 |
| **Van Nuys** | | | | | | | | | | | | |
| 1970 | 3.2 | 3.7 | 12.1 | 27.5 | 0.033 | 0.33 | 3.2 | 3.6 | 1,650 | 1,870 | 100 | 132 |
| 1975 | 5.4 | 5.7 | 19.8 | 34.1 | 0.066 | 0.55 | 5.3 | 5.5 | 2,750 | 2,860 | 165 | 198 |
| 1980 | 7.7 | 7.8 | 28.6 | 36.3 | 0.099 | 0.88 | 7.6 | 7.6 | 3,960 | 4,070 | 242 | 264 |

[a]Based on aircraft emissions below 3000 feet altitude.

[b]Includes lead.

16

emphasizes that during an LTO cycle, CO emissions from a small general aviation piston engine can, in many cases, be expected to approach CO emissions from a commercial air carrier turbine engine.

The existing and potential air quality impact of sulfur oxides and lead is considered to be negligible in comparison to other sources of these two pollutants. Therefore, no further analysis was performed on these pollutants in this study. The particulate problem associated with aircraft operations has already been shown to be confined to the smoke problem and hence the air quality impact discussion is very brief in this report.

Emission projections for the additional airports at Dallas-Ft. Worth, San Francisco, Denver, and Boston were based on the similarity of the particular airport to one or more of those in Table 4.

# RESULTS OF IMPACT EVALUATION

### REGIONAL IMPACT

The implementation plans of eight air quality control
regions were reviewed in detail. These regions have
critical problems in terms of their ability to meet the
National Ambient Air Quality Standards and also have
airports with high air passenger activity. Four of the
regions considered are those in which the four major air
carrier facilities considered in the Northern Research Study
are located. The analysis of regional implementation
strategies was extended to include San Francisco, Boston,
Denver, and Dallas-Fort Worth. Table 5 reflects the present
status of implementation plans relating to the control
strategies (by pollutant) for these regions and their
ability to meet the air quality standards by 1975.

As an aid in assessing aircraft emissions and their regional
impact Tables 6 through 13 present the 1970 emission
inventories and emission projections for 1975 and 1980, for
the eight regions cited, along with reductions expected as a
result of Federal standards for emissions from light-duty
motor vehicles.* In addition, one or more of the proposed
strategies representing control of smaller sources or
additional controls on motor vehicle sources are cited so
that the spectrum of control demands is evident. Present
and projected estimates of aircraft emissions are also
tabulated, along with the reductions to be expected if the
proposed standards are met. The reductions for 1975
represent application of the only feasible control strategy
available by that date, ground operation control. Two
values are shown for 1980 potential reduction: the first
represents the actual reductions achievalbe by 1980; the
second, mass reductions achievable in the 1980-1990 time
frame as a result of the proposed 1979 design standards.
Note that in 9 of the 17 possible region/pollutant
combinations (an 8-region by 2-pollutant matrix plus Los
Angeles NOx) the potential reductions in aircraft emissions
are comparable to (at least half of) or greater than the
reductions due to minimum strategies proposed for 1980 by
the various regional or State agencies.

More importantly, in 4 of these 9 cases, the air quality
standard will not be met or will be only marginally met in
the 1975-1980 time frame. In these cases aircraft emission
reductions before and after 1980 would represent effective
control strategies. In all regions facing difficulties in

19

TABLE 5

ABILITY TO MEET
NATIONAL AMBIENT AIR QUALITY STANDARDS
IN 1975

(yes = able, no = unable)

Based on Current State Implementation Plan Information

| Region | Pollutant | | |
|--------|-----|-----|--------|
|  | CO | HC | $NO_2$* |
| 1. Los Angeles | Yes | No | No |
| 2. New York | No | No | -- |
| 3. Washington, D.C. | No | Yes | -- |
| 4. Chicago | Yes | Yes | -- |
| 5. Denver | No | No | -- |
| 6. San Francisco | Yes | No | -- |
| 7. Dallas/Fort Worth | Yes | Yes | -- |
| 8. Boston | No | No | -- |

*$NO_2$ air quality data is currently being reevaluated. Results of this reassessment may require additional or accelerated control of aircraft $NO_x$ emissions to those herein proposed.

20

TABLE 6

METROPOLITAN LOS ANGELES INTRASTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 | | | 1975 | | | 1980[c] | | |
|---|---|---|---|---|---|---|---|---|---|
| | CO | HC[a] | $NO_x$ | CO | HC[a] | $NO_x$ | CO | HC[a] | $NO_x$ |
| **WITHOUT ADDITIONAL CONTROLS** | | | | | | | | | |
| Region | 4,130 | 651 | 573 | 4,400 | 693 | 611 | 4,800 | 756 | 668 |
| Aircraft (for entire region) | 41.1 | 6.8 | 4.2 | 51.4 | 4.9 | 9.3 | 70.0 | 3.2 | 15.6 |
| **REGION WITH PROPOSED CONTROLS** (Aircraft control not included) | | | | 880 | 178 | 335 | 515 | 130 | 275 |
| **REDUCTION FOR SPECIFIC STRATEGIES** | | | | | | | | | |
| Present motor vehicle program | | | | 2,200 | 365 | 164 | 3,720 | 548 | 350 |
| Petroleum industry | | | | | 23.7 | | | 25.5 | |
| Organic solvents | | | | | 25.6 | | | 2.2 | |
| Incineration | | | | 14.6 | | 1.1 | 16.4 | | 1.1 |
| Combustion of fuels | | | | 1.8 | | 9.1 | 2.2 | | 9.1 |
| Agriculture | | | | | | | | | |
| Periodic vehicle inspection | | | | 584 | 34.7 | 73 | 230 | 7.3 | 25.6 |
| Retrofit evaporative control | | | | | 27.4 | | | 9.1 | |
| 1/3 conversion to gaseous fuels | | | | 485 | | +16.4[b] | 175 | | +14.6[b] |
| 20% traffic reduction | | | | 200.7 | 30.8 | 47.5 | 109.5 | 18.3 | 27.4 |
| **AIRCRAFT CONTROL** | | | | | | | | | |
| Turbine ground operation | | | | 10.4 | 2.5 | | 10.9 | 1.3 | 1.0 |
| Turbine emission standard | | | | | 0.3 | | 1.9 (25.8) | 0.4 (2.7) | (13.4) |
| Piston emission standard | | | | | | | 2.3 (30.9) | 0.0 (0.3) | |
| Sum of aircraft control strategies | | | | 10.4 | 2.8 | 0 | 15.1 (56.7) | 1.7 (3.0) | 1.0 (3.4) |

[a] Reactive HC based on California SIP

[b] Increase rather than decrease due to engine operation tradeoff

[c] Values shown in parenthesis are projected 1990 emission reductions.

TABLE 7

NEW YORK PORTION OF THE N.J. - N.Y. - CONN. INTERSTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 CO | 1970 HC | 1970 $NO_x$ | 1975 CO | 1975 HC | 1975 $NO_x$ | 1980[d] CO | 1980[d] HC | 1980[d] $NO_x$ |
|---|---|---|---|---|---|---|---|---|---|
| WITHOUT ADDITIONAL CONTROLS | | | | | | | | | |
| Region | 4,207 | 832 | 741 | 4,840 | 955 | 851 | 5,260 | 1,040 | 926 |
| Aircraft (JFK only) | 12.6 | 9.5 | 2.6 | 11.3 | 5.7 | 4.7 | 10.7 | 2.8 | 6.4 |
| WITH STATE PROPOSED CONTROLS | | | | | | | | | |
| Region | | | | 2,630 | 485 | 727 | 1,136 | 268 | 622 |
| REDUCTION FOR SPECIFIC STRATEGIES | | | | | | | | | |
| National Motor Vehicle Standards | | | | 2,139 | 431 | 101 | 4,066 | 702 | 269 |
| (Other Strategies) | | | | 41[a] | 20.8[b] | 23.6[c] | 44.6[a] | 21[b] | 25.6[d] |
| AIRCRAFT CONTROL | | | | | | | | | |
| Ground Operation | | | | 5.7 | 3.6 | | 5.1 | 1.6 | |
| Emission Standards | | | | | .4 | | 0.8 (9.6) | 0.6 (3.0) | 0.5 (6.1) |

Note: La Guardia ≅ 60-70% of JFK.
[a]Downtown truck control.
[b]Process evaporation.
[c]Gas space heat downtown.
[d]Values shown in parenthesis are projected 1990 emission reductions.

TABLE 8

NATIONAL CAPITAL INTERSTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 CO | 1970 HC | 1970 NO$_x$ | 1975 CO | 1975 HC | 1975 NO$_x$ | 1980[c] CO | 1980[c] HC | 1980[c] NO$_x$ |
|---|---|---|---|---|---|---|---|---|---|
| WITHOUT ADDITIONAL CONTROLS | | | | | | | | | |
| Region Aircraft (National) | 1,389 2.4 | 267 0.6 | 184 0.8 | 1,554 2.7 | 299 0.7 | 206 0.9 | 1,735 3.0 | 335 0.7 | 230 1.1 |
| WITH STATE PROPOSED CONTROLS | | | | | | | | | |
| Region | | | | 1,025 | 155 | 188 | 460 | 117 | 150 |
| REDUCTION FOR SPECIFIC STRATEGIES | | | | | | | | | |
| National Motor Vehicle Standards | | | | 470 | 97 | 20 | 1,215 | 190 | 78 |
| Minimum Strategies | | | | 25.2[a] | 2.2[a] | 0.5[b] | 11.3[a] | 1.3[a] | 0.3[b] |
| AIRCRAFT CONTROL | | | | | | | | | |
| Ground Operation | | | | 1.1 | .3 | | 1.2 | .4 | |
| Emission Standards | | | | 0.1 | 0.1 | | 0.2 (2.9) | 0.2 (0.7) | 0.1 (1.0) |

[a] Use of liquified petroleum gas for fleet vehicles.
[b] Motor vehicle maintenance and inspection.
[c] Values shown in parenthesis are projected 1990 emission reductions.

TABLE 9

ILLINOIS PORTION OF THE METROPOLITAN CHICAGO INTERSTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 | | | 1975 | | | 1980e | | |
|---|---|---|---|---|---|---|---|---|---|
| | CO | HC | $NO_x$ | CO | HC | $NO_x$ | CO | HC | $NO_x$ |
| **WITHOUT ADDITIONAL CONTROLS** | | | | | | | | | |
| Region | 2,730 | 606 | 383 | 3,064 | 688 | 435 | 3,496 | 796 | 504 |
| Aircraft (O'Hare) | 14.7 | 9.6 | 3.8 | 13.8 | 6.3 | 5.8 | 13.3 | 3.7 | 7.4 |
| **WITH STATE PROPOSED CONTROLS** | | | | | | | | | |
| Region | | | | 1,480 | 235.5 | 306 | 506 | 96 | 196 |
| **REDUCTION FOR SPECIFIC STRATEGIES** | | | | | | | | | |
| National Motor Vehicle Standards | | | | 1,383 | 262 | 94.5 | 2,748 | 465 | 265 |
| Aggregate Stationary Source Controls[a] | | | | 4.4[b] | 1.1[c] | 6.0[d] | 5.3[b] | 1.3[c] | 7.4[d] |
| **AIRCRAFT CONTROL** | | | | | | | | | |
| Ground Operation | | | | 6.5 | 3.6 | | 6.2 | 2.0 | |
| Emission Standards | | | | | | 0.6 | 1.1 (12.2) | 0.8 (3.9) | 0.6 (6.5) |

Note: Midway emissions ≅ 20% O'Hare.
[a] Minimum source strategy assumed to be 10% of aggregate.
[b] Incinerators.
[c] Refinery solvents.
[d] Values shown in parenthesis are projected 1990 emission reductions.

TABLE 10

METROPOLITAN DENVER INTRASTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 CO | 1970 HC | 1970 NOx | 1975 CO | 1975 HC | 1975 NOx | 1980a CO | 1980a HC | 1980a NOx |
|---|---|---|---|---|---|---|---|---|---|
| WITHOUT ADDITIONAL CONTROLS | | | | | | | | | |
| Region | 873 | 174 | 139 | 965 | 192 | 154 | 1,065 | 212 | 170 |
| Aircraft (Stapleton) | 4.5 | 2.6 | 1.0 | 4.6 | 1.7 | 1.6 | 4.8 | 1.0 | 2.0 |
| WITH STATE PROPOSED CONTROLS | | | | | | | | | |
| Region | | | | 516 | 98 | | 252 | 65 | |
| REDUCTION FOR SPECIFIC STRATEGIES | | | | | | | | | |
| National Motor Vehicle Standards | | | | 280 | 70 | | 757 | 140 | |
| Retrofit Pre '67 Cars | | | | 66 | 14.5 | | 12 | 2.6 | |
| Tune-ups | | | | 103 | 9 | | 44 | 4 | |
| AIRCRAFT CONTROL | | | | | | | | | |
| Ground Operation | | | | 1.8 | 1.0 | | 1.7 | 0.5 | |
| Emission Standards | | | | | 0.2 | | 0.3 (3.5) | 0.2 (1.1) | 0.2 (1.8) |

[a] Values shown in parenthesis are projected 1990 emission reductions.

TABLE 11

SAN FRANCISCO BAY AREA INTRASTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 CO | 1970 HC[b] | 1970 NO$_x$ | 1975 CO | 1975 HC | 1975 NO$_x$ | 1980[d] CO | 1980[d] HC[b] | 1980[d] NO$_x$ |
|---|---|---|---|---|---|---|---|---|---|
| **WITHOUT ADDITIONAL CONTROLS** | | | | | | | | | |
| Region Aircraft (S.F. Int'l.) | 1,980 11.0 | 315 3.2 | 266 2.1 | 2,150 11.5 | 340 2.2 | 287 4.7 | 2,350 12.7 | 371 1.2 | 313 7.9 |
| **WITH STATE PROPOSED CONTROLS** | | | | | | | | | |
| Region | | | | 451 | 89 | 156 | 291 | 69 | 125 |
| **REDUCTION FOR SPECIFIC STRATEGIES** | | | | | | | | | |
| National Motor Vehicle Standards | | | | 1,030 | 172 | 77 | 1,730 | 252 | 164 |
| Minimum Strategies | | | | 168[e] | 7.7[e] | 21.8[d] | 18[c] | 7.7[c] | 10.8[e] |
| Vehicle Inspection | | | | 266 | 10.9 | +7.3[f] | 106 | 2.9 | +7.3[f] |
| **AIRCRAFT CONTROL** | | | | | | | | | |
| Ground Operation | | | | 5.3 | | | 5.6 | 0.7 | |
| Emission Standards | | | | 0 | 0.1 | | 1.0 13.3 | 0.2 1.4 | 0.5 6.8 |

Note: Oakland and San Jose ≅ 20% of S.F. Int'l.

[a] Values shown in parenthesis are projected 1990 emission reductions.
[b] Defined highly reactive.
[c] Agricultural burning.
[d] 20% traffic reduction.
[e] 1/3 conversion to gaseous fuels.
[f] Increase rather than reduction.

26

TABLE 12

METROPOLITAN DALLAS - FORT WORTH INTRASTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 | | | 1975 | | | 1980 [a] | | |
|---|---|---|---|---|---|---|---|---|---|
| | CO | HC | NO$_x$ | CO | HC | NO$_x$ | CO | HC | NO$_x$ |
| WITHOUT ADDITIONAL CONTROLS | | | | | | | | | |
| Region | 2,340 | 454 | 280 | 2,620 | 509 | 314 | 2,920 | 567 | 350 |
| Aircraft (Love Field) | 7.2 | 4.5 | 1.8 | 6.9 | 3.0 | 2.7 | 6.7 | 1.8 | 3.5 |
| WITH STATE PROPOSED CONTROLS | | | | | | | | | |
| Region | | | | | 256 | 270 | | 149 | 178 |
| REDUCTION FOR SPECIFIC STRATEGIES | | | | | | | | | |
| National Motor Vehicle Standards | | | | | 199 | 44 | | 393 | 172 |
| Minimum, Control Stationary Source and Gases | | | | | 6.4 | | | 6.4 | |
| Maintenance and Inspection | | | | | 48 | | | 19 | |
| AIRCRAFT CONTROL | | | | | | | | | |
| Ground Operation | | | | 3.1 | 1.7 | | 2.9 | 0.9 | |
| Emission Standards | | | | | 0.3 | | 0.5 (5.9) | 0.4 1.8 | 0.3 (3.2) |

[a] Values shown in parenthesis are projected 1990 emission reductions.

27

TABLE 13

METROPOLITAN BOSTON INTRASTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 | | | 1975 | | | 1980a | | |
|---|---|---|---|---|---|---|---|---|---|
| | CO | HC | NOx | CO | HC | NOx | CO | HC | NOx |
| WITHOUT ADDITIONAL CONTROLS | | | | | | | | | |
| Region<br>Aircraft (Logan) | 1,352<br>7.9 | 263<br>5.8 | 206<br>1.6 | 1,555<br>7.0 | 302<br>3.5 | 237<br>2.8 | 1,690<br>6.5 | 329<br>1.7 | 258<br>3.9 |
| WITH STATE PROPOSED CONTROLS | | | | | | | | | |
| Region | | | | 1,034 | 141.5 | 211.7 | 490 | 82 | 183 |
| REDUCTION FOR SPECIFIC STRATEGIES | | | | | | | | | |
| National Motor Vehicle Standards | | | | 502 | 95 | 25 | 1,200 | 178 | 75 |
| Gasoline Handling Evaporative Losses | | | | | 12 | | | 13 | |
| Solvent Control | | | | | 52 | | | 56 | |
| Other Strategies Sited None Actually Proposed | | | | | | | | | |
| AIRCRAFT CONTROL | | | | | | | | | |
| Ground Operation | | | | 3.5 | 2.2 | | 3.1 | 1.0 | |
| Emission Standards | | | | | 0.2 | | 0.5<br>(5.9) | 0.4<br>(1.8) | 0.3<br>(3.7) |

aValues shown in parenthesis are projected 1990 emission reductions.

meeting the air quality standards, every viable control strategy will have to be applied to meet requirements of the Clean Air Act.

Table 6, which relates to the implementation plan for metropolitan Los Angeles, lists all proposed strategies and gives aircraft emission figures representative of all aircraft activity, including LAX, in the region. For a specific region, total aircraft emissions can be substantially higher than those attributed to the area's major air carrier airport. The region encompassing metropolitan Los Angeles, for example, includes, besides LAX, several smaller commercial air carrier airports and numerous general aviation facilities. It is not surprising then that LAX accounts for only 40%, 70%, and 73%, respectively, of the total regional aircraft emissions of CO, HC, and NOx in 1970. This general relationship of emissions attributable to major airports and total regional aircraft emissions could be expected in similar highly populated air quality control regions.

In the Los Angeles region, uncontrolled emissions from aircraft are expected to account for 14% of the CO, 2.5% of the reactive HC, and 5.5% of the NOx total emissions by 1980.

Emissions from piston aircraft have a particularly significant impact on regional CO levels. Although piston aircraft were responsible for about 0.5% of the total CO emissions in 1970, their contribution to CO emissions, if uncontrolled, is expected to reach 10% by 1980.

## SUB REGIONAL AND LOCALIZED IMPACT

This section deals with the effect of aircraft emissions on air quality at major airports and downwind of these airports. Emission densities and other parameters of emission intensity and air quality impact are first presented to provide indications of the contribution of aircraft to air pollutant concentration around a number of major U. S. airports. Then detailed results of sampling and dispersion modeling are presented to give deeper insight into the localized impact of aircraft at airports where aircraft contributions to air pollutant concentration are expected to be particularly important.

## GENERAL INDICATORS OF LOCALIZED AIR QUALITY IMPACT

<u>Passenger Usage Density and Air Pollution Potential</u>. An indication of localized impact of aircraft on air quality is

presented in Table 14 for the 20 largest U. S. air carrier
airports, as determined by passenger enplanement.  On the
basis of concentration of passenger activity, proximity of
the airport to built-up areas, and meteorological pollution
potential[10] (a function of atmospheric mixing height and
wind speed), seven airports, designated by asterisks in
Table 14, could be expected to be particularly important
contributors to localized air pollutant concentrations.  The
results of Table 14 indicate most directly the airport
contributions to localized carbon monoxide concentrations;
the airport contributions to oxidant and nitrogen dioxide
concentrations are indicated less directly because
intermediate atmospheric reactions are involved in their
production.

<u>Emission Density Comparison</u>.  Emission densities have been
calculated for four of the airports that show a major air
quality impact potential.  Table 15 indicates that emission
densities due to aircraft alone in 1970 were in most cases
comparable to those of densely populated metropolitan areas
served by the corresponding airports.

This emission density comparison suggests that, in these
four airport areas, the contribution by aircraft to ambient
air concentrations of hydrocarbon, CO, and NOx is
substantial.  Such contributions are particularly important
where major airports lie in or near metropolitan areas in
which national ambient air quality standards are currently
exceeded.  As shown in Table 5, this is the case for the
four areas considered.

The comparison of emission densities (airport versus
metropolitan area) for 1975 and 1980 demonstrates that the
ratio of the airport emission densities to those of the
metropolitan areas will increase in most cases, sometimes
dramatically.  The trends can be identified in Table 15,
which indicates that aircraft are expected to become
increasingly significant contributors to air pollutant
concentrations at airports and in their vicinities.

It should be kept in mind that the emissions densities
presented in Table 15 are averaged for the given areas and
that variation in actual emission rates within the defined
areas exist.

The majority of the HC, CO, and NOx emissions in
metropolitan areas are due to area rather than point
sources.  This tends to minimize variation in emission
densities throughout a metropolitan area.  However, one
would expect to observe higher emission densities where

30

TABLE 14

INDICATIONS OF LOCALIZED AIRPORT IMPACT OF 20 LARGEST AIR CARRIER AIRPORTS

| Airport | Enplaned Passengers Millions (FY 1970) | Aircraft Activity Percent Commercial Aviation | Percent General Aviation | Airport Area, Miles$^2$ | Passengers /area X 10$^5$ | Airport Proximity to Built-up Areas[a] | Morning Meteorological Air Pollution Potential $(\bar{\chi}/\bar{Q})$[b] |
|---|---|---|---|---|---|---|---|
| * O'Hare | 13.5 | 95 | 5 | 14.1 | 36 | 2 | 50 |
| * Los Angeles | 8.5 | 76 | 22 | 4.8 | 40 | 2 | 50 |
| * Atlanta | 8.2 | 86 | 14 | 6.6 | 33 | 2 | 50 |
| * J.F. Kennedy | 7.0 | 86 | 14 | 8.1 | 25 | 2 | 30 |
| * La Guardia | 5.9 | 80 | 20 | 0.9 | 65 | 2 | 30 |
| San Francisco | 5.5 | 78 | 21 | 8.1 | 20 | 1 | 50 |
| * Dallas (Love) | 5.3 | 70 | 30 | 2.0 | 38 | 2 | 30 |
| * Washington (Nat.) | 4.9 | 66 | 33 | 1.0 | 49 | 1 | 70 |
| Boston | 4.5 | 66 | 34 | 3.7 | 24 | 1 | 20 |
| Miami | 4.4 | 66 | 31 | 4.2 | 22 | 2 | 20 |
| Detroit | 3.7 | 71 | 27 | 7.5 | 14 |  | 40 |
| Denver | 3.5 | 48 | 52 | 7.2 | 13 |  | 30 |
| Newark | 3.4 | 76 | 24 | 3.4 | 19 | 2 | 30 |
| Philadelphia | 3.2 | 70 | 30 | 3.9 | 17 | 2 | 30 |
| St. Louis | 3.1 | 58 | 38 | 2.9 | 18 | 2 | 40 |
| Pittsburgh | 3.0 | 64 | 29 | 4.8 | 14 |  | 80 |
| Minneapolis | 2.6 | 55 | 37 | 4.6 | 13 | 2 | 60 |
| Cleveland | 2.5 | 45 | 55 | 2.3 | 17 |  | 50 |
| Seattle | 2.5 | 68 | 32 | 2.8 | 16 | 2 | 40 |
| Houston | 2.2 | 73 | 27 | 11.4 | 6 | 1 | 30 |

a  1 = Residential and business areas adjacent to airport boundaries.
   2 = Residential and business areas adjacent to airport boundaries, and a significant frequency of wind from airport toward these areas.

b  This parameter is based on a simple model of dispersion over urban areas, in which an average area-wide pollutant concentration, $\bar{\chi}$, is normalized for an average emission rate, $\bar{Q}$. High $\bar{\chi}/\bar{Q}$ values indicate high potential pollutant concentrations. The values listed above are morning upper decile levels for a 10-kilometer along-wind distance. More detailed information on this parameter is presented in Ref. 10.

31

Table 15.  COMPARISON OF EMISSION DENSITIES FOR AIRPORTS VERSUS URBAN AREAS FOR 1970, 1975, and 1980

| | Area,[a] mi² | Emission densities,[b] tons/mi²-day | | | | | | | | |
| | | 1970 | | | 1975 | | | 1980 | | |
| | | Carbon monoxide | Hydro-carbons | Nitrogen oxides | Carbon monoxide | Hydro-carbons | Nitrogen oxides | Carbon monoxide | Hydro-carbons | Nitrogen oxides |
|---|---|---|---|---|---|---|---|---|---|---|
| Los Angeles metropolitan area | 1250.0 | 7.2 | 2.0 | 1.0 | 4.8 | 1.1 | 0.9 | 2.8 | 0.9 | 0.8 |
| Los Angeles Airport - all emission sources | 3.9 | 20.6 | 10.3 | 2.0 | 20.2 | 7.4 | 3.5 | 19.1 | 4.0 | 5.6 |
| Los Angeles Airport - aircraft alone | 3.9 | 11.2 | 8.8 | 1.1 | 11.7 | 6.1 | 2.6 | 13.0 | 3.4 | 4.9 |
| New York metropolitan area | 320.0 | 14.5 | 3.4 | 3.6 | 11.4 | 2.4 | 3.6 | 5.5 | 1.3 | 3.2 |
| Airport - all emission sources | 4.5 | 19.6 | 7.7 | 2.1 | 16.2 | 4.9 | 2.7 | 11.2 | 2.4 | 3.0 |
| Airport - aircraft alone | 4.5 | 7.7 | 5.8 | 0.8 | 6.9 | 3.5 | 1.5 | 6.5 | 1.7 | 2.3 |
| Washington D.C. metropolitan area | 61.0 | 12.5 | 1.7 | 1.7 | 7.9 | 1.1 | 1.5 | 3.3 | 0.4 | 1.3 |
| National Airport - all emission sources | 1.0 | 10.2 | 2.4 | 1.7 | 10.1 | 2.3 | 1.8 | 9.5 | 2.1 | 1.9 |
| National Airport - aircraft alone | 1.0 | 6.6 | 1.7 | 1.0 | 7.4 | 1.9 | 1.2 | 8.3 | 2.0 | 1.4 |
| Chicago metropolitan area | 227.0 | 8.1 | 2.5 | 1.4 | 6.3 | 1.7 | 1.4 | 1.4 | 0.9 | 1.2 |
| O'Hare Airport - all emission sources | 6.7 | 14.1 | 5.4 | 1.9 | 12.9 | 3.6 | 2.0 | 9.1 | 2.0 | 2.3 |
| O'Hare Airport - aircraft alone | 6.7 | 6.0 | 3.9 | 0.8 | 5.7 | 2.6 | 1.3 | 5.5 | 1.5 | 1.8 |

[a] Airport areas represent those areas devoted to the operation of the airport, but not necessarily the total area owned by the airport.

[b] Emissions used to calculate airport emission densities are based on all aircraft emissions within each airport area.

32

there is high population activity such as in downtown and
industrial areas as opposed to residential areas within the
region.

## Detailed Investigation of Localized Pollutant Concentrations

The emissions density data previously discussed pointed to
the fact that major airports are and will continue to be
significant area sources of air pollution emissions.  If the
health and welfare of the exposed population is to be
protected, the conclusion may be drawn that the emissions
must be reduced equally for all such sources, e.g., whether
they be airport or non-airport area sources of pollution.

### 8-Hour Carbon Monoxide Concentrations.  Carbon monoxide
concentrations at the Los Angeles International Airport and
in its vicinity were measured from May to November, 1970[2].
The sampling was done by the Los Angeles County Air
Pollution Control District under EPA contract.  Carbon
monoxide concentrations were continuously monitored at
several sampling sites, including 4 sites in the airport
terminal area, and 2 sites located upwind and downwind of
the airport complex.  At all of these, ambient
concentrations of CO were measured.  The monitoring sites
were located as shown in Figure 1.  Data from site 209 were
analyzed extensively to determine as quantitatively as
possible the air quality impact of aircraft CO emissions on
8-hour ambient CO concentrations in residential and business
areas downwind of the airport.

Site 209 is located directly downwind of the L. A. airport
when the wind blows from its most frequent direction, as
indicated by the wind rose in Figure 1.  Until recently this
area was a residential neighborhood, but now it is almost
completely owned by the Los Angeles Airport.  Other
residential areas, however, are located only a few blocks
west and north of this area; and it was concluded that
concentrations measured at site 209 are indicative of
concentrations in such residential areas.

Figure 2 presents an estimated frequency distribution of
carbon monoxide concentrations at site 209 during the winter
months, the time of highest CO concentrations in the Los
Angeles area.  This frequency distribution is based on
sampling data collected at site 209 during August and is
adjusted to represent wintertime concentrations using a
seasonal conversion based on air quality data for the entire
Los Angeles basin.  Derivation of the results shown in
Figure 2 is detailed in Appendix A.  It can be seen, in
Figure A-3 of that section, that site 209 is exposed to the

33



Figure 1
AIR SAMPLING LOCATIONS
AT LOS ANGELES INTERNATIONAL AIRPORT

FREQUENCY OF WIND DIRECTION AT L.A.
AIRPORT, IN PERCENTAGES OF TOTAL,
1951-1960

Calm – 14%



FIGURE 2

EXPECTED CO CONCENTRATIONS, 8-HOUR AVERAGING TIME, WINTER 1970, STATION 209, LAX

same levels of carbon monoxide whether it be influenced by
pollution from other than the airport (easterly winds) or
from the airport alone (westerly winds). Figure 2 shows
that the 8-hour CO standard, which is not to be exceeded
more than once per year, is estimated to have been exceeded
at site 209 13 times per month, or 39 times in the winter 3-
month period.

Part of the carbon monoxide concentrations shown in Figure 2
is due to aircraft. To estimate the portion of the
concentration that is due to aircraft, dispersion modeling
was applied. The dispersion modeling methodology is
discussed in Appendix B. The model's resulting estimate of
the current contribution by aircraft to total CO
concentrations, shown in Figure 3, indicates that aircraft
are highly significant contributors to local CO
concentrations downwind of the airport. Figure 3 indicates
that expected aircraft contributions constitute 60-70% of
the total CO concentrations in the area of site 209.

Between 1970 and 1980, CO emissions from aircraft are
estimated to increase by fifteen percent (Table 4) while CO
emissions from all other sources in the Los Angeles area are
expected to decrease to 20% of their 1970 levels.[12] Using
the estimated changes in emissions from these two source
categories, and assuming that the emission changes yield
proportional changes in pollutant concentrations due to each
source category, CO concentration frequency distributions
for various aircraft contributions can be derived from
Figure 2. The result is presented in Figure 4 for various
1970 aircraft contributions to pollutant concentrations.

Figure 4 indicates that without controls of CO emissions
from aircraft the 8-hour CO standard will be exceeded more
than once during the 1980 winter months at site 209 if the
aircraft contribution to the total CO concentration in 1970
is as little as 20%. As shown in Figure 3, the 1970
contribution by aircraft exceeds this percentage over a
large area downwind of the airport. If the reasonable
assumption is made that Figure 2 approximates the 1970
winter CO concentration frequency distribution in this area,
it is evident that in 1980 the 8-hour CO concentrations will
continue to exceed the standard in this same area downwind
of the Los Angeles Airport if aircraft CO emissions are not
controlled.

As noted in Appendix A, the analysis resulting in Figures 2
and 4 can be repeated using data from September, rather than
from August, as a basis. The September data will yield
higher concentrations than will the August data for similar

36



FIGURE 3
VICINITY OF LOS ANGELES INTERNATIONAL:
Percent Contribution by Aircraft to
Carbon Monoxide Levels

(Based on 1970 emissions data)

37



FIGURE 4
FREQUENCY DISTRIBUTIONS FOR CARBON MONOXIDE FOR VARIOUS
AIRCRAFT EMISSION CONTRIBUTIONS AT STATION 209 – WINTER 1980

Notes
1. 80% rollback from 1970 on non-AC sources
2. 1980 AC CO emissions = 1.15 X 1970 emissions

AMBIENT A/Q STANDARD = 9 ppm

8-HOUR CO CONCENTRATION

Probability (%) of exceeding the given pollutant level

No Aircraft Contribution
20% Aircraft Contribution
40% Aircraft Contribution
60% Aircraft Contribution
80% Aircraft Contribution
100% Aircraft Contribution

1 day/quarter
1 day/year
3 days/month
1 day/month
8 days/month
12 days/month
17 days/month

38

frequencies of occurrence. Consequently, the results from
the September data analysis can be used to indicate an upper
value of a range of frequencies at which the 8-hour CO
standard is exceeded; the results from the August data can
be used to indicate a lower value of the range. The ranges
for 1970, and for 1980 with various aircraft contributions,
is presented in Table 16.

<u>1-Hour CO Concentrations at the Los Angeles Airport</u>. The 1-
hour CO air quality standard of 35 ppm (40 ug/m3) was
exceeded at only one of the outdoor continuous sampling
locations at the Los Angeles Airport. A summary of the 1-
hour sampling data at these receptors is presented in Table
17, which indicates that only at site 205 was the 1-hour CO
standard frequently exceeded. Site 205 was located next to
heavy automobile traffic on World Way Boulevard at an
automobile passenger unloading area. The 1-hour CO standard
was exceeded 12 times during the approximately 4-week period
of sampler operation. Expected reductions in CO emissions
from automobiles probably would reduce concentrations at
sites such as 205 to levels below the 1-hour standard.
Generally the 8-hour CO standard of 10 ug/m3 is the most
difficult of the two standards to reach, and statistically
if the 8-hour standard is met, the 1-hour CO standard will
also be met.[13]

<u>Carbon Monoxide Concentrations at Other Airports</u>.
Dispersion modeling was used to provide estimates of 1-hour
CO concetrnations both from aircraft alone and from all
airport and adjacent sources within 10 kilometers of the
center of each airport. This modeling was done for Los
Angeles, J. F. Kennedy, Chicago-O'Hare, and Washington
National Airports. The results, presented in Table 18, are
predicted concentrations at airport area points where: (1)
the general public could have access for 1-hour periods, and
(2) the total concentrations, as estimated by dispersion
modeling, exceed the standards.

Although minimal reliance should be placed on the precise
numerical values predicted by the model, these values are of
the same order of magnitude as the values from actual
measurements presented in Table 17. These results indicate
that localized carbon monoxide effects are not limited to
Los Angeles Airport.

The potential of high 8-hour CO concentrations downwind of
other airports, with large aircraft contributions, exists
near airports besides Los Angeles Airport. As previously
discussed, Table 14 indicates the potential of such
concentrations at six additional airports.

39

TABLE 16

EXPECTED RANGE OF DAYS THAT 8-HR STANDARD WILL BE EXCEEDED IN
VICINITY OF L.A. AIRPORT, 1970 and 1980[a]

|  | Based on August Data[b] | | Based on September Data |
|---|---|---|---|
| Days Standard Exceeded in 1970 | 39 | to | 65 |
| Days Standard Exceeded in 1980, With Following % Contributions by Aircraft (at 1970 emission levels) to Total CO Concentrations | | | |
| 80% | 36 | to | 61 |
| 60% | 22 | to | 49 |
| 40% | 9 | to | 32 |
| 20% | 1 | to | 14 |
| 0% | 0 | to | 1 |

[a] Because the highest CO concentrations occur during winter months, it is assumed that the frequency of exceeding the standard during the winter quarter gives the frequency of exceeding the standard the entire year.
[b] From Figures 2 and 4.

40

TABLE 17

LOS ANGELES AIRPORT

NUMBER OF TIMES THE 1-HOUR CO STANDARD WAS EXCEEDED
MAY 10 THROUGH NOVEMBER 9, 1970, CONTINUOUS SAMPLING SITES

| Site* | Total Hours of Sampling | Number of Hourly Values When Standard Exceeded | Highest Two Hourly Values |
|-------|------------------------|-----------------------------------------------|---------------------------|
| 201 | 3710 | 0 | 27, 26 |
| 203 | 4256 | 2 | 46, 40 |
| 204 | 4258 | 0 | 23, 19 |
| 205 | 637 | 12 | 51, 49 |
| 208 | 4326 | 1 | 37, 28 |
| 209 | 4279 | 0 | 31, 27 |
| Downtown LA | 4965 | 3 | 37, 35 |

*Refer to Figure 1 for Location.

Table 18

Dispersion Model Estimates of 1-Hour
Carbon Monoxide Concentrations

| Site Location* | CO Concentration, mg/m$^3$ | |
| | Aircraft Sources Only | Total |
|---|---|---|
| JFK (T) | 85 | 100 |
| JFK (T) | 4 | 45 |
| JFK (T) | 3 | 44 |
| LAX (P) | 55 | 62 |
| LAX (P) | 32 | 45 |
| ORD (T) | 21 | 41 |
| ORD (S) | 9 | 41 |
| DCA (P) | 110 | 120 |
| DCA (P) | 45 | 59 |

*DCA = Washington National Airport, LAX = Los Angeles International
Airport, JFK = John F. Kennedy International Airport, and ORD =
O'Hare Airport, Chicago

(T) = Terminal area

(P) = Peripheral area--away from terminals, but within airport
      boundary

(S) = Outside of airport boundary, in airport surroundings

42

<u>Hydrocarbon and Potential Oxidant Concentrations</u>.  Isopleths
of 1970 hydrocarbon concentrations due to aircraft alone at
the Los Angeles Airport are presented in Figure 5.  These
isopleths are based on the dispersion modeling methodology
presented in Appendix B, and are a result of meteorological
conditions that are particularly conducive to high
hydrocarbon concentrations.  Such conditions would be
expected to occur at least once per year.

The results indicate that there are large areas surrounding
the airport where the hydrocarbon concentrations due to
aircraft are well in excess of the standard.

Between 1970 and 1980, Table 4 indicates that at the Los
Angeles Airport, hydrocarbon emissions from aircraft will
decline to about 40% of their 1970 values.  These reductions
are reflected in Figure 6 which presents isopleths of 1980
hydrocarbon concentrations due to aircraft alone, at Los
Angeles Airport, based on meteorological conditions
equivalent to those used for the isopleths in Figure 5.
Even with the reduction in aircraft hydrocarbon emissions,
it is likely that in 1980 the hydrocarbon standard will
continue to be exceeded over a large area due to aircraft
emissions alone.

As indicated earlier, hydrocarbon concentrations at levels
typically found in the atmosphere are not harmful to health.
However, if airport hydrocarbon concentrations were followed
downwind for several hours under conditions conducive to the
accumulation of high oxidant concentrations,[7] aircraft-
generated hydrocarbons could be expected to be large
contributors to downwind oxidant concentrations over the Los
Angeles area.

A modeling analysis was performed to estimate hydrocarbon
concentrations downwind of Los Angeles Airport in 1980.  The
meteorological conditions used were similar to those used
for Figures 5 and 6.  The methodology of this analysis is
presented in Appendix C, and results are presented in Figure
7.  The three curves in Figure 7 show nonmethane hydrocarbon
concentrations downwind of Los Angeles Airport resulting
from the surroundings plus total airport emissions, total
airport emissions alone, and aircraft emissions alone.  The
initial concentration at the western airport boundary (0 km
in Figure 7) is shown to be zero, which is a result of the
proximity of the western boundary to the ocean, wind
direction from the west, and the assumption of negligible
hydrocarbon concentrations in wind coming off at the ocean.
At a point 3 hours downwind (16 km from the eastern airport
boundary) the overall hydrocarbon concentration will have

43



(numbers in $\mu g/m^3$)

FIGURE 5    HYDROCARBON ISOPLETHS IN THE VICINITY OF LOS ANGELES INTERNATIONAL: AIRCRAFT SOURCES

3-Hr Average for 1970 (6 – 9 AM)



(numbers in μg/m³)

FIGURE 6    HYDROCARBON ISOPLETHS IN THE VICINITY OF LOS ANGELES INTERNATIONAL AIRCRAFT SOURCES
3-Hr Average for 1980 (6 - 9 AM)

45



FIGURE 7

CALCULATED NON-METHANE HYDROCARBON CONCENTRATIONS
DOWNWIND OF LOS ANGELES AIRPORT FOR 1980
WITH NON-AIRCRAFT SOURCES CONTROLLED

Meteorological Conditions Used:
Wind from West
Stability Class 3
Wind Speed 1.5 m/sec
Mixing Height = 200m

Total, All Sources

Total Airport

Aircraft Alone

NAAQS = 160 μg/m³

Airport East Boundary
(3.2 km)

Concentration, μg/m³

DOWNWIND DISTANCE, KILOMETERS

46

been in excess of the standard for 3 hours, enough time for possible formation of oxidant in concentrations exceeding the standard.

It is important to emphasize that this analysis was performed for 1980. If it were repeated for 1970, the concentrations for each of the curves would be at least double the 1980 values.

The emissions densities presented in Table 15 indicate that among the four airports studied, emission densities from aircraft alone are highest at Los Angeles Airport. However, the range among these emission density values is still less than a factor of 2.3 in 1980, indicating that conclusions concerning future aircraft-generated hydrocarbon and oxidant concentrations at the Los Angeles Airport and vicinity apply generally to the other airports studied, and that additional reductions in aircraft-generated hydrocarbon concentrations are necessary.

Oxides of Nitrogen. Although the ambient air quality standard is for $NO_2$ (100 ug/m3, annual concentration), the result of the dispersion modeling is presented as oxides of nitrogen (NOx). This is done because there exists no well-defined relationship for the conversion of NO to $NO_2$. In the presence of hydrocarbons; the NO to $NO_2$ conversion is accelerated; best estimates indicate that 90 percent of the NO is converted to $NO_2$ within a 2-hour period in the presence of sunlight. The reaction is essentially negligible at night. Considering all NOx as $NO_2$ could result in an overestimation of annual average concentrations.

Oxides of nitrogen concentrations due to aircraft alone are presented in Figure 8 for Los Angeles Airport area for 1970. These modeling approximations indicate that LAX is responsible for NOx impact over a large area surrounding the airport. With growth of overall aircraft activity, and the changeover to bigger and higher pressure ratio turbine engines, aircraft emissions of NOx will increase greatly between 1970 and 1980. Present and expected future NOx emissions from aircraft at the four major airports studied are given in Table 15, which indicates that between 1970 and 1980 aircraft emissions of NOx will increase by factors of 2.2 at O'Hare Airport, 1.4 at Washington National Airport, 4.5 at Los Angeles International Airport, and 2.9 at John F. Kennedy Airport.

The general affect of increased NOx emissions from aircraft at LAX is reflected in Figure 9, which presents isopleths of

47



(numbers in $\mu g/m^3$)

NO$_x$ ISOPLETHS IN THE VICINITY OF LOS ANGELES INTERNATIONAL: AIRCRAFT SOURCES
Annual Average for 1970

FIGURE 8

48

1980 NOx concentrations due to aircraft.  Figure 9 indicates
that NOx concentrations due to aircraft alone could be
widespread in residential areas around LAX, and that in some
areas, the NO2 concentrations due to aircraft are comparable
to the standard.  It should be emphasized that these NOx
concentrations are due to aircraft alone, and NOx emissions
from other sources would be expected to significantly
increase the concentrations plotted in Figures 8 and 9.

NOx concentrations of similar magnitude to those in Figures
8 and 9 can be expected in the vicinity of other airports.
For example, isopleths showing expected 1980 NOx emissions
densities due to aircraft alone for O'Hare Airport are
presented in Figure 10.  Without emission controls, aircraft
using O'Hare Airport can be expected to be large future
contributors to localized NOx concentrations, as was the
case for Los Angeles Airport.

<u>Smoke and Particulates</u>.  Smoke generated by aircraft causes
significant reductions in visibility and is a cause of
widespread complaint by affected citizens.

The 1-year air quality monitoring program conducted at Los
Angeles International Airport indicated increased soiling
effects in the airport vicinity due to aircraft activity.
Atmospheric measurements of particulates using a tape
sampler technique gave higher readings (indicative of
soiling) for the airport area than for locations several
miles removed, such as downtown Los Angeles.  Additionally,
sampling at sites surrounding and adjacent to the Los
Angeles Airport area showed increasing soiling values from
upwind of the airport to a maximum immediately downwind of
the airport.

Measurement of total weight of particulate material, based
on Hi-Vol sampling, showed little variation between airport
and downtown areas.

Results of the dispersion modeling analysis for all four
airports indicated that particulate concentrations due to
aircraft in some parts of the airports could exceed the
secondary particulate air quality standards.



FIGURE 9    ISOPLETHS IN THE VICINITY OF LOS ANGELES INTERNATIONAL· AIRCRAFT SOURCES
Annual Average for 1980
(numbers in $\mu g/m^3$)



FIGURE 10     (numbers in $\mu g/m^3$)

NO$_X$ ISOPLETHS IN THE VICINITY OF CHICAGO-O'HARE INTERNATIONAL:    AIRCRAFT SOURCES

Annual Average for 1980

51

# TECHNOLOGICAL FEASIBILITY OF CONTROLLING AIRCRAFT EMISSIONS |

Information on emission control methods is necessary to determine the levels to which aircraft emissions can feasibly be reduced. An earlier Federal study,[1][14] identified potential control approaches including modification of aircraft engines, fuels, and ground operational procedures. This study indicated that modification of aircraft engines and ground operational procedures appear to be the most feasible and effective control procedures. More recently, the Aerospace Industries Association (AIA) has issued a report[15] summarizing results of investigations conducted by industry on: (1) emission characteristics of aircraft gas turbine engines; and (2) potential methods for reducing aircraft turbine engine emissions. The AIA report also identifies the possibility of reducing emissions through modifications of engines (especially combustor design) and of ground operational procedures.

The current reassessment of control methods must consider each of the aforementioned approaches. In assessing the feasibility of a control method, four factors must be explored: (1) effect of the method on the functioning or capacity of the aircraft system; (2) effectiveness of the method in reducing emissions; (3) cost of utilizing the method; and (4) time required for implementing the method. Information on emission-measurement instrumentation is also necessary to ensure that aircraft emissions can be measured with the accuracy and sensitivity required for enforcing the desired standards.

The Environmental Protection Agency has conducted several studies (references 16-27) to obtain information for assessment of aircraft emission control methods. This report summarizes the information obtained in these investigations. The specific objectives of this analysis of aircraft emission control technology are:

(1) To identify methods of controlling aircraft emissions through modification of engines, fuels, and ground operations.

(2) To estimate their effectiveness in reducing aircraft emissions.

(3) To estimate the time required for and cost of implementation.

(4) To assess the technology of measuring emissions from aircraft engines and to identify areas requiring advancements in instrumentation or test procedures.

Emission control by fuel modifications was reassessed to evaluate developments in aircraft fuel technology. This investigation was discontinued after preliminary analysis indicated that no significant reductions in emissions could be achieved by modifying fuels, except for reductions in sulfur or lead content that result in proportionate reductions of SO  and lead emissions.

A list of specific emission control methods involving engine modifications was formulated on the basis of preliminary analyses, which indicated that each method was feasible and offered a significant reduction in one or more emission classes. Feasibility was assessed on the basis of the following factors:

(1) No reduction in engine reliability (safety).

(2) Little or no reduction in engine performance (power-weight ratio).

(3) Reasonable cost of implementation.

The preliminary list of control methods was then subjected to more detailed analysis of control effectiveness and implementation costs. Control methods involving changes in ground operations were evaluated in a similar manner.

Evaluation of the emission control methods involving engine modifications gave primary consideration to the following emission classes: carbon monoxide (CO), nitrogen oxides (NOx), total hydrocarbons (including drained fuel) (THC), dry particulates (DP), and smoke.

## EMISSION CONTROL BY ENGINE MODIFICATION

### Engine Classification

To facilitate analyses of engine modifications, aircraft engines are categorized according to their thrust or power level. The classification system is indicated in Table 19.

TABLE 19

AIRCRAFT ENGINE CLASSIFICATION

| Engine class | Engine Type | Power Range, lb thrust or eshp |
|---|---|---|
| T1 | Turbine | Less than 6,000 |
| T2 | Turbine | 6,000 to 29,000 |
| T3 | Turbine | Greater than 29,000 |
| P1 | Piston | All piston engines |

Although this classification system is based simply upon
power level it effectively groups engines of similar
emission potential (when the emission rates are normalized
according to an appropriate engine-size parameter). Also,
since effectiveness factors and costs of the control methods
are similar for engine models within each class, the system
is particularly useful for this analysis.

Three classes of turbine engines are defined, and all
piston engines are included in a single class. This system
thus categorizes engines according to their principal
applications and according to certain design characteristics
that affect emission rates.

The small turbine engine class (T1) includes most of the
turboshaft and small turbojet and turbofan engines used in
business and small commercial aircraft. It also includes
auxiliary power units (APU) used on large commercial
aircraft. These engines are considered as one class because
the relatively small size of the combustor components (or
large surface-volume ratio) makes control of certain
emissions more difficult than with larger engines.

The next turbine engine class (T2) includes most of the
turbojet and turbofan engines used in medium-to-large
commercial aircraft. The design characteristics of most of
these engines are basically similar.

The third turbine engine class (T3) includes large
turbofan engines for "jumbo" transport aircraft and the SST
engines currently in use or under development.

Emission Control Methods and Effectiveness

Technology for controlling emissions from aircraft
engines by means of engine modifications has been analyzed.
The purpose of this analysis was to identify specific
methods of reducing pollutant emissions from aircraft
engines and to indicate the reductions in rates of emission
attainable by these methods. Various engine modifications
appear to be feasible in that they can be applied to
aircraft without degrading engine reliability or seriously
reducing aircraft performance. Costs of implementing these
control methods also appear to be within reasonable limits,
at least in preliminary analysis.

<u>Turbine Engines</u> - The engine modification control methods
considered feasible for turbine engines are listed and
described briefly in Table 20. Six methods are, at least in

Table 20. ENGINE MODIFICATIONS FOR EMISSION CONTROL FOR EXISTING AND FUTURE
TURBINE ENGINES

| Control method | Modification |
|---|---|
| **Existing engines** | |
| t1 - Minor combustion chamber redesign | Minor modification of combustion chamber and fuel nozzle to achieve best state-of-art emission performance. |
| t2 - Major combustion chamber redesign | Major modification of combustion chamber and fuel nozzle incorporating advanced fuel injection concepts (carburetion or prevaporization). |
| t3 - Fuel drainage control | Modify fuel supply system or fuel drainage system to eliminate release of drained fuel to environment. |
| t4 - Divided fuel supply system | Provide independent fuel supplies to subsets of fuel nozzles to allow shutdown of one or more subsets during low-power operation. |
| t5 - Water injection | Install water injection system for short duration use during maximum power (takeoff and climb-out) operation. |
| t6 - Modify compressor air bleed rate | Increase air bleed rate from compressor at low-power operation to increase combustor fuel-air ratio. |
| **Future engines** | |
| t7 - Variable-geometry combustion chamber | Use of variable airflow distribution to provide independent control of combustion zone fuel-air ratio. |
| t8 - Staged injection combustor | Use of advanced combustor design concept involving a series of combustion zones with independently controlled fuel injection in each zone. |

57

principle, applicable to existing engines by retrofitting of new or modified parts, and to engines currently in production.  Two methods are considered to be applicable only to future engines of new design, since the modifications required are too extensive to be applied to engines for which development has been completed.

The first control method consists of simple modifications of the combustor and fuel nozzles to reduce all emission rates to the best levels currently attainable within each engine class.  The degree of control attainable depends upon the performance of specific engines compared with those engines in the same class demonstrating the lowest emission rates.  In general, this control method requires emission quality control (emission reduction to levels demonstrated by other engines of that model). Additionally, for certain high-emission engine models, it means emission reduction to the level of other engines of the same class.  Each of the other control methods is more specifically directed at one or two pollutant classes.

Reductions in emissions achievable through the use of a control method vary with the pollutant considered, the engine class, and the engine operating mode.  Estimates of the effectiveness of each control method have been made for all combinations of these factors and are presented in Tables 21 and 22.  The estimation of emission control effectiveness for turbine engines is based upon reductions attainable from "lowest current emission rates."  These rates are defined as those attainable through control method t1 (table 19), minor combustion chamber redesign.

It is predicted that all engines in each class could be modified to achieve these "best rates." The values of these rates are listed in Table 21.  These "best rates" are not the lowest rates indicated for each engine class, but are rates near the low end of those emission rates that appear to be realistically attainable.  The use of the "best rate" basis is necessary to allow effectiveness estimates for each engine class.  Because of the wide variations in actual emission rates of turbine engines, an effectiveness analysis based on average rates would be less significant.  Table 22 indicates the effectiveness of control methods t2 through t8.  Some estimates are based upon demonstrated performance. Most, however, are not based on direct experience with these control methods on aircraft engines.  Therefore, estimates of effectiveness are based largely on theoretical analyses of engine performance under the operating conditions associated with the control methods.  The bases for these estimates are summarized in Table 23.

58

Table 21.  EFFECTIVENESS OF t1 - MINOR COMBUSTION CHAMBER
REDESIGN[a] - ON REDUCTION OF EMISSIONS FROM TURBINE ENGINES
(Emission rates in lb/1000 lb of fuel)

| Engine class | Pollutant | Mode | | |
|---|---|---|---|---|
| | | Idle/taxi | Approach | Takeoff |
| T1 | CO | 25 | 5 | 2 |
| T1 | THC | 10 | 1 | 0.2 |
| T1 | $NO_x$ | 3 | 7 | 11 |
| T1 | DP | 0.2 | 0.5 | 0.5 |
| T2 | CO | 45 | 6 | 1 |
| T2 | THC | 10 | 1 | 0.1 |
| T2 | $NO_x$ | 2 | 6 | 12 |
| T2 | DP | 0.2 | 0.5 | 0.5 |
| T3 | CO | 50 | 3 | 0.5 |
| T3 | THC | 10 | 1 | 0.1 |
| T3 | $NO_x$ | 3 | 10 | 40 |
| T3 | DP | 0.1 | 0.1 | 0.1 |

[a]Minor combustor redesign is assumed to reduce the smoke to
invisible or "smokeless" levels for all engine classes.

59

Table 22

Effectiveness of Engine Modification in Control
of Emissions from Turbine Engines, by Operating Mode[a]

| Control method | Engine class | Pollutant | Mode | | |
|---|---|---|---|---|---|
| | | | Idle/taxi | Approach | Takeoff |
| t2[b] | T1 | DP | 0.5 | 0.5 | 0.5 |
| t2 | T1 | $NO_x$ | NC[c] | NC | 0.5 |
| t2 | T2 | DP | 0.5 | 0.5 | 0.5 |
| t2 | T3 | $NO_x$ | NC | NC | 0.5 |
| t3 | T1 | THC | NC | NC | 0[d] |
| t3 | T2 | THC | NC | NC | 0[d] |
| t3 | T3 | THC | NC | NC | 0[d] |
| t4 | T1 | CO | 0.25 | NC | NC |
| t4 | T1 | THC | 0.25 | NC | NC |
| t4 | T2 | CO | 0.25 | NC | NC |
| t4 | T2 | THC | 0.25 | NC | NC |
| t4 | T3 | CO | 0.25 | NC | NC |
| t4 | T3 | THC | 0.25 | NC | NC |
| t5 | T1 | $NO_x$ | NC | NC | 0.1 |
| t5 | T2 | $NO_x$ | NC | NC | 0.1 |
| t5 | T3 | $NO_x$ | NC | NC | 0.1 |
| t6 | T1 | CO | 0.5 | NC | NC |
| t6 | T1 | THC | 0.5 | NC | NC |
| t6 | T2 | CO | 0.5 | NC | NC |
| t6 | T2 | THC | 0.5 | NC | NC |
| t6 | T3 | CO | 0.5 | NC | NC |
| t6 | T3 | THC | 0.5 | NC | NC |
| t7 or t8 | T1 | CO | 0.1 | NC | NC |
| t7 or t8 | T1 | THC | 0.1 | NC | NC |
| t7 or t8 | T1 | $NO_x$ | NC | NC | 0.75 |
| t7 or t8 | T1 | DP | 0.5 | 0.5 | 0.5 |
| t7 or t8 | T2 | CO | 0.1 | NC | NC |
| t7 or t8 | T2 | THC | 0.1 | NC | NC |
| t7 or t8 | T2 | $NO_x$ | NC | NC | 0.75 |
| t7 or t8 | T2 | DP | 0.5 | 0.5 | 0.5 |
| t7 or t8 | T3 | CO | 0.1 | NC | NC |
| t7 or t8 | T3 | THC | 0.1 | NC | NC |
| t7 or t8 | T3 | $NO_x$ | NC | NC | 0.75 |
| t7 or t8 | T3 | DP | 0.5 | 0.5 | 0.5 |

[a]Emission rate is fraction of best current rate assumed to be attainable through minor combustion chamber redesign and with control method cited

[b]t2 = Major combustion chamber redesign
   t3 = Fuel drainage control
   t4 = Divided fuel supply system
   t5 = Water injection
   t6 = Modify compressor air bleed rate
   t7 = Variable-geometry combustion chamber
   t8 = Staged injection combustor

[c]NC indicates no change

[d]Refers to raw fuel drainage only

Table 23

Bases for Control Method Effectiveness Estimates for Turbine Engines

| Control method | Rationale |
|---|---|
| t1 - Minor combustion chamber redesign | The assumption is made that emission rates for all engines within a given class can be reduced to common, optimum levels (on a lb/1000 lb fuel basis) by minor combustor modifications. These optimum emission rates are based on the best performance reported for each engine class, excluding extreme data points. |
| t2 - Major combustion chamber redesign | Estimates are based on reports of carbureting fuel injector performance and reduction of smoke emission. Concept is incorporated in some Class T3 engines. Estimates are based on assumption that best emission rate for Class T1 and T2 engines is at an exhaust visibility threshold at maximum power. Carburetion appears to reduce smoke level, and presumably particulate emissions, to approximately half that level. Additionally, premixing of air and fuel can be used to give substantial $NO_x$ reduction by decreasing residence time in the combustor. |
| t3 - Fuel drainage control | Estimate is based on the assumption that fuel drainage can be completely eliminated by collecting drained fuel and returning to fuel tank. |
| t4 - Divided fuel supply system | Control method results in combustion zone fuel-air ratio similar to that at approach condition. Reduction in CO and THC from idle to approach is approximately 90 percent in Class T1 and T2 engines and 90 percent in Class T3 engines. Effectiveness is reduced by one order because combustor is not operating at "well-designed" condition. |
| t5 - Water injection | Water injection is assumed only at takeoff at a rate up to twice the fuel rate. Water injection into compressor or diffuser is assumed to be by system similar to those in current use. Effectiveness based upon published results with steam injection.[28] Water injection assumed to be of equal effectiveness when injected upstream of combustor. |
| t6 - Modify compressor air | Assumptions are (1) fraction of air that can be bled is small so that engine operating point is nearly unchanged, (2) combustor f/a varies inversely with air bleed rate, and (3) CO and THC emissions at idle vary as the (air mass flow rate)$^3$ and inversely as $(f/a)^3$. This relationship is based upon data from Reference 14. If maximum air bleed rate is 20 percent, CO and THC emission rates are reduced by 50 percent. |
| t7 - Variable-geometry combustion chamber | Combustor primary zone is assumed to operate at a constant f/a equal to normal f/a at approach power condition (primary equivalence ratio = 0.6). CO and THC emissions at idle are reduced to levels corresponding to approach power, or by 90 percent for Classes T1, T2, and T3. This |
| t8 - Staged injection combustor | incorporates design characteristics that provide a good mixture in the combustion zone. This feature and constant f/a operation combine to reduce $NO_x$ emissions at full power by 75 percent[26] and particulate emissions by 50 percent at all power levels as in t2. |

61

Emission-control effectiveness is indicated in Tables 21, 22, and 23 for each control method and for each pollutant for which a significant degree of control expected. Pollutants for which little or no control expected are not listed. Effectiveness is indicated separately for each engine class. No specific estimates have been made for control of reactive hydrocarbons, odor, or aldehydes because control methods applicable to these emissions are not yet identified. Reductions in these emissions are expected along with reductions in THC emissions. Any of the modifications defined for existing turbine engines (t1 through t6) could be combined to achieve increased emission control effectiveness; exceptions are modifications t4 and t6, which are mutually exclusive.

**Piston Engines** - The control methods considered feasible for aircraft piston engines are listed with brief descriptions in Table 24. These methods include most of the approaches that have been developed for automotive engines for control of carbon monoxide and total hydrocarbon. Methods for controlling nitrogen oxide (NOx) emissions are not included because the fuel-rich operating conditions of aircraft piston engines result in low NOx emission rates. Piston engine emission characteristics are included in Figure 11. As this figure indicates, fuel-air ratio has a significant effect on aircraft piston engine emissions. Plans for changes in engine operating conditions to reduce CO and THC emissions must also consider NOx to prevent significant increases in emissions of this pollutant.

Table 24 lists nine piston-engine control methods, including the use of direct-flame afterburners and water injection, methods that are not being considered currently for automotive engines. Afterburners might be used to advantage in this application because they can utilize the high-velocity airflow around the aircraft. Although aircraft piston engines and automobile engines are fundamentally similar, their applications are significantly different, with different requirements. Reliability is of primary importance in aircraft piston engine applications and therefore is given paramount consideration in identifying applicable control methods. The piston-engine emission-control methods were identified and evaluated through reviews of published investigations. Of the methods identified, all are considered applicable to existing engines except those that would require redesign of the basic engine or its control systems.

Effectiveness estimates for piston engines are based on reductions of current uncontrolled rates listed in Table 25.

62

Table 24

Engine Modifications for Emission Control
for Existing and Future Piston Engines

| Control method | Modification |
|---|---|
| **Existing engines** | |
| p1 - Fuel-air ratio control | Limiting rich fuel-air ratios to only those necessary for operational reliability. |
| p2 - Simple air injection | Air injected at controlled rate into each engine exhaust port. |
| p3 - Thermal reactors | Air injection thermal reactor installed in place of, or downstream of, exhaust manifold. |
| p4 - Catalytic reactors for HC and CO control | Air injection catalytic reactor installed in exhaust system. Operation with lead-free or low-lead fuel required. |
| p5 - Direct-flame afterburner | Thermal reactor with injection of air and additional fuel installed in exhaust system. |
| p6 - Water injection | Water injected into intake manifold with simultaneous reduction in fuel rate to provide for cooler engine operation at leaner fuel-air ratios. |
| p7 - Positive crankcase ventilation | Current PCV system used with automotive engines applie to aircraft engines. Effective only in combination with one of preceding control methods. |
| p8 - Evaporative emission controls | A group of control methods used singly or in combination to reduce evaporative losses from the fuel system. Control methods commonly include charcoal absorbers and vapor traps in combination with relatively complex valving and fuel flow systems. |
| **Future engines** | |
| p9 - Engine redesign | Coordinated redesign of combustion chamber geometry, compression ratio, fuel distribution system, spark and valve timing, fuel-air ratio, and cylinder wall temperature to minimize emissions while maintaining operational reliability. |

63



FIGURE 11

PISTON ENGINE EMISSION CHARACTERISTICS

64

TABLE 25

CURRENT UNCONTROLLED EMISSION RATES
FOR PISTON ENGINES[29]
(lb/1000 lb of fuel)

| Pollutant | Idle | Taxi | Approach | Takeoff |
|---|---|---|---|---|
| CO | 896 | 882 | 918 | 849 |
| THC[a] | 48 | 76 | 80 | 18 |
| $NO_x$ (as $NO_2$) | 7 | 4 | 4 | 6 |

[a] Total hydrocarbon (THC) emission rates have been increased by 50% to account for crankcase blow-by emissions. Evaporative emissions are not included in these rates.

TABLE 26

EFFECTIVENESS OF ENGINE MODIFICATIONS IN
CONTROL OF EMISSIONS FROM PISTON ENGINES
BY POLLUTANT[a]

| Control Method | Controlled Emission Rate | |
|---|---|---|
| | CO | THC[b] |
| P1 Fuel-air ratio control | 0.5 | 0.5 |
| P2 - Simple air injection | 0.1 | 0.5 |
| P3 - Thermal reactor | 0.1 | 0.25 |
| P4 - Catalytic reactor (requires lead-free fuel) | 0.1 | 0.25 |
| P5 - Direct-flame afterburner | 0.1 | 0.1 |
| P6 - Water injection | 0.1 | 0.25 |
| P7 - Positive crankcase ventilation (PCV) | NC | d |
| P8 - Evaporative emission control | NC | e |
| P9 - Engine redesign | 0.1 | 0.5 |

[a] Emission rate is fraction of uncontrolled emission rate after installation of control method and applies to all operating modes.
[b] Exhaust HC only.
[c] NC indicates no change.
[d] PCV would eliminate blow-by emissions when used in combination with p1, p2, p3, p4, p5, or p8. Blow-by THC emission estimated to be equal to 30% of uncontrolled exhaust emission.
[e] Evaporative controls would reduce THC emissions due to evaporation from fuel supply. Magnutude of uncontrolled emissions is inknown.

65

Since emission rates from piston engines do not vary as widely as those from turbine engines, control effectiveness can be based on average rates for existing engines. The effectiveness estimates shown in Table 26 are based in most cases on the application of individual control methods without other engine changes. Method p7 (PCV) is an exception; it is considered to be most effective in combination with method p1, p2, p3, p4, p5, p6, or p9.

Piston-engine modifications p2 through p6 are designed to serve the same function and, thus, are mutually exclusive. All of the others could be combined with any of the modifications p2 through p6 to achieve increased emission-control effectiveness.

Cost and Time Requirements for Control-Method Development and Implementation

Existing Engines - Estimates of the cost and time requirements of applying each control method applicable to existing engines are preliminary and are intended to indicate the magnitude of costs and time involved in controlling emissions from all civil aircraft. Cost and time requirements are estimated separately for control-method development and implementation. Development includes all effort required from initial stages through certification of the control method for a specific engine class and tooling for production. Implementation includes initial installation of the control method on all engines of a given class and costs associated with additional effort or materials required for the control method throughout the remaining service life of the engines. These estimates are based on a turbine engine life of 10 years with engine overhauls every 5,000 hours or 2 1/2 years and a piston engine life of 10 years with engine overhauls every 5,000 hours or 5 years. Operating costs for water injection are based upon experience with the water injection system on the Boeing 747 aircraft.

Because few of the control methods have been developed for or applied to aircraft engines, and because many factors affect total implementation costs, many uncertainties are involved in the estimates. Estimates of development costs and time requirements are based on the previous experience of aircraft engine manufacturers in similar modifications. Estimates of implementation costs are considered to be less certain than development costs. The cost and service life of a modified engine component is difficult to predict accurately. Yet these factors strongly affect the cumulative costs of operating and maintaining the modified

66

engine.  Because implementation costs could be far greater
than development costs for some control methods, the
estimates of implementation costs are only indicative of
cost penalties that might be involved with control-method
implementation.

Three potential levels of aircraft emission control
entail three distinct associated cost levels: (1)
retrofitting in-use engines, (2) modifying present
production designs to incorporate emission control
technology in new engines of models presently being
produced, and (3) incorporating emission control technology
into new engine designs during the design phases of a new
engine model.

Costs are highest for retrofitting in-use engines, are
significantly lower for modifying existing designs in new
production engines and are lowest for incorporating emission
technology during engine design.  Table 27 presents
estimates of the development time, development costs, and
implementation costs for application of the control methods
that could be retrofitted on the current population of all
civil engines.

The development time requirements listed in Table 27 are
the periods required to reach the point where installation
of the control methods in existing engines could begin.  The
application of controls in all existing engines would
require an additional time period that depends primarily on
the availability of engine maintenance facilities.  The time
for implementation is estimated to be 2 1/2 years for
turbine engines and 5 years for piston engines.  These time
estimates allow implementation of the emission control
method during normal maintenance procedures, minimizing
cost.  Table 28 presents costs by category: air carrier,
general aviation, and civil aviation.  These tables
represent cost to retrofit the various control methods to
the current population of aircraft.

From another perspective, implementation costs may be
expressed as fractions of total engine costs.  For a typical
class T2 (turbine) engine, the cost of installing and
maintaining control systems ranges from $300 to $69,900,
assuming a 10-year engine life.  Based on a total engine
cost of $250,000, these control-method implementation costs
represent 0.1 to 25 percent of the total engine cost.  For a
typical piston engine, estimated control-method
implementation costs range from $100 to $4,000, also based
upon a 10-year engine life.  For a total engine cost of

67

Table 27

Time and Costs for Modification of Current
Civil Aviation[a] Engines

| Control method | Development time, years | Development cost, $10^6$ dollars | Implementation cost, $10^6$ dollars |
|---|---|---|---|
| **Turbine engines** | | | |
| Minor combustion chamber redesign | 2.5 to 5 | 37 | 383 |
| Major combustion chamber redesign | 2.5 to 7.5 | 74 | 665 |
| Fuel drainage control | 1    to 2.5 | 1.5 | 5.4 |
| Divided fuel supply | 5    to 7.5 | 84 | 102 |
| Water injection | 2.5 to 4 | 25 | 175 |
| Compressor air bleed | 4    to 6.5 | 90 | 58 |
| **Piston engines** | | | |
| Simple air injection | 1.5 to 3 | 9 | 165 |
| Thermal reactor | 3    to 6 | 25 | 424 |
| Catalytic reactor | 2.5 to 5 | 22 | 535 |
| Direct-flame afterburner | 3    to 6 | 25 | 424 |
| Water injection | 1.5 to 3 | 9 | 400 |
| Positive crankcase ventilation | 2    to 4 | 4 | 94 |
| Evaporative emission control | 1.5 to 2.5 | 4 | 269 |

[a]"Civil aviation" includes air carrier and general aviation engines

Table  28

Cost Results for Turbine Engine Population
by Separate Use Categories

| Engine class | Control method | Cost scaling factor | Development cost per engine family, $10^6$ dollars | Implementa-tion cost per engine, $10^3$ dollars | Total cost, $10^6$ dollars | | |
|---|---|---|---|---|---|---|---|
| | | | | | Air carrier | General aviation | Civil aviation[a] |
| T1 | t1 | 0.35 | 0.90 | 12.4 | 19.2 | 90.5 | 109.7 |
| T1 | t2 | 0.35 | 1.80 | 21.3 | 34.5 | 159.3 | 193.8 |
| T1 | t3 | -- | 0.05 | 0.1 | 0.4 | 1.0 | 1.4 |
| T1 | t4 | 0.35 | 1.80 | 3.7 | 14.9 | 51.5 | 66.4 |
| T1 | t5 | 0.35 | 0.62 | 5.5 | 9.8 | 43.6 | 53.4 |
| T1 | t6 | 0.35 | 2.20 | 2.1 | 15.5 | 48.1 | 63.6 |
| T2 | t1 | 1.00 | 0.90 | 35.5 | 243.0 | 17.8 | 259.8 |
| T2 | t2 | 1.00 | 1.80 | 69.9 | 418.0 | 31.0 | 449.6 |
| T2 | t3 | -- | 0.05 | 0.3 | 2.0 | -- | 2.0 |
| T2 | t4 | 1.00 | 1.80 | 10.5 | 87.0 | 8.3 | 95.3 |
| T2 | t5 | 1.00 | 0.62 | 15.6 | 108.7 | 8.2 | 116.9 |
| T2 | t6 | 1.00 | 2.20 | 6.0 | 61.5 | 7.1 | 68.6 |
| T3 | t1 | 1.64 | 0.90 | 58.3 | 50.0 | -- | 50.0 |
| T3 | t2 | 1.64 | 1.80 | 100.0 | 95.0 | -- | 95.0 |
| T3 | t3 | 1.64 | 0.05 | 0.6 | 2.0 | -- | 2.0 |
| T3 | t4 | 1.64 | 1.80 | 17.2 | 13.7 | -- | 13.7 |
| T3 | t5 | 1.64 | 0.62 | 25.6 | 29.5 | -- | 29.5 |
| T3 | t6 | 1.64 | 2.20 | 9.9 | 16.0 | -- | 16.0 |

[a]"Civil aviation" includes air carrier and general aviation engines

$6,000, these implementation costs represent 2 to 65 percent of the total.

Retrofit cost and time estimates for turbine engines were developed by using the application of low-smoke combustors to the JT8D engine class as a reference for cases in which no direct experience was available. Cost and time requirements for this modification, which is considered a minor combustor redesign for a class T2 engine, were estimated in detail in 1969.[27] Requirements for other control methods were determined essentially by proportioning the cost and time expenditures according to the complexity of the method, with respect to the reference case. Requirements for other engine classes were determined by using appropriate scaling factors and by again using the JT8D modifications as reference. Time and cost estimates for piston engines are based largely on experience to date with emission controls for automobile engines. Significant differences, such as certification and safety requirements and production levels, were considered in scaling the costs from the experience with automobiles.

Costs of emission control technology are substantially lower when applied to new engines only. These costs are less than one-half the retrofit costs on a per-engine basis. These estimates cannot be totalled as were the retrofit estimates because of uncertainty concerning the number of engines that would be affected.

Future Engines - Cost estimates have been developed also for incorporation of emission controls in future engines, that is, engines that have not yet been developed. These estimates are defined only as fractions of total engine cost, since no reasonable basis is available for estimating the numbers of engines that would be affected.

Emission control in turbine engines that is attained through the use of advanced combustor-design concepts is estimated to represent an increase in total engine cost of 3 to 4 percent. Emission control in piston engines that is achieved by engine-design modifications would not necessarily result in any significant increase in engine cost. If greater control of emissions is required than can be achieved by engine design modifications, however, one or more of the control methods applicable to existing engines will be necessary. The costs of these control methods, which involve the addition of auxiliary devices such as thermal reactors, will be significant, probably in the range of 5 to 10 percent of total engine cost.

70

These estimates represent the increased costs of new engines with emission controls installed. Additional continuing costs may accrue for maintenance of the controls. These maintenance costs will be considerably less than those entailed in modifications of existing engines.

## EMISSION CONTROL BY MODIFICATION OF GROUND OPERATIONS

### Definition of Ground Operations

The cycle of operations performed by an aircraft during its arrival at and departure from an airport can be defined quite precisely because most of these operations are prescribed by airport or aircraft operating procedures. Characteristic operating or LTO (landing-takeoff) cycles have been defined for various classes of aircraft for purposes of estimating pollutant emissions.

The LTO cycle can be separated logically into flight and ground operations. Flight operations include the approach and climb-out modes as well as landing and takeoff, even though the latter occur partially on the ground. Ground operations include the taxi and idle modes of the cycle. This separation is logical for two reasons. First, flight operations as defined here are those that cannot readily be modified to reduce pollutant emissions. Second, flight operations are conducted almost entirely with aircraft engines at full or part power; under these conditions, pollutant emission rates are quite different from those at the low power levels characteristic of ground operations. Aircraft ground operations contribute substantially to the concentrations of CO and THC at air carrier airports because of the relatively high emission rates of these pollutants at low engine power levels, and because ground operations are largely confined to limited areas within the airport boundaries.

### Emission Control Methods

Six methods offer some degree of control of CO and THC emissions at air carrier airports by modification of turbine-aircraft ground-operation procedures.

(1) Increase engine speed during idle and taxi operations.

(2) Increase engine speed and reduce number of engines operating during idle and taxi.

71

(3) Reduce idle operating time by controlling departure times from gates.

(4) Reduce taxi operating time by transporting passengers to aircraft.

(5) Reduce taxi operating time by towing aircraft between runway and gate.

(6) Reduce operating time of aircraft auxiliary power supply by providing ground-based power supply.

The first two methods reduce emissions by requiring that engines be operated at more efficient power settings than those in current practice (Figure 12); the next four methods reduce emissions by reducing operating time of either main or auxiliary engines. The effectiveness of these methods in reducing emissions varies considerably. Table 29 summarizes the reductions in CO and THC emissions that would result at Los Angeles International Airport from the six suggested ground-operation changes. Tables developed for other major air carrier airports show emission reductions of the same magnitude.

The control methods listed, with the possible exception of number 3, are not applicable to small, piston-engine aircraft, and, therefore, do not seem to offer means for controlling emissions at general aviation airports. Periods of delay at take-off are significant at some general aviation airports; however, aircraft ground traffic at general aviation airports may not be sufficiently controlled to allow an effective system of controlled gate departures or engine start-ups to reduce periods of delay.

Implementation Cost and Time Requirements

The cost and time requirements of the control methods involving ground operation modifications have been estimated for Los Angeles International. Table 30 presents summary of the estimates. Implementation of these methods at other airports would involve costs of the same magnitude. Specific costs, however, would vary with airport activity level and the present availability of auxiliary equipment. FAA and the airlines have estimated savings for control method 2, and their estimates are within 20% of the estimate in Table 30.

Tables 29 and 30 indicate that alternative 2 is the most attractive means of reducing turbine aircraft emissions



FIGURE 12

HYDROCARBON AND CARBON MONOXIDE EMISSIONS
FROM A TYPICAL AIRCRAFT TURBINE ENGINE (JT3D)

73

Table 29

Comparative Reductions Resulting from Control
Methods Applied at Los Angeles International Airport

| Control method | Resultant emissions, % of uncontrolled emissions | |
|---|---|---|
| | CO | Hydrocarbons |
| 1. Increase engine idle speed | 71 | 93 |
| 2. Increase idle speed and use minimal engines for taxi | | |
| Two engines | 53 | 66 |
| Single engine | 39 | 51 |
| 3. Eliminate delays at gate and runway | 90 | 91 |
| 4. Transport passengers between terminal and aircraft | 98 | 97 |
| 5. Tow aircraft to avoid taxi emissions | 34 | 42 |
| 6. Avoid use of aircraft auxiliary power units (APU) | 96 | 98.5 |

Table 30

Costs and Time for Operations Changes
at Los Angeles International Airport

| Control method | Time, years | Initial cost, $10^6$ dollars | Annual operating cost change,[a] $10^6$ dollars |
|---|---|---|---|
| 1.  Increase engine speed | 0 | 0 | 8.5 |
| 2.  Increase speed, reduce number | 0.3 | 0 | -0.7 |
| 3.  Control gate departure | 5 | 15 | -0.4 |
| 4.  Transport passengers | 2.5 | 65 | 5.0 |
| 5.  Tow aircraft | 1 | 1.2 | 0.4 |
| 6.  Reduce APU operation | 0.5 | 1.3 | 1.5 |

[a] Minus sign indicates an estimated savings

providing that operational and safety requirements can be
met.

## COMPARATIVE EVALUATION OF EMISSION CONTROL METHODS

The engine and ground operation modifications just
discussed can be compared in terms of effectiveness, cost,
and implementation time. A "potential benefit factor" has
been defined to allow comparison of cost/benefit of the
emission control methods. The potential benefit factor
(PBF) is the net emission reduction resulting from a
particular control strategy, averaged over the next 20
years, divided by the cost.

$$PBF = \frac{FYE \times CE \times ECF}{CP}$$

where FYE is the fraction of the next 20 years that the
control method is effective; CE is the control method
effectiveness (the percentage reduction of a particulate
pollutant); ECF is the emission contribution fraction
(percentage of total aircraft emissions at relevant airports
contributed by engines affected by this control strategy);
and CP is the cost of the control strategy for the pollutant
considered. Emissions at major carrier airports were used
to determine effectiveness of turbine engine control methods
and those at general aviation airports to determine
effectiveness of piston engine emission control methods.

The potential benefit factor is a measure of the cost-
effectiveness of each control strategy. Potential benefit
factors (Table 31) have been calculated for the control
strategies previously described as applied to (1)
retrofitting in-use aircraft, (2) modifying new engines of
present models, and (3) incorporating control methods in new
engine designs. The higher numbers represent the most cost-
effective strategies for emission reduction.

The potential benefit factors in Table 31 are a
composite for all turbine and piston engines. Although
these factors indicate the relative merits of the control
methods, the factor for an individual engine classification
may be significantly different. For example, retrofit of
water injection for class T3 shows a potential benefit
factor of 4.2, whereas the average for all turbine engines
is only 1.4. Additionally, while some control strategies
show a high potential benefit number, other strategies must
also be used to achieve significant emission reductions.
For example, fuel venting represents from 4 to 20% of total
hydrocarbon emissions, dependent upon airport considered.

Table 31

Comparison of Emission Control Methods

| Control Method | Potential Benefit Factor | | |
|---|---|---|---|
| | HC & CO | $NO_x$ | Smoke |
| Turbine Engines | | | |
| A. Retrofit-Engine Modifications | | | |
|   1. Minor combustion chamber redesign | 0.37 | 0.37 | 0.37 |
|     (APU) | (2.5) | | |
|   2. Major combustion chamber redesign | 0.3 | 1.1 | 1.1 |
|     (T3 and APU) | | (6.6) | |
|     (T2 only) | | | (5.0) |
|   3. Fuel drainage control | 10 | -- | -- |
|     (T2 and T3 only) | (20) | | |
|   4. Divided fuel supply | 1.5 | -- | -- |
|   5. Water injection | -- | 1.4 | -- |
|     (T3 only) | | (4.2) | |
|   6. Compressor air bleed | 1.3 | -- | -- |
| B. New Production Engine Modification | | | |
|   1. Minor combustion chamber redesign | 5.0 | 5.0 | 5.0 |
|   2. Major combustion chamber redesign | 4.6 | 4.6 | 4.6 |
|   3. Fuel drainage control | 30 | -- | -- |
|   4. Divided fuel supply | 5.0 | -- | -- |
|   5. Water injection | -- | 1.4 | -- |
|     (T3 only) | | (4.2) | |
|   6. Compressor air bleed | 4.0 | -- | -- |
| C. Future Engine Emission Control | | | |
|   1. Fuel drainage control | 30 | -- | -- |
|   2. Divided fuel supply | 15 | -- | -- |
|   3. Water injection | -- | 2.0 | -- |
|     (T3 only) | | (5.6) | |
|   4. Compressor air bleed | 15 | -- | -- |
|   5. Variable geometry combustion chamber | 25 | 25 | 25 |
|   6. Staged injection combustor | 25 | 25 | 25 |
| D. Ground Operations Modification | | | |
|   1. Increase engine idle speed | 2.4 | -- | -- |
|   2. Increase speed, reduce number | $10^5$ | -- | -- |
|   3. Eliminate delays | 10 | -- | -- |
|   4. Transport passengers | 0.1 | -- | -- |
|   5. Tow aircraft | 75 | -- | -- |
|   6. Reduce APU operation | 1.0 | -- | -- |
| Piston Engine | | | |
| A. Retrofit-Engine Modification | | | |
|   1. Fuel-air ratio control | 50 | -- | -- |
|   2. Air injection | 5 | -- | -- |
|   3. Thermal reactor | 2 | -- | -- |

Table 31 (Cont.)

Comparison of Emission Control Methods

| Control Method | Potential Benefit Factor | | |
|---|---|---|---|
| | HC & CO | NO$_x$ | Smoke |
| 4. Catalytic reactor | 1.5 | -- | -- |
| 5. Direct-flame afterburner | 1 | -- | -- |
| 6. Water injection | 2 | -- | -- |
| 7. Positive crankcase ventilation | 3 | -- | -- |
| 8. Evaporative emission control | 1.5 | -- | -- |
| B. New Production Engine Modifications | | | |
| 1. Fuel-air ratio control | 500 | -- | -- |
| 2. Air injection | 30 | -- | -- |
| 3. Thermal reactor | 6.6 | -- | -- |
| 4. Catalytic reactor | 5.0 | -- | -- |
| 5. Direct-flame afterburner | 3.3 | -- | -- |
| 6. Water injection | 15 | -- | -- |
| 7. Positive crankcase ventilation | 50 | -- | -- |
| 8. Evaporative emission control | 3.0 | -- | -- |
| C. Future Engines | | | |
| 1. Fuel-air ratio control | 500 | -- | -- |
| 2. Air injection | 30 | -- | -- |
| 3. Thermal reactor | 6.6 | -- | -- |
| 4. Catalytic reactor | 5.0 | -- | -- |
| 5. Direct-flame afterburner | 3.3 | -- | -- |
| 6. Water injection | 15 | -- | -- |
| 7. Positive crankcase ventilation | 50 | -- | -- |
| 8. Evaporative emission control | 6.0 | -- | -- |
| 9. Engine redesign | 25 | -- | -- |
| D. Ground Operations Modifications | | | |
| 1. Eliminate delays | 10 | -- | -- |

78

Consequently, to achieve substantial reduction cf hydrocarbon emissions a less attractive control method is necessary in addition to eliminating fuel venting.

A review of the PBF values in Table 31 supports the following conclusions providing that all operational and safety requirements can be met:

(1) Modification 2 for ground operation procedures is the most cost-effective method of reducing hydrocarbon and carbon monoxide emissions from turbine engines,

(2) Incorporating emission control methods into design of new engines is the most cost-effective method of over-all aircraft emission control.

(3) Control of fuel-air ratio is the most cost-effective method of reducing hydrocarbon and carbon monoxide emissions from piston engines.

(4) Retrofits of class T3 turbines is a more cost-effective method for NOx control compared to retrofit of other turbine engine classes.

(5) Fuel drainage control has high PBF because of extremely low cost of implementation (CP) rather than high control effectiveness (CE).

Because cost-effectiveness varies significantly among engine classes and control strategies, several factors in addition to cost and effectiveness must be considered in developing emission control strategies for aircraft engines.

## EMISSION MEASUREMENT TECHNOLOGY

Reliable methods for measuring the rates at which pollutants are emitted from aircraft engines are required for the support of an emission-control program. Emission measurements are required for evaluating the effectiveness of control methods, and specific measurement methods must be incorporated in emission-control standards.

The state of emission-measurement technology has been assessed to determine whether measurement techniques are sufficiently well advanced to support the development of emission-control methods and the implementation of emission standards for aircraft engines. The conclusion drawn from this assessment is that current measurement technology will meet the requirements of an emission-control program. Although measurement techniques for particulate emissions

are inadequate at present, improved techniques are being
developed through cooperative government-industry action.

Measurement of emission rates from an aircraft engine
involves three major requirements:

(1) A test procedure specifying engine operating
conditions.

(2) A sampling technique for obtaining a
representative sample of exhaust gas.

(3) Analytical instrumentation for determining
pollutant concentrations in the exhaust-gas sample.

Aircraft engine manufacturers, FAA, and EPA are devoting
substantial effort toward meeting these requirements for
measuring emissions from turbine engines.

Sampling and Test Procedures

Obtaining a representative sample of exhaust gas from an
aircraft engine for analysis of emission rates is a complex
and difficult procedure.  Sampling emissions from turbine
engines is difficult at the outset because of the jet-blast
environment in which the sampling equipment must be
installed.  Beyond this problem, the following factors all
significantly affect the composition of the exhaust sample:

(1) Engine power level.

(2) Temporal and spatial variations in exhaust
composition.

(3) Sampling-line diameter, length, material, and
temperature.

(4) Ambient temperature and humidity.

(5) Ambient pollutant levels.

Procedures for sampling and analyzing turbine-engine
exhaust gases have been under development for several years
by engine manufacturers, FAA, and EPA.  More recently, the
Society of Automotive Engineers Aircraft Exhaust Emission
Measurement (E-31) Committee has been formed to standardize
these procedures.  Standardization of measurement techniques
will minimize variations resulting from the factors listed
above; however, the several sources of error in collecting
exhaust samples and the variability of samples among

different engines must be considered in the establishment of
a standard emission measurement procedure.

Sampling requirements for aircraft piston engines are
similar to those for automobile engines.  The exhaust gases
are well mixed by the time they reach the exhaust stack
exit.  Consequently, no factors are apparent, beyond those
already recognized as affecting automobile exhaust
emissions, that would cause variability in exhaust samples
from aircraft piston engines.  Differences in engine
operation, however, must be considered in the establishment
of a standard emission measurement procedure.

Emissions Measurement Instrumentation

Measuring the concentrations of most gaseous pollutants
in exhaust samples from aircraft engines is generally within
the capabilities of existing instruments and should remain
so, even when engines are modified to reduce emission rates.

The various types of instruments that are available and
in current use for aircraft emission measurement have been
reviewed.  Instruments that appear to be most suitable for
measuring turbine-engine emissions at the present time are
presented in Table 32.

81

Table 32

Instrumentation for Measurement
of Turbine Engine Emissions

| Measurement method | Pollutant class |
|---|---|
| Non-dispersive infrared (NDIR) | CO and $CO_2$ |
| Heated flame ionization | THC |
| Chemiluminescence | NO |
| Chemiluminescence[a] | $NO_2$ |
| SAE smokemeter (ARP1179) | Smoke |
| None | Particulates |
| Determined from fuel analysis | $SO_2$ |
| 3-MBTH | Aldehydes |
| Human odor panel | Odor |

[a]The non-dispersive ultraviolet instrument (NDUV)
may also prove acceptable for $NO_2$ measurement

82

# APPENDIX A:
# ANALYSIS OF CARBON MONOXIDE CONCENTRATION
# AT LOS ANGELES INTERNATIONAL AIRPORT

When continuous air quality monitoring data is available, statistical analysis may be applied to determine frequencies of occurrence of any concentration for any averaging time either by interpolation of the data or by extrapolation if the available data is limited.  It has been observed that all air quality data regardless of averaging time follows a log normal distribution.[13]

The continuous carbon monoxide data taken at LAX during six months in 1970 were analyzed statistically for 1-hour and 8-hour averaging times at several sites to determine the expected frequencies when the NAAQS would be exceeded.  With the use of the simple rollback technique, adjusted frequencies could be determined for changes in emissions and various control strategies for aircraft and non-aircraft emission sources.  Dispersion modeling results were used to predict the degree of influence aircraft emissions have in locations beyond the boundaries of Los Angeles Airport.

The analysis focused on the 8-hour exposure case in areas adjacent to the airport where it would be expected that people would meet the exposure time criteria either as residents or business employees.  The 1-hour exposure case would apply to the terminal area itself as well as the areas considered in the 8-hour averaging time case.

Corrections were made to the available ambient data because of the recognized seasonal variation of carbon monoxide levels in the Los Angeles basin.  A recent report published by the LAAPCD contained sufficient data to calculate the summer-winter correction factors for the hourly and 8-hour averaging times.  The average correction factors for the basin to convert August-September data to December-January data were found to be 1.5 for the 1-hour data and 1.9 for the 8-hour case.

Data and statistical information on carbon monoxide analysis presented in a paper by Larsen[31] were also utilized in this phase of the analysis.  The L. A. basin CO data in the Larsen paper were used to check the LAX data for consistency

83

in terms of the frequency and range of observed carbon
monoxide levels. Tabulated and plotted data in this
reference indicate the air pollution hot spot represented by
the Los Angeles Airport and its environs. Figure A-1, taken
from the reference shows this point quite clearly. Figure 1
in the main text of this report indicates the location of
the continuous ambient carbon monoxide stations. Station
209 was chosen as representative of an off airport site for
the 8 and 1-hour analysis. Figure A-2 shows the plot of the
raw station 209 data for the months of August and September.

It is obvious that station 209 is directly influenced by the
airport only when the wind is blowing from a westerly
direction. The September data were categorized into East or
West influences and the results are plotted on Figure A-3.
It can be seen that the composite plot is representative of
both these subcategories and therefore was used for all
subsequent analysis. It further demonstrates that the
airport exerts the same impact on the air quality at station
209 as the non-airport area sources surrounding it. Figure
2, in the text of the report, shows the August station 209
frequency distributions for maximum 8-hour daily averages
adjusted for the summer-winter correction factor. The
frequency of occurrence relating to one day per quarter is
assumed to be equivalent to the one day per year frequency
associated with the 8-hour NAAQS because it can be assumed
that the worst exposure case would occur during the winter
quarter of the year. This plot has then been adjusted
(Figures A-4 and A-5) for expected rollback emission
reductions of non-aircraft sources in combination with
various percent contributions due to due to aircraft sources
and assumed levels of aircraft emission controls. Similar
methodology was used in estimating expected 1980 CO
concentrations with various aircraft contributions. These
are given in the main text. Modeling results were used to
determine the relating distribution and magnitude of
aircraft emissions around LAX. It can be seen that the
station 209 analysis is quite representative of other areas
adjacent to LAX where adverse influences of aircraft
operations can be expected to occur.

The same procedures were followed in plotting the adjusted
September data to determine the frequency with which the
standard would be expected to be exceeded for various
percent aircraft contributions. This data would represent
the upper limits of the analysis.

Similar frequency analysis can be performed for the 1-hour
exposure case. However, unless there is extreme variation
between the slopes (or standard geometric deviations) of the

84

FIGURE A-1.

MAXIMUM ANNUAL 8-HOUR-AVERAGING-TIME CONCENTRATION OF
CARBON MONOXIDE EXPECTED AT VARIOUS SITES IN THE LOS ANGELES AREA.





FIGURE A-2

BASELINE DATA, DAILY MAXIMUM 8-HR. AVERAGE
CO CONCENTRATIONS, STATION 209, LAX, 1970



FIGURE A-3

FREQUENCY DISTRIBUTION FOR 8-HR. CO DATA, STATION 209, LAX, SEPTEMBER 1970

FIGURE A-4

EXPECTED CO CONCENTRATION DISTRIBUTION, WINTER, STATION 209, LAX
FOR 80 PERCENT AIRCRAFT CONTRIBUTION



FIGURE A-5

EXPECTED CO DISTRIBUTION, WINTER, STATION 209, LAX
FOR 20 PERCENT AIRCRAFT CONTRIBUTION

1-hour data and the 8-hour averaging time data, the 1-hour standard will be met if the strategies are imposed to meet the 8-hour standard.  This would appear to be the case in those areas at LAX where the 1-hour CO levels are higher than the standard at the present time.

# APPENDIX B:

# DISPERSION MODELING METHODOLOGY AND

# ISOPLETH DERIVATION

The primary and most direct method of estimating aircraft contributions to air pollutant concentrations involved the application of frequently used dispersion modeling procedures to estimate air pollutant concentrations caused by aircraft alone and by all sources located in the airport vicinity (within a 10-kilometer radius of the airport center). Dispersion models similar to the one used in this study are specified by EPA as one means of showing that implementation plans for certain regions will be adequate to meet the ambient air quality standards. Much of the analysis of aircraft air quality impact presented in this report is based on modeling work performed, under EPA contract, by Northern Research and Engineering Corporation. A general description of the modeling procedure is presented here; a more detailed account of the modeling work and results is available in the contract report.[3]

The procedure in the modeling study involved: (1) approximating emission sources as continuous, stationary point sources of constant strength over the time period being considered, (2) modeling the dispersion of pollutants from these sources using an empirical mathematical model, and (3) estimating concentrations at specified receptor points by summing the pollutant contributions from each point source, and (4) constructing isopleths of estimated pollutant concentrations based on the estimated receptor point concentrations.

The point sources used in the modeling approximated the location and strength of emission sources at each of the four airports studied. Lines along which automobile or aircraft movement occur were represented by series of point sources. Area sources, representing airport surroundings out to a 10-kilometer radius from the airport center, were represented by circular arrangements of point sources around the airports. Altogether, 149 to 276 point sources were used for each air carrier airport, depending on the size and complexity of the airport. The number of sources was chosen to provide a reasonable approximation of emissions at the

91

airport and in the vicinity without need for excessive
computer time or computer program complexity.

The basis of the atmospheric dispersion modeling is an
empirical, mathematical approximation of pollutant
dispersion after emission from a point source.  This
approximation yields a plume whose concentration
distribution is Gaussian in the vertical and crosswind
direction.  The distribution is dependent upon downwind
distance from the source and on atmospheric stability.
Eventually the upper boundary of the atmospheric mixing
layer restricts vertical spread of the plume and modifies
the distribution of pollutants in the vertical direction.
This dispersion model should be considered as a general
approximation of airport dispersion patterns; considerable
model development would be required to include more detailed
small-scale dispersion patterns, such as those around large
buildings or near jet blasts.

In calculation of long-term concentrations, the fact
that there is a distribution of meteorological conditions is
used to simplify the basic dispersion model.  The result,
known as the Martin-Tikvart model, approximates plume spread
in the crosswind direction and sums the contributions of all
combinations of wind speeds and atmospheric stabilities.

The concentration at any receptor point is obtained as
the sum of the contributions from each point source of
emissions.  The accuracy of the concentration value for this
type of model is dependent upon the proximity of the
receptor point and the emission sources.  Because the
sources of emission are actually a collection of points,
lines areas, and volumes, rather than merely a collection of
points, as assumed in the model, greater accuracy general'
results when the receptor point is not close proximity to
any sources.  To limit inaccuracies attributable to the
point source, receptor locations within 100 meters of a
point source were not considered in the results.

The model provided estimates of air pollutant
concentrations both from aircraft alone and from all sources
at a number of sites located in and around the selected
airports.  Receptors considered in this study were located
according to the following overall scheme at air carrier
airports: (1) one receptor at the center of each major
terminal, (2) one receptor 100 meters from the head of each
runaway, (3) sixteen receptors on the airport boundary,
spaced equally on a compass rose located at the designated
center of the airport, and (4) sixteen more receptors
located in the airport surroundings, 5 kilometers from the

92

center of the airport and spaced equally on the compass
rose.  Not more than 50 receptors were used, the actual
number depending on the number of terminals and runways at
each airport.

The resulting concentrations at the various receptor points
were used in constructing isopleths of pollutant
concentration.  Isopleths were constructed for 6-9 a.m.
hydrocarbon and annual NOx concentrations due to aircraft
alone, and for aircraft contributions to total CO
concentrations.

The model input data used in calculating annual
concentrations of NOx were based on yearly distributions of
wind direction, stability class and wind speed class, and
annual average values of mixing height and emission rates.
The short-term meteorological and activity conditions used
to calculate the 8-hour and 1-hour CO conditions and the 6-9
a.m. hydrocarbon concentration were chosen to be
representative of conditions that would be expected to yield
high concentrations of these pollutants, i.e., low wind
speed, high atmospheric stability, and low mixing height,
and moderate to high aircraft activity.  The conditions for
calculation of short-term concentrations are presented in
Table B-1.

Because the results of the model have not been
extensively validated or verified, the concentrations
generated by the model should be considered to be very
approximate.  They are useful, however, in indicating
general pollutant concentration levels of the extent of
aircraft contributions to localized pollutant concentration.

TABLE B-1

SHORT-TERM METEOROLOGICAL AND ACTIVITY CONDITIONS

| | 6-9 A.M. HC at L.A. Airport | 8-Hour CO at L.A. Airport[a] | LAX | 1-Hour CO ORD | JFK | DCA |
|---|---|---|---|---|---|---|
| Wind speed class | 1 | 1 | 1 | 1 | 1 | 1 |
| Stability class (Turner) | C | E | E | F | E | E |
| Wind direction, deg. | 255 | 255 | 90 | 215 | 200 | 320 |
| Wind variability, deg. | 20 | 20 | 40 | 30 | 10 | 20 |
| Mixing height, m. | 200 | 200 | 535 | 700 | 960 | 980 |
| Aircraft activity, LTO cycles. | 60 (1970) 79 (1980) | 260 | 54 | 49 | 30 | 34 |
| Direction of movement | West | West | E | SW | S | N |
| Idle time at runway, sec. | 60 | 150 | 240 | 260 | 540 | 300 |
| Estimated annual frequency of occurrence of meteorological con- itions | at least once | | 81 | 29[b] | 10 | 67 |

[a] These conditions are used in estimating ratios between aircraft generated and total 8-hour CO concentrations; the ratios are not sensitive to the conditions assumed.
[b]  Based on 5 months of data.

# APPENDIX C:

# AREA — SOURCE DISPERSION MODELING TO ESTIMATE

# DOWNWIND POLLUTANT CONCENTRATIONS

The modeling method used in this analysis involved approximating emissions both at airports and in surrounding areas as area sources, and relating these emissions to downwind pollutant concentrations by assuming Gaussian pollutant distribution in the vertical and crosswind directions. For each receptor point, the concentration caused by small-area elements was determined by integrating in the crosswind and upwind directions over each source region. The airport and surroundings were considered as separate source regions. The concentrations due to these two source regions were calculated separately then added together to obtain the total concentration at each receptor. Near the airport source, concentrations are the same as those from an area source of infinite extent.[32] At greater distances, edge effects caused by the finite width of the airport are considered by including the integration in the cross-wind direction. Also included is the limit to vertical mixing imposed by a more stable layer aloft.

For the purpose of this modeling, the airport was assumed to cover an area of 3.2 by 3.2 kilometers. The time period for the analysis, 8 a.m. to 11 a.m., was selected on the basis of recurring meteorological conditions conducive to high air pollutant concentrations. A diurnal correction factor was applied to the resulting concentrations to correct for the disproportionately greater amount of activity that occurred during this 3-hour period than occurred during other 3-hour periods during the day. The specific meteorological conditions used for the time period considered were: wind from west; stability class = 3, wind speed = 1.5 m/second mixing height = 200 m. These conditions are representative of severe conditions, from an air pollution standpoint, that are expected to occur at least once a year in the Los Angeles area.

95

# REFERENCES

1. Nature and Control of Aircraft Engine Exhaust Emissions. Report of the Secretary of Health, Education, and Welfare to the United States Congress. December 1968.

2. Jet Aircraft Emissions and Air Quality in the Vicinity of the Los Angeles International Airport. Air Pollution Control District, County of Los Angeles, California. April 1971.

3. The Potential Impact of Aircraft Emissions Upon Air Quality. Northern Research and Engineering Corporation. Final Report to the U. S. Environmental Protection Agency. Research Triangle Park, North Carolina. Contract Number 68-02-0085. December 1971.

4. Assessment of Aircraft Emission Control Technology. Northern Research and Engineering Corporation. Final Report to the U. S. Environmental Protection Agency. Research Triangle Park, North Carolina. Contract Number 68-04-0011. September 1971.

5. Analysis of Aircraft Exhaust Emission Measurements. Cornell Aeronautical Laboratory. Available from NTIS--PB 204-879. Contract Number 68-04-0040. October 1971.

6. National Primary and Secondary Ambient Air Quality Standards. Environmental Protection Agency. Federal Register 36(84):8187, April 30, 1971.

7. Air Quality Criteria for Hydrocarbons. U. S. DHEW, PHS, EHS, National Air Pollution Control Administration. Publication Number AP-64. Washington, D. C. March 1970.

8. Federal Air Quality Control Regions. Environmental Protection Agency, Office of Air Programs, Research Triangle Park, North Carolina. Publication Number AP-102. January 1972.

9. Requirements for Preparation, Adoption, and Submittal of Implementation Plans. Environmental Protection Agency. Federal Register 36(158):15486, August 14, 1971.

10. Mixing Heights, Wind Speeds, and Potential for Urban Air Pollution Throughout the Contiguous United States. Environmental Protection Agency, Office of Air Programs, Research Triangle Park, North Carolina. Publication Number AP-101. January 1972.

11. Climatography of U. S., Summary of Observations for Los Angeles International Airport, 1951-1960. U. S. Department of Commerce, Weather Bureau. Washington, D. C. 1962.

12. The State of California Implementation Plan for Achieving and
    Maintaining the National Ambient Air Quality Standards. California
    Air Resources Board. Sacramento, California. January 1972.

13. A Mathematical Model for Relating Air Quality Measurements to Air
    Quality Standards. Environmental Protection Agency, Office of Air
    Programs, Research Triangle Park, North Carolina. Publication
    Number AP-89. November 1971.

14. Nature and Control of Aircraft Engine Exhaust Emissions. Northern
    Research and Engineering Corporation. Final Report to the National
    Air Pollution Control Administration. Durham, North Carolina.
    Contract Number CPA 222-68-27. November 1968.

15. A Study of Aircraft Gas Turbine Engine Exhaust Emissions. Aerospace
    Industries Association. Washington, D. C. August 1971.

16. Collection and Assessment of Aircraft Emissions Baseline Data -
    Turbo-prop Engines. Detroit Diesel Allison Division (GMC). Avail-
    able from NTIS--PB 202-961. Contract Number 68-04-0029. September
    1971.

17. Exhaust Emissions Test: AiResearch Aircraft Propulsion and Auxiliary
    Power Gas Turbine Engines. AiResearch Division Garrett Corporation.
    Available from NTIS--PB 204-920. Contract Number 68-04-0022.
    September 1971.

18. Assessment of Aircraft Emission Control Technology. Northern
    Research and Engineering Corporation. Available from NTIS--PB 204-878.
    Contract Number 68-04-0011. September 1971.

19. Collection and Assessment of Aircraft Emissions - Piston Engines.
    Teledyne Continental Motors. Available from NTIS--PB 204-196.
    Contract Number 68-04-0035. October 1971.

20. Analysis of Aircraft Exhaust Emission Measurements: Statistics.
    Cornell Aeronautical Laboratory. Available from NTIS--PB 204-869.
    Contract Number 68-04-0040. November 1971.

21. A Study of Aircraft Powerplant Emissions (Piston and Turbine).
    Scott Research Laboratories, Inc. Available from NTIS--PB 207-107.
    Contract Number 68-04-0037. January 1971.

22. Collection and Assessment of Aircraft Emissions Baseline Data -
    Turbine Engines. Pratt and Whitney Aircraft. Available from NTIS--
    PB 207-321. Contract Number 68-04-0027. February 1972.

98

23. A Field Survey of Emissions from Aircraft Turbine Engines. U. S. Bureau of Mines, RI 7634. Bartlesville Energy Research Center, Bartlesville, Oklahoma.

24. Gaseous Emissions from a Limited Sample of Military and Commercial Aircraft Turbine Engines. Southwest Research Institute. Available from NTIS--PB 204-177. Interim Report, Contract Number EHS 70-108.

25. A Study of Exhaust Emissions from Reciprocating Aircraft Power Plants. Scott Research Laboratories. Available from NTIS--PB 197-627. Contract Number CPA 22-69-129. December 1970.

26. Design Criteria for Control of Nitrogen Oxide Emissions from Aircraft Turbine Engines. Ronald S. Fletcher, Richard D. Siegel, and E. Karl Bastress. Northern Research and Engineering Corporation. Report Number 1162-1.

27. Time Requirements for Retrofitting Jet Aircraft with Improved Combustor Design. Northern Research and Engineering Corporation. Final Report to National Air Pollution Control Administration, Durham, North Carolina. Contract Number CPA 22-69-90. July 1969.

28. Reduction of Nitrogen Oxides from Gas Turbines by Steam Injection. N. R. Dibelius, M. B. Hilt, and R. H. Johnson. ASME Paper 71-67-58, American Society of Mechanical Engineers.

29. A Study of Exhaust Emissions from Reciprocating Aircraft Power Plants. Scott Research Laboratories, Inc. Scott Project Number 1136. Final Report to the U. S. Environmental Protection Agency. Research Triangle Park, North Carolina. Contract Number CPA 22-69-129. December 1970.

30. Profile of Air Pollution Control. County of Los Angeles, Air Pollution Control District. 1971.

31. Ambient Carbon Monoxide Exposures. R. I. Larsen and H. W. Burke. APCA 69-167, Air Pollution Control Association. June 1969.

32. A Simple Method of Calculating Dispersion for Urban Areas. Steven R. Hanna. Journal of the Air Pollution Control Association, $21$(12):774-777. December 1971.

☆U.S. GOVERNMENT PRINTING OFFICE: 1973  514-151/133 1-3

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRIENDS OF THE EARTH )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES ENVIRONMENTAL )<br>PROTECTION AGENCY, et al., )<br><br>Defendants. ) | Civ No. 1: 12-cv-00363(ABJ) |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MARIANNE L. ENGELMAN LADO
BRIDGET M. LEE
Admitted *pro hac vice*
Earthjustice
156 William Street, Suite 800
New York, NY 10038
(212) 791-1881
(212) 918-1556 [*FAX*]
mengelmanlado@earthjustice.org
blee@earthjustice.org

TIMOTHY D. BALLO
D.C. Bar No. 977077
Earthjustice
1625 Massachusetts
Avenue NW, Suite 702
Washington, DC 20036
(202) 667-4500
(202) 667-2356 [*FAX*]
tballo@earthjustice.org

HELEN KANG
DEBORAH BEHLES
Golden Gate University
School of Law
Environmental Law and
Justice Clinic
536 Mission Street
San Francisco, CA 94105
(415) 442-6647
(415) 896-2450 [*FAX*]
hkang@ggu.edu
dbehles@ggu.edu

*Counsel for Friends of the Earth*

Dated: September 14, 2012

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ........................................................................................................... 1

I.      FACTUAL AND REGULATORY BACKGROUND ........................................... 2

     A.    EPA Has Long Known that Lead Air Pollution Endangers Human Health
          and Has Repeatedly Regulated Lead Emissions. ......................................... 2

     B.    EPA Has Recognized the Contribution to Overall Lead Air Pollution
          Made by Lead Emissions from Aircraft Engines. ...................................... 5

II.     LEGAL STANDARD .......................................................................................... 7

III.    ARGUMENT ....................................................................................................... 7

     A.    EPA Has a Mandatory Duty to Determine Whether Emissions from
          Aircraft Cause or Contribute to Air Pollution that May Endanger Public
          Health or Welfare. ...................................................................................... 7

          1.   The Plain Meaning and Structure of Section 231 Establishes a
              Mandatory Duty that EPA Undertake an Endangerment Determination
              ...................................................................................................... 8

          2.   EPA's Ability to Exercise Discretion in Making an Endangerment
              Determination Does Not Diminish Its Mandatory Duty to Conduct
              Such Determination. ................................................................... 13

          3.   The Legislative History of the Clean Air Act Supports the Plain
              Meaning of Section 231, Which Imposes a Mandatory Duty to
              Conduct an Endangerment Determination. ........................................ 16

     B.    EPA Has a Mandatory Duty to Make an Endangerment Determination
          Specifically for Lead. ................................................................................ 19

     C.    Sovereign Immunity Does Not Apply When EPA Has a Mandatory
          Duty…………………………………………………………………....24

CONCLUSION.................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alaska Department of Environmental Conservation v. EPA,*
  540 U.S. 461 (2004)......................................................................................................13

*Allied Pilots Association v. Pension Benefit Guarantee Corporation,*
  334 F.3d 93 (D.C. Cir. 2003) ....................................................................................9, 12

*America's Community Bankers v. F.D.I.C.,*
  200 F.3d 822 (D.C. Cir. 2000) .......................................................................................12

*American Lung Association v. Reilly,*
  962 F.2d 258 (2d Cir. 1992)......................................................................................15, 17

*American Trucking Associations v. EPA,*
  175 F.3d 1027 (D.C. Cir. 1999) .....................................................................................15

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)..........................................................................................................7

*Beaty v. Food & Drug Administration,*
  --- F. Supp. 2d --, 2012 WL 1021048 (D.D.C. Mar. 27, 2012) ................................11

*Bennett v. Spear,*
  520 U.S. 154 (1997)......................................................................................................9, 14

*Bloomgarden v. Coyer,*
  479 F.2d 201 (D.C. Cir. 1973) .........................................................................................7

*Burnett v. Al Baraka Investment & Development Corporation,*
  274 F. Supp. 2d 86 (D.D.C. 2003) ................................................................................12

*Center for Biological Diversity v. EPA,*
  794 F. Supp. 2d 151 (D.D.C. 2011) ....................................................................... passim

*Center for Biological Diversity v. U.S. Fish & Wildlife Service,*
  450 F.3d 930 (9th Cir. 2006) ..........................................................................................11

*Chamber of Commerce v. Reich,*
  74 F.3d 1322 (D.C. Cir. 1996) ........................................................................................24

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
  467 U.S. 837 ......................................................................................................................16

*Coalition for Responsible Regulation v. EPA,*
  684 F.3d 102 (D.C. Cir. 2012) ................................................................................21

*Environmental Defense Fund v. Thomas,*
  870 F.2d 892 (2d Cir. 1989) .............................................................................14, 15

*Ethyl Corporation v. EPA,*
  541 F.2d 1 (D.C. Cir. 1976) .................................................................8, 18, 20, 23

*Harrison v. PPG Industries,*
  446 U.S. 578 (1980) ...............................................................................................16

*Lane v. Pena,*
  518 U.S. 187 (1996) ...............................................................................................25

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
  523 U.S. 26 (1998) .................................................................................................12

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ..........................................................................................14, 21

*Montgomery v. Chao,*
  546 F.3d 703 (D.C. Cir. 2008) ................................................................................7

*National Association of Clean Air Agencies v. EPA,*
  489 F.3d 1221 (D.C. Cir. 2007) ..................................................................11, 14, 17

*Natural Resources Defense Council, Inc. v. Train,*
  545 F.2d 320 (2d Cir. 1976) ..................................................................................20

*Pennsylvania v. Del. Valley Citizens' Council for Clean Air,*
  483 U.S. 711 (1987) ...............................................................................................16

*Porto Rico Railway, Light & Power Co. v. Mor,*
  253 U.S. 345 (1920) .................................................................................................9

*Ruckelshaus v. Sierra Club,*
  463 U.S. 680 (1983) ...............................................................................................16

*Sea-Land Service, Inc. v. Alaska Railroad,*
  659 F.2d 243 (D.C. Cir. 1981) ..............................................................................24

*Sierra Club v. EPA,*
  850 F. Supp. 2d 300 (D.D.C. 2012) ......................................................................24

*Sierra Club v. Leavitt,*
  355 F. Supp. 2d 544 (D.D.C. 2005) .................................................................15, 24

iv

*Trudeau v. Federal Trade Commission,*
   456 F.3d 178 (D.C. Cir. 2006) .................................................................................24

*United States ex rel. Totten v. Bombardier Corporation,*
   380 F.3d 488 (D.C. Cir. 2004) ...........................................................................12, 13

**STATUTES**

5 U.S.C. § 702 ...................................................................................................................24

42 U.S.C. §§ 7401–7671(q) ................................................................................................8

42 U.S.C. § 7408(1)(A) .......................................................................................................2

42 U.S.C. § 7412(b)(1) ......................................................................................................23

42 U.S.C. § 7571(a) ....................................................................................9, 11, 17, 22

42 U.S.C. § 7571(a)(1) ......................................................................................................10

42 U.S.C. § 7571(a)(2)(A) ...................................................................................8, 19, 21

42 U.S.C. § 7571(a)(3) .................................................................................................10, 11

42 U.S.C. § 7602(g) ..........................................................................................................21

Fed. R. Civ. P. 56(a) ...........................................................................................................7

**LEGISLATIVE HISTORY**

H.R. Conf. Rep. No. 95-564 (Aug. 3, 1977) ...............................................................18, 23

H.R. Rep. No. 91-1146 (Dec. 31, 1970) .............................................................................17

H.R. Rep. No. 95-294 (May 12, 1977) .....................................................14, 18, 19, 23

Pub. L. No. 91-604, § 231(a)(1)–(2); 84 Stat. 1676, 1703–04 (Dec. 31, 1970) .............17, 23

Pub. L. No. 95-95, § 401(f); 91 Stat. 685, 791 (Aug. 7, 1977) ...........................17, 22, 23

**REGULATIONS AND FEDERAL REGISTER ENTRIES**

14 C.F.R. § 34.61 ..............................................................................................................20

40 C.F.R. § 87.21 ........................................................................................................20, 21

40 C.F.R. § 471.13 ............................................................................................................23

38 Fed. Reg. 19,088 (July 17, 1973) ...............................................................................21, 22

EPA, 1977 Clean Air Act Amendments to Prevent Significant Deterioration, 43 Fed. Reg.
26,388 (June 19, 1978)..........................................................................................................21

EPA, Addition of Lead to List of Air Pollutants, 41 Fed. Reg. 14,921 (Apr. 8, 1976) .............2, 23

EPA, Advance Notice of Proposed Rulemaking on Lead Emission from Piston-Engine
Aircraft Using Leaded Aviation Gasoline, 75 Fed. Reg. 22,440 (Apr. 28, 2010) .................5, 6

EPA, Air Quality Designations for the 2008 Lead (Pb) National Ambient Air Quality
Standards, 75 Fed. Reg. 71,033 (Nov. 22, 2010)........................................................................6

EPA, Air Quality Designations for the 2008 Lead (Pb) National Ambient Air Quality
Standards, 76 Fed. Reg. 72,097 (Nov. 22, 2011)........................................................................6

EPA, Control of Air Pollution from New Motor Vehicles and New Motor Vehicle
Engines; Certification and Test Procedures; Gasoline Lead Content, 53 Fed. Reg. 470
(Jan. 7, 1988)..........................................................................................................................24

EPA, Endangerment and Cause or Contribute Findings for Greenhouse Gases Under
Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496 (Dec. 15, 2009) ("GHG
Endangerment Finding").............................................................................................................8

EPA, Lead; Identification of Dangerous Lead Levels, 66 Fed. Reg. 1206 (Jan. 5, 2001)...............3

EPA, National Ambient Air Quality Standards for Lead, 73 Fed. Reg. 66,964 (Nov. 12,
2008) ...................................................................................................................................3, 4, 5

EPA, National Primary and Secondary Ambient Air Quality Standards for Lead, 43 Fed.
Reg. 46,246 (Oct. 5, 1978)....................................................................................................2, 3

EPA, Petition Requesting Rulemaking to Limit Lead Emissions from General Aviation
Aircraft; Request for Comments, 72 Fed. Reg. 64,570 (Nov. 16, 2007)....................................5

EPA, Prohibition on Gasoline Containing Lead or Lead Additives for Highway Use, 61
Fed. Reg. 3832 (Feb. 2, 1996) ..................................................................................................3

EPA, Regulation of Fuel and Fuel Additives, 47 Fed. Reg. 38,070 (Aug. 27, 1982).....................3

EPA, Regulation of Fuels and Fuel Additives, 37 Fed. Reg. 3882 (Feb. 23, 1972)................20, 23

EPA, Regulation of Fuels and Fuel Additives, 38 Fed. Reg. 1254 (Jan. 10, 1973)............2, 20, 23

**OTHER AUTHORITIES**

EPA, Air Quality Criteria for Lead (June 1986), Docket ID No. EPA-HQ-OAR-2007-
0294-0178 (filed Apr. 28, 2010) ...............................................................................................3

EPA, Integrated Science Assessment for Lead (Second External Review Draft) (Feb. 2012), *available at* http://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=235331#Download ................................. 4

EPA, Lead Emissions from the Use of Leaded Aviation Gasoline in the United States, Technical Support Document (Oct. 2008), Docket ID No. EPA-HQ-OAR-2006-0735-5917 (filed Dec. 18, 2009) ......................................................................................................... 7

EPA, Lead Emissions from Use of Leaded Aviation Gasoline, Technical Support Document, Docket ID No. EPA-HQ-OAR-2007-0294-0163 (Oct. 2008) (filed Apr. 28, 2010) ................................................................................................................................... 6

EPA, PBT National Action Plan for Alkyl-lead (June 2002), Docket ID No. EPA-HQ-OAR-2007-0294-0158 (filed Apr. 28, 2010) ............................................................................. 5

EPA, Recommended Best Practice for Quantifying Speciated Organic Gas Emissions from Aircraft Equipped with Turbofan, Turbojet, and Turboprop Engines (May 2009), http://www.epa.gov/nonroad/aviation/420r09901.pdf ................................................... 22

EPA, Table of EPA Initial Nonattainment Designations, http://www.epa.gov/leaddesignations/2008standards/documents/2010-11-16/table1.html (last visited Sept. 14, 2012) ............................................................................... 7

Friends of the Earth, Supplemental Comment on EPA's ANPR (Feb. 16, 2011), Docket ID No. EPA-HQ-OAR-2007-0294-0498 (filed Feb. 23, 2011) ................................................. 6

Friends of the Earth, Supplemental Comments on EPA's ANPR (Aug. 31, 2011), Docket ID No. EPA-HQ-OAR-2007-0294-0501 (filed Sept. 1, 2011) ................................................. 4

Friends of the Earth, Supplemental Comments on EPA's ANPR (Nov. 28, 2011), Docket ID No. EPA-HQ-OAR-2007-0294-0503 (filed Nov. 30, 2011) ................................................. 6

Marie Lynn Miranda et al., *A Geospatial Analysis of the Effects of Aviation Gasoline on Childhood Blood Lead Levels*, Envtl. Health Perspectives 119 (Oct. 2011), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3230438/ ..................................................... 4

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Pursuant to this Court's Order of August 20, 2012, Plaintiff Friends of the Earth ("FoE")

files this memorandum in opposition to the portion of Defendants' Motion for Summary

Judgment that concerns the threshold issue whether Section 231(a)(2)(A) of the Clean Air Act

imposes a non-discretionary duty to determine whether lead emissions from lead-fueled general

aviation aircraft engines cause or contribute to lead air pollution which may reasonably be

anticipated to endanger public health or welfare. FoE seeks to compel the United States

Environmental Protection Agency and Lisa Jackson, the Agency's Administrator (collectively,

"EPA"), to carry out this duty, which EPA has avoided for decades despite its long recognition

that there is no safe exposure level for lead and that use of aviation gasoline is the largest source

of lead emissions in the United States. Given overwhelming evidence of the grave health effects

caused by human lead exposure and the contribution of aircraft lead emissions to air pollution, it

is unconscionable that EPA has failed to carry out its duty to make an endangerment

determination.

The existence of an enforceable mandatory duty is manifest by the plain meaning and

structure of Section 231(a) and is supported by the legislative history of the Act. An

endangerment determination is a compulsory step within EPA's duty to regulate aircraft

emissions. *Ctr. for Biological Diversity v. EPA*, 794 F. Supp. 2d 151, 158–62 (D.D.C. 2011)

("*CBD*"). Moreover, Section 231(a) specifically requires that EPA study "emissions of air

pollutants from aircraft" and, following such study, that EPA propose emissions standards for

those pollutants. Lead, uncontrovertibly, fits under the definition of "air pollutant," and, indeed,

EPA identified lead as an air pollutant from aircraft when it conducted its Section 231(a)(1)

1

study forty years ago. The plain language, structure, and legislative history of the Act compel

EPA to undertake the endangerment determination as to aircraft lead emissions. For these

reasons, FoE requests that this Court find that EPA has a mandatory duty under Clean Air Act

Section 231(a)(2) and deny EPA's Motion for Summary Judgment.

## I.    FACTUAL AND REGULATORY BACKGROUND

### A. EPA Has Long Known that Lead Air Pollution Endangers Human Health and Has Repeatedly Regulated Lead Emissions.

EPA has repeatedly regulated lead with the growing understanding of lead's toxicity,

particularly its serious adverse impacts on children. In 1973, in recognition of the risks posed by

lead exposure, EPA began to phase out the use of lead in motor vehicle gasoline, noting that the

resulting lead air pollution presented "a significant risk of harm to the health of urban population

groups, especially in children." EPA, Regulation of Fuels and Fuel Additives, 38 Fed. Reg. 1254

(Jan. 10, 1973).

In 1976, under Section 108 of the Clean Air Act, EPA listed lead as a criteria pollutant—

*i.e.*, a pollutant from numerous or diverse sources that endangers public health or welfare. *See*

EPA, Addition of Lead to List of Air Pollutants, 41 Fed. Reg. 14,921 (Apr. 8, 1976); 42 U.S.C.

§ 7408(1)(A). In 1978, EPA promulgated National Ambient Air Quality Standards ("NAAQS")

for airborne lead emissions, concluding that "it remains the Agency's belief that airborne lead

directly and indirectly contributes to the risk of adverse health consequences and that sufficient

clinical and epidemiological evidence is available to form a judgment as to the extent of this

contribution." EPA, National Primary and Secondary Ambient Air Quality Standards for Lead,

43 Fed. Reg. 46,246, 46,250 (Oct. 5, 1978). EPA based its decision on its finding that increases

in airborne lead leads to increases in blood lead levels and that adverse health effects from

2

increased blood lead levels include the "risk of permanent, severe, neurological damage or death." *Id.* at 46,247.

In 1982, EPA reiterated its "concern over the impact of total environmental loadings of lead, including exposures that may result from contaminated soil, dust, water, or foodstuffs . . . [and, thus,] increases in exposure resulting from increased use of lead in gasoline should be avoided." EPA, Regulation of Fuel and Fuel Additives, 47 Fed. Reg. 38,070, 38,076 (Aug. 27, 1982).

In 1986, EPA revised its "Air Quality Criteria" for lead, recognizing that lead is more dangerous than EPA had previously found and concluding that reducing lead air pollution would "result in significant widespread reductions in levels of lead in human blood." EPA, Air Quality Criteria for Lead 1-159 (June 1986), Docket ID No. EPA-HQ-OAR-2007-0294-0178 (filed Apr. 28, 2010). EPA recognized that "young children are at greatest risk for experiencing lead-induced health effects." *Id.*[1]

In 1996, EPA completed its phaseout of the last one percent of lead from automobile gasoline. *See* EPA, Prohibition on Gasoline Containing Lead or Lead Additives for Highway Use, 61 Fed. Reg. 3832 (Feb. 2, 1996).

In 2001, EPA acknowledged that "there is no known threshold for lead." EPA, Lead; Identification of Dangerous Lead Levels, 66 Fed. Reg. 1206, 1215 (Jan. 5, 2001); *see also* 73 Fed. Reg. at 66,984 (acknowledging that "there is now no recognized safe level of [lead] in children's blood").

---

[1] Indeed, in 1991, the Secretary of Health and Human Services characterized lead poisoning as the "number one environmental threat to the health of children in the United States." EPA, National Ambient Air Quality Standards for Lead, 73 Fed. Reg. 66,964, 66,968 (Nov. 12, 2008).

3

In 2008, EPA tightened the air quality standards for lead due to increased evidence of

adverse health effects at lower levels than previously thought. *See* 73 Fed. Reg. 66,964. In

particular, the Administrator found that "the current evidence indicates the need for a standard

level that is substantially lower than the current level to provide increased public health

protection, especially for at-risk groups, including most notably children."[2] *Id.* at 66,985. EPA

recognized that airborne lead emissions can continue to harm human health for years: "[o]nce

deposited out of the air, [lead] can subsequently be resuspended into the ambient air and, because

of the persistence of [lead], [lead] emissions contribute to media concentrations for some years

into the future." *Id.* at 66,971.

As part of its most recent review of the NAAQS for lead, EPA acknowledged that "[w]ith

each successive assessment to-date, the epidemiologic and toxicological study findings show that

progressively lower blood [lead] levels or [lead] exposures are associated with cognitive deficits

and behavioral impairments." EPA, Integrated Science Assessment for Lead (Second External

Review Draft) 2-63 (Feb. 2012), *available at*

http://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=235331#Download (last visited Sept. 13,

2012).

As EPA has acknowledged, there is no safe exposure level for lead; even small, discrete

doses of emissions can cause adverse health impacts. 73 Fed. Reg. at 66,972 (recognizing that

no "safe" threshold exists). The adverse health effects from lead exposure include "neurological,

---

[2] Children who live near sources of airborne lead, such as airports that use leaded aviation gasoline, have increased blood lead levels and, thus, a higher risk of adverse impacts from lead air pollution. *See* Marie Lynn Miranda et al., *A Geospatial Analysis of the Effects of Aviation Gasoline on Childhood Blood Lead Levels*, Envtl. Health Perspectives 119(10) (Oct. 2011), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3230438/ (last visited Sept. 12, 2012) (submitted to EPA on August 31, 2011, *see* Friends of the Earth, Supplemental Comments on EPA's ANPR (Aug. 31, 2011), Docket ID No. EPA-HQ-OAR-2007-0294-0501 (filed Sept. 1, 2011).

4

hematological and immune effects for children and hematological, cardiovascular and renal effects for adults." *Id.* at 66,987. Indeed, EPA has documented both the risk and severity of the effects of lead air pollution on human health. EPA, Advance Notice of Proposed Rulemaking on Lead Emission from Piston-Engine Aircraft Using Leaded Aviation Gasoline, 75 Fed. Reg. 22,440, 22,449 (Apr. 28, 2010) ("Lead has been demonstrated to exert 'a broad array of deleterious effects on multiple organ systems via widely diverse mechanisms of action'" and "has been classified as a probable human carcinogen.").

### B. EPA Has Recognized the Contribution to Overall Lead Air Pollution Made by Lead Emissions from Aircraft Engines.

EPA has recognized that lead is an air pollutant emitted by aircraft since 1972. *See* EPA, Aircraft Emissions: Impact on Air Quality and Feasibility of Control 5 (1972) (attached as Ex. A to the Decl. of Bridget M. Lee (Sept. 14, 2012) and submitted herewith). Ten years ago, EPA also identified aviation gasoline as the largest lead pollution source category in the nation. *See* EPA, Petition Requesting Rulemaking to Limit Lead Emissions from General Aviation Aircraft; Request for Comments, 72 Fed. Reg. 64,570, 64,571 (Nov. 16, 2007) (discussing the results of the 2002 emissions inventory); EPA, PBT National Action Plan for Alkyl-lead (June 2002), Docket ID No. EPA-HQ-OAR-2007-0294-0158 (filed Apr. 28, 2010). In 2010, EPA issued an Advance Notice of Proposed Rulemaking ("ANPR") for lead emissions from aircraft that described information upon which EPA would rely in conducting an eventual endangerment determination. *See* 75 Fed. Reg. at 22,440. The ANPR documents EPA's recognition that lead emissions from aircraft contribute to increased concentrations of lead in the air. *See id.* at 22,457–58 (citing Bill Piazza, Los Angeles Unified School District, Envtl. Health & Safety Board, Santa Monica Municipal Airport: A Report on the Generation and Downwind Extent of Emissions Generated from Aircraft and Ground Support Operations (June 1999), Docket ID No.

5

EPA-HQ-OAR-2007-0294-0123 (filed Apr. 28, 2010)). Lead from general aviation aircraft
engines is released at approximately 20,000 airports throughout the country and represent "the
largest single source category for emissions of lead to air, comprising approximately half of the
national inventory." *Id.* at 22,440, 22,442. In the ANPR, EPA reported that 779 tons of lead
were estimated to have been emitted from aircraft in just one year. *Id.* at 22,453.

Studies confirm the contribution of aircraft emissions to airborne lead pollution, as EPA
has acknowledged. For example, in 2006 and 2007, EPA conducted a study at the Santa Monica
Airport of lead emissions from piston-engine aircraft. *Id.* at 22,458. EPA reported that "ambient
lead increased with increasing proximity to the airport" and that the data from the Santa Monica
Airport study "suggest that piston-engine activity can increase ambient lead concentrations in
downwind neighborhood sites, resulting in levels that are four to five times higher than
background levels and maximum impact site concentrations that are up to 25 times higher than
background lead levels." *Id.*

Significantly, airports at which leaded aviation gasoline is used are located in or near
each of the twenty areas identified by EPA as failing to meet federal Clean Air Act standards for
lead air pollution. *Compare* EPA, Air Quality Designations for the 2008 Lead (Pb) National
Ambient Air Quality Standards, 75 Fed. Reg. 71,033 (Nov. 22, 2010), *and* EPA, Air Quality
Designations for the 2008 Lead (Pb) National Ambient Air Quality Standards, 76 Fed. Reg.
72,097 (Nov. 22, 2011), *with* EPA, Lead Emissions from Use of Leaded Aviation Gasoline,
Technical Support Document, Docket ID No. EPA-HQ-OAR-2007-0294-0163 (Oct. 2008) (filed
Apr. 28, 2010); *see also* Friends of the Earth, Supplemental Comment on EPA's ANPR (Feb. 16,
2011), Docket ID No. EPA-HQ-OAR-2007-0294-0498 (filed Feb. 23, 2011); Friends of the
Earth, Supplemental Comments on EPA's ANPR (Nov. 28, 2011), Docket ID No. EPA-HQ-

6

OAR-2007-0294-0503 (filed Nov. 30, 2011). In fact, three of the highest lead-emitting airports

are located in Los Angeles County, a non-attainment area. *See* EPA, Lead Emissions from the

Use of Leaded Aviation Gasoline in the United States, Technical Support Document 11–12 (Oct.

2008), Docket ID No. EPA-HQ-OAR-2006-0735-5917 (filed Dec. 18, 2009) (Van Nuys; Long

Beach/Daugherty F; Brackett Field); EPA, Table of EPA Initial Nonattainment Designations,

http://www.epa.gov/leaddesignations/2008standards/documents/2010-11-16/tableI.html (last

visited Sept. 14, 2012).

## II.    LEGAL STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A summary

judgment motion "must withstand scrutiny on both its factual and legal foundations."

*Bloomgarden v. Coyer*, 479 F.2d 201, 207 (D.C. Cir. 1973). In assessing a summary judgment

motion, a court "must view the evidence in the light most favorable to the nonmoving party [and]

draw all reasonable inferences in his favor." *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir.

2008). As set forth below, Defendants have not demonstrated that they are entitled to judgment

as a matter of law based on material facts that are not genuinely disputed and, thus, the Court

should deny EPA's motion.

## III.   ARGUMENT

### A. EPA Has a Mandatory Duty to Determine Whether Emissions from Aircraft Cause or Contribute to Air Pollution that May Endanger Public Health or Welfare.

Section 231(a)(2)(A) imposes on EPA a mandatory duty to determine whether lead

emissions from aircraft engines cause or contribute to lead air pollution which may reasonably be

7

anticipated to endanger public health or welfare. 42 U.S.C. § 7571(a)(2)(A).[3] The existence of

such duty is manifest by the plain meaning of Section 231(a) and is supported by the overall

structure of the section and of the statute as a whole as well as by the legislative history of the

Clean Air Act.

### 1. The Plain Meaning and Structure of Section 231 Establishes a Mandatory Duty that EPA Undertake an Endangerment Determination.

The Clean Air Act, 42 U.S.C. §§ 7401–7671(q), grants the Administrator of the EPA

exclusive authority to regulate aircraft emissions. Specifically, Section 231(a) of the Act—

originally enacted in 1970 and amended to its present form in 1977—sets forth the following

scheme for the regulation of such pollutants:

Study; proposed standards; hearings; issuance of regulations

(1) Within 90 days after December 31, 1970, the Administrator *shall* commence a study and investigation of emissions of air pollutants from aircraft in order to determine--
(A) the extent to which such emissions affect air quality in air quality control regions throughout the United States, and
(B) the technological feasibility of controlling such emissions.

(2)(A) The Administrator *shall*, from time to time, issue proposed emission standards applicable to the emission of any air pollutant from any class or classes of aircraft engines which in his judgment causes, or contributes to, air pollution which may reasonably be anticipated to endanger public health or welfare.

---

[3] Under Section 231(a)(2)(A), EPA must determine (1) whether lead air pollution, considered cumulatively, may reasonably be anticipated to endanger public health or welfare, and (2) whether lead emissions from general aviation aircraft engines cause or contribute to overall lead air pollution. *See* EPA, Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496, 66,506 (Dec. 15, 2009) ("GHG Endangerment Finding") (interpreting the parallel endangerment finding standard for motor vehicles, the EPA stated that "the Administrator is to consider the cumulative impact of sources of a pollutant in assessing the risks from air pollution, and is not to look only at the risks attributable to a single source or class of sources" and that the Administrator "need not find that emissions from any one sector or group of sources are the sole or even the major part of an air pollution problem"). EPA need not possess proof of actual harm in order to make an endangerment finding. *See Ethyl Corp. v. EPA*, 541 F.2d 1, 13–20 (D.C. Cir. 1976).

8

(B)(i) The Administrator *shall* consult with the Administrator of the Federal Aviation Administration on aircraft engine emission standards.
(ii) The Administrator *shall* not change the aircraft engine emission standards if such change would significantly increase noise and adversely affect safety.

(3) The Administrator *shall* hold public hearings with respect to such proposed standards. Such hearings *shall*, to the extent practicable, be held in air quality control regions which are most seriously affected by aircraft emissions. Within 90 days after the issuance of such proposed regulations, he *shall* issue such regulations with such modifications as he deems appropriate. Such regulations *may* be revised from time to time.

42 U.S.C. § 7571(a) (emphasis added).

By its plain meaning, Section 231(a)(2)(A)'s instruction creates a mandatory duty with its imperative language: the Administrator "*shall*, from time to time, issue proposed emission standards applicable to the emission of any air pollutant from any class or classes of aircraft engines which in his judgment causes, or contributes to, air pollution which may reasonably be anticipated to endanger public health or welfare." *Id.* (emphasis added); *see Bennett v. Spear*, 520 U.S. 154, 175 (1997) (finding the use of "the imperative shall" means a mandatory duty); *Allied Pilots Ass'n v. Pension Benefit Guar. Corp.*, 334 F.3d 93, 98 (D.C. Cir. 2003) (noting the "well-recognized principle that the word 'shall' is ordinarily the language of a command") (internal quotation marks and citation omitted). Here, "shall" imposes on EPA a mandatory duty to propose standards for air pollutants that cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare. "Shall" applies to the entire provision since there is no punctuation or words that suggest otherwise; "[w]hen several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all." *Porto Rico Ry., Light & Power Co. v. Mor*, 253 U.S. 345, 348 (1920). EPA cannot follow Congress's command that it issue emission standards for air pollutants unless and until EPA

9

makes an endangerment finding for such emissions. Determining endangerment is a compulsory first step within EPA's duty to regulate aircraft emissions; thus, EPA has a mandatory duty to undertake these determinations. *See CBD*, 794 F. Supp. 2d at 160.

The mandatory nature of the endangerment finding is further demonstrated by the plain language of other provisions in Section 231(a). The first clause of Section 231(a) places a mandatory duty on EPA to study aircraft emissions, their effect on air quality, and the feasibility of control measures. *See* 42 U.S.C. § 7571(a)(1). The statutory provision at issue here immediately follows the command to study the effect of aircraft emissions on air quality, thus indicating Congress's understanding that EPA would have completed a study of emissions to base its judgment regarding whether a particular pollutant endangers public health or welfare on the results of such study. Indeed, EPA did complete such study in 1972, and issued a report that identified six pollutants from aircraft, including lead. EPA, Aircraft Emissions: Impact on Air Quality and Feasibility of Control 5, 14–16 (1972) (listing "total hydrocarbons, carbon monoxide, nitrogen oxides, sulfur dioxide, particulate matter (including lead), and lead" as pollutants from aircraft).[4]

The third subsection of Section 231(a) mandates that EPA hold public hearings on its proposed standards and issue final regulations within 90 days of the issuance of proposed standards. 42 U.S.C. § 7571(a)(3). Each subsection places an unqualified mandatory duty on EPA, each designed to result in the imposition of enforceable standards for aircraft emissions. Under the most plain reading of Section 231(a), Congress has mandated that EPA conduct a

---

[4] In the 1972 study, EPA did not fully evaluate the impact of lead or sulfur oxides finding that it "is considered to be negligible in comparison to other sources of these two pollutants." EPA, Aircraft Emissions: Impact on Air Quality and Feasibility of Control 17 (1972). This statement was made before the phase-out of lead in automobile fuel. Since 2002, EPA has identified

10

study, propose standards, engage the public, and issue final regulations. *See Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1230 (D.C. Cir. 2007) (Congress "require[ed] the administrator to study and investigate emissions of air pollutants from aircraft and adopt regulations to control them."). Indeed, the first line of Section 231(a) reads: "Study; proposed standards; hearings; issuance of regulations." 42 U.S.C. § 7571(a).

Significantly, in contrast with the mandate of Section 231(a)(2) that EPA "*shall,* from time to time," propose regulations, Section 231(a)(3) provides that "[s]uch regulations *may* be revised from time to time." 42 U.S.C. § 7571(a)(3) (emphasis added). When a statute uses both "may" and "shall," the normal inference is that each is being used in its ordinary sense—the one being permissive, the other mandatory." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 935 (9th Cir. 2006); *see also Beaty v. Food & Drug Admin.*, --- F. Supp. 2d --, 2012 WL 1021048, *5 (D.D.C. Mar. 27, 2012) ("Given the structure of the statute, it is clear that Congress intended for the word 'shall' to have a different meaning than 'may'—specifically, to be mandatory rather than permissive."). The use of the word "may" in Section 231(a)(3) reinforces, by contrast, Congress's intent to establish a mandatory duty to conduct endangerment determinations under Section 231(a)(2)(A).

The D.C. District Court recently held that EPA's duty to regulate aircraft pollution under Section 231(a) includes a nondiscretionary duty to conduct endangerment findings. *CBD*, 794 F. Supp. 2d at 158–62 (holding that EPA has an enforceable duty under Section 231(a)(2)(A) independent of a petition for agency action to make an endangerment finding for greenhouse gases emitted by aircraft engines). The *CBD* court reasoned: "Congress's use of mandatory language, and paragraph 231(a)(2)(A)'s role in the aircraft-emissions-regulation regime created by section 231, strongly suggest that Congress intended the predicate

endangerment finding to be a compulsory step." *Id.* at 162. A conclusion that EPA is under no

obligation to conduct endangerment determinations would undermine Congress's clear command

that limits be placed on the harmful pollutants emitted from aircraft and render nugatory the

mandate to regulate. *See id.* at 160.

The *CBD* court's ruling is grounded in sound reasoning that is aligned with the canons of

statutory construction. The court examined the role of Section 231(a)(2)(A) in the context of the

surrounding provisions and of the statute as a whole. *Id.* ("EPA reads paragraph 231(a)(2)(A) in

a vacuum, but it cannot be understood without reference to the provisions around it."). The court

determined that "Congress's use of 'shall' throughout subsection 231(a) suggests that it intended

to mandate a certain outcome—the regulation of harmful aircraft emissions." *Id.* (citing *Allied

Pilots Ass'n v. Pension Ben. Guar. Corp.*, 334 F.3d at 99). Such examination is consistent with

the most basic tenets of statutory interpretation. "Consistency of interpretation of one portion of

a statute with the apparent meaning of another portion is a traditional tool of statutory

interpretation." *Am.'s Cmty. Bankers v. F.D.I.C.*, 200 F.3d 822, 836 (D.C. Cir. 2000) (citing

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998)). "It is the

entire statute that must be reviewed, however, and not specific clauses or provisions in

isolation." *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 93 (D.D.C. 2003) (citing

*Lexecon Inc. v. Milberg*, 523 U.S. at 36)). The *CBD* court undertook precisely this type of

analysis of Section 231(a)(2)(A)'s place within the overall scheme of the Clean Air Act.

Critically, the *CBD* court concluded that the duty to issue regulations under Section 231

"would be defeated by allowing EPA to avoid triggering its obligation to regulate in the first

place." 794 F. Supp. 2d at 160. Again, this conclusion is well grounded in the traditional canons

of statutory interpretation. *See United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488,

12

499 (D.C. Cir. 2004) (recognizing the "cardinal principle of statutory construction that a statute

ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or

word shall be superfluous, void, or insignificant") (quoting *Alaska Dep't of Envtl. Conservation

v. EPA*, 540 U.S. 461, 518 n.13 (2004)). An interpretation of Section 231(a)(2)(A) that allows

EPA never to determine endangerment would render superfluous Congress's command that the

Agency regulate such emissions.

Defendants' attempts to discredit the court's ruling in *CBD* amount to mere disagreement

with the court's reading of the relevant statutory provisions. Defendants read Section

231(a)(2)(A) in isolation, ignoring EPA's duty to conduct a study of aircraft emissions, the

Agency's 1972 study, and the identification of lead as an air pollutant emitted by aircraft

contained therein. Defendants' interpretation of Section 231(a)(2)(A) as allowing for the

perpetual non-regulation of potentially harmful pollutants—in the case of lead, non-regulation

dating back to the 1970s—ignores the plain language and overarching structure of Section 231(a)

and, if accepted, would fly in the face of the purpose of the statute. Thus, consistent with *CBD*,

this Court should determine that EPA has a mandatory duty under Section 231 to undertake an

endangerment determination.[5]

### 2. EPA's Ability to Exercise Discretion in Making an Endangerment Determination Does Not Diminish Its Mandatory Duty to Conduct Such Determination.

As this court concluded in *CBD*, the conclusion that Congress intended the predicate

endangerment determination to be a compulsory step "does not rob EPA of regulatory discretion;

on the contrary, . . . section 231 'confer[s] broad discretion to the Administrator to weigh various

---

[5] Indeed, Defendants mischaracterize the language of the statute, eliminating the word "shall" from Section 231(a)(2)(A). Defs.' Summ. J. Br. at 3 ("[U]nder Section 231, EPA *may* regulate a pollutant emitted by aircraft engines.") (emphasis added).

13

factors in arriving at appropriate standards' for aircraft emissions." *CBD*, 794 F. Supp. 2d at 162

(quoting *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d at 1230).[6]  The fact that Section

231(a)(2)(A) allows for the exercise of the Administrator's discretion related to the substance of

the endangerment finding does not diminish the underlying duty to undertake an endangerment

determination and, in the event endangerment is found, to issue emission standards.

The ability of EPA to use its judgment when making an endangerment determination

does not relieve EPA of its nondiscretionary duty to make *some* judgment and issue proposed

regulations accordingly.  *See Massachusetts v. EPA*, 549 U.S. 497, 533 (2007) ("[T]he use of the

word 'judgment' is not a roving license to ignore the statutory text.  It is but a direction to

exercise discretion within defined statutory limits."); *Envtl. Def. Fund v. Thomas*, 870 F.2d 892,

898–99 (2d Cir. 1989) (finding that a section of the Clean Air Act with a parallel structure

imposed a mandatory duty on EPA to revise air quality standards while leaving the content of the

regulatory decision within the Agency's discretion).  Indeed, as the Supreme Court held in

*Bennett v. Spear*—"[i]t is rudimentary administrative law that discretion as to the substance of

the ultimate decision does not confer discretion to ignore the required procedures of

decisionmaking." 520 U.S. at 172.

In addition to the *CBD* decision, other cases interpreting sections of the Clean Air Act

with structures similar to that of Section 231 support the *CBD* court's conclusion that the

existence of language affording an agency some discretion over its regulatory decisions does not

render discretionary a clear mandatory duty to conduct rulemaking.  In *Environmental Defense

Fund v. Thomas*, for example, plaintiffs sought to compel EPA to revise the NAAQS for sulfur

---

[6] As discussed below, *see infra* at Section III.B, the legislative history of the 1977 Clean Air Act
Amendments reinforces the conclusion that the language was intended to provide EPA discretion
to use its judgment in how it undertakes the endangerment determination, not whether.

14

oxides under Section 109(d) of the Clean Air Act. 870 F.2d 892. That section provided that "the

Administrator *shall* complete a thorough review of the criteria published under Section 108

. . . and promulgate such new standards *as may be appropriate*." *Id.* at 895 (emphasis added).

Like Section 231(a), Section 109(d) commands EPA to take certain action by using the word

"shall," but affords the Agency some discretion with respect to the specifics of such action. In

that case—much as it does here—EPA argued that the phrase "as may be appropriate" gave it

discretion "simply not to address the issue with a formal public opinion." *Id.* at 898. The Court

of Appeals for the Second Circuit rejected that argument, holding that "[t]he words 'as may be

appropriate' clearly suggest that the Administrator must exercise judgment and the presence of

'shall' in the section implies only that the district court has jurisdiction to order the

Administrator to make *some* formal decision whether to revise the NAAQS, the content of that

decision being within the Administrator's discretion." *Id.* at 898–99; *see also Am. Trucking*

*Ass'ns v. EPA*, 175 F.3d 1027, 1047 (D.C. Cir. 1999) (adopting the Second Circuit's reasoning

regarding mandatory duty from *Am. Lung Ass'n v. Reilly*, 962 F.2d 258, 262–63 (2d Cir. 1992),

which cited *Envtl. Def. Fund v. Thomas* with approval); *Sierra Club v. Leavitt*, 355 F. Supp. 2d

544, 549 (D.D.C. 2005) (holding that a statutory clause that provides an agency flexibility in

determining the substance of a regulation does not nullify a clear mandatory duty).

   Both the Second Circuit and the D.C. Circuit subsequently have reconfirmed the

*Environmental Defense Fund* court's finding that a nondiscretionary duty exists even where a

statute affords the agency some discretion with respect to the substance of its ultimate regulatory

decision. *See Am. Trucking Ass'ns v. EPA*, 175 F.3d at 1047; *Am. Lung Ass'n v. Reilly*, 962 F.2d

at 263. Similarly, here, contrary to EPA's argument, the "in his judgment language" does not

grant EPA the discretion to decline to conduct the requisite endangerment determinations.

15

3. **The Legislative History of the Clean Air Act Supports the Plain Meaning of Section 231, Which Imposes a Mandatory Duty to Conduct an Endangerment Determination.**

The amendments to the Clean Air Act directly support Plaintiff's plain meaning

interpretation of Section 231(a).[7]  In 1977, Congress amended various provisions of the Clean

Air Act, among them, Section 231(a)(1) and (a)(2).  The amendments of 1977 included changes

to subsections (a)(1) and (a)(2) of Section 231, shown here:

> (1) Within 90 days after ~~the date of the enactment of the Clean Air Act Amendments of 1970~~**December 31, 1970**, the Administrator shall commence a study and investigation of emissions of air pollutants from aircraft in order to determine--
> (A) the extent to which such emissions affect air quality in air quality control regions throughout the United States, and
> (B) the technological feasibility of controlling such emissions.
>
> (2) ~~Within 180 days after commencing such study and investigation, t~~**(A) The** Administrator ~~shall publish a report of such study and investigation and~~ shall**, from time to time,** issue proposed emission standards applicable to **the** emissions of any air pollutant from any class or classes of aircraft engines which in his judgment causes**,** or contributes to**,** ~~or are likely to cause or contribute to~~ air pollution which ~~endangers the~~ **may reasonably be anticipated to endanger** public health or welfare.

*Compare* Pub. L. No. 91-604, § 231(a)(1)–(2); 84 Stat. 1676, 1703–04 (Dec. 31, 1970) *with* Pub.

L. No. 95-95, § 401(f); 91 Stat. 685, 791 (Aug. 7, 1977) (amending 42 U.S.C. § 7571(a)).

The original language of Section 231(a)(2) provided: "[w]ithin 180 days after

commencing such study and investigation, the Administrator shall publish a report of such study

and investigation and shall issue proposed emissions standards . . . ."  Pub. L. No. 91-604, §

---

[7] The use of legislative history to discern Congressional intent is particular appropriate in the case of the complex Clean Air Act. *See, e.g., Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711, 723 (1987) (considering factors endorsed by Congress); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 851 (looking to the legislative history to determine Congressional intent); *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 683 (1983) (using legislative history to establish Congress's designation of discretionary authority); *Harrison v. PPG Indus.*, 446 U.S. 578, 589–90 (1980) (declining to adopt a statutory interpretation based on lack of support in the legislative history).

16

231(a)(2). In 1977, the report had been published, but EPA had yet to propose emissions standards for all of the pollutants identified in that study. Accordingly, the command to publish the report was removed and "from time to time" was substituted for "[w]ithin 180 days"—a deadline that had long passed. *Compare* Pub. L. No. 91-604, § 231(a)(2), *with* Pub. L. No. 95-95, § 401(f). The legislative history includes no indication that this change was meant to remove any mandatory duty.[8] *See CBD*, 794 F. Supp. 2d at 161 (EPA has a mandatory duty to act "from time to time" under Section 231). Indeed, the legislative history that accompanied the original enactment of Section 231 states that "Section 231 directs the Secretary to prescribe, *as soon as practicable*, giving appropriate consideration to technological feasibility and economic cost, emission standards for any class of aircraft or aircraft engines which cause or contribute to air pollution endangering the health or welfare of any persons." H.R. Rep. No. 91-1146 (Dec. 31, 1970). The mandatory regulatory sequence envisioned by Congress was not dismantled by Congress's recognition that EPA needed more time to execute the latter step.

In addition to altering the time frame during which EPA must carry out its mandatory duties under Section 231, the 1977 amendments standardized a number of other provisions of the Clean Air Act by allowing for regulation of emissions of air pollutants "which in [the Administrator's] judgment cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare." H.R. Conf. Rep. No. 95-564, at 183 (Aug. 3,

---

[8] The "from time to time" language sets no specific date for the fulfillment of the duty, but does not negate the duty. "[W]hen a statute requires agency action at indefinite intervals, such as 'from time to time' . . . 'unreasonable delay' [can] be a meaningful standard for judicial review. *Am. Lung Ass'n v. Reilly*, 962 F.2d at 263 (interpreting unreasonable delay provision in Section 304 of the Clean Air Act, 42 U.S.C. § 7604(a), which was added by the 1990 Clean Air Amendments); *see also Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d at 1229 (D.C. Cir. 2007) (relying on "from time to time" language in support of statement that Congress required EPA to study and adopt regulations to control aircraft emissions). By its terms, the mandate to act "from time to time" indicates a periodic and continuing duty.

1977) (uniform standard applies to Sections 108, 111, 202, 211, and 231, and to hazardous stationary source emissions). The legislative history indicates that Congress made such changes, including the language affording the Administrator discretion in weighing the risks associated with air pollution, to incorporate the reasoning of Court of Appeals for the D.C. Circuit in *Ethyl Corp. v. EPA*, 541 F.2d 1, which upheld EPA's regulation of lead additives to automobile gasoline given the precautionary nature and purpose of the Act's mandate to protect public health. *See* H.R. Rep. No. 95-294, at 46–47 (May 12, 1977) (citing *Ethyl*, 541 F.2d at 12–18).

In *Ethyl,* the court reasoned that: "[a] statute allowing for regulation in the face of danger is, necessarily, a precautionary statute. Regulatory action may be taken before the threatened harm occurs; indeed, the very existence of such precautionary legislation would seem to demand that regulatory action precede, and, optimally, prevent, the perceived threat." 541 F.2d at 13. Indeed, "[a]waiting certainty will often allow for only reactive, not preventive, regulation." *Id.* at 25. The 1977 amendments recognize the *Ethyl* court's reasoning that "[d]anger . . . is not set by a fixed probability of harm, but rather is composed of reciprocal elements of risk and harm, or probability and severity," 541 F.2d at 18, and allow the Agency to exercise its discretion when evaluating potential dangers to public health and welfare.

The House Report for the Clean Air Act Amendments of 1977 confirms that Congress had not intended the "in his judgment" language to exercise judgment in weighing and predicting future health risks. H.R. Rep. No. 95-294, at 51. The House Report states, "the committee language is intended to emphasize the necessarily judgmental element in the task of predicting future health risks of present action and to confer upon the Administrator the requisite authority to exercise such judgment." *Id.* The House Report continues:

> In upholding the majority opinion in the en banc rehearing in Ethyl, the committee is moving in a direction which is consistent with most judicial

18

> interpretations of the act. Most other courts have held that a substantial element
> of judgment, including making comparative assessment of risks, projections of
> future possibilities, establishing margins of safety and margins of error,
> extrapolating from limited data, etc., are necessary and permissible under the act
> in order to protect public health and encourage development of new technology.

*Id.* at 50–51. There is no indication that the "in his judgment" language in the original text, and

unchanged by the 1977 amendments, was meant to diminish EPA's mandatory duty to regulate

aircraft emissions. In fact, the opposite is true; the language is meant to remove the barrier of

needing definitive proof that such emissions cause harm before regulating. *Id.*

The plain reading of Section 231(a)(2)(A) as imposing a mandatory duty on EPA to

conduct endangerment findings is supported by the structure of the section and the overall

purpose of the Act as well as the legislative history of the 1977 amendments.

### B. EPA Has a Mandatory Duty to Make an Endangerment Determination Specifically for Lead.

In addition to the reasons discussed above, EPA's own interpretations and the legislative

history of Section 231 demonstrate that the Agency has a mandatory duty to make an

endangerment finding specifically for lead.

Section 231(a)(2)(A) requires the Administrator to "issue proposed emission standards

applicable to the emission of *any air pollutant* . . . ." 42 U.S.C. § 7571(a)(2)(A) (emphasis

added). Lead emissions fit within the definition of "air pollutant" under Section 231. Indeed,

EPA's 1972 report on its study of emissions of air pollutants from aircraft, which was required

by Section 231(a)(1), identified six pollutants from aircraft, including lead. EPA, Aircraft

Emissions: Impact on Air Quality and Feasibility of Control 10, 15 (1972). Except for lead, EPA

has regulated all the other air pollutants identified in its 1972 study. *See* 40 C.F.R. § 87.21

(regulating hydrocarbons, carbon monoxide, nitrogen dioxide and particulate matter, as a smoke

number); 14 C.F.R. § 34.61 (regulating sulfur level in fuel). As discussed above, *see supra*

19

Section III.A.1, the statute links EPA's mandatory duty to study air pollutants from aircraft and

the duty to conduct endangerment findings. Given that lead has long been identified as an air

pollutant under Section 231 and EPA conducted the study as required by Section 231(a)(1), EPA

has a mandatory duty to undertake the endangerment determination.

EPA also has identified lead as an air pollutant, and found endangerment from lead,

under other sections of the Clean Air Act. *See, e.g.*, EPA, Regulation of Fuels and Fuel

Additives, 37 Fed. Reg. 3882 (proposed Feb. 23, 1972) (finding endangerment from lead in

gasoline under Section 212); 38 Fed. Reg. 1254 (regulating the use of lead in gasoline under

Section 212); *Natural Res. Def. Council, Inc. v. Train*, 545 F.2d 320 (2d Cir. 1976) (finding EPA

had a duty to list lead as an air pollutant under Section 108).[9]

Ignoring that Plaintiff's claim is limited to EPA's unreasonable delay in making an

endangerment finding for lead, Defendants suggest that finding that a mandatory duty exists

under Section 231(a)(2)(A) would require EPA to conduct endangerment determinations for

"each and every chemical compound emitted by aircraft engines." Defs.' Summ. J. Br. at 25.

This attempt to distract the Court from the plain meaning of the statutory provision in question

should be rejected. Indeed, the plain language of the statute specifically requires endangerment

determinations for "any air pollutant," 42 U.S.C. § 7571(a)(2)(A), not, as Defendants would have

it, for "each and every chemical compound emitted by aircraft engines," Defs.' Summ. J. Br. at

25. The Clean Air act defines "air pollutant" as an "air pollution agent or combination of such

---

[9] As with other sources of airborne lead, lead emissions from aircraft contribute to overall lead
pollution, which has an impact on health. As the D.C. Circuit in *Ethyl* explained:

> Once the lead is in the body, however, its source becomes irrelevant; all lead in
> the bloodstream, from whatever source, is essentially fungible. Thus so long as
> there are multiple sources of lead exposure it is virtually impossible to isolate one
> source and determine its particular effect on the body. The effect of any one
> source is meaningful only in cumulative terms.

*Ethyl*, 541 F.2d. at 9.

20

agents." 42 U.S.C. § 7602(g). "Air pollutant" is thus limited to substances that are harmful

"agents" of pollution, which is narrower than each and every chemical compound emitted. *See,*

*e.g., Massachusetts v. EPA*, 549 U.S. at 529 n. 26 (finding that greenhouse gases are air

pollutants because they "both 'ente[r] the ambient air' *and* tend to warm the atmosphere"). In

addition, EPA has more narrowly interpreted "any air pollutant" under the requirements related

to visibility and prevention of significant deterioration demonstrating that "any air pollutant"

does not necessarily mean every substance emitted. *See Coal. for Responsible Regulation v.*

*EPA*, 684 F.3d 102, 133 (D.C. Cir. 2012) (citing EPA, 1977 Clean Air Act Amendments to

Prevent Significant Deterioration, 43 Fed. Reg. 26,388 (June 19, 1978)); *see also Coal. for*

*Responsible Regulation,* 684 F.3d at 134–35 (upholding EPA's interpretation of "any air

pollutant" as "any regulated air pollutant" under the Prevention of Significant Deterioration

provisions).

Moreover, contrary to Defendants' suggestion that EPA would have to conduct

endangerment determinations for as many as eighty organic compounds emitted by aircraft, *see*

Defs.' Summ. J. Br. at 25, EPA has already found endangerment, *see* 38 Fed. Reg. 19,088,

19,089 (July 17, 1973), and regulates all organic compounds in exhaust as the general category

"hydrocarbons," 40 C.F.R. § 87.21 (regulating total hydrocarbons from airplane exhaust); EPA,

Recommended Best Practice for Quantifying Speciated Organic Gas Emissions from Aircraft

Equipped with Turbofan, Turbojet, and Turboprop Engines 9 (May 2009),

http://www.epa.gov/nonroad/aviation/420r09901.pdf (defining hydrocarbon emissions as all

organic compounds in exhaust). Thus, EPA's assertion that it would have to conduct

endangerment determinations for organic compounds is factually wrong because it has already

found endangerment for organic compounds as a category of air pollutants.

21

The history of the Clean Air Act amendments also supports the conclusion that Congress intended to impose a mandatory duty on EPA to undertake an endangerment determination under Section 231 specifically for lead. As discussed above, Congress's 1977 amendments to Section 231 replaced the 180-day deadline (which had passed) with the duty to propose emissions standards "from time to time," thus providing EPA flexibility to conduct endangerment determinations and propose emissions standards for lead and other pollutants not yet regulated.[10] *See supra* at Section III.A.3. Moreover, though the 1977 amendments also eliminated language that required EPA to issue a report on its Section 231(a)(1) study—presumably in light of the fact that such report had been issued five years earlier, Congress preserved the provision—Section 231(a)(1)—that required a study and investigation of "emissions of air pollutants from aircraft," Pub. L. 95-95, § 401(f), thereby retaining the structure of Section 231(a) that links "the study and investigation of emissions of air pollutants for aircraft" with the endangerment determination and the proposal of emissions standards, 42 U.S.C. § 7571(a).

The 1977 amendments also changed the language of Section 231 by lowering the threshold of the proof of harm from air pollutants that "*are likely to* cause or contribute to air pollution which endangers human health" to air pollutants "which *may reasonably be anticipated* to endanger public health or welfare." *Compare* Pub. L. 91-604; 84 Stat. 1676, 1704 (Dec. 31, 1970) *with* Pub. L. 95-95, § 401(f) (emphasis added); *see also* H.R. Rep. No. 95-294, at 49–51. Congress made clear that such change was intended to incorporate the reasoning of the *Ethyl* decision, which had upheld EPA's endangerment finding for lead that assessed risks from lead

---

[10] At the time of the 1977 amendments, EPA already had regulated four of the six pollutants identified in its 1972 report. *See* 38 Fed. Reg. 19,088 (promulgating emissions standards for carbon monoxide, hydrocarbons, nitrogen oxides and smoke (particulate matter) from aircraft).

22

instead of waiting for proof of harm. *See* H.R. Rep. No. 95-294, at 47–48. In *Ethyl*, the Court

described Congress's knowledge of the harm from all lead emissions:

> Congress understood that the body lead burden is caused by multiple sources. It
> understood that determining the effect of lead automobile emissions, by
> themselves, on human health is of no more practical value than finding the
> incremental effect on health of the fifteenth sleeping pill swallowed by a would-
> be suicide. It did not mean for "endanger" to be measured only in incremental
> terms.

541 F.2d at 30–31.

Notably, when Congress amended the endangerment language in Section 231, it also

amended the parallel provisions of five other sections of the Act to provide a "uniform standard

of proof" for EPA's regulation of sources under those sections. H.R. Conf. Rep. No. 95-564, at

183 (describing amendment of endangerment language in Sections 108, 111, 112, 202, 211, and

231 of the Clean Air Act). Pursuant to this standard, EPA has found endangerment for, and

regulated, lead emissions from other sources such as motor vehicles. *See, e.g.*, EPA, Regulation

of Fuels and Fuel Additives, 37 Fed. Reg. 3882 (proposed Feb. 23, 1972) (finding endangerment

from lead from motor vehicle fuel); EPA, Regulation of Fuels and Fuel Additives, 38 Fed. Reg.

1254 (Jan. 10, 1973); *see also* EPA, Addition of Lead to List of Air Pollutants, 41 Fed. Reg.

14,921 (Apr. 8, 1976) (listing lead as a criteria pollutant under Section 108); 42 U.S.C.

§ 7412(b)(1) (listing lead compounds as hazardous air pollutants under Section 112); 40 C.F.R. §

471.13 (regulating lead under New Source Performance Standards pursuant to Section 111);

EPA, Control of Air Pollution from New Motor Vehicles and New Motor Vehicle Engines;

Certification and Test Procedures; Gasoline Lead Content, 53 Fed. Reg. 470 (Jan. 7, 1988)

(regulating lead pursuant to Section 202).

**C. Sovereign Immunity Does Not Apply When EPA Has a Mandatory Duty.**

If the Court agrees that Section 231(a)(2)(A) imposes on EPA a mandatory duty to

conduct an endangerment finding, the sovereign immunity defense raised by Defendants does

not apply. *See Sierra Club v. EPA*, 850 F. Supp. 2d 300, 303 (D.D.C. 2012); *Sierra Club v.

Leavitt*, 355 F. Supp. 2d at 557 (holding that EPA's sovereign immunity was waived in suit

alleging unreasonable delay of nondiscretionary duty).

Moreover, in the attempt to invoke the sovereign immunity bar, Defendants fail to inform

the Court of the long-standing exception to the sovereign immunity defense in all actions for

specific, nonmonetary relief against a United States agency or officer acting in an official

capacity. *See Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186 (D.C. Cir. 2006) ("[T]here is

no doubt that § 702 [of the Administrative Procedure Act ("APA")] waives the Government's

immunity from actions seeking relief other than money damages.") (internal quotation marks and

citation omitted); *Sea-Land Serv., Inc. v. Alaska R. R.*, 659 F.2d 243, 244 (D.C. Cir. 1981)

("Insofar as appellants seek equitable relief, we conclude that sovereign immunity does not bar

the way.") (citing 5 U.S.C. § 702 ("An action in a court of the United States seeking relief other

than money damages and stating a claim that an agency or an officer or employee thereof acted

or failed to act in an official capacity or under color of legal authority shall not be dismissed nor

relief therein be denied on the ground that it is against the United States or that the United States

is an indispensable party.")). The Court of Appeals for the D.C. Circuit has held that this

exception extends to cases where plaintiffs seek nonmonetary relief against the United States,

even if plaintiffs' claims are not brought under the APA. *See, e.g., Chamber of Commerce v.

Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("The APA's waiver of sovereign immunity applies

to any suit whether under the APA or not."). Indeed, even the case cited by Defendants notes the

24

APA's broad waiver of sovereign immunity for cases not seeking monetary damages. *Lane v.*

*Pena*, 518 U.S. 187, 196 (1996) (a case seeking monetary damages).

## CONCLUSION

For the foregoing reasons, FoE respectfully requests that this Court find that EPA has a

mandatory duty under the Clean Air Act Section 231(a)(2) and deny EPA's Motion for Summary

on this threshold issue.

Respectfully submitted on September 14, 2012.

/s/ Marianne L. Engelman Lado
MARIANNE L. ENGELMAN LADO
BRIDGET M. LEE
Admitted *pro hac vice*
Earthjustice
156 William Street, Suite 800
New York, NY 10038-5326
Phone: (212) 791-1881
mengelmanlado@earthjustice.org
blee@earthjustice.org

/s/ Timothy D. Ballo
TIMOTHY D. BALLO
D.C. Bar No. 977077
Earthjustice
1625 Massachusetts Avenue NW, Suite 702
Washington, DC 20036-2212
Phone: (202) 667-4500
tballo@earthjustice.org

HELEN KANG
DEBORAH BEHLES
Golden Gate University School of Law
Environmental Law and Justice Clinic
536 Mission Street
San Francisco, CA 94105-2968
Phone: (415) 442-6647
hkang@ggu.edu
dbehles@ggu.edu

*Counsel for Friends of the Earth*

25

# **Exhibit B**

Claim #933  Date Filed: 9/27/2012

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor and Case Number: GMAC Mortgage LLC, Case No. 12-BK-12032 / 12-BK-12020

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
SIDNEY T. LEWIS, for Betty HAMILTON

☐ Check this box if this claim amends a previously filed claim.

Name and address where notices should be sent:
SIDNEY T. LEWIS
1913 Argyle Dr
Cols., OH. 43219

Telephone number: (~940~) (614) 940-3306    email: hasidngone@yahoo.com

Court Claim Number: 07-BK-57237 S.D, OH.
(If known)
Filed on: 9/12/07

Name and address where payment should be sent (if different from above):
"      "
Same as above

Telephone number: 614 940-3306    email:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

1. Amount of Claim as of Date Case Filed: $ 5,000,000.00
If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

2. Basis for Claim: Skimming of Equity; false Claims; easement, Land, interference with gov. Program
(See instruction #2)

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

3. Last four digits of any number by which creditor identifies debtor: 1234

3a. Debtor may have scheduled account as: 05-CV-6544/05-CV-6954
(See instruction #3a)

3b. Uniform Claim Identifier (optional):
(See instruction #3b)

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

4. Secured Claim (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☑ Real Estate  ☐ Motor Vehicle  ☐ Other
Describe:
Value of Property: $ 83,136.00  Annual Interest Rate_____ % ☐ Fixed ☐ Variable
(when case was filed)
Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any: $_____  Basis for perfection: _____

Amount of Secured Claim: $ 0    Amount Unsecured: $_____

RECEIVED
OCT 05 2012
KURTZMAN CARSON CONSULTANTS

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

6. Claim Pursuant to 11 U.S.C. § 503(b)(9):
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
(See instruction #6)

**Amount entitled to priority:**

$_____

7. Credits. The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

8. Documents: Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

9. Signature: (See instruction #9) Check the appropriate box.
☐ I am the creditor.  ☑ I am the creditor's authorized agent. (Attach copy of power of attorney, if any.)  ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)  ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: SIDNEY LEWIS
Title: Executory of Bettie Hamilton
Company:
Address and telephone number (if different from notice address above):

_Signature_ Sidney Lewis    9/15/12 (Date)

RECEIVED SEP 27 2012 U.S. BANKRUPTCY COURT S.D. DIST. OF NEW YORK

Telephone number: _____  Email: _____

COURT USE ONLY

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or b*

1212032120927000000000003

EXHIBIT

A

Deed for Ohio     VOL **2870** PAGE **402**    413-012598-203

1195

    KNOW ALL MEN BY THESE PRESENTS, THAT,   Robert C. Weaver  , Secretary of
Housing and Urban Development, of Washington, D. C., acting by and through
the Federal Housing Commissioner, (hereinafter referred to as "Grantor"),
who acquired title by deed recorded in Deed Book Volume  2852  , Page 508 ,
Recorder's Office Franklin     County, Ohio, for and in consideration of
ONE DOLLAR ($1.00) to him paid by    Robert Hamilton and Betty Hamilton
                (hereinafter referred to as "Grantee(s)",)
whose tax mailing address will be   1913 Argyle Dr., Columbus, Ohio
the receipt of which is hereby acknowledged, and other good and valuable con-
siderations, does hereby grant, bargain, sell and convey to said Robert Hamilton
& Betty Hamilton       and to the heirs and assigns of said Grantee(s),
forever the following REAL ESTATE, situated in the City of Columbus, County of Franklin
and State of Ohio and bounded and described as follows, to wit:

         Being Lot No. 11 of Argyle Park Subdivision, as the same
         is numbered and delineated upon the recorded plat thereof,
         of record in Plat Book 36, Page 6, Recorder's Office, Franklin
         County, Ohio.



TRANSFER TAX EXEMPT
By D.C.
ARCH J. WARREN
FRANKLIN COUNTY, AUDITOR



TRANSFERRED
JAN 23 1968
ARCH J WARREN
AUDITOR
FRANKLIN COUNTY

JAN 23 1968
Received......JAN 2 5 1968....19....M....O'Clock...P....M
Recorded............................19.....In Franklin County
      JAMES A. SCHAEFER, Recorder
Recorder's Fee $....2.00

      BEING the same property acquired by the grantor pursuant to the pro-
visions of the National Housing Act, as amended (12 USC 1701 et seq.) and
the Department of Housing and Urban Development Act (79 Stat. 667).

      SUBJECT TO ALL covenants, restrictions, reservations, easements, condi-
tions and rights appearing of record; and SUBJECT to any state of facts an
accurate survey would show.

      TO HAVE AND TO HOLD said premises, with the appurtenances thereunto
belonging, to the said Grantee(s), and to the heirs and assigns of said
Grantee(s), forever, SUBJECT to any purchase money mortgage executed by the
said Grantee(s) ~~and delivered simultaneously herewith.~~

      AND THE SAID GRANTOR, and his successors hereby covenants with the
said Grantee(s), and the heirs and assigns of said Grantee(s), that said
premises are free and clear from all encumbrances whatsoever, by, from,
through or under said Grantor, EXCEPT restrictions, easements, rights,
reservations, exceptions, limitations, agreements, covenants and conditions
of record; and EXCEPT any state of facts which would be disclosed by an
accurate survey of the premises herein conveyed.



VOL **2870** PAGE **403**

-2-

413-012598-203

SAID GRANTOR, and his successors, hereby further convenants that said Grantor, and his successors will FOREVER WARRANT AND DEFEND the same with the appurtenances thereunto belonging, unto said Grantee(s), and the heirs and assigns of said Grantee(s), against the lawful claims of all persons claiming by, from, through or under the said Grantor herein.

IN WITNESS WHEREOF the undersigned on January 2, 1968,    , has set his hand and seal as Field Office        Assistant Director  , FHA Field Office, Columbus    , Ohio, for and on behalf of the said Secretary of Housing and Urban Development, under authority and by virtue of the Code of Federal Regulations, Title 24, Chapter II, Part 200, Subpart D.

Robert C. Weaver
Secretary of Housing and Urban Development

Signed, acknowledged and de-
livered in the presence of:

By: Federal Housing Commissioner

By: *Edwin E. Davis*                    (SEAL)
Edwin E. Davis

Field Office    Assistant Director
FHA Field Office,    Columbus    , Ohio

STATE OF OHIO            )
COUNTY OF    Franklin    ) ss

Before me, the undersigned, a notary public in and for the said State and County, personally appeared the above named    Edwin E. Davis    who is personally well known to me and known to me to be the duly appointed Field Office    Assistant Director    , FHA Field Office,    Columbus    , Ohio, and the person who executed the foregoing instrument bearing date of    January 2, 1968    , by virtue of the authority vested in him by the Code of Federal Regulations, Title 24, Chapter II, Part 200, Subpart D, and acknowledged the signing thereof, and that such signing was freely and voluntarily performed, as his free act and deed as Field Office Assistant Director    for and on behalf of    Robert C. Weaver    , Secretary of Housing and Urban Development, for the uses and purposes therein mentioned.

In testimony whereof, I have hereunto signed my name and affixed my official seal this    2nd    day of    January 1968.

*Robert T.*

Notary Public

"The form of this instrument was prepared by the Office of the General Counsel of the Federal Housing Administration, and the material in the blank space in the form was inserted by or under the direction of ELMER E. HOLLEY, Chief, Home Mortgage Section, Office of the General Counsel, Federal Housing Administration, Washington, D. C. 20411."

EXHIBIT

B

0A105 - K63

# IN THE COURT OF COMMON PLEAS
# FRANKLIN COUNTY, OHIO

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

| | |
|---|---|
| **GMAC Mortgage Company** | **Case No. 03 CVE 06 6954** |
| **Plaintiff,** | |
| | **Judge Patrick E. Sheeran** |
| vs. | |
| **Sidney T. Lewis, et al.** | **CONFIRMATION ENTRY OF** |
| | **SALE AND DISTRIBUTION OF** |
| **Defendants.** | **PROCEEDS** |

This action was heard on the return of the Sheriff of Franklin County of the sale of property commonly known as 1913 Argyle Drive, Columbus, OH 43219, parcel no. 010-136627-00 (the "Property"). The legal description of the Property is attached to this order as Exhibit A, which is incorporated herein by reference.

1.   The Property was sold by the Sheriff on October 28, 2011 to GMAC Mortgage Company for the following amount: **$82,136.00.** Plaintiff subsequently assigned its bid to Federal National Mortgage Association ("Plaintiff's Assignee").

2.   Having carefully examined the proceedings of the officer, the Court finds that the sale of the Property conformed in all respects to the law and the prior orders of this Court and hereby confirms and approves the sale of the Property and these proceedings.

3.   The Sheriff shall convey the Property to Federal National Mortgage Association by deed according to law free and clear of all liens and encumbrances and shall issue the deed in the following name:  Federal National Mortgage Association.

4.   The tax mailing address of the purchaser of the Property is as follows: P.O. Box 650043, Dallas, TX 75265-0043.

5.   The prior deed reference with respect to the Property is as follows: Deed dated April 26, 2001, filed April 26, 2001, recorded at Official Instrument Number 20010426009526, Recorder's Office, Franklin County.

Ref# 03-0741/JNT2

0A105 - K64

6. The purchaser of the Property is hereby subrogated to the rights of the mortgagees and lien holders in the Property to the extent necessary to protect the purchaser's title to the Property.

7. The Court hereby grants the purchaser of the Property a writ of possession to put the purchaser in possession of the Property.

8. The Court hereby orders the release of all mortgages and liens held by all parties to this action. As a result, the Clerk of Courts shall cause certificates of satisfaction and release to be presented for recording by the County Recorder with respect to each of the mortgages and liens listed on Exhibit B, which is attached to this order for the convenience of the Clerk of Courts and incorporated herein by reference. Such mortgages and liens shall be released only to the extent that they encumber the property foreclosed upon in this action and not to the extent that they encumber any other property.

9. Because Federal National Mortgage Association is the assignee of the successful bid of GMAC Mortgage Company, which holds a valid and subsisting mortgage on the Property, Federal National Mortgage Association need not pay the full amount of the purchase price to the Sheriff. Instead, Federal National Mortgage Association need only pay court costs, real estate taxes and assessments, and Sheriff's costs. The deposit amount of **$250.00** tendered at the Sheriff's sale shall be distributed as follows:

   a. The Clerk of Courts shall be paid **$1,371.00** for court costs.

   b. The County Treasurer shall be paid **$1,277.35** for taxes and assessments currently due on the Property and payable through full year 2010 as well as an estimated portion of the 2011 taxes pro-rated through December 9, 2011. Grantee takes title subject to all taxes, interest, penalties, assessments, and tax lien certificates if any.

   c. The Sheriff shall be paid **$125.00** for Sheriff's costs.

   d. The Auditor shall be paid **$164.90** for conveyance fees and transfer tax.

   e. The Recorder shall be paid **$36.00** for recording the deed.

Ref# 03-0741/JNT2

12-12020-mg    Doc 5026    Filed 09/11/13    Entered 09/11/13 17:59:41    Main Document
Franklin County Ohio Clerk of Courts of the Common Pleas- 2011 Dec 12 5:03 PM-03CV006954
Pg 291 of 582

0A105 – K65

      f.     Since the deposit is not sufficient to satisfy these items, the Plaintiff's Assignee

shall pay the Sheriff the deficit of **$2,724.25** to cover all requisite disbursements.

10.     The following amount shall be applied as a credit toward the amount of the judgment

previously entered in favor of the Plaintiff: **$79,161.75**.

**IT IS SO ORDERED.**

_____

Judge Patrick E. Sheeran
Common Pleas Judge

Approved:


/s/ Matthew J Richardson
Matthew J. Richardson (0077157)
Manley Deas Kochalski LLC
P. O. Box 165028
Columbus, OH  43216-5028
Telephone:  614-222-4921
Fax:  614-220-5613
Email:  mjr2@mdk-llc.com
Attorney for Plaintiff


Approval via 11/14/11 email
Mary Johnson
Assistant Prosecutor
373 S. High Street – 17th Floor
Columbus, OH 43215
Fax: 614-462-2530


Circulating for approval
Sidney T. Lewis, pro-se
1875 Alvason Ave.
Columbus, OH  43219


Circulating for approval
Michelle Sutter
Attorney for the State of Ohio Department of Taxation
Assistant Attorney General
101 East Town Street
Columbus, OH  43215


Ref# 03-0741/JNT2

Franklin County Ohio Clerk of Courts of the Common Pleas- 2011 Dec 12 5:03 PM-03CV006954

0A105 - K66

## EXHIBIT A

### Legal Description of the Property

Situated in the County of Franklin, in the State of Ohio, and in the City of Columbus:

Being all of Lot No. Eleven (11) of Argyle Park Subdivision, as the same is numbered and delineated upon the recorded plat thereof, of record in Plat Book 36, Page 6, Recorder's Office, Franklin County, Ohio.

Property Address: 1913 Argyle Drive, Columbus, OH 43219

Parcel No.  010-136627-00

Ref# 03-0741/JNT2

0A105 - K67

## EXHIBIT B

### Mortgages and Liens to be Released

1.  Certificate of Judgment in favor of State of Ohio, Department of Taxation, c/o Ohio Attorney General, 150 East Gay Street, 21st Floor, Columbus, OH 43215, Judgment Creditor, against Robert A. Hamilton and Allison R. Hamilton, 51 South Oakley Avenue Columbus, Ohio 43204, Judgment Debtor, in the amount of $221.29, plus interest and costs, filed on November 2, 1993, recorded at Certificate of Judgment 93JG-11-33202, Clerk of Court's Office, Franklin County, Ohio.

    The above mentioned lien also filed in Official Records Volume 43005, Page E03, Recorder's Office, Franklin County, Ohio.

2.  Certificate of Judgment in favor of State of Ohio, Department of Taxation, c/o Ohio Attorney General, 150 East Gay Street, 21st Floor, Columbus, OH 43215, Judgment Creditor, against Robert Ben Hamilton, PO Box 651 Port Colborne Ont. Canada, L3K5V8, Judgment Debtor, in the amount of $57.50, plus interest and costs, filed on January 7, 1997, recorded at Certificate of Judgment 97JG-01-00144, Clerk of Court's Office, Franklin County, Ohio.

3.  Certificate of Judgment in favor of State of Ohio, Department of Taxation, c/o Ohio Attorney General, 150 East Gay Street, 21st Floor, Columbus, OH 43215, Judgment Creditor, against Robert A. Hamilton and Allison R. Hamilton, 51 South Oakley Avenue Columbus, Ohio 43204, Judgment Debtor, in the amount of $591.45, plus interest and costs, filed on November 26, 1997, recorded at Certificate of Judgment 97JG-11-19818, Clerk of Court's Office, Franklin County, Ohio.

    The above referenced lien also recorded in Official Records volume 61797, Page G18, Recorder's Office, Franklin County, Ohio.

4.  Ohio Bureau of Employment Lien in favor of State of Ohio, Bureau of Employment Services, c/o Ohio Attorney General, 150 East Gay Street, 21st Floor, Columbus, OH 43215, Judgment Creditor, against Robert L. Hamilton dba Hamilton Construction Co., 8877 Winston Road Pickerington, Ohio 43147, Judgment Debtor, in the amount of $558.30, plus interest and costs, filed May 7, 1999, recorded at Official Instrument Number 199905070115223, Recorder's Office, Franklin County, Ohio.

5.  Ohio Bureau of Employment Lien in favor of State of Ohio, Bureau of Employment Services, c/o Ohio Attorney General, 150 East Gay Street, 21st Floor, Columbus, OH 43215, Judgment Creditor, against Robert L. Hamilton dba Hamilton Construction Co., 8877 Winston Road Pickerington, Ohio 43147, Judgment Debtor, in the amount of $729.15, plus interest and costs, filed May 7, 1999, recorded at Official Instrument Number 199905070115224, Recorder's Office, Franklin County, Ohio.

6.  Mortgage in favor of The Huntington Mortgage Company, 7575 Huntington Park Drive, Columbus, OH 43235, from Robert Hamilton, unmarried, in the amount of $45,500.00, filed January 25, 2000, recorded at Official Instrument Number 200001250017092, Recorder's Office, Franklin County, Ohio.

Ref# 03-0741/JNT2

0A105 - K68

as assigned to GMAC Mortgage Corporation, 3451 Hammond Avenue, Waterloo, IA 50702, by Assignment filed July 20, 2000, recorded at Official Instrument Number 200007200143660, Recorder's Office, Franklin County, Ohio.

7.   Lien Affidavit in favor of Ohio Medicaid Recovery Program, c/o Bruce H. Burkholder, 300 Spruce Street, Floor One, Columbus, OH  43215, Judgment Creditor, against Robert Hamilton, no address listed, Judgment Debtor, in the amount of $10,529.14, plus interest and costs, filed August 17, 2005, recorded at Official Instrument Number 200508170167270, Recorder's Office, Franklin County, Ohio.

8.   Certificate of Judgment in favor of The Huntington National Bank, no address shown, Judgment Creditor, against Sidney T. Lewis and Yvonne D. Webb-Lewis, no address listed, Judgment Debtor, in the amount of $28,517.00, plus interest and costs, filed on August 23, 2005, recorded at Certificate of Judgment 05JG-08-06455, Clerk of Court's Office, Franklin County, Ohio.

The above referenced lien also recorded in Official Records Volume 83986, Page J05, Recorder's Office, Franklin County, Ohio.

Ref# 03-0741/JNT2

0A105 - K69

Franklin County Court of Common Pleas

**Date:**                12-12-2011

**Case Title:**          GMAC MORTGAGE COMPANY -VS- SIDNEY T LEWIS

**Case Number:**         03CV006954

**Type:**                CONFIRMATION OF SALE

It Is So Ordered.

/s/ Judge Patrick E. Sheeran

Electronically signed on 2011-Dec-12    page 7 of 7

EXHIBIT

C

E141 _E1

# ORDER OF SALE

| | | |
|---|---|---|
| GMAC Mortgage Company | | CASE NO. 03 CVE 06 6954 |
| | **PLAINTIFF** | JUDGE Patrick E. Sheeran |
| -vs- | | ACTION CODE NO. 6030 |
| Sidney Lewis, et al. | | COMPLAINT FILED 06/17/2003 |
| | **DEFENDANT** | |

**THE STATE OF OHIO,**    )  To the Sheriff of said County, Greetings:
**Franklin County, ss**     )

WHEREAS, at a term of the Court of Common Pleas, held at Columbus, in and for said County on the ___19th___ day of ___Sept___ 20_03_ A.D. in this cause it was ordered, adjudged and decreed as follows, to wit:

That an order of sale issued to the Sheriff of said County, directing him to ___appraise, advertise___ ___ and sell as upon execution the following described premises to wit:

### PLEASE SEE ATTACHED SHEET

RECEIVED OF
FRANKLIN COUNTY SHERIFF
2011 JUL 27 AM 8: 55

PARCEL NO. __010-136627-00__  ADDRESS __1913 Argyle Drive, Columbus, OH 43219__

WE THEREFORE COMMAND YOU, That you proceed to carry out said order, judgment and decree into execution agreeable to the tenor thereof, and that you expose to sale the above described Real Estate, under the Statute regulating sales on Execution, and that you apply the proceeds of such sale in satisfaction of said judgment and decree, with costs and interest, as specified therein; and that you make report of your proceedings herein; to our Court of Common Pleas within sixty days from date hereof, and bring this order with you. And I certify under seal of this Court that the description of the property herein is correctly copied from the records on file in this office.

WITNESS my signature as Clerk of our said Court of Common Pleas, and the seal of said Court at Columbus, this __26th__ day of __July__ __,20_11_ A.D. John O'Grady, Clerk by _____Deputy.

COC-CV-82 (Rev. 2-2001)

FILED
COMMON PLEAS COURT
FRANKLIN CO. OHIO
2011 OCT 31 PM 12: 42
CLERK OF COURTS

Ref# 03-0741/F1/jjc

E1410 — E2

## LEGAL DESCRIPTION

Situated in the County of Franklin, in the State of Ohio, and in the City of Columbus:

Being all of Lot No. Eleven (11) of ARGYLE PARK SUBDIVISION, as the same is numbered and delineated upon the recorded plat thereof, of record in Plat Book 36, Page 6, Recorder's Office, Franklin County, Ohio.

Ref# 03-0741/F1/jjc

E1410 - E3              **SHERIFF'S RETURN OF ORDER OF SALE**

GMAC Mortgage Company
Plaintiff

vs.                                        Case No. 03CVE06 6954

Sidney T Lewis et al
Defendant                                  Judge Sheeran

**THE STATE OF OHIO, FRANKLIN COUNTY, ss}**

In obedience to the command of the Order of Sale hereto I did, on 8/2/2011 summon:

1. Arthur E Lee, 2. J Gregory Hart, 3. Robert D Timmons three disinterested freeholders, residents of said County, who were by me duly sworn to impartially appraise the lands and tenements therein described, upon actual view, and afterwards, on the date, said Appraisers returned to me, under their hands and seals, that they did, upon actual view of the premises, estimate and partially appraise the real value in money of the same at $48,000.00. The original of said appraisal I forthwith deposited in the Office of the Clerk of the Court of Common Pleas. And on 9/27/2011 I caused to be advertised in the Daily Reporter the said lands and tenements to be sold at public sale, in the Hall of Justice of said County, on 10/28/2011 and having advertised the said lands and tenements for more than thirty days previous to the day of sale, to wit: five consecutive weeks on the same day of the week each week; and in pursuance of said notice, I did at the time and place above mentioned, proceed to offer said lands and tenements at public sale, in the Hall of Justice, and then and there came above plaintiff who bid the sum of $82,136.00 and said sum being more than two thirds of the appraised value thereof, and being the highest and best bidder therefore, I then and there publicly sold and struck off lands and tenements to him/her for the above mentioned bid.

10/28/2011

PARCEL NO. 010-136627
ADDRESS       1913 Argyle Drive Columbus Ohio
              43219
              Rebecca R Shrader
              (614)222-4921

Sheriff's Invoice for Fees

| | |
|---|---|
| Service and Return | $50.00 |
| Swearing Appraisers | $9.00 |
| Writing Advertisement | $1.00 |
| Total Sheriff's Fee | $60.00 |

Appraiser's Fees

| | |
|---|---|
| Three each at | $55.00 |
| Total | $165.00 |

**ZACHARY SCOTT, SHERIFF**

BY _Shay K. Duff_ DEPUTY

E1410 - E4

## REAL ESTATE JUDICIAL SALE
## PURCHASER INFORMATION FORM
### As Prescribed by Buckeye State Sheriffs' Association
R.C. §2329.26 - R.C. §2329.27 - R.C. §2329.271
*Must be complete and legible or it will be returned.*
*Failure to provide the following information at the time of the sale may nullify the sale and cause the purchaser to be in contempt.*

**In the Court of** __Common Pleas, Franklin County, Ohio__

**Case #** __03 CVE 06 6954__                                  **Sale Date** __October 28, 2011__

**Parcel #** __010-136627-00__                              **Property Address** __1913 Argyle Drive__

**City/Township** __Columbus__                               **County** __Franklin__

**(A)** Is the property now **RESIDENTIAL RENTAL PROPERTY?** ☒ Yes ☐ No
Will the **PURCHASER** occupy the lands and tenements?    ☐ Yes ☒ No

| **(B) PURCHASER:** (Required of ALL PURCHASERS) *(Must be readily accessible through CONTACT PERSON if any business entity listed in Section (D))* | **(C) CONTACT PERSON:** (Required if currently RESIDENTIAL RENTAL PROPERTY and PURCHASER is any business entity listed in Section (D)) |
|---|---|
| Name: __GMAC Mortgage Company c/o GMAC Mortgage, LLC__ | Name __Shelley Peterson/Property Preservation Conveyance__ |
| Address: __1100 Virginia Drive, Foreclosure Department__ | Address: __1100 Virginia Drive, Foreclosure Department__ |
| City: __Fort Washington__ | City: __Fort Washington__ |
| State: __Pennsylvania__   Zip: __19034__ | State: __Pennsylvania__   Zip: __19034__ |
| Phone 1 __319-236-4784__ | Phone 1 __319-236-4784__ |
| Phone 2 (___) ___-___ | Phone 2 (___) ___-___ |
|  | Email: __Shelley_Peterson@GMACM.COM__ |

| **(D) The PURCHASER is a:** ("X" one) (Required of ALL PURCHASERS) | **(E) The CONTACT PERSON is a:** ("X" one) (Required if currently RESIDENTIAL RENTAL PROPERTY and PURCHASER is any business listed in Section (D)) |
|---|---|
| ☐ TRUST | |
| ☐ BUSINESS TRUST | |
| ☐ ESTATE | ☐ TRUSTEE (for Trust of Business Trust) |
| ☐ PARTNERSHIP | ☐ EXECUTOR OR ADMINISTRATOR (for Estate) |
| ☐ LIMITED PARTNERSHIP | ☐ GENERAL PARTNER (for Partnership or Limited Partnership) |
| ☐ LIMITED LIABILITY COMPANY | ☐ MEMBER, MANAGER or OFFICER (for Limited Liability Company) |
| ☐ ASSOCIATION | ☐ ASSOCIATE (for Association) |
| ☒ CORPORATION | ☒ MEMBER, MANAGER or OFFICER (for any other Business Entity) |
| ☐ OTHER BUSINESS ENTITY | |
| ☐ NONE OF THE ABOVE (Non-Business) | |

**(F)** PURCHASER'S principal place of business is located in: ("X" one) ☐ this County; ☐ State of Ohio; ☒ State of Pennsylvania

| **(G) LOCAL CONTACT:** (Required if NOT RESIDENTIAL RENTAL PROPERTY and PURCHASER is any business listed in Section (D)) | **(H) PROPERTY TO BE DEEDED TO:** (Required of ALL PURCHASERS) |
|---|---|
| Name: _____ | Name(s): __Federal National Mortgage Association__ |
| Address: _____ | Address: __P.O. Box 650043__ |
| City: _____ | City: __Dallas__ |
| State: _____ Zip: _____ | State: __Texas__   Zip: __75265-0043__ |
| Phone 1 (___) ___-___ | Phone 1 (___) ___-___ |
| Email: _____ | Phone 2 (___) ___-___ |
| (This person must be a natural person who is employed by the purchasing entity and whom the purchasing entity has designated to receive notices or inquiries about the property and whose office is in: | (**NOTE** Once this form is submitted to the court, changes to the deed may only be made with a court order). |
| 1...this county, if principal place of business is in this county; | **\* \* NOTICE \* \*** |
| 2...in Ohio, if principal place of business is in Ohio; | This information must be obtained at the time of sale, shall be part of the sheriff's record of proceedings and shall be part of the record of the court of common pleas. The information is a public record and open to public inspection. |
| 3...the principal place of business, if principal place of business is outside of Ohio.) | |

Ref# 03-0741/TM

TRANSFERRED

DEC 2 7 2011

CLARENCE E. MINGO II
AUDITOR
FRANKLIN COUNTY, OHIO    18330

Conveyance
Mandatory- *82, 2011*

Permissive- *82, 2011*

CLARENCE E. MINGO
FRANKLIN COUNTY AUDITOR

2011122800169527
Pgs: 3    $36.00    T20110064039
12/29/2011 10:42AM BXALLODIAL BO
Daphne Hawk
Franklin County Recorder

## SHERIFF'S DEED
Rev. Code § 2329.36

I, ZACHARY SCOTT, Sheriff of Franklin County, Ohio, pursuant to the Order of

Sale entered on July 26, 2011, in which GMAC MORTGAGE COMPANY recovered of

~~ROBERT HAMILTON,~~ Sidney T. Lewis ET AL., the judgment granted on September 19, 2003 in the

amount of Forty-One Thousand Four Hundred Eleven and 34/100 Dollars, plus interest,

together with the costs of said action, and in consideration of the sum of Eighty-Two

Thousand One Hundred Thirty-Six and 00/100 Dollars, the receipt whereof is hereby

acknowledged from the sale conducted on October 28, 2011, and upon Confirmation of

Sale, do hereby **GRANT, SELL AND CONVEY** unto assignee, FEDERAL NATIONAL

MORTGAGE ASSOCIATION, all the rights, title and interest of the parties in the Court of

Common Pleas, Franklin County, Ohio, Case No. 03 CVE 06 6954, and all pleadings therein

incorporated herein by reference in and to the following Lands and Tenements situated in

the County of Franklin and State of Ohio, known and described as follows, to-wit:

**(SEE ATTACHED EXHIBIT A)**

This deed does not reflect any restrictions, conditions or easements of record.



This is to certify that the foregoing is a true and correct copy of
a .....Deed........ on record in Recorders Office, Franklin County,
Ohio, Instrument # .201122800169527....... in testimony
whereof I have hereunto subscribed my name and affixed my
official seal this .......9th........ day of ....May.... 20 .12.....

Daphne Hawk, Recorder

By ................................ Deputy

Prior Owner:                    ~~Robert Hamilton~~ Sidney T. Lewis et.al.
Property Address:               1913 Argyle Drive, Columbus, OH 43219
Permanent Parcel No.:           010-136627-00
                                Deed Deed dated April 26, 2001, filed April 26, 2001,
                                recorded at Official Instrument Number
Prior Instrument Number:        20010426009526, Recorder's Office, Franklin County
Tax Mailing Address:            P.O. Box 650043, Dallas, TX 75265-0043

Executed this 22nd day of December, 2011

Zachary Scott
Sheriff of Franklin County, Ohio

STATE OF **OHIO**              )
                              ) SS:
COUNTY OF **FRANKLIN**        )

*The foregoing was acknowledged before me this* 22nd *day of* December*, 20*11 *by*

*Zachary Scott, Sheriff of Franklin County, Ohio.*



MELODY E. HENKEL
Notary Public, State of Ohio
My Commission Expires 09-05-2016

Notary Public
State of Ohio
My Commission Expires 9-5, 2016

THIS INSTRUMENT WAS PREPARED BY:
Manley Deas Kochalski LLC, P. O. Box 165028, Columbus, OH 43216-5028



**EXHIBIT A**

Situated in the County of Franklin, in the State of Ohio, and in the City of Columbus:

Being all of Lot No. Eleven (11) of ARGYLE PARK SUBDIVISION, as the same is
numbered and delineated upon the recorded plat thereof, of record in Plat Book 36, Page 6,
Recorder's Office, Franklin County, Ohio.



EXHIBIT

D

2012021400020839
Pgs: 2    $28.00    T20120010294
02/14/2012 10:13AM BXALLODIAL BO
Daphne Hawk
Franklin County Recorder

**TRANSFERRED**

FEB 1 4 2012

CLARENCE E. MINGO II
AUDITOR
FRANKLIN COUNTY, OHIO

*1847*

Conveyance
Mandatory- *10.00*
Permissive- *10.00*
CLARENCE E. MINGO II
FRANKLIN COUNTY AUDITOR

## LIMITED WARRANTY DEED

KNOW ALL MEN BY THESE PRESENTS, THAT **Fannie Mae a/k/a Federal National Mortgage Association organized and existing under the laws of the United States of America**, for valuable consideration paid, grants with limited warranty covenants to **Lawrence Boyd**, whose tax mailing address is _1913 Argyle Dr_ _Cols, OH 43219_ , the following real property:

Situated in the County of Franklin, in the State of Ohio, and in the City of Columbus:

Being all of Lot No. Eleven (11) of ARGYLE PARK SUBDIVISION, as the same is numbered and delineated upon the recorded plat thereof, of record in Plat Book 36, Page 6, Recorder's Office, Franklin County, Ohio.

Parcel Number: 010-136627

Property Address:    1913 Argyle Drive, Columbus, Ohio 43219

Prior Instrument Reference: Official Instrument Number 201112280169527, Recorder's Office, Franklin County, Ohio.

Subject to taxes and assessments, which are now or may hereafter become liens on said premises and except conditions, restrictions and easements, if any, contained in former deeds of record for said premises, subject to all of which this conveyance is made.



This is to certify that the foregoing is a true and correct copy of a .......Deed........ on record in Recorders Office, Franklin County, Ohio, Instrument # ..201202140020839.... in testimony whereof I have hereunto subscribed my name and affixed my official seal this ............ day of .....May...... 20....

Daphne Hawk, Recorder

By ................................Deputy

Executed this 10th day of February 2012.

**Fannie Mae a/k/a Federal National Mortgage Association**

By:  Manley Deas & Kochalski LLC as Attorney-In-Fact

By:  _____
        Keith Hamilton, Assistant Secretary

**POA RECORDED: Official Instrument Number 200811120165080**

State of Ohio    }
County of Franklin    }    SS:

Be it remembered, that on this 10th day of February 2012 before me, the subscriber, a Notary Public in and for said County and State, personally came Keith Hamilton the Assistant Secretary of Manley Deas & Kochalski LLC as Attorney-In-Fact for **Fannie Mae a/k/a Federal National Mortgage Association**, the grantor in the foregoing Deed, and acknowledged the signing hereof to be his/her and its free and voluntary act and deed on behalf of the company. In testimony thereof, I have hereunto subscribed my name and affixed my notarial seal on the day and year aforesaid.

_____
Notary Public

This Instrument Prepared By:
Manley Deas Kochalski LLC
P.O. Box 165028
Columbus, Ohio 43216-5028
File No. 20120044

Suzanne Feehan
Notary Public, State of Ohio
My Commission Expires 01-18-2014



EXHIBIT

E

**This document has been electronically entered in the records of the United States Bankruptcy Court for the Southern District of Ohio.**

**IT IS SO ORDERED.**



John E. Hoffman, Jr.
United States Bankruptcy Judge

**Dated: November 01, 2011**

---

## UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION AT COLUMBUS

*In re*:                                    :

                                            :        Case No. 11-60903

ESTATE OF BETTIE JEAN                       :

HAMILTON,                                   :        Chapter 7

                                            :        Judge Hoffman

               *Debtor*.                    :

### ORDER DISMISSING CASE WITH PREJUDICE

This matter is before the Court sua sponte.  On October 27, 2011, Sidney T. Lewis, as executor, filed a petition on behalf of the probate estate of Bettie Jean Hamilton.

Relief under the Bankruptcy Code is not available to a probate estate. 11 U.S.C. § 109.  The case is **DISMISSED**, with prejudice.

**IT IS SO ORDERED.**

Copies to:

All Creditors and Parties in Interest

# # #

```
MIME-Version:1.0
From:nysbinfo@nysb.uscourts.gov
To:courtmail@localhost.localdomain
Bcc: JHaims@mofo.com, LIBKCourt@logs.com, Pfleming@morganlewis.com, abehlmann@lowenstein.com, adam.harris@srz.com, adoshi@magnozzikye.com,
jguso@bergersingerman.com, jpintarelli@mofo.com, jshifer@kramerlevin.com, jwishnew@mofo.com, ken.ziman@skadden.com, kristen.serrao@klgates.
Do not notice for BK case: mholton@graisellsworth.com, mmenge@graisellsworth.com;mmathis@graisellsworth.com;kmatthews@graisellsworth.com;

Message-Id:<11871373@nysb.uscourts.gov>
Subject:12-12020-mg Notice (GENERIC)

Content-Type: text/html
```

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to ▇ ▇ other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free cop▼ and 30-page limit do not apply.

**U.S. Bankruptcy Court**

**Southern District of New York**

Notice of Electronic Filing

The following transaction was received from Bickerstaff, Chris entered on 9/28/2012 at 12:36 PM and filed on 9/27/2012

| | |
|---|---|
| **Case Name:** | Residential Capital, LLC |
| **Case Number:** | 12-12020-mg |
| **Document Number:** | 1624 |

**Docket Text:**
Notice of Praecipe and Filing Proof of Claim With Exhibits in Support, Filed by Yvonne D. Lewis. Two Proof of Claims From Sidney T. Lewis/Yvonne D. Lewis and Sidney T. Lewis, for Betty Hamilton (Bickerstaff, Chris).

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**12-12020 lewis praecipe.pdf
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=9/28/2012] [FileNumber=11871371-0]
[52d1e51e54c87eb90805b14aa7b4f94893b04adbd51e084b75d4dad22c59fd5cec67
39742ca575482418e80c7016e916328c8fe277eea20d61e0cd5520209fc7]]
**Document description:** Exhibit 1
**Original filename:**12-12020 exhibit 1 lewis.pdf
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=9/28/2012] [FileNumber=11871371-1]
[38f5ff80bc52e6a3e68cc07cdef2930f890f013194b7512eceb63c6bcf23d8664eb1
a0b4b4610825d540647f26cc47f412dbbebaddb62f462ee6564f29c73d9e]]
**Document description:** Exhibit 2
**Original filename:**12-12020 exhibit 2 lewis.pdf
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=9/28/2012] [FileNumber=11871371-2]
[850480ce709032a368b8b83ee1c5d61322cdd50ccff6e230027efe70951e2cbda5fa
d9a072525b92f80bacf334f3bad2cb2cce1ec02138265dbc89d627a71fc7]]
**Document description:** Exhibit 3
**Original filename:**12-12020 exhibit 3 lewis.pdf
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=9/28/2012] [FileNumber=11871371-3]
[50777f2774a5ced2ecbd001a3225f36afc3663aabc86c27baf1a717baedd6d2b5a23
6afbf0b2bc6964fcf3d91b0792b5797947b2463f26a35ad51f95d1fbd41a]]
**Document description:** Exhibit 4
**Original filename:**12-21020 exhibit 4 lewis.pdf
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=9/28/2012] [FileNumber=11871371-4]
[936944b5fa662c5925cfeba2f621d9798ddf830d5dd57815bccea569507263bbb5da
2b7bc2d6aff5b8c90474a077db6ea7fd9ba3b97a7150228cd937838ef14b]]
**Document description:** Exhibit 5
**Original filename:**12-12020 exhibit 5 lewis.pdf
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=9/28/2012] [FileNumber=11871371-5]
[00e6f3001b914193f68273e10de05b59f3afca26dd40525c0b1093cf97d11a6839b8
9a45ad3c3437363bedad602164d19ed02832964fd16bd2a6e0a89c059570]]
**Document description:** Exhibit 6
**Original filename:**12-12020 exhibit 6 lewis.pdf
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=9/28/2012] [FileNumber=11871371-6]
[5170f7a17fbb3b869385d58750cc0170e6aa26fa17abd6b390abc45ae412636df076
a035055c3f30734b890723d5b40b15e0f1c9f829fa0a7676b07130d33760]]
**Document description:** Exhibit 6.1
**Original filename:**12-12020 exhibit 6.1 lewis.pdf
**Electronic document Stamp:**
[STAMP NYSBStamp_ID=842906028 [Date=9/28/2012] [FileNumber=11871371-7]
[3d2fc3710f39e1620175b418cafc00428d495b809ebb5f0ccf533830362d2217908
d561911acf16591079b30bd65a1a70be677482aaac161c64426e1c9ce4ba]]
**Document description:** Exhibit 7
**Original filename:**12-12020 exhibit 7 lewis.pdf
**Electronic document Stamp:**

IN Re: RESCAP, 12-bk-12020


Document #1624

# PRAECIPE

TO: Clerk of the U.S. Bankruptcy
COURT For The S.D. of N.Y.

Enclosed please find the
following documents to be filed
in Bankruptcy case No. 12-bk-12020:

(1) Notice of Filing Proof of
Claim w/ Exhibits in support.

(2) Proof of Claims (2)

Yvonne D. Lewis

SEP 2 7 2012

## IN THE U.S. BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK
### (at Manhattan)

SEP 2 7 2012

| | |
|---|---|
| In Re: Residential Capital, LLC., et al., And, | )    Case No. <u>12-bk-12020</u> (MG) |
| In Re: GMAC, Mortgage Co., et al, | )    Chapter    (Ch.11, Joint Admin. ) |
|        Debtors | ) (Related BR Case No.07-bk-57237, S.D., OHIO) |
| | ) (Related BR Case No. 12-bk-12032, S.D., N.Y.) |
| | )      JUDGE: GLENN, MARTIN |
| UNITED STATES of America, Ex Rel., | ) |
| Yvonne D. Lewis, et al., | )         Adversary Case No.: 1:12-av-1731 |
|      Plaintiffs/ Surplus Creditors | ) (Related Case Nos. 1:12-12020, 1:12-12032; |
| Vs. | )    05-CV-7346 (03-CV-7478); 03-CV-10836; |
| | )    05-CV-4555; 03-CV-474; 03-CV-6954) |
|   GMAC, Mortgage Co., et al, | )  (11-AP-875,COA10th Dist., OHIO), |
|      Defendants/ Bankrupt Debtors, | )    (10-AP-110, COA10th Dist., OHIO) |
| | ) |
| | ) ***NOTICE OF FILING OF PROOF OF CLAIM*** |

## UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF OHIO;
### (at Columbus)

[18 USC §§ 2, 245(b)(2)(B), 371, 664, 666, 1001, 1505, 1962][29 USC §§ 1131, 1132(h), 1140]
[26 USC §§ 101(h), 267(b)(1)][42 USC §§ 1441, 2000d, 3535, 4621(c)(4), 4651(3),7407(d)(1)(C)(i)]

| | |
|---|---|
| In Re: SIDNEY T. LEWIS, pro se, | )   Case No. 2:07-bk-57237 |
| | )       (Ch.7 ) |
| Debtor | ) (Related BR Case No. 2:05-bk-75111, S.D., OH.) |
| | ) (Related DR Case No. 2:96-cv-494, S.D., OH.) |
| Social Security No.: xxx-xx-5959 | ) JUDGE: HOFFMAN, JOHN, Jr. |
| | |
| In Re: Yvonne D. Lewis, | )   Case No. 2:05-bk-75111 |
| | )       (Ch.7 ) |
| Debtor | ) (Related BR Case No. 2:07-bk-57237, S.D., OH.) |
| | )  (Related DR Case No. 2:96-cv-494, S.D., OH.) |
| Social Security No.: xxx-xx-2390 | ) JUDGE: HOFFMAN, JOHN, Jr. |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO;
### (at Columbus)

[18 USC §§ 2, 371, 245(b)(2)(B), 664, 666, 1962][29 USC §§ 1131, 1132(h), 1140]
[26 USC §§ 101(f)(3)(A), 267(b)(1) & (c)(4)][42 U.S.C. §§ 1441, 3535(d), 4651(3), 7573)]

SEP 2 7 2012

| | |
|---|---|
| UNITED STATES of America, Ex Rel., | ) |
| Sidney T. Lewis, et al., | ) Action No. 2:08-cv-75 |
| Plaintiffs | ) (Related Dist. Ct. Cases 2:08-cv-16; 2:96-cv-494; |
| Vs. | ) 2:08-cv-1040, 2:08-cv-736, 2:09-cv-179); |
| | ) JUDGE: ALGENON L. MARBLEY |
| Larry McClatchey, Ch. 7 Trustee from | ) |
| Kegler Brown Hill & Ritter, et al., | ) Mag. Judge: MARK ABEL [RICO 2:96-cv-494] |
| And, | ) [Notice of Appeal re Bankruptcy Matter, Case |
| Larry McClatchey, Atty. for Ch. 7 Trustee, | ) No. 2:07-bk-57237, S.D., OH] |
| from Kegler Brown Hill & Ritter, et al., | ) Mag. Judge: MARK ABEL [RICO 2:96-cv-494] |
| Defendants. | |
| | |
| UNITED STATES of America, Ex Rel., | ) |
| James Johnston, et al., | ) Action No. 2:08-cv-736 |
| Plaintiffs | ) (Related Dist. Ct. Cases 2:08-cv-16; 2:96-cv-494; |
| Vs. | ) 08-cv-75, 08-cv-736, 09-cv-179; 2:08-cv-1040); |
| | ) JUDGE: GREGORY FROST |
| Sidney T. Lewis, et al., | ) Mag. Judge: MARK ABEL [RICO 2:96-cv-494] |
| Defendants. | [Remvd. From Fr. Cnty., CPC case 08CVH-10168] |
| | |
| UNITED STATES of America, Ex Rel., | ) |
| Sidney T. Lewis, et al., | ) Action No. 2:08-cv-1040 |
| Plaintiffs | ) (Related Dist. Ct. Cases 2:08-cv-16; 2:96-cv-494; |
| Vs. | ) 08-cv-75, 08-cv-736, 09-cv-179; 2:08-cv-1042); |
| | ) JUDGE: HOLSCHUH |
| James Johnston, et al., | ) Magistrate Judge: TERENCE P. KEMP |
| Defendants. | [Original Action Civil Rights Complaint/RICO ] |

## _NOTICE OF FILING OF PROOF OF CLAIM BY CREDITORS SIDNEY LEWIS AND YVONNE LEWIS, F/K/A YVONNE MOORE; WITH STATEMENT OF FACTS AND EXHIBITS_

NOTICE IS HEREBY GIVEN that on or about September 25, 2012 the Creditors Sidney Lewis and

Yvonne Lewis, f/k/a Yvonne Moore, on behalf of themselves and on behalf of the United States of

America, 12 USC §§ 1709, 1715z-19; 31 U.S.C.A. §§ 3729 to 3733; 18 USC §§ 2, 371, 1505, 1962; 42

USC §§ 1441, 2000d, 3535, 4621(c)(4), have filed their proof of claim for Debtors' false (loss

mitigation) claims to collect "soft dollar credits" in furtherance of "Equity Skimming [Id. 1715z-19]"

(Related Case Nos. 1:12-cv-361, 363, D.C.); and Debtors' "RICO Enterprise [Id. 1962]"  associated

2 of 4 pages

with "Equity Index Annuities [Id. 101(f)(3)(a)]" through "Trust Mills [Id. 1962]" (Originating Case Nos.

2:96-cv-494, 2:08-cv-75[1], S.D., OH) pursuant to Fed. R. Bankr. Proc., Rules 2018(a), 3004, 7023.1 and

Rule 23.1 F.R.Civ.P. for the following creditor(s):

*1.* Creditors Yvonne Lewis, f/k/a Yvonne Moore, Lot 17 of the Argyle Park Subdivision; And, 820, 828, and 832 E. 5th Avenue, Columbus, Ohio.

2. Creditors Sidney Lewis, (e.g., Executor of Bettie Hamilton Probate Estate in BR Case No. 2:11-bk-60903, S.D., OH., Docket Sheet at 01/07/2012, "Chapter 7 Trustee's Report of No Distribution" entered 01/07/2012, Lot 11, Argyle Park Subdivision), Lots 11 and 17 of the Argyle Park Subdivision.

The deadline for filing claims is *November 9, 2012*, except that the deadline for filing claims by a

governmental unit is *November 30, 2012*. (See: Doc 1309, pg. 2)  If the deadline for filing claims has not

expired, a claim filed by the Lewis creditor pursuant to Fed. R. Bankr. Proc. 3002(c) or 3003(c) shall

supersede the proof of claim filed by the Rescap debtors under 1:12-cv-361 Consent Decree Orders and

2:96-cv-494 Consent Decree Orders for GMAC's Liability for omissions in its 2006 defective affidavit

(See: Exhibit 5 in support of POC, GMAC's affidavit) under the GMAC Original Servicing Agreement

dated as executed on Aug. 21, 2001 and fourth Addendum dated and effective Sept. 1, 2007. (See: Doc.

793-1, pgs. 58 and 86 of 111, at P.7.1, in BR Case No. 12-bk-12020, USBRC, S.D. NY, GMAC

Original Servicing Agreement).

---

[1] (Compare: Doc. 86, date: 06/09/09, Page: 3 of 6, in case no 2:08-cv-75, USDC, S.D., OH; **Larry McClatchey**, "**DECEMBER 1, 2008**, this Court and Judge Frost issued a Related Case Memorandum that determined that Case Numbers 2:08-cv-75 and 2:08-cv-736 would remain with the judges to whom they were assigned (doc. no. 79)"; Compare With: case no. 1:12-cv-361, USDC, .DC.; for HUD related misconduct, "…the Administrator to provide cash payments to borrowers whose homes were finally sold or taken in foreclosure between and including January 1, 2008 and **DECEMBER 31, 2011;…**"; Compare To: Doc #: 9-1, Filed: 09/10/08, Pages: 32 to 36 of 44, case no. 2:08-cv-736 USDC, S.D., OHIO, judge Gregory Frost, "HUD-1 Settlement Sheet" and "Addendum to HUD-1 Settlement Statement, **Larry McClatchey**,")

Respectfully Submitted,

Dated: Sept. 24, 2012 _____        Dated: Sept. 24, 2012 _____
                      Sidney T. Lewis, pro se                                Yvonne D. Lewis, pro se
                      1875 Alvason Avenue                                    1875 Alvason Avenue
                      Columbus, OH  43219                                    Columbus, OH  43219

CERTIFICATE OF SERVICE

A copy of the foregoing: **NOTICE OF FILING OF PROOF OF CLAIM BY CREDITORS SIDNEY LEWIS AND YVONNE LEWIS, F/K/A YVONNE MOORE; WITH STATEMENT OF FACTS AND EXHIBITS**  was served on Debtors counsels of record, and other parties to the instant action, by hand delivery, electronic mail service, or by certified U.S. Mail Service, Postage Prepaid on Sept. 24, 2012.

Dated: Sept. 24, 2012 _____        Dated: Sept. 24, 2012 _____
                      Sidney T. Lewis, pro se                                Yvonne D. Lewis, pro se

## IN THE U.S. BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK
(at Manhattan)

In Re: Residential Capital, LLC., et al., And,   ) Case No. <u>12-bk-12020</u> (MG)
In Re: GMAC, Mortgage Co., et al,               ) Chapter     (Ch.11, Joint Admin. )
        Debtors                            )(Related BR Case 07-bk-57237, S.D., OHIO)
                                                  ) (Related BR Case 12-bk-12032, S.D., N.Y.)
                                                  ) JUDGE: GLENN, MARTIN
                                                  )
UNITED STATES of America, Ex Rel.,              )
Yvonne D. Lewis, et al.,                        )     Adversary Case No.: 1:12-av-1731
        Plaintiffs/ Surplus Creditors      ) (Related Case Nos. 1:12-12020, 1:12-12032;
Vs.                                             )  05-CV-7346 (03-CV-7478); 03-CV-10836;
                                                  )  05-CV-4555; 03-CV-474; 03-CV-6954)
 GMAC, Mortgage Co., et al,                    ) (11-AP-875, 10-AP-110, COA10th Dist., OH.),
        Defendants/ Bankrupt Debtors,      )
                                                  ) **<u>EXHIBITS TO SUPPORT STATEMENT</u>**
                                                   **<u>OF FACTS FOR PROOF OF CLAIMS</u>**

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO;
(at Columbus)

[18 USC §§ 2, 245(b)(2)(B), 371, 664, 666, 1001, 1505, 1962][29 USC §§ 1131, 1132(h), 1140]
[26 USC §§ 101(h), 267(b)(1)][42 USC §§ 1441, 2000d, 3535, 4621(c)(4), 4651(3), 7407(d)(1)]

In Re: SIDNEY T. LEWIS, pro se,        )        Case No. <u>2:07-bk-57237</u>
                                        )            (Ch.7 )
Debtor                                 )  (Related BR Case No. 2:05-bk-75111, S.D., OH.)
                                        )  (Related DR Case No. 2:96-cv-494, S.D., OH.)
Social Security No.: xxx-xx-5959       )        JUDGE: HOFFMAN, JOHN, Jr.


In Re: Yvonne D. Lewis,                )        Case No. <u>2:05-bk-75111</u>
                                        )            (Ch.7 )
Debtor                                 )  (Related BR Case No. 2:07-bk-57237, S.D., OH.)
                                        )   (Related DR Case No. 2:96-cv-494, S.D., OH.)
Social Security No.: xxx-xx-2390       )   JUDGE: HOFFMAN, JOHN, Jr.


## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO;
(at Columbus)

[18 USC §§ 2, 371, 245(b)(2)(B), 664, 666, 1962][29 USC §§ 1131, 1132(h), 1140]
[26 USC §§ 101(f)(3)(A), 267(b)(1) & (c)(4)][42 U.S.C. §§ 1441, 3535(d), 4651(3), 7573)]

| | | |
|---|---|---|
| UNITED STATES of America, Ex Rel., | ) | |
| Sidney T. Lewis, et al., | ) | Action No. <u>2:08-cv-75</u> |
| Plaintiffs | ) | (Related Dist. Ct. Cases 2:08-cv-16; 2:96-cv-494; |
| Vs. | ) | 2:08-cv-1040, 2:08-cv-736, 2:09-cv-179); |
| | ) | JUDGE: <u>ALGENON L. MARBLEY</u> |
| Larry McClatchey, Ch. 7 Trustee from | ) | |
| Kegler Brown Hill & Ritter, et al., | ) | Mag. Judge: MARK ABEL [RICO 2:96-cv-494] |
| And, | ) | [*Notice of Appeal re Bankruptcy Matter, Case* |
| Larry McClatchey, Atty. for Ch. 7 Trustee, | ) | *No. 2:07-bk-57237, S.D., OH]* |
| from Kegler Brown Hill & Ritter, et al., | ) | Mag. Judge: MARK ABEL [RICO 2:96-cv-494] |
| Defendants. | | |
| | | |
| UNITED STATES of America, Ex Rel., | ) | |
| James Johnston, et al., | ) | Action No. <u>2:08-cv-736</u> |
| Plaintiffs | ) | (Related Dist. Ct. Cases 2:08-cv-16; 2:96-cv-494; |
| Vs. | ) | 08-cv-75, 08-cv-736, 09-cv-179; 2:08-cv-1040); |
| | | JUDGE: <u>GREGORY  FROST</u> |
| Sidney T. Lewis, et al., | ) | Mag. Judge: MARK ABEL [RICO 2:96-cv-494] |
| Defendants. | | [Remvd. From Fr. Cnty., CPC case 08CVH-10168] |
| | | |
| UNITED STATES of America, Ex Rel., | ) | |
| Sidney T. Lewis, et al., | ) | Action No. <u>2:08-cv-1040</u> |
| Plaintiffs | ) | (Related Dist. Ct. Cases 2:08-cv-16; 2:96-cv-494; |
| Vs. | ) | 08-cv-75, 08-cv-736, 09-cv-179; 2:08-cv-1042); |
| | | JUDGE: <u>HOLSCHUH</u> |
| James Johnston, et al., | ) | Magistrate Judge: TERENCE P. KEMP |
| Defendants. | | [Original Action Civil Rights[1] Complaint/RICO[2]] |

---

[1] ("Having forfeited his right to appeal these orders on the merits, Mr. Lewis is barred from collaterally attacking the same orders in this case." (See: Doc. 3, at pg. 4 of 6, Magistrate's REPORT AND RECOMMENDATION to Dismiss Case in case no. 2:08-cv-1040);
[2] <u>SEE AND</u> <u>COMPARE</u>: Docs. 7 & 9, Related Case Memo for 2:08-cv-75, Kegler-Brown et al. Defendants & OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION to Dismiss Case in case no. 2:08-cv-1040; <u>COMPARE WITH</u>: RICO Related Case no. 2:96-cv-494, Kegler-Brown et al. Defendants.)

EXHIBITS TO SUPPORT STATEMENT OF FACTS FOR PROOF OF CLAIMS

Exhibits

1   Sept. 30, 1975 - FHA Mortgage Deed/Dower (executed by Y. Moore a/k/a/ Y. Lewis).

2   **Sept. 11, 1987** - FAA, Record of Approval, 14 CFR part § 150, "Land Use Controls".

3   Sept. 2, 1992   - FAA Permanent Subdivision Avigation Easement (FAR, Part 150, for

Lots 1-128, Argyle Park Subdivision "APS", Columbus, OH.) executed April 20, 1992

and recorded in County Recorders Office on Sept. 2, 1992; And, Vol. 57 FR 40242,

Passenger Facility Charges "PFC's", Col., OH., (14 CFR part §158) dated Sept. 2, 1992.

4   **Sept. 11, 1996** - Merger of American Equity Investment Life Ins. Co. ("AEL", IOWA)

with Century Insurance Co. (OH.), Foreign license from the OHIO Depart. of Ins. (ODI),

to sell "Equity Index Annuities" as "Tax Exempt Policies" under 26 USC §§ 101(f)(3)(a),

267(b) (1) and (c)(4).

5   Jan. 27, 2006  - Affidavit of GMAC (creditor) In Support of Motion For Relief From Stay

11 USC § 362(d) in In Re: Yvonne Lewis, case no. 05-bk-75111, USBRC, S.D., Ohio.

6   Mar. 8, 2006   - Trustee's Abandonment of 1875 Alvason Ave. on request of GMAC

(Creditor) in U.S. Bankruptcy Court for S.D. of Ohio in case no. 05-bk-75111.


6.1  Dec. 1, 2008 – Related Cases Memo, Doc. 14, Removal & BR appeal matters (in In Re:

Sidney T. Lewis, case no. 07-bk-57237, USBRC, S.D., Ohio) in case no 2:08-cv-736.


7   Dec. 16, 2010 - Garretson Resolution Group's (Admin. of Panter C/A, 01-CI-02109, Jeff.

Cnty., KY.) Response to Lewis' Subpoena Duces Tecum served on **Dec. 9, 2010.**

8  Jan. 13, 2011 - Mike DeWine, Ohio's current AG, responds to the Lewis's Complaint under Ohio Consumer Protection Act, for AEL's Defective Notice of 2001-2005 Strube/Malone/Panter C/A for Unlawful Living Trust and Equity Index Annuities sales and response of Garretson to Subpoena Duces Tecum served on **Dec. 9, 2010**.

9  Oct. 26, 2011 - First Letter to Eric LaFayette, Esq. (Lewis claimants' attorney) from CHARLES F. SMITH, Atty., of the lawfirm of **Skadden, Arps, Slate, Meagher & Flom, LLP,** on behalf of **"AEL"** (collectively, "American Equity") in Fr. Cnty. Ohio CPC case no. 11-CV-12667 filed Jan. 9, 2012.

10  Dec. 23, 2011 - Second Letter to Eric LaFayette, Esq. from Skadden…[sic.] & Flom, LLP, by MARCELLA L. LAPE, on behalf of "AEL" in Fr. Cnty., CPC case no. 11-CV-12667.

11  Jan. 9, 2012 - Agreed Motion and Stipulation To Extend American Equity Answer  Period in CPC case 11-CV-12667, referencing a dismissal demand by "AEL" on **Dec. 30, 2011.**

12  April 4, 2012 -  Consent Judgment executed for the *Jan. 1, 2008 to **Dec. 31, 2011,*** Class Period in related case no. 12-cv-361, USDC, Dist. of Columbia, entered April 5, 2012.

13  Sept. 14, 2012 – Declaration of Bridget M. Lee, for impacted HUD/FHA mortgages by FAA in related case FoE vs. U.S. EPA, no. 12-cv-363, USDC, D.C. filed Sept. 14, 2012.

EXHIBIT 1

1975 FHA MORTGAGE
DEED WITH DOWER



935530008

⌣ ⌣ VOL 3553 PAGE 21 ⌣

STATE OF OHIO
FHA Form No. 3145H
Revised November 1972

This form is used in connection with
mortgages insured under the one- to four-
family provisions of the National Housing
Act.

P-27987

# MORTGAGE DEED
## WITH DOWER

19296

KNOW ALL MEN BY THESE PRESENTS, THAT Ronald L. Moore, by Yvonne D. Moore, his
Attorney-In-Fact, and Yvonne D. Moore, husband and wife, both being
over 18 years of age,

of The City of Columbus                                    , County of  Franklin                100's
and State of Ohio, the Grantor, for and in consideration of the sum of Twenty-four Thousand Eight Hundred and no/
Dollars ($4,800.00, to him paid by  CENTRAL SAVINGS AND LOAN COMPANY

, a corporation organized and existing under the laws of
The United States of America    , and having its principal place of business at 46 E. Gay Street,
Columbus, Ohio  43215        , Grantee, the receipt of which is hereby acknowledged, does give, grant,
bargain, sell, and convey unto the Grantee the following-described premises, situated in the    City
of    Columbus                            , County of  Franklin              , State
of Ohio, and bounded and described as follows, to wit:

Being Lot Number Seventeen (17) of ARGYLE PARK
SUBDIVISION, as the same is numbered and
delineated upon the recorded plat thereof, of
record in Plat Book 36, page 6, Recorder's
Office, Franklin County, Ohio.

Received OCT. 8 1975₉₉... At........O'Clock. P. M
Recorded...OCT. 8 1975...19... In Franklin County
JAMES A. SCHAEFER, Recorder
Recorder's Fee $...4.00

Columbus, Ohio                                        September 30, 1975
For value received, the undersigned hereby sells, assigns and sets over unto:
CITIZENS MORTGAGE CORPORATION, a corporation organized and existing under the
laws of the State of Delaware, whose address is, 24700 Northwestern Highway,
Southfield, Michigan 48075, all its right, title and interest in and to the
within Mortgage, without recourse.

CENTRAL SAVINGS AND LOAN COMPANY
X
JAMES L. BILGARD, TREAS.
X
JANE G. CLARKSON
ASST. SECY.

together with the privileges and appurtenances thereunto belonging, and all the rents, issues, and profits which may arise or be had therefrom; and all
the estate, title, and interest of the said Grantor, either in law or in equity, of, in, and to the said premises to have and to hold the above-granted and
bargained premises, with all the privileges and appurtenances thereto belonging, including all heating, plumbing and lighting fixtures and equipment
now or hereafter attached to or used in connection with the said premises, and all the rents, issues, and profits which may arise or be had therefrom,
unto the said Grantee, its successors or assigns, forever. And the Grantor covenants that it and until the execution and delivery of these presents, he is
well seized of the above-described premises in fee simple, and has good right to bargain and sell the same in manner and form above written, and that
the same are free from all encumbrances whatsoever; and that he will warrant and defend said premises, with the above-mentioned appurtenances to
the said Grantee, its successors and assigns, forever, against all lawful claim or claims and demands whatsoever.

And, for a valuable consideration, the said  Grantors                                              OMXXX
, does hereby remise, release, and forever quitclaim, unto the Grantee all the Grantee all right and title
of dower in the above-described premises.

The conditions of this deed are such that whereas the Grantor has executed and delivered to the Grantee his certain promissory note, of even
date herewith, in the principal sum of  Twenty-four Thousand Eight Hundred and no/100's
Dollars ($24,800.00 with interest from date at the rate of    Nine                  percentum (  9 %) per
annum on the unpaid balance until paid, said principal and interest being payable at the office of Citizens Mortgage Corporation
at 24700 Northwestern Highway
Southfield, Michigan 48075    , or at such other place as the holder may designate in writing, in monthly installments of
One Hundred Ninety-nine and 64/100's            Dollars ($ 199.64 ), commencing on
the first day of  November            , 19 75, and on the first day of each month thereafter until the principal and interest are fully
paid, except that the final payment of principal and interest, if not sooner paid, shall be due and payable on the first day of  October, 2005.

3221

E x. 1

: VOL 3553 PAGE 22

AND WHEREAS the Grantor further covenants and agrees that:

1. He will promptly pay the principal of and interest on the indebtedness evidenced by the said note, at the times and in the manner therein provided. Privilege is reserved to pay the debt in whole or in an amount equal to one or more monthly payments on the principal that are next due on the note, on the first day of any month prior to maturity; provided, however, that written notice of an intention to exercise such privilege is given at least thirty (30) days prior to prepayment.

2. In order more fully to protect the security of this deed, he will pay to the Grantee, together with, and in addition to, such payments of principal and interest, the following sums:

(a) An amount sufficient to provide the holder hereof with funds to pay the next mortgage insurance premium if this instrument and the note secured hereby are insured, or a monthly charge (in lieu of a mortgage insurance premium) if they are held by the Secretary of Housing and Urban Development, as follows:

(I) If and so long as said note of even date and this instrument are insured or are reinsured under the provisions of the National Housing Act, an amount sufficient to accumulate in the hands of the holder one (1) month prior to its due date the annual mortgage insurance premium, in order to provide such holder with funds to pay such premium to the Secretary of Housing and Urban Development pursuant to the National Housing Act, as amended, and applicable Regulations thereunder; or

(II) If and so long as said note of even date and this instrument are held by the Secretary of Housing and Urban Development, a monthly charge (in lieu of a mortgage insurance premium) which shall be in an amount equal to one-twelfth (1/12) of one-half (½) per centum of the average outstanding balance due on the note computed without taking into account delinquencies or prepayments;

(b) A sum equal to the ground rents, if any, next due, plus the premiums that will next become due and payable on policies of fire and other hazard insurance protecting the premises covered hereby, plus taxes and assessments next due on the premises covered by this deed (all as estimated by the Grantee) less all sums already paid therefor divided by the number of months to elapse before one month prior to the date when such ground rents, premiums, taxes and assessments will become delinquent, such sums to be held by the Grantee in trust to pay said ground rents, premiums, taxes and special assessments before the same become delinquent; and

(c) All payments mentioned in the two preceding subsections of this paragraph and all payments to be made under the note secured hereby shall be added together, and the aggregate amount thereof shall be paid by the Grantee each month in a single payment to be applied by the Grantee to the following items in the order set forth:

(I) premium charges under the contract of insurance with Secretary of Housing and Urban Development, or monthly charge (in lieu of mortgage insurance premium), as the case may be;

(II) ground rents, taxes, special assessments, fire and other hazard insurance premiums;

(III) interest on the note secured hereby; and

(IV) amortization of the principal of said note.

Any deficiency in the amount of such aggregate monthly payment shall, unless made good by the Grantor prior to the due date of the next such payment, constitute an event of default under this deed. The Grantee may collect a "late charge" not to exceed two cents (2¢) for each dollar ($1) of each payment more than fifteen (15) days in arrears to cover the extra expense involved in handling delinquent payments.

3. If the total of the payments made by the Grantor under subsection (b) of paragraph 2 preceding shall exceed the amount of the payments actually made by the Grantor for ground rents, taxes, or assessments or insurance premiums, as the case may be, such excess, at the option of the Grantor, shall be credited by the Grantee on subsequent payments to be made by the Grantor, or refunded to the Grantee. If, however, the monthly payments made by the Grantor under such subsection shall not be sufficient to pay ground rents, taxes, or assessments or insurance premiums, when the same shall become due and payable, then the Grantor shall pay to the Grantee any amount necessary to make up the deficiency, on or before the date when payment of such ground rents, taxes, assessments or insurance premiums shall be due. If at any time the Grantor shall tender to the Grantee, in accordance with the provisions of said note, full payment of the entire indebtedness represented thereby, the Grantee shall, in computing the amount of such indebtedness, credit to the account of the Grantor all payments made under the provisions of subsection (a) of paragraph 2, above, which the Grantee has not become obligated to pay to the Secretary of Housing and Urban Development, and any balance remaining in the funds accumulated under the provisions of subsection (b) of paragraph 2. If there shall be a default under any of the provisions of this deed resulting in a public sale of the premises covered hereby or if the Grantee acquires the property otherwise after default, the Grantee shall apply, at the time of the commencement of such proceedings, or at the time the property is otherwise acquired, the balance then remaining in the funds accumulated under such subsection (b) of paragraph 2 as a credit against the amount of principal then remaining unpaid under said note, and shall properly adjust any payments which shall have been made under subsection (a) of paragraph 2.

4. He will pay all ground rents, taxes, assessments, water rates, and other governmental or municipal charges, fines, or impositions, levied upon said premises, or upon the interest of the Grantee in said or said premises, for which provision has not been made hereinbefore, and in default thereof the Grantee may pay the same; and he will promptly deliver the official receipts therefor to the Grantee.

5. The Grantee, its successors or assigns, shall have the right to pay any ground rents, taxes, assessments, water rents, and other governmental or municipal charges, fines or impositions, which the Grantor has agreed to pay under paragraph 4, above, and to make any payments hereinabove provided to be made by the Grantor in subsections (a) and (b) of paragraph 2 hereof, and any amount so paid by the Grantee shall then be added to the principal debt named herein and bear interest at the rate set forth in the note secured hereby, payable monthly, from the date of such payment, and be secured by this deed.

6. He will keep the improvements now existing or hereafter erected on the premises covered by this deed, insured as may be required from time to time by the Grantee against loss by fire and other hazards, casualties and contingencies including war damage insurance, in such amounts and for such periods as may be required by the Grantee and will pay promptly, when due, any premiums on such insurance provision for payment of which has not been made hereinbefore. All insurance shall be carried in companies approved by the Grantee and the policies and renewals thereof shall be held by the Grantee and have attached thereto loss-payable clauses in favor of and in form acceptable to the Grantee. In event of loss Grantor will give immediate notice by mail to the Grantee, who may make proof of loss if not made promptly by Grantor, and each insurance company concerned is hereby authorized and directed to make payment for such loss directly to the Grantee instead of to the Grantor jointly, and the insurance proceeds, or any part thereof, may be applied by the Grantee at its option either to the reduction of the indebtedness hereby secured or to the restoration or repair of the property damaged. In event of foreclosure of this mortgage deed, or other transfer of title to the property covered hereby in extinguishment of the indebtedness secured hereby, all right, title and interest of the Grantor in and to any insurance policies then in force shall pass to the purchaser or Grantee.

7. He will keep the mortgaged premises in as good order and condition as they are now, and will not commit or permit waste, reasonable wear and tear excepted.

8. That if the premises, or any part thereof, be condemned under any power of eminent domain, or acquired for a public use, the damages, proceeds, and the consideration for such acquisition, to the extent of the full amount of indebtedness upon this Mortgage, and the Note secured hereby remaining unpaid, are hereby assigned by the Grantor to the Grantee and shall be paid forthwith to the Grantee to be applied by it on account of the indebtedness secured hereby, whether due or not.

9. The Grantor further agrees that should this deed and the note secured hereby not be eligible for insurance under the National Housing Act within **60 days** from date hereof (written statement of any officer of the Department of Housing and Urban Development or authorized agent of the Secretary of Housing and Urban Development dated subsequent to the **aforesaid** time from the date of this deed, declining to insure said note and this deed, being deemed conclusive proof of such ineligibility) the Grantee or the holder of the note may, at its option, declare all sums secured hereby immediately due and payable.

Ex. 1

VOL 3553 PAGE 23

10.  Upon a default in any of the terms of the note secured hereby, or upon a breach of any condition or covenant of this deed, the rents and profits of the real estate herein described shall immediately accrue to the benefit of the Grantee, and such rents shall be immediately payable to the Grantee.

11.  Upon any default in the note secured hereby, or under this deed, foreclosure proceedings may be instituted, at the option of the Grantee, In any such action, the Grantee shall be entitled, without notice and without regard to the adequacy of the security of the debt, to the appointment of a receiver of the rents and profits of the mortgaged premises and in case of any other suit, or legal proceeding, wherein the Grantee shall be made a party thereto by reason of this mortgage, its costs and expenses, and the reasonable fees and charges of the attorneys or solicitors of the Grantee, so made parties, for services in such suit or proceedings, shall be a further lien and charge upon the said premises under this mortgage, and all such expenses shall become so much additional indebtedness secured hereby and be allowed in any decree foreclosing this mortgage.

12.  The Grantee is authorized and empowered to do all things provided to be done by a mortgagee under Section 1311-14 of the Revised Code, and under the Act of the Legislature passed May 27, 1915, 106 Ohio Laws, Pages 522-534, and any amendments or supplements thereto.

Now, therefore, if the Grantor shall well and truly perform all the conditions of this deed, and of the note secured hereby, then this deed shall be void; otherwise, it shall remain in full force and virtue.

The covenants herein contained shall bind, and the benefits and advantages shall inure to, the respective heirs, executors, administrators, successors and assigns of the parties hereto. Whenever used, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

IN WITNESS WHEREOF, the Grantor (s) ha **ve** hereunto set **their** . hand **s** , this **30th** .
day of **September** . A.D. 19 **75** .

x _Ronald L. Moore By_
_Yvonne D. Moore Atty. In Fact_
**Ronald L. Moore**
by **Yvonne D. Moore, his Attorney-in-Fact**

Signed, acknowledged and delivered in the presence of

x _Yvonne D. Moore_
**Yvonne D. Moore**

STATE OF OHIO        )
                     ) ss:
COUNTY OF **Franklin**  )

Before me, the undersigned, a **Notary Public** in and for said State and County, personally appeared the above-named, **Ronald L. Moore, and Yvonne D. Moore,** who acknowledged the signing of the above mortgage deed, and severally acknowledged the signing thereof, and that such signing was their free and voluntary act and deed, for the uses and purposes therein mentioned.

IN TESTIMONY WHEREOF, I have hereunto signed my name, and affixed my official seal, this **30th** day of **September** . A.D. 19 **75** .

**FRANK D. FARKAS**
NOTARY PUBLIC, FRANKLIN COUNTY, OHIO
MY COMMISSION EXPIRES AUG. 27, 1920

The conditions of this mortgage have been complied with, and the sums is fully paid, satisfied, and discharged.

The form of this instrument was prepared by the Office of the General Counsel, Department of Housing and Urban Development, and the material in the blank space in the form was inserted by or under the direction of **Central Savings and Loan Company** .

_Ex. 1_



**GENERAL WARRANTY DEED**
STATUTORY FORM  Rev. Code, Secs. 5301.01 to .08

**Know all Men by These Presents;** That Willie Joe Cook and Frances G. Cook, husband and wife, of Franklin County, Ohio for One Dollar ($1.00) and other good and valuable consideration paid, grant, with general warranty covenants, to Ronald L. Moore and Yvonne D. Moore, husband and wife, whose tax mailing address is 1875 Alvason Avenue, Columbus, Ohio, the following real property: Situated in the County of Franklin in the State of Ohio and in the City of Columbus and bounded and described as follows:

22508

Being Lot Number Seventeen (17) of ARGYLE PARK SUBDIVISION, as the same is numbered and delineated upon the recorded plat thereof, of record in Plat Book 36, page 6, Recorder's Office, Franklin County, Ohio.

This conveyance is subject to the lien of any taxes and assessments not now due and payable; zoning ordinances and regulations ; legal highways; and restrictions, conditions reservations and easements of record.

Prior Instrument of Reference:  Volume 2570  , Page 475  .

wife-husband of the grantor, releases all rights of dower therein.

Witness their hands this 30th day of September , 1975.

Signed and acknowledged in the presence of:

_Willie Joe Cook_
XWillie Joe Cook

_Kathryn A. Rose_    _Frances G. Cook_
XFrances G. Cook

**THE STATE OF OHIO.** Franklin COUNTY. ss.

Be It Remembered, That on this 30th day of September , 1975, before me, the subscriber, a Notary Public in and for said County, personally came the above named, Willie Joe Cook and Frances G. Cook, husband and wife, the Grantor's in the foregoing Deed, and acknowledged the signing of the same to be their voluntary act and deed, for the uses and purposes therein mentioned.

In Testimony Whereof, I have hereunto subscribed my name and affixed my official seal, on the day and year last aforesaid.

_Kathryn A. Rose_
KATHRYN A. ROSE
NOTARY PUBLIC, FRANKLIN COUNTY, OHIO
MY COMMISSION EXPIRES MARCH 17, 1979

This Instrument was prepared by
J. C. CHANDER, V. Attorney at Law
531 East Livingston Avenue, Cols., Ohio  43215

1. Name or names of Grantor(s) and marital status.
2. Description of land or interest therein and encumbrances, reservations, and exceptions, if any.
3. Delete whichever is not applicable.

This space for Auditor's Stamp

TRANSFERRED
OCT 6 1975
ARCH J. WARREN
AUDITOR
FRANKLIN COUNTY, OHIO

TRANSFER TAX
PAID
$24.90
By
ARCH J. WARREN
FRANKLIN COUNTY, AUDITOR

This space for Recorder's Stamp
4.00
Received... OCT 6 1975...19...At...........O'clock .....M
Recorded...OCT 8...1975...19.....In Franklin County
JAMES A. SCHAEFER, Recorder
.00
Recorder's Fee $......

_Ex. 1_

EXHIBIT 2

FAA RECORD OF APPROVAL
DATED SEPt. 11, 1987

FAA, PART 150
" LAND USE CONTROLS

20824 - C23



# Memorandum

U.S. Department
of Transportation

Federal Aviation
Administration

---

**Subject:** ACTION: FAR Part 150 Noise Compatibility Program, **Date:** SEP 11 1987
Record of Decision; Port Columbus International
Airport, Columbus, Ohio

**From:** Director, AGL-1

**Reply to Attn. of:** Lamberts:384-7387

**To:** Administrator

The city of Columbus, Public Utilities and Aviation Department, owner and
operator of Port Columbus International Airport, has submitted noise exposure
maps (NEM's) and a proposed noise compatibility program (NCP) to this
office. The NEM's were previously accepted by FAA effective July 27, 1987.
The proposed NCP must be approved or disapproved on or before January 23,
1988. A Federal Register notice announcing the submission of the NCP for
FAA approval was published July 27, 1987. The maps and proposed program
have been coordinated with airport users, community officials, land use
planning agencies, and the public. Documentation of this coordination is
found in the appendices of the study report.

Earlier review of the proposed NCP by this office and APP-600 found the
program to be compliant with the standards set forth in FAR Part 150, para-
graph 150.23. This submittal requests formal FAA review and approval of
the NCP for Port Columbus International Airport. The airport is situated
in the eastern part of the city of Columbus, which is currently designated
as a medium hub. It has 184 based aircraft and had approximately 230,000
operations in 1986. This Part 150 study was funded under AIP Grant
84-2-3-39-0025-03-85 with a Federal project share of $267,188, which
includes a master plan update.

This office believes the NCP complies with published standards for FAR Part
150 submittals. We have coordinated this report with Regional Counsel, the
regional Planning Staff, and affected operational divisions. We are pleased
to forward this candidate NCP for your consideration. We recommend you
approve this NCP.

William H. Pollard

Attachment

EXHIBIT 2

20824 – C24

2

Date:
Subject:  FAR Part 150 Noise Compatibility Program, Record of Decision;
          Port Columbus International Airport, Columbus, Ohio

Associate Administrator for Airports, ARP-1

Concur/Non-concur: _____ Date: 9/16/87

Associate Administrator for Policy and International Aviation, API-1

Concur/Non-concur: _____ Date: 9/18/87

Chief Counsel, AGC-1

Concur/Non-concur: by: _____ Date: 9/21/87

Administrator, AOA-1

Approved/Disapproved: _____ Date: 9-25-87

*EX. 2*

# EXHIBIT 3

FAA AVIGATION EASEMENT

EXECUTED APRIL 20, 1992

RECORDED SEPT. 2, 1992

20318F14

**ATTACHMENT B**
**Avigation Easement**

137475

TIME _____ 10:20A

RECORDER FRANKLIN CO., OHIO

SEP 2 1992

RICHARD B. METCALF, RECORDER

RECORDER'S FEE _____ 18ᵒᵒ

HOMEOWNER PARTICIPATION AGREEMENT
RESIDENTIAL SOUND INSULATION PROGRAM
Port Columbus International Airport

This easement is conveyed from _Yvonne DeCarol Webb_,
hereinafter called "Grantor", to the Columbus Municipal Airport
Authority of Columbus, Ohio, hereinafter called the "Grantee".
This easement is entered into this _20th_ day of _April_,
1992.

Grantor is the owner of land and improvements thereto located at
_1875 Alvason Ave., Columbus_, of the State of Ohio, and
described as follows:

**DESCRIPTION**

Being Lot Number Seventeen (17) of Argyle Park Subdivision, as
the same is numbered and delineated upon the recorded plat
thereof, of record in Plat Book 36, page 6, Reorder's Office,
Franklin County, Ohio.

Ex.3

MAILED
ENVELOPE FURNISHED

The Grantee is the proprietor of the Port Columbus International
Airport.

TRANSFER
NOT NECESSARY

SEP 2 1992

JOSEPH W. TESTA
AUDITOR
FRANKLIN COUNTY OHIO

CONVEYANCE TAX
EXEMPT

JOSEPH W. TESTA

20318F15

ATTACHMENT B   (continued)
Avigation Easement

HOMEOWNER PARTICIPATION AGREEMENT
RESIDENTIAL SOUND INSULATION PROGRAM
Port Columbus International Airport

WHEREAS, The Property is subject to existing or forecast aircraft noise levels of 65 Ldn or

higher, is subject to frequent aircraft overflights, and is subject to occasionally loud aircraft

noise associated with takeoff and landing; and

WHEREAS, Grantor has been advised that the Property is located in a noise-impacted area (65

Ldn or higher); and

WHEREAS, Grantor acknowledges that the approximate aircraft flight path in relation to the

Property is as shown on the "1991 Noise Exposure Map from the Part 150 Noise Compatibility

Program" which is attached hereto and marked Exhibit A; and

WHEREAS, Grantee intends to sound insulate the Property to meet Federal Aviation

Administration (FAA) guidelines for Part 150 Noise Mitigation Programs;

NOW, THEREFORE, in consideration of the foregoing, Grantor does hereby grant a permanent

avigation easement and right of way for noise to the Columbus Municipal Airport Authority,

owner and operator of Port Columbus International Airport in all airspace extending from the

surface of the property to an infinite height above the Property.

Grantor further agrees that no structures exceeding 50 feet in height (as measured from ground

level) shall be constructed on the Property and no other improvements, fixtures or structures in

excess of 50 feet in height (as measured from ground level) shall be permitted to be located or

remain on the Property.  Grantor further grants to the Columbus Municipal Airport Authority

the right to trim any trees or other vegetation which exceed 50 feet in height (as measured from

Ex. 3

- 2 -

20318F16

ATTACHMENT B  (continued)
Avigation Easement

HOMEOWNER PARTICIPATION AGREEMENT
RESIDENTIAL SOUND INSULATION PROGRAM
Port Columbus International Airport

ground level), at no cost or expense to Grantor.  By virtue of this Agreement, the Grantor, for

and on behalf of itself and its successors and assigns, waives as to the Columbus Municipal

Airport Authority, and any successor agency legally authorized to operate said airport, but only

to said Columbus Municipal Airport Authority and said successor agencies, any and all claims

for damage of any kind.

Grantor hereby grants to Grantee all that certain avigation easement over and above the Property

hereinafter described for the use and benefit of the Grantee, its successors and assigns, for the

use and benefit of the public, as an easement and right-of-way appurtenant to the Port

Columbus International Airport, for the unobstructed passage of all aircraft, ("aircraft" being

defined for the purpose of this easement as any contrivance now known or hereinafter invented,

used or designed for navigation or flight in the air by whomsoever owned and operated), which

easement is bounded and described as follows, to wit:

Grantor shall not permit or create any electrical interference with radio communication between

any installation at Port Columbus International Airport and aircraft, and shall not make it

difficult for flyers to distinguish between airport lights and others, and shall not impair visibility

in the vicinity of the airport or otherwise to endanger landing, taking off or maneuvering of

aircraft, it being understood and agreed that all of the aforementioned covenants and agreements

contained shall run with the land.

The Grantor, for and on behalf of itself and its successors and assigns, does further hereby

convenant and agree with the Columbus Municipal Airport Authority that it will not, from and

after the effective date hereof, sue, prosecute, molest or trouble the Columbus Municipal

Ex.3

- 3 -

20318F17

ATTACHMENT B   (continued)
Avigation Easement

HOMEOWNER PARTICIPATION AGREEMENT
RESIDENTIAL SOUND INSULATION PROGRAM
Port Columbus International Airport

Airport Authority in respect to or on account of the flight of any and all aircraft over or near the

Property or for any effects resulting therefrom, including, but not limited to, noise, air

pollution, or any and all other possible damages (except damage resulting from negligent

operation of the airport) to or taking of the Property resulting from such flights.

This easement and non-suit covenant is granted solely to the Columbus Municipal Airport

Authority and any successor agency (but only in their capacities as airport operators) and does

not grant any right to private persons or entities, and no such persons or entities shall be the

direct or indirect beneficiary of this easement and non-suit covenant.

Said easement and right of way, and all rights appertaining thereunto, to the Columbus

Municipal Airport Authority, its successors and assigns, shall remain in effect until said Port

Columbus International Airport shall be abandoned and shall cease to be used for public airport

purposes.

Grantor covenants that Grantor is the owner in fee simple of the Premises, and that at the time of

signing this avigation easement, Grantor has full ownership rights and powers to convey this

easement free and clear from all other grants, bargains, sales, liens, taxes, assessments and

encumbrances of whatever kind or nature, and Grantor covenants with the Grantee, its

successors, and assigns, to warrant and forever defend against all and every person or persons

claiming any right or title adverse to the easement herein granted.

Ex. 3

- 4 -

20318F18
## ATTACHMENT B  (continued)
### Avigation Easement

### HOMEOWNER PARTICIPATION AGREEMENT
### RESIDENTIAL SOUND INSULATION PROGRAM
Port Columbus International Airport

IN WITNESS WHEREOF, the said Grantor has caused this Avigation Easement to be executed

this _20.ᵗʰ_ day of _APRIL_, 1992.

WITNESS(ES):                                   GRANTOR(S):

_Tiffany R. Parker_                            _Yvonne D. Webb_

_Anthony C. Iacoboni_

Ex. 3

- 5 -

ZU318F19

ATTACHMENT B  (continued)
Avigation Easement

## HOMEOWNER PARTICIPATION AGREEMENT
## RESIDENTIAL SOUND INSULATION PROGRAM
Port Columbus International Airport

STATE OF OHIO )
)
) ss.:
)
COUNTY OF FRANKLIN )

On this 20TH day of APRIL , 1992, before me the undersigned Notary
Public in and for the State of OHIO , duly commissioned and sworn, personally
appeared YVONNE D. WEBB and , to me
known to be the individual(s) described in and who executed the within instrument and
acknowledged that he/she/they signed and sealed the same as his/her/their free and voluntary act
and deed for the uses and purposes herein mentioned.

IN WITNESS WHEREOF I have hereunto set my hand and affixed my official seal.

Notary Public in and for the
State of OHIO
residing at WORTHINGTON

My Commission Expires On: No EXPIRATI

**ROD COURTNEY BORDEN**
ATTORNEY· AT LAW
NOTARY PUBLIC · STATE OF OHIO
LIFETIME COMMISSION

### CERTIFICATE OF RESIDENCE

I,(we) YVONNE D. WEBB, do hereby certify that grantor's precise residence is,
1825 ALVASON AVENUE . Dated this 20th day of April, 1992.

GRANTOR(S):

Yvonne D. Webb



Ex. 3

EXHIBIT 4

AMERICAN EQUITY
MERGER
SEPT. 11, 1996



Debra J. Richardson
Vice President and Secretary

September 11, 1996

Harold Duryee, Director of Insurance
Ohio Department of Insurance
2100 Stella Court
Columbus, OH 43215-0167

RE:    Merger of American Equity Investment Life Insurance Company
       with Century Life Insurance Company

Dear Commissioner Duryee:

We are writing to notify you of the anticipated acquisition and merger of American Equity Investment
Life Insurance Company, an Iowa domestic insurer ("American Equity") with and into Century Life
Insurance Company, an Iowa domestic insurer ("Century"). Century, which will be survivor of the
merger, holds a certificate of authority in your state.

The acquisition was approved on July 19, 1996, by Order of the Iowa Deputy Commissioner of Insurance
pursuant to the Iowa Insurance Company Holding System Act. The closing date is in September, 1996,
subject to fulfillment of all conditions. Upon the consummation of the merger, the name of Century will
be changed to "American Equity Investment Life Insurance Company," and the Articles of Incorporation
and Bylaws of the surviving company, which was incorporated on October 19, 1980, will be amended
and restated. American Equity's parent company, American Equity Investment Life Holding Company,
a Delaware corporation, will become the 100% owner of the surviving life company.

To facilitate your review of this transaction, we enclose herewith the following documents pertaining to
American Equity:

    1. Acquisition and Merger Agreement
    2. Order of the Iowa Deputy Commissioner of Insurance

Upon completion of the merger, we will send you a letter confirming that the closing occurred and
enclosing a certified copy of the Articles of Merger. At that time, we will request the issuance of an
amended Certificate of Authority which reflects the surviving company's new name.

Should you have questions, please contact the undersigned at 515/221-0002, ext. 227. Thank you for
your assistance

        Very truly yours,

        Debra J. Richardson

Enclosures

**RECEIVED**

*EXHIBIT 4-*

SEP 16 1996

**LIFE, ACCIDENT & HEALTH**

5000 Westown Parkway, Suite 200•West Des Moines, IA 50266•Phone (515) 221-0002•Fax (515) 221-9947

## BEFORE THE INSURANCE COMMISSIONER FOR THE STATE OF IOWA

| | | |
|---|---|---|
| In the matter of the application of | ) | |
| AMERICAN EQUITY INVESTMENT | ) | |
| LIFE HOLDING COMPANY for approval | ) | |
| of a plan to acquire CENTURY LIFE | ) | |
| INSURANCE COMPANY and merge it with | ) | **ORDER** |
| AMERICAN EQUITY INVESTMENT | ) | (Iowa Code §521A.3(4)) |
| LIFE INSURANCE COMPANY | ) | |

Pursuant to Iowa Code § 521A.3(4)(b) (1995), a public hearing was held June 25, 1996 at which representatives of American Equity Investment Life Holding Company and American Equity Investment Life Insurance Company appeared and submitted testimonial and documentary evidence in support of the proposed plan to acquire Century Life Insurance Company. After a careful review of the evidence submitted, the commissioner finds that none of the criteria set forth in Iowa Code § 521A.3(4)(a) (1995) are violated by the proposed acquisition. The acquisition is, therefore, approved.

DATED this 19th day of July, 1996.

ROBERT L. HOWE
Deputy Commissioner of Insurance

Copies to:

William Demuth
Iowa Department of Economic Development
200 E. Grand Ave.
Des Moines, Iowa 50319

Mark Couch
"Des Moines Register"
P.O. Box 957
Des Moines, Iowa 50304

William L. Fairbank
Whitfield & Eddy
317 Sixth Avenue, Suite 1200
Des Moines, Iowa 50309

Or-AmEqu.doc
SMG

1

EX. 4

*69711*

## ARTICLES OF CORRECTION
## OF
## AMERICAN EQUITY INVESTMENT LIFE INSURANCE COMPANY
### (formerly known as Century Life Insurance Company)

**TO THE SECRETARY OF STATE**
**OF THE STATE OF IOWA:**

Pursuant to Section 490.124 of the Iowa Business Corporation Act, American Equity Investment Life Insurance Company hereby adopts the following Articles of Correction:

1.    On September 30, 1996, American Equity Investment Life Insurance Company (formerly known as Century Life Insurance Company) filed Restated Articles of Incorporation.

2.    Article III of the Restated Articles of Incorporation contained an incorrect statement of the purposes of the corporation in that certain types of insurance which the company intends to offer were inadvertently omitted.

3.    To correct this omission, subclause (2) of Article III will state as follows:

(2)    To issue all forms of life insurance policies, including without limitation, ordinary life, limited payment life, variable life, endowment policies, fixed and variable annuities, accident policies, accident and health policies, hospital and medical expense policies, group accident and health policies and noncancellable accident and health policies.

AMERICAN EQUITY INVESTMENT
LIFE INSURANCE COMPANY

By: _____
D. J. Noble, President

*E x, 4*

501819 CORR1D    $5.00    DONNA    2



**ODI**
**Ohio Department of Insurance**

John R. Kasich, Governor
Mary Taylor, Lt. Governor/Director

50 West Town Street
Third Floor – Suite 300
Columbus, OH 43215-4186
(614) 644-2658
www.insurance.ohio.gov

# CERTIFICATION OF RECORDS

I, **Tina L. Chubb**, Records Administrator for the Ohio Department of Insurance, do hereby certify that the attached copy of the Certificate of Authority and Articles of Incorporation for American Equity Investment Life Insurance Company on file with the Ohio Department of Insurance is a true and accurate copy of the original records maintained in the ordinary course of business by this agency.

Signed and dated this 25th day of August, 2011.

Tina L. Chubb, Records Administrator
Ohio Department of Insurance

Jillian Froment, Deputy Director
Ohio Department of Insurance

E X. 4

**Accredited by the National Association of Insurance Commissioners (NAIC)**
Consumer Hotline: 1-800-686-1526       Fraud Hotline: 1-800-686-1527       OSHIIP Hotline: 1-800-686-1578
TDD Line: (614) 644-3745                    (Printed in house)

# EXHIBIT 5

## AFFIDAVIT OF GMAC
## (CREDITOR)

U.S. BANKRUPTCY COURT
FOR S.D. OF OHIO
CASE NO. 05-bk-75111
FILED JAN. 27, 2006

B0508359

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | CASE NO. 05-75111 |
| | ) | CHAPTER 7 |
| Yvonne Lewis | ) | |
| | ) | |
| Debtor | ) | JUDGE HOFFMAN |
| | ) | |
| | ) | **(1875 Alvason Ave, Columbus)** |

## AFFIDAVIT IN SUPPORT OF MOTION FOR RELIEF FROM STAY

State of _PENNSYLVANIA_

County of _PHILADELPHIA_

I, _JOHN TIMSON_ , being duly cautioned and sworn state as follows:

1. I am an employee of GMAC Mortgage Corporation, its successors and assigns, ("Creditor"), a creditor in the within bankruptcy. I am authorized to give this affidavit. The information contained in this affidavit is based upon my personal knowledge or based upon the Creditor's business records. These business records are kept in the normal course of business and the Creditor relies upon them in the conduct of its business. The information contained in these records was created at or near the events described therein. I am a custodian of those records.

2. Creditor holds the note and mortgage relating to debtor's real property referenced above. At the request of my attorney, I have reviewed those records and concluded that Debtor is currently due for the _3/1/05_ payment. The last payment received from the debtor was on _3/10/05_

$Ex. 5$

in the amount of $ _3/2.98_ and it was applied to the ___1/1/05___ payment. . The funds being

held in suspense are _#0.00_ . The total amount to reinstate the loan contractually is

$_10,968.28_. The total amount to payoff this loan good through February 6, 2006, is $62,322.38.

FURTHER AFFIANT SAYETH NAUGHT.

Sworn to and subscribed in my presence this _26th_ day of _January_, 2006.

NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Zahirah Y. Sweet, Notary Public
City Of Philadelphia, Philadelphia County
My Commission Expires Mar. 7, 2009
Member, Pennsylvania Association of Notaries

$EX.5$

## CERTIFICATE OF SERVICE

A copy of the foregoing Affidavit in Support of Motion for Relief from the Automatic Stay was served

by regular U.S. Mail and/or electronically as permitted by the rules, this 27th day of January, 2006, upon the

following parties at the addresses stated below.

Yvonne Lewis
1875 Alvason Ave
Columbus, OH 43219

Sidney Lewis
1875 Alvason Ave
Columbus, OH 43219

Clyde C. Hardesty, III, Trutee
P.O. Box 731
Newark, OH 43058-0731

Office of the U.S. Trustee
The Schaff Building
170 North High Street, Suite 200
Columbus, OH 43215

/S/ Andrew A. Paisley
Attorney for Movant

E x . 5

EXHIBIT 6

TRUSTEE'S ABANDONMENT
FILED MARCH 8, 2006
U.S. BANKRUPTCY COURT FOR
S.D. OF OHIO
Case No. 05-bK-75111

B0508359

*D2258E06*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

In Re                                          )        CASE NO  05-75111
                                               )        CHAPTER 7
      Yvonne Lewis                             )
                                               )
      Debtor                                   )        JUDGE HOFFMAN
                                               )
                                               )        (1875 Alvason Ave, Columbus)

---

**TRUSTEE'S ABANDONMENT OF PROPERTY AFTER CERTIFICATION AND
REPRESENTATIONS BY PARTY REQUESTING ABANDONMENT**

---

The Trustee having been requested by GMAC Mortgage Corporation to abandon the
property set forth below and based on the representations made by such party as follows

1    The property to be abandoned is real estate ("Property"), and the property is
     located at 1875 Alvason Ave, Columbus, Ohio 43219

2    The fair market value of the Property is $55,200 00

3    The amount of the claim of the party requesting abandonment as of the date of the
     Petition Date is $60,779 47

4    The liens or encumbrances against the Property are  No others known to Movant

5    The party requesting abandonment, as set forth above, certifies, that pursuant to
     Local Bankruptcy Rule 6007-1, that it has checked the Docket Sheet in this
     proceeding as of the date set for the 341 meeting (December 9, 2005) and has
     determined that no parties have requested further notice of abandonment other
     than that given by the 341 Notice

6    The party requesting abandonment, as set forth above, has attached to this
     Abandonment, the applicable note, filed copies of mortgages, and assignments, if
     any

Ex. 6

D2258E07

Based on the representations and certifications of the party requesting abandonment, as set forth above, Clyde C Hardesty, III, the duly qualified and acting Trustee for the above named bankruptcy estate, pursuant to 11 U S C Section §554, abandons the identified Property as such Property is burdensome to and/or is of inconsequential value and benefit to the bankruptcy estate

/S/ Clyde C. Hardesty, III
Clyde C Hardesty, III #
P O Box 731
Newark, OH 43058-0731
(740) 344-6567
trusteeclyde@adelphia net
Attorney for Trustee

EX. 6

## CERTIFICATE OF SERVICE

D2258E08

A copy of the foregoing Trustee's Abandonment of Real Property was served by

regular U S Mail and electronically as appropriate, as permitted by the rules, this 8th day of

March, 2006, upon the following parties in interest at the addresses stated below

Yvonne Lewis
1875 Ahason Ave
Columbus, OH 43219

Sidney Lewis
1875 Alvason Ave
Columbus, OH 43219

Clyde C Hardesty, III, Trustee
P O Box 731
Newark, OH 43058-0731

Office of the U S Trustee
The Schaff Building
170 North High Street, Suite 200
Columbus, OH 43215

The Law Offices of
John D Clunk Co , LPA

/S/ Andrew A. Paisley
Andrew A Paisley (#42515) Ext 248
Scott P Crupak (#0076117) Ext 237
Attorneys for Movant
5601 Hudson Drive
Hudson, Ohio 44236
(330) 342-8203 telephone
(330) 342-8205 facsimile
Email ceubanks@johndclunk com

EX. 6

# EXHIBIT 6.1

### RELATED CASE MEMORANDUM
### FILED DEC. 1, 2008
### IN CASE NO. 2:08-CV-736
### U.S. DIST. COURT FOR S.D. OF OHIO

Case: 2:08-cv-00736-GLF-MRA Doc #: 14 Filed: 12/01/08 Page: 1 of 3 PAGEID #: 472



**United States District Court**
Southern District of Ohio

TIME: **FILED**

DEC - 1 2008

**JAMES BONINI**, Clerk
**COLUMBUS, OHIO**

Joseph P. Kinneary United States Courthouse
85 Marconi Boulevard, Suite 260
Columbus, Ohio 43215

James Bonini
Clerk of Court

Telephone:  614.719.3000
Facsimile:   614.719.3037

**Related Case Memorandum**
**Civil Cases**

TO:          District Judge Holschuh, District Judge Marbley & District Judge Frost

FROM:        Eduardo Rivera, Case Administrator

DATE:        November 4, 2008

SUBJECT:     Case Caption: Lewis v. Johnston

CASE         Case Number: 2:08-cv-1040

             File Date: November 5, 2008

---

This memorandum is to notify you that the civil cover sheet on the above referenced case reflects
the following alleged related case(s):

**Related Case(s):**

Case Caption:   Lewis v. McClatchey

Case Number:  2:08-cv-75                    District Judge:  Marbley

File Date:   1/25/08                         Magistrate Judge:  N/A

**Related Case(s):**

Case Caption:   Johnston v. Lewis

Case Number:  2:08-cv-736                   District Judge:  Frost

File Date:   7/29/08                         Magistrate Judge:  Abel

Memo Re: Related Civil Cases
Page 2

       The District Judges having conferred, we respond to Case Administrator *Ed Rivera* _____ as follows:

**Judges' Response:**

☐    We agree that the cases are **not** related and that the subject case should remain with the Judge to whom it is assigned.

☐    We agree that the cases **are** related and that the subject case should be transferred to the docket of Judge _____.

☒    We agree that although the cases **are** related, the subject case nevertheless should remain with the Judge to whom it was assigned.

☐    We are unable to agree and will accept any decision made by the Chief Judge.

 

United States District Judge

 

_____
United States District Judge

 

United States District Judge

cc: Courtroom Deputies

Case: 2:08-cv-00736-GLF-MRA Doc #: 14 Filed: 12/01/08 Page: 3 of 3  PAGEID #: 474

Memo Re: Related Civil Cases
Page 2

The District Judges having conferred, we respond to Case Administrator _____
_____ as follows:


**Judges' Response:**

☐      We agree that the cases are **not** related and that the subject case should
remain with the Judge to whom it is assigned.

☐      We agree that the cases **are** related and that the subject case should be
transferred to the docket of Judge _____.

☐      We agree that although the cases **are** related, the subject case nevertheless
should remain with the Judge to whom it was assigned.

☒      We are unable to agree and will accept any decision made by the Chief
Judge.

☒ — *OUR CASE IS CLOSED.*

_____
United States District Judge


_____
United States District Judge


_____
United States District Judge


cc: Courtroom Deputies

EXHIBIT M

GARRETSON'S RESPONSE
TO SUBPOENA DUCES TECUM
DATED DEC. 16, 2010

E1366 - P7



GARRETSON
RESOLUTION GROUP

December 16, 2010

Yvonne D. Webb-Lewis
Trustee of the Vacy O. Webb Revocable Living Trust
1875 Alvason Avenue
Columbus, Ohio 43219

     RE:    Subpoena Duces Tecum

Dear Ms. Webb-Lewis:

Enclosed please find all of the documents held by the Garretson Firm Resolution Group, Inc. in response to the Subpoena Duces Tecum served on our office on December 9, 2010. Mr. Webb excluded himself from the class certified in the case of Pamela Panter and the Garretson Firm Resolution Group, Inc. does not have any further documentation in response to this subpoena.

Please do not hesitate to call members of our compliance team, Sylvius H. von Saucken, Esq. or Annie Warner, Esq., if you have any questions.

Thank you and happy holidays.

Sincerely,

*Annie War*

Annie Warner, Esq.
The Garretson Firm Resolution Group, Inc.

Enclosures

c:    Ohio Department of Insurance Consumer Services Division
    Elections Commission of Ohio
    Ethics Commission of Ohio
    Ohio Department of Agriculture Enforcement Division
    Ohio Disciplinary Counsel

*EX. 7*

www.garretsongroup.com

Cincinnati Office
Phone 513.794.0400 · Fax 513.936.5186
7775 Cooper Road · Cincinnati, OH · 45242

Charlotte Office
Phone 704.559.4300 · Fax 704.559.4331
2115 Rexford Road · 4th Floor · Charlotte, NC · 28211

EXHIBIT 8

MIKE DeWINE,
Ohio Attorney General
Letter dated Jan. 13, 2011

 **Mike DeWine**
Ohio Attorney General

**Consumer Protection**
*Office*  (614) 466-8831
*Fax*     (614) 466-8898

30 East Broad Street, 14th Floor
Columbus, Ohio 43215
www.ohioattorneygeneral.gov

January 13, 2011

Sidney T. Lewis
Yvonne D. Webb-Lewis
1875 Alvason Avenue
Columbus, Ohio 43219

Dear Mr. and Mrs. Lewis:

I am in receipt of your constituent inquiry received by our office on December 9, 2010. Your request was forwarded to the Consumer Protection Section for review. I am writing to follow up on your request for our office to review the documents that you submitted with respect to your difficulties with American Investment Life Insurance Company (AILIC), regarding equity indexed annuities. I am sorry to know of the difficulties you are facing.

First, you asked us to confirm whether the notice of defective living trust was given to the State of Ohio. In reviewing your documents, I am assuming you are asking whether or not we received noticed of the class actions that are referenced in the documents. Unfortunately, I cannot answer this question for you as the Consumer Protection Section does not generally receive notices related to insurance and annuities class actions.

Second, in reviewing the documents attached, it appears that you wanted us to review and take action with respect to the court's decision on AILIC's class action settlement related to annuities and living trusts that were sold, apparently, between 1997 and 2007. First, the matter relates to a court decision and we do not have the authority to overturn the court's decision. Second, this also appears to be a matter concerning a transaction that is at least three years old and the statute that we enforce, the Ohio Consumer Sales Practices Act has a time limitation of two years.

I did confer with Greg Mobley with the Ohio Department of Insurance concerning your inquiry with us, since matters related to insurance and annuities are usually referred to them as we do not have jurisdiction over these matters. Mr. Mobley has informed me that you have filed a separate complaint with them and that they will be providing a response soon.

*EXHIBIT 8*

Ohio Attorney General Mike DeWine
January 13, 2011
Page 2


I apologize that I cannot be of further assistance to you at this time. You may want to speak with your attorney, concerning what other options may be available to you. If you are not currently represented by an attorney, you may want to call the Columbus Bar Association Lawyer Referral Service at 614/221.0754 or toll-free at 877/560.1014.

Very truly yours,

MIKE DEWINE
Ohio Attorney General

Susan Choe
Section Chief
Consumer Protection
(614) 466-1306
FAX (614) 466-8898
Susan.choe@ohioattorneygeneral.gov


EX. 8

# EXHIBIT 9

Letter To Atty.
  Eric LaFayette, Esq.
FROM Charles F. Smith
  Attorney for AEL
    Dated Oct. 26, 2011
FROM LawFirm OF SKADDEN,
  ARPS, SLATE, MEAGHER & FLOM, LLP

  FILED IN FR. CNTY. OHIO CPC
    CASE No. 11-cv-12669

0A154 — M4

## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

155 NORTH WACKER DRIVE

CHICAGO, ILLINOIS 60606-1720

———

TEL: (312) 407-0700

FAX: (312) 407-0411

www.skadden.com

FIRM/AFFILIATE OFFICES

———

BOSTON
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WASHINGTON, D.C.
WILMINGTON

———

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

DIRECT DIAL
312/407-0516
DIRECT FAX
312/407-8523
EMAIL ADDRESS
CHARLES.SMITH@SKADDEN.COM

October 26, 2011

**VIA FEDERAL EXPRESS**

Eric LaFayette, Esq.
Eric LaFayette & Co, LLP
415 E. Broad St., Suite 112
Columbus, Ohio 43215

RE:    Lewis v. Addison Insurance Marketing, Inc. et al.

Dear Mr. LaFayette:

On behalf of American Equity Investment Life Holding Company and American Equity Investment Life Insurance Company (collectively, "American Equity"), I write in response to the recently-filed action, *Lewis v. Addison Insurance Marketing Inc., et al.*, case No. 11CVB-10-12667, pending in the Common Pleas Court of Franklin County, Ohio. As I informed you last year when you filed a nearly-identical action, your client's claims against American Equity were released by a prior settlement in *Panter v. Tackett.*, Case No. 01-CI-02109 (Jefferson County, Kentucky) and must be dismissed immediately. If you do not dismiss this action on or before November 2, 2011, we will seek sanctions.

On February 21, 2008, American Equity and the *Panter* plaintiffs entered into a Stipulation of Settlement, in which they agreed that all claims asserted against American Equity and all matters relating to American Equity raised by and in connection with the action, were settled, compromised, and dismissed on the merits and with prejudice on the terms and conditions set forth in the Stipulation of Settlement and its incorporated Release (enclosed for your reference). After notice and a hearing, the court approved that settlement and entered final judgment on July

*EX. 9*

0A154 — M5

Eric LaFayette
October 26, 2011
Page 2

17, 2008.[1]  As a result, your client's claims against both American Equity companies
were released on that date.

Based on the filing of the *Lewis* Complaint and the attachment
thereto, it appears that you may hold the mistaken belief that Mr. Webb excluded
himself from the settlement with American Equity. This is not the case. As against
American Equity, the *Panter* action was certified as an opt-out class action. Thus,
any person who fell within the definition of the settlement class automatically
became a member <u>unless</u> he or she sent a letter by mail on or before April 18, 2008
to:

> Panter Exclusions
> American Equity Investment Life Insurance Company
> P.O. Box 71218
> West Des Moines, IA  50325-0218[2]

<u>American Equity has no record of ever receiving such a request from the *Lewis*
Plaintiffs.</u>

Subsequent to the settlement between the *Panter* plaintiffs and
American Equity, the plaintiffs entered into settlement agreements with the
remaining defendants. It appears from the records of the Garretson Law Group that
Mr. Webb may have opted out of the settlement between the plaintiffs and the
McIntyre Defendants. Indeed, the *Lewis* plaintiffs sent their November 29, 2009
exclusion request to "McIntyre Exclusions, as *Class Claims Administrator*."[3]  The
*Lewis* plaintiffs did not, however, send any similar paperwork to opt out of the
settlement with American Equity.

Accordingly, the *Lewis* plaintiffs—one of whom is an alleged
beneficiary of a living trust and the other of whom is an alleged trustee of the living
trust—are members of the American Equity Settlement Class in *Panter* and are

---

[1]   For your reference, a copy of the *Panter* Court's Order of Final Approval of Stipulation of
Settlement and Certification of the Settlement Class is enclosed. The Stipulation of Settlement is
attached to the Court's Order as Exhibit A.

[2]   See Notice of Proposed Settlement, annexed hereto.

[3]   See Request for Exclusion, annexed hereto. Also note that the *Lewis* plaintiffs sent this opt-out
letter to the Garretson Law Group over a year and a half after the deadline to opt out of the
settlement with American Equity.

$Ex. 9$

0A154 - M6
Eric LaFayette
October 26, 2011
Page 3

subject to *Panter's* Stipulation of Settlement and incorporated Release. The *Panter*
Settlement Class includes "all persons residing in the United States who, at any time
during the period from January 1, 1997 through December 31, 2007, purchased, had
an ownership interest in, or obtained a Policy (as defined herein) or a Living Trust
(as defined herein) from, through, in connection with, or involving the McIntyre
Defendants (as defined herein) and/or Tackett (as defined herein), and/or any
predecessor, successor, affiliate, agent, assign, or entity of the McIntyre Defendants
or Tackett."(Stipulation of Settlement, II.A.43)

The *Panter* Release provides that:

> Plaintiff and all Class Members subject to the Settlement Agreement,
> on behalf of themselves, their heirs, successors, and assigns, and any
> other persons they represent, shall fully, finally, and forever release
> and discharge the Releasees[4] from any and all causes of action,
> claims, damages, equitable, legal, and administrative relief, interest,
> demands, and rights, including, without limitation, claims for mental
> anguish, whether based on federal, state, or local law, statute,
> ordinance, regulation, contract, common law, or any other source, that
> have been, could have been, may be or could be alleged or asserted
> now or in the future by Plaintiff or any Class Member against the
> Releasees or any of them in the Action or in any other court action or
> before any administrative body (including any state Department of
> Insurance or other regulatory entity or organization), tribunal,
> arbitration panel, or other adjudicatory body, on the basis of,
> connected with, arising out of, or related to, in whole or in part, the
> Released Transactions.

(Stipulation of Settlement, VII.A.1.) The Release further states that "Plaintiffs and
all Class Members (who do not timely request exclusion from the Class) further
agree that, from the date of execution of this Agreement, they will not institute any
court action or any other proceeding on the basis of, connected with, arising out of,
or related to, in whole or in part, the Released Transactions against the Releasees.
(Id. at VII.A.2.)  "Released Transactions," as defined by the Stipulation of

---

[4]   The Stipulation of Settlement defines "Releasees" as American Equity, American Equity's past,
present, and future parents, subsidiaries, affiliates, partners, predecessors, successors and assigns,
and each of their and American Equity's respective past and present officers, directors,
employees, branch managers, Agents (including those acting on an Agent's behalf or at an
Agent's direction), representatives, attorneys, heirs, administrators, executors, insurers,
predecessors, successors, and assigns, or any of them. (Stipulation of Settlement, II.A.41.)

$E \times . 9$

0A154 – M7

Eric LaFayette
October 26, 2011
Page 4

Settlement, includes "the marketing, solicitation, application, underwriting,
acceptance, sale, purchase, operation, performance, retention, administration and/or
replacement (by means of surrender, partial surrender, withdrawal, and/or
termination of any policy) of the Policies and Living Trusts." (Id. at II.A.40.)

Here, in direct violation of the *Panter* Release, plaintiffs Yvonne D.
Webb-Lewis and Sidney T. Lewis have initiated a court action arising out of the
Released Transactions against American Equity. Indeed, the *Lewis* plaintiffs attempt
to sue American Equity based on allegations that American Equity violated the Ohio
Consumer Sales Practices Act and committed fraud in connection with its alleged
participation in the marketing and sale of living trusts.

In light of this violation, we expect that you will voluntarily dismiss
the *Lewis* action against both American Equity defendants on or before Wednesday,
November 2nd. Please send a copy of the dismissal to my attention by fax or email
by the close of business on that day. If you fail to dismiss this action and American
Equity is forced to appear and obtain dismissal by motion, we will seek our
attorneys' fees and costs.

Please contact me if you have any questions.

Best regards,

Charles F. Smith

Enclosures

*Ex. 9*

EXHIBIT 10

LETTER FROM AEL,
MARCELLA L. LAPE
TO
ERIC LAFAYETTE
DATED DEC. 23, 2011

FILED IN FR. CNTY. OHIO
CPC Case No. 11-CV-12667

0A154 - M61

## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

155 NORTH WACKER DRIVE

CHICAGO, ILLINOIS 60606-1720

—

TEL: (312) 407-0700

FAX: (312) 407-0411

www.skadden.com

DIRECT DIAL
312/407-0954
DIRECT FAX
312/827-9387
EMAIL ADDRESS
MLAPE@SKADDEN.COM

FIRM/AFFILIATE OFFICES

BOSTON
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
—
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

December 23, 2011

### VIA FEDERAL EXPRESS AND ELECTRONIC MAIL

Eric LaFayette, Esq.
Eric LaFayette & Co, LLP
415 E. Broad St., Suite 112
Columbus, Ohio 43215

RE:    Lewis v. Addison Insurance Marketing, Inc. et al.

Dear Mr. LaFayette:

I write on behalf of American Equity Investment Life Holding
Company and American Equity Investment Life Insurance Company (collectively,
"American Equity") to once again request that you immediately dismiss *Lewis v.
Addison Insurance Marketing Inc., et al.*, case No. 11CVB-10-12667, now pending
in the Common Pleas Court of Franklin County, Ohio. As my colleague Chuck
Smith and I informed you by telephone and letter last year, by letter on October 24,
2011, and by telephone on November 11, 2011, the Lewises' claims against
American Equity were released by a prior settlement and release in *Panter v.
Tackett.*, Case No. 01-CI-02109 (Jefferson County, Kentucky). Moreover, pursuant
to the Panter Order of Final Approval of Stipulation of Settlement and Certification
of the Settlement Class, the Lewises are <u>permanently enjoined</u> from pursuing the
released claims against American Equity. (*See* Final Order, at 8 (attached as Ex. A).)

As you are aware, under the current schedule, American Equity is
required to answer or otherwise plead to the Lewis Complaint on or before January
10, 2011. I have left you several messages this week to determine whether you have
agreed to voluntarily dismiss this action based on the Panter Settlement and Release,
but have yet to receive a return call. If we do not hear back from you by December
30, 2011, with confirmation that you have dismissed this action, we will have no

*Ex. 10*

0A154  –  M62

Eric Lafayette, Esq.
December 23, 2011
Page 2


choice but to seek appropriate relief from the Court, including asking the Court for
an order to show cause why you and your clients should not be held in contempt of
court. We will also ask the Court for all fees and costs incurred in defending this
action.

Please contact Chuck Smith at (312) 407-0516 or me at (312) 407-
0954 if you have any questions. We look forward to hearing from you promptly.

Best regards,

Marcella L. Lape


Enclosures

*Ex. 10*

EXHIBIT 11

AGREED MOTION &
STIPULATION TO EXTEND
AMERICAN EQUITY ANSWER
DATE   FILED JAN. 9, 2012
IN FR. CNTY. OHIO CPC case 11-CV-12667

0A154 - L98

## IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

| | | |
|---|---|---|
| SIDNEY LEWIS, et al., | : | Case No. 11 CVB 10 12667 |
| | : | |
| Plaintiffs, | : | Judge: Richard S. Sheward |
| | : | |
| v. | : | **AGREED MOTION AND STIPULATION TO** |
| | : | **EXTEND AMERICAN EQUITY ANSWER** |
| | : | **DATE** |
| ADDISON INSURANCE | : | |
| MARKETING, INC., et al., | : | |
| | : | |
| Defendants. | : | |

Defendants American Equity Investment Life Insurance Company and American Equity Investment Life Holding Company (jointly, "American Equity"), with the agreement of counsel to Plaintiffs Sidney Lewis and Yvonne D. Webb-Lewis ("Plaintiffs") hereby move to extend American Equity's time to answer or otherwise respond to Plaintiffs' complaint an additional 28 days until February 7, 2012. This is the second extension sought by American Equity. The reasons for the extension are as follow:

1. Plaintiffs filed their complaint against American Equity on October 12, 2011.

2. By letter dated October 26, 2011, American Equity, through outside counsel at Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden Arps"), informed counsel for Plaintiffs that the claims asserted in the above-captioned lawsuit had been released by a class action settlement in *Panter v. Tackett*, Case No. 01-CI-02109 (Jefferson County, Kentucky) and demanded that the lawsuit be dismissed immediately. American Equity also provided Plaintiffs' counsel with copies of the relevant pleadings in the *Panter* case, including the Stipulation of Settlement and Order of Final Approval of Settlement. See October 26, 2011 Letter (Ex. "A").

3. On November 11, 2011, Plaintiffs' counsel informed counsel for American Equity that he would review the settlement information from *Panter v. Tackett* and determine whether

1

*Ex. 11*

12-12020-mg    Doc 5026    Filed 09/11/13    Entered 09/11/13 17:59:41    Main Document
Franklin County Ohio Clerk of Courts of the Common Pleas- 2012 Jan 09 5:30 PM-11CV012667
Pg 367 of 582

0A154 - L99

the case should be voluntarily dismissed. Plaintiffs' counsel also agreed to stipulate to a 60-day
extension for American Equity to answer the complaint or otherwise plead.

4.  On November 16, 2011, American Equity filed a Joint Motion and Stipulation to
Extend American Equity's Answer Date 60 days until January 10, 2011. The Court granted the
Motion on November 28, 2011.

5.  On December 23, 2011, American Equity, through Skadden Arps, sent Plaintiffs'
counsel a letter again requesting that Plaintiffs immediately dismiss this lawsuit. American
Equity explained that the Plaintiffs' claims were released by *Panter* and that pursuant to the
Order of Final Approval of Settlement, the Plaintiffs are permanently enjoined from pursuing
released claims against American Equity. American Equity demanded that Plaintiffs dismiss the
action on or before December 30, 2011, and advised that if it did not receive confirmation of
dismissal from Plaintiffs by December 30, 2011, it would be forced to file a motion to enforce
the *Panter* settlement agreement and a motion to show cause why Plaintiffs and their counsel
should not be held in contempt of court for violation of the agreement. See December 23, 2011
Letter (Ex. "B").

6.  On December 30, 2011, Plaintiffs' counsel, via e-mail and voicemail, requested that
American Equity permit him until January 8, 2011, to meet with his clients and determine
whether to dismiss this action. American Equity agreed to refrain from filing any motions until
after January 8, 2011, on the condition that Plaintiffs' counsel agreed to provide American
Equity with an additional 28 days to answer Plaintiffs' complaint or otherwise plead. See
December 30-31, 2011 Email Exchange (Ex. "C").

7.  On January 8, 2011, Plaintiffs' counsel informed counsel for American Equity that he
had determined to withdraw from the case based on a difference of opinion on how to proceed

2

$E \times$ , 11

## 0A154 - M1

and recommended that American Equity contact the Plaintiffs directly. See January 8, 2012

Letter (Ex. "D").    A proposed order is attached hereto.

Respectfully submitted,

*/s/ Erika J. Schoenberger*
David W. Walulik (0076079)
FROST BROWN TODD LLC
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45202
Telephone: (513) 651-6800
Facsimile: (513) 651-6981
Email: dwalulik@fbtlaw.com

Erika J. Schoenberger (0077808)
FROST BROWN TODD LLC
10 W. Broad Street, Suite 2300
Columbus, Ohio 43215
Telephone: 614-464-1211
Facsimile: 614-464-1737
Email: eschoenberger@fbtlaw.com
*Counsel for Defendants*
*American Equity Investment Life Insurance*
*Company and American Equity Investment Life*
*Holding Company*

$E \times \cdot 11$

3

0A154 - M2

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Agreed Motion and Stipulation was served via regular U.S. Mail this 9th day of January, 2012, upon:

Eric L. LaFayette
415 East Broad Street, Suite 112
Columbus, Ohio 43215


/s/ Erika J. Schoenberger
Erika J. Schoenberger

COLLibrary 0111804.0580467  330724v1

*Ex, 11*

EXHIBIT 12

CONSENT JUDGMENT

FILED IN CASE NO. 1:12-CV-00361

DOC. 13, FILED 04/04/12 IN THE

U.S. DISTRICT COURT FOR THE

DISTRICT OF COLUMBIA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

APR - 4 2012

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

UNITED STATES OF AMERICA,
*et al.*,

        Plaintiffs,

        v.

BANK OF AMERICA CORP. *et al.*,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**12 0361**

Civil Action No. _____

## CONSENT JUDGMENT

WHEREAS, Plaintiffs, the United States of America and the States of Alabama, Alaska,

Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii,

Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota,

Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico,

New York, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, South

Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin, Wyoming,

the Commonwealths of Kentucky, Massachusetts, Pennsylvania and Virginia, and the District of

Columbia filed their complaint on March 12, 2012, alleging that Residential Capital, LLC, Ally

Financial, Inc., and GMAC Mortgage, LLC (collectively, "Defendant") violated, among other

laws, the Unfair and Deceptive Acts and Practices laws of the Plaintiff States, the False Claims

Act, the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, the

Servicemembers Civil Relief Act, and the Bankruptcy Code and Federal Rules of Bankruptcy Procedure;

WHEREAS, the parties have agreed to resolve their claims without the need for litigation;

WHEREAS, Defendant, by its attorneys, has consented to entry of this Consent Judgment without trial or adjudication of any issue of fact or law and to waive any appeal if the Consent Judgment is entered as submitted by the parties;

WHEREAS, Defendant, by entering into this Consent Judgment, does not admit the allegations of the Complaint other than those facts deemed necessary to the jurisdiction of this Court;

WHEREAS, the intention of the United States and the States in effecting this settlement is to remediate harms allegedly resulting from the alleged unlawful conduct of the Defendant;

AND WHEREAS, Defendant has agreed to waive service of the complaint and summons and hereby acknowledges the same;

NOW THEREFORE, without trial or adjudication of issue of fact or law, without this Consent Judgment constituting evidence against Defendant, and upon consent of Defendant, the Court finds that there is good and sufficient cause to enter this Consent Judgment, and that it is therefore ORDERED, ADJUDGED, AND DECREED:

## I.   JURISDICTION

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, 1355(a), and 1367, and under 31 U.S.C. § 3732(a) and (b), and over Defendant.  The Complaint states a claim upon which relief may be granted against Defendant. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) and 31 U.S.C. § 3732(a).

## II.    SERVICING STANDARDS

2.     Defendant shall comply with the Servicing Standards, attached hereto as Exhibit A, in accordance with their terms and Section A of Exhibit E, attached hereto.

## III.    FINANCIAL TERMS

3.     *Payment Settlement Amounts.*  Defendant shall pay into an interest bearing escrow account to be established for this purpose the sum of $109,628,425, which sum shall be added to funds being paid by other institutions resolving claims in this litigation (which sum shall be known as the "Direct Payment Settlement Amount") and which sum shall be distributed in the manner and for the purposes specified in Exhibit B.  Defendant's payment shall be made by electronic funds transfer no later than seven days after the Effective Date of this Consent Judgment, pursuant to written instructions to be provided by the United States Department of Justice.  After Defendant has made the required payment, Defendant shall no longer have any property right, title, interest or other legal claim in any funds held in escrow.  The interest bearing escrow account established by this Paragraph 3 is intended to be a Qualified Settlement Fund within the meaning of Treasury Regulation Section 1.468B-1 of the U.S. Internal Revenue Code of 1986, as amended.  The Monitoring Committee established in Paragraph 8 shall, in its sole discretion, appoint an escrow agent ("Escrow Agent") who shall hold and distribute funds as provided herein.  All costs and expenses of the Escrow Agent, including taxes, if any, shall be paid from the funds under its control, including any interest earned on the funds.

4.     *Payments to Foreclosed Borrowers.*  In accordance with written instructions from the State members of the Monitoring Committee, for the purposes set forth in Exhibit C, the Escrow Agent shall transfer from the escrow account to the Administrator appointed under

3

Exhibit C $1,489,813,925.00 (the "Borrower Payment Amount") to enable the Administrator to provide cash payments to borrowers whose homes were finally sold or taken in foreclosure between and including January 1, 2008 and December 31, 2011; who submit claims for harm allegedly arising from the Covered Conduct (as that term is defined in Exhibit G hereto); and who otherwise meet criteria set forth by the State members of the Monitoring Committee. The Borrower Payment Amount and any other funds provided to the Administrator for these purposes shall be administered in accordance with the terms set forth in Exhibit C.

5.      *Consumer Relief.* Defendant shall provide $185,000,000 of relief to consumers who meet the eligibility criteria in the forms and amounts described in Paragraphs 1-8 of Exhibit D, and $15,000,000 of refinancing relief to consumers who meet the eligibility criteria in the forms and amounts described in Paragraph 9 of Exhibit D, to remediate harms allegedly caused by the alleged unlawful conduct of Defendant. Defendant shall receive credit towards such obligation as described in Exhibit D.

## IV. ENFORCEMENT

6.      The Servicing Standards and Consumer Relief Requirements, attached as Exhibits A and D, are incorporated herein as the judgment of this Court and shall be enforced in accordance with the authorities provided in the Enforcement Terms, attached hereto as Exhibit E.

7.      The Parties agree that Joseph A. Smith, Jr. shall be the Monitor and shall have the authorities and perform the duties described in the Enforcement Terms, attached hereto as Exhibit E.

8.      Within fifteen (15) days of the Effective Date of this Consent Judgment, the participating state and federal agencies shall designate an Administration and Monitoring Committee (the "Monitoring Committee") as described in the Enforcement Terms. The

Monitoring Committee shall serve as the representative of the participating state and federal

agencies in the administration of all aspects of this and all similar Consent Judgments and the

monitoring of compliance with it by the Defendant.

## V.    RELEASES

9.    The United States and Defendant have agreed, in consideration for the terms

provided herein, for the release of certain claims, and remedies, as provided in the Federal

Release, attached hereto as Exhibit F. The United States and Defendant have also agreed that

certain claims, and remedies are not released, as provided in Paragraph 11 of Exhibit F. The

releases contained in Exhibit F shall become effective upon payment of the Direct Payment

Settlement Amount by Defendant.

10.    The State Parties and Defendant have agreed, in consideration for the terms

provided herein, for the release of certain claims, and remedies, as provided in the State Release,

attached hereto as Exhibit G. The State Parties and Defendant have also agreed that certain

claims, and remedies are not released, as provided in Part IV of Exhibit G. The releases

contained in Exhibit G shall become effective upon payment of the Direct Payment Settlement

Amount by Defendant.

## VI.    SERVICEMEMBERS CIVIL RELIEF ACT

11.    The United States and Defendant have agreed to resolve certain claims arising

under the Servicemembers Civil Relief Act ("SCRA") in accordance with the terms provided in

Exhibit H. Any obligations undertaken pursuant to the terms provided in Exhibit H, including

any obligation to provide monetary compensation to servicemembers, are in addition to the

obligations undertaken pursuant to the other terms of this Consent Judgment. Only a payment to

5

an individual for a wrongful foreclosure pursuant to the terms of Exhibit H shall be reduced by
the amount of any payment from the Borrower Payment Amount.

## VII. OTHER TERMS

12. The United States and any State Party may withdraw from the Consent Judgment
and declare it null and void with respect to that party if the Defendant does not make the
Consumer Relief Payments (as that term is defined in Exhibit F (Federal Release)) required
under this Consent Judgment and fails to cure such non-payment within thirty days of written
notice by the party.

13. This Court retains jurisdiction for the duration of this Consent Judgment to
enforce its terms. The parties may jointly seek to modify the terms of this Consent Judgment,
subject to the approval of this Court. This Consent Judgment may be modified only by order of
this Court.

14. The Effective Date of this Consent Judgment shall be the date on which the
Consent Judgment has been entered by the Court and has become final and non-appealable. An
order entering the Consent Judgment shall be deemed final and non-appealable for this purpose if
there is no party with a right to appeal the order on the day it is entered.

15. This Consent Judgment shall remain in full force and effect for three and one-half
years from the date it is entered ("the Term"), at which time the Defendants' obligations under
the Consent Judgment shall expire, except that, pursuant to Exhibit E, Defendants shall submit a
final Quarterly Report for the last quarter or portion thereof falling within the Term and
cooperate with the Monitor's review of said report, which shall be concluded no later than six
months after the end of the Term. Defendant shall have no further obligations under this
Consent Judgment six months after the expiration of the Term, but the Court shall retain

6

jurisdiction for purposes of enforcing or remedying any outstanding violations that are identified

in the final Monitor Report and that have occurred but not been cured during the Term.

16.     Except as otherwise agreed in Exhibit B, each party to this litigation will bear its

own costs and attorneys' fees associated with this litigation.

17.     Nothing in this Consent Judgment shall relieve Defendant of its obligation to

comply with applicable state and federal law.

18.     The parties further agree to the additional terms contained in Exhibit I hereto.

19.     The sum and substance of the parties' agreement and of this Consent Judgment

are reflected herein and in the Exhibits attached hereto. In the event of a conflict between the

terms of the Exhibits and paragraphs 1-18 of this summary document, the terms of the Exhibits

shall govern.

SO ORDERED this __4__ day of __April__, 2012

_Rosmary M Collyer_

UNITED STATES DISTRICT JUDGE

7

For the United States:


_____
TONY WEST
Acting Associate Attorney General
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC  20530
Tel.:    202-514-9500
Fax:    202-514-0238

For the Department of the Treasury:

For the Department of Housing andUrban Development:


_____
GEORGE W. MADISON
General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220
Tel.:    202-622-0283
Fax:    202-622-2882


_____
HELEN R. KANOVSKY
General Counsel
U.S. Department of Housing and Urban Development
451 7th Street, S.W.
Washington, DC  20410
Tel.:    202-402-5023
Fax:    202-708-3389

For the Federal Trade Commission
(as to Exhibit F only):

For the Consumer Financial Protection Bureau
(as to Exhibit F only):


_____
Amanda Basta
Attorney
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC  20058
Tel:    202-326-2340
Fax:    202-326-2558


_____
Lucy Morris
Deputy Enforcement Director
Consumer Financial Protection Bureau
1500 Pennsylvania Avenue, NW
(Attn:  1801 L Street)
Washington, DC  20220
Tel:    202-435-7154

8

For the Department of the Treasury:

GEORGE W. MADISON
General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220
Tel.:        202-622-0283
Fax:        202-622-2882


For the Federal Trade Commission
(as to Exhibit F only):



Amanda Basta
Attorney
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC  20058
Tel:    202-326-2340
Fax:    202-326-2558

For the Department of Housing and Urban
Development:

HELEN R. KANOVSKY
General Counsel
U.S. Department of Housing and Urban
Development
451 7th Street, S.W.
Washington, DC  20410
Tel.:    202-402-5023
Fax:    202-708-3389


For the Consumer Financial Protection Bureau
(as to Exhibit F only):



Lucy Morris
Deputy Enforcement Director
Consumer Financial Protection Bureau
1500 Pennsylvania Avenue, NW
(Attn:  1801 L Street)
Washington, DC  20220
Tel:    202-435-7154

8

For the Department of the Treasury:

_____

GEORGE W. MADISON
General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220
Tel.:      202-622-0283
Fax:      202-622-2882


For the Federal Trade Commission
(as to Exhibit F only):


_____

Amanda Basta
Attorney
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC  20058
Tel:    202-326-2340
Fax:    202-326-2558

For the Department of Housing and Urban
Development:

HELEN R. KANOVSKY
General Counsel
U.S. Department of Housing and Urban
Development
451 7th Street, S.W.
Washington, DC  20410
Tel.:    202-402-5023
Fax:    202-708-3389


For the Consumer Financial Protection Bureau
(as to Exhibit F only):


_____

Lucy Morris
Deputy Enforcement Director
Consumer Financial Protection Bureau
1500 Pennsylvania Avenue, NW
(Attn:  1801 L Street)
Washington, DC  20220
Tel:    202-435-7154

For the Department of the Treasury:

For the Department of Housing andUrban Development:

_____

GEORGE W. MADISON
General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220
Tel.:       202-622-0283
Fax:       202-622-2882

_____

HELEN R. KANOVSKY
General Counsel
U.S. Department of Housing and Urban
Development
451 7th Street, S.W.
Washington, DC  20410
Tel.:    202-402-5023
Fax:    202-708-3389

For the Federal Trade Commission
(as to Exhibit F only):

For the Consumer Financial Protection Bureau
(as to Exhibit F only):

_____

Amanda Basta
Attorney
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC  20058
Tel:    202-326-2340
Fax:    202-326-2558

_____

Lucy Morris
Deputy Enforcement Director
Consumer Financial Protection Bureau
1500 Pennsylvania Avenue, NW
(Attn:  1801 L Street)
Washington, DC  20220
Tel:    202-435-7154

8

For the Department of the Treasury:

For the Department of Housing and Urban Development:

GEORGE W. MADISON
General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220
Tel.:      202-622-0283
Fax:      202-622-2882

HELEN R. KANOVSKY
General Counsel
U.S. Department of Housing and Urban Development
451 7th Street, S.W.
Washington, DC 20410
Tel.:    202-402-5023
Fax:    202-708-3389

For the Federal Trade Commission
(as to Exhibit F only):

For the Consumer Financial Protection Bureau
(as to Exhibit F only):

Amanda Basta
Attorney
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20058
Tel:    202-326-2340
Fax:    202-326-2558

Lucy Morris
Deputy Enforcement Director
Consumer Financial Protection Bureau
1500 Pennsylvania Avenue, NW
(Attn: 1801 L Street)
Washington, DC 20220
Tel:    202-435-7154

8

For the Ohio Attorney General
MIKE DEWINE:


_____
MATTHEW J. LAMPKE
JEFFREY R. LOESER
SUSAN A. CHOE
Assistant Attorneys General
Ohio Attorney General
30 E. Broad St., 14th Floor
Columbus, OH 43215
Tel.:   614-466-1305
Fax:   614-466-8898

For the Ohio Department of
Commerce, Division of Financial
Institutions:


_____
JENNIFER S. M. CROSKEY
Assistant Attorney General
Ohio Attorney General, Executive
Agencies
30 E. Broad St., 26th Floor
Columbus, OH 43215
Tel: 614-466-2980
Fax: 614-728-9470

44

For the Ohio Attorney General
MIKE DEWINE:

For the Ohio Department of
Commerce, Division of Financial
Institutions:

_____

MATTHEW J. LAMPKE
JEFFREY R. LOESER
SUSAN A. CHOE
Assistant Attorneys General
Ohio Attorney General
30 E. Broad St., 14th Floor
Columbus, OH 43215
Tel.:  614-466-1305
Fax:  614-466-8898

JENNIFER S. M. CROSKEY
Assistant Attorney General
Ohio Attorney General, Executive
Agencies
30 E. Broad St., 26th Floor
Columbus, OH 43215
Tel: 614-466-2980
Fax: 614-728-9470

# EXHIBIT 13

NOTICE OF GMAC CH. 11
BANKRUPTCY IN THE
U.S. BANKRUPTCY COURT
FOR THE S.D. OF N.Y.
FILED MAY 14, 2012
CASE NOS. 12-bk-12020, 12-bk-12032,
JOINT ADM.

# GMAC Mortgage

May 14, 2012

Dear Homeowner,

As you may have read or heard, Residential Capital, LLC (ResCap), recently announced that it and its subsidiaries, including GMAC Mortgage, are restructuring under Chapter 11. Although you may not be familiar with our name, ResCap is the parent company of GMAC Mortgage, which services your mortgage. As servicer, GMAC Mortgage collects and keeps track of your mortgage payments and ensures that they are applied to your account and properly distributed to the lenders and investors who own your loan.

The restructuring of ResCap and GMAC Mortgage does not change your obligations as a mortgage borrower. As such, you must continue to make your scheduled mortgage **payments on time and in full to the address listed on your monthly account statement.**

While nothing has changed in relation to the amount of your mortgage payments or where you send those payments, we understand you may have some questions. Please feel free to contact our toll-free Homeowner Hotline at (888) 926-3479 between 8 a.m. and 5 p.m. EST, or refer to http://www.kccllc.net/rescap for additional information regarding ResCap's Chapter 11 reorganization. If you have specific questions about your loan, please reach out to the customer service number listed on your monthly statement.

In the coming weeks, you will receive a Notice of Chapter 11 Bankruptcy Cases, Meeting of Creditors, and Deadlines in the mail. No action is required on your part, related to this restructuring.

For our part, everyone on the GMAC Mortgage team is committed to providing the same high level of service and responsiveness we've always shown to the homeowners whose mortgage loans are entrusted to us. We look forward to helping you continue to build equity and value in your home.

Sincerely,

Thomas Marano
Chief Executive Officer
Residential Capital, LLC

GMAC Mortgage, LLC
1100 Virginia Drive
Fort Washington, PA 19034

EXHIBIT E

# EXHIBIT 13

DECLARATION OF BRIDGET M. LEE
(FOE) IN CASE FOE vs. U.S. EPA IN
CASE No. 12-cv-363 IN THE U.S.
DISTRICT COURT, DISTRICT OF COLUMBIA
FILED SEPT, 14, 2012

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FRIENDS OF THE EARTH,                    )
                                         )
      Plaintiff,                         )
                                         )
v.                                       )   Civ. No. 1: 12-cv-00363-ABJ
                                         )
UNITED STATES ENVIRONMENTAL              )
PROTECTION AGENCY, et al.,               )
                                         )
      Defendants.                        )
                                         )

**CERTIFICATE OF SERVICE**

I, Marianne Engelman Lado, do hereby certify that on this 14th day of September, 2012, I

filed the foregoing Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for

Summary Judgment and Declaration of Bridget M. Lee, with Exhibit A, using the Court's

CM/ECF system, which caused a copy to be served on counsel of record. I further certify that I

caused a copy of the foregoing to be served this day by First-Class U.S. Mail on:

      Yvonne D. Webb-Lewis
      Sidney T. Lewis
      1875 Alvason Avenue
      Columbus, Ohio 43219

              /s/ Marianne L. Engelman Lado
              Marianne L. Engelman Lado
              Earthjustice
              156 William Street, Suite 800
              New York, NY 10038-5326
              Phone: (212) 791-1881
              Fax: (212) 918-1556
              mengelmanlado@earthjustice.org

              *Counsel for Friends of the Earth*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FRIENDS OF THE EARTH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civ. No. 1: 12-cv-00363-ABJ |
| | ) |
| UNITED STATES ENVIRONMENTAL | ) |
| PROTECTION AGENCY and | ) |
| LISA JACKSON, Administrator, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DECLARATION OF BRIDGET M. LEE**

I, Bridget M. Lee, declare and state as follows:

1.      I submit this declaration in support of Plaintiff's Memorandum in Opposition to

Defendants' Motion for Summary, filed September 14, 2012.

2.      Attached hereto as Exhibit A is a true and correct copy of "Aircraft Emissions:

Impact on Air Quality and Feasibility of Control," a report prepared by the United Stets

Environmental Protection Agency.

I declare, under penalty of perjury, that the foregoing information is true, accurate, and correct.

Executed on September 14, 2012, in New York, New York.


_____
Bridget M. Lee

**Exhibit A**

TD
886.7
.U52

TD
886.7
.U52



# AIRCRAFT EMISSIONS:

# IMPACT ON AIR QUALITY

# AND FEASIBILITY OF CONTROL



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

TD
886.7
.452

# PREFACE

This report presents the available information on the present and predicted nature and extent of air pollution related to aircraft operations in the United States. In addition, it presents an investigation of the present and future technological feasibility of controlling such emissions. This report is published in accordance with Section 231 (a) of the Clean Air Act as amended, which states:

"(1)  Within 90 days after the date of enactment of the Clean Air Amendments of 1970, the Administrator shall commence a study and investigation of emissions of air pollutants from aircraft in order to determine-

"A.  the extent to which such emissions affect air quality in air quality control regions throughout the United States, and

"B.  the technological feasibility of controlling such emissions

"(2)  Within 180 days after commencing such study and investimation, the Administrator shall publish a report of such study and investigation . . ."

i

# TABLE OF CONTENTS

Page

LIST OF FIGURES ........................................................v

LIST OF TABLES ........................................................vii

INTRODUCTION ..........................................................1

CONCLUSIONS ...........................................................5

METHODOLOGY FOR ASSESSMENT OF AIR QUALITY IMPACT ......................7

    NATIONAL AMBIENT AIR QUALITY STANDARDS ...........................7

    BASIC REQUIREMENTS FOR IMPACT EVALUATION .........................10

        EMISSION FACTORS .............................................10

        SELECTION OF CRITICAL AREAS AND AIRPORTS .....................12

        EMISSION PROJECTIONS .........................................13

RESULTS OF IMPACT EVALUATION .........................................19

    REGIONAL IMPACT OF AIRCRAFT EMISSIONS ............................19

    SUBREGIONAL AND LOCALIZED IMPACT .................................29

        GENERAL INDICATIONS OF LOCALIZED AIR QUALITY IMPACT ..........29

            PASSENGER USAGE DENSITY AND AIR POLLUTION POTENTIAL .....29

            EMISSION DENSITY COMPARISON .............................30

        DETAILED INVESTIGATION OF LOCALIZED POLLUTANT CONCENTRATION..33

            8-HOUR CARBON MONOXIDE CONCENTRATIONS ..................33

            1-HOUR CARBON MONOXIDE CONCENTRATIONS AT LOS ANGELES AIRPORT
                                             .....39

            CARBON MONOXIDE CONCENTRATIONS AT OTHER AIRPORTS........39

            HYDROCARBONS AND POTENTIAL OXIDANT CONCENTRATIONS.......43

            OXIDES OF NITROGEN .....................................47

            SMOKE AND PARTICULATES .................................49

TECHNOLOGICAL FEASIBILITY OF CONTROLLING AIRCRAFT EMISSIONS ...........53

iii

Page

EMISSION CONTROL BY ENGINE MODIFICATION ......................... 54

  ENGINE CLASSIFICATION ....................................... 54

  EMISSION CONTROL METHODS AND EFFECTIVENESS .................. 56

    TURBINE ENGINES ........................................ 56

    PISTON ENGINES ......................................... 62

  COST AND TIME REQUIREMENTS FOR CONTROL METHOD

  DEVELOPMENT AND IMPLEMENTATION ............................. 66

    EXISTING ENGINES ....................................... 66

    FUTURE ENGINES ......................................... 70

EMISSION CONTROL BY MODIFICATION OF GROUND OPERATIONS ........... 71

  DEFINITION OF GROUND OPERATIONS ............................ 71

  EMISSION CONTROL METHODS ................................... 71

  IMPLEMENTATION COST AND TIME REQUIREMENTS .................. 72

COMPARATIVE EVALUATION OF EMISSION CONTROL METHODS .............. 76

EMISSION MEASUREMENT TECHNOLOGY ................................. 79

  SAMPLING AND TEST PROCEDURES ............................... 80

  EMISSION MEASUREMENT INSTRUMENTATION ....................... 81

APPENDIX A ...................................................... 83

APPENDIX B ...................................................... 91

APPENDIX C ...................................................... 95

REFERENCES ...................................................... 97

# LIST OF FIGURES

Page

1. AIR SAMPLING LOCATIONS AT LOS ANGELES INTERNATIONAL AIRPORT.......... 34

2. EXPECTED CO CONCENTRATIONS, 8-HOUR AVERAGING TIME, WINTER
   1970, STATION 209, LAX................................................. 35

3. VICINITY OF LOS ANGELES INTERNATIONAL: PERCENT OF CONTRIBUTION
   BY AIRCRAFT TO CARBON MONOXIDE LEVELS................................. 37

4. FREQUENCY DISTRIBUTIONS FOR CARBON MONOXIDE FOR VARIOUS
   AIRCRAFT EMISSION CONTRIBUTIONS AT STATION 209, WINTER 1980.......... 38

5. HYDROCARBON ISOPLETHS IN THE VICINITY OF LOS ANGELES INTER-
   NATIONAL:  AIRCRAFT SOURCES (3-Hr. Average for 1970)................. 44

6. HYDROCARBON ISOPLETHS IN THE VICINITY OF LOS ANGELES INTER-
   NATIONAL:  AIRCRAFT SOURCES (3-Hr. Average for 1980)................. 45

7. CALCULATED NON-METHANE HYDROCARBON CONCENTRATIONS DOWNWIND
   OF LOS ANGELES AIRPORT FOR 1980 WITH NON-AIRCRAFT SOURCES
   CONTROLLED........................................................... 46

8. $NO_x$ ISOPLETHS IN THE VICINITY OF LOS ANGELES INTERNATIONAL:
   AIRCRAFT SOURCES (Annual Average for 1970).......................... 48

9. $NO_x$ ISOPLETHS IN THE VICINITY OF LOS ANGELES INTERNATIONAL:
   AIRCRAFT SOURCES (Annual Average for 1980).......................... 50

10. $NO_x$ ISOPLETHS IN THE VICINITY OF CHICAGO-O'HARE INTER-
    NATIONAL:  AIRCRAFT SOURCES (Annual Average for 1980).............. 51

11. PISTON ENGINE EMISSION CHARACTERISTICS.............................. 64

12. HYDROCARBON AND CARBON MONOXIDE EMISSIONS FROM A TYPICAL
    AIRCRAFT TURBINE ENGINE (JT3D)..................................... 73

A-1. MAXIMUM 8-HOUR AVERAGE CO CONCENTRATIONS IN LOS ANGELES AREA........85

A-2. BASELINE DATA, DAILY MAXIMUM 8-HOUR AVERAGE CO CONCENTRATIONS,
     STATION 209, LAX, 1970...........................................86

A-3. FREQUENCY DISTRIBUTION FOR 8-HOUR CO DATA, STATION 209, LAX,
     SEPTEMBER 1970...................................................87

A-4. EXPECTED CO CONCENTRATION DISTRIBUTION, WINTER, STATION 209,
     LAX FOR 80 PERCENT AIRCRAFT CONTRIBUTION.........................88

A-5. EXPECTED CO DISTRIBUTION, WINTER, STATION 209, LAX FOR 20
     PERCENT AIRCRAFT CONTRIBUTION....................................89

v

# LIST OF TABLES

Page

TABLE

1. NATIONAL AMBIENT AIR QUALITY STANDARDS...................................... 9

2. AIRCRAFT CLASSIFICATION SYSTEM........................................... 11

3. PRESENT AND PROJECTED LTO CYCLES FOR 1970, 1975, and 1980........... 14

4. CURRENT AND PROJECTED EMISSIONS FOR AIRCRAFT AND AIRPORTS........... 16

5. ABILITY OR NON-ABILITY TO MEET THE NATIONAL AMBIENT AIR QUALITY
   STANDARDS IN 1975..................................................... 20

6. METROPOLITAN LOS ANGELES INTRASTATE AQCR EMISSIONS................... 21

7. NEW YORK PORTION OF THE N.J. - N.Y. - CONN. INTERSTATE AQCR
   EMISSIONS............................................................. 22

8. NATIONAL CAPITAL INTERSTATE AQCR EMISSIONS........................... 23

9. ILLINOIS PORTION OF THE METROPOLITAN CHICAGO INTERSTATE AQCR
   EMISSIONS............................................................. 24

10. METROPOLITAN DENVER INTRASTATE AQCR EMISSIONS........................ 25

11. SAN FRANCISCO BAY AREA INTRASTATE AQCR EMISSIONS..................... 26

12. METROPOLITAN DALLAS - FORT WORTH INTRASTATE AQCR EMISSIONS.......... 27

13. METROPOLITAN BOSTON INTRASTATE AQCR EMISSIONS........................ 28

14. INDICATIONS OF LOCALIZED AIRPORT IMPACT OF 20 LARGEST AIR
    CARRIER AIRPORTS..................................................... 31

15. COMPARISON OF EMISSION DENSITIES FOR AIRPORTS VERSUS URBAN
    AREAS FOR 1970, 1975, and 1980...................................... 32

16. EXPECTED RANGE OF DAYS THAT 8-HR STANDARD WILL BE EXCEEDED
    IN VICINITY OF LAX FOR VARIOUS LEVELS OF AIRCRAFT IMPACT............. 40

17. LOS ANGELES AIRPORT - NUMBER OF TIMES THE 1-HOUR CO STANDARD
    WAS EXCEEDED - MAY 10 THROUGH NOVEMBER 9, 1970...................... 41

18. DISPERSION MODEL ESTIMATES OF 1-HOUR CO CONCENTRATIONS.............. 42

19. AIRCRAFT ENGINE CLASSIFICATION....................................... 55

20. ENGINE MODIFICATIONS FOR EMISSION CONTROL FOR EXISTING AND
    FUTURE TURBINE ENGINES............................................... 57

Page

21. EFFECTIVENESS OF tl - MINOR COMBUSITON CHAMBER REDESIGN -
    ON REDUCTION OF EMISSIONS FROM TURBINE ENGINES...................... 59

22. EFFECTIVENESS OF ENGINE MODIFICATION IN CONTROL OF EMISSIONS
    FROM TURBINE ENGINES, BY OPERATING MODE............................. 60

23. BASES FOR CONTROL METHOD EFFECTIVENESS ESTIMATES FOR TURBINE
    ENGINES............................................................. 61

24. ENGINE MODIFICATIONS FOR EMISSION CONTROL FOR EXISTING AND
    FUTURE PISTON ENGINES............................................... 63

25. CURRENT UNCONTROLLED EMISSION RATES FOR PISTON ENGINES............. 65

26. EFFECTIVENESS OF ENGINE MODIFICATIONS IN CONTROL OF
    EMISSIONS FROM PISTON ENGINES BY POLLUTANT.......................... 65

27. TIME AND COSTS FOR MODIFICATION OF CURRENT CIVIL AVIATION
    ENGINES............................................................. 68

28. COST RESULTS FOR TURBINE ENGINE POPULATION BY SEPARATE USE
    CATEGORIES.......................................................... 69

29. COMPARATIVE REDUCTIONS RESULTING FROM CONTROL METHODS APPLIED
    AT LOS ANGELES INTERNATIONAL AIRPORT................................ 74

30. COSTS AND TIME FOR OPERATIONS CHANGES AT LOS ANGELES INTER-
    NATIONAL AIRPORT.................................................... 75

31. COMPARISON OF EMISSION CONTROL METHODS............................. 77

32. INSTRUMENTATION FOR MEASUREMENT OF TURBINE ENGINE EMISSIONS......... 82

B-1. SHORT-TERM METEOROLOGICAL AND ACTIVITY CONDITIONS.................. 94

viii

# INTRODUCTION

Public awareness that aircraft were a source of air pollution developed in the late 1950's with the introduction of turbine-engine aircraft. Visible exhaust plumes from the engines and increased levels of exhaust odors at airports caused complaints to be lodged. The complaints, in turn, stimulated investigations into the nature and extent of aircraft emissions. The Air Quality Act of 1967 specifically identified aircraft emissions as a subject of concern and required an investigation by the Department of Health, Education, and Welfare. The study[1], submitted to Congress on January 17, 1969, concluded that:

"1. Reduction of particulate emissions from jet aircraft is both desirable and feasible. Engine manufacturers and airlines have indicated that improvements in turbine engine combustor design can be built into new engines and retrofitted on engines already in use. Testing programs are already underway. Furthermore, they have indicated that application of this technology will be underway by the early 1970's. While there are no laws or regulations to compel the industry to follow through on this work, it appears that public pressures resulting primarily from the adverse effects of odors and visibility obscuration will lead industry to initiate the application of this technology as soon as possible and to complete it within the shortest possible time. Accordingly, it is the intention of this Department to encourage such action by engine manufacturers and airline operators and to keep close watch on their progress. If, at any time, it appears that progress is inadequate or that completion of the work will be unduly prolonged, or that the concern of the industry lags, the Department will recommend regulatory action to the Congress that statutory authority for such action be provided.

"2. Further research is needed to define more precisely the present and probable future nature and magnitude of all other air pollution problems associated with aircraft activity in the United States and to identify needs for control measures. Emphasis must be placed particularly on assessment of air pollutant levels in the

air terminal environment and their effects on health and safety and on evaluation of possible long-term effects of upper atmospheric pollution resulting from aircraft flight activity.  The Department will undertake research appropriate to the solution of this problem.

"3. As further research results in identification of needs for additional measures to control air pollution from any type of aircraft, and as measures to achieve such control become available through research and development, it is the Department's expectation that engine manufacturers, airline operators, and other segments of the aviation community will take the initiative in the development and application of such control measures.  If the private sector fails to provide adequate controls, the Department will not hesitate to recommend to the Congress that Federal regulatory action be authorized.

"4. In light of the relatively small contribution of aircraft to community air pollution in all places for which adequate data are available, and in view of the practical problems that would result from State and local regulatory action in this field, it is the Department's conclusion that adoption and enforcement of State or local emission control regulations pertaining to aircraft cannot be adequately justified at this time.  The Department recommends that, if and when regulations become necessary, the rationale used to develop Federal rather than local emission standards for motor vehicles be applied to aircraft.

"5. The Department recognizes that State and local agencies, in cooperation with the Federal Aviation Administration and other cognizant agencies, are the most appropriate groups to insure that control of airport pollution hazards will be given adequate consideration in the selection of airport sites, planning for expansion and reconstruction of airports, design of airports, and planning and conduct of ground operations.

"6. The Department will include information on progress in the control of air pollution from aircraft in the annual report which must be submitted under section 306 of the Air Quality Act."

As a result of conclusion (1) above, in March 1970, at a meeting held by the Secretaries of Health, Education, and Welfare and of Transportation, representatives of 31 airlines agreed to a schedule for retrofitting JT8D engines with reduced smoke combustors, to be substantially completed by the end of 1972.  This agreement sought to significantly

2

abate visible (smoke) emissions from aircraft powered by
this widely used engine.   This retrofit program is 85%
complete (July 1972).  Conclusion (2) pointed to the need
for studying air terminal environments, a need which led to
an EPA-sponsored study of Los Angeles International Airport
by the Los Angeles Air Pollution Control District.   This
study was completed in April 1971.[2]

Passage of the 1970 Clean Air Act Amendments essentially
required that we reassess the aircraft emissions problem and
update our knowledge concerning the air quality impact and
feasibility of control of such emissions.

The data base for this report includes information
developed by Northern Research and Engineering[3][4], Cornell
Research Laboratories[5], the previously cited LAPCD study,
and information compiled separately by EPA personnel.

3

# CONCLUSIONS

The various approaches taken in this study to assess the impact of aircraft on air quality indicate, both individually and collectively, that aircraft operations "cause or contribute to or are likely to cause or contribute to air pollution which endangers the public health or welfare" (Sec. 231(a), Clean Air Act Amendments of 1970). Based on this general conclusion a realistic program of emissions control should be instituted. Though such a control program cannot be quantitatively related to the air quality considerations discussed herein, pollutant emissions from aircraft and aircraft engines should be reduced through the application of the present and prospective technology described in this study. A control program should have inherent flexibility so that as more extensive impact data become available the required controls can be modified accordingly.

The results of EPA's current study of aircraft emissions and their control have led to the following specific conclusions:

1. Aircraft emissions are significant contributors to the regional burden of pollution in comparison to other sources which will have to be controlled to meet National Ambient Air Quality Standards.

2. When airports are viewed as concentrated area sources of pollution emissions, either in isolation or in concert with their surrounding pollution sources, it can be demonstrated that airports will probably exert localized impact on air quality, in excess of the standards, even though relief is provided elsewhere in the region by controls relating to automobiles and stationary sources. That is, unless aircraft emissions are reduced, airports will still remain intense area emitters of pollutants when the emission densities in the surrounding region have been greatly reduced.

3. Aircraft emissions have impact on air quality in residential and business areas adjacent to major U. S. airports. The control of non-aircraft sources in and around such airports will not be adequate to insure compliance with

the National Ambient Air Quality Standards indicating the need for controlling aircraft emissions.

4. There exists a variety of control techniques for effecting aircraft emissions reductions which appear both feasible and economically attractive during the next two decades. Emissions may be reduced by means of the following general approaches:

(a) Modification of ground operational procedures.

(b) Improvement in maintenance and quality control procedures to minimize emissions from existing families of turbine engines.

(c) Development and demonstration of new combustion technology for major reductions in emissions from second-generation turbine and piston aircraft engines.

(d) Retrofit of turbine engine fleets with existing technology for near-term reduction of emissions.

# METHODOLOGY FOR IMPACT ASSESSMENT

Assessment of air quality impact involves investigation at several different levels: (a) global, (b) regional (sub-global), (c) urban, and (d) local. In this report the urban level is defined as an air quality control region. The ability to conduct investigations or assessment at these levels depends entirely on the analytical tools and data bases available. Until quite recently most assessments were source oriented and presented data in terms of national or air quality control region inventories. With the development of models and more refined monitoring systems, we can now explore the more localized "hot spots" within an urban area. The earlier report[1] on the impact of aircraft emissions dealt only with national and regional inventories and projections of aircraft emissions and pointed to the need for a closer look at local airports and their immediate environments. Hence, this study concentrates on assessing local effects through a combination of approaches involving monitoring, statistical analysis, and modeling. Additionally, aircraft emissions are compared with those from other sources of the same pollutants in terms of relative importance and relative cost of control.

The potential impact of aircraft emissions on the global and sub-global environments is not being ignored. Studies of pollution at these levels involve an integrated assessment of all contributors to the global pollution inventory, and hence are beyond the scope of this report. The Clean Air Act mandates that EPA study the geophysical effects of air pollution. Research and monitoring components of EPA are now engaged in preliminary phases of such studies.

To provide continuity, we have updated pertinent data prepared by Northern Research and Engineering which was contained in the previous report[1]. Discrepancies between similar data presentations in the two reports result from the better data base obtained in this study.

## NATIONAL AMBIENT AIR QUALITY STANDARDS

In order to assess the significance of aircraft emissions, one must evaluate their contribution to pollutant concentrations in the atmosphere and relate the resulting concentrations to the national ambient air quality standards.

7

In accordance with the Clean Air Act Amendments of 1970, the EPA established primary and secondary ambient air quality standards[6] for six major pollutants: carbon monoxide, nitrogen dioxide, hydrocarbons, photochemical oxidants, sulfur dioxide, and particulates. The primary standards provide for protection of public health and the secondary standards for prevention of all other undesirable effects of air pollution. Table 1 shows the national standards for these six pollutants.

It should be noted that nonmethane hydrocarbons at concentrations observed in the atmosphere have not been associated with health effects. The relationship between nonmethane hydrocarbons and photochemical oxidants indicates, however, that peak photochemical oxidant concentrations are associated with hydrocarbon concentrations averaged over the time period from 6 to 9 a.m.[7] The peak oxidant levels normally appear some three hours later. The nonmethane hydrocarbon standard is based on this relationship.

As a basis for implementation of the standards, the entire United States has been divided into some 240 Air Quality Control Regions[8]. Regional boundaries are based on considerations of urban-industrial concentration, existing jurisdictional boundaries, and other factors including topography and meteorology, which would affect levels of air quality in an area.

In accordance with the provisions of Section 110 of the Clean Air Act, the States have submitted plans that provide for the implementation, maintenance, and enforcement of the national air quality standards on a regional (air quality region) basis. The State implementation plan for each region must provide for attainment of the primary standards in 3-5 years depending on whether an extension has been granted. The State plan is required to set forth the procedure for attaining the secondary standards within a reasonable amount of time.

Strategies which States are proposing to meet the standards and the possible impact aircraft emissions and their control may have on the strategies are discussed in the section on regional impact.

8

Table 1   NATIONAL AMBIENT AIR QUALITY STANDARDS

| Pollutant | Standard Description |
|---|---|
| Carbon monoxide (Primary and secondary standards are the same) | - 10 milligrams per cubic meter (9 ppm), maximum 8-hour concentration not to be exceeded more than once per year.<br><br>- 40 milligrams per cubic meter (35 ppm), maximum 1-hour concentration not to be exceeded more than once per year. |
| Nitrogen dioxide (Primary and secondary standards are the same) | - 100 micrograms per cubic meter (0.05 ppm), annual arithmetic mean. |
| Hydrocarbons (non-methane) (Primary and secondary standards are the same) | - 160 micrograms per cubic meter (0.24 ppm), maximum 3-hour concentration (6-9 a.m.) not to be exceeded more than once per year.  For use as a guide in devising implementation plans to meet the oxidant standards. |
| Particulate matter<br>    Primary standard | - 75 micrograms per cubic meter, annual geometric mean.<br><br>- 260 micrograms per cubic meter, maximum 24-hour concentration not to be exceeded more than once per year. |
|     Secondary standard | - 60 micrograms per cubic meter, annual geometric mean, as a guide to be used in assessing implementation plans to achieve the 24-hour standard.<br><br>- 150 micrograms per cubic meter, maximum 24-hour concentration not to be exceeded more than once per year. |
| Sulfur dioxide<br>    Primary standard | - 80 micrograms per cubic meter, annual arithmetic mean.<br><br>- 365 micrograms per cubic meter, maximum 24-hour concentration not to be exceeded more than once per year. |
|     Secondary standard | - 60 micrograms per cubic meter, annual arithmetic mean.<br><br>- 260 micrograms per cubic meter, maximum 24-hour concentration not to be exceeded more than once per year.<br><br>- 1300 micrograms per cubic meter, maximum 3-hour concentration not to be exceeded more than once per year. |
| Oxidant (Primary and secondary standards are the same) | - 160 micrograms per cubic meter, maximum 1-hour concentrati   not to be exceeded more than once per year. |

9

BASIC REQUIREMENT FOR IMPACT EVALUATION

EMISSION FACTORS

Pollutants emitted by aircraft engines include gaseous
hydrocarbons, carbon monoxide, oxides of nitrogen,
particulate matter, and sulfur oxides.  In order to evaluate
the impact of aircraft emissions on the ambient air levels
of these pollutants, the logical first step is an estimate
of the total emissions due to aircraft.  Because emission
rates vary according to engine type, number of engines and
operating mode, we have classified aircraft by type, defined
the typical operating modes for each class throughout their
landing and takeoff (LTO) cycles, and determined emission
factors for each class operating in each mode.

The aircraft classification system groups aircraft into 12
separate types that include the currently used commercial
air carriers, and general aviation, and military aircraft.
(Classes 8-11 are exclusively military aircraft and are
excluded from further consideration in this report.)
Provision was also made in the classification system for the
possible introduction of supersonic commercial aircraft in
the future.   The basis for classification of civilian and
commercial aircraft is presented in Table 2.

The aircraft modes of operation for which emission rates
were categorized are:

      (1)  Start-up and idle
      (2)  Taxi
      (3)  Idle at runway
      (4)  Takeoff
      (5)  Climb-out to 3,000 foot elevation
      (6)  Fuel dumping
      (7)  Approach from 3,000 foot elevation
      (8)  Landing
      (9)  Idle and shutdown
      (10) Maintenance

Emission factors were developed for the civil aviation
aircraft classes.  A representative listing of emission
factors for piston and turbine engines is presented in
subsequent discussions of control feasibility.

The aircraft emission data, obtained through various
research programs funded by EPA, are summarized in the
report prepared for EPA by Cornell University.[5]

Emissions from non-aircraft sources on and around the
airport are also accounted for in the air quality analyses.
These sources of emissions include airport heating plants,

10

TABLE 2

AIRCRAFT CLASSIFICATION SYSTEM

| Category | Class | Ref. 14 class-fication | Type | Examples | Engine Model | Type | Thrust or power[a] | Engines per aircraft |
|---|---|---|---|---|---|---|---|---|
| **Air Carrier** | 1 | - | Supersonic transport | Concorde Tupolev TU-144 | R-R/Snecma Olympus 593 | Turbojet | 39,000 lb. | 4 |
| | 2 | | Jumbo jet transport | Boeing 747 Douglas DC-10 | P&WA JT9D | Turbofan | 43,000 lb. | 4 |
| | 3 | 1 | Long-range jet transport | Boeing 707 Douglas DC-8 | P&WA JT3D | Turbofan | 18,000 lb. | 4 |
| | 4 | 2 | Medium range jet transport | Boeing 727 Douglas DC-9 | P&WA JT8D | Turbofan | 13,900 lb. | 2.6 |
| | 5 | 4 | Turboprop transport | Lockheed Electra Fairchild Hiller FH-227 | Allison 501-D13 | Turbo-prop | 3,750 hp. | 2.5 |
| **General Aviation** | 6 | 3 | Business jet | Lockheed Jetstar North American Sabreliner | P&WA JT12 | Turbojet | 2,900 lb. | 2.1 |
| | 7 | 6 | Piston-engine utility | Cessna 210 Centurion Piper 32-300 Cherokee Six | Continental 10-520-A | Opposed piston | 292 hp. | 1[b] |
| **V/Stol** | 12 | 7 | Helicopters and V/STOL | Silorsky S-61 Vertol 107 | General Electric CT58 | Turbo-shaft | 1,390 hp. | 2 |

[a]Equivalent shaft power.
[b]Representative of Van Nuys and Tamiami.

11

fuel storage losses, automobiles, service vehicles, and areas neighboring the airport. To estimate the impact of aircraft emissions on air quality near the ground, one must take into account emissions from the time an aircraft enters the atmospheric mixing layer during approach until it leaves this layer during climb-out. In defining an LTO cycle representative of this consideration, a height of 3,000 feet above the runway was selected as a reasonable approximation of atmospheric mixing depth over major U. S. metropolitan areas.[1] The number of LTO cycles performed, and the relative lengths of time spent in each operational mode of an LTO cycle, combined with the appropriate emission factors, determine the quantities of pollutants emitted by aircraft.

SELECTION OF CRITICAL AREAS AND AIRPORTS

Once the general emission characteristics of aircraft were determined, specific regions and airports having high aircraft activity and air pollution potential were selected for impact evaluation.

As a part of the Northern study[3], several airports were selected to represent, as nearly as possible, those at which the impact of emissions from aircraft and related activities would probably be greatest. The factors considered in evaluating the potential impact of individual airports included: (1) aircraft activity levels, (2) airport area, (3) mean wind speed, and (4) relative activity of different types of aircraft (commercial air carrier and general aviation). On the basis of these considerations and the availability of airport and aircraft activity data, these airports were selected for study:

    (1) Commercial Air Carrier

       Los Angeles International

       Washington National

       J. F. Kennedy International

       O'Hare International

    (2) General Aviation

       Van Nuys, California

       Tamiami, Florida

Less elaborate evaluations of four additional airports and
their impact in their respective air quality control regions
were developed as the regional impact analysis was expanded
to include an examination of State implementation plans for
the attainment of the air quality standards.

The four additional airports, located in San Francisco,
Dallas-Ft. Worth, Denver, and Boston, were selected on the
basis of high levels of aircraft activity and severity of
the regional pollutant levels.

EMISSION PROJECTIONS

The basic emission factors for any particular engine type
are not expected to change substantially with time unless
changes are required by emission standards.  In addition,
the number and type of engines representative of one
particular class of aircraft are not expected to change
substantially in the next 10-20 years.  The important and
determining factors affecting the projected controlled or
uncontrolled emissions are: (1) changes in the level of
airport activity, and (2) changes in the mix of the various
classes of aircraft.

As a part of the Northern Research Study, records of
aircraft activity by class were obtained for the selected
airports.  Prospective growth in activity at each airport
was estimated by projecting past and current activity data
to 1975 and 1980.  The general trend at the selected
airports is towards more aircraft operations in classes 1,
2, 4, 6 and 7; and less in classes 3 and 5.  The total
yearly activity data and projections are summarized in Table
3.

The air carrier airports are so-called because of the
preponderance of commercial air carrier activity, which, in
1970, ranged from 66 percent of total activity at Washington
National to 92 percent at Chicago O'Hare.  Activity at
Tamiami and Van Nuys Airports is approximately 99 percent
general aviation aircraft.

Additionally, data were obtained on the uses and locations
of taxiways, runways, terminals, hangars, heating plants,
fuel storage areas, and roadways at each airport in order to
locate and quantify the various sources of emissions during
the operation of aircraft.

Based on projections from Reference 3, revised to
incorporate more accurate emission factors, total projected
emissions of pollutants from aircraft and from all sources

13

Table 3

Present and Projected LTO Cycles for 1970, 1975, and 1980

| Airport | Type of aircraft | | | | Total LTO cycles | | |
|---|---|---|---|---|---|---|---|
| | Air carrier | General aviation | Military | Helicopters | 1970[a] | 1975 | 1980 |
| All FAA operated airports | - | - | - | - | $28 \times 10^6$ | $39 \times 10^6$ | $59 \times 10^6$ |
| Air carrier airports | | | | | | | |
| Los Angeles International | 203,900 | 59,900 | 4,200 | 4,050 | 272,000 | 305,200 | 358,100 |
| Washington National | 109,800 | 55,500 | 1,500 | - | 166,700 | 169,800 | 173,500 |
| J. F. Kennedy International | 188,800 | 27,800 | - | - | 219,200 | 208,500 | 241,300 |
| Chicago | 314,300 | 21,200 | - | - | 339,900 | 357,000 | 410,800 |
| General aviation airports | | | | | | | |
| Van Nuys, California | 20 | 279,400 | 2,700 | - | 281,600 | - | 700,000 |
| Tamiami,[b] Florida | - | 200,800 | - | - | 200,800 | - | - |

[a] Where parts do not add up to total, LTO cycles not classified by type were included in total

[b] 1971 estimated activity

14

were calculated for the years 1975 and 1980 at each of the
selected airports except New Tamiami (which lacked reliable
activity projections).  These projections are presented in
Table 4 for total hydrocarbons, carbon monoxide, nitrogen
oxides, sulfur dioxide, particulate matter (including lead),
and lead.  For a more complete assessment of proposed
control strategies, emission projections for three of the
pollutants (hydrocarbons, carbon monoxide, and nitrogen
oxides) were also developed for 1990.  The projected values
for 1990 are presented in the discussion of control
feasibility and impact.  The emission projections are based
on present emission rates for each aircraft engine class and
do not incorporate potential future reductions in emissions
as a result of aircraft emission standards.  The projected
aircraft emissions reflect increased activity and changes in
the mix of existing engines.

At the four air carrier airports during the 1970's, as a
result of continued introduction of jet engines found in
present-day new jet aircraft, total emissions of carbon
monoxide from aircraft are not projected to change greatly.
Hydrocarbon emissions, however, although predicted to
increase by 18 percent at Washington National Airport, are
expected to decrease by about 60 to 70 percent at Los
Angeles, John F. Kennedy, and O'Hare Airport.  The estimated
average increase in aircraft operations is 20 percent at
these airports during the 1970's, indicating in general,
lower hydrocarbon and carbon monoxide emissions from the
newer and, in many cases, larger engines.  As shown in Table
4 there will be substantial increases in aircraft NOx
emissions of 275 percent at Los Angeles, 146 percent at John
F. Kennedy, 98 percent at O'Hare, and 33 percent at
Washington National Airport between 1970 and 1980.  These
increases reflect the greater amounts of NOx emitted during
an entire LTO cycle from the newer engines.  Some increases
in SO2 and particulate emissions from aircraft are
projected, since such increases usually follow increases in
aircraft operations.

At Van Nuys Airport, the projected increases in all
pollutants parallel the large projected increases in
activity at this airport.  During the 1970's, emissions of
hydrocarbons, carbon monoxide, NOx, and lead from aircraft
are projected to increase by about 140 percent.

As Table 4 indicates, we estimate that in 1975 CO emissions
from aircraft at Van Nuys Airport will exceed CO emissions
from aircraft at a major commercial airport, Washington
National.  This estimation indicates the increasing
importance of general aviation aircraft emissions, and

15

Table 4.  CURRENT AND PROJECTED EMISSIONS[a] FROM AIRCRAFT AND AIRPORTS

(tons/year)

| Airport and year | Particulates[b] | | NOx | | SO2 | | Lead | | Carbon monoxide | | Total hydrocarbons | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Aircraft | Airport total | Aircraft | Airport total | Aircraft | Airport total | Aircraft | Airport total | Aircraft | Airport total | Aircraft | Airport total |
| **Los Angeles** | | | | | | | | | | | | |
| 1970 | 570 | 616 | 3,050 | 4,369 | 431 | 434 | 0.3 | 35.2 | 16,030 | 29,230 | 12,570 | 14,660 |
| 1975 | 610 | 627 | 6,790 | 8,110 | 490 | 561 | 0.9 | 22.0 | 16,630 | 28,730 | 8,660 | 10,530 |
| 1980 | 680 | 693 | 11,490 | 12,480 | 623 | 726 | 1.0 | 7.8 | 18,480 | 27,280 | 4,770 | 5,760 |
| **Washington National** | | | | | | | | | | | | |
| 1970 | 231 | 253 | 820 | 1,074 | 105 | 319 | 0.5 | 4.8 | 2,410 | 3,731 | 610 | 864 |
| 1975 | 242 | 253 | 980 | 1,211 | 121 | 330 | 0.5 | 2.1 | 2,700 | 3,691 | 680 | 823 |
| 1980 | 286 | 297 | 1,090 | 1,277 | 143 | 352 | 0.5 | 0.9 | 3,030 | 3,470 | 720 | 775 |
| **John F. Kennedy** | | | | | | | | | | | | |
| 1970 | 570 | 660 | 2,580 | 4,846 | 418 | 902 | 0.3 | 53.9 | 12,590 | 32,390 | 9,490 | 12,680 |
| 1975 | 550 | 605 | 4,660 | 6,640 | 415 | 913 | 0.4 | 27.5 | 11,280 | 26,680 | 5,700 | 8,010 |
| 1980 | 550 | 583 | 6,370 | 7,580 | 442 | 957 | 0.9 | 7.8 | 10,680 | 18,380 | 2,830 | 3,930 |
| **O'Hare** | | | | | | | | | | | | |
| 1970 | 900 | 1,001 | 3,760 | 6,290 | 562 | 605 | 0.2 | 63.8 | 14,740 | 34,540 | 9,580 | 13,210 |
| 1975 | 970 | 1,023 | 5,760 | 7,520 | 600 | 660 | 0.4 | 28.6 | 13,840 | 31,440 | 6,300 | 8,830 |
| 1980 | 1,100 | 1,100 | 7,440 | 8,540 | 718 | 803 | 0.6 | 7.7 | 13,530 | 22,330 | 3,710 | 4,920 |
| **Van Nuys** | | | | | | | | | | | | |
| 1970 | 3.2 | 3.7 | 12.1 | 27.5 | 0.033 | 0.33 | 3.2 | 3.6 | 1,650 | 1,870 | 100 | 132 |
| 1975 | 5.4 | 5.7 | 19.8 | 34.1 | 0.066 | 0.55 | 5.3 | 5.5 | 2,750 | 2,860 | 165 | 198 |
| 1980 | 7.7 | 7.8 | 28.6 | 36.3 | 0.099 | 0.88 | 7.6 | 7.6 | 3,960 | 4,070 | 242 | 264 |

[a] Based on aircraft emissions below 3000 feet altitude.

[b] Includes lead.

16

emphasizes that during an LTO cycle, CO emissions from a small general aviation piston engine can, in many cases, be expected to approach CO emissions from a commercial air carrier turbine engine.

The existing and potential air quality impact of sulfur oxides and lead is considered to be negligible in comparison to other sources of these two pollutants. Therefore, no further analysis was performed on these pollutants in this study. The particulate problem associated with aircraft operations has already been shown to be confined to the smoke problem and hence the air quality impact discussion is very brief in this report.

Emission projections for the additional airports at Dallas-Ft. Worth, San Francisco, Denver, and Boston were based on the similarity of the particular airport to one or more of those in Table 4.

# RESULTS OF IMPACT EVALUATION

### REGIONAL IMPACT

The implementation plans of eight air quality control
regions were reviewed in detail.  These regions have
critical problems in terms of their ability to meet the
National Ambient Air Quality Standards and also have
airports with high air passenger activity.  Four of the
regions considered are those in which the four major air
carrier facilities considered in the Northern Research Study
are located.  The analysis of regional implementation
strategies was extended to include San Francisco, Boston,
Denver, and Dallas-Fort Worth.  Table 5 reflects the present
status of implementation plans relating to the control
strategies (by pollutant) for these regions and their
ability to meet the air quality standards by 1975.

As an aid in assessing aircraft emissions and their regional
impact Tables 6 through 13 present the 1970 emission
inventories and emission projections for 1975 and 1980, for
the eight regions cited, along with reductions expected as a
result of Federal standards for emissions from light-duty
motor vehicles.*  In addition, one or more of the proposed
strategies representing control of smaller sources or
additional controls on motor vehicle sources are cited so
that the spectrum of control demands is evident.  Present
and projected estimates of aircraft emissions are also
tabulated, along with the reductions to be expected if the
proposed standards are met.  The reductions for 1975
represent application of the only feasible control strategy
available by that date, ground operation control.  Two
values are shown for 1980 potential reduction: the first
represents the actual reductions achievalbe by 1980; the
second, mass reductions achievable in the 1980-1990 time
frame as a result of the proposed 1979 design standards.
Note that in 9 of the 17 possible region/pollutant
combinations (an 8-region by 2-pollutant matrix plus Los
Angeles NOx) the potential reductions in aircraft emissions
are comparable to (at least half of) or greater than the
reductions due to minimum strategies proposed for 1980 by
the various regional or State agencies.

More importantly, in 4 of these 9 cases, the air quality
standard will not be met or will be only marginally met in
the 1975-1980 time frame.  In these cases aircraft emission
reductions before and after 1980 would represent effective
control strategies.  In all regions facing difficulties in

19

TABLE 5

ABILITY TO MEET
NATIONAL AMBIENT AIR QUALITY STANDARDS
IN 1975

(yes = able, no = unable)

Based on Current State Implementation Plan Information

| Region | Pollutant | | |
|--------|-----|-----|----------|
| | CO | HC | NO$_2$* |
| 1. Los Angeles | Yes | No | No |
| 2. New York | No | No | -- |
| 3. Washington, D.C. | No | Yes | -- |
| 4. Chicago | Yes | Yes | -- |
| 5. Denver | No | No | -- |
| 6. San Francisco | Yes | No | -- |
| 7. Dallas/Fort Worth | Yes | Yes | -- |
| 8. Boston | No | No | -- |

*NO$_2$ air quality data is currently being reevaluated. Results of this reassessment may require additional or accelerated control of aircraft NO$_x$ emissions to those herein proposed.

TABLE 6

METROPOLITAN LOS ANGELES INTRASTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 CO | 1970 HC[a] | 1970 NO$_x$ | 1975 CO | 1975 HC[a] | 1975 NO$_x$ | 1980[c] CO | 1980[c] HC[a] | 1980[c] NO$_x$ |
|---|---|---|---|---|---|---|---|---|---|
| **WITHOUT ADDITIONAL CONTROLS** | | | | | | | | | |
| Region | 4,130 | 651 | 573 | 4,400 | 693 | 611 | 4,800 | 756 | 668 |
| Aircraft (for entire region) | 41.1 | 6.8 | 4.2 | 51.4 | 4.9 | 9.3 | 70.0 | 3.2 | 15.6 |
| **REGION WITH PROPOSED CONTROLS** | | | | | | | | | |
| (Aircraft control not included) | | | | 880 | 178 | 335 | 515 | 130 | 275 |
| **REDUCTION FOR SPECIFIC STRATEGIES** | | | | | | | | | |
| Present motor vehicle program | | | | 2,200 | 365 | 164 | 3,720 | 548 | 350 |
| Petroleum industry | | | | | 23.7 | | | 25.5 | |
| Organic solvents | | | | | 1.8 | | 16.4 | 2.2 | 9.1 |
| Incineration | | | | 14.6 | | | 2.2 | | |
| Combustion of fuels | | | | 1.8 | | 1.1 | | | |
| Agriculture | | | | | | 9.1 | | 7.3 | |
| Periodic vehicle inspection | | | | 584 | 25.6 | +16.4[b] | 230 | 9.1 | +14.6[b] |
| Retrofit evaporative control | | | | | 34.7 | | 175 | 18.3 | |
| 1/3 conversion to gaseous fuels | | | | 485 | 27.4 | 73 | 109.5 | | 25.6 |
| 20% traffic reduction | | | | 200.7 | 30.8 | 47.5 | | | 27.4 |
| **AIRCRAFT CONTROL** | | | | | | | | | |
| Turbine ground operation | | | | 10.4 | 2.5 | | 10.9 | 1.3 | 1.0 |
| Turbine emission standard | | | | | 0.3 | | 1.9 (25.8) | 0.4 (2.7) | (13.4) |
| Piston emission standard | | | | | | | 2.3 (30.9) | 0.0 (0.3) | 1.0 |
| Sum of aircraft control strategies | | | | 10.4 | 2.8 | 0 | 15.1 (56.7) | 1.7 (3.0) | 3.4 |

[a] Reactive HC based on California SIP

[b] Increase rather than decrease due to engine operation tradeoff

[c] Values shown in parenthesis are projected 1990 emission reductions.

TABLE 7

NEW YORK PORTION OF THE N.J. - N.Y. - CONN. INTERSTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 | | | 1975 | | | 1980[d] | | |
|---|---|---|---|---|---|---|---|---|---|
| | CO | HC | $NO_x$ | CO | HC | $NO_x$ | CO | HC | $NO_x$ |
| WITHOUT ADDITIONAL CONTROLS | | | | | | | | | |
| Region | 4,207 | 832 | 741 | 4,840 | 955 | 851 | 5,260 | 1,040 | 926 |
| Aircraft (JFK only) | 12.6 | 9.5 | 2.6 | 11.3 | 5.7 | 4.7 | 10.7 | 2.8 | 6.4 |
| WITH STATE PROPOSED CONTROLS | | | | | | | | | |
| Region | | | | 2,630 | 485 | 727 | 1,136 | 268 | 622 |
| REDUCTION FOR SPECIFIC STRATEGIES | | | | | | | | | |
| National Motor Vehicle Standards | | | | 2,139 | 431 | 101 | 4,066 | 702 | 269 |
| (Other Strategies) | | | | 41[a] | 20.8[b] | 23.6[c] | 44.6[a] | 21[b] | 25.6[a] |
| AIRCRAFT CONTROL | | | | | | | | | |
| Ground Operation | | | | 5.7 | 3.6 | | 5.1 | 1.6 | |
| Emission Standards | | | | | .4 | | 0.8 (9.6) | 0.6 (3.0) | 0.5 (6.1) |

Note: La Guardia ≅ 60-70% of JFK.
a Downtown truck control.
b Process evaporation.
c Gas space heat downtown.
d Values shown in parenthesis are projected 1990 emission reductions.

22

TABLE 8

NATIONAL CAPITAL INTERSTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 CO | 1970 HC | 1970 NOx | 1975 CO | 1975 HC | 1975 NOx | 1980[c] CO | 1980[c] HC | 1980[c] NOx |
|---|---|---|---|---|---|---|---|---|---|
| **WITHOUT ADDITIONAL CONTROLS** | | | | | | | | | |
| Region | 1,389 | 267 | 184 | 1,554 | 299 | 206 | 1,735 | 335 | 230 |
| Aircraft (National) | 2.4 | 0.6 | 0.8 | 2.7 | 0.7 | 0.9 | 3.0 | 0.7 | 1.1 |
| **WITH STATE PROPOSED CONTROLS** | | | | | | | | | |
| Region | | | | 1,025 | 155 | 188 | 460 | 117 | 150 |
| **REDUCTION FOR SPECIFIC STRATEGIES** | | | | | | | | | |
| National Motor Vehicle Standards | | | | 470 | 97 | 20 | 1,215 | 190 | 78 |
| Minimum Strategies | | | | 25.2[a] | 2.2[a] | 0.5[b] | 11.3[a] | 1.3[a] | 0.3[b] |
| **AIRCRAFT CONTROL** | | | | | | | | | |
| Ground Operation | | | | 1.1 | .3 | | 1.2 | .4 | |
| Emission Standards | | | | 0.1 | 0.1 | | 0.2 (2.9) | 0.2 (0.7) | 0.1 (1.0) |

[a] Use of liquified petroleum gas for fleet vehicles.
[b] Motor vehicle maintenance and inspection.
[c] Values shown in parenthesis are projected 1990 emission reductions.

TABLE 9

ILLINOIS PORTION OF THE METROPOLITAN CHICAGO INTERSTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 CO | 1970 HC | 1970 NO$_x$ | 1975 CO | 1975 HC | 1975 NO$_x$ | 1980e CO | 1980e HC | 1980e NO$_x$ |
|---|---|---|---|---|---|---|---|---|---|
| **WITHOUT ADDITIONAL CONTROLS** | | | | | | | | | |
| Region | 2,730 | 606 | 383 | 3,064 | 688 | 435 | 3,496 | 796 | 504 |
| Aircraft (O'Hare) | 14.7 | 9.6 | 3.8 | 13.8 | 6.3 | 5.8 | 13.3 | 3.7 | 7.4 |
| **WITH STATE PROPOSED CONTROLS** | | | | | | | | | |
| Region | | | | 1,480 | 235.5 | 306 | 506 | 96 | 196 |
| **REDUCTION FOR SPECIFIC STRATEGIES** | | | | | | | | | |
| National Motor Vehicle Standards | | | | 1,383 | 262 | 94.5 | 2,748 | 465 | 265 |
| Aggregate Stationary Source Controls[a] | | | | 4.4[b] | 1.1[c] | 6.0[d] | 5.3[b] | 1.3[c] | 7.4[d] |
| **AIRCRAFT CONTROL** | | | | | | | | | |
| Ground Operation | | | | 6.5 | 3.6 | | 6.2 | 2.0 | |
| Emission Standards | | | | | | 0.6 | 1.1 / 12.2 | 0.8 / 3.9 | 0.6 (6.5) |

Note: Midway emissions ≅ 20% O'Hare.
[a] Minimum source strategy assumed to be 10% of aggregate.
[b] Incinerators.
[c] Refinery solvents.
[d] Values shown in parenthesis are projected 1990 emission reductions.

24

TABLE 10

METROPOLITAN DENVER INTRASTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 CO | 1970 HC | 1970 NOx | 1975 CO | 1975 HC | 1975 NOx | 1980a CO | 1980a HC | 1980a NOx |
|---|---|---|---|---|---|---|---|---|---|
| **WITHOUT ADDITIONAL CONTROLS** | | | | | | | | | |
| Region | 873 | 174 | 139 | 965 | 192 | 154 | 1,065 | 212 | 170 |
| Aircraft (Stapleton) | 4.5 | 2.6 | 1.0 | 4.6 | 1.7 | 1.6 | 4.8 | 1.0 | 2.0 |
| **WITH STATE PROPOSED CONTROLS** | | | | | | | | | |
| Region | | | | 516 | 98 | | 252 | 65 | |
| **REDUCTION FOR SPECIFIC STRATEGIES** | | | | | | | | | |
| National Motor Vehicle Standards | | | | 280 | 70 | | 757 | 140 | |
| Retrofit Pre '67 Cars | | | | 66 | 14.5 | | 12 | 2.6 | |
| Tune-ups | | | | 103 | 9 | | 44 | 4 | |
| **AIRCRAFT CONTROL** | | | | | | | | | |
| Ground Operation | | | | 1.8 | 1.0 | | 1.7 | 0.5 | |
| Emission Standards | | | | | 0.2 | | 0.3 (3.5) | 0.2 (1.1) | 0.2 (1.8) |

[a] Values shown in parenthesis are projected 1990 emission reductions.

25

TABLE 11

### SAN FRANCISCO BAY AREA INTRASTATE AQCR EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 CO | 1970 HC[b] | 1970 NO$_x$ | 1975 CO | 1975 HC[b] | 1975 NO$_x$ | 1980[d] CO | 1980[d] HC[b] | 1980[d] NO$_x$ |
|---|---|---|---|---|---|---|---|---|---|
| **WITHOUT ADDITIONAL CONTROLS** | | | | | | | | | |
| Region | 1,980 | 315 | 266 | 2,150 | 340 | 287 | 2,350 | 371 | 313 |
| Aircraft (S.F. Int'l.) | 11.0 | 3.2 | 2.1 | 11.5 | 2.2 | 4.7 | 12.7 | 1.2 | 7.9 |
| **WITH STATE PROPOSED CONTROLS** | | | | | | | | | |
| Region | | | | 451 | 89 | 156 | 291 | 69 | 125 |
| **REDUCTION FOR SPECIFIC STRATEGIES** | | | | | | | | | |
| National Motor Vehicle Standards | | | | 1,030 | 172 | 77 | 1,730 | 252 | 164 |
| Minimum Strategies | | | | 168[d] | 7.7[e] | 21.8[d] | 18[c] | 7.7[c] | 10.8[e] |
| Vehicle Inspection | | | | 266 | 10.9 | +7.3[f] | 106 | 2.9 | +7.3[f] |
| **AIRCRAFT CONTROL** | | | | | | | | | |
| Ground Operation | | | | 5.3 | (1.3) | | 5.6 | 0.7 | |
| Emission Standards | | | | 0 | 0.1 | | 1.0 (13.3) | 0.2 (1.4) | 0.5 (6.8) |

Note: Oakland and San Jose ≅ 20% of S.F. Int'l.
a Values shown in parenthesis are projected 1990 emission reductions.
b Defined highly reactive.
c Agricultural burning.
d 20% traffic reduction.
e 1/3 conversion to gaseous fuels.
f Increase rather than reduction.

TABLE 12

METROPOLITAN DALLAS - FORT WORTH INTRASTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 | | | 1975 | | | 1980[a] | | |
|---|---|---|---|---|---|---|---|---|---|
| | CO | HC | $NO_x$ | CO | HC | $NO_x$ | CO | HC | $NO_x$ |
| WITHOUT ADDITIONAL CONTROLS | | | | | | | | | |
| Region | 2,340 | 454 | 280 | 2,620 | 509 | 314 | 2,920 | 567 | 350 |
| Aircraft (Love Field) | 7.2 | 4.5 | 1.8 | 6.9 | 3.0 | 2.7 | 6.7 | 1.8 | 3.5 |
| WITH STATE PROPOSED CONTROLS | | | | | | | | | |
| Region | | | | | 256 | 270 | | 149 | 178 |
| REDUCTION FOR SPECIFIC STRATEGIES | | | | | | | | | |
| National Motor Vehicle Standards | | | | | 199 | 44 | | 393 | 172 |
| Minimum, Control Stationary Source and Gases | | | | | 6.4 | | | 6.4 | |
| Maintenance and Inspection | | | | | 48 | | | 19 | |
| AIRCRAFT CONTROL | | | | | | | | | |
| Ground Operation | | | | 3.1 | 1.7 | | 2.9 | 0.9 | |
| Emission Standards | | | | | 0.3 | | 0.5 (5.9) | 0.4 1.8 | 0.3 (3.2) |

[a] Values shown in parenthesis are projected 1990 emission reductions.

TABLE 13

METROPOLITAN BOSTON INTRASTATE AQCR
EMISSIONS, KILOTONS PER YEAR

| EMISSIONS | 1970 CO | 1970 HC | 1970 NOx | 1975 CO | 1975 HC | 1975 NOx | 1980a CO | 1980a HC | 1980a NOx |
|---|---|---|---|---|---|---|---|---|---|
| **WITHOUT ADDITIONAL CONTROLS** | | | | | | | | | |
| Region | 1,352 | 263 | 206 | 1,555 | 302 | 237 | 1,690 | 329 | 258 |
| Aircraft (Logan) | 7.9 | 5.8 | 1.6 | 7.0 | 3.5 | 2.8 | 6.5 | 1.7 | 3.9 |
| **WITH STATE PROPOSED CONTROLS** | | | | | | | | | |
| **REDUCTION FOR SPECIFIC STRATEGIES** | | | | | | | | | |
| Region | | | | 1,034 | 141.5 | 211.7 | 490 | 82 | 183 |
| National Motor Vehicle Standards | | | | 502 | 95 | 25 | 1,200 | 178 | 75 |
| Gasoline Handling Evaporative Losses | | | | | 12 | | | 13 | |
| Solvent Control | | | | | 52 | | | 56 | |
| Other Strategies Sited None Actually Proposed | | | | | | | | | |
| **AIRCRAFT CONTROL** | | | | | | | | | |
| Ground Operation | | | | 3.5 | 2.2 | | 3.1 | 1.0 | |
| Emission Standards | | | | | 0.2 | | 0.5 (5.9) | 0.4 (1.8) | 0.3 (3.7) |

[a]Values shown in parenthesis are projected 1990 emission reductions.

28

meeting the air quality standards, every viable control
strategy will have to be applied to meet requirements of the
Clean Air Act.

Table 6, which relates to the implementation plan for
metropolitan Los Angeles, lists all proposed strategies and
gives aircraft emission figures representative of all
aircraft activity, including LAX, in the region.  For a
specific region, total aircraft emissions can be
substantially higher than those attributed to the area's
major air carrier airport.  The region encompassing
metropolitan Los Angeles, for example, includes, besides
LAX, several smaller commercial air carrier airports and
numerous general aviation facilities.  It is not surprising
then that LAX accounts for only 40%, 70%, and 73%,
respectively of the total regional aircraft emissions of
CO, HC, and NOx in 1970.  This general relationship of
emissions attributable to major airports and total regional
aircraft emissions could be expected in similar highly
populated air quality control regions.

In the Los Angeles region, uncontrolled emissions from
aircraft are expected to account for 14% of the CO, 2.5% of
the reactive HC, and 5.5% of the NOx total emissions by
1980.

Emissions from piston aircraft have a particularly
significant impact on regional CO levels.  Although piston
aircraft were responsible for about 0.5% of the total CO
emissions in 1970, their contribution to CO emissions, if
uncontrolled, is expected to reach 10% by 1980.

## SUB REGIONAL AND LOCALIZED IMPACT

This section deals with the effect of aircraft emissions on
air quality at major airports and downwind of these
airports.  Emission densities and other parameters of
emission intensity and air quality impact are first
presented to provide indications of the contribution of
aircraft to air pollutant concentration around a number of
major U. S. airports.  Then detailed results of sampling and
dispersion modeling are presented to give deeper insight
into the localized impact of aircraft at airports where
aircraft contributions to air pollutant concentration are
expected to be particularly important.

## GENERAL INDICATORS OF LOCALIZED AIR QUALITY IMPACT

<u>Passenger Usage Density and Air Pollution Potential</u>.  An
indication of localized impact of aircraft on air quality is

presented in Table 14 for the 20 largest U. S. air carrier
airports, as determined by passenger enplanement.  On the
basis of concentration of passenger activity, proximity of
the airport to built-up areas, and meteorological pollution
potential[10] (a function of atmospheric mixing height and
wind speed), seven airports, designated by asterisks in
Table 14, could be expected to be particularly important
contributors to localized air pollutant concentrations.  The
results of Table 14 indicate most directly the airport
contributions to localized carbon monoxide concentrations;
the airport contributions to oxidant and nitrogen dioxide
concentrations are indicated less directly because
intermediate atmospheric reactions are involved in their
production.

**Emission Density Comparison.**  Emission densities have been
calculated for four of the airports that show a major air
quality impact potential.  Table 15 indicates that emission
densities due to aircraft alone in 1970 were in most cases
comparable to those of densely populated metropolitan areas
served by the corresponding airports.

This emission density comparison suggests that, in these
four airport areas, the contribution by aircraft to ambient
air concentrations of hydrocarbon, CO, and NOx is
substantial.  Such contributions are particularly important
where major airports lie in or near metropolitan areas in
which national ambient air quality standards are currently
exceeded.  As shown in Table 5, this is the case for the
four areas considered.

The comparison of emission densities (airport versus
metropolitan area) for 1975 and 1980 demonstrates that the
ratio of the airport emission densities to those of the
metropolitan areas will increase in most cases, sometimes
dramatically.  The trends can be identified in Table 15,
which indicates that aircraft are expected to become
increasingly significant contributors to air pollutant
concentrations at airports and in their vicinities.

It should be kept in mind that the emissions densities
presented in Table 15 are averaged for the given areas and
that variation in actual emission rates within the defined
areas exist.

The majority of the HC, CO, and NOx emissions in
metropolitan areas are due to area rather than point
sources.  This tends to minimize variation in emission
densities throughout a metropolitan area.  However, one
would expect to observe higher emission densities where

TABLE 14

INDICATIONS OF LOCALIZED AIRPORT IMPACT OF 20 LARGEST AIR CARRIER AIRPORTS

| Airport | Enplaned Passengers Millions (FY 1970) | Aircraft Activity | | Airport Area, Miles² | Passengers/area X 10⁵ | Airport Proximity to Built-up Areas [a] | Morning Meteorological Air Pollution Potential $(\bar{X}/\bar{Q})$ [b] |
|---|---|---|---|---|---|---|---|
| | | Percent Commercial Aviation | Percent General Aviation | | | | |
| * O'Hare | 13.5 | 95 | 5 | 14.1 | 36 | 2 | 50 |
| * Los Angeles | 8.5 | 76 | 22 | 4.8 | 40 | 2 | 50 |
| * Atlanta | 8.2 | 86 | 14 | 6.6 | 33 | 2 | 50 |
| * J.F. Kennedy | 7.0 | 86 | 14 | 8.1 | 25 | 2 | 30 |
| * La Guardia | 5.9 | 80 | 20 | 0.9 | 65 | 2 | 30 |
| San Francisco | 5.5 | 78 | 21 | 8.1 | 20 | 1 | 50 |
| * Dallas (Love) | 5.3 | 70 | 30 | 2.0 | 38 | 2 | 30 |
| * Washington (Nat.) | 4.9 | 66 | 33 | 1.0 | 49 | 1 | 70 |
| Boston | 4.5 | 66 | 34 | 3.7 | 24 | 1 | 20 |
| Miami | 4.4 | 66 | 31 | 4.2 | 22 | 2 | 20 |
| Detroit | 3.7 | 71 | 27 | 7.5 | 14 | | 40 |
| Denver | 3.5 | 48 | 52 | 7.2 | 13 | 2 | 30 |
| Newark | 3.4 | 76 | 24 | 3.4 | 19 | 2 | 30 |
| Philadelphia | 3.2 | 70 | 30 | 3.9 | 17 | 2 | 30 |
| St. Louis | 3.1 | 58 | 38 | 2.9 | 18 | 2 | 40 |
| Pittsburgh | 3.0 | 64 | 29 | 4.8 | 14 | | 80 |
| Minneapolis | 2.6 | 55 | 37 | 4.6 | 13 | 2 | 60 |
| Cleveland | 2.5 | 45 | 55 | 2.3 | 17 | | 50 |
| Seattle | 2.5 | 68 | 32 | 2.8 | 16 | 2 | 40 |
| Houston | 2.2 | 73 | 27 | 11.4 | 6 | 1 | 30 |

a  1 = Residential and business areas adjacent to airport boundaries.
   2 = Residential and business areas adjacent to airport boundaries, and a significant frequency of
       wind from airport toward these areas.
b  This parameter is based on a simple model of dispersion over urban areas, in which an average area-
   wide pollutant concentration, $\bar{X}$, is normalized for an average emission rate, $\bar{Q}$. High $\bar{X}/\bar{Q}$ values
   indicate high potential pollutant concentrations. The values listed above are morning upper
   decile levels for a 10-kilometer along-wind distance. More detailed information on this parameter
   is presented in Ref. 10.

31

Table 15.  COMPARISON OF EMISSION DENSITIES FOR AIRPORTS VERSUS URBAN AREAS FOR 1970, 1975, and 1980

| | Area,[a] mi² | Emission densities,[b] tons/mi²-day | | | | | | | | |
| | | 1970 | | | 1975 | | | 1980 | | |
| | | Carbon monoxide | Hydro-carbons | Nitrogen oxides | Carbon monoxide | Hydro-carbons | Nitrogen oxides | Carbon monoxide | Hydro-carbons | Nitrogen oxides |
|---|---|---|---|---|---|---|---|---|---|---|
| Los Angeles metropolitan area | 1250.0 | 7.2 | 2.0 | 1.0 | 4.8 | 1.1 | 0.9 | 2.8 | 0.9 | 0.8 |
| Los Angeles Airport - all emission sources | 3.9 | 20.6 | 10.3 | 2.0 | 20.2 | 7.4 | 3.5 | 19.1 | 4.0 | 5.6 |
| Los Angeles Airport - aircraft alone | 3.9 | 11.2 | 8.8 | 1.1 | 11.7 | 6.1 | 2.6 | 13.0 | 3.4 | 4.9 |
| New York metropolitan area | 320.0 | 14.5 | 3.4 | 3.6 | 11.4 | 2.4 | 3.6 | 5.5 | 1.3 | 3.2 |
| Airport - all emission sources | 4.5 | 19.6 | 7.7 | 2.1 | 16.2 | 4.9 | 2.7 | 11.2 | 2.4 | 3.0 |
| Airport - aircraft alone | 4.5 | 7.7 | 5.8 | 0.8 | 6.9 | 3.5 | 1.5 | 6.5 | 1.7 | 2.3 |
| Washington D.C. metropolitan area | 61.0 | 12.5 | 1.7 | 1.7 | 7.9 | 1.1 | 1.5 | 3.3 | 0.4 | 1.3 |
| National Airport - all emission sources | 1.0 | 10.2 | 2.4 | 1.7 | 10.1 | 2.3 | 1.8 | 9.5 | 2.1 | 1.9 |
| National Airport - aircraft alone | 1.0 | 6.6 | 1.7 | 1.0 | 7.4 | 1.9 | 1.2 | 8.3 | 2.0 | 1.4 |
| Chicago metropolitan area | 227.0 | 8.1 | 2.5 | 1.4 | 6.3 | 1.7 | 1.4 | 1.4 | 0.9 | 1.2 |
| O'Hare Airport - all emission sources | 6.7 | 14.1 | 5.4 | 1.9 | 12.9 | 3.6 | 2.0 | 9.1 | 2.0 | 2.3 |
| O'Hare Airport - aircraft alone | 6.7 | 6.0 | 3.9 | 0.8 | 5.7 | 2.6 | 1.3 | 5.5 | 1.5 | 1.8 |

[a]Airport areas represent those areas devoted to the operation of the airport, but not necessarily the total area owned by the airport.

[b]Emissions used to calculate airport emission densities are based on all aircraft emissions within each airport area.

32

there is high population activity such as in downtown and industrial areas as opposed to residential areas within the region.

## Detailed Investigation of Localized Pollutant Concentrations

The emissions density data previously discussed pointed to the fact that major airports are and will continue to be significant area sources of air pollution emissions. If the health and welfare of the exposed population is to be protected, the conclusion may be drawn that the emissions must be reduced equally for all such sources, e.g., whether they be airport or non-airport area sources of pollution.

8-Hour Carbon Monoxide Concentrations. Carbon monoxide concentrations at the Los Angeles International Airport and in its vicinity were measured from May to November, 1970[2]. The sampling was done by the Los Angeles County Air Pollution Control District under EPA contract. Carbon monoxide concentrations were continuously monitored at several sampling sites, including 4 sites in the airport terminal area, and 2 sites located upwind and downwind of the airport complex. At all of these, ambient concentrations of CO were measured. The monitoring sites were located as shown in Figure 1. Data from site 209 were analyzed extensively to determine as quantitatively as possible the air quality impact of aircraft CO emissions on 8-hour ambient CO concentrations in residential and business areas downwind of the airport.

Site 209 is located directly downwind of the L. A. airport when the wind blows from its most frequent direction, as indicated by the wind rose in Figure 1. Until recently this area was a residential neighborhood, but now it is almost completely owned by the Los Angeles Airport. Other residential areas, however, are located only a few blocks west and north of this area; and it was concluded that concentrations measured at site 209 are indicative of concentrations in such residential areas.

Figure 2 presents an estimated frequency distribution of carbon monoxide concentrations at site 209 during the winter months, the time of highest CO concentrations in the Los Angeles area. This frequency distribution is based on sampling data collected at site 209 during August and is adjusted to represent wintertime concentrations using a seasonal conversion based on air quality data for the entire Los Angeles basin. Derivation of the results shown in Figure 2 is detailed in Appendix A. It can be seen, in Figure A-3 of that section, that site 209 is exposed to the

33



Figure 1
AIR SAMPLING LOCATIONS
AT LOS ANGELES INTERNATIONAL AIRPORT

FREQUENCY OF WIND DIRECTION AT L.A.
AIRPORT, IN PERCENTAGES OF TOTAL,
1951-1960

Calm - 14%



FIGURE 2

EXPECTED CO CONCENTRATIONS, 8-HOUR AVERAGING TIME, WINTER 1970, STATION 209, LAX

35

same levels of carbon monoxide whether it be influenced by
pollution from other than the airport (easterly winds) or
from the airport alone (westerly winds). Figure 2 shows
that the 8-hour CO standard, which is not to be exceeded
more than once per year, is estimated to have been exceeded
at site 209 13 times per month, or 39 times in the winter 3-
month period.

Part of the carbon monoxide concentrations shown in Figure 2
is due to aircraft. To estimate the portion of the
concentration that is due to aircraft, dispersion modeling
was applied. The dispersion modeling methodology is
discussed in Appendix B. The model's resulting estimate of
the current contribution by aircraft to total CO
concentrations, shown in Figure 3, indicates that aircraft
are highly significant contributors to local CO
concentrations downwind of the airport. Figure 3 indicates
that expected aircraft contributions constitute 60-70% of
the total CO concentrations in the area of site 209.

Between 1970 and 1980, CO emissions from aircraft are
estimated to increase by fifteen percent (Table 4) while CO
emissions from all other sources in the Los Angeles area are
expected to decrease to 20% of their 1970 levels.[12] Using
the estimated changes in emissions from these two source
categories, and assuming that the emission changes yield
proportional changes in pollutant concentrations due to each
source category, CO concentration frequency distributions
for various aircraft contributions can be derived from
Figure 2. The result is presented in Figure 4 for various
1970 aircraft contributions to pollutant concentrations.

Figure 4 indicates that without controls of CO emissions
from aircraft the 8-hour CO standard will be exceeded more
than once during the 1980 winter months at site 209 if the
aircraft contribution to the total CO concentration in 1970
is as little as 20%. As shown in Figure 3, the 1970
contribution by aircraft exceeds this percentage over a
large area downwind of the airport. If the reasonable
assumption is made that Figure 2 approximates the 1970
winter CO concentration frequency distribution in this area,
it is evident that in 1980 the 8-hour CO concentrations will
continue to exceed the standard in this same area downwind
of the Los Angeles Airport if aircraft CO emissions are not
controlled.

As noted in Appendix A, the analysis resulting in Figures 2
and 4 can be repeated using data from September, rather than
from August, as a basis. The September data will yield
higher concentrations than will the August data for similar

36



FIGURE 3
VICINITY OF LOS ANGELES INTERNATIONAL:
Percent Contribution by Aircraft to
Carbon Monoxide Levels

(Based on 1970 emissions data)



FIGURE 4
FREQUENCY DISTRIBUTIONS FOR CARBON MONOXIDE FOR VARIOUS
AIRCRAFT EMISSION CONTRIBUTIONS AT STATION 209 – WINTER 1980

Notes
1. 80% rollback from 1970 on non-AC sources
2. 1980 AC CO emissions = 1.15 X 1970 emissions

Probability (%) of exceeding the given pollutant level

8-HOUR CO CONCENTRATION

38

frequencies of occurrence. Consequently, the results from
the September data analysis can be used to indicate an upper
value of a range of frequencies at which the 8-hour CO
standard is exceeded; the results from the August data can
be used to indicate a lower value of the range. The ranges
for 1970, and for 1980 with various aircraft contributions,
is presented in Table 16.

1-Hour CO Concentrations at the Los Angeles Airport. The 1-
hour CO air quality standard of 35 ppm (40 ug/m3) was
exceeded at only one of the outdoor continuous sampling
locations at the Los Angeles Airport. A summary of the 1-
hour sampling data at these receptors is presented in Table
17, which indicates that only at site 205 was the 1-hour CO
standard frequently exceeded. Site 205 was located next to
heavy automobile traffic on World Way Boulevard at an
automobile passenger unloading area. The 1-hour CO standard
was exceeded 12 times during the approximately 4-week period
of sampler operation. Expected reductions in CO emissions
from automobiles probably would reduce concentrations at
sites such as 205 to levels below the 1-hour standard.
Generally the 8-hour CO standard of 10 ug/m3 is the most
difficult of the two standards to reach, and statistically
if the 8-hour standard is met, the 1-hour CO standard will
also be met.[13]

Carbon Monoxide Concentrations at Other Airports.
Dispersion modeling was used to provide estimates of 1-hour
CO concetnrations both from aircraft alone and from all
airport and adjacent sources within 10 kilometers of the
center of each airport. This modeling was done for Los
Angeles, J. F. Kennedy, Chicago-O'Hare, and Washington
National Airports. The results, presented in Table 18, are
predicted concentrations at airport area points where: (1)
the general public could have access for 1-hour periods, and
(2) the total concentrations, as estimated by dispersion
modeling, exceed the standards.

Although minimal reliance should be placed on the precise
numerical values predicted by the model, these values are of
the same order of magnitude as the values from actual
measurements presented in Table 17. These results indicate
that localized carbon monoxide effects are not limited to
Los Angeles Airport.

The potential of high 8-hour CO concentrations downwind of
other airports, with large aircraft contributions, exists
near airports besides Los Angeles Airport. As previously
discussed, Table 14 indicates the potential of such
concentrations at six additional airports.

39

TABLE 16

EXPECTED RANGE OF DAYS THAT 8-HR STANDARD WILL BE EXCEEDED IN
VICINITY OF L.A. AIRPORT, 1970 and 1980[a]

| | Based on August Data[b] | | Based on September Data |
|---|---|---|---|
| Days Standard Exceeded in 1970 | 39 | to | 65 |
| Days Standard Exceeded in 1980, With Following % Contributions by Aircraft (at 1970 emission levels) to Total CO Concentrations | | | |
| 80% | 36 | to | 61 |
| 60% | 22 | to | 49 |
| 40% | 9 | to | 32 |
| 20% | 1 | to | 14 |
| 0% | 0 | to | 1 |

[a] Because the highest CO concentrations occur during winter months, it is assumed that the frequency of exceeding the standard during the winter quarter gives the frequency of exceeding the standard the entire year.
[b] From Figures 2 and 4.

40

TABLE 17

LOS ANGELES AIRPORT

NUMBER OF TIMES THE 1-HOUR CO STANDARD WAS EXCEEDED
MAY 10 THROUGH NOVEMBER 9, 1970, CONTINUOUS SAMPLING SITES

| Site* | Total Hours of Sampling | Number of Hourly Values When Standard Exceeded | Highest Two Hourly Values |
|---|---|---|---|
| 201 | 3710 | 0 | 27, 26 |
| 203 | 4256 | 2 | 46, 40 |
| 204 | 4258 | 0 | 23, 19 |
| 205 | 637 | 12 | 51, 49 |
| 208 | 4326 | 1 | 37, 28 |
| 209 | 4279 | 0 | 31, 27 |
| Downtown LA | 4965 | 3 | 37, 35 |

*Refer to Figure 1 for Location.

Table 18

Dispersion Model Estimates of 1-Hour
Carbon Monoxide Concentrations

| Site Location* | CO Concentration, mg/m$^3$ | |
|---|---|---|
| | Aircraft Sources Only | Total |
| JFK (T) | 85 | 100 |
| JFK (T) | 4 | 45 |
| JFK (T) | 3 | 44 |
| LAX (P) | 55 | 62 |
| LAX (P) | 32 | 45 |
| ORD (T) | 21 | 41 |
| ORD (S) | 9 | 41 |
| DCA (P) | 110 | 120 |
| DCA (P) | 45 | 59 |

*DCA = Washington National Airport, LAX = Los Angeles International
 Airport, JFK = John F. Kennedy International Airport, and ORD =
 O'Hare Airport, Chicago

(T) = Terminal area

(P) = Peripheral area--away from terminals, but within airport
      boundary

(S) = Outside of airport boundary, in airport surroundings

42

Hydrocarbon and Potential Oxidant Concentrations. Isopleths
of 1970 hydrocarbon concentrations due to aircraft alone at
the Los Angeles Airport are presented in Figure 5.  These
isopleths are based on the dispersion modeling methodology
presented in Appendix B, and are a result of meteorological
conditions that are particularly conducive to high
hydrocarbon concentrations.  Such conditions would be
expected to occur at least once per year.

The results indicate that there are large areas surrounding
the airport where the hydrocarbon concentrations due to
aircraft are well in excess of the standard.

Between 1970 and 1980, Table 4 indicates that at the Los
Angeles Airport, hydrocarbon emissions from aircraft will
decline to about 40% of their 1970 values.  These reductions
are reflected in Figure 6 which presents isopleths of 1980
hydrocarbon concentrations due to aircraft alone, at Los
Angeles Airport, based on meteorological conditions
equivalent to those used for the isopleths in Figure 5.
Even with the reduction in aircraft hydrocarbon emissions,
it is likely that in 1980 the hydrocarbon standard will
continue to be exceeded over a large area due to aircraft
emissions alone.

As indicated earlier, hydrocarbon concentrations at levels
typically found in the atmosphere are not harmful to health.
However, if airport hydrocarbon concentrations were followed
downwind for several hours under conditions conducive to the
accumulation of high oxidant concentrations,[7] aircraft-
generated hydrocarbons could be expected to be large
contributors to downwind oxidant concentrations over the Los
Angeles area.

A modeling analysis was performed to estimate hydrocarbon
concentrations downwind of Los Angeles Airport in 1980.  The
meteorological conditions used were similar to those used
for Figures 5 and 6.  The methodology of this analysis is
presented in Appendix C, and results are presented in Figure
7.  The three curves in Figure 7 show nonmethane hydrocarbon
concentrations downwind of Los Angeles Airport resulting
from the surroundings plus total airport emissions, total
airport emissions alone, and aircraft emissions alone.  The
initial concentration at the western airport boundary (0 km
in Figure 7) is shown to be zero, which is a result of the
proximity of the western boundary to the ocean, wind
direction from the west, and the assumption of negligible
hydrocarbon concentrations in wind coming off at the ocean.
At a point 3 hours downwind (16 km from the eastern airport
boundary) the overall hydrocarbon concentration will have

43



FIGURE 5    HYDROCARBON ISOPLETHS IN THE VICINITY OF LOS ANGELES INTERNATIONAL: AIRCRAFT SOURCES

3-Hr Average for 1970 (6 - 9 AM)

(numbers in $\mu g/m^3$)



(numbers in $\mu g/m^3$)

HYDROCARBON ISOPLETHS IN THE VICINITY OF LOS ANGELES INTERNATIONAL AIRCRAFT SOURCES

3-Hr Average for 1980 (6 - 9 AM)

FIGURE 6



FIGURE 7

CALCULATED NON-METHANE HYDROCARBON CONCENTRATIONS
DOWNWIND OF LOS ANGELES AIRPORT FOR 1980
WITH NON-AIRCRAFT SOURCES CONTROLLED

been in excess of the standard for 3 hours, enough time for possible formation of oxidant in concentrations exceeding the standard.

It is important to emphasize that this analysis was performed for 1980. If it were repeated for 1970, the concentrations for each of the curves would be at least double the 1980 values.

The emissions densities presented in Table 15 indicate that among the four airports studied, emission densities from aircraft alone are highest at Los Angeles Airport. However, the range among these emission density values is still less than a factor of 2.3 in 1980, indicating that conclusions concerning future aircraft-generated hydrocarbon and oxidant concentrations at the Los Angeles Airport and vicinity apply generally to the other airports studied, and that additional reductions in aircraft-generated hydrocarbon concentrations are necessary.

Oxides of Nitrogen. Although the ambient air quality standard is for NO2 (100 ug/m3, annual concentration), the result of the dispersion modeling is presented as oxides of nitrogen (NOx). This is done because there exists no well-defined relationship for the conversion of NO to NO2. In the presence of hydrocarbons; the NO to NO2 conversion is accelerated; best estimates indicate that 90 percent of the NO is converted to NO2 within a 2-hour period in the presence of sunlight. The reaction is essentially negligible at night. Considering all NOx as NO2 could result in an overestimation of annual average concentrations.

Oxides of nitrogen concentrations due to aircraft alone are presented in Figure 8 for Los Angeles Airport area for 1970. These modeling approximations indicate that LAX is responsible for NOx impact over a large area surrounding the airport. With growth of overall aircraft activity, and the changeover to bigger and higher pressure ratio turbine engines, aircraft emissions of NOx will increase greatly between 1970 and 1980. Present and expected future NOx emissions from aircraft at the four major airports studied are given in Table 15, which indicates that between 1970 and 1980 aircraft emissions of NOx will increase by factors of 2.2 at O'Hare Airport, 1.4 at Washington National Airport, 4.5 at Los Angeles International Airport, and 2.9 at John F. Kennedy Airport.

The general affect of increased NOx emissions from aircraft at LAX is reflected in Figure 9, which presents isopleths of

47



FIGURE 8

$NO_x$ ISOPLETHS IN THE VICINITY OF LOS ANGELES INTERNATIONAL: AIRCRAFT SOURCES
Annual Average for 1970

(numbers in $\mu g/m^3$)

48

1980 NOx concentrations due to aircraft.  Figure 9 indicates
that NOx concentrations due to aircraft alone could be
widespread in residential areas around LAX, and that in some
areas, the NO2 concentrations due to aircraft are comparable
to the standard.  It should be emphasized that these NOx
concentrations are due to aircraft alone, and NOx emissions
from other sources would be expected to significantly
increase the concentrations plotted in Figures 8 and 9.

NOx concentrations of similar magnitude to those in Figures
8 and 9 can be expected in the vicinity of other airports.
For example, isopleths showing expected 1980 NOx emissions
densities due to aircraft alone for O'Hare Airport are
presented in Figure 10.  Without emission controls, aircraft
using O'Hare Airport can be expected to be large future
contributors to localized NOx concentrations, as was the
case for Los Angeles Airport.

Smoke and Particulates.  Smoke generated by aircraft causes
significant reductions in visibility and is a cause of
widespread complaint by affected citizens.

The 1-year air quality monitoring program conducted at Los
Angeles International Airport indicated increased soiling
effects in the airport vicinity due to aircraft activity.
Atmospheric measurements of particulates using a tape
sampler technique gave higher readings (indicative of
soiling) for the airport area than for locations several
miles removed, such as downtown Los Angeles.  Additionally,
sampling at sites surrounding and adjacent to the Los
Angeles Airport area showed increasing soiling values from
upwind of the airport to a maximum immediately downwind of
the airport.

Measurement of total weight of particulate material, based
on Hi-Vol sampling, showed little variation between airport
and downtown areas.

Results of the dispersion modeling analysis for all four
airports indicated that particulate concentrations due to
aircraft in some parts of the airports could exceed the
secondary particulate air quality standards.



(numbers in $\mu g/m^3$)

ISOPLETHS IN THE VICINITY OF LOS ANGELES INTERNATIONAL: AIRCRAFT SOURCES
Annual Average for 1980

FIGURE 9



FIGURE 10    (numbers in μg/m³)

NOₓ ISOPLETHS IN THE VICINITY OF CHICAGO-O'HARE INTERNATIONAL: AIRCRAFT SOURCES

Annual Average for 1980

51

# TECHNOLOGICAL FEASIBILITY OF CONTROLLING

# AIRCRAFT EMISSIONS |

Information on emission control methods is necessary to determine the levels to which aircraft emissions can feasibly be reduced. An earlier Federal study,[1][14] identified potential control approaches including modification of aircraft engines, fuels, and ground operational procedures. This study indicated that modification of aircraft engines and ground operational procedures appear to be the most feasible and effective control procedures. More recently, the Aerospace Industries Association (AIA) has issued a report[15] summarizing results of investigations conducted by industry on: (1) emission characteristics of aircraft gas turbine engines; and (2) potential methods for reducing aircraft turbine engine emissions. The AIA report also identifies the possibility of reducing emissions through modifications of engines (especially combustor design) and of ground operational procedures.

The current reassessment of control methods must consider each of the aforementioned approaches. In assessing the feasibility of a control method, four factors must be explored: (1) effect of the method on the functioning or capacity of the aircraft system; (2) effectiveness of the method in reducing emissions; (3) cost of utilizing the method; and (4) time required for implementing the method. Information on emission-measurement instrumentation is also necessary to ensure that aircraft emissions can be measured with the accuracy and sensitivity required for enforcing the desired standards.

The Environmental Protection Agency has conducted several studies (references 16-27) to obtain information for assessment of aircraft emission control methods. This report summarizes the information obtained in these investigations. The specific objectives of this analysis of aircraft emission control technology are:

(1) To identify methods of controlling aircraft emissions through modification of engines, fuels, and ground operations.

53

(2) To estimate their effectiveness in reducing aircraft emissions.

(3) To estimate the time required for and cost of implementation.

(4) To assess the technology of measuring emissions from aircraft engines and to identify areas requiring advancements in instrumentation or test procedures.

Emission control by fuel modifications was reassessed to evaluate developments in aircraft fuel technology. This investigation was discontinued after preliminary analysis indicated that no significant reductions in emissions could be achieved by modifying fuels, except for reductions in sulfur or lead content that result in proportionate reductions of SO and lead emissions.

A list of specific emission control methods involving engine modifications was formulated on the basis of preliminary analyses, which indicated that each method was feasible and offered a significant reduction in one or more emission classes. Feasibility was assessed on the basis of the following factors:

(1) No reduction in engine reliability (safety).

(2) Little or no reduction in engine performance (power-weight ratio).

(3) Reasonable cost of implementation.

The preliminary list of control methods was then subjected to more detailed analysis of control effectiveness and implementation costs. Control methods involving changes in ground operations were evaluated in a similar manner.

Evaluation of the emission control methods involving engine modifications gave primary consideration to the following emission classes: carbon monoxide (CO), nitrogen oxides (NOx), total hydrocarbons (including drained fuel) (THC), dry particulates (DP), and smoke.

## EMISSION CONTROL BY ENGINE MODIFICATION

### Engine Classification

To facilitate analyses of engine modifications, aircraft engines are categorized according to their thrust or power level. The classification system is indicated in Table 19.

54

TABLE 19

AIRCRAFT ENGINE CLASSIFICATION

| Engine class | Engine Type | Power Range, lb thrust or eshp |
|---|---|---|
| T1 | Turbine | Less than 6,000 |
| T2 | Turbine | 6,000 to 29,000 |
| T3 | Turbine | Greater than 29,000 |
| P1 | Piston | All piston engines |

55

Although this classification system is based simply upon power level it effectively groups engines of similar emission potential (when the emission rates are normalized according to an appropriate engine-size parameter). Also, since effectiveness factors and costs of the control methods are similar for engine models within each class, the system is particularly useful for this analysis.

Three classes of turbine engines are defined, and all piston engines are included in a single class. This system thus categorizes engines according to their principal applications and according to certain design characteristics that affect emission rates.

The small turbine engine class (T1) includes most of the turboshaft and small turbojet and turbofan engines used in business and small commercial aircraft. It also includes auxiliary power units (APU) used on large commercial aircraft. These engines are considered as one class because the relatively small size of the combustor components (or large surface-volume ratio) makes control of certain emissions more difficult than with larger engines.

The next turbine engine class (T2) includes most of the turbojet and turbofan engines used in medium-to-large commercial aircraft. The design characteristics of most of these engines are basically similar.

The third turbine engine class (T3) includes large turbofan engines for "jumbo" transport aircraft and the SST engines currently in use or under development.

Emission Control Methods and Effectiveness

Technology for controlling emissions from aircraft engines by means of engine modifications has been analyzed. The purpose of this analysis was to identify specific methods of reducing pollutant emissions from aircraft engines and to indicate the reductions in rates of emission attainable by these methods. Various engine modifications appear to be feasible in that they can be applied to aircraft without degrading engine reliability or seriously reducing aircraft performance. Costs of implementing these control methods also appear to be within reasonable limits, at least in preliminary analysis.

Turbine Engines - The engine modification control methods considered feasible for turbine engines are listed and described briefly in Table 20. Six methods are, at least in

56

Table 20. ENGINE MODIFICATIONS FOR EMISSION CONTROL FOR EXISTING AND FUTURE TURBINE ENGINES

| Control method | Modification |
|---|---|
| **Existing engines** | |
| t1 – Minor combustion chamber redesign | Minor modification of combustion chamber and fuel nozzle to achieve best state-of-art emission performance. |
| t2 – Major combustion chamber redesign | Major modification of combustion chamber and fuel nozzle incorporating advanced fuel injection concepts (carburetion or prevaporization). |
| t3 – Fuel drainage control | Modify fuel supply system or fuel drainage system to eliminate release of drained fuel to environment. |
| t4 – Divided fuel supply system | Provide independent fuel supplies to subsets of fuel nozzles to allow shutdown of one or more subsets during low-power operation. |
| t5 – Water injection | Install water injection system for short duration use during maximum power (takeoff and climb-out) operation. |
| t6 – Modify compressor air bleed rate | Increase air bleed rate from compressor at low-power operation to increase combustor fuel-air ratio. |
| **Future engines** | |
| t7 – Variable-geometry combustion chamber | Use of variable airflow distribution to provide independent control of combustion zone fuel-air ratio. |
| t8 – Staged injection combustor | Use of advanced combustor design concept involving a series of combustion zones with independently controlled fuel injection in each zone. |

principle, applicable to existing engines by retrofitting of new or modified parts, and to engines currently in production. Two methods are considered to be applicable only to future engines of new design, since the modifications required are too extensive to be applied to engines for which development has been completed.

The first control method consists of simple modifications of the combustor and fuel nozzles to reduce all emission rates to the best levels currently attainable within each engine class. The degree of control attainable depends upon the performance of specific engines compared with those engines in the same class demonstrating the lowest emission rates. In general, this control method requires emission quality control (emission reduction to levels demonstrated by other engines of that model). Additionally, for certain high-emission engine models, it means emission reduction to the level of other engines of the same class. Each of the other control methods is more specifically directed at one or two pollutant classes.

Reductions in emissions achievable through the use of a control method vary with the pollutant considered, the engine class, and the engine operating mode. Estimates of the effectiveness of each control method have been made for all combinations of these factors and are presented in Tables 21 and 22. The estimation of emission control effectiveness for turbine engines is based upon reductions attainable from "lowest current emission rates." These rates are defined as those attainable through control method t1 (table 19), minor combustion chamber redesign.

It is predicted that all engines in each class could be modified to achieve these "best rates." The values of these rates are listed in Table 21. These "best rates" are not the lowest rates indicated for each engine class, but are rates near the low end of those emission rates that appear to be realistically attainable. The use of the "best rate" basis is necessary to allow effectiveness estimates for each engine class. Because of the wide variations in actual emission rates of turbine engines, an effectiveness analysis based on average rates would be less significant. Table 22 indicates the effectiveness of control methods t2 through t8. Some estimates are based upon demonstrated performance. Most, however, are not based on direct experience with these control methods on aircraft engines. Therefore, estimates of effectiveness are based largely on theoretical analyses of engine performance under the operating conditions associated with the control methods. The bases for these estimates are summarized in Table 23.

Table 21.  EFFECTIVENESS OF t1 - MINOR COMBUSTION CHAMBER
REDESIGN[a] - ON REDUCTION OF EMISSIONS FROM TURBINE ENGINES
(Emission rates in lb/1000 lb of fuel)

| Engine class | Pollutant | Mode | | |
|---|---|---|---|---|
| | | Idle/taxi | Approach | Takeoff |
| T1 | CO | 25 | 5 | 2 |
| T1 | THC | 10 | 1 | 0.2 |
| T1 | $NO_x$ | 3 | 7 | 11 |
| T1 | DP | 0.2 | 0.5 | 0.5 |
| T2 | CO | 45 | 6 | 1 |
| T2 | THC | 10 | 1 | 0.1 |
| T2 | $NO_x$ | 2 | 6 | 12 |
| T2 | DP | 0.2 | 0.5 | 0.5 |
| T3 | CO | 50 | 3 | 0.5 |
| T3 | THC | 10 | 1 | 0.1 |
| T3 | $NO_x$ | 3 | 10 | 40 |
| T3 | DP | 0.1 | 0.1 | 0.1 |

[a]Minor combustor redesign is assumed to reduce the smoke to
invisible or "smokeless" levels for all engine classes.

59

Table 22

Effectiveness of Engine Modification in Control
of Emissions from Turbine Engines, by Operating Mode[a]

| Control method | Engine class | Pollutant | Mode | | |
|---|---|---|---|---|---|
| | | | Idle/taxi | Approach | Takeoff |
| t2[b] | T1 | DP | 0.5 | 0.5 | 0.5 |
| t2 | T1 | $NO_x$ | NC[c] | NC | 0.5 |
| t2 | T2 | DP | 0.5 | 0.5 | 0.5 |
| t2 | T3 | $NO_x$ | NC | NC | 0.5 |
| t3 | T1 | THC | NC | NC | 0[d] |
| t3 | T2 | THC | NC | NC | 0[d] |
| t3 | T3 | THC | NC | NC | 0[d] |
| t4 | T1 | CO | 0.25 | NC | NC |
| t4 | T1 | THC | 0.25 | NC | NC |
| t4 | T2 | CO | 0.25 | NC | NC |
| t4 | T2 | THC | 0.25 | NC | NC |
| t4 | T3 | CO | 0.25 | NC | NC |
| t4 | T3 | THC | 0.25 | NC | NC |
| t5 | T1 | $NO_x$ | NC | NC | 0.1 |
| t5 | T2 | $NO_x$ | NC | NC | 0.1 |
| t5 | T3 | $NO_x$ | NC | NC | 0.1 |
| t6 | T1 | CO | 0.5 | NC | NC |
| t6 | T1 | THC | 0.5 | NC | NC |
| t6 | T2 | CO | 0.5 | NC | NC |
| t6 | T2 | THC | 0.5 | NC | NC |
| t6 | T3 | CO | 0.5 | NC | NC |
| t6 | T3 | THC | 0.5 | NC | NC |
| t7 or t8 | T1 | CO | 0.1 | NC | NC |
| t7 or t8 | T1 | THC | 0.1 | NC | NC |
| t7 or t8 | T1 | $NO_x$ | NC | NC | 0.75 |
| t7 or t8 | T1 | DP | 0.5 | 0.5 | 0.5 |
| t7 or t8 | T2 | CO | 0.1 | NC | NC |
| t7 or t8 | T2 | THC | 0.1 | NC | NC |
| t7 or t8 | T2 | $NO_x$ | NC | NC | 0.75 |
| t7 or t8 | T2 | DP | 0.5 | 0.5 | 0.5 |
| t7 or t8 | T3 | CO | 0.1 | NC | NC |
| t7 or t8 | T3 | THC | 0.1 | NC | NC |
| t7 or t8 | T3 | $NO_x$ | NC | NC | 0.75 |
| t7 or t8 | T3 | DP | 0.5 | 0.5 | 0.5 |

[a]Emission rate is fraction of best current rate assumed to be attainable
through minor combustion chamber redesign and with control method cited

[b]t2 = Major combustion chamber redesign
t3 = Fuel drainage control
t4 = Divided fuel supply system
t5 = Water injection
t6 = Modify compressor air bleed rate
t7 = Variable-geometry combustion chamber
t8 = Staged injection combustor

[c]NC indicates no change

[d]Refers to raw fuel drainage only

60

Table 23

Bases for Control Method Effectiveness Estimates for Turbine Engines

| Control method | Rationale |
|---|---|
| t1 - Minor combustion chamber redesign | The assumption is made that emission rates for all engines within a given class can be reduced to common, optimum levels (on a lb/1000 lb fuel basis) by minor combustor modifications. These optimum emission rates are based on the best performance reported for each engine class, excluding extreme data points. |
| t2 - Major combustion chamber redesign | Estimates are based on reports of carbureting fuel injector performance and reduction of smoke emission. Concept is incorporated in some Class T3 engines. Estimates are based on assumption that best emission rate for Class T1 and T2 engines is at an exhaust visibility threshold at maximum power. Carburetion appears to reduce smoke level, and presumably particulate emissions, to approximately half that level. Additionally, premixing of air and fuel can be used to give substantial $NO_x$ reduction by decreasing residence time in the combustor. |
| t3 - Fuel drainage control | Estimate is based on the assumption that fuel drainage can be completely eliminated by collecting drained fuel and returning to fuel tank. |
| t4 - Divided fuel supply system | Control method results in combustion zone fuel-air ratio similar to that at approach condition. Reduction in CO and THC from idle to approach is approximately 90 percent in Class T1 and T2 engines and 90 percent in Class T3 engines. Effectiveness is reduced by one order because combustor is not operating at "well-designed" condition. |
| t5 - Water injection | Water injection is assumed only at takeoff at a rate up to twice the fuel rate. Water injection into compressor or diffuser is assumed to be by system similar to those in current use. Effectiveness based upon published results with steam injection.[28] Water injection assumed to be of equal effectiveness when injected upstream of combustor. |
| t6 - Modify compressor air | Assumptions are (1) fraction of air that can be bled is small so that engine operating point is nearly unchanged, (2) combustor f/a varies inversely with air bleed rate, and (3) CO and THC emissions at idle vary as the (air mass flow rate)$^3$ and inversely as (f/a)$^3$. This relationship is based upon data from Reference 14. If maximum air bleed rate is 20 percent, CO and THC emission rates are reduced by 50 percent. |
| t7 - Variable-geometry combustion chamber<br><br>t8 - Staged injection combustor | Combustor primary zone is assumed to operate at a constant f/a equal to normal f/a at approach power condition (primary equivalence ratio = 0.6). CO and THC emissions at idle are reduced to levels corresponding to approach power, or by 90 percent for Classes T1, T2, and T3. This incorporates design characteristics that provide a good mixture in the combustion zone. This feature and constant f/a operation combine to reduce $NO_x$ emissions at full power by 75 percent[26] and particulate emissions by 50 percent at all power levels as in t2. |

61

Emission-control effectiveness is indicated in Tables 21, 22, and 23 for each control method and for each pollutant for which a significant degree of control expected. Pollutants for which little or no control expected are not listed. Effectiveness is indicated separately for each engine class. No specific estimates have been made for control of reactive hydrocarbons, odor, or aldehydes because control methods applicable to these emissions are not yet identified. Reductions in these emissions are expected along with reductions in THC emissions. Any of the modifications defined for existing turbine engines (t1 through t6) could be combined to achieve increased emission control effectiveness; exceptions are modifications t4 and t6, which are mutually exclusive.

**Piston Engines** – The control methods considered feasible for aircraft piston engines are listed with brief descriptions in Table 24. These methods include most of the approaches that have been developed for automotive engines for control of carbon monoxide and total hydrocarbon. Methods for controlling nitrogen oxide (NOx) emissions are not included because the fuel-rich operating conditions of aircraft piston engines result in low NOx emission rates. Piston engine emission characteristics are included in Figure 11. As this figure indicates, fuel-air ratio has a significant effect on aircraft piston engine emissions. Plans for changes in engine operating conditions to reduce CO and THC emissions must also consider NOx to prevent significant increases in emissions of this pollutant.

Table 24 lists nine piston-engine control methods, including the use of direct-flame afterburners and water injection, methods that are not being considered currently for automotive engines. Afterburners might be used to advantage in this application because they can utilize the high-velocity airflow around the aircraft. Although aircraft piston engines and automobile engines are fundamentally similar, their applications are significantly different, with different requirements. Reliability is of primary importance in aircraft piston engine applications and therefore is given paramount consideration in identifying applicable control methods. The piston-engine emission-control methods were identified and evaluated through reviews of published investigations. Of the methods identified, all are considered applicable to existing engines except those that would require redesign of the basic engine or its control systems.

Effectiveness estimates for piston engines are based on reductions of current uncontrolled rates listed in Table 25.

Table 24

Engine Modifications for Emission Control
for Existing and Future Piston Engines

| Control method | Modification |
| --- | --- |
| **Existing engines** | |
| p1 - Fuel-air ratio control | Limiting rich fuel-air ratios to only those necessary for operational reliability. |
| p2 - Simple air injection | Air injected at controlled rate into each engine exhaust port. |
| p3 - Thermal reactors | Air injection thermal reactor installed in place of, or downstream of, exhaust manifold. |
| p4 - Catalytic reactors for HC and CO control | Air injection catalytic reactor installed in exhaust system.  Operation with lead-free or low-lead fuel required. |
| p5 - Direct-flame afterburner | Thermal reactor with injection of air and additional fuel installed in exhaust system. |
| p6 - Water injection | Water injected into intake manifold with simultaneous reduction in fuel rate to provide for cooler engine operation at leaner fuel-air ratios. |
| p7 - Positive crankcase ventilation | Current PCV system used with automotive engines applied to aircraft engines.  Effective only in combination with one of preceding control methods. |
| p8 - Evaporative emission controls | A group of control methods used singly or in combination to reduce evaporative losses from the fuel system. Control methods commonly include charcoal absorbers and vapor traps in combination with relatively complex valving and fuel flow systems. |
| **Future engines** | |
| p9 - Engine redesign | Coordinated redesign of combustion chamber geometry, compression ratio, fuel distribution system, spark and valve timing, fuel-air ratio, and cylinder wall temperature to minimize emissions while maintaining operational reliability. |



FIGURE 11

PISTON ENGINE EMISSION CHARACTERISTICS

TABLE 25

CURRENT UNCONTROLLED EMISSION RATES
FOR PISTON ENGINES[29]
(lb/1000 lb of fuel)

| Pollutant | Idle | Taxi | Approach | Takeoff |
|-----------|------|------|----------|---------|
| CO | 896 | 882 | 918 | 849 |
| THC[a] | 48 | 76 | 80 | 18 |
| $NO_x$ (as $NO_2$) | 7 | 4 | 4 | 6 |

[a] Total hydrocarbon (THC) emission rates have been increased by 50% to account for crankcase blow-by emissions. Evaporative emissions are not included in these rates.

TABLE 26

EFFECTIVENESS OF ENGINE MODIFICATIONS IN
CONTROL OF EMISSIONS FROM PISTON ENGINES
BY POLLUTANT[a]

| Control Method | Controlled Emission Rate | |
|----------------|------|------|
| | CO | THC[b] |
| P1 Fuel-air ratio control | 0.5 | 0.5 |
| P2 - Simple air injection | 0.1 | 0.5 |
| P3 - Thermal reactor | 0.1 | 0.25 |
| P4 - Catalytic reactor (requires lead-free fuel) | 0.1 | 0.25 |
| P5 - Direct-flame afterburner | 0.1 | 0.1 |
| P6 - Water injection | 0.1 | 0.25 |
| P7 - Positive crankcase ventilation (PCV) | NC | d |
| P8 - Evaporative emission control | NC | e |
| P9 - Engine redesign | 0.1 | 0.5 |

[a] Emission rate is fraction of uncontrolled emission rate after installation of control method and applies to all operating modes.
[b] Exhaust HC only.
[c] NC indicates no change.
[d] PCV would eliminate blow-by emissions when used in combination with p1, p2, p3, p4, p5, or p8. Blow-by THC emission estimated to be equal to 30% of uncontrolled exhaust emission.
[e] Evaporative controls would reduce THC emissions due to evaporation from fuel supply. Magnitude of uncontrolled emissions is unknown.

65

Since emission rates from piston engines do not vary as widely as those from turbine engines, control effectiveness can be based on average rates for existing engines. The effectiveness estimates shown in Table 26 are based in most cases on the application of individual control methods without other engine changes. Method p7 (PCV) is an exception; it is considered to be most effective in combination with method p1, p2, p3, p4, p5, p6, or p9.

Piston-engine modifications p2 through p6 are designed to serve the same function and, thus, are mutually exclusive. All of the others could be combined with any of the modifications p2 through p6 to achieve increased emission-control effectiveness.

Cost and Time Requirements for Control-Method Development and Implementation

Existing Engines - Estimates of the cost and time requirements of applying each control method applicable to existing engines are preliminary and are intended to indicate the magnitude of costs and time involved in controlling emissions from all civil aircraft. Cost and time requirements are estimated separately for control-method development and implementation. Development includes all effort required from initial stages through certification of the control method for a specific engine class and tooling for production. Implementation includes initial installation of the control method on all engines of a given class and costs associated with additional effort or materials required for the control method throughout the remaining service life of the engines. These estimates are based on a turbine engine life of 10 years with engine overhauls every 5,000 hours or 2 1/2 years and a piston engine life of 10 years with engine overhauls every 5,000 hours or 5 years. Operating costs for water injection are based upon experience with the water injection system on the Boeing 747 aircraft.

Because few of the control methods have been developed for or applied to aircraft engines, and because many factors affect total implementation costs, many uncertainties are involved in the estimates. Estimates of development costs and time requirements are based on the previous experience of aircraft engine manufacturers in similar modifications. Estimates of implementation costs are considered to be less certain than development costs. The cost and service life of a modified engine component is difficult to predict accurately. Yet these factors strongly affect the cumulative costs of operating and maintaining the modified

66

engine.  Because implementation costs could be far greater
than development costs for some control methods, the
estimates of implementation costs are only indicative of
cost penalties that might be involved with control-method
implementation.

Three potential levels of aircraft emission control
entail three distinct associated cost levels: (1)
retrofitting in-use engines, (2) modifying present
production designs to incorporate emission control
technology in new engines of models presently being
produced, and (3) incorporating emission control technology
into new engine designs during the design phases of a new
engine model.

Costs are highest for retrofitting in-use engines, are
significantly lower for modifying existing designs in new
production engines and are lowest for incorporating emission
technology during engine design.  Table 27 presents
estimates of the development time, development costs, and
implementation costs for application of the control methods
that could be retrofitted on the current population of all
civil engines.

The development time requirements listed in Table 27 are
the periods required to reach the point where installation
of the control methods in existing engines could begin.  The
application of controls in all existing engines would
require an additional time period that depends primarily on
the availability of engine maintenance facilities.  The time
for implementation is estimated to be 2 1/2 years for
turbine engines and 5 years for piston engines.  These time
estimates allow implementation of the emission control
method during normal maintenance procedures, minimizing
cost.  Table 28 presents costs by category: air carrier,
general aviation, and civil aviation.  These tables
represent cost to retrofit the various control methods to
the current population of aircraft.

From another perspective, implementation costs may be
expressed as fractions of total engine costs.  For a typical
class T2 (turbine) engine, the cost of installing and
maintaining control systems ranges from $300 to $69,900,
assuming a 10-year engine life.  Based on a total engine
cost of $250,000, these control-method implementation costs
represent 0.1 to 25 percent of the total engine cost.  For a
typical piston engine, estimated control-method
implementation costs range from $100 to $4,000, also based
upon a 10-year engine life.  For a total engine cost of

67

Table 27

Time and Costs for Modification of Current
Civil Aviation[a] Engines

| Control method | Development time, years | Development cost, $10^6$ dollars | Implementation cost, $10^6$ dollars |
|---|---|---|---|
| Turbine engines | | | |
|   Minor combustion chamber redesign | 2.5 to 5 | 37 | 383 |
|   Major combustion chamber redesign | 2.5 to 7.5 | 74 | 665 |
|   Fuel drainage control | 1 to 2.5 | 1.5 | 5.4 |
|   Divided fuel supply | 5 to 7.5 | 84 | 102 |
|   Water injection | 2.5 to 4 | 25 | 175 |
|   Compressor air bleed | 4 to 6.5 | 90 | 58 |
| Piston engines | | | |
|   Simple air injection | 1.5 to 3 | 9 | 165 |
|   Thermal reactor | 3 to 6 | 25 | 424 |
|   Catalytic reactor | 2.5 to 5 | 22 | 535 |
|   Direct-flame afterburner | 3 to 6 | 25 | 424 |
|   Water injection | 1.5 to 3 | 9 | 400 |
|   Positive crankcase ventilation | 2 to 4 | 4 | 94 |
|   Evaporative emission control | 1.5 to 2.5 | 4 | 269 |

[a]"Civil aviation" includes air carrier and general aviation engines

68

Table  28

Cost Results for Turbine Engine Population
by Separate Use Categories

| Engine class | Control method | Cost scaling factor | Development cost per engine family, $10^6$ dollars | Implementation cost per engine, $10^3$ dollars | Total cost, $10^6$ dollars | | |
|---|---|---|---|---|---|---|---|
| | | | | | Air carrier | General aviation | Civil aviation[a] |
| T1 | t1 | 0.35 | 0.90 | 12.4 | 19.2 | 90.5 | 109.7 |
| T1 | t2 | 0.35 | 1.80 | 21.3 | 34.5 | 159.3 | 193.8 |
| T1 | t3 | -- | 0.05 | 0.1 | 0.4 | 1.0 | 1.4 |
| T1 | t4 | 0.35 | 1.80 | 3.7 | 14.9 | 51.5 | 66.4 |
| T1 | t5 | 0.35 | 0.62 | 5.5 | 9.8 | 43.6 | 53.4 |
| T1 | t6 | 0.35 | 2.20 | 2.1 | 15.5 | 48.1 | 63.6 |
| T2 | t1 | 1.00 | 0.90 | 35.5 | 243.0 | 17.8 | 259.8 |
| T2 | t2 | 1.00 | 1.80 | 69.9 | 418.0 | 31.0 | 449.6 |
| T2 | t3 | -- | 0.05 | 0.3 | 2.0 | -- | 2.0 |
| T2 | t4 | 1.00 | 1.80 | 10.5 | 87.0 | 8.3 | 95.3 |
| T2 | t5 | 1.00 | 0.62 | 15.6 | 108.7 | 8.2 | 116.9 |
| T2 | t6 | 1.00 | 2.20 | 6.0 | 61.5 | 7.1 | 68.6 |
| T3 | t1 | 1.64 | 0.90 | 58.3 | 50.0 | -- | 50.0 |
| T3 | t2 | 1.64 | 1.80 | 100.0 | 95.0 | -- | 95.0 |
| T3 | t3 | 1.64 | 0.05 | 0.6 | 2.0 | -- | 2.0 |
| T3 | t4 | 1.64 | 1.80 | 17.2 | 13.7 | -- | 13.7 |
| T3 | t5 | 1.64 | 0.62 | 25.6 | 29.5 | -- | 29.5 |
| T3 | t6 | 1.64 | 2.20 | 9.9 | 16.0 | -- | 16.0 |

[a]"Civil aviation" includes air carrier and general aviation engines

$6,000, these implementation costs represent 2 to 65 percent of the total.

Retrofit cost and time estimates for turbine engines were developed by using the application of low-smoke combustors to the JT8D engine class as a reference for cases in which no direct experience was available. Cost and time requirements for this modification, which is considered a minor combustor redesign for a class T2 engine, were estimated in detail in 1969.[27] Requirements for other control methods were determined essentially by proportioning the cost and time expenditures according to the complexity of the method, with respect to the reference case. Requirements for other engine classes were determined by using appropriate scaling factors and by again using the JT8D modifications as reference. Time and cost estimates for piston engines are based largely on experience to date with emission controls for automobile engines. Significant differences, such as certification and safety requirements and production levels, were considered in scaling the costs from the experience with automobiles.

Costs of emission control technology are substantially lower when applied to new engines only. These costs are less than one-half the retrofit costs on a per-engine basis. These estimates cannot be totalled as were the retrofit estimates because of uncertainty concerning the number of engines that would be affected.

Future Engines - Cost estimates have been developed also for incorporation of emission controls in future engines, that is, engines that have not yet been developed. These estimates are defined only as fractions of total engine cost, since no reasonable basis is available for estimating the numbers of engines that would be affected.

Emission control in turbine engines that is attained through the use of advanced combustor-design concepts is estimated to represent an increase in total engine cost of 3 to 4 percent. Emission control in piston engines that is achieved by engine-design modifications would not necessarily result in any significant increase in engine cost. If greater control of emissions is required than can be achieved by engine design modifications, however, one or more of the control methods applicable to existing engines will be necessary. The costs of these control methods, which involve the addition of auxiliary devices such as thermal reactors, will be significant, probably in the range of 5 to 10 percent of total engine cost.

These estimates represent the increased costs of new engines with emission controls installed. Additional continuing costs may accrue for maintenance of the controls. These maintenance costs will be considerably less than those entailed in modifications of existing engines.

## EMISSION CONTROL BY MODIFICATION OF GROUND OPERATIONS

### Definition of Ground Operations

The cycle of operations performed by an aircraft during its arrival at and departure from an airport can be defined quite precisely because most of these operations are prescribed by airport or aircraft operating procedures. Characteristic operating or LTO (landing-takeoff) cycles have been defined for various classes of aircraft for purposes of estimating pollutant emissions.

The LTO cycle can be separated logically into flight and ground operations. Flight operations include the approach and climb-out modes as well as landing and takeoff, even though the latter occur partially on the ground. Ground operations include the taxi and idle modes of the cycle. This separation is logical for two reasons. First, flight operations as defined here are those that cannot readily be modified to reduce pollutant emissions. Second, flight operations are conducted almost entirely with aircraft engines at full or part power; under these conditions, pollutant emission rates are quite different from those at the low power levels characteristic of ground operations. Aircraft ground operations contribute substantially to the concentrations of CO and THC at air carrier airports because of the relatively high emission rates of these pollutants at low engine power levels, and because ground operations are largely confined to limited areas within the airport boundaries.

### Emission Control Methods

Six methods offer some degree of control of CO and THC emissions at air carrier airports by modification of turbine-aircraft ground-operation procedures.

(1) Increase engine speed during idle and taxi operations.

(2) Increase engine speed and reduce number of engines operating during idle and taxi.

71

(3) Reduce idle operating time by controlling departure times from gates.

(4) Reduce taxi operating time by transporting passengers to aircraft.

(5) Reduce taxi operating time by towing aircraft between runway and gate.

(6) Reduce operating time of aircraft auxiliary power supply by providing ground-based power supply.

The first two methods reduce emissions by requiring that engines be operated at more efficient power settings than those in current practice (Figure 12); the next four methods reduce emissions by reducing operating time of either main or auxiliary engines. The effectiveness of these methods in reducing emissions varies considerably. Table 29 summarizes the reductions in CO and THC emissions that would result at Los Angeles International Airport from the six suggested ground-operation changes. Tables developed for other major air carrier airports show emission reductions of the same magnitude.

The control methods listed, with the possible exception of number 3, are not applicable to small, piston-engine aircraft, and, therefore, do not seem to offer means for controlling emissions at general aviation airports. Periods of delay at take-off are significant at some general aviation airports; however, aircraft ground traffic at general aviation airports may not be sufficiently controlled to allow an effective system of controlled gate departures or engine start-ups to reduce periods of delay.

Implementation Cost and Time Requirements

The cost and time requirements of the control methods involving ground operation modifications have been estimated for Los Angeles International. Table 30 presents summary of the estimates. Implementation of these methods at other airports would involve costs of the same magnitude. Specific costs, however, would vary with airport activity level and the present availability of auxiliary equipment. FAA and the airlines have estimated savings for control method 2, and their estimates are within 20% of the estimate in Table 30.

Tables 29 and 30 indicate that alternative 2 is the most attractive means of reducing turbine aircraft emissions



FIGURE 12

HYDROCARBON AND CARBON MONOXIDE EMISSIONS
FROM A TYPICAL AIRCRAFT TURBINE ENGINE (JT3D)

73

Table 29

Comparative Reductions Resulting from Control
Methods Applied at Los Angeles International Airport

| Control method | Resultant emissions, % of uncontrolled emissions | |
| --- | --- | --- |
| | CO | Hydrocarbons |
| 1.  Increase engine idle speed | 71 | 93 |
| 2.  Increase idle speed and use minimal engines for taxi | | |
|     Two engines | 53 | 66 |
|     Single engine | 39 | 51 |
| 3.  Eliminate delays at gate and runway | 90 | 91 |
| 4.  Transport passengers between terminal and aircraft | 98 | 97 |
| 5.  Tow aircraft to avoid taxi emissions | 34 | 42 |
| 6.  Avoid use of aircraft auxiliary power units (APU) | 96 | 98.5 |

Table 30

Costs and Time for Operations Changes
at Los Angeles International Airport

| Control method | Time, years | Initial cost, $10^6$ dollars | Annual operating cost change,[a] $10^6$ dollars |
|---|---|---|---|
| 1.  Increase engine speed | 0 | 0 | 8.5 |
| 2.  Increase speed, reduce number | 0.3 | 0 | -0.7 |
| 3.  Control gate departure | 5 | 15 | -0.4 |
| 4.  Transport passengers | 2.5 | 65 | 5.0 |
| 5.  Tow aircraft | 1 | 1.2 | 0.4 |
| 6.  Reduce APU operation | 0.5 | 1.3 | 1.5 |

[a]Minus sign indicates an estimated savings

providing that operational and safety requirements can be met.

## COMPARATIVE EVALUATION OF EMISSION CONTROL METHODS

The engine and ground operation modifications just discussed can be compared in terms of effectiveness, cost, and implementation time. A "potential benefit factor" has been defined to allow comparison of cost/benefit of the emission control methods. The potential benefit factor (PBF) is the net emission reduction resulting from a particular control strategy, averaged over the next 20 years, divided by the cost.

$$PBF = \frac{FYE \times CE \times ECF}{CP}$$

where FYE is the fraction of the next 20 years that the control method is effective; CE is the control method effectiveness (the percentage reduction of a particulate pollutant); ECF is the emission contribution fraction (percentage of total aircraft emissions at relevant airports contributed by engines affected by this control strategy); and CP is the cost of the control strategy for the pollutant considered. Emissions at major carrier airports were used to determine effectiveness of turbine engine control methods and those at general aviation airports to determine effectiveness of piston engine emission control methods.

The potential benefit factor is a measure of the cost-effectiveness of each control strategy. Potential benefit factors (Table 31) have been calculated for the control strategies previously described as applied to (1) retrofitting in-use aircraft, (2) modifying new engines of present models, and (3) incorporating control methods in new engine designs. The higher numbers represent the most cost-effective strategies for emission reduction.

The potential benefit factors in Table 31 are a composite for all turbine and piston engines. Although these factors indicate the relative merits of the control methods, the factor for an individual engine classification may be significantly different. For example, retrofit of water injection for class T3 shows a potential benefit factor of 4.2, whereas the average for all turbine engines is only 1.4. Additionally, while some control strategies show a high potential benefit number, other strategies must also be used to achieve significant emission reductions. For example, fuel venting represents from 4 to 20% of total hydrocarbon emissions, dependent upon airport considered.

76

Table 31

Comparison of Emission Control Methods

| Control Method | Potential Benefit Factor | | |
|---|---|---|---|
| | HC & CO | $NO_x$ | Smoke |
| Turbine Engines | | | |
| A. Retrofit-Engine Modifications | | | |
| 1. Minor combustion chamber redesign (APU) | 0.37 (2.5) | 0.37 | 0.37 |
| 2. Major combustion chamber redesign (T3 and APU) (T2 only) | 0.3 | 1.1 (6.6) | 1.1 (5.0) |
| 3. Fuel drainage control (T2 and T3 only) | 10 (20) | -- | -- |
| 4. Divided fuel supply | 1.5 | -- | -- |
| 5. Water injection (T3 only) | -- | 1.4 (4.2) | -- |
| 6. Compressor air bleed | 1.3 | -- | -- |
| B. New Production Engine Modification | | | |
| 1. Minor combustion chamber redesign | 5.0 | 5.0 | 5.0 |
| 2. Major combustion chamber redesign | 4.6 | 4.6 | 4.6 |
| 3. Fuel drainage control | 30 | -- | -- |
| 4. Divided fuel supply | 5.0 | -- | -- |
| 5. Water injection (T3 only) | -- | 1.4 (4.2) | -- |
| 6. Compressor air bleed | 4.0 | -- | -- |
| C. Future Engine Emission Control | | | |
| 1. Fuel drainage control | 30 | -- | -- |
| 2. Divided fuel supply | 15 | -- | -- |
| 3. Water injection (T3 only) | -- | 2.0 (5.6) | -- |
| 4. Compressor air bleed | 15 | -- | -- |
| 5. Variable geometry combustion chamber | 25 | 25 | 25 |
| 6. Staged injection combustor | 25 | 25 | 25 |
| D. Ground Operations Modification | | | |
| 1. Increase engine idle speed | 2.4 | -- | -- |
| 2. Increase speed, reduce number | $10^5$ | -- | -- |
| 3. Eliminate delays | 10 | -- | -- |
| 4. Transport passengers | 0.1 | -- | -- |
| 5. Tow aircraft | 75 | -- | -- |
| 6. Reduce APU operation | 1.0 | -- | -- |
| Piston Engine | | | |
| A. Retrofit-Engine Modification | | | |
| 1. Fuel-air ratio control | 50 | -- | -- |
| 2. Air injection | 5 | -- | -- |
| 3. Thermal reactor | 2 | -- | -- |

77

Table 31 (Cont.)

Comparison of Emission Control Methods

| Control Method | Potential Benefit Factor | | |
|---|---|---|---|
| | HC & CO | $NO_x$ | Smoke |
| 4. Catalytic reactor | 1.5 | -- | -- |
| 5. Direct-flame afterburner | 1 | -- | -- |
| 6. Water injection | 2 | -- | -- |
| 7. Positive crankcase ventilation | 3 | -- | -- |
| 8. Evaporative emission control | 1.5 | -- | -- |
| B. New Production Engine Modifications | | | |
| 1. Fuel-air ratio control | 500 | -- | -- |
| 2. Air injection | 30 | -- | -- |
| 3. Thermal reactor | 6.6 | -- | -- |
| 4. Catalytic reactor | 5.0 | -- | -- |
| 5. Direct-flame afterburner | 3.3 | -- | -- |
| 6. Water injection | 15 | -- | -- |
| 7. Positive crankcase ventilation | 50 | -- | -- |
| 8. Evaporative emission control | 3.0 | -- | -- |
| C. Future Engines | | | |
| 1. Fuel-air ratio control | 500 | -- | -- |
| 2. Air injection | 30 | -- | -- |
| 3. Thermal reactor | 6.6 | -- | -- |
| 4. Catalytic reactor | 5.0 | -- | -- |
| 5. Direct-flame afterburner | 3.3 | -- | -- |
| 6. Water injection | 15 | -- | -- |
| 7. Positive crankcase ventilation | 50 | -- | -- |
| 8. Evaporative emission control | 6.0 | -- | -- |
| 9. Engine redesign | 25 | -- | -- |
| D. Ground Operations Modifications | | | |
| 1. Eliminate delays | 10 | -- | -- |

78

Consequently, to achieve substantial reduction cf hydrocarbon emissions a less attractive control method is necessary in addition to eliminating fuel venting.

A review of the PBF values in Table 31 supports the following conclusions providing that all operational and safety requirements can be met:

(1) Modification 2 for ground operation procedures is the most cost-effective method of reducing hydrocarbon and carbon monoxide emissions from turbine engines,

(2) Incorporating emission control methods into design of new engines is the most cost-effective method of over-all aircraft emission control.

(3) Control of fuel-air ratio is the most cost-effective method of reducing hydrocarbon and carbon monoxide emissions from piston engines.

(4) Retrofits of class T3 turbines is a more cost-effective method for NOx control compared to retrofit of other turbine engine classes.

(5) Fuel drainage control has high PBF because of extremely low cost of implementation (CP) rather than high control effectiveness (CE).

Because cost-effectiveness varies significantly among engine classes and control strategies, several factors in addition to cost and effectiveness must be considered in developing emission control strategies for aircraft engines.

## EMISSION MEASUREMENT TECHNOLOGY

Reliable methods for measuring the rates at which pollutants are emitted from aircraft engines are required for the support of an emission-control program. Emission measurements are required for evaluating the effectiveness of control methods, and specific measurement methods must be incorporated in emission-control standards.

The state of emission-measurement technology has been assessed to determine whether measurement techniques are sufficiently well advanced to support the development of emission-control methods and the implementation of emission standards for aircraft engines. The conclusion drawn from this assessment is that current measurement technology will meet the requirements of an emission-control program. Although measurement techniques for particulate emissions

are inadequate at present, improv d techniques are being
developed through cooperative go    rnment-industry action.

Measurement of emission rates from an aircraft engine
involves three major requirements:

(1) A test procedure specifying engine operating
conditions.

(2) A sampling technique for obtaining a
representative sample of exhaust gas.

(3) Analytical instrumentation for determining
pollutant concentrations in the exhaust-gas sample.

Aircraft engine manufacturers, FAA, and EPA are devoting
substantial effort toward meeting these requirements for
measuring emissions from turbine engines.

Sampling and Test Procedures

Obtaining a representative sample of exhaust gas from an
aircraft engine for analysis of emission  ites is a complex
and difficult procedure.  Sampling emissions from turbine
engines is difficult at the outset because of the jet-blast
environment in which the sampling equipment must be
installed.  Beyond this problem, the following factors all
significantly affect the composition of the exhaust sample:

(1) Engine power level.

(2) Temporal and spatial variations in exhaust
composition.

(3) Sampling-line diameter, length, material, and
temperature.

(4) Ambient temperature and humidity.

(5) Ambient pollutant levels.

Procedures for sampling and analyzing turbine-engine
exhaust gases have been under development for several years
by engine manufacturers, FAA, and EPA.  More recently, the
Society of Automotive Engineers Aircraft Exhaust Emission
Measurement (E-31) Committee has been formed to standardize
these procedures.  Standardization of measurement techniques
will minimize variations resulting from the factors listed
above; however, the several sources of error in collecting
exhaust samples and the variability of samples among

80

different engines must be considered in the establishment of
a standard emission measurement procedure.

Sampling requirements for aircraft piston engines are
similar to those for automobile engines. The exhaust gases
are well mixed by the time they reach the exhaust stack
exit. Consequently, no factors are apparent, beyond those
already recognized as affecting automobile exhaust
emissions, that would cause variability in exhaust samples
from aircraft piston engines. Differences in engine
operation, however, must be considered in the establishment
of a standard emission measurement procedure.

Emissions Measurement Instrumentation

Measuring the concentrations of most gaseous pollutants
in exhaust samples from aircraft engines is generally within
the capabilities of existing instruments and should remain
so, even when engines are modified to reduce emission rates.

The various types of instruments that are available and
in current use for aircraft emission measurement have been
reviewed. Instruments that appear to be most suitable for
measuring turbine-engine emissions at the present time are
presented in Table 32.

81

Table 32

Instrumentation for Measurement
of Turbine Engine Emissions

| Measurement method | Pollutant class |
|---|---|
| Non-dispersive infrared (NDIR) | CO and $CO_2$ |
| Heated flame ionization | THC |
| Chemiluminescence | NO |
| Chemiluminescence[a] | $NO_2$ |
| SAE smokemeter (ARP1179) | Smoke |
| None | Particulates |
| Determined from fuel analysis | $SO_2$ |
| 3-MBTH | Aldehydes |
| Human odor panel | Odor |

[a]The non-dispersive ultraviolet instrument (NDUV)
may also prove acceptable for $NO_2$ measurement

# APPENDIX A:
# ANALYSIS OF CARBON MONOXIDE CONCENTRATION
# AT LOS ANGELES INTERNATIONAL AIRPORT

When continuous air quality monitoring data is available, statistical analysis may be applied to determine frequencies of occurrence of any concentration for any averaging time either by interpolation of the data or by extrapolation if the available data is limited. It has been observed that all air quality data regardless of averaging time follows a log normal distribution.[13]

The continuous carbon monoxide data taken at LAX during six months in 1970 were analyzed statistically for 1-hour and 8-hour averaging times at several sites to determine the expected frequencies when the NAAQS would be exceeded. With the use of the simple rollback technique, adjusted frequencies could be determined for changes in emissions and various control strategies for aircraft and non-aircraft emission sources. Dispersion modeling results were used to predict the degree of influence aircraft emissions have in locations beyond the boundaries of Los Angeles Airport.

The analysis focused on the 8-hour exposure case in areas adjacent to the airport where it would be expected that people would meet the exposure time criteria either as residents or business employees. The 1-hour exposure case would apply to the terminal area itself as well as the areas considered in the 8-hour averaging time case.

Corrections were made to the available ambient data because of the recognized seasonal variation of carbon monoxide levels in the Los Angeles basin. A recent report published by the LAAPCD contained sufficient data to calculate the summer-winter correction factors for the hourly and 8-hour averaging times. The average correction factors for the basin to convert August-September data to December-January data were found to be 1.5 for the 1-hour data and 1.9 for the 8-hour case.

Data and statistical information on carbon monoxide analysis presented in a paper by Larsen[31] were also utilized in this phase of the analysis. The L. A. basin CO data in the Larsen paper were used to check the LAX data for consistency

83

in terms of the frequency and range of observed carbon
monoxide levels. Tabulated and plotted data in this
reference indicate the air pollution hot spot represented by
the Los Angeles Airport and its environs. Figure A-1, taken
from the reference shows this point quite clearly. Figure 1
in the main text of this report indicates the location of
the continuous ambient carbon monoxide stations. Station
209 was chosen as representative of an off airport site for
the 8 and 1-hour analysis. Figure A-2 shows the plot of the
raw station 209 data for the months of August and September.

It is obvious that station 209 is directly influenced by the
airport only when the wind is blowing from a westerly
direction. The September data were categorized into East or
West influences and the results are plotted on Figure A-3.
It can be seen that the composite plot is representative of
both these subcategories and therefore was used for all
subsequent analysis. It further demonstrates that the
airport exerts the same impact on the air quality at station
209 as the non-airport area sources surrounding it. Figure
2, in the text of the report, shows the August station 209
frequency distributions for maximum 8-hour daily averages
adjusted for the summer-winter correction factor. The
frequency of occurrence relating to one day per quarter is
assumed to be equivalent to the one day per year frequency
associated with the 8-hour NAAQS because it can be assumed
that the worst exposure case would occur during the winter
quarter of the year. This plot has then been adjusted
(Figures A-4 and A-5) for expected rollback emission
reductions of non-aircraft sources in combination with
various percent contributions due to due to aircraft sources
and assumed levels of aircraft emission controls. Similar
methodology was used in estimating expected 1980 CO
concentrations with various aircraft contributions. These
are given in the main text. Modeling results were used to
determine the relating distribution and magnitude of
aircraft emissions around LAX. It can be seen that the
station 209 analysis is quite representative of other areas
adjacent to LAX where adverse influences of aircraft
operations can be expected to occur.

The same procedures were followed in plotting the adjusted
September data to determine the frequency with which the
standard would be expected to be exceeded for various
percent aircraft contributions. This data would represent
the upper limits of the analysis.

Similar frequency analysis can be performed for the 1-hour
exposure case. However, unless there is extreme variation
between the slopes (or standard geometric deviations) of the

FIGURE A-1.

MAXIMUM ANNUAL 8-HOUR-AVERAGING-TIME CONCENTRATION OF
CARBON MONOXIDE EXPECTED AT VARIOUS SITES IN THE LOS ANGELES AREA.





FIGURE A-2

BASELINE DATA, DAILY MAXIMUM 8-HR. AVERAGE
CO CONCENTRATIONS, STATION 209, LAX, 1970



FIGURE A-3
FREQUENCY DISTRIBUTION FOR 8-HR. CO DATA, STATION 209, LAX, SEPTEMBER 1970

Key
o - easterly wind influence.
Δ - westerly wind influence.

8-HOUR CO CONCENTRATION (ppm)

Probability (%) of exceeding the given pollutant level.

FIGURE A-4

EXPECTED CO CONCENTRATION DISTRIBUTION, WINTER, STATION 209, LAX
FOR 80 PERCENT AIRCRAFT CONTRIBUTION



FIGURE A-5

EXPECTED CO DISTRIBUTION, WINTER, STATION 209, LAX
FOR 20 PERCENT AIRCRAFT CONTRIBUTION

1-hour data and the 8-hour averaging time data, the 1-hour
standard will be met if the strategies are imposed to meet
the 8-hour standard.  This would appear to be the case in
those areas at LAX where the 1-hour CO levels are higher
than the standard at the present time.

# APPENDIX B:

# DISPERSION MODELING METHODOLOGY AND

# ISOPLETH DERIVATION

The primary and most direct method of estimating aircraft contributions to air pollutant concentrations involved the application of frequently used dispersion modeling procedures to estimate air pollutant concentrations caused by aircraft alone and by all sources located in the airport vicinity (within a 10-kilometer radius of the airport center).  Dispersion models similar to the one used in this study are specified by EPA as one means of showing that implementation plans for certain regions will be adequate to meet the ambient air quality standards.  Much of the analysis of aircraft air quality impact presented in this report is based on modeling work performed, under EPA contract, by Northern Research and Engineering Corporation. A general description of the modeling procedure is presented here; a more detailed account of the modeling work and results is available in the contract report.[3]

The procedure in the modeling study involved: (1) approximating emission sources as continuous, stationary point sources of constant strength over the time period being considered, (2) modeling the dispersion of pollutants from these sources using an empirical mathematical model, and (3) estimating concentrations at specified receptor points by summing the pollutant contributions from each point source, and (4) constructing isopleths of estimated pollutant concentrations based on the estimated receptor point concentrations.

The point sources used in the modeling approximated the location and strength of emission sources at each of the four airports studied.  Lines along which automobile or aircraft movement occur were represented by series of point sources.  Area sources, representing airport surroundings out to a 10-kilometer radius from the airport center, were represented by circular arrangements of point sources around the airports.  Altogether, 149 to 276 point sources were used for each air carrier airport, depending on the size and complexity of the airport.  The number of sources was chosen to provide a reasonable approximation of emissions at the

91

airport and in the vicinity without need for excessive
computer time or computer program complexity.

The basis of the atmospheric dispersion modeling is an
empirical, mathematical approximation of pollutant
dispersion after emission from a point source.  This
approximation yields a plume whose concentration
distribution is Gaussian in the vertical and crosswind
direction.  The distribution is dependent upon downwind
distance from the source and on atmospheric stability.
Eventually the upper boundary of the atmospheric mixing
layer restricts vertical spread of the plume and modifies
the distribution of pollutants in the vertical direction.
This dispersion model should be considered as a general
approximation of airport dispersion patterns; considerable
model development would be required to include more detailed
small-scale dispersion patterns, such as those around large
buildings or near jet blasts.

In calculation of long-term concentrations, the fact
that there is a distribution of meteorological conditions is
used to simplify the basic dispersion model.  The result,
known as the Martin-Tikvart model, approximates plume spread
in the crosswind direction and sums the contributions of all
combinations of wind speeds and atmospheric stabilties.

The concentration at any receptor point is obtained as
the sum of the contributions from each point source of
emissions.  The accuracy of the concentration value for this
type of model is dependent upon the proximity of the
receptor point and the emission sources.  Because the
sources of emission are actually a collection of points,
lines areas, and volumes, rather than merely a collection of
points, as assumed in the model, greater accuracy general'
results when the receptor point is not close proximity to
any sources.  To limit inaccuracies attributable to the
point source, receptor locations within 100 meters of a
point source were not considered in the results.

The model provided estimates of air pollutant
concentrations both from aircraft alone and from all sources
at a number of sites located in and around the selected
airports.  Receptors considered in this study were located
according to the following overall scheme at air carrier
airports: (1) one receptor at the center of each major
terminal, (2) one receptor 100 meters from the head of each
runaway, (3) sixteen receptors on the airport boundary,
spaced equally on a compass rose located at the designated
center of the airport, and (4) sixteen more receptors
located in the airport surroundings, 5 kilometers from the

92

center of the airport and spaced equally on the compass
rose.  Not more than 50 receptors were used, the actual
number depending on the number of terminals and runways at
each airport.

The resulting concentrations at the various receptor points
were used in constructing isopleths of pollutant
concentration.  Isopleths were constructed for 6-9 a.m.
hydrocarbon and annual NOx concentrations due to aircraft
alone, and for aircraft contributions to total CO
concentrations.

The model input data used in calculating annual
concentrations of NOx were based on yearly distributions of
wind direction, stability class and wind speed class, and
annual average values of mixing height and emission rates.
The short-term meteorological and activity conditions used
to calculate the 8-hour and 1-hour CO conditions and the 6-9
a.m. hydrocarbon concentration were chosen to be
representative of conditions that would be expected to yield
high concentrations of these pollutants, i.e., low wind
speed, high atmospheric stability, and low mixing height,
and moderate to high aircraft activity.  The conditions for
calculation of short-term concentrations are presented in
Table B-1.

Because the results of the model have not been
extensively validated or verified, the concentrations
generated by the model should be considered to be very
approximate.  They are useful, however, in indicating
general pollutant concentration levels of the extent of
aircraft contributions to localized pollutant concentration.

TABLE B-1

SHORT-TERM METEOROLOGICAL AND ACTIVITY CONDITIONS

|  | 6-9 A.M. HC at L.A. Airport | 8-Hour CO at L.A. Airport[a] | LAX | 1-Hour CO ORD | JFK | DCA |
|---|---|---|---|---|---|---|
| Wind speed class | 1 | 1 | 1 | 1 | 1 | 1 |
| Stability class (Turner) | C | E | E | F | E | E |
| Wind direction, deg. | 255 | 255 | 90 | 215 | 200 | 320 |
| Wind variability, deg. | 20 | 20 | 40 | 30 | 10 | 20 |
| Mixing height, m. | 200 | 200 | 535 | 700 | 960 | 980 |
| Aircraft activity, LTO cycles. | 60 (1970) 79 (1980) | 260 | 54 | 49 | 30 | 34 |
| Direction of movement | West | West | E | SW | S | N |
| Idle time at runway, sec. | 60 | 150 | 240 | 260 | 540 | 300 |
| Estimated annual frequency of occurrence of meteorological conitions | at least once | | 81 | 29[b] | 10 | 67 |

[a] These conditions are used in estimating ratios between aircraft generated and total 8-hour CO concentrations; the ratios are not sensitive to the conditions assumed.
[b] Based on 5 months of data.

94

# APPENDIX C:

# AREA – SOURCE DISPERSION MODELING TO ESTIMATE

# DOWNWIND POLLUTANT CONCENTRATIONS

The modeling method used in this analysis involved approximating emissions both at airports and in surrounding areas as area sources, and relating these emissions to downwind pollutant concentrations by assuming Gaussian pollutant distribution in the vertical and crosswind directions. For each receptor point, the concentration caused by small-area elements was determined by integrating in the crosswind and upwind directions over each source region. The airport and surroundings were considered as separate source regions. The concentrations due to these two source regions were calculated separately then added together to obtain the total concentration at each receptor. Near the airport source, concentrations are the same as those from an area source of infinite extent.[32] At greater distances, edge effects caused by the finite width of the airport are considered by including the integration in the cross-wind direction. Also included is the limit to vertical mixing imposed by a more stable layer aloft.

For the purpose of this modeling, the airport was assumed to cover an area of 3.2 by 3.2 kilometers. The time period for the analysis, 8 a.m. to 11 a.m., was selected on the basis of recurring meteorological conditions conducive to high air pollutant concentrations. A diurnal correction factor was applied to the resulting concentrations to correct for the disproportionately greater amount of activity that occurred during this 3-hour period than occurred during other 3-hour periods during the day. The specific meteorological conditions used for the time period considered were: wind from west; stability class = 3, wind speed = 1.5 m/second mixing height = 200 m. These conditions are representative of severe conditions, from an air pollution standpoint, that are expected to occur at least once a year in the Los Angeles area.

# REFERENCES

1. Nature and Control of Aircraft Engine Exhaust Emissions. Report of the Secretary of Health, Education, and Welfare to the United States Congress. December 1968.

2. Jet Aircraft Emissions and Air Quality in the Vicinity of the Los Angeles International Airport. Air Pollution Control District, County of Los Angeles, California. April 1971.

3. The Potential Impact of Aircraft Emissions Upon Air Quality. Northern Research and Engineering Corporation. Final Report to the U. S. Environmental Protection Agency. Research Triangle Park, North Carolina. Contract Number 68-02-0085. December 1971.

4. Assessment of Aircraft Emission Control Technology. Northern Research and Engineering Corporation. Final Report to the U. S. Environmental Protection Agency. Research Triangle Park, North Carolina. Contract Number 68-04-0011. September 1971.

5. Analysis of Aircraft Exhaust Emission Measurements. Cornell Aeronautical Laboratory. Available from NTIS--PB 204-879. Contract Number 68-04-0040. October 1971.

6. National Primary and Secondary Ambient Air Quality Standards. Environmental Protection Agency. Federal Register 36(84):8187, April 30, 1971.

7. Air Quality Criteria for Hydrocarbons. U. S. DHEW, PHS, EHS, National Air Pollution Control Administration. Publication Number AP-64. Washington, D. C. March 1970.

8. Federal Air Quality Control Regions. Environmental Protection Agency, Office of Air Programs, Research Triangle Park, North Carolina. Publication Number AP-102. January 1972.

9. Requirements for Preparation, Adoption, and Submittal of Implementation Plans. Environmental Protection Agency. Federal Register 36(158):15486, August 14, 1971.

10. Mixing Heights, Wind Speeds, and Potential for Urban Air Pollution Throughout the Contiguous United States. Environmental Protection Agency, Office of Air Programs, Research Triangle Park, North Carolina. Publication Number AP-101. January 1972.

11. Climatography of U. S., Summary of Observations for Los Angeles International Airport, 1951-1960. U. S. Department of Commerce, Weather Bureau. Washington, D. C. 1962.

12. The State of California Implementation Plan for Achieving and
    Maintaining the National Ambient Air Quality Standards. California
    Air Resources Board. Sacramento, California. January 1972.

13. A Mathematical Model for Relating Air Quality Measurements to Air
    Quality Standards. Environmental Protection Agency, Office of Air
    Programs, Research Triangle Park, North Carolina. Publication
    Number AP-89. November 1971.

14. Nature and Control of Aircraft Engine Exhaust Emissions. Northern
    Research and Engineering Corporation. Final Report to the National
    Air Pollution Control Administration. Durham, North Carolina.
    Contract Number CPA 222-68-27. November 1968.

15. A Study of Aircraft Gas Turbine Engine Exhaust Emissions. Aerospace
    Industries Association. Washington, D. C. August 1971.

16. Collection and Assessment of Aircraft Emissions Baseline Data -
    Turbo-prop Engines. Detroit Diesel Allison Division (GMC). Avail-
    able from NTIS--PB 202-961. Contract Number 68-04-0029. September
    1971.

17. Exhaust Emissions Test: AiResearch Aircraft Propulsion and Auxiliary
    Power Gas Turbine Engines. AiResearch Division Garrett Corporation.
    Available from NTIS--PB 204-920. Contract Number 68-04-0022.
    September 1971.

18. Assessment of Aircraft Emission Control Technology. Northern
    Research and Engineering Corporation. Available from NTIS--PB 204-878.
    Contract Number 68-04-0011. September 1971.

19. Collection and Assessment of Aircraft Emissions - Piston Engines.
    Teledyne Continental Motors. Available from NTIS--PB 204-196.
    Contract Number 68-04-0035. October 1971.

20. Analysis of Aircraft Exhaust Emission Measurements: Statistics.
    Cornell Aeronautical Laboratory. Available from NTIS--PB 204-869.
    Contract Number 68-04-0040. November 1971.

21. A Study of Aircraft Powerplant Emissions (Piston and Turbine).
    Scott Research Laboratories, Inc. Available from NTIS--PB 207-107.
    Contract Number 68-04-0037. January 1971.

22. Collection and Assessment of Aircraft Emissions Baseline Data -
    Turbine Engines. Pratt and Whitney Aircraft. Available from NTIS--
    PB 207-321. Contract Number 68-04-0027. February 1972.

23. A Field Survey of Emissions from Aircraft Turbine Engines.  U. S.
    Bureau of Mines, RI 7634.  Bartlesville Energy Research Center,
    Bartlesville, Oklahoma.

24. Gaseous Emissions from a Limited Sample of Military and Commercial
    Aircraft Turbine Engines.  Southwest Research Institute.  Available
    from NTIS--PB 204-177.  Interim Report, Contract Number EHS 70-108.

25. A Study of Exhaust Emissions from Reciprocating Aircraft Power
    Plants.  Scott Research Laboratories.  Available from NTIS--PB 197-627.
    Contract Number CPA 22-69-129.  December 1970.

26. Design Criteria for Control of Nitrogen Oxide Emissions from Air-
    craft Turbine Engines.  Ronald S. Fletcher, Richard D. Siegel, and
    E. Karl Bastress.  Northern Research and Engineering Corporation.
    Report Number 1162-1.

27. Time Requirements for Retrofitting Jet Aircraft with Improved
    Combustor Design.  Northern Research and Engineering Corporation.
    Final Report to National Air Pollution Control Administration,
    Durham, North Carolina.  Contract Number CPA 22-69-90.  July 1969.

28. Reduction of Nitrogen Oxides from Gas Turbines by Steam Injection.
    N. R. Dibelius, M. B. Hilt, and R. H. Johnson.  ASME Paper 71-67-58,
    American Society of Mechanical Engineers.

29. A Study of Exhaust Emissions from Reciprocating Aircraft Power
    Plants.  Scott Research Laboratories, Inc.  Scott Project Number 1136.
    Final Report to the U. S. Environmental Protection Agency.  Research
    Triangle Park, North Carolina.  Contract Number CPA 22-69-129.
    December 1970.

30. Profile of Air Pollution Control. County of Los Angeles, Air Pollution
    Control District.  1971.

31. Ambient Carbon Monoxide Exposures.  R. I. Larsen and H. W. Burke.
    APCA 69-167, Air Pollution Control Association.  June 1969.

32. A Simple Method of Calculating Dispersion for Urban Areas.  Steven R.
    Hanna.  Journal of the Air Pollution Control Association, 21(12):774-
    777.  December 1971.

☆U.S. GOVERNMENT PRINTING OFFICE: 1973 514-151/133 1-3

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FRIENDS OF THE EARTH | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ No. 1: 12-cv-00363(ABJ) |
| | ) | |
| UNITED STATES ENVIRONMENTAL | ) | |
| PROTECTION AGENCY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MARIANNE L. ENGELMAN LADO
BRIDGET M. LEE
Admitted *pro hac vice*
Earthjustice
156 William Street, Suite 800
New York, NY 10038
(212) 791-1881
(212) 918-1556 [*FAX*]
mengelmanlado@earthjustice.org
blee@earthjustice.org

TIMOTHY D. BALLO
D.C. Bar No. 977077
Earthjustice
1625 Massachusetts
Avenue NW, Suite 702
Washington, DC 20036
(202) 667-4500
(202) 667-2356 [*FAX*]
tballo@earthjustice.org

HELEN KANG
DEBORAH BEHLES
Golden Gate University
School of Law
Environmental Law and
Justice Clinic
536 Mission Street
San Francisco, CA 94105
(415) 442-6647
(415) 896-2450 [*FAX*]
hkang@ggu.edu
dbehles@ggu.edu

*Counsel for Friends of the Earth*

Dated: September 14, 2012

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ..................................................................................................... 1

I.    FACTUAL AND REGULATORY BACKGROUND ........................................... 2

    A.    EPA Has Long Known that Lead Air Pollution Endangers Human Health and Has Repeatedly Regulated Lead Emissions. ........................................ 2

    B.    EPA Has Recognized the Contribution to Overall Lead Air Pollution Made by Lead Emissions from Aircraft Engines. ...................................... 5

II.    LEGAL STANDARD ........................................................................................ 7

III.    ARGUMENT .................................................................................................... 7

    A.    EPA Has a Mandatory Duty to Determine Whether Emissions from Aircraft Cause or Contribute to Air Pollution that May Endanger Public Health or Welfare. ................................................................................. 7

        1.    The Plain Meaning and Structure of Section 231 Establishes a Mandatory Duty that EPA Undertake an Endangerment Determination ................................................................................. 8

        2.    EPA's Ability to Exercise Discretion in Making an Endangerment Determination Does Not Diminish Its Mandatory Duty to Conduct Such Determination. ............................................................... 13

        3.    The Legislative History of the Clean Air Act Supports the Plain Meaning of Section 231, Which Imposes a Mandatory Duty to Conduct an Endangerment Determination. ...................................... 16

    B.    EPA Has a Mandatory Duty to Make an Endangerment Determination Specifically for Lead. ......................................................................... 19

    C.    Sovereign Immunity Does Not Apply When EPA Has a Mandatory Duty............................................................................................. 24

CONCLUSION...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alaska Department of Environmental Conservation v. EPA,*
    540 U.S. 461 (2004)...................................................................................................13

*Allied Pilots Association v. Pension Benefit Guarantee Corporation,*
    334 F.3d 93 (D.C. Cir. 2003) ..................................................................................9, 12

*America's Community Bankers v. F.D.I.C.,*
    200 F.3d 822 (D.C. Cir. 2000) .................................................................................12

*American Lung Association v. Reilly,*
    962 F.2d 258 (2d Cir. 1992)................................................................................15, 17

*American Trucking Associations v. EPA,*
    175 F.3d 1027 (D.C. Cir. 1999) ...............................................................................15

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)......................................................................................................7

*Beaty v. Food & Drug Administration,*
    --- F. Supp. 2d --, 2012 WL 1021048 (D.D.C. Mar. 27, 2012) ...............................11

*Bennett v. Spear,*
    520 U.S. 154 (1997)..................................................................................................9, 14

*Bloomgarden v. Coyer,*
    479 F.2d 201 (D.C. Cir. 1973) ...................................................................................7

*Burnett v. Al Baraka Investment & Development Corporation,*
    274 F. Supp. 2d 86 (D.D.C. 2003) ...........................................................................12

*Center for Biological Diversity v. EPA,*
    794 F. Supp. 2d 151 (D.D.C. 2011) .................................................................. passim

*Center for Biological Diversity v. U.S. Fish & Wildlife Service,*
    450 F.3d 930 (9th Cir. 2006) ....................................................................................11

*Chamber of Commerce v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996) ..................................................................................24

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
    467 U.S. 837 ...............................................................................................................16

*Coalition for Responsible Regulation v. EPA,*
  684 F.3d 102 (D.C. Cir. 2012) .................................................................................................21

*Environmental Defense Fund v. Thomas,*
  870 F.2d 892 (2d Cir. 1989) ...............................................................................................14, 15

*Ethyl Corporation v. EPA,*
  541 F.2d 1 (D.C. Cir. 1976) .....................................................................................8, 18, 20, 23

*Harrison v. PPG Industries,*
  446 U.S. 578 (1980) .................................................................................................................16

*Lane v. Pena,*
  518 U.S. 187 (1996) .................................................................................................................25

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
  523 U.S. 26 (1998) ...................................................................................................................12

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ...........................................................................................................14, 21

*Montgomery v. Chao,*
  546 F.3d 703 (D.C. Cir. 2008) ...................................................................................................7

*National Association of Clean Air Agencies v. EPA,*
  489 F.3d 1221 (D.C. Cir. 2007) ....................................................................................11, 14, 17

*Natural Resources Defense Council, Inc. v. Train,*
  545 F.2d 320 (2d Cir. 1976) .....................................................................................................20

*Pennsylvania v. Del. Valley Citizens' Council for Clean Air,*
  483 U.S. 711 (1987) .................................................................................................................16

*Porto Rico Railway, Light & Power Co. v. Mor,*
  253 U.S. 345 (1920) ...................................................................................................................9

*Ruckelshaus v. Sierra Club,*
  463 U.S. 680 (1983) .................................................................................................................16

*Sea-Land Service, Inc. v. Alaska Railroad,*
  659 F.2d 243 (D.C. Cir. 1981) .................................................................................................24

*Sierra Club v. EPA,*
  850 F. Supp. 2d 300 (D.D.C. 2012) .........................................................................................24

*Sierra Club v. Leavitt,*
  355 F. Supp. 2d 544 (D.D.C. 2005) ....................................................................................15, 24

iv

*Trudeau v. Federal Trade Commission,*
    456 F.3d 178 (D.C. Cir. 2006) ........................................................................24

*United States ex rel. Totten v. Bombardier Corporation,*
    380 F.3d 488 (D.C. Cir. 2004) ..................................................................12, 13

**STATUTES**

5 U.S.C. § 702 ..................................................................................................24

42 U.S.C. §§ 7401–7671(q) .................................................................................8

42 U.S.C. § 7408(1)(A) ........................................................................................2

42 U.S.C. § 7412(b)(1) ......................................................................................23

42 U.S.C. § 7571(a) ....................................................................9, 11, 17, 22

42 U.S.C. § 7571(a)(1) .......................................................................................10

42 U.S.C. § 7571(a)(2)(A) ........................................................................8, 19, 21

42 U.S.C. § 7571(a)(3) .................................................................................10, 11

42 U.S.C. § 7602(g) ...........................................................................................21

Fed. R. Civ. P. 56(a) ............................................................................................7

**LEGISLATIVE HISTORY**

H.R. Conf. Rep. No. 95-564 (Aug. 3, 1977) .................................................18, 23

H.R. Rep. No. 91-1146 (Dec. 31, 1970) .............................................................17

H.R. Rep. No. 95-294 (May 12, 1977) ..............................................14, 18, 19, 23

Pub. L. No. 91-604, § 231(a)(1)–(2); 84 Stat. 1676, 1703–04 (Dec. 31, 1970) .....17, 23

Pub. L. No. 95-95, § 401(f); 91 Stat. 685, 791 (Aug. 7, 1977) .................17, 22, 23

**REGULATIONS AND FEDERAL REGISTER ENTRIES**

14 C.F.R. § 34.61 ...............................................................................................20

40 C.F.R. § 87.21 .........................................................................................20, 21

40 C.F.R. § 471.13 .............................................................................................23

38 Fed. Reg. 19,088 (July 17, 1973) ..............................................................21, 22

EPA, 1977 Clean Air Act Amendments to Prevent Significant Deterioration, 43 Fed. Reg.
26,388 (June 19, 1978)...........................................................................................................21

EPA, Addition of Lead to List of Air Pollutants, 41 Fed. Reg. 14,921 (Apr. 8, 1976) .............2, 23

EPA, Advance Notice of Proposed Rulemaking on Lead Emission from Piston-Engine
Aircraft Using Leaded Aviation Gasoline, 75 Fed. Reg. 22,440 (Apr. 28, 2010) .................5, 6

EPA, Air Quality Designations for the 2008 Lead (Pb) National Ambient Air Quality
Standards, 75 Fed. Reg. 71,033 (Nov. 22, 2010)........................................................................6

EPA, Air Quality Designations for the 2008 Lead (Pb) National Ambient Air Quality
Standards, 76 Fed. Reg. 72,097 (Nov. 22, 2011)........................................................................6

EPA, Control of Air Pollution from New Motor Vehicles and New Motor Vehicle
Engines; Certification and Test Procedures; Gasoline Lead Content, 53 Fed. Reg. 470
(Jan. 7, 1988)...........................................................................................................................24

EPA, Endangerment and Cause or Contribute Findings for Greenhouse Gases Under
Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496 (Dec. 15, 2009) ("GHG
Endangerment Finding")...........................................................................................................8

EPA, Lead; Identification of Dangerous Lead Levels, 66 Fed. Reg. 1206 (Jan. 5, 2001)...............3

EPA, National Ambient Air Quality Standards for Lead, 73 Fed. Reg. 66,964 (Nov. 12,
2008) .................................................................................................................................3, 4, 5

EPA, National Primary and Secondary Ambient Air Quality Standards for Lead, 43 Fed.
Reg. 46,246 (Oct. 5, 1978)....................................................................................................2, 3

EPA, Petition Requesting Rulemaking to Limit Lead Emissions from General Aviation
Aircraft; Request for Comments, 72 Fed. Reg. 64,570 (Nov. 16, 2007)....................................5

EPA, Prohibition on Gasoline Containing Lead or Lead Additives for Highway Use, 61
Fed. Reg. 3832 (Feb. 2, 1996) ..................................................................................................3

EPA, Regulation of Fuel and Fuel Additives, 47 Fed. Reg. 38,070 (Aug. 27, 1982).....................3

EPA, Regulation of Fuels and Fuel Additives, 37 Fed. Reg. 3882 (Feb. 23, 1972)................20, 23

EPA, Regulation of Fuels and Fuel Additives, 38 Fed. Reg. 1254 (Jan. 10, 1973).............2, 20, 23

**OTHER AUTHORITIES**

EPA, Air Quality Criteria for Lead (June 1986), Docket ID No. EPA-HQ-OAR-2007-
0294-0178 (filed Apr. 28, 2010)...............................................................................................3

EPA, Integrated Science Assessment for Lead (Second External Review Draft) (Feb. 2012), *available at* http://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=235331#Download ................................ 4

EPA, Lead Emissions from the Use of Leaded Aviation Gasoline in the United States, Technical Support Document (Oct. 2008), Docket ID No. EPA-HQ-OAR-2006-0735-5917 (filed Dec. 18, 2009) ........................................................................................................ 7

EPA, Lead Emissions from Use of Leaded Aviation Gasoline, Technical Support Document, Docket ID No. EPA-HQ-OAR-2007-0294-0163 (Oct. 2008) (filed Apr. 28, 2010) ................................................................................................................................ 6

EPA, PBT National Action Plan for Alkyl-lead (June 2002), Docket ID No. EPA-HQ-OAR-2007-0294-0158 (filed Apr. 28, 2010) ............................................................................ 5

EPA, Recommended Best Practice for Quantifying Speciated Organic Gas Emissions from Aircraft Equipped with Turbofan, Turbojet, and Turboprop Engines (May 2009), http://www.epa.gov/nonroad/aviation/420r09901.pdf .................................................. 22

EPA, Table of EPA Initial Nonattainment Designations, http://www.epa.gov/leaddesignations/2008standards/documents/2010-11-16/tableI.html (last visited Sept. 14, 2012) .............................................................................. 7

Friends of the Earth, Supplemental Comment on EPA's ANPR (Feb. 16, 2011), Docket ID No. EPA-HQ-OAR-2007-0294-0498 (filed Feb. 23, 2011) .................................................. 6

Friends of the Earth, Supplemental Comments on EPA's ANPR (Aug. 31, 2011), Docket ID No. EPA-HQ-OAR-2007-0294-0501 (filed Sept. 1, 2011) .................................................. 4

Friends of the Earth, Supplemental Comments on EPA's ANPR (Nov. 28, 2011), Docket ID No. EPA-HQ-OAR-2007-0294-0503 (filed Nov. 30, 2011) ................................................ 6

Marie Lynn Miranda et al., *A Geospatial Analysis of the Effects of Aviation Gasoline on Childhood Blood Lead Levels*, Envtl. Health Perspectives 119 (Oct. 2011), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3230438/ ...................................................... 4

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Pursuant to this Court's Order of August 20, 2012, Plaintiff Friends of the Earth ("FoE")

files this memorandum in opposition to the portion of Defendants' Motion for Summary

Judgment that concerns the threshold issue whether Section 231(a)(2)(A) of the Clean Air Act

imposes a non-discretionary duty to determine whether lead emissions from lead-fueled general

aviation aircraft engines cause or contribute to lead air pollution which may reasonably be

anticipated to endanger public health or welfare. FoE seeks to compel the United States

Environmental Protection Agency and Lisa Jackson, the Agency's Administrator (collectively,

"EPA"), to carry out this duty, which EPA has avoided for decades despite its long recognition

that there is no safe exposure level for lead and that use of aviation gasoline is the largest source

of lead emissions in the United States. Given overwhelming evidence of the grave health effects

caused by human lead exposure and the contribution of aircraft lead emissions to air pollution, it

is unconscionable that EPA has failed to carry out its duty to make an endangerment

determination.

The existence of an enforceable mandatory duty is manifest by the plain meaning and

structure of Section 231(a) and is supported by the legislative history of the Act. An

endangerment determination is a compulsory step within EPA's duty to regulate aircraft

emissions. *Ctr. for Biological Diversity v. EPA*, 794 F. Supp. 2d 151, 158–62 (D.D.C. 2011)

("*CBD*"). Moreover, Section 231(a) specifically requires that EPA study "emissions of air

pollutants from aircraft" and, following such study, that EPA propose emissions standards for

those pollutants. Lead, uncontrovertibly, fits under the definition of "air pollutant," and, indeed,

EPA identified lead as an air pollutant from aircraft when it conducted its Section 231(a)(1)

1

study forty years ago. The plain language, structure, and legislative history of the Act compel

EPA to undertake the endangerment determination as to aircraft lead emissions. For these

reasons, FoE requests that this Court find that EPA has a mandatory duty under Clean Air Act

Section 231(a)(2) and deny EPA's Motion for Summary Judgment.

## I.    FACTUAL AND REGULATORY BACKGROUND

### A. EPA Has Long Known that Lead Air Pollution Endangers Human Health and Has Repeatedly Regulated Lead Emissions.

EPA has repeatedly regulated lead with the growing understanding of lead's toxicity,

particularly its serious adverse impacts on children. In 1973, in recognition of the risks posed by

lead exposure, EPA began to phase out the use of lead in motor vehicle gasoline, noting that the

resulting lead air pollution presented "a significant risk of harm to the health of urban population

groups, especially in children." EPA, Regulation of Fuels and Fuel Additives, 38 Fed. Reg. 1254

(Jan. 10, 1973).

In 1976, under Section 108 of the Clean Air Act, EPA listed lead as a criteria pollutant—

*i.e.*, a pollutant from numerous or diverse sources that endangers public health or welfare. *See*

EPA, Addition of Lead to List of Air Pollutants, 41 Fed. Reg. 14,921 (Apr. 8, 1976); 42 U.S.C.

§ 7408(1)(A). In 1978, EPA promulgated National Ambient Air Quality Standards ("NAAQS")

for airborne lead emissions, concluding that "it remains the Agency's belief that airborne lead

directly and indirectly contributes to the risk of adverse health consequences and that sufficient

clinical and epidemiological evidence is available to form a judgment as to the extent of this

contribution." EPA, National Primary and Secondary Ambient Air Quality Standards for Lead,

43 Fed. Reg. 46,246, 46,250 (Oct. 5, 1978). EPA based its decision on its finding that increases

in airborne lead leads to increases in blood lead levels and that adverse health effects from

2

increased blood lead levels include the "risk of permanent, severe, neurological damage or death." *Id.* at 46,247.

In 1982, EPA reiterated its "concern over the impact of total environmental loadings of lead, including exposures that may result from contaminated soil, dust, water, or foodstuffs . . . [and, thus,] increases in exposure resulting from increased use of lead in gasoline should be avoided." EPA, Regulation of Fuel and Fuel Additives, 47 Fed. Reg. 38,070, 38,076 (Aug. 27, 1982).

In 1986, EPA revised its "Air Quality Criteria" for lead, recognizing that lead is more dangerous than EPA had previously found and concluding that reducing lead air pollution would "result in significant widespread reductions in levels of lead in human blood." EPA, Air Quality Criteria for Lead 1-159 (June 1986), Docket ID No. EPA-HQ-OAR-2007-0294-0178 (filed Apr. 28, 2010). EPA recognized that "young children are at greatest risk for experiencing lead-induced health effects." *Id.*[1]

In 1996, EPA completed its phaseout of the last one percent of lead from automobile gasoline. *See* EPA, Prohibition on Gasoline Containing Lead or Lead Additives for Highway Use, 61 Fed. Reg. 3832 (Feb. 2, 1996).

In 2001, EPA acknowledged that "there is no known threshold for lead." EPA, Lead; Identification of Dangerous Lead Levels, 66 Fed. Reg. 1206, 1215 (Jan. 5, 2001); *see also* 73 Fed. Reg. at 66,984 (acknowledging that "there is now no recognized safe level of [lead] in children's blood").

---

[1] Indeed, in 1991, the Secretary of Health and Human Services characterized lead poisoning as the "number one environmental threat to the health of children in the United States." EPA, National Ambient Air Quality Standards for Lead, 73 Fed. Reg. 66,964, 66,968 (Nov. 12, 2008).

3

In 2008, EPA tightened the air quality standards for lead due to increased evidence of adverse health effects at lower levels than previously thought. *See* 73 Fed. Reg. 66,964. In particular, the Administrator found that "the current evidence indicates the need for a standard level that is substantially lower than the current level to provide increased public health protection, especially for at-risk groups, including most notably children."[2] *Id.* at 66,985. EPA recognized that airborne lead emissions can continue to harm human health for years: "[o]nce deposited out of the air, [lead] can subsequently be resuspended into the ambient air and, because of the persistence of [lead], [lead] emissions contribute to media concentrations for some years into the future." *Id.* at 66,971.

As part of its most recent review of the NAAQS for lead, EPA acknowledged that "[w]ith each successive assessment to-date, the epidemiologic and toxicological study findings show that progressively lower blood [lead] levels or [lead] exposures are associated with cognitive deficits and behavioral impairments." EPA, Integrated Science Assessment for Lead (Second External Review Draft) 2-63 (Feb. 2012), *available at* http://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=235331#Download (last visited Sept. 13, 2012).

As EPA has acknowledged, there is no safe exposure level for lead; even small, discrete doses of emissions can cause adverse health impacts. 73 Fed. Reg. at 66,972 (recognizing that no "safe" threshold exists). The adverse health effects from lead exposure include "neurological,

---

[2] Children who live near sources of airborne lead, such as airports that use leaded aviation gasoline, have increased blood lead levels and, thus, a higher risk of adverse impacts from lead air pollution. *See* Marie Lynn Miranda et al., *A Geospatial Analysis of the Effects of Aviation Gasoline on Childhood Blood Lead Levels*, Envtl. Health Perspectives 119(10) (Oct. 2011), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3230438/ (last visited Sept. 12, 2012) (submitted to EPA on August 31, 2011, *see* Friends of the Earth, Supplemental Comments on EPA's ANPR (Aug. 31, 2011), Docket ID No. EPA-HQ-OAR-2007-0294-0501 (filed Sept. 1, 2011).

4

hematological and immune effects for children and hematological, cardiovascular and renal effects for adults." *Id.* at 66,987. Indeed, EPA has documented both the risk and severity of the effects of lead air pollution on human health. EPA, Advance Notice of Proposed Rulemaking on Lead Emission from Piston-Engine Aircraft Using Leaded Aviation Gasoline, 75 Fed. Reg. 22,440, 22,449 (Apr. 28, 2010) ("Lead has been demonstrated to exert 'a broad array of deleterious effects on multiple organ systems via widely diverse mechanisms of action'" and "has been classified as a probable human carcinogen.").

### B. EPA Has Recognized the Contribution to Overall Lead Air Pollution Made by Lead Emissions from Aircraft Engines.

EPA has recognized that lead is an air pollutant emitted by aircraft since 1972. *See* EPA, Aircraft Emissions: Impact on Air Quality and Feasibility of Control 5 (1972) (attached as Ex. A to the Decl. of Bridget M. Lee (Sept. 14, 2012) and submitted herewith). Ten years ago, EPA also identified aviation gasoline as the largest lead pollution source category in the nation. *See* EPA, Petition Requesting Rulemaking to Limit Lead Emissions from General Aviation Aircraft; Request for Comments, 72 Fed. Reg. 64,570, 64,571 (Nov. 16, 2007) (discussing the results of the 2002 emissions inventory); EPA, PBT National Action Plan for Alkyl-lead (June 2002), Docket ID No. EPA-HQ-OAR-2007-0294-0158 (filed Apr. 28, 2010). In 2010, EPA issued an Advance Notice of Proposed Rulemaking ("ANPR") for lead emissions from aircraft that described information upon which EPA would rely in conducting an eventual endangerment determination. *See* 75 Fed. Reg. at 22,440. The ANPR documents EPA's recognition that lead emissions from aircraft contribute to increased concentrations of lead in the air. *See id.* at 22,457–58 (citing Bill Piazza, Los Angeles Unified School District, Envtl. Health & Safety Board, Santa Monica Municipal Airport: A Report on the Generation and Downwind Extent of Emissions Generated from Aircraft and Ground Support Operations (June 1999), Docket ID No.

EPA-HQ-OAR-2007-0294-0123 (filed Apr. 28, 2010)). Lead from general aviation aircraft engines is released at approximately 20,000 airports throughout the country and represent "the largest single source category for emissions of lead to air, comprising approximately half of the national inventory." *Id.* at 22,440, 22,442. In the ANPR, EPA reported that 779 tons of lead were estimated to have been emitted from aircraft in just one year. *Id.* at 22,453.

Studies confirm the contribution of aircraft emissions to airborne lead pollution, as EPA has acknowledged. For example, in 2006 and 2007, EPA conducted a study at the Santa Monica Airport of lead emissions from piston-engine aircraft. *Id.* at 22,458. EPA reported that "ambient lead increased with increasing proximity to the airport" and that the data from the Santa Monica Airport study "suggest that piston-engine activity can increase ambient lead concentrations in downwind neighborhood sites, resulting in levels that are four to five times higher than background levels and maximum impact site concentrations that are up to 25 times higher than background lead levels." *Id.*

Significantly, airports at which leaded aviation gasoline is used are located in or near each of the twenty areas identified by EPA as failing to meet federal Clean Air Act standards for lead air pollution. *Compare* EPA, Air Quality Designations for the 2008 Lead (Pb) National Ambient Air Quality Standards, 75 Fed. Reg. 71,033 (Nov. 22, 2010), *and* EPA, Air Quality Designations for the 2008 Lead (Pb) National Ambient Air Quality Standards, 76 Fed. Reg. 72,097 (Nov. 22, 2011), *with* EPA, Lead Emissions from Use of Leaded Aviation Gasoline, Technical Support Document, Docket ID No. EPA-HQ-OAR-2007-0294-0163 (Oct. 2008) (filed Apr. 28, 2010); *see also* Friends of the Earth, Supplemental Comment on EPA's ANPR (Feb. 16, 2011), Docket ID No. EPA-HQ-OAR-2007-0294-0498 (filed Feb. 23, 2011); Friends of the Earth, Supplemental Comments on EPA's ANPR (Nov. 28, 2011), Docket ID No. EPA-HQ-

6

OAR-2007-0294-0503 (filed Nov. 30, 2011). In fact, three of the highest lead-emitting airports are located in Los Angeles County, a non-attainment area. *See* EPA, Lead Emissions from the Use of Leaded Aviation Gasoline in the United States, Technical Support Document 11–12 (Oct. 2008), Docket ID No. EPA-HQ-OAR-2006-0735-5917 (filed Dec. 18, 2009) (Van Nuys; Long Beach/Daugherty F; Brackett Field); EPA, Table of EPA Initial Nonattainment Designations, http://www.epa.gov/leaddesignations/2008standards/documents/2010-11-16/table1.html (last visited Sept. 14, 2012).

## II.    LEGAL STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A summary judgment motion "must withstand scrutiny on both its factual and legal foundations." *Bloomgarden v. Coyer*, 479 F.2d 201, 207 (D.C. Cir. 1973). In assessing a summary judgment motion, a court "must view the evidence in the light most favorable to the nonmoving party [and] draw all reasonable inferences in his favor." *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008). As set forth below, Defendants have not demonstrated that they are entitled to judgment as a matter of law based on material facts that are not genuinely disputed and, thus, the Court should deny EPA's motion.

## III.    ARGUMENT

### A. EPA Has a Mandatory Duty to Determine Whether Emissions from Aircraft Cause or Contribute to Air Pollution that May Endanger Public Health or Welfare.

Section 231(a)(2)(A) imposes on EPA a mandatory duty to determine whether lead emissions from aircraft engines cause or contribute to lead air pollution which may reasonably be

7

anticipated to endanger public health or welfare. 42 U.S.C. § 7571(a)(2)(A).[3] The existence of

such duty is manifest by the plain meaning of Section 231(a) and is supported by the overall

structure of the section and of the statute as a whole as well as by the legislative history of the

Clean Air Act.

### 1. The Plain Meaning and Structure of Section 231 Establishes a Mandatory Duty that EPA Undertake an Endangerment Determination.

The Clean Air Act, 42 U.S.C. §§ 7401–7671(q), grants the Administrator of the EPA

exclusive authority to regulate aircraft emissions. Specifically, Section 231(a) of the Act—

originally enacted in 1970 and amended to its present form in 1977—sets forth the following

scheme for the regulation of such pollutants:

Study; proposed standards; hearings; issuance of regulations

(1) Within 90 days after December 31, 1970, the Administrator *shall* commence a study and investigation of emissions of air pollutants from aircraft in order to determine--
(A) the extent to which such emissions affect air quality in air quality control regions throughout the United States, and
(B) the technological feasibility of controlling such emissions.

(2)(A) The Administrator *shall*, from time to time, issue proposed emission standards applicable to the emission of any air pollutant from any class or classes of aircraft engines which in his judgment causes, or contributes to, air pollution which may reasonably be anticipated to endanger public health or welfare.

---

[3] Under Section 231(a)(2)(A), EPA must determine (1) whether lead air pollution, considered cumulatively, may reasonably be anticipated to endanger public health or welfare, and (2) whether lead emissions from general aviation aircraft engines cause or contribute to overall lead air pollution. *See* EPA, Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496, 66,506 (Dec. 15, 2009) ("GHG Endangerment Finding") (interpreting the parallel endangerment finding standard for motor vehicles, the EPA stated that "the Administrator is to consider the cumulative impact of sources of a pollutant in assessing the risks from air pollution, and is not to look only at the risks attributable to a single source or class of sources" and that the Administrator "need not find that emissions from any one sector or group of sources are the sole or even the major part of an air pollution problem"). EPA need not possess proof of actual harm in order to make an endangerment finding. *See Ethyl Corp. v. EPA*, 541 F.2d 1, 13–20 (D.C. Cir. 1976).

(B)(i) The Administrator *shall* consult with the Administrator of the Federal
Aviation Administration on aircraft engine emission standards.
(ii) The Administrator *shall* not change the aircraft engine emission standards if
such change would significantly increase noise and adversely affect safety.

(3) The Administrator *shall* hold public hearings with respect to such proposed
standards. Such hearings *shall*, to the extent practicable, be held in air quality
control regions which are most seriously affected by aircraft emissions. Within 90
days after the issuance of such proposed regulations, he *shall* issue such
regulations with such modifications as he deems appropriate. Such regulations
*may* be revised from time to time.

42 U.S.C. § 7571(a) (emphasis added).

By its plain meaning, Section 231(a)(2)(A)'s instruction creates a mandatory duty with its

imperative language: the Administrator "*shall*, from time to time, issue proposed emission

standards applicable to the emission of any air pollutant from any class or classes of aircraft

engines which in his judgment causes, or contributes to, air pollution which may reasonably be

anticipated to endanger public health or welfare." *Id.* (emphasis added); *see Bennett v. Spear*,

520 U.S. 154, 175 (1997) (finding the use of "the imperative shall" means a mandatory duty);

*Allied Pilots Ass'n v. Pension Benefit Guar. Corp.*, 334 F.3d 93, 98 (D.C. Cir. 2003) (noting the

"well-recognized principle that the word 'shall' is ordinarily the language of a command")

(internal quotation marks and citation omitted).  Here, "shall" imposes on EPA a mandatory duty

to propose standards for air pollutants that cause or contribute to air pollution which may

reasonably be anticipated to endanger public health or welfare.  "Shall" applies to the entire

provision since there is no punctuation or words that suggest otherwise; "[w]hen several words

are followed by a clause which is applicable as much to the first and other words as to the last,

the natural construction of the language demands that the clause be read as applicable to all."

*Porto Rico Ry., Light & Power Co. v. Mor*, 253 U.S. 345, 348 (1920).  EPA cannot follow

Congress's command that it issue emission standards for air pollutants unless and until EPA

9

makes an endangerment finding for such emissions. Determining endangerment is a compulsory first step within EPA's duty to regulate aircraft emissions; thus, EPA has a mandatory duty to undertake these determinations. *See CBD*, 794 F. Supp. 2d at 160.

The mandatory nature of the endangerment finding is further demonstrated by the plain language of other provisions in Section 231(a). The first clause of Section 231(a) places a mandatory duty on EPA to study aircraft emissions, their effect on air quality, and the feasibility of control measures. *See* 42 U.S.C. § 7571(a)(1). The statutory provision at issue here immediately follows the command to study the effect of aircraft emissions on air quality, thus indicating Congress's understanding that EPA would have completed a study of emissions to base its judgment regarding whether a particular pollutant endangers public health or welfare on the results of such study. Indeed, EPA did complete such study in 1972, and issued a report that identified six pollutants from aircraft, including lead. EPA, Aircraft Emissions: Impact on Air Quality and Feasibility of Control 5, 14–16 (1972) (listing "total hydrocarbons, carbon monoxide, nitrogen oxides, sulfur dioxide, particulate matter (including lead), and lead" as pollutants from aircraft).[4]

The third subsection of Section 231(a) mandates that EPA hold public hearings on its proposed standards and issue final regulations within 90 days of the issuance of proposed standards. 42 U.S.C. § 7571(a)(3). Each subsection places an unqualified mandatory duty on EPA, each designed to result in the imposition of enforceable standards for aircraft emissions. Under the most plain reading of Section 231(a), Congress has mandated that EPA conduct a

_____

[4] In the 1972 study, EPA did not fully evaluate the impact of lead or sulfur oxides finding that it "is considered to be negligible in comparison to other sources of these two pollutants." EPA, Aircraft Emissions: Impact on Air Quality and Feasibility of Control 17 (1972). This statement was made before the phase-out of lead in automobile fuel. Since 2002, EPA has identified

10

study, propose standards, engage the public, and issue final regulations. *See Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1230 (D.C. Cir. 2007) (Congress "require[ed] the administrator to study and investigate emissions of air pollutants from aircraft and adopt regulations to control them."). Indeed, the first line of Section 231(a) reads: "Study; proposed standards; hearings; issuance of regulations." 42 U.S.C. § 7571(a).

Significantly, in contrast with the mandate of Section 231(a)(2) that EPA "*shall,* from time to time," propose regulations, Section 231(a)(3) provides that "[s]uch regulations *may* be revised from time to time." 42 U.S.C. § 7571(a)(3) (emphasis added). When a statute uses both "may" and "shall," the normal inference is that each is being used in its ordinary sense—the one being permissive, the other mandatory." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 935 (9th Cir. 2006); *see also Beaty v. Food & Drug Admin.*, --- F. Supp. 2d --, 2012 WL 1021048, *5 (D.D.C. Mar. 27, 2012) ("Given the structure of the statute, it is clear that Congress intended for the word 'shall' to have a different meaning than 'may'— specifically, to be mandatory rather than permissive."). The use of the word "may" in Section 231(a)(3) reinforces, by contrast, Congress's intent to establish a mandatory duty to conduct endangerment determinations under Section 231(a)(2)(A).

The D.C. District Court recently held that EPA's duty to regulate aircraft pollution under Section 231(a) includes a nondiscretionary duty to conduct endangerment findings. *CBD*, 794 F. Supp. 2d at 158–62 (holding that EPA has an enforceable duty under Section 231(a)(2)(A) independent of a petition for agency action to make an endangerment finding for greenhouse gases emitted by aircraft engines). The *CBD* court reasoned: "Congress's use of mandatory language, and paragraph 231(a)(2)(A)'s role in the aircraft-emissions-regulation regime created by section 231, strongly suggest that Congress intended the predicate

endangerment finding to be a compulsory step." *Id.* at 162. A conclusion that EPA is under no obligation to conduct endangerment determinations would undermine Congress's clear command that limits be placed on the harmful pollutants emitted from aircraft and render nugatory the mandate to regulate. *See id.* at 160.

The *CBD* court's ruling is grounded in sound reasoning that is aligned with the canons of statutory construction. The court examined the role of Section 231(a)(2)(A) in the context of the surrounding provisions and of the statute as a whole. *Id.* ("EPA reads paragraph 231(a)(2)(A) in a vacuum, but it cannot be understood without reference to the provisions around it."). The court determined that "Congress's use of 'shall' throughout subsection 231(a) suggests that it intended to mandate a certain outcome—the regulation of harmful aircraft emissions." *Id.* (citing *Allied Pilots Ass'n v. Pension Ben. Guar. Corp.*, 334 F.3d at 99). Such examination is consistent with the most basic tenets of statutory interpretation. "Consistency of interpretation of one portion of a statute with the apparent meaning of another portion is a traditional tool of statutory interpretation." *Am.'s Cmty. Bankers v. F.D.I.C.*, 200 F.3d 822, 836 (D.C. Cir. 2000) (citing *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998)). "It is the entire statute that must be reviewed, however, and not specific clauses or provisions in isolation." *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 93 (D.D.C. 2003) (citing *Lexecon Inc. v. Milberg*, 523 U.S. at 36)). The *CBD* court undertook precisely this type of analysis of Section 231(a)(2)(A)'s place within the overall scheme of the Clean Air Act.

Critically, the *CBD* court concluded that the duty to issue regulations under Section 231 "would be defeated by allowing EPA to avoid triggering its obligation to regulate in the first place." 794 F. Supp. 2d at 160. Again, this conclusion is well grounded in the traditional canons of statutory interpretation. *See United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488,

12

499 (D.C. Cir. 2004) (recognizing the "cardinal principle of statutory construction that a statute

ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or

word shall be superfluous, void, or insignificant") (quoting *Alaska Dep't of Envtl. Conservation

v. EPA*, 540 U.S. 461, 518 n.13 (2004)).  An interpretation of Section 231(a)(2)(A) that allows

EPA never to determine endangerment would render superfluous Congress's command that the

Agency regulate such emissions.

Defendants' attempts to discredit the court's ruling in *CBD* amount to mere disagreement

with the court's reading of the relevant statutory provisions.  Defendants read Section

231(a)(2)(A) in isolation, ignoring EPA's duty to conduct a study of aircraft emissions, the

Agency's 1972 study, and the identification of lead as an air pollutant emitted by aircraft

contained therein.  Defendants' interpretation of Section 231(a)(2)(A) as allowing for the

perpetual non-regulation of potentially harmful pollutants—in the case of lead, non-regulation

dating back to the 1970s—ignores the plain language and overarching structure of Section 231(a)

and, if accepted, would fly in the face of the purpose of the statute.  Thus, consistent with *CBD*,

this Court should determine that EPA has a mandatory duty under Section 231 to undertake an

endangerment determination.[5]

### 2. EPA's Ability to Exercise Discretion in Making an Endangerment Determination Does Not Diminish Its Mandatory Duty to Conduct Such Determination.

As this court concluded in *CBD*, the conclusion that Congress intended the predicate

endangerment determination to be a compulsory step "does not rob EPA of regulatory discretion;

on the contrary, . . . section 231 'confer[s] broad discretion to the Administrator to weigh various

---

[5] Indeed, Defendants mischaracterize the language of the statute, eliminating the word "shall" from Section 231(a)(2)(A). Defs.' Summ. J. Br. at 3 ("[U]nder Section 231, EPA *may* regulate a pollutant emitted by aircraft engines.") (emphasis added).

13

factors in arriving at appropriate standards' for aircraft emissions." *CBD*, 794 F. Supp. 2d at 162

(quoting *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d at 1230).[6]  The fact that Section

231(a)(2)(A) allows for the exercise of the Administrator's discretion related to the substance of

the endangerment finding does not diminish the underlying duty to undertake an endangerment

determination and, in the event endangerment is found, to issue emission standards.

    The ability of EPA to use its judgment when making an endangerment determination

does not relieve EPA of its nondiscretionary duty to make *some* judgment and issue proposed

regulations accordingly.  *See Massachusetts v. EPA*, 549 U.S. 497, 533 (2007) ("[T]he use of the

word 'judgment' is not a roving license to ignore the statutory text.  It is but a direction to

exercise discretion within defined statutory limits."); *Envtl. Def. Fund v. Thomas*, 870 F.2d 892,

898–99 (2d Cir. 1989) (finding that a section of the Clean Air Act with a parallel structure

imposed a mandatory duty on EPA to revise air quality standards while leaving the content of the

regulatory decision within the Agency's discretion).  Indeed, as the Supreme Court held in

*Bennett v. Spear*—"[i]t is rudimentary administrative law that discretion as to the substance of

the ultimate decision does not confer discretion to ignore the required procedures of

decisionmaking."  520 U.S. at 172.

    In addition to the *CBD* decision, other cases interpreting sections of the Clean Air Act

with structures similar to that of Section 231 support the *CBD* court's conclusion that the

existence of language affording an agency some discretion over its regulatory decisions does not

render discretionary a clear mandatory duty to conduct rulemaking.  In *Environmental Defense

Fund v. Thomas*, for example, plaintiffs sought to compel EPA to revise the NAAQS for sulfur

---

[6] As discussed below, *see infra* at Section III.B, the legislative history of the 1977 Clean Air Act
Amendments reinforces the conclusion that the language was intended to provide EPA discretion
to use its judgment in how it undertakes the endangerment determination, not whether.

oxides under Section 109(d) of the Clean Air Act. 870 F.2d 892. That section provided that "the

Administrator *shall* complete a thorough review of the criteria published under Section 108

. . . and promulgate such new standards *as may be appropriate*." *Id.* at 895 (emphasis added).

Like Section 231(a), Section 109(d) commands EPA to take certain action by using the word

"shall," but affords the Agency some discretion with respect to the specifics of such action. In

that case—much as it does here—EPA argued that the phrase "as may be appropriate" gave it

discretion "simply not to address the issue with a formal public opinion." *Id.* at 898. The Court

of Appeals for the Second Circuit rejected that argument, holding that "[t]he words 'as may be

appropriate' clearly suggest that the Administrator must exercise judgment and the presence of

'shall' in the section implies only that the district court has jurisdiction to order the

Administrator to make *some* formal decision whether to revise the NAAQS, the content of that

decision being within the Administrator's discretion." *Id.* at 898–99; *see also Am. Trucking

Ass'ns v. EPA*, 175 F.3d 1027, 1047 (D.C. Cir. 1999) (adopting the Second Circuit's reasoning

regarding mandatory duty from *Am. Lung Ass'n v. Reilly*, 962 F.2d 258, 262–63 (2d Cir. 1992),

which cited *Envtl. Def. Fund v. Thomas* with approval); *Sierra Club v. Leavitt*, 355 F. Supp. 2d

544, 549 (D.D.C. 2005) (holding that a statutory clause that provides an agency flexibility in

determining the substance of a regulation does not nullify a clear mandatory duty).

　　　　Both the Second Circuit and the D.C. Circuit subsequently have reconfirmed the

*Environmental Defense Fund* court's finding that a nondiscretionary duty exists even where a

statute affords the agency some discretion with respect to the substance of its ultimate regulatory

decision. *See Am. Trucking Ass'ns v. EPA*, 175 F.3d at 1047; *Am. Lung Ass'n v. Reilly*, 962 F.2d

at 263. Similarly, here, contrary to EPA's argument, the "in his judgment language" does not

grant EPA the discretion to decline to conduct the requisite endangerment determinations.

15

3. **The Legislative History of the Clean Air Act Supports the Plain Meaning of Section 231, Which Imposes a Mandatory Duty to Conduct an Endangerment Determination.**

The amendments to the Clean Air Act directly support Plaintiff's plain meaning interpretation of Section 231(a).[7] In 1977, Congress amended various provisions of the Clean Air Act, among them, Section 231(a)(1) and (a)(2). The amendments of 1977 included changes to subsections (a)(1) and (a)(2) of Section 231, shown here:

> (1) Within 90 days after ~~the date of the enactment of the Clean Air Act Amendments of 1970~~**December 31, 1970**, the Administrator shall commence a study and investigation of emissions of air pollutants from aircraft in order to determine--
> (A) the extent to which such emissions affect air quality in air quality control regions throughout the United States, and
> (B) the technological feasibility of controlling such emissions.
>
> (2) ~~Within 180 days after commencing such study and investigation, t~~**(A) The** Administrator ~~shall publish a report of such study and investigation and~~ shall**, from time to time,** issue proposed emission standards applicable to **the** emissions of any air pollutant from any class or classes of aircraft engines which in his judgment causes**,** or contributes to**,** ~~or are likely to cause or contribute to~~ air pollution which ~~endangers the~~ **may reasonably be anticipated to endanger** public health or welfare.

*Compare* Pub. L. No. 91-604, § 231(a)(1)–(2); 84 Stat. 1676, 1703–04 (Dec. 31, 1970) *with* Pub. L. No. 95-95, § 401(f); 91 Stat. 685, 791 (Aug. 7, 1977) (amending 42 U.S.C. § 7571(a)).

The original language of Section 231(a)(2) provided: "[w]ithin 180 days after commencing such study and investigation, the Administrator shall publish a report of such study and investigation and shall issue proposed emissions standards . . . ." Pub. L. No. 91-604, §

---

[7] The use of legislative history to discern Congressional intent is particular appropriate in the case of the complex Clean Air Act. *See, e.g., Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711, 723 (1987) (considering factors endorsed by Congress); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 851 (looking to the legislative history to determine Congressional intent); *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 683 (1983) (using legislative history to establish Congress's designation of discretionary authority); *Harrison v. PPG Indus.*, 446 U.S. 578, 589–90 (1980) (declining to adopt a statutory interpretation based on lack of support in the legislative history).

231(a)(2). In 1977, the report had been published, but EPA had yet to propose emissions standards for all of the pollutants identified in that study. Accordingly, the command to publish the report was removed and "from time to time" was substituted for "[w]ithin 180 days"—a deadline that had long passed. *Compare* Pub. L. No. 91-604, § 231(a)(2), *with* Pub. L. No. 95-95, § 401(f). The legislative history includes no indication that this change was meant to remove any mandatory duty.[8] *See CBD*, 794 F. Supp. 2d at 161 (EPA has a mandatory duty to act "from time to time" under Section 231). Indeed, the legislative history that accompanied the original enactment of Section 231 states that "Section 231 directs the Secretary to prescribe, *as soon as practicable*, giving appropriate consideration to technological feasibility and economic cost, emission standards for any class of aircraft or aircraft engines which cause or contribute to air pollution endangering the health or welfare of any persons." H.R. Rep. No. 91-1146 (Dec. 31, 1970). The mandatory regulatory sequence envisioned by Congress was not dismantled by Congress's recognition that EPA needed more time to execute the latter step.

In addition to altering the time frame during which EPA must carry out its mandatory duties under Section 231, the 1977 amendments standardized a number of other provisions of the Clean Air Act by allowing for regulation of emissions of air pollutants "which in [the Administrator's] judgment cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare." H.R. Conf. Rep. No. 95-564, at 183 (Aug. 3,

---

[8] The "from time to time" language sets no specific date for the fulfillment of the duty, but does not negate the duty. "[W]hen a statute requires agency action at indefinite intervals, such as 'from time to time' . . . 'unreasonable delay' [can] be a meaningful standard for judicial review. *Am. Lung Ass'n v. Reilly*, 962 F.2d at 263 (interpreting unreasonable delay provision in Section 304 of the Clean Air Act, 42 U.S.C. § 7604(a), which was added by the 1990 Clean Air Amendments); *see also Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d at 1229 (D.C. Cir. 2007) (relying on "from time to time" language in support of statement that Congress required EPA to study and adopt regulations to control aircraft emissions). By its terms, the mandate to act "from time to time" indicates a periodic and continuing duty.

1977) (uniform standard applies to Sections 108, 111, 202, 211, and 231, and to hazardous
stationary source emissions). The legislative history indicates that Congress made such changes,
including the language affording the Administrator discretion in weighing the risks associated
with air pollution, to incorporate the reasoning of Court of Appeals for the D.C. Circuit in *Ethyl
Corp. v. EPA*, 541 F.2d 1, which upheld EPA's regulation of lead additives to automobile
gasoline given the precautionary nature and purpose of the Act's mandate to protect public
health. *See* H.R. Rep. No. 95-294, at 46–47 (May 12, 1977) (citing *Ethyl*, 541 F.2d at 12–18).

In *Ethyl,* the court reasoned that: "[a] statute allowing for regulation in the face of danger
is, necessarily, a precautionary statute. Regulatory action may be taken before the threatened
harm occurs; indeed, the very existence of such precautionary legislation would seem to demand
that regulatory action precede, and, optimally, prevent, the perceived threat." 541 F.2d at 13.
Indeed, "[a]waiting certainty will often allow for only reactive, not preventive, regulation." *Id.* at
25. The 1977 amendments recognize the *Ethyl* court's reasoning that "[d]anger . . . is not set by
a fixed probability of harm, but rather is composed of reciprocal elements of risk and harm, or
probability and severity," 541 F.2d at 18, and allow the Agency to exercise its discretion when
evaluating potential dangers to public health and welfare.

The House Report for the Clean Air Act Amendments of 1977 confirms that Congress
had not intended the "in his judgment" language to exercise judgment in weighing and predicting
future health risks. H.R. Rep. No. 95-294, at 51. The House Report states, "the committee
language is intended to emphasize the necessarily judgmental element in the task of predicting
future health risks of present action and to confer upon the Administrator the requisite authority
to exercise such judgment." *Id.* The House Report continues:

> In upholding the majority opinion in the en banc rehearing in Ethyl, the
> committee is moving in a direction which is consistent with most judicial

18

> interpretations of the act. Most other courts have held that a substantial element
> of judgment, including making comparative assessment of risks, projections of
> future possibilities, establishing margins of safety and margins of error,
> extrapolating from limited data, etc., are necessary and permissible under the act
> in order to protect public health and encourage development of new technology.

*Id.* at 50–51. There is no indication that the "in his judgment" language in the original text, and

unchanged by the 1977 amendments, was meant to diminish EPA's mandatory duty to regulate

aircraft emissions. In fact, the opposite is true; the language is meant to remove the barrier of

needing definitive proof that such emissions cause harm before regulating. *Id.*

The plain reading of Section 231(a)(2)(A) as imposing a mandatory duty on EPA to

conduct endangerment findings is supported by the structure of the section and the overall

purpose of the Act as well as the legislative history of the 1977 amendments.

### B. EPA Has a Mandatory Duty to Make an Endangerment Determination Specifically for Lead.

In addition to the reasons discussed above, EPA's own interpretations and the legislative

history of Section 231 demonstrate that the Agency has a mandatory duty to make an

endangerment finding specifically for lead.

Section 231(a)(2)(A) requires the Administrator to "issue proposed emission standards

applicable to the emission of *any air pollutant* . . . ." 42 U.S.C. § 7571(a)(2)(A) (emphasis

added). Lead emissions fit within the definition of "air pollutant" under Section 231. Indeed,

EPA's 1972 report on its study of emissions of air pollutants from aircraft, which was required

by Section 231(a)(1), identified six pollutants from aircraft, including lead. EPA, Aircraft

Emissions: Impact on Air Quality and Feasibility of Control 10, 15 (1972). Except for lead, EPA

has regulated all the other air pollutants identified in its 1972 study. *See* 40 C.F.R. § 87.21

(regulating hydrocarbons, carbon monoxide, nitrogen dioxide and particulate matter, as a smoke

number); 14 C.F.R. § 34.61 (regulating sulfur level in fuel). As discussed above, *see supra*

19

Section III.A.1, the statute links EPA's mandatory duty to study air pollutants from aircraft and the duty to conduct endangerment findings. Given that lead has long been identified as an air pollutant under Section 231 and EPA conducted the study as required by Section 231(a)(1), EPA has a mandatory duty to undertake the endangerment determination.

EPA also has identified lead as an air pollutant, and found endangerment from lead, under other sections of the Clean Air Act. *See, e.g.*, EPA, Regulation of Fuels and Fuel Additives, 37 Fed. Reg. 3882 (proposed Feb. 23, 1972) (finding endangerment from lead in gasoline under Section 212); 38 Fed. Reg. 1254 (regulating the use of lead in gasoline under Section 212); *Natural Res. Def. Council, Inc. v. Train*, 545 F.2d 320 (2d Cir. 1976) (finding EPA had a duty to list lead as an air pollutant under Section 108).[9]

Ignoring that Plaintiff's claim is limited to EPA's unreasonable delay in making an endangerment finding for lead, Defendants suggest that finding that a mandatory duty exists under Section 231(a)(2)(A) would require EPA to conduct endangerment determinations for "each and every chemical compound emitted by aircraft engines." Defs.' Summ. J. Br. at 25. This attempt to distract the Court from the plain meaning of the statutory provision in question should be rejected. Indeed, the plain language of the statute specifically requires endangerment determinations for "any air pollutant," 42 U.S.C. § 7571(a)(2)(A), not, as Defendants would have it, for "each and every chemical compound emitted by aircraft engines," Defs.' Summ. J. Br. at 25. The Clean Air act defines "air pollutant" as an "air pollution agent or combination of such

---

[9] As with other sources of airborne lead, lead emissions from aircraft contribute to overall lead pollution, which has an impact on health. As the D.C. Circuit in *Ethyl* explained:
> Once the lead is in the body, however, its source becomes irrelevant; all lead in the bloodstream, from whatever source, is essentially fungible. Thus so long as there are multiple sources of lead exposure it is virtually impossible to isolate one source and determine its particular effect on the body. The effect of any one source is meaningful only in cumulative terms.

*Ethyl*, 541 F.2d. at 9.

20

agents." 42 U.S.C. § 7602(g). "Air pollutant" is thus limited to substances that are harmful

"agents" of pollution, which is narrower than each and every chemical compound emitted. *See,*

*e.g., Massachusetts v. EPA*, 549 U.S. at 529 n. 26 (finding that greenhouse gases are air

pollutants because they "both 'ente[r] the ambient air' *and* tend to warm the atmosphere"). In

addition, EPA has more narrowly interpreted "any air pollutant" under the requirements related

to visibility and prevention of significant deterioration demonstrating that "any air pollutant"

does not necessarily mean every substance emitted. *See Coal. for Responsible Regulation v.*

*EPA*, 684 F.3d 102, 133 (D.C. Cir. 2012) (citing EPA, 1977 Clean Air Act Amendments to

Prevent Significant Deterioration, 43 Fed. Reg. 26,388 (June 19, 1978)); *see also Coal. for*

*Responsible Regulation,* 684 F.3d at 134–35 (upholding EPA's interpretation of "any air

pollutant" as "any regulated air pollutant" under the Prevention of Significant Deterioration

provisions).

  Moreover, contrary to Defendants' suggestion that EPA would have to conduct

endangerment determinations for as many as eighty organic compounds emitted by aircraft, *see*

Defs.' Summ. J. Br. at 25, EPA has already found endangerment, *see* 38 Fed. Reg. 19,088,

19,089 (July 17, 1973), and regulates all organic compounds in exhaust as the general category

"hydrocarbons," 40 C.F.R. § 87.21 (regulating total hydrocarbons from airplane exhaust); EPA,

Recommended Best Practice for Quantifying Speciated Organic Gas Emissions from Aircraft

Equipped with Turbofan, Turbojet, and Turboprop Engines 9 (May 2009),

http://www.epa.gov/nonroad/aviation/420r09901.pdf (defining hydrocarbon emissions as all

organic compounds in exhaust). Thus, EPA's assertion that it would have to conduct

endangerment determinations for organic compounds is factually wrong because it has already

found endangerment for organic compounds as a category of air pollutants.

The history of the Clean Air Act amendments also supports the conclusion that Congress intended to impose a mandatory duty on EPA to undertake an endangerment determination under Section 231 specifically for lead. As discussed above, Congress's 1977 amendments to Section 231 replaced the 180-day deadline (which had passed) with the duty to propose emissions standards "from time to time," thus providing EPA flexibility to conduct endangerment determinations and propose emissions standards for lead and other pollutants not yet regulated.[10] *See supra* at Section III.A.3. Moreover, though the 1977 amendments also eliminated language that required EPA to issue a report on its Section 231(a)(1) study—presumably in light of the fact that such report had been issued five years earlier, Congress preserved the provision— Section 231(a)(1)—that required a study and investigation of "emissions of air pollutants from aircraft," Pub. L. 95-95, § 401(f), thereby retaining the structure of Section 231(a) that links "the study and investigation of emissions of air pollutants for aircraft" with the endangerment determination and the proposal of emissions standards, 42 U.S.C. § 7571(a).

The 1977 amendments also changed the language of Section 231 by lowering the threshold of the proof of harm from air pollutants that "*are likely to* cause or contribute to air pollution which endangers human health" to air pollutants "which *may reasonably be anticipated* to endanger public health or welfare." *Compare* Pub. L. 91-604; 84 Stat. 1676, 1704 (Dec. 31, 1970) *with* Pub. L. 95-95, § 401(f) (emphasis added); *see also* H.R. Rep. No. 95-294, at 49–51. Congress made clear that such change was intended to incorporate the reasoning of the *Ethyl* decision, which had upheld EPA's endangerment finding for lead that assessed risks from lead

---

[10] At the time of the 1977 amendments, EPA already had regulated four of the six pollutants identified in its 1972 report. *See* 38 Fed. Reg. 19,088 (promulgating emissions standards for carbon monoxide, hydrocarbons, nitrogen oxides and smoke (particulate matter) from aircraft).

22

instead of waiting for proof of harm. *See* H.R. Rep. No. 95-294, at 47–48. In *Ethyl*, the Court

described Congress's knowledge of the harm from all lead emissions:

> Congress understood that the body lead burden is caused by multiple sources. It
> understood that determining the effect of lead automobile emissions, by
> themselves, on human health is of no more practical value than finding the
> incremental effect on health of the fifteenth sleeping pill swallowed by a would-
> be suicide. It did not mean for "endanger" to be measured only in incremental
> terms.

541 F.2d at 30–31.

Notably, when Congress amended the endangerment language in Section 231, it also

amended the parallel provisions of five other sections of the Act to provide a "uniform standard

of proof" for EPA's regulation of sources under those sections. H.R. Conf. Rep. No. 95-564, at

183 (describing amendment of endangerment language in Sections 108, 111, 112, 202, 211, and

231 of the Clean Air Act). Pursuant to this standard, EPA has found endangerment for, and

regulated, lead emissions from other sources such as motor vehicles. *See, e.g.*, EPA, Regulation

of Fuels and Fuel Additives, 37 Fed. Reg. 3882 (proposed Feb. 23, 1972) (finding endangerment

from lead from motor vehicle fuel); EPA, Regulation of Fuels and Fuel Additives, 38 Fed. Reg.

1254 (Jan. 10, 1973); *see also* EPA, Addition of Lead to List of Air Pollutants, 41 Fed. Reg.

14,921 (Apr. 8, 1976) (listing lead as a criteria pollutant under Section 108); 42 U.S.C.

§ 7412(b)(1) (listing lead compounds as hazardous air pollutants under Section 112); 40 C.F.R. §

471.13 (regulating lead under New Source Performance Standards pursuant to Section 111);

EPA, Control of Air Pollution from New Motor Vehicles and New Motor Vehicle Engines;

Certification and Test Procedures; Gasoline Lead Content, 53 Fed. Reg. 470 (Jan. 7, 1988)

(regulating lead pursuant to Section 202).

**C. Sovereign Immunity Does Not Apply When EPA Has a Mandatory Duty.**

If the Court agrees that Section 231(a)(2)(A) imposes on EPA a mandatory duty to conduct an endangerment finding, the sovereign immunity defense raised by Defendants does not apply. *See Sierra Club v. EPA*, 850 F. Supp. 2d 300, 303 (D.D.C. 2012); *Sierra Club v. Leavitt*, 355 F. Supp. 2d at 557 (holding that EPA's sovereign immunity was waived in suit alleging unreasonable delay of nondiscretionary duty).

Moreover, in the attempt to invoke the sovereign immunity bar, Defendants fail to inform the Court of the long-standing exception to the sovereign immunity defense in all actions for specific, nonmonetary relief against a United States agency or officer acting in an official capacity. *See Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186 (D.C. Cir. 2006) ("[T]here is no doubt that § 702 [of the Administrative Procedure Act ("APA")] waives the Government's immunity from actions seeking relief other than money damages.") (internal quotation marks and citation omitted); *Sea-Land Serv., Inc. v. Alaska R. R.*, 659 F.2d 243, 244 (D.C. Cir. 1981) ("Insofar as appellants seek equitable relief, we conclude that sovereign immunity does not bar the way.") (citing 5 U.S.C. § 702 ("An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.")). The Court of Appeals for the D.C. Circuit has held that this exception extends to cases where plaintiffs seek nonmonetary relief against the United States, even if plaintiffs' claims are not brought under the APA. *See, e.g., Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("The APA's waiver of sovereign immunity applies to any suit whether under the APA or not."). Indeed, even the case cited by Defendants notes the

24

APA's broad waiver of sovereign immunity for cases not seeking monetary damages. *Lane v.*

*Pena*, 518 U.S. 187, 196 (1996) (a case seeking monetary damages).

## CONCLUSION

For the foregoing reasons, FoE respectfully requests that this Court find that EPA has a

mandatory duty under the Clean Air Act Section 231(a)(2) and deny EPA's Motion for Summary

on this threshold issue.

Respectfully submitted on September 14, 2012.

/s/ Marianne L. Engelman Lado
MARIANNE L. ENGELMAN LADO
BRIDGET M. LEE
Admitted *pro hac vice*
Earthjustice
156 William Street, Suite 800
New York, NY 10038-5326
Phone: (212) 791-1881
mengelmanlado@earthjustice.org
blee@earthjustice.org

/s/ Timothy D. Ballo
TIMOTHY D. BALLO
D.C. Bar No. 977077
Earthjustice
1625 Massachusetts Avenue NW, Suite 702
Washington, DC 20036-2212
Phone: (202) 667-4500
tballo@earthjustice.org

HELEN KANG
DEBORAH BEHLES
Golden Gate University School of Law
Environmental Law and Justice Clinic
536 Mission Street
San Francisco, CA 94105-2968
Phone: (415) 442-6647
hkang@ggu.edu
dbehles@ggu.edu

*Counsel for Friends of the Earth*

25

**Exhibit C**

E1307 - Q74

TERMINATION NO. 12
BY: NCB 9/12/11

## IN THE COURT OF COMMON PLEAS
### FRANKLIN COUNTY, OHIO

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

| | |
|---|---|
| GMAC Mortgage Corporation | Case No. 05CVE-04-4555 |
| **Plaintiff,** | Judge Julie M. Lynch |
| vs. | |
| Yvonne D. Lewis aka Yvonne D. Webb-Lewis, et al. | **JUDGMENT ENTRY AND DECREE IN FORECLOSURE** |
| **Defendants.** | |

This matter is before the Court on Plaintiff's Motion for Default Judgment. The real

property that is the subject of this foreclosure action (the "Property") is as follows:

Situated in the County of Franklin, in the State of Ohio, and in the City of Columbus:

Being Lot Number Seventeen (17) of ARGYLE PARK SUBDIVISION, as the same is numbered and delineated upon the recorded plat thereof, of record in Plat Book 36, Page 6, Recorder's Office, Franklin County, Ohio.

Parcel No. 010-136633-00

Address: 1875 Alvason Avenue, Columbus, OH 43219

The Court further finds that Yvonne D. Lewis aka Yvonne D. Webb-Lewis executed the

promissory note referenced in the Complaint (the "Note") and therefore promised, among other

things, to make monthly payments on or before the date such payments were due. The Court

further finds that the sums due under the Note were accelerated in accordance with the terms of

the Note and Mortgage. The Court further finds that Yvonne D. Lewis aka Yvonne D. Webb-

Lewis and Sidney T. Lewis executed and delivered the mortgage referenced in the Complaint

(the "Mortgage"), that the Mortgage secures the amounts due under the Note.

1                                                          E42

E13Q7 - Q75

The Court finds that the Note and Mortgage are in default because payments required to be made under the Note and Mortgage have not been made. The Court further finds that the conditions of the Mortgage have broken, the break is absolute, and Plaintiff is entitled to have the equity of redemption and dower of the current title holders foreclosed.

The Court further finds that there is due to Plaintiff on the Note principal in the amount of $53,138.32 plus interest on the principal amount at the rate of 7% per annum from January 1, 2005. The Court further finds that there is due on the Note all late charges imposed under the Note, all advances made for the payment of real estate taxes and assessments and insurance premiums, and all costs and expenses incurred for the enforcement of the Note and Mortgage, except to the extent the payment of one or more specific such items is prohibited by Ohio law.

The Court notes that, all personal obligations of Yvonne D. Lewis aka Yvonne D. Webb-Lewis on the Note have been discharged under the United States Bankruptcy Code. As a result, the Court does not grant personal judgment against Yvonne D. Lewis aka Yvonne D. Webb-Lewis for the amount due on the Note.

The Court finds that the Mortgage was recorded with the County Recorder and is a valid and subsisting first mortgage on the Property. The Court further finds that the parties to the Mortgage intended that it attach to the entire fee simple interest in the Property. The Mortgage is, however, junior in priority under Ohio law to the lien held by the County Treasurer to secure the payment of real estate taxes and assessments. All amounts payable under Section 323.47 of the Ohio Revised Code shall be paid from the proceeds of the sale before any distribution is made to other lien holders.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED** that unless the sums found to be due to Plaintiff are fully paid within three (3) days from the date of the entry of this

2

E13Q7 - Q76

decree, the equity of redemption of the defendant title holders in the Property shall be foreclosed

and the Property shall be sold free of the interests of all parties to this action. In addition, an

order of sale shall issue to the Sheriff of Franklin County, directing him to appraise, advertise

and sell the Property according to the law and the orders of this Court and to report his

proceedings to this Court.

Notice of the time and place of the sale of the Property shall be given to all persons who

have an interest in the Property according to the provisions of Section 2329.26 of the Ohio

Revised Code.

**IT IS FURTHER ORDERED** that the Sheriff shall send counsel for the party

requesting the Order of Sale a copy of the publication notice promptly upon its first publication.

There is no just reason for delay in entering Judgment as aforesaid.

IT IS SO ORDERED.

Judge Julie M. Lynch    9/12/11
Common Pleas Judge

3

E1307 - Q77

**Direction to Clerk:**
**Pursuant to Civ.R.58(B), you are to serve**
**notice of this judgment and its date of**
**entry upon the journal to all parties not**
**in default for failure to appear within**
**three days of the judgment's entry up**
**the journal, and note the service in the**
**appearance docket.**

Approved:

Matthew J. Richardson (0077157)
Manley Deas Kochalski LLC
P. O. Box 165028
Columbus, OH  43216-5028
Telephone:  614-222-4921
Fax:  614-220-5613
Email:  mjr2@mdk-llc.com
Attorney for Plaintiff
MDK File Number 05-2846

4

## Exhibit D

# IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| GMAC Mortgage Corporation, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 11AP-875 |
| Yvonne D. Lewis aka | : | (REGULAR CALENDAR) |
| Yvonne D. Webb-Lewis et al., | : | |
| Defendants-Appellants. | : | |
|  | : | |

FILED
COURT OF APPEALS
FRANKLIN CO. OHIO

2011 DEC 30  PM 2: 18

CLERK OF COURTS

## JOURNAL ENTRY OF DISMISSAL

Appellants having filed a voluntary motion to dismiss, the same is granted and this appeal is hereby dismissed. Costs shall be assessed against appellants.

_____
Judge Susan Brown

_____
Judge Lisa L. Sadler

_____
Judge John A. Connor

## Exhibit E

# IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

| | |
|---|---|
| GMAC Mortgage Corporation | Case No. 05CVE-04-4555 |
| **Plaintiff,** | Judge Julie M. Lynch |
| vs. | |
| Yvonne D. Lewis aka Yvonne D. Webb-Lewis, et al. | **CONFIRMATION ENTRY OF SALE AND DISTRIBUTION OF PROCEEDS** |
| **Defendants.** | |

This action was heard on the return of the Sheriff of Franklin County of the sale of

property commonly known as 1875 Alvason Avenue, Columbus, OH 43219, parcel no. 010-

136633-00 (the "Property"). The legal description of the Property is attached to this order as

Exhibit A, which is incorporated herein by reference.

1.  The Property was sold by the Sheriff on April 20, 2012 to GMAC Mortgage Corporation

    for the following amount: **$81,480.00**. Plaintiff subsequently assigned its bid to Federal

    National Mortgage Association ("Plaintiff's Assignee").

2.  Having carefully examined the proceedings of the officer, the Court finds that the sale of

    the Property conformed in all respects to the law and the prior orders of this Court and

    hereby confirms and approves the sale of the Property and these proceedings.

3.  The Sheriff shall convey the Property to Federal National Mortgage Association by deed

12-53200-mfw Doc 502-6 Filed 03/11/13 Entered 03/20/13 17:59:43 March 20 465 - 065 Franklin County Ohio Clerk of Courts of the Common Pleas- 2013 Jun 17 09:43 AM-10A465 M Attachment

Pg 535 of 582

according to law free and clear of all liens and encumbrances and shall issue the deed in the following name: Federal National Mortgage Association.

4.    The tax mailing address of the purchaser of the Property is as follows: P.O. Box 650043, Dallas, TX 75265-0043.

5.    The prior deed reference with respect to the Property is as follows: Deed filed May 5, 1997, recorded in Official Records Volume 35026, Page G14, Recorder's Office, Franklin County, Ohio.filed May 23, 1990, recorded in Official Records Volume 15237, Page D07, Recorder's Office, Franklin County, Ohio.

6.    The purchaser of the Property is hereby subrogated to the rights of the mortgagees and lien holders in the Property to the extent necessary to protect the purchaser's title to the Property.

7.    The Court hereby grants the purchaser of the Property a writ of possession to put the purchaser in possession of the Property.

8.    The Court hereby orders the release of all mortgages and liens held by all parties to this action. As a result, the Clerk of Courts shall cause certificates of satisfaction and release to be presented for recording by the County Recorder with respect to each of the mortgages and liens listed on Exhibit B, which is attached to this order for the convenience of the Clerk of Courts and incorporated herein by reference. Such mortgages and liens shall be released only to the extent that they encumber the property foreclosed upon in this action and not to the extent that they encumber any other property.

9.    Because Federal National Mortgage Association is the assignee of the successful bid of GMAC Mortgage Corporation, which holds a valid and subsisting mortgage on the Property, Federal National Mortgage Association need not pay the full amount of the

Ref# 05-2846/NNW

purchase price to the Sheriff. Instead, Federal National Mortgage Association need only pay an amount necessary to pay court costs, real estate taxes and assessments, and Sheriff's costs. The deposit amount of **$350.00** tendered at the Sheriff's sale shall be distributed as follows:

a.    The Clerk of Courts shall be paid **$399.00** for court costs.

b.    The County Treasurer shall be paid **$1,046.69** for taxes and assessments currently due on the Property and payable through full year 2011 as well as an estimated portion of the 2012 taxes pro-rated through MAY 28, 2012. Grantee takes title subject to all taxes, interest, penalties, assessments, and tax lien certificates if any.

c.    The Sheriff shall be paid **$125.00** for Sheriff's costs.

d.    The Auditor shall be paid **$163.50** for conveyance fees and transfer tax.

e.    The Recorder shall be paid **$36.00** for recording the deed.

f.    Since the deposit is not sufficient to satisfy these items, the Plaintiff's Assignee shall pay the Sheriff the deficit of **$1,420.19** to cover all requisite disbursements.

10.   The following amount shall be applied as a credit toward the amount of the judgment previously entered in favor of the Plaintiff:  **$79,709.81**.

**IT IS SO ORDERED.**

_____
Judge Julie M. Lynch
Common Pleas Judge

Approved:

/s/ Matthew J Richardson
_____
Matthew J. Richardson (0077157)            Via fax 5/25/12
Holly N. Wolf (0068847)                     _____
Manley Deas Kochalski LLC                   Mary Johnson
P. O. Box 165028                            Assistant Prosecutor
Columbus, OH  43216-5028                    373 South High Street
Telephone:  614-222-4921                    17th Floor
Fax:  614-220-5613                          Columbus, OH 43215
Email:  mjr2@mdk-llc.com                    Via Email
Attorney for Plaintiff                      Attorney for Franklin County Treasurer

Ref# 05-2846/NNW

## EXHIBIT A

### Legal Description of the Property

Situated in the County of Franklin, in the State of Ohio, and in the City of Columbus:

Being Lot Number Seventeen (17) of ARGYLE PARK SUBDIVISION, as the same is numbered and delineated upon the recorded plat thereof, of record in Plat Book 36, Page 6, Recorder's Office, Franklin County, Ohio.

Parcel No. 010-136633-00

Address: 1875 Alvason Avenue, Columbus, OH 43219

Property Address: 1875 Alvason Avenue, Columbus, OH 43219

Parcel No. 010-136633-00

Ref# 05-2846/NNW

## **EXHIBIT B**

Mortgages and Liens to be Released

Mortgage in favor of The Huntington Mortgage Company, 7575 Huntington Park Drive, Columbus, OH 43235, from Yvonne D. Lewis aka Yvonne D. Webb-Lewis and Sidney T. Lewis, Husband and Wife, in the amount of $63,400.00, dated March 9, 2001, filed March 20, 2001, recorded as Official Instrument No. 200103200055720, Recorder's Office, Franklin County, Ohio,

as assigned by The Huntington Mortgage Company to GMAC Mortgage Corporation, 3451 Hammond Avenue, Waterloo, IA 50702, by Assignment dated October 4, 2001, filed November 14, 2001, recorded in Official Instrument No. 200111140262914, Recorder's Office, Franklin County, Ohio.

Franklin County Court of Common Pleas

**Date:** 06-04-2012

**Case Title:** GMAC MORTGAGE CORPORATION -VS- YVONNE D LEWIS

**Case Number:** 05CV004555

**Type:** CONFIRMATION OF SALE

It Is So Ordered.

/s/ Judge Julie M. Lynch

Electronically signed on 2012-Jun-04     page 6 of 6

# Exhibit F

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

FILED
COURT OF APPEALS
FRANKLIN CO. OHIO

2012 JUN 18 AM 10: 55

CLERK OF COURTS

GMAC Mortgage Corporation,      :

    Plaintiff-Appellee,      :

v.      :      No. 12AP-506

                          05 CV 4555

Yvonne D. Lewis aka      :      (ACCELERATED CALENDAR)
Yvonne D. Webb-Lewis et al.,

                         :

    Defendants-Appellants.      :

                         :

### JOURNAL ENTRY OF DISMISSAL

      Appellants not demonstrating that there are reasonable grounds for this appeal, and appellants having been adjudicated vexatious litigators by the Franklin County Court of Common Pleas, appellants' June 12, 2012 motion for leave to file an appeal challenging the trial court's confirmation of sale order is denied, and this appeal is hereby dismissed.

_____
Judge William A. Klatt

_____
Judge Peggy Bryant

_____
Judge John A. Connor

# **Exhibit G**

E1672 - A5

*YOU ARE THEREFORE COMMANDED, to deliver the possession of the real property aforesaid to the plaintiff* GMAC MORTGAGE CORPORATION

*and that the goods and chattels, and for want thereof, then of the lands and tenements of the Defendant* YVONNE D LEWIS AKA YVONNE D WEBB-LEWIS

*you cause to be made the sum of $_____ damages for withholding the possession, and $ 40.00 the cost herein _____ and that you make due return of this writ within sixty days, with your proceedings under the same duly endorsed thereon.*

FILED
COMMON PLEAS COURT
FRANKLIN CO. OHIO
2012 SEP 10 AM 9:05
CLERK OF COURTS

*WITNESS my hand and the seal of said Court at Columbus, Ohio, this* 16TH _____ *day of* JULY _____ 20 12

MARYELLEN O'SHAUGHNESSY _____ *Clerk*

*By* ALBERTA MCDOWELL _____ *Deputy*

The State of Ohio, Franklin County, ss.    SHERIFF's RETURN

*Received this writ* July 18 _____ A.D. 20 12 , *at* 11:33 _____ *o'clock* A _____ *M. and pursuant to its command* On 7-20-12 notice was posted on address listed within to vacate by 8-10-12. On 8-15-12 Geo - Evic notice posted. On 8-24-12 Evic. Complete. Prop. restored to Plaintiff. Writ returned per Plaintiff's Atty on 9-4-12

| SHERIFF's FEES | Dolls. | Cts |
|---|---|---|
| Service | | |
| Mileage 3 X 8 | 60 | |
| Return | | 85 |
| Total | | 85 |

Writ returned per Plaintiff's Atty on
Zach Scott
Sheriff Of Franklin County, OH
By: _____ Deputy

No. 05CV4555

Doc. _____    Page _____

CUMMON PLEAS COURT
FRANKLIN    County, O.

GMAC MORTGAGE CORPORATION
Plaintiff

VS.

YVONNE D LEWIS ET AL
1875 ALVASON AVE
COLUMBUS, OH 43219
et al., Defendants

HABERE FACIAS

Issued 07-17 _____ 20 12

7-20-12 POSTED TO VACATE BY 8-10-12

8-15-12 OCCUPIED, NEEDS SET-OUT

8-24-12 EVICTION COMPLETE
8.17.12 it joins with full pics

ANDREW C CLARK 83519 _____ Atty

PO BOX _____

5028 _____

# **Exhibit H**

FINAL APPEALABLE ORDER

**IN THE COMMON PLEAS COURT
FRANKLIN COUNTY, OHIO**

98285H07

| | | |
|---|---|---|
| GMAC Mortgage Company | : | Case No. 03 CV 6954 |
| Plaintiff | : | Judge *TRAVIS* |
| vs. | : | **FORECLOSURE CASE** |
| Sidney T. Lewis | : | |
| Defendants. | : | |
| | : | |

## ORDER AND DECREE OF FORECLOSURE

This matter is before the Court on Plaintiff's Motion for Summary Judgment. All

Defendants, including Defendant Sidney T. Lewis ("Mortgagor"), have been served with

summons according to law and are properly before the Court.

The Court finds on the basis of Plaintiff's complaint, the answers filed in this action, and

the evidence submitted, including the affidavit and exhibits filed by Plaintiff in support of its

Motion for Summary Judgment ("Plaintiff's Affidavit"), that there are no genuine issues of

material fact in this action and that Plaintiff is entitled to judgment in its favor as a matter of law.

The Court further finds that reasonable minds can come to but one conclusion, which is adverse

to Mortgagor, and therefore grants Plaintiff's Motion for Summary Judgment. As a result, the

defendants in this action are forever barred from asserting any right, title or interest in and to the

property described in the Complaint, which property is commonly known as: 1913 Argyle Drive,

Columbus, OH 43210, parcel no. 010-136627 (the "Property").

The Court finds that Mortgagor executed the promissory note attached as Exhibit A

Plaintiff's Affidavit (the "Note"), that Plaintiff is the owner and holder of the Note, that the Note



een accelerated, and that Mortgagor is in default on the Note. The Court further finds that

Mortgagor executed and delivered the mortgage attached as Exhibit B to Plaintiff's Affidavit (the

"Mortgage"), that Plaintiff is the owner and holder of the Mortgage, and that the Mortgage

secures the amounts due under the Note.

In regard to the Note, the Court finds that the Note is in default and that there is due on

the Note principal in the amount of $41,411.34, plus interest on the principal amount at the rate

of 8.25% per annum from February 1, 2003, plus outstanding late charges, plus advances, if any,

made to protect Plaintiff's interest in the Property, plus costs and expenses incurred to enforce

Plaintiff's rights under the Note and Mortgage, for which sum judgment is hereby entered in

favor of Plaintiff and against Mortgagor.

In regard to the Mortgage, the Court finds that the Mortgage was recorded with the

County Recorder and is a valid and subsisting first lien on the Property, subject only to the lien

held by the County Treasurer to secure the payment of property taxes. The Court further finds

that, because Mortgagor is in default on the Note, the conditions of the Mortgage have broken,

the break is absolute, and that, as a result, Plaintiff is entitled to have the equity of redemption

and dower of Mortgagor foreclosed.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED** that Plaintiff

recover personal judgment against Mortgagor for the amount of the judgment set forth above,

together with the costs of this action.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that unless the amount

of the judgment set forth above, together with the costs of this action, are fully paid within three

(3) days from the date of the entry of this decree (1) the equity of redemption and dower of

Mortgagor in and to the Property shall be foreclosed, (2) the Property shall be sold, and (3) an

Order of Sale shall be issued to the Sheriff of this County directing him to appraise the Property,

advertise the sale of the Property in a paper of general circulation within the County, and sell the

Property as upon execution and according to law free and clear of the interests of all parties to

this action.  The proceeds from the sale of the Property shall be distributed in the following order

of priority:

- First, the Clerk of Courts shall be paid for all costs of this action.

- Second, the Franklin County Treasurer shall be paid for all unpaid taxes,
  assessments, interest, and penalties on the Property.

- Third, Plaintiff shall be paid an amount equal to the sum of the following: (1) the
  principal due on the Note in the amount of $41,411.34, (2) interest on the
  principal amount at the rate of 8.25% per annum from February 1, 2003, (3)
  outstanding late charges, (4) advances, if any, made to protect Plaintiff's interest in
  the Property, and (5) costs and expenses incurred to enforce Plaintiff's rights under
  the Note and Mortgage.

- Fourth, the balance of the proceeds, if any, shall be deposited with the Clerk of
  Courts pending further order of the Court.

Following the sale of the Property, the Sheriff shall report his proceedings to the Court

for further order.

Plaintiff shall give notice of the time and place of the sale of the Property to all persons

who have an interest in the Property and shall otherwise comply with the provisions of Section

2329.26 of the Ohio Revised Code.

Judge
Franklin County Common Pleas Judge

Approved:

98285HI0

Theodore K. Manley (0059767)
Brian T. Deas (0061706)
Edward M. Kochalski (0001986)
Manley, Deas & Kochalski, LLC
243 North Fifth Street, Suite 341
Columbus, OH 43215-2603
614-220-5611
Attorney for Plaintiff

Copies to:

Theodore K. Manley
Manley, Deas & Kochalski, LLC
243 North Fifth Street, Suite 341
Columbus, OH 43215-2603
Attorney for Plaintiff

Unknown Spouse, if any, of
Sidney T. Lewis
1875 Alvason Avenue
Columbus, OH 43219

Unknown Spouse, if any, of
Sidney T. Lewis
1913 Argyle Drive
Columbus, OH 43219

Unknown Tenants, if any
1913 Argyle Drive
Columbus, OH 43219

Sidney T. Lewis
1875 Alvason Avenue
Columbus, OH 43219

Sidney T. Lewis
1913 Argyle Drive
Columbus, OH 43219

Michelle T. Sutter
Assistant Attorney General
101 East Town Street
Attorney for State of Ohio Department of
Taxation
Columbus, OH 43215

Copies Mailed by Clerk.                          Clerk of Courts

## Exhibit I

16134E04

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

FILED
COURT OF APPEALS

04 AUG 10 PH 3:35

CLERK OF COURT

| | | |
|---|---|---|
| GMAC Mortgage Corporation, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 04AP-690 |
| v. | : | (ACCELERATED CALENDAR) |
| Sidney T. Lewis, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY OF DISMISSAL

Appellant's August 5, 2004 voluntary motion to dismiss is granted.  This appeal is hereby dismissed.  Costs of this appeal shall be divided equally between both parties.

_____
JUDGE

_____
JUDGE

ON COMPUTER 12

NOT LEGIBLE

17674312

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

05 SEP 29 PM 3: 37
CLERK OF COURTS

GMAC Mortgage Company,            :

    Plaintiff-Appellee,         :

                            No. 05AP-284
                          (C.P.C. No. 03CVE06-6954)

v.                                :

Sidney T. Lewis,                  :            (ACCELERATED CALENDAR)

    Defendant-Appellant.        :

### JUDGMENT ENTRY

For the reasons stated in the opinion of this court rendered herein on

September 29, 2005, it is the judgment and order of this court that this appeal is

dismissed.  Costs assessed against appellant.

KLATT, J., BROWN, P.J., & McGRATH, J.

By _William A. Klatt_____

Judge William A. Klatt

ON COMPUTER 12

NOT LEGIBLE

I 7636ᴵ¹2Ᵹ

**IN THE COURT OF APPEALS OF OHIO**

**TENTH APPELLATE DISTRICT**

FILED
APPEALS

05 SEP 29 PM 1:54

CLERK OF COURTS

| | | |
|---|---|---|
| GMAC Mortgage Company, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 05AP-284<br>(C.P.C. No. 03CVE06-6954) |
| Sidney T. Lewis, | : | (ACCELERATED CALENDAR) |
| Defendant-Appellant. | : | |

## O P I N I O N

Rendered on September 29, 2005

*Manley Deas Kochalski LLC,* and *Rachel A. Leier,* for appellee.

*Sidney T. Lewis,* pro se.

APPEAL from the Franklin County Court of Common Pleas.

KLATT, J.

{¶1}    Defendant-appellant, Sidney T. Lewis, appeals from a judgment of the Franklin County Court of Common Pleas vacating the sheriff's sale of his property. Because the judgment does not adversely affect appellant, we dismiss this appeal.

{¶2}    On June 24, 2003, plaintiff-appellee, GMAC Mortgage Company ("GMAC"), filed a complaint in the Franklin County Court of Common Pleas alleging that the appellant was in default on a promissory note secured by a mortgage on property located at 1913 Argyle Drive, Columbus, Ohio ("the property"). GMAC averred that it was the

**ON COMPUTER 12**

NOT LEGIBLE

No. 05AP-284    17636I0I                                                           2

holder of the note and mortgage, that the mortgage was a valid lien upon the real estate described in the mortgage, and that it was entitled to have the mortgage foreclosed. Appellant filed an answer in which he admitted executing the note and mortgage. He also admitted that the principal sum of the loan was outstanding. Appellant denied, however, that GMAC was entitled to foreclose on the mortgage. He also filed a counterclaim against GMAC, alleging that the complaint contained misleading and false information.

{¶3}    Subsequently, GMAC moved for summary judgment. GMAC supported its motion with an employee affidavit stating that GMAC was the holder of the note and mortgage, that appellant was in default, that GMAC accelerated the debt, and that appellant owed the principal of $41,411.34 plus interest. On September 19, 2003, the trial court granted GMAC summary judgment and ordered the mortgage foreclosed and the property sold if appellant could not satisfy the amount due and payable. Appellant did not pay the amount due. On October 15, 2003, appellant filed a motion to set aside the trial court's foreclosure order. Before the trial court addressed appellant's motion, the property was appraised at $63,000 and scheduled for a sheriff's sale on December 26, 2003. The property was not sold on that date. The property was re-appraised in May 2004 at $54,000.

{¶4}    On June 21, 2004, the trial court amended its September 19, 2003 order of foreclosure to eliminate appellant's personal liability on the promissory note. The trial court also denied appellant's motion to set aside its order of foreclosure and scheduled the property for another sheriff's sale on July 9, 2004. On July 8, 2004, however, appellant filed a motion for stay as well as a notice of appeal to this court from the trial court's June 21, 2004 order amending its foreclosure order. GMAC did not timely receive

NOT LEGIBLE

No. 05AP-284                                                                                    3

notice of appellant's appeal and purchased the property at the July 9 sheriff's sale. That

sale has never been confirmed by the trial court. On August 5, 2004, appellant filed in

this court a motion to dismiss his appeal, the result of a purported settlement reached

between the parties. This court granted appellant's motion and dismissed his appeal on

August 10, 2004. On January 5, 2005, the trial court reactivated the matter.

{¶5} On March 10, 2005, GMAC filed a motion to vacate the July 9, 2004

sheriff's sale in which it purchased the property. GMAC claimed that appellant wanted an

interior appraisal of the property and requested an interior appraisal to satisfy appellant's

concerns over the valuation of the property.[1] The trial court granted GMAC's motion and

vacated the July 9, 2004 sheriff's sale. It is from this judgment which appellant appeals,

assigning the following errors:

> I. It is reversible error for the trial court to prejudice the instant
> Appellant's right to file a Derivative Claim resounding in "Tort"
> pursuant to O.R.C. §2315.21(B)(1)&(2) and "Breach of Duty"
> stemming from the Appellee's negligent, intentional, and
> unlawful purchase of the subject real property on July 9, 2004
> * * * based on an unlawful real property appraisal which was
> not returned to the Court upon "Actual View" according to law
> * * * while said Appellee accrues unnecessary Statutory
> interests pursuant to O.R.C. §2329.33 in its favor by the
> unreasonable delay * * * in filing its pleadings, motions, and
> otherwise concealment of certain "material facts" for over 270
> days * * *. Under Civ.R.12(A)(2)(b), Appellant was uncon-
> stitutionally deprived of the 14 days to file a motion for leave
> to file a derivative claim or otherwise respond to the
> Appellee's "Motion to Set Aside" due to the "Order of Court
> Granting Appellee's Motion to Set Aside" issued by the Trial
> Court on the same day as the Motion, March 10, 2005.
> Appellant's derivative claim under O.R.C. §2315.21(B)(1)&(2)
> would [be] inclined to magnify the Appellee's unlawful
> purposes of "unjust enrichment" through retention of
> Appellant's "Beneficial Equitable Interest" in the subject

---

[1] The trial court had already granted GMAC's request that the appraisal of appellant's property include an interior inspection.

NOT LEGIBLE

No. 05AP-284 17636700                                                          4

property by using the guise of the Statutory Interest scheme to pilfer Appellant's "equitable collateral interests" and impede the Appellant's "Right of Redemption" through accumulated accrued interest penalty and unnecessary costs.

II. It is reversible error for the trial court to arbitrarily include Mario Casas, Maria Ingraham, and Beneficial Ohio as Defendants and contingent purchasers * * * then exclude Mario Casas, Maria Ingraham, and Beneficial Ohio as Defendants and Purchasers of the subject property at the Sheriff's Sale of July 9, 2005 * * *.

III. The present case involves [w]hether or not the Appellee knew or should have known by the Appellate Court issues in Appellate Case No. 04AP-690, that involved an "unlawful appraisal of the subject property" * * * and that the Appellate Court Order in Appellate Case No. 04AP-690 as filed on August 10, 2004, appraised the Appellee that the subject property, a residential dwelling, was not appraised upon "actual view" in accordance with R.C. §2329.17, and for Appellee to purchase said property under such circumstances on July 9, 2004, would constitute "constructive fraud" upon Appellant.

IV. The present case involves [w]hether or not the Appellee knew or should have known that its delay in filing a Motion To Vacate The Sheriff's Sale from July 9, 2004 * * * until Appellee's Motion to Set Aside Sheriff's Sale filed on March 10, 2005 * * * would cause statutory interest to accrue, accumulate, and otherwise prejudice and diminish the Appellant's "equitable collateral interests", or otherwise cause "unjust enrichment" by the unnecessary accr5ued statutory interest penalty, costs, and diminished "equitable collateral interests" as additional financial injury to the collateral remainder interests of the Appellant.

{¶6} Although appellant's assignments of error are very difficult to decipher, it is apparent that he is appealing from the trial court's order vacating the sheriff's sale of his property. Absent that order, however, appellant would lose title to the property because GMAC purchased the property at the July 9 sheriff's sale. Therefore, appellant appeals from an order that is favorable to him. It is fundamental that an appeal lies only on behalf

NOT LEGIBLE

No. 05AP-284                    17636I04        5

of an aggrieved party. *Ohio Contract Carriers Assn., Inc. v. Public Utilities Comm.* (1942),

140 Ohio St. 160, syllabus. Thus, in order to have standing to appeal, a person must be

able to demonstrate a present interest in the subject matter of the litigation which has

been prejudiced by the judgment appealed from. *Midwest Fireworks Mfg. Co., Inc. v.*

*Deerfield Twp. Bd. of Zoning Appeals* (2001), 91 Ohio St.3d 174, 177; *Farmer v. Farmer*

(Dec. 29, 1999), Columbiana App. No. 98-CO-58. A future, contingent, or speculative

interest is not sufficient to confer standing to appeal. Id., citing *Ohio Contract Carriers*

*Assn.*, supra. The party seeking to appeal bears the burden to establish standing.

*Jenkins v. Gallipolis* (1998), 128 Ohio App.3d 376, 381.

{¶7}    Appellant has not demonstrated a present interest that has been prejudiced

by the trial court's order vacating the sheriff's sale. Appellant first argues that the order

prejudiced his rights to file a claim against GMAC arising from the unlawful purchase of

the property. We disagree. To the extent his claim relates to irregularities associated

with the sheriff's sale, that claim became moot when the trial court vacated the sale.

Moreover, vacating the sheriff's sale does not prejudice appellant's ability to assert any

other claim against GMAC.

{¶8}    Appellant also contends that the property was not appraised based on an

actual view of the interior of the property before the sheriff's sale. Again, the trial court's

order vacated the previous sheriff's sale of the property and provided for another

appraisal of the property, one that would include an interior inspection of the property as

appellant requested. Therefore, the trial court's order does not prejudice appellant's

rights. In fact, the order provides him the relief he requested. Cf. *Lewis v. J.E. Wiggins &*

NOT LEGIBLE

17636I05

No. 05AP-284                                                                                      6

*Co.*, Franklin App. No. 04AP-469, 2004-Ohio-6724, at ¶23 (entry which grants requested relief cannot be characterized as adverse).

{¶9}    Appellant has not demonstrated a present interest in this case that has been prejudiced by the trial court's order vacating the sheriff's sale. Accordingly, appellant has not been adversely affected by the order and lacks standing to pursue this appeal. This appeal is dismissed and the case is remanded to the trial court for further proceedings.

*Appeal dismissed and cause remanded.*

BROWN, P.J., and McGRATH, J., concur.

**Exhibit J**

9-798015
FILED
COURT OF APPEALS
FRANKLIN CO OHIO

2007 JUN 19 PM 2 05

CLERK OF COURTS

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

GMAC Mortgage Company,

    Plaintiff-Appellee,

v                                 No 06AP-188
                                  (C P C No 03CVE06-6954)

Sidney T Lewis et al ,

    Defendants-Appellants              (ACCELERATED CALENDAR)

## JUDGMENT ENTRY

For the reasons stated in the memorandum decision of this court rendered herein on June 19, 2007, having granted appellant's motion to proceed, denying all motions to dismiss and having overruled appellant's assignments of error, it is the judgment and order of this court that the judgment of the Franklin County Court of Common Pleas is affirmed  Costs to appellant

                    WHITESIDE, PETREE & KLATT, JJ

By _____
      Judge Alba Whiteside

WHITESIDE, J , retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution

ON COMPUTER 12

*Trial G*

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

FILED
COURT OF APPEALS
FRANKLIN CO OHIO
2007 JUN 19 PM 2: 02
CLERK OF COURTS
02320E10

GMAC Mortgage Company,

    Plaintiff-Appellee,

v

Sidney T Lewis et al ,

    Defendants-Appellants

No 06AP-188
(C P C No 03CVE06-6954)

*Sheisan*
(ACCELERATED CALENDAR)

---

## MEMORANDUM DECISION

### Rendered on June 19, 2007

---

*Manley, Deas, Kochalski, LLC,* and *Rachel A. Leier,* for appellee

*Sidney T Lewis,* pro se

---

APPEAL from the Franklin County Court of Common Pleas

WHITESIDE, J

{¶1}  Defendant-appellant, Sidney T Lewis, appeals from a judgment of the Franklin County Court of Common Pleas denying various motions by appellant in a foreclosure action brought by plaintiff-appellee, GMAC Mortgage Company  Also before the court are a current motion to dismiss this appeal filed by appellee, and an older motion to dismiss filed by appellant  This last motion has manifestly been abandoned and is overruled  Appellant's contemporaneous motion for leave to proceed is granted

No 06AP-188

2

{¶2}    Appellee's motion to dismiss asserts that appellant has been declared a vexatious litigator by the Franklin County Court of Common Pleas and has not sought leave of court to advance this appeal as required by R C 2323 52(D)(3) A review of the record and filings in this case established that appellant's notice of appeal and merit brief in this appeal pre-date his adjudication as a vexatious litigator in the court of common pleas Appellant has filed nothing in the current appeal since his adjudication as a vexatious litigator that would require leave of court, this appeal has advanced on this court's case schedule and initiative since that time Appellee's motion to dismiss is accordingly denied

{¶3}    Appellant brings the following two assignments of error, which will be addressed together

> I  A void judgment is no judgment at all and is without legal effect
>
> II  Of course, bankruptcy adjudications themselves, as well as the manner in which the rights of debtors and creditors are adjusted, are <u>matters of federal law</u>

{¶4}    Appellant argues that his wife, Yvonne Webb-Lewis, held a dower interest in the property foreclosed upon in this case, and that she entered bankruptcy proceedings on October 14, 2005 and was not discharged until February 21, 2006 by the bankruptcy court. Appellant points out that a dower interest in real estate is includable in a bankruptcy estate, *In re Lambert* (Bankr N D Ohio1986), 57 B R  710, 712, *Standard Fed  Bank v Staff,* 168 Ohio App 3d 14, 2006-Ohio-3601, and contends that the trial court's January 24, 2006 order was therefore in violation of the automatic stay under Section 362, Title 11, U S Code during the pendency of Yvonne's bankruptcy proceedings The spouse's

No 06AP-188                                                                                    3

dower interest is a separate property interest of the spouse and inchoate  The dower

interest of the bankrupt spouse is not part of the bankrupt estate although it may be

terminated by sale of the fee interest during administration of the bankruptcy provided the

spouse is compensated for the value of his inchoate dower interest in a manner similar to

that provided by Ohio law with respect to judicial rules in R C  2103 01 et seq

{¶5}   Initially we note that appellant did not file a notice or suggestion of

bankruptcy in the trial court in this particular action in a timely fashion and appellant thus

did not timely contend he was entitled to the stay  Appellant can hardly complain that the

trial court acted in violation of a stay that he saw fit not to bring to the trial court's attention

in a timely fashion, especially a stay because of his spouse's bankruptcy to which he was

not a party

{¶6}   More specifically, the automatic stay under Section 362 operates to stay

only actions or proceedings against the debtor or his property  *Rhone-Poulenc

Surfactants & Specialties v  Commr of Internal Revenue* (C A 3, 2001), 249 F 3d 175,

179, as noted above  The property in the present case has long since been disposed of in

the foreclosure action, and all that remained in the action were appellant's diverse

attempts to bring grievances against various parties involved in the foreclosure process

Protection of appellant's wife's dower interest in the process was not implicated in any

way by the motions that the trial court disposed of in its latest entry. We therefore find that

the bankruptcy stay did not apply to bar consideration by the trial court of the matters

disposed of

No  06AP-188                                                                                    4

{¶7}   In accordance with the foregoing, appellant's assignments of error on
appeal do not have merit and are overruled, and the judgment of the trial court denying
appellant's motions is affirmed

*Motion for leave to proceed granted;*
*motions to dismiss denied;*
*judgment affirmed*

PETREE and KLATT, JJ , concur

WHITESIDE, J , retired of the Tenth Appellate District,
assigned to active duty under authority of Section 6(C), Article
IV, Ohio Constitution

---

THE STATE OF OHIO
Franklin County ss

I JOHN O GRADY Clerk
OF THE COURT OF APPEALS
WITHIN AND FOR SAID COUNTY
HEREBY CERTIFY THAT THE ABOVE AND FOREGOING IS TRULY TAKEN
AND COPIED FROM THE
Memorandum Decision
NOW ON FILE IN MY OFFICE AS THE SAME HAS THE SEAL OF SAID
COUNTY THIS  22  DAY OF  final  A D 20
JOHN O'GRADY Clerk
By                                        Deputy

**<u>Exhibit K</u>**

0A105 - K63

# IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

| | |
|---|---|
| **GMAC Mortgage Company** | **Case No. 03 CVE 06 6954** |
| **Plaintiff,** | **Judge Patrick E. Sheeran** |
| **vs.** | |
| **Sidney T. Lewis, et al.** | **CONFIRMATION ENTRY OF SALE AND DISTRIBUTION OF PROCEEDS** |
| **Defendants.** | |

This action was heard on the return of the Sheriff of Franklin County of the sale of

property commonly known as 1913 Argyle Drive, Columbus, OH 43219, parcel no. 010-136627-

00 (the "Property"). The legal description of the Property is attached to this order as Exhibit A,

which is incorporated herein by reference.

1.  The Property was sold by the Sheriff on October 28, 2011 to GMAC Mortgage Company

    for the following amount: **$82,136.00**. Plaintiff subsequently assigned its bid to Federal

    National Mortgage Association ("Plaintiff's Assignee").

2.  Having carefully examined the proceedings of the officer, the Court finds that the sale of

    the Property conformed in all respects to the law and the prior orders of this Court and

    hereby confirms and approves the sale of the Property and these proceedings.

3.  The Sheriff shall convey the Property to Federal National Mortgage Association by deed

    according to law free and clear of all liens and encumbrances and shall issue the deed in

    the following name:  Federal National Mortgage Association.

4.  The tax mailing address of the purchaser of the Property is as follows: P.O. Box 650043,

    Dallas, TX 75265-0043.

5.  The prior deed reference with respect to the Property is as follows: Deed dated April 26,

    2001, filed April 26, 2001, recorded at Official Instrument Number 20010426009526,

    Recorder's Office, Franklin County.

Ref# 03-0741/JNT2

6. The purchaser of the Property is hereby subrogated to the rights of the mortgagees and lien holders in the Property to the extent necessary to protect the purchaser's title to the Property.

7. The Court hereby grants the purchaser of the Property a writ of possession to put the purchaser in possession of the Property.

8. The Court hereby orders the release of all mortgages and liens held by all parties to this action. As a result, the Clerk of Courts shall cause certificates of satisfaction and release to be presented for recording by the County Recorder with respect to each of the mortgages and liens listed on Exhibit B, which is attached to this order for the convenience of the Clerk of Courts and incorporated herein by reference. Such mortgages and liens shall be released only to the extent that they encumber the property foreclosed upon in this action and not to the extent that they encumber any other property.

9. Because Federal National Mortgage Association is the assignee of the successful bid of GMAC Mortgage Company, which holds a valid and subsisting mortgage on the Property, Federal National Mortgage Association need not pay the full amount of the purchase price to the Sheriff. Instead, Federal National Mortgage Association need only pay court costs, real estate taxes and assessments, and Sheriff's costs. The deposit amount of **$250.00** tendered at the Sheriff's sale shall be distributed as follows:

   a. The Clerk of Courts shall be paid **$1,371.00** for court costs.

   b. The County Treasurer shall be paid **$1,277.35** for taxes and assessments currently due on the Property and payable through full year 2010 as well as an estimated portion of the 2011 taxes pro-rated through December 9, 2011. Grantee takes title subject to all taxes, interest, penalties, assessments, and tax lien certificates if any.

   c. The Sheriff shall be paid **$125.00** for Sheriff's costs.

   d. The Auditor shall be paid **$164.90** for conveyance fees and transfer tax.

   e. The Recorder shall be paid **$36.00** for recording the deed.

Ref# 03-0741/JNT2

      f.      Since the deposit is not sufficient to satisfy these items, the Plaintiff's Assignee

            shall pay the Sheriff the deficit of **$2,724.25** to cover all requisite disbursements.

10.    The following amount shall be applied as a credit toward the amount of the judgment

      previously entered in favor of the Plaintiff: **$79,161.75**.

**IT IS SO ORDERED.**

                                   _____

                                   Judge Patrick E. Sheeran
                                   Common Pleas Judge

Approved:

/s/ Matthew J Richardson_____
Matthew J. Richardson (0077157)
Manley Deas Kochalski LLC
P. O. Box 165028
Columbus, OH 43216-5028
Telephone: 614-222-4921
Fax: 614-220-5613
Email: mjr2@mdk-llc.com
Attorney for Plaintiff

Approval via 11/14/11 email_____
Mary Johnson
Assistant Prosecutor
373 S. High Street – 17th Floor
Columbus, OH 43215
Fax: 614-462-2530

Circulating for approval_____
Sidney T. Lewis, pro-se
1875 Alvason Ave.
Columbus, OH 43219

Circulating for approval_____
Michelle Sutter
Attorney for the State of Ohio Department of Taxation
Assistant Attorney General
101 East Town Street
Columbus, OH 43215

0A105 - K66

## EXHIBIT A

### Legal Description of the Property

Situated in the County of Franklin, in the State of Ohio, and in the City of Columbus:

Being all of Lot No. Eleven (11) of Argyle Park Subdivision, as the same is numbered and delineated upon the recorded plat thereof, of record in Plat Book 36, Page 6, Recorder's Office, Franklin County, Ohio.

Property Address: 1913 Argyle Drive, Columbus, OH 43219

Parcel No.  010-136627-00

0A105 - K67

## EXHIBIT B

### Mortgages and Liens to be Released

1.  Certificate of Judgment in favor of State of Ohio, Department of Taxation, c/o Ohio Attorney General, 150 East Gay Street, 21st Floor, Columbus, OH 43215, Judgment Creditor, against Robert A. Hamilton and Allison R. Hamilton, 51 South Oakley Avenue Columbus, Ohio 43204, Judgment Debtor, in the amount of $221.29, plus interest and costs, filed on November 2, 1993, recorded at Certificate of Judgment 93JG-11-33202, Clerk of Court's Office, Franklin County, Ohio.

    The above mentioned lien also filed in Official Records Volume 43005, Page E03, Recorder's Office, Franklin County, Ohio.

2.  Certificate of Judgment in favor of State of Ohio, Department of Taxation, c/o Ohio Attorney General, 150 East Gay Street, 21st Floor, Columbus, OH 43215, Judgment Creditor, against Robert Ben Hamilton, PO Box 651 Port Colborne Ont. Canada, L3K5V8, Judgment Debtor, in the amount of $57.50, plus interest and costs, filed on January 7, 1997, recorded at Certificate of Judgment 97JG-01-00144, Clerk of Court's Office, Franklin County, Ohio.

3.  Certificate of Judgment in favor of State of Ohio, Department of Taxation, c/o Ohio Attorney General, 150 East Gay Street, 21st Floor, Columbus, OH 43215, Judgment Creditor, against Robert A. Hamilton and Allison R. Hamilton, 51 South Oakley Avenue Columbus, Ohio 43204, Judgment Debtor, in the amount of $591.45, plus interest and costs, filed on November 26, 1997, recorded at Certificate of Judgment 97JG-11-19818, Clerk of Court's Office, Franklin County, Ohio.

    The above referenced lien also recorded in Official Records volume 61797, Page G18, Recorder's Office, Franklin County, Ohio.

4.  Ohio Bureau of Employment Lien in favor of State of Ohio, Bureau of Employment Services, c/o Ohio Attorney General, 150 East Gay Street, 21st Floor, Columbus, OH 43215, Judgment Creditor, against Robert L. Hamilton dba Hamilton Construction Co., 8877 Winston Road Pickerington, Ohio 43147, Judgment Debtor, in the amount of $558.30, plus interest and costs, filed May 7, 1999, recorded at Official Instrument Number 199905070115223, Recorder's Office, Franklin County, Ohio.

5.  Ohio Bureau of Employment Lien in favor of State of Ohio, Bureau of Employment Services, c/o Ohio Attorney General, 150 East Gay Street, 21st Floor, Columbus, OH 43215, Judgment Creditor, against Robert L. Hamilton dba Hamilton Construction Co., 8877 Winston Road Pickerington, Ohio 43147, Judgment Debtor, in the amount of $729.15, plus interest and costs, filed May 7, 1999, recorded at Official Instrument Number 199905070115224, Recorder's Office, Franklin County, Ohio.

6.  Mortgage in favor of The Huntington Mortgage Company, 7575 Huntington Park Drive, Columbus, OH 43235, from Robert Hamilton, unmarried, in the amount of $45,500.00, filed January 25, 2000, recorded at Official Instrument Number 200001250017092, Recorder's Office, Franklin County, Ohio.

Ref# 03-0741/JNT2

0A105 - K68

as assigned to GMAC Mortgage Corporation, 3451 Hammond Avenue, Waterloo, IA 50702, by Assignment filed July 20, 2000, recorded at Official Instrument Number 200007200143660, Recorder's Office, Franklin County, Ohio.

7.   Lien Affidavit in favor of Ohio Medicaid Recovery Program, c/o Bruce H. Burkholder, 300 Spruce Street, Floor One, Columbus, OH 43215, Judgment Creditor, against Robert Hamilton, no address listed, Judgment Debtor, in the amount of $10,529.14, plus interest and costs, filed August 17, 2005, recorded at Official Instrument Number 200508170167270, Recorder's Office, Franklin County, Ohio.

8.   Certificate of Judgment in favor of The Huntington National Bank, no address shown, Judgment Creditor, against Sidney T. Lewis and Yvonne D. Webb-Lewis, no address listed, Judgment Debtor, in the amount of $28,517.00, plus interest and costs, filed on August 23, 2005, recorded at Certificate of Judgment 05JG-08-06455, Clerk of Court's Office, Franklin County, Ohio.

The above referenced lien also recorded in Official Records Volume 83986, Page J05, Recorder's Office, Franklin County, Ohio.

0A105 - K69

Franklin County Court of Common Pleas

**Date:**               12-12-2011

**Case Title:**      GMAC MORTGAGE COMPANY -VS- SIDNEY T LEWIS

**Case Number:**   03CV006954

**Type:**            CONFIRMATION OF SALE

It Is So Ordered.

/s/ Judge Patrick E. Sheeran

Electronically signed on 2011-Dec-12    page 7 of 7

**<u>Exhibit 3</u>**

**Rosenbaum Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------- )
                                                                )
In re:                                                          )   Case No. 12-12020 (MG)
                                                                )
RESIDENTIAL CAPITAL, LLC, <u>et al.</u>,                        )   Chapter 11
                                                                )
                                            Debtors.            )   Jointly Administered
                                                                )
--------------------------------------------------------------- )

**DECLARATION OF NORMAN S. ROSENBAUM IN SUPPORT OF DEBTORS'**
**COMBINED OBJECTION TO PROOFS OF CLAIM**
**FILED BY SIDNEY T. LEWIS AND YVONNE D. LEWIS**

Norman S. Rosenbaum, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury:

6.      I am a partner in the law firm of Morrison & Foerster LLP ("<u>M&F</u>").  M&F maintains offices for the practice of law, among other locations in the United States and worldwide, at 1290 Avenue of the Americas, New York, New York 10104.  I am an attorney duly admitted to practice before this Court and the courts of the State of New York.  By this Court's Order entered on July 16, 2012, M&F was retained as counsel to Residential Capital, LLC and its affiliated debtors (the "<u>Debtors</u>").

7.      I submit this declaration (the "<u>Declaration</u>") in support of the *Debtors' Combined Objection to Proofs of Claim Filed by Sidney T. Lewis and Yvonne D. Lewis* (the "<u>Objection</u>") and in compliance with this Court's Order entered March 21, 2013, pursuant to section 105(a) of Title 11, United States Code (the "<u>Bankruptcy Code</u>") and Rules 1009, 3007 and 9019(b) of the Federal Rules of Bankruptcy Procedure approving: (i) Claim Objection Procedures; (ii) Borrower Claim Procedures; (iii) Settlement Procedures; and (iv) Schedule Amendment Procedures [Docket No. 3294] (the "<u>Claim Objection Procedures Order</u>").

8.      It is my understanding that in connection with the filing of the Objection, the

Debtors have complied with the Claim Objection Procedures Order.  I have been advised by attorneys under my supervision that in accordance with the Claim Objection Procedures Order, prior to filing the Objection, the Debtors mailed request letters to Sidney T. Lewis and Yvonne D. Lewis (the "Lewises") to request additional supporting documentation and explanation in support of Claim Nos. 932 and 933 (the "Lewis Claims").  I am further advised that the Debtors conferred with SilvermanAcampora LLP as Special Counsel to the Creditors' Committee for Borrower Issues ("Special Counsel") in drafting the request letters and provided Special Counsel with copies of the request letters sent to the Lewises.

9.      After receiving and reviewing the Lewises' response to the request letters [Docket No. 4259], the Debtors conferred with Special Counsel as to appropriateness of objecting to the Lewis Claims.  The Debtors agreed with Special Counsel that the Lewis Claims should be disallowed and expunged.

10.     To the best of my knowledge, prior to the filing of the Objection, both the Debtors and Special Counsel have fully complied with all other relevant terms of the Claim Objection Procedures Order.

Dated: September 11, 2013
        New York, New York

                                        /s/ Norman S. Rosenbaum
                                        Norman S. Rosenbaum

## Exhibit 4

**Nosek Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------x

In re:                                                       Chapter 11
                                                             Case No. 12-12020 (MG)
RESIDENTIAL CAPITAL, LLC, et al.
                                                             (Jointly Administered)

                                        Debtors.
--------------------------------------------------------------------x

### DECLARATION OF ROBERT D. NOSEK IN SUPPORT OF THE DEBTORS' COMBINED OBJECTION TO PROOFS OF CLAIM FILED BY SIDNEY T. LEWIS AND YVONNE D. LEWIS

Robert D. Nosek, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury:

1.      I am counsel to the firm SilvermanAcampora LLP ("SilvermanAcampora"), with offices located at 100 Jericho Quadrangle, Suite 300, Jericho, New York 11753.  I am duly admitted to practice law before this Court and the courts of the State of New York.  By this Court's Order entered November 30, 2012, SilvermanAcampora was retained as special counsel to the Official Committee of Unsecured Creditors of Residential Capital, LLC, et al. for borrower issues.

2.      I submit this declaration (the "Declaration") in support of the *Debtors' Combined Objection to Proofs of Claim Filed by Sidney T. Lewis and Yvonne D. Lewis* (the "Objection") and in compliance with this Court's Order entered March 21, 2013, pursuant to section 105(a) of Title 11, United States Code (the "Bankruptcy Code") and Rules 1009, 3007 and 9019(b) of the Federal Rules of Bankruptcy Procedure approving: (i) Claim Objection Procedures; (ii) Borrower Claim Procedures; (iii) Settlement Procedures; and (iv) Schedule Amendment Procedures [Docket No. 3294] (the "Claims Objection Procedures Order").

3.      Unless otherwise stated in this Declaration, I have personal knowledge of the facts hereinafter set forth and, if called as a witness, I could and would testify competently

thereto.

4.      Pursuant to the Claims Objection Procedures Order, prior to filing the Objection, the Debtors provided SilvermanAcampora with copies of Claim Nos. 932 and 933 (the "Lewis Claims") filed by Sidney T. Lewis & Yvonne D. Lewis (the "Lewises"), which the Debtors intended to include in the Objection.

5.      I or my designee at my direction first reviewed the Lewis Claims to determine if such claims were actually filed without sufficient explanation or sufficient supporting documentation to determine the validity of such claims.  Thereafter, I or my designee at my direction conferred with the Debtors and agreed that the Lewises should receive request letters, requesting additional explanation and documentation in support of their claims.

6.      I or my designee at my direction also conferred with the Debtors in drafting the request letters, and the Debtors provided copies of such letters to SilvermanAcampora.

7.      SilvermanAcampora has reviewed the basis of the Lewis Claims and the additional documents provided by the Lewises in response to the Request Letters, and SilvermanAcampora does not object to the Debtors' determination and reasoning for filing the Objection.

8.      To the best of my knowledge, prior to the filing of the Objection, both the Debtors and SilvermanAcampora have fully complied with all other relevant terms of the Claims Objections Procedures Order.


Dated: September 11, 2013
       Jericho, New York


                                        /s/  Robert D. Nosek
                                        Robert D. Nosek

## Exhibit 5

**Request Letters**

ny-1103021

                    MORRISON | FOERSTER

June 11, 2013

**Claim Number: 932**

Dear Claimant:

You are receiving this letter because you or someone on your behalf filed a Proof of Claim form in the jointly-administered chapter 11 bankruptcy cases of Residential Capital, LLC ("ResCap"), GMAC Mortgage, LLC and other affiliated debtors and debtors in possession (collectively, the "Debtors") pending before the United States Bankruptcy Court for the Southern District of New York, Case No. 12-12020 (MG) (the "ResCap bankruptcy case"), and we need additional information from you regarding the claims you are asserting against the Debtors.

**The Information we Need From You Regarding Your Proof of Claim**:
We reviewed a copy of the Proof of Claim form and documents that you filed in the ResCap bankruptcy case. A copy of your Proof of Claim form is enclosed for your reference. In reviewing the Proof of Claim form and the documents you submitted, you did not submit sufficient information to support the nature of your "Basis for Claim" nor do we have sufficient information to understand the calculations you used to determine the amount you have claimed. In order to evaluate your claim, we need to understand the specific reasons as to why you believe you are owed money or are entitled to other relief from one or more of the Debtors. Please also provide a specific explanation of how you calculated the amount of your claim.

**You Must Respond to this Letter by no Later Than July 11, 2013**:
In accordance with the Order of the Bankruptcy Court (Docket No. 3294, filed March 21, 2013), you **must** respond to this letter by no later than July 11, 2013 with an explanation stating the legal and factual reasons why you believe you are owed money or are entitled to other relief from one or more of the Debtors as of May 14, 2012 (the date the Debtors filed their bankruptcy cases). You **must** provide copies of any and all documentation that you believe supports the basis for your claim. Included with this letter is a form to assist you in responding to our request.

**Consequences of Failing to Respond**:
If you do not provide the basis for your claim and the supporting documentation by July 11, 2013, the Debtors may file a formal objection to your Proof of Claim on one or more bases including that you failed to provide sufficient information and documentation to support your claim, and your claim may be disallowed and permanently expunged. If your claim is disallowed and expunged, you will not receive any payment for your claim and any other requests you may have made for non-monetary relief in your Proof of Claim will be denied. Therefore, it is very important that you respond by the date stated above with the requested information and documentation supporting the basis for your claim.

If your claim relates to a mortgage loan that you believe was originated or serviced by one of the Debtors, please be sure to include the loan number and property address that the loan relates to in the information

and documentation that you send us, so that we can effectively search our records for information on your property and loan, and evaluate your claim.

**Questions**:
If you have any questions about this letter, or need help in providing the requested information and document(s), you should contact an attorney. You may also contact the Special Counsel to the Official Committee of Unsecured Creditors[1] (contact information provided below):

**SPECIAL COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
SILVERMANACAMPORA LLP
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
Telephone: 866-259-5217
Website: http://silvermanacampora.com
E-mail address: rescapborrower@silvermanacampora.com


**You must send the requested information and document(s) supporting your claim on or before the date provided in this letter to either;**

> (i)     **Claims.Management@gmacrescap.com, or**
> (ii)    **Residential Capital, LLC**
>         **P.O. Box 385220**
>         **Bloomington, Minnesota 55438**


**Please mark each document you send with the Claim Number referenced above.**



Sincerely,

Claims Management
Residential Capital, LLC

---

[1] Please be advised that SilvermanAcampora LLP does not represent you individually and, therefore, cannot provide you with legal advice.

          M O R R I S O N  |  F O E R S T E R

June 11, 2013

**Claim Number: 933**

Dear Claimant:

You are receiving this letter because you or someone on your behalf filed a Proof of Claim form in the jointly-administered chapter 11 bankruptcy cases of Residential Capital, LLC ("ResCap"), GMAC Mortgage, LLC and other affiliated debtors and debtors in possession (collectively, the "Debtors") pending before the United States Bankruptcy Court for the Southern District of New York, Case No. 12-12020 (MG) (the "ResCap bankruptcy case"), and we need additional information from you regarding the claims you are asserting against the Debtors.

<u>**The Information we Need From You Regarding Your Proof of Claim**</u>:
We reviewed a copy of the Proof of Claim form and documents that you filed in the ResCap bankruptcy case. A copy of your Proof of Claim form is enclosed for your reference. In reviewing the Proof of Claim form and the documents you submitted, you did not submit sufficient information to support the nature of your "Basis for Claim", and we do not have sufficient information to understand the calculations you used to determine the amount you have claimed. In order to evaluate your claim, we need to understand the specific reasons as to why you believe you are owed money or are entitled to other relief from one or more of the Debtors. Please also provide a specific explanation of how you calculated the amount of your claim.

<u>**You Must Respond to this Email by no Later Than July 11, 2013**</u>:
In accordance with the Order of the Bankruptcy Court (Docket No. 3294, filed March 21, 2013), you **must** respond to this email by no later than July 11, 2013 with an explanation stating the legal and factual reasons why you believe you are owed money or are entitled to other relief from one or more of the Debtors as of May 14, 2012 (the date the Debtors filed their bankruptcy cases). You **must** also provide copies of any and all documentation that you believe supports the basis for your claim. Included with this letter is a form to assist you in responding to our request.

<u>**Consequences of Failing to Respond**</u>:
If you do not provide the basis for your claim and the supporting documentation by July 11, 2013, the Debtors may file a formal objection to your Proof of Claim on one or more bases including that you failed to provide sufficient information and documentation to support your claim, and your claim may be disallowed and permanently expunged. If your claim is disallowed and expunged, you will not receive any payment for your claim and any other requests you may have made for non-monetary relief in your Proof of Claim will be denied. Therefore, it is very important that you respond by the date stated above with the requested information and documentation supporting the basis for your claim.

If your claim relates to a mortgage loan that you believe was originated or serviced by one of the Debtors, please be sure to include the loan number and property address that the loan relates to in the information and documentation that you send us, so that we can effectively search our records for information on your property and loan, and evaluate your claim.

**Questions**:

If you have any questions about this email, or need help in providing the requested information and document(s), you should contact an attorney. You may also contact the Special Counsel to the Official Committee of Unsecured Creditors[1] (contact information provided below):

**SPECIAL COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

SILVERMANACAMPORA LLP
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
Telephone: 866-259-5217
Website: http://silvermanacampora.com
E-mail address: rescapborrower@silvermanacampora.com


**You must send the requested information and document(s) supporting your claim on or before the date provided in this letter to either;**

    **(i)**    **Claims.Management@gmacrescap.com, or**
    **(ii)**    **Residential Capital, LLC**
            **P.O. Box 385220**
            **Bloomington, Minnesota 55438**


**Please mark each document you send with the Claim Number referenced above.**


Sincerely,

Claims Management
Residential Capital, LLC

---

[1] Please be advised that SilvermanAcampora LLP does not represent you individually and, therefore, cannot provide you with legal advice.