# 5

# SUBPRIME LENDING

## CONTENTS

*Mortgage securitization: "This stuff is so complicated how is anybody going to know?"* ............................................................................68
*Greater access to lending: "A business where we can make some money"* ............72
*Subprime lenders in turmoil: "Adverse market conditions"* ................................74
*The regulators: "Oh, I see"* ..................................................................................75

In the early 1980s, subprime lenders such as Household Finance Corp. and thrifts such as Long Beach Savings and Loan made home equity loans, often second mortgages, to borrowers who had yet to establish credit histories or had troubled financial histories, sometimes reflecting setbacks such as unemployment, divorce, medical emergencies, and the like. Banks might have been unwilling to lend to these borrowers, but a subprime lender would if the borrower paid a higher interest rate to offset the extra risk. "No one can debate the need for legitimate non-prime (subprime) lending products," Gail Burks, president of the Nevada Fair Housing Center, Inc., testified to the FCIC.[1]

Interest rates on subprime mortgages, with substantial collateral—the house—weren't as high as those for car loans, and were much less than credit cards. The advantages of a mortgage over other forms of debt were solidified in 1986 with the Tax Reform Act, which barred deducting interest payments on consumer loans but kept the deduction for mortgage interest payments.

In the 1980s and into the early 1990s, before computerized "credit scoring"—a statistical technique used to measure a borrower's creditworthiness—automated the assessment of risk, mortgage lenders (including subprime lenders) relied on other factors when underwriting mortgages. As Tom Putnam, a Sacramento-based mortgage banker, told the Commission, they traditionally lent based on the four C's: credit (quantity, quality, and duration of the borrower's credit obligations), capacity (amount and stability of income), capital (sufficient liquid funds to cover down payments, closing costs, and reserves), and collateral (value and condition of the property).[2] Their decisions depended on judgments about how strength in one area, such as collateral, might offset weaknesses in others, such as credit. They underwrote borrowers one at a time, out of local offices.

In a few cases, such as CitiFinancial, subprime lending firms were part of a bank holding company, but most—including Household, Beneficial Finance, The Money Store, and Champion Mortgage—were independent consumer finance companies. Without access to deposits, they generally funded themselves with short-term lines of credit, or "warehouse lines," from commercial or investment banks. In many cases, the finance companies did not keep the mortgages. Some sold the loans to the same banks extending the warehouse lines. The banks would securitize and sell the loans to investors or keep them on their balance sheets. In other cases, the finance company itself packaged and sold the loans—often partnering with the banks extending the warehouse lines. Meanwhile, the S&Ls that originated subprime loans generally financed their own mortgage operations and kept the loans on their balance sheets.

## MORTGAGE SECURITIZATION: "THIS STUFF IS SO COMPLICATED HOW IS ANYBODY GOING TO KNOW?"

Debt outstanding in U.S. credit markets tripled during the 1980s, reaching $13.8 trillion in 1990; 11% was securitized mortgages and GSE debt. Later, mortgage securities made up 18% of the debt markets, overtaking government Treasuries as the single largest component—a position they maintained through the financial crisis.[3]

In the 1990s mortgage companies, banks, and Wall Street securities firms began securitizing mortgages (see figure 5.1). And more of them were subprime. Salomon Brothers, Merrill Lynch, and other Wall Street firms started packaging and selling "non-agency" mortgages—that is, loans that did not conform to Fannie's and Freddie's standards. Selling these required investors to adjust expectations. With securitizations handled by Fannie and Freddie, the question was not "will you get the money back" but "when," former Salomon Brothers trader and CEO of PentAlpha Jim Callahan told the FCIC.[4] With these new non-agency securities, investors had to worry about getting paid back, and that created an opportunity for S&P and Moody's. As Lewis Ranieri, a pioneer in the market, told the Commission, when he presented the concept of non-agency securitization to policy makers, they asked, "'This stuff is so complicated how is anybody going to know? How are the buyers going to buy?'" Ranieri said, "One of the solutions was, it had to have a rating. And that put the rating services in the business."[5]

Non-agency securitizations were only a few years old when they received a powerful stimulus from an unlikely source: the federal government. The savings and loan crisis had left Uncle Sam with $402 billion in loans and real estate from failed thrifts and banks. Congress established the Resolution Trust Corporation (RTC) in 1989 to offload mortgages and real estate, and sometimes the failed thrifts themselves, now owned by the government. While the RTC was able to sell $6.1 billion of these mortgages to Fannie and Freddie, most did not meet the GSEs' standards. Some were what might be called subprime today, but others had outright documentation errors or servicing problems, not unlike the low-documentation loans that later became popular.[6]



Figure 5.1

RTC officials soon concluded that they had neither the time nor the resources to sell off the assets in their portfolio one by one and thrift by thrift. They turned to the private sector, contracting with real estate and financial professionals to securitize some of the assets. By the time the RTC concluded its work, it had securitized $25 billion in residential mortgages.[7] The RTC in effect helped expand the securitization of mortgages ineligible for GSE guarantees.[8] In the early 1990s, as investors became

## Subprime Mortgage Originations

*In 2006, $600 billion of subprime loans were originated, most of which were securitized. That year, subprime lending accounted for 23.5% of all mortgage originations.*



NOTE: Percent securitized is defined as subprime securities issued divided by originations in a given year. In 2007, securities issued exceeded originations.
SOURCE: Inside Mortgage Finance

*Figure 5.2*

more familiar with the securitization of these assets, mortgage specialists and Wall Street bankers got in on the action. Securitization and subprime originations grew hand in hand. As figure 5.2 shows, subprime originations increased from $70 billion in 1996 to $100 billion in 2000. The proportion securitized in the late 1990s peaked at 56%, and subprime mortgage originations' share of all originations hovered around 10%.

Securitizations by the RTC and by Wall Street were similar to the Fannie and Freddie securitizations. The first step was to get principal and interest payments from a group of mortgages to flow into a single pool. But in "private-label" securities (that is, securitizations not done by Fannie or Freddie), the payments were then "tranched" in a way to protect some investors from losses. Investors in the tranches received different streams of principal and interest in different orders.

Most of the earliest private-label deals, in the late 1980s and early 1990s, used a rudimentary form of tranching. There were typically two tranches in each deal. The

less risky tranche received principal and interest payments first and was usually guaranteed by an insurance company. The more risky tranche received payments second, was not guaranteed, and was usually kept by the company that originated the mortgages.

Within a decade, securitizations had become much more complex: they had more tranches, each with different payment streams and different risks, which were tailored to meet investors' demands. The entire private-label mortgage securitization market—those who created, sold, and bought the investments—would become highly dependent on this slice-and-dice process, and regulators and market participants alike took for granted that it efficiently allocated risk to those best able and willing to bear that risk.

To demonstrate how this process worked, we'll describe a typical deal, named CMLTI 2006-NC2, involving $947 million in mortgage-backed bonds.[9] In 2006, New Century Financial, a California-based lender, originated and sold 4,499 subprime mortgages to Citigroup, which sold them to a separate legal entity that Citigroup sponsored that would own the mortgages and issue the tranches. The entity purchased the loans with cash it had raised by selling the securities these loans would back. The entity had been created as a separate legal structure so that the assets would sit off Citigroup's balance sheet, an arrangement with tax and regulatory benefits.

The 4,499 mortgages carried the rights to the borrowers' monthly payments, which the Citigroup entity divided into 19 tranches of mortgage-backed securities; each tranche gave investors a different priority claim on the flow of payments from the borrowers, and a different interest rate and repayment schedule. The credit rating agencies assigned ratings to most of these tranches for investors, who—as securitization became increasingly complicated—came to rely more heavily on these ratings. Tranches were assigned letter ratings by the rating agencies based on their riskiness. In this report, ratings are generally presented in S&P's classification system, which assigns ratings such as "AAA" (the highest rating for the safest investments, referred to here as triple-A), "AA" (less safe than AAA), "A," "BBB," and "BB," and further distinguishes ratings with "+" and "-." Anything rated below "BBB-" is considered "junk." Moody's uses a similar system in which "Aaa" is highest, followed by "Aa," "A," "Baa," "Ba," and so forth. For example, an S&P rating of BBB would correspond to a Moody's rating of Baa. In this Citigroup deal, the four senior tranches—the safest—were rated triple-A by the agencies.

Below the senior tranches and next in line for payments were eleven "mezzanine" tranches—so named because they sat between the riskiest and the safest tranches. These were riskier than the senior tranches and, because they paid off more slowly, carried a higher risk that an increase in interest rates would make the locked-in interest payments less valuable. As a result, they paid a correspondingly higher interest rate. Three of these tranches in the Citigroup deal were rated AA, three were A, three were BBB (the lowest investment-grade rating), and two were BB, or junk.

The last to be paid was the most junior tranche, called the "equity," "residual," or "first-loss" tranche, set up to receive whatever cash flow was left over after all the other investors had been paid. This tranche would suffer the first losses from any

defaults of the mortgages in the pool. Commensurate with this high risk, it provided the highest yields (see figure 5.3). In the Citigroup deal, as was common, this piece of the deal was not rated at all. Citigroup and a hedge fund each held half the equity tranche.[10]

While investors in the lower-rated tranches received higher interest rates because they knew there was a risk of loss, investors in the triple-A tranches did not expect payments from the mortgages to stop. This expectation of safety was important, so the firms structuring securities focused on achieving high ratings. In the structure of this Citigroup deal, which was typical, $737 million, or 78%, was rated triple-A.

## GREATER ACCESS TO LENDING:
### "A BUSINESS WHERE WE CAN MAKE SOME MONEY"

As private-label securitization began to take hold, new computer and modeling technologies were reshaping the mortgage market. In the mid-1990s, standardized data with loan-level information on mortgage performance became more widely available. Lenders underwrote mortgages using credit scores, such as the FICO score, developed by Fair Isaac Corporation. In 1994, Freddie Mac rolled out Loan Prospector, an automated system for mortgage underwriting for use by lenders, and Fannie Mae released its own system, Desktop Underwriter, two months later. The days of laborious, slow, and manual underwriting of individual mortgage applicants were over, lowering cost and broadening access to mortgages.

This new process was based on quantitative expectations: Given the borrower, the home, and the mortgage characteristics, what was the probability payments would be on time? What was the probability that borrowers would prepay their loans, either because they sold their homes or refinanced at lower interest rates?

In the 1990s, technology also affected implementation of the Community Reinvestment Act (CRA). Congress enacted the CRA in 1977 to ensure that banks and thrifts served their communities, in response to concerns that banks and thrifts were refusing to lend in certain neighborhoods without regard to the creditworthiness of individuals and businesses in those neighborhoods (a practice known as redlining).[11]

The CRA called on banks and thrifts to invest, lend, and service areas where they took in deposits, so long as these activities didn't impair their own financial safety and soundness. It directed regulators to consider CRA performance whenever a bank or thrift applied for regulatory approval for mergers, to open new branches, or to engage in new businesses.[12]

The CRA encouraged banks to lend to borrowers to whom they may have previously denied credit. While these borrowers often had lower-than-average income, a 1997 study indicated that loans made under the CRA performed consistently with the rest of the banks' portfolios, suggesting CRA lending was not riskier than the banks' other lending.[13] "There is little or no evidence that banks' safety and soundness have been compromised by such lending, and bankers often report sound business opportunities," Federal Reserve Chairman Alan Greenspan said of CRA lending in 1998.[14]

## Residential Mortgage-Backed Securities

*Financial institutions packaged subprime, Alt-A and other mortgages into securities. As long as the housing market continued to boom, these securities would perform. But when the economy faltered and the mortgages defaulted, lower-rated tranches were left worthless.*



### 1 Originate
Lenders extend mortgages, including subprime and Alt-A loans.

### 2 Pool
Securities firms purchase these loans and pool them.

### 3 Tranche
Residential mortgage-backed securities are sold to investors, giving them the right to the principal and interest from the mortgages. These securities are sold in tranches, or slices. The flow of cash determines the rating of the securities, with AAA tranches getting the first cut of principal and interest payments, then AA, then A, and so on.

*Figure 5.3*

In 1993, President Bill Clinton asked regulators to improve banks' CRA performance while responding to industry complaints that the regulatory review process for compliance was too burdensome and too subjective. In 1995, the Fed, Office of Thrift Supervision (OTS), Office of the Comptroller of the Currency (OCC), and Federal Deposit Insurance Corporation (FDIC) issued regulations that shifted the regulatory focus from the efforts that banks made to comply with the CRA to their actual results. Regulators and community advocates could now point to objective, observable numbers that measured banks' compliance with the law.

Former comptroller John Dugan told FCIC staff that the impact of the CRA had been lasting, because it encouraged banks to lend to people who in the past might not have had access to credit. He said, "There is a tremendous amount of investment that goes on in inner cities and other places to build things that are quite impressive. . . . And the bankers conversely say, 'This is proven to be a business where we can make some money; not a lot, but when you factor that in plus the good will that we get from it, it kind of works.'"[15]

Lawrence Lindsey, a former Fed governor who was responsible for the Fed's Division of Consumer and Community Affairs, which oversees CRA enforcement, told the FCIC that improved enforcement had given the banks an incentive to invest in technology that would make lending to lower-income borrowers profitable by such means as creating credit scoring models customized to the market. Shadow banks not covered by the CRA would use these same credit scoring models, which could draw on now more substantial historical lending data for their estimates, to underwrite loans. "We basically got a cycle going which particularly the shadow banking industry could, using recent historic data, show the default rates on this type of lending were very, very low," he said.[16] Indeed, default rates were low during the prosperous 1990s, and regulators, bankers, and lenders in the shadow banking system took note of this success.

## SUBPRIME LENDERS IN TURMOIL: "ADVERSE MARKET CONDITIONS"

Among nonbank mortgage originators, the late 1990s were a turning point. During the market disruption caused by the Russian debt crisis and the Long-Term Capital Management collapse, the markets saw a "flight to quality"—that is, a steep fall in demand among investors for risky assets, including subprime securitizations. The rate of subprime mortgage securitization dropped from 55.1% in 1998 to 37.4% in 1999. Meanwhile, subprime originators saw the interest rate at which they could borrow in credit markets skyrocket. They were caught in a squeeze: borrowing costs increased at the very moment that their revenue stream dried up.[17] And some were caught holding tranches of subprime securities that turned out to be worth far less than the value they had been assigned.

Mortgage lenders that depended on liquidity and short-term funding had immediate problems. For example, Southern Pacific Funding (SFC), an Oregon-based subprime lender that securitized its loans, reported relatively positive second-quarter

results in August 1998. Then, in September, SFC notified investors about "recent adverse market conditions" in the securities markets and expressed concern about "the continued viability of securitization in the foreseeable future."[18] A week later, SFC filed for bankruptcy protection. Several other nonbank subprime lenders that were also dependent on short-term financing from the capital markets also filed for bankruptcy in 1998 and 1999. In the two years following the Russian default crisis, 8 of the top 10 subprime lenders declared bankruptcy, ceased operations, or sold out to stronger firms.[19]

When these firms were sold, their buyers would frequently absorb large losses. First Union, a large regional bank headquartered in North Carolina, incurred charges of almost $1.7 billion after it bought The Money Store. First Union eventually shut down or sold off most of The Money Store's operations.

Conseco, a leading insurance company, purchased Green Tree Financial, another subprime lender. Disruptions in the securitization markets, as well as unexpected mortgage defaults, eventually drove Conseco into bankruptcy in December 2002. At the time, this was the third-largest bankruptcy in U.S. history (after WorldCom and Enron).

Accounting misrepresentations would also bring down subprime lenders. Keystone, a small national bank in West Virginia that made and securitized subprime mortgage loans, failed in 1999. In the securitization process—as was common practice in the 1990s—Keystone retained the riskiest "first-loss" residual tranches for its own account. These holdings far exceeded the bank's capital. But Keystone assigned them grossly inflated values. The OCC closed the bank in September 1999, after discovering "fraud committed by the bank management," as executives had overstated the value of the residual tranches and other bank assets.[20] Perhaps the most significant failure occurred at Superior Bank, one of the most aggressive subprime mortgage lenders. Like Keystone, it too failed after having kept and overvalued the first-loss tranches on its balance sheet.

Many of the lenders that survived or were bought in the 1990s reemerged in other forms. Long Beach was the ancestor of Ameriquest and Long Beach Mortgage (which was in turn purchased by Washington Mutual), two of the more aggressive lenders during the first decade of the new century. Associates First was sold to Citigroup, and Household bought Beneficial Mortgage before it was itself acquired by HSBC in 2003.

With the subprime market disrupted, subprime originations totaled $100 billion in 2000, down from $135 billion two years earlier.[21] Over the next few years, however, subprime lending and securitization would more than rebound.

## THE REGULATORS: "OH, I SEE"

During the 1990s, various federal agencies had taken increasing notice of abusive subprime lending practices. But the regulatory system was not well equipped to respond consistently—and on a national basis—to protect borrowers. State regulators, as well as either the Fed or the FDIC, supervised the mortgage practices of state

banks. The OCC supervised the national banks. The OTS or state regulators were responsible for the thrifts. Some state regulators also licensed mortgage brokers, a growing portion of the market, but did not supervise them.[22]

Despite this diffusion of authority, one entity was unquestionably authorized by Congress to write strong and consistent rules regulating mortgages for all types of lenders: the Federal Reserve, through the Truth in Lending Act of 1968. In 1969, the Fed adopted Regulation Z for the purpose of implementing the act. But while Regulation Z applied to all lenders, its enforcement was divided among America's many financial regulators.

One sticking point was the supervision of nonbank subsidiaries such as subprime lenders. The Fed had the legal mandate to supervise bank holding companies, including the authority to supervise their nonbank subsidiaries. The Federal Trade Commission was given explicit authority by Congress to enforce the consumer protections embodied in the Truth in Lending Act with respect to these nonbank lenders. Although the FTC brought some enforcement actions against mortgage companies, Henry Cisneros, a former secretary of the Department of Housing and Urban Development (HUD), worried that its budget and staff were not commensurate with its mandate to supervise these lenders. "We could have had the FTC oversee mortgage contracts," Cisneros told the Commission. "But the FTC is up to their neck in work today with what they've got. They don't have the staff to go out and search out mortgage problems."[23]

Glenn Loney, deputy director of the Fed's Consumer and Community Affairs Division from 1998 to 2010, told the FCIC that ever since he joined the agency in 1975, Fed officials had been debating whether they—in addition to the FTC—should enforce rules for nonbank lenders. But they worried about whether the Fed would be stepping on congressional prerogatives by assuming enforcement responsibilities that legislation had delegated to the FTC. "A number of governors came in and said, 'You mean to say we don't look at these?'" Loney said. "And then we tried to explain it to them, and they'd say, 'Oh, I see.'"[24] The Federal Reserve would not exert its authority in this area, nor others that came under its purview in 1994, with any real force until after the housing bubble burst.

The 1994 legislation that gave the Fed new responsibilities was the Home Ownership and Equity Protection Act (HOEPA), passed by Congress and signed by President Clinton to address growing concerns about abusive and predatory mortgage lending practices that especially affected low-income borrowers. HOEPA specifically noted that certain communities were "being victimized . . . by second mortgage lenders, home improvement contractors, and finance companies who peddle high-rate, high-fee home equity loans to cash-poor homeowners."[25] For example, a Senate report highlighted the case of a 72-year-old homeowner, who testified at a hearing that she paid more than $23,000 in upfront finance charges on a $150,000 second mortgage. In addition, the monthly payments on the mortgage exceeded her income.[26]

HOEPA prohibited abusive practices relating to certain high-cost refinance mortgage loans, including prepayment penalties, negative amortization, and balloon pay-

ments with a term of less than five years. The legislation also prohibited lenders from making high-cost refinance loans based on the collateral value of the property alone and "without regard to the consumers' repayment ability, including the consumers' current and expected income, current obligations, and employment."[27] However, only a small percentage of mortgages were initially subject to the HOEPA restrictions, because the interest rate and fee levels for triggering HOEPA's coverage were set too high to catch most subprime loans.[28] Even so, HOEPA specifically directed the Fed to act more broadly to "prohibit acts or practices in connection with [mortgage loans] that [the Board] finds to be unfair, deceptive or designed to evade the provisions of this [act]."[29]

In June 1997, two years after HOEPA took effect, the Fed held the first set of public hearings required under the act. The venues were Los Angeles, Atlanta, and Washington, D.C. Consumer advocates reported abuses by home equity lenders. A report summarizing the hearings, jointly issued with the Department of Housing and Urban Development and released in July 1998, said that mortgage lenders acknowledged that some abuses existed, blamed some of these on mortgage brokers, and suggested that the increasing securitization of subprime mortgages was likely to limit the opportunity for widespread abuses. The report stated, "Creditors that package and securitize their home equity loans must comply with a series of representations and warranties. These include creditors' representations that they have complied with strict underwriting guidelines concerning the borrower's ability to repay the loan."[30] But in the years to come, these representations and warranties would prove to be inaccurate.

Still, the Fed continued not to press its prerogatives. In January 1998, it formalized its long-standing policy of "not routinely conducting consumer compliance examinations of nonbank subsidiaries of bank holding companies,"[31] a decision that would be criticized by a November 1999 General Accounting Office report for creating a "lack of regulatory oversight."[32] The July 1998 report also made recommendations on mortgage reform.[33] While preparing draft recommendations for the report, Fed staff wrote to the Fed's Committee on Consumer and Community Affairs that "given the Board's traditional reluctance to support substantive limitations on market behavior, the draft report discusses various options but does not advocate any particular approach to addressing these problems."[34]

In the end, although the two agencies did not agree on the full set of recommendations addressing predatory lending, both the Fed and HUD supported legislative bans on balloon payments and advance collection of lump-sum insurance premiums, stronger enforcement of current laws, and nonregulatory strategies such as community outreach efforts and consumer education and counseling. But Congress did not act on these recommendations.

The Fed-Lite provisions under the Gramm-Leach-Bliley Act affirmed the Fed's hands-off approach to the regulation of mortgage lending. Even so, the shakeup in the subprime industry in the late 1990s had drawn regulators' attention to at least some of the risks associated with this lending. For that reason, the Federal Reserve, FDIC, OCC, and OTS jointly issued subprime lending guidance on March 1, 1999.

This guidance applied only to regulated banks and thrifts, and even for them it would not be binding but merely laid out the criteria underlying regulators' bank examinations. It explained that "recent turmoil in the equity and asset-backed securities market has caused some non-bank subprime specialists to exit the market, thus creating increased opportunities for financial institutions to enter, or expand their participation in, the subprime lending business."[35]

The agencies then identified key features of subprime lending programs and the need for increased capital, risk management, and board and senior management oversight. They further noted concerns about various accounting issues, notably the valuation of any residual tranches held by the securitizing firm. The guidance went on to warn, "Institutions that originate or purchase subprime loans must take special care to avoid violating fair lending and consumer protection laws and regulations. Higher fees and interest rates combined with compensation incentives can foster predatory pricing. . . . An adequate compliance management program must identify, monitor and control the consumer protection hazards associated with subprime lending."[36]

In spring 2000, in response to growing complaints about lending practices, and at the urging of members of Congress, HUD Secretary Andrew Cuomo and Treasury Secretary Lawrence Summers convened the joint National Predatory Lending Task Force. It included members of consumer advocacy groups; industry trade associations representing mortgage lenders, brokers, and appraisers; local and state officials; and academics. As the Fed had done three years earlier, this new entity took to the field, conducting hearings in Atlanta, Los Angeles, New York, Baltimore, and Chicago. The task force found "patterns" of abusive practices, reporting "substantial evidence of too-frequent abuses in the subprime lending market." Questionable practices included loan flipping (repeated refinancing of borrowers' loans in a short time), high fees and prepayment penalties that resulted in borrowers' losing the equity in their homes, and outright fraud and abuse involving deceptive or high-pressure sales tactics. The report cited testimony regarding incidents of forged signatures, falsification of incomes and appraisals, illegitimate fees, and bait-and-switch tactics. The investigation confirmed that subprime lenders often preyed on the elderly, minorities, and borrowers with lower incomes and less education, frequently targeting individuals who had "limited access to the mainstream financial sector"—meaning the banks, thrifts, and credit unions, which it viewed as subject to more extensive government oversight.[37]

Consumer protection groups took the same message to public officials. In interviews with and testimony to the FCIC, representatives of the National Consumer Law Center (NCLC), Nevada Fair Housing Center, Inc., and California Reinvestment Coalition each said they had contacted Congress and the four bank regulatory agencies multiple times about their concerns over unfair and deceptive lending practices.[38] "It was apparent on the ground as early as '96 or '98 . . . that the market for low-income consumers was being flooded with inappropriate products," Diane Thompson of the NCLC told the Commission.[39]

The HUD-Treasury task force recommended a set of reforms aimed at protecting

borrowers from the most egregious practices in the mortgage market, including better disclosure, improved financial literacy, strengthened enforcement, and new legislative protections. However, the report also recognized the downside of restricting the lending practices that offered many borrowers with less-than-prime credit a chance at homeownership. It was a dilemma. Gary Gensler, who worked on the report as a senior Treasury official and is currently the chairman of the Commodity Futures Trading Commission, told the FCIC that the report's recommendations "lasted on Capitol Hill a very short time.... There wasn't much appetite or mood to take these recommendations."[40]

But problems persisted, and others would take up the cause. Through the early years of the new decade, "the really poorly underwritten loans, the payment shock loans" continued to proliferate outside the traditional banking sector, said FDIC Chairman Sheila Bair, who served at Treasury as the assistant secretary for financial institutions from 2001 to 2002. In testimony to the Commission, she observed that these poor-quality loans pulled market share from traditional banks and "created negative competitive pressure for the banks and thrifts to start following suit." She added,

> [Subprime lending] was started and the lion's share of it occurred in the nonbank sector, but it clearly created competitive pressures on banks.... I think nipping this in the bud in 2000 and 2001 with some strong consumer rules applying across the board that just simply said you've got to document a customer's income to make sure they can repay the loan, you've got to make sure the income is sufficient to pay the loans when the interest rate resets, just simple rules like that ... could have done a lot to stop this.[41]

After Bair was nominated to her position at Treasury, and when she was making the rounds on Capitol Hill, Senator Paul Sarbanes, chairman of the Committee on Banking, Housing, and Urban Affairs, told her about lending problems in Baltimore, where foreclosures were on the rise. He asked Bair to read the HUD-Treasury report on predatory lending, and she became interested in the issue. Sarbanes introduced legislation to remedy the problem, but it faced significant resistance from the mortgage industry and within Congress, Bair told the Commission. Bair decided to try to get the industry to adopt a set of "best practices" that would include a voluntary ban on mortgages that strip borrowers of their equity, and would offer borrowers the opportunity to avoid prepayment penalties by agreeing instead to pay a higher interest rate. She reached out to Edward Gramlich, a governor at the Fed who shared her concerns, to enlist his help in getting companies to abide by these rules. Bair said that Gramlich didn't talk out of school but made it clear to her that the Fed avenue wasn't going to happen.[42] Similarly, Sandra Braunstein, the director of the Division of Consumer and Community Affairs at the Fed, said that Gramlich told the staff that Greenspan was not interested in increased regulation.[43]

When Bair and Gramlich approached a number of lenders about the voluntary

program, Bair said some originators appeared willing to participate. But the Wall Street firms that securitized the loans resisted, saying that they were concerned about possible liability if they did not adhere to the proposed best practices, she recalled. The effort died.[44]

Of course, even as these initiatives went nowhere, the market did not stand still. Subprime mortgages were proliferating rapidly, becoming mainstream products. Originations were increasing, and products were changing. By 1999, three of every four subprime mortgages was a first mortgage, and of those 82% were used for refinancing rather than a home purchase. Fifty-nine percent of those refinancings were cash-outs,[45] helping to fuel consumer spending while whittling away homeowners' equity.