# Exhibit J

12-12020-mg   Doc 5100-12   Filed 09/18/13   Entered 09/18/13 14:20:59   Exhibit J
to Declaration   Pg 2 of 99
Case 1:12-cv-00211-RD-B   Document 1-2   Filed 02/28/12   Page 2 of 93

**JACKSON DEMANDS JURY TRIAL**

## IN THE CIRCUIT COURT OF MOBILE ALABAMA

| | |
|---|---|
| **CORLA JACKSON**<br>**Plaintiff,** | § |
| | § |
| **V.** | § |
| | § |
| **GMAC MORTGAGE**<br>**CORPORATION, ET AL** | § |
| | § |
| **Defendants.** | § |

NO: CV 2012-00049
JCW

### INJUCTION & QUIET TITLE
### <u>SECURITLATION FRAUD</u>
### <u>BOTH STATE AND FEDERAL LAWS</u>

**NEW DISCOVERY TO BACK FRAUD UNDER RULE (60b)**
**STATE AND FEDERAL LAWS**

**VIOLATION OF HATE CRIME UNDER LOANS AND LOAN MODIFICATION**
**STATE AND FEDERAL LAWS**

**BREACH OF CONTRACT AND BAD FAITH UNDER**
**STATE AND FEDERAL LAWS**

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COMES NOW the Plaintiff,** (CORLA JACKSON) , under the Grounds of (GMAC
MORTGAGE CORPORATION) Did In Fact Commit Fraud Under Rule (60b) Under Federal
And State Laws As Well As Perjury and Obstruction of Justice. Also They Committed
SECURITLATION FRAUD Under Both STATE AND FEDERAL LAWS, As Well As FRAUD
UNDER RULE (60b) Under Both STATE AND FEDERAL LAWS.

Total Documents Filed_____

"Rule 65(d)(2), Ala. R. Civ. P., requires:

" 'Every order granting an injunction shall set forth the reasons for its issuance; shall be
specific in terms; shall describe in reasonable detail, and not by reference to the
complaint or other document, the act or acts sought to be restrained . '

**JACKSON DEMANDS JURY TRIAL**

**EXHIBIT**
**J**

**JACKSON DEMANDS JURY TRIAL**

SECURITLATION FRAUD Under STATE AND FEDERAL LAWS, As Well As NEW
DISCOVERY OF FRAUD UNDER RULE (60b) Under Both STATE AND FEDERAL LAWS.

GMAC MORTGAGE did not comply with the terms of it's own Pooling and Servicing
Agreement and further did not comply with the Security's Exchange Laws Or Option
One Mortgage Notes Trustees in attempting to obtain assignment of plaintiff (Plaintiff's)
Jackson Property By Law…Preparing Paperwork Themselves…

Plaintiff (Jackson) is a third party beneficiary of the **Pooling and Servicing Agreement
created by the defendant trust** (Wells Fargo Bank) . Indeed without such Pooling and
Servicing Agreements Recorded And Signed By All Trust And Investors, Plaintiff
(Jackson) and other mortgages similarly situated like this would never have been able to
obtain financing anywhere. The Tile To The Property Has Been Clouded…By The
Defendants…And Major Damages Occurred For Making False Claims Forcing Plaintiff
Into Bankruptcy From (2005-2012) Which Is Fraud Under Rule (60b) With New
Discovery…Backed By The Defendants Own Evidence…

In Addition To The Above (Jackson) The Plaintiff Credit Has Been Destroyed By The
Defendants Making False Claims Over And Over Again Knowing They Did Not Own
The Notes By Law. Defendants Never Showed Their Original Notes, Original Deeds,
Original Assignments, Original Affidavits, Or A Copy Of Their Own Canceled Check
Purchasing This Note From The Original Lender.  In Addition To All Of The Above This
Note Was Written Under A HUD Settlement Statement Form Which Verified The
Conventional Loan Was Not And Insured Conventional Loan And Was Guaranteed To
Other Lending Remedy's To Prevent An Foreclosure By Any Other Lender Which Could
Not Be Done Because The Defendants Made False Claims When They Did Not Own The
Note…Period…This Was Information That Could Have Been Verified By Mers And The
SEC Security's Exchange Which Never Happen…

Instead The Defendants Provided Blank Alonges Made Payable To No One And Copy Of
A False Affidavits From Someone They Could Not Spell Their First Middle Or Last
Name As Appeared On The False Affidavits That Was Prepared By The Defendants
Making Notes Out To Themselves Illegally Against The Law…None Of This Was Ever
Verified By Law Or The Security's Exchange or Mers…Which Is Security's Fraud..

# In Addition To The Grounds Set Forth Above…

GMAC MORTGAGE Has Violated Acts Under The HATE CRIME Protection Acts That
Protected Jackson On Her Notes Backed By Security's And Policy's That They Committed Fraud
On As Well As Perjury On A Mortgage They Did Not Own Or Was Assigned From (2005-2012)
And On Mortgage Under False Pretense …The Damages Is In The Millions Of Dollars On What
They Did To Plaintiff…To Date…Demanding Jury Trial Is Necessary…

In Addition To This They Violated Jackson Civil Human And Constructional Rights As A
Citizens Of The United States And Refused Her A Loan Or A Loan Modification After
Destroying Her Credit And Clouding The Title To Her Home And Assets Illegally Against The

**JACKSON DEMANDS JURY TRIAL**

12-12020-mg    Doc 5100-12    Filed 09/18/13    Entered 09/18/13 14:20:59    Exhibit J
Case 1:12-cv-00211-RD-B Document 1-2   Filed 02/28/13   Page 59 of 93
to Declaration    Pg 4 of 99

**JACKSON DEMANDS JURY TRIAL**

Law....They Violated LOAN MODIFICATION To Help Victims Like Jackson Under Federal
Laws In Which They Did Not Do.

Jackson Was Released From Bankruptcy On January 20, 2010 When They Defrauded The State
Courts They Owned Jackson Home And Was Assigned A Note Back In (2005) Which
Was Not True That Lead To An Illegal Order Issued By Judges Youngpeter Under The
Grounds Of False Pretense On Up The Later When They Did Not Even Own The Note
Neither Were They Assigned Jackson Note At That Time...

Jackson Kept Going After Them And They Committed Fraud This Time To Prove They
Committed Fraud Under Rule (60b) The First Time.  This Now Is Returned Back To The
Courts To Seek Legal Justice By Law.  Under Demand By Jury Trial!

Rules of Civil Procedure, and as grounds therefore, shows as follows:

### *Factual Evidence through the Courts*

**Rule 60(b) provides, in pertinent part**: On motion and upon such terms as are

just, the court may relieve a party or a party's legal representative from a final judgment,

order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or

excusable neglect; (2) newly discovered evidence which by due diligence could not have

been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether

heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of

an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released,

or discharged, or a prior judgment upon which it is based has been reversed or otherwise

vacated, or it is no longer equitable that the judgment should have prospective

application; or (6) any other reason justifying relief from the operation of the judgment.

The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not

more than four (4) months after the judgment, order, or proceeding was entered or taken."

    1.    Our supreme court has stated: "'[T]he decision whether to grant or deny [a

Rule 60(b)] motion is within the sound discretion of the trial judge, and the appellate

12-12020-mg   Doc 5100-12   Filed 09/18/13   Entered 09/18/13 14:20:59   Exhibit J
Case 1:12-cv-00211-RD-B   Document 1-2   Filed 02/28/13   Page 5 of 53
to Declaration    Pg 5 of 99

**JACKSON DEMANDS JURY TRIAL**

standard of review is whether the trial court abused its discretion. *Pierson v. Pierson*, 347
So. 2d 985 (Ala. 1977). In reviewing a ruling of a trial court on a Rule 60(b)(6) motion,
the trial court's decision will not be disturbed unless it is determined "that there is an
absence of reasonable cause, that rights of others subsequently arising would be
adversely affected, or that it is unjust." *Textron, Inc. v. Whitfield*, 380 So. 2d 259 (Ala.
1979), quoting *Nunn v. Stone*, 356 So. 2d 1212 (Ala. Civ. App. 1978).' "Ex parte
Dowling, 477 So. 2d 400, 402 (Ala. 1985)." *Osborn v. Roche*, 813 So. 2d 811, 815 (Ala.
2001).

    2.    Our supreme court has further recognized that in certain cases
"aggravating- circumstances may allow a trial court to treat what would otherwise be a
Rule 60(b)(1) motion [or 60(b)(3) motion] as a Rule 60(b)(6) motion." *Ex parte Wal-
Mart Stores, Inc.*, 725 So. 2d 279, 284 (Ala. 1998). The supreme court has stated that the
aggravating- circumstances exception "applies to an extraordinary circumstance not
contemplated by Rule 60(b)(1) [or 60(b)(3)], for the purpose of protecting the public,
vindicating the judicial process, and promoting the public's confidence in the legal
system." *R.E. Grills, Inc. v. Davison*, 641 So. 2d 225, 230 (Ala. 1994).

    3.    "The `catch all' provision of clause (6) of Rule 60(b) allows a trial court to
grant relief from a judgment for `any other reason justifying relief.' *Barnett v. Ivey*, 559
So. 2d 1082, 1084 (Ala. 1990).

    4.    "Although grounds for relief under Rule 60(b)(1) generally cannot be
valid grounds under Rule 60(b)(6), this Court has recognized an exception when, in the
interest of justice, aggravating circumstances may be considered sufficient to allow the
trial court to treat what would otherwise be a Rule 60(b)(1) motion as within Rule

**JACKSON DEMANDS JURY TRIAL**

JACKSON DEMANDS JURY TRIAL

JACKSON DEMANDS JURY TRIAL

12-12020-mg   Doc 5100-12   Filed 09/18/13   Entered 09/18/13 14:29:59   Exhibit J
Case 1:12-cv-00211-RD-B   Document 1-2   Filed 02/28/13   Page 59 of 93
to Declaration   Pg 7 of 99
**JACKSON DEMANDS JURY TRIAL**

60(b)(6). *Chambers County Comm'rs v. Walker*, 459 So. 2d 861 (Ala. 1984); Giles v.

Giles, 404 So. 2d 649 (Ala. 1981); Rebel Oil Co. v. Pike, 473 So. 2d 529 (Ala. Civ. App.

1985)."

     5.     It is the prevailing rule in Alabama "that a litigant ... has responsibility for

keeping track of his case and knowing its status." *D. & J. Mineral & Mining, Inc. v.*

*Wilson*, 456 So. 2d 1099, 1100 (Ala. Civ. App. 1984). Therefore, a trial court "owes no

duty to notify a party of the setting of a case or to continue a case because of the absence

of a party ...." *D. & J. Mineral*, 456 So. 2d at 1100-01.

     6.     Our caselaw recognizes that the failure of a party to advise the clerk of a

proper service address may "fall into the category of excusable neglect...." *DeQuesada v.*

*DeQuesada, 698 So. 2d 1096, 1099 (Ala. Civ. App. 1996)*.

## JACKSON DEMANDS JURY TRIAL

B18W (Form 18W) (08/07)

# United States Bankruptcy Court

### Southern District of Alabama
### Case No. 05-13142
### Chapter 13

In re Debtor(s) (name(s) used by the debtor(s) in the last 8 years, including married, maiden, trade, and address):
Corla Reeves Jackson
13230 Tom Gaston Road
Mobile, AL 36695

Social Security / Individual Taxpayer ID No.:
xxx-xx-9711

Employer Tax ID / Other nos.:

## DISCHARGE OF DEBTOR AFTER COMPLETION
## OF CHAPTER 13 PLAN

It appearing that the debtor is entitled to a discharge,

**IT IS ORDERED:**

The debtor is granted a discharge under section 1328(a) of title 11, United States Code, (the Bankruptcy Code).

BY THE COURT

Dated: 1/20/10

MARGARET A. MAHONEY
United States Bankruptcy Judge

### SEE THE BACK OF THIS ORDER FOR IMPORTANT INFORMATION.


AOL | Mail | Toolbar

Location: Mobile, AL 36695 | Search History | Advanced Search | Settings

**Web**  Images | Videos | Maps | News | Shopping | more »

**What does it mean when a Hurricanes leave sags and dips**

Web Results 1 - 10 of about 2,660

[PDF] <u>SAFE REHABILITATION OF HURRICANE-DAMAGED HOMES</u>
Roofs that sag in the middle or at the ends due to load-bearing walls that have shifted. ... a dip
in the roof and sill beam. ribbon board, cracked floor joist ..... However if there is a lot of water
damage, and/or mold growth ... In adults , lead poisoning may cause high blood pressure,
fertility ...
hud.gov/offices/lead/library/misc/HUD_CSS_Booklet.pdf - Similar

[PDF] <u>Response to Floods and Water Damage for Libraries, ...</u>
Jun 14, 2008 ... Go onto the roof if rising water makes it necessary as long as no thunderstorm
is in progress. ... highway dips, where water may pool and pose threats. ... Emergency Drying
Procedures for Water Damaged Collections. ... Pools of cool standing water (which can cause
hypothermia if the water is less ...
www.loc.gov/preserv/emergprep/floodcomp.pdf - Similar

<u>Roofing: How dry does the deck need to be?, asphalt shingles, ...</u>
Apr 30, 2009 ... Anything that might soak up water, like insulation must be ripped out as it
can ... Several interior rooms beneath the damaged roof show obvious signs of warped ... one
could SEE an extreme bow or sag, but are there degrees of tolerance in what ... Look for
isolated humps or dips between rafters. ...
en.allexperts.com/q/Roofing-1598/2009/4/dry-deck-need... - Similar

<u>Hurricane Survival Tips - Hurricane Mitigation & Survival</u>
The two huge masses of water do leave the land in much the same way, ... When water kills
or does damage, the wind put it up to it. ..... and with major hurricanes, it ain't over until the
National Guard arrives. .... Invest in a hurricane roof as the main hole you want to avoid is a
big one with a view of Heaven. ...
www.hurricane-man.com/survival-tips.html - Similar

<u>General information | RAGBRAI</u>
This may cause your group to be ineligible for the lottery. ..... RAGBRAI is a major economic
boost to every church, Boy Scout or Girl .... Your wristband also will give you priority to sag
wagons, bicycle shop repairs and many other services. ... If you race ahead, lag behind or
leave the official bicycle route, ...
ragbrai.com/index.php/about/general-information/ - Similar

<u>Antigua - Local Reports (Caribbean Hurricane Network)</u>
that it does not necessarily mean that the case brought by ABITPC against govern - .... It was
badly damaged by the 1990s hurricanes that kept visiting Antigua.. . ...... Whatever will cause
this dip could occur earlier? I certainly hope not! ..... WHAT a way to start a week... with a 140
mph major hurricane on your ...
stormcarib.com/reports/2003/antigua.shtml - Similar

<u>Using Technology to Reduce Risk and Improve Worker Safety | ...</u>
The root cause of this unwanted connection is often a result of insulation breakdown. ...
equipment damage and present a fire and explosion risk to personnel (see photo 1). .... 5) To
reduce the momentary line-voltage dip occasioned by the occurrence and ..... Utility
Deregulation, What Does it Mean to Inspectors? ...
www.iaei.org/magazine/?p=2449 - Similar

<u>Pain in Maine, but they can measure rain « Climate Audit</u>
But all the data sufficient to predict hurricanes is OK? ..... (Heck, if it's like my house, the
whole electrical system voltage sags whenever a big ..... that $CO_2$ is not a major factor in
causing the earth to warm: You are a denier. ...... Does this mean that it's OK to shade the
truth about AGW so that someone, ...
www.climateaudit.org/?p=1816 - Similar

12-12020-mg    Doc 5100-12    Filed 09/18/13    Entered 09/18/13 14:29:59    Exhibit J
to Declaration    Pg 10 of 99
Case 1:12-cv-00121-RD-B    Document 1-2    Filed 02/28/12    Page 9 of 93

## JACKSON DEMANDS JURY TRIAL

PAGE  68/82

Date: 09/26/04

### ALLONGE TO NOTE
### (INVESTOR)

This allonge makes reference to the following Note:

Borrower:  CORLA  JACKSON
Loan #:
Property Address:  13230  TOM GASTON RD,   MOBILE, AL
Loan Amount: $240,000.00

Note Date:  09/26/04

Therefore, in reference to the captioned note, the following applies:

Pay to the order of:

Without Recourse

Option One Mortgage Corporation
A California Corporation

By: _Jeanette Arrenoud_

Assistant Secretary

UKD3050.en 073-14-03)

Case 11-01545    Claim 3-1 Part 3    Filed 07/25/11    Desc NOTE    Page 4 of 4

**WHAT THEY DID WAS WRONG THEY PROVIDED A BLANK COPY OF AN
ALLONGE WITHOUT ORIGINAL DEED OR COPY OF CHECK TO PROVE
THEY PURCHASED LOAN FOR THE DOLLAR SAID AMOUNT THEY
CLAIMED VICTIMS OWED ON NOTES THAT DID NOT BELONG TO THEM
AT ALL….HE NAMES THEY SIGNED ON THE ILLEGAL DOCUMENTS WAS NO**

## JACKSON DEMANDS JURY TRIAL

**JACKSON DEMANDS JURY TRIAL**

LONGER WORKING FOR COMPANY IT WAS SHUT DOWN LISTED BELOW
AND WAS NOT AUTHORIZED BY SECURITY'S EXCHANGE TO ASSIGN
ASSIGNMENTS ON CAMPANY'S ILLEGALLY AGAINST THE FEDERAL
LAWS VIOLATING SECURITY'S LAWS....

YOU DO NOT MAKE ASSINGMENT OUT TO YOURSELF IF YOU OWN THE
ORIGINAL DEEDS BACKED BY SECURITYS OR WITHOUT SECURITY'S YOU
SHOW YOUR CANCELED CHECK YOU PAID FOR THE PROPERTY AS WELL AS
THE ORIGINAL NOTES AND LOAN DOCUMENTS WITH VALID SURVEYS BY
ORIGINAL LENDER....THIS DID NOT HAPPEN IN THIS CASE...

THEY COMMITED FRUAD UNDER SECURITY'S AND FRUAD UNDER RULE (60b)
USING A JUDGES THEY APPOINTED TO HELP THEM ON THESE
CASES...KNOWING THEY DID NOT OWN THE NOTES...THIS IS MAJOR
CORRUPTION AND CONSPIRACY'S TO KEEP THE CASES FROM BEING HEARD
DEMAND BY JURY TRIAL AND PRIOR TO PROCESS OF SERVICE.... THE
AMOUNT OF DAMAGES IS YET TO BE DETERMAN BY JURY....FOR WHAT THEY
DID TO PLAINTIFF TO DATE MAKING FALSE CLAIMS THAT CAUSED HER
MAJOR DAMAGES AND PERSONAL INJURY'S DESTROYING HER HOME IN
CORRUPTION AND CONSPIRACY'S SO THEY COULD CASH IN ON WHAT SHE
OWNED BACKED BY POLICY'S AND SECURITY'S....THEY DEFENDANTS GMAC
MORTGAGE DID NOTE EVEN OWN THE NOTES...THIS COULD HAVE BEEN
VERIFIED BY THE SEC OR MERS...THEY DID NOT OWN THE PLAINTIFF NOTE
FROM THE VERY BEGINNNING FROM (2005-2012)...AND IS RESPONSIBLE FOR
MAJOR DAMAGES THEY KEPT HIDDEN UNTIL NOW...THEY MADE FALSE
CLAIMS ON A NOTE THEY DID NOT OWN BY LAW AND THEY KNEW THIS....

PLAINTIFF JACKSON NOTE WAS NOT CONVENTIONAL INS...WHICH ENTITLED
HER TO ALL OPTIONS WITH ALL OF HER ASSETS TO PREVENT
FORECLOSURED OR BANKRUPTCY HAD THEY NOT LIED MAKING FALSE
CLAIMS TO A NOTE AND PROPERTY THEY DID NOT OWN BY LAW...THEY
SHOULD BE PROSCUTED TO THE FULLUES EXTENT OF THE LAW FOR WHAT
THEY DID TO PLAINTIFF AND ALL THE OTHER VICTIMS IN A UNDERGROUND
BLACK MARKET CURRENCY RING ROBBING VICTIMS OF THEM HOMES AND
ASSETS UNDER FALSE PRETESNSE AS WELL AS THE GOVERNMENT AND
FEDERAL RESERVE ON BAIL OUT FUNDS TAX BREAKS AND TARP MONEY
THAT WAS SUPOSE TO HELP VICTIMS AND NOT THEM TO PROFIT OFF OF...

ROBBING VICTIMS UNDER FALSE PRETESE IS ILLEGAL AND AGAISNT THE
LAW THEY WERE NOT RECORDED ON A NEW DEED NEITHER WAS A NEW
ASSIGNMENT THE ORIGINALS NEVER HAPPEN BECAUSE THEY COULD NOT
JACKSON NOTE WAS BACKED BY SECURITY'S AND POLICY'S WHICH AND
UNDER A HUD SETTLEMENT STATEMENT FORM THAT GUARANTEED HER
HELP ON CONVENTIONAL UNINSURED NOTES/OR OTHER ASSETS....THE
DEFENDANTS CAUSED MAJOR DAMGES TO DATE...AND COVERED IT UP AND
NOW THE TRUTH IS OUT!

**JACKSON DEMANDS JURY TRIAL**

# GMAC Mortgage

P.O. Box 52052
Phoenix, AZ 85072

April 2, 2008

Corla Jackson
13230 Tom Gaston Rd
Mobile, AL 36695-0000

RE:  Property Address    : 13230 Tom Gaston Rd  Mobile, AL 36695-0000
     Account No.         : ●●●●●●2124
     Tracking No.        : 902022
     Date of Loss        : 3/13/2008

Dear Corla Jackson:

We realize how difficult a loss to your home can be, and we want to process your claim as quickly and efficiently as possible. Due to the status of your loan and investor requirements, we have the responsibility to assist to ensure the damage is repaired. To assist in the claim-handling process, please submit the following items to our office:

1. The insurance claim check(s) (SIGNED/ENDORSED BY ALL PARTIES LISTED ON THE CHECK(S).

2. The enclosed *Homeowner's Statement* completed and signed by you.

3. A copy of the insurance adjuster's detailed report or your contractor's detailed damage estimate for repairs.

4. A copy of the signed contract between you and your contractor doing the repairs.

5. The enclosed *Contractor Affidavit/Statement* needs to be completed and returned to our office once ALL REPAIRS HAVE BEEN COMPLETED.

Upon receipt of the fully endorsed insurance claim check and above required information, we will release a portion of the claim funds within 4-5 business days after receipt. If all required items are not received, we are unable to proceed with a disbursement of the claim funds until the missing items are submitted.

Due to the amount of loss, partial funds will be released at various stages. After the first release of insurance funds, periodic property inspections will be needed to confirm repair progress. **FLORIDA PROPERTIES: Please contact our office 10 to 14 business days prior to needing additional funds to allow time for the property inspection.** NON-FLORIDA PROPERTIES: please contact our office 7-10 business days prior to needing additional funds.

If I may be of further assistance, please contact me at 1-866-354-7281.

Sincerely,
Insurance Claims Center
FAX: (866)336-3811

GMAC TPA 13 (a)
HAZ6-NWCLMDQ

Enclosures
** BRE **

高

12-12020-mg Doc 5100-13 Filed 09/18/13 Entered 09/18/13 14:39:59 Exhibit J
Case 12-cv-06011-KD-B Document 1-2 Filed 02/25/13 Page 52 of 58
to Declaration Pg 13 of 99

## JACKSON DEMANDS JURY TRIAL



LOAN NUMBER:

STATE OF ALABAMA

COUNTY OF MOBILE

**ASSIGNMENT OF MORTGAGE**

FOR VALUE RECEIVED, the undersigned, THE MORTGAGE CORPORATION (the "Assignor"), does hereby transfer, assign, ... unto GMAC MORTGAGE, LLC (the "Assignee"), its successors, transferees, and ... right, title and interest of said Assignor in and to that certain Mortgage executed by ..., A SINGLE WOMAN, to OPTION ONE MORTGAGE CORPORATION dated the 5th ..., and filed for record in Book 5623, Page 1910, in the Probate Office ... the property described in said Mortgage, together with the note and ... ... and all interest of the undersigned in and to the property described ...

It is expressly understood and agreed that ... said assignment of the said Mortgage is without warranty, representation or recourse ... ...

IN WITNESS WHEREOF, said Assignor ... set its signature this 19th day of June , 2008.

OPTION ONE MORTGAGE CORPORATION

By: _____
Brian D. McConnell
Assistant Secretary

STATE OF CALIFORNIA )

COUNTY OF ORANGE )

I, R.A. Salazar, a Notary Public in and for the said County and State, do hereby certify that Brian D McConnell, whose name ... Assistant Secretary of OPTION ONE MORTGAGE CORPORATION, is signed to the foregoing ... and who is known to me, acknowledged before me on this day that, being informed of the ... the instrument, he/she, as such officer, and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and official seal this 19th day of June, 2008.

_____
Notary Public

My Commission Expires 08/02/2011

[Notary Seal]
R. A. SALAZAR
Commission # 1757905
Notary Public - California
Orange County
My Comm. Expires Aug 2, 2011

This instrument prepared by:
Coleen McCullough
Stertz & Perrett, P.C.
P.O. Box 55727
Birmingham, AL 35255

[Probate stamp]
State of Alabama Mobile County
I certify this instrument was filed on
JULY 11, 2008 8:31:26 PM
S.D. FEE                    $9.00
RECORDING FEE               $7.50
TOTAL AMOUNT                $9.50
2008048095
Don Davis, Judge of Probate

## EXHIBITS ALSO ATTACHED _____

## JACKSON DEMANDS JURY TRIAL

**JACKSON DEMANDS JURY TRIAL**

They Could Note Even Spell Brian D. McConnell...And Option One Mortgage Was Closed At This Time...The Documents Were Prepared By Defendants Signing Over Notes To Themselves With False Affidavit's Without Originals Or Copy Of Their Canceled Checks To Prove They Purchased Loans Or Was Assigned Notes...If They Owned The Notes Why Wasn't It Recorded Or Why Would They Have To Get False Affidavit's And Black Allonges Not Showing The Currency Amount They Purchased Home For...They Did Not Even Own Jackson Note When They Filed The First False Claim And Then Came Back With Fake Documents To Rob Her Again...And Hung Their Own Selves Because They Did Not Own The Note When They Filed The First Claim Committing Fraud Under Rule (60b) And Security's Fraud!

JACKSON KEPT GOING AFTER THEM AND THEY TURNED THIS INTO A HATE CRIME....HATE CRIMES ARE NOT JUST FOR COLORED PEOPLE THEY CAN BE DONE TO ALL RACES IF THEY GO AFTER CROOKS LIKE THIS...THEY USE PEOPLE TO COMMIT HATE CRIMES TO HELP CORRUPT CASES IN CONSPIRACY'S...AND THEY USE JUDGES THAT HELP THEM IN EXCHANGE FOR PERSONAL GAIN AND FAVOR AND AVOID THE GOOD JUDGES THAT DO NOT TAKE PERSONAL GAIN AND FAVOR VERSUS FOLLOWING STATE AND FEDERAL LAWS....THEY CHOSE THEIR AFFILIATES TO GO AROUND NONE CROOKED JUDGES AND THAT IS HOW THEY  DID ALL OF THIS!...

NO GOOD JUDGES WOULD HAVE ALLOWED THE FEDERAL LAWS TO BE BROKEN LIKE WHAT HAPPEN TO THE PLAINTIFF TO DATE, AFTER SHE KEPT FILING MOTION AFTER MOTION AFTER MOTION AND COMPALAINTS AND WAS HARASSED AND FALSELY ARRRESTED (2) TIMES IN A HATE CROME AND IF SHE DID NOT PAY A LAWYER SHE WOULD NOT HAVE BEEN AQUITED OF ALL THE FALSE CHARGES THAT THEY CONSPIRED AND PUT BEFORE HER TO GET RID OF HER BEFORE THEY ALL GOT EXPOSED IN THIS UNDERGROUND BLACK MARKET CURRENCY RING VIOLATING FEDERAL AND STATES LAWS....TO DATE!....

THIS IS MAJOR CORRUPTION THEY MADE FALSE CLAIMS TO CAUSE JACKSON HARDSHIP DAMAGES AND INJURRY'S WHEN THEY DID NOT EVEN OWN THE NOTE AND HER NOTE WAS BACKED BY POLICY'S THEY LIED ABOUT SAYING REPAIRS WERE COMPLETED IN WRITING WHEN THEY WERE NOT AND WAS TOLD BY GOVERNMENTAL OFFICIALS AND STRUCTURAL ENGINEERS.....!

HOW DID THEY BACK THIS HOUSE BY SECURITY WHEN THE VALUE WAS NEVER PUT BACK TO ITS ORIGINAL POSITION FOR THE DOLLAR AMOUNT THEY SAID THE HOME WAS WORTH...THAT IS WHY THEY REFUSED TO EXCKSIE THE APPRAISAL CLAUSE ON THE HOME THEY KNEW THEY HAD COMMITTED FRAUD UNDER RULE (60b) AND NEW DISCOVERY WAS DISCOVERED LATER IN THEIR OWN AFFIDAVATE ABOVE!....

**JACKSON DEMANDS JURY TRIAL**

**JACKSON DEMANDS JURY TRIAL**

## Quiet Title

An **action to quiet title** is a <u>lawsuit</u> brought in a <u>court having jurisdiction</u> over land disputes, in order to establish a party's title to : :  : :  : against anyone and everyone, and thus "quiet" any challenges or  :  : : title. It comprises a complaint that the ownership (title) of a parcel of :  : other real property is defective in some fashion, typically where title to the property is ambiguous. A typical ground for complaint includes the <u>**fraudulent conveyance**</u> of a property, **perhaps by a forged deed or under** <u>**coercion**</u>**.**

Unlike acquisition through a <u>deed</u> of sale, a quiet title action will give the party seeking such relief no cause of action against previous owners of the property.

**This Caused Jackson The Plaintiff Major Damages…To Date!**
**Total Exhibits And Documents Filed _____**

WHEREFORE,

This the <u>18,</u> day of January 2012

Respectfully submitted,

Plaintiff: _____
Corla Jackson
13230 Tom Gaston Road
Mobile, Alabama. 36695
Tel. (251) 554-1785
Fax. (251) 865-0735

**JACKSON DEMANDS JURY TRIAL**

CONTINUED – 2005-12-06-1428

**DESCRIPTION**

| | QNTY | UNIT | RCV | DEPREC. | ACV | REVIEWE |
|---|---|---|---|---|---|---|

See  additional pictures for verification of damages.

Hardwood floors
Lights- water from leaking roof inside electricals and outlets

Replacements

NuTone intercom system
Security Camera's
Temporary repairs
 New Tarp (see roofing pictures)

X— The support is bent \ warped and has shifted causing major structural damage to the roof and dwelling throughout.

Room Totals: 2005-12-06-1428

|  | 27,535.92 | 0.00 | 27,535.92 |
|---|---|---|---|

**Grand Total Areas:**

| | | | | | |
|---|---|---|---|---|---|
| 0.00 | SF Walls | 0.00 | SF Ceiling | 0.00 | SF Walls & Ceiling |
| 0.00 | SF Floor | 0.00 | SY Flooring | 0.00 | LF Floor Perimeter |
| 0.00 | SF Long Wall | 0.00 | SF Short Wall | 0.00 | LF Ceil. Perimeter |
| 0.00 | Floor Area | 0.00 | Total Area | 0.00 | Interior Wall Area |
| 0.00 | Exterior Wall Area | 0.00 | Exterior Perimeter of Walls | | |
| 0.00 | Surface Area | 0.00 | Number of Squares | 0.00 | Total Perimeter Length |
| 0.00 | Total Ridge Length | 0.00 | Total Hip Length | 0.00 | Area of Face 1 |

JACKSON, CORLA

JACKSON, CORL

12-12020-mg    Doc 5100-13    Filed 09/18/13    Entered 09/18/13 14:39:50    Exhibit J
to Declaration    Pg 17 of 99
Case 1:12-cv-00401-KD-B Document 1-2 Filed 02/25/13    Page 58 of 58

**JACKSON DEMANDS JURY TRIAL**

# CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of January 2012, I filed the foregoing document with the clerk of court, and deposited a copy of the same, registered mail to:

Registered Agent: GMAC Mortgage LLC

CSC-LAWYERS INCORPORATION SERVICES INCORPOERATED
150 SOUTH PERRY STREET
MONTGOMERY, ALABAMA. 36104

PRINCIPAL OFFICE: GMAC MORTGAGE
100 WITMER RAOD
HORSHAM, PA. 19044

**C.C. COPIES TO:**                               **NOTARY**
PRESIDENT & VICE PRESIDENT OF THE UNITED STATES
UNITES STATES ATTORNEY GENERAL
GOVERNOR OF ALABAMA
ATTORNEY GENERAL OF ALABAMA
SECURITY'S EXCHANGE
HILLERY CLINTON
GOVERNOR RICK PERRY
BARRY FREEDMAN
IVAN PARKER
L.DANIEL MIMS
CNN NEWS
OPRAH WHINFREY STATION
TYLER PERRY PRODUCTIONS
STEPHEN STILBERG

OTHER NEWS STATIONS TO BE ADDED                Dated this 18, day of January, 2012
                                               **JACKSON DEMAND BY JURY TRIAL**
                                               NUMBER OF DOCUMENTS FILED WITH
                                               CASE LAWS ATTACHED (1-2) PAGES

                                               Corla Jackson                    1/18/2012
                                               13230 Tom Gaston Road
                                               Mobile, Alabama. 36695
                                               251.554.1785. 251.865.0735
                                               Total Documents Filed: _____

STATE OF ALA MOBILE CO
I HEREBY CERTIFY THIS
PLEADING WAS FILED

2012 JAN 18 PM 4:33

CLERK CIRCUIT COURT

State of Alabama
County of Mobile
Expiration 11-3-12

**JACKSON DEMANDS JURY TRIAL**

# Exhibits & Case Laws

Number Of Pages:_____

As a result of the foregoing transaction, Smith and others ultimately initiated litigation against Walden in the Montgomery Circuit Court (case no. CV–95–1093), seeking a judgment declaring the ownership of certain property. Walden filed several counterclaims against Smith, seeking damages for default on a promissory note, breach of a joint-venture agreement, and fraudulent suppression. Because a detailed summary of the background of these disputes was provided in Walden v. Hutchinson, 987 So.2d 1109 (Ala.2007), from which we quote extensively below, we use the terms defined therein as defined terms in this opinion.

12-12020-mg   Doc 5100-13   Filed 09/18/13   Entered 09/18/13 14:39:59   Exhibit J
Case 1:12-cv-00401-KD-B   Document 1-2   Filed 02/29/13   Page 19 of 99
to Declaration    Pg 19 of 99



**AlaFile E-Notice**

57-CV-2008-000362.00

Judge: ALBERT L JOHNSON

To:   WOOTEN NICHOLAS HEATH
       nhwooten@gmail.com

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA

PHYLLIS HORACE VS. LASALLE BANK NATIONAL ASSOCIATION, ET AL
57-CV-2008-000362.00

The following matter was FILED on 1/13/2011 5:43:39 PM

**C001 HORACE PHYLLIS**

MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT

[Attorney: DICKSON NATHAN ANDREW II]

Notice Date:      1/13/2011 5:43:39 PM

KATHY S. COULTER
CIRCUIT COURT CLERK
RUSSELL COUNTY, ALABAMA
RUSSELL COUNTY JUDICIAL CENTER
PHENIX CITY, AL 36867

334-298-0516
kathy.coulter@alacourt.gov

| STATE OF ALABAMA | | | |
|---|---|---|---|
| Unified Judicial System | Revised 3/08 | | Case |

57-RUSSELL    ☐ District Court  ☑ Circuit Court    CV20...

**PHYLLIS HORACE VS. LASALLE BANK NATIONAL ASSOCIATION, ET AL**

CIVIL MOTION COVER SHEET
Name of Filing Party: C001 - HORACE PHYLLIS

Name, Address, and Telephone No. of Attorney or Party. If Not Represented.
NATHAN A. DICKSON
POST OFFICE BOX 350
UNION SPRINGS, AL 36089
Attorney Bar No.: DIC031

☐ Oral Arguments Requested

## TYPE OF MOTION

### Motions Requiring Fee

☐ Default Judgment ($50.00)
☐ Joinder in Other Party's Dispositive Motion (i.e. Summary Judgment, Judgment on the Pleadings, or other Dispositive Motion not pursuant to Rule 12(b)) ($50.00)
☐ Judgment on the Pleadings ($50.00)
☐ Motion to Dismiss, or in the Alternative Summary Judgment($50.00)
☐ Renewed Dispositive Motion(Summary Judgment, Judgment on the Pleadings, or other Dispositive Motion not pursuant to Rule 12(b)) ($50.00)
☐ Summary Judgment pursuant to Rule 56($50.00)
☐ Motion to Intervene ($297.00)
☐ Other _____ pursuant to Rule _____ ($50.00)

*Motion fees are enumerated in §12-19-71(a). Fees pursuant to Local Act are not included. Please contact the Clerk of the Court regarding applicable local fees.

☐ Local Court Costs $ _____

### Motions Not Requiring Fee

☐ Add Party
☐ Amend
☐ Change of Venue/Transfer
☐ Compel
☐ Consolidation
☐ Continue
☐ Deposition
☐ Designate a Mediator
☐ Judgment as a Matter of Law (during Trial)
☐ Disburse Funds
☐ Extension of Time
☐ In Limine
☐ Joinder
☐ More Definite Statement
☐ Motion to Dismiss pursuant to Rule 12(b)
☐ New Trial
☐ Objection of Exemptions Claimed
☐ Pendente Lite
☐ Plaintiff's Motion to Dismiss
☐ Preliminary Injunction
☐ Protective Order
☐ Quash
☐ Release from Stay of Execution
☐ Sanctions
☐ Sever
☐ Special Practice in Alabama
☐ Stay
☐ Strike
☐ Supplement to Pending Motion
☐ Vacate or Modify
☐ Withdraw
☑ Other Memorandum in support of summary judgment pursuant to Rule (Subject to Filing Fee)

Check here if you have filed or are filing contemporaneously with this motion an Affidavit of Substantial Hardship...

Date: 1/13/2011 5:43:16 PM

Signature of Attorney or Party:
/s NATHAN A. DICKSON

*This Cover Sheet must be completed and submitted to the Clerk of Court upon the filing of any motion. Each motion should contain a separate Cover Sheet.
**Motions titled 'Motion to Dismiss' that are not pursuant to Rule 12(b) and are in fact Motions for Summary Judgments are subject to filing fee.

FILED
PM
KATHY S. COULTER, CLERK

IN THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA

PHYLLIS HORACE,

       PLAINTIFF,

VS.

                              **CASE NUMBER:**

                              CV-2008-362

LASALLE BANK NATIONALASSOCIATION
as Trustee for Certificate Holders of
BEAR STEARNS ASSET BACKED SECURITIES I, LLC
asset backed certificates, series 2006-EC2;
MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC., ENCORE CREDIT CORP.,
EMC MORTGAGE CO., and BANK OF AMERICA,
As successor-in-interest to Lasalle Bank National
Assn.,

       DEFENDANTS.

---

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

       Plaintiff Phyllis Horace, through counsel, submits this memorandum of law in support of

her motion for summary judgment on the issue of standing as to Defendant LaSalle Bank

National Association ("LaSalle"). Plaintiff's Complaint claims that LaSalle did not have

possession of the mortgage note when it notified her that foreclosure was forthcoming. Namely,

LaSalle had no — and cannot have any — authority to institute foreclosure proceedings because

LaSalle is not entitled to the money secured by the promissory note.

### **INTRODUCTION**

      On November 11, 2005, Plaintiff borrowed $283,500.00 for the purchase of property at

3745 Knowles Road in Phenix City, Alabama.  The loan was secured by a mortgage to the lender

12-12020-mg  Doc 5100-13  Filed 09/18/13  Entered 09/18/13 14:29:59  Exhibit J
to Declaration    Pg 22 of 99
Case 1:12-cv-06101-KD-B  Document 1-2  Filed 02/25/11  Page 21 of 58

Encore Credit Corp ("Encore"). The mortgage was recorded in the office of the probate judge on August 11, 2006. At some unknown time after the signing of the mortgage documents, Encore executed a blank endorsement.[1] No other assignments or endorsements are present in the record provided to the Plaintiff.[2]

On October 16, 2008, LaSalle sent a "Notice of Acceleration of Promissory Note and Mortgage" to Plaintiff. Plaintiff then filed the instant cause. The court enjoined the foreclosure by order entered on November 20, 2008. Plaintiff currently lives in the subject property. Plaintiff comes before the court today requesting a judgment that the foreclosure proceeding be permanently enjoined as to the defendant Trustee LaSalle acting for its beneficiary trust (and Bank of America as the successor-in-interest), the only entity to give notice of foreclosure and for summary judgment on her claims related to the wrongful foreclosure of this real property.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." ALA. R. CIV. PROC. 56(c)(3), *Young v. La Quinta Inns, Inc.*, 682 So.2d 402 (Ala.1996). A court considering a motion for summary judgment will view the record in the light most favorable to the nonmoving party, *Hurst v. Alabama Power Co.*, 675 So.2d 397 (Ala.1996), *Fuqua v. Ingersoll-Rand Co.*, 591 So.2d 486 (Ala. 1991); will accord the nonmoving party all reasonable favorable inferences from the evidence, *Fuqua, supra, Aldridge v. Valley Steel Constr., Inc.*, 603 So.2d 981 (Ala. 1992); and will resolve all reasonable doubts against the moving party. *Ex parte Brislin*, 719 So.2d 185 (Ala.1998).

---

1 Bates #: Horace v. LaSalle 29.
2 Bates #: Horace v. LaSalle 2.

## III. ARGUMENTS

### A. THE DEFENDANT TRUST HAS NO STANDING TO FORECLOSE BECAUSE THERE HAS BEEN NO VALID ENFORCEABLE ASSIGNMENT TO THE TRUSTEE OF THE TRUST

#### A-1.The Defendant Trust Is A New York Common Law Trust Governed By New York Law Based On Its Trust Agreement

The October 16, 2008 Notice sent to Plaintiff was on behalf of the legal entity,"LaSalle

Bank National Association, as Trustee for Certificate holders of Bear Stearns Asset Backed

Securities I LLC, Asset-Backed Certificates, Series 2006-EC2" (hereafter the "Trust"). LaSalle

is not the originator of the mortgage, the servicer, or even a bank. Instead, this entity is a New

York common law trust created by an agreement known as "Pooling and Service Agreement."

Allegedly, the Plaintiff's loan, along with other loans, were pooled into a trust and converted into

mortgage-backed securities ("MBS") that can be bought and sold by investors — a process

known as securitization. The underlying promissory notes of each and every mortgage held by

the Trust serve as generate a potential income stream for investors.

The Trust allegedly holding the Plaintiff's note was created on or about February 1, 2006,

and is identified as "LaSalle Bank National Association, as Trustee for Certificate holders of

Bear Stearns Asset Backed Securities I LLC, Asset-Backed Certificates, Series 2006-EC2." The

Trust, by its terms, set a "closing date" of February 28, 2006.The terms of the Trust are

contained in the Pooling and Servicing Agreement ("PSA" or the "Trust agreement"), which is

an approximately 400-page document that creates the Trust and defines the rights, duties and

- 3 -

obligations of the parties to the Trust Agreement.[3]  The PSA is filed under oath with the

Securities and Exchange Commission and is attached to LaSalle's motion for summary judgment

as Exhibit 1.  The PSA also incorporates by reference a separate document called the Mortgage

Loan Purchase Agreement ("MLPA"). These various documents, and hence the acquisition of

the mortgage assets for the Trust, are governed under the law of the State of New York pursuant

to section 11.03 of the PSA (found at page 133 of 397 of the PSA).

The Trust, being sued through its trustee, is a New York Corporate Trust formed to act as

a "REMIC" trust (defined below) pursuant to the U.S. Internal Revenue Code ("IRC").  Pursuant

to the terms of the Trust and the applicable Internal Revenue Service ("IRS") regulations adopted

and incorporated into the terms of the Trust, the "closing date" of the Trust (February 28, 2006)

is also the "Startup Day" for the Trust under the REMIC provisions of the IRC.  The Startup Day

is significant because the IRC ties the limitations upon which a REMIC trust may receive its

assets to this date.  The relevant portion of the IRC addressing the definition of a REMIC is:

> (a) General rule. For purposes of this title, the terms 'real estate mortgage
> investment conduit'and 'REMIC' mean any entity—
>   (1) to which an election to be treated as a REMIC applies for the taxable year
> and all prior taxable years,
>   (2) all of the interests in which are regular interests or residual interests,
>   (3) which has 1 (and only 1) class of residual interests (and all distributions, if
> any, with respect to such interests are pro rata),
>   (4) *as of the close of the 3rd month beginning after the startup day*and at all
> times thereafter, substantially all of the assets of which consist of qualified
> mortgages and permitted investments.

26 U.S.C.S. § 860D(emphasis added).

---

3It is settled that the duties and powers of a trustee are defined by the terms of the trust
agreement and are tempered only by the fiduciary obligation of loyalty to the beneficiaries (see,
United States Trust Co. v First Nat'l City Bank, 57 A.D.2d 285, 295-296, aff'd 45 NY2d 869;
Restatement [Second] of Trusts § 186, comments a, d). *See In re* IBJ Schroder Bank & Trust
Co., 271 A.D.2d 322 (N.Y. App. Div. 1st Dep't 2000)

The IRC also provides definitions of prohibited transactions and prohibited contributions

which are relevant to this case as well. In the context of this case, the relevant statute is the

definition of *prohibited contributions* which is as follows:

26 U.S.C. 860G(d)(1) states:

Except as provided in section 860G(d)(2), "if any amount is contributed to a
REMIC after the startup day, there is hereby imposed a tax for the taxable year of
the REMIC in which the contribution is received equal to 100 percent of the
amount of such contribution."

26 U.S.C. 860G(d)(2) states:
(2) Exceptions. Paragraph (1) shall not apply to any contribution which is made in
cash and is described in any of the following subparagraphs:
    (A) Any contribution to facilitate a clean-up call (as defined in regulations) or a
qualified liquidation.
    (B) Any payment in the nature of a guarantee.
    (C) Any contribution during the 3-month period beginning on the startup day.
    (D) Any contribution to a qualified reserve fund by any holder of a residual
interest in the REMIC.
    (E) Any other contribution permitted in regulations.

The PSA (primarily in section 9.12) addresses these sections of the IRC by obliging the

parties to the Trust to avoid any action which might jeopardize the tax status of any REMIC

and/or impose any tax upon the Trust for prohibited contributions or prohibited transactions.

These PSA provisions are important to the court's analysis of the facts in this case because of the

interplay between the New York trust law, the IRC's REMIC provisions, and the PSA's

incorporation of the IRC REMIC provisions.

### A-2. The Trust Instrument/PSA Sets Forth A Specific Time, Method And Manner Of Funding The Trust

The Trust seeking to foreclose on the Plaintiff has included in the terms of its Trust

agreement (the PSA) a specific time, method and manner of funding the Trust with its assets.

- 5 -

The *most critical* time is the Trust's closing date, February 28, 2006.[4] According to the terms of

the PSA, all of the assets of the Trust were to be transferred to the Trust on or before the closing

date.5 This requirement is to ensure that the Trust will receive REMIC status and thus be

exempt from federal income taxation. Section 2.02(a) of the PSA provides for a window of 90

days after the Trust closing date in which the Trust may complete any missing paperwork or

finalize any documents necessary to complete the transfers of assets from the depositor to the

Trust.6 Thus, for an asset to become an asset of the Trust it *must* have been transferred to the

Trust within the time set forth in the PSA. The additional 90 days in the timeline requirement is

incorporated from the REMIC provisions of the IRC to provide a "clean-up period" for a REMIC

to complete the documents associated with the transfers of assets to a REMIC after the startup

day (which is also the Trust closing date). Therefore, according to the plain terms of the Trust

agreement in this case, the closing date/startup date was February 28, 2006 and the last day for

transfer of assets into the Trust was May 29, 2006.

## B. THE TRUST AGREEMENT PROVIDES THE ONLY MANNER IN WHICH ASSETS MAY BE PROPERLY TRANSFERRED TO THE TRUST AND ANY ACT IN CONTRAVENTION OF THE TRUST AGREEMENT IS VOID

### B-1. Transfer of Assets to the Trust Pursuant to the Trust Instrument/PSA

As a generic matter, there are several methods by which the underlying assets of the

Trust, specifically the individual promissory notes, might be transferred or conveyed. A trust's

ability to transact is restricted to the actions authorized by its trust documents. In this case, the

Trust documents permit only one specific method of transfer to the Trust. That method is set

forth in Section 2.01 of the PSA:

---

4http://sec.gov/Archives/edgar/data/1352655/000088237706000801/d431341.htm(last viewed 1/7/10) **This date is defined in the Trust instrument at page 25 of 397 in exhibit 1.**

5  This requirement is found at Section 2.01 on page 56 of 397.
6  This requirement is found at page 58 of 397.

12-12020-mg   Doc 5100-13   Filed 09/18/13   Entered 09/18/13 14:29:58   Exhibit J
Case 1:12-cv-00401-KD-B   Document 1-2   Filed 02/25/13   Page 28 of 58
to Declaration   Pg 27 of 99

Pursuant to the Mortgage Loan Purchase Agreement, each Seller sold, transferred, assigned, set over and otherwise conveyed to the Depositor, without recourse, all the right, title and interest of such Seller in and to the assets sold by it in the Trust Fund....

In connection with such sale, the Depositor has delivered to, and deposited with, the Trustee or the Custodian, as its agent, the following documents or instruments with respect to each Mortgage Loan so assigned: (i) the original Mortgage Note, including any riders thereto, endorsed without recourse (A) in blank or to the order of *"LaSalle Bank National Association, as Trustee for Certificateholders of Bear Stearns Asset Backed Securities I LLC, Asset-Backed Certificates, Series 2006-EC2,"* or (B) in the case of a loan registered on the MERS system, in blank, and in each case showing an unbroken chain of endorsements from the original payee thereof to the Person endorsing it to the Trustee,

The analysis of this transfer language requires the court to consider each part. In the second paragraph of the language in the Trust Agreement, the first statement is one of transfer, stating *"the Depositor has delivered to and deposited with the Trustee or the Custodian the following documents"*. The key document is the original mortgage note, which requires mandatory endorsements found in this language: *"the original mortgage note....endorsed without recourse"* followed by two alternatives which are phrased in the either/or format. The first labeled "A" states *"in blank or to the order of "LaSalle Bank National Association, as Trustee for Certificateholders of Bear Stearns Asset Backed Securities I LLC ,Asset-Backed Certificates, Series 2006-EC2."* The second possibility stated in "B" provides as the "or" proposition for transfer the following statement *"in the case of a loan registered on the MERS system, in blank..."* In each case, the affirmative language of the Trust agreement places a burden on the depositor to make a valid legal transfer in the terms required by the Trust instrument. The key language in the entire paragraph is the final statement trailing the "either/or" language of A & B which reads: *"and in each case showing an unbroken chain of endorsements from the original payee thereof to the Person endorsing it to the Trustee".*

- 7 -

Stacked upon the top of this requirement of an unbroken chain of endorsements is the

requirement of certification of the final contents of the collateral file for the benefit of the Trust.

This requirement is found at Exhibit 1 to the MLPA (Mortgage Loan Purchase Agreement),

which is an attachment to and incorporated as a part of the PSA in Section 2.01. This Document

is found at Horace 391 and states as follows:

> With respect to each Mortgage Loan, the Mortgage File shall include each of the
> following items, which shall be available for inspection by the Purchaser or its
> designee, and which shall be delivered to the Purchaser or its designee pursuant to
> the terms of this Agreement.
>
> (a) The original Mortgage Note, including any riders thereto, endorsed without
> recourse to the order of *"LaSalle Bank National Association, as Trustee for
> certificateholders of Bear Stearns Asset Backed Securities I LLC, Asset-Backed
> Certificates, Series 2006-EC2,"* and showing to the extent available to the related
> Mortgage Loan Seller an unbroken chain of endorsements from the original payee
> thereof to the Person endorsing it to the Trustee;

The foregoing requirement demonstrates clearly that while the parties to the securitization made

provisions whereby promissory notes for this Trust might be delivered in blank to the Trustee,

there were two requirements that were *mandatory*. First, all notes sold to the Trust were required

to have an unbroken chain of endorsements from the original payee to the person endorsing it to

the Trustee. This requirement stems from a particular business concern in securitization, namely

to evidence that there was in fact a "true sale" of the securitized assets and that they are in no

way still property of the originator, sponsor, or depositor, and thus not subject to the claims of

creditors of the originator, sponsor, or depositor. A fact testified to by the Plaintiff's

securitization expert, Thomas J. Adams, who explained under examination by Counsel for the

Trust as follows:

```
            Page 83
            17 Q So what then I guess with respect to
            18 notes is -- what's the purpose then of having a
            19 chain of endorsements, if what I'm concerned
```

- 8 -

```
20 about is who currently owns it?
21 A My understanding is that it helps
22 establish how you came to possess it.
23 Q Okay. And why does that matter?
Page 84
1 A From an investor perspective in a
2 mortgage backed securities governed by a pooling
3 and servicing agreement, you want confidence
4 that the collateral for the file is properly
5 conveyed to it, that -- that the -- that they
6 will have the right to establish their ownership
7 as investors in that collateral.
```

Second, there was a requirement that ultimately, within 90 days of the Trust closing date,

the actual promissory note must be endorsed over to the trustee for the specific trust to

effectively transfer the asset into the trust and therefore make the Horace promissory note Trust

property. This requirement finds support in logic and law and is, in fact, the ancient and settled

law of New York on this issue.

## B-2. New York Law Governs The Mandatory Requirements To Effectively Transfer An Asset To A Trust

It is not contested that securitization trusts, such as the defendant, are subject to

the common law of New York.[7]  New York's trust law is ancient and settled. There are

a few principles of New York Trust law that are particularly important to the analysis of

whether any particular asset is an asset of a given trust. Under New York law, the

analysis of whether an asset is trust property is determined under the law of gifts.[8]  In

order to have a valid inter vivos gift, there must be a delivery of the gift (either by a

---

[7] As early as 1935, in Burgoyne v. James, 282 N.Y.S. 18, 21 (1935), the New York Supreme Court recognized that business trusts, also known as ""Massachusetts trusts"," are deemed to be common law trusts. See also In re Estate of Plotkin, 290 N.Y.S.2d 46, 49 (N.Y. Sur. 1968) (characterizing common stock trust funds as ""common law trust[s]""). Other jurisdictions are in accord. See, e.g., Mayfield v. First 'Nat'l Bank of Chattanooga, 137 F.2d 1013 (6th Cir. 1943) (applying common law trust principles to a pool of mortgage participation certificate holders).
[8] ""In the case of a trust where there is a trustee other than the grantor, transfer will be governed by the existing rules as to intent and delivery (the elements of a gift)""In re Becker, 2004 N.Y. Slip Op. 51773U, 4 (N.Y. Sur. Ct. 2004).

physical delivery of the subject of the gift) or a constructive or symbolic delivery (such as by an instrument of gift) sufficient to divest the donor of dominion and control over the property[9] and "what is sufficient to constitute delivery 'must be tailored to suit the circumstances of the case'".[10]  The delivery rule requires that "'[the] delivery necessary to consummate a gift must be as perfect as the nature of the property and the circumstances and surroundings of the parties will reasonably permit.'"[11]

"Under New York law there are four essential elements of a valid trust of personal property: (1) A designated beneficiary; (2) a designated trustee, who must not be the beneficiary; (3) a fund or other property sufficiently designated or identified to enable title thereto to pass to the trustee; and (4) the actual delivery of the fund or other property, or of a legal assignment thereof to the trustee, with the intention of passing legal title thereto to him as trustee."[12] There is no trust under the common law until there is a valid delivery of the asset in question to the Trust.[13]  If the trust fails to acquire the

---

[9]  (see, Matter of Szabo, 10 N.Y.2d 94, 98-99, *supra*; Speelman v Pascal, 10 N.Y.2d 313, 318-320, supra; Beaver v. Beaver, 117 N.Y. 421, 428-429, supra; Matter of Cohn, 187 App. Div. 392, 395) as cited in Gruen v. Gruen, 68 N.Y.2d 48, 56 (N.Y. 1986).

[10](Matter of *Szabo*, supra, at p. 98).

[11]  (id.; Vincent v Rix, 248 N.Y. 76, 83; Matter of Van Alstyne, supra, at p 309; see, Beaver v. Beaver, supra, at p 428) as cited in Gruen v. Gruen, 68 N.Y.2d 48, 56-57 (N.Y. 1986) .

12  Brown v. Spohr, 180 N.Y. 201, 209-210 (N.Y. 1904).

13  Until the delivery to the trustee is performed by the settlor, or until the securities are definitely ascertained by the declaration of the settlor, when he himself is the trustee, no rights of the beneficiary in a trust created without consideration arise (cf. Riegel v. Central Hanover Bank & Trust Co., 266 App. Div. 586; Matter of Gurlitz [Lynde], 105 Misc 30, aff'd 190 App. Div. 907, supra; Marx v. Marx, 5 Misc 2d 42) as cited in Sussman v. Sussman, 61 A.D.2d 838 (N.Y. App. Div. 2d Dep't 1978).

property, then there is *no trust* over that property which may be enforced.[14] An attempt to convey to a trust will fail if there is no designated beneficiary in the conveyance.[15]

In the context of mortgage-backed securitization, it is clear that registration of the notes and mortgages in the name of the trustee for the trust is necessary for effective transfer to the trust. Within the Statutes of New York governing Trusts, Estates Powers and Trusts Law (EPTL) section 7-2.1(c) authorizes investment trusts to acquire real or personal property "in the name of the trust as such name is designated in the instrument creating said trust." Further, the actual contracts of the parties, which include the custodial agreements, the mortgage loan purchase agreements, and the trust instrument known as the "pooling and servicing agreement," prescribe a very specific method of transfer of the notes and mortgages to the Trust. Because the method of transfer is set forth in the Trust instrument, it is not subject to any variance or exception.[16] The Trust documents require that the promissory notes and mortgages be transferred to the Trustee, which under New York trust law requires valid delivery. The question then arises — "What constitutes valid delivery to the Trustee?"

---

14 In an action against the individual defendant as trustee, based on the theory of breach of fiduciary obligation, the complaint was properly dismissed on the ground that he had acquired no title or separate control of the goods and, hence, there was no actual trust over the property to breach. Kermani v. Liberty Mut. Ins. Co., 4 A.D.2d 603 (N.Y. App. Div. 3d Dep't 1957).

15 Wells Fargo Bank v. Farmer, 2008 N.Y. Misc Lexis 3248.

16 Courts may neither ignore the actual provisions of transaction documents nor create contractual remedies that were omitted from the governing contracts by the contracting parties. *See Schmidt v. Magnetic Head Corp.*, 468 N.Y.S.2d 649, 654 (N.Y. App. Div. 1983) (""It is fundamental that courts enforce contracts and do not rewrite them . . . An obligation undertaken by one of the parties that is intended as a promise . . . should be expressed as such, and not left to implication."" (citations omitted)); *Morlee Sales Corp. v. Manufacturers Trust Co.*, 172 N.E.2d 280, 282 (N.Y. 1961) (""[T]he courts may not by construction add or excise terms . . . and thereby 'make a new contract for the parties under the guise of interpret[ation].'"" (quoting *Heller v. Pope*, 250 N.E. 881, 882 (N.Y. 1928))

When the requirements of transfer to the trustee are viewed in the context of the

corporate or business trust indenture, more information about compliance with these

requirements becomes apparent.  One must first understand that

> "[t]he corporate trustee has very little in common with the ordinary trustee . . . .
> The trustee under a corporate indenture . . . has his [or her] rights and duties
> defined, not by the fiduciary relationship, but exclusively by the terms of the
> agreement. His [or her] status is more that of a stakeholder than one of a
> trustee."[17]

Indeed, "[a]n indenture trustee is unlike the ordinary trustee. In contrast with the latter,

some cases have confined the duties of the indenture trustee to those set forth in the

indenture."[18]  The indenture trustee, it has been said, resembles a stakeholder whose

obligations are defined by the terms of the indenture agreement.[19]  Moreover,"[i]t is

settled that the duties and powers of a trustee are defined by the terms of the trust

agreement and are tempered only by the fiduciary obligation of loyalty to the

beneficiaries".[20]

The clear import of these cases and statutes is that the delivery of an asset to a

trustee under the terms of a corporate indenture requires strict compliance with the

mandatory transfer terms of the trust indenture.  Thus the Trustee in this case can only

take delivery in strict compliance with the terms of the PSA/Trust document. Further,

given that New York Estates Powers and Trusts Law section 7-2.1(c) authorizes a

trustee to acquire property "in the name of the trust as such name is designated in the

---

[17]  AG Capital Funding Partners, L.P. v. State St. Bank & Trust Co., 2008 N.Y. Slip Op. 5766, 7 (N.Y. 2008)
[18] Green v. Title Guarantee & Trust Co., 223 A.D. 12, 227 N.Y.S. 252 (1st Dept.), aff'd, 248 N.Y. 627 (1928);
Hazzard v. Chase National Bank, 159 Misc. 57, 287 N.Y.S. 541 (Sup. Ct. 1936), aff'd, 257 A.D. 950, 14 N.Y.S.2d
147 (1st Dept.), aff'd, 282 N.Y. 652, cert. denied, 311 U.S. 708 (1940).
[19]  See Meckel v. Continental Resources, 758 F.2d 811, 816 (2d Cir. 1985) as cited in Ambac Indem. Corp. v.
Bankers Trust Co., 151 Misc. 2d 334, 336 (N.Y. Sup. Ct. 1991).
[20]see, United States Trust Co. v First Nat'l City Bank, 57 A.D.2d 285, 295-296, aff'd 45 NY2d 869; Restatement
[Second] of Trusts § 186, comments a, d) as cited in In re IBJ Schroder Bank & Trust Co., 271 A.D.2d 322 (N.Y.
App. Div. 1st Dep't 2000).

instrument creating said trust property," there should be little doubt that for transfer to

an trustee to be effective, the property must be registered in the name of the trustee *for

the particular trust.*   Trust property cannot be, as the Defendant argues, held with

incomplete endorsements and assignments that do not indicate that the property is held

in trust by a trustee for a specific beneficiary trust.  In fact, it is clear in the law of New

York that an attempt to transfer to a trust which fails to specify both a trustee and a

beneficiary is ineffective as a conveyance to the Trust.   *"The failure to name a

beneficiary for the Trustee renders the assignment without merit."*21

   This position is further supported logically in the common law of New York by

the following propositions:

   (1) "Until the delivery to the trustee is performed by the settlor, or until the

securities are definitely ascertained by the declaration of the settlor, when he himself is

the trustee, no rights of the beneficiary in a trust created without consideration arise".[22]

   (2) The delivery necessary to consummate a gift must be as perfect as the nature

of the property and the circumstances and surroundings of the parties will reasonably

permit; there must be a change of dominion and ownership; intention or mere words

cannot supply the place of an actual surrender of control and authority over the thing

intended to be given.[23]   It is the consummation of the donor's intent to give that

completes the transaction. Intention alone, no matter how fully established, is of no avail

---

21 Wells Fargo Bank, N.A. v. Farmer, 2008 NY Slip Op 51133U, 6 (N.Y. Sup. Ct. 2008)
[22] (cf. Riegel v. Central Hanover Bank & Trust Co., 266 App. Div. 586; Matter of Gurlitz [Lynde], 105 Misc. 30, aff'd 190 App. Div. 907, supra; Marx v. Marx, 5 Misc 2d 42) as cited in Sussman v. Sussman, 61 A.D.2d 838 (N.Y. App. Div. 2d Dep't 1978).
[23] Vincent v. Putnam, 248 N.Y. 76, 82-84 (N.Y. 1928).

without the consummated act of delivery.[24] How could one logically argue that

delivering a promissory note endorsed in blank (making it bearer paper) into a trustee's

vault is "delivery beyond the authority and control of the donor" when the vault is

managed by the agent of the donor? If the donor were to claim that the promissory note

were its property, not the trustee's, there would be no evidentiary basis for the trustee to

claim ownership. Accordingly, New York law expressly requires that for property to be

validly delivered to a trust, the property must pass completely out of the control of the

donor (and its agents):

> "If the donor delivers the property to the third person simply for the purpose of
> his delivering it to the donee as the agent of the donor, the gift is not complete
> until the property has actually been delivered to the donee. Such a delivery is not
> absolute, for the ordinary principle of agency applies, by which the donor can
> revoke the authority of the agent, and resume possession of the property, at any
> time before the authority is executed.""[25]

Another case addressing this issue holds that "In order that delivery to a third person

shall be effective, he must be the agent of the donee. Delivery to an agent of the donor is

ineffective, as the agency could be terminated before delivery to the intended donee."[26]

Trustees for securitizations often occupy many roles simultaneously and

conflictingly both as document custodians and trustees for myriad thousands of

securitizations as well as for various parties who are active in the securitization process

including originators, servicers, sponsors and depositors. Accordingly, it is

inconceivable that anything other than registration into "the name of the trust as such

---

[24]Phillippsen v. Emigrant Indus.Sav. Bank, 86 N.Y.S.2d 133, 137-138 (N.Y. Sup. Ct. 1948). (*Beaver v. Beaver, supra,* 117 N.Y. 421, 428, 22 N.E. 940, 941, 6 L.R.A. 403, 15 Am.St.Rep. 531).

[25] (See, also, Grant Trust & Savings Co. v. Tucker, 49 Ind. App. 345; Furenes v. Eide, 109 Ia. 511; Dickeschied v. Exchange Bank, 28 W. Va. 340; Love v. Francis, 63 Mich. 181; [**428] Merchant v. Building Co. [***15] , 17 Ohio Circuit Ct. 190.)

[26] In re Nat'l Commer. Bank & Trust Co., 257 A.D. 868, 869-870 (N.Y. App. Div. 3d Dep't 1939) citing Vincent v. Rix, supra v. Rix, supra; Bump v. Pratt, 84 Hun, 201.

name is designated in the instrument creating said trust property"27 could ever qualify
as delivery to any particular securitization trust. Absent such registration, there would
be nothing that would indicate which of thousands of trusts in the care of a trustee a
particular promissory note might belong to or if it were the personal property of the
trustee itself. Absent such registration, a promissory note would simply be bearer paper,
and thus the property of anyone who obtained possession of it. Further, if anything less
constituted delivery, why are our courts overwhelmed with robo-signed mortgage
assignments and affidavits expressing legally-impossible transfers into the specific trusts
long *after* the trusts have closed for funding?

       This point was recently slammed home to the public consciousness in a
watershed decision out of the State of Massachusetts. On January 7, 2011, the Supreme
Judicial Court of Massachusetts—the highest court in that state—rendered a unanimous
verdict in a case captioned *U.S. Natl. Bank Assn., Trustee, v. Ibanez, For ABFC 2005-
0PT 1 Trust, ABFC Asset Backed Certificates, Series 2005-0PT 1*, No. SJC-10694,
(Mass. Jan. 7, 2011). While that ruling is of course not binding upon this court, it is
very much contrary to the mortgage securitization industry's position in cases involving
the foreclosure of mortgage loans which have allegedly been securitized. The facts of
the case in Massachusetts and the facts of this instant case are similar. Both the
Massachusetts and the Horace cases concern an entity seeking to foreclose on the
mortgagor when the foreclosing entities did not possess the underlying promissory note
at the time of the foreclosure (or attempted foreclosure in the Horace situation). The case
was a ruling on two consolidated cases – both cases were filed by banks (as trustees for

---

27 EPTL 7-2.1(c)

- 15 -

two separate trusts) to quiet title on properties they had foreclosed and purchased at the
foreclosure sale to satisfy the mortgagor's debt. The Massachusetts Supreme Judicial
Court held that neither bank proved that its trust owned the mortgages when they
foreclosed on the homes; therefore, neither had title to the foreclosed properties and that
their foreclosures were void. Effectively, this put the borrowers back into the place they
were before the foreclosure. The Massachusetts Supreme Judicial Court did not tell the
homeowners they are allowed to shirk their obligation to pay their mortgages, which are
still outstanding, valid obligations. The Massachusetts Supreme Judicial Court did,
however, sharply instruct the banks that they must have the proper documentation which
demonstrates a valid right to foreclose before a foreclosure can be carried out. It is well
worth noting the conclusion of the Massachusetts *Ibanez* opinion. The Massachusetts
Supreme Judicial Court noted that "The legal principles and requirements we set forth
are well established in our case law and our statutes. All that has changed is the [banks']
apparent failure to abide by those principles and requirements in the rush to sell
mortgage-backed securities." Just as the principles and requirements of Massachusetts
law are well-founded, so too are those of New York law, and they should be upheld even
if adherence to the law is inconvenient for banks rushing to sell mortgage-backed
securities.

**B-3     THE INTENT TO TRANSFER AN ASSET TO THE TRUST *IS NOT A
TRANSFER TO THE TRUST***

The contents of these statutes, cases and contracts lead to one inescapable
conclusion:  the intent of the parties and the requirements of the contracts were that the
assets be conveyed to the Trusts by the Trust closing dates. For a transfer to any

- 16 -

particular trust to be effective, there should have been a registration of the assets into

"the name of the trust as such name is designated in the instrument creating said trust

property"—this is the only method by which these assets could have been "divested

from the possession and title" of the donors.

In response to the lucidity of the controlling law on this issue, the mortgage

foreclosure industry has chosen to argue that it is clear that it was the parties'"intent" to

transfer these assets and therefore "no court" would ever declare that these assets were

not transferred to these trusts. The controlling law is overwhelmingly against the

industry in this position. The failure to deliver the notes and mortgages to these trusts as

required by the trust instruments is a default under the terms of every agreement that

these parties executed, including their agreements for payment guarantees with the

monoline bond insurers. The securitization industry chose to create its securitization

trusts under New York law precisely because the law was ancient and settled. Now that

the actions of the foreclosure industry contradicts that law, parties such as the defendant

trust are left to argue hope against precedent. The well-settled New York trust law

provides that "A mere intention to make a gift which has not been carried into effect,

confers no right upon the intended beneficiary. There must be also delivery beyond

the power of further control and dominion."[28] Equity will not help out an incomplete

delivery. If the agent of the donor has failed to make the delivery expected equity will

---

[28](Vincent v. Rix, 248 N.Y. 76, 85 v. Rix, 248 N.Y. 76, 85; Matter of Green, 247 App. Div. 540; McCarthy v. Pieret, 281 N.Y. 407, 409.) as cited by In re FIRST TRUST & DEPOSIT CO., 264 A.D. 940, 941 (N.Y. App. Div. 4th Dep't 1942)

- 17 -

not declare him a trustee for the donee.[29] "Thus, Thornton on Gifts and Advancements

(§140) notes:

> "In determining whether there has been a valid delivery, the situation of the
> subject of the gift must be considered. Thus if it is actually present, and capable
> of delivery without serious effort, it is not too much to say that there must be an
> actual delivery, although the donor need not in person or by agent hand the
> article to the donee, if the latter assumes the possession."

There was absolutely nothing in the physical nature of the papers to be delivered in this

case, or in the physical condition or the surroundings of the donor, that made a

symbolical delivery necessary."[30]  It is true that the old rule requiring an actual delivery

of the thing given has been very largely relaxed, but a symbolical delivery is sufficient

only when the conditions are so adverse to actual delivery as to make a symbolical

delivery as nearly perfect and complete as the circumstances will allow.[31]

   Further, the failure to convey to a trust per the controlling trust document is not a

matter that may be cured by the breaching party.  New York law is unflinchingly clear

that a trustee has only the authority granted by the instrument under which he holds,

either deed or will. This fundamental rule has existed from the beginning and is still

law.[32] An indenture trustee is unlike the ordinary trustee. In contrast with the latter,

some cases have confined the duties of the indenture trustee to those set forth in the

indenture.[33] From this context springs the seminal rule of law that effectively causes the

parties to the Trust agreement and the Trust to be "gored by their own bull". New

---

[29]Vincent v. Putnam, 248 N.Y. 76, 82-84 (N.Y. 1928)
[30]In re Van Alstyne, 207 N.Y. 298, 309-310 (N.Y. 1913).
[31] In re Van Alstyne, 207 N.Y. 298, 309-310 (N.Y. 1913).
[32]Allison & Ver Valen Co. v. McNee, 170 Misc. 144, 146 (N.Y. Sup. Ct. 1939).
[33]Ambac Indem. Corp. v. Bankers Trust Co., 151 Misc. 2d 334, 336 (N.Y. Sup. Ct. 1991).

York's law is so well-settled regarding the limitations of a trustee's power to act that

New York's Estates Powers and Trust Law Section 7-2.4 states:

> § 7-2.4 Act of trustee in contravention of trust
>
> If the trust is expressed in the instrument creating the estate of the trustee, every
> sale, conveyance or other act of the trustee in contravention of the trust, except as
> authorized by this article and by any other provision of law, is void.

Therefore, the trustees for these trusts may only acquire assets in the manner set forth in the trust

instrument and may not acquire assets in violation of the trust instrument. To the extent that any

assets were not conveyed to these trusts as required and when required by the trust instrument,

they are not assets of the trusts and the trustee cannot correct this deficiency now since the

funding period provided in the Trust instruments passed many years ago. The attempt to acquire

assets by these trusts which violate the terms of the Trust instrument are void. Therefore, late

assignments, improper chains of title, late endorsements, improper chains of title in the

endorsements and the attempt to transfer to the trusts by foreclosure deed are just a number of

the many examples of actions which are *void* if taken by a party to the indenture who is

attempting to transfer property to the Trustee for the Trust in violation of the trust instrument.

## C.    THE TRUST NEVER PROPERLY ACQUIRED THE MORTGAGE NOTE AND
## THE TRUST CANNOT CURE ITS FATAL STANDING DEFECT

Under New York law there is no trust over property that has not been properly transferred

to a trust. The Defendant Trust stated to the U.S. Securities and Exchange Commission in filings

under oath that it has assets in excess of $400 million.[34] To acquire assets, the Trust must be

---

34 http://sec.gov/Archives/edgar/data/1352655/000088237706000801/d431341.htm (last viewed 1/7/10)

funded in accordance with the requirements of the PSA/Trust documents. The pertinent terms of the agreement are found at §2.01 (Conveyance of Trust Fund) of the PSA.[35] This section details how the mortgage notes in the instant case were transferred from Encore Credit Corp. (as Originator) to EMC Mortgage Corp. (as the Sponsor and Master Servicer) to Bear Stearns Asset Backed Securities I LLC (the Depositor) to LaSalle Bank National Association (the Trustee). Bear Stearns as the Depositor was required to deliver to LaSalle the original mortgage note showing an unbroken chain of endorsements from the original payee to the person endorsing it to the Trustee. The person endorsing to the Trustee was the Bear Stearns entity.[36]

In the discovery provided to the Plaintiff, the only endorsement to the Horace mortgage note is a blank endorsement "pay to the order of _____ without recourse Encore Credit Corp, A California Corporation," signed by an unreadable name with an unreadable title.[37] The last assignment of the mortgage was a blank endorsement with a stamp by Encore — nothing has been submitted by the Trust to the Court indicating that Encore ever assigned the mortgage to any other entity. Thus, based on the documents in this case, Encore, not LaSalle, is the mortgage holder. LaSalle does not have the authority to foreclose the mortgage.

No later than May 29, 2006 there should have been — at a minimum — endorsements from Encore Credit Corp. to EMC Mortgage Corp., then EMC Mortgage Corp. to Bear Stearns, then Bear Stearns to LaSalle.[38] And yet, there is no "showing" of an unbroken chain of endorsements in the documents provided to the Plaintiff. The affidavit of Thomas J. Adams, expert for the Plaintiff, testified to this:

---

35 Bates #: Lasalle/Horace 0067.

[36]*See* Bates #: LaSalle/Horace 0067-0068: ""(A) in blank or to the order of ""LaSalle Bank National Association, as Trustee for Certificateholders of Bear Stearns Asset Backed Securities I LLC, Asset-Backed Certificates, Series 2006-EC2,"" or (B) in the case of a loan registered on the MERS system, in blank, and in each case showing an unbroken chain of endorsements from the original payee thereof to the Person endorsing it to the Trustee, . . .""

[37]Bates #: Horace v. LaSalle 29.

[38] Plaintiff states ""at a minimum"" because there may have been more transfers.

"According to the requirements set forth in the Trust Agreement I would expect to see a series of endorsements of the promissory note reflective of each party who had an interest in the promissory note reflective of each party who had an ownership interest in the promissory note culminating with a blank endorsement from the depositor at the very minimum."[39]

The Trust never possessed the mortgage note per the terms of the PSA (Pooling and Service Agreement). Further, in the PSA's exhibits, Exhibit One sets forth the contents of the collateral file for each mortgage loan that is trust property and further includes a final specific endorsement to the Trustee for the specific trust in this case to effect a final transfer to the Trust and to make the Horace promissory note trust property.

Any attempt by LaSalle, or Bank of America, to transfer the promissory note to the Trust at this late date would fail for numerous reasons, not the least of which is that the closing date of February 28, 2006 passed nearly 5 years ago. By the terms of the Trust and the applicable provision of the Internal Revenue Code incorporated into and a part of the Trust agreement, the promissory note cannot be transferred to the Trust.[40] Because the uncontradicted evidence in the case is that the Horace loan has never been conveyed to the Trust and a conveyance to the Trust at this time would be void as violating the terms of the PSA the Court is left with one clear and inescapable proposition: *The Trust has never owned the Horace promissory note and the Trust can never own the Horace promissory note.*

## D. THE TRUST IS NOT ENTITLED TO THE MONEY SECURED BY THE HORACE MORTGAGE AND CANNOT FORECLOSE

Per Ala. Code §35-10-12, the power to sell lands is held by the person who " . . . by assignment or otherwise, becomes entitled to the money thus secured." As outlined above, the

[39]Affidavit and Testimony of Thomas J. Adams, ¶ 12.
[40]Affidavit and Testimony of Thomas J. Adams, ¶17.

- 21 -

Trust has not provided documentation to show that it was or is entitled to the money secured by

the mortgage of Horace's property. "The defendant Trust [LaSalle] has offered no proof of

ownership and the collateral file offered by the defendant Trust clearly demonstrates that this

loan was not securitized nor was it transferred to this Trust."[41]

## CONCLUSION

Based on the law, the terms of the Pooling and Service Agreement, the failure to show

the proper chain of endorsements, and the arguments contained herein, Plaintiff moves this Court

to permanently enjoin LaSalle Bank National Association (and Bank of America as its successor-

in-interest) from foreclosing on the property at 3745 Knowles Road, Phenix City because they

have failed to make the required showing that they are or ever were or ever could be the holder

of the mortgage promissory note.

RESPECTFULLY SUBMITTED,

/s/ Nicholas H. Wooten
Nicholas H. Wooten – Ala. Bar No. Woo084
(Attorney for Plaintiff)
P.O. Box 3889
Auburn, AL 36831-3389
Tel. (334) 887-3000
Fax (334) 821-7720

OF COUNSEL:

Mr. Nick Wooten
WOOTEN LAW FIRM, P.C.
P.O. Box 3889
Auburn, Al. 36831
(334) 887-3000

_____

41 Affidavit and Testimony of Thomas J. Adams, ¶14 and deposition testimony page 140, lines 4-8.

- 22 -

**JINKS, CROW, & DICKSON, P.C.**
PO Box 350
219 Prairie Street North
Union Springs, AL 36089


## CERTIFICATE OF SERVICE

    I hereby certify that I have served a copy of the foregoing upon the Defendants by providing an electronic copy on this the 13th day of January 2011.

All counsel of Record


           /s/ Nick Wooten

         OF COUNSEL

12-12020-mg   Doc 5100-13   Filed 09/18/13   Entered 09/18/13 14:29:59   Exhibit J
to Declaration   Pg 44 of 99
Case 1:12-cv-00101-KD-B   Document 1-2   Filed 02/29/11   Page 43 of 58

Defendant Trust and its agents declaring that the Trust has no interest in her promissory
note and may not pursue foreclosure against her and preserving for trial the issue of
damages against the Defendant trust and its agents.

RESPECTFULLY SUBMITTED,

/s/ Nicholas H. Wooten
Nicholas H. Wooten – Ala. Bar No. Woo084
(Attorney for Plaintiff)
P.O. Box 3889
Auburn, AL 36831-3389
Tel. (334) 887-3000
Fax (334) 821-7720

OF COUNSEL:

Mr. Nick Wooten
WOOTEN LAW FIRM, P.C.
P.O. Box 3389
Auburn, Al. 36831
(334) 887-3000

JINKS, CROW, & DICKSON, P.C.
PO Box 350
219 Prairie Street North
Union Springs, AL 36089

CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Defendants by
providing an electronic copy on this the 13th day of January 2011.

All counsel of Record

/s/ Nick Wooten
OF COUNSEL



## AlaFile E-Notice

57-CV-2008-000362.00

Judge: ALBERT L JOHNSON

To: WOOTEN NICHOLAS HEATH
nhwooten@gmail.com

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA

PHYLLIS HORACE VS. LASALLE BANK NATIONAL ASSOCIATION, ET AL
57-CV-2008-000362.00

The following matter was FILED on 3/30/2011 2:12:06 PM

Notice Date:     3/30/2011 2:12:06 PM

KATHY S. COULTER
CIRCUIT COURT CLERK
RUSSELL COUNTY, ALABAMA
RUSSELL COUNTY JUDICIAL CENTER
PHENIX CITY, AL 36867

334-298-0516
kathy.coulter@alacourt.gov

ELECTRONICALLY FILED
PM
60
CIRCU
RUSSELL       COURT       BAMA
KATHY S. COULTER, CLERK

| | | |
|---|---|---|
| PHYLLIS HORACE, | ) | IN THE CIRCUIT COURT OF |
| Plaintiff, | ) | RUSSELL COUNTY, ALABAMA |
| VS. | ) | CASE NO. CV 08-362 |
| LASALLE BANK NATIONAL ASSOCIATION, et al., | ) | |
| Defendants, | ) | |

## ORDER

This cause comes before the court for hearing on March 21, 2011.

It is hereby

ORDERED, ADJUDGED, AND DECREED:

Following hearing and review of all submissions from the parties the Court has come to two conclusions necessary for the disposition of this case:

First, the Court is surprised to the point of astonishment that the defendant trust (LaSalle Bank National Association) did not comply with the terms of its own Pooling and Servicing Agreement and further did not comply with New York Law in attempting to obtain assignment of plaintiff Horace's note and mortgage.

Second, plaintiff Horace is a third party beneficiary of the Pooling and Servicing Agreement created by the defendant trust (LaSalle Bank National Association). Indeed without such Pooling and Servicing Agreements, plaintiff Horace and other mortgagors similarly situated would never have been able to obtain financing.

Consequently, plaintiff's motion for summary judgment is granted to the extent that

12-12020-mg   Doc 5100-13   Filed 09/18/13   Entered 09/18/13 14:29:59   Exhibit J
Case 9:12-cv-00111-KD-B   Document 1-2   Filed 02/29/11   Page 48 of 58
to Declaration    Pg 47 of 99

defendant trust (LaSalle Bank National Association) is permanently enjoined from foreclosing on

the property at 3745 Knowles Road in Phenix City, Alabama.

Further, the Court is of the opinion there is no reason for further delay as to the entry of

final judgment concerning the issue of foreclosure by the trust (LaSalle Bank National

Association).

That notice shall issue to the parties.

DONE this the 25th day of March, 2011.

ALBERT L. JOHNSON, CIRCUIT JUDGE

2011 MAR 30 PM 1:45

12-12020-mg   Doc 5100-13   Filed 09/18/13   Entered 09/18/13 14:29:59   Exhibit J
Case 1:12-cv-00121-KD-B   Document 1-2   Filed 02/29/13   Page 49 of 58
to Declaration    Pg 48 of 99



**AlaFile E-Notice**

57-CV-2008-000362.00

Judge: ALBERT L JOHNSON

To:  WOOTEN NICHOLAS HEATH
nhwooten@gmail.com

# NOTICE OF ELECTRONIC FILING

IN THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA

PHYLLIS HORACE VS. LASALLE BANK NATIONAL ASSOCIATION, ET AL
57-CV-2008-000362.00

The following matter was FILED on 1/13/2011 5:42:27 PM

**C001 HORACE PHYLLIS**
MOTION FOR OTHER
[Attorney: DICKSON NATHAN ANDREW II]

Notice Date:     1/13/2011 5:42:27 PM

KATHY S. COULTER
CIRCUIT COURT CLERK
RUSSELL COUNTY, ALABAMA
RUSSELL COUNTY JUDICIAL CENTER
PHENIX CITY, AL 36867

334-298-0516
kathy.coulter@alacourt.gov

Case 5:12-cv-00101-KD-B   Document 1-2   Filed 02/25/13   Page 28 of 58

ELECTRONICALLY FILED

CIRCUIT COURT OF
RUSSELL COUNTY, ALABAMA
KATHY S. COULTER, CLERK

| STATE OF ALABAMA | | | | Case |
|---|---|---|---|---|
| Unified Judicial System | | | Revised 3/5/08 | |
| 57-RUSSELL | ☐ District Court | ☑ Circuit Court | | CV2( |

| | |
|---|---|
| PHYLLIS HORACE  VS.  LASALLE BANK NATIONAL ASSOCIATION, ET AL | **CIVIL MOTION COVER SHEET**<br><br>Name of Filing Party: C001 - HORACE PHYLLIS |

| Name, Address, and Telephone No. of Attorney or Party. If Not Represented. | ☐ Oral Arguments Requested |
|---|---|
| NATHAN A. DICKSON<br><br>POST OFFICE BOX 350<br>UNION SPRINGS, AL 36089 | |
| Attorney Bar No.:  DIC031 | |

## TYPE OF MOTION

**Motions Requiring Fee**

- ☐ Default Judgment ($50.00)
- ☐ Joinder in Other Party's Dispositive Motion (i.e. Summary Judgment, Judgment on the Pleadings, or other Dispositive Motion not pursuant to Rule 12(b)) ($50.00)
- ☐ Judgment on the Pleadings ($50.00)
- ☐ Motion to Dismiss, or in the Alternative Summary Judgment($50.00)
- ☐ Renewed Dispositive Motion(Summary Judgment, Judgment on the Pleadings, or other Dispositive Motion not pursuant to Rule 12(b)) ($50.00)
- ☐ Summary Judgment pursuant to Rule 56($50.00)
- ☐ Motion to Intervene ($297.00)
- ☑ Other    Summary Judgment

  pursuant to Rule  56                        ($50.00)

  _____

  *Motion fees are enumerated in §12-19-71(a). Fees pursuant to Local Act are not included. Please contact the Clerk of the Court regarding applicable local fees.

- ☐ Local Court Costs $ _____

**Motions Not Requiring Fee**

- ☐ Add Party
- ☐ Amend
- ☐ Change of Venue/Transfer
- ☐ Compel
- ☐ Consolidation
- ☐ Continue
- ☐ Deposition
- ☐ Designate a Mediator
- ☐ Judgment as a Matter of Law (during Trial)
- ☐ Disburse Funds
- ☐ Extension of Time
- ☐ In Limine
- ☐ Joinder
- ☐ More Definite Statement
- ☐ Motion to Dismiss pursuant to Rule 12(b)
- ☐ New Trial
- ☐ Objection of Exemptions Claimed
- ☐ Pendente Lite
- ☐ Plaintiff's Motion to Dismiss
- ☐ Preliminary Injunction
- ☐ Protective Order
- ☐ Quash
- ☐ Release from Stay of Execution
- ☐ Sanctions
- ☐ Sever
- ☐ Special Practice in Alabama
- ☐ Stay
- ☐ Strike
- ☐ Supplement to Pending Motion
- ☐ Vacate or Modify
- ☐ Withdraw
- ☐ Other _____

  pursuant to Rule               (Subject to Filing Fee)

| Check here if you have filed  or are filing contemporaneously with this motion an Affidavit of Substantial Hardship or if you are filing on behalf of an agency or department of the State, county, or municipal government. (Pursuant to §6-5-1 Code of Alabama (1975), governmental entities are exempt from prepayment of filing fees)   ☐ | Date:<br><br>1/13/2011 5:41:48 PM | Signature of Attorney or Party:<br><br>/s NATHAN A. DICKSON |

*This Cover Sheet must be completed and submitted to the Clerk of Court upon the filing of any motion. Each motion should contain a separate Cover Sheet.

**Motions titled 'Motion to Dismiss' that are not pursuant to Rule 12(b) and are in fact Motions for Summary Judgments are subject to filing fee.

ELECTRONICALLY FILED
PM
362.00
CIRCUIT COURT OF
RUSSELL COUNTY, ALABAMA
KATHY S. COULTER, CLERK

## IN THE CIRCUIT COURT OF RUSSELL COUNTY, ALABAMA

| | |
|---|---|
| PHYLLIS HORACE, )<br><br>Plaintiff, )<br><br>vs. )<br><br>LASALLE BANK NATIONAL )<br>ASSOCIATION, AS TRUSTEE FOR )<br>CERTIFICATE HOLDERS OF BEAR )<br>STEARNS ASSET BACKED SECURITIES )<br>I LLC, ASSET BACKED CERTIFICATES, )<br>SERIES 2006-EC2; BEAR STEARNS )<br>ASSET BACKED SECURITIES I LLC, )<br>ASSET BACKED CERTIFICATES, SERIES )<br>2006-EC2; MORTGAGE ELECTRONIC )<br>REGISTRATION SYSTEMS, INC.; ENCORE )<br>CREDIT CORPORATION; EMC MORTGAGE)<br>COMPANY; BANK OF AMERICA, et al., )<br>)<br>Defendants. ) | CASE NUMBER:<br>CV-08-362 |

### PLAINTIFF PHYLLIS HORACE'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56 OF THE ALABAMA RULES OF CIVIL PROCEDURE AND RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Comes now Phyllis Horace and moves this Honorable Court for an Order granting summary judgment in her favor as set forth in her motion and supporting brief as follows:

### SUMMARY JUDGMENT IS APPROPRIATE IN THIS CASE

The plaintiff moves pursuant to Rule 56 for summary judgment in this matter on her claims of wrongful foreclosure against the Defendant Trust designated as "LaSalle Bank National Association, as Trustee for Certificate holders of Bear Stearns Asset Backed Securities I LLC, Asset-Backed Certificates, Series 2006-EC2". The Plaintiff asserts that Summary Judgment is proper under the law and facts and prays that after

consideration of her motion, her evidentiary submissions and her brief that the Court will

enter a Summary Judgment in her favor finding that the Defendant trust has no interest in

her promissory note and no ability to foreclose and further finding that the Trust's

institution of foreclosure against her was wrongful and further enjoining the Trust from

prosecuting a foreclosure against her in this case. The Plaintiff feels it important to note

that her claims and her motion do not seek to obviate the underlying promissory note but

is in the nature of a claim against a stranger to her mortgage loan who seeks to foreclose

upon her property under false and fraudulent pretenses. Under the Plaintiff's theory of

the case it is clear that the Trust is a stranger to her mortgage loan and that success upon

her claim against the Trust will not defeat the right of a holder in due course to enforce

the promissory note executed in conjunction with her home mortgage loan. In effect the

Plaintiff asserts that there is a proper payee of her mortgage promissory note but it is not

the defendant Trust or its agents who are involved in the foreclosure upon which she sued

in the present case.

## STATEMENT OF FACTS

1.      On or about November 11, 2005 Phyllis Horace ("Mrs. Horace") executed

a mortgage to facilitate the purchase of her home for her family in Russell County,

Alabama.

2.      At the time the funds were borrowed, the nation was in the midst of the

expanding housing bubble.

3.      The Defendant Encore Credit Corp, a mortgage lender, offered Mrs.

Horace a loan that is commonly referred to as a 2/28 ARM. This loan involved an initial

two year teaser rate period during which Mrs. Horace was required to make only interest

payments at a low teaser rate. At the expiration of the teaser period, the loan recast to a substantially higher monthly payment based on the terms of the note and mortgage.

4.      Mrs. Horace and her husband (who is not a signatory and thus not bound to the mortgage) (together the "Horace's") enjoyed income from regular employment, which was used to make their monthly mortgage payments.

5.      After the loan recast at the end of the teaser period, the Horace's income was not sufficient to cover the fully indexed payment, a fact which was known to the Defendants at the time of originating this loan.

6.      Despite the predatory and unfair origination of the Horace loan, the loan's origination is not the subject of the summary judgment motion. The Horace's have reserved those issues for trial. The Horace's provide this information to the Court as background to explain the original claimed default which led to this litigation.

7.      This motion and the crux of this case is about the validity of the transfers of mortgage promissory notes in the Wall Street financing process known as "securitization" and the resulting issues regarding the ability of the securitization trust in this case to foreclose. Ultimately, much of the outcome of this case hinges upon the Court's ruling regarding the validity or not of the Trust's assertions that it is the owner of the Horace Promissory note.

8.      Securitization is the practice of pooling and selling contractual debt obligations ("receivables") such as residential mortgages, commercial mortgages, auto loans or credit card debt, to a specially-created entity, typically a trust. The trust pays for the receivables by issuing debt securities (variously referred to as bonds, pass-through securities, or Collateralized mortgage obligation (CMOs)) to investors. The trust collects

payment of principal and interest on the receivables, which it then uses to make regular payments to investors on their debt securities.' Securitization thus provides ... and commercial borrowers with financing from securities markets.

　　　9.　　　There are numerous reasons why financial institutions **engage in securitization**, including the management of credit and interest rate risk, relief from regulatory capital requirements, and liquidity enhancement. Securitization began to be used as a financing technique with mortgages in 1971. "For decades before that, banks were essentially portfolio lenders; they held loans until they matured or were paid off. These loans were funded principally by deposits, and sometimes by debt, which was a direct obligation of the bank (rather than a claim on specific assets). But after World War II, depository institutions simply could not keep pace with the rising demand for housing credit. Banks, as well as other financial intermediaries sensing a market opportunity, sought ways of increasing the sources of **mortgage funding**. To attract investors, investment bankers eventually developed an investment vehicle that isolated **defined mortgage pools**, segmented the credit risk, and **structured** the cash flows from the underlying loans."

　　　10.　　　Banks use a variety of structures for securitization trusts depending on the type of asset **being securitized**, but all securitization structures are subject to two overriding concerns. First, is ensuring favorable tax treatment of the bank, the **securitization trust**, and the investors. Ideally through the securitization **trust having** "pass-thru" tax status, meaning that the securitization trust ... of its own income

---

'See ... R. ... ANN REISS BOOK, THE ANATOMY OF STRUCTURED SECURITIES 103 (Oxford Univ. Press.
... [footnote text illegible] ...

when it is paid on the receivables.[3]   Second, and perhaps more critical, is ensuring that

the trust's assets are "bankruptcy remote," meaning that they are insulated from the

claims of the *bank's* creditors.   This involves ensuring that the transfer of the receivables

to the trust is a "true sale" and not a financing transaction.

      11.     Bankruptcy remoteness is critical for making the economics of

securitization work.   By insulating the receivables placed in the trust from the claims of

the bank's creditors, securitization enables investors to invest based solely on the quality

of the receivables and not have to worry about the bank's other business activities. To

accomplish this, the bank conveys receivables to a trust for the benefit of certificate

holders.

      12.     Applying these industry standards to the transaction at issue, Horace

points out that the Defendant is a securitization trust identified as "LaSalle Bank National

Association as Trustee for Certificate holders of Bear Stearns Asset Backed Securities I,

LLC, Bear Stearns Asset Backed Securities I LLC Asset Backed Certificates, and Series

2006-EC2" (hereinafter the "Trust").[4]

      13.     The Trust was formed on February 1, 2006 by the execution of the trust

agreement, which is known in the industry as a Pooling and Servicing Agreement

(hereinafter "PSA").[5]  The Trust's closing date was February 28, 2006.[6]

      14.     The Trust is a common law trust created pursuant to the laws of the State

of New York, and its existence and actions are governed and controlled by New York

law.

---

[3] *See id.*
[4] *See* PSA for Defendant Trust page 5 of 397
[5] *See* PSA page 5 of 397
[6] *See* PSA page 25 of 397

15.    New York trust law is ancient and well-settled with respect to the determination of whether an asset is trust property.

16.    Under New York law, the analysis of whether an asset is trust property is determined under the law of gifts.[7] In order to have a valid inter vivos gift, there must be a delivery of the gift (either by a physical delivery of the subject of the gift) or a constructive or symbolic delivery (such as by an instrument of gift) sufficient to divest the donor of dominion and control over the property[8] and "what is sufficient to constitute delivery 'must be tailored to suit the circumstances of the case.'"[9] The delivery rule requires that "'[the] delivery necessary to consummate a gift must be as perfect as the nature of the property and the circumstances and surroundings of the parties will reasonably permit.'"[10]

17.    New York law is also settled that (1) "Until the delivery to the trustee is performed by the settlor, or until the securities are definitely ascertained by the declaration of the settlor, when he himself is the trustee, no rights of the beneficiary in a trust created without consideration arise".[11] (2) The delivery necessary to consummate a gift must be as perfect as the nature of the property and the circumstances and surroundings of the parties will reasonably permit; there must be a change of dominion

---

[7]*See, e.g., In re* Becker, 2004 N.Y. Slip Op. 51773U, 4 (N.Y. Sur. Ct. 2004) ("In the case of a trust where there is a trustee other than the grantor, transfer will be governed by the existing rules as to intent and delivery (the elements of a gift).").

[8]  (see, Matter of Szabo, 10 N.Y.2d 94, 98-99, supra; Speelman v. Pascal, 10 N.Y.2d 313, 318-320, supra; Beaver v Beaver, 117 NY 421, 428-429, supra; Matter of Cohn, 187 App. Div. 392, 395) as cited in Gruen v. Gruen, 68 N.Y.2d 48, 56 (N.Y. 1986).

[9](Matter of *Szabo*, supra, at p. 98).

[10]  (id.; Vincent v. Rix, 248 N.Y. 76, 83; Matter of Van Alstyne, supra, at p 309; see, Beaver v. Beaver, supra, at p 428) as cited in Gruen v. Gruen, 68 N.Y.2d 48, 56-57 (N.Y. 1986).

[11]  (cf. Riegel v. Central Hanover Bank & Trust Co., 266 App. Div. 586; Matter of Gurlitz [Lynde], 105 Misc. 30, aff'd 190 App. Div. 907, supra; Marx v. Marx, 5 Misc. 2d 42) as cited in Sussman v. Sussman, 61 A.D.2d 838 (N.Y. App. Div. 2d Dep't 1978).

and ownership; intention or mere words cannot supply the place of an actual surrender of control and authority over the thing intended to be given.[12]

18.    Lastly, "under New York law there are four essential elements of a valid trust of personal property: (1) A designated beneficiary; (2) a designated trustee, who must not be the beneficiary; (3) a fund or other property sufficiently designated or identified to enable title thereto to pass to the trustee; and (4) the actual delivery of the fund or other property, or of a legal assignment thereof to the trustee, with the intention of passing legal title thereto to him as trustee."[13] There is no trust under the common law until there is a valid delivery of the asset in question to the trust.[14] Furthermore, when the trust fails to acquire the property, then *there is no trust over that property that may be enforced.*[15]

19.    When New York trust law is applied to the Trust and the facts of this case, it is apparent that there was never a valid delivery of Mrs. Horace's mortgage note to the Trust, so the *Trust* may not enforce the mortgage note.

20.    According to the terms of the PSA, all promissory notes transferred to the Trust are required to have a complete chain of endorsements from the original payee thereof to either "Blank" or to the Trustee for the specific Trust. This means that each promissory note must have the following complete chain of endorsements in order to

---

[12]Vincent v. Putnam, 248 N.Y. 76, 82-84 (N.Y. 1928).

[13]Brown v. Spohr, 180 N.Y. 201, 209-210 (N.Y. 1904).

[14] Until the delivery to the trustee is performed as trustee, or until the securities are definitely ascertained by the declaration of the settlor, when he himself is the trustee, no rights of the beneficiary in a trust created without consideration arise (cf. Riegel v. Central Hanover Bank & Trust Co., 266 App. Div. 586; Matter of Gurlitz [Lynde], 105 Misc 30, aff'd 190 App Div 907, supra; Marx v Marx, 5 Misc 2d 42) as cited in Sussman v. Sussman, 61 A.D.2d 838 (N.Y. App. Div. 2d Dep't 1978).

[15] In an action against the individual defendant as trustee, based on the theory of breach of fiduciary obligation, the complaint was properly dismissed on the ground that he had acquired no title or separate control of the goods and, hence, there was no actual trust over the property to breach. Kermani v. Liberty Mut. Ins. Co., 4 A.D.2d 603 (N.Y. App. Div. 3d Dep't 1957).

comply with the Trust's documents and thus fit within the authorization of the Trust's activities:

From Encore Credit Corporation to

↓

EMC Mortgage Corporation; who endorsed to

↓

Bear Stearns Asset Backed Securities I, LLC, as the Depositor; who endorsed either in blank or specifically to

↓

LaSalle Bank National association as trustee for Certificate holders of Bear Stearns Asset Backed Securities I, LLC, Bear Stearns Asset Backed Securities I LLC Asset Backed Certificates, and Series 2006-EC2

21.     The PSA requires this complete chain of endorsements to be in place by the Trust's closing date or under no circumstances later than 90 days after the Trust's closing date. Therefore the last possible day to transfer to the Trust within the terms of the Trust agreement was May 29, 2006.

22.     During the litigation of this case, the Defendants produced a collateral file that included the original, wet-ink, signed note in this case. *This note contained a single endorsement in blank by the Encore Credit Corporation and no other.* Accordingly, the endorsement chain presented by the Defendant Trust does not comply with that required by the PSA. This means that under New York trust law, there is no effective transfer of the Horace mortgage note to the Defendant Trust, so the Trust cannot enforce the note.

23.     There is no evidence that Mrs. Horace's mortgage promissory note has been securitized, and there is no effective conveyance of Mrs. Horace's mortgage

promissory note to the Defendant Trust, which has claimed ownership and sought to foreclose.[16]

24.    In the case before the Court there is no good faith basis for the defendant Trust to assert or otherwise claim that the Horace promissory note is Trust property.

25.    Mrs. Horace requests that the Court enter a summary judgment in her favor that the Trust is not the owner of her promissory note and that the Trust has no right to foreclose upon her real property.

26.    Mrs. Horace also requests that the Court enter any appropriate Orders to effectuate this Judgment.

27.    Mrs. Horace also requests that the Court direct liability in her favor on her claims against the Trust and the parties acting on the Trust's behalf with respect to her claims regarding the foreclosure action instituted by these parties and that the Court seat a jury for the sole purpose of determining what damages should be awarded against these parties for their wrongful conduct.

## PLAINTIFF'S EVIDENTIARY SUBMISSIONS IN SUPPORT OF HER MOTION

## FOR SUMMARY JUDGMENT

The Plaintiff submits the following list of exhibits in support of her motion for summary judgment in this case:

28.    Attached as exhibit 1 to this motion is the PSA consisting of all exhibits including the form custody agreement and the mortgage loan purchase agreement pulled from the SEC's website and consisting of 397 pages. This exhibit does not include the mortgage loan schedule submitted by the defendant's in this case.

---

[16]  A fact noted in the opinions and testimony of Horace's securitization expert, Thomas J. Adams who opines that the promissory note is not an asset of the Defendant trust in his deposition at 140:4-8.

29.    Attached as exhibit 2 to this motion is the affidavit of Thomas J. Adams
previously provided to the Defendant's in this case.

30.    Attached as exhibit 3 to this motion is the deposition of Thomas J. Adams
taken by counsel for the defendants, Shaun Ramey.

31.    Attached as exhibit 4 to this motion is the complete collateral file
produced by the defendants in this case which consists of 62 pages as produced by the
Defendants.

32.    Attached as exhibit 5 to this motion is an exhibit which shows the
transfers required by the Trust instrument as a recapitulation of the voluminous
document.

33.    Attached as exhibit 6 to this motion is an exhibit which demonstrates the
transfers of the mortgage promissory note revealed by the contents of the mortgage
collateral file.

34.    Attached as exhibit 7 is Horace 391 which is a single document from the
PSA which sets forth the required documents for the collateral files of loans properly
transferred to the Defendant trust.

35.    Additionally, other documents are attached to this motion which are
referenced in this motion or in brief by their Bates Stamp number which include, at least,
Bates Stamped documents numbered 2 & 29.

<div align="center">CONCLUSION</div>

The plaintiff requests that the Court consider her motion, her evidentiary
submissions and her brief in support of her motion for summary judgment and upon
consideration of the same, enter summary judgment as prayed for herein against the

**Multiple Injuries**    #50    **E.D. Physician Record**

JACKSON, CORLA    396009
46 B F
018996    BENJAMIN, REGINA M.   MD
E/R

**Diagnostic Considerations:** circle potential diagnoses

Smoke inhalation   Ft Burns   early

**X-ray:** (Read by ___ Rad)
1 - □ CXR    __ N
2 - □ C spine __ N
3 - □ FA    __ N
4 - □ Pelvis __ N
5 - □ RT FA    __ N
6 - □ ___ __ N

Reviewed / discussed with Radiologist:

**Treatment / Course:**

**Medications / Orders**      **Response**
__ O2   1" heplock
__ Tetanus: TT / dT / TIG
__ Pain meds:    Morphine IV
__ Immobilization: static   dynamic    2" bolus IV
   Applied by: ___ E.P. ___ other
__ compression dressing    __ crutches
__ NPO
other procedures / meds:    ATA web q 2
LR 1000 mL

Repeat exam at: 1430 — witnesses
**Findings:** improved

**Medical Decis. Making:** L1: straightforward; L2,3: low/complex, L4: mod, L5: hi
S.such box. I ordered 2), check normals ✓ (circle) and note abnormals.

Procedure:
( __ see addendum)
Course: same / better / worse
Critical Care: ___ minutes / hour(s)

Recheck Mcc: Still Wheez
ATA repeated
Solumedrol 125 IV

**Clinical Impression:**
① Smoke inhalation
② 5cm abrevation
③ 4cm laceration
① forearm
② Forearm

Contusion Buttock
⑤ 1° Burn
B) LE

BURNS
cleaned and dressed.

**Lab:**
□ CBC: ___ nl ___ nl except
Hct ___ Hgb ___ Plts ___
WBC ___
Neut % ___ Lymph % ___
Mono % ___ Eos % ___
Baso% ___
□ BMP: ___ nl ___ nl except
□ CMP: ___ nl ___ nl except
NA ___ K ___ Glu ___ Cl ___
CO2 ___ Anion gap ___ BUN ___
Creat. ___ B/C Ratio ___ Calcium ___
Alk Phos ___ SGPT (ALT) ___
SGOT (AST) ___ T. Bili ___ T. Prot ___
Albumin ___ Globulin ___ A/G Ratio ___
□ U/A: ___ dip neg ___ dip neg except
Micro neg ___ neg except ___
__ Qual hCG: □ Blood □ Urine Neg / Pos
__ send quantitative

□ Other data reviewed:
□ ETOH    □ Drug screen
□ PT, PTT, INR ___ □ T & G x ___ units RBC

□ ABG: on ___ RA / O2: ___ % / L
pH: ___ PO2 ___
PCO2 ___ HCO3 ___

□ P. Ox ___ %: on ___ RA / O2: ___ % / L
___ nl / hypoxia

□ EKG ___ Nl study
__ NSR ___ nl intervals
__ nl QRS ___ nl ST-T waves
Compared to:
__ unchanged / changed
Read by: ___ E.P.
□ Cardiac monitor: ___ NSR

**Wound Repair:**

| Location | Length / Depth | Repair |
|---|---|---|
| ① RFA | 3 cm | Dermabond / staples |
| | superfic / SQ / M SHOG | # of 3 - 0 Vicryl |
| | | Running |
| | | # of 3 - 0 Nylon |
| | | Dermabond / staples |
| ② LFA | 4 cm | skin-simple |
| | superfic / SQ / M skin simple | # of ___ - 0 |
| | | Interrupted # of ___ - 0 |

**Comments:**
sensat. intact ___ vasc. intact ① LFA subq simple running
Level of contamination: ___ clean / min / mod / severe skin mattress
Anesthesia: local / digital block ___ mL of lido __ c epi / HCO3
__ prep    Suture removal/instruct: 10 days    c ___ epi ___
__ Explored: ___ no F.B. ___ no tendon inj / F.B. identified / tendon injury
__ irrigat, ___ débrided ___ undermined ___ revised ___ F.B. removed
(for above: min = 1, mod = 2, extensive = 3)

**Consultation:**
Consulted Dr. ___
Suggests: admit / discharge / will see: ___ (time) ___ / Transfer to ___
Case discussed with: patient / family / other:

**Disposition:**
__ Transfer to: ___ Accepting Physician ___ EMTALA form completed
__ Admit: ___ IP / ___ OP ICU / Tele / Med-Surg
Admitting physician ___ Covering Physician: ___
Orders written in ED ___
✓ Discharged. Condition: ✓ improved ___ unchanged   dtd PMS-5 d
Instructions given: ✓ written—refer to: ___ WMH form ___ RTW form ___ school excuse
___ off work / school or ___ lmtd work / school / gym thru ___
Discharge Rx: □ Albuterol 5d prcd Loutab
Certified Emergency? □ Yes □ No
Sig: ___ date ___ Attend. / Resid. / PA / NP
___ date ___ Attend. / Resid. / PA / NP
Sea: ___ Addendum ___ Attending note
Copies to: ___ □ dictated

[redacted] 396009
JACKSON, CORLA
[redacted] 46 B F [redacted]
018996 BENJAMIN, REGINA M. MD
E/R

## Multiple Injuries

PROVIDENCE HOSPITAL EMERGENCY DEPARTMENT, MOBILE, AL (334) 633-10

Check (✓) for normals, circle (positives), slash negatives, note findings

Date: 3/13/05 E.P. time: ______ Age: ______ Wt: ______ Sex: M / F

P: 111 BP: 186/70 RR: 18 Temp: 99.1

Chief Complaint: (Multiple injuries) House Fire - fell

Referred by: self / clinic / PMD / family / EMS
Historian: patient / family / friend / EMS

Arrived by: EMS / walk-in / wheelchair
Hx limited by: Altered LOC / acuity / intoxication

### HPI

**Onset:** ___ undetermined
**Occurred:** 0830 time ______ date
______ mins / hrs / days PTA

**Location:**
(home) work
Other:

**Activity during Injury:** ___ unknown
putting fire out
fell 8 ft off ladder

**Mechanism of Injury:** ___ unknown
fell

**Location (anatomic):**
Burns legs, smoke inhalation, lacs

**Injury description (quality):**
deformity / dislocation / sprain / strain /
contusion / laceration / puncture / stab / abrasion /
GSW / F.B. / burn
Pain: ___ none / at rest / ō wt bearing / ō use
Pain quality: sharp / dull / aching / throbbing

**Modifying factors:** ___ none
witnessed / unwitnessed
Ambulatory at scene: (yes) / no
Contributing factors: ETOH / drugs /
seizure / syncope / suicide attempt
Other:

**Assoc. sxs:** ___ none
no complaints / "just stiff and sore"
wounds / bony deformity / swelling
Pain: head / face / neck / chest / abd /
back / pelvis / RUE / LUE / RLE / LLE
(LOC): unknown / dazed / + LOC
Duration: ______ secs / mins / hrs
Remembers: incident / coming to hospital
GCS: 15 / 15

**Prior Hx:** ___ none
EMS: spinal immobilization
Other:

Pt was trying to put fire out — she has smoke inhalation burns to legs - lac's to arms, injury to hip

Last ate: ______

### ROS

All systems reviewed: ___ negative ___ negative except as marked

___ Constit: weak / faint / fever / chills / diaphoresis
___ Eyes: F.B. sensat. / vision probs
___ ENT: ear, nose or throat s/s's / hearing probs / hoarseness
✓ CV: chest discomfort / palpitations
✓ Resp: (SOB / breathing probs) / cough / (wheezing)
___ GI: N / V
___ GU: urinary probs / kidney probs / genitalia pain LMP: ______ nl / abnl
✓ MS: other painful areas: hip
___ Skin: skin probs
___ Neuro: numbness / tingling / focal deficits / paralysis / dizzy / change in behavior / incontinence / seizures
___ Psych: psych probs / anxiety / depression
___ Hemat / Lymph: bruising / bleeding
___ Endo: polyuria / polydipsia
___ Immun / Allerg: HIV / AIDS / splenectomy

HP1109

### Past, Family, Social History

Reviewed: ___ RN note ___ Old Records ___ NH records ___ EMS note

**PMH:** ___ none ___ unknown
peptic ulcer / GI bleed (HTN)
arthritis / CAD / IDDM / NIDDM
thrombophlebitis / clotting probs
c/s/ hx ...

**Meds:** ___ none (reviewed RN note)
ASA / NSAIDs / Coumadin / Plavix
insulin / steroids
antihistamines / narcotics / sedatives

**Allergies:** ___ (reviewed RN note)
Diphtheria tetanus current: (no)
___ yes; year ______

**Surgical Hx:** (none) ___ unknown
Prior trauma:
Other:

**Family Hx:** (none) ___ unknown ___ NI
DM / CAD
clotting probs

**Social Hx:** ___ unknown
Tobacco: current ✓ no ___ yes
quit ___ years ago; hx of ___ pack yea
ETOH: (soc) drinks / wk
Recent? ______
Drugs:
Occupation:
Home situation: ☐ lives alone ☐ w/spouse ☐ w/family ☐ N.H. ☐ CBRF

### Physical Exam

___ Exam limited by: urgency of condition / pt. uncooperative
Gen: Anxious: ___ (no) / mild / mod / severe Distress: ___ no (mild) / mod / severe
✓ VS nl Orthostat. VS: ______
Nutritional status: (nl) / obese Hydration: (nl) / dehydrated
Longboard / cervical immob. (ED / EMS) / IV / intubation / splint
✓ nl color, tone
✓ awake, alert, appropriate
___ diaphoretic
___ cyanotic

**Head / Neck (MSK):**
✓ head ō trauma, skin nl
___ neck ō tend, ROM full

**Eyes:**
✓ lids, conj. nl
___ PERRL, EOM's full
___ cornea, chambers, discs nl

**ENT:**
___ nose nl
___ ext. ears, canals, TM's nl
___ mouth, teeth, oropharynx nl

patent airway

burns right ↓ legs

**CV:**
✓ nl rate, rhythm (L) (R) forearms
___ heart sounds nl
✓ pulses = neck & all 4 ext.

**Resp, Chest:** lacerations
✓ no resp distress
___ breath sounds nl, clear, equal
___ chest inspect., palpat. nl

**Spine / pelvis / ribs (MSK):**
✓ thorac., lumbar inspect., palpat. nl
___ pelvis stable, inspect., palpat. nl

**GI / Abdomen / Flank:**
✓ skin nl appearance, BS nl
✓ soft, nontender
✓ flank nl appearance, nontender
___ rectal nl, heme neg.

**MSK:**
✓ gait nl
___ tone, nails nt

**Skin / Nails:** nose
___ nl appearance ō cyanosis
___ color, nl capillary refill
✓ hydrated, warm & dry. sooty exudate

**Neuro:**
✓ alert & oriented x 3
___ motor / sensory nl
___ reflexes intact, symmetrical
___ nl gait, cerebellar function
___ cranial nerves intact
Phor...

**Psych:**
___ affect, mood nl
___ judgment, memory nl
(+) hoarse

(R) / (L) upper ext.
(mark nl as R, L or B):
___ appearance nl, nontender
___ ROM full ō pain
___ stable
___ strength and tone nl
(+) ev... lungs

(R) / (L) lower ext.
(mark nl as R, L or B):
___ appearance nl, nontender
___ ROM full ō pain
___ stable
___ strength and tone nl
(+) mi... wheeze

Glasgow Coma Score 15
Eyes open: 4-spontaneous 3-to command 2-to pain 1-none.
Verbal: 5-nl 4-confused 3-inappropriate 2-incoherent sounds 1-none
Motor: 6-normal 5-localizes pain 4-withdrawn 3-decorticate (flex.) 2-decerebrate (ext.) 1-none

(L) hip / buttock tender - large ... (L) buttock

Copyright © 2000, EvolveMed, EMG Photocopying without permission is prohibited
E.D. PHYSICIAN RECORD AAEM Template http://www.aaem.org Page 1 of 2

# GE Money
# Home Loans

PO BOX 25142
Santa Ana, CA 92799-0905

February 8, 2006

**Address**

RE: Account No.              : ●●●2124
    Property Address         : 13230 Tom Gaston Rd  Mobile, AL 36695-0000
    File No.                 : CRTN
    Date of Loan             : LDT

Dear Corla Jackson,

We realize how difficult a loss to your home can be, and we want to process your claim as quickly and efficiently as possible. To assist in the claim- handling process, please submit the following items to our office:

1. The insurance claim check(s) (SIGNED/ENDORSED BY ALL PARTIES LISTED ON THE CHECKS).
2. The enclosed *Homeowner's Statement* completed and signed by you.
3. A copy of the insurance adjuster's detailed report or your contractor's detailed damage estimate for repairs.
4. A copy of the signed contract between you and your contractor doing the repairs.
5. The enclosed *Contractor Affidavit/Statement* needs to be completed and returned to our office once ALL REPAIRS HAVE BEEN COMPLETED.

Upon receipt of the fully endorsed insurance claim check and above required information, we will release a portion of the claim fu within 4-5 business days after receipt.  If all required items are not received, we are unable to proceed with a  disbursement of the claim funds until the missing items are submitted.

Due to the amount of loss, partial funds will be released at various stages. After the first release of insurance funds, periodic prope inspections will be needed to confirm repair progress. Please contact our office seven to ten business days prior to needing additiona funds to allow time for the property inspection.

If I may be of additional assistance, please call me at 1-866-354-7281.

Sincerely,

Insurance Claims Center
FAX:  (866)336-3811
*Same Phone Number (##)*

GE TPA 13
HAZ6-NWCLMDP
Enclosures
BRE

*Plaintiff Was Supose To Be Given Fund In Full
To Gutt Out on Rebuilt
Without Dedection on Depreciations*

# GMAC Mortgage

P.O. Box 25144
Santa Ana, CA 92799-5144

February 14, 2007

Corla Jackson
13230 Tom Gaston Rd
Mobile, AL 36695-0000

RE:  Property Address   : 13230 Tom Gaston Rd  Mobile, AL 36695-0000
     Tracking No        : 732379
     Date of Loss       : 08/24/2005
     Account No         : ██████2124

Dear Corla Jackson :

Our office was previously notified of damage sustained to the above- referenced property. At that time, you were provided with the required forms to be completed and returned to our office with the endorsed claim check.

We are currently reviewing our files and request an update on the status of your claim. Please check the appropriate information below:

☒  Send me information again.

☐  The endorsed insurance claim check, *Homeowner's Statement*, and detailed damage estimate will be sent to your office by _____.

☐  Repairs have been completed. Please contact me at _____ to set up an inspection of the property.

Please return any documentation in the enclosed self-addressed envelope.

Your prompt attention to this matter is greatly appreciated.

If I we may be of further assistance, please contact our office at 1-866-354-7281.

Insurance Claims Center
FAX: (866)336-3811

** BRE **

*Property Cannot Be Signed off One By County Cheny Building INSPECTOR... See Attached Letters*

(1) *Property Has Been Distroyed By Mayor Water Dam. Which Contaminated Rain Water Debris, Wood Framing, Insol Etc.*

(2) *PROPERTY Has Been Distroyed By Toxic Mold*

(3) *Please Turn In your (Policy) For Complete PAY off by Farmers Insurance Group...  Carla Jackson*



GMAC Mortgage

P.O. Box 52052
Phoenix, AZ 85072

April 2, 2008

Corla Jackson
13230 Tom Gaston Rd
Mobile, AL 36695-0000

RE:  Property Address    : 13230 Tom Gaston Rd  Mobile, AL 36695-0000
     Account No.          : ____2124
     Tracking No.         : 902022
     Date of Loss         : 3/13/2008

Dear Corla Jackson:

We realize how difficult a loss to your home can be, and we want to process your claim as quickly and efficiently as possible. Due to the status of your loan and investor requirements, we have the responsibility to ensure the damage is repaired. To assist in the claim-handling process, please submit the following items to our office:

1.  The insurance claim check(s) (SIGNED/ENDORSED BY ALL PARTIES LISTED ON THE CHECK(S).

2.  The enclosed *Homeowner's Statement* completed and signed by you.

3.  A copy of the insurance adjuster's detailed report or your contractor's detailed damage estimate for repairs.

4.  A copy of the signed contract between you and your contractor doing the repairs.

5.  The enclosed *Contractor Affidavit/Statement* needs to be completed and returned to our office once ALL REPAIRS HAVE BEEN COMPLETED.

    Upon receipt of the fully endorsed insurance claim check and above required information, we will release a portion of the claim funds within 4-5 business days after receipt. If all required items are not received, we are unable to proceed with a disbursement of the claim funds until the missing items are submitted.

    Due to the amount of loss, partial funds will be released at various stages. After the first release of insurance funds, periodic property inspections will be needed to confirm repair progress. **FLORIDA PROPERTIES: Please contact our office 10 to 14 business days prior to needing additional funds to allow time for the property inspection.** NON-FLORIDA PROPERTIES: please contact our office 7-10 business days prior to needing additional funds.

    If I may be of further assistance, please contact me at 1-866-354-7281.

    Sincerely,
    Insurance Claims Center
    FAX: (866)336-3811

    GMAC TPA 13 (a)
    HAZ6-NWCLMDQ

    Enclosures
    ** BRE **

Sep 07 07 02:47p                                         251-653-5803                    p.2

 **Research and
Engineering, Inc.**

5815 I-10 Industrial Parkway
Theodore, Alabama 36582
(251) 653-9009
Fax (251) 653-5803
E-mail: AL@LAREC2.com
www.LAREC2.com

August 23, 2007

**GMAC** Mortgage
P.O. Box 25144
Santa Anna, CA 92799-5144

Re: Structural Inspection of Jackson Residence, 13230 Tom Gaston Rd., Mobile, AL
File No.      : GMC002124
Date of Loss  : 08/24/2005

Dear Sir or Madam:

This letter is to further comment on the findings of an Engineering Inspection to the
subject residence at the above address performed in April, 2006. This dwelling is insured
by Farmers Insurance Policy # 92649-56-20 and was under repair from damage sustained
in Hurricane Katrina in August, 2005 at the time of that inspection. The claim number
for those repairs is 1007093144-1-1. As stated in my report:

The subject structure is located in a high wind area and in accordance with the
International Building Code is required to be constructed to withstand a Basic Wind
Speed (3 second gust) of 140 miles per hour. The dwelling is located in an area that is
defined as Exposure C in accordance with the aforementioned code.

The damage caused by Hurricane Katrina included structural damage to the roof structure
as well as considerable interior damage due to water incursion from the loss of the
integrity of the roof cover. Although much of the damage was a direct result of the wind
load of the hurricane, the damage was augmented by the substandard construction of the
roof structure.

The aforementioned report was based upon a visual inspection of the structure at that
time. Since a large portion of the roof was destroyed and there was considerable interior
damage, I would consider the structure <u>unlivable</u> as a result of my observations. In order
to complete the repairs from the point of that inspection it would be very difficult for a
contractor to perform the necessary work with the residence occupied.

Since my inspection was limited to a visual inspection, it was impossible to determine
damage to the structure beyond the roof structural damage. There was evidence of water
incursion which undoubtedly caused interior damage to the walls and ceilings. Also,
based upon the observed quality of the framing and workmanship in the roof structure, I
would expect other deficiencies in the framing of the walls.

12-12020-mg   Doc 5100-13   Filed 09/18/13   Entered 09/18/13 14:29:59   Exhibit J
Case 1:12-cv-00121-KD-B   Document 1-2   Filed 02/29/13   Page 69 of 58
to Declaration   Pg 66 of 99

Sep 07 07 02:47p

251-653-5803                          p.3

Letter Re: Jackson, August 23, 2007, page 2.

Based upon the observed level of damage to the structure and the construction
deficiencies previously reported, my recommendation is that the repairs required will be
extensive enough in accordance with the Mobile County Building Code to make it
necessary for the structure to meet current code requirements. This is particularly
important since the structure is located in an Exposure C environment and in the 140 mph
wind load area.

If there are any further questions, please feel free to contact me.

Thank you for the opportunity to be of service to you.

Sincerely,

J. Albert McEachern, Jr., P.E.
Consulting Engineer

CC: Ms. Jackson

what does it mean when a Hurricane leaves sags and dips of causing major rain wate... Page 1 of 2


AOL | Mail | Toolbar

Location: Mobile, AL 36695 | Search History | Advanced Search | Settings

Web   Images | Videos | Maps | News | Shopping | more »

**What does it mean when a Hurricanes leave sags and dips**

Web Results 1 - 10 of about 2,660

## [PDF] SAFE REHABILITATION OF HURRICANE-DAMAGED HOMES
Roofs that sag in the middle or at the ends due to load-bearing walls that have shifted. ... a dip in the roof and sill beam. ribbon board, cracked floor joist .... However if there is a lot of water damage, and/or mold growth ... In adults , lead poisoning may cause high blood pressure, fertility ...
hud.gov/offices/lead/library/misc/HUD_CSS_Booklet.pdf - Similar

## [PDF] Response to Floods and Water Damage for Libraries, ...
Jun 14, 2008 ... Go onto the roof if rising water makes it necessary as long as no thunderstorm is in progress. ... highway dips, where water may pool and pose threats. ... Emergency Drying Procedures for Water Damaged Collections. ... Pools of cool standing water (which can cause hypothermia if the water is less ...
www.loc.gov/preserv/emergprep/floodcomp.pdf - Similar

## Roofing: How dry does the deck need to be?, asphalt shingles, ...
Apr 30, 2009 ... Anything that might soak up water, like insulation must be ripped out as it can ... Several interior rooms beneath the damaged roof show obvious signs of warped ... one could SEE an extreme bow or sag, but are there degrees of tolerance in what ... Look for isolated humps or dips between rafters. ...
en.allexperts.com/q/Roofing-1598/2009/4/dry-deck-need... - Similar

## Hurricane Survival Tips - Hurricane Mitigation & Survival
The two huge masses of water do leave the land in much the same way,`.... When water kills or does damage, the wind put it up to it. .... and with major hurricanes, it ain't over until the National Guard arrives. .... Invest in a hurricane roof as the main hole you want to avoid is a big one with a view of Heaven. ...
www.hurricane-man.com/survival-tips.html - Similar

## General information | RAGBRAI
This may cause your group to be ineligible for the lottery. .... RAGBRAI is a major economic boost to every church, Boy Scout or Girl .... Your wristband also will give you priority to sag wagons, bicycle shop repairs and many other services. ... If you race ahead, lag behind or leave the official bicycle route, ...
ragbrai.com/index.php/about/general-information/ - Similar

## Antigua - Local Reports (Caribbean Hurricane Network)
that it does not necessarily mean that the case brought by ABITPC against govern - .... it was badly damaged by the 1990s hurricanes that kept visiting Antigua.. . ...... Whatever will cause this dip could occur earlier? I certainly hope not! ..... WHAT a way to start a week... with a 140 mph major hurricane on your ...
stormcarib.com/reports/2003/antigua.shtml - Similar

## Using Technology to Reduce Risk and Improve Worker Safety | ...
The root cause of this unwanted connection is often a result of insulation breakdown. ... equipment damage and present a fire and explosion risk to personnel (see photo 1). .... 5) To reduce the momentary line-voltage dip occasioned by the occurrence and ..... Utility Deregulation, What Does It Mean to Inspectors? ...
www.iaei.org/magazine/?p=2449 - Similar

## Pain in Maine, but they can measure rain « Climate Audit
But all the data sufficient to predict hurricanes is OK? ..... (Heck, if it's like my house, the whole electrical system voltage sags whenever a big ..... that $CO_2$ is not a major factor in causing the earth to warm: You are a denier. ...... Does this mean that it's OK to shade the truth about AGW so that someone, ...
www.climateaudit.org/?p=1816 - Similar

40

| Potential Health Effects Associated with Inhalation Exposure to Molds and Mycotoxins |
|---|
| • Allergic Reactions (e.g., rhinitis and dermatitis or skin rash) <br> • Asthma <br> • Hypersensitivity Pneumonitis <br> • Other Immunologic Effects |

Research on mold and health effects is ongoing. This list is not intended to be all-inclusive.

The health effects listed above are well documented in humans. Evidence for other health effects in humans is less substantial and is primarily based on case reports or occupational studies.

All molds have the potential to cause health effects. Molds produce allergens, irritants, and in some cases, toxins that may cause reactions in humans. The types and severity of symptoms depend, in part, on the types of mold present, the extent of an individual's exposure, the ages of the individuals, and their existing sensitivities or allergies. Specific reactions to mold growth can include the following:

Allergic Reactions: Inhaling or touching mold or mold spores may cause allergic reactions in sensitive individuals. Allergic reactions to mold are common – these reactions can be immediate or delayed. Allergic responses include hay fever-type symptoms, such as sneezing, runny nose, red eyes, and skin rash (dermatitis). Mold spores and fragments can produce allergic reactions in sensitive individuals regardless of whether the mold is dead or alive. Repeated or single exposure to mold or mold spores may cause previously non-sensitive individuals to become sensitive. Repeated exposure has the potential to increase sensitivity.

Asthma: Molds can trigger asthma attacks in persons who are allergic (sensitized) to molds. The irritants produced by molds may also worsen asthma in non-allergic (non-sensitized) people.

Hypersensitivity Pneumonitis: Hypersensitivity pneumonitis may develop following either short-term (acute) or long-term (chronic) exposure to molds. The disease resembles bacterial pneumonia and is uncommon.

Irritant Effects: Mold exposure can cause irritation of the eyes, skin, nose, throat, and lungs, and sometimes can create a burning sensation in these areas.

Opportunistic Infections: People with weakened immune systems (i.e., immune-compromised or immune-suppressed individuals) may be more vulnerable to infections by molds (as well as more vulnerable than healthy persons to mold toxins). *Aspergillus fumigatus*, for example, has been known to infect the lungs of immune-compromised individuals. These individuals inhale the mold spores which then start growing in their lungs. *Trichoderma* has also been known to infect immune-compromised children.

Healthy individuals are usually not vulnerable to opportunistic infections from airborne mold exposure. However, molds can cause common skin diseases, such as athlete's foot, as well as other infections such as yeast infections.

## Mold Toxins (Mycotoxins)

Molds can produce toxic substances called mycotoxins. Some mycotoxins cling to the surface of mold spores; others may be found within spores. More than 200 mycotoxins have been identified from common molds, and many more remain to be identified. Some of the molds that are known to produce mycotoxins are commonly found in moisture-damaged buildings. Exposure pathways for mycotoxins can include inhalation, ingestion, or skin contact. Although some mycotoxins are well known to affect humans and have been shown to be responsible for human health effects, for many mycotoxins, little information is available.

Aflatoxin B₁ is perhaps the most well known and studied mycotoxin. It can be produced by the molds *Aspergillus flavus* and *Aspergillus parasiticus* and is one of the most potent carcinogens known. Ingestion of aflatoxin B₁ can cause liver cancer. There is also some evidence that inhalation of aflatoxin B₁ can cause lung cancer. Aflatoxin B₁ has been found on contaminated grains, peanuts, and other human and animal foodstuffs. However, *Aspergillus flavus* and *Aspergillus parasiticus* are not commonly found on building materials or in indoor environments.

41

12-12020-mg  Doc 5100-13  Filed 09/18/13  Entered 09/18/13 14:39:59  Exhibit J
to Declaration  Pg 69 of 99
Case 1:12-cv-00101-KD-B  Document 1-2  Filed 02/25/13  Page 58 of 58



**Research and**
**Engineering, inc.**

5815 I-10 Industrial Parkway
Theodore, Alabama 36582

(251) 653-9009
Fax: (251) 653-5803
E-mail: amca2000@aol.com

April 7, 2006

Subject: Hurricane Ivan-Hurricane Katrina
Farmers Insurance Policy #: 92649-56-20

Re: Structural Engineer Inspection Report (Residence - Dwellings)
Ms. Coria Jackson & GMAC Mortgage
13230 Tom Gaston Road
Mobile, Alabama 36695

To Whom It May Concern:

This letter is to report the findings of an Engineering Inspection to the subject residence at the above address. This dwelling is insured by Farmers Insurance Policy # 92649-56-20 and is currently under repair from damage sustained in Hurricane Ivan (September 2004) and Hurricane Katrina (August 2005). The claim numbers for both Hurricanes are (2C-118138) and (1007093144-1-1). This policy includes a clause insuring against code violations, and therefore the repairs being performed include modifications to meet the Building Code.

In accordance with the International Building Code 2000, the current applicable code to Mobile County, this residence is required to be constructed to withstand a Basic Wind Speed (3 second gust) of 140 miles per hour. The subject structure is located in a high wind area and is in an open field, with no trees or other structures to slow down or block southerly winds from the Gulf of Mexico. Therefore, the dwelling is located in an area that is defined as Exposure (C) in accordance with the aforementioned code.

The damage caused by Hurricane Ivan and Hurricane Katrina included structural damage to the roof structure as well as considerable interior damage due to water incursion from the loss of the integrity of the roof cover including lifting of the sheathing and roofing materials and loss of ridge and power vents. Hurricane Ivan & Hurricane Katrina perils forced in rain via ridge caps, ridge vents, hooded powered vents, and vents, lifted shingles, lifted decking, windows and soffit.

Although much of the damage was a direct result of the wind load of the hurricane, because the house was not built in compliance with Mobile County Building Codes, the damages were augmented by the substandard construction of the roof structure. Specifically:

- Roof structure is a hip style, high slope, design with fiberglass reinforced architectural shingles on 24/16 7/16" OSB. In many locations the maximum 24" on centers spacing of the 2 x 6 rafters was exceeded.
- The maximum hip and ridge rafter spans were also exceeded.
- Although there were rat runs in some locations to support the mid span of the 2 x 6 rafters, the maximum spans for the rafters were exceeded in many locations.
- The rat run supports were not adequate in size or support. In one case only two 2 x 4 supports were used to hold a 2 x 4 rat run over 8 rafters.
- There was no cross bracing of any of the rafters.

- The workmanship of the carpentry was substandard.
- Recommended nailing schedules were not adhered to and in some cases the OSB panels were barely attached to the rafters.
- Minimum nailing requirements for the architectural shingles was not met. In some cases as few as 2 nails were used to attach a strip of roofing.
- The rafter materials used included many finger-joint splices, some less than 2 feet apart. Although the code allows use of finger-joint splices, the required grade markings were not apparent.
- The use of 7/16" OSB for roof sheathing with 24" on centers rafters is minimal in most locations, but is not recommended for high wind loads with Exposure C.
- The Dryer Vent was improperly installed and discharged into the attic space.
- Window seals were improperly sealed allowing water to be forced in.

This inspection was a visual only inspection. Based upon the observed code deficiencies, it is recommended that a more detailed study be made of this Structure and a plan for completing the repairs be made that incorporates reinforcing the structure to meet current codes to avoid additional losses due to future storms

If you have any further questions, please call me at, (251) 653-9009.

Thank you for the opportunity to be of service to you.

Sincerely,

J. Albert McEachern, Jr., P.E.
Consulting Engineer
Ph: (251) 653-9009
Fax: (251) 653- 5803

Photos



Photo1



Photo 2

Photos



Photo 3
Note lack of braces and mid span supports



Photo 4
Note OSB has been replaced on slope to right

Photos



Photo 5



Photo 6

12-12020-mg   Doc 5100-13   Filed 09/18/13   Entered 09/18/13 14:29:59   Exhibit J
to Declaration     Pg 74 of 99
Case 1:12-cv-00121-KD-B   Document 1-2   Filed 02/29/12   Page 73 of 58



Photo 7

12-12020-mg Doc 5100-13 Filed 09/18/13 Entered 09/18/13 14:29:59 Exhibit J
to Declaration Pg 75 of 99
Case 1:12-cv-00101-KD-B Document 1-2 Filed 02/25/13 Page 74 of 58





## Farmers did Deceptive Practices
## Breached Contract
## Bad Faith
## Committing Fraud

To prevent from covering all the Hurricane Ivan & Hurricane Katrina covered losses
On This Structural Damages Roof In Full
And the Entire Dwellings Inside
Also on the Other Structures & Personal Property, to date!



# OPTION ONE
## M O R T G A G E
*a H&R BLOCK company*



018418/FL-RE-PI-

| | | | |
|---|---|---|---|
| Payment Due Date | | | 08/01/04 |
| Current Payment | $ | 1,920.64 | |
| Past Due Payment(s) | $ | .00 | |
| Unpaid Late Charges | $ | .00 | |
| Other Charges | $ | .00 | |
| Total Amount Due | $ | 1,920.64 | |
| After 08/16/04 Add Late Charge Of | $ | 102.17 | |
| Total Payment After 08/16/04 | $ | 2,022.81 | |

## Account Information

| Item Description | Amount | |
|---|---|---|
| **Balances** | | |
| Principal Balance | $ | 240,000.00 |
| Escrow Balance | $ | 871.14 |
| Unpaid Late Charges | $ | .00 |
| **Payment Factors** | | |
| Int Rate - First Mtg | | 7.650% |
| Principal & Interest | $ | 1,702.83 |
| Escrow Payment | $ | 217.81 |
| Other | $ | .00 |
| Total Payment Amount | $ | 1,920.64 |
| **Year to Date** | | |
| Interest | $ | 1,428.00 |
| Taxes | $ | .00 |

CORLA JACKSON
13230 TOM GASTON RD
MOBILE   AL   36695-8658

| | |
|---|---|
| **Loan Number** | ████4848 |
| Property Address | 13230 TOM GASTON RD |
| | MOBILE   AL   36695 |
| Home Phone | 251-865-4440 |
| Work Phone | 702-524-3135 |

# Activity Since Last Statement

| Date | Description | Principal | Interest | Escrow | Misc. | Late/Other Charges | Total |
|---|---|---|---|---|---|---|---|
| 06/03 | NEW LOAN SET UP | $240,000.00- | | | | | |
| 06/03 | PREDIST PMT | | $1,428.00 | $871.14 | | | $2,299.14 |

Payments received after the statement date may not appear on this statement.



## WELCOME TO OPTION ONE

Option One Mortgage Corporation is pleased to welcome you as a customer. We are happy to have helped facilitate the financing of your home loan. For your convenience, we will send you a billing statement every month which includes a payment stub and an envelope that you can use to mail in your payments.

*Please verify the information on the billing statement, particularly your property and mailing addresses. You can use the back of the payment stub to indicate any corrections or changes needed.*

*To access your account information online, you must first register as a new user. During the registration process, you will be asked to choose a user name and password. You will then use the user name and password you created to log in.*

New Loan Verification Line: 888.323.4390
Online account access: www.optiononeonline.com

DETACH AND SEND LOWER PORTION WITH PAYMENT

# GE Money
# Home Loans

PO BOX 25142
Santa Ana, CA 92799-9905

February 8, 2006

**Address**

RE: Account No.                : ████2124
    Property Address     : 13230 Tom Gaston Rd Mobile, AL 36695-0000
    File No.                     : CRTN
    Date of Loss              : LDT

Dear Corla Jackson

We realize how difficult a loss to your home can be, and we want to process your claim as quickly and efficiently as possible. To assist in the claim- handling process, please submit the following items to our office:

1. The insurance claim check(s) (SIGNED/ENDORSED BY ALL PARTIES LISTED ON THE CHECKS».
2. The enclosed *Homeowner's Statement* completed and signed by you.
3. A copy of the insurance adjuster's detailed report or your contractor's detailed damage estimate for repairs.
4. A copy of the signed contract between you and your contractor doing the repairs.
5. The enclosed *Contractor Affidavit/Statement* needs to be completed and returned to our office once ALL REPAIRS HAVE BEEN COMPLETED.

Upon receipt of the fully endorsed insurance claim check and above required information, we will release a portion of the claim funds within 4-5 business days after receipt. If all required items are not received, we are unable to proceed with a  disbursement of the claim funds until the missing items are submitted.

Due to the amount of loss, partial funds will be released at various stages. After the first release of insurance funds, periodic property inspections will be needed to confirm repair progress. Please contact our office seven to ten business days prior to needing additional funds to allow time for the property inspection.

If I may be of additional assistance, please call me at 1-866-354-7281.

Sincerely,

Insurance Claims Center
FAX: (866)336-3811

GE TPA 13
HAZ6-NWCLMDP
Enclosures
BRE



Loan Number: ⬛3367          Servicing Number: 001347464-8          Date: 05/26/04

# INSTRUCTIONS TO CLOSING AGENT

**BORROWER:** CORLA JACKSON
**DOCUMENT DATE:** 05/26/04
**DISBURSEMENT DATE:** 06/01/04
**BRANCH:** Atlanta House
**PROPERTY ADDRESS:** 13230  TOM GASTON RD
    MOBILE, AL  36695-8658
**COUNTY:** Mobile

**MONTHLY PAYMENT:**
P & I:   $1,702.83
TAX:     $73.32
INS.:    $144.49
FLOOD:   $0.00
MISC:    $0.00
TOTAL:   $1,920.64

**TO:** HERITAGE TITLE
     2521 HILLCREST RD STE C
     MOBILE, AL 36695
     CLOSING AGENT
     Phone: (251) 776-1661
     Fax:   (251) 662-3336
     E-Mail:paigetitle@yahoo.com

**TITLE CO:** STEWART TITLE COMPANY
     5760 I-55 NORTH SUITE 200
     JACKSON, MS 39211
     CLOSING AGENT
     Phone: (601) 977-9776
     Fax:   (601) 977-9790

**CLOSING AGENT NO./:** JACKSON

**TITLE ORDER NO.:** 999010283

**SALES PRICE:**
**LOAN AMOUNT:** $240,000.00

**INTEREST RATE:** 7.650%
**LOAN TERM:** 360

**FIRST PAYMENT DATE:** August 01, 2004
**LAST PAYMENT DATE:** July 01, 2034

## TITLE INSURANCE REQUIREMENTS

ALTA POLICY** must contain endorsements: 6.1, 8.1 (OR EQUIV)    CLTA 116 (OR EQUIV)

EAGLE TITLE POLICY **All Inclusive/Comprehensive (If Applicable)
    with liability in the amount of $ 240,000.00 .        on property described herein.

    <u>Date</u> and <u>Time</u> of Title Policy must be exactly as reflected on the Deed of Trust/Mortgage/Security Deed.

** Please issue ALTA Short Form Policy when available.  For Second Mortgage Loans, Lender will accept CLTA or
    standard ALTA Policy in lieu of an Extended Coverage ALTA Policy.

LIABILITY SUBJECT ONLY TO: (Gen. & Spec. taxes) Fiscal Year; COUNTY/PARISH: All 2003 Paid
CITY:                                         SCHOOL:
CITY/SCHOOL:                                  SPECIAL DISTRICT:
TOWN/TOWNSHIP/BOROUGH/PLANTATION:
VILLAGE:                                      SURFACE WATER MANAGEMENT:

Funds may be used for account of the vestees or mortgagors, and you will record all instruments when you comply with the
following:

1.  Issue said form of Policy showing name of insured to read
        Option One Mortgage Corporation, a California Corporation, Its
                Successors and/or Assigns

2.  Issue said form of Policy showing title vested as shown below.
    Title must be vested in individuals only.
    CORLA JACKSON, A  SINGLE WOMAN

3.  Issue said form of Policy free from encumbrances except items
    . NONE
    of Preliminary Title Report or Title Commitment dated  05/03/04

4.  Survey exception, if applicable, MUST be removed from the title policy.  If survey is required to remove the survey exception
    and issue the title policy as requested, contact the Lender prior to disbursement of funds.

5.  VERIFICATION that vesting on Grant/Warranty Deed matches Deed of Trust/Mortgage/Security Deed.

6.  All liens, judgements, delinquent or outstanding personal and/or property taxes must be paid in full and released or a partial
    reconveyance issued releasing our subject property. INDEMNIFICATIONS are NOT ACCEPTABLE.  - PROOF OF PAYOFF
    IS REQUIRED.

7.  This loan MUST record in        [X] First Lien Position        [ ] Second Lien Position.

8.  Forward original title policy in duplicate directly to lender within 90 days of closing (see page 5)

Page 1 of 6                                                                              USD0121.wp (05-14-04)

12-12020-mg Doc 5100-13 Filed 09/18/13 Entered 09/18/13 14:29:59 Exhibit J
Case 1:12-cv-00401-D-B Document 31-2 Filed 02/25/13 Page 79 of 58
to Declaration   Pg 79 of 99

# NexTier Bank

1301 Grandview Avenue, Suite 120
Pittsburgh, PA 15211
Phone: 877-533-2784 Fax: 412-390-3535

To whom it may concern,

Based on the credit information supplied to me, Corla Jackson would qualify for a mortgage if all negative information regarding her mortgage were taking off the three credit bureaus. **(Trans Union, Equifax and Experian)** Then her credit scores would need to go back up in the 700 Range. Once her credit scores are increased and the negative reporting of her current mortgage company is removed she would be able to apply for a new mortgage.

**This property is uninhabitable to live in, it cannot be borrowed against, or used as a secured instrument to** be sold as a primary residents for anyone to live in until it is brought up to zoning coded, and all the structural damages are completed, for its intended use.

Based on our knowledge of all (Structural Damages) it must also comply, with high wind zoning laws first, which exceeds the limit of the mortgage of (**$240,000**), and the limit of insurance of (**$312,000**). We cannot put a mortgage against a property that cannot be lived in safely, or as permanent primary residents, to occupy per our appraisers guidelines.

This letter basically says (Ms. Jackson) would qualify for a mortgage, if she did not carry the liability on an insured uninhabitable home, which cannot legal be occupied, until it can be signed off on by (Mobile County Chief Building Inspector.

When we closed on Ms. Jackson's current property the lender required the homeowner to obtain homeowners insurance that would cover any damages whether from fire, flooding, hurricane or any other storm related damages to this property. **This insurance covers, the entire replacement cost.**

This case had nothing to do with mold, at the time of loss. This had to do with Structural Damages being completed on this Dwelling, at the time of loss. Because the Structural Damages was not completed, and not brought up to high wind codes, to prevent further and major damages at the time of loss mold set in, by not removing and replacing the wet contaminated rain water debris throughout out the entire Dwelling. This included inside the walls, structure, and hard wood floors throughout.

If you have any questions or concerns regarding this matter, please do not hesitate to call or e-mail me.

Sincerely,

*[signature]*

**Steve Arthur**
**412-390-3530 Ext. 108**
**412-298-2748 Cell Phone** *(Evenings and Weekends)*
sarthur@fedmc.com
*************************************************************

Federated Mortgage Corp. or any subsidiaries of Federated Mortgage Corp. shall not be liable for the contents contained in this electronic data. The views contained in this electronic document are the views of the individual sending this document.
*************************************************************

| A. U.S. Department of Housing and Urban Development | | B. Type of Loan | | |
|---|---|---|---|---|
| | | 1. [ ] FHA | 2. [ ] FMHA | 3. [ ] Conv. Unins. |
| | | 4. [ ] VA | 5. [ ] Conv. Ins. | [X] Other. |
| | | 6. File Number | | 7. Loan Number |
| | | 401582 | | |
| **Settlement Statement** | | 8. Mortgage Ins. Case No. | | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked ("POC") were paid outside the closing; they are shown here for information purposes and are not included in the totals.

D. Name of Borrower: Carls Jackson

E. Name of Seller:

F. Name of Lender: Option One Mortgage Corporation, 1600 Parkwood Circle SE, Atlanta, GA 30339-2147

G. Property Location: 13230 Tom Gaston Rd, Mobile, AL

H. Settlement Agent: Heritage Title, LLC (228) 868-7152

Place of Settlement     TIN: 69-1283722

I. Settlement Date: 6/26/2004     Proration Date: 6/1/2004

| 100. Gross amount due from borrower: | | 400. Gross amount due to sellers |  |
|---|---|---|---|
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 234,766.18 | 403. | |
| 104. Pay off of Vendors Lien | 5,000.00 | 404. | |
| 105. Pay off Vendors Lien | 5,000.00 | 405. | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. Gross amount due from borrower | 244,766.18 | 420. Gross amount due to sellers | 0.00 |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 240,000.00 | 502. Settlement charges to seller (line 1400) | 0.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. Lender Credit to Borrower | 4,800.00 | 508. | |
| 209. | | 509. | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes | | 511. County taxes | |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. Total paid by/for borrower | 244,800.00 | 520. Total reduction in amount due seller | 0.00 |
| 301. Gross amount due from borrower (line 120) | 244,766.18 | 601. Gross amount due to seller (line 420) | 0.00 |
| 302. Less amount paid by/for borrower (line 220) | 244,800.00 | 602. Less total reduction in amount due seller (line 520) | 0.00 |
| 303. CASH (FROM)(TO) BORROWER | 33.82 | 603. CASH (FROM)(TO) SELLER | 0.00 |

SUBSTITUTE FORM 1099 SELLER STATEMENT – The information contained in blocks E, G, H and I and on line 401 (or, if line 401 is subtotaled, lines 403 and 404), 406, 407 and 408-412 (applicable part of buyer's real estate tax reportable to the IRS) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.
SELLER INSTRUCTION – If this real estate was your principal residence, file form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of form 4797, Form 6252 and/or Schedule D (Form 1040).

You are required by law to provide Heritage Title, LLC (228) 868-7152 with your correct taxpayer identification number.
If you do not provide Heritage Title, LLC (228) 868-7152 with your correct taxpayer identification number, you may be subject to civil or criminal penalties.

| | | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|---|
| 700. | Total sales/broker commission | | | | |
| | Division of commission (line 700) as follows: | | | | |
| 701. | $ | | | | |
| 702. | $ | | | | |
| 703. | Commission paid at settlement | | | | |
| 704. | | | | | |
| 800. | **Items payable in connection with loan** | | | | |
| 801. | Loan origination fee | | | | |
| 802. | Loan discount | | | | |
| 803. | Appraisal fee | to Colorado Federal Savings Bank | | | |
| 804. | Credit report | | POCB 300.00 | | |
| 805. | Lender's inspection fee | | | | |
| 806. | Mortgage insurance application fee | | | | |
| 807. | Assumption fee | | | | |
| 808. | Processing Fee | to Colorado Federal Savings Bank | | | |
| 809. | Application Fee | | | 378.00 | |
| 810. | Administration Fee | | | | |
| 811. | Tax Service Fee | to Fidelity National Tax Service | | | |
| 812. | Flood Certification Fee | to First American Flood Data Services | | 70.00 | |
| 813. | Broker Fee | to Colorado Federal Savings Bank | | 12.00 | |
| 814. | Funding Fee | to Option One Mortgage Corporation | | 3,120.00 | |
| 815. | Underwriting Fee | to Option One Mortgage Corporation | | 50.00 | |
| | | | | 595.00 | |
| 900. | **Items required by lender to be paid in advance** | | | | |
| 901. | Interest from 6/1/2004 to 7/1/2004 at $51.0000/day for 30 days. | | | 1,530.00 | |
| 902. | Mortgage insurance premium for | | | | |
| 903. | Hazard insurance premium for 1 yr. | to Farmers Insurance | POCB 1739.62 | | |
| 904. | | | | | |
| 905. | | | | | |
| 1000. | **Reserves deposited with lender** | | | | |
| 1001. | Hazard insurance | | | | |
| 1002. | Mortgage insurance 4 mo.@ $144.4800 per mo. | | | 577.92 | |
| 1003. | City property taxes | | | | |
| 1004. | County property taxes | | | | |
| 1005. | Annual assessments (maint.) 11 mo.@ $73.3200 per mo. | | | 806.52 | |
| 1006. | | | | | |
| 1007. | | | | | |
| 1008. | | | | | |
| 1009. | Aggregate Accounting Adjustment to Carla Jackson | | | (513.34) | |
| 1100. | **Title charges** | | | | |
| 1101. | Settlement or closing fee | to Heritage Title, LLC | | | |
| 1102. | Abstract or title search | to Heritage Title, LLC | | 350.00 | |
| 1103. | Title examination | | | 100.00 | |
| 1104. | Title insurance binder | | | | |
| 1105. | Document preparation | | | | |
| 1106. | Notary fees | | | | |
| 1107. | Attorney's fees to | | | | |
| | Includes above items no.: | | | | |
| 1108. | Title insurance to Heritage Title, LLC | | | | |
| | Includes above items no.: | | | 705.00 | |
| 1109. | Lender's coverage $240,000.00 | $175.00 | | | |
| 1110. | Owner's coverage $240,000.00 | $530.00 | | | |
| 1111. | | | | | |
| 1112. | Endorsement Fee | | | | |
| 1113. | Courier Fee to Heritage Title, LLC | | | 30.00 | |
| 1200. | **Government recording and transfer charges** | | | | |
| 1201. | Recording fees: Mortgage $434.00 | | | | |
| 1202. | City/county tax/stamps: | | | 434.00 | |
| 1203. | State tax/stamps: | | | | |
| 1204. | | | | | |
| 1205. | | | | | |
| 1206. | | | | | |
| 1300. | **Additional settlement charges** | | | | |
| 1301. | Survey | | | | |
| 1302. | Pest inspection | | | | |
| 1303. | Pay off Mortgage to Southtrust Bank | | | | |
| 1304. | Payoff Mortgage to Hibernia Bank | | | 44,834.89 | |
| 1305. | Pay on Account to NCO Financial | | | 181,398.15 | |
| 1400. | Total settlement charges (entered on lines 103, section J and 502, section K) | | | 291.00 | |
| | | | | 234,786.18 | |

CERTIFICATION: I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

Carla Jackson _(signature)_ 5/26/04

Carla Jackson

Paid In Full

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.





12-12020-mg  Doc 5100-13  Filed 09/18/13  Entered 09/18/13 14:29:59  Exhibit J
to Declaration    Pg 83 of 99
Case 1:12-cv-00101-KD-B Document 1-2  Filed 02/23/12  Page 52 of 58

28.50
360.00
388.50
10.00
398.50
2.0
400.50

WHEN RECORDED MAIL TO:
OPTION ONE MORTGAGE CORPORATION
P.O. BOX 57096
IRVINE, CA 92619-7096
ATTN:   RECORDS MANAGEMENT

2004042906   Book-5505  Page-1916
Total Number of Pages: 11

*Heritage Title, LLC*    $240,000.00

Loan Number: ⬛⬛⬛⬛8367
Servicing Number: 001347464-8

[Space Above This Line For Recording Data]

## MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on   May 26, 2004          . The grantor is
CORLA JACKSON, A  SINGLE WOMAN

("Borrower"). This Security Instrument is given to
        Option One Mortgage Corporation, a California Corporation

which is organized and existing under the laws of CALIFORNIA                          , and whose
address is
                    3 Ada, Irvine, CA  92618
("Lender"). Borrower owes Lender the principal sum of
TWO HUNDRED FORTY THOUSAND
          . . . AND NO/100THs        Dollars (U.S.  $240,000.00          ).
This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides
for monthly payments, with the full debt, if not paid earlier, due and payable on July 01, 2034          .
This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and
all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced
under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's
covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby
mortgage, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following
described property located in
                              Mobile                              County, Alabama:
02-35-06-23-0-000-002.010
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART THEREOF.

State of Alabama - Mobile County
I certify this instrument was filed on

Thu, Jun-10-2004 @ 2:13:56PM
RECORDING FEE            28.50
SURCHARGE                10.00
S. R. FEE                 2.00
MORTGAGE TAX            360.00
TOTAL AMOUNT           $400.50

2004042906
Don Davis, Judge of Probate

which has the address of  13230   TOM GASTON RD, MOBILE

Alabama        36695-8658       ("Property Address");                      [Street, City],
            [Zip Code]

TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever,
together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and
fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this
Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

ALABAMA - Single Family
Page 1 of 7

*C.J.*

ALD10011.wp (11-30-01)

Loan Number: ████ 9367        Servicing Number: 001347464-8        Date: 05/26/04

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal and Interest; Prepayment and Late Charges. Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. Funds for Taxes and Insurance. Subject to applicable law or to a written waiver by Lender. Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. Section 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates or expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

3. Application of Payments. Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If the Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower; (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the hold of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

5. Hazard or Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, or applicable Law otherwise requires, insurance proceeds shall be applied first to reimburse Lender for costs and expenses incurred in connection with obtaining any

Page 2 of 7                                                     ALD10012.wp (11-30-01)

C. J.

Loan Number: ●●●●●3367    Servicing Number: 001347464-8    Date: 05/26/04

If Lender invokes the power of sale, Lender shall give a copy of a notice to Borrower in the manner provided in paragraph 14. Lender shall publish the notice of sale once a week for three consecutive weeks in a newspaper published in Nobile County, Alabama, and thereupon shall sell the Property to the highest bidder at public auction at the front door of the County Courthouse of this County. Lender shall deliver to the purchaser Lender's deed conveying the Property. Lender or its designee may purchase the Property at any sale. Borrower covenants and agrees that the proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this

Loan Number: 651003367    Servicing Number: 001347464-8    Date: 05/26/04

interest, upon notice from Lender to Borrower requesting payment.

8. Mortgage Insurance. If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments no longer be required, at the option of Lender, of mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirements for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

9. Inspection. Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

10. Condemnation. The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking or any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Lender may apply, use or release the condemnation proceeds in the same manner as provided in paragraph 5 hereof with respect to insurance proceeds.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not exceed or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

11. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

12. Successors and Assigns Bound; Joint and Several Liability; Co-signers. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph

17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

13. Loan Charges. If the loan secured by this Security Instrument is subject to a law which sets maximum loan charge, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

14. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

15. Governing Law; Severability. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

Loan Number: _____3367          Servicing Number: 001347464-8          Date: 05/26/04

[Check applicable boxes]

☒ Adjustable Rate Rider          ☐ Condominium Rider          ☐ 1-4 Family Rider
☐ No Prepayment Penalty Option Rider     ☐ Planned Unit Development Rider     ☐ Occupancy Rider
☐ Other(s) (specify)

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.
Witnesses:

_____(Seal)
                         -Borrower

_____(Seal)
                         -Borrower

_____(Seal)
CORLA  JACKSON          -Borrower          _____(Seal)
                                                                  -Borrower

_____(Seal)
                         -Borrower          _____(Seal)
                                                                  -Borrower

STATE OF ALABAMA,                    Mobile County ss:

On this    26th   day of  May               , 2004      , I,

_____ , a Notary Public in and for said county and in said state,

hereby certify that   Corla  Jackson

, whose name(s)   is   signed to the
foregoing conveyance, and who   is   known to me, acknowledged before me that, being informed
of the contents of the conveyance,   s he   executed the same voluntarily and as
         She    act on the day the same bears date.
Given under my hand and seal of office this   26th   day of  May      , 2004

My Commission Expires: 5/8/2005          _____
                                                         Notary Public

This instrument was prepared by

Page 7 of 7                                        ALD10017.wp (11-30-01)

Case 1:12-cv-00111-KD-B Document 1-2 Filed 02/23/12 Page 58 of 58

WHEN RECORDED MAIL TO:
OPTION ONE MORTGAGE CORPORATION
P.O. BOX 57096
IRVINE, CA 92619-7096
ATTN: RECORDS MANAGEMENT

CERTIFIED COPY OF ORIGINAL

Loan Number: [redacted]8387
Servicing Number: 001347464-9

Space Above This Line For Recording Data

# MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on May 26, 2004 . The grantor is CORLA JACKSON, A SINGLE WOMAN

("Borrower"). This Security Instrument is given to

Option One Mortgage Corporation, a California Corporation

which is organized and existing under the laws of CALIFORNIA , and whose address is

3 Ada, Irvine, CA 92618

("Lender"). Borrower owes Lender the principal sum of
TWO HUNDRED FORTY THOUSAND
. . . AND NO/100THS Dollars (U.S. $240,000.00 ).
This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on July 01, 2034 .
This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in Mobile County, Alabama:

02-35-05-23-0-000-002.010
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART THEREOF.

which has the address of 13230 TOM GASTON RD, MOBILE [Street, City],
Alabama 36695-8658 [Zip Code] ("Property Address");

TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

C.J.

4/21/2004 17:17    r412-398-4436    Federated Mortgage Corp.    Blakeney→Jennifer    6/6

## Supplemental Addendum

File No. 24-Jack

| Borrower/Client | Carla Jackson | | | |
| Property Address | 13230 Tom Gaston Rd | | | |
| City Mobile | | County Mobile | State AL | Zip Code 36695-8658 |
| Lender Colonial Federal Savings Bank | | | | |

Subject property value is $350,000 for three acres. This equates to roughly $17,500 per acre.

A $34,000 adjustment was made in each comparable sale to accommodate an additional two acres to subject and all sales.

The adjusted values of each comparable sale as well as the subject's indicated value will increase accordingly.

The subject and five acres will be, say, $340,000.

All site line adjustments are in excess of 10% after the $34,000 addition.  All other adjustments are within guidelines.

All comparable sales are in more defined and well developed subdivisions with higher per acre site values than subject.

The $34,000 adjustments for additional acreage attempts to reconcile all valuable variables involved while acknowledging a reasonable addition in values for this acreage.

Form TADD — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

# GMAC Mortgage

P.O. Box 25144
Santa Ana, CA 92799-5144

September 6, 2006

Corla Jackson
13230 Tom Gaston Rd
Mobile, AL 36695-0000

RE: Property Address    :13230 Tom Gaston Rd  Mobile, AL 36695-0000
    File No.            : GMC002124
    Date of Loss        : 08/24/2005

To Whom It May Concern:

This letter is to confirm the following. Hurrican Katrina damages on this property have been partiall completed. At this point we have confirmed that only the roof has been completed.

To date we received a total of 69,294.45 in checks payable to Ms. Jackson and GMAC. The estimate provided by Town & Country Roofing was $59,800.00. Leaving only 9,494.45 for the rest of repair the property.

According to Ms. Jackson she has not received any additional funds for repair of the rest of the damages to the property.

Any further assistance need you may contact me at 866-354-7281 ext. 8534

Sincerely,

Insurance Claims Center
FAX: (866)336-3811

3451 Hammond Avenue
PO Box 780
Waterloo IA 50704-0780

**GMAC Mortg**

September 29, 2008

Corla Jackson
13230 Tom Gaston Rd
Mobile AL 36695

RE: Account Number     ⬛2124
        Property Address     13230 Tom Gaston Rd
                           Mobile AL 36695

Dear Corla Jackson:

I am writing to confirm the review completed by our insurance claims division relating to your insurance losses to the property at 13230 Tom Gaston Road. Thank you for taking the time to provide us with the documentation relative to this situation.

We have confirmed two insurance losses were filed on this property:

1. Fire claim dated March 13, 2008. Claim settlement of $18,213.23
2. Hurricane loss dated August 24, 2005. Claim settlement of $69,294.15

I understand you do not feel Farmers has properly handled the claims filed under your homeowner's policy; however, this dispute is between you and your insurance provider.

GMAC Mortgage has no rights to file under the mortgage clause if the carrier has paid out on the claim, which it appears Farmers has paid on both claims. If Farmers denied the claim, we need written documentation from Farmers to you indicating they are denying your claim.

Typically, if Farmers feels GMAC Mortgage should have filed under the mortgage clause they would send a letter confirming this request. We have no record of a letter of request to file under the mortgage clause or a letter denying payment of the claim from Farmers Insurance.

Based on this review, there is no additional action required of GMAC Mortgage at this time. We must continue our attempts to collect the payments owed on this mortgage.

If I can be of additional assistance, please contact me at 1-800-627-0128, extension 2365385.

Sincerely,

Sharon Robinson

Sharon Robinson
Advocacy Resolution Specialist
Executive Offices

# Mold Reporter

Home

## News, Vol. 1, No. 3

About

Prev | Next | Volume 1, Number 3

### The Final Solution: Mold-Contaminated House Burned to Ground

Search

In February of this year, the Associated Press reported a Eugene, Oregon, couple's plan to burn their house to the ground, letting the fire department it for a training exercise. It became contaminated while Mark and Mary Ja O'Hara were having it remodeled. They and their children were made sick result (headaches, respiratory problems, rapid weight loss, swollen and pai joints, chronic fatigue, profuse nosebleeds and severely inflamed sinuses). After the house is demolished, they plan to rebuild on the same 8-acre plot land.

The O'Haras are seeking $3.5 million in damages in a lawsuit that will probably be brought to trial this summer. They allege that their architect (Michael Cockram of Eugene) failed to control the quality of work by the general contractor, Stangland Construction, which failed to keep the inside the house dry during remodeling. These issues are being contested.

The family tried to decontaminate their personal belongings, but had to dis many of them.

### Melinda Ballard & Family win Large Settlement against Farmers Insurance

It was a lawsuit that made legal history. The Dripping Springs, Texas, famil whose house was lost to mold last year was awarded $32 million by a jury i the first part of June, 2001. Farmers Insurance Exchange, they found, failed adequately and swiftly cover repairs for a water leak. As a result, the mold Stachybotrys overran their 22-room house and severely damaged the parent health and that of their child.

The award was broken down as follows:

- $6.2 million in actual damages. The house will have to be decontaminated, leveled, and rebuilt.
- $12 million in punitive damages.
- $5 million for mental anguish
- $8.9 million in lawyers' fees.

The award may be reduced by Judge John Dietz when he officially enters the judgment on June 25. Also: Farmers may appeal. And political pressure may ultimately release insurers from the necessity of covering conditions that may

12-12020-mg   Doc 5100-13   Filed 09/18/13   Entered 09/18/13 14:29:59   Exhibit J
Case 1:12-cv-00101-KD-B   Document 31-2   Filed 02/25/13   Page 51 of 58
to Declaration     Pg 92 of 99

 **FARMERS**

Farmers National Catastrophe Center of Excellence
17150 West 118th Terrace
Olathe, KS  66061

April 6, 2006

Ms. Corla Jackson
13230 Tom Gaston Rd
Mobile, AL  36695

RE:         Claim: 1007093144:
            Policy: ████5620:
            DATE OF LOSS:       08/29/05

Dear Ms. Jackson:

In regards to the estimate you have provided from Town and Country Roofing, LLC.  We have updated your estimate to include replacement of your shingles, roof decking, framing for rafter repair, insulation, and 10% overhead and 10% profit to cover contractor charges.  As has been addressed in previous letters, mold is specifically excluded from coverage therefore I will not be able to include the mold remediation from the estimate provided.

Sincerely,
Fire Insurance Exchange

James M. Jenkins
Catastrophe Claims Service Representative
National Catastrophe Center

12-12020-mg Doc 5100-13 Filed 09/18/13 Entered 09/18/13 14:29:59 Exhibit J
to Declaration Pg 93 of 99
Case 1:12-cv-00121-KD-B Document 1-2 Filed 02/25/13 Page 52 of 58

# TOWN & COUNTRY
# ROOFING CONTRACTORS L.L.C.
## 633-8224 FAX 634-1655

## PROPOSAL FOR STRUCTURE DAMAGED ROOF

NAME:CORLA JACKSON
INS. COMPANY:FARMERS INSURANCE
STREET:13230 TOM GASTON RD.
CITY:MOBILE  STATE:AL.
PHONE:228-235-8047

REROOF DUE TO HURRICAN'S IVAN & KATRINA
REMOVE PRESENT ROOFING TO THE BASE,CLEAN DECK
THROUGHLY.APPLY FIFTEEN POUND FELT.INSTALL WEATHER
WATCH STROM GAURD IN ALL VALLEYS.REPLACE ALL ROOF
JACKS AND PIPE COLLARS.INSTALL TWO POWER
TURBINES.INSTALL WHITE ALUMINUM EAVE METAL
SURROUNDING PRIMMISSES OF HOUSE.COVER ROOF WITH
FOURTY YEAR COMP. SHINGLES.
ROOF PITCH NINE ON TWELVE,FIFTY FOUR SQUARES.TOTAL
PRICE FOR ROOF $13,500.00

WOOD WORK
RAISE LOW RAFFTERS AND REPLACE DAMAGED SURRPORT
BEAMS AND TRUSSES.REMOVE AND REPLACE ALL
DECKING.INSTALL FIFTY FOUR HUNDRED SQUARE FEET OF
HALF INCH (OSB) DECKING.TOTAL PRICE $18,400.00 (NOT
INCLUDING FACIAL BOARDS OR SOFFITS)

Commercial • Residential                    Roofing
                                            Since 1975
## TOWN & COUNTRY
## ROOFING, LLC
All Types Roofing & Waterproofing
**We Stop Leaks**
WRITTEN GUARANTEE - FREE ESTIMATES
LICENSED & BONDED
251-633-8224

Fax  633-4418        Presented by: B.B.

12-12020-mg   Doc 5100-13   Filed 09/18/13   Entered 09/18/13 14:29:59   Exhibit J
to Declaration   Pg 94 of 99
Case 1:12-cv-00121-KD-B   Document 1-2   Filed 02/25/13   Page 59 of 58

**TREATMENT**
TREAT WOOD IN INTIRE ATTIC FOR MOLD.TOTAL PRICE
$4,750.00 *or Remove Wet Damaged 2/4's/wood*

**INSULATION**
REMOVE ALL INSULATION IN ATTIC AND REBLOW.TOTAL
PRICE $5,900.00

**DEBRIS**
HAUL OFF ALL DEBRIS DEVELOPED FROM JOB AND CLEAN IN
WAY OF SAME.TOTAL PRICE $5,000.00

INSPECTION IS REQUIRED BY COUNTY ON THIS SEVERLY
STURCTURAL DAMAGED AND DANGEROUS ROOF.
ADDITIONAL FEES FOR STATE OF ALABAMA GENERAL
CONTRACTORS REQUIRED BY LAW AND EXPECT FEES
~~$10,000.00~~ *FRANK MOORE #12,250.00 (Contractors Licensing Fee only) For over seeing Job - Required!*
*or WH Construction, Addinal Fees*
THE ROOF STRUCTURE WAS DAMAGED BECAUSE THE ROOF
AND ITS SUPPORT WAS TIED INTO THE FRAMING OF THE
HOUSE WHICH CAUSE MAJOR DAMAGE.

THESE FEES SHOULD COVER THE INTIRE STUCTURAL
DAMAGED ROOF ONLY.

IF YOU HAVE ANY QUESTIONS PLEASE CALL THE NUMBER
LISTED ABOVE.

THANK YOU FOR CALLING TOWN & COUNTRY!



*Total $ 59,800 —*

12-12020-mg Doc 5100-13 Filed 09/18/13 Entered 09/18/13 14:29:59 Exhibit J-e 1 of 2
Case 0:12-cv-60121-KD-B Document 1-2 Filed 02/25/13 Page 94 of 58
to Declaration    Pg 95 of 99

| Dictionary | Thesaurus | Encyclopedia | Translator | Web |

Login | Register | Help



mortgage clause

**Related Searches**

Standard mortgage c...
Bank mortgage claus..
Mortgagee clause
Enculpatory clause
Countrywide home lo...
Loss payee on prope...

**Nearby Words**

mortgage banker
mortgage bond
mortgage broker
**mortgage clause**
mortgage deed
mortgage holder
mortgage loan

## mortgage clause · 1 dictionary result

Bank of America® Mortgage
Take Advantage Of Low Refi Rates For Home Loans Up To $3 Million.
www.bankofamerica.com

Mortgage
Refinance Now and Save - No SSN Rqd Get 4 Free Quotes - Save Here!
MortgageRefinance.SmartQuote.com

See Todays Mortgage Rates
$180,000 Mortgage under $999/mo. As Seen on Good Morning America!
www.Mortgage.LowerMyBills.com

### Legal Dictionary

Main Entry: **mortgage clause**
Function: *noun*
: a clause in an insurance contract (as for fire insurance) that entitles a named mortgagee to be paid for damage or loss to the property —see also OPEN MORTGAGE CLAUSE, STANDARD MORTGAGE CLAUSE

Merriam-Webster's Dictionary of Law, © 1996 Merriam-Webster, Inc.
Cite This Source

Bank of America® Mortgage
Take Advantage Of Low Refi Rates For Home Loans Up To $3 Million.
www.bankofamerica.com

Mortgage
Refinance Now and Save - No SSN Rqd Get 4 Free Quotes - Save Here!
MortgageRefinance.SmartQuote.com

Search another word or see **mortgage clause** on Thesaurus | Reference



Search faster for words with Dictionary.com Premium.

Sign Up Now

See Todays Mortgage Rates
$180,000 **Mortgage** under $999/mo. As Seen on Good Morning America!
www.Mortgage.LowerMyBills.com

4.25% Fixed Refinance
No Hidden Fees. Refi & Save w/ DPR® As Featured on CNNMoney and Forbes!
Mortgage.DeltaPrimeRefinance.com



mortgage clause

About · Privacy Policy · Terms of Use · Ask Answers · Advertise with Us · Link to Us · Contact Us
Dictionary.com LLC. Copyright © 2009. All rights reserved.

⋆ Forum         ⋆ Style guide
⋆ School gear    ⋆ Literary terms


THE DAILY BEAST

Berlin Wall Legend Shattered

GET XTRA INSIGHT ▶


SPELL YOUR WAY TO THE TOP OF THE CLASS
PLAY
Miss Spell's CLASS
⊲ A NEW word game from Dictionary.com ⊳


Dictionary.com

Find out what 'truth' is...in Icelandic!

Use our multilingual dictionary to find words in 30 different languages.

Follow us:   Twitter   Facebook

Home | Español

# RCS – Residential Credit Solutions

First Time Visitors
About Your Loan / About Us  Contact Information
Existing Customers

<div align="center">**Customer Login**</div>

User Name:

Password:

<div align="center">| Log In |</div>

Forgot your Username?

Forgot your Password?

Not Registered Yet?

Escrow Account Information  Insurance Information  Payment Services  Payment Counseling  Payoff
Request  End of Year FAQs  Insurance Loss Draft FAQs  Contact Information

**Make A Payment**

Investor Services
General Investor Information  Corporate Information  Contact Information
Existing Customers    Insurance Information



## Homeowner's Insurance Information

Insuring your home is an important way to protect your most
valuable asset. Maintaining adequate insurance means that
you will be covered in the unlikely event of a loss.

Having homeowner's insurance is an obligation under your
mortgage contract, and providing your lender with evidence of
adequate insurance coverage is an important responsibility of
home ownership. Everyone must have hazard insurance on
their property. If your property is located in a flood zone, you
must also obtain flood insurance on your property. In certain
states or geographic zones where windstorms, earthquakes, or
hurricanes occur, additional coverage against resulting
damage is required.



# Exhibits & Case Laws

Number Of Pages: _____

As a result of the foregoing transaction, Smith and others ultimately initiated litigation
against Walden in the Montgomery Circuit Court (case no. CV–95–1093), seeking a
judgment declaring the ownership of certain property. Walden filed several counterclaims
against Smith, seeking damages for default on a promissory note, breach of a joint-
venture agreement, and fraudulent suppression. Because a detailed summary of the
background of these disputes was provided in Walden v. Hutchinson, 987 So.2d 1109
(Ala.2007), from which we quote extensively below, we use the terms defined therein as
defined terms in this opinion.

12-12020-mg  Doc 5100-13  Filed 09/18/13  Entered 09/18/13 14:29:59  Exhibit J
Case 2:12-cv-00101-KD-B  Document 1-2  Filed 02/25/12  Page 58 of 58
to Declaration    Pg 99 of 99

| State of Alabama<br>Unified Judicial System<br><br>Form ARCIvP-93  Rev. 5/99 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Case Number:<br>CV AO 10 [ ] 79.<br>Date of Filing:  Judge Code:<br>01 18 2012<br>Month  Day  Year |
|---|---|---|

### GENERAL INFORMATION

IN THE CIRCUIT COURT OF _Mobile_ , **ALABAMA**

_(Name of County)_

_Orla Jackson_ Plaintiff  v.  _GMAC Mortgage_ Defendant

| First Plaintiff | ☐ Business  ☒ Individual  ☐ Government  ☐ Other | First Defendant | ☐ Business  ☐ Individual  ☐ Government  ☐ Other |
|---|---|---|---|

**NATURE OF SUIT:** Select primary cause of action, by checking box (check only one) that best characterizes your action:

**TORTS: PERSONAL INJURY**
- ☐ WDEA - Wrongful Death
- ☐ TONG - Negligence: General
- ☐ TOMV - Negligence: Motor Vehicle
- ☐ TOWA - Wantonness
- ☐ TOPL - Product Liability/AEMLD
- ☐ TOMM - Malpractice-Medical
- ☐ TOLM - Malpractice-Legal
- ☐ TOOM - Malpractice-Other
- ☐ TBFM - Fraud/Bad Faith/Misrepresentation
- ☐ TOXX - Other: _____

**TORTS: PROPERTY INJURY**
- ☐ TOPE - Personal Property
- ☐ TORE - Real Property

**OTHER CIVIL FILINGS**
- ☐ ABAN - Abandoned Automobile
- ☐ ACCT - Account & Nonmortgage
- ☐ APAA - Administrative Agency Appeal
- ☐ ADPA - Administrative Procedure Act
- ☐ ANPS - Adults in Need of Protective Services

**OTHER CIVIL FILINGS (cont'd)**
- ☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/ Enforcement of Agency Subpoena/Petition to Preserve
- ☐ CVRT - Civil Rights
- ☐ COND - Condemnation/Eminent Domain/Right-of-Way
- ☐ CTMP - Contempt of Court
- ☐ CONT - Contract/Ejectment/Writ of Seizure
- ☐ TOCN - Conversion
- ☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/Injunction Election Contest/Quiet Title/Sale For Division
- ☐ CVUD - Eviction Appeal/Unlawful Detainer
- ☐ FORJ - Foreign Judgment
- ☐ FORF - Fruits of Crime Forfeiture
- ☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
- ☐ PFAB - Protection From Abuse
- ☐ FELA - Railroad/Seaman (FELA)
- ☐ RPRO - Real Property
- ☐ WTEG - Will/Trust/Estate/Guardianship/Conservatorship
- ☐ COMP - Workers' Compensation
- ☐ CVXX - Miscellaneous Circuit Civil Case

**ORIGIN** (check one): F ☐ INITIAL FILING  A ☐ APPEAL FROM DISTRICT COURT  O ☐ OTHER:
R ☐ REMANDED  T ☐ TRANSFERRED FROM OTHER CIRCUIT COURT

**HAS JURY TRIAL BEEN DEMANDED?**  ☐ YES  ☐ NO    Note: Checking "Yes" does not constitute a demand for a jury trial. (See Rules 38 and 39, Ala.R.Civ.P, for procedure)

**RELIEF REQUESTED:** ☐ MONETARY AWARD REQUESTED  ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:** [ ]   Date _1/18/2012_   Signature of Attorney/Party filing this form _Orla Jackson_

**MEDIATION REQUESTED:** ☐ YES  ☐ NO  ☐ UNDECIDED