| DOCKET No. FST-CV-09-5011591-S | : | SUPERIOR COURT |
|---|---|---|
| | : | |
| RESIDENTIAL FUNDING LLC. | : | J.D. OF STAMFORD/NORWALK |
| | : | |
| v. | : | AT STAMFORD |
| | : | |
| LA CASSE, THOMAS | : | DATED 03/16/2012 |

## SUPPLEMENTAL DISCLOSURE OF EXPERT WITNESS REPORT

Now comes the defendant by counsel and discloses the report of the expert witness,

Marie McDonnell of McDonnell Analytics previously disclosed as an expert to this court.

Her report is attached hereto.

Donald M. Brown, Esq.
Juris No. 421865

## CERTIFICATION

I hereby certify that a copy of the foregoing and within expert report was electronically
delivered to all parties of record by facsimile transmission and by U.S. Priority Mail to the
following addresses of record on 3/16/2012:

PHV Calandrelli Joseph
Prince Lobel Tye LLP                    Donald M. Brown, Esq.
100 Cambridge St
Boston, MA, 02114

Dowley & Associates
116 Washington St
Middletown, CT, 06457

Paul Nakian
90 Campbell Dr
Stamford, CT, 06903

LAW OFFICES OF DONALD M. BROWN
19 HETTIE FRED ROAD GREENWICH CT 08831
(203) 359-3771 & (800) 636-2701 FAX



**Foreclosure Forensics™ – Property of Thomas LaCasse**

**mcdonnell**
PROPERTY ANALYTICS

# Foreclosure Forensics™

*Documenting the Gaps in the Chain of Title*

*Borrower*

Thomas LaCasse

153 Valley Forge Road, Weston, Fairfield County, Connecticut 06883

_____

*Lender / Nominee*

Homecomings Financial Network, Inc.

Mortgage Electronic Registration Systems, Inc.

_____

*Assignee*

Luminent Mortgage Trust 2006-3

March 16, 2012

*Prepared By*

MCDONNELL PROPERTY ANALYTICS, INC.

888 Washington Street, Suite 101A

Dedham, MA 02026

Tel: 781-326-8486 | Fax: 866-625-0211

Support@mcdonnellanalytics.com

# Table of Contents

TABLE OF CONTENTS ...........................................................................................................................3

ABSTRACT ...........................................................................................................................................4
    SUBJECT ........................................................................................................................................6
    PURPOSE & USE OF REPORT ............................................................................................................4
    METHODOLOGY .............................................................................................................................4

RESEARCH ..........................................................................................................................................8
    TRANSACTION DETAILS...................................................................................................................8
    LOAN LEVEL DETAILS .....................................................................................................................8
    LOOKUP REFERENCES .....................................................................................................................9
    SECURITIZATION DETAILS ...............................................................................................................9
    MERS RESEARCH.........................................................................................................................10
    TITLE DOCUMENTS SUPPLIED .......................................................................................................10
    ADDITIONAL DOCUMENTS REVIEWED ............................................................................................11

ANALYSIS ..........................................................................................................................................12
    I.       SECURITIZATION ANALYSIS ............................................................................... 12
    II.      FORECLOSURE FORENSICS.................................................................................. 17
        The "Breeder Document" ........................................................................................17
        The Foreclosure was Grounded in a Fraudulent Assignment .................................................18
    III.     ROBO-SIGNER ANALYSIS .................................................................................. 20
        CONCLUSIONS .....................................................................................................21

TABLE OF EXHIBITS ...........................................................................................................................22
    A.      Mortgage, 01/30/2006 ......................................................................... 22
    B.      InterestFirstSM Adjustable Rate Note, 01/30/2006.............................................. 22
    C.      Allonge to Promissory Note ...................................................................... 22
    D.      Adjustable Rate Rider, 01/30/2006 ............................................................ 22
    E.      Complaint, 05/07/2009 ......................................................................... 22
    F.      Assignment of Mortgage, 07/25/200 ........................................................... 22
    G.      Notice of Entry of Judgment of Strict Foreclosure, 09/08/2009.................................. 22
    H.      Defendant's Motion to Open and Vacate Judgment to Conduct Necessary Discovery, 01/14/201222
    I.       MERS Research Results, 02/15/2012............................................................. 22
    J.       Bloomberg Research Results, 02/16/2012........................................................ 22
    K.      Monthly Remittance Reports..................................................................... 22
    L.      Prospectus Supplement Excerpt .................................................................. 22

### PURPOSE & USE OF REPORT

The purpose of this examination is to illuminate:

1. the ownership history of the borrower's mortgage;

2. whether the party presently claiming to own the borrower's Property is supported or contradicted by the facts unearthed through my investigation; and

3. whether the foreclosure was prosecuted by the proper party.

### METHODOLOGY

McDonnell Property Analytics, Inc.'s methodology for tracing the transfers and assignments of residential mortgages involves the following:

1. an examination of the relevant public land records; and

2. researching public and private mortgage-related databases including:

   a. Fannie Mae's Loan Lookup;

   b. Freddie Mac's Self-Service Loan Lookup;

   c. Mortgage Electronic Registration Systems, Inc.'s website;

   d. Bloomberg Professional and/or ABSNet Loan (robust mortgage-backed securities databases utilized by institutional investors); and

   e. the Securities and Exchange Commission's public access websites.

# Summary

My forensic examination of the documents and records supplied for my review, when compared with credible evidence compiled through the use of the Bloomberg Terminal and further researched via the Securities and Exchange Commission's online database allowed me to conclude the following with respect to the ownership of Thomas LaCasse's Note and Mortgage:

☑ The Mortgage Loan in question – or an economic interest therein – was securitized into the Luminent Mortgage Trust 2006-3 on or about April 28, 2006.

☑ HSBC Bank USA, National Association as Trustee for the Certificateholders of the Luminent Mortgage Trust 2006-3 is the real party in interest entitled to receive payment on the subject Note, and therefore, to enforce the Mortgage.

☑ The Assignment of Mortgage executed by Jeffrey Stephan on July 25, 2009 is a hoax. This Assignment does not represent a true sale of the LaCasse Note and Mortgage; rather is it a self-dealing false document prepared, executed and recorded by and on behalf of GMAC Mortgage, LLC to create the appearance that RFC had the legal standing to institute the foreclosure action on the LaCasse Property while suppressing the fact – and thus avoiding the burden of proof – that the Note and Mortgage had been sold a total of four (4) times and securitized three (3) years earlier.

☑ The Assignment of Mortgage was ineffective to transfer the LaCasse Mortgage to RFC; and even if RFC can demonstrate that it is currently "holding" LaCasse's original Note, *it is not the owner of the Note* entitled to receive payment on the Note.

☑ The Complaint and subsequent papers filed by RFC with this Honorable Court that claim RFC is the current holder of the LaCasse Note and Mortgage misstate the facts and are intrinsically and extrinsically unfair and deceptive.

☑ The Judgment of Strict Foreclosure granted on September 2, 2009 was obtained under false pretenses by a party, Residential Funding Company, LLC fka Residential Funding Company, which had no standing to institute the foreclosure action.

Foreclosure Forensics™ – Property of Thomas LaCasse
© 2012 McDonnell Property Analytics, Inc., All Rights Reserved

# Abstract

*SUBJECT*

The subject of this analysis is a consumer mortgage transaction that took place on January 30, 2006 ("Settlement Date") by and between Thomas LaCasse ("Borrower" or "LaCasse") and Homecomings Financial Network, Inc. ("Lender" or "Homecomings").

On the Settlement Date LaCasse executed an InterestFirst<sup>SM</sup> Adjustable Rate Note ("Note") in favor of Homecomings and granted a Mortgage ("Mortgage") to obtain funds in the amount of $650,000.00. To secure repayment of the debt, LaCasse pledged residential property located at 153 Valley Forge Road, Weston, Fairfield County, Connecticut 06883 ("Property").

The Mortgage was recorded in the Office of the Town Clerk of the Town of Weston on February 8, 2006 in File Number 2018, Vol. 432, Pg. 496.  (*See* Exhibit A. – Mortgage, 01/30/2006)

Mortgage Electronic Registration Systems, Inc. ("MERS") is defined in the Mortgage, Definition (C), as *"a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument…"*** (emphasis in original). The Mortgage was registered with the MERS System under MIN #1000626-0425910742-5.

The InterestFirst<sup>SM</sup> Adjustable Rate Note indicates that the principal amount of the loan ($650,000.00) will be financed at a fixed rate of 6.500% for the first three (3) years after which interest rates are to be adjusted annually based on an Index and Margin formula. Interest-only payments are required for the first ten (10) years. Beginning on March 1, 2016, monthly payments of principal and interest will be established in an amount sufficient to amortize the debt to a zero balance over the remaining twenty (20) year term to maturity. The distinguishing Loan Level Details are described in the Research section of this report.  (*See* Exhibit B. – InterestFirst<sup>SM</sup> Adjustable Rate Note, 01/30/2006)

The Note bears a specific endorsement on Page 5 in which Raynette Buerke, Assistant Secretary of Homecomings Financial Network, Inc. (the Lender) negotiated the Note in favor of Residential Funding Corporation.  (*See* Exhibit B. – InterestFirst<sup>SM</sup> Adjustable Rate Note, Page 5, 01/30/2006)

An undated Allonge to Promissory Note contains an endorsement "in blank" executed by John Hagebock, Assistant Vice President of Residential Funding Corporation, which effectively converted the Note to bearer paper. The Allonge also indicates that the Note was aggregated into Pool #3850, and that the original Loan Number #7754073 was reassigned a Loan ID #10419663. (*See* Exhibit C. – Allonge to Promissory Note)

The Adjustable Rate Rider appended to the Mortgage mimics the terms set forth in the Note. (*See* Exhibit D. – Adjustable Rate Rider, 01/30/2006)

On May 7, 2009, Residential Funding Company, LLC f/k/a Residential Funding Company ("RFC"), claiming to be the holder of the subject Note and Mortgage, filed a Complaint against Thomas LaCasse seeking to foreclose the Mortgage due to an alleged default under the terms of the Note. The case was filed with the Superior Court, Judicial District of Stamford/Norwalk ("Court") thereby opening Docket No. FST-CV-09-5011591-S. On May 11, 2009, RFC recorded a Lis Pendens against the Property in the Office of the Town Clerk for the Town of Weston in File Number 1911, Vol. 484, Pg. 718.  (*See* Exhibit E. - Complaint & Lis Pendens, 05/07/2009)

On July 25, 2009, Jeffrey Stephan, acting in his alleged capacity as Vice President of Mortgage Electronic Registration Systems, Inc. as nominee for Homecomings Financial Network, Inc., executed an Assignment of Mortgage that purports to assign the LaCasse Mortgage from Mortgage Electronic Registration Systems, Inc. as nominee for Homecomings Financial Network, Inc. to Residential Funding Company, LLC fka Residential Funding Corporation located at c/o GMAC Mortgage, LLC, 4 Walnut Grove Drive, Horsham, PA 19044.

The Assignment of Mortgage was recorded in the Office of the Town Clerk of the Town of Weston on August 10, 2009 in File Number 000384, Vol. 489, Pg. 786.  (*See* Exhibit F. - Assignment of Mortgage, 07/25/2009)

Subsequent to these events, the subject Mortgage was foreclosed upon and the Court issued a Notice of Judgment of Strict Foreclosure on September 2, 2009.  (*See* Exhibit G. - Notice of Judgment of Strict Foreclosure, 09/02/2009)

On January 14, 2012, LaCasse filed a motion to reopen the case, vacate the Judgment of Strict Foreclosure, and conduct discovery in which he raised a challenge to Residential Funding Company, LLC's standing, and consequently, the jurisdiction of the Superior Court at Stamford. (*See* Exhibit H. - Defendant's Motion to Open and Vacate Judgment to Conduct Necessary Discovery, 01/14/2012)

# Research

## *TRANSACTION DETAILS*

| | |
|---|---|
| Source Documents: | Mortgage; Adjustable Rate Rider; InterestFirst[SM] Adjustable Rate Note |
| Settlement Date: | January 30, 2006 |
| Borrower: | Thomas LaCasse |
| Lender: | Homecomings Financial Network, Inc. |
| Nominee: | Mortgage Electronic Registration Systems, Inc. |
| Zip Code | 06883 |
| Principal Amount: | $650,000.00 |
| First Payment Date: | March 1, 2006 |
| Maturity Date: | February 1, 2036 |
| Riders: | InterestFirst[SM] Adjustable Rate Rider; Legal Description |

## *LOAN LEVEL DETAILS*

| | |
|---|---|
| Source Documents: | Mortgage; Adjustable Rate Rider; InterestFirst[SM] Adjustable Rate Note |
| Loan Number: | Note: 7754073; Mortgage: 042-591074-2 |
| Initial Interest Rate: | 6.5000% |
| Principal & Interest: | $3,520.83 |
| Type of Loan: | 10 Year Interest Only; 3 Year Fixed; 27 Year ARM; 30-Year Term |
| Index: | The "Index" is the average of Interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published In *The Wall Street Journal.* |
| 1st Rate Change: | February 1, 2009 |
| Reset Intervals: | Every 12 Months |
| Life Rate Cap: | 12.5000% |
| Life Rate Floor: | 2.2500% |
| Adjustable Cap: | 2.0000% |
| Adjustable Floor: | 2.0000% |
| Margin: | 2.2500% |
| Neg. Am. Limit: | Not Applicable |

Foreclosure Forensics™ – Property of Thomas LaCasse
© 2012 McDonnell Property Analytics, Inc., All Rights Reserved

**mcdonnell** PROPERTY ANALYTICS

## LOOKUP REFERENCES

| | |
|---|---|
| Source Documents: | Bloomberg RMBS Database; EDGAR Website; SEC Info Website |
| Trust I.D.: | Luminent Mortgage Trust 2006-3 |
| EDGAR Website:[1] | http://www.sec.gov/cgi-bin/browse-edgar?company=&match=&CIK=1360715&filenum=&State=&Country=&SIC=&owner=exclude&Find=Find+Companies&action=getcompany |
| SEC Info Website:[2] | http://www.secinfo.com/$/SEC/Registrant.asp?CIK=1360715 |
| Trust Agreement: | *See:* PSA |
| Prospectus:  424B5 | http://www.secinfo.com/dqTm6.v1f8.htm#1stPage |
| PSA: | http://www.secinfo.com/dqTm6.v2Q5.c.htm#1stPage |
| Form 8-K: | http://www.secinfo.com/$/SEC/Documents.asp?CIK=1360715&Party=BFO&Type=8-K&Label=Current+Reports+--+Form+8-K |
| MLPA: | http://www.secinfo.com/dqTm6.v2Q5.c.htm#1stPage (*See* PSA Exhibit K) |
| Loan Schedule: | http://www.secinfo.com/dqTm6.v1Eu.htm#1stPage |
| Governing Law: | State of New York (*See* Section 11.03 of the PSA) |

## SECURITIZATION DETAILS

| | |
|---|---|
| Source Documents: | Rule 424(b)(5) Prospectus & Prospectus Supplement |
| Lender: | Homecomings Financial Network, Inc. |
| Originator: | SouthStar Funding, LLC, IndyMac Bank, FSB, Paul Financial, LLC, **Residential Funding Corporation**, American Mortgage Network, Inc., Bear Stearns Residential Mortgage Corporation, and et. Al. |
| Seller: | Maia Mortgage Finance Statutory Trust, a Maryland Business Trust |
| Sponsor: | Luminent Mortgage Capital, Inc. |
| Depositor: | Structured Asset Mortgage Investments II Inc. |
| Issuing Entity: | Luminent Mortgage Trust 2006-3 |

---

[1] **EDGAR**, the **Electronic Data-Gathering, Analysis, and Retrieval** system, performs automated collection, validation, indexing, acceptance, and forwarding of submissions by companies and others who are required by law to file forms with the U.S. Securities and Exchange Commission (the "SEC"). The database is freely available to the public via the Internet at:  http://www.sec.gov/.

[2] *SEC Info*[SM] is a service of *Fran Finnegan & Company* that provides real-time access to documents that were first filed at and disclosed by the *U.S. Securities and Exchange Commission (SEC)* pursuant to Federal law or the *Canadian Securities Administrators (CSA)* pursuant to Canadian law by a Filer or Filing Agent who is an SEC/CSA Registrant.

The benefit of using *SEC Info*[SM] rather than **EDGAR** to search the official filings is the enhancements such as hyperlinks between *Table of Contents* and *Sections* that allow the user to quickly and efficiently search, view and print relevant information contained within documents that often consist of hundreds of pages of complex contract and disclosure language. To learn more about *SEC Info*[SM] visit:  http://www.secinfo.com/$/About.asp

| Trustee: | HSBC Bank USA, National Association |
|---|---|
| Delaware Trustee: | Not Applicable |
| Master Servicer: | Wells Fargo Bank, National Association |
| Servicers: | EMC Mortgage Corporation, IndyMac Bank, FSB, Paul Financial, LLC, **Residential Funding Corporation** and Wells Fargo Bank, National Association |
| Custodian: | Wells Fargo Bank, National Association |
| Underwriter: | Bear Stearns & Co. and Wachovia Capital Markets, LLC |
| Cut-Off Date: | April 1, 2006 |
| Closing Date: | On or about April 28, 2006 |

### MERS RESEARCH

| Source Documents: | Mortgage; MERS Website at: https://www.mers-servicerid.org/sis/ |
|---|---|
| MOM: | Yes |
| MIN Number:[3] | 1000626-0425910742-5 |
| Lender I.D.: | Homecomings Financial Network, Inc. |
| Servicer I.D.: | GMAC Mortgage, LLC |
| Investor I.D.: | Residential Funding Company, LLC |
| Status: | Inactive. |

### TITLE DOCUMENTS SUPPLIED

#### WESTON LAND RECORDS, CONNECTICUT

| EXECUTION DATE | RECORDING DATE | DOCUMENT | INSTRUMENT |
|---|---|---|---|
| 01/30/2006 | 02/08/2006 | Vol. 432, Pg. 496 | Open-End Mortgage Deed & Adjustable Rate Rider |
| 05/07/2009 | 05/11/2009 | Vol. 484, Pg. 718 | Lis Pendens |
| 07/25/2009 | 08/10/2009 | Vol. 489, Pg. 786 | Assignment of Mortgage |

#### SUPERIOR COURT, JUDICIAL DISTRICT OF STAMFORD/NORWALK, CONNECTICUT

| EXECUTION DATE | RECORDING DATE | DOCKET NO. | INSTRUMENT |
|---|---|---|---|
| 05/07/2009 | 05/18/2009 | FST-CV-09-5011591-S | Complaint |

---

[3] In the MERS lexicon, "MIN" stands for Mortgage Identification Number which is a unique 18-digit number assigned to each mortgage registered into the MERS® System. The first seven (7) digits represent the identity of the MERS Member who registered the Mortgage into the MERS® System. You can search for the identity of the originating MERS Member here by typing in the first 7 digits of the MIN: https://www.mersonline.org/mers/mbrsearch/mbrsearch.htm.

**mcdonnell**
PROPERTY ANALYTICS

***ADDITIONAL DOCUMENTS REVIEWED***

- All documents contained in the Abstract Section of this report;

- All documents and pleadings provided by the Mortgagor's attorney including:

  - Mortgage, 01/30/2006
  - InterestFirst[SM] Adjustable Rate Note, 01/30/2006
  - Adjustable Rate Rider, 01/30/2006
  - Allonge to Promissory Note, 01/30/2006
  - Lis Pendens, 05/07/2009
  - Complaint, 05/07/2009
  - Assignment of Mortgage, 07/25/2009
  - Affidavit of Debt, 08/06/2009
  - Motion for Default for Failure to Appear, 08/18/2009
  - Motion for Judgment of Strict Foreclosure and Finding of Entitlement of Possession, 08/18/2009
  - Notice of Entry of Judgment of Strict Foreclosure, 09/08/2009
  - Motion to Reset Law Days and Reenter Judgment, 12/28/2009
  - Debt Collection, 09/08/2009
  - Affidavit of Attorney's Fees Re: Bankruptcy, 01/14/2010
  - Updated Calculation of Debt, 01/14/2010
  - Motion to Reset Law Days and Reenter Judgment, 11/22/2010
  - Certificate of Assistant Secretary, 05/20/2011
  - Updated Calculation of Debt, 11/09/2011
  - Memorandum of Law in Support of Defendant's Motion to Vacate Judgment and Dismiss with Prejudice, 11/11/2011
  - Motion to Vacate Judgment and Dismiss with Prejudice, 11/11/2011
  - Request for Production of Documents, 01/02/2012
  - Motion for Leave to Compel Discovery, 01/02/2012
  - Residential Funding Company, LLC's Objection to Defendant's Motion for Leave to Compel Discovery, 01/13/2012
  - Defendant's Motion to Open and Vacate Judgment to Conduct Necessary Discovery, 01/14/2012
  - Residential Funding Company, LLC's Objection to Defendant's Motion to Vacate Judgment and Dismiss with Prejudice, 01/23/2012

# Analysis

My examination of the evidence available as of this writing revealed the following facts:

## I.   Securitization Analysis

(1)   MERS indicates that the MIN[4] status of the subject loan is "Inactive." It also states that: *"This mortgage loan is registered on the MERS® System for informational purposes only. Mortgage Electronic Registration Systems, Inc. is not the mortgagee for this loan."*

(2)   The date on which MERS deactivated the subject Mortgage is unknown.

(3)   All transfers of the beneficial ownership rights in the Note and Mortgage, as well as the transfer(s) of servicing rights up to and including the deactivation date, should be booked into the MERS® System.

(4)   Presently, MERS reports that GMAC Mortgage, LLC was the "Servicer" of the subject transaction, and that Residential Funding Company, LLC was the "Investor" as of the date the Mortgage was deactivated from the MERS® System. This information indicates that the Lender, Homecomings Financial Network, Inc., sold LaCasse's Note and Mortgage ("Mortgage Loan").  (*See* Exhibit I. – MERS Research Results, 02/15/2012)

(5)   Using my access to Bloomberg Professional's database of Residential Mortgage Backed Securities ("Bloomberg"), I found that LaCasse's Mortgage Loan is presently being tracked as a receivable of the **Luminent Mortgage Trust 2006-3** (*"Issuing Entity"* or "REMIC Trust" or "Deal").[5] (*See* Exhibit J. – Bloomberg Research Results, 02/16/2012)

(6)   I was able to verify this finding by examining the collateral loan performance tape provided by the *Servicer* to Bloomberg each month and comparing that information to the loan level details contained in LaCasse's Note, Mortgage and Adjustable Rate Rider. Our side-by-side comparison revealed that eleven (11) out of thirteen (13) data-points were a perfect match. (*See* Exhibit J. – Bloomberg Research Results, 02/16/2012)

---

[4] In the MERS lexicon, "MIN" stands for Mortgage Identification Number which is a unique 18-digit number assigned to each mortgage registered into the MERS® System.

[5] **NOTE**: The phrase *"I found that the Borrower's Mortgage Loan is presently being tracked as a receivable…"* is a term of art that I purposely use to describe what we are seeing when viewing the information available through Bloomberg. Essentially, Bloomberg provides current and historical data to investors regarding the collateral loan performance, delinquency rates, trigger events, etc. that enable investors to monitor their holdings. This data derives from the accounting supplied by the *Servicer, Master Servicer*, and *Securities Administrator* each month as required by the Pooling and Servicing Agreement that governs the Trust. Whether or not a particular Note and Mortgage were legally conveyed into a securitized Trust in accordance with "Applicable Laws" is a separate and distinct factual analysis which ultimately requires a legal opinion I do not, and cannot render here.

(7)    The only apparent non-matches were the "Loan Number" and "Interest Only Term." The Interest Only Term that Bloomberg reports may have been thrown off due to the default and foreclosure of the subject Mortgage Loan.

(8)    As for the variation in the loan numbers, Bloomberg accurately identifies LaCasse's re-serialized Loan Number as #0010419663, which is a precise match to the Loan ID number on the Allonge to Promissory Note.  (*See* Exhibit C. – Allonge to Promissory Note)

(9)    As further evidence, I was able to obtain several Monthly Remittance Reports prepared by Wells Fargo Bank, N.A., the Securities Administrator for the Luminent Mortgage Trust 2006-3 that enable us to establish that LaCasse's Mortgage Loan # 0010419663 is identified therein under the "Foreclosure Loan Detail" beginning with the June 25, 2009 report through to the present time.  (*See* Exhibit K. – Monthly Remittance Report)

(10)    Hence, the evidence shows that the Mortgage Loan in question – or an economic interest therein – is the property of Luminent Mortgage Trust 2006-3.

(11)    The Luminent Mortgage Trust 2006-3 is a public offering, and the Prospectus, Prospectus Supplement and Pooling and Servicing Agreement (referred to in the industry as the "Deal Documents") are available on the Securities and Exchange Commission's public access website. To perform a search, simply go to EDGAR's Company Search page and type in the Central Index Key ("CIK") 1360715, which you can do here at: http://www.sec.gov/edgar/searchedgar/companysearch.html.

(12)    A more user friendly way to search these same filings may be found on the *SEC Info*[SM] website at:  http://www.secinfo.com/$/SEC/Registrant.asp?CIK=1360715.

(13)    The Prospectus Supplement contains a summary of the securitization and lists the entities that were involved. This offering circular may be viewed in its entirety at: http://www.secinfo.com/dqTm6.v1f8.htm#1stPage. (*See* Exhibit L. – Prospectus Supplement Excerpt)

(14)    The Pooling and Servicing Agreement ("PSA")[6] that governs the securitization describes how the Mortgage Loans are to be conveyed into the REMIC Trust in Section 2.01. The PSA may also be viewed in its entirety at: http://www.secinfo.com/dqTm6.v2Q5.c.htm#1stPage.

(15)    The securitization paradigm involves one or more "true sales" that are designed to move the Mortgage Loans away from the originating *Lender* and into a bankruptcy remote Qualified Special Purpose Entity commonly referred to as the *Issuing Entity*. The purpose of the *Issuing Entity* is to hold the assets securely on behalf of investors who purchase securities backed by the Mortgage Loans.

---

[6] The Pooling And Servicing Agreement Dated as of April 1, 2006 was executed by and between: Structured Asset Mortgage Investments Ii Inc., *Depositor*; Luminent Mortgage Capital, Inc., *Sponsor*; Wells Fargo Bank, National Association, *Master Servicer* and *Securities Administrator*; and HSBC Bank USA, National Association, *Trustee*.

Foreclosure Forensics™ – Property of Thomas LaCasse
© 2012 McDonnell Property Analytics, Inc., All Rights Reserved

**mcdonnell** PROPERTY ANALYTICS

(16)    A diagram outlining the Transaction Structure for this securitization is found in the Prospectus Supplement on page S-24.  (*See* Exhibit L. – Prospectus Supplement Excerpt, Transaction  Structure)

(17)    Section 2.01 of the Pooling and Servicing Agreement contains the active granting language by which a Special Purpose Entity Known as the *Depositor* purports to sell, transfer and assign all of the Mortgage Loans listed in the MLS to the Trustee for the *Issuing Entity*.

(18)    The *Depositor* in this case was Structured Asset Mortgage Investments II Inc.

(19)    According to the Prospectus Supplement, the *Depositor* acquired the Mortgage Loans from Maia Mortgage Finance Statutory Trust, a Maryland Business Trust ("Maia Mortgage") who served as the *Seller* for this Deal.  (*See* Exhibit L. – Prospectus Supplement Excerpt, p. S-7)

(20)    A Mortgage Loan Purchase Agreement ("MLPA")[7] executed by and between the *Seller*, *Sponsor* and *Purchaser/Depositor* contains the active transfer and assignment language conveying the Mortgage Loans from the *Seller* to the *Purchaser/Depositor*. The MLPA is incorporated into the Pooling and Servicing Agreement as Exhibit K and may be reviewed in its entirety at: http://www.secinfo.com/dqTm6.v2Q5.c.htm#1stPage.

(21)    Prior thereto, the *Seller* acquired the Mortgage Loans from a number of different mortgage companies, including Residential Funding Corporation to whom Homecomings sold the LaCasse Note and Mortgage.  (*See* Exhibit L. – Prospectus Supplement Excerpt, p. S-7; and Exhibit B. – InterestFirst[SM] Adjustable Rate Note, 01/30/2006)

(22)    The window of time to complete the securitization process described herein began on the date the *Issuing Entity* was created, April 1, 2006, and concluded on the Closing Date which was on or about April 28, 2006 or within a restricted window of time thereafter (90 days).

(23)    Section 2.01 of the PSA describes what documents must be delivered by the *Depositor* to the Trustee for the *Issuing Entity* which is also summarized in the Prospectus Supplement on pages S-44 & S-45 which states as follows:

     With respect to each Mortgage Loan:

     (a)  the original mortgage note, endorsed without recourse in the following form: *"Pay to the order of HSBC Bank USA, National Association, as trustee for certificateholders of Structured Asset Mortgage Investments II Inc., Luminent Mortgage Trust 2006-3, Mortgage Pass-Through Certificates, Series 2006-3 without recourse,"* or in blank with all intervening endorsements that show a complete chain of endorsement from the originator

---

[7] The Mortgage Loan Purchase Agreement was executed by and between Maia Mortgage Finance Statutory Trust as Mortgage Loan *Seller*; Luminent Mortgage Capital, Inc. as *Sponsor*; and Structured Asset Mortgage Investments II Inc. as *Purchaser* Dated as of April 28, 2006.

to the seller, if the original mortgage note is unavailable to the depositor, a photocopy thereof, if available, together with a lost note affidavit;

(b)  the original recorded mortgage or a photocopy thereof;

(c)  a duly executed assignment of the mortgage to *"HSBC Bank USA, National Association, as trustee for certificateholders of Structured Asset Mortgage Investments II Inc., Luminent Mortgage Trust 2006-3, Mortgage Pass-Through Certificates, Series 2006-3, without recourse"*; in recordable form or, for each mortgage loan subject to the Mortgage Electronic Registration Systems, Inc. (the *"MERS® System"*), evidence that the mortgage is held for the trustee as described in the Agreement;

(d)  all interim recorded assignments of such mortgage, if any and if available to the depositor; and

(e)  the original or duplicate original lender's title policy or, in the event such original title policy has not been received from the insurer, such original or duplicate original lender's title policy will be delivered within one year of the closing date or, in the event such original lender's title policy is unavailable, a photocopy of such title policy or, in lieu thereof, a current lien search on the related property.

(24)  Since LaCasse's Mortgage was a MERS Original Mortgage ("MOM"), the parties to the PSA were required to provide *"evidence that the mortgage is held for the trustee as described in the Agreement."*

(25)  As stated in paragraph 4 above, MERS reports that Residential Funding Company, LLC was the "Investor" i.e., the owner and holder of the LaCasse Note and Mortgage at the time the Mortgage Loan was deactivated from the MERS® System.

(26)  This proves that the information contained in the MERS® System is either not up to date (as required by the PSA); or that it is intentionally misleading. As demonstrated above, the current "Investor" is HSBC Bank USA, National Association as Trustee for the Certificateholders of the Luminent Mortgage Trust 2006-3.

(27)  The data entered into the MERS® System is managed by the *Servicer*, GMAC Mortgage, LLC ("GMAC"). As the *Servicer*, GMAC knows the identity of the legal owner and holder of the Mortgage Loans it services. GMAC's loan servicing platform contains information that will confirm my findings i.e., that the LaCasse Note and Mortgage were securitized in to the Luminent Mortgage Trust 2006-3 on or about April 28, 2006 when the Deal closed.

(28)  My research shows that Residential Funding Company ("RFC") purchased the LaCasse Note and Mortgage from Homecomings Financial Network, Inc. RFC then resold the LaCasse Note and Mortgage to Maia Mortgage for securitization purposes. Subsequently, RFC was

designated as one of five (5) servicers pursuant to the Pooling and Servicing Agreement. (*See* Exhibit L. – Prospectus Supplement Excerpt, p. S-7)

(29)  According to the representations and warranties made to investors and to adhere strictly to the terms of Section 2.01 of the Pooling and Servicing Agreement the LaCasse Note and Mortgage would have been transferred and assigned into the REMIC Trust as follows:

> A.  from the *Lender* (Homecomings Financial Network, Inc.) to the *Originator* (Residential Funding Corporation);
>
> B.  from the *Originator* (Residential Funding Corporation) to the *Seller/Sponsor* (Maia Mortgage Finance Statutory Trust / Luminent Mortgage Capital, Inc.);
>
> C.  from the *Seller/Sponsor* (Maia Mortgage Finance Statutory Trust / Luminent Mortgage Capital, Inc.) to the *Depositor* (Structured Asset Mortgage Investments II Inc.); and finally,
>
> D.  from the *Depositor* (Structured Asset Mortgage Investments II Inc.), to
>
> E.  the Trustee  for the *Issuing Entity*, (HSBC Bank USA, National Association, as Trustee for Certificateholders of Structured Asset Mortgage Investments II Inc., Luminent Mortgage Trust 2006-3, Mortgage Pass-Through Certificates, Series 2006-3).

(30)  This sequence of conveyances was intended by the transaction parties as described in the Prospectus, Prospectus Supplement, Mortgage Loan Purchase Agreement, and the Pooling and Servicing Agreement and had to take place on or about April 28, 2006 when the Luminent Mortgage Trust 2006-3 closed.  (*See* Exhibit L. – Prospectus Supplement Excerpt, p. S-24)

(31)  Section 11 of the Mortgage Loan Purchase Agreement states that the transfers and assignments outlined above are to be governed by Articles 8 and 9 of the Uniform Commercial Code.[8]

---

[8] **Mortgage Loan Purchase Agreement**

SECTION 11. Recordation of Assignments of Mortgage.

(b) It is the express intent of the parties hereto that the conveyance of the Mortgage Loans by the Mortgage Loan Seller to the Purchaser, as contemplated by this Agreement be, and be treated as, a sale, except under United States generally accepted accounting principals (sic)...

(b)(i) this Agreement shall also be deemed to be a security agreement within the meaning of Articles 8 and 9 of the applicable Uniform Commercial Code;

## II.  Foreclosure Forensics

### *The "Breeder Document"*

(32)  In the lexicon of identity theft, a "breeder document" [9] is the alpha-document, genuine or fraudulent, that can serve as a basis to obtain other identification documents or benefits fraudulently.

(33)  For example, in identity theft cases the "birth certificate" is often referred to as the "breeder document" because once fabricated, an imposter can use it to acquire a driver's license, Social Security Number, bank account, passport, etc.; and obtain the rights and privileges of citizenship to which s/he is not legally entitled.

(34)  Translating this concept over to the realm of foreclosure fraud, the breeder document is the fraudulent assignment of mortgage, which purports to grant a title interest in the underlying real property to the fraudster, and serves as the basis for obtaining other documents necessary to extinguish the property owner's rights and transfer full legal and equitable title as well as possession to the fraudster.

(35)  In the instant case, the July 25, 2009, Assignment of Mortgage executed by Jeffrey Stephan is the breeder document from which all other documents necessary to complete the foreclosure, sale, and transfer of LaCasse's Property to Residential Funding Company, LLC – the  alleged "Assignee" – arose.

(36)  Based on the facts set forth herein I find that the above referenced Assignment of Mortgage contains false statements, misrepresentations, and omissions of material fact as follows:

    i.    It is a false statement to say that on <u>July 25, 2009</u> Mortgage Electronic Registration Systems, Inc. as nominee for Homecomings Financial Network, Inc. assigned LaCasse's Mortgage to Residential Funding Company, LLC fka Residential Funding Company ("Assignee" or "RFC") because the Deal Documents filed under oath with the SEC provide credible evidence that LaCasse's Note and Mortgage had been securitized into the Luminent Mortgage Trust 2006-3 on or before <u>April 28, 2006</u> when the securitization closed.

    ii.    It is a misrepresentation, at best, for MERS to claim that it was assigning *"all the right, title, interest, claim and demand whatsoever"* to Residential Funding Company on July 25, 2009 when my research indicates that RFC divested its interest more than three (3) years earlier when RFC sold the LaCasse Note and Mortgage to Maia Mortgage Finance Statutory Trust on or about April 28, 2006.

    iii.    It is a misrepresentation of a material fact to purport to transfer LaCasse's Mortgage from "Party A" (*Lender*) to "Party E" (*Issuing Entity*) in the securitization chain,

---

[9]  The Oxford Dictionary:  http://oxforddictionaries.com/definition/breeder+document?region=us.

thereby skipping over three (3) necessary parties who took title to the Property in a methodical, sequential and verifiable series of transactions.

iv.    It is an omission of a material fact to conceal the role of the intervening assignees, "Party B" (*Originator*), "Party C" (*Seller*), and "Party D" (*Depositor*) who bought and sold LaCasse's Mortgage in order to effectuate two (2) "true sales" that were necessary to achieve the privileges of bankruptcy remoteness and favored tax status as a Real Estate Mortgage Investment Conduit ("REMIC") pursuant to Title 26 of the Internal Revenue Code, 26 U.S.C. § 860G.

v.    It is a misrepresentation of a material fact for Jeffrey Stephan ("Stephan"), the MERS Certifying Officer who executed the Assignment of Mortgage, to state that he was executing the Assignment in his capacity as Vice President of Mortgage Electronic Registration Systems, Inc., as nominee for Homecomings Financial Network, Inc., its successors and assigns when Stephan is employed by the *Servicer*, GMAC Mortgage, LLC and not the *Lender*, Homecomings Financial Network, Inc. (*See* Exhibit M. - Deposition Excerpt of Jeffrey Stephan)

vi.    In summary, the conveyance suggested by the July 25, 2009 Assignment is a fake.

(37)    The instant Assignment of Mortgage does not represent a true sale to a *bona fide* purchaser for value. Rather is it a self-dealing "breeder document" prepared, executed and recorded by and at the direction of GMAC Mortgage, LLC, the *Servicer* of the LaCasse Mortgage Loan for the Luminent Mortgage Trust 2006-3.

(38)    This false document was purposely prepared to create the appearance in the public record that Residential Funding Company, LLC had the authority to foreclose LaCasse's Property while suppressing the fact – and thus avoiding the burden of proof – that behind the scenes, LaCasse's Note and Mortgage had been sold four (4) times and was securitized on or about April 28, 2006.

### *The Foreclosure was Grounded in a Fraudulent Assignment*

(39)    Through my research and forensic examination of the subject transaction I have established that the Luminent Mortgage Trust 2006-3 is the rightful owner of the LaCasse Note and Mortgage.

(40)    In order for the LaCasse Mortgage Loan to become an asset of the Luminent Mortgage Trust 2006-3, it had to be transferred and assigned to the *Issuing Entity* on or about April 28, 2006.

(41)    The "Pay History" shown on page 2 of the Bloomberg Research Results shows a 24-month history that tracks the LaCasse loan while he was in Bankruptcy ("B") and Foreclosure ("F"). (*See* Exhibit J. – Bloomberg Research Results, 02/16/2012)

(42)    The Monthly Remittance Report for the Luminent Mortgage Trust 2006-3 dated June 25, 2009 shows that Loan Number 0010419663, the LaCasse Mortgage Loan, first appeared in

the "Foreclosure Detail" section of the report the month following the May 18, 2009 filing of the Complaint in Strict Foreclosure.  (*See* Exhibit K. – Monthly Remittance Report, 06/25/2009)

(43)    The Monthly Remittance Report for the Luminent Mortgage Trust 2006-3 dated August 25, 2009 shows that Loan Number 0010419663, the LaCasse Mortgage Loan, was carried on the books of the *Issuing Entity* immediately prior to the September 2, 2009 Notice of Judgment of Strict Foreclosure.  (*See* Exhibit K. – Monthly Remittance Report, 08/25/2009)

(44)    The Monthly Remittance Report for the Luminent Mortgage Trust 2006-3 dated January 25, 2012 shows that Loan Number 0010419663, the LaCasse Mortgage Loan, is still being tracked as a receivable of the Luminent Mortgage Trust 2006-3.  (*See* Exhibit K. – Monthly Remittance Report, 01/25/2012)

(45)    Accordingly, the Assignment of Mortgage which purports to assign the LaCasse Mortgage from Mortgage Electronic Registration Systems, Inc. as nominee for Homecomings Financial Network, Inc. to Residential Funding Company, LLC fka Residential Funding Company executed by Jeffrey Stephan on July 25, 2009 is a hoax.

(46)    This Assignment does not represent a true sale to a *bona fide* purchaser for value. Rather is it a self-dealing "breeder document" prepared, executed and recorded by and at the direction of GMAC Mortgage, LLC, the *Servicer* of the LaCasse Mortgage Loan on behalf of the Luminent Mortgage Trust 2006-3.

(47)    This false document was intentionally prepared as a litigation tool to create the appearance in the public record, and on Court papers, that Residential Funding Company, LLC had the authority to foreclose LaCasse's Property while suppressing the fact – and thus avoiding the burden of proof – that behind the scenes, LaCasse's Note and Mortgage had been sold four (4) times and was securitized on or about April 28, 2006.

(48)    The foreclosure of the subject Property is fatally flawed based on the following facts:

☒    RFC was not the owner of the LaCasse Note on May 18, 2009 when it docketed the Complaint in Strict Foreclosure; nor is it the current owner of the subject Note.

☒    HSBC Bank USA, National Association as Trustee for the Certificateholders of the Luminent Mortgage Trust 2006-3 is the real party in interest entitled to receive payment on the subject Note, and therefore, enforce the Mortgage.

☒    The instant Assignment of Mortgage was executed more than two (2) months after the Complaint was filed.

☒    More importantly, the Assignment of Mortgage is a fraudulent for all of the reasons explained above. Therefore, it is a legal nullity. No rights in the LaCasse Mortgage were transferred thereby to RFC.

☒ The Plaintiff intentionally misrepresents its current status in the Complaint in Strict Foreclosure when it states in paragraph 4:

> …Said Mortgage was assigned to Residential Funding Company, LLC fka Residential Funding Company by virtue of an Assignment of Mortgage to be recorded on the Weston Land Records. The Plaintiff, Residential Funding Company, LLC fka Residential Funding Company, is the holder of said Note and Mortgage.

☒ As explained above, the Assignment was ineffective to transfer the LaCasse Mortgage to RFC; and even if it can demonstrate that it is currently "holding" LaCasse's original Note, *it is not the owner of the Note* entitled to receive payment on the Note.

## III.  Robo-Signer Analysis

(49)  Jeffrey Stephan has been branded a "robo-signer" due to admissions he made during two depositions on June 7, 2009[10] and December 10, 2009[11] in which he admitted that he did not take the time to review the documents he was signing or verify the facts contained therein.

(50)  In the instant case, Jeffrey Stephan, in his capacity as a Vice President of Mortgage Electronic Registration Systems, Inc., had access to each and every transfer of the beneficial ownership rights involving LaCasse's Note and Mortgage through the MERS® System.

(51)  In addition, as an employee of the *Servicer*, GMAC Mortgage, LLC, he had access to the "investor" records. Therefore, Stephan knew or should have known that the Assignment of Mortgage he was asked to sign contained false statements, misrepresentations, and omissions of material facts that were intentionally misleading.

(52)  Moreover, Stephan knew that the Assignment of Mortgage and Affidavit of Debt he signed were necessary in order for RFC to institute the foreclosure action and seize LaCasse's Property.

(53)  Stephan fits my definition of a "robo-signer" because my forensic examination revealed that he knowingly and willfully executed legal documents that contain false and misleading statements that affect title to LaCasse's Property and he did not bother to verify the facts; or he remained willfully blind to the truth of the matter.

---

[10]This deposition is related to a foreclosure case in Maine, *Federal National Mortgage Association  v. Nicole M. Bradbury, et al.*, Maine District Court, District Nine, Division of Northern Cumberland, Docket No. BRI-RE-09-65. (*See* http://www.scribd.com/doc/33129394/2nd-Deposition-of-Jeffrey-Stephan-%E2%80%93-GMAC-s-Assignment-Affidavit-Slave)

[11]  This deposition is related to a foreclosure case in Florida, *GMAC Mortgage v. Ann Neu*, in the Circuit Court of  the Fifteenth Judicial Circuit in and for Palm Beach County, FL, Case Number 50 2008 CA 040805XXXX MB. (*See* http://www.scribd.com/doc/28762965/Full-Deposition-of-Jeffrey-Stephan-GMAC-s-Assignment-Affidavit-Slave-10-000-Documents-a-Month

## CONCLUSIONS

In conclusion, based on (1) my having confirmed that the loan in question is being tracked as an asset of the Luminent Mortgage Trust 2006-3; (2) an examination of the Assignment of Mortgage recorded on August 10, 2009 in the Office of the Town Clerk of the Town of Weston; and (3) my experience and specialized knowledge with respect to the securitization process, it is my opinion that:

☑ The Mortgage Loan in question – or an economic interest therein – was securitized into the Luminent Mortgage Trust 2006-3 on or about April 28, 2006.

☑ HSBC Bank USA, National Association as Trustee for the Certificateholders of the Luminent Mortgage Trust 2006-3 is the real party in interest entitled to receive payment on the subject Note, and therefore, to enforce the Mortgage.

☑ The Assignment of Mortgage executed by Jeffrey Stephan on July 25, 2009 is a hoax. This Assignment does not represent a true sale of the LaCasse Note and Mortgage; rather is it a self-dealing false document prepared, executed and recorded by and on behalf of GMAC Mortgage, LLC to create the appearance that RFC had the legal standing to institute the foreclosure action on the LaCasse Property while suppressing the fact – and thus avoiding the burden of proof – that the Note and Mortgage had been sold a total of four (4) times and securitized three (3) years earlier.

☑ The Assignment of Mortgage was ineffective to transfer the LaCasse Mortgage to RFC; and even if RFC can demonstrate that it is currently "holding" LaCasse's original Note, *it is not the owner of the Note* entitled to receive payment on the Note.

☑ The Complaint and subsequent papers filed by RFC with this Honorable Court that claim RFC is the current holder of the LaCasse Note and Mortgage misstate the facts and are intrinsically and extrinsically unfair and deceptive.

☑ The Judgment of Strict Foreclosure granted on September 2, 2009 was obtained under false pretenses by a party, Residential Funding Company, LLC fka Residential Funding Company, which had no standing to institute the foreclosure action.

Respectfully submitted,

*Marie Mc Donnell*

_____

Marie McDonnell, President,
McDonnell Property Analytics, Inc.
*Mortgage Fraud and Forensic Analyst*
*Certified Fraud Examiner, ACFE*

# Table of Exhibits

A.    Mortgage, 01/30/2006

B.    InterestFirst$^{SM}$ Adjustable Rate Note, 01/30/2006

C.    Allonge to Promissory Note

D.    Adjustable Rate Rider, 01/30/2006

E.    Complaint, 05/07/2009

F.    Assignment of Mortgage, 07/25/200

G.    Notice of Entry of Judgment of Strict Foreclosure, 09/08/2009

H.    Defendant's Motion to Open and Vacate Judgment to Conduct Necessary Discovery, 01/14/2012

I.    MERS Research Results, 02/15/2012

J.    Bloomberg Research Results, 02/16/2012

K.    Monthly Remittance Reports

L.    Prospectus Supplement Excerpt

# EXHIBIT "A"

VOL 432 PG 0496

19/ 133

Return To:
HOMECOMINGS FINANCIAL NETWORK, INC.
One Meridian Crossing, Ste. 100
Minneapolis MN 55423
**Loan Number:** 042-591074-2

Prepared By:     HomeComings Financial Network
800 Corporate Drive, Suite 424
Fort Lauderdale, FL  33334

002018

——————————[Space Above This Line For Recording Data]———————————

## OPEN-END MORTGAGE DEED

MIN 100062604259107425

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated    JANUARY 30TH,  2006                 ,
together with all Riders to this document.
**(B) "Borrower"** is
THOMAS LACASSE, AN UNMARRIED MAN

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee
**under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

CONNECTICUT-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS       Form 3007  1/01
MFCT7770 (06/2004)  /  042-591074-2
-6A(CT) (0005)
Page 1 of 14                         Initials
VMP MORTGAGE FORMS - (800)521-7291

VOL 432 PG 0497

(D) "Lender" is  HOMECOMINGS FINANCIAL NETWORK, INC.

Lender is a  CORPORATION
organized and existing under the laws of  DELAWARE
Lender's address is  800 CORPORATE DRIVE, SUITE 424
FT LAUDERDALE, FL 33334
(E) "Note" means the promissory note signed by Borrower and dated JANUARY 30TH, 2006
The Note states that Borrower owes Lender  SIX HUNDRED FIFTY THOUSAND AND NO/100

Dollars
(U.S. $  650,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than FEBRUARY 1ST, 2036
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider   [ ] Condominium Rider           [ ] Second Home Rider
[ ] Balloon Rider           [ ] Planned Unit Development Rider   [ ] 1-4 Family Rider
[ ] VA Rider                [ ] Biweekly Payment Rider       [ ] Other(s) [specify]


(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.
(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or
not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

MI-CT7270 (06-2004) - 042-591074-2
[Logo] 6A(CT) (0005)               Page 2 of 14          Initials [signature]        Form 3007  1/01

VOL432PG0498

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and
modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this
Security Instrument and the Note. For this purpose, Borrower in consideration of this debt does hereby
grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and
to the successors and assigns of MERS, the following described property located
in the CITY/TOWN LAND RECORDS                    of FAIRFIELD COUNTY
            [Type of Recording Jurisdiction]              [Name of Recording Jurisdiction]
Legal description attached hereto and made a part hereof

Parcel ID Number: 17/3/17                          which currently has the address of
153 VALLEY FORGE ROAD                                                        [Street]
WESTON                              [City] , Connecticut     06883    [Zip Code]
("Property Address"):

      TO HAVE AND TO HOLD this property unto MERS (solely as nominee for Lender and Lender's
successors and assigns) and to the successors and assigns of MERS, forever, together with all the
improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures
now or hereafter a part of the property. All replacements and additions shall also be covered by this
Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."
Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in
this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender
and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but
not limited to, the right to foreclose and sell the Property; and to take any action required of Lender
including, but not limited to, releasing and canceling this Security Instrument.

      BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has
the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for
encumbrances of record. Borrower warrants and will defend generally the title to the Property against all
claims and demands, subject to any encumbrances of record.

      THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform
covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real
property.

      UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
      1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any
prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items
pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

MFCT7770 (06/2004) / 042-591074-2
[Logo] -6A(CT) (0005)                    Page 3 of 14      Initials  7L          Form 3007  1/01

VOL 432 PG 0499

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

MFCT7770 (06/2004)    (042-591074-2
-6A(CT) (0005)                    Page 4 of 14        Initials ___        Form 3007    1/01

VOL432PG0500

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15, and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

MFCT7770 (06/2004) / 042-591074-2
GA(CT) (0005)                     Page 5 of 14                         Form 3007  1/01

VOL 432 PG 0501

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

MFCT7770 (06 2004)    (042-591074-2
-6A(CT) (0005)                    Page 6 of 14          Initials    Form 3007    1/01

VOL432 PG0502

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

VOL 432 PG 0503

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

MI-CT7770 (06-2004) · 042-591074-2
_6A(CT) (0005)                    Page 8 of 14              Initials: _TL_              Form 3007  1/01

VOL 432 PG 0504

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

MFCT7770 (06/2004) / 042-591074-2
-6A(CT) (00050)                  Page 9 of 14                               Form 3007   1/01

VOL 432 PG 0505

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

MFCT7770 (09/2004) · 042-591074-2
-6A(CT) (0006)                    Page 10 of 14              Initials: _____              Form 3007  1/01

VOL 432 PG 0506

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

MFCT7770 (06/2004) / 042-591074-2
(logo) -6A(CT) (0006)                Page 11 of 14        Initials _____    Form 3007  1/01

VOL 432 PG 0507

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

MFCT7770 (06/2004) · (042-591074-2
-6A(CT) (0006)                    Page 12 of 14                    Initials                    Form 3007   1/01

VOL 432 PG 0508

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration: Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default: (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and foreclosure or sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in court the non-existence of a default or any other defense of Borrower to acceleration and foreclosure or sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke any of the remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment and discharge of all sums secured by this Security Instrument, this Security Instrument shall become null and void and Lender shall release this Security Instrument Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower waives all rights of homestead exemption in, and statutory redemption of, the Property and all right of appraisement of the Property and relinquishes all rights of curtesy and dower in the Property.

**25. Future Advances.** Lender is specifically permitted, at its option and in its discretion, to make additional loans and future advances under this Security Instrument as contemplated by Section 49-2(c) of the Connecticut General Statutes, and shall have all rights, powers and protections allowed thereunder.

VOL 432 PG 0509

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

WITNESS — Joseph LaCasse

Amanda Weiner

_____ (Seal)
THOMAS LACASSE                    -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)          _____ (Seal)
                      -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                      -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                      -Borrower                                -Borrower


STATE OF CONNECTICUT,    Fairfield                    County ss: Westport
    The foregoing instrument was acknowledged before me this 30th q January, 2006
by
THOMAS LACASSE, AN UNMARRIED MAN


My Commission Expires:

Notary Public

State of Connecticut

MFCT7770 (06 2004) / 042-591074-2
(logo) -6A(CT) (0005)                Page 14 of 14                        Form 3007   1/01

VOL 432 PG 0510

## SCHEDULE A
## DESCRIPTION

      ALL THAT CERTAIN piece, parcel or tract of land, with the buildings
and improvements located thereon, situated in the Town of Weston, County of Fairfield and
State of Connecticut, shown and designated as "Area = 2.002 Ac. +" on that certain map entitled
"Map of Property Prepared For Charles E. Squires Weston, Conn. Scale: 1"=40' Feb. 15, 1993",
which map is on file in the office of the Town Clerk of said Weston as Map No. 3262.



# EXHIBIT "B"

# InterestFirst<sup>SM</sup> ADJUSTABLE RATE NOTE

(One-Year LIBOR Index-(As Published In *The Wall Street Journal*)-Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

JANUARY 30TH, 2006                    EAST GREENWICH                    RHODE ISLAND
[Date]                                [City]                            [State]

153 VALLEY FORGE ROAD, WESTON, CT 06883
[Property Address]

**1.    BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $    650,000.00    (this amount is called "Principal"), plus interest, to the order of Lender. Lender is  HOMECOMINGS FINANCIAL NETWORK, INC.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.    INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    6.5000    %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.    PAYMENTS**

(A) Time and Place of Payments

I will make a payment on the first day of every month, beginning on  MARCH 1ST, 2006    . Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.

I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on  FEBRUARY 1ST, 2036    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  800 CORPORATE DRIVE, SUITE 424, FT LAUDERDALE, FL 33334
or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

My monthly payment will be in the amount of U.S. $    3,520.83    before the First Principal and Interest Payment Due Date, and thereafter will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of change in monthly payment.

MULTISTATE InterestFirst ADJUSTABLE RATE NOTE -ONE-YEAR LIBOR INDEX
7754073 (0307)            MFCD6237 (04/2005) / 042-181075-2
                          VMP Mortgage Solutions, Inc. (800)521-7291
Page 1 of 5                                Initials:

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

**4.    ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of  FEBRUARY, 2009           , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding  TWO AND ONE FOURTH         percentage points (    2.2500        %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than       8.5000       % or less than  4.5000        %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than      12.5000       %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on the Note (the "First Principal and Interest Payment Due Date") shall be on that date which is the       10th        anniversary date of the first payment due date, as reflected in Section 3(A) of the Note.

**5.    BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period

7764073 (2007)
MFC04KJJT (02/2008) / 042.461024-2

Page 2 of 5

Initials / IL

when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.    LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.    BORROWER'S FAILURE TO PAY AS REQUIRED**

(A) Late Charges for Overdue Payments
If the Note Holder has not received the full amount of any monthly payment by the end of    15    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.0000    % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

(B) Default
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

7764073 (0307)
MFC06237 (042003) / 042-591074-2

Page 4 of 5

Initial: _TL_

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____(Seal)        _____(Seal)
THOMAS LACASSE                -Borrower                                        -Borrower


_____(Seal)        _____(Seal)
                              -Borrower                                        -Borrower


                                              WITHOUT RECOURSE
                                              PAY TO THE ORDER OF
_____(Seal)         RESIDENTIAL FUNDING CORPORATION        (Seal)
                              -Borrower                                        -Borrower
                                              _____
                                              RAYNETTE BUERKE
                                              ASSISTANT SECRETARY
                                              HOMECOMINGS FINANCIAL NETWORK, INC.
                                              A DELAWARE CORPORATION

_____(Seal)        _____(Seal)
                              -Borrower                                        -Borrower


                                              [Sign Original Only]

# EXHIBIT "C"

### ALLONGE TO PROMISSORY NOTE

FOR PURPOSES OF FURTHER ENDORSEMENT OF THE FOLLOWING DESCRIBED NOTE, THIS ALLONGE IS AFFIXED AND BECOMES A PERMANENT PART OF SAID NOTE

POOL:    3850        LOAN ID:    10419663

NOTE DATE:    1/30/2006        LOAN AMOUNT:    $650,000.00

BORROWER NAME:  THOMAS  LACASSE

PROPERTY ADDRESS:    153 VALLEY FORGE ROAD, WESTON, CT  06883

PAY TO THE ORDER OF

WITHOUT RECOURSE

Residential Funding Corporation

By:

Name: John Hagebock

Title: Assistant Vice President

Residential Funding Corporation

# EXHIBIT "D"

VOL432PG0511

# ADJUSTABLE RATE RIDER
### (LIBOR One-Year Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 30TH    day of    JANUARY, 2006    , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to HOMECOMINGS FINANCIAL NETWORK, INC.

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:
153 VALLEY FORGE ROAD
WESTON, CT 06883

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of    6.5000    %. The Note provides for changes in the interest rate and the monthly payments as follows:

4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The interest rate I will pay may change on the first day of    FEBRUARY, 2009    , and on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."

MULTISTATE ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family - Fannie Mae
UNIFORM INSTRUMENT
-166R (0401)  Form 3189 6/01    MFCD6151 - (08/2004) - 042-591074-2
Page 1 of 4    Initials: _____
VMP Mortgage Solutions, Inc.
(800)521-7291

VOL 432 PG 0512

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND ONE FOURTH                                        percentage points ( 2.2500          %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 8.5000          % or less than 4.5000          %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than    12.5000          %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

-166R (0401)                              Page 2 of 4                    Form 3189 6/01
MFCD0434 - (08/2004) / 042-541074-2

Initials:

VOL 432 PG 0513

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

VMP-166R (0401)                Page 3 of 4        Initials: _____        Form 3189 6/01

VOL 432 PG 0514

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
THOMAS LACASSE              -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
                           -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
                           -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
                           -Borrower                                    -Borrower

VMP-166R (0401)                    Page 4 of 4                    Form 3189 6/01
MFCD6131 - (08/2004) / 042-591074-1

RECEIVED FOR RECORD  FEB  8  AD 06
AT 10:46 A M. ATEST _____

# EXHIBIT "E"

| | |
|---|---|
| **RETURN DATE: JUNE 02, 2009** | : **SUPERIOR COURT** |
| **RESIDENTIAL FUNDING COMPANY, LLC FKA RESIDENTIAL FUNDING CORPORATION** | : **JUDICIAL DISTRICT OF STAMFORD/NORWALK** |
| **VS:** | : **AT STAMFORD** |
| | : |
| **THOMAS LACASSE** | : **MAY 07, 2009** |

### COMPLAINT

1.     The Plaintiff, Residential Funding Company, LLC fka Residential Funding Corporation has an office and place of business with an address of 4 Walnut Grove Drive, Horsham, PA 19044.

2.     At all times complained of herein, the Defendant(s), Thomas LaCasse, owned real property situated in the Town of Weston, County of Fairfield and State of Connecticut known as 153 Valley Forge Road,  (hereinafter the "Property") being more particularly described in Schedule A attached hereto and made a part hereof.

3.     On or about January 30, 2006, the Defendant(s), Thomas LaCasse, executed and delivered to Homecomings Financial Network, Inc., a Note (the "Note") for a loan in the original principal amount of $650,000.00.

4.     On said date to secure said Note the Defendant(s), Thomas LaCasse, did execute and deliver to Mortgage Electronic Registration Systems, Inc. as Nominee for Homecomings Financial Network, Inc., a Mortgage on the Property.  Said Mortgage was dated January 30, 2006 and recorded February 08, 2006 in Volume 432 at Page 496 of the Weston Land Records.  Said Mortgage was assigned to Residential Funding Company, LLC fka Residential Funding Corporation by virtue of an Assignment of Mortgage to be recorded on the Weston Land Records.  The Plaintiff, Residential Funding Company, LLC fka Residential Funding Corporation, is the holder of said Note and Mortgage.

5.     Said Note is in default and the Plaintiff, Residential Funding Company, LLC fka Residential Funding Corporation as the holder of said Mortgage and Note has elected to accelerate the balance due on said Note, to declare said Note to be due in full and to foreclose the Mortgage securing said Note.

6.     The Plaintiff has provided written notice in accordance with the Note and Mortgage to the Defendant(s) of the default under the Note and Mortgage, but said Defendant(s) has failed and neglected to cure the default.  The Plaintiff has elected to accelerate the balance due on said Note, to declare said Note to be due in full and to foreclose the Mortgage securing said Note.

7.     The following liens or encumbrances claim to have an interest in the Property which liens or encumbrances are prior in right to the Mortgage herein:

a.     The Town/City of Weston may claim an interest in the Property by virtue of inchoate liens for real estate taxes on the Grand Lists of October 1, 2002 and thereafter.

b.     George C. Guidera and Mark E. Harper claims an interest in the Property by virtue of a Mortgage in the amount of $103,000.00 dated December 15, 1993 and recorded on December 15, 1993 in Volume 216 at Page 145 of the Weston Land Records.

8.     There are no liens or encumbrances claiming to have an interest in the Property which liens or encumbrances are subsequent in right to the Mortgage herein.

9.     The Defendant(s) Thomas LaCasse, is the owner of the equity of redemption of the Property and, on information and belief, is in possession of the Property.

10.     The Plaintiff, Residential Funding Company, LLC fka Residential Funding Corporation, has further caused a Lis Pendens to be recorded on the Land Records of the Town of Weston.  A copy of said Lis Pendens is attached hereto as Exhibit A.

11.     The Plaintiff, Residential Funding Company, LLC fka Residential Funding Corporation, has further caused a notice to be given to the Defendant(s), Thomas LaCasse, of his rights pursuant to the Statutes pertaining to unemployment and underemployment by annexing to this Writ, Summons and Complaint a copy of the notice provided for in said Statute.

WHEREFORE, the plaintiff claims:

1. Foreclosure of the Mortgage;
2. Possession of the Property;
3. Money damages against the makers of, or obligors on, the Note described herein and/or their Estates, if deceased, (unless same has been precluded by virtue of a Bankruptcy filing);
4. A reasonable attorney's fee (unless same has been precluded by virtue of a Bankruptcy filing);
5. Interest (unless same has been precluded by virtue of a Bankruptcy filing);
6. Costs of suit (unless same has been precluded by virtue of a Bankruptcy filing);
7. Deficiency Judgment against the makers of, or obligors on, the Note described herein, and/or their Estate, if deceased (unless same has been precluded by virtue of a Bankruptcy filing); and
8. Such other and further relief as the Court may deem just and equitable.

Notice is hereby given to the Defendant(s) that the Plaintiff intends to seek satisfaction of any judgment rendered in its favor in this action out of any debt accruing to said Defendant(s) by reason of their personal services, (unless same has been precluded by virtue of a Bankruptcy filing).

Dated at Hartford, Connecticut on May 07, 2009

Plaintiff

By _____
JEFFREY M. KNICKERBOCKER
Hunt Leibert Jacobson, P.C.
Its Attorneys

01625-80701

HUNT LEIBERT JACOBSON, P.C. ● ATTORNEYS AT LAW
50 WESTON STREET ● HARTFORD, CONNECTICUT 06120 ● (860) 808-0606 ● JURIS NO. 101589

| | | |
|---|---|---|
| **RETURN DATE: JUNE 02, 2009** | : | **SUPERIOR COURT** |
| **RESIDENTIAL FUNDING COMPANY, LLC FKA RESIDENTIAL FUNDING CORPORATION** | : | **JUDICIAL DISTRICT OF STAMFORD/NORWALK** |
| **VS:** | : | **AT STAMFORD** |
| | : | |
| **THOMAS LACASSE** | : | **MAY 07, 2009** |

### STATEMENT OF AMOUNT IN DEMAND

The amount, legal interest, or property in demand is not less than $15,000.00, exclusive of interest and costs.

Plaintiff

By

JEFFREY M. KNICKERBOCKER
Hunt Leibert Jacobson, P.C.
Its Attorneys

HUNT LEIBERT JACOBSON, P.C. ● ATTORNEYS AT LAW
50 WESTON STREET ● HARTFORD, CONNECTICUT 06120 ● (860) 808-0606 ● JURIS NO. 101589

RETURN DATE: JUNE 02, 2009     :   **SUPERIOR COURT**

**RESIDENTIAL FUNDING COMPANY, LLC**   :   **JUDICIAL DISTRICT OF**
**FKA RESIDENTIAL FUNDING**             **STAMFORD/NORWALK**
**CORPORATION**

**VS:**                           :   **AT STAMFORD**
                                  :
**THOMAS LACASSE**            :   **MAY 07, 2009**

NOTICE TO HOMEOWNER

        If you are a homeowner, under the terms of Conn. Gen. Stat. Section 49-31d, et seq., you are hereby given notice that under those statutes, if you are UNEMPLOYED or UNDER-EMPLOYED you may make application to the Court to which this matter is returnable for relief from foreclosure.  You may qualify for relief under those statutes if:

**NOTICE: A PERSON WHO IS UNDEREMPLOYED OR UNEMPLOYED AND WHO HAS FOR A CONTINUOUS PERIOD OF AT LEAST TWO YEARS PRIOR TO THE COMMENCEMENT OF THIS FORECLOSURE ACTION OWNED AND OCCUPIED THE PROPERTY BEING FORECLOSED AS SUCH PERSON'S PRINCIPAL RESIDENCE, MAY BE ENTITLED TO CERTAIN RELIEF PROVISIONS UNDER SECTIONS 49-31D TO 49-31I, INCLUSIVE, OF THE CONNECTICUT GENERAL STATUTES. YOU SHOULD CONSULT AN ATTORNEY TO DETERMINE YOUR RIGHTS UNDER SECTIONS 49-31D TO 49-31I, INCLUSIVE, OF THE CONNECTICUT GENERAL STATUTES.**

        In order to qualify for relief under those statutes, you must make application for protection from foreclosure within <u>25 DAYS</u> of the return date.

01625-80701

HUNT LEIBERT JACOBSON, P.C. ● ATTORNEYS AT LAW
50 WESTON STREET ● HARTFORD, CONNECTICUT 06120 ● (860) 808-0606 ● JURIS NO. 101589

## SCHEDULE A
## DESCRIPTION

      ALL THAT CERTAIN piece, parcel or tract of land, with the buildings and improvements located thereon, situated in the Town of Weston, County of Fairfield and State of Connecticut, shown and designated as "Area = 2.002 Ac. +" on that certain map entitled "Map of Property Prepared For Charles E. Squires Weston, Conn. Scale: 1"=40' Feb. 15, 1993", which map is on file in the office of the Town Clerk of said Weston as Map No. 3262.

01625-80701

HUNT LEIBERT JACOBSON, P.C. ● ATTORNEYS AT LAW
50 WESTON STREET ● HARTFORD, CONNECTICUT 06120 ● (860) 808-0606 ● JURIS NO. 101589



**RETURN DATE: JUNE 02, 2009**          :   **SUPERIOR COURT**

**RESIDENTIAL FUNDING COMPANY, LLC**    :   **JUDICIAL DISTRICT OF**
**FKA RESIDENTIAL FUNDING**                 **STAMFORD/NORWALK**
**CORPORATION**

**VS:**                                 :   **AT STAMFORD**
                                        :
**THOMAS LACASSE**                      :   **MAY 07, 2009**

## <u>LIS PENDENS</u>

Notice is hereby given of the pendency of a civil action between the above-named Plaintiff and against Thomas LaCasse, by Writ dated May 07, 2009, and made returnable to the Superior Court for the Judicial District of Stamford/Norwalk at Stamford on June 02, 2009, which action is brought, inter alia, to foreclose a certain mortgage from the Defendant(s), Thomas LaCasse, to Mortgage Electronic Registration Systems, Inc. as Nominee for Homecomings Financial Network, Inc., which mortgage was dated January 30, 2006 and recorded February 08, 2006 in Volume 432 at Page 496 of the Weston Land Records.    Said Mortgage was assigned to Residential Funding Company, LLC fka Residential Funding Corporation by virtue of an Assignment of Mortgage to be recorded on the Weston Land Records.

In said action, the following items are claimed:

1.    Foreclosure of the Mortgage;

2.    Possession of the Property;

3.    Money damages against the makers of, or obligors on, the Note described herein and/or their Estates, if deceased, (unless same has been precluded by virtue of a Bankruptcy filing);

4.    A reasonable attorney's fee (unless same has been precluded by virtue of a Bankruptcy filing);

HUNT LEIBERT JACOBSON, P.C. ● ATTORNEYS AT LAW
50 WESTON STREET   ●   HARTFORD, CONNECTICUT 06120   ●   (860) 808-0606   ●   JURIS NO. 101589

5.    Interest (unless same has been precluded by virtue of a Bankruptcy filing);

6.    Costs of suit (unless same has been precluded by virtue of a Bankruptcy filing);

7.    Deficiency Judgment against the makers of, or obligors on, the Note described herein, and/or their Estate, if deceased (unless same has been precluded by virtue of a Bankruptcy filing); and

8.    Such other and further relief as the Court may deem just and equitable.

The property the plaintiff seeks an interest in and to is located in the Town of Weston, County of Fairfield and State of Connecticut, and is known as 153 Valley Forge Road, Weston, Connecticut, and is more particularly bounded and described as set forth in Schedule A attached hereto.

Dated at Hartford, Connecticut on May 07, 2009

Plaintiff

By_____//    **JEFFREY M. KNICKERBOCKER**

JEFFREY M. KNICKERBOCKER
Hunt Leibert Jacobson, P.C.
Its Attorneys

01625-80701

HUNT LEIBERT JACOBSON, P.C. ● ATTORNEYS AT LAW
50 WESTON STREET  ●  HARTFORD, CONNECTICUT 06120  ●  (860) 808-0606  ●  JURIS NO. 101589

## SCHEDULE A
## DESCRIPTION

ALL THAT CERTAIN piece, parcel or tract of land, with the buildings and improvements located thereon, situated in the Town of Weston, County of Fairfield and State of Connecticut, shown and designated as "Area = 2.002 Ac. +" on that certain map entitled "Map of Property Prepared For Charles E. Squires Weston, Conn. Scale: 1"=40' Feb. 15, 1993", which map is on file in the office of the Town Clerk of said Weston as Map No. 3262.

01625-80701

HUNT LEIBERT JACOBSON, P.C. ● ATTORNEYS AT LAW
50 WESTON STREET   ●   HARTFORD, CONNECTICUT 06120   ●   (860) 808-0606   ●   JURIS NO. 101589

State of Connecticut                     SS: Hartford                          5/11/2009

County of Hartford


Then and by virtue hereof, and by direction of the Plaintiff's Attorney, I left a true and attested verified
copy of the within original JD-CV-103 NOTICE, FORECLOSURE MEDIATION NOTICE TO
HOMEOWNER, FORECLOSURE MEDIATION REQUEST, WRIT, SUMMONS, COMPLAINT,
STATEMENT OF AMOUNT IN DEMAND, NOTICE, SCHEDULE A and EXHIBIT at the office of
Susan Bysiewicz, Secretary of State, Statutory Agent for Service and duly authorized to accept service
on behalf of the within named Defendant, and paid statutory fees in the amount of $25.00

                              Thomas  LaCasse

And afterwards, on the 11th of May, 2009, a true and attested verified copy of the within original JD-
CV-103 NOTICE, FORECLOSURE MEDIATION NOTICE TO HOMEOWNER, FORECLOSURE
MEDIATION REQUEST, WRIT, SUMMONS, COMPLAINT, STATEMENT OF AMOUNT IN
DEMAND, NOTICE, SCHEDULE A and EXHIBIT with an endorsement thereon of service upon the
Connecticut Secretary of State, was deposited in the U.S. Mail, Wethersfield, Certified Mail and Return
Receipt Requested, addressed to the within named Defendant

                              Thomas  LaCasse

                              133 Colony Road

                              Longmeadow, MA  01106

And afterwards, on the 11th of May, 2009, a true and attested verified copy of the within original JD-
CV-103 NOTICE, FORECLOSURE MEDIATION NOTICE TO HOMEOWNER, FORECLOSURE
MEDIATION REQUEST, WRIT, SUMMONS, COMPLAINT, STATEMENT OF AMOUNT IN
DEMAND, NOTICE, SCHEDULE A and EXHIBIT with an endorsement thereon of service upon the
Connecticut Secretary of State, was deposited in the U.S. Mail, Wethersfield, Regular Mail, addressed
to the within named Defendant

                              Thomas  LaCasse

                              133 Colony Road

                              Longmeadow, MA  01106

The within is the original JD-CV-103 NOTICE, FORECLOSURE MEDIATION NOTICE TO
HOMEOWNER, FORECLOSURE MEDIATION REQUEST, WRIT, SUMMONS, COMPLAINT,
STATEMENT OF AMOUNT IN DEMAND, NOTICE, SCHEDULE A and EXHIBIT with my doings
hereon endorsed.

**Fees:**

| | |
|---|---|
| Service | $60.00 |
| Copies/Pages | $42.00 |
| Secretary of State | $25.00 |
| Postage/Overnight Mail | $9.00 |
| 10 Miles | $5.50 |
| Endorsements | $4.00 |
| **Total Fees** | $145.50 |

Attest

John T. Fiorillo
Connecticut State Marshal
Hartford County

# EXHIBIT "F"

VOL 489 PG 786

After recording please return to:
HUNT LEIBERT JACOBSON PC
50 Weston Street
Hartford CT 06120

1153E

## ASSIGNMENT OF MORTGAGE

POOL NUMBER_____                                    000384

KNOW YE THAT **Mortgage Electronic Registration Systems, Inc. as Nominee for Homecomings Financial Network, Inc,** ( Assignor"), having an office and place of business at 3300 SW 34th Avenue Suite 101, Ocala, FL 34474 for the consideration of One Dollar and other valuable considerations, does hereby assign to **Residential Funding Company, LLC fka Residential Funding Corporation** ("Assignee"), having an address of c/o GMAC Mortgage, LLC, 4 Walnut Grove Drive, Horsham, PA 19044, its successors and assigns forever, all the right, title, interest, claim, and demand whatsoever as the said Assignor has or ought to have in or to a certain mortgage from Thomas LaCasse to Mortgage Electronic Registration Systems, Inc. as Nominee for Homecomings Financial Network, Inc. dated January 30, 2006 and recorded on February 08, 2006 in Volume 432 at Page 496 of the Weston Land Records , in or to the property described in said mortgage deed situated in the Town of Weston, County of Fairfield and State of Connecticut, without warranty or representation by, or recourse to, said Assignor.

TO HAVE AND TO HOLD the premises, with all the appurtenances, unto the said Assignee, its successors and assigns forever, so that neither the Assignor nor its successors, nor any other person under it or them shall hereafter have any claim, right or title in or to the premises, or any part thereof; but therefrom it is and they are by these presents forever barred and secluded.

IN WITNESS WHEREOF, on the  25  day of ____July_____, 2009, said corporation has caused this deed to be executed and delivered, and its corporate seal to be hereto affixed in its behalf by _____Jeffrey Stephan_____, who is duly authorized and empowered.

Signed, sealed and delivered                    MORTGAGE ELECTRONIC REGISTRATION
In the presence of:_                             SYSTEMS, INC. AS NOMINEE FOR HOMECOMINGS
                                                FINANCIAL NETWORK, INC.

                                                By _____
                                                Its Vice President

                                                **Jeffrey Stephan**
                                                **Vice President**

STATE OF _____PA___ :
                    :  ss.
COUNTY OF _____Montgomery___ :

On this  25  day of ____July_____, 2009, before me personally came _____Jeffrey Stephan____ to me known, who being by me duly sworn, did depose and say that he/she is a Vice President of MERS, INC, which executed the above instrument: that he/she knows the seal of said corporation: that the seal affixed to said instrument is such corporate seal, that it was so affixed by order of the Board of Directors of said corporation, and that he/she signed his/her name thereto by means of electronic process by like order acknowledged.

_____
Notary Public
My Commission Expires:

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Nikole Shelton, Notary Public
Upper Dublin Twp., Montgomery County
My Commission Expires Aug. 11, 2010
Member, Pennsylvania Association of Notaries

**PROPERTY:**
153 Valley Forge Road
Weston, CT 06883
Lacasse, Thomas
File 01625-80701

RECEIVED FOR RECORD
At _____
AUG 10 2009   11:32 AM
Attest _____

*01625-80701$8*

# EXHIBIT "G"

| | |
|---|---|
| **DOCKET NO. FST-CV-09-5011591-S** | **: SUPERIOR COURT** |
| **RESIDENTIAL FUNDING COMPANY, LLC FKA RESIDENTIAL FUNDING CORPORATION** | **: JUDICIAL DISTRICT OF     STAMFORD/NORWALK** |
| **V.** | **: AT STAMFORD** |
| **THOMAS LACASSE, ET AL.** | **: SEPTEMBER 08, 2009** |

<u>**NOTICE OF ENTRY OF JUDGMENT OF STRICT FORECLOSURE**</u>

Pursuant to Connecticut Practice Book Section 17-22, the Plaintiff hereby notifies all non-appearing Defendants that a Judgment of Strict Foreclosure was entered by the Stamford/Norwalk Superior Court on August 31, 2009 in the above-captioned matter, as more fully set forth as follows.

The Court found the value of the property located 153 Valley Forge Road, Weston, CT 06883 to be $590,000.00 and the debt due to Residential Funding Company, LLC fka Residential Funding Corporation to be $696,497.60. Additionally, the Court awarded attorney's fees of $1,500.00, a title search fee of $225.00 and an appraisal fee of $335.00.

The Court set the first law day as October 20, 2000 and approved the following order of law days:

| October 20, 2000: | Thomas LaCasse |
|---|---|

THIS LAW FIRM IS A DEBT COLLECTOR.  ANY
INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

If there is no prior redemption on the property, title shall vest in Residential Funding Company, LLC fka Residential Funding Corporation on October 21, 2009.

Plaintiff

By /s/ Juris No. 421368
    Bruce Fair
    Hunt Leibert Jacobson, P.C.
    Its Attorneys
    50 Weston Street
    Hartford, Ct. 06120
    (860) 808-0606
    Juris No. 101589



## **CERTIFICATION**

This is to certify that a copy of the foregoing was mailed by first class mail, postage pre-paid to all non-appearing Defendants on September 08, 2009.


Thomas LaCasse
133 Colony Road
Longmeadow, MA 01106




 /s/ Juris No. 421368
Bruce Fair

# EXHIBIT "H"

| | | |
|---|---|---|
| **DOCKET NO.  CV - 09- 5011591 S** | : | **SUPERIOR COURT** |
| **RESIDENTIAL FUNDING COMPANY LLC** | | |
| | : | **JUDICIAL DISTRICT OF STAMFORD / NORWALK** |
| **VS:** | | |
| | : | **AT STAMFORD** |
| **THOMAS J. LA CASSE** | : | **JANUARY 14, 2012** |

## DEFENDANT'S MOTION TO OPEN AND VACATE JUDGMENT
## TO CONDUCT NECESSARY DISCOVERY

The Defendant, Thomas J. La Casse, in the above-entitled action, respectfully

requests this court open and vacate the judgment in this matter so that defendant may

conduct crucial and necessary post-judgment discovery in corroboration of his claims

and have his U.S. Constitutional Rights protected.  In support of the instant motion the

defendant represents and states as follows:

1.  The Defendant filed a *Motion To Vacate Judgment And Dismiss With Prejudice*

(Mot. # 133.00) on November 14, 2011.  Defendant has raised serious claims of

fraud, unconscionability, unfair and deceptive acts and practices, inclusive, but

not limited to numerous instances of the Defendant's locks being changed ahead

of any ruling and/or court order by any United States court.  Defendant's  Motion

To Vacate Judgment And Dismiss With Prejudice  clearly outlines the Plaintiff's

gross misconduct, and lack of necessary authority for Plaintiff to take physical

possession of Thomas La Casse's home.  As a result, and in direct correlation

with the stated misconduct on every occasion the Defendant's home was

ransacked, vandalized, and grand theft was committed.  The Defendant realleges

and incorporates by reference the entirety of his November 14, 2011 *Motion To*

*Vacate Judgment And Dismiss With Prejudice.*

**ORAL ARGUMENT REQUESTED**
**TESTIMONY MAY BE REQUIRED**

2.  The Defendant filed a Motion For Leave To Compel Discovery (Mot. # 139.00) on

    January 3, 2012.  In said motion, Defendant outlined to the Court the necessity to

    conduct discovery so that he could substantiate the claims as made above and in

    the incorporated *Motion To Vacate Judgment And Dismiss With Prejudice*.

3.  So that there is no question or potential ensuing conflict regarding the

    admissibility of facts and evidence obtained through the discovery process,

    Defendant respectfully requests that the Judgment in this matter be opened and

    vacated for the purpose of having an open-reinstated case for which to compel

    and conduct discovery.

4.  The current status of the pending foreclosure matter is post-judgment procedure

    and the re-argument of Defendant's unresolved *Motion To Vacate Judgment And

    Dismiss With Prejudice*.

5.  Defendant argues that the responses obtained from discovery, inclusive of new

    evidence, would have no admissibility and legal effect while the case is in a

    closed status.  It is procedurally necessary and correct for the judiciary to grant

    the opening of the judgment so that any and all responses to served discovery

    will be admissible as valid evidence in this case.

6.  It is pointed out to the Court, that the vacating of the standing judgment is fair

    and equitable for both parties, as the discovery is necessary and crucial to the

    proper defense of this action.  The sought discovery is believed to greatly change

    the outcome of this pending foreclosure matter.  The Court, has the ultimate

    power to re-enter judgment if after complete discovery is had, that Defendant is

    unable to prove and substantiate its claims.

7.  Plaintiff in its new Objections alleges that allowing discovery prior to the ruling on

    the Defendant's *Motion To Vacate Judgment And Dismiss With Prejudice*, and/or

the pending evidentiary hearing is a delay tactic, and putting the cart before the

horse.  Defendant disagrees; it is maintained that if Defendant is not granted

leave to conduct discovery, and such discovery that will be admissible, the

Defendant's Constitutional Rights promised under the Fourteenth Amendment

will be denied and withheld.

8.  As plead in the pending *Motion To Vacate Judgment And Dismiss With

    Prejudice*, the standing of the Plaintiff and the Jurisdiction of this Court have

    been challenged.  The presumption held by the Superior Court at Stamford that

    Residential Funding Company, LLC was the holder in due course and rightful

    owner of the alleged note at the time of filing is rejected and repelled.

9.  Defendant has pending and concurrently filed a Motion For Leave To Compel

    Discovery which has outlined the more specific and moving grounds for which

    the Defendant relies to seek the authority to serve discovery.

   **WHEREFORE**, for all the foregoing facts and presentment, the defendant,

Thomas J. La Casse, respectfully asks that his instant *Motion To Open/Vacate

Judgment* be GRANTED.  Any and all discovery necessary to corroborate his claims

already presented to this Court in his  prior and pending motions should be allowed so

that justice and equity to all parties is upheld.

**The Defendant (Thomas J. La Casse)**
*Respectfully Submitted*,


By:_____-042191-_____
Paul S. Nakian, Defendant's Attorney

90 Campbell Drive
Stamford, CT  06903
Tel: 203-357-7777 - Office


Email: NakianLaw@aol.com

Juris #042191

## ORDER

The foregoing Defendant's *Motion To Open And Vacate Judgment To Conduct Necessary Discovery* having been presented to the court;

It is hereby ORDERED:  **GRANTED**   /   **DENIED**

By the Court:

_____
Clerk  /  Judge

Date of Order: _____

## Certification of Service

The Defendant, Thomas J. La Casse, certifies that a copy of the above referenced

*Motion To Open And Vacate Judgment To Conduct Necessary Discovery* was mailed to

the following parties via First Class, U.S. Mail on January 14, 2012 at the following

Addresses:

Plaintiffs' Counsel:  Dowley & Associates
Attn: Jennifer G. Farrell
116 Washington Street
MIddletown, CT  06457

## Certification Of Service By The Defendant:

_042191_

_____
Thomas J. La Casse by Paul S. Nakian
Defendant's Counsel

# EXHIBIT "I"



**1 record matched your search:**

This mortgage loan is registered on the MERS® System for informational purposes only.

Mortgage Electronic Registration Systems, Inc. is not the mortgagee for this loan.

MIN: 1000626-0425910742-5    Note Date: 01/30/2006          MIN Status: Inactive

Servicer:    GMAC Mortgage, LLC                          Phone: (800) 766-4622
             Waterloo, IA

If you are a borrower on this loan, you can click here to enter additional information and display the Investor name.

Return to Search

For more information about MERS please go to www.mersinc.org

Copyright© 2006 by MERSCORP, Inc.

MERS® Servicer Identification System - Investor                    Page 1 of 1

12-12020-mg    Doc 5106-5    Filed 09/18/13    Entered 09/18/13 18:18:12    Exhibit 5
Expert Disclosure    FST-CV-5011591-S Doc. 161    Pg 78 of 98

Select borrower type and enter borrower information to see Investor for MIN 1000626-0425910742-5.

◉ Investor for Individual Borrower

Your entries may be either upper or lower case.
Fields marked★are required.
★ Last Name: LACASSE

★ SSN: XXX - XX - 8812

★ ☐ By checking this box, the borrower or borrower's authorized representative is attesting to the fact that he or she is in fact the borrower or borrower's authorized representative for the loan in question. Additionally, borrowers wishing to learn the identity of their loan's investor must confirm their identity by entering their last name or corporation name as well as their SSN or TIN. If this information does not match the information contained in the MERS® System for the borrower of the loan, the investor information will not be displayed. Borrowers should verify the results with their loan servicer.

★ [ Submit ]

○ Investor for Corporation/Non-Person Entity Borrower

Your entries may be either upper or lower case.
Fields marked★are required.
★ Corporation/Non-Person Entity Name: [                                        ]

★ Taxpayer Identification Number: [              ]

★ ☐ By checking this box, the borrower or borrower's authorized representative is attesting to the fact that he or she is in fact the borrower or borrower's authorized representative for the loan in question. Additionally, borrowers wishing to learn the identity of their loan's investor must confirm their identity by entering their last name or corporation name as well as their SSN or TIN. If this information does not match the information contained in the MERS® System for the borrower of the loan, the investor information will not be displayed. Borrowers should verify the results with their loan servicer.

★ [ Submit ]

Servicer:    GMAC Mortgage, LLC                    Phone: (800) 766-4622
Waterloo, IA

Investor:    Residential Funding Company, LLC

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

[ Close Window ]

# EXHIBIT "J"



# Bloomberg Research Results

*March 16, 2012*

Borrower: Thomas LaCasse
Lender:  Homecomings Financial Network, Inc.
Date of Transaction:  January 30, 2006

Our inquiry using Bloomberg Professional's Loan Search engine successfully traced your loan, which was securitized into the **Luminent Mortgage Trust 2006-3.** The Loan Level Details on the following pages match the characteristics of the Adjustable Rate Rider to your Mortgage. In addition, the Loan Number on Line 48 below is a precise match to the Loan Number on the Allonge to Promissory Note which means, we have a perfect match. (*See* Line 48 below)



**McDonnell Property Analytics, Inc.**
© 2012 Bloomberg



# Bloomberg Research Results

*March 16, 2012*

Borrower: Thomas LaCasse
Lender:  Homecomings Financial Network, Inc.
Date of Transaction:  January 30, 2006

| BLOOMBERG FIELDS | BLOOMBERG LOAN LEVEL DETAILS | LOAN DOCUMENTS | DATA POINTS |
|---|---|---|---|
| Loan | 10419663 | 7754073 Note & 0425910742 Mortgage* | 1. No Match |
| Pay History | FFFFFFFFFFFFFBBB BBBBBBBB | | |
| Current Amount | $649,974.31 | | |
| Original Amount | $650,000.00 | $650,000.00 | 2. Match |
| Group(s) | 0, 3, 7 | | |
| Modifications | | | |
| Modification Date | | | |
| Rate | 3.000% | | |
| Previous Rate | 0.000% | 6.5000%** | |
| Principal & Interest | $1,624.94 | | |
| Previous Principal & Interest | $0.00 | $3,520.83*** | |
| Interest Only Term | 49 | 120 | 3. No Match |
| Documentation | Limited | | |
| Original Loan To Value | 54.16% | | |
| Amortization Loan To Value | 54.16% | | |
| HA Loan To Value | 65.29% | | |
| FICO Score | 686 | | |
| Age | 71 | | |
| Months To Maturity | 289 | | |
| Type | ARM | ARM | 4. Match |
| Index | LIBOR12MO | LIBOR One-Year | 5. Match |
| Initial MTR | -35 | | |
| Life Cap – Interest Rate | 12.500% | 12.5000% | 6. Match |
| Life Floor – Interest Rate | 2.250% | 2.2500% | 7. Match |
| Adjustable Rate Cap | 2.000% | 2.000% | 8. Match |



# Bloomberg Research Results

*March 16, 2012*

Borrower: Thomas LaCasse
Lender:  Homecomings Financial Network, Inc.
Date of Transaction:  January 30, 2006

| BLOOMBERG FIELDS | BLOOMBERG LOAN LEVEL DETAILS | LOAN DOCUMENTS | DATA POINTS |
|---|---|---|---|
| Adjustable Rate Floor | 0.000% | 2.000%**** | 9. Match |
| Margin | 2.250% | 2.2500% | 10. Match |
| Geographic Region | CT | CT | 11. Match |
| Delinquency Days | - | | |
| Special Servicing | Foreclosure | | |
| Property Type | Single Housing | | |
| Occupancy | Own | | |
| Purpose | Purchase | | |
| Origination (Focal Date) | Feb-06 | Feb-06 | 12. Match |
| Zip Code | 06883 | 06883 | 13. Match |
| MSA | Bridgeport-Stamford-Norwalk, CT | | |
| Servicing Fees | 0.3% | | |
| Lien | 1 | | |
| #Months B/F/R | 24 | | |

**DATA POINTS** – denote instances where information is contained both in the "Bloomberg Loan Level Details" and the "Loan Documents" we reviewed.

\*      Loan Numbers are often re-serialized when loans have been pooled for securitization.

\*\*      The Previous Rate in the Bloomberg servicer tape is different from the Loan Documents due to subsequent interest rate changes from the origination of the loan to the present time.

\*\*\*      Likewise, the Previous P&I (Principal and Interest) is different due to the fact that these amounts reflect different time periods.

\*\*\*\*      The Adjustable Rate Cap and Floor govern the increase or decrease that interest rates can change on any given change date and are always the same amount. When the "Adjustable Rate Floor" is given a value of 0.000 we reference the "Adjustable Rate Cap" to determine if there is a "Match" for this Data Point.

**McDonnell Property Analytics, Inc.**
© 2012 Bloomberg

# EXHIBIT "K"

Contact:   Customer Service - CTSLink
Wells Fargo Bank, N.A.
Securities Administration Services
8480 Stagecoach Circle
Frederick, MD 21701-4747
www.ctslink.com
Telephone:    1-866-846-4526
Fax:          240-586-8675

Luminent Mortgage Capital
Mortgage Pass-Through Certificates
Distribution Date:    25-Jun-2009

24-Jun-2009    5:32:34PM

**Luminent Mortgage Capital**
**Mortgage Pass-Through Certificates**
**Series 2006-3**

**Foreclosure Detail - All Mortgage Loans in Foreclosure during Current Period**

**I1-1**

| | |
|---|---|
| New Foreclosure Loans | 1 |
| Loans in Foreclosure | |
| Original Principal Balance | 650,000.00 |
| Current Actual Balance | 649,974.31 |
| | |
| Current Foreclosure Total | |
| Loans in Foreclosure | 20 |
| Original Principal Balance | 4,992,552.00 |
| Current Actual Balance | 4,990,858.08 |

**12 Month Foreclosure History**



**I1-2**

| | |
|---|---|
| New Foreclosure Loans | |
| Loans in Foreclosure | 7 |
| Original Principal Balance | 2,069,290.00 |
| Current Actual Balance | 2,064,568.03 |
| | |
| Current Foreclosure Total | |
| Loans in Foreclosure | 57 |
| Original Principal Balance | 14,194,304.00 |
| Current Actual Balance | 14,156,814.83 |

**12 Month Foreclosure History**



**I1-3**

| | |
|---|---|
| New Foreclosure Loans | 4 |
| Loans in Foreclosure | |
| Original Principal Balance | 2,339,700.00 |
| Current Actual Balance | 2,328,360.84 |
| | |
| Current Foreclosure Total | |
| Loans in Foreclosure | 20 |
| Original Principal Balance | 11,920,396.00 |
| Current Actual Balance | 11,877,940.04 |

**12 Month Foreclosure History**

Luminent Mortgage Capital
Mortgage Pass-Through Certificates
Distribution Date:    25-Jun-2009

24-Jun-2009    5:32:34PM

Contact:    Customer Service - CTSLink
Wells Fargo Bank, N.A.
Securities Administration Services
8480 Stagecoach Circle
Frederick, MD 21701-4747
www.ctslink.com
Telephone:    1-866-846-4526
Fax:    240-586-8675

**Luminent Mortgage Capital**
**Mortgage Pass-Through Certificates**
**Series 2006-3**

**Foreclosure Loan Detail - All Mortgage Loans in Foreclosure during Current Period**

| Group | Loan Number | Month Loan Entered FC | First Payment Date | State | LTV at Origination | Original Principal Balance | Current Actual Balance | Paid To Date | Months Delinquent | Current Loan Rate | Approximate Delinquent Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I-2 | 0016061482 | Dec-2008 | 01-Apr-2006 | FL | 63.04 | 725,000.00 | 781,594.34 | 01-Apr-2008 | 13 | 4.500% | 52,882.24 |
| I-2 | 0016063571 | Apr-2009 | 01-Mar-2006 | CO | 80.00 | 184,000.00 | 200,941.43 | 01-Nov-2008 | 6 | 4.875% | 6,779.18 |
| I-2 | 0016063583 | Dec-2008 | 01-Mar-2006 | FL | 80.00 | 212,000.00 | 231,289.48 | 01-Jul-2008 | 10 | 4.875% | 12,617.20 |
| I-2 | 0016063587 | Apr-2009 | 01-Mar-2006 | FL | 80.00 | 268,000.00 | 286,249.23 | 01-May-2008 | 12 | 4.875% | 18,936.19 |
| I-2 | 0016063591 | Apr-2009 | 01-Mar-2006 | FL | 80.00 | 264,000.00 | 276,087.32 | 01-Feb-2008 | 15 | 4.875% | 23,508.37 |
| I-2 | 0016063636 | Apr-2009 | 01-Mar-2006 | IL | 80.00 | 288,000.00 | 306,248.46 | 01-Sep-2008 | 8 | 4.875% | 13,404.86 |
| I-2 | 0016063656 | Jun-2009 | 01-Apr-2006 | CA | 76.91 | 400,000.00 | 436,648.12 | 01-Dec-2008 | 5 | 4.875% | 12,637.61 |
| I-2 | 0016063699 | Jun-2009 | 01-Apr-2006 | TX | 79.98 | 163,000.00 | 177,064.21 | 01-Aug-2008 | 9 | 4.875% | 8,637.00 |
| I-2 | 0016063705 | Apr-2009 | 01-Apr-2006 | FL | 80.00 | 199,200.00 | 209,149.64 | 01-Aug-2007 | 21 | 4.875% | 26,180.33 |
| I-2 | 0016063707 | Apr-2009 | 01-Apr-2006 | FL | 80.00 | 176,800.00 | 183,274.25 | 01-Oct-2007 | 19 | 4.888% | 20,473.15 |
| I-2 | 0016063711 | Apr-2009 | 01-Apr-2006 | FL | 80.00 | 256,000.00 | 275,659.27 | 01-Dec-2007 | 13 | 4.875% | 19,930.94 |
| I-2 | 0016063715 | Apr-2009 | 01-Apr-2006 | FL | 79.98 | 295,900.00 | 317,891.36 | 01-Mar-2008 | 14 | 4.875% | 25,003.03 |
| I-2 | 0016063731 | Jun-2009 | 01-Apr-2006 | FL | 80.00 | 440,000.00 | 466,661.43 | 01-Nov-2007 | 18 | 4.875% | 49,027.42 |
| I-2 | 0016063740 | Apr-2009 | 01-Apr-2006 | CA | 80.00 | 400,000.00 | 443,958.64 | 01-May-2008 | 12 | 4.875% | 29,383.65 |
| I-2 | 0016067009 | Jun-2008 | 01-Apr-2006 | FL | 80.00 | 220,000.00 | 234,098.20 | 01-Dec-2007 | 17 | 4.875% | 23,033.58 |
| I-2 | 0016067011 | Aug-2008 | 01-Apr-2006 | FL | 90.00 | 297,350.00 | 317,594.37 | 01-Feb-2008 | 15 | 4.875% | 27,042.94 |
| I-2 | 0016067020 | May-2009 | 01-Mar-2006 | FL | 80.00 | 144,000.00 | 155,376.82 | 01-Dec-2008 | 6 | 5.375% | 4,966.84 |
| I-2 | 0016094472 | Apr-2009 | 01-Mar-2006 | CA | 64.04 | 365,000.00 | 399,149.64 | 01-Nov-2008 | 5 | 4.875% | 13,456.66 |
| II-1 | 0010308139 | May-2008 | 01-Feb-2006 | FL | 80.00 | 175,920.00 | 175,842.25 | 01-Nov-2007 | 18 | 6.125% | 18,994.70 |
| II-1 | 0010333677 | Oct-2008 | 01-Feb-2006 | FL | 66.94 | 164,700.00 | 164,293.64 | 01-Feb-2008 | 13 | 6.125% | 12,648.41 |
| II-1 | 0010355807 | Apr-2009 | 01-Mar-2006 | FL | 62.61 | 335,000.00 | 334,999.99 | 01-Sep-2008 | 8 | 4.375% | 14,516.64 |
| II-1 | 0010363849 | Jan-2009 | 01-Feb-2006 | FL | 90.00 | 152,010.00 | 152,010.00 | 01-Jul-2008 | 10 | 5.375% | 9,488.01 |
| II-1 | 0010388831 | May-2009 | 01-Feb-2006 | CA | 80.00 | 438,300.00 | 438,270.00 | 01-Aug-2008 | 7 | 4.875% | 16,499.02 |
| II-1 | 0010414575 | Feb-2008 | 01-Mar-2006 | FL | 80.00 | 160,530.00 | 160,530.00 | 01-Aug-2007 | 21 | 5.375% | 20,698.38 |
| II-1 | 0010419663 | Jun-2009 | 01-Mar-2006 | CT | 54.16 | 650,000.00 | 649,974.31 | 01-Dec-2008 | 5 | 4.500% | 19,174.24 |
| II-1 | 0010420175 | Apr-2009 | 01-Mar-2006 | FL | 80.00 | 171,200.00 | 171,200.00 | 01-Aug-2008 | 9 | 5.000% | 9,373.21 |
| II-1 | 0010439013 | Jan-2009 | 01-Mar-2006 | NM | 89.98 | 181,900.00 | 181,707.26 | 01-Apr-2008 | 13 | 5.250% | 14,568.02 |
| II-1 | 0010440009 | Mar-2008 | 01-Apr-2006 | NY | 80.00 | 240,000.00 | 239,826.47 | 01-Sep-2007 | 20 | 4.875% | 27,710.52 |
| II-1 | 0010454637 | Mar-2009 | 01-Apr-2006 | CA | 77.73 | 171,000.00 | 170,953.48 | 01-Oct-2008 | 7 | 5.375% | 8,216.43 |
| II-1 | 0010468791 | Mar-2009 | 01-Apr-2006 | CA | 79.55 | 247,000.00 | 246,972.53 | 01-Sep-2008 | 8 | 5.250% | 13,069.01 |
| II-1 | 0010474763 | Apr-2009 | 01-Apr-2006 | FL | 80.00 | 231,200.00 | 231,200.00 | 01-Oct-2008 | 7 | 5.375% | 11,112.06 |
| II-1 | 0010474813 | Mar-2009 | 01-Apr-2006 | FL | 80.00 | 202,400.00 | 201,782.57 | 01-Oct-2008 | 7 | 4.125% | 7,806.49 |
| II-1 | 0010474875 | Apr-2009 | 01-Apr-2006 | CA | 80.00 | 455,992.00 | 455,992.00 | 01-Nov-2008 | 6 | 4.375% | 16,187.71 |
| II-1 | 0010479819 | Oct-2008 | 01-Apr-2006 | FL | 80.00 | 255,200.00 | 255,178.95 | 01-May-2008 | 12 | 5.375% | 19,787.10 |
| II-1 | 0010479921 | Apr-2009 | 01-Apr-2006 | CO | 80.00 | 112,800.00 | 112,725.47 | 01-Oct-2008 | 7 | 4.500% | 4,678.14 |
| II-1 | 0080015951 | Apr-2009 | 01-Mar-2006 | MD | 80.00 | 178,400.00 | 178,400.00 | 01-Oct-2008 | 7 | 4.375% | 7,377.55 |
| II-1 | 0080015954 | Apr-2009 | 01-Mar-2006 | CA | 73.61 | 265,000.00 | 264,999.16 | 01-Oct-2008 | 6 | 7.175% | 12,234.08 |
| II-1 | 0080015956 | Jan-2009 | 01-Mar-2006 | CO | 80.00 | 204,000.00 | 204,000.00 | 01-Aug-2008 | 9 | 6.875% | 12,388.75 |
| II-2 | 0010303402 | Apr-2009 | 01-Mar-2006 | VA | 79.98 | 344,400.00 | 343,617.48 | 01-Oct-2008 | 7 | 6.125% | 15,011.82 |
| II-2 | 0010316594 | May-2009 | 01-Jan-2006 | AZ | 80.00 | 230,400.00 | 230,400.00 | 01-Nov-2008 | 6 | 6.375% | 9,139.20 |

Luminent Mortgage Capital
Mortgage Pass-Through Certificates
Distribution Date:    25-Aug-2009

24-Aug-2009    11:01:17AM

Contact:  Customer Service - CTSLink
Wells Fargo Bank, N.A.
Securities Administration Services
8480 Stagecoach Circle
Frederick, MD 21701-4747
www.ctslink.com
Telephone:    1-866-846-4526
Fax:    240-586-8675

**Luminent Mortgage Capital**
**Mortgage Pass-Through Certificates**
**Series 2006-3**

**Foreclosure Loan Detail - All Mortgage Loans in Foreclosure during Current Period**

| Group | Loan Number | Month Loan Entered FC | First Payment Date | State | LTV at Origination | Original Principal Balance | Current Actual Balance | Paid To Date | Months Delinquent | Current Loan Rate | Approximate Delinquent Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I-2 | 0016032408 | May-2009 | 01-Mar-2006 | CA | 79.98 | 313,100.00 | 343,748.82 | 01-Mar-2008 | 12 | 4.625% | 21,196.50 |
| I-2 | 0016032441 | Apr-2009 | 01-Mar-2006 | FL | 80.00 | 212,000.00 | 237,380.45 | 01-Nov-2008 | 8 | 4.625% | 9,710.59 |
| I-2 | 0016032443 | Dec-2008 | 01-Mar-2006 | FL | 80.00 | 224,000.00 | 241,793.79 | 01-Apr-2008 | 15 | 4.625% | 19,230.96 |
| I-2 | 0016032480 | Apr-2009 | 01-Mar-2006 | WA | 80.00 | 156,000.00 | 171,379.16 | 01-Nov-2008 | 8 | 4.375% | 6,656.44 |
| I-2 | 0016032719 | Aug-2009 | 01-Mar-2006 | MI | 80.00 | 228,000.00 | 245,374.34 | 01-Feb-2009 | 5 | 3.625% | 5,187.58 |
| I-2 | 0016032746 | May-2009 | 01-Mar-2006 | FL | 80.00 | 142,400.00 | 155,471.91 | 01-Dec-2008 | 7 | 4.625% | 5,617.18 |
| I-2 | 0016032749 | Jul-2009 | 01-Mar-2006 | FL | 80.00 | 154,400.00 | 165,429.54 | 01-Feb-2009 | 5 | 4.625% | 4,479.85 |
| I-2 | 0016032754 | Jan-2009 | 01-Mar-2006 | FL | 75.00 | 210,000.00 | 216,149.52 | 01-Aug-2008 | 11 | 4.625% | 12,108.55 |
| I-2 | 0016032766 | Feb-2008 | 01-Mar-2006 | FL | 80.00 | 208,000.00 | 217,906.97 | 01-Jul-2007 | 24 | 4.625% | 30,331.40 |
| I-2 | 0016032773 | Jan-2009 | 01-Mar-2006 | FL | 79.98 | 223,350.00 | 243,149.13 | 01-Aug-2008 | 11 | 4.625% | 13,669.96 |
| I-2 | 0016032820 | May-2008 | 01-Mar-2006 | KY | 75.00 | 106,500.00 | 112,105.32 | 01-Aug-2007 | 23 | 4.500% | 14,554.40 |
| I-2 | 0016050262 | May-2009 | 01-Mar-2006 | VA | 80.00 | 304,000.00 | 335,564.34 | 01-Dec-2008 | 7 | 4.700% | 10,878.37 |
| I-2 | 0016060537 | Jul-2009 | 01-May-2006 | CA | 77.44 | 395,000.00 | 437,358.75 | 01-Feb-2009 | 5 | 4.100% | 9,503.48 |
| I-2 | 0016061482 | Dec-2008 | 01-Apr-2006 | FL | 63.04 | 725,000.00 | 781,594.34 | 01-Apr-2008 | 15 | 4.250% | 58,011.45 |
| I-2 | 0016063571 | Apr-2009 | 01-Mar-2006 | CO | 80.00 | 184,000.00 | 200,941.43 | 01-Nov-2008 | 8 | 4.625% | 8,223.45 |
| I-2 | 0016063583 | Dec-2008 | 01-Mar-2006 | FL | 80.00 | 212,000.00 | 231,289.48 | 01-Jul-2008 | 12 | 4.625% | 14,279.59 |
| I-2 | 0016063587 | Apr-2009 | 01-Mar-2006 | FL | 80.00 | 268,000.00 | 286,249.23 | 01-May-2008 | 14 | 4.625% | 20,993.61 |
| I-2 | 0016063591 | Apr-2009 | 01-Mar-2006 | FL | 80.00 | 264,000.00 | 276,087.32 | 01-Aug-2008 | 17 | 4.625% | 25,492.75 |
| I-2 | 0016063636 | Apr-2009 | 01-Mar-2006 | IL | 80.00 | 288,000.00 | 306,248.46 | 01-Sep-2008 | 10 | 4.625% | 15,606.02 |
| I-2 | 0016063699 | Jun-2009 | 01-Apr-2006 | TX | 79.98 | 169,000.00 | 177,064.21 | 01-Aug-2008 | 11 | 4.625% | 9,909.65 |
| I-2 | 0016063705 | Apr-2009 | 01-Apr-2006 | FL | 80.00 | 199,200.00 | 209,149.64 | 01-Aug-2007 | 23 | 4.625% | 27,683.59 |
| I-2 | 0016063707 | Apr-2009 | 01-Apr-2006 | FL | 80.00 | 176,800.00 | 183,274.25 | 01-Oct-2007 | 21 | 4.660% | 21,801.78 |
| I-2 | 0016063709 | Jul-2009 | 01-Apr-2006 | FL | 79.98 | 203,100.00 | 222,234.66 | 01-Feb-2009 | 5 | 4.625% | 6,010.16 |
| I-2 | 0016063715 | Apr-2009 | 01-Apr-2006 | FL | 79.98 | 295,900.00 | 317,891.36 | 01-Mar-2008 | 16 | 4.625% | 27,287.88 |
| I-2 | 0016063731 | Jun-2009 | 01-Apr-2006 | FL | 80.00 | 440,000.00 | 466,661.43 | 01-Apr-2008 | 20 | 4.625% | 52,381.55 |
| I-2 | 0016066977 | Jul-2009 | 01-Apr-2006 | IL | 80.00 | 744,000.00 | 824,409.01 | 01-Feb-2009 | 5 | 4.625% | 22,237.50 |
| I-2 | 0016067011 | Aug-2008 | 01-Mar-2006 | FL | 90.00 | 297,350.00 | 317,594.37 | 01-Feb-2008 | 17 | 4.625% | 29,325.64 |
| I-2 | 0016067020 | May-2009 | 01-Mar-2006 | FL | 80.00 | 144,000.00 | 155,376.82 | 01-Dec-2008 | 7 | 5.125% | 6,229.27 |
| I-2 | 0016067039 | Aug-2009 | 01-Apr-2006 | MO | 80.00 | 103,600.00 | 114,470.76 | 01-Apr-2009 | 3 | 4.500% | 2,085.84 |
| I-2 | 0016094472 | Apr-2009 | 01-Apr-2006 | CA | 64.04 | 365,000.00 | 399,149.64 | 01-Nov-2008 | 8 | 4.625% | 16,325.56 |
| I-2 | 0010308139 | May-2008 | 01-Feb-2006 | FL | 80.00 | 175,920.00 | 175,842.25 | 01-Nov-2007 | 20 | 6.125% | 20,701.84 |
| II-1 | 0010333677 | Oct-2008 | 01-Feb-2006 | FL | 66.94 | 164,700.00 | 164,293.64 | 01-Apr-2008 | 15 | 4.750% | 14,055.18 |
| II-1 | 0010355807 | Apr-2009 | 01-Feb-2006 | FL | 62.61 | 335,000.00 | 334,999.99 | 01-Sep-2008 | 10 | 4.375% | 16,791.84 |
| II-1 | 0010388831 | May-2009 | 01-Feb-2006 | CA | 80.00 | 438,300.00 | 438,270.00 | 01-Oct-2008 | 9 | 3.500% | 19,338.64 |
| II-1 | 0010388897 | Aug-2009 | 01-Mar-2006 | FL | 75.00 | 577,500.00 | 575,291.99 | 01-Mar-2009 | 4 | 3.500% | 12,500.61 |
| II-1 | 0010414575 | Feb-2008 | 01-Mar-2006 | FL | 80.00 | 160,530.00 | 160,530.00 | 01-Aug-2007 | 23 | 5.375% | 22,056.20 |
| II-1 | 0010419663 | Jun-2009 | 01-Mar-2006 | CT | 54.16 | 650,000.00 | 649,974.31 | 01-Dec-2008 | 7 | 4.500% | 23,724.06 |
| II-1 | 0010420175 | Apr-2009 | 01-Mar-2006 | FL | 80.00 | 171,200.00 | 171,200.00 | 01-Aug-2008 | 11 | 5.000% | 10,714.27 |
| II-1 | 0010439013 | Jan-2009 | 01-Mar-2006 | NM | 89.98 | 181,900.00 | 181,707.26 | 01-Apr-2008 | 15 | 5.250% | 16,057.56 |
| II-1 | 0010440009 | Mar-2008 | 01-Apr-2006 | NY | 80.00 | 240,000.00 | 239,826.47 | 01-Oct-2007 | 21 | 4.875% | 28,224.60 |

Page 27

Luminent Mortgage Capital
Mortgage Pass-Through Certificates
Distribution Date:    25-Jan-2012

20-Jan-2012    1:07:29PM

## Luminent Mortgage Capital
## Mortgage Pass-Through Certificates
## Series 2006-3

Contact:    Customer Service - CTSLink
Wells Fargo Bank, N.A.
Securities Administration Services
8480 Stagecoach Circle
Frederick, MD 21701-4747
www.ctslink.com
Telephone:    1-866-846-4526
Fax:    240-586-8675

### Foreclosure Loan Detail - All Mortgage Loans in Foreclosure during Current Period

| Group | Loan Number | Month Loan Entered FC | First Payment Date | State | LTV at Origination | Original Principal Balance | Current Actual Balance | Paid To Date | Months Delinquent | Current Loan Rate | Approximate Delinquent Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I-2 | 0016063610 | Sep-2011 | 01-Apr-2006 | FL | 79.98 | 143,900.00 | 146,102.93 | 01-Apr-2011 | 8 | 3.625% | 4,033.82 |
| I-2 | 0016063656 | Feb-2011 | 01-Apr-2006 | CA | 76.91 | 400,000.00 | 436,648.12 | 01-Dec-2008 | 36 | 3.625% | 52,286.94 |
| I-2 | 0016063703 | Jan-2010 | 01-Apr-2006 | FL | 79.98 | 215,900.00 | 222,802.12 | 01-Jan-2009 | 35 | 3.658% | 25,616.64 |
| I-2 | 0016063710 | Jul-2011 | 01-Apr-2006 | FL | 80.00 | 320,000.00 | 350,039.02 | 01-Apr-2009 | 32 | 3.625% | 35,806.93 |
| I-2 | 0016063722 | Jan-2011 | 01-Apr-2006 | VA | 80.00 | 404,000.00 | 440,495.78 | 01-Nov-2009 | 25 | 3.625% | 33,854.67 |
| I-2 | 0016066971 | Dec-2011 | 01-Apr-2006 | CO | 80.00 | 276,000.00 | 287,517.50 | 01-Nov-2009 | 13 | 3.083% | 9,951.10 |
| I-2 | 0016066977 | Dec-2011 | 01-Apr-2006 | IL | 80.00 | 744,000.00 | 824,409.01 | 01-Feb-2009 | 34 | 3.625% | 91,366.47 |
| I-2 | 0016066984 | Jan-2012 | 01-Apr-2006 | CO | 80.00 | 156,000.00 | 171,363.27 | 01-Dec-2009 | 24 | 4.000% | 13,459.16 |
| I-2 | 0016067004 | Dec-2009 | 01-Apr-2006 | FL | 76.94 | 400,000.00 | 439,199.71 | 01-May-2008 | 43 | 3.625% | 69,296.47 |
| I-2 | 0016067005 | Nov-2011 | 01-Apr-2006 | FL | 80.00 | 217,600.00 | 234,843.96 | 01-Nov-2010 | 13 | 3.625% | 9,748.28 |
| I-2 | 0016067010 | Aug-2011 | 01-Apr-2006 | FL | 80.00 | 216,000.00 | 236,335.43 | 01-Oct-2009 | 26 | 3.625% | 18,937.59 |
| I-2 | 0016067018 | Dec-2010 | 01-Apr-2006 | IN | 79.98 | 180,850.00 | 200,291.91 | 01-Apr-2009 | 32 | 3.625% | 20,545.00 |
| I-2 | 0016094469 | Sep-2009 | 01-Apr-2006 | FL | 75.00 | 727,500.00 | 782,987.05 | 01-Mar-2009 | 33 | 3.375% | 77,548.91 |
| I-2 | 0016094470 | Dec-2011 | 01-Apr-2006 | FL | 80.00 | 224,000.00 | 244,792.88 | 01-Jul-2010 | 17 | 3.625% | 13,023.20 |
| II-1 | 0016094473 | Nov-2011 | 01-Apr-2006 | CA | 77.26 | 367,000.00 | 423,061.74 | 01-Apr-2011 | 8 | 2.000% | 5,704.83 |
| II-1 | 0010355807 | Apr-2009 | 01-Mar-2006 | FL | 62.61 | 335,000.00 | 334,999.99 | 01-Sep-2008 | 39 | 3.000% | 41,791.17 |
| II-1 | 0010419663 | Jan-2011 | 01-Mar-2006 | CT | 54.16 | 650,000.00 | 649,974.31 | 01-Dec-2008 | 36 | 3.000% | 72,634.79 |
| II-1 | 0010460609 | Sep-2011 | 01-Mar-2006 | FL | 65.00 | 146,240.00 | 146,240.00 | 01-Oct-2007 | 50 | 3.000% | 25,183.77 |
| II-1 | 0010474763 | Sep-2011 | 01-Mar-2006 | FL | 80.00 | 224,800.00 | 224,800.00 | 01-Jan-2011 | 11 | 3.000% | 6,645.66 |
| II-1 | 0010475027 | Jan-2012 | 01-Apr-2006 | UT | 80.00 | 231,200.00 | 231,200.00 | 01-Oct-2008 | 38 | 3.000% | 32,223.48 |
| II-1 | 0080015951 | Sep-2010 | 01-Mar-2006 | MD | 80.00 | 365,600.00 | 365,600.00 | 01-Aug-2008 | 40 | 3.000% | 50,544.20 |
| II-1 | 0009900929 | Feb-2011 | 01-May-2005 | FL | 80.00 | 178,400.00 | 178,400.00 | 01-May-2009 | 31 | 3.000% | 15,981.63 |
| II-2 | 0010319588 | Apr-2008 | 01-Apr-2006 | FL | 80.00 | 105,600.00 | 110,508.60 | 01-Feb-2010 | 22 | 5.750% | 12,045.36 |
| II-2 | 0010348137 | Oct-2009 | 01-Feb-2006 | FL | 80.00 | 236,000.00 | 236,000.00 | 01-Oct-2007 | 50 | 3.000% | 59,619.36 |
| II-2 | 0010371327 | Nov-2010 | 01-Mar-2006 | FL | 80.00 | 218,160.00 | 218,160.00 | 01-May-2009 | 31 | 3.875% | 32,560.41 |
| II-2 | 0010434097 | May-2010 | 01-Mar-2006 | FL | 90.00 | 121,500.00 | 121,445.42 | 01-Jun-2010 | 18 | 3.000% | 8,425.28 |
| II-2 | 0010439339 | Apr-2011 | 01-Mar-2006 | CA | 58.49 | 243,920.00 | 243,920.00 | 01-Sep-2009 | 27 | 3.000% | 28,264.32 |
| II-2 | 0010449593 | Feb-2011 | 01-Apr-2006 | FL | 80.00 | 112,600.00 | 105,753.94 | 01-Nov-2010 | 13 | 3.000% | 4,761.72 |
| II-2 | 0010456351 | Mar-2009 | 01-Mar-2006 | FL | 80.00 | 217,600.00 | 217,559.63 | 01-Sep-2010 | 15 | 3.000% | 12,922.14 |
| II-2 | 0080016023 | Dec-2010 | 01-Mar-2006 | GA | 80.00 | 250,224.00 | 248,262.13 | 01-Jul-2010 | 17 | 3.000% | 16,395.70 |
| II-2 | 0080016029 | Nov-2010 | 01-Apr-2006 | FL | 80.00 | 205,600.00 | 223,211.17 | 01-Jun-2010 | 18 | 6.500% | 22,993.15 |
| II-2 | 0080016049 | Jun-2010 | 01-Apr-2006 | FL | 75.00 | 183,750.00 | 183,563.89 | 01-Jan-2010 | 23 | 3.000% | 19,618.43 |
| II-2 | 0080016068 | Apr-2010 | 01-Mar-2006 | FL | 80.00 | 232,000.00 | 232,000.00 | 01-Jul-2009 | 29 | 3.000% | 31,465.17 |
| II-2 | 0080016098 | Nov-2010 | 01-Mar-2006 | FL | 80.00 | 182,400.00 | 180,841.10 | 01-Aug-2010 | 21 | 3.000% | 15,861.18 |
| II-2 | 0080016118 | Apr-2011 | 01-Mar-2006 | CA | 80.00 | 344,000.00 | 343,520.66 | 01-Aug-2010 | 16 | 3.000% | 20,181.74 |
| II-2 | 0080016122 | Jan-2012 | 01-Mar-2006 | FL | 80.00 | 220,800.00 | 220,800.00 | 01-Jun-2008 | 42 | 3.000% | 51,106.00 |
| II-2 | 0080016123 | Nov-2008 | 01-Mar-2006 | FL | 80.00 | 238,400.00 | 238,400.00 | 01-Jun-2008 | 42 | 3.000% | 55,179.63 |
| II-2 | 0080016206 | Aug-2011 | 01-Mar-2006 | NJ | 80.00 | 160,000.00 | 152,764.72 | 01-Nov-2010 | 13 | 4.750% | 8,503.24 |
| II-2 | 0080016211 | Sep-2009 | 01-Mar-2006 | NY | 80.00 | 295,960.00 | 295,960.00 | 01-May-2008 | 43 | 3.000% | 61,966.72 |

# EXHIBIT "L"

Prospectus supplement dated April 27, 2006 (to prospectus dated March 28, 2006)

# $673,771,000

### (Approximate)

## Luminent Mortgage Trust 2006-3
## Issuing Entity

## Wells Fargo Bank, National Association
## Master Servicer and Securities Administrator

## Structured Asset Mortgage Investments II Inc.
### Depositor

## Luminent Mortgage Capital, Inc.
### Sponsor

**Luminent Mortgage Trust 2006-3, Mortgage Pass-Through Certificates, Series 2006-3**

---

**You should consider carefully the risk factors beginning on page S-25 in this prospectus supplement.**

---

**The Issuing Entity**

The issuing entity will consist primarily of a pool of adjustable rate type mortgage loans secured by first liens on one- to four-family residential properties.

The issuing entity will issue the following classes of certificates that are offered under this prospectus supplement:

- seven classes of group I senior certificates designated Class I-1A-1, Class I-1A-2, Class I-1A-3, Class I-2A-1, Class I-2A-2, Class I-2A-3 and Class I-2X Certificates,

- nine classes of group II senior certificates designated Class II-1A-1, Class II-1A-2, Class II-1X-1, Class II-2A-1, Class II-2A-2, Class II-2X-1, Class II-3A-1, Class II-3A-2 and Class II-3X-1 Certificates,

- seven classes of group I subordinate certificates designated Class I-M-1, Class I-M-2, Class I-M-3, Class I-B-1, Class I-B-2, Class I-B-3 and Class I-B-4 Certificates, and

- three classes of group II subordinate certificates designated Class II-B-1, Class II-B-2 and Class II-B-3 Certificates,

all as more fully described in the tables beginning on page S-5 of this prospectus supplement.

The certificates are obligations only of the issuing entity, as the issuing entity. Neither the certificates nor the mortgage loans are insured or guaranteed by any person, except as described in this prospectus supplement. Distributions on the certificates will be payable solely from the assets transferred to the issuing entity for the benefit of certificateholders.

**Credit Enhancement**

Credit enhancement for the offered certificates related to loan group I will consist of excess spread, overcollateralization and subordination.

Credit enhancement for the offered certificates related to loan group II will consist of subordination.

Distributions on the certificates will be on the 25th of each month, or, if the 25th is not a business day, on the next business day, beginning with May 2006.

**Neither the Securities and Exchange Commission nor any state securities commission has approved the certificates or determined if this prospectus supplement or the prospectus is accurate or complete. Any representation to the contrary is a criminal offense.**

**The Attorney General of the state of New York has not passed on or endorsed the merits of this offering. Any representation to the contrary is unlawful.**

The price to investors will vary from time to time and will be determined at the time of sale. The proceeds to the depositor from the offering are expected to be approximately 99.91% of the aggregate certificate principal balance of the offered certificates, plus accrued interest on the group II offered certificates, less expenses.  See *"Method of Distribution"* in this prospectus supplement.

The Underwriters will deliver to purchasers the offered certificates in book-entry form through The Depository Trust Company, Clearstream Banking, société anonyme and the Euroclear System, in each case, on or about April 28, 2006.

**Bear, Stearns & Co. Inc.**

**Wachovia Securities**

**Underwriters**

# TABLE OF CONTENTS

## PROSPECTUS SUPPLEMENT

TRANSACTION STRUCTURE ............................................... S-24
RISK FACTORS ................................................................. S-25
THE MORTGAGE POOL ...................................................... S-38
STATIC POOL INFORMATION ............................................. S-58
THE ISSUING ENTITY ......................................................... S-58
THE DEPOSITOR ............................................................... S-58
THE SPONSOR AND THE SELLER ....................................... S-59
THE MASTER SERVICER AND THE SERVICERS ........... S-60
DESCRIPTION OF THE CERTIFICATES ............................ S-82
YIELD, PREPAYMENT AND MATURITY
   CONSIDERATIONS ......................................................... S-131
USE OF PROCEEDS ........................................................... S-161
FEDERAL INCOME TAX CONSEQUENCES ..................... S-161
STATE AND OTHER TAXES ................................................ S-165
ERISA CONSIDERATIONS .................................................. S-165
METHOD OF DISTRIBUTION .......................................... S-167
LEGAL MATTERS ............................................................. S-168
LEGAL PROCEEDINGS ...................................................... S-168
AFFILIATIONS, RELATIONSHIPS AND RELATED
   TRANSACTIONS .......................................................... S-168
RATINGS ......................................................................... S-168
LEGAL INVESTMENT ....................................................... S-170
AVAILABLE INFORMATION .............................................. S-171
REPORTS TO CERTIFICATEHOLDERS ............................ S-172
SCHEDULE A ................................................................... A-1
SCHEDULE B ................................................................... B-1
ANNEX I   GLOBAL CLEARANCE,
   SETTLEMENT AND TAX ..................................................... I-1

## PROSPECTUS

RISK FACTORS. ...................................................................5
SERVICING OF MORTGAGE LOANS ..................................22
DESCRIPTION OF THE SECURITIES ...................................29
DESCRIPTION OF CREDIT ENHANCEMENT ......................49
THE AGREEMENTS. .............................................................61
THE DEPOSITOR .................................................................61
LEGAL ASPECTS OF THE MORTGAGE LOANS .................75
FEDERAL INCOME TAX CONSEQUENCES ...........................91
PENALTY AVOIDANCE ......................................................116
STATE AND OTHER TAX CONSEQUENCES ........................116
ERISA CONSIDERATIONS. ..................................................116
LEGAL INVESTMENT MATTERS. .......................................124
USE OF PROCEEDS ...........................................................125
METHOD OF DISTRIBUTION. ............................................125
LEGAL MATTERS .............................................................126
FINANCIAL INFORMATION ...............................................126
AVAILABLE INFORMATION ..............................................126
RATINGS. ..........................................................................126
REPORTS TO SECURITYHOLDERS ....................................127
INCORPORATION OF INFORMATION BY REFERENCE .......127
GLOSSARY OF TERMS .......................................................128

## SUMMARY OF PROSPECTUS SUPPLEMENT

*The following summary provides a brief description of material aspects of this offering and does not contain all of the information that you should consider in making your investment decision. To understand all of the terms of the offered certificates, read carefully this entire prospectus supplement and the entire accompanying prospectus. A glossary is included at the end of this prospectus supplement. Capitalized terms used but not defined in the glossary at the end of this prospectus supplement or in the following summary have the meanings assigned to them in the glossary at the end of the prospectus.*

| | |
|---|---|
| Issuing Entity | Luminent Mortgage Trust 2006-3. |
| Title of Series | Luminent Mortgage Trust 2006-3, Mortgage Pass-Through Certificates, Series 2006-3. |
| Cut-off Date | April 1, 2006. |
| Closing Date | On or about April 28, 2006. |
| Depositor | Structured Asset Mortgage Investments II Inc. |
| Sponsor | Luminent Mortgage Capital, Inc. |
| Master Servicer | Wells Fargo Bank, National Association. |
| Servicers | EMC Mortgage Corporation, IndyMac Bank, FSB, Paul Financial, LLC, Residential Funding Corporation and Wells Fargo Bank, National Association. |
| Originators | SouthStar Funding, LLC, IndyMac Bank, FSB, Paul Financial, LLC, Residential Funding Corporation, American Mortgage Network, Inc., Bear Stearns Residential Mortgage Corporation and various other originators, none of which will originate more than 10% of the mortgage loans in the aggregate of each loan group or 10% in the aggregate of any subgroup. |
| Trustee | HSBC Bank USA, National Association. |
| Securities Administrator | Wells Fargo Bank, National Association. |
| Distribution Dates | Distributions on the offered certificates will be made on the 25th day of each month, or, if such day is not a business day, on the next succeeding business day, beginning in May 2006. |
| Offered Certificates | The classes of offered certificates and their pass-through rates and initial certificate principal balances are set forth in the table below.   The issuing entity will also issue other certificates designated as the Class P, Class R, Class I-B-IO, Class II-B-4, Class II-B-5 and Class II-B-6 Certificates, which classes are not offered pursuant to this prospectus supplement. |

**The Issuing Entity**

The depositor will establish a trust with respect to the Luminent Mortgage Trust 2006-3, Mortgage Pass-Through Certificates, Series 2006-3, pursuant to a pooling and servicing agreement dated as of April 1, 2006, among the depositor, the seller, the master servicer, the securities administrator and the trustee.

See *"Description of the Certificates"* in this prospectus supplement.

The certificates represent in the aggregate the entire beneficial ownership interest in the issuing entity. Distributions of interest and/or principal on the offered certificates will be made only from payments received in connection with the mortgage loans described below.

**The Sponsor**

Luminent Mortgage Capital, Inc., a Maryland corporation and real estate investment trust having common stock traded on the New York Stock Exchange under the trading symbol "LUM."

**The Seller**

Maia Mortgage Finance Statutory Trust, an indirect wholly-owned subsidiary of the sponsor, will sell the mortgage loans to the depositor. The seller acquired the mortgage loans from the servicers and from American Mortgage Network, Inc., or AmNet.

**The Originators**

Approximately 75.30% of the subgroup I-1 mortgage loans and 38.40% group I mortgage loans in the aggregate were originated by IndyMac Bank, FSB, or IndyMac. Approximately 21.01% of the subgroup I-2 mortgage loans and 10.31% group I mortgage loans in the aggregate were originated by Bear Stearns Residential Mortgage Corporation, or Bear Residential. Approximately 52.07% of the subgroup I-2 mortgage loans and 25.56% group I mortgage loans in the aggregate were originated by SouthStar Funding, LLC, or SouthStar. Approximately 24.70% and 13.14% of the subgroup I-1 and subgroup I-2 mortgage loans and 19.03% group I mortgage loans in the aggregate were originated by Paul Financial, LLC, or Paul Financial. Approximately 11.68, 44.28, 43.48% of the subgroup II-1, subgroup II-2 and subgroup II-3 mortgage loans, respectively, and 38.27% group II mortgage loans in the aggregate were originated by AmNet. Approximately 88.32%, 55.72%, 56.52% of the subgroup II-1, subgroup II-2 and subgroup II-3 mortgage loans, respectively, and 61.73% group II mortgage loans in the aggregate were originated by Residential Funding Corporation, or RFC. The remainder of the mortgage loans were originated by various originators, none of which have originated more than 10% of the mortgage loans in the aggregate of each loan group or 10% in the aggregate of any subgroup.

**The Servicers**

Approximately 75.30% of the subgroup I-1 mortgage loans and 38.34% group I mortgage loans in the aggregate will be serviced by IndyMac. Approximately 86.86% of the subgroup I-2 mortgage loans and 42.63% group I mortgage loans will be serviced by EMC Mortgage Corporation, or EMC. Approximately 24.70% and 13.14% of the subgroup I-1 and subgroup I-2 mortgage loans and 19.03% group I mortgage loans will be serviced by Paul Financial. Approximately 11.68%, 44.28% and 43.48% of the subgroup II-1, subgroup II-2 and subgroup II-3 mortgage loans, respectively, and 38.27% group II mortgage loans will be serviced by Wells Fargo Bank, N.A, or Wells Fargo. Approximately 88.32%, 55.72% and 56.52% of the subgroup II-1, subgroup II-2 and subgroup II-3 mortgage loans, respectively, and 61.73% group II mortgage loans will be serviced by RFC.

**The Mortgage Loans**

The issuing entity will contain approximately 2,263 first lien adjustable rate mortgage loans secured by one- to four-family residential real properties and individual condominium units.

The mortgage loans have been divided into two primary loan groups, designated as loan group I and loan group II, as more fully described below and in Schedule A to this prospectus supplement. The mortgage loans in loan group I have been further divided into two subgroups, designated as subgroup I-1 and subgroup I-2. The mortgage loans in loan group II have been further divided into three subgroups, designated as subgroup II-1, subgroup II-2 and subgroup II-3. Except under the limited circumstances described in this prospectus supplement, the Class I-1A-1, Class I-1A-2 and Class I-1A-3 Certificates will be entitled to receive distributions solely with respect to the subgroup I-1 mortgage loans, the Class I-2A-1, Class I-2A-2 and Class I-2A-3 Certificates will be entitled to receive distributions solely with respect to the subgroup I-2 mortgage loans, the Class II-1A-1, Class II-1A-2 and Class II-1X-1 Certificates will be entitled to receive distributions solely with respect to the subgroup II-1 mortgage loans, the Class II-2A-1, Class II-2A-2 and Class II-2X-1 Certificates will be entitled to receive distributions solely with respect to the subgroup II-2 mortgage loans and the Class II-3A-1, Class II-3A-2 and Class II-3X-1 Certificates will be entitled to receive distributions solely with respect to the subgroup II-3 mortgage loans.

The mortgage loans have an aggregate principal balance of approximately $682,535,877 as of the cut-off date. The subgroup I-1 mortgage loans have an aggregate principal balance of approximately $187,910,780 as of the cut-off date. The subgroup I-2 mortgage loans have an aggregate principal balance of approximately $181,114,056 as of the cut-off date. The subgroup II-1 mortgage loans have an aggregate principal balance of approximately $55,727,777 as of the cut-off date. The subgroup II-2 mortgage loans have an aggregate principal balance of approximately $173,265,457 as of the cut-off date. The subgroup II-3 mortgage loans have an aggregate principal balance of approximately $84,517,809 as of the cut-off date.

Substantially all of the group II mortgage loans have an initial fixed-rate period of three or five

years. After the fixed rate period, if any, the interest rate on each (i) group I mortgage loan will be adjusted annually based on One-Year MTA, or annually based on COFI, and (ii) group II mortgage loan will be adjusted semi-annually based on Six-Month LIBOR or annually based on One-Year LIBOR, to equal the related index plus a fixed percentage set forth in or computed in accordance with the related note, subject to rounding and to certain other limitations, including an initial cap, a subsequent periodic cap on each adjustment date and a maximum lifetime mortgage rate, all as more fully described under *"The Mortgage Pool"* in this prospectus supplement. The related index is as described under *"The Mortgage Pool—Indices on the Mortgage Loans"* in this prospectus supplement. As to each mortgage loan, the related servicer will be responsible for calculating and implementing interest rate adjustments.

All of the group I mortgage loans have a negative amortization feature, under which accrued interest on a mortgage loan will be deferred and added to the principal balance of that mortgage loan if the minimum monthly payment on such mortgage loan on its interest payment date is less than the amount of accrued interest due on that mortgage loan on that payment date.

While the interest rate on each group I mortgage loan will adjust monthly (with respect to certain of the group I mortgage loans, after a period of up to 13 months after origination during which the related mortgage rate is fixed), the minimum monthly payment due on the mortgage loans generally will only adjust annually. After a fixed payment period of two years or five years, if applicable, on each annual payment adjustment date, the minimum monthly payment due on such mortgage loan will be reset to fully amortize such mortgage loan over its remaining term to maturity, subject to the conditions that (i) the amount of the monthly payment on the related mortgage loan will not increase or decrease by an amount that is more than 7.50% of the monthly payment on such mortgage loan prior to such adjustment, (ii) as of the fifth anniversary of the first due date with respect to

such mortgage loan, and on every fifth anniversary thereafter, and if stated in the related mortgage note, on the last payment adjustment date prior to the related mortgage loan's scheduled maturity date, the minimum monthly payment on the related mortgage loan will be reset without regard to the limitation described in clause (i) above, and (iii) if the unpaid principal balance on such mortgage loan exceeds 110% or 115%, as the case may be, of the original principal balance on such mortgage loan due to deferred interest having been added to the principal balance of such mortgage loan, then the monthly payment on such mortgage loan will be reset on that payment date without regard to the limitation described in clause (i) above to amortize fully the then unpaid principal balance of such mortgage loan over its remaining term to maturity. *See "The Mortgage Pool—General—Negative Amortization Loans" in this prospectus supplement.*

Approximately 87.76%, 88.06% and 91.94% of the subgroup II-1, subgroup II-2 and subgroup II-3 mortgage loans, respectively, and 89.05% of the aggregate group II mortgage loans, respectively, will require payment of interest only for the initial period set forth in the related mortgage note.

### The Group I-1 Mortgage Loans

The following table describes certain characteristics of all of the subgroup I-1 mortgage loans as of the cut-off date:

Number of mortgage loans: .................... 488

Aggregate stated principal balance: .............................. $187,910,780

Range of stated principal balances:................ $39,895 to $1,291,914

Average stated principal balance: .................................... $385,063

Range of mortgage rates (per annum): 1.00% to 8.50%

Weighted average mortgage rate (per annum): ..................................................... 7.306%

Range of remaining terms to stated maturity (months): ................................. 330 to 479

Weighted average remaining term to stated maturity (months): ............................... 361

Weighted average loan-to-value ratio at origination:..................................... 76.97%

Weighted average gross margin (per annum): ................................. 3.526%

Weighted average cap at first interest adjustment date (per annum): ............................... N/A

Weighted average periodic cap (per annum): N/A

Weighted average maximum lifetime mortgage rate (per annum):......................... 10.609%

Weighted average months to first interest adjustment date (months):........................ 1

Loan Index Type:

One Year MTA ................................. 99.42%

COFI .................................... 0.58%

### The Group I-2 Mortgage Loans

The following table describes certain characteristics of all of the subgroup I-2 mortgage loans as of the cut-off date:

Number of mortgage loans: ..................... 640

Aggregate stated principal balance: ................................ $181,114,056

Range of stated principal balances: ................ $55,599 to $1,430,000

Average stated principal balance: ..................................... $282,991

Range of mortgage rates (per annum): 1.00% to 9.125%

Weighted average mortgage rate (per annum): ..................................................... 7.055%

Range of remaining terms to stated maturity (months):.................................. 352 to 480

Weighted average remaining term to stated maturity (months): ................................. 382

Weighted average loan-to-value ratio at origination:..................................... 77.65%

Weighted average gross margin (per annum): ................................. 3.396%

Non-Zero Weighted average cap at first interest adjustment date (per annum): ............. N/A

## TRANSACTION STRUCTURE



Parity Act may have on the prepayment performance of the mortgage loans. The amendment of the Parity Act does not retroactively affect loans originated before July 1, 2003. See "*Material Legal Aspects of the Loans—Enforceability of Prepayment and Late Payment Fees*" in the prospectus.

In addition, the related servicer may waive the collection of any otherwise applicable prepayment charge or reduce the amount thereof actually collected in accordance with its general servicing practices and as described in the related Servicing Agreement.

Certain prepayment charges are classified as "hard" prepayment charges, meaning that the borrower has to cover the prepayment charge regardless of the reason for prepayment, while others are classified as "soft," meaning that the borrower has to cover the prepayment charge unless the borrower has conveyed the related mortgaged property to a third party.

**Mortgage Loan Statistical Data**

Schedule A to this prospectus supplement sets forth in tabular format certain information as of the cut-off date about the mortgage loans in each loan group. Other than with respect to rates of interest, percentages are approximate and are stated by cut-off date principal balance of all of the mortgage loans in the related loan group. The sum of the respective columns may not equal the total indicated due to rounding.

**Assignment of the Mortgage Loans; Repurchase**

At the time of issuance of the certificates, the depositor will cause the mortgage loans, together with all principal and interest due with respect to such mortgage loans after the cut-off date to be sold to the trust. The mortgage loans will be identified by loan group in a schedule appearing as an exhibit to the Agreement. Such schedule will include information as to the principal balance of each mortgage loan as of the cut-off date, as well as information including, among other things, the mortgage rate, the borrower's monthly payment and the maturity date of each mortgage note.

In addition, the depositor will deposit with Wells Fargo Bank, National Association, as custodian and agent for the trustee, for the benefit of the certificateholders, the following documents with respect to each mortgage loan:

(a)     the original mortgage note, endorsed without recourse in the following form: "Pay to the order of HSBC Bank USA, National Association, as trustee for certificateholders of Structured Asset Mortgage Investments II Inc., Luminent Mortgage Trust 2006-3, Mortgage Pass-Through Certificates, Series 2006-3 without recourse," or in blank with all intervening endorsements that show a complete chain of endorsement from the originator to the seller, if the original mortgage note is unavailable to the depositor, a photocopy thereof, if available, together with a lost note affidavit;

(b)     the original recorded mortgage or a photocopy thereof;

(c)     a duly executed assignment of the mortgage to "HSBC Bank USA, National Association, as trustee for certificateholders of Structured Asset Mortgage Investments II Inc., Luminent Mortgage Trust 2006-3, Mortgage Pass-Through Certificates, Series 2006-3, without recourse"; in recordable form or, for each mortgage loan subject to the Mortgage Electronic Registration Systems, Inc. (the "MERS® System"), evidence that the mortgage is held for the trustee as described in the Agreement;

(d)      all interim recorded assignments of such mortgage, if any and if available to the depositor; and

(e)      the original or duplicate original lender's title policy or, in the event such original title policy has not been received from the insurer, such original or duplicate original lender's title policy will be delivered within one year of the closing date or, in the event such original lender's title policy is unavailable, a photocopy of such title policy or, in lieu thereof, a current lien search on the related property.

With respect to each mortgage loan subject to the MERS® System, in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. ("MERS"), the assignment of the mortgage related to each such mortgage loan shall be registered electronically through the MERS® System and MERS shall serve as mortgagee of record solely as nominee in an administrative capacity on behalf of the trustee and shall not have any interest in such mortgage loans.

Assignments of the mortgage loans provided to the custodian on behalf of the trustee will be recorded in the appropriate public office for real property records, except (i) in states as to which an opinion of counsel is delivered to the trustee to the effect that such recording is not required to protect the trustee's interests in the mortgage loan against the claim of any subsequent transferee or any successor to or creditor of the depositor or the sponsor, or (ii) with respect to any mortgage loan electronically registered through the MERS® System. The seller will be responsible for the recordation of such assignments and the costs incurred in connection therewith.

The custodian on behalf of the trustee will perform a limited review of the mortgage loan documents on or prior to the closing date or in the case of any document permitted to be delivered after the closing date, promptly after the custodian's receipt of such documents and will hold such documents in trust for the benefit of the holders of the related certificates.

The seller is required, pursuant to the mortgage loan purchase agreement, to represent and warrant that the representations and warranties contained in the mortgage loan purchase agreement and the Underlying Sale Agreements are true and correct as of the closing date. All of depositor's right, title and interest to the mortgage loans and all rights of the depositor under the mortgage loan purchase agreement will be assigned to the trustee pursuant to the Agreement. Each Underlying Seller will make representations and warranties in related Underlying Sale Agreement between the related Underlying Seller and the seller. All right, title and interest in the Underlying Sale Agreements will be assigned to the trustee insofar as they relate to the representations and warranties made by the Underlying Sellers, including all representations and warranties with respect to the mortgage loans. In addition, the seller will represent that no event has occurred from the date of the purchase of the mortgage loans by the seller from the Underlying Sellers to the closing date which would result in any of the representations and warranties made by such Underlying Seller being untrue in any material respect. A form of the mortgage loan purchase agreement and of the Underlying Sale Agreements containing such representations and warranties will be attached as an exhibit to the Agreement. The depositor will file the Agreement along with the exhibits to the Agreement with the Securities and Exchange Commission in a report on Form 8-K.

The representations and warranties of the seller with respect to the mortgage loans include the following:

1.      Each mortgage loan at the time it was made complied in all material respects with applicable local, state, and federal laws, including, but not limited to, all applicable predatory and abusive lending laws;

     2.     No mortgage loan is a "High Cost Loan" or "Covered Loan," as applicable, (as such terms are defined in the then current Standard & Poor's LEVELS® Glossary, Appendix E, in effect as of the Closing Date) and no mortgage loan originated on or after October 1, 2002 through March 6, 2003 is governed by the Georgia Fair Lending Act; and; and

     3.     With respect to each representation and warranty with respect to any mortgage loan made by the servicers in the Servicing Agreements that is made as of the related Closing Date (as defined in the applicable Servicing Agreement), no event has occurred since the related Closing Date (as defined in the applicable Servicing Agreement) that would render such representations and warranties to be untrue in any material respect as of the Closing Date.

After the closing date, if any document is found to be missing or defective in any material respect, or if a representation or warranty with respect to any mortgage loan is breached and such breach materially and adversely affects the interests of the holders of the certificates in such mortgage loan, the trustee or the custodian, as agent for the trustee, is required to notify the seller or Underlying Seller, as applicable, in writing. If the seller or Underlying Seller, as applicable, cannot or does not cure such omission, defect or breach within 60 days of its receipt of notice from the trustee or the custodian, the seller or Underlying Seller, as applicable, is required, within 90 days of the notice from the trustee, to repurchase the related mortgage loan from the trust fund at a price equal to 100% of the Stated Principal Balance thereof as of the date of repurchase plus accrued and unpaid interest thereon at the mortgage rate to the first day of the month following the month of repurchase, plus any costs and damages incurred by the trust in connection with any violation of such mortgage loan of any anti-predatory lending laws, and reduced by any portion of the servicing fee or advances payable to the purchaser of the mortgage loan. Rather than repurchase the mortgage loan as provided above, the seller or Underlying Seller, as applicable, may remove such mortgage loan from the trust fund and substitute in its place another mortgage loan of like characteristics. However, such substitution is only permitted within two years after the closing date.

With respect to any repurchase or substitution of a mortgage loan that is not in default or as to which a default is not imminent, the trustee must have received a satisfactory opinion of counsel that such repurchase or substitution will not cause the trust fund to lose the status of its REMIC elections or otherwise subject the trust to a prohibited transaction tax. The obligation to cure, repurchase or substitute as described above constitutes the sole remedy available to the certificateholders, the trustee or the depositor for omission of, or a material defect in, a mortgage loan document or for a breach of representation or warranty by the sponsor with respect to a mortgage loan.

**The Originators**

The principal originators of the mortgage loans are: SouthStar Funding, LLC with respect to approximately 52.07% of the subgroup I-2 mortgage loans and 25.56% group I mortgage loans, Bear Stearns Residential Mortgage Corporation, with respect to approximately 21.01% of the subgroup I-2 mortgage loans and 10.31% group I mortgage loans, IndyMac Bank, FSB with respect to approximately 75.30% of the subgroup I-1 mortgage loans and 38.34% group I mortgage loans, Paul Financial, LLC with respect to approximately 24.70% and 13.14% of the subgroup I-1 and subgroup I-2 mortgage loans and 19.03% group I mortgage loans, Residential Funding Corporation with respect to approximately 88.32%, 55.72%, 56.52% of the subgroup II-1, subgroup II-2 and subgroup II-3 mortgage loans, respectively, and 61.73% group II mortgage loans, and American Mortgage Network, Inc. with respect to approximately 11.68, 44.28, 43.48% of the subgroup II-1, subgroup II-2 and subgroup II-3 mortgage loans, respectively, and 38.27% group II mortgage loans in the aggregate mortgage loans. The remainder of the mortgage loans in each loan group were originated by various originators, none of which originated more than 10% of the related mortgage loans.